IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL G. OBER | ) | CIVIL ACTION LAW |
| | ) | |
| Plaintiff | ) | |
| | ) | 1:CV-01-0084 |
| vs. | ) | |
| | ) | |
| PAUL EVANKO, MARK | ) | |
| CAMPBELL, THOMAS COURY, | ) | JURY TRIAL DEMANDED |
| JOSEPH WESTCOTT, | ) | |
| HAWTHORNE CONLEY | ) | |
| | ) | |
| Defendants | ) | |

FILED
HARRISBURG

JAN 1 6 2001

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

## COMPLAINT

### INTRODUCTORY STATEMENT

This is a civil rights complaint brought by the plaintiff, a Pennsylvania State Police Captain, against the Commissioner of the Pennsylvania State Police in his individual capacity, for the deprivation of the plaintiff's federally guaranteed rights under the Due Process Clause, and the Privileges and Immunities Clause, of the 14th Amendment, his 1st and 4th Amendment rights and his interest in property. The gravamen of Captain Ober's complaint is that Commissioner Evanko unlawfully promulgated a pattern of career damaging personnel actions against Captain Ober

1

because Captain Ober properly obeyed lawful directives during a probe into alleged illegal activities by Governor's Office personnel and PSP "higher ups", that could have included Colonel Evanko himself. Commissioner Evanko retaliated against Captain Ober for what Evanko considered treasonous behavior towards himself personally even though Ober had no lawful alternative but to follow FBI requests and could not inform Colonel Evanko of the federal probe without committing a crime. In a vindictive display of intentional abuse, after he learned of the investigation, Paul Evanko set out on a course of conduct that severely damaged Captain Ober's career and caused irreparable injury to his person. Mr. Evanko successfully secured the permission and concurrence of the defendant Campbell to violate Captain Ober's rights and then, despite knowing they were wrong, he enlisted the support of the other defendants to systematically injure and destroy the career and person of Captain Darrell G. Ober.

## JURISDICTION AND VENUE

2.) Jurisdiction is conferred on this Court by 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) and (4) and the remedial statute 42 U.S.C. §1983.

3.) This court's supplemental jurisdiction is invoked as per 28 U.S.C. §1367.

4.) A jury trial is demanded.

5.) Punitive damages are requested.

6.) Venue is properly in the Middle District of Pennsylvania since the parties, witnesses, material facts, and other evidence are all common to Dauphin County Pennsylvania.

## PARTIES

7.) Darrell Ober is a Captain in the Pennsylvania State Police currently assigned to the Bureau of Liquor Control Enforcement (LCE) as the Director, Administration Division.

8.) The defendant, Colonel Paul Evanko, is the Commissioner of the Pennsylvania State Police. Coury, Westcott, and Conley all assisted Commissioner Evanko in running the Department.

9.) The defendant Mark Campbell was, at all times complained of herein, Governor Tom Ridge's Assistant Chief of Staff.

## RIGHTS VIOLATED

10.) The defendants Paul Evanko and Mark Campbell violated the plaintiffs' rights to substantive due process of law, a 14th Amendment right, and deprived plaintiff of his federally protected interest in property. At various times, as hereinafter described Coury, Westcott, and Conley knowingly assisted Evanko in carrying out the plan to injure Ober.

11.) The defendants violated the plaintiff's right to enjoy the protections afforded by the Privileges and Immunities Clause of the 14th Amendment.

12.) The defendants Evanko and Campbell violated the plaintiff's 1st Amendment rights and discriminated against him in his right to enjoy the equal protection of the laws.

13.) The defendants Paul Evanko and Mark Campbell violated the plaintiff Darrell Ober's right to be free of civil conspiracies both as a matter of federal law pursuant to 42 U.S.C. §1983 and as a matter of Pennsylvania tort law.

14.) The defendants unlawfully violated plaintiff's 4th Amendment rights, subjecting him unlawfully to custodial investigations and invasions of privacy in a series of investigations and administrative actions as part of an intentional effort to destroy plaintiff's career and use him as a teaching example to other members of the PSP, that they must adhere to an employment policy of blind loyalty to Evanko above any other dictate of law, duty, or morality, or face debilitating professional or personal injury.

15.) The defendants violated Captain Ober's rights to be free of debilitating and injurious policies and practices intentionally designed to inflict emotional distress on Captain Ober.

4

## DAMAGES

16.) The plaintiff seeks compensatory and punitive damages for pain and suffering for humiliation, embarrassment, injurious adverse employment actions, and emotional trauma, pursuant to 42 U.S.C. 1983 and according to Pennsylvania tort law.

17.) The plaintiff seeks damages for lost earnings and lost promotional, and career opportunities, and also for injuries to reputation and privacy.

18.) The plaintiff seeks compensatory damages for the deprivation of his federally guaranteed rights, and if and when appropriate, intends to move for punitive damages against the individual defendants.

19.) The defendants unlawfully damaged plaintiff's reputation and cruelly placed him in a false light to his colleagues and the public in violation of Pennsylvania law.

## OPERATIVE FACTS

20.) Darrell G. Ober, on or about September 1998, was one of the brightest and the best, a rising star in the Pennsylvania State Police (PSP) organization. A Cum laude graduate of the Pennsylvania State University, Darrell graduated with a class rank of number 1 from the Pennsylvania Law Enforcement Academy. His work history was replete with numerous career enhancing achievements, citations, and experience qualifications. His career potential was without any foreseeable limit.

21.) On May 2, 1998, Captain Ober was named as Director, Internal Affairs Division, and later, in early September 1998, Darrell Ober was named as the Acting Bureau Director of the PSP's Bureau of Professional Responsibility.

22.) This career path is customarily associated in the State Police with advancement to the very highest ranks in the organization including Commissioner. Colonel Evanko's career included service in the Bureau of Professional Responsibility, as did Colonel Coury's and Colonel Conley's careers.

23.) On or about late September or early October 1998, the plaintiff was contacted by the FBI about a political corruption case.

24.) The FBI indicated that a reliable confidential Informant (CI) had reported that members of the "Governor's Office" and "high-ranking members of the PSP" might be involved in accepting payoffs in return for special consideration for certain applicants on the PSP cadet eligibility list.

25.) The FBI expressly and clearly requested that Darrell not divulge this information to potential investigation targets including top-ranking PSP officials. There is no PSP policy or regulation to guide a member on how to conduct or report on an investigation into alleged criminal or other misconduct by a high ranking PSP official such as Commissioner or Deputy Commissioner.

26.) Since Ober was chosen by the FBI as a contact, obviously because he was not a target, or potential target, of the investigation, he felt, consistent with FBI directives, that it was equally important to limit any superior to whom he might report, to someone he was personally certain would not be involved in an unlawful matter, and to whom no conflict would present itself, but at the same time, be someone who was, hopefully a superior in his chain of command. It never occurred to Captain Ober that he should not, or would not, comply with the letter and spirit of PSP practices and policies and that is precisely what he did.

27.) Consequently, Captain Ober (he was promoted to Captain in the Spring of 1995) reported the corruption matter, as related by the FBI, to Lieutenant Colonel Robert C. Hickes, newly appointed Deputy Commissioner of Staff. Captain Ober was confident that Colonel Hickes was of impeccable character, and knew, because of his position, that Hickes could not be involved. Though not in his direct chain of command, informing Lt. Col. Hickes, meant plaintiff complied with PSP Regulations. He could not inform Evanko or one of his assistants because of the clear and unambiguous FBI directive. Upon learning of the FBI probe from Ober, Hickes ordered Ober to maintain confidentially, and to keep Hickes informed. These were lawful orders.

7

28.) On or about May 1999 the plaintiff learned from the FBI that the FBI had reached the conclusion that the wrong doing seemed limited to one PSP Trooper and that it had not reached higher. Subsequently, it was learned that the investigation may have been compromised even before plaintiff was informed by Agent Kush. Plaintiff made the latter deduction because Campbell, to whom Evanko went for permission to unlawfully investigate plaintiff, was in the Governor's office. FBI body wires from an informant mentioned sources in the Governor's office, high PSP officials and even a State Senator and a State Representative, earlier in the investigation. He even learned that another PSP member had been informed before he was in an earlier attempt at investigation. Only the FBI to whom Evanko personally went, knows the answers to these questions.

29.) Thus upon information and belief, the plaintiff believes that a real possibility still exists that the corruption investigation referred to above was truncated or otherwise limited because of PSP leadership, interests and/or the concerns of others, regardless plaintiff was unlawfully investigated by defendants to ascertain what he knew, and to punish him for putting the law above the PSP leadership interests.

30.) Subsequently, on May 12, 1999, the plaintiff and Lieutenant Colonel Hickes informed Commissioner Evanko about the FBI investigation.

31.) Upon being told of the investigation by plaintiff and LTC Hickes, the defendant Evanko exploded in a fit of rage. He told Hickes and the plaintiff Darrell Ober that "I will have Louie Freed (Director of the FBI) on the phone tonight and have the agents involved transferred by tomorrow".

32.) Upon information and belief plaintiff alleges that FBI Special Agent Ralph Kush was quickly transferred from the underlying corruption case, in a display of what plaintiff believes was an inappropriate influence on the FBI by Colonel Evanko.

33.) Subsequent to learning about the FBI investigation, Col. Evanko sought the personal and official approval of the defendant Mark Campbell to begin an investigation into Captain Ober. Campbell was an Assistant to the Pennsylvania Governor's Chief of Staff.

34.) At the time Campbell and Evanko conferred on investigating Ober, they both knew that Ober had committed no wrong, had broken no law, and had violated no regulation, practice, or custom of the Pennsylvania State Police.

35.) Nonetheless, in order to punish Ober because he had followed proper PSP procedure, obeyed the law, and conducted himself in a spirit supportive of proper law enforcement duties and practices, consistent with his oath, as opposed to demonstrating blind devotion, obedience and subservience to the personal and political interests and concerns of the defendants, both Evanko and Campbell

decided to use Ober as an example to PSP officers and members to show that obedience to the political sensitivities of their PSP leader and his political mentors, is a necessity regardless of what the law may require, even if that leader himself is a target, or potential target, of an official law enforcement agency investigation himself.

36.) Campbell and Evanko then decided to launch the first investigation into the affairs of Captain Ober, which was only the beginning of a series of unlawful antipersonnel actions undertaken, by the defendants, to destroy Captain Ober's career and to inflict personal pain.

## INVESTIGATIONS

37.) Investigations such as those done on Captain Ober have the effect of destroying an officer's standing and reputation among his colleagues. He becomes shunned and is subjected to insults and is ostracized. When this policy is fostered by the leader of the PSP, the impact, like here, is dramatic. Plaintiff was subjected to an unlawful and improper investigation into his activities at the direction of Evanko and Campbell. These investigations were conducted for two unlawful reasons. The first was to learn the breadth and depth of Ober's knowledge about the FBI investigation and whether Evanko and someone in the Governors office was a target, or actually under suspicion, and the second was to harass and injure

Ober as a way to send a signal to others that the defendants as a leadership cadre, require the obedience, even the unlawful obedience of PSP members, above all other considerations, as an unwritten term and condition of employment. Such a policy is a shocking perversion of the public trust and of plaintiff's rights.

38.) Shortly after Evanko had been informed by plaintiff about the FBI probe, and after he had threatened action against the FBI agents involved, he had a meeting in his office with a number of his top staff members to discuss the "investigation" he planned into Captain Ober.

39.) It is averred that this meeting followed Colonel Evanko's meeting with the defendant Mark Campbell where Evanko secured permission to investigate the plaintiff, because Evanko proceeded to harass plaintiff, have others, such as the defendants, Conley, Coury and Westcott, harass him, and have him officially investigated despite the fact that Evanko was told he should not conduct an investigation into plaintiff because it was not proper, there being no cause for such an inquiry, as required by PSP policies and rules and by both the Pennsylvania and the United States Constitution.

40.) In that meeting was a member of Commissioner Evanko's top confidants, among which were the defendants Conley, Coury and Westcott.

41.) Each of the foregoing individuals personally participated in various violations of the plaintiff's federally guaranteed rights as a way to demonstrate their loyalty to Commissioner Evanko and to show their agreement with his policy that loyalty to the leader is above all, even if it means the law will be violated and the integrity of an investigation into matters of public corruption should be compromised if the leader's interest is at issue. Beyond being against the stated goals and purposes of the Pennsylvania State Police, this policy is anti American and violates due process clauses of the 5th and 14th Amendments in their spirit and letter.

42.) Acting upon the orders of their superiors, two PSP majors conducted a custodial interview of the plaintiff that was no more than an inquiry into his personal loyalty to Evanko. The format of the interrogation was permeated with an ill disguised plan to learn what was discovered about the role, if any, of PSP upper echelon leaders and Governor's Office personnel, in the alleged money for hiring scam the FBI was investigating.

43.) Later the defendant, Coury, blocked certain of plaintiff's promotional opportunities and also launched another totally improper investigation into plaintiff's personal affairs, for a PSP pet project of Col. Evanko's that clearly exceeds the proper role and function of the PSP as a government agency.

44.) On at least two occasions Lieutenant Colonel Westcott also personally violated plaintiff's rights in carrying out the vindictive, unlawful desires of Col. Evanko to injure plaintiff by changing his recommendation for a PEMA (Pennsylvania Emergency Management Agency) appointment causing Plaintiff's removal. Lieutenant Colonel Wescott changed plaintiff's selection for appointment to PEMA as an act of unlawful blatant abuse of plaintiff's rights to please Evanko.

45.) Colonel Conley also performed acts of vengeance for the defendant Evanko, such as stripping plaintiff of his cell phone for no reason, and denying him reimbursements for expenses allowed others.

46.) The defendant Evanko, by and through the aforementioned group of conspirators, who acted at his behest, unlawfully, and for no just or proper purpose, violated the plaintiff's rights and interests in his property and his right to be free of irrational and purposeless government actions devoid of rational or reasonable government purposes that rose to shocking levels. The defendants committed at least the following adverse employment actions against the plaintiff solely because Plaintiff obeyed the law, performed his public duty in a proper fashion, and put his right and duty to perform his job in a lawful manner, over blind obedience and misplaced loyalty to his PSP leaders.

13

a.) Plaintiff was summarily transferred to Washington, Pennsylvania from Harrisburg, Pennsylvania in a hateful attempt to separate him from his children. Only the intervention of the Pennsylvania Courts saved plaintiff from an unlawful transfer and,

b.) plaintiff was made to suffer demeaning career injuring transfers and constructive demotions that have destroyed his reputation and effectiveness among colleagues, and totally destroyed his opportunities to advance in his chosen profession and,

c.) has been denied opportunities for overtime and to be reimbursed like those of equal rank and experience in the PSP and,

d.) has been unduly and unreasonably discriminated against in his attempts to obtain educational opportunities within the PSP and,

e.) was subjected to career destroying investigations without just cause.

f.) was subjected to an irrational, baseless, series of vituperative personal attacks on his character, and a series of attacks on his job performance, meant to destroy his reputation, career, self confidence, and motivation to perform his duties and,

g.) was denied a number of opportunities to improve his career through promotion and, or, transfer and,

h.) was refused considerations for promotional opportunities or requests for career enhancing transfers of assignments and,

i.) was discriminated against by defendants who created a pervasive atmosphere among PSP staff fostering retaliation, resentment, and officially sanctioned harassment of Darrell Ober through petty humiliations, acts and threats of personnel actions, and outright ostracism designed to destroy Obers' good will and effectiveness among the PSP workforce, and

j.) as a matter of PSP policy, the defendants effectuated numerous actions meant to intentionally injure plaintiff primarily through himself, Westcott, Coury, and some other of plaintiffs' superiors which have essentially decimated Captain Ober's career, his professional credentials, his opportunities and availability for promotion, and which have hampered the performance of his law enforcement duties to the detriment of the PSP and the public.

47.) The plaintiff has suffered innumerable insults, humiliations and embarrassments at the hands of PSP officers who were made to fear that they would suffer official retribution from their leaders if they treated plaintiff in an even handed, fair, way.

48.) Conclusive evidence of Evanko's unlawful misconduct is evidenced by a series of transfers, constructive demotions, and injurious personal actions

engendered by Evanko abuse of lawful authority.

49.) Captain Ober was unlawfully removed from a prestigious assignment to the PSP Centennial Book Committee when Lt. Col. Coury instituted the unjustified, illegal and subsequently unfounded, investigation into Ober's personal activities. He was never informed that the investigation ended with an "unfounded" result, and he was never returned to the Committee in violation of his rights.

50.) On or about April 24, 1999, Captain Ober was assigned as project manager on the largest and most technical law enforcement project in PSP history (Incident Information Management System). He was promised personally by Commissioner Evanko that he would be returned to his position as Director of Internal Affairs, Bureau of Professional Responsibility upon completion of the projects. After Evanko, in an irresponsible act of outlandish and extreme retribution be summarily removed Ober from the assignment and returned him to the position of Director of Internal Affairs for 5 days before transferring Ober to Troop "B" Washington Pa away from his family. The Commissioner's unlawful action in removing Ober, created a project liability, cost taxpayers countless dollars, and caused unconscionable delay all of this was to facilitate the personal vengeance of Paul Evanko in violation of federal and state law, and his own

governor's wishes.

51.) Captain Ober, as a Captain, was transferred into a position that has traditionally and consistently called for a Lieutenant in the Pennsylvania State Police Bureau of Liquor Enforcement. This was done to humiliate, embarrass and demean plaintiff and to demonstrate to him that any chance to move forward in his career in the PSP is essentially over, merely because, he believes.

WHEREFORE the plaintiff Darrell G. Ober demands judgement of the defendants for the deprivation of his federally guaranteed rights and for the violation of his rights under Pennsylvania law more particularly as follows:

a.) Plaintiff demands judgement jointly and severally of the defendants Evanko, Campbell, Coury, Westcott, and Conley for the deprivation of his 1st Amendment rights to be free of unlawful injurious employment actions in retaliation for his proper exercise of protected speech and,

b.) Plaintiff demands judgement jointly and severally of the defendants Evanko, Campbell, Coury, Westcott, and Conley for the deprivation of his federally guaranteed rights to substantive due process and of his interest in property pursuant to the due process clause of the 14th Amendment and,

c.) Plaintiff demands judgement of the defendants Evanko, Campbell, and Coury for the deprivation of his 4th Amendment rights to be free of unlawful

17

seizures of his person subjecting him to unlawful custodial interrogations denying him and other procedural safeguards and,

    d.) Plaintiff demands judgement of the defendant Evanko under the Privileges and Immunities clause of the 14th Amendment for depriving him of his rights to pursue his chosen occupation free of arbitrary and capricious government molestation.

    e.) Plaintiff demands judgement of all defendants for the deprivation of his right to be free of unlawful conspiracies to deprive him of his federally guaranteed rights under the 14th Amendment pursuant to 42 U.S.C. §1983 and,

    f.) Plaintiff demands judgement of all defendants jointly and severally for the deprivation of his federally guaranteed rights to be free of emotional pain and mental distress imposed pursuant to the intentional effort engaged in by all defendants to deprive him of his federally guaranteed rights under 42 U.S.C. §1983 and,

    g.) Plaintiff demands judgement of all defendants, jointly and severally for the violation of his rights under Pennsylvania law to be free of civil conspiracies and the intentional infliction of mental distress as supplemental state claims and,

    h.) Plaintiff demands judgement of the defendants jointly and severally for the denial of his rights pursuant to the equal protection of the laws clause of the

14th Amendment pursuant to 42 U.S.C. §1983 and,

    i.) Plaintiff demands judgement of the defendant Evanko for falselight defamation as a supplemental state claim, all together with costs, fees, special damages in the amount of $25,000.00 for legal fees incurred in defeating the unlawful efforts by the defendant Evanko to illegally assign plaintiff to Washington County Pennsylvania, punitive damages and such other relief as the court may deem appropriate.

                                  Respectfully Submitted,

                                  DON BAILEY
                                  PA ID# 23786
                                  4311 N. 6TH STREET
                                  HARRISBURG, PA 17110
                                  (717) 221-9500

JANUARY 16, 2001