2 to CT

21
5/30

ORIGINAL



FILED

MAY 2 9 2001

PER
HARRISBURG, PA.          DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                              :
                          Plaintiff           :        NO. 1: CV-01-0084
                                              :        (Judge Caldwell)
            vs.                               :
                                              :        CIVIL ACTION - LAW
PAUL EVANKO, MARK CAMPBELL,                   :
THOMAS COURY, JOSEPH WESTCOTT,                :        JURY TRIAL DEMANDED
HAWTHORNE CONLEY,                             :
JOANNA REYNOLDS, AND                          :
SYNDI GUIDO                                   :
                          Defendants          :

---

**EXHIBITS TO DEFENDANTS' BRIEF IN SUPPORT
OF THEIR MOTION TO DISMISS OR STRIKE
PLAINTIFF'S SECOND AMENDED COMPLAINT**

---

JAMES M. SHEEHAN
General Counsel
Commonwealth of Pennsylvania

SYNDI L. GUIDO
Deputy General Counsel

Governor's Office of General Counsel
333 Market Street, 17th Floor
Harrisburg, PA  17101
(717) 783-6563

JOANNA N. REYNOLDS
Assistant Counsel
Pennsylvania State Police
1800 Elmerton Avenue
Harrisburg, PA  17110
(717) 783-5568
(Counsel for Defendants)

Dated:  May 29, 2001

SP 3 200 (2 89)





**PENNSYLVANIA STATE POLICE**
**DEPARTMENT DIRECTIVE**

AR 4-25
9/2/93



**SUBJECT:   INTERNAL INVESTIGATIONS**

**25.01     AUTHORITY**

The Bureau of Professional Responsibility (BPR), Internal Affairs Division, is authorized to recommend to the Commissioner policies and procedures to initiate, conduct and/or control all necessary investigations, and to process all complaints or allegations of misconduct by personnel. Members of the Bureau of Professional Responsibility, when performing Internal Affairs duties, are vested with the line authority of the Commissioner.

**25.02     PURPOSE**

The purpose of this regulation is to establish a prompt, fair, thorough, factual and impartial means to investigate complaints or allegations involving personnel.

**25.03     GOALS**

A. <u>Protection of the Public</u>: The public has the right to expect efficient, fair and impartial law enforcement. Any misconduct by personnel must be detected, thoroughly investigated and properly adjudicated to assure these goals.

B. <u>Protection of the Department</u>: The integrity of the Department depends on the personal integrity and self-discipline of all personnel. When an informed public knows that the Department honestly and fairly investigates and adjudicates all allegations of misconduct against its personnel, confidence will be promoted and public support will be enhanced.

C. <u>Protection of Personnel</u>: A thorough investigation of all allegations of misconduct serves to protect the integrity of personnel and will safeguard against false or malicious complaints.

AR 4-25
9/2/93

D.   <u>Discovery of Unsatisfactory Performance</u>: Personnel who demonstrate an inability to satisfactorily perform their duties must be identified for the protection of the public, the Department and its personnel.

25.04   DEFINITIONS

A.   <u>Administrative Action</u>:  Corrective action taken by command/supervisory personnel which may include the issuance of a Disciplinary Action Report (DAR), Form SP 3-336.

B.   <u>Administrative Investigation</u>:  Inquiries into alleged misconduct by personnel or any inquiry into the actions of Department personnel required by directives where no misconduct is alleged.

C.   <u>BPR Control Number</u>:  A sequential number assigned by the Internal Affairs Division to index all complaints and administrative investigations.

D.   <u>Bureau Register</u>:  A compilation of data indexing the initiation and processing of administrative investigations by BPR Control Number.

E.   <u>Complainant</u>:  A person with knowledge of an alleged incident of misconduct, or violation of a statute or Department directive, who brings the information to the attention of the Department.

F.   <u>Complaint</u>:   Any allegation of misconduct made against Department personnel.

G.   <u>Complaint Investigation</u>:  An administrative investigation which was initiated because of a complaint.

H.   <u>Full Investigation</u>:  An in-depth investigation in which all pertinent facts are gathered and are thoroughly and impartially reported in a General Investigation Report, Form SP 7-0025.

I.   <u>Limited Investigation</u>:  An investigation which is reported by Correspondence, Form STD-501, and clearly establishes that:

1.   The alleged misconduct failed to constitute a violation of Department rules and regulations.

AR 4-25
9/2/93

2. The complainant was mistaken and the misconduct alleged was not attributed to personnel.

3. The complaint appears to be as a result of official police action which was adverse to the complainant and alleges only a de minimus violation.

4. The complainant(s) refused to verify their complaint by signing a completed Complaint Verification Form and the nature of the complaint does not include allegations of criminal conduct or conduct which could reasonably be construed to result in a recommendation of court-martial by the Department Disciplinary Officer.

J. <u>Medical Treatment</u>: Care received at a recognized medical facility or from a licensed medical practitioner.

K. <u>Misconduct</u>: Any violation of the Pennsylvania State Police Code of Conduct or any other conduct which could reasonably be expected to destroy public respect and confidence in the Pennsylvania State Police.

L. <u>Non-Complaint Investigation</u>: An investigation into the actions of Department personnel as provided by directive or requested by the Office of Chief Counsel, and no misconduct is alleged.

M. <u>Performance Inadequacies</u>: Minor infractions of omission/commission by a member which violate a Department policy or regulation. Infractions of this type do not include conduct which involves compliance to lawful orders, the veracity of a member, criminal or civil liability, or publicity which may adversely affect the Department or its personnel.

## 25.05 COMPLAINT INVESTIGATION CATEGORIES

A. <u>Physical Abuse</u>: An allegation that an individual was physically mistreated or assaulted (does not include physical force investigations that are initiated by Department directive with no complaint).

AR 4-25
9/2/93

B. <u>Verbal Abuse</u>:   An allegation that profane or demeaning language was directed at the complainant or another person by personnel.

C. <u>Criminal Conduct</u>:   Any alleged violation(s) of federal, state or local statutes.

D. <u>Improper Conduct On Duty</u>:   Any alleged misconduct committed while on duty that, by its very nature, is demeaning to the professional image of the Department, and constitutes a violation of Department rules and regulations.

E. <u>Improper Conduct Off Duty</u>:   Any alleged conduct which could reasonably be expected to impact negatively upon the public's perception of the Department even though it occurred off duty.

F. <u>Dissatisfaction With Performance of Duty</u>:   An allegation that personnel failed to adequately perform or document a required or expected task, e.g., improper or incomplete accident or criminal investigations, failure to assist a disabled motorist, etc.

G. <u>Other</u>: Allegations that are not easily categorized or identified as falling into a specific category, etc.

25.06   NON-COMPLAINT INVESTIGATION CATEGORIES

A. <u>Legal Intervention</u>:   Incidents when a member/enforcement officer, while in the course of their duties, intentionally involves a vehicle in a collision or establishes a roadblock which results in a collision, for the purpose of preventing the escape of a subject.

B. <u>Shooting Incident</u>:   Incidents when a member/enforcement officer discharges a weapon, including tear gas; another law enforcement officer discharges a weapon in the presence of a member/enforcement officer; or, a subject fires a weapon while a member/enforcement officer is present. Exceptions are listed in Section 25.10 E. 9.

C. <u>Physical Force Incident</u>:   Incidents when a member/enforcement officer uses physical force which results in death, or injury which requires medical treatment to any involved individual other than the member/enforcement officer.

-4-

D. **Attorney Work Product**: Investigations conducted at the request of the Office of Chief Counsel.

## 25.07  DISPOSITIONS

A. **Complaint Investigations**:

1. Sustained: Investigation indicates misconduct did actually occur.

2. Not Sustained: Investigation failed to conclusively prove or disprove the allegation.

3. Unfounded: Indicates that the incident did not or could not have occurred as alleged.

4. Policy Void: Indicates that the action of the Department or the involved member(s) was consistent with Department policy, but the complainant still suffered harm.

5. Withdrawn: Indicates that the complainant refused to sign a Complaint Verification and the investigation was terminated or an investigation was otherwise concluded on advice of the Director, Bureau of Professional Responsibility.

B. **Non-Complaint Investigations**:

1. Justified: The actions taken were within the guidelines, for the use of force under the existing circumstances, as established by the Department.

2. Improper: The actions taken exceeded the limits defined by the Department or by law for the use of force.

## 25.08  DUTIES AND RESPONSIBILITIES

A. **Personnel**: Personnel shall ensure that the confidentiality of all complaints is maintained in accordance with existing regulations.

B. **Director, Bureau of Professional Responsibility**: The Director, Bureau of Professional Responsibility shall:

1. Assign and coordinate all investigations required by this regulation. Depending on the

AR 4-25
9/2/93

nature of the incident, the investigation may
be conducted by a member of the Internal
Affairs Division or assigned to a Commissioned
Officer or noncommissioned officer of the
Director's choice.

2. Assist the Affirmative Action Officer in the
investigation of affirmative action-related
complaints upon request. Also, review other
such complaints and investigations in
consultation with the Affirmative Action
Officer.

3. Ensure that all investigations are conducted
in a fair, prompt, thorough and impartial
manner. Reports shall be completed in a
timely manner and within established statutes
of limitations per collective bargaining
agreement.

4. Retain supervisory responsibility for all
investigations. Specific investigative
procedures may be ordered if it is determined
to be necessary, prudent or desirable.

5. Furnish an acknowledgement of receipt, in
writing, to the complainant. Refer to
Appendage III.

6. Provide a report, as requested, summarizing
the Internal Affairs Division's activities, to
the Commissioner/designee.

C. <u>Director, Internal Affairs Division</u>: The Director,
Internal Affairs Division shall:

1. In the absence of the Director, Bureau of
Professional Responsibility, assume all duties
relative to the administration of the internal
affairs function.

2. Exercise supervisory control over all
investigations assigned to members of the
Internal Affairs Division.

3. Ensure all investigations are conducted in a
fair, prompt, thorough and impartial manner.

4. Make the notifications to the Office of Chief
Counsel as outlined in Sections 25.10 D. 1.
and 25.10 E. 1.

AR 4-25
9/2/93

D.  <u>Area Commanders/Bureau Directors</u>:    The Area
Commanders/Bureau Directors shall:

1.  Review all investigative reports in a timely manner and within established statutes of limitations per collective bargaining agreement.

2.  Provide guidance and advice to the Troop Commander/Division Director responsible for making administrative decisions.

3.  Assume the responsibilities enumerated in Section 25.08 E. when the subject of the investigation is a Troop Commander/Division Director under their command, or as directed by a Deputy Commissioner.

4.  Endorse the Troop Commander's/Division Director's administrative decision by indicating concurrence or nonconcurrence.

    a.  In cases of verbal abuse or dissatisfaction with performance of duty, a simple statement of this finding shall suffice if there is concurrence. All statements of nonconcurrence require a full explanation of points of difference.

    b.  Allegations, other than verbal abuse and dissatisfaction with performance of duty, require an endorsement indicative of an independent review of the facts.

E.  <u>Troop Commanders/Division Directors</u>:    Troop
Commanders/Division Directors shall:

1.  Ensure compliance with the provisions of this regulation.

2.  Determine, in concurrence with the Director, Bureau of Professional Responsibility, whether an investigation shall be a full or limited investigation.

    a.  Upon receipt of a Use of Force or Complaint Reception and Processing Worksheet, Form SP 1-101, in which the allegation involves only performance inadequacies, the Troop

-7-

AR 4-25
9/2/93

Commander/Division Director shall contact the Disciplinary Officer and provide the details of the complaint.

b. If the Disciplinary Officer concurs with the Troop Commander/Division Director that the complaint involves only performance inadequacies, the Disciplinary Officer shall contact the Director, Bureau of Professional Responsibility, for concurrence. The Director, Bureau of Professional Responsibility, shall then ensure contact is made with the Troop Commander/Division Director and provide them with a BPR Control Number.

c. For issues relating to performance inadequacies, the Troop Commander/Division Director shall be responsible for ensuring the preparation and submission of the Review of Performance Complaint, Form SP 1-101A. This report shall be appended to the Use of Force or Complaint Reception and Processing Worksheet, and a copy forwarded to the Bureau of Professional Responsibility for retention. The Troop Commander/Division Director shall retain a copy of this report and maintain it in a supervisory file established for that purpose.

d. In all other cases, concurrence must be obtained directly from the Director, Bureau of Professional Responsibility, regarding the scope of investigations to be conducted.

e. Inform the Director, Bureau of Professional Responsibility of those cases when a complainant refuses to sign a Complaint Verification after being requested to do so by a Troop/Bureau investigator.

3. Assign a Lieutenant or noncommissioned officer, outside of the subject's chain of command, to those investigations required by this regulation which are to be investigated

-8-

at the Troop/Division level. An investigator in the subject's chain of command may be assigned when warranted by circumstances. All assignments shall be made in concurrence with the Director, Bureau of Professional Responsibility, prior to actual assignment.

NOTE: When the subject is a Pennsylvania State Troopers Association (PSTA) member, PSTA officers (President, Vice-President, Secretary, Treasurer) or members of the Grievance Committee shall not be assigned to conduct the investigation.

4.   Assist members of the Internal Affairs Division in investigations required by this regulation upon request.

5.   Notify affected personnel of the results of the investigation as soon as practicable and within established statutes of limitations. Notices to personnel who had previously been issued a Notification of Inquiry, Form SP 1-102, shall be made in writing, by either correspondence or initiation of administrative action.   The correspondence shall include a specific disposition using one of the defined terms contained in this directive.

   a.   If the disposition of the investigation is unfounded, the subject shall not be counseled. Other performance issues uncovered through the investigation shall be addressed in separate correspondence or by counseling, which shall be made a part of the supervisory file.

   b.   If an allegation is not sustained, the member may be counseled on relevant regulations or directives.

6.   Initiate administrative action when warranted, upon receipt of an investigation, in accordance with AR 4-9 or FR 3-3. When administrative action is initiated in accordance with FR 3-3, the Troop Commander/ Division Director shall prepare a detailed summary outlining the basis for discipline. The summary will be provided to the member as required by existing collective bargaining agreements. If a DAR is issued, a copy of the summary will be forwarded as an attachment to

AR 4-25
9/2/93

the supplemental General Investigation Report. The DAR and a copy of the summary will also be forwarded under separate cover to the Disciplinary Officer. When administrative action is initiated for employees, the provisions of AR 4-9 shall be applicable.

7. Institute the following steps when an investigation is reviewed and it is discovered that someone other than or in addition to the individual listed in Block 4 of the Use of Force or Complaint Reception and Processing Worksheet has violated Department policies, regulations or procedures and there is a likelihood that a DAR will be issued:

   a. Advise the additional subject(s) of the complaint by issuing a Notification of Inquiry, Form SP 1-102.

   b. Direct the subject(s) to submit correspondence, STD-501, to the Troop Commander/Division Director addressing the issue(s) listed in the Notification of Inquiry.

   c. List the subject(s) in Block 5 of the supplemental General Investigation Report.

   d. Direct further investigation or, if the investigation is complete, initiate the review process.

8. Notify the complainant of the results of the investigation, either verbally or in writing. Notify public officials who were interviewed, such as district attorneys, judges, etc., either verbally or in writing, of the results of the investigation if it is unfounded. These notifications shall be noted in the supplemental General Investigation Report.

9. Refer the investigation, if circumstances warrant, to the appropriate Criminal Investigation Unit when the facts of the investigation reveal that false information has been provided with the intent to implicate personnel in the commission of a crime, or the facts indicate other criminal conduct on the part of the complainant.

-10-

AR 4-25
9/2/93

F. <u>Investigators</u>: Investigators shall:

1. Ensure that all investigations conducted are thorough and impartial.

2. Contact the Director, Bureau of Professional Responsibility immediately whenever investigative difficulties occur or when assistance is desired in any phase of the investigation.

3. Assist federal, state, county and municipal law enforcement agencies with investigations wherein personnel may be implicated in illegal activities or other acts of misconduct.

4. Assist, upon request, the Office of Chief Counsel, in preparing cases when personnel are subjected to administrative action and/or criminal action, and conduct an investigation into factual allegations contained in civil actions, claims or other notices which could expose the Department or its personnel to civil liability.

5. Notify the Director, Bureau of Professional Responsibility, immediately, when it becomes apparent by the facts gathered during an investigation that the Department may be the subject of civil litigation.

6. Obtain a written prosecutorial decision from the district attorney in all cases where the conduct alleged may be criminal in nature. This decision should be obtained prior to the issuance of the Administrative Warning. The Director, Bureau of Professional Responsibility, shall be notified in the event the district attorney declines to render such written prosecutorial decision, or fails to render same in a timely manner.

7. When practical, the subject(s) shall be given reasonable notice of the time, date and location of their interview. They should be informed of their right to have a union representative present at the interview. In all cases, requests for union representation during an interview by a subject(s) of an investigation shall be granted.

AR 4-25
9/2/93

NOTE: The subject(s) assumes responsibility for arranging for such representation. Absent exigent circumstances, the subject(s) shall be provided reasonable time to arrange for representation. The subject(s) has no right to a specific representative, only to one that is the nearest and most readily available.

8.  Ensure the constitutional rights specified in <u>Miranda v. Arizona</u> and <u>Garrity v. New Jersey</u> are protected; and provisions granted by existing collective bargaining agreements are not violated. (Refer to Appendages IX and X.) Issue the Administrative Warning, Form SP 1-104 (Appendage VIII), in administrative investigations to further advise the subject(s) of the investigation of their rights under "Garrity"; that the questioning concerns administrative matters relating to the official business of the Department. The Rights Warning and Waiver Notice to Pennsylvania State Police Personnel, Form SP 1-103 (Appendage IX), shall be given to the subject(s) of the investigation to advise of rights under "Miranda" when there is the possibility of criminal charges.

9.  Issue the Notification of Inquiry as soon as practical to the affected personnel. In those cases where the investigation could be impeded or compromised, the investigator shall determine the appropriate time to issue the notification. (Refer to Appendage IV.)

10. Any subject interviewed in regards to an investigation who has reason to believe their statements could result in administrative action being taken against them, shall be afforded union representation if requested.

11. Provide personnel, who are required or requested to sign any forms during a BPR investigation, with a copy of any signed forms.

12. When applicable, transcribe the complaint on the Complaint Verification, Form SP 1-108, Appendage XII and obtain the complainant's signature.

G.   <u>Personnel Receiving Complaints</u>:   Personnel receiving complaints shall:

1.   Receive complaints against personnel in a courteous manner.

2.   Document complaints when they are received. Complainants shall not be advised to call back later to speak with a supervisor or instructed to contact the Bureau of Professional Responsibility directly. This does not prohibit supervisors from recontacting a complainant to clarify complaint information.

   <u>NOTE</u>:   Personnel desiring to initiate a complaint shall be responsible for completing their own Use of Force or Complaint Reception and Processing Worksheet.

3.   Ensure the confidentiality of all complaints is maintained.

4.   Process all complaints in accordance with the provisions of this regulation.

H.   <u>Personnel Who are the Subject of an Administrative Investigation</u>:

1.   May at any time during the course of an internal investigation, be ordered by the appropriate authority to submit to any or all of the following:

   a.   Breath test.

   b.   Urine test.

   c.   Blood test.

   d.   Polygraph test.

   e.   Lineup.

   f.   Medical/psychological/psychiatric examination.

   g.   Any other non-testimonial evidence test.

   h.   Questioning related to alleged misconduct or performance of duty.

2.    Shall be advised that none of the results of the tests or information received from the procedures listed in Section 25.08 H. 1., can be used against them in a criminal prosecution.

3.    Shall, upon direction of the investigating officer or other authority, be required to submit correspondence related to the alleged misconduct or performance of duty. Absent exigent circumstances the submission shall be within 48 hours of being directed to do so. The 48 hours can be extended with the approval of the investigating officer or the Director, Bureau of Professional Responsibility.

4.    Shall be interviewed by the investigating officer.

5.    May obtain the results of any of the test/examination procedures listed in Section 25.08 H. 1. upon written request to the Director, Bureau of Professional Responsibility. The results may be provided in the form of a copy or other written documentation.

6.    Shall be afforded all rights contained in existing collective bargaining agreements.

7.    Shall maintain confidentiality of investigations until completed.

8.    Shall cooperate and answer all questions honestly and completely.

I.    Personnel Who are the Subject of a Criminal Investigation: Personnel who are the subject of a criminal investigation shall be afforded the constitutional protections which are guaranteed as a result of United States Supreme Court decisions in Miranda v. Arizona and Garrity v. New Jersey, as applicable.


25.09    INVESTIGATIVE ASSIGNMENT CRITERIA

A.    Circumstances:    Administrative investigations conducted under the following circumstances are subject to the provisions of this directive and the Internal Affairs Division may, at the discretion of the Director, Bureau of Professional Responsibility, retain primary investigative responsibility:

-14-

AR 4-25
9/2/93

1.    Shooting incidents and physical force incidents as defined in directives, regardless of personnel duty status.

2.    Any allegation of criminal conduct directed against personnel.

3.    Any allegation of misconduct directed against members.

4.    Citizen complaints or any allegation of misconduct directed against personnel which could result in termination of employment. The provisions of AR 4-9 shall apply to performance inadequacies and/or cases of minor misconduct, e.g., traffic citations.

5.    Allegations of violations of AR 4-6, FR 1-1 and other allegations of discrimination, harassment or violation of civil rights.

6.    Investigations initiated in accordance with FR 6-4, legal intervention.

7.    Investigations initiated as a result of contemplated administrative action related to FR 6-4.

8.    Investigations initiated in accordance with FR 5-4.

9.    Motor vehicle accidents resulting in the death of any person when:

      a.    Pursuit is a factor.

      b.    A Department vehicle is involved.

10.   Any dog bite resulting from a Canine Enforcement Team requiring treatment by a licensed medical practitioner.

11.   Investigations conducted at the request of the Commissioner.

B.    <u>Investigative Responsibility</u>:    The following criteria will be considered by the Director, Bureau of Professional Responsibility, in determining if the Internal Affairs Division will assume investigative responsibility or if the investigation will be assigned to Troop/Division personnel:

AR 4-25
9/2/93

1.  Seriousness or complexity of the allegation to be investigated.

2.  Source of the complaint.

3.  Number of personnel involved.

4.  Duty assignment of personnel involved.

5.  Geographical limitations.

6.  Need for internal security relative to all or part of the investigation.

7.  Any exceptional circumstance noted by or brought to the attention of the Director, Bureau of Professional Responsibility.

C.  Performance Inadequacies:  The Internal Affairs Division will not assume investigative responsibility for mere performance inadequacies or procedural discrepancy violations unless they are indicative of a more serious underlying problem. Addressing the preceding issues is a function of first line supervision and should be handled at that level through counseling, training or other remedial action.

D.  Complaints Initiated by Personnel:  The Use of Force or Complaint Reception and Processing Worksheet shall be completed in accordance with Section 25.10 B. of this regulation. No investigation will be undertaken into complaints lodged by personnel unless a substantiation of the allegation would give rise to formal discipline.

E.  Investigatory Difficulties:  If in the course of monitoring an ongoing investigation, the Director, Bureau of Professional Responsibility, determines that investigatory difficulties exist, the Internal Affairs Division may be directed to assume full or partial responsibility for conducting that specific investigation.  This may occur at any stage of the investigation.

25.10  COMPLAINT PROCESSING

A.  Types of Complaints:  Complaints may be received in any of the following manners and shall be processed in accordance with this regulation in all instances:

AR 4-25
9/2/93

1.    Telephone:  Self-explanatory.

2.    In Person:    Individuals may appear at a Department installation, or may make a complaint to personnel at any location.

3.    Correspondence:  Self-explanatory.

B.    Receiving Complaints:

1.    Every complaint, whether anonymous, verbal or written, received by personnel shall be recorded on the Use of Force or Complaint Reception and Processing Worksheet, and processed as described in Appendage I.  When the complaint involves personnel in the chain of command and the process described in Appendage I is inappropriate, contact may be made directly with the Internal Affairs Division.

2.    Complainants shall not be required to appear at a Department installation to initiate a complaint.

3.    Complainants may remain anonymous; however, a reasonable effort to obtain identification should be made.

4.    If their identity is known, complainants shall be advised that a Department representative will contact them.

5.    The following procedure shall be followed by personnel receiving a complaint at times other than normal working hours:

a.    In those cases which are not of a serious nature and do not require an immediate response from an Internal Affairs Division investigator, the information shall be documented and processed in accordance with Appendage I.

b.    In serious cases which warrant the immediate response of an Internal Affairs Division investigator, personnel receiving the complaint shall immediately notify, through channels, the Troop Officer of the Day (OD).  The Troop OD shall then contact the Department Headquarters

-17-

AR 4-25
9/2/93

OD, who shall provide the name of the appropriate Bureau of Professional Responsibility duty member to call for an evaluation of the necessity of an immediate response. Any incident which results in the death or serious injury of a person; that involves the physical arrest of personnel, or major breaches of conduct by personnel; or that is likely to generate more than routine public interest, should be considered serious in nature.

C.   Notifying Involved Individuals:

1.   The Director, Bureau of Professional Responsibility, shall notify the complainant that their complaint has been received. When personnel initiate a complaint, this notification may not be required. (Refer to Appendage III.)

2.   The assigned investigator shall officially notify affected personnel of a pending investigation, unless circumstances dictate otherwise. The Notification of Inquiry shall be issued to the subject(s) and serve as the official notification. (Refer to Appendage IV.)

D.   Investigation Procedures: The following procedures shall be followed by individuals conducting personnel investigations:

1.   Complaints of physical abuse, discrimination and sexual harassment provide a high potential for liability to the Department and its personnel. Based upon a request from the Office of Chief Counsel, all such complaints shall be investigated immediately to determine the factual circumstances surrounding the complaint in order to assist the Office of Chief Counsel in developing legal theories that can be advanced in defense of any resulting claims and to properly evaluate the potential for liability to which the Department or its members could be exposed. The Office of Chief Counsel shall be provided notice of complaints of this nature by the Director, Internal Affairs Division as soon as possible after receipt.

-18-

2.    The Use of Force or Complaint Reception and Processing Worksheet shall be prepared in accordance with this regulation and will serve in place of an incident memo.  A BPR Control Number shall be obtained by the Troop Commander/Division Director and entered in Block 1.  No incident memo will be prepared, nor will a Troop Incident Number be assigned.

3.    Complaints from citizens shall be verified through the completion of the Complaint Verification, Form SP 1-108, Appendage XII. In some cases this would have been accomplished through the use of Appendage XIII by the Bureau of Professional Responsibility by mail prior to assignment.  If the verification is not attached to the complaint the investigator shall complete Appendage XII. In doing so, investigators shall request the complainant's signature in the allotted block before the interview.

   a.    If the complainant refuses to sign the form, the investigator shall print "Refused" in the signature block.  The complainant shall be informed that such refusal constitutes a withdrawal of their complaint.  The investigator shall attempt to complete an interview of the complainant, and shall afterwards confer with the Director, Bureau of Professional Responsibility for a determination on the future course of the investigation.  Except in cases of criminal conduct or those which could give rise to court-martial proceedings, as determined by the Department Disciplinary Officer, the investigation shall be terminated with the submission of a limited investigation documenting action taken.

   b.    If travel distance or other circumstances prohibit a personal interview, the investigator shall request assistance from the Bureau of Professional Responsibility in obtaining a completed verification form.

-19-

AR 4-25
9/2/93

4.   The General Investigation Report shall be used
to report full investigations. Correspondence
shall    be    used    to    report    limited
investigations.

NOTE:   When appropriate, an Initial Crime
Report,  Form  SP 7-004,  or  Non-Traffic
Citation, Form SP 7-0017B shall be prepared
and assigned a Troop Incident Number.

5.   Personal contact, when practical, shall be
made with complainants, witnesses and involved
personnel.  Anonymous complaints shall not be
automatically    dismissed.    A    thorough
investigation   shall   be   conducted   to
independently   prove   or   disprove   the
allegation.  The investigator should make a
reasonable effort to determine the identity of
anonymous complainants.

NOTE:  No administrative action shall be taken
against personnel solely on the basis of an
unsupported anonymous complaint.  In addition,
no  investigation  shall  be  initiated  into
anonymous complaints unless a substantiation
of the allegation could give rise to formal
discipline as determined by the Disciplinary
Officer.

6.   Personnel who are directly or indirectly
associated with a matter under investigation
may be directed by the investigating officer
or other authority to submit correspondence
containing an account of their knowledge and
involvement.    Such   correspondence   shall
include   complete   answers   to   any related
questions of the investigator. Absent exigent
circumstances, personnel shall be provided 48
hours to submit the correspondence to the
investigator   or   higher   authority.    Any
subsequent requests for additional information
may  be  made  by  the  investigator  citing
specific   questions   to   be   answered.    All
submitted correspondence shall be included as
attachments  to  the  General  Investigation
Report.

7.   The  subject  of  the  investigation  shall  be
personally interviewed.

     a.   All  related  interviews  conducted
during BPR personnel investigations
which  allege  criminal  conduct  or

-20-

gross misconduct shall be tape-recorded.

(1) Prior to beginning an interview which requires tape-recording, the subject shall be informed that their statement will be tape-recorded.

(2) Personnel, during administrative investigations, have no right to refuse the interview being tape-recorded.

(3) Individuals not employed by the Department have the right to refuse their interview being tape-recorded.

b. The subject(s) of a taped interview may obtain a copy of the related cassette tape.

(1) Upon written request to the Director, Bureau of Professional Responsibility, and within 15 working days after the last interview is completed, the subject(s) shall be provided with a copy of their taped interview. Requesting personnel shall immediately provide correspondence encompassing a written receipt. For other than Department personnel, a handwritten receipt is acceptable.

(2) The subject(s), who is a PSTA member, may simultaneously tape-record the interview being conducted and also be tape-recorded by a member conducting a BPR investigation. At the conclusion of the interview, the subject's cassette tape shall be removed and immediately placed in an envelope by the BPR investigator. The envelope shall then be sealed and the subject directed to place their

AR 4-25
9/2/93

signature, date and time upon the seal. The sealed envelope shall be further enveloped in a postage stamped and addressed mailing envelope provided by the member. The package shall be immediately mailed to the PSTA office where the enclosed envelope will be retained in a sealed condition until notified by BPR that the contents of the interview may be released to the subject(s).

c.    Interviews meeting the criteria set forth in this regulation for tape-recording which have not, for whatever reason, been tape-recorded will be reduced to writing by the investigator, who shall then show the written statement to the subject for their review. The subject will then be requested to sign each page and complete the signature block on the statement's last page. The signature block shall state:

By my signature on this and each of the foregoing _____ pages, I hereby adopt the statement contained herein and acknowledge the statement's completeness and veracity.

_____ Signature

_____ Date

d.    Tape-recorded interviews may be summarized for reporting purposes. The investigator must ensure that the summary is accurate and that the original tape is included as an attachment to the investigative report.

8.    All documents and/or reports, or copies thereof, if originals are not available, which have been generated by the investigation shall be collected.

AR 4-25
9/2/93

9. All available investigative tools shall be employed to secure evidence to assist in determining the facts of an investigation. All evidence collected shall be processed in accordance with the procedures outlined in OM 7-7. Examples of investigative tools and evidence to be used in the investigation are as follows:

    a. Documents and Records:

        (1) Medical reports - refer to Appendage V.

        (2) Licenses, registrations or any applications.

        (3) Telephone toll records.

        (4) Financial records - refer to Appendage VI.

        (5) Credit Bureau checks.

        (6) Search warrants/affidavits.

        (7) Employment records - refer to Appendage VII.

        (8) Subpoenas.

        (9) Initial Crime Reports.

      (10) Accident Reports.

        NOTE: A Request for Criminal Record Check, Form SP 4-164, commonly referred to as a "rap sheet," shall only be included if relevant.

    b. Clothing: Especially important in incidents of shooting or alleged physical abuse.

    c. Photographs:

        (1) Victims - physical abuse, shootings, etc.

        (2) Scenes - location of alleged violation.

AR 4-25
9/2/93

    (3)    Photo lineups - <u>U.S. v. Wade</u> covers the Supreme Court guidelines associated with lineups. Refer to Appendage XI.

d.    Radio Tapes: These are reused on a 30 or 60-day cycle. It is incumbent upon the investigator to obtain the tape prior to its reuse or erasure.

e.    Sketches: Prepared of scene, if warranted.

f.    Weapons: Ascertain if:

    (1)    Issued/personal.

    (2)    Ammunition - issued/personal.

    (3)    Alterations.

    (4)    Make, model, serial number and caliber.

    (5)    Qualified with weapon - Permanent Firearms Scoring Record, Form SP 8-104.

    (6)    Request to Carry a Personal Handgun on Duty, Form SP 1-600, is completed and on file.

g.    Technical Aids:

    (1)    Laboratory.

        (a)    Ballistics Section.

        (b)    Chemistry Section.

        (c)    Documents Section.

        (d)    Photographic Section.

        (e)    Latent Print Section.

        (f)    Automated Fingerprint Identification System Section.

    (2)    Polygraph.

-24-

      (3)   Helicopter.

      (4)   Scuba Teams.

10.  Personal property of personnel is not subject to search and seizure for administrative work-related investigations without reasonable suspicion.   Probable cause and/or a search warrant, as required by law, are necessary to search and seize the personal property for criminal investigative purposes.   However, Department property may be searched at any time, even if assigned to or used exclusively by a single individual.   This search may be conducted by any authorized person pursuant to an investigation.

11.  At no time will recommendations be offered as to the appropriate administrative action to be taken.   The investigator shall not express assumptions, personal opinion, or conclusions in the General Investigation Report.

12.  The following exceptions to completing a General Investigation Report are necessary when conducting full investigations:

a.  Block 5 shall read as follows:

    Name of Subject Personnel
    Troop/Bureau - Station/Division
    Date of Enlistment/Hiring
    Social Security Number of Subject Personnel

    NOTE:  Additional subjects shall be entered in the INSTRUCTIONS Block, under the subheading ADDITIONAL SUBJECTS, using the above format.

b.  The subheadings CONCLUSION, and RECOMMENDATION and COMMENT in Block 6 shall not be included when the report is used for administrative investigation purposes.

c.  All attachments shall be consecutively numbered under the subheading, LIST OF ATTACHMENTS. Each attachment shall be numbered, along the lower right corner to correspond with this list.  In the format of:  Attachment No.\_\_\_\_\_,

AR 4-25
9/2/93

Page_____ of_____.  The Use of Force
or    Complaint    Reception    and
Processing Worksheet shall always be
Attachment Number 1.  Attachments to
supplemental General Investigation
Reports shall continue consecutively
from the last attachment number in
the original report.

d.   No    references    to    race/ethnicity
shall be included when identifying
interviewees, unless relevant to the
issue under investigation.

13.   When the facts of an investigation indicate
that  a  Report  of  Incident/Accident,  Form
STD-430,  shall  be  submitted  according  to
AR 4-12, it shall be submitted directly to the
Director, Bureau of Staff Services, and noted
in the details section of the report.  A copy
shall not be made an attachment to the General
Investigation Report.

14.   Department    directives,    contract/agreement
provisions, the Pennsylvania Rules of Criminal
Procedure  and  statutes  shall  be  strictly
adhered to while conducting investigation(s).

15.   Individuals   under   investigation   shall   be
advised of their Constitutional Rights, which
may apply during the investigation.

16.   The investigation shall be completed and all
reports  shall  be  received  by  the  Director,
Bureau of Professional Responsibility within
30 days after assignment, unless another time
period is specified by the Director.  It is
important for the assigned investigator to
complete  the  investigation  and  submit  the
report promptly.

E.   <u>Investigation of Non-Complaint Incidents</u>:

1.   Incidents    involving    legal    intervention,
shooting or use of physical force, provide a
high potential for liability to the Department
and its personnel.  Based on a request from
the Office of Chief Counsel, in all such
incidents an immediate investigation shall be
conducted  into  the  factual  circumstances
surrounding the incident in order to assist
the Office of Chief Counsel in developing
legal theories that can be advanced in defense

-26-

of any resulting claims and to properly evaluate the potential for liability to which the Department or its members could be exposed. The Office of Chief Counsel shall be provided notice of the above-referenced types of incidents by the Director, Internal Affairs Division as soon as possible after their occurrence.

2.    The involved member(s)/enforcement officer(s) shall immediately notify, through the chain of command, the Troop Commander responsible for the area in which the incident occurred. For a member not under their command, the Troop Commander shall notify the member's Troop Commander, Division Director; and, if on detached status, the member's current Troop Commander/Division Director shall also be notified. For Enforcement Officers, the Troop Commander shall notify the Director, Operations Division, Bureau of Liquor Control Enforcement. If serious injury or death occurred to an individual, the Troop Commander shall immediately notify the Deputy Commissioner of Operations, through the chain of command, if possible. The Troop Commander shall also provide immediate notification to the Bureau of Professional Responsibility, in accordance with Department directives, in all shooting/physical force incidents.

3.    In those incidents requiring immediate response, the Troop Commander shall ensure that a supervisor who is not directly involved in the incident is immediately assigned to secure the scene of the incident. The assigned supervisor shall initiate a preliminary investigation, pending assignment of a principal investigator, who shall be selected through concurrence with the Director, Bureau of Professional Responsibility.

4.    If the use of physical force results in injury which requires medical treatment to personnel only, and no other investigative criteria applies, an administrative investigation is not required.

5.    Any member/enforcement officer, who discharges a weapon which results in an injury or death, or whose use of physical force results in a death, shall immediately be assigned to

AR 4-25
9/2/93

Station/Office duties, pending an evaluation of the circumstances surrounding the incident by the Deputy Commissioner of Administration. In addition, any member/enforcement officer whose use of physical force results in an injury may, at the discretion of the Deputy Commissioner of Administration, be assigned to Station/Office duties pending evaluation of the circumstances surrounding the incident. For those incidents in which responsibility cannot be immediately determined, all members/enforcement officers directly involved in the incident shall be placed in this status, where appropriate. This action is not to be construed as disciplinary in nature.

6. Whenever a member/enforcement officer is directly involved in a shooting incident which results in injury or death:

   a. The assigned criminal investigator and BPR investigator shall interview the involved personnel, as soon as possible.

   b. The Troop Commander/Bureau Director shall ensure that the Member Assistance Program Office Manager is notified immediately.

   c. The member's/enforcement officer's Troop Commander/Bureau Director, in conjunction with the Manager, Member Assistance Program, shall, as soon as possible, but not more than 72 hours after the incident, arrange for the affected member(s)/ enforcement officer(s) to receive appropriate professional counseling. This shall not preclude professional counseling of members/enforcement officers involved in shooting incidents not resulting in injury or death or in other use of physical force incidents. In addition, the Troop Commander/Bureau Director, in conjunction with the Manager, Member Assistance Program, shall ensure appropriate professional counseling is provided to any personnel, e.g., Police Communications Operators, supervisors, etc., indirectly

AR 4-25
9/2/93

involved with and adversely affected by an incident.

d.    The Troop Commander/Bureau Director shall ensure the PSTA President is notified, as soon as possible in those incidents involving members.

7.    During the investigation of a shooting incident, it may be necessary for the investigator to take possession of a member's/ enforcement officer's weapon. The Troop Commander/Division Director shall make arrangements for immediate replacement of the weapon.

8.    Release of a member's/enforcement officer's name to the news media shall be coordinated through the Public Information Office.

9.    An investigation of a non-complaint incident is not required for the following shooting incidents:

a.    Firearms training/qualification.

b.    A member/enforcement officer discharging a weapon while off duty as permitted by law for purposes such as hunting, fishing, target shooting, etc.

c.    When a member destroys an animal in accordance with the provisions of FR 7-3.

10.    During the investigation of a non-complaint incident, the investigator shall exercise discretion in determining if an aggrieved citizen should be interviewed. This does not apply to instances where the citizen initiates the complaint and alleges physical abuse.

F.    Limited Investigations:

1.    A limited investigation may be conducted when a requirement under the definition of "Limited Investigation" is met. In addition, a limited investigation may be conducted when the Troop Commander/Division Director and the Director, Bureau of Professional Responsibility concur that a full investigation is not warranted due to mitigating circumstances. A BPR Control

-29-

AR 4-25
9/2/93

Number and investigator shall be assigned to all limited investigations.

2. Limited investigations shall be prepared on correspondence directed to the investigator's Troop Commander/Bureau Director.

    a. Limited investigations should include a synopsis of the allegations. Enclosures may include:

        (1) Information from involved personnel submitted correspondence.

        (2) Copies of pertinent investigative reports.

        (3) Any other documents which are relevant to the investigation.

        (4) Notification of Inquiry issued to involved personnel.

    b. Investigator's assessment as to why this investigation should be handled on a limited basis, as defined in Section 25.04 I.

3. Upon completion of a limited investigation, the Troop Commander/Division Director shall prepare an endorsement, citing reasons for their decision and a notation that the complainant and involved personnel were notified of this decision. The endorsement shall also include a statement of the disposition using one of the defined categories listed in Section 25.07, excluding the categories "Sustained" or "Not-Sustained." The limited investigation must be converted into a full investigation if any element of misconduct is determined.

4. Troop Commanders/Division Directors shall forward the endorsed, limited investigation, through channels, to the Director, Bureau of Professional Responsibility. If, during the review process, a determination is made that the facts contained in the limited investigation are insufficient to support the final disposition, the report may be returned to the Troop Commander/Division Director

-30-

directing that the investigator conduct a full investigation. If a limited investigation is returned under these circumstances, all prior notifications to the complainant and involved personnel shall be deemed to be void.

G.  <u>Submission of Internal Investigation Reports for Full Investigations</u>:

1.  All applicable General Investigation Reports shall be forwarded directly, in duplicate, to the Director, Bureau of Professional Responsibility, by the assigned investigator.

2.  After reviewing the report for investigative content, the Director, Bureau of Professional Responsibility, shall either forward it to the Deputy Commissioner of Administration for further processing or return it to the investigator for additional investigation. A copy of the investigative reports on incidents involving legal intervention, shooting, use of physical force, or complaints of physical abuse, discrimination, or sexual harassment shall be forwarded to the Office of Chief Counsel for evaluation at the time the report is forwarded to the Deputy Commissioner of Administration.

3.  The Deputy Commissioner of Administration or designee shall forward the investigative report to the appropriate Area Commander/Bureau Director, who shall review and forward it to the Troop Commander/Division Director. In cases which appear to warrant the issuance of a DAR, the Area Commander/Bureau Director shall ensure consultation with the Troop Commander/Division Director prior to an administrative decision being made. An administrative decision shall be formulated by the Troop Commander/Division Director and communicated to the subject(s) of the investigation in a timely manner.

    a.  If the investigation involves a member and a DAR will be issued, the provisions of FR 3-3 apply.

    b.  If disciplinary action will be taken against an employee, the provisions of AR 4-9 apply.

AR 4-25
9/2/93

4. The investigative report shall be returned, through channels, to the Deputy Commissioner of Administration, by the appropriate Troop Commander/Division Director, after they have completed their supplement report of the General Investigation Report and detailed their administrative decision. The supplement report shall, at a minimum, contain the following:

   a. A statement of the disposition using one of the defined categories listed in Section 25.07. If there is more than one element to the allegation and the dispositions differ, each element must be individually addressed. Allegations in the categories Verbal Abuse or Dissatisfaction with Performance of Duty that are disposed of as unfounded or not sustained may be satisfactorily addressed by simply stating the appropriate disposition with no explanation necessary.

   b. Except as exempted in the above section, a statement on those mitigating or aggravating circumstances that influenced the dispositional decision.

   c. A statement that notification regarding the disposition of the complaint was made to the subject and the complainant. The method used to notify the complainant must be stated.

   d. When a DAR is issued, the detailed summary provided to the involved member shall be included as an attachment.

5. The Deputy Commissioner of Administration shall forward all reports to the Director, Bureau of Professional Responsibility, for further action or filing.

6. The central location for the collection and maintenance of all administrative investigation information shall be the Bureau of Professional Responsibility, Internal Affairs Division. All personnel investigations are of

-32-

AR 4-25
9/2/93

a confidential nature and may be reviewed only upon authorization of the Commissioner/ designee.

7.  General Investigation Reports and limited investigation reports shall be purged after ten years, or two years after the member/employee separates, unless litigation warrants retention.

## 25.11    INTERNAL AFFAIRS DIVISION PERSONNEL

A.  <u>Selection</u>: Staffing an Internal Affairs Division is an important factor in the success or failure of the Division. To be considered for assignment in the Internal Affairs Division, members must:

1.  Be volunteers.

2.  Have demonstrated that they possess a high degree of investigative skill and the ability to write clear, concise and complete investigative reports.

3.  Have an excellent reputation, among both their peers and supervisors, in terms of integrity and overall performance as members.

4.  Be familiar with those statutes, collective bargaining agreements, and Department directives, policies and procedures which are related to administrative investigations.

5.  Have a thorough knowledge in the collection and preservation of evidence.

6.  Should have knowledge of the availability of records and information maintained by other sources and agencies.

7.  Should possess the ability to perform photographic surveillance and possess or be willing to acquire the proper certification required to perform electronic surveillance.

8.  Should be in good physical condition and present a professional appearance.

9.  Should be able to interact effectively with people and be proficient in interviewing and interrogation techniques.

-33-

AR 4-25
9/2/93

B.   <u>Tenure</u>:  It is a generally accepted practice to periodically rotate members assigned to an Internal Affairs Division.  This rotation process will assure the infusion of new personnel and new ideas, and allow greater member participation.  The investigator positions within the Division shall be posted in accordance with AR 4-20.  Investigators shall serve for a period of time to be determined by the Commissioner.

AR 4-25
9/2/93

## APPENDAGE I

## USE OF FORCE OR COMPLAINT RECEPTION AND PROCESSING WORKSHEET
### FORM SP 1-101

A. **PURPOSE:** This form is used to provide a uniform method of receiving and recording complaints against personnel and recording incidents for non-complaint investigations.

B. **PREPARATION:** This form shall be printed with ballpoint pen or typewritten, in original only, by the individual receiving the complaint.

C. **BLOCK INSTRUCTIONS:**

1. **BPR CONTROL NUMBER:** To be obtained by the Troop Commander/Division Director from the Director, Bureau of Professional Responsibility.

2. **COMPLAINANT INFORMATION:** This section is for recording the vital information regarding the individual making the complaint. Personnel shall not place their names in this section unless they are the actual complainant. When personnel receive information from an outside source, that source shall be noted in this section. For non-complaint investigations and anonymous complaints, this section shall be left blank.

3. **NON-COMPLAINT USE OF FORCE REPORT:** Check the appropriate box.

4. **SUBJECT OF ALLEGATION/REPORT:** Self-explanatory.

5. **DETAILS OF ALLEGATION:**

   a. **ROUTE/STREET:** Self-explanatory.

   b. **CITY/TWP/BORO:** Self-explanatory.

   c. **COUNTY:** Self-explanatory.

   d. **DATE:** Self-explanatory.

   e. **TIME:** Self-explanatory.

   f. **DAY:** Self-explanatory.

   g. **TYPE OF ALLEGATION:** Refer to Section 25.05. Check the appropriate box.

I-1

h.   SYNOPSIS:   A brief explanation of what the complaint alleges or what occurred during a non-complaint incident is sufficient.

6.   RECEPTION DATA:

a.   DATE RECEIVED:  Self-explanatory.

b.   TIME RECEIVED:  Self-explanatory.

c.   LOCATION RECEIVED:  Self-explanatory.

d.   RECEIVED BY:  The name of the individual who initially receives the details of the allegation from the complainant shall be recorded here.  Do not advise complainants to call back later to speak to a supervisor.

7.   FOR BUREAU USE:  This space shall be used <u>only</u> by the Bureau of Professional Responsibility.

8.   ADDITIONAL   SUBJECTS   OF   ALLEGATION/REPORT: Self-explanatory.

D.   DISTRIBUTION WHEN A COMPLAINT IS RECEIVED AT A TROOP/BUREAU LOCATION:

1.   Personnel Receiving Complaint - Forward through channels to the individual's Troop Commander/Division Director by the most expedient means possible.  If the complaint involves an individual in the chain of command, the individual may be bypassed when submitting the Worksheet through channels.

2.   Troop   Commander/Division   Director   -   The   Troop Commander/Division Director, after reviewing the Worksheet, shall assess if a full or limited investigation is appropriate.

a.   The   Director,   Bureau   of   Professional Responsibility or a designee shall then be contacted by telephone for concurrence.  At this time, a BPR Control Number will be assigned and recorded in the Bureau Register. An investigator will also be assigned.

(1)  If the decision is made for the investigation to be conducted by Troop/Bureau members, the Worksheet shall be forwarded to the investigating officer for inclusion as the first attachment to the General Investigation Report.

Case 1:01-cv-00084-CCC    Document 21    Filed 05/29/2001    Page 38 of 142

(2) If the decision is made for the investigation to be conducted by a member of the Internal Affairs Division, the Worksheet shall be immediately forwarded to the Director, Bureau of Professional Responsibility. It will then be forwarded to the Internal Affairs Division investigator for attachment to the General Investigation Report.

b. Upon receipt of a nonwritten complaint which alleges dissatisfaction with performance of duty or verbal abuse, the Troop Commander/Division Director shall immediately contact the Director, Bureau of Professional Responsibility to discuss the details of the allegation. When appropriate, the Director, Bureau of Professional Responsibility may elect to proceed by forwarding a Complaint Verification, Form SP 1-108, to the complainant requesting more specific information about the allegation, before initiating an investigation. In such cases, the Troop Commander/Division Director shall forward the original Worksheet to the Bureau of Professional Responsibility and retain a copy in a chronological file at the Troop/Bureau for 60 days, after which the Worksheet shall be purged.

c. The original Worksheet shall be retained in an active file at the Bureau of Professional Responsibility for 30 days, following the mailing of the Complaint Verification Form. Failure of the complainant to complete and return the Complaint Verification Form within 30 days will result in termination of the complaint and transfer of the original Worksheet to an inactive file. Completed Complaint Verification Forms shall be evaluated by the Director, Bureau of Professional Responsibility to determine if an investigation is warranted.

3. It may be determined by the Director, Bureau of Professional Responsibility that action other than an investigation is appropriate; in such cases the Worksheet shall be forwarded to the Director, Bureau of Professional Responsibility with related cover correspondence.

AR 4-25
9/2/93

E.   DISTRIBUTION WHEN A COMPLAINT IS RECEIVED BY THE BUREAU OF
PROFESSIONAL RESPONSIBILITY:

1.   When it is determined that the investigation shall be
conducted by a member of the Internal Affairs Division,
the Worksheet shall be prepared and forwarded to the
assigned Internal Affairs Division investigator for
attachment to the General Investigation Report.

2.   When it is determined that the investigation shall be
conducted by Troop/Bureau members, the Worksheet shall be
prepared and forwarded to the Troop Commander/Division
Director of the affected personnel.   The assigned
investigator shall attach it to the General Investigation
Report.

F.   DISTRIBUTION WHEN THE SUBJECT OF THE COMPLAINT IS A MEMBER
ASSIGNED TO THE BUREAU OF PROFESSIONAL RESPONSIBILITY:   When
a complaint is received concerning a member assigned to the
Bureau of Professional Responsibility, the Worksheet shall be
sent directly, under confidential cover, to the Deputy
Commissioner of Administration.

SP 1-101 (1-93)

**PENNSYLVANIA STATE POLICE**

**USE OF FORCE OR COMPLAINT**
**RECEPTION AND PROCESSING WORKSHEET**

| BPR CONTROL NUMBER |
|---|
| 1.    AR 4-25 |
|      9/2/93 |

**1. COMPLAINANT INFORMATION**

| NAME | FIRST | | M.I. | LAST | | |
|---|---|---|---|---|---|---|
| HOME ADDRESS | STREET/P.O. BOX | | | | | |
| | CITY | | STATE | ZIP CODE | HOME PHONE # ( ) | |
| EMPLOYER | NAME & ADDRESS | | | | WORK PHONE # ( ) | |

**2.    NON-COMPLAINT USE OF FORCE REPORT**  ☐ SHOOTING INCIDENT   ☐ PHYSICAL FORCE   ☐ LEGAL INTERVENTION

**4. SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)**

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | JOB ASSIGNMENT | |
| SSN    —    — | | DOE | ⟵ TO BE COMPLETED IF KNOWN OR AVAILABLE | |

**5.    DETAILS OF ALLEGATION**

ROUTE/STREET

| CITY/TWP/BORO | COUNTY | DATE | TIME | DAY |
|---|---|---|---|---|
| | | | | |

| TYPE OF ALLEGATION (CHECK ONE) | ☐ PHYSICAL ABUSE   ☐ VERBAL ABUSE   ☐ CRIMINAL CONDUCT      ☐ IMPROPER CONDUCT ON DUTY   ☐ IMPROPER CONDUCT OFF DUTY   ☐ DISSATISFACTION WITH PERFORMANCE OF DUTY |
|---|---|
| | ☐ OTHER (Please explain) |
| SYNOPSIS | |

**6.    RECEPTION DATA**

| DATE RECEIVED | TIME RECEIVED | LOCATION RECEIVED | TROOP/BUREAU    — | STATION/DIVISION |
|---|---|---|---|---|
| RECEIVED BY | NAME | | | SSN    —    — |

**7.    FOR BUREAU USE**

| INVESTIGATOR | NAME | | | SSN    —    — |
|---|---|---|---|---|
| CONTROL NO. ISSUED BY | | DATE ASSIGNED | DATE DUE | SP 1-101-A ☐   LIMITED INVESTIGATION ☐ |

I-5

AR 4-25

9/2/93

**ADDITIONAL SUBJECTS OF ALLEGATION/REPORT**

| NAME | FIRST | | | M.I. | LAST |
|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | | STATION/DIVISION | | JOB ASSIGNMENT |
| SSN | — | — | DOE | | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
| NAME | FIRST | | | M.I. | LAST |
| LOCATION | TROOP/BUREAU | | STATION/DIVISION | | JOB ASSIGNMENT |
| SSN | — | — | DOE | | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
| NAME | FIRST | | | M.I. | LAST |
| LOCATION | TROOP/BUREAU | | STATION/DIVISION | | JOB ASSIGNMENT |
| SSN | — | — | DOE | | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
| SYNOPSIS (CONT.) | | | | | |

AR 4-25
9/2/93

APPENDAGE II

REVIEW OF PERFORMANCE COMPLAINT
SP 1-101A

A.   PURPOSE:  The review of performance complaint is used to:

  1.   Provide Troop Commanders/Division Directors with a
       guideline to assist in determining if a member is merely
       lacking in a performance outside the Department Internal
       Affairs/Discipline System.

  2.   Document action taken in cases of performance
       inadequacies for future reference in the event of
       repeated behavior; a basis for progressive discipline; to
       document/maintain consistency throughout the Department.

B.   BLOCK INSTRUCTIONS:  This form shall be printed with ballpoint
     pen or typewritten, in original only, by the Troop Commander/
     Division Director reviewing the complaint.

  1.   SUBJECT AND BPR NUMBER:  Self-explanatory.

  2.   DATE(S) OCCURRED:  Self-explanatory.

  3.   DID COMMISSION/OMISSION TAKE PLACE OR BECOME KNOWN TO THE
       PUBLIC?  Check appropriate box.

  4.   WAS THE COMMISSION/OMISSION WHOLLY A MATTER OF INTERNAL
       ADMINISTRATION?  Check appropriate box.

  5.   WAS THE MEMBER PREVIOUSLY COUNSELED REGARDING SIMILAR
       BEHAVIOR?  IF YES, LIST DATES, CIRCUMSTANCES, AND BY
       WHOM:  This requires review of member's supervisory file
       and performance evaluation.  Check appropriate box.  If
       yes is checked, provide details.

  6.   WHAT, IF ANY, EFFECT DID THE MEMBER'S COMMISSION/OMISSION
       HAVE (E.G. DESTROYED RESPECT FOR THE PENNSYLVANIA STATE
       POLICE, IMPROPER EXAMPLE FOR OTHERS, ETC.):  Self-
       explanatory.  If none, leave blank.

  7.   LIST  AND  IDENTIFY  AGGRAVATING  AND/OR  MITIGATING
       CIRCUMSTANCES:  Self-explanatory.

  8.   WAS MEMBER DISCIPLINED WITHIN THE PAST FIVE YEARS
       REGARDING SIMILAR PERFORMANCE?  IF YES, LIST DATES AND
       PENALTIES:  Self-explanatory.

  9.   WAS MEMBER PREVIOUSLY GIVEN REMEDIAL TRAINING REGARDING
       SIMILAR  PERFORMANCE?   IF  YES,  LIST  DATES  AND
       CIRCUMSTANCES:  Self-explanatory.

AR 4-25
9/2/93

10. PRE-ADJUDICATION MEETING WAS HELD? DATE: Self-explanatory. This is to verify whether the Troop Commander/Division Director met with the member for the purpose of determining the validity of a performance inadequacy.

11. ATTENDEES: List the names of any persons, in attendance with the member and their position. Example: Trooper John J. Jones - Troop PSTA Representative.

12. REMARKS: List any pertinent comments made by the parties during the meeting.

13. DETERMINATION: Check appropriate box.

14. DATE MEMBER WAS NOTIFIED OF DETERMINATION: Self-explanatory.

15. DATE COMPLAINANT WAS NOTIFIED OF DETERMINATION: Self-explanatory. Check appropriate box if notification was written or verbal.

16. DISCIPLINARY OFFICER CONTACTED? IF YES, LIST DATE: Self-explanatory.

17. MEMBER COUNSELED? IF YES, LIST DATE: Self-explanatory.

18. DAR/TROOP COMMANDER'S WRITTEN REPRIMAND ISSUED? IF YES, LIST DATE: Self-explanatory.

19. BPR INVESTIGATION INITIATED: Check appropriate box.

20. REMEDIAL TRAINING SCHEDULED? IF YES, LIST DATE(S) AND TYPE: Self-explanatory.

21. REMARKS/DETAILS: Self-explanatory.

22. INITIATING OFFICER, TITLE AND DATE: Self-explanatory.

C. DISTRIBUTION:

1. If a performance inadequacy is founded, the Troop Commander/Division Director shall be responsible for ensuring the preparation and submission of the Review of Performance Complaint. This report shall be appended to the Use of Force or Complaint Reception and Processing Worksheet, Form SP 1-101, and forwarded to the Bureau of Professional Responsibility.

2. The Troop Commander/Division Director shall retain a copy of this report in a supervisory file established for that purpose.

AR 4-25
9/2/93

SP 1-101A (8-93)

**REVIEW OF PERFORMANCE COMPLAINT**

1. SUBJECT                                                                          BPR #

___ 'E (S) OCCURRED:

3. DID COMMISSION/OMISSION TAKE PLACE OR BECOME KNOWN TO THE PUBLIC?

☐ YES    ☐ NO

4. WAS THE COMMISSION/OMISSION WHOLLY A MATTER OF INTERNAL ADMINISTRATION?

☐ YES    ☐ NO

5. WAS THE MEMBER PREVIOUSLY COUNSELED REGARDING SIMILAR BEHAVIOR?
IF YES LIST DATES, CIRCUMSTANCES AND BY WHOM:

☐ YES    ☐ NO

6. WHAT, IF ANY, EFFECT DID THE MEMBER'S COMMISSION/OMISSION HAVE (E.G. DESTROYED RESPECT FOR THE PENNSYLVANIA STATE POLICE, IMPROPER EXAMPLE FOR OTHERS, ETC.):

7. LIST AND IDENTIFY AGGRAVATING AND/OR MITIGATING CIRCUMSTANCES:

8. WAS MEMBER DISCIPLINED WITHIN THE PAST FIVE YEARS REGARDING SIMILAR PERFORMANCE? IF YES, LIST DATES AND PENALTIES:

☐ YES    ☐ NO

9. WAS MEMBER PREVIOUSLY GIVEN REMEDIAL TRAINING REGARDING SIMILAR PERFORMANCE? IF YES, LIST DATES AND CIRCUMSTANCES:

☐ YES    ☐ NO

**ADJUDICATION OF PERFORMANCE COMPLAINT**

10. PRE-ADJUDICATION MEETING WAS HELD?                         DATE:

☐ YES    ☐ NO

11. ATTENDEES:

12. REMARKS:

___ DETERMINATION:

☐ UNFOUNDED    ☐ SUSTAINED    ☐ NOT SUSTAINED

___ ATE MEMBER WAS NOTIFIED OF DETERMINATION:

15. DATE COMPLAINANT WAS NOTIFIED OF DETERMINATION:

☐ WRITTEN    ☐ VERBAL

AR 4-25
9/2/93

## ACTION TAKEN

16. DISCIPLINARY OFFICER CONTACTED? IF YES, LIST DATE:

☐ YES    ☐ NO

17. MEMBER COUNSELED? IF YES, LIST DATE:

☐ YES    ☐ NO

18. DAR/TROOP COMMANDER'S WRITTEN REPRIMAND ISSUED? IF YES, LIST DATE:

☐ YES    ☐ NO

19. BPR INVESTIGATION INITIATED?

☐ YES    ☐ NO

20. REMEDIAL TRAINING SCHEDULED? IF YES, LIST DATE (S) AND TYPE:

☐ YES    ☐ NO

21. REMARKS/DETAILS

22. INITIATING OFFICER                           TITLE                    DATE

II-4

AR 4-25
9/2/93

APPENDAGE III

Dear:

     This will acknowledge receipt of the complaint which you filed with this agency.

     You will be contacted by a Department representative in the near future.  Any questions you may have concerning your complaint should be directed to the Bureau of Professional Responsibility at (717) 783-5145.

               Very truly yours,


               Director
               Bureau of Professional Responsibility

AR 4-25    APPENDAGE IV

| SP 1-102 (8-93) 9/2/93<br>COMMONWEALTH OF PENNSYLVANIA<br>PENNSYLVANIA STATE POLICE<br>**NOTIFICATION OF INQUIRY** | **NOTE:** INVESTIGATORS SHALL PREPARE ORIGINAL AND ONE COPY, RETAIN THE ORIGINAL WITH CASE FILE AND PROVIDE COPY TO THE SUBJECT OF INVESTIGATION. ONE OF THE THREE LISTED INVESTIGATION TYPES SHALL BE CHECKED.<br>BPR · |
|---|---|

_____    _____    _____
RANK                NAME               TROOP/STATION

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING:

☐ A COMPLAINT INVESTIGATION IS BEING CONDUCTED INTO AN INCIDENT IN WHICH YOU ARE ALLEGED TO HAVE BEEN INVOLVED. THE DETAILS OF THE COMPLAINT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐ A NON-COMPLAINT INVESTIGATION IS BEING CONDUCTED IN ACCORDANCE WITH DEPARTMENT DIRECTIVES. THE DETAILS OF YOUR INVOLVEMENT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐ AN ADMINISTRATIVE INVESTIGATION IS BEING CONDUCTED PURSUANT TO A REQUEST FROM THE OFFICE OF CHIEF COUNSEL. YOUR INVOLVEMENT HAS BEEN IDENTIFIED AS FOLLOWS:

_____
SIGNATURE OF INVESTIGATOR

I ACKNOWLEDGE RECEIPT OF THIS NOTIFICATION AND I AM AWARE OF MY RIGHT TO UNION REPRESENTATION.

_____    _____    _____    _____    _____
SIGNATURE          BADGE/I.D. NO.      SOCIAL SECURITY NO.  DATE       TIME

SP 1-109 (9-99)

APPENDAGE V

AR 4-25
9/2/93

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
**AUTHORIZATION TO OBTAIN MEDICAL INFORMATION**

I, _____, do hereby, voluntarily and without promises or threats of
any kind, authorize _____, of the Pennsylvania State Police to
obtain information from all medical authorities, hospitals, clinics, or physicians who possess any and all records
concerning my medical examinations, treatments, and/or hospital/clinic admissions relative to the examination and/or
treatment of _____.

I further understand that the information obtained is to be used for internal, administrative purposes only and will not be
used as evidence against me in any criminal proceeding.

_____
SIGNATURE

_____         _____
WITNESS                                  PRESENT STREET ADDRESS

_____         _____
WITNESS                                  CITY          STATE          ZIP CODE

_____
DATE OF BIRTH

_____
DATE                                     TIME

V-1

SP 1-106 (9-86)

AR 4-25
9/2/93



# APPENDAGE VI

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
## AUTHORIZATION TO OBTAIN FINANCIAL INFORMATION

I, _____ , do hereby, voluntarily and without promises or threats of any kind, authorize _____ of the Pennsylvania State Police to obtain and examine my financial records held by any financial institution that possess such records.

I further understand that the information obtained is to be used for internal, administrative purposes only and may not be used as evidence against me in any criminal proceeding.

_____
SIGNATURE

_____
WITNESS

_____
PRESENT STREET ADDRESS

_____
WITNESS

_____
CITY        STATE        ZIP CODE

_____
DATE                TIME

VI-1

SP 1 -107 (9 - 86)                    APPENDAGE VII                    AR 4-25
9/2/93

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
**AUTHORIZATION TO OBTAIN EMPLOYMENT RECORDS**


I, _____ , do hereby, voluntarily and without promises or threats of
any kind, authorize _____ of the Pennsylvania State Police to
obtain and examine all records held by my previous employer(s) concerning my employment history and job performance.

I further understand that the information obtained is to be used for internal, administrative purposes only and will not be
used against me as evidence in any criminal proceeding.


_____
SIGNATURE

_____                    _____
WITNESS                                          PRESENT STREET ADDRESS

_____                    _____
WITNESS                                          CITY              STATE              ZIP CODE

                                                 _____
                                                 DATE                              TIME

AR 4-25
9/2/93

SP 1-184 (8-93)

● APPENDAGE VIII ●

COMMONWEALTH OF PENNSYLVANIA
**PENNSYLVANIA STATE POLICE**
**ADMINISTRATIVE WARNING**

Member/Employe _____

Interviewer _____

BPR Control No. _____ Date _____

This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police. I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any pending criminal action. During the course of this questioning, even if you disclose information which indicates you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statement nor its fruits will be used against you in a criminal proceeding.

Since this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action. You do have the right to have a union representative with you during such questioning. If during the course of interview, you have reason to believe that your statements could result in administrative action being initiated against you, union representation will be provided upon request.

Do you understand what I have just explained to you?    ☐ YES    ☐ NO

Do you have any questions concerning what I have just explained to you?    ☐ YES    ☐ NO

_____    _____
SIGNATURE OF EMPLOYE/MEMBER                              DATE

_____    _____
SIGNATURE OF INTERVIEWER                                    DATE

SP 1 - 103 (9-86)

APPENDAGE IX

PENNSYLVANIA STATE POLICE

AR 4-25
9/2/93

# RIGHTS WARNING AND WAIVER NOTICE
# TO PENNSYLVANIA STATE POLICE PERSONNEL

TIME _____

DATE _____

PLACE _____

My name is _____ of the Pennsylvania State Police. You have an absolute right to remain silent and anything you say can and will be used against you in a court of law. You also have the right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge before any questioning, if you so desire. If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue. If you do exercise your right to remain silent, your refusal to answer will not be grounds for administrative action.

## WAIVER

I fully understand the statement warning me of my rights, and I am willing to answer questions. I do not want an attorney and I understand that I may stop answering questions anytime during the questioning. No promises have been made to me, nor have I been threatened in any manner. I also understand that my refusal to answer questions will not be grounds for administrative action.

_____
SIGNATURE

WITNESS:

S/ _____

S/ _____

AR 4-25
9/2/93

APPENDAGE X

<u>Garrity v. New Jersey</u>, 87 S.Ct. 616, 385 U.S. 493, 17 L.Ed. 2d 562 (1967)

This case involved a situation where police officers who were being criminally investigated were given a choice to either incriminate themselves or forfeit their jobs under a state (New Jersey) statute dealing with forfeiture of office, tenure and pension rights by public employees who refuse to testify on grounds of self-incrimination. The officers chose to make confessions. However, the Supreme Court of the United States held the confessions were not voluntary, but were coerced. The court said that the option to lose their means of livelihood or to pay the penalty of self-incrimination is in direct contrast of free choice to speak out or to remain silent. That practice, the court said, is likely to exert such pressure upon an individual as to disable him from making a free and rationale choice. The protection of an individual under the Fourteenth Amendment against coerced statements prohibits the use of these statements, obtained under threat of removal from office, in subsequent criminal proceedings.

In summary, <u>Garrity</u> held that public employee statements that are induced by threat of dismissal or other discipline may not be used in a subsequent criminal prosecution.

X-1

## APPENDAGE XI

<u>U.S. v. Wade</u>, 87 S. Ct. 1926, 388 U.S. 218, 18 L.Ed. 2d 1149 (1967)

The question addressed in this case was whether courtroom identifications of an accused at trial are to be excluded from evidence because the accused was exhibited to the witnesses before trail at a post indictment lineup conducted for identification purposes without notice to and in the absence of the accused's appointed counsel.  The Supreme Court of the United States held that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence, and was no violation of Wade's privilege against self-incrimination.  However, the courtroom identification should have been excluded because the lineup was conducted without notice to and in the absence of counsel.  The principle followed is that, in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.  The security of that right is as much the aid of the right to counsel as it is of the other guarantees of the Sixth Amendment.

In summary, <u>Wade</u> held that pretrial lineups constitute a critical step in the prosecutive process such that every individual has a right to counsel at such proceedings.

AR 4-25
9/2/93

APPENDAGE XII

COMPLAINT VERIFICATION
FORM SP 1-108

A.   PURPOSE:  The Complaint Verification provides a complainant with the opportunity to directly lodge a complaint with the Department in writing and on an official form.  It also serves to formally involve a complainant as a party in our complaint process.

B.   POLICY:  The form shall be used to verify citizen complaints that have not already been articulated in writing and properly signed by the complainant.  The form may be used for other type complaints with the approval of the Director, Bureau of Professional Responsibility.

C.   PREPARATION:  The verification form will only be employed by an investigator assigned a BPR investigation or of the Bureau of Professional Responsibility.

   1.   Except as outlined in paragraph 2. below, the verification form shall be completed by the assigned investigator.  The allegations shall be recorded from the complaint worksheet or from the complainant's present account.  The form shall then be presented to the complainant for review and signing.  A copy of the completed form may be mailed to the complainant by the investigator upon request.  If travel distance or other circumstances preclude personal contact with a complainant, the investigator shall request that the verification form be sent by the Bureau of Professional Responsibility.

   2.   The form will be mailed by the Bureau of Professional Responsibility to the complainant under the following circumstances:

      a.   When the Director, Bureau of Professional Responsibility determines that an investigation would most likely not be conducted if the complainant failed to return a completed verification form.

      b.   At other times, with the approval of the Director, Bureau of Professional Responsibility.

AR 4-25
9/2/93

D.    BLOCK INSTRUCTIONS:

1.    NAME:  Self-explanatory.

2.    HOME ADDRESS:  Self-explanatory.

3.    REMARKS:  The complainant's allegations will be detailed under remarks.  When the form is completed by the investigator, the allegations may be recorded from the complaint worksheet or as related by the complainant.

4.    SIGNATURE:  Self-explanatory.

5.    DATE:  Self-explanatory.

SP 1-188 (6-93)



COMMONWEALTH OF PENNSYLVANIA
**PENNSYLVANIA STATE POLICE**
**COMPLAINT VERIFICATION**

AR 4-25
9/2/93

**BPR CONTROL NUMBER**

**COMPLAINANT INFORMATION**

| 1. NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|

| 2. HOME ADDRESS | STREET/P.O. BOX |
|---|---|
| | CITY |

| STATE | ZIP | HOME PHONE # ( ) | WORK PHONE # ( ) |
|---|---|---|---|

3.

**REMARKS:** PROVIDE A DETAILED NARRATIVE OF THE INCIDENT. IF THE COMPLAINT INVOLVES VERBAL ABUSE OR RUDENESS STATE THE SPECIFIC TERM, PHRASE, OR LANGUAGE CONSIDERED TO BE OFFENSIVE. IF THE COMPLAINT CONCERNS DISSATISFACTION WITH AN INVESTIGATION OR OTHER POLICE SERVICE, EXPLAIN WHAT ACTION OR OMISSION WAS UNACCEPTABLE. IF ADDITIONAL SPACE IS NEEDED USE THE REVERSE SIDE.

I AFFIRM THAT THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION OR BELIEF.

| 4. SIGNATURE | 5. DATE |
|---|---|

XII-3

AR 4-25
9/2/93

APPENDAGE XIII

Dear:

The preliminary personnel complaint you filed with the Pennsylvania State Police has been referred to the Bureau of Professional Responsibility for processing. To initiate an investigation, you must complete and return the enclosed Complaint Verification Form within thirty (30) days. Failure to return the completed verification form signed and within thirty (30) days will result in the termination of your complaint.

When completing Block 3, "Remarks," consider the following issues: Where did the incident occur? Give a location to the best of your knowledge and ability. When did the incident take place? Note the date, day of week and time, if possible. Who was present when the incident happened? List names, addresses and telephone numbers, if known. What are the details of the incident? Begin with your initial contact and give a detailed account of the events surrounding your complaint. If the allegation is verbal abuse or rudeness, please state the specific term, phrase or language that you considered offensive. An allegation such as "poor attitude" is not definite enough to permit a determination as to any wrongdoing having occurred. Complaints that indicate displeasure with service rendered by State Police personnel should also indicate a specific instance or instances of lack of action or unacceptable action. Merely disagreeing with the result of an action taken is not basis for a complaint.

Please be aware that your complaint will have no impact on cases before a court of law. If an arrest is at issue, proper redress is found through the judicial system and should be pursued there.

Upon our receipt of the completed verification form, you will be notified of the action to follow.

Any questions you may have concerning your complaint should be directed to the Bureau of Professional Responsibility, at (717) 783-5145.

Very truly yours,

Director
Bureau of Professional Responsibility

XIII-1

$\mathcal{B}$

Pennsylvania State Police Field Regulation
FR 1-1.17 (Reporting of Information)

FR 1-1
9/20/2000

B.      Vote as they choose.

C.      Express their opinion on any political subject or candidate, privately.

D.      Maintain political neutrality.

E.      Attend political meetings as private citizens.

1.14      USE OF OUTSIDE INFLUENCE

Members shall not knowingly use, attempt to use, or permit the use of any outside influence to gain promotion, transfer, or change of duty for themselves or other members.

1.15      HOLDING OFFICE IN LIQUOR ESTABLISHMENT

Members shall not own, hold office in, or be employed by an organization or establishment which dispenses alcoholic beverages.

1.16      REQUIRED RESIDENCY

Members shall reside within the limits of the Commonwealth and shall maintain a telephone in such residence.  Any change of address or telephone number shall be reported in accordance with AR 4-2.

1.17      REPORTING OF INFORMATION

A.      Members shall report to their supervisor all information that comes to their attention concerning organized crime, racketeering, vice conditions or violations of any laws concerning such activities.

B.      Members shall promptly report to their supervisor any information which comes to their attention and which tends to indicate that any other member or employe has violated any law, rule, regulation or order.

-7-

Pennsylvania State Police Field Regulation
FR 1-1.28 (Internal Investigations)

1.27    **PAYMENT OF DEBTS**

A.    Members shall promptly pay their just debts.  They shall not assign their salary or contract for any debts or liabilities which they are unable or unwilling to pay.  They must discharge honorably and promptly all claims or judgements and satisfy all executions which may be held against them within a reasonable amount of time.

B.    Members who file bankruptcy petitions or receive notice that a financial judgement and/or creditor claim has been filed against them shall submit correspondence, through channels, to their Commander, or Director.  The correspondence shall set forth the circumstances of the bankruptcy petition, or an accounting of how the judgement/claim will be satisfied or the grounds for contesting the judgement/claim.  The Commander or Director shall forward the correspondence, through channels, to the Director, Bureau of Personnel.  After appropriate review, the correspondence shall be filed in the member's official personnel folder.

1.28    **INTERNAL INVESTIGATIONS**

Whenever there is public criticism of the Department or when complaints are received in connection with any police action; investigation or inquiry indicating misconduct of personnel; harassment or intimidation of subjects, individuals, or groups; or dereliction of any nature by the Department or members of the Department; all members engaged in such police action; investigation; hearing or other inquiry; shall prepare written statements, at once, setting forth the facts in order that a record will be available for future reference.  Due to the internal administrative nature of such police action, investigation, hearing or other inquiry, all members are required to truthfully and completely answer all questions relating thereto.   Procedures in cases that will result in criminal prosecution will include those rights accorded to all citizens of the Commonwealth.

1.29    **CARRYING OF WEAPONS AND AMMUNITION**

A.    Members/███████████████, while on duty and in uniform, shall   carry   the   issued   ████   and   ammunition. Members/███████████████ may also carry one authorized personal handgun and ammunition.  The personal handgun and

Pennsylvania State Police Field Regulation
FR 3-2.04 (General Transfers)
and FR 3-2.05 (Temporary Intratroop Transfers)

FR 3-2
4/16/96

5.  Bureau Director whenever the requested transfer is between Divisions of that Bureau.

6.  Deputy Commissioner of Staff, Administration and/or Operations, whenever the transfer is from an organizational segment under one's authority to a segment under the other's authority. In such cases, the sending authority shall make a recommendation and the receiving authority shall make the final decision.

F.  Monthly Report: Troop Commanders/Bureau Directors shall submit a monthly supplemental investigation, through channels, under confidential cover, to the approving authority, concerning every member so assigned from another Troop or Bureau. The supplemental investigation shall indicate the status of the individual concerned in regards to the emergency or hardship, and a recommendation to continue/discontinue the emergency or hardship transfer. A copy shall be provided to the involved member's regular Troop or Bureau.

2.04    GENERAL TRANSFERS

A.  Applicability: Any member may be transferred anywhere within the Department whenever it is determined that such transfer(s) is necessary to:

1.  Fulfill the requirement(s) for additional services.

2.  Fulfill the need(s) for specific or specialized skills.

3.  Accomplish any other need(s) of the Department.

B.  Procedures: All general transfers require one of the following approvals, dependent upon the nature of the transfer:

1.  Intratroop: General transfers within Troops may be made at the discretion of the Troop Commander, consistent with the provisions of existing labor agreements in effect and with the approval of the Area Commander. The exception is for newly-graduated Troopers during their Coach-Trainee period, in which case no such approval is required.

-8-

FR 3-2
4/16/96

a. A draft of all proposed general transfers shall be submitted, under confidential cover, to the Area Commander at least 15 days prior to the proposed effective date. The 15-day requirement may be waived by the Area Commander when the transfer is to fill a vacancy which is a result of a promotion, intertroop transfer or separation. The draft shall be in triplicate, indicating the reason(s) for the transfer(s) and the likelihood of incurring moving expenses. The Area Commander shall, within five days of receipt of the proposed transfers, approve/disapprove the proposal as authorized and return same to the Troop Commander.

b. Upon receipt of an approved general transfer, the Troop Commander shall submit to the Director, Bureau of Personnel, the required number of copies needed for inclusion in the member's Official Personnel File.

2. Intertroop: General transfers between Troops shall be made by the Commissioner. The Director, Bureau of Personnel, shall submit, as the needs of the Department require, a draft of proposed intertroop transfers to the Commissioner for approval. The Commissioner, after evaluating the proposal, shall make whatever order deemed necessary and forward the action to the Director, Bureau of Personnel, for implementation.

3. Administrative: General transfers between organizational segments within a Bureau may be made at the discretion of the Bureau Director, except that transfers between training installations within the Bureau of Training and Education; laboratory facilities within the Bureau of Laboratory and Communications Services; Aviation Patrol Units within the Bureau of Emergency and Special Operations; or the District Enforcement Offices within the Bureau of Liquor Control Enforcement; require the approval of the Commissioner. Transfers between Bureaus, Area Commands or an Area Command and a Bureau, require approval of the Commissioner. The following procedure shall be followed:

-9-

FR 3-2
4/16/96

      a.    Transfers directed by a Bureau Director shall be reported to the Director, Bureau of Personnel, on a Bureau Personnel Order.

      b.    The Director, Bureau of Personnel, shall submit, as the needs of the Department require, a draft of other proposed administrative transfers to the Commissioner for approval. The Commissioner after evaluating the proposal shall make whatever order necessary and forward action to the Director, Bureau of Personnel, for implementation.

2.05      **TEMPORARY INTRATROOP TRANSFERS**

A.    Applicability: A temporary intratroop transfer may be made to fulfill a special need of the Department. Verbal approval for such transfers may be obtained in extreme cases; however, written justification shall be furnished, through channels, to the Area Commander for approval as soon as possible.

      1.    Temporary transfers shall not exceed 30 days unless a longer period is authorized by the Area Commander. Requests for an extension of an additional 30-day period must include justification, and be approved by the Area Commander prior to the beginning of any extension.

      2.    All temporary transfers shall be covered by a Troop Personnel Order and must be specifically identified as temporary.

B.    Coach-Trainee Period: Newly-graduated Troopers may be assigned to another Station prior to assignment to their regular Station as part of their training and familiarization of the Troop area; however, Troop Commanders shall endeavor to allow newly-graduated Troopers to receive their Coach-Trainee training at their regularly-assigned Station.

      1.    Troop Commanders shall advise all newly-graduated Troopers of their proposed regular Station at least 10 days prior to the effective date of the assignment.

-10-

FR 3-2
4/16/96

2.      Changes of assignment during this training period may be
        made by the Troop Commander without prior approval.

3.      A Troop Personnel Order(s) shall be prepared covering
        the assignment(s) made.

2.06        EXPENSES

Transfers effected at the request of members will be made without
expense to the Commonwealth. Expenses incurred as a result of other
transfers will be paid in accordance with Department directives.

-11-

Pennsylvania State Police Field Regulations
FR 3-3.04 (Authority) and FR 3.305 (Responsibility)

FR 3-3
3/3/99

of Training and Education, and approved by the Commissioner.

    2.    A Cadet may be dismissed from the Department by the Deputy Commissioner of Administration as authorized by the Commissioner, upon recommendation of the Director, Bureau of Training and Education, for violations of any Department or Academy rules and regulations, or for failure to meet the physical, academic, or attitudinal standards set for Cadets.

**B.**    <u>Probationary Troopers</u>: A probationary Trooper shall be given all the rights contained in this regulation, except that they may be dismissed, at the discretion of the Commissioner, for proper cause.

## 3.04    AUTHORITY

The Commissioner has the ultimate responsibility for the conduct and discipline of members and therefore has the authority to discipline members pursuant to the provisions of this regulation.

## 3.05    RESPONSIBILITY

**A.**    <u>General</u>: Members accused of actions that are contrary to statutory requirements or Department rules and regulations pertaining to conduct or performance shall be treated justly, fairly, and timely. Allegations of violations must be documented or otherwise capable of being shown to have been based on reasonable belief. Investigations of such allegations shall be conducted in strict accordance with existing policy governing internal investigations and contractual obligations. Subject to the exercise of legal rights, members shall cooperate in all investigations of their conduct and answer all questions pertaining to their position as a Pennsylvania State Police Officer, completely, truthfully, and to the best of their ability. Disciplinary action based on arbitrariness, supposition, unfounded or unsubstantiated complaints, personal bias, or prejudice shall not be imposed. Commanders and Directors shall exercise their responsibility in processing disciplinary action cases promptly and unhesitatingly without favor or prejudice.

-3-

FR 3-3
3/3/99

B.    Commanders, Directors, and Supervisors:    Commanders,
Directors, and supervisors are responsible for the conduct and
performance of members of their immediate command. They are
charged with the responsibility and authority to initiate
investigations relating to allegations of violations of statutes,
rules, and regulations which are committed by members of their
command.  Commanders and Directors are responsible and
expected to take appropriate disciplinary action in accordance
with existing policy.

1.    Supervisors are expected to closely monitor and actively
supervise the conduct and performance of subordinates.
Supervisors are accountable for the proper processing of
complaints involving alleged violations of statutes, as well
as violations of conduct or performance, regardless of how
they are brought to the supervisor's attention.

2.    Commanders and Directors shall not discipline or attempt
to discipline a member not of their command. This does
not prevent supervisors or Commanders and Directors
from taking immediate corrective action for improper
conduct or performance.  Any such misconduct or
impropriety should thereafter be reported as soon as
practicable, directly to the individual's Commanding Officer
or Bureau Director along with the appropriate or necessary
correspondence.

3.06    DISCIPLINARY OFFICER

A.    Authority: The Commissioner shall appoint a Commissioned
Officer to perform the functions of Disciplinary Officer.  The
Disciplinary Officer has the authority to take any necessary action
consistent with the purpose of this regulation.

B.    Duties: The primary duties of the Disciplinary Officer shall be to:

1.    Coordinate, evaluate, and process all Disciplinary Action
Reports (DARs) submitted. Evaluation, as used in this
context, shall include the careful examination of all
applicable reports to ensure that reasonably adequate
facts are contained therein which substantiate and justify
any intended disciplinary action.

-4-

CAPTAIN DARRELL OBER       *    IN THE
C/O: PENNSYLVANIA STATE POLICE
DEPARTMENT HEADQUARTERS     *    COMMONWEALTH COURT
1800 ELMERTON AVENUE
HARRISBURG, PENNSYLVANIA 17109    *      OF

           Petitioner,          *    PENNSYLVANIA

    vs.                     *    Case No. _____

COLONEL PAUL EVANKO          *
SUPERINTENDENT, PENNSYLVANIA
STATE POLICE                 *
DEPARTMENT HEADQUARTERS
1800 ELMERTON AVENUE         *
HARRISBURG, PENNSYLVANIA 17109
                           *

and                              *

PENNSYLVANIA STATE POLICE      *
      a/k/a: Commonwealth of Pennsylvania
DEPARTMENT HEADQUARTERS
1800 ELMERTON AVENUE         *
HARRISBURG, PENNSYLVANIA 17109
                           *

SERVE:                   *
         Barbara L. Christie, Esq.
         Office of Chief Counsel       *
         Pennsylvania State Police
         Department Headquarters    *
         1800 Elmerton Avenue
         Harrisburg Pennsylvania 17109   *

            Respondents.         *
*    *    *    *    *    *    *    *    *    *    *    **

## PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Petitioner, Captain Darrell Ober (Captain Ober), by and through his attorneys, John Miller,

Esq., Byron L. Warnken, Esq., James A. Lanier, Esq., and the Law Offices of Bonnie L. Warnken,

pursuant to Pa. Rule 1531, brings this Petitioner's Motion for Preliminary Injunction against Colonel

Paul Evanko, Superintendent, Pennsylvania State Police (Colonel Evanko), and the Pennsylvania State Police, a/k/a the Commonwealth of Pennsylvania (PSP) (collectively, the Respondents).

Captain Ober seeks to prohibit and enjoin the Respondents from instituting a punitive transfer against Captain Ober. Such a punitive transfer violates the law and Captain Ober's rights. Captain Ober has a clear right to immediate relief because, without immediate relief, he will suffer irreparable harm. Captain Ober is entitled to a preliminary injunction against the Respondents. Chambliss v. City of Philadelphia, 112 Pa. Cmwlth. 290, 525 A.2d 291 (1987).

Effective January 29, 2000, Captain Ober has been ordered to report to Area III, Troop B - Washington, for an unknown length of time, to an unspecified position. Captain Ober's transfer is punitive in nature. The PSP administrative regulations prohibit the agency from imposing a punitive transfer on a non-probationary law enforcement officer unless, and until, the officer has been found administratively guilty, following the procedural protections mandated in the PSP Field Regulations Manual. The Respondents have violated his administrative rights by unilaterally imposing a punitive transfer upon Captain Ober, scheduled to take effect on January 29, 2000, entailing a weekly commute of nearly 32 hours of commuting time. This punitive transfer violates (1) PSP Field Regulation sections 3-2 (2.04) and 3-3 (3.05), (2) the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, (3) the Pennsylvania "Whistleblower" Act, (4) the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and (5) the Pennsylvania Constitution. This punitive transfer has been ordered to be imposed upon Captain Ober, even though he was never charged with, much less found guilty of, any administrative disciplinary violation.

Accordingly, Captain Ober respectfully requests this Court to (1) issue a preliminary

injunction, pursuant to Pa. Rule 1531, pending a hearing on the merits of his mandamus proceeding, compelling the Respondents to show cause, if they have any, by a date certain, why the rights guaranteed in the PSP Field Regulations Manual, the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, the Pennsylvania "Whistleblower" Act, the Due Process Clause of the Fourteenth Amendment, and the Pennsylvania Constitution should not be afforded to Captain Ober; (2) sign an order, prohibiting the Respondents from imposing the punitive transfer, pending a hearing on the merits of his mandamus proceeding; (3) order the Respondents from taking any retaliatory action against Captain Ober in response to his lawful exercise of his constitutional and statutory rights and privileges.

## PARTIES

1.   Respondent Colonel Evanko is the Commissioner of the PSP.

2.   Respondent PSP is the chief law enforcement agency for the Commonwealth of Pennsylvania.

3.   Captain Ober is a non-probationary, 18 ½-year veteran law enforcement officer of the PSP.

## FACTUAL ALLEGATIONS

4.   On May 2, 1998, Captain Ober was assigned as the Director of the Internal Affairs Division of the PSP's Bureau of Professional Responsibility (BPR).  As Director of the Internal Affairs Division, Captain Ober's chief duty was to manage and oversee the investigation of all complaints filed against sworn and civilian PSP employees.

5.   Captain Ober directly managed three separate internal affairs sections.  Each internal affairs section consisted of a Lieutenant, three or four investigators, and administrative staff.

6.    In late September or early October 1998, Captain Ober was contacted by Federal Bureau of Investigation Special Agent Ralph W. Kush (SA Kush).

7.    SA Kush advised Captain Ober that the Pittsburgh Office of the FBI was investigating political corruption in Western Pennsylvania.

8.    Specifically, SA Kush advised Captain Ober that the FBI had information alleging corruption in the PSP Cadet hiring process.  The alleged corruption of the Cadet program took the form of cash payments to political figures and/or to sworn PSP officers in return for individuals who placed low on the Cadet qualification list to be given a higher ranking.

9.    Because the political corruption investigation was ongoing, neither SA Kush nor Captain Ober had any inclination as to how high the political corruption went within the PSP, possibly up to or including Colonel Evanko.

10.    SA Kush requested that Captain Ober keep knowledge of the investigation confidential.  Captain Ober elected to inform Lieutenant Colonel Robert C. Hickes (Lt. Colonel Hickes).  Captain Ober informed the FBI that Lt. Col. Hickes was made aware of the investigation.

11.    Thus, in light of the seriousness of the investigation, in early October 1998, Captain Ober informed Lt. Colonel Hickes of the FBI's investigation.

12.    Captain Ober chose to inform Lt. Colonel Hickes because Lt. Colonel Hickes: (1) was superior in command; (2) had been recently promoted to the rank of Lieutenant Colonel, and (3) while at the rank of Major, had been assigned to a PSP position outside the scope of the FBI's investigation and thus was not a subject of the corruption investigation.

13.    Lt. Colonel Hickes ordered Captain Ober to: (1) maintain the FBI's request for confidentiality, including not advising Colonel Evanko; (2) cooperate with SA Kush during the FBI's

4

investigation; and (3) keep him (Lt. Colonel Hickes) informed as to the status of the FBI's investigation.

14.    On October 21, 1998, Captain Ober met with SA Kush and Special Agent Michael J. Soohy (SA Soohy) at PSP Troop T - Everett. At this meeting, SA Kush played an audiotape from a body wire confirming that the FBI had targets who were conspiring to corrupt the Cadet hiring process through cash payoffs.

15.    After that meeting, Captain Ober provided Lt. Colonel Hickes with a status report of what transpired during this meeting.

16.    Over the next few months, SA Kush contacted Captain Ober sporadically to provide updates. When appropriate, Captain Ober advised Lt. Colonel Hickes as to the investigation's status.

17.    On March 15, 1999, SA Kush and SA Soohy met with Captain Ober. At this meeting, SA Kush played a videotape of a cash payoff being received by a sworn PSP officer. After this meeting, Captain Ober advised Lt. Colonel Hickes of what transpired at the meeting and on the videotape.

18.    On April 26, 1999, Captain Ober was temporarily detached from the Internal Affairs Division to the Bureau of Technology Services at the request of Colonel Evanko. In his new assignment, Captain Ober was assigned as the lead officer on a multi-million dollar PSP system integration procurement project. Captain Ober continued to be the FBI's contact person, even though he was no longer part of the Internal Affairs Division.

19.    On May 1, 1999, SA Kush advised Captain Ober that the political corruption portion of the FBI's investigation involving the PSP was completed. The FBI did not find agency-wide corruption within the PSP. Ultimately, the FBI had determined that the PSP corruption did not go

5

"to the top," but rather involved only one low ranking sworn officer.

20.     During the week of May 3, 1999, Captain Ober informed Lt. Colonel Hickes of the FBI's conclusions.  Lt. Colonel Hickes indicated that he would arrange a briefing of Colonel Evanko.

21.     On May 12, 1999, Captain Ober and Lt. Colonel Hickes briefed Colonel Evanko on the FBI's investigation.  Immediately, Colonel Evanko became enraged because the FBI did not inform him directly.  Colonel Evanko threatened to have the FBI agents transferred from the FBI's Pittsburgh Field Office for not informing him about the investigation.  Colonel Evanko then demanded that Captain Ober prepare a memorandum detailing his and Lt. Colonel Hickes's involvement in, and knowledge of, the FBI's investigation.

22.     Captain Ober provided a two-page memorandum for Colonel Evanko detailing his and Lt. Colonel's involvement in, and knowledge of, the FBI's investigation.

23.     Colonel Evanko should have been delighted and/or relieved to learn that what could have been corruption of the PSP's Cadet program was merely the illegal conduct of one low ranking sworn officer.  Colonel Evanko should likewise have been proud of the professionalism and integrity of Captain Ober, who, in the face of an FBI investigation which the FBI feared could possibly go "all the way to the top," maintained the requisite confidentiality, integrity, and attention to detail, all of which only added to the speed with which the PSP were cleared.  Instead, Colonel Evanko took great offense that Captain Ober failed to violate the FBI's request/order of confidentiality and failed to inform him about the FBI's investigation from the onset, notwithstanding and/or because he (Colonel Evanko) was a potential target.

24.     On June 28, 1999, Captain Ober was contacted by Major Thomas Williams and Major Robert Wertz.  Major Williams and Major Wertz informed Captain Ober that, by order of

6

Colonel Evanko, they had been ordered to conduct an "administrative inquiry" into Captain Ober's

actions in regard to the FBI investigation.

25.    Majors Williams and Wertz advised Captain Ober that: (1) no allegation of

misconduct existed; (2) they had uncovered no evidence of any misconduct; (3) no Internal Affairs

Control Number had been assigned to this "inquiry," as required by the Internal Affairs Division; and

(4) no Use of Force or Complaint Reception and Processing Worksheet existed, as required by the

Internal Affair Division.

26.    Majors Williams and Wertz further advised Captain Ober that Colonel Evanko would

review their findings to determine if a formal disciplinary investigation of the Internal Affair

Division was warranted.

27.    Majors Williams and Wertz then interrogated Captain Ober as to his involvement in

the FBI's investigation.  This interrogation was tape-recorded.

28.    Thus, Captain Ober was subjected to a secret administrative discipline investigation,

conducted under the authority of Colonel Evanko.  This "star chamber" inquiry was in violation of

(1) the rules and regulations of the PSP, as established in the Field Regulations Manual, (2) Captain

Ober's rights under Article 26 of the Pennsylvania State Police Troopers Association Collective

Bargaining Agreement, (3) the Pennsylvania "Whistleblower" Act, (4) Captain Ober's Fourteenth

Amendment right to Due Process, and (5) the Pennsylvania Constitution.

29.    Captain Ober was never informed as to the findings of Major Williams and Major

Wertz's "administrative inquiry."  Captain Ober was also never informed as to Colonel Evanko's

final determination after reviewing the "administration inquiry" report.  Finally, Colonel Evanko

denied Captain Ober's reimbursement requests for administrative costs incurred as part of the FBI's

investigation.

30.    On August 23, 1999, Major Hawthorne Conley (Major Conley) rescinded Captain Ober's use of agency property that had been issued to Captain Ober. Captain Ober was also stripped of agency responsibilities, by order of Colonel Evanko.

31.    On August 24, 1999, Major Lyle H. Szupinka, Commander of Area III, approached Captain Ober and confronted him about his handling of the FBI investigation.

32.    On November 8, 1999, Captain Ober filed PSP Grievance #164. Captain Ober grieved: (1) how the Majors "administrative inquiry" was handled in violation of the PSP Field Regulations Manual and the Collective Bargaining Agreement between the Commonwealth and the Pennsylvania State Troopers Association; and (2) the denial of administrative costs incurred as part of the FBI's investigation.

33.    On December 9, 1999, Captain Ober learned that Major Conley, Chief of the Bureau of Professional Responsibility, and Captain Ober's direct superior while Commander of the Internal Affairs Division, admitted that Colonel Evanko had a "secret file" on Captain Ober.

34.    On December 22, 1999, Captain Ober filed Grievance #167. Captain Ober grieved additional administrative costs that Captain Ober was not reimbursed for by the PSP.

35.    On January 10, 2000, at approximately 4:00 p.m., Captain Ober was contacted by Major Conley by telephone. Major Conley informed Captain Ober that he was being transferred from the Bureau of Technology Services back to Internal Affairs Division on January 24, 2000. Then, Captain Ober was being assigned to Area III, Troop B - Washington on January 29, 2000. Therefore, Captain Ober's re-assignment to the Internal Affairs Division would last five days. Captain Ober did not request either transfer, nor was he consulted prior to any final decision to

8

implement this involuntary transfer.

36.     Major Conley further advised Captain Ober that his assignment in Area III, Troop B
- Washington was for an unknown assignment for an unspecified length of time.

37.     After receiving his inexact and nebulous orders, Captain Ober contacted Major
Szupinka, Commander of Area III, and the individual who confronted Captain Ober about his
handling of the FBI investigation in August 1999. Major Szupinka informed Captain Ober that: (1)
he (Major Szupinka) was contacted the prior week by "the front office" and told that "they" were
assigning Captain Ober to his as "an Area III Assistant;" (2) that he did not request Captain Ober's
reassignment to Area III; (3) that he did not request any assistance or reassignment of any personnel;
(4) that he had no idea what Captain Ober's job description or assignment would be while stationed
at Area III; and (5) that he had no idea how long Captain Ober's assignment would last.

38.     The "position" to which Captain Ober is being assigned in Area III did not exist prior
to his assignment. This "position" is a newly-created -- never previously existing -- "position,"
which was created just for Captain Ober by Colonel Evanko.

39.     To add to the punitive nature of the transfer, Captain Ober currently resides in Enola,
Pennsylvania. He has been transferred to a "made-up" position in Washington, Pennsylvania, with
a daily commute in excess of six-and-a-half hours (420 miles round trip). As a consequence of
Captain Ober's punitive transfer, an 18 ½-year veteran Captain of the PSP with an exemplary service
record, with a spouse and three children, who has lived in Enola, Pennsylvania for many years, has
been reassigned with only several days' notice, to a permanent duty station entailing nearly 32 hours
a week in commuting time alone. Furthermore, the Personnel Order signed by Colonel Evanko does
not specify the duration of the transfer. Therefore, this transfer is considered "permanent." F.R.

Manual 3-2(2.01)(E).

40.    Thus, almost eight months after the Colonel Evanko learned of the FBI's investigation, four months after the low ranking PSP member was arrested, and after the negative publicity of the political corruption scandal died down, the PSP transferred Captain Ober back to the Internal Affairs Division, only to be retransferred five days later, halfway across the Commonwealth of Pennsylvania. This "transfer-upon-transfer" is to a newly-created position, created just for Captain Ober. Prior to his transfer to Area III, Area III -- like all areas -- had an area Major, an area Captain, and lower-ranked commanders for each Troop station. No other region in the Commonwealth has multiple Captains assigned to an Area Headquarters staff. However, with the newly-created "Ober" slot, Area III -- and only Area III -- has an extra Captain, assigned at the Area level, to serve directly under the Major. One reason that such a slot never existed before is consistent with the explanation provided to Captain Ober, that, in fact, there is no need for a Captain to be assigned to the Area III staff.

41.    In Captain Ober's case, (1) the PSP Field Regulations Manual and the Collective Bargaining Agreement covering discipline of sworn officers became implicated both (a) when he was "administratively investigated" by Majors Williams and Wertz, and (b) when he was subjected to an interrogation (although either one of these events would suffice), and (2) the PSP violated the Field Regulations Manual and the Collective Bargaining Agreement when it (a) ordered him transferred him to a nearly 32-hour-per-week commute, and (b) did so to punish him, even though he had not violated any agency rules and regulations. Thus, once the Field Regulations Manual and the Collective Bargaining Agreement became implicated, the PSP could not punish Captain Ober unless and until he was properly charged, tried, and found guilty, under the Field Regulations

Manual and the Collective Bargaining Agreement, with violating one or more departmental rules and/or regulations. The PSP investigated and interrogated Captain Ober. However, the PSP never even charged or tried Captain Ober, much less found him guilty. Instead, the PSP unilaterally -- and in violation of Pennsylvania law -- imposed its punishment upon him because of Colonel Evanko's hurt pride and irrational temperament.

42.    The nature of Majors Williams and Wertz's "inquiry" and interrogation were in no way routine. Moreover, Majors Williams and Wertz's own words makes it quite apparent that the PSP was conducting an administrative discipline investigation.

## ARGUMENT

I.    **CAPTAIN OBER IS ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING THE RESPONDENTS ATTEMPT TO PUNITIVELY TRANSFER HIM.**

In order to receive a preliminary injunction, the movant must show (1) that the relief sought is necessary and immediate; (2) that the injunction will thwart an irreparable harm, (3) that, if harmed, the movant cannot be remedied by damages; (4) that greater injury will result by refusing the injunction than by granting it; (5) that the injunction will restore the parties to their status as existing prior to alleged wrongful conduct; and (6) that the injunction is reasonable suited to abate the activity. WPNT v. Secret Communications, Inc., 443 Pa. Super. 269, 661 A.2d 409 (1995).

### A.    Captain Ober's Need for Relief is Necessary and Immediate.

Effective January 29, 2000, Captain Ober will be assigned to travel to Area III, Troop B - Washington. This duty station is over a six hour, 420 mile round-trip commute from his current residence and duty station. The transfer in question is punitive in nature and in violation of PSP

11

regulations, the labor agreement between the Pennsylvania State Troopers Association and the Commonwealth, Pennsylvania "Whistleblower" Act, the Due Process Clause of the Fourteenth Amendment, and the Pennsylvania Constitution. Captain Ober will suffer immediate harm if he is forced to comply with this illegal transfer, therefore, the harm he will suffer is imminent.

> B.    **The Preliminary Injunction Will Subvert an Irreparable Harm.**

The imposition of the punitive transfer will cause Captain Ober irreparable harm. This harm will come, not only to Captain Ober, but to Captain Ober's spouse and three children. This illegal and retaliatory transfer will cause Captain Ober to sustain irreparable: (1) pain, suffering, and humiliation of being punished and ostracized, when he should have been awarded, (2) damage to his home life and harm to his wife and children, (3) damage to the strength of his custody order, as a consequence of his banishment, which separates him from his eldest child, from a prior marriage, who would for residing with his stepmother and not his father, and (4) damage in the form of demonstratable psychiatric harm, supportable by expert medical testimony, to his eldest child.

All of these harms, either singularly or taken as a whole, are irreparable harms that Captain Ober will sustain if he is not granted a preliminary injunction against his punitive transfer to Area III, Troop B - Washington.

> C.    **Captain Ober Cannot Be Remedied By Damages.**

The damages Captain Ober will sustain, while significant, are not actionable at law. If Captain Ober is forced to report to Area III, Troop B - Washington as part of his punitive transfer, only then will he be damaged. Therefore, Captain Ober's only alternative is to enjoin the action that will cause his damages.

No monetary damages will reinstate Captain Ober's reputation within the PSP, undo the

humiliation of the punitive transfer, or repair the personal and psychological damage that will be inflicted upon him and his family. Captain Ober's only remedy is to prohibit the action that will cause all of the harms that he will sustain if he is forced to report to the Area III assignment on January 29, 2000.

**D.** **·Captain Ober's Injuries Through the Enforcement of the Punitive Transfer are Greater than Whatever Injuries, if Any, The Respondents Will Sustain if Enjoined.**

Captain Ober's preliminary injunction seeks to maintain the status quo. If Captain Ober is transferred, the injuries will be immediate and severe. If enjoined, the damages to the Respondents, if any, will be minimal.

**E.** **A Preliminary Injunction is Reasonable Suited to Abate the Activity.**

Captain Ober's only action in equity to thwart the Respondent's illegal action is to enjoin the action sought. If the Respondents are allowed to continue with the punitive transfer, Captain Ober's damages will be immediate and permanent. The preliminary injunction enjoining the Respondents from implementing the punitive transfer is the only equitable remedy applicable to Captain Ober's situation. The preliminary injunction is the only remedy to abate the Respondent's illegal actions.

## SUMMARY

Captain Ober will suffer irreparable harm if the Respondents are not immediately enjoined from their action of transferring Captain Ober. Captain Ober seeks a clear right to immediate relief and thus, is entitled to a preliminary injunction enjoining the Respondents from punitively transferring him. Captain Ober's need for relief is necessary and immediate to thwart an irreparable harm. If the punitive transfer is allowed to proceed, Captain Ober will suffer significant injuries

13

that cannot be remedies through an award for damages. Captain Ober's injunction will maintain the status quo and is his only equitable remedy to avoid an illegal and retaliatory transfer.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner Captain Darrell Ober respectfully urges this Court to issue an Order as to each of the following prayers for relief, pursuant to Pa. Rule 1531:

(1)    Issue a preliminary injunction:

(a)    Enjoining the Respondents from punitively transferring Captain Ober from his current duty assignment at the Bureau of Technology Services to Area III, Troop B - Washington in violation of Captain Ober's rights as provided in the PSP Field Regulations, the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, the Pennsylvania "Whistleblower" Act, the Due Process Clause of the Fourteenth Amendment, and the Pennsylvania Constitution; and

(b)    Prohibiting the Respondents from taking any retaliatory action against Captain Ober in response to the lawful exercise of his constitutional and statutory rights and privilege; and

(2)    After a hearing on the merits of the show cause order, issue an order:

(a)    Prohibiting the Respondents from imposing the punitive transfer upon Captain Ober;

(b)    Reassigning Captain Ober to his previous position at the Bureau of Technology Services;

(c)    Prohibiting the Respondents from taking any retaliatory action against Captain Ober in response to his lawful exercise of his constitutional and statutory rights and

14

privilege;

      (d)     In the event that this Court finds that some portion of his various causes of action do afford damages, awarding to Captain Ober damages caused to Captain Ober as a consequence of the illegal action of the Respondents;

      (e)     Awarding to Captain Ober costs and attorney's fees; and

      (f)     Granting to Captain Ober such further relief as this Court deems appropriate.

Respectfully submitted,


John Miller, Esq.
7 West Main Street
Fawn Grove, Pennsylvania 17321
717-382-9543
Pa. Bar #50033


Byron L. Warnken, Esq.
James A. Lanier, Esq.
Law Offices of Bonnie L. Warnken
32 East Preston Street
Baltimore, Maryland 21202-2727
410-727-5951

Attorneys for Petitioner Captain Ober

January 26, 2000

15

| | | |
|---|---|---|
| CAPTAIN DARRELL OBER | * | IN THE COMMONWEALTH |
| Petitioner, | * | COURT OF |
| v. | * | PENNSYLVANIA |
| COLONEL PAUL EVANKO, et. al. | * | Case No. _____ |
| Respondents. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ORDER GRANTING PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION

Having reviewed Petitioner's Motion for Preliminary Injunction, and any Response filed by the Respondents, this Court hereby issues, this _____ day of January, 2000, an Injunction on behalf of Petitioner Captain Ober, as follows:

1.      The Respondents are ordered to appear on the _____ day of _____, 2000, at ____ __.m., to show cause, if they have any, why they should not be enjoined from violating the administrative, statutory, and Constitutional rights of Captain Ober, as provided in the PSP Field Regulations, the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, the Pennsylvania "Whistleblower" Act, as well as the Due Process Clause of the Fourteenth Amendment and the Pennsylvania Constitution, in particular, the punitive transfer of Captain Ober;

2.      The Respondents are ordered, pending a hearing on the merits of the accompanying request for mandamus, to refrain from implementing the punitive transfer of Captain Ober; and

3.      The Respondents are ordered, pending a hearing on the merits of the request for mandamus, to refrain from taking any retaliatory action against Captain Ober in response to his lawful exercise of his constitutional and statutory rights and privileges.

_____
Judge

| | | |
|---|---|---|
| CAPTAIN DARRELL OBER | * | IN THE |
| C/O: PENNSYLVANIA STATE POLICE | | |
| DEPARTMENT HEADQUARTERS | * | COMMONWEALTH COURT |
| 1800 ELMERTON AVENUE | | |
| HARRISBURG, PENNSYLVANIA 17109 | * | OF |
| | | |
| Petitioner, | * | PENNSYLVANIA |
| | | |
| vs. | * | Case No. _____ |
| | | |
| COLONEL PAUL EVANKO | * | |
| COMMISSIONER, PENNSYLVANIA | | |
| STATE POLICE | * | |
| DEPARTMENT HEADQUARTERS | | |
| 1800 ELMERTON AVENUE | * | |
| HARRISBURG, PENNSYLVANIA 17109 | | |
| | * | |
| and | | |
| | * | |
| PENNSYLVANIA STATE POLICE | | |
| a/k/a: Commonwealth of Pennsylvania | * | |
| DEPARTMENT HEADQUARTERS | | |
| 1800 ELMERTON AVENUE | * | |
| HARRISBURG, PENNSYLVANIA 17109 | | |
| | * | |
| SERVE: | | |
| Barbara L. Christie, Esq. | * | |
| Office of Chief Counsel | | |
| Pennsylvania State Police | * | |
| Department Headquarters | | |
| 1800 Elmerton Avenue | * | |
| Harrisburg Pennsylvania 17109 | | |
| | * | |
| Respondents. | | |

*    *    *    *    *    *    *    *    *    *    *    *    **

## PETITIONER'S PETITION FOR REVIEW FOR A WRIT OF MANDAMUS

## INTRODUCTION

Petitioner, Captain Darrell Ober (Captain Ober), by and through his attorneys, John Miller,

Esq., Byron L. Warnken, Esq., James A. Lanier, Esq., and the Law Offices of Bonnie L. Warnken,

pursuant to 42 Pa. C.S. § 761(c), and 43 Pa. C.S. § 1423, brings this Petition for Review for a Writ

of Mandamus against Colonel Paul Evanko, Commissioner, Pennsylvania State Police (Colonel Evanko), and the Pennsylvania State Police, a/k/a the Commonwealth of Pennsylvania (PSP) (collectively, the Respondents).

Captain Ober seeks to prohibit and enjoin the Respondents from instituting a punitive transfer against Captain Ober. Such a punitive transfer violates the law and Captain Ober's rights. Captain Ober has a clear legal right, and the Respondents have a clear legal duty. Therefore, Captain Ober is entitled to a Writ of Mandamus. Styers v. Wade, 372 Pa. Cmwlth 38, 372 A.2d 1236 (1977).

However, the same laws that provide Captain Ober with a viable legal cause of action fail to provide him with an adequate remedy at law. No law provides Captain Ober with compensation (1) for the pain, suffering, and humiliation of his being punished and ostracized, when he should have been rewarded, (2) for the harm to his wife and three young children, ages four, six, and twelve, (3) for the harm to the strength of his custody order, as a consequence of his banishment, which separates him from his eldest child, from a prior marriage, who would for residing with his stepmother and not his father, and (4) for the demonstrable psychiatric harm, supportable by expert medical testimony, to the child. Effective January 29, 2000, Captain Ober has been ordered to report to Area III, Troop B - Washington, which is approximately 210 miles from Captain Ober's residence, for an unknown length of time, to an unspecified position. Captain Ober's transfer is punitive in nature. The PSP administrative regulations prohibit the agency from imposing a punitive transfer on a non-probationary law enforcement officer unless, and until, the officer has been found administratively guilty, following the procedural protections mandated in the PSP Field Regulations Manual. The Respondents have violated his administrative rights by unilaterally imposing a punitive

transfer upon Captain Ober, scheduled to take effect on January 29, 2000, entailing a weekly commute of nearly 32 hours of commuting time (420 miles daily round trip). This punitive transfer violates (1) PSP Field Regulation sections 3-2 (2.04) and 3-3 (3.05), (2) the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, (3) the Pennsylvania "Whistleblower" Act, (4) the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and (5) the Pennsylvania Constitution. This punitive transfer has been ordered to be imposed upon Captain Ober, even though he was never charged with, much less found guilty of, any administrative disciplinary violation.

Accordingly, Captain Ober respectfully requests this Court to (1) sign an order, prohibiting the Respondents from imposing the punitive transfer, pending a hearing on the merits of his mandamus proceeding; (2) after a full hearing on the merits, issue a Writ of Mandamus in favor of Captain Ober permanently prohibiting the Respondents from punitively transferring Captain Ober; (3) order Captain Ober to be reassigned to his previous position at the Bureau of Technology Services; and (4) order the Respondents from taking any retaliatory action against Captain Ober in response to his lawful exercise of his constitutional and statutory rights and privileges.

## PARTIES

1.      Respondent Colonel Evanko is the Commissioner of the PSP.

2.      Respondent PSP is the chief law enforcement agency for the Commonwealth of Pennsylvania.

3.      Captain Ober is a non-probationary, 18 ½-year veteran law enforcement officer of the PSP.

## FACTUAL ALLEGATIONS

3

4.     On May 2, 1998, Captain Ober was assigned as the Director of the Internal Affairs Division of the PSP's Bureau of Professional Responsibility (BPR).  As Director of the Internal Affairs Division, Captain Ober's chief duty was to manage and oversee the investigation of all complaints filed against sworn and civilian PSP employees.

5.     Captain Ober directly managed three separate internal affairs sections.  Each internal affairs section consisted of a Lieutenant, three or four investigators, and administrative staff.

6.     In late September or early October 1998, Captain Ober was contacted by Federal Bureau of Investigation Special Agent Ralph W. Kush (SA Kush).

7.      SA Kush advised Captain Ober that the Pittsburgh Office of the FBI was investigating political corruption in Western Pennsylvania.

8.     Specifically, SA Kush advised Captain Ober that the FBI had information alleging corruption in the PSP Cadet hiring process.  The alleged corruption of the Cadet program took the form of cash payments to political figures and/or to sworn PSP officers in return for individuals who placed low on the Cadet qualification list to be given a higher ranking.

9.      Because the political corruption investigation was ongoing, neither SA Kush nor Captain Ober had any inclination as to how high the political corruption went within the PSP, possibly up to or including Colonel Evanko.

10.     SA Kush requested that Captain Ober keep knowledge of the investigation confidential.  Captain Ober elected to inform Lieutenant Colonel Robert C. Hickes (Lt. Colonel Hickes).  Captain Ober informed the FBI that Lt. Col. Hickes was made aware of the investigation.

11.     Thus, in light of the seriousness of the investigation, in early October 1998, Captain Ober informed Lt. Colonel Hickes of the FBI's investigation.

4

12.    Captain Ober chose to inform Lt. Colonel Hickes because Lt. Colonel Hickes: (1) was superior in command; (2) had been recently promoted to the rank of Lieutenant Colonel, and (3) while at the rank of Major, had been assigned to a PSP position outside the scope of the FBI's investigation and thus was not a subject of the corruption investigation.

13.    Lt. Colonel Hickes ordered Captain Ober to: (1) maintain the FBI's request for confidentiality, including not advising Colonel Evanko; (2) cooperate with SA Kush during the the FBI's investigation; and (3) keep him (Lt. Colonel Hickes) informed as to the status of the FBI's investigation.

14.    On October 21, 1998, Captain Ober met with SA Kush and Special Agent Michael J. Soohy (SA Soohy) at PSP Troop T - Everett.  At this meeting, SA Kush played an audiotape from a body wire confirming that the FBI had targets who were conspiring to corrupt the Cadet hiring process through cash payoffs.

15.    After that meeting, Captain Ober provided  Lt. Colonel Hickes with a status report of what transpired during this meeting.

16.    Over the next few months, SA Kush contacted Captain Ober sporadically to provide updates.  When appropriate, Captain Ober advised Lt. Colonel Hickes as to the investigation's status.

17.    On March 15, 1999, SA Kush and SA Soohy met with Captain Ober.  At this meeting, SA Kush played a videotape of a cash payoff being received by a sworn PSP officer.  After this meeting, Captain Ober advised Lt. Colonel Hickes of what transpired at the meeting and on the videotape.

18.    On April 26, 1999, Captain Ober was temporarily detached from the Internal Affairs Division to the Bureau of Technology Services at the request of Colonel Evanko.  In his new

5

assignment, Captain Ober was assigned as the lead officer on a multi-million dollar PSP system integration procurement project. Captain Ober continued to be the FBI's contact person, even though he was no longer part of the Internal Affairs Division.

19.    On May 1, 1999, SA Kush advised Captain Ober that the political corruption portion of the FBI's investigation involving the PSP was completed. The FBI did not find agency-wide corruption within the PSP. Ultimately, the FBI had determined that the PSP corruption did not go "to the top," but rather involved only one low ranking sworn officer.

20.    During the week of May 3, 1999, Captain Ober informed Lt. Colonel Hickes of the FBI's conclusions. Lt. Colonel Hickes indicated that he would arrange a briefing of Colonel Evanko.

21.    On May 12, 1999, Captain Ober and Lt. Colonel Hickes briefed Colonel Evanko on the FBI's investigation. Immediately, Colonel Evanko became enraged because the FBI did not inform him directly. Colonel Evanko threatened to have the FBI agents transferred from the FBI's Pittsburgh Field Office for not informing him about the investigation. Colonel Evanko then demanded that Captain Ober prepare a memorandum detailing his and Lt. Colonel Hickes's involvement in, and knowledge of, the FBI's investigation.

22.    Captain Ober provided a two-page memorandum for Colonel Evanko detailing his and Lt. Colonel's involvement in, and knowledge of, the FBI's investigation.

23.    Colonel Evanko should have been delighted and/or relieved to learn that what could have been corruption of the PSP's Cadet program was merely the illegal conduct of one low ranking sworn officer. Colonel Evanko should likewise have been proud of the professionalism and integrity of Captain Ober, who, in the face of an FBI investigation which the FBI feared could possibly go "all the way to the top," maintained the requisite confidentiality, integrity, and attention to detail, all

6

of which only added to the speed with which the PSP were cleared. Instead, Colonel Evanko took great offense that Captain Ober failed to violate the FBI's request/order of confidentiality and failed to inform him about the FBI's investigation from the onset, notwithstanding and/or because he (Colonel Evanko) was a potential target.

24.    On June 28, 1999, Captain Ober was contacted by Major Thomas Williams and Major Robert Wertz. Major Williams and Major Wertz informed Captain Ober that, by order of Colonel Evanko, they had been ordered to conduct an "administrative inquiry" into Captain Ober's actions in regard to the FBI investigation.

25.    Majors Williams and Wertz advised Captain Ober that: (1) no allegation of misconduct existed; (2) they had uncovered no evidence of any misconduct; (3) no Internal Affairs Control Number had been assigned to this "inquiry," as required by the Internal Affairs Division; and (4) no Use of Force or Complaint Reception and Processing Worksheet existed, as required by the Internal Affair Division.

26.    Majors Williams and Wertz further advised Captain Ober that Colonel Evanko would review their findings to determine if a formal disciplinary investigation of the Internal Affair Division was warranted.

27.    Majors Williams and Wertz then interrogated Captain Ober as to his involvement in the FBI's investigation. This interrogation was tape-recorded.

28.    Thus, Captain Ober was subjected to a secret administrative discipline investigation, conducted under the authority of Colonel Evanko. This "star chamber" inquiry was in violation of (1) the rules and regulations of the PSP, as established in the Field Regulations Manual, (2) Captain Ober's rights under Article 26 of the Pennsylvania State Police Troopers Association Collective

Bargaining Agreement, (3) the Pennsylvania "Whistleblower" Act, (4) Captain Ober's Fourteenth Amendment right to Due Process, and (5) the Pennsylvania Constitution.

29.    Captain Ober was never informed as to the findings of Major Williams and Major Wertz's "administrative inquiry." Captain Ober was also never informed as to Colonel Evanko's final determination after reviewing the "administration inquiry" report. Finally, Colonel Evanko denied Captain Ober's reimbursement requests for administrative costs incurred as part of the FBI's investigation.

30.    On August 23, 1999, Major Hawthorne Conley (Major Conley) rescinded Captain Ober's use of agency property that had been issued to Captain Ober. Captain Ober was also stripped of agency responsibilities, by order of Colonel Evanko.

31.    On August 24, 1999, Major Lyle H. Szupinka, Commander of Area III, approached Captain Ober and confronted him about his handling of the FBI investigation.

32.    On November 8, 1999, Captain Ober filed PSP Grievance #164. Captain Ober grieved: (1) how the Majors "administrative inquiry" was handled in violation of the PSP Field Regulations Manual and the Collective Bargaining Agreement between the Commonwealth and the Pennsylvania State Troopers Association; and (2) the denial of administrative costs incurred as part of the FBI's investigation.

33.    On December 9, 1999, Captain Ober learned that Major Conley, Chief of the Bureau of Professional Responsibility, and Captain Ober's direct superior while Commander of the Internal Affairs Division, admitted that Colonel Evanko had a "secret file" on Captain Ober.

34.    On December 22, 1999, Captain Ober filed Grievance #167. Captain Ober grieved additional administrative costs that Captain Ober was not reimbursed for by the PSP.

8

35.    On January 10, 2000, at approximately 4:00 p.m., Captain Ober was contacted by Major Conley by telephone. Major Conley informed Captain Ober that he was being transferred from the Bureau of Technology Services back to Internal Affairs Division on January 24, 2000. Then, Captain Ober was being assigned to Area III, Troop B - Washington on January 29, 2000. Therefore, Captain Ober's re-assignment to the Internal Affairs Division would last five days. Captain Ober did not request either transfer, nor was he consulted prior to any final decision to implement this involuntary transfer.

36.    Major Conley further advised Captain Ober that his assignment in Area III, Troop B - Washington was for an unknown assignment for an unspecified length of time.

37.    After receiving his inexact and nebulous orders, Captain Ober contacted Major Szupinka, Commander of Area III, and the individual who confronted Captain Ober about his handling of the FBI investigation in August 1999. Major Szupinka informed Captain Ober that: (1) he (Major Szupinka) was contacted the prior week by "the front office" and told that "they" were assigning Captain Ober to his as "an Area III Assistant;" (2) that he did not request Captain Ober's reassignment to Area III; (3) that he did not request any assistance or reassignment of any personnel; (4) that he had no idea what Captain Ober's job description or assignment would be while stationed at Area III; and (5) that he had no idea how long Captain Ober's assignment would last.

38.    The "position" to which Captain Ober is being assigned in Area III did not exist prior to his assignment. This "position" is a newly-created -- never previously existing -- "position," which was created just for Captain Ober by Colonel Evanko.

39.    To add to the punitive nature of the transfer, Captain Ober currently resides in Enola, Pennsylvania. He has been transferred to a "made-up" position in Washington, Pennsylvania, with

9

a daily commute in excess of six-and-a-half hours (420 miles round trip). As a consequence of Captain Ober's punitive transfer, an 18 ½-year veteran Captain of the PSP with an exemplary service record, with a spouse and three children, who has lived in Enola, Pennsylvania for many years, has been reassigned with only several days' notice, to a permanent duty station entailing nearly 32 hours a week in commuting time alone. Furthermore, the Personnel Order signed by Colonel Evanko does not specify the duration of the transfer. Therefore, this transfer is considered "permanent." F.R. Manual 3-2(2.01)(E).

40.    Thus, almost eight months after the Colonel Evanko learned of the FBI's investigation, four months after the low ranking PSP member was arrested, and after the negative publicity of the political corruption scandal died down, the PSP transferred Captain Ober back to the Internal Affairs Division, only to be retransferred five days later, halfway across the Commonwealth of Pennsylvania. This "transfer-upon-transfer" is to a newly-created position, created just for Captain Ober. Prior to his transfer to Area III, Area III -- like all areas -- had an area Major, an area Captain, and lower-ranked commanders for each Troop station. No other region in the Commonwealth has multiple Captains assigned to an Area Headquarters staff. However, with the newly-created "Ober" slot, Area III -- and only Area III -- has an extra Captain, assigned at the Area level, to serve directly under the Major. One reason that such a slot never existed before is consistent with the explanation provided to Captain Ober, that, in fact, there is no need for a Captain to be assigned to the Area III staff.

41.    In Captain Ober's case, (1) the PSP Field Regulations Manual and the Collective Bargaining Agreement covering discipline of sworn officers became implicated both (a) when he was "administratively investigated" by Majors Williams and Wertz, and (b) when he was subjected

10

to an interrogation (although either one of these events would suffice), and (2) the PSP violated the Field Regulations Manual and the Collective Bargaining Agreement when it (a) ordered him transferred him to a nearly 32-hour-per-week commute, and (b) did so to punish him, even though he had not violated any agency rules and regulations. Thus, once the Field Regulations Manual and the Collective Bargaining Agreement became implicated, the PSP could not punish Captain Ober unless and until he was properly charged, tried, and found guilty, under the Field Regulations Manual and the Collective Bargaining Agreement, with violating one or more departmental rules and/or regulations. The PSP investigated and interrogated Captain Ober. However, the PSP never even charged or tried Captain Ober, much less found him guilty. Instead, the PSP unilaterally -- and in violation of Pennsylvania law -- imposed its punishment upon him because of Colonel Evanko's hurt pride and irrational temperament.

42.     The nature of Majors Williams and Wertz's "inquiry" and interrogation were in no way routine. Moreover, Majors Williams and Wertz's own words makes it quite apparent that the PSP was conducting an administrative discipline investigation.

## ARGUMENT

### I.     CAPTAIN OBER'S TRANSFER IS PUNITIVE IN NATURE.

#### A.     Captain Ober's Transfer Violates the Procedural Requirements That the Field Regulations Manual Mandates Prior to the Implementation of an Involuntary Transfer.

The PSP, through the Field Regulations Manual (FR Manual), promulgated administrative rules and regulations controlling how the PSP functions. The policy and procedures involving involuntary transfer of sworn officers is set forth in FR Manual 3-2. FR Manual, 3-2(2.01)(A)

11

provides that "transfers within the Department are governed by the policies and procedures established in this regulation, or by any other action of the Commissioner."

### 1.     "General Transfers"

A sworn officer may be subject to a "general transfer" anywhere within the PSP whenever "it is determined that such transfer(s) is necessary to: (1) fulfil the requirement(s) for additional services; (2) fulfil the need(s) for specific or specialized skills; [or] (3) accomplish any other needs of the Department." FR Manual, 3-2(2.04)(A). Furthermore, general transfers between Bureaus and Area Commands, like Captain Ober's proposed punitive transfer, "shall be reported to the Director, Bureau of Personnel, on a Bureau Personnel Order." FR Manual, 3-2(2.04)(B)(3)(a). Then, the Director, Bureau of Personnel, shall submit, **as the needs of the Department require**, a draft of other proposed administrative transfers to the Commissioner for approval." FR Manual, 3-2(2.04)(B)(3)(b) (emphasis added).

The FR Manual requires that, prior to a transfer between Bureaus and Area Commands, the Bureau requesting personnel must make an official request to the Bureau of Personnel. Then, after evaluation by the Bureau of Personnel, the request will be submitted "as the needs of the Department require" to Colonel Evanko. Id. Captain Ober's transfer from the Bureau of Technology Services to the Internal Affairs Division to Area III is not in conformity with these regulations. This is revealed through Captain Ober's discussions with both Major Conley and Major Szupinka.

When Captain Ober asked Major Conley to clarify his new assignment, Major Conley could not provide any information as to the length of the assignment or the actual job description of what Captain Ober would be doing in Area III. Violation of the general transfer regulations became patently obvious when Captain Ober spoke to Major Szupinka. Major Szupinka informed Captain

12

Ober that he did not request for any personnel to be transferred to Area III, either Captain Ober, or any personnel. Furthermore, Major Szupinka has no idea what Captain Ober will be doing when he reports to Area III, nor does Major Szupinka know how long Captain Ober's Area III assignment will last.

Major Szupinka did not request Captain Ober or any personnel. Therefore, there is no need for any "additional services" in Area III. FR Manual, 3-2(2.04)(A)(1). Furthermore, because Captain Ober was not specifically requested by Major Szupinka (or any personnel who have Captain Ober's expertise), none of Captain Ober's "specific or specialized skills" are required in Area III. FR Manual, 3-2(2.04)(A)(2). Moreover, because neither Major Conley nor, more importantly, Major Szupinka has any idea what Captain Ober's job functions will be, Captain Ober's transfer cannot "accomplish any other need(s) within the Department" because there are no needs in Area III. FR Manual, 3-2(2.04)(A)(3).

Additionally, because Major Szupinka did not request any personnel, the triggering request mandated in FR Manual, 3-2(2.04)(B)(3)(b) did not happen. Therefore, Colonel Evanko had no cause to transfer Captain Ober (or anyone else) to Area III because Area III, through Major Szupinka, made no request to the Bureau of Personnel for any additional personnel. Because none of the general transfer requirements of the FR Manual has been met, Captain Ober's transfer cannot have been made "for the good of the Department."

## 2. "Any Other Action of the Commissioner"

Captain Ober does not contest that under the "any other action of the Commissioner" provision of the FR Manual, Colonel Evanko has vast discretion to institute transfers. Rossi v. Commonwealth, Pennsylvania State Police, 100 Pa. Cmwlth. 639, 515 A.2d 120 (1986). However,

this vast discretion "is not unlimited." Id. at 643-44. Furthermore, specifically tailored regulations must take precedence over general provisions. Morabito's Auto Sales v. Commonwealth, 552 Pa. 291, 715 A.2d 384 (1998); 1 Pa. C.S. § 1933. Therefore, although Colonel Evanko has the general power to transfer, as part of his discretion, he may not transfer in violation of any specific regulation that controls, especially when the transfer is an attempt to circumvent the well-established PSP discipline system.

There are specific regulations and procedures that cover transfers between Bureaus and Area Commands. FR Manual, 3-2(2.04)(B)(3)(b). Therefore, Colonel Evanko's general discretionary powers to transfer must give way to the specific requirements of the FR Manual. Morabito's, 552 Pa. 291; 1 Pa. C.S. § 1933. Colonel Evanko violated the specific regulations concerning transfers between Bureaus and Area Commands by not following the requirements of FR Manual, 3-2(2.04)(B)(3)(b).

**B.      Captain Ober's Transfer Was a Disciplinary Punishment in Violation of the FR Manual and the Collective Bargaining Agreement.**

If a transfer is not requested by the sworn officer, or is not pursuant to FR Manual 3-2, then the transfer must be part of an administrative disciplinary determination. The FR Manual specifically mandates that "transfers shall not be used in lieu of appropriate disciplinary action but, where the facts in a case support the need for relocation of the member, they may be utilized as an additional disciplinary measure in conjunction with the disciplinary action imposed by the Disciplinary Officer." FR Manual 3-2(2.01)(F).

In 18½ years with the PSP, Captain Ober has never been the subject of any disciplinary proceeding, much less ever been found administratively "guilty" of misconduct or wrongdoing.

14

Captain Ober has only received two complaints in his 18 ½-years with the PSP. Those complaints were both administratively adjudicated as "unfounded," meaning that the complaints were bogus. The only time Captain Ober's conduct was ever called into question through a conduct-related investigation was Majors Williams and Wertz's "administrative inquiry." By their own admission, the Majors revealed that the "administrative inquiry" was conducted under the command of Colonel Evanko and was not "disciplinary" in nature. If the inquiry was not "disciplinary," as the Majors stated, then that inquiry cannot trigger any disciplinary transfer. If the Majors mislead Captain Ober and their "administrative inquiry" was, in fact, a disciplinary investigation, not only was the Majors' disciplinary investigation a violation of the disciplinary procedures provided in FR Manual, 3-3, and Article 26 of the Collective Bargaining Agreement, but there was never any finding of wrongdoing of the part of Captain Ober. Moreover, even if the PSP determined that Captain Ober had performed some form of misconduct, Captain Ober certainly was not afforded any administrative trial board prior to the imposition of this punitive transfer.

Captain Ober's transfer is punitive. He is being "punished" as a direct result of Colonel Evanko's hurt pride and irrational indignation because Colonel Evanko was not informed of the FBI's investigation until its conclusion. If this is so, not only can Captain Ober not be transferred, Captain Ober cannot even be the subject of an administrative disciplinary investigation because "**disciplinary action based on arbitrariness**, supposition, unfounded or unsubstantiated complaints, **personal bias**, or prejudice **shall not be imposed**." FR Manual, 3-3(3.05)(A) (emphasis added).

      **C.**      **Captain Ober's Involuntary Transfer Violates Article 38 of the Collective Bargaining Agreement Between the Commonwealth and the Pennsylvania State Troopers Association.**

Article 38 of the Collective Bargaining Agreement (CBA) provides that "when an

15

involuntary intratroop transfer must be made, the member to be transferred must be the member who has the least seniority in his/her rank in that station (provided he/she has not been moved involuntary in the previous six months) except in case of promotion, in conjunction with the imposition of discipline or where there is a need for special skills or specialty." Collective Bargaining Agreement, art. 38 § 3.

Captain Ober's transfer was not part of a promotion, the imposition of any disciplinary action (see I.B.), or required any special skill or specialty that Captain Ober possess (see I.A.1.). Therefore, when imposing an involuntary transfer, Colonel Evanko must transfer based on seniority in rank. Captain Ober was promoted to the rank of Captain, effective March 3, 1995. Currently he is senior to 24 other PSP Captains.[1] There is no indication that any other Captain was considered for this Area III transfer prior to Captain Ober's assignment. Captain Ober's punitive transfer is between Bureaus and Area Commands and not intratroop. However, in light of the fact that Captain Ober's transfer between Bureaus and Area Commands is more onerous than a normal intratroop transfer, Colonel Evanko should be bound by the requirements for a less-onerous involuntary transfer.

**D.    By Transferring Captain Ober in Retaliation for His Involvement with the FBI's Investigation, Colonel Evanko Violated Pennsylvania's "Whistleblower" Law.**

Pennsylvania's "Whistleblower" law protects public employees from discrimination or retaliation by the employer. 43 P.S. § 1423. Specifically, section 1423 provides:

---

[1] The PSP Captains with less seniority than Captain Ober are Carmen Altavilla, John R. Brown, Erby Conley, Charles Connon, William Conway, John Gallaher, James Garofalo, Robert Haught, Theodore Kohuth, Jon Kurtz, Joseph Maurt, Coleman McDonough, Michael Nagurny, Frank Pawlowski, David Points, Larry Riley, Sidney Simon, Charles Skurkis, John Thierwechter, Robert Titler, James Torker, Cynthia Transue, James Tripp, and Richard Zenk.

16

(a) Persons not to be discharged. -- **No employer may** discharge, threaten or **otherwise discriminate or retaliate against an employee regarding the employee's** compensation, terms, conditions, **location** or privileges **of employment because the employee** or a person acting on behalf of the employee **makes a good faith report** or is about to report, verbally or in writing, **to the employer or appropriate authority an instance of wrongdoing** or waste.

(b) Discrimination prohibited. -- **No employer may** discharge, threaten or **otherwise discriminate or retaliate against an employee regarding the employee's** compensation, terms, conditions, **location** or privileges **of employment because the employee is requested by an appropriate authority to participate in an investigation**, hearing or inquiry held by an appropriate authority or in a court action.

(emphasis added).

Captain Ober's punitive transfer can be directly traced to his good faith report to Colonel Evanko that the FBI had conducted a investigation into the PSP. Colonel Evanko was personally offended by the fact that Captain Ober followed the instructions/orders of "an appropriate authority" -- the FBI -- instead of compromising the investigation by immediately coming to Colonel Evanko.

On April 26, 1999, Captain Ober was transferred to the Bureau of Technology Services at the request of Colonel Evanko. Captain Ober's assignment was as the lead officer on a multi-million dollar PSP system integration procurement project. Colonel Evanko told Captain Ober that he specifically wanted Captain Ober to head this project because of Captain Ober's intelligence, leadership ability, and special managerial skills. On May 12, 1999, a mere sixteen days later, Captain Ober informed Colonel Evanko about the FBI's investigation. Immediately, Captain Ober fell out of favor with Colonel Evanko. Eight months after the FBI notification, Captain Ober is being transferred to a non-position while in the middle of the multi-million dollar procurement project. Captain Ober's transfer from the Bureau of Technology Services did not come from a request of Captain Ober's commander. In fact, Captain Ober's commander, Major Wesley Waugh,

as well as Lt. Colonel Hickes, Mr. Rodney Ditzler, the Project Executive Director, and Mr. Ronald Wilt, the Program Manager, all opposes Captain Ober's transfer.

It was not until after Colonel Evanko learned of the FBI's investigation that Captain Ober was: (1) investigated by two Majors during an "administrative inquiry" instituted under the direction of Colonel Evanko; (2) stripped of agency equipment for no cause; (2) removed from PSP committees by order of Colonel Evanko; (3) repeatedly denied reimbursement for job-related expenses; (4) barred from Internal Affairs Division meetings, even though his appearance was specifically requested by the now-Commander of the Internal Affairs Division; and (5) punitively transferred halfway across the Commonwealth of Pennsylvania to a "made-up" position in Washington, Pennsylvania, with a daily commute in excess of six hours.

## SUMMARY

On January 29, 2000, Captain Darrell Ober will be subjected to an illegal punitive and retaliatory transfer by Colonel Evanko and the PSP. This transfer directly violates (1) PSP rules and regulations, (2) the Collective Bargaining Agreement between the Commonwealth and Pennsylvania State Troopers Association, (3) the Pennsylvania "Whistleblower" Law, (4) the Due Process Clause of the Fourteenth Amendment, and (5) the Pennsylvania Constitution. Captain Ober has asserted a clear legal right, to which the Commonwealth and Colonel Evanko have a corresponding duty. Additionally, if Captain Ober is transferred, none of the harm that he will suffer, and damages that he will sustain, will be compensable through an action in law. Therefore, the only adequate remedy against Colonel Evanko's gross abuse of authority and pattern of harassment is for this Court to prohibit the Respondents from instituting the illegal, punitive, and retaliatory transfer through a Writ of Mandamus.

18

## PRAYER FOR RELIEF

WHEREFORE, Petitioner Captain Darrell Ober respectfully urges this Court to issue an Order as to each of the following prayers for relief, pursuant to 42 Pa. C.S. § 761(c) and 43 Pa. C.S. § 1423:

(1)    Issue a show cause order, pending a hearing on the merits:

      (a)    Compelling the Respondents to appear on a date certain to show cause, if the Respondents have any, why they should not be restrained and enjoined from violating the rights of Captain Ober, as provided in the PSP Field Regulations, the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, the Pennsylvania "Whistleblower" Act, the Due Process Clause of the Fourteenth Amendment, and the Pennsylvania Constitution;

      (b)    Prohibiting the Respondents from violating the rights of Captain Ober, as provided in the PSP Field Regulations, the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, the Pennsylvania "Whistleblower" Act, the Due Process Clause of the Fourteenth Amendment and the Pennsylvania Constitution, and prohibiting the Respondents from implementing the punitive transfer, pending a hearing on the merits of the show cause; and

      (c)    Prohibiting the Respondents from taking any retaliatory action against Captain Ober in response to the lawful exercise of his constitutional and statutory rights and privilege; and

(2)    After a hearing on the merits of the show cause order, issue an order:

      (a)    Prohibiting the Respondents from imposing the punitive transfer upon

19

Captain Ober;

(b)     Reassigning Captain Ober to his previous position at the Bureau of Technology Services;

(c)     Prohibiting the Respondents from taking any retaliatory action against Captain Ober in response to his lawful exercise of his constitutional and statutory rights and privilege;

(d)     In the event that this Court finds that some portion of his various causes of action do afford damages, awarding to Captain Ober damages caused to Captain Ober as a consequence of the illegal action of the Respondents;

(e)     Awarding to Captain Ober costs and attorney's fees; and

(f)     Granting to Captain Ober such further relief as this Court deems appropriate.

Respectfully submitted,

John Miller, Esq.
7 West Main Street
Fawn Grove, Pennsylvania 17321
717-382-9543
Pa. Bar #50033

Byron L. Warnken, Esq.
James A. Lanier, Esq.
Law Offices of Bonnie L. Warnken
32 East Preston Street
Baltimore, Maryland 21202-2727
410-727-5951

20

Attorneys for Petitioner Captain Ober

January 26, 2000

| | | |
|---|---|---|
| CAPTAIN DARRELL OBER | * | IN THE COMMONWEALTH |
| Petitioner, | * | COURT OF |
| v. | * | PENNSYLVANIA |
| COLONEL PAUL EVANKO, et. al. | * | Case No. _____ |
| Respondents. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ORDER GRANTING PETITIONER'S APPLICATION FOR A WRIT OF MANDAMUS

Having reviewed Petitioner's Application for a Writ of Mandamus, and any Response filed by the Respondents, this Court hereby issues, this _____ day of _____, 2000, an Writ of Mandamus on behalf of Petitioner Captain Ober, as follows:

1. The Respondents are ordered to refrain from instituting the punitive transfer to Area III Troop B - Washington, against Captain Ober in violation of the administrative, statutory, and Constitutional rights of Captain Ober, as provided in the PSP Field Regulations, the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, the Pennsylvania "Whistleblower" Act, the Due Process Clause of the Fourteenth Amendment, and the Pennsylvania Constitution;

2. The Respondents are ordered to return Captain Ober to his previous position at the Bureau of Technology Services;

3. The Respondent are ordered to refrain from taking any retaliatory action against Captain Ober in response to his lawful exercise of his constitutional and statutory rights and privileges.

_____
Judge

E

CAPTAIN DARRELL OBER                    *    IN THE

                   Petitioner,               *    COMMONWEALTH COURT

vs.                                     *    OF

COLONEL PAUL EVANKO, et. al.            *    PENNSYLVANIA

                  Respondents.             *    Case No. 35MD2000

*     *     *     *     *     *     *     *     *     *     *     *     *

### PETITIONER'S MOTION TO WITHDRAW PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION AND PETITONER'S MOTION TO WITHDRAW PETITIONER'S REQUEST FOR EXPEDITED HEARING

Petitioner, Captain Darrell Ober (Captain Ober), by and through his attorneys, John Miller, Esq., Byron L. Warnken, Esq., James A. Lanier, Esq., hereby withdraw: (1) Petitioner's Motion for Preliminary Injunction and (2) Petitioner's Request for Expedited Hearing.

The Respondents have stipulated to the injunctive relief sought by Captain Ober in his Motion for Preliminary Injunction, thereby making the need for a preliminary injunction hearing and the need for an expedited hearing moot. The Respondents have agreed to maintain this stipulation until the Court rules upon Captain Ober's Application for a Writ of Mandamus. This stipulation is attached at Appendix A.

This motion to withdrawal in no way affects Petitioner's Application for Writ of Mandamus.

                                 _____
                                 John Miller, Esquire
                                 7 West Main Street
                                 P.O. Box 27
                                 Fawn Grove, Pennsylvania 17321

Bar No. 50033


Byron L. Warnken, Esquire
James A. Lanier, Esquire
32 East Preston Street
Baltimore, Maryland 21202-2727

Attorneys for Petitioner Ober.

January 27, 2000



**PENNSYLVANIA STATE POLICE**
**DEPARTMENT HEADQUARTERS**
**1800 ELMERTON AVENUE**
**HARRISBURG, PA. 17110**
Office of Chief Counsel
(717) 783-5568

January 27, 2000

FAXED AND SENT FIRST CLASS MAIL

Mr. Byron L. Warnken, Esquire
32 East Preston Street
Baltimore, MD 21202-2727

RE: Ober v. Evanko and Pennsylvania State Police (Commonwealth Court of Pennsylvania)

Dear Mr. Warnken:

Pursuant to our conversation, this confirms that we will suspend the transfer of Captain Ober in exchange for your withdrawal of the motion for a preliminary injunction.

We agree to return Captain Ober to the IIMS (Integrated Incident Management System) position he served in prior to the transfer, in the Bureau of Technology Services, under the supervision of Major Wesley Waugh. We agree also not to transfer Captain Ober outside the Harrisburg/Hershey area until such time as the instant litigation is resolved either in our favor or your favor; however, we reserve the right to transfer Captain Ober to other existing positions in this area, that meet the operational needs of the Department, during the pendency of the litigation. (This agreement would not extend to any appeal from a Commonwealth Court determination).

This suspension of transfer will not affect the Department's intent to proceed forward with the mandamus action nor does it waive or limit any arguments that we may raise in this action, but it will obviate the need for the preliminary injunction hearing scheduled for tomorrow.

I assume that you will be cancelling the preliminary injunction hearing scheduled for tomorrow in Philadelphia – please fax me a copy of whatever document you file with the court that accomplishes this.

Very Truly Yours,

*Joanna N. Reynolds*

Joanna N. Reynolds

A



*An Internationally Accredited Law Enforcement Agency*

CAPTAIN DARRELL OBER                    *        IN THE

         Petitioner,                  *        COMMONWEALTH COURT

                               *        OF

v.                                       *        PENNSYLVANIA

COLONEL PAUL EVANKO, et. al.             *        Case No. 35MD2000

         Respondents.                 *

*     *     *     *     *     *     *     *     *     *     *     *     *

### ORDER GRANTING PETITIONER'S MOTION TO WITHDRAW PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION AND PETITONER'S MOTION TO WITHDRAW PETITIONER'S REQUEST FOR EXPEDITED HEARING

Having reviewed Petitioner's Motion to Withdraw Petitioner's Motion for Preliminary Injunction and Petitioner's Motion to Withdraw Petitioner's Request for Expedited Hearing, and any Response filed by the Respondents, this Court hereby issues, this _____ day of January, 2000, that:

1.     Petitioner's Motion for Preliminary Injunction be dismissed as moot in light of the stipulation by Respondents;

2.     Petitioner's Motion for Expedited Hearing be dismissed as moot in light of the stipulation by Respondents;

3.     Petitioner's Application for Writ of Mandamus be set on the docket in the ordinary course of business.

 

 

                                           _____

                                           Judge

| | | |
|---|---|---|
| CAPTAIN DARRELL OBER | * | IN THE |
| Petitioner, | * | COMMONWEALTH COURT |
| vs. | * | OF |
| COLONEL PAUL EVANKO, et. al. | * | PENNSYLVANIA |
| Respondents. | * | Case No. 35MD2000 |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### CERTIFICATE OF SERVICE

This is to certify that one copy of (1) Petitioner's Motion to Withdraw Petitioner's Motion for Preliminary Injunction and Petitioner's Motion to Withdraw Petitioner's Request for Expedited Hearing; and (2) a certificate of service in the above-caption matter was mailed, first class, postage prepaid, this 27th day of January, 2000, to: Joanna N. Reynolds, Esq., Office of Chief Counsel, Pennsylvania State Police Department Headquarters, 1800 Elmerton Avenue, Harrisburg Pennsylvania 17109.

John Miller, Esquire
7 West Main Street
P.O. Box 27
Fawn Grove, Pennsylvania 17321

Bar No. 50033

Attorney for Petitioner Ober

F

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

CAPTAIN DARRELL OBER,                        :
                         Petitioner    :
                                       :
                  v.                   :     NO. 35 M.D. 2000
                                       :
COLONEL PAUL EVANKO,                         :
COMMISSIONER, PENNSYLVANIA   :
STATE POLICE, et al.,                              :
                     Respondents  :

RECEIVED

BY_____

FEB 2 5 2000

OFFICE OF GENERAL COUNSEL

REFERRED _____

**RESPONDENTS' APPLICATION TO DISMISS FOR**
**MOOTNESS PURSUANT TO Pa.R.C.P. 1972(4)**

AND NOW, this 23rd day of February, 2000  come respondents,  the Pennsylvania State

Police and Colonel Paul J. Evanko, Commissioner, by and through their attorney, Assistant

Counsel Joanna N. Reynolds, and respectfully petition  this Honorable Court to dismiss as moot

the Petition for Review for a Writ of Mandamus filed in the above-entitled matter, and in support

thereof state as follows:

       1.      On January 26, 2000, the petitioner, Captain Darrell Ober, filed a Motion for a

Preliminary Injunction and a Petition for Review for a Writ of Mandamus, seeking an order

enjoining Colonel Evanko and the Pennsylvania State Police from transferring him to Area III,

Troop B – Washington, Pennsylvania.

       2.      Captain Ober alleged that he was being transferred to a "made-up" position in

Area III, Troop B – Washington in order to punish him by making him commute 420 miles a day

from his home in Enola, Pennsylvania.  (Petition, ¶¶ 38, 39).

       3.      In fact, the Special Projects Officer position in Area III, Troop B – Washington

was not "made up" to punish Captain Ober.  Rather, the position was created to assist the Area

Commander, Major Lyle Szupinka, in coordinating police services at the Conference of the National Governors Association, which will be held in Pennsylvania later this year. The transfer was necessary because Major Szupinka still has an area command to supervise while taking care of the ever-increasing duties associated with the Conference, and Captain Ober possesses organizational and administrative skills necessary for coordination of the Conference's large-scale security needs.

4.      Captain Ober's transfer to Area III, Troop B, was not unique. A similar transfer occurred previously when Captain Cynthia Transue was transferred from the Bureau of Research and Development in Harrisburg, to Area VI in Philadelphia in order to assist Major Robert Werts in coordinating police services for this summer's Republican National Convention.

5.      On January 27, 2000, in exchange for Captain Ober's withdrawal of his motion for a preliminary injunction, the Pennsylvania State Police voluntarily rescinded Captain Ober's transfer to Area III, Troop B – Washington and agreed not to transfer him outside of the Harrisburg/Hershey area during the pendency of this litigation.

6.      On February 12, 2000, Colonel Evanko transferred a Philadelphia resident, Captain Dave Young, from his position as Commander of the Organized Crime Section in Harrisburg to the Special Projects Officer position in Area III, Troop B – Washington.

7.      By order dated February 16, 2000, Captain Ober was transferred, effective February 19, 2000, to the position of Central Section Commander in the Bureau of Liquor Control Enforcement, Harrisburg, Pennsylvania. The transfer was necessary because that section's commander was recently suspended without pay pending disposition of criminal charges filed against him.

2

8.    Since Captain Ober's transfer to Troop B—Washington has been rescinded, that position has been filled by Captain Young, and Ober has been reassigned to a position in the Harrisburg area, any possibility that petitioner could suffer the harm alleged in his petition for review has been eliminated.  Accordingly, any controversy over Captain Ober's transfer to Area III, Troop B, has been obviated and rendered moot.

WHEREFORE, the Petition for Review for a Writ of Mandamus should be dismissed as moot.

Respectfully submitted,


Joanna N. Reynolds
Assistant Counsel
Pennsylvania State Police
1800 Elmerton Avenue
Harrisburg, PA  17110
(717) 783-5568
Attorney I.D. #37436

Dated:  February 23, 2000

3

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

CAPTAIN DARRELL OBER,        :
            Petitioner      :
                         :
          v.            :     NO. 35 M.D. 2000
                         :
COLONEL PAUL EVANKO,      :
COMMISSIONER, PENNSYLVANIA :
STATE POLICE, et al.,         :
           Respondents  :

## VERIFICATION

I, Joanna N. Reynolds, hereby verify that the facts set forth in the foregoing

application to dismiss for mootness are true and correct to the best of my knowledge,

information, and belief.  I understand that the statements made herein are made subject to

the penalties of 18 Pa. C.S. § 4909 relating to unsworn falsification to authorities.


_Joanna N. Reynolds_
Joanna N. Reynolds
Assistant Counsel
Pennsylvania State Police


Dated:      February 23, 2000

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

CAPTAIN DARRELL OBER,                    :
                          Petitioner     :
                                         :
                                         :
             v.                          :     NO. 35 M.D. 2000
                                         :
COLONEL PAUL EVANKO,                     :
COMMISSIONER, PENNSYLVANIA               :
STATE POLICE, et al.,                    :
                          Respondents    :

## PROOF OF SERVICE

    I hereby certify that on this date a copy of the foregoing application to dismiss for

mootness was served on the following persons by first class mail, addressed as follows:

              Byron L. Warnken, Esquire
              James A. Lanier, Esquire
              32 East Preston Street
              Baltimore, MD  21202-2727


              Joanna N. Reynolds
              Assistant Counsel
              Pennsylvania State Police

Dated:  February 23, 2000

5

G

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

CAPTAIN DARRELL OBER,

        Petitioner

        v.

COLONEL PAUL EVANKO,
COMMISSIONER, PENNSYLVANIA
STATE POLICE and PENNSYLVANIA
STATE a/k/a COMMONWEALTH OF
PENNSYLVANIA,

        Respondents

NO. 35 M.D. 2000

'00 APR 3 PM 12 48
CHIEF COUNSEL
STATE POLICE
RECEIVED

## ORDER

    AND NOW, this 30th day of March, 2000, upon review of the pleadings and argument in the above-captioned matter, Respondent's Application to Dismiss for Mootness is hereby GRANTED.

    The injunctive aspect of this case which sought to enjoin Respondents from transferring Petitioner to a position in a distant location from his home for "retaliatory purposes" was settled by the parties by agreement, thereby rendering the remaining Petition for Review for Writ of Mandamus moot. While the conduct complained of is capable of repetition, this Court does not find the mootness exception to be applicable as such conduct is not likely to evade review. Accordingly, the Petition for Review for Writ of Mandamus is dismissed as moot.

JAMES R. KELLEY, Judge

Certified from the Record

MAR 3 1 2000

and Order Exit

CAPTAIN DARRELL OBER                          *       IN THE COMMONWEALTH
C/O: PENNSYLVANIA STATE POLICE
DEPARTMENT HEADQUARTERS                        *       COURT OF
1800 ELMERTON AVENUE
HARRISBURG, PENNSYLVANIA 17109                 *       PENNSYLVANIA

          Plaintiff,                          *

      v.                                       *       Case No. _____

COLONEL PAUL EVANKO                            *
COMMISSIONER, PENNSYLVANIA
STATE POLICE                                   *
DEPARTMENT HEADQUARTERS
1800 ELMERTON AVENUE                           *
HARRISBURG, PENNSYLVANIA 17109
                                               *
and
                                               *
PENNSYLVANIA STATE POLICE
          a/k/a: Commonwealth of Pennsylvania  *
DEPARTMENT HEADQUARTERS
1800 ELMERTON AVENUE                           *
HARRISBURG, PENNSYLVANIA 17109
                                               *
SERVE:
          Barbara L. Christie, Esq.            *
          Office of Chief Counsel
          Pennsylvania State Police            *
          Department Headquarters
          1800 Elmerton Avenue                 *
          Harrisburg Pennsylvania 17109
                                               *
          Defendants.

*     *     *     *     *     *     *     *     *     *     *     *     *

## PETITION FOR REVIEW IN NATURE OF COMPLAINT FOR VIOLATION
## OF THE PENNSYLVANIA WHISTLEBLOWER ACT STATUTE

Plaintiff, Captain Darrell Ober (Captain Ober), by and through his attorneys, John Miller,

Esq., Byron L. Warnken, Esq., James A. Lanier, Esq., and the Law Offices of Bonnie L.

Warnken, pursuant to Pennsylvania Rule 1007, brings this cause of action against Colonel Paul

Evanko, Commissioner, Pennsylvania State Police (Colonel Evanko), and the Pennsylvania State Police, a/k/a the Commonwealth of Pennsylvania (PSP) (collectively, the Defendants). In support of this cause of action, Captain Ober asserts the following:

1.      Defendant Colonel Evanko is the Commissioner of the PSP.

2.      Defendant PSP is the chief law enforcement agency for the Commonwealth of Pennsylvania.

3.      Captain Ober is a non-probationary, 18 ½-year veteran law enforcement officer of the PSP.

4.      On May 2, 1998, Captain Ober was assigned as the Director of the Internal Affairs Division of the PSP's Bureau of Professional Responsibility (BPR).

5.      As Director of the Internal Affairs Division, Captain Ober's chief duty was to manage and oversee the investigation of all complaints filed against sworn and civilian PSP employees.

6.      Captain Ober directly managed three separate internal affairs sections. Each internal affairs section consisted of a Lieutenant, three or four investigators, and administrative staff.

7.      In late September or early October 1998, Captain Ober was contacted by Federal Bureau of Investigation (FBI) Special Agent Ralph W. Kush (SA Kush).

8.      SA Kush advised Captain Ober that the Pittsburgh Office of the FBI was investigating political corruption in Western Pennsylvania.

9.      SA Kush advised Captain Ober that the FBI had information alleging corruption in the PSP Cadet hiring process. The alleged corruption of the Cadet program took the form of cash

2

payments to political figures and/or to sworn PSP officers in return for individuals who placed low on the Cadet qualification list to be given a higher ranking.

10.    Because the political corruption investigation was ongoing, neither SA Kush nor Captain Ober had any inclination as to how high the political corruption went within the PSP, possibly up to or including Colonel Evanko.

11.    Captain Ober informed Lieutenant Colonel Robert C. Hickes (Lt. Colonel Hickes). Captain Ober informed the FBI that Lt. Col. Hickes was made aware of the investigation.

12.    Thus, in light of the seriousness of the investigation, in early October 1998, Captain Ober informed Lt. Colonel Hickes of the FBI's investigation.

13.    Captain Ober chose to inform Lt. Colonel Hickes because Lt. Colonel Hickes: (1) was superior in command; (2) had been recently promoted to the rank of Lieutenant Colonel, and (3) while at the rank of Major, had been assigned to a PSP position outside the scope of the FBI's investigation and thus was not a subject of the corruption investigation.

14.    Lt. Colonel Hickes ordered Captain Ober to: (1) maintain the confidentiality of the FBI's investigation, including not advising Colonel Evanko; (2) cooperate with SA Kush during the FBI's investigation; and (3) keep him (Lt. Colonel Hickes) informed as to the status of the FBI's investigation. The orders given by Lt. Colonel Hickes were within his scope of authority to issue.

15.    With Lt. Colonel Hickes' knowledge and approval, on October 21, 1998, Captain Ober met with SA Kush and Special Agent Michael J. Soohy (SA Soohy) at PSP Troop T - Everett. At this meeting, SA Kush played a audiotape from a body wire confirming that the FBI had targets who were conspiring to corrupt the Cadet hiring process through cash payoffs.

3

16.    After that meeting, Captain Ober provided Lt. Colonel Hickes with a status report of what transpired during this meeting.

17.    Over the next few months, SA Kush contacted Captain Ober sporadically to provide updates. When appropriate, Captain Ober advised Lt. Colonel Hickes as to the investigation's status.

18.    With Lt. Colonel Hickes' knowledge and approval, on March 15, 1999, SA Kush and SA Soohy met with Captain Ober at which time SA Kush played a videotape of a cash payoff being received by a sworn PSP officer.

19.    After this meeting, Captain Ober advised Lt. Colonel Hickes of what transpired at the meeting and on the contents of the videotape.

20.    On April 26, 1999, Captain Ober was temporarily detached from the Internal Affairs Division to the Bureau of Technology Services at the request of Colonel Evanko.

21.    In his new assignment, Captain Ober was assigned as the lead officer on a multi-million dollar PSP system integration procurement project.

22.    With Lt. Colonel Hickes' knowledge and approval, Captain Ober continued to be the FBI's contact person in the investigation of corruption, even though he was no longer part of the Internal Affairs Division.

23.    On May 1, 1999, SA Kush advised Captain Ober that the political corruption portion of the FBI's investigation involving the PSP was completed.

24.    The FBI did not find agency-wide corruption within the PSP. Ultimately, the FBI had determined that the PSP corruption did not go "to the top," but rather involved only one low ranking sworn officer.

25.     During the week of May 3, 1999, Captain Ober informed Lt. Colonel Hickes of the FBI's conclusions.  Lt. Colonel Hickes indicated that he would arrange a briefing of Colonel Evanko.

26.     On May 12, 1999, Captain Ober and Lt. Colonel Hickes briefed Colonel Evanko on the FBI's investigation.

27.     Colonel Evanko became enraged because the FBI did not inform him directly about the investigation.

28.     Colonel Evanko threatened to have the FBI agents transferred from the FBI's Pittsburgh Field Office for not informing him about the investigation.

29.     Colonel Evanko then demanded that Captain Ober prepare a memorandum detailing his and Lt. Colonel Hickes' involvement in, and knowledge of, the FBI's investigation.

30.     Captain Ober provided a two-page memorandum for Colonel Evanko detailing his and Lt. Colonel's involvement in, and knowledge of, the FBI's investigation.

31.     Colonel Evanko took great offense that Captain Ober failed to violate the confidentiality imposed on him by Lt. Colonel Hickes by failing to inform him about the FBI's investigation from the onset, notwithstanding and/or because he (Colonel Evanko) was a potential target.

32.     On June 28, 1999, Captain Ober was contacted by Major Thomas Williams and Major Robert Werts.

33.     Major Williams and Major Werts informed Captain Ober that, by order of Colonel Evanko, they had been ordered to conduct an "administrative inquiry" into Captain Ober's actions in regard to the FBI investigation.

5

34.    Majors Williams and Werts advised Captain Ober that: (1) no allegation of misconduct existed; (2) they had uncovered no evidence of any misconduct; (3) no Internal Affairs Control Number had been assigned to this "inquiry," as required by the Internal Affairs Division; and (4) no Use of Force or Complaint Reception and Processing Worksheet existed, as required by the Internal Affair Division.

35.    Majors Williams and Werts further advised Captain Ober that Colonel Evanko would be reviewing their findings to determine if a formal disciplinary investigation of the Internal Affair Division was warranted.

36.    Majors Williams and Werts then conducted a tape recorded interrogation of Captain Ober as to his involvement in the FBI's investigation.

37.    Thus, Captain Ober was subjected to a secret administrative discipline investigation, conducted under the authority of Colonel Evanko.

38.    This "star chamber" inquiry was in violation of (1) the rules and regulations of the PSP, as established in the Field Regulations Manual and Administrative Regulations Manual, (2) Captain Ober's rights under Article 26 of the Pennsylvania State Police Troopers Association Collective Bargaining Agreement, (3) the Pennsylvania "Whistleblower" Act, (4) Captain Ober's Fourteenth Amendment right to Due Process, and (5) the Pennsylvania Constitution.

39.    Captain Ober was never informed as to the findings of Major Williams and Major Werts' "administrative inquiry."

40.    Captain Ober was also never informed as to Colonel Evanko's final determination after reviewing the "administration inquiry" report.

41.    Colonel Evanko denied Captain Ober's reimbursement requests for administrative

6

costs incurred as part of the FBI's investigation.  On March 21, 2000, Colonel Evanko's decision to deny those reimbursements was overturned by a PSP sworn employee grievance board.

42.    On August 23, 1999, Major Hawthorne Conley (Major Conley) rescinded Captain Ober's use of agency property that had been issued to Captain Ober.

43.    Captain Ober was also stripped of agency responsibilities, by order of Colonel Evanko.

44.    On August 24, 1999, Major Lyle H. Szupinka, Commander of Area III, approached Captain Ober and confronted him about his handling of the FBI investigation.

45.    On November 8, 1999, Captain Ober filed PSP Grievance #164.  Captain Ober grieved: (1) how the Majors "administrative inquiry" was handled in violation of the PSP Field Regulations Manual, the Administrative Regulations Manual, and the Collective Bargaining Agreement between the Commonwealth and the Pennsylvania State Troopers Association; and (2) the denial of administrative costs incurred as part of the FBI's investigation.

46.    On December 22, 1999, Captain Ober filed Grievance #167.  Captain Ober grieved additional administrative costs that Captain Ober was not reimbursed for by the PSP.

47.    On January 10, 2000, at approximately 4:00 p.m., Captain Ober was contacted by Major Conley by telephone.

48.    Major Conley informed Captain Ober that he was being transferred from the Bureau of Technology Services back to Internal Affairs Division on January 24, 2000.

49.    Major Conley informed Captain Ober that after the transfer back to Internal Affairs, Captain Ober was being assigned to Area III, Troop B - Washington on January 29, 2000. Therefore, Captain Ober's re-assignment to the Internal Affairs Division would last five days.

50.     Captain Ober did not request either transfer, nor was he consulted prior to any final decision to implement this involuntary transfer.

51.     Major Conley further advised Captain Ober that his assignment in Area III, Troop B - Washington was for an unknown assignment for an unspecified length of time.

52.     After receiving his inexact and nebulous orders, Captain Ober contacted Major Szupinka, Commander of Area III, and the individual who confronted Captain Ober about his handling of the FBI investigation in August 1999.

53.     Major Szupinka informed Captain Ober that: (1) he (Major Szupinka) was contacted the prior week by "the front office" and told that "they" were assigning Captain Ober to his as "an Area III Assistant;" (2) that he did not request Captain Ober's reassignment to Area III; (3) that he did not request any assistance or reassignment of any personnel; (4) that he had no idea what Captain Ober's job description or assignment would be while stationed at Area III; and (5) that he had no idea how long Captain Ober's assignment would last.

54.     The "position" to which Captain Ober was assigned in Area III did not exist prior to his assignment. This "position" was a newly-created – never previously existing – "position," created just for Captain Ober by Colonel Evanko.

55.     To add to the punitive nature of that transfer, Captain Ober currently resides in Enola, Pennsylvania. He was transferred to a "made-up" position in Washington, Pennsylvania, with a daily commute in excess of six-and-a-half hours (420 miles round trip).

56.     As a consequence of Captain Ober's punitive transfer, an 18 ½-year veteran Captain of the PSP with an exemplary service record, with a spouse and three children, who has lived in Enola, Pennsylvania for many years, was reassigned with only several days' notice, to a

permanent duty station entailing nearly 32 hours a week in commuting time alone.

57.    Furthermore, the Personnel Order signed by Colonel Evanko does not specify the duration of the transfer.  Therefore, the transfer would have been considered "permanent."  F.R. Manual 3-2(2.01)(E).

58.    On January 26, 2000, Captain Ober filed for a Petition for a Writ of Mandamus and a Request for a Preliminary Injunction to prohibit the permanent punitive transfer.

59.    On January 27, 2000, through settlement negotiations, Captain Ober agreed to pull his Request for a Preliminary Injunction in exchange for the Defendants rescinding the punitive transfer.

60.    Instead of transferring Captain Ober across the State, Colonel Evanko and the Pennsylvania State Police assigned Captain Ober to a Lieutenant position, one rank lower than he currently holds, in the PSP's Bureau of Liquor Control Enforcement.  This assignment to a Lieutenant's position is a functional dismissal.

61.    On March 30, 2000, the Honorable James R. Kelley of the Commonwealth Court of Pennsylvania dismissed Captain Ober's Petitioner for a Writ of Mandamus.  Judge Kelley ruled that, in light of the settlement by the parties to rescind the punitive transfer, the remaining Petition for Writ of Mandamus was moot.

62.    Judge Kelley's decision did not decide any of the merits of Captain Ober's Petition, thereby creating this cause of action.

## COUNT I - VIOLATION OF PENNSYLVANIA'S
## WHISTLEBLOWER STATUTE - RETALIATION (§ 1423(a))

63.    Plaintiff, Captain Ober, hereby incorporates by reference the allegations contained

in paragraphs 1 through 62 of this Complaint.

64.    Captain Ober was requested by the FBI to participate in an investigation of the Pennsylvania State Police.

65.    Captain Ober did participate in the investigation and told only his superior, Lt. Colonel Hickes, about the investigation.

66.    Captain Ober was ordered by Lt. Colonel Hickes to keep the FBI's investigation confidential from all members of the PSP, including Colonel Evanko.

67.    After the investigation was concluded, Captain Ober was ordered by Lt. Colonel Hickes to inform Colonel Evanko about the investigation.

68.    When Colonel Evanko found out about Captain Ober's participation in the FBI investigation, Colonel Evanko took adverse action against Captain Ober.

69.    The adverse actions that Colonel Evanko took included initiating a "star chamber" inquiry into Captain Ober and his role in the FBI investigation.  This inquiry was in contrivance of policies and procedures of the Pennsylvania State Police.

70.    The nature of the "inquiry" and interrogation were in no way routine.  Moreover, Majors Williams and Werts' own words made it quite apparent that the PSP was conducting an administrative discipline investigation.

71.    Captain Ober then, in good faith, filed multiple written grievances with the Pennsylvania State Police concerning Colonel Evanko's authorization of the "star chamber" inquiry.

72.    Colonel Evanko then took adverse action against Captain Ober by attempting to transfer Captain Ober across the state of Pennsylvania to a "made up" position as well as other

10

intra-agency retaliatory maneuvers.

73.    Captain Ober then, in good faith, lawfully filed for a preliminary injunction and request for a permanent injunction in the form of a Application for a Writ of Mandamus to prohibit the punitive transfer.

74.    Through an agreement with Captain Ober's counsel, Colonel Evanko and the Pennsylvania State Police withdrew the punitive transfer order.

75.    Colonel Evanko then assigned Captain Ober to a position of Lieutenant, one rank lower than the rank of Captain, in the Bureau of Liquor Control Enforcement.

76.    This assignment to a position of Lieutenant occurred within one month after the order for transfer was withdrawn.

77.    These complaints filed by Captain Ober are of the type that the Pennsylvania State Police are charged to enforce and are in the interests public policy in that the effective, efficient, and fair administration of the Pennsylvania State Police are essential to public safety.

78.    The actions of Colonel Evanko and the Pennsylvania State Police were taken in reprisal for participating in the FBI investigation and/or, in the alternative, the grievances Captain Ober filed with the Pennsylvania State Police, and/or the injunctive relief Captain Ober sought, to avoid the unlawful punitive transfer.

79.    Colonel Evanko was acting in his official capacity as Commissioner of the Pennsylvania State Police at the time this action was taken and as Captain Ober's ultimate supervisor.

80.    Colonel Evanko's actions occurred within the scope of his employment as Commissioner of the Pennsylvania State Police.

11

81.     Colonel Evanko and the PSP breached their duties to Captain Ober by punishing him for maintaining the order of confidentiality by Lt. Colonel Hickes with regard to the FBI's investigation.

82.     As a direct result of Defendants' conduct and actions, Captain Ober suffered, and continues to suffer, mental anguish, humiliation, disgrace, personal and professional embarrassment, severe emotional distress, inconvenience, and other damages.

WHEREFORE, Plaintiff, Captain Ober, demands judgment against Defendants, Colonel Evanko and Pennsylvania State Police; (1) in the amount of One Hundred Thousand Dollars ($100,000) in compensatory damages, (2) pre-judgment interest, (3) post-judgment interest, (4) the costs of this action, (5) attorneys' fees, (6) a formal written apology acknowledging the wrongdoing of the Defendants, and (7) for such other relief as this court may deem just and proper.

## COUNT II - VIOLATION OF PENNSYLVANIA'S
## WHISTLEBLOWER STATUTE - RETALIATION (§ 1423(b))

83.     Plaintiff, Captain Ober, hereby incorporates by reference the allegations contained in paragraphs 1 through 82 of this Complaint.

84.     Captain Ober was requested by the FBI to participate in an investigation of the Pennsylvania State Police.

85.     Captain Ober did participate in the investigation and told only his superior, Lt. Colonel Hickes, about the investigation.

86.     Captain Ober was ordered by Lt. Colonel Hickes to keep the FBI's investigation confidential from all members of the PSP, including Colonel Evanko.

12

87.    When Colonel Evanko found out about Captain Ober's participation in the FBI investigation, Colonel Evanko took adverse action against Captain Ober.

88.    The adverse actions that Colonel Evanko took included initiating a "star chamber" inquiry into Captain Ober and his role in the FBI investigation. This inquiry was in contrivance of policies and procedures of the Pennsylvania State Police.

89.    The nature of the "inquiry" and interrogation were in no way routine. Moreover, Majors Williams and Werts' own words made it quite apparent that the PSP was conducting an administrative discipline investigation.

90.    The adverse actions that Colonel Evanko took included transferring Captain Ober across the state of Pennsylvania to a "made up" position as well as other intra-agency retaliatory maneuvers.

91.    The adverse actions that Colonel Evanko took included assigning Captain Ober to a position of Lieutenant, one rank lower than the rank of Captain, of the PSP's Bureau of Liquor Control Enforcement.

92.    The adverse actions taken by Colonel Evanko and the Pennsylvania State Police were in reprisal for Captain Ober's participation with the FBI's investigation into the Pennsylvania State Police.

93.    Colonel Evanko was acting in his official capacity as Commissioner of the Pennsylvania State Police at the time this action was taken and as Captain Ober's ultimate supervisor.

94.    Colonel Evanko's actions occurred within the scope of his employment as Commissioner of the Pennsylvania State Police.

13

95.    Colonel Evanko and the PSP breached their duties to Captain Ober by retaliating against him for maintaining the order of confidentiality by Lt. Colonel Hickes with regard to the FBI's investigation.

96.    As a direct result of Defendants' conduct and actions, Captain Ober suffered, and continues to suffer, mental anguish, humiliation, disgrace, personal and professional embarrassment, severe emotional distress, inconvenience, and other damages.

WHEREFORE, Plaintiff, Captain Ober, demands judgment against Defendants, Colonel Evanko and Pennsylvania State Police; (1) in the amount of One Hundred Thousand Dollars ($100,000) in compensatory damages, (2) pre-judgment interest, (3) post-judgment interest, (4) the costs of this action, (5) attorneys' fees, (6) a formal written apology acknowledging the wrongdoing of the Defendants, and (7) for such other relief as this court may deem just and proper.

Respectfully submitted,


John Miller, Esq.
7 West Main Street
Fawn Grove, Pennsylvania 17321
717-382-9543
Pa. Bar #50033


Byron L. Warnken, Esq.
James A. Lanier, Esq.
Law Offices of Bonnie L. Warnken
32 East Preston Street
Baltimore, Maryland 21202-2727

14

410-727-5951

Attorneys for Plaintiff Captain Ober

May 4, 2000

## CERTIFICATE OF SERVICE

This is to certify that the Complaint contained herein was mailed certified, return receipt requested, restricted delivery, paid postage, this 4ᵗʰ day of May, 2000, to Defendant Colonel Paul Evanko, Commissioner, Pennsylvania State Police, Department Headquarters, 1800 Elmerton Avenue, Harrisburg, Pennsylvania, 17109; and Defendant Pennsylvania State Police, a/k/a: Commonwealth of Pennsylvania, Department Headquarters, 1800 Elmerton Avenue, Harrisburg, Pennsylvania 17109, c/o Barbara L. Christie, Esq., Office of Chief Counsel, Pennsylvania State Police, Department Headquarters, 1800 Elmerton Avenue, Harrisburg, Pennsylvania, 17109.

_____
Byron L. Warnken, Esq.
James A. Lanier, Esq.
Law Offices of Bonnie L. Warnken
32 East Preston Street
Baltimore, Maryland 21202-2727
(410) 727-5951

Attorneys for Plaintiff

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

CAPTAIN DARRELL OBER
c/o: PENNSYLVANIA STATE
POLICE DEPARTMENT
HEADQUARTERS,
                Petitioner

       v.

COLONEL PAUL EVANKO
COMMISSIONER, ...
PENNSYLVANIA STATE POLICE
DEPARTMENT HEADQUARTERS
and PENNSYLVANIA STATE
POLICE a/k/a: COMMONWEALTH
OF PENNSYLVANIA
DEPARTMENT HEADQUARTERS,
                Respondents

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 238 M.D. 2000

Argued: August 30, 2000

BEFORE:   HONORABLE DAN PELLEGRINI, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE PELLEGRINI           FILED: September 6, 2000

       Before this Court is an application to dismiss as moot and preliminary objections of Respondents, Colonel Paul Evanko (Colonel Evanko) and the Pennsylvania State Police (State Police), to the Petition for Review in the Nature of

a Complaint for Violation of the Pennsylvania Whistleblower Act[1] Statute (Complaint) filed by Captain Darrell Ober (Ober).[2]

Ober held the position as the Director of Internal Affairs Division of the Pennsylvania State Police's Bureau of Professional Responsibility, which included the duties of managing and overseeing complaints filed against State Police employees.  In September or October of 1998, the Federal Bureau of Investigation (FBI) contacted Ober concerning their investigation of political corruption in the State Police's cadet hiring process.  It was unknown how high the corruption went in the State Police.  Concerned that it may reach high into the chain of command of the state, Ober informed a superior officer outside the scope of the investigation, Lt. Colonel Hickes, of the FBI investigation.  Lt. Colonel Hickes ordered Ober to maintain confidentiality of the investigation and not advise his superior Lieutenant Colonel, Colonel Evanko, or the State Police Commissioner.  He also ordered Ober to cooperate with the FBI investigation and to keep him apprised of the status of the investigation.  Over the next few months, Ober was contacted by the FBI and was provided updates of the investigation, which he in turn reported to Lt. Colonel Hickes.  On May 1, 1999, the FBI advised Ober that the investigation was complete and that the corruption involved one lower-level sworn officer.  On May 12, 1999, Ober and Lt. Colonel Hickes briefed Colonel Evanko on the FBI investigation.

---

[1] The Pennsylvania Whistleblower Law, Act of December 12, 1986, P.L. 169, 43 P.S. §§1421-1428.

[2] For purposes of these motions, we will consider the facts as pled in the complaint as true. See Lutz v. Springettsbury Township, 667 A.2d 251 (Pa. Cmwlth. 1995).

As Ober alleges, Colonel Evanko became enraged because neither the FBI nor Ober informed him directly of the investigation. Colonel Evanko directed Ober to prepare a memorandum of his involvement in the FBI investigation and commenced a "secret" administrative investigation as to Ober's involvement with the FBI's investigation. Ober alleges various retaliatory acts by Colonel Evanko, including a denial of reimbursement for administrative costs incurred in the FBI investigation and an involuntary transfer on short notice to Washington, Pennsylvania for a "new position" created by Colonel Evanko. After filing a Petition for Writ of Mandamus with this Court to stop the alleged punitive transfer, by agreement, the State Police rescinded the transfer and an order was entered dismissing the Writ of Mandamus as moot. Instead of the transfer, the State Police assigned Ober to a lesser ranking position as a Lieutenant in the Bureau of Liquor Control Enforcement.

The State Police argue that Ober's complaint is moot for two reasons. First, they assert that these claims were decided by this Court's dismissal of the mandamus action which raised similar claims. However, the dismissal of that mandamus action as moot arose out of the agreement of the parties, not litigation and a judgment. Because there was no final determination on the merits necessary to preclude the present claims, Ober is not estopped from pursuing his Whistleblower claims. *See Consolidated Coal Company v. District 5, United Mine Workers of America*, 485 A.2d 1118 (Pa. Super. 1984).

The State Police also argue that the claims are moot because Ober received the same amount of compensation in the Lieutenant position as he did as a Captain and has since been returned to a Captain position within the Bureau of

3

Liquor Control Enforcement.   While this may be so, his remedy under the Whistleblower Law is not limited to backpay awards.  Claims may also be asserted for assessment of a civil penalty of up to $500 and for reimbursement of litigation costs and attorney fees.  43 P.S. §§1425 and 1426.  Because of the availability of these additional remedies, Ober's claims for violations of the Whistleblower Law are not moot merely because he has lost no pay or seniority.

Because Ober is not estopped from pursuing his claims under the Whistleblower Law, and because there are remedies available to him for the alleged violations, the State Police's motion to dismiss the Complaint as moot is denied.

The State Police have also filed preliminary objections to the Complaint in the nature of a demurrer.[3]  They allege that Ober has not pled a cause of action under the Whistleblower Law because he cannot plead a causal connection between an alleged report of wrongdoing and any retaliatory actions by Evanko or the State Police.

Under §1422 of the Whistleblower Law, a "whistleblower" is defined as:

> A person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith

---

[3] In ruling on preliminary objections in the nature of a demurrer, all well-pled facts and reasonable inferences are deemed true.  *Lutz*, 667 A.2d at 253.  A demurrer may be sustained when it appears with certainty that the law does not permit a recovery under the allegations pled. *Id.*

4

report of the wrongdoing or waste, verbally or in writing,
to one of the person's superiors, to an agent of the
employer or to an appropriate authority.

To establish a cause of action for a violation, the employee "must show by preponderance of the evidence that, prior to the alleged reprisal, the employee or a person acting on behalf of the employee had reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority." 43 P.S. §1424(b). A wrongdoing is "a violation which is not of merely a technical or minimal nature of a federal or state statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interests of the public or employer." 43 P.S. §1422. *See also Podgurski v. Pennsylvania State Police*, 722 A.2d 730 (Pa. Superior Ct. 1998).

In this case, Ober alleges that the precipitating report was that "on May 12, 1999, [he] and Lt. Colonel Hickes briefed Colonel Evanko on the FBI's investigation." (Paragraph 26 of the Complaint). Ober does not allege that he witnessed or had any independent evidence of the underlying corruption being investigated that caused any retaliation against him, but only that his report of the completed FBI's investigation caused Colonel Evanko to become disturbed because he was not told when Ober was approached by the FBI. An employee's report of an investigation only, that does not also allege his evidence of a wrongdoing on the part of the employer, is not a report of wrongdoing under the act. 43 P.S. §1422; *see Golaschevsky v. Commonwealth, Department of Environmental Resources*, 683 A.2d 1299 (Pa. Cmwlth. 1996), *affirmed*, 554 Pa. 157, 720 A.2d 757 (1998). Because he alleges that he made a report of an

5

investigation, not any evidence of any wrongdoing, Ober is not a "whistleblower" as defined by the law.

Because Ober has plead no facts upon which to support a showing that he is a whistleblower who reported an instance of wrongdoing to the employer or an appropriate authority, 43 P.S. §1424(b), he has failed to plead a cause of action under the Whistleblower Law.  Accordingly, the preliminary objections of the State Police are granted and the complaint is dismissed.


_Dan Pellegrini_
DAN PELLEGRINI, JUDGE

6

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

CAPTAIN DARRELL OBER        :
c/o: PENNSYLVANIA STATE     :
POLICE DEPARTMENT        :
HEADQUARTERS,            :
             Petitioner   :

     v.                    :

COLONEL PAUL EVANKO     :
COMMISSIONER,         :
PENNSYLVANIA STATE POLICE :
DEPARTMENT HEADQUARTERS :
and PENNSYLVANIA STATE   :
POLICE a/k/a: COMMONWEALTH :
OF PENNSYLVANIA        :
DEPARTMENT HEADQUARTERS,:
       Respondents:  No. 238 M.D. 2000

## O R D E R

AND NOW, this 6th day of September, 2000, the application to dismiss the Petition for Review as moot is denied.

Respondent's Preliminary Objections are granted and the Petition for Review in the Nature of a Complaint in Equity is dismissed.

*Dan Pellegrini*

DAN PELLEGRINI, JUDGE

Certified from the Record

SEP 0 6 2000

and Order Exit