

ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER )     CIVIL ACTION LAW
)
**Plaintiff** )
)     1:CV-01-0084
**vs.** )
)     (JUDGE CALDWELL)
PAUL EVANKO, MARK )
CAMPBELL, THOMAS COURY, )     JURY TRIAL DEMANDED
JOSEPH WESTCOTT, )
HAWTHORNE CONLEY and )
JOANNA REYNOLDS )
**Defendants** )

**FILED**
**HARRISBURG**
**JUN 2 5 2001**
MARY E. D'ANDREA, CLERK
Per _____
DEPUTY CLERK

## PLAINTIFF'S EXHIBITS IN OPPOSITION
## TO MOTION TO DISMISS

PENNSYLVANIA STATE POLICE DEPARTMENT
DIRECTIVE..............................................................Exhibit "A"

PENNSYLVANIA STATE POLICE DEPARTMENT
DIRECTIVE AR1-1 ORGANIZATION............................ ...Exhibit "B"

MEMORANDUM OPINION JUDGE PELLEGRINI
DATED SEPTEMBER 6, 2000................................Exhibit "C"

ARBITRATORS REPORT......................................Exhibit "D"

OBSTRUCTING GOVERNMENTAL
OPERATIONS......................................................Exhibit "E"

PSP FIELD REGULATIONS 1-2..........................................Exhibit "F"

CAPTAIN OBER'S FACTUAL ANALYSIS.......................Exhibit "G"

SP 5-200 (12-83)





AR 1-1
7/31/97

## PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

SUBJECT:    ORGANIZATION

1.01    TABLE OF ORGANIZATION

A.    Authority:  The Table of Organization of the Pennsylvania State Police, Appendage B, reflects the structure of the Department as adopted by the Executive Board.

B.    Definitions:

1.    Organizational: All references to organizational segments, when used in Department and Troop Tables of Organization, shall conform to the following designations:

a.    Area:  An organizational segment comprised of two or more Troops, which is supervised by an Area Commander accountable for the performance of subordinates and to whom the Commissioner delegates the authority to take independent action on assigned functions.

b.    Bureau:  An organizational segment comprised of Divisions, which is supervised by a Bureau Director accountable for the performance of subordinates and to whom the Commissioner delegates the authority to take independent action on assigned functions.

c.    Division:  An organizational segment of a Bureau comprised of Sections, which is supervised by a Division Director accountable for the performance of subordinates and to whom commensurate authority is delegated to perform specific functions. Certain Divisions have decentralized locations and perform functions in a specific geographical area.

AR 1-1
7/31/97

d.    Executive and Administrative Offices:    An organizational segment comprised of the Commissioner, the Commissioner's Personal Staff, the Deputy Commissioners, and the various other organizational segments not under Area, Troop or Bureau Commands.

e.    Office:    An organizational segment of the Department which is supervised by the senior ranking office person accountable for the performance of subordinates and to whom commensurate authority is delegated to perform specific functions.

f.    Section:  An organizational segment comprised of Units, which is supervised by a Section Commander (Troop) or Section Supervisor (Division or Office) accountable for the performance of subordinates and to whom commensurate authority is delegated to perform specific functions.

g.    Station:  An organizational segment of a Troop comprised of one or more Sections, which is supervised by a Station Commander accountable for the performance of subordinates and to whom commensurate authority is delegated to perform specific functions in a specific geographical area.

h.    Troop:  An organizational segment of an Area, geographically comprised of Stations, which is supervised by a Troop Commander accountable for the performance of subordinates and to whom commensurate authority is delegated for performing specific functions in a specific geographical area. Troops A through R are comprised of three Sections:  Patrol, Criminal Investigation, and Staff Services.  Troop T is comprised of two Sections: Patrol and Staff Services.

i.    Unit: An organizational segment of a Section which is supervised by a Unit Supervisor, accountable for the performance of subordinates and to whom

AR 1-1
7/31/97

  commensurate authority is delegated to perform specific functions.

2.  The following definitions shall apply when referring to the individuals employed by the Department:

  a.  Employe: A civilian working full time for the Department.

  b.  Enforcement Officer: An employe working full time for the Bureau of Liquor Control Enforcement, authorized by law to enforce the provisions of the Liquor Code and any regulations promulgated pursuant thereto.

  c.  Member: A sworn Pennsylvania State Police Trooper.

  d.  Personnel: Employes, Enforcement Officers, and members collectively.

1.02  ADMINISTRATIVE AUTHORITY AND ORGANIZATION

A. Commissioner's Personal Staff:

1.  Executive Officer to the Commissioner.

2.  Legislative Liaison Office.

3.  Municipal Police Officers' Education and Training Commission.

4.  Office of Chief Counsel.

5.  Public Information Office.

6.  Administrative Officer to the Commissioner.

B. Commissioner's Command Staff:

1.  Deputy Commissioner of Administration:

AR 1-1
7/31/97

      a.     **Equal Employment Opportunity Office.**

      b.     Bureau of Personnel.

      c.     Bureau of Professional Responsibility.

      d.     Bureau of Training and Education.

      e.     Department Discipline Office.

      f.     Heritage Affairs Office.

      g.     Liaison Office-Labor Relations.

      h.     Member Assistance Program.

2.     Deputy Commissioner of Operations:

      a.     Bureau of Criminal Investigation.

      b.     Bureau of Drug Law Enforcement.

      c.     Bureau of Liquor Control Enforcement.

      d.     Bureau of Patrol.

      e.     Public Information Coordinator.

      f.     Area Commanders.

      g.     Troop Commanders.

      h.     Section Commanders.

      i.     Station Commanders.

      j.     Troop Administrative Managers.

3.     Deputy Commissioner of Staff:

      a.     Executive Service Section.

      b.     Grant Acquisition Office.

Case 1.01-cv-00084-CCC    Document 25    Filed 08/23/2001    Page 6 of 80

    c.      Bureau of Emergency and Special Operations.

    d.      Bureau of Laboratory and Communications Services.

    e.      Bureau of Records and Identification Services.

    f.      Bureau of Research and Development.

    g.      Bureau of Staff Services.

**1.03      FUNCTIONS AND RESPONSIBILITIES**

This section outlines major functions and responsibilities of each organizational segment and level of command.

A.    Commissioner:

Assists the Governor by enforcing the law and preserving the peace through the detection of crime, apprehension of criminals, and patrol of the highways.

Exercises administrative, command and fiscal authority, and responsibility over the Department.

Maintains discipline and, when necessary, administers disciplinary action.

Establishes policies and procedures, and prescribes training standards for the Department, while ensuring that the Department continues to maintain a high proficiency in administration, training, and operational activities.

Formulates rules and regulations consistent with the Department's consent decree, and subject to approval of the Governor, prescribing qualifications prerequisite to membership in the force and selecting members on the basis of merit.

Administers the Lethal Weapons Training Act and the Municipal Police Officers' Education and Training Act.

AR 1-1
7/31/97

Organizational segments which comprise the Commissioner's Personal Staff are as follows:

1.    Executive Officer to the Commissioner:

    a.    Assists the Commissioner in general and administrative affairs.

    b.    Represents the Commissioner and the Department at public functions, at the direction of the Commissioner.

    c.    Performs other duties as the Commissioner may direct.

2.    Legislative Liaison Office:

    a.    Represents the Commissioner before Senate and House committees by testifying on legislative issues which impact upon the Department.

    b.    Keeps the Commissioner and Deputy Commissioners informed on legislative matters of interest to the Department.

    c.    Represents the Commissioner at legislative functions sponsored by members of the General Assembly.

    d.    Attends sessions of the General Assembly, including committee meetings, to keep apprised of all developments and comments in the legislature which may affect the Department.

    e.    Maintains files on legislation introduced in the General Assembly which may affect the Department.

    f.    Furnishes affected Bureaus with copies of legislation which may have a direct bearing on the functional responsibilities of that particular Bureau.

SP 3-200 (10-99)





AR Manual

# PENNSYLVANIA STATE POLICE
## DEPARTMENT DIRECTIVE

February 23, 2001

Change No. 866

SUBJECT:   AR 1-1, ORGANIZATION

1.   Special Order 99-76, Department Reorganization, is cancelled; it shall be removed from files and destroyed.

2.   AR 1-1 has been revised.

### INSTRUCTIONS

Remove these pages:          Insert these pages:

1 through 70                 1 through 66
A.1 through IV               A.1 through D

3.   Commanders and Directors shall ensure all members of their command review this regulation in its entirety.

4.   The revised Pennsylvania State Police Location Map, Appendage C, will be distributed under separate cover as soon as it is available.

5.   This Change Sheet shall be inserted into the back of Volume II of the AR Manual immediately behind Change Sheet No. 865.

*Col. Paul J Evanko*

Paul J. Evanko
Colonel   PSP

Distribution "AR"

*Exhibit "B"*

ORGANIZATION

1.01        TABLE OF ORGANIZATION

A.      Authority:  The Table of Organization of the Pennsylvania State Police, Appendage B, reflects the structure of the Department as adopted by the Executive Board.

B.      Definitions:

1.      Organizational:  All references to organizational segments, when used in Department and Troop Tables of Organization, shall conform to the following designations:

a.      Area:  An organizational segment comprised of one or more Troops, which is supervised by an Area Commander accountable for the performance of subordinates, and to whom the Commissioner delegates the authority to take independent action on assigned functions.

b.      Bureau:  An organizational segment comprised of Divisions, which is supervised by a Bureau Director accountable for the performance of subordinates, and to whom the Commissioner delegates the authority to take independent action on assigned functions.

c.      Division:  An organizational segment of a Bureau comprised of Sections, which is supervised by a Division Director accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions. Certain Divisions have decentralized locations and perform functions in a specific geographical area.

d.      Executive and Administrative Offices:  An organizational segment comprised of the Commissioner, the Commissioner's Personal Staff, the Deputy Commissioners, and the various other organizational segments not under Area, Troop, or Bureau Commands.

-1-

*Exhibit "B*

AR 1-1
2/23/2001

e.    Office:   An organizational segment of the Department which is supervised by the senior ranking office person accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

f.    Section: An organizational segment comprised of Units, which is supervised by a Section Commander (Troop) or Section Supervisor (Division or Office) accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

g.    Station:  An organizational segment of a Troop comprised of one or more Sections, which is supervised by a Station Commander accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions in a specific geographical area.

h.    Troop:  An organizational segment of an Area, geographically comprised of Stations, which is supervised by a Troop Commander accountable for the performance of subordinates, and to whom commensurate authority is delegated for performing specific functions in a specific geographical area. Troops A through R are comprised of three Sections: Patrol, Criminal Investigation, and Staff Services. Troop T is comprised of two Sections: Patrol and Staff Services.

i.    Unit: An organizational segment of a Section that is supervised by a Unit Supervisor, accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

2.    The following definitions shall apply when referring to the individuals employed by the Department:

a.    Employe:  A civilian working full time for the Department.

AR 1-1
2/23/2001

b.    Enforcement Officer:  An employe working full time for the Bureau of Liquor Control Enforcement, authorized by law to enforce the provisions of the Liquor Code and any regulations promulgated pursuant thereto.

c.    Member:   A sworn Pennsylvania State Police Trooper.

d.    Personnel:  Employes, enforcement officers, and members collectively.

1.02    ADMINISTRATIVE AUTHORITY AND ORGANIZATION

A.    Commissioner's Personal Staff:

1.    Administrative Officer to the Commissioner.

2.    Executive Officer to the Commissioner.

3.    Legislative Affairs Office.

4.    Municipal Police Officers' Education and Training Commission.

5.    Office of Chief Counsel.

6.    Public Information Office.

B.    Commissioner's Command Staff:

1.    Deputy Commissioner of Administration:

a.    Department Discipline Office.

b.    Equal Employment Opportunity Office.

c.    Executive Officer to Deputy Commissioner of Administration.

d.    Member Assistance Program.

e.    Bureau of Personnel.

AR 1-1
2/23/2001

      f.      Bureau of Professional Responsibility.

      g.      Bureau of Training and Education.

2.      Deputy Commissioner of Operations:

      a.      Executive Officer to Deputy Commissioner of Operations.

      b.      Executive Service Section.

      c.      Bureau of Criminal Investigation.

      d.      Bureau of Drug Law Enforcement.

      e.      Bureau of Emergency and Special Operations.

      f.      Bureau of Liquor Control Enforcement.

      g.      Bureau of Patrol.

      h.      Public Information Coordinator.

      i.      Area Commanders.

      j.      Troop Commanders.

      k.      Section Commanders.

      l.      Station Commanders.

      m.      Troop Administrative Managers.

3.      Deputy Commissioner of Staff:

      a.      Bureau of Forensic Services.

      b.      Bureau of Records and Identification.

      c.      Bureau of Research and Development.

      d.      Bureau of Staff Services.

      e.      Bureau of Technology Services.

C.   Chain of Command:

  1.   Chain of command is the normal and logical progression of supervisory and command function within the Department.

  2.   Personnel shall adhere to, and utilize, the chain of command except when prevented by exigent circumstances, when exempted by existing regulations, e.g., AR 4-26, Sexual Harassment Policy.  Personnel shall not bypass the established chain of command without first consulting with the appropriate supervisor.

1.03     FUNCTIONS AND RESPONSIBILITIES

This section outlines major functions and responsibilities of each organizational segment and level of command.

A.   Commissioner:

Assist the Governor by enforcing the law and preserving the peace through the detection of crime, apprehension of criminals, and patrol of the highways.

Exercise administrative, command and fiscal authority, and responsibility over the Department.

Maintain discipline and, when necessary, administer disciplinary action.

Establish policies and procedures, and prescribe training standards for the Department, while ensuring that the Department continues to maintain a high proficiency in administration, training, and operational activities.

Administer the Lethal Weapons Training Act and the Municipal Police Officers' Education and Training Act.

Organizational segments that comprise the Commissioner's Personal Staff are as follows:

  1.   Administrative Officer to the Commissioner:

AR 1-1
2/23/2001

    a.    Maintain a log of correspondence received in the Commissioner's Office for response by the Commissioner, Deputy Commissioners, Bureau Directors, Office Directors, and Area or Troop Commanders.

    b.    Monitor, track, and review correspondence forwarded from or through the Executive and Administrative Offices to ensure necessary action regarding the correspondence has been completed.

    c.    Ensure that response correspondence generated from Department Headquarters is mailed and all copies are appropriately distributed.

2.    Executive Officer to the Commissioner:

    a.    Assist the Commissioner in general and administrative affairs.

    b.    Represent the Commissioner and the Department at public functions, at the direction of the Commissioner.

    c.    Perform other duties as the Commissioner may direct.

3.    Legislative Affairs Office:

    a.    Represent the Commissioner before Senate and House committees by testifying and coordinating testimony on legislative issues impacting the Department.

    b.    Attend sessions of the General Assembly, including committee meetings and legislative functions, to inform and advise the Commissioner and Deputy Commissioners on legislative matters.

    c.    Coordinate development of Department legislative initiatives, regulations, and policy issues with the Governor's Policy and Legislative Affairs Offices and the General Assembly.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

CAPTAIN DARRELL OBER                  :
c/o: PENNSYLVANIA STATE               :
POLICE DEPARTMENT                     :
HEADQUARTERS,                         :
             Petitioner    :
                        :
      v.                            :
                        :
COLONEL PAUL EVANKO                   :
COMMISSIONER,                         :
PENNSYLVANIA STATE POLICE             :
DEPARTMENT HEADQUARTERS :
and PENNSYLVANIA STATE                :
POLICE a/k/a: COMMONWEALTH :
OF PENNSYLVANIA                       :
DEPARTMENT HEADQUARTERS, :  No. 238 M.D. 2000
        Respondents:  Argued: August 30, 2000

BEFORE:   HONORABLE DAN PELLEGRINI, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE PELLEGRINI          FILED: September 6, 2000

      Before this Court is an application to dismiss as moot and preliminary objections of Respondents, Colonel Paul Evanko (Colonel Evanko) and the Pennsylvania State Police (State Police), to the Petition for Review in the Nature of

*Exhibit "C"*

a Complaint for Violation of the Pennsylvania Whistleblower Act[1] Statute
(Complaint) filed by Captain Darrell Ober (Ober).[2]

Ober held the position as the Director of Internal Affairs Division of
the Pennsylvania State Police's Bureau of Professional Responsibility, which
included the duties of managing and overseeing complaints filed against State
Police employees. In September or October of 1998, the Federal Bureau of
Investigation (FBI) contacted Ober concerning their investigation of political
corruption in the State Police's cadet hiring process. It was unknown how high the
corruption went in the State Police. Concerned that it may reach high into the
chain of command of the state, Ober informed a superior officer outside the scope
of the investigation, Lt. Colonel Hickes, of the FBI investigation. Lt. Colonel
Hickes ordered Ober to maintain confidentiality of the investigation and not advise
his superior Lieutenant Colonel, Colonel Evanko, or the State Police
Commissioner. He also ordered Ober to cooperate with the FBI investigation and
to keep him apprised of the status of the investigation. Over the next few months,
Ober was contacted by the FBI and was provided updates of the investigation,
which he in turn reported to Lt. Colonel Hickes. On May 1, 1999, the FBI advised
Ober that the investigation was complete and that the corruption involved one
lower-level sworn officer. On May 12, 1999, Ober and Lt. Colonel Hickes briefed
Colonel Evanko on the FBI investigation.

---

[1] The Pennsylvania Whistleblower Law, Act of December 12, 1986, P.L. 169, 43 P.S.
§§1421-1428.

[2] For purposes of these motions, we will consider the facts as pled in the complaint as
true. *See Lutz v. Springettsbury Township*, 667 A.2d 251 (Pa. Cmwlth. 1995).

As Ober alleges, Colonel Evanko became enraged because neither the FBI nor Ober informed him directly of the investigation. Colonel Evanko directed Ober to prepare a memorandum of his involvement in the FBI investigation and commenced a "secret" administrative investigation as to Ober's involvement with the FBI's investigation. Ober alleges various retaliatory acts by Colonel Evanko, including a denial of reimbursement for administrative costs incurred in the FBI investigation and an involuntary transfer on short notice to Washington, Pennsylvania for a "new position" created by Colonel Evanko. After filing a Petition for Writ of Mandamus with this Court to stop the alleged punitive transfer, by agreement, the State Police rescinded the transfer and an order was entered dismissing the Writ of Mandamus as moot. Instead of the transfer, the State Police assigned Ober to a lesser ranking position as a Lieutenant in the Bureau of Liquor Control Enforcement.

The State Police argue that Ober's complaint is moot for two reasons. First, they assert that these claims were decided by this Court's dismissal of the mandamus action which raised similar claims. However, the dismissal of that mandamus action as moot arose out of the agreement of the parties, not litigation and a judgment. Because there was no final determination on the merits necessary to preclude the present claims, Ober is not estopped from pursuing his Whistleblower claims. *See Consolidated Coal Company v. District 5, United Mine Workers of America*, 485 A.2d 1118 (Pa. Super. 1984).

The State Police also argue that the claims are moot because Ober received the same amount of compensation in the Lieutenant position as he did as a Captain and has since been returned to a Captain position within the Bureau of

3

Liquor Control Enforcement.    While this may be so, his remedy under the Whistleblower Law is not limited to backpay awards.  Claims may also be asserted for assessment of a civil penalty of up to $500 and for reimbursement of litigation costs and attorney fees.  43 P.S. §§1425 and 1426.  Because of the availability of these additional remedies, Ober's claims for violations of the Whistleblower Law are not moot merely because he has lost no pay or seniority.

Because Ober is not estopped from pursuing his claims under the Whistleblower Law, and because there are remedies available to him for the alleged violations, the State Police's motion to dismiss the Complaint as moot is denied.

The State Police have also filed preliminary objections to the Complaint in the nature of a demurrer.[3]  They allege that Ober has not pled a cause of action under the Whistleblower Law because he cannot plead a causal connection between an alleged report of wrongdoing and any retaliatory actions by Evanko or the State Police.

Under §1422 of the Whistleblower Law, a "whistleblower" is defined as:

> A person who witnesses or has evidence of wrongdoing
> or waste while employed and who makes a good faith

---

[3] In ruling on preliminary objections in the nature of a demurrer, all well-pled facts and reasonable inferences are deemed true.  *Lutz*, 667 A.2d at 253.  A demurrer may be sustained when it appears with certainty that the law does not permit a recovery under the allegations pled.  *Id.*

4

report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority.

To establish a cause of action for a violation, the employee "must show by preponderance of the evidence that, prior to the alleged reprisal, the employee or a person acting on behalf of the employee had reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority." 43 P.S. §1424(b). A wrongdoing is "a violation which is not of merely a technical or minimal nature of a federal or state statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interests of the public or employer." 43 P.S. §1422. *See also Podgurski v. Pennsylvania State Police*, 722 A.2d 730 (Pa. Superior Ct. 1998).

In this case, Ober alleges that the precipitating report was that "on May 12, 1999, [he] and Lt. Colonel Hickes briefed Colonel Evanko on the FBI's investigation." (Paragraph 26 of the Complaint). Ober does not allege that he witnessed or had any independent evidence of the underlying corruption being investigated that caused any retaliation against him, but only that his report of the completed FBI's investigation caused Colonel Evanko to become disturbed because he was not told when Ober was approached by the FBI. An employee's report of an investigation only, that does not also allege his evidence of a wrongdoing on the part of the employer, is not a report of wrongdoing under the act. 43 P.S. §1422; *see Golaschevsky v. Commonwealth, Department of Environmental Resources*, 683 A.2d 1299 (Pa. Cmwlth. 1996), *affirmed*, 554 Pa. 157, 720 A.2d 757 (1998). Because he alleges that he made a report of an

5

investigation, not any evidence of any wrongdoing, Ober is not a "whistleblower" as defined by the law.

Because Ober has plead no facts upon which to support a showing that he is a whistleblower who reported an instance of wrongdoing to the employer or an appropriate authority, 43 P.S. §1424(b), he has failed to plead a cause of action under the Whistleblower Law. Accordingly, the preliminary objections of the State Police are granted and the complaint is dismissed.

_Dan Pellegrini_
DAN PELLEGRINI, JUDGE

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

CAPTAIN DARRELL OBER                    :
c/o: PENNSYLVANIA STATE                 :
POLICE DEPARTMENT                       :
HEADQUARTERS,                           :
                           Petitioner   :
                                        :
        v.                              :
                                        :
COLONEL PAUL EVANKO                     :
COMMISSIONER,                           :
PENNSYLVANIA STATE POLICE               :
DEPARTMENT HEADQUARTERS                 :
and PENNSYLVANIA STATE                  :
POLICE a/k/a: COMMONWEALTH              :
OF PENNSYLVANIA                         :
DEPARTMENT HEADQUARTERS, :
                           Respondents: No. 238 M.D. 2000

## O R D E R

AND NOW, this 6th day of September, 2000, the application to dismiss the Petition for Review as moot is denied.

Respondent's Preliminary Objections are granted and the Petition for Review in the Nature of a Complaint in Equity is dismissed.

_Dan Pellegrini_

DAN PELLEGRINI, JUDGE

Certified from the Record

SEP 0 6 2000

and Order Exit

EXHIBIT O

block her exit from an area in which he had already ordered her to remain was passive and did not consist of any active striking or pushing. Thus, I agree with the Commonwealth that FR 1-2.03, requiring obedience of lawful orders, and FR 1-1.32, which requires that members never behave disrespectfully toward other members, were broken by Corporal Stanton. I further believe that there was no justification whatsoever for Corporal Stanton to place her hand on her service weapon, an act which trenches on, if not violates, FR 1-1.32.

Taken with the violations of the other Field Regulations, the FR 1-1.32 and FR 1-2.03 violations aggravate any penalty that would be appropriately levied for the former alone. I am convinced that if the total effect of these violations does not absolutely justify a ten-day suspension, that penalty is not so excessive as to warrant my interference. However, the additional penalty of a disciplinary transfer is a different matter.

Beyond the exercise engaged in by Captain Titler, in which he attempts to give penalties consistent with those in similar cases, it is extremely difficult to quantify punitive measures so that they correspond with the severity and frequency of offenses. The Department here has found ten days *and* a disciplinary transfer to be the correct measure. Traditionally many arbitrators have been unwilling to interfere with discipline, once it is determined that all or substantially all the underlying charges have been proven. Where, however, a punishment is not consistent with the objectives of rehabilitation or necessary to safeguard the employer's interests, it will be viewed as excessive and arbitrators will intervene. I reluctantly do so here.

While the impact of a suspension is finite, a disciplinary transfer to a distant station is like a demotion: the punitive effect never ends. Even more, unlike demotions, which most severely impact income, disciplinary transfers have an impact on one's family by resulting in either a forced relocation of the household or a reduction in time the member would have with his or her family because of a lengthy commute.

That is not to say there are no instances in which such transfers are justified. Examples include cases where a member has committed some localized but highly notorious infraction diminishing the aura of authority he or she would need, as a police officer, in dealing with the public. Another would be where a member's infraction earned him the distrust and hostility of a large contingent of his station. In these types of cases, a

12

Exhibit
1 of 2

transfer out of the locale or station would be necessary to safeguard the Department's' interests. A disciplinary transfer might also be justified where a member with a history of minor but repeated offenses would likely have a better chance of rehabilitation by being switched from a station with a pervasive history of such problems to another, less problem plagued station with a new commander and co-workers.

The instant case fits neither the "necessary" or "rehabilitative" reasons for transfer. It is unnecessary because there is no evidence that an appropriately disciplined Corporal Stanton would repeat the same offense if left at the Communications Center. And, while Corporal Stanton lost face with her civilian and Departmental counterparts at the Center and her Departmental supervisors, the same could be true any time a member is guilty of some infraction. Carried to its logical extreme, the Department would constantly transfer members each time they had a disciplinary problem.

Nor is a disciplinary assignment required for rehabilitation in this case. While I have carefully considered Captain Points' testimony concerning the unsupervised nature of her work at the Center and the excellent disciplinary environment in the Bowmansville station, the fact is that Corporal Stanton worked for nearly a year without incurring discipline at the Center prior to this incident. As noted above, there is no reason to believe Corporal Stanton, properly chastened by a two- week suspension, would not mend her ways. If she does not and the Department proves she was again inattentive to her duties, or sleeping, or violating other significant standards even one additional time at the Center within twenty-four months from the date of this Decision and Award, a transfer would be appropriate. Further, other proportionate penalties up to and including discharge may be appropriate. However, given its harsh effect and the lack of a clear necessity or need for rehabilitative effect, a forced transfer at this time would be premature.

An Award will be entered sustaining the discipline and the ten-day suspension but vacating the disciplinary transfer, but subjecting Corporal Stanton to future transfer under the circumstances set forth above.

2 of 2



EXHIBIT I

CHAPTER 51
OBSTRUCTING GOVERNMENTAL OPERATIONS

Subchapter
    A.    Definition of Offenses Generally
    B.    Escape

SUBCHAPTER A
DEFINITION OF OFFENSES GENERALLY

Sec.
5101.    Obstructing administration of law or other governmental function.
5102.    Obstructing or impeding the administration of justice by picketing, etc.
5103.    Unlawfully listening into deliberations of jury.
5104.    Resisting arrest or other law enforcement.
5105.    Hindering apprehension or prosecution.
5106.    Failure to report injuries by firearm or criminal act.
5107.    Aiding consummation of crime.
5108.    Compounding.
5109.    Barratry.
5110.    Contempt of General Assembly.
5111.    Dealing in proceeds of unlawful activities.

**5101.    Obstructing administration of law or other governmental function.**

A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

**5102.    Obstructing or impeding the administration of justice by picketing, etc.**

    (a)    Offense defined.--A person is guilty of a misdemeanor of the second degree if he intentionally interferes with, obstructs or impedes the administration of justice, or with the intent of influencing any judge, juror, witness or court officer in the discharge of his duty, pickets or parades in or near any building housing a court of this Commonwealth, or in or near a building or residence occupied by or used by such judge, juror, witness or court officer, or with such intent uses any sound-truck or similar device, or resorts to any other demonstration in or near any such building or residence.

51:1           PSP Rev. 5/15/97



*EXHIBIT J*

FR 1-2
5/18/2000

concerning race, religion, national origin, sex, age, handicap, or politics.

C.  <u>Addressing the Public</u>:  While on duty in any capacity, members shall at all times address the general public, defendants, and all other persons by their surname and not by first name, e.g., Mr. Smith, Mrs. Jones; not Jim or Mary.  Professionals shall be addressed by their titles.

2.13    COOPERATION WITH OTHER AGENCIES



Members shall cooperate with all agencies engaged in the administration of justice, federal and state departments, and other public agencies providing all the aid and information permitted by existing regulations.

2.14    REQUESTS FOR ASSISTANCE

When the public requests assistance or advice, or makes complaints or reports, either by telephone or in person, all pertinent information shall be obtained in an official and courteous manner and shall be properly and judiciously acted upon consistent with existing rules, regulations, and policies.  The requesting person shall not be referred to another agency in matters necessitating police action.  Instead, all information shall be made available to the agency or department having jurisdiction in accordance with existing regulations.  In cases of emergency, it may be necessary to provide immediate police service and then notify the proper authority.

2.15    SUGGESTIONS PERTAINING TO SERVICES

Except in the transaction of personal business, members shall not recommend or suggest in any manner, the employment or procurement of a particular product, professional service, or commercial service, e.g., an attorney, ambulance service, towing service, bondsman, mortician, etc.  In the case of ambulance or towing service, when such a service is necessary and the person needing the service is unable or unwilling to procure same, members shall contact the nearest available agency offering the required service, in accordance with existing regulations.



*Exhibit "F"*

June 12, 2001

Don,

I have completely my factual analysis of the Defendant's MTD. I hope this is not too much detail!

Paragraph 1 - Last sentence is misleading, "According to Ober, the defendants retaliated against him for going outside his chain of command and confiding in Lieutenant Colonel Hickes, who *supposedly* (emphasis added) ordered Ober to keep the FBI investigation secret from his superiors."

Nothing supposed it. Defendants established this as fact nearly two years ago, through their own investigation. There is no dispute that Hickes issue the order.

FR 2.03 (Lawful Orders – Exhibit A) states that any verbal order issued by any Deputy Commissioner is valid; not conditional on chain of command. This, coupled with the fact that no Department regulation existed at the time mandating the chain of command be followed, (already acknowledged by the defendants), is critical.

If the sentence were written as it really happed, ("…. Lieutenant Colonel Hickes *ordered* …"), the court would be able to draw the conclusion that I, as a subordinate officer, was under lawful orders not to divulge the investigation to anyone. Once Hickes gave the order, the responsibility for that order was his.

Paragraph 2– Re: defendants March 16 MTD, "…which was authored, signed, and served by defendants' lead counsel, Syndi Guido." Reynolds name is on the cover of the MTD. Didn't she admit to writing it? Are they trying to suggest that Reynolds had nothing to do with the drafting of this response? It is a lie.

It is misleading to state, "…defense counsel mistakenly cited the wrong administrative regulation…". Then what is the correct citing? It suggests that chain of command regulation does exist; they just cited the wrong one.

Paragraph 3 – According to Exhibit B, the judge struck the April 2, 2001 brief and motion from the record. We should request the judge strike this paragraph from the defendant's motion.

Paragraph 4 – No comment.

Paragraph 5 – The first sentence refers to a "second amended complaint"; there is no second amended complaint. The second sentence directs the reader to footnote 1. Defendants are correct, I believe their actions are vile, hateful, etc., and I believe my actions were legal and proper. I am complaining they misrepresented FR 1-1.17 because they did!

*Exhibit*

1

Footnote number 2 should be stricken from this motion. It also refers to statements made in the proposed amended complaint that were stricken from the record.

Paragraph 6 - No comment.

Paragraph 7 - Use of the word "secret". Maybe we should put this in bold print: OBER DID NOT KEEP THE EXISTENCE OF THE FBI INVESTIGATION A SECRET. HE REPORTED IT TO LIEUTENANT COLONEL HICKES!

Again, with the "According to Ober, Lieutenant Colonel Hickes ordered him not to tell anyone else about the investigation". The factually correct statement would be: "Upon hearing the information, LTC Hickes ORDERED Captain Ober, a subordinate officer, not to divulge this information."

Exhibit C is a copy of the Oath of Enlistment that I signed which requires me to obey the orders of a superior officer; which is preciously what I did.

We should respond to footnote number 3 and elsewhere in the MTD where this appears. Conley and Hickes promotions were effective the same day (Saturday October 3rd). However, the information from the FBI came to me BEFORE the 3rd and they damn well know this from their own investigation. Yet they continue to rail on about my obligation to report to Conley; knowing that Conley did not report to BPR until at least the 6th and that I had already informed Hickes, and been given his order, on the 5th. This is all established on the tape of my IAD interview.

Paragraph 8: "Yet, he has not mentioned a single person who has treated him in that fashion because of the particular inquiry". The defendants would be five examples. If I am obligated to supply names, I can. How many would they like?

Paragraph 9: The defendants are fixated on the transfer as the only evidence of action taken by Evanko. The timeline between May 1999 and January 2000 is filled with numerous examples of actions taken against me. The transfer was the egregious action that "sparked" the intervention of the state court. Why did Evanko rescind the transfer? The logical conclusion is because he knew it was illegal, he had been caught and knew he would be exposed.

Paragraph 10: Paragraph is a blatant lie. "…Evanko explained that Captain Ober had been transferred to Washington in order to assist the Area Commander in coordinating services at the Conference of the National Governors Association…". Evanko OR ANYBODY ELSE, NEVER "EXPLAINED" this to me. Accordingly to the personnel order, the transfer was permanent with no mention of the NGA (refer to Defendants OWN Exhibit B; FR 3-2).

Defendants are trying to pull a fast one with the regulations. They are co-mingling sections 2.04 and 2.05. They are attempting to use Evanko's authority

under 2.04 (A) to assign me to Washington but call it a temporary transfer that falls under the provisions of 2.05. These are two entirely different regulations. They cannot transfer a member under 2.04 without following section B., Procedures. In my situation subsection 3. would apply. This failure was pointed out to them in Exhibit E; page 13. Their way around this is to call it a temporary transfer under the provisions of 2.05. The problem is, I was not assigned to a Troop and do not fall under these provisions. Besides, they would have followed the procedures of this section either. This is a giant "I got you" and evidence of another misrepresentation to the court.

Interestingly, defendants did not include page one of FR 3-2 that contains the most damning section; (I included at the end of Exhibit E); which states transfers may not be used in lieu of discipline.

The NGA assignment is a lie; created for after the fact to cover their tracks. Why didn't Evanko send me to "the important Washington position"? Because I filed and injunction? The NGA story is a myth and I am eager to prove it.

"In the meantime, to fulfill his promise to Ober, Colonel Evanko temporarily assigned him as the Central Section Command...." What promise? The only promise we ever discussed was being sent back to IAD after IIMS. If Evanko was fulfilling a promise, why didn't he send me to the Central Section Command to begin with? It was open in January. Doesn't this contradict his promise to send me back to IAD? That was a problem inasmuch as he already promoted Lieutenant Brown into the position? Why was that necessary?

There was nothing "temporary" about my assignment to the Central Section. It was temporary because of the unexpected and unannounced retirement of Captain Alfred Campbell. Proof of the fact lies in the Personnel Orders (Exhibits F and G and FR 3-2, Transfers). Unless noted otherwise, transfers are to be considered PERMANENT. Neither personnel order indicates the transfer was temporary; by regulation that makes them permanent.

This sentence would be more accurate if the defendants had said, "Because Ober was able to defeat Evanko's planned illegal transfer to Washington, Evanko decided to find another way to punish Ober. He decided to demote him to a Lieutenant's position which was his way of disgracing Ober to the entire Department."

Paragraph 11: "Still, Ober was not happy. Even though he retained the same rank any pay, Ober did not like the fact that his new position had been held by a Lieutenant". The position was so unimportant, it had been held by a SERGEANT for the previous seven months. Why would I be happy; this was a punitive, disciplinary action intended to disgrace and humiliate me. Of the 70 Section Commanders in the State; 69 of them were Lieutenants and one was a Captain! Assigning me to a Lieutenant's position also violates the provisions of AR 1-10.07 (C) (Exhibit H).

3

Paragraph 12 - If we are required to provide specifics, we can.

Paragraph 13 – See above re: specifics. The last sentence is interesting, the conclusion we are asking to be drawn is for a jury to decide. Defendants are saying it is unjustified because they were caught red-handed. They are asking me and the court to accept an "Oops, just a little mistake, sorry about that, don't be mad".

Paragraphs 14 and 15- Legal stuff, your area.

Paragraph 16 – Defendants state that our complaint contains very few factual averments, then they proceed to list four specific examples of actions taken against me that are listed in the complaint!

Paragraph 17 – Hard to respond as it contains so much doublespeak. Defendants overlooked the other investigation into my personal affairs; Westcott blocked my from PEMA on two occasions; my overtime and equal pay opportunities; training denials; and request for career enhancing assignments. Instead they make Evanko sound benevolent by "allowing" me to stay in Harrisburg and me sound ungrateful by "complaining" that I had been assigned a job previously filled by a Lieutenant. Ridiculous!

Paragraphs 18, 19, 20, 21, 22, 23, 24 & 25 – Legal stuff; all yours.

Paragraph 26 – Legal stuff all yours; I do note the statement: "...and the Commissioner's actions were in no way retaliatory". Are they kidding??

Paragraph 27 – Do they really believe that potential corruption in the hiring practices of a state police agency is NOT speech constituting on a matter of public concern??!!

Paragraph 28 – Defendants are trying to set a trap by saying that I could not have been acting in the public interest by telling Hickes after being requested by the FBI to keep the matter confidential. Therefore, I had to be acting on my personal interest. This "theory" ignores two facts. One, the FBI's request not to divulge the existence of their investigation was not a legally binding one; it was a request commonly made by law enforcement investigators not to divulge details to potential target that might hamper or impede the investigation. I informed Hickes because I made a JUDGEMENT call that someone of appropriate rank and authority ought to be made aware and, to me, Hickes was an obvious choice. This has been explained to the defendants many, many times. The second point is in all of their rhetoric; the defendants NEVER acknowledge the precarious position I was in. They arguing that I my actions were inappropriate and violated regulations, yet, they ignore the LEGAL implications of informing potential targets of the existence of the FBI probe. It is clear they were expecting me to break the law to keep them informed (Exhibit H - Obstruction).

4

Defendants also fail to mention their Exhibit AR 4-25.08 (F) 3. states, "Investigators shall assist federal, state, county and municipal law enforcement agencies wherein investigations may be implicated in illegal activities or other acts of misconduct". In my situation, we could argue I was loosely defined as an "investigator".

In my situation, the provisions of FR 1-2.13, Cooperation With Other Agencies (Exhibit J) were implicated. "Members shall cooperate with other agencies..."

Paragraph 29 – The report was not "belated"; it was given to Evanko as soon as the FBI indicated the probe yielded no other members than Trooper Stanton. (Exhibit K).

There is nothing significant about me not alleging Evanko retaliated against me because I knew of independent evidence of corruption in the cadet selection program. This is an interesting statement and one that makes me think they are very nervous. They have either been listening in or realize they are vulnerable because of some of the "irregularities" I have seen.

Paragraph 30 – Defendants have not proven my reasoning is "...so clearly distorted". What is "so clearly distorted" was Evanko's reaction and the actions taken against me.

Paragraph 31 – Defendants are again fixated on the transfer as the only important discipline or punishment being taken against me. Punishment began with the witch-hunt investigation. Actions taken against me ran on a continuous cycle for the ENTIRE eight month into January. I protested the actions through the grievance process. In fact, I was transferred four hours after a Step One hearing with Conley on the second grievance.

The "significant" Washington assignment is a myth and was created after the fact. Comparing my situation to LIEUTENANT Young's is preposterous. Defendants are again misrepresenting the facts. Young was a Lieutenant and could have turned the promotion down. Because he was given a choice; it is irrelevant WHERE he is from. If we ever get the chance, we will see how sweet his deal really was!

Paragraph 32 – My fourth amendment rights are implicated when the defendants, knowing no violations were committed, used the administrative provisions to compel me to participate in an administrative interview process hoping to find some evidence of wrongdoing. This occurred twice.

Paragraphs 33, 34, and 35 – Legal stuff; all yours.

Paragraph 36 – "Ober has chosen to take a simple mistake and blow it completely out of proportion". Matter for a jury. There is no evidence this was a simple mistake other than the defendants saying so.

Re: FR 1-1.17 – To the contrary! Defendants did NOT describe that regulation to the court. In fact, they so obviously and, "stubbornly", misrepresented the regulation they again have no credible explanation to offer in this MTD.

Paragraphs 37, 38, 39 and 40 – Legal stuff; yours.

Paragraph 41 – Evanko may be ultimate responsibility for the conduct of every member of the force (FR 3-3.04); however, he has no authority or immunity to violate members labor contract or due process rights. He cannot use this regulation to conduct "star chamber" inquiries.

Paragraph 42 – Again, a misquote of the regulation. Additionally, this section, even being misrepresented, still does apply in either situation. When the FBI first contacted me, no specific members where implicated. By the time Trooper Stanton was implicated, I had already long been under Hickes valid order not to divulge information.

New assertions that I violated regulations!! I will first deal with them one by one.

AR 4-25.10 – I DID comply! My verbal report to a Deputy Commissioner would easily satisfy this requirement. In fact, the rest of the regulation states: "When the complaint involves personnel in the chain of command and the process described in Appendage I is inappropriate (underline added), contact may be made directly with the Internal Affairs Division" (Note: Not the Director, BPR but the Internal Affairs Division).

Appendage I of AR 4-25 D. 1. states: "If the complaint involves an individual in the chain of command, the individual may be bypassed when submitting the Worksheet through channels".

Defendant's allegations of my wrong doing not only fails to recognize the sensitive nature of the investigation, they fail to recognize their OWN RULES WHICH PERMIT EXCEPTIONS. The language of AR 4-25 clearly recognizes exceptions do exist. You could argue that had I taken the actions they are suggesting, in addition to breaking the law, I would be violating the very regulations they are citing!

Additional support to the exceptions policy is found in AR 4-25, Appendage I which states: "When a complaint is received concerning a member assigned to the Bureau of Professional Responsibility, the Worksheet shall be sent directly, under confidential cover, to the Deputy Commissioner of Administration."

When I informed Hickes, the decision to grant an exception to existing regulations was his; if he wanted a Worksheet generated, he would have ordered it.

FR 1-1.28 – Preparing a written statement, etc. I went well beyond this requirement and reported to a Deputy Commissioner! Hickes orders negated any obligation or requirement to record anything. Yet, defendants NEVER discuss Hickes order. They must know they are vulnerable and there is no way around the implications and defense of an order issued by a Deputy Commissioner.

Paragraph 43 – The regulation references to the Conley's position as the Director, BPR are irrelevant. I do note that AR 4-25 C. states: The Director, Internal Affairs Division shall:

> 1.    In the absence of the Director, Bureau of Professional Responsibility, assume all duties relative to the administration of the Internal Affairs Division.

As an aside, Conley was unknown to me. Coury told me he was recommending me for the Director, BPR and not Conley because Colonel Walp promoted Conley out of BPR because he was incompetent as a Lieutenant. Colonel Walp needed a minority Captain and promoted Conley into the Emergency Preparedness Officer's position where he had no staff and couldn't hurt anyone. Hickes will back this up.

Paragraph 44 – I vehemently dispute the statement "..it is well within Commissioner Evanko's authority to investigate that unauthorized breach in the chain of command". The defendants have not established that such a breach EVER occurred. And any personnel investigations Evanko orders must comply with the rules and regulations of the agency and my civil rights.

AR 4-25 .09 (A) (11) states: "Investigations conducted at the request of the Commissioner". However, this regulation does not supercede either the labor contract or my constitutional rights.

Defendants again misrepresented AR 4-25.04 (B) both as policy and practice. This is an exercise in word-smithing and misdirection.

I was specifically told an Administrative "Inquiry" was being conducted and an Administrative Investigation was not. Administrative Investigations are defined; Inquiry's are not. Assuming the defendants position, then why were the provisions of AR 4-25 regarding notification NEVER followed? According to AR 4-25, I should have been notified of the results of the investigation in writing or initiation of administrative action (would have been Conley's responsibility).

I was also told (PSTA Representative was present) by Majors Werts and Williams they were NOT conducting an administrative investigation and at the time of my interview, they had found NO evidence of misconduct.

The Notification of Inquiry (Exhibit L) is an altered document that was necessary to accomplish their investigative objective; it was "customized" for me.

Also, contrary to the rules and practices of the agency, no BPR Control Number was assigned to the Administrative Warning (Exhibit M) that is a clear indication this one was conducted "off the books".

The definition of "Administrative Investigation" in AR 4-25.04 B. states: "Inquires into alleged misconduct by personnel OR any inquiry into the actions of Department personnel required by directives where no misconduct is alleged." In policy and practice, the latter refers to "Non-Complainant Investigations" which are defined in AR 4-25.04 (L). Examples would be use of force, failure to qualify, prisoner escapes, attorney work products, etc. Defendants again misrepresented the application and intent of this regulation.

Paragraph 45 – Yes, it was ENTIRELY inappropriate for Evanko to consult Campbell because there was no reason to!  The investigation by the FBI was completed and a Trooper was arrested.

Paragraph 46 – Again, a reference to "...the way it had been mishandled by personnel under Evanko's command".  Defendants have not shown that Hickes or I mishandled ANTHING!

Paragraph 47 – There was nothing "temporary" about this transfer; see prior comments.

Defendant's misrepresentation and half-truths of their authority under FR 3-2.04 (A) must be challenged.  See prior comments, the procedures required to affect a transfer under this regulation were not followed.

Paragraph 49 – "...to a position where Evanko felt I would be the most useful..." If this is true, this statement indicts Evanko as the world's worst police administrator.  If he REALLY believed the needs of the Department would be better served with me being prematurely ripped from a $100 million dollar technology project and sent 200 miles to an assignment for which the preparations were already wrapped up and then, having failed in that maneuver, transferring me to replace a Sergeant who was filling in for a Lieutenant, he should be removed as a public disgrace!

AR 4-25.11 (B) – "It is a generally accepted practice to periodically rotate members assigned to an Internal Affairs Division".  THIS IS ANOTHER

MISREPRESENTATION TO THE COURT. This is a statement about internal affairs in general; it does not establish this a Department policy.

As a matter of fact, it is NOT the customary practice to rotate personnel through internal affairs in PSP. In general, members leave by one of three ways: they are asked to leave because of performance issues; they retire or they get promoted. I think it is safe to say IAD is one of the most stable divisions in the Department; experiencing little turnover.

This is particularly true for the Directors position. Besides, the statement is irrelevant; are they forgetting that Evanko promised to bring me back to IAD upon completion of the IIMS Project? (Exhibit N).

Paragraph 50 – More legal stuff. I note their failure to acknowledge the actions taken against me were disciplinary.

Paragraph 51, 52, 53, 54, 55 – All legal stuff and in your ballpark.

In summary, the defendants MTD does not survive even cursory analysis. It is replete with contradictions, misleading references, play on words, and selective references. Despite trying to dazzle us with exhibits and misdirection, their motion easily falls apart when you scratch below the surface. Defendants MTD is a desperate attempt to justify their actions totally devoid of any credibility.

The case is quite simple. The FBI called me. I informed Hickes. Hickes gives an order. Evanko becomes enraged and, despite knowing that I have not violated any regulations, proceeds to discipline me in a number of ways. In doing so, he violates the agency rules and regulations as violates my rights.

With this MTD; the defendants have cited three regulations that were supposedly violated. They also state the investigation was "mishandled". If all that were true, why have they NEVER initiated a single action against me in accordance with Department regulations? As they say, isn't Evanko ultimately charged with the discipline of the entire Department? I was never counseled, never received an oral or written reprimand, never issued a Supervisors Notation never one mention on a performance evaluation. If they REALLY believe I violated regulations, they are derelict in their duties in not taking action against me.

Exhibit O is a recent example of what one arbitrator had to say about disciplinary transfers. It certainly applies in my case.

Finally, much has been said about chain of command. The truth is, it is widely recognized even among the most rigid organizations, that strict adherence to the chain of command leads to gridlock and paralysis. The defendants themselves, in their most recent creation (AR 1-1.02 (c)) acknowledge there are instances

when the chain is not followed.  Exhibits P, Q, R, S, T and U are but a few of the many, many instances when the chain of command is not only on a regular basis.

I am also loaning you a copy of Retired Colonel McKetta's book.  It provides some great insight in the PSP.  I have met with Colonel McKetta.  He is 85 and in poor health.  He is very empathetic to my situation.  Should we weigh the benefit of having the Colonel give us an affidavit re: the practices of the agency, etc.?

Thanks,

Darrell

*EXHIBIT A*

SP 3-200 (12-93)

FR 1-2
2/20/98





**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE

SUBJECT:     DUTY REQUIREMENTS

2.01        PURPOSE

The purpose of this regulation is to establish policy and guidelines of duty requirements for the conduct of members.

2.02        PERFORMANCE OF DUTY

Members shall conscientiously strive to enforce the laws of the Commonwealth and render service to all citizens within the Commonwealth. Members shall also be held responsible for the proper performance of all duties assigned to them, the appropriate use of delegated authority, and strict adherence to the rules, regulations, or directives promulgated by the Department.  Ignorance of the rules, regulations, or directives shall not be considered an excuse or justification for any violation of such by a member.  Members shall be responsible for their acts and shall not attempt to shift the burden of responsibility for executing or failing to execute a lawful order or police duty.  Supervisors shall ensure that members are given commensurate authority necessary for the effective performance of duty.

2.03        LAWFUL ORDERS

Members shall promptly obey and execute any and all lawful orders of a supervisor.  This shall include orders relayed from a supervisor by a member of the same or lesser rank.  A lawful order is any order, in keeping with the performance of any duty, issued either verbally or written over the signature of the Commissioner, any Deputy Commissioner, Area Commander, Bureau Director, Troop Commander, Division Director, Office Director, or any other supervisor prescribed by the various rules, regulations, or directives of the Department and necessary for the preservation of good order, efficiency, and the proper discipline of the Department and its members.

-1-

*EXHIBIT B*

*see as*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,
      Plaintiff          :

                    :

                    :

        vs.            :      CIVIL ACTION NO. 1:CV-01-0084

                    :

PAUL EVANKO,
MARK CAMPBELL,           :
THOMAS COURY,
JOSEPH WESTCOTT,        :
HAWTHORNE CONLEY,
          Defendants    :

FILED
HARRISBURG, PA

APR 2 3 2001

MARY E. D'ANDREA, CLERK
PER_____
DEPUTY CLERK

O R D E R

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

      Plaintiff's complaint was filed in this matter on
January 16, 2001.  On March 16, 2001 defendants filed a motion to
dismiss and a brief in support.

      On April 2, 2001, plaintiff filed a brief in opposition
to defendants' motion and in addition filed a motion to amend his
complaint.  Attached to the latter motion is the proposed amended
complaint, marked Exhibit A.  On April 19, 2001, defendants filed
a motion to dismiss or strike the plaintiff's amended complaint.
This motion has not yet been briefed.  Plaintiff's April 2, 2001
filing has caused certain confusion, and this order is intended to
clarify and correct any uncertainty.

      Federal Rule of Civil Procedure 15(a) provides that a
party may amend a pleading once at any time before a responsive

pleading is served.  A motion to dismiss is not within the definition or description of "pleading" (Fed. R. Civ. P. 7).

In order to rectify the impasse that has been created by plaintiff's filing of April 2, 2001, it is Ordered as follows:

a)  Defendant's motion to strike plaintiff's amended complaint (doc. no. 9) is granted, and plaintiff's motion to file an amended complaint (doc. no. 6) is stricken from the record in its entirety.

b)  Plaintiff is afforded ten (10) days to file an amended complaint, as permitted by Fed. R. Civ. P. 15(a).

c)  Defendant is afforded ten (10) days thereafter to file a motion to dismiss or a responsive pleading.

d)  Defendants shall brief any motion pursuant to local rules.  Any such brief shall not incorporate prior briefs and must stand on its own.

e)  Defendants' motion to dismiss (doc. no. 4), filed March 16, 2001, is dismissed as moot.

f)  Plaintiff's counsel shall hereafter strictly comply with federal and local rules of procedure.

William W. Caldwell
United States District Judge

Date:  April 23, 2001

2

AR 4-1
6/20/79

# *EXHIBIT C*

### APPENDAGE II

SP 1-327 (2-79)

PENNSYLVANIA STATE POLICE
## ORIGINAL ENLISTMENT

| Name of Cadet | Social Security No. | Home address |
|---|---|---|

### ENLISTMENT AND OATH

I DO HEREBY ACKNOWLEDGE to have voluntarily enlisted this _____ day of

_____, 19 _____, as a member of the Pennsylvania State Police. I do

solemnly swear (or affirm) that I will bear true faith and allegiance to the COMMONWEALTH OF

PENNSYLVANIA, that I will serve it honestly and faithfully, that I will support the constitution

of the Commonwealth of Pennsylvania, that I will perform all my duties as a Pennsylvania State

Police Officer according to the law and regulations governing same, that I will conduct myself ac-

cording to the regulations as set forth by the Commissioner of the Pennsylvania State Police, and

that I will obey the orders of my superior officers. I understand that I must serve a probationary

period of 18 months from the date of my enlistment, during which time I may be dismissed by the

Commissioner for violation of rules and regulations, incompetency, and inefficiency without action

of a court martial board or the right of appeal to a civil court.

Signature of Enlistee

## BUREAU OF TRAINING & EDUCATION

### CERTIFICATION OF ENLISTMENT

I certify that the above named cadet fulfills all legal requirements for enlistment and is

hereby accepted into the service of the Pennsylvania State Police under this contract of enlist-

ment, and, in doing so, have strictly observed the regulations which govern the Pennsylvania

State Police.

| Pennsylvania State Police Academy Hershey, Pennsylvania | Signature, Director |
|---|---|

00-01
Personnel Order
January 7, 2000

EXHIBIT D

SUBJECT:        Promotions and/or Transfers

TO:             Area, Troop and Station Commanders
                and Bureau Directors

FROM:           Commissioner

1.      The following personnel matters are announced as follows:

        Major Richard D. A. Morris, Director, Legislative Affairs
        Office, has retired effective January 7, 2000. Captain
        Michael D. Simmers assumes command as Acting Director,
        Legislative Affairs Office, until further notice.

        A request has been forwarded to the Executive Board to
        establish a Policy Office. Mr. Ronald E. Plesco, Executive
        Policy Specialist 2, will assume the responsibilities as Acting
        Director reporting to the Commissioner.

        Captain Ernest Humphreys, Jr., Director, Planning Division,
        Bureau of Research and Development, has retired effective
        January 7, 2000.

        Captain Darrell G. Ober, Director, Internal Affairs Division,
        Bureau of Professional Responsibility, is assigned as
        Special Projects Officer to Commander, Area III, effective
        January 29, 2000.

        Lieutenant John R. Brown is promoted to Captain and
        assumes command of the Internal Affairs Division, Bureau
        of Professional Responsibility, effective January 29, 2000.

2.      The following promotions and transfers as indicated are
        effective January 29, 2000:

        Donald G. Benedick, Bureau of Research and
        Development, is promoted to Lieutenant.

        Albert L. Brown III, Troop D, Butler, is promoted to
        Lieutenant.

*EXHIBIT E*

| | | |
|---|---|---|
| CAPTAIN DARRELL OBER | * | IN THE |
| C/O: PENNSYLVANIA STATE POLICE | | |
| DEPARTMENT HEADQUARTERS | * | COMMONWEALTH COURT |
| 1800 ELMERTON AVENUE | | |
| HARRISBURG, PENNSYLVANIA 17109 | * | OF |
| | | |
| Petitioner, | * | PENNSYLVANIA |
| | | |
| vs. | * | Case No. _____ |
| | | |
| COLONEL PAUL EVANKO | * | |
| COMMISSIONER, PENNSYLVANIA | | |
| STATE POLICE | * | |
| DEPARTMENT HEADQUARTERS | | |
| 1800 ELMERTON AVENUE | * | |
| HARRISBURG, PENNSYLVANIA 17109 | | |
| | * | |
| and | | |
| | * | |
| PENNSYLVANIA STATE POLICE | | |
| a/k/a: Commonwealth of Pennsylvania | * | |
| DEPARTMENT HEADQUARTERS | | |
| 1800 ELMERTON AVENUE | * | |
| HARRISBURG, PENNSYLVANIA 17109 | | |
| | * | |
| SERVE: | | |
|     Barbara L. Christie, Esq. | * | |
|     Office of Chief Counsel | | |
|     Pennsylvania State Police | * | |
|     Department Headquarters | | |
|     1800 Elmerton Avenue | * | |
|     Harrisburg Pennsylvania 17109 | | |
| | * | |
| Respondents. | | |

*    *    *    *    *    *    *    *    *    *    *    *    **

## PETITIONER'S PETITION FOR REVIEW FOR A WRIT OF MANDAMUS

### INTRODUCTION

Petitioner, Captain Darrell Ober (Captain Ober), by and through his attorneys, John Miller,

Esq., Byron L. Warnken, Esq., James A. Lanier, Esq., and the Law Offices of Bonnie L. Warnken,

pursuant to 42 Pa. C.S. § 761(c), and 43 Pa. C.S. § 1423, brings this Petition for Review for a Writ

of Mandamus against Colonel Paul Evanko, Commissioner, Pennsylvania State Police (Colonel Evanko), and the Pennsylvania State Police, a/k/a the Commonwealth of Pennsylvania (PSP) (collectively, the Respondents).

Captain Ober seeks to prohibit and enjoin the Respondents from instituting a punitive transfer against Captain Ober. Such a punitive transfer violates the law and Captain Ober's rights. Captain Ober has a clear legal right, and the Respondents have a clear legal duty. Therefore, Captain Ober is entitled to a Writ of Mandamus. Styers v. Wade, 372 Pa. Cmwlth 38, 372 A.2d 1236 (1977).

However, the same laws that provide Captain Ober with a viable legal cause of action fail to provide him with an adequate remedy at law. No law provides Captain Ober with compensation (1) for the pain, suffering, and humiliation of his being punished and ostracized, when he should have been rewarded, (2) for the harm to his wife and three young children, ages four, six, and twelve, (3) for the harm to the strength of his custody order, as a consequence of his banishment, which separates him from his eldest child, from a prior marriage, who would for residing with his stepmother and not his father, and (4) for the demonstrable psychiatric harm, supportable by expert medical testimony, to the child. Effective January 29, 2000, Captain Ober has been ordered to report to Area III, Troop B - Washington, which is approximately 210 miles from Captain Ober's residence, for an unknown length of time, to an unspecified position. Captain Ober's transfer is punitive in nature. The PSP administrative regulations prohibit the agency from imposing a punitive transfer on a non-probationary law enforcement officer unless, and until, the officer has been found administratively guilty, following the procedural protections mandated in the PSP Field Regulations Manual. The Respondents have violated his administrative rights by unilaterally imposing a punitive

2

transfer upon Captain Ober, scheduled to take effect on January 29, 2000, entailing a weekly commute of nearly 32 hours of commuting time (420 miles daily round trip). This punitive transfer violates (1) PSP Field Regulation sections 3-2 (2.04) and 3-3 (3.05), (2) the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, (3) the Pennsylvania "Whistleblower" Act, (4) the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and (5) the Pennsylvania Constitution. This punitive transfer has been ordered to be imposed upon Captain Ober, even though he was never charged with, much less found guilty of, any administrative disciplinary violation.

Accordingly, Captain Ober respectfully requests this Court to (1) sign an order, prohibiting the Respondents from imposing the punitive transfer, pending a hearing on the merits of his mandamus proceeding; (2) after a full hearing on the merits, issue a Writ of Mandamus in favor of Captain Ober permanently prohibiting the Respondents from punitively transferring Captain Ober; (3) order Captain Ober to be reassigned to his previous position at the Bureau of Technology Services; and (4) order the Respondents from taking any retaliatory action against Captain Ober in response to his lawful exercise of his constitutional and statutory rights and privileges.

## PARTIES

1.     Respondent Colonel Evanko is the Commissioner of the PSP.

2.     Respondent PSP is the chief law enforcement agency for the Commonwealth of Pennsylvania.

3.     Captain Ober is a non-probationary, 18 ½-year veteran law enforcement officer of the PSP.

## FACTUAL ALLEGATIONS

3

4.     On May 2, 1998, Captain Ober was assigned as the Director of the Internal Affairs Division of the PSP's Bureau of Professional Responsibility (BPR).  As Director of the Internal Affairs Division, Captain Ober's chief duty was to manage and oversee the investigation of all complaints filed against sworn and civilian PSP employees.

5.     Captain Ober directly managed three separate internal affairs sections.  Each internal affairs section consisted of a Lieutenant, three or four investigators, and administrative staff.

6.     In late September or early October 1998, Captain Ober was contacted by Federal Bureau of Investigation Special Agent Ralph W. Kush (SA Kush).

7.     SA Kush advised Captain Ober that the Pittsburgh Office of the FBI was investigating political corruption in Western Pennsylvania.

8.     Specifically, SA Kush advised Captain Ober that the FBI had information alleging corruption in the PSP Cadet hiring process.  The alleged corruption of the Cadet program took the form of cash payments to political figures and/or to sworn PSP officers in return for individuals who placed low on the Cadet qualification list to be given a higher ranking.

9.     Because the political corruption investigation was ongoing, neither SA Kush nor Captain Ober had any inclination as to how high the political corruption went within the PSP, possibly up to or including Colonel Evanko.

10.     SA Kush requested that Captain Ober keep knowledge of the investigation confidential.  Captain Ober elected to inform Lieutenant Colonel Robert C. Hickes (Lt. Colonel Hickes).  Captain Ober informed the FBI that Lt. Col. Hickes was made aware of the investigation.

11.     Thus, in light of the seriousness of the investigation, in early October 1998, Captain Ober informed Lt. Colonel Hickes of the FBI's investigation.

4

12.     Captain Ober chose to inform Lt. Colonel Hickes because Lt. Colonel Hickes: (1) was superior in command; (2) had been recently promoted to the rank of Lieutenant Colonel, and (3) while at the rank of Major, had been assigned to a PSP position outside the scope of the FBI's investigation and thus was not a subject of the corruption investigation.

13.     Lt. Colonel Hickes ordered Captain Ober to: (1) maintain the FBI's request for confidentiality, including not advising Colonel Evanko; (2) cooperate with SA Kush during the the FBI's investigation; and (3) keep him (Lt. Colonel Hickes) informed as to the status of the FBI's investigation.

14.     On October 21, 1998, Captain Ober met with SA Kush and Special Agent Michael J. Soohy (SA Soohy) at PSP Troop T - Everett.  At this meeting, SA Kush played an audiotape from a body wire confirming that the FBI had targets who were conspiring to corrupt the Cadet hiring process through cash payoffs.

15.     After that meeting, Captain Ober provided  Lt. Colonel Hickes with a status report of what transpired during this meeting.

16.     Over the next few months, SA Kush contacted Captain Ober sporadically to provide updates.  When appropriate, Captain Ober advised Lt. Colonel Hickes as to the investigation's status.

17.     On March 15, 1999, SA Kush and SA Soohy met with Captain Ober.  At this meeting, SA Kush played a videotape of a cash payoff being received by a sworn PSP officer.  After this meeting, Captain Ober advised Lt. Colonel Hickes of what transpired at the meeting and on the videotape.

18.     On April 26, 1999, Captain Ober was temporarily detached from the Internal Affairs Division to the Bureau of Technology Services at the request of Colonel Evanko.  In his new

5

assignment, Captain Ober was assigned as the lead officer on a multi-million dollar PSP system integration procurement project. Captain Ober continued to be the FBI's contact person, even though he was no longer part of the Internal Affairs Division.

19.    On May 1, 1999, SA Kush advised Captain Ober that the political corruption portion of the FBI's investigation involving the PSP was completed. The FBI did not find agency-wide corruption within the PSP. Ultimately, the FBI had determined that the PSP corruption did not go "to the top," but rather involved only one low ranking sworn officer.

20.    During the week of May 3, 1999, Captain Ober informed Lt. Colonel Hickes of the FBI's conclusions. Lt. Colonel Hickes indicated that he would arrange a briefing of Colonel Evanko.

21.    On May 12, 1999, Captain Ober and Lt. Colonel Hickes briefed Colonel Evanko on the FBI's investigation. Immediately, Colonel Evanko became enraged because the FBI did not inform him directly. Colonel Evanko threatened to have the FBI agents transferred from the FBI's Pittsburgh Field Office for not informing him about the investigation. Colonel Evanko then demanded that Captain Ober prepare a memorandum detailing his and Lt. Colonel Hickes's involvement in, and knowledge of, the FBI's investigation.

22.    Captain Ober provided a two-page memorandum for Colonel Evanko detailing his and Lt. Colonel's involvement in, and knowledge of, the FBI's investigation.

23.    Colonel Evanko should have been delighted and/or relieved to learn that what could have been corruption of the PSP's Cadet program was merely the illegal conduct of one low ranking sworn officer. Colonel Evanko should likewise have been proud of the professionalism and integrity of Captain Ober, who, in the face of an FBI investigation which the FBI feared could possibly go "all the way to the top," maintained the requisite confidentiality, integrity, and attention to detail, all

6

of which only added to the speed with which the PSP were cleared. Instead, Colonel Evanko took great offense that Captain Ober failed to violate the FBI's request/order of confidentiality and failed to inform him about the FBI's investigation from the onset, notwithstanding and/or because he (Colonel Evanko) was a potential target.

24.    On June 28, 1999, Captain Ober was contacted by Major Thomas Williams and Major Robert Wertz. Major Williams and Major Wertz informed Captain Ober that, by order of Colonel Evanko, they had been ordered to conduct an "administrative inquiry" into Captain Ober's actions in regard to the FBI investigation.

25.    Majors Williams and Wertz advised Captain Ober that: (1) no allegation of misconduct existed; (2) they had uncovered no evidence of any misconduct; (3) no Internal Affairs Control Number had been assigned to this "inquiry," as required by the Internal Affairs Division; and (4) no Use of Force or Complaint Reception and Processing Worksheet existed, as required by the Internal Affair Division.

26.    Majors Williams and Wertz further advised Captain Ober that Colonel Evanko would review their findings to determine if a formal disciplinary investigation of the Internal Affair Division was warranted.

27.    Majors Williams and Wertz then interrogated Captain Ober as to his involvement in the FBI's investigation. This interrogation was tape-recorded.

28.    Thus, Captain Ober was subjected to a secret administrative discipline investigation, conducted under the authority of Colonel Evanko. This "star chamber" inquiry was in violation of (1) the rules and regulations of the PSP, as established in the Field Regulations Manual, (2) Captain Ober's rights under Article 26 of the Pennsylvania State Police Troopers Association Collective

7

Bargaining Agreement, (3) the Pennsylvania "Whistleblower" Act, (4) Captain Ober's Fourteenth Amendment right to Due-Process, and (5) the Pennsylvania Constitution.

29.    Captain Ober was never informed as to the findings of Major Williams and Major Wertz's "administrative inquiry." Captain Ober was also never informed as to Colonel Evanko's final determination after reviewing the "administration inquiry" report. Finally, Colonel Evanko denied Captain Ober's reimbursement requests for administrative costs incurred as part of the FBI's investigation.

30.    On August 23, 1999, Major Hawthorne Conley (Major Conley) rescinded Captain Ober's use of agency property that had been issued to Captain Ober. Captain Ober was also stripped of agency responsibilities, by order of Colonel Evanko.

31.    On August 24, 1999, Major Lyle H. Szupinka, Commander of Area III, approached Captain Ober and confronted him about his handling of the FBI investigation.

32.    On November 8, 1999, Captain Ober filed PSP Grievance #164. Captain Ober grieved: (1) how the Majors "administrative inquiry" was handled in violation of the PSP Field Regulations Manual and the Collective Bargaining Agreement between the Commonwealth and the Pennsylvania State Troopers Association; and (2) the denial of administrative costs incurred as part of the FBI's investigation.

33.    On December 9, 1999, Captain Ober learned that Major Conley, Chief of the Bureau of Professional Responsibility, and Captain Ober's direct superior while Commander of the Internal Affairs Division, admitted that Colonel Evanko had a "secret file" on Captain Ober.

34.    On December 22, 1999, Captain Ober filed Grievance #167. Captain Ober grieved additional administrative costs that Captain Ober was not reimbursed for by the PSP.

8

35.    On January 10, 2000, at approximately 4:00 p.m., Captain Ober was contacted by Major Conley by telephone. Major Conley informed Captain Ober that he was being transferred from the Bureau of Technology Services back to Internal Affairs Division on January 24, 2000. Then, Captain Ober was being assigned to Area III, Troop B - Washington on January 29, 2000. Therefore, Captain Ober's re-assignment to the Internal Affairs Division would last five days. Captain Ober did not request either transfer, nor was he consulted prior to any final decision to implement this involuntary transfer.

36.    Major Conley further advised Captain Ober that his assignment in Area III, Troop B - Washington was for an unknown assignment for an unspecified length of time.

37.    After receiving his inexact and nebulous orders, Captain Ober contacted Major Szupinka, Commander of Area III, and the individual who confronted Captain Ober. about his handling of the FBI investigation in August 1999. Major Szupinka informed Captain Ober that: (1) he (Major Szupinka) was contacted the prior week by "the front office" and told that "they" were assigning Captain Ober to his as "an Area III Assistant;" (2) that he did not request Captain Ober's reassignment to Area III; (3) that he did not request any assistance or reassignment of any personnel; (4) that he had no idea what Captain Ober's job description or assignment would be while stationed at Area III; and (5) that he had no idea how long Captain Ober's assignment would last.

38.    The "position" to which Captain Ober is being assigned in Area III did not exist prior to his assignment. This "position" is a newly-created -- never previously existing -- "position," which was created just for Captain Ober by Colonel Evanko.

39.    To add to the punitive nature of the transfer, Captain Ober currently resides in Enola, Pennsylvania. He has been transferred to a "made-up" position in Washington, Pennsylvania, with

9

a daily commute in excess of six-and-a-half hours (420 miles round trip). As a consequence of Captain Ober's punitive transfer, an 18 ½-year veteran Captain of the PSP with an exemplary service record, with a spouse and three children, who has lived in Enola, Pennsylvania for many years, has been reassigned with only several days' notice, to a permanent duty station entailing nearly 32 hours a week in commuting time alone. Furthermore, the Personnel Order signed by Colonel Evanko does not specify the duration of the transfer. Therefore, this transfer is considered "permanent." F.R. Manual 3-2(2.01)(E).

40.    Thus, almost eight months after the Colonel Evanko learned of the FBI's investigation, four months after the low ranking PSP member was arrested, and after the negative publicity of the political corruption scandal died down, the PSP transferred Captain Ober back to the Internal Affairs Division, only to be retransferred five days later, halfway across the Commonwealth of Pennsylvania. This "transfer-upon-transfer" is to a newly-created position, created just for Captain Ober. Prior to his transfer to Area III, Area III -- like all areas -- had an area Major, an area Captain, and lower-ranked commanders for each Troop station. No other region in the Commonwealth has multiple Captains assigned to an Area Headquarters staff. However, with the newly-created "Ober" slot, Area III -- and only Area III -- has an extra Captain, assigned at the Area level, to serve directly under the Major. One reason that such a slot never existed before is consistent with the explanation provided to Captain Ober, that, in fact, there is no need for a Captain to be assigned to the Area III staff.

41.    In Captain Ober's case, (1) the PSP Field Regulations Manual and the Collective Bargaining Agreement covering discipline of sworn officers became implicated both (a) when he was "administratively investigated" by Majors Williams and Wertz, and (b) when he was subjected

10

to an interrogation (although either one of these events would suffice), and (2) the PSP violated the Field Regulations Manual and the Collective Bargaining Agreement when it (a) ordered him transferred him to a nearly 32-hour-per-week commute, and (b) did so to punish him, even though he had not violated any agency rules and regulations. Thus, once the Field Regulations Manual and the Collective Bargaining Agreement became implicated, the PSP could not punish Captain Ober unless and until he was properly charged, tried, and found guilty, under the Field Regulations Manual and the Collective Bargaining Agreement, with violating one or more departmental rules and/or regulations. The PSP investigated and interrogated Captain Ober. However, the PSP never even charged or tried Captain Ober, much less found him guilty. Instead, the PSP unilaterally -- and in violation of Pennsylvania law -- imposed its punishment upon him because of Colonel Evanko's hurt pride and irrational temperament.

42.    The nature of Majors Williams and Wertz's "inquiry" and interrogation were in no way routine. Moreover, Majors Williams and Wertz's own words makes it quite apparent that the PSP was conducting an administrative discipline investigation.

## ARGUMENT

**I.    CAPTAIN OBER'S TRANSFER IS PUNITIVE IN NATURE.**

**A.    Captain Ober's Transfer Violates the Procedural Requirements That the Field Regulations Manual Mandates Prior to the Implementation of an Involuntary Transfer.**

The PSP, through the Field Regulations Manual (FR Manual), promulgated administrative rules and regulations controlling how the PSP functions. The policy and procedures involving involuntary transfer of sworn officers is set forth in FR Manual 3-2. FR Manual, 3-2(2.01)(A)

11

provides that "transfers within the Department are governed by the policies and procedures established in this regulation, or by any other action of the Commissioner."

### 1.    "General Transfers"

A sworn officer may be subject to a "general transfer" anywhere within the PSP whenever "it is determined that such transfer(s) is necessary to: (1) fulfil the requirement(s) for additional services; (2) fulfil the need(s) for specific or specialized skills; [or] (3) accomplish any other needs of the Department." FR Manual, 3-2(2.04)(A).  Furthermore, general transfers between Bureaus and Area Commands, like Captain Ober's proposed punitive transfer, "shall be reported to the Director, Bureau of Personnel, on a Bureau Personnel Order."  FR Manual, 3-2(2.04)(B)(3)(a).  Then, the Director, Bureau of Personnel, shall submit, **as the needs of the Department require**, a draft of other proposed administrative transfers to the Commissioner for approval."  FR Manual, 3-2(2.04)(B)(3)(b) (emphasis added).

The FR Manual requires that, prior to a transfer between Bureaus and Area Commands, the Bureau requesting personnel must make an official request to the Bureau of Personnel.  Then, after evaluation by the Bureau of Personnel, the request will be submitted "as the needs of the Department require" to Colonel Evanko.  Id.  Captain Ober's transfer from the Bureau of Technology Services to the Internal Affairs Division to Area III is not in conformity with these regulations.  This is revealed through Captain Ober's discussions with both Major Conley and Major Szupinka.

When Captain Ober asked Major Conley to clarify his new assignment, Major Conley could not provide any information as to the length of the assignment or the actual job description of what Captain Ober would be doing in Area III.  Violation of the general transfer regulations became patently obvious when Captain Ober spoke to Major Szupinka.  Major Szupinka informed Captain

12

Ober that he did not request for any personnel to be transferred to Area III, either Captain Ober, or any personnel. Furthermore, Major Szupinka has no idea what Captain Ober will be doing when he reports to Area III, nor does Major Szupinka know how long Captain Ober's Area III assignment will last.

Major Szupinka did not request Captain Ober or any personnel. Therefore, there is no need for any "additional services" in Area III. FR Manual, 3-2(2.04)(A)(1). Furthermore, because Captain Ober was not specifically requested by Major Szupinka (or any personnel who have Captain Ober's expertise), none of Captain Ober's "specific or specialized skills" are required in Area III. FR Manual, 3-2(2.04)(A)(2). Moreover, because neither Major Conley nor, more importantly, Major Szupinka has any idea what Captain Ober's job functions will be, Captain Ober's transfer cannot "accomplish any other need(s) within the Department" because there are no needs in Area III. FR Manual, 3-2(2.04)(A)(3).

Additionally, because Major Szupinka did not request any personnel, the triggering request mandated in FR Manual, 3-2(2.04)(B)(3)(b) did not happen. Therefore, Colonel Evanko had no cause to transfer Captain Ober (or anyone else) to Area III because Area III, through Major Szupinka, made no request to the Bureau of Personnel for any additional personnel. Because none of the general transfer requirements of the FR Manual has been met, Captain Ober's transfer cannot have been made "for the good of the Department."

### 2. "Any Other Action of the Commissioner"

Captain Ober does not contest that under the "any other action of the Commissioner" provision of the FR Manual, Colonel Evanko has vast discretion to institute transfers. Rossi v. Commonwealth, Pennsylvania State Police, 100 Pa. Cmwlth. 639, 515 A.2d 120 (1986). However,

13

this vast discretion "is not unlimited." Id. at 643-44. Furthermore, specifically tailored regulations must take precedence over general provisions. Morabito's Auto Sales v. Commonwealth, 552 Pa. 291, 715 A.2d 384 (1998); 1 Pa. C.S. § 1933. Therefore, although Colonel Evanko has the general power to transfer, as part of his discretion, he may not transfer in violation of any specific regulation that controls, especially when the transfer is an attempt to circumvent the well-established PSP discipline system.

There are specific regulations and procedures that cover transfers between Bureaus and Area Commands. FR Manual, 3-2(2.04)(B)(3)(b). Therefore, Colonel Evanko's general discretionary powers to transfer must give way to the specific requirements of the FR Manual. Morabito's, 552 Pa. 291; 1 Pa. C.S. § 1933. Colonel Evanko violated the specific regulations concerning transfers between Bureaus and Area Commands by not following the requirements of FR Manual, 3-2(2.04)(B)(3)(b).

**B.      Captain Ober's Transfer Was a Disciplinary Punishment in Violation of the FR Manual and the Collective Bargaining Agreement.**

If a transfer is not requested by the sworn officer, or is not pursuant to FR Manual 3-2, then the transfer must be part of an administrative disciplinary determination. The FR Manual specifically mandates that "transfers shall not be used in lieu of appropriate disciplinary action but, where the facts in a case support the need for relocation of the member, they may be utilized as an additional disciplinary measure in conjunction with the disciplinary action imposed by the Disciplinary Officer." FR Manual 3-2(2.01)(F).

In 18½ years with the PSP, Captain Ober has never been the subject of any disciplinary proceeding, much less ever been found administratively "guilty" of misconduct or wrongdoing.

14

Captain Ober has only received two complaints in his 18 ½-years with the PSP. Those complaints were both administratively adjudicated as "unfounded," meaning that the complaints were bogus. The only time Captain Ober's conduct was ever called into question through a conduct-related investigation was Majors Williams and Wertz's "administrative inquiry." By their own admission, the Majors revealed that the "administrative inquiry" was conducted under the command of Colonel Evanko and was not "disciplinary" in nature. If the inquiry was not "disciplinary," as the Majors stated, then that inquiry cannot trigger any disciplinary transfer. If the Majors mislead Captain Ober and their "administrative inquiry" was, in fact, a disciplinary investigation, not only was the Majors' disciplinary investigation a violation of the disciplinary procedures provided in FR Manual, 3-3, and Article 26 of the Collective Bargaining Agreement, but there was never any finding of wrongdoing of the part of Captain Ober. Moreover, even if the PSP determined that Captain Ober had performed some form of misconduct, Captain Ober certainly was not afforded any administrative trial board prior to the imposition of this punitive transfer.

Captain Ober's transfer is punitive. He is being "punished" as a direct result of Colonel Evanko's hurt pride and irrational indignation because Colonel Evanko was not informed of the FBI's investigation until its conclusion. If this is so, not only can Captain Ober not be transferred, Captain Ober cannot even be the subject of an administrative disciplinary investigation because "**disciplinary action based on arbitrariness**, supposition, unfounded or unsubstantiated complaints, **personal bias**, or prejudice **shall not be imposed**." FR Manual, 3-3(3.05)(A) (emphasis added).

C. **Captain Ober's Involuntary Transfer Violates Article 38 of the Collective Bargaining Agreement Between the Commonwealth and the Pennsylvania State Troopers Association.**

Article 38 of the Collective Bargaining Agreement (CBA) provides that "when an

15

involuntary intratroop transfer must be made, the member to be transferred must be the member who has the least seniority in his/her rank in that station (provided he/she has not been moved involuntary in the previous six months) except in case of promotion, in conjunction with the imposition of discipline or where there is a need for special skills or specialty." Collective Bargaining Agreement, art. 38 § 3.

Captain Ober's transfer was not part of a promotion, the imposition of any disciplinary action (see I.B.), or required any special skill or specialty that Captain Ober possess (see I.A.1.). Therefore, when imposing an involuntary transfer, Colonel Evanko must transfer based on seniority in rank. Captain Ober was promoted to the rank of Captain, effective March 3, 1995. Currently he is senior to 24 other PSP Captains.[1] There is no indication that any other Captain was considered for this Area III transfer prior to Captain Ober's assignment. Captain Ober's punitive transfer is between Bureaus and Area Commands and not intratroop. However, in light of the fact that Captain Ober's transfer between Bureaus and Area Commands is more onerous than a normal intratroop transfer, Colonel Evanko should be bound by the requirements for a less-onerous involuntary transfer.

**D.    By Transferring Captain Ober in Retaliation for His Involvement with the FBI's Investigation, Colonel Evanko Violated Pennsylvania's "Whistleblower" Law.**

Pennsylvania's "Whistleblower" law protects public employees from discrimination or retaliation by the employer. 43 P.S. § 1423. Specifically, section 1423 provides:

---

[1]  The PSP Captains with less seniority than Captain Ober are Carmen Altavilla, John R. Brown, Erby Conley, Charles Connon, William Conway, John Gallaher, James Garofalo, Robert Haught, Theodore Kohuth, Jon Kurtz, Joseph Maurt, Coleman McDonough, Michael Nagurny, Frank Pawlowski, David Points, Larry Riley, Sidney Simon, Charles Skurkis, John Thierwechter, Robert Titler, James Torker, Cynthia Transue, James Tripp, and Richard Zenk.

16

(a) Persons not to be discharged. -- **No employer may** discharge, threaten or **otherwise discriminate or retaliate against an employee regarding the employee's** compensation, terms, conditions, **location** or privileges **of employment because the employee** or a person acting on behalf of the employee **makes a good faith report** or is about to report, verbally or in writing, **to the employer or appropriate authority an instance of wrongdoing** or waste.

(b) Discrimination prohibited. -- **No employer may** discharge, threaten or **otherwise discriminate or retaliate against an employee regarding the employee's** compensation, terms, conditions, **location** or privileges **of employment because the employee is requested by an appropriate authority to participate in an investigation,** hearing or inquiry held by an appropriate authority or in a court action.

(emphasis added).

Captain Ober's punitive transfer can be directly traced to his good faith report to Colonel Evanko that the FBI had conducted a investigation into the PSP. Colonel Evanko was personally offended by the fact that Captain Ober followed the instructions/orders of "an appropriate authority" -- the FBI -- instead of compromising the investigation by immediately coming to Colonel Evanko.

On April 26, 1999, Captain Ober was transferred to the Bureau of Technology Services at the request of Colonel Evanko. Captain Ober's assignment was as the lead officer on a multi-million dollar PSP system integration procurement project. Colonel Evanko told Captain Ober that he specifically wanted Captain Ober to head this project because of Captain Ober's intelligence, leadership ability, and special managerial skills. On May 12, 1999, a mere sixteen days later, Captain Ober informed Colonel Evanko about the FBI's investigation. Immediately, Captain Ober fell out of favor with Colonel Evanko. Eight months after the FBI notification, Captain Ober is being transferred to a non-position while in the middle of the multi-million dollar procurement project. Captain Ober's transfer from the Bureau of Technology Services did not come from a request of Captain Ober's commander. In fact, Captain Ober's commander, Major Wesley Waugh,

17

as well as Lt. Colonel Hickes, Mr. Rodney Ditzler, the Project Executive Director, and Mr. Ronald Wilt, the Program Manager, all opposes Captain Ober's transfer.

It was not until after Colonel Evanko learned of the FBI's investigation that Captain Ober was: (1) investigated by two Majors during an "administrative inquiry" instituted under the direction of Colonel Evanko; (2) stripped of agency equipment for no cause; (2) removed from PSP committees by order of Colonel Evanko; (3) repeatedly denied reimbursement for job-related expenses; (4) barred from Internal Affairs Division meetings, even though his appearance was specifically requested by the now-Commander of the Internal Affairs Division; and (5) punitively transferred halfway across the Commonwealth of Pennsylvania to a "made-up" position in Washington, Pennsylvania, with a daily commute in excess of six hours.

## SUMMARY

On January 29, 2000, Captain Darrell Ober will be subjected to an illegal punitive and retaliatory transfer by Colonel Evanko and the PSP. This transfer directly violates (1) PSP rules and regulations, (2) the Collective Bargaining Agreement between the Commonwealth and Pennsylvania State Troopers Association, (3) the Pennsylvania "Whistleblower" Law, (4) the Due Process Clause of the Fourteenth Amendment, and (5) the Pennsylvania Constitution. Captain Ober has asserted a clear legal right, to which the Commonwealth and Colonel Evanko have a corresponding duty. Additionally, if Captain Ober is transferred, none of the harm that he will suffer, and damages that he will sustain, will be compensable through an action in law. Therefore, the only adequate remedy against Colonel Evanko's gross abuse of authority and pattern of harassment is for this Court to prohibit the Respondents from instituting the illegal, punitive, and retaliatory transfer through a Writ of Mandamus.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner Captain Darrell Ober respectfully urges this Court to issue an Order as to each of the following prayers for relief, pursuant to 42 Pa. C.S. § 761(c) and 43 Pa. C.S. § 1423:

    (1)    Issue a show cause order, pending a hearing on the merits:

    (a)    Compelling the Respondents to appear on a date certain to show cause, if the Respondents have any, why they should not be restrained and enjoined from violating the rights of Captain Ober, as provided in the PSP Field Regulations, the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, the Pennsylvania "Whistleblower" Act, the Due Process Clause of the Fourteenth Amendment, and the Pennsylvania Constitution;

    (b)    Prohibiting the Respondents from violating the rights of Captain Ober, as provided in the PSP Field Regulations, the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, the Pennsylvania "Whistleblower" Act, the Due Process Clause of the Fourteenth Amendment and the Pennsylvania Constitution, and prohibiting the Respondents from implementing the punitive transfer, pending a hearing on the merits of the show cause; and

    (c)    Prohibiting the Respondents from taking any retaliatory action against Captain Ober in response to the lawful exercise of his constitutional and statutory rights and privilege; and

    (2)    After a hearing on the merits of the show cause order, issue an order:

    (a)    Prohibiting the Respondents from imposing the punitive transfer upon

19

Captain Ober;

   (b)  Reassigning Captain Ober to his previous position at the Bureau of Technology Services;

   (c)  Prohibiting the Respondents from taking any retaliatory action against Captain Ober in response to his lawful exercise of his constitutional and statutory rights and privilege;

   (d)  In the event that this Court finds that some portion of his various causes of action do afford damages, awarding to Captain Ober damages caused to Captain Ober as a consequence of the illegal action of the Respondents;

   (e)  Awarding to Captain Ober costs and attorney's fees; and

   (f)  Granting to Captain Ober such further relief as this Court deems appropriate.

      Respectfully submitted,

John Miller, Esq.
7 West Main Street
Fawn Grove, Pennsylvania 17321
717-382-9543
Pa. Bar #50033


Byron L. Warnken, Esq.
James A. Lanier, Esq.
Law Offices of Bonnie L. Warnken
32 East Preston Street
Baltimore, Maryland 21202-2727
410-727-5951

20

Attorneys for Petitioner Captain Ober

January 26, 2000

| | | |
|---|---|---|
| **CAPTAIN DARRELL OBER** | \* | **IN THE COMMONWEALTH** |
| **Petitioner,** | \* | **COURT OF** |
| v. | \* | **PENNSYLVANIA** |
| **COLONEL PAUL EVANKO, et. al.** | \* | **Case No. _____** |
| **Respondents.** | \* | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### ORDER GRANTING PETITIONER'S APPLICATION FOR A WRIT OF MANDAMUS

Having reviewed Petitioner's Application for a Writ of Mandamus, and any Response filed by the Respondents, this Court hereby issues, this _____ day of _____, 2000, an Writ of Mandamus on behalf of Petitioner Captain Ober, as follows:

1.    The Respondents are ordered to refrain from instituting the punitive transfer to Area III Troop B - Washington, against Captain Ober in violation of the administrative, statutory, and Constitutional rights of Captain Ober, as provided in the PSP Field Regulations, the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, the Pennsylvania "Whistleblower" Act, the Due Process Clause of the Fourteenth Amendment, and the Pennsylvania Constitution;

2.    The Respondents are ordered to return Captain Ober to his previous position at the Bureau of Technology Services;

3.    The Respondent are ordered to refrain from taking any retaliatory action against Captain Ober in response to his lawful exercise of his constitutional and statutory rights and privileges.

_____
Judge

FR 3-2
5/23/2001

TRANSFERS

2.01        PURPOSE

The purpose of this regulation is to establish uniform guidelines and procedures for transfers.

2.02        DEFINITIONS

A.      Authority:  Transfers shall be effective only after they have been approved by the Commissioner unless otherwise stated in this regulation; however, the Commissioner retains the authority to effect any transfer.

B.      Limitations:  No member shall attempt to circumvent these provisions; nor shall any member knowingly use, attempt, or permit the use of, any outside influence to gain a transfer or change of duty for themselves or another member.

C.      Notification:  Troop Commanders and Bureau/Office Directors shall inform transferring members of the reason for the transfer and, if possible, its duration.  Such notification shall be made, if possible, at least ten days prior to the effective date of the transfer, and shall include Preference Transfer Requests, Form SP 3-316, if possible, and the training assignments of newly graduated Troopers.

D.      Regulated:  Transfers within the Department are governed by the policies and procedures established in this regulation, or by any other action of the Commissioner.

E.      Term:    Transfers shall be considered permanent unless specifically stated to be otherwise, pursuant to the exceptions contained in this regulation.

F.      Use:  Transfers shall not be used in lieu of appropriate disciplinary action but, where the facts in a case support the need for relocation of the member, they may be utilized as an additional disciplinary measure in conjunction with the disciplinary action imposed by the Discipline Officer.

-1-



SPLE - 4 (8-90)

**PENNSYLVANIA STATE POLICE**
**BUREAU OF LIQUOR CONTROL ENFORCEMENT**
**3655 VARTAN WAY**
**HARRISBURG, PA 17110**

2000 - 5
Bureau Personnel Order
May 30, 2000

*EXHIBIT F*

OFFICE OF THE DIRECTOR

TELEPHONE
AREA CODE (717) 540-7410

SUBJECT:        Assignment

TO:
Section Commanders
All District Enforcement Offices
Special Investigations Section
Report Examination Unit
Office of Chief Counsel

FROM:
Major Francis E. Koscelnak
Director, Bureau of Liquor Control Enforcement

1.        Effective May 30, 2000, Captain Darrell G. Ober, Central Section Commander, will be assigned as the Director, Division of Administration, Bureau of Liquor Control Enforcement.

*Francis E. Koscelnak*

Major Francis E. Koscelnak
Director, Bureau of Liquor Control Enforcement

FEK/awb

cc:  Capt. McDonald
     Capt. Ober
     Deputy Commissioner of Operations
     Sgt. Sweeting
     CSSU
     A. Belmont
     Bureau of Personnel
     Comptroller – PSP
     File



SP 3-200 (10-99)

*Capt Mc*
00-03
Personnel Order
February 14, 2000

# PENNSYLVANIA STATE POLICE
## DEPARTMENT DIRECTIVE

*EXHIBIT G*

SUBJECT:    Promotions and/or Transfers and Rescission

TO:    Area, Troop and Station Commanders
and Bureau Directors

FROM:    Commissioner

REFERENCE:    (a)    Personnel Order 00-01, Promotions and/or Transfers, dated
January 7, 2000.

1.    The following personnel matters are announced as follows:

Lieutenant David F. Young, Bureau of Criminal
Investigation, is promoted to Captain and is assigned as
Special Projects Officer assisting the Commander, Area III
with preparations for the National Governors' Association
Convention, effective February 12, 2000.

Sergeant George L. Bivens, Bureau of Criminal
Investigation, is promoted to Lieutenant and is assigned as
Organized Crime Section Commander, Bureau of Criminal
Investigation, effective February 19, 2000.

Sergeant Barry E. Staub, Troop H, Harrisburg, is promoted
to Lieutenant and is assigned as Heritage Affairs Officer,
Bureau of Criminal Investigation, effective February 19,
2000.

Captain Cynthia L. Transue, Bureau of Research and
Development, is assigned as Special Projects Officer
assisting the Commander, Area VI with preparations for the
Republican National Convention, effective July 1, 1999.



2.    The assignment of Captain Darrell G. Ober as Special
Projects Officer to Commander, Area III, effective January
29, 2000, as announced in Reference (a), is rescinded.

- 2 -

3.    The following personnel assignment is announced effective February 19, 2000:

 Captain Darrell G. Ober is assigned to the Bureau of Liquor Control Enforcement, as the Central Section Commander, Operations Division.

4.    The following promotions and transfers as indicated, for the rank of Sergeant, are effective February 19, 2000:

| Name | Present Location | Assigned To |
|---|---|---|
| Anthony J. Sivo | Troop K | Troop M |
| Thomas R. Williams | Troop F | Troop P |
| Glenn C. Domon | Troop H | Troop M |
| Michael S. Keelon | Troop B | Troop B |
| Stephen R. Kapanka | Troop M | Troop M |
| Thomas R. Chelgren | Troop C | Troop B |
| Ronald L. Hicks | Troop F | Troop P |
| Robert L. Starr | Troop T | Troop E |

5.    The following promotions and transfers as indicated, for the rank of Corporal, are effective February 19, 2000:

| Name | Present Location | Assigned To |
|---|---|---|
| Ronald H. Clark | Troop F | Troop P |
| Edward A. Ostrowski | Troop A | Troop G |
| Thomas E. Izbinski | Troop C | Troop F |
| Carl P. Medsger | Troop C | Troop F |
| Charles T. Kindlimann, Jr. | Troop F | Troop P |
| Michael R. Schneider | Troop M | Troop M |
| Scott A. Bright | Troop B | Troop T |
| John T. Malone | Troop J | Troop K |
| Francis C. Aigeldinger III | Troop N | Troop N |
| Norman J. Cramer | Troop N | Troop N |
| David P. Gouldy | Troop L | Troop J |
| Eric S. Hermick | Troop D | Troop H |
| Maurice A. Tomlinson | Troop J | Troop J |
| Neil A. Miller | Troop B | Troop T |
| Sharon M. Mulcahey | Troop E | Troop F |
| Bruce W. Williams | Troop J | Troop J |
| Jeremy M. Richard | Troop F | Troop P |
| James M. Petti | Troop P | Troop P |
| Edward M. Martin | Troop F | Troop F |
| Wayne C. Burkes | Troop B | Troop T |
| Thomas G. Lett | Troop T | Troop H |
| James E. Ruff | | |

*EXHIBIT H*

    a.    Up to 20 Troopers are justified 3 Corporals.

    b.    21 - 27 Troopers are justified 4 Corporals.

    c.    28 - 35 Troopers are justified 5 Corporals.

    d.    36 - 43 Troopers are justified 6 Corporals.

    e.    44 - 51 Troopers are justified 7 Corporals.

    f.    52 - 59 Troopers are justified 8 Corporals.

    g.    60 - 67 Troopers are justified 9 Corporals.

    h.    68 - 75 Troopers are justified 10 Corporals.

    i.    76 - 83 Troopers are justified 11 Corporals.

NOTE: On Stations, Police Communications Operators (PCO) will be included with Troopers in determining the number of Corporals.

2.    A second Sergeant position may be justified if a Patrol Unit has 6 or more Corporals assigned; however, this is not automatic. The additional position must be requested through channels to the Deputy Commissioner of Operations, via correspondence, Form STD-501. The request must be detailed and contain appropriate information and justification.

10.07    DEPARTMENT HEADQUARTERS

A.    <u>Bureaus</u>: Bureaus shall be commanded by a Major or civilian equivalent.

B.    <u>Divisions</u>: Divisions may be commanded by a Captain, Lieutenant, or civilian equivalent.

C.    <u>Sections</u>: Sections may be supervised by a Lieutenant, Sergeant, Corporal, or civilian equivalent. A Trooper may supervise a Section if it is only staffed with civilians.

Case 1:01-cv-00084-CCC    Document 25    Filed 06/25/2001    Page 68 of 80

*EXHIBIT K*

# Tribune-Review

Back to Headlines...

Regional News - October 1, 1999

## State trooper, Indiana man face charges of bribery

**By Joe Mandak**
**TRIBUNE-REVIEW**

A Fayette County state trooper and his Indiana County friend were charged Thursday with trying to bribe an unidentified state legislator in an effort to get the friend a job with the Pennsylvania State Police.

Trooper Kipp Stanton, 29, of 477 Sixth St., Donora, is suspended without pay from his job at the state police barracks near Uniontown. He is charged with criminal conspiracy, attempted bribery, an attempt to violate the Ethics Act for state employees and criminal solicitation.

Stanton's friend, Dennis Bridge, 35, of 431 Maple St., Indiana, is charged with criminal conspiracy.

State police contend that Stanton tried to help Bridge get into the Pennsylvania State Police Academy by offering to broker a $10,000 bribe through a middleman to an unidentified state official. Sources familiar with the probe said the official was a legislator, but would not identify him further.

Stanton allegedly introduced Bridge to the middleman, whom authorities identified only as Michael Fiore, a Democratic committeeman from the East Liberty section of Pittsburgh.

State police spokesman Jack Lewis said Fiore was not charged because he is cooperating in the probe.

Among other things, Fiore consented to be audio- and videotaped when he met with Bridge and Stanton on Feb. 27 and accepted a $1,000 down payment at his place of business.

Fiore could not be reached. A message left with his son at Mike's Auto Body, 6223 Meadow St., Pittsburgh, was not returned.

Although the bribe sting occurred in Allegheny County, the charges against Bridge and Stanton were filed yesterday with District Justice Richard Orendorff in Indiana. Bridge and Stanton allegedly hatched the plan in Indiana, and Bridge spoke about it there by telephone on several occasions.

The men are free on their own recognizance pending a preliminary hearing at 3:45 p.m. Oct. 20 before Orendorff.

Senior Deputy Attorney General Paul von Geis Jr., who is prosecuting the case, didn't return a call for comment.

Attorney General spokesman Kevin Harley and Lewis said there is no continuing investigation into the legislator.

Case 1:01-cv-00084-CCC    Document 25    Filed 06/25/2001    Page 69 of 80

Both Lewis and Harley said they didn't know if Stanton's claim that a politician "got him on the job" was true or an empty boast, but both said they knew of no continuing probe into how Stanton got his job.

According to court papers, Stanton "advised Bridge that he could contact the individual who offered to get him (Stanton) on the job to (also) assist Bridge in being accepted to the Pennsylvania State Police Academy."

"To my knowledge, there is no investigation of who the other person (the legislator) is," Lewis said. "Essentially, the politician didn't have any role in this."

"The investigation into another politician is nonexistent," Harley said. "It's nothing. This (case) is what it is.

"Fiore did approach a politician, and this politician wasn't interested in this at all. The politician was not interested in any type of remuneration or bribe Fiore was offering."

The FBI was originally involved in the case but is not now, according to court papers. Pittsburgh FBI spokesman Jeff Killeen declined comment.

"Our regulations state that we can't comment on a state prosecution in which people have been charged. We can't comment on stuff that may impact the accused's right to a fair trial," Killeen said.

Bridge declined comment when he was reached at home yesterday afternoon. He referred questions to defense attorney Tom Johnson of Indiana, who didn't return calls.

Stanton didn't return messages left on his home answering machine.

According to a probable cause affidavit filed by Cpl. Jeffrey Shaw of the state Bureau of Criminal Investigation in Harmarville, Allegheny County, the bribe plot began in early 1997. Shaw was unavailable for comment yesterday.

In September 1996, Bridge received the results of the state police cadet examination he took earlier that year and learned that he didn't score high enough to become a trooper.

In February or March of 1997, Stanton was helping Bridge move into a new residence and mentioned that he knew someone who could help Bridge get into the police academy.

A short time later, Stanton called Bridge "and informs him that his contact can help him get the position but ... Bridge must be willing to make a contribution to the one that assists Bridge in obtaining the position," the affidavit stated.

On Feb. 11, 1997, Stanton told Fiore that Bridge was willing to pay $10,000 to receive an appointment to the academy.

In May 1997, Stanton further informed Fiore that "in addition to the $10,000 ... (Bridge) would make yearly contributions to the politician who assisted him in the amount of $2,500 a year until the politician retired from public office."

Stanton, Bridge and Fiore eventually had several more conversations over the next two years in an effort to firm up the deal, ultimately leading to the $1,000 down payment in February,

police said.

Click here for advertising information

PNCBANK

Back to Headlines...

Images and text copyright © 1999 by The Tribune-Review Publishing Co.
Reproduction or reuse prohibited without written consent from PittsburghLIVE.

EXHIBIT L

SP 1-102 (8-93)

NOTE: INVESTIGATORS SHALL PREPARE ORIGINAL AND ONE COPY, RETAIN THE ORIGINAL WITH CASE FILE AND PROVIDE COPY TO THE SUBJECT OF INVESTIGATION. ONE OF THE THREE LISTED INVESTIGATION TYPES SHALL BE CHECKED.

BPR -

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**
**NOTIFICATION OF INQUIRY**

| Captain | Darrell G. Ober | Bureau of Professional Responsibility |
|---|---|---|
| RANK | NAME | TROOP/STATION |

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING:

☐ A COMPLAINT INVESTIGATION IS BEING CONDUCTED INTO AN INCIDENT IN WHICH YOU ARE ALLEGED TO HAVE BEEN INVOLVED. THE DETAILS OF THE COMPLAINT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐ A NON-COMPLAINT INVESTIGATION IS BEING CONDUCTED IN ACCORDANCE WITH DEPARTMENT DIRECTIVES. THE DETAILS OF YOUR INVOLVEMENT ARE AS FOLLOWS: (EXPLANATION BELOW)

☒ AN ADMINISTRATIVE INVESTIGATION IS BEING CONDUCTED PURSUANT TO A REQUEST FROM THE ~~OFFICE OF CHIEF COUNSEL.~~ YOUR INVOLVEMENT HAS BEEN IDENTIFIED AS FOLLOWS: Commissioner

By order of the Pennsylvania State Police Commissioner, Paul J. Evanko, I have been

assigned to make inquiry into your knowledge of the facts or circumstances surrounding

the political corruption investigation that was conducted by the FBI in Western

Pennsylvania.

_Cpt. Thomas C. Coll_                    _Major Thomas F. William_
                                          SIGNATURE OF INVESTIGATOR

ACKNOWLEDGE RECEIPT OF THIS NOTIFICATION AND I AM AWARE OF MY RIGHT TO UNION REPRESENTATION.

| _Captain DWS_ | _815_ | _204-02-0F84_ | _4/28/99_ | _1220_ |
|---|---|---|---|---|
| SIGNATURE | BADGE/I.D. NO. | SOCIAL SECURITY NO. | DATE | TIME |

SP 1-104 (8-93)

*EXHIBIT M*

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE-POLICE
**ADMINISTRATIVE WARNING**

**Member/Employe**    Captain Darrell G. Ober

**Interviewer**    Major Thomas F. Williams and Major Robert G. Werts

**BPR Control No.** _____ **Date** June 22, 1999

**This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police. I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any pending criminal action. During the course of this questioning, even if you disclose information which indicates you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statement nor its fruits will be used against you in a criminal proceeding.**

**Since this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action. You do have the right to have a union representative with you during such questioning. If during the course of the interview, you have reason to believe that your statements could result in administrative action being initiated against you, union representation will be provided upon request.**

**Do you understand what I have just explained to you?**    ☒YES    ☐NO

**Do you have any questions concerning what I have just explained to you?**    ☐YES    ☒NO

_____    4/28/99
SIGNATURE OF EMPLOYE/MEMBER    DATE

_____    6/25/99
SIGNATURE OF INTERVIEWER    DATE

*EXHIBIT N*                                    Ober

XBRI11-01017 S XBRD41-00002 04/21/99 14:18:30 - 04/20/99 13:03:07 BZ0LWK1HPCYZ
SN P,        FILE 14        EXECUTIVE AND ADMINISTRATIVE OFFICES

SUBJECT:      DETACHED STATUS

TO:        AREA, TROOP, AND STATION COMMANDERS;
           AND BUREAU AND OFFICE DIRECTORS

        1.   EFFECTIVE MONDAY, APRIL 26, 1999, CAPTAIN DARRELL G.
OBER, DIRECTOR, INTERNAL AFFAIRS DIVISION, BUREAU OF PROFESSIONAL
RESPONSIBILITY, WILL BE DETACHED TO THE BUREAU OF TECHNOLOGY SERVICES.
CAPTAIN OBER WILL FUNCTION AS TEAM LEADER FOR SYSTEM INTEGRATOR
PROCUREMENT FOR THE INCIDENT INFORMATION MANAGEMENT SYSTEM (IIMS) PHASE
OF THE DEPARTMENT AUTOMATION PROJECT.   CAPTAIN OBER WILL RETURN TO THE
INTERNAL AFFAIRS DIVISION UPON COMPLETION OF THE ASSIGNMENT.

        2.   NO ACKNOWLEDGEMENT OF THIS MESSAGE IS REQUIRED.

AUTH\COLONEL PAUL J EVANKO\COMMISSIONER\PSP    SLO

EXHIBIT P

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:               June 6, 2001

SUBJECT:            Relocation of Pittsburgh District Office
                    Bureau of Liquor Control Enforcement

TO:                 Director, Facility Management Division

FROM:               Captain Darrell G. Ober
                    Director, Administration Division
                    Bureau of Liquor Control Enforcement

REFERENCE:     (a)     Your Correspondence re: Subject dated May 18, 2001.

1.     I have reviewed the floor plans for the Pittsburgh District Office. My comments are as follows;

- Three interview rooms are not necessary; I suggest one.
- Provisions for a vault are needed in the evidence room.
- Pass through lockers are needed for the receiving room.
- Should the automotive supply room be located against an outside wall an accessed by an overhead door?
- The 165' Attorney's office; small offset looks like it would be suitable for a closet.
- District Office File Room – Could we do without the wall facing the clerical unit and go with a more open file system or concept?
- Conference room – Should it have two entrance doors?
- I am not a big fan of having to enter the mechanical room through the receiving area.
- I am not sure what a "Evidence holding" room is.
- An overhead door is needed to go directly into the main evidence room.

2.     These are my initial impressions.  Due to time constraints I have not discussed them with the Western Section or District Office Commanders. I have forwarded them a copy of the Reference (a) for their review as well as a copy of this correspondence.

3.     Thank you for your assistance with this most important project.

*EXHIBIT G*

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

DATE:        November 6, 2000

SUBJECT:     Officer of the Day Report

TO:          Deputy Commissioner of Operations

FROM:        Captain Darrell G. Ober
             Bureau of Liquor Control Enforcement

1.      This officer was scheduled for the subject duty from November 3 - 5, 2000.

2.      I was contacted by PCO Angela M. Miller, Troop H, Harrisburg on Friday, November 3 and Sunday November 5 re: issuing emergency hauling permits to move equipment necessary to repair damage from a mobile pipeline oil spill which occurred in Ephrata, PA.  Due to the potential environmental consequences, approval to issue permits was granted by this officer.

*EXHIBIT R*

PSP-501X

**COMMONWEALTH OF PENNSYLVANIA**

**DATE:**       February 15, 2001

**SUBJECT:**    Department Headquarters Officer of the Day Report

**TO:**         Deputy Commissioner of Operations

**FROM:**       Captain Darrell G. Ober
                Director, Administration Division
                Bureau of Liquor Control Enforcement

1.    This officer was scheduled for the subject duties on February 14, 2001.

2.    No incidents were brought to the attention of this officer.



SP 3-200 (10-99)

*EXHIBIT S*

## PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

May 14, 2001

**CIRCULAR**          **CIRCULAR**          **CIRCULAR**

SUBJECT:    **ADDRESS CHANGE – BUREAU OF EMERGENCY AND SPECIAL OPERATIONS AVIATION PATROL UNIT VI, FRANKLIN**

TO:         Commissioner

FROM:       Major Richard S. Zenk *RSZ*
            Director
            Bureau of Emergency and Special Operations

1.      Effective immediately, the new address for Aviation Patrol Unit VI, Franklin is as follows:

                1526 Airport Road
                Franklin, PA 16323

2.      The telephone and FAX numbers will remain the same.

**DISTRIBUTION:**

Commissioner          (25)
Area Commanders       (06)
Troop Commanders      (48)
State Police Academy  (05)
Comptroller           (05)

*EXHIBIT T*

PSP-501X

**COMMONWEALTH OF PENNSYLVANIA**


**DATE:**          May 18, 2001


**SUBJECT:**       Department Headquarters Officer of the Day Report


**TO:**            Deputy Commissioner of Operations


**FROM:**          Captain Darrell G. Ober
                   Director, Administration Division
                   Bureau of Liquor Control Enforcement


1.     This officer was scheduled for the subject duties on May 17, 2001.

2.     No incidents were brought to the attention of this officer.

*EXHIBIT U*

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

DATE:            May 18, 2001

SUBJECT:         Relocation of Pittsburgh District Office
                 Bureau of Liquor Control Enforcement

TO:              Director, Bureau of Liquor Control Enforcement

FROM:            Director, Facility Management Division

ENCLOSURE:       (1)    Two (2) Copies of Floor Plans.

        1.      Enclosure (1) is two (2) copies of a proposed floor plan for the Subject relocation for review by you or your representative.

        2.      List comments or if this plan is satisfactory, please initial one (1) copy and return to this office at your earliest convenience, but no later than June 1, 2001.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DARRELL G. OBER** | ) | **CIVIL ACTION LAW** |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **1:CV-01-0084** |
| **vs.** | ) | |
| | ) | **(JUDGE CALDWELL)** |
| **PAUL EVANKO, MARK** | ) | |
| **CAMPBELL, THOMAS COURY,** | ) | **JURY TRIAL DEMANDED** |
| **JOSEPH WESTCOTT,** | ) | |
| **HAWTHORNE CONLEY and** | ) | |
| **JOANNA REYNOLDS** | ) | |
| **Defendants** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this **25th day of JUNE, 2001**, a true and correct

copy of the **PLAINTIFF'S EXHIBITS IN OPPOSITION TO MOTION TO**

**DISMISS** was served upon the following counsel of record by United States Mail,

postage prepaid:

**SYNDI L. GUIDO**
**DEPUTY GENERAL COUNSEL**
**OFFICE OF GENERAL COUNSEL**
333 Market Street, 17th Floor
Harrisburg, PA 17101
Attorney for Defendants'

BY: _____
Don Bailey ID# 23786
4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500