

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL G. OBER, | : | |
| Plaintiff | : | NO. 1:CV-01-0084 |
| | : | (Judge Caldwell) |
| | : | |
| v. | : | CIVIL ACTION - LAW |
| | : | |
| PAUL EVANKO, MARK CAMPBELL, | : | JURY TRIAL DEMANDED |
| THOMAS COURY, JOSEPH WESTCOTT, | : | |
| HAWTHORNE CONLEY, | : | |
| Defendants | : | |

### STATEMENT OF THE MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Local Rule 56.1, defendants file the following statement of material facts as to which there is no genuine issue to be tried:

1. Prior to joining the Pennsylvania State Police, the plaintiff, Darrell Ober, was an officer with the Indiana University of Pennsylvania Police Department. To become a campus police officer, Ober attended the Pennsylvania Law Enforcement Academy, a twelve-week course held by the Department of Education; he graduated second in his class of 20. (Ober Dep., 12/05/2001, at 15, 56-60.)

2. Ober enlisted with the Pennsylvania State Police on July 20, 1981, as a cadet. At the State Police Academy in Hershey, Pennsylvania, Ober received training on chain of command, as well as the Department's Field Regulations, including FR 1-1. He became a State Police trooper on December 5, 1981. As a condition of employment, Ober signed an Oath of Office promising to adhere to PSP regulations as prescribed by the Commissioner. (Ober Dep., 12/05/2001, at 16; Conley Dep. at 246, 252; Einsel Aff.)

3. Initially, Ober was assigned as a trooper to a patrol unit in Troop S, Mercer Station. He was promoted to corporal on February 18, 1987, and promoted to sergeant in March of 1991. Ober became a lieutenant two years later and accepted a position in the newly-created Systems and Process Review Division of the Bureau of Professional Responsibility. On March 3, 1995, Ober was promoted to captain and made the Director of the Systems and Process Review Division. In 1998, at the request of Major R. Dane Merryman, Ober became the Director of the Bureau of Professional Responsibility's other division – Internal Affairs. (Ober Dep., 12/05/2001, at 16-22)

4. In late September or early October 1998, while Ober was Director of the Internal Affairs Division, he was contacted by Special Agent Ralph Kush of the Federal Bureau of Investigation ("FBI"). (Kush Dep. at 27-28.) Special Agent Kush called State Police headquarters and asked for Internal Affairs. He was transferred to Ober. (Kush Dep. at 27-28.) Kush then told Ober that the FBI suspected an enlisted member of the

State Police was engaged in illegal activity. Kush also wanted to obtain information about the selection process for Pennsylvania State Police cadets. (Soohy Dep. at 17, 27, 52; Kush Dep. at 32-34; Ober Dep., 12/05/2001, at 81-82, 88.) Kush needed that information as background for an investigation he was conducting into allegations that Trooper Kipp Stanton was receiving payoffs for assisting Pennsylvania State Police applicants to obtain cadet positions. (Kush Dep. at 12-13, 33-34; Ober Dep., 12/05/2001, at 81.) This particular FBI investigation originated in 1994 or 1995, but had been dormant from approximately 1997-1998, when a new FBI supervisor determined that additional investigation was appropriate. (Kush Dep. at 11, 19-20.)

5. Before contacting Captain Ober, Special Agent Kush had already contacted other members of the Pennsylvania State Police about the Stanton investigation. In January 1997, Kush had discussed the investigation with Lieutenant Klaus Behrens, who was then the Western Section Commander of the Bureau of Professional Responsibility. (Kush Dep. at 18; Behrens Aff.) Kush had also discussed the investigation with Captain Frank Monaco, then Director of the Organized Crime Division, Bureau of Criminal Investigation, in August or September of 1998, shortly before he first spoke with Captain Ober. Kush explained the background of the Stanton investigation to Captain Monaco and other members of the Western Regional Office of the Organized Crime Division. Captain Monaco determined that Kush did not require the assistance of the Bureau of

3

Criminal Investigation and referred him to the Bureau of Professional Responsibility. (Coury Dep., 03/12/2002, at 30-31; Monaco Aff.)

6.  When Special Agent Kush contacted Captain Ober, Ober had never worked with anyone from the FBI before. (Ober Dep., 12/05/2001, at 31.) Kush and Ober did not know each other. (Ober Dep., 12/05/2001, at 80, Kush Dep. at 27.)

7.  On October 5, 1998, Captain Ober told Lieutenant Colonel Robert Hickes, Deputy Commissioner of Staff, about the FBI investigation. (Hickes Dep. at 47.) Lieutenant Colonel Hickes was not in Captain Ober's direct chain of command. (Hickes Dep. at 58.) In violation of State Police Field Regulation 1-1.17 (Reporting of Information), Captain Ober did not tell his immediate supervisor, the Director of the Bureau of Professional Responsibility,[1] about the FBI investigation involving Trooper Kipp Stanton. (Hickes Dep. at 50, 59-60; Evanko Dep. at 80, 104-105, 109, 316-320.)

8.  During their conversation on October 5, 1998, Captain Ober told Lieutenant Colonel Hickes that Agent Kush contacted him in confidence about a political corruption investigation the FBI had been doing. It was an investigation that had been done previously and there was one segment that had been allowed to lie dormant. The FBI had information that a person could buy his way into the Pennsylvania State Police. The FBI

---

[1] At the time, defendant Conley was the Director of the Bureau of Professional Responsibility. He was subsequently appointed Deputy Commissioner of the State Police and promoted from Major to Lieutenant Colonel.

4

wanted to pursue that further and needed information about the State Police hiring process. (Hickes Dep. at 48-49.) Captain Ober told Hickes that the term "colonel" had been used and that there were suspicions that the Governor's office might be involved. (Hickes Dep. at 49.) Captain Ober also said that the FBI had asked him not to reveal the information to anyone else. (Hickes Dep. at 49-50, 51.) Consequently, Hickes ordered Captain Ober not to tell anyone else about the FBI investigation and to update him periodically on the progress of the investigation. (Hickes Dep. at 58, 63-64.)

9. Despite what Captain Ober told Lieutenant Colonel Hickes, the FBI had not directed Ober to keep the investigation a secret from other members of the State Police. (Kush Dep. at 35-36, 50-51, 190-191, 193, 212.) Indeed, Captain Ober admits that the FBI was not in a position to give him such a directive. (Ober Dep., 12/05/2001, at 146.) Ober even admits that Agent Kush never told him to keep the investigation a secret from his Bureau Director, Major Conley. (Ober Dep., 12/05/2001, at 131; Kush Dep. at 35.)

10. Moreover, contrary to what Captain Ober told Lieutenant Colonel Hickes on October 5, 1998, the FBI had not mentioned a colonel or the Governor's Office being part of the investigation. In fact, no mention had been made of a Lieutenant Colonel or the Governor's Office until over a week later when the FBI recorded a conversation on October 13, 1998, amongst a confidential informant, Trooper Kipp Stanton, and Dennis Jay Bridge (who was attempting to obtain a cadet position.) (Kush Dep. at 142-143, 197-

202, 206, Exhibits 2 and 3.) The FBI did not play that tape-recording for Captain Ober until October 21, 1998, and it was Ober, not the FBI, who first picked up on the references to a Lieutenant Colonel and the Governor's Office. (Kush Dep. at 39-41, 43, 132, 206-207; Ober Dep., 12/07/2001, at 287-288.) It was Ober, not the FBI, who first suggested that a Lieutenant Colonel or someone at the Governor's Office would have to be involved. (Kush Dep. at 45.)

11. At one point in the conversation recorded on October 13, 1998, Bridge said, hypothetically, "Let's say a Senator or governor or somebody helps me . . ." In that same recorded conversation, Bridge also said: "If he (referring to a politician) can help us, and we know that . . . definitely he can help us . . . show he can help us, he got the money, we move on, and we're in business. Apparently he's gonna have to talk to some Lieutenant Colonel . . . he's gonna talk with somebody that's affiliated with the State Police . . . that's gonna know all that." These two quoted portions of the recorded conversation are the only references to the Governor's office or any high-ranking member of the State Police in the entire conversation. Significantly, neither statement was made by Trooper Stanton or the FBI's informant; rather, they were made by Dennis Jay Bridge, the person who was attempting to buy his way into the State Police. (Kush Dep. at 26, 28-29, 49, and Exhibit #3.) There is no evidence that Bridge had any accurate information

6

regarding how the complex process for hiring State Police cadets could be illegally manipulated.

12. In late April or early May, 1999, the FBI concluded their investigation, after determining that Trooper Kipp Stanton was the only member of the State Police who had engaged in wrongdoing. (Hickes Dep. at 74-79; Kush Dep. at 71.)

13. On May 12, 1999, Captain Ober and Lieutenant Colonel Hickes first told Colonel Evanko about the FBI investigation. (Hickes Dep. at 76-77.) It was not until the next day, May 13, 1999, that Hickes told Evanko he had ordered Ober not to tell anyone else of the FBI's investigation because Colonel Evanko, his deputies, and the Governor's Office had all been targets of the investigation. (Hickes Dep. at 78-83; Evanko Dep. at 42-45.) Unbeknownst to Colonel Evanko, Hickes had already disclosed the existence of the FBI's investigation to the Governor's Office in late February or early March, 1999, before the investigation had been concluded. (Lebecki Aff. at ¶ 4; Wooley Aff. at ¶ 5.)

14. Colonel Evanko questioned what Captain Ober and Lieutenant Colonel Hickes told him about the FBI's investigation, as well as Captain Ober's failure to report the FBI's investigation into suspected illegal activity by a member or members of the State Police to his direct supervisor. Colonel Evanko was particularly concerned about Lieutenant Colonel Hickes' involvement, and he requested an administrative inquiry into

7

the facts and circumstances surrounding the FBI investigation. (Evanko Dep. at 52-56, 69, 71-74, 80, 108, 183-184.)

15. Since the Bureau of Professional Responsibility was created in 1986, the Commissioner has had the authority to request administrative inquiries or investigations. (Hickes Dep. at 158-162; Pennsylvania State Police Special Order 85-111 and Administrative Regulation 4-25; Skurkis Dep.*[2] at 67-60; Skurkis Aff.) Indeed, former Commissioners have ordered similar administrative inquiries in the past. (Hickes Dep. at 158-162; Skurkis Dep.* at 57-60; Skurkis Aff.)

16. As a courtesy, Colonel Evanko told the Governor's Deputy Chief of Staff, Mark Campbell, about the FBI's investigation and informed Campbell that he planned to conduct an inquiry into the matter. Evanko did not ask Mr. Campbell's permission to conduct the inquiry or seek Campbell's advice on how to handle the situation. Campbell did not object to Evanko doing an inquiry, nor did he authorize or approve it. (Evanko Dep. at 68-69, 294-296, 302-303; Campbell Dep. at 30-34, 42-46, 48-50.)

17. Colonel Evanko then assigned Majors Thomas Williams and Robert Werts to conduct the administrative inquiry. As part of that inquiry, Williams and Werts interviewed Captain Ober, Lieutenant Colonel Hickes, FBI Special Agent Kush, as well

---

[2] The depositions that are marked with an asterisk were taken by plaintiff and recorded by PR Video, with an employee of PR Video administering the oath. Defendants have just discovered information about PR Video that calls into question the validity of those depositions. Within the next few

as Colonel Evanko, Lieutenant Colonels Coury and Westcott, Major R. Dane Merryman, and Sgt. Dana Seifner.

18. When Majors Werts and Williams talked to Captain Ober, the interview was conducted in the same manner as any other administrative investigation or inquiry. (Ober Dep., 12/05/2001, at 199-205.) Consistent with the State Police Administrative Regulation 4-25 and the Collective Bargaining Agreement, Art. 26, § 5, Ober was given *Garrity* warnings and permitted to have a union representative present. As provided by State Police Field Regulation 1-1.28 ("Internal Investigations"), Ober was required to answer the questions presented to him. As Ober admits, he was not in custody and he would not have been subject to any criminal sanctions if he refused to answer the questions. As long as he was willing to risk employment sanctions, Ober could have refused to answer any questions and left the interview. (Ober Dep., 12/05/2001, at 202-208, Brown Dep.* at 103-104; Brown Aff.) There is no question that Ober fully understood the nature of administrative inquiries and investigations. In fact, Ober has personally conducted similar interviews and administered the same *Garrity* warnings that were given to him by Majors Werts and Williams. (Ober Dep., 12/05/2001, at 48-50, 200-202.)

---

days, defendants intend to move to strike the depositions. However, defendants have included references to the challenged depositions in case the Court ultimately decides they should not be stricken.

19. The administrative inquiry requested by Colonel Evanko was completed by July 21, 1999. Although he believed Captain Ober and Lieutenant Colonel Hickes had not exercised good judgment in dealing with the FBI matter, Colonel Evanko chose not to discipline either one. (Evanko Dep. at 210-12; Conley Dep. at 248.)

20. In May 1999, when Captain Ober and Lieutenant Colonel Hickes told the Commissioner about the FBI's investigation, Ober had been temporarily dispatched from the Bureau of Professional Responsibility to the Bureau of Technology, where he was the Team Leader for System Integrator Procurement for the Incident Information Management System (hereafter IIMS.) (Evanko Dep. at 212-214; Hickes Dep. at 31-32.) Ober had completed that assignment by January 2000. (Hickes Dep. at 33, 129-142.)

21. Meanwhile, the Pennsylvania State Police were planning security for two large political gatherings scheduled to take place in Pennsylvania during the summer of 2000 – the Republican National Convention and the Conference of the National Governors Association. In preparation, Lieutenant Colonel Westcott and Major Werts conferred with the California Highway Patrol and the San Diego Police Department. Those agencies had coordinated security for the Republican National Convention when it was held there a few years earlier. (Westcott Dep. at 96-97.) Based on their experience, the California agencies recommended having a team of people, working full-time, to prepare an operational security plan for the upcoming convention in Pennsylvania.

(Evanko Dep. at 279; Westcott Dep. at 97.) Consequently, Colonel Evanko assigned Captain Cynthia Transue to assist Major Werts, the Area VI Commander, in preparing for the Republican National Convention. (Evanko Dep. at 218-220.)

22. From November 29 to December 3, 1999, a major civil disorder arising from demonstrations at the World Trade Conference occurred in Seattle, Washington. As a result of that crisis, the State Police concerns regarding security at the Conference of the National Governor's Association. (Evanko Dep. at 229, 231, 285.) Consequently, Colonel Evanko decided to assign Captain Ober to assist Major Szupinka, the Area III Commander, in preparing for that conference, just as he had assigned Captain Transue to help Major Werts with the Republican National Convention. (Westcott Dep. at 98, 120; Evanko Dep. at 218-220, 230-231.)

23. Captain Ober's assignment to assist Major Szupinka was made more than eight months after Ober and Hickes told Colonel Evanko of the FBI investigation, and it did not affect Ober's rank, pay, benefits, or status. (Evanko Dep. at 218-219, 221-223; Westcott Dep. at 98; Ober Dep., 12/05/2001, at 39-40.)

24. The Commissioner has the authority to transfer commissioned officers as needed to fulfill the needs of the Department, in accordance with F.R. 3-2, Transfers. (Evanko Dep. at 236; Westcott Dep. at 95-96, 107, 128, 133.) The Commissioner transferred Captains Transue and Ober pursuant to this authority. (Conley Dep. at 187;

11

Evanko Dep. at 218-220.) The collective bargaining agreement does not address inter-troop transfers, such as Captain Ober's. (CBA between Com. of Pa. and PSTA, Art. 38.)

25. On January 26, 2000, Captain Ober filed a petition for mandamus and a request for a preliminary injunction to prevent his transfer to assist Major Szupinka with the Conference of the National Governor's Association. In exchange for the withdrawal of Captain Ober's motion for a preliminary injunction, Colonel Evanko voluntarily rescinded Captain Ober's transfer and agreed to keep him in the Harrisburg/Hershey area until a final decision had been reached on the mandamus petition. This agreement was formalized and filed with the Pennsylvania Commonwealth Court. (*See Ober v. Evanko*, Petitioner's Mot. to Withdraw, App. A, No. 35 M.D. 2000 (Pa. Commw. filed Jan. 27, 2000).)

26. Although Colonel Evanko agreed to keep Captain Ober in the Harrisburg/Hershey area during the pendency of his lawsuit, Colonel Evanko did not transfer him back to IIMS because Ober had already finished his assignment there. (Evanko Dep. at 219, 223.) Evanko did not send Ober back to the Bureau of Professional Responsibility because the Bureau Director, Major Conley, had concerns about Ober's judgment and did not want him to serve as Director of the Internal Affairs Division. (Evanko Dep. at 219, 237; Conley Dep. at 165-166, 173-179.)

27. Unfortunately, no captain's position was vacant in the Harrisburg/Hershey area in early 2000. Consequently, on February 19, 2000, Colonel Evanko temporarily assigned Ober to serve as the Central Section Commander of the Bureau of Liquor Control Enforcement, a position previously held by a lieutenant. (Evanko Dep. 237-238, 240; Westcott Dep. at 132, 134, 137.) Ober's assignment involved no loss of pay or rank, and the Pennsylvania State Troopers Association (Captain Ober's grievance representative) did not object to it. (Conley Dep. 185; Lazarro Dep. at 82-84.)

28. Shortly after Ober's transfer to the Bureau of Liquor Control Enforcement, an appropriate Captain's position became available in the Harrisburg area. On May 30, 2000, Colonel Evanko assigned Captain Ober as Director of the Administration Division, Bureau of Liquor Control Enforcement. (Evanko Dep. at 293.)

29. If Captain Ober has ever been shunned, ostracized or harassed, or subjected to verbal insults, such action was not done at the direction or behest of any of the defendants. (Evanko Dep. at 299, 303; DeWire Dep.* at 69-70; DeWire Aff.; Conley Aff.; Coury Aff.; Westcott Aff.; Campbell Aff.)

30. There is no evidence that defendant Coury improperly ordered an investigation into Ober's personal affairs. Ober's complaint stems from IAD #1999-409 (Ober Dep., 12/05/2001, at 219, 287.) That investigation was commenced after Lieutenant Colonel Coury received a letter from retired Colonel Phil Conti, complaining

13

that Ober had used his position with the State Police to improperly solicit historical artifacts from retired State Police members or their widows. (Coury Dep., 04/15/2002, at 16, 37.) Lieutenant Colonel Coury forwarded the complaint to the Bureau of Professional Inquiry for inquiry or investigation as it deemed appropriate. (Coury Dep., 04/15/2002, at 14-16, 24, 42.) After an administrative inquiry, Lieutenant Colonel Coury determined that the allegations against Captain Ober were "unfounded", and notified him of that determination. (Coury Dep., 04/15/2002, at 49-50, 74.)

31. There is no proof that any defendant prevented Captain Ober from being assigned to the Pennsylvania Emergency Management Agency (PEMA). (Westcott Dep. at 145-152; DeWire Dep.* at 67, 74; DeWire Aff.) Per O.M. 7-1, 10.6, Captain Ober voluntarily withdrew his PEMA appointment when he was transferred to Area III to assist Major Szupinka. When Ober was transferred to the Bureau of Liquor Control Enforcement as Central Section Commander, the Bureau Director, Major Francis Koscelnak, refused to allow Captain Ober to assume PEMA duties because Major Koscelnak wanted Ober to concentrate on his new operational duties. Major Koscelnak believed Ober did not have time to devote to PEMA duties; moreover, the restrictive funding for positions in the Bureau of Liquor Control Enforcement did not allow for alternative part-time assignments, such as PEMA. (Koscelnak Dep.* at 16-19; Koscelnak Aff.) When Major Phillip DeWire replaced Koselnak as Director of the Bureau of

Liquor Control Enforcement, Ober made another request for a PEMA assignment. However, Major Leonard Washington, Director of Bureau of Emergency and Special Operations (which includes PEMA Operations) refused to consider Ober for placement on the PEMA team. (DeWire Dep.* at 44; DeWire Aff..)

32. Captain Ober is unhappy that he has not been promoted to Major. (Ober Dep., 12/05/2001, at 242-249.) However, the decision to promote anyone to the rank of Major is within the sole discretion of the State Police Commissioner. *See* O.M. 7-9, "Career Development and Promotion Testing," 3.2. Vacancies in Major rank positions are seldom available. Of those that have become available, the Commissioner determined that someone besides Captain Ober was best qualified for the position. (Evanko Aff.) None of the other defendants have the authority to promote Captain Ober or to deny him a promotion.

33. While Captain Ober was Director of the Internal Affairs Division of the Bureau of Professional Responsibility, he was issued a cellular phone. Then Ober was temporarily assigned to the Bureau of Technology to work on the IIMS project. Because Ober was no longer working in the Bureau of Professional Responsibility, the Bureau Director, then Major Conley, asked him to return the Bureau's cellular phone. (Conley Dep. at 77-80, Ober Dep., 12/05/2001, at 299-300.)

34. While he was Director of the Bureau of Professional Responsibility, Conley denied Ober's request for reimbursement of expenses associated with the FBI investigation. Conley also denied Ober's request to be reimbursed for framing a retirement plaque for a State Police member. Conley did not believe those expenses were justified. (Conley Dep. at 242-244, 257, and Exhibit #1.) However, Ober subsequently grieved Conley's decisions. Ultimately, Ober was reimbursed for expenses associated with the FBI investigation but not the retirement plaque. (Evanko Dep. at 185; Ober Dep. 12/05/2001, at 301-310.)

35. Captain Ober has complained about not being chosen for two educational opportunities. (Ober Dep., 12/05/2001, at 350-352, 354-362.) The first was a national alcohol symposium conference designed for section commanders, which was scheduled for June 2000. (Ober Dep., 12/05/2001, at 354-355, 358.) By June 2000, however, Captain Ober had been transferred to the position of Administrative Division Director, and the course was not pertinent to his new duties. (Evanko Dep. at 92-93; Westcott Dep. at 166.) Second, Captain Ober was not chosen to attend the Northwestern University's police staff and command school. (Ober Dep. 12/05/2002, at 350-352.) While Lieutenant Colonel Coury was away, Major Einsel denied Captain Ober's application because his application had been received late. (Evanko Dep. at 274-276.)

16

36. Captain Ober has complained about being removed from the State Police Centennial Book Committee. That committee is comprised of active and retired employees and members of the Pennsylvania State Police who are putting together a souvenir book for the Pennsylvania State Police centennial anniversary. Members of the committee are all volunteers who do not receive a salary for their work on the committee; at times, however, the committee met during working hours. On August 20, 1999, the Commissioner informed the head of the committee that Captain Ober could no longer serve on the committee because his assignment as Team Leader for System Integrator Procurement for the IIMS required his full-time commitment. (Evanko Dep. at 285-288; Infantino Aff.)

Respectfully submitted,

James M. Sheehan, General Counsel
Commonwealth of Pennsylvania

By: _____
Syndi L. Guido, Deputy General Counsel
Barbara L. Christie, Chief Counsel
Joanna N. Reynolds, Assistant Counsel

Governor's Office of General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
Dated: May 6, 2002                    (717) 783-6563

17

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL G. OBER, | : | |
| Plaintiff | : | NO. 1: CV-01-0084 |
| | : | (Judge Caldwell) |
| vs. | : | |
| | : | CIVIL ACTION - LAW |
| PAUL EVANKO, MARK | : | |
| CAMPBELL, THOMAS COURY, | : | JURY TRIAL DEMANDED |
| JOSEPH WESTCOTT, | : | |
| HAWTHORNE CONLEY, | : | |
| Defendants | : | |

### CERTIFICATE OF SERVICE

I hereby certify that on this date a copy of Defendants' Motion for Summary Judgment and Statement Of The Material Facts As To Which There Is No Genuine Issue To Be Tried was served on plaintiff's counsel, by first-class mail, addressed as follows:

>Don Bailey, Esquire
>4311 North 6th Street
>Harrisburg, PA 17110

>Syndi L. Guido
>Deputy General Counsel
>Governor's Office of General Counsel
>333 Market Street, 17th Floor
>Harrisburg, PA 17101

Dated: May 6, 2002