58

5/21/0:

> to CV

# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DARRELL G. OBER** | ) | **CIVIL ACTION LAW** |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **NO. 1:CV-01-0084** |
| **VS.** | ) | |
| | ) | |
| **PAUL EVANKO, MARK** | ) | |
| **CAMPBELL, THOMAS COURY** | ) | |
| **JOSEPH WESTCOTT,** | ) | |
| **HAWTHORNE CONLEY,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| **Defendants** | ) | **(JUDGE CALDWELL)** |

**FILED**
HARRISBURG, PA

MAY 2 0 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## PLAINTIFF'S CONCISE STATEMENT OF
## UNDISPUTED MATERIAL FACTS And Affidavit of Darrell Ober

1.) As of September 1998, the plaintiff Darrell G. Ober was a Captain in the

PSP; he was acting Bureau Director of the Bureau of Professional Responsibility

(BPR), and was then the director of the Internal Affairs Division (IAD) of the Bureau.

2.) To the FBI, those who head up internal affairs are a cut above the average,

the brightest and most honest of the best. Soohey Deposition _____, Kush

Deposition___.

3.) On or about September 29, 1998 FBI Agent Ralph Kush called Darrell Ober

and informed him of an FBI investigation into public corruption which might implicate

1

higher ups in the PSP and the Governors office.

4.) A concern for confidentiality was discussed Ober Dep___.

5.) Ober realized that only a small hand-full of officers at the very top of the State Police Organization were in a position to make the improper, unlawful decisions the FBI information indicated might be occurring.

6.) Ober recollects FBI Agent Ralph Kush expected confidentiality as with any investigation.

7.) The defendant Hawthorne Conley was the Commanding Officer (Troop B) of Trooper Kip Stanton, in Western Pennsylvania, during the time that he was claiming to be able to procure PSP Academy positions for money. Ober knew Conley had a duty to contact elected representations who were implicated in the scam.

8.) Mr. Conley was the newly appointed (effective date October 3, 1998) Director of BPR but was not only not available but didn't arrive at his post until on or about October 12-13-1998.

9.) On or about October 5, 1998 Captain Ober, the plaintiff, discussed the FBI inquiry with Lt. Colonel Robert C. Hickes.

10.) Ober knew that Hickes was not in an official position to be part of the corruption and believed, due to his knowledge of Hickes personally that, he would not be part of any such corruption.

11.) By reputation, and rumor, Ober believed it highly unlikely that Colonel Evanko and/or Lt. Colonel Coury would sell a PSP Academy position to anyone for any price. But Ober believed he had a duty to respect the FBI investigation

12.) It did occur to Captain Ober, based upon personal impressions, reputation, and rumor, that Colonel. Evanko and Lt. Colonel Coury, were capable, however, of manipulating Academy admissions for political or personal reasons.

12.) Captain Ober passed on to Lt. Colonel. Hickes what the FBI had told him about the probe at the end of September 1998 on October 5, 1998 with the intention to go no further, Hickes was a Deputy Commissioner.

13.) After Captain Ober had finished briefing Lt. Colonel. Hickes, Colonel Hickes ordered Captain Ober not to share the FBI investigation information with anyone, to keep it secret, and to cooperate with the FBI.

14.) Captain Ober followed Colonel. Hicke's orders, working to make sure he maintained the security and integrity of the FBI investigation into public corruption.

15.) On April 26, 1999 Colonel. Evanko appointed Captain Ober as the lead procurement officer of the IIMS (Incident Information Management System) project utilizing modern technology to boast productivity for PSP investigation and data keeping functions. This project was of the upmost and highest priory.

16.) Choosing Captain Ober for this position was a major career enhancing

3

move and marked him among his colleagues as an exceptional career officer.

17.) On May 12, 1999 Colonel Hickes and Captain Ober informed Colonel Evanko about the FBI investigation and that it did not yield inculpatory information implicating higher ups in the PSP front office , or in the Governors Office, but that at least one Trooper (Trooper Stanton) had behaved in a criminal fashion.

18.) Colonel. Evanko became extremely angry and said he should have been told and that he would call Louie Freeh (FBI Director) and have the FBI Agent responsible transferred. Evanko Dep ___, Hickes Dep___ Complaint paragraph 31.

19.) Paul Evanko called FBI Director Louie Freeh and I picked up the phone and called him and if they were conducting a political corruption investigation into the higher ranks of the state police that SAC ought to be transferred and he hadn't told me. Evanko Deposition pages 44-45.

20.) Paul Evanko was concerned that he might be personally embarrassed because he wasn't told of the FBI probe. Evanko Deposition pages 46-48. Coury was also concerned about Evanko and the Governor's Office being embarrassed. See paragraph 64.

21.) Paul Evanko was upset because he felt he wasn't told earlier. Evanko Deposition page 47.

22.) Paul Evanko testified it was Lt. Colonel Hickes duty to inform him of the FBI probe. Evanko Deposition page 48.

23.) Lt. Colonel Hickes told Evanko he ordered Captain Ober not to reveal what he knew Evanko Dep pg 49. Hickes so informed Evanko on May 12, 1999 in Ober presence id page 49, 50.

24.) Hickes and Ober expressed fear to Evanko that the probe might involve higher ranking individuals in the state police and governors office and for this reason they could not reveal knowledge of it. Evanko Deposition page 51.

25.) Evanko was upset, not just that he was not informed earlier, but that he was not informed at the inception ie., initially, when the FBI disclosed the probe; Evanko Deposition page 52.

26.) On May 13, 1999 Paul Evanko learned, and he admits, that the FBI Agent made a choice ie., a decision not to inform him of the probe. Evanko Deposition page 55, 56.

27.) Evanko says that the FBI Agent didn't mention the rank of Colonel or the Governors Office during the initial call, and that Ober couldn't have learned of it until a tape was played for Ober on October 21, 1998, some 16 days or so after Ober told Hickes that that was what the FBI agent indicated. This is a red herring that is not relevant to any material issue in this case.

28.) Evanko also admits that he knows of no facts of record that Ober is clairvoyant or has supernatural ability, and that he has no explanation of how Ober could have known on October 5, 1998 that a confidential informant would refer to higher ups in the state police or the governors office some 2 to 3 weeks later, after he so informed Lt. Colonel Hickes, his superior, and was ordered to keep his information secret until the FBI was done. Evanko Deposition pages 55-59.

28.) As of his deposition on March 27, 2002 Colonel. Evanko had not reached any conclusion about who had the best recollection of the October 5, 1998 conversation between FBI Agent Kush and Captain Darrell Ober ie, whether Ober's or Kush's recollection should be deemed most reliable.

29.) Evanko maintains that he didn't think the FBI suspected him.

30.) According to Evanko, as of his admitted May 20, 1999 phone conversation with Special Agent in charge of the FBI's Western District of Pennsylvania Office, Rick Mascara, Mascara had no knowledge that any evidence had been produced which had implicated high ranking officials of the PSP and the Governors Office. Evanko Dep pages 62-31.Paul Evanko says he never called Louie Freeh or anyone in his office. However, compare page 44 ln 21-45 of Evanko's deposition with page 63 of Evanko's Deposition.

32.) FBI Agent Ralph Kush was not only transferred, but was put on surveillance duty, a merial and undesirable work detail for FBI Agents _____.

33.) Paul Evanko called the defendant Mark Campbell the afternoon of May 12, 1999, upon learning of the FBI probe from Ober and Hickes. Evanko Deposition page 64 ln 6-page 69 ln 6. Evanko later e-mailed Campbell on transferring Ober (Jan 4, 2000) before Conley told Ober on January 10, 2000. See Paragraph 32; Ober Aff. paragraph 17.

34.) Evanko claims to have first learned that Lt. Colonel. Hickes had talked earlier to Mary Wooly in the Governors Office, only a few weeks or even days before his own deposition. Evanko Dep pages._____

35.) Neither Evanko, or his attorneys, disclosed their knowledge of Hickes contacts with the Governors Office with opposing counsel as required by federal and ethical rules. Evanko Dep page 67. See F.R. Civ.P. 26(a)(1)(A). See Ethical Problem for Pennsylvania Litigators, PBI, Ralph Adam Kline, page 14 paragraph 18.

36.) Evanko claims never to have thought, or believed, that Ober has been disloyal or violated any PSP regulation, and claims never to have carried any personal anger against Hickes or Ober about not being informed of the investigation. Evanko Deposition pages 70-71.

7

37.) Within days of being told about the FBI probe Evanko ordered an investigation into Captain Ober.

38.) Evanko never initiated any investigation into why the earlier disclosure by the FBI to PSP officials of the same public corruption matters the FBI reported to Ober, weren't reported to him sooner. Evanko Deposition page 106-116.

39.) Ober had expressed concern to FBI Agent Kush about what to do with the information relayed to him by the FBI. Evanko Deposition page 107.

40.) Ober's voicing concern to the FBI about what to do with the public corruption information because it involved PSP higher ups - indicates, when compared against his conduct, that he learned it early and that's why he went to Hickes ie. to preserve the integrity of the investigation, a matter of great public concern.

41.) Evanko outright asked FBI SAC Mascara whether there were any pending investigations into higher ups in the PSP. Evanko Deposition page 118. Evanko asked the FBI SAC about pending investigations knowing there had been a question about PSP higher ups which included himself. Evanko Deposition page 119.

42.) Mascara allegedly told Evanko that if Evanko's name had surfaced he would have been told. Evanko Deposition pages 141-149.

43.) FBI SAC Mascara mentioned testing as one part of the FBI investigation. Evanko Deposition page 150.

8

44.) Evanko denies telling Hickes and Ober that he was going to have the FBI Agent involved in the underlying investigation transferred. Evanko Deposition page 151.

45.) On May 13, 1999 Colonel Evanko had a meeting in his office with Colonel Coury, Colonel Westcott, and Colonel Hickes. After Hickes left the defendants conferred on what to do bout the situation.

46.) Stanton, the PSP Trooper who was implicated in overt criminal actions in the underlying criminal action, was under the defendant Conley's command at the time of the FBI investigation, through and including, when the FBI first informed Ober of the investigation. Evanko Deposition page 167.

47.) Mr. Evanko came to the conclusion that Hickes was his concern, and didn't give Ober much of a second thought, (Evanko Deposition Page 178), even though Evanko believed Ober violated a PSP regulation (Field Regulation 1-1.17) (or practice) in not informing Conley, who was Stanton's Commander, in an investigation that would have required systemic (Evanko Deposition Page 169) wrongdoing. See Evanko Deposition 169-178.

48.) After Colonel Hickes left on May 13, 1999, Colonel Evanko was told that the situation was not appropriate for a BPR investigation (Although a BPR number was assigned on July 20, 1999). He, Colonel Coury and Colonel Westcott decided to

9

Assign Major Werts and Major Williams to do the investigation. Evanko Deposition Page 179.

49.) Evanko denies knowing that Ober and Merryman were read rights but remembers Westcott testifying that he went out and flew a PSP airplane up to Major Williams to brief him on his special assignment. Evanko Deposition Pages 180-183.

50.) In Evanko's estimation, the unauthorized improper use of PSP resources to help a private company (PNC) transport its money, using at least 40 state troopers, PSP helicopters, and other vehicles, was not worthy of seeking private reimbursement, while denying Ober reimbursement for 2 cups of coffee in Indiana to FBI agents, to ensure security, was a proper action. Evanko Deposition Page 184-190.

51.) Although Evanko testified he was not concerned about Ober - only Hickes, he knew Hickes was not involved with the FBI at all when he sent Williams (who he personally mentioned to Mascara) out to sort things out. Evanko Deposition Page 195.

52.) During the lunch break in Colonel Evanko's deposition, Captain Ober checked his personnel file, and learned that a document (from Colonel Coury to him) which he had copied previously (but which had not been provided when he and his attorney reviewed his file at PSP headquarters, had clearly been taken from his file). This document, P281, demonstrated conclusively that Colonel Coury performed an unjustified anti-personnel action on Captain Ober, and that someone unlawfully purged

Ober's personnel file of the document. Evanko Deposition Pages 199-202. See and compare plaintiff's Exhibit #281, the document which was taken from Ober's file, and plaintiff's Exhibit 66, the substituted sanitized version.

53.) Colonel Evanko felt the expenses incurred by Captain Ober in secretly meeting the FBI, should have been paid for by the FBI. Evanko Deposition Page 206.

54.) There is no evidence of record indicating that the PSP ever asked the FBI to reimburse the Indiana expenses even after Captain Ober won his grievance and was reimbursed.

55.) The Pennsylvania Historical Educational and Museum Committee is separate from the PSP. Evanko Deposition Page 207-208.

56.) Evanko appointed Ober to be the team leader to develop selection criteria for the systems integrator for phase one of the IIMS project. Evanko Deposition 213.

57.) Evanko promised to return Ober to IAD (Bureau of Professional Responsibility) upon completion of the 13 month project. Evanko Deposition Pages 213-214.

58.) Ober filed grievances on November 8, 1999 and December 22, 1999. Evanko knew of the grievances but didn't know what the dates were. Evanko Deposition Page 217.

11

59.) Evanko denies however, on being kept up on grievances filed against the Department. Evanko Deposition Page 218.

60.) It was Colonel Evanko who decided to send Ober to Washington County, over 200 miles away from his home, in January 2000, weeks after Ober mentioned retaliation in one of his grievances. Evanko Deposition Page 218.

61.) Evanko says his reasons were that Ober was finishing up his IIMS assignment, that he was available, and that Conley didn't want him returned, and, he could do the job. Evanko never discussed any of these alleged reasons with Captain Ober. Evanko Deposition Page 219. And it was Evanko himself who created Ober's "availability" by promoting John Brown to Ober's position. Ober Aff paragraph 18.

62.) Ober was not finished with his IIMS assignment, and in fact eventually worked on the assignment for at least 2 more months. In fact he had not even voted on the project and important meetings were planned when Ober was transferred to Washington by Evanko. Ober Aff. Paragraphs 19.

63.) Major Walp, head of the PSP IIMS project asked that Ober he retained on the IIMS assignment. Evanko Deposition Page 222.

64.) Evanko did not consider any other Captain's for the job, only Ober. Evanko Deposition Page 223.

65.) Darrell Ober complained of retaliation in one of his grievances he filed in late 1999. Evanko said he never read the grievances.

66.) According to Evanko, Ober did not return to IAD in the Bureau of Professional Responsibility, or if he did it was for a short period of time Evanko Deposition Page 224..

67.) According to Evanko, he transferred Ober back to IAD for a pay period for The formality of it Evanko Deposition Page 225. Evanko testified he didn't treat Ober this way to insult or harm him. Id. Pages 225-227.

68.) Ober filed an injunction in Commonwealth Court on January 26, 2000. See Ober Aff. Paragraph 17. See Evanko Dep pages 227-228.

69.) Ober was needed at IIMA to complete that project., Evanko Deposition Page 228. Ober never actually went back to IAD nor did he go to Washington. Evanko Deposition Page 228. Instead Evanko transferred Captain Ober to Liquor Control Enforcement to fill a lieutenant's position.

70.) Evanko's argument that he yielded to Ober's injunction (Evanko Deposition Page 229) is simply not credible. Ober was never needed for the National Governor's Conference. The Seattle World Trade problems are just pretexual. There is no evidence of their engendering any responses by the PSP. See Ober Aff. Paragraphs 17, 18, 19..

13

71.) It was the defendant Westcott's opinion that Major Zipinka needed Captain Ober in Washington, not Zipinka. Evanko Deposition Pages 231-232.

73.) Evanko talked to Lt. Young and promoted him to Captain to go out to Western Pennsylvania ie. Washington after Ober won in Commonwealth Court. Evanko's offer to promote Young was conditional that he go out to help Zipinka. Evanko Deposition Page 232.

74.) It is a reasonable inference that Evanko promoted Young to cover himself because Ober had taken legal action and succeeded in defeating the transfer. See Ober Aff. Paragraph 17.

75.) In all of Paul Evanko's career as Commissioner of the Pennsylvania State Police, he only knows of one captain who was placed in a lieutenants position, and that was Captain Ober. Evanko Deposition Pages 227-228.

76.) Every single witness who testified in this matter, including all defendants, the plaintiff, and all other officers, testified that Captain Ober was the only Captain who was ever assigned to fill a lieutenant's position, to their knowledge. The Collective experience of the witnesses exceeds 20 to 30 uninterrupted years in each case, and over 300 collective years of experience.

77.) Paul Evanko never gave Mary Bungo, his personal secretary, the authority to make a final decision on how the PSP was organized. Evanko Deposition Page 245.

14

78.) Mary Bungo does have authority to sign off on a regulation change if all three deputy administrators sign off on it. Evanko Deposition Page 246.

79.) Colonel Evanko did not sign a change order regarding AR-1.102(c) dealing with the chain of command. Evanko Dep page 248. According to Evanko it was autopenned after review by of the three deputy commissioners, and he had no recall of the procedure outlined in plaintiff's counsel's question on the matter. See Evanko Deposition Page 249.

80.) Contrary to representations by defendants' counsel to plaintiff, and to this court, there are no facts known to indicate AR-1.102(c) was needed for accredition purposes. Evanko Deposition Pages 249-252. He never heard of subsection ⬜C⬜ until after this litigation arose id pages 252-254.

81.) Evanko e-mailed Mark Campbell in early January 2000 (January 4, 2000). Evanko claims he was keeping Campbell informed because of the National Governor's Conference. There is no evidence that Evanko so informed Campbell on Captain Young and defendants have refused to cooperate with Discovery. See Evanko Deposition Page 257. See Exhibit in Support paragraph 32.

82.) Colonel Hickes spoke with Mary Wooly in the Governor's Office about the FBI probe without getting permission from Colonel Evanko. According to Evanko speaking to someone about a matter of public concern without advising him first is a

violation of the chain of command. Evanko Deposition Page 262.

83.) Colonel Evanko had no recollection of signing a change order for AR-1 on or about February of 2001. Evanko Dep page 263.

84.) This is the change that defendants' counsel told the Court in argument was in effect at the time Ober was handling the FBI probe. Ober Aff.¶31

85.) Evanko has never known ink to smear on one of his documents that was a year old. Evanko Deposition Page 264.

86.) The National Governor's Conference was to take place in State College Pennsylvania not Washington, PA. When questioned why Ober was sent to Washington, PA to help Zipinka, Evanko said he was needed full time, but didn't even know if anyone who from Altoona or Blairsville, or anyone closer to State College was doing on the project. Evanko Dep. Pgs 283-285.

87.) Evanko says Coury took Ober off the Centennial Book Committee. Evanko Dep page. 285, but then testified that □I (Evanko) probably made the decision...or he made the decision and I agreed with it. Evanko Dep. 285-286

88.) Evanko says Ober was taken off the Book Committee because he was too busy. Evanko Deposition Page 286, but he never talked to Ober about it, or even consulted the head of the Committee, Evanko Deposition Page 286-288. The Committee wraps up its work in 2005 *id* 288.

89.) Evanko admits that one of his purposes in investigating Ober, was to learn if he himself and someone in the Governor's Office was a target, or under suspicion, in the FBI probe. Evanko Deposition Page 301.

90.) On page 302 of his deposition Evanko redescribes his motives regarding the Governor's Office and his reasons for ordering an investigation.

91.) According to Evanko the investigation (See paragraph 22) was not a BPR investigation, yet on July 20, 1999, acting IAD Director John (Rick) Brown assigned the case IAD #1999-503. See Evanko Deposition Page 305. Brown is the "investigator" in this case who read Major Merryman his rights when the defendants learned Merryman allowed Ober to do what every PSP member can do ie. Review a Historial File. That was during this litigation and was an act of retaliation.

92.) FR 1-1.17(6) does not contain the word might as erroneously represented to this court in defendants' brief to dismiss the complaint. Evanko Deposition Pages 312-319.

92.) Two signed (apparently by auto pen) change orders appeared in the AR-1 Historical file, when it was reviewed by Ober and his counsel. Ober Aff.93.) The two change orders, if used together, do not conform to actual changes in AR-1, only one of which (on February 23, 2001) was supposedly authorized by the PSP front office ie. there is no explanation for 2 there being 2.

17

94.) The two change orders hearing February 2001 dates had fresh ink on them which smeared when rubbled with moderate pressure by plaintiff's counsel during a review of documents at PSP headquarters.

95.) These documents were not part of the Historical File of AR-1 but were prepared to benefit defendants in this litigation.

96.) Mary Bungo, Mr. Evanko's personal secretary, has no rellection of "sub section c" or what it relates to. Bungo Deposition Page 19.

97.) Mary Bungo would only have auto penned a completed document, not a draft. Bungo Dep. Pg 20.

98.) Mary Bungo recognized the form of McAlreavy Deposition Exhibits 4 and 5 (P-105 and P-62). Bungo Deposition Pages 22-23. The two documents (purported change orders to AR-1, whose ink smeared) had been prepared separately ie., had different print. According to Bungo, possibly even a different font. Id. At 21.

99.) Mary Bungo  never remembers any trouble with the ink drying on auto pen signatures. Bungo Deposition Page 25, and never for a year, id..

100.) Lt. Colonel Hickes and Captain Ober could have gained absolutely nothing from not telling Colonel Evanko about the FBI probe (into possibly higher ups). Hickes Deposition Pages 129-130.

18

101.) Captain Ober, contrary to Mr. Coury's claim that he violated a culture of the PSP, did not so do by not telling Mr. Evanko he was a potential target of the investigation. Hickes Deposition Page 134.

102.) Paul Evanko's appointees to investigate Ober, namely Major Williams and Werts, admit that the trooper who claimed the ability to influence PSP academy appointments,  was Mr. Stanton, and that Trooper Stanton, claimed to have contacts with high ranking officials in the PSP and the Administration, Hickes Deposition Page 136, where counsel reads a question by Williams to Hickes, made during the investigation into Ober.

103.) Hickes had never known a Deputy Commissioner to jump in an airplane and fly off to tell a PSP Major to investigate someone. Hickes Deposition Page 112.

103.) Colonel Hickes was frightened by Colonel Evanko's strong reaction when informed by he and Ober of the FBI probe. Hickes Deposition Page 107.

104.) As a result Hickes went to Barbara Christi, now defendant's attorney, then PSP counsel, for advice. Hickes Deposition Page 107.

105.) Christi told Hickes that he was "reasonable" in his judgment regarding the decision he made about the FBI probe. Hickes Deposition Page 108.

106.) It is an undisputed fact in this case that on October 5, 1998, Colonel Hickes ordered Ober not to reveal to anyone what the FBI told him, with the exception

19

of Colonel. Hickes himself.

107.) It is an undisputed fact in this case that Paul Evanko was informed of the Hickes order to Ober on October 5, 1998 ordering Ober to maintain secrecy, on about May 12-13, 1999.

108.) Colonel. Hickes has 29 years experience in the PSP and he has never seen any Captain, except Captain Ober, ever assigned to a lieutenants position.

109.) An officer stationed in IAD is put there because of a reputation for integrity, Hickes Deposition Page 104.

110.) Colonel Evanko asked whether the FBI suspected him. Hickes Deposition Page 82.

111.) It would have made no difference as to whether Ober understood the FBI correctly, or not, as to confidentiality. Given the facts at the time, Ober made the right decision as to informing Evanko. Hickes Deposition Pages 83-84.

112.) The number of Colonels (Lt. Colonels and full Colonel's) in the PSP is 4. The FBI information indicated a Colonel might be involved. As a potential group of targets, Evanko was in that group and consequently should not have been told of the investigation. Hickes Deposition Pages 78-80.

113.) Doc Fielder, a well- known street politician in Pittsburgh, was mentioned in the FBI probe and was involved directly, if not peripherally, in the subject matter

of the FBI probe.

114.) Hawthorne Conley knows Doc Fielder and admits to knowing him.

115.) Captain Ober was concerned about the information in the FBI probe and appeared uncomfortable with it to Colonel Hickes. Hickes Deposition 66-67.

116.) Hickes has never believed Ober to have powers of prophecy or to be psychic. Hickes Deposition Page 65.

117.) Evanko told Hickes that Ober had misrepresented the facts from the FBI to Hickes. Hickes Deposition Page 61.

118.) Defense counsel had intentionally not disclosed information which should have been disclosed to defense counsel under Federal Rules of Civil Procedure (F.R. Civ.P. 26). Hickes Deposition (While being examined by defense counsel) pages 57-60.

119.) The defendant Coury knows of no rule that Ober broke having to do with the chain of command. Coury Deposition Page 18.

120.) In his Ober investigation interview, P64 (and also see P63, Mr. Coury's memo to Colonel. Evanko), Major Williams leads Mr. Coury by a clear suggestion, to attempt to create an AR 425 violation. See P64 page 6 (142) of the Coury interview.

121.) Coury, who claims to have read or reviewed nothing on the underlying matter, on June 28, 1999, told Major Williams that the Ober incident was a ▯major

21

incident because the allegations pointed at the Commissioner. Coury complained that the FBI aren't tight hipped. P64 page 6 (142).

122.) Coury was concerned about the Governor and because it was an election year. Id. Same paragraph.

123.) Coury told Williams, that because no single individual was named as a target (there are a grand total of 4 people at the top of the PSP Hierachy, 3 Lt. Colonel's and one Colonel. 3 of whom, excluding Colonel Hickes, Ober could identify as a potential target) that if he were in Ober's shoes he (Coury) would have reported the FBI probe to his superior. Id same paragraph.

124.) Williams, in a rambling leading question, suggests to Coury that Ober was disloyal and untrustworthy because he followed Hickes' order and respected the FBI expectations in not informing potential targets of the investigation. Id. Page 7 (143) first 2 full paragraphs.

125.) On November 1, 1999 Coury wrote Ober and told him he had applied too late (November 1, 1999) for a training opportunity Ober had requested. See P65, correspondence from Coury to Ober.

126.) It was plain that Ober had applied in time ie. on October 19, 1999, and not October 28, 1999, the deadline being October 22, 1999. See P281.

127.) P281 was removed from plaintiff's personnel file during this litigation. See Ober Aff.. See P68, a memo from Rebecca L. Brown to Ober. The person chosen a sargeant and a lietenant were less qualified.

128.) Coury admits that if Ober were not an extremely lucky prophet, or involved with the FBI confidential informants in the underlying matter, he wouldn't have known that a Colonel in the state police, or people in the Governor's Office, might have been involved in the illicit activity the FBI was investigating. Coury Deposition Pages 30-31.

129.) According to Coury, Ober violated a principle of culture, meaning PSP culture, in not telling him or Evanko that they could be potential targets. Coury Deposition Page 32. However if Ober had informed Coury he would have violated basic law enforcement rules or even been guilty of obstruction of justice.

130.) Coury told Evanko there was no violation of regulations or field regulations by anyone. Coury Deposition Pages 58-39.

131.) It was after the staff meeting on May 12, 1999 that Evanko called Mark Campbell. Coury Deposition Page 39.

132.) Only the Commissioner can effect a transfer. Coury Deposition Page 43.

133.) Conley had no faith in Ober after Ober didn't inform him of the FBI probe. Coury Deposition Page 45.

23

134.) Coury's admission that he and Conley talked about switching Captain Ober and Captain Skurkis, demonstrates that, contrary to Paul Evanko's claim that Ober (who was on detached status anyway) was available, is simply not truthful. Coury Deposition Page 45. Evanko made Ober available by promoting the investigator in this case, Captain Brown, to Ober's position at the same time that he transferred Ober to Washington - without telling him. Ober Aff___.

135.) AT the time of Ober's transfer (Jan 2000) Conley said he didn't want Ober back, but Ober had never been the object of Department discipline, not having even a supervisory inquiry or notation, nor had he ever received a poor performance evaluation. Coury Deposition Page 50.

136.) In less than a year after informing Colonel Evanko of the FBI investigation, Evanko. Ober was denied training opportunities based upon false information, was investigated in a full blown custodial investigation where he was ordered to answer questions and read his rights under threat of termination, was transferred as a Captain to a lieutenant's position, was transferred to Washington PA, over 200 miles from his home without warning, was selectively investigated for allegedly acquiring PSP artifacts (while the PSP, Coury, Evanko, and many others, even today, are actually violating state and federal law and PSP regulations regarding this same issue see ¶69) improperly dismissed from the PSP Centennial Book

Committee, denied a chance to serve on the Pennsylvania Emergency Agency (PEMA), although his participation was requested, passed over on promotions, his mental stability questioned and investigated by Coury in retaliation for filing this law suit, had material documents taken from his personnel file, which are directly related to anti-personnel actions by the defendant Coury in retaliation for filing this law suit, and witnessed an attempt to mislead the federal judge in his case, in addition to having sanctions filed against him. See Ober Aff.__.

137.) Coury knows of no one except for Captain Ober who was placed in a lieutenant's position as a Captain. Coury Deposition Page 56.

138.) Mr. Coury would not tell a target in October 1999, that he was being investigated. Coury Deposition Page 65.

139.) Coury both initiated and adjudicated the investigation into Ober☐s procurement of PSP artifacts. Coury Deposition Page 5.

140.) Captain Ober☐s request for training was of a type that is normally approved. Coury Deposition Page 38-46.

141.) Coury and Conley denied Ober☐s reimbursement for his FBI related expenses which had already been approved by Hickes, but Ober won after going through the grievance procedure. Coury Deposition Pages 58-60

142.) Coury reasons that Ober shouldn't have been reimbursed for the FBI expenses even  knowing Hickes ordered Ober to maintain secrecy for roughly 7 months ,until the FBI closed the investigation. Coury Deposition Pages 58-68.

143.) Coury knows of no one he transferred more than 200 miles from their home except for Captain Ober.

144.) Ober's colleague Captain McDonald, served in an acting capacity as a stand-in for his commander in LCE for 208 hours between May 30, 2000 and September 2001. Ober served for 40 hours. Coury Deposition Pages 93-94, Ober Aff__.

145.) Coury never heard about subsection "C" to AR-1-1.102 in this litigation. Coury Deposition Page 98.

146.) The so-called "museum investigation" Coury initiated into Ober on PSP artifacts was closed as unfounded . But after it was closed, and during the pendency of this litigation, additional information was added to Ober's file on February 12, 2001. Coury Deposition Pages 110-111.

147.) Coury sent Ober a hand written letter of praise and encouragement on March 5, 1998. Coury Deposition Page 116.

148.) Coury himself said by- passing the chain of command was acceptable in exigent cirumstances, but could not define what exigent circumstances were. Coury

Deposition Pages 120-121.

149.) Ober had over 18 years experienceand had never been disciplined, removed from a committee, had equipment taken from him, was never forced to reimburse the PSP for expenses, was never involuntarily transferred or removed from any special assignment. Ober Deposition page 1, 1st paragraph.

150.) Within 8 months of telling Paul Evanko of the FBI investigation into PSP hiring practices, Ober suffered all of the above and more. Ober Aff..

151.) Lou Lazzaro, Pennsylvania State Troopers Association President, never told the defendant Thomas Coury that Darrell Ober was mentally ill, was unstable, or needed counseling. In fact, Lazzaro never indicated in anyway that Ober wasn't performing his job in a proper way or was losing perspective. See Lazzaro Deposition page 28 ln 16-page 29 ln 24; page 31 ln 18-page 32 ln 5.

152.) Lt. Colonel.Coury called Ober's boss, Major DeWire, on or about May 2001, and had him report to a meeting with Coury and Department psychologist Larry Walker to discuss Ober☐s mental stability. DeWire Deposition _____.

153.) DeWire offered that Ober was stable and seemed to be in good mental health. DeWire Deposition_____.

154.) DeWire felt that the meeting was for the purpose of threatening Ober. DeWire Dep_____.

155.) DeWire felt the purpose of the meeting was to use DeWire to carry a message to Ober. DeWire Deposition_____.

156.) Lou Lazzaro, immediate past president of the PSTA, knows of no other situation in the PSP where a captain was assigned to do a Lieutenants job. See Lazzaro Deposition page 36 lns 15-22.

157.) In 29 years with the PSP Lt. Colonel Hickes has never seen a Captain assigned to a Lieutenants position. See Hickes Deposition page 102 lns 10-21.

158.) Prior to May 12, 1999 Ober had a spotless service record, had risen quickly through the ranks and had just been appointed as tram leader on a collossal project (IIMS). Ober Aff. ¶5, 6, and 7.

159.) The investigation into Ober was not in accord with PSP regulations or custom. Ober Aff. ¶'s 5, 6, and 7.

160.) Ober was selectively investigated Ober Aff. ¶8.

161.) The investigation into Ober for collecting PSP artifacts did not conform to PSP protocol and was conducted in a manner designed to embarrass Ober. Ober Aff. ¶10.

162.) The removal of Ober from the centennial Book Committee on August 24, 1999 by Paul Evanko was totally unsupported by any PSP need, or any rational purpose. It was a blatantly retaliatory Act. Ober Aff. ¶11.

163.) Hawthorne Conley, on the same day Ober was taken off the Book Committee by Evanko, remove Ober's cell phone.

164.) Conley falsely testified that Ober slammed a door after leaving a meeting with him. Ober Aff. ¶13.

165.) Conley barred Ober from attending an IAD meeting even though he was invited by the acting director. This was purely retaliatory, served absolutely no viable PSP purpose, and was meant to humiliate Ober. Ober Aff. ¶15.

166.) Conley searched Ober's records and came up with an invoice already paid by the PSP eight months before. He ordered Ober to repay the Department. Ober Aff. ¶15.

167.) This occurred after Ober had filed the grievance over Evanko's belated denial of reimbursement for out of pocket expenses incurred during Ober's work with the FBI. In this grievance Ober mentioned the word "retaliation" Ober Aff. ¶15.

168.) The grievance Ober filed when Commissioner Evanko reversed Ober's reimbursement for annual leave and expenses regarding his FBI cooperation was also an act of retaliatory spite. Ober Aff. 16.

169.) In January 2000 Evanko, Westcott, Conley, and Coury conspired to transfer Ober to Washington, PA without notice or warning. They backed off in 24

hours after Ober filed an injunction in Commonwealth Court because the transfer was disciplinary in nature Ober Aff. ¶18.

170.) In retaliation for Ober's successful utilization of the courts on the transfer the defendants Evanko and Westcott decided to Constructively demote Ober by assigning him, as a captain to a Lietenants position in LCE. They made sure Ober was available by taking him from a needed detachment to IIMS and filling his position at IAD. Ober Aff ¶20.

171.) Ober was needed at IIMS, as Evanko admitted in his deposition, and in fact Ober spent 2 months at full time just completing his duties. Ober Aff. ¶21.

172.) Ober has been personally, emotionally, and financially harmed by the defendants actions. Ober Aff. ¶22, 23, and 24.

173.) Evanko's decision to keep Ober from a PEMA assignment was an act of retaliation having no rational basis elsewhere. Ober Aff. ¶25.

174.) Evanko has intentionally prevented Ober from being promoted since May 12, 1999. Ober Aff. ¶26.

175.) Evanko even brought a lieutenant in from Pittsburgh to pay him out of class wages and subsistance to fill in a Directors position in Obers own Bureau that Captain Ober had to answer to. It was a Captains position. Ober Aff. ¶28, 29.

176.) To further humiliate Ober he was denied a training opportunity he was

already approved for by Westcott. In another case Coury did the same thing by falsely claiming Ober hadn't applied in time. Ober Aff. ¶30.

177.) The documents proving the above was removed from Obers personnel file. Ober Aff. ¶30.

178.) Ober was denied other opportunities Ober Aff. ¶31.

179.) The defendants misrepresentations to the Court and the manipulation of the pertinent files including removing and adding documents in Ober's case amount to an effort to keep him from pursuing his case in Court. Ober Aff. ¶'s 34, 35, 36, and 37.

180.) Coury falsely indicated that he explored having Ober analysed mentally because the Union President had suggested it and when he brought Ober's superior, Major DeWire over to the front office for a conference De Wire felt he was being asked to convey a message to Ober to back off and that it might be a threat. Ober Aff. ¶39.

Respectfully Submitted,

Don Bailey
4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500

Dated: May 20, 2002

31

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DARRELL G. OBER** | ) | **CIVIL ACTION LAW** |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **1:CV-01-0084** |
| **vs.** | ) | |
| | ) | **(JUDGE CALDWELL)** |
| **PAUL EVANKO, MARK** | ) | |
| **CAMPBELL, THOMAS COURY,** | ) | **JURY TRIAL DEMANDED** |
| **JOSEPH WESTCOTT,** | ) | |
| **HAWTHORNE CONLEY** | ) | |
| **Defendants** | ) | |

### CERTIFICATE OF SERVICE

I hereby certify that on this <sup>20TH DAY OF MAY 2002</sup> true and correct copy of the **PLAINTIFFS**

**MOTION FOR SUMMARY JUDGMENT ALONG WITH EXHIBITS IN SUPPORT** were

served upon the following counsel of record by United States Mail, postage prepaid:

**BARBARA CHRISTIE ESQ.**
**JOANNA REYNOLDS, ESQ.**
1800 ELMERTON AVENUE
HARRISBURG, PA 17110

BY:_____
Don Bailey ID# 23786
4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500

**STATE OF <u>PENNSYLVANIA</u>**        :

**COUNTY OF <u>DAUPHIN</u>**        : 

<u>**AFFIDAVIT**</u>

I, Captain Darrell G. Ober, being first duly sworn according to law, depose and say:

1.    In May 1999, I had been a member of the Pennsylvania State Police for over 18 years. I rose quickly through the organization to the rank of Captain faster than any of my Academy classmates and the vast majority of my peers. There are nearly 4,200 enlisted members in the State Police, fewer than 45 of us are privileged enough to hold the rank of Captain. I had a spotless service record. In over 18 years, I had never been involuntarily transferred over 200 miles from my family, removed from any committees, demoted, had any issued equipment removed from me, forced to reimburse the Department for expenditures, or removed from any special assignments. Yet, in the span of eight months, Paul Evanko, Mark Campbell, Thomas Coury, Joseph Westcott and Hawthorne Conley took all of the above actions, and many more, against me.

2.    My career with the State Police and my life changed forever on May 12, 1999. On May, 12, 1999 Lieutenant Colonel Hickes and I informed Evanko of the existence of an FBI investigation into possible job selling in the State Police; an investigation that could have included the defendants as potential targets (P22). The FBI informed me of the probe the preceding October during the time when I was assigned as the Director, Internal Affairs Division (P22). Evanko became enraged when we told him of the existence of the probe (P22). Since that time, the defendants have intentionally abused their power and authority and conspired to injure me without regard or concern for the consequences. The defendants have

1

destroyed my career, and have tried to destroy my self-confidence and reputation among my peers. In an indescribable act of vengeance, they even tried to separate me from my wife and three young children.

3.    The defendants conspired to harm me simply because I upheld my oath of office and put no one above the law. My actions in assisting the FBI demonstrate that I could not, and would not be corrupted, nor would I allow my position to be used for political maneuvering. Because I put the law, and State Police rules above the personal political agenda and ego of the Commissioner and his inner staff, my ambitions and career have been destroyed.

4.    I exercised my rights to grieve some of the actions taken against me through my labor contract (P127) and through the courts and for that I have been harassed and suffered retaliation. The defendants have said that I have no case because I did not engage in protected speech and that their actions were not retaliatory. I am not trained as an attorney, but when a FBI agent from the Political Corruption Unit called me about possible job selling in the State Police, I treated the information with the utmost concern and respect (P22). Any actions I took and decisions I made were motivated by my sense of duty and to do the right thing by the citizens of this Commonwealth.

The defendants have injured me in at least the following ways:

5.    In May 1999, Evanko, Westcott, Coury, Campbell and Conley subjected me to a totally improper internal affairs investigation into the assistance I provided to the FBI in a matter involving possible political corruption (P22). As clearly evidenced by Evanko and Coury's depositions, initiating this investigation had no basis in regulation (P25, P26, P27, P28, P29, P286) which justified it's undertaking and it was nothing more than a political

2

witch hunt to ferret out members disloyal to Evanko. I know from my experience as the Director, Internal Affairs that this investigation was improper and without a legitimate basis either in the law, Pennsylvania State Police regulations, custom or practice. The irrational and overzealous mindset of the defendants is best represented by Westcott's testimony that he personally assigned this investigation to two State Police Majors and even felt it necessary to jump in a State Police airplane and fly to Montoursville to personally discuss it with one of them; namely Major Williams. These Major's ordered me, without any prior notice or opportunity to secure legal counsel, to report to a Deputy Commissioners Office and compelled me to participate and forced me to answer questions. They told me that they knew I had not violated any regulations but were ordered by the Commissioner to investigate me. To this date, not one defendant or anyone else has ever identified any regulation that I supposedly violated by participating in the FBI investigation or handling it in the manner in which I did; at least not a regulation that existed in October 1998.

6. As I have testified, having two Majors assigned to investigate me in and of itself meant I was in deep trouble. This was done to send a message to me and to the entire Department that my career was over and that I had committed an unpardonable sin. Majors in the State Police (there are less than 20 Majors in the entire Department) are not assigned to conduct investigations when a member is suspected of committing a crime. For example, it was a Corporal who investigated and arrested the Trooper involved in accepting a $1,000 bribe and who was one of the eventual targets of the FBI job-selling probe (P60 and P61).

7. Nothing about this investigation conformed to the rules or practices of the agency. As a former Director of Internal Affairs, they knew I was fully aware that their intimidating "investigation" was off the books, i.e. not in

conformance with law or regulation.  There was never a complaint, a complaint verification and never an allegation of wrongdoing which PSP rules requires.  Yet the defendants knowing full well that I did nothing wrong, circumvented the law, my due process rights (P309) and State Police regulations (P302) in order to punish me in a never ending series of actions against me which included a constructive demotion, denied reimbursements, punitive transfers, harassment, treated me like a criminal by reading me my rights, and forced me to answer questions over absolutely nothing, used investigations to destroy my reputation through insinuating that I would misrepresent my badge, and the list goes on.  I have never been informed of the results of Evanko's off the book investigation or if it has ever been closed (P2).  This is a source of never ending concern and stress for me.

8.    Evanko, Coury and Westcott have singled me out for investigation and persecution.  Through discovery and their testimony, they knew rather quickly in the investigation that, unbeknownst to me, at least five other members of the Department (including another Captain and a Lieutenant) also knew of the existence of this FBI probe before I was informed (P22, P30). Yet, they were never made the target of an intense high level probe.

9.    The defendants have tried to make much about the fact that I reported the existence of the FBI probe to Hickes and not to Coury or Evanko (P63). The record is painfully clear as to my reasons for not initially reporting this information to individuals who I believed occupied positions that could have come under the scrutiny of the FBI probe.  I went to Hickes for advice and guidance.  Hickes gave me specific orders to maintain the confidentially and integrity of the FBI probe and I followed his orders (P280). As far as I or anyone else should be concerned, if Evanko was unhappy with Hickes' orders, he should direct his attention to Hickes; not me.  The defendants have also expressed great displeasure with me for

not informing Conley. In doing so, they conveniently overlook two important facts. One is the ample evidence and testimony that LTC Hickes had already ordered me not to discuss the investigation with anyone by the time Conley came into the picture (P22). According to PSP rules and regulations, this was a valid and lawful order (P134, P282). Secondly, before he came to BPR as the Director, Conley was the Commanding Officer of Troop B, Washington; the very Troop where the FBI probe was being conducted. The defendants, including Conley, know full well that PSP regulations (P141) requires Troop Commanders to hold meetings with each member of the General Assembly in their respective areas of responsibility. The FBI probe of possible job selling in the PSP was into the local legislators in and around the Troop B area. The defendants also ignore the fact that had I reported the existence of the FBI probe to potential targets, I would have possibly been committing the crime of obstruction of justice (P244).

10.   The defendants, particularly Coury, launched a second totally improper investigation in May 1999 into my personal affairs as it relates to collecting State Police artifacts (P36). They bastardized the Supervisory Inquiry process in order to harm me (P33, P34, P35). The Supervisory Inquiry process was designed to be an expedient way for *supervisors* to resolve minor complaints lodged against their subordinates. I was made to suffer the humiliation of being investigated by a Corporal from Internal Affairs; one of my own subordinates and certainly not my supervisor. Coury testified that this investigation was launched based on a letter he received and a conversation he had with the author and one other individual. Yet, through discovery I find the letter referred to by Coury does not even mention my name (P47). In fact, the author stated he did not want anything done. The author is now deceased and his memo speaks for itself. The other individual Coury testified that he had a conversation with about me was never even interviewed during the investigation. This

5

"inquiry" was allowed to continue for over seven months; longer than most full investigations would take and four months longer than permitted by my labor contract (P309). Not one person was ever required to complete a Complaint Verification Form and none of the people interviewed were ever told that the inquiry was ultimately adjudicated as "unfounded" and that I had done nothing wrong. This is, however, not surprising since no one ever informed me either. In preparing for this lawsuit, I requested to review my personnel file (P137, P138). There, seven months after the case was adjudicated, I found a copy of the adjudication that was never given to me (P78). The fact that this investigation was ever launched in the first place has caused damage to my name and reputation. I have a right to my private life and to collect PSP memorabilia. Evanko himself collects State Police memorabilia and openly admitted it in his deposition. The inquiry was not adjudicated by any supervisor in my chain of command like is normally done. Instead it was technically adjudicated by one of my peers; another Captain, but in reality, by Coury (P37, P38). It was humiliating enough to be put through this ordeal, but to know that one of my peers reviewed the file and sat in judgement of me is embarrassing beyond what I am able to describe. Worse yet, through discovery, I have learned the defendants are still investigating me and this case is not closed despite being adjudicated as "unfounded". I found a supplemental report was placed in the file over 14 months after the case was supposedly closed (P44). Ironically, the file was supplemented less than *one month* after I filed this lawsuit! I was never informed that this case had remained opened or that it has been re-opened. I live under the threat that investigations are being conducted on me and will never end; even after they are "unfounded". Through their investigations Coury and the others have inserted themselves into all aspects of my life; even my hobbies. The hypocrisy of investigating me and not other memorabilia collectors is now a matter of record. Minutes of the State Police museum committee and the defendants own in-house newsletters shown how, as early as

1997, the defendants knew I had violated no rule and that the existence of non-museum collectors of State Police memorabilia is common (P70, P71, P72, P73, P74, P77, P254, P255, P256, P257, P258, P259, P260, P261, P262). Evanko himself has admitted to improperly diverting items donated to the State Police museum for private display in his own office. Evanko has sent letters to family members of deceased Troopers using his official title and position soliciting their donations (P75). Yet, when confronted with these facts, Coury testified that he never had Evanko investigated like he did me. Thus I am selectively singled out for anti-personnel actions. Even as I write this affidavit, the defendants are permitting the State Police to house a 1972 Plymouth Fury at the Academy (P69). This vehicle is being restored for the State Police museum. PSP regulations clearly say this is a blatant violation and misuse of state owned facilities. State money, time, labor, and facilities are being abused for this project.

11.   Years ago I swelled with pride when I was asked to serve on the Pennsylvania State Police Centennial Book Committee by Chairman Marc Infantino. This project would afford me an opportunity to share my pride and interest in Pennsylvania State Police history with the world. In all the years I served on the Committee, I attended one meeting during my working hours that lasted for one hour. I never had any problems whatsoever with this committee interfering with my primary duty assignments. I devoted many off-duty hours toward the project. However, without so much as a phone call, Evanko and Coury removed me from the committee on August 24, 1999 (P189, P192, P223). I was removed by way of a memo that was sent to the Committee Chairman from Evanko. The Chairman told me that I was the only member of the Committee that Evanko took a personal interest in. Evanko's memo says I was too busy working on IIMS to serve on the Committee. This is ridiculous. The book was not due to be published for *five* years (2004). As I have testified, I personally checked with the entire project and command staff at IIMS and

found that neither Evanko nor anyone else ever made even one inquiry into my workload or ability to fulfill my project obligations before deciding that I was too busy and kicking me off this committee. I cannot describe the anger and humiliation I experienced over this vindictive and hateful act meant to limit my associations and freedom to express myself.

12.     Shortly after the investigations were launched against me, Conley began his personal harassment of me. First, he directed that a Corporal remove my cell phone from me due to what he claimed was "substantial" usage. I have never been told what constitutes "substantial" (P9). Oddly, this happened the very same day that Evanko and Coury kicked me off the Book Committee. As I have testified, Conley never asked me one question about airtime charges; he never discussed it with me (P12). He took the phone simply because he had the power and authority to do so. Conley's hatred of me is easily seen in his deposition and one would only need to compare Conley's cell phone airtime usage and charges to mine to appreciate the hypocrisy of his actions (P10 and P11). By removing my cell phone, Conley was showing me that he and the other defendants would take any and all actions against me, no matter how petty, to harass, intimidate and embarrass me. Conley's interest in the economies of the State Police are curious considering as a matter of routine, Conley, although assigned to Harrisburg, regularly reported to and from work at a satellite office located near his home in Western Pennsylvania. Checking in and out of a satellite office afforded Conley the advantage of being able to continue his commute to home or work to and from Harrisburg on State time and while being paid. Comparing this abuse of authority with the false pretense that I had to leave the Book Committee for being "too busy" shows that I was put into a special punishment category.

13.     According to documents and to his deposition, Conley wanted me removed as the Director, Internal Affairs. Yet, at no time did Conley or

anyone else ever indicate to me that they wanted me removed. Conley's testimony makes it clear that he easily went along with the investigations ordered by Coury and Evanko. As further evidence of the proclivity for embellishment and the irrational mindset of the defendants, Conley testified falsify in his deposition about an incident when I supposedly slammed a door after storming out of a meeting with him. Having been somewhat involved in the design of the IAD building, I not only knew this was not true, but was not physically possible. After his deposition, I visited the Internal Affairs Division and found that I was correct. The door slamming incident testified to by Conley is not physically possible and his testimony was not true. Besides, I would have never behaved in such an unprofessional manner and there is nothing in any of my records or files that would even remotely suggest that I would.

14.    In August 1999 Evanko publicly humiliated me by snubbing me when he ignored my hand salute to him during an award ceremony held to honor the employee of the month in IIMS. September 1999, Conley barred me from attending an IAD Division meeting after I had been invited to attend by the Acting Division Director, then Lieutenant Brown. As I have testified, there was no basis for Conley to bar me from this meeting, a meeting with my own subordinates. Conley's action was purely retaliatory and served only to demonstrate that he wanted no one to trust me. Acting with such hateful pettiness served no legitimate purpose other than to harass, intimidate and retaliate against me. It was an action intentionally designed to demonstrate to not only my colleagues but my subordinates that I was to be shunned and was not entitled to respect in the eyes of my fellow state police personnel.

15.    Seven months after the fact, and after I filed my first grievance (P127), on December 13, 1999 Conley dug up an old invoice (P15) and ordered me to reimburse the State $69.00 (P13, P16, P17) for a bill that had already

been paid by the Department in May 1999.  The charge was for framing a Letter of Commendation that was issued to a retiring Sergeant (P14).  In an agency with a half billion-dollar budget, I never imagined $69.00 would be viewed so critically.  If Conley disagreed with the propriety of the expenditure, the most that he would have ever needed to do was explain his position and caution me against future occurrences.  Instead, seven months after the costs were incurred (and after the investigations into me were launched) he ordered me to reimburse the Department.  When I reported to his office to pay the bill, he would not even let me look at the frame until after I had written a check.  He treated me like a juvenile criminal who could not be trusted.  This act, after the fact, was meant to tell me I was being reviewed and every activity and action was being studied to find a way to harass me consequently in the grievance I filed I alleged retaliation.

16.    At about the same time, I received a memo from Evanko saying he was denying me 8.00 hours annual leave reimbursement and was also denying me reimbursement for $84.00 (P50, P51, P52, P53, P54, P55, P56, P57). Both of these reimbursements were related to the FBI probe. LTC Hickes, the equivalent of Deputy Secretary in state government, had already approved both of these requests.  Commissioner Evanko's "pulling rank" and denying these reimbursements was just another example of spitefulness, vindictive hatred and persistent harassment.  No one else has been treated this way but me; more insults, more embarrassment, and more intimidation.

17.    I filed a grievance when Commissioner Evanko denied these reimbursements (P127).  The grievance was heard before a Special Appeals Board and I won (P129, P131, P132).  However, as Mr. Grab testified, in an unprecedented move Evanko and Coury ordered the Special Appeals Board ruling appealed.  They did this even though the

labor contract says the Board's decisions are final and binding on the parties (P309). It was pure harassment and their appeal was denied. Even after the appeal was denied (P130), they still wouldn't pay me; I was forced to submit a request for reimbursement in writing to Coury to get my $84.00 (P132). I have never seen anyone in all my years of service be treated so badly; so consistently in such a persistently unfair way.

18.   It seemed as though the harassment would never end.   However, in January 2000, in an irrational and hateful act of vengeance, Evanko, Coury, Westcott and Conley conspired to destroy my life with my family by involuntarily transferring me over 200 miles from my home in Enola to Washington, Pennsylvania (P127, P161, P193).   P32 confirms that by January 4, 2000 Evanko sought the approval and concurrence of Campbell to execute my punitive transfer.  In doing so they carried their irrational hatred of me to a level beyond what I am able to describe.  They did so because I refused to suffer quietly at their whim and in retaliation for me exercising my contractual rights to grieve the improper actions they were taking against me.  Being involuntarily transferred to Washington was the lowest point of my career and my life.  I was in Conley's office for a Step One grievance hearing at 12:30 PM on January 10, 2000.  Conley (P4) knew I was being transferred.  Yet, he waited until I went home and telephoned me at 4:30 PM the same day to inform me of the transfer.  He didn't even have the courage to tell me to my face; just like the other improper cowardly acts the defendants have taken against me. All one has to do is read the Personnel Order 00-01 and PSP regulations FR 3-2 (P284) to know this was a *permanent,* disciplinary transfer. My wife and I were devastated.  She sobbed for hours after we were told and neither of us slept that night.  I thought my union would fight this injustice for me. However, the only action they would take on my behalf would not bring immediate relief to the situation.  I felt completely alone, helpless and desperate.  On our own, we filed an injunction in Commonwealth Court

and blocked the transfer. When faced with an injunction, the Department quickly withdrew the transfer within 24 hours. Evanko and Coury have testified, in part, this was because out of Evanko's concern for me and because he did not want to prolong placing someone in Washington. This is false. Where was his concern for me when he transferred me to Washington in the first place? In reality, Evanko and his attorney's knew he had been caught red-handed. As I have indicated, according to PSP's own regulations, this was a *permanent transfer*. Promoting Lieutenant Young to Captain, inventing the story about Szupinka needing assistance, the NGA myth, comparisons to the RNC and trying to fluff up the story with histrionics related to the World Trade Organization riots in Seattle are blatantly transparent attempts to cover-up the disciplinary intent of my transfer to Washington. The numerous inconsistencies in the depositions of Westcott, Coury, and Evanko and a review of the applicable PSP rules (P214, P215, P216, P217, P218) and Personnel Orders are all that are necessary to debunk these falsehoods.

19. For example, Westcott testified the transfer to Washington was necessary because of information provided to Major Werts during a conference Werts attended in San Diego; that the closer an organization got to a big event, the more it was necessary to assign an assistant to the task force commander. However, what Westcott failed to tell us and what the documents prove; that meeting was held in *1998 and Werts own report states the exact opposite with respect to when support personnel should be assigned* (P212 and P213). On the other hand, Evanko states the transfer was necessary for some vague reason related to the World Trade Organization riots (they occurred in November 1999). Westcott also testified that the Department would not promote someone into the position earmarked for me in Washington. In reality, that is exactly what Evanko and Westcott did to cover their tracks after I filed the injunction (P314).

part, was faulty in the way he characterized the completion of my assignment. Had Evanko not been obsessed with punishing me, he would have just left me in IIMS to complete my original assignment; one that he gave to me personally. As I have testified, to fill my shoes, Major Waugh, with no day-to-day experience in the project, was detached from his regular position (just like I was) to complete my job on the project (P194). In turn, Captain Nagurny was paid out of class wages for six months until Major Waugh returned to full duty. What an incredible abuse of government resources of PSP talent, and all to do anything to get me and cause injury.

22.  Fighting for my rights has had a huge financial impact on my family. We have spent approximately $30,000 to protect ourselves from the despicable acts committed by these defendants (P293). We cannot afford to replace our 11 year old vehicle with 140,000 miles on it. For the past three years we have put our family vacation plans to Disney World on hold, we have all but abandoned our dream of buying a vacation cabin and have also been forced to put our home remodeling plans on hold. Meanwhile, the defendants do not have to worry about paying any bills; the taxpayers are footing their bills. I have to live with this injustice everyday. I do not have a free staff of attorney's, free discovery costs; I drive my own vehicle to depositions and cannot afford to travel by airplane or helicopter. I have used a tremendous amount of annual leave to fight for my rights; time I would have used to spend with my family. I do not have the benefit of having resources like the Director, Internal Affairs, personally assigned to assist me in defeating my opponents. I have swallowed my pride and asked for financial support to pay my legal bills (P156, P166, P168, P174, P299, P300, P301), and for that, my opponent's lawyers at the behest of Evanko, investigate me further. They have lied to this court, misled my attorney, and they do so with absolutely no fear or concern. Documents have been added and removed from my

personnel files; false documents sporting wet ink have been created, and my attorney and me have been falsely accused of not producing documents.

23.    The defendants' actions against me have hampered my ability to provide for my family and live my life free from their oppressive influences. I am motivated by the same desire to provide for my family as any other father is. However, the defendants have either directly or indirectly caused my earning potentials to be reduced. For example, since May 1999, I am no longer selected to serve in temporary, higher-class positions and receive the extra compensation commonly enjoyed by my peers (P318). I estimate the compensation I have been denied to be approximately $500.00 per year. The other Captain in my Bureau is selected to serve over five times as often as I am. According to PSP and Management Directives (P315), higher-class assignments are *supposed* to be given on an equal basis (P136). But not in my case. It is humiliating, degrading, and embarrassing to not be selected on an equal basis for these assignments. Before the defendants singled me out for persecution, I was given the same opportunities as my peers (P7, P8, P124); but not anymore.

24.    Another way my earning potential has been reduced by the defendants (particularly Westcott) was by summarily removing me from an assignment to a secondary job function as a liaison officer for the Pennsylvania Emergency Management Agency (PEMA). Westcott did this in March 2000 (P232). Prior to then, I served on PEMA for many years. Yet, just *one day* after an article appeared in a local newspaper about the injunction I filed in Commonwealth Court to block my disciplinary transfer to Washington (P177, 178, P190, P191, P230), Major Koscelnak removed me from PEMA. Koscelnak testified the reason I was removed from PEMA was so I could devote my time to learning the duties of the position

I demoted to in LCE.  One more blatant inaccuracy.  I had been a Lieutenant for eight years prior to being demoted to LCE and a Captain for five of those years.  Until being placed in Evanko's penalty box, I was empowered to be the lead procurement officer in the multi-million-dollar systems integrator selection process.  There was nothing remotely suggestive that would let anyone believe that I would not be able to handle an occasional callout to PEMA while being demoted to a Lieutenant and running the smallest Section in LCE.  PEMA afforded me some professional growth opportunity as well as a means to supplement my income through overtime.  My wife has not worked outside of our home for the past seven years; choosing instead to stay home and be a full-time mother to our three sons.  Kicking me off PEMA, out of sheer spite, was one more glaring example of retaliation taken against me.  To be treated this way for no legitimate purpose causes me pain; pain that is so deep, it's hard to describe.

25.    In July 2000, an opening happened to come up in PEMA (P233, P234); by now I have been transferred within LCE to a Captain's position.  I expressed interest in the position (P191).  After a few days Major DeWire told me Major Washington (who was in charge of PEMA) had approved my request.  However, a few hours later that very same day, Major DeWire told me my approval was withdrawn because the "front office" got involved.  Eventually Captain Skurkis, who had no experience whatsoever with PEMA, and, according to his testimony, was not even interested in the assignment, was eventually selected (P128).  As an example of the earnings I have been denied, Skurkis testified he has earned approximately 40 hours overtime on PEMA just for duty related to September 11 alone (approximately $2,500).  It frustrates me knowing I can no longer serve in an assignment that I enjoyed, while knowing how much the extra income would mean to my family (P335).

26.    Since the defendants began taking actions against me, my career advancement opportunities have been decimated.  The fact that Evanko did not promote me to the Director of BPR speaks for itself (P158, P266, P277).  Despite being the most credentialed, eligible member in the entire Department for the position, I was not selected.  Evanko also passed me over for a promotion as the Director of LCE; the Bureau where I currently am a Division Director.   In both instances, instead of promoting me, Evanko promoted individuals who have never served in either Bureau in any capacity over me.  Failing to promote me into these positions has impacted on my earnings potential by approximately $8,000 per year.

27.    From May 12, 1999 (when Evanko blew up at LTC Hickes and I), I went from being the lead procurement officer on a crucial, monumental, 100 million dollar technology project, to a one week transfer back to IAD; to a 200 mile transfer to Washington Pennsylvania (a penalty box created just for me); to being demoted to a Lieutenant's position; to being kicked off a career enhancing committee and being denied overtime and promotional chances.   These malicious transfers and denials seem endless.   The uncertainty, stress and anxiety subjected me and my family to periods of intense stress. We never knew what to expect next; especially after we won the injunction.  It is emotionally debilitating knowing the defendants have subjected me to these actions for no other reason than to satisfy their need for punishment and revenge.  My career opportunities can be best summed up by what Major DeWire told me.  He said he would not recommend me for promotion because he knew I would not be promoted anyway; there was no value in alienating him against his boss when I stood no chance and would not be promoted.  Being treated as I have been has shaken me to my core; I have no hopes and no dreams. Without a future it is sometimes difficult to show up for work everyday and perform a job for executives who are out to destroy me but my respect and

commitment to the Pennsylvania State Police will not allow me to be a quitter.

28.    In February 2000, after I stopped the transfer to Washington, Evanko and Westcott demoted me to a Lieutenant's position in LCE.  There was no need to put me there.  There was no urgent need to fill this Lieutenant position.  This is evidenced by the fact that no Sergeant was promoted to Lieutenant to fill the position in January when other vacant Lieutenant positions were being filled.  Furthermore, a Sergeant had been filling the position in out of class status for over seven months (P224, P225, P226, P227, P228, P229).  As if being demoted wasn't humiliating enough, when the Director, Administration Division went on leave in March, a Lieutenant from Pittsburgh was brought to Harrisburg and paid out of class wages and subsistence to sit in as the Acting Director, Administration Division during the Director's absence (P231).    The Director, Administration Division, is a Captain's position.  There I sat a Captain for over five years, demoted to a Lieutenants position (P271, P272), now answering to a Lieutenant!

29.    Distributing a Personnel Order transferring me, a Captain, to a Lieutenant's position, was the defendant's way of announcing that Darrell Ober is being punished and his career is over.  For three months I was put on display and humiliated; I was put under the supervision of another Captain and for a time, technically under the supervision of a Lieutenant; given the job description of a Lieutenant and forced to perform Lieutenant's work.   It was the biblical version of being stoned in public.  There was no temporary or larger plan; this was, according to PSP regulations, a *permanent transfer and permanent demotion*.  Eventually, I was restored to a Captain's position; but not in some grand display of forgiveness but rather because one of the Captains assigned to LCE unexpectedly retired (P235).  Realizing more legal opposition I am certain,

the defendants relented and grudgingly restored me to a Captain's position (P233).

30.     As if taking away promotional opportunities from me weren't hurtful enough, Westcott and Coury went out of their way to deny me training opportunities (P246, P247, P248, P249, P250, P251). In March of 2000, I was humiliated in front of my co-workers and peers, when after being approved to attend training in Washington D.C one day, it was disapproved the next day by Westcott. This was training that other members of my Bureau had been approved to attend just one year before. As if everyone didn't know, Westcott was sending a message to me and everyone else that I am a marked man, I am persona non grata, I have the plague and the defendants will go to any lengths to get me. In November 1999, another training I applied for (P6, P66, P76) was rejected because Coury said I was eight days too late in submitting my application (P65, P133). This is false. Fortunately for me, I made a copy of the application when I found it in my Bureau file. The copy that I made clearly indicates the application was submitted at least two days in advance of the deadline. Luckily there is a staff member who witnessed it all and made a notation on that document proving me right (P68, P281). That memo is now missing from my file (P139, P140). I no longer bother applying for any specialized training; I can't subject myself to any more rejections. What is the use?

31.     In January 2000, I applied to Evanko for the position as Director, Legislative Affairs Office (P219, P220, P221, P222, P326). Based on the applicants who were interviewed and who was ultimately selected, I was easily the most qualified candidate. Yet, Evanko never even acknowledged my resume and application. How humiliating to learn that I did not even rate consideration above a subordinate officer (a Lieutenant) or a Captain with a disciplinary history of sexual harassment, and who

was, at the time, under investigation on another complaint (and is currently a defendant in another sex discrimination civil suit). The Captain who was selected over me has since been promoted to Major.   This is another promotion opportunity taken from me by Evanko.

32.    I worry about what official files are being kept on me and how that affects not only my career in the State Police, but also any post State Police career I might consider.  I know my files have been altered.  As mentioned previously, documents that would have assisted me in proving my case have been removed.   When this was discussed during depositions, one of the defendants' attorneys made the statement that maybe I removed this document from the file myself.   What a totally outrageous and hurtful statement.  I have never been in possession of any of my personnel files unsupervised.  What possible motive could I possibly have for removing documents that support my case? This litigation itself is a joke to these people.

33.    Until I made an official request to review my file, I knew nothing about an adjudication regarding the museum investigation until I discovered it in my file.   That adjudication could have been an important document for other court actions and grievances that I had filed.    Just like the witch-hunt investigation Evanko ordered on me, (which after extensively investigating me and coming up dry) no one ever informed me of the results.  It makes me feel like I live and work under a microscope.   Imagine what would happen to me if I ever did stumble and make a mistake?

34.    One of the most outrageous things that has happened in this litigation has been the false representation of regulations to the judge in order to get my lawsuit thrown out of court.    Even the judge said that one of the regulations, had it been in effect at the time, could have defeated me. It has been frustrating to watch the Department manipulate the facts to try

and fool the Commonwealth Court Judges and the arbitrator. They got away with it because no testimony had even been taken and no depositions were ever taken. Words cannot describe the fear and anguish you feel when you realize what lengths the defendants are willing to go to defeat you; that they are so desperate that they would lie to a federal judge. It made me wonder how many other times they have tried this and weren't caught. I am ashamed and sick to my stomach when I think of what they did. They could not possibly have made an error on the revision dates to AR 1-1. Had I not caught their false representations to the court, I might have been out of luck.

35.    The "phantom" regulations presented to this court were never used by the defendants as a basis to formally discipline me; never cited in Commonwealth Court filings related to my injunction, mandamus or whistleblower lawsuit; and never cited in response to any of my grievances. They just magically appear out of thin air to defeat me in this lawsuit. In my experience, I know there is no way this was an innocent error. I know this from my review of the historical file; from discovery and from my attorney's telephone conversation with the defense attorney's. No logical person, reviewing all the facts, could ever come to the conclusion there was anything innocent about the sudden finding of the very regulation that would "save the day" (AR 1-1.02) for the defendants. The AR is not a per capita distribution. I know from my experience that most recipients get the changes and, at most, give them a cursory glance and put them in the book. In many offices, the clerical staff does this. It is beyond comprehension to believe that, in preparing to defend against this lawsuit, any attorney would have any inclination whatsoever to review one of the largest regulations in the Department entitled, "Table of Organization" which deals with organizational definition, composition and relationships; just *three days before their brief was submitted* without someone telling them which rock to look under. To believe this was

included in things like attending the Commissioner's Staff meetings. This would be one reason why I am not assigned to fill in as the acting director in his absence. He does other things like making sure I was not selected to attend a recent awards ceremony to represent my Bureau. Instead, a Lieutenant was selected over me after the other Captain was not available (P322). God bless him, he is a decent man who thinks he is protecting me. Experiences like these are constant reminders of how deep-seated the defendant's hatred of me is and how it affects others around me. When I am in my peer group, I feel like everyone is looking at me and talking about me (P211, P159). Some will make polite conversation but most will treat me like a leper. I am the guy no one wants the Commissioner to see them with; and I have been told that. I have not written down every instance when this has happened, but as recently as last month, when I was fueling my car at Department Headquarters, Lieutenant Wesley Thurston pulled up and said, "Hi Captain, is it safe to be seen with you yet?" Now I don't believe these officers say these things to hurt me and probably think joking about it eases the tension, however, they don't know or realize the hurt and anger I feel inside when this happens, because it reminds me of how powerless I am.

39.     I have lived and worked for over a year knowing that Coury was secretly making inquires into my emotional state, and the plotting against me never ends. Within two weeks of filing my amended complaint, Major DeWire told me that Coury requested that DeWire meet with Coury and the State Police psychologist to discuss my mental well being. Major DeWire testified that he believed that he was being used to carry a message to me that I had better back off or I would be put through a psychological evaluation. Imagine what it is like to catch the defendants cheating red-handed, file an amended complaint and for my trouble, have them question my mental health? The intimidation never ends. Coury testified that his inquiry into my emotional well being was based on a concern that