*Vol I  Exhibits 1-125*

59

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER : 1: CV – 00-0084
:
     Plaintiff :
:
vs. :
:
PAUL EVANKO, MARK : (Judge Caldwell)
CAMPBELL, THOMAS COURY, :
JOSEPH WESTCOTT, :
HAWTHORNE CONLEY :
:
          Defendants :JURY TRIAL DEMANDED

FILED
HARRISBURG PA

MAY 2 0 2002

MARY E. D'ANDREA CLERK
Per _____
              Deputy Clerk

## PLAINTIFF'S EXHIBITS

The following documents have already been provided to the defendant's and are again reproduced and provided:

PLANTIFF 1: Memo dated February 7, 2001 from Evanko to Deputy Commissioner of Staff re: Reconfiguration of Area Commands I and IV.

PLAINTIFF 2: Special Order 98-22, re: Internal Investigations.

PLANTIFF 3: E-mail from Coury to Conley dated February 10, 2000, subject: STD-501.

PLAINTIFF 4: STD-501 from Conley to Commissioner, dated February 18, 2000 re: Captain Ober.

PLAINTIFF 5: E-mails from Ober to Szupinka dated January 12 – 17, 2000, re: State Vehicle.

PLAINTIFF 6: Memo from Ober to Deputy Commissioner of Administration, dated November 10, 1999, re: Northwestern Traffic Institute.

 

PLAINTIFF 7: Memo from Conley to Division Directors, dated December 15, 1998, re: Ober's Temporary Assignment to Higher Rank.

PLAINTIFF 8: Memo from Conley to Division Directors, dated October 15, 1998, re: Ober's Temporary Assignment to Higher Rank.

PLAINTIFF 9: E-mail from Conley to Ober, dated August 23, 1999, re: Cell Phone.

PLAINTIFF 10: Bureau of Professional Responsibility Roster, dated July 21, 1999.

PLAINTIFF 11: Record of cell phone usage for cell numbers 717-877-4106 and 717-805-3018.

PLAINTIFF 12: Undated memo from Ober to Director, Bureau of Technology Services, re: Cellular Telephones.

PLAINTIFF 13: E-mail from Conley to Ober, dated December 13, 1999, re: Division Director's Letter.

PLAINTIFF 14: Letter of Commendation to Sergeant Ronald L. Hillegass, dated January 7, 1999 from Ober.

PLAINTIFF 15: Invoice and receipt from Framers' Workshop, dated May 14, 1999.

PLAINTIFF 16: Desk Memorandum, dated December 16, 1999 from Ober to Director, Bureau of Professional Responsibility.

PLAINTIFF 17: General Invoice in the amount of $69.35, dated December 14, 1999.

PLAINTIFF 18: E-mail from Conley to Ober, dated January 26, 2000, re: Return of Bureau of Property.

PLAINTIFF 19: E-mail from Ober to Brown, dated January 26, 2000 re: Return of BPR Vehicle and Equipment.

PLAINTIFF 20: E-mail from Ober to Brown, dated January 26, 2000 re: Return of BPR Vehicle and Equipment.

PLAINTIFF 21: Letter from Major Paul Woodring, dated February 9, 1996, to Mr. Charles Leazier.

 

PLAINTIFF 22: Copy of investigation ordered by Evanko and conducted by Major's Werts and Williams (IAD 1999-503).

PLAINTIFF 23: Memo from Captain Brown to Captain Oleyniczak, dated May 6, 1999.

PLAINTIFF 24: SP 1-101, subject McCormick, complainant Romano, date of allegation November 25, 1999.

PLAINTIFF 25: Sample General Investigation Report, dated April 21, 1993.

PLAINTIFF 26: Sample Memo from Lieutenant Sample to Commander Area I, dated August 27, 1997.

PLAINTIFF 27: Sample General Investigation Report, dated August 27, 1997.

PLAINTIFF 28: Sample Summary Report from Lieutenant Sample to Trooper Doe, dated August 27, 1997.

PLAINTIFF 29: Bureau of Professional Responsibility 1999 Annual Report.

PLAINTIFF 30: May 25, 1999 interview of FBI Agent Ralph Kush.

PLAINTIFF 31: June 8, 1999 interview of Conley.

PLAINTIFF 32: Undated e-mail from Evanko to Campbell, re: Reorganization.

PLAINTIFF 33: Email from Brown to Ober, dated March 29, 2000, re: Supervisory Inquiry.

PLAINTIFF 34: Email from DeWire to Ober, dated August 8, 2001, re: Supervisory Inquiry.

PLAINTIFF 35: Undated draft Supervisory Inquiry Process regulation.

PLAINTIFF 36: Copy of Investigative Report directed by Coury and conducted by Mrgich (IAD 1999-409).

PLAINTIFF 37: Desk Memo, dated December 3, 1999 from Brown to Deputy Commissioner of Administration.

PLAINTIFF 38: Desk Memo, dated October 5, 1999 from Acting Director, Internal Affairs to Director, Bureau of Professional Responsibility.

PLAINTIFF 39: Desk Memo, dated November 19, 1999, from Director, Bureau of Professional Responsibility to Deputy Commissioner of Administration.

 

PLAINTIFF 40: Desk Memo, dated October 5, 1999, from Acting Director, Internal Affairs Division to Director, Bureau of Professional Responsibility.

PLAINTIFF 41: Bureau of Professional Responsibility Route Slip, re: IAD 1999-409, dated September 1, 1999.

PLAINTIFF 42: Bureau of Professional Responsibility Route Slip, re: IAD 1999-409, dated November 12, 1999.

PLAINTIFF 43: Undated Desk Memo, from Acting Director, IAD to Director, BPR.

PLAINTIFF 44: Memo, dated February 12, 2001, from Pudliner to Conley re: IAD 1999-409.

PLAINTIFF 45: SP 1-101, dated May 27, 1999, Ober – Subject; Coury – Complainant.

PLAINTIFF 46: Letter to Phil Conti.

PLAINTIFF 47: Letter from Philip Conti to Tom, dated May 22, 1999.

PLAINTIFF 48: Memo from Ober to Director, Bureau of Professional Responsibility, dated September 10, 1999, re: Supervisory Inquiry 1999-409.

PLAINTIFF 49: Pennsylvania State Police Historical, Educational and Memorial Center Board of Directors, dated February 7, 2001.

PLAINTIFF 50: Memo dated October 21, 1999, from Conley to Ober, re: Time and Attendance.

PLAINTIFF 51: Memo from Evanko to Deputy Commissioner of Administration, dated October 4, 1999, re: Time and Attendance.

PLAINTIFF 52: Memo from Conley to Ober, dated July 1, 1999, re: Time and Attendance.

PLAINTIFF 53: STD-929, Time and Attendance Record, for June 12 – 25, 1999 for Ober.

PLAINTIFF 54: Request for Leave, STD-330, for Ober dated May 18, 1999.

PLAINTIFF 55: Request for Leave, STD-330, for Ober dated May 20, 1999.

PLAINTIFF 56: Request for Leave, STD-330, for Ober dated March 5, 1999.



PLAINTIFF 57: STD-929, Time and Attendance Record, for pay period ending March 19, 1999.

PLAINTIFF 58: Police Criminal Complaint, defendant Dennis Jay Bridge, filed September 30, 1999.

PLAINTIFF 59: Affidavit of Probable Cause, dated September 30, 1999, defendant Bridge.

PLAINTIFF 60: Police Criminal Complaint, defendant Kipp Stanton, filed September 30, 1999.

PLAINTIFF 61: Affidavit of Probable Cause, dated September 30, 1999, defendant Stanton.

PLAINTIFF 62: AR Change No. 866, dated February 23, 2001.

PLAINTIFF 63: Memo from Coury to Commissioner, dated June 16, 1999, re: meeting with Commissioner and Hickes.

PLAINTIFF 64: Bureau of Professional Responsibility interview of Coury, dated June 28, 1999.

PLAINTIFF 65: Memo Coury to Ober, dated November 1, 1999, re: Northwestern University Traffic Institute.

PLAINTIFF 66: Memo from Ober to Director, Bureau of Personnel, dated October 19, 1999, re: School of Police Staff and Command.

PLAINTIFF 67: Department Special Order 99-102, dated October 7, 1999.

PLAINTIFF 68: E-mail from Ober to Brown, November 10, 1999, re: Northwestern University Traffic Institute.

PLAINTIFF 69: January 2001 High Performance MoPar magazine article, "Out of Retirement".

PLAINTIFF 70: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from May 18, 1999 meeting.

PLAINTIFF 71: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from January 21, 1998 meeting.

PLAINTIFF 72: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from November 19, 1997.

 

PLAINTIFF 73: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from September 17, 1997.

PLAINTIFF 74: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from April 9, 1997.

PLAINTIFF 75: Memo from Evanko to Sarah Shuller, dated August 26, 1998.

PLAINTIFF 76: April 1999 "Communicator", page 5.

PLAINTIFF 77: Retirees' Scoop; May 1999 "Communicator".

PLAINTIFF 78: Memo from Coury to Ober, dated December 23, 1999, re: Supervisory Inquiry IAD# 1999-409.

PLAINTIFF 79: Desk Memo from Acting Director, Internal Affairs Division to Deputy Commissioner of Administration, dated December 3, 1999.

PLAINTIFF 80: Desk Memo from Acting Director, Internal Affairs Division to Director, Bureau of Professional Responsibility, dated October 5, 1999.

PLAINTIFF 81: Desk Memo from Director, Bureau of Professional Responsibility to Deputy Commissioner of Administration, dated November 19, 1999.

PLAINTIFF 82: Desk Memo from Acting Director, IAD to Director, BPR dated October 5, 1999.

PLAINTIFF 83: BPR Route Slip, dated November 12, 1999.

PLAINTIFF 84: Desk Memo

PLAINTIFF 85: E-mail from DeWire to Ober, dated October 4, 2000, re: Chain of Command.

PLAINTIFF 86: E-mail from Ober to Coury, dated May 18, 2001, re: OD Report.

PLAINTIFF 87: Mary Bungo's affidavit dated May 15, 2001.

PLAINTIFF 88: Special Order 2001-24, dated March 21, 2001.

PLAINTIFF 89: Bureau of Research and Development route slip, dated April 11, 2001.

PLAINTIFF 90: Memo from Barbara Christie to Deputy Commissioner Staff, dated April 10, 2001.



PLAINTIFF 91: E-mail from DeWire to Ober re: Chain of Command, dated October 4, 2000.

PLAINTIFF 92: Signature route slip, Commissioner's sign-off dated February 22, 2001.

PLAINTIFF 93: Signature route slip, Deputy/Staff sign-off dated February 17, 2000.

PLAINTIFF 94: Undated, hand-written file notes.

PLAINTIFF 95: AR Manual Change No. 866, dated February 23, 2001.

PLAINTIFF 96: Draft AR 1-1.

PLAINTIFF 97: Project Tracking Summary, date assigned October 10, 2000.

PLAINTIFF 98: Project Tracking Summary, date assigned September 30, 1999.

PLAINTIFF 100: Project Tracking Summary, date assigned August 19, 1999.

PLAINTIFF 101: Project Tracking Summary, date assigned July 17, 1997.

PLAINTIFF 102: Project Tracking Summary, date assigned February 10, 1998.

PLAINTIFF 103: Project Tracking Summary, date assigned July 17, 1997.

PLAINTIFF 104: Reproduction Request, dated February 23, 2001.

PLAINTIFF 105: AR Manual Change No. 866, dated February 23, 2001.

PLAINTIFF 106: AR 1-1; Organization, dated February 23, 2001.

PLAINTIFF 107: Draft AR 1-1.

PLAINTIFF 108: Undated, hand written note.

PLAINTIFF 109: Draft AR 1-1, Change No. 866 Change Sheet.

PLAINTIFF 110: Draft 1-1 text; dated February 23, 2001.

PLAINTIFF 111: Desk Memo from Durante to Dir., Planning Division, dated February 21, 2001.

 

PLAINTIFF 112: E-mail from Merryman to Margeson, dated February 8, 2001 re: E's.

PLAINTIFF 113: E-mail from Merryman to Margeson, dated January 29, 2001, re: E's.

PLAINTIFF 114: Undated CLEAN Message re: Area Command Reconfiguration.

PLAINTIFF 115: Pennsylvania State Police Organization Chart.

PLAINTIFF 116: Desk Memo from Merryman to Margeson, dated February 13, re: Reconfig of Area Commands.

PLAINTIFF 117: Desk Memo from Coury to Commissioner, dated February 7, 2001, re: Reconfiguration of Area Commands.

PLAINTIFF 118: Memo from Werts to Commissioner, dated February 5, 2001 re: Organization: reconfiguration of Areas.

PLAINTIFF 119: Pennsylvania State Police Location Map, dated October 12, 1994.

PLAINTIFF 120: Pennsylvania State Police Location Map, dated October 12, 1994.

PLAINTIFF 121: Letter from Coury to Ober, dated November 10, 1994.

PLAINTIFF 122: Letter from Coury to Ober, dated January 6, 1995.

PLAINTIFF 123: Handwritten letter from Coury to Ober, dated March 5, 1998.

PLAINTIFF 124: Memo from Coury to Director, Internal Affairs Division, dated May 15, 1996.

PLAINTIFF 125: Memo from Merryman to Bureau Directors, dated June 17, 1999 re: AR 1-1, Organization.

PLAINTIFF 126: FR 7-4, dated December 23, 1996.

PLAINTIFF 127: Ober's grievances (six).

PLAINTIFF 128: Memo from Skurkis to Director, Bureau of Emergency and Special Operations, dated June 29, 2000.

PLAINTIFF 129: Memo from Reynolds to Mullin, dated April 24, 2000 re: Loss of or Damage to State Property Appeal Board.



PLAINTIFF 130: Memo from Mullin to Reynolds, dated May 8, 2000 re: Request to Reopen Proceedings.

PLAINTIFF 131: Memo from Bonney to Director, Staff Services, dated June 26, 2000 re: Final Determination.

PLAINTIFF 132: Memo from Ober to Deputy Commissioner of Administration, dated July 27, 2000 re: Reimbursement Appeal.

PLAINTIFF 133: Memo from Coury to Ober, dated November 1, 1999 re: Northwestern University Traffic Institute.

PLAINTIFF 134: FR 1-2, dated May 16, 2000.

PLAINTIFF 135: AR 4-22, dated September 15, 2000.

PLAINTIFF 136: AR 4-11, dated August 20, 1997.

PLAINTIFF 137: Memo from Ober to Director, Bureau of Liquor Control Enforcement, dated July 27, 2000, re: review of Bureau personnel file.

PLAINTIFF 138: Memo from DeWire to Ober, dated July 28, 2000 re: review of Bureau personnel file.

PLAINTIFF 139: Memo from McDonald to Ober, dated March 27, 2002 re: review of Bureau personnel file.

PLAINTIFF 140: Memo from Ober to Acting Director of LCE, dated March 27, 2002, re: review of Bureau personnel file.

PLAINTIFF 141: AR 1-1; pages 37, 39 and 40, dated July 31, 1997.

PLAINTIFF 142: Bits & Bytes, May 2000.

PLAINTIFF 143: Bits & Bytes, September 2000.

PLAINTIFF 144: Bits & Bytes, April 2000.

PLAINTIFF 145: Bits & Bytes, January 2002.

PLAINTIFF 146: E-mail from Commissioner to all personnel, dated January 8, 2002.

PLAINTIFF 147: E-mail from Wilt to Ober, dated January 31, 2000 re IIMS.

PLAINTIFF 148: Undated e-mail from Schmidt to Ober.

 

PLAINTIFF 149: E-mail from Shelton to Ober, dated January 20, 2000 re: IIMS.

PLAINTIFF 150: Memo from Ober to OA, dated March 8, 2000 re: Grievance #HQ-172.

PLAINTIFF 151:E-mail from Ober to Hostert, dated March 27, 2000.

PLAINTIFF 152: E-mail from Szupinka to Ober, dated February 4, 2000.

PLAINTIFF 153: E-mail from Ober to Grab, dated January 24, 2000.

PLAINTIFF 154: Memo from McCommons to Ober, dated January 10, 2000.

PLAINTIFF 155: E-mail from Laughlin to Ober, dated March 13, 2000.

PLAINTIFF 156: E-mail from Ober to Mike, dated January 23, 2001.

PLAINTIFF 157: E-mail from Ober to Lazzaro, dated December 7, 2000.

PLAINTIFF 158: E-mail from PSP postmaster to everyone, dated September 1, 2000.

PLAINTIFF 159: E-mail from Ober to Ruth Brown, dated December 6, 2000.

PLAINTIFF 160: E-mail from Ober to Riley, dated August 25, 1999.

PLAINTIFF 161: E-mail from Ober to Brian, dated January 11, 2000.

PLAINTIFF 162: E-mail from Ditzler to Ober, dated January 7, 2000.

PLAINTIFF 163: Letter from Kwiatek to Ober, dated March 27, 2000.

PLAINTIFF 164: E-mail from Ober to Conley, dated September 7, 1999.

PLAINTIFF 165: Letter from Gallegos to Ober, dated January 29, 2001.

PLAINTIFF 166: Letter from Lazzaro to Ober, dated July 27, 2000.

PLAINTIFF 167: E-mail from Ober to Suber, dated April 2, 2001.

PLAINTIFF 168: Letter from Lazzaro to Ober, dated June 9, 2000.

PLAINTIFF 169: Memo from Ober to Commissioner, dated December 24, 1997.




PLAINTIFF 170: Memo from Ober to Deputy Commissioner of Administration, dated October 29, 1996.

PLAINTIFF 171: Undated CALEA Concerns Outline.

PLAINTIFF 172: E-mail from Wilt to Ober, dated May 31, 2000.

PLAINTIFF 173: E-mail from Christensen to Ober, dated March 9, 2000.

PLAINTIFF 174: Letter from Gallegos to Ober, dated January 16, 2001.

PLAINTIFF 175: Letter from Hunter to Ober, dated January 29, 2001.

PLAINTIFF 176: E-mail from Ober to Brown, dated January 25, 2000.

PLAINTIFF 177: E-mail from Ober to Davis, dated January 28, 2000.

PLAINTIFF 178: E-mail from Ober to Davis, dated January 27, 2000.

PLAINTIFF 179: E-mail from Ober to Binker, dated January 17, 2000.

PLAINTIFF 180: E-mail from Ober to Skiles, dated February 14, 2000.

PLAINTIFF 181: E-mail from Waugh to Ober, dated February 10, 2000.

PLAINTIFF 182: E-mail from Waugh to Ober, dated February 15, 2000.

PLAINTIFF 183: E-mail from Ober to Skiles, dated February 21, 2000.

PLAINTIFF 184: E-mail from Waugh to Ober, dated November 12, 1999.

PLAINTIFF 185: Letter from McSpadden to Ober, dated December 22, 2000.

PLAINTIFF 186: Letter from Kwiatek to Ober, dated March 15, 2000.

PLAINTIFF 187: Letter from P.M. Conti to Ober, dated September 4, 1994.

PLAINTIFF 188: Custody Order dated February 5, 1999.

PLAINTIFF 189: E-mail from Infantino to Ober, dated September 3, 1999.

PLAINTIFF 190: E-mail from Davis to Ober, dated February 17, 2000.

PLAINTIFF 191: E-mail from Ober to Davis, dated June 26, 2000.

PLAINTIFF 192: Undated Centennial Book Committee assignment page.



PLAINTIFF 193: E-mail from Ober to Waugh, dated January 11, 2000.

PLAINTIFF 194: E-mail from Waugh to Ober, dated March 16, 2000.

PLAINTIFF 195: CLEAN Message, dated April 20, 1999.

PLAINTIFF 196: May 1999 IIMS Newsletter.

PLAINTIFF 197: RFQC Procurement Project Structure, dated August 30, 1999.

PLAINTIFF 198: Memo from Backenstoss to Wilt, dated January 27, 2000.

PLAINTIFF 199: E-mail from Ober to Wilt, dated February 7, 2000.

PLAINTIFF 200: Memo from Ober to IIMS Program Manager, dated February 10, 2000.

PLAINTIFF 201: E-mail from Wilt to Ober, dated February 15, 2000.

PLAINTIFF 202: Agenda, IIMS Oversight Committee, dated February 22, 2000.

PLAINTIFF 203: IIMS Systems Integrator BAFO Evaluation Results, dated February 21, 2000.

PLAINTIFF 204: Agenda, IIMS Oversight Committee, dated February 14, 2000.

PLAINTIFF 205: IIMS Systems Integrator Committee Contact Information, dated August 30, 1999.

PLAINTIFF 206: Ober's notes from April 6, 2000 debriefing meeting with IBM.

PLAINTIFF 207: Debriefing notes from March 23, 2000 meeting with Andersen Consulting.

PLAINTIFF 208: E-mail from Wilt to Ober dated February 10, 2000.

PLAINTIFF 209: E-mail from Ober to group list, dated February 14, 2000.

PLAINTIFF 210: E-mail from Ober to Stephen, dated January 7, 2000.

PLAINTIFF 211: E-mail from Bucher to DeWire, dated August 22, 2001.

PLAINTIFF 212: Memo from Westcott to Commissioner, dated January 4, 1999.

 

PLAINTIFF 213: Memo from Werts to Deputy Commissioner of Operations, dated December 28, 1998.

PLAINTIFF 214: Memo to file from Merryman, dated January 26, 2000.

PLAINTIFF 215: CLEAN Message, dated April 7, 1999.

PLAINTIFF 216: Bureau of Research and Development Personnel Order 99-5, dated June 16, 1999.

PLAINTIFF 217: National Governor's Association article.

PLAINTIFF 218: E-mail from PSP Commissioner to Everyone, dated August 9, 2000.

PLAINTIFF 219: Desk Memo from Ober to Director, Bureau of Technology Services, dated January 18, 2000.

PLAINTIFF 220: Memo from Ober to Commissioner dated January 17, 2000.

PLAINTIFF 221:Ober's resume.

PLAINTIFF 222: Pages 6 and 7 of AR 1-1.

PLAINTIFF 223: Memo from Evanko to Infantino, dated August 24, 1999.

PLAINTIFF 224:Memo from Koselnak to Valencic, dated September 2, 1999.

PLAINTIFF 225:Memo from Koselnak to Chief Counsel, date January 13, 2000.

PLAINTIFF 226: Memo from Koselnak to Department Disciplinary Officer, dated September 2, 1999.

PLAINTIFF 227: Memo from Koselnak to Williams, dated September 1, 1999.

PLAINTIFF 228: Memo from Bonney to Williams, dates January 27, 2000.

PLAINTIFF 229: Memo from Koselnak to McDonald, dated May 30, 2000.

PLAINTIFF 230: Newspaper article, March 9, 2000.

PLAINTIFF 231: Memo from Koselnak to Ryan, dated February 17, 2000.

PLAINTIFF 232: Email from Koselnak to Ober, dated February 21, 2000.

PLAINTIFF 233: Memo from Campbell to Bureau Staff, dated February 25, 2000.

 

PLAINTIFF 234: Memo from Evanko to Bureau Directors, dated February 3, 2000.

PLAINTIFF 235: Memo from Campbell to Commissioner, dated May 8, 2000.

PLAINTIFF 236: CLEAN Message, dated May 16, 2000 re: Lieutenant Vacancies.

PLAINTIFF 237: Email from Szupinka to Ober, dated January 18, 2000.

PLAINTIFF 238: Email from Szupinka to Ober, dated January 26, 2000.

PLAINTIFF 239: Indiana Gazette article, dated April 3, 2001.

PLAINTIFF 240: Post-Gazette article, dated February 9, 2001.

PLAINTIFF 241: Special Order 2000-2, dated January 7, 2000.

PLAINTIFF 242: Workplace Rights and Responsibilities.

PLAINTIFF 243: BPR Handout.

PLAINTIFF 244: Section 5101; Title 18.

PLAINTIFF 245: Letter from Reynolds to Warnken, dated January 27, 2000.

PLAINTIFF 246: Memo from Westcott to Director, LCE, dated April 28, 2000.

PLAINTIFF 247: Memo from Koselnak to Section Commanders, dated March 23, 2000.

PLAINTIFF 248: Memo from Koselnak to Central Section Commander, dated April 18, 2000.

PLAINTIFF 249: Memo from Koselnak to Deputy Commissioner of Operations, dated April 19, 2000.

PLAINTIFF 250: STD-279, dated April 19, 2000.

PLAINTIFF 251: STD-279, dated September 7, 1999.

PLAINTIFF 252: Letter from Lanier to Reynolds, dated February 9, 2000.

PLAINTIFF 253: Ethical Problems for Pennsylvania Litigators.

 

PLAINTIFF 254: Page Two, "Communicator"; Retirees' Scoops.

PLAINTIFF 255: Page Two, "Communicator"; Retirees' Scoops.

PLAINTIFF 256: Page Four, "Communicator"; Retirees' Scoops.

PLAINTIFF 257: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 258: Page Six, "Communicator"; Retirees' Scoops.

PLAINTIFF 259: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 260: Page Eight, "Communicator"; Retirees' Scoops.

PLAINTIFF 261: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 262: Page Four, "Communicator"; Retirees' Scoops.

PLAINTIFF 263: CLEAN Message dated January 7, 2000.

PLAINTIFF 264: CLEAN Message dated January 11, 2000.

PLAINTIFF 265: FR 1 Preface; Interaction With People, dated February 20, 1998.

PLAINTIFF 266: Personnel Order 00-18; dated August 31, 2000.

PLAINTIFF 267: Envelop to Ober.

PLAINTIFF 268: Management Directive 540.7, dated June 22, 1998.

PLAINTIFF 269: Memo from Ober to Director, BPR, dated May 28, 1998.

PLAINTIFF 270: Desk Memo from Hain to Ober, dated November 25, 1996.

PLAINTIFF 271: Lieutenants Job Description issued to Captain Ober, dated March 7, 2000.

PLAINTIFF 272: Lieutenants Job Description issued to Lieutenant Williams, dated December 17, 1998.

PLAINTIFF 273: Desk Memo from Woodring to Ober, dated March 28, 1995

PLAINTIFF 274: Memo from Hickes to Director, BPR, dated March 28, 1995.

 

PLAINTIFF 275:Deputy Commissioners Letter of Appreciation, dated January 19, 2000.

PLAINTIFF 276: Bureau Directors Memo from Waugh to Ober, dated January 19, 2000.

PLAINTIFF 277: CLEAN Message dated June 2, 2000.

PLAINTIFF 278: BPR interview of LTC Hickes, dated July 2, 1999.

PLAINTIFF 279: BPR interview of Evanko, dated June 28, 1999.

PLAINTIFF 280: Memo from Hickes to Commissioner, dated May 18, 1999.

PLAINTIFF 281: Memo from Ober to Director, Bureau of Personnel, dated October 19, 1999 with margin note sent to Personnel 10/20/99.

PLAINTIFF 282: FR 1-1, dated March 25, 1992.

PLAINTIFF 283: Evanko's handwritten notes, dated May 20, 1999.

PLAINTIFF 284: FR 3-2, dated April 16, 1996.

PLAINTIFF 285: Special Assignment.

PLAINTIFF 286: AR 4-25, dated September 2, 1993.

PLAINTIFF 287: AR 1-10, page 4 dated September 16, 1997.

PLAINTIFF 288: Undated, handwritten file notes.

PLAINTIFF 289: Undated, handwritten file notes.

PLAINTIFF 290: Ober's Performance Evaluations.

PLAINTIFF 291: Memo from Demkovitz to Ober, dated May 31, 2000.

PLAINTIFF 292: Memo from McSpadden to Ober dated January 30, 2001.

PLAINTIFF 293: Attorney bills.

PLAINTIFF 294: Memo from Aitchison to Ober, dated March 20, 2001.

PLAINTIFF 295: Memo from Frankel to Ober, dated January 22, 2001.

PLAINTIFF 296: Memo from Lazzaro to Ober, dated January 26, 2001.

 

PLAINTIFF 297: Memo from Lightman to Lazzaro, dated January 28, 2001.

PLAINTIFF 298: Memo from Lazzaro to Ober, dated February 1, 2001.

PLAINTIFF 299: Memo from Gallegos to Ober, dated July 2, 2001.

PLAINTIFF 300: Minutes – Grand Lodge, dated March 23 –24, 2001.

PLAINTIFF 301: Memo from Ruda to Ober, dated July 15, 2000.

PLAINTIFF 302: FR 3-3, dated March 3, 1999.

PLAINTIFF 303: Ober's promotion results.

PLAINTIFF 304: Letters of Appreciation from Citizens/Co-workers.

PLAINTIFF 305: Prior adjudication's.

PLAINTIFF 306: Ober's 2002 Performance Evaluation.

PLAINTIFF 307: Personnel Order 99-16, dated June 30, 1999.

PLAINTIFF 308: Personnel Order 00-07, dated March 10, 2000.

PLAINTIFF 309: 1998 – 2000 Collective Bargaining Agreement between Commonwealth and PSTA.

PLAINTIFF 310: McDonald's Performance Evaluation, dated October 11, 2000.

PLAINTIFF 311: Ober's Commission.

PLAINTIFF 312: Memo from Campbell to Commissioner, dated May 25, 2000.

PLAINTIFF 313: Personnel Order 99-20.

PLAINTIFF 314: Personnel Order 00-04.

PLAINTIFF 315: Management Directive 525.4 Amended, dated November 7, 1996.

PLAINTIFF 316: Receipt from Bailey to Christi, dated April 1, 2002.

PLAINTIFF 317: Arbitration decisions.

PLAINTIFF 318: Acting Bureau Director memo and rosters.



PLAINTIFF 319: Arbitration decision, dated June 16, 1999.

PLAINTIFF 320: CLEAN Message from PSP Postmaster to Everyone, dated March 7, 2000.

PLAINTIFF 321: Letter from Ober to Kwiatek, dated March 17, 2000.

PLAINTIFF 322: E-mail from DeWire to Ober, dated February 6, 2002.

PLAINTIFF 323; Memo from Evanko to Deputy Commissioner of Administration, dated December 18, 1991.

PLAINTIFF 324: IIMS milestones and timeline, dated March 26, 2002.

PLAINTIFF 325: IIMS Meeting agenda, dated February 18, 2000.

PLAINTIFF 326: Memo from Ober to Commissioner, dated January 17, 2000.

PLAINTIFF 327: Memo from Merryman to Commissioner, dated December 16, 1997.

PLAINTIFF 328: Management Directive 205.16 Amended, dated November 22, 1995

PLAINTIFF 329: Management Directive 205.14 Amended, dated February 2, 1998.

PLAINTIFF 330: Management Directive 1980-18, dated May 16, 1984.

PLAINTIFF 331: Memo from Evanko to Wilson, dated November 15, 1999.

PLAINTIFF 332: Memo from Evanko to Christensen, dated July 27, 1999.

PLAINTIFF 333: Ober's Job Description, dated June 2, 2000.

PLAINTIFF 334: Letter from Brown to Ober, dated February 2, 2000.

PLAINTIFF 335: PEMA related messages; various dates.

PLAINTIFF 336: Supervisor's Class Syllabus.

STD-501

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

**DATE:**          February 7, 2001

**SUBJECT:**       Reconfiguration of Area Commands I and VI

**TO:**            Deputy Commissioner of Staff

**FROM:**          Colonel Paul J. Evanko
                   Commissioner

**ENCLOSURE:**     (1)    Correspondence from Lt. Colonel Thomas K. Coury, Deputy
                          Commissioner of Operations, dated February 7, 2001, to the
                          Commissioner, concerning "Subject", with Enclosures from
                          the Commander, Area VI.

        1.    I approve the reconfiguration of Area Commands I and VI as
articulated in Enclosure (1), effective as soon as feasible.

        2.    Ensure the appropriate administrative changes are
implemented by the Bureau of Research and Development to facilitate this
reconfiguration.

        3.    Questions concerning this correspondence and the
reconfiguration shall be directed to the Deputy Commissioner of Operations.

P1



SP 3-200 (12-93)

98-22
Special Order
March 5, 1998







**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE



SUBJECT:           Internal Investigations

TO:                Area, Troop and Station Commanders, and Bureau Directors

FROM:              Deputy Commissioner of Administration

REFERENCE:     (a)     AR 4-25, Internal Investigations.

ENCLOSURE:     (1)     Revisions to AR 4-25, Internal Investigations.


      1.    The Bureau of Professional Responsibility is conducting a comprehensive revision of Reference (a); however, due to the complexity of the related issues, this revision is not expected to be completed in the immediate future. Therefore, in the interim, other necessary amendments to Reference (a) have been incorporated in Enclosure (1).

      2.    Questions concerning the contents of this special order shall be directed to the Director, Bureau of Professional Responsibility, at (717) 783-5145.

      3.    Commanders and directors shall ensure that troop office and library copies of Reference (a) are properly annotated.


Thomas K. Coury
Lt. Colonel    PSP


Distribution "B"

ENCLOSURE (1)
Special Order 98-22

REVISIONS TO AR 4-25, INTERNAL INVESTIGATIONS

25.04    DEFINITIONS

D.    Bodily Injury:  Impairment of physical condition or substantial pain which requires medical treatment.

O.    Serious Bodily Injury:  Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

25.06    NON-COMPLAINT INVESTIGATION CATEGORIES

B.    Shooting Incident:  Incidents when a member or enforcement officer discharges a weapon, e.g., bullet, shot, teargas, SERT "beanbag," etc.; another law enforcement officer discharges a weapon in the presence of a member or enforcement officer; or, a subject fires a weapon while a member or enforcement officer is present.  Exceptions are listed in this regulation.

25.07    DISPOSITIONS

A.    Complaint Investigations:

4.    Policy Void:  Indicates that the action of the Department or the involved member(s) was not inconsistent with existing Department policy, but the complainant still suffered harm.

25.08    DUTIES AND RESPONSIBILITIES

B.    The Director, Bureau of Professional Responsibility, shall:

3.    Ensure that a record of all investigations is maintained; that all investigations are conducted in a fair, prompt, thorough, and impartial manner; and that internal investigation reports are kept in a secured area within the Bureau.  Reports shall be completed within the time limits established through collective bargaining agreements.  Extensions to the initial 40-day investigative time period shall be based solely on criteria related to the complexity of the investigation and available resources.

6.  Ensure the completion of an annual report which includes an analysis of use of force investigations and statistical summaries of the activities of the Internal Affairs Division. The statistical summaries shall be made available to the public and Department personnel.

7.  Provide a weekly summary of complaints and internal affairs investigations to the Commissioner, and retain authority to report directly to the Commissioner in matters requiring the highest level of executive awareness.

E.  Troop Commanders and Division Directors shall:

5.  Notify affected personnel of the results of the investigation as soon as practicable and within established time limits. Notices to personnel who had previously been issued a Notification of Inquiry, Form SP 1-102, shall be made in writing, by either correspondence or initiation of administrative action. The correspondence shall include a specific disposition using one of the defined terms contained in this regulation.

H.  Personnel Who are the Subject of an Administrative Investigation:

1.  May at any time during the course of an internal investigation, be ordered by the appropriate authority to submit to any or all of the following:

g.  Any other non-testimonial evidence or test, such as photographs and financial disclosure statements.

25.09   INVESTIGATIVE ASSIGNMENT CRITERIA

A.  Circumstances: Administrative investigations conducted under the following circumstances are subject to the provisions of this regulation. The Internal Affairs Division shall review, and may retain primary investigative responsibility for:

C.   <u>Performance Inadequacies</u>:  The Internal Affairs Division will not assume investigative responsibility for mere performance inadequacies or procedural discrepancy violations, unless they are indicative of a more serious underlying problem.  Addressing these types of inadequacies and violations is a function of first line supervision, and shall, in most instances, be handled at that level through counseling, training, or other remedial action.

25.10   COMPLAINT PROCESSING

D.   <u>Investigation Procedures</u>:   The following procedures shall be followed by individuals conducting personnel investigations:

16.   The investigation shall be completed and all reports shall be received by the Director, Bureau of Professional Responsibility, within 40 days after assignment, unless an extension is granted by the director.  The granting of extensions shall be based solely on criteria related to the complexity of the investigation and available resources.  It is important for the assigned investigator to complete the investigation and submit the report promptly.

NOTE: When an investigation exceeds 90 days, the investigator shall provide periodic status reports, either verbally or in writing, to the complainant until the investigation has been adjudicated.  When Department personnel initiate an investigation, the notification will not be required.

E.   <u>Investigation of Non-Complaint Incidents</u>:

5.   Any member or enforcement officer, who discharges a weapon which results in an injury or death, or whose use of physical force results in a death or serious bodily injury, shall immediately be assigned to station or office duties, pending an evaluation of the circumstances surrounding the incident by the Deputy Commissioner of Administration.  In addition, any member or enforcement officer whose use of physical force results in a lesser injury may, at the discretion of the Commanding Officer or Division Director, be assigned to station or office duties pending the evaluation of the circumstances surrounding the incident.

F.     Limited Investigations:

3.     Upon completion of a limited investigation, the Troop Commander or Division Director shall review the limited investigation report and prepare an endorsement citing reasons for their decision and a notation that the complainant and involved personnel were notified of this decision. The endorsement shall also include a statement of the disposition using one of the defined categories listed in this regulation, excluding the categories "Sustained" or "Not-Sustained." The limited investigation must be converted into a full investigation if any element of misconduct is determined.

G.     Submission of Administrative Investigation Reports:

2.     The Director, Bureau of Professional Responsibility, shall review the report for investigative content, and either forward it for further processing or return it to the investigator for additional investigation. A copy of the investigative reports on incidents involving legal intervention, shooting, use of physical force, or complaints of physical abuse, discrimination, or sexual harassment shall be forwarded to the Office of Chief Counsel for evaluation at the time the report is approved by the Director, Bureau of Professional Responsibility.

7.     Full and limited investigation reports shall be purged after ten years, or two years after the member or employe separates, unless litigation warrants retention.

**EVANKO, PAUL J**

| | |
|---|---|
| **From:** | COURY, THOMAS K |
| **Sent:** | Thursday, February 10, 2000 4:08 PM |
| **To:** | CONLEY, HAWTHORNE N |
| **Cc:** | EVANKO, PAUL J |
| **Subject:** | STD-501 |
| | |
| **Importance:** | High |

As you recall, when the Commissioner directed Capt. Ober to return to BPR for two weeks prior to reporting to Troop B, there was a decision made to permit Capt. Ober to remain in Technology Services for those two weeks.
For the Commissioner record he would like a STD 501 from you to him on who you spoke with to make those arrangements. It is only so the Commissioner has the chain of events of what took place prior to the filing of the lawsuit.

Although I do not recall the date, I clearly recall that you called me on the phone and asked if I would agree that it was best to leave Capt. Ober in Technology Services & we discussed several reasons why. I concurred & told you to proceed to do so.

P3

1

STD-501

COMMONWEALTH OF PENNSYLVANIA

**DATE:**          February 18, 2000

**SUBJECT:**       Captain Darrell G. OBER

**TO:**            Commissioner

**FROM:**          Major Hawthorne N. Conley
                   Director, Bureau of Professional Responsibility

      1.    On January 7th, 2000, you informed me that Captain OBER would be reassigned to the Bureau of Professional Responsibility, effective January 14th. After discussion, you adjusted that date to January 24th. This would return Captain OBER to my command for approximately five days. It was my belief the return of Captain OBER to the Bureau of Professional Responsibility would be disruptive to the peace and harmony the Bureau was currently enjoying. In an effort to maintain the current atmosphere, I was looking for a way to make productive use of Captain OBER, without actually returning him to the Bureau.

      2.    I spoke with Major WAUGH, Director, Bureau of Technology Services, on January 17th/18th, concerning another issue. During that conversation, he indicated that he was sorry his Bureau was losing Captain OBER, and that his performance at Technology Services would be missed. I didn't tell him at that time that I was considering asking him if he would like to retain Captain OBER for an additional week.

      3.    On January 19th, 2000, I was contacted by Major Lyle SZUPINKA, Commander, Area III. He informed me that he had been contacted by Captain OBER, who had asked him if there was anything he (SZUPINKA) could do that he would not have to return to the Bureau of Professional Responsibility during the week of January 24-28, 2000. I explained to Major SZUPINKA he could have two options; either he could travel to Area III early, or remain at the Bureau of Technology Services. The choice would be Major SZUPINKA's. During this conversation, I explained to Major SZUPINKA that Captain OBER's request is what I had on my mind anyway, so this worked out fine for everyone involved.

      4.    All arrangements subsequent to the date of January 19th were made between Captain OBER and Major SZUPINKA.

      5.    Several days later, I made Colonel COURY aware of the arrangements I had made.

*P4*



## OBER, DARRELL G

| | |
|---|---|
| **om:** | OBER, DARRELL G |
| **nt:** | Monday, January 17, 2000 8:03 AM |
| **o:** | SZUPINKA, LYLE H |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | RE: State Vehicle |

Major,

      Given a choice, I would like to stay and continue working on the Systems Integration Project.  Inasmuch as my transfer occurred at a critical time and before the project is completed, much work remains to be done.  I will coordinate vehicle turn in with Mr. Binker and ensure an issued items are returned to BPR.

Captain Ober

    -----Original Message-----
**From:**    SZUPINKA, LYLE H
**Sent:**    Thursday, January 13, 2000 11:48 AM
**To:**    OBER, DARRELL G
**Subject:**    RE: State Vehicle

I talked to Major CONLEY, you have two options, you can stay where you are and finish up what your doing with the Bureau of Tech.,or you can visit Troop G Stations (no overnight, just visit what you can each day). Either gets you out of the need to go back. Let me know which you want. Also keep in contact with transportation so you can pick up your vehicle. Also BPR needs the keys to the building and office and the laptop back. Turn your BPR vehicle in to transportation when you pick up the other vehicle.

    -----Original Message-----
**From:**    OBER, DARRELL G
**Sent:**    Thursday, January 13, 2000 10:21 AM
**To:**    SZUPINKA, LYLE H
**Cc:**    OBER, DARRELL G
**Subject:** RE: State Vehicle

Major,

      Thank you for taking the time and trouble to make all of these arrangements for me.

      Yes, I am being returned to BPR for the period of January 24 - 28.  I am open to any options that will not involve overnight travel.  I want to maximize what precious little time I have left with my family.

Captain Ober

    -----Original Message-----
**From:**    SZUPINKA, LYLE H
**Sent:**    Wednesday, January 12, 2000 2:36 PM
**To:** OBER, DARRELL G
**Subject:**    RE: State Vehicle

I talked to Rick BINKER and he is calling a mid-mileage vehicle in from the field to be assigned to you. I also talked to Communications Division and told them we had to have a radio for the vehicle and they said they would locate one. Transportation is to call Communications and make installment arrangements. The car you have is to be kept in BPR. I think in the end you'll end up with something with lower miles on it. If not as soon as you get here we'll switch vehicles with something from B to make sure you get something decent.
Also I talked to Major WAUGH and he is to see that a computer is shipped out for your use. Troop B has been told to have your office ready by the end of the month. I will shortly call Bob ZINSKI and see about getting furniture for your office. I've also arranged for a labeled parking space for you at Troop Hdqtrs and a sign for your door. They will read Area III Projects Officer. If you can think of anything else let me know.
In addition I understand you are going back to BPR for a short time. If that's going to be uncomfortable call me and I'll call Major CONLEY and see if he can send you out here or have you visit Troop G Stations or anything else you need to be out of that office.

    -----Original Message-----
**From:**    OBER, DARRELL G
**Sent:**    Wednesday, January 12, 2000 12:17 PM
**To:**    SZUPINKA, LYLE H
**Cc:**    OBER, DARRELL G
**Subject:**    State Vehicle

Major,

P5



I was contacted this date by Steve Vergot of the Technical Support Division with respect to radio installation on a state vehicle. I am unaware of any change in my vehicle status. It was my assumption I would be taking my currently assigned vehicle to my new location. Could you please clarify? Thank you.

Captain Ober

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:           November 10, 1999

SUBJECT:        Northwestern University Traffic Institute

TO:             Deputy Commissioner of Administration
                (Through channels)

FROM:           Captain Darrell G. Ober
                Systems Integrator Procurement Team Leader
                Bureau of Technology Services

ENCLOSURE:      (1)     Correspondence re: Subject.

1.      I am in receipt of your memo re: the subject training.   It would appear my non-selection, in part, was based on timeliness of my request.

2.      By way of explanation, I submitted my request for consideration on October 19, 1999.  I have been unable to pinpoint the exact cause of delay so future occurrences may be avoided.

3.      Please be assured such tardiness is uncharacteristic of my work ethic.

P6

December 15, 1998


Temporary Assignment to Higher Rank -
Captain Darrell G. Ober


Division Directors and Section Commanders


Major Hawthorne N. Conley
Director, Bureau of Professional Responsibility


     1.    Effective Monday, December 28, 1998, to and including Tuesday, January 5, 1999, Captain Darrell G. Ober shall be temporarily assigned the duties of a Major, functioning as the Acting Director, Bureau of Professional Responsibility.  Captain Ober's responsibility in this assignment shall be to carry out the day-to-day responsibilities of the Major.

     2.    The Director, Bureau of Professional Responsibility will be on annual leave during this time period.


cc:  Deputy Commissioner of Administration
     Director, Bureau of Personnel
     BPR FILE


P7

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

DATE:      October 15, 1998

SUBJECT:   Temporary Assignment to Higher Rank -
           Captain Darrell G. Ober

TO:        Division Directors and Section Commanders

FROM:      Major Hawthorne N. Conley
           Director, Bureau of Professional Responsibility

    1.    Effective Friday, October 16, 1998, to and including Monday, October 26, 1998, Captain Darrell G. Ober shall be temporarily assigned the duties of a Major, functioning as the Acting Director, Bureau of Professional Responsibility. Captain Ober's responsibility in this assignment shall be to carry out the day-to-day responsibilities of the Major.

    2.    The Director, Bureau of Professional Responsibility will be attending the annual Chiefs of Police Conference in Utah during this time period.

cc:  Deputy Commissioner of Administration
     Director, Bureau of Personnel
     BPR FILE

P8

**OBER, DARRELL G**

| | |
|---|---|
| From: | CONLEY, HAWTHORNE N |
| nt: | Monday, August 23, 1999 6:21 PM |
| : | OBER, DARRELL G |
| ubject: | RE: Cell Phone |

Captain Ober

It's good to hear from you, it has been a while since we've spoke.

The vacation was great. I had the opportunity to visit with all my children and grand children. Thanks for asking.

As far as the cell phone is concerned there is no issue. What I've discovered after reviewing the records is that the phone assigned to your position (Director IA) is used substantially each month. In accordance with the administration's move to make everyone (Troop CO's, Bureau Directors) accountable for monies spent, and staying within their assigned budgets, I want to make sure I am spending BPR's money wisely.  I am trying to ensure the money I do spend is necessary and is in furtherance of BPR's goals and objectives.

What I need to know, is a cell phone necessary for your position?  If yes, does not the Bureau of Technology Services have money set a side for your needs? Is the Bureau of Technology Services willing to reimburse BPR for the cell phone and its usage?

Please call or stop by so that we may discuss my concerns

Major HN Conley

> ——Original Message——
> From:     OBER, DARRELL G
> Sent:     Friday, August 20, 1999 9:00 AM
> To:       CONLEY, HAWTHORNE N
> Subject:  Cell Phone
>
> Major Conley,
>
> I understand that you have been on vacation.  I trust you had an enjoyable time.
>
> Sometime in mid-July Corporal Leidigh contacted me and informed me that the Bureau of Professional Responsibility was collecting the issued bag phones and replacing them with flip phones.  Corporal Leidigh asked that I return my phone.  The next week I ran into Corporal Mrgich and Trooper Oberdorff at Department Headquarters.  I gave my phone to them for return.
>
> On Thursday, August 12, I had an occasion to again speak to Corporal Leidigh regarding training.  When I inquired about my replacement cell phone, I was told there was some concern as to whether I was entitled to a phone and that I would have to speak to you or Captain Skurkis.
>
> Is there an issue with respect to me being issued a replacement phone?
>
> Thank you for your assistance.
>
> Captain Ober

P9

(Rev. July 21, 1999)

## BUREAU OF PROFESSIONAL RESPONSIBILITY

| NAME | ADDRESS/TELEPHONE NO. | SPOUSE NAME |
|------|----------------------|-------------|
| BLOUCH, Donna J.<br><br>AA1 - BPR/DHQ | 25 Rye Lane<br>Palmyra, PA  17078<br><br>(717) 838-3662 | Timothy |
| BORISH, Wallace F.<br><br>TPR - SPR/WEST | 539 Tenth Street<br>Oakmont, PA  15139<br><br>(412) 828-5268 | Lorena |
| BROWN, John R.<br><br>LT - BPR/IAD/CENTRAL<br>Pager 1-888-812-4531 | 6519 Sanibel Drive<br>Harrisburg, PA  17111<br><br>(717) 671-1098 | Lisa |
| CARNAHAN, Donald T.<br><br>LT - BPR/IAD/EAST<br>Pager 1-800-359-9337<br>       Code #1791 | 348 Sarver Road<br>Sarver, PA  16055<br><br>(724) 353-1456 | Susan |
| CHRISTIE, Lisa S.<br><br>SGT - BPR/IAD/DHQ | 530 Mundis Mill Rd.<br>York, PA  17402<br><br>(717) 757-4563 | Randy |
| CONLEY, Hawthorne N.<br><br>MAJOR - BPR/DHQ<br>Pager 1-888-975-9552<br>Cell #717-877-4106 | 808 Garden City Drive<br>Monroeville, PA 15146<br>HOME: (412) 372-2350<br>       -or-<br>3049 Canby St., Apt. 17<br>Harrisburg, PA  17103<br>APT:  (717) 234-4651 | Marlease |
| ESHLEMAN, Scott A.<br><br>CPL - SPR/CENTRAL | 17 Thistle Drive<br>Denver, PA  17517<br><br>(717) 484-0399 | Elissa |
| GRAHAM, Kevin W.<br><br>LT - SPR/WEST<br>Pager 1-800-215-7596<br>       Code #05023 | R.D. #2, Box 209G<br>Evans Road<br>Export, PA  15632<br><br>(724) 327-8790 | Jeryl |

| NAME | ADDRESS/TELEPHONE NO. | SPOUSE NAME |
|------|----------------------|-------------|
| MCCORMICK, Casey M.<br><br>CPL - IAD/EAST<br>Pager 1-800-752-6500,<br>     Code #4886 | 3314 E. Galen Hall Rd.<br>Reinholds, PA 17569<br><br>(610) 678-2446<br>Celphone 717-617-4037 | |
| MCNEAL, Janet A.<br><br>CPL - SPR/CENTRAL<br>Cell #717-805-3020 | 1156 Zion Ridge Ave.<br>Bellefonte, PA 16823<br><br>(814) 383-2498 | William |
| MILLER, David V.<br><br>LT - SPR/EAST<br>Pager 1-800-374-4434<br>     Code #52764 | 16 Aspen Way<br>Schwenksville, PA 19473<br><br>(610) 287-1414 | Tina |
| MRGICH, Robert D.<br><br>CPL - IAD/CENTRAL<br>Pager 1-888-812-4938 | 650 Fairview Road<br>Mt. Joy, PA  17552<br><br>(717) 653-4279 | Jessica |
| MURRAY, Robert L.<br><br>CPL - IAD/EAST<br>Pager 1-800-752-6500,<br>     Code #4818 | 6149 North 11th Street<br>Philadelphia, PA 19141<br><br>(215) 224-7370/927-9864 | Yvonne |
| OBER, Darrell G.<br><br>CAPT - BPR/IAD/DHQ<br>Pager 1-800-895-5447<br>Cell #717-805-3018 | 71 Millers Gap Road<br>Enola, PA  17025<br><br>(717) 790-0708 | Kim |
| OBERDORF, Jerry L.<br><br>TPR - IAD/CENTRAL<br>Pager 1-888-812-4936 | 206 Barley Field Circle<br>Carlisle, PA  17013<br><br>(717) 766-0753 | Wendy |
| RAIN, Garret L.<br><br>CPL - IAD/Central<br>Pager 1-888-812-4937 | 1400 Georgetown Road<br>Middletown, PA 17057<br><br>(717) 985-1260 | Robin |
| ROMANICK, Mark S.<br><br>CPL - SPR/EAST<br>Pager 610-490-9634 | P.O. Box 1067,<br>423 Featherbed Ln.,<br>Concordville, PA  19331<br><br>(610) 558-3557 | Cynthia |
| SEIFNER, Dana<br><br>SGT - IAD/WEST<br>  ager 1-800-359-9337<br>     Code #0974 | 503 Straube Avenue<br>Baden, PA  15005-1025<br><br>(724) 869-0612 | Joseph |

Sheet1

| CELL NUMBER | BEGIN DATE | END DATE | SERVICE CHARGE | PEAK USAGE (MINUTES) | PEAK COST | OFF-PEAK USAGE (MINS) | OFF-PEAK COST | LONG DISTANCE | ROAMING COST | SUBTOTAL COST |
|---|---|---|---|---|---|---|---|---|---|---|
| 717-877-4106 | 7/1/97 | 9/30/97 | $80.11 | 17 | $0.00 | 0 | $0.00 | $0.00 | $5.94 | $86.05 |
| 717-877-4106 | 10/1/97 | 12/31/97 | $100.26 | 15 | $0.00 | 3 | $0.00 | $0.00 | $0.00 | $100.26 |
| 717-877-4106 | 1/1/98 | 3/31/98 | $96.87 | 14 | $0.00 | 0 | $0.00 | $0.00 | $3.24 | $100.11 |
| 717-877-4106 | 4/1/98 | 6/30/98 | $97.38 | 12 | $0.00 | 4 | $0.00 | $0.00 | $4.10 | $101.48 |
| 717-877-4106 | 7/1/98 | 9/1/98 | $97.60 | 19 | $0.00 | 2 | $0.00 | $0.00 | $0.00 | $97.60 |
| 717-877-4106 | 10/1/98 | 12/1/98 | $114.91 | 92 | $5.78 | 120 | $10.56 | $0.00 | $46.01 | $182.77 |
| 717-877-4106 | 1/1/99 | 4/1/99 | $103.99 | 87 | $3.40 | 135 | $2.88 | $0.00 | $15.63 | $125.90 |
| 717-877-4106 | 4/1/99 | 7/1/99 | $97.71 | 161 | $0.00 | 35 | $0.00 | $0.88 | $87.64 | $186.23 |
| 717-805-3018 | 4/1/98 | 6/30/98 | $58.05 | 0 | $0.00 | 0 | $0.00 | $0.00 | $0.00 | $58.05 |
| 717-805-3018 | 1/1/99 | 3/30/99 | $88.86 | 85 | $0.00 | 12 | $0.00 | $0.00 | $8.28 | $97.14 |
| 717-805-3018 | 7/1/98 | 9/30/98 | $88.75 | 64 | $0.00 | 2 | $0.00 | $0.00 | $58.81 | $147.56 |
| 717-805-3018 | 10/1/98 | 12/31/98 | $88.86 | 55 | $0.00 | 6 | $0.00 | $0.00 | $6.61 | $95.47 |
| 717-805-3018 | 4/1/99 | 6/30/99 | $88.86 | 137 | $0.00 | 15 | $0.00 | $0.88 | $14.38 | $103.24 |

*(handwritten annotations: "MAJOR", "CAPTAIN", column markers a b c d e f g, and formula "(a + a + e + f + g)")*

Page ^

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:

SUBJECT:        Cellular Telephones

TO:             Director, Bureau of Technology Services
                Attention: Director, Technical Support Division

FROM:           Captain Darrell G. Ober
                Acting Director, Bureau of Professional Responsibility

REFERENCE:      (a)      Special Order 97-143, dated October 16, 1997.

1.      I am requesting approval be given to the purchase of three cellular telephones for investigative use by members of the Internal Affairs Division. The telephones are to be assigned to the Section Commanders.

2.      There has been an on-going need for cellular telephone support within the Division for some time.  Recent cases highlighted the need and utility of cellular telephones as investigative aids.  As you are aware, members of the Internal Affairs Division arrested a member from Troop M, Bethlehem for a variety of charges.  The operations arrest plan included telephonic contact with the Troop Commander from the staging area.  Subsequent to the arrest, continued telephonic contact was necessary to ensure investigative steps were properly being executed by support members in locations far removed from the incident.  In both situations, cellular telephones played a communications role.  Two Department supplied telephones were employed (the Division Directors and one issued to the Systems and Process Review Eastern Section Commander) and one personally owned telephone were utilized.

3.      Additionally, members of the Eastern Section were assigned to investigate a member involved shooting. The Section Commander was able to provide the Division Director with an on the scene evaluation thereby allowing for immediate access to command level decisions.  The cellular telephone used was supplied by the local Troop.

4.      Given the critical nature of the job function associated with the internal affairs function, it is not good business for the investigators and Section Commanders to rely on loaned or personally owned cellular telephones to accomplish our mission.  Accordingly,  your favorable consideration is requested.

cc:     IAD File

*P/2*

## OBER, DARRELL G

| | |
|---|---|
| From: | CONLEY, HAWTHORNE N |
| Sent: | Monday, December 13, 1999 2:30 PM |
| To: | OBER, DARRELL G |
| Subject: | Division Director's Letter |

Captain:

The problem is the unauthorized use of the Bureau's Visa to pay for mounting and framing of your Division Director's Letter of Commendation for Retired Sergeant Hillegass. To bring closure to the issue requires a check made out to the Commonwealth in the amount of $69.35. I know you took donation(s)/collection to cover gift(s) which were to be given to Sergeant Hillegass, and I assume this is one of those gifts; however using the Bureau's Visa for this expenditure was inappropriate, and the Commonwealth needs to be reimbursed. Please advise how you plan on handling.

HN Conley

-----Original Message-----
| | |
|---|---|
| From: | OBER, DARRELL G |
| Sent: | Friday, December 10, 1999 7:57 AM |
| To: | CONLEY, HAWTHORNE N |
| Cc: | OBER, DARRELL G |
| Subject: | Division Director's Letter |

Major,

   I recently contacted Sergeant Christie to inquiry as to the status of retired Sergeant Hillegass's Division Director's Letter of Commendation. I plan on meeting with Sergeant Hillegass next week. I understand there may be an issue regarding the letter which needs addressed. Inasmuch as I was responsible for and authored the letter, could you please advise me what the problem is so I may bring closure to this issue and present it to Sergeant Hillegass? Thank you.

Captain Ober

P13

# PENNSYLVANIA STATE POLICE

Commonwealth  of Pennsylvania

LETTER OF COMMENDATION
January 7, 1999

Sergeant Ronald L. Hillegass
Pennsylvania State Police
Bureau of Professional Responsibility
1800 Elmerton Avenue
Harrisburg, Pennsylvania  17110

Dear Sergeant Hillegass:

Your friends and co-workers have gathered here today to celebrate, recognize and appreciate your career with the Pennsylvania State Police. I congratulate you on your retirement. Your journey with the Department began on July 27, 1972. Your career has spanned over twenty-six and one-half years. Twenty-six years - did you ever imagine it was possible? Without doubt, I am certain tomorrow brings with it a flood of memories, emotion and reflection.

During the past twenty-six years, you have served at Troop T, Newville; the Bureau of Research and Development; Troop L, Reading; Troop L, Jonestown; Troop S, Harrisburg; and the Bureau of Professional Responsibility. In the Bureau of Professional Responsibility you served in both the Systems and Process Review and Internal Affairs Divisions. No stranger to inspections, during your career you were detached four times to the former Inspection Division. You were also handpicked to participate in the Hanover Riot investigation. You were ..hed for six months to conduct this investigation. You were promoted to Corporal in 1982, and to Sergeant in 1985. You have served as both Criminal Investigation and Patrol Unit Supervisors, and are also a former Station Commander of Troop S, Harrisburg.

While I am certain not all-inclusive, the preceding paragraph summarizes many of your significant duty assignments. Some day all of us will be able to look back and reflect on the places we have been, the people we have met and the experiences we have had. There is no job like being a policeman. To quote an old saying, "We see the best of times and the worst of times." You and I have worked together many years. I am one of the many individuals you have worked with who are in your debt. We faced both professional and personal challenges together. I know you well enough to recognize that your journey with the Department means more to you than reviewing a list of duty assignments. You are admired and respected by all who have come to know you. Your legacy is one that the rest of us can be both proud and envious of. Honest, hard-working, reverent, intelligent, a man with great dignity, integrity and character. These are words that describe you as a man. We should all be so lucky to be thought of so highly.

In closing, I cannot resist adapting something that is precious to me. It was once said about my father that his statement about life *was* his life. In similar fashion, the statement you have made about your career, was your career

We wish you and Nancy the very best. God bless you.

Sincerely,

Captain Darrell G. Ober
Director, Internal Affairs Division
Bureau of Professional Responsibility

P/4

# 1786

THE FRAMERS WORKSHOP
45 NORTH PROGRESS AVENUE
HARRISBURG, PA 17109
***717-545-3390***

4301720700016371 TRM1

DATE 05/14/99          TIME 09:12 AM

ITEM: 001  VPC SALE
ACCT: 4715150001158279      EXP: 9907 S
RESP: AUTH/TKT '022448
CUST: 4715

AMOUNT:        $69.35
  TX:           $0.00

TOTAL:        $69.35

I AGREE TO PAY ABOVE TOTAL AMOUNT
ACCORDING TO CARD ISSUER AGREEMENT
(MERCHANT AGREEMENT IF CREDIT VOUCHER)

X _Donna J. Blount_

   PROF RESPONSIBILITY
TOP COPY-MERCHANT BOTTOM COPY-CUSTOMER

---

## framers' workshop

Progress Plaza
45 N. Progress Ave.
Harrisburg, PA 17109
Phone: 545-3390
Fax: 545-5721

Queensgate Shopping Center
York, PA 17403
Phone: (717) 848-8869
Fax: (717) 848-5445

Cedar Cliff Mall
1104 Carlisle Road
Camp Hill, PA
Phone: (717) 737-2499
Fax (717) 737-2324

Name: PA. STATE POL (BPR)   Date: 4/07
Address:                    Salesperson: Z
City:                Zip:   Promised: 5/4 TUES

Home Phone: 657-4200 (Donna)   Work Phone:

| | | Cost/Ft. | |
|---|---|---|---|
| Liner # | | | |
| Description | | Footage. | |
| Moulding # N 15-155 | | Cost/Ft. 6.30 | 37.80 |
| Description | | Footage. 6 | |

Glass: (Regular)  Non-Glare  Plexi  None  Other: _____ 5.50

| Mats: | Top | Middle | Bottom | Horiz. | Vert. |
|---|---|---|---|---|---|
| # | 6334 8 | | | 8 3/8 x 10 1/4 | |
| Color | | | | | |
| Top | 23/4 | | | 5 1/2 x 5 1/2 | 8.05 |
| Bottom | 1 | | | 13 7/8 x 16 1/4 | |
| Sides | | | | | |

Mounting: ☑Drymount  ☐Museum  ☐Stretch  ☐AFFC
Materials: ☑Foam Core  ☐Chip & Foam  ☐Chip & Rag  ☐4-Ply Rag
☐Cardboard  ☐Thin F.C.  ☐Other:                        7.50

Miscellaneous

Description/Condition/# Of Pieces          Materials  58.85
USTER                                      Labor     10.50
                                           Art
                                           Subtotal  69.35

Special Instructions:

Louisa                                     Tax   EXEMPT
                                           Total
                                           Deposit
Not responsible for items left over (90) ninety days.   Balance

---



COMMONWEALTH OF PENNSYLVANIA
STD-502            REV. 5-97

## DESK MEMORANDUM

SUBJECT

### General Invoice

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Director, Bureau of Professional Responsibility | Captain Darrell G. Ober |

| DATE SENT | DATE DUE |
|---|---|
| December 16, 1999 | |

| | PLEASE CALL | | APPROVAL | | SEE ME |
|---|---|---|---|---|---|
| | RETURNED YOUR CALL | | AS REQUESTED | | COMMENT |
| | INFORMATION & FILE | | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| | NECESSARY ACTION | | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

Request For Reimbursement Denied. As Discussed you know the purchase was in Appropriate & Not Authorized

P16

COMMONWEALTH OF PENNSYLVANIA
STD.-152
REV. 8-96

# GENERAL INVOICE

| | |
|---|---|
| INVOICE NO. | FL1162777 10097' 145193 |
| DATE | December 14, 1999 |
| ORDER NO. | |
| V.T. NO. OR ADVANCEMENT ACCOUNT NO. | |

**PAYOR (NAME AND ADDRESS)**

Pennsylvania State Police
DHQ – Advancement Account
1800 Elmerton Avenue
Harrisburg, PA 1710

**PAYEE (NAME AND ADDRESS)**

Darrell G. Ober
71 Millers Gap Road
Enola, PA 17025

VENDOR FED. I.D. (SOC. SEC. NO.) (CIRCLE ONE)
20...000100084

TERMS

| DATE OF TRANSACTION | ITEM AND DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 05/14/99 | Framing of Division Directors letter of commendation. | 1 | 1 | 69.35 | $69.35 |
| | Date Pd. _____ Check # _____ Amount $ _____ | | | | |
| | Document No./Justification *Framing of Division Director's letter of Commendation* | | | | |
| | Date _____ Goods/Services | | | | |
| | Invoice Rec'd _____ Accepted Date | | | | |
| | Approved by: _____ | | | | |
| | _____ _____ | | | | |
| | Signature        Date | | | | |
| | Payment Mode: Comptroller   Adv. Acct. | | | | |

| FUND | DEPT | APP | YR | LEDG | ORG | COST FUNC | OBJECT |
|---|---|---|---|---|---|---|---|
| 001 | 020 | 181 | 98 | 1 | 7310 | | 385 |
| 001 | 020 | 181 | 98 | 1 | 7310 | | 385 |

| | | |
|---|---|---|
| TOTAL | | $69.35 |

**EXPENDITURE SYMBOL**

I CERTIFY THAT THE ABOVE EXPENSES, SERVICES, MATERIALS OR PRODUCTS WERE ACTUALLY INCURRED, RENDERED OR FURNISHED FOR THE USE OF THE COMMONWEALTH OF PENNSYLVANIA AND THAT THE ABOVE PRICES CHARGED WERE FAIR AND REASONABLE.

_____
SIGNATURE

ACKNOWLEDGEMENT OF THE FOLLOWING IS REQUIRED IF PAYMENT IS MADE FROM ADVANCED REQUISITION MONEYS.

I HEREBY ACKNOWLEDGE RECEIPT IN FULL AS SET FORTH IN THIS INVOICE IN THE AMOUNT OF $ _____

_____
SIGNATURE

**1. TREASURY**

P17.

**OBER, DARRELL G**

| | |
|---|---|
| **From:** | CONLEY, HAWTHORNE N |
| **Sent:** | Wednesday, January 26, 2000 12:29 PM |
| **To:** | OBER, DARRELL G |
| **Cc:** | SZUPINKA, LYLE H ; BROWN, JOHN R |
| **Subject:** | Return of Bureau Property |

Captain Ober

Per discussion and your request the following is a list of items you are to return to the Bureau of Professional Responsibility. I believe you said you were meeting with Lieutenant Brown later today to facilitate the return of the bureau's vehicle you were assigned. Please provide Lieutenant Brown with the necessary codes so that telephone 717-675-4205 can be reprogrammed

Vehicle equipment number: 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 along with it's assigned credit card

Pennsylvania State Police Turnpike credit card

AT&T telephone card

Laptop computer , and it's accessories

BPR building exterior key

BPR interior master key

Transportation advised that you were issued a vehicle today.

Good luck in your new assignment

P18

## OBER, DARRELL G

| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Wednesday, January 26, 2000 2:13 PM |
| **To:** | BROWN, JOHN R |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | Return of BPR Vehicle & Equipment |

Rick,

I believe I have everything rounded up to return as per Major Conley's orders. I left my call back number on you voice mail. Please give me a call and see if we do the returns today. Thank you.

DGO

*P19*

## OBER, DARRELL G

| | |
|---|---|
| From: | OBER, DARRELL G |
| Sent: | Thursday, January 27, 2000 7:15 AM |
| To: | BROWN, JOHN R |
| Cc: | OBER, DARRELL G |
| Subject: | Return of BPR Vehicle and Equipment |

Rick,

This e-mail is to follow up on the voice mail I just left for you.  I am available any time today to return the subject items.  Thank you.

DGO

P20



# PENNSYLVANIA STATE POLICE
## DEPARTMENT HEADQUARTERS
### 1800 ELMERTON AVENUE
### HARRISBURG, PA. 17110

LETTER #6

February 9, 1996

Mr. Charles Leazier
333 Market Street
Blandon, PA 17591

Dear Mr. Leazier:

The letter of complaint you wrote to Colonel Paul J. Evanko, Commissioner of the Pennsylvania State Police, has been referred to the Bureau of Professional Responsibility for appropriate action. I have reviewed your letter and, based on the information you provided, have been unable to determine that a violation of State Police rules or regulations occurred. Therefore, no further administrative action can be taken by the Internal Affairs Division. A record of your complaint has, however, been placed in our files.

The Pennsylvania State Police takes great pride in the professionalism and integrity of its members and insists that the public be treated fairly, courteously and with respect. I regret that you feel we have not met that high standard and thank you for bringing that to my attention.

Sincerely,

Major Paul J. Woodring
Director
Bureau of Professional Responsibility

*P21*





PLAINTIFF 22 —

INVESTIGATIVE REPORT

DIRECTED BY EVANKO

CONDUCTED BY MAJOR'S

WERTS & WILLIAMS

(IAD # 1999 - 503



**Pennsylvania State Police**
**Bureau of Professional Responsibility**
**7820 Allentown Boulevard**
**Harrisburg, Pa   17112**

May 6, 1999

Captain Henry D. Oleyniczak
Commanding Officer
Troop J, Lancaster
2099 Lincoln Highway East
Lancaster, PA 17602

Dear Captain Oleyniczak:

I received a Use of Force or Complaint Reception and Processing Worksheet on May 5, 1999, initiated by Trooper Michael A. Romano, and endorsed by Sergeant Thomas J. McClung, alleging they were dissatisfied with Corporal Casey M. McCormick's handling of an investigation where a necklace was believed stolen and members may have been involved. Trooper Romano and Sergeant McClung further allege Corporal McCormick's ego was damaged causing her to take the investigation to a new level. (Refer to IAD-10728)

I have reviewed the complaint and nowhere does it articulate Corporal McCormick was involved in any misconduct. I have determined their complaint is without merit and will not take any supervisory action in this matter.

The investigative report completed by Corporal McCormick was complete and thorough, addressing all the issues. The investigation cleared all of the subjects of any wrongdoing, something a competent and thorough investigation is designed to do. This investigation had criminal potential because of the theft allegation. It is a sound investigative course of action to look into the involvement of the subjects when they actively partake in the recovery of the relevant property. The necklace was the issue in this case. It is reasonable to investigate and document the subjects' involvement, especially since they did not advise Corporal McCormick, or anyone in the chain of command outside of Sergeant McClung, who had personal interest in the case. I would have been disappointed if Corporal McCormick had not investigated what occurred with the necklace that was at the heart of the investigation.

I am disappointed with the actions of Trooper Romano and Sergeant McClung. As members of the Pennsylvania State Police who have positions of responsibility, their actions may be questioned at any time. It is the Internal Affairs Division's responsibility to investigate thoroughly complaints made by the public of possible member misconduct. Corporal McCormick was just doing her usual outstanding job.

P23
1 oF2

Captain Henry D. Oleyniczak
Page two
May 6, 1999

The complaint was forwarded to me directly, circumventing the chain of command, and violated the mandates of AR 4-25, page 17 and Appendage I. I find it ironic the complaining members are critical of what a BPR investigator should know when, in fact, they don't know how to process a perceived complaint. Apparently they need training in this area.

I am forwarding this correspondence for any supervisory action you deem appropriate. I am receptive to complaints or criticisms of Internal Affairs Division personnel when they are warranted or deserved. Consequently, I will take the necessary steps to resolve those issues when they arise.

I look forward to our continued cooperation in the future. Thank you for your attention to this matter.

Sincerely,

Lieutenant John R. Brown
Acting Director, Internal Affairs Division
Bureau of Professional Responsibility

Enclosure: SP 1-101

SP 1 101 (1 93)

PENNSYLVANIA STATE POLICE
## USE OF FORCE OR COMPLAINT
## RECEPTION AND PROCESSING WORKSHEET

BPR CONTROL NUMBER

1.

**2.** COMPLAINANT INFORMATION

| | | | |
|---|---|---|---|
| NAME | FIRST Michael | M.I. A | LAST ROMANO |

| HOME ADDRESS | STREET/P.O. BOX 1183 Kingsway rd apt 1 | | | |
|---|---|---|---|---|
| | CITY West Chester | STATE PA | ZIP CODE 19382 | HOME PHONE # ( 610 ) 701-9887 |

| EMPLOYER | NAME & ADDRESS PSP Avondale 2 Moxley Ln Avondale, PA 19311 | WORK PHONE # ( 610 ) 268-2022 |
|---|---|---|

**3.**

| NON-COMPLAINT USE OF FORCE REPORT | ☐ SHOOTING INCIDENT | ☐ PHYSICAL FORCE | ☐ LEGAL INTERVENTION |
|---|---|---|---|

**4.** SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)

| NAME | FIRST Casey | M.I. M | LAST McCORMICK |
|---|---|---|---|

| LOCATION | TROOP/BUREAU BPR | STATION/DIVISION IAD Eastern section | JOB ASSIGNMENT Investigator |
|---|---|---|---|

| SSN — — | DOE | ← TO BE COMPLETED IF XNOWN OR AVAILABLE |
|---|---|---|

**5.** DETAILS OF ALLEGATION

ROUTE-STREET 2 Moxley Ln

| CITY-TWP/BORO London grove Twp. | COUNTY Chester | DATE 11|25|99 | TIME 1000 | DAY WED |
|---|---|---|---|---|

| TYPE OF ALLEGATION (CHECK ONE) | ☐ PHYSICAL ABUSE ☐ VERBAL ABUSE ☐ CRIMINAL CONDUCT | ☒ IMPROPER CONDUCT ON DUTY ☒ IMPROPER CONDUCT OFF DUTY ☐ DISSATISFACTION WITH PERFORMANCE OF DUTY |
|---|---|---|
| | ☐ OTHER (Please explain) | |

| SYNOPSIS | On 11|10|98 this officer along with several other persons at |
|---|---|

PSP Avondale received a PSP Notification of Inquiry (BPR 10728). A Donna MILAM alleged that 1) her son's necklace was taken|stolen from her residence and troopers from PSP Avondale (myself included) may have been responsible for the theft and 2) myself and Tpr. Maurice NADACHOWSKI told MILAM we would shoot her son when we arrested him. The Notification of Inquiry further advises that I will be interviewed under GARRITY Warnings. No other inappropriate conduct, performance of duty,etc is mentioned,alleged, or even insinuated in this

**6.** RECEPTION DATA

| DATE RECEIVED | TIME RECEIVED | LOCATION RECEIVED | TROOP/BUREAU — | STATION/DIVISION |
|---|---|---|---|---|
| RECEIVED BY | NAME | | | SSN — — |

FOR BUREAU USE

*P24 1of5*

| INVESTIGATOR | NAME | | SSN — — |
|---|---|---|---|

| 8. | ADDITIONAL SUBJECTS OF ALLEGATION/REPORT | | | | |

| NAME | FIRST | | M.I. | LAST |
|------|-------|--|------|------|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |

SS — — DOE TO BE COMPLETED IF KNOWN OR AVAILABLE →

| NAME | FIRST | | M.I. | LAST |
|------|-------|--|------|------|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |

SSN — — DOE TO BE COMPLETED IF KNOWN OR AVAILABLE →

| NAME | FIRST | | M.I. | LAST |
|------|-------|--|------|------|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |

SSN — — DOE TO BE COMPLETED IF KNOWN OR AVAILABLE →

RECEIVED
MAY 0 8 REC'D
PA. STATE POLICE
By BPR

SYNOPSIS (CONT.)    Notification of Inquiry. (see attached copy).

On 11|25|98 I was interviewed at PSP Avondale by Cpl. McCORMICK. My Garrity Warnings were read to me. Sgt. Gerald BRAHL was present as the union representative. Among the issues discussed was whether any threat was made that MILAM's son would be shot. Also discussed and questioned was the alleged theft of the necklace. Cpl. McCORMICK then asked many questions as to how Tpr. NADACHOWSKI and myself discovered the necklace was stolen by MILAM's other son and subsequently pawned by a female friend of the son. (Background: This officer during the course of another investigation interviewed a female subject. This officer knew the female to be acquainted with the MILAM family. The female subsequently told me that MILAM's son gave her the necklace and asked her to pawn it for marijuana. This officer and Tpr. NADACHOWSKI at our supervisor's direction located the necklace in a pawn shop.) Cpl. McCORMICK asked specific questions as to why this officer and Tpr. NADACHOWSKI bypassed her and her investigation when it was discovered where the chain was at and how it came to be there. Prior to this interview with Cpl. McCORMICK, this officer was also told by her to prepare an STD501 with responses to her questions surrounding the stolen necklace. (see attached STD501 by Cpl. McCORMICK dated 11|06|98). This officer gave Cpl. McCORMICK a STD501 with my answers on the interview date.

CONTINUED

SP 1 101 (1 93)

PENNSYLVANIA STATE POLICE

## USE OF FORCE OR COMPLAINT
## RECEPTION AND PROCESSING WORKSHEET

BPR CONTROL NUMBER

1.

---

**2.  COMPLAINANT INFORMATION**

| | FIRST | | M.I. | LAST |
|---|---|---|---|---|
| .ME | | | | |

| HOME ADDRESS | STREET/P.O. BOX | | | | | |
|---|---|---|---|---|---|---|
| | CITY | | STATE | ZIP CODE | HOME PHONE # ( ) |

| EMPLOYER | NAME.& ADDRESS | WORK PHONE # ( ) |
|---|---|---|

---

**3.**

| NON-COMPLAINT USE OF FORCE REPORT | ☐ SHOOTING INCIDENT | ☐ PHYSICAL FORCE | ☐ LEGAL INTERVENTION |
|---|---|---|---|

---

**4.  SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)**

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|

| LOCATION | TROOP/BUREAU | STATION/DIVISION | JOB ASSIGNMENT |
|---|---|---|---|

| SSN | __ __ | DOE | | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
|---|---|---|---|---|

---

**5.  DETAILS OF ALLEGATION**

ROUTE/STREET

| CITY/TWP/BORO | COUNTY | DATE | TIME | DAY |
|---|---|---|---|---|

| TYPE OF .GATION (CHECK ONE) | ☐ PHYSICAL ABUSE  ☐ VERBAL ABUSE  ☐ CRIMINAL CONDUCT | ☐ IMPROPER CONDUCT ON DUTY  ☐ IMPROPER CONDUCT OFF DUTY  ☐ DISSATISFACTION WITH PERFORMANCE OF DUTY |
|---|---|---|
| | ☐ OTHER (Please explain) | |

SYNOPSIS

Continuation:                                                PAGE 3

As a result of Tpr. NADACHOWSKI and myself determining that MILAM's son was

the person responsible for the removal of the chain, the son was charged by

Cpl.McCORMICK for False Reports .

On 04|16|99 this officer received a notice from Cpt. Henry D. OLEYNICZAK

regarding  BPR 10728 report as submitted by Cpl. McCORMICK. The report

relates that  the BPR"investigation revolved around two specific allegations."

the first was PSP Avondale members being accused of stealing the necklace.

---

**6.  RECEPTION DATA**

| DATE RECEIVED | TIME RECEIVED | LOCATION RECEIVED | TROOP/BUREAU | STATION/DIVISION |
|---|---|---|---|---|
| | | | __ | |

| IVED BY | NAME | | SSN __ __ |
|---|---|---|---|

**FOR BUREAU USE**

| INVESTIGATOR | NAME | | SSN __ __ |
|---|---|---|---|

| CONTROL NO. ISSUED BY | | DATE ASSIGNED | DATE DUE | |
|---|---|---|---|---|

**8.** ADDITIONAL SUBJECTS OF ALLEGATION/REPORT

| NAME | FIRST | | M.I. | LAST | |
|------|-------|---|------|------|---|

| LOCATION | TROOP/BUREAU | STATION/DIVISION | JOB ASSIGNMENT |
|----------|--------------|------------------|----------------|

SSI         —         —         DOE                          ← TO BE COMPLETED IF KNOWN OR AVAILABLE

| NAME | FIRST | | M.I. | LAST | |
|------|-------|---|------|------|---|

| LOCATION | TROOP/BUREAU | STATION/DIVISION | JOB ASSIGNMENT |
|----------|--------------|------------------|----------------|

SSN         —         —         DOE                          ← TO BE COMPLETED IF KNOWN OR AVAILABLE

| NAME | FIRST | | M.I. | LAST | |
|------|-------|---|------|------|---|

| LOCATION | TROOP/BUREAU | STATION/DIVISION | JOB ASSIGNMENT |
|----------|--------------|------------------|----------------|

SSN         —         —         DOE                          ← TO BE COMPLETED IF KNOWN OR AVAILABLE     PAGE 4

**SYNOPSIS (CONT.)** This was unfounded. The second portion of the investigation was the Internal Affairs Division trying to determine whether I and others ,"contrived information in order to cease the Internal Affairs Division Investigation.." and why the information on the whereabout of the necklace was not immediately reported to BPR. This portion of the investigation was also unfounded.

At no time was I advised by any BPR person including Cpl. McCORMICK or Tpr. Robert JONES either orally or in writing (specifically no Notification of Inquiry was sent.) that they were investigating me or Tpr. NADACHOWSKI for bypassing their investigation or contriving information to cease the BPR investigation. Tpr. NADACHOWSKI and I were only notified via the Notification of Inquiry that we subject of the alleged theft of the necklace and the threat that we would shoot the son. We , furthermore, were not notified of the expanded investigation during our interviews with Cpl. McCORMICK. A BPR investigator of all people should know that an individual has to be notified officially that he|she is the subject of an investigation before continuing an investigation and interviewing the subject. Furthermore, Lt. Susan LYSEK was also present during Tpr. NADACHOWSKI's interview and my interview because of problems with the BPR investigation. One would think that she either believed we were notified about the second portion of the BPR investigation or she would have known we should not have been questioned on it. Lastly, it is very apparent that Cpl. McCORMICK became personally upset

SP 1 101 (1 93)

PENNSYLVANIA STATE POLICE

**USE OF FORCE OR COMPLAINT**
**RECEPTION AND PROCESSING WORKSHEET**

BPR CONTROL NUMBER

1.

2.

**COMPLAINANT INFORMATION**

| | FIRST | | M.I. | LAST |
| ME | | , | | |

| HOME ADDRESS | STREET/P.O. BOX | | | | |
| | CITY | | STATE | ZIP CODE | HOME PHONE # ( ) |
| EMPLOYER | NAME & ADDRESS | | | | WORK PHONE # ( ) |

3.

**NON-COMPLAINT USE OF FORCE REPORT**   ☐ SHOOTING INCIDENT   ☐ PHYSICAL FORCE   ☐ LEGAL INTERVENTION

4.

**SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)**

| NAME | FIRST | | M.I. | LAST |
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |

| SSN __ __ | DOE | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |

5.

**DETAILS OF ALLEGATION**

ROUTE/STREET

| CITY/TWP/BORO | COUNTY | DATE | TIME | DAY |

| TYPE OF ALLEGATION (CHECK ONE) | ☐ PHYSICAL ABUSE ☐ VERBAL ABUSE ☐ CRIMINAL CONDUCT | ☐ IMPROPER CONDUCT ON DUTY ☐ IMPROPER CONDUCT OFF DUTY ☐ DISSATISFACTION WITH PERFORMANCE OF DUTY |
| | ☐ OTHER (Please explain) | PAGE 5 |

SYNOPSIS   that Tpr. NADACHOWSKI and I solved the BPR allegation by doing good

police work. It is very apparent that Cpl. McCORMICK took the BPR investigation

to a new level that she should have not have because her ego was damaged.

Lastly, three questions remain: 1) Was there an allegation that Tpr. NADACHOWSKI,

myself, or someone else at PSP Avondale conspired to bypass BPR? 2) Who made

this allegation? 3) If there was an official allegation, why wasn't Tpr.

NADACHOWSKI and/or myself informed ?   *I concur. Sgt TJ McClung '3/0*

**RECEPTION DATA**

| DATE RECEIVED | TIME RECEIVED | LOCATION RECEIVED | TROOP/BUREAU __ | STATION/DIVISION |
| RECEIVED BY | NAME | | | SSN __ __ |

**FOR BUREAU USE**

| INVESTIGATOR | NAME | | SSN __ __ |
| CONTROL NO. ISSUED BY | | DATE ASSIGNED | DATE DUE | |



PSP-501-X(11-95)

COMMONWEALTH OF PENNSYLVANIA

DATE:    November 6 1998

SUBJECT:    BPR # 10728, Complaint by Donna MILAM concerning her son's missing/stolen necklace

TO:    Troopers assigned to detail to arrest Jose MARIN, 07/13/98 at his residence

FROM:    Cpl. C. M. MCCORMICK, BPR/IAD Eastern Section

1. Please prepare an STD-501 outlining your involvement with this incident. In an effort to keep the information relevant and pertinent to the issue/s, I suggest you focus you attention of the following questions.

(a) Specify your involvment/assignment in the incident at the MILAM/MARIN trailer on 07/13/98.
(b) Indicate whether you had any contact with the necklace at that time or at any time thereafter.
(c) Indicate whether you have had any contact since that time with Jose MARIN, Marco (Polo) MARIN or Sharon JOHNSTON, Larry TUCKER or Cara MARTIN.
(d) Indicate the nature of that interaction.
(e) Indicate when you first had knowledge of who was responsible for the removal of the necklace from the residence or that it was pawned. (who told you that and what did they relate to you).
(f) indicate whether you had any part in the planning, removal or the pawning of the jewelry from the MILAM/MARIN residence.

2. Please provide the letter to my office by 11/16/98.  Address: BPR/IAD Eastern Section, 8320 Schantz Rd, Breinigsville PA 19831.

3. I will meet with you during that week for a short interview.

I ►                    ON                    18► ►0► ►1!        11/10        16:48 ☐ :02/02 NO:347

SP-1-102 (8 93)

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
NOTIFICATION OF INQUIRY

NOTE:    INVESTIGATORS SHALL PREPARE ORIGINAL AND ONE COPY, RETAIN
THE ORIGINAL WITH CASE FILE AND PROVIDE COPY TO THE SUBJECT
OF INVESTIGATION. ONE OF THE THREE LISTED INVESTIGATION
TYPES SHALL BE CHECKED.

BPR    10728

QUIGLEY, STROSSER    KING
ROMANO/NADACHOWSKI/NANGLE    J/AVONDALE

RANK                    NAME                    TROOPSTATION

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING:

☒ A COMPLAINT INVESTIGATION IS BEING CONDUCTED INTO AN INCIDENT IN WHICH YOU ARE ALLEGED TO HAVE
BEEN INVOLVED. THE DETAILS OF THE COMPLAINT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐ A NON-COMPLAINT INVESTIGATION IS BEING CONDUCTED IN ACCORDANCE WITH DEPARTMENT DIRECTIVES. THE
DETAILS OF YOUR INVOLVEMENT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐ AN ADMINISTRATIVE INVESTIGATION IS BEING CONDUCTED PURSUANT TO A REQUEST FROM THE OFFICE OF CHIEF
COUNSEL. YOUR INVOLVEMENT HAS BEEN IDENTIFIED AS FOLLOWS:

DONNA MILAM COMPLAINED THAT HER SON JOSE WAS ARRESTED
BY TROOPERS 7/13/98. SHORTLY THEREAFTER, HER SON'S (JOSE)
NECKLACE WAS DISCOVERED TO BE MISSING. MILAM BELIEVES
TROOPER/S MAY BE RESPONSIBLE FOR REMOVING THE JEWELRY.
    MILAM ALSO CLAIMED TWO TROOPERS TOLD HER THEY
WOULD SHOOT HER SON WHEN THEY ARRESTED HIM FOR THE
ROBBERY. SHE OBJECTED TO THIS.

MARCO MARIN, MILAM'S OTHER SON IS ACCUSED OF THEFT
AND FALSE REPORTS IN THIS MATTER.

YOU WILL BE INTERVIEWED UNDER GARRITY WARNINGS, ON
11/19/98. ADVISE IF YOU NEED ANOTHER DATE/TIME, OR SPECIFIC
TIME THAT DAY. I EXPECT TO BE THERE BETWEEN 11AM-4PM
AS NEEDED.

SIGNATURE OF INVESTIGATOR

I ACKNOWLEDGE RECEIPT OF THIS NOTIFICATION AND I AM AWARE OF MY RIGHT TO UNION REPRESENTATION.

SIGNATURE                    BADGE I.D. NO.        SOCIAL SECURITY NO.            DATE            TIME

Rev: 5/1/93                                                                                          BPR - 1

SP 7-       (10-83)                                          1. INCIDENT NO.                    2. DATE OF REPORT
                                                            BPR # 0000                         April 21, 1993

PENNSYLVANIA STATE POLICE                                   3. INVESTIGATING OFFICER
**GENERAL INVESTIGATION REPORT**                            Corporal Ima Goodexample

                                                            4. TROOP - STATION
                                                            Troop X Anywhere

SUBJECT (NATURE OF INVESTIGATION OR NAME AND ADDRESS OF INDIVIDUAL)

Rank, Name (last, first & m.i.)
Troop, Station
DOE 00/00/00  SSN 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

6.

INSTRUCTIONS: REPORT WILL BE PREPARED IN THE FOLLOWING ORDER:   REASON FOR INVESTIGATION, SYNOPSIS OF INVESTIGATION, CONCLUSION,
RECOMMENDATIONS AND COMMENT (WHEN APPROPRIATE), LIST OF ATTACHMENTS (IF ANY) AND DETAILS WHICH SUPPORT THE SYNOPSIS.

**REASON FOR INVESTIGATION:**

Generally, paragraphs are not indented for a personnel investigation, however, they should be short and
separated by a double space.

A brief, factual statement that furnishes the reason the investigation was conducted. For example, "Letter of
complaint, dated 12-07-89, from Mr. John DOE, R.D. # 1 Carlisle, Pa. 17013, alleging that Trooper John
SMITH was rude while conducting a traffic stop on 12-01-89"; or "Civil Suit, DOE vs Commonwealth of
Pennsylvania, Penna. State Police et. al. filed in U.S. Middle Court involving the subject member"; or
"Personnel complaint instituted by Sergeant John DOE, traffic supervisor, Troop H, Harrisburg, alleging that
Trooper SMITH failed to report for duty on 12-07-89 as required."

**SYNOPSIS OF INVESTIGATION:**

A synopsis is a synopsis; i.e., don't repeat everything that you will have under the details. Also, remember
when synopsizing you should not include any of your own opinions. Include a concise summary of your
investigation into the complaint that was made. It may include a brief statement as to what occurred, but must
include the pertinent facts that were uncovered in the investigation. In essence, it is a summary of the
DETAILS portion of the report. It may NOT contain or reflect the investigator's opinion.

For example:

On 12-07-89, the complainant was stopped on Interstate I-81 for speeding @ 87 M.P.H. in a posted 55 M.P.H.
zone and was cited by Trooper DOE for the violation. The Complainant alleges Trooper DOE was rude by
calling him a "jerk." Trooper DOE alleges he was not rude and did not call the complainant a "jerk" and the
complainant was angry because he was going to lose his drivers license. Trooper WILLIAMS, who was with
Trooper DOE at the time of the stop, indicated he heard the complainant yelling. However, WILLIAMS did
not hear the context of the conversation between DOE and the complainant.

This is an example of a very minor complaint. As each investigation is unique, the content of the SYNOPSIS
will vary. It should be of a nature that the report reviewer can read the SYNOPSIS and learn all of the
pertinent facts of the investigation. The reviewer may continue on to the DETAILS portion of the report to
learn the particulars of the investigation.

P25
1 OF 2

7. SIGNATURE                    BADGE NO.        8. SUPV. INITIALS        BADGE NO.      9.  ☐ ORIGINAL
                                                                                            ☐ SUPPLEMENTAL

**Personnel Investigation BPR - 0000**
**Page 2**

## LIST OF ATTACHMENTS:

1. SP1-101 for Trooper DOE
2. STD-501 submitted by Trooper DOE
3. Copy of Daily Duty Roster for 00/00/00
4. Audio cassette of interview with Trooper DOE (if applicable)
5. Photographs of Accident Scene (if applicable)

This is simply a list of the Attachments which accompany your investigation. Please remember that your Worksheet, Form SP1-101, will always be Attachment # 1. Your Attachments will also display a label, stamp or notation indicating that the page is ATTACHMENT # _____, PAGE _____ OF _____. It is possible that you could have several pieces of paper listed along with the Worksheet and all of them could be Attachment # 1, but they would be labeled accordingly as to what page they are in reference to Attachment # 1. Remember,
All personnel who are <u>subjects</u> in an investigation **SHALL** submit an STD-501 to the investigator. This correspondence then becomes one of your attachments.

## DETAILS:

The DETAILS portion of the report shall contain the in-depth description of what occurred, as well as a summary of pertinent information gleaned from your interviews. It may <u>not</u> include or reflect your opinion. Interviews shall conform to the requirements of O.M. 7-2 with regard to sex, age, address, employer, telephone number, date/time/place interviewed. <u>Race is only included in personnel investigations when there is an allegation of discrimination, ethnic intimidation, or where it is determined to be germane to the investigation.</u> The complainant shall always be interviewed in the course of your investigation, including those cases when the complaint is instituted by a member of the Department. You may also find it beneficial to interview the subject(s) of the investigation last. Attachments are included for clarification and are not intented to take the place of a synopsized statement from the individual.

### GENERAL COMMENTS ON REPORT SUBMISSION

1. A.R. 4-25 is the governing regulation for personnel investigations.

2. Submit your report in duplicate and ensure that you have labeled or stamped your attachments accordingly.

   a. Sometimes, your investigation will be returned by BPR for clarification of an issue or for additional information. Ensure that you return an original and one copy when returning the corrected report to BPR.

3. <u>Full Investigations</u> are returned directly to BPR. Get into the habit of submitting these reports via CERTIFIED MAIL, return receipt requested. You have put a lot of hard work into this product so take a little bit more time and ensure that your report is received by BPR.

   a. <u>Limited Investigations</u> are completed in an STD-501 format in an original and one copy. <u>These investigations are submitted directly to your Troop Commander/Bureau Director.</u>

4. Generally, when a legal intervention (SILI) occurs, the responding supervisor is responsible for the investigation and submission of the BPR report. Should the circumstances warrant the investigation by someone, other than the responding supervisor, contact should be made to the Director, BPR via your Troop Commander/Bureau Director.

5. Investigations dealing with duty status, AWL, etc., shall include a copy of the roster(s) indicating

**Personnel Investigation BPR - 0000**
**Page 3**

the subject's work shift and a copy of the Time and Attendance Worksheet. These forms should indicate the shift worked and the pay status for the time in question. Include a copy of the Request for Leave form if appropriate.

    a.    Example: A member/employee arrives for work and is two hours late. He/she is docked for the two hours. The roster(s), daily and weekly, will indicate the scheduled shift and assignment. The Time and Attendance Worksheet will indicate the time he/she was paid for working; and the leave slip will show why an by whom the pay was docked.

6.    The investigator should always take steps which will protect the credibility of the investigation. The member, employee, complainant and all involved parties are entitled to impartial and timely inquiries.

7.    The investigator should avoid a predetermined judgement as to who is right or wrong. He/she should concentrate on collecting and recording all related facts. The investigator should be considerate of the concerns of all parties and display an attitude of fairness.

8.    The investigator should be mindful that the content of his/her investigation will be used in adjudicating the related complaint and possibly for determining discipline. Consequently, these investigations impact the viability of the Department's "complaint review" and "disciplinary" systems. All the facts, aggravating and mitigating, must be recorded.

9.    During the course of an investigation, it may become apparent as to where the fault lies. This is a dangerous stage wherein the objectivity of the investigator may become tainted. It is important that the investigator maintains an objective posture at this stage and continues to record the facts from all sides of the issue. <u>Investigator's opinions, whether indirect, inferred or reflected, shall never be included in a BPR report.</u>

10.    Additional reminders:

    a.    Review and understand the elements of the regulation or laws which are alleged to have been violated. A thorough understanding of the regulation or law violated will aid you in formulating your questions and in determining what physical evidence is available to prove or disprove the allegation. Following this practice will help establish direction for the investigation.

    b.    Establish a tentative list of whom will be interviewed. Arm yourself with as many related facts as possible prior to the particular interview. The subject(s) of the investigation are generally interviewed last.

    c.    Include all <u>relevant</u> source documents as attachments to the report, e.g., investigative reports, mobile unit logs, incident memo, supervisory notes, discrepancy notices, performance reports, assignment slips, etc. <u>Do not</u> include items which are not germane to the investigation.

Personnel Investigation BPR - 0000
Page 4

    d.       Involved personnel are required to provide a detailed written account (within 48 hours) of their actions and knowledge relative to a complaint when they are <u>subjects</u> of the investigation as per AR 4-25 25.08 H 3 and 25.10 D 5. You can also require this documentation from <u>members</u> who have knowledge of the incident as per FR 1.28. Involved employees <u>could be required</u> to provide this written account but they must be ordered to do so by their supervisor (Troop Commander/Bureau Director) as per AR 4-6 6.05 K.

    e.       When applicable, obtain related radio transmissions, tapes and interviews from radio operators.

    f.       Prepare a list of possible questions in advance of the interview. Subjects should respond without being evasive. Give consideration to taping the interview in accordance with AR 4-25 25.10 D 5 a. (criminal conduct or gross misconduct). These tapes should not be transcribed under normal circumstances. Your summarization will suffice in most situations. **Ask the hard questions.** Many times investigators are reluctant to ask those questions that beg to be asked. This is a prime reason for having an investigation returned for further investigation.

    g.       Department personnel have the right to a union representative during interviews (Weingarten Rights). Personnel do not have a right to a specific union representative. Reasonable notice of investigatory meetings should be given to the employee; however, the employer is not required to reschedule an interview simply because the union representative of choice is not available. If no representative is available, reasonable accommodation should be made regarding rescheduling when some representatives will be available. The determination as to what is "reasonable" will be determined on a case-by-case basis. 

    h.       Prepare the "Details" portion of the report only after you are satisfied that all of the facts have been obtained. Organize the details in the interest of the reader. Remember, short sentences, common English usage and short paragraphs communicate effectively.

    i.       Mail your completed report and one copy via Certified Mail to:

           Director, Bureau of Professional Responsibility
           Department Headquarters
           1800 Elmerton Avenue
           Harrisburg, Penna. 17110



STD—501, 9—86

SAMPLE

COMMONWEALTH OF PENNSYLVANIA

DATE:          August 27, 1997

SUBJECT:       Personnel Investigation - IAD-12345

TO:            Commander, Area I

FROM:
               Lieutenant Joe B. SAMPLE    JBS
               Acting Commanding Officer
               Troop H, Harrisburg

    1.    The allegation that Trooper John M. DOE failed to submit two (2) reports in a timely fashion is **SUSTAINED**.

    2.    A Pre-Disciplinary Conference was not requested by Trooper DOE. A Disciplinary Action Report was issued on September 6, 1997. NOTE: Trooper DOE refused to sign the Disciplinary Action Report.

*P26*

SAMPLE

SP 7 - 0025 (10 - 83)

| | 1. INCIDENT NO.<br>IAD - 12345 | 2. DATE OF REPORT<br>08/27/97 |
|---|---|---|

PENNSYLVANIA STATE POLICE

**GENERAL INVESTIGATION REPORT**

3. INVESTIGATING OFFICER
Lieutenant Joe B. Sample

4. TROOP - STATION
Troop H, Harrisburg

5. SUBJECT (NATURE OF INVESTIGATION OR NAME AND ADDRESS OF INDIVIDUAL)
Trooper John M. DOE
Troop H, Harrisburg
Date of Enlistment: 02/16/81
Social Security Number: 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

6.

INSTRUCTIONS: REPORT WILL BE PREPARED IN THE FOLLOWING ORDER:   REASON FOR INVESTIGATION, SYNOPSIS OF INVESTIGATION, CONCLUSION, RECOMMENDATIONS AND COMMENT (WHEN APPROPRIATE), LIST OF ATTACHMENTS (IF ANY) AND DETAILS WHICH SUPPORT THE SYNOPSIS.

### LIST OF ATTACHMENTS:

10.   Summary Report, dated August 27, 1997

11.   Correspondence, dated August 27, 1997, from Captain Joe B. SAMPLE to Trooper John M. DOE, relative Personnel Investigation - IAD -12345

### DETAILS:

The allegation that Trooper DOE failed to submit Supplemental Incident Reports in a timely fashion is **SUSTAINED.**

On May 2, 1997, Corporal Ima SAMPLE approached Trooper DOE relative to two (2) Supplemental Reports, H1-123456 and H1-789101. At that time, Corporal SAMPLE informed Trooper DOE that the reports were overdue. Up until the time Corporal SAMPLE submitted the Use of Force or Complaint Reception and Processing Worksheet on May 13, 1997, Trooper DOE had not submitted the required reports.

Trooper DOE did submit a Supplemental Report for incident H1-123456 on June 16, 1997, and he submitted a Supplemental Report for incident H1-789101 on July 15, 1997.

In view of the above, I have determined that disciplinary action is warranted. Trooper DOE did not request a Pre-Disciplinary Conference. A Disciplinary Action Report was issued on September 6, 1997. Trooper DOE refused to sign the Disciplinary Action Report, nonetheless Corporal SAMPLE provided Trooper DOE with a copy of the Disciplinary Action Report.

THE ABOVE IS A SAMPLE OF AN IAD ADJUDICATION, NOTE THE BELOW INFORMATION:

Paragraph #1 - Identify your conclusion/disposition (Ref: AR 4-25, 25.07), for complaint investigations use **SUSTAINED, NOT SUSTAINED** or **UNFOUNDED.**  Non-Complaint investigations are adjudicated as **JUSTIFIED** or **IMPROPER.**

Paragraph #2 - Provide a brief synopsis of the investigation.

*P27*
*1 of 2*

| 7. SIGNATURE<br>LT. JOE B. SAMPLE | BADGE NO.<br>123 | 8. SUPV. INITIALS | BADGE NO. | 9. ☐ ORIGINAL |
|---|---|---|---|---|

SAMPLE

General Investigation Report - IAD-12345
Page 2

Paragraph #3 - Identify the action you have taken, as per the contract with the Pennsylvania State Trooper's Association.

STD-501, 9-86

●                    ● SAMPLE

COMMONWEALTH OF PENNSYLVANIA

DATE:           August 27, 1997

SUBJECT:        Summary Report - IAD-12345

TO:             Trooper John M. DOE
                Patrol Unit
                Troop H, Harrisburg

FROM:           Lieutenant Joe B. SAMPLE
                Acting Commanding Officer
                Troop H, Harrisburg

REFERENCE:      (a)     Collective Bargaining Agreement Between the Commonwealth of
                        Pennsylvania and the PSTA


1.      On June 6, 1997, Corporal Ima SAMPLE was interviewed.  He related that Trooper DOE failed to submit Supplemental Incident Reports for incident H1-123456, which was due on March 9, 1997, and incident H1-789101, which was due on April 22, 1997.  On May 2, 1997, Corporal SAMPLE pointed out to Trooper DOE that he was late with these reports.  As of May 13, 1997, no supplemental reports were submitted by Trooper DOE.

2.      On June 11, 1997, Corporal Late REPORT, Criminal Investigation Unit Supervisor, PSP, Harrisburg was interviewed.  Corporal REPORT stated that Trooper DOE was provided with Assignment Slips for both investigations.

3.      On July 30, 1997, Trooper DOE was interviewed and asked if Corporal REPORT did bring these late reports to his attention.  Trooper DOE responded that Corporal REPORT did indeed bring these reports to his attention on May 2, 1997.  Trooper DOE did state that he had no additional information to include in the supplemental report.  At that point he was asked why didn't he submit a negative supplemental, meaning a supplemental report documenting the fact that no new information has been discovered.  Trooper DOE replied that he probably should have submitted something.


*P28*
*1 OF 2*

SAMPLE

Summary Report - IAD-12345
August 27, 1997
Page 2

    4.    This Summary Report is being provided since I am contemplating the issuance of a Disciplinary Action Report as a result of your actions in this matter.

    5.    If you desire to meet with me to provide any justification or new information prior to my final determination, you may request a meeting by contacting Sergeant Very RESPONSIBLE, Acting Patrol Commander within three (3) days of receipt of this Summary Report.

*TPR. JOHN M. DOE*
**RECEIVED BY**

*09/06/97*
**DATE**

*1430*
**TIME**

*LT. JOE B. SAMPLE*
**WITNESSED BY**

*09/06/97*
**DATE**

*1430*
**TIME**

ATTACHMENT _10_
PAGE _2_ OF _2_



# BUREAU
# OF
# PROFESSIONAL
# RESPONSIBILITY

# 1999
# ANNUAL REPORT

Colonel Paul J. Evanko
Commissioner

P29
1 of 22



# Bureau of Professional Responsibility
# 1999 Annual Report

## TABLE OF CONTENTS

Bureau Director's Message ................................................................................... 2

Mission Statement ............................................................................................. 3

Distribution Table .......................................................................................... 4 - 5

**Internal Affairs Division:**

1999 Overview ............................................................................................. 6 – 8

Department Statistical Summary for 1999 ........................................................ 9 - 10

Comparison of Personnel Investigations from 1998-1999 .................................. 11 - 12

Department Statistical Summary By Area, 1999 .............................................. 13 - 18

Departmental Statistical Summary By Bureau, 1999 ............................................ 19

**Systems and Process Review Division:**

1999 Overview ........................................................................................... 20 - 21



# *A Message from the Director...*

The Bureau of Professional Responsibility 1999 Annual Report, contains a summary of activities involving the Internal Affairs Division, as well as the Systems and Process Review Division, thereby providing an overview of the Bureau's significant functions from the preceding year.

The Systems and Process Review Division conducted 53 reviews of Department entities during 1999, including six specialty reviews. Enhancements were made to the review process, such as making the task list available via the enterprise network. With the ongoing updating of the task list, personnel are provided with current information concerning agency operations, therefore, providing ease in complying with Department rules and regulations.

One of the most controversial topics facing all police departments during recent times has been "racial profiling." As Director of the Bureau of Professional Responsibility, I have recently been directed by the Commissioner to chair our Department's Committee on Racial Profiling. The Committee's objective is to establish indicators of profiling and, once identified, establish a mechanism that it may be promptly investigated. In the past year, there have been ten racial profiling complaints - five were unfounded, three were withdrawn, and two are pending. Although it appears our Department has not experienced a history of these type complaints, we remain cognizant of the need to stay in the forefront of all diversity issues as they relate to law enforcement.

Through our commitment to the Mission of the Pennsylvania State Police, the Bureau of Professional Responsibility has, and will continue to police and maintain the integrity of the force.

*Major Hawthorne N. Conley*
*Director*
*Bureau of Professional Responsibility*

2

## Bureau Mission Statement

**Ensure integrity is maintained within the Agency by:**

**Promoting voluntary compliance to Agency Rules, Regulations, and Policies;**

**Ensuring all complaints are investigated promptly, thoroughly and fairly;**

**Providing inspections and speciality reviews with regularity;**

**Staying abreast of changing industry standards;**

**Ensuring citizens of the Commonwealth are served by a well disciplined and efficient State Police force.**

## 1999 ANNUAL REPORT DISTRIBUTION TABLE

### Executive and Administrative Locations

Commissioner ....................................................................................................1
    Executive Officer to Commissioner .........................................................1
    Office of Chief Counsel ............................................................................1
    Public Information Office ..........................................................................1
    Legislative Affairs Office ..........................................................................1
    M.P.O.E.T.C. ............................................................................................1

Deputy Commissioner of Operations ...............................................................1
    Executive Officer to Deputy Commissioner .............................................1
    Public Information Coordinator ................................................................1

Deputy Commissioner of Staff .........................................................................1

Deputy Commissioner of Administration ...........................................................1
    Executive Officer to Deputy Commissioner .............................................1
    Department Discipline Office ....................................................................1
    Equal Employment Opportunity Office .....................................................1
    Member Assistance Program ...................................................................1

### Bureau Locations

Bureau of Criminal Investigation ......................................................................1
Bureau of Drug Law Enforcement....................................................................1
Bureau of Emergency and Special Operations ..................................................1
Bureau of Forensics and Criminal Identification ...............................................1
Bureau of Liquor Control Enforcement .............................................................1
Bureau of Patrol............................................................................................1
Bureau of Personnel ......................................................................................1
Bureau of Professional Responsibility ..............................................................1
    Internal Affairs Division .........................................................................1
        Central Section ...........................................................................1
        Eastern Section ..........................................................................1
        Western Section .........................................................................1
    Systems and Process Review Division .....................................................1
        Central Section ...........................................................................1
        Eastern Section ..........................................................................1
        Western Section .........................................................................1
Bureau of Records and Identification................................................................1
Bureau of Research and Development ..............................................................1
Bureau of Staff Services .................................................................................1
Bureau of Technology Services .......................................................................1
Bureau of Training and Education ....................................................................1

**Area Locations**

Area Commanders (I, II, III, IV, V, VI) ...................................................................6
Troops (A,B,C,D,E,F,G,H,J,K,L,M,N,P,R,T).........................................................16

## Internal Affairs Division
## 1999 Overview

During calendar year 1999, the Bureau of Professional Responsibility, Internal Affairs Division, conducted a total of **723** personnel investigations which included both full investigations and supervisory inquiries. (Refer to tables on page 9 & 10). These investigations arose from citizen complaints; internally initiated complaints alleging violation of Department rules and regulations; self-initiated physical force, shooting, and legal intervention incidents; and civil litigation involving both enlisted and civilian personnel. This number represents an overall **15.1 percent increase** from the **628** investigations conducted during calendar year 1998.

Of these **723** investigations conducted in 1999, **479** were full investigations and **244** were supervisory inquiries. When comparing the number of full investigations conducted during 1999, there is a **.011 percent increase** from the **474** full investigations conducted during 1998. (Refer to table on pages 11 & 12).

### ANONYMOUS COMPLAINTS

Anonymous complaints have been a controversial issue since the inception of the Bureau of Professional Responsibility. However, anonymous complaints continue to have minimal impact upon the total number of complaint investigations conducted. Of the **13** anonymous complaints received, **only 1** met the criteria as defined by Article 26, Section 9, of the current collective bargaining agreement. The thirteen anonymous complaints accounted for only **.018 percent** of the **723** complaint generated investigations or supervisory inquiries.

### COMPLAINT VERIFICATION

The Complaint Verification Form continues to be a valuable tool in responding to complaints from the public. Upon return of the form, the reviewer has the opportunity to make a determination if the allegation gives rise to a full internal administrative investigation, or involves performance inadequacies and/or procedural discrepancies which can be addressed through first line supervision in the form of a supervisory inquiry. An essential component of this process is the obligation of the Department to respond to the citizen's written complaint.

# Overview

Complainants must feel that their voice was heard and their efforts were not in vain.   NOTE:   In 1999, **309** complainants failed to return the Complaint Verification Form.  Based on the nature of the allegation and the failure to return the form, no investigation was conducted.

During 1999, two (2) members of the Pennsylvania State Police left Department service as a result of internal investigations alleging serious misconduct.  In the one instance an eleven year veteran was involved in stealing confiscated marijuana and later assisted a Columbian cocaine drug trafficker escape by slipping a him a handcuff key This subject received an eight (8) year prison term, as a result of charges filed against, him regarding the aforementioned allegations.  In the second instance the member, under investigation with regard to a domestic violence incident and a DUI was eligible for retirement and exercised this option.

# Major Investigations

Outlined below are other internal investigations in which member misconduct resulted in criminal charges been filed.

1. A charge of Receving Stolen Property was filed against a member after he was found to be in possession of stolen property.  The member received ARD in a plea agreement.
2. Charges of Sexual Assault, Aggravated Indecent Assault, Indecent Assault, and Official Oppression, were brought against a member alleged to have committed a rape on duty.  The charges were subsequently withdrawn by the district attorney citing insufficient evidence.
3. Charges of Official Oppression, Sexual Assault, Indecent Assault, and Indecent Exposure, were filed against a member alleging improper sexual conduct with three (3) teenage girls whom he had come in contact, while on duty.  Additional criminal charges were filed against this member involving three (3) adult females.  The member is presently incarcerated in a county prison in lieu of $1,000,000.00 bail awaiting trial.
4. A member was charged with Simple Assault, Terroristic Threats, and two counts of Recklessly Endangering Another Person, alleging he swerved his vehicle towards two victims, endangering their welfare.  Case pending trial.
5. Charges of Criminal Conspiracy, Criminal Attempt, and Criminal Solicitation to commit Bribery, were filed against a member attempting to help a friend bribe his way into a state police position.  Case pending trial.

7

6. Four members have had criminal charges of Simple Assault and/or Harassment filed against them after they were involved in domestic disputes in which it was alleged they struck another person and caused injury. In two of the cases the charges were withdrawn, when the victim refused to testify or failed to appear at the hearing.

7. A member was charged with Theft By Unlawful Taking and Receiving Stolen Property after he was caught stealing copper from his supplemental place of employment. The subject was employed outside PSP, because he was suspended without pay, as a result of his involvement in a Hit and Run accident while operating a marked police unit while on duty.

# Bureau of Professional Responsibility
## Internal Affairs Division
## Department Statistical Summary for 1999

| Non-Compliant Category (Mandatory) | NUMBER OF INVESTIGATIONS | ADJUDICATIONS | | | | | |
|---|---|---|---|---|---|---|---|
| | | J | I | O | SP | U | |
| Self Initiated Shooting Incident | 16 | 11 | 0 | 0 | 5 | 0 | |
| Shooting Incident - Accidental Discharge | 2 | 1 | 1 | 0 | 0 | 0 | |
| Shooting Incident - Animal | 0 | 0 | 0 | 0 | 0 | 0 | |
| Self Initiated Legal Intervention | 15 | 13 | 2 | 0 | 0 | 0 | |
| Use of Force - O.C. Spray | 1 | 1 | 0 | 0 | 0 | 0 | |
| Use Of Force - Other | 2 | 2 | 0 | 0 | 0 | 0 | |
| Self Initiated Physical Force | 69 | 67 | 0 | 1 | 1 | 0 | |
| Shooting Incident - SERT | 3 | 2 | 0 | 0 | 1 | 0 | |
| Shooting Incident - SERT Tear Gas | 10 | 9 | 0 | 0 | 1 | 0 | |
| Use Of Force- Shots Fired Officers Present | 9 | 8 | 0 | 0 | 1 | 0 | |
| **TOTALS** | 127 | 114 | 3 | 1 | 9 | 0 | |

KEY FOR ADJUDICATION CODES:    J=Justified    I=Improper    O=Other    SP=Still Pending    S=Sustained    U=Unfounded

9

## Department Statistical Summary for 1999 (cont.)

| Complaint Category | NUMBER OF INVESTIGATIONS | INTERNAL COMPLAINTS | CITIZEN COMPLAINTS | ADJUDICATIONS S | N | U | O | W | C | P | SP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Criminal Conduct | 52 | 19 | 33 | 9 | 8 | 10 | 1 | 0 | 0 | 0 | 24 |
| Criminal Conduct – Domestic Violence | 6 | 1 | 5 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 1 |
| Criminal Conduct – PFA | 3 | 1 | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Improper Conduct On Duty | 79 | 45 | 34 | 46 | 13 | 12 | 2 | 1 | 0 | 0 | 5 |
| Improper Conduct Off Duty | 25 | 16 | 9 | 15 | 3 | 5 | 1 | 0 | 0 | 0 | 2 |
| Verbal Abuse | 8 | 2 | 6 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Physical Abuse | 13 | 0 | 13 | 1 | 2 | 10 | 0 | 0 | 0 | 0 | 0 |
| Dissatisfaction With Performance of Duty | 90 | 62 | 28 | 65 | 11 | 7 | 1 | 3 | 1 | 0 | 2 |
| Supervisory Inquiry | 244 | 25 | 219 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Other | 17 | 15 | 2 | 7 | 1 | 3 | 2 | 0 | 0 | 0 | 4 |
| Agency Complaint | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CET Dog Bite | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Escape | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Information Only | 1 | 0 | 1 | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| MV Accident -Dept Vehicle Involved | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M.V. Accident – Pursuit | 5 | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| Profiling | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sexual Harassment | 5 | 5 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 1 |
| Traffic Violation – DUI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Summary | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other - Civil Suit | 45 | 45 | 0 | 3 | 6 | 30 | 2 | 2 | 0 | 0 | 2 |
| **TOTALS** | 596 | 244 | 352 | 157 | 54 | 82 | 9 | 6 | 0 | 1 | 42 |

KEY FOR ADJUDICATION CODES:    O=Other    SP=Still Pending    S=Sustained    N=Not Sustained    U=Unfounded    W=Withdrawn    C=Counseled    P=Policy Void

10

# Bureau of Professional Responsibility

## Internal Affairs Division

## Comparison of Personnel Investigations from 1998-1999

| Non-Compliant Category (Mandatory) | Number of Investigations | | Justified | | Improper | | Other | | Unfounded | | Still Pending | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 |
| Self Initiated Shooting Incident | 20 | 16 | 19 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| Shooting Incident – Accidental Discharge | 6 | 2 | 0 | 1 | 5 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Shooting Incident – Animal | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Legal Intervention | 23 | 15 | 23 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Use Of Force – O.C. Spray | N/A | 1 | N/A | 1 | N/A | 2 | N/A | 0 | N/A | 0 | N/A | 0 |
| Use Of Force – Other | N/A | 2 | N/A | 2 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| Self Initiated Physical Force | 62 | 69 | 57 | 67 | 1 | 0 | 3 | 1 | 0 | 0 | 1 | 1 |
| Shooting Incident – SERT | 2 | 3 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Shooting Incident – SERT Tear Gas | 11 | 10 | 11 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Shooting Incident – Vehicle | 1 | N/A | 1 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A |
| Use Of Force – Shots Fired – Officers Present | N/A | 9 | N/A | 8 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 1 |
| Total Number of Investigations | 126 | 127 | 114 | 114 | 6 | 3 | 5 | 1 | 0 | 0 | 1 | 9 |

## Comparison Of Personnel Investigation from 1998 – 1999 (cont.)

| Complaint Category | Number of Investigations | | Sustained | | Not Sustained | | Other | | Unfounded | | Withdrawn | | Counseled | | Policy Void | | Still Pending | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 | 1998 | 1999 |
| Criminal Conduct | 43 | 52 | 8 | 9 | 5 | 8 | 1 | 1 | 6 | 10 | 1 | 0 | 0 | 0 | 0 | 0 | 22 | 24 |
| Criminal Conduct – Domestic Violence | N/A | 6 | N/A | 3 | N/A | 1 | N/A | 0 | N/A | 1 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 1 |
| Criminal Conduct – PFA | N/A | 3 | N/A | 1 | N/A | 1 | N/A | 0 | N/A | 1 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| Improper Conduct On Duty | 74 | 79 | 38 | 46 | 11 | 13 | 4 | 2 | 12 | 12 | 1 | 1 | 2 | 0 | 0 | 0 | 6 | 5 |
| Improper Conduct Off Duty | 24 | 25 | 10 | 15 | 4 | 3 | 1 | 0 | 4 | 5 | 1 | 1 | 0 | 0 | 0 | 0 | 3 | 2 |
| Verbal Abuse | 3 | 8 | 1 | 1 | 1 | 6 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Physical Abuse | 36 | 13 | 4 | 4 | 5 | 2 | 4 | 0 | 10 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 3 | 2 |
| Dissatisfaction With Performance of Duty | 113 | 90 | 60 | 65 | 4 | 11 | 4 | 1 | 21 | 7 | 0 | 3 | 15 | 0 | 0 | 0 | 7 | 2 |
| Supervisory Inquiry | 154 | 244 | N/A | N/A | N/A | N/A | N/A | N/A | 15 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Other | 21 | 17 | 8 | 7 | 2 | 1 | 2 | 2 | 6 | 3 | 1 | 0 | 1 | 0 | 0 | 0 | 2 | 4 |
| Agency Complaint | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| CET Dog Bite | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| Escape | N/A | 1 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| Information Only | N/A | 1 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| M. V. Accident – Dept. Vehicle Involved | N/A | 1 | N/A | 1 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| M. V. Accident – Pursuit | N/A | 5 | N/A | 0 | N/A | 5 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| Profiling | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| Sexual Harassment | N/A | 5 | N/A | 0 | N/A | 2 | N/A | 1 | N/A | 1 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 1 |
| Traffic Violation – DUI | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| Traffic Violation – Other | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 |
| Traffic Violation – Summary | N/A | 1 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 0 | N/A | 1 |
| Other – Civil Suit | 34 | 45 | 2 | 3 | 4 | 6 | 3 | 2 | 23 | 30 | 0 | 2 | 0 | 0 | N/A | N/A | 0 | 2 |
| Total Number of Investigations | 502 | 596 | 131 | 157 | 44 | 54 | 19 | 9 | 87 | 82 | 5 | 6 | 19 | 0 | 1 | 1 | 42 | 42 |

12

 

## BUREAU OF PROFFESSIONAL RESPONSIBILITY
## INTERNAL AFFAIRS DIVISION
## DEPARTMENT STATISTICAL SUMMARY, AREA I, FOR 1999

| NON-COMPLAINT CATEGORY (Mandatory) | TOTAL NUMBER OF INVESTIGATIONS | TROOPS | | | | | |
|---|---|---|---|---|---|---|---|
| | | H | | L | | N | |
| | | T | I | T | I | T | I |
| Self Initiated Shooting Incident | 6 | 2 | 3 | 0 | 1 | 0 | 0 |
| Shooting Incident – Accidental Discharge | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Shooting Incident – Animal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Legal Intervention | 4 | 2 | 0 | 0 | 0 | 2 | 0 |
| Use Of Force – O.C. Spray | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Use Of Force – Other | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| Self Initiated Physical Force | 15 | 9 | 1 | 3 | 0 | 2 | 0 |
| Shooting Incident – SERT | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| Shooting Incident – SERT Tear Gas | 3 | 0 | 0 | 0 | 2 | 1 | 0 |
| Use Of Force – Shots Fired Officers Present | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| **TOTALS** | 31 | 13 | 5 | 4 | 3 | 6 | 0 |

| COMPLAINT CATEGORY | TOTAL NUMBER OF INVESTIGATIONS | TROOPS | | | | | |
|---|---|---|---|---|---|---|---|
| | | H | | L | | N | |
| | | T | I | T | I | T | I |
| Criminal Conduct | 10 | 1 | 3 | 0 | 2 | 1 | 3 |
| Criminal Conduct – Domestic Violence | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| Criminal Conduct – PFA | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| Improper Conduct Off Duty | 2 | 1 | 1 | 0 | 0 | 0 | 0 |
| Improper Conduct On Duty | 13 | 3 | 1 | 2 | 4 | 3 | 0 |
| Discrimination | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Verbal Abuse | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Physical Abuse | 2 | 0 | 1 | 0 | 0 | 1 | 0 |
| Dissatisfaction With Performance Of Duty | 22 | 14 | 1 | 3 | 1 | 2 | 1 |
| Supervisory Inquiry | 57 | 29 | 0 | 8 | 0 | 20 | 0 |
| Other | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Agency Complaint | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CET Dog Bite | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Escape | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Information Only | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M.V. Accident – Department Vehicle Involved | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M.V. Accident – Pursuit | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Profiling | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sexual Harassment | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – DUI | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Summary | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other – Civil Suit | 13 | 2 | 0 | 1 | 1 | 8 | 1 |
| **TOTALS** | 124 | 51 | 8 | 14 | 8 | 35 | 8 |

T: Troop Investigation          I: IAD Investigation

13



# BUREAU OF PROFFESSIONAL RESPONSIBILITY
## INTERNAL AFFAIRS DIVISION
### DEPARTMENT STATISTICAL SUMMARY, AREA II, FOR 1999

| NON-COMPLAINT CATEGORY (Mandatory) | TOTAL NUMBER OF INVESTIGATIONS | TROOPS | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | F | | P | | R | |
| | | T | I | T | I | T | I |
| Self Initiated Shooting Incident | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Shooting Incident – Accidental Discharge | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Shooting Incident – Animal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Legal Intervention | 2 | 1 | 0 | 0 | 0 | 1 | 0 |
| Use Of Force – O.C. Spray | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Use Of Force – Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Physical Force | 7 | 1 | 0 | 2 | 0 | 4 | 0 |
| Shooting Incident – SERT | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Shooting Incident – SERT Tear Gas | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Use Of Force – Shots Fired Officers Present | 2 | 2 | 0 | 0 | 0 | 0 | 0 |
| **TOTALS** | 11 | 4 | 0 | 2 | 0 | 5 | 0 |

| COMPLAINT CATEGORY | TOTAL NUMBER OF INVESTIGATIONS | TROOPS | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | F | | P | | R | |
| | | T | I | T | I | T | I |
| Criminal Conduct | 6 | 0 | 0 | 2 | 2 | 0 | 2 |
| Criminal Conduct – Domestic Violence | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Criminal Conduct – PFA | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Improper Conduct Off Duty | 4 | 1 | 0 | 2 | 0 | 0 | 1 |
| Improper Conduct On Duty | 15 | 4 | 0 | 3 | 1 | 4 | 3 |
| Discrimination | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Verbal Abuse | 2 | 0 | 0 | 1 | 0 | 0 | 1 |
| Physical Abuse | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| Dissatisfaction With Performance Of Duty | 10 | 1 | 0 | 4 | 0 | 5 | 0 |
| Supervisory Inquiry | 33 | 15 | 0 | 4 | 0 | 14 | 0 |
| Other | 2 | 0 | 0 | 0 | 0 | 2 | 0 |
| Agency Complaint | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CET Dog Bite | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Escape | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Information Only | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M.V. Accident – Department Vehicle Involved | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M.V. Accident – Pursuit | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Profiling | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sexual Harassment | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| Traffic Violation – DUI | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Summary | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other – Civil Suit | 4 | 1 | 0 | 1 | 0 | 2 | 0 |
| **TOTALS** | 79 | 22 | 0 | 18 | 3 | 28 | 8 |

T: Troop Investigation          I: IAD Investigation



# BUREAU OF PROFFESSIONAL RESPONSIBILITY
## INTERNAL AFFAIRS DIVISION
### DEPARTMENT STATISTICAL SUMMARY, AREA III, FOR 1999

| NON-COMPLAINT CATEGORY (Mandatory) | TOTAL NUMBER OF INVESTIGATIONS | TROOPS | | | | | |
| | | A | | B | | G | |
| | | T | I | T | I | T | I |
|---|---|---|---|---|---|---|---|
| Self Initiated Shooting Incident | 3 | 0 | 2 | 0 | 1 | 0 | 0 |
| Shooting Incident – Accidental Discharge | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| Shooting Incident – Animal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Legal Intervention | 2 | 0 | 0 | 2 | 0 | 0 | 0 |
| Use Of Force – O.C. Spray | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| Use Of Force – Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Physical Force | 19 | 9 | 0 | 8 | 0 | 2 | 0 |
| Shooting Incident – SERT | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Shooting Incident – SERT Tear Gas | 3 | 2 | 0 | 1 | 0 | 0 | 0 |
| Use Of Force – Shots Fired Officers Present | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| **TOTALS** | 30 | 12 | 2 | 13 | 1 | 2 | 0 |

| COMPLAINT CATEGORY | TOTAL NUMBER OF INVESTIGATIONS | TROOPS | | | | | |
| | | A | | B | | G | |
| | | T | I | T | I | T | I |
|---|---|---|---|---|---|---|---|
| Criminal Conduct | 15 | 0 | 6 | 2 | 5 | 1 | 1 |
| Criminal Conduct – Domestic Violence | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| Criminal Conduct – PFA | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Improper Conduct Off Duty | 2 | 0 | 0 | 1 | 1 | 0 | 0 |
| Improper Conduct On Duty | 10 | 1 | 0 | 1 | 3 | 5 | 0 |
| Discrimination | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Verbal Abuse | 5 | 2 | 0 | 0 | 0 | 3 | 0 |
| Physical Abuse | 5 | 2 | 0 | 1 | 1 | 1 | 0 |
| Dissatisfaction With Performance Of Duty | 15 | 6 | 1 | 6 | 0 | 2 | 0 |
| Supervisory Inquiry | 52 | 19 | 0 | 16 | 0 | 17 | 0 |
| Other | 3 | 0 | 0 | 1 | 1 | 1 | 0 |
| Agency Complaint | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CET Dog Bite | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Escape | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Information Only | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M.V. Accident – Department Vehicle Involved | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| M.V. Accident – Pursuit | 2 | 1 | 0 | 0 | 0 | 1 | 0 |
| Profiling | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sexual Harassment | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – DUI | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Summary | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| Other – Civil Suit | 10 | 1 | 0 | 7 | 0 | 2 | 0 |
| **TOTALS** | 123 | 33 | 7 | 37 | 11 | 34 | 1 |

T: Troop Investigation          I: IAD Investigation



# BUREAU OF PROFFESSIONAL RESPONSIBILITY
## INTERNAL AFFAIRS DIVISION
### DEPARTMENT STATISTICAL SUMMARY, AREA IV, FOR 1999

| NON-COMPLAINT CATEGORY (Mandatory) | TOTAL NUMBER OF INVESTIGATIONS | TROOPS | | | | | |
|---|---|---|---|---|---|---|---|
| | | C | | D | | E | |
| | | T | I | T | I | T | I |
| Self Initiated Shooting Incident | 4 | 0 | 0 | 1 | 3 | 0 | 0 |
| Shooting Incident – Accidental Discharge | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| Shooting Incident – Animal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Legal Intervention | 2 | 0 | 0 | 1 | 0 | 1 | 0 |
| Use Of Force – O.C. Spray | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Use Of Force – Other | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Physical Force | 15 | 2 | 0 | 11 | 0 | 2 | 0 |
| Shooting Incident – SERT | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Shooting Incident – SERT Tear Gas | 2 | 1 | 0 | 1 | 0 | 0 | 0 |
| Use Of Force – Shots Fired Officers Present | 2 | 1 | 0 | 1 | 0 | 0 | 0 |
| **TOTALS** | 27 | 5 | 0 | 16 | 3 | 3 | 0 |

| COMPLAINT CATEGORY | TOTAL NUMBER OF INVESTIGATIONS | TROOPS | | | | | |
|---|---|---|---|---|---|---|---|
| | | C | | D | | E | |
| | | T | I | T | I | T | I |
| Criminal Conduct | 7 | 0 | 1 | 0 | 4 | 1 | 1 |
| Criminal Conduct – Domestic Violence | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Criminal Conduct – PFA | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Improper Conduct Off Duty | 5 | 1 | 0 | 1 | 1 | 2 | 0 |
| Improper Conduct On Duty | 14 | 5 | 0 | 1 | 2 | 3 | 3 |
| Discrimination | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Verbal Abuse | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Physical Abuse | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| Dissatisfaction With Performance Of Duty | 14 | 3 | 0 | 3 | 0 | 8 | 0 |
| Supervisory Inquiry | 32 | 11 | 1 | 11 | 1 | 8 | 0 |
| Other | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Agency Complaint | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CET Dog Bite | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Escape | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Information Only | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M.V. Accident – Department Vehicle Involved | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M.V. Accident – Pursuit | 3 | 1 | 0 | 2 | 0 | 0 | 0 |
| Profiling | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sexual Harassment | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| Traffic Violation – DUI | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Summary | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other – Civil Suit | 5 | 2 | 0 | 0 | 1 | 2 | 0 |
| **TOTALS** | 83 | 24 | 2 | 18 | 11 | 24 | 4 |

T: Troop Investigation          I: IAD Investigation



# BUREAU OF PROFFESSIONAL RESPONSIBILITY
## INTERNAL AFFAIRS DIVISION
### DEPARTMENT STATISTICAL SUMMARY, AREA V, FOR 1999

| NON-COMPLAINT CATEGORY (MANDATORY) | TOTAL NUMBER OF INVESTIGATIONS | TROOP T | |
| --- | --- | --- | --- |
| | | TROOP INVEST. | IAD INVEST. |
| Self Initiated Shooting Incident | 0 | 0 | 0 |
| Shooting Incident – Accidental Discharge | 0 | 0 | 0 |
| Shooting Incident – Animal | 0 | 0 | 0 |
| Self Initiated Legal Intervention | 0 | 0 | 0 |
| Use Of Force – O.C. Spray | 0 | 0 | 0 |
| Use Of Force – Other | 0 | 0 | 0 |
| Self Initiated Physical Force | 1 | 1 | 0 |
| Shooting Incident – SERT | 0 | 0 | 0 |
| Shooting Incident – SERT Tear Gas | 0 | 0 | 0 |
| Use Of Force – Shots Fired Officers Present | 0 | 0 | 0 |
| **TOTALS** | 1 | 1 | 0 |

| COMPLAINT CATEGORY | TOTAL NUMBER OF INVESTIGATIONS | TROOP T | |
| --- | --- | --- | --- |
| | | TROOP INVEST. | IAD INVEST. |
| Criminal Conduct | 6 | 1 | 5 |
| Criminal Conduct – Domestic Violence | 2 | 0 | 2 |
| Criminal Conduct – PFA | 0 | 0 | 0 |
| Improper Conduct Off Duty | 4 | 3 | 1 |
| Improper Conduct On Duty | 7 | 5 | 2 |
| Discrimination | 0 | 0 | 0 |
| Verbal Abuse | 1 | 1 | 0 |
| Physical Abuse | 1 | 1 | 0 |
| Dissatisfaction With Performance Of Duty | 7 | 5 | 2 |
| Supervisory Inquiry | 17 | 17 | 0 |
| Other | 0 | 0 | 0 |
| Agency Complaint | 0 | 0 | 0 |
| CET Dog Bite | 0 | 0 | 0 |
| Escape | 0 | 0 | 0 |
| Information Only | 0 | 0 | 0 |
| M.V. Accident – Department Vehicle Involved | 0 | 0 | 0 |
| M.V. Accident – Pursuit | 0 | 0 | 0 |
| Profiling | 0 | 0 | 0 |
| Sexual Harassment | 0 | 0 | 0 |
| Traffic Violation – DUI | 0 | 0 | 0 |
| Traffic Violation – Other | 0 | 0 | 0 |
| Traffic Violation – Summary | 0 | 0 | 0 |
| Other – Civil Suit | 0 | 0 | 0 |
| **TOTALS** | 45 | 33 | 12 |




# BUREAU OF PROFFESSIONAL RESPONSIBILITY
## INTERNAL AFFAIRS DIVISION
### DEPARTMENT STATISTICAL SUMMARY, AREA VI, FOR 1999

| NON-COMPLAINT CATEGORY (Mandatory) | TOTAL NUMBER OF INVESTIGATIONS | TROOPS | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | J | | K | | M | |
| | | T | I | T | I | T | I |
| Self Initiated Shooting Incident | 3 | 0 | 2 | 0 | 1 | 0 | 0 |
| Shooting Incident – Accidental Discharge | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Shooting Incident – Animal | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Legal Intervention | 5 | 1 | 0 | 1 | 0 | 3 | 0 |
| Use Of Force – O.C. Spray | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Use Of Force – Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Physical Force | 11 | 5 | 0 | 4 | 0 | 2 | 0 |
| Shooting Incident – SERT | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Shooting Incident – SERT Tear Gas | 2 | 2 | 0 | 0 | 0 | 0 | 0 |
| Use Of Force – Shots Fired Officers Present | 3 | 1 | 0 | 0 | 1 | 1 | 0 |
| **TOTALS** | 25 | 10 | 2 | 5 | 2 | 6 | 0 |

| COMPLAINT CATEGORY | TOTAL NUMBER OF INVESTIGATIONS | TROOPS | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | J | | K | | M | |
| | | T | I | T | I | T | I |
| Criminal Conduct | 7 | 0 | 2 | 0 | 3 | 0 | 2 |
| Criminal Conduct – Domestic Violence | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Criminal Conduct – PFA | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Improper Conduct Off Duty | 6 | 2 | 0 | 2 | 1 | 1 | 0 |
| Improper Conduct On Duty | 16 | 3 | 1 | 4 | 3 | 2 | 3 |
| Discrimination | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Verbal Abuse | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Physical Abuse | 3 | 2 | 0 | 1 | 0 | 0 | 0 |
| Dissatisfaction With Performance Of Duty | 20 | 5 | 0 | 7 | 2 | 4 | 2 |
| Supervisory Inquiry | 43 | 10 | 0 | 21 | 0 | 12 | 0 |
| Other | 4 | 0 | 1 | 1 | 1 | 0 | 1 |
| Agency Complaint | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CET Dog Bite | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Escape | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Information Only | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| M.V. Accident – Department Vehicle Involved | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| M.V. Accident – Pursuit | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Profiling | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sexual Harassment | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – DUI | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Summary | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other – Civil Suit | 9 | 1 | 0 | 6 | 0 | 2 | 0 |
| **TOTALS** | 109 | 23 | 4 | 42 | 10 | 21 | 9 |

T:  Troop Investigation          I:  IAD Investigation

# BUREAU OF PROFESSIONAL RESONSIBILITY
# INTERNAL AFFAIRS DIVISION
# STATISTICAL SUMMARY, DEPT. BUREAUS

| NON-COMPLAINT CATEGORY (MANDATORY) | TOTAL NUMBER OF INVESTIGATIONS | BPR | | | ALL OTHERS |
|---|---|---|---|---|---|
| | | EAST | WEST | CENT | |
| Self Initiated Shooting Incident | 13 | 2 | 5 | 6 | 0 |
| Shooting Incident – Accidental Discharge | 0 | 0 | 0 | 0 | 0 |
| Shooting Incident – Animal | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Legal Intervention | 0 | 0 | 0 | 0 | 0 |
| Use Of Force – O.C. Spray | 0 | 0 | 0 | 0 | 0 |
| Use Of Force – Other | 0 | 0 | 0 | 0 | 0 |
| Self Initiated Physical Force | 2 | 0 | 0 | 1 | 1 |
| Shooting Incident –SERT | 2 | 1 | 0 | 1 | 0 |
| Shooting Incident – SERT Tear Gas | 2 | 1 | 0 | 1 | 0 |
| Use Of Force – Shots Fired Officers Present | 1 | 1 | 0 | 0 | 0 |
| **TOTALS** | 20 | 5 | 5 | 9 | 1 |

| COMPLAINT CATEGORY | TOTAL NUMBER OF INVESTIGATIONS | BPR | | | ALL OTHERS |
|---|---|---|---|---|---|
| | | EAST | WEST | CENT | |
| Criminal Conduct | 43 | 12 | 18 | 13 | 0 |
| Criminal Conduct – Domestic Violence | 5 | 1 | 0 | 4 | 0 |
| Criminal Conduct – PFA | 3 | 0 | 0 | 3 | 0 |
| Improper Conduct Off Duty | 8 | 1 | 2 | 4 | 1 |
| Improper Conduct  On Duty | 30 | 11 | 9 | 5 | 5 |
| Discrimination | 0 | 0 | 0 | 0 | 0 |
| Verbal Abuse | 1 | 1 | 0 | 0 | 0 |
| Physical Abuse | 3 | 0 | 2 | 1 | 0 |
| Dissatisfaction With Performance Of Duty | 12 | 5 | 1 | 3 | 3 |
| Supervisory Inquiry | 11 | 0 | 1 | 1 | 9 |
| Other | 10 | 4 | 2 | 2 | 2 |
| Agency Complaint | 0 | 0 | 0 | 0 | 0 |
| CET Dog Bite | 0 | 0 | 0 | 0 | 0 |
| Escape | 0 | 0 | 0 | 0 | 0 |
| Information Only | 1 | 1 | 0 | 0 | 0 |
| M.V. Accident – Dept. Vehicle Involved | 0 | 0 | 0 | 0 | 0 |
| M.V. Accident – Pursuit | 0 | 0 | 0 | 0 | 0 |
| Profiling | 0 | 0 | 0 | 0 | 0 |
| Sexual Harassment | 4 | 1 | 1 | 2 | 0 |
| Traffic Violation – Other | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – Summary | 0 | 0 | 0 | 0 | 0 |
| Traffic Violation – DUI | 0 | 0 | 0 | 0 | 0 |
| Other – Civil Suit | 7 | 3 | 1 | 2 | 1 |
| **TOTALS** | 138 | 40 | 37 | 40 | 21 |

# Systems and Process Review Division
# 1999 Overview

The Systems and Process Review Division conducted 53 reviews of Department locations during 1999. Of those, 40 were scheduled reviews including three Troop Headquarters, 26 Stations, two Bureau Headquarters and nine detached Bureau locations. Additionally, six specialty reviews were conducted at the request of Department Commanders, and seven follow-up reviews were completed in response to unsatisfactory ratings having been assigned during previous scheduled reviews. Each in-depth examination included analysis of the physical facility, vehicles, equipment, records and reports, personnel, and the administration of police services.

Where appropriate, location operations were divided into four functions: patrol, crime, staff, and property management. Each operation was critically assessed for efficiency, effectiveness, and compliance to existing regulation. Based upon the level of compliance and comparison to other locations within the Department, exceptional, satisfactory, or unsatisfactory ratings were assigned to the overall function.

The vast majority of functions were deemed satisfactory. Furthermore, ten functions earned exceptional ratings as a result of their exemplary administration. A total of nine functions were rated as unsatisfactory, the majority involving the property management system. Any function determined unsatisfactory is subject to a follow-up review at a later date.

The most common deficiencies found during reviews included late reports, improper maintenance of warrants, and improper packaging/labeling of evidence. Discrepancies involving directive files, manuals, and annotations were also significant.

The reviews recognized 32 issues meriting further consideration by the Department. Those issues, presented to the Bureau of Research and Development in the form of action recommendations, emanated from the identification of procedural conflicts, improved operations, or other noteworthy practices observed at locations under review. Each recommendation was evaluated by the Bureau of Research and Development and staffed accordingly.

A 1999 enhancement to the review process included the introduction of the Division Task Lists, and lists of other assorted requirements, onto the Enterprise network. The lists identify those items which are subject to analysis during a review. Periodic updating of the lists by the Division, and the ease of access to the network affords all Department locations up-to-date information necessary to

maintain compliance with Department standards.  Verbal or e-mail requests to any Division member, soliciting those lists applicable to the requestor's location, will result in transmission of a series of Microsoft Word files which can be viewed or printed as needed.

The following is a narration of an interview which occurred on May 25, 1999, at the PSP Findlay Station, between Major Thomas F. WILLIAMS of the Pennsylvania State Police and Agent Ralph KUSH of the Federal Bureau of Investigation.

Agent KUSH stated:

"Before I start, I'd like to give you some background on this case. This case actually began approximately five (5) years ago as a bribery case which occurred in East Liberty. In January 1996, I arrested the subject and he immediately told me he could give us a police officer who was involved in trying to buy a Trooper position for a friend of his. The subject told us that for a certain amount of money, this police officer could get a person into the PSP Academy. The subject told us the police officer was a Trooper named Kipp STANTON. I can't give you the name of the above subject, as he is now a confidential informant for the FBI.

I did some checking and verified that Kipp STANTON was indeed a State Trooper. I became concerned that perhaps STANTON was working undercover, and if that was the case there would be two agencies bumping into each other. I subsequently contacted Klaus BEHRENS, and ran this scenario by him. He checked and verified that the PSP had no undercover case involving our CI, and Trooper STANTON was not working undercover.

The political corruption case involved a guy named Dennis Jay BRIDGE. BRIDGE is a friend of Trooper STANTON, and our CI. BRIDGE took the test to get on PSP, however, he placed in Band "B," which made him ineligible. He was willing to pay a politician $10,000.00 to be moved into Band "A," provided he received appointment to the Academy.

Our CI informed us that Trooper STANTON had approached him or phoned him several times and advised him he had a friend named Jay BRIDGE, who would pay $10,000.00 to get an appointment to the PSP Academy. Trooper STANTON wanted our CI to make arrangements through a State Senator or Representative to get his friend appointed to the Academy. For this service, BRIDGE would pay the politician $10,000.00, and make a political contribution to him of $5,0000.00 each year, as long as he held his office. (Numerous phone calls and personal conversations were recorded and transcriptions are attached.)

At some point in time, I believe BRIDGE had a hard time coming up with the $10,000.00. I allowed the case to become stagnant. Last summer my supervisor reviewed my caseload and looked at this case. He told me to get on the case, so I did.

P30
1 OF 2

Interview/FBI Agent Ralph KUSH, on 05/25/99
Page 2

In October 1999, I contacted Captain OBER, of the
Internal Affairs office. We discussed this case and I
brought him up-to-date on our investigation."

Major WILLIAMS notes:

"At this point in time, I specifically asked Agent KUSH
if he ever asked or stressed the need for discretion on
the part of Captain OBER discussing the case with anyone.
Agent KUSH stated he does not recall asking the Captain
not to discuss the case, but hoped he would not discuss
it. He stated that if Captain OBER did not discuss this
case, he supported his decision not to do so.

Agent KUSH stated he believed he met with Captain OBER on
two occasions. He did not recall specific dates, but the
dates may be in his report. On one occasion, he and OBER
reviewed a tape where BRIDGE mentioned that if a
politician would help him, he (the politician) would
apparently have to talk to some Lieutenant Colonel - no
name was ever mentioned. Trooper STANTON then replied,
'The person who eyeballs. . ., the rest of the comment
was unintelligible. Agent KUSH distinctly remembers that
when the title of Lieutenant Colonel was mentioned his
ears really perked up.

Agent KUSH further stated that at one point during the
investigation, their CI referred BRIDGE to a man named
Doc FEILDER (phonetic spelling). Apparently FEILDER is
an influential male in the Pittsburgh area with political
connections. FEILDER either made direct contact with a
Pennsylvania State Representative or put BRIDGE in
contact with him. The State Representative advised he
could not get BRIDGE an appointment to the PSP Academy,
however, if he was interested in a job as a Liquor
Enforcement Officer or a Police Communications Operator,
perhaps he could help. BRIDGE apparently advised he was
not interested in anything but a Trooper position."



# BUREAU OF PROFESSIONAL RESPONSIBILITY

## INTERNAL AFFAIRS DIVISION

Transcript of Interview
with Major Hawthorne N. CONLEY
June 8, 1999

The date is June 8th, 1999. The time is approximately 1247. We're at the BPR Headquarters in Harrisburg, in the conference room. Present is Major Tom WILLIAMS, Major Robert WERTS, and Major Hoppy (Hawthorne) CONLEY. We're going to be interviewing Major CONLEY in relation to the administrative inquiry concerning Captain Darrell OBER and Lieutenant Colonel HICKES.

WILLIAMS:          Basically, we wanted to start the interview out by asking you, were you ever advised, in any way, shape, or form of this investigation?  The investigation I'm referring to is the investigation that was conducted by the FBI.  Captain OBER was contacted by the FBI in early October, and advised that there was an on-going investigation involving a Trooper STANTON out in the western part of Pennsylvania, and he was involved in possibly trying to buy a State Police position for a civilian member, a friend of his, he was also involved in meeting with an informant, and there was supposed to be a sum of ten thousand dollars passed.  Were you ever advised at any time after Captain OBER was informed of this investigation? Can you tell us, were you advised by Captain OBER; and if not, who were you advised of, and when did that occur?

CONLEY:          I was never advised of this investigation, and I learned of the investigation on the evening of May 12th, 1999, when Lieutenant Colonel COURY asked me of my knowledge of the investigation.  I had none whatsoever.  The following morning, on the 13th of May, I checked my voice mail and Captain OBER left me a message indicating that there was an investigation that I should be aware of involving a Kipp STANTON, and that it was possibly a corruption case.  Until May of 1999, I had no knowledge of this investigation.

                 I'd like to let you know that I have been in charge of the Bureau of Professional Responsibility since October 3rd, 1998, officially reporting here on the 6th, the morning of the 6th.  Actually the 5th was the day I should've been here, but I was off.  I attended a funeral of a family member.  When I

Interview/Major Hawthorne N. CONLEY, on 06/08/99
Page 2

                    arrived on the morning of the 6th, I met with
                    Captain OBER shortly and he gave me no knowledge,
                    no information on this case whatsoever.

WILLIAMS:       When you reported on the 6th, how long was it
                    before you had your first official meeting with
                    Captain OBER?

CONLEY:         I don't have that documented, but I'm sure we had
                    a meeting sometime during that day of the 6th.

WILLIAMS:       Can you tell me, during the course of your
                    conversation with Captain OBER, did you advise him
                    that you wanted to be aware of all serious-type
                    investigations, or words to that effect? Did you
                    impart that to the Captain?

CONLEY:         Oh absolutely.  I told Captain OBER, who's the
                    Director of IA, and Captain SKURKIS, who's the
                    Director of SPR, that as a Bureau Director, I'm
                    held responsible for things that occur within the
                    Bureau.  I did not want to run their Divisions,
                    however, I expect them to keep me informed as to
                    what's going on.

WILLIAMS:       Okay now, on your - you say on your voice mail that
                    Captain OBER had called you.  I believe it was on
                    October (May) 13th?

CONLEY:         That's correct.

WILLIAMS:       Telling me that there was an investigation that
                    you should be aware of.

CONLEY:         Yes.

WILLIAMS:       Did you ever follow-up on that?  Did he ever then
                    advise you of this investigation at that time?

CONLEY:         No.  On the 14th of May, I traveled to New York,
                    Albany, New York, to participate in the New York

Interview/Major Hawthorne N. CONLEY, on 06/08/99
Page 3

State Police promotional examination, and I did not return to the office until June 2nd of 1999. I have not spoken to Captain OBER for several weeks now, nor has he attempted to get a hold of me in that period of time.

WERTS:      Was there any conversation between OBER and you regarding this investigation? I know you said on 5/13 you got a voice mail from him.

CONLEY:     That's correct.

WERTS:      Okay, after that, does he explain to you, at any time, does he explain to you anything about this investigation?

CONLEY:     He has never done that.

WERTS:      So, in other words, the only contact that he made with you was by phone and there was a message left on your voice mail.

CONLEY:     That's correct.

WILLIAMS:   Major, in your conversation with Captain OBER upon your first reporting here and apprising him of your expectations and other Bureau members of your expectations, was the chain of command ever discussed?

CONLEY:     Not specifically. We are a paramilitary organization and my door is always open to - well, let me back that. I discussed it with not only Captain OBER, but the other Bureau members as well. What I've told them is that I will talk to anybody about anything, however, things of an official nature must be through the chain of command. In other words, a Trooper's got to give Corporals an opportunity to fix it, and the Sergeants give the Lieutenants an opportunity to fix it before it gets to me, because when it gets to my desk, it doesn't

go any further - I will fix it, my way.  That's what I explained to Captain OBER, and the other members of this Bureau, repeatedly.

WILLIAMS:    Describe your feelings to me, now that you can reflect back on this, as to how you feel in that Captain OBER never informed you of this investigation and you're the Bureau Director.  Tell me how you feel about that.

CONLEY:    Oh, well I'll tell you, I'm very disappointed, and this has been an ongoing problem since I arrived in the Bureau in October.  I made my boss aware of it and I've attempted to work it out.  Because OBER's a Captain with the Pennsylvania State Police, I try to give him a wide girth and let him do what was necessary to get his job done.  However, we have continuously failed to communicate effectively.

An example of that is in the old office, our offices were side to side, side by side, and he may want to take the afternoon or take a couple hours off in the afternoon, rather than coming and tell me that initially, he would drop a leave slip in my "IN" basket and then leave the office.  I had to call him on that and tell him that it was not a big deal, however, we work in the same office - he can talk to me.  I may or may not look in my "IN" basket for the rest of that day, and unless he tells me he's leaving that building, I assume he's in that day.  This was something that we talked about early on.  I don't have a lot of documentation on that because he is a Captain and I try to avoid that.  This is just indicative of something that's been going on for a long time and its just about hit its peak now.

We had a conversation just before he left.  He was detached to the Bureau of Technology Services, where again, I thought at this point we had reached a level where we could communication, but I've

Interview/Major Hawthorne N. CONLEY, on 06/08/99
Page 5

about had it with him, personally.  I've really had it with him.

WILLIAMS:    Is it the policy of your Bureau to allow a member to rent a hotel room in order to interview somebody concerning  an  investigation?    Is  that  Bureau policy?

CONLEY:      There's no Bureau policy written on that, but I don't know that we've ever done that in the past. I returned to the Bureau in October of 1998, but I've served in the Bureau from 86 until 93, and there were occasions when, as an investigator or as a commander within the Bureau, when there was a need to be uh, conducting investigations separate from    State    installations,    State    Police installations,  and  we've  done  that  by  making arrangements by going to a State office building and taking a free office, or if it was appropriate, we might conduct the interview several Troops away. We have not, to my knowledge, ever rented a hotel room for interview purposes.  I'm not saying that we  would  never  do  that,  but  we  would  have  to discuss it first.

WILLIAMS:    And this was not, the rental of this room, which occurred on whatever date it was. . .

CONLEY:      I think it was March 15th, 1999.

WILLIAMS:    The rental of this room was never discussed with you as the Bureau Director, is that correct?

CONLEY:      That's correct.  I didn't learn, I never learned of the rental of this room until just recently when I returned from New York, when a General Invoice came into us, into the Bureau, wanting to know how to handle it.  That was forwarded to us from the fiscal officer in the Bureau of Staff Services on June 1st.

Interview/Major Hawthorne N. CONLEY, on 06/08/99
Page 6

WILLIAMS:        And the reason it was forwarded to you was why?

CONLEY:          Well, the reason for the expenditure, and it was an
                 unusual expenditure for our Bureau.  The invoice
                 basically lacked justification.  It states the room
                 was used in conjunction for a confidential Bureau
                 of Professional Responsibility investigation and it
                 also indicates that Harrigan's Restaurant supplied
                 beverages for the meeting.  The problem I had with
                 this is that on March 15th, 1999, Captain OBER was
                 on an annual day, a day that I approved off for
                 him.  This invoice lacks identification with an
                 investigation number, and I had no knowledge of
                 this.

WILLIAMS:        Based on your knowledge of this entire
                 investigation involving the FBI, would this have
                 been considered at that time an official BPR
                 investigation?

CONLEY:          No.

WILLIAMS:        What type of investigation would it have been
                 considered?

CONLEY:          Well, it was never made a complaint to us.  We
                 never took a number.  You understand now, when
                 complaints are made to us, we take a number,
                 initially.  And we've never taken a number until
                 uh, I don't have the paperwork in front of me, but
                 Captain OBER provided Lieutenant Rick BROWN with
                 information here a week or two ago, and that's the
                 first time we've taken a number on this
                 investigation.

WILLIAMS:        So, at that point in time, if I understand you
                 correctly, it still would have been an official FBI
                 investigation versus a PSP investigation, or an
                 Internal Affairs investigation?

CONLEY:          That's accurate.

RS

Interview/Major Hawthorne N. CONLEY, on 06/08/99
Page 7


WILLIAMS:     Okay, that's really all the questions we have for
              you, Major. Is there anything that you would care
              to add, that you can think of just off the top of
              your head? If there is, go ahead and make comment
              on that now.

CONLEY:       Well, two things. I hope your investigation, your
              inquiry here will justify this expenditure here,
              because I'm not going to sign off on it and
              authorize payment until I know that this is an
              appropriate expenditure. I guess my primary
              concern is that State Police was not doing an
              investigation, the FBI was. And if we needed a
              private room, the FBI should've paid for this room
              at that time, not the State Police.

              I guess my concern with Captain OBER is his lack of
              trust with me and the organization, and I'm not so
              sure its justified and I haven't, in my thirty
              years with the State Police and in my last six
              months with the Bureau here, I don't know why he
              would distrust individuals. I'm concerned that
              when I came in here in October, he felt it
              necessary to avoid telling me about this
              investigation.

              I have concerns with him jumping the chain of
              command, and changing directions completely. This
              is a uh, really this is the administrative side of
              the house and he's gone - my understanding, he's
              gone to the staff side of the house to make a
              decision.

              If he's looking for people who were pure or
              pristine as far as their knowledge of what's going
              on in Harrisburg, if that wasn't me, I don't know
              who it was. I mean, I haven't been in Harrisburg
              in over three years now. I have nothing to do with
              Personnel or hiring of individuals. I don't know
              why this case could not have been discussed with
              me. And to this day, I don't know that my bosses

Interview/Major Hawthorne N. CONLEY, on 06/08/99
Page 8

had anything to do, or should've been looked at. I don't know why he could not have talked to those folks as well. I didn't get that in the voice mail and I haven't gotten it in any information that I received since I've been back to work.

WERTS:        One more issue I want to go back to. With the exception of the General Invoice, has any reports whatsoever been submitted by Captain OBER, to your knowledge?

CONLEY:       Concerning this investigation?

WERTS:        Concerning this investigation.

CONLEY:       I'm unaware of any at this point.

WILLIAMS:     Do you know, by chance, do you know if any notes were ever taken by Captain OBER concerning this investigation?

CONLEY:       I'm unaware of any.

WILLIAMS:     Personal notes, I'm talking about.

CONLEY:       No.

WILLIAMS:     Would it be commonplace for, in a situation like this, based on your knowledge of the Bureau and your knowledge of the Department, that an individual would take personal notes as to his contact with the FBI, what was discussed, so on and so forth?

CONLEY:       Oh absolutely. I'm sure Captain OBER has notes, things that he can jog his memory on, as to what occurred and when they occurred. I'm sure he has them, but I haven't seen them, nor have they been exposed to me. This is an example, this reimbursement, this invoice, it's typed and dated May 24th, but the actual expenditure was March

Interview/Major Hawthorne N. CONLEY, on 06/08/99
Page 9

                15th.  Now here's a hotel invoice here, but I'm
                sure he has a lot of information as to what
                occurred in that meeting.

WILLIAMS:      Okay, that's basically all we have.  We're still in
                the BPR Headquarters in Harrisburg, June 8th, 1999.
                Go ahead.

CONLEY:        Could I add something else?  I know I said it once
                before, but I want to reiterate this. 4-25 holds me
                responsible for investigations or internal
                investigation within the organization, and OBER has
                responsibility to keep me informed on what's going
                on within the organization.  Now whether the
                investigation began in October, or begins today,
                when it came to OBER's attention, he should've
                brought it to my attention at the earliest
                opportunity.  As far as I'm concerned, he should've
                brought it to me.  I should not have sought - I did
                not need to seek this information out, he should've
                sought me out and apprised me of this on October
                6th, when I arrived here.    And him failing to do
                that lets me down, it really does. It doesn't say
                much for the State Police, or him as an officer in
                the State Police right now.  I don't know what his
                reasoning is, but I'm very, very disappointed in
                him, especially with this being a paramilitary
                organization and we do have a chain of command.

WILLIAMS:      Okay, this will conclude the interview.  Its still
                June 8, 1999.  We're at BPR Headquarters in
                Harrisburg, and we're going to conclude this
                interview at approximately 1305 hours.

EVANKO, PAUL J

**To:**           mcampbell@state.pa.us
**Subject:**      Reorganization

Mark:  FYI

Last night we had another shooting, this time in Emporium.  Again, a domestic abuse complaint, with the subject attacking the responding Trooper with a knife.  The subject is still alive, but prognosis is not good.  The Trooper was not hurt.

One of my personal goals this year is to restructure  Commissioned Officers positions  in Headquarters, as vacancies through attrition occur.   To that end I am issuing a Personnel Order this week downgrading two Captain positions in the Bureau of Research and Development to Lieutenant positions.  I am also downgrading one Lieutenant position in R&D to a Sergeant.

With your concurrence, I am downgrading the Legislative Liaison position from Major to Captain. (I have designated Captain Simmers the Acting Director, effective when Rich retires on the 7th, until we can talk.  Depending on what happens with Simmers,  I intend to downgrade his "existing position" to a Lieutenant or possibly a Sergeant).  Ron Plesco will be a direct report to me as the Director, Policy Office (much the same as Education, Environmental Protection, Transportation, Welfare, and Community and Economic Development Policy offices are part of the Agency's Executive Offices).

I am transferring Captain Darrell Ober effective 28 Jan 00.

Major Virginia Smith-Elliott, my Equal Employment Opportunity Officer, is retiring in April.  I am downgrading that position to a Lieutenant.

The Heritage Affairs Officer is a Captain:  when to retires, time unknown, I am downgrading to a Lieutenant.
The Forensic Services Accreditation Section Commander is a Lieutenant:  when he retires, time unknown, I will either downgrade or possibly civilianize.
The Bureau of Personnel, Director, Personnel Services Division, is a Captain:  when he retires, time unknown, I am downgrading to a Lieutenant.

I am looking at the entire Headquarters organizational structure.

I don't know if I told you, but Tom Hain is retiring in March.

Mark: have you heard anything about my civilianization proposal to OA?

When can I meet with you?



**OBER, DARRELL G**

| | |
|---|---|
| **From:** | BROWN, JOHN R |
| **Sent:** | Wednesday, March 29, 2000 10:56 AM |
| **To:** | OBER, DARRELL G |
| **Subject:** | FW: Supervisory Inquiry |

Darrell,

The answer to your question is "No."

-----Original Message-----
| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Tuesday, March 28, 2000 2:40 PM |
| **To:** | BROWN, JOHN R |
| **Subject:** | Supervisory Inquiry |

Rick,

    Has there been anything put out by IAD with respect to guidelines/procedures for conducting Supervisory Inquiry's?  If so, I need a copy.  Thanks,

DGO

*P33*

1



# Ober, Darrell G



| From: | Dewire, Phillip L |
| Sent: | Wednesday, August 08, 2001 12:35 PM |
| To: | Mcdonald, Leonard H; Ober, Darrell G |
| Subject: | FW: Supervisory Inquiry |

-----Original Message-----
**From:** Brown, John R (PSP)
**Sent:** Wednesday, August 08, 2001 12:00 PM
**To:** Altavilla, Carmen; Conley, Erby; Holmberg, Joseph; Kohuth, Theodore; Koscelnak, Francis; LaCrosse, Thomas; Marcantino, Michael; Marut, Joseph; Mcdonough, Coleman; Monaco, Frank; Oleyniczak, Henry; Pawlowski, Frank; Peacock, Roger; Points, David; Rice, John; Seilhamer, Terry; Simon, Sidney; Szupinka, Lyle; Transue, Cynthia; Tripp, James; Waters, Roger; Werts, Robert
**Cc:** Titler, Robert B (PSP); Harrison, Carl M; Blocker, Tyree; Capriotti, John; Connon, Charles; Conway, William; Dewire, Phillip; Doutt, Kathryn; Duignan, John; Einsel, Robert; Gallaher, John; Garofalo, James; Hackenberg, Ronald; Haught, Robert; Kurtz, Jon; Mcdonald, Leonard; Merryman, R Dane; Nagurny, Michael; Periandi, Ralph; Riley, Larry; Sauers, George; Stein, Richard; Thierwechter, John; Torkar, James; Waugh, Wesley; Young, David; Zenk, Richard
**Subject:** Supervisory Inquiry

Buck Slip Change

Supervisory Inquiry:  The message from BPR has been changed to read;

Forwarded for any action you deem appropriate.  Contact with the complainant **is not** required, unless additional information is necessary for your inquiry.  However, this does not prohibit you from contacting the complainant, if you so desire.  Please forward the results of your inquiry to the Director, Internal Affairs Division within 40 days.  Should your inquiry uncover facts sufficient to warrant an investigation, please notify this officer.

I will be forwarding correspondence to complainants in these supervisory matters indicating their complaint has been received and has been referred to the Troop/ Bureau for appropriate action.  The complainants will also be told not to expect any further communication from the Department on this matter unless the Troop/Bureau requires additional information.  Of course you still have the option to write the complainant, if you feel it is necessary.

Additionally, a number of these issues can be handled more expeditiously through the use of the Review of Performance Complaint, SP1-101A, identified in AR 4-25 as Appendage II.  This form is a check off document and is used to provide Commanders/Directors with a guideline to assist in determining if a member is merely lacking in a performance outside the Department Internal Affairs/Discipline System.  This form documents action taken in cases of performance inadequacies for future reference in the event of repeated behavior; a basis for progressive discipline and maitain consistency throughout the Dept.

The instructions for completion are short, please take a minute to review them.  The most important thing to remember when using the SP1-101A is to contact the **Department Disciplinary Officer, and IAD** prior to using the process to ensure consistent application.

Hopefully, the measures outlined in this message will help streamline the Supervisory Inquiry process and require less paperwork and a committment of your personnel to conduct the inquiry.

I will be looking to further streamline the process and give you wider latitude in handling these issues.  Please forward any suggesstions you may have, I would like to see this process work better and be less of a committment of your resources.

Thanks for your assistance in this matter.

Capt. Rick Brown
Director, Internal Affairs Division

*P34*

Supervisory Inquiry: Includes lessor conduct; infractions; omissions/commissions which violate Department policy or regulation; and performance inadequacies for which, if true, would not give rise to formal discipline.  Other examples include dissatisfaction with performance of duty, rudeness/discourtesy, etc. Complaints processed as Supervisory Inquiries are intended to be those which can be reviewed and resolved by the appropriate command level/supervisory personnel.

SUPERVSIORY INQUIRY PROCESS

    A.    General: The Supervisory Inquires process is intended to afford Commanders and supervisor's a mechanism by which they may resolve complaints which relate to supervisory issues at their level. Addressing and resolving minor complaints or performance inadequacies are a function of supervision and chain of command. Supervisory inquires are intended to be resolved through counseling, training or other remedial action.

    B.    Responsibilities:

        1.    Troop Commanders/Division Directors shall ensure:

            a.    All complaints assigned as Supervisory Inquires are assigned to the appropriate supervisory personnel for resolution.

            b.    The Director, Internal Affairs Division is contacted should any inquiry uncover facts which warrant an internal affairs investigation.

            c.    Complainants are contacted and advised of the results of the inquiry.

            d.    Subjects of Supervisory Inquires are notified of the results.  Notification can be in the form of correspondence, counseling, issuance of a Supervisory Notation, etc.  Other than "unfounded", use of internal affairs investigation adjudication terms is discouraged and should be avoided.

    C.    The Director, Internal Affairs Division shall:

        1.    Ensure the Supervisory Inquiry process is administered in a uniform manner throughout the Department.

        2.    Records of Supervisory Inquires conducted by the Department are maintained.

P35
1 of 4

D.    Reporting:    Reporting results of a Supervisory Inquiry is intended to be a reflection of the gravity of the alleged action.  The results of Supervisory Inquiries shall be reported on correspondence, Form STD-501, and shall conation the following:

1.    A brief synopsis of the allegation.

2.    A brief synopsis of information obtained from an interview of the complainant.

3.    A brief synopsis containing information obtained from involved personnel.

4.    Copies of relevant investigative reports.

5.    Copies of any other documents that are relevant to the inquiry.

6.    Notification of Inquiry issued to involved personnel.

E.    Endorsement: Upon completion of a supervisory investigation, Troop Commanders/Division Directors shall prepare an endorsement citing reasons for their outcome and a notation that the complainant and the involved personnel were notified of the outcome.

F.    Upgrading:    Supervisory inquires must be converted a full investigation if a substantiation of the allegations of misconduct would give rise to formal discipline.

G.    Routing:  Troop Commanders/Division Directors shall forward the endorsed supervisory inquires, through channels, to the Director, Bureau of Professional Responsibility.  If during the review process, a determination is made that the facts contained in the supervisory investigation are insufficient to support the final disposition, the report may be returned to the Troop Commander/Division Director, directing that the investigator conduct a full investigation.  If a supervisory investigation is returned under these circumstances, all prior notifications to the complainant and involved personnel shall be deemed void.

H.    Documentation of Action Taken: Troop Commanders/Division Directors shall ensure upon completion of a supervisory investigation appropriate action (e.g., issuance of a Supervisory Notation, interim Performance Evaluation Report, etc.) is taken.

INTERNAL AFFAIRS INVESTIGATIVE/SUPERVISORY INQUIRY PROCEDURES

A.  Individuals assigned to conduct internal affairs investigations and supervisory inquires shall ensure the procedures outlined in OM 7-19 are followed.

B.  The Complaint Resolution Worksheet shall be prepared in accordance with this regulation.  An IAD Control Number shall be obtained by the Troop Commander/Division Director and entered in Block 1. No incident memo will be prepared, nor will a Troop Incident Number be assigned.

C.  Investigators shall ensure external complainants have completed Complaint Verification, when appropriate.

D.     Reporting:   The Internal Affairs Investigation Report shall be used to report internal affairs investigations.

E.     Personal contact, when practical, shall be made with complainants, witnesses and involved personnel. Anonymous complaints shall not be automatically dismissed. A thorough investigation shall be conducted to independently prove or disprove the allegation.   The investigator should make a reasonable effort to determine the identity of anonymous complainants.

NOTE: Consistent with existing labor agreements, no administrative action shall be taken against personnel solely on the basis of an unsupported anonymous complaint.  In addition, no investigation shall be initiated into anonymous complaints unless a substantiation of the allegation could give rise to criminal charges as determined by the Director, Bureau of Professional Responsibility.

F.     The subjects of investigations/inquires shall be personally interviewed.

G.     All documents and/or reports, or copies thereof, if originals are not available, which have been generated by the investigation shall be collected.

H.     All available investigative tools shall be employed to secure evidence to assist in determining the facts of an investigation.  All evidence collected shall be processed in accordance with the procedures outlined in OM 7-7.

PLAINTIFF 36

INVESTIGATIVE REPORT

DIRECTED BY COVRY

CONDUCTED BY CORPORAL

MRGICH. (IAD # 1999-409)

COMMONWEALTH OF PENNSYLVANIA
STD-502X          REV (11/95)

## DESK MEMORANDUM

**SUBJECT :**

Supervisory Inquiry #1999-409

**TO (NAME & ADDRESS) :**

Deputy Commissioner of Administration

**FROM (NAME & ADDRESS) :**

Acting Director, Internal Affairs Division *JRB*
Bureau of Professional Responsibility

**DATE SENT:**     12/03/99

**DATE NEEDED :**

| | | | |
|---|---|---|---|
| PLEASE CALL: | APPROVAL | SEE ME | |
| RETURNED YOUR CALL | AS REQUESTED | COMMENT | |
| INFORMATION & FILE | PREPARE REPLY/REPORT | NOTE AND RETURN | |
| ✓ NECESSARY ACTION | SIGNATURE | | |

**RECEIVED BY :**          **DATE :**          **TIME :**

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| EO Dep. Admin. | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**MESSAGE:**

Subject inquiry is forwarded for whatever action you deem appropriate.  Attached please find copies of adjudication responses to complainants/members from several Troop Commanders with their endorsements.  Remember your are not restricted to a conclusion of Sustained, Not Sustained or Unfounded.  You can word as you feel necessary.  Verbiage as "appropriate supervisory action taken", "appropriate administrative action was taken", "no further administrative action necessary," etc, will office.  Also attached find a copy of the Endorsement and Documentation of Action Taken section of the proposed Supervisory Special Order for your information.  If you need anything else let me know.

*Pls Do An Admin Findings*

*P37*

COMMONWEALTH OF PENNSYLVANIA
STD-502          REV. 5-97

# DESK MEMORANDUM

SUBJECT

Supervisory Inquiry #1999-409

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Director, Bureau of Professional Responsibility | Acting Director, Internal Affairs Division *JRB* Bureau of Professional Responsibility |

| DATE SENT | DATE DUE |
|---|---|
| October 5, 1999 | |

|   |   |   |   |   |   |
|---|---|---|---|---|---|
|   | PLEASE CALL |   | APPROVAL |   | SEE ME |
|   | RETURNED YOUR CALL |   | AS REQUESTED |   | COMMENT |
| X | INFORMATION & FILE |   | PREPARE REPLY/REPORT |   | NOTE AND RETURN |
| X | NECESSARY ACTION |   | SIGNATURE | X *Review* |   |

| RECEIVED BY | DATE | TIME |
|---|---|---|
|   |   |   |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| DEP. COM. ADMIN. |   |   |   |   |   |
| Capt *points* | OP |   |   |   |   |
| Dep Admin | TC | 11/27 |   |   |   |
| Dir BRR | DWC | 12/01/99 |   |   |   |

MESSAGE:

The subject inquiry is being forwarded for your review and any action you deem appropriate.

FORWARDED FOR YOUR REVIEW, AS PER MAJOR CONLEY, 11/12/99. THIS IS THE ORIGINAL REPORT.

Lt. Brown

c:   IAD FILE

For possible violations

Frk

CALL me

P38

COMMONWEALTH OF PENNSYLVANIA
STD-502          REV. 5-97

BPR    Old Copy

## DESK MEMORANDUM

**SUBJECT**

Correspondence from Philip Conti

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Deputy Commissioner of Administration | Director, Bureau of Professional Responsibility |

| DATE SENT | 11/19/99 | DATE DUE | |

| | PLEASE CALL | | APPROVAL | | SEE ME |
|---|---|---|---|---|---|
| | RETURNED YOUR CALL | | AS REQUESTED | | COMMENT |
| X | INFORMATION & FILE | | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| | NECESSARY ACTION | | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

**MESSAGE:**

s discussed, we need a Special Order from the Commissioner prohibiting the reference of, "as a ennsylvania State Police member," when members solicit retirees for artifacts, etc.

*P39*

COMMONWEALTH OF PENNSYLVANIA
STD-502          REV. 5-97

# DESK MEMORANDUM

**SUBJECT**

Supervisory Inquiry #1999-409

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Director, Bureau of Professional Responsibility | Acting Director, Internal Affairs Division   *JRB* Bureau of Professional Responsibility |

| DATE SENT | DATE DUE |
|---|---|
| October 5, 1999 | |

|   | | | | |
|---|---|---|---|---|
| | PLEASE CALL | APPROVAL | | SEE ME |
| | RETURNED YOUR CALL | AS REQUESTED | | COMMENT |
| X | INFORMATION & FILE | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| X | NECESSARY ACTION | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| *DEP. COM. ADMIN.* | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**MESSAGE:**

The subject inquiry is being forwarded for your review and any action you deem appropriate.

*FORWARDED FOR YOUR REVIEW, AS PER MAJOR CONLEY, 11/12/99. THIS IS THE ORGINAL REPORT.*

*Lt. Brown*

:    IAD FILE

*P40*

BUREAU OF PROFESSIONAL RESPONSIBILITY

Date _____ 08/01/99

IAD # _____ 1999-409

DB # _____

1. Major Hawthorne N. Conley (✗) _____

2. Lieutenant John R. Brown (✗) JRB

        1. DETERMINE IF OBER GAVE ANYTHING TO THE MUSEUM

3. Sgt. Lisa S. Christie ( ) _____

        2. HAVE OBER INTERVIEWED

4. Cpl. Noel Ruiz ( ) 3. LOOKS LIKE MRS. POSO WANTED HER GIFTS TO GO TO MUSEUM

→ 4. Check w/ Controller's, C/O REGAN
5. A.A. Donna J. Blouch ( ) 100 ✗ Capt Ober

6. CPL. MRGICH? turned anything over to Museum Committee
Capt Ober #657-4231, Poso - 4yrs. ago.

· LETTER TO BE SENT _____

Message: Original report submitted. There is additional info. Refer to Attachments #'s 17 & 18.

The next question is where do we go from here. Capt. Ober told me on 8/31/99. He received a letter from Col. Evanko removing him from the Museum Committee. Ok, is me about this.

P41

Date ___11/12/99___

IAD # ___1999- 409___

DB # _____

1.  Major Hawthorne N. Conley  ( ✔   *HNC*

2.  Lieutenant John R. Brown  ( ✔   *JRB*

3.  Sgt. Lisa S. Christie  ( ✔         IAD FILE

4.  Cpl. Noel Ruiz  ( )

5.  A.A. Donna J. Blouch  ( )

6.  C.T. Brenda Stutzman  ( )

- LETTER TO BE SENT - _____

Message: *Cpl. Rain delivered to Lt. Col. Coury 11/12/99, original copy, file folder still on your desk.*

P42

COMMONWEALTH OF PENNSYLVANIA
STD-502                    REV. 2/93

## DESK MEMORANDUM

SUBJECT

*SUPERVISORY INQUIRY, IAD# 1999-409*

TO (NAME & ADDRESS)

*DIR,*

*BPR*

FROM (NAME & ADDRESS)

*ACTING DIR,*

*IAD*

DATE SENT

DATE NEEDED

| | | | |
|---|---|---|---|
| PLEASE CALL: | APPROVAL | | SEE ME |
| RETURNED YOUR CALL | AS REQUESTED | | COMMENT |
| X INFORMATION & FILE | PREPARE REPLY / REPORT | | NOTE AND RETURN |
| X NECESSARY ACTION | SIGNATURE | | |

RECEIVED BY             DATE             TIME

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

*The subject inquiry is being forwarded for your review and any action you deem appropriate.*

P43

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:              February 12, 2001

SUBJECT:           Supervisory Inquiry IAD #1999-409

TO:                Lieutenant Colonel Hawthorne N. Conley
                   Deputy Commissioner of Administration

FROM:              Major W. John Pudliner  WJP
                   Director, Bureau of Professional Responsibility

REFERENCES:    (a)    Supervisory Inquiry IAD #1999-409, dated August 23, 1999
                      Submitted by Corporal Robert D. Mrgich, Bureau of Professional
                      Responsibility

1.    On February 12, 2001, I contacted retired Major Matthew Hunt via telephone at
(17) 545-4565.  Mr. Hunt related that he had spoken to one Lee J. Poso from Rome, New York approximately
e week ago.  He stated that Captain Darrell Ober had contacted Ms. Poso's friend, retired Corporal James B.
ooks, regarding Pennsylvania State Police memorabilia.  Mr. Brooks, who is now deceased, sent three boxes
memorabilia to Captain Ober.  Retired Major Hunt indicated that Ms. Poso told him that Captain Ober had
icated to Mr. Brooks that he represented himself as a member of the Pennsylvania State Police Museum
mmittee.

2     Ms. Poso had been previously interviewed by Corporal Robert D. Mrgich during
supervisory Inquiry listed in Reference (a).  On august 4, 1999, Ms. Poso submitted a handwritten letter
closure 6 of Reference a) to Corporal Mrgich.  In the letter, she indicates that Mr. Brooks was aware that
tain Ober did not represent the Museum Committee.

3.    Ms. Poso further indicated to retired Major Hunt that Captain Ober had contacted
via telephone, approximately one month ago and made inquiry as to whether she had been contacted by any
bers of the Pennsylvania State Police regarding his activities.

*p44*

1-101 (1-93)

PENNSYLVANIA STATE POLICE
## USE OF FORCE OR COMPLAINT
## RECEPTION AND PROCESSING WORKSHEET

BPR CONTROL NUMBER

IAD 1999-409

### COMPLAINT INFORMATION

| NAME | FIRST LT. COL. THOMAS | M.I. K. | LAST COURY |
|---|---|---|---|

HOME ADDRESS
STREET/P.O. BOX DEPUTY Comm. ADMINISTRATION
CITY | STATE | ZIP CODE | HOME PHONE # ( )

EMPLOYER
NAME & ADDRESS | WORK PHONE # ( )

### NON-COMPLAINT USE OF FORCE REPORT

☐ SHOOTING INCIDENT   ☐ PHYSICAL FORCE   LEGAL INTERVENTION

### SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)

| NAME | FIRST DARRELL | M.I. G. | LAST OBER |
|---|---|---|---|

LOCATION
TROOP/BUREAU DHQ   STATION/DIVISION BUR. TECH. SERVICES   JOB ASSIGNMENT CAPTAIN

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   DOE 7/20/81   ← TO BE COMPLETED IF KNOWN OR AVAILABLE

### DETAILS OF ALLEGATION

RTE/STREET

TWP/BORO | COUNTY | DATE | TIME | DAY

TYPE OF ALLEGATION (CHECK ONE)
☐ PHYSICAL ABUSE      ☐ IMPROPER CONDUCT ON DUTY
☐ VERBAL ABUSE        ☒ IMPROPER CONDUCT OFF DUTY
☐ CRIMINAL CONDUCT    ☐ DISSATISFACTION WITH PERFORMANCE ON DUTY
☐ OTHER (Please explain)

SYNOPSIS   COMP. RECEIVED CORRESPONDENCE
FROM PHILIP M. CENTI AND A LETTER FROM
MRS. WILLIS J. HAYMAN THE WIDOWER OF
WILLIAM HAYMAN, A DECEASED RETIRED
TROOPER FROM THE RODEO DETAIL. INFORMATION
CONTAINED THEREIN IS THAT CAPTAIN
OBER CONTACTED AND MET WITH HER
AFTER HER HUSBAND'S DEATH AND OBTAINED
RODEO BOOKS AND PICTURES. THERE IS
ALSO MENTION THAT CAPTAIN OBER IS NOT

### RECEPTION DATA

RECEIVED 5/27/99   TIME RECEIVED 1235   LOCATION RECEIVED   TROOP/BUREAU Q-BPR   STATION/DIVISION P45

RECEIVED BY   NAME LT. JOHN R. BROWN   SSN 1 OF 2

### FOR BUREAU USE

INVESTIGATOR ☒ NAME CPL. MRGICH, IAD CENTRAL

ENCLOSURE
PAGE ___ OF ___

CTRL NO. ISSUED BY LT. L.S. CHRISTIE   DATE ASSIGNED 5/27/99   DATE DUE 7/6/99   SP 1-101A   ☐ LIMITED INVESTIGATION

ADDITIONAL SUBJECTS OF ALLEGATION/REPORT

| NAME | FIRST | | M.I. | LAST | |
|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT | |

| – | – | DOE | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
|---|---|---|---|

| NAME | FIRST | | M.I. | LAST | |
|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT | |

| – | – | DOE | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
|---|---|---|---|

| NAME | FIRST | | M.I. | LAST | |
|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT | |

| – | – | DOE | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
|---|---|---|---|

**SYNOPSIS (CONT.)**

A REPRESENTATIVE OF THE RP MUSEUM PROJECT.

SEE ATTACHED CORRESPONDENCE.

M-63.

Dear Phil Conti -

I'll have to explain for I forgot about in 1995, after Bill died I received a letter + a visit from Darrell Ober + I gave him some things of rodeo books + a picture. You can check with him for I am sorry to have forgot all about it. I had a stroke in 91 + my right side of my head was not too smart at that time -

I think that the pictures in the envelope will help.

I hope you can stop some time + we can meet - Remember In 89

Probably maybe we met in the several time we can to Retiree meetings.

It has been very nice talking with you. I have enjoyed reading the Retiree Steps you sent.

P46

ENCLOSURE    2

PAGE    1    OF    1

Philip M. Conti
1081 Acri Drive
Harrisburg, Pennsylvania 17111
717-564-8088

May 22, 1999

Dear Tom:

Your attention is invited to the attached exchange of correspondence with Marian Hayman, the widow of Willis J. Hayman, who was one of the most colorful entertainers in our rodeo history.   He was an outstanding horseman, and was featured playing his violin while standing on his motorcycle and circling the field.

The other incident was one involving a Stitt, who was and may still be working with Marc Infantino on the pictorial history book.  He approached a coal region family, and was given artifacts which we will never see.   Unfortunately, I cannot come across my notes.   My contacts with the family were by phone, not written.

In my last two columns, I have devoted space to this problem of dealing with private collectors.   Since I have taken time to do that, I'm sure the message will get across.   So, perhaps it might be best to set this matter aside and see what happens.   Should there be a repeat of this nature, I will contact you immediately.   Let's hope that does not happen.

It is indeed my pleasure to be working with you on this PSP-HEMC project.   Let's hope that we will by the year 2005 have something we can truly be proud of.

Warmest regards,

*Phil*

*P 47*

ENCLOSURE ___3___

PAGE___ *1* ___OF___ *1*___

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:          September 10, 1999

SUBJECT:       Supervisory Inquiry 1999-409

TO:            Director, Bureau of Professional Responsibility

FROM:          Captain Darrell G. Ober
               Systems Integrator Procurement Team Leader
               Bureau of Technology Services

REFERENCE:     (a)    AR 4-25.

1.    In accordance with Reference (a), I am requesting a copy of
my taped interview regarding the subject investigation.

2.    Thank you for your assistance.

*P48*

PSP-HEMC                                                                    Page 1 of 2

## Pennsylvania State Police
## Historical, Educational and Memorial Center

[Home][Goals][Support][Mission][Merchandise][e-mail us]

# Pennsylvania State Police
# Historical, Educational and Memorial Center

# Board of Directors

### July 2000

*President*
Major William J. Regan
Pa State Police, retired
417 Trail Road
Hummelstown, PA 17036

*First V.P.*
Anne Coury
1689 Nottingham Way
Hummelstown, PA 17036

*Second V.P.*
Maj.Matthew Hunt
Pa State Police, retired
2281 Forest Hills Drive  Harrisburg, PA
17112

*Treasurer*
Mr. Earl B. Hoffman, Jr.
1746 East Chocolate Avenue
Hershey, Pa 17033-1181

*Secretary*
Captain Kirk R. Trate
Pa State Police, retired
23 Larchwood Drive
Wyoniissing, PA 19610

Hon.Frank Tulli, Jr.
Pa House of Representatives
Box 202020
Harrisburg, PA 17110

Amy Corl
Pa Chiefs
3905 North Front Street

James Manganell
1516 Greenview Ave
Reading, PA 19601

*P49*
*1 OF 3*

2/7/01

⬤                                    ⬤

## Pennsylvania State Police
## Historical, Educational and Memorial Center

[Home][Goals][Support][Mission][Merchandise][e-mail us]

## *Pennsylvania State Police*
## *Historical, Educational and Memorial Center*

## *Committee Members*

### *September 2000*

## Budget and Finance Committee

Earl Hoffman, *Chairman*                           Frank Tulli, Jr.

Edward Catalone                          James Manganell

Robert Zinsky                             John Vartan

Lou Lazzaro                               Dean Hooper

Curt Zimmerman

## Sales Committee *(Finance Sub-Committee)*

Frank O'Rourke, *Chairman*                      Joe Stabler

Min Martin                                Joe Kelly

Dale Zartman                              Gary Mysel

Don Rossi

## Building Committee

Anne Coury, *Chairman*

Pennsylvania State Police                                                                    Page 2 of 2

Dave Davis                                          Tom Coury

Ed Catalone                                        Dave Bowser

Mike Selgrath                                      Larry Riley

---

## *Artifacts Committee*

Matt Hunt, *Chairman*                              Kirk Trate

Harold Trout                                        Bill Grooms

Rick Radcliffe                                      Art Cronin

Dave Points                                         Jim Hazen

Tom Golden
Kaminsky                                            George

Amy Corl                                            Sid Deyo

Paul France

Robert Einsel - no current committee assignation

Cpt. Michael Simmers - PSP Liaison

© 2000 PSP-HEMC

---

[top]

STD—501. 9—86

COMMONWEALTH OF PENNSYLVANIA

**DATE:** October 21, 1999

**SUBJECT:** Time and Attendance – Captain Darrell G. Ober
General Invoice – Captain Darrell G. Ober

**TO:** Director, Bureau of Technology Services
**Attn: Captain Darrell G. Ober**

**FROM:** Major Hawthorne N. Conley
Director, Bureau of Professional Responsibility

**ENCLOSURE:** (1)    Correspondence relative the Subject from Colonel Paul J. Evanko, Commissioner, to Deputy Commissioner of Administration, Attn: Director, Bureau of Professional Responsibility, dated October 4, 1999.

    1.    Per orders of the Commissioner, you are hereby notified that your reimbursement request for the amount of $83.74, dated May 24, 1999, is **denied.**

    2.    Per orders of the Commissioner, you are hereby notified that your request to restore 8.00 hours of annual leave taken on March 15, 1999, is **denied.**

    3.    Should you have any questions concerning this matter, telephone me at 657-4224.

*P50*

PSP-501X                          ●        COMMONWEALTH OF PENNSYLVANIA

**DATE:**          October 4, 1999

**SUBJECT:**       Time and Attendance – Captain Darrell Ober
                   General Invoice – Captain Darrell Ober

**TO:**            Deputy Commissioner of Administration
                   Attn:  Director, Bureau of Professional Responsibility

**FROM:**          Colonel Paul J. Evanko
                   Commissioner

**ENCLOSURES:**    (1)    Correspondence from Captain Darrell G. Ober, Systems
                          Integrator Procurement Team Leader, Bureau of Technology
                          Services, to Director, Bureau of Professional Responsibility,
                          dated July 16, 1999, regarding Time and Attendance.

                   (2)    Correspondence from Major Hawthorne N. Conley, Director,
                          Bureau of Professional Responsibility, to Captain Darrell G.
                          Ober, dated July 1, 1999, regarding Time and Attendance, with
                          Enclosures.

                   (3)    General Invoice – Reimbursement for Captain Darrell Ober.


                   1.     I have conducted a full and complete review of the
                          circumstances surrounding Captain Ober's requests.  Based
                          on my review Captain Ober's requests are denied.  Therefore,
                          the amount of $83.74 shall not be provided to Captain Ober.
                          Additionally, the date of March 15, 1999, shall remain charged
                          to annual leave.

                   2.     Please notify Captain Ober and provide him with a copy of this
                          correspondence.

*P51*

STD–501, 9–86

COMMONWEALTH OF PENNSYLVANIA

DATE:     July 1, 1999

SUBJECT:   Time & Attendance

TO:    Captain Darrell G. Ober

FROM:    Major Hawthorne N. Conley
         Director, Bureau of Professional Responsibility

ENCLOSURES:   (1)   Time and Attendance Record for pay period ending
                    June 25, 1999.

              (2)   Time and Attendance Record for pay period ending
                    March 19, 1999.

    1.    Upon your temporary detached duty status to the Bureau of
Technology Services, Strategic Development Division on April 26,
1999, your 1999 Record of Absence Form as well as your STD-330,
Request for Leave slips, were forwarded for retention by the
timekeeper for that Division.  Therefore, Enclosure (1) is being
returned for processing through the appropriate timekeeper.

    2.    Enclosure (2), requesting a leave adjustment for March
15, 1999, **shall not** be processed pending resolution of ongoing
administrative inquiry.  Retention of Enclosure (2) will be
maintained by the Bureau of Professional Responsibility.

    3.    If you have questions concerning this correspondence, you
may contact the Director, Bureau of Professional Responsibility.

cc:  Director, Bureau of Technology Services
     BPR FILE

P52

COMMONWEALTH OF PENNSYLVANIA
STD-929
REV. 4/97

# TIME AND ATTENDANCE RECORD

☐ ADJUSTMENT

☐ ALTERNATE WORK SCHEDULE (AWS)
AWS AGREEMENT NO.

**EMPLOYEE NAME**
LAST: OBER    FIRST: DARRELL    MI: G.

EMPLOYEE NO.: 099820 | 045606    POSITION NO.: 61/25/99    PAY PERIOD ENDING: PA. STATE P...    PAY PROCESSING DATE: 1/29/99

| DATE | HOURS WORKED (AM-PM) REGULAR | | PREMIUM | | REGULAR HOURS PAID SALARY/WAGE | AWS ADD'NL HOURS | CODE RT | STRAIGHT TIME CODE T1 | TIME & ONE HALF CODE T2 | DOUBLE TIME CODE T3 | QUARTER TIME CODE T5 | HALF TIME CODE T6 | TIME & ONE HALF CODE T4 | DOUBLE TIME CODE T9 | SHIFT DIFF |
|------|-------|-----|-------|-----|------|------|------|------|------|------|------|------|------|------|------|
| | START | END | START | END | | | | | | | | | | | |
| 13 | 8ºº Nºº | | | | D | | | | | | | | | | |
| 14 | 8ºº Nºº | | | | ✓ | | | | | | | | | | |
| 15 | 8ºº Nºº | | | | ✓ | | | | | | | | | | |
| 16 | 8ºº Nºº | | | | 8ºº | | | | | | | | | | |
| 17 | 8ºº Nºº | | | | 8ºº | | | | | | | | | | |
| 18 | | | | | 8ºº | | | | | | | | | | |
| 19 | | | | | D | | | | | | | | | | |
| 20 | | | | | ✓ | | | | | | | | | | |
| 21 | | | | | ✓ | | | | | | | | | | |
| ●● | | | | | ✓ | | | | | | | | | | |
| 23 | | | | | ✓ | | | | | | | | | | |
| 24 | | | | | ✓ | | | | | | | | | | |
| 25 | | | | | ✓ | | | | | | | | | | |

MEAL PERIOD:
FROM: _____ TO: _____
DOUBLE TIME ELIGIBILITY BEGIN DATE: _____

REMARKS:

| | RT | T1 | T2 | T3 | T5 | T6 | T4 | T9 | S1 |
|--|----|----|----|----|----|----|----|----|----|

* Indicate a full work day by placing a checkmark in this column.

** Information only - Regular hours are derived from the scheduled work week and are unaffected by Alternate Work Schedules.

2062157-01 6/98

4168-0621-8208 ©1998, Moore Document Solutions, All rights reserved. - 0305
Complete by typing or printing. Forward all
copies to person responsible for approving leave.
★ SEE REVERSE SIDE FOR LEAVE CODES.

# REQUEST FOR LEAVE

COMMONWEALTH OF PENNSYLVANIA
STD-335
REV. 7/96

NAME (LAST, FIRST, MIDDLE INITIAL)
Bier, Darrell G

EMPLOYE NO.
1998200

EMPLOYE SIGNATURE
Darrell G. Bier

DATE
5/25/99

| LEAVE CODE* | HOURS | LEAVE BEGIN DATE | TIME | LEAVE END DATE | TIME | LEAVE BALANCE (LAST STATEMENT) |
|---|---|---|---|---|---|---|
| A | 16.00 | 6/28/99 | 0800 | 6/30/99 | 1600 | |
| H | 24.00 | 6/28/99 | 0800 | 6/25/99 | 1600 | |

REMARKS:

- [ ] Medical Appointment Time ____
- [ ] Family Relationship ____
- [ ] Meal Period ____ to ____
- [ ] Alternate Work Schedule ____
- [ ] Medical Certificate Attached
- [ ] Change
- [ ] Other ____

APPROVING AUTHORITY SIGNATURE
Major Winn C

DATE
05/28/99

[ ] APPROVED   [ ] DISAPPROVED

TIMEKEEPER INITIALS

[ ] C336L POSTED

RECORD FILE-TIMEKEEPER

P54

REQUEST FOR LEAVE

COMMONWEALTH OF PENNSYLVANIA
STD.530
REV. 7/96

2062157-01 6/98

4168-0621-8208 ©1998, Moore Document Solutions, All rights reserved. -03%
Complete by typing or printing. Forward all
copies to person responsible for approving leave.
★ SEE REVERSE SIDE FOR LEAVE CODES.

NAME (LAST, FIRST, MIDDLE INITIAL)
OBER DARRELL

EMPLOYE NO.
099820

EMPLOYE SIGNATURE
Darrell B-Ob

DATE
5/20/99

* LEAVE CODE *
A

HOURS
8.00

LEAVE BEGIN DATE

TIME

LEAVE END DATE

TIME

LEAVE BALANCE (LAST STATEMENT)

REMARKS:

☐ Medical Appointment Time
☐ Family Relationship
☐ Meal Period
☐ Alternate Work Schedule _____ to _____
☐ Medical Certificate Attached
☒ Charge
☐ Other

RESTORE LEAVE TAKEN ON 3/15/99
REL: IAD #1998-391 As PER
LTC HICKES.

APPROVING AUTHORITY SIGNATURE

DATE
05/28/99

☐ APPROVED
☐ DISAPPROVED

TIMEKEEPER INITIALS

1. RECORD FILE-TIMEKEEPER

C338L POSTED ☐

ENCLOSURE (2)

P55



REQUEST FOR LEAVE

COMMONWEALTH OF PENNSYLVANIA
STD-330
REV. 8-85

NAME (LAST, FIRST, MIDDLE INITIAL)
OBER, DARRELL G.

EMPLOYE NO.
099820

EMPLOYE SIGNATURE
Darrell G. Ober

DATE
3/5/99

| LEAVE CODE* | HOURS | LEAVE BEGIN DATE | TIME | LEAVE END DATE | TIME | LEAVE BALANCE (LAST STATEMENT) |
|---|---|---|---|---|---|---|
| A | 8.00 | 3/5/99 | 1882 | 3/5/99 | 1601 | |

LEAVE CODE:
HOURS    LEAVE BEGIN DATE    TIME    LEAVE END DATE    TIME    LEAVE BALANCE (LAST STATEMENT)

REMARKS

☐ Medical Appointment Time
☐ Family Relationship
☐ Meal Period
☐ Alternate Work Schedule _____ to _____
☐ Medical Certificate Attached
☐ Change
☐ Other _____

APPROVING AUTHORITY SIGNATURE

| APPROVING AUTHORITY SIGNATURE | DATE | | TIMEKEEPER INITIALS | C336L POSTED |
|---|---|---|---|---|
| | 03/08/99 | ☑ APPROVED  ☐ DISAPPROVED | | ☐ |

3. EMPLOYE

P56

# TIME AND ATTENDANCE RECORD

STD-929
REV. 4/97

☒ ADJUSTMENT

☐ ALTERNATE WORK SCHEDULE (AWS)
   AWS AGREEMENT NO. _____

**LAST:** Ober
**FIRST:** Darrell
**MI:** G

EMPLOYEE NAME

EMPLOYEE NO. 098820

POSITION NO.

PAY PERIOD ENDING 3/9/99

PAY PROCESSING DATE

AGENCY: PSP- BPR

| | HOURS WORKED (AM-PM) | | | | | | | REGULAR HOURS PAID SALARY/WAGE CODE RT | AWS ADD'TNL HOURS | STRAIGHT TIME CODE T1 | TIME & ONE HALF TIME CODE T2 | DOUBLE TIME CODE T3 | QUARTER TIME CODE T5 | HALF TIME CODE T6 | TIME & ONE HALF TIME CODE T4 | DOUBLE TIME CODE T9 | SHIFT/WKND/TRAINING DIFFERENTIALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | REGULAR | | PREMIUM | | | | | REGULAR OVERTIME | | | | | OVERTIME APPLICABLE TO SHIFT DIFFERENTIAL | | | |
| | START | END | START | END | START | END | | | | | | | | | | | |

REMARKS:

HOLIDAY TIME ELIGIBILITY BEGIN DATE: _____

FISCAL PERIOD: _____

FROM: _____ TO: _____

* Indicate a full work day by placing a checkmark in this column.

** Information only - Regular hours paid are derived from the scheduled work week and are unaffected by Alternate Work Schedules.

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF: __INDIANA__

**POLICE CRIMINAL COMPLAINT**

**COMMONWEALTH OF PENNSYLVANIA**

**VS.**

Magisterial District Number: 40-2-01

District Justice Name: Hon. Richard Orendorff

Address: 801 Water St.
Indiana PA. 15701

Telephone: (724) 463-8781

Docket No.: CR-742-99

Date Filed: 09-30-99

OTN: H 105905-2

**DEFENDANT:**     NAME and ADDRESS

Dennis Jay Bridge
431 Maple St.
Indiana PA 15701
ph (724) 463-8410

| Defendant's Race/Ethnicity | Defendant's Sex | Defendant's D.O.B. | Defendant's Social Security Number | Defendant's SID |
|---|---|---|---|---|
| [X] White  [ ] Asian  [ ] Black  [ ] Hispanic  [ ] Native American  [ ] Unknown | [ ] Female  [X] Male | 02/11/1964 | 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 | |

Defendant's A.K.A.

Defendant's Vehicle Information:
Plate Number    State    Registration Sticker (MM/YY)

Defendant's Driver's License Number    State

| Complaint/Incident Number | Complaint/Incident Numbers if other Participants | UCR/NIBRS Code |
|---|---|---|
| X76-0020562 | | 260 |

District Attorney's Office  [ ] Approved  [ ] Disapproved because: _____
(The district attorney may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing Pa.R.Cr.P. 107.)

(Name of Attorney for Commonwealth - Please Print or Type)    (Signature of Attorney for Commonwealth)    (Date)

I, __Cpl. Jeffrey A. SHAW__    5054
(Name of Affiant-Please Print or Type)    (Officer Badge Number/I.D.)

of __Pennsylvania State Police__    PAPSP1101
(Identify Department or Agency Represented and Political Subdivision)    (Police Agency ORI Number)    (Originating Agency Case Number (OCA))

do hereby state:(check the appropriate box)

1. [X] I accuse the above named defendant, who lives at the address set forth above
   [ ] I accuse an defendant whose name is unknown to me but who is described as _____

   [ ] I accuse the defendant whose name and popular designation or nickname is unknown to me and whom I have therefore designated as John Doe
   with violating the penal laws of the Commonwealth of Pennsylvania at __431 Maple St__
   (Place-Political Subdivision)

   in __Indiana__ _____ County on or about __03/01/97 0800 hrs.__

   Participants were: (if there were participants, place their names here, repeating the name of the above defendant)
   __Dennis Jay Bridge__

   __Kipp Arlen Essex Stanton__

2. The acts committed by the accused were:
   (Set forth a summary of the facts sufficient to advise the defendant of the nature of the offense charged. A citation to the statue allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section and subsection of the statute or ordinance allegedly violated.)

   PACC 903(a)1 Criminal Conspiracy    THIRD DEGREE FELONY

   The actor, with the intent of promoting or facilitating the crimes Obstruction of the administration of Law, 18 Pa.C.S 5101, Bribery 18 PA.C.S. 4701 and Ethics Act Violations, 65 Pa.C.S. 1103 (b) with the objective of purchasing employment with the Pennsylvania State Police for himself through the payment of money to a public servant who was expected to arrange for and/or recommend the actor for state police employment, conspired and agreed with Trooper Kipp Arlen Essex Stanton that they or one or more of them would engage in conduct constituting an attempt to commit the aforesaid crime in furtherance thereof, did commit the overt acts of discussing and agreeing with Trooper Stanton to provide a pecuniary benefit to an unnamed public servant for the purpose of securing employment with the Pennsylvania State Police, accompanying Trooper Stanton to meetings with Michael Fiore, who agreed to channel the actor's money to said public servant, paying cash to Mr. Fiore for the express purpose of having Mr. Fiore funnel it to a public servant who was to exert his

P58

**POLICE CRIMINAL COMPLAINT**

(Continuation of 2.)

Defendant Name: Dennis Jay Bridge

Docket Number:    CR-742-99

influence with the Pennsylvania State Police on behalf of the actor, all for the purpose of unlawfully securing Pennsylvania State Police employment for Mr Bridge by means other than official Pennsylvania State Police hiring procedures in violation of section 903(a)(1).

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly, or in violation of

| | (Section) | (Sub-Section) | of the | (PA Statute) | (counts) |
|---|---|---|---|---|---|
| 1. | 903 | (a)(1) | of the | PA Crimes Code | 1 |
| 2. | | | of the | | |
| 3. | | | of the | | |
| 4. | | | of the | | |

3. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made. (In order for a warrant of arrest to issue, the attached affidavit of probable cause must be completed and sworn to before the issuing authority.

4. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 PA. C.S. § 4904) relating to unsworn falsification to authorities.

SEPTEMBER 30 , 19 99            _____ (Signature of Affiant)

AND NOW, on this date    SEPTEMBER 30    , 19  99 , I certify the complaint has been properly completed and verified. An affidavit of probable cause must be completed in order for a warrant to issue.

40-2-01
(Magisterial District)

_____ (Issuing Authority)                SEAL

2-3

/04/00   12:47  FAX 4124653988                  IND CO PRO & COC

**POLICE**

**CRIMINAL COMPLAINT**

Defendant Name: Dennis Jay Bridge

Docket Number: CR-742-99

## AFFIDAVIT of PROBABLE CAUSE

### AFFIDAVIT OF PROBABLE CAUSE

Jeffrey A. SHAW, being duly sworn, states that:

I am a Pennsylvania State Police Trooper employed by the Commonwealth of Pennsylvania, as such I am an investigative or law enforcement officer within the meaning of 18 Pa. C.S. 5702.

In September 1996 Dennis Jay BRIDGE received the results of the Pennsylvania State Police cadet examination. BRIDGE was placed in the "B" band as a result of his test score. (Individuals must place in "A" band to be eligible for further processing)

In February/March 1997 BRIDGE was in the process of moving and STANTON was assisting BRIDGE with the move. STANTON mentioned the Pennsylvania State Police examination to BRIDGE and advised BRIDGE that he could contact the individual that offered to get him (STANTON) on the job to assist BRIDGE in being accepted to the Pennsylvania State Police Academy. BRIDGE and STANTON agreed that STANTON should make the contact. In a telephone conversation in this same general time frame STANTON makes telephonic contact with BRIDGE and informs him that his contact can help him get the position but, that BRIDGE must be willing to make a contribution to the one that assists BRIDGE in obtaining the position.

On 02/11/1997 STANTON contacts Michael FIORE and advises FIORE that BRIDGE was willing to pay $10,000.00 to receive an appointment to the Pennsylvania State Police Academy. On 05/02/97 STANTON in a conversation with FIORE informs FIORE that BRIDGE in addition to the $10,000.00 initially agreed upon, would make yearly contributions to the politician who assisted him in the amount of $2,500.00 a year until the politician retired from public office.

During the time frame between February 1997 and February 1999 there are numerous conversations between STANTON, FIORE and BRIDGE discussing the arrangement. On February 27, 1999, STANTON, BRIDGE and FIORE are conducting a meeting at FIORE's place of business. During this conversation the details of the arrangement are agreed upon and BRIDGE gives FIORE $1,000.00 to secure FIORE's assistance in procuring the State Police position.

The above information was obtained from statements made by BRIDGE and from consentual audio and video tape conversations and meetings between FIORE, STANTON and BRIDGE.

I, _Cpl. Jeffrey A. SHAW_____, **BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.**

                                                    _____
                                                    (Signature of Affiant)

Sworn to me and subscribed before me this ___30TH___ day of ___SEPTEMBER___, 19_99_

___09/30/99___Date   _____, District Justice

                                                    SEAL   P59

My commission expires first Monday of January, _2000_.

                                    3-3

12/05/00  05.50  FAX 4124000000          IND CO PRO & COC          ☐ 01

COMMONWEALTH OF PENNSYL    NIA
COUNTY OF:          INDIANA

**POLICE**
**CRIMINAL COMPLAINT**

Magisterial District Number: 40-2-01

District Justice Name: Hon. Richard Orendorff

Address:      801 Water St.
              Indiana PA. 15701

Telephone:    (724) 463-8781

**COMMONWEALTH OF PENNSYLVANIA**
**VS.**

DEFENDANT:
              NAME and ADDRESS

Kipp Arlen Essex STANION
477 Sixth St
Donora PA. 15033
ph#(724) 379-7596

| | |
|---|---|
| Docket No.: | CR-743-99 |
| Date Filed: | 09-30-99 |
| OTN: | H 105906-3 |

| Defendant's Race/Ethnicity | Defendant's Sex | Defendant's D.O.B. | Defendant's Social Security Number | Defendant's SID |
|---|---|---|---|---|
| ☐ White  ☐ Asian ☐ Hispanic ☐ Native American ☒ Black ☐ Unknown | ☐ Female ☒ Male | 10/19/1969 | 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 | |
| Defendant's A.K.A. | Defendant's Vehicle Information: Plate Number    State   Registration Sticker(MM/YY) | | Defendant's Driver's License Number State PA  22334996 | |
| Complaint/Incident Number X76-0020562 | Complaint/Incident Numbers if other Participants | | | UCR/NIBRS Code 260 |

District Attorney's Office   ☐ Approved   ☐ Disapproved because: _____
(The district attorney may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing Pa.R.Cr.P. 107.)

_____    _____    _____
(Name of Attorney for Commonwealth - Please Print or Type)    (Signature of Attorney for Commonwealth)    (Date)

I, Cpl Jeffrey A SHAW                                          5054
   (Name of Affiant-Please Print or Type)                    (Officer Badge Number/I.D.)
of Pennsylvania State Police          PAPSP1101          _____
   (Identify Department or Agency Represented and Political Subdivision)   (Police Agency CRI Number)   (Originating Agency Case Number(OCA))

do hereby state:(check the appropriate box)

1. ☒ I accuse the above named defendant, who lives at the address set forth above
   ☐ I accuse an defendant whose name is unknown to me but who is described as _____

   ☐ I accuse the defendant whose name and popular designation or nickname is unknown to me and whom I have
      therefore designated as John Doe
   with violating the penal laws of the Commonwealth of Pennsylvania at  431 Maple Street Indiana Boro
                                                                      (Place-Political Subdivision)

in  Indiana _____ County on or about  03/01/1997 through 02/27/1999
Participants were: (if there were participants, place their names here, repeating the name of the above defendant)
   Kipp Arlen Essex STANION
   Dennis Jay BRIDGE

2. The acts committed by the accused were:
(Set forth a summary of the facts sufficient to advise the defendant of the nature of the offense charged.  A citation to the statue allegedly violated without more, is not sufficient.  In a summary case, you must cite the specific section and subsection of the statute or ordinance allegedly violated.)
      COUNT 1 CRIMINAL CONSPIRACY 18 Pa.C.S. 903 (a)(1)  THIRD DEGREE FELONY
      The actor, with the intent of promoting or facilitating the crimes of Obstruction of
      the Administration of Law, 18 Pa.C.S. 5101, Bribery 18 Pa.C.S. 4701 and Ethics Act
      violations, 65 Pa.C.S. 1103 (b) with the objective of purchasing employment with the
      Pennsylvania State Police for his co-conspirator, Dennis Jay Bridge, through the
      payment of money to a public servant who was expected to arrange for and/or
      recommend Mr. Bridge for State Police employment, conspired and agreed with Dennis
      Jay Bridge that they or one or more of them would engage in conduct constituting an
      attempt to commit the aforesaid crimes and in furtherance thereof, did commit the
      overt acts of contacting Michael Fiore, requesting Mr. Fiore to make contact with a
      public servant, arranging for the payment of cash to the public servant through Mr.
      Fiore. The actor escorted Mr. Bridge to a face to face meeting with Mr. Fiore
      including a meeting wherein Mr. Bridge paid cash to Mr. Fiore with the express
      purpose that Mr. Fiore would forward the money to a public servant who would exert
      his influence to insure employment for Mr. Bridge with the Pennsylvania State Police

412-(4/96)(Internet Version)                    1-3

P60
1 OF 3

12/05/00  08:56  FAX 4124653968    IND CO PRO & SUG




**POLICE
CRIMINAL COMPLAINT**

(Continuation of 2.)

Defendant Name: Kipp Arlen Essex STANTON

Docket Number:    CR-743-99

and acting as a conduit for messages between Mr. Fiore and Mr. Bridge, all for the
purpose of unlawfully securing Pennsylvania State Police employment for Mr. Bridge
by means other than official Pennsylvania State Police hiring procedures in
violation of Section 903 (a)(1).

COUNT 2 CRIMINAL ATTEMPT 18 Pa.C.S. 901(a)  THIRD DEGREE FELONY

The actor committed an attempt when, with intent to commit the crime of Bribery in
Official and Political matters 18 Pa.C.S. 4701(a)(1)(3), agreed to offer a pecuniary
benefit to a public servant as consideration for the opinion, recommendation or
other exercise of discretion for the public servant and/or as consideration for a
violation of a known legal duty as a public servant; the said actor did the acts of
contacting Michael Fiore, requesting Mr. Fiore to make contact with a public
servant, arranging for the payment of cash to the public servant through Mr. Fiore,
escorting Mr. Bridge to face to face meetings with Mr. Fiore including a meeting
wherein Mr. Bridge paid cash to Mr. Fiore with the express purpose that Mr. Fiore
would forward the money to a public servant who would exert his influence to insure
employment for Mr. Bridge with the Pennsylvania State Police and acting as conduit
for messages between Mr. Fiore and Mr. Bridge, all for the purpose of unlawfully
securing Pennsylvania State Police employment for Mr. Bridge by means other than the
official Pennsylvania State Police hiring procedures which constituted a substantial
step toward the commission of the aforesaid crimes in violation of section 901 (a)

COUNT 3 CRIMINAL ATTEMPT 18 Pa.C.S. 901(a)  STATUTORY FELONY

The actor committed an attempt when, with intent to commit the crime of Ethics Act
violation, 65 Pa.C.S. 1103(b), agreed to offer or give to a public official or
public employee anything of monetary value based upon the actor's and co-defendant's
understanding that the official action or judgement or the public official or public
employee would be influenced thereby, the actor did the acts of contacting Michael

all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act
of Assembly, or in violation of

| | Section | | Sub-Section | | | PA Statute | | counts |
|---|---|---|---|---|---|---|---|---|
| 1. | 903 | | (a)(1) | of the | Title 18 | | | 1 |
| 2. | 901 | | (a) | of the | Title 18 | | | 2 |
| 3. | 901 | | (a) | of the | Title 18 | | | 3 |
| 4. | 902 | | (a) | of the | Title 65 | | | 4 |

3. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges
I have made. (In order for a warrant of arrest to issue, the attached affidavit of probable cause must be completed
and sworn to before the issuing authority.

4. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information
and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 PA. C.S.
§ 4904) relating to unsworn falsification to authorities.

_____SEPTEMBER 30_____ , 19 99                    _____
                                                  (Signature of Affiant)

AND NOW, on this date ____SEPTEMBER 30____ , 19 99 , I certify the complaint has been properly
completed and verified. An affidavit of probable cause must be completed in order for a warrant to issue.

_____40-2-01_____                    _____        SEAL
(Magisterial District)                (Issuing Authority)

AOPC 412-(4/96)(Internet Version)            2-3                      #0921-003

06/2000  09:53  RECEIVED FROM:            4124653968

12/05/00  09:56  FAX 4124653988         IND CO PRO & COC                                      Ø04

(Continuation of 2.)

| Defendant Name: | Kipp Arlen Essex STANTON |
| Docket Number: | CR-743-99 |

**POLICE**
**CRIMINAL COMPLAINT**

Fiore, requesting Mr. Fiore to make contact with a public servant, arranging for the payment of cash to the public servant through Mr. Fiore, escorting Mr. Bridge to face to face meetings with Mr. Fiore including a meeting wherein Mr. Bridge paid cash to Mr. Fiore with the express purpose that Mr. Fiore would forward the money to a public servant who would exert his influence to ensure employment for Mr. Bridge with the Pennsylvania State Police and acting as a conduit for messages between Mr. Fiore and Mr. Bridge, all for the purpose of unlawfully securing Pennsylvania State Police employment for Mr. Bridge by means other than the official Pennsylvania State Police hiring procedures which constituted a substantial step toward the commission of the aforesaid crime in violation of section 901(a).

COUNT 4 CRIMINAL SOLICITATION  18 Pa.C.S. 902(a) THIRD DEGREE FELONY

The actor with the intent of promoting or facilitating the crimes of Obstruction of the administration of Law 18 Pa.C.S. 5101, Bribery and Ethics Act violations, commanded, encouraged or requested Dennis Jay Bridge and/or Michael Fiore to engage in specific conduct which would constitute the aforesaid crimes or an attempt to commit the aforesaid crimes, or which would establish that person's complicity in their commissions or attempted commission, namely, the actor requested and encouraged Dennis Jay Bridge to pay money to Michael Fiore to deliver to a public servant and requested and encouraged Mr. Fiore to contact said public servant and arrange for the public servant to accept said money for the purpose of securing Mr. Bridge's employment with the Pennsylvania State Police in violation of section 902(a).

12/05/...



Defendant Name: Kipp Arlen Essex STANTON

Docket Number:    CR-743-99



**POLICE**
**CRIMINAL COMPLAINT**

## AFFIDAVIT of PROBABLE CAUSE

AFFIDAVIT OF PROBABLE CAUSE

Jeffrey A. SHAW, being duly sworn, states that:

I am a Pennsylvania State Police Trooper employed by the Commonwealth of Pennsylvania, as such I am an investigative or law enforcement officer within the meaning of 18 Pa. C.S. 5702.

In September 1996 Dennis Jay BRIDGE received the results of the Pennsylvania State Police cadet examination. BRIDGE was placed in the "B" band as a result of his test score. (Individuals must place in "A" band to be eligible for further processing)

In February/March 1997 BRIDGE was in the process of moving and STANTON was assisting BRIDGE with the move. STANTON mentioned the Pennsylvania State Police examination to BRIDGE and advised BRIDGE that he could contact the individual that offered to get him (STANTON) on the job to assist BRIDGE in being accepted to the Pennsylvania State Police Academy. BRIDGE and STANTON agreed that STANTON should make the contact. In a telephone conversation in this same general time frame STANTON makes telephonic contact with BRIDGE and informs him that his contact can help him get the position but, that BRIDGE must be willing to make a contribution to the one that assists BRIDGE in obtaining the position.

On 02/11/1997 STANTON contacts Michael FIORE and advises FIORE that BRIDGE was willing to pay $10,000.00 to receive an appointment to the Pennsylvania State Police Academy. On 05/02/97 STANTON in a conversation with FIORE informs FIORE that BRIDGE in addition to the $10,000.00 initially agreed upon, would make yearly contributions to the politician who assisted him in the amount of $2,500.00 a year until the politician retired from public office.

During the time frame between February 1997 and February 1999 there are numerous conversations between STANTON, FIORE and BRIDGE discussing the arrangement. On February 27, 1999, STANTON, BRIDGE and FIORE are conducting a meeting at FIORE's place of business. During this conversation the details of the arrangement are agreed upon and BRIDGE gives FIORE $1,000.00 to secure FIORE's assistance in procuring the State Police position.

The above information was obtained from statements made by BRIDGE and from consensual audio and video tape conversations and meetings between FIORE, STANTON and BRIDGE.

I, __Cpl Jeffrey A SHAW_____, BEING DULY SWORN ACCORDING TO LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this ____30TH____ day of ____SEPTEMBER____, 19__99__.

__09/30 /99____
Date

_____, District Justice

My commission expires first Monday of January, __2000__    SEAL    P61

717  540 7452    DEC.05'2000 09:54 RECEIVED FROM:    4124653968    #0921-005

SP 3-200 (10-99)






AR Manual

# PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

February 23, 2001

Change No. 866

SUBJECT:    AR 1-1, ORGANIZATION

1.    Special Order 99-76, Department Reorganization, is cancelled; it shall be removed from files and destroyed.

2.    AR 1-1 has been revised.

<u>INSTRUCTIONS</u>

Remove these pages:          Insert these pages:

1 through 70                 1 through 66
A.1 through IV               A.1 through D

3.    Commanders and Directors shall ensure all members of their command review this regulation in its entirety.

4.    The revised Pennsylvania State Police Location Map, Appendage C, will be distributed under separate cover as soon as it is available.

5.    This Change Sheet shall be inserted into the back of Volume II of the AR Manual immediately behind Change Sheet No. 865.

Paul J. Evanko
Colonel   PSP

<u>Distribution "AR"</u>

P62

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:          June 16, 1999

SUBJECT:       Meeting Between the Commissioner and
               Lt. Colonel Robert Hickes

TO:            Commissioner

FROM:          Lt. Colonel Thomas K. Coury
               Deputy Commissioner of Administration

REFERENCE:     (a)   Per orders from the Commissioner to Lt. Colonel Thomas K. Coury to
                     submit correspondence.

1.    On Wednesday afternoon, May 12, 1999, shortly after the Corporal
promotions ceremony I had just left the Academy and received a page.
I responded to the page and was directed to report back to the Academy
and meet with the Commissioner. I proceeded back to the Academy and
located the Commissioner and Lt. Colonel Robert Hickes in the office of
the Director, Bureau of Training and Education. Only the Commissioner
and Lt. Colonel Hickes were present in the office. The Commissioner
asked me to come in and told me that he and Lt. Colonel Hickes had just
had a discussion, which to some degree involved me and he thought I
should be aware of what took place in that meeting. He asked me to sit
down and told Lt. Colonel Hickes to tell me what he had just shared with
him, meaning what information Lt. Colonel Hickes had just given the
Commissioner. Lt. Colonel Hickes recited that in October 1998, shortly
after he had taken office, he was approached by Captain Darryl Ober.
Captain Ober, the Director of the Internal Affairs Division of the Bureau
of Professional Responsibility was the Acting Bureau Director at that
time, according to Lt. Colonel Hickes. According to Lt. Colonel Hickes,
Captain Ober in his capacity as Acting Director of the Bureau of
Professional Responsibility had been contacted by the FBI Pittsburgh
Office. The FBI allegedly told Captain Ober that they were working with
an informant in southwestern Pennsylvania. The informant had told the
FBI that he, the informant, knew a Trooper in southwestern Pennsylvania
by the name of Trooper Kip Stanton. The informant further advised the
FBI that Trooper Kip Stanton had told him that he, Trooper Stanton, could
get people into the State Police Academy. That Stanton could have them
moved between Band "B" to Band "A", that he could get them through the
polygraph, the background investigation and into the Academy. The
informant asked Trooper Stanton how he proposed to do this. Trooper

P63
1 OF 3

Meeting Between the Commissioner...Hickes
June 16, 1999
Page Two

Stanton allegedly told the informant that he had friends in the administration of the State Police, the higher ranks of the State Police and connections in the Governor's Office. Based on the informant's information, the FBI then contacted Captain Ober with this information. Captain Ober, again according to Lt. Colonel Hickes, not knowing what to do since I am Captain Ober's commander and because this allegation could possibly involve me, the Commissioner, and the Deputy Commissioner of Operations and the Governor's Office, thought that he should go to Lt. Colonel Hickes. He thought this because Lt. Colonel Hickes was the least likely person to possibly be involved in this allegation. According to Lt. Colonel Hickes, Captain Ober met with him and discussed the FBI's contact with him. Lt. Colonel Hickes then directed Captain Ober to share the information with no one. In other words, not to tell the Commissioner, not to tell me, not to tell Lt. Colonel Westcott, or anyone else, and that Captain Ober was to cooperate with the FBI's investigation. From October until approximately March Lt. Colonel Hickes said that Captain Ober did provide information to the FBI. Information that he would gather from the Bureau of Personnel. It would be information such as class size, the number of people going into the class, band information and other information relating to Academy classes. Sometime in May, approximately two weeks earlier, the FBI had contacted Captain Ober and told him that the information was unfounded and that the most that they could uncover was that we possibly had a bad Trooper. That is pretty much what Lt. Colonel Hickes recited and at times some of that information was filled in by the Commissioner. I asked Lt. Colonel Hickes why Captain Ober went to him and he stated that he (Lt. Colonel Hickes) was just new in his position and that Captain Ober thought that the person most likely not to be involved in this allegation would be Lt. Colonel Hickes. At that point, the Commissioner began asking Lt. Colonel Hickes some questions. Colonel Evanko asked Lt. Colonel Hickes why he didn't report it to him. Lt. Colonel Hickes said to the Commissioner that he knew the information was unfounded and therefore he saw no harm in the investigation proceeding without informing the Commissioner. Colonel Evanko again asked him why he was not informed about this investigation. Lt. Colonel Hickes' second response was that he didn't want it to be perceived that he was interfering with an investigation, plus he thought that it would be better if the Commissioner did not know because that way it could not be perceived that the Commissioner interfered with an investigation. Once again the Commissioner, still not satisfied, again asked Lt. Colonel Hickes why he didn't tell him about this FBI meeting with Captain Ober.

Meeting Between the Commissioner...Hickes
June 16, 1999
Page Three

At this point, Lt. Colonel Hickes said that it was a tough decision for him to make, that he found it very much an issue of a balance between his personal integrity and an issue of trust. Lt. Colonel Hickes stated that his integrity was such that he must do it the way he felt was the way it should be done, and that was not to tell the Commissioner. He also went on to state that he had given it a lot of thought since making that decision and quite honestly would do it that way again in the future unless ordered to do differently by the Commissioner. The Commissioner asked Lt. Colonel Hickes that if Captain Ober and Lt. Colonel Hickes knew two weeks earlier than this meeting that the information was unfounded, why didn't Lt. Colonel Hickes come to him sooner. Lt. Colonel Hickes' response was that he knows the Commissioner is busy and that he had a hard time arranging a meeting with the Commissioner so that he and Captain Ober could share all of this information with the Commissioner. To the best of my recollection that was the extent of the conversion I overheard between the Commissioner and Lt. Colonel Hickes.

TKC/sks

cc:  Commander, Area II
     File



# BUREAU OF PROFESSIONAL RESPONSIBILITY

## INTERNAL AFFAIRS DIVISION

Transcript of Interview
with Lt. Colonel Thomas K. Coury
June 28, 1999

Alright, its Monday, June 28th, 1999.  It is approximately 10:15 AM.   We're  in  the  office  of  the  Deputy  Commissioner  of Administration  with  Lieutenant  Colonel  Tom  COURY,  Major  Tom WILLIAMS, and Major Robert WERTS.

WERTS:        Alright, so you're aware Tom, the tape recorder is on and running?

COURY:        I'm aware, Bob.

WILLIAMS:     Colonel, will you tell us in your own words when you found out about this political corruption investigation which was occurring out in Western Pennsylvania?  Can you give us the date and the time, and who was present and what was said during the course of when you found out about this investigation?

COURY:        The  first  I  heard  about  this  investigation  was  on Wednesday  afternoon,  May  12th.    I'm  not  sure exactly  what  time  Major,  but  it  was  early  in  the afternoon,  probably  one,  two  o'clock,  something  like that.  We had the Corporal promotions that morning.  In the  afternoon,  I  left  the  Academy  and  actually  was sitting out in the parking lot in front of the Academy when my pager went off.  I responded to my page, it was to my office.

I called my office and said - they told me that the Commissioner  wanted  to  see  me,  that  he  was  in  the Academy  in  the  Director,  Training  and  Education's office.   So I went in the Academy and uh, entered the Director's  office,  and  in  the  office  there  was  two people  and  it  was  the  Commissioner  and  it  was Lieutenant Colonel HICKES.

They were both seated and uh, I asked the Commissioner what I could do for him and he said uh, "Come in," and he said uh, "you should take a seat."  He said, "I have something that's," uh, "to discuss with you."  He said, "And I think you should sit down," and uh, because he said, "to some extent, it concerns you.  It certainly concerns you."  So I sat down, and that's the first I knew of any political corruption investigation, whether it was internally, externally, or had I ever even heard the first mention of the topic.

Colonel EVANKO went on to say that uh, he asked Colonel HICKES  sort  of  to  fill  -  he  said,  "Bob,  how  about filling Tom in, basically to what we just sat here and discussed."  And Bob started to - his conversation, and at times if he missed a point, the Colonel would jump in and fill it in.  And at times the Colonel would ask Colonel HICKES some questions.

/3/

Interview/Lieutenant Colonel Thomas K. COURY, on 06/28/99
Page 2

Colonel HICKES proceeded to say that in October of
1998, I don't recall that he gave a date or anything,
that he was approached by Captain Darrell OBER. At
that time, Captain OBER was the Acting Director of the
Bureau of Professional Responsibility. I'm not sure -
I wasn't sure at that time whether Darrell was acting
because it was a transition period between Major
MERRYMAN and Major CONLEY, or that Major MERRYMAN was
off or CONLEY was off, or the exact circumstances, but
just that Darrell OBER was the Acting Director of BPR.

Colonel HICKES related that Captain OBER had gone to
see him and told him that he had had a uh, he had had
a conversation with the FBI. That conversation with
the FBI was that the FBI had contacted him as the
direct - as the Acting Director of BPR, and said that
they had an informant in the Western part of the State.
That this informant knew a Trooper and the Trooper's
name was Trooper Kip STANTON.

I initially thought that STANTON was from "G," although
that wasn't mentioned and I subsequently learned that
STANTON is actually from "B," but that Trooper STANTON
had told the informant that he can get people into the
State Police Academy, that he can get them from Band
"B" to "A," he can get them through the polygraph and
the background, and can actually get them into the
Academy. When the informant asked STANTON how he
thought he could do that, STANTON responded to him that
he had high placed connections or sources, or something
like that in the upper ranks or administration of the
State Police and into the Governor's Office.

It appeared to me what Bob HICKES was then saying was
that OBER had gone to him on seeking insight into what
he, meaning OBER, should do. Colonel HICKES related to
me that he told OBER, tell no one, and to cooperate
with the investigation, that the FBI did look into it
and for the months of October through May, that OBER
did provide information to the FBI.

I recall asking Bob HICKES, "Where did OBER get
information and what type of information did he
provide?" Bob said that he provided information about
class size, numbers of people entering the Academy. I
asked where he would get that information. I was told
that he got that information from the Bureau of
Personnel.

I asked Bob why OBER went to him, when I'm the guy
that's in Captain OBER's chain of command. Bob said

Interview/Lieutenant Colonel Thomas K. COURY, on 06/28/99
Page 3

well, that OBER felt that Bob, being the newest person in office, would be the least likely person to be involved in any allegation. Uh, Bob proceeded to say that uh, and I didn't have a time frame, Bob didn't say when, but that ultimately the FBI contacted OBER, and said that the information was unfounded, as I believe was the terminology Bob used. And that the most they had was, that the most the FBI had was that we might have a bad cop, Bob went on to say, and that he and OBER had just met and briefed the Commissioner.

WERTS:      Excuse me, Colonel. When you say, "We may have a bad cop," . . .

COURY:      The PSP.

WERTS:      . . .referring to STANTON?

COURY:      Yes, STANTON being a bad cop.

WERTS:      Okay.

COURY:      And after Bob relayed the story to me, there was mostly questions and answers. Questions on the part of the Commissioner, which Bob answered. Some of the questions I can recall is uh, the Commissioner asked Bob, why Bob didn't come to him with it. Bob said, well he knew the information was unfounded. I can specifically recall him saying, "Colonel, Tom, I knew you'd guys wouldn't be involved in this, so I thought that it was better probably not to tell you and just let the investigation go and reach its conclusion."

And then there was more discussion and then the Colonel again said, "But Bob, I just don't understand why you wouldn't tell us." "Well Colonel, uh, I thought that by not telling you, it could never be said that you interfered with an investigation or that I," meaning Colonel HICKES, "interfered with an investigation."

There was more discussion, minor issues, just chatted back and forth. The Colonel again said, "You know Bob, I, I just still can't understand it. I just still can't understand why you wouldn't, why you wouldn't come and tell me about it." And Bob said, "Well Colonel," and he held up his hands, he said, "You know," he said, "I gave a lot of hard thought, a lot of soul searching and, you know, in one hand I have my trust," he said, "and in the other hand," he said, "I have my," I believe the word he used was "integrity."

Interview/Lieutenant Colonel Thomas K. COURY, on 06/28/99
Page 4

And he said, "And I had to go with this the way I believe my integrity told me to go."

His discussion continued. I guess we were in there uh, maybe forty-five minutes, uh, something like that. After he made the statement about the trust and integrity issue he said again, "And I've given it a lot of thought since then Colonel," he said, "and I have to tell you that I would do it that way again if the case arose, unless you ordered me not to." I think basically, that's about uh, that's about all that took place in that conversation.

I - the Commissioner did ask him uh, why did it take the two of them, meaning Colonel HICKES and Captain OBER, about two weeks before they ever came and even told the Commissioner about it. And Bob's response was, "Well you're a busy guy and it was sort of hard to pin down your schedule and this was really the earliest we could get to you." And I think the Colonel said something like, you know, "Hey, had you told me you had something very important to discuss with me, I would've been there."

And really that was about the sum and substance of the conversation. I, I recall some specific things that struck me odd that, that he did not say. It struck me odd that in the discussion he never - this informant never, at least to Colonel HICKES' knowledge, mentioned a name. Whether I was supposed to be involved or the Deputy Commissioner of Administration, this administration, that administration, never said the Colonel. It was just high ranking officials or people within the administration. And, which made me think that, "Gee, if you didn't have any names, why wouldn't - why wouldn't you tell us?" Its not as if, from what I could tell, a specific allegation was made that Tom COURY and Paul EVANKO have the ability to jockey the test results around. So that, that struck me very odd.

It also struck me immediately during the conversation that Bob never said uh, in response to the Colonel's three questions, "Well Colonel, the FBI directly or indirectly told me not to say anything." He never mentioned that. And uh, again, that made we wonder why he wouldn't tell us.

WERTS:      Okay, just two follow-up questions here.

COURY:      Sure.

Interview/Lieutenant Colonel Thomas K. COURY, on 06/28/99
Page 5

WERTS:      And I want to make sure that we have this.  Did Colonel
            HICKES ever mention anything about a specific rank?

COURY:      Absolutely not.  I'm positive about that.

WERTS:      And did he ever mention anything about the
            confidentiality or nondisclosure?

COURY:      Absolutely not.

WERTS:      Okay.  Another question, which deals with your
            instructions from Colonel EVANKO.  As one of the
            Deputies, have you ever been told by Colonel EVANKO
            that he was to be kept abreast of major incidents which
            would occur?

COURY:      Absolutely.

WERTS:      Okay.  To the best of your knowledge, or in your
            presence, has Colonel HICKES ever been instructed along
            those lines?

COURY:      Yes.

WILLIAMS:   Colonel, would you consider this a major incident?

COURY:      Absolutely, I consider it a major incident for a number
            of reasons.  First the allegations pointed at the
            Commissioner and the Commissioner's a cabinet official.
            You know, all three of us guys in this room know that
            the FBI is not noted for their uh, tight-lip, so to
            speak.  And I think that there would be a great
            potential for this kind of information to leak out.
            And I think that that would've been damaging to -
            possibly damaging to the Commissioner.

            The allegation was also made that people in the
            Governor's Office - I think when that kind of
            allegation is made, the Commissioner first of all has
            a duty to tell the Governor's Office about any
            inquiries about doing - being done by the FBI.  If it
            came out in the paper, which I think it could have,
            that it could've been potentially embarrassing to the
            Governor.  And I think that's certainly uh, made more
            serious by the fact that it was an election year.

            This allegation - this came up, from what I can tell,
            in October.  You know, the election was in November.  I
            think it could've been very embarrassing to the
            administration to be caught blind-sided on something
            like this.

Interview/Lieutenant Colonel Thomas K. COURY, on 06/28/99
Page 6

administration to be caught blind-sighted on something like this.

WILLIAMS: Colonel, you have had the unique experience of being the former Director of the Bureau of Professional Responsibility, is that correct?

COURY: Yes.

WILLIAMS: In your capacity as the Director, Bureau of Professional Responsibility, or even if you were in an acting capacity, and an incident such as this came to your attention and it was however loosely perceived that perhaps your supervisor, who would then be the Deputy of Administration, would that be correct?

COURY: Yes.

WILLIAMS: What would be the procedure outlined in AR 4-25, I believe it is, as to who you should report that possible violation to? Who should the Director or the Acting Director, Bureau of Professional Responsibility, report something like that to?

COURY: AR 4-25 would indicate it should be the Deputy Commissioner of Administration's supervisor, who would be the Commissioner. And in this case, you know, as the former Director of BPR, I can say that had I been the Director of BPR, I would've reported it to the Deputy Commissioner of Administration, because nobody was named in it. I mean, when you look at the totality of the circumstances, you have a Trooper who relays this information to an informant. He gives no names. First thing as the Director of BPR I would've looked at was the history of Trooper Kip STANTON. And if you do that, you immediately find out he has not been one of our stellar people. He has a long history himself in the BPR system. So short of having somebody named, I would've went to my immediate supervisor on that one.

WERTS: But barring that?

COURY: Barring that would've been the Commissioner.

WERTS: Would've been the Commissioner.

COURY: And I would've felt comfortable going with the Commissioner on that one again, because he was not named.

Interview/Lieutenant Colonel Thomas K. COURY, on 06/28/99
Page 7

WILLIAMS:    If a Director who works under you did not report this
             type of information to you, you said you felt that the
             Acting Director, Bureau of Professional Responsibility
             should have reported it to you and you outlined the
             reasons for doing this.  Can you tell me in your own
             words, what your feeling would be about such a person,
             and we're not talking about the person directly, I'm
             talking about anyone who failed to report this type of
             incident to you who you feel that should.  I'm not
             trying to put words in your mouth, but where would you
             feel so far as loyalty and trust regarding this
             individual?

COURY:       Well loyalty is certainly one issue, but I think
             there's a bigger picture here. And that bigger picture
             is that person's use of discretion, uh, that person's
             ability to follow orders, and actually that person's
             common-sense, if you will.  I think the way that the
             Captain handled it didn't follow any of those
             guidelines.   So that concerns me because of the
             importance of that position that he holds.   On the
             issue of - there is certainly an issue of loyalty
             there.  I think I'm loyal to the people that report to
             me.   I expect them to be loyal to me.  I don't think
             that I could work with an individual knowing that for
             six months he and I have had conversation and there's
             an investigation going on to which I know nothing of.

WILLIAMS:    You have been the Deputy of Administration for just
             over four years, is that correct?

COURY:       Yes.

WILLIAMS:    Almost five years?

COURY:       Yes.

WILLIAMS:    And prior to that, you were Director of BPR for two or
             two and a half years?

COURY:       Yes.

WILLIAMS:    In that time frame, was there ever any type of
             investigation that was kept, high profile investigation
             that was kept from the front office, from the
             Commissioner or the Deputy of Administration, to your
             knowledge?

COURY:       Not that I can recall.  To my knowledge, there were
             none.

Interview/Lieutenant Colonel Thomas K. COURY, on 06/28/99
Page 8

WERTS:       During your tenure as the Director of BPR, was it ever
             the policy for the Division Director to set up a
             meeting at a hotel, basically rent a room for the
             purpose of having a meeting with, well in this case,
             with the FBI Agents, while you were the Director?  Did
             anything like this ever happen before?

COURY:       No, not that I can recall.  Its generally not necessary
             to rent rooms.  There are plenty off site locations
             available at no cost.  And those type of meetings
             usually, the Director knows about those types of
             meetings.

WERTS:       That was, and again, was the next question that I
             wanted to ask and I wanted to make sure that we were
             talking about the same thing.  In the event that
             something like that would be necessary to do, it would
             be done with the knowledge of the Director, the Bureau
             Director at this point?

COURY:       I think any Bureau Director would want to know that and
             would have instructed his Division Director that he
             wanted to know that.

WERTS:       Alright, its now 10:35.  And this is the end of this
             portion of the tape.

STD-501X (9-86)

COMMONWEALTH OF PENNSYLVANIA

**DATE:**     November 1, 1999

**SUBJECT:**     Northwestern University Traffic Institute

**TO:**     Captain Darrell G. Ober
Bureau of Technology Services

**FROM:**     Lt. Colonel Thomas K. Coury *TKCIHE*
Deputy Commissioner of Administration

1.     Thank you for your interest in attending the Northwestern University Traffic Institute, School of Police Staff and Command, which is being hosted by the New Jersey State Police.  Your request was not received in the Bureau of Personnel by the October 22, 1999, deadline.  Your request was received on October 28, 1999, and a selection was already made.

2.     The Department has selected Lt. Timothy J. Allue and Sgt. Timothy J. McDonald to attend the session.

3.     Your desire to improve your managerial skills is indicative of your sound commitment to the established goals and objectives of our Department.  Should a similar course be offered in the future, I hope you will again express an interest in attending.

P65

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

DATE:          October 19, 1999

SUBJECT:       Specialized Training Opportunity – School of Police Staff and
               Command

TO:            Director, Bureau of Personnel

FROM:          Captain Darrell G. Ober

Reference:     (a)    Special Order 99-102, dated October 7, 1999.

Enclosure:     (1)    Resume of Qualifications.


1.    I request to be considered for the Subject training.

2.    The requested information is as follows:

      a.    RANK:     Captain.
      b.    DOB:      November 16, 1957.
      c.    DOE:      July 20, 1981.
      d.    DOR:      March 3, 1995.

3.    Enclosure (1) is a resume of my qualifications.

*p66*

BB₁
SP 3-200 (12-93)

99-102
Special Order
October 7, 1999

  

**PENNSYLVANIA STATE POLICE**
**DEPARTMENT DIRECTIVE**

SUBJECT:      Specialized Training Opportunity - School of Police Staff and Command

TO:           Area, Troop, and Station Commanders; Bureau and Office Directors

FROM:         Deputy Commissioner of Administration

REFERENCE:    (a)    Collective Bargaining Agreements Between Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, Article 37.

      1.      The New Jersey State Police is hosting a ten-week training program administered by faculty of the Northwestern University Traffic Institute (NUTI), School of Police Staff and Command. The training program is scheduled to begin on February 28, 2000, and end on May 19, 2000, at the New Jersey State Police Sea Girt Academy. The training program will be given in two installments: one, 4 weeks in length, and the other 6 weeks in length with a two-week break between installments.

      2.      The Department will select two members to participate in the program, which will provide the knowledge and skills necessary for assuming increased responsibilities in administrative staff or line command positions. The two members can anticipate a rigorous schedule with course curriculum focused on six major topics: Managerial Functions, Personnel Management, Police as a Public Agency, Skill of an Effective Police Executive, Techniques for Senior Commanders, and Techniques for Senior Staff Officers. The selected members may receive 18 college credits upon successful completion of the program.

      3.      Members who wish to be considered for the program shall meet the following basic requirements:

      a.      Have attained the rank of Sergeant or higher.

      b.      Have not previously attended the nine-month NUTI training program or the FBI National Academy training program. Members who have previously applied for the NUTI or the FBI training programs are eligible to apply for this program.

*P67*

## OBER, DARRELL G

| | |
|---|---|
| **From:** | BROWN, REBECCA L |
| **Sent:** | Wednesday, November 10, 1999 4:11 PM |
| **To:** | OBER, DARRELL G |
| **Subject:** | Northwestern University Traffic Institute |

I know you didn't ask, and please understand that I'm not taking offense - but I just wanted to let you know that your submission was forwarded to our Bureau office on 10/20/99.  I have a feeling that it could have been delayed there (unintentionally, of course).  Just thought the info might help.  Have a nice weekend!

P68

1

# Out of Retirement

**MOPAR**

BY GREG RAGER, WITH DAVE POINTS

The Pennsylvania State Police (PSP) has struck gold! Actually, they've struck blue and gold—in the form of one of their original 1972 patrol vehicles currently undergoing a total restoration at their training academy in Hershey, Pennsylvania. The Pennsylvania State Police Historical, Educational and Memorial Center is going to be built in the Hershey area of Pennsylvania, near the famous Hershey chocolate factory and amusement park. It was quickly decided that a former PSP patrol vehicle would be the centerpiece of the museum.

A lengthy discussion soon centered on what type of vehicle and from what era that museum piece should be. Throughout the years the PSP has used Fords, Chevrolets, and Plymouths (and yes, even one year—a Duesenberg!). However, due to the influence of the "veterans" on the museum's Board of Directors (retired troopers, also affectionately known as "old timers"), it was decided that a performance vehicle best exemplified the history of the PSP. The rest was easy: it was quickly decided that a Plymouth between 1968 and 1973 would be the only logical choice. There's no arguing that when the words *fast* or *performance* are mentioned, Plymouths are the only choice.

The PSP used Plymouths from 1967 to 1979. For most of those years, the top-of-the-line 440 was the engine that made these vehicles legendary. (In 1969 and 1971, a 383cid high-performance engine was used.) From 1968 to 1971, the cruisers were white with a green hood and trunk. In 1972, they were dark blue with a gold hood, roof, and trunk. In 1973, due to motorist's complaints that the patrol vehicles couldn't be seen at night, the vehicles were bright yellow with a bright blue hood and trunk! Needless to say, that color combination was only used one year. From 1974 until 1991, the marked patrol vehicles were predominately white, with a blue hood and trunk.

A Restoration Committee was formed to locate and restore one of the above Plymouths. The group agreed the vehicle had to be a former marked Pennsylvania State Police patrol vehicle. Authenticity was essential to the project, and the group was adamant about the vehicle being an original PSP car. There would not be a replica (or clone) in the museum! The Restoration Committee is highly experienced in Mopars. All are existing or retired members of the PSP and, within the group, they own:

a '68 Barracuda Formula "S" convertible, a '69 Hemi Road Runner, a '69 GTX, a '69 Dodge Daytona, a '70 Road Runner, a '70 Challenger T/A, and two Superbirds. You can't get more experienced than that! One committee member, Rick Binker, is director of the Transportation Division and is responsible for overseeing the entire fleet of 2,500 vehicles. He started his career as a line mechanic in the PSP garage and worked on these patrol vehicles early on in his career.

After deciding on the type of patrol vehicle to restore, the lengthy process of locating a restorable cruiser was begun. "Wanted" ads were placed in a variety of publications (the PSP is very good about placing wanted ads!). As a result of these ads, the chase was on (the PSP is also very good about chases!). Committee members Dave Points and Rick Binker spent many hours traveling around the state trying to locate a suitable candidate for restoration. They learned the hard way that all cars sound good over the telephone. After a nine-month search, they located a vehicle in Butler, PA—as far away from Hershey as you can get without being in Ohio.

After numerous disappointments, looking at rust buckets and vehicles alleged to be former PSP vehicles, Rick and Dave weren't expecting much. Arriving at a field, they observed a dark green '72 Plymouth Fury II resting next to a tree. Before they went even close to the car, Rick said, "This was one of our cars." When asked how he knew, Rick simply stated, "Hey, I worked on these babies, I know it was our car!" Rick wasn't kidding. As the hood was opened and the big 440 stared back at them, Rick pointed out several features that were Special Ordered to PSP specifications. The siren bracket was still mounted in its assigned location. Special wiring and fuses for the siren and red light were still there. Glancing inside the vehicle, Rick pointed out the manually operated foot siren button, the fast-idle lockout, and the unique red light activation switch. He then pointed to an air conditioning shut-off switch used when pursuits reached speeds over 100



P69



Once Rick ... (Director of the PSP's Transportation Division) saw his own handwriting under the hood, there was no doubt this car was for real. The date indicates the antifreeze check may have been performed just prior to the car going to auction in 1978.



Other finger-prints that document the car's authen-ticity as a real PSP cruiser are the A/C SHUTOFF switch mounted in the dash (for pursuits over 100 mph), the (N81) Fast Idle Throttle Lock mounted under the dash, and. . .



. . .the PSP-installed, foot-operated siren button (much like a dimmer switch) and grommet in the heavy-duty, black rubber floor mat (even though the Broadcast Sheet calls for carpeting). Also visi-ble is the (J52) Inside Hood Release.

## A vintage police car undergoes restoration toward becoming a museum piece



Once the Fury arrived at its new home, a brief "re-swearing in" ceremony was per-formed. Left to right are retired PSP Major, William Regan (chairman of the museum committee); Bill Cooper (who donated the car to the museum); and PSP Commissioner, Colonel Paul Evanko.



Showing more than a little lower body rust, the Fury is typical of a nearly 30 year-old Pennsylvania car. Missing are the (W11) Deluxe Full Wheel Covers the '72 PSP Furies were equipped with. The anten-na and radio were obviously installed after the car left PSP patrol service.

mph. The final confirma-tion of authentication came when Rick looked at the underside of the hood. In white crayon was the inscription "-50°11/2/78," obviously referring to the antifreeze. Rick recognized his own handwriting, as he had written those words many years ago.

The two super sleuths then pulled off some mold-ings and trim pieces and discovered blue and gold paint. Green paint scraped off the trunk and fenders revealed gold and blue paint underneath. The boys knew they were on a roll when they removed the rear seat and found two Broadcast Sheets. On the bottom of the sheets were the typed words "PENN STATE POLICE." They had finally found a Numbers Matching and restorable Plymouth for the museum. Just when they thought it couldn't get any better than that, the owner, Bill Cooper of Conneaut Lake, Pennsylvania, not only donated the vehicle, but with the help of his friend and State Police Dispatcher, Michael Marquis, transported the Fury across the state to Hershey.

While the exact work history of the cruiser is a little fuzzy, a check of service records indicate it was taken out of patrol service at 50,000 miles. It was then painted dark green and used for a variety of purposes, such as transportation to court and training. Some of the vehicles were even used as undercover cars. In 1978, at 80,000 miles, this Fury was removed from State Police inventory and sold at auction to a private individual, who only drove it a short time before gasoline costs became prohibitive. The Fury now has just over 84,000



FOR COMPLETE EDITORIAL CONTENT AND PRODUCT INFORMATION— GO TO
GR8RIDE.com



# ARIZONA RUST-FREE CLASSIC CARS & PARTS

## Dodge



## Chrysler

## Plymouth

### 1940's Through The 1970's

(A) Body  (B) Body  (C) Body  (E) Body

The Southwest's Premiere Source
For Classic Used Auto Parts!

## When Aftermarket Will Not Do!

# Desert Valley Auto Parts

## CALL TOLL-FREE (800) 905-8024

*We Ship Worldwide*

Desert Valley Auto Parts
2227 W. Happy Valley Rd.
Phoenix, AZ 85027

(623) 582-9141 Fax

Visit us on the internet:
www.dvap.com

   

miles on the odometer.

Decoding the Fender Tag and Broadcast Sheet reveals the vehicle has a Scheduled Production Date of June 5, 1972 (very late in the model year), at the Newark, Delaware assembly plant. Interestingly enough, this Fury II is not a (A38) Police Package car. Rather, it is obviously a Special Order Vehicle with select Police Package equipment installed, such as the reinforced roof, heavy-duty suspension, electrical and cooling systems, certified speedometer, etc.—a scenario not at all uncommon on fleet orders. The car has an electric trunk release (to quickly get to the goodies) and air conditioning. It also had no radio (troopers couldn't be distracted by listening to music). Rick described another feature of the cruiser: the automatic interior light switch was disabled (L48 option), so the interior lights wouldn't come on when the trooper exited the vehicle. This was a safety issue still in use today: the trooper isn't silhouetted in the vehicle while exiting at night when answering emergency calls.

The restoration committee is hard at work. This will be a total restoration, with every part being refurbished, restored, or replaced. The Fury will be mounted on a rotisserie and the vehicle stripped and restored to the condition it was in when initially placed in service.

Because the Pennsylvania State Police have a reputation for quickly getting the job done, the committee is restoring the cruiser without waiting for funds to complete the project. Plans are being made to secure funding, with one idea being to sell scale-model '72 Fury patrol vehicles to finance the project. You can help with this worthwhile endeavor into preserving Mopar history. The committee needs sheetmetal and many other parts for the Fury. Please contact Dave Points at (717) 772-6928 or e-mail him at dkpoints@aol.com if you have any parts for this car. The committee is encouraging the donation of any parts, as the museum is registered as a non-profit corporation and all donations are tax deductible.

There can be no doubt former cop cars are starting to catch on big in the world of collectible Mopars. And, just like all the other trends, it will be the big-block cars (like this 440-powered C-Body) that take off first. From time to time *HPM* will be bringing you updates on the PSP's progress in restoring their 1972 Fury. When it's done and ready to be inducted into the museum, we'll run a full-blown color feature on it. Stay tuned. ♠

## Breaking It Down

The VIN (Vehicle Identification Number) on this car, PM41U2F269659, translates as follows:
**P** = Plymouth Fury
**M** = Medium Price Class (Fury II)
**41** = Four-door sedan
**U** = (E86) 440 4-barrel engine-285 (net) horsepower
**2** = 1972 model year
**F** = Newark, Delaware assembly plant
**269659** = Build sequence number

Decoding the Fender Tag reveals this car was built with (but not limited to) the following equipment:
**E86** = 440 cubic-inch 8-cylinder, 4-barrel carb
**D34** = Standard-duty A-727 TorqueFlite automatic transmission
**999** = Special Order exterior paint
**B1** = Medium Class cloth and vinyl bench seat
**X9** = Black interior trim code
**TX9** = Black upper door frames
**605** = Scheduled production date of June 5, 1972
**K14487** = Vehicle Order Number
**999** = Special Order roof paint
**U** = Built to specifications for USA order
**F38** = Roof light reinforcement
**F42** = Additional dome lamp
**F58** = Rear crossmember reinforcement or welds
**F82** = Electric trunk release
**H51** = Air conditioning w/front heater
**Y39** = Special Order Vehicle
**26** = 26-inch radiator
**END** = End of codes

## Crunching The Numbers

In the wonderful world of Mopar number crunching, a "K" as the second digit of the VIN designates the vehicle as a purpose-built police car. And once the Police Package car was specified on the order form, the Fender Tag would then carry the A38 Police Package code as well. But in 1972, only the low-end Fury I was available as a built-from-the-ground-up police car with the "K" designation. While there's no way to know the exact reasons why the PSP cars were spec'd out the way they were, perhaps they may have wanted something a little more plush (?) for the troopers and opted for the Fury II. While the PSP could have simply added the A38 code to a standard civilian variety Fury II, and gotten all the Police Package goodies, they chose instead to custom-build the cars with select police equipment from the options list. In either of these three scenarios, a police agency would have ended up with a full-boogie, take-no-prisoners (yeah, right!) cop car. The 1972 *Plymouth Police Catalog* states, "Most of the above-listed engines and equipment may be ordered as a 'Package' on any Fury I, II, or III Packages (Code A38) are the same as police models but do not include floor mats or partial horn ring steering wheel." Oddly enough, the "K" prefix in the Vehicle Order Number designates it as a police car order. The PSP Bid Price for the 1972 Fury was $3,464 per car, and many police agencies throughout the state coat-tailed on the PSP bid, buying identical cars through the same Fleet Order.

## Police Car Enthusiast Organizations

If you would like to know more about vintage police cars, or would like to join a group whose primary interest and expertise lies with these unique emergency vehicles, the organization below is dedicated solely to old cop cars.

**Police Car Owners of America (PCOOA)**
The Last Precinct Police Museum
15677 Hwy. 62 West
Eureka Springs, AR 72632
(501) 253-4948
Attn: Jim Post

You can also visit a web site devoted to police car enthusiasts at: www.copcar.com.



# FORCE 10
## FOUR-PISTON ALUMINUM CALIPERS FOR MOPARS

The new FORCE 10 high performance four-piston aluminum caliper series from Stainless Steel Brakes Corporation is the ultimate performance brake upgrade on your Mopar. These clear anodized calipers are completely made in the USA from 356-T6 aircraft quality aluminum.

• Lighter than stock cast calipers
• Fits 14-inch and larger wheels
• 11, 12 and 13-inch rotors
• Powder coating and polishing upgrades
• Available in the Extreme Duty line

1 YEAR WARRANTY

**UPGRADES**
• **TURBO-SLOTTED ROTORS**
• **ADJUSTABLE PROP VALVE**
• **STAINLESS FLEX HOSES**
• **HIGH PERFORMANCE PADS**

Stainless Steel Brakes carries an extensive line of brake products including drum-to-disc conversions, Turbo-Slotted™ rotors, high-performance pads, and more.

Rear Disc Conversions for Dana 8.75-inch & 9.75-inch Rearends

**800-448-7722**

**SSBC** Stainless Steel Brakes CORPORATION

CATLOG SEND $3
11470 Main Road
Clarence, New York 14031
Fax (716) 759-8688

**www.ssbrakes.com**

VISA   MasterCard   Discover



# Bent on Perfection™
1999-2000 Catalog available

Over 20,000 Lines in stock
**Exact Duplication** of OEM and custom bent (brake, fuel, and other...)
Domestic or imported — car & truck

**CLASSIC TUBE**
**800.882.3711**
716.759.1800   24 hour fax at 716.759.1014
online at www.classictube.com

UPS C.O.D.   Discover   MasterCard   VISA   American Express

**BEST BEST QUALITY PRICE**
State-of-the-art CNC tube bender gives you the best in prebent tubing. Straight length tubing available, too.

Tubing • Stainless, OEM & Aluminum
Fittings • Stainless & OEM Style Color Coded Steel
Spring Wrap Kits • Gravel Guard – Stainless & OEM • Everything for the job & Conversion Kits

5/18/99

### Status of Building site and building plans.

Col. Tom Coury related the results of his meeting with Dr. Lepley and Bob Stetts, general counsel for Dr. Lepley and the Milton Hershey School. The Hershey group told Col. Coury that they have not yet made a decision regarding the fate of Senior Hall, and it is both a structural issue and an emotional issue.

This delay may have tilted matters in favor of PSP HEMC because several other entities who showed interest in Senior Hall lost interest or ceased to exist during the decision making process. Hershey said they were aware that the PSP HEMC is stronger and is moving forward. Col. Coury told Dr. Lepley that PSP HEMC is ready to take the next step, toward occupying a building or building a building. Dr. Lepley provided the name of the head of the Hershey Real Estate Group and said that he would tell him to expect a call from HEMC. It was suggested, discussed, and agreed by the Board that it would be advisable to include members of the Hershey Trust Group in invitations to future PSP functions.

President Regan appointed Paul Chylack and a group of four to meet with the Hershey Real Estate Division to determine their level of commitment and discuss options.

### Memorabilia:

Col. Coury continued his report to the board with information concerning the helicopter collectible and cruiser collectible. White Rose has all of the necessary documentation and graphics it requires to produce the helicopter. Due to White Rose's molds for the cruiser not being suitable for production of a model like the PSP police car, Col. Coury is considering alternative vendors such as Road Champs.

### Vartan Meeting:

Regarding the meeting with Mr. John Vartan, Col. Coury reports that Mr. Vartan still supports the HEMC, and he donated a Commemorative weapon for display. Mr. Vartan also promised he would provide an architectural plan of the museum. Attorney Goldberg suggested providing John Vartan with several pictures of existing police museum buildings. Philip Conti said that he could contact Jim McMann, curator of the Hershey Museum, for recommendations regarding square footage, etc.

### Progress of Artifacts Committee:

Philip Conti told the Board that he would transport the PSP Commission document, currently in bad need of restoration, to Brian Howard, a restorer for the state museum. This document is considered to be among the most important of the historical documents relating to the state police. If Mr. Howard feels he cannot execute the restoration, then he will recommend another source. Ltc. Conti said that artifacts are continuing to come in, although slowly, and that they will continue to be received at the State Police Academy until there is no longer room. He related to the board that he has been told that some artifacts are being funneled off by collectors falsely representing themselves as representatives of HEMC. Col. Coury requested the names of the individuals for investigation.

P 70

3

1/2/98

Captain Riley stated that the forms are to be used only to sell bricks to PSP personnel, active and retired, and that Colonel Evanko's statement should not be construed as solicitation. LTC Coury will review the changes with the Chief Counsel's Office.

Retired LTC Conti reported for the Artifacts Committee that the data base is nearing completion. Barb Wilhelm finalized the contributor form and it was approved by the Office of Chief Counsel.

Barb Wilhelm explained that a thank you letter is automatically generated for artifacts similar to the one to be generated for the sale of the bricks. The letters will be signed by President Regan.

Discussion was held on the possibility of getting a non-salaried intern to assist with cataloging of artifacts.

The Artifacts Committee is also working with the Finance Committee to acquire grants for funding.

LTC Conti also advised that the committee is working to preserve Captain Groome's Commission and is in the process of obtaining bids for preservation of the document. He has also been in contact with the family of Colonel Adams and advised that Retired Sergeant Trout will be picking up items from the family. Major Hazen is in the process of obtaining artifacts from retiree Tom Jones from the Butler area.

Concern was expressed over the practice of some active members who are approaching retirees or their families to purchase PSP memorabilia. A suggestion was made by Colonel Evanko to put an article in the Communicator regarding the purchase/solicitation of PSP memorabilia of retirees by active members.

Care of artifacts was discussed. LTC Conti reiterated that all memorabilia was being logged and kept in a secure area.

Captain Riley advised that Lt. Dave Jungling of Troop D, Butler, has the photos of the clown car acquired by the Committee and will be making contact with the owner of the PSP clown car to see if he would be interested in a trade.

New Business - President Regan advised that when names of prospective Board members are received from the nominating committee, a meeting will be held to vote on the new members. There was discussion on the makeup of the Advisory Nominating Committee. The proposal called for five members to be on the nominating committee: the Commissioner and the Deputy Commissioner of Administration of the PSP, and the President, Vice-President and Secretary/Treasurer of the PSTA. LTC Coury will discuss the proposed makeup of the committee with the Office of Chief Counsel.

Mr. Zinsky advised he has approached General Services about the old facade at 21st and Herr which had previously been PSP Troop H Headquarters. Following discussion, it was decided to pursue acquiring the facade or replicate the facade in plaster for display in the HEMC. The Building and Artifacts Committees will work jointly on details and present a report to the group.

Art Cronin mentioned the old bell from the 21st and Herr site and stated that it was a part of PSP history also in that it was used to signify daily activities. This will also be explored.

The next meeting is scheduled for Wednesday, February 18, at 12:30 p.m. at the Academy in Hershey.

P71

11/8/97

Captain Riley reported approval was received from the IRS on the tax exempt status and this advance ruling is good from June 9, 1997 to September 31, 2001. Mr. Sheridan is to explain further when he arrives. The Pennsylvania sales tax exempt status was disapproved and it states that in order for HEMC to be approved it must meet five requirements, and according to them HEMC does not meet those requirements. Those requirements are: 1) advances a charitable purpose; 2) donates or renders a substantial portion of its services and; 3) benefits a substantial class of persons who are legitimate subjects of charity; 4) relieves the government of some of its burdens; 5) operates entirely free on private property. There were appeal forms provided if HEMC wishes to appeal. It was question as to the appeal time and Captain Riley indicated it was 90 days from October 22, 1997.

President Regan then indicated that copies of this information was sent to Mr. Sheridan and Mr. Sheridan would be able to discuss this briefly when he arrived.

Mr. Lightman was questioned by James Hazen as to whether an appeal should be filed just protect HEMC's interests. Mr. Lightman indicated that he did not deal with that area of law. There was then a discussion regarding the Federal approval versus the Pennsylvania denial of tax exempt status and Arthur Goldberg offered to have one of the experts in his firm check into the matter.

President Regan then stated again that Mr. Sheridan would be attending the meeting and it would be brought to his attention and he would be the one to determine which way to go.

President Regan stated if there were no further questions, the Artifacts report would be given by Col. Conti.

Col. Conti then reported Carr was being added to the Committee and that Tom Ziemba was interested in joining the Artifacts Committee. It was through him that HEMC first learned about the replica rodeo car in Hershey. The Committee is working on updating and logging the memorabilia. Once Barbara has all the information she needs for the data basis, the logging can be completed. Reported disappointed the way the memorabilia was coming in. Most calls deal with smaller items and his Committee is thinking in terms of getting bigger items for the museum displays. Something has to be done to get more positive results and motivation.

President Regan then questioned as to how many big ticket items are out there and what big ticket items was he referring to.

Col. Conti stated he was talking about items that immediately catch the eye when displayed, pictures and documents, these things are valuable but not display material. He has also been in contact with the family of Col. Adams and they definitely have big ticket items.

P72

9/17/97

Earl Hoffman offered the Financial Committee Report.

On the advise of Mr. Sheridan, HEMC proceeded with its non-profit status application, but fundraising is on hold until HEMC can get all legal ramifications resolved.

Discussion followed on the Memorandum of Understanding with Mr. Lightman indicating that the Memorandum of Understanding and by-law changes should be completed in October so brick sales could commence. Among other items, the Memorandum of Understanding must spell out what happens if it goes bankrupt, what happens to the items the State donates, what happens to the items that private individuals donate, and how HEMC will handle the fundraising aspects.

Col. Conti reported for the Artifacts Committee that HEMC is continuing to use all means to encourage retirees to contribute artifacts they have. So far the response has been slow. HEMC's process for accepting and securing donations is being automated and as the responses accelerate, HEMC will be in a better position to accept and record items.

There was discussion of different donations coming from former commissioners, their estates, and/or families. Concern was expressed on how some items may have come into an individual's possession, whether by gift or auction, etc., and about a statute of limitations. Mr. Lightman agreed to check into this. Arthur Goldberg indicated that a lot of PSP items were auctioned off legally as well as given to people years ago.

HEMC will need to determine the method to let the general public know of HEMC's interest in having artifacts connected with the State Police, maybe by advertisement. Donors should be advise of confidentially unless they wish to be recognized as the donor. Mr. Lightman mentioned that some people may wish to donate items and claim a tax deduction or they may just want to loan an item and retain ownership. A plan should be developed prior to seeking out these artifacts regarding the methods of accepting, confidentiality, or acknowledgment. Col. Conti indicated that individuals who have given items were told they could do it on a loan basis.

At the last meeting it was mentioned that there was a need to place a value figure, if requested, not as a general practice, but if someone wants this for tax purposes. The Hershey Museum Curator has offered to help. Mr. Lightman responded that this should be done for insurance purposes and HEMC will need a competent, qualified appraiser to appraise everything that is going into the museum. Col. Conti indicated that this was something that could be included on the data base. Barbara Wilhelm indicated she is hoping to get as much information as possible in the data base. Major Regan indicated that receipts have been given for each item donated.

P73

PENNSYLVANIA STATE POLICE HISTORICAL, EDUCATIONAL,
AND MEMORIAL CENTER COMMITTEE MEETING
April 9, 1997
Page 3

Major Regan requested members of the Building Committee contact appropriate personnel at Hershey Trust and the Board of Managers of the Milton Hershey School about the feasibility of testing and acquiring the land and prepare a report for the next meeting.

Major Regan also advised that Representative Tulli had furnished us with a copy of a grant application to enable us to apply for up to $10,000. The project will be put on hold until incorporation.

Major Regan reported on the subject of newspaper ads for PSP memorabilia which are being run by active members. He stated that we cannot control who runs these ads or the purchase of items from flea markets or auctions. One member with whom he spoke was not aware of the conflict his request for PSP memorabilia might present for the Center and advised that if he becomes aware of any significant items, he would contact the Committee.

Lt. Selgrath reported on the Memorial Wall being constructed at the Academy to honor those members killed in the line of duty. The wall will contain photographs of members killed in the line of duty with a granite podium in front holding a leather-bound book of biographies and circumstances of death. The podium was donated by the members of the 100th Cadet Class. The wall will be dedicated at the Memorial Service on May 2. Once the Center is completed, the wall will be moved to the Center.

Mr. Vartan inquired about the computerization of these photographs and biographies. They are currently being prepared by Academy staff who will maintain computer records. When the Center receives a computer this information will be stored in the Center computer.

Sgt. Hershey suggested publication of a book with the information on members killed in the line of duty to be sold in the gift shop. There will be further discussion on this.

Mr. Hoffman, reporting for the Finance Committee, asked Mr. Catalone to report on the status of selling bricks as a fund raiser. Mr. Catalone's committee obtained two samples of Pennsylvania granite and one sample of South African granite, and suggested possible selling prices for active and retired personnel. Mr. Catalone also provided preliminary ideas for a brochure, recommended placement of bricks be in a wall that could be added to in the future, and recommended a floor area or pathway not be used. Purchase of bricks could be only in the name of Department personnel. Only one brick per person would be allowed, though donations in excess of the selling price of the brick would be permitted.

*P74*



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
1800 ELMERTON AVENUE
HARRISBURG, PA 17110

COLONEL PAUL J. EVANKO
COMMISSIONER

August 26, 1998

Ms. Sarah Shuller
414 South Richard Street
Bedford, Pennsylvania 15522

Dear Ms. Shuller:

It's my understanding that you are the heir to a private collection of Pennsylvania State Police memorabilia. I'm writing to tell you of efforts that are currently underway to preserve and protect the legendary history of the men and women who have proudly served the Pennsylvania State Police.

The Pennsylvania State Police was established in 1905 as the first statewide uniformed police department in the United States. Its members patrolled the countryside, fought fires, protected game, controlled mob violence, and relentlessly tracked down criminals. Its sterling reputation for fairness, honesty, and impartiality was forged from the very beginning when its members found themselves in the middle of many of the nation's most violent labor riots, and has served as a model for law enforcement agencies ever since.

President Theodore Roosevelt was so impressed with the effectiveness of the Pennsylvania State Police that on November 10, 1916 he wrote from Sagamore Hill, "The Pennsylvania State Police is a model of efficiency, a model of honesty, a model of absolute freedom from political contamination. One of the great difficulties in our large States has been to secure an efficient policing of rural sections. In communities where there are still frontier conditions, such as Texas and Arizona, the need has been partially met by establishing bodies of rangers; but there is no other body so emphatically efficient for modern needs as the Pennsylvania State Police. I have seen them at work. I know personally numbers of the men in its ranks. I know some of the officers. I feel so strongly about them that the mere fact that a man is honorably discharged from this Force would make me at once, and without hesitation, employ him for any purpose needing courage, prowess, good judgement, loyalty, and entire trustworthiness. This is a good deal to say of any organization, and I say it without qualification of the Pennsylvania State Police."

Obviously, much about our nation, our Commonwealth, and our Department has changed since President Roosevelt wrote so glowingly of our members, but there are two things that have remained the same. The current members of the Pennsylvania State Police are just as dedicated as those who preceded us to providing the very finest police services to the citizens of this Commonwealth, and are just as determined to preserve the rich and illustrious heritage to which we are heir.

P 75
1 OF 2

Ms. Sarah Shuller
August 26, 1998
Page Two

The Pennsylvania State Police Historical, Educational and Memorial Center committee, under the leadership of retired State Police Major William J. Regan, is a nonprofit organization that is currently raising funds, collecting memorabilia, and negotiating for an appropriate location for an historical, educational and memorial center dedicated exclusively to the accomplishments and sacrifices of the fine men and women who make up the Pennsylvania State Police.

The Board of Directors is an energetic and talented group of individuals that includes representatives of the judiciary, the bar, the local business community, the Pennsylvania State Troopers Association, Department retirees, and past and present State Police administrations. The board has surveyed all fifty states to collect information on how other Departments have elected to preserve their heritage, and has visited the sites of State Police museums in New Jersey, Maryland and Delaware, and the Royal Canadian Mounted Police Museum in Regina, Saskatchewan. It has developed a mission statement to provide overall direction to its committee members, and in all its activities, exhibits and programs, it will place special emphasis on the rich history, culture and heritage of the Pennsylvania State Police. It will do so by designing, financing, and building an institution to collect, preserve, and exhibit artifacts of significance to the Department's history. This State Police Historical, Educational and Memorial Center will serve as an educational facility to highlight the diversity of State Police services and to serve as a memorial to those who gave their lives upholding the proud traditions of the State Police while serving the citizens of Pennsylvania. The State Police Historical, Educational and Memorial Center is expected to be completed by May 2, 2005, in celebration of the Department's 100th anniversary.

I have thrown my full support behind this tribute to past, present, and future members of our State Police family and I hope you will, too. I can personally assure you that, should you decide to donate any of the items from your personal collection, they will be most gratefully received and properly catalogued. Receipts will be furnished for all donations and significant artifacts will be publicly displayed along with the names of their donors. *I can think of no better way to ensure that our loved ones receive the kind of public recognition they so richly deserve than by having memorabilia from their careers prominently displayed along with their names in the State Police Historical, Educational and Memorial Center.*

Should you have any questions about the State Police Historical, Educational and Memorial Center or care to discuss making a donation, please contact Major William J. Regan, PSP Retired, by mail at 1746 East Chocolate Avenue, Hershey, PA 17033. Thank you so very much for your time and consideration.

Sincerely,

Col. Paul J. Evanko

Colonel Paul J. Evanko
Commissioner

VISIT THE PSP WEB SITE AT www.psp.state.pa.us    *APRIL 1999*    PAGE FIVE

# RETIREES' SCOOPS

## CONTINUED

local attorney hired Harry Crytzer to begin an investigation which Tom joined. A continuing investigation is being conducted by Troop H. Charlie Lutz is now online: JLutz77751@aol.com. Bob Kresicki is now online: rakarizona@uswest.net.

Every now and then I receive mail from widows who are upset when they find themselves trying to adjust to a new life. They worry over health-care coverage and other problems associated with widowhood. They wonder about COLAs, while the rest of us rejoice over one - and they get none. These matters must be discussed with your wives, so they have a better understanding of how to handle them when they are left behind. Be a good spouse, and do what is right by your loved one. A widow recently wrote to tell me of the hardships she and her Trooper husband had to endure during his 30 years on the job. But, they prevailed. She wrote, "All in all, I wouldn't change my life with him. We had a great love, marriage, two daughters and five grandchildren."

The other day I was disturbed by the news that one of our widows was somehow coerced into donating her Trooper husband's artifacts to a private collector with the thought that she was giving them to our PSP museum project. To all who have artifacts, I beseech you to donate them to our museum by sending them either to the Academy or to me - no one else.

Supt. Lynn G. Adams created his detective division January 1, 1930. His first appointments were: William Miller, Curwen Jones, George Stedman, Lewis Whitecotton, Russell Knies, and James Griffith. On July 14, 1935, Supt. Adams added Robert Musser, Anthony Parry, William Nevin and Frank McCartney to the detective division roster. William Miller and Curwen Jones worked the "Babes in the Woods" case, which attracted national attention in November, 1934. William Kasparavich and William Broderick, Troop E, were also assigned to that case.

According to the Cumberland County Historical Society, when Eliot Ness was ordered in 1929 to pick a special Treasury Department team to break Al Capone's criminal organization in Chicago, he handpicked nine men for what was to be known as the "Untouchables." Named were Marty Lahart; Barney Cloonan; Sam Seager, a former death-row guard; Lyle Chapman, an investigator; Mike King, an analyst; Joe Leeson, a tracking expert; Paul

Robsky, an excellent wire-tapper; William Gardner, a Chippewa Indian star athlete and contemporary of Jim Thorpe; and Tom Friel, a former member of the Pennsylvania State Police.

We send all members of the Retiree Association notice that dues for 1999 are now payable: $7 for active members and $10 for associate members. Please send your checks to Robert A. Caruso, 205 S. 31 St., Harrisburg, PA 17109. Bob will gladly accept your checks, covering dues for more than one year. Many are doing this in lieu of annual payments.

I thank all those who remembered my 83rd birthday with cards, letters and phone calls. I appreciate your thoughtfulness.

The 5th reunion of the PSP Rodeo Team and Equation Unit is scheduled for June 12, 1999, rain or shine, at the Schellsville VFW picnic grove, from noon until whenever it ends!!! ANY active or retired personnel interested in attending are welcome. IF YOU ARE INTERESTED IN ATTENDING, SEE THE RODEO REUNION ARTICLE ON PAGE 9 OF THIS COMMUNICATOR.

The Public Information Office needs your help in maintaining the COMMUNICATOR mailing list. To improve the accuracy of the mailing list, and to cut back on unnecessary printing and postage expenses, you will have to renew your subscription to the COMMUNICATOR every two years. THERE IS NO FEE TO RENEW YOUR COMMUNICATOR SUBSCRIPTION. PLEASE SEE THE NOTICE ON PAGE 7 OF THIS ISSUE OF THE COMMUNICATOR FOR MORE INFORMATION ON HOW TO RENEW YOUR FREE SUBSCRIPTION TO THE COMMUNICATOR.

**DEATHS:** John H. Large, Jim Thorpe, PA; Joseph G. Hostenske, Greensburg, PA; Joseph F. Murphy, Dupont, PA; Edward B. Herbst, Reamstown, PA; Melvin L. Woodring, Montoursville, PA; Gordon G. Fowler, York, PA; Stanley J. Oleski, Washington, PA; and Edward J. Kedell, Pottsville, PA.

*Clarifying expectations sometimes takes a great deal of courage. It seems easier to act as though differences don't exist and to hope things will work out than it is to face the differences and work together to arrive at a mutually agreeable set of expectations.*

# ATTENTION COLLECTORS



BE ON THE LOOKOUT

1988 Chevrolet Caprice
White w/ Blue Markings

Second Edition
Historic Patrol Car Series

The 1988 Chevrolet Caprice will be featured as the second 1/43 scale model in our series of historic PSP patrol cars. This model is scheduled to be available in June 1999. Order forms for the 1988 model patrol car will appear in the May COMMUNICATOR. We urge you to order early as a quick sellout is expected. The first in the series, a 1949 Ford, sold out last year.

P76

# RETIREES' SCOOPS

## BY PHILIP M. CONTI

Memorial brick applications are received daily at our museum office in Hershey. We would, however, encourage more active personnel, both enlisted and civilian, to join us in this campaign. Early reservations will avoid a possible price increase, and help the fund benefit from interest earnings. This is not a museum for retired personnel only. It will be a museum for everyone who has served in any capacity and has pride in the relationship he or she enjoyed with our distinguished Department. Don't overlook the fact that when you eventually take your children and grandchildren for a visit through the museum, they will want to see first of all - your brick. Will it be there? Or will you have to admit that you blew it. Please come aboard! And soon.

In my last column, I mentioned that a widow had been duped into turning over her deceased Trooper husband's artifacts to a private collector. She did this thinking she was donating his belongings to the State Police museum. I have since learned that another widow was sweet-talked into doing the same thing. Both widows are up in years, and easy victims of this kind of approach. Again, I beg you not to surrender any PSP artifacts to private collectors who may explicitly or by implication solicit you as museum agents. Any artifacts you wish to donate to the museum should be sent or delivered to the Academy or me. If these methods are not convenient, please contact me for assistance. You will receive an official PSP acknowledgment form for your family records.

We send Happy Birthday greetings to: Adolph Chop, 82, June 2; Ariba Liebergall, 84, June 2; John Clisham, 82, June 7; Lawrence Munson, 86, June 7; David Roberts, 83, June 12; James Sweeney, 83, June 12; Adam Budjako, 85, June 14; Stanley Kramer, 81, June 15; Robert Rice, 84, June 20; Keith Dane, 85, June 22; Paul Lutz, 85, June 24; James McGeehan, 83, June 24; and William Nevin, 92, June 30. Belated birthday greetings to Stanley Balut, 82, April 12; and Paul Engle, 91, in May. Paul is a resident of L.A. We regret the death of old-timers: Melvin L. Woodring, 90; Edward B. Herbst, 80; and George M. Pintarch, 83. Col. C. M. Wilhelm died June 14, 1959 - 40 years ago. Col. James D. Barger died June 6, 1992 - 7 years ago. Col. Percy W. Foote died June 23, 1961 - 38 years ago. Lt. Col. Joseph Dussia was born June 7, 1916 - 83 years ago.  Lt. Col. Albert F. Dahlstrom died June 30, 1992 - 7 years ago.

We congratulate Nicholas and Augustine Carlance on their 51st wedding anniversary, June 5; Jerome and Marie Boyd, their 54th, June 6; Wayne and Virginia Myers, their 52nd, June 8; James and Clarice Winters, their 57th, June 10; Edmund and Mary Ganis, their 57th, June 13; Robert and Jean Rice, their 58th, June 14; Charles and Mary Simmons, their 58th, June 18; Aloysius and Eleanor McKinney, their 58th, June 18; Earl and Lorrayne Glasser, their 53rd, June 22; and Frank and Clara Pataki, their 52nd, June 28. Belated congratulations to Paul and Jane Engle who celebrated their 61st anniversary January 15.

Carl Renz is home from the hospital after a long stay. Two years after quadruple bypass surgery, Newt Robbins is still playing racquetball and flying high. That a quote from Newt.  William James is now in a nursing home: 300 Third Ave., Kingston, Pa. 18704. John Malloy is recovering from a fractured leg and other injuries as the result of a fall, while riding a bicycle.  Because of health problems, Frank Clemens has curtailed travel plans, something he has enjoyed doing for years. Stan Kramer is legally blind. Mike Wisniewski, Charlie Wall and Rhea Perwein are on the sick list. John Amick finds it difficult to walk without a cane.

We are delighted with the number of retirees who are joining

that. Anyone in need of an application may obtain one by simply writing me. An active Trooper wanted to know if he could join the Retiree Assn now. He plans on retiring Dec. 31, 2013. No, you can't do that. Two days into retirement Roy Fuller accepted appointment as police chief at Perryopolis. His wife, Connie, is opening a craft shop in Perryopolis. Their son, Roy, manages a ServiceMaster firm in Philly; son, Jeffrey, graduated from W. Virginia University in May with a degree in Industrial Engineering, and will work out of Hagerstown, MD, with Rayloc Industries; son, Matthew, will be a high school junior. Ralph Fiorenza is a detective with the Lake County Sheriff's Office in Tavares, Florida. Chet Lapa and his wife narrowly escaped serious injury, when a drunk driver struck their car. They were wearing seat belts. Their grandson, Matthew Quiggle, is headed for West Point Military Academy in June. Matthew's twin brother, Robert, received a full scholarship to Erie's Mercyhurst College. Carl Benson enjoyed his month-long visit with relatives in Florida. Adele Paul writes from Cleveland, Ohio, where she is welcoming spring big time.

Anne Maurer, Bill's widow, was treated to a trip to Paris and London by her family. Anne's granddaughter, Kristen, is attending Goucher College, after graduating from Susquehanna Twp. High with honors. Another granddaughter, Kelly, will be married this summer. Gary Mortimer is a scheduling coordinator at the Lebanon Valley Brethren Home in Palmyra, and thoroughly enjoys his work. John Shambach has retired from the National Security Agency after 12 years service. Penny Germ writes, "I can look back when I first met Fred in Lancaster. How proud I was to be his wife. He had me in a bubble, now it broke." Ray and Mary Lou enjoyed their lengthy visit to Florida. During their visit they lunched with Al and Ellie Schmutzler at Ft. Myers. Their Florida trip was followed by a trip to Palm Springs and Escondido, CA. Paul Baclawski operates a licensed driving school in Williamsport. Josephine Collitt, George's widow, was the subject of an interesting article in the Harrisburg Patriot, regarding her writing achievements. She is the author of several books for family reading.  George and Jackie Kaminsky enjoyed their 8-day tour of Arizona - their 36th wedding anniversary treat. Jim Paulshock's son, Bryan, graduated with the 103rd Cadet Class on April 9th, and was sent to the Reading Troop. Jim's daughter, Kristen, has applied for admission to the Academy. Mary Wagaman, John's widow, wrote an interesting piece for the Lancaster paper about how John, after years in an orphan home, joined the State Police and served 30 years.  Cancer cut short his retirement. In an earlier column, I noted that one of our widows wanted a 1969 PSP Yearbook. Ed McGroarty responded with an offer to give an extra copy he had. So, the column served a good purpose, as it should. Howard Berringer has retired again after 15 yeas as prosecutor for the city of Boise, Idaho. Retired Lt. Col. Joseph Blackburn was appointed commissioner of the Lower Paxton Twp Police Department, one of the state's largest townships. We wish him well. Col. Paul Chylak's cousin, Nestor Chylak, a major league umpire, was recently inducted into the Baseball Hall of Fame at Cooperstown, NY.

Some time ago, I had asked if there was a 3-generation family in PSP service, and I received word that the ~~Gormley~~ family qualified. The Durilla story was carried in a recent column. I am now informed that the Mathew O'Brien family of Erie also qualifies. Mathew Jerome O'Brien, now deceased, was followed by his son, Mathew John O'Brien, now retired, and by his grandson, Corporal Mathew Michael O'Brien, now on active duty. Are there

*P.11*

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA<br>PENNSYLVANIA STATE POLICE

DATE:        December 23, 1999

SUBJECT:     Supervisory Inquiry IAD# 1999-409

TO:          Director, Bureau of Technology Services
                  Attn: Captain Darrell G. Ober

FROM:       Lt. Colonel Thomas K. Coury
                  Deputy Commissioner of Administration

REFERENCE: (a)   Supervisory Inquiry, IAD# 1999-409, prepared by Corporal Robert D. Mrgich, Bureau of Professional Responsibility, dated August 23, 1999, with attachments.

1. After careful review of Enclosure (1), I have concluded that the allegation is unfounded. No additional inquiry or formal investigation is warranted in this case.

2. It was alleged that you had used your position of being a member of the Centennial Book Committee to obtain Pennsylvania State Police historical items for your personal use. However, the facts and circumstances of this investigation indicate that this allegation is not true.

3. In 1995 you corresponded with two Department retirees or their caregivers and later received historical items from these individuals. Written correspondence to the individuals as contained in Enclosure (1) demonstrate that at no time did you identify yourself as a member of the museum project or of the Centennial Book Committee. Additionally, you obtained the historical items in 1995, and did not become a member of the Centennial Book Committee until August 1996.

4. No administrative action will be taken and this Supervisory Inquiry is closed.

P78

COMMONWEALTH OF PENNSYLVANIA
STD-502X        REV (11/95)

## DESK MEMORANDUM

SUBJECT :

Supervisory Inquiry #1999-409

TO (NAME & ADDRESS) :

Deputy Commissioner of Administration

FROM (NAME & ADDRESS) :

Acting Director, Internal Affairs Division *JRB*
Bureau of Professional Responsibility

DATE SENT:    12/03/99

DATE NEEDED :

| | PLEASE CALL: | | APPROVAL | | SEE ME |
| | RETURNED YOUR CALL | | AS REQUESTED | | COMMENT |
| | INFORMATION & FILE | | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| ✓ | NECESSARY ACTION | | SIGNATURE | | |

RECEIVED BY :        DATE :        TIME :

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|-------|---------|------|-------|---------|------|
| *EO Dep. Admin.* | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

ubject inquiry is forwarded for whatever action you deem appropriate.  Attached please find copies of
djudication responses to complainants/members from several Troop Commanders with their
ndorsements.  Remember you are not restricted to a conclusion of Sustained, Not Sustained or
nfounded.  You can word as you feel necessary.  Verbiage as "appropriate supervisory action taken",
ppropriate administrative action was taken", "no further administrative action necessary," etc., will
ffice.  Also attached find a copy of the Endorsement and Documentation of Action Taken section of the
oposed Supervisory Special Order for your information.  If you need anything else let me know.

*pls Do AN Admin Finding*

*P79*

COMMONWEALTH OF PENNSYLVANIA
STD-502          REV. 5-97

## DESK MEMORANDUM

SUBJECT

Supervisory Inquiry #1999-409

TO (NAME & ADDRESS)
Director,
Bureau of Professional Responsibility

FROM (NAME & ADDRESS)
Acting Director, Internal Affairs Division  *JRB*
Bureau of Professional Responsibility

DATE SENT
October 5, 1999

DATE DUE

|   |  |  |  |  |
|---|---|---|---|---|
| | PLEASE CALL | APPROVAL | | SEE ME |
| | RETURNED YOUR CALL | AS REQUESTED | | COMMENT |
| X | INFORMATION & FILE | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| X | NECESSARY ACTION | SIGNATURE | X | *Review* |

RECEIVED BY | DATE | TIME

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| DEP. COM. ADMIN. | | | | | |
| Capt *Points* | OP | | | | |
| Dep Admin | TC | 11/27 | | | |
| Dir BPR | DMC | 12/02/99 | | | |

MESSAGE:

The subject inquiry is being forwarded for your review and any action you deem appropriate.

*FORWARDED FOR YOUR REVIEW, AS PER MAJOR CONLEY,*
*11/12/99.  THIS IS THE ORGINAL REPORT.*

*Lt. Brown*

c:    IAD FILE

*For possible violations*

*Call me*

*Frb*

*P80*



COMMONWEALTH OF PENNSYLVANIA
STD-502              REV. 5-97

## DESK MEMORANDUM

**SUBJECT**

Correspondence from Philip Conti

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Deputy Commissioner of Administration | Director, Bureau of Professional Responsibility |

| DATE SENT | DATE DUE |
|---|---|
| 11/19/99 | |

|  | | | | |
|---|---|---|---|---|
| | PLEASE CALL | APPROVAL | | SEE ME |
| | RETURNED YOUR CALL | AS REQUESTED | | COMMENT |
| X | INFORMATION & FILE | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| | NECESSARY ACTION | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

s discussed, we need a Special Order from the Commissioner prohibiting the reference of, "as a ennsylvania State Police member," when members solicit retirees for artifacts, etc.

P81

COMMONWEALTH OF PENNSYLVANIA
STD-502          REV. 5-97

# DESK MEMORANDUM

SUBJECT

Supervisory Inquiry #1999-409

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Director, Bureau of Professional Responsibility | Acting Director, Internal Affairs Division *JRB* Bureau of Professional Responsibility |

| DATE SENT | DATE DUE |
|---|---|
| October 5, 1999 | |

| | | | | | |
|---|---|---|---|---|---|
| | PLEASE CALL | | APPROVAL | | SEE ME |
| | RETURNED YOUR CALL | | AS REQUESTED | | COMMENT |
| X | INFORMATION & FILE | | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| X | NECESSARY ACTION | | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| DEP. COM. ADMIN. | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

The subject inquiry is being forwarded for your review and any action you deem appropriate.

*FORWARDED FOR YOUR REVIEW, AS PER MAJOR CONLEY,*
*11/12/99. THIS IS THE ORGINAL REPORT.*

*Lt. Brown*

:    IAD FILE

*P82*

Date _____ 11/12/99 _____

IAD # _____ 1999- 409 _____

DB # _____

1. Major Hawthorne N. Conley ( ✓ ) _HNC_____

2. Lieutenant John R. Brown ( ✓ ) _JRB_____

3. Sgt. Lisa S. Christie ( ✓ ) _____ IAD FILE

4. Cpl. Noel Ruiz ( ) _____

5. A.A. Donna J. Blouch ( ) _____

6. C.T. Brenda Stutzman ( ) _____

- LETTER TO BE SENT - _____

Message: _Cpl. Rain delivered to Lt. Col. Coury 11/12/99, original copy, file folder still on your desk._

P 83

OBER, DARRELL G

| | |
|---|---|
| **From:** | DEWIRE, PHILLIP L |
| **Sent:** | Wednesday, October 04, 2000 9:29 AM |
| **To:** | MCDONALD, LEONARD H; OBER, DARRELL G; BELMONT, ALICE M |
| **Subject:** | FW: Chain of Command |

For your information and compliance.

-----Original Message-----
**From:** PSP Dep Comm Of Ops
**Sent:** Wednesday, October 04, 2000 9:20 AM
**To:** KOSCELNAK, FRANCIS E; OLEYNICZAK, HENRY D; PEACOCK, ROGER C; SEILHAMER, TERRY L; SZUPINKA, LYLE H; WERTS, ROBERT G
**Cc:** BLOCKER, TYREE C; DEWIRE, PHILLIP L; DOUTT, KATHRYN E; PERIANDI, RALPH M; WASHINGTON, LEONARD JR
**Subject:** Chain of Command

   At the recent Area and Troop Commanders meeting in State College, I forgot to mention something when I briefly met with just the Area Commanders.
   I believe in and support communication through the chain of command. As the Deputy Commissioner of Operations, I believe it is my duty to support your unity of command by communicating with the Troop Commanders through the Area Commanders. Only in the case of exigent circumstances will I deviate from that practice. In such a case, I will still subsequently notify you and not rely solely on the Troop Commander to apprise you of the communication.
   Accordingly, please remember the upward chain of command to the Commissioner is through the Deputy Commissioner of Operations unless exigent circumstances exist or the Commissioner contacts the Area Commander (or Bureau Director) directly. If that type of direct communication occurs, I would still appreciate the Area Commander (or Bureau Director) subsequently contacting me to apprise me of the communication as opposed to expecting the Commissioner to advise me of the communication.
   Clearly defined expectations on the issue of chain of command and communication supports all of our operations and has proven to be the most efficient and effective way of doing business in paramilitary organizations.

                              Thank you for your cooperation,
                              Lt. Colonel Tom Coury

P85

1

**OBER, DARRELL G**

| | |
|---|---|
| **From:** | COURY, THOMAS K |
| **To:** | OBER, DARRELL G |
| **Sent:** | Friday, May 18, 2001 8:54 AM |
| **Subject:** | Read: OD Report |

Your message

| | |
|---|---|
| To: | COURY, THOMAS K |
| Subject: | OD Report |
| Sent: | 5/18/01 8:03 AM |

was read on 5/18/01 8:54 AM.

*p86*

STATE OF   Pennsylvania

COUNTY OF  Dauphin

## AFFIDAVIT

I, Mary Bungo, being first duly sworn according to law, depose and say:

1.    I, Mary Bungo, am assigned to the PSP Executive Offices as the Executive Secretary to Commissioner Paul Evanko.

2.    Among my duties are the review and processing of revisions and amendments to PSP Department regulations, once they reach the Commissioner's Office for approval.

3.    I participated in the review and processing of revisions and amendments to Administrative Regulation (AR) 1-1, **Organization**, which included AR-1.02C, **Chain of Command**.

4.    I had various questions and comments relating to portions of AR 1-1 when Corporal William McAveary brought it to me for final approval.  None of those questions and comments were about AR 1-1.02C.

5.    After addressing my areas of concern, Corporal McAveary brought me the final revised version of AR 1-1.  Because AR 1-1 had to be processed quickly in order to prepare the Department for its triennial Commission on Accreditation of Law Enforcement Agencies (CALEA) accreditation inspection, I auto-penned the Change Sheet which accompanied distribution of the official regulation, with the Commissioner's facsimile signature, in the presence of Corporal McAveary.

6.    The Commissioner never personally saw the revisions to AR 1-1 nor did he personally approve the amendments to AR 1-1.

_Mary Bungo_

Sworn to and subscribed before me this

_15th_ Day of _MAY_ 2001

_Gretchen A. Paul_        P87

Notary Public

My Commission Expires:

NOTARIAL SEAL
GRETCHEN A. PAUL, NOTARY PUBLIC
SUSQUEHANNA TWP., DAUPHIN CO., PA
MY COMMISSION EXPIRES MAY 27, 2002

SP 3-200 (10-99)



**PENNSYLVANIA STATE POLICE**
**DEPARTMENT DIRECTIVE**



2001-24
Special Order
March 21, 2001

| | |
|---|---|
| **SUBJECT:** | On-Site Reaccreditation Assessment of the Department by the Commission on Accreditation for Law Enforcement Agencies (CALEA) |
| **TO:** | Area, Troop, and Station Commanders; Bureau and Office Directors |
| **FROM:** | Commissioner |
| **REFERENCES:** | (a)  Standards for Law Enforcement Agencies, Fourth Edition, dated January 1999. |
| | (b)  AR 1-11, Accreditation Program. |
| | (c)  Facts About Accreditation, Form SP 9-101. |
| **ENCLOSURES:** | (1)  Pennsylvania State Police On-Site Agenda. |
| | (2)  Accreditation Familiarization Training Handout. |
| | (3)  Pennsylvania State Police Public Notice. |

      1.    The Department's reaccreditation on-site assessment has been scheduled for Saturday, April 7, 2001, through Thursday, April 12, 2001. The assessment will be conducted by Major John A. Leonard, Connecticut State Police; Sergeant Rich Weisman, Columbus, Ohio Division of Police; Deputy Executive Director John Hurley, U.S. Customs Service. The assessors will be evaluating the Department's compliance with the requirements of Reference (a) during the assessment by inspecting our policies, procedures, equipment, installations, and personnel. The assessors' findings will be the subject of a review hearing at the CALEA conference in St. Louis, Missouri, on July 28, 2001. The Department's reaccreditation hinges on the conduct of a successful assessment; consequently, it is imperative that all personnel extend full cooperation and courtesy to the assessors during the assessment.

P86
1 OF 2

DATE APR 11 2001

MAJOR MERRYMAN ( ) _Rom_
LT. BENEDICK ( ) _____
  PLANNING & ANALYS. ( ) _____
  ADMINISTRATIVE ( ) _____
LT. THURSTON ( ) _____
SGT. MARGESON ( ✓ ) _____
  ACCREDITATION ( ) _____
  SYSTEMS & PROC. ( ) _____
  MGMT. INFO. & UCR ( ) _____
MS. OTSTOT ( ) _____
MS. WELSH ( ) _____
FILE ( ) _____

_P/s ensure the file_
_is copied for forwarding_
_to Chief Counsel_

## DEPUTY / STAFF

**ROUTING**

- ☐ Commissioner
- ☐ Deputy / Administration
- ☐ Deputy / Operations
- ☐ X.O. Commissioner
- ☐ Dir., BFCI
- ☑ Dir., R & D
- ☐ Dir., Staff Services
- ☐ Dir., Technology Services
- ☐ Executive Secretary
- ☐ Dir., JNET Office
- ☐ Administrative officer
- ☐ _____
- ☐ _____
- ☐ _____
- ☐ _____

**ACTION**

- ☐ FYI
- ☐ Keep / Discard
- ☐ File
- ☐ Necessary Action
- ☐ For Compliance
- ☐ As Requested
- ☐ Edit / Revise
- ☐ Prepare Draft
- ☐ Comment / Approve
- ☐ Return
- ☐ Arrange Meeting
- ☐ See Me
- ☐ _____

Message: _____
_____
_____ P89
_____
_____

# COMMONWEALTH OF PENNSYLVANIA
## PENNSYLVANIA STATE POLICE

**DATE:**        April 10, 2001

**SUBJECT:**     AR 1-1.02

*Completed
4-12-01
Marie*

**TO:**          Deputy Commissioner of Staff

**FROM:**        Barbara L. Christie
                 Chief Counsel

*need proj. # & mark
completed*

Please provide me with a full and complete copy of the historical file, including change sheets and special orders, regarding any and all changes made to the above-noted regulation. I also require a copy of any and all transmittal memos regarding the regulation. I need these materials as soon as possible and no later than close of business on Thursday, April 12, 2001.

BLC:jh

*1997 - Present
as per Judy
3-5568
(please call when this
is compiled)*

*p90*

## OBER, DARRELL G

| | |
|---|---|
| **From:** | DEWIRE, PHILLIP L |
| **Sent:** | Wednesday, October 04, 2000 9:29 AM |
| **To:** | MCDONALD, LEONARD H; OBER, DARRELL G; BELMONT, ALICE M |
| **Subject:** | FW: Chain of Command |

For your information and compliance.
-----Original Message-----
**From:** PSP Dep Comm Of Ops
**Sent:** Wednesday, October 04, 2000 9:20 AM
**To:** KOSCELNAK, FRANCIS E; OLEYNICZAK, HENRY D; PEACOCK, ROGER C; SEILHAMER, TERRY L; SZUPINKA, LYLE H; WERTS, ROBERT G
**Cc:** BLOCKER, TYREE C; DEWIRE, PHILLIP L; DOUTT, KATHRYN E; PERIANDI, RALPH M; WASHINGTON, LEONARD JR
**Subject:** Chain of Command

At the recent Area and Troop Commanders meeting in State College, I forgot to mention something when I briefly met with just the Area Commanders.

I believe in and support communication through the chain of command. As the Deputy Commissioner of Operations, I believe it is my duty to support your unity of command by communicating with the Troop Commanders through the Area Commanders. Only in the case of exigent circumstances will I deviate from that practice. In such a case, I will still subsequently notify you and not rely solely on the Troop Commander to apprise you of the communication.

Accordingly, please remember the upward chain of command to the Commissioner is through the Deputy Commissioner of Operations unless exigent circumstances exist or the Commissioner contacts the Area Commander (or Bureau Director) directly. If that type of direct communication occurs, I would still appreciate the Area Commander (or Bureau Director) subsequently contacting me to apprise me of the communication as opposed to expecting the Commissioner to advise me of the communication.

Clearly defined expectations on the issue of chain of command and communication supports all of our operations and has proven to be the most efficient and effective way of doing business in paramilitary organizations.

Thank you for your cooperation,
Lt. Colonel Tom Coury

P91

| SUBJECT: | | | | | CONTACT PERSON (S): | | | |
|---|---|---|---|---|---|---|---|---|
| AR 1-1, ORGANIZANATION | | | | | Various Throughout the Department | | Change No 866 | |
| 10 30/00 mim | | | | | Corporal William J. Mcareavy, Bureau of R&D | | | |

| PROJECT #: | | REFERENCE CODES: | | | | | |
|---|---|---|---|---|---|---|---|
| 000547 | | (1) INFORMATION & FILE | (2) NECESSARY ACTION | (3) APPROVAL | | (4) AS REQUESTED | |
| | | (5) PREPARE REPLY | (6) SIGNATURE | (7) COMMENT | | (8) OTHER | |

| | DRAFT #1 | DATE SENT: | | | CALEA: | PROGRAMMING DIVISION | DIRECTOR, R & D | |
|---|---|---|---|---|---|---|---|---|
| REFERENCE | ROUTE | | INITIALS: | DATE: | REFERENCE | ROUTE | INITIALS | DATE: |
| | CHIEF COUNSEL | | | | | COMMISSIONER | | |
| | DEPUTY / STAFF | | | | | | | |
| | DEPUTY / OPERATIONS | | | | | | | |
| | DEPUTY / ADMINISTRATION | | | | | DIRECTOR, BUREAU OF R&D | | |

MESSAGE:

| | DRAFT #2 | DATE SENT: | | | CALEA: | PROGRAMMING DIVISION | DIRECTOR, R & D | |
|---|---|---|---|---|---|---|---|---|
| REFERENCE | ROUTE | | INITIALS: | DATE: | REFERENCE | ROUTE | INITIALS | DATE: |
| | CHIEF COUNSEL | | | | | COMMISSIONER | | |
| | DEPUTY / STAFF | | | | | | | |
| | DEPUTY / OPERATIONS | | | | | | | |
| | DEPUTY / ADMINISTRATION | | | | | DIRECTOR, BUREAU OF R&D | | |

MESSAGE:

| | FINAL | DATE SENT: JAN 2 2 2001 | | | CALEA: | PROGRAMMING DIVISION WJM 10/30/00 | DIRECT. BUR R&D | |
|---|---|---|---|---|---|---|---|---|
| X | | | | | | | | |
| REFERENCE | ROUTE | | INITIALS: | DATE: | REFERENCE | ROUTE | INITIALS | DATE: |
| | CHIEF COUNSEL | | | | 6 | COMMISSIONER | | 2/22/0 |
| X | DEPUTY / STAFF | | RCH | 1/23 | | | | |
| X | DEPUTY / OPERATIONS | | | 1/31 | | | | |
| X | DEPUTY / ADMINISTRATION | | | 2/12 | X | DIRECTOR, BUREAU OF R&D | | |

MESSAGE: Complete revision of AR 1-1.

P92

| SUBJECT:— | | CONTACT PERSON(S): | |
|---|---|---|---|
| **AR 1-1, ORGANIZATION** | | VARIOUS THROUGHOUT DEPARTMENT CPL. ROBERT F. KELLY BUREAU OF R&D | |

rin 2-1-00 (10-29-00 rin )    wm 2/1/00

| PROJECT #: 970343 | REFERENCE CODES: | | | |
|---|---|---|---|---|
| | (1) INFORMATION & FILE | (2) NECESSARY ACTION | (3) APPROVAL | (4) AS REQUESTED |
| | (5) PREPARE REPLY | (6) SIGNATURE | (7) COMMENT | (8) OTHER |

| | DRAFT #1 | DATE SENT: | | | CALEA: | PROGRAMMING DIVISION | | DIRECTOR, R & D | |
|---|---|---|---|---|---|---|---|---|---|
| REFERENCE | | ROUTE | INITIALS: | DATE: | REFERENCE | | ROUTE | INITIALS | DATE: |
| | CHIEF COUNSEL | | | | | COMMISSIONER | | | |
| | DEPUTY / STAFF | | | | | | | | |
| | DEPUTY / OPERATIONS | | | | | | | | |
| | DEPUTY / ADMINISTRATION | | | | | DIRECTOR, BUREAU OF R&D | | | |

**MESSAGE:**

| | DRAFT #2 | DATE SENT: | | | CALEA: | PROGRAMMING DIVISION | | DIRECTOR, R & D | |
|---|---|---|---|---|---|---|---|---|---|
| REFERENCE | | ROUTE | INITIALS: | DATE: | REFERENCE | | ROUTE | INITIALS | DATE: |
| | CHIEF COUNSEL | | | | | COMMISSIONER | | | |
| | DEPUTY / STAFF | | | | | | | | |
| | DEPUTY / OPERATIONS | | | | | | | | |
| | DEPUTY / ADMINISTRATION | | | | | DIRECTOR, BUREAU OF R&D | | | |

**MESSAGE:**

| X | FINAL | DATE SENT: FEB 1 7 2000 | | | CALEA: GC(R) 2(3) | PROGRAMMING DIVISION 8/2 | | DIRECTOR, R&D | |
|---|---|---|---|---|---|---|---|---|---|
| REFERENCE | | ROUTE | INITIALS: | DATE: | REFERENCE | | ROUTE | INITIALS | DATE: |
| | CHIEF COUNSEL | | | | 6 | COMMISSIONER | | | |
| 3 | DEPUTY / STAFF | | RC# | 2/17 | | | | | |
| 3 | DEPUTY / OPERATIONS | | | | | | | | |
| 3 | DEPUTY / ADMINISTRATION | | | | X | DIRECTOR, BUREAU OF R&D | | | |

**MESSAGE:  COMPLETE REVISION OF AR 1-1**

P93

COL:

THE ORG STRUCTURE FOR THE
TROOP SECTIONS IS
        PATROL
        STAFF
        CRIME.

HAS A DECISION BEEN MADE OR
IS IT FORTHCOMING RELATIVE TO
THE EXECUTIVE OFFICER
        OPERATIONS OFFICER
        STATION COMMANDER
CONCEPT?

            RCH

YES — THE 4 of us must
talk before we go forward
statewide — BOB — coordinate a
Time for the 4 us

P94

SP 3-200 (10-99)



        AR Manual

# PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

February 23, 2001

Change No.  866

SUBJECT:    AR 1-1, ORGANIZATION

1.    Special Order 99-76, Department Reorganization, is cancelled; it shall be removed from files and destroyed.

2.    AR 1-1 has been revised.

## INSTRUCTIONS

Remove these pages:          Insert these pages:

1 through 70                 1 through 68
A.1 through IV               A.1 through D

3.    Commanders and Directors shall ensure all members of their command review this regulation in its entirety.

4.    The revised Pennsylvania State Police Location Map, Appendage C, will be distributed under separate cover as soon as it is available.

5.    This Change Sheet shall be inserted into the back of Volume II of the AR Manual immediately behind Change Sheet No. 865.

Paul J. Evanko
Colonel   PSP

Distribution "AR"

*P95*

An Internationally Accredited Law Enforcement Agency

## ORGANIZATION

1.01    TABLE OF ORGANIZATION

A.    Authority:  The Table of Organization of the Pennsylvania State Police, Appendage B, reflects the structure of the Department as adopted by the Executive Board.

B.    Definitions:

1.    Organizational:  All references to organizational segments, when used in Department and Troop Tables of Organization, shall conform to the following designations:

a.    Area:  An organizational segment comprised of one or more Troops, which is supervised by an Area Commander accountable for the performance of subordinates, and to whom the Commissioner delegates the authority to take independent action on assigned functions.

b.    Bureau:  An organizational segment comprised of Divisions, which is supervised by a Bureau Director accountable for the performance of subordinates, and to whom the Commissioner delegates the authority to take independent action on assigned functions.

c.    Division:  An organizational segment of a Bureau comprised of Sections, which is supervised by a Division Director accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions. Certain Divisions have decentralized locations and perform functions in a specific geographical area.

d.    Executive and Administrative Offices:  An organizational segment comprised of the Commissioner, the Commissioner's Personal Staff, the Deputy Commissioners, and the various

P96
1 of 5

AR 1-1
XX/XX/2000

other organizational segments not under Area, Troop, or Bureau Commands.

e.    Office:    An organizational segment of the Department which is supervised by the senior ranking office person accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

f.    Section: An organizational segment comprised of Units, which is supervised by a Section Commander (Troop) or Section Supervisor (Division or Office) accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

g.    Station:   An organizational segment of a Troop comprised of one or more Sections, which is supervised by a Station Commander accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions in a specific geographical area.

h.    Troop:   An organizational segment of an Area, geographically comprised of Stations, which is supervised by a Troop Commander accountable for the performance of subordinates, and to whom commensurate authority is delegated for performing specific functions in a specific geographical area. Troops A through R are comprised of three Sections:  Patrol, Criminal Investigation, and Staff Services.  Troop T is comprised of two Sections: Patrol and Staff Services.

i.    Unit: An organizational segment of a Section that is supervised by a Unit Supervisor, accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

2. The following definitions shall apply when referring to the individuals employed by the Department:

   a. Employe: A civilian working full time for the Department.

   b. Enforcement Officer: An employe working full time for the Bureau of Liquor Control Enforcement, authorized by law to enforce the provisions of the Liquor Code and any regulations promulgated pursuant thereto.

   c. Member: A sworn Pennsylvania State Police Trooper.

   d. Personnel: Employes, enforcement officers, and members collectively.

1.02    ADMINISTRATIVE AUTHORITY AND ORGANIZATION

A. Commissioner's Personal Staff:

   1. Administrative Officer to the Commissioner.

   2. Executive Officer to the Commissioner.

   3. Legislative Affairs Office.

   4. Municipal Police Officers' Education and Training Commission.

   5. Office of Chief Counsel.

   6. Public Information Office.

B. Commissioner's Command Staff:

   1. Deputy Commissioner of Administration:

      a. Department Discipline Office.

AR 1-1
XX/XX/2000

    b.    Equal Employment Opportunity Office.

    c.    Executive Officer to Deputy Commissioner of Administration.

    d.    Member Assistance Program.

    e.    Bureau of Personnel.

    f.    Bureau of Professional Responsibility.

    g.    Bureau of Training and Education.

2.    Deputy Commissioner of Operations:

    a.    Executive Officer to Deputy Commissioner of Operations.

    b.    Executive Service Section.

    c.    Bureau of Criminal Investigation.

    d.    Bureau of Drug Law Enforcement.

    e.    Bureau of Emergency and Special Operations.

    f.    Bureau of Liquor Control Enforcement.

    g.    Bureau of Patrol.

    h.    Public Information Coordinator.

    i.    Area Commanders.

    j.    Troop Commanders.

    k.    Section Commanders.

    l.    Station Commanders.

    m.    Troop Administrative Managers.

3.    Deputy Commissioner of Staff:

AR 1-1
XX/XX/2000

    a.    Bureau of Forensic Services.

    b.    Bureau of Records and Identification.

    c.    Bureau of Research and Development.

    d.    Bureau of Staff Services.

    e.    Bureau of Technology Services.

C.    <u>Chain of Command</u>

    1.    Chain of command is the normal and logical progression of supervisory and command function within the Department.

    2.    Personnel shall adhere to, and utilize, the chain of command except when prevented by exigent circumstances, when exempted by existing regulations, e.g., AR 4-26, Sexual Harassment Policy. Personnel shall not bypass the established chain of command without first consulting with the appropriate supervisor.

1.03    FUNCTIONS AND RESPONSIBILITIES

This section outlines major functions and responsibilities of each organizational segment and level of command.

A.    <u>Commissioner:</u>

Assist the Governor by enforcing the law and preserving the peace through the detection of crime, apprehension of criminals, and patrol of the highways.

Exercise administrative, command and fiscal authority, and responsibility over the Department.

Maintain discipline and, when necessary, administer disciplinary action.

# Project Tracking Summary

**PRIORITY:** ☑

**Project No.:** 2000 0547    **Orig. Source:** RD

**Contact Person:**

**Date Assigned:** 10/10/2000

**Assigned To:** MCAREAVY, W

**Date Due:** 10/31/2000

**Index Code:**

**Date Signed:**

**Subject:** AR 1-1 RESUBMISSION

| DATE/TIME | REMARKS |
|---|---|
| 10/10/00   0900 | RECEIVED AND REVIEWED |
| 0900-0915 | CHECKED WITH ROSE POLEK, STAN BURKHOLDER, BRENDA ESTEP, AND SHAWNEE SMITH CONCERNING CHANGES TO BUREA OF PERSONNEL IN AR 1-1. WILL ATTEMPT TO LOCATE NEW SECTIONS. |
| 10/16/00   1515 | RECEIVED APPROPRIATE NEW SECTIONS FROM LT. BENEDICK. |
| 10/20/00   1250 | SUBMITTED TO PAM. |
| 01/19/01   1035 | RESUBMITTED TO SHARON. |
| 02/12/01   1430 | RECEIVED BACK FOR CORRECTIONS |
| 02/22/01   1235 | RESUBMITTED TO FRONT OFFICE. |
| 02/27/01   0945 | RECEIVED BACK SIGNED W/ REPRO ORDER. DELIVERED TO REPRO. |
| 03/06/00 | PICKED UP FROM REPRO. DISTRIBUTED. PROJECT COMPLETED. |

P97

# Project Tracking Summary

PRIORITY: ☐

**Project No.:** 1997 0343   **Orig. Source:** PA

**Date Assigned:** 09/30/1999

**Date Due:** 10/30/1999

**Date Signed:**

**Contact Person:** _____

**Assigned To:** KELLY, R

**Index Code:**

**Subject:** AR 1-1 PATROL SERVICES DIVISION

| DATE/TIME | REMARKS |
|---|---|
| 9/14/00 | RECEIVED PROJECT FROM CPL. KELLY. |
| 10/10/00  0900 | PROJECT REACTIVATED AND NUMBER |
|  | REASSIGNED. |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

P98

# Project Tracking Summary

PRIORITY: ☐

Project No.: 1997 0343  **Orig. Source:** PA

**Date Assigned:** 09/30/1999

**Date Due:** 10/30/1999

**Date Signed:**

**Contact Person:** Various

**Assigned To:** KELLY, R

**Index Code:**

**Subject:** AR 1-1 PATROL SERVICES DIVISION

| DATE/TIME | REMARKS |
|---|---|
| 10/08/99 | PROJECT RECEIVED |
| 10/08/99 | COMPILED DATA RECEIVED IN RESPONSE TO CPL BORZA'S REQUEST FOR UPDATES. REVIEWED POSSIBLE CHANGES. |
| 10/12/99 | INCORPORATED THE FOLLOWING CHANGES: — RESEARCH + DEVELOPMENT (GRANTS), RECORDS AND IDENTIFICATION, TECHNOLOGY SERVICES, RESO, TRAINS + EDUCATION, LEGISLATIVE AFFAIRS, OFFICE |
| 10/19/99 — | BCI |
| 10/19/99 | CURRENTLY WE HAVE NO INFO FOR THE BUREAU OF FORENSIC SERVICES. R/O CONTACTED MAJ. CAPRIOTTI (S-0705) WHO STATED SOME ONE WOULD BE IN TOUCH TOMMORROW CONCERNING THEIR UPDATE. |
| 10/21/99 | RECEIVED FUNCTIONAL STATEMENTS FOR FORENSIC SERVICES. INCORPORATED MATERIAL INTO AR-1-1. RE-ORGANIZED STAFF SERVICES. |
| 10/22/99 | BODY OF AR IS COMPLETED NEED TO GET APPENDAGES FROM PAM TO COMPLETE. |
| 10/25/99 | APPENDAGE REVISED, COPY OF MAP CHANGES + PROJECT SUBMITTED TO PAM. |
| 10/26/99 | RECEIVED PHONE CALL FROM CAPTAIN KURKIS BPR-SYSTEMS REVIEW WHO STATED HE HAD SOME MINOR CHANGES TO INCORPORATE. HE RELATED INFO WOULD COME TO R+D IN 1 OR 2 DAYS. |

P99

/09/00   RECEIVED CORRECTIONS ●            ●

/14/00   SPOKE W/ BRAD DE GEORGE FROM
         PERSONEL WHO WILL BE SENDING OVER
         MORE CHANGES.

1/18/00   RECEIVED CHANGES FROM PERSONNEL.

01/18/00 -   ADDED CHANGES

1/20/00

01/20 - 01/26/00   RE-EDITED PROJECT.

1/26/00 -   CHANGES SUBMITTED TO MARIE.

02/09/00   RECEIVED FROM SHARON/MAJ

02/14/00   RETURNED TO SHARON/MAJ
           REC/

02/15/00   RETURNED TO SHARON/MAJ

02/17/06   PROJECT RETURNED FROM COMMISSIONER.
           INSTRUCTIONS TO WMTPER ATTACHED NOTE.
           STATUS PENDING

09/14/00 -   DUFFY ADVISED PROJECT IS ACTIVE AGAIN.
           MORE INFO HAS BEEN RECEIVED. PROJECT BEING
           ASSIGNED TO MCAREAVY. PROJECT INFO GIVEN
           TO MCAREAVY.

# BUREAU OF RESEARCH AND DEVELOPMENT
## PROGRAMMING DIVISION
### SYSTEMS AND PROCEDURES SECTION
### PROJECT TRACKING SUMMARY

| PROJECT NUMBER 970343 | | | | |
|---|---|---|---|---|
| DATE ASSIGNED 08/19/99 | DATE DUE 09/19/99 | SUBJECT  Proposed AR 1-1 Revision, Organization | | INDEX CODE |
| ASSIGNED TO Corporal H. Gregory Fersner | ORIGINATING BUREAU Various Entities Within the PSP Organization | CONTACT PERSON(S) Various Individuals Within the PSP Organization | AFFECTED REFERENCE(S) | DATE SIGNED |

| TIME/DATE | REMARKS |
|---|---|
| | MEMBERS IN HIS/HER AREA OF COMMAND |
| | THIS RESPONSIBILITY HAD PREVIOUSLY BEEN THE |
| | DEPUTY COMMISSIONER OF OPERATIONS, BUT WAS NOW |
| | REMOVED. IT WAS DISCOVERED, DURING RESEARCH, |
| | THAT THIS CHANGE HAD ALREADY BEEN INCORPORATED |
| | IN AR 1-1 |
| 09/30/99 | PROJECT DISCUSSED WITH, & RESPONSIBILITY FOR |
| | SAME GIVEN TO TPR. ROBERT KELLY, AS PER |
| | DIRECTION BY CPL. MARCELLA ROBERSON, ACTING |
| | PROGRAMMING DIV. SUPERVISOR |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | P/00 |

# Project Tracking Summary

PRIORITY: ☐

**Project No.:** 1997 0343   **Orig. Source:** PA

**Date Assigned:** 07/17/1997

**Date Due:** 08/16/1997

**Date Signed:**

**Contact Person:**

**Assigned To:** FERSNER, H

**Index Code:**

**Subject:** AR 1-1 PATROL SERVICES DIVISION

| DATE/TIME | REMARKS |
|---|---|
| 08/19/98 | REC'D; ATTEMPTED TO CONTACT CPL. BORZA & SCHEDULE AN APPOINTMENT TO DISCUSS PROJECT - HE WORKED 11-7 SHIFT-I WILL MAKE FURTHER ATTEMPTS TOMORROW, 08/20/98 |
| 08/20/98 | SPOKE W/CPL BORZA RELATIVE TO PROJECT RELATED HE WAS UNABLE TO LOCATE DICK ASSOCIATED W/PROJECT. ADVISED MEL PREVIOUSLY SENT LETTERS TO ALL BUREAU RELATIVE TO THE BUREAU RESTRUCTURE. WITH THOSE LETTERS RETURNED, COMPLETION OF THE PROJECT WOULD BE REASONABLY EASY TO FULFILL |
| 08/27/98 | RECEIVED A COPY OF PROPOSAL FOR PRISON ESCAPE, 1ST REVISED LIST FROM CPL |
| RE 8R7-8 | ROBINSON, SPOKE W/CPL ROBINSON RE TO THE LIST. HE RELATED THE |
| 09/13/99 | RECEIVED CORRESPONDENCE DATED 12/08/98 THAT CAPT. RICHARD A SETH, CO, TROOP T, REQUESTS HELICOPTER TO BE INCLUDED WITHIN TROOP T'S CENTRAL SECTION TO CONSOLIDATE WORK SITES (GEOGRAPHICALLY |
| 09/16/99 | RECEIVED FROM STATE MARSHALL A COPY OF TELETYPE DATED 11/12/96 (XBRD4C-0299) WHICH EXPANDED THE RESPONSIBILITIES OF TROOP CDR. TO INCLUDE MEETING ANNUALLY WITH THE GENERAL ASSEMBLY |

P/01

# Project Tracking Summary

PRIORITY: ☐

Project No.: 1998 0040    Orig. Source: RD

Date Assigned: 02/10/1998

Date Due: 03/12/1998

Date Signed:

Contact Person: [            ]

Assigned To: ROBINSON, M

Index Code:

Subject: AR 1-1 DEFINITIONS

| DATE/TIME | REMARKS |
|---|---|
| 2/11/98 | No immediate standard relationship |
| 2/11/98 | Period @ |
| 9-24-98 | Took project from Marcy in FEB after getting Mark's old project. Have not worked project yet as priority is low. |
| 6-4-99 | Completed 501 from MdGws to Bureaus, etc. So please send all updates now that OA approved the newest chart. |

P102

# Project Tracking Summary

PRIORITY: ☐

**Project No.:** 1997 0343    **Orig. Source:** PA

**Date Assigned:** 07/17/1997

**Date Due:** 08/16/1997

**Date Signed:**

**Contact Person:**

**Assigned To:** VANBUSKIRK, R

**Index Code:**

**Subject:** AR 1-1 PATROL SERVICES DIVISION

| DATE/TIME | REMARKS |
|---|---|
| 7-18-97 | No Cert. Revisions known/Req. at this time. To Mark - (cpr |
| 7-25-97 | An attempt (thru (Cpt Transue) to incorporate this revision into currently approved AR 1-1 sub for review. |
| 7/30/97 | Sgt Margeson advised that the request was denied & to proceed w/the repro. This project will be a stand alone change (bureau revisions/changes are still pending O.A. approval & PA bulletin publication = 6 months). |
| 10-15-97 | Received revision to sub & to OM 7-2 (Assigment report) (incident report) & a special order. |
| 11-10-97 | Sub along w/ Projects 97 468 & 97 338. Also made minor changes to other areas — suggestion program to Planning Division & Bureau of Forensic Services. Append A revised to reflect Cpt Seilhamers changes/corrections. |

P103

S-440 (10-90)

## REPRODUCTION REQUEST

| BUREAU OR DIVISION | DATE |
|---|---|
| Programming | 02/23/01 |

1. SUBMIT IN DUPLICATE WITH MATERIAL TO BE REPRODUCED ATTACHED.
2. MATERIAL MUST BE PROOFREAD BY THE REQUESTOR PRIOR TO SUBMISSION FOR REPRODUCTION.
3. DUPLICATION OF ANY DEPARTMENT FORM OR PUBLICATION REQUIRES R&D APPROVAL.

PROOFED BY
mim

**WHEN COMPLETED**

☐ MAIL

☒ CALL
705-2315

**CONTACT PERSON**

Cpl. McAreavy

### TYPE OF SERVICE REQUIRED

☒ DUPLICATING   ☒ NEW   ☒ STAPLE   ☐ BIND

☐ COMPOSITION   ☐ REVISED   ☒ COLLATE   ☐ PAD

☐ LETTERING/ART   ☐ RERUN   ☐ CUT   ☐ FOLD

☒ DRILL

| QUANTITY DESIRED | NUMBER OF PAGES | BOTH SIDES YES | BOTH SIDES NO | DESCRIPTION (INCLUDE ANY SPECIAL INSTRUCTIONS) | QUANTITY ON HAND | DATE REQUIRED |
|---|---|---|---|---|---|---|
| Dist. "AR" | 1 | ☐ | ☒ | AR 1-1, Change No. 866 | - 0 - | ASAP |
| | 66 | ☒ | ☐ | Pages 1 through 66 | " | " |
| | 4 | ☒ | ☐ | Pages A.1 through A.4 | " | " |
| | 1 | ☐ | ☒ | Page B.1 | " | " |
| | 1 | ☐ | ☒ | Page D.1 | " | " |

3.1 ₀¹

**REQUESTED BY**

Cpl. McAreavy
000547
SIGNATURE

**R & D APPROVAL**

(5) COPIES ☐

**REPRODUCTION AND GRAPHIC SERVICES**

GK   2/27/01

P104

SP 3-200 (10-99)

  AR Manual



# PENNSYLVANIA STATE POLICE
## DEPARTMENT DIRECTIVE

February 23, 2001

Change No. 866

SUBJECT:   AR 1-1, ORGANIZATION

1.   Special Order 99-76, Department Reorganization, is cancelled; it shall be removed from files and destroyed.

2.   AR 1-1 has been revised.

## INSTRUCTIONS

| Remove these pages: | Insert these pages: |
|---|---|
| 1 through 70 | 1 through 66 |
| A.1 through IV | A.1 through D |

3.   Commanders and Directors shall ensure all members of their command review this regulation in its entirety.

4.   The revised Pennsylvania State Police Location Map, Appendage C, will be distributed under separate cover as soon as it is available.

5.   This Change Sheet shall be inserted into the back of Volume II of the AR Manual immediately behind Change Sheet No. 865.

*Col. Paul J Evanko*

Paul J. Evanko
Colonel   PSP

Distribution "AR"

*P/05*

*An Internationally Accredited Law Enforcement Agency*



AR 1-1
2/23/2001

# ORGANIZATION

1.01        TABLE OF ORGANIZATION

A.    Authority:  The Table of Organization of the Pennsylvania State Police, Appendage B, reflects the structure of the Department as adopted by the Executive Board.

B.    Definitions:

1.    Organizational:  All references to organizational segments, when used in Department and Troop Tables of Organization, shall conform to the following designations:

a.    Area:  An organizational segment comprised of one or more Troops, which is supervised by an Area Commander accountable for the performance of subordinates, and to whom the Commissioner delegates the authority to take independent action on assigned functions.

b.    Bureau:  An organizational segment comprised of Divisions, which is supervised by a Bureau Director accountable for the performance of subordinates, and to whom the Commissioner delegates the authority to take independent action on assigned functions.

c.    Division:  An organizational segment of a Bureau comprised of Sections, which is supervised by a Division Director accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions. Certain Divisions have decentralized locations and perform functions in a specific geographical area.

d.    Executive and Administrative Offices:  An organizational segment comprised of the Commissioner, the Commissioner's Personal Staff, the Deputy Commissioners, and the various other organizational segments not under Area, Troop, or Bureau Commands.



e.      Office:   An organizational segment of the Department which is supervised by the senior ranking office person accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

f.      Section: An organizational segment comprised of Units, which is supervised by a Section Commander (Troop) or Section Supervisor (Division or Office) accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

g.      Station:  An organizational segment of a Troop comprised of one or more Sections, which is supervised by a Station Commander accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions in a specific geographical area.

h.      Troop:  An organizational segment of an Area, geographically comprised of Stations, which is supervised by a Troop Commander accountable for the performance of subordinates, and to whom commensurate authority is delegated for performing specific functions in a specific geographical area. Troops A through R are comprised of three Sections:  Patrol, Criminal Investigation, and Staff Services.  Troop T is comprised of two Sections: Patrol and Staff Services.

i.      Unit: An organizational segment of a Section that is supervised by a Unit Supervisor, accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

2.      The following definitions shall apply when referring to the individuals employed by the Department:

a.      Employe:   A civilian working full time for the Department.

    b.    Enforcement Officer:  An employe working full time for the Bureau of Liquor Control Enforcement, authorized by law to enforce the provisions of the Liquor Code and any regulations promulgated pursuant thereto.

    c.    Member:   A sworn Pennsylvania State Police Trooper.

    d.    Personnel:  Employes, enforcement officers, and members collectively.

**1.02**    ADMINISTRATIVE AUTHORITY AND ORGANIZATION

    A.    <u>Commissioner's Personal Staff</u>:

        1.    Administrative Officer to the Commissioner.

        2.    Executive Officer to the Commissioner.

        3.    Legislative Affairs Office.

        4.    Municipal Police Officers' Education and Training Commission.

        5.    Office of Chief Counsel.

        6.    Public Information Office.

    B.    <u>Commissioner's Command Staff</u>:

        1.    Deputy Commissioner of Administration:

            a.    Department Discipline Office.

            b.    Equal Employment Opportunity Office.

            c.    Executive Officer to Deputy Commissioner of Administration.

            d.    Member Assistance Program.

            e.    Bureau of Personnel.

AR 1-1
2/23/2001

      f.      Bureau of Professional Responsibility.

      g.      Bureau of Training and Education.

2.      Deputy Commissioner of Operations:

      a.      Executive Officer to Deputy Commissioner of Operations.

      b.      Executive Service Section.

      c.      Bureau of Criminal Investigation.

      d.      Bureau of Drug Law Enforcement.

      e.      Bureau of Emergency and Special Operations.

      f.      Bureau of Liquor Control Enforcement.

      g.      Bureau of Patrol.

      h.      Public Information Coordinator.

      i.      Area Commanders.

      j.      Troop Commanders.

      k.      Section Commanders.

      l.      Station Commanders.

      m.      Troop Administrative Managers.

3.      Deputy Commissioner of Staff:

      a.      Bureau of Forensic Services.

      b.      Bureau of Records and Identification.

      c.      Bureau of Research and Development.

      d.      Bureau of Staff Services.

      e.      Bureau of Technology Services.

AR 1-1
2/23/2001

C.   Chain of Command:

1.   Chain of command is the normal and logical progression of supervisory and command function within the Department.

2.   Personnel shall adhere to, and utilize, the chain of command except when prevented by exigent circumstances, when exempted by existing regulations, e.g., AR 4-26, Sexual Harassment Policy. Personnel shall not bypass the established chain of command without first consulting with the appropriate supervisor.

1.03   FUNCTIONS AND RESPONSIBILITIES

This section outlines major functions and responsibilities of each organizational segment and level of command.

A.   Commissioner:

Assist the Governor by enforcing the law and preserving the peace through the detection of crime, apprehension of criminals, and patrol of the highways.

Exercise administrative, command and fiscal authority, and responsibility over the Department.

Maintain discipline and, when necessary, administer disciplinary action.

Establish policies and procedures, and prescribe training standards for the Department, while ensuring that the Department continues to maintain a high proficiency in administration, training, and operational activities.

Administer the Lethal Weapons Training Act and the Municipal Police Officers' Education and Training Act.

Organizational segments that comprise the Commissioner's Personal Staff are as follows:

1.   Administrative Officer to the Commissioner:

## ORGANIZATION

1.01        TABLE OF ORGANIZATION

A.    Authority:  The Table of Organization of the Pennsylvania State Police, Appendage B, reflects the structure of the Department as adopted by the Executive Board.

B.    Definitions:

1.    Organizational:  All references to organizational segments, when used in Department and Troop Tables of Organization, shall conform to the following designations:

a.    Area:  An organizational segment comprised of one or more Troops, which is supervised by an Area Commander accountable for the performance of subordinates, and to whom the Commissioner delegates the authority to take independent action on assigned functions.

b.    Bureau:  An organizational segment comprised of Divisions, which is supervised by a Bureau Director accountable for the performance of subordinates, and to whom the Commissioner delegates the authority to take independent action on assigned functions.

c.    Division:  An organizational segment of a Bureau comprised of Sections, which is supervised by a Division Director accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions. Certain Divisions have decentralized locations and perform functions in a specific geographical area.

d.    Executive and Administrative Offices:  An organizational segment comprised of the Commissioner, the Commissioner's Personal Staff, the Deputy Commissioners, and the various

P/07
1 OF 5

AR 1-1
XX/XX/2000

other organizational segments not under Area, Troop, or Bureau Commands.

e.    Office:    An organizational segment of the Department which is supervised by the senior ranking office person accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

f.    Section: An organizational segment comprised of Units, which is supervised by a Section Commander (Troop) or Section Supervisor (Division or Office) accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

g.    Station:    An organizational segment of a Troop comprised of one or more Sections, which is supervised by a Station Commander accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions in a specific geographical area.

h.    Troop:    An organizational segment of an Area, geographically comprised of Stations, which is supervised by a Troop Commander accountable for the performance of subordinates, and to whom commensurate authority is delegated for performing specific functions in a specific geographical area. Troops A through R are comprised of three Sections:  Patrol, Criminal Investigation, and Staff Services.  Troop T is comprised of two Sections: Patrol and Staff Services.

i.    Unit:  An organizational segment of a Section that is supervised by a Unit Supervisor, accountable for the performance of subordinates, and to whom commensurate authority is delegated to perform specific functions.

2.    The following definitions shall apply when referring to the individuals employed by the Department:

    a.    Employe:    A civilian working full time for the Department.

    b.    Enforcement Officer:  An employe working full time for the Bureau of Liquor Control Enforcement, authorized by law to enforce the provisions of the Liquor Code and any regulations promulgated pursuant thereto.

    c.    Member:    A sworn Pennsylvania State Police Trooper.

    d.    Personnel:  Employes, enforcement officers, and members collectively.

1.02    ADMINISTRATIVE AUTHORITY AND ORGANIZATION

A.    <u>Commissioner's Personal Staff</u>:

    1.    Administrative Officer to the Commissioner.

    2.    Executive Officer to the Commissioner.

    3.    Legislative Affairs Office.

    4.    Municipal Police Officers' Education and Training Commission.

    5.    Office of Chief Counsel.

    6.    Public Information Office.

AR 1-1
XX/XX/2000

B.    Commissioner's Command Staff:

    1.    Deputy Commissioner of Administration:

        a.    Department Discipline Office.

        b.    Equal Employment Opportunity Office.

        c.    Executive Officer to Deputy Commissioner of Administration.

        d.    Executive Service Section.

        e.    Member Assistance Program.

        f.    Bureau of Personnel.

        g.    Bureau of Professional Responsibility.

        h.    Bureau of Training and Education.

    2.    Deputy Commissioner of Operations:

        a.    Executive Officer to Deputy Commissioner of Operations.

        b.    Bureau of Criminal Investigation.

        c.    Bureau of Drug Law Enforcement.

        d.    Bureau of Emergency and Special Operations.

        e.    Bureau of Liquor Control Enforcement.

        f.    Bureau of Patrol.

        g.    Public Information Coordinator.

        h.    Area Commanders.

        i.    Troop Commanders.

  j.  Section Commanders.

  k.  Station Commanders.

  l.  Troop Administrative Managers.

 3.  Deputy Commissioner of Staff:

  a.  Bureau of Forensic Services.

  b.  Bureau of Records and Identification.

  c.  Bureau of Research and Development.

  d.  Bureau of Staff Services.

  e.  Bureau of Technology Services.

## 1.03  FUNCTIONS AND RESPONSIBILITIES

This section outlines major functions and responsibilities of each organizational segment and level of command.

A.  Commissioner:

Assist the Governor by enforcing the law and preserving the peace through the detection of crime, apprehension of criminals, and patrol of the highways.

Exercise administrative, command and fiscal authority, and responsibility over the Department.

Maintain discipline and, when necessary, administer disciplinary action.

Establish policies and procedures, and prescribe training standards for the Department, while ensuring that the Department continues to maintain a high proficiency in administration, training, and operational activities.

Administer the Lethal Weapons Training Act and the Municipal Police Officers' Education and Training Act.

Bell,
We need a new
Route sclip with
the new #
(000547).

P108

*Bill's  # 000 547*

AR Manual

February 23, 2001

Change No. 866

SUBJECT:    AR 1-1, ORGANIZATION

1.    Special Order 99-76, Department Reorganization, is cancelled; it shall be removed from files and destroyed.

2.    AR 1-1 has been revised.

INSTRUCTIONS

Remove these pages:              Insert these pages:

1 through 70                     1 through 68
A.1 through IV                   A.1 through D

3.    Commanders and Directors shall ensure all members of their command review this regulation in its entirety.

4.    The revised Pennsylvania State Police Location Map, Appendage C, will be distributed under separate cover as soon as it is available.

5.    This Change Sheet shall be inserted into the back of Volume II of the AR Manual immediately behind Change Sheet No. 865.

Paul J. Evanko
Colonel    PSP

Distribution "AR"

*P/09*

AR 1-1
2/23/2001

    c.     Coordinate development of Department legislative initiatives, regulations, and policy issues with the Governor's Policy and Legislative Affairs Offices and the General Assembly.

    n.     Coordinate the promulgation of legislatively mandated and Department-initiated regulations through the Office of Chief Counsel, Office of General Counsel Governor's Policy Office, Office of Attorney General, General Assembly, and the Independent Regulatory Review Commission in compliance with Executive Order 1996-1.

    e.     Analyze proposed legislation. Furnish affected Bureaus/Offices with copies of proposed and newly enacted legislation. Obtain legislative proposals and create the Department's Legislative Agenda.

    f.     Serve as ombudsmen for members of the General Assembly, Pennsylvania Congressional Delegation, and for state and federal government agencies resolving constituent issues involving the Department.

4.    Municipal Police Officers' Education and Training Commission:

    a.     Establish and maintain training standards for all municipal and campus police officers in the Commonwealth.

    b.     Establish and maintain standards for instructors, schools, curriculum for municipal police training in the Commonwealth.

    c.     Establish psychological and physical standards for certification or decertification of municipal police officers.

    d.     Responsible for recertifying Commonwealth municipal police officers on a biennial basis through verification of firearms qualification, CPR, and first aid and safety certifications.



P110
10F6

AR 1-1
2/23/2001

1.  Department Discipline Office:

    a.  Initiate necessary disciplinary action consistent with regulations.

    b.  Coordinate, evaluate, and process all Disciplinary Action Reports (DAR).

    c.  Request or conduct further investigations as necessary to properly administer discipline.

    d.  Impose disciplinary sanctions ranging from written reprimands to a maximum of a 30-day suspension without pay.

    e.  Direct, with the concurrence of the Deputy Commissioner of Administration, that a member be court-martialed.

    e.  Prepare and maintain appropriate records to ensure the uniform administration of disciplinary action.

    g.  Ensure the concept and administration of discipline are fair, impartial, and consistent.

    h.  Inform the Commissioner, on a continual basis, of the effectiveness of the disciplinary system and the compliance by all personnel with its provisions.

2.  Equal Employment Opportunity Office:

    a.  Provide data, recommendations, and suggestions to assist the Department in the development of equal employment opportunity goals and objectives.

    b.  Maintain a system of auditing and reporting to monitor program effectiveness, and ensure that all Department installations are in compliance with mandated responsibilities.

    c.  Analyze annually the Department employment policies, practices, and procedures relative to their impact on minorities and women.

AR 1-1
2/23/2001

    (8)     Process all enlisted transfers, promotions, and placement.

  d.    Personnel Services Division:

    (1)     Administer the Department's Cadet Recruitment Program.

    (2)     Administer the Department's Ceremonial Program.

    (3)     Administer the Department's Award Program.

    (4)     Develop and administer the Department's Random Drug Testing Program.

5.    Bureau of Professional Responsibility:

  a.    Internal Affairs Division:

    (1)     Receive and document all allegations of misconduct by personnel.

    (2)     Initiate, conduct, control, and coordinate the assignment and completion of investigations of allegations of misconduct, administrative investigations required by directive, and investigations in which personnel are the subject.

    (3)     Initiate, conduct, control, and coordinate the assignment and completion of investigations concerning the use of physical force or shooting incidents involving members/ enforcement officers, as required by directive.

    (4)     Maintain records of investigations conducted under the supervision of the Division.

    (5)     Disseminate statistical information concerning allegations of misconduct by personnel.

(22)    Ensure the security of the Troop Headquarters installation. Ensure compliance with energy conservation measures, fire laws, safety laws, and regulations concerning the handicapped.

(23)    Supervise the rotation of Department vehicles within the Troop and provide transportation for special details, when required.

(24)    Supervise the operation of the Community Services Unit and the implementation of all related programs in accordance with OM 7-6.

11.    Station Commanders:

a.    Prepare and submit Line Inspection Correction Reports indicating the corrective action taken in accordance with OM 7-4.

b.    Prepare and submit annual written objectives which support the achievement of the Department's goals and the Area/Troop objectives in accordance with AR 1-9.

c.    Ensure unannounced spot checks of accountable property are conducted in accordance with AR 3-1.

d.    Conduct a change of command inventory, when necessary, to ensure that all charged fixed assets are accountable in accordance with AR 3-1.

e.    Ensure the contents of new/newly revised Department and/or Troop policies, procedures, directives, regulations, and manuals are brought to the attention of all personnel under their command by roll call/weekly classes.

f.    Attend at least one meeting of a municipal government within their Station's primary jurisdiction each month. A designee may be substituted for their required attendance no more

AR 1-1
2/23/2001

(7)    Coordinate Right to Know Law plans, procedures, and training.

(8)    Administer the Facility Fixed Asset Information System in conjunction with the Office of the Budget.

(9)    Administer the Safe Drinking Water Act for all Department facilities by monitoring tests and conducting any follow-up tests that are required.

(10)   Recommend and develop the capital budget for the repair or renovation of State-owned Department facilities.

(10)   Coordinate the Department recycling efforts in conjunction with the Commonwealth Agency Recycling Office (CARO).

(11)   Prepare bid proposals, plans, and specifications for contracted services (e.g., janitorial, snow removal, grounds, etc.), for State-owned and leased facilities.

b.    Fiscal Division:

(1)    Develop, prepare, and control the budget and rebudget.

(2)    Develop and maintain procedures on all budgeting, accounting, and other fiscal matters.

(3)    Maintain fiscal liaison with the Governor's staff, legislature, and other Commonwealth agencies.

(4)    Review and process requests for equipment and other operating expenditures within the Department.

AR 1-1
2/23/2001

(2) Prepare specifications, evaluate, recommend, and inspect all new communications equipment and systems purchased and/or leased by the Department.

(3) Design special communications equipment and systems.

(4) Administer the telephone communications program to include telephone equipment and features.

(5) Administer the statewide paging and cellular telephone program.

(6) Coordinate radio and telephone communications requirements for Station relocations/renovations.

(7) Coordinate the implementation and administration of the National Emergency Police Frequency Program.

(8) Administer the technical phases of the radar program and provide expert testimony in the courts of the Commonwealth regarding the technical aspects of communications equipment.

(9) Evaluate speed-timing devices for the Pennsylvania Department of Transportation Bureau of Traffic Safety Operations.

(10) Ensure radar repair and testing is performed in compliance with published regulations.

(11) Administer the Commonwealth Telephone Management Information System and the Commonwealth Management Information System automated inventories. ✓

(12) Provide technical assistance relating to communications during special operations.

COMMONWEALTH OF PENNSYLVANIA
STD-502          REV 5-97

# DESK MEMORANDUM

SUBJECT
Updated Org Chart - Area I and VI Realignment

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Dir., Planning Div | Cpl. A. R. Durante |

| DATE SENT | DATE DUE |
|---|---|
| 02/21/01 | |

| | | | |
|---|---|---|---|
| ☐ PLEASE CALL | ☐ APPROVAL | ☐ SEE ME |
| ☐ RETURNED YOUR CALL | ☐ AS REQUESTED | ☐ COMMENT |
| ☒ INFORMATION & FILE | ☐ PREPARE REPLY/REPORT | ☐ NOTE AND RETURN |
| ☒ NECESSARY ACTION | ☐ SIGNATURE | |

RECEIVED BY                                    DATE                    TIME

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| Dir., Programming Div | | | | | |
| Cpl. McAreavy | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:
2001-42

*P111*

## MARGESON, WALTER J

**From:**    MERRYMAN, R. DANE
**Sent:**    Thursday, February 08, 2001 3:59 PM
**To:**     MARGESON, WALTER J
**Subject:** RE: E's

Duffy:

I vote for the easy way.  Where is AR 1-1 at the moment?   I was just advised that the Commissioner has directed a realignment of Area commands 1 and 6.

OK, we have spoken about this since the previous paragraph.  Can you ensure we fetch it back from the front, or is that something that Sharon should handle?


Major R. Dane Merryman
Director, Bureau of Research and Development
Pennsylvania State Police
717.783.9772
rmerryman@psp.state.pa.us


-----Original Message-----
From: MARGESON, WALTER J
Sent: Thursday, February 08, 2001 2:39 PM
To: MERRYMAN, R. DANE
Subject: RE: E's

Major,

After careful consideration,

There are a couple of ways we can handle this.

The easiest way is to change the spelling in the definition section of the AR 1-1 and add a line to the change sheet that simply says effective immediately we use two Es, or words to that effect.

The more difficult way is to try and invent enough verbiage to justify a Special Order and issue that.

Either way, the AR 1-1 will need revised to reflect the change.  Also either way, attrition is the best way to convert existing directives.

Let me know how you want to proceed.

-Duffy

-----Original Message-----

P112

2/26/01

From: MERRYMAN, R. DANE
Sent: Monday, January 29, 2001 10:17 AM
To: MARGESON, WALTER J
Subject: FW: E's

Well now,  this is BIG.  Actually, I am pleased to see the change.
What is the best way to proceed?  I prefer we be responsible.
Your comments please.


Major R. Dane Merryman
Director, Bureau of Research and Development
Pennsylvania State Police
717.783.9772
rmerryman@psp.state.pa.us


-----Original Message-----
From: BONNEY, LINDA M
Sent: Monday, January 29, 2001 10:15 AM
To: MERRYMAN, R. DANE
Subject: E's

In the annals of really important stuff, this ranks right up there!

I have noticed, and subsequently been informed, that the
Governor's Office of Administration is now officially spelling
employee with two e's.  Mary Bungo doesn't want to make the call
for us, and the Commissioner apparently wants either Personnel or
R&D to make the call.  I vote for two e's from now on.  How difficult
will that be?  Do we then have to make sure when any regulation or
manual is redone that we "search" all employe, Employe,
Employes and employes to make the change overall? Or, do we
only change what we now write?  Maybe, since the OA has done it,
we could find out from them.

Please put this on your to-do list.


*Linda*

p113

2/26/01

SUBJECT:    AREA COMMAND RECONFIGUARATION

TO:    AREA, TROOP AND STATION COMMANDERS AND
BUREAU AND OFFICE DIRECTORS

REFERENCE:    (A)    AR 1-1, ORGANIZATION

1.    EFFECTIVE IMMEDIATELY, AT THE DIRECTION OF THE COMMISSIONER, THE AREA COMMAND STRUCTURES OF AREAS I AND VI ARE TEMPORARY RECONFIGURED AS INDICATED IN THIS MESSAGE. PERMANENT RECONFIGURATION OF AREAS I AND VI WILL BE EFFECTIVE UPON COMPLETION OF THE NECESSARY REGULATORY CHANGES BY THE BUREAU OF RESEARCH AND DEVELOPMENT.

2.    THIS RECONFIGURATION SPECIFICALLY AFFECTS TROOP N, HAZLETON, AND TROOP J, LANCASTER.  TROOP N, HAZLETON IS NOW UNDER THE AREA COMMAND AUTHORITY OF THE COMMANDER AREA VI.  TROOP J, LANCASTER, IS NOW UNDER THE AREA COMMAND AUTHORITY OF THE COMMANDER, AREA I.

3.    COMMANDERS, AREAS I AND VI, AND COMMANDING OFFICERS, TROOPS J, LANCASTER AND N, HAZLETON, SHALL ENSURE THAT ALL AFFECTED STATIONS ARE PROMPTLY NOTIFIED OF THESE CHANGES.

4.    TROOP COMMANDERS SHALL ACKNOWLEDGE RECEIPT OF THIS MESSAGE FOR ALL STATIONS UNDER THEIR COMMAND TO TERMINAL "XPSP09."  BUREAU DIRECTORS SHALL ACKNOWLDEGE RECEIPT OF THIS MESSAGE VIA CLEAN MESSAGE OR CORRESPONDENCE, FORM STD-501, TO THE DEPUTY COMMISSIONER OF OPERATIONS.

AUTH/LT COL THOMAS K COURY/DEPUTY COMMISSIONER OF OPERATIONS

P114

# PENNSYLVANIA STATE POLICE ORGANIZATIONAL CHART

**COMMISSIONER**

- Office of General Counsel / Chief Counsel
- Legislative Affairs Office
- Public Information Office
- Municipal Police Officers' Education & Training Commission

**EXISTING**
- Office of the Budget / Comptroller
- Governor's Policy Office / Policy Office

## Deputy Commissioner of Administration

- Discipline Office
- Member Assistance Office
- Equal Employment Opportunity Office

- **Bureau of Personnel**
  - Personnel Management Division
  - Personnel Benefit Division
  - Employment Service & Systems Division
  - Personnel Services Division

- **Bureau of Training and Education**
  - Administrative Division
  - Training Division

- **Bureau of Professional Responsibility**
  - Internal Affairs Division
  - Systems & Process Review Division

## Deputy Commissioner of Operations

- **Bureau of Patrol**
  - Patrol Services Division
  - Safety Program Division

- **Bureau of Criminal Investigation**
  - Special Investigations Division
  - Organized Crime Division
  - Heritage Affairs Office

- **Bureau of Drug Law Enforcement**
  - Administration Division
  - Operations Division

- **Bureau of Liquor Control Enforcement**
  - Administration Division
  - Operations Division

- **Bureau of Emergency & Special Operations**
  - Emergency Operations Office
  - Tactical Operations Division
  - Aviation & Special Services Division

- Area Command I
  - Troop H
  - Troop L
  - Troop N
- Area Command II
  - Troop F
  - Troop P
  - Troop R
- Area Command III
  - Troop A
  - Troop B
  - Troop G
- Area Command IV
  - Troop C
  - Troop D
  - Troop E
- Area Command V
  - Troop T
- Area Command VI
  - Troop J
  - Troop K
  - Troop M

## Deputy Commissioner of Staff

- **Bureau of Research & Development**
  - Planning Division
  - Programming Division

- **Bureau of Forensic Services**
  - Investigation & Operational Support Division
  - Scientific Services Division
  - Quality Management Division

- **Bureau of Staff Services**
  - Procurement & Supply Division
  - Transportation Division
  - Fiscal Division
  - Facility Management Division

- **Bureau of Technology Services**
  - Computer Operations Division
  - Technical Support Division
  - Strategic Development Division

- **Bureau of Records & Identification**
  - Operational Records Division
  - Criminal Records & Identification Division
  - Firearms Division

P1/5

COMMONWEALTH OF PENNSYLVANIA
STD-502                          REV. 2/93

**DESK MEMORANDUM**

SUBJECT

*Recarfig of Area Commands*

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Sgt Margeson | JM |

| DATE SENT | DATE NEEDED |
|---|---|
| 2/x3 | |

| | | |
|---|---|---|
| PLEASE CALL: | APPROVAL | SEE ME |
| RETURNED YOUR CALL | AS REQUESTED | COMMENT |
| INFORMATION & FILE | PREPARE REPLY / REPORT | NOTE AND RETURN |
| NECESSARY ACTION | SIGNATURE | |

| RECEIVED BY | DATE | TIME |
|---|---|---|

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

*Duffy   As discussed.*

P116

PSP-501X                          COMMONWEALTH OF PENNSYLVANIA

**DATE:**          February 7, 2001

**SUBJECT:**       Reconfiguration of Area Commands I and VI

**TO:**            Commissioner

**FROM:**          Lt. Colonel Thomas K. Coury *TKC*
                   Deputy Commissioner of Operations

**ENCLOSURE:**     (1)   Correspondence from Major Robert G. Werts, Commander,
                         Area VI, Troop M, Bethlehem Headquarters, to Commissioner,
                         via Deputy Commissioner of Operations, dated February 5,
                         2001, regarding Organization: Reconfiguration of Areas.

                   1.    Per our discussion of February 6, 2001, Enclosure (1) is
                         forwarded for your review.

                   2.    Based on my discussions with both Commanders Area I and
                         Area VI, the proposed reconfiguration is operationally sound.
                         The proposed was developed by Major Werts and Major
                         Oleyniczak and submitted to me for my review.

                   3.    For the reasons I verbally indicated to you, I support the
                         reconfiguration. I'm available for further discussion on the
                         issue should you so desire.

*P117*

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

**DATE:**          February 05, 2001

**SUBJECT:**       **ORGANIZATION:  RECONFIGURATION OF AREAS**

**TO:**            Commissioner
                   via Deputy Commissioner of Operations  *TKC*

**FROM:**          Major Robert G. Werts
                   Commander, Area VI
                   Troop M, Bethlehem Headquarters

**REFERENCE(S):**  (a)    Administrative Regulation 1-1, Organization

**ENCLOSURE(S):**  (1)    Maps Showing Reconfiguration of Areas I and VI

　　　　1.    I have spoken to Commander Area I, Major Oleyniczak, regarding this matter.  He and I are in agreement that this would make the running of each area much more efficient.

　　　　2.    The first responsibility of each Area Commander as written in the above referenced regulation is to "serve as liaison between field operations and Department Headquarters."   In addition, Area Commanders are to "periodically visit all Department installations in their Area", "maintain communication with county officials and municipal law enforcement authorities in the Area," and "establish communications on a continuing basis with news media in the Area."

　　　　3.    In order to meet these requirements with any efficiency, the Area Commander must not only travel to each Station, but be able to spend some time at the Stations, and be present at the installation at the change of shift.  To spend two or three hours driving to an installation, only to get there when all of the Troopers are out on patrol, only speak to the Station Commander, and then spend two or three hours driving back to his/her office, is anything but efficient or effective.  This gives no time to visit county officials, municipal law enforcement authorities, and deal with the news media, or act as liaison with members in the field.

*P118
1 OF 2*

Organization: Reconfiguration of Areas
February 05, 2001
Page 2

4. One way to manage this problem, is to stay overnight in an area. This is not very efficient, but must be done from time to time. The alternative to staying overnight, is to reconfigure the area. It should be noted that I am only speaking of Area I and Area VI. I am suggesting that Area I be reconfigured to include Troop J, Lancaster, comprising of Lancaster and Chester Counties, and that Area VI be reconfigured to include Troop N, Hazleton, comprising of the Counties of Columbia, Carbon, Monroe, and the southern part of Luzerne, as specified in Administrative Regulation 1-1, Appendage A, Section B 13.

5. A definite advantage to both Area I and Area VI Commanders in this reconfiguration, are the highway systems that are available to travel from one location to another. The Area I Commander has Interstates 81, 78, 76, 83, and Route 30. The Area VI Commander has the Northeast extension of the PA Turnpike, and Interstate 80.

6. Enclosure (1) shows the Interstates reconfiguration of both of these areas. I would be available to discuss this issue at any time.

RGW:dmo

cc:    Area VI File



APPENDAGE III

AR 1-1
10/12/94

PENNSYLVANIA STATE POLICE LOCATION MAP

PRESENT CONFIGURATION

III-1

P119

PENNSYLVANIA STATE POLICE LOCATION MAP

RE-CONFIGURATION

APPENDAGE III

AR 1-1
10/12/94



**PENNSYLVANIA STATE POLICE**
DEPARTMENT HEADQUARTERS
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

November 10, 1994

Lieutenant Darrell G. Ober
Commander, Central Section
Systems and Process Review Division
1800 Elmerton Avenue
Harrisburg, PA 17110

Dear Lieutenant Ober:

During the month of October, 1994, you and fellow members of the Systems and Process Review Division conducted a full and complete review of the Bureau of Research and Development.

I would like to take this opportunity to express to you my sincere appreciation and congratulations for a job well done. The professionalism you displayed and your dedication and commitment to the Department is not only a credit to the Pennsylvania State Police and the Bureau of Professional Responsibility but also to you as an individual.

As the Director, Bureau of Professional Responsibility, I am proud that the Bureau of Professional Responsibility is comprised of members of your ability and competence. I am always confident that when given an assignment, you and your fellow Systems and Process Review Division team members will perform in an exemplary manner. I wish you continued success in the Department and the Systems and Process Review Division.

Sincerely,

Major Thomas K. Coury
Director
Bureau of Professional Responsibility

*Buckle Up Pennsylvania*
It's Your Life
It's Our Law

P/2/



**PENNSYLVANIA STATE POLICE**
DEPARTMENT HEADQUARTERS
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

January 6, 1995

Lieutenant Darrell G. Ober
Commander, Central Section
Systems and Process Review Division
1800 Elmerton Avenue
Harrisburg, PA 17110

Dear Lieutenant Ober:

I recently had the opportunity to review the findings and Consensus Report on the Systems and Process Review of the Bureau of Records and Information Services.

As the Director of the Bureau of Professional Responsibility, please allow me to extend to you my personal thank you for the exemplary manner in which you have performed this important assignment.

Best of wishes for a prosperous new year.

Sincerely,

Major Thomas K. Coury
Director
Bureau of Professional Responsibility

*Buckle Up Pennsylvania*
It's Your Life
It's Our Law

P122



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

OFFICE OF DEPUTY COMMISSIONER

March 5, 1998

Darrell,

I justed wanted to share with you how much I appreciate the job you are doing. I have received many positive comments from Area & Troop Commanders on your outstanding performance.

The extra mile you go to cooperate & work with your fellow Commanders is duly noted. Needless to say, when they are happy, it makes the Commissioner & my job easier.

Keep up the Good work!

Tom

P123

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

**DATE:**      May 15, 1996

**SUBJECT:**  Acting Director of Bureau of Professional Responsibility

**TO:**          Director, Internal Affairs Division
                   Director, Systems and Process Review Division

**FROM:**     Lt. Colonel Thomas K. Coury
                   Deputy Commissioner of Administration


     1.    Teaching a member to be administratively prepared to perform at the next higher level is an important function to the Department.

     2.    In order for both Division Directors of the Bureau of Professional Responsibility to have an opportunity to perform the duties of a Bureau Director, I have decided to rotate the designation of Acting Director of the Bureau between both Division Directors. Each Division Director will serve as Acting for two pay periods and the function will then be rotated. This rotation plan will continue for as long as an Acting Director is required.

     3.    On June 1, 1996, Captain Ober will assume the duties of Acting Director of the Bureau.

P124

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:              June 17, 1999

SUBJECT:           AR 1-1, Organization

TO:                Bureau Directors
                   Executive and Administrative Offices
                   Commander, Area V

FROM:              Major R. Dane Merryman
                   Director
                   Bureau of Research and Development

REFERENCE:    (a)  AR 1-1, Organization.

ENCLOSURE:    (1)  Pennsylvania State Police Organizational Chart, dated
                   June 1999.

    1.    The Governor's Office of Administration has recently approved Enclosure (1).

    2.    Reference (a) is being updated. Please review the responsibilities currently listed in AR 1-1. Make any corrections or updates necessary, and return the updates to the Bureau of Research and Development, Attention: Corporal Karen L. Borza, Programming Division, by July 9, 1999.

    3.    Any questions regarding this correspondence, contact Corporal Borza at 717-787-0893.

P/25