Vol II Exhibits 126-274

60
5/21/0

ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA

MAY 2 0 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

DARRELL G. OBER                    :    1: CV – 00-0084
                                   :
        Plaintiff                  :
                                   :
                                   :
    vs.                            :
                                   :
                                   :
PAUL EVANKO, MARK                  :    (Judge Caldwell)
CAMPBELL, THOMAS COURY,            :
JOSEPH WESTCOTT,                   :
HAWTHORNE CONLEY                   :
                                   :
        Defendants                 : JURY TRIAL DEMANDED

## PLAINTIFF'S EXHIBITS

The following documents have already been provided to the defendant's and are again reproduced and provided:

PLANTIFF 1: Memo dated February 7, 2001 from Evanko to Deputy Commissioner of Staff re: Reconfiguration of Area Commands I and IV.

PLAINTIFF 2: Special Order 98-22, re: Internal Investigations.

PLAINTIFF 3: E-mail from Coury to Conley dated February 10, 2000, subject: STD-501.

PLAINTIFF 4: STD-501 from Conley to Commissioner, dated February 18, 2000 re: Captain Ober.

PLAINTIFF 5: E-mails from Ober to Szupinka dated January 12 – 17, 2000, re: State Vehicle.

PLAINTIFF 6:  Memo from Ober to Deputy Commissioner of Administration, dated November 10, 1999, re: Northwestern Traffic Institute.

PLAINTIFF 7: Memo from Conley to Division Directors, dated December 15, 1998, re: Ober's Temporary Assignment to Higher Rank.

PLAINTIFF 8: Memo from Conley to Division Directors, dated October 15, 1998, re: Ober's Temporary Assignment to Higher Rank.

PLAINTIFF 9: E-mail from Conley to Ober, dated August 23, 1999, re: Cell Phone.

PLAINTIFF 10: Bureau of Professional Responsibility Roster, dated July 21, 1999.

PLAINTIFF 11: Record of cell phone usage for cell numbers 717-877-4106 and 717-805-3018.

PLAINTIFF 12: Undated memo from Ober to Director, Bureau of Technology Services, re: Cellular Telephones.

PLAINTIFF 13: E-mail from Conley to Ober, dated December 13, 1999, re: Division Director's Letter.

PLAINTIFF 14: Letter of Commendation to Sergeant Ronald L. Hillegass, dated January 7, 1999 from Ober.

PLAINTIFF 15: Invoice and receipt from Framers' Workshop, dated May 14, 1999.

PLAINTIFF 16: Desk Memorandum, dated December 16, 1999 from Ober to Director, Bureau of Professional Responsibility.

PLAINTIFF 17: General Invoice in the amount of $69.35, dated December 14, 1999.

PLAINTIFF 18: E-mail from Conley to Ober, dated January 26, 2000, re: Return of Bureau of Property.

PLAINTIFF 19: E-mail from Ober to Brown, dated January 26, 2000 re: Return of BPR Vehicle and Equipment.

PLAINTIFF 20: E-mail from Ober to Brown, dated January 26, 2000 re: Return of BPR Vehicle and Equipment.

PLAINTIFF 21: Letter from Major Paul Woodring, dated February 9, 1996, to Mr. Charles Leazier.

PLAINTIFF 22: Copy of investigation ordered by Evanko and conducted by Major's Werts and Williams (IAD 1999-503).

PLAINTIFF 23: Memo from Captain Brown to Captain Oleyniczak, dated May 6, 1999.

PLAINTIFF 24: SP 1-101, subject McCormick, complainant Romano, date of allegation November 25, 1999.

PLAINTIFF 25: Sample General Investigation Report, dated April 21, 1993.

PLAINTIFF 26: Sample Memo from Lieutenant Sample to Commander Area I, dated August 27, 1997.

PLAINTIFF 27: Sample General Investigation Report, dated August 27, 1997.

PLAINTIFF 28: Sample Summary Report from Lieutenant Sample to Trooper Doe, dated August 27, 1997.

PLAINTIFF 29: Bureau of Professional Responsibility 1999 Annual Report.

PLAINTIFF 30: May 25, 1999 interview of FBI Agent Ralph Kush.

PLAINTIFF 31: June 8, 1999 interview of Conley.

PLAINTIFF 32: Undated e-mail from Evanko to Campbell, re: Reorganization.

PLAINTIFF 33: Email from Brown to Ober, dated March 29, 2000, re: Supervisory Inquiry.

PLAINTIFF 34: Email from DeWire to Ober, dated August 8, 2001, re: Supervisory Inquiry.

PLAINTIFF 35: Undated draft Supervisory Inquiry Process regulation.

PLAINTIFF 36: Copy of Investigative Report directed by Coury and conducted by Mrgich (IAD 1999-409).

PLAINTIFF 37: Desk Memo, dated December 3, 1999 from Brown to Deputy Commissioner of Administration.

PLAINTIFF 38: Desk Memo, dated October 5, 1999 from Acting Director, Internal Affairs to Director, Bureau of Professional Responsibility.

PLAINTIFF 39: Desk Memo, dated November 19, 1999, from Director, Bureau of Professional Responsibility to Deputy Commissioner of Administration.

PLAINTIFF 40: Desk Memo, dated October 5, 1999, from Acting Director, Internal Affairs Division to Director, Bureau of Professional Responsibility.

PLAINTIFF 41: Bureau of Professional Responsibility Route Slip, re: IAD 1999-409, dated September 1, 1999.

PLAINTIFF 42: Bureau of Professional Responsibility Route Slip, re: IAD 1999-409, dated November 12, 1999.

PLAINTIFF 43: Undated Desk Memo, from Acting Director, IAD to Director, BPR.

PLAINTIFF 44: Memo, dated February 12, 2001, from Pudliner to Conley re: IAD 1999-409.

PLAINTIFF 45: SP 1-101, dated May 27, 1999, Ober – Subject; Coury – Complainant.

PLAINTIFF 46: Letter to Phil Conti.

PLAINTIFF 47: Letter from Philip Conti to Tom, dated May 22, 1999.

PLAINTIFF 48: Memo from Ober to Director, Bureau of Professional Responsibility, dated September 10, 1999, re: Supervisory Inquiry 1999-409.

PLAINTIFF 49: Pennsylvania State Police Historical, Educational and Memorial Center Board of Directors, dated February 7, 2001.

PLAINTIFF 50: Memo dated October 21, 1999, from Conley to Ober, re: Time and Attendance.

PLAINTIFF 51: Memo from Evanko to Deputy Commissioner of Administration, dated October 4, 1999, re: Time and Attendance.

PLAINTIFF 52: Memo from Conley to Ober, dated July 1, 1999, re: Time and Attendance.

PLAINTIFF 53: STD-929, Time and Attendance Record, for June 12 – 25, 1999 for Ober.

PLAINTIFF 54: Request for Leave, STD-330, for Ober dated May 18, 1999.

PLAINTIFF 55: Request for Leave, STD-330, for Ober dated May 20, 1999.

PLAINTIFF 56: Request for Leave, STD-330, for Ober dated March 5, 1999.



PLAINTIFF 57: STD-929, Time and Attendance Record, for pay period ending March 19, 1999.

PLAINTIFF 58: Police Criminal Complaint, defendant Dennis Jay Bridge, filed September 30, 1999.

PLAINTIFF 59: Affidavit of Probable Cause, dated September 30, 1999, defendant Bridge.

PLAINTIFF 60: Police Criminal Complaint, defendant Kipp Stanton, filed September 30, 1999.

PLAINTIFF 61: Affidavit of Probable Cause, dated September 30, 1999, defendant Stanton.

PLAINTIFF 62: AR Change No. 866, dated February 23, 2001.

PLAINTIFF 63: Memo from Coury to Commissioner, dated June 16, 1999, re: meeting with Commissioner and Hickes.

PLAINTIFF 64: Bureau of Professional Responsibility interview of Coury, dated June 28, 1999.

PLAINTIFF 65: Memo Coury to Ober, dated November 1, 1999, re: Northwestern University Traffic Institute.

PLAINTIFF 66: Memo from Ober to Director, Bureau of Personnel, dated October 19, 1999, re: School of Police Staff and Command.

PLAINTIFF 67: Department Special Order 99-102, dated October 7, 1999.

PLAINTIFF 68: E-mail from Ober to Brown, November 10, 1999, re: Northwestern University Traffic Institute.

PLAINTIFF 69: January 2001 High Performance MoPar magazine article, "Out of Retirement".

PLAINTIFF 70: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from May 18, 1999 meeting.

PLAINTIFF 71: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from January 21, 1998 meeting.

PLAINTIFF 72: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from November 19, 1997.

PLAINTIFF 73: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from September 17, 1997.

PLAINTIFF 74: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from April 9, 1997.

PLAINTIFF 75: Memo from Evanko to Sarah Shuller, dated August 26, 1998.

PLAINTIFF 76: April 1999 "Communicator", page 5.

PLAINTIFF 77: Retirees' Scoop; May 1999 "Communicator".

PLAINTIFF 78: Memo from Coury to Ober, dated December 23, 1999, re: Supervisory Inquiry IAD# 1999-409.

PLAINTIFF 79: Desk Memo from Acting Director, Internal Affairs Division to Deputy Commissioner of Administration, dated December 3, 1999.

PLAINTIFF 80: Desk Memo from Acting Director, Internal Affairs Division to Director, Bureau of Professional Responsibility, dated October 5, 1999.

PLAINTIFF 81: Desk Memo from Director, Bureau of Professional Responsibility to Deputy Commissioner of Administration, dated November 19, 1999.

PLAINTIFF 82: Desk Memo from Acting Director, IAD to Director, BPR dated October 5, 1999.

PLAINTIFF 83: BPR Route Slip, dated November 12, 1999.

PLAINTIFF 84: Desk Memo

PLAINTIFF 85: E-mail from DeWire to Ober, dated October 4, 2000, re: Chain of Command.

PLAINTIFF 86: E-mail from Ober to Coury, dated May 18, 2001, re: OD Report.

PLAINTIFF 87: Mary Bungo's affidavit dated May 15, 2001.

PLAINTIFF 88: Special Order 2001-24, dated March 21, 2001.

PLAINTIFF 89: Bureau of Research and Development route slip, dated April 11, 2001.

PLAINTIFF 90: Memo from Barbara Christie to Deputy Commissioner Staff, dated April 10, 2001.

PLAINTIFF 91: E-mail from DeWire to Ober re: Chain of Command, dated October 4, 2000.

PLAINTIFF 92: Signature route slip, Commissioner's sign-off dated February 22, 2001.

PLAINTIFF 93: Signature route slip, Deputy/Staff sign-off dated February 17, 2000.

PLAINTIFF 94: Undated, hand-written file notes.

PLAINTIFF 95: AR Manual Change No. 866, dated February 23, 2001.

PLAINTIFF 96: Draft AR 1-1.

PLAINTIFF 97: Project Tracking Summary, date assigned October 10, 2000.

PLAINTIFF 98: Project Tracking Summary, date assigned September 30, 1999.

PLAINTIFF 100: Project Tracking Summary, date assigned August 19, 1999.

PLAINTIFF 101: Project Tracking Summary, date assigned July 17, 1997.


PLAINTIFF 102: Project Tracking Summary, date assigned February 10, 1998.

PLAINTIFF 103: Project Tracking Summary, date assigned July 17, 1997.

PLAINTIFF 104: Reproduction Request, dated February 23, 2001.

PLAINTIFF 105: AR Manual Change No. 866, dated February 23, 2001.

PLAINTIFF 106: AR 1-1; Organization, dated February 23, 2001.

PLAINTIFF 107: Draft AR 1-1.

PLAINTIFF 108: Undated, hand written note.

PLAINTIFF 109: Draft AR 1-1, Change No. 866 Change Sheet.

PLAINTIFF 110: Draft 1-1 text; dated February 23, 2001.

PLAINTIFF 111: Desk Memo from Durante to Dir., Planning Division, dated February 21, 2001.

PLAINTIFF 112: E-mail from Merryman to Margeson, dated February 8, 2001 re: E's.

PLAINTIFF 113: E-mail from Merryman to Margeson, dated January 29, 2001, re: E's.

PLAINTIFF 114: Undated CLEAN Message re: Area Command Reconfiguration

PLAINTIFF 115: Pennsylvania State Police Organization Chart.

PLAINTIFF 116: Desk Memo from Merryman to Margeson, dated February 13, re: Reconfig of Area Commands.

PLAINTIFF 117: Desk Memo from Coury to Commissioner, dated February 7, 2001, re: Reconfiguration of Area Commands.

PLAINTIFF 118: Memo from Werts to Commissioner, dated February 5, 2001 re: Organization: reconfiguration of Areas.

PLAINTIFF 119: Pennsylvania State Police Location Map, dated October 12, 1994.

PLAINTIFF 120: Pennsylvania State Police Location Map, dated October 12, 1994.

PLAINTIFF 121: Letter from Coury to Ober, dated November 10, 1994.

PLAINTIFF 122: Letter from Coury to Ober, dated January 6, 1995.

PLAINTIFF 123: Handwritten letter from Coury to Ober, dated March 5, 1998.

PLAINTIFF 124: Memo from Coury to Director, Internal Affairs Division, dated May 15, 1996.

PLAINTIFF 125: Memo from Merryman to Bureau Directors, dated June 17, 1999 re: AR 1-1, Organization.

PLAINTIFF 126: FR7-4, dated December 23, 1996.

PLAINTIFF 127: Ober's grievances (six).

PLAINTIFF 128: Memo from Skurkis to Director, Bureau of Emergency and Special Operations, dated June 29, 2000.

PLAINTIFF 129: Memo from Reynolds to Mullin, dated April 24, 2000 re: Loss of or Damage to State Property Appeal Board.

PLAINTIFF 130: Memo from Mullin to Reynolds, dated May 8, 2000 re: Request to Reopen Proceedings.

PLAINTIFF 131: Memo from Bonney to Director, Staff Services, dated June 26, 2000 re: Final Determination.

PLAINTIFF 132: Memo from Ober to Deputy Commissioner of Administration, dated July 27, 2000 re: Reimbursement Appeal.

PLAINTIFF 133: Memo from Coury to Ober, dated November 1, 1999 re: Northwestern University Traffic Institute.

PLAINTIFF 134: FR 1-2, dated May 16, 2000.

PLAINTIFF 135: AR 4-22, dated September 15, 2000.

PLAINTIFF 136: AR 4-11, dated August 20, 1997.

PLAINTIFF 137: Memo from Ober to Director, Bureau of Liquor Control Enforcement, dated July 27, 2000, re: review of Bureau personnel file.

PLAINTIFF 138: Memo from DeWire to Ober, dated July 28, 2000 re: review of Bureau personnel file.

PLAINTIFF 139: Memo from McDonald to Ober, dated March 27, 2002 re: review of Bureau personnel file.

PLAINTIFF 140: Memo from Ober to Acting Director of LCE, dated March 27, 2002, re: review of Bureau personnel file.

PLAINTIFF 141: AR 1-1; pages 37, 39 and 40, dated July 31, 1997.

PLAINTIFF 142: Bits & Bytes, May 2000.

PLAINTIFF 143: Bits & Bytes, September 2000.

PLAINTIFF 144: Bits & Bytes, April 2000.

PLAINTIFF 145: Bits & Bytes, January 2002.

PLAINTIFF 146: E-mail from Commissioner to all personnel, dated January 8, 2002.

PLAINTIFF 147: E-mail from Wilt to Ober, dated January 31, 2000 re IIMS.

PLAINTIFF 148: Undated e-mail from Schmidt to Ober.

PLAINTIFF 149: E-mail from Shelton to Ober, dated January 20, 2000 re: IIMS.

PLAINTIFF 150: Memo from Ober to OA, dated March 8, 2000 re: Grievance #HQ-172.

PLAINTIFF 151: E-mail from Ober to Hostert, dated March 27, 2000.

PLAINTIFF 152: E-mail from Szupinka to Ober, dated February 4, 2000.

PLAINTIFF 153: E-mail from Ober to Grab, dated January 24, 2000.

PLAINTIFF 154: Memo from McCommons to Ober, dated January 10, 2000.

PLAINTIFF 155: E-mail from Laughlin to Ober, dated March 13, 2000.

PLAINTIFF 156: E-mail from Ober to Mike, dated January 23, 2001.

PLAINTIFF 157: E-mail from Ober to Lazzaro, dated December 7, 2000.

PLAINTIFF 158: E-mail from PSP postmaster to everyone, dated September 1, 2000.

PLAINTIFF 159: E-mail from Ober to Ruth Brown, dated December 6, 2000.

PLAINTIFF 160: E-mail from Ober to Riley, dated August 25, 1999.

PLAINTIFF 161: E-mail from Ober to Brian, dated January 11, 2000.

PLAINTIFF 162: E-mail from Ditzler to Ober, dated January 7, 2000.

PLAINTIFF 163: Letter from Kwiatek to Ober, dated March 27, 2000.

PLAINTIFF 164: E-mail from Ober to Conley, dated September 7, 1999.

PLAINTIFF 165: Letter from Gallegos to Ober, dated January 29, 2001.

PLAINTIFF 166: Letter from Lazzaro to Ober, dated July 27, 2000.

PLAINTIFF 167: E-mail from Ober to Suber, dated April 2, 2001.

PLAINTIFF 168: Letter from Lazzaro to Ober, dated June 9, 2000.

PLAINTIFF 169: Memo from Ober to Commissioner, dated December 24, 1997.

PLAINTIFF 170: Memo from Ober to Deputy Commissioner of Administration, dated October 29, 1996.

PLAINTIFF 171: Undated CALEA Concerns Outline.

PLAINTIFF 172: E-mail from Wilt to Ober, dated May 31, 2000.

PLAINTIFF 173: E-mail from Christensen to Ober, dated March 9, 2000.

PLAINTIFF 174: Letter from Gallegos to Ober, dated January 16, 2001.

PLAINTIFF 175: Letter from Hunter to Ober, dated January 29, 2001.

PLAINTIFF 176: E-mail from Ober to Brown, dated January 25, 2000.

PLAINTIFF 177: E-mail from Ober to Davis, dated January 28, 2000.

PLAINTIFF 178: E-mail from Ober to Davis, dated January 27, 2000.

PLAINTIFF 179: E-mail from Ober to Binker, dated January 17, 2000.

PLAINTIFF 180: E-mail from Ober to Skiles, dated February 14, 2000.

PLAINTIFF 181: E-mail from Waugh to Ober, dated February 10, 2000.

PLAINTIFF 182: E-mail from Waugh to Ober, dated February 15, 2000.

PLAINTIFF 183: E-mail from Ober to Skiles, dated February 21, 2000.

PLAINTIFF 184: E-mail from Waugh to Ober, dated November 12, 1999.

PLAINTIFF 185: Letter from McSpadden to Ober, dated December 22, 2000.

PLAINTIFF 186: Letter from Kwiatek to Ober, dated March 15, 2000.

PLAINTIFF 187: Letter from P.M. Conti to Ober, dated September 4, 1994.

PLAINTIFF 188: Custody Order dated February 5, 1999.

PLAINTIFF 189: E-mail from Infantino to Ober, dated September 3, 1999.

PLAINTIFF 190: E-mail from Davis to Ober, dated February 17, 2000.

PLAINTIFF 191: E-mail from Ober to Davis, dated June 26, 2000.

PLAINTIFF 192: Undated Centennial Book Committee assignment page.

PLAINTIFF 193: E-mail from Ober to Waugh, dated January 11, 2000.

PLAINTIFF 194: E-mail from Waugh to Ober, dated March 16, 2000.

PLAINTIFF 195: CLEAN Message, dated April 20, 1999.

PLAINTIFF 196: May 1999 IIMS Newsletter.

PLAINTIFF 197: RFQC Procurement Project Structure, dated August 30, 1999.

PLAINTIFF 198: Memo from Backenstoss to Wilt, dated January 27, 2000.

PLAINTIFF 199: E-mail from Ober to Wilt, dated February 7, 2000.

PLAINTIFF 200: Memo from Ober to IIMS Program Manager, dated February 10, 2000.

PLAINTIFF 201: E-mail from Wilt to Ober, dated February 15, 2000.

PLAINTIFF 202: Agenda, IIMS Oversight Committee, dated February 22, 2000.

PLAINTIFF 203: IIMS Systems Integrator BAFO Evaluation Results, dated February 21, 2000.

PLAINTIFF 204: Agenda, IIMS Oversight Committee, dated February 14, 2000.

PLAINTIFF 205: IIMS Systems Integrator Committee Contact Information, dated August 30, 1999.

PLAINTIFF 206: Ober's notes from April 6, 2000 debriefing meeting with IBM.

PLAINTIFF 207: Debriefing notes from March 23, 2000 meeting with Andersen Consulting.

PLAINTIFF 208: E-mail from Wilt to Ober dated February 10, 2000.

PLAINTIFF 209: E-mail from Ober to group list, dated February 14, 2000.

PLAINTIFF 210: E-mail from Ober to Stephen, dated January 7, 2000.

PLAINTIFF 211: E-mail from Bucher to DeWire, dated August 22, 2001.

PLAINTIFF 212: Memo from Westcott to Commissioner, dated January 4, 1999.

PLAINTIFF 213: Memo from Werts to Deputy Commissioner of Operations, dated December 28, 1998.

PLAINTIFF 214: Memo to file from Merryman, dated January 26, 2000.

PLAINTIFF 215: CLEAN Message, dated April 7, 1999.

PLAINTIFF 216: Bureau of Research and Development Personnel Order 99-5, dated June 16, 1999.

PLAINTIFF 217: National Governor's Association article.

PLAINTIFF 218: E-mail from PSP Commissioner to Everyone, dated August 9, 2000.

PLAINTIFF 219: Desk Memo from Ober to Director, Bureau of Technology Services, dated January 18, 2000.

PLAINTIFF 220: Memo from Ober to Commissioner dated January 17, 2000.

PLAINTIFF 221: Ober's resume.

PLAINTIFF 222: Pages 6 and 7 of AR 1-1.

PLAINTIFF 223: Memo from Evanko to Infantino, dated August 24, 1999.

PLAINTIFF 224: Memo from Koselnak to Valencic, dated September 2, 1999.

PLAINTIFF 225: Memo from Koselnak to Chief Counsel, date January 13, 2000.

PLAINTIFF 226: Memo from Koselnak to Department Disciplinary Officer, dated September 2, 1999.

PLAINTIFF 227: Memo from Koselnak to Williams, dated September 1, 1999.

PLAINTIFF 228: Memo from Bonney to Williams, dates January 27, 2000.

PLAINTIFF 229: Memo from Koselnak to McDonald, dated May 30, 2000.

PLAINTIFF 230: Newspaper article, March 9, 2000.

PLAINTIFF 231: Memo from Koselnak to Ryan, dated February 17, 2000.

PLAINTIFF 232: Email from Koselnak to Ober, dated February 21, 2000.

PLAINTIFF 233: Memo from Campbell to Bureau Staff, dated February 25, 2000.

PLAINTIFF 234: Memo from Evanko to Bureau Directors, dated February 3, 2000.

PLAINTIFF 235: Memo from Campbell to Commissioner, dated May 8, 2000.

PLAINTIFF 236: CLEAN Message, dated May 16, 2000 re: Lieutenant Vacancies.

PLAINTIFF 237: Email from Szupinka to Ober, dated January 18, 2000.

PLAINTIFF 238: Email from Szupinka to Ober, dated January 26, 2000.

PLAINTIFF 239: Indiana Gazette article, dated April 3, 2001.

PLAINTIFF 240: Post-Gazette article, dated February 9, 2001.

PLAINTIFF 241: Special Order 2000-2, dated January 7, 2000.

PLAINTIFF 242: Workplace Rights and Responsibilities.

PLAINTIFF 243: BPR Handout.

PLAINTIFF 244: Section 5101; Title 18.

PLAINTIFF 245: Letter from Reynolds to Warnken, dated January 27, 2000.

PLAINTIFF 246: Memo from Westcott to Director, LCE, dated April 28, 2000.

PLAINTIFF 247: Memo from Koselnak to Section Commanders, dated March 23, 2000.

PLAINTIFF 248: Memo from Koselnak to Central Section Commander, dated April 18, 2000.

PLAINTIFF 249: Memo from Koselnak to Deputy Commissioner of Operations, dated April 19, 2000.

PLAINTIFF 250: STD-279, dated April 19, 2000.

PLAINTIFF 251: STD-279, dated September 7, 1999.

PLAINTIFF 252: Letter from Lanier to Reynolds, dated February 9, 2000.

PLAINTIFF 253: Ethical Problems for Pennsylvania Litigators.

PLAINTIFF 254: Page Two, "Communicator"; Retirees' Scoops.

PLAINTIFF 255: Page Two, "Communicator"; Retirees' Scoops.

PLAINTIFF 256: Page Four, "Communicator"; Retirees' Scoops.

PLAINTIFF 257: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 258: Page Six, "Communicator"; Retirees' Scoops.

PLAINTIFF 259: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 260: Page Eight, "Communicator"; Retirees' Scoops.

PLAINTIFF 261: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 262: Page Four, "Communicator"; Retirees' Scoops.

PLAINTIFF 263: CLEAN Message dated January 7, 2000.

PLAINTIFF 264: CLEAN Message dated January 11, 2000.

PLAINTIFF 265: FR 1 Preface; Interaction With People, dated February 20, 1998.

PLAINTIFF 266: Personnel Order 00-18; dated August 31, 2000.

PLAINTIFF 267: Envelop to Ober.

PLAINTIFF 268: Management Directive 540.7, dated June 22, 1998.

PLAINTIFF 269: Memo from Ober to Director, BPR, dated May 28, 1998.

PLAINTIFF 270: Desk Memo from Hain to Ober, dated November 25, 1996.

PLAINTIFF 271: Lieutenants Job Description issued to Captain Ober, dated March 7, 2000.

PLAINTIFF 272: Lieutenants Job Description issued to Lieutenant Williams, dated December 17, 1998.

PLAINTIFF 273: Desk Memo from Woodring to Ober, dated March 28, 1995

PLAINTIFF 274: Memo from Hickes to Director, BPR, dated March 28, 1995.

PLAINTIFF 275:Deputy Commissioners Letter of Appreciation, dated January 19, 2000.

PLAINTIFF 276: Bureau Directors Memo from Waugh to Ober, dated January 19, 2000.

PLAINTIFF 277: CLEAN Message dated June 2, 2000.

PLAINTIFF 278: BPR interview of LTC Hickes, dated July 2, 1999.

PLAINTIFF 279: BPR interview of Evanko, dated June 28, 1999.

PLAINTIFF 280: Memo from Hickes to Commissioner, dated May 18, 1999.

PLAINTIFF 281: Memo from Ober to Director, Bureau of Personnel, dated October 19, 1999 with margin note sent to Personnel 10/20/99.

PLAINTIFF 282: FR 1-1, dated March 25, 1992.

PLAINTIFF 283: Evanko's handwritten notes, dated May 20, 1999.

PLAINTIFF 284: FR 3-2, dated April 16, 1996.

PLAINTIFF 285: Special Assignment.

PLAINTIFF 286: AR 4-25, dated September 2, 1993.

PLAINTIFF 287: AR 1-10, page 4 dated September 16, 1997.

PLAINTIFF 288: Undated, handwritten file notes.

PLAINTIFF 289: Undated, handwritten file notes.

PLAINTIFF 290: Ober's Performance Evaluations.

PLAINTIFF 291: Memo from Demkovitz to Ober, dated May 31, 2000.

PLAINTIFF 292: Memo from McSpadden to Ober dated January 30, 2001.

PLAINTIFF 293: Attorney bills.

PLAINTIFF 294: Memo from Aitchison to Ober, dated March 20, 2001.

PLAINTIFF 295: Memo from Frankel to Ober, dated January 22, 2001.

PLAINTIFF 296: Memo from Lazzaro to Ober, dated January 26, 2001.

PLAINTIFF 297: Memo from Lightman to Lazzaro, dated January 28, 2001.

PLAINTIFF 298: Memo from Lazzaro to Ober, dated February 1, 2001.

PLAINTIFF 299: Memo from Gallegos to Ober, dated July 2, 2001.

PLAINTIFF 300: Minutes – Grand Lodge, dated March 23 –24, 2001.

PLAINTIFF 301: Memo from Ruda to Ober, dated July 15, 2000.

PLAINTIFF 302: FR 3-3, dated March 3, 1999.

PLAINTIFF 303: Ober's promotion results.

PLAINTIFF 304: Letters of Appreciation from Citizens/Co-workers.

PLAINTIFF 305: Prior adjudication's.

PLAINTIFF 306: Ober's 2002 Performance Evaluation.

PLAINTIFF 307: Personnel Order 99-16, dated June 30, 1999.

PLAINTIFF 308: Personnel Order 00-07, dated March 10, 2000.

PLAINTIFF 309: 1998 – 2000 Collective Bargaining Agreement between Commonwealth and PSTA.

PLAINTIFF 310: McDonald's Performance Evaluation, dated October 11, 2000.

PLAINTIFF 311: Ober's Commission.

PLAINTIFF 312: Memo from Campbell to Commissioner, dated May 25, 2000.

PLAINTIFF 313: Personnel Order 99-20.

PLAINTIFF 314: Personnel Order 00-04.

PLAINTIFF 315: Management Directive 525.4 Amended, dated November 7, 1996.

PLAINTIFF 316: Receipt from Bailey to Christi, dated April 1, 2002.

PLAINTIFF 317: Arbitration decisions.

PLAINTIFF 318: Acting Bureau Director memo and rosters.

PLAINTIFF 319: Arbitration decision, dated June 16, 1999.

PLAINTIFF 320: CLEAN Message from PSP Postmaster to Everyone, dated March 7, 2000.

PLAINTIFF 321: Letter from Ober to Kwiatek, dated March 17, 2000.

PLAINTIFF 322: E-mail from DeWire to Ober, dated February 6, 2002.

PLAINTIFF 323; Memo from Evanko to Deputy Commissioner of Administration, dated December 18, 1991.

PLAINTIFF 324: IIMS milestones and timeline, dated March 26, 2002.

PLAINTIFF 325: IIMS Meeting agenda, dated February 18, 2000.

PLAINTIFF 326: Memo from Ober to Commissioner, dated January 17, 2000.

PLAINTIFF 327: Memo from Merryman to Commissioner, dated December 16, 1997.

PLAINTIFF 328: Management Directive 205.16 Amended, dated November 22, 1995

PLAINTIFF 329: Management Directive 205.14 Amended, dated February 2, 1998.

PLAINTIFF 330: Management Directive 1980-18, dated May 16, 1984.

PLAINTIFF 331: Memo from Evanko to Wilson, dated November 15, 1999.

PLAINTIFF 332: Memo from Evanko to Christensen, dated July 27, 1999.

PLAINTIFF 333: Ober's Job Description, dated June 2, 2000.

PLAINTIFF 334: Letter from Brown to Ober, dated February 2, 2000.

PLAINTIFF 335: PEMA related messages; various dates.

PLAINTIFF 336: Supervisor's Class Syllabus.

SP 3-200 (12-93)




FR 7-4
12/23/96

  

## PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

SUBJECT:   UNDERCOVER VICE, DRUG, AND ORGANIZED CRIME OPERATIONS

4.01     PURPOSE

The purpose of this regulation is to establish policy and procedures governing undercover vice, drug, and organized crime operations, specifically relating to surveillance, decoy, and raid operations.

4.02     POLICY

Violations of statutes relating to vice, drug, and organized crimes have a significant negative effect on the quality of life in the Commonwealth. Members, particularly those in organizational segments having primary responsibility for operations in this area, shall identify, prioritize, and take appropriate action against such offenses, consistent with the provisions of Department regulations and relevant statutes.

4.03     GENERAL

A.     Analysis:  Prior to conducting any vice, drug or organized crime operation, members shall conduct a thorough analysis of the following areas:

1.     The crime/offense or suspected crime/offense.

2.     Victim(s).

3.     Location, including the surrounding neighborhood.

4.     Suspects and/or potential suspects, to include their habits, associates, vehicles, methods of operation or any other pertinent information.

-1-



FR 7-4
12/23/96

B.    <u>Familiarization</u>: Prior to engaging in an operation, members shall become familiar with:

1.    All intelligence information pertinent to the case.

2.    The location and surrounding area of the operation. Members may use photographs, maps, drive throughs or other available means.

3.    Incident-specific plans if available, e.g., raid plans, etc., and the identity of other undercover personnel involved in the operation, to include their disguises, if applicable.

C.    <u>Support</u>: To assist in covert operations, members shall draw on the various support functions and Units of the Department on an as-needed basis.  Support includes, but is not limited to, the following:

1.    Expense funds.

2.    Specialized investigative equipment, e.g., night vision scopes, etc.

3.    Undercover vehicles and surveillance vans.

4.    Troop Identification (ID) Units.

5.    Backup members.

6.    Additional members to provide relief and security.

7.    Fictitious identification.

8.    Special Emergency Response Teams (SERT).

D.    <u>Arrest Procedures</u>:  Members conducting undercover vice, drug or organized crime operations shall be guided by Department policy, State and federal statutes, and case laws governing arrest procedures, and allowable use of force.  Observation by other members and videotape documentation should be utilized where possible.

-2-

FR 7-4
12/23/96

E.  Communications:  Communications among all participants of an operation shall be maintained at all times, with radio/personnel check-ins at specified time intervals.  If it is deemed that the safety of a participant may be jeopardized by utilizing conventional communications, arrangements should be made to ensure their safety, e.g., periodic check-ins, surveillance, etc. Encrypted radios shall be used if available.  Consideration shall also be given to mobile telephones, pagers, visual communications, and body wires where appropriate, as well as a provision for emergency communications.  In operations between different operational Units or different agencies, arrangements shall be made for joint communications.

F.  Fictitious Identification:  All requests for fictitious drivers' licenses and vehicle registrations shall be forwarded, through channels, to the Director, Bureau of Criminal Investigation, ATTN:  Director, Organized Crime Division, for review, approval, and processing. Members who are assigned to undercover Units will be issued documents and will retain those documents as long as they remain in the undercover position.  Fictitious documents shall be returned to the Director, Organized Crime Division, whenever members leave their position for any reason.  On occasion, requests for the issuance of fictitious documents to a member(s) on a short-term basis may be considered.  Such requests must be justified by operational needs relating to a specific investigation. Additionally, documents which are issued under these circumstances shall be returned to the Director, Organized Crime Division, expeditiously upon completion of the specific investigation.  Members shall endeavor to maintain the confidentiality of fictitious identification.

4.04  PROCEDURES

A.  Making Contacts:  Making contacts with suspects shall be conducted in such a manner as to keep safety concerns as a top priority.  Consideration to being introduced to a suspect by a mutual contact or by an informant should be given when appropriate.  Members shall ensure supervisors/coworkers are familiar with their mission and location as much as possible.

-3-

FR 7-4
12/23/96

B.   Surveillance:  Members shall comply with the Crimes Code,
     Chapter 57, relating to the restrictions placed on electronic
     wiretapping and surveillance.  Members engaged in following the
     movements of a suspect shall attempt to utilize Department
     aircraft where/when available, and shall attempt to use several
     members in different vehicles to lessen the probability of being
     identified or perceived as a threat.

C.   Decoy:  Members may, at the discretion of the supervisor,
     disguise themselves to appear as victims, "johns," "hookers," drug
     dealers, etc., based on the nature of the operation.  The manner
     of dress/disguise shall be documented on the investigative report
     for future investigatory or court purposes; photographs may also
     be utilized for documentation purposes.  Backup members must
     be briefed as to the disguise so they are able to quickly identify
     undercover members.

D.   Raids:  Members engaging in raids shall wear the issued
     uniform/raid jacket to assist in their identification.  Prior to a vice
     or organized crime raid, the supervisor in charge shall ensure the
     proper legal authorization, e.g., search warrant, arrest warrant,
     etc., is in order and valid on its face.  The supervisor shall also:

     1.   Coordinate the raid, including the selection and
          communication with any support units, e.g., SERT, Troop
          ID Units, fire department personnel, etc., or emergency
          medical services personnel where needed/appropriate.

     2.   Develop strategies and tactics for approaching, entering,
          securing, and leaving the raid site(s).

     3.   Verify all areas within the target are properly searched,
          and evidence/contraband is properly collected/seized, and
          documented.

4.05   RESPONSIBILITIES

A.   Director, Organized Crime Division:  The Director, Organized
     Crime Division, shall ensure records of all fictitious documents
     issued are maintained in a secure area.  Access shall be
     restricted to the Director, Bureau of Criminal Investigation; the
     Director, Organized Crime Division; or designee.  Such records

-4-

FR 7-4
12/23/96

shall contain information concerning the identities, real and fictitious, associated with the documents; and the assignment justifying the issuance and the date of issuance for all fictitious licenses and registrations. Records shall be reviewed semiannually by the Director, Organized Crime Division, to ensure compliance with the return requirements contained in this directive. All information relating to the issuance of specific fictitious identification shall be confidential and shall not be disclosed to any person without just cause. The Director, Organized Crime Division, shall be advised as soon as practical whenever information which may compromise the confidentiality of fictitious documents has been disclosed.

B.    Supervisors: Supervision is essential to ensure that operations are conducted in such a manner so as to achieve their maximum potential. **A Unit Supervisor, Section Commander or higher authority shall authorize all raids or preplanned forcible entries.**

1.    In the event that two or more supervisors of equal rank are assigned to an operation, one shall be designated as the supervisor in charge. Supervisors shall ensure:

a.    Members are closely supervised.

b.    The local police department/station is notified of undercover operations when appropriate.

c.    Legal questions or anticipated legal problems are properly addressed.

d.    The proper reports are prepared and necessary documentation is made.

e.    The number and placement of backup members are selected based on the anticipated need.

f.    Fictitious identification is returned as required by this regulation.

2.    Supervisors shall also ensure that any necessary plan is developed, supported, and carried out.

-5-

GRIEVANCE FORM

HQ-164

NAME AND RANK OF GRIEVANT/SPOKESPERSON
*CAPTAIN DARRELL G. BER*

☐ IF GROUP GRIEVANCE, CHECK BLOCK & LIST NAMES BELOW

TROOP/BUREAU
*TECHNOLOGY SERVICES*

STATION/DIVISION
*STRATEGIC DEVELOPMENT*

NAME OF REPRESENTATIVE (IF ANY)
*N/A*

(CHECK ONE)

☐ ...ANCE    ☒ CONTRACT INTERPRETATION    ☐ APPEAL DISCIPLINE

DATE OF ALLEGED CONTRACTUAL VIOLATION OR WHEN YOU BECAME AWARE OF SAME/OR DATE ACKNOWLEDGMENT OF PENALTY TO BE IMPOSED

DATE *10/28/99*

ALLEGED VIOLATION: CITE SPECIFIC CONTRACT PROVISIONS. IF DISCIPLINE—CITE ART: XXVIII (DISCIPLINE)

*ARTICLE 4; SALARIES – ARTICLE 13; VACATIONS*
*ARTICLE 26; DISCIPLINE; ARTICLE 28; GRIEVANCE PROCEDURE*

DETAILS—FULLY EXPLAIN ALLEGED VIOLATIONS / FOR DISCIPLINE SEE INSTRUCTION SHEET

*SEE ATTACHED*

LIST OF ATTACHMENTS/COPY D.A.R., RESPONSE LETTER, ETC.

*SEE ATTACHED*

LIST OF WITNESSES/NAME AND RANK

*SEE ATTACHED*

SUGGESTED REMEDY:

*SEE ATTACHED*

NAME AND RANK OF GROUP GRIEVANCE MEMBERS (EACH NAME MUST BE INITIALED)

*N/A*

SIGNATURE OF GRIEVANT/SPOKESPERSON
*Captain Darrell Gober*

DATE FILED *11/8/99*

*P.127*
*1 OF 46*

STEP -1-                                    IF DISCIPLINE SUBMIT DIRECTLY TO STEP -2-

GRIEVANCE WAS RECEIVED  October 8, 1999  AND IS ☐ AFFIRMED  ☒ DENIED
                                   DATE

ARTICLE 4, SALARIES - DENIED. Decision made by the Commissioner. I do not have the authority to resolve at this level.

ARTICLE 13, VACATIONS - DENIED. Insufficient articulation of information to support your allegation.

ARTICLE 26, DISCIPLINE - DENIED. No action of a disciplinary nature has been taken against you.

NOTE: Meeting conducted with grievant accompanied by Corporal Louis LAZZARO, PSTA President.

SIGNATURE (TROOP C.O./BUR. DIR.)                                    DATE MEETING HELD
MAJOR [signature]                                                   11/15/99
                          SIGNATURE
☐ CHECK TO APPEAL TO NEXT LEVEL.                                   DATE:

*(left margin, rotated)* RESPONSE TO CONTRACTUAL INTERPRETATION... ONLY

NOTICE: MUST BE POSTMARKED WITHIN 5 DAYS FROM RECEIPT OF FIRST STEP RESPONSE

| GRIEVANCE SUMMARY FORM COMPLETED ☐ YES ☐ NO | F.O.P. REPRESENTATIVE NOTIFIED ☐ YES ☐ NO | F.O.P. REPRESENTATIVE PRESENT ☐ YES ☐ NO |
|---|---|---|
| CHECK APPROPRIATE BLOCK | GIVEN OPPORTUNITY TO REVIEW INFORMATION USED FOR O.A.R. ☐ YES ☐ NO  DATE: | RIGHTS EXPLAINED ☐ YES ☐ NO |
| REASON FOR APPEAL: EXCESSIVE PUNISHMENT ☐  FACTUAL DISPUTE ☐ | SIGNATURE: | DATE: |

*(left margin)* DISCIPLINE ONLY

| DATE MEETING HELD | GRIEVANCE BOARD ACTION |
|---|---|
| DECISION RENDERED: | |

*(left margin, rotated)* STEP NO. 2 GRIEVANCE COMMITTEE ACTION

| DATE HEARING SET | LOCATION | ARBITRATOR ASSIGNED |
|---|---|---|
| DECISION RENDERED: | | |

*(left margin, rotated)* NO. 3 [RATION]

# DESK MEMORANDUM

**SUBJECT**

Grievance #HQ-164

**TO (NAME & ADDRESS)**
Captain Darrell G. Ober
Bureau of Technology Services

**FROM (NAME & ADDRESS)**
Major Hawthorne N. Conley
Director, Bureau of Professional Responsibility

**DATE SENT**
11/16/99

**DATE DUE**

| | | |
|---|---|---|
| | PLEASE CALL | APPROVAL | SEE ME |
| | RETURNED YOUR CALL | AS REQUESTED | COMMENT |
| X | INFORMATION & FILE | PREPARE REPLY/REPORT | NOTE AND RETURN |
| | NECESSARY ACTION | SIGNATURE | |

**RECEIVED BY**       **DATE**       **TIME**

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**MESSAGE:**

COMMONWEALTH OF PENNSYLVANIA

DATE:            November 8, 1999

SUBJECT:         Grievance HQ-164

TO:              Director, Bureau of Professional Responsibility
                 (Through channels)

FROM:            Captain Darrell G. Ober
                 Team Leader, System Integrator Selection Process
                 Bureau of Technology Services

ENCLOSURE:       (1)    Subject grievance.

                 1.    Enclosure (1) is forwarded for your information and action as
                       appropriate.


CC: PSTA


11/8/99

Hand Carried
's Dir, BPR
As per Maj'n Waugh

RECEIVED

NOV 0 9 RECD

PA. STATE POLICE

By

SUPPLEMENTAL - GRIEVANCE NUMBER HQ-164

DETAILS-Fully Explain Alleged Violations:

On June 28, 1999, without advanced notice, I was summoned to the Deputy Commissioner of Staff's office. Upon my arrival, I was informed by Major Thomas Williams and Major Robert Wertz that they had been ordered, by the Commissioner, to conduct an "administrative inquiry", of which I was the subject.

I was interviewed regarding my knowledge of an on-going political corruption investigation being conducted by the FBI in Western Pennsylvania. I had previously supplied the Commissioner with a memo on May 13, 1999 detailing my knowledge of this investigation. I was advised that no allegation of misconduct existed; no Internal Affairs Control Number had been assigned; and that no Use of Force or Complaint Reception and Processing Worksheet existed. I was ordered to participate in this interview. When completed, I was informed the Commissioner was going to review this "administrative inquiry" and make a determination as to whether misconduct had occurred. If he found evidence of misconduct, he would then order an Internal Affairs Investigation be conducted. The investigators informed me that up to that point in the investigation, they had found no evidence of misconduct. Upon my request, a PSTA representative was supplied for me. However, no exigent circumstances existed which would have prohibited me from obtaining my own representative. My interview was tape-recorded.

Conducting this investigation is a violation of the rules and regulations of the Department; is in violation of the labor contract; and is an egregious violation of due process.

On October 28, 1999, I received written notice that my reimbursement and leave requests associated with this investigation had been denied by the Commissioner. Both requests had been previously been approved by the Deputy Commissioner of Staff. Denial of both is tantamount to discipline. This is the most recent negative personnel action that has been taken against me since the "administrative inquiry" was conducted thereby reinforcing its disciplinary nature and intent.

LIST OF ATTACHMENTS:

1.  STD-501, dated October 21, 1999, from the Director, Bureau of Professional Responsibility.
2.  STD-501X, dated October 4, 1999, from the Commissioner.
3.  SP 1-104, Administrative Warning, signed June 28, 1999.
4.  SP 1-102, Notification of Inquiry, signed June 28, 1999.
5.  STD-152, General Invoice, dated May 24, 1999.
6.  STD-330, Request for Leave, dated March 15, 1999.
7.  STD-501, dated May 13, from this officer.

## LIST OF WITNESSES/NAME AND RANK:

1.  Lieutenant Colonel Robert C. Hickes, Deputy Commissioner of Staff
2.  Lieutenant Colonel Thomas K. Coury, Deputy Commissioner of Administration
3.  Major Hawthorne C. Conley, Director, Bureau of Professional Responsibility
4.  Major R. Dane Merryman, Director, Bureau of Research and Development
5.  Major Thomas F. Williams, Commanding Officer, Area II
6.  Major Robert G. Wertz, Commanding Officer, Area VI
7.  Captain David K. Points, Labor Relations Coordinator
8.  Captain Larry Williams, (retired)
9.  Lieutenant John R. Brown, Acting Director, Internal Affairs Division
10. Trooper Thomas Carr
11. Special Agent Ralph W. Kush, Federal Bureau of Investigation
12. Special Agent Michael J. Soohy, Supervisory Special Agent, Federal Bureau of Investigation

## SUGGESTED REMEDIES:

1.  Immediate reimbursement of $83.74.
2.  Immediate restoration of 8.00 of Annual Leave.
3.  Immediate surrender to grievant all original investigative documents, notes, transcripts, recordings and records, collected and associated with this internal investigation.
4.  Immediate purging of all copies of investigative documents, notes, transcripts, recordings, and records collected and associated with this internal investigation.
5.  Immediate purging of any record of this investigation in the Bureau of Professional Responsibility Bureau Personnel Files and the Bureau of Personnel Official Files.
6.  An immediate, official notice sent to all individuals interviewed/involved explaining the catalyst of this investigation and assurance to all parties that no evidence of misconduct/violation of rules or regulations was found to have been committed by the grievant.

COMMONWEALTH OF PENNSYLVANIA

DATE:       October 21, 1999

SUBJECT:    Time and Attendance – Captain Darrell G. Ober
            General Invoice – Captain Darrell G. Ober

TO:         Director, Bureau of Technology Services
            **Attn: Captain Darrell G. Ober**

FROM:       Major Hawthorne N. Conley
            Director, Bureau of Professional Responsibility

ENCLOSURE:  (1)    Correspondence relative the Subject from Colonel Paul J. Evanko, Commissioner, to Deputy Commissioner of Administration, Attn: Director, Bureau of Professional Responsibility, dated October 4, 1999.

        1.      Per orders of the Commissioner, you are hereby notified that your reimbursement request for the amount of $83.74, dated May 24, 1999, is **denied.**

        2.      Per orders of the Commissioner, you are hereby notified that your request to restore 8.00 hours of annual leave taken on March 15, 1999, is **denied.**

        3.      Should you have any questions concerning this matter, telephone me at 657-4224.

**DATE:**     October 4, 1999

**SUBJECT:**   Time and Attendance – Captain Darrell Ober
         General Invoice – Captain Darrell Ober

**TO:**      Deputy Commissioner of Administration *TKC*
        Attn: Director, Bureau of Professional Responsibility

**FROM:**    Colonel Paul J. Evanko
        Commissioner

**ENCLOSURES:** (1)  Correspondence from Captain Darrell G. Ober, Systems Integrator Procurement Team Leader, Bureau of Technology Services, to Director, Bureau of Professional Responsibility, dated July 16, 1999, regarding Time and Attendance.

        (2)  Correspondence from Major Hawthorne N. Conley, Director, Bureau of Professional Responsibility, to Captain Darrell G. Ober, dated July 1, 1999, regarding Time and Attendance, with Enclosures.

        (3)  General Invoice – Reimbursement for Captain Darrell Ober.

     1.  I have conducted a full and complete review of the circumstances surrounding Captain Ober's requests. Based on my review Captain Ober's requests are denied. Therefore, the amount of $83.74 shall not be provided to Captain Ober. Additionally, the date of March 15, 1999, shall remain charged to annual leave.

     2.  Please notify Captain Ober and provide him with a copy of this correspondence.

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE·POLICE
## ADMINISTRATIVE WARNING

ember/Employe    Captain Darrell G. Ober

Interviewer    Major Thomas F. Williams and Major Robert G. Werts

BPR Control No. _____    Date June 22, 1999

This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police. I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any pending criminal action. During the course of this questioning, even if you disclose information which indicates you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statement nor its fruits will be used against you in a criminal proceeding.

Since this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action. You do have the right to have a union representative with you during such questioning. If during the course of the interview, you have reason to believe that your statements could result in administrative action being ...ated against you, union representation will be provided upon request.

Do you understand what I have just explained to you?    ☒YES    ☐NO

Do you have any questions concerning what I have just explained to you?    ☐YES    ☒NO

_____    4/28/99
SIGNATURE OF EMPLOYE/MEMBER                DATE

_____    6/28/99
SIGNATURE OF INTERVIEWER                DATE

PENNSYLVANIA STATE POLICE
NOTIFICATION OF INQUIRY

OF INVESTIGATION. ONE OF THE THREE LISTED INVESTIGATION
TYPES SHALL BE CHECKED.

BPR -

| Captain | Darrell G. Ober | Bureau of Professional Responsibility |
|---|---|---|
| RANK | NAME | TROOP/STATION |

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING:

[ ] A COMPLAINT INVESTIGATION IS BEING CONDUCTED INTO AN INCIDENT IN WHICH YOU ARE ALLEGED TO HAVE BEEN INVOLVED. THE DETAILS OF THE COMPLAINT ARE AS FOLLOWS: (EXPLANATION BELOW)

[ ] A NON-COMPLAINT INVESTIGATION IS BEING CONDUCTED IN ACCORDANCE WITH DEPARTMENT DIRECTIVES. THE DETAILS OF YOUR INVOLVEMENT ARE AS FOLLOWS: (EXPLANATION BELOW)

[X] AN ADMINISTRATIVE INVESTIGATION IS BEING CONDUCTED PURSUANT TO A REQUEST FROM THE ~~DEPUTY DEPUTY~~ ~~COUNSEL~~. YOUR INVOLVEMENT HAS BEEN IDENTIFIED AS FOLLOWS:                    Commissioner

By order of the Pennsylvania State Police Commissioner, Paul J. Evanko, I have been

assigned to make inquiry into your knowledge of the facts or circumstances surrounding

the political corruption investigation that was conducted by the FBI in Western

Pennsylvania.


*Pr. Thomas G. Coll*

*mgn. Thomas F. Wilson*
SIGNATURE OF INVESTIGATOR

I KNOWLEDGE RECEIPT OF THIS NOTIFICATION AND I AM AWARE OF MY RIGHT TO UNION REPRESENTATION.

| *Captain DMSC* | *815* | *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* | *4/29/99* | *1220* |
|---|---|---|---|---|
| SIGNATURE | BADGE I.D. NO. | SOCIAL SECURITY NO. | DATE | TIME |

COMMONWEALTH OF PENNSYLVANIA
TO—132        REV. 5-96

# GENERAL INVOICE

INVOICE NO. _____ ⌐ 7

| (E AND ADDRESS) | PAYEE (NAME AND ADDRESS) | |
|---|---|---|
| e  sylvania State Police | Captain Darrell G. Ober | DATE  May 24, 1999 |
| epartment Headquarters | 71 Millers Gap Road | ORDER NO. |
| dvancement Account | Enola, PA  17025 | |
| 800 Elmerton Avenue | | Y.T. NO. OR ADVANCEMENT ACCOUNT NO. |
| arrisburg, PA  17110 | | |
| | VENDOR FED. I.D./SOC. SEC. NO. (CIRCLE ONE) | TERMS |

| DATE OF TRANSACTION | ITEM AND DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| '15/99 | Room was used in conjunction for Confidential Bureau of Professional Responsibility Investigation | | | | $ 75.00 |
| | Harrigans Restaurant supplied beverages for the meeting | | | | $ 4.24 |

| EXPENDITURE SYMBOL | FUND | DEPT | APP | YR | LOC | ORG | COST FUNCTION | OBJ | TOTAL | $ 83.74 |
|---|---|---|---|---|---|---|---|---|---|---|
| | 001 | 020 | 181 | 98 | 1 | 9270 | | 396 | | |

CERTIFY THAT THE ABOVE EXPENSES, SERVICES, MATERIALS OR PRODUCTS WERE ACTUALLY INCURRED, RENDERED OR FURNISHED OR THE USE OF THE COMMONWEALTH OF PENNSYLVANIA AND HAT THE ABOVE PRICES CHARGED WERE FAIR AND REASONABLE.

ACKNOWLEDGEMENT OF THE FOLLOWING IS REQUIRED IF PAYMENT IS MADE FROM ADVANCED REQUISITION MONEYS.

I HEREBY ACKNOWLEDGE RECEIPT IN FULL AS SET FORTH IN THE INVOICE IN THE AMOUNT OF $_____

_____ SIGNATURE

_____ SIGNATURE

**1. TREASURY**

A Holiday Inn

1395 WAYNE AVE
INDIANA, PA 157
(724) 463-3561. FAX: (724) 463-8005
800-477-3561
Independently Owned and Operated by Crown American Associates

DARRELL ZIMMER

| | |
|---|---|
| Room | 125-11 |
| Arrive Date | 3/15/99 |
| Dept. Date | 3/15/99 |
| Folio # | 126144 |
| Room Rate | .00 |
| Account | 1-19444 |
| Mkt/Seg | 8-4005 |

Page  1

I authorize you to bill the full balance of my account to my credit card which was presented upon registration

X
SIGNATURE

The management is not responsible for any valuables not secured in safety deposit boxes pr
at the front office. I agree that my liability for the charges is not waived and agree to be held per
facie in the event that the indicated person, company or association fails to pay for any part
full amount of such charges.

X
SIGNATURE

| DATE | WORK REGISTER # | ID | DESCRIPTION | CHARGE | PAYMENT | BALANCE |
|---|---|---|---|---|---|---|
| 315 | 911 | 0315000 | MAR | AM SET-UP FEE | 75.00$ | .00$ | 75.00$ |
| 315 | 911 | 542044 | 775 | HARRIGANS | 4.24$ | .00$ | 79.24$ |
| 315 | 912 | 0315001 | MAR | SET-UP ROOM 7X | 4.50$ | .00$ | 83.74$ |
| 315 | 914 | 0315002 | MAR | VISA PAYMENT | .00$ | -83.74$ | .00$ |

***TOTAL*** .00$

| ACCT. NO. | | DATE OF CHARGE | FOLIO NO./CHECK |
|---|---|---|---|
| CARD MEMBER NAME | | AUTHORIZATION | I.D. |
| ESTABLISHMENT NO. & LOCATION | ESTABLISHMENT AGREES TO TRANSMIT TO CARD ISSUER FOR PAYMENT | | |
| | | PURCHASES & SERVICES | |
| CARD MEMBER'S SIGNATURE  X | | TOTAL AMOUNT | |

COMMONWEALTH OF PENNSYLVANIA
STD-398
REV #5

# REQUEST FOR LEAVE

NAME (LAST, FIRST, MIDDLE INITIAL)
OBER, DARRELL G.

EMPLOYEE NO.
099820

EMPLOYEE SIGNATURE
[signature]

| LEAVE CODE | HOURS | LEAVE BEGIN DATE | TIME | LEAVE BEGIN DATE | TIME | LEAVE END DATE | TIME | LEAVE BALANCE (LAST STATEMENT) | DATE |
|---|---|---|---|---|---|---|---|---|---|
| A | 8.00 | 3/15/99 | 08:00 | 3/15/99 | 16:00 | 3/15/99 | | | 3/5/99 |
| LEAVE CODE | HOURS | LEAVE BEGIN DATE | TIME | | | | | | |

REMARKS:

☐ Medical Appointment Time _____
☐ Family Relationship _____
☐ Meal Period _____ to _____
☐ Alternate Work Schedule _____
☐ Medical Certificate Attached
☐ Change _____
☐ Other _____

APPROVING AUTHORITY SIGNATURE
Major G.M. [signature]

DATE
02/08/99

☒ APPROVED
☐ DISAPPROVED

| TIMEKEEPER INITIALS | C336L POSTED |
|---|---|
| | ☐ |

3. EMPLOYEE

STD-601, 9-69

COMMONWEALTH OF PENNSYLVANIA

DATE:         May 13, 1999

SUBJECT:      FBI Investigation

TO:           Commissioner

FROM:        Captain Darrell G. Ober
               Bureau of Technology Services

     1.     During my assignment as the Director, Internal Affairs Division, and while the Acting Director of the Bureau of Professional Responsibility, I was contacted, by telephone, in early October, 1998 by FBI Special Agent Ralph W. Kush, Pittsburgh Office, regarding an on-going investigation the FBI was conducting involving possible political corruption in Western Pennsylvania.

     2.     According to Kush, an FBI informant was approached by a subject, Dennis Jay Bridges, who was seeking assistance in entering the Pennsylvania State Police Academy as a Cadet. Bridges had taken the entrance examination and finished in Band "B". Kush stated Bridges was attempting to become a Trooper through a series of financial transactions involving an unidentified State Senator and unknown high ranking individuals in either the Governor's Office, the State Police, or both. Bridges made contact with the CI through Trooper Kip A. E. Stanton, Troop B, Uniontown. According to Kush, Bridges and Stanton both knew other Troopers who were able to gain entry into the Department in such a manner.

     3.     During my initial contact with Kush, he expressed his desire to make contact with someone from the Internal Affairs Division in the State Police. Kush stressed the need for discretion until such time as more information could be developed. He further stressed the State Police would not be needed to play an active role in the investigation; only as resource for information such as enlistment process data, procedure, Cadet class schedule, etc. Since the focus of their investigation was on political corruption, Kush was agreeable to the State Police Internal Affairs Division handling any and all criminal prosecution of Department members, if warranted.

     4.     After weighing all of the options, it was my decision to approach Lieutenant Colonel Hickes (inasmuch as he had just assumed office) and inform him of this on-going investigation. I briefed LTC Hickes on the details as I knew them to be. Upon orders of LTC Hickes, I have not spoken about this investigation to any other Department personnel. I was further ordered to assist the FBI to the extent possible and only until such time as disclosure could be made without compromising the outcome of this investigation.

5.      Since October, I have had incidental contact with Kush and his Supervisor, Micha█ █. Soohy. Sporadically Kush wou█ elephone me to provide me with a status report or to make further inquiry mostly concerning Cadet applications issues, e.g., class appointment dates, etc.

6.      I met with both Kush and Soohy on two occasions; the most recent being March 15, 1999. Within the past two weeks, Kush has informed me that recent developments in the case have lead him to conclude the investigation cannot move forward and the no evidence of impropriety in the either the Governor's Office or the State Police have been uncovered. Kush stated it was the appropriate time for the State Police to pick up the criminal investigation on Trooper Stanton.

7.      When informed of the status of the investigation, I contacted LTC Hickes and provided him with this information. LTC Hickes stated to me that he would arrange for a time to brief the Commissioner at the earliest possible opportunity.

GRIEVANCE FORM

GRIEVANCE NO. *HQ-167*

NAME AND RANK OF GRIEVANT/SPOKESPERSON

*CAPTAIN DARRELL GROOBER*

☐ IF GROUP GRIEVANCE, CHECK BLOCK & LIST NAMES BELOW

TROOP/BUREAU
*TECHNOLOGY SERVICES*

STATION/DIVISION
*STRATEGIC DEVELOPMENT*

NAME OF REPRESENTATIVE (IF ANY)
*N/A*

TYPE OF GRIEVANCE (CHECK ONE)
☐ CONTRACT INTERPRETATION    ☐ APPEAL    ☒ DISCIPLINE

☒ CONTRACT INTERPRETATION

DATE OF ALLEGED CONTRACTUAL VIOLATION OR WHEN YOU BECAME AWARE OF SAME/OR DATE ACKNOWLEDGMENT OF PENALTY TO BE IMPOSED
DATE: *12/13/99  (12/13/99)*

ALLEGED VIOLATION: CITE SPECIFIC CONTRACT PROVISIONS. IF DISCIPLINE—CITE ART: XXVIII (DISCIPLINE)

*ARTICLE 26; DISCIPLINE*
*ARTICLE 28; GRIEVANCE PROCEDURE*

DETAILS—FULLY EXPLAIN ALLEGED VIOLATIONS / FOR DISCIPLINE SEE INSTRUCTION SHEET

*SEE ATTACHED*

LIST OF ATTACHMENTS/COPY D.A.R., RESPONSE LETTER, ETC.

*SEE ATTACHED*

LIST OF WITNESSES/NAME AND RANK

*SEE ATTACHED*

SUGGESTED REMEDY:

*SEE ATTACHED.*

NAME AND RANK OF GROUP GRIEVANCE MEMBERS (EACH NAME MUST BE INITIALED)

*N/A*

SIGNATURE OF GRIEVANT/SPOKESPERSON

DATE FILED *12/22/99*

STEP -1-

IF DISCIPLINE SUBMIT DIRECTLY TO STEP -2-

GRIEVANCE WAS RECEIVED 12/22/99
DATE
AND IS ☐ AFFIRMED ☒ DENIED

Captain Darrell Ober, accompanied by Trooper Thomas Lett.

Grievance denied.  Failed to articulate how discipline was imposed.

In response to your concern as to timeliness of Step 1 Hearing - I refer you to confirmation of E-mail dated 12-22-99, where you acknowledged my intention to schedule the Step 1 Hearing within ten days of January 4, 2000 (my return from scheduled leave).

RESPONSE TO CONTRACTUAL INTERPRETATION ONLY

SIGNATURE (TROOP C.O./BUR. DIR.)

MAJOR A. N. Curley
SIGNATURE

DATE MEETING HELD
01/10/2000

☐ CHECK TO APPEAL TO NEXT LEVEL
DATE:

NOTICE: MUST BE POSTMARKED WITHIN 5 DAYS FROM RECEIPT OF FIRST STEP RESPONSE

| GRIEVANCE SUMMARY FORM COMPLETED ☐ YES ☐ NO | F.O.P. REPRESENTATIVE NOTIFIED ☐ YES ☐ NO | F.O.P. REPRESENTATIVE PRESENT ☐ YES ☐ NO |
| CHECK APPROPRIATE BLOCK  GIVEN OPPORTUNITY TO REVIEW INFORMATION USED FOR D.A.R. ☐ YES ☐ NO  DATE: | | RIGHTS EXPLAINED ☐ YES ☐ NO |
| REASON FOR APPEAL: EXCESSIVE PUNISHMENT ☐    FACTUAL DISPUTE ☐ | SIGNATURE: | DATE: |

DISCIPLINE ONLY

STEP NO. 2
GRIEVANCE COMMITTEE ACTION

DATE MEETING HELD

DECISION RENDERED:

GRIEVANCE BOARD ACTION

DATE HEARING SET

LOCATION

ARBITRATOR ASSIGNED

DECISION RENDERED:

COMMONWEALTH OF PENNSYLVANIA
STD-502                    REV 5-97

# DESK MEMORANDUM

SUBJECT
GRIEVANCE #HQ - 167

TO (NAME & ADDRESS)
DIRECTOR, BUREAU OF PROFESSIONAL RESPONSIBILITY

FROM (NAME & ADDRESS)
CAPTAIN DARRELL G. OBER
BUREAU OF TECHNOLOGY SERVICES

DATE SENT
12/22/1999

DATE DUE

| | | | | | |
|---|---|---|---|---|---|
| ☐ | PLEASE CALL | ☐ | APPROVAL | ☐ | SEE ME |
| ☐ | RETURNED YOUR CALL | ☐ | AS REQUESTED | ☐ | COMMENT |
| ☐ | INFORMATION & FILE | ☐ | PREPARE REPLY/REPORT | ☐ | NOTE AND RETURN |
| ☒ | NECESSARY ACTION | ☐ | SIGNATURE | | |

RECEIVED BY                DATE                TIME

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:
CC: PSTA

HAND CARRIED
TO BPR - 12/22/99

STEP ONE
DECISION
RECEIVED 1/13/00

SUPPLEMENTAL – GRIEVANCE NUMBER HQ – 167

**DETAILS – Fully Explain Alleged Violations:

**The provisions of this grievance incorporate all allegations of prior grievance number HQ – 164.

On January 7, 1999, prior to my present detached assignment in the Bureau of Technology Services and when I was the Director, Internal Affairs Division, Bureau of Professional Responsibility, I presented a Division Directors Letter of Commendation to retiring Sergeant Ronald L. Hillegass. Subsequently, I asked the Bureau of Professional Responsibility, Administrative Assistant 1, Donna J. Blouch, to coordinate framing of this commendation with the Bureau of Staff Services Artist Illustrator 2, Alice Welborn.

Some time later, Ms. Welborn, as I recall, informed Ms. Blouch there were some difficulties in framing this particular item. Ms. Welborn indicated this Commendation would have to be framed by an outside source and at the Bureau of Professional Responsibility's expense.

I was detached to the Bureau of Technology Services on April 26, 1999. The Commendation was taken to Framer's Workshop on April 27, 1999. It was picked up, and paid for utilizing the Bureau of Professional Responsibility's Visa Card, on May 14, 1999.

During my last conversation with retired Sergeant Hillegass (possibly October 1999), I learned that he had never received his Letter of Commendation. I made an inquiry as to the status of this Commendation through Sergeant Lisa S. Christie, Internal Affairs Division. Sergeant Christie directed me to the Director Bureau of Professional Responsibility.

I made an inquiry of the Director, Bureau of Professional Responsibility, on December 10, 1999. On December 13, 1999, I was informed by the Director, Bureau of Professional Responsibility, via e-mail, that I was being charged $69.35 for framing of the Division Director's Letter of Commendation.

On December 13, 1999, I wrote out check number 2553 payable to the "Commonwealth of Pennsylvania" in the amount of $69.35 and presented it to the Director, Bureau of Professional Responsibility. Only then was I permitted to have Sergeant Hillegass's Letter of Commendation.

On December 16, 1999, I forwarded a General Invoice to the Director, Bureau of Professional Responsibility, requesting reimbursement. On December 22, 1999, I received a negative response to my request.



Utilizing this Commendation as leverage to extract payment from me is retaliatory (refer to Grievance Number HQ – 164), is tantamount to discipline and is the most recent example of negative personnel actions which have been taken against me.

LIST OF ATTACHMENTS:

1.    Copy of e-mail message to the Director, Bureau of Professional Responsibility, dated, December 10, 1999.

2.    Copy of e-mail message from the Director, Bureau of Professional Responsibility, dated December 13, 1999.

3.    Copy of receipt from the Framers' Workshop, dated May 14, 1999.

4.    Grievance Number HQ-164.

5.    General Invoice to Director, Bureau of Professional Responsibility, dated December 16, 1999.

LIST OF WITNESSES/NAME AND RANK:

1.    Retired Sergeant Ronald L. Hillegass.

2.    Sergeant Lisa S. Christie, Bureau of Professional Responsibility.

3.    Donna J. Blouch, Administrative Assistant 1, Bureau of Professional Responsibility.

4.    Alice M. Welborn, Artist Illustrator 2, Bureau of Staff Services.

5.    Jeffery H. Albright, Form Layout Specialist 2, Bureau of Staff Services.

6.    Major Hawthorne C. Conley, Director, Bureau of Professional Responsibility.

SUGGESTED REMEDIES:

1.    Immediate reimbursement to grievant in the amount of $69.35.

OBER, DARRELL G

| | |
|---|---|
| From: | OBER, DARRELL G |
| Sent: | Friday, December 10, 1999 7:57 AM |
| To: | CONLEY, HAWTHORNE N |
| Cc: | OBER, DARRELL G |
| Subject: | Division Director's Letter |

Major,

   I recently contacted Sergeant Christie to inquiry as to the status of retired Sergeant Hillegass's Division Director's Letter of Commendation.  I plan on meeting with Sergeant Hillegass next week.  I understand there may be an issue regarding the letter which needs addressed.  Inasmuch as I was responsible for and authored the letter, could you please advise me what the problem is so I may bring closure to this issue and present it to Sergeant Hillegass?  Thank you.

Captain Ober

OBER, DARRELL G

From:           CONLEY, HAWTHORNE N
Sent:           Monday, December 13, 1999 2:30 PM
To:             OBER, DARRELL G
Subject:        Division Director's Letter

Captain:

The problem is the unauthorized use of the Bureau's Visa to pay for mounting and framing of your Division Director's
Letter of Commendation for Retired Sergeant Hillegass. To bring closure to the issue requires a check made out to the
Commonwealth in the amount of $69.35. I know you took donation(s)/collection to cover gift(s) which were to be given to
Sergeant Hillegass, and I assume this is one of those gifts; however using the Bureau's Visa for this expenditure was
inappropriate, and the Commonwealth needs to be reimbursed. Please advise how you plan on handling.

HN Conley

        ——Original Message——
        From:           OBER, DARRELL G
        Sent:           Friday, December 10, 1999 7:57 AM
        To:             CONLEY, HAWTHORNE N
        Cc:             OBER, DARRELL G
        Subject:        Division Director's Letter

        Major,

            I recently contacted Sergeant Christie to inquiry as to the status of retired Sergeant Hillegass's Division Director's
        Letter of Commendation.  I plan on meeting with Sergeant Hillegass next week.  I understand there may be an issue
        regarding the letter which needs addressed.  Inasmuch as I was responsible for and authored the letter, could you
        please advise me what the problem is so I may bring closure to this issue and present it to Sergeant Hillegass?
        Thank you.

        Captain Ober

THE FRAMERS WORKSHOP
45 NORTH PROGRESS AVENUE
HARRISBURG, PA. 17109
***717-545-3396***

4301729798816371 TRM1
DATE 05/14/99         TIME 09:12 AM

ITEM: 001 UPC SALE
ACCT: 4715159001158279       EXP: 9907 S
RESP: AUTH/TKT 022440
CUST: 4715

AMOUNT:              $69.35
TAX:                  $0.00

TAL:                 $69.35

I AGREE TO PAY ABOVE TOTAL AMOUNT
ACCORDING TO CARD ISSUER AGREEMENT
(MERCHANT AGREEMENT IF CREDIT VOUCHER)

PROF RESPONSIBILITY
TOP COPY-MERCHANT BOTTOM COPY-CUSTOMER

---

## framers' workshop

Progress Plaza
45 N. Progress Ave.
Harrisburg, PA 17109
Phone: 545-3360
Fax: 545-5721

Queensgate Shopping
Center
York, PA 17403
Phone: (717) 848-8859
Fax: (717) 848-8445

Cedar Cliff Mall
1104 Carlisle Road,
Camp Hill, PA
Phone: (717) 737-2409
Fax: (717) 737-2224

Name: PA. STATE POL  (BPR)   Date: 4/27
Address:                      Salesperson: Z
City:                 Zip:    Premised: 5/4 TU
Home Phone: 657-4200 (Beth M)  Work Phone:

| Liner # | | | Cost/FL | |
| Description | | | Footage | |
| Moulding # N 15 - 155 | | | Cost/FL 6.30 | 37.85 |
| Description | | | Footage 6 | |
| Glass: (Regular) Non-Glare  Plexi  None  Other | | | | 5.50 |

| Mats: | Top | Middle | Bottom | Horiz. | Vert. | |
|-------|-----|--------|--------|--------|-------|---|
| Mat # | 6.33 48 | | | 7 3/8 x 10 1/4 | | |
| Color | | | | 5 1/2 x 7 1/2 | 8.05 |
| Top | 03/0 | | | | |
| Bottom | | | | 13 76 x 16 1/4 | |
| Sides | | | | | |

Mounting:  Drymount  Museum  Stretch  AFFC
Materials:  Foam Core  Chip & Foam  Clip & Rag  4-Ply Rag
           Cardboard  Thin F.C  Other
                                                    7.00

Miscellaneous

Description/Condition/# Of Pieces
LETTER

Special Instructions:
Pa Visa

Not responsible for items left over (90) ninety days

| Materials | 58.85 |
| Labor | 10.50 |
| Art | |
| Subtotal | 69.35 |
| | |
| Tax | EXEMPT |
| Total | |
| Deposit | |
| Balance | |

# DESK MEMORANDUM

**SUBJECT**

General Invoice

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Director, Bureau of Professional Responsibility | Captain Darrell G. Ober |

| DATE SENT | DATE DUE |
|---|---|
| December 16, 1999 | |

| | | | |
|---|---|---|---|
| PLEASE CALL | APPROVAL | SEE ME | |
| RETURNED YOUR CALL | AS REQUESTED | COMMENT | |
| INFORMATION & FILE | PREPARE REPLY/REPORT | NOTE AND RETURN | |
| NECESSARY ACTION | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

Request For Reimbursement Denied. As Discussed you know the purchase are in Appropriate & Not Authorized

COMMONWEALTH OF PENNSYLVANIA
STD—102
REV. 8-96

**GENERAL INVOICE**

INVOICE NO

| PAYOR (NAME AND ADDRESS) | PAYEE (NAME AND ADDRESS) |
|---|---|
| Pennsylvania State Police<br>DHQ - Advancement Account<br>1800 Elmerton Avenue<br>Harrisburg, PA 17110 | Darrell G. Ober<br>71 Millers Gap Road<br>Enola, PA 17025 |

DATE: December 14, 1999

ORDER NO.

V.T. NO. OR ADVANCEMENT ACCOUNT NO.

VENDOR FED. I.D. (SEC. SEC. NO.) (SINGLE COPY)

| ITEM AND DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| Framing of Division Director's letter of commendation. | 1 | 1 | 69.35 | $69.35 |

TERMS

DATE OF TRANSACTION: 05/14/99

Date Pd. _____ Check # _____ Amount $ _____

Document No./Justification *Framing of Division Director's letter of commendation*

Invoice Rec'd _____ Goods/Services _____

Date _____ Accepted Date _____

Approved by: _____

Signature _____ Date _____

Payment Mode: Comptroller Calc. Acct.

| FUND | DEPT | APPR | YR | LEDG | ORG | COST FUNCTION | FUND | OBJECT |
|---|---|---|---|---|---|---|---|---|
| 001 | 020 | 181 | 98 | 1 | 7310 | | 7310 | 385 |

EXPENDITURE SYMBOL

| FUND | DEPT | APP | YR | LDG | ORG | COST FUNCTION | OBJ |
|---|---|---|---|---|---|---|---|
| 001 | 020 | 181 | 98 | 1 | 7310 | | 385 |

SIGNATURE

I CERTIFY THAT THE ABOVE EXPENSES, SERVICES, MATERIALS OR PRODUCTS WERE ACTUALLY INCURRED, RENDERED OR FURNISHED FOR THE USE OF THE COMMONWEALTH OF PENNSYLVANIA, AND THAT THE ABOVE PRICES CHARGED WERE FAIR AND REASONABLE.

ACKNOWLEDGEMENT OF THE FOLLOWING IS REQUIRED IF PAYMENT IS MADE FROM ADVANCED REQUISITION MONEYS.

I HEREBY ACKNOWLEDGE RECEIPT IN FULL AS SET FORTH IN THIS INVOICE IN THE AMOUNT OF $ _____

TOTAL $69.35

SIGNATURE

1. TREASURY

FL 1102777  10/97  14S193



GRIEVANCE FORM

GRIEVANCE NO. HO-169

NAME AND RANK OF GRIEVANT/SPOKESPERSON

CAPTAIN DARRELL G. OBER

☐ IF GROUP GRIEVANCE, CHECK BLOCK & LIST NAMES BELOW

TROOP/BUREAU: TECHNOLOGY SERVICES

STATION/DIVISION: STRATEGIC DEVELOPMENT

NAME OF REPRESENTATIVE (IF ANY): N/A

TYPE OF GRIEVANCE (CHECK ONE)
☒ CONTRACT INTERPRETATION
☒ APPEAL DISCIPLINE

DATE OF ALLEGED CONTRACTUAL VIOLATION OR WHEN YOU BECAME AWARE OF SAME/OR DATE ACKNOWLEDGMENT OF PENALTY TO BE IMPOSED

DATE: 1/10/00

ALLEGED VIOLATION: CITE SPECIFIC CONTRACT PROVISIONS. IF DISCIPLINE—CITE ART: XXVIII (DISCIPLINE)

ARTICLE 26; DISCIPLINE    ARTICLE 23; GRIEVANCE PROCEDURE
ARTICLE 38; TRANSFERS

DETAILS—FULLY EXPLAIN ALLEGED VIOLATIONS / FOR DISCIPLINE SEE INSTRUCTION SHEET

SEE ATTACHED

LIST OF ATTACHMENTS/COPY D.A.R., RESPONSE LETTER, ETC.

SEE ATTACHED

LIST OF WITNESSES/NAME AND RANK

SEE ATTACHED

SUGGESTED REMEDY:

SEE ATTACHED

NAME AND RANK OF GROUP GRIEVANCE MEMBERS (EACH NAME MUST BE INITIALED)

N/A

SIGNATURE OF GRIEVANT/SPOKESPERSON: Captain D. G. Ober

DATE FILED: 1/24/00

STEP -1-                                        IF DISCIPLINE SUBMIT DIRECTLY TO STEP -2-

GRIEVANCE WAS RECEIVED January 2__ 2000                AND IS ☐ AFFIRMED ☒ DENIED on January 24, 2000
                          DATE

because authority to resolve it does not exist at this level.

RESPONSE TO CONTRACTUAL INTERPRETATIONS ONLY

SIGNATURE (TROOP C.O./BUR. DIR.)                                          DATE MEETING HELD

_signature_          01/24/2000
                SIGNATURE
☐ CHECK TO APPEAL TO NEXT LEVEL                                           DATE:

**NOTICE: MUST BE POSTMARKED WITHIN 5 DAYS FROM RECEIPT OF FIRST STEP RESPONSE**

| | GRIEVANCE SUMMARY FORM COMPLETED ☐ YES ☐ NO | | F.O.P. REPRESENTATIVE NOTIFIED ☐ YES ☐ NO | F.O.P. REPRESENTATIVE PRESENT ☐ YES ☐ NO |
| DISCIPLINE ONLY | CHECK APPROPRIATE BLOCK | GIVEN OPPORTUNITY TO REVIEW INFORMATION USED FOR D.A.R. ☐ YES ☐ NO  DATE: | | RIGHTS EXPLAINED ☐ YES ☐ NO |
| | REASON FOR APPEAL: EXCESSIVE PUNISHMENT ☐  FACTUAL DISPUTE ☐ | | SIGNATURE: | DATE: |

STEP NO. 2 GRIEVANCE COMMITTEE ACTION

DATE MEETING HELD                                GRIEVANCE BOARD ACTION

DECISION RENDERED:

STEP NO. 3 ARBITRATION

DATE HEARING SET          LOCATION                        ARBITRATOR ASSIGNED

DECISION RENDERED:

## SUPPLEMENTAL – GRIEVANCE NUMBER HQ – 169

**\*\*DETAILS – Fully Explain Alleged Violations:**

\*\*The provisions of this grievance incorporate all allegations of prior grievance numbers HQ – 164 and HQ - 167.

On January 10, 2000, I was contacted by telephone at home by the Director, Bureau of Professional Responsibility, and informed that, effective January 29, 2000, I was being transferred from the Bureau of Technology Services (where I was detached from the Bureau of Professional Responsibility) to Area III and assigned to Troop B, Washington as an assistant to the Area III Commander.

I received Department Personnel Order 00-01, (backdated to January 7, 2000) on January 12, 2000. This order confirms the information provided to me by the Director, Bureau of Professional Responsibility.

My transfer from the Bureau of Technology Services to Area III is punitive, disciplinary, and the latest in a series of negative personnel actions which have been taken against me. Additionally, this transfer is a retaliatory action by the Department due to my filing Grievances #'s HQ -164 and HQ – 167.

This transfer is in direct violation of the provisions of Article 26 and Article 28. The provisions of Articles 26 and 28 are based on due process. The procedural steps must be adhered to when an allegation of misconduct or violation of a Department rule or regulation has been committed by a bargaining unit member. I have never been charged with, much less convicted of, any violations of Department rules or regulations. There is no factual basis for this transfer according to the provisions of FR 3-2. This transfer is a blatantly transparent disciplinary action being executed in circumvention of the articles of Department regulations and articles of the labor agreement.

The provisions of Article 38 must be followed should there be special needs in Area III. I have seniority over 24 other members currently holding the rank of Captain. Thus, in addition to the other, on-going egregious due process violations which have been taken against me, the provisions of Article 38 have been violated in that the least senior member in rank is not being transferred to this position.

LIST OF ATTACHMENTS:

1.    Copy Personnel Order 00-01, dated, January 7, 2000.

2.    Grievance Number HQ-164.

3.    Grievance Number HQ-167.

LIST OF WITNESSES/NAME AND RANK:

1.    Major Hawthorne N. Conley, Director, Bureau of Professional Responsibility.

2.    Major Lyle Szupinka, Commander, Area III.

SUGGESTED REMEDIES:

1.    Rescind this transfer and reassign me to the Bureau of Technology Services.

2.    Prohibit the Department from taking any further disciplinary/retaliatory actions against me.

SP 3-200 (10-99)



**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE



Personnel Order
January 7, 2000

SUBJECT:     Promotions and/or Transfers

TO:          Area, Troop and Station Commanders
             and Bureau Directors

FROM:        Commissioner

1.    The following personnel matters are announced as follows:

Major Richard D. A. Morris, Director, Legislative Affairs Office, has retired effective January 7, 2000. Captain Michael D. Simmers assumes command as Acting Director, Legislative Affairs Office, until further notice.

A request has been forwarded to the Executive Board to establish a Policy Office. Mr. Ronald E. Plesco, Executive Policy Specialist 2, will assume the responsibilities as Acting Director reporting to the Commissioner.

Captain Ernest Humphreys, Jr., Director, Planning Division, Bureau of Research and Development, has retired effective January 7, 2000.

Captain Darrell G. Ober, Director, Internal Affairs Division, Bureau of Professional Responsibility, is assigned as Special Projects Officer to Commander, Area III, effective January 29, 2000.

Lieutenant John R. Brown is promoted to Captain and assumes command of the Internal Affairs Division, Bureau of Professional Responsibility, effective January 29, 2000.

2.    The following promotions and transfers as indicated are effective January 29, 2000:

Donald G. Benedick, Bureau of Research and Development, is promoted to Lieutenant.

Albert L. Brown III, Troop D, Butler, is promoted to Lieutenant.

NAME AND RANK OF GRIEVANT/SPOKESPERSON

CAPTAIN DARREL G. OBER

☐ IF GROUP GRIEVANCE, CHECK BLOCK & LIST NAMES BELOW

TROOP/BUREAU                    STATION/DIVISION

LIQUOR CONTROL ENFORCEMENT | OPERATIONS

NAME OF REPRESENTATIVE (IF ANY)

N/A

(CHECK ONE)

TYPE OF GRIEVANCE   ☒ CONTRACT INTERPRETATION   ☐ APPEAL DISCIPLINE

DATE OF ALLEGED CONTRACTUAL VIOLATION OR WHEN YOU BECAME AWARE OF SAME/OR DATE ACKNOWLEDGMENT OF PENALTY TO BE IMPOSED

DATE: 2/15/00

ALLEGED VIOLATION: CITE SPECIFIC CONTRACT PROVISIONS. IF DISCIPLINE—CITE ART: XXVIII (DISCIPLINE)

ARTICLE 26; DISCIPLINE      ARTICLE 28; GRIEVANCE PROCEDURE
ARTICLE 38; TRANSFERS

DETAILS—FULLY EXPLAIN ALLEGED VIOLATIONS / FOR DISCIPLINE SEE INSTRUCTION SHEET

SEE ATTACHED

LIST OF ATTACHMENTS/COPY D.A.R., RESPONSE LETTER, ETC.

SEE ATTACHED

LIST OF WITNESSES/NAME AND RANK

SEE ATTACHED

SUGGESTED REMEDY:

SEE ATTACHED

NAME AND RANK OF GROUP GRIEVANCE MEMBERS (EACH NAME MUST BE INITIALED)

N/A

SIGNATURE OF GRIEVANT/SPOKESPERSON   Captain Darrel G. Ober

DATE FILED   2/28/00

SUPPLEMENTAL - GRIEVANCE NUMBER HQ- 172

***DETAILS - Fully Explain Alleged Violations:**

***The provisions of this grievance incorporate all allegations of prior grievance numbers HQ – 164; HQ – 167; and HQ – 169.

On February 15, 2000, I was informed by the Director, Bureau of Liquor Control Enforcement, Major Francis E. Koscelnak, that effective, February 19, 2000, that I was being transferred to the Bureau of Liquor Control Enforcement, Operations Division, as the Central Section Commander. Department Personnel Order 00-03, dated February 14, 2000, confirms the information provided to me by Major Koscelnak

During our first meeting on February 23, 2000, Major Koscelnak, again informed me that I was being assigned to the Bureau of Liquor Control Enforcement, as the Central Section Commander. I would be reporting to and supervised by the Division Director, Captain Leonard H. McDonald.

As far as can be determined, a Lieutenant has been assigned to the position of Central Section Commander, since the Bureau of Liquor Control Enforcement was created in 1987. Two other Sections exist in the Bureau of Liquor Control Enforcement (East and West) both are commanded by Lieutenants. The Central Section Commander's position has been vacated since August 1999 due the arrest and suspension of Lieutenant Huston Williams. Since that time, the Acting Section Commander has been the Harrisburg District Office Commander, Sergeant Stephen F. Valencic.

There are currently 70 Section Commanders in the Department. In every instance, with the exception of me, a Lieutenant is assigned to the position. As was the case when the Department attempted to transfer me to Troop B, Washington, yet another unique position or transfer has been created for *me and only me*. I have again being singled out for disparate, disciplinary actions in circumvention of established processes. Despite retaining my rank and pay status, this transfer to the position of Central Section Commander is, for all intents and purposes, a demotion.

No valid operational reason exists to justify transferring me from the IIMS Program. In fact, such action has exposed a high profile, $120 million dollar project to unnecessary risk. The entire Bureau of Technology Services Command Staff and IIMS Program Staff has expressed their desire to retain me on the project. My assignment as the Procurement Team Leader has afforded me unique insight, understanding and organizational memory into the project. My abrupt removal and transfer from the position and responsibility of Procurement Team Leader and Lead Negotiator to a lower grade position only reinforce its disciplinary nature and intent.

This transfer to a lower grade position is the latest in a pattern of appalling negative personnel actions being taken against me without just cause. It violates long-standing practices of chain of command relationships common in the Department. The illegal actions taken against me by the Department have violated my due process rights established in the rules and regulations of the Department, the Collective Bargaining Agreement between the Commonwealth of Pennsylvania and the Pennsylvania State Troopers Association, the Pennsylvania Whistleblowers Act, the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Pennsylvania Constitution. I have never been charged with, much less convicted of ANY administrative violations of the Department.

The harassment by the Department has caused irreparable embarrassment, humiliation and damage to my career. To say nothing of the personal stress, anxiety, embarrassment and humiliation this ordeal has caused my family.

Furthermore, the harassing disciplinary actions taken against me not only represent gross abuse of office and egregious violation of my due process rights, they are in retaliation for my filing grievances HQ – 164; HQ – 167; HQ – 169 and for filing an injunction on January 26, 2000, against the Department in order to stop my illegal transfer to Troop B, Washington.

**LIST OF ATTACHMENTS:**

1. Copy of Personnel Order 00-03, dated February 14, 2000.
2. Grievance Number HQ – 164.
3. Grievance Number HQ – 167.
4. Grievance Number HQ – 169.
5. Copy of Mandamus filed in Dauphin County Court (printed from an electronic copy; web transmission does not read all punctuation from original document correctly).

**LIST OF WITNESSES/NAME AND RANK:**

1. Lieutenant Colonel Robert C. Hickes, Deputy Commissioner of Staff.
2. Major Wesley R. Waugh, Director, Bureau of Technology Services.
3. Major Francis E. Koscelnak, Director, Bureau of Liquor Control Enforcement.
4. Captain Leonard H. McDonald, Director, Director, Operations Division, Bureau of Liquor Control Enforcement.
5. Mr. Rodney Ditzler, Director, Strategic Development Division.
6. Mr. Ron Wilt, IIMS Program Manager.
7. Attorney Steven Shaiman.

SUPPLEMENTAL - GRIEVANCE NUMBER HQ- 172 

SUGGESTED REMEDIES:

1.  Transfer to the Bureau of Technology Services, IIMS Program
    Management Office and/or promotion to the rank of Major in the
    Harrisburg/Hershey area.

2.  All other remedies previously identified in grievances number HQ – 164;
    HQ –167; HQ 169.

3.  Reimbursement of all attorneys' fees I have incurred to fight the illegal and
    unconscionable actions of the Department.

4.  An order forbidding the Department to take any further
    harassment/punitive actions/discipline against me.

5.  In addition the surrender and destruction of illegal files compiled against
    me previously cited in grievances HQ – 164; HQ – 167 and HQ – 169; I
    want the original files associated with the "museum investigation"
    surrendered to me and all file copies destroyed. I want to be restored to
    the "Book Committee" which I was removed without just cause.

6.  An immediate, official notice sent to all individuals interviewed/involved
    explaining the catalyst of this investigation and assurance to all parties
    that no evidence of misconduct/violation of rules or regulations was found
    to have been committed by the grievant.

SP 3-200 (10-99)



**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE

00-03
Personnel Order
February 14, 2000

SUBJECT:     Promotions and/or Transfers and Rescission

TO:          Area, Troop and Station Commanders
             and Bureau Directors

FROM:        Commissioner

REFERENCE:   (a)  Personnel Order 00-01, Promotions and/or Transfers, dated
                  January 7, 2000.

1.   The following personnel matters are announced as follows:

     Lieutenant David F. Young, Bureau of Criminal
     Investigation, is promoted to Captain and is assigned as
     Special Projects Officer assisting the Commander, Area III
     with preparations for the National Governors' Association
     Convention, effective February 12, 2000.

     Sergeant George L. Bivens, Bureau of Criminal
     Investigation, is promoted to Lieutenant and is assigned as
     Organized Crime Section Commander, Bureau of Criminal
     Investigation, effective February 19, 2000.

     Sergeant Barry E. Staub, Troop H, Harrisburg, is promoted
     to Lieutenant and is assigned as Heritage Affairs Officer,
     Bureau of Criminal Investigation, effective February 19,
     2000.

     Captain Cynthia L. Transue, Bureau of Research and
     Development, is assigned as Special Projects Officer
     assisting the Commander, Area VI with preparations for the
     Republican National Convention, effective July 1, 1999.

2.   The assignment of Captain Darrell G. Ober as Special
     Projects Officer to Commander, Area III, effective January
     29, 2000, as announced in Reference (a), is rescinded.

3.    The following personnel assignment is announced effective February 19, 2000:

Captain Darrell G. Ober is assigned to the Bureau of Liquor Control Enforcement, as the Central Section Commander, Operations Division.

4.    The following promotions and transfers as indicated, for the rank of Sergeant, are effective February 19, 2000:

| Name | Present Location | Assigned To |
| --- | --- | --- |
| Anthony J. Sivo | Troop K | Troop M |
| Thomas R. Williams | Troop F | Troop P |
| Glenn C. Domon | Troop H | Troop M |
| Michael S. Keelon | Troop B | Troop B |
| Stephen R. Kapanka | Troop M | Troop M |
| Thomas R. Chelgren | Troop C | Troop B |
| Ronald L. Hicks | Troop F | Troop P |
| Robert L. Starr | Troop T | Troop E |

5.    The following promotions and transfers as indicated, for the rank of Corporal, are effective February 19, 2000:

| Name | Present Location | Assigned To |
| --- | --- | --- |
| Ronald H. Clark | Troop F | Troop P |
| Edward A. Ostrowski | Troop A | Troop G |
| Thomas E. Izbinski | Troop C | Troop F |
| Carl P. Medsger | Troop C | Troop F |
| Charles T. Kindlimann, Jr. | Troop F | Troop P |
| Michael R. Schneider | Troop M | Troop M |
| Scott A. Bright | Troop B | Troop T |
| John T. Malone | Troop J | Troop K |
| Francis C. Aigeldinger III | Troop N | Troop N |
| Norman J. Cramer | Troop N | Troop N |
| David P. Gouldy | Troop L | Troop J |
| Eric S. Hermick | Troop D | Troop H |
| Maurice A. Tomlinson | Troop J | Troop J |
| Neil A. Miller | Troop B | Troop T |
| Sharon M. Mulcahey | Troop E | Troop F |
| Bruce W. Williams | Troop J | Troop J |
| Jeremy M. Richard | Troop F | Troop P |
| James M. Petti | Troop P | Troop P |
| Edward M. Martin | Troop F | Troop F |
| Wayne C. Burkes | Troop B | Troop T |
| Thomas G. Lett | Troop T | Troop H |
| James E. Ruff | Ex. & Adm. | Ex. & Adm. |
| John A. Boss | Trng. & Ed. | Trng. & Ed. |

Rev. 9/90

## GRIEVANCE FORM

GRIEVANCE NO. *HQ-174*

NAME AND RANK OF GRIEVANT/SPOKESPERSON

*CAPTAIN DARRELL G. OBER*

☐ IF GROUP GRIEVANCE, CHECK BLOCK & LIST NAMES BELOW

TROOP/BUREAU
*LIQUOR CONTROL ENFORCEMENT*

STATION/DIVISION
*OPERATIONS*

NAME OF REPRESENTATIVE (IF ANY)
*N/A*

TYPE OF GRIEVANCE

(CHECK ONE)

☐ CONTRACT INTERPRETATION

☒ APPEAL DISCIPLINE

DATE OF ALLEGED CONTRACTUAL VIOLATION OR WHEN YOU BECAME AWARE OF SAME/OR DATE ACKNOWLEDGMENT OF PENALTY TO BE IMPOSED

DATE: *3/10/00*

ALLEGED VIOLATION: CITE SPECIFIC CONTRACT PROVISIONS. IF DISCIPLINE—CITE ART: XXVIII (DISCIPLINE)

*ARTICLE 26; DISCIPLINE*

DETAILS—FULLY EXPLAIN ALLEGED VIOLATIONS / FOR DISCIPLINE SEE INSTRUCTION SHEET

*SEE ATTACHED*

LIST OF ATTACHMENTS/COPY D.A.R., RESPONSE LETTER, ETC.

*NONE*

LIST OF WITNESSES/NAME AND RANK

*SEE ATTACHED*

SUGGESTED REMEDY:

*SEE ATTACHED*

NAME AND RANK OF GROUP GRIEVANCE MEMBERS (EACH NAME MUST BE INITIALED)

*N/A*

SIGNATURE OF GRIEVANT/SPOKESPERSON

*Captain Darrell G. Ober*

DATE FILED

SUPPLEMENTAL - GRIEVANCE NUMBER HQ-174



***DETAILS - Fully Explain Alleged Violations:

***The provisions of this grievance incorporate all allegations of prior grievance numbers HQ – 164; HQ – 167; HQ – 169 and HQ -172.

    On March 10, 2000, the Director, Bureau of Liquor Control Enforcement, Major Francis E. Koscelnak, informed me that my request to continue to serve the Department in a secondary job function as a Team Leader for an Emergency Preparedness Liaison Officer for the Pennsylvania Emergency Management Agency (PEMA) was denied.

    I have continually served as either a PEMA Emergency Preparedness Team member or a Team Leader since approximately 1995.  I have served in the aforementioned capacities while holding the following primary job functions:

- Section Commander (Bureau of Professional Responsibility, Systems and Process Review Division).
- Division Director (Bureau of Professional Responsibility, Systems and Process Review).
- Division Director (Bureau of Professional Responsibility, Internal Affairs Division).
- Team Leader, Systems Integrator Procurement Project (while detached to the Bureau of Technical Services).

    During the past five years that I have held this secondary job function, it has involved minimal training, minimal activation, and has **NEVER** interfered with my ability to perform or fulfill the responsibilities of my primary job functions.

    I was informed that the reason I would no longer be permitted to serve in this secondary job function was so that I could become "fully involved" and "learn the responsibilities of my new position" as a Section Commander in the Bureau of Liquor Control Enforcement.

    The position I currently maintain is designed for and normally filled by a Lieutenant (refer to Grievance #HQ – 172).  For the past six months, a Sergeant filled it.

    The Department's Emergency Operations Officer (functional overseer of the program) did not request my removal from PEMA.

    The day prior to me being removed from this position, details of a lawsuit that I filed against the Department was published in the local newspaper.

    In contrast to the stated reason(s) for me being removed from this secondary job function, no valid operational reason exists that justifies my termination from this position.  Despite my attempts to stop the negative actions

1

being taken against me through the grievance process and Commonwealth Court, the agency continues to engage in a clear and continuing pattern of illegal actions, harassment, retaliation, disparate treatment, discipline and systematic dismantling of meaningful duties and assignments that are commensurate with my rank and position.

LIST OF ATTACHMENTS:

NONE

LIST OF WITNESSES/NAME AND RANK:

1.    Major Francis E. Koscelnak, Director, Bureau of Liquor Control Enforcement.

2.    Captain Jeffery R. Davis, Emergency Operations Officer.

SUGGESTED REMEDIES:

1.    In addition to all other remedies articulated in the prior grievances, I want to be immediately returned to the position of Emergency Preparedness Liaison Officer.

Rev. 9/90

AMENDMENT

GRIEVANCE FORM

GRIEVANCE NO. HQ-172; HQ-
HQ-164; HQ-167; HQ-1

NAME AND RANK OF GRIEVANT/SPOKESPERSON
CAPTAIN DARRELL G. OBER

☐ IF GROUP GRIEVANCE, CHECK BLOCK & LIST NAMES BELOW

BUREAU
LIQUOR CONTROL ENFORCEMENT

STATION/DIVISION
OPERATIONS

NAME OF REPRESENTATIVE (IF ANY)
N/A

(CHECK ONE)
TYPE OF GRIEVANCE   ☐ CONTRACT INTERPRETATION   ☒ APPEAL DISCIPLINE

DATE OF ALLEGED CONTRACTUAL VIOLATION OR WHEN YOU BECAME AWARE OF SAME/OR DATE ACKNOWLEDGMENT OF PENALTY TO BE IMPOSED

DATE: REFER TO AFOREMENTIONED GRIEVANCE NUMB

ALLEGED VIOLATION: CITE SPECIFIC CONTRACT PROVISIONS. IF DISCIPLINE—CITE ART: XXVIII (DISCIPLINE)

SEE ATTACHED AMENDMENT

DETAILS—FULLY EXPLAIN ALLEGED VIOLATIONS / FOR DISCIPLINE SEE INSTRUCTION SHEET

SEE ATTACHED AMENDMENT

LIST OF ATTACHMENTS/COPY D.A.R., RESPONSE LETTER, ETC.

F.O.P. CONTRACT SIDE LETTER OF AGREEMENT WITH THE COMMONWEALTH OF PENNSYLVANIA

LIST OF WITNESSES/NAME AND RANK

REFER TO INDIVIDUAL GRIEVANCES

SUGGESTED REMEDY:

REFER TO INDIVIDUAL GRIEVANCES

NAME AND RANK OF GROUP GRIEVANCE MEMBERS (EACH NAME MUST BE INITIALED)

N/A

SIGNATURE OF GRIEVANT/SPOKESPERSON
Captain Ober

DATE FILED 3/21/00

F.O.P. Contract Side Letter of Agreement with the
Commonwealth re: Member Treatment

# MEMBER TREATMENT

1. The Employer agrees not to engage in or permit discrimination or harassment against any member on the basis of race, creed, color, ancestry, sex, marital status, age, national origin, union membership, union activity or political affiliation.

2. Incidents which are at variance with this principle may be appealed through the grievance and arbitration procedure.

   In cases of alleged harassment, the only remedy available to the arbitrator shall be a cease and desist award.

   If a subsequent alleged harassment arbitration involving the same parties results in a cease and desist award, the member who has committed the act of harassment shall be subject to progressive discipline by the Department. Further substantiated acts of harassment shall result in more severe discipline.

Rev. 9/90

## GRIEVANCE FORM

GRIEVANCE NO. *HQ-176*

NAME AND RANK OF GRIEVANT/~~SPOKESPERSON~~
*CAPTAIN DARRELL G. OBER*

☐ IF GROUP GRIEVANCE, CHECK BLOCK & LIST NAMES BELOW

TROOP/BUREAU
*LIQUOR Control Enforcement*

SECTION/DIVISION
*ADMINISTRATION*

NAME OF REPRESENTATIVE (IF ANY)
*N/A*

TYPE OF GRIEVANCE (CHECK ONE)
☒ CONTRACT INTERPRETATION   ☐ APPEAL DISCIPLINE

DATE OF ALLEGED CONTRACTUAL VIOLATION OR WHEN YOU BECAME AWARE OF SAME/OR DATE ACKNOWLEDGMENT OF PENALTY TO BE IMPOSED
DATE: *6/28/00*

ALLEGED VIOLATION: CITE SPECIFIC CONTRACT PROVISIONS.  IF DISCIPLINE—CITE ART: XXVIII (DISCIPLINE)

*ARTICLE 26, DISCIPLINE*

DETAILS—FULLY EXPLAIN ALLEGED VIOLATIONS / FOR DISCIPLINE SEE INSTRUCTION SHEET

*SEE ATTACHED*

LIST OF ATTACHMENTS/COPY D.A.R., RESPONSE LETTER, ETC.

*SEE ATTACHED*

LIST OF WITNESSES/NAME AND RANK

*SEE ATTACHED*

SUGGESTED REMEDY:

*SEE ATTACHED*

NAME AND RANK OF GROUP GRIEVANCE MEMBERS (EACH NAME MUST BE INITIALED)

*N/A*

SIGNATURE OF GRIEVANT/~~SPOKESPERSON~~
*Captain D. G. Ober*

DATE FILED *6/30/00*

## SUPPLEMENTAL – GRIEVANCE NUMBER HQ – 176

**DETAILS – Fully Explain Alleged Violations:**

**The provisions of this grievance incorporate all allegations of prior grievance numbers HQ-164; HQ-167; HQ-169; HQ-172 and HQ-174.

On June 10, 2000, Captain Coleman J. McDonough was transferred from the Bureau of Patrol to Troop F, Montoursville. While assigned to the Bureau of Patrol, Captain McDonough was one of the Department's Pennsylvania Emergency Management Agency (PEMA) Emergency Preparedness Team Leaders.

On June 20, via e-mail, I confirmed with Captain Jeffrey R. Davis, Department Emergency Operations Officer, that a vacancy existed as a PEMA Emergency Team Leader as a result of Captain McDonough's transfer.

On June 28, 2000, the incoming Director, Bureau of Liquor Control Enforcement, Major Phillip L. DeWire informed me that I had been selected to fill the PEMA position created by the transfer of Captain McDonough. However, later that same day, Major DeWire informed me that the Department had rescinded approval of my selection to this position.

I am currently assigned to the Bureau of Liquor Control Enforcement as the Director, Administration Division. I served as a PEMA Emergency Preparedness Team member and/or Team Leader from 1995 until I was stripped of these duties by the Department in February 2000. I served in PEMA while performing the following primary job functions:

- Central Section Commander (Bureau of Professional Responsibility, Systems and Process Review Division).
- Division Director (Bureau of Professional Responsibility, Systems and Process Review Division).
- Division Director (Bureau of Professional Responsibility, Internal Affairs Division).
- Team Leader, Systems Integrator Procurement Project (while detached to the Bureau of Technology Services).

As stated in grievance number HQ-174, my assignment to PEMA has involved minimal training, minimal activation and has **NEVER** interfered with my ability to perform or fulfil the responsibilities of my primary job functions.

This latest action against me comes just three weeks after I filed a Whistleblower lawsuit against the Department.

1



No valid operational reason exists to deny my reassignment to a position for which I am qualified, have been trained, have held for five years, am available for, and fully capable of performing.  As has been stated many times in the above listed grievances, the Department continues to engage in a clear and continuing pattern of illegal actions, punishment, harassment, retaliation and disciplinary actions against me.

## LIST OF ATTACHMENTS:

1.    Department Personnel Order 00 -12, dated June 7, 2000.
2.    E-mail message from this officer to Captain Jeffery R. Davis, dated June 13, 2000.

## LIST OF WITNESSES/NAME AND RANK:

1.    Captain Jeffrey R. Davis, Emergency Operation Officer.
2.    Major Phillip L. DeWire, Director, Bureau of Liquor Control Enforcement.
3.    Major Leonard Washington Jr., Director, Bureau of Emergency and Special Operations.

## SUGGESTED REMEDIES:

1.    In addition to all other remedies articulated in the prior grievances, I want to be immediately restored to the position of Emergency Preparedness Liaison Officer.

2



**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE

00-12
Personnel Order
June 7, 2000

SUBJECT:          Promotions and/ or Transfers

TO:               Area, Troop and Station Commanders
                  and Bureau Directors

FROM:             Commissioner

1.      The following personnel matters are announced as follows:

Major Francis E. Koscelnak, Bureau of Liquor Control Enforcement, is hereby named Commander, Area II, effective July 8, 2000.

Captain Phillip L. DeWire, Troop F, Montoursville is hereby promoted to Major, effective June 10, 2000, and will assume command as the Director, Bureau of Liquor Control Enforcement, effective July 8, 2000.

Captain Darrell G. Ober, Bureau of Liquor Control Enforcement, has assumed command as the Director, Administration Division, effective May 30, 2000.

Captain Coleman J. McDonough, Bureau of Patrol, is hereby transferred to and will assume command of Troop F, Montoursville, effective June 10, 2000.

Lieutenant Roger N. Waters, Troop B, Washington, is hereby promoted to Captain and transferred to the Bureau of Patrol, and will assume command as the Director, Patrol Services Division, effective June 10, 2000.

Sergeant Brian E. Acken, Bureau of Criminal Investigation, is hereby promoted to Lieutenant, and transferred to the Bureau of Technology Services, effective June 10, 2000.

Sergeant Robert L. Lizik, Troop D, Butler, is hereby promoted to Lieutenant and transferred to the Bureau of Professional Responsibility, effective June 10, 2000.

OBER, DARRELL G 

From:          DAVIS, JEFFREY R
Sent:          Tuesday, June 20, 2000 9:53 AM
To:            OBER, DARRELL G
Subject:       RE: PEMA-EPLO Duties

Darrell:

Yes, we need another team leader.  I forwarded your notification of interest to Major Washington for discussion with your new Bureau Director.  I'm still waiting for word back.  I hope things work out.

Jeff

> ----Original Message----
> From:          OBER, DARRELL G
> Sent:          Tuesday, June 13, 2000 2:45 PM
> To:            DAVIS, JEFFREY R
> Cc:            OBER, DARRELL G
> Subject:       PEMA-EPLO Duties
>
> Jeff,
>
>     Here we go again...with the transfer of Captain McDonough, are you again in need of a Team Leader?  Thanks,
>
> Darrell

STD-501x



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

**DATE:**          June 29, 2000

**SUBJECT:**      Vacancy – State Police Emergency Preparedness Liaison Team

**TO:**            Director, Bureau of Emergency and Special Operations

**FROM:**          Captain Charles J. Skurkis
                   Director, Systems and Process Review Division
                   Bureau of Professional Responsibility

      1.      I would like to express my interest in the subject vacancy.  I am familiar with the duties and responsibilities of the position.

      2.      If selected, the following personal information is provided for necessary dissemination:

         Work phone – 717-657-4211
         Department issued cellular phone – 717-805-3020
         Department issued voice pager – 888-812-4935

*P128*

STD-501X (9-86)

COMMONWEALTH OF PENNSYLVANIA

**DATE:**         April 24, 2000

**SUBJECT:**      Loss of or Damage to State Property or Equipment and
                  Travel and Subsistence Appeal Board – Captain Darrell Ober

**TO:**           William Mullin
                  Office of Administration

**FROM:**         Joanna N. Reynolds
                  Assistant Counsel
                  Pennsylvania State Police

It has come to the Commissioner's attention that the Board met on March 21, 2000, to consider Captain Darrell Ober's requests for reimbursement of travel expenses and leave. The Board, by a 2-0 vote, with Major Leonard Washington, Jr., abstaining, apparently voted to approve the travel expenses and restore eight hours of annual leave. This was done without <u>any</u> consultation with Major Hawthorne Conley, Director, Bureau of Professional Responsibility, Captain Ober's former supervisor, and the Commissioner, who had denied the requests by Captain Ober. Moreover, the decision was purportedly based on conversations with Lt. Colonel Robert Hickes, Deputy Commissioner of Staff, who supposedly approved the travel by Captain Ober, even though he was not Captain Ober's supervisor at the time the expenses and leave were incurred.

For the following reasons, the Commissioner and this office request that the Board re-open its proceedings to consider the following evidence:

1)    The packet sent to the Board members had no information in it concerning the reasons why Captain Ober's requests for reimbursement for travel expenses and restoration of annual leave were denied. Although Captain Ober's arguments were presented in the packet, the reasons for denial were not, nor did the appeal Board attempt to discover what those reasons were.

*P129*
*1 of 4*

2)      The Commissioner denied the requests for travel reimbursement and restoration of annual leave for the following reasons:

    a)      The person who allegedly approved the expenses, Lt. Colonel Hickes, was not authorized to do so under the Commonwealth travel regulations, inasmuch as he was not Captain Ober's supervisor.

    b)      There was no need for Captain Ober to secure a hotel room to listen to audiotapes supplied by the F.B.I. and discuss cadet selection procedures – he could have gone directly to the F.B.I. to do so. This investigation was supposedly an F.B.I. investigation. If the F.B.I. felt it necessary to meet with Captain Ober in a hotel room, the arrangement and expenses of that meeting were the responsibility of the F.B.I.

    c)      There was no need for Captain Ober to utilize his personal car to travel to Indiana, Pennsylvania to meet with the F.B.I. – he should have used a Commonwealth vehicle, per State Police regulations. See Field Regulation 5-1, 1.08 (D).

    d)      There was no need for Captain Ober to utilize annual leave to meet with the F.B. I. – if the matter was job related, he should have used on-duty time to meet with that agency.

    e)      Although the travel expenses and use of annual leave occurred on March 15, 1999, Captain Ober did not submit the requests for reimbursement until more than two months had elapsed, when they were submitted to a supervisor in the Bureau of Technology Services (where Captain Ober was temporarily assigned), Major Wesley Waugh, who had no background as to the circumstances under which the expenses were incurred. It is believed by the Commissioner that Captain Ober did this to avoid the analysis of his requests for reimbursement by an appropriate supervisor, i.e. his supervisor in the Bureau of Professional Responsibility, Major Hawthorne Conley. (Management Directive 230.10 Amended, Section 08, paragraph a, requires that travel reimbursement requests be submitted at least monthly to the agency comptroller).

3)    The decision by the Appeal Board is inconsistent with Commonwealth travel regulations (Management Directive 230.10 Amended) in the following particulars:

    a)    The regulations require that <u>supervisors</u> review and approve STD 191, Travel Expense Voucher forms, submitted by employees, to ensure necessity, propriety, correctness, and accuracy of travel incurred. (See Management Directive 230.10, Section 03, paragraphs k and m) Captain Ober did not submit the STD 191 to his supervisor, but instead got authority to travel from a Lt. Colonel who was not in his chain of command and submitted the STD 191 to a supervisor in the Bureau of Technology Services, who was not his supervisor at the time he incurred the expenses, and was not familiar with the expenses he was claiming.

    b)    Employees traveling on official business are expected to exercise the same care in incurring expenses that a prudent person would exercise in traveling on personal business. (See Management Directive 230.10, Section 03, paragraph e.) Captain Ober did not act in this instance as a prudent person would — he did not get prior approval from his supervisor to incur travel expenses, he did not travel on state time, he did not use a Commonwealth vehicle when one was available, and he did not use F.B.I. facilities to conduct the meeting, but instead incurred the cost of using a hotel.

Since the Board has no authority to amend the Commonwealth's travel regulations, and since the original decision would allow reimbursement of expenses absent proper supervisory approval, the original decision of the Board is invalid on it face.

4)    The Board considered the issue of restoration of annual leave, when there was no jurisdiction to do so under the terms of the Collective Bargaining Agreement. The Board is limited to issues arising under Field Regulation 4-1, Loss of or Damage to State Property or Equipment, and Field Regulation 5-1, Travel and Subsistence. Restoration of leave, although related to travel and subsistence issues, is <u>not</u> addressed by FR 5-1, and should not have been considered by the Appeal Board.



5)    Some of the information contained in the May 13, 1999 memorandum from Captain Ober to the Commissioner is specifically disputed by the Commissioner. (This memo was contained in the packet provided to the Appeal Board by the State Police Bureau of Personnel).

For the reasons stated above, the Commissioner and the Office of Chief Counsel request the Board to re-open its proceedings to reconsider their decision and discuss the issue with the persons involved in the denial process, specifically Colonel Paul Evanko, Commissioner, Lt. Colonel Thomas Coury, Deputy Commissioner of Administration and Major Hawthorne Conley, Director, Bureau of Professional Responsibility.

Commonwealth of Pennsylvania
Office of Administration

| | |
|---|---|
| **Date:** | May 8, 2000 |
| **Subject:** | Request for Reopening of Proceedings before the Article 28 Section 10 Reimbursement/Compensation Issues Board |
| **To:** | Joanna Reynolds<br>Assistant Counsel<br>Pennsylvania State Police |
| **From:** | William Mullin *[signature]*<br>Bureau of Labor Relations |

This is in response to your memorandum of April 24 requesting that the Board reopen its proceedings on the claims of Captain Darrell Ober. The Board, following a scheduled meeting and discussion of the Ober issues, voted on March 21, 2000 to approve Captain Ober's travel expense claim, as well as to restore certain annual leave to his annual leave balance. Major Leonard Washington represented the Department at the Board meeting. The Department also provided the Board in advance of the meeting with the documents and information it considered relevant for the Board's consideration. In addition, the Department was given the opportunity at the meeting to present any additional evidence and/or arguments with regard to this matter.

We believe reopening the proceedings would be inappropriate. The clear and unambiguous contract language of Article 28 Section 10 states "The findings of the Board shall be final and binding." Given this language and the opportunities available to the Department, both prior to and at the meeting to present its case, we believe the parties are precluded from reopening this matter for further consideration of arguments that could have previously been made by one of the parties.

With respect to the issues raised in your memorandum concerning travel expenses, we do not believe that the Board's decision to reimburse Captain Ober amended the Commonwealth's Travel Expense Regulations (Management Directive 230.10 Amended) or that the decision was contrary to the policies articulated in those regulations. Specifically, you contend the regulations were violated in that Captain Ober did not submit his Travel Expense Voucher to his supervisor, but instead received authorization to travel from a Lt. Colonel who was not in his chain of command. You also contend he submitted his travel expense voucher to a supervisor who had not been his supervisor at the time he incurred the expenses. Finally, you state that Captain Ober did not get prior approval from his supervisor to incur travel expenses, did not travel on state time, did not use a Commonwealth vehicle

P 130
1 OF 3

that was available, and that he incurred expenses inappropriately by conducting a meeting at a hotel rather than at FBI facilities.  We will address these concerns in the order of their listing above:

1.  Contention that Captain Ober failed to submit his travel voucher to his supervisor - This claim is without merit, as Ober did submit his voucher to the officer supervising him at the time when the voucher was completed.

2.  Contention that Ober received authorization to travel from a Lt. Colonel not in his chain of command - The regulations do not address who must authorize an employee's travel. That is, the regulations do not state that authorization to travel must be obtained from a manager in that employee's specific chain of command.  Rather, the regulations in Section 3a. merely state that an employee is entitled to reimbursement for expenses incurred "… in the performance of their duties …"  Ober received authorization for his activities from a superior officer.

3.  Contention that Ober submitted his travel expense voucher to a supervisor who had not been his supervisor at the time the expenses were incurred - The regulations do not require that a voucher be submitted to and signed by the specific supervisor who authorized the travel. Rather, Section 3n. of the regulations requires that whichever supervisor signs the voucher "… ensure the necessity, propriety, correctness, and accuracy of travel expenses incurred." Although, it will normally be the supervisor who authorized the travel who signs the voucher, the normal course of business presumes that there will be situations when a supervisor will retire or be transferred before his subordinate's expense voucher is completed, or that the employee himself will be transferred prior to completing the voucher. In this case, if Ober's supervisor had any questions regarding Ober's expenses, the responsibility for ensuring their necessity, propriety, etc. rested upon that supervisor.

4.  Contention that Ober did not travel on state time - The regulations do not address, let alone prohibit, an employee traveling on state time versus traveling on their personal time.

5.  Contention that Ober did not use a state vehicle - The regulations do not require that an employee utilize a state vehicle.  The unstated policy is that an employee may elect to utilize his personal vehicle unless specifically directed to use an available state vehicle. We note that Ober did not request reimbursement of mileage for use of his personal vehicle.

6.  Contention that Ober inappropriately used a hotel room for a meeting in lieu of FBI facilities – This contention is without merit, in as much as, we understand this had been previously discussed with and approved by Lt. Colonel Hickes.

On the matter of the annual leave action, Lt. Colonel Hickes was aware that Captain Ober would be traveling and meeting with the FBI while on annual leave, and Ober was told the leave day would be changed and his leave balance credited at a later date. We would also note a contract grievance had been filed on this collateral issue. Consequently, the Board, with full knowledge of both parties, elected to also address this leave issue (and resolve that claim) in its finding. We believe this was an efficient manner in which to dispose of this related claim. We find nothing inappropriate in disposing of both issues simultaneously given the status held by our office in addressing both Board and grievance matters.

We trust this addresses the questions you raised and that our position on this matter is clear.

STD-501X (9-86)

*Oder, Darrell*

**Commonwealth of Pennsylvania**

**Date:**          June 26, 2000

**Subject:**          Final Determination

**To:**          Director, Bureau of Staff Services

**From:**          Linda M. Bonney, Director *Linda M. Bonney*
               Bureau of Personnel

1.     Attached is a copy of correspondence from the Board of Appeal for Reimbursement/Compensation Issues, Section 10 to Article 28, PSTA Agreement.

2.     The attached individual report form reflects the amount that the Department shall reimburse the member.  This determination is final and binding; and is not subject to any further appeal.

SG/sg
cc:     Director, Benefits Division
        File

*P 131*
*1 of 2*

COMMONWEALTH OF PENNSYLVANIA
EXECUTIVE OFFICE
OFFICE OF ADMINISTRATION
(717) 787-5514



BUREAU OF LABOR RELATION
404 Finance Building
Harrisburg, Pennsylvania 1712
FAX # 783-0430

May 30, 2000

Robert C. Hickes
Deputy Commissioner of Staff
Pennsylvania State Police
1800 Elmerton Avenue
Harrisburg, PA 17120

&

Louis Lazzaro
President
Pennsylvania State Troopers Association
3625 Vartan Way
Harrisburg, PA 17110

Dear Messrs. Hickes and Lazzaro:

In accordance with the appeal procedure established under Article 28 Grievance Procedure Section 10 Reimbursement/Compensation Issues and FR 4-1, Loss of or Damage to Commonwealth Property or Equipment and FR 5-1, Travel and Subsistence, the Board of Appeal issued a final disposition on the below listed case heard on March 21, 2000. Captain Darell Ober is to be reimbursed by the Pennsylvania State Police (PSP) the amount listed below. In addition, he will have the noted hours of annual leave credited to his annual leave balance. The Board's decision resolves grievance 00-CI-0147 (HQ-164), previously submitted by Captain Ober, through the parties' grievance procedure, on the reimbursement and annual leave issues.

| Name and Rank | Reimbursement/Compensation | Amount |
|---|---|---|
| Captain Darrell Ober | Room rental and associated fees | $83.74 |

| Name and Rank | Reimbursement | Amount |
|---|---|---|
| Captain Darrell Ober | Annual leave | 8.0 Hours |

__(Abstained)__
Major Leonard Washington
Pennsylvania State Police

William Mullin
Office of Administration

Bruce Edwards
PA State Troopers Assoc.

copy:    Donald O. Adams
         Joanna Reynolds, Esquire
         Mark Grab
         Paul T. McCommons

STD—501, 9—86

DATE:                July 27, 2000

SUBJECT:             Reimbursement – Appeal Board Decision

TO:                  Deputy Commissioner of Administration
                     (through channels)

FROM:                Captain Darrell G. Ober
                     Director, Division of Administration
                     Bureau of Liquor Control Enforcement

REFERENCE:      (a)   Article 28, Grievance Procedure, Collective Bargaining Agreement
                      between the Commonwealth of Pennsylvania and the Pennsylvania State
                      Troopers Association, effective July 1, 1998 to June 30, 2000.


        1.    In accordance with Reference (a), the Appeal Board met on March 21,
2000 and discussed the reimbursement issues raised in Grievance #HQ-164. The Appeal Board voted
-0-1 to overturn the denials of these reimbursements and award me 8.00 hours of annual leave, and
monetary reimbursement in the amount of $83.74.

        2.    As documented on my Employe Statement of July 7, 2000, a leave
adjustment of 8.00 hours of annual leave was made to my leave balance. However, as of this date, I
have not yet received the reimbursement of $83.74 for which I was awarded and entitled.

        3.    I am kindly requesting your assistance in securing this long overdue
reimbursement.

        4.    Should you have any questions, I can be reached at 540-7460. Thank
you for your assistance.



DGO/awb

c: Capt. Ober

P132

STD-501X (9-86)

COMMONWEALTH OF PENNSYLVANIA

DATE:        November 1, 1999

SUBJECT:     Northwestern University Traffic Institute

TO:          Captain Darrell G. Ober
             Bureau of Technology Services

FROM:        Lt. Colonel Thomas K. Coury *TKCIHE*
             Deputy Commissioner of Administration

1.    Thank you for your interest in attending the Northwestern University Traffic Institute, School of Police Staff and Command, which is being hosted by the New Jersey State Police. Your request was not received in the Bureau of Personnel by the October 22, 1999, deadline. Your request was received on October 28, 1999, and a selection was already made.

2.    The Department has selected Lt. Timothy J. Allue and Sgt. Timothy J. McDonald to attend the session.

3.    Your desire to improve your managerial skills is indicative of your sound commitment to the established goals and objectives of our Department. Should a similar course be offered in the future, I hope you will again express an interest in attending.

P133

*EXHIBIT A*

SP 3-200 (12-93)

FR 1-2
2/20/98



**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE



SUBJECT:   DUTY REQUIREMENTS

2.01      PURPOSE

The purpose of this regulation is to establish policy and guidelines of duty requirements for the conduct of members.

2.02      PERFORMANCE OF DUTY

Members shall conscientiously strive to enforce the laws of the Commonwealth and render service to all citizens within the Commonwealth. Members shall also be held responsible for the proper performance of all duties assigned to them, the appropriate use of delegated authority, and strict adherence to the rules, regulations, or directives promulgated by the Department. Ignorance of the rules, regulations, or directives shall not be considered an excuse or justification for any violation of such by a member. Members shall be responsible for their acts and shall not attempt to shift the burden of responsibility for executing or failing to execute a lawful order or police duty. Supervisors shall ensure that members are given commensurate authority necessary for the effective performance of duty.

2.03      LAWFUL ORDERS

Members shall promptly obey and execute any and all lawful orders of a supervisor. This shall include orders relayed from a supervisor by a member of the same or lesser rank. A lawful order is any order, in keeping with the performance of any duty, issued either verbally or written over the signature of the Commissioner, any Deputy Commissioner, Area Commander, Bureau Director, Troop Commander, Division Director, Office Director, or any other supervisor prescribed by the various rules, regulations, or directives of the Department and necessary for the preservation of good order, efficiency, and the proper discipline of the Department and its members.

-1-

P134
1 OF 4

FR 1-2
2/20/98

2.04     CONFLICTING ORDERS

Members who are given an order that is in conflict with a previous order or regulation shall respectfully call attention to such conflict. If the supervisor giving the order does not alter or retract the conflicting order, then the order shall stand and, under those circumstances, the responsibility shall be the supervisor's. In such situations, the member obeying the conflicting order shall not be held responsible for disobedience of any order issued. When an order contrary to the provisions of any previous order, rule, regulation, or directive is given to a member, the member shall comply with the order unless it is a violation of the law, and shall thereafter submit correspondence, Form STD-501, through channels to the Commissioner, stating the facts and circumstances.

2.05     COMPETENCY

A.     <u>Competency to be Maintained</u>: Members shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions. They shall direct and coordinate their efforts in such a manner as will tend to establish and maintain the highest standards of efficiency in carrying out the functions and objectives of the Department. The fact that a member was deemed competent at the time of employment shall not preclude a later judgment of incompetency arising from their performance which would indicate a deficiency in adequate strength, qualifications, or capacity to fulfill the requirements of their assigned tasks. Such incompetency may be demonstrated by lack of knowledge or application of laws required to be enforced, apparent unwillingness or inability to perform assigned tasks, or the failure to conform to work standards established for the member's rank or position.

B.     <u>Record of Incompetency</u>: In addition to other methods of proof, a written record of repeated disciplinary actions for infractions of the rules, regulations, or directives shall be considered prima facie evidence of incompetency.

FR 1-2
2/20/98

2.06          RESTRICTIONS

A.    <u>On-Duty Time Restricted to Police Work</u>:  Members shall restrict their police duties during working hours to their assigned duty area, unless otherwise directed.  Members, while in uniform or on duty, shall not perform any police duty for the purpose of private gain, make any purchases, conduct personal business, or devote any of their time to any activity other than that which relates to police work.

B.    <u>Carrying of Unauthorized Articles</u>:  Members shall not carry books, magazines, newspapers, packages, bundles, etc., while on duty, except when necessary in the performance of their duties.

C.    <u>Reading on Duty</u>:  Members shall not read books, magazines, newspapers, or other printed matter while on duty and in view of the public, except as may be required in the performance of their duties.

2.07          SUSPENSION

A.    <u>Surrender of Equipment</u>:  Suspended members shall immediately surrender their badge, identification card, issued firearms, and any other specified equipment, to their Troop Commander, Bureau Director, or designee.

B.    <u>Prohibited Action</u>:  Suspended members are not permitted to wear any part of the uniform, or act in the capacity of, or represent themselves as a member of the Pennsylvania State Police in any manner.

2.08          SUBMITTING TO MEDICAL OR PSYCHIATRIC EXAMINATIONS OR TESTS

A.    Whenever a Troop Commander or Bureau Director has reasonable grounds to believe that a member of their command is being influenced by a medical or psychiatric condition including, but not limited to, the use of an intoxicant, which has affected, or is likely to affect, the member's ability to perform assigned duties, the Troop Commander or Bureau Director shall direct the member to undergo reasonable tests or examinations.  This shall be done at the expense of the Department,  to determine the fitness of the member for duty.

-3-



FR 1-2
2/20/98

B.    Members who have suffered an injury, illness, or any other condition incurred in the line of duty, which could affect their ability to perform assigned duties may be required by the Commissioner to undergo reasonable tests or examinations, at the expense of the Department, to determine their fitness for duty.

C.    Members who have suffered an injury, illness, or any other debilitating condition not incurred in the line of duty which could affect their ability to perform required assigned duties, may be required by the Commissioner to obtain and submit a complete medical report from their physician concerning their physical or mental condition. The report shall include a detailed diagnosis and prognosis of the injury, illness, or condition, and any other pertinent information which would aid the State Police Medical Officer (SPMO) in evaluating the situation prior to the member's return to active duty status.

D.    When any of the above conditions exist, Troop Commanders or Bureau Directors may place members on medically limited duty pending evaluation and clearance to return to full duty by the SPMO.

2.09    SUBMITTING TO POLYGRAPH EXAMINATIONS

When ordered by the Commissioner, members shall submit to a polygraph examination when such an examination is relevant to a particular internal administrative investigation or inquiry. Only questions relevant to the internal administrative investigation or inquiry shall be asked.

2.10    DUTY REQUIREMENTS

A.    Reporting for Duty: Members shall report for duty at the time and place specified by their supervisor and at that time shall be physically and mentally fit, properly attired, and ready to assume on-duty status. Members not appearing for duty, scheduled hearings, court appearances, or other designated assignments on time, shall be in violation of this section.

B.    Conditions of Absence: Members shall not fail to report for duty due to illegal or improper conduct.

-4-

AR 4-22
9/15/2000

EMPLOYE PERFORMANCE REVIEW PROGRAM

22.01        PURPOSE

The purpose of this regulation is to establish policy for evaluating the performance of personnel.  Performance evaluation is a vital tool that assists management in determining the effectiveness of individuals, Stations, Troops, Bureaus, Offices, and the Department.  Performance evaluations help identify an individual's work-related strengths and weaknesses.  They also provide standards personnel can use to gauge their own development and their contribution to the Department. Accordingly, performance evaluation is not just a once-a-year project, but an ongoing process which requires continuously communicating expectations of job performance to personnel, documenting job performance of personnel, and providing personnel with feedback regarding their performance.

22.02        GENERAL PROVISIONS

A.        Policy: An evaluation of the performance of all Department personnel shall be conducted at least annually by each individual's immediate supervisor on the Employe Performance Review, Form 363L. Instructions for completing the form are contained in Appendage A.  The evaluation shall cover a specific period and shall be based upon criteria specific to the assignment of the individual during the rating period.  Newly hired/promoted non-Civil Service noncontract-covered employes shall receive a six-month interim evaluation following hire/promotion.  Entry-level probationary employes shall receive an evaluation at least bimonthly until successful completion of the probationary period. Other probationary employes and members selected to a specialized position shall receive a progress review of performance within the first three months of the probationary period and an Employe Performance Review just prior to the end of the probationary period; all newly promoted personnel (with the exception of members) shall receive a progress review of performance within the first three months of the six-month probationary period, and an Employe Performance Review just prior to the end of the probationary period. Probationary Employe Performance Reviews for new

-1-

P 135
1 OF 32

AR 4-22
9/15/2000

Troopers and Liquor Enforcement Officer Trainees shall be completed in accordance with the appropriate regulations. In addition, at any time an individual's performance is deemed unsatisfactory, they shall be immediately informed in writing through an interim Employe Performance Review. The supervisor shall discuss Employe Performance Review ratings with the ratee in person, and the ratee shall be given the opportunity to sign and make written comments on the completed Employe Performance Review.

B.   Preparation:   At the beginning of the evaluation period, supervisors are required to issue and review the Job Description, Form STD-370, and Identification of Essential Job Functions/ADA form, for the position being evaluated, as well as the factors and expectations or standards upon which the ratee will be evaluated. Instructions for completing the Job Description and Identification of Essential Job Functions/ADA forms are provided in Appendages B and C, respectively.

1.   If a Job Description for the position does not exist, one shall be created and a copy issued to the position holder. The Job Description shall be reviewed with the ratee at the time of the Employe Performance Review interview to ensure the ratee understands the responsibilities of the position for which they have been rated and will be rated at the next evaluation. If the responsibilities of the position have changed, the Job Description shall be modified to reflect those changes. The new responsibilities shall be reviewed with the ratee. The Job Description need not accompany the Employe Performance Review unless it has changed. Any time an individual's job responsibilities undergo a major change (such as with promotion, transfer, selection to a specialized position, or addition of major job responsibilities), a new Job Description shall be prepared immediately and distributed in accordance with Appendage B of this regulation. Each ratee shall be evaluated on performance of the duties of the position occupied during the span of the rating period being considered. Current Job Descriptions for all Department positions shall be kept on file in the Bureau of Personnel and be made available to all personnel, upon request.

2.   Essential job functions of the position occupied by the ratee shall be reviewed with the ratee at the beginning of

AR 4-22
9/15/2000

the rating period. If changes have occurred in the Job Description of the ratee, the essential job functions shall be modified accordingly. The Essential Job Functions/ ADA form shall be attached to the Job Description.

3.    Supervisors are also required to review with subordinates the factors on which the subordinates will be evaluated from the Employe Performance Review, and to convey to subordinates, in writing, the expectations or standards (levels of performance of the job duties required to achieve a rating of SATISFACTORY within the factors). Where possible, the expectations or standards should include the quality, quantity, and time frames of assigned work. At locations with personnel having the same or very similar job responsibilities and different supervisors, expectations or standards should be jointly prepared for personnel by those supervisors, or by the reviewing officer with the input of the supervisors, to ensure consistency and fairness. Supervisors and subordinates should discuss and mutually understand the performance factors and expectations or standards that will be used in evaluating the performance of the ratees in their duties.

C.    Annual Evaluations: Supervisors shall complete Employe Performance Review evaluations on their subordinates on at least an annual basis. Supervisors are exempt from the requirement to complete the first Employe Performance Review annual evaluation for Probationary Troopers due to the bimonthly Employe Performance Reviews already being conducted during the probationary period. When rating supervisory personnel on Factor 7, quality of SUPERVISION/MANAGEMENT, particular attention shall be paid to the Employe Performance Reviews those supervisory personnel complete for their subordinates, including the accuracy of the ratings as they relate to actual performance and the documentation supporting the ratings.

D.    Probationary Evaluations: Employe Performance Reviews for Probationary Troopers and Liquor Enforcement Officer Trainees shall be carried out as specified in the applicable regulations and directives. The performance of entry-level employees who are in probationary status shall be reviewed bimonthly with the employe until successful completion of the probationary period. Entry-level employes are defined as newly hired Commonwealth employes, except those in non-Civil Service management positions who do not serve a probationary period. As stated previously, these

AR 4-22
9/15/2000

non-civil service management positions shall receive an interim evaluation at the end of their first six months in the position. All entry-level probationary employes shall have a written Employe Performance Review completed on a bimonthly basis until successful completion of the probationary period. Other probationary employes shall have a performance progress review by the end of the first two and one-half months, and a written Employe Performance Review completed prior to the end of the probationary period. Where performance is less than the level of SATISFACTORY, a formal interim Employe Performance Review shall be prepared on a monthly basis until performance improves to a rating of SATISFACTORY.

E.  Interim Evaluations:  An interim Employe Performance Review may be prepared at any time during the rating period. Reasons may include a notable improvement or a decrease in the level of an individual's performance. Supervisors shall provide prompt written notification to a subordinate whose performance is perceived as unsatisfactory through an interim Employe Performance Review. When possible, notification shall be given at least 90 calendar days prior to the end of the annual rating period. The notification shall document the perceived unsatisfactory performance and include actions the subordinate should take to improve performance. Interim Employe Performance Reviews shall be prepared for all individuals who received a rating of UNSATISFACTORY in any factor on their previous annual Employe Performance Review. Any time an interim Employe Performance Review is prepared, all factors shall be rated, with particular attention to the documentation in the COMMENTS Section(s) to the factor(s) rated as UNSATISFACTORY. The interim Employe Performance Review of these individuals shall continue until their performance becomes satisfactory every one, two, or three months, etc., at the discretion of the supervisor. Interim Employe Performance Reviews shall be completed, processed, and retained in the same manner as annual Employe Performance Reviews.

F.  Semiannual Progress Review:  Supervisors shall conduct a semiannual progress review with the personnel for whom they will complete an Employe Performance Review. The progress review provides the supervisor and subordinate an opportunity to reaffirm the standards and expectations the supervisor will use in evaluating the subordinate's performance and to discuss their impressions of the subordinate's work to date. For personnel, except members, the date, and any noteworthy discussion of the

-4-

semiannual progress review, shall be documented in the supervisory file.   A Supervisor's Notation, Form SP 3-352 (Appendage D), shall be utilized for members, with a copy retained in the supervisory file.   The progress review may be conducted in conjunction with other reviews of performance, so long as the reviews held are approximately halfway through the evaluation period.

G.   Documentation:

1.   Supervisors shall document, through supervisory notes, the positive and negative work-related performance of each of their subordinates.  The supervisory notes shall be confidential and maintained by the evaluating supervisor in a supervisory file.  The notes shall not be kept in the Troop or Bureau personnel file.  Supervisors shall report the positive or negative work-related performance of personnel they do not directly supervise, to the proper supervisor for consideration in creating a supervisory note. The supervisory file shall not contain confidential information such as medical information, information which is irrelevant to performance or is illegal or information which is discriminatory.

2.   The supervisory file shall be maintained by all supervisors for each of their subordinates, both members and employes, for the purpose of providing positive and negative feedback to the subordinate and documentation of counseling sessions, commendations, disciplinary actions, and Employe Performance Review ratings. Supervisors are the exclusive custodians of their supervisory files and shall maintain them in a secure location. Access to information from the supervisory file shall be at the discretion of the supervisor; however, subordinates shall be provided with documentation pertinent to their performance.  Documentation pertinent to supervisory action including, but not limited to, counseling, recommendation for commendation, and performance evaluation, shall be provided to the reviewing officer upon request.

3.   The following information shall be kept in the supervisory file:

a.   Supervisor's Notation (used only for members).

AR 4-22
9/15/2000

      b.    Notes and records on counseling sessions.

      c.    Notes and records on oral reprimands.

      d.    Other supervisory notes and records on matters such as performance or conduct relative to specific work assignments.

      e.    A copy of the latest Employe Performance Review.

      f.    A copy of the Job Description with the Identification of Essential Job Functions/ADA form attached.

      g.    Letters received from the Department or the public regarding subordinates' performance or conduct.

    4.    Supervisory file information shall be retained for one year from the last Employe Performance Review rating or as long as necessary to address particular problems, e.g., ongoing disciplinary situations, performance problems, etc. It shall then be purged and the information destroyed or given to the subordinate.

H.    Training:  All supervisors shall be trained in the performance evaluation process. Training shall be accomplished through the Basic Supervision course offered by the Bureau of Training and Education. Commanders and Directors, or their designees, may also contact the Bureau of Personnel to request training for their personnel who have not received training through the Basic Supervision course.

22.03    PROCEDURES

A.    Dissemination:  The Director, Bureau of Personnel, shall distribute annual Employe Performance Review forms to the appropriate management personnel who shall be responsible for ensuring the proper distribution of the forms within their respective commands.

B.    Ratings:  Supervisors shall complete a subordinate's Employe Performance Review within 30 days of the end of the evaluation period of the subordinate. Where unusual situations prevent completion of the Employe Performance Review within that time frame, an additional month may be granted to complete the

AR 4-22
9/15/2000

Employe Performance Review.   However, the Employe Performance Review should be received in the Bureau of Personnel no later than two months after the end of the rating cycle.  Refer to Appendage A for the procedure for completing the Employe Performance Review.

C.    Raters:  Commanders and Directors shall ensure a supervisor is assigned to evaluate each person under their command. All personnel shall receive an Employe Performance Review. The supervisor who rates a subordinate shall be sufficiently knowledgeable of the subordinate's work performance, and shall have supervised the subordinate for at least 90 calendar days.

D.    Transfer of Personnel:   Personnel transferred/promoted fewer than 90 calendar days before the end of their Employe Performance Review shall be rated by the supervisor at their previous location/previous rank.  Personnel whose supervisor was transferred, promoted, etc., fewer than 90 calendar days prior to the end of the ratee's evaluation period, shall be rated by that supervisor.  The Employe Performance Review shall be forwarded to that supervisor for completion.   The Employe Performance Review interview may be completed by telephone with the ratee, or the reviewing officer may hold the interview with the ratee.   In both instances, the supervisor completing the Employe Performance Review shall incorporate any information provided by the current supervisor into the rating.  In the event that the former supervisor is not available because of retirement, etc., the reviewing officer shall complete the Employe Performance Review as the rater, with his or her supervisor functioning as the reviewing officer.   Circumstances which prevent completing the Employe Performance Review in accordance with this regulation should be reported to the Personnel Management Division, Bureau of Personnel.   This situation should be acknowledged in the RATER COMMENTS Section of the Employe Performance Review.  If personnel are transferred/promoted more than 90 calendar days following the completion of their last Employe Performance Review and more than 90 calendar days before the end of the next evaluation period, their supervisor at the previous location/previous rank shall prepare a draft Employe Performance Review and forward it, through channels, to the individual's new supervisor.  The draft Employe Performance Review shall serve as advisory information on the individual's performance at the previous assignment and shall be incorporated into the individual's next formal Employe Performance Review.

AR 4-22
9/15/2000

E.    Promotion, Transfer, or Retirement of Supervisor:  Supervisors, having advance notice, who are promoted, transferred, or retire shall prepare a draft Employe Performance Review for all the personnel of their supervision who have not received a formal Employe Performance Review within the last 90 calendar days or whose current evaluation period will not expire within the next 90 calendar days.  These drafts shall be submitted to the rater's supervisor, who shall furnish the drafts to the new supervisor. The draft Employe Performance Review shall serve as advisory information on the subordinate's performance and shall be incorporated by the new supervisor into the next formal Employe Performance Review.  Promoted and transferred supervisors shall be responsible for Employe Performance Reviews of former subordinates whose evaluation periods expire fewer than 90 calendar days from the date of promotion or transfer.

F.    Detached Members:  If a member is on detached duty, the Troop, Bureau, or Office where the detached member is assigned shall complete the detached member's Employe Performance Review.

G.    Post Rating Interview:    After a supervisor completes a subordinate's Employe Performance Review, the supervisor shall conduct a rating interview.  The following steps are to be taken sequentially:

1.    The supervisor shall discuss the rating assigned to the rated individual with his or her supervisor, the reviewing officer.  Where the supervisor is the Commissioner, there is no reviewing officer and references to the reviewing officer do not apply.  Reviewing officers who agree with assigned ratings shall place their signature in the appropriate space. The reviewing officer and supervisor shall attempt to resolve any disagreement in an individual's rating.  If the reviewing officer and supervisor cannot agree, the rating will be resolved in a discussion with the reviewing officer's supervisor.  Reviewing officers shall not unilaterally change an individual's rating.   If changes are to be made, a new Employe Performance Review shall be prepared by the supervisor.

2.    The supervisor shall provide the  subordinate a copy of the subordinate's Employe Performance Review at least two days before meeting with the subordinate to discuss the rating.

AR 4-22
9/15/2000

3.     The supervisor and the rated subordinate shall discuss the strengths and weaknesses associated with the subordinate's performance in a rating interview. The supervisor shall also conduct career counseling relative to such topics as advancement, specialization, training appropriate for the subordinate's position, etc. Specific courses need not be identified.

4.     If the supervisor and subordinate mutually agree upon a change in an Employe Performance Review rating, the supervisor shall complete a new Employe Performance Review, checking the appropriate boxes, including the documentation, signatures, etc., or the supervisor shall draw a horizontal line through the item to be changed and insert the new rating. The supervisor and subordinate shall then initial any changes on the Employe Performance Review and the supervisor shall apprise the reviewing officer of the changes.

5.     Supervisors and subordinates shall discuss the Job Description and expectations, standards, or goals required for the subordinate to achieve SATISFACTORY ratings during the next evaluation period. This discussion shall include, but not be limited to:

     a.     Tasks of the position.

     b.     Level of performance expected.

     c.     Evaluation rating criteria, e.g., how the supervisor will be evaluating actual performance in relation to the standards and expectations in each rating category.

6.     At the conclusion of the rating interview, the individual rated shall check the appropriate boxes, be given the opportunity to make written comments, as desired, and sign and date the form in the appropriate spaces. If the individual rated refuses to sign the form, the supervisor shall print in the space for employe signature "Individual refuses to sign." Supervisors shall remind individuals who refuse to sign the form that their signature is for the purpose of acknowledging the fact that they reviewed the form with their supervisor. Their signature is not for the

AR 4-22
9/15/2000

purpose of signifying the evaluated individual's approval of the rating.

7.  The supervisor shall provide the individual with a copy of their Sexual Harassment Policy as referenced in AR 4-26, along with the Acknowledgement of Receipt of the Commonwealth of Pennsylvania Sexual Harassment Policy form. The individual shall sign and return the form, which the supervisor shall append to the Employe Performance Review.

H.  Appeal:   Personnel may request a review of the Employe Performance Review rating with a reviewing officer by checking the appropriate box on the form.  The reviewing officer shall be the supervisor of the person who rated the subordinate. Reviewing officers shall schedule an Employe Performance Review with the person requesting the meeting, as soon as practicable. Upon request, an employe has the right to union representation when discussing their Employe Performance Review with the reviewing officer.  After reviewing the Employe Performance Review rating with the requestor, the reviewing officer shall meet with the rater.  If it is determined that a change on the Employe Performance Review should be made, the person who completed the Employe Performance Review rating (the rater) shall complete a new Employe Performance Review form which reflects the changes; or they may draw a horizontal line through the item(s) to be changed and insert the new rating. **Do not make erasures.**  The changes shall be initialed by the reviewing officer, the supervisor who completed the Employe Performance Review, and the individual evaluated.  If it is determined that no changes will be made, the reviewing officer will notify the evaluated individual of this determination. Personnel may dispute a rating either through a written rebuttal of the rating under EMPLOYE COMMENTS on the Employe Performance Review or by attaching a written statement to the Employe Performance Review.  The written statement should be objective and respond only to that information contained in the Employe Performance Review.  If applicable, the written rebuttal shall be included in the individual's official personnel file.

I.  Second Appeal Process: There is no second appeal process available to anyone for whom the second appeal would be made to a position higher than Bureau Director, Office Director, or Area Commander.   Other personnel may appeal an Employe Performance Review rating after a review of the Employe

Performance Review with the reviewing officer.  The appeal must be in writing and shall, specifically, list all information that refutes the disputed rating factor(s).  The appeal shall be directed to the Area or Troop Commander, Bureau or Office Director, as the appeal officer.  Appeal officers shall determine if the Employe Performance Review rating, interview, and review were conducted in conformance with this regulation. A finding by an appeal officer that the regulation was not adhered to shall result in an order requiring the rating be redone.  The decision of the appeal officer shall be final in this case.  The appeal officer may also review appeals on the ratings and discuss these with the reviewing officer and rater to determine if a change is appropriate. However, the decision of the rater on rating levels is final.

AR 4-22
9/15/2000

APPENDAGE A

EMPLOYE PERFORMANCE REVIEW
FORM 363L

A.    PREPARATION:

1.    The Employe Performance Review shall be completed, in quadruplicate, with ballpoint pen or typewritten.

2.    Prior to receipt of the Employe Performance Review for the annual evaluation, the information at the top of the form will have been pretyped. This information shall be verified by the rater for accuracy. If corrections are necessary, they shall be made by the rater by drawing a single horizontal line through the incorrect information and printing the correct information directly above. The ratee and rater shall initial any correction. Do not erase.

3.    At the beginning of the evaluation period, raters shall meet with personnel to discuss expectations for performance in each of the JOB FACTORS. These expectations and standards for JOB FACTORS shall be prepared in writing for subordinates. The date of meeting shall be completed in Item 1 of COMMUNICATION OF PERFORMANCE STANDARDS.

4.    Approximately six months prior to the annual evaluation, or two and one-half months for probationary personnel who are not entry level, the supervisor shall hold a progress review meeting with the subordinate to discuss performance in each of the JOB FACTORS. Item 2 of COMMUNICATION OF PERFORMANCE STANDARDS shall be completed with the date of the progress review.

5.    Raters shall place an "X" in the appropriate box to indicate a rating for each of the factors listed under JOB FACTORS. Raters should consider the ratee's total performance in the job factor during the current rating period in selecting the appropriate rating.

B.    DEFINITIONS:  The definition of each of the ratings appears with the rating.

C.    JOB FACTORS:  Nonsupervisory, supervisory, and management personnel shall be rated on the first six job factors. Supervisory and management personnel shall also be rated on the job factor SUPERVISION/MANAGEMENT. This rating for supervisors and managers shall include evaluation by their supervisors regarding the quality of ratings given their subordinates.

A.1

AR 4-22
9/15/2000

1.   JOB KNOWLEDGE/SKILLS:

   a.   Does the individual display adequate knowledge and skills to perform the responsibilities of the position?

   b.   Does the individual display adequate knowledge of technical information related to job responsibilities?

   c.   Does the individual display adequate knowledge of work practices, policies, and necessary resources to complete job responsibilities?

2.   WORK RESULTS:

   a.   Is work accurate and complete?

   b.   Is there a tendency to make many errors?

   c.   Are reports properly, legibly, accurately, and neatly prepared?

   d.   Is the individual effective in the responsibilities of the position?

   e.   Is the amount of work completed acceptable?  Is it greater than required?  Is it less than required?

   f.   Is work completed within acceptable time frames?

   g.   Are assignments promptly and effectively executed?

   h.   Are there attempts to avoid work?

3.   COMMUNICATIONS:

   a.   Is information exchanged with others in a clear, organized, and concise manner?

   b.   Are written and oral communications provided to supervisors, peers, subordinates, and the public on a timely, concise, and clear basis?

   c.   Does the individual demonstrate an adequate understanding of written and oral communications, instructions, regulations, and directions?

A.2

AR 4-22
9/15/2000

4.    INITIATIVE/PROBLEM SOLVING:

    a.    Does the individual recognize problems and resolve them or suggest solutions for resolution?

    b.    Are regular work assignments performed with no more than normal supervisory monitoring or assistance?

    c.    Is thoroughness and accuracy exercised in analyzing facts, situations, etc.?

    d.    Are decisions based on a logical analysis of circumstances?

    e.    Does the individual readily become involved in or take control in work-related situations?

5.    INTERPERSONAL RELATIONS AND EQUAL EMPLOYMENT OPPORTUNITY (EEO):

    a.    Does the individual get along well with other personnel and supervisors?

    b.    Does the individual relate well with the general public? Have there been any founded complaints? Have there been any commendations, or written or verbal expressions of satisfaction from the public or peers?

    c.    Is the individual considerate in their approach? Arrogant?

    d.    Do the relationships of the individual with peers, supervisors, and subordinates contribute to, or detract from, accomplishment of work assignments?

    e.    Does the individual have the respect of other personnel? Does the individual have the respect of the public?

    f.    Equal Employment Opportunity for nonsupervisors. Does the individual:

        (1)    Maintain a good working relationship with other employes, supervisors, and the public without regard to race, sex, national origin, or disability?

        (2)    Refrain from discriminatory acts of harassment, insults, and/or racial, sexual, and ethnic slurs?

A.3

AR 4-22
9/15/2000

g.  Equal Employment Opportunity for supervisors or managers. Does the supervisor or manager:

   (1)  Make decisions affecting subordinates' conditions of employment in a nonbiased manner?

   (2)  Maintain work environment free from discrimination and harassment?

   (3)  Identify and resolve, or assist in resolving, discriminatory problems?

6.  WORK HABITS:

   a.  Is work organized or disorganized?

   b.  Is proper care taken of Commonwealth equipment?

   c.  Does the individual comply with Commonwealth and Department regulations, policies, and procedures?

   d.  Does the individual report to work at the scheduled time and with minimum absenteeism?

   e.  Does the individual apply safety techniques to their use of Commonwealth equipment?

   f.  Does the individual apply sound accident prevention techniques?

   g.  Does the individual practice safe driving techniques?  Use their seat belts?  Drive defensively?

   h.  Does the member use the siren and lights in accordance with regulations?

   i.  Does the member follow pursuit regulations?

   j.  Does the individual present an appearance appropriate to their position and job responsibilities?

   k.  Does the member uphold their sworn duties?

A.4

AR 4-22
9/15/2000

7.    SUPERVISION/MANAGEMENT: Does the supervisor or manager:

    a.    Provide effective leadership?

    b.    Properly delegate work responsibilities and authority to subordinates?

    c.    Monitor the activities of subordinates and provide effective and timely feedback?

    d.    Ensure that the work responsibilities of the positions of their command or supervision are effected promptly and accurately?

    e.    Conduct timely, accurate, and effective performance evaluations?

    f.    Properly manage overtime?

    g.    Ensure compliance with established procedures and regulations and take corrective action when necessary?

    h.    Organize and coordinate activities properly?

    i.    Treat subordinates fairly?  Impartially?

    j.    Disseminate pertinent information to subordinates?  Discourage rumors?  Discourage harmful cliques?

    k.    Develop subordinates?

    l.    Demonstrate sound administration?

    m.    Make sound, timely decisions.

    n.    Operate in conformance with Department regulations and procedures?

D.    DOCUMENTATION: Each factor rated OUTSTANDING, NEEDS IMPROVEMENT, and UNSATISFACTORY shall be documented in the COMMENTS Sections.  Documentation should include specific examples of performance.  It is recommended that documentation be provided for the rating of all job factors, regardless of rating level, in order to provide the personnel with specific feedback regarding their performance.  In addition, Troop Commanders and Bureau/Office Directors may require documentation in the COMMENTS Section for ratings of COMMENDABLE and SATISFACTORY.

AR 4-22
9/15/2000

E.    OVERALL RATING:  The importance of job factors varies from job to job; therefore, there is no prescribed formula for averaging the ratings to arrive at an overall rating.  For example, for supervisors and managers, the job factor of SUPERVISION/MANAGEMENT may be of more importance than the other job factors.  If any job factors are considered to have more importance than others, this shall be communicated to personnel at the beginning of the rating period. Decisions to place more importance on some job factors than others must be based on the responsibilities of the position and not on the individual. Therefore, there should be consistency in the importance among personnel with similar job responsibilities.

F.    TRAINING AND DEVELOPMENT RECOMMENDATIONS:  The supervisor shall review the performance and skill levels of the individual in relation to job responsibilities.    Training and/or developmental experiences which may enhance the achievement of the individual's career goals and maximize their performance shall be discussed.  The Department's educational leave and policy on shift scheduling for academic study shall also be discussed.  When making recommendations for individual and career enhancement, supervisors should be cognizant of the individual's immediate plans toward achievement of short- and long-term career goals, e.g., applying for specialized training or positions, attending Department or out-service training, pursuing academic degrees, etc.

G.    COMMENTS AND SIGNATURES:  The rater, reviewing officer, and ratee (in that order) shall each sign the evaluation form and add any comments needed to provide more information or clarify ratings.   The ratee shall check the appropriate boxes under EMPLOYE COMMENTS.  Ratees wishing to attach additional comments to the rating form, for retention in the official personnel folders and Troop or Bureau personnel files, may do so at any time.

H.    DISTRIBUTION AND RETENTION:

1.    One copy shall be furnished to the ratee two to three days prior to the evaluation interview.  The ratee should review this copy and bring it with them prepared to discuss the evaluation.  The ratee retains this copy at the end of the evaluation interview.

2.    The original form, along with the Acknowledgement of Receipt of the Commonwealth of Pennsylvania Sexual Harassment Policy form, shall be forwarded, through channels, to the Bureau of Personnel and filed in the ratee's official personnel folder.

3.    One copy shall be retained in the Troop or Bureau personnel file.

AR 4-22
9/15/2000

4.    One copy shall be retained by the supervisor and filed in the ratee's supervisory file.

5.    Employe Performance Reviews shall be kept in the official personnel folder and the Troop or Bureau personnel file for three years.

# ●MPLOYE PERFORMANCE R●●EW

AR 4-22
9/15/2000
020

363L (Rev. 6/98)

| GENERAL INFORMATION | TYPE REPORT | ☐ PROBATIONARY (CS/NCS union covered) ☐ PROBATIONARY (CS non-union) | ☐ INTERIM | ☐ ANNUAL |
|---|---|---|---|---|

PLOYE NAME

AGENCY
020 STATE POLICE

EMPLOYE NUMBER

CLASS TITLE

☐ SUPERVISOR
☐ NON-SUPERVISOR

STATUS
☐ CIVIL SERVICE   ☐ NCS   ☐ SMS

ORGANIZATION

RATING PERIOD
FROM                          TO

## GENERAL INSTRUCTIONS

Verify/Complete General Information.  Indicate whether employe is a supervisor or non-supervisor.

Review the employe's job description for the rating cycle.  Review/discuss job standards (expectations/objectives/duties), to ensure appraisal relates to the specific responsibilities, job assignments and standards which have been conveyed to the employe for the rating cycle.  Update the job description and essential job functions for the next rating cycle.

Indicate when you conveyed job standards to the employe and when progress review(s) was conducted.

Base the appraisal on the employe's performance during the entire review period, not isolated incidents or performance prior to current review period.

The comments sections should be used to: support performance ratings, indicate problem areas and provide guidance to employes on how to improve performance.  Comments MUST be provided for outstanding, needs improvement and unsatisfactory ratting, but are highly recommended for all other ratings.  (ATTACH ADDITIONAL 8 ½ X 11 PAPER IF NEEDED.)

## PERFORMANCE RATING DEFINITIONS

Outstanding:  Results are achieved on a consistent basis and significantly surpass job standards.

Commendable:  The employe clearly exceeds job standards on a regular basis and demonstrates a high   degree of initiative and quality of work.

Satisfactory:  The employe meets the standards of the employe's job in a fully adequate manner.

Needs Improvement:  The employe meets many of the standards of the employe's job in a satisfactory manner.  Improvement is expected.

Unsatisfactory:  Excessive performance deficiencies exist and must be corrected.

## COMMUNICATION OF PERFORMANCE STANDARDS

1. Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employe on _____
   date(s)

2. Progress Review(s) was conducted on _____ (at least one during rating cycle)
   date(s)

A.8

AR 4-22

EMPLOYE NAME: 9/15/2000

EMPLOYE NUMBER        020

## JOB FACTORS

**1. JOB KNOWLEDGE/SKILLS** This factor measures the employe's demonstrated knowledge of relevant job information such as: work practices, procedures, resources, policies, and technical information as well as the relationship of work to the organization's mission. Possession of essential skills required to perform the job also are measured.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ |
| Demonstrates superior job knowledge and skills. Consistently provides and applies accurate and appropriate job information/resources. Applies new techniques. | Has thorough knowledge of the job and related resources. Strives to expand knowledge. Frequently recommends changes in procedures and methods as needs dictate. | Has adequate knowledge and skills to completely perform all job responsibilities. Handles inquiries properly. Has some knowledge of related work. | Possesses basic job knowledge but requires some improvement with regard to the technical aspects of the job and/or understanding of resources, policies and procedures. | Demonstrates a lack of basic job knowledge and or skills to perform job as detailed in comments |

Comments:

**2. WORK RESULTS** This factor measures the employe's demonstrated ability to meet established expectations of quality and quantity within established time frames.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ |
| Work consistently exceeds the expected quality, quantity and timeliness requirements. | Work frequently exceeds the expected quality, quantity and timeliness requirements. | Work meets the expected quality, quantity and timeliness requirements. | Occasionally has difficulty meeting the expected quality, quantity and/or timeliness requirements. | Consistently fails to meet expected quality, quantity and/or timeliness requirements. |

Comments:

**3. COMMUNICATIONS** This fact measures the employe's demonstrated ability to exchange information with others clearly and concisely, to provide information to others on a timely basis within and outside the organization, and to listen, organize, and present thoughts logically and in a clear, concise manner, both orally and in writing.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ |
| Particularly adept at organizing and presenting facts and ideas. Exceptionally skilled in soliciting and clarifying information to ensure understanding. Promotes easy exchange of information. Writes and speaks clearly, concisely and is articulate. | Initiates and encourages timely and effective exchange of information. Proficient in organizing and presenting facts and ideas orally and in writing. Seeks and provides appropriate feedback. | Effectively exchanges relevant information. Speaks and writes clearly. Keeps others informed as needed. Listens with understanding. | Occasionally lacks clarity of expression orally or in writing. Inconsistent in keeping others informed and at times fails to listen effectively. | Frequently is difficult to understand. Is vague orally or in writing. Often does not keep others informed. Is an ineffective listener and/or frequently interrupts. |

Comments:

**4. INITIATIVE/PROBLEM SOLVING** This factor measures the employe's demonstrated ability to perform work without specific instruction beyond that normally provided by a supervisor and within established limits of responsibility and authority. It also assesses the employe's ability to determine what needs to be done within available resources and to pursue appropriate means of accomplishing tasks.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ |
| Regularly takes the initiative to identify and resolve work unit agency problems. Perceives full dimension of problems and limitations. Develops corrective solutions and follows through to conclusion. Requires minimal supervision. | Frequently assumes responsibility for identifying solutions and methods to resolve concerns. Adept at defining and analyzing complex problems and solutions. Requires moderate supervision. | Recognizes problems and suggests and/or assists in developing solutions. Carries through solution implementation. Requires normal supervision. | Resolves routine problems. Exhibits little initiative in identifying problems or solutions. Needs to improve ability to recognize potential problems and evaluate solutions and their impact. Requires more than normal supervision. | Fails to recognize or seek help in resolving routine problems. Requires frequent reminders of what needs to be done. |

Comments:

A.9

EMPLOYE NAME:

AR 4-22

EMPLOYE NUMBER: 9/15/2000  020

## JOB FACTORS

### 5. INTERPERSONAL RELATIONS/EQUAL EMPLOYMENT OPPORTUNITY (EEO)
This factor measures the employe's demonstrated ability to develop and maintain positive and constructive internal/external relationships. Consideration should be given to the employe's demonstrated willingness to function as a team player, give and receive constructive criticism, resolve conflicts, recognize needs and sensitivities of others and treat others in a fair and equitable manner. Supervisors also are to be assessed on their demonstrated commitment to Equal Employment Opportunity.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ |
| Consistently promotes and maintains harmonious work environment. Exhibits understanding of needs of others that is reflected in attitude in dealing with them. Is respected and trusted. Actively promotes/adheres to EEO program activities/requirements. | Maintains cooperative and positive work relationships. Handles conflict constructively. Promotes team work and cooperation, and fair and equitable treatment of others. Promotes/adheres to EEO program activities and requirements. | Interacts in a cooperative, positive manner. Avoids disruptive behavior. Deals appropriately with anger, frustration, conflict, etc. Treats others fairly and equitably. Adheres to EEO policy/administrative requirements. | Usually gets along with others. Allows personal bias to affect job relationships. Requires occasional reminders regarding needs and sensitivities of others. Does not consistently adhere to EEO policy/administrative requirements. | Interpersonal relationships are counter productive to work unit functions as described in comments. Generally ignores EEO policy/administrative requirements. |

Comments:

### 6. WORK HABITS
This factor measures the employe's demonstrated ability to utilize proper conduct, speech and ethical behavior in the work environment. Compliance with Commonwealth/agency/work unit policies and procedures such as attendance, punctuality, safety, security, housekeeping and other norms are assessed, as well as proper care and maintenance of assigned equipment.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ |
| Work is planned/organized to cover all phases of job assignments. Work meets/exceeds deadlines and future steps are anticipated. Equipment and supplies are used for wisely and in accord with procedure. Employe serves as role model for other employes with regard to work rules. | Work is planned/organized to accomplish job assignments effectively and in a timely manner including those of unusual nature. Scheduled meetings/deadlines are met with few exceptions. Personal care is taken in use of equipment, with minimal waste. Employe adheres to organizational rules and procedures | Work is planned to meet routine volume and timeliness. Employe adheres to organizational work rules and procedures with rare exceptions. Appropriate care is taken in use of equipment. | Organization and planning of work is infrequently demonstrated. Work often requires revisions resulting in decreased productivity or missed deadlines. Employe needs improvement in complying with rules, regulations and or care of equipment. | Employe regularly fails to meet expected work results due to lack of effective organization, use of equipment or adherence to established rules/regulations. |

Comments:

### 7. SUPERVISION/MANAGEMENT
(Required for all supervisors/managers) This factor measures the supervisor's demonstrated ability to assign work responsibility and authority to subordinates, established monitoring activities and systems to ensure work progresses to completion, ensure compliance with established procedures/regulations, and take corrective action when necessary. It also assesses the supervisor's adherence to or completion of personnel/administrative requirements, i.e. timely performance evaluations, appropriate discipline, management of overtime, leave etc.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ |
| Manages/supervises employes and work activities to consistently achieve a smooth/timely work flow, high level of quality and quantity. Continuously strives to improve operations, staff and instills team spirit. Consistently complies with personnel/administrative requirements. | Manages/supervises employes to achieve effective and timely work products. Delegates work effectively and appropriately to achieve maximum results. Provides adequate direction and training. Complies with personnel and administrative requirements. | Manages/supervises employes adequately to achieve satisfactory or normal work production and effectiveness. Meets personnel and administrative requirements. | Inconsistent effective supervision or management of staff. At times, fails to direct/train staff within existing means. Less than adequate quality and quantity of production. Inconsistent adherence to personnel and administrative requirements. | Ineffective supervision or management of staff. Fails to establish appropriate monitoring/control activities. Production is poor in quality and or quantity. Often ignores personnel and administrative requirements. |

Comments:

AR 4-22

EMPLOYE NAME:    9/15/2000                    EMPLOYE NUMBER:         020

## OVERALL RATING

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACT |
|:-----------:|:-----------:|:------------:|:-----------------:|:-----------:|
| ☐ | ☐ | ☐ | ☐ | ☐ |

**TRAINING AND DEVELOPMENT RECOMMENDATIONS:**

**COMMENTS AND SIGNATURES**                    **(Attach additional 8 ½ x 11 paper if necessary)**

RATER COMMENTS: (This section should comment on any aspect(s) of employe's performance not covered elsewhere and should explain overall rating).

RATER SIGNATURE:                              DATE

REVIEWER COMMENTS:

REVIEWER SIGNATURE:                           DATE

EMPLOYE COMMENTS:

☐ **I AGREE WITH THIS RATING**        ☐ **I DISAGREE WITH THIS RATING**

☐ **I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER**

☐ **DISCUSSION WITH MY REVIEWING OFFICER OCCURRED** _____
                                                        (DATE)

☐ **I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR; MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.**

COMMENTS:

EMPLOYE'S SIGNATURE:                          DATE

AR 4-22
9/15/2000

APPENDAGE B

JOB DESCRIPTION
FORM STD-370

A.    PURPOSE:  The Job Description is used to document the duties and responsibilities, delegation of authority, and chain of command for all employe positions within the Department.

B.    USE:

    1.    The form may be used by:

        a.    An employe to request change in the classification of their current position.

        b.    Department supervisors to document the main responsibilities of a position, to request the classification of a proposed new civilian position, or to request the review of the classification of an existing civilian position.

        c.    The Office of Administration to request the review of a position classification.

    2.    This form shall be used for enlisted and Civil Service and non-Civil Service positions.

C.    PREPARATION:  The form shall be typewritten and completed in an original and three copies.

    1.    If the form is used by an employe to request a change in the classification of their current position, the employe shall complete the report.

    2.    In other cases, the immediate supervisor or another supervisor closely acquainted with the duties and responsibilities of the position shall complete the report.  The supervisor should collaborate with personnel in the position, whenever possible, to obtain an accurate Job Description.

    3.    An updated copy of the Job Description will be required every three years by Special Order even if the job has not changed.



AR 4-22
9/15/2000

D.    DISTRIBUTION:  When a new Job Description is prepared, the distribution shall be as follows:

1.    Original forwarded to the Bureau of Personnel for inclusion in the official personnel folder.

2.    Copy forwarded to the Troop Commander or Bureau Director for inclusion in the Troop or Bureau personnel file.

3.    Copy given to the subordinate.

4.    Copy retained by the supervisor.

E.    BLOCK INSTRUCTIONS:   If additional space is required to complete any entry, use plain white 8½ x 11 inch sheets of paper to complete the Job Description. If the Job Description is being completed for a vacant position, begin at Block 3.

1.    NAME OF EMPLOYE:  Enter the last name first, followed by the first name and middle initial.

2.    EMPLOYE NUMBER:  Self-explanatory.

POSITION NUMBER:  Self-explanatory.

3.    DEPARTMENT:  Self-explanatory.

BUREAU: Enter the appropriate Bureau or Troop.

DIVISION: Enter the appropriate Division or Troop Section.

HEADQUARTERS: Enter physical location, such as Avondale or Expungement Unit.

ORGANIZATION CODE:  Self-explanatory.

4.    CLASS TITLE:  Enter the class title or rank.

WORKING TITLE: Enter working title if different from rank or class title, such as Bureau Director, Division Director, or Section Supervisor.

CLASS CODE:  Self-explanatory.

B.2

AR 4-22
9/15/2000

5.    REGULAR WORK SCHEDULE:  Enter the regularly scheduled start and end times of each day (unless shifts are rotating), lunch length, and hours per week.

POSITION IS:  Check the appropriate boxes to indicate whether the job is full-time or part-time, and whether it is permanent or temporary.

REPORTS TO:  Self-explanatory.

DAYS WORKED (CHECK ALL THAT APPLY):  Self-explanatory.

EXPLAIN ANY SCHEDULE VARIATIONS:  If there are rotating shifts, explain the system of rotation, indicating whether the shifts change at weekly or monthly intervals, and what shifts are rotated through, or if there are variable shifts.

6.    WORK DESCRIPTION:

a.    This portion of the Job Description is reserved for the detailed description of what work is performed.  It is important that the information reflected in this space be an accurate account of the work.  Do not copy phrases from class specifications or make statements such as "performs duties of a Clerk 1," "performs duties of a Trooper," or "performs difficult accounting duties." Only the permanently assigned duties shall be described.

b.    Each kind of work that is performed should be carefully explained. The task, which is considered most important, should be given first, followed by the less important work, until the least important is described.  If the work varies from season to season or at specific times, duties should be grouped together according to such periods. Indicate the amount of time devoted to duties, e.g., one kind of work takes one-half of the time, or another kind takes one day a month, etc.  The time spent on each duty shall be shown as a percentage, e.g., 75% of the total time available to do the job. Use whatever methods will give a clear time usage as indicated for each type of work.

c.    The responsibilities that are most critical or frequently performed should be listed.  These responsibilities should be described in approximately 8 to 14 statements, indicating what, why, and how tasks are performed.  For example:

B.3

AR 4-22
9/15/2000

(1)  "Directs and supervises activities of section supervisors by assigning work, developing objectives and standards, discussing and resolving problems, and performing employe evaluations. These tasks are done to ensure that section work activities are performed efficiently and that feedback is provided to employes to show work performance and to show the need for improvement where necessary."

(2)  "Types general correspondence, endorsements, CLEAN Messages, reports, speeches, and personnel forms, using a personal computer and follows established office procedures, to ensure accurate and timely distribution of information."

(3)  "Processes out-going mail in accordance with Department procedures and U.S. Postal regulations, and determines the most feasible and economical methods of mailing to ensure prompt delivery of Department mail."

7.  Work Assignments and Review Description:  Indicate the nature and degree of the supervision that is received from other persons. Describe the kind of instructions that are given when new work is assigned, as well as the kind of review given to the work when it is completed. Indicate the frequency with which instructions and advice on work is given, and describe the degree to which instructions are specified in detail.

8.  Work Assignments and Review of Subordinate Personnel Description: Describe the extent and nature of supervision. Give detailed information concerning how frequently other personnel in the work unit are supervised and under what circumstances. Describe the nature of this supervision by referring to such factors as responsibilities for distributing or assigning work, rejecting or revising completed work, training new personnel, administering discipline, controlling attendance, and signing evaluations.

9.  Organizational Chart: An Organizational chart is an illustration of the organization and the way it functions.  This chart should be a block diagram showing at a minimum all positions in the Division Section (Troop) Station, or Office in which the position identified in the Job Description is assigned.  The chart shall include the Division Director's title, name, and class title, subordinate position titles (if assigned, employe names and class titles.  In the case of organizational charts attached to Job Descriptions for Division

B.4

AR 4-22
9/15/2000

Directors/Section Supervisors and above, the chart shall also show the title, name, and class title of the incumbent of the next senior level position. For charts depicting unfilled positions, names of members assigned are not necessary.

10.    Identification of Essential Job Functions/ADA Statement: Refer to Appendage G.

CERTIFICATION: The number of pages, including those attached, shall be listed on the form, and appropriate signatures, titles, and the date of each signature shall be affixed to the form.

B.5

AR 4-22    9/15/2000

| COMMONWEALTH OF PENNSYLVANIA STD-370    REV. 10-96 | JOB DESCRIPTION |
|---|---|

| 1. Name of Employe (Last, First, MI) | 2. Employe Number | Position Number |
|---|---|---|

| Department | Bureau | Division | Headquarters | Organization Code |
|---|---|---|---|---|

| 4. Class Title | Working Title | Class Code |
|---|---|---|

**5. Regular Work Schedule**

Start Time: _____    Lunch Length: _____

End Time: _____    Hours/Week: _____

Days Worked (check all that apply):

| S | M | T | W | Th | F | S |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

**Position is:**

☐ Full-Time    ☐ Permanent

☐ Part-Time    ☐ Temporary

Reports to:    Name        Class Title

Explain any schedule variations:

6.  Describe the work assigned to this position, listing the critical duties and responsibilities first.  Explain work in familiar terms and include machines or equipment used.  Use additional paper if needed.

AR 4-22    9/15/2000

7.  Briefly describe how work is assigned to this position and how the work is reviewed.

8.  If this is a supervisory position, briefly describe how work is assigned to subordinate personnel and how their work is reviewed.  (If this is not a supervisory position, leave blank.)

9.  Attach an Organizational Chart identifying all reporting relationships for this position.

10.  Attach a statement identifying the essential functions of the positions.

## CERTIFICATION

I certify that to the best of my knowledge all statements contained within the job description are correct:  This job description consists of _____ pages.  (count this form as 1 page)

Employe's
Signature _____

Class
Title _____

Date _____

Immediate Supervisor's
Signature _____

Class
Title _____

Date _____

Reviewing Officer's
Signature _____

Class
Title _____

Date _____

APPENDAGE C

IDENTIFICATION OF ESSENTIAL JOB FUNCTIONS/ADA

A.    PURPOSE:  The Americans with Disabilities Act (ADA) requires that essential job functions be identified for each position in order to determine whether an individual with a disability can perform the requirements of a position with or without reasonable accommodation.

B.    DEFINITION:   Essential job functions are the necessary and fundamental job duties of the position.  The following are reasons a function could be considered essential:

1.    The position exists to perform the function.  If the function in question was removed from the position and, therefore, was no need for the position, that function would be essential.

2.    There are a limited number of other personnel available to perform the function, or among whom the function can be distributed.  Staffing levels or heavy work flow during peak periods may make performance of each function essential and limit an employer's flexibility to reassign a particular function.

3.    A function is highly specialized and the person in the position is hired for special expertise or ability to perform it.  If the member or employe did not perform the function, there would be no one else to do so.

4.    If a member or employe spends most of the time or a majority of the time performing a certain task, that task would be essential to the job.

5.    The consequences of not requiring a person in the job to perform a function.  Sometimes infrequently performed functions are essential because there would be serious consequences if it cannot or is not performed.

6.    The terms of a collective bargaining agreement may list duties to be performed in particular jobs.  This would be evidence that those listed functions are essential.

AR 4-22
9/15/2000

C.    PREPARATION

    1.    NAME:  Self-explanatory.

    2.    CLASSIFICATION:  Rank or civilian classification.

    3.    ESSENTIAL JOB FUNCTIONS:   List essential job functions identified using the Job Description and guidelines listed above in DEFINITION. Do not simply copy the Job Description responsibilities, but identify those functions which are essential and any skills, abilities, or requirements for completing those functions, such as "Ability to lift up to 50 pounds," and "Ability to sit in one position for extended periods of time."

    4.    SUPERVISOR SIGNATURE:  Self-explanatory.

    5.    DATE:  Self-explanatory.

AR 4-22
9/15/2000

## IDENTIFICATION OF ESSENTIAL JOB FUNCTIONS/ADA

**Name:** _____

**Classification:** _____

**Essential Job Functions:** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____
**Supervisor Signature**                              **Date**

C.3

J9 (12-93)







AR 4-11
8/20/97

## PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

SUBJECT:    TEMPORARY ASSIGNMENT TO HIGHER RANK OR
CLASSIFICATION

11.01        PURPOSE

The purpose of this regulation is to provide policy and procedures for
utilizing temporary assignments in a higher rank or classification, and
payment for such assignments.

11.02        GENERAL PROVISIONS

A.    Before personnel are assigned to work in a higher rank or
classification, every effort shall be made to ensure that such an
assignment is absolutely essential to the continued operation of
the organizational segment.

B.    Troop Commanders/Bureau Directors should consider the "whole
job" prior to making any assignment out of rank or classification.
Many jobs, particularly supervisory and managerial positions, are
predicated on duties and responsibilities that are not likely to be
experienced or required to be performed in short time periods.
The duties unique to these higher-level positions may include
preparing performance evaluations, approving leave, assigning
and reviewing work, preparing work schedules, assisting in
budget preparation, and recommending and implementing
changes to operations and procedures, as well as an assortment
of higher-level duties which constitute the "whole job."

C.    When the Troop Commander/Bureau Director determines that the
continued performance of the duties and responsibilities of a
position are absolutely essential, priority consideration shall be
given to accomplishing these duties on a temporary basis and on
a non-overtime basis in the following order:

P136
PAG 1 OF 9

AR 4-11
8/20/97

1.    Higher rank, higher classification, or managerial personnel shall be used to absorb the most essential responsibilities when temporarily unstaffed or vacant positions exist for a short period of time.

2.    Personnel in the same rank or classification, or in the same pay range shall be temporarily assigned on a rotational basis, where practicable.

3.    Personnel in the next lower rank, classification, or pay grade who are qualified to perform the duties of the higher level position shall be temporarily assigned the duties on a rotational basis, where practicable.

D.    For personnel to be compensated for temporarily working in a position of a higher rank or classification, the higher position must be an approved existing permanent position in the Department complement for which a temporary replacement is needed, or there must be a temporary position with duties in a higher rated rank/classification to which a permanent member/employe may be assigned.  Temporary assignments must be separate and distinct from the individual's regular assignment.  Employes will not be compensated for working in a higher classification during the period in which a reclassification action is pending.  A position may be temporarily filled because the incumbent is on any approved leave with or without pay, suspension, absence without leave, temporary reassignment, or has been separated from the position.  Employes temporarily assigned to work in a higher classification must meet the minimum experience and training requirements for the higher classification.

E.    When employes are assigned duties which are in another bargaining unit from that of the employe, the eligibility provisions of the employe's bargaining unit will apply.  Employes cannot be assigned to law enforcement positions and will not be paid for working  out-of-classification  in  the  L1  (State  Police) bargaining unit.

F.    The calendar quarter will begin on the first day of the first pay period that ends in the calendar quarter, and will end on the last day of the last full pay period within the calendar quarter.  For example:  the third quarter will begin June 28, 1997, and end September 19, 1997.  The

-2-

AR 4-11
8/20/97

fourth quarter will begin September 20, 1997, and end
December 26, 1997. The first quarter for 1998 will begin
December 27, 1997, and end March 20, 1998. The second
quarter will begin March 21, 1998, and end June 26, 1998.

11.03       PROVISIONS FOR ALL PERSONNEL

A.    The pay of personnel temporarily assigned to a higher rank or
classification who are injured on the job and qualify for work-
related disability pay, or qualify under the provisions of the Heart
and Lung Act, will be based upon computations made at their
regular biweekly salary/hourly rate for those days.

B.    Personnel temporarily assigned to a higher rank or classification
who earn alert time/standby time will be paid at their regular
biweekly salary/hourly rate for those hours. Personnel called in
to work in a higher rank or classification will receive call time pay
for time worked in the higher rank or classification, provided the
requirements for assignment and payment have been met.

C.    Personnel who work overtime (except employes in bargaining
units A5, B5, and Management) while assigned to a higher rank
or classification are to be paid the overtime rate at the higher rank
or classification rate provided they were working in the higher
rank or classification when working overtime. For employes in
bargaining units A5, B5, or Management, the Department is not
obligated to pay overtime; however, if it is determined that
overtime will be compensated, the Commissioner will authorize
payment either by an hour-for-hour compensatory time, or straight
time overtime pay in accordance with Commonwealth
Management Directives.

D.    All personnel transactions (e.g., contract pay increase, pay
increment, etc.) which occur while temporarily working in a higher
rank or classification are to be processed on an individual's
regular biweekly salary/hourly rate when they become effective.
When personnel terminate employment, leave payoff will be at
the regular salary/hourly rate.

E.    Personnel will be paid for temporary assignment to a higher rank
or classification as stated above provided the eligibility criteria has
been met in the quarter.

AR 4-11
8/20/97

11.04    PROVISIONS FOR EMPLOYES UNDER BARGAINING UNITS A1, A2, A4, B1, B2, B4, G1, G2, J1, J2, N1, N2, AND P4.

A.    An employe temporarily assigned to a higher classification must accumulate five full days within the quarter to be compensated for any days worked in the higher classification.  Full days worked may not be carried over from one quarter to the next.  Employes will only be paid at the higher classification for actual hours worked, e.g., if an employe uses three hours of leave, they will be carried at the higher classification for 4.5/5 hours.  Once the five full days are accumulated, all partial and full days will be paid at the higher classification in that quarter.

B.    An eligible employe will be paid higher pay for a holiday provided the employe is required to perform the higher-level duties on their scheduled workday immediately before, and immediately after such holiday, and is paid out-of-classification pay on those days. The holiday will not count as one of the five full days required in a quarter.

C.    An employe shall not be temporarily assigned to perform, in general, the duties and responsibilities of a position in a higher classification for more than nine continuous months, or the length of the leave of absence from the position to which the employe being replaced has guaranteed right to return, whichever is greater.

D.    An employe assigned to perform the duties of the higher classification during the absence of a Troop Administrative Manager shall be assigned to the Clerical Supervisor 2 classification.

11.05    PROVISIONS FOR EMPLOYES UNDER BARGAINING UNITS A5, B5, AND MANAGEMENT

A.    An employe assigned to a higher classification must acquire five cumulative calendar days to be paid out-of-classification pay. Employes will be paid out-of-classification pay for full days worked.

AR 4-11
8/20/97

B.    If an employe works in a higher classification for the required number of days and is absent for a holiday or any leave with pay, the employe will be paid out-of-classification pay for such leave and the absence will count toward the required cumulative calendar days. However, the employe must be assigned the higher-level duties on their scheduled workday immediately before and immediately after such absences.

11.06    PROVISIONS FOR EMPLOYES UNDER BARGAINING UNITS K4 AND K5

A.    An employe assigned to a higher classification must acquire ten full cumulative calendar days to be paid higher classification pay. Employes will be paid higher pay for full days only.  When they have reached their eleventh day in the quarter, partial days will be paid in the higher classification duties.

B.    An employe who is absent for any paid leave days or holidays will not be paid higher classification pay.  However, such absences will count toward the required cumulative calendar days if the days preceding and succeeding the absence are worked in the higher classification assignment.

11.07    PROVISIONS FOR MEMBERS (BARGAINING UNIT L1)

A.    When a member works a full shift of at least eight hours, the majority of which are worked in a higher rank, the whole shift shall be considered as worked in the higher rank.

B.    When a member is temporarily assigned the distinguishing duties and responsibilities of a higher rank for **five days** in the quarter, the member shall receive pay for one rank higher.

C.    Payment in the next higher rank will be for days actually worked and will not include holidays or leave periods.

AR 4-11
8/20/97

11.08          AUTHORIZATION AND NOTIFICATION

A.    The Troop Commander/Bureau Director shall ensure that personnel assigned to work in a higher rank or classification receive correspondence prior to the assignment. The correspondence shall state the reason for the temporary assignment and provide a completion date, whenever possible. When such an assignment is necessary during the off-duty hours of the Troop Commander, the Officer-of-the-Day may verbally authorize the action for that shift only. When such an assignment is necessary during the off-duty hours of the Bureau Director, the supervisor of the preceding shift may verbally authorize the action for that shift only. Whenever verbal authorization has been granted, assignment correspondence shall be forwarded to the affected individuals as soon as possible.

B.    If the Commanding Officer/Bureau Director is made aware of the absence of a subordinate which will result in other members/ employes experiencing a temporary additional workload, but **WILL NOT** include a responsibility for performing the distinguishing duties of the higher rank or classification, the Commanding Officer/Bureau Director shall ensure that it is made clear that no out-of-classification/rank assignment has been made and no additional compensation will be forthcoming.

11.09          REPORTING

To ensure compensation of eligible personnel for working in a higher rank or classification, the Troop Commander/Bureau Director shall ensure that a Time and Attendance Record, Form STD-929, is prepared and processed for each pay period ending date. Refer to Appendage A for instructions. A copy of the Time and Attendance Record shall be sent to the Bureau of Personnel, Personnel Placement and Processing Section, with a copy of the correspondence for monitoring purposes.

AR 4-11
7/23/96

APPENDAGE A

INSTRUCTIONS FOR COMPLETING THE TIME AND ATTENDANCE RECORD,
FORM STD-929, FOR HIGHER RANK/CLASSIFICATION INPUT

1.   PA STATE POLICE
2.   BARGAINING UNIT
3.   PAY RANGE AND STEP - SEE ATTACHED LISTING OF CODES
4.   EMPLOYE DURATION CODE - (1 - PERMANENT) (2 - TEMPORARY)
5.   WORK WEEK HOURS - (37.5) (40)
6.   EMPLOYE NAME
7.   EMPLOYE NUMBER
8.   POSITION NUMBER
9.   PAY PERIOD ENDING
10.  PAY PROCESSING DATE
11.  TIMEKEEPER NUMBER
12.  DEPARTMENT (020)
13.  PAY GROUP (2)
14.  APPROPRIATION - (181 STATE POLICE) (171 LCE)
15.  ORG/LOCATION CODE
16.  PAY METHOD - (1 - SALARY) (2 - WAGE)
17.  CLASS CODE - SEE ATTACHED LISTING OF CODES
18.  HIGHER RANK/CLASSIFICATION CODE
19.  DAYS WORKED IN HIGHER RANK/CLASSIFICATION
20.  HIGHER RANK/CLASSIFICATION - NUMBER OF HOURS
21.  HIGHER RANK/CLASSIFICATION - O.T. STRAIGHT TIME HOURS
22.  HIGHER RANK/CLASSIFICATION - O.T. TIME AND ONE HALF HOURS
23.  HIGHER RANK/CLASSIFICATION - O.T. DOUBLE TIME HOURS
24.  PAY RANGE/STEP OF HIGHER RANK/CLASSIFICATION
     EXAMPLE:  TROOPER AT 01E/12 (LONGEVITY LEVEL) ASSIGNED TO
     CORPORAL AT 02E/12 (LONGEVITY LEVEL)
25.  SPECIAL FACTOR CODE - SEE ATTACHED LISTING OF CODES

A.1

AR 4-11
7/23/96

JUSTIFICATION
SPECIAL FACTOR CODES

| | |
|---|---|
| W01 | ANNUAL LEAVE |
| W02 | SICK LEAVE |
| W03 | PERSONAL LEAVE |
| W04 | COMPENSATORY LEAVE |
| W05 | DISABILITY LEAVE |
| W06 | EDUCATIONAL LEAVE |
| W07 | MILITARY LEAVE WITH PAY |
| W08 | PARENTAL LEAVE WITHOUT PAY |
| W09 | MILITARY LEAVE WITHOUT PAY |
| W10 | APPROVED LEAVE WITHOUT PAY |
| W11 | ABSENT WITHOUT LEAVE |
| W12 | SUSPENSION |
| W13 | TEMPORARY ASSIGNMENT |
| W15 | SCHEDULED DAY OFF |
| W17 | SEPARATION |
| W18 | OTHER JUSTIFICATION |

ENLISTED CLASS CODES/PAY RANGES

| CLASS CODE/CLASSIFICATION | | PAY RANGES | |
|---|---|---|---|
| 74010 | TROOPER | 01 | TROOPER |
| 74020 | CORPORAL | 02 | CORPORAL |
| 74030 | SERGEANT | 04 | SERGEANT |
| 74050 | LIEUTENANT | 06 | LIEUTENANT |
| 74060 | CAPTAIN | 08 | CAPTAIN |
| 74070 | MAJOR | 09 | MAJOR |

COMMONWEALTH OF PENNSYLVANIA
STD-929
REV. 4-94

AR 4-11
7/23/96

# TIME AND ATTENDANCE RECORD

☐ ADJUSTMENT

☐ ALTERNATE WORK SCHEDULE (AWS)
AWS AGREEMENT NO. _____

EMPLOYEE NAME: LAST _____ FIRST _____ MI _____

EMPLOYEE NO. _____

POSITION NO. _____

AGENCY/INSTITUTION _____

TIMEKEEPER'S NUMBER _____

PAGE _____ OF _____

| | | 6 | | | | 7 | | 8 | 9 | 10 | 11 | | 12 | 13 | 14 | 15 | 16 | 17 |
| 2 | 3 | | 4 | 5 |

**HOURS WORKED (AM/PM)**

| | REGULAR | | PREMIUM | |
| START | END | START | END | START | END |

**REGULAR HOURS AND SALARY/WAGE — CODE R1**

| | RT | T1 | T2 | T3 | T5 | T6 | T7 | T4 | T9 | T8 | S1 |

STRAIGHT TIME — CODE T1

TIME & ONE HALF — CODE T2

DOUBLE TIME — CODE T3

QUARTER TIME — CODE T5

HALF TIME — CODE T6

DOUBLE TIME & ONE HALF — CODE T7

**REGULAR OVERTIME**

**OVERTIME APPLICABLE TO SHIFT DIFFERENTIAL**
TIME & ONE HALF — CODE T4
DOUBLE TIME — CODE T9
DOUBLE TIME & ONE HALF — CODE T8

SHIFT/WEEKEND/TRAINING DIFFERENTIALS*** — S1

LEAVES WITHOUT PAY*** — *

PAID LEAVES ** — A S P

HIGHER CLASS CO — 18

DAYS — 19

HC — 20

H1 — 21

H2 — 22

H3 — 23

PAY SOURCE FACTOR OF 5 — 24

SPC SOURCE FACTOR OF* — 25

**HIGHER CLASS ACTIVITY**

MEAL PERIOD: FROM _____ TO _____

DOUBLE TIME ELIGIBILITY BEGIN DATE: FROM _____ TO _____

DATE _____

REMARKS

TOTALS

CONTROL TOTAL - DO NOT INCLUDE HIGHER CLASS

EMPLOYEE/TIMEKEEPER SIGNATURE _____

SUPERVISOR'S SIGNATURE _____ DATE _____

WORK WEEK: 40  37.5

*Indicate a full work day by placing a checkmark in this column.

**See reverse side of form for codes to be used for entries in this section.

PAY PERIOD ENDING _____

PAY PROC DATE _____

CURRENT _____ NEW _____

DEPT _____ FG _____ APP _____ ORG _____ PAY METH _____ CLASS CO _____

1. TIMEKEEPER

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

DATE:          July 27, 2000

SUBJECT:       Review of Bureau Personnel File

TO:            Director, Bureau of Liquor Control Enforcement

FROM:          Captain Darrell G. Ober
               Director, Administration Division

REFERENCE:     (a)    AR 4-8.

        1.    In accordance with the provisions of Reference (a), I am requesting
permission to review my subject file.

P137

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

ATE:        July 28, 2000

SUBJECT:    Review of Bureau Personnel File

TO:         Captain Darrell G. Ober
            Director, Division of Administration

FROM:       Major Phillip L. DeWire
            Director, Bureau of Liquor Control Enforcement

REFERENCES:    (a)    AR 4-8, Personnel Information.

               (b)    Your memorandum dated July 27, 2000.


1.      Permission is granted for you to review your Bureau Personnel File on July 28, 2000 during your lunch break at 1230 hours. The review will be held in my office with me present.


PLD/awb


*P/38*

STD-501X

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:           March 27, 2002

SUBJECT:        Review of Bureau Personnel File

TO:             Captain Darrell G. Ober
                Director, Division of Administration

FROM:           Captain Leonard H. McDonald
                Acting Director, Bureau of Liquor Control Enforcement

REFERENCES:     (a)     AR 4-8, Personnel Information.

                (b)     Your memorandum dated March 27, 2002.


      1.     Permission is granted for you to review your Bureau Personnel File on March 27, 2002 at 0745 hours. The review will be held in the Bureau Headquarters conference room with me present.


LHM/awb

P139



**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**

DATE:            March 27, 2002

SUBJECT:         Review of Bureau Personnel File

TO:              Acting Director, Bureau of Liquor Control Enforcement

FROM:            Captain Darrell G. Ober
                 Director, Administration Division

REFERENCE:       (a)    AR 4-8.

1.    In accordance with the provisions of Reference (a), I am requesting permission to review my subject file.

P140

duty, and designate a Troop Commander to be acting Area Commander during the absence.

y.    Perform other assignments and duties as directed by the Commissioner or Deputy Commissioner of Operations.

z.    Arrange annual meetings with each member of the General Assembly whose district includes areas within their command where the Department has primary jurisdiction.  Meetings with legislators are generally at their district office, or any other convenient location, and may be attended by the appropriate Troop Commander.

7.    Troop Commanders:

a.    Exercise line authority over all personnel and functions within their Troop in accordance with Department policies and directives; serve as Area Commander when so designated by the appropriate Area Commander; and supervise and evaluate the performance of subordinate Commanders.

b.    Retain command responsibility for drug investigations initiated by Troop members, whether conducted independently, or in conjunction with Region Strike Force members or other agencies.

c.    Institute procedures in accordance with Department policies and directives that will enable them to properly plan, direct, control, and coordinate the operations of the Troop.

d.    Ensure efficient management is practiced in the administration of the Troop to achieve maximum effectiveness of operation with personnel and equipment under their command.

e.    Immediately forward written notification, through channels, to the appropriate Bureau Director whenever specialists, such as Procurement and

P/4/
10 F3

o.    Encourage and assist personnel under their command in furthering their education.

p.    Perform inspections and/or conduct investigations of personnel within the Troop in accordance with Department directives.  Ensure that all personnel are personally inspected at the start of their assigned work shift, delegating authority, when necessary, to subordinate personnel to accomplish such an inspection.

q.    Visit and periodically inspect all Department installations within the Troop, and ensure that Line Inspections and Command Visits are conducted and reported in accordance with OM 7-4.

r.    Ensure that reports and correspondence required by Department directives are properly transmitted by them and personnel under their command. Reports and correspondence requiring an endorsement will be endorsed in accordance with AR 1-2.

s.    Advise the Area Commander of matters of importance.

t.    Ensure development of plans and programs for participation in conferences and seminars involving civic and business groups.

u.    Submit recommendations, through channels, to the Commissioner for relocation, consolidation or establishment of facilities within the Troop.

v.    Notify the Area Commander, in advance, of contemplated leaves of absence and/or any deviation from the regularly-scheduled days off duty.

w.    Establish and maintain communications with local, county, and State officials within the Troop.  Attend local municipal government meetings within the Troops primary jurisdiction, as they deem

AR 1-1
7/31/97

appropriate.    Additionally,    supervisors    are encouraged to attend municipal government meetings within their jurisdiction on a frequent basis in order to further establish a community presence and to act as a means of improving communication with community leaders.  Policy issues coming to the attention of the supervisors are conveyed to the Troop Commander for appropriate response.

x.    Designate a Section Commander, Troops A through R, to attend at least one meeting of a local municipal government within the area of their    respective    Headquarters'    primary jurisdiction each month.

y.    Arrange annual meetings with each member of the General Assembly whose district includes areas within their command where the Department has primary jurisdiction.  Meetings with legislators are generally at their district office, or any convenient location, and may be also attended by the Area Commander.  Maintain a record of government meeting attendance and meetings with legislators within their Troop, to include: the meeting date, the name and jurisdiction of the municipal government or the name of the legislator, and the name(s) of Department personnel who attended.  The record is available for reference or upon request of the Area Commander or higher authority and is retained for the current and four previous calendar quarters.

z.    Ensure Staff Services Section Commanders are assigned to serve as Troop Labor Relations Coordinators, and that they are consulted prior to taking action in areas impacting on labor relations.  Troop Commanders also ensure Troop Labor Relations Coordinators attend labor/management meetings, seminars, training classes, and staff conferences concerning labor relations matters.

8.    Section Commanders:

# BITS & BYTES



---

**May 2000**

---

## In This Issue

**1** Enterprise Network
- ❑ Top Ten Network Users "Musts"
- ❑ Completion of Enterprise Network Phase I.

**1** Technical Support Division
- ❑ New Mobile Command Post

**2** IIMS Update
- ❑ Portable Computing Needs Analysis Team
- ❑ Systems Integrator
- ❑ Mobile Office Update

Pennsylvania State Police
Bureau of Technology Services
Harrisburg

## ENTERPRISE NETWORK

### Top Ten Network Users "Musts":

1. **DO NOT** give your log-on password to anyone; do not write it down.

2. **DO NOT** visit Internet sites that are not job related.

3. **DO NOT** load or download any software unless authorized by the Bureau of Technology Services in writing.

4. **DO NOT** move computer equipment without prior authorization from the Director, Bureau of Technology Services, or his designee.

5. **DO NOT** leave workstations in a locked state for long periods of time or at the end of your shift. Remember to log off.

6. **DO NOT** password protect Enterprise Network screensavers on shared workstations.

7. **DO NOT** simply power off a personal computer that you find in a locked state. This could corrupt the logged-on user's profile or the PC's operating system.

8. **DO NOT** delete the file "MAILBOX.PAB" from your home directory.

9. **DO NOT** close the Logon Script prematurely.

10. **DO NOT** change Q-Term settings unless absolutely necessary. Q-Term settings are specific to machines, not users.

### Completion of Enterprise Network Phase I

With the completion of Phase I in February, the Department is now looking forward to the implementation of Phase II of the Enterprise Network. Phase II will entail the integration of non-PSP users to the Enterprise Network. There are approximately 400 individual sites that must be connected. These include local police agencies, city police, federal agencies and the majority of county 911 centers in the state. Also during this phase, additional computers and printers are to be distributed to Department locations. The Enterprise Network will continue to grow and adapt to changes to meet the future needs of the Department.

## TECHNICAL SUPPORT DIVISION

### New Mobile Command Post

On March 1st, 2000, the Department took delivery of a custom built, 37 foot Mobile Command Post (MCP). The MCP is built on a Freightliner chassis with an aluminum Grumman Olson body. It is powered by a turbo-charged diesel engine with a 4-speed automatic transmission. A 20 KW diesel generator provides power for the onboard electronic and electrical systems. Other mechanical features include a computer-controlled automatic leveling system, automatic ice chains, pneumatic telescoping

P142

mast with a surveillance camera, and a manual telescoping radio antenna mast.

The exterior is painted white with Pennsylvania State Police graphics and is equipped with an awning, full warning lighting, and lockable storage.

The interior features a communication area with five stations, a galley, and conference area. The radios will operate with the existing PSP radio system, the new Statewide Radio System, Citizen Band (CB), low band, and UHF radios. A small key system that combines four cellular and/or four landline circuits, an intercom, fax, and a public address system controls the telephone system.

Eight computer positions and a color printer are available and terminated in a 12 port patch panel. Provisions for two mobile data terminals are also included. Two TV monitors and VCRs capable of receiving off-the-air broadcast TV, CATV, or video input from surveillance cameras are available.

This High Tech resource is the direct result of almost a year's effort by personnel from the Technical Support Division who developed specifications, deployment policy, management procedures, and prepared procurement documents for subsequent acquisition by the Department's Transportation Division. The MCP will be centrally located in the Harrisburg area and will be available for rapid deployment statewide in support of appropriate operational requirements.

# IIMS UPDATE

## Portable Computing Needs Analysis Team

The Portable Computing Needs Analysis Team is conducting an analysis of responses to the Portable Computing Needs Survey. Specific needs, including reporting; ability to look up reference materials; giving PowerPoint presentations; access to CLEAN/NCIC; e-mail; and access to the internet and the Enterprise Network are being evaluated for over 120 job functions for which personnel responded.

Nine vendors met with team members to display various portable computing solutions. The team has received samples from several vendors for evaluation.

Personnel are reminded that this project in not intended to address the needs of Patrol Unit members or supervisors. Their needs will be addressed by the Mobile Office Evaluation Team.

## Systems Integrator

The Systems Integrator Team is still actively engaged in contract negotiations with Lockheed Martin Corporation, Management and Data Systems. The negotiations are currently focused on finalizing the statement of work. it is anticipated the contract negotiations will be completed and a formal contract signed by mid May, 2000. After the signing of the contract, phase I of IIMS will commence. This consists of detailed design work and component selection to start in July, 2000.



## Mobile Office Update

The evaluation of prototype mobile computers provided by GTE and Motorola for Gate 2 evaluation concluded on April 11. GTE passed the evaluation with two modular mobile computer configurations – Data911 and Motorola MW-520. Motorola also passed Gate 2 evaluation with its MW-520 mobile computer system. The Mobile Office team is working with GTE and Motorola to develop their final solution prototype to be assessed in the Best and Final Offer (BAFO) stage of Gate 3. The Mobile Office Evaluation Team conducted discussions with both prospective vendors from April 17 to April 20. The second round of the Continuous Discussion stage of Gate 3 is scheduled for May 9th and 10th. At the conclusion of this round, GTE and Motorola will be released to work on their final solution for the Mobile Office.

The Mobile Office Team conducted site visits to several police agencies in Texas that use hardware, software or services proposed by either GTE or Motorola. Some of the departments visited were Houston, College Station, Tarrant County, Bedford, Garland, Fort Worth and the Texas Department of Public Safety Highway Patrol. The weeklong trip provided the Team with valuable information and insight into the products and vendors vying for the Phase 1 Mobile Office. A great deal of knowledge into major deployments of mobile computing solutions was gained by the Team and will prove vital in selecting the vendor and solution best suited for the Pennsylvania State Police.

# BITS & BYTES

September 2000

## In This Issue

**1**  IIMS Update

- Systems Integrator
- Mobile Office

**1**  Enterprise Network

- Help Desk Service Guide
- "A Busy Summer"

**2**  Bureau of Technology Services

- New Identification Cards

Pennsylvania State Police
Bureau of Technology Services
Harrisburg

## IIMS UPDATE

### *Systems Integrator*

The Systems Integrator contract with Lockheed Martin, Management and Data Systems was signed on August 28, 2000 culminating much hard work by both sides involved. The Notice to Proceed was issued on September 5, 2000. The project schedule of Phase I begins September 25, 2000 at the new Program Management Office located at 651 East Park Drive, Harrisburg, PA 17111.

### *Mobile Office*

The Mobile Office Team is currently engaged in contract negotiations with Motorola and anticipates a signed contract in early fall 2000.

Work is being done to finalize the Mobile Office mounting solution. Coordination with the National Highway Traffic Safety Institute is in the works to have airbags deployed to test the mount.

Currently, the Mobile Office Team is preparing to move with the SI team and all of the IIMS program personnel to the new Program Management Office. This move should take place on September 25, 2000. The new phone numbers will be provided in the next update.

To view a photo of the Pennsylvania State Police Mobile Office go to the Pennsylvania State Police IIMS web site and follow the links to the Mobile Office Program.

## ENTERPRISE NETWORK

### *Help Desk Service Guide*
24 Hours Monday through Friday
**PHONE: 1-877-PSP-DESK**

The Help Desk manages calls in accordance with their business impact or severity of impact on computer operations, operating twenty-four (24) hours a day, Monday through Friday with weekend coverage provided by data center operations.

The Help Desk monitors all systems and network lines to ensure availability; serves as a central point of contact for the reporting of any hardware or software problems; assists with User ID functionality such as cancel, print, status, routing and related tasks; broadcasts information about upcoming changes including scheduled/unscheduled system outages; logs all incoming calls and facilitates problem solving; contacts proper sources in a timely manner to correct any problems that cannot be solved directly, and communicates with all information system departments to maintain a high level of system availability.

*P 143*



When calling the Help Desk please give your name and extension; identify the PC you are using by property ticket number (physically attached to your computer), and indicate which system or software package you are encountering a problem with. For hardware related problems provide the model number of the failing device. Also, check your screen for any error messages that may help determine the cause of the problem. Please make a note of the Help Desk repair ticket number provided to you.

Whenever a quick response is *not critical* send e-mail messages to: PSPDESK@psp.state.pa.us

### *"A Busy Summer"*

July and August have been busy months for the Enterprise Network. Along with our regular duties and responsibilities for running the network, we were asked to support the National Governors' Conference in State College, Pennsylvania.

On July 1st, a team from our Enterprise Network went to State College to help set up a command post that consisted of servers, routers and hubs along with 29 individual work stations with various printers attached to them. The bulk of the work was completed in one day and the command post was ready for operation on July 2nd. At the conclusion of the conference, a team went back to State College to dismantle the command post again completing the work in one day. The National Governors' Conference was a huge success and all the support equipment supplied by PSP performed well.

Right on the heels of the National Governors' Conference

the Enterprise Network was asked to set up a command post in support of the Republican National Convention. On July 24th, a team went to the convention site in Philadelphia, Pennsylvania, to set up routers and hubs and to make sure all the cabling was in place. On July 25th and 26th, another team set up the work stations and printers enabling the command post to be ready for operation on July 27th. On August 7th, a team dismantled the command post and transported the equipment home to Department Headquarters. Again it can be reported that the equipment performed well and ran without any difficulty.

## BUREAU OF TECHNOLOGY SERVICES

### *New Identification Cards*

The Department is readying a new Photo Identification system to maintain personnel photographs and prepare identification cards for issuance to all Department personnel and authorized vendors. The recently acquired system components located at Department Headquarters consist of a Multicapture/Retrieve Station with specialized printer to produce the cards. The Photo ID system links to the central repository resources and duplicates the PRINTRAK photo imaging systems currently being distributed to the field to take mugshot photographs. By late fall, all Troops will have photo imaging configurations.

The new identification card for members, employees, liquor enforcement officers and

authorized vendors changes from the current format. The new identification card utilizes a vertical display versus the current horizontal display. This allows the ID card to be compatible with the member's badge when being displayed in the badge case. The new ID card will have a digital photograph, bar coding and security laminate. Security provisions will help prevent counterfeiting and bar coding will provide for functions such as identification in storage records.

The production of the new identification cards will be assumed by the Bureau of Personnel. The identification cards can be prepared periodically or as needed for new hires, cadets, and vendor personnel. The photographing process will generally be as follows:

Personnel will go to their respective Troop or Department Headquarters where their photograph will be taken at the Multicapture /Retrieve Station.

The photograph will be transmitted, via the Enterprise Network, to the personnel database server at Department Headquarters (computer center).

The new card will then be produced by the Bureau of Personnel at the "photo shop" and distributed to the employee or other recipient.

The new identification cards will not be used for facility access. The transition period to the new identification cards should begin by the start of the new year.



*Capt Aber*

# BITS & B_ T_S



April 2000

---

## In This Issue

**1**    IIMS Update

**2**    Computer Operations

**2**    High Technology Conference Room

**3**    Enterprise Network

Pennsylvania State Police
Bureau of Technology Services
Harrisburg

## IIMS Update

### SYSTEMS INTEGRATOR

After several years of strategic planning, design, and acquisition efforts by a wide variety of Department personnel, Lockheed Martin Corporation, Management & Data Systems, headquartered in Valley Forge, PA, has been selected as the IIMS systems Integrator. Currently we are in contract negotiations, projected to be completed by June 2000. The processes used by the Department to select and acquire the systems Integrator are highly innovative and have been lauded by vendors and several state agencies as a future model.

Lockheed Martin Corporation is a $26 billion corporation renowned for its high technology products and capabilities. Lockheed Martin Management & Data Systems employs 2,800 people with $1.5 billion in annual revenues. In addition to the resources brought to bear by Lockheed Martin, they have assembled a world-class consortium to meet the extensive requirements of IIMS. This consortium includes TRW, SAIC, DynCorp, Carnegie Mellon Research Institute, Penn State University, L. Robert Kimball and Associates, and others.

As part of the project, the Department will install computers in patrol vehicles; obtain bar-coding technology for processing of evidence, and utilize computer-aided dispatching and geographic information systems to improve dispatching services. This will enable us to spend less time doing paperwork. IIMS will place the Department at the forefront in the modernization and transformation of law enforcement. Other states have already taken notice and are watching what we are doing as they prepare similar endeavors.

The IIMS project will be implemented incrementally in two major phases; Phase 1 consists of detailed design work and component selection, and is expected to commence in July 2000. Phase 2 involves the actual roll out of component solutions, taking an additional two years at an estimated total cost $80 to $110 million to achieve a full implementation.

### MOBILE OFFICE UPDATE

The evaluation of prospective vendors for the installation of the Phase 1 Mobile Office has entered Gate 2 – prototype evaluation. On March 6, 2000, the Mobile Office Evaluation Team received the first of its Mobile Computer Prototypes from the remaining vendors vying for the Phase 1 Mobile Office contract. The vendors, GTE and Motorola, were both required to install their hardware and software solution into two fully equipped patrol vehicles for evaluation by the Mobile Office Evaluation Team. A total of eight

*P144*

patrol vehicles are equipped with Mobile Computing Devices and it is expected that the evaluation will be completed the first week of April.

In order to assess the needs of non-patrol Department personnel, a Portable Computing Needs Analysis (PCNA) Team was formed as a subcommittee within the Mobile Office Team. A survey was distributed, via the Enterprise Network, to obtain input from the field to better assess the needs and justification for portable computing devices (i.e., laptops) in the field. The results will be evaluated and the Team will make their recommendations. The PCNA Team will then schedule Discovery Days wherein vendors present their products to the Team for evaluation and a better understanding of what is currently available.

### CLEAN UNIT UPDATE

What's new with CLEAN? Did you know that we now have a link on the Pennsylvania State Police website (www.psp.state.pa.us)? In order to assist users in complying with CLEAN/NCIC Regulations, user-friendly templates and worksheets have been posted for your use. These templates and worksheets have been designed to assist the investigator in gathering and documenting vital information for PSP and CLEAN/NCIC regulation compliance.

The templates include a Missing Person Declaration and the State Police Validations Supplemental. Both templates are in Word 97 and allow the user to enter the required information and then

print out the completed document. By utilizing the templates, the user is ensuring compliance with the CLEAN/NCIC regulations for validation as well as the required PSP reporting regulations.

The available worksheets include the Missing Person CLEAN/NCIC Entry Worksheet, Vehicle, Registration CLEAN/NCIC Entry Worksheet, Stolen Gun CLENA/NCIC Entry Worksheet, and Wanted Person CLEAN/NCIC Entry Worksheet. These worksheets are also in Word 97 and are designed to enable the user to gather all of the pertinent information needed to make entry into CLEAN/NCIC that is in compliance with the CLEAN/NCIC regulations. Upon entry, the worksheet should then be copied and attached to the copy of the CLEAN/NCIC entry and the investigative report.

We hope that you will find these templates and worksheets as a valuable tool for assisting you in your reporting and documentation. Should you have any questions or comments, please contact the CLEAN Administrative Unit at kleemhuis@psp.state.pa.us.

### HIGH TECHNOLOGY CONFERENCE ROOM

February 16, 2000 marked the culmination of a two-year cooperative effort by the Bureaus of Technology Services and Staff Services when Pennsylvania State Police Commissioner, Colonel Paul J. Evanko, formally dedicated the High Tech Conference Room.

The conference room embodies the latest in audio-video technology. It features state-of-

the-art communications, video, and computer systems. This includes video teleconferencing, a five by seven-foot rear projection screen and several large screen, plasma video monitors, twelve laptop computers using Group System applications. Three remote touch screens control all electronic devices and environmental systems. Telephone and electric power sources are provided at convenient locations on the conference tables.

The High Technology Conference Room features a 1200 square foot area with seating for 48 people. It is available to all Commonwealth Agencies. An adjacent 1500 square foot room, which can be partitioned into two equally sized rooms, can participate remotely in main conference room activities or can support two separate functions.

### Enterprise Network WE'VE MOVED!!!

Starting the week of March 27th, the PSP Enterprise Network moved their entire project office from Plaza 21 in Camp Hill to Department Headquarters at Elmerton Avenue. Preparation for this move has been going on for the past several weeks. Their new home will be Troop H's old location on the 1st Floor. They expect to be moved by mid-April. During the transition to their work area, their primary goal is to provide level 2 support for the Help Desk. Please be patient with requests until their staff is set up in their permanent work location. The Enterprise Network Staff thanks you for your cooperation.

# BITS & BYTES



January 2002

## In This Issue

**1**    IIMS Program

- IIMS Program Update
- Initial Mobile Office *Rollout Update*

**2**    IIMS Program

- Initial Mobile Office *Scores Again!*
- Consolidated Dispatch Environment (CDE)

**2**    Technical Support Division (TSD)

- Tips to Assist BCRs & TCSs in Resolving Adelphia Telephone Problems
- Programming Change Requests

Pennsylvania State Police
Bureau of Technology Services
Harrisburg

## IIMS Program Update

In September 2000, the Pennsylvania State Police and Lockheed Martin Management & Data Systems entered into an aggressive schedule to identify and define requirements and establish systems design, architecture, and implementation plans for the IIMS Program. In December 2001, the IIMS Program achieved its objective with the completion of Phase I.

At this time, the Department is awaiting a bid proposal from Lockheed Martin for the development and implementation effort as Phase II Systems Integrator.

Once the Systems Integrator is under contract, the implementation of all components for the IIMS Program will proceed. This will include the five Centralized Dispatch Centers (CDCs) and the Mobile Office Environment (MOE) in patrol cars. Each CDC will be supported by a Computer Aided Dispatch (CAD) system. The CAD system components will include Automatic Vehicle Locators (AVL), Geographic Information System (GIS) mapping capability, and a new Records Management System (RMS).

## Initial Mobile Office
### *Rollout Update*

The rollout of the 525 Initial Mobile Offices has been completed. Over 2,400 enlisted members and Police Communications Operators (PCOs) have been trained in the implementation area. Several make-up-training classes will be conducted in February 2002. These classes will assist those personnel who may have missed their originally assigned training or who have transferred into troops where IMO units have been deployed. Information regarding the makeup training will be forthcoming.

All patrol vehicles equipped with the M/A Com M801 radios, approximately 275 units, have had filters installed to eliminate possible interference with the Department's VHF radio. These IMO units should be fully operational and should operate normally where there is sufficient 800 MHz radio coverage. The new PSP Help Desk should be contacted at 1-877-PSP-DESK for all IMO problems, whether radio related or not. The Mobile Office Team is awaiting the latest software upgrade to the M/A Com M803 and will begin field-

*P145*

testing it as soon as it arrives. Once accepted, the M803 radios will be installed in all 525 IMO vehicles and should significantly enhance the operational effectiveness of the IMO units deployed. Your continued patience with the IMO System and the Mobile Office Team's efforts to optimize its performance on a radio system still under development is greatly appreciated.

## Initial Mobile Office
### IMO Scores Again!

While patrolling Interstate 81 in Franklin County on December 21, 2001, Trooper Randy B. Kane, Troop H, Chambersburg, initiated a registration inquiry on a Tennessee registration plate via the IMO. He received a National Crime Information Center (NCIC) hit on the 2001 Pontiac for an overdue rental car, which was reported stolen from Newark, New Jersey. A traffic stop was conducted and three individuals were taken into custody and searched. The vehicle was impounded and searched at PSP Chambersburg with the assistance of Trooper Daniel J. Housel and his canine. The dog quickly alerted on the trunk area of the car. A jacket belonging to one of the occupants was found to contain a large amount of cash and cocaine residue. One of the occupants was also found to possess approximately 28 grams of ecstasy, approximately 1 gram of cocaine and $13,754.00 in cash, which was seized. Great job Trooper Kane and Trooper Housel!!

## Consolidated Dispatch Environment (CDE)

In anticipation for the next phase of the IIMS program, the CDE team has been reviewing the requirements and documents produced to make any final modifications. The requirements and documents will be used for the procurement and implementation of the CDE components: Computer Aided Dispatch (CAD), Automatic Vehicle Locator (AVL), and Geographic Information System (GIS).

The Request for Proposal (RFP) for the Consolidated Dispatch Center (CDC) in the Harrisburg area has been published on the Department of General Services (DGS) web site for vendors to submit building lease proposals. The CDE team continues to work with DGS to finalize the specific locations of the other four CDCs.

## Technical Support Division (TSD)
### Tips to Assist Bureau Communications Representatives (BCRs) & Troop Communications Specialists (TCSs) in Resolving Adelphia Telephone Problems

NOTE: The information below only pertains to locations that have transitioned to the Adelphia Telephone System.

When reporting a problem to the Adelphia Help Desk, keep a detailed log of your attempt to resolve this issue. Include time and date of the initial call, Trouble Ticket number, and whom you spoke to at the Adelphia Help Desk. If the problem continues, the log will aid the TSD personnel in taking the problem to the next step with Adelphia for resolution.

When arriving on-site to resolve a reported problem, the Adelphia technician will bring paperwork regarding the repair. The Adelphia technician is only able to work on the issue that is detailed in the paperwork. If additional problems arise with the same telephone, call the Adelphia Help Desk and request to amend the existing Trouble Ticket with the new issue. The technician will then be able to work on the additional issues while they are still at your location.

The technician will ask you to sign the paperwork once the issue has been resolved. Before you sign the paperwork, check to make sure that the work is completed and resolved to your satisfaction. If the work is not completed to your satisfaction, do not sign the paperwork. Retain the copies of the paperwork that the technician gives you with your Trouble Ticket Log for tracking purposes and future reference. Report the problem again. If unsuccessful after the second repair call, contact TSD at 717-540-5020.

### Programming Change Requests

Please remember that per the Office of Administration (OA) Contract, Adelphia has 12 business days to complete a request for programming changes (e.g., adding or deleting features such as call forwarding or moving phone numbers on your set) to analog or Integrated Services Digital Network (ISDN) telephones. These type changes are to be requested via an STD-501, through channels, to TSD.

Ober, Darrell G
_____

**From:**          SP, PSP Commissioner
**Sent:**          Tuesday, January 08, 2002 9:11 AM
**To:**            SP-ALL PSP PERSONNEL
**Subject:**       IIMS Program Update


# IIMS Program Update

In September 2000, the Pennsylvania State Police (PSP) and Lockheed Martin Management & Data Systems entered into an aggressive schedule to identify and define requirements and establish systems design, architecture, and implementation plans for the PSP's Criminal Investigative Traffic Safety Incident Information Management System (IIMS). In December, the IIMS Program achieved its objective with the completion of Phase I.

At this time, the Department is awaiting a bid proposal from Lockheed Martin for the development and implementation effort as Phase II Systems Integrator. Once the Systems Integrator is under contract the implementation of all components for the IIMS Program will proceed. This will include the five Consolidated Dispatch Centers (CDC), Mobile Office Environment (MOE) in patrol cars and Computer-Aided-Dispatch (CAD) which will include a new Records Management System (RMS).

Questions may be directed to Lieutenant Jacob M. Crider, IT Implementation Coordinator, at 717-705-0143, or by e-mail to SP-iimsinfo@state.pa.us.

P146

## OBER, DARRELL G

| | |
|---|---|
| **From:** | WILT, RONALD C |
| **Sent:** | Monday, January 31, 2000 9:33 AM |
| **To:** | OBER, DARRELL G |
| **Subject:** | RE: IIMS Stuff |

Darrell:
Congrats! I am thrilled as well. Catch up on the BAFOs and please give me your take. Maybe you can help with our Readiness Planning by identifying areas where we need to prepare in anticipation of the SI negotiations and Phase 1 activities. I've already identified PMO staffing as a critical, but have not gone beyond that. Hopefully, you can read with the perspective of readiness/preparedness.
Welcome back.
Ron
p.s. I'll have to tell you the story when I was about to be discharged from the USAF and changed my mind the day of discharge.

-----Original Message-----
**From:** OBER, DARRELL G
**Sent:** Monday, January 31, 2000 9:00 AM
**To:** WILT, RONALD C
**Subject:** IIMS Stuff

Ron,

I received a memo indicating that I am being reassigned to the IIMS Project. Needless to say, I am thrilled. Attached is this weeks status report. If you have not objections, I would like to pour into the BAFO proposals and hopes that I can catch up. As such, I would like to stay with the reading and skip the CORE Team meeting, if okay with you.

DGO

<< File: weekly status report.doc >>

P147

Capt. Darrell Ober

Thank you for the complimentary remarks about our online law library.

As for your lawsuit against the Commissioner, we do not file friend of the court briefs at the trial court level.

One of your allegations calls to mind another case.

In early December 1997, former Cicero police chief David Niebur was approached by FBI agents who asked him to cooperate with an investigation of town officials; Niebur agreed. Subsequently the mayor, directly and indirectly, sought information about the probe and the ongoing grand jury investigation. Niebur declined to reveal his testimony, and was terminated.

Niebur's lawsuit is pending in the Northern District of Illinois: Niebur v. Town of Cicero, No. 98 C 4157, 90 F.Supp.2d 930, 2000 U.S. Dist. LEXIS 3969. Niebur's attorneys are Michael William Condon and Michael D. Bersani, of the firm of Hervas, Sotos & Condon, P.C., in Itasca, IL.

--- Sent by:
Wayne Schmidt, Attorney/Director
AELE Law Enforcement Legal Center
841 W. Touhy Ave.
Park Ridge IL 60068-3351
Website: www.aele.org/
E-mail: AELE@aol.com

P148

# OBER, DARRELL G

| | |
|---|---|
| **From:** | Shelton, Barbara [BShelton@exec.gsinc.state.pa.us] |
| **Sent:** | Thursday, January 20, 2000 4:06 PM |
| **To:** | 'OBER, DARRELL G' |
| **Subject:** | RE: Rumors |

Darrell,
Thanks for the kind words. I hope to cross paths with you sometime in the future (not in your official capacity, of course!). As I told Col. Hickes, you did a great job running this project. Your style of being able to get things done without using threatening behaviors has been the key to PSP's success thus far. Good luck to you. Barb

-----Original Message-----
**From:** OBER, DARRELL G [mailto:DOBER@psp.state.pa.us]
**Sent:** Thursday, January 20, 2000 3:06 PM
**To:** 'bshelton@exec.gsinc.state.pa.us'
**Subject:** Rumors


Barb,

If rumors are accurate, I understand "Congratulations" are in order. I am happy for you. You have been a good friend to the PSP and a great contact for me. Thank you again for all of your assistance and support. I wish you the best that life has to offer.

Darrell

P149

1

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:            March 8, 2000

SUBJECT:         Grievance # HQ - 172

TO:              Office of Administration
                 Grievance Coordinator, Bureau of Labor Relations

FROM:            Captain Darrell G. Ober
                 Commander, Central Section
                 Bureau of Liquor Control Enforcement

ENCLOSURE:       (1)    Copy of Writ of Mandamus for Subject Grievance.

                 1.    For your convenience, I am providing a "clean" copy of
                       Enclosure (1).  A clean copy was not available to me when I
                       filed this grievance.

                 2.    Thank you.  I can be reached at 540-7443 should you need to
                       speak with me.

P150

## OBER, DARRELL G

| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Monday, March 27, 2000 9:48 AM |
| **To:** | HOSTERT, TIMOTHY J |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | RE: |

Tim,

I apologize for the delay in response. My e-mail has been corrupted and has put me out of service for a few days.

Thank you very much for your encouraging words. Yes, this ordeal has been quite stressful for my family. It is with great regret that I find myself at the center of this scandal. However, I will stand my ground when it comes to issues of principle, due process and integrity.

How is your family? Betsy and the not so little one are well I trust. I miss our working relationship as I have a great deal of respect for the work that you do for the Department. Thanks again and I hope to take you up on your generous offer.

DGO

-----Original Message-----
| | |
|---|---|
| **From:** | HOSTERT, TIMOTHY J |
| **Sent:** | Thursday, March 23, 2000 3:32 PM |
| **To:** | OBER, DARRELL G |
| **Subject:** | |

Captain Ober,

I heard about your situation and wanted to send you a note of support. I know the past months must have been difficult. As always, you have the courage to take a stand, good job!! If there is anything I can do to help, let me know. If your ever out out this way maybe we can go out for lunch or dinner.

We here at SPR West are upholding our duty as you taught us (the last three crime functions have been unsatisfactory).

Take care, Tim

P.S. Sorry I am late in sending this I really meant to send it long ago.

P151

**OBER, DARRELL G**

| | |
|---|---|
| **From:** | GRAB, MARK A |
| **Sent:** | Monday, January 24, 2000 8:51 AM |
| **To:** | OBER, DARRELL G |
| **Subject:** | RE: Grievance Number |

Well the hits just keep on coming don't they?  Ok Darrell, HQ-169.  Pretty soon, you'll be eligible for our best customer discount.  Hang in there my friend, Mark

-----Original Message-----
| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Monday, January 24, 2000 7:33 AM |
| **To:** | GRAB, MARK A |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | Grievance Number |

Mark,

Here we go again, I need yet another number.  Thanks,

Darrell

P153

1

P E N N S Y L V A N I A
# STATE TROOPERS
Organized 1962          A S S O C I A T I O N

GRIEVANCE BOARD MEMBERS:
PAUL T. McCOMMONS
LEROY HOPKINS
KENNETH J. YUHAS
JAMES P. FLYNN, JR.
JOSEPH E. SARKIS

January 10, 2000

Darrell G. Ober
71 Millers Gap Rd.
Enola, PA  17025

RE:    Grievance HQ-164

Dear Capt. Ober:

On January 6, 2000, the grievance board again considered your grievance for merit to pursue it under the regular arbitration system concerning discipline.  After consideration of the facts furnished by you, the grievance board felt there is still insufficient information to justify pursuit in arbitration as a discipline issue.

Although you may perceive some of the actions taken as discipline, the documentation does not support it.  The remedy available pertaining to the violations you raised is to present these issues before the special arbitration board.  As you know, this has already been done on your behalf.

It is with regret that I must inform you that there is no further action the grievance board can take in this matter as presented.

On Behalf of the Grievance Board,

Paul T. McCommons
Chairman

PTM/kab

pc:    Gary M. Lightman
       Grievance Board
       Thomas Lett, President Lodge 41

Certified #Z340425031

P154

PSTA  3625 VARTAN WAY, HARRISBURG, PA 17110   (717) 540-5646 / 800-541-9934   Fax (717) 540-5318 / 800 540 5318

**OBER, DARRELL G**

| | |
|---|---|
| From: | LAUGHLIN, BRIAN E |
| Sent: | Monday, March 13, 2000 2:56 PM |
| To: | OBER, DARRELL G |
| Subject: | MORAL SUPPORT |

CAPTAIN,
I JUST WANTED TO LET YOU KNOW THAT SINCE I HAVE KNOWN YOU, THAT FATEFUL MORNING PHONE CALL IN MARCH 98 OFFERING ME A POSITION IN SPR AS A SERGEANT, I HAVE RESPECTED YOU KNOWLEDGE AND ABILITY. TO SIMPLY STATE THAT I WAS SHOCKED TO HEAR OF YOUR RECENT DILEMMA WITH PSP, WOULD BE AN UNDERSTATEMENT. I JUST WANTED TO TAKE THIS OPPORTUNITY TO OFFER MY SUPPORT, FOR WHAT ITS WORTH. IF I MAY BE OF ANY ASSISTANCE, DO NOT HESITATE TO CALL ON ME (I AM ALSO A TRAINED SERT NEGOTIATOR AND HAVE TALKED PEOPLE DOWN FROM ROOFTOPS BEFORE.) HANG IN THERE, SIR.

P155

## OBER, DARRELL G

| | |
|---|---|
| **From:** | PSPNUT@aol.com |
| **Sent:** | Tuesday, January 23, 2001 4:44 PM |
| **To:** | dzak@charter.net; DOBER@psp.state.pa.us |
| **Subject:** | Memo From the National Lodge |

Mike,

Hi, I trust that you have been well.  In yesterday's mail I received a memo from National President Gil Gallegos.  In order to move forward with my requests for assistance, the National Lodge still needs a formal request from the State Lodge.  I will forward a similar request to this one through my local lodge to get Lazarro moving.  Gil mentions several articles of the National Bylaws as reference guidelines that must be followed.

Would you please ensure whatever action needs to take place is done on my behalf.  I have been forced to (again) hire my own attorney to file my federal suit and, as you might expect, the legal bills continue to mount.  My request of the National Lodge for legal and financial support is important to me.

Thanks for your help.

Darrell Ober

P156

## OBER, DARRELL G

| From: | OBER, DARRELL G |
|-------|-----------------|
| Sent: | Thursday, December 07, 2000 1:45 PM |
| To: | LAZZARO, LOUIS J |
| Cc: | OBER, DARRELL G |
| Subject: | Filing of Federal Suit |

Lou,

    As you are aware, I did not receive a favorable ruling with respect to my grievances.  Gary indicated when I spoke with him on October 16 that he felt the PSTA should be considering filing a federal suit on my behalf and he was going to discuss this with you.  Has he done this and have you reached a determination?  Thanks,

Darrell

1

P157

OBER, DARRELL G

| | |
|---|---|
| From: | PSP Postmaster |
| Sent: | Friday, September 01, 2000 11:14 AM |
| To: | Everyone |
| Subject: | Department Issues |

*In order to keep personnel up-to-date on personnel related issues affecting the Department, the Commissioner announces the following promotions and transfers, effective September 2, 2000:*

*Major Hawthorne N. Conley, Director, Bureau of Professional Responsibility, is hereby promoted to the rank of Lieutenant Colonel and transferred to the Executive and Administrative Offices, where he will assume command as the Deputy Commissioner of Administration.*

*Captain W. John Pudliner, Jr., Commanding Officer, Troop A, Greensburg, is hereby promoted to the rank of Major and transferred to the Bureau of Professional Responsibility, where he will assume command.*

*Captain Henry D. Oleyniczak, Commanding Officer, Troop J, Lancaster, is hereby promoted to the rank of Major and transferred to Area I, where he will assume command.*

*Captain Frank E. Pawlowski, Bureau of Criminal Investigation, is hereby transferred to Troop J, Lancaster, where he will assume command.*

*Captain David F. Young, Executive Officer, Area III, is hereby transferred to the Bureau of Criminal Investigation, where he will assume command as the Director, Special Investigations Division.*

*Captain Frank H. Monaco, Commanding Officer, Troop B, Washington, is hereby transferred to Troop A, Greensburg, where he will assume command.*

*Captain Roger N. Waters, Bureau of Patrol, is hereby transferred to Troop B, Washington, where he will assume command.*

*Captain Cynthia L. Transue, Executive Officer, Area VI, is hereby transferred to the Bureau of Patrol, where she will assume command as the Director, Patrol Services Division.*

*The promotion ceremony will held on Friday, September 29, 2000, 1000 hours at the State Police Academy, Hershey.*

1

P158

## OBER, DARRELL G

| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Wednesday, December 06, 2000 1:13 PM |
| **To:** | BROWN, RUTH A |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | RE: 2001 Captain & Major Promotion Examination - S.O. 2000-103 |

Ruth,

Oops, my deepest apology. I thought you were asking me why take the exam. I would like to discuss this with you and will give you a call.

Darrell

-----Original Message-----
**From:**      BROWN, RUTH A
**Sent:**      Tuesday, December 05, 2000 4:04 PM
**To:**        OBER, DARRELL G
**Subject:**   RE: 2001 Captain & Major Promotion Examination - S.0. 2000-103

I meant why the SWTC?

-----Original Message-----
**From:**      OBER, DARRELL G
**Sent:**      Tuesday, December 05, 2000 1:58 PM
**To:**        BROWN, RUTH A
**Cc:**        OBER, DARRELL G
**Subject:**   RE: 2001 Captain & Major Promotion Examination - S.0. 2000-103

Ruth,

My record of success and service to this organization speaks for itself. Despite the egregious actions taken against me and my career, I remain deserving of consideration.

Darrell

-----Original Message-----
**From:**      BROWN, RUTH A
**Sent:**      Tuesday, December 05, 2000 1:44 PM
**To:**  OBER, DARRELL G
**Subject:**     RE: 2001 Captain & Major Promotion Examination - S.0. 2000-103

Why?

-----Original Message-----
**From:**      OBER, DARRELL G
**Sent:**      Tuesday, December 05, 2000 1:32 PM
**To:**        BROWN, RUTH A
**Cc:**        OBER, DARRELL G; DEWIRE, PHILLIP L
**Subject:**   2001 Captain & Major Promotion Examination - S.0. 2000-103

Ms. Brown,

By way of this e-mail, I am expressing my intention to participate in the subject promotion process for the rank of Major. My preference for test site is the Southwest Training Center.

Captain Darrell G. Ober
Director, Administration Division
Bureau of Liquor Control Enforcement

P159

## OBER, DARRELL G

**From:** RILEY, LARRY W
**Sent:** Wednesday, August 25, 1999 1:10 PM
**To:** OBER, DARRELL G
**Subject:** RE: Copies of Strike Photos

OK, I'm glad you advised me.  I had not yet seen Tpr. Carr and not removed them from the case.  To be honest, I'm afraid they would not have been very good photocopies anyway.

Also, thanks for the boots and photos for the museum.

Larry

> -----Original Message-----
> **From:** OBER, DARRELL G
> **Sent:** Wednesday, August 25, 1999 12:44 PM
> **To:** RILEY, LARRY W
> **Subject:** Copies of Strike Photos
>
> Larry,
>
> As consequence would have it, I have been informed by Mr. Infantino as of yesterday Colonel Evanko has removed me from the Centennial Committee.  As such, I will no longer be involved in the project.  That being the case, I will no longer need copies of the subject photo's.
>
> Thank you for your willingness to assist in the project.  I will pass on the information we discussed to Mr. Infantino.  Take care and thanks again.
>
> Darrell

*P160*

OBER, DARRELL G

| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Tuesday, January 11, 2000 7:22 AM |
| **To:** | 'bkohler@pheaa.org' |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | Job Transfer |

Brain,

I was informed late yesterday that very shortly I will be transferred to Troop B, Washington.

I am very sorry to report that I will no longer be able to fulfil my responsibilities as the Vice-President of the Minor Division of the Silver Spring Township Baseball Association. As a consequence, I will no longer be able to represent our Township at the Tri-Township Meetings (there is one scheduled for tomorrow night). I will not be able to participate in registration (scheduled for this Thursday and Saturday). Please remove my name as a T-Ball Head Coach and 13-Year Old Assistant Coach. I will not be able to fulfil these obligations either. In fact, I will be lucky if I get to see Grant and Ben play at all.

I am very sorry to bring this news to you and for the impact on the Association. I need to dramatically curtail my activities to spend whatever tie I have left with my family.

I would like to discuss these issues, turn over information and assist in transition to the extent possible. As soon as I am able, I will telephone you. Thanks,

Darrell

1

P161

**OBER, DARRELL G**

| | |
|---|---|
| **From:** | DITZLER, RODNEY L |
| **Sent:** | Friday, January 07, 2000 8:32 AM |
| **To:** | OBER, DARRELL G |
| **Subject:** | RE: Steve Shaiman Re: meeting Commissioner |

Darrell:

     I appreciate the kind words and will forever be grateful for your contribution. I would love to treat you to one last lunch. Maybe it can even be a place that serves exotic food such as venison or other game dishes.

     These are the times that test our true character and I know you will handle it in a very professional manner as you always do.

            Rod

-----Original Message-----
| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Friday, January 07, 2000 7:56 AM |
| **To:** | DITZLER, RODNEY L |
| **Subject:** | RE: Steve Shaiman Re: meeting Commissioner |

Rod,

     I e-mailed Stephen to obtain a list of possible dates. I will forward them to you or the Major when received.

     I know the past few days have been stressful for you and the IIMS project. I regret very much the actions that have been taken. You have supported me and offered many kind words. Thank you for the opportunity, training and confidence you have shown in me. I truly enjoyed my time here and will leave this assignment a better officer.

     As you know, life is not about what happens to us but how we handle it. To that end, I can say this experience has shown us the true character of many individuals.

     Happy birthday! I may even consider letting you buy me one last lunch!

DGO

-----Original Message-----
| | |
|---|---|
| **From:** | DITZLER, RODNEY L |
| **Sent:** | Thursday, January 06, 2000 3:17 PM |
| **To:** | OBER, DARRELL G |
| **Cc:** | WILT, RONALD C |
| **Subject:** | Steve Shaiman Re: meeting Commissioner |

Darrell:

     In our meeting with the Commissioner yesterday, he expressed an interest that he would like to meet Steve. Please provide a list of dates that Steve will be in Harrisburg so that we can potentially select some dates for the meeting.

           Thanks,
             Rod

*P162*

1222 S. Queen St.
Palmyra, Pa. 17078-3548
March 27, 2000

Captain Darrel G. Ober
71 Miller's Gap Rd.
Enola, Pa. 17025

Dear Captain Ober,

I enjoyed visiting with you on the phone this past week. Sounds as though not much has changed over the years since I left the Department. Thanks very much for the copies of your grievance and suit material. Most enlightening. You are being had in my opinion. With your years of service, they probably figure that you can't/won't do much to fight it.

Enclosed are a couple pages relating to the grievance process set up in the by-laws of the PSTA that might give you some insight of their system. I spoke to Al, jr. over the weekend and he said that there were two types of grievances —PSP and FOP. He said that the FOP grievance form must be obtained from the Local Lodge Secretary or other officer and it is a color coded document. The process apparently is to complete this; then send it through channels in the Dept.; then when it is denied by the Commissioner, it goes to the FOP/PSTA Grievance committee for determination on whether they will assist in pursuing it. If they decide not to assist, that is the end of it for them when they notify you to that effect. If they take it up, they will advise you as to what extent, etc. I asked Bud Everdale, the Lodge #38 President, about it via e-mail but am still waiting to hear from him. I did not identify who was looking for aid.

Another thought came to me concerning your current assignment.

*P163*
*1 OF 2*

2.

In my time at HQ any change in the T.O. and position reclassifications as to rank, etc. had to be sent in and approved by the Governor's Office of Administration. I don't know what the procedure is today but I am sure there is still some kind of fiscal control exercised by them on position allocation, etc. It might prove of value to you to get copies of the latest "approved" T.O. charts and also the position allocations allowed by the Secretary of Administration's Office. These should show specifically the ranks an/or salary allocations approved for certain job spots – including yours.

In the past, all promotions, changes, etc. were submitted for "routine" approval to the OA – especially if they affected budgetary allocations.

I hope this gives you a clue on where else to look. If you have any questions on what I have said here, please give me a call. I would suggest not using your office phone for obvious reasons.

Kindest Regards,

Al Kwiatek, Sr.

PS: My e-mail address is albert@nbn.net if you have a home PC. Don't use your office machine. If you have one at home, give me your address, OK?

## OBER, DARRELL G

| | |
|---|---|
| From: | OBER, DARRELL G |
| Sent: | Tuesday, September 07, 1999 9:24 AM |
| To: | CONLEY, HAWTHORNE N |
| Cc: | BROWN, JOHN R |
| Subject: | RE: AR 4-25 |

Major,

I looked for the subject information on several occasions since my transfer. Approximately two weeks ago I retrieved a number of items from my old office in Internal Affairs and found not only the attached AR 4-25 draft work but a shooting force policy Lieutenant Brown was also looking for. (I have also forwarded this under separate cover).

It was my understanding revisions to AR 4-25 were going to be made within the framework of the Discipline Committee. I wish you the best of luck with these revisions which are gladly attached to this e-mail.

DGO



4-25REV.NEW



IADGUIDE.WPD



NOTIFICA.WPD

-----Original Message-----

| | |
|---|---|
| From: | CONLEY, HAWTHORNE N |
| Sent: | Friday, September 03, 1999 1:30 PM |
| To: | OBER, DARRELL G |
| Cc: | BROWN, JOHN R |
| Subject: | AR 4-25 |

Captain Ober

In late May 1999 I instructed Lieutenant Brown to begin looking over subject for possible revisions. I also told him that you had been working on a draft which you were to provide for my review; however for a variety of reasons this never occurred. He indicated that on June 1, 1999 you promised to forward your research and rough draft of subject to him. to date the requested information has not arrived.

I realized you are busy in your current assignment, and perhaps the request slipped your mind. Would you now take a moment and forward requested information that we may proceed.

If getting time to fulfill this request is an issue, please advise and I'll speak to Major Waugh.

P164



**GRAND LODGE**
**FRATERNAL ORDER OF POLICE®**

5900 JEFFERSON NE, SUITE F, ALBUQUERQUE, NEW MEXICO 87109
PHONE 505-344-3159 • FAX 505-342-1004

GILBERT G. GALLEGOS
NATIONAL PRESIDENT

January 29, 2001

Captain Darrell G. Ober
71 Millers Gap Road
Enola, PA 17025

Dear Brother Ober:

I received the information regarding the Complaint you filed before the United States District Court for the Middle District of Pennsylvania. I have discussed this matter with Pennsylvania National Trustee Lou Lazzaro who asked counsel for the Pennsylvania State Police Association to review this matter and make a recommendation regarding the filing of an Amicus Curiae Brief. As you know, Mr. Gary Lightman is also the Associate General Counsel for the Grand Lodge and he will give our General Counsel and me the appropriate recommendation concerning the involvement of the Grand Lodge.

I request that your attorneys contact Mr. Lightman to discuss applicable legal issues and appropriateness of an Amicus by the Grand Lodge. Further, I understand that timing for such filings is important to consider, thus we will not file--if at all--such brief until necessary.

Thank you for sending me the information. I wish you the best in your endeavor to address your grievances against the Pennsylvania State Police.

Sincerely,

Gilbert G. Gallegos
National President

CC:   Tom Rutherford, General Counsel
      Gary Lightman, Associate General Counsel
      Lou Lazzaro, Pennsylvania National Trustee
      Mike Lutz, Pennsylvania State President

*P165*

PENNSYLVANIA
STATE TROOPERS
ORGANIZED 1962   ASSOCIATION

July 27, 2000

Darrell G. Ober
71 Millers Gap Road
Enola, PA 17025

Dear Captain Ober:

Enclosed is a check in the amount of $2,000 from the PSTA approved at our recent Board of Directors meeting on July 19, 2000. This is per your request for legal aid relative to your litigation with the Department.

If you have any further questions, please do not hesitate to contact me.

Very truly yours,

Louis J. Lazzaro
President

LJL/ls

PSTA   3625 Vartan Way, Harrisburg, PA 17110   (717) 540-5646 ● 800-541-9934   Fax (717) 540-5318 ● 800-540-5318
e-mail: psta@paonline.com   website: www.psta.org

## OBER, DARRELL G

| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Monday, April 02, 2001 10:23 AM |
| **To:** | SUBER, BERCHARD V |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | Meeting |

Lt.,

I again apologize for the miscommunication re: last Saturday's meeting. Hopefully, we can set this up again in the future.

As I mentioned in my memo to you, I sent you a copy of my suit for informational purposes. For the most part, the suit speaks for itself. It could very well be that I might have difficulty speaking to certain aspects of the suit until after it's conclusion.

Nonetheless, I accepted your invitation to speak to the Board. I did this because I believe my experiences have relevance to all members.

I will be sure to keep you posted. Thanks again for the invitation and hopefully we can reschedule in the future.

DGO

1

P/67

# PENNSYLVANIA STATE TROOPERS ASSOCIATION

ORGANIZED 1962

June 9, 2000

Darrell G. Ober
71 Millers Gap Road
Enola, PA 17025

Dear Captain Ober,

     Your request for legal aid reimbursement was discussed at the Round Robin on May 23, 2000. This matter was tabled until the next Board of Directors meeting, which has not yet been scheduled. As soon as the Board of Directors meeting is scheduled, you will be notified of the date, time, and place, and you will be given the opportunity to present your request, and answer any questions.

     If you have any questions, please do not hesitate to contact me.

Very truly yours,

Louis J. Lazzaro
President

LJL/ls

P168

PSTA  3625 Vartan Way, Harrisburg, PA 17110   (717) 540-5646 • 800-541-9934   Fax (717) 540-5318 • 800-540-5318
e-mail: psta@paonline.com    website: www.psta.org

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:            December 24, 1997

SUBJECT:         Commissioner's Monthly Award for Excellence Program

TO:              Commissioner
                 (through channels)

FROM:            Captain Darrell G. Ober
                 Director, Systems and Process Review Division
                 Bureau of Professional Responsibility

REFERENCE:       (a)  Administrative Regulation 4-13.

1.   In accordance with your instructions, the following information is provided to you in reference to the subject award.

2.   During the review of the Bureau of Personnel, the review team made inquires regarding the low participation by personnel in the subject program.  There are approximately 650 individuals who are eligible for the award on a monthly basis.  However, in 1997, only 12 individuals were nominated for the award for the entire year.

3.   The Commissioner's Monthly Award for Excellence Program began in February, 1994 under Commissioner Walp.  It was developed in conjunction with the Department's Strategic Planning and Total Quality Management initiatives.  The first award was issued in March, 1994.  A review of the program's available records shows that participation has been weak since its inception.  In fact, in the 34 months prior to 1997 for which records are available, 13 months had no submissions and 13 had only one (including one individual who was nominated three times).

4.   Determining the root cause for the low participation involved reviewing records maintained by the Bureau of Personnel and discussions with a sampling of Headquarters personnel.  Personnel whom SPR contacted are to be complimented for their candor in discussing this matter.  The most common contributory factors identified by the review team as responsible for the low participation are as follows:

a.   **AWARENESS OF NOMINATION PROCESS:**  Some personnel reported being unaware that any Department personnel may submit nominations.  They believed nominations must be made by Bureau Directors.  Nominations by any personnel have always been permitted.  Impulse may suggest the remedy lies in training and promotion of the program.  However, some directors/supervisors expressed reservations over not having control of the nomination process.  Reference (a) requires nominations be submitted through channels.  Endorsements are not required.

1

P169
1 of 2

**THE AWARD WILL CREATE ANIMOSITY:** There are supervisors who believe most members/employees are doing a commendable job. In their minds, singling one individual for recognition creates animosity among co-workers who are equally deserving. On the surface, this may appear to be a valid point. However, as the participation numbers suggest, ample opportunity to recognize deserving individuals exists; it is just not being taken advantage of.

The belief that competitive animosity will be created might be linked to the descriptor "award" rather than recognition. It is not known how competitive the process is viewed. The term "award" does imply some degree of competition is involved in being selected. Conversely, as the numbers indicate, being selected from a field of one may even be a source of embarrassment to the recipients.

**DISPARITY IN SELECTION:** The perception also exists that disparate treatment exists among the award recipients. The Bureau most frequently cited as receiving "favored" status is the Bureau of Research and Development. In reality, the number of award winners from the Bureau of Research and Development is a result of expected familiarity with the directives and more frequent participation in the program, rather than favored status. Ironically, the program, while intended to recognize superior performance, may actually play a role in perpetuating a counterproductive image of the award winners; particularly those assigned to the Bureau of Research and Development.

**FREQUENCY OF THE AWARD:** Some personnel believe justification for the criteria of this award does not occur or exist on a monthly basis.

**INDIVIDUAL IDIOSYNCRASIES:** Some individuals have requested not to be considered for the award for personal reasons. Others, who have been nominated and not chosen, have asked not to be considered again due to the embarrassment of not being selected.

4. SPR was informed by members of the Bureaus of Personnel and Research and Development that revisions to this portion of Reference (a) were in the process. However, no such revision could be located.

5. It is the conclusion of SPR that the Commissioner's Monthly Award for Excellence Program is not meeting its intended goal. Given the longstanding deficiencies which exist in the program, it is unlikely that sufficient repairs can be made to preserve the integrity of an award befitting the Commissioner's name. As such, consideration should be given to abandoning the program.

2

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:        October 29, 1996

SUBJECT:     Officer Safety

TO:          Deputy Commissioner of Administration
             (through channels)

FROM:        Captain Darrell G. Ober
             Director, Systems and Process Review Division
             Bureau of Professional Responsibility

     1.   Our Department is on the threshold of surpassing an important milestone. We are close to establishing a new mark for the longest period in our history without having a Trooper killed in the line of duty. The standard currently stands at seven years and nine months (P2c. Dean N. Zeigler 10/17/42 to Pfc. John A. Ditkosky, 07/24/50). The last members of the Department to fall were Corporal Paul Almer and Troop Wayne D. Bilheimer (04/12/89, seven years, six months and counting). We have not lost a Trooper in this decade.

     2.   With the relative young ages and experience present in the Department's patrol units, coupled with the seeming increase in the number of assaults on our officers and at fault traffic accidents, it may be appropriate to remind our members of the real dangers that exist and reinforce safe procedures and driving habits. Unfortunately, we cannot deny our past losses nor can we ignore the tendency of history to repeat itself. An awareness and acknowledgement of the aforementioned may prove beneficial toward extending our safety record.

     3.   I am not suggesting anything be considered that would cheapen the memory of our fallen brothers. I recommend consideration be given to bringing this matter to our members attention through an informational video, Communicator article, Department directive, etc., or perhaps this could be used as a means to enhance relations with the PSTA in a joint project.

1

*P170*

CALEA CONCERNS OUTLINE

Acknowledgement and thank you to Colonel for honoring SPR request to attend command conference.  Information and experience gained will benefit SPR in system assessment.

-- There are indications the CALEA process is flawed. Our concerns re CALEA management and internal credibility were confirmed by presentation and reaction of command staff. Whispers within DHQ suggest the feelings are universally held.

Providing candid feedback is consistent with the mission of SPR.  The Department is liable for criticizm for knowing about the reassessment for five years and being so far behind the eightball.

--    There are instances of significant policy decisions being made at lower levels and often by committee; ex.  AR 3-3 re custodial officers.

--    No communication exists between CALEA and SPR.  This is a liabiity for the Department.  CALEA focus seems to be based on file obsession.  For the past five years little or no attention has been paid to performance.  Despite offers and assurances, no patrnership has yet to be formed. SPR measures and tests compliance on a daily basis.  The duality of purpose between CALEA and SPR needs to be addressed.  This is probably common in other Departments.

-- First consideration of adoption of policy seems to be based on what CALEA says.  Consideration is not being given to whether or not we want to adopt the policy change.  This contradicts most of the other management and leadership training we are receiving.  In SPR we continually evaluate policy based on is the action necessary.  What if we stopped doing this?

We believe the Commissioners name and office are being misused to sell the project.  The failure to accept the process is self-evident from the mood of the command conference. Motivation to accept is being provided in the form of a threat; "Do you want to be the one named as responsibnile to the Commissioner as the person who did not get us reaccreditated?" Because of the threat, the perception that process is mismanged, lacks substance and value overstated all are undermining the credibility and confidence in the Commissioner.

--    Assignments of standards rsponsibility is being mishandled.  Resentment exists among administrative staff.  CALEA Section has more staff in many instances than the components they self-assigned responsibilities.  This is percieved as arrogant. The term "CALEA Nazis" has been used to describe tactics employes.  Use Vicky in Chief Counsels Office as an example.

1

P171
1 OF 2

-- Stress levels within R&D (as evidenced by MAP involvement) and overtime usage (again) are clear indicators of problems. Is overtime being applied as a bandaid to correct poor management paractices?

**OBER, DARRELL G**

| | |
|---|---|
| From: | WILT, RONALD C |
| Sent: | Wednesday, May 31, 2000 2:31 PM |
| To: | OBER, DARRELL G |
| Subject: | Congrats |

Darrell:
Glad to see you have been put in a position commensurate with your rank and capabilities.
Ron

P172

**OBER, DARRELL G**

| | |
|---|---|
| **From:** | CHRISTENSEN, DAVID J |
| **Sent:** | Thursday, March 09, 2000 8:00 AM |
| **To:** | OBER, DARRELL G |
| **Subject:** | lawsuit |

Capt., I just read the article in todays paper about your lawsuit. I wish you the best of luck. I know what it is like to be wrongfully accused and punished. I worked for Sgt. Kean who treated me like dirt. I chose to fight back and won. Fight the good fight and you will win. Good Luck. Dave.

1

P173



**GRAND LODGE**
**FRATERNAL ORDER OF POLICE®**

5900 JEFFERSON NE, SUITE F, ALBUQUERQUE, NEW MEXICO 87109
PHONE 505-344-3159 • FAX 505-342-1004

GILBERT G. GALLEGOS
NATIONAL PRESIDENT

January 16, 2001

Captain Darrell G. Ober
Director of Administration
Bureau of Liquor Control Enforcement
3655 Vartan Way
Harrisburg, PA 17110

Dear Brother Ober:

Thank you for sending me the latest information regarding your court case. It appears the case is significant and obviously expensive to litigate. As you know, I also received your previous correspondence and mailed it to National Trustee Lou Lazzaro and Pennsylvania State President Mike Lutz.

Article 24 of the National Bylaws provides the procedures for legal aid requests made to the Grand Lodge. To date, I have not received any request for funds from either your local lodge or the Pennsylvania State Lodge. We cannot move forward on your situation until they forward a formal request. The policy of the Grand Lodge is that we will not grant legal aid funds to individual members. The funds may be used for an individual member's case, but the money is given to the lodge.

I have forwarded your information to Jim Gaudet, Chairman of the Legal Assistance and Financial Aid Committee, for his review even though he will be unable to act on your situation until your lodge submits a request.

I urge you and your lodge leadership to review Section 26 of the National Bylaws. It will guide you through the process. We have a National Board of Trustees meeting in March, therefore, your earliest attention to this matter as proscribed in the Bylaws will facilitate action at the meeting.

I wish you the best of luck in your case.

Sincerely,

Gilbert G. Gallegos
National President

CC:     Mike Lutz, Pennsylvania State President
        Lou Lazzaro, Pennsylvania National Trustee
        Jerry Atnip, National Secretary
        Jim Gaudet, Chair, Legal Assistance and Financial Aid Committee

*P174*

NATIONAL HEADQUARTERS • 1410 DONELSON PIKE A-17 • NASHVILLE, TENNESSEE 37217 • 615-399-0900 • FAX 615-399-0400

**William L. Hunter, Jr., CPP**

3209 Linden Parkway
Harrisburg, PA 17110-9306

Home Phone 717+652-3919
Email theehunter@msn.com

January 29, 2001

Hello Captain Darrell:

Thank you for sharing the court filings. While reading it my mind raced back to 1989 when they tried to politicize the Bureau of Professional Responsibility (BPR) to injury me. I too was relieved of an assignment I enjoyed, Commanding Officer of Troop H, and relegated to a Division. I too was passed over for promotion. Like you, I did nothing illegal, immoral, or unethical, and committed no acts contrary to Department policy. That is the part that made me "madder" that a wet rooster. I.E., they tried to shaft me for no legitimate reason. After almost 12 years I still become angry when I focus on it.

As you are aware, BPR was created by former Commissioner Dunn to operate almost alone if external pressures required. The related administrative regulation gives the Director BPR a tremendous amount of authority to root out wrongdoing without political interference. You may recall BPR was created after a House Committee investigated the State Police for not properly investigating, adjudicating, and disposing of improper conduct cases. If you want some interesting reading, read the findings of the Deal Commission.

Darrell, you did right. If there are reasons to believe a PSP Officer, or Cabinet Rank Officer may have been involved in misconduct, such must be investigated without influence or interference of a possible target. To do otherwise would pollute BPR, and in turn be a disservice to the people of Pennsylvania who believe the Pennsylvania State Police is a good and honest outfit.

While you are going through this, keep an eye on the big picture. This matter will pass one way or the other, and Commissioners and Deputies will change. Your upward mobility must continue. I was promoted to Major and BPR Director 24 months after the two thugs tried to destroy me. Keep an eye on the oak leaf. Please tell Mrs. Ober hello.

*Bill*

Major, Bill. Hunter
PSP, Retired

WLH

*P175*

## OBER, DARRELL G

| | |
|---|---|
| From: | OBER, DARRELL G |
| Sent: | Tuesday, January 25, 2000 9:47 AM |
| To: | BROWN, JOHN R |
| Cc: | OBER, DARRELL G |
| Subject: | RE: State Car |

Rick,

Thanks for the message. I spoke with Transportation today. In actuality, my replacement car is not here yet. It is due to be delivered today from Troop A. Transportation is going to call when it gets here (in light of weather conditions). I will contact you when Transportation gives me the green light. Thanks for the offer to facilitate the exchange. That works fine for me and would be my preference. I will be in touch.

DGO

-----Original Message-----

| | |
|---|---|
| From: | BROWN, JOHN R |
| Sent: | Monday, January 24, 2000 4:30 PM |
| To: | OBER, DARRELL G |
| Subject: | State Car |

Captain,

Good afternoon sir, thanks again for the card and the kind remarks. I know you are hanging tough. Remember if I can be of any assistance please don't hesitate to contact me.

Transportation called and said they have a new car for you. They don't want the old one back, and said the bureau should get it. Let me know how you want to handle this. You and I can take care of this and not involve anyone else from the bureau. Let me know what you want to do.

Rick

*P176*

1

## OBER, DARRELL G

| | |
|---|---|
| From: | OBER, DARRELL G |
| Sent: | Friday, January 28, 2000 7:56 AM |
| To: | DAVIS, JEFFREY R |
| Cc: | OBER, DARRELL G |
| Subject: | Transfer to Troop B |

Jeff,

At this time it does not appear that my proposed transfer to Troop B will go through. If it is not to late, I would to re-state my interest in remaining part of the PEMA operation. I hope to know more details soon and will pass them on to you. I placed my identification card and key in the inter-office mail to you yesterday. Thanks,

Darrell

P177

1

## OBER, DARRELL G

| | |
|---|---|
| From: | OBER, DARRELL G |
| Sent: | Thursday, January 27, 2000 8:48 AM |
| To: | DAVIS, JEFFREY R |
| Cc: | OBER, DARRELL G |
| Subject: | RE: Equipment Turn in For PEMA |

Jeff,

I have placed the below listed items in the inter-office mail.  Should I ever get back to this area, I would appreciate consideration for an opportunity to again join PEMA.  I really enjoyed the assignment.  Thanks again for everything.

DGO

-----Original Message-----
From:    DAVIS, JEFFREY R
Sent:    Tuesday, January 18, 2000 3:22 PM
To:      OBER, DARRELL G
Subject: RE: Equipment Turn in For PEMA

Darrell:

I believe the I.D. card and key are the only two items of equipment.  On the 28th, just put them in inter-office mail for my attention.

Thanks for you help over the last couple of years and good luck with your new assignment.

Jeff

-----Original Message-----
From:    OBER, DARRELL G
Sent:    Tuesday, January 18, 2000 7:24 AM
To:      DAVIS, JEFFREY R
Cc:      OBER, DARRELL G
Subject: Equipment Turn in For PEMA

Jeff,

I have my PEMA identification card and key to the desk.  Can you think of any other PEMA related equipment that I will need to turn in?  Thanks,

Darrell

P178

1

## OBER, DARRELL G

| | |
|---|---|
| From: | OBER, DARRELL G |
| Sent: | Monday, January 17, 2000 11:16 AM |
| To: | BINKER, RICHARD O |
| Cc: | OBER, DARRELL G |
| Subject: | Turn in Vehicle |

Rick,

  Major Szupinka asked that I coordinate my vehicle turn in with you.  For the time being, I can still be reached by e-mail or 657-4231.  Thanks,

Darrell

P179

1

## OBER, DARRELL G

| | |
|---|---|
| **From:** | SKILES, KATHY A |
| **Sent:** | Monday, February 14, 2000 12:33 PM |
| **To:** | OBER, DARRELL G |
| **Subject:** | RE: Car for Capt. Ober |

yes

-----Original Message-----
**From:**      OBER, DARRELL G
**Sent:**      Monday, February 14, 2000 12:33 PM
**To:**        SKILES, KATHY A
**Cc:**        OBER, DARRELL G
**Subject:**   FW: Car for Capt. Ober

Kathy,

   Will this suffice as an official request?  Thanks,

DGO
-----Original Message-----
**From:**      WAUGH, WESLEY R
**Sent:**      Monday, February 14, 2000 12:28 PM
**To:**        OBER, DARRELL G
**Subject:**   FW: Car for Capt. Ober

FYI.  WRW

-----Original Message-----
**From:**      WAUGH, WESLEY R
**Sent:**      Monday, February 14, 2000 12:27 PM
**To:**        SKILES, KATHY A
**Subject:**   FW: Car for Capt. Ober

Forwarded for necessary action.  Thanks.  WRW

-----Original Message-----
**From:**      BINKER, RICHARD O
**Sent:**      Friday, February 11, 2000 11:29 AM
**To:**        WAUGH, WESLEY R
**Subject:**   Car for Capt. Ober

Wes,
   I will be bringing a mid mileage car (about 65K miles) in from Troop G (Eq.# 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) to assign to Capt. Ober.
When the mid mileage car is brought in, the radio will be removed and re-installed into a new car being returned to
Troop G. Have you requested a radio for Capt. Obers' car? If not, please contact Kathy Skiles to secure a radio.
                                                                                    Rick

P/80

1

OBER, DARRELL G

**From:** WAUGH, WESLEY R
**Sent:** Thursday, February 10, 2000 1:31 PM
**To:** OBER, DARRELL G
**Subject:** RE: Exchange of State Car

Thank you.  WRW

-----Original Message-----
**From:** OBER, DARRELL G
**Sent:** Thursday, February 10, 2000 9:54 AM
**To:** WAUGH, WESLEY R ; BINKER, RICHARD O
**Cc:** OBER, DARRELL G
**Subject:** Exchange of State Car

Major,

As per your request, I have contacted Mr. Binker in Transportation.  Until a vehicle can be pulled from the field for me, I will be assigned a non-radio motor pool vehicle.  I am on my way to DHQ to pick up same now.  Mr. Binker said I could leave Lt./Captain Young's vehicle at DHQ and he would make arrangements to pick-up. I will be resuming our scheduled review of IBM BAFO for the remainder of the day.

Captain Ober

P181

1

**OBER, DARRELL G**

| | |
|---|---|
| **From:** | WAUGH, WESLEY R |
| **Sent:** | Tuesday, February 15, 2000 10:28 AM |
| **To:** | OBER, DARRELL G |
| **Subject:** | FW: Car for Capt. Ober |

FYI -- we're working on this.  WRW

-----Original Message-----
| | |
|---|---|
| **From:** | SKILES, KATHY A |
| **Sent:** | Monday, February 14, 2000 12:31 PM |
| **To:** | WAUGH, WESLEY R |
| **Subject:** | RE: Car for Capt. Ober |

We are looking as we speak (or write).  We gave our last radio to IIMS!
If we get jammed up, I'll let you know.  It's difficult to justify buying a radio at this point.  I've asked staff to see if there are
any radios in cars that should not have them.  We also may look at buying a cheap radio.  As a final alternative, we may
recommend cellular as an interim solution until the new radio system is up and running.

-----Original Message-----
| | |
|---|---|
| **From:** | WAUGH, WESLEY R |
| **Sent:** | Monday, February 14, 2000 12:27 PM |
| **To:** | SKILES, KATHY A |
| **Subject:** | FW: Car for Capt. Ober |

Forwarded for necessary action.  Thanks.  WRW

-----Original Message-----
| | |
|---|---|
| **From:** | BINKER, RICHARD O |
| **Sent:** | Friday, February 11, 2000 11:29 AM |
| **To:** | WAUGH, WESLEY R |
| **Subject:** | Car for Capt. Ober |

Wes,
    I will be bringing a mid mileage car (about 65K miles) in from Troop G (Eq.# 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) to assign to Capt. Ober.
When the mid mileage car is brought in, the radio will be removed and re-installed into a new car being returned to
Troop G. Have you requested a radio for Capt. Obers' car? If not, please contact Kathy Skiles to secure a radio.
                                                                                                Rick

P/82

## OBER, DARRELL G

| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Monday, February 21, 2000 8:15 AM |
| **To:** | SKILES, KATHY A ; BINKER, RICHARD O |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | State Vehicle and Radio |

Rick and Kathy,

I do not know if you have been made aware of the latest development in my situation. I have been informed, effective February 19, I am being transferred to LCE (Central Section). That being the case, I will no longer need the vehicle you have been so kindly securing for me.

Thank you very much for all of your assistance. I appreciate the patience you both have extended to me during this ordeal.

Darrell

1

*P183*

## OBER, DARRELL G

| | |
|---|---|
| **From:** | WAUGH, WESLEY R |
| **Sent:** | Friday, November 12, 1999 8:22 AM |
| **To:** | OBER, DARRELL G |
| **Cc:** | CONLEY, HAWTHORNE N |
| **Subject:** | FW: Grievance HQ-164, Captain Ober |
| | |
| **Importance:** | High |

Forwarded for appropriate action.  Please make your arrangements directly with Major Conley or Mrs. Blough.  WRW

-----Original Message-----
| | |
|---|---|
| **From:** | CONLEY, HAWTHORNE N |
| **Sent:** | Wednesday, November 10, 1999 3:44 PM |
| **To:** | WAUGH, WESLEY R |
| **Subject:** | Grievance HQ-164, Captain Ober |

Please arrange for Captain Ober to appear in my office, either Monday November 15, 1999 between 1000 and 1600 hours or Tuesday November 16, 1999 between 0800 and 1600 hours for the purpose of having a hearing concerning subject. Please have the Captain contact me, or Mrs. Blouch to confirm the exact of the meeting office. If Captain Ober will not be available please advise that I may arrange meet with the PSTA on behave of Captain Ober, in a timely fashion.

P184



# National Law Enforcement Officers' Rights Center

### of the Police Research and Education Project (PREP)

750 First Street, N.E., Suite 920 • Washington, D.C. 20002-4241
(202) 842-4420 • (800) 322-NAPO • (202) 842-4396 Fax
www.napo.org ~ napo@erols.com

Robert T. Scully
*Executive Director*
Stephen R. McSpadden
*General Counsel*

December 22, 2000

Captain Darrell Ober
71 Millers Gap Road
Enola, PA 17025

Dear Captain Ober:

Both Robert Scully, our Executive Director, and I have reviewed your letter and all of the material attached which you sent to us in late November. We also tried to contact Byron Warnken, but he was unavailable due to his representation of the Maryland State Troopers in several pressing matters.

We are not able to be of any assistance to you, I regret having to advise you. We do not have a legal defense fund to provide financial assistance with legal fees (although a number of our member organizations in the West and Midwest do have them). Also, we do not have the staffing or manpower resources to litigate a case in federal or state court. (I am currently the only attorney here.) Except for your resume, I am returning all of the attachments which you sent, so that you can use them again.

If you have a strong and meritorious case, you should be able to get an attorney to represent you, because attorneys fees can usually be awarded to the winning party, as you probably know. To file a section 1983 case, you will need to show a denial of due process on the basis that you may not have had a constitutionally adequate or fair hearing—although that is usually required only for suspensions or terminations—or to show another significant constitutional violation.

I wish you luck. Let me know if your bring suit and what the outcome is.

Sincerely,

Stephen R. McSpadden
General Counsel

P/85

1222 S. Queen St.
Palmyra, Pa. 17078-3548
March 15, 2000

Captain Darrel G. Ober
71 Miller's Gap Road
Enola, Pa. 17025

Dear Captain Ober:

I recently read an article in the Patriot-News describing your suit against the Department and Colonel Evanko.

You are to be commended for taking a stand against what appears to be a dictatorial attitude by the Commissioner and his unorthodox management methods. In reading the article, it appears to me that you are quite justified in your action and I wish you utmost success in pursuing it.

The Commissioner used similar tactics against Captain Tom Berryhill regarding the dissolution of Troop S after having made a tour of the Troop S stations and telling the men what a fine job they were doing. Deviousness has no place in proper management and the current administration apparently has no understanding of that concept. I am sure Bob Hickes privately supports your position.

Good luck and my very best wishes for success in your endeavors.

Sincerely,

Albert F. Kwiatek, Sr.

Albert F. Kwiatek, Sr.

Major – Retired, PSP

P/86
1 OF 2

**4B  Times-News,**  Erie, Pa.  Sunday, January 30, 2000

# The State

## Road death, gun death: no difference

The recent death of Trooper Matthew R. Bond in a crash on I-90 is a tragedy for his family, the State Police, and entire Erie community as well. My experiences on I-90 suggest that it has become a raceway for trucks and cars between the Ohio and New York State lines.

As a former trooper stationed in Erie many years ago, I can assure you that the only real solution to lessening serious accidents on the interstate system is insuring that there is adequate and continuous enforcement; not sporadic, well publicized speed checks such as the "Centipede" or the "Tag D" projects funded by periodic federal grants. Electronic and other speed signs are not enough.

Today the truckers especially are aware that enforcement on the I-system is haphazard at best. You can be sure that when the truckers hit the state line, they know that they can "run free."

Although the Erie troop didn't have a dedicated station to the interstate system as elsewhere in the state they did have "line patrols" for the interstate that required coverage. The troopers cannot be faulted for lack of adequate coverage; nor can their commanders.

The problem lies in the gradual decrease of staff on the I-system for several years, culminating two years ago when Governor Ridge and State Police Commissioner Evanko decided to eliminate having a dedicated troop of men and women from what was known as Troop S, to patrol the interstate highways.

The result suggests that smashed mailbox cases now take priority over traffic safety patrols especially on the interstate system. A proper survey of interstate crashes would bear this out today.

It has been many years since the state police has had a manpower increase to provide necessary traffic safety patrol staffing for pro-active efforts rather than re-active responses after the incident has occurred.

Think about this the next time you are travelling I-90 at 65 miles an hour and an eighteen-wheeler breezes by you at 75 or 80. Maybe your legislator can help?

Finally, is a death on our highways from a crash less important than a death by a gun in a robbery?

The end results seem to be the same. A valued life is lost.

Albert F. Kwiatek, Sr.
Major, PSP, retired, Palmyra

P. M. Conti
1081 Acri Drive
Harrisburg, Pa. 17111

September 4, 1994

Dear Darrell:

Sometime ago, you spoke to me about your interest in the brass book ends that were once sold through our Retiree Association.

The books ends were made through the efforts of retiree John Stewart, now in his late 80s. Once this project became too much for him, in addition to the rising cost of producing brass items, he gave it up.

The molds for the book ends were given to Ed Grazer, who retired from the Lancaster Troop. I understand that Ed makes the book ends from a less expense metal and are painted black.

One of our retirees recently attended an antique show, where he came across a set of old brass book ends. The dealer would accept nothing less than $125 for the set. As we get closer to the Department's centennial anniversary, I imagine the price will jump significantly.

By the way Edwin Grazer's address is: 113 Garden City Drive, Lancaster, Pa. 17602.

Regards,

Phil

P187

DARRELL G. OBER,                    )        IN THE COURT OF COMMON PLEAS
         Plaintiff              )        OF CUMBERLAND COUNTY,
                               )        PENNSYLVANIA
   vs.                             )
                               )        NO. 3279 CIVIL 1989
CHERYL H. (OBER) HINKLE,            )
         Defendant              )        CIVIL ACTION - LAW

## ORDER

AND NOW, this ___5th___ day of ___February___, 1999, upon receipt of the

Conciliator's Report, it appearing that the parties have agreed to the terms and provisions of this

Order which was dictated in their presence and approved by them, it is hereby ordered and

directed as follows:

    1. All prior orders entered in this matter are VACATED.

    2. The parties shall share legal custody of their minor child, Benjamin B.

Ober, d.o.b. February 27, 1987.

    3. Father shall have primary physical custody of the minor child subject to

periods of partial custody and visitation with Mother as follows:

        A. On alternating weekends from Thursday immediately after

school if Benjamin is in school, or 3:30 p.m. in the event that Benjamin

is not in school, through the following Monday morning at which time

Mother shall return Benjamin to school if he is in school, or no later than

9:00 a.m. at Father's residence if Benjamin is not in school. In the event

that Mother cannot exercise a pick up on Thursday, she must notify

P188
1 of 6

Father one week in advance that she is unable to pick the child up so that Father can make alternate arrangements. Mother shall provide Father with this notification in writing.

4. The parties shall alternate custody of Benjamin on the following holidays: President's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving, New Year's Day, and Martin Luther King's birthday. This alternating schedule will commence with Father exercising custody of Benjamin on President's Day, 1999, and the schedule shall alternate thereafter. The time for these holiday visitations shall occur from the day prior to the holiday directly after school if Benjamin is in school, or 3:30 p.m., until the day after the holiday at such time Benjamin will be returned to school if he is in school, or by 9:00 a.m., if he is not in school.

5. The Christmas holiday shall be alternated between the parties and shall be broken into two segments. Segment A shall be from Benjamin's release from school for the Christmas holiday until December 25th at 12:00 noon. Segment B shall be from December 25th at 12:00 noon until the first day of Benjamin's return to school following the Christmas holiday. Father shall have Segment A in 1999 and all odd-numbered years and Segment B in 2000 and all even-numbered years. Mother shall have Segment A in 2000 and all even-numbered years and Segment B in 1999 and all odd-numbered years.

6. The parties shall alternate Benjamin's Spring/Easter vacation from school. This period of vacation shall occur from when Benjamin is released from school until the date that he is required to return to school. Mother shall have Benjamin in 2000 and all even-numbered years, while Father shall have Benjamin in 1999 and all odd-numbered years.

7. Mother shall have Benjamin on Mother's Day and Father shall have Benjamin on Father's Day. These periods of custody shall include the entire weekend. It is the intention of this paragraph that the parties will exchange that weekend in the event that Mother's Day or Father's Day does not fall on their regularly scheduled weekend under the other provisions of this Order.

8. Each party shall be entitled to four (4) weeks of vacation time per year with Benjamin. They shall provide each other with fourteen (14) days advance written notice as to when they intend to exercise these weeks of vacation. The parties agree that they will notify each other in the event that they intend to take Benjamin out of state. Said periods of custody shall not include a scheduled weekend of the other parent unless agreed to by the parties.

9. The parties shall refrain from making any disparaging remarks concerning the other in the presence of Benjamin or disparaging remarks concerning members of the other party's household.

10. The minor child is in need of therapy pursuant to the psychological evaluation completed in this case. The parties shall ensure that the appropriate

therapy is completed in accordance with the psychological evaluation and the direction of the therapist. The parties further agree to use Stanley E. Schneider, Ed.D., as their therapist in this matter. The cost of these therapy sessions shall be shared such that all unreimbursed portions of the sessions will be paid 50% by Father and 50% by Mother.

11. Nothing herein shall prevent the parties from agreeing, from time to time, to different or additional periods of partial custody for the Mother.

BY THE COURT,

/s/ Kevin A. Hess
KEVIN A. HESS, J.

John J. Connelly, Jr., Esquire
Christopher C. Houston, Esquire

mlb

TRUE COPY FROM RECORD
In Testimony Whereof, I here unto set my hand
and the seal of said Court at Carlisle, Pa.
This 5th day of Feb , 19 99
Shirly a Peiper
Dpty . Prothonotary

DARRELL G. OBER,                    )       IN THE COURT OF COMMON PLEAS
          Plaintiff                 )       OF CUMBERLAND COUNTY,
                                    )       PENNSYLVANIA
     vs.                            )
                                    )       NO. 3279 CIVIL 1989
CHERYL H. (OBER) HINKLE,            )
          Defendant                 )       CIVIL ACTION - LAW

JUDGE PREVIOUSLY ASSIGNED:  The Honorable Kevin A. Hess

## CUSTODY CONCILIATION CONFERENCE SUMMARY REPORT

IN ACCORDANCE WITH CUMBERLAND COUNTY RULE OF CIVIL

PROCEDURE 1915.3-8(b), the undersigned Custody Conciliator submits the following report:

1.  The pertinent information concerning the child(ren) who is(are) the subject of this litigation is as follows:

NAME                    BIRTHDATE               CURRENTLY IN
                                                CUSTODY OF

Benjamin B. Ober        February 27, 1987

2.  A Conciliation Conference was held on January 27, 1999, and the following individuals were present:  the Plaintiff and his attorney, John J. Connelly, Jr., Esquire; the Defendant appeared pro se.

3.  Items resolved by agreement:  See attached Order.

4.  Issues yet to be resolved:  See attached Order.

5.  The Plaintiff's position on custody is as follows:  See attached Order.

6.  The Defendant's position on custody is as follows:  See attached Order.

7.  Need for separate counsel to represent child(ren):  Neither party requested.

8. Need for independent psychological evaluation or counseling: See attached Order.

9. Other matters or comments: The parties have been through several conciliations and had an evaluation completed by Dr. Schneider. Dr. Schneider made some specific recommendations to the parties as it related to their minor child, Benjamin. The parties at the last conciliation entered into the attached recommended Order but it was premised upon the minor child receiving therapy sessions as it relates primarily to his relationship with his mother and for his mother to understand what is occurring in the child's life. Furthermore, the evaluation reflected that the parties were unable to effectively communicate with each other and that it was hoped that after the issues were resolved between the Mother and son, that that would in itself help resolve the problems of communication. There are a number of issues that need to be dealt with by the parties as in any custody case on an on-going basis and it was hoped that these therapy sessions would empower the parties to do that. In the event that the therapy does not work or that the parties are unable to continue to communicate, the Conciliator indicated to the parties that they may request another conciliation to raise any outstanding issues.

Date: January 29, 1999

Michael L. Bangs
Custody Conciliator

OBER, DARRELL G

| | |
|---|---|
| om: | INFANTINO, MARC J |
| ent: | Friday, September 03, 1999 7:37 AM |
| o: | OBER, DARRELL G |
| Subject: | RE: Centennial Committee |

-----Original Message-----
From:      **OBER, DARRELL G**
Sent:      Wednesday, September 01, 1999 8:39 AM
To:        INFANTINO, MARC J
Subject:   Centennial Committee

Marc,

    On Tuesday, August 30, 1999, I received a carbon copy in my in-basket of the August 24th memo that was directed to you removing me from the subject Committee.

    I have the material which was provided to me when I was selected to the Committee for return to you. I would like to do this a.s.a.p. I am hoping Thursday or Friday of this week is good for you.

    With respect to your request to borrow items from me for inclusion in the book, at this time I would have to decline the offer. I would not want take any actions which appear to violate the clear intent of the Commissioner's memo to eliminate my involvement in the project.

    Please let me know when I can return the mentioned items. My very best to you and the remaining members of the Committee.

Captain Ober

September 3, 1999

Darrell

I will be in Friday if you want to return the photos (Early PSP Activities), (Significant Events), (PSP Buildings), and (Aviation) files.

It is too bad this has happened.

Marc

1

*P189*

## OBER, DARRELL G

| | |
|---|---|
| From: | DAVIS, JEFFREY R |
| ent: | Thursday, February 17, 2000 8:39 AM |
| o: | OBER, DARRELL G |
| Subject: | RE: PEMA |

OK.  Sounds good to me.  Just check with Major Koscelnak to make sure there will be no problems on his end.  Let me know next week, and I'll send back the ID card and cabinet key.

Jeff

-----Original Message-----
From:       OBER, DARRELL G
Sent:       Thursday, February 17, 2000 8:27 AM
To:         DAVIS, JEFFREY R
Cc:         OBER, DARRELL G
Subject:    RE: PEMA

Jeff,

   Thanks for the update.  I will talk to Major Waugh, although at this point may not be necessary.  Effective Saturday, I have been told, I will be transferred to the Central Section Command of LCE here in Harrisburg.  That should ensure my continued availability for the detail.  Thanks again,

DGO

-----Original Message-----
From:    DAVIS, JEFFREY R
Sent:    Wednesday, February 16, 2000 8:16 AM
To:      OBER, DARRELL G
Subject: RE: PEMA

Darrell:

Major Washington told me to check with Major Waugh.  I placed a phone call in to him a week to 10 days ago and have not heard back yet.  As long as it is OK with Major Waugh, it is OK with me -- I'm still waiting for his return call.

Jeff

-----Original Message-----
From:       OBER, DARRELL G
Sent:       Wednesday, February 16, 2000 7:31 AM
To:  DAVIS, JEFFREY R
Cc:  OBER, DARRELL G
Subject:    PEMA

Jeff,

   Is there any word on my request to return to my status as Blue Team EPLO?  Thanks,

Darrell

*P190*

1

# OBER, DARRELL G

| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Monday, June 26, 2000 7:46 AM |
| **To:** | DAVIS, JEFFREY R |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | RE: PEMA-EPLO Duties |

Jeff,

Thanks for the update.  I have been on leave and am just getting caught up.  I also hope I am able to resume my PEMA duties.  Thanks again.

Darrell

-----Original Message-----
| | |
|---|---|
| **From:** | DAVIS, JEFFREY R |
| **Sent:** | Tuesday, June 20, 2000 9:53 AM |
| **To:** | OBER, DARRELL G |
| **Subject:** | RE: PEMA-EPLO Duties |

Darrell:

Yes, we need another team leader.  I forwarded your notification of interest to Major Washington for discussion with your new Bureau Director.  I'm still waiting for word back.  I hope things work out.

Jeff

-----Original Message-----
| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Tuesday, June 13, 2000 2:45 PM |
| **To:** | DAVIS, JEFFREY R |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | PEMA-EPLO Duties |

Jeff,

Here we go again...with the transfer of Captain McDonough, are you again in need of a Team Leader?
Thanks,

Darrell

1

*P 191*

I)  <u>Scuba</u>  *(Rick Binker)*

- PSP Scuba Teams

J)  <u>Rodeo Events / Mounted</u>  *(Bob Clark)*

- Rodeo Photos, PSP Mounted

K)  <u>General/Misc. Enlisted Activities, Civilian Activities,</u>  *(Marc J. Infantino)*

- Civilian, Lab, PSP Action Photos not related to significant events, Etc.

L)  <u>State Highway Patrol Activities</u>  *(Marc J. Infantino)*

## II.  PRIVATE COLLECTIONS/ARTIFACTS *(Darrell Ober)*

- Coordinate with private collectors photographing specific items in their collections
- Coordinate museum items to get photographed

## III.  RESEARCH TOPICS *(all members)*

A.  Manpower/Cadet Training throughout PSP history

- short history of the development of the Training Schools - Academy
- training schools/academy classes - # started, # graduated, date of graduation
- changes in curriculum over the years
- list of complement increases

B.  Photos of all Commissioners/Superintendents, Acting Commissioners, Deputies

C.  Photos/Biographies of Officers Killed in Line of Duty

D.  List of Medal of Honor, Commendation Medals, Distinguished Service Medal recipients.

E.  Organizational structure and changes throughout the history of the Department (including Introduction of Bureaus and new Troop Headquarters)

F.  Short Historical Narrative of the Department

G.  Short interesting stories of the PSP

H.  Photos of hand guns, long guns, and automatic weapons used by PSP. *(Jim Murphy)*

P/92

# OBER, DARRELL G

| | |
|---|---|
| From: | OBER, DARRELL G |
| ent: | Tuesday, January 11, 2000 7:05 AM |
| To: | WAUGH, WESLEY R |
| Cc: | OBER, DARRELL G |
| Subject: | Transfer |

Major,

     To keep you informed, Major Conley telephoned me at home yesterday (1600) to inform me that he had been instructed to relay the following to me:

- My stay in the Bureau of Technical Services has been extended until January 21, 2000.
- I will be assigned to the Bureau of Professional Responsibility from January 24 - 29, 2000.
- January 31, 2000 I am to report to Area III for assignment to the Area III Commander. Major Conley stated he is not aware of what my responsibilities will be nor the duration of this assignment.

Captain Ober

P193

1

**OBER, DARRELL G**

| | |
|---|---|
| From: | WAUGH, WESLEY R |
| ent: | Thursday, March 16, 2000 11:03 AM |
| o: | OBER, DARRELL G |
| Subject: | Out of Office AutoReply: Debriefing Notes - A/C & IBM |

I will be out of the office on a special assignment until an undetermined date in May 2000. In my absence, Captain Michael R. Nagurny will be the Acting Director of the Bureau of Technology Services. Captain Nagurny can be reached at 717-787-1499 or by e-mail at mnagurny@psp.state.pa.us. Although I will periodically be checking both e-mail and voice mail, you should direct all business communications to Captain Nagurny. Thank you.

P194

PRR221-00516 S XBRD41-00002 04/20/99 16:07:22 - 04/20/99 13:03:07    PAGE  1 OF  1
SN P,              FILE 14              EXECUTIVE AND ADMINISTRATIVE OFFICES    BZ0LWK1HPCYZ

ECT:        DETACHED STATUS

TO:         AREA, TROOP, AND STATION COMMANDERS;
            AND BUREAU AND OFFICE DIRECTORS

    1.  EFFECTIVE MONDAY, APRIL 26, 1999, CAPTAIN DARRELL G.
OBER, DIRECTOR, INTERNAL AFFAIRS DIVISION, BUREAU OF PROFESSIONAL
RESPONSIBILITY, WILL BE DETACHED TO THE BUREAU OF TECHNOLOGY SERVICES.
CAPTAIN OBER WILL FUNCTION AS TEAM LEADER FOR SYSTEM INTEGRATOR
PROCUREMENT FOR THE INCIDENT INFORMATION MANAGEMENT SYSTEM (IIMS) PHASE
OF THE DEPARTMENT AUTOMATION PROJECT.  CAPTAIN OBER WILL RETURN TO THE
INTERNAL AFFAIRS DIVISION UPON COMPLETION OF THE ASSIGNMENT.

    2.  NO ACKNOWLEDGEMENT OF THIS MESSAGE IS REQUIRED.

AUTH\COLONEL PAUL J EVANKO\COMMISSIONER\PSP    SLO

P 195



**May 1999**

## This Issue

**1** Systems Integrator Team Formed

**1** IIMS Implementation Coordinator Appointed

**2** Meet Joe and Jeff

**2** The PSP Technology Glossary

**2** Voice Recognition and Natural Language Processing

Upcoming Issues:

New ID Cards?

Project Updates

Pennsylvania State Police
Bureau of Technology Services
1800 Elmerton Avenue
Harrisburg, Pennsylvania 17110

# CRIMINAL INVESTIGATIVE TRAFFIC SAFETY
# INCIDENT INFORMATION
# MANAGEMENT SYSTEM

## Systems Integrator Team Established

*Discovery Days set for June*

A Systems Integrator (SI) Design Team has been established to prepare a Request for Qualified Contractor (RFQC) and oversee the acquisition of a SI for the Incident Information Management System (IIMS).

Captain Darrell G. Ober, Director, Internal Affairs Division, Bureau of Professional Responsibility, was selected by the Commissioner to lead the SI Team. Captain Ober will be detached to the Bureau of Technology Services until the SI is selected, and the captain will then return to his permanent position in BPR.

The SI will be responsible for facilitating the acquisition of IIMS components, assembling them, and making them work as a unified system. While PSP will retain complete control of the evaluation and acceptance of the individual IIMS components, the SI will assist in preparation of acquisition documents and advise PSP throughout the process. PSP plans to have the SI perform the actual contracting with component vendors to expedite the acquisitions.

Parallel sub-component projects to the SI procurement process are also underway. A Mobile Office Team is scheduled to begin the Mobile Office selection process on June 10, 1999. A Bar Coding Team will follow to begin that selection process.



## IIMS Implementation Coordinator Appointed

Lieutenant Robert B. Titler, Station Commander, Troop H, Carlisle, has been appointed IIMS Implementation Coordinator. Lieutenant Titler joined the Bureau of Technology Services on May 15, 1999.

Lieutenant Titler will be responsible for ensuring that the implementation of the Criminal Investigative Traffic Safety Incident Information Management System (IIMS) meets the needs and expectations of the Department. He will work closely with the Project Executive, Project Manager, design teams, and the Systems Integrator (SI) to acquire in-depth knowledge of IIMS hardware, software, and applications and related systems, and to identify issues associated with the systems which may impact upon field and bureau operations.

Lieutenant Titler will serve as liaison between the IIMS project and the Department's field operations. The liaison duties will include preparing and presenting briefings on the IIMS project, and coordinating and performing field visits as needed to keep Department personnel informed on IIMS progress. The duties will also include soliciting suggestions, responding to complaints, conducting rumor control activities, and performing a number of other duties required for the successful implementation of IIMS.

*P196*

 

# PENNSYLVANIA STATE POLICE (PSP)
# SYSTEMS INTEGRATOR
# RFQC PROCUREMENT PROJECT STRUCTURE

## COMMISSIONER
### Colonel Paul J. Evanko

## EXECUTIVE OVERSIGHT COMMITTEE
Lieutenant Colonel Robert C. Hickes, Deputy Commissioner of Staff - Committee Chair
Major Virginia L. Smith-Elliott, Equal Employment Opportunity Officer, PSP
Major Tyree C. Blocker, Director, Bureau of Drug Law Enforcement, PSP
Major Wesley R. Waugh, Director, Bureau of Technology Services, PSP
Mr. Glen R. Grell, Deputy General Counsel, Office of General Counsel
Ms. Barbara L. Shelton, Deputy Secretary for Procurement, Department of General Services
Mr. Robert E. Greenwood, Deputy Secretary of the Budget, Office of the Budget
Ms. Terri J. Savidge, JNET, Executive Director, Office of Administration

**EXECUTIVE OVERSIGHT COMMITTEE:** The Executive Oversight Committee is responsible for providing high-level management and guidance to the Systems Integrator selection process and project direction. The Executive Oversight Committee is also responsible for approving the Voting Committee's final recommendation for contract services prior to submission to the Commissioner.

**MEETINGS:** An Executive Oversight Committee kickoff meeting is scheduled for August 11, 1999, at 9:00 a.m., in the PSP's Strategic Development Division, 2629 Market Place, Harrisburg, PA. Thereafter, regularly scheduled Executive Oversight Committee Meetings will be held at 9:00 a.m. on the second Monday of every month. Meetings are projected to last no longer than 90 minutes. Additional meetings may be scheduled on an as needed basis.

## VOTING COMMITTEE
Captain Darrell G. Ober, PSP – Committee Chair
Sergeant Jeffery T. Backenstoss, PSP
Corporal Robert L. Starr, PSP
Mr. Andrew C. Jones, PSP
Ms. Sherry R. Greer, PSP

**VOTING COMMITTEE:** The Voting Committee is responsible for evaluating the RFQC Draft and vendor proposals. The Voting Committee will make recommendations, in the form of an Executive Summary, to the Executive Oversight Committee.

## ADVISORY COMMITTEE
Ms. Kathy A. Skiles, PSP
Mr. Floyd Hartley, PSP
Mr. Thomas F. Jakubiak, Office of Chief Counsel, PSP

1

*P197*



Mr. Joseph P. Gluvna, Department of General Services
Office of Administration
Mr. Corey McCue, Comptroller

**ADVISORY COMMITTEE:** The Advisory Committee's responsibility is to review the RFQC Draft Proposal and to advise the other Committee's on an as-needed basis.

### CORE TEAM
Captain Darrell G. Ober, PSP
Lieutenant Robert B. Titler, PSP
Mr. Rodney L. Ditzler, Bureau of Technology Services, PSP
Mr. Ronald C. Wilt, IIMS Project Manager, PSP
Mr. Jeffrey Staas, KPMG

**CORE TEAM:** The Core Team is responsible for providing process oversight; and administrative and resource support to all IIMS Committees.

### CONTRACT NEGOTIATIONS SUB-COMMITTEE
Mr. Floyd Hartley, PSP
Mr. Thomas F. Jakubiak, Office of Chief Counsel, PSP
Bureau of Staff Services, PSP
Mr. Corey McCue, Comptroller
Mr. Joseph P. Gluvna, Department of General Services

**CONTRACT NEGOTIATION SUB-COMMITTEE:** The Contract Negotiation Sub-Committee is responsible for executing the contract for services between the Systems Integrator and the Commonwealth.

**rev. 8/30/99**

2

DATE:            January 27, 2000

SUBJECT:         BAFO Evaluation Timeline

TO:              Ron WILT
                 IIMS Program Manager

FROM:            Sgt. Jeffrey T. BACKENSTOSS

1.  We are proposing the following Systems Integrator
    BAFO timeline.

| DATES | ACTIVITY | COMPANY |
|---|---|---|
| January 28, 31 & February 1, 2 | Independent BAFO Review | Lockheed Martin |
| February 3,4,7,8,9 | Independent BAFO Review | Andersen Consulting |
| February 10,11,14,15 | Independent BAFO Review | IBM |
| February 16,17,18 | Evaluation Discussions & Vote | |

Conference calls involving SI Team Members will be conducted on February 1 for
Lockheed Martin, February 8 for Andersen Consulting and February 14 for IBM.
Discussions during these conference calls will be proposal and schedule specific.
Schedule may be revised pending discussions held during conference calls.

## OBER, DARRELL G

| | |
|---|---|
| **From:** | PSPNUT@aol.com |
| **Sent:** | Monday, February 07, 2000 9:12 AM |
| **To:** | RWILT@psp.state.pa.us |
| **Cc:** | DOBER@psp.state.pa.us |
| **Subject:** | Re: SI Stuff |

Ron,

I expect to be in on Tuesday and Thursday this week. I am still playing catch-up. As mentioned in the status report, below is a beginning point re: negotiations:

DATE:       February 6, 2000

SUBJECT:      Systems Integrator Negotiation Committee

TO:       IIMS Program Manager

FROM:       Captain Darrell G. Ober
        Systems Integrator Procurement Team Leader

issue as       1. This correspondence is intended to follow-up the subject
        per the Weekly Status Report.

        2. I have had some discussion with Attorney Shaiman regarding
the       Systems Integrator contract negotiations. By way of summary,
following are       Attorney Shaiman's preliminary recommendations:

        · The Department should expect, at a minimum, the Systems
        Integrator to be represented by five individuals.

commit       · A signer that is a decision-maker and empowered to
contract.        the resources of the company to the conditions of the

legal       · An attorney or a contracts individual empowered by the
        staff.

        · The Program Manager.

        · A Technical Specialist.

        · A representative from sales.

        · The Department should be represented, at a minimum, by the
        following:

        · Attorney Shaiman.

        · Procurement Team Leader Captain Ober.

Waugh?)       · A leader with signature authority (LTC Hicks? Major

        · Program Manager Ron Wilt.

        · Sergeant Jeffery Backenstoss.

        · Mr. George Hogshead.

high-       3. Attorney Shaiman also recommended we consider having a
the       ranking (LTC Hicks?) Department representative initiate
strong       discussions. This should be someone capable of making a
and tempo of       impression that, consequently, will establish the tone
        the discussions.

*[handwritten notes:]*
> Chief Counsel or Commissioner Staff Services.
> Regular /Memo to Spardea

Not necessary to Have Non-Dep. 7 @ NCG.

Run By Budget
___ Invited Copy
___ Guvara

P 199

1

4. Certainly, we need to meet and discuss our committee make-up, strategy, etc. I will make inquires of the other projects regarding their process, the involvement of General Services, Office of the Budget, General Counsel, etc. I also expect to float these issues by the Executive Oversight Committee. (I am also following up on Ms. Shelton's status).

5. When we meet to discuss these issues, it would be beneficial to establish our internal "negotiations committee training schedule" so we can factor this into our timeline.

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:              February 10, 2000

SUBJECT:           BAFO  Evaluation Timeline

TO:                IIMS Program Manager

FROM:              Captain Darrell G. Ober
                   Systems Integrator Procurement Team Leader
                   Bureau of Technology Services

1.      We are currently working with the following Systems Integrator
        BAFO timeline:

| DATES | ACTIVITY |
|-------|----------|
| February 15 – 17 | BAFO Evaluation Discussions with Voting Team |
| February 18 | Conduct Voting |
| ~~February 21~~ | Present voting results to Executive Oversight Committee |

TO DO:

- UPDATE CONTACT LIST / MEETING schedule list
- Contact L/M ; corporate level representation
   - PSP Representation
- Establish date for Ex. Ovm. Results
   - Critria used
   - How each voted
   - use scaning sheets
   - All voting committe
- Memo to cc rec: signature of content
- Invite Cuny, Floyd, Reber
- Schedule meeting

P200

**OBER, DARRELL G**

| | |
|---|---|
| **From:** | WILT, RONALD C |
| **Sent:** | Tuesday, February 15, 2000 9:33 AM |
| **To:** | DITZLER, RODNEY L; OBER, DARRELL G; 'pspnut@aol.com'; BLOCKER, TYREE C; ggrell@state.pa.us; HICKES, ROBERT C; rgreenwood@state.pa.us; tsavidge@state.pa.us; vsmithelliott@psp.state.pa.us; WAUGH, WESLEY R |
| **Cc:** | WILT, RONALD C |
| **Subject:** | Lockheed Martin Reorganization/Divestiture Plans |

As previously discussed, Lockheed Martin Corporation, one of the three Systems Integrators pursuing the IIMS Program SI role, has announced plans to reorganize certain business segments and divest others.  As such, I was instructed to request a meeting with appropriate corporate representatives to discuss the potential impact to Management and Data Systems, the business unit under the Systems Integration segment of Lockheed Martin pursuing the SI contract.  Mr. Barbee, V.P. of Integrated Technology Solutions, M&DS, made necessary arrangements.  The following Lockheed Martin representatives will be attending:

- Mr. Art Johnson, V.P., Strategic Development (a direct report to Vance Coffman, who is the Chairman, CEO, and President of LM)
- Marcus Hansen, Executive V.P. of M&DS
- Tom Carroll, proposed Program Manager for the IIMS Program

Additional profile information is forthcoming on Mr. Johnson.  I will forward it when received.

The meeting has been scheduled for Friday, February 18, 2000, in the Strategic Development Division Technology Building, 2629 Market Place, Harrisburg, PA.  Members of the IIMS Executive Oversight Committee are invited to attend the meeting.  For planning purposes, please let me know by Wednesday, 4:00 P.M., if you plan to attend.  If you have questions, please do not hesitate to reply via e-mail or call me at 657-4140.

Ron Wilt
IIMS Program Manager



PENNSYLVANIA STATE POLICE
IIMS SYSTEMS INTEGRATOR
EVALUATION OVERSIGHT COMMITTEE
MEETING
February 22, 2000

# AGENDA

9:00          Call to Order                              Captain Ober

### UPDATES

- Report on meeting with Lockheed Martin regarding divestiture

- Executive Summary  - Systems Integrator BAFO scoring
  - Captain Ober
  - Sergeant Backenstoss
  - Mr. Andy Jones
  - Ms. Sherry Greer
  - Attorney Steve Shaiman
  - Mr. George Hogshead, KPMG

- Mobile Office Initial Proposal
  - Lieutenant Robert Scott

P2202

Pennsylvania State Police



CONFIDENTIAL

## IIMS Systems Integrator Best and Final Offer (BAFO) Proposal Evaluation Results

The IIMS Systems Integrator Evaluation Team conducted formal voting on February 18, 2000 on the BAFO Proposals of the three IIMS Prime Contractors. The voting results constitute a rank order recommendation of the overall value of each Proposal. The Systems Integrator Evaluation Team recommends that the highest rated Prime Contractor be named the "Selected Prime" pending the Executive Oversight Committee and Commissioner approvals. The Selected Prime will then be notified and contract negotiations initiated. Should the Selected Prime become nonviable during contract negotiations or fail to reach an acceptable contract in a reasonable period of time, the Evaluation Team recommends initiating negotiations with the number 2 ranked Prime Contractor in accordance with the process stated in the RFQC.

| Prime Contractor | Final Weighted BAFO Score | Rank Order |
|---|---|---|
| Lockheed Martin | 742.22 of 1000 Possible Points | 1 |
| Andersen Consulting | 712.80 of 1000 Possible Points | 2 |
| IBM | 442.71 of 1000 Possible Points | 3 |

Refer to Attachment 1, Evaluation Process, for a description of the Evaluation and Voting Processes.

Refer to Attachment 2, BAFO Point Distribution and Cost Evaluation Process, for a description of the weighted point distribution and cost evaluation process.

Refer to Attachment 3, Evaluation Score Sheet for evaluation categories, weighting and detailed voting results.

### IIMS Systems Integrator BAFO Proposal Summaries

**Lockheed Martin**

*Strengths:*
- Very impressive methodologies and toolsets; proactively researching existing and emerging technologies and their applicability to IIMS
- Developed a very strong, experienced, and well suited consortium to meet the immense requirements of IIMS
- Good understanding of the role of the SI which complements PSP's concept of IIMS
- Displayed strong engineering disciplines to develop the complex Technical Architecture required for IIMS
- Demonstrated a consistently high level of research and effort to understand and develop IIMS
- Can-do corporate culture is an appropriate fit with PSP for such a complex and aggressive program as IIMS





Pennsylvania State Police

CONFIDENTIAL

- Only Prime with Systems Engineering Institute (SEI) software development and engineering certifications
- Strong Program/Project Management skills and disciplines
- Brings a wealth of very large-scale technology integration experience
- Pledges to act as an *"Honest Broker"* which will provide unbiased advice on package selections and helps prevent conflict of interest issues
- Displays the ability to start IIMS immediately and maintain the aggressive schedule mandated for IIMS
- Phase 1 twelve-month schedule appeared realistic and attainable

*Weaknesses:*
- Continued to propose consortium members holding the subcontracts for Phase 2 products after being advised that PSP had serious concerns about the Systems Integrator's ability to be responsible for contracts they do not hold
- Failed to adequately propose the Evidence/Property Management elements of IIMS and did not include costs for these areas
- Phase 2 cost estimates lacked sufficient detail to discern individual system cost
- Change Management proposal, while having merit, was not the strongest presented
- Failed to convince Evaluation Team members that the "user" will be heavily involved in the design and development of IIMS
- Objectionable contract provision proposed in "Excusable Delays" which attempts to relieve the Prime of specific responsibility for subcontractor performance

## Andersen Consulting

*Strengths:*
- Showed a great deal of understanding of the PSP's vision of IIMS
- Displayed a high level of sensitivity and understanding to the human factors affecting IIMS
- Strong Change Management philosophy
- Displayed very strong consulting expertise
- Good understanding of the "user" role in defining and developing IIMS
- Excellent Program Manager candidate
- Showed a great of responsiveness to issues covered during Continuous Discussions in their BAFO Proposal
- Provided an excellent level of system cost detail in the Phase 2 cost estimates

*Weaknesses:*
- Tied their Performance Incentive proposal to the actual NTE cost in Phase 1 after being informed explicitly not to do so



Pennsylvania State Police

CONFIDENTIAL

- Deferred some Phase 1 deliverables and their associated costs to Phase 2
- Failed to convince Team Members that their 8 month Phase 1 Schedule could be attained
- Proposal of Navigator's multitude of descriptions and functions was ill defined and confusing
- Engineering and Integration skills were not conveyed as a corporate strength
- Did not attach hours to deliverables. This becomes a Program Management weakness
- Technical Architecture was not customized to IIMS. It appeared to be boilerplate information

### IBM

*Strengths:*
- Corporate knowledge of Enterprise Network and CLEAN
- Proposed formal Phase 1 training for technical personnel
- Phase 2 cost estimates itemized in depth
- Portions of the Technical Architecture were well researched

*Weaknesses:*
- Did not display adequate understanding of PSP's vision of IIMS
- Phase 1 costs were extremely high
- Additionally, IBM assumes that PSP will provide virtually all PMO equipment, consumables and associated costs to PSP
- Fifteen month Phase 1 schedule, given their approach, is not aggressive
- Insistence on utilizing Enterprise Network contract as basis for negotiations
- User interviews appeared directed at high level management
- Emphasizes pre-packaged product selection
- Proposes final pilot test period as constituting final IIMS performance and acceptance test
- Supplied too much boilerplate general information not customized to PSP IIMS
- IBM PMO organizational chart did not fit PSP's PMO strategy

PSP CONFIDENTIAL

ATTACHMENT 1

01/06/00

## IIMS SYSTEMS INTEGRATOR
## RFQC BEST AND FINAL OFFER PROPOSAL
## EVALUATION PROCESS

**I.     PURPOSE:**   The purpose of this document is to create a record of the procedures utilized by the Pennsylvania State Police in the selection of a Systems Integrator for the IIMS Program.

**II.     OVERVIEW:**  The purpose of the Best and Final Offer (BAFO) Proposal is to provide the Department with the Primes' detailed solution, associated costs, and value in accomplishing IIMS.  BAFO Proposals will be evaluated using detailed pre-established criteria that will rank order the Primes and result in the selection of the Systems Integrator. Primes not submitting a BAFO Proposal within the established time frame will not be permitted to continue in the RFQC process.

**III.     FUNDEMENTAL QUESTION:**      There is one fundamental question the BAFO Evaluation Process is intended to address:

- Which Prime's Proposal presents the best IIMS Solution and value to the Pennsylvania State Police and to the Commonwealth of Pennsylvania?

**IV.     REVIEW OF BAFO PROPOSALS**

- To ensure uniformity and consistency in reviewing proposals, a schedule which identifies both the number of independent reviews and Voting Committee discussions will be established.
- Each member of the Voting Committee will independently review proposals.
- At scheduled intervals, the Voting Committee will meet to discuss each BAFO Proposal.  The purpose of such meetings is to assist members of the Voting Committee in identifying strengths, weaknesses, and common areas of concern of each proposal.  Additionally, the Voting Committee will estimate and establish the time needed to complete both independent review and Committee discussion prior to conducting the voting.
- Selected sub-committees shall conduct staffing reviews of proposals.   Sub-committee components will generate Comment Summary Reports to the Evaluation Committee.  Comment Summary Reports shall identify strengths and weakness of each proposal and shall not include recommendations.  Sub-committee components shall not participate in the voting process. At the discretion of the Voting Committee, sub-components may be requested to provide a presentation to the Voting Committee based on their review.  The following sub-committee components shall review BAFO Proposals:
  - KPMG
  - Enterprise Network
  - Technical Support Division
  - Attorney Stephen Shaiman (Section Five)

1

PSP CONFIDENTIAL

01/06/00

ATTACHMENT 1

- The Voting Committee will conduct BAFO Proposal voting after all members have reviewed the proposals, met and discussed them and after all sub-committee reports have been reviewed.
- The results of the Voting Committee will result in establishing a rank order and recommendation as to which Prime should be the selected Systems Integrator.

## V.    BAFO PROPOSAL EVALUATION CATEGORIES

| MAJOR EVALUATION CATEGORIES | PERCENT | POINTS |
|---|---|---|
| TAB 1.  Letter of Transmittal | 1 | 10 |
| TAB 2.  Executive Summary | 5 | 50 |
| TAB 3.  Mandatory Requirements | 1 | 10 |
| TAB 4.  Statement of Work | 60 | 600 |
| TAB 5.  General Contract Conditions | 2 | 20 |
| TAB 6.  Costs (20% - 200 points; Value 10% - 100 points) | 30 | 300 |
| | | |
| TAB 8.  Attachments and Appendices | 1 | 10 |
| TOTAL | 100 | 1000 |

- The Major Evaluation Categories listed above, and associated sub-categories will be evaluated using the Evaluation Criteria identified in item VI, as published in the RFQC, as amended.
- The BAFO scoring process will use a total of 1000 points distributed between the Major Evaluation categories.

## VI.    EVALUATION CRITERIA

The above Evaluation Categories will be evaluated using the following criteria, as amended, in the RFQC:

- Value
- Integration
- Flexibility
- Performance
- Support
- Training
- System Reliability
- Ease of Operation
- Ergonomics
- Accuracy and Availability of Information
- Implementation
- Security
- Ease of Migration
- Aggressive Schedule

2



PSP CONFIDENTIAL                                                    01/06/00

ATTACHMENT 1

**VII.    BAFO VOTING PROCESS:** The BAFO Voting Process will consist of a single voting stage, subject to the following:

- The BAFO voting will be a weighted vote on a scale of 1 through 10 on the established evaluation categories for each Proposal.
- After the BAFO voting results are tabulated, the Voting Committee will rank order the Primes by score and make a recommendation to the Executive Oversight Committee.

**VIII.    APPROVAL OF BAFO RESULTS**

- The Voting Committee will forward, in the Form of an Executive Summary, the name of the Selected Prime to the Executive Oversight Committee for concurrence.
- Upon concurrence by the Executive Oversight Committee, the IIMS Program Manager will notify each Prime in writing of the results.
- The name of the Selected Prime will be posted to the IIMS web site.
- Non-selected Primes will be notified and afforded the opportunity to attend a debriefing at a time and location to be determined by the Department.

Attachment 2

PSP Confidential

# IIMS SYSTEMS INTEGRATOR BEST AND FINAL OFFER (BAFO) PROPOSAL EVALUATION POINT DISTRIBUTION AND COST EVALUATION PROCESS

Evaluations will use 1000 available points distributed as shown below.  Voting will be on a 1 through 10 scale.

## TAB 1 – LETTER OF TRANSMITTAL – 10 POINTS

## TAB 2 – EXECUTIVE SUMMARY – 50 POINTS

## TAB 3 – MANDATORY REQUIREMENTS – 10 POINTS

## TAB 4 – STATEMENT OF WORK – 600 POINTS
   **4.1 INTRODUCTION – 0 POINTS**
   **4.2 TEAM APPROACH – 25 POINTS**
   **4.3 SYSTEMS INTEGRATOR CONTRACT STRUCTURE – 175 POINTS**
   **4.4 PROJECT MANAGEMENT – 150 POINTS**
   **4.5 TECHNICAL ARCHITECTURE – 250 POINTS**

## TAB 5 – SAMPLE CONTRACT CONDITIONS – 20 POINTS
Mr. Stephen Shaiman, Legal Counsel, will be review TAB 5 and provide a summary to the Voting Team.  The Voting Team will consider the summary prior to voting on TAB 5.

## TAB 6 – COSTS – 300 POINTS
- PHASE 1 NTE COST-180 POINTS
- PHASE 2 COSTS ASESSMENT-20 POINTS
- VALUE ASSESSMENT 100-POINTS

PHASE 1 NTE COST QUOTES

THE LOWEST PHASE 1 NOT-TO-EXCEED COST QUOTE WILL RECEIVE 100% OF THE 180 POINTS AVAILABLE FOR COST.  THE REMAINING NTE COSTS WILL BE DIVIDED INTO THE LOWEST NTE COST QUOTE.  THIS WILL YIELD A PERCENTAGE TO BE MULTIPLIED BY THE 180 AVAILABLE COST POINTS.  THIS PROCESS WILL ASSIGN COST POINTS TO THE COSTLIER PROPOSALS PROPORTIONAL TO THE RATIO OF THE DIFFERENCE BETWEEN THE LOWEST AND HIGHER COST PROPOSALS. FOR EXAMPLE: 3 PHASE 1 NTE COST PROPOSALS CONTAIN THE FOLLOWING COSTS:

PROPOSAL 1 -  $6,850,000 - WOULD RECEIVE 180 POINTS
PROPOSAL 2 -  $7,543,019 - WOULD RECEIVE 163.44 POINTS
PROPOSAL 3 - $32,071,019 - WOULD RECEIVE  38.34 POINTS

Attachment 2

PSP Confidential

PROPOSAL 1 WOULD RECEIVE 100% OF THE 180 AVAILABLE COST POINTS.
PROPOSAL 2 WOULD THEN BE DIVIDED INTO THE LOWEST NTE
$(6,850,000 \div 7,543,109 = .908)$ THIS PERCENTAGE IS THEN MULTIPLIED BY THE 180 AVAILABLE COST POINTS $(.908 \times 180)$ YIELDING 163.44.
PROPOSAL 3 $(6,850,000 \div 32,071.636 = .213)$ $.213 \times 180 = 38.34$

Phase 2 Cost Assessment

Voting Team Members will review the Phase 2 Cost Estimates and make a particularized judgement of the value of the Phase 2 Cost Estimate based on, but not limited to:

- Cost estimates amounts compared to the other proposals
- Range of Phase 2 estimated costs
- Completeness of cost detail provided
- Accuracy and/or benefits of cost assumptions

Overall Value Assessment

Definition – Value: The relationship of the quality of a proposal and its contents versus the cost. Each Voting Team Member will utilize particularized judgment in determining the value of each proposal and its contents in relation to the other Proposals.

The Voting Team will discuss the correlation of the overall quality of each Proposal to that Proposal's Cost prior to voting.

The following is a conceptual example of how evaluators may assign points:

Attachment 2 

 PSP Confidential

| Overall Quality | Cost | Vote |
|---|---|---|
| Extremely High | Extremely Low | 10 |
| Very High | Very Low | 9 |
| High | Low | 8 |
| Above Average | Below Average | 7 |
| Average | Average | 6 |
| Below Average | Above Average | 5 |
| Low | High | 4 |
| Very Low | Very High | 3 |
| Extremely Low | Extremely High | 2 |
| Unacceptable | Unacceptable | 1 |

LOCKHEED MARTIN

**Grading Guidelines**
10 Exceeds All Requirements
8-9 Exceeds Most Requirements
6-7 Exceeds Some Requirements
5 Meets All Requirements
3-4 Meets Most Requirements
1-2 Meets Some Requirements
0 Fails To Meet Any requirements

| RFQC Section | Evaluation Categories | Total Assigned Point Value (1000 Total) | Percentage of Total | Grade | Worksheet Grading (Calculated Automatically) |
|---|---|---|---|---|---|
| TAB 1 | Letter of Transmittal | 10 | 1 | 8.20 | 8.20 |
| TAB 2 | Executive Summary | 50 | 5 | 7.60 | 38.00 |
| TAB 3 | Mandatory Requirements | 10 | 1 | 10.00 | 10.00 |
| TAB 4 | Statement of Work | | | | |
| TAB 4.2 | Team Approach | 25 | 2.5 | 7.00 | 17.50 |
| TAB 4.3 | Systems Integrator Contract Structure | 175 | 17.5 | 5.40 | 94.50 |
| TAB 4.4 | Project Management | 150 | 15 | 7.20 | 108.00 |
| TAB 4.5 | Technical Architecture | 250 | 25 | 8.00 | 200.00 |
| TAB 5 | Sample Contract Conditions | 20 | 2 | 3.00 | 6.00 |
| TAB 8 | Attachments and Appendices | 10 | 1 | 8.00 | 8.00 |
| TAB 6 | Overall Value Assessment | 100 | 10 | 6.60 | 66.00 |
| | Phase 2 Cost Assessment | 20 | 2 | 5.60 | 11.20 |
| | | | | **Sub-Total Points** | 567.40 |
| TAB 6 (Not Lowest NTE) | Phase 1 NTE Cost Calculation | 180 | 18 | **Cost Points** | 174.82 |
| | Total Available Evaluation Points/Percent | 1000 | 100% | | |
| | *Enter the Lowest NTE Cost Figure | $6,556,024 | | | |
| | *Enter the NTE Cost Figure of the Prime being graded on this worksheet. | $6,750,124 | | **Total Points** | 742.22 |

FINAL CALCULATIONS
2/21/00

Grading Worksheet
PSP Confidential

Andersen

**Grading Guidelines**
10 Exceeds All Requirements
8-9 Exceeds Most Requirements
6-7 Exceeds Some Requirements
5 Meets All Requirements
3-4 Meets Most Requirements
1-2 Meets Some Requirements
0 Fails To Meet Any requirements

| RFQC Section | Evaluation Categories | Total Assigned Point Value (1000 Total) | Percentage of Total | Grade | Total Points | Worksheet Grading (Calculated Automatically) |
|---|---|---|---|---|---|---|
| TAB 1 | Letter of Transmittal | 10 | 1 | 8.40 | | 8.40 |
| TAB 2 | Executive Summary | 50 | 5 | 7.00 | | 35.00 |
| TAB 3 | Mandatory Requirements | 10 | 1 | 10.00 | | 10.00 |
| TAB 4 | Statement of Work | | | | | |
| TAB 4.2 | Team Approach | 25 | 2.5 | 7.20 | | 18.00 |
| TAB 4.3 | Systems Integrator Contract Structure | 175 | 17.5 | 6.40 | | 112.00 |
| TAB 4.4 | Project Management | 150 | 15 | 6.80 | | 102.00 |
| TAB 4.5 | Technical Architecture | 250 | 25 | 6.60 | | 165.00 |
| TAB 5 | Sample Contract Conditions | 20 | 2 | 4.00 | | 8.00 |
| TAB 8 | Attachments and Appendices | 10 | 1 | 7.60 | | 7.60 |
| TAB 6 | Overall Value Assessment | 100 | 10 | 5.20 | | 52.00 |
| | Phase 2 Cost Assessment | 20 | 2 | 7.40 | | 14.80 |
| TAB 6 (Lowest NTE) | Phase 1 — Cost for Prime with the lowest NTE. Phase 1 NTE Cost (Enter "10" in the grade column ONLY if the Prime being graded on this worksheet has the lowest NTE.) | 180 | 18 | 10 | 10 | 180.00 |
| | Total Available Points/Percent | 1000 | 100% | | | 712.80 |

FIANL CALCULATIONS
2/21/00

RFQC 1999-PSP1
Attachment 3

Grading Worksheet
PSP Confidential

IBM

Grading Guidelines
10   Exceeds All Requirements
8-9  Exceeds Most Requirements
6-7  Exceeds Some Requirements
5    Meets All Requirements
3-4  Meets Most Requirements
1-2  Meets Some Requirements
0    Fails To Meet Any requirements

| RFQC Section | Evaluation Categories | Total Assigned Point Value (1000 Total) | Percentage of Total | Grade | Worksheet Grading (Calculated Automatically) |
|---|---|---|---|---|---|
| TAB 1 | Letter of Transmittal | 10 | 1 | 7.60 | 7.60 |
| TAB 2 | Executive Summary | 50 | 5 | 6.80 | 34.00 |
| TAB 3 | Mandatory Requirements | 10 | 1 | 10.00 | 10.00 |
| TAB 4 | Statement of Work | | | | |
| TAB 4.2 | Team Approach | 25 | 2.5 | 5.00 | 12.50 |
| TAB 4.3 | Systems Integrator Contract Structure | 175 | 17.5 | 4.60 | 80.50 |
| TAB 4.4 | Project Management | 150 | 15 | 5.00 | 75.00 |
| TAB 4.5 | Technical Architecture | 250 | 25 | 6.20 | 155.00 |
| TAB 5 | Sample Contract Conditions | 20 | 2 | 1.80 | 3.60 |
| TAB 8 | Attachments and Appendices | 10 | 1 | 3.60 | 3.60 |
| TAB 6 | Overall Value Assessment | 100 | 10 | 1.60 | 16.00 |
| | Phase 2 Cost Assessment | 20 | 2 | 5.40 | 10.80 |
| | | | | Sub-Total Points | 408.60 |
| TAB 6 (Not Lowest NTE) | Phase 1 NTE Cost Calculation | 180 | 18 | Cost Points | 34.11 |
| | Total Available Evaluation Points/Percent | 1000 | 100% | | |
| | *Enter the Lowest NTE Cost Figure | $6,556,024 | | | |
| | *Enter the NTE Cost Figure of the Prime being graded on this worksheet. | $34,594,677 | | | |
| | | | | Total Points | 442.71 |

FINAL CALCULATIONS
2/21/00

RFQC 1999-PSP1
Attachment 3

Grading Worksheet
PSP Confidential

PENNSYLVANIA STATE POLICE
IIMS SYSTEMS INTEGRATOR
EVALUATION OVERSIGHT COMMITTEE
MEETING
February 14, 2000

# AGENDA

9:00          Call to Order                              Captain Ober

### UPDATES

- Status of Systems Integrator BAFO reviews
  - Voting is anticipated by 2/18
  - Presentation to Executive Oversight Committee 2/21
- Systems Integrator Negotiations
- Mobile Office Business Case Approval

### ACTION ITEMS

- None

10:30         Adjourn

Next monthly meeting: 9:00 A.M., Monday March 13, 2000

P204

# PENNSYLVANIA STATE POLICE
## IIMS SYSTEMS INTEGRATOR
### RFQC 1999-PSP1

## PROJECT COMMITTEE CONTACT INFORMATION rev. 8/30/99

| Committee | Name | Prefix | Agency | Address | Telephone | Fax | e-mail |
|---|---|---|---|---|---|---|---|
| Executive Oversight | Robert C. Hickes | LTC | PSP | Executive and Administrative Offices 1800 Elmerton Avenue Harrisburg, PA 17110 | 783-5567 | 787-2948 | Rhickes@psp.state. pa.us |
| Executive Oversight | Virginia L. Smith-Elliot | Major | PSP | Executive and Administrative Offices 1800 Elmerton Avenue Harrisburg, PA 17110 | 787-7220 | 787-2948 | Vsmithelliott@psp. state.pa.us |
| Executive Oversight | Tyree C. Blocker | Major | PSP | Bureau of Drug Law Enforcement 1800 Elmerton Avenue Harrisburg, PA 17110 | 783-8514 | 783-2935 | tblocker@psp.state. pa.us |
| Executive Oversight | Wesley R. Waugh | Major | PSP | Bureau of Technology Services 1800 Elmerton Avenue, Harrisburg, PA 17110 | 787-8596 | 705-4050 | wwaugh@psp.state. pa.us |
| Executive Oversight | Glen R. Grell | Mr. | OGC | Office of General Counsel 17th Floor, 333 Market Street Harrisburg, PA 17101 | 787-9344 | 787-1788 787-9187 | ggrell@.state.pa.us |
| Executive Oversight | Glenn Reber | Ms. | DGS | Department of General Services 414 North Office Building Harrisburg, PA 17105 | 787-5295 | 772-4696 | Greber@exec. gsinc.state.pa.us |
| Executive Oversight | Robert E. Greenwood | Mr. | OB | Office of the Budget 7th Floor, Bell Tower, 303 Walnut Street Harrisburg, PA 17105 | 787-2542 Ext. 3015 | 783-3368 | Rgreenwood@state. pa.us |
| Executive Oversight | Terri J. Savidge | Ms. | OA | JNET 1800 Elmerton Avenue Harrisburg, PA 17110 | 705-0760 | 783-6955 | tsavidge@state. pa.us |
| Voting | Darrell G. Ober | Capt. | PSP | Bureau of Technology Services Strategic Development Division 2629 Market Place Harrisburg, PA 17110 | 657-4231 | 657-4360 | dober@psp.state.pa. us |

1

P 205
1 OF 3

| Type | Name | Title | Dept | Address | Phone | Phone 2 | Email |
|---|---|---|---|---|---|---|---|
| Voting | Jeffery T. Backenstoss | Sgt. | PSP | Bureau of Technology Services Strategic Development Division 2629 Market Place Harrisburg, PA 17110 | 657-4292 | 657-4360 | jbackenstoss@psp.state.us |
| Voting | Robert L. Starr | Cpl. | PSP | Bureau of Technology Services Strategic Development Division 2629 Market Place Harrisburg, PA 17110 | 657-4293 | 657-4360 | rstarr@psp.state.pa.us |
| Voting | Andrew C. Jones | Mr. | PSP | Bureau of Technology Services Strategic Development Division 2629 Market Place Harrisburg, PA 17110 | 657-4170 | 657-4360 | ajones@psp.state.pa.us |
| Voting | Sherry R. Greer | Ms. | PSP | Bureau of Technology Services Strategic Development Division 2629 Market Place Harrisburg, PA 17110 | 657-4137 | 657-4360 | sgreer@psp.state.pa.us |
| Advisory | Kathy A. Skiles | Ms. | PSP | Bureau of Technology Services Tecnical Support Division 1800 Elmerton Avenue Harrisburg, PA 17110 | 783-5587 | 783-4384 | kskiles@psp.state.pa.us |
| Advisory | Floyd Hartley | Mr. | PSP | Bureau of Technology Services 1800 Elmerton Avenue Harrisburg, PA 17110 | 783-5580 | 772-1434 | fhartley@psp.state.Pa.us |
| Advisory | Thomas F. Jakubiak | Mr. | PSP | Office of Chief Counsel 1800 Elmerton Avenue Harrisburg, PA 17110 | 783-5568 | 772-2883 | tjakubiak@psp.state.pa.us |
| Advisory | Joseph P. Gluvna | Mr. | DGS | 414 North Office Building Harrisburg, PA 17105 | 783-0257 | 783-6241 | jgluvna@exec.gsinc.pa.us |
| Advisory | Corey McCue | Mr. | Compt | Office of the Budget 2nd Floor, Pinnick Building Harrisburg, PA 17105 | 787-8901 | 783-9536 | cmccue@state.pa.us |
| Advisory | | | OA | | | | |
| Core | Darrell G. Ober | Capt. | PSP | Bureau of Technology Services Strategic Development Division | 657-4231 | 657-4360 | dober@psp.state.pa.us |

2

| Category | Title | Name | Agency | Address | Phone 1 | Phone 2 | Email |
|---|---|---|---|---|---|---|---|
| Core | Lt. | Robert B. Titler | PSP | Bureau of Technology Services 1800 Elmerton Avenue Harrisburg, PA 17110 | 705-0143 | 705-4050 | rtitler@psp.state.pa.us |
| Core | Mr. | Rodney L. Ditzler | PSP | Bureau of Technology Services Strategic Development Division 2629 Market Place Harrisburg, PA 17110 | 657-4150 | 657-4360 | rditzler@psp.state.pa.us |
| Core | Mr. | Ronald C. Wilt | PSP | Bureau of Technology Services Strategic Development Division 2629 Market Place Harrisburg, PA 17110 | 657-4140 | 657-4360 | rwilt@psp.state.pa.us |
| Core | Mr. | Jeffrey Staas | KPMG | Bureau of Technology Services Strategic Development Division 2629 Market Place Harrisburg, PA 17110 | 657-4154 | 657-4360 | |
| Core | | | PSP | Bureau of Staff Services | | | |
| Contract Negotiations | Mr. | Floyd Hartley | PSP | Bureau of Technology Services 1800 Elmerton Avenue Harrisburg, PA 17110 | 783-5580 | 772-1434 | fhartley@psp.state.Pa.us |
| Contract Negotiations | Mr. | Corey McCue | Compt | Office of the Budget 2nd Floor, Pittnick Building Harrisburg, PA 17105 | 787-8901 | 783-9536 | cmccue@state.pa.us |
| Contract Negotiations | Mr. | Thomas F. Jakubiak | PSP | Office of Chief Counsel 1800 Elmerton Avenue Harrisburg, PA 17110 | 783-5568 | 772-2883 | tjakubiak@psp.state.pa.us |
| Contract Negotiations | Mr. | Joseph P. Glivna | DGS | 414 North Office Building Harrisburg, PA 17105 | 783-0257 | 783-6241 | jglivna@exec.gsinc.pa.us |

4/6/00 — IBM                                    DEBRIEFING

MEETING 1:10 P.M.    OPENING - OBEN          END: 2:50

GARY — PUBLIC DOCUMENT / L/M WILL GET

    — tech scores

  • What WAS SCORED?    **BAFO.**

  • INABILITY to be precise


MARY — What DID WE DO WELL.

    Prior PSP Experience? How WAS it viewed?

P206

*BEGAN 1305*
*END 1450*

# DEBRIEFING – ANDERSEN COUNSULTING    3/23/00

## STRENGTHS

- Identified very well with PSP vision of IIMS; very responsive to PSP needs
- Good balance on project team structure; good team approach and composition
- Good recognition of "human" factors and "human" consequences of implementation of sophisticated technology
- Strong Change Management section, real world approach, good understanding of PSP culture
- Capability Release Model had merit; incremental and logical
- Consolidated dispatch, good description and evidence of Pennsylvania based research
- GIS, & Mobile Office were also well done
- Good detail on cost section
- Master budget document contained detail, format and mapped schedule to cost
- Strong Project Manager
- Provided a good list of PSP positions needed and their roles

## NEUTRAL – DESERVING MENTION

- Navigator
  - Software license issues
  - Provide a jumpstart
  - Objectivity
  - Needed to expand on role of Navigator.  Is it a data model or structure?

## AREAS NEEDED IMPROVEMENT

- Overall "light" on integration, technology and engineering capabilities
- Too heavy on role as a consultant; PSP not convinced they possess the level of technical expertise, experience and maturity to execute a grand scale integration project
- Phase One NTE costs tied to incentive plan
- Project Management section not specific enough to IIMS; too much textbook information
- Quality assurance was boilerplate, not specific to IIMS, not as mature as we would have liked to see
- Same for risk management
- Security issues not strong
- Too many expectations of PSP personnel
- Performance Monitoring Tools – not sophisticated enough for a large scale project such as IIMS; *WE WERE LOOKING FOR BASELINE OF 5*
- Did not identify with "Balanced Scoresheet or Royalty Payment" concepts
- Program Management – discussed at too high of a level; not specific to PSP; failed to identify the "how"

*STEVEN*
*READ*
*MYSELF*

*P207*
*1 OF 2*

*DAVE*
*JUDY*
*CHRISTOPHER*



## DEBRIEFING – ANDERSEN COUNSULTING    3/23/00

- Did not present the issue of Enterprise Database as though they really understood what it is; no mention of Master Index
- Training – PSP uncertain if strategy will work; too dependant on PSP resources
- Failed to incorporate suggestions and requirements provided by PSP in Tab 5; indicated Andersen Consulting Role is primarily that of an advisor
- Moved detail design specifications to Phase 2 instead of completing in Phase 1

Judy- Look @ RFQc's tie back to intent; too many pages
Willing to be Flexible; eliminate entire step.

# OBER, DARRELL G

| | |
|---|---|
| **From:** | WILT, RONALD C |
| **Sent:** | Thursday, February 10, 2000 8:19 AM |
| **To:** | OBER, DARRELL G |
| **Subject:** | RE: IIMS SI Measurability |

Darrell:
Thanks for the info. I have some other ideas as well. I would like to get the SI gang together at your earliest convenience and schedule two GroupSystems sessions with a larger audience.
1.  Collect Measurability data (Include Major Waugh, possibly Oversight??, LTC, Rodney, Brian, etc.
2.  Brainstorm a Readiness Assessment (i.e., capture risk areas, logistical needs, resources required with timeframes). The result of (1) will be data to be used for negotiations, etc. The result of (2) will be an Action Item report, of which I would like to delegate to Andy (Program Controls will have Action Item and Issue resolution tracking responsibilities). Please let me know when I can get the group together. I realize that evaluation and voting are a priority, so maybe the week of February 21, before Change Management on the 24th.

When do you plan on holding the next Oversight (in addition to the one scheduled for 2-14-00)? I need to plan for MO IP approvals, which I would expect will be ready by the 21st.

May I offer this schedule, and you can give me your opinion:
February 14th - Oversight - Regular SI stuff, MO BCP approvals)
February 21st - Oversight (SI BAFO approvals, MO IP approvals)
February 22nd - Negotiation Planning Kick-Off
February 23 - Group Systems - Success Measures (a.m.); Readiness (p.m.)
February 24th - Change Management meeting (10-3) - one of my drivers

The schedule is getting booked, so anything you can do to help me juggle the schedule is appreciated.
Hope all is well (with baseball, family, apple pie, and all the important stuff)
Ron

-----Original Message-----
| | |
|---|---|
| **From:** | **OBER, DARRELL G** |
| **Sent:** | Thursday, February 10, 2000 7:31 AM |
| **To:** | WILT, RONALD C; DITZLER, RODNEY L; SCOTT, ROBERT J; KOVEL, NANCY B; ACKEN, BRIAN E |
| **Subject:** | FW: IIMS SI Measurability |

Core Team,

        The IIMS Measurability document we spoke of is attached.

DGO

-----Original Message-----
| | |
|---|---|
| **From:** | WAUGH, WESLEY R |
| **Sent:** | Tuesday, February 01, 2000 12:08 PM |
| **To:** | OBER, DARRELL G |
| **Cc:** | DITZLER, RODNEY L |
| **Subject:** | IIMS SI Measurability |

<< File: IIMSmeasurability.doc >>
---------------------------------------------------------
Major Wesley R. Waugh
Director, Bureau of Technology Services
Pennsylvania State Police
1800 Elmerton Avenue
Harrisburg, PA 17110
717-787-8596

P208

# OBER, DARRELL G

| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Monday, February 14, 2000 2:40 PM |
| **To:** | 'j.backenstoss@worldnet.att.net'; 'bobs5@prodigy.net'; 'ajones@pa.net'; 'sgreer12@aol.com'; 'ghogshead@kpmg.com'; 'sas@stevenslee.com' |
| **Cc:** | WILT, RONALD C; OBER, DARRELL G |
| **Subject:** | SI Stuff - Live from Strategic Development Division |

Systems Integration Team:

We have finished our Executive Oversight Committee Meeting. A number of things to pass on to you:

- Wednesday's meet and discuss (2/16/00). Due to the Strategic Development Division building dedication, I have reserved the classroom at the Bureau of Liquor Control Enforcement. The address is: 3655 Vartan Way, Harrisburg; telephone number 540-7410. Direction: Continue north on Progress Avenue past Interstate Drive; go past Camelot Village apartment on your left; go through one traffic light; Vartan Way will be on the right. Follow to LCE (you will pass the PSTA building. If you come to a daycare center or Widner University, you went too far).
- We have use of the High-Tech Conference Room on Friday and Group Systems to conduct voting.
- The Committee expressed concerns re: L/M internal restructuring. Selected members of the Committee would like to meet with corporate level representatives from L/M to discuss. The Voting Committee should also be involved. Ron has contacted Mr. Barbee and relayed our concerns and has asked for a corporate level representatives meet and discuss with us a.s.a.p. I am awaiting his response. LTC Hickes and Glen Grell.
- After voting, the Executive Oversight Committee is expecting the following:
- All members of the Voting Committee to be present (Cpl. Starr can be excused due to vacation conflict) as well as Mr. Hogshead and Attorney Shaiman. The Executive Summary Report should include:
  The criteria utilized a breakdown of scoring.
  A summary of strengths and weaknesses of each proposal.
  A breakdown of points assigned to each area.
  Members of the Voting Committee must be prepared to discuss their individually assigned scores for any/all proposals.

With respect to the negotiation, the Committee suggested forward correspondence (I will take care of) to determine who has signature responsibility authority. We should also extent an invitation to Corey.

I will forward any additional information I come across.

DGO

P209

# OBER, DARRELL G

| | |
|---|---|
| **From:** | OBER, DARRELL G |
| **Sent:** | Friday, January 07, 2000 7:48 AM |
| **To:** | 'sas@stevenslee.com' |
| **Cc:** | OBER, DARRELL G |
| **Subject:** | FW: Steve Shaiman Re: meeting Commissioner |

Stephen,

      As per Rodney's message, the Commissioner would like to meet with you. I do not believe we have firmed up a schedule for next week. Inasmuch as BAFO's are due Friday, it may be good to get together next week and get your input on things such as our review and voting process, clean up any loose ends, etc. The Executive Oversight Meeting is scheduled for Monday (9:00 - 10:30) and you are welcome to attend. Perhaps that is one optional date we could provide the Commissioner. I have no other conflicts the remainder of the week.

      On a related note, I was informed this week, upon order of the Commissioner, Friday January 14, will be my last day on this project. I would like to discuss with you the risk now imposed on the project by such action.

DGO

-----Original Message-----

| | |
|---|---|
| **From:** | DITZLER, RODNEY L |
| **Sent:** | Thursday, January 06, 2000 3:17 PM |
| **To:** | OBER, DARRELL G |
| **Cc:** | WILT, RONALD C |
| **Subject:** | Steve Shaiman Re: meeting Commissioner |

Darrell:

      In our meeting with the Commissioner yesterday, he expressed an interest that he would like to meet Steve. Please provide a list of dates that Steve will be in Harrisburg so that we can potentially select some dates for the meeting.

      Thanks,
        Rod

P210

1

**From:** Bucher, Vickie A
**Sent:** Wednesday, August 22, 2001 10:06 AM
**To:** Dewire, Phillip L
**Cc:** Christie, Barbara L; Reynolds, Joanna N
**Subject:** Need for Contact Person



Paw Print.gif

        In connection with the Stare v. Williams & PSP lawsuit, we are requesting that a contact person be appointed to help our office gather some needed documents. Previously, Capt. Alfred Campbell had been appointed as contact person. Upon his retirement, Capt. Darryl Ober took over that position, but due to pending litigation, we would prefer to have another individual from BLCE appointed as contact person. Please advise. Thank you.

Vickie Bucher
PSP, Legal Office

P211

1

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:          January 4, 1999

SUBJECT:       Permanent Assignment of Captain Cynthia L. Transue
               to the Republican National Convention Task Force

TO:            Commissioner

FROM:          Lt. Colonel Joseph H. Westcott
               Deputy Commissioner of Operations

ENCLOSURE:     (1)    Correspondence regarding "Subject" from Major Robert G.
                      Werts, to the Deputy Commissioner of Operations, dated
                      December 28, 1998.

          1.    I fully concur with the recommendation as submitted by Major
Robert G. Werts in Enclosure (1).

          2.    Captain Transue's considerable work experience in the
southeastern section of Pennsylvania, coupled with her proven command and
organizational skills as displayed during the 1997 Presidential Summit in
Philadelphia, make her an excellent candidate for the Department's
Planning/Liaison Officer for the upcoming Republican National Convention.

          3.    Additionally, Captain Transue's appointment as the
Planning/Liaison Officer, in such a high profile event as the Republican National
Convention, will demonstrate the Department's commitment to placing qualified
female personnel in critical positions of leadership and command.

          4.    Based on the information provide herein and in Enclosure (1),
I request that Captain Cynthia L. Transue be assigned as the full-time Pennsylvania
State Police Planning/Liaison Officer for the 2000 Republican National Convention,
effective July, 1, 1999. Pending your approval, Captain Transue would also be
required to attend periodic related organizational meetings prior to July 1, the first
of which is scheduled for January 12, 1999.

          5.    Thank you for your expeditious consideration of this matter.

P-212

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

DATE:           December 28, 1998

SUBJECT:        Recommendation:  Permanent assignment of Captain Cynthia L. Transue to
                Republican National Convention Task Force

TO:             Deputy Commissioner of Operations

FROM:           Major Robert G. Werts
                Commander, Area VI
                Area Command Headquarters, Bethlehem

1.      In 1997 the Pennsylvania State Police provided security and transportation for State Executive, their wives, families and other dignitaries during the Presidential Summit in Philadelphia, PA.  The after action report of that operation clearly suggests that an individual be identified well in advance and that that person be permanently assigned to handle planning and liaison with other law enforcement agencies.

2.      In addition to the foregoing, during our recent trip to San Diego, California, both San Diego Police Department and the California Highway Patrol strongly recommended that that assignment be made as soon as possible.  The Philadelphia Police Department, the United States Secret Service, and the Federal Bureau of Investigation have already identified members of those agencies who will be their contact and liaison for the Republican National Convention in 2000.  I am therefore requesting we identify an individual to meet that responsibility.

3.      The individual who would serve in this capacity would in fact have two responsibilities.  The first would deal with planning.  Planning will encompass the number of persons the Department will commit to this event.  What equipment will be utilized and when and where it would be needed.  An overall Task Force Operation Plan will have to be developed over the next year.  It is imperative that an individual be assigned to this on a daily basis to insure our plan has the desired effect.

4.      Our "planner" will have to deal with a number of technical specialist.  First and foremost in the field of communication.  This will involve our radio system.  A decision will have to be made as to whether the present system and/or the new 800 megahertz system will be utilized.  Cell phones and the companies that provide that services.  Computers and specialist that can handle down-linking video information.  It may also include dealing with specialist to deal with explosives, when planning for terrorist activities.

Recommendation:  Permanent assignment of Captain Cynthia L. Transue to
Republican National Convention Task Force
Page 2

5.    Planning  must also include the completion of the AFTER-ACTION
Report.  This will be vital for the success of future operations of a similar nature.

6.    The second responsibility this individual will have is the one of liaison.
The following is only a partial list, as it continues to grow each day, of those agencies we
will interact with to prepare for this convention.

1.    United States Secret Service
2.    Federal Bureau of Investigation
3.    Alcohol, Tobacco, and Firearms
4.    United States Capitol Police
5.    New Jersey State Police
6.    Delaware State Police
7.    Illinois State Police
8.    California Highway Patrol
9.    Philadelphia Police Department
10.   San Diego Police Department
11.   Camden New Jersey Police Department
12.   Republican National Convention Security Representative
13.   Hotel Security at nearly 40 Hotels in the greater Philadelphia area
14.   Nearly 50 other municipal Police Departments in Southeastern Pennsylvania
15.   Delaware River Port Authority
16.   Pennsylvania Emergency Management Agency
17.   Pennsylvania National Guard
18.   United States Coast Guard
19.   Railroad Police including Conrail and Amtrack
20.   Philadelphia Airport

7.    For the foregoing reasons I have requested you identify one individual
to be detached to Area VI.  Further, that an office and sperate phone line be made
available at Troop K Headquarters for this position.  I am recommending Captain Cynthia
L. Transue, Director of Programming Division, Bureau of Research and Development, for
this position based on the following criteria.

a.    Captain Transue was born and raised in Bucks County.  She
has been stationed at Belmont Barracks both as a Trooper and
a Corporal.  This has given her a unique familiarization with
both the city and the highway system in and around that area.

Recommendation:  Permanent assignment of Captain Cynthia L. Transue to
Republican National Convention Task Force
Page 3

b.    She is a graduate of the F.B.I. National Academy and knows
and has dealt with a number of Federal Law Enforcement
Agencies during her career.  She holds the rank of Captain
and I believe to deal with these and other officials the
Department must show the importance it gives to this event by
assigning an individual of this rank.

c.    I cannot detach a Troop Commander for this period of time
without jeopardizing the Troop Operations.  While the position
she presently holds is vital and important, it is not specific in
nature, i.e., Patrol - B.C.I. - Tech Services.  Rather, it is more
general and would therefore have less impact on the overall
operations if she were assigned to this position.  In addition,
there are members assigned to the Bureau of Research and
Development who have been there for a much greater time
than Captain Transue and have been in an acting status in the
past during her absence.

d.    Captain Transue handled aspects of the planning of the
C.A.L.E.A. Recertification and Conference and dealt with some
transportation issues that may be needed during the
Republican National Convention.

e.    She has previous experience in dealing with this type of event.
She worked in the Task Force Operations Plan for the
Presidential Summit in April 1997.  She has the ability to work
well with others.

8.    I have attempted to utilize the same "Team Members" that made the
Presidential Summit a success for this Department.  Captains Oleyniczak, LaCrosse,
Kohuth, Pawlowski, and Transue were all part of that successful team.  Consistent with the
foregoing, my recommendation for this position is Captain Transue.

9.    It is my position at this time and my recommendation that this position
not be filled until July 1, 1999.  If I can offer any other additional information, please do not
hesitate to call me.

RGW:mr

xc:    Area VI file

**DATE:**          January 26, 2000

**SUBJECT:**       Preparation for the National Governor's Conference

**TO:**            FILE

**FROM:**          Major R. Dane Merryman
                   Director, Bureau of Research and Development

     1.      In discussion with Major Lyle Szupinka this date concerning a staffing request for the National Governor's Conference, I asked Major Szupinka if preparations were "pretty much wrapped up." Major Szupinka responded "About 90%.  All we are waiting for is for them to tell us where some of the events will be held."

     2.      The staffing request was for two members from this Bureau to be assigned to the detail.

P214

```
                                                        PAGE  1 OF  1
XBRD41-01151 S XPSL41-00002 04/07/99 11:39:37 - 04/07/99 10:21:51 BZ2LCK0PJSAC
    XPSL41 P,
```

     JECT:      DETACHED STATUS

TO:            AREA, TROOP AND STATION COMMANDERS
               AND BUREAU DIRECTORS

          1.  EFFECTIVE THURSDAY, JULY 1, 1999, CAPTAIN CYNTHIA L. TRANSUE,
DIRECTOR, PROGRAMMING DIVISION, BUREAU OF RESEARCH AND DEVELOPMENT, WILL BE
DETACHED TO THE COMMANDER, AREA VI, UNTIL THE CONCLUSION OF THE REPUBLICAN
NATIONAL CONVENTION THAT WILL BE HELD IN PHILADELPHIA IN AUGUST, 2000.

          2.  THERE IS NO NEED TO ACKNOWLEDGE THIS MESSAGE.

AUTH/COLONEL PAUL J. EVANKO/COMMISSIONER/PSP

P215

SP 3-200 (12-93)

99-5
Personnel Order
Research and Development
June 16, 1999





## PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

SUBJECT:        Transfers and Detached Status

TO:             All Bureau Personnel

FROM:           Director, Bureau of Research and Development

1.    Effective May 15, 1999, Corporal Edgars Linauts, Troop T, King of Prussia,  was transferred to the Bureau of Research and Development, Planning Division.

2.    Effective June 26, 1999, Trooper Sandra L. Miller will be transferred to the Bureau of Forensic Services.

3.    Effective July 1, 1999, Captain Cynthia L. Transue will be detached to the Commander, Area VI, until the conclusion of the Republican National Convention that will be held in Philadelphia in August 2000.

4.    Effective July 10, 1999, Corporal Raymond J. Cook will be transferred to the Bureau of Criminal Investigation.

5.    Effective July 10, 1999, Trooper Andrew J. Phillips, Troop H, Carlisle, will be transferred to the Bureau of Research and Development, Planning Division.

R. Dane Merryman
Major        PSP

P216

# National Governors' Association

### State College, July 8–July 11, 2000

The Commonwealth of Pennsylvania hosted the National Governors' Association (NGA) Annual Summer Business Meeting, July 8 through July 11, 2000, at the Pennsylvania State University, University Park. The NGA meetings bring together the Nation's Governors and other national and international dignitaries, to address the most pressing issues from current events and government. Thirty-eight Governors attended the meetings with their families and staff. Extensive media coverage and large demonstrations accompanied the event. Daily attendance was between 1,200 and 1,500 people.

The Pennsylvania State Police mission for this event was to provide transportation and security for the Governors and their families. Troopers had to balance the rights of demonstrators and freedom of speech against the safety of the dignitaries and the security of the community. The event involved 2 years of planning between event organizers, the NGA, the staff of State College, NGA 2000, the Office of Governor Tom Ridge, and the Pennsylvania State Police.

The Pennsylvania State Police was the lead law enforcement agency at the NGA. The State Police was responsible for coordinating security issues with all involved agencies at the federal, state, and local levels. Personnel from each Troop, Bureau, and Office were assigned to assist at the event. All personnel displayed integrity and professionalism and completed the mission of the State Police without a significant incident or disruption to the meetings.



P217

## OBER, DARRELL G

From:           PSP Commissioner
Sent:           Wednesday, August 09, 2000 3:35 PM
To:             Everyone
Subject:        NGA and RNC

A JOB WELL DONE

With the conclusion of the National Governor's Convention and the Republican National Convention, I would like to take this opportunity to thank everyone for their performance, both those who were assigned to the events and those who took care of business in the Troops and Bureaus.

The pride and professionalism of the Pennsylvania State Police was readily apparent at both events. Everyone in the Department should be very proud of our accomplishments. It would be impossible to thank everyone individually for their contributions to making these events a great accomplishment for our Department.

We had been planning for the NGA and RNC literally for years. The plans and preparations were nothing less than extraordinary. The coordination with literally hundreds of organizations and thousands of people, including local, state and federal agencies was astounding.

While we were well prepared for every contingency, plans are worthless without the people in our organization making things happen. I can sum up our performance in only one word, PROFESSIONAL. Every person went above and beyond the call of duty in performing their duties. Everyone played a significant part in assuring our flawless performance at these events.

Let me emphasize the fact that there were NO small tasks or assignments during these events. Individual opinions of our entire Department at these events were often based on a single contact with a single Trooper or employee. I am sure that there are some people who formed an opinion about the Pennsylvania State Police based on seeing a single Trooper in his/her uniform. All the comments have been, without exception, very positive.

It is important that I thank not only those of you who were assigned to the events, but also those who handled our normal business. You were equally responsible for the success of these events. While personnel were at the NGA and the RNC, the rest of you contributed to our high achievements by increasing your workload and assuring that we continued to provide professional police services to our communities.

I am very proud of this Department and the total TEAM EFFORT displayed by all of you. I salute and thank each and every one.

Sincerely,
Colonel Paul J. Evanko
Commissioner

*P218*

MONWEAL H OF PENNSYLVANIA
502                          REV. 6-97

# DESK MEMORANDUM

BJECT        Position Consideration Request – Legislative Affairs Office

| (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| irector, Bureau of Technology Services | Capt. Darrell G. Obe |

| ATE SENT      January 18, 2000 | DATE DUE |
|---|---|

| | | | |
|---|---|---|
| PLEASE CALL | APPROVAL | SEE ME |
| RETURNED YOUR CALL | AS REQUESTED | COMMENT |
| INFORMATION & FILE | PREPARE REPLY/REPORT | NOTE AND RETURN |
| NECESSARY ACTION | SIGNATURE | |

| RECEIVED BY | DATE | TIME |
|---|---|---|

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| Deputy Commissioner of Staff | RCH | 1/21/00 | | | |
| Commissioner's AO | | | | | |
| Commissioner | | | | | |

MESSAGE:

P219

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:        January 17, 2000

SUBJECT:     Director, Legislative Affairs Office

TO:          Commissioner
             (Through channels)

FROM:        Captain Darrell G. Ober
             Systems Integrator Procurement Team Leader
             Bureau of Technology Services

1. This officer kindly requests consideration for the position of Director, Legislative Affairs Office, which was recently vacated due to the retirement of Major Richard D. A. Morris.

2. I have given careful thought to the duties and responsibilities of this position. Given my variety of experience, administrative background, solid interpersonal and leadership skills, I would make an excellent choice for this position.

3. By way of reference, I have attached a resume. At your convenience, I am available to further discuss this most important assignment should you deem such action necessary.

4. Thank you for your consideration.

P220

# RESUME
# CAPTAIN DARRELL G. OBER

Home Address
71 Millers Gap Road
Enola, Pennsylvania 17025
Home Telephone: (717) 790-0708
Work Telephone: (717) 657-4231

## DEPARTMENT EXPERIENCE

**April 1999 to Present** – Selected by the Commissioner of the Pennsylvania State Police to serve as the Team Leader for the Incident Information Management System (IIMS) Systems Integrator Procurement Process. In this capacity, my assignment was to create an organization project structure designed to secure the services of a systems integrator for the Pennsylvania State Police. This integration project is the largest technology project of its kind in the history of law enforcement.

**May 1998 to April 1999** - Assigned as the Director, Internal Affairs Division, Bureau of Professional Responsibility. The position involves managing the internal affairs function of approximately 4,100 enlisted and 1,500 civilian personnel. Direct management is provided in the form of leadership to three sections, each comprised of a Lieutenant, three or four investigators, and the administrative staff. Members of the Internal Affairs Division conduct administrative and criminal investigations, Supervisory Inquires, and Attorney Work Products.

**March 1995 to May 1998** – Promoted to Captain and assigned as the Director, Systems and Process Review Division, Bureau of Professional Responsibility. This position involves supervising the inspection activities of approximately 160 Department components. Oversight is provided in the form of leadership to three sections, each comprised of a Lieutenant and three non-commissioned officers. The Systems and Process Review Division is responsible for conducting in-depth inspections of Department personnel and installations. Inspections include evaluations of reporting procedures, policies and procedures, as well as determination of compliance levels of both Department policy and standards established by the Commission on Accreditation for Law Enforcement Agencies (CALEA). A thorough working knowledge of Department rules, regulations, cultural effects, and application of process modeling is fundamental to this position. I am a charter member of the Systems and Process Review Division. As Division Director, I am responsible for the complete rewrite of Operations Manual 7-4, Inspections; creation of the Systems and Process Review Service Evaluation Form; implementation of a training program for property management; establishing a line inspection program for the Bureau of Professional Responsibility; and creation of a Division newsletter for dissemination of internal information.

1

# RESUME
## CAPTAIN DARRELL G. OBER

**March 1993 to March 1995** – Promoted to Lieutenant and assigned as the Central Section Commander, Systems and Process Review Division, Bureau of Professional Responsibility. My initial administrative responsibilities included developing Department policy, candidate selection criteria, and internal procedures for the newly-created inspection Division. Upon staffing, my duties expanded to include operational responsibilities of the Central Section, comprised of Troops F, G, H, all Bureau headquarters, and decentralized components co-located in the aforementioned Troops.

**March 1991 to March 1993** – Promoted to Sergeant and assigned as Supervisor, Systems and Procedures Section, Programming Division, Bureau of Research and Development. My duties in this position included supervising the development, writing, editing, revising, and staffing of the entire Department directives system Suggestion Program, Records Management Units, and clerical staff.

**August 1989 to March 1991** – As a result of a competitive selection process, I was selected and transferred to the Systems and Procedures Section, Programming Division, Bureau of Research and Development, as a staff analyst. My duties included writing, editing, revising, and preparing assigned Department draft directives for the Commissioner.

**September 1988 to August 1989** – Requested and received a preference transfer to Troop G, McConnellsburg. Performed supervisory functions in the Patrol Unit.

**February 1988 to September 1988** – Promoted to Corporal and transferred to Troop T, Bowmansville. Performed supervisory functions in the Patrol Unit.

**June 1985 to February 1988** – Requested and received a preference transfer to Troop G, McConellsburg. Performed general police duties in both the Patrol and Criminal Investigation Units.

**September 1983 to June 1985** – Requested and received a preference transfer to Troop D, Mercer. Performed general police duties in traffic and criminal investigations.

**December 1981 to September 1983** – Assigned to Troop S, Mercer. Performed general police duties in traffic and criminal investigations.

**July 1981** – Enlisted in the Pennsylvania State Police on July 20, 1981.

## TRAINING

Advanced In-Service Training, sponsored by the Department, include the following: Radar; Statements and Confessions; Intoxilyzer Certification; Criminal Investigation; Annual Pistol Qualification; Advanced First Aid and Emergency

2



# RESUME
## CAPTAIN DARRELL G. OBER

Care Courses; Operation Whiteline; Aids Awareness; Stress Management; Ethnic Intimidation and Institutional Vandalism; Carnival Fraud; Interview and Interrogation Technique Course; Kinesics Interviewing; Ethics Training; Worldwide Lessons in Leadership; Basic Supervision; Cult Investigation; Basic and Advanced Police Executive Training (POLEX); Professionalism, Proper Conduct and Civil Liability; Issues for Consideration as Professional Law Enforcement Manager; and annual updates.

Out-Service Training: Office of Administrative courses to include the following: Effective Writing; The Basics of Writing Policies and Procedures; Conflict Management; Personnel Selection Interviewing; Managing for Government Responsiveness. Other courses to include: State Nuclear-Biological-Chemical Officer Training in Planning, Preparedness and Response to Terrorist Incidents Involving Weapons of Mass Destruction (PEMA); How to Conduct Internal Investigations; Official Misconduct and the Independent Counsel Power; Internal Affairs, Managing Citizen Complaints and Employee Discipline; Character-Based Behavioral Training (Ohio State Highway Patrol). I have attended the New York State Police Internal Affairs Bureau Conference -1999; International Association of Chiefs of Police -- Advanced Internal Affairs: Proactive Steps for Corruption Prevention; Portsmouth, New Hampshire.

Other Out-Service Training includes the following: Internal Audit and Staff Inspection sponsored by Rollins College, Winter Park, Florida; and Comprehensive Staff Inspections Training Workshop, sponsored by The Institute of Police Technology and Management, Jacksonville, Florida.

## EDUCATION

Pennsylvania State University
University Park, Pennsylvania
(Cum laude)

Bachelors of Science Degree
Administration of Justice
May 1979

Pennsylvania Law
Enforcement Academy
Scotland, Pennsylvania
(Class rank: 1)

Act 120 Certification
April 1980

## ADDITIONAL DEPARTMENT RESPONSIBLITIES

In addition to my regular duties, I have served as the Department representative on the Cadet Background Investigation Screening Board; the Chairman, Background Investigation Hearing Board; and as the Cadet Dismissal Hearing Officer.

I am also one of the Emergency Preparedness Liaison Officers for the Pennsylvania Emergency Management Agency.

# RESUME
## CAPTAIN DARRELL G. OBER

I have been selected to serve on Oral Board Promotion Panels for both the Pennsylvania (for Corporals) and Virginia State Police (for Lieutenants).

AR 1-1
7/31/97

Organizational segments which comprise the Commissioner's Personal Staff are as follows:

1.    Executive Officer to the Commissioner:

    a.    Assists the Commissioner in general and administrative affairs.

    b.    Represents the Commissioner and the Department at public functions, at the direction of the Commissioner.

    c.    Performs other duties as the Commissioner may direct.

2.    Legislative Liaison Office:

    a.    Represents the Commissioner before Senate and House committees by testifying on legislative issues which impact upon the Department.

    b.    Keeps the Commissioner and Deputy Commissioners informed on legislative matters of interest to the Department.

    c.    Represents the Commissioner at legislative functions sponsored by members of the General Assembly.

    d.    Attends sessions of the General Assembly, including committee meetings, to keep apprised of all developments and comments in the legislature which may affect the Department.

    e.    Maintains files on legislation introduced in the General Assembly which may affect the Department.

    f.    Furnishes affected Bureaus with copies of legislation which may have a direct bearing on the functional responsibilities of that particular Bureau.

P222

AR.1-1
7/31/97

g.  Obtains comments and/or proposals from Bureaus on newly-introduced legislation, and distributes the comments and/or proposals to the appropriate Committee Chairperson.

h.  Assists members of the General Assembly in dealing with and/or resolving constituent problems involving the Department.

i.  Coordinates security with the Capitol Police prior to and during any demonstrations at the State Capitol Complex.

3.  Municipal Police Officers' Education and Training Commission:

a.  Establishes and maintains training standards for all municipal and campus police officers in the Commonwealth.

b.  Establishes and maintains standards for instructors, schools, curriculum for municipal police training in the Commonwealth.

c.  Establishes psychological and physical standards for certification or decertification of municipal police officers.

d.  Responsible for recertifying Commonwealth municipal police officers on a biennial basis through verification of firearms qualification, CPR, and first aid certifications.

4.  Office of Chief Counsel:

a.  Advises the Commissioner, Deputy Commissioners, and Bureau Directors by rendering opinions on legal questions arising out of Department functions.

b.  Represents the Department, or individuals thereof, in civil actions before State and federal courts, and administrative agencies and boards, or coordinates

*I Received this*
*memo in my In-Basket*
*on my return to*
*ity on 8/3/99.*

August 24, 1999

Mr. Marc Infantino
Pennsylvania State Police
Bureau of Staff Services
1800 Elmerton Avenue
Harrisburg, PA  17110

Dear Mr. Infantino:

    I am writing to inform you that Captain Darrell Ober will no longer be able to continue as a member of the Pennsylvania State Police Centennial Committee.

    As you probably are aware, Captain Ober was detached from his position of Director, Internal Affairs, Bureau of Professional Responsibility, and temporarily assigned to the Bureau of Technology Services. Captain Ober is currently the Team Leader for System Integrator Procurement for the Incident Information Management System of the Department's Automation Project.  As such, his duties prevent him from working with the Centennial Committee.   The System Integrator Project is at a crucial juncture, the competitive bidding project, which involves a mutli-million dollar contract, has recently been published.  As a result, we must devote significant resources to this project inasmuch as it will have a profound impact on our future.

    It is my understanding that because of your energy and enthusiasm, the Centennial Committee is well on its way to publishing a quality historical book for our 100th Anniversary in 2005.  While I am sure that Captain Ober will be missed on this important project, it is a priority of this administration that we successfully integrate all of our electronic resources.

    I appreciate your understanding in this matter and look forward to receiving a copy of the historical book at our 100th Anniversary.

                                        Sincerely,

                                        Colonel Paul J. Evanko
                                        Commissioner

TKC/sks
cc:    Deputy Commissioner of Staff
       Captain Darrell Ober
       File

*P223*

STD-501. 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:          September 2, 1999

SUBJECT:      Temporary Assignment to Higher Rank or Classification

TO:          Sergeant Stephen Valencic
              Harrisburg District Office, Bureau of Liquor Control Enforcement

FROM:       Major Francis E. Koscelnak
              Director, Bureau of Liquor Control Enforcement

REFERENCES:     (a)    Bureau Special Order 99-5, dated February 17, 1999 relative to the Subject.

               (b)    Administrative Regulation 4-11, Temporary Assignment to Higher Rank or Classification.

      1.    In accordance with the provisions of References (a) and (b), you are hereby notified to assume a temporary assignment of a higher rank/classification, as follows:

       (a)    Rank/Classification:     Acting Central Section Commander - 74050

       (b)    Location Code:        5460

       (c)    Date and Time Assigned:  08/31/99 - 0815 hours

       (d)    Date and Time End:     Indefinite.

       (e)    Remarks:            The Central Section Commander is on a temporary assignment in the Bureau of Patrol.

FEK/mp

cc:  B. Deimler
     File

P224

STD-501. 9-86

COMMONWEALTH OF PENNSYLVANIA

`TE:            January 13, 2000

SUBJECT:       Legal Action Against Department Personnel

TO:            Chief Counsel

FROM:          Major Francis E. Koscelnak
               Director, Bureau of Liquor Control Enforcement

REFERENCES:    (a)    FR 3-3.

               (b)    FR 5-4.

               (c)    Notification of Chief Counsel's Office on January 12, 2000 by
                      Telephone of the Arrest of Lieutenant Huston Williams, Jr.

ENCLOSURES:    (1)    Police Criminal Complaint and Affidavit of Probable Cause
                      dated January 11, 2000 charging Lieutenant Huston Williams, Jr.
                      with criminal conduct.

               (2)    Correspondence STD-501 dated January 12, 2000 from Captain
                      Leonard H. McDonald, Director of Operations, concerning Subject.

               (3)    CLEAN Message dated January 12, 2000.

       1.      On January 11, 2000, Lieutenant Huston Williams, Jr. was charged in a
criminal complaint with four (4) counts of indecent assault, Section 3126-(a) (1) of Title 18.
Consistent with Reference (a), he was suspended without pay.

       2.      Lieutenant Williams has requested that the Commonwealth provide him
with legal representation in this matter.

       3.      Upon reviewing Enclosure (1), the criminal conduct referred to occurred
while Lieutenant Williams was on duty.  Although he was on duty, the conduct he is charged with
was unlawful and illegal.


FEK/awb

   : File

P225

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

DATE:          September 2, 1999

SUBJECT:       Restricted Duty Status –
               Lieutenant Huston Williams, Jr.

TO:            Department Disciplinary Officer

FROM:          Major Francis E. Koscelnak
               Director, Bureau of Liquor Control Enforcement

ENCLOSURE:     (1)    Copy of Memorandum dated September 1, 1999 relative to Subject.

        1.     Enclosure (1) is forwarded for your information.   Captain Leonard H.
McDonald, Director of Operations, provided the original correspondence to Lieutenant Williams
this date.

FEK/awb

cc:  File

P226

STD–501, 9–86

COMMONWEALTH OF PENNSYLVANIA

DATE:    September 1, 1999

SUBJECT:    CONFIDENTIAL
Duty Status - Restricted

TO:    Lieutenant Huston Williams, Jr.
Central Section Commander

FROM:    Major Francis E. Koscelnak
Director, Bureau of Liquor Control Enforcement

REFERENCE:    (a)    FR 3-3, Discipline, dated January 21, 1993.

1.    You are hereby notified, effective immediately, that you are being placed on restricted duty status per Reference (a).

2.    During the time you are on restricted duty status, you are subject to the following conditions:

a.    You are hereby advised that you will be performing the duties as specified by the Director, Bureau of Patrol.

b.    You shall cooperatively participate in all investigations of your conduct and answer all questions pertaining to your position as a Pennsylvania State Police Officer completely, truthfully and to the best of your ability.

c.    You shall not interfere, impede or attempt to interfere and/or impede this investigation.

3.    In the event it is necessary to contact any personnel of the Bureau of Liquor Control Enforcement for any reason, contact shall be made through Captain Leonard H. McDonald, Director of Operations.

RECEIVED BY _Lt. Huston Williams_    DATE _09/02/99_ TIME _1010 Hours_

FEK/awb

cc:  Capt. McDonald
Disciplinary Officer    File

P227

PSP   Personnel   Hbg   717 ⬤ 772 1436          01/27 '00 16:42 NO.137  02/03

STD-501, 9-86                                              COMMONWEALTH OF PENNSYLVANIA
                                                                      **CONFIDENTIAL**

DATE:        January 27, 2000


SUBJECT:     Suspension Benefits -
             Lieutenant Huston Williams, Jr.


TO:          Director, Bureau of Liquor Control Enforcement
             ATTN: Lieutenant Williams


FROM:        Linda M. Bonney, Director
             Bureau of Personnel


REFERENCE:   (a)    State Police Health Program Handbook.


ENCLOSURE:   (1)    Pennsylvania State Police Health Program form (F-200).


     1.    As a result of Lieutenant Huston Williams' suspension effective January 12, 2000, benefits are affected as follows:

        a.    Blue Cross, Blue Shield, and Major Medical coverages will end January 31, 2000, the end of the grace period as addressed in Reference (a). The local Blue Cross plan will generate a non-group conversion notice and Lieutenant Williams may continue these benefits by paying the monthly premiums.

        b.    Vision, dental, prescription drug, Doctor Office Visit, and Emergency Counseling benefits will also end January 31, 2000. There are no provisions for the direct billing of these benefits coverages. The prescription drug identification card shall be mailed to the Bureau Director at the end of the grace period and retained in the Bureau office.

        c.    Group life insurance coverage in the amount of $40,000 will continue provided that he chooses to pay the State-rate premiums. This office will bill him directly.

     2.    An F-200 reflecting the above changes was completed by this office. The Bureau office copy is attached as Enclosure (1).

     3.    Should Lieutenant Williams return to an active-duty status, his benefits will be reinstated accordingly.

     4.    A copy of this correspondence has been sent to Lieutenant Williams' residence.

     5.    Questions regarding any of the above may be directed to Sonya C. Augustine, Retirement and Benefits Section, Bureau of Personnel, at 717-772-6935.

*P228*

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:            May 30, 2000

SUBJECT:         Temporary Assignment to Higher Rank or Classification

TO:              Captain Leonard H. McDonald
                 Director, Division of Operations
                    ATTN:  Sergeant Stephen Valencic

FROM:            Major Francis E. Koscelnak
                 Director, Bureau of Liquor Control Enforcement

REFERENCES:  (a)    Bureau Special Order 99-5, dated February 17, 1999,
                    regarding Subject

             (b)    Administrative Regulation 4-11, Temporary Assignment to Higher
                    Rank or Classification

        1.       In accordance with the provisions of References (a) and (b), you are
hereby notified to assume a temporary assignment of a higher rank/classification, as follows:

             (a)    Rank/Classification:      Acting Central Section Commander
                                              74050

             (b)    Station Code:             5460

             (c)    Date and Time Assigned:   05/30/00 - 0815 hours

             (d)    Date and Time End:        Until such time as the
                                              position of Central Section
                                              Commander is filled.

             (e)    Remarks:                  The individual in the position of
                                              Central Section Commander
                                              has been reassigned.

FEK/mp

cc:  B. Deimler
     File

P229

3/9/00

INSID

# Trooper sues after transfer

BY PETE SHELLEM
OF THE PATRIOT-NEWS

A Pennsylvania State Police captain who claims he was transferred because he did not tell Commissioner Paul Evanko about an FBI investigation into corruption in the agency has filed suit in Commonwealth Court.

Capt. Darrel G. Ober, former head of the state police internal affairs division, claims Evanko launched a secret investigation of him and eventually transferred him from Harrisburg to Washington, Pa., because he didn't inform Evanko about the FBI probe.

The State Police withdrew the transfer immediately after Ober filed suit, but subsequently transferred him from the Bureau of Technology Services, where he led the implementation of a multi-million dollar computer system, to a lieutenant's position in the Bureau of Liquor Control Enforcement.

Lawyers for the state police have asked the court to dismiss the suit as moot since they rescinded the Washington transfer, but Ober still claims the transfer to the LCE was done as punishment.

Ober, an 18-year veteran, says he was contacted by the FBI in 1998 and told they were conducting an investigation into corruption in the cadet hiring process that could "go to the top."

The FBI told Ober to keep the investigation confidential and he informed only his commanding officer, Lt. Col. Robert C. Hickes.

After the investigation was complete last May and only one trooper was charged with taking cash to fix grades on the cadet qualification test, Ober and Hickes briefed Evanko, according to the suit.

"Immediately, Col. Evanko became enraged because the FBI did not inform him directly," the suit says. "Col. Evanko threatened to have the FBI agents transferred from the Pittsburgh Field Office for not informing him about the investigation."

The next month, Ober claims, he was contacted by two majors

who said they were conducting an administrative inquiry into Ober's conduct at Evanko's orders.

During an interrogation, the majors told Ober no internal affairs case had been opened against him, as required by state police rules, but they said Evanko would review their findings to determine whether disciplinary action should be taken, the suit says.

The major who commands the area around Washington confronted him about his handling of the FBI probe before the transfer. Ober also claims he learned that Evanko was keeping a secret file on him.

On Jan. 10, Ober says he was informed he was being transferred to Washington. He said he contacted the area commander, who said he did not request additional personnel and did not know what Ober's assignment would be.

The transfer would have meant a 210-mile commute from Ober's East Pennsboro Twp. home.

In their response to the suit, the state police said the transfer was to aid in coordinating police services for the Conference of the National Governors' Association later this year.

"The fact that Capt. Ober does not like his current position is irrelevant," assistant counsel Joanna Reynolds said in her motion to dismiss the suit. "In his discretion Col. Evanko has determined that Capt. Ober's skills and services are no longer needed in the Bureau of Information Technology Services."

Ober's lawyer, James A. Lanier, concedes Evanko has wide discretion in transfers, but said he can't use it as punishment.

"The colonel cannot abuse his discretion to exact punishment from a trooper or a captain simply because he didn't like what the captain did," Lanier said. "If you think he did something wrong, fine, file charges and go through the administrative procedures. Don't simply say 'he [upset me]' and I'm going to transfer him halfway across the state."

## Legislation would limit doctor fees

A series of constituent complaints has compelled Rep. Michael McGeehan, D-Philadelphia, to propose legislation that would restrict the amount of fees charged by doctors, hospitals and other health care providers.

In a co-sponsorship memo to colleagues, McGeehan said he has r a steady of com from o ents wh under why th signific betwe amoun vider e it acc, carrie

McC stitue hospi than f carrie accep "W

have insurance c individual would the $1,000 bill," l lieve that if a he



LETTERS POLICY
We welcome letters from readers considered for publication, a letter must include the writer's name (no initials or pen names) address and telephone number. We don't publish copies, form letters, poetry or letters addressed to anyone other than the editor. We routinely edit for length, accuracy and clarity. Please limit your letter to 250 words. Please write no more than once a month.
Address: Letters to the Editor, The Patriot-News Co., PO Box 2265, Harrisburg, PA 17105
Fax: 717-255-8456
E-Mail Address: editpage@patriot-news.com
All submissions become the property of The Patriot-News Co. and will not be returned; submissions may be edited and may be published or otherwise reused in any medium.

While at the said Brown as restroom. When Brown was told courtroom whil Hope took a t Manlove said.

Manlove turn ly to Hope, and back around, B the district justi

Manlove, a for cer, said he was body escapes ou

Camp Hill District Justice Robert V. Manlove only to be run down by the judge himself, yesterday was ordered to stand trial in Cumberland County Court.

John A. Brown, 35, was held for court after a preliminary hearing before District Justice Thomas A. Placey on the escape charge, plus a retail theft charge that landed him in Manlove's office in the first place.

Placey reduced Brown's bail on the theft count to $15,000, but ordered him returned to the county prison in lieu of bail totaling $115,000 to await formal court arraignment.

Brown, of the 1600 block of Green Street, was arrested Feb.





P230

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:          February 17, 2000

SUBJECT:       Temporary Assignment to Higher Rank or Classification

TO:            Lt. Jerry P. Ryan
               Western Section Commander, Bureau of Liquor Control Enforcement

FROM:          Major Francis E. Koscelnak
               Director, Bureau of Liquor Control Enforcement

REFERENCES: (a)   Bureau Special Order 99-5, dated February 17, 1999,
                  regarding Subject

            (b)   Administrative Regulation 4-11, Temporary Assignment to Higher
                  Rank or Classification

    1.     In accordance with the provisions of References (a) and (b), you are
hereby notified to assume a temporary assignment of a higher rank/classification, as follows:

            (a)   Rank/Classification:    Act. Director, Div. of Administration
                                          74060

            (b)   Station Code:           5410

            (c)   Date and Time Assigned: 03/06/00 - 0815 hours

            (d)   Date and Time End:      03/10/00 - 1615 hours

            (e)   Remarks:                The Director, Division of
                                          Administration will be on
                                          approved leave during the time
                                          period indicated.

FEK/mp

.c:  B. Deimler
     File

P231

## OBER, DARRELL G

| | |
|---|---|
| From: | OBER, DARRELL G |
| Sent: | Monday, February 21, 2000 8:52 AM |
| To: | KOSCELNAK, FRANCIS E |
| Cc: | OBER, DARRELL G |
| Subject: | PEMA |

Major,

For the past several years I have served as one of the PEMA Emergency Preparedness Liaison Officers's (EPLO's) In this assignment, I was responsible for one of the three response teams. Over the years there has been minimal impact in either training or actual activation's to my job primary assignment. I was forced to resign from this position when I was informed I was being transferred to Troop B. Inasmuch as I am now assigned to LCE, I would like to resume my PEMA duties. I have checked with Captain Davis. My position has not been filled and he would like to have me back on the response team.

Your approval is kindly requested.

DGO

P232

1

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:          February 25, 2000

SUBJECT:       Emergency Duty Opportunity -
               Department Emergency Preparedness Liaison Teams

TO:    Bureau Administrative Staff          Supervisor, Special Investigations Section
       Executive Officer                    Supervisor Report Examination Unit
       Central Section Commander            Computer Service Support Unit
       District Office Commander, Harrisburg Legal Unit

FROM:          Captain Alfred Campbell    AC
               Director, Division of Administration
               Bureau of Liquor Control Enforcement

ENCLOSURE:     (1)    Correspondence STD-501 dated February 3, 2000 from the Commissioner
                      relative to the Subject.

      1.     Enclosure (1) is forwarded for the information of all personnel.

      2.     Interested personnel shall respond, through channels, in accordance with
Paragraph 5 of Enclosure (1), ensuring that correspondence is received in this office no later than March
13, 2000.

AC/mp

P233

STD-501X (6-99)

Commonwealth of Pennsylvania

Date:           February 3, 2000

Subject:        Emergency Duty Opportunity, Department Emergency Preparedness
                Liaison Teams

To:             Bureau, Division and Office Directors

From:           Colonel Paul J. Evanko
                Commissioner

Reference:      (a)      Commonwealth of Pennsylvania Emergency Operations Plan.

1.      Reference (a) requires the Department to maintain an Emergency
Preparedness Liaison Team of sufficient size to staff the Department cell at the
Pennsylvania Emergency Management Agency (PEMA) Emergency Operations
Center (EOC). Members of this team are available to respond to the EOC whenever
the EOC is activated in response to emergency situations throughout the
Commonwealth. The PEMA EOC is located in Commerce Park, Susquehanna
Township, Dauphin County.

2.      The Department maintains three, four member liaison teams that
are on a rotational call basis. These teams are under the supervision of the
Department Emergency Operations Officer in the Bureau of Emergency and Special
Operations. There are currently several permanent and alternate positions to be filled.
This correspondence is to encourage expressions of interest from Department
Headquarters personnel, who wish to participate in the Department's emergency
operations functions.

3.      Personnel assigned to the teams, and alternates, should live within
30 minutes of Harrisburg and be prepared to respond to the EOC in various weather
conditions. Typically, team personnel are activated for exercises and actual
emergencies several days per year. Team personnel are required to perform various
tasks including, but not limited to:

•       Operate the PEMA network computer.

P0234

- Operate the Department CLEAN terminal.

- Answer telephone calls and make phone calls to various sources.

- Prepare intra-office and inter-office correspondence.

- Perform general record-keeping activities.

- Perform these functions under difficult and stressful conditions.

4.    In addition to actual emergencies, each team is activated approximately two to three times per year to participate in training exercises. These include radiological exercises for nuclear power plant emergencies, weather-related and flood scenarios, prison disturbances, airline disasters, civil disorders, etc.

5.    Directors shall ensure that a copy of this correspondence is provided to each Section Commander under their directorship for subsequent circulation to Bureau and Division personnel. Personnel who desire to be considered for team participation shall submit correspondence, through channels, to the Director, Bureau of Emergency and Special Operations, to arrive not later than March 17, 2000.

6.    Questions concerning this opportunity shall be directed to the Emergency Operations Officer at 717-787-4969.

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

DATE:        May 8, 2000

SUBJECT:     Retirement

TO:          Commissioner
             (through channels)

FROM:        Captain Alfred Campbell
             Director, Division of Administration
             Bureau of Liquor Control Enforcement

REFERENCE:   (a)    AR 4-1, Employment and Separations.

          1.    I hereby apply for voluntary retirement benefits effective midnight Friday, May 26, 2000.

                 Social Security Number:      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
                 Date of Birth:              February 22, 1947
                 Date of Enlistment:        January 25, 1973
                 Type of Separation:        Voluntary Retirement

          2.    I hereby acknowledge the Department's policy concerning rehiring/reinstatement as stated in AR 4-1, and therefore, I realize that by submitting this resignation/retirement, I cannot withdraw my request, or be rehired or reinstated as a member of the Pennsylvania State Police in the future.

AC/awb

P235

WHLD11-05785 S XPNL11-00002 05/█████00 10:02:57 - 05/16/00 10:0███9  PAGE  1 OF  2
SN XPNL11 P,                                                        BZ32TKT0J7X4

SUBJECT:  LIEUTENANT VACANCIES

TO:       AREA, TROOP AND STATION COMMANDERS AND
          BUREAU DIRECTORS


    1.  LIEUTENANT PROMOTIONS AND TRANSFERS ARE TENTATIVELY SCHEDULED
TO BE EFFECTIVE MAY 27, 2000.  LIEUTENANT VACANCIES ARE AS FOLLOWS:

          TROOP G - 1          TROOP N - 1

    2.  OTHER VACANCIES FOR THE RANK OF LIEUTENANT, AS A RESULT OF
GENERAL TRANSFERS, MAY OCCUR.  THEREFORE, LIEUTENANTS DESIRING TO TRANSFER
ARE ENCOURAGED TO SUBMIT PREFERENCE TRANSFER REQUESTS AT THIS TIME.

    3.  ONLY THOSE REQUESTS ON THE AUTOMATED PREFERENCE TRANSFER SYSTEM
FOR THE RANK OF LIEUTENANT BY 1600 HOURS, THURSDAY, MAY 18, 2000, SHALL BE
CONSIDERED WHEN FORMULATING THE PREFERENCE TRANSFER LIST.

P236

WHLD11-05785 S XPNL11-00002 05/●00 10:02:59 - 05/16/00 10:0●9 BZ32TKT0J7X4 PAGE 2 OF 2
        4.  PROMOTION CEREMONY WILL BE HELD AT THE STATE POLICE ACADEMY
ON FRIDAY, MAY 26, 2000 AT 1030 HOURS.

        5.  TROOP COMMANDERS SHALL ACKNOWLEDGE RECEIPT OF THIS MESSAGE
FOR ALL STATIONS UNDER THEIR COMMAND TO TERMINAL "XPNL11."  BUREAU DIRECTORS
  ALL ACKNOWLEDGE RECIEPT OF THIS MESSAGE, VIA CLEAN MESSAGE OR VIA CORRES-
PONDENCE, FORM STD-501, TO THE DIRECTOR, BUREAU OF PERSONNEL.

AUTH/COLONEL PAUL J EVANKO/COMMISSIONER/PSP

**OBER, DARRELL G**

om:              SZUPINKA, LYLE H
ent:             Tuesday, January 18, 2000 11:55 AM
To:              OBER, DARRELL G
Cc:              HOLMBERG, JOSEPH A; MONACO, FRANK H; PUDLINER, WILFRED J JR
Subject:         NGA meeting and new telephone numberTelephone number

There is an NGA meeting at State College 2/22-23. Contact Lt.WAY at Troop G, HDQTRS  and he will make hotel arrangements for you the eve of the 22nd. On the 22nd the meeting starts at 1300 and ends on the 23rd as soon as were finished with necessary business. You should attend.

Your new telephone number at Washington HDQTRS will be 724 223 5232.

P237

1

**OBER, DARRELL G**

| | |
|---|---|
| **.om:** | OBER, DARRELL G |
| **Sent:** | Wednesday, January 26, 2000 3:01 PM |
| **To:** | SZUPINKA, LYLE H |
| **Subject:** | RE: Leave - Week of January 31 |

Major,

Yes, I will take you up on your offer.  Thank you very much.

Captain Ober

-----Original Message-----
**From:**      SZUPINKA, LYLE H
**Sent:**      Wednesday, January 26, 2000 2:58 PM
**To:**        OBER, DARRELL G
**Subject:**   RE: Leave - Week of January 31

Sounds good. Do you want to visit Troop G, Lewistown, Huntingdon and McConnellsburg on 2/3-4? If so I'll see you about noon on 2/7.

-----Original Message-----
**From:**      OBER, DARRELL G
**Sent:**      Wednesday, January 26, 2000 2:52 PM
**To:**        SZUPINKA, LYLE H
**Cc:**        OBER, DARRELL G
**Subject:**   Leave - Week of January 31

Major,

I am forwarding a Request for Leave slip, via Troop mail, for personal leave for the period January 31 - February 1.  I also included a request for February 2 as a compensatory day for Martin Luther King Day.  Thank you.

Captain Ober

P238

Indiana Printing & Publishing Co.                     Page 1 of 2

BASEBALL'S ALMOST HERE

How much do you need to open an account with NDB?
A. $2000    B. $1000    C. $0  → click here to get started





Home -> News -> Content

Tuesday 3 April, 2001

NEWS SEARCH


Advanced search

**News**
Top Stories
Today's Photos
Sports
Local Scores
Weather
State/National/World
Business
Obituaries
Weddings/Engagements
Columnists
Archives
Letters to the Editor
Submit A Letter
Entertainment
TV Guide
PA Lottery
National News

▶ **What's New!**
▶ **School News**
▶ **Photo Gallery**
▶ **Sports Almanac!**
▶ **Sports Wire!**
▶ **Automobiles**
▶ **Community**
▶ **Contact Us**
▶ **IUP**
▶ **Classifieds**
▶ **Coupons**
▶ **Millennium Project**
▶ **Business**

**Top Stories**

## Charges Against Trooper Dropped

By:CHAUNCEY ROSS, Gazette Staff Writer                    April 03, 2001

**Blaming a loophole in state law for damaging their case, prosecutors this morning withdrew their accusation in Indiana County Court that a state police trooper tried to get his friend into the Pennsylvania State Police Academy through bribery.**

Judge Gregory Olson, who ruled in August that telephone conversations recorded by wiretaps could not be used as evidence, granted a motion today to drop criminal charges against Kipp Stanton of Donora.

Deputy Attorney General Paul von Geis told Olson that without the wiretap evidence, prosecutors probably could not convict Stanton for conspiracy and obstruction of administration of law.

Stanton was assigned to the state police station in Uniontown in September 1999 when prosecutors filed charges against him and Dennis Bridge of Maple Street, Indiana. Stanton had been stationed in Indiana from 1994 to 1999.

Prosecutors said that Stanton and Bridge had planned to pay $10,000 to a state legislator so that Bridge would be accepted to the police academy. The bribe was arranged with Michael Fiore, an Allegheny County Democratic committeeman who acted as an informant and allowed investigators to listen to his telephone conversations with Stanton and Bridge, prosecutors said.

According to court records, Stanton and Bridge made a $1,000 cash down payment to Fiore in February 1999 and investigators captured the transaction on audio- and videotape.

The recordings were stricken from the evidence after Stanton's defense attorney, Bruce Antkowiak of Greensburg, argued that Pennsylvania's wiretap law favored privacy rights.

"All the judge did was follow the existing law," von Geis said this morning. "Unfortunately, when the Legislature revised the electronic-surveillance law in 1998, they neglected to include provisions that would allow us to admit wiretap evidence collected under federal guidelines and in other states."

P239

Indiana Printing & Publishing Co.            Page 2 of 2

| Directory |
|---|
| ▷ **NIE** |
| ▷ **Our Newspaper** |
| ▷ **Cool Links** |
| ▷ **Fun and Games** |
| ▷ **Consumer Guide** |
| ▷ **Personal Finance** |
| ▷ **Lifestyles** |

**READER POLL**

Should downtown Indiana restaurants be permitted to sell alcoholic beverages at outdoor sidewalk tables? E-mail us at ox289@ptd.net with comments.

○ YES

○ NO

[ Submit Vote ]

This space is seen 150,000 times each month

Von Geis said testimony from Bridge and Fiore would not be enough to win the case.

"Without the wiretaps, you strip away their credibility."

In court this morning, Olson said his hands were tied.

"It's a matter to be considered by the Legislature," Olson told von Geis. "Perhaps they would consider that their action in 1998 was ill-advised."

When contacted at his office this morning, Antkowiak declined to comment on the resolution of the case and said Stanton also would make no comment.

Stanton was placed on unpaid suspension by the state police after he was arrested.

A state police spokesman this morning said it was too early to comment on how Stanton's position in the department might change. The department had not been notified of the court's decision, and an internal investigation will continue, according to Cpl. Lou Southard.

Von Geis said prosecution of a criminal-conspiracy charge against Bridge would continue. No trial date has been scheduled.

©Indiana Printing & Publishing Co. 2001

## Reader Opinions

Be the first person to voice your opinion on this story!

Back to top     E-mail this story to a friend     Voice your opinion on this story



Copyright © 1995-2000 PowerAdz.com, LLC. Zwire!, AdQuest, AdQuest Classifieds, AdQuest 3D ® are Trademarks of PowerAdz.com, LLC. All Rights Reserved.

 

 **PG News**  **Real Estate Connection**

post-gazette.com

| Nation & World | Region & State | Neighborhoods | Business & Technology |
| Sports | Health & Science | Magazine | Editorial Opinion |



PG Home
PG News
Special Reports
News Links
Photo Journal
AP Wire
Sports
Classifieds
Cars
Weather
Magazine
City Guide
PG Store
PG Delivery

# State abandons evidence appeal in trooper's case

Friday, February 09, 2001

By Tom Gibb, Post-Gazette Staff Writer

INDIANA, Pa. -- The commonwealth has thrown in the towel on a court appeal to use wiretap evidence against a state trooper accused of trying to help a friend buy his way into the state police academy.

That, in turn, has put the whole case in serious jeopardy.

"Not being able to use the tapes makes the case much more difficult," Kevin Harley, a spokesman for the state attorney general's office, said yesterday.

But prosecutors likely will wait to see what other evidence is allowed before deciding the future of the case, Harley said.

In 1999, Kipp Stanton, 31, of Donora -- now suspended from the state police -- was charged in Indiana County with conspiracy, attempted bribery and criminal solicitation after investigators said he offered to broker bribes so that friend Dennis Bridge, 36, of Indiana, Pa., could get into the academy.

Bridge had a long-standing desire to be a trooper but scored far too low on entrance tests.

The attorney general's office built its case heavily on wiretaps of phone calls between Stanton, Bridge and would-be middleman Michael Fiore, 50, a Democratic committeeman from East Liberty who was working as an informant for police.

"There are certainly a lot of tapes, so that was a major issue," defense lawyer Bruce Antkowiak of Greensburg said yesterday.

In August, though, Indiana County Judge Gregory Olson ruled in a pretrial hearing that the wiretaps, set up by the FBI, were made without proper warrants, didn't pass muster under state privacy laws and couldn't be used in court.

The attorney general's office appealed to the state Superior Court but, in

P 240

SP 3-200 (10-99)





ENCLOSURE (15)

**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE

2000-2
Special Order
January 7, 2000

SUBJECT:       "WORKPLACE RIGHTS AND RESPONSIBILITIES" Poster

TO:                Area, Troop, and Station Commanders; and Bureau and Office
                     Directors

FROM:            Commissioner

1.      The Department has designed a poster entitled "Workplace Rights and Responsibilities."

2.      There is an expectation for all Pennsylvania State Police personnel to conduct themselves in a manner that reflects the spirit and letter of our organizational values of teamwork, professionalism, and integrity.

3.      The basic rights and responsibilities depicted on this poster reflect those tenets that we are expected to abide by, and are inherent in the concept, "Workplace Rights and Responsibilities."

4.      Posters will be distributed, under separate cover, to each Troop, Bureau, and Office.  Upon receipt, Troop Commanders, and Bureau and Office Directors shall ensure a poster is issued to each installation.

5.      Remaining posters shall be retained at the Equal Employment Opportunity Office.

6.      Requests for additional posters shall be directed to the Equal Employment Opportunity Office at 717-787-7220.

Col. Paul J Evanko

Paul J. Evanko
Colonel    PSP

Distribution "B"

P241

# PENNSYLVANIA STATE POLICE



# WORKPLACE RIGHTS AND RESPONSIBILITIES

## YOU ARE VALUED AS AN EMPLOYE OF THE DEPARTMENT. AS SUCH, YOU HAVE THE RIGHT TO:

1. Be treated fairly, with dignity and respect.

2. Work in an environment free of discrimination based on race, color, religious creed, ancestry, union membership, age, sex, sexual orientation, national origin, AIDS or HIV status, or disability.

3. Receive fair and reasonable access to Department-sponsored training opportunities.

   Reject an improper and unlawful "order," suggestion or requests from anyone - of any rank or classification - regarding sexual conduct or activities.

5. Have access to, and be informed of all rules, regulations, and directives that affect your work environment.

## YOU ALSO HAVE THE RESPONSIBILITY TO:

1. Report improper or unlawful behavior to the proper authorities, through your chain of command, or other channels, WITHOUT FEAR OF REPRISAL.

2. Treat coworkers, supervisors, and subordinates with the dignity and respect you would expect to receive.

3. Refrain from participation in conversations, use of language, or behaviors that may be offensive or discriminatory.

## IF YOU FEEL ANY OF THESE RIGHTS HAVE BEEN VIOLATED, PLEASE CONTACT:

THE EQUAL EMPLOYMENT OPPORTUNITY OFFICE
717-787-7220   FAX: 717-787-2948

P242

# BUREAU OF PROFESSIONAL RESPONSIBILITY

. . . The public has the right to expect efficient, fair and impartial law enforcement and therefore any allegations of misconduct by State Police Officers must be detected, thoroughly investigated and properly adjudicated to maintain the trust placed in the Department by the people of Pennsylvania . . .

The declaration you have just read was taken from the findings of a PA House of Representative Sub-Committee. The year was 1986, and the Sub-Committee was known as the Deal Commission. It had just concluded an investigation of the Pennsylvania State Police. The Commission publicly reviewed certain allegations of member misconduct of which the Department had difficulty producing thorough investigations and proper adjudications. In response, State Police Commissioner, Colonel Jay Cochran, Jr. created the Internal Affairs Division and The Bureau of Professional Responsibility. He was quoted as saying, "never again." In its final report the Deal Commission praised the Bureau as a necessary addition. As a consequence, employees and members who serve BPR should never lose sight of the importance of our mission.

P243

# CHAPTER 51
## OBSTRUCTING GOVERNMENTAL OPERATIONS

**Subchapter**
- A.  Definition of Offenses Generally
- B.  Escape

## SUBCHAPTER A
## DEFINITION OF OFFENSES GENERALLY

Sec.
5101.  Obstructing administration of law or other governmental function.
5102.  Obstructing or impeding the administration of justice by picketing, etc.
5103.  Unlawfully listening into deliberations of jury.
5104.  Resisting arrest or other law enforcement.
5105.  Hindering apprehension or prosecution.
5106.  Failure to report injuries by firearm or criminal act.
5107.  Aiding consummation of crime.
5108.  Compounding.
5109.  Barratry.
5110.  Contempt of General Assembly.
5111.  Dealing in proceeds of unlawful activities.

**5101.    Obstructing administration of law or other governmental function.**

A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

**5102.    Obstructing or impeding the administration of justice by picketing, etc.**

(a)    **Offense defined.**--A person is guilty of a misdemeanor of the second degree if he intentionally interferes with, obstructs or impedes the administration of justice, or with the intent of influencing any judge, juror, witness or court officer in the discharge of his duty, pickets or parades in or near any building housing a court of this Commonwealth, or in or near a building or residence occupied by or used by such judge, juror, witness or court officer, or with such intent uses any sound-truck or similar device, or resorts to any other demonstration in or near any such building or residence.

P244



**PENNSYLVANIA STATE POLICE**
**DEPARTMENT HEADQUARTERS**
**1800 ELMERTON AVENUE**
**HARRISBURG, PA. 17110**
Office of Chief Counsel
(717) 783-5568

January 27, 2000

FAXED AND SENT FIRST CLASS MAIL

Mr. Byron L. Warnken, Esquire
32 East Preston Street
Baltimore, MD 21202-2727

RE: Ober v. Evanko and Pennsylvania State Police (Commonwealth Court of Pennsylvania)

Dear Mr. Warnken:

Pursuant to our conversation, this confirms that we will suspend the transfer of Captain Ober in exchange for your withdrawal of the motion for a preliminary injunction.

We agree to return Captain Ober to the IIMS (Integrated Incident Management System) position he served in prior to the transfer, in the Bureau of Technology Services, under the supervision of Major Wesley Waugh. We agree also not to transfer Captain Ober outside the Harrisburg/Hershey area until such time as the instant litigation is resolved either in our favor or your favor; however, we reserve the right to transfer Captain Ober to other existing positions in this area, that meet the operational needs of the Department, during the pendency of the litigation. (This agreement would not extend to any appeal from a Commonwealth Court determination).

This suspension of transfer will not affect the Department's intent to proceed forward with the mandamus action nor does it waive or limit any arguments that we may raise in this action, but it will obviate the need for the preliminary injunction hearing scheduled for tomorrow.

I assume that you will be cancelling the preliminary injunction hearing scheduled for tomorrow in Philadelphia – please fax me a copy of whatever document you file with the court that accomplishes this.

Very Truly Yours,

Joanna N. Reynolds

Joanna N. Reynolds

*An Internationally Accredited Law Enforcement Agency*

P245

PSP-501X                                    COMMONWEALTH OF PENNSYLVANIA

**DATE:**            April 28, 2000

**SUBJECT:**         Request for Approval of Out of State Travel
                     National Alcohol Education Symposium
                     June 11-14, 2000

**TO:**              Director, Bureau of Liquor Control Enforcement

**FROM:**            Lt. Colonel Joseph H. Westcott
                     Deputy Commissioner of Operations

**REFERENCE:**   (a)     Memorandum relative Subject dated, April 19, 2000.


1.       This request is denied.  Due to the Liquor Control Enforcement
         limited responsibilities concerning violation of the Pennsylvania
         Crimes Code, it is felt that members whose duties are more directly
         related to crime prevention should have the opportunity to attend.

P246

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

DATE:          March 23, 2000

SUBJECT:       Training Opportunity –
               Alcohol Policy XII Conference – June 11-14, 2000

TO:            Section Commanders

FROM:          Major Francis E. Koscelnak FE K | *
               Director, Bureau of Liquor Control Enforcement

REFERENCE:     (a)    1998-2000 Provisions from Boards of Arbitration Awards and Collective
                      Bargaining Agreements Between Commonwealth of Pennsylvania and the
                      Pennsylvania State Troopers Association, effective July 1, 1998 to June 30,
                      2000.

ENCLOSURE:     (1)    Registration Packet for National Crime Prevention Council, Alcohol Policy
                      XII Conference Alcohol and Crime Research and Practice for Prevention.

        1.     In accordance with Article 37, Section 9 of Reference (a), a training
opportunity is available to attend the National Crime Prevention Council, Alcohol Policy XII Conference,
Alcohol and Crime Research and Practice for Prevention, to be held on June 11-14, 2000 in Washington,
D.C.  Enclosure (1) contains details on the contents of this conference.

        2.     One (1) Bureau representative will attend.  Interested Section Commanders
shall forward correspondence to this office, to be received no later than the close of business April 17,
2000.

        3.     Selection of the attendee will be in accordance with the provisions of
Reference (a).

FEK/mp

P247

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

DATE:          April 18, 2000

SUBJECT:       Alcohol Policy XII Conference -
               June 11-14, 2000

TO:            Central Section Commander

FROM:          Major Francis E. Koscelnak
               Director, Bureau of Liquor Control Enforcement

REFERENCES:    (a)    Memorandum dated March 23, 2000 from Director, Bureau of Liquor
                      Control Enforcement relative to Subject.

               (b)    Your memorandum dated March 28, 2000.


          1.    In accordance with References (a) and (b), you have been approved to
attend the Subject conference.  You shall also select one (1) Enforcement Officer 3 from your section
to accompany you to the conference.

          2.    The name of the affected Enforcement Officer 3 shall be provided to this
office no later than the close of business April 21, 2000 so that the appropriate arrangements can be
made.


FEK/jla

P248

STD–501, 9–86

COMMONWEALTH OF PENNSYLVANIA

**rE:**            April 19, 2000

**SUBJECT:**       Request for Approval of Out-of-State Travel
                   National Alcohol Education Symposium
                   June 11 – 14, 2000

**TO:**            Deputy Commissioner of Operations

**FROM:**          Major Francis E. Koscelnak        *FEk/xnm*
                   Director
                   Bureau of Liquor Control Enforcement

**REFERENCE:**     (a)  FR 5-1, Section 1.05, Travel and Subsistence, Request for
                        Approval of Out-of-State Travel

**ENCLOSURE:**     (1)  Training Agenda from subject Conference

                   (2)  Approval of Out-of-State Travel Form

                   (3)  Out-Service Training Authorization Form

                   (4)  Approval of Out-of-State Travel Form

                   (5)  Out-Service Training Authorization Form


         1.   Enclosures (1) through (5), are forwarded for your
information and approval.

         2.   The method of transportation will be state automobile and
the mileage one way is 128 miles.  Below is a breakdown of estimated
costs:

|  |  |
|---|---:|
| Registration | $  225.00 |
| Transportation | 0.00 |
| Lodging three nights | 447.00 |
| Meals | 216.00 |
|  | $  888.00 (per person) |

FEK/bld

*P249*

COMMONWEALTH OF PENNSYLVANIA
STD-279     REV. 12-95

ICS
☐ 310
☐ 320     OT     811934     **SHOW THIS NUMBER ON INVOICE**

# OUT-SERVICE TRAINING AUTHORIZATION

DATE PREPARED
April 19, 2000

EMPLOYE OR TRAINING SOURCE NAME AND ADDRESS)
NCPC-AP12 Conference
PO Box 631824
Baltimore, MD  21263-1824

PAYEE FED. I. D/SOC. SEC. NO.

BILL TO - AGENCY (PROVIDE ORIGINAL AND TWO COPIES OF INVOICE)
DEPARTMENT     PA State Police
BUREAU/INSTITUTION     Bureau of Liquor
     Control Enforcement
ADDRESS     3655 Vartan Way
     Harrisburg, PA  17110

EFFECTIVE DATE
June 11, 2000

TERMINATION DATE
June 14, 2000

TRAINING SITE (CITY/STATE)
Washington, DC

EMPLOYE NAME, ADDRESS AND TELEPHONE NO.
See Course Title & Description

TRAINING SOURCE NAME, ADDRESS AND TELEPHONE NO.
Renaissance Washington DC Hotel
999 9th Street, NW
Washington, DC  20001
(202) 898-9000

PAYMENT NOT TO EXCEED
$ 225.00

**SEE INSTRUCTIONS ON REVERSE SIDE**

| CLASSIFICATION | CREDIT OFFERED | CLASS MEETS | M | T | W | T | F | S | S | LEAVE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| See Course Title and Description | -0- | | | | | | | | | TYPE | HOURS | DAYS |
| | CREDIT HOURS PAID IN PREVIOUS 12 MOS. | BEGINS | | | | | | | 0800 | Work Assignment No Leave Charged | | |
| | | ENDS | | | 1800 | | | | | | | |

COURSE TITLE AND DESCRIPTION (OUTLINE TRAINING OBJECTIVES AND RELEVANCE OF TRAINING TO EMPLOYE'S PRESENT DUTIES.)

Darrell G. Ober, Captain, Central Section Commander, Bureau of Liquor Control Enforcement
Todd M. Merlina, Enforcement Officer 3, Harrisburg District Enforcement Office, Bureau of Liquor Control Enforcement

Course Title and Description - Alcohol Policy XII Conference "Alcohol and Crime Research and Practice for Prevention" - The following topics will be discussed:  Alcohol and Crime Research & Practice for Prevention, Environmental Approaches to Reducing Drinking-Related Violence and Other Crimes, Reducing DUI - Keeping Us on Track, Keynote Address on Alcohol and Crime, and other various related sessions.

1.  Method of Transportation and Mileage one way - State Car, 128 miles
2.  Estimated Costs
    a.  Transportation - $0.00
    b.  Lodging - $447.00
    c.  Meals - $216.00
    d.  Registration - $225.00
    e.  Miscellaneous - $0.00
    f.  Total:  $888.00 per person     $1,776.00 (two people)

3.  Department required.

| I HEREBY CERTIFY THAT I WILL ATTEND THE FULL PROGRAM OUTLINED ABOVE. | | SUPERVISOR'S SIGNATURE | DATE |
|---|---|---|---|
| EMPLOYE'S SIGNATURE | DATE | | |

| ESTIMATED COSTS FOR AGENCY INFORMATION | | | SUMMARY OF TRAINING COSTS | |
|---|---|---|---|---|
| LODGING AND SUBSISTENCE EXPENSE | TRANSPORTATION EXPENSES | TOTAL EST. TRAVEL EXPENSES | TRAINING COSTS | TRAINING COSTS TO BE PAID BY EMPLOYER |
| $ | $ | $ | $ 450.00 | $ 450.00 |

| | | | | ACCOUNT CODE | | | | | | COODED |
|---|---|---|---|---|---|---|---|---|---|---|
| FUND | DEPT | APP | YR | LDG | ORG | COST FUNCTION | OBJ | | AMOUNT OF ENCUMBRANCE | |
| 084 | 020 | 171 | 99 | 1 | 5400 | | 339 | | 1,326 00 | PRE-AUDIT |
| | 020 | 171 | 99 | 1 | 5400 | | 147 | | 450 00 | |
| | | | | | | | | | | POSTED |

| AGENCY APPROVAL | DATE | COMPTROLLER APPROVAL | DATE |
|---|---|---|---|

P250
10F2

COMMONWEALTH OF PENNSYLVANIA
STD-274        (REV. 1-91)

## REQUEST FOR APPROVAL OF OUT OF STATE TRAVEL
### (Complete when required by Management Directive 230.10.)
### THIS FORM MUST BE APPROVED PRIOR TO TRAVEL

| DEPARTMENT | DATE |
|---|---|
| . State Police, Bureau of Liquor Control Enforcement | April 19, 2000 |

APPROVAL IS REQUESTED OF THE OFFICIAL EXPENSES TO BE INCURRED BY

| NAME | POSITION TITLE | ORGANIZATIONAL UNIT / BUREAU |
|---|---|---|
| Darrell G. Ober | Captain - Central Section Commander | Liquor Control Enforcement |
| Todd M. Merlina | Enforcement Officer 3 Harrisburg District Enforcement Office | Liquor Control Enforcement |

DESTINATION (CITY AND STATE)

FROM   Harrisburg, PA     TO     Washington, DC

ACTUAL DATES OF TRAVEL

FROM   June 11, 2000     TO     June 14, 2000

PURPOSE (EXPLAIN IN DETAIL)

Attend the Alcohol Policy XII Conference "Alcohol & Crime Research and Practice for Prevention"

---

METHOD OF TRANSPORTATION

- [ ] PLANE (TOURIST CLASS UNLESS AN EXCEPTION IS APPROVED IN ACCORDANCE WITH THE TRAVEL REGULATIONS)
  - [ ] CONVENTIONAL TICKET
  - [ ] SUPERSAVER TICKET (STD-201 MUST BE APPROVED.)
- [ ] TRAIN
- [ ] RENTAL CAR
- [X] STATE CAR
- [ ] PERSONAL CAR
- [ ] OTHER (SPECIFY)

ESTIMATED COST

| | |
|---|---|
| TRANSPORTATION | |
| LODGING | $447.00 |
| MEALS | $216.00 |
| CONFERENCE REGISTRATION | $225.00 |
| MISCELLANEOUS | |
| OTHER | |
| TOTAL | $ $888.00 per person |

APPROVED

_____
AGENCY HEAD

APPROVAL OF THIS FORM DOES NOT AUTHORIZE SUBSIS-
TENCE OR LODGING RATES WHICH ARE HIGHER THAN THOSE
AUTHORIZED IN M. D. 230.10.  ACTUAL EXPENSES INCURRED,
UP TO THE ALLOWABLE MAXIMUMS, WILL BE REIMBURSED IF
PROPERLY PRESENTED AND JUSTIFIED ON FORM STD-191.

] APPROVAL BY THE OFFICE OF ADMINISTRATION ATTACHED.

| ACCOUNT CODE | | | | | | |
|---|---|---|---|---|---|---|
| FUND | DEPT | APP | YEAR | LOG | ORG | COST FUNCTION |
| | | | | | | |
| | | | | | | |

COMMONWEALTH OF PENNSYLVANIA
STD-279        REV. 12-95

## OUT-SERVICE TRAINING AUTHORIZATION

ICS
☐ 310
☐ 320

**SHOW THIS NUMBER ON INVOICE**

OT 755246

DATE PREPARED
September 7, 1999

| EMPLOYE OR TRAINING SOURCE NAME AND ADDRESS | BILL TO - AGENCY (PROVIDE ORIGINAL AND TWO COPIES OF INVOICE) | |
|---|---|---|
| UA
6 King Street West
Alexandria, VA  22302 | DEPARTMENT  PA State Police
Liquor Control Enforcement
BUREAU/INSTITUTION  3655 Vartan Way
ADDRESS  Harrisburg, PA  17110 | EFFECTIVE DATE
9/30/99
TERMINATION DATE
10/02/99 |

PAYEE FED. I. D./SOC. SEC. NO.
53-0239451

TRAINING SITE (CITY/STATE)
Washington, D.C.

EMPLOYE NAME, ADDRESS AND TELEPHONE NO.
See course title and description

TRAINING SOURCE NAME, ADDRESS AND TELEPHONE NO.
Marriott at Metro Center
775 12th Street, NW
Washington, DC  20005
(202) 737-2200

PAYMENT NOT TO EXCEED
$ 195.00

**SEE INSTRUCTIONS ON REVERSE SIDE**

| CLASSIFICATION
See course title
and description | CREDIT OFFERED
0
CREDIT HOURS PAID IN
PREVIOUS 12 MOS. | CLASS MEETS | M | T | W | T | F | S | S | LEAVE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BEGINS | | | | 6:00 p.m. | | | | TYPE | HOURS | DAYS |
| | | ENDS | | | | | | 12:00 Noon | | Work Assignment No leave charged | | |

COURSE TITLE AND DESCRIPTION (OUTLINE TRAINING OBJECTIVES AND RELEVANCE OF TRAINING TO EMPLOYE'S PRESENT DUTIES.)

Francis Koscelnak, Major, Director, Bureau of Liquor Control Enforcement
Michael Clements, Lieutenant, Eastern Section Commander, Bureau of Liquor Control Enforcement
Todd Merlina, Enforcement Officer 3, Harrisburg District Enforcement Office, Bureau of
Liquor Control Enforcement

Course Title and Description - National Alcohol Education Symposium - The following topics
will be discussed:  College Drinking, Reform the Norm... Not Every body is doing it, The ABC's
of, as well as other alcohol related matters.

1.  Method of Transportation and Mileage one way - State Car, 128 miles
2.  Estimated Costs
    A.  Transportation - $0.00
    B.  Lodging - $377.86
    C.  Meals - $156.00
    D.  Registration - $195.00
    E.  Miscellaneous - $0.00
    F.  Total:  $$728.86 per person     $2,186.58 (three people)

3.  Department Required

I HEREBY CERTIFY THAT I WILL ATTEND THE FULL PROGRAM OUTLINED ABOVE.

SUPERVISOR'S SIGNATURE                                          DATE

EMPLOYE'S SIGNATURE                          DATE

### ESTIMATED COSTS FOR AGENCY INFORMATION

| LODGING AND SUBSISTENCE EXPENSE | TRANSPORTATION EXPENSES | TOTAL EST. TRAVEL EXPENSES | TRAINING COSTS | TRAINING COSTS TO BE PAID BY EMPLOYER |
|---|---|---|---|---|
| $ | $ | $ | $ 585.00 | $ 585.00 |

### SUMMARY OF TRAINING COSTS

### ACCOUNT CODE

| FUND | DEPT | APP | YR | LDG | ORG | COST FUNCTION | OBJ | AMOUNT OF ENCUMBRANCE | CODED |
|---|---|---|---|---|---|---|---|---|---|
| 84 | 020 | 171 | 99 | 1 | 5400 | | 339 | 1,601 58 | PRE-AUDIT |
| 84 | 020 | 171 | 99 | 1 | 5400 | | 147 | 585 00 | |
| | | | | | | | | | POSTED |

APPROVAL                          DATE          COMPTROLLER APPROVAL                          DATE

P 251
1 of 2

COMMONWEALTH OF PENNSYLVANIA
STD-174                    (REV. 4-96)

# REQUEST FOR APPROVAL OF OUT OF STATE TRAVEL
(Complete when required by Management Directive 230.10.)

## THIS FORM MUST BE APPROVED PRIOR TO TRAVEL.

| DEPARTMENT | DATE |
|---|---|
| State Police, Bureau of Liquor Control Enforcement | 9/8/99 |

APPROVAL IS REQUESTED OF THE OFFICIAL EXPENSES TO BE INCURRED BY

| NAME | POSITION TITLE | ORGANIZATIONAL UNIT / BUREAU |
|---|---|---|
| Francis Koscelnak | Major - Director | Liquor Control Enforcement |
| Michael Clements | Lieutenant - Eastern Section Commander | Liquor Control Enforcement |
| Todd Merlina | Enforcement Officer 3 Hbg., DEO | Liquor Control Enforcement |

DESTINATION (CITY AND STATE)

FROM _____ Hbg., PA _____ TO _____ Washington, DC _____

ACTUAL DATES OF TRAVEL

FROM _____ 9/30/99 _____ TO _____ 10/2/99 _____

PURPOSE (EXPLAIN IN DETAIL)

Attend the National Alcohol Education Symposium

---

METHOD OF TRANSPORTATION

- [ ] PLANE (TOURIST CLASS UNLESS AN EXCEPTION IS APPROVED IN ACCORDANCE WITH THE TRAVEL REGULATIONS)
  - [ ] CONVENTIONAL TICKET
  - [ ] SUPERSAVER TICKET (STD-201 MUST BE APPROVED.)
- [ ] TRAIN
- [ ] RENTAL CAR
- [X] STATE CAR
- [ ] PERSONAL CAR
- [ ] OTHER (SPECIFY)

| ESTIMATED COST | |
|---|---|
| TRANSPORTATION | |
| LODGING | 1,133.58 |
| MEALS | 468.00 |
| CONFERENCE REGISTRATION | 585.00 |
| MISCELLANEOUS | |
| OTHER | |
| TOTAL $ | 2,186.58 |

APPROVED

_[signature]_

AGENCY HEAD

APPROVAL OF THIS FORM DOES NOT AUTHORIZE SUBSISTENCE OR LODGING RATES WHICH ARE HIGHER THAN THOSE AUTHORIZED IN M. D. 230.10. ACTUAL EXPENSES INCURRED, UP TO THE ALLOWABLE MAXIMUMS, WILL BE REIMBURSED IF PROPERLY PRESENTED AND JUSTIFIED ON FORM STD-191.

APPROVAL BY THE OFFICE OF ADMINISTRATION ATTACHED.

| ACCOUNT CODE | | | | | | |
|---|---|---|---|---|---|---|
| FUND | DEPT | APP | YEAR | LDG | ORG | COST FUNCTION |
| | | | | | | |
| | | | | | | |

*Law Offices
of*

# BONNIE L. WARNKEN

32 EAST PRESTON STREET
BALTIMORE, MARYLAND 21202-2727
(410) 727-5951
*(410) 727-1049 (Fax)*

February 9, 2000

Joanna N. Reynolds, Esq.
Office of Chief Counsel
Pennsylvania State Police
1800 Elmerton Avenue
Harrisburg Pennsylvania 17109

Re: Ober v. Evanko, et. al.

Dear Ms. Reynolds:

This letter is in response to the offer of settlement you proposed yesterday. First, let me confirm that you offer of settlement was as follows: in return for Captain Ober (1) dismissing his application for writ of mandamus, (2) dismissing both intra-agency grievances, and (3) enjoining himself from future lawsuits involving transfer, Captain Ober would (1) be transferred to Control Section Supervisor of the Liquor Control Enforcement Division, and (2) retain current rank and salary (significant because the Control Section Supervisor position is a Lieutenant position). I have discussed this matter with Captain Ober. Captain Ober believes that the settlement offer as proposed in unacceptable.

As you are aware, Captain Ober is currently part of the negotiations, and ultimately will be voting on, the multi-million dollar Pennsylvania State Police system integration procurement project. This is the most expensive and most expansive procurement project ever undertaken by the PSP. Moreover, the procurement project will affect the PSP now and for years to come – ultimately revolutionizing how the PSP conducts law enforcement within the Commonwealth of Pennsylvania. Captain Ober is, above everything else, a dedicated and devoted member of the Pennsylvania State Police. He does not want to see the procurement project, which will benefit all PSP employees as well as the citizens of Pennsylvania, delayed or compromised because of his differences with Colonel Evanko. Therefore, any settlement must include keeping him on the procurement project until the project is fully implemented. To not do so would jeopardize a project and would not be in the best interest of the agency.

Furthermore, Captain Ober believes that he is eligible to be promoted to Major. If there are no current slot for Major, Captain Ober's concern is that he will be perpetually passed over for promotion because of his disagreements with Colonel Evanko. Captain Ober wants a written assurance that any future promotions to a Major position will be made based on merit.

P252
1 of 2



Joanna N. Reynolds, Esq.
February 9, 2000
Page 2 of 2

Once the procurement project is completed, Captain Ober would like to attend the Federal Bureau of Investigation's (FBI) intensive three-month training program that is conducted at Quantico, Virginia. His exemplary background and wide-range of experience, talent, and ability makes him uniquely qualified to attend the FBI Academy.

Captain Ober wants the original files of the secret "administrative inquiry" conducted by Major Williams and Major Wertz turn over to him and all copies held by the PSP destroyed. This request also includes turning over and destroying all files concerning the secret "museum investigation" that is the subject of one of Captain Ober's intra-agency grievance.

Captain Ober wants to be reimbursed sixteen hours of leave time that he was forced to use when his request for administrative leave was denied. The sixteen hours that Captain Ober was forced to use is directly attributable to the FBI investigation into Trooper Kip Stanton's criminal conduct. Furthermore, Captain Ober wants to be reimbursed $153 for costs he was forced to incur because of the unreasonable denial of his grievance. Captain Ober wants to be reappointed to the PSP's bicentennial committee (commonly referred to as the "book committee." Colonel Evanko unceremoniously removed Captain Ober from the "book committee" without any justification. Captain Ober wants reimbursement for reasonable attorney's fees he incurred to fight the illegal and unconscionable actions of Colonel Evanko. Finally, Captain Ober wants a personal written apology from Colonel Evanko to him and his family for forcing them to undergo the personal, professional, and emotional trauma that this ordeal has caused.

Once you have had an opportunity to review this counter-offer, please contact me so that we may further discuss settlement.

Very truly yours,

James A. Lanier, Esq.

Cc:    Cpt. Darrell Ober
       Client file

*Winning Trial Advocacy Techniques*
PBI No. 2002-2964

# Ethical Problems for Pennsylvania Litigators

Presented By
**Ralph Adam Fine**

**Pennsylvania**
**Bar Institute**
CONTINUING LEGAL EDUCATION ARM
OF THE PENNSYLVANIA BAR ASSOCIATION

P253

1 of 3

# ETHICAL PROBLEMS FOR PENNSYLVANIA LITIGATORS

presented by

### Ralph Adam Fine[*]

© 2002 Ralph Adam Fine

*The following fifty-one hypotheticals are designed to facilitate the discussion and analysis of ethical problems faced by litigators in Pennsylvania. Neither they nor the discussion and analysis is intended to be legal advice; nothing in the presentation is a prediction of how either a lawyer-disciplinary body or a court might rule. The analysis is predicated upon the Pennsylvania Rules of Professional Conduct, which are derived from both the Model Rules of Professional Conduct, promulgated by the American Bar Association, and the now superseded Pennsylvania Code of Professional Responsibility.*

* * *

1. You represent John Peters in a personal injury action. You believe that the case is worth at least $100,000, and should be settled for no less than that amount. You also know, however, that Mr. Peters needs money and, as a result, would settle for far less than the case is worth. The insurance-company lawyer offers to pay $35,000. You are afraid that if you tell Mr. Peters, he will jump at the offer and direct you to accept it. Must you nevertheless tell him about the $35,000 offer?

---

[*]Ralph Adam Fine has been a judge on the Wisconsin Court of Appeals since 1988. He served as a judge on the Wisconsin circuit court from 1979 to 1988, and presided over more than 350 jury trials. Judge Fine has taught trial-advocacy, evidence, and appellate-advocacy at some 100 continuing-legal-education programs around the country, at intensive, hands-on trial-advocacy workshops for law firms, and as Professorial Lecturer in Law at the George Washington University National Law Center in Washington, D.C. In January of 1995, the University of Virginia School of Law presented Judge Fine with the Honorable William J. Brennan, Jr., Award for his contributions to the teaching of trial advocacy. He is the author of *The How-To-Win Trial Manual* (Juris rev. 2d.ed. 2001), *The "How-To-Win" Appeal Manual* (Juris 2000) and of the annually supplemented *Fine's Wisconsin Evidence* (Juris), which Judge Jack B. Weinstein, original co-author of *Weinstein's Federal Evidence*, called "probably the best single-volume state treatise on the subject that I have seen." Judge Fine is a senior contributing editor and reporter for the four-volume treatise *Evidence in America* (Lexis); a contributor to the ABA publications *Emerging Problems Under The Federal Rules of Evidence 2d Ed.* (West 1991) and *Emerging Problems Under The Federal Rules of Evidence 3d Ed.* (Lexis 1998).

Ralph Adam Fine can be reached by e-mail at: ralphadamfine@win-your-trial.com. His workshop web site is: www.win-your-trial.com

Yes. Rule 1.2(a) provides in material part:

> "A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter."

Moreover, Rule 1.4 provides:

> "(a)   A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
>
> "(b)   A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation."

The Comment to Rule 1.4, notes, in material part:

> "The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so. For example, a lawyer negotiating on behalf of a client should provide the client with facts relevant to the matter, inform the client of communications from another party and take other reasonable steps that permit the client to make a decision regarding a serious offer from another party. *A lawyer who receives from opposing counsel an offer of settlement in a civil controversy* or a proffered plea bargain in a criminal case *should promptly inform the client of its substance unless prior discussions with the client have left it clear that the proposal will be unacceptable. See Rule 1.2(a).* Even when a client delegates authority to the lawyer, the client should be kept advised of the status of the matter."

(Emphasis added.)

other things, the report must contain "the data or other information considered by the witness in forming" his or her opinions. The expert's report goes through several drafts. May you tell her to destroy all drafts, preserving only the original?

Probably not. As one commentator has noted, many "courts have concluded that, for the cross-examiner, the expert's journey can be as relevant as his or her destination." Patrick Emery Longan, *Ethics and Experts*, VIII—1 ABA COMMITTEE ON PRETRIAL PRACTICE & DISCOVERY NEWSLETTER, 13 at 16 (Winter 1998). Thus, "[t]o deprive the [litigation] process of such material is potentially in the same category with counseling a client to destroy documents that appear to be incriminating but could be explained away." *Ibid.* Rule 3.4 of the Pennsylvania Rules of Professional Conduct provides:

> "A lawyer shall not:
>
> "(a) Unlawfully obstruct another party's access to evidence or alter, destroy or conceal a document or other material having potential evidentiary value or assist another person to do any such act;"



17. Under Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, a testifying expert witness must produce a report that is given to the other side. The Advisory Committee Notes to this provision advise that it "does not preclude counsel from providing assistance to experts in preparing the reports." How much input may the lawyer have?

Just as beauty depends on the eye of the beholder, the answer to this question will depend upon the eye of the particular judge hearing your case, or, perhaps, a disciplinary body. *Compare Marek v. Moore*, 171 F.R.D. 298 (D. Kan. 1997) (declining to strike expert witness after the witness's Rule 26(a)(2)(B) report was modified with the witness's approval after discussion with lawyer) (Attorneys do not "have license to change the opinions and reports of expert witnesses. Any changes in the preparation of a report must be what the expert himself has freely authorized and adopted as his own and not merely for appeasement or because of intimidation or some undue influence by the party or counsel who has retained him.") *with Occulto v. Adamar of New Jersey, Inc.*, 125 F.R.D. 611 (D.N.J. 1989) (condemning attorney's forwarding of draft report to medical expert with the heading: "Please have re-typed on your own stationary") (uppercasing in original removed).



Ralph Adam Fine — page 14

In extreme cases, inducing an expert witness to alter his or her report may violate Rule 3.4, which provides, as material here:

"A lawyer shall not: ...

"(b)  Falsify evidence, counsel or assist a witness to testify falsely ...."

18. You represent Dr. Jones in a medical-malpractice case. In the course of your investigation, you turn up a witness who has information about Dr. Jones's office practices that are adverse to your case. Must you give the name of that witness to the other side?

Under Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure the answer is "yes," unless the parties have stipulated or the court has ordered otherwise, or the matter is one of those listed in FRCP 26(1)(E)[see appendix].

Rule 26(a)(1)(A) provides:

"(1) *Initial Disclosures*. Except in categories of proceedings specified in Rule 26(a)(1)(E), or to the extent otherwise stipulated or directed by order, a party must, without awaiting a discovery request, provide to other parties:

(A) the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information;"

The Advisory Committee Note to this provision states:

"As officers of the court, counsel are expected to disclose the identity of those persons who may be used by them as witnesses *or who, if their potential testimony were known, might reasonably be expected to be deposed or called as a witness by any of the other parties*."



(Emphasis added.) Violation of Rule 26(a)(1)(A) implicates Rule 3.4(a), quoted above.

19. You represent Lynn Rogers. You have authority to settle for $95,000, but, because you are dealing with an inexperienced plaintiff's lawyer, you believe you can settle the case for $50,000. May you tell the other lawyer that Ms. Rogers will not "pay a penny more than fifty grand"?

PAGE TWO

## CHIEF COUNSEL'S COLUMN
### by Francis X. O'Brien, Jr.

If the questions I've been asked within the last month are a reliable indication, there is a good bit of misinformation circulating about the *Bolden* Consent Decree. Since the misinformation and confusion will only further impede this department's efforts at meeting its obligations under the Consent Decree, I'll use my space this month to let you know what's going on.

First of all, the Consent Decree has *not* been amended. In April of this year the plaintiffs asked the court to raise the Consent Decree figure of 9.2% to 10.2%. The plaintiffs claimed that the cadet written entrance examination is discriminatory, and not valid for screening cadet applicants. The test was developed for the department by an outside expert as required by the Consent Decree and the department is confident that the exam is valid and not biased.

On the basis of their request to amend the decree, the plaintiffs also asked the court to order that the 40-member cadet class scheduled to enter the Academy in June consist of 30 minorities. Desirous of resolving the impasse, getting the cadet class into the Academy, and allowing the department time to submit the cadet exam to the court for its approval, counsel for the parties discussed terms for resolution of the matter. Prior to the department's agreement to any terms attorneys for all the parties participated in discussions.

The P.S.P. agreed to bring in cadet classes 37 ½% minority down from the 50% minority of recent years. This will continue until the judge rules on the validity of the cadet exam. In the meantime, this cannot result in a minority composition exceeding 10.2%. There is also no mandatory obligation to reach that figure, or requirement that the minority composition of each rank exceed 9.2%. When the judge rules on the cadet exam he will also rule on the plaintiffs' request to amend the Consent Decree from 9.2% to 10.2%.

As of this writing the department has filed a motion asking the court to approve the cadet entrance written exam. A hearing on this should be scheduled in the near future.

☐ ☐ ☐

"The Communications Division will provide technical guidance for radar arrests and personnel are available for court appearances."

"Microphones located at the Communications Desk are designed to cancel out background noise. You should be 4" - 6" from the microphone when speaking. Remember to speak directly into the microphone."

## RETIREES' SCOOPS
### Phil Conti, Reporter

Our association officers met June 11 at Holiday Inn, this year's reunion site at Valley Forge. The business session was well attended. Among other things, a change in the reunion format and adoption of revised by-laws are under consideration. The reunion is shaping up to be one of the nicest in years. Please plan on being there the weekend of Oct. 7-9 to enjoy the company of dear friends.

Happy birthday greetings are sent to: Chester A. Shuler, 89, Aug. 3; Lewis A. Whitecotton, 84, Aug. 9; and Charles Moody, 82, Aug. 23. Belated greetings to Jim Tooey, who turned 80 on May 22, and was honored in style by a loving family at the Lanerch Country Club.

President Ed Mays tells us that one more appeal may be made to the state Supreme Court in the civic association case, a possibility over which we have no control. To protect retiree interests, it is urgent that additional donations be made to the now depleted litigation fund in support of this final legal step. Please send contributions to Bob Smith, 400 Latshmere Drive, Harrisburg, Pa. 17109.

Heard from Lyle Young, who reports he and Becky (now retired, too) are well again, after a bout with the flu. Also received mail from Al Glasser, who visited briefly with our senior retiree, John Grance, a Bay Pines nursing home patient. John is in poor health, and Al describes him as "a lonesome, old man just waiting to turn in his chips." Gordon and Mildred Livengood visited their daughter and family in Hawaii to celebrate grandson's first birthday. Their son-in-law is a lieutenant commander, USN. We are sorry to report the recent death of Clarence Tempke's widow, Catherine.

It was good, indeed, to see Eleanor Kelly at Wildwood, N. J., in May. Eleanor was Commissioner Urella's secretary. The surprise meeting was arranged by Paul Gilfoyle. Andy Kutney, now retired from Temple University, and his wife, also retired, are now raising buffaloes at their ranch near Tunkhannock. Beefalo, a cross between buffalo and cattle, is lean, tasty meat, and Andy predicts it will soon be a major meat source. I promise to give it a try.

Dr. Roland Bauman, of the state museum, wants to establish a permanent PSP exhibit at the museum. This is a worthwhile project. Retirees are urged to donate old uniform and equipment items. Why not bring them to the reunion in October for collection? I have a buyer for Elmer Faber's "Behind the Law." If any retiree has a copy to sell to a researcher, please write me for further details. We also have an active trooper, who collects shoulder patches. He needs patches from our three old uniforms: State Police, Highway Patrol and Motor Police. If anyone can help with these items, please write me.

Don't forget to write your letters to House and Senate friends in support of Senate Bill #715, adjusting pensions. Don't let this important measure die, because we did nothing.

Space, unfortunately, does not allow the eulogizing of our beloved deceased, good men though they all be. Yet, this month I mention the death of Vic Nelson, a dedicated leader among the northeast retirees; he will be missed.

DEATHS: Victor L. Nelson, Wyoming, Pa.; Hayden J. Clifford, Ambler, Pa.; James F. Updyke, Upper Darby, Pa.; Ralph V. Mears, Sacramento, Cal.; Alfred V. Kidd, Huntingdon, Pa.



## SAD MEMORIES

Troop "C" sent us this photo and information concerning. . . "the first state highway patrolment killed. . ." in 1927.

Patrolman Russell T. Swanson, a native of Mt. Jewett, was assigned to Troop "B" Greensburg. The officer had stopped a vehicle bearing Minnesota license plates and the operator could not properly identify himself. Ptlm. Swanson ordered the operator and passengers to a magistrate's office for questioning. Enroute to the office Ptlm. Swanson was shot and killed on April 19, 1929 thus becoming the first member of the 'Highway Patrol' to be killed in the line of duty. He was 23 years old with 1½ years service.

The photo shows police officers lined up outside a house in Mt. Jewett as the casket is carried out. Ptlm. Swanson was buried in Nebo Cemetery in Mt. Jewett.

This grave and others across the Commonwealth were visited during Law Enforcement Week in May honoring those members who died in the line of duty.

PAGE TWO

## CHIEF COUNSEL'S COLUMN
### by Francis X. O'Brien, Jr.

The "knock and announce" rule of Criminal Procedure Rule 2007 was the subject of a recent Pennsylvania Supreme decision. In *Com. v. Beard,* 461 A.2d 790 (June 30, 1983), the Supreme Court reversed Superior Court and held that, on the facts of the case, the Pittsburgh police officers had acted properly in serving a warrant.

The officers had a warrant to search for heroin in an apartment occupied jointly by Lynette Beard and Marvin Jones. The officers learned that Jones would be arriving at approximately 1:00 p.m. to cut and package heroin. They began surveillance of the apartment at that hour, and when Jones approached the apartment at about 1:30, the officers followed him to the rear of the premises. Jones saw the officers, ran inside shouting "Police!" and locked the door behind him. The officers continued pursuit, forcibly entering the locked door. Upon entering the apartment, the officers observed several packages of heroin near Jones as he was flushing something down the toilet. Several charges were filed against Jones and Beard, who was asleep in the apartment.

The suppression court granted the motions to suppress the evidence found in the apartment. In affirming the suppression order, a divided three-judge panel of Superior Court reasoned that the officers could have waited until Jones entered the apartment and then given him "the opportunity to surrender [his] privacy peacefully" after a "knock and announce." The court did state that the officers "had acted reasonably in waiting for Jones's arrival before executing the search warrant."

Chief Justice Roberts, writing for a unanimous Supreme Court, reversed the order of suppression and remanded the case for trail. The Court held that neither the "knock and announce" rule nor the Fourth Amendment require that the police "delay announcing their authority and purpose until occupants of a dwelling who are outside the premises have gone inside." Once the officers quite properly approached Jones outside, his reaction provided exigent circumstances sufficient to excuse them from compliance with Rule 2007. The officers' forcible entry was necessary to prevent destruction of evidence.

□ □ □

The lawyer was questioning a witness in a murder case. "Did you say that she shot him at close range?"

"Yes."

"Were there any powder marks on him?"

"Yes," the witness replied, "that's why she shot him at close range."

## RETIREES' SCOOPS
### by Phil Conti

By the time this issue of the COMMUNICATOR is circulated, this year's reunion at Valley Fore will be in full swing. We're looking forward to a pleasant weekend planned by Ed Mays and his southeast committee members. We send a big "thank you" to the men of Pioneer Lodge 37 for sponsoring a hospitality room at the reunion. We do appreciate such thoughtfulness.

Once in a while a letter will come in, highly critical of the delay in settling the civic association case, with the writer placing blame for the delay on some particular litigant group. Yet, in a democracy such as ours everyone is entitled to access the courts, regardless of how upsetting it might be to our interested parties. That's just the way it is. Maybe one day we'll see court reforms designed to move all cases with more dispatch. We should be so lucky!

Happy birthday greetings are sent to Calvin M. Ross, 80, on October 11. The reunion is not too early an occasion for a birthday party, Cal.

Get well wishes are sent to Ben Lee, recovering from surgery; Agnes McCartney, widow of former Commissioner Frank G. McCartney, recuperating at home after hospital stay; and Carrie Mauk, widow of former Deputy Commissioner Jacob C. Mauk, a shut-in in poor health.



**Retired Lebanon County breakfast-clubbers: Front from left, George Kurteson, Joe Adomaitis, Jim Rucco, Adam Budjako, Gene Rickert, Bill Anselmi, Henry Herman. Back from left, Lloyd Leinthall, Jim Marks, Ellis Jackson, Bill Hennings, Joe Everly, Al Kwiatek, Stan Petzak, Ray Folk.**

Breakfast is the most important meal of the day. Look at this healthy bunch, all members of the Retired Lebanon County Breakfast Bunch.

Our heartfelt sympathy is sent to Joe Packer, whose wife, Frances, died recently after a lengthy illness. Frank Schramko still keeps himself busy, taking on private investigations for selective clients. He recently helped to reunite a World War II veteran and his son to end a separation of 41 years. Al Zale, Columbia County's chief deputy sheriff, took time to write me about his interest in this column. Thanks, Al. Recently

received a phone call from Al Hertz, 82, former West Wyoming police chief, who delights in visiting old state police friends, especially those who need cheering. How nice it would be if we were all more thoughtful about dear friends facing distressful circumstances. Do you know of any?

It was good to hear from Father Frank Christof, who celebrated this summer his first anniversary in the priesthood. May you serve many more years, dear friend.

In an earlier column I asked for a copy of "Behind the Law" for a researcher eager to purchase the book. Replies came in and a sale will undoubtedly be made. So, this column can indeed serve a number of purposes.

Bob Smith reminds us that our 1984-85 dues of $5.00 are now payable. Give Bob a hand by sending in your checks early.

With the excitement of baseball season's closing and another long football season facing us, we should find many occasions for relaxation, when the chores are all done. How about dropping me a note between games. I'm still looking for contributions from you good people, whose news items would certainly be of interest to others. And moreso than you think.

DEATHS: John T. Ziegler, Downingtown, Pa.; Joseph Rhine, Harrisburg; William C. Techmanski, Scranton.

## CORRECTION

We extend thanks to Ben Lichty who phoned to tell us that we were incorrect in reporting Department Records..."show there was a real Tpr. Francis L. Haley, a Pottsville native, who was murdered October 14, 1924 while trying to arrest a Philip Hartman following an armed robbery at the *Graffenburg Inn.* Ben says the robbery was at the Abbottstown Bank.

Ben also noted he is donating several items of PSP history to the Historical and Museum Commission to be a part of a permanent PSP display. We hope others will do likewise.

□ □ □

"PANET, commonly called "WATTS," is not free."

"Monitoring police radio transmissions is a popular hobby. Make sure your radio transmissions are professional. It may be the only contact many people have with the Department."

SP 3-200 (12-93)





*Capt. Aber*

00-18
Personnel Order
August 31, 2000



## PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

SUBJECT:          Promotions and/or Transfers

TO:               Area, Troop and Station Commanders;
                  Bureau and Office Directors

FROM:             Commissioner

        1.    The following promotions and transfers, as indicated, are effective September 2, 2000:

        Major Hawthorne N. Conley, Director, Bureau of Professional Responsibility, is hereby promoted to the rank of Lieutenant Colonel and transferred to the Executive and Administrative Offices, where he will assume command as the Deputy Commissioner of Administration.

        Captain W. John Pudliner, Jr., Commanding Officer, Troop A, Greensburg, is hereby promoted to the rank of Major and transferred to the Bureau of Professional Responsibility, where he will assume command.

        Captain Henry D. Oleyniczak, Commanding Officer, Troop J, Lancaster, is hereby promoted to the rank of Major and transferred to Area I, where he will assume command.

        Captain Frank E. Pawlowski, Bureau of Criminal Investigation, is hereby transferred to Troop J, Lancaster, where he will assume command.

        Captain David F. Young, Executive Officer, Area III, is hereby transferred to the Bureau of Criminal Investigation, where he will assume command as the Director, Special Investigations Division.

        Captain Frank H. Monaco, Commanding Officer, Troop B, Washington, is hereby transferred to Troop A, Greensburg, where he will assume command.

        Captain Roger N. Waters, Bureau of Patrol, is hereby transferred to Troop B, Washington, where he will assume command.

*P266*

PAGE FOUR

## RETIREES' SCOOPS

### by Phil Conti

It is time again to remind all members that your 1992 dues of $5.00 are now payable. New directories will be distributed with payments. Harold Trout will be patiently awaiting your checks at 914 W. Foxcroft Drive, Camp Hill, Pa. 17011. Please don't disappoint him by delaying payment. He likes to close out his books early.

Since I took over this column from "Scoops" Thomas 12 years ago, I have had excellent support from fellow retirees, for which I am indeed grateful. For some months now, I have been trying desperately with disappointing results to get information on the deaths and burial places of Joseph E. Conway, William F. Golden, James E. Rose, John E. Hancock, and Anthony Tornetta, who were killed in World War II service. In the case of Hancock, we have an FOP lodge memorializing his name; yet, no one in that lodge has come up with the circumstances of Hancock's death and burial site. If such information has been lost by that lodge, I find that disheartening. Surely there must be widows, relatives or close friends, who can be helpful in this project. It is difficult to believe that these men who sacrificed so much are not better remembered in less than 50 years. I am saddened by the prospects of dropping this project in defeat. Once again I plead for support. Please write me at 1081 Acri Drive, Harrisburg, Pa. 17111, or phone 717-564-8088.

Happy Birthday greetings are sent to: George W. Finnin, 83, Dec. 1; Raymond B. Malloy, 86, Dec. 4; Frank N. Sapudar, 82, Dec. 6; George J. Vanderslice, 81, Dec. 11; James B. Brooks, 89, Dec. 12; Aloysius J. Wilson, 85, Dec. 16; Harry E. Bell, 81, Dec. 27; Durward A. Gehr, 87, Dec. 28; and Carlton M. Mendenhall, 82, Dec. 31.

Congratulations are sent to Fred and Mary Jane Denn, on their 58th Wedding Anniversary, Dec. 20. December was obviously not a good month for marriages -and for a good reason from the bride's point of view.

Add to the sick list: Sylvester Orlando, Stan Oleski, Earl Moore, Dean Vannucci, Chester Dey, Charlie Bohner, Sylvester and Jessie Stanalonis, Kathy Stafford (John's wife), Helen Callahan (Jack's wife), Kay Hoover (Will's widow), Eleanor Gill (Al's wife), Lloyd Brubaker, and Henry "Herkie" Herman. This is but the tip of the iceberg. You surely know others sick or shut-ins. Cards and letters, please.

We send our heartfelt sympathy to Stan and Louise Oleski, whose son Stan III died in September. We regret the death of Dorothy Kelly, Francis X. Kelly's widow.

Troop J retirees welcome all to their breakfast sessions the second Thursday of each month at Gap Diner at 10 a.m. At the recent Washington Troop lodge picnic, Paul Bowser, 81, was the oldest retiree present; Keith McCully had the longest service record among attending retirees. Both men received gift certificates. Jim Patt enjoyed his recent 2-week Florida vacation. Bob Mangiacarne's son, Bob, recently graduated from the U.S. Air Force Academy and is serving a 3-year duty tour in Japan.

Charlie Bohner is trying to find the whereabouts of John Webster, a former trooper at Greensburg. Can anyone help? Received a pleasant letter from Giovanna Ripka, John's widow, who recounted the wonderful worldwide travels she and John enjoyed before he suffered a disabling stroke. George Tuckey is handling security at the Montgomery County Courthouse. Charlie Adamo is a candidate for Lawrence County commissioner on the Democratic ticket. Tom Tridico was appointed to the Greensburg city council to fill a vacancy. He is running unopposed for a 4-year term in November.

Bo Tarlecky's recently born twin grandchildren brings his total number of grandchildren to 19, which is a high figure to be sure, but not the highest among retirees. That record to date belongs to Jerry Boyd with 22 (23 in December), unless that can be topped. Jim and Clarice Winters returned from a 2-week tour of England, Wales and Scotland, as representatives of the Hershey Region, Antique Car Club of America. The tour featured visits to a large antique car museum and flea market in England.

We regret two errors in the new directory. Please add to your copy the name of William S. O'Brien, 507 E. Sheridan Ave., New Castle, Pa. 16105. Add to Milton E. Squiller's name "c/o Pittsburgh National Bank."

Once again retirees are reminded to keep their nomination of beneficiary in the Immediate Relief Funds and State Retirement System current to prevent complications.

I have received a request from the granddaughter of Captain George F. Lumb, Deputy Superintendent of the Department of State Police from 1908 to 1920, who is seeking a copy of Katherine Mayo's book THE STANDARD BEARERS. If anyone, possessing a copy of that publication about the Pennsylvania State Police, is willing to sell it, please get in touch with me. I will gladly serve as a go-between.

With the swift passage of time, we will soon be sitting at the table enjoying a delicious Thanksgiving Day dinner with dear family members. May we all give thanks for the blessings we enjoy in life, and pray for those who are deprived.

DEATHS: Earl O. Bergstrom, Hollidaysburg, Pa.; Robert W. Ruhl, Lock Haven, Pa.; Harold L. Desch, Harrisburg, Pa.; Russell E. Dougherty, Bethlehem, Pa.; Walter W. Hill, Drexel Hill, Pa.; John P. Rikpa, Reading, Pa.; Thomas W. Dooner, Scottsdale, Arizona; Clyde F. Stryker, Green Valley, Arizona, and Charles H. Moyer, Carlisle, Pa.

## September Separations

Cpl. Lawrence S. Orslene
Troop T
Enlisted: 04/15/57
Retired: 09/04/91

Tpr. Edward M. Gaydos
Troop K
Enlisted: 02/08/62
Retired: 09/13/91

Tpr. Jack R. Pierce
Troop P
Enlisted: 06/25/70
Retired: 09/13/91

Tpr. Bernard T. Rhodes
Exec. & Adm. Office
Enlisted: 04/10/56
Retired: 09/13/91

DLE James J. McGill, Jr.
Troop M
Appointed: 09/10/81
Retired: 09/27/91

Clk 2 Mary W. Mullen
Rec. & Info. Services
Appointed: 04/28/80
Retired: 09/27/91

Tpr. Michael J. Prushinski
Troop R
Enlisted: 08/26/87
Resigned: 09/27/91

EO3 Charles B. Douglass
LCF
Enlisted: 06/01/68
Retired: 09/27/91



**What Did the Stork Bring**

Departmental
Peggy Crouthamel, grandson
Betty Kaplan, granddaughter

LCE
Clk. Stn. 3 Connie and Mr. Jamie Davis, girl

Troop A
Tpr. & Mrs. William A. Teper, Jr., boy

Troop B
Tpr. & Mrs. Ken Markilinski, boy

Troop C
Tpr. & Mrs. James Sharer, girl

P256

## RETIREES' SCOOPS

As we draw closer to the new year, it is important that our 1992 Association dues be paid without delay. Please send your $5.00 checks to Harold Trout, 914 W. Foxcroft Drive, Camp Hill, PA 17011. Harold is waiting anxiously to credit your records and send you a copy of the new Retiree Directory, which in itself is worth the five bucks. Please give this matter your prompt attention.

We appeal here to the many troopers who have retired in 1991 and will retire in 1992 to join our Retiree Assn. There are many actions to be taken to enhance our retirement years, and it is only through organizational strength that beneficial results can be successfully won. Think about this, and join us. Each new member will receive a copy of the new Retiree Directory.

Happy Birthday greetings are sent to: Harold Stansfield, 81, Jan 4; Earl Ging, 91, Jan. 8; Willard Schauer, 82, Jan. 15; John R. Stewart, 87, Jan. 20; Malcolm Gramley, 86, Jan. 26; Russell Knowles, 82, Jan. 26; and William Earley, 82, Jan. 29.

Congratulations are sent to Lewis and Maguerite Small on their 64th wedding anniversary Jan. 3; Charles and Mary Bohner, their 50th, Jan. 7; Harold and Rose Trout, their 53rd, Jan. 23; and Durward and Ruth Ellen Gehr, their 63rd, Jan. 26. Lew and Marguerite hold the title for the longest wedded retiree couple.

Add to the sick list: Mildred Derr (Wilbur's wife), Cliff Yahner, Dean Vannucci, Tom Jones, Eleanor Grill (Al's wife), Charlie Bohner, Earl Moore, David Martin, John Krupey, Howard Kisner, Gerald Patterson, Sal Conti, Marcella Treglia (Earl's wife), and Fred Gardner. A letter from Father Francis Christof assures us that he is off the sick list.

In our last column we mentioned the omission of a name in the new retiree directory. It has come to light with regret that the printer omitted an entire column. Please insert the following names and addresses in your copy of the directory: NODICH, John, R.D. 2, Box 202, Ottsville, Pa. 18942; NOEL, John W., 221 Brook St., Peckville, Pa. 18452; NOLAN, Thomas E. 43323 N. 43rd St. W. Lancaster, CA 93536; NORRIS, John J., 2 Godfrey Lane, Hollidaysburg, Pa. 16648; NOVAK, Dave, R.D. 6, Box 54, Bedford, Pa. 15522; NOVATNAK, Michael D., 315 Fern St., Hawley, Pa. 18428; NOVOTNY, Frank J., 146 W. Coal St., Nesquehoning, Pa. 18240; NOWAKOWSKI, George S., 174 Foote Ave., Duryea, Pa. 18642; NUHFER, Raymond N., 2619 Charolotte St., Erie, Pa. 16508; O'BRIEN, William S., 507 E. Sheridan Ave., New Castle, Pa. 16105; O'BOYLE, John E., 55 Upper High St.,

Frackville, Pa. 17931; O'DONNELL, James R., 7025 Clearfield St., Harrisburg, Pa. 17111; O'DONNELL, Lawrence J., 925 Willow St., Scranton, Pa. 18505.

We announce with regret the deaths of Helen Callahan (Jack's wife); and Shirley Basci (Anthony's wife). Both women succumbed to long term battles with cancer.

In order to help me with something I should have done a long time ago, I am asking the leaders of each retiree breakfast group to send me the name of the group and the date, time and place of their gatherings. I've had requests for this information, and regret my not being able to reply productively. Please!

Emilie Lonardi, daughter of Carlo and Dotty, recently received the coveted Forrest E. Connor Memorial Scholarship awarded by the American Assn. of School Administrators. Emilie, a former assistant principal at Camp Hill High, is studying for her doctorate at Penn State. Nelson Kreider's step-daughter, Jacqueline Whalen, received her Chiropractic doctorate magna cum laude from Palmer College. Another step-daughter is a medical college student at Philadelphia. Bill Nevin's granddaughter, Heather Neil, is off to Poland, where she will teach English at a private school. English is a popular subject among the Poles.

Ed and Terry Goddard in company with Jim and Winnie Padden enjoyed their 6-day tour of San Francisco, San Diego and Lake Tahoe. Kent Riegel has been appointed to the staff of the U.S. Marshal at Reading. Joe Packer was recently appointed Regional Vice President for PARSE's southeast region. Tom Shelar was recently promoted to Agent-In-Charge of Special Operations with the state Attorney General's Office. Tom has been with the AG for nine years. A morning phone call from Bernie and Jeannine Stanalonis from their Florida residence brightened the day for me.

Charlie Bohner is justifiably proud of his days as scoutmaster. Many of his boys have become distinguished judges, lawyers, doctors, and business executives. Lt. Col. Walter Marm, a Congressional Medal of Honor recipient, is numbered among Charlie's graduates. Tom Jones is the remaining survivor of the Department's crack pistol team that won national and international acclaim back in the 30s and 40s. Others on this famed team were: Major Jacob Mauk, Walter Kunkle, Bruce Burtner, Lewis Feloni, Tom Eshleman, Bob McKee, Clemence Snipas and William Stile. Bill Chalfont was promoted to Asst. Resident Manager of the Chippewa Regional Correctional Facility at Kincheloe, Michigan. Mike Depsky, now a resident of Wildwood Crest, N.J., is a popular manager of a local club in S. Jersey.

Ralph Kell bought Fred Denn's badge, and is seeking other PSP memorabilia to buy for his growing collection. The granddaughter of Capt. George F. Lumb, our Department's first deputy superintendent is seeking a copy of Katherine Mayo's book, THE STANDARD BEARERS, which she is willing to purchase. Anyone having a copy to sell is urged to get in touch with me to negotiate a price. Bill Gressang still remembers, with good reason, the Lewistown Army sergeant who saved his life in Sicily during World War II. Andy Kutney is president of the Pennsylvania Bison Association. Andy has a buffalo herd numbering 29 of these big animals which he raises and butchers to meet the growing demand for buffalo meat.

I again thank all retirees who write to help me put this column together. Without such contributions, my efforts would indeed be strained.

Evelyn joins me in wishing all of you nice people a most Blessed Christmas Season abounding with memorable moments shared with loved ones.

DEATHS: Jack W. Bert, Dover, Delaware; and Richard H. Klick, Kingston, Pa.



**Stork Club**

Departmental
Mrs. Thelma Detwiler, granddaughter
Mr. & Mrs. Thomas Thompson, son
Sgt. & Mrs. Robert McKnight, granddaughter

Troop A
Tpr. & Mrs. Jeffrey Doman, girl
Tpr. & Mrs. James S. Bock, girl

Troop J
Tpr. & Mrs. Patrick Quigley, boy
Tpr. & Mrs. Ron Brynarsky, grandson

Troop K
PCO Susan Krieble, girl

Troop M
Tpr. & Mrs. Gerard F. Walsh, boy

Troop N
Tpr. & Mrs. Frank DeAndrea, Jr., girl
Tpr. & Mrs. James J. Hischar, girl
T.A.M. Marjorie L. Dorris, grandson
Tpr. & Mrs. Thomas J. Lazicki, girl

Troop T
Cpl. & Mrs. Richard Dean, girl
Tpr. & Mrs. William Badie, boy

P257

## RETIREES' SCOOPS

As we draw closer to the new year, it is important that our 1992 Association dues be paid without delay. Please send your $5.00 checks to Harold Trout, 914 W. Foxcroft Drive, Camp Hill, PA 17011. Harold is waiting anxiously to credit your records and send you a copy of the new Retiree Directory, which in itself is worth the five bucks. Please give this matter your prompt attention.

We appeal here to the many troopers who have retired in 1991 and will retire in 1992 to join our Retiree Assn. There are many actions to be taken to enhance our retirement years, and it is only through organizational strength that beneficial results can be successfully won. Think about this, and join us. Each new member will receive a copy of the new Retiree Directory.

Happy Birthday greetings are sent to: Harold Stansfield, 81, Jan 4; Earl Ging, 91, Jan. 8; Willard Schauer, 82, Jan. 15; John R. Stewart, 87, Jan. 20; Malcolm Gramley, 86, Jan. 26; Russell Knowles, 82, Jan. 26; and William Earley, 82, Jan. 29.

Congratulations are sent to Lewis and Maguerite Small on their 64th wedding anniversary Jan. 3; Charles and Mary Bohner, their 50th, Jan. 7; Harold and Rose Trout, their 53rd, Jan. 23; and Durward and Ruth Ellen Gehr, their 63rd, Jan. 26. Lew and Marguerite hold the title for the longest wedded retiree couple.

Add to the sick list: Mildred Derr (Wilbur's wife), Cliff Yahner, Dean Vannucci, Tom Jones, Eleanor Grill (Al's wife), Charlie Bohner, Earl Moore, David Martin, John Krupey, Howard Kisner, Gerald Patterson, Sal Conti, Marcella Treglia (Earl's wife), and Fred Gardner. A letter from Father Francis Christof assures us that he is off the sick list.

In our last column we mentioned the omission of a name in the new retiree directory. It has come to light with regret that the printer omitted an entire column. Please insert the following names and addresses in your copy of the directory: NODICH, John, R.D. 2, Box 202, Ottsville, Pa. 18942; NOEL, John W., 221 Brook St., Peckville, Pa. 18452; NOLAN, Thomas E. 43323 N. 43rd St. W. Lancaster, CA 93536; NORRIS, John J., 2 Godfrey Lane, Hollidaysburg, Pa. 16648; NOVAK, Dave, R.D. 6, Box 54, Bedford, Pa. 15522; NOVATNAK, Michael D., 315 Fern St., Hawley, Pa. 18428; NOVOTNY, Frank J., 146 W. Coal St., Nesquehoning, Pa. 18240; NOWAKOWSKI, George S., 174 Foote Ave., Duryea, Pa. 18642; NUHFER, Raymond N., 2619 Charolotte St., Erie, Pa. 16508; O'BRIEN, William S., 507 E. Sheridan Ave., New Castle, Pa. 16105; O'BOYLE, John E., 55 Upper High St., Frackville, Pa. 17931; O'DONNELL, James R., 7025 Clearfield St., Harrisburg, Pa. 17111; O'DONNELL, Lawrence J., 925 Willow St., Scranton, Pa. 18505.

We announce with regret the deaths of Helen Callahan (Jack's wife); and Shirley Basci (Anthony's wife). Both women succumbed to long term battles with cancer.

In order to help me with something I should have done a long time ago, I am asking the leaders of each retiree breakfast group to send me the name of the group and the date, time and place of their gatherings. I've had requests for this information, and regret my not being able to reply productively. Please!

Emilie Lonardi, daughter of Carlo and Dotty, recently received the coveted Forrest E. Connor Memorial Scholarship awarded by the American Assn. of School Administrators. Emilie, a former assistant principal at Camp Hill High, is studying for her doctorate at Penn State. Nelson Kreider's step-daughter, Jacqueline Whalen, received her Chiropractic doctorate magna cum laude from Palmer College. Another step-daughter is a medical college student at Philadelphia. Bill Nevin's granddaughter, Heather Neil, is off to Poland, where she will teach English at a private school. English is a popular subject among the Poles.

Ed and Terry Goddard in company with Jim and Winnie Padden enjoyed their 6-day tour of San Francisco, San Diego and Lake Tahoe. Kent Riegel has been appointed to the staff of the U.S. Marshal at Reading. Joe Packer was recently appointed Regional Vice President for PARSE's southeast region. Tom Shelar was recently promoted to Agent-in-Charge of Special Operations with the state Attorney General's Office. Tom has been with the AG for nine years. A morning phone call from Bernie and Jeannine Stanalonis from their Florida residence brightened the day for me.

Charlie Bohner is justifiably proud of his days as scoutmaster. Many of his boys have become distinguished judges, lawyers, doctors, and business executives. Lt. Col. Walter Marm, a Congressional Medal of Honor recipient, is numbered among Charlie's graduates. Tom Jones is the remaining survivor of the Department's crack pistol team that won national and international acclaim back in the 30s and 40s. Others on this famed team were: Major Jacob Mauk, Walter Kunkle, Bruce Burtner, Lewis Feloni, Tom Eshleman, Bob McKee, Clemence Snipas and William Stile. Bill Chalfont was promoted to Asst. Resident Manager of the Chippewa Regional Correctional Facility at Kincheloe, Michigan. Mike Depsky, now a resident of Wildwood Crest, N.J., is a popular manager of a local club in S. Jersey.

Ralph Kell bought Fred Denn's badge, and is seeking other PSP memorabilia to buy for his growing collection. The granddaughter of Capt. George F. Lumb, our Department's first deputy superintendent is seeking a copy of Katherine Mayo's book, THE STANDARD BEARERS, which she is willing to purchase. Anyone having a copy to sell is urged to get in touch with me to negotiate a price. Bill Gressang still remembers, with good reason, the Lewistown Army sergeant who saved his life in Sicily during World War II. Andy Kutney is president of the Pennsylvania Bison Association. Andy has a buffalo herd numbering 29 of these big animals which he raises and butchers to meet the growing demand for buffalo meat.

I again thank all retirees who write to help me put this column together. Without such contributions, my efforts would indeed be strained.

Evelyn joins me in wishing all of you nice people a most Blessed Christmas Season abounding with memorable moments shared with loved ones.

DEATHS: Jack W. Bert, Dover, Delaware; and Richard H. Klick, Kingston, Pa.



**Stork Club**

Departmental
Mrs. Thelma Detwiler, granddaughter
Mr. & Mrs. Thomas Thompson, son
Sgt. & Mrs. Robert McKnight, grand-daughter

Troop A
Tpr. & Mrs. Jeffrey Doman, girl
Tpr. & Mrs. James S. Bock, girl

Troop J
Tpr. & Mrs. Patrick Quigley, boy
Tpr. & Mrs. Ron Brynarsky, grandson

Troop K
PCO Susan Krieble, girl

Troop M
Tpr. & Mrs. Gerard F. Walsh, boy

Troop N
Tpr. & Mrs. Frank DeAndrea, Jr., girl
Tpr. & Mrs. James J. Hischar, girl
T.A.M. Marjorie L. Dorris, grandson
Tpr. & Mrs. Thomas J. Lazicki, girl

Troop T
Cpl. & Mrs. Richard Dean, girl
Tpr. & Mrs. William Badie, boy

PAGE SIX

## RETIREES' SCOOPS
### by Phil Conti, Reporter

Once again, the lead for this column is a reminder to all Association members that 1993 dues are now payable. ($5 for active members and $6 for associate members). Please send your checks to Harold K. Trout, 914 W. Foxcroft Drive, Camp Hill, PA 17011, as soon as possible. Harold will be glad to hear from you.

Some members, in submitting their checks to Harold, have included notes indicating their concern about a COLA. In the New Year an aggressive campaign will be undertaken to convince the General Assembly members that a COLA is truly needed and long overdue. We will keep you posted on this joint effort by all state retiree groups. We have also been promised support from the Pa. State Troopers Assn.

We send Happy Birthday greetings to: William Gressang, 83, Mar. 2; Jack Arms, 93, Mar. 14; Andrew Baigis, 84, Mar. 14; Donald Cutting, 81, Mar. 14; Albert Shuller, 90, Mar. 14; Thomas Jones, 87, Mar. 26; George Sauer, 90, Mar. 28; and Cliff Yahner, 81, Mar. 30.

Congratulations go to Harold and Becky Luther, who celebrate their 54th wedding anniversary Mar. 1; Willard and Ethel Schauer, their 59th Mar. 15; Jerome and Betty Wychulis, their 52nd Mar. 20; Irvin and Ruth Good, their 53rd Mar. 21; and George and Margaret Baxter, their 53rd Mar. 24. Belated congratulations are sent to Stan and Mary Butcavage who celebrated their 51st anniversary June 21.

We are grateful to Bob Martin, and all serving on the Immediate Relief Assn. board, for their efforts in securing a fair 2-year agreement with the Royal Maccabees Ins. Co. The contract allows spousal coverage of $5,000 for only 50 cents more per month. We retirees will always be thankful for whatever is done in our behalf.

Add to the sick list: Eleanor Grill (Al's wife), Helen Aitken (Bill's widow), Mary Butcavage (Stan's wife), Joe Kiefer, Henry "Herky" Herman, Cliff Yahner, Barbara Weimer (Dick's wife), and others mentioned in this column. Make a New Year's resolution to write often to our dear sick and shut-in friends.

Bill O'Brien writes that Vicki is slowly recovering from her stroke, and able to walk about the house with a quad cane now. Dick and Barbara Weimer are vacationing in Florida, following Barb's hip replacement surgery. Helen Aitken is recovering well from major surgery. Her reports are truly uplifting, and manifest so clearly that a positive attitude can overcome adversity. June and Don Fisher survived a severe winter storm that clobbered them with 36" of snow, thanks to help from neighbors. Don is a stroke victim, whose activities are limited. Ed Nagosky and George Baxter, also stroke victims, are limited in what they can do by themselves. They, and other stroke patients, need all the encouragement we can lend them during this stressful episode in their lives. Al Schmutzler writes that he is again

enjoying retirement to the full after the insertion of a pacemaker to remedy a heart condition.

We announce with regret the death of Helen Lee, Ben's widow; Madeline McCartney, Fred's widow; and Marcella Desch, Harold's widow.

George Froio is enjoying a Florida vacation. Tony and Millie Parry are back from a pleasant visit with their family in California. Dan Fiscus and his family have moved into the new home they've built during the past year. Dan says, "This is the first hunting season that I had all the time I wanted to hunt." He did not mention what he bagged, if anything. Willard Schauer will again head an important Allegheny County Chiefs of Police committee responsible for that group's annual publication. We've been informed that another retiree family must give up their home for another with fewer maintenance responsibilities due to ill-health. We share their distress in having to make such an emotional change.

Drawing on old memories, particularly rodeo days, Jim Griffith says, "Gad, we had some great horsemen! "Wild Bill" Hayman was the tops for my money." Jim enjoyed his recent visit with his son in Reno, where he operates the Kawasaki agency, and his daughter, who is with the Fresno PD. Anyone having a PMP ring and willing to sell can contact Ralph Kell. At their annual Christmas party, the Northwest Retiree Group presented their chaplain, Father Dollinger, with a retiree watch appropriately inscribed.

Stan Butcavage puts in part-time as a courier to and from the airport and area business places. Stan says, "This keeps me young." Tony Caldonetti is a part-time armored car courier, while Connie is Rep. Tim Holden's top aide for Schuylkill and Northumberland counties. William Moran has moved to Apache Junction, Arizona. That sounds like an interesting place for a western. Frank Clemens sent me a photograph picturing him, Joe Davoney, Pete Gustaitis, Stan Butcavage, Joe Packer, and Jim Ziegler, whose combined PSP service totalled 177 years, 4 months, and 15 days. Richard J. Kane represents the manufacturer of the spectrum environment light filter, a fast-selling adaptor for fluorescent fixtures. Richard is looking for retirees interested in joining the firm's sales staff in their local areas. For details contact him at 1252 St. Ann St., Scranton, Pa. 18504, (717) 343-7036.

A week before Christmas, Harrisburg area's Cumberland Valley High School won the AAAA state football championship by defeating Upper St. Clair 28-12. The CV starring quarterback was Sam Kinback, the grandson of our late Association president, Marshall Kinback. Young Kinback completed 7 of 13 passes for 115 yards and 1 touchdown.

For a long time I and others contributed stamps to Charlie Bohner. With Charlie's

passing, perhaps there is someone else who would like to have our stamps. Please write me if you are interested.

Once again, I remind you that this is your column - not mine. I urge you to contribute your news items, as many do. We are interested in what is happening to you. Really we are.

DEATHS: John R. Morrow, Schuylkill Haven; and Albert C. Kweder, Quakertown.



## STORK CLUB

**TROOP A**
Cpl. Mary Smith, boy
**TROOP C**
Tpr. & Mrs. John Buonpane, girl
Lt. & Mrs. Ron Raber, grandson
Tpr. & Mrs. David Nazaruk, girl
Cpl. & Mrs. William Keesler, boy
Tpr. & Mrs. Thomas Perry, twin boys
**TROOP D**
Tpr. & Mrs. Joseph Sonafelt, boy
**TROOP E**
Cpl. & Mrs. James Boniger, girl
**TROOP F**
Tpr. & Mrs. Martin Smolko, boy
**TROOP H**
Tpr. & Mrs. Rodney Capouillez, girl
Tpr. & Mrs. Robert Trostle, boy
Tpr. & Mrs. Michael Hogan, boy
**TROOP L**
Tpr. & Mrs. Harold Dillon, girl
Sgt. & Mrs. Frank Fetterolf, boy
Cpl. & Mrs. Arthur Zeplin, grandson
**TROOP P**
Tpr. & Mrs. David Pelachick, girl
**TROOP T**
Tpr. & Mrs. Randy Romig, girl
Cpl. & Mrs. Vincent Babich, girl



## WEDDING BELLS

**TROOP A**
Tpr. Daniel Morearity & Deborah
Tpr. Gregory Peck & Kimberly Shuba
**TROOP B**
Tpr. Adam Steinheiser & Jeanette Tedesco
**TROOP E**
Tpr. Robert Sipe & Paula Woods
**TROOP H**
Sgt. Kim & Tpr. Lucinda Hawkins
**TROOP K**
Tpr. David Stahl
**Bureau of Liquor Control**
E.O. Andrew Gier & Trudy Connors

P258

## RETIREES'S SCOOPS
### by Philip M. Conti, Reporter

Unless circumstances warrant it, this will be a final reminder that our 1993 Association dues are now payable: $5 for active members and $6 for associate members. Please send your checks to Harold K. Trout, 914 W. Foxcroft Drive, Camp Hill, PA 17011, as soon as possible.

I wish I could report something favorable about the prospects of a COLA, but it is too early in the present General Assembly session to evaluate our urgent appeal.

We send Happy Birthday greetings to: Anthony Kaleita, 80, Apr. 15; Earl Garman, 85, Apr. 17; Lewis Small, 89, Apr. 18; Lloyd Leinthall, 80, Apr. 20; and Stanley Szymanowicz, 82, Apr. 24. Belated greetings go to: Leonard Washington, 80, Feb. 2; John Beemer, 80, Jan. 12; and Edmund DeLeo, 80, June 3, 1992.

We congratulate Michael and Kathleen Wassel on their 61st wedding anniversary, Apr. 2; Warren and Naomi Singer, their 54th, Apr. 3; Joe and Alie Tierney, their 51st, Apr. 6; Al and Eleanor Grill, their 51st, Apr. 10; John and Ann Maggioncalda, their 53rd, Apr. 16; Cliff and Yoma Yahner, their 54th, Apr. 17; John and Jennie Amick, their 53rd, Apr. 18; Charles and Laura Rice, their 53rd, Apr. 18; George and Mary Pintarch, their 53rd, Apr. 20; and Walter and Dorothy Marm, their 54th, Apr. 27.

Belated congratulations are sent to John and Betty Amour who celebrated their 52nd wedding anniversary Dec. 7. John says, "We'll not forget our first wedding anniversary - Pearl Harbor Day."

Add to the sick list: Barney Singer, Foster Ott, Gerald Machemer, Mary Kisner (Howard's wife), Walter Heuer, Ted Davidson, Marie Rhine (Joe's widow), and Rita Cronin (Art's wife). There are others to be sure. Please remember all our sick and shut-in friends. You will feel good about doing so.

Now and then it happens that we place a retiree on the sick list, and are notified of his death, as The Communicator comes off the press. The publication of a monthly paper has no shield against such incidents. Yet, we deeply regret events of this kind when they occur.

Survivor-spouses are now eligible to secure health care coverage at their own expense, regardless of when the annuitant died. Interested survivor–spouses may obtain further program details by contacting Donna Strawser, SERS Health Benefits Coordinator, P.O. Box 1147, Harrisburg, Pa. 17108-1147, phone 717-237-0204.

Dan Evanisko is a patient at the Overlook Nursing Home, New Wilmington. John Nicklow is security director for Lake Buena Vista Holiday Inn, Orlando, Fla. Doug Greenfield enjoys his post as supervisor for the Harvey Childs Bonding Co., Greenville. Max

Roseck has resigned as Lawrence County probation officer in favor of entering the race for sheriff on the Democratic ticket.

Gene Corsi advises that the Bethlehem Troop breakfast group will meet on April 1, at 9 a.m. at the Blue Fountain Restaurant, US Rt. 1, Langhorne. Leo and Dot Cotter are babysitting their grandchildren for daughter, Katie, in Georgia. They plan to attend Dot's 50th class reunion in Pennsylvania this spring. A trip to Alaska is also planned for 1993. Bill and Vicki O'Brien are spending the winter in Phoenix, Arizona, hoping that the change in climate will substantially aid her recovery from the effects of a stroke. Jim Landis is now a Lancaster County notary public. Jim, in company with his daughter and her family, enjoyed their first-ever visit to Disney World. He now looks forward to the May marriage of his son, Jamie, to lovely Lynne.

Richard and Kathy Amour celebrated their 25th wedding anniversary Mar. 9. In the December, 1992, issue of The Communicator there appeared a photo of four Highway Patrolmen, one of whom was unidentified. Dick Fitzpatrick writes that the unknown rider is Joe Temple. Ruth Adams Schilling, Col. Adams' daughter and widowed in 1991, writes that she is actively engaged in volunteer services for the ages in Sun City Center, Fla. May the good Lord bless all of our retirees, and there are many, who give of their precious time to comfort the lonely and sick. Robert Swartwood operates his Swartwood Investigative Services at Lancaster, specializing in executive protection and confidential investigations.

Jim Rutkowski is interested in purchasing an old "bobby" helmet from anyone willing to part with one. Jim can be reached at the Northeast Training Center, 717-288-3659. Dave Stitt wants to purchase any PSP memorabilia. Dave may be contacted at the Hollidaysburg Barracks, 814-696-0261. The Northwest retirees reelected the following officers for 1993: Art Berardi, president; Ed Pasi, vice president; Paul Seta, treasurer; and Harry Jabo, secretary. Ed and Sally Herbst celebrated their 40th wedding anniversary with a pleasant trip to Arizona.

Tom Aneskevich says his lost mail directed to Harold Trout "took the wrong off-ramp." Dan Monkiewicz is a nuclear security analyst for the Philadelphia Electric Company. Bill Nevin tells me that he, Harold Stansfield, Frank Heiser, Howard Kisner, Bob Musser, Harry Bell and Kenneth Herman, are the only survivors of the Training School Class of September, 1933. Charlie Vall and wife, Chris, enjoyed their all-expense paid trip to Colorado via AMTRAK - a gift from son, Fred. Ray Folk and his wife are proud of their new grandchild, Christopher, who was baptized Jan. 17 by Father Cappelloni, brother of their daughter-in-law. The baptismal water was drawn from the River Jordan.

Once again you are urged to send me your news items. My address is: 1081 Acri Drive, Harrisburg, Pa. 17111. Your contributions to the column will be appreciated.

With the swift passage of time, we look foward anxiously to another beautiful springtime, and the opportunity it offers for spending more recreational hours outdoors. You duffers especially know what I mean.

DEATHS: Paul E. Eberts, Harrisburg; Eugene F. Sharpe, Coatesville; Theordore A. Malinowski, Macungie; Emil Awglis, Lancaster; Kenneth W. Leeper, Meadville; Rogert L. Spence, Jessup; Anthony E. Discavage, Lancaster; Steve Slota, Oakdale; and Vincent Fiorani, Bedford.

*Promotions—continued from page 1*

**Phillip Lee DeWire** of Hughesville, Lycoming County, is promoted to Captain. DeWire will serve in the department's Bureau of Professional Responsibility, Staff Inspection Division, in Harrisburg. A native of Muncy, Lycoming County, DeWire enlisted in the State Police in 1968. Following his training at the State Police Academy in Hershey, he was assigned to Troop C, Shippenville. As he progressed through the ranks, DeWire also served in Highspire, Montoursville, Stonington, Selinsgrove, and Wyoming. DeWire was promoted to Corporal in 1981, Sergeant in 1988 and Lieutenant in 1992.

**Robert H. Martz** of Lehighton, Carbon County, is promoted to Captain. Martz will serve as director of the Bureau of Liquor Control Enforcement's Operations Division, Harrisburg. A native of Lebanon, Lebanon County, Martz enlisted in the State Police in 1972. Following his training at the State Police Academy in Hershey, he was assigned to Troop J, Avondale. As he progressed through the ranks, Martz also served in Lehighton, Hazleton, Hollidaysburg and Dunmore. Martz was promoted to Corporal in 1983, Sergeant in 1988 and Lieutenant in 1991.

**Virginia L. Smith** of Harrisburg is promoted to Captain. Smith is the first black woman in State Police history to reach the rank of captain. She serves as the department's Affirmative Action Officer and will retain that position. A native of Rose Township, Allegheny County, Smith enlisted in the State Police in 1975. Following her training at the State Police Academy in Hershey, she was assigned to Troop E in Franklin, Venango County. As she progressed through the enlisted ranks, Smith became a patrol supervisor stationed at several Troop B, Washington, stations and Troop J, Avondale. She later became patrol section commander at Troop M, Bethlehem. Smith was promoted to Corporal in 1982, Sergeant in 1986 and Lieutenant in 1990.

*P259*

## RETIREES' SCOOPS
### Phil Conti, Reporter

In June, the panel of Association officers met in Altoona to review plans for this year's reunion, set for the weekend of Sept. 24-26. President Bob Milliron and his reunion committee have settled on a program that will surely please those who attend. Details will follow soon by mail. Please make your plans to join us for a pleasant weekend shared with old friends.

Gov. Casey continues to improve after undergoing heart and liver transplant surgery. We wish him well. This reminds us how well Herman Faiola is doing since his heart transplant surgery in 1985. Herm is surviving proof of medical science's advancement in the field of organ transplantation.

We send Happy Birthday greetings to: Joseph Hubitsky, 80, Sept. 1; Thayer B. Wise, 85, Sept. 7; Robert E. Deitrich, 82, Sept. 10; Paul D. Bowser, 83, Sept. 12; Melvin L. Woodring, 85, Sept. 15; David J. Cole, 86, Sept. 16; Leroy R. Foulkrod, 83, Sept. 19; James R. Vaughn, 89, Sept. 27.

We are saddened by the death of Ervin "Jack" Arms, 93, the second oldest among our retirees. Jack died of injuries suffered in an auto accident. Bill Nevin claims "Jack would have lived to be a hundred if it were not for the accident." Our oldest living retiree is Leroy Thomas, 93, of Wyoming. Moving up to second place is Raymond N. Nuhfer, of Erie, who will be 93 in August.

Congratulations are sent to William and Margaret Banzhaf on the occasion of their 53rd wedding anniversary Sept. 3; Andrew and Helen Royko, their 55th Sept. 3; Alex and Mary Baceski, their 52nd Sept. 10; George and Ethel Spotts, their 51st Sept. 12; George and Mabel Finnin, their 59th Sept. 14; Adam and Louise Budjako, their 56th Sept. 16; George and Agnes Hirschmann, their 52nd Sept. 21; Donald and Elizabeth Cutting, their 56th Sept. 29; and Peter and Helen Povlick, their 51st Sept. 29.

Gene Corsi tells me the Troop M, Bethlehem breakfast group will meet on Oct. 7 at the Blue Fountain Diner on Rt. 1, Langhorne, at 11 a.m. for breakfast or brunch.

Carl Benson's two granddaughters graduated from Lycoming College. Two other grandchildren are college students. Carl has seen two granddaughters married in recent months, and a third married in July. Amidst this social schedule, Carl was honored by Williamsport's Divine Providence Hospital for his 2,000 hours of volunteer services.

Francis and Marta Maher enjoyed their 2-week vacation in Ireland. Francis is enrolled at St. Vincent College, Latrobe. Frank Clemens keeps me posted on his current travels across the country, before heading overseas to Slovakia. Evelyn and I completed an extended tour of the New England states in July. A Puritan family that came to the Massachusetts colony from Norwich, England, in 1633. So, the trip had special meaning for her–and for me. Jim Boyd operates "Your Handyman & Deck Building Company" at Clifton Heights.

Andy Kutney's buffalo herd now number 40 head. His buffalo meat trade is thriving. Andy is recovering extremely well from injuries suffered when his tractor overturned on him some months back. Joe and Carmella Ruffa are deeply concerned these days with the serious illness of a young grandson. Phil Hoffman runs a remodeling business at Camp Hill. Ed Gallagher is doing well following eye surgery.

I offer a personal plug with your indulgence. I have 30 PSP History books remaining on hand. A copy of the 672-page volume with 100 photos can be ordered for $7 plus $3 mailing cost. You might consider a copy as a Christmas gift for some interested relative or friend. In any case, once gone there will be no more. Write me at: 1081 Acri Drive, Harrisburg, PA 17111.

Add to the sick list: Bill Banzhaf, Tony Parry, Ed Gallagher, Ed Nagosky, Walter Heuer, and George Baxter.

As always, I urge you to remember our sick and shut-in friends. The following written by Charles H. Towne conveys this message more poignantly. It is entitled AROUND THE CORNER:

*Around the corner I have a friend in this great city that has no end. Yet days go by and weeks rush on, and 'ere I know it, a year has gone. And I never see my old friend's face, for life is a swift and terrible race. He knows I like him just as well as in the days when I rang his bell and he rang mine. We were younger then; and now we are busy and tired men–tired with trying to make a name. "Tomorrow," I say, "I'll call on him, just to show I'm thinking of him." But, tomorrow comes and tomorrow goes, and the distance between us grows and grows. Around the corner, yet miles away! "Here's a telegram, sir! Jim died today! And that's what we get and deserve in the end: Around the corner–a vanished friend.*

Again, I urge you to submit news items for this column. Please do not hesitate to do so, for we are truly interested in what is happening to you and your loved ones.

Evelyn joins me in wishing all of you the happiest of summertimes.

Deaths: Ervin M. Arms, Harrisburg, and Evan R. Chaplin, Bokeelia, Fla.

## CENTRAL AREA PENNSYLVANIA STATE POLICE IMMEDIATE RELIEF FUND ENROLLMENT

The Central Area Pennsylvania State Police Immediate Relief Fund was established over 40 years ago. The purpose of the Fund is to offer immediate monetary assistance upon the death of a member of the Fund. On May 7, the Board of Directors of the Immediate Relief Fund endorsed an open enrollment period for all personnel of Troops F, G, H, N, P, R, S, T, the Academy, and Departmental Headquarters.

The open enrollment period will continue until April 30, 1994. Application must be made prior to reaching the age of 50.

The Fund is presently paying the beneficiary the sum of $1,800, which is tax free and paid immediately upon notification of a member's death. Solvency of the Fund is maintained by assessing members $6 after the deaths of three members of the Fund. Assessments are due within 20 days of the assessment notice.

Additional information and applications may be obtained, as follows: Troop F, Tpr. Daryl Baker; Troop G, Tpr. Robert L. Taylor; Troop H, Cpl. Steven J. Condes, Retired; Troop N, Tpr. Dan Gentile; Troop P, Cpl. Ronald J. Zukosky; Troop R, Contact Representative of Troop P, Troop S, Tpr. Merle J. Ammerman; Troop T, Dennis DeFrank; Departmental Headquarters, Sgt. George Kaminsky and Tpr. Louis Vittor; Academy, Ms. Janet L. Meinsler.

## The Communicator

Published monthly by the Public Information Office, Department Headquarters, for employees, active and retired. Items for publication should be sent to Sgt. Richard Morris, 1800 Elmerton Avenue, Harrisburg, PA 17110 by the 5th of each month. Any members or employees having feature stories or information concerning areas of expertise that you feel will be beneficial to employees, are encouraged to submit them to *The Communicator* for publication.

P260

## RETIREES' SCOOPS
### by Phil Conti

We send Happy Birthday greetings to: George Barkauskas, 84, Aug. 25; Stiles Smith, 87, Oct. 5; Charles Harbaugh, 80, Oct. 5; John Reed, 85, Oct. 6; Walter Smith, 81, Oct. 8; Calvin Ross, 90, Oct. 11; Edward Barr, 83, Oct. 13; Irvin Good, 82, Oct. 20; Joseph Packer, 81, Oct. 23; James Griffith, 81, Oct. 25; and Samuel May, 89, Oct. 30.

Congratulations to Richard and Gladys Gray on their 57th wedding anniversary, Oct. 5; Robert and Betty Klare, their 53rd, Oct. 12; Sam and Olga Rennard, their 52nd, Oct. 14; Malcolm and Edna Gramley, their 57th, Oct. 20; John and Vera Reed, their 59th, Oct. 27; Robert and Ruth Dietrich, their 57th, Oct. 27; and George and Dorothy Boyer, their 51st, Oct. 31. Belated congratulations go to Ralph and Marge Chronister on their 53rd wedding anniversary May 4. Ralph celebrated his 80th birthday Sept. 8. Both Ralph and Marge are longtime volunteers at Harrisburg's Dauphin Manor Nursing Home.

Add to the sick list: John I. Swann, Anthony C. Parry, Albert Weir, and Robert O. Bechdel. There are so many more to be sure. Cards and letters, please.

An Erie Morning News story reports that Anthony Ruffa, the 2-1/2 year-old grandson of Joe and Carmella Ruffa, underwent complicated brain surgery at Denver, Colorado; and the odds of the tot's recovery are excellent. Bill and Vick O'Brien have occupied their new apartment, which is more accommodating for Vicki, who is recovering from a stroke. Bill says, "I'm finished with mowing grass, raking leaves and shoveling snow."

Williard Schauer was a winner in Pittsburgh's South Hills Interfaith Ministries Walk-A-Thon. Handicapped entries had to walk one mile. Willard crossed the finish line in 35 minutes 4 seconds with an impressive lead. Willard underwent an eye exam at the Pittsburgh Station and salutes DLE Joseph Cepaitis for his friendly and courteous demeanor. Some retirees have not been received so well when stopping by a station. So, we commend enlisted and civilian personnel who show us old-timers cordiality.

Bill Nevin received a letter from Ken Herman, a 1933 PSP classmate, who has an interesting life story to relate. Bill and Ken are two of the six 1933 class survivors. Bill's granddaughter, Heather Neill, will return to a private school at Krakow, Poland, where she teaches English. Two retirees have expressed to me their interest in collecting stamps. They

are: Clarence Conapitski, 1005 Halfway Drive, Myerstown, Pa. 17067; and Carl Maciejewski, 914 Hope St., Avoca, Pa. 18641. Both will appreciate your contributions.

At the recent 75th Annual State American Legion Convention at Monroeville, Bob Bamat was honored as one of Pennsylvania's American Legion Post Commanders of the Year. From the more than 900 Post Commanders in Pennsylvania, only Bob and a handful of other commanders qualified for this special award. Daniel Spang was appointed the first chief of the newly-formed Mifflin County Police Department. On a recent trip to Myrtle Beach for a family gathering, Wilbur Derr stopped by to visit with Charles Hartman, which he frequently does.

Frank Clemens has completed another sweep of the contiguous states, visiting former U.S. Marine buddies, and will soon leave for an extended visit to Slovakia. We continue to enjoy mail from Helen Aitken, Bill's widow, whose sense of humor and uplifted spirits will surely carry her to a 100th birthday.

From time to time an interest is shown by someone wanting to buy a copy of one of Katherine Mayo's 3 books: "Justice To All," "Mounted Justice," and "The Standard-Bearers." If anyone possessing a copy of these books is willing to sell, I can find a buyer. Please write me.

We announce with regret the deaths of Mary "Kay" Kinback, Marshal's widow; and Lillie M. Haller, a longtime police communications operator at PSP Headquarters.

As always, I remind you that this is your column–not mine. While you may consider things that affect you and your loved ones to be insignificant, we look at them from a different angle and truly care. Many retirees write how pleased they are to read about former associates who have taken a different path in retirement. My address is 1081 Acri Drive, Harrisburg, Pa. 17111. Please write.

Meanwhile, Evelyn and I hope your summertime activities, whatever they were, have supplied you with happy memories.

DEATHS: Clyde K. Lamborn, Palmyra, Pa.; and Joseph R. Souders. Waynesburg, Pa.







Lt. Col. Joseph Blackburn took part in the June 28 kickoff of "National Sobriety Checkpoint Week." Joining Lt. Col. Blackburn at the Capitol press conference were Acting Governor Mark Singel and representatives from the Mothers Against Drunk Driving, (MADD), PennDOT, Dauphin County and Nationwide Insurance.



Bill Gardner, an inspector from the Avon and Somerset Constabulary, Great Britain, recently visited the Academy in Hershey. From l-r are Maj. Ralph Galicki, Mitch Dorum, Gardner and Lt. Col. Joseph Blackburn. P261

PAGE FOUR

## RETIREE'S' SCOOPS
### by Phil Conti

By the time this column is published, this year's reunion at Erie will be history. The October issue of The Communicator will carry two columns: one of which will be a rundown on the reunion, while the other will be our regular monthly offering. We are grateful to Col. Walp and his predecessors who have allowed this to become a tradition.

Again, I remind you that this is your column–not mine. Surely there are somethings you would like to share with us. A few retiree's are thoughtful enough to send me their local news items; but I need more of you to do this for me. How about it? Now and then news items are sent to Lt. Morris at Headquarters. This is extra work for him, since he in turn forwards those letters to me. My address is: 1081 Acri Drive, Harrisburg, Pa. 17111.

We send Happy Birthday greetings to: Charles Minnich, 91, Nov. 1; Joseph Kiefer, 80, Nov. 2; William Keuch, 93, Nov. 6; Philip White, 88, Nov. 8; Harold Trout, 80, Nov. 9; Paul Rittelmann, 86, Nov. 14; Michael Wassell, 89, Nov. 16; James McGeehan, 87, Nov. 24; Joseph Kirwan, 81, Nov. 27; and Andrew Rabel, 82, Nov. 30. Belated birthday greetings go to Sam Semelsberger who celebrated his 80th May 19, and to John Hornick on his 80th May 16.

Capt. George F. Lumb was born Nov. 10, 1874 – 120 years ago. Col. Earl J. Henry died Nov. 6, 1971 – 23 years ago. Col. Cyril Laffey died in office Nov. 30, 1984 – 10 years ago.

As we draw to the Department's 90th anniversary, it is proper to note the oldest of our retiree's, all of whom were born before our agency's founding on May 2, 1905; Leroy Thomas, 94; Raymond Nuhfer, 94; Earl Ging, 93; William Keuch, 92; James Brooks, 91; Albert Shuller, 91; George Sauer, 91; James Tooey, 91; Calvin Ross, 91; Charles Minnich, 90; Lewis Small, 90; James Vaughn, 90; Samuel May, 90; and John Stewart, 89. We salute these old-timers who have been so much a part of our history.

We congratulate George and Helen Barkauskas who celebrate their 56th wedding anniversary Nov. 9; Michael and Seal McGeary, their 55th Nov. 18. Evelyn and I celebrate our 58th Nov. 29.

For a long time now, I have listed the birthdays of those retiree's who have been fortunate enough to reach their 80th birthday, and those who have celebrated a golden wedding anniversary. If you fall into either of these groups, and have not seen your name mentioned, please write to me. It is important, at least to me, that we acknowledge all who have reached these milestones in life.

We announce with regret the deaths of Marjorie Egan, 78, Ed's widow; Lena Zimliki, 82, Al's widow; and Ellen Hornick, 73, John's beloved. Ellen and I both graduated from Erie's Strong Vincent High School.

Father Frank Christof will undergo knee surgery this month. A report on his condition will follow in the next column. Merl Shetter is one of the lucky ones to fully recover from the effects of a stroke, which kept him away from last year's reunion at Altoona. Joe Gydosh is recovering from a foot problem that put him in the hospital for treatment. Bill Banzhaf had to undergo arterial grafting that was necessary for the dialysis treatments he regularly receives three times weekly. Tony Parry is back home after a hospital stay at the Hershey Medical Center.

Another letter was received from Helen Aitken, Bill's widow, and a correspondent of ours for many years. She sets a remarkable example in growing older and enduring the problems of widowhood as well as any we've known. I wish space would allow me to share her letters with you. Ed Kedell's son, Edward, a Penn State student, returned from Lyon, France, where he received his B.S. degree in Finance and International Business after five years of study. Ed's daughter Jodi will enter Penn State at the State College campus this month. Chet Lapa is feeling much better these days after three angioplasty procedures in the past year. Chet's twin grandsons, Matt and Robb Quiggle, completed training with the Troop A, Greensburg, camp cadet program in July. My own grandson, Mike Deitrich, was a graduate of the Troop J, Lancaster, camp cadet program last summer at Indiantown Gap. These camp cadet programs statewide are truly undertakings we can be proud of.

Tom Ziemba has 5 Pennsylvania Motor Police bronze hat ornaments, which he is offering for sale. Anyone interested can reach Tom at 717-533-8389. Bob Haycock has retired from his 20-year second career with UBA Fire & Explosion Investigators, and presently enjoys residence at Punta Gorda, Florida and frequent golf outings. Dick Weimer winters at Fort Myers, and spends time with Bob. Both served in the Lancaster Troop. "Dutch" Livengood's daughters have sent me a box filled with memorabilia "Dutch" saved through the years. I will sort through this material soon to see if anything may be of value to the museum project. We are all string-savers, so to speak, and whatever we save may indeed be worth donating to the museum in due time.

As this column nears our doors, we should be uplifted by the early days of another beautiful Pennsylvania autumn. Before we are beset with the busy holiday season and the onset of winter, it would be best for us to relax and savor the comfortable conditions that autumn offers. Take time, for instance, to get in touch one way or another with our sick and shut-in friends who are denied the activities we more fortunate can choose at will. It takes but a few moments to do this. Evelyn joins me in wishing all of you well in whatever it is the spirit moves you to do. Remember how precious time is. Don't waste it!

DEATHS: Chester L. Wallace, Belle Vernon, and Joseph J. Julo, Whitehall.



## BIRTHS

**BUREAU OF DRUG LAW ENFORCEMENT**
Tpr. & Mrs. Anthony Ravotti, girl
**BUREAU OF LABORATORY & COMMUNICATIONS SERVICES**
Cpl. & Mrs. Robert Grimes, girl
**BUREAU OF STAFF SERVICES**
Mr. & Mrs. Vincent Delaney, girl
**BUREAU OF EMERGENCY SPEICAL OPERATIONS**
Cpl. & Mrs. James R. Cochran, girl
Tpr. & Mrs. Robert Buckley, girl
**TROOP A**
Maintenance Worker Dan Antoniak, granddaughter
Tpr. & Mrs. Douglas Fresch, girl
**TROOP B**
Tpr. & Mrs. Chris Callaghan, girl
Cpl. & Mrs. James Cassimelio, girl
**TROOP C**
Tpr. & Mrs. James Sharer, boy
Tpr. & Mrs. John Buonpane, boy
Tpr. & Mrs. Timothy Bell, boy
**TROOP F**
Tpr. & Mrs. Thomas Bush, boy
Tpr. & Mrs. Robbie Murphy, girl
**TROOP G**
Tpr. & Mrs. Gary Wolfe, girl
Tpr. & Mrs. Doug Evans, boy
Tpr. & Mrs. John Young, girl
**TROOP L**
Tpr. & Mrs. Thadd Dillon, boy
**TROOP M**
Cpl. & Mrs. Joseph Wilson, boy
Tpr. & Mrs. Steven Groman, boy
**TROOP N**
Cpl. & Mrs. Keith Husar, boy
**TROOP P**
Cpl. & Mrs. Kenneth Martin, boy
**TROOP S**
Tpr. & Mrs. William Spagnola, twin girls
Tpr. & Mrs. James Jenkins, girl
Tpr. & Mrs. Kevin Miller, boy

P262

F16

XSDD11-00648 S XPNL11-00001 01/07/●● 14:39:59 – 01/04/00 15:07:● AGE 1 OF 2
SN XPNL11 P,   ●● BZ32TKJPSYW6

SUBJECT:      PROMOTIONS AND TRANSFERS

TO:           AREA, TROOP AND STATION COMMANDERS
              AND BUREAU DIRECTORS

REFERENCE:    (A) FR 3-2, TRANSFERS.

        1.  THE DEPARTMENT WILL BE FILLING VACANCIES FOR THE RANK OF
LIEUTENANT, VIA TRANSFERS AND PROMOTIONS WITH AN EFFECTIVE DATE OF JANUARY
28, 2000.

        2.  AS DIRECTED IN REFERENCE (A), MEMBERS SHALL SUBMIT
PREFERENCE TRANSFER REQUESTS, IN DUPLICATE, THROUGH CHANNELS TO THEIR TROOP
COMMANDER/BUREAU DIRECTOR.  TROOP COMMANDERS/BUREAU DIRECTORS SHALL ENSURE
ANY PREFERENCE TRANSFER REQUEST FOR THE RANK OF LIEUTENANT
IS IMMEDIATELY PUT INTO THE AUTOMATED PREFERENCE TRANSFER SYSTEM.

        3.  ONLY THOSE REQUESTS ON THE AUTOMATED PREFERENCE TRANSFER
SYSTEM FOR THE RANK OF LIEUTENANT BY NOON ON FRIDAY, JANUARY 7, 2000,

P263
1 OF 2

XSDD11-00648 S XPNL11-00001 01/07 ●0 14:40:00 - 01/04/00 15:07:●● BZ32TKJPSYW6 ●AGE 2 OF 2
SHALL BE CONSIDERED WHEN FORMULATING THE PREFERENCE TRANSFER LIST.

       4.   INFORMATION RELATIVE THE PROMOTION CEREMONY WILL BE
FORTHCOMING.

       5.   TROOP COMMANDERS SHALL ACKNOWLEDGE RECEIPT OF THIS MESSAGE
FOR ALL STATIONS UNDER THEIR COMMAND TO TERMINAL "XPNL11." BUREAU DIRECTORS
SHALL ACKNOWLEDGE RECEIPT OF THIS MESSAGE VIA CLEAN TERMINAL OR VIA
CORRESPONDENCE, FROM STD-501, TO THE DIRECTOR, BUREAU OF PERSONNEL.

AUTH/COLONEL PAUL J EVANKO/COMMISSIONER/PSP

XSDD11-00660 S XPNL11-00002 01/11/00 13:13:57 - 01/11/00 13:13:44 BZ32TKK4PPP7 PAGE 1 OF 1
SN XPNL11 P,

SUBJECT: LIEUTENANT PROMOTION CEREMONY

TO:      AREA, TROOP, AND STATION COMMANDERS
         AND BUREAU DIRECTORS

         1.  THE PROMOTION CEREMONY FOR THE NEWLY PROMOTED CAPTAIN AND
LIEUTENANTS WILL BE HELD AT THE STATE POLICE ACADEMY, HERSHEY, ON JANUARY
28, 2000, AT 1030 HOURS.

         2.  A CLEAN MESSAGE WILL BE FORTHCOMING REGARDING THE PROMOTIONS/
TRANSFERS FOR THE RANKS OF SERGEANT AND CORPORAL.

THERE IS NO NEED TO ACKNOWLEDGE THIS MESSAGE.

AUTH/LT. COL. THOMAS K COURY/DEPUTY COMMISSIONER/ADMIN.

P264

FR 1 Preface
2/20/98

## INTERACTION WITH PEOPLE

The "Golden Rule" is as applicable today as it has always been. People should be treated the way we and members of our families would like to be treated.

The type of treatment and interaction should not depend on the perceived status of the person, or any other variable that might be considered. We must never infringe upon the basic human rights of any person.

During the course of our employment we interact with many people. They may be colleagues, supervisors, subordinates, male or female, enlisted or civilian, victims, suspects, people of different races, ethnic backgrounds, religions, sexual orientation, or other numerous distinctions. Each person shall be treated fairly, meaning impartially and honestly, without self-interest, prejudice, or favoritism. They shall be treated equally, meaning in an identical manner as all others, without bias. They shall be treated with respect, decency, and courtesy, giving them the esteem due to any person, in any situation.

It is the policy of this Department that any interaction with any person, during the course of our employment, fall within these guidelines.

P265

To Be Opened
only by
Capt. Darell Ober
Pennsylvania State Police

P267

# MANAGEMENT DIRECTIVE

**540.7 Amended**
Number

**COMMONWEALTH OF PENNSYLVANIA**

## GOVERNOR'S OFFICE

Subject:

**Employe Performance Review**

| By Direction Of: | Date: |
|---|---|
| *Thomas G. Paese*    Thomas G. Paese, Secretary of Administration | June 22, 1998 |

**This amendment exempts certain positions from the performance evaluation process with approval of the Secretary of Administration. It also provides for "interim" evaluations for Non-Civil Service nonunion represented employes.**

**1. SCOPE.** Applies to all employes in agencies under the Governor's jurisdiction except those employes covered by Form PLCB 1678, D4 employes covered by Form DEBE 333, and other classes or positions approved by the Secretary of Administration.

**2. POLICY.**

a. Pursuant to *Section 206(5) and 704, Civil Service Act of August 5, 1941, P.L. 752, as amended; 4 Pa. Code, Subchapter B, §99.13; and Management Directive 505.7, Personnel Rules,* all employes, both Civil Service and Non-Civil Service, shall receive periodic performance evaluations.

b. The Employe Performance Review (EPR) system became effective November 1, 1993, and was fully implemented by November 1, 1995.

c. The EPR system is to be administered on an annual cycle. Agencies may choose any annual cycle(s) appropriate for effectively assessing employes' performance. The format chosen for annual rating cycles should be consistently applied throughout the organization.

d. Prior to the beginning of a rating cycle, supervisors are to provide employes with standards of performance. These standards may be conveyed in any manner which facilitates mutual understanding of assigned work and performance expectations regarding quantity, quality, and time frames. Specific standards are to be conveyed regarding job knowledge/skills; work results; communication; initiative/problem solving; interpersonal relations/equal employment opportunity; work habits; and supervision/management (where applicable).

e. At least one semiannual and one mid-probationary progress review are to occur.

f. An **annual rating** is to be finalized as soon as possible but not later than two months following the end of the rating cycle. This two month extension is to be used **only** to accommodate unusual or emergency situations which prohibit the completion of the rating.

g. Completion of ratings for **Civil Service probationary periods** and requests for extensions are to meet time frames established in *Management Directive 580.8, Classified Service Probationary Periods.*

P268
1 OF 12

Distribution: **B**

**h.** Completion of ratings for **positions covered by a collective bargaining agreement or memorandum of understanding (both Civil Service and Non-Civil Service)** should meet time frames consistent with the established union probationary period. In most cases, the time frames are the same, thus requiring only one probationary rating. However, where the Civil Service and union probationary periods are different, two separate ratings are to be prepared consistent with the respective probationary period time frames. If the union probationary period is to be extended, action must be taken consistent with time frames and procedures outlined in the contract or memorandum of understanding.

**i.** Employes appointed, transferred, or promoted into a **Non-Civil Service nonrepresented or Senior Management Service (SMS) position** should receive an **interim evaluation** and annual ratings thereafter.

**j.** All employe performance evaluations are to be finalized and filed in the employe's Official Personnel Folder no later than two months from the due date.

**k.** Form 363L (Enclosure 3) is to be used to rate employes. These forms are confidential and are not considered a public record. The Commonwealth Technology Center (CTC) will generate these forms two months before the rating is due. However, if supervisors have access to personal computers, agencies may use of PC generated form if it retains the same format and content as Form 363L. Copies of Form 363L are also acceptable. The Department of General Services (DGS) does not stock Form 363L.

**3. RESPONSIBILITIES.**

**a. Agency Heads** are to ensure that the EPR system is administered properly within their agencies and ratings are completed in a **timely manner** for **all employes.**

**b. Agency Personnel Officers** are to:

(1) Establish and disseminate internal agency instructions regarding the use of the EPR.

(2) Determine agency annual rating cycle(s) and inform the Office of Administration (OA) of such cycle(s).

(3) Train supervisors and managers in the use of the EPR and the development of standards/expectations.

(4) Monitor compliance with established policy and procedures and **ensure that performance evaluations are received and filed in the Official Personnel Folder in a timely manner.**

(5) Provide technical assistance to agency employes, supervisors, and managers.

**c. Raters.** A rater normally is the employe's immediate supervisor. The rater is to be knowledgeable of the employe's work performance. In the event of supervisory changes which do not provide a current supervisor with adequate time to assess performance (reorganizations, retirement, etc.), the reviewing officer or another manager who has knowledge of the employe's performance may do the rating. Exceptions to the rule must be clearly documented and justified. When a change in supervision is anticipated, efforts should be made to obtain interim ratings or other documented input prior to the supervisor's departure. Raters are to:

(1) Develop and convey performance standards to employes at the beginning of the rating cycle and as work assignments dictate. These standards may be conveyed in writing or orally. The format chosen should be consistent for all employes in a supervisory unit.

(2) Identify and discuss training and developmental needs.

(3) Conduct required progress reviews.

(4) Complete substantive performance reviews in accordance with this directive, agency internal direction, and in a **timely manner.**

**d. Reviewing Officers.** A reviewing officer is usually the immediate supervisor's supervisor. However, another manager knowledgeable of the employe's performance may be designated to function as the employe's reviewing officer. Exceptions to the rule must be clearly documented and justified. Reviewing officers are to:

(1) Ensure supervisors comply with their supervisory and performance evaluation responsibilities as outlined in this directive and evaluate supervisors on their effective use of the EPR process.

(2) Provide input and assessment into performance standards to ensure appropriateness to agency goals and consistency among similar positions.

(3) Participate in the evaluation process as provided on Form 363L and this directive.

(4) Discuss ratings/standards with employes at their request and resolve discrepancies between supervisors and employes.

e. **Commonwealth Technology Center (CTC), OA,** will produce and distribute monthly Forms 363L and Report PET84101, List of Performance Evaluations Due. The forms and report are produced for annual ratings due for Civil Service and Non-Civil Service employes and those designated as SMS. This same form and report is produced and distributed by CTC for probationary ratings due for Civil Service employes. Until further notice, agencies should maintain a tickler system to identify when Non-Civil Service union covered employes are to receive probationary ratings and when interim evaluations are due for Non-Civil Service nonunion or SMS employes (usually six months after appointment/promotion) and appropriately advise supervisors.

f. **State Civil Service Commission (SCSC)** will maintain copies of end of probationary period evaluations for classified service employes and for employes whose performance evaluation results in disciplinary action, dismissal, etc. The performance evaluation is not to be the official notification to an employe of an adverse action.

g. **The Office of Administration** will monitor the administration of the EPR system; conduct EPR training; and provide technical assistance, as required.

4. **PROCEDURES.**

a. Agencies are to determine the rating cycle(s) for organizations.

b. Information on an organization's annual rating cycle, referred to as the Performance Evaluation Cycle Code, must be recorded and maintained in the Integrated Personnel Payroll System (IPPS) to ensure that Form 363L and corresponding report can be generated by CTC.

c. **Agencies are to periodically review rating cycle(s) to make certain that all cycles are accurate and that all positions linked to the organization are appropriately coded to ensure employes will receive timely performance evaluations.**

d. Questions regarding Policy or Procedure should be directed to the Personnel Management Review Division, 717-787-8575, or FAX to 717-772-3153. Questions regarding the IPPS should be directed to the Personnel Systems Division, 717-783-5108 or FAX to 717-783-3472. Questions regarding the distribution of EPR forms should be referred to CTC, 782-8131.

e. All requests to exempt an agency position or classes of positions from the performance evaluation process are to be submitted to the Secretary of Administration for approval.

f. **Training.**

(1) Personnel Offices are to ensure that managers and supervisors receive adequate training which addresses the following:

(a) Purpose of performance evaluations.

(b) Responsibilities of supervisors and reviewing officers.

(c) Contents of and instructions for Form 363L.

(d) Internal agency procedures/time frames for using and processing Form 363L for annual, Civil Service probationary, Non-Civil Service union covered probationary, mid-rating cycle reviews for Non-Civil Service nonunion covered and SMS employes, and interim reports.

(e) Various methods for developing and conveying standards.

**(f)** Procedures/requirements for progress review(s).

**(g)** Using the Training and Development Section.

**(h)** Guidelines for conducting quality performance based interviews.

**(i)** Guidelines for documenting performance and dealing with performance problems

**NOTE: Emphasis must be placed on the need to prepare performance evaluations in a timely and substantive manner.**

**(2)** All supervisors are to receive formal EPR training as soon as possible upon entering a supervisory position but definitely within six months of assuming supervisory duties.

**(3)** Refresher EPR training is to be conducted as needed.

**(4)** Top management should receive training as well as a specific briefing on the overall requirements of the system, agency compliance, personnel office monitoring procedures, and the role of top management in the process.

**g. Instructions for use of Form 363L.**

**(1)** Form 363L is to be used to rate employes at the end of their rating cycle for annual, probationary, or mid-rating cycle ratings and, when necessary, for interim ratings.

**(2)** At the beginning of and/or during the rating cycle, supervisors are to ensure the accuracy of the employe's job description and provide employes with written or oral standards of performance. Supervisors will be held accountable for conveying standards and for ratings based on these standards. Supervisors should maintain a record of the date(s) that standards were conveyed.

**(3)** Reviewing officers are to ensure supervisors have standards that are consistent with agency goals and similar positions.

**(4)** At least one semiannual progress review and one mid-probationary progress review are required. The supervisor should maintain a record of the date on which the progress review occurred.

**(5)** At the end of the rating cycle, supervisors are to complete Form 363L as follows:

**(a)** Verify and complete general employe information section and indicate whether employe is a supervisor or nonsupervisor.

**(b)** Review the employe's job description and job standards to ensure the appraisal relates to the specific responsibilities, job assignments, and standards which were conveyed to the employe for the rating cycle.

**(c)** Update the job description and essential job functions, if necessary, for the next rating cycle.

**(d)** Indicate on Form 363L the date(s) when job standards were conveyed to the employe and when the progress review(s) was conducted.

**(e)** Rate the employe by assessing each of six job factors (seven for supervisors) in relation to the established standards. Although written comments are required only if the rating is outstanding, needs improvement, or is unsatisfactory, written comments are recommended for all ratings. Comments should be specific enough to justify these ratings. Additional space for comments is provided by using Enclosure 1.

**(f)** Provide an overall rating based upon a composite of the factor ratings and consideration of those factors which may be substantially more important than others and carry greater weight in the overall assessment of the employe's performance. The comments section should address overall performance and provide rationale for the overall rating, especially where certain job factors are considered to be substantially more important than others.

(g)   Complete the Training and Development section by listing training needs to improve current performance or for future development. Specific courses need not be identified — only the training/development need. Information provided in this section should be given to the Training Officer for use in the development of courses and/or coordination of training schedules.

(h)   Share Form 363L with the reviewing officer and obtain comments and signatures.

(i)   Discuss the rating with the employe and obtain comments and signature. Attach additional 8-1/2 x 11 paper for any section which requires additional space for comments. If additional paper is required, it should contain the information in Enclosure 1.

(j)   Necessary copies are to be made consistent with internal processing procedures. The original is to be filed in the employe's Official Personnel Folder and copies provided to the employe and supervisor.

(k)   Copies of Civil Service probationary ratings and all unsatisfactory overall ratings for Civil Service employes are to be sent to the SCSC.

h.   **Interim Ratings.**

(1)   A rating for a Non-Civil Service and nonunion represented or SMS employe approximately six months following appointment, transfer, or promotion into the position.

(2)   Interim ratings also may be prepared at any time during the rating cycle if the:

(a)   Employe's rater changes.

(b)   Employe transfers or is promoted.

(c)   Job significantly changes, resulting in totally new standards but not in a change in classification.

(d)   Employe is assigned to work out of classification for an extended period of time.

(3)   Disciplinary action is initiated due to continued unsatisfactory performance. However, the performance evaluation is not to be the official notification of the adverse action.

(4)   Interim ratings are to be considered when completing the employe's annual or probationary rating.

i.   **Ratings for Non-Civil Service Employes.**

(1)   The *Pennsylvania Code* requires all employes to receive periodic performance evaluations.

(2)   In addition, effective management encourages a systematic employe appraisal process to measure current performance levels and to create a mechanism for reinforcing strengths, identifying deficiencies, and providing that information to employes so they may improve future performance. Therefore, it is incumbent that all employes receive timely performance evaluations.

(3)   Non-Civil Service and nonunion represented employes or SMS employes are to receive an interim rating approximately six months following appointment, transfer, or promotion into the position and anual ratings thereafter.

(4)   Non-Civil Service union represented employes are to receive a probationary period rating consistent with the established union probationary period and annual ratings thereafter.

k.   **Review and Appeals.**

(1)   If an employe requests discussion with the reviewing officer, the discussion should occur within two weeks or as soon as possible.

(2)   If an employe is dissatisfied with a rating, the employe may discuss it with the reviewing officer. If disagreement exists between the supervisor and the reviewing officer, the appeal should be raised to the next level of authority. The agency decision is final. Classified service employes may appeal alleged discrimination to the SCSC pursuant to *Section 951(b)* of the *Civil Service Act.*

### I. Personnel Office Monitoring Procedures.

(1)  Agency Personnel Offices are to establish effective monitoring processes to track the completion of performance evaluations for both Civil Service and Non-Civil Service employes.

(2)  Completed ratings are to be reviewed for completion, adherence to instructions, appropriate, consistent, and substantive comments identification of training needs, and proper signatures.  If an employe requests to meet with the reviewing officer, the Personnel Office should ensure the meeting occurred.  Training information and position accuracy information should be given to appropriate staff for action.

(3)  Follow-up procedures should be established to deal with delinquent ratings.

(4)  Top management should be made aware of untimeliness problems and continuing problems associated with improper completion of forms.

(5)  Where agencies have field personnel offices that administer the EPR process on a decentralized basis, the central office should establish a post-audit or other monitoring process to ensure the provisions of this directive are met.

(6)  By April 1 of each year, each central Personnel Office should complete Enclosure 2 for the past calendar year.  Field Personnel Offices should complete the report and send it to their respective central Personnel Office to compile the results and submit one composite agency report to the Personnel Management Review Division, Office of Administration.  Tracking data used to prepare the report should be maintained for three years.  Central Personnel Offices are responsible for ensuring the accuracy of this data.

(7)  When completing Enclosure 2, ensure that each month's statistics for ratings due and received are tracked separately so that delinquent ratings are not added to the ratings due and received in subsequent months.  If ratings received late are added to the statistics for subsequent months, the integrity of the timeliness statistics is compromised.  *Generally, an annual EPR report is timely if it is received by the last day of the due month.*  For example:

**Anniversary Date Cycle:**  CTC report indicates rating is due in March 1998.  Rating is due March 1st but it is considered timely if completed by March 31st.

**Fiscal Cycle:**  Ratings are for the period July 1st thru June 30th.  Ratings are due July 1st, but are considered timely if completed by July 31st.

**Calendar Cycle:**  Ratings are for the period January 1, 1998 thru December 31, 1998.  Ratings are due January 1, 1999, but are considered timely if completed by January 31, 1999.

**Federal Cycle:**  Ratings are for the period October 1st thru September 30th.  Ratings are due October 1st, but are considered timely if completed by October 31st.

*Probationary period ratings are considered timely if they are received by the probationary period ending date, not the last day of the month.*

For annual ratings, a two month extension from the date the rating is due is permissible for extenuating circumstances, i.e., extended leave, change in supervision, unexpected workload or priority, statistical reports required to complete the ratings, etc.

3 Enclosures:

1 —  Additional Performance Evaluation Review Comments
2 —  Employe Performance Review Timeliness and Completion Report
3 —  Sample Form 363L — Employe Performance Review

**This directive supersedes Management Directive 540.7 dated August 13, 1996.**

## ADDITIONAL PERFORMANCE EVALUATION REVIEW COMMENTS

**Comments Regarding Performance Evaluation Review for:**

Name: _____

Employe #: _____

Date: _____

Comments:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


_____        _____
Signature of Rater                      Date


_____        _____
Signature of Employe                   Date

Enclosure 1 to Management Directive 540.7 Amended                    Page 1 of 1

Revised 5/98

# EMPLOYE PERFORMANCE REVIEW TIMELINESS AND COMPLETION REPORT
## January 1, 19-- to December 31, 19--

Agency Name:
Agency rating cycle or cycles:
(Circle as many as apply)

Rating cycles:
- ANNIVERSARY — Anniversary date — End of month due
- FISCAL — 7/1-6/30 — 7/31
- FEDERAL — 10/1-9/30 — 10/31
- CALENDAR — 1/1-12/31 — 1/31
- OTHER — Any 12 month cycle — End of month due

| TIMELY: | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SPT | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. # of Annual EPR's due | | | | | | | | | | | | | |
| B. # of Annual EPR's received timely | | | | | | | | | | | | | |
| C. % received timely (B/A) | | | | | | | | | | | | | |
| D. # of Civil Service Probationary EPR's due (union & non-union) | | | | | | | | | | | | | |
| E. # of Civil Service Probationary EPR's received timely | | | | | | | | | | | | | |
| F. % received timely (E/D) | | | | | | | | | | | | | |
| G. # of non-Civil Service union covered Probationary EPR's due | | | | | | | | | | | | | |
| H. # of non-CS union covered Probationary EPR's received timely | | | | | | | | | | | | | |
| I. % received timely (H/G) | | | | | | | | | | | | | |
| J. # of non-Civil Service non-union & SMS interim EPR's due | | | | | | | | | | | | | |
| K. # of non-CS non-union & SMS interim EPR's received timely | | | | | | | | | | | | | |
| L. % received timely (K/J) | | | | | | | | | | | | | |
| M. TOTAL # EPR'S DUE (A+D+G+J) | | | | | | | | | | | | | |
| N. TOTAL # EPR'S RECEIVED TIMELY (B+E+H+K) | | | | | | | | | | | | | |
| O. TOTAL # OF EPR'S OVERDUE (M-N) | | | | | | | | | | | | | |
| P. TOTAL % OVERDUE (O/M) | | | | | | | | | | | | | |
| Q. # of EPR's received late but by12/31* | | | | | | | | | | | | | |
| R. Total # of EPR's still overdue as of 12/31/--** (O-Q) | | | | | | | | | | | | | |
| S. TOTAL % NOT COMPLETED as of 12/31/--** (R/M) | | | | | | | | | | | | | |

*Calendar cycle-- EPR's timely by January 31
** Calendar cycle-- EPR's completed by March 31
Probationary Reports due by probationary period end date

This report due by April 1 every year

SEND TO: PERSONNEL MANAGEMENT REVIEW DIVISION, 513 FINANCE BUILDING, HARRISBURG, PA. 17120

## SAMPLE FORM 363L — EMPLOYE PERFORMANCE REVIEW

### FORM 363L - EMPLOYE PERFORMANCE REVIEW

| GENERAL INFORMATION | TYPE REPORT __ PROBATIONARY (CS/NCS union covered)  __INTERIM  __ANNUAL __ PROBATIONARY ( CS non-union) | |
|---|---|---|
| EMPLOYE NAME | AGENCY | EMPLOYE NUMBER |
| CLASS TITLE | __ SUPERVISOR __ NON-SUPERVISOR | STATUS __ CIVIL SERVICE  __ NCS  __ SMS |
| ORGANIZATION | RATING PERIOD  FROM | TO |

### GENERAL INSTRUCTIONS

Verify/Complete General Information.  Indicate whether employe is a supervisor or non-supervisor.

Review the employe's job description for the rating cycle.  Review/discuss job standards (expectations/objectives/ duties) to ensure appraisal relates to the specific responsibilities, job assignments and standards which have been conveyed to the employe for the rating cycle.  Update the job description and essential job functions for the next rating cycle.

Indicate when you conveyed job standards to the employe and when progress review(s) was conducted.

Base the appraisal on the employe's performance during the entire review period, not isolated incidents or performance prior to current review period.

The comments sections should be used to:  support performance ratings, indicate problem areas and provide guidance to employes on how to improve performance.  Comments MUST be provided for outstanding, needs improvement and unsatisfactory ratings, but are highly recommended for all other ratings.  (ATTACH ADDITIONAL 8½ x 11 PAPER IF NEEDED.)

### PERFORMANCE RATING DEFINITIONS

Outstanding:  Results are achieved on a consistent basis and significantly surpass job standards.

Commendable:  The employe clearly exceeds job standards on a regular basis and demonstrates a high degree of initiative and quality of work.

Satisfactory:  The employe meets the standards of the employe's job in a fully adequate manner.

Needs Improvement:  The employe meets many of the standards of the employe's job in a satisfactory manner. Improvement is expected.

Unsatisfactory:  Excessive performance deficiencies exist and must be corrected.

### COMMUNICATION OF PERFORMANCE STANDARDS

1.  Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employe on _____
    date(s)

2.  Progress Review(s) was conducted on _____ (at least one during rating cycle)
    date(s)



EMPLOYE NAME:                                              EMPLOYE NUMBER:

| JOB FACTORS |
|---|

**1. JOB KNOWLEDGE/SKILLS**  This factor measures the employe's demonstrated knowledge of relevant job information such as: work practices, procedures, resources, policies, and technical information as well as the relationship of work to the organization's mission. Possession of essential skills required to perform the job also are measured.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| Demonstrates superior job knowledge and skills. Consistently provides and applies accurate and appropriate job information/resources. Applies new techniques. | Has thorough knowledge of the job and related resources. Strives to expand knowledge. Frequently recommends changes in procedures and methods as needs dictate. | Has adequate knowledge and skills to completely perform all job responsibilities. Handles inquiries properly. Has some knowledge of related work. | Possesses basic job knowledge but requires some improvement with regard to the technical aspects of the job and/or understanding of resources, policies and procedures. | Demonstrates a lack of basic job knowledge and or skills to perform job as detailed in comments. |

Comments:

**2. WORK RESULTS**  This factor measures the employe's demonstrated ability to meet established expectations of quality and quantity within established time frames.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| Work consistently exceeds the expected quality, quantity and timeliness requirements. | Work frequently exceeds the expected quality, quantity and timeliness requirements. | Work meets the expected quality, quantity and timeliness requirements. | Occasionally has difficulty meeting the expected quality, quantity and/or timeliness requirements. | Consistently fails to meet expected quality, quantity and/or timeliness requirements. |

Comments:

**3. COMMUNICATIONS**  This factor measures the employe's demonstrated ability to exchange information with others clearly and concisely, to provide information to others on a timely basis within and outside the organization, and to listen, organize, and present thoughts logically and in a clear, concise manner, both orally and in writing.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| Particularly adept at organizing and presenting facts and ideas. Exceptionally skilled in soliciting and clarifying information to ensure understanding. Promotes easy exchange of information. Writes and speaks clearly, concisely and is articulate. | Initiates and encourages timely and effective exchange of information. Proficient in organizing and presenting facts and ideas orally and in writing. Seeks and provides appropriate feedback. | Effectively exchanges relevant information. Speaks and writes clearly. Keeps others informed as needed. Listens with understanding. | Occasionally lacks clarity of expression orally or in writing. Inconsistent in keeping others informed and at times fails to listen effectively. | Frequently is difficult to understand. Is vague orally or in writing. Often does not keep others informed. Is an ineffective listener and/or frequently interrupts. |

Comments:

**4. INITIATIVE/PROBLEM SOLVING**  This factor measures the employe's demonstrated ability to perform work without specific instruction beyond that normally provided by a supervisor and within established limits of responsibility and authority. It also assesses the employe's ability to determine what needs to be done within available resources and to pursue appropriate means of accomplishing tasks.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| Regularly takes the initiative to identify and resolve work unit/agency problems. Perceives full dimension of problems and limitations. Develops corrective solutions and follows through to conclusion. Requires minimal supervision. | Frequently assumes responsibility for identifying solutions and methods to resolve concerns. Adept at defining and analyzing complex problems and solutions. Requires moderate supervision. | Recognizes problems and suggests and/or assists in developing solutions. Carries through solution implementation. Requires normal supervision. | Resolves routine problems. Exhibits little initiative in identifying problems or solutions. Needs to improve ability to recognize potential problems and evaluate solutions and their impact. Requires more than normal supervision. | Fails to recognize or seek help in resolving routine problems. Requires frequent reminders of what needs to be done. |

Comments:



EMPLOYE NAME:                                    EMPLOYE NUMBER:

| JOB FACTORS |
|---|

**5. INTERPERSONAL RELATIONS/EQUAL EMPLOYMENT OPPORTUNITY** This factor measures the employe's demonstrated ability to develop and maintain positive and constructive internal/external relationships. Consideration should be given to the employe's demonstrated willingness to function as a team player, give and receive constructive criticism, resolve conflicts, recognize needs and sensitivities of others and treat others in a fair and equitable manner. Supervisors also are to be assessed on their demonstrated commitment to equal emploment opportunity.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| Consistently promotes and maintains harmonious work environment. Exhibits understanding of needs of others that is reflected in attitude in dealing with them. Is respected and trusted. Actively promotes/adheres to EEO program activities/requirements. | Maintains cooperative and positive work relationships. Handles conflict constructively. Promotes team work and cooperation, and fair and equitable treatment of others. Promotes/adheres to EEO program activities and requirements. | Interacts in a cooperative, positive manner. Avoids disruptive behavior. Deals appropriately with anger, frustration, conflict etc. Treats others fairly and equitably. Adheres to EEO policy/administrative requirements. | Usually gets along with others. Allows personal bias to affect job relationships. Requires occasional reminders regarding needs and sensitivities of others. Does not consistently adhere to EEO policy/administrative requirements. | Interpersonal relationships are counter productive to work unit functions as described in comments. Generally ignores EEO policy/administrative requirements. |

Comments:

**6. WORK HABITS** This factor measures the employe's demonstrated ability to utilize proper conduct, speech and ethical behavior in the work environment. Compliance with Commonwealth/agency/work unit policies and procedures such as attendance, punctuality, safety, security, housekeeping and other norms are assessed, as well as proper care and maintenance of assigned equipment.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| Work is planned/organized to cover all phases of job assignments. Work meets/exceeds deadlines and future steps are anticipated. Equipment and supplies are cared for wisely and in accord with procedure. Employe serves as role model for other employes with regard to work rules. | Work is planned/organized to accomplish job assignments effectively and in a timely manner including those of unusual nature. Scheduled meetings/deadlines are met with few exceptions. Personal care is taken in use of equipment, with minimal waste. Employe adheres to organizational rules and procedures. | Work is planned to meet routine volume and timeliness. Employe adheres to organizational work rules and procedures with rare exceptions. Appropriate care is taken in use of equipment. | Organization and planning of work is infrequently demonstrated. Work often requires revisions resulting in decreased productivity or missed deadlines. Employe needs improvement in complying with rules, regulations and/or care of equipment. | Employe regularly fails to meet expected work results due to lack of effective organization, use of equipment or adherence to established rules/regulations. |

Comments:

**7. SUPERVISION/MANAGEMENT** (Required for all supervisors/managers) This factor measures the supervisor's demonstrated ability to assign work responsibility and authority to subordinates, establish monitoring activities and systems to ensure work progresses to completion, ensure compliance with established procedures/regulations, and take corrective action when necessary. It also assesses the supervisor's adherence to or completion of personnel/administrative requirements, i.e. timely performance evaluations, appropriate discipline, management of overtime, leave etc.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| Manages/supervises employes and work activities to consistently achieve a smooth/timely work flow, high level of quality and quantity. Continuously strives to improve operations, staff and instills team spirit. Consistently complies with personnel/administrative requirements. | Manages/supervises employes to achieve effective and timely work products. Delegates work effectively and appropriately to achieve maximum results. Provides adequate direction and training. Complies with personnel and administrative requirements. | Manages/supervises employes adequately to achieve satisfactory or normal work production and effectiveness. Meets personnel and administrative requirements. | Inconsistent effective supervision or management of staff. At times, fails to direct/train staff within existing means. Less than adequate quality and quantity of production. Inconsistent adherence to personnel and administrative requirements. | Ineffective supervision or management of staff. Fails to establish appropriate monitoring/control activities. Production is poor in quality and/or quantity. Often ignores personnel and administrative requirements. |

Comments:

EMPLOYE NAME:                                EMPLOYE NUMBER:

| OVERALL RATING | | | | |
|---|---|---|---|---|
| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
| — | — | — | — | — |

**TRAINING AND DEVELOPMENT RECOMMENDATIONS:**

| COMMENTS AND SIGNATURES | (Attach additional 8 1/2 x 11 paper if necessary) |
|---|---|

**RATER COMMENTS:** (This section should comment on any aspect(s) of employe's performance not covered elsewhere and should explain overall rating).

RECEIVED
BUR. OF L.C.E.
1998 JUL -7 AM 11:

| RATER SIGNATURE: | DATE: |
|---|---|

**REVIEWER COMMENTS:**

| REVIEWER SIGNATURE: | DATE: |
|---|---|

**EMPLOYE COMMENTS:**

    ____ I AGREE WITH THIS RATING.    ____ I DISAGREE WITH THIS RATING.

    ____ I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER.

    ____ DISCUSSION WITH MY REVIEWING OFFICER OCCURRED _____.
                                                (DATE)

    ____ I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN GIVEN AN
           OPPORTUNITY TO DISCUSS IT WITH THE RATER; MY SIGNATURE DOES NOT NECESSARILY
           MEAN THAT I AGREE WITH THE REPORT.

COMMENTS:

| EMPLOYE'S SIGNATURE: | DATE: |
|---|---|

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:               May 28, 1998

SUBJECT:            Internal Affairs Investigation 10464

TO:                 Director, Bureau of Professional Responsibility

FROM:               Captain Darrell G. Ober
                    Director, Internal Affairs Division

REFERENCES:   (a)   AR 4-25.

              (b)   FR 1-2, 2.09.

ENCLOSURES:   (1)   Correspondence from the Chief Counsel re: Admissibility of
                    Polygraph Examination in Administrative Proceedings, dated
                    May 20, 1998.

              (2)   Proposed questions to be asked of subjects in subject
                    investigation.


1.    The subject internal investigation relates to allegations of cheating on the most recent Lieutenant's promotional examination.

2.    In accordance with Reference (b), the Internal Affairs Division requested the Commissioner order the subjects of this investigation submit to a polygraph examination.

3.    This correspondence is submitted to answer the concerns of the Commissioner as relayed by Lieutenant Colonel Westcott on May 19, 1998.

4.    Enclosure (1) clearly establishes that the results of a polygraph examination may not be utilized as a basis for discipline or be admitted at any administrative proceeding against a member.   However, at this point in the investigation, the aforementioned administrative limitations are a secondary issue. Approval to utilize the polygraph is critical to the investigation for two reasons.

a.    **NATURE OF THE ALLEGATIONS:** The nature of the allegations are so serious it is crucial the Department utilize whatever means necessary to determine the veracity of the charges; even if the method employed to determine the truth cannot be used in the discipline process.  The tradeoff of potential discipline for truth is one we should gladly make.  The need to determine the truth is especially pronounced given the fact that Lieutenant Stackhouse is assigned to the Executive Office. Determining the corpus delicti of this alleged conduct may well hinge on either an admission or a failed polygraph.  Clearly, by refusing to submit to the polygraph examination, the subjects have placed

P 269
1 0F 2

themselves in a position of inferred guilt. As police officers, we and others, will draw that conclusion. Why else would an innocent individual refuse to participate in the very thing that would clear their name and lift the shroud of suspicion which surrounds them? By virtue of her assignment, that shroud includes the Executive Office. I am appalled that Lieutenant Stackhouse has willingly placed the integrity of the Commissioner's Office at risk; especially if she has nothing to hide. The ethics and loyalty of such a decision are self-evident. As a Commissioned Officer assigned to the Executive Office, she should not be permitted to misplace her loyalty to the PSTA and hide behind the advice of a Lodge President. As the Director, Internal Affairs Division, I am committed to determining the truth of all allegations; especially those which place the dignity and integrity of the Commissioner's Office in jeopardy. The negative impact to the Commissioner of even the *perception* of irregularity or favoritism concerning this investigation could be devastating. On the other hand, there is every reason to believe aggressive pursuit of this investigation will be viewed in a positive light.

      b.     **THE POLYGRAPHS USE AS AN INVESTIGATIVE TOOL:** As investigators, we can think of fewer cases which are more suitable to utilize the polygraph than this one. The most obvious outcome we are looking for is an admission. There are indicators that suggest continued investigation may produce such an admission from Sergeant Freed. Captain Marcantino telephoned me on May 18 to advise he is instituting a Review of Performance Complaint, Form SP 1-101A, against Freed for insubordination. Even though the legal limitations of polygraphs are well recognized in the law enforcement community, it is commonly relied upon as an investigative tool. Such use is authorized in Reference (a).

      4.     Enclosure (2) is the proposed list of questions the investigator would like to have the subjects answer.

      5.     The maximum adjudication date for this investigation is June 24, 1998. This may also become a secondary issue.

      6.     I request approval to proceed with this investigation by scheduling a polygraph examination for the subjects of this investigation. A Department polygraher would be utilized and the entire process coordinated through the Bureau of Criminal Investigation.

COMMONWEALTH OF PENNSYLVANIA
STD-502X          REV. 1-96

# DESK MEMORANDUM

| SUBJECT |
|---|
| **Legislative Budget and Finance Committee<br>Report Review Team** |

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Capatin Darrell Ober<br>Director, Systems and Process Review | Trooper Thomas R. Hain<br>Executive Officer to the Commissioner |

| DATE SENT | DATE RECEIVED |
|---|---|
| November 25, 1996 | |

| | | | | | |
|---|---|---|---|---|---|
| | PLEASE CALL | | APPROVAL | | SEE ME |
| | RETURNED YOUR CALL | | AS REQUESTED | | COMMENT |
| X | INFORMATION & FILE | | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| | NECESSARY ACTION | | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

   The Commissioner would like to thank you again for all your help in reviewing the Legislative Budget and Finance Committee report, and in developing an informed and coherent response.  He has also asked that a copy of the attached photograph be forwarded for your use.  Thank you.

P 270

COMMONWEALTH OF PENNSYLVANIA
STD 370         REV. 10-86

# J B DESCRIPTION

| 1. Name of Employe (Last, First, MI) | | | 2. Employe Number | Position Number |
|---|---|---|---|---|
| C__P, DARRELL | | | 099820 | 011321 |

| Department | Bureau | Division | Headquarters | Organization Code |
|---|---|---|---|---|
| PENNSYLVANIA STATE POLICE | LIQUOR CONTROL ENFORCEMENT | OPERATIONS | HARRISBURG | 5460 |

| 4. Class Title | Working Title | Class Code |
|---|---|---|
| CAPTAIN | CENTRAL SECTION COMMANDER | 74060 |

**5. Regular Work Schedule**

| Start Time: | 0815 | Lunch Length: | 30 MIN. |
|---|---|---|---|
| End Time: | 1615 | Hours/Week: | 40 HRS. |

Position is:

| X | Full-Time | X | Permanent |
|---|---|---|---|
| | Part-Time | | Temporary |

| Reports to: | Name | Class Title |
|---|---|---|
| DIRECTOR, DIVISION OF OPERATIONS | LEONARD H. MCDONALD | CAPTAIN |

Days Worked (check all that apply):

| S | M | T | W | Th | F | S |
|---|---|---|---|---|---|---|
| | X | X | X | X | X | |

Explain any schedule variations:

6. Describe the work assigned to this position, listing the critical duties and responsibilities first. Explain work in familiar terms and include machines or equipment used. Use additional paper if needed.

25%   Supervises District Office Commanders by observing, coaching, correcting and documenting performance; completing performance evaluations and conducting performance evaluation interviews.

25%   Directs management practices of Liquor Enforcement Officers by ensuring Bureau and Department goals and objectives are all achieved, ensuring the enforcement goals and objectives are the focus of all personnel.

17%   Conducts Internal Affairs investigations into allegations of misconduct by District Office Commanders, Enforcement Officer 3's and Liquor Enforcement Officers, as well as General Investigations.

10%   Conducts line inspections by visiting each assigned District Enforcement Office as per regulations, ensuring that each office is in compliance with Bureau, Department and CALEA standards and assist in preparation of Systems and Process Review Inspections.

8%   Coordinates investigations by ensuring that ample personnel are available at raid details; coordinating the temporary assignment of out-of district personnel, when needed; directing in-depth investigations, when needed, including nuisance bar prosecution.

5%   Attends/commands raids that are more than routine in nature, that require significant numbers of uniformed officers, or at the direction of the Director, Division of Operations.

5%   Plans logistics of raids by assisting District Office Commanders in planning for required numbers of Liquor Enforcement Officers, uniformed officers, vehicles, storage space, communications, and news media notification for all large raids.

1%   Handles news conferences on matters of a regional nature or at the direction of the Director, Division of Operations.

1%   Conducts training exercises of subordinate personnel on appropriate matters; audits proposed training classes for appropriate subject matters; reports findings of training audits to Director, Division of Administration.

Pg 271
1 OF 6

Job Description
Page 2

2%      Performs other related duties and those duties of a law enforcement officer as required, including, but not
        limited to interpreting laws and statutes of the Commonwealth, pursuing suspects, effecting arrests;
        qualifying with and, when necessary, using agency firearms and other self-defense devices; operating
        vehicles and using equipment in conjunction with law enforcement duties; responding to emergencies,
        civil disorders and disasters; and performing rescue functions.

1%      Plans, coordinates and assists the District Office Commanders with the security of their facilities.

7. Briefly describe how work is assigned to ⬤ position and how the work is reviewed. ⬤

Assignments are received from the Director of Operations, the Director of Administration or are self-initiated.  Upon completion, the work is forwarded to the appropriate Division Direction for his review, approval and submission to the Bureau Director.

8. If this is a supervisory position, briefly describe how work is assigned to subordinate personnel and how their work is reviewed.  (If this is not a supervisory position, leave blank.)

Work is assigned to the appropriate District Office Commander, either orally or in writing.  The finished assignment is then forwarded through channels to the appropriate Division Director.

9. Attach an Organizational Chart identifying all reporting relationships for this position.

10. Attach a statement identifying the essential functions of the positions.

## CERTIFICATION

I certify that to the best of my knowledge all statements contained within the job description are correct:  This job description consists of __3__ pages.  (count this form as 1 page)

| | | |
|---|---|---|
| Employe's Signature _____ | Class Title _____ | Date _____ |
| Immediate Supervisor's Signature _Capt. Leonard N. M'Oneil_ | Class Title _CAPTAIN_ | Date _03/07/200 0_ |
| Reviewing Officer's Signature _Major F. E. Konchnah_ | Class Title _Director, B.L.C.E._ | Date _03/07/2000_ |



Director, Bureau of Liquor Control Enforcement
Major

Director, Division of Administration
Captain

Director, Division of Operations
Captain

Central Section Commander
Captain

Harrisburg District Office Commander
(Sgt.)

Altoona District Office Commander
(Sgt.)

Williamsport District Office Commander
(Cpl.)

## ESSENTIAL JOB FUNCTIONS

1.  Supervises District Office Commanders.

2.  Directs management practices of Liquor Enforcement Officers.

3.  Conducts Internal Affairs Investigations and General Investigations

4.  Conducts line inspections.

5.  Coordinates investigations and temporary assignments of out of district of personnel and directs in-depth investigations.

6.  Attends/commands raids as necessary; plans logistics of raids.

7.  Handles news conferences as directed.

8.  Conducts and audits training exercises as appropriate.

9.  Performs other related duties and those duties of a law enforcement officer as required, including, but not limited to interpreting laws and statutes of the Commonwealth, pursuing suspects, effecting arrests; qualifying with and, when necessary, using agency firearms and other self-defense devices; operating vehicles and using equipment in conjunction with law enforcement duties; responding to emergencies, civil disorders and disasters; and performing rescue functions.

10. Plans, coordinates and assists the District Office Commanders with the security of their facilities.

_____           _____
Supervisor's or Manager's Signature                Date

## PERFORMANCE STANDARDS/EXPECTATIONS
## SECTION COMMANDER

1. <u>JOB KNOWLEDGE/SKILLS</u>:  Performance is satisfactory when:

   There is an adequate working knowledge of the PA Liquor Code, Title 40, PA Crimes Code, Rules of Criminal Procedure, and all applicable Department rules and regulations.  No major errors are made due to lack of knowledge.

   Keep all District Office Commanders advised of the current PLCB Advisory Opinions and changes in Department and Bureau regulations and policies.

2. <u>WORK RESULTS</u>:  Performance is satisfactory when:

   Most required reports/work are submitted in a timely and professional manner with few omissions or errors.  Quantity of work is consistent with that performed by co-workers.

3. <u>COMMUNICATIONS</u>:  Performance is satisfactory when:

   There is an open line of communication with most PA State Police personnel and most other criminal justice agencies.  There is an exchange of information with most criminal justice agencies so as to assist this Department, as well as the other agencies, in maintaining a high level of professionalism.

   The Director of Operations is informed of most incidents that would be considered other than normal daily duties.

4. <u>INITIATIVE/PROBLEM SOLVING</u>:  Performance is satisfactory when:

   Possible problems are recognized and steps are taken to resolve those problems before they become detrimental to the daily activities within the office.

5. <u>INTERPERSONAL RELATIONS/AFFIRMATIVE ACTION</u>:  Performance is satisfactory when:

   An open line of communication is maintained with your peers and your subordinates, and by being able to not only give but also receive constructive criticism.  A commitment is made to support the Department's Affirmative Action Plan, and everyone is treated in a fair and equitable manner.

6. <u>WORK HABITS</u>:  Performance is satisfactory when:

   A good example is set for your subordinates with your appearance, attendance, punctuality, attention to detail, and conduct.

7. <u>SUPERVISION/MANAGEMENT</u>:  Performance is satisfactory when:

   Assignments are distributed in a fair manner and authority is delegated as appropriate. A system is used to ensure the work progresses in a timely manner within established procedures and regulations. Progressive disciplinary action is taken when necessary.

COMMONWEALTH OF PENNSYLVANIA
STD-470          REV. 10-96

# JOB DESCRIPTION

| 1. Name of Employe (Last, First, MI) | | 2. Employe Number | Position Number |
|---|---|---|---|
| WILLIAMS JR., HUSTON | | 115595 | 011321 |

| Department | Bureau | Division | Headquarters | Organization Code |
|---|---|---|---|---|
| PENNSYLVANIA STATE POLICE | LIQUOR CONTROL ENFORCEMENT | OPERATIONS | HARRISBURG | 5460 |

| 4. Class Title | Working Title | Class Code |
|---|---|---|
| LIEUTENANT | CENTRAL SECTION COMMANDER | 74050 |

**5. Regular Work Schedule**

| Start Time: | 0815 | Lunch Length: | 30 MIN. |
|---|---|---|---|
| End Time: | 1615 | Hours/Week: | 40 HRS. |

Position is:

| X | Full-Time | X | Permanent |
|---|---|---|---|
| | Part-Time | | Temporary |

Reports to:

| Name | Class Title |
|---|---|
| DIRECTOR, DIVISION OF OPERATIONS | LEONARD H. MCDONALD | CAPTAIN |

Explain any schedule variations:

Days Worked (check all that apply):

| S | M | T | W | Th | F | S |
|---|---|---|---|---|---|---|
| | X | X | X | X | X | |

**6. Describe the work assigned to this position, listing the critical duties and responsibilities first. Explain work in familiar terms and include machines or equipment used. Use additional paper if needed.**

25%    Supervises District Office Commanders by observing, coaching, correcting and documenting performance; completing performance evaluations and conducting performance evaluation interviews.

25%    Directs management practices of Liquor Enforcement Officers by ensuring Bureau and Department goals and objectives are all achieved, ensuring the enforcement goals and objectives are the focus of all personnel.

17%    Conducts Internal Affairs investigations into allegations of misconduct by District Office Commanders, Enforcement Officer 3's and Liquor Enforcement Officers, as well as General Investigations.

10%    Conducts line inspections by visiting each assigned District Enforcement Office as per regulations, ensuring that each office is in compliance with Bureau, Department and CALEA standards and assist in preparation of Systems and Process Review Inspections.

8%    Coordinates investigations by ensuring that ample personnel are available at raid details; coordinating the temporary assignment of out-of-district personnel, when needed; directing in-depth investigations, when needed, including nuisance bar prosecution.

5%    Attends/commands raids that are more than routine in nature, that require significant numbers of uniformed officers, or at the direction of the Director, Division of Operations.

5%    Plans logistics of raids by assisting District Office Commanders in planning for required numbers of Liquor Enforcement Officers, uniformed officers, vehicles, storage space, communications, and news media notification for all large raids.

1%    Handles news conferences on matters of a regional nature or at the direction of the Director, Division of Operations.

1%    Conducts training exercises of subordinate personnel on appropriate matters; audits proposed training classes for appropriate subject matters; reports findings of training audits to Director, Division of Administration.

P272
1 of 8

Job Description
Lt. Huston Williams, Jr.
Page 2


2%     Performs other related duties and those duties of a law enforcement officer as required, including, but not
       limited to interpreting laws and statutes of the Commonwealth, pursuing suspects, effecting arrests;
       qualifying with and, when necessary, using agency firearms and other self-defense devices; operating
       vehicles and using equipment in conjunction with law enforcement duties; responding to emergencies,
       civil disorders and disasters; and performing rescue functions.

1%     Plans, coordinates and assists the District Office Commanders with the security of their facilities.

7.  Briefly describe how work is assigned to ● position and how the work is reviewed. ●

Assignments are received from the Director of Operations, the Director of Administration or are self-initiated.  Upon completion, the work is forwarded to the appropriate Division Direction for his review, approval and submission to the Bureau Director.

8.  If this is a supervisory position, briefly describe how work is assigned to subordinate personnel and how their work is reviewed.  (If this is not a supervisory position, leave blank.)

Work is assigned to the appropriate District Office Commander, either orally or in writing.  The finished assignment is then forwarded through channels to the appropriate Division Director.

9.  Attach an Organizational Chart identifying all reporting relationships for this position.

10. Attach a statement identifying the essential functions of the positions.

## CERTIFICATION

I certify that to the best of my knowledge all statements contained within the job description are correct:  This job description consists of __3__ pages.  (count this form as 1 page)

| | | |
|---|---|---|
| Employe's Signature _Huston William_ | Class Title _LIEUTENANT_ | Date _12/17/98_ |
| Immediate Supervisor's Signature _Capt. Errol H. _____ | Class Title _CAPTAIN_ | Date _12/19/98_ |
| Reviewing Officer's Signature _Major F.E. Koroslugh_ | Class Title _Major_ | Date _12/31/98_ |



## ESSENTIAL JOB FUNCTIONS

1.   Supervises District Office Commanders.

2.   Directs management practices of Liquor Enforcement Officers.

3.   Conducts Internal Affairs Investigations and General Investigations

4.   Conducts line inspections.

5.   Coordinates investigations and temporary assignments of out of district of personnel and directs in-depth investigations.

6.   Attends/commands raids as necessary; plans logistics of raids.

7.   Handles news conferences as directed.

8.   Conducts and audits training exercises as appropriate.

9.   Performs other related duties and those duties of a law enforcement officer as required, including, but not limited to interpreting laws and statutes of the Commonwealth, pursuing suspects, effecting arrests; qualifying with and, when necessary, using agency firearms and other self-defense devices; operating vehicles and using equipment in conjunction with law enforcement duties; responding to emergencies, civil disorders and disasters; and performing rescue functions.

10.   Plans, coordinates and assists the District Office Commanders with the security of their facilities.


_Capt. Leonard H. McDonald_                     _12/18/98_
Supervisor's or Manager's Signature              Date

PERFORMANCE STANDARDS/EXPECTATIONS
SECTION COMMANDER

1.   JOB KNOWLEDGE/SKILLS:  Performance is satisfactory when:

There is an adequate working knowledge of the PA Liquor Code, Title 40, PA Crimes Code, Rules of Criminal Procedure, and all applicable Department rules and regulations.  No major errors are made due to lack of knowledge.

Keep all District Office Commanders advised of the current PLCB Advisory Opinions and changes in Department and Bureau regulations and policies.

2.   WORK RESULTS:  Performance is satisfactory when:

Most required reports/work are submitted in a timely and professional manner with few omissions or errors.  Quantity of work is consistent with that performed by co-workers.

3.   COMMUNICATIONS:  Performance is satisfactory when:

There is an open line of communication with most PA State Police personnel and most other criminal justice agencies.  There is an exchange of information with most criminal justice agencies so as to assist this Department, as well as the other agencies, in maintaining a high level of professionalism.

The Director of Operations is informed of most incidents that would be considered other than normal daily duties.

4.   INITIATIVE/PROBLEM SOLVING:  Performance is satisfactory when:

Possible problems are recognized and steps are taken to resolve those problems before they become detrimental to the daily activities within the office.

5.   INTERPERSONAL RELATIONS/AFFIRMATIVE ACTION:  Performance is satisfactory when:

An open line of communication is maintained with your peers and your subordinates, and by being able to not only give but also receive constructive criticism.  A commitment is made to support the Department's Affirmative Action Plan, and everyone is treated in a fair and equitable manner.

6.   WORK HABITS:  Performance is satisfactory when:

A good example is set for your subordinates with your appearance, attendance, punctuality, attention to detail, and conduct.

7.   SUPERVISION/MANAGEMENT:  Performance is satisfactory when:

Assignments are distributed in a fair manner and authority is delegated as appropriate.  A system is used to ensure the work progresses in a timely manner within established procedures and regulations.  Progressive disciplinary action is taken when necessary.

PENNSYLVANIA STATE POLICE
BUREAU OF LIQUOR CONTROL ENFORCEMENT

| COMPLEMENT as of 02/16/00 | CURRENT | VACANCY |
|---|---|---|
| PSP Enlisted | 16 | 1 |
| Enforcement Officer 3s | 21 | 0 |
| Liquor Enforcement Officers | 113 | 16 |
| L.E.O. Auditors | 8 | 1 |
| Computer Programmer | 1 | 0 |
| Information Technology Generalist | 1 | 0 |
| Legal Assistants | 5 | 0 |
| Clerical (HDQ, Rpt, Ex., DEO's) | 44 | 6 |
| Attorneys | 8 | 1 |
| Clerical (Legal) | 5 | 0 |
| TOTALS | 222 | 25 |

Key:
(-#) indicates vacancy
(+#) indicates overage
(*  ) Detached SIS Auditors

STATE POLICE DEPUTY COMMISSIONER OF OPERATIONS

BUREAU OF L.C.E.
1 Major/Director

ASTNT. COUNSEL
8 Atty. (-1)
5 Cler.

DIVISION OF ADMINISTRATION
1 Capt.

ADMINISTRATIVE OFFICER
1 A.O.

ADMIN. SECT.
4 Cler.

RPT EXAM UNIT
5 L.A.
4 Cler.

C.S.S.U.
1 ITG
1 C.P.

DIVISION OF OPERATIONS
1 Capt.

EASTERN SECT. COMMANDER
1 Lt.

CENTRAL SECT. COMMANDER
1 Lt.

WESTERN SECT. COMMANDER
1 Lt.

SPECIAL INV. SEC. SUPV.
1 Cpl.

PHILADELPHIA D.O. COMMDR.
1 Sgt.
- EO3s 4
- LIQUOR ENF. OFFICER 23 (- 6)
- CLERICAL 5 (-2)
- L.E.O. AUDITORS * 1 (-1)

WILKESBARRE D.O. COMMDR.
1 Sgt.
- EO3s 2
- LIQUOR ENF. OFFICER 12 (-1)
- CLERICAL 3 (-1)
- L.E.O. AUDITORS * 1

ALLENTOWN D.O. COMMDR.
1 Cpl.
- EO3s 2
- LIQUOR ENF. OFFICER 14 (-2)
- CLERICAL 5
- L.E.O. AUDITORS * 1

WILLIAMSPORT D.O. COMMDR.
1 Cpl.
- EO3s 2
- LIQUOR ENF. OFFICER 6 (-1)
- CLERICAL 3
- L.E.O. AUDITORS

HARRISBURG D.O. COMMDR.
1 Sgt.
- EO3s 2
- LIQUOR ENF. OFFICER 11 (-1)
- CLERICAL 3 (-1)
- L.E.O. AUDITORS

ALTOONA D.O. COMMDR.
1 Sgt.
- EO3s 1
- LIQUOR ENF. OFFICER 5 (-2)
- CLERICAL 3
- L.E.O. AUDITORS * 1

PITTSBURGH D.O. COMMDR.
1 Sgt.
- EO3s 4
- LIQUOR ENF. OFFICER 28 (-2)
- CLERICAL 6 (-2)
- L.E.O. AUDITORS * 2

PUNXSUTAWNEY D.O. COMMDR.
1 Sgt.
- EO3s 1
- LIQUOR ENF. OFFICER 6 (-1)
- CLERICAL 3
- L.E.O. AUDITORS

ERIE D.O. COMMDR.
1 Sgt.
- EO3s 1
- LIQUOR ENF. OFFICER 8
- CLERICAL 3
- L.E.O. AUDITORS * 1

SPECIAL INV.
- EO3s 0 (-1)
- SPEC. INVS. 0 Tpr. (1)
- CLERICAL 1
- L.E.O. AUDITORS 1

COMMONWEALTH OF PENNSYLVANIA
STD-502                    REV. 2/93

## DESK MEMORANDUM

| SUBJECT |
|---|
| LCE Meeting |

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| CAPT. OBER | Maj. WOODRING |

| DATE SENT | DATE NEEDED |
|---|---|
| 3-28-95 | |

| | PLEASE CALL: | | APPROVAL | | SEE ME |
|---|---|---|---|---|---|
| | RETURNED YOUR CALL | | AS REQUESTED | | COMMENT |
| X | INFORMATION & FILE | | PREPARE REPLY / REPORT | | NOTE AND RETURN |
| | NECESSARY ACTION | | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

Thanks to you and SGT.
HORGAS for the great job!

P273

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

DATE:        March 28, 1995

SUBJECT:     Guest Speaker at the Bureau of Liquor Control Enforcement
             District Office Commanders Meeting

TO:          Director, Bureau of Professional Responsibility

FROM:        Major Robert C. Hickes *RCH*
             Director, Bureau of Liquor Control Enforcement


      1.      Please express my personal appreciation to Captain Darrell G. Ober, Director, Systems and Process Review Division and Sergeant William A. Horgas, Systems and Process Review, Central Section for their participation in the March 22, 1995 Bureau of Liquor Control Enforcement District Office Commanders Meeting.  Their presentation concerning the function and methodology of the Systems and Process Review Division was both interesting and enlightening.

      2.      Because five (5) offices of the Bureau of Liquor Control Enforcement are scheduled for review during 1995, it was important to initiate dialogue concerning expectations of the review team.   Captain Ober's presentation went a long way towards alleviating concerns of members of this Bureau relative to the review function.

      3.      Thank you again for the participation of members of your Bureau in our command conference.  If there is a way for me to reciprocate, please let me know.


RCH/mp


*P274*