Vol III Ex 275 - 303

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA

MAY 2 0 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

| | | |
|---|---|---|
| DARRELL G. OBER | : | 1: CV - 00-0084 |
| | : | |
| Plaintiff | : | |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| PAUL EVANKO, MARK | : | (Judge Caldwell) |
| CAMPBELL, THOMAS COURY, | : | |
| JOSEPH WESTCOTT, | : | |
| HAWTHORNE CONLEY | : | |
| | : | |
| Defendants | : | JURY TRIAL DEMANDED |

## PLAINTIFF'S EXHIBITS

The following documents have already been provided to the defendant's and are again reproduced and provided:

PLANTIFF 1: Memo dated February 7, 2001 from Evanko to Deputy Commissioner of Staff re: Reconfiguration of Area Commands I and IV.

PLAINTIFF 2: Special Order 98-22, re: Internal Investigations.

PLAINTIFF 3: E-mail from Coury to Conley dated February 10, 2000, subject: STD-501.

PLAINTIFF 4: STD-501 from Conley to Commissioner, dated February 18, 2000 re: Captain Ober.

PLAINTIFF 5: E-mails from Ober to Szupinka dated January 12 – 17, 2000, re: State Vehicle.

PLAINTIFF 6:  Memo from Ober to Deputy Commissioner of Administration, dated November 10, 1999, re: Northwestern Traffic Institute.

PLAINTIFF 7: Memo from Conley to Division Directors, dated December 15, 1998, re: Ober's Temporary Assignment to Higher Rank.

PLAINTIFF 8: Memo from Conley to Division Directors, dated October 15, 1998, re: Ober's Temporary Assignment to Higher Rank.

PLAINTIFF 9: E-mail from Conley to Ober, dated August 23, 1999, re: Cell Phone.

PLAINTIFF 10: Bureau of Professional Responsibility Roster, dated July 21, 1999.

PLAINTIFF 11: Record of cell phone usage for cell numbers 717-877-4106 and 717-805-3018.

PLAINTIFF 12: Undated memo from Ober to Director, Bureau of Technology Services, re: Cellular Telephones.

PLAINTIFF 13: E-mail from Conley to Ober, dated December 13, 1999, re: Division Director's Letter.

PLAINTIFF 14: Letter of Commendation to Sergeant Ronald L. Hillegass, dated January 7, 1999 from Ober.

PLAINTIFF 15: Invoice and receipt from Framers' Workshop, dated May 14, 1999.

PLAINTIFF 16: Desk Memorandum, dated December 16, 1999 from Ober to Director, Bureau of Professional Responsibility.

PLAINTIFF 17: General Invoice in the amount of $69.35, dated December 14, 1999.

PLAINTIFF 18: E-mail from Conley to Ober, dated January 26, 2000, re: Return of Bureau of Property.

PLAINTIFF 19: E-mail from Ober to Brown, dated January 26, 2000 re: Return of BPR Vehicle and Equipment.

PLAINTIFF 20: E-mail from Ober to Brown, dated January 26, 2000 re: Return of BPR Vehicle and Equipment.

PLAINTIFF 21: Letter from Major Paul Woodring, dated February 9, 1996, to Mr. Charles Leazier.



PLAINTIFF 22: Copy of investigation ordered by Evanko and conducted by Major's Werts and Williams (IAD 1999-503).

PLAINTIFF 23: Memo from Captain Brown to Captain Oleyniczak, dated May 6, 1999.

PLAINTIFF 24: SP 1-101, subject McCormick, complainant Romano, date of allegation November 25, 1999.

PLAINTIFF 25: Sample General Investigation Report, dated April 21, 1993.

PLAINTIFF 26: Sample Memo from Lieutenant Sample to Commander Area I, dated August 27, 1997.

PLAINTIFF 27: Sample General Investigation Report, dated August 27, 1997.

PLAINTIFF 28: Sample Summary Report from Lieutenant Sample to Trooper Doe, dated August 27, 1997.

PLAINTIFF 29: Bureau of Professional Responsibility 1999 Annual Report.

PLAINTIFF 30: May 25, 1999 interview of FBI Agent Ralph Kush.

PLAINTIFF 31: June 8, 1999 interview of Conley.

PLAINTIFF 32: Undated e-mail from Evanko to Campbell, re: Reorganization.

PLAINTIFF 33: Email from Brown to Ober, dated March 29, 2000, re: Supervisory Inquiry.

PLAINTIFF 34: Email from DeWire to Ober, dated August 8, 2001, re: Supervisory Inquiry.

PLAINTIFF 35: Undated draft Supervisory Inquiry Process regulation.

PLAINTIFF 36: Copy of Investigative Report directed by Coury and conducted by Mrgich (IAD 1999-409).

PLAINTIFF 37: Desk Memo, dated December 3, 1999 from Brown to Deputy Commissioner of Administration.

PLAINTIFF 38: Desk Memo, dated October 5, 1999 from Acting Director, Internal Affairs to Director, Bureau of Professional Responsibility.

PLAINTIFF 39: Desk Memo, dated November 19, 1999, from Director, Bureau of Professional Responsibility to Deputy Commissioner of Administration.

PLAINTIFF 40: Desk Memo, dated October 5, 1999, from Acting Director, Internal Affairs Division to Director, Bureau of Professional Responsibility.

PLAINTIFF 41: Bureau of Professional Responsibility Route Slip, re: IAD 1999-409, dated September 1, 1999.

PLAINTIFF 42: Bureau of Professional Responsibility Route Slip, re: IAD 1999-409, dated November 12, 1999.

PLAINTIFF 43: Undated Desk Memo, from Acting Director, IAD to Director, BPR.

PLAINTIFF 44: Memo, dated February 12, 2001, from Pudliner to Conley re: IAD 1999-409.

PLAINTIFF 45: SP 1-101, dated May 27, 1999, Ober – Subject; Coury – Complainant.

PLAINTIFF 46: Letter to Phil Conti.

PLAINTIFF 47: Letter from Philip Conti to Tom, dated May 22, 1999.

PLAINTIFF 48: Memo from Ober to Director, Bureau of Professional Responsibility, dated September 10, 1999, re: Supervisory Inquiry 1999-409.

PLAINTIFF 49: Pennsylvania State Police Historical, Educational and Memorial Center Board of Directors, dated February 7, 2001.

PLAINTIFF 50: Memo dated October 21, 1999, from Conley to Ober, re: Time and Attendance.

PLAINTIFF 51: Memo from Evanko to Deputy Commissioner of Administration, dated October 4, 1999, re: Time and Attendance.

PLAINTIFF 52: Memo from Conley to Ober, dated July 1, 1999, re: Time and Attendance.

PLAINTIFF 53: STD-929, Time and Attendance Record, for June 12 – 25, 1999 for Ober.

PLAINTIFF 54: Request for Leave, STD-330, for Ober dated May 18, 1999.

PLAINTIFF 55: Request for Leave, STD-330, for Ober dated May 20, 1999.

PLAINTIFF 56: Request for Leave, STD-330, for Ober dated March 5, 1999.

PLAINTIFF 57: STD-929, Time and Attendance Record, for pay period ending March 19, 1999.

PLAINTIFF 58: Police Criminal Complaint, defendant Dennis Jay Bridge, filed September 30, 1999.

PLAINTIFF 59: Affidavit of Probable Cause, dated September 30, 1999, defendant Bridge.

PLAINTIFF 60: Police Criminal Complaint, defendant Kipp Stanton, filed September 30, 1999.

PLAINTIFF 61: Affidavit of Probable Cause, dated September 30, 1999, defendant Stanton.

PLAINTIFF 62: AR Change No. 866, dated February 23, 2001.

PLAINTIFF 63: Memo from Coury to Commissioner, dated June 16, 1999, re: meeting with Commissioner and Hickes.

PLAINTIFF 64: Bureau of Professional Responsibility interview of Coury, dated June 28, 1999.

PLAINTIFF 65: Memo Coury to Ober, dated November 1, 1999, re: Northwestern University Traffic Institute.

PLAINTIFF 66: Memo from Ober to Director, Bureau of Personnel, dated October 19, 1999, re: School of Police Staff and Command.

PLAINTIFF 67: Department Special Order 99-102, dated October 7, 1999.

PLAINTIFF 68: E-mail from Ober to Brown, November 10, 1999, re: Northwestern University Traffic Institute.

PLAINTIFF 69: January 2001 High Performance MoPar magazine article, "Out of Retirement".

PLAINTIFF 70: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from May 18, 1999 meeting.

PLAINTIFF 71: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from January 21, 1998 meeting.

PLAINTIFF 72: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from November 19, 1997.



PLAINTIFF 73: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from September 17, 1997.

PLAINTIFF 74: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from April 9, 1997.

PLAINTIFF 75: Memo from Evanko to Sarah Shuller, dated August 26, 1998.

PLAINTIFF 76: April 1999 "Communicator", page 5.

PLAINTIFF 77: Retirees' Scoop; May 1999 "Communicator".

PLAINTIFF 78: Memo from Coury to Ober, dated December 23, 1999, re: Supervisory Inquiry IAD# 1999-409.

PLAINTIFF 79: Desk Memo from Acting Director, Internal Affairs Division to Deputy Commissioner of Administration, dated December 3, 1999.

PLAINTIFF 80: Desk Memo from Acting Director, Internal Affairs Division to Director, Bureau of Professional Responsibility, dated October 5, 1999.

PLAINTIFF 81: Desk Memo from Director, Bureau of Professional Responsibility to Deputy Commissioner of Administration, dated November 19, 1999.

PLAINTIFF 82: Desk Memo from Acting Director, IAD to Director, BPR dated October 5, 1999.

PLAINTIFF 83: BPR Route Slip, dated November 12, 1999.

PLAINTIFF 84: Desk Memo

PLAINTIFF 85: E-mail from DeWire to Ober, dated October 4, 2000, re: Chain of Command.

PLAINTIFF 86: E-mail from Ober to Coury, dated May 18, 2001, re: OD Report.

PLAINTIFF 87: Mary Bungo's affidavit dated May 15, 2001.

PLAINTIFF 88: Special Order 2001-24, dated March 21, 2001.

PLAINTIFF 89: Bureau of Research and Development route slip, dated April 11, 2001.

PLAINTIFF 90: Memo from Barbara Christie to Deputy Commissioner Staff, dated April 10, 2001.

PLAINTIFF 91: E-mail from DeWire to Ober re: Chain of Command, dated October 4, 2000.

PLAINTIFF 92: Signature route slip, Commissioner's sign-off dated February 22, 2001.

PLAINTIFF 93: Signature route slip, Deputy/Staff sign-off dated February 17, 2000.

PLAINTIFF 94: Undated, hand-written file notes.

PLAINTIFF 95: AR Manual Change No. 866, dated February 23, 2001.

PLAINTIFF 96: Draft AR 1-1.

PLAINTIFF 97: Project Tracking Summary, date assigned October 10, 2000.

PLAINTIFF 98: Project Tracking Summary, date assigned September 30, 1999.

PLAINTIFF 100: Project Tracking Summary, date assigned August 19, 1999.

PLAINTIFF 101: Project Tracking Summary, date assigned July 17, 1997.

PLAINTIFF 102: Project Tracking Summary, date assigned February 10, 1998.

PLAINTIFF 103: Project Tracking Summary, date assigned July 17, 1997.

PLAINTIFF 104: Reproduction Request, dated February 23, 2001.

PLAINTIFF 105: AR Manual Change No. 866, dated February 23, 2001.

PLAINTIFF 106: AR 1-1; Organization, dated February 23, 2001.

PLAINTIFF 107: Draft AR 1-1.

PLAINTIFF 108: Undated, hand written note.

PLAINTIFF 109: Draft AR 1-1, Change No. 866 Change Sheet.

PLAINTIFF 110: Draft 1-1 text; dated February 23, 2001.

PLAINTIFF 111: Desk Memo from Durante to Dir., Planning Division, dated February 21, 2001.



PLAINTIFF 112: E-mail from Merryman to Margeson, dated February 8, 2001 re: E's.

PLAINTIFF 113: E-mail from Merryman to Margeson, dated January 29, 2001, re: E's.

PLAINTIFF 114: Undated CLEAN Message re: Area Command Reconfiguration.

PLAINTIFF 115: Pennsylvania State Police Organization Chart.

PLAINTIFF 116: Desk Memo from Merryman to Margeson, dated February 13, re: Reconfig of Area Commands.

PLAINTIFF 117: Desk Memo from Coury to Commissioner, dated February 7, 2001, re: Reconfiguration of Area Commands.

PLAINTIFF 118: Memo from Werts to Commissioner, dated February 5, 2001 re: Organization: reconfiguration of Areas.

PLAINTIFF 119: Pennsylvania State Police Location Map, dated October 12, 1994.

PLAINTIFF 120: Pennsylvania State Police Location Map, dated October 12, 1994.

PLAINTIFF 121: Letter from Coury to Ober, dated November 10, 1994.

PLAINTIFF 122: Letter from Coury to Ober, dated January 6, 1995.

PLAINTIFF 123: Handwritten letter from Coury to Ober, dated March 5, 1998.

PLAINTIFF 124: Memo from Coury to Director, Internal Affairs Division, dated May 15, 1996.

PLAINTIFF 125: Memo from Merryman to Bureau Directors, dated June 17, 1999 re: AR 1-1, Organization.

PLAINTIFF 126: FR 7-4, dated December 23, 1996.

PLAINTIFF 127: Ober's grievances (six).

PLAINTIFF 128: Memo from Skurkis to Director, Bureau of Emergency and Special Operations, dated June 29, 2000.

PLAINTIFF 129: Memo from Reynolds to Mullin, dated April 24, 2000 re: Loss of or Damage to State Property Appeal Board.

PLAINTIFF 130: Memo from Mullin to Reynolds, dated May 8, 2000 re: Request to Reopen Proceedings.

PLAINTIFF 131: Memo from Bonney to Director, Staff Services, dated June 26, 2000 re: Final Determination.

PLAINTIFF 132: Memo from Ober to Deputy Commissioner of Administration, dated July 27, 2000 re: Reimbursement Appeal.

PLAINTIFF 133: Memo from Coury to Ober, dated November 1, 1999 re: Northwestern University Traffic Institute.

PLAINTIFF 134: FR 1-2, dated May 16, 2000.

PLAINTIFF 135: AR 4-22, dated September 15, 2000.

PLAINTIFF 136: AR 4-11, dated August 20, 1997.

PLAINTIFF 137: Memo from Ober to Director, Bureau of Liquor Control Enforcement, dated July 27, 2000, re: review of Bureau personnel file.

PLAINTIFF 138: Memo from DeWire to Ober, dated July 28, 2000 re: review of Bureau personnel file.

PLAINTIFF 139: Memo from McDonald to Ober, dated March 27, 2002 re: review of Bureau personnel file.

PLAINTIFF 140: Memo from Ober to Acting Director of LCE, dated March 27, 2002, re: review of Bureau personnel file.

PLAINTIFF 141: AR 1-1; pages 37, 39 and 40, dated July 31, 1997.

PLAINTIFF 142: Bits & Bytes, May 2000.

PLAINTIFF 143: Bits & Bytes, September 2000.

PLAINTIFF 144: Bits & Bytes, April 2000.

PLAINTIFF 145: Bits & Bytes, January 2002.

PLAINTIFF 146: E-mail from Commissioner to all personnel, dated January 8, 2002.

PLAINTIFF 147: E-mail from Wilt to Ober, dated January 31, 2000 re IIMS.

PLAINTIFF 148: Undated e-mail from Schmidt to Ober.

PLAINTIFF 149: E-mail from Shelton to Ober, dated January 20, 2000 re: IIMS.

PLAINTIFF 150: Memo from Ober to OA, dated March 8, 2000 re: Grievance #HQ-172.

PLAINTIFF 151:E-mail from Ober to Hostert, dated March 27, 2000.

PLAINTIFF 152: E-mail from Szupinka to Ober, dated February 4, 2000.

PLAINTIFF 153: E-mail from Ober to Grab, dated January 24, 2000.

PLAINTIFF 154: Memo from McCommons to Ober, dated January 10, 2000.

PLAINTIFF 155: E-mail from Laughlin to Ober, dated March 13, 2000.

PLAINTIFF 156: E-mail from Ober to Mike, dated January 23, 2001.

PLAINTIFF 157: E-mail from Ober to Lazzaro, dated December 7, 2000.

PLAINTIFF 158: E-mail from PSP postmaster to everyone, dated September 1, 2000.

PLAINTIFF 159: E-mail from Ober to Ruth Brown, dated December 6, 2000.

PLAINTIFF 160: E-mail from Ober to Riley, dated August 25, 1999.

PLAINTIFF 161: E-mail from Ober to Brian, dated January 11, 2000.

PLAINTIFF 162: E-mail from Ditzler to Ober, dated January 7, 2000.

PLAINTIFF 163: Letter from Kwiatek to Ober, dated March 27, 2000.

PLAINTIFF 164: E-mail from Ober to Conley, dated September 7, 1999.

PLAINTIFF 165: Letter from Gallegos to Ober, dated January 29, 2001.

PLAINTIFF 166: Letter from Lazzaro to Ober, dated July 27, 2000.

PLAINTIFF 167: E-mail from Ober to Suber, dated April 2, 2001.

PLAINTIFF 168: Letter from Lazzaro to Ober, dated June 9, 2000.

PLAINTIFF 169: Memo from Ober to Commissioner, dated December 24, 1997.

PLAINTIFF 170: Memo from Ober to Deputy Commissioner of Administration, dated October 29, 1996.

PLAINTIFF 171: Undated CALEA Concerns Outline.

PLAINTIFF 172: E-mail from Wilt to Ober, dated May 31, 2000.

PLAINTIFF 173: E-mail from Christensen to Ober, dated March 9, 2000.

PLAINTIFF 174: Letter from Gallegos to Ober, dated January 16, 2001.

PLAINTIFF 175: Letter from Hunter to Ober, dated January 29, 2001.

PLAINTIFF 176: E-mail from Ober to Brown, dated January 25, 2000.

PLAINTIFF 177: E-mail from Ober to Davis, dated January 28, 2000.

PLAINTIFF 178: E-mail from Ober to Davis, dated January 27, 2000.

PLAINTIFF 179: E-mail from Ober to Binker, dated January 17, 2000.

PLAINTIFF 180: E-mail from Ober to Skiles, dated February 14, 2000.

PLAINTIFF 181: E-mail from Waugh to Ober, dated February 10, 2000.

PLAINTIFF 182: E-mail from Waugh to Ober, dated February 15, 2000.

PLAINTIFF 183: E-mail from Ober to Skiles, dated February 21, 2000.

PLAINTIFF 184: E-mail from Waugh to Ober, dated November 12, 1999.

PLAINTIFF 185: Letter from McSpadden to Ober, dated December 22, 2000.

PLAINTIFF 186: Letter from Kwiatek to Ober, dated March 15, 2000.

PLAINTIFF 187: Letter from P.M. Conti to Ober, dated September 4, 1994.

PLAINTIFF 188: Custody Order dated February 5, 1999.

PLAINTIFF 189: E-mail from Infantino to Ober, dated September 3, 1999.

PLAINTIFF 190: E-mail from Davis to Ober, dated February 17, 2000.

PLAINTIFF 191: E-mail from Ober to Davis, dated June 26, 2000.

PLAINTIFF 192: Undated Centennial Book Committee assignment page.

PLAINTIFF 193: E-mail from Ober to Waugh, dated January 11, 2000.

PLAINTIFF 194: E-mail from Waugh to Ober, dated March 16, 2000.

PLAINTIFF 195: CLEAN Message, dated April 20, 1999.

PLAINTIFF 196: May 1999 IIMS Newsletter.

PLAINTIFF 197: RFQC Procurement Project Structure, dated August 30, 1999.

PLAINTIFF 198: Memo from Backenstoss to Wilt, dated January 27, 2000.

PLAINTIFF 199: E-mail from Ober to Wilt, dated February 7, 2000.

PLAINTIFF 200: Memo from Ober to IIMS Program Manager, dated February 10, 2000.

PLAINTIFF 201: E-mail from Wilt to Ober, dated February 15, 2000.

PLAINTIFF 202: Agenda, IIMS Oversight Committee, dated February 22, 2000.

PLAINTIFF 203: IIMS Systems Integrator BAFO Evaluation Results, dated February 21, 2000.

PLAINTIFF 204: Agenda, IIMS Oversight Committee, dated February 14, 2000.

PLAINTIFF 205: IIMS Systems Integrator Committee Contact Information, dated August 30, 1999.

PLAINTIFF 206: Ober's notes from April 6, 2000 debriefing meeting with IBM.

PLAINTIFF 207: Debriefing notes from March 23, 2000 meeting with Andersen Consulting.

PLAINTIFF 208: E-mail from Wilt to Ober dated February 10, 2000.

PLAINTIFF 209: E-mail from Ober to group list, dated February 14, 2000.

PLAINTIFF 210: E-mail from Ober to Stephen, dated January 7, 2000.

PLAINTIFF 211: E-mail from Bucher to DeWire, dated August 22, 2001.

PLAINTIFF 212: Memo from Westcott to Commissioner, dated January 4, 1999.



PLAINTIFF 213: Memo from Werts to Deputy Commissioner of Operations, dated December 28, 1998.

PLAINTIFF 214: Memo to file from Merryman, dated January 26, 2000.

PLAINTIFF 215: CLEAN Message, dated April 7, 1999.

PLAINTIFF 216: Bureau of Research and Development Personnel Order 99-5, dated June 16, 1999.

PLAINTIFF 217: National Governor's Association article.

PLAINTIFF 218: E-mail from PSP Commissioner to Everyone, dated August 9, 2000.

PLAINTIFF 219: Desk Memo from Ober to Director, Bureau of Technology Services, dated January 18, 2000.

PLAINTIFF 220: Memo from Ober to Commissioner dated January 17, 2000.

PLAINTIFF 221: Ober's resume.

PLAINTIFF 222: Pages 6 and 7 of AR 1-1.

PLAINTIFF 223: Memo from Evanko to Infantino, dated August 24, 1999.

PLAINTIFF 224: Memo from Koselnak to Valencic, dated September 2, 1999.

PLAINTIFF 225: Memo from Koselnak to Chief Counsel, date January 13, 2000.

PLAINTIFF 226: Memo from Koselnak to Department Disciplinary Officer, dated September 2, 1999.

PLAINTIFF 227: Memo from Koselnak to Williams, dated September 1, 1999.

PLAINTIFF 228: Memo from Bonney to Williams, dates January 27, 2000.

PLAINTIFF 229: Memo from Koselnak to McDonald, dated May 30, 2000.

PLAINTIFF 230: Newspaper article, March 9, 2000.

PLAINTIFF 231: Memo from Koselnak to Ryan, dated February 17, 2000.

PLAINTIFF 232: Email from Koselnak to Ober, dated February 21, 2000.

PLAINTIFF 233: Memo from Campbell to Bureau Staff, dated February 25, 2000.



PLAINTIFF 234: Memo from Evanko to Bureau Directors, dated February 3, 2000.

PLAINTIFF 235: Memo from Campbell to Commissioner, dated May 8, 2000.

PLAINTIFF 236: CLEAN Message, dated May 16, 2000 re: Lieutenant Vacancies.

PLAINTIFF 237: Email from Szupinka to Ober, dated January 18, 2000.

PLAINTIFF 238: Email from Szupinka to Ober, dated January 26, 2000.

PLAINTIFF 239: Indiana Gazette article, dated April 3, 2001.

PLAINTIFF 240: Post-Gazette article, dated February 9, 2001.

PLAINTIFF 241: Special Order 2000-2, dated January 7, 2000.

PLAINTIFF 242: Workplace Rights and Responsibilities.

PLAINTIFF 243: BPR Handout.

PLAINTIFF 244: Section 5101; Title 18.

PLAINTIFF 245: Letter from Reynolds to Warnken, dated January 27, 2000.

PLAINTIFF 246: Memo from Westcott to Director, LCE, dated April 28, 2000.

PLAINTIFF 247: Memo from Koselnak to Section Commanders, dated March 23, 2000.

PLAINTIFF 248: Memo from Koselnak to Central Section Commander, dated April 18, 2000.

PLAINTIFF 249: Memo from Koselnak to Deputy Commissioner of Operations, dated April 19, 2000.

PLAINTIFF 250: STD-279, dated April 19, 2000.

PLAINTIFF 251: STD-279, dated September 7, 1999.

PLAINTIFF 252: Letter from Lanier to Reynolds, dated February 9, 2000.

PLAINTIFF 253: Ethical Problems for Pennsylvania Litigators.

PLAINTIFF 254: Page Two, "Communicator"; Retirees' Scoops.

PLAINTIFF 255: Page Two, "Communicator"; Retirees' Scoops.

PLAINTIFF 256: Page Four, "Communicator"; Retirees' Scoops.

PLAINTIFF 257: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 258: Page Six, "Communicator"; Retirees' Scoops.

PLAINTIFF 259: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 260: Page Eight, "Communicator"; Retirees' Scoops.

PLAINTIFF 261: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 262: Page Four, "Communicator"; Retirees' Scoops.

PLAINTIFF 263: CLEAN Message dated January 7, 2000.

PLAINTIFF 264: CLEAN Message dated January 11, 2000.

PLAINTIFF 265: FR 1 Preface; Interaction With People, dated February 20, 1998.

PLAINTIFF 266: Personnel Order 00-18; dated August 31, 2000.

PLAINTIFF 267: Envelop to Ober.

PLAINTIFF 268: Management Directive 540.7, dated June 22, 1998.

PLAINTIFF 269: Memo from Ober to Director, BPR, dated May 28, 1998.

PLAINTIFF 270: Desk Memo from Hain to Ober, dated November 25, 1996.

PLAINTIFF 271: Lieutenants Job Description issued to Captain Ober, dated March 7, 2000.

PLAINTIFF 272: Lieutenants Job Description issued to Lieutenant Williams, dated December 17, 1998.

PLAINTIFF 273: Desk Memo from Woodring to Ober, dated March 28, 1995

PLAINTIFF 274: Memo from Hickes to Director, BPR, dated March 28, 1995.

PLAINTIFF 275: Deputy Commissioners Letter of Appreciation, dated January 19, 2000.

PLAINTIFF 276: Bureau Directors Memo from Waugh to Ober, dated January 19, 2000.

PLAINTIFF 277: CLEAN Message dated June 2, 2000.

PLAINTIFF 278: BPR interview of LTC Hickes, dated July 2, 1999.

PLAINTIFF 279: BPR interview of Evanko, dated June 28, 1999.

PLAINTIFF 280: Memo from Hickes to Commissioner, dated May 18, 1999.

PLAINTIFF 281: Memo from Ober to Director, Bureau of Personnel, dated October 19, 1999 with margin note sent to Personnel 10/20/99.

PLAINTIFF 282: FR 1-1, dated March 25, 1992.

PLAINTIFF 283: Evanko's handwritten notes, dated May 20, 1999.

PLAINTIFF 284: FR 3-2, dated April 16, 1996.

PLAINTIFF 285: Special Assignment.

PLAINTIFF 286: AR 4-25, dated September 2, 1993.

PLAINTIFF 287: AR 1-10, page 4 dated September 16, 1997.

PLAINTIFF 288: Undated, handwritten file notes.

PLAINTIFF 289: Undated, handwritten file notes.

PLAINTIFF 290: Ober's Performance Evaluations.

PLAINTIFF 291: Memo from Demkovitz to Ober, dated May 31, 2000.

PLAINTIFF 292: Memo from McSpadden to Ober dated January 30, 2001.

PLAINTIFF 293: Attorney bills.

PLAINTIFF 294: Memo from Aitchison to Ober, dated March 20, 2001.

PLAINTIFF 295: Memo from Frankel to Ober, dated January 22, 2001.

PLAINTIFF 296: Memo from Lazzaro to Ober, dated January 26, 2001.

PLAINTIFF 297: Memo from Lightman to Lazzaro, dated January 28, 2001.

PLAINTIFF 298: Memo from Lazzaro to Ober, dated February 1, 2001.

PLAINTIFF 299: Memo from Gallegos to Ober, dated July 2, 2001.

PLAINTIFF 300: Minutes – Grand Lodge, dated March 23 –24, 2001.

PLAINTIFF 301: Memo from Ruda to Ober, dated July 15, 2000.

PLAINTIFF 302: FR 3-3, dated March 3, 1999.

PLAINTIFF 303: Ober's promotion results.

PLAINTIFF 304: Letters of Appreciation from Citizens/Co-workers.

PLAINTIFF 305: Prior adjudication's.

PLAINTIFF 306: Ober's 2002 Performance Evaluation.

PLAINTIFF 307: Personnel Order 99-16, dated June 30, 1999.

PLAINTIFF 308: Personnel Order 00-07, dated March 10, 2000.

PLAINTIFF 309: 1998 – 2000 Collective Bargaining Agreement between Commonwealth and PSTA.

PLAINTIFF 310: McDonald's Performance Evaluation, dated October 11, 2000.

PLAINTIFF 311: Ober's Commission.

PLAINTIFF 312: Memo from Campbell to Commissioner, dated May 25, 2000.

PLAINTIFF 313: Personnel Order 99-20.

PLAINTIFF 314: Personnel Order 00-04.

PLAINTIFF 315: Management Directive 525.4 Amended, dated November 7, 1996.

PLAINTIFF 316: Receipt from Bailey to Christi, dated April 1, 2002.

PLAINTIFF 317: Arbitration decisions.

PLAINTIFF 318: Acting Bureau Director memo and rosters.



PLAINTIFF 319: Arbitration decision, dated June 16, 1999.

PLAINTIFF 320: CLEAN Message from PSP Postmaster to Everyone, dated March 7, 2000.

PLAINTIFF 321: Letter from Ober to Kwiatek, dated March 17, 2000.

PLAINTIFF 322:E-mail from DeWire to Ober, dated February 6, 2002.

PLAINTIFF 323; Memo from Evanko to Deputy Commissioner of Administration, dated December 18, 1991.

PLAINTIFF 324: IIMS milestones and timeline, dated March 26, 2002.

PLAINTIFF 325: IIMS Meeting agenda, dated February 18, 2000.

PLAINTIFF 326: Memo from Ober to Commissioner, dated January 17, 2000.

PLAINTIFF 327: Memo from Merryman to Commissioner, dated December 16, 1997.

PLAINTIFF 328: Management Directive 205.16 Amended, dated November 22, 1995

PLAINTIFF 329: Management Directive 205.14 Amended, dated February 2, 1998.

PLAINTIFF 330: Management Directive 1980-18, dated May 16, 1984.

PLAINTIFF 331: Memo from Evanko to Wilson, dated November 15, 1999.

PLAINTIFF 332: Memo from Evanko to Christensen, dated July 27, 1999.

PLAINTIFF 333: Ober's Job Description, dated June 2, 2000.

PLAINTIFF 334: Letter from Brown to Ober, dated February 2, 2000.

PLAINTIFF 335: PEMA related messages; various dates.

PLAINTIFF 336: Supervisor's Class Syllabus.



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

OFFICE OF DEPUTY COMMISSIONER

### Deputy Commissioner Letter of Appreciation

January 19, 2000

Captain Darrell G. Ober
Pennsylvania State Police
Bureau of Technology Services
1800 Elmerton Avenue
Harrisburg, PA 17110

Dear Captain Ober:

Please accept my personal thanks and the gratitude of the Pennsylvania State Police for the stellar job that you have done in securing the services of a Systems Integrator for the Incident Information Management System.

In late April 1999, you were tasked with developing the protocol for the "Request For Qualified Contractor" (RFQC) acquisition of a Systems Integrator for the Incident Information Management System. At that time, no formal process was in place which would aid you in your task. Additionally, this acquisition involved breaking new ground for the Pennsylvania State Police and agency resources were nonexistent.

You embraced your mission with enthusiasm, and a sense of purpose. By networking with members of the Department of General Services and the Office of General Counsel, you quickly established a working model upon which the .RFQC process was founded. Additionally, you assembled a project team which exemplified spirit, enthusiasm, cooperation and dedication. Your skills at team building and achieving consensus are surpassed only by the intelligence and wisdom that you brought to this project.

On January 14, 2000, the competing vendors submitted their best and final offer to become the Systems Integrator for the Pennsylvania State Police. You have nurtured and navigated the process of acquiring a qualified Systems Integrator for the Incident Information Management System exceedingly well. Your work is a credit to your ability as a leader, and has been in the finest tradition of the Pennsylvania State Police. Thank you again for a job very well done.

Sincerely,

*Robert C. Hickes*

Lt. Colonel Robert C. Hickes
Deputy Commissioner of Staff    P275



**PENNSYLVANIA STATE POLICE**
BUREAU OF TECHNOLOGY SERVICES
1800 ELMERTON AVENUE
HARRISBURG, PA 17110
Telephone:  (717) 787-8596



January 19, 2000

Captain Darrell G. Ober
Pennsylvania State Police
Bureau of Professional Responsibility
7820 Allentown Boulevard
Harrisburg, PA  17112

Dear Captain Ober:

I wish to take this opportunity to thank you for your work on the Criminal Investigative Traffic Safety Incident Information Management System (IIMS) program as the System Integrator Team Leader.

As the principal architect of the System Integrator acquisition process, you have brought considerable knowledge, skills, and abilities to bear on the complex issues associated with the hiring of the IIMS integrator.  You have influenced this project in immeasurable ways, and you should take great pride in your accomplishments.  I am certain that all bureau personnel join me in expressing our most profound appreciation for your efforts.

I wish you the best of luck in all your future endeavors.

Sincerely,

Major Wesley R. Waugh
Director
Bureau of Technology Services

P276

WHLD11-05911 S XPSP71-00006 06/02/00 13:07:25 - 06/02/00 13:●:17 BZFTRKV2PHS5    PAGE  1 OF  4
SN XPSP71 P, FILE 14 EXECUTIVE OFFICES

SUBJECT:    DEPARTMENT ISSUES

TO:            AREA, TROOP AND STATION COMMANDERS; BUREAU AND OFFICE DIRECTORS

        1.   IN ORDER TO KEEP DEPARTMENT PERSONNEL UP-TO-DATE ON IMPORTANT
ISSUES AFFECTING THE ADMINISTRATION, OPERATION OR THE PERSONNEL OF THE
DEPARTMENT, THE COMMISSIONER IS HEREBY ANNOUNCING THE FOLLOWING PROMOTIONS
AND/OR TRANSFERS:

        MAJOR FRANCIS E. KOSCELNAK WILL BE TRANSFERRED AND ASSUME COMMAND
AS THE COMMANDER, AREA II, EFFECTIVE JULY 8, 2000.

        CAPTAIN PHILLIP L. DEWIRE IS HEREBY PROMOTED TO MAJOR, EFFECTIVE
JUNE 10, 2000, AND WILL ASSUME COMMAND AS THE DIRECTOR, BUREAU OF LIQUOR
CONTROL ENFORCEMENT, EFFECTIVE JULY 8, 2000.

        CAPTAIN DARRELL G. OBER HAS ASSUMED COMMAND AS THE DIRECTOR,
ADMINISTRATION DIVISION, BUREAU OF LIQUOR CONTROL ENFORCEMENT, EFFECTIVE
MAY 30, 2000.

WHLD11-05911 S XPSP71-00006 06/●/00 13:07:26 - 06/02/00 13:0●7 BZFTRKV2PHS5

PAGE  2 OF  4

CAPTAIN COLEMAN J. McDONOUGH, BUREAU OF  PATROL, IS HEREBY TRANSFERRED TO AND WILL ASSUME COMMAND OF TROOP F, MONTOURSVILLE, EFFECTIVE JUNE 10, 2000.

LIEUTENANT ROGER N. WATERS, TROOP B, WASHINGTON, IS HEREBY .OMOTED TO CAPTAIN AND TRANSFERRED TO THE BUREAU OF PATROL, AND WILL ASSUME COMMAND AS THE DIRECTOR, PATROL SERVICES, EFFECTIVE JUNE 10, 2000. DIVISION.

LIEUTENANT DANA SEIFNER, BUREAU OF PROFESSIONAL RESPONSIBILITY, IS HEREBY TRANSFERRED TO TROOP B, WASHINGTON, EFFECTIVE JUNE 10, 2000.

SERGEANT BRIAN E. ACKEN, BUREAU OF CRIMINAL INVESTIGATION, IS HEREBY PROMOTED TO LIEUTENANT, AND TRANSFERRED TO THE BUREAU OF TECHNOLOGY SERVICES, EFFECTIVE JUNE 10, 2000.

SERGEANT ROBERT L. LIZIK, TROOP D, BUTLER, IS HEREBY PROMOTED TO LIEUTENANT AND TRANSFERRED TO THE BUREAU OF PROFESSIONAL RESPONSIBILITY, EFFECTIVE JUNE 10, 2000.

SERGEANT TODD B. JOHNSON, BUREAU OF EMERGENCY AND SPECIAL

PAGE 3 OF 4

WHLD11-05911 S XPSP71-00006 06/■/00 13:07:26 - 06/02/00 13:■17 BZFTRKV2PHS5 OPERATIONS, IS HEREBY PROMOTED TO LIEUTENANT AND TRANSFERRED TO TROOP E, ERIE, EFFECTIVE JUNE 10, 2000.

      SERGEANT BERCHARD V. SUBER, TROOP K, PHILADELPHIA, IS HEREBY PROMOTED TO LIEUTENANT AND TRANSFERRED TO TROOP R, DUNMORE, EFFECTIVE JUNE 10, 2000.

      SERGEANT DOUGLAS W. MARTIN, BUREAU OF EMERGENCY AND SPECIAL OPERATIONS IS HEREBY PROMOTED TO LIEUTENANT AND TRANSFERRED TO THE BUREAU OF LIQUOR CONTROL ENFORCEMENT, EFFECTIVE JUNE 10, 2000.

      2.  THE FOLLOWING TROOP ADMINISTRATIVE MANAGERS WILL ALSO BE INCLUDED IN THE PROMOTION CEREMONY:

      MS. CHERYL L. BURTON, TROOP P, WYOMING
      MS. KATHLEEN M. CAMPBELL, TROOP K, PHILADELPHIA
      MS. JEAN DAVENPORT, TROOP F, MONTOURSVILLE
      MS. ELEANOR R. SPEECE, TROOP H, HARRISBURG
      MS. CATHY A. YARTIN, TROOP B, WASHINGTON

      3.  THE PROMOTION CEREMONY WILL BE HELD AT THE STATE POLICE

WHLD11-05911 S XPSP71-00006 06/02/00 13:07:27 - 06/02/00 13██:17 BZFTRKV2PHS5
ACADEMY ON FRIDAY, JUNE 9, 20██ AT 1000 HOURS, WITH PROMOT██ REPORTING
TO THE CAFETERIA BY 0930 HOURS.  PROMOTEES SHALL CONTACT THE PERSONNEL
SERVICES DIVISION, BUREAU OF PERSONNEL, AT 717-783-5665 BY 1400 HOURS ON
TUESDAY, JUNE 6, 2000, REGARDING DETAILS OF THE PROMOTION CEREMONY.

    4.   THERE IS NO NEED TO ACKNOWLEDGE THIS MESSAGE.

AUTH/COLONEL PAUL J. EVANKO/COMMISSIONER/PSP          SKS



# BUREAU
# OF
# PROFESSIONAL
# RESPONSIBILITY

## INTERNAL AFFAIRS
## DIVISION

Transcript of Interview
with
Lt. Colonel Robert C. HICKES

July 2, 1999

P278
1 OF 10

Alright, this is July 2nd. It is 10:08 AM. We are present in the Commissioner's conference room with Lieutenant Colonel HICKES, Major WILLIAMS, and Major WERTS.

WERTS:    Colonel, as you are aware, there is a tape on in the room.

WILLIAMS:    Colonel, we'd like to start it out - its my understanding that on or about 05 October 1998, Captain OBER contacted you about a political corruption case that the FBI was investigating in Western Pennsylvania. Can you tell us what he told you about that case and any instructions you might have given him concerning that case?

HICKES:    (55 second pause) Yeah. Uh, in essence you're correct - on or about the 5th of October, Captain OBER did contact me and ask to speak to me in confidence.

Uh, he advised me that he had been contacted by the Federal Bureau of Investigation in Western Pennsylvania, and that they had informed him that an informant was approached to facilitate purchasing or buying a candidate's way onto the Pennsylvania State Police as a Cadet, and that that supposedly was a common practice and had been done numerous times in the past; that buying a position with the State Police allegedly was facilitated by a political or political officials, uh, someone within the Governor's Office within a high position there and someone with rank within the Pennsylvania State Police. Uh, he indicated to me that the term "Colonel" had been used, uh, not Commissioner, or not Deputy, not Lieutenant Colonel, but Colonel. Uh, allegedly money was to be paid to move from Band "B" to Band "A," which is where this perspective was, and that uh, money would also be paid to progress through aspects of the hiring process.

That investigation, uh, to the best of my knowledge, was furthered by wiretap information. The FBI had not requested participation in the investigation, uh, that they had said that there had been a far larger political corruption investigation that they had been working on, that this was a minor component of a larger corruption investigation that had been left dormant for some time. Uh, as I said, they weren't asking us to participate, they were simply asking for background information - how does our process work.

Captain OBER advised me that the FBI had requested absolute confidentiality. He had indicated to me that he told the FBI that uh, he needed to advise at

least one other person, and that person he uh, determined was me. My instructions to Captain OBER were to disclose the information to no one else; cooperate with the FBI, based on their request simply to provide background information, that we did not have an investigation in accordance with our regulations and the law; and to keep me advised periodically of the progress.

WERTS: Colonel, was all that information given to you on the first meeting, on or about the 5th?

HICKES: I believe it was - yes.

WILLIAMS: Colonel, I'd just like to ask you, and I know you touched on this, but I would just like to ask you - during the conversation that you had with Captain OBER on the 5th of October, did at any time Captain OBER advise you what positions within the Department or outside the Department, I guess I'm referring to the Governor's Office, were allegedly suspected of participating in the buying of these positions?

HICKES: State that again please, Major.

WILLIAMS: Sure. During the above conversation that you had with Captain OBER on or about October 5th, did he ever tell you what positions within the Department or outside the Department were allegedly suspected of participating in the buying of these Trooper positions?

HICKES: (33 second pause) Other than what I've uh, indicated to you about the general uh, theme that had been related to him by the FBI concerning a political official high in the Governor's Office, uh, and the term "Colonel" being used - no.

WILLIAMS: Okay. During the course of this investigation, which I understand lasted approximately six months, did Captain OBER keep you updated as to how this investigation was proceeding? And if so, can you recall what he and you would have discussed?

HICKES: (32 second pause) Over the course of the investigation, I had told Captain OBER to keep me posted on any progress that had been made. Uh, I would say over the first several months, he may have uh, just caught me in the hallway and said, "Haven't heard anything," something along those lines. This wasn't uh, the kind of investigation that we were participants in.

He did contact me sometime in early 1999, I believe,

Interview/Lt. Colonel Robert C. HICKES, on 07/02/99
Page 3

to indicate that he had been requested to go to Western Pennsylvania to meet with the FBI. At that time, I told him that uh, that was fine; I approved that. And he indicated that uh, based on the confidentiality, he felt he should take his personal car and take leave time in order to accomplish that. I disagreed with him and told him that it was certainly something that uh, I was sanctioning that he should do, and uh, but I would defer to him if he felt more comfortable under the circumstances, he would be able to do that. Uh, he did do that some time subsequent to that.

The only real briefing I got was to view the videotape that the FBI had made of uh, I believe its Trooper STANTON, and to get an update that uh, I think that they were going to proceed against the political official once money had been exchanged and to see where that took them.

Then some time in late April, early May, he had advised me that they had concluded that this really didn't go any higher and that we were uh, removed from the confidentiality concerns that they had relative to the case.

WERTS:      Did you see that tape, the video?

HICKES:     Yes, I did.

WERTS:      Was that the one that's kind of half covered, you only see like half of the screen?

HICKES:     Yes, it is.

WERTS:      Okay, I just wanted to make sure its the same one.

WILLIAMS:   Colonel, at some point in time, its my understanding that both you and Captain OBER met with the Commissioner in order to inform him of this investigation. Can you tell me what the date was that you met with Commissioner EVANKO, where you met, and just a brief synopsis of what conversation took place that day?

HICKES:     I believe we met on May 12th. The issue and, and is that a Wednesday?

WILLIAMS:   Yeah, I believe it is.

Interview/Lt. Colonel Robert C. HICKES, on 07/02/99
Page 4

HICKES:          The uh, issue was based upon the nature of the allegation, my desire to have Captain OBER present to be able to provide further explanation if the Colonel had any desire to have more information than I possessed, which clearly with no contact with the FBI and no involvement other than through Captain OBER, I really didn't have the knowledge that he did. Uh, once we were released from the confidentiality, either based upon unavailability of the Commissioner primarily, or uh, Captain OBER, we - it was not conducive to do that. We had a meeting at the Academy on the 12th. I'm not certain, but I believe it was - had to do with uh, the Technology Project and Captain OBER was also present. I asked the Commissioner if we could talk to him privately and I believe we did in Major EINSEL's office, and made the notification to him verbally then.

WILLIAMS:        Subsequent to that meeting, did you then meet with Commissioner EVANKO and Lieutenant Colonel COURY?

HICKES:          (23 second pause) Yes.

WILLIAMS:        And where was that meeting and what was that discussion about, Colonel?

HICKES:          Could we go off tape a minute, please?

                 *********************

WERTS:           Back on tape.

HICKES:          That meeting was also in Major EINSEL's office. Uh, Colonel COURY had been outside the office and uh, knocked on the door. The Commissioner simply said, "Come on in. This involves you," and he asked me to provide him the same synopsis that I've already provided you relative to what occurred.

WERTS:           Colonel, do you remember when you were told by OBER that the allegations against either high ranking members or people in the Governor's Office were unfounded?

HICKES:          (41 second pause) It was late April or early May. I don't have a specific date. I uh, recall being uncomfortable that it was taking uh, at least a week to advise the Commissioner. There had been occasions that I saw him, but as I said, I felt I needed OBER in the room when I, when I made the notification and

Interview/Lt. Colonel Robert C. HICKES, on 07/02/99
Page 5

uh, I only really did see him one or two times.

WERTS:     Okay.  Do you know if Captain OBER, either prior to or after his initial discussion with you and your instructions on confidentiality, do you know if OBER discussed this with anyone else?

HICKES:    To the best of my knowledge, he did not.  I don't know.

WERTS:     And with the exception of OBER, and the Commissioner and COURY, and now us, have you discussed this with anyone else?

HICKES:    Yes, I have.

WERTS:     And who would that be?

HICKES:    (23 second pause)  On the 13th of May, there was a subsequent meeting at the Academy in the library and the Commissioner at that meeting had Colonel WESTCOTT, Colonel COURY, himself, and me.  And at that meeting uh, he also then asked me to advise that group of the circumstances that had occurred during this investigation.  At that meeting, he also advised that he was going to have an investigation and discussed with this group uh, who may be appropriate to do that investigation.  Subsequent to that meeting, I returned to Headquarters and I also then discussed it with the Department's Chief Counsel, Ms. CHRISTIE.

WERTS:     Since then, have you discussed this with anyone else?

HICKES:    I have not discussed it in specific terms.  I've discussed it uh, to the degree that I think there are probably people that know that there's an issue.  I'm not sure that they didn't have specifics on the issue, but I'll leave it at that.

WILLIAMS:  Colonel, I want to go back to your meeting with the Commissioner, the meeting between you, the Commissioner, and Captain OBER, which occurred on I believe you said 05/12/98.  Did either you or the Captain advise the Commissioner that the FBI had directed non-disclosure of this investigation?

HICKES:    (43 second pause) Yes.

WILLIAMS:  And that would've been either you, or can you tell me

Interview/Lt. Colonel Robert C. HICKES, on 07/02/99
Page 6

who would've said that, for clarification purposes?

HICKES: I would have said that. I can't say whether Captain OBER said that also or not.

WILLIAMS: In any conversation you had with Commissioner EVANKO, did either you or Captain OBER ever tell him that the allegations of influence were not specific as to a Colonel in the PSP, or someone in the Governor's Office, but rather that the Trooper claimed to have contacts with high ranking officials in the agency and the administration?

HICKES: Ask that again, please.

WILLIAMS: Sure. In any conversation you had with Commissioner EVANKO, did either you or Captain OBER ever tell him that the allegations of influence were not specific as to a Colonel in the PSP, or someone in the Governor's Office, but rather that the Trooper claimed to have contacts with high ranking officials in the agency and the administration?

HICKES: (30 second pause) My involvement with this investigation was only through information provided to me by Captain OBER. As I had said earlier, during an early contact, Captain OBER indicated that the term "Colonel" had been used. When we advised the Commissioner, we advised him that they had had contacts within the Governor's Office, allegedly, or high within the Pennsylvania State Police. Uh, the Commissioner's concern was that the FBI should have notified him and that unless he was a suspect, that he couldn't understand when they had done that. Subsequent to that, I did advise the Commissioner that the term "Colonel" been relayed to me, but I did not know what the FBI's position was relative to the investigation, because I was not privy to that.

WERTS: Colonel, would you explain to us why you did not inform the Commissioner when you first learned of this on the 5th or thereabouts?

HICKES: Yeah. Let me start by saying that uh, when Captain OBER informed me of this information, particularly on the 5th of October, was not a pleasant day for me. This is the kind of information that in law enforcement is, is one that you really wish you didn't have to have. You've got a decision to make. Uh, the decision, the easy decision would be simply

Interview/Lt. Colonel Robert C. HICKES, on 07/02/99
Page 7

tell him.  Uh, but I was influenced by a number of
factors in this particular case.  One was the FBI's
request to confidentiality, and uh, the information
provided to me was that they had sought absolute
confidentiality, but the Captain told them he had to
inform at least somebody because he wasn't going to
be on his own here.  Second was that uh, the
information that they had provided involved what they
did not tell us, that they (inaudible) political
corruption.  So we really only had a piece of the
information and really didn't know where all they
were going, or what all they were going to be
investigating.  So not being part of that
investigation, you don't know what they have or what
they don't have.

Uh, the request for confidentiality begs that it be
kept a secret.  Within law enforcement, the only way
you keep a secret is not tell anyone.  Uh, for me to
have informed the Commissioner in this particular
case would have put him in the same conundrum that I
was in.  Does he then tell Colonel WESTCOTT; does he
tell Colonel COURY; does he tell the Governor's
Office; or is he going to be sitting on this?  At
some point, the buck has to stop.  At some point,
someone has to say, "Look, I'm just gonna keep my
mouth shut and let this thing run its course."  Uh, I
would have placed the Commissioner in a very
uncomfortable situation by telling him because then
he would've been confronted with the same dilemma
that I was confronted with.  It was out of concern
for that dilemma that I would've put him in, that I
didn't.  But out of that same concern for him,
particularly at this time frame - he had not been
reconfirmed, there were rumors about abound in the
Department.  I felt that it was best that no one know
about this.  Hence, I ordered Captain OBER to tell no
one and I told no one, so that this investigation
could run its course.

Based on my experience in the Bureau of Professional
Responsibility, and based on my evaluation of this
investigation, I wasn't too concerned about it.  Uh,
my belief is that it would turn out very much the way
that it did, that you had a person in Western
Pennsylvania shooting off their mouth, but with very
little to back that up and very little credibility to
it, but uh, I also had a concern for the law.  Uh,
within our call of honor, my mission is to maintain
the honor of the force.  My mission is also to obey

Interview/Lt. Colonel Robert C. HICKES, on 07/02/99
Page 8

the law.    The FBI asked for confidentiality, and there was the potential that if I tell, that could compromise that investigation.    And looking at all those things in totality, I made a decision that this secret was better kept with me, that I absolutely would tell the Commissioner, but I would have to tell him at an appropriate time when - number one, I had more information; and number two, I was assured that I was not going to compromise an investigation.

WERTS:    I just have a follow-up on that and you mentioned briefly about the process that was going on at that time.    We were in a gubernatorial election process and all that was going on.    Did you consider the impacts that this possibly could have had with the RIDGE Administration?

HICKES:    I need you to clarify that question.

WERTS:    Well basically, if this had come out through the FBI, which I think everybody in the room knows that those things happen with the Bureau, what impact this could possibly have had with the reelection of the Governor, and them not knowing anything about it.    I guess that's about as clarifying as I can get.

HICKES:    I'll tell you, Major, my first duty is to law enforcement, and I have a wealth of background in the Bureau of Professional Responsibility, and my belief is this was an FBI investigation, not a State Police investigation.    And whatever the FBI finds, they need to do their duty.    And if that, God forbid, had fallen somewhere within the RIDGE Administration or somewhere within this Administration, then so be it.    And it did not uh, enter my decision-making to tell or to not tell that this would have impacted negatively on the RIDGE Administration.

WILLIAMS:    Colonel, if there was no confidentiality restriction given to you through Captain OBER concerning this case, would you have informed the Commissioner about this case?

HICKES:    (27 second pause)  Well what I probably would've done is told Captain OBER he had made a mistake.  If there was no confidentiality concern, then he needed to go to Colonel COURY, and advised through channels what had happened.  I don't think it would've been my duty or responsibility to run to the Commissioner on a matter that wasn't within my command.    I'm sure we

Interview/Lt. Colonel Robert C. HICKES, on 07/02/99
Page 9


would've talked about it at some point, but that
would've been my course of action.

WILLIAMS:    Okay.  (Tape ends)

                    - Side B -

WERTS:      Alright, continuing to tape.

WILLIAMS:   Repeat what I said?

WERTS:      Yeah, just that you don't have any more questions.

WILLIAMS:   I don't have any more questions.  Bob, do you have
            any more questions?

WERTS:      No.  Colonel, is there anything you want to finish up
            with or anything you want to say?

WILLIAMS    We always like to give the person we're interviewing
            an opportunity to say anything that maybe we didn't
            ask or you wanted to include into the notes or into
            the report that we're going to submit.  So now is
            your opportunity if you want to do that, Colonel.

HICKES:     Major, I really don't have anything else I want to
            add.  I've talked to the Commissioner.  I told him
            that I understood that there was going to be a day of
            reckoning when I made my decision in October.  I did
            not divulge the information until I had an
            opportunity, until this investigation was concluded,
            and my decision was based on what I felt was best for
            the Pennsylvania State Police.  Beyond that, I have
            nothing to add.

WILLIAMS:   Okay.

WERTS:      Alright, we're concluding the tape.  It is 10:42.
            Still present in the room are Colonel HICKES, Major
            WILLIAMS, and myself - Major WERTS.



# PENNSYLVANIA

# BUREAU OF PROFESSIONAL RESPONSIBILITY

## INTERNAL AFFAIRS DIVISION

Transcript of Interview
with Colonel Paul J. Evanko
June 28, 1999

STATE POLICE

P279
1 OF 11

Alright, its Monday, June 28th, 1999. It is 10:45 AM and we're in the office of the Commissioner with Colonel EVANKO, Major WILLIAMS, and Major WERTS present in the room.

WERTS:      Sir, to your knowledge, there is a tape on.

EVANKO:     Yes, I understand that and I approve of it.

WILLIAMS:   Colonel, what we'd like you to do is just basically in your own words tell us when you first became aware of the political corruption investigation which was being conducted by the FBI in Western Pennsylvania. Who notified you of that investigation and basically, what they told you about that investigation.

EVANKO:     The first that I was aware of an alleged FBI investigation into the selling of State Police, alleged State Police positions, was the afternoon of May 12th, 1999, when Lieutenant Colonel HICKES and Captain OBER approached me, and asked if I had a few minutes, they wanted to talk to me. We went into, I think it was Major EINSEL's office, sat down, and Colonel HICKES, Lieutenant Colonel HICKES proceeded to tell me that in early October of 1998, he'd been approached by Captain OBER, who told him that the FBI had approached him, Captain OBER, with information that high ranking State Police officials and high ranking Governor's Office personnel were involved in the selling of State Police Trooper positions. And that was the first I was aware that there was any type of a inquiry being conducted by the FBI.

WERTS:      I would just back up and follow that up with a question. When you say "high ranking," was any specific rank mentioned during the course of this?

EVANKO:     No, there was no specific rank mentioned. Uh, what Colonel HICKES told me on a subsequent day, and I - on a day after this, and I'm not sure if it was the following day or the day after it, he came over and told me that the word "Colonel" was used some time, but that was after this May 12th meeting.

WILLIAMS:   And what would you consider a high ranking member of the Pennsylvania State Police?

EVANKO:     Director, Bureau of Personnel, Director uh, any of the Directors or senior commanders' positions.

WILLIAMS:   Which would encompass most of the Major positions, is that correct?

EVANKO:     Yes.

Interview/Colonel Paul J. EVANKO, on 06/28/99
Page 2

WILLIAMS:     I understand that there was a subsequent meeting after
              you had this meeting with Captain OBER and Lieutenant
              Colonel HICKES. I understand that at the Academy there
              was a subsequent meeting between you, Lieutenant
              Colonel HICKES, and Lieutenant Colonel COURY. Can you
              tell me what was discussed at that meeting, basically
              in your own words?

EVANKO:       After Lieutenant Colonel HICKES finished briefing me on
              this investigation, and Captain OBER left, I got a hold
              of Colonel COURY, told him to come into the office, and
              I think I paged him and got a hold of him, told him to
              come into the office and I told Colonel HICKES, "You
              tell Lieutenant Colonel COURY what you just told me."
              And I have a copy of the document that Colonel COURY
              has submitted to me on these facts, and what he relays
              in that document is what was relayed by Lieutenant
              Colonel HICKES to both of us at that time.

WILLIAMS:     Colonel, a question that I'd like to ask you, are you
              like most commanders who when you have a new appointee
              to your staff, that you would have a discussion as to
              what your expectations are and what you would expect
              out of that individual? Lieutenant Colonel HICKES was
              a newly appointed member to your staff. Did you have
              such a discussion with him? And if you did, what was
              your expectations insofar as him reporting high profile
              incidents to you?

EVANKO:       The first several days of his assignment we spent a
              substantial amount of time together, and I kept a
              number of the notes of what my priorities were for the
              Department, what my expectations of his performance
              were, and what I expected from him. One of the things
              that I stressed with him was to keep me informed. Keep
              me up-to-date on everything that's going on, and that
              includes not only the good things that are going on,
              but the bad things that are going on, that I had to
              know as much information as possible as to what was
              going on in this Department. I laid out all of my
              priorities for him and the priorities for the Bureaus
              under his command. But one of the things that I
              stressed to him, "You got to keep me informed of what's
              going on. I have to know what's going on in this
              Department." As much as I stress with each of the
              other two Deputies, I stressed with him as well.

              All three of them know if there's something going on
              that I should be aware of, talk to me. I'm available
              twenty-four hours a day, seven days a week. This is
              the fifth year that I've been Commissioner, going into

Interview/Colonel Paul J. EVANKO, on 06/28/99
Page 3

the fifth year that I've been Commissioner, and anybody can reach me any time of the day or night, anywhere except in my last trip to Armenia.  So I, I very emphatically stressed that point.

WERTS:    I want to go back to the meeting of May 12th.  At any time during that meeting, did Colonel HICKES mention to you anything about the FBI requesting confidentiality or nondisclosure, specifically to you, basically?

EVANKO:   What he told me was that uh, I don't know if he used the word confidentiality, but that uh, that I think the words were, "OBER was instructed," if not "keep it tight to the vest," something along those lines.  I know, I know what it was.  It was to use uh, discretion on who he told about this investigation.

And during this meeting on May 12th, I kept - and if I asked Colonel HICKES once, I asked him three or four times,  "Why didn't you tell me about this investigation?  I should've know about what was going on here."  In fact, and I know that we're on the record here, but uh, I'm in full disclosure by everybody.  Its important in this case so that I have all the facts to make a decision is that uh, I was very angry during this meeting.  Simply because of the fact if there's an alleged FBI investigation into the State Police, I should've been aware of it.

And Director FREE and I are friends.  The SAC in Pittsburgh is a friend of mine and I said, "I should call the SAC up now.  In fact, I should call FREE up now.  And if there was a high level investigation going in the State Police and they didn't tell me, that SAC should be transferred.  I should call FREE right now!"  And, and because I was angry at that particular time about not being told about a significant FBI investigation into the State Police.  So I just wanted to put that on the record because it did occur during that meeting between us.

Also during that meeting, after Captain OBER left, and this was before Colonel HICKES came - or before Colonel COURY came in.  Colonel HICKES asked me a number of times, "What can I tell Captain OBER?  Because I told OBER, I gave OBER orders not to disclose this anybody, and now he's out here on a, on a - what can I tell him?"  What he was asking me is uh, give OBER blessings that everything's okay with him.  Well, everything's not okay, because I don't have the facts, and I told Bob that.  I don't have the facts to be able to do

Interview/Colonel Paul J. EVANKO, on 06/28/99
Page 4

that.  I need to gather facts and know what happened here in this case before I can absolve Captain OBER of any potential, for lack of a better word, wrongdoing. So Colonel HICKES did ask me about that several times.

WERTS:        In Colonel HICKES' statement, written statement, he mentions that one of the reasons he didn't get back to you was the fact that you were (inaudible) your availability.  Did he ever request a meeting where he basically said, you know, "There's a problem, I have to tell you about it," and he was refused?

EVANKO:       No.  I've been available, again, twenty-four hours a day, seven days a week.  One of the first things that I do, and it happened in the first few days of Lieutenant Colonel HICKES' assignment to me, is to give him all my phone numbers.  He can get me any time that you want to get me.  And in addition to that, I got all of his contact numbers.  The only time in four and a half years that I haven't been available is when I was in Armenia because of the phone system, and that was only a week or so ago.  But no, he - all three Lieutenant Colonels, at any time of the day or night, have direct access to me, whether I'm in here behind closed doors, uh, wherever I am, whether its contact from the Governor's Office or any of the Lieutenant Colonels, anybody has access to me at all times of the day and night.  So no - the answer to whether he has never been without access to me - he can always get me.

And the statement that uh, that I was, "you were not advised," - Colonel HICKES' statement that, "You were not advised sooner due to your unavailability," is simply not accurate.  I've gone over the - I looked at my calendar for the dates prior to that and there were many times that we were either together, you know, at the State Police Memorial Service on April 30th.  I was in this office here the 4th, the 5th, and the 6th.  The 4th after the prayer breakfast, the 5th after the Cadet run.  Uh, well I can go down over a list of dates that I was available prior to this between the time that he was notified by Captain OBER that this investigation didn't go anywhere or didn't involve us, didn't involve any senior ranking government officials, Governor's Office officials, or uh, high ranking State Police officials.  I was available numerous times between the time he was told that by Captain OBER, to the time they decided to tell me.

Interview/Colonel Paul J. EVANKO, on 06/28/99
Page 5

WERTS:      Colonel, were you ever assigned to the Bureau of
            Professional Responsibility?

EVANKO:     Yes, I was the Director of BPR.

WERTS:      During the course of that assignment, did you ever
            encounter a time when you would not inform this front
            office, the Commissioner or the Deputy Commissioners,
            of a high profile incident that would be similar to
            what we're talking about?

EVANKO:     No, I think I would've been negligent not to have done
            so.

WERTS:      During your assignment there, did a situation ever come
            up where it would've been appropriate for the Division
            Director to travel on an annual leave day to Western
            Pennsylvania, rent a room for the purpose of conducting
            this investigation and not inform the Director (TAPE
            ENDS)

                        - SIDE B -

WERTS:      Alright, the tape had stopped.  Its 10:56, and Colonel
            EVANKO is proceeding with the answer to the question.

EVANKO:     The answer to the Division Director traveling out of
            his office to meet in another part of the State and not
            telling the Bureau Director, never occurred.  I think
            it was inappropriate and wrong for him to do that.

WERTS:      You comments regarding the fact that would it be
            necessary for anyone in the BPR system, to your
            knowledge, to rent a room just to conduct interviews?

EVANKO:     No.

WILLIAMS:   Colonel, I just wanted to ask you when - you're totally
            familiar with this incident as we sit here today, are
            you not?

EVANKO:     I'm totally familiar with it as far as the briefing
            from Lieutenant Colonel HICKES on May 12th, and the
            documents submitted to me by him, the one page document
            dated May 18th, and the document dated by Captain OBER
            to me dated May 13th.  So I'm - I understand it as it
            relates to those briefings and those documents.  And
            that's one of the reasons that I've asked for an
            assignment for the two of you to collect all this data
            and partially for me, and give me all the facts in the
            case.

Interview/Colonel Paul J. EVANKO, on 06/28/99
Page 6

WILLIAMS:    Based on your position as a cabinet member to the Governor, and based on the documents that you have in front of you, would this be something that you should have reported either to the Governor's Office or to the Governor himself?

EVANKO:      I think I should've reported this, if I had been informed of it, with the facts that I know to the General Counsel for the Governor.  I think he at least should have been informed of this and he should have been informed of it by me.

WILLIAMS:    Had this come to perhaps the news media's attention or something of that sort, would this be a potentially damaging or embarrassing situation to either you or perhaps the Governor?

EVANKO:      It would've been embarrassing to not only the Governor's Office, but in particularly to me and the Pennsylvania State Police in general.  And in particular, by the findings and when you look at the facts as I know them now, in particular because of those because of the lack of substantiating data early on to even - to get a uh, a reasonable suspicion that any high ranking - the lack of reasonable suspicion that any high ranking officials were involved in any wrongdoing at any time.  So it would've been terribly embarrassing to the State Police, to me, and to the Governor's Office.

WERTS:       And let me just go back and ask you a question regarding OBER reporting this information.  In the present chain of command, who would OBER be responsible to report it to if he were the Acting Director of BPR?

EVANKO:      If he had been the Acting Director of BPR, he should've reported it directly to Lieutenant Colonel COURY.

WERTS:       Okay.  Assuming, and this is just an assumption at this point for the sake of this discussion, that he felt that the possibility existed that Lieutenant Colonel COURY might be involved in this, who then would he be responsible to report it to?

EVANKO:      He should've reported it to me directly.

WILLIAMS:    I know I don't have anything else, unless you have anything you want to add Colonel.

EVANKO:      I do have some things I'd like to add, but I'd like to go through my notes and, because I talked to the FBI

Interview/Colonel Paul J. EVANKO, on 06/28/99
Page 7

and I'd like to go through my notes, find my record of the notes that I made with that conversation, and I'd like to put those in the record as well.

WERTS:    We'll stop the tape here for a few minutes for the Colonel to review his notes and then come back on.

---

WERTS:    Okay, we're resuming the statement of Colonel EVANKO. It is 11:05 AM.

EVANKO:    I just want to go over a couple of the notes that I made at different times after May 12th. One of the things Colonel HICKES came to me and asked was, "What can I tell Darrell?" And I said, "Nothing, not until we get all the facts together." I also told him, and I told him on May 12th, after he had told Colonel COURY and I about this incident, I told him, "I need somebody to gather all the facts and I'm going to assign somebody to gather all the facts in this case."

And at some point, Bob came to me and I told him that both you Major WERTS and you Major WILLIAMS were assigned as the gatherer of these facts, so he is, he was aware of that. But he came and said, "What can I tell Darrell?" I said, "You can't tell him anything, not until we get all the facts together."

And so its clear, it wasn't until sometime after the 12th that he came to me and he said that he wanted me to know that the word "Colonel" was used at some point. He also - I also found out that he'd gone to our Chief Counsel sometime after May 12th, and asked our Chief Counsel about potential obstruction of justice had he disclosed to us or disclosed to me, but that was after May 12th. I think that's significant to note.

WERTS:    Okay, just for the record, I have a copy of the correspondence from the Chief Counsel to you, Colonel EVANKO, and it says basically there on Thursday afternoon, May 13th, Colonel HICKES advised me that he'd been informed of these allegations. So it would be the 13th is what you're talking about?

EVANKO:    Yes. I also, after May 12th, called the SAC in Pittsburgh, Rick MASCARA, because he's a friend of mine, and I told him there's something I needed to talk to him - I tell you what, the date was May 20th, of 1999. And I told him there was something I needed to talk to him about, and I prefaced my remarks by saying

Interview/Colonel Paul J. EVANKO, on 06/28/99
Page 8

that if what I ask is going to interfere in any FBI investigation, no, I understood that he couldn't respond to any of my questions. I understood that. And I wanted to - I asked him if either I or the Pennsylvania State Police were the subject of an FBI investigation into quote, selling Trooper positions, end quote - or any other corruption allegations since October of 1998. Specifically, was I the subject of an investigation or any my Lieutenant Colonels or the State Police.

His response to that was, "An investigation out of where?" Quote, "Out of where, out of what office?" That was his response to my first question. And he said, "I have to plead ignorance in this." He said, "Some time ago, I remember that there was a case against a specific Trooper, but I'd have to get up-to-date on it." I also asked him, "Was I the subject of an investigation or were any of my Lieutenant Colonels?" And his response was, "If you were, I would've been told about it." He said, "I can only reiterate that the, and this is paraphrasing, "that I remember something in October of last year or some time back thereabout, local municipalities and testing," he said, "but I'm really not familiar with what you're talking about. I'll have to get back to you."

My notes are a little scattered here, so - can you turn that off until I . . .

WERTS:         Sure.

_____

WERTS:         Resuming.

EVANKO:        My conversation with the SAC was on May 20th, around twelve o'clock. I asked him those preliminary questions. He said he'd get back to me. About 12:37, he gave me a call back, and said that there were allegations that had surfaced around January of 97, 1997. He said, "I didn't get here until June, but the allegations about political corruption surfaced in January of 1997." Part of that allegation had to do with a State Police Trooper by the name of, I think its STANTON, using his position to influence the purchase of State Police positions. There was a CI involved, a local political official, and he went on and talked about STANTON's alleged involvement.

Interview/Colonel Paul J. EVANKO, on 06/28/99
Page 9

He said the Internal Affairs of the State Police, Captain OBER in particular, was notified because the case was set had been set aside until around October of 98, but Captain OBER was then notified and they told him that they were going to take a run at this. They mentioned a particular State Representative's name.

WERTS:      And this is information that you obtained from the SAC at Pittsburgh?

EVANKO:     That's right.  He did tell me that there was nothing systemic in the allegation, that nobody but STANTON was mentioned.  I asked him then, "Is the investigation closed?" He said it is - the investigation is closed. It was turned over to PSP, specifically Captain OBER.

WERTS:      Colonel, when were you advised of this?

EVANKO:     May 20th, 1999, when I called FBI Agent Rick MASCARA, who is a SAC in Pittsburgh.

WERTS:      I don't know if you have it there or if he gave you this information.  Did he ever mention to you a specific date when OBER was first advised of this?

EVANKO:     He just said that it wasn't until October of 98, that they got around to it and decided to take a run at it, but he didn't mention a specific date, just around October of 98.  And he got that from the case agent.

WERTS:      It would've been either KUSH or KELLY.

EVANKO:     Uh, KUSH.

WERTS:      KUSH?

EVANKO:     KUSH.

WERTS:      Did he ever mention to you a specific that they then, if you will, turned the investigation over to Captain OBER?

EVANKO:     No, he never mentioned a specific date.  I did tell him that somebody would be getting a hold of him if he didn't mind to sit down and get some facts from him.

WERTS:      I'm going to turn this off for second for you to read through your notes again.

EVANKO:     Okay.

156

Interview/Colonel Paul J. EVANKO, on 06/28/99
Page 10

---

WERTS:      Okay, resuming the statement.

EVANKO:     As Special Agent MASCARA talked to me about this, he
            did tell me that Captain OBER was concerned about,
            quote, "Going anywhere," end quote, with this
            information. What he was implying is as to who he
            should tell about this information, who Captain OBER
            should tell about this information.

WERTS:      Let me ask you something. During the course of your
            conversation with the SAC, did the SAC ever mention to
            you anything specific with regards to a particular rank
            within our agency?

EVANKO:     No, he just talked about Trooper STANTON.

WERTS:      Okay. He never mentioned anything with respect to a
            particular individual other than Trooper STANTON?

EVANKO:     No. In fact, uh, the word - he did tell me that it was
            not systemic. Yeah, that's all, that's all I have.

WERTS:      Okay. End of tape. It is 11:15. Once again, the 28th
            of June 1999, and we are in the Commissioner's Office,
            again, with Colonel EVANKO, Major WILLIAMS, and myself
            Major WERTS.

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

**DATE:**        May 18, 1999

**SUBJECT:**    FBI Investigation

**TO:**         Commissioner

**FROM:**       Lt. Colonel Robert C. Hickes *RCH*
Deputy Commissioner of Staff

1.  This correspondence is submitted in response to your request of May 13, 1999, for information concerning what was known of the FBI investigation relative to political corruption.

2.  During my first week as Deputy Commissioner of Staff, I believe Monday, October 5, 1998, Captain Darrell Ober, Director, Internal Affairs Division, contacted me and asked to speak to me in confidence. Captain Ober advised that while he was Acting Director of the Bureau of Professional Responsibility he was contacted by the Federal Bureau of Investigation, Pittsburgh Office, relative to a political corruption case that they were investigating. The FBI provided the following information to Captain Ober:

    a.  An informant was approached to facilitate buying a candidate's position as a State Police Cadet. This was supposedly a common practice and had been done numerous times in the past.

    b.  Buying a position with the Pennsylvania State Police allegedly was facilitated by political official(s), someone in the Governor's Office, and someone of high rank in the State Police. The term Colonel was used.

    c.  Money was to be paid to move from Band B to Band A and also to progress through each aspect of the hiring process, i.e., polygraph, physical test, background, etc.

    d.  This investigation was furthered by wiretap information.

    e.  The Pennsylvania State Police aspect of the FBI investigation was a minor component in a larger political corruption investigation and had been known for some time.

*P280*
*1 OF 2*   *Hickes - 1*



3.   Captain Ober advised that the FBI had requested absolute confidentiality. Captain Ober stated that he told the FBI that he had to advise at least one other person.  Upon my promotion, Captain Ober determined that he would advise me, since I had not been a Colonel at the time of the allegation.  Based upon the information provided by Captain Ober, I ordered him as follows:

    a.   Disclose the information to no one else.

    b.   Cooperate with the FBI as requested according to PSP regulations and the law.

    c.   Advise me periodically of progress.

4.   Over the next five months, I talked to Captain Ober two or three times at his initiation, and he advised that no progress had been made.  In mid to late March, 1999, Captain Ober advised that a Trooper Stanton, Troop B, had facilitated a meeting between the prospective candidate and the informant and an amount of money (I believe $1,000) was exchanged. The FBI was to attempt to link the bribe to a member of the Pennsylvania House of Representatives from Pittsburgh, Pennsylvania.

5.   At the end of April, early May, Captain Ober advised that the Representative didn't do anything illegal.  The Representative talked about helping the candidate become a PCO or "PLCB Officer," but not a Trooper.  Captain Ober informed me that we were released from the confidentiality pledge.

6.   You were advised by both Captain Ober and myself on Wednesday, May 12, 1999.  You were not advised sooner due to your unavailability.

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

DATE:                October 19, 1999

SUBJECT:             Specialized Training Opportunity – School of Police Staff and
                     Command

TO:                  Director, Bureau of Personnel

FROM:                Captain Darrell G. Ober

Reference:           (a)     Special Order 99-102, dated October 7, 1999.

Enclosure:           (1)     Resume of Qualifications.


1.      I request to be considered for the Subject training.

2.      The requested information is as follows:

        a.      RANK:        Captain.
        b.      DOB:         November 16, 1957.
        c.      DOE:         July 20, 1981.
        d.      DOR:         March 3, 1995.

3.      Enclosure (1) is a resume of my qualifications.


P281.

BTS: Personnel: 10/20/99

SP 3-200 (2-89)



**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE



FR 1-1
3/25/92

SUBJECT:  GENERAL REQUIREMENTS

1.01   PURPOSE

The purpose of this regulation is to establish policy and
guidelines of general requirements for members' conduct.

1.02   UNBECOMING CONDUCT

Unbecoming conduct is that type of conduct which could
reasonably be expected to destroy public respect for
Pennsylvania State Police officers and/or confidence in the
Department.  Members shall not conduct themselves in a manner
which is unbecoming to a police officer.

1.03   CONFORMANCE TO LAWS

A.   Members shall conform to and abide by the laws of the
     United States, Commonwealth of Pennsylvania, all other
     states of the United States, and subdivisions thereof.

B.   Violation of any law shall be critically reviewed by the
     Department to determine whether court-martial proceed-
     ings should be instituted.

1.04   LOYALTY TO DEPARTMENT

Members shall not publicly criticize the Department, its
policies or other members or employes by talking, writing or
expressing in any other manner, where such talking, writing
or other expression is defamatory, obscene, or unlawful, or
when the member knows that such criticism is false.

1.05   DISSEMINATION OF INFORMATION

A.   Members shall not disseminate, in any manner, any
     confidential information of the Department or its
     members, without proper authority.  For the purpose of
     this regulation, confidential information shall be
     defined as information which:

-1-

*P282
1 of 13*

FR 1-1
3/25/92

1.  The disclosure thereof could:

    a.  Endanger a member, or any other person.

    b.  Impede a just disposition of a case.

    c.  Aid a person to escape arrest.

    d.  Delay the apprehension of a criminal.

    e.  Permit the removal of stolen property or evidence by a suspect.

    f.  Compromise or negate the judicial process.

    g.  Violate a statute of the United States or this Commonwealth pertaining to the release of designated confidential information.

    h.  Make known the contents of an internal or criminal investigation record or report to an unauthorized person.

2.  Would identify a person who is acting as a confidential informant; however, members may divulge such identity to other members when it is authorized by proper authority and necessary in the performance of police work.

B.  Members may be assigned to positions or functions whereby they will come in contact with information pertaining to the internal administration of the Department, development of procedures and programs, or publicly sensitive matters. Such information shall be regarded as restricted, and members shall exercise prudent consideration prior to divulging the substance or contents of same to any unauthorized person. Members failing to exercise such prudent consideration shall be subject to being assigned to other positions or functions within the Department.

C.  Members may remove or copy official records or reports from a Department installation only in accordance with existing regulations and procedures and with proper authority.

D.  Members may divulge, make known, or exhibit the contents of an official file or record only:

1.  To duly authorized police officers or agencies.

-2-

2.    As provided by law and with approval of the Troo
Commander or Bureau/Division Director.

3.    Under subpoena duces tecum served on the Commis
sioner.

1.06    SEEKING PUBLICITY

Members shall not directly or indirectly seek publicity fo
themselves through the press, radio, television or other new
media; nor shall they furnish information to same for th
purpose of gaining personal recognition as a police officer.

1.07    BADGE OF OFFICE

A.    The term "badge of office" shall include: the identi-
fication card, badge, official position, title, uniform,
or any other tangible or intangible thing by which it
can be construed that the concept "Pennsylvania State
Police" is being interjected. Members shall not:

1.    Participate in any form of solicitation where use
is made of their badge of office, without the
written approval of the Commissioner. "Partici-
pate," as used in this subsection, is not limited
in its definition to active conduct by the members,
but rather extends to tacid approval of the use of
the members' badge of office by any other party.

2.    Solicit or accept such items as athletic uniforms,
equipment and supplies, trophies, prizes or any
other property from a person or business which is
regulated by the Commonwealth, has certain con-
tracts with the Commonwealth or is seeking to
obtain business with the Commonwealth.

3.    Accept athletic uniforms, equipment and supplies,
trophies, prizes or any other property if:

a.    The sponsor's name and an insignia, etc.,
identifying the Pennsylvania State Police
appear on the item(s).

b.    The sponsor's name appears on the item(s)
and it is common knowledge that the team
is affiliated with the Pennsylvania State
Police.

4.    Use any insignia or emblem designating the
Pennsylvania State Police, or the term "State
Police," "Trooper," etc., which could be reasonably
construed to represent the Pennsylvania State

-3-

FR I-1
3/25/92

Police individually or as a member of an organization in which the member is an officer, chairperson, etc., in context with any promotion, solicitation, fund-raiser or merchandising effort without the written approval of the Commissioner.

a. The use of the name "Pennsylvania State Police" or an insignia or emblem designating or representing the Department may be used in conjunction with a publicly accepted, legally constituted, charitable function, e.g., Camp Cadet, Gifts for Kids, Special Olympics, Heart Fund, Cancer Society, Cystic Fibrosis, etc.

b. Questions concerning the appropriateness of a charity shall be directed to the Deputy Commissioner of Staff.

5. Use or permit the use of their badge of office for personal or financial gain.

6. Use or permit the use of their badge of office for the benefit of any individual or group of individuals, except with the written consent of their Troop Commander or Bureau/Division Director.

7. Seek or accept any form of reward or remuneration, excluding wages paid by the Department, as a result of their conduct while acting within the authority of their badge of office, except as directed by the Commissioner.

8. Use or permit the use of their badge of office in any manner wherein it can reasonably be construed that preferential treatment is desired by members.

9. Use "Pennsylvania State Police" or "State Police" as part of the address of their driver's license or registration card, (as well as for any other personal reason not authorized by the Commissioner).

B. Members shall not appear at any non-Department function or engage in any activity while in uniform, off duty, without the prior approval of their Troop Commander/ Bureau Director. This does not apply to travel between the members residence and official headquarters.

C. It is the specific intent of this section to limit the use of the members' badge of office to matters within the scope of their employment. This section shall not

-4-

FR 1
3/25

be construed to restrict members in the free exercise constitutionally-protected freedoms that are not necessarily limited by the conditions of their employment.

1.08   DISPLAY OF IDENTIFICATION

Whenever members take any police action, they shall prompt and respectfully identify themselves by giving their name rank and other appropriate identification to persons involved. Members shall also furnish their name, rank and badge number in a respectful manner to any citizen who may reasonably request the same. Members in civilian clothe shall, at all times, carry their badge and official identification card, except when this is not feasible due to specific duty assignments.

1.09   ASSOCIATIONS

Members shall avoid associations or dealings with racketeers, known illegal gamblers, or persons who have a reputation in the community for criminal behavior, except in the performance of duty as directed by a Supervisor. Members, after being advised by a supervisor to avoid further associations or dealings with such individuals, shall be subject to disciplinary action if such associations or dealings continue.

1.10   VISITING PROHIBITED ESTABLISHMENTS

Frequenting, visiting, or entering a house of moral turpitude, gambling house, or establishment wherein any criminal law of the United States, the Commonwealth of Pennsylvania or any other state is violated, is permitted only in the performance of duty as directed by a supervisor.

1.11   JOINING ORGANIZATIONS

A.   Members shall not, with the specific intent to further its aims, join or become a member of any organization or society which has, as a purpose, the overthrow of, or interference with, any lawfully-constituted government of the United States, except in the performance of duty and while acting under proper and specific orders from a supervisor.

B.   Members shall not organize, join or become members of any society or organization which has an expressed objective or aim to unlawfully interfere with the

-5-



FR 1-1
3/25/92

administration, discipline, operation or control of members of the Pennsylvania State Police, except in the performance of duty and while acting under proper and specific orders from a supervisor.

C.  Members shall promptly notify their Commanding Officer whenever they have any knowledge of the organizing or attempt to organize any society, club, or association of members or employes of the Department which violates any provision of this section.

1.12   MILITARY ORGANIZATIONS

Members may enlist, reenlist, or accept a commission in any federal or state military organization only with the approval of the Commissioner.

1.13   POLITICS

Members shall avoid all political or religious arguments while on duty. They shall not use their position for politi-cal influence. Members shall not sign or circulate any political petition, or any other type of petition, in their capacity as a Pennsylvania State Police officer unless authorized by the Commissioner. Members shall not be an officer in a political party or run for or hold a political office during their employment. Members shall not solicit any assessments, contributions or services for any political party. Nothing contained herein shall affect the right of members to :

A.  Hold membership in, and privately support, a political party.

B.  Vote as they choose.

C.  Express their opinion on any political subject or candidate, privately.

D.  Maintain political neutrality.

E.  Attend political meetings as private citizens.

1.14   USE OF OUTSIDE INFLUENCE

Members shall not knowingly use, attempt to use, or permit the use of any outside influence to gain promotion, transfer, or change of duty for themselves or other members.

-6-

FR
3/25

## 1.15    HOLDING OFFICE IN LIQUOR ESTABLISHMENT

Members shall not own, hold office in, or be employed by
organization or establishment licensed by the Pennsylva
Liquor Control Board to dispense alcoholic beverages with
the Commonwealth without the approval of the Commissioner n
shall they do so in any other state.

## 1.16    REQUIRED RESIDENCY

Members shall reside within the limits of the Commonweal
and shall maintain a telephone in such residence. Any chang
of address or telephone number shall be reported in accor
dance with AR 4-2.

## 1.17    REPORTING OF INFORMATION

A. Members shall report to their supervisor all information
that comes to their attention concerning organized
crime, racketeering, vice conditions or violations of
any laws concerning such activities.

B. Members shall promptly report to their supervisor any
information which comes to their attention and which
tends to indicate that any other member or employe has
violated any law, rule, regulation or order.

## 1.18    INTERFERENCE WITH INVESTIGATIONS ASSIGNED TO OTHER MEMBERS

Members shall not interfere with an investigation assigned to
another member for investigation without the consent of the
assignee, except by order of their supervisor; nor shall they
interfere with the operation of any Bureau, Division, Section
or Unit.

## 1.19    INTERVENTION IN ARREST OR PROSECUTION

Members shall not intervene or interfere in any lawful arrest
or prosecution brought by another member of the Department or
by any other agency or person.

## 1.20    INTERFERENCE WITH DISCIPLINE

Members shall not exert, or attempt to exert, any influence
on any of the participants in any disciplinary procedure,
except as expressly provided by regulation.



FR I-1
3/25/92

I.21   ALCOHOLIC BEVERAGES IN DEPARTMENT INSTALLATIONS

Alcoholic beverages shall not be brought into, or stored in, any Department installation or vehicle, or any part thereof, except in an emergency situation, on orders from a supervisor, or when it has been officially seized (property of a suspect or prisoner, evidence of a crime, found property).

I.22   USE OF ALCOHOL - OFF DUTY

Members, while off duty, shall not consume alcoholic beverages to the extent that it results in public behavior which could reasonably be expected to destroy public respect and/or confidence in the officer and/or Department; or renders the member unfit to report for their next regular tour of duty.

I.23   USE OF DRUGS

A.   The use or ingestion of any controlled substance, as defined by Act 64, The Controlled Substance, Drug, Device and Cosmetic Act, or prescription drug by members, either on or off duty, when the substance or drug has not been prescribed by a licensed medical practitioner, is prohibited.

B.   The abuse of any drug, whether on or off duty, and whether prescribed or not, is prohibited.

1.   Abuse of a legally-prescribed drug refers to the inappropriate use of a prescription drug by not following the directions of the licensed medical practitioner regarding dosage, intermixing of drugs and alcohol, misappropriation of a prescription, etc.

2.   Abuse of a drug/chemical compound not requiring a prescription refers to the inappropriate use of nonprescription drugs resulting in an adverse effect on a member's job performance or public behavior which could reasonably be expected to destroy public respect of the member and/or the Department.

C.   When members take any legally-prescribed drug or non-prescription drug and have reason to believe that it will functionally impair their duty performance, it shall be reported to their supervisor immediately prior to engaging in any duty activity.

D.   When controlled substances are prescribed in the medical care and treatment of members by a licensed medical practitioner, or when members otherwise employ a con-

-8-

1.23

trolled substance for medical reasons, they
immediately submit correspondence, Form STD-501,
channels, to their Troop Commander/Bureau Di
Contained in the correspondence shall be the name
prescribing practitioner, the controlled sub
involved, the date of the prescription, the ill
disease being treated and any potential side effe
the drug.

E. The intentional use or ingestion of a controlle
stance by members during an undercover assignme
the purpose of furthering an investigation is p
ited. The only justification for the ingestion
controlled substance by members in the course
criminal investigation during the performance
member's lawful duty is if the member's personal
is in immediate jeopardy. In the event members
dently, passively or unintentionally ingest or
controlled substance, or if members intentionally
or use a controlled substance in the performa
their official duty, they shall immediately
correspondence, Form STD-501, through channels, to
Troop Commander/Bureau Director setting fort
detail, the time; date and location of the incide
identity of those present; the controlled sub
involved; and a statement detailing the circums
pertaining to the use or ingestion of the substanc

F. Any drug screen test for members for a cont
substance that results in a confirmed positive
shall be the basis for administrative/discip
action, unless the member's use or ingestion
substance was prescribed for the member by a li
medical practitioner and/or the member has full
plied with this regulation.

1.24   TESTIFYING IN CIVIL CASES

Members shall not testify in any civil case in whi
Department may have an interest without prior approval
Commissioner, unless they have been legally summoned
so, in which case their Commanding Officer shall be not

1.25   CLAIMS FOR DAMAGES

Members may file a legal action regarding official matt
make other legal compromises, only after notifyi
Commissioner, through channels. Such notice must inc
reasonable explanation of the nature of the claim
compromise involved and a copy of the complaint/petiti

-9-

B.    Members, while on duty and in civilian clothes, shall carry the issued revolver and ammunition or an authorized personal handgun and ammunition. In addition to one of the above handguns, members may also carry an additional handgun and ammunition, which shall be an authorized personal handgun and ammunition. Any handgun(s) and ammunition shall be concealed from public view. The additional handgun and ammunition may be carried in the vehicle or on or about the person.

C.    Prior to carrying any personal handgun on duty, members must receive authorization, from the Commissioner, in accordance with FR 10-1. Authorization from the Commissioner is considered effective only while members are currently qualified with the handgun, in accordance with FR 9-2. Members shall also ensure all Department requirements and restrictions are met in accordance with FR 10-1.

D.    Members, while on duty, shall not carry any other weapon (firearm or otherwise) on their person or in any vehicle, unless such weapon is Department issued or authorized by the Commissioner.

E.    Under no circumstances shall more than one issued revolver and one personal handgun, or two personal handguns be authorized and/or carried simultaneously.

F.    If the carrying of weapons in a court is restricted by any federal, state or county court judge, members shall not carry any weapon(s) in that court and may surrender any weapon(s) for secure storage at the court.

G.    Members, while off duty and in any public place within the Commonwealth, shall endeavor to carry the issued revolver and ammunition. Members, while off duty, may carry a personal handgun(s); however, members who desire to do so are required to qualify in accordance with the provisions of FR 9-2.

H.    Members who are armed and in civilian clothes shall conceal their weapon(s) from public view.

FR I-1
3/25/92

   I.   The provisions of this section do not apply to members
       carrying weapons/ammunition while off duty as permitted
       by law for purposes such as hunting, fishing, target
       shooting, etc.

## 1.30   USE OF FIREARMS

The use or handling of firearms by members in a careless or
imprudent manner, or the unjustified endangering of human
lives by firearms in violation of the rules and regulations
relating thereto, is strictly forbidden.

## 1.31   OPERATION OF VEHICLES

Members shall: (1) drive a vehicle in a careful and prudent
manner; (2) obey all laws of the Commonwealth pertaining
thereto; and (3) insist on the same deportment and compli-
ance from the driver of any vehicle in which the member may
be a passenger. Members shall, at all times, set a proper
example for other persons by their operation of a vehicle.

## 1.32   QUARRELING OR FIGHTING WITH MEMBERS

Members shall never behave disrespectfully or use threatening
or insulting language toward any other member engaged in the
execution of their position or duty. Members shall not draw
or lift a weapon toward, offer violence against, or strike or
attempt to strike any other member.

## 1.33   GAMBLING

Members shall not engage or participate in gambling in any
form while on duty and in uniform, or while in any Department
installation. Members shall not engage in any form of
illegal gambling at any time, except in the performance of
duty, and while acting under proper and specific orders from
a supervisor.

## 34   FALSE ENLISTMENT

The integrity and high moral standards of the Pennsylvania
State Police must be maintained; therefore, no person shall
procure their enlistment in the Department by willfully
misrepresenting their qualifications, character, reputation
or physical condition.

FR 1-
3/25/

1.35    DISCRIMINATION OR HARASSMENT

Members shall not discriminate or harass, for or against,
prepare any communication which makes reference to a person
race, color, religious creed, sex, sexual orientation, ag
national origin, ancestry, or non-job-related handicap
disability, unless it serves a specific police purpose
accordance with Department directives.  Members shall no
engage in the presentation of any racial, sexual, religious
ethnic or handicap joke, slur or story.

FBI Rick Morgan   Pittsburgh  SAC
712 456 9110        MPJ/20/99        my pager
                                     1-500-533-2202

1. Arun advised by the techs recently that we (PSP) were the subject of a
   FBI investigation into "selling Tpr positions" (or any other corruption
   allegations) since Oct 95)

                    ASAC Schedletts  1½ yr   Thomas Davis

        1200
        out 7 whom - which office?
        got flood ignorance
        Sometime ago seem to remember
        was a case agent or specific Trooper
        was [?] w/ [?]


2. Was A a subject of an investigation or any of L. Cobb's
        If you were I would have been told - sure you are [?]
        no - I remotely remember something about an investigation
           w/ local authorities + taping
        not familiar w/ this
        get back to you

                                     P283
                                     1 OF 2

John [illegible]
[illegible]

1237

Probably wasn't helpful - didn't get here until June

1st [illegible] Jan 97 - EM notified, kept Obert - decision sent [illegible] until Oct 98 - took a run at it - political corruption case

position to influence SP positions - re Tpr Staton

CI Staton approached him - I can pay you 10K for the

turned over tapes + conversations to Obert - someone went to Rep & nothing happened - Obert concerned about going anywhere w/ info - [illegible] Washington [illegible] - [illegible] - investigated - TO PSP

Whatever criteria - looks like Staton is bad - nothing captured - nobody else but Staton mentioned - [illegible] 2½ years

Major Williams to see you - sort things out

[illegible] here at Baltimore

Exhibit-2

JR 2 [illegible]

SP 3-200 (12-93)

FR 3
4/16/





**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE

SUBJECT:    TRANSFERS

2.01        INTRODUCTION

A.    <u>Regulated</u>:  Transfers within the Department are governed by th
policies and procedures established in this regulation, or by an
other action of the Commissioner.

B.    <u>Limitations</u>:  No member shall attempt to circumvent thes
provisions; nor shall any member knowingly use, attempt to use
or permit the use of any outside influence to gain a transfer o
change of duty for themselves or another member.

C.    <u>Authority</u>:  Transfers shall be effective only after they have bee
approved by the Commissioner unless otherwise stated in thi
regulation; however, the Commissioner retains the authority t
effect any transfer.

D.    <u>Notification</u>:  Troop Commanders/Bureau Directors shall inform
transferring members of the reason for the transfer and, i
possible, its duration.  Such notification shall be made, if possible
at least ten days prior to the effective date of the transfer, and
shall include preference transfer requests, if possible, and the
training assignments of newly-graduated Troopers.

E.    <u>Term</u>:    Transfers shall be considered permanent unless
specifically stated to be otherwise, pursuant to the exceptions
contained in this regulation.

F.    <u>Use</u>:    Transfers shall not be used in lieu of appropriate
disciplinary action but, where the facts in a case support the need
for relocation of the member, they may be utilized as an additional
disciplinary measure in conjunction with the disciplinary action
imposed by the Disciplinary Officer.

P284
1 0F11

FR 3-2
4/16/96

2.02     PREFERENCE TRANSFERS

A.     Applicability:  Dependent upon existing vacancies, preference transfers will be granted on the basis of the needs of the Department, coupled with the performance and deportment of the member.  However, a member does not acquire a vested right to any particular transfer.

B.     Eligibility:  Any member below the rank of Captain is eligible to submit a Preference Transfer Request, Form SP 3-316, for another Troop provided they have:

1.     Completed their required probationary period as a Trooper.

2.     Served a minimum of one year in the Troop to which assigned, unless the assignment resulted from a promotion.  When a promotion is concurrent with a new assignment, the one year minimum does not apply.

3.     Served a specified time frame, if required, upon the acceptance of a specialized position.

C.     Procedures:  The following procedures shall be followed when submitting and processing Preference Transfer Requests:

1.     Any eligible member desiring a preference transfer shall submit a Preference Transfer Request, in duplicate, to their Troop Commander/Bureau Director.  No other correspondence is necessary when submitting the request unless unusual circumstances exist.

2.     Members may specify one, two or three Troops, or up to three Patrol Sections within Troops S and/or T, in priority order, to which they desire to transfer.  Station choices may not be specified.

3.     When the Personnel Order announcing preference transfers is distributed, affected members may submit correspondence, Form STD-501, to the appropriate Troop Commander indicating their Station preference.  Troop Commanders are under no obligation to honor Station preference requests submitted by members transferring

-2-

into their Troop.  Station preference requests are f
Troop Commanders information only when formu
Station assignments.

4.    Detached members who submit a  Preference Tra
Request, and ultimately receive the transfer, are ad
that detached status will end on the  effective date o
transfer, and the member shall report to the reque
Troop for further assignment.

5.    Members shall not submit a Preference Transfer Req
for a Bureau.  Members wishing to express an intere
a position within a Bureau shall submit correspondenc
directed in AR 4-20, Position Vacancies and Special
Training.

D.    Responsibilities:  The following lists the responsibilities invol
in submitting, accepting, and processing Preference Trans
Requests:

1.    Troop Commanders/Bureau Directors are responsible
verifying the accuracy of the information on Preferen
Transfer Requests and shall ensure that members me
the eligibility requirements as contained in this regulati
prior to signing the forms.  Troop Commanders/Bure
Directors shall ensure the Preference Transfer Reques
are entered into the Automated Preference Transf
System.

2.    Preference Transfer Requests shall be entered into th
Automated Preference Transfer System within five days o
receipt.  A file of all original Preference Transfer Request
entered into the system shall be maintained by each Troo
Commander/Bureau Director.  The duplicate copy shall b
returned to the member attached to the input confirmatio
receipt which is automatically provided by the system.
the duplicate has not been received by the member withi
ten days of submission, an inquiry should be made by the
member, through channels, to the Troop Commander
Bureau Director.

3-2
3/97

3.  Affected Bureau Directors shall provide the Director, Bureau of Personnel, with a list of members under their command who are required to serve in their present assignment for a specific period of time. This list shall include the member's name, date of assignment, and the term of assignment. Any subsequent deletions and/or additions shall also be forwarded upon the effective date of the end/start of the assignment.

E.  Automated Preference Transfer System: The following is an explanation of and directions for utilizing the Automated Preference Transfer System:

1.  The Automated Preference Transfer System maintains a current record of members, by rank and choice, who have a Preference Transfer Request on file. Troopers' standings for transfer shall be determined by longevity date; other members' standings shall be determined by time in grade and, if necessary, longevity date. Ties, if any, will be resolved within the Automated Preference Transfer System utilizing a computer-generated random number method.

    NOTE: Members are advised that the random numbers shall be changed at the beginning of each calendar year and may affect the standings of those who have a Preference Transfer Request in the Automated Preference Transfer System.

2.  Personnel may review preference transfer standings, including their random number, within the affected ranks for any Troop via the Automated Preference Transfer System. To use the Automated Preference Transfer System, a link must be established with the Pennsylvania State Police MAPPER System. To gain access to MAPPER, the following steps must be completed:

    a.  The previous operator must have signed off the CLEAN System.

    b.  Place the cursor in the home position (upper left-hand corner) and complete the following steps to obtain the MAPPER idle logo:

-4-

FF
4/1

(1)    Key in a caret ( ^ ) and depress the tran
key.  If the completion of this step does
establish the link, place the cursor in
home position and key in $$OPEN PSP
and depress the transmit key.

(2)    Once the link has been established, key
caret ( ^ ) and depress the transmit key.

c.    A MAPPER idle logo, similar to the following,
appear on the terminal screen:

PENNSYLVANIA STATE POLICE
**** M A P P E R 3 5 R 1 A ****
Station: 1335 System: IDLE

PURGE AT 22:30:00 on 24 MAR 92

Please enter the following information, or pre
SignOn to sign on as a new user.

User-id    _____
Dept #    _____
Password    _____

d.    The cursor is automatically placed at the User-i
field.   Personnel shall enter the information a
depicted below using the return key to advance t
the next field, and depressing the transmit key afte
completing the Password field; or, by depressing
the F1 (Function 1) key to sign on as a new user
and selecting the Preference Transfer Reques
option from the New User Menu.

User-id    TRANSFER
Dept #    16
Password    PSP

e.    The Preference Transfer Request Standings menu
will appear along with the available selections and
instructions for its use.

FR 3-2
4/16/96

F.  <u>Cancel/Update Preference Transfer Request</u>:   A change/ cancellation of a preference transfer request may be made by submitting a revised Preference Transfer Request in duplicate, through channels, indicating that a previous request is to be cancelled/updated. Members with a Preference Transfer Request on file in the Automated Preference Transfer System and who are promoted, or receive a general transfer, will automatically have their Preference Transfer Request removed from the system by the Bureau of Personnel.

G.  <u>Formulation of Preference Transfers</u>:  Preference transfers will be made on the basis of the requests entered into the Automated Preference Transfer System.   Therefore, it is essential that changes be made promptly and the correct forms be furnished to the Troop Commander/Bureau Director to prevent transfer to a Troop no longer preferred.

H.  <u>Exceptions</u>:  If a member has submitted a Preference Transfer Request and one of the following exceptions apply, they may not be considered for, or receive, such transfer until approval has been granted.   These situations will be reviewed and determination made by the Director, Bureau of Personnel, with the concurrence of the Deputy Commissioner of Administration.

    1.  Disciplinary:  Members suspended without pay within one year of the date of the proposed preference transfers listed on the Personnel Order.  The one year is to be calculated from the date the Disciplinary Action Report, Form SP 3-336, is acted upon by the Disciplinary Officer.

    2.  Limited Duty/Disability Leave:  Members who are currently on limited duty/disability leave.  Determinant factors which will be considered when evaluating a member's eligibility will be the:

        a.  Diagnosis/prognosis of the injury/ailment.

        b.  Length of time a member's name has appeared on the Quarterly Limited Duty Status Report.

        c.  Member's ability to return to full duty status within 90 calendar days.



3.    Restricted Duty: Members who are currently on res
duty.

4.    Any other circumstances as determined by
Commissioner.

2.03    EMERGENCY OR HARDSHIP TRANSFERS

A.    Applicability: Emergency or hardship transfers may be gra
in verified cases of emergency or hardship, but only for the pe
of that emergency, or until arrangements can be made to alle
the hardship.

B.    Justification: Members shall submit a written request for s
transfer, via correspondence, to their Troop Commander/Bur
Director, justifying in detail the reason(s) for the transfer.

C.    Verification: Troop Commanders/Bureau Directors shall ass
Commissioned Officers to investigate the validity of requests
transfer.

D.    Recommendation: The assigned Commissioned Officer sh
prepare and submit a General Investigation Report, For
SP 7-0025, to the Troop Commander/Bureau Director. The repo
shall be endorsed and forwarded, through channels, to th
approving authority.

E.    Approving Authority: Final determination shall be made by the

1.    Deputy Commissioner of Operations whenever the
requested transfer is between Areas.

2.    Area Commander whenever the requested transfer is
between Troops within the same Area.

3.    Troop Commander whenever the requested transfer is
within the Troop.

4.    Deputy Commissioner of Staff, Administration and/or
Operations, whenever the requested transfer is between
Bureaus.

FR 3-2
4/16/96

5.   Bureau Director whenever the requested transfer is between Divisions of that Bureau.

6.   Deputy Commissioner of Staff, Administration and/or Operations, whenever the transfer is from an organizational segment under one's authority to a segment under the other's authority. In such cases, the sending authority shall make a recommendation and the receiving authority shall make the final decision.

F.   <u>Monthly Report</u>:  Troop Commanders/Bureau Directors shall submit a monthly supplemental investigation, through channels, under confidential cover, to the approving authority, concerning every member so assigned from another Troop or Bureau. The supplemental investigation shall indicate the status of the individual concerned in regards to the emergency or hardship, and a recommendation to continue/discontinue the emergency or hardship transfer.  A copy shall be provided to the involved member's regular Troop or Bureau.

2.04   GENERAL TRANSFERS

A.   <u>Applicability</u>:  Any member may be transferred anywhere within the Department whenever it is determined that such transfer(s) is necessary to:

1.   Fulfill the requirement(s) for additional services.

2.   Fulfill the need(s) for specific or specialized skills.

3.   Accomplish any other need(s) of the Department.

B.   <u>Procedures</u>:  All general transfers require one of the following approvals, dependent upon the nature of the transfer:

1.   Intratroop:  General transfers within Troops may be made at the discretion of the Troop Commander, consistent with the provisions of existing labor agreements in effect and with the approval of the Area Commander. The exception is for newly-graduated Troopers during their Coach-Trainee period, in which case no such approval is required.

-8-

FR
4/1

a. A draft of all proposed general transfers sha
submitted, under confidential cover, to the A
Commander at least 15 days prior to the propo
effective date. The 15-day requirement may
waived by the Area Commander when the tran
is to fill a vacancy which is a result of a promot
intertroop transfer or separation. The draft shall
in triplicate, indicating the reason(s) for
transfer(s) and the likelihood of incurring mov
expenses. The Area Commander shall, within f
days of receipt of the proposed transfe
approve/disapprove the proposal as authorized a
return same to the Troop Commander.

b. Upon receipt of an approved general transfer, t
Troop Commander shall submit to the Directo
Bureau of Personnel, the required number of copie
needed for inclusion in the member's Offici
Personnel File.

2. Intertroop: General transfers between Troops shall b
made by the Commissioner. The Director, Bureau o
Personnel, shall submit, as the needs of the Department
require, a draft of proposed intertroop transfers to th
Commissioner for approval. The Commissioner, afte
evaluating the proposal, shall make whatever orde
deemed necessary and forward the action to the Director
Bureau of Personnel, for implementation.

3. Administrative: General transfers between organizationa
segments within a Bureau may be made at the discretion
of the Bureau Director, except that transfers between
training installations within the Bureau of Training and
Education; laboratory facilities within the Bureau of
Laboratory and Communications Services; Aviation Patrol
Units within the Bureau of Emergency and Special
Operations; or the District Enforcement Offices within the
Bureau of Liquor Control Enforcement; require the
approval of the Commissioner. Transfers between
Bureaus, Area Commands or an Area Command and a
Bureau, require approval of the Commissioner. The
following procedure shall be followed:

FR 3-2
4/16/96

a.   Transfers directed by a Bureau Director shall be reported to the Director, Bureau of Personnel, on a Bureau Personnel Order.

b.   The Director, Bureau of Personnel, shall submit, as the needs of the Department require, a draft of other proposed administrative transfers to the Commissioner for approval.  The Commissioner after evaluating the proposal shall make whatever order necessary and forward action to the Director, Bureau of Personnel, for implementation.

2.05   TEMPORARY INTRATROOP TRANSFERS

A.   Applicability:  A temporary intratroop transfer may be made to fulfill a special need of the Department.  Verbal approval for such transfers may be obtained in extreme cases; however, written justification shall be furnished, through channels, to the Area Commander for approval as soon as possible.

1.   Temporary transfers shall not exceed 30 days unless a longer period is authorized by the Area Commander. Requests for an extension of an additional 30-day period must include justification, and be approved by the Area Commander prior to the beginning of any extension.

2.   All temporary transfers shall be covered by a Troop Personnel Order and must be specifically identified as temporary.

B.   Coach-Trainee Period:  Newly-graduated Troopers may be assigned to another Station prior to assignment to their regular Station as part of their training and familiarization of the Troop area; however, Troop Commanders shall endeavor to allow newly-graduated Troopers to receive their Coach-Trainee training at their regularly-assigned Station.

1.   Troop Commanders shall advise all newly-graduated Troopers of their proposed regular Station at least 10 days prior to the effective date of the assignment.

-10-



2.   Changes of assignment during this training period
made by the Troop Commander without prior app

3.   A Troop Personnel Order(s) shall be prepared c
the assignment(s) made.

2.06    EXPENSES

Transfers effected at the request of members will be made w
expense to the Commonwealth.  Expenses incurred as a result of
transfers will be paid in accordance with Department directives.



SPECIAL ASSIGNMENT

PENNSYLVANIA STATE POLICE

An Internationally Accredited Law Enforcement Agency

P285
1 of 3

# National Governors' Association

### State College, July 8-11, 2000

The Commonwealth of Pennsylvania hosted the National Governors' Association (NGA) Annual Summer Business Meeting July 8-11, 2000 at the Pennsylvania State University, University Park. The NGA meetings bring together the Nation's Governors and offer a national and international platform to discuss the most pressing issues from current events and domestic policy. This year the Governors addressed issues such as extensive media coverage and large demonstrations accompanied the meetings and their families and the several hundred people who attended. The Pennsylvania State Police this year was called to provide transportation and security for the Governors and their families.

strators and freedom of speech against the safety of the dignitaries and the security of the community. The event involved two years of planning between event organizers, the NGA, the staff of State College NGA 2000, the Office of Governor Tom Ridge, and the Pennsylvania State Police.

The Pennsylvania State Police was the lead law enforcement agency at the NGA. The State Police was responsible for coordinating security issues with all involved agencies at the federal, state and local levels. Personnel from each Troop Bureau and Office were assigned to assist in the event. All personnel displayed professionalism, integrity and completed the mission of the State Police without a significant incident or disruption to the meetings.



# Republican National Convention

## Philadelphia, July 31–August 3, 2000

The Pennsylvania State Police assisted the city of Philadelphia with security at the Republican National Convention held in the city of Philadelphia from July 31 through August 3, 2000. The primary mission was the transportation and security of visiting dignitaries, Lieutenant Governors, and their designated staff members. The secondary mission was to provide assistance to the Philadelphia Police Department in the event of public unrest, disobedience or rioting.

With than a year of planning and organization was required for this event, organizational and task force meetings between federal, state, and municipal agencies and the Republican National convention staff occurred, action plans for transportation, housing, credentials, intelligence and many other anticipated issues. The State Police and the Philadelphia Police personnel staffed a plan for security of delegates, dignitaries, the staff and their families, and the general public.

Hundreds of training exercises, hazardous materials and weapons of mass destruction, were provided. Firearms ranges and personnel assigned to the Mounted Detail were provided with refresher training in riot formations and crowd control tactics for confrontations with demonstrators. In addition, the Department purchased a variety of new equipment for use in the event of a nuclear/biological/chemical (NBC) terrorist attack during the convention.

After all of the meetings, training, coordination, and issuing of new equipment, it was dependent upon the personnel of all involved agencies to complete the mission. Troopers worked 12-hour shifts and slept in dormitories at Temple University. The pride and professionalism of the Pennsylvania State Police was evident as delegates and dignitaries toured the city of Philadelphia and attended convention activities with a feeling of safety. The dedication and commitment of everyone involved was to prevent any incidents.

The personnel involved with the Republican National Convention in Philadelphia distinguished themselves and are worthy of praise for a job well done. In addition, accolades of praise extended to the Philadelphia Police Department. They displayed professionalism and restraint during a world-wide media event that forced the city and the police department to be self-... the media event taxing on its personnel assemblies.



SP 3 200 (2 89)

**PENNSYLVANIA STATE POLICE**
**DEPARTMENT DIRECTIVE**

AR 4-25
9/2/93

*See SO95-82*
*See SO98-22*
*See SO98-69*

SUBJECT:  INTERNAL INVESTIGATIONS

25.01    **AUTHORITY**

The Bureau of Professional Responsibility (BPR), Internal Affairs Division, is authorized to recommend to the Commissioner policies and procedures to initiate, conduct and/or control all necessary investigations, and to process all complaints or allegations of misconduct by personnel.  Members of the Bureau of Professional Responsibility, when performing Internal Affairs duties, are vested with the line authority of the Commissioner.

25.02    **PURPOSE**

The purpose of this regulation is to establish a prompt, fair, thorough, factual and impartial means to investigate complaints or allegations involving personnel.

25.03    **GOALS**

A.    <u>Protection of the Public</u>:  The public has the right to expect efficient, fair and impartial law enforcement.  Any misconduct by personnel must be detected, thoroughly investigated and properly adjudicated to assure these goals.

B.    <u>Protection of the Department</u>:  The integrity of the Department depends on the personal integrity and self-discipline of all personnel.  When an informed public knows that the Department honestly and fairly investigates and adjudicates all allegations of misconduct against its personnel, confidence will be promoted and public support will be enhanced.

C.    <u>Protection of Personnel</u>:  A thorough investigation of all allegations of misconduct serves to protect the integrity of personnel and will safeguard against false or malicious complaints.

*P286*
*1 of 58*

AR 4-25
9/2/93

    D.   <u>Discovery of Unsatisfactory Performance</u>: Personnel who demonstrate an inability to satisfactorily perform their duties must be identified for the protection of the public, the Department and its personnel.

25.04   DEFINITIONS

    A.   <u>Administrative Action</u>: Corrective action taken by command/supervisory personnel which may include the issuance of a Disciplinary Action Report (DAR), Form SP 3-336.

    B.   <u>Administrative Investigation</u>: Inquiries into alleged misconduct by personnel or any inquiry into the actions of Department personnel required by directives where no misconduct is alleged.

    C.   <u>BPR Control Number</u>: A sequential number assigned by the Internal Affairs Division to index all complaints and administrative investigations.

    D.   <u>Bureau Register</u>: A compilation of data indexing the initiation and processing of administrative investigations by BPR Control Number.

    E.   <u>Complainant</u>: A person with knowledge of an alleged incident of misconduct, or violation of a statute or Department directive, who brings the information to the attention of the Department.

    F.   <u>Complaint</u>: Any allegation of misconduct made against Department personnel.

    G.   <u>Complaint Investigation</u>: An administrative investigation which was initiated because of a complaint.

    H.   <u>Full Investigation</u>: An in-depth investigation in which all pertinent facts are gathered and are thoroughly and impartially reported in a General Investigation Report, Form SP 7-0025.

    I.   <u>Limited Investigation</u>: An investigation which is reported by Correspondence, Form STD-501, and clearly establishes that:

        1.   The alleged misconduct failed to constitute a violation of Department rules and regulations.

AR 4-25
9/2/93

2. The complainant was mistaken and the misconduct alleged was not attributed to personnel.

3. The complaint appears to be as a result of official police action which was adverse to the complainant and alleges only a de minimus violation.

4. The complainant(s) refused to verify their complaint by signing a completed Complaint Verification Form and the nature of the complaint does not include allegations of criminal conduct or conduct which could reasonably be construed to result in a recommendation of court-martial by the Department Disciplinary Officer.

J. <u>Medical Treatment</u>: Care received at a recognized medical facility or from a licensed medical practitioner.

K. <u>Misconduct</u>: Any violation of the Pennsylvania State Police Code of Conduct or any other conduct which could reasonably be expected to destroy public respect and confidence in the Pennsylvania State Police.

L. <u>Non-Complaint Investigation</u>: An investigation into the actions of Department personnel as provided by directive or requested by the Office of Chief Counsel, and no misconduct is alleged.

M. <u>Performance Inadequacies</u>: Minor infractions of omission/commission by a member which violate a Department policy or regulation. Infractions of this type do not include conduct which involves compliance to lawful orders, the veracity of a member, criminal or civil liability, or publicity which may adversely affect the Department or its personnel.

25.05   COMPLAINT INVESTIGATION CATEGORIES

A. <u>Physical Abuse</u>: An allegation that an individual was physically mistreated or assaulted (does not include physical force investigations that are initiated by Department directive with no complaint).

-3-

AR 4-25
9/2/93

B. <u>Verbal Abuse</u>:   An allegation that profane or demeaning language was directed at the complainant or another person by personnel.

C. <u>Criminal Conduct</u>:   Any alleged violation(s) of federal, state or local statutes.

D. <u>Improper Conduct On Duty</u>:   Any alleged misconduct committed while on duty that, by its very nature, is demeaning to the professional image of the Department, and constitutes a violation of Department rules and regulations.

E. <u>Improper Conduct Off Duty</u>:   Any alleged conduct which could reasonably be expected to impact negatively upon the public's perception of the Department even though it occurred off duty.

F. <u>Dissatisfaction With Performance of Duty</u>:   An allegation that personnel failed to adequately perform or document a required or expected task, e.g., improper or incomplete accident or criminal investigations, failure to assist a disabled motorist, etc.

G. <u>Other</u>:  Allegations that are not easily categorized or identified as falling into a specific category, etc.

25.06   NON-COMPLAINT INVESTIGATION CATEGORIES

A. <u>Legal Intervention</u>:   Incidents when a member/enforcement officer, while in the course of their duties, intentionally involves a vehicle in a collision or establishes a roadblock which results in a collision, for the purpose of preventing the escape of a subject.

B. <u>Shooting Incident</u>:   Incidents when a member/ enforcement officer discharges a weapon, including tear gas; another law enforcement officer discharges a weapon in the presence of a member/ enforcement officer; or, a subject fires a weapon while a member/enforcement officer is present. Exceptions are listed in Section 25.10 E. 9.

C. <u>Physical Force Incident</u>:   Incidents when a member/enforcement officer uses physical force which results in death, or injury which requires medical treatment to any involved individual other than the member/enforcement officer.

AR 4-25
9/2/93

    D.    <u>Attorney Work Product</u>:  Investigations conducted at the request of the Office of Chief Counsel.

25.07    DISPOSITIONS

    A.    <u>Complaint Investigations</u>:

        1.    Sustained:  Investigation indicates misconduct did actually occur.

        2.    Not Sustained:  Investigation failed to conclusively prove or disprove the allegation.

        3.    Unfounded:  Indicates that the incident did not or could not have occurred as alleged.

        4.    Policy Void:  Indicates that the action of the Department or the involved member(s) was consistent with Department policy, but the complainant still suffered harm.

        5.    Withdrawn:  Indicates that the complainant refused to sign a Complaint Verification and the investigation was terminated or an investigation was otherwise concluded on advice of the Director, Bureau of Professional Responsibility.

    B.    <u>Non-Complaint Investigations</u>:

        1.    Justified:  The actions taken were within the guidelines, for the use of force under the existing circumstances, as established by the Department.

        2.    Improper:  The actions taken exceeded the limits defined by the Department or by law for the use of force.

25.08    DUTIES AND RESPONSIBILITIES

    A.    <u>Personnel</u>:  Personnel shall ensure that the confidentiality of all complaints is maintained in accordance with existing regulations.

    B.    <u>Director, Bureau of Professional Responsibility</u>: The Director, Bureau of Professional Responsibility shall:

        1.    Assign and coordinate all investigations required by this regulation.  Depending on the

AR 4-25
9/2/93

nature of the incident, the investigation may be conducted by a member of the Internal Affairs Division or assigned to a Commissioned Officer or noncommissioned officer of the Director's choice.

2.  Assist the Affirmative Action Officer in the investigation of affirmative action-related complaints upon request. Also, review other such complaints and investigations in consultation with the Affirmative Action Officer.

3.  Ensure that all investigations are conducted in a fair, prompt, thorough and impartial manner. Reports shall be completed in a timely manner and within established statutes of limitations per collective bargaining agreement.

4.  Retain supervisory responsibility for all investigations. Specific investigative procedures may be ordered if it is determined to be necessary, prudent or desirable.

5.  Furnish an acknowledgement of receipt, in writing, to the complainant. Refer to Appendage III.

6.  Provide a report, as requested, summarizing the Internal Affairs Division's activities, to the Commissioner/designee.

C.  <u>Director, Internal Affairs Division</u>: The Director, Internal Affairs Division shall:

1.  In the absence of the Director, Bureau of Professional Responsibility, assume all duties relative to the administration of the internal affairs function.

2.  Exercise supervisory control over all investigations assigned to members of the Internal Affairs Division.

3.  Ensure all investigations are conducted in a fair, prompt, thorough and impartial manner.

4.  Make the notifications to the Office of Chief Counsel as outlined in Sections 25.10 D. 1. and 25.10 E. 1.

D.    **Area Commanders/Bureau Directors:**    The Area Commanders/Bureau Directors shall:

1.    Review all investigative reports in a timely manner and within established statutes of limitations per collective bargaining agreement.

2.    Provide guidance and advice to the Troop Commander/Division Director responsible for making administrative decisions.

3.    Assume the responsibilities enumerated in Section 25.08 E. when the subject of the investigation is a Troop Commander/Division Director under their command, or as directed by a Deputy Commissioner.

4.    Endorse the Troop Commander's/Division Director's administrative decision by indicating concurrence or nonconcurrence.

   a.    In cases of verbal abuse or dissatisfaction with performance of duty, a simple statement of this finding shall suffice if there is concurrence. All statements of nonconcurrence require a full explanation of points of difference.

   b.    Allegations, other than verbal abuse and dissatisfaction with performance of duty, require an endorsement indicative of an independent review of the facts.

E.    **Troop Commanders/Division Directors:**    Troop Commanders/Division Directors shall:

1.    Ensure compliance with the provisions of this regulation.

2.    Determine, in concurrence with the Director, Bureau of Professional Responsibility, whether an investigation shall be a full or limited investigation.

   a.    Upon receipt of a Use of Force or Complaint Reception and Processing Worksheet, Form SP 1-101, in which the allegation involves only performance inadequacies, the Troop

-7-

AR 4-25
9/2/93

Commander/Division Director shall contact the Disciplinary Officer and provide the details of the complaint.

b.  If the Disciplinary Officer concurs with the Troop Commander/Division Director that the complaint involves only performance inadequacies, the Disciplinary Officer shall contact the Director, Bureau of Professional Responsibility, for concurrence. The Director, Bureau of Professional Responsibility, shall then ensure contact is made with the Troop Commander/Division Director and provide them with a BPR Control Number.

c.  For issues relating to performance inadequacies, the Troop Commander/Division Director shall be responsible for ensuring the preparation and submission of the Review of Performance Complaint, Form SP 1-101A. This report shall be appended to the Use of Force or Complaint Reception and Processing Worksheet, and a copy forwarded to the Bureau of Professional Responsibility for retention. The Troop Commander/Division Director shall retain a copy of this report and maintain it in a supervisory file established for that purpose.

d.  In all other cases, concurrence must be obtained directly from the Director, Bureau of Professional Responsibility, regarding the scope of investigations to be conducted.

e.  Inform the Director, Bureau of Professional Responsibility of those cases when a complainant refuses to sign a Complaint Verification after being requested to do so by a Troop/Bureau investigator.

3.  Assign a Lieutenant or noncommissioned officer, outside of the subject's chain of command, to those investigations required by this regulation which are to be investigated

-8-

at the Troop/Division level. An investigator in the subject's chain of command may be assigned when warranted by circumstances. All assignments shall be made in concurrence with the Director, Bureau of Professional Responsibility, prior to actual assignment.

NOTE: When the subject is a Pennsylvania State Troopers Association (PSTA) member, PSTA officers (President, Vice-President, Secretary, Treasurer) or members of the Grievance Committee shall not be assigned to conduct the investigation.

4. Assist members of the Internal Affairs Division in investigations required by this regulation upon request.

5. Notify affected personnel of the results of the investigation as soon as practicable and within established statutes of limitations. Notices to personnel who had previously been issued a Notification of Inquiry, Form SP 1-102, shall be made in writing, by either correspondence or initiation of administrative action. The correspondence shall include a specific disposition using one of the defined terms contained in this directive.

   a. If the disposition of the investigation is unfounded, the subject shall not be counseled. Other performance issues uncovered through the investigation shall be addressed in separate correspondence or by counseling, which shall be made a part of the supervisory file.

   b. If an allegation is not sustained, the member may be counseled on relevant regulations or directives.

6. Initiate administrative action when warranted, upon receipt of an investigation, in accordance with AR 4-9 or FR 3-3. When administrative action is initiated in accordance with FR 3-3, the Troop Commander/Division Director shall prepare a detailed summary outlining the basis for discipline. The summary will be provided to the member as required by existing collective bargaining agreements. If a DAR is issued, a copy of the summary will be forwarded as an attachment to

AR 4-25
9/2/93

the supplemental General Investigation Report. The DAR and a copy of the summary will also be forwarded under separate cover to the Disciplinary Officer. When administrative action is initiated for employees, the provisions of AR 4-9 shall be applicable.

7. Institute the following steps when an investigation is reviewed and it is discovered that someone other than or in addition to the individual listed in Block 4 of the Use of Force or Complaint Reception and Processing Worksheet has violated Department policies, regulations or procedures and there is a likelihood that a DAR will be issued:

   a. Advise the additional subject(s) of the complaint by issuing a Notification of Inquiry, Form SP 1-102.

   b. Direct the subject(s) to submit correspondence, STD-501, to the Troop Commander/Division Director addressing the issue(s) listed in the Notification of Inquiry.

   c. List the subject(s) in Block 5 of the supplemental General Investigation Report.

   d. Direct further investigation or, if the investigation is complete, initiate the review process.

8. Notify the complainant of the results of the investigation, either verbally or in writing. Notify public officials who were interviewed, such as district attorneys, judges, etc., either verbally or in writing, of the results of the investigation if it is unfounded. These notifications shall be noted in the supplemental General Investigation Report.

9. Refer the investigation, if circumstances warrant, to the appropriate Criminal Investigation Unit when the facts of the investigation reveal that false information has been provided with the intent to implicate personnel in the commission of a crime, or the facts indicate other criminal conduct on the part of the complainant.

AR 4-25
9/2/93

F.    Investigators:    Investigators shall:

1.    Ensure that all investigations conducted are thorough and impartial.

2.    Contact the Director, Bureau of Professional Responsibility immediately whenever investigative difficulties occur or when assistance is desired in any phase of the investigation.

3.    Assist federal, state, county and municipal law enforcement agencies with investigations wherein personnel may be implicated in illegal activities or other acts of misconduct.

4.    Assist, upon request, the Office of Chief Counsel, in preparing cases when personnel are subjected to administrative action and/or criminal action, and conduct an investigation into factual allegations contained in civil actions, claims or other notices which could expose the Department or its personnel to civil liability.

5.    Notify the Director, Bureau of Professional Responsibility, immediately, when it becomes apparent by the facts gathered during an investigation that the Department may be the subject of civil litigation.

6.    Obtain a written prosecutorial decision from the district attorney in all cases where the conduct alleged may be criminal in nature. This decision should be obtained prior to the issuance of the Administrative Warning. The Director, Bureau of Professional Responsibility, shall be notified in the event the district attorney declines to render such written prosecutorial decision, or fails to render same in a timely manner.

7.    When practical, the subject(s) shall be given reasonable notice of the time, date and location of their interview. They should be informed of their right to have a union representative present at the interview. In all cases, requests for union representation during an interview by a subject(s) of an investigation shall be granted.

AR 4-25
9/2/93

NOTE:  The subject(s) assumes responsibility for arranging for such representation.  Absent exigent circumstances, the subject(s) shall be provided reasonable time to arrange for representation.  The subject(s) has no right to a specific representative, only to one that is the nearest and most readily available.

8.  Ensure the constitutional rights specified in <u>Miranda v. Arizona</u> and <u>Garrity v. New Jersey</u> are protected; and provisions granted by existing collective bargaining agreements are not violated.  (Refer to Appendages IX and X.)  Issue the Administrative Warning, Form SP 1-104 (Appendage VIII), in administrative investigations to further advise the subject(s) of the investigation of their rights under "Garrity"; that the questioning concerns administrative matters relating to the official business of the Department.  The Rights Warning and Waiver Notice to Pennsylvania State Police Personnel, Form SP 1-103 (Appendage IX), shall be given to the subject(s) of the investigation to advise of rights under "Miranda" when there is the possibility of criminal charges.

9.  Issue the Notification of Inquiry as soon as practical to the affected personnel.  In those cases where the investigation could be impeded or compromised, the investigator shall determine the appropriate time to issue the notification.  (Refer to Appendage IV.)

10.  Any subject interviewed in regards to an investigation who has reason to believe their statements could result in administrative action being taken against them, shall be afforded union representation if requested.

11.  Provide personnel, who are required or requested to sign any forms during a BPR investigation, with a copy of any signed forms.

12.  When applicable, transcribe the complaint on the Complaint Verification, Form SP 1-108, Appendage XII and obtain the complainant's signature.

AR 4-25
9/2/93

G.  **Personnel Receiving Complaints:**  Personnel receiving complaints shall:

1.  Receive complaints against personnel in a courteous manner.

2.  Document complaints when they are received. Complainants shall not be advised to call back later to speak with a supervisor or instructed to contact the Bureau of Professional Responsibility directly. This does not prohibit supervisors from recontacting a complainant to clarify complaint information.

    NOTE: Personnel desiring to initiate a complaint shall be responsible for completing their own Use of Force or Complaint Reception and Processing Worksheet.

3.  Ensure the confidentiality of all complaints is maintained.

4.  Process all complaints in accordance with the provisions of this regulation.

H.  **Personnel Who are the Subject of an Administrative Investigation:**

1.  May at any time during the course of an internal investigation, be ordered by the appropriate authority to submit to any or all of the following:

    a.  Breath test.

    b.  Urine test.

    c.  Blood test.

    d.  Polygraph test.

    e.  Lineup.

    f.  Medical/psychological/psychiatric examination.

    g.  Any other non-testimonial evidence test.

    h.  Questioning related to alleged misconduct or performance of duty.



AR 4-25
9/2/93

2.  Shall be advised that none of the results of the tests or information received from the procedures listed in Section 25.08 H. 1., can be used against them in a criminal prosecution.

3.  Shall, upon direction of the investigating officer or other authority, be required to submit correspondence related to the alleged misconduct or performance of duty. Absent exigent circumstances the submission shall be within 48 hours of being directed to do so. The 48 hours can be extended with the approval of the investigating officer or the Director, Bureau of Professional Responsibility.

4.  Shall be interviewed by the investigating officer.

5.  May obtain the results of any of the test/examination procedures listed in Section 25.08 H. 1. upon written request to the Director, Bureau of Professional Responsibility. The results may be provided in the form of a copy or other written documentation.

6.  Shall be afforded all rights contained in existing collective bargaining agreements.

7.  Shall maintain confidentiality of investigations until completed.

8.  Shall cooperate and answer all questions honestly and completely.

I.  <u>Personnel Who are the Subject of a Criminal Investigation</u>: Personnel who are the subject of a criminal investigation shall be afforded the constitutional protections which are guaranteed as a result of United States Supreme Court decisions in <u>Miranda v. Arizona</u> and <u>Garrity v. New Jersey</u>, as applicable.

25.09   INVESTIGATIVE ASSIGNMENT CRITERIA

A.  <u>Circumstances</u>: Administrative investigations conducted under the following circumstances are subject to the provisions of this directive and the Internal Affairs Division may, at the discretion of the Director, Bureau of Professional Responsibility, retain primary investigative responsibility:

-14-

AR 4-25
9/2/93

1. Shooting incidents and physical force incidents as defined in directives, regardless of personnel duty status.

2. Any allegation of criminal conduct directed against personnel.

3. Any allegation of misconduct directed against members.

4. Citizen complaints or any allegation of misconduct directed against personnel which could result in termination of employment. The provisions of AR 4-9 shall apply to performance inadequacies and/or cases of minor misconduct, e.g., traffic citations.

5. Allegations of violations of AR 4-6, FR 1-1 and other allegations of discrimination, harassment or violation of civil rights.

6. Investigations initiated in accordance with FR 6-4, legal intervention.

7. Investigations initiated as a result of contemplated administrative action related to FR 6-4.

8. Investigations initiated in accordance with FR 5-4.

9. Motor vehicle accidents resulting in the death of any person when:

   a. Pursuit is a factor.

   b. A Department vehicle is involved.

10. Any dog bite resulting from a Canine Enforcement Team requiring treatment by a licensed medical practitioner.

11. Investigations conducted at the request of the Commissioner.

B. Investigative Responsibility: The following criteria will be considered by the Director, Bureau of Professional Responsibility, in determining if the Internal Affairs Division will assume investigative responsibility or if the investigation will be assigned to Troop/Division personnel:

-15-

AR 4-25
9/2/93

1. Seriousness or complexity of the allegation to be investigated.

2. Source of the complaint.

3. Number of personnel involved.

4. Duty assignment of personnel involved.

5. Geographical limitations.

6. Need for internal security relative to all or part of the investigation.

7. Any exceptional circumstance noted by or brought to the attention of the Director, Bureau of Professional Responsibility.

C. <u>Performance Inadequacies</u>:  The Internal Affairs Division will not assume investigative responsibility for mere performance inadequacies or procedural discrepancy violations unless they are indicative of a more serious underlying problem. Addressing the preceding issues is a function of first line supervision and should be handled at that level through counseling, training or other remedial action.

D. <u>Complaints Initiated by Personnel</u>:  The Use of Force or Complaint Reception and Processing Worksheet shall be completed in accordance with Section 25.10 B. of this regulation.  No investigation will be undertaken into complaints lodged by personnel unless a substantiation of the allegation would give rise to formal discipline.

E. <u>Investigatory Difficulties</u>:  If in the course of monitoring an ongoing investigation, the Director, Bureau of Professional Responsibility, determines that investigatory difficulties exist, the Internal Affairs Division may be directed to assume full or partial responsibility for conducting that specific investigation.  This may occur at any stage of the investigation.


25.10    COMPLAINT PROCESSING

A. <u>Types of Complaints</u>:  Complaints may be received in any of the following manners and shall be processed in accordance with this regulation in all instances:

-16-

AR 4-25
9/2/93

1.   Telephone:  Self-explanatory.

2.   In Person:    Individuals may appear at a Department installation, or may make a complaint to personnel at any location.

3.   Correspondence:  Self-explanatory.

B.   Receiving Complaints:

1.   Every complaint, whether anonymous, verbal or written, received by personnel shall be recorded on the Use of Force or Complaint Reception and Processing Worksheet, and processed as described in Appendage I. When the complaint involves personnel in the chain of command and the process described in Appendage I is inappropriate, contact may be made directly with the Internal Affairs Division.

2.   Complainants shall not be required to appear at a Department installation to initiate a complaint.

3.   Complainants may remain anonymous; however, a reasonable effort to obtain identification should be made.

4.   If their identity is known, complainants shall be advised that a Department representative will contact them.

5.   The following procedure shall be followed by personnel receiving a complaint at times other than normal working hours:

a.   In those cases which are not of a serious nature and do not require an immediate response from an Internal Affairs Division investigator, the information shall be documented and processed in accordance with Appendage I.

b.   In serious cases which warrant the immediate response of an Internal Affairs Division investigator, personnel receiving the complaint shall immediately notify, through channels, the Troop Officer of the Day (OD).  The Troop OD shall then contact the Department Headquarters

-17-

AR 4-25
9/2/93

OD, who shall provide the name of the appropriate Bureau of Professional Responsibility duty member to call for an evaluation of the necessity of an immediate response. Any incident which results in the death or serious injury of a person; that involves the physical arrest of personnel, or major breaches of conduct by personnel; or that is likely to generate more than routine public interest, should be considered serious in nature.

C.    **Notifying Involved Individuals**:

1. The Director, Bureau of Professional Responsibility, shall notify the complainant that their complaint has been received. When personnel initiate a complaint, this notification may not be required. (Refer to Appendage III.)

2. The assigned investigator shall officially notify affected personnel of a pending investigation, unless circumstances dictate otherwise. The Notification of Inquiry shall be issued to the subject(s) and serve as the official notification. (Refer to Appendage IV.)

D.    **Investigation Procedures**: The following procedures shall be followed by individuals conducting personnel investigations:

1. Complaints of physical abuse, discrimination and sexual harassment provide a high potential for liability to the Department and its personnel. Based upon a request from the Office of Chief Counsel, all such complaints shall be investigated immediately to determine the factual circumstances surrounding the complaint in order to assist the Office of Chief Counsel in developing legal theories that can be advanced in defense of any resulting claims and to properly evaluate the potential for liability to which the Department or its members could be exposed. The Office of Chief Counsel shall be provided notice of complaints of this nature by the Director, Internal Affairs Division as soon as possible after receipt.

-18-

AR 4-25
9/2/93

2. The Use of Force or Complaint Reception and Processing Worksheet shall be prepared in accordance with this regulation and will serve in place of an incident memo. A BPR Control Number shall be obtained by the Troop Commander/Division Director and entered in Block 1. No incident memo will be prepared, nor will a Troop Incident Number be assigned.

3. Complaints from citizens shall be verified through the completion of the Complaint Verification, Form SP 1-108, Appendage XII. In some cases this would have been accomplished through the use of Appendage XIII by the Bureau of Professional Responsibility by mail prior to assignment. If the verification is not attached to the complaint the investigator shall complete Appendage XII. In doing so, investigators shall request the complainant's signature in the allotted block before the interview.

   a. If the complainant refuses to sign the form, the investigator shall print "Refused" in the signature block. The complainant shall be informed that such refusal constitutes a withdrawal of their complaint. The investigator shall attempt to complete an interview of the complainant, and shall afterwards confer with the Director, Bureau of Professional Responsibility for a determination on the future course of the investigation. Except in cases of criminal conduct or those which could give rise to court-martial proceedings, as determined by the Department Disciplinary Officer, the investigation shall be terminated with the submission of a limited investigation documenting action taken.

   b. If travel distance or other circumstances prohibit a personal interview, the investigator shall request assistance from the Bureau of Professional Responsibility in obtaining a completed verification form.

-19-

AR 4-25
9/2/93

4.  The General Investigation Report shall be used to report full investigations. Correspondence shall be used to report limited investigations.

NOTE:  When appropriate, an Initial Crime Report, Form SP 7-004, or Non-Traffic Citation, Form SP 7-0017B shall be prepared and assigned a Troop Incident Number.

5.  Personal contact, when practical, shall be made with complainants, witnesses and involved personnel. Anonymous complaints shall not be automatically dismissed. A thorough investigation shall be conducted to independently prove or disprove the allegation. The investigator should make a reasonable effort to determine the identity of anonymous complainants.

NOTE:  No administrative action shall be taken against personnel solely on the basis of an unsupported anonymous complaint. In addition, no investigation shall be initiated into anonymous complaints unless a substantiation of the allegation could give rise to formal discipline as determined by the Disciplinary Officer.

6.  Personnel who are directly or indirectly associated with a matter under investigation may be directed by the investigating officer or other authority to submit correspondence containing an account of their knowledge and involvement. Such correspondence shall include complete answers to any related questions of the investigator. Absent exigent circumstances, personnel shall be provided 48 hours to submit the correspondence to the investigator or higher authority. Any subsequent requests for additional information may be made by the investigator citing specific questions to be answered. All submitted correspondence shall be included as attachments to the General Investigation Report.

7.  The subject of the investigation shall be personally interviewed.

a.  All related interviews conducted during BPR personnel investigations which allege criminal conduct or

AR 4-25
9/2/93

gross      misconduct      shall      be
tape-recorded.

(1)  Prior to beginning an interview
which requires tape-recording,
the subject shall be informed
that their statement will be
tape-recorded.

(2)  P e r s o n n e l ,      d u r i n g
administrative investigations,
have no right to refuse the
interview being tape-recorded.

(3)  Individuals not employed by the
Department have the right to
refuse their interview being
tape-recorded.

b.  The subject(s) of a taped interview
may obtain a copy of the related
cassette tape.

(1)  Upon written request to the
Director,      B u r e a u      of
Professional    Responsibility,
and within 15 working days
after the last interview is
completed, the subject(s) shall
be provided with a copy of
their   taped      interview.
Requesting  personnel  shall
i m m e d i a t e l y      p r o v i d e
correspondence encompassing a
written receipt.    For other
than Department personnel, a
handwritten    receipt    is
acceptable.

(2)  The subject(s), who is a PSTA
member,   may   simultaneously
tape-record the interview being
conducted  and  also  be  tape-
recorded by a member conducting
a BPR investigation.    At the
conclusion of the interview,
the subject's cassette tape
shall   be   removed   and
immediately  placed  in  an
envelope   by   the   BPR
investigator.   The  envelope
shall then be sealed and the
subject directed to place their

-21-

AR 4-25
9/2/93

signature, date and time upon
the seal. The sealed envelope
shall be further enveloped in a
postage stamped and addressed
mailing envelope provided by
the member. The package shall
be immediately mailed to the
PSTA office where the enclosed
envelope will be retained in a
sealed condition until notified
by BPR that the contents of the
interview may be released to
the subject(s).

c.   Interviews meeting the criteria set
forth in this regulation for tape-
recording which have not, for
whatever reason, been tape-recorded
will be reduced to writing by the
investigator, who shall then show
the written statement to the subject
for their review. The subject will
then be requested to sign each page
and complete the signature block on
the statement's last page. The
signature block shall state:

By my signature on this and each of
the foregoing _____ pages, I
hereby adopt the statement contained
herein and acknowledge the
statement's completeness and
veracity.

_____ Signature

_____ Date

d.   Tape-recorded interviews may be
summarized for reporting purposes.
The investigator must ensure that
the summary is accurate and that the
original tape is included as an
attachment to the investigative
report.

8.   All documents and/or reports, or copies
thereof, if originals are not available, which
have been generated by the investigation shall
be collected.

-22-

AR 4-25
9/2/93

9.  All available investigative tools shall be employed to secure evidence to assist in determining the facts of an investigation. All evidence collected shall be processed in accordance with the procedures outlined in OM 7-7. Examples of investigative tools and evidence to be used in the investigation are as follows:

a.  Documents and Records:

(1)  Medical reports - refer to Appendage V.

(2)  Licenses, registrations or any applications.

(3)  Telephone toll records.

(4)  Financial records - refer to Appendage VI.

(5)  Credit Bureau checks.

(6)  Search warrants/affidavits.

(7)  Employment records - refer to Appendage VII.

(8)  Subpoenas.

(9)  Initial Crime Reports.

(10)  Accident Reports.

NOTE: A Request for Criminal Record Check, Form SP 4-164, commonly referred to as a "rap sheet," shall only be included if relevant.

b.  Clothing:  Especially important in incidents of shooting or alleged physical abuse.

c.  Photographs:

(1)  Victims - physical abuse, shootings, etc.

(2)  Scenes - location of alleged violation.

-23-

AR 4-25
9/2/93

> (3) Photo lineups - <u>U.S. v. Wade</u> covers the Supreme Court guidelines associated with lineups. Refer to Appendage XI.

d.  Radio Tapes: These are reused on a 30 or 60-day cycle. It is incumbent upon the investigator to obtain the tape prior to its reuse or erasure.

e.  Sketches: Prepared of scene, if warranted.

f.  Weapons: Ascertain if:

> (1) Issued/personal.
>
> (2) Ammunition - issued/personal.
>
> (3) Alterations.
>
> (4) Make, model, serial number and caliber.
>
> (5) Qualified with weapon - Permanent Firearms Scoring Record, Form SP 8-104.
>
> (6) Request to Carry a Personal Handgun on Duty, Form SP 1-600, is completed and on file.

g.  Technical Aids:

> (1) Laboratory.
>
>> (a) Ballistics Section.
>>
>> (b) Chemistry Section.
>>
>> (c) Documents Section.
>>
>> (d) Photographic Section.
>>
>> (e) Latent Print Section.
>>
>> (f) Automated Fingerprint Identification System Section.
>
> (2) Polygraph.

-24-

(3)  Helicopter.

(4)  Scuba Teams.

10.  Personal property of personnel is not subject to search and seizure for administrative work-related investigations without reasonable suspicion.  Probable cause and/or a search warrant, as required by law, are necessary to search and seize the personal property for criminal investigative purposes.  However, Department property may be searched at any time, even if assigned to or used exclusively by a single individual.  This search may be conducted by any authorized person pursuant to an investigation.

11.  At no time will recommendations be offered as to the appropriate administrative action to be taken.  The investigator shall not express assumptions, personal opinion, or conclusions in the General Investigation Report.

12.  The following exceptions to completing a General Investigation Report are necessary when conducting full investigations:

a.  Block 5 shall read as follows:

Name of Subject Personnel
Troop/Bureau - Station/Division
Date of Enlistment/Hiring
Social Security Number of Subject Personnel

NOTE:  Additional subjects shall be entered in the INSTRUCTIONS Block, under the subheading ADDITIONAL SUBJECTS, using the above format.

b.  The subheadings CONCLUSION, and RECOMMENDATION and COMMENT in Block 6 shall not be included when the report is used for administrative investigation purposes.

c.  All attachments shall be consecutively numbered under the subheading, LIST OF ATTACHMENTS. Each attachment shall be numbered, along the lower right corner to correspond with this list.  In the format of:  Attachment No._____,

AR 4-25
9/2/93

Page_____ of_____. The Use of Force
or Complaint Reception and
Processing Worksheet shall always be
Attachment Number 1. Attachments to
supplemental General Investigation
Reports shall continue consecutively
from the last attachment number in
the original report.

d.    No references to race/ethnicity
shall be included when identifying
interviewees, unless relevant to the
issue under investigation.

13.    When the facts of an investigation indicate
that a Report of Incident/Accident, Form
STD-430, shall be submitted according to
AR 4-12, it shall be submitted directly to the
Director, Bureau of Staff Services, and noted
in the details section of the report. A copy
shall not be made an attachment to the General
Investigation Report.

14.    Department directives, contract/agreement
provisions, the Pennsylvania Rules of Criminal
Procedure and statutes shall be strictly
adhered to while conducting investigation(s).

15.    Individuals under investigation shall be
advised of their Constitutional Rights, which
may apply during the investigation.

16.    The investigation shall be completed and all
reports shall be received by the Director,
Bureau of Professional Responsibility within
30 days after assignment, unless another time
period is specified by the Director. It is
important for the assigned investigator to
complete the investigation and submit the
report promptly.

E.    Investigation of Non-Complaint Incidents:

1.    Incidents involving legal intervention,
shooting or use of physical force, provide a
high potential for liability to the Department
and its personnel. Based on a request from
the Office of Chief Counsel, in all such
incidents an immediate investigation shall be
conducted into the factual circumstances
surrounding the incident in order to assist
the Office of Chief Counsel in developing
legal theories that can be advanced in defense

AR 4-25
9/2/93

of any resulting claims and to properly evaluate the potential for liability to which the Department or its members could be exposed. The Office of Chief Counsel shall be provided notice of the above-referenced types of incidents by the Director, Internal Affairs Division as soon as possible after their occurrence.

2. The involved member(s)/enforcement officer(s) shall immediately notify, through the chain of command, the Troop Commander responsible for the area in which the incident occurred. For a member not under their command, the Troop Commander shall notify the member's Troop Commander, Division Director; and, if on detached status, the member's current Troop Commander/Division Director shall also be notified. For Enforcement Officers, the Troop Commander shall notify the Director, Operations Division, Bureau of Liquor Control Enforcement. If serious injury or death occurred to an individual, the Troop Commander shall immediately notify the Deputy Commissioner of Operations, through the chain of command, if possible. The Troop Commander shall also provide immediate notification to the Bureau of Professional Responsibility, in accordance with Department directives, in all shooting/physical force incidents.

3. In those incidents requiring immediate response, the Troop Commander shall ensure that a supervisor who is not directly involved in the incident is immediately assigned to secure the scene of the incident. The assigned supervisor shall initiate a preliminary investigation, pending assignment of a principal investigator, who shall be selected through concurrence with the Director, Bureau of Professional Responsibility.

4. If the use of physical force results in injury which requires medical treatment to personnel only, and no other investigative criteria applies, an administrative investigation is not required.

5. Any member/enforcement officer, who discharges a weapon which results in an injury or death, or whose use of physical force results in a death, shall immediately be assigned to

-27-

AR 4-25
9/2/93

Station/Office duties, pending an evaluation of the circumstances surrounding the incident by the Deputy Commissioner of Administration. In addition, any member/enforcement officer whose use of physical force results in an injury may, at the discretion of the Deputy Commissioner of Administration, be assigned to Station/Office duties pending evaluation of the circumstances surrounding the incident. For those incidents in which responsibility cannot be immediately determined, all members/enforcement officers directly involved in the incident shall be placed in this status, where appropriate. This action is not to be construed as disciplinary in nature.

6. Whenever a member/enforcement officer is directly involved in a shooting incident which results in injury or death:

a. The assigned criminal investigator and BPR investigator shall interview the involved personnel, as soon as possible.

b. The Troop Commander/Bureau Director shall ensure that the Member Assistance Program Office Manager is notified immediately.

c. The member's/enforcement officer's Troop Commander/Bureau Director, in conjunction with the Manager, Member Assistance Program, shall, as soon as possible, but not more than 72 hours after the incident, arrange for the affected member(s)/enforcement officer(s) to receive appropriate professional counseling. This shall not preclude professional counseling of members/enforcement officers involved in shooting incidents not resulting in injury or death or in other use of physical force incidents. In addition, the Troop Commander/Bureau Director, in conjunction with the Manager, Member Assistance Program, shall ensure appropriate professional counseling is provided to any personnel, e.g., Police Communications Operators, supervisors, etc., indirectly

-28-

AR 4-25
9/2/93

involved with and adversely affected by an incident.

d.  The Troop Commander/Bureau Director shall ensure the PSTA President is notified, as soon as possible in those incidents involving members.

7.  During the investigation of a shooting incident, it may be necessary for the investigator to take possession of a member's/enforcement officer's weapon. The Troop Commander/Division Director shall make arrangements for immediate replacement of the weapon.

8.  Release of a member's/enforcement officer's name to the news media shall be coordinated through the Public Information Office.

9.  An investigation of a non-complaint incident is not required for the following shooting incidents:

a.  Firearms training/qualification.

b.  A member/enforcement officer discharging a weapon while off duty as permitted by law for purposes such as hunting, fishing, target shooting, etc.

c.  When a member destroys an animal in accordance with the provisions of FR 7-3.

10.  During the investigation of a non-complaint incident, the investigator shall exercise discretion in determining if an aggrieved citizen should be interviewed. This does not apply to instances where the citizen initiates the complaint and alleges physical abuse.

F.  Limited Investigations:

1.  A limited investigation may be conducted when a requirement under the definition of "Limited Investigation" is met. In addition, a limited investigation may be conducted when the Troop Commander/Division Director and the Director, Bureau of Professional Responsibility concur that a full investigation is not warranted due to mitigating circumstances. A BPR Control

-29-



AR 4-25
9/2/93

Number and investigator shall be assigned to all limited investigations.

2.   Limited investigations shall be prepared on correspondence directed to the investigator's Troop Commander/Bureau Director.

    a.   Limited investigations should include a synopsis of the allegations. Enclosures may include:

        (1)   Information from involved personnel submitted correspondence.

        (2)   Copies of pertinent investigative reports.

        (3)   Any other documents which are relevant to the investigation.

        (4)   Notification of Inquiry issued to involved personnel.

    b.   Investigator's assessment as to why this investigation should be handled on a limited basis, as defined in Section 25.04 I.

3.   Upon completion of a limited investigation, the Troop Commander/Division Director shall prepare an endorsement, citing reasons for their decision and a notation that the complainant and involved personnel were notified of this decision. The endorsement shall also include a statement of the disposition using one of the defined categories listed in Section 25.07, excluding the categories "Sustained" or "Not-Sustained." The limited investigation must be converted into a full investigation if any element of misconduct is determined.

4.   Troop Commanders/Division Directors shall forward the endorsed, limited investigation, through channels, to the Director, Bureau of Professional Responsibility. If, during the review process, a determination is made that the facts contained in the limited investigation are insufficient to support the final disposition, the report may be returned to the Troop Commander/Division Director

AR 4-25
9/2/93

directing that the investigator conduct a full investigation. If a limited investigation is returned under these circumstances, all prior notifications to the complainant and involved personnel shall be deemed to be void.

G. <u>Submission of Internal Investigation Reports for Full Investigations</u>:

1. All applicable General Investigation Reports shall be forwarded directly, in duplicate, to the Director, Bureau of Professional Responsibility, by the assigned investigator.

2. After reviewing the report for investigative content, the Director, Bureau of Professional Responsibility, shall either forward it to the Deputy Commissioner of Administration for further processing or return it to the investigator for additional investigation. A copy of the investigative reports on incidents involving legal intervention, shooting, use of physical force, or complaints of physical abuse, discrimination, or sexual harassment shall be forwarded to the Office of Chief Counsel for evaluation at the time the report is forwarded to the Deputy Commissioner of Administration.

3. The Deputy Commissioner of Administration or designee shall forward the investigative report to the appropriate Area Commander/Bureau Director, who shall review and forward it to the Troop Commander/Division Director. In cases which appear to warrant the issuance of a DAR, the Area Commander/ Bureau Director shall ensure consultation with the Troop Commander/Division Director prior to an administrative decision being made. An administrative decision shall be formulated by the Troop Commander/Division Director and communicated to the subject(s) of the investigation in a timely manner.

   a. If the investigation involves a member and a DAR will be issued, the provisions of FR 3-3 apply.

   b. If disciplinary action will be taken against an employee, the provisions of AR 4-9 apply.

AR 4-25
9/2/93

4.   The investigative report shall be returned, through channels, to the Deputy Commissioner of Administration, by the appropriate Troop Commander/Division Director, after they have completed their supplement report of the General Investigation Report and detailed their administrative decision. The supplement report shall, at a minimum, contain the following:

   a.   A statement of the disposition using one of the defined categories listed in Section 25.07. If there is more than one element to the allegation and the dispositions differ, each element must be individually addressed. Allegations in the categories Verbal Abuse or Dissatisfaction with Performance of Duty that are disposed of as unfounded or not sustained may be satisfactorily addressed by simply stating the appropriate disposition with no explanation necessary.

   b.   Except as exempted in the above section, a statement on those mitigating or aggravating circumstances that influenced the dispositional decision.

   c.   A statement that notification regarding the disposition of the complaint was made to the subject and the complainant. The method used to notify the complainant must be stated.

   d.   When a DAR is issued, the detailed summary provided to the involved member shall be included as an attachment.

5.   The Deputy Commissioner of Administration shall forward all reports to the Director, Bureau of Professional Responsibility, for further action or filing.

6.   The central location for the collection and maintenance of all administrative investigation information shall be the Bureau of Professional Responsibility, Internal Affairs Division. All personnel investigations are of

-32-

a confidential nature and may be reviewed only upon authorization of the Commissioner/designee.

7.  General Investigation Reports and limited investigation reports shall be purged after ten years, or two years after the member/employee separates, unless litigation warrants retention.

## 25.11  INTERNAL AFFAIRS DIVISION PERSONNEL

A.  <u>Selection</u>:  Staffing an Internal Affairs Division is an important factor in the success or failure of the Division.  To be considered for assignment in the Internal Affairs Division, members must:

1.  Be volunteers.

2.  Have demonstrated that they possess a high degree of investigative skill and the ability to write clear, concise and complete investigative reports.

3.  Have an excellent reputation, among both their peers and supervisors, in terms of integrity and overall performance as members.

4.  Be familiar with those statutes, collective bargaining agreements, and Department directives, policies and procedures which are related to administrative investigations.

5.  Have a thorough knowledge in the collection and preservation of evidence.

6.  Should have knowledge of the availability of records and information maintained by other sources and agencies.

7.  Should possess the ability to perform photographic surveillance and possess or be willing to acquire the proper certification required to perform electronic surveillance.

8.  Should be in good physical condition and present a professional appearance.

9.  Should be able to interact effectively with people and be proficient in interviewing and interrogation techniques.

AR 4-25
9/2/93

B.    <u>Tenure</u>:  It is a generally accepted practice to periodically rotate members assigned to an Internal Affairs Division.    This rotation process will assure the infusion of new personnel and new ideas, and allow greater member participation.    The investigator positions within the Division shall be posted in accordance with AR 4-20.    Investigators shall serve for a period of time to be determined by the Commissioner.

AR 4-25
9/2/93

APPENDAGE  I

USE OF FORCE OR COMPLAINT RECEPTION AND PROCESSING WORKSHEET
FORM SP 1-101

A.   PURPOSE:  This form is used to provide a uniform method of receiving and recording complaints against personnel and recording incidents for non-complaint investigations.

B.   PREPARATION: This form shall be printed with ballpoint pen or typewritten, in original only, by the individual receiving the complaint.

C.   BLOCK INSTRUCTIONS:

1.   BPR CONTROL NUMBER:  To be obtained by the Troop Commander/Division Director from the Director, Bureau of Professional Responsibility.

2.   COMPLAINANT INFORMATION:  This section is for recording the vital information regarding the individual making the complaint.  Personnel shall not place their names in this section unless they are the actual complainant.  When personnel receive information from an outside source, that source shall be noted in this section.  For non-complaint investigations and anonymous complaints, this section shall be left blank.

3.   NON-COMPLAINT USE OF FORCE REPORT:  Check the appropriate box.

4.   SUBJECT OF ALLEGATION/REPORT:  Self-explanatory.

5.   DETAILS OF ALLEGATION:

   a.   ROUTE/STREET:  Self-explanatory.

   b.   CITY/TWP/BORO:  Self-explanatory.

   c.   COUNTY:  Self-explanatory.

   d.   DATE:  Self-explanatory.

   e.   TIME:  Self-explanatory.

   f.   DAY:  Self-explanatory.

   g.   TYPE OF ALLEGATION:  Refer to Section 25.05. Check the appropriate box.

I-1

AR 4-25
9/2/93

    h.   SYNOPSIS:  A brief explanation of what the complaint alleges or what occurred during a non-complaint incident is sufficient.

6.   RECEPTION DATA:

    a.   DATE RECEIVED:  Self-explanatory.

    b.   TIME RECEIVED:  Self-explanatory.

    c.   LOCATION RECEIVED:  Self-explanatory.

    d.   RECEIVED BY:  The name of the individual who initially receives the details of the allegation from the complainant shall be recorded here.  Do not advise complainants to call back later to speak to a supervisor.

7.   FOR BUREAU USE:  This space shall be used _only_ by the Bureau of Professional Responsibility.

8.   ADDITIONAL  SUBJECTS  OF  ALLEGATION/REPORT: Self-explanatory.

D.   DISTRIBUTION WHEN A COMPLAINT IS RECEIVED AT A TROOP/BUREAU LOCATION:

    1.   Personnel Receiving Complaint - Forward through channels to the individual's Troop Commander/Division Director by the most expedient means possible.  If the complaint involves an individual in the chain of command, the individual may be bypassed when submitting the Worksheet through channels.

    2.   Troop Commander/Division Director  -  The Troop Commander/Division Director, after reviewing the Worksheet, shall assess if a full or limited investigation is appropriate.

        a.   The Director, Bureau of Professional Responsibility or a designee shall then be contacted by telephone for concurrence.  At this time, a BPR Control Number will be assigned and recorded in the Bureau Register. An investigator will also be assigned.

           (1)   If the decision is made for the investigation to be conducted by Troop/Bureau members, the Worksheet shall be forwarded to the investigating officer for inclusion as the first attachment to the General Investigation Report.

AR 4-25
9/2/93

    (2)   If the decision is made for the investigation to be conducted by a member of the Internal Affairs Division, the Worksheet shall be immediately forwarded to the Director, Bureau of Professional Responsibility. It will then be forwarded to the Internal Affairs Division investigator for attachment to the General Investigation Report.

b.   Upon receipt of a nonwritten complaint which alleges dissatisfaction with performance of duty or verbal abuse, the Troop Commander/Division Director shall immediately contact the Director, Bureau of Professional Responsibility to discuss the details of the allegation. When appropriate, the Director, Bureau of Professional Responsibility may elect to proceed by forwarding a Complaint Verification, Form SP 1-108, to the complainant requesting more specific information about the allegation, before initiating an investigation. In such cases, the Troop Commander/Division Director shall forward the original Worksheet to the Bureau of Professional Responsibility and retain a copy in a chronological file at the Troop/Bureau for 60 days, after which the Worksheet shall be purged.

c.   The original Worksheet shall be retained in an active file at the Bureau of Professional Responsibility for 30 days, following the mailing of the Complaint Verification Form. Failure of the complainant to complete and return the Complaint Verification Form within 30 days will result in termination of the complaint and transfer of the original Worksheet to an inactive file. Completed Complaint Verification Forms shall be evaluated by the Director, Bureau of Professional Responsibility to determine if an investigation is warranted.

3.   It may be determined by the Director, Bureau of Professional Responsibility that action other than an investigation is appropriate; in such cases the Worksheet shall be forwarded to the Director, Bureau of Professional Responsibility with related cover correspondence.

AR 4-25
9/2/93

E.   DISTRIBUTION WHEN A COMPLAINT IS RECEIVED BY THE BUREAU OF
     PROFESSIONAL RESPONSIBILITY:

     1.   When it is determined that the investigation shall be
          conducted by a member of the Internal Affairs Division,
          the Worksheet shall be prepared and forwarded to the
          assigned Internal Affairs Division investigator for
          attachment to the General Investigation Report.

     2.   When it is determined that the investigation shall be
          conducted by Troop/Bureau members, the Worksheet shall be
          prepared and forwarded to the Troop Commander/Division
          Director of the affected personnel.    The assigned
          investigator shall attach it to the General Investigation
          Report.

F.   DISTRIBUTION WHEN THE SUBJECT OF THE COMPLAINT IS A MEMBER
     ASSIGNED TO THE BUREAU OF PROFESSIONAL RESPONSIBILITY:   When
     a complaint is received concerning a member assigned to the
     Bureau of Professional Responsibility, the Worksheet shall be
     sent directly, under confidential cover, to the Deputy
     Commissioner of Administration.

I-4

PENNSYLVANIA STATE POLICE
## USE OF FORCE OR COMPLAINT
### RECEPTION AND PROCESSING WORKSHEET

SP 1-101 (1-93)

**BPR CONTROL NUMBER**

1. AR 4-25
9/2/93

---

**2. COMPLAINANT INFORMATION**

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|

| HOME ADDRESS | STREET/P.O. BOX | | | | |
|---|---|---|---|---|---|
| | CITY | | STATE | ZIP CODE | HOME PHONE # ( ) WORK PHONE # ( ) |

| EMPLOYER | NAME & ADDRESS |
|---|---|

---

**3. NON-COMPLAINT USE OF FORCE REPORT**    ☐ SHOOTING INCIDENT    ☐ PHYSICAL FORCE    ☐ LEGAL INTERVENTION

---

**4. SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)**

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|

| LOCATION | TROOP/BUREAU | STATION/DIVISION | JOB ASSIGNMENT |
|---|---|---|---|

| SSN | | DOB | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
|---|---|---|---|

---

**5. DETAILS OF ALLEGATION**

| ROUTE/STREET | | | DATE | TIME | DAY |
|---|---|---|---|---|---|
| CITY/TWP/BORO | COUNTY | | | | |

| TYPE OF ALLEGATION (CHECK ONE) | ☐ PHYSICAL ABUSE ☐ VERBAL ABUSE ☐ CRIMINAL CONDUCT | ☐ IMPROPER CONDUCT ON DUTY ☐ IMPROPER CONDUCT OFF DUTY ☐ DISSATISFACTION WITH PERFORMANCE OF DUTY |
|---|---|---|
| | ☐ OTHER (Please explain) | |

| SYNOPSIS | |
|---|---|

---

**6. RECEPTION DATA**

| DATE RECEIVED | TIME RECEIVED | LOCATION RECEIVED | TROOP/BUREAU | STATION/DIVISION |
|---|---|---|---|---|
| | | | — | SSN — — |

| RECEIVED BY | NAME | SSN — — |
|---|---|---|

---

**FOR BUREAU USE**

| | NAME | | | SSN — — |
|---|---|---|---|---|
| INVESTIGATOR | | DATE ASSIGNED | DATE DUE | SP 1-101-A ☐ LIMITED INVESTIGATION ☐ |
| CONTROL NO. ISSUED BY | | | | |

I-5

 

AR 4-25

9/2/93

**a.** ADDITIONAL SUBJECTS OF ALLEGATION/REPORT

| NAME | FIRST | | M.I. | LAST | |
|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT | |
| SSN | — — | DOE | | TO BE COMPLETED IF KNOWN OR AVAILABLE | |

| NAME | FIRST | | M.I. | LAST | |
|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT | |
| SSN | — — | DOE | | TO BE COMPLETED IF KNOWN OR AVAILABLE | |

| NAME | FIRST | | M.I. | LAST | |
|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT | |
| SSN | — — | DOE | | TO BE COMPLETED IF KNOWN OR AVAILABLE | |

| SYNOPSIS (CONT.) | |
|---|---|

AR 4-25
9/2/93

APPENDAGE II

REVIEW OF PERFORMANCE COMPLAINT
SP 1-101A

A.   PURPOSE:  The review of performance complaint is used to:

1.   Provide Troop Commanders/Division Directors with a guideline to assist in determining if a member is merely lacking in a performance outside the Department Internal Affairs/Discipline System.

2.   Document action taken in cases of performance inadequacies for future reference in the event of repeated behavior; a basis for progressive discipline; to document/maintain consistency throughout the Department.

B.   BLOCK INSTRUCTIONS:  This form shall be printed with ballpoint pen or typewritten, in original only, by the Troop Commander/Division Director reviewing the complaint.

1.   SUBJECT AND BPR NUMBER:  Self-explanatory.

2.   DATE(S) OCCURRED:  Self-explanatory.

3.   DID COMMISSION/OMISSION TAKE PLACE OR BECOME KNOWN TO THE PUBLIC?  Check appropriate box.

4.   WAS THE COMMISSION/OMISSION WHOLLY A MATTER OF INTERNAL ADMINISTRATION?  Check appropriate box.

5.   WAS THE MEMBER PREVIOUSLY COUNSELED REGARDING SIMILAR BEHAVIOR?  IF YES, LIST DATES, CIRCUMSTANCES, AND BY WHOM:  This requires review of member's supervisory file and performance evaluation.  Check appropriate box.  If yes is checked, provide details.

6.   WHAT, IF ANY, EFFECT DID THE MEMBER'S COMMISSION/OMISSION HAVE (E.G. DESTROYED RESPECT FOR THE PENNSYLVANIA STATE POLICE, IMPROPER EXAMPLE FOR OTHERS, ETC.):  Self-explanatory.  If none, leave blank.

7.   LIST AND IDENTIFY AGGRAVATING AND/OR MITIGATING CIRCUMSTANCES:  Self-explanatory.

8.   WAS MEMBER DISCIPLINED WITHIN THE PAST FIVE YEARS REGARDING SIMILAR PERFORMANCE?  IF YES, LIST DATES AND PENALTIES:  Self-explanatory.

9.   WAS MEMBER PREVIOUSLY GIVEN REMEDIAL TRAINING REGARDING SIMILAR PERFORMANCE?  IF YES, LIST DATES AND CIRCUMSTANCES:  Self-explanatory.

II-1

AR 4-25
9/2/93

10. PRE-ADJUDICATION MEETING WAS HELD? DATE: Self-explanatory. This is to verify whether the Troop Commander/Division Director met with the member for the purpose of determining the validity of a performance inadequacy.

11. ATTENDEES: List the names of any persons, in attendance with the member and their position. Example: Trooper John J. Jones - Troop PSTA Representative.

12. REMARKS: List any pertinent comments made by the parties during the meeting.

13. DETERMINATION: Check appropriate box.

14. DATE MEMBER WAS NOTIFIED OF DETERMINATION: Self-explanatory.

15. DATE COMPLAINANT WAS NOTIFIED OF DETERMINATION: Self-explanatory. Check appropriate box if notification was written or verbal.

16. DISCIPLINARY OFFICER CONTACTED? IF YES, LIST DATE: Self-explanatory.

17. MEMBER COUNSELED? IF YES, LIST DATE: Self-explanatory.

18. DAR/TROOP COMMANDER'S WRITTEN REPRIMAND ISSUED? IF YES, LIST DATE: Self-explanatory.

19. BPR INVESTIGATION INITIATED: Check appropriate box.

20. REMEDIAL TRAINING SCHEDULED? IF YES, LIST DATE(S) AND TYPE: Self-explanatory.

21. REMARKS/DETAILS: Self-explanatory.

22. INITIATING OFFICER, TITLE AND DATE: Self-explanatory.

C. DISTRIBUTION:

1. If a performance inadequacy is founded, the Troop Commander/Division Director shall be responsible for ensuring the preparation and submission of the Review of Performance Complaint. This report shall be appended to the Use of Force or Complaint Reception and Processing Worksheet, Form SP 1-101, and forwarded to the Bureau of Professional Responsibility.

2. The Troop Commander/Division Director shall retain a copy of this report in a supervisory file established for that purpose.

AR 4-25
9/2/93

SP 1-101A (8-93)                    REVIEW OF PERFORMANCE COMPLAINT                    SPR 3

SUBJECT

E (S) OCCURRED:

3. DID COMMISSION/OMISSION TAKE PLACE OR BECOME KNOWN TO THE PUBLIC?            ☐ YES   ☐ NO

4. WAS THE COMMISSION/OMISSION WHOLLY A MATTER OF INTERNAL ADMINISTRATION?      ☐ YES   ☐ NO

                                                                               ☐ YES   ☐ NO
5. WAS THE MEMBER PREVIOUSLY COUNSELED REGARDING SIMILAR BEHAVIOR?
IF YES LIST DATES, CIRCUMSTANCES AND BY WHOM:

6. WHAT, IF ANY, EFFECT DID THE MEMBER'S COMMISSION/OMISSION HAVE (E.G. DESTROYED RESPECT FOR THE PENNSYLVANIA STATE POLICE, IMPROPER EXAMPLE FOR OTHERS, ETC.):

7. LIST AND IDENTIFY AGGRAVATING AND/OR MITIGATING CIRCUMSTANCES:

WAS MEMBER DISCIPLINED WITHIN THE PAST FIVE YEARS REGARDING SIMILAR PERFORMANCE? IF YES, LIST DATES AND PENALTIES:   ☐ YES   ☐ NO

9. WAS MEMBER PREVIOUSLY GIVEN REMEDIAL TRAINING REGARDING SIMILAR PERFORMANCE? IF YES, LIST DATES AND CIRCUMSTANCES:   ☐ YES   ☐ NO

ADJUDICATION OF PERFORMANCE COMPLAINT
                                    DATE:                                       ☐ YES   ☐ NO
10. PRE-ADJUDICATION MEETING WAS HELD?

11. ATTENDEES:

12. REMARKS:

DETERMINATION:          ☐ UNFOUNDED   ☐ SUSTAINED   ☐ NOT SUSTAINED

ATE MEMBER WAS NOTIFIED OF DETERMINATION:

                                                                               ☐ WRITTEN   ☐ VERBAL
15. DATE COMPLAINANT WAS NOTIFIED OF DETERMINATION:
                                    II-3

AR 4-25
9/2/93

**ACTION TAKEN**

| | | |
|---|---|---|
| 16. DISCIPLINARY OFFICER CONTACTED? IF YES, LIST DATE: | ☐ YES | ☐ NO |
| 17. MEMBER COUNSELED? IF YES, LIST DATE: | ☐ YES | ☐ NO |
| 18. DAB/TROOP COMMANDER'S WRITTEN REPRIMAND ISSUED? IF YES, LIST DATE: | ☐ YES | ☐ NO |
| 19. DPR INVESTIGATION INITIATED? | ☐ YES | ☐ NO |
| 20. REMEDIAL TRAINING SCHEDULED? IF YES, LIST DATE (S) AND TYPE: | ☐ YES | ☐ NO |

21. REMARKS/DETAILS

| 22. INITIATING OFFICER | TITLE | DATE |
|---|---|---|
| | | |

II-4

AR 4-25
9/2/93

APPENDAGE III

Dear:

This will acknowledge receipt of the complaint which you filed with this agency.

You will be contacted by a Department representative in the near future. Any questions you may have concerning your complaint should be directed to the Bureau of Professional Responsibility at (717) 783-5145.

Very truly yours,

Director
Bureau of Professional Responsibility

III-1

AR 4-25                    APPENDAGE IV

| SP 1-102 (8-93)    9/2/93 | NOTE:   INVESTIGATORS SHALL PREPARE ORIGINAL AND ONE COPY, RETAIN |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | THE ORIGINAL WITH CASE FILE AND PROVIDE COPY TO THE SUBJECT |
| PENNSYLVANIA STATE POLICE | OF INVESTIGATION. ONE OF THE THREE LISTED INVESTIGATION |
| NOTIFICATION OF INQUIRY | TYPES SHALL BE CHECKED.    BPR - |

_____ _____ _____
RANK                      NAME                      TROOP/STATION

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING:

☐ A COMPLAINT INVESTIGATION IS BEING CONDUCTED INTO AN INCIDENT IN WHICH YOU ARE ALLEGED TO HAVE BEEN INVOLVED. THE DETAILS OF THE COMPLAINT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐ A NON-COMPLAINT INVESTIGATION IS BEING CONDUCTED IN ACCORDANCE WITH DEPARTMENT DIRECTIVES. THE DETAILS OF YOUR INVOLVEMENT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐ AN ADMINISTRATIVE INVESTIGATION IS BEING CONDUCTED PURSUANT TO A REQUEST FROM THE OFFICE OF CHIEF COUNSEL. YOUR INVOLVEMENT HAS BEEN IDENTIFIED AS FOLLOWS:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____
SIGNATURE OF INVESTIGATOR

I ACKNOWLEDGE RECEIPT OF THIS NOTIFICATION AND I AM AWARE OF MY RIGHT TO UNION REPRESENTATION.

| SIGNATURE | BADGE/I.D. NO. | SOCIAL SECURITY NO. | DATE | TIME |
|---|---|---|---|---|

SP 1-100 (9-80)

APPENDAGE V

AR 4-25
9/2/93

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

## AUTHORIZATION TO OBTAIN MEDICAL INFORMATION

I, _____, do hereby, voluntarily and without promises or threats of

any kind, authorize _____, of the Pennsylvania State Police to

obtain information from all medical authorities, hospitals, clinics, or physicians who possess any and all records

concerning my medical examinations, treatments, and/or hospital/clinic admissions relative to the examination and/or

treatment of _____.

I further understand that the information obtained is to be used for internal, administrative purposes only and will not be

used as evidence against me in any criminal proceeding.

_____
SIGNATURE

_____
WITNESS

_____
PRESENT STREET ADDRESS

_____
CITY          STATE          ZIP CODE

_____
WITNESS

_____
DATE OF BIRTH

_____
DATE          TIME

SP 1-100 (9-86)

APPENDAGE VI

AR 4-25
9/2/93

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
AUTHORIZATION TO OBTAIN FINANCIAL INFORMATION

I, _____ , do hereby, voluntarily and without promises or threats of any kind, authorize _____ of the Pennsylvania State Police to obtain and examine my financial records held by any financial institution that possess such records.

I further understand that the information obtained is to be used for internal, administrative purposes only and may not be used as evidence against me in any criminal proceeding.

_____
SIGNATURE

_____
WITNESS

_____
PRESENT STREET ADDRESS

_____
WITNESS

_____
CITY          STATE          ZIP CODE

_____
DATE                        TIME

SP 1-107 (9-84)

APPENDAGE VII

AR 4-25
9/2/93

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

## AUTHORIZATION TO OBTAIN EMPLOYMENT RECORDS

I, _____ , do hereby, voluntarily and without promises or threats of

any kind, authorize _____ of the Pennsylvania State Police to

obtain and examine all records held by my previous employer(s) concerning my employment history and job performance.

I further understand that the information obtained is to be used for internal, administrative purposes only and will not be
used against me as evidence in any criminal proceeding.

_____
SIGNATURE

_____
PRESENT STREET ADDRESS

_____
WITNESS

_____
CITY          STATE          ZIP CODE

_____
WITNESS

_____
DATE                          TIME

AR 4-25
9/2/93

APPENDAGE VIII

SP 1-104 (8-93)

COMMONWEALTH OF PENNSYLVANIA
**PENNSYLVANIA STATE POLICE**
**ADMINISTRATIVE WARNING**

Member/Employe _____

Interviewer _____

BPR Control No. _____ Date _____

This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police.  I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any pending criminal action.  During the course of this questioning, even if you disclose information which indicates you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statement nor its fruits will be used against you in a criminal proceeding.

Since this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action.  You do have right to have a union representative with you during such questioning.  If during the course of interview, you have reason to believe that your statements could result in administrative action being initiated against you, union representation will be provided upon request.

Do you understand what I have just explained to you?        ☐ YES        ☐ NO

Do you have any questions concerning what I have just explained to you?        ☐ YES        ☐ NO

_____
SIGNATURE OF EMPLOYE/MEMBER                        DATE

_____
SIGNATURE OF INTERVIEWER                        DATE



APPENDAGE IX

AR 4-25
9/2/93

SP 1 - 103 (9-86)

PENNSYLVANIA STATE POLICE

## RIGHTS WARNING AND WAIVER NOTICE
## TO PENNSYLVANIA STATE POLICE PERSONNEL

TIME _____

DATE _____

PLACE _____

My name is _____ of the Pennsylvania State Police.
You have an absolute right to remain silent and anything you say can and will be used against you in a court of law   You
also have the right to talk to an attorney before and have an attorney present with you during questioning.  If you cannot
afford to hire an attorney, one will be appointed to represent you without charge before any questioning, if you so desire.
If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue.  If you do
exercise your right to remain silent, your refusal to answer will not be grounds for administrative action.

### WAIVER

I fully understand the statement warning me of my rights, and I am willing to answer questions.  I do not want an attorney
and I understand that I may stop answering questions anytime during the questioning.  No promises have been made to me,
nor have I been threatened in any manner.  I also understand that my refusal to answer questions will not be grounds for
administrative action.

_____
SIGNATURE

WITNESS:

S/ _____

S/ _____

IX-1

AR 4-25
9/2/93


APPENDAGE X


Garrity v. New Jersey, 87 S.Ct. 616, 385 U.S. 493, 17 L.Ed. 2d 562
(1967)

This case involved a situation where police officers who were being
criminally investigated were given a choice to either incriminate
themselves or forfeit their jobs under a state (New Jersey) statute
dealing with forfeiture of office, tenure and pension rights by
public employees who refuse to testify on grounds of self-
incrimination.  The officers chose to make confessions.  However,
the Supreme Court of the United States held the confessions were
not voluntary, but were coerced.  The court said that the option to
lose their means of livelihood or to pay the penalty of self-
incrimination is in direct contrast of free choice to speak out or
to remain silent.  That practice, the court said, is likely to
exert such pressure upon an individual as to disable him from
making a free and rationale choice.  The protection of an
individual under the Fourteenth Amendment against coerced
statements prohibits the use of these statements, obtained under
threat of removal from office, in subsequent criminal proceedings.


In summary, Garrity held that public employee statements that are
induced by threat of dismissal or other discipline may not be used
in a subsequent criminal prosecution.

AR 4-25
9/2/93

APPENDAGE XI

U.S. v. Wade, 87 S. Ct. 1926, 388 U.S. 218, 18 L.Ed. 2d 1149 (1967)

The question addressed in this case was whether courtroom identifications of an accused at trial are to be excluded from evidence because the accused was exhibited to the witnesses before trail at a post indictment lineup conducted for identification purposes without notice to and in the absence of the accused's appointed counsel. The Supreme Court of the United States held that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence, and was no violation of Wade's privilege against self-incrimination. However, the courtroom identification should have been excluded because the lineup was conducted without notice to and in the absence of counsel. The principle followed is that, in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial. The security of that right is as much the aid of the right to counsel as it is of the other guarantees of the Sixth Amendment.

In summary, Wade held that pretrial lineups constitute a critical step in the prosecutive process such that every individual has a right to counsel at such proceedings.

XI-1

AR 4-25
9/2/93

APPENDAGE XII

COMPLAINT VERIFICATION
FORM SP 1-108

A.  PURPOSE:  The Complaint Verification provides a complainant with the opportunity to directly lodge a complaint with the Department in writing and on an official form.  It also serves to formally involve a complainant as a party in our complaint process.

B.  POLICY:  The form shall be used to verify citizen complaints that have not already been articulated in writing and properly signed by the complainant.  The form may be used for other type complaints with the approval of the Director, Bureau of Professional Responsibility.

C.  PREPARATION:  The verification form will only be employed by an investigator assigned a BPR investigation or of the Bureau of Professional Responsibility.

1.  Except as outlined in paragraph 2. below, the verification form shall be completed by the assigned investigator.  The allegations shall be recorded from the complaint worksheet or from the complainant's present account.  The form shall then be presented to the complainant for review and signing.  A copy of the completed form may be mailed to the complainant by the investigator upon request.  If travel distance or other circumstances preclude personal contact with a complainant, the investigator shall request that the verification form be sent by the Bureau of Professional Responsibility.

2.  The form will be mailed by the Bureau of Professional Responsibility to the complainant under the following circumstances:

a.  When the Director, Bureau of Professional Responsibility determines that an investigation would most likely not be conducted if the complainant failed to return a completed verification form.

b.  At other times, with the approval of the Director, Bureau of Professional Responsibility.

XII-1

AR 4-25
9/2/93

D.    BLOCK INSTRUCTIONS:

    1.    NAME:  Self-explanatory.

    2.    HOME ADDRESS:  Self-explanatory.

    3.    REMARKS:  The complainant's allegations will be detailed under remarks.   When the form is completed by the investigator, the allegations may be recorded from the complaint worksheet or as related by the complainant.

    4.    SIGNATURE:  Self-explanatory.

    5.    DATE:  Self-explanatory.




SP 1-108 (6-93)

COMMONWEALTH OF PENNSYLVANIA

PENNSYLVANIA STATE POLICE

COMPLAINT VERIFICATION

AR 4-25
9/2/93

BPR CONTROL NUMBER

COMPLAINANT INFORMATION

| 1. NAME | FIRST | | M.I. | LAST | |
|---|---|---|---|---|---|
| 2. HOME ADDRESS | STREET/P.O. BOX | | | | |
| | CITY | | | | |
| | STATE | ZIP | HOME PHONE # ( ) | | WORK PHONE # ( ) |

3. REMARKS: PROVIDE A DETAILED NARRATIVE OF THE INCIDENT. IF THE COMPLAINT INVOLVES VERBAL ABUSE OR RUDENESS STATE THE SPECIFIC TERM, PHRASE, OR LANGUAGE CONSIDERED TO BE OFFENSIVE. IF THE COMPLAINT CONCERNS DISSATISFACTION WITH AN INVESTIGATION OR OTHER POLICE SERVICE, EXPLAIN WHAT ACTION OR OMISSION WAS UNACCEPTABLE. IF ADDITIONAL SPACE IS NEEDED USE THE REVERSE SIDE.

I AFFIRM THAT THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION OR BELIEF.

5. DATE

AR 4-25
9/2/93

AR 4-25
9/2/93

APPENDAGE XIII

Dear:

The preliminary personnel complaint you filed with the Pennsylvania State Police has been referred to the Bureau of Professional Responsibility for processing. To initiate an investigation, you must complete and return the enclosed Complaint Verification Form within thirty (30) days. Failure to return the completed verification form signed and within thirty (30) days will result in the termination of your complaint.

When completing Block 3, "Remarks," consider the following issues: Where did the incident occur? Give a location to the best of your knowledge and ability. When did the incident take place? Note the date, day of week and time, if possible. Who was present when the incident happened? List names, addresses and telephone numbers, if known. What are the details of the incident? Begin with your initial contact and give a detailed account of the events surrounding your complaint. If the allegation is verbal abuse or rudeness, please state the specific term, phrase or language that you considered offensive. An allegation such as "poor attitude" is not definite enough to permit a determination as to any wrongdoing having occurred. Complaints that indicate displeasure with service rendered by State Police personnel should also indicate a specific instance or instances of lack of action or unacceptable action. Merely disagreeing with the result of an action taken is not basis for a complaint.

Please be aware that your complaint will have no impact on cases before a court of law. If an arrest is at issue, proper redress is found through the judicial system and should be pursued there.

Upon our receipt of the completed verification form, you will be notified of the action to follow.

Any questions you may have concerning your complaint should be directed to the Bureau of Professional Responsibility, at (717) 783-5145.

Very truly yours,

Director
Bureau of Professional Responsibility

XIII-1

AR 1-10
9/16/97

EXHIBIT H

    a.    Up to 20 Troopers are justified 3 Corporals.

    b.    21 - 27 Troopers are justified 4 Corporals.

    c.    28 - 35 Troopers are justified 5 Corporals.

    d.    36 - 43 Troopers are justified 6 Corporals.

    e.    44 - 51 Troopers are justified 7 Corporals.

    f.    52 - 59 Troopers are justified 8 Corporals.

    g.    60 - 67 Troopers are justified 9 Corporals.

    h.    68 - 75 Troopers are justified 10 Corporals.

    i.    76 - 83 Troopers are justified 11 Corporals.

NOTE: On Stations, Police Communications Operators (PCO) will be included with Troopers in determining the number of Corporals.

2.    A second Sergeant position may be justified if a Patrol Unit has 6 or more Corporals assigned; however, this is not automatic. The additional position must be requested through channels to the Deputy Commissioner of Operations, via correspondence, Form STD-501. The request must be detailed and contain appropriate information and justification.

10.07    DEPARTMENT HEADQUARTERS

A.    <u>Bureaus</u>: Bureaus shall be commanded by a Major or civilian equivalent.

B.    <u>Divisions</u>: Divisions may be commanded by a Captain, Lieutenant, or civilian equivalent.

C.    <u>Sections</u>: Sections may be supervised by a Lieutenant, Sergeant, Corporal, or civilian equivalent. A Trooper may supervise a Section if it is only staffed with civilians.

P287



7/20/00 Spoke with Major Conley.
vestigation at Request of Commissioner
F ascertain facts, no personel
ction involved.

JLB

3/14/01: FWD COPY OF WORKSHEET TO COMMISSIONER.

Capt.

Last info Known on this:

In BsKt 07/16/99, pending disp. per
Lt. Brown, Acting Dir BPR.

Is this still pending?

Noel

P288

STD-501A  3-86

COMMONWEALTH OF PENNSYLVANIA

DATE:    6-28-99

SUBJECT:

TO:

Bob : Be available for an interview with
Major Winter Williams on FRI.
7-2-99 @ 1000 hrs re your May
12Th disclosures to me.

FROM:

                                    PCE

# PERFORMANCE EVALUATION REPORT

NOTE: See reverse of work sheet for instructions.

TYPE REPORT: **ANNUAL**

EMPLOYE: OBER , DARRELL G.

AGENCY: STATE POLICE

SOCIAL SECURITY NUMBER: 2?4-42-C48

CLASS TITLE: PLC TRPR

C.F.: 00000

POSITION NUMBER — AGCY: 025  BUR: 2350  CLASS: 74010  SE 1

RANGE: 1?12.00  STEP: 01  D

EVALUATION PERIOD: 12-85/12-86

PRESENT STATUS:

LOCATION: MCCONNELLSBURG STATION

ANNIVERSARY DATE: 12, 1986

DATE REG. STATUS STARTS

| GENERAL PERFORMANCE FACTORS – All employes should be evaluated on the first six factors. | EXCELLENT | VERY GOOD | GOOD | FAIR | UNSAT FACTO |
|---|---|---|---|---|---|
| 1. QUALITY OF WORK – Completeness; accuracy; neatness; professional or technical proficiency. | | X | | | |
| 2. WORK HABITS – Planning and organization of work; care of equipment and supplies | | X | | | |
| 3. RELATIONSHIP WITH PEOPLE – Ability to get along with others. Effectiveness in dealing with the public. | X | | | | |
| 4. DEPENDABILITY – Degree to which employe can be relied upon to work steadily and effectively; punctuality; regularity of attendance. | | X | | | |
| 5. QUANTITY OF WORK – Amount of work performed. | | | X | | |
| 6. INITIATIVE – Resourcefulness; versatility; originality; ability to conceive and carry out program improvements. | | | X | | |
| 7. ANALYTICAL ABILITY – Thoroughness and accuracy of analysis of data, facts, laws, rules and procedures. | X | | | | |
| 8. ABILITY AS SUPERVISOR – Proficiency in training employes. In planning, organizing, laying out work for work unit. Activity in promoting cost reduction leadership. | | | | | |
| 9. ADMINISTRATIVE ABILITY – Promptness of action; soundness of decision; application of good management principles. | | | | | |
| 10. SAFETY – Application of accident prevention techniques and unit's safety record. | | X | | | |
| SPECIAL PERFORMANCE FACTORS – List below. Define and rate employe on any appropriate factors not listed above. | | | | | |
| 11. COMMITMENT TO AFFIRMATIVE ACTION. | | | | | |
| 12. APPEARANCE, I.E. ATTIRE, HAIR, EXCESSIVE WEIGHT | X | | | | |
| OVERALL EVALUATION | | X | | | |

COMMENTS (CONTINUE ON ADDITIONAL SHEETS OF 8½ X 11 WHITE PAPER.)

1. **QUALITY OF WORK:** Trooper OBER is a well qualified and talented officer whose performance of duty has been outstanding in every respect. Trooper OBER has an excellent working knowledge of the Vehicle and Criminal Laws of the Commonwealth as well as the Rules of Criminal Procedures. This Technical knowledge has enabled Trooper OBER to perform his duties as a patrol officer and criminal investigator over the past year in exceptionally outstanding manner, which sets him apart from his peers.

EVALUATOR SIGNATURE (EMPLOYE'S IMMEDIATE SUPERVISOR): John D. Seelman

TITLE: Corporal   P290

DATE: 29 October 19

REVIEWING OFFICER SIGNATURE (EVALUATOR'S IMMEDIATE SUPV.): 10F70

TITLE: Sergeant

DATE: 29 October 19

I WOULD LIKE TO DISCUSS THIS REPORT WITH THE REVIEWING OFFICER: ☐ YES ☒ NO

AS REQUESTED, REVIEWING OFFICER DISCUSSED REPORT. REVIEWING OFFICER SIGNATURE

DATE:

I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND THAT I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR. MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

EMPLOYE SIGNATURE: Tpr. Darrell G. Ob

DATE: 29 OCT B6

1. EMPLOYE

PERFORMANCE EVALUATION REPORT:   (CONTINUED)     Annual Report

OBER, Darrell G., Pennsylvania State Police, 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
State Police Trooper, 12/85 to 12/86

2.  <u>WORK HABITS:</u>  Trooper OBER plans his work so as to accomplish as much as is possible during the work day.  His reports are consistantly on time and he exercises care of equipment and supplies issued to him for the accomplishment of his assigned duties.

3.  <u>RELATIONSHIP WITH PEOPLE:</u>  Trooper OBER has the exceptional ability of being able to get along with other people, both the individuals that he works with and the public.  This is quite evident when you look at his accomplishments as an a criminal investigator. No complaints have been received against Trooper OBER during this rating period.

4.  <u>DEPENDABILITY:</u>  Trooper OBER is well qualified and totally dedicated to furthering the interests of the Pennsylvania State Police.  He consistently fulfills his many responsibilities in a highly professional and selfless manner.  He discharges all of his duties with the highest degree of integrity, and he has the moral courage to do what is right in any given situation.  He completes all his tasks with minimal guidance.

5.  <u>QUANTITY OF WORK:</u>  Trooper OBER gives the Commonwealth its monies worth when it comes to the amount of work performed.  While working as a Temporary Criminal Investigator he worked long hours to accomplish the work at hand.  Since he has been assigned to this station he has consistently looked for additional work when his workload was low.

6.  <u>INITIATIVE:</u>  In the relatively short amount of time that Trooper OBER has been assigned to this station, he has demonstrated his initiative through his ability to get results on the criminal investigations that other investigators may have terminated.  He is able to interview and interrogate individuals and get desireable results because of his resourcefulness, versatility and originality.

7.  <u>ANALYTICAL ABILITY:</u>  This is supported by items 1 through 6.

12.  <u>APPEARANCE:</u>  Trooper OBER meets the height and weight standards established by the Pennsylvania State Police.  He is well groomed and dresses neatly both on and off duty, except when required not to by the nature of his duty assignment.  He is physically fit.

<u>GENERAL COMMENTS:</u>  Trooper OBER has earned the respect of both his peers and superiors over this past rating period.  Very few Pennsylvania State Policemen could measure up to the standards that Trooper OBER sets for himself.  It is my opinion that he should continue to receive assignments that will develop the potential he has.  Trooper OBER has  Bachelor's Degree in Law Enfecement and Corrections from the Pennsylvania State University and graduated in the upper 1/5 of his class.  Trooper OBER is an asset to the Pennsylvania State Police and I would recommend that his future assignments be in the area of criminal investigations.

# PERFORMANCE EVALUATION REPORT

TYPE REPORT

**ANNUAL**

NOTE: See reverse of work sheet for instruction

| EMPLOYE | | AGENCY | | SOCIAL SECURITY NUM |
|---|---|---|---|---|
| OBER , DARRELL G. | | STATE POLICE | | 204-42-048 |

| CLASS TITLE | | | | C.F. | POSITION NUMBER | | |
|---|---|---|---|---|---|---|---|
| PLC TRPR | | | | 00000 | AGCY 020 | BUR 2350 | CLASS 74010 |

| Y | RANGE | STEP | EVALUATION PERIOD | PRESENT STATUS |
|---|---|---|---|---|
| 1208.80 | 01 | E | 12-86/12-87 | |

| LOCATION | ANNIVERSARY DATE | DATE REG. STATUS STARTS |
|---|---|---|
| MCCONNELLSBURG STATION | 12, 1987 | |

GENERAL PERFORMANCE FACTORS – All employes should be evaluated on the first six factors.

| | EXCELLENT | VERY GOOD | GOOD | FAIR | UNSAT FACT |
|---|---|---|---|---|---|
| 1. QUALITY OF WORK – Completeness; accuracy; neatness; professional or technical proficiency. | X | | | | |
| 2. WORK HABITS – Planning and organization of work; care of equipment and supplies | X | | | | |
| 3. RELATIONSHIP WITH PEOPLE – Ability to get along with others. Effectiveness in dealing with the public. | X | | | | |
| 4. DEPENDABILITY – Degree to which employee can be relied upon to work steadily and effectively; punctuality; regularity of attendance. | X | | | | |
| 5. QUANTITY OF WORK – Amount of work performed. | X | | | | |
| 6. INITIATIVE – Resourcefulness; versatility; originality; ability to conceive and carry out program improvements. | X | | | | |
| 7. ANALYTICAL ABILITY – Thoroughness and accuracy of analysis of data, facts, laws, rules and procedures. | X | | | | |
| 8. ABILITY AS SUPERVISOR – Proficiency in training employees. In planning, organizing, laying out work for work unit. Activity in promoting cost reduction leadership. | | | | | |
| 9. ADMINISTRATIVE ABILITY – Promptness of action; soundness of decision; application of good management principles. | | | | | |
| 10. SAFETY – Application of accident prevention techniques and unit's safety record. | X | | | | |
| SPECIAL PERFORMANCE FACTORS – List below. Define and rate employe on any appropriate factors not listed above. | | | | | |
| 11. COMMITMENT TO AFFIRMATIVE ACTION. | | | | | |
| 12. APPEARANCE, I.E. ATTIRE, HAIR, EXCESSIVE WEIGHT | X | | | | |
| | | | | | |
| OVERALL EVALUATION | | | | | |

COMMENTS (CONTINUE ON ADDITIONAL SHEETS OF 8½ X 11 WHITE PAPER.)

1. **QUALITY OF WORK:** Trooper OBER is a talented officer whose performance of duty has been good. Trooper OBER has an excellent working knowledge of the Vehicle and Criminal Laws of the Commonwealth as well as the Rules of Criminal Procedures. This Technical knowledge has enabled Trooper OBER to perform his duties as a patrol officer over the past year in outstanding manner.

2. **WORK HABITS:** Trooper OBER plans his work so as to accomplish as much as is possible during the work day. He exercises care of equipment and supplies issued to him for the accomplishment of his assigned duties.

| EVALUATOR SIGNATURE (EMPLOYE'S IMMEDIATE SUPERVISOR) | TITLE Corporal | DATE 14 Nov 87 |
|---|---|---|
| REVIEWING OFFICER SIGNATURE (EVALUATOR'S IMMEDIATE SUPV.) E.F.W. Phipps | TITLE SERGEANT | DATE 11/14/87 |

| LD LIKE TO DISCUSS THIS ORT WITH THE REVIEWING OFFICER? ☐ YES ☒ NO | AS REQUESTED, REVIEWING OFFICER DISCUSSED REPORT. REVIEWING OFFICER SIGNATURE | DATE |

I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND THAT I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR. M SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

Tpr. Darrell G. Ober  14 Nov 87

EMPLOYE SIGNATURE        DATE

1. EMPLOYE



Page 2

PERFORMANCE EVALUATION REPORT:  (CONTINUED)    Annual Report

OBER, Darrell G., Pennsylvania State Police, 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
State Police Trooper, 12/86 to 12/87

3   <u>RELATIONSHIP WITH PEOPLE:</u>  Trooper OBER has the exceptional
ability of being able to get along with other people, both the
individuals that he works with and the public.  No complaints have
been received against Trooper OBER during this rating period.

4.   <u>DEPENDABILITY:</u>  Trooper OBER discharges all of his duties with the
highest degree of integrity, and he has the moral courage to do what
is right in any given situation.  He completes all his tasks with
minimal guidance.

5.   <u>QUANTITY OF WORK:</u>  Trooper OBER continues to do his share of the
work at this station and looks for additional work when his workload
is low.

6.   <u>INITIATIVE:</u>  During the past year, Trooper OBER has used his
ability  and initiative to effect arrests in a number of Traffic
Violation Complaints/Incidents.  He has been able to get results on
these complaints/incidents because of his resourcefulness, versatility
and originality.

7.   <u>ANALYTICAL ABILITY:</u>  This is supported by items 1 through 6.

12.   <u>APPEARANCE:</u>  Trooper OBER meets the height and weight standards
established by the Pennsylvania State Police.  He is well groomed and
dresses neatly both on and off duty, except when required not to by
the nature of his duty assignment.  He is physically fit.

<u>GENERAL COMMENTS:</u>  Trooper OBER has earned the respect of both his
peers and superiors over this past rating period.  It is my opinion
that he should continue to receive assignments that will develop the
potential he has.  Trooper OBER has  Bachelor's Degree in Law
Enfocement and Corrections from the Pennsylvania State University and
graduated in the upper 1/5 of his class.  Trooper OBER is an asset to
the Pennsylvania State Police.

# PERFORMANCE EVALUATION REPORT

NOTE: See reverse of work sheet for instructions

TYPE REPORT: **ANNUAL**

| EMPLOYEE | | AGENCY |
|---|---|---|
| OBER , DARRELL G. | | STATE POLICE |

SOCIAL SECURITY NUMBER: 204-42-048█

| CLASS TITLE | | | C.F. | POSITION NUMBER |
|---|---|---|---|---|
| PLC CPL | | | 00000 | AGCY 020 / BUR 2350 / CLASS 74020 / SE |

| PAY RANGE | STEP | EVALUATION PERIOD | PRESENT STATUS |
|---|---|---|---|
| 1290.40  02  E | | 12-87/12-88 | |

| LOCATION | ANNIVERSARY DATE | DATE REG. STATUS STARTS |
|---|---|---|
| MCCONNELLSBURG STATION | 12, 1987 | |

| GENERAL PERFORMANCE FACTORS — All employes should be evaluated on the first six factors. | EXCELLENT | VERY GOOD | GOOD | FAIR | UNSAT FACTOR |
|---|---|---|---|---|---|
| 1. QUALITY OF WORK — Completeness; accuracy; neatness; professional or technical proficiency. | X | | | | |
| 2. WORK HABITS — Planning and organization of work; care of equipment and supplies | X | | | | |
| 3. RELATIONSHIP WITH PEOPLE — Ability to get along with others. Effectiveness in dealing with the public. | X | | | | |
| 4. DEPENDABILITY — Degree to which employee can be relied upon to work steadily and effectively; punctuality; regularity of attendance. | X | | | | |
| 5. QUANTITY OF WORK — Amount of work performed. | | X | | | |
| 6. INITIATIVE — Resourcefulness; versatility; originality; ability to conceive and carry out program improvements. | X | | | | |
| 7. ANALYTICAL ABILITY — Thoroughness and accuracy of analysis of data, facts, laws, rules and procedures. | X | | | | |
| 8. ABILITY AS SUPERVISOR — Proficiency in training employes. In planning, organizing, laying out work for work unit. Activity in promoting cost reduction leadership. | X | | | | |
| 9. ADMINISTRATIVE ABILITY — Promptness of action; soundness of decision; application of good management principles. | X | | | | |
| 10. SAFETY — Application of accident prevention techniques and unit's safety record. | X | | | | |
| SPECIAL PERFORMANCE FACTORS — List below. Define and rate employe on any appropriate factors not listed above. | | | | | |
| 11. COMMITMENT TO AFFIRMATIVE ACTION. | X | | | | |
| 12. APPEARANCE, I.E. ATTIRE, HAIR, EXCESSIVE WEIGHT | X | | | | |
| OVERALL EVALUATION | X | | | | |

COMMENTS (CONTINUE ON ADDITIONAL SHEETS OF 8½ X 11 WHITE PAPER.)

1. <u>QUALITY OF WORK</u> —In addition to his regular supervisory duties Cpl. OBER is in charge of vehicle maintenance. He performs these duties in an excellent manner.

2. <u>WORK HABITS</u> — Plans his work so as to accomplish as much as possible during the work day. Reports and duties performed in a timely manner. Arrives for work well ahead of time and often stays late.

3. <u>RELATIONSHIP WITH PEOPLE</u> — Has an excellent relationship with the public, his peers and subordinates. No complaints were received during this rating period.

4. <u>DEPENDABILITY</u> — He has used no sick leave while at McConnellsburg station. He arrives for work early and has stayed late on numerous occasions.

5. <u>QUANTITY OF WORK</u> — He exceeds what is expected.

6. <u>INITIATIVE</u> — Always willing to suggest and try new ways of doing his job.

Cont'd.

| EVALUATOR SIGNATURE (EMPLOYE'S IMMEDIATE SUPERVISOR) | TITLE | DATE |
|---|---|---|
| Robert W. Phipps | SERGEANT | 11-04-88 |
| REVIEWING OFFICER SIGNATURE (EVALUATOR'S IMMEDIATE SUPV.) | TITLE | DATE |
| [signature] | Captain | 11-09-88 |

WOULD LIKE TO DISCUSS THIS REPORT WITH THE REVIEWING OFFICER: ☐ YES  ☒ NO

AS REQUESTED, REVIEWING OFFICER DISCUSSED REPORT. REVIEWING OFFICER SIGNATURE

DATE

I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND THAT I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR. MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

EMPLOYE SIGNATURE: [signature]   DATE: 11-14-88

1. EMPLOYE

PERFORMANCE EVALUATION REPORT 

Cpl. Darrell G. OBER                    SOC.  204-42-C484

7. <u>ANALYTICAL ABILITY</u> — He has an excellent knowledge of laws and procedures who is often sought out for this knowledge by members of this station.

8. <u>ABILITY AS SUPERVISOR</u> — Very capable in supervising, training and leading personnel. Can be counted on to make good supervisory decisions without having to be led by the hand.

9. <u>ADMINISTRATIVE ABILITY</u> — Supported by factors 1,2,3,5,6,7,8 and 11.

10. <u>SAFETY</u> — He has had no accidents or work related injuries during this rating period.

11. <u>COMMITMENT TO AFFIRMATIVE ACTION</u> — He is fair and impartial to all personnel.

12. <u>APPEARANCE</u> —  Conforms to Department regulations.

STD-310

# PERFORMANCE EVALUATION REPORT

TYPE REPORT: **ANNUAL**

NOTE: See reverse of work sheet for instructions.

| EMPLOYE | AGENCY | SOCIAL SECURITY NUMBER |
|---|---|---|
| OBER , DARRELL G. | STATE POLICE | 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 |

| CLASS TITLE | | | | C. F. | POSITION NUMBER AGCY | BUR | CLASS | SERIA |
|---|---|---|---|---|---|---|---|---|
| PLC CPL | | | | 00000 | 020 5320 | 74020 | 000 | |

| RANGE | STEP | EVALUATION PERIOD | PRESENT STATUS |
|---|---|---|---|
| 1383.20   02   E | | 12-88/12-89 | |

| LOCATION | ANNIVERSARY DATE | DATE REG. STATUS STARTS |
|---|---|---|
| PROGRAMMING DIV | 12, 1989 | |

GENERAL PERFORMANCE FACTORS — All employes should be evaluated on the first six factors.

| | EXCELLENT | VERY GOOD | GOOD | FAIR | UNSATIS-FACTORY |
|---|---|---|---|---|---|
| 1. QUALITY OF WORK — Completeness; accuracy; neatness; professional or technical proficiency. | | X | | | |
| 2. WORK HABITS — Planning and organization of work; care of equipment and supplies | | X | | | |
| 3. RELATIONSHIP WITH PEOPLE — Ability to get along with others. Effectiveness in dealing with the public. | | X | | | |
| 4. DEPENDABILITY — Degree to which employe can be relied upon to work steadily and effectively; punctuality; regularity of attendance. | | | X | | |
| 5. QUANTITY OF WORK — Amount of work performed. | | | X | | |
| 6. INITIATIVE — Resourcefulness; versatility; originality; ability to conceive and carry out program improvements. | | X | | | |
| 7. ANALYTICAL ABILITY — Thoroughness and accuracy of analysis of data, facts, laws, rules and procedures. | | X | | | |
| 8. ABILITY AS SUPERVISOR — Proficiency in training employes. In planning, organizing, laying out work for work unit. Activity in promoting cost reduction leadership. | | X | | | |
| 9. ADMINISTRATIVE ABILITY — Promptness of action; soundness of decision; application of good management principles. | | X | | | |
| 10. SAFETY — Application of accident prevention techniques and unit's safety record. | X | | | | |
| SPECIAL PERFORMANCE FACTORS — List below. Define and rate employe on any appropriate factors not listed above. | | | | | |
| 1. COMMITMENT TO AFFIRMATIVE ACTION. | | X | | | |
| 2. APPEARANCE, I.E. ATTIRE, HAIR, EXCESSIVE WEIGHT | | X | | | |
| OVERALL EVALUATION | | X | | | |

COMMENTS (CONTINUE ON ADDITIONAL SHEETS OF 8½ X 11 WHITE PAPER.)

# 10 SAFETY — EMPLOYEE HAS HAD NO ACCIDENTS THIS RATING PERIOD.

| EVALUATOR SIGNATURE (EMPLOYE'S IMMEDIATE SUPERVISOR) | TITLE | DATE |
|---|---|---|
| R. W. Phipps | SERGEANT | 11/10/89 |

| REVIEWING OFFICER SIGNATURE (EVALUATOR'S IMMEDIATE SUPV.) | TITLE | DATE |
|---|---|---|
| | PATROL SECTION COMMANDER | 11-13-89 |

WOULD YOU LIKE TO DISCUSS THIS REPORT WITH THE REVIEWING OFFICER: ☐ YES  ☒ NO

AS REQUESTED, REVIEWING OFFICER DISCUSSED REPORT. REVIEWING OFFICER SIGNATURE

I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND THAT I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR. MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

| EMPLOYE SIGNATURE | DATE |
|---|---|
| Darrell G. Ober | 12/05/89 |

1. EMPLOYE

# PERFORMANCE EVALUATION REPORT

TYPE REPORT

**NOTE:** See reverse of work sheet for instructions

**ANNUAL**

| EMPLOYE | AGENCY | SOCIAL SECURITY NUMB |
|---|---|---|
| OBER , DARRELL G. | STATE POLICE | 204-42-048 |

CLASS TITLE

PLC SGT

| | C.F. | POSITION NUMBER | | | |
|---|---|---|---|---|---|
| | 00000 | AGCY 020 | BUR 5320 | CLASS 74030 | SE 4 |

| AY 1079.20 | RANGE 04 | STEP E | EVALUATION PERIOD 12-90/12-91 | PRESENT STATUS |
|---|---|---|---|---|

LOCATION

PROGRAMMING DIV

| ANNIVERSARY DATE 12, 1991 | DATE REG. STATUS STARTS |
|---|---|

| GENERAL PERFORMANCE FACTORS — All employes should be evaluated on the first six factors. | EXCELLENT | VERY GOOD | GOOD | FAIR | UNSAT FACTO |
|---|---|---|---|---|---|
| 1. QUALITY OF WORK — Completeness; accuracy; neatness; professional or technical proficiency. | X | | | | |
| 2. WORK HABITS — Planning and organization of work; care of equipment and supplies | X | | | | |
| 3. RELATIONSHIP WITH PEOPLE — Ability to get along with others. Effectiveness in dealing with the public. | | X | | | |
| 4. DEPENDABILITY — Degree to which employe can be relied upon to work steadily and effectively; punctuality; regularity of attendance. | X | | | | |
| 5. QUANTITY OF WORK — Amount of work performed. | X | | | | |
| 6. INITIATIVE — Resourcefulness; versatility; originality; ability to conceive and carry out program improvements. | X | | | | |
| 7. ANALYTICAL ABILITY — Thoroughness and accuracy of analysis of data, facts, laws, rules and procedures. | X | | | | |
| 8. ABILITY AS SUPERVISOR — Proficiency in training employes. In planning, organizing, laying out work for work unit. Activity in promoting cost reduction leadership. | | X | | | |
| 9. ADMINISTRATIVE ABILITY — Promptness of action; soundness of decision; application of good management principles. | X | | | | |
| 10. SAFETY — Application of accident prevention techniques and unit's safety record. | X | | | | |
| SPECIAL PERFORMANCE FACTORS — List below. Define and rate employe on any appropriate factors not listed above. | | | | | |
| 11. COMMITMENT TO AFFIRMATIVE ACTION. | | X | | | |
| 12. APPEARANCE, I.E. ATTIRE, HAIR, EXCESSIVE WEIGHT | X | | | | |
| OVERALL EVALUATION | X | | | | |

COMMENTS (CONTINUE ON ADDITIONAL SHEETS OF 8½ X 11 WHITE PAPER.)

| EVALUATOR SIGNATURE (EMPLOYE'S IMMEDIATE SUPERVISOR) | TITLE CAPTAIN | DATE 12-20-91 |
|---|---|---|
| REVIEWING OFFICER SIGNATURE (EVALUATOR'S IMMEDIATE SUPV.) | TITLE MAJOR | DATE 12-20-91 |

...D LIKE TO DISCUSS THIS
...ORT WITH THE REVIEWING OFFICER: ☐ YES ☒ NO

| AS REQUESTED, REVIEWING OFFICER DISCUSSED REPORT. REVIEWING OFFICER SIGNATURE | DATE |
|---|---|

I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND THAT I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR. M
SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

EMPLOYE SIGNATURE   DATE 12-20-91

**1. EMPLOYE**

PERFORMANCE EVALUATION REPORT
GENERAL PERFORMANCE FACTORS

1.  QUALITY OF WORK - There is no one in our Department with more
    technical proficiency regarding the management of our system
    of directives.  Sergeant Ober's work is neat, complete and
    extremely accurate.

2.  WORK HABITS - Ratee is very well organized, a skill that is a
    requirement to manage the complex system of directives
    employed by our Department.

3.  RELATIONSHIP WITH PEOPLE - Ratee has an outstanding attitude
    and personality that enables him to work well with others.

4.  DEPENDABILITY - Ratee is extremely dependable, loyal and
    dedicated.  He will do whatever it takes to accomplish a
    given task.  He does not abuse sick leave.

5.  QUANTITY OF WORK - Ratee works diligently throughout his
    shift.  He often performs project work in addition to his
    other duties.

6.  INITIATIVE - Ratee is self-motivated and innovative.  He
    constantly looks for ways to improve our system of direc-
    tives.

7.  ANALYTICAL ABILITY - Refer to factor 1.

8.  ABILITY AS SUPERVISOR - Ratee distributes work fairly, and
    tries to match projects with the strengths of the assigned
    project person.  He leads by example, and often pitches in to
    help subordinates.

9.  ADMINISTRATIVE ABILITY - Refer to factors 1, 2 and 8.  Ratee
    makes sound decisions and acts promptly on those decisions.

10. SAFETY - Ratee has not had a Department vehicle accident or a
    lost-time injury in this reporting period.

11. COMMITMENT TO AFFIRMATIVE ACTION - Ratee treats everyone
    fairly, and is sensitive to affirmative action-related
    issues.

12. APPEARANCE - Ratee presents an excellent appearance.


COMMENTS - Ratee excels in all categories.

# PERFORMANCE EVALUATION REPORT

**NOTE:** See reverse of work sheet for instructions.

**TYPE REPORT:** ANNUAL

| EMPLOYE | | AGENCY | SOCIAL SECURITY NUMBER |
|---|---|---|---|
| OBER , DARRELL G. | | STATE POLICE | 204-42-048_ |

| CLASS TITLE | | C.F. | POSITION NUMBER | | | |
|---|---|---|---|---|---|---|
| PLC CPL | | 00000 | AGCY 020 | BUR 5320 | CLASS 74020 | SE 0 |

| PAY 1456.00 | RANGE 02 | STEP E | EVALUATION PERIOD 12-89/12-90 | PRESENT STATUS |
|---|---|---|---|---|

| LOCATION | ANNIVERSARY DATE | DATE REG. STATUS STARTS |
|---|---|---|
| PROGRAMMING DIV | 12, 1990 | |

| GENERAL PERFORMANCE FACTORS — All employes should be evaluated on the first six factors. | EXCELLENT | VERY GOOD | GOOD | FAIR | UNSATISFACTORY |
|---|---|---|---|---|---|
| 1. QUALITY OF WORK — Completeness; accuracy; neatness; professional or technical proficiency. | X | | | | |
| 2. WORK HABITS — Planning and organization of work; care of equipment and supplies | | X | | | |
| 3. RELATIONSHIP WITH PEOPLE — Ability to get along with others. Effectiveness in dealing with the public. | | X | | | |
| 4. DEPENDABILITY — Degree to which employee can be relied upon to work steadily and effectively; punctuality; regularity of attendance. | | X | | | |
| 5. QUANTITY OF WORK — Amount of work performed. | X | | | | |
| 6. INITIATIVE — Resourcefulness; versatility; originality; ability to conceive and carry out program improvements. | X | | | | |
| 7. ANALYTICAL ABILITY — Thoroughness and accuracy of analysis of data, facts, laws, rules and procedures. | X | | | | |
| 8. ABILITY AS SUPERVISOR — Proficiency in training employes. In planning, organizing, laying out work for work unit. Activity in promoting cost reduction leadership. | | | | | |
| 9. ADMINISTRATIVE ABILITY — Promptness of action; soundness of decision; application of good management principles. | | | | | |
| 10. SAFETY — Application of accident prevention techniques and unit's safety record. | X | | | | |
| S. CIAL PERFORMANCE FACTORS — List below. Define and rate employe on any appropriate factors not listed above. | | | | | |
| 11. COMMITMENT TO AFFIRMATIVE ACTION. | X | | | | |
| 12. APPEARANCE, I.E. ATTIRE, HAIR, EXCESSIVE WEIGHT | X | | | | |
| | | | | | |
| OVERALL EVALUATION | X | | | | |

COMMENTS (CONTINUE ON ADDITIONAL SHEETS OF 8½ X 11 WHITE PAPER.)

CPL. OBER'S TENURE IN THE BUREAU OF RESEARCH AND DEVELOPMENT HAS BENEFITED THE DEPARTMENT THROUGH HIS EXEMPLARY PERFORMANCE IN THE FOLLOWING FACTORS:

#1. QUALITY OF WORK - ALL ASSIGNMENTS ARE SUBMITTED WITH A HIGH DEGREE OF ACCURACY AND COMPLETENESS.

#2. WORK HABITS - COMPLEX PROJECT LOAD WITH CONSTANTLY SHIFTING PRIORITIES IS ORGANIZED EFFECTIVELY.

#3. RELATIONSHIP WITH PEOPLE - MEMBER EFFECTIVELY DEALS WITH INDIVIDUALS IN TITLE AND OTHER BUREAUS OF ALL RANKS AND POSITIONS.

(SEE ATTACHED PAGE)

| EVALUATOR SIGNATURE (EMPLOYE'S IMMEDIATE SUPERVISOR) | TITLE | DATE |
|---|---|---|
| Sgt f.d.Allen | SUPERVISOR, SYSTEMS AND PROCEDURES SECTION | 01-31-91 |
| REVIEWING OFFICER SIGNATURE (EVALUATOR'S IMMEDIATE SUPV.) | TITLE | DATE |
| Penald H Haulenberg | (CAPTAIN) | 1-31-91 |

WOULD LIKE TO DISCUSS THIS REPORT WITH THE REVIEWING OFFICER: ☐ YES ☒ NO

AS REQUESTED, REVIEWING OFFICER DISCUSSED REPORT. REVIEWING OFFICER SIGNATURE

| | DATE |
|---|---|
| Cpl. D.G. Ober | 1-31-91 |

I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND THAT I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR. MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

EMPLOYE SIGNATURE: Cpl D.G. Ober    DATE: 01-31-91

1. EMPLOYE

#4. DEPENDABILITY - WORKS EXTREMELY WELL WITH MINIMUM SUPERVISION, IS PUNCTUAL AND DISPLAYS MINIMUM ABSENTEEISM.

#5. QUANTITY OF WORK - MEMBER COMPLETES ASSIGNED PROJECTS WELL ABOVE STANDARD LEVELS.

#6. INITIATIVE - MEMBER READILY EXPRESSES OPINION IN WORK-RELATED SITUATIONS AND SUGGESTS ORIGINAL IMPROVEMENTS.

#7. ANALYTICAL ABILITY - MEMBER HAS DEMONSTRATED AN EXTENSIVE ABILITY TO ANALYZE COMPLEX PROJECTS THOROUGHLY AND ACCURATELY.

#10. SAFETY - MEMBER'S SAFETY RECORD REMAINS UNBLEMISHED.

#11. COMMITMENT TO AFFIRMATIVE ACTION - MEMBER MAINTAINS GOOD WORKING RELATIONSHIPS WITH ALL CO-WORKERS, DISPLAYING NO PREJUDICIAL BEHAVIOR.

#12. APPEARANCE - MEMBER CONSISTENTLY REPRESENTS DEPARTMENT IN A PROFESSIONAL MANNER THROUGH ATTIRE, GROOMING, AND DEMEANOR.

DURING THE PAST YEAR, CAL. OBER HAS EFFECTIVELY PERFORMED THE DUTIES OF THE SUPERVISOR, SYSTEMS AND PROCEDURES SECTION, DURING PERIODS OF ABSENCE OF THE SUPERVISOR.

# PERFORMANCE EVALUATION REPORT

| | TYPE REPORT |
|---|---|
| NOTE: See reverse of work sheet for instructions. | **ANNUAL** |

| EMPLOYE | | | AGENCY | SOCIAL SECURITY NUMBER |
|---|---|---|---|---|
| OBER | , DARRELL | G. | STATE POLICE | 204-42-048_ |

| CLASS TITLE | | | | C.F. | POSITION NUMBER | | | |
|---|---|---|---|---|---|---|---|---|
| PLC SGT | | | | 00000 | AGCY 020 | BUR 5320 | CLASS 74030 | 4 |

| SA | RANGE | STEP | EVALUATION PERIOD | PRESENT STATUS |
|---|---|---|---|---|
| .091.20 | 04 | E | 12-91/12-92 | |

| LOCATION | ANNIVERSARY DATE | DATE REG. STATUS STARTS |
|---|---|---|
| PROGRAMMING DIV | 12, 1992 | |

| GENERAL PERFORMANCE FACTORS - All employes should be evaluated on the first six factors. | EXCELLENT | VERY GOOD | GOOD | FAIR | UNSAT FACTO |
|---|---|---|---|---|---|
| 1. QUALITY OF WORK - Completeness; accuracy; neatness; professional or technical proficiency. | X | | | | |
| 2. WORK HABITS - Planning and organization of work; care of equipment and supplies | X | | | | |
| 3. RELATIONSHIP WITH PEOPLE - Ability to get along with others. Effectiveness in dealing with the public. | X | | | | |
| 4. DEPENDABILITY - Degree to which employe can be relied upon to work steadily and effectively; punctuality; regularity of attendance. | X | | | | |
| 5. QUANTITY OF WORK - Amount of work performed. | X | | | | |
| 6. INITIATIVE - Resourcefulness; versatility; originality; ability to conceive and carry out program improvements. | | X | | | |
| 7. ANALYTICAL ABILITY - Thoroughness and accuracy of analysis of data, facts, laws, rules and procedures. | X | | | | |
| 8. ABILITY AS SUPERVISOR - Proficiency in training employes. In planning, organizing, laying out work for work unit. Activity in promoting cost reduction leadership. | X | | | | |
| 9. ADMINISTRATIVE ABILITY - Promptness of action; soundness of decision; application of good management principles. | X | | | | |
| 10. SAFETY - Application of accident prevention techniques and unit's safety record. | X | | | | |
| SPECIAL PERFORMANCE FACTORS - List below. Define and rate employe on any appropriate factors not listed above. | | | | | |
| 11. COMMITMENT TO AFFIRMATIVE ACTION. | X | | | | |
| 12. APPEARANCE, I.E. ATTIRE, HAIR, EXCESSIVE WEIGHT | X | | | | |
| OVERALL EVALUATION | X | | | | |

COMMENTS (CONTINUE ON ADDITIONAL SHEETS OF 8 ½ X 11 WHITE PAPER.)

Please see attached sheet

| EVALUATOR SIGNATURE (EMPLOYE'S IMMEDIATE SUPERVISOR) | TITLE | DATE |
|---|---|---|
| *[signature]* | Captain | 1-27-93 |
| REVIEWING OFFICER SIGNATURE (EVALUATOR'S IMMEDIATE SUPV.) | TITLE | DATE |
| *[signature]* | MAJOR | 1-27-93 |

| LIKE TO DISCUSS THIS ...T WITH THE REVIEWING OFFICER: | ☐ YES  ☒ NO. | AS REQUESTED, REVIEWING OFFICER DISCUSSED REPORT. REVIEWING OFFICER SIGNATURE | DATE |
|---|---|---|---|

I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND THAT I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR. MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

*[signature]* Darrell G. Ober    1/28/93

EMPLOYE SIGNATURE    DATE

1. EMPLOYE

PERFORMANCE EVALUATION REPORT
GENERAL PERFORMANCE FACTORS

The member being evaluated supervises the Systems and Procedures
Section, Programming Division, Bureau of Research and Development.

1.  QUALITY OF WORK - In performing his duties, the member is
    constantly required to ensure that his section performs
    accurately and that signature-ready directives are properly,
    legibly, and neatly prepared. In doing so on a daily basis,
    he consistently excels in this factor and demonstrates a more
    than sufficient knowledge of rules and regulations. Very few
    projects are returned by higher authorities for questions of
    substance, but are returned mostly for personal preference
    reasons.

2.  WORK HABITS - The member consistently displays excellent work
    habits. Such habits are absolutely necessary due to the
    nature of the Department's system of directives. The quality
    and quantity of his Section's output are indicative of his
    industriousness and ability to organize work.

3.  RELATIONSHIP WITH PEOPLE - The member gets along well with
    subordinates and superiors alike. He demonstrates an excel-
    lent ability to keep separate his professional and personal
    relationships. This ability has earned the respect of those
    with whom he works, within and without the division.

4.  DEPENDABILITY - The member can be counted on to uphold his
    sworn duties and follow rules and regulations. He consist-
    ently arrives at work early and willingly adjusts his sched-
    ule to accommodate duty requirements, particularly for "rush"
    jobs. He fulfills work assignments with a minimum amount of
    supervision. He used only two sick days in 1992.

5.  QUANTITY OF WORK - The amount of work done more than meets
    acceptable standards, particularly with the advent of the
    Accreditation Section and project. The member's Section is
    constantly required to accomplish more and more with less
    resources. During 1992 the Section received and acted on
    almost 600 separate projects. Many of the 600 projects were
    major undertakings of great importance to the Department and
    the Accreditation process. Additionally, the member willing-
    ly assumed a more active role in the functions of the Sug-
    gestion Unit in the absence of an enlisted Supervisor.

6.  INITIATIVE - The member is never reluctant to take on extra
    work and demonstrates the ability to reorganize and priori-
    tize projects on a daily basis. Also, the member seeks ways
    to improve operations within the Division and thereby improve

the operations of the Department. During the rating period he initiated and carried out several independent projects. The only negative aspect of this factor is a reluctance to acknowledge and embrace the potential for computer applications.

7.  ANALYTICAL ABILITY - Excellence in this rating factor is evidenced by the quality of his Section's work projects. His position requires a thorough and accurate knowledge of directives, laws, and procedures and the ability to apply that knowledge. The member demonstrates daily the required knowledge and application via signature-ready directives forwarded for the Commissioner's attention.

8.  ABILITY AS SUPERVISOR - The member recognizes that as a Supervisor it is his job to direct the activities of his subordinates through organizing, coordinating and monitoring their activities. He also demonstrates an ability to get the most out of ever diminishing resources by assigning projects to subordinates based on their specific abilities.

9.  ADMINISTRATIVE ABILITY - In addition to the ability to make sound and prompt decisions and to apply sound administrative principles as described in other rating factors, it should be noted that the member finished 6th in the recent promotion test for the rank of lieutenant.

10. SAFETY - Member has not been involved in a Department-vehicle accident during this evaluation period nor has he suffered an on-duty injury.

11. COMMITMENT TO AFFIRMATIVE ACTION - The member makes decisions in a non-biased manner and his Section is free from discriminatory acts of harassment, insults, racial and ethnic slurs.

12. APPEARANCE - The member presents an excellent appearance. He maintains proper weight for his height and maintains a regular, personal exercise program.

# PERFORMANCE EVALUATION REPORT

NOTE: See reverse of work sheet for instructions

| TYPE REPORT |
| --- |
| Newly-Promoted |

| EMPLOYE | AGENCY | SOCIAL SECURITY NUMB |
| --- | --- | --- |
| Darrell G. OBER | Pa. State Police | 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 |

| CLASS TITLE | | POSITION NUMBER | | |
| --- | --- | --- | --- | --- |
| Lieutenant | | AGCY | BUR | CLASS | SE |
| | | | 5030 | | |

| PAY | RANGE | STEP | EVALUATION PERIOD | PRESENT STATUS |
| --- | --- | --- | --- | --- |

| LOCATION Bureau of Professional Responsibility | ANNIVERSARY DATE | DATE REG. STATUS STARTS |
| --- | --- | --- |
| Staff Inspection Division | | |

| GENERAL PERFORMANCE FACTORS – All employes should be evaluated on the first six factors. | EXCELLENT | VERY GOOD | GOOD | FAIR | UNSATI FACTO |
| --- | --- | --- | --- | --- | --- |
| 1. QUALITY OF WORK – Completeness; accuracy; neatness; professional or technical proficiency. | X | | | | |
| 2. WORK HABITS – Planning and organization of work; care of equipment and supplies | | X | | | |
| 3. RELATIONSHIP WITH PEOPLE – Ability to get along with others. Effectiveness in dealing with the public. | | X | | | |
| 4. DEPENDABILITY – Degree to which employe can be relied upon to work steadily and effectively; punctuality; regularity of attendance. | | X | | | |
| 5. QUANTITY OF WORK – Amount of work performed. | | | X | | |
| 6. INITIATIVE – Resourcefulness; versatility; originality; ability to conceive and carry out program improvements. | | X | | | |
| 7. ANALYTICAL ABILITY – Thoroughness and accuracy of analysis of data, facts, laws, rules and procedures. | X | | | | |
| 8. ABILITY AS SUPERVISOR – Proficiency in training employes. In planning, organizing, laying out work for work unit. Activity in promoting cost reduction leadership. | | | | | |
| 9. ADMINISTRATIVE ABILITY – Promptness of action; soundness of decision; application of good management principles. | | X | | | |
| 10. SAFETY – Application of accident prevention techniques and unit's safety record. | | X | | | |
| SPECIAL PERFORMANCE FACTORS – List below. Define and rate employe on any appropriate factors not listed above. | | | | | |
| 11. Commitment to Affirmative Action | | X | | | |
| 12. Appearance. | | X | | | |
| OVERALL EVALUATION | | X | | | |

COMMENTS (CONTINUE ON ADDITIONAL SHEETS OF 8½ X 11 WHITE PAPER.)

Evaluation completed per Special Order 92-109.  Reference Personnel Order 93-7 dated March 15, 1993.

Blk #8.  No evaluation made on this factor.  The ratee does not supervise anyo at this time.  Once the Staff Inspection Process becomes operational, the rate will function as a Supervisor.

Factor #1.  Ratee is thorough, proficient and innovative in his writing.  He h taken the responsibility to create orders and regulations associated with the establishment of a new inpsection process and has performed in stellar fashion

MORE

| EVALUATOR SIGNATURE (EMPLOYE'S IMMEDIATE SUPERVISOR) | TITLE CAPTAIN | DATE 09/02/93 |
| --- | --- | --- |
| REVIEWING OFFICER SIGNATURE (EVALUATOR'S IMMEDIATE SUPV.) | TITLE Major | DATE 09-02-93 |

| WOULD LIKE TO DISCUSS THIS REPORT WITH THE REVIEWING OFFICER: | ☐ YES ☒ NO | AS REQUESTED, REVIEWING OFFICER DISCUSSED REPORT. | DATE |
| --- | --- | --- | --- |

I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND THAT I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR.  MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

EMPLOYE SIGNATURE                            9/2/93
                                              DATE

1. EMPLOYE

Factor #6.    The ratee has been instrumental in creating the concept being developed for the new Staff Inspection process.  In doing so, he has shown resourcefulness, originality and the ability to incorporated improvements into the program.

Factor #7.    The ratee is very familiar with Department rules and regulations and has used that knowledge to the benefit of the Division in creating the new Inspection process.

PERFORMANCE EVALUATION REPORT

NOTE: See reverse of work sheet for instructions.

TYPE REPORT: **ANNUAL**

| EMPLOYE | AGENCY | SOCIAL SECURITY NUMBER |
|---|---|---|
| OBER , DARRELL G. | STATE POLICE | 204-42-048 |

CLASS TITLE: **PLC LT**

C.F. 00000  POSITION NUMBER AGCY 020 BUR 5030 CLASS 74050 8

| SA 959.75 | RANGE 06 | STEP E | EVALUATION PERIOD 12-92/12-93 | PRESENT STATUS |
|---|---|---|---|---|

LOCATION: **STAFF INSPECTION DIVISION**

ANNIVERSARY DATE: 12, 1993

DATE REG. STATUS STARTS:

| GENERAL PERFORMANCE FACTORS - All employes should be evaluated on the first six factors. | EXCELLENT | VERY GOOD | GOOD | FAIR | UNSAT FACTO |
|---|---|---|---|---|---|
| 1. QUALITY OF WORK - Completeness; accuracy; neatness; professional or technical proficiency. | X | | | | |
| 2. WORK HABITS - Planning and organization of work; care of equipment and supplies | | X | | | |
| 3. RELATIONSHIP WITH PEOPLE - Ability to get along with others. Effectiveness in dealing with the public. | X | | | | |
| 4. DEPENDABILITY - Degree to which employe can be relied upon to work steadily and effectively; punctuality; regularity of attendance. | | X | | | |
| 5. QUANTITY OF WORK - Amount of work performed. | | X | | | |
| 6. INITIATIVE - Resourcefulness; versatility; originality; ability to conceive and carry out program improvements. | X | | | | |
| 7. ANALYTICAL ABILITY - Thoroughness and accuracy of analysis of data, facts, laws, rules and procedures. | X | | | | |
| 8. ABILITY AS SUPERVISOR - Proficiency in training employes. In planning, organizing, laying out work for work unit. Activity in promoting cost reduction leadership. | | | | | |
| 9. ADMINISTRATIVE ABILITY - Promptness of action; soundness of decision; application of good management principles. | | X | | | |
| 10. SAFETY - Application of accident prevention techniques and unit's safety record. | | X | | | |
| SPECIAL PERFORMANCE FACTORS - List below. Define and rate employe on any appropriate factors not listed above. | | | | | |
| 11. COMMITMENT TO AFFIRMATIVE ACTION. | | X | | | |
| 12. APPEARANCE, I.E. ATTIRE, HAIR, EXCESSIVE WEIGHT | X | | | | |
| OVERALL EVALUATION | | X | | | |

COMMENTS (CONTINUE ON ADDITIONAL SHEETS OF 8 ½ X 11 WHITE PAPER.)

k #8.  No evaluation made on this factor since the ratee does not supervise anyon
       at this time.  Once the Review process becomes fully operational, the rate
       will assume supervisory reponsibility.

       Refer to attached sheet for comments.

| EVALUATOR SIGNATURE (EMPLOYE'S IMMEDIATE SUPERVISOR) | TITLE Captain | DATE |
|---|---|---|
| REVIEWING OFFICER SIGNATURE (EVALUATORS IMMEDIATE SUPERIOR) | TITLE | DATE |

I CARE TO DISCUSS THIS PART WITH THE REVIEWING OFFICER:  ☐ YES  ☐ NO.

AS REQUESTED, REVIEWING OFFICER DISCUSSED REPORT. REVIEWING OFFICER SIGNATURE

DATE

I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND THAT I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR. MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

EMPLOYE SIGNATURE    DATE 1/5/94

1 EMPLOYE

<u>Performance evaluation comments for Lt. Darrell OBER</u>

#1.   The quality of work submitted by the ratee is exceptional in its clarity, content and accuracy.   He has drafted special orders, administrative regulations and other correspondence since assignment to SPR and has proven himself consistently able to blend his knowledge of rules and regulations with his communication skills to produce an effective work product.

#3.   The ratee gets along well with his fellow personnel and supervisors.   He uses his personality and sense of humor in a beneficial fashion and is thereby able to offer suggestions to others without appearing to be arrogant or offensive.

#5.   The ratee willingly accepts assignments and completes them before established due dates.   In addition, he recognizes matters that need addressed and takes it on his own to prepare a thorough analysis for his supervisor's information.

#6.   Lt. OBER has played an integral part in establishing the new system of Systems Review.   He has grasped readily the concept and displayed confidence in implementing the program.

#7.   The ratee is very thorough in analyzing information and situations and follows a logical path to well considered decisions.

#9.   The ratee demonstrates sound administrative techniques in his decision making and during Station Reviews for which he functioned as the Review Team leader.

10#.  The ratee has had no accidents or injuries in the past year that could be attributed to negligence or carelessness.

11#.  The ratee is always neatly attired and groomed.  ·He is not overweight and consistently presents a positive image as a member of the Department.

# EMPLOYE PERFORMANCE REVIEW

3o3L (Rev. 3-94)

| GENERAL INFORMATION | TYPE REPORT | | |
|---|---|---|---|
| | [X] ANNUAL | — PROBATIONARY | — INTERIM |

| LOYE NAME | AGENCY | EMPLOYE NUMBER |
|---|---|---|
| OBER, DARRELL G. | 020 STATE POLICE | 099820 |

| ASS TITLE | | STATUS |
|---|---|---|
| ST PLC LT | [X] SUPERVISOR  — NON-SUPERVISOR | [ ] CIVIL SERVICE [X] N |

| ORGANIZATION | RATING PERIOD |
|---|---|
| 5030 SYS & PROCS REV DIV | FROM 12/93        TO 12/94 |

## GENERAL INSTRUCTIONS

Verify/Complete General Information. Indicate whether employe is a supervisor or non-supervisor.

Review the employe's job description for the rating cycle. Review/discuss job standards (expectations/objectives/duties), to ensure appraisal relates to the specific responsibilities, job assignments and standards which have been conveyed to the employe for the rating cycle. Update the job description and essential job functions for the next rating cycle.

Indicate when you conveyed job standards to the employe and when progress review(s) was conducted.

Base the appraisal on the employe's performance during the entire review period, not isolated incidents or performance prior to current review period.

The comments sections should be used to: support performance ratings, indicate problem areas and provide guidance to employes on how to improve performance. Comments MUST be provided for outstanding, needs improvement and unsatisfactory ratings, but are highly recommended for all other ratings. (ATTACH ADDITIONAL 8 1/2 X 11 PAPER IF NEEDED.)

## PERFORMANCE RATING DEFINITIONS

**Outstanding:** Results are achieved on a consistent basis and significantly surpass job standards.

**Commendable:** The employe clearly exceeds job standards on a regular basis and demonstrates a high degree of initiative and quality of work.

**Satisfactory:** The employe meets the standards of the employe's job in a fully adequate manner.

**Needs Improvement:** The employe meets many of the standards of the employe's job in a satisfactory manner. Improvement is expected.

**Unsatisfactory:** Excessive performance deficiencies exist and must be corrected.

## COMMUNICATION OF PERFORMANCE STANDARDS

1. Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employe on ___02 FEB 94___
   date(s)

2. Progress Review(s) was conducted on ___15-June 94___ (at least one during rating cycle)
   date(s)

EMPLOYE NAME:  OBER,  DARRELL G.  EMPLOYE NUMBER:  099820

## JOB FACTORS

### 1. JOB KNOWLEDGE/SKILLS
This factor measures the employe's demonstrated knowledge of relevant job information such as: work practices, procedures, resources, policies, and technical information as well as the relationship of work to the organization's mission. Possession of essential skills required to perform the job also are measured.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [XXXX] | [ ] | [ ] | [ ] | [ ] |
| Demonstrates superior job knowledge and skills. Consistently provides and applies accurate and appropriate job information/resources. Applies new techniques. | Has thorough knowledge of the job and related resources. Strives to expand knowledge. Frequently recommends changes in procedures and methods as needs dictate. | Has adequate knowledge and skills to completely perform all job responsibilities. Handles inquiries properly. Has some knowledge of related work. | Possesses basic job knowledge but requires some improvement with regard to the technical aspects of the job and/or understanding of resources, policies and procedures. | Demonstrates a lack of basic job knowledge and or skills to perform job as detailed in comments. |

Comments:
   See attached sheet for all comments.

### 2. WORK RESULTS
This factor measures the employe's demonstrated ability to meet established expectations of quality and quantity within established time frames.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [XXXX] | [ ] | [ ] | [ ] | [ ] |
| Work consistently exceeds the expected quality, quantity and timeliness requirements. | Work frequently exceeds the expected quality, quantity and timeliness requirements. | Work meets the expected quality, quantity and timeliness requirements. | Occasionally has difficulty meeting the expected quality, quantity and/or timeliness requirements. | Consistently fails to meet expected quality, quantity and/or timeliness requirements. |

Comments:

### 3. COMMUNICATIONS
This factor measures the employe's demonstrated ability to exchange information with others clearly and concisely, to provide information to others on a timely basis within and outside the organization, and to listen, organize, and present thoughts logically and in a clear, concise manner, both orally and in writing.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [XXXX] | [ ] | [ ] | [ ] | [ ] |
| Particularly adept at organizing and presenting facts and ideas. Exceptionally skilled in soliciting and clarifying information to ensure understanding. Promotes easy exchange of information. Writes and speaks clearly, concisely and is articulate. | Initiates and encourages timely and effective exchange of information. Proficient in organizing and presenting facts and ideas orally and in writing. Seeks and provides appropriate feedback. | Effectively exchanges relevant information. Speaks and writes clearly. Keeps others informed as needed. Listens with understanding. | Occasionally lacks clarity of expression orally or in writing. Inconsistent in keeping others informed and at times fails to listen effectively. | Frequently is difficult to understand. Is vague orally or in writing. Often does not keep others informed. Is an ineffective listener and/or frequently interrupts. |

Comments:

### 4. INITIATIVE/PROBLEM SOLVING
This factor measures the employe's demonstrated ability to perform work without specific instruction beyond that normally provided by a supervisor and within established limits of responsibility and authority. It also assesses the employe's ability to determine what needs to be done within available resources and to pursue appropriate means of accomplishing tasks.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [XXXX] | [ ] | [ ] | [ ] | [ ] |
| Regularly takes the initiative to identify and resolve work unit/agency problems. Perceives full dimension of problems and limitations. Develops corrective solutions and follows through to conclusion. Requires minimal supervision. | Frequently assumes responsibility for identifying solutions and methods to resolve concerns. Adept at defining and analyzing complex problems and solutions. Requires moderate supervision. | Recognizes problems and suggests and/or assists in developing solutions. Carries through solution implementation. Requires normal supervision. | Resolves routine problems. Exhibits little initiative in identifying problems or solutions. Needs to improve ability to recognize potential problems and evaluate solutions and their impact. Requires more than normal supervision. | Fails to recognize or seek help in resolving routine problems. Requires frequent reminders of what needs to be done. |

Comments:

EMPLOYE NAME:  OBER,  DARRELL    EMPLOYE NUMBER:  C99820

## JOB FACTORS

### 5.  INTERPERSONAL RELATIONS/AFFIRMATIVE ACTION
This factor measures the employe's demonstrated ability to develop and maintain positive and constructive internal/external relationships. Consideration should be given to the employe's demonstrated willingness to function as a team player, give and receive constructive criticism, resolve conflicts, recognize needs and sensitivities of others and treat others in a fair and equitable manner. Supervisors also are to be assessed on their demonstrated commitment to Affirmative Action.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☒ xxxx | ☐ | ☐ | ☐ |
| Consistently promotes and maintains harmonious work environment. Exhibits understanding of needs of others that is reflected in attitude in dealing with them. Is respected and trusted. Actively promotes/adheres to Affirmative Action program activities/requirements. | Maintains cooperative and positive work relationships. Handles conflict constructively. Promotes team work and cooperation, and fair and equitable treatment of others. Promotes/adheres to Affirmative Action program activities and requirements. | Interacts in a cooperative, positive manner. Avoids disruptive behavior. Deals appropriately with anger, frustration, conflict, etc. Treats others fairly and equitably. Adheres to Affirmative Action policy/administrative requirements. | Usually gets along with others. Allows personal bias to affect job relationships. Requires occasional reminders regarding needs and sensitivities of others. Does not consistently adhere to Affirmative Action policy/administrative requirements. | Interpersonal relationships are counter productive to work unit functions as described in comments. Generally ignores Affirmative Action policy/administrative requirements. |

Comments:

### 6.  WORK HABITS
This factor measures the employe's demonstrated ability to utilize proper conduct, speech and ethical behavior in the work environment. Compliance with Commonwealth/agency/work unit policies and procedures such as attendance, punctuality, safety, security, housekeeping and other norms are assessed, as well as proper care and maintenance of assigned equipment.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ xxxx | ☐ | ☐ | ☐ | ☐ |
| Work is planned/organized to cover all phases of job assignments. Work meets/exceeds deadlines and future steps are anticipated. Equipment and supplies are cared for wisely and in accord with procedure. Employe serves as role model for other employes with regard to work rules. | Work is planned/organized to accomplish job assignments effectively and in a timely manner including those of unusual nature. Scheduled meetings/deadlines are met with few exceptions. Personal care is taken in use of equipment, with minimal waste. Employe adheres to organizational rules and procedures. | Work is planned to meet routine volume and timeliness. Employe adheres to organizational work rules and procedures with rare exceptions. Appropriate care is taken in use of equipment. | Organization and planning of work is infrequently demonstrated. Work often requires revisions resulting in decreased productivity or missed deadlines. Employe needs improvement in complying with rules, regulations and/or care of equipment. | Employe regularly fails to meet expected work results due to lack of effective organization, use of equipment or adherence to established rules/regulations. |

Comments:

### 7.  SUPERVISION/MANAGEMENT
(Required for all supervisors/managers)  This factor measures the supervisor's demonstrated ability to assign work responsibility and authority to subordinates, establish monitoring activities and systems to ensure work progresses to completion, ensure compliance with established procedures/regulations, and take corrective action when necessary. It also assesses the supervisor's adherence to or completion of personnel/administrative requirements, i.e. timely performance evaluations, appropriate discipline, management of overtime, leave etc.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ xxxx | ☐ | ☐ | ☐ | ☐ |
| Manages/supervises employes and work activities to consistently achieve a smooth/timely work flow, high level of quality and quantity. Continuously strives to improve operations, staff and instills team spirit. Consistently complies with personnel/administrative requirements. | Manages/supervises employes to achieve effective and timely work products. Delegates work effectively and appropriately to achieve maximum results. Provides adequate direction and training. Complies with personnel and administrative requirements. | Manages/supervises employes adequately to achieve satisfactory or normal work production and effectiveness. Meets personnel and administrative requirements. | Inconsistent effective supervision or management of staff. At times, fails to direct/train staff within existing means. Less than adequate quality and quantity of production. Inconsistent adherence to personnel and administrative requirements. | Ineffective supervision or management of staff. Fails to establish appropriate monitoring/control activities. Production is poor in quality and/or quantity. Often ignores personnel and administrative requirements. |

Comments:

EMPLOYE NAME:  OBER,  DARRELL G    EMPLOYE NUMBER  099820

## OVERALL RATING

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|:---:|:---:|:---:|:---:|:---:|
| XXXX | ☐ | ☐ | ☐ | ☐ |

TRAINING AND DEVELOPMENT RECOMMENDATIONS:

**COMMENTS AND SIGNATURES**       (Attach additional 8 1/2 x 11 paper if necessary)

**RATER COMMENTS:** (This section should comment on any aspect(s) of employe's performance not covered elsewhere and should explain overall ra...

Lt. Ober is a gifted member of the State Police with special strengths in administration and practical application of theory.  These skills make him especially valuable in his present position with the Systems and Process Review Division.

RATER SIGNATURE: _Phillip A. Dillon  Capt/SPR_    DATE  _12/13/94_

REVIEWER COMMENTS:

Lt. Ober's dedication to the Department and Division of Systems and Process Review is commendable.

REVIEWER SIGNATURE: _Major Phil K Cy_    DATE  _12/13/94_

EMPLOYE COMMENTS:

☒ I AGREE WITH THIS RATING.       ☐ I DISAGREE WITH THIS RATING.

☐ I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER.

☐ DISCUSSION WITH MY REVIEWING OFFICER OCCURRED _____ .
   (DATE)

☐ I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE RATER; MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

COMMENTS:

EMPLOYEE'S SIGNATURE: _____    DATE  _12/2?/94_

#1. JOB SKILLS/KNOWLEDGE:    Lt. Ober's previous assignment with the Bureau of Research and Development has provided him with exceptional technical knowledge and perspective on the Department regulations, goals and mission.  This knowledge has served as a base for Lt. Ober's consistently superior performance in his present capacity reviewing systems and processes within the Department.

#2. WORK RESULTS:    Lt. Ober consistently exceeds Department standards in the preparation of work assignments, timeliness of submission and accuracy of the finished work product.  He accepts assignments without complaint and initiates action when information comes to his attention that would benefit the Department.

#3. COMMUNICATIONS:    Lt. Ober displays exceptional skills in both oral and written communication.  He is articulate, concise and able to convey information to others in such a way as to ensure understanding of and support for, Department objectives. This ability was particularly evident during the creation of the SPR Division and training of personnel.

#4. INITIATIVE/PROBLEM SOLVING:    The nature of Lt. Ober's present assignment is for him to identify Department problems and offer suggestions or solutions.  He is outstanding in his approach to this assignment and, operating within his authority and the chain of command, takes the necessary action to advance suggestions or solutions to the next step.

#5. INTERPERSONAL RELATIONS/AFFIRMATIVE ACTION:    Lt. Ober gets along well with his supervisor and other members of the SPR Division.  His ability to function as a team player is reflected by the harmonious work environment within his inspection unit.

#6. WORK HABITS:    Lt. Ober displays excellent work habits.  He complies with Department rules and regulations, is very organized and consistently submits work assignment prior to due dates.

#7. SUPERVISION/MANAGEMENT:    Lt. Ober supervises four individuals engaged in inspections of segments of the Department, some of which have never been inspected.  His supervisory skills significantly contribute to the consistent delivery of a high quality product.  He is fair and impartial in his treatment of subordinates and develops their abilities through training and suggestions on how to better achieve the goals of the Department. He continues to improve his own skills by taking advantage of training opportunities offered by the Department.

LP 3-590 (4-93)

# CAREER COUNSELING CHECKLIST

| 1. NAME | 2. SOCIAL SECURITY NUMBER | 3. RANK | 4. BADGE NUMBER |
|---|---|---|---|
| Darrell G. OBER | 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 | Lieutenant | 259 |

5. TROOP/BUREAU
Bureau of Professional Responsibility

6. STATION/DIVISION
Systems and Process Review Division

| 7. ITEM | YES | NO |
|---|---|---|
| 1. Identified the member's career goals. | | |
| 2. Discussed present assignment goals. | | |
| 3. Discussed the member's plans for training and education, applying for specialized positions and promotion. | | |
| 4. Reviewed and discussed the Department's Training Calendar. | | |
| 5. Identified courses available through the Academy that meet the member's training/educational needs. | | |
| 6. Explained the Department's educational leave and tuition reimbursement policies. | | |
| 7. Explained the Department's policy on shift scheduling and time off for academic study. | | |
| 8. Comments and/or recommendations for career enhancement. | | |

I HAVE READ AND RECEIVED A COPY OF THE CAREER COUNSELING CHECKLIST.

8. MEMBER'S SIGNATURE                                    DATE

9. SUPERVISOR'S SIGNATURE                                DATE

COMMONWEALTH OF PENNSYLVANIA
STD-170    REV. 8-83

JOB DESCRIPTION

| 1. NAME OF EMPLOYE (LAST NAME FIRST) | 2. SOCIAL SECURITY NUMBER | 3. REQUEST INITIAT... |
|---|---|---|
| OBER, Darrell G. | 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 | ☐ EMPLOYE  ☒ AGENCY  ☐ OFFICE OF  ☐ ADMINISTRA... |

| 4. DEPARTMENT | BUREAU | DIVISION | HEADQUARTERS |
|---|---|---|---|
| Pennsylvania State Police | Professional Responsibility | Staff Inspection |  |

5. PRESENT CLASS TITLE: Lieutenant    POSITION NUMBER

6. REGULAR SCHEDULE OR HOURS OF WORK

| DAY | MON | TUES | WED | THURS | FRI | SAT | SUN |
|---|---|---|---|---|---|---|---|
| FROM | 8:15 | 8:15 | 8:15 | 8:15 | 8:15 | | |
| TO | 4:15 | 4:15 | 4:15 | 4:15 | 4:15 | | |

WORK IS: ☒ FULL-TIME  ☐ PART-TIME  ☒ PERMANENT  ☐ T...

LENGTH OF LUNCH PERIOD: 1/2 hour
TOTAL HOURS PER WEEK: 37 1/2
EXPLAIN ROTATION OF SHIFT...

7. Describe in detail the work you do, listing the most important duties first. Try to explain your work in a way that someone unfamiliar with your j... understand. (If you use machines or equipment, please list them and the approximate amount of time you use them.) Use as much additional pa... as you need.

1.    Inspection of organization segments by:

50%   Physically inspecting facilities, personnel and equipment to ensure the operating in accordance with established rules and procedures and are con... to fulfilling the mission of the Department.

2.    Compiles knowledge by:

10%   Collecting and maintaining knowledge and information of existing regulations, manuals and Special Orders that impact upon the operation organizational segment of the Department, in addition to State or F regulations and pertinent labor contracts.

3.    Prepares reports by:

15%   Drafting or dictating a written report that contains the findings of a Inspection and takes steps to ensure that the report is brought to the att... of the Division Director in a timely fashion.

4.    Conduct pre-inspection analysis by:

05%   Analyzing and inspecting statistical data and previous line inspection r... before inspecting a segment in an attempt to identify those areas of Dep... operations that warrant greater scrutiny or examination.

5.    Assist in the development of a Staff Inspection Manual by:

05%   Examining current procedure and identifying areas of strength or deficie... recommending procedure that will address the needs of the Departme... incorporate that information into a Staff Inspection Manual.

CERTIFICATION:

I certify that to the best of my knowledge all statements shown above are correct.

Darrell G. Ober    5/13/93

STD-370 Job Description
Page two

6.          Assesses efficiency and morale of field operations by:

05%          Conducting interviews with local governmental officials to assess the perception
             of the performance of the State Police in meeting the needs of the citizens of
             the area; interviewing State Police officers at area of inspection to determine
             the state or morale and efficiency of supervisory personnel within the agency and
             to solicit suggestions as to how to improve the operation of the State Police.

7.          Perform miscellaneous duties by:

10%          Performing other duties as required including serving on boards, conducting
             investigations, attending ceremonies, drafting suggestions, evaluating special
             equipment and making recommendations.

8. Describe how you are supervised by telling how your work is assigned and how your supervisor reviews your work.

The majority of the work assignment is accomplished through scheduled activities on an annual or biennial rotation. Special assignments are conveyed either orally or in written form. The completed work project is then submitted for review.

9. Prepare an organization chart and identify your supervisor and all employes whose performance rating you sign by names and class titles. If you are not a supervisor, your supervisor must complete this part and identify his supervisor and all his subordinates.



3

_____ Total number subordinates reporting to you

10. Describe the kind of supervision you give the employes on the above chart by explaining the type of work assigned and the type of work review exercised. If you are not a supervisor, your supervisor must complete this part for all employes shown above.

Supervision is provided the members listed in Sections 1 through 3 by ensuring adherance to an established schedule of inspections, by reviewing the reports generated through those inspections and by personnally observing performance during the inspection process.

11. FOR THE EMPLOYEE'S IMMEDIATE SUPERVISOR: Review your subordinate's statements. You may make any comments or include any information you feel is appropriate or would be helpful. Use additional paper if needed.

EMPLOYE'S IMMEDIATE SUPERVISOR'S SIGNATURE _Phillip L DelVac_   CLASS TITLE _DIVISION DIRECTOR STJ_   DATE _5/14/93_

➡ TO BE COMPLETED BY THE CLASSIFYING AUTHORITY ➡

APPROVED POSITION CLASSIFICATION

REVIEWING ANALYST'S SIGNATURE                                                        DATE

SP 3-251 (8-90)



# PERFORMANCE EVALUATION REPORT

## CAPTAINS

## I.  GENERAL INFORMATION

Name  Darrell G. Ober          Professional Responsibility,  Systems and Process Review

_BUREAU TROOP_     _DIVISION/STATION_

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          Rating Period:  07/01/94      06/30/95
_SOCIAL SECURITY NUMBER_                _FROM_          _TO_

12/03/79          03/03/95
_DATE OF ENLISTMENT_      _DATE OF PROMOTION TO CURRENT RANK_

## II.  RANKINGS

| DIMENSION | RANKING LEVEL | | |
|---|:---:|:---:|:---:|
| 1.   Supervision and Managment of Personnel | (E) | M | N |
| 2.   Training | (E) | M | N |
| 3.   Planning and Analysis | E | (M) | N |
| 4.   Administration | E | (M) | N |
| 5.   Internal Coordination | (E) | M | N |
| 6.   Personal Development and Management | (E) | M | N |
| 7.   Communication Skills | (E) | M | N |
| 8.   External Relations | (E) | M | N |
| 9.   Special Assignments | (E) | M | N |
| 10.  Deportment/Demeanor | (E) | M | N |
| 11.  Police Operations | (E) | M | N |
| OVERALL RATING | (E) | M | N |

For each Dimension and the Overall Rating, select the proper ranking level;  E (Exceeds Standards), M (Meets Standards), N (Needs Improvement).  Documentation of performance in each dimension shall be included on a separate sheet of 8½" x 11" paper and attached to this Performance Evaluation Report.  Documentation for the Overall Rating shall be included in the Rater Comments (Section III) of this report.

Captain Darrell G. OBER
Performance Evaluatio

DIMENSION 1.    Supervision and Management - Provides a superior work environment for subordinates, encouraging maximum performance.

DIMENSION 2.    Training - Encourages training of Division personnel and regularly assesses training needs.

DIMENSION 3.    Planning and Analysis - Anticipates Department and Division needs and prepares to meet them through short-term and long-term planning.

DIMENSION 4.    Administration - Oversees daily requirements of command through involvement with the administration of the Division.

DIMENSION 5.    Internal Coordination - Hold regular Division meetings, and provides accurate and current information to personnel.

DIMENSION 6.    Personal Development and Management - Keeps current on Department policies and regulations and recommends revisions that will improve the management of the Agency.

DIMENSION 7.    Communication Skills - Communicates very effectively, both orally and in writing, with subordinates, superiors and peers.

DIMENSION 8.    External Relations - Has established a positive image based on expertise and professionalism with citizens and organizations.

DIMENSION 9.    Special Assignments - Performs all special assignments with minimal direction.  Meets timetables and due dates with a superior product.

DIMENSION 10.    Deportment/Demeanor - Displays high standards and is respected for his opinions and decisions by his associates.

DIMENSION 11.    Police Operations - The Captain's expertise and knowledge of this Department would serve him well in any emergency or special operation.

PER/CAPTAINS

III. OVERALL COMMENTS AND SIGNATURES

| RATER | COMMENTS: |
|---|---|
| | I consider Captain Ober an outstanding Division Director |
| | and representative of the Pennsylvania State Police. |
| | |
| | |
| | |
| SIGNATURE: Major Paul J Woodring | DATE: 8-29-95 |

| REVIEWING OFFICER | COMMENTS: |
|---|---|
| | |
| | |
| | |
| | |
| | |
| SIGNATURE: LT Col _____ | DATE: 8/29/95 |

| RATEE | COMMENTS: |
|---|---|
| | |
| | |
| | |
| | |
| | |
| SIGNATURE: Captain Daniel 6 Ober | DATE: 8/29/95 |

I have read this report and discussed it with my supervisor.  My signature does not necessarily mean agreement.

I would like to discuss this evaluation with my Reviewing Officer:    ☐ YES*    ☒ NO

* If "YES" checked, attach Performance Evaluation Review Report, Form SP 3-350.

363L (Rev. 3-94)

# EMPLOYE PERFORMANCE REVIEW

| GENERAL INFORMATION | TYPE REPORT | | | |
|---|---|---|---|---|
| | | [X] ANNUAL | [ ] PROBATIONARY | [ ] INTERIM |

| EMPLOYE NAME | AGENCY | EMPLOYE NUMBER |
|---|---|---|
| -BER, DARRELL G. | 020 STATE POLICE | 099820 |

| CLASS TITLE | | STATUS |
|---|---|---|
| ST PLC CAPT | [ ] SUPERVISOR  [ ] NON-SUPERVISOR | |

| ORGANIZATION | | [ ] CIVIL SERVICE  [X] NC |
|---|---|---|
| 5030  SYS & PROCS REV DIV | RATING PERIOD | |
| | FROM 12/94    TO 12/95 | |

## GENERAL INSTRUCTIONS

Verify/Complete General Information. Indicate whether employe is a supervisor or non-supervisor.

Review the employe's job description for the rating cycle. Review/discuss job standards (expectations/objectives/duties), to ensure appraisal relates to the specific responsibilities, job assignments and standards which have been conveyed to the employe for the rating cycle. Update the job description and essential job functions for the next rating cycle.

Indicate when you conveyed job standards to the employe and when progress review(s) was conducted.

Base the appraisal on the employe's performance during the entire review period, not isolated incidents or performance prior to current review period.

The comments sections should be used to: support performance ratings, indicate problem areas and provide guidance to employes on how to improve performance. Comments MUST be provided for outstanding, needs improvement and unsatisfactory ratings, but are highly recommended for all other ratings. (ATTACH ADDITIONAL 8 1/2 X 11 PAPER IF NEEDED.)

## PERFORMANCE RATING DEFINITIONS

**Outstanding:** Results are achieved on a consistent basis and significantly surpass job standards.

**Commendable:** The employe clearly exceeds job standards on a regular basis and demonstrates a high degree of initiative and quality of work.

**Satisfactory:** The employe meets the standards of the employe's job in a fully adequate manner.

**Needs Improvement:** The employe meets many of the standards of the employe's job in a satisfactory manner. Improvement is expected.

**Unsatisfactory:** Excessive performance deficiencies exist and must be corrected.

## COMMUNICATION OF PERFORMANCE STANDARDS

1. Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employe on ___3/3/95___
   date(s)

2. Progress Review(s) was conducted on ___9/8/95___ (at least one during rating cycle)
   date(s)

EMPLOYE NAME:  OBER,  DARRELL G.                    EMPLOYE NUMBER:  099820

## JOB FACTORS

### 1. JOB KNOWLEDGE/SKILLS
This factor measures the employe's demonstrated knowledge of relevant job information such as: work practices, procedures, resources, policies, and technical information as well as the relationship of work to the organization's mission. Possession of essential skills required to perform the job also are measured.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Demonstrates superior job knowledge and skills. Consistently provides and applies accurate and appropriate job information/resources. Applies new techniques. | Has thorough knowledge of the job and related resources. Strives to expand knowledge. Frequently recommends changes in procedures and methods as needs dictate. | Has adequate knowledge and skills to completely perform all job responsibilities. Handles inquiries properly. Has some knowledge of related work. | Possesses basic job knowledge but requires some improvement with regard to the technical aspects of the job and/or understanding of resources, policies and procedures. | Demonstrates a lack of basic job knowledge and or skills to perform job as detailed in comments. |

Comments:

### 2. WORK RESULTS
This factor measures the employe's demonstrated ability to meet established expectations of quality and quantity within established time frames.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Work consistently exceeds the expected quality, quantity and timeliness requirements. | Work frequently exceeds the expected quality, quantity and timeliness requirements. | Work meets the expected quality, quantity and timeliness requirements. | Occasionally has difficulty meeting the expected quality, quantity and/or timeliness requirements. | Consistently fails to meet expected quality, quantity and/or timeliness requirements. |

Comments:

### 3. COMMUNICATIONS
This factor measures the employe's demonstrated ability to exchange information with others clearly and concisely, to provide information to others on a timely basis within and outside the organization, and to listen, organize, and present thoughts logically and in a clear, concise manner, both orally and in writing.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Particularly adept at organizing and presenting facts and ideas. Exceptionally skilled in soliciting and clarifying information to ensure understanding. Promotes easy exchange of information. Writes and speaks clearly, concisely and is articulate. | Initiates and encourages timely and effective exchange of information. Proficient in organizing and presenting facts and ideas orally and in writing. Seeks and provides appropriate feedback. | Effectively exchanges relevant information. Speaks and writes clearly. Keeps others informed as needed. Listens with understanding. | Occasionally lacks clarity of expression orally or in writing. Inconsistent in keeping others informed and at times fails to listen effectively. | Frequently is difficult to understand. Is vague orally or in writing. Often does not keep others informed. Is an ineffective listener and/or frequently interrupts. |

Comments:

### 4. INITIATIVE/PROBLEM SOLVING
This factor measures the employe's demonstrated ability to perform work without specific instruction beyond that normally provided by a supervisor and within established limits of responsibility and authority. It also assesses the employe's ability to determine what needs to be done within available resources and to pursue appropriate means of accomplishing tasks.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Regularly takes the initiative to identify and resolve work unit/agency problems. Perceives full dimension of problems and limitations. Develops corrective solutions and follows through to conclusion. Requires minimal supervision. | Frequently assumes responsibility for identifying solutions and methods to resolve concerns. Adept at defining and analyzing complex problems and solutions. Requires moderate supervision. | Recognizes problems and suggests and/or assists in developing solutions. Carries through solution implementation. Requires normal supervision. | Resolves routine problems. Exhibits little initiative in identifying problems or solutions. Needs to improve ability to recognize potential problems and evaluate solutions and their impact. Requires more than normal supervision. | Fails to recognize or seek help in resolving routine problems. Requires frequent reminders of what needs to be done. |

Comments:

EMPLOYE NAME:  OBER,  DARRELL G.   EMPLOYE NUMBER:  099820

## JOB FACTORS

### 5. INTERPERSONAL RELATIONS/AFFIRMATIVE ACTION
This factor measures the employe's demonstrated ability to develop and maintain positive and constructive internal/external relationships. Consideration should be given to the employe's demonstrated willingness to function as a team player, give and receive constructive criticism, resolve conflicts, recognize needs and sensitivities of others and treat others in a fair and equitable manner. Supervisors also are to be assessed on their demonstrated commitment to Affirmative Action.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Consistently promotes and maintains harmonious work environment. Exhibits understanding of needs of others that is reflected in attitude in dealing with them. Is respected and trusted. Actively promotes/adheres to Affirmative Action program activities/ requirements. | Maintains cooperative and positive work relationships. Handles conflict constructively. Promotes team work and cooperation, and fair and equitable treatment of others. Promotes/adheres to Affirmative Action program activities and requirements. | Interacts in a cooperative, positive manner. Avoids disruptive behavior. Deals appropriately with anger, frustration, conflict, etc. Treats others fairly and equitably. Adheres to Affirmative Action policy/administrative requirements. | Usually gets along with others. Allows personal bias to affect job relationships. Requires occasional reminders regarding needs and sensitivities of others. Does not consistently adhere to Affirmative Action policy/administrative requirements. | Interpersonal relationships are counter productive to work unit functions as described in comments. Generally ignores Affirmative Action policy/administrative requirements. |

Comments:

### 6. WORK HABITS
This factor measures the employe's demonstrated ability to utilize proper conduct, speech and ethical behavior in the work environment. Compliance with Commonwealth/agency/work unit policies and procedures such as attendance, punctuality, safety, security, housekeeping and other norms are assessed, as well as proper care and maintenance of assigned equipment.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Work is planned/ organized to cover all phases of job assignments. Work meets/ exceeds deadlines and future steps are anticipated. Equipment and supplies are cared for wisely and in accord with procedure. Employe serves as role model for other employes with regard to work rules. | Work is planned/organized to accomplish job assignments effectively and in a timely manner including those of unusual nature. Scheduled meetings/deadlines are met with few exceptions. Personal care is taken in use of equipment, with minimal waste. Employe adheres to organizational rules and procedures. | Work is planned to meet routine volume and timeliness. Employe adheres to organizational work rules and procedures with rare exceptions. Appropriate care is taken in use of equipment. | Organization and planning of work is infrequently demonstrated. Work often requires revisions resulting in decreased productivity or missed deadlines. Employe needs improvement in complying with rules, regulations and/or care of equipment. | Employe regularly fails to meet expected work results due to lack of effective organization, use of equipment or adherence to established rules/regulations. |

Comments:

### 7. SUPERVISION/MANAGEMENT
(Required for all supervisors/managers)  This factor measures the supervisor's demonstrated ability to assign work responsibility and authority to subordinates, establish monitoring activities and systems to ensure work progresses to completion, ensure compliance with established procedures/regulations, and take corrective action when necessary. It also assesses the supervisor's adherence to or completion of personnel/administrative requirements, i.e. timely performance evaluations, appropriate discipline, management of overtime, leave etc.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Manages/supervises employes and work activities to consistently achieve a smooth/timely work flow, high level of quality and quantity. Continuously strives to improve operations, staff and instills team spirit. Consistently complies with personnel/ administrative requirements. | Manages/supervises employes to achieve effective and timely work products. Delegates work effectively and appropriately to achieve maximum results. Provides adequate direction and training. Complies with personnel and administrative requirements. | Manages/supervises employes adequately to achieve satisfactory or normal work production and effectiveness. Meets personnel and administrative requirements. | Inconsistent effective supervision or management of staff. At times, fails to direct/train staff within existing means. Less than adequate quality and quantity of production. Inconsistent adherence to personnel and administrative requirements. | Ineffective supervision or management of staff. Fails to establish appropriate monitoring/control activities. Production is poor in quality and/or quantity. Often ignores personnel and administrative requirements. |

Comments:

EMPLOYE NAME:  OBER,  DARRELL G.                    EMPLOYE NUMBER:  099820

## OVERALL RATING

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|:---:|:---:|:---:|:---:|:---:|
| [X] | [ ] | [ ] | [ ] | [ ] |

**TRAINING AND DEVELOPMENT RECOMMENDATIONS:**

## COMMENTS AND SIGNATURES          (Attach additional 8 1/2 x 11 paper if necessary)

**RATER COMMENTS:** (This section should comment on any aspect(s) of employe's performance not covered elsewhere and should explain overall rati

I consider Captain Ober a self-starting, motivated professional who consistently exceeds the expectations of a person in his assignment.

**RATER SIGNATURE:** Major Paul J Wooding          **DATE** 11-30-95

**REVIEWER COMMENTS:**

**REVIEWER SIGNATURE:** LT Col. Chan YC          **DATE** 11/30/95

**EMPLOYE COMMENTS:**

[X] I AGREE WITH THIS RATING.          [ ] I DISAGREE WITH THIS RATING.

[ ] I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER.

[ ] DISCUSSION WITH MY REVIEWING OFFICER OCCURRED _____ .
                                                              (DATE)

[ ] I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE RATER; MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

COMMENTS:

**EMPLOYE'S SIGNATURE:** Darrell G. Ober          **DATE** 12/1/95

Employe Performance Review – Capt. Darrell G. Ober
Rating Period 12/94 to 12/95

1.   JOB KNOWLEDGE/SKILLS

     **Outstanding** – Consistently provides and applies accurate and
     appropriate job information/resources.  Keeps current on
     Department policies and regulations and recommends revisions
     that will improve operations.

2.   WORK RESULTS

     **Outstanding** – Consistently meets established expectations of
     quality and quantity within established time frames.

3.   COMMUNICATIONS

     **Outstanding** – Provides information in a clear, concise,
     organized manner.  The Captain is articulate and responsive
     with superior officers and subordinates.

4.   INITIATIVE/PROBLEM SOLVING

     **Outstanding** – Regularly takes the initiative to seek out
     problem areas and provide a clear, well thought out remedy.

5.   INTERPERSONAL RELATIONS/AFFIRMATIVE ACTION

     **Outstanding** – Always promotes and maintains an environment of
     understanding, professionalism, respect and sensitivity.

6.   WORK HABITS

     **Outstanding** – Work is planned and well organized.  Complies
     with policies and procedures of the Department and
     Commonwealth.  Equipment is well maintained according to
     Department guidelines.

7.   SUPERVISION/MANAGEMENT

     **Outstanding** – Provides a superior work environment for
     subordinates, encouraging maximum performance.

STD-370
REV. 8-83

JOB DESCRIPTION

1. NAME OF EMPLOYEE (LAST NAME FIRST):

Ober, Darrell G.

2. SOCIAL SECURITY NUMBER

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

3. REQUEST INITIATED BY:
☐ EMPLOYEE
☑ AGENCY
☐ OFFICE OF ADMINISTRATION

4. DEPARTMENT

PSP Professional Responsibility

BUREAU

DIVISION

Systems and Process Review

HEADQUARTERS

DHO

5. PRESENT CLASS TITLE

Captain

POSITION NUMBER

6.

| HOURS | REGULAR SCHEDULE OR HOURS OF WORK | | | | | | | WORK IS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DAY → | MON | TUES | WED | THURS | FRI | SAT | SUN | ☑ FULL-TIME ☐ PART-TIME | ☐ PERMANENT ☐ TEMPORARY | | |
| FROM | | | 8:00 | | | | | LENGTH OF LUNCH PERIOD  1/2 hour | EXPLAIN ROTATION OF SHIFTS (IF ANY) | | |
| TO | | | 4:00 | | | | | TOTAL HOURS PER WEEK  40 | | | |

7. Describe in detail the work you do, listing the most important duties first. Try to explain your work in a way that someone unfamiliar with your job can understand. (If you use machines or equipment, please list them and the approximate amount of time you use them.) Use as much additional paper (8½ x 11) as you need.

50%    1.  Supervises review teams to ensure compliance with review guidelines and procedures; ensures reviews and reports are complete and submitted in a timely fashion, assists in the review process by participating in the review.

05%    2.  Conducts pre-review interviews with Troop/Bureau Commanders, collects material for reviews and makes arrangements for overnight accommodations at review sites; inspects statistical data and computer generated reports to isolate specific areas of interest to review team members; interviews local officials to assess the performance of the State Police locally and the degree of cooperation with local departments and agencies.

05%    3.  Monitors submission of the Line Inspection Reports and examines them to identify areas that impact upon the Department or warrant the attention of the Systems and Process Review Division; maintains files for the Line Inspection/Systems and Process Review Reports and purges outdated reports per regulations.

05%    4.  Directs the administrative responsibilities of the Division, including budget and contract management, approvals and authorization equipment management by conferring with superiors and subordinates, completing assignments, responding to requests, solving problems and making decisions as required.

05%    5.  Coordinates intra-department activities by responding to inquires and providing information as requested; attending staff meetings, command conferences, etc.

10%    6.  Maintains necessary knowledge and skills by keeping current on changes in Department policies and regulations, law enforcement procedure and management principles; attending training as needed and reading professional literature; adapts review procedures as needed to address changes in rules and regulations and to accommodate efficiency in the review process.

05%    7.  Ensures effective flow of information from and through the Division by communicating clearly, both orally and in writing, holding staff meetings as needed and providing an atmosphere which encourages accurate and efficient communication.

CERTIFICATION:

I certify that to the best of my knowledge all statements shown above are correct.

_Captain Dall Ober_

SIGNATURE OF EMPLOYEE

9/8/95

DATE

The majority of the work assignment is accomplished through scheduled activities on an annual or biennial rotation. Special assignments are conveyed either orally or in written form. The completed work project is then submitted for review.

Prepare an organization chart and identify your supervisor and all employes whose performance rating you sign by names and class titles. If you are supervisor, your supervisor must complete this part and identify his supervisor and all his subordinates.



3

_____ Total number subordinates reporting to you

0. Describe the kind of supervision you give the employes on the above chart by explaining the type of work assigned and the type of work review exercised. you are not a supervisor, your supervisor must complete this part for all employes shown above.

Supervision is provided the members listed in Sections 1 through 3 by ensuring adherance to an established schedule of inspections, by reviewing the reports generated through those inspections and by personnally observing performance during the inspection process.

11. FOR THE EMPLOYE'S IMMEDIATE SUPERVISOR: Review your subordinate's statements. You may make any comments or include any information you feel is appropriate or would be helpful. Use additional paper if needed.

EMPLOYE'S IMMEDIATE SUPERVISOR'S SIGNATURE  Paul J Woodling   CLASS TITLE  MAJOR   DATE  9-12-95

➡ TO BE COMPLETED BY THE CLASSIFYING AUTHORITY ➡

APPROVED POSITION CLASSIFICATION

REVIEWING ANALYST'S SIGNATURE                                          DATE

STD-370, Job Description
Page two

05%       8.    Ensures effective working relationships with external agencies and organizations by maintaining a professional Department image, and an atmosphere of cooperation with the general public, media, other law enforcement agencies and the courts, and public and private organizations.

10%       9.  Performs other duties as required, including serving on boards, conducting investigations, attending ceremonies, drafting Department regulations, evaluating special equipment and reviewing legislation, suggestions and proposed regulations for the purpose of making recommendations.

# EMPLOYE PERFORMANCE REVIEW

363L (Rev. 3-94)

| GENERAL INFORMATION | TYPE REPORT | | |
|---|---|---|---|
| | [X] ANNUAL | [ ] PROBATIONARY | [ ] INTERIM |

| ~LOYE NAME | | AGENCY | EMPLOYE NUMBER |
|---|---|---|---|
| ~BER,  DARRELL G. | | 020 STATE POLICE | 099820 |

| ASS TITLE | SUPERVISOR | STATUS |
|---|---|---|
| ST PLC CAPT | [ ] SUPERVISOR  [ ] NON-SUPERVISOR | [ ] CIVIL SERVICE  [X] NCS |

| ORGANIZATION | RATING PERIOD |
|---|---|
| 5030  SYS & PROCS REV DIV | FROM 12/94      TO 12/95 |

## GENERAL INSTRUCTIONS

Verify/Complete General Information.  Indicate whether employe is a supervisor or non-supervisor.

Review the employe's job description for the rating cycle.  Review/discuss job standards (expectations/objectives/duties), to ensure appraisal relates to the specific responsibilities, job assignments and standards which have been conveyed to the employe for the rating cycle.  Update the job description and essential job functions for the next rating cycle.

Indicate when you conveyed job standards to the employe and when progress review(s) was conducted.

Base the appraisal on the employe's performance during the entire review period, not isolated incidents or performance prior to current review period.

The comments sections should be used to: support performance ratings, indicate problem areas and provide guidance to employes on how to improve performance.  Comments MUST be provided for outstanding, needs improvement and unsatisfactory ratings, but are highly recommended for all other ratings.  (ATTACH ADDITIONAL 8 1/2 X 11 PAPER IF NEEDED.)

## PERFORMANCE RATING DEFINITIONS

**Outstanding:** Results are achieved on a consistent basis and significantly surpass job standards.

**Commendable:** The employe clearly exceeds job standards on a regular basis and demonstrates a high degree of initiative and quality of work.

**Satisfactory:** The employe meets the standards of the employe's job in a fully adequate manner.

**Needs Improvement:** The employe meets many of the standards of the employe's job in a satisfactory manner.  Improvement is expected.

**Unsatisfactory:** Excessive performance deficiencies exist and must be corrected.

## COMMUNICATION OF PERFORMANCE STANDARDS

1. Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employe on    3/3/95
   date(s)

2. Progress Review(s) was conducted on     9/8/95        (at least one during rating cycle)
   date(s)

EMPLOYE NAME: OBER, DARRELL G          EMPLOYE NUMBER: 099820

## JOB FACTORS

### 1. JOB KNOWLEDGE/SKILLS
This factor measures the employe's demonstrated knowledge of relevant job information such as: work practices, procedures, resources, policies, and technical information as well as the relationship of work to the organization's mission. Possession of essential skills required to perform the job also are measured.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Demonstrates superior job knowledge and skills. Consistently provides and applies accurate and appropriate job information/resources. Applies new techniques. | Has thorough knowledge of the job and related resources. Strives to expand knowledge. Frequently recommends changes in procedures and methods as needs dictate. | Has adequate knowledge and skills to completely perform all job responsibilities. Handles inquiries properly. Has some knowledge of related work. | Possesses basic job knowledge but requires some improvement with regard to the technical aspects of the job and/or understanding of resources, policies and procedures. | Demonstrates a lack of basic job knowledge and or skills to perform job as detailed in comments. |

Comments:

### 2. WORK RESULTS
This factor measures the employe's demonstrated ability to meet established expectations of quality and quantity within established time frames.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Work consistently exceeds the expected quality, quantity and timeliness requirements. | Work frequently exceeds the expected quality, quantity and timeliness requirements. | Work meets the expected quality, quantity and timeliness requirements. | Occasionally has difficulty meeting the expected quality, quantity and/or timeliness requirements. | Consistently fails to meet expected quality, quantity and/or timeliness requirements. |

Comments:

### 3. COMMUNICATIONS
This factor measures the employe's demonstrated ability to exchange information with others clearly and concisely, to provide information to others on a timely basis within and outside the organization, and to listen, organize, and present thoughts logically and in a clear, concise manner, both orally and in writing.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Particularly adept at organizing and presenting facts and ideas. Exceptionally skilled in soliciting and clarifying information to ensure understanding. Promotes easy exchange of information. Writes and speaks clearly, concisely and is articulate. | Initiates and encourages timely and effective exchange of information. Proficient in organizing and presenting facts and ideas orally and in writing. Seeks and provides appropriate feedback. | Effectively exchanges relevant information. Speaks and writes clearly. Keeps others informed as needed. Listens with understanding. | Occasionally lacks clarity of expression orally or in writing. Inconsistent in keeping others informed and at times fails to listen effectively. | Frequently is difficult to understand. Is vague orally or in writing. Often does not keep others informed. Is an irreffective listener and/or frequently interrupts. |

Comments:

### 4. INITIATIVE/PROBLEM SOLVING
This factor measures the employe's demonstrated ability to perform work without specific instruction beyond that normally provided by a supervisor and within established limits of responsibility and authority. It also assesses the employe's ability to determine what needs to be done within available resources and to pursue appropriate means of accomplishing tasks.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Regularly takes the initiative to identify and resolve work unit/agency problems. Perceives full dimension of problems and limitations. Develops corrective solutions and follows through to conclusion. Requires minimal supervision. | Frequently assumes responsibility for identifying solutions and methods to resolve concerns. Adept at defining and analyzing complex problems and solutions. Requires moderate supervision. | Recognizes problems and suggests and/or assists in developing solutions. Carries through solution implementation. Requires normal supervision. | Resolves routine problems. Exhibits little initiative in identifying problems or solutions. Needs to improve ability to recognize potential problems and evaluate solutions and their impact. Requires more than normal supervision. | Fails to recognize or seek help in resolving routine problems. Requires frequent reminders of what needs to be done. |

Comments:

EMPLOYE NAME: OBER, DARRELL G.     EMPLOYE NUMBER: 099820

## JOB FACTORS

### 5. INTERPERSONAL RELATIONS/AFFIRMATIVE ACTION
This factor measures the employe's demonstrated ability to develop and maintain positive and constructive internal/external relationships. Consideration should be given to the employe's demonstrated willingness to function as a team player, give and receive constructive criticism, resolve conflicts, recognize needs and sensitivities of others and treat others in a fair and equitable manner. Supervisors also are to be assessed on their demonstrated commitment to Affirmative Action.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Consistently promotes and maintains harmonious work environment. Exhibits understanding of needs of others that is reflected in attitude in dealing with them. Is respected and trusted. Actively promotes/adheres to Affirmative Action program activities/requirements. | Maintains cooperative and positive work relationships. Handles conflict constructively. Promotes team work and cooperation, and fair and equitable treatment of others. Promotes/adheres to Affirmative Action program activities and requirements. | Interacts in a cooperative, positive manner. Avoids disruptive behavior. Deals appropriately with anger, frustration, conflict, etc. Treats others fairly and equitably. Adheres to Affirmative Action policy/administrative requirements. | Usually gets along with others. Allows personal bias to affect job relationships. Requires occasional reminders regarding needs and sensitivities of others. Does not consistently adhere to Affirmative Action policy/administrative requirements. | Interpersonal relationships are counter productive to work unit functions as described in comments. Generally ignores Affirmative Action policy/administrative requirements. |

Comments:

### 6. WORK HABITS
This factor measures the employe's demonstrated ability to utilize proper conduct, speech and ethical behavior in the work environment. Compliance with Commonwealth/agency/work unit policies and procedures such as attendance, punctuality, safety, security, housekeeping and other norms are assessed, as well as proper care and maintenance of assigned equipment.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Work is planned/organized to cover all phases of job assignments. Work meets/exceeds deadlines and future steps are anticipated. Equipment and supplies are cared for wisely and in accord with procedure. Employe serves as role model for other employes with regard to work rules. | Work is planned/organized to accomplish job assignments effectively and in a timely manner including those of unusual nature. Scheduled meetings/deadlines are met with few exceptions. Personal care is taken in use of equipment, with minimal waste. Employe adheres to organizational rules and procedures. | Work is planned to meet routine volume and timeliness. Employe adheres to organizational work rules and procedures with rare exceptions. Appropriate care is taken in use of equipment. | Organization and planning of work is infrequently demonstrated. Work often requires revisions resulting in decreased productivity or missed deadlines. Employe needs improvement in complying with rules, regulations and/or care of equipment. | Employe regularly fails to meet expected work results due to lack of effective organization, use of equipment or adherence to established rules/regulations. |

Comments:

### 7. SUPERVISION/MANAGEMENT
(Required for all supervisors/managers) This factor measures the supervisor's demonstrated ability to assign work responsibility and authority to subordinates, establish monitoring activities and systems to ensure work progresses to completion, ensure compliance with established procedures/regulations, and take corrective action when necessary. It also assesses the supervisor's adherence to or completion of personnel/administrative requirements, i.e. timely performance evaluations, appropriate discipline, management of overtime, leave etc.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Manages/supervises employes and work activities to consistently achieve a smooth/timely work flow, high level of quality and quantity. Continuously strives to improve operations, staff and instills team spirit. Consistently complies with personnel/administrative requirements. | Manages/supervises employes to achieve effective and timely work products. Delegates work effectively and appropriately to achieve maximum results. Provides adequate direction and training. Complies with personnel and administrative requirements. | Manages/supervises employes adequately to achieve satisfactory or normal work production and effectiveness. Meets personnel and administrative requirements. | Inconsistent effective supervision or management of staff. At times, fails to direct/train staff within existing means. Less than adequate quality and quantity of production. Inconsistent adherence to personnel and administrative requirements. | Ineffective supervision or management of staff. Fails to establish appropriate monitoring/control activities. Production is poor in quality and/or quantity. Often ignores personnel and administrative requirements. |

Comments:

EMPLOYE NAME: OBER, DARRELL G.    EMPLOYE NUMBER 099820

## OVERALL RATING

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|:---:|:---:|:---:|:---:|:---:|
| [X] | [ ] | [ ] | [ ] | [ ] |

TRAINING AND DEVELOPMENT RECOMMENDATIONS:

## COMMENTS AND SIGNATURES    (Attach additional 8 1/2 x 11 paper if necessary)

RATER COMMENTS: (This section should comment on any aspect(s) of employe's performance not covered elsewhere and should explain overall rati

I consider Captain Ober a self-starting, motivated professional who consistently exceeds the expectations of a person in his assignment.

RATER SIGNATURE: Major Paul J Wooding    DATE    11-30-95

REVIEWER COMMENTS:

REVIEWER SIGNATURE: LT Col. _____    DATE    11/30/95

EMPLOYE COMMENTS:

[X] I AGREE WITH THIS RATING.    [ ] I DISAGREE WITH THIS RATING.

[ ] I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER.

[ ] DISCUSSION WITH MY REVIEWING OFFICER OCCURRED _____ .
                                                        (DATE)

[ ] I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE RATER; MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

COMMENTS:

EMPLOYEE'S SIGNATURE: Darrell G. Ober    DATE    12/1/95

Employe Performance Review - Capt. Darrell G. Ober
Rating Period 12/94 to 12/95

1.  JOB KNOWLEDGE/SKILLS

    Outstanding - Consistently provides and applies accurate and
    appropriate job information/resources.   Keeps current on
    Department policies and regulations and recommends revisions
    that will improve operations.

2.  WORK RESULTS

    Outstanding - Consistently meets established expectations of
    quality and quantity within established time frames.

3.  COMMUNICATIONS

    Outstanding - Provides information in a clear, concise,
    organized manner.  The Captain is articulate and responsive
    with superior officers and subordinates.

4.  INITIATIVE/PROBLEM SOLVING

    Outstanding - Regularly takes the initiative to seek out
    problem areas and provide a clear, well thought out remedy.

5.  INTERPERSONAL RELATIONS/AFFIRMATIVE ACTION

    Outstanding - Always promotes and maintains an environment of
    understanding, professionalism, respect and sensitivity.

6.  WORK HABITS

    Outstanding - Work is planned and well organized.  Complies
    with policies and procedures of the Department and
    Commonwealth.  Equipment is well maintained according to
    Department guidelines.

7.  SUPERVISION/MANAGEMENT

    Outstanding - Provides a superior work environment for
    subordinates, encouraging maximum performance.

JOB DESCRIPTION

STD-370    REV. 8-83

| 1 NAME OF EMPLOYE LAST NAME FIRST: | 2 SOCIAL SECURITY NUMBER | 3 REQUEST INITIATED BY |
|---|---|---|
| Ober, Darrell G. | 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 | ☐ EMPLOYE ☑ AGENCY ☐ OFFICE OF ADMINISTRATION |

| DEPARTMENT | BUREAU | DIVISION | HEADQUARTERS |
|---|---|---|---|
| SP Professional Responsibility | | Systems and Process Review | DHQ |

5 PRESENT CLASS TITLE: Captain

POSITION NUMBER

| 6 | REGULAR SCHEDULE OR HOURS OF WORK | | | | | | | WORK IS |
|---|---|---|---|---|---|---|---|---|

| DAY → | MON | TUES | WED | THURS | FRI | SAT | SUN | ☑ FULL-TIME ☐ PART-TIME ☐ PERMANENT ☐ TEMPORARY |
|---|---|---|---|---|---|---|---|---|
| HOURS FROM | | | 8:00 | | | | | LENGTH OF LUNCH PERIOD: 1/2 hour |
| TO | | | 4:00 | | | | | TOTAL HOURS PER WEEK: 40 |

EXPLAIN ROTATION OF SHIFTS (IF ANY)

7. Describe in detail the work you do, listing the most important duties first. Try to explain your work in a way that someone unfamiliar with your job can understand. (If you use machines or equipment, please list them and the approximate amount of time you use them.) Use as much additional paper (8½ x 11) as you need.

**50%** 1. Supervises review teams to ensure compliance with review guidelines and procedures; ensures reviews and reports are complete and submitted in a timely fashion, assists in the review process by participating in the review.

**05%** 2. Conducts pre-review interviews with Troop/Bureau Commanders, collects material for reviews and makes arrangements for overnight accommodations at review sites; inspects statistical data and computer generated reports to isolate specific areas of interest to review team members; interviews local officials to assess the performance of the State Police locally and the degree of cooperation with local departments and agencies.

**05%** 3. Monitors submission of the Line Inspection Reports and examines them to identify areas that impact upon the Department or warrant the attention of the Systems and Process Review Division; maintains files for the Line Inspection/Systems and Process Review Reports and purges outdated reports per regulations.

**05%** 4. Directs the administrative responsibilities of the Division, including budget and contract management, approvals and authorization equipment management by conferring with superiors and subordinates, completing assignments, responding to requests, solving problems and making decisions as required.

**05%** 5. Coordinates intra-department activities by responding to inquires and providing information as requested; attending staff meetings, command conferences, etc.

**10%** 6. Maintains necessary knowledge and skills by keeping current on changes in Department policies and regulations, law enforcement procedure and management principles; attending training as needed and reading professional literature; adapts review procedures as needed to address changes in rules and regulations and to accommodate efficiency in the review process.

**05%** 7. Ensures effective flow of information from and through the Division by communicating clearly, both orally and in writing, holding staff meetings as needed and providing an atmosphere which encourages accurate and efficient communication.

CERTIFICATION:

I certify that to the best of my knowledge all statements shown above are correct.

Captain Darrell Ober
SIGNATURE OF EMPLOYE

9/8/95
DATE

The majority of the work assignment is accomplished through scheduled activities on an annual or biennial rotation. Special assignments are conveyed either orally or in written form. The completed work project is then submitted for review.

Prepare an organization chart and identify your supervisor and all employes whose performance rating you sign by names and class titles. If you are a supervisor, your supervisor must complete this part and identify his supervisor and all his subordinates.



3

Total number subordinates reporting to you

10. Describe the kind of supervision you give the employes on the above chart by explaining the type of work assigned and the type of work review exercised. If you are not a supervisor, your supervisor must complete this part for all employes shown above.

Supervision is provided the members listed in Sections 1 through 3 by ensuring adherance to an established schedule of inspections, by reviewing the reports generated through those inspections and by personnally observing performance during the inspection process.

11. FOR THE EMPLOYE'S IMMEDIATE SUPERVISOR: Review your subordinate's statements. You may make any comments or include any information you feel is appropriate or would be helpful. Use additional paper if needed.

EMPLOYE'S IMMEDIATE SUPERVISOR'S SIGNATURE _Paul J Woodling_   CLASS TITLE _MAJOR_   DATE _9-12-95_

➡ TO BE COMPLETED BY THE CLASSIFYING AUTHORITY ➡

APPROVED POSITION CLASSIFICATION

REVIEWING ANALYST'S SIGNATURE                                    DATE

STD-370, Job Description
Page two

05%       8.    Ensures effective working relationships with external agencies and organizations by maintaining a professional Department image, and an atmosphere of cooperation with the general public, media, other law enforcement agencies and the courts, and public and private organizations.

10%       9.  Performs other duties as required, including serving on boards, conducting investigations, attending ceremonies, drafting Department regulations, evaluating special equipment and reviewing legislation, suggestions and proposed regulations for the purpose of making recommendations.

# EMPLOYE PERFORMANCE REVIEW

565L (Rev. 3-94)                                                                           020  7320

| GENERAL INFORMATION | TYPE REPORT | [X] ANNUAL | ☐ PROBATIONARY | ☐ INTERIM |
|---|---|---|---|---|

| EMPLOYE NAME | AGENCY | EMPLOYE NUMBER |
|---|---|---|
| ...ER,  DARRELL G. | 020 STATE POLICE | 099820 |

| CLASS TITLE | ☐ SUPERVISOR | STATUS |
|---|---|---|
| ST PLC CAPT | ☐ NON-SUPERVISOR | ☐ CIVIL SERVICE  [X] NCS |

| ORGANIZATION | RATING PERIOD |
|---|---|
| 7320  SYS & PROC REV DIV | FROM 03/96    TO 03/97 |

## GENERAL INSTRUCTIONS

Verify/Complete General Information.  Indicate whether employe is a supervisor or non-supervisor.

Review the employe's job description for the rating cycle.  Review/discuss job standards (expectations/objectives/duties), to ensure appraisal relates to the specific responsibilities, job assignments and standards which have been conveyed to the employe for the rating cycle.  Update the job description and essential job functions for the next rating cycle.

Indicate when you conveyed job standards to the employe and when progress review(s) was conducted.

Base the appraisal on the employe's performance during the entire review period, not isolated incidences or performance prior to current review period.

The comments sections should be used to: support performance ratings, indicate problem areas and provide guidance to employes on how to improve performance.  Comments MUST be provided for outstanding, needs improvement and unsatisfactory rating, but are highly recommended for all other ratings.  (ATTACH ADDITIONAL 8 1/2 X 11 PAPER IF NEEDED.)

## PERFORMANCE RATING DEFINITIONS

**Outstanding:**   Results are achieved on a consistent basis and significantly surpass job standards.

**Commendable:**   The employe clearly exceeds job standards on a regular basis and demonstrates a high degree of initiative and quality of work.

**Satisfactory:**   The employe meets the standards of the employe's job in a fully adequate manner.

**Needs Improvement:**   The employe meets many of the standards of the employe's job in a satisfactory manner.  Improvement is expected.

**Unsatisfactory:**   Excessive performance deficiencies exist and must be corrected.

## COMMUNICATION OF PERFORMANCE STANDARDS

1.  Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employe on  _____
                              date(s)

2.  Progress Review(s) was conducted on  _NONE HELD_  (at least one during rating cycle)
                                          date(s)



EMPLOYE NAME:  OBER,  DARRELL G.    EMPLOYE NUMBER: 099820    020 7320

## JOB FACTORS

### 1. JOB KNOWLEDGE/SKILLS
This factor measures the employe's demonstrated knowledge of relevant job information such as: work practices, procedures, resources, policies, and technical information as well as the relationship of work to the organization's mission. Possession of essential skills required to perform the job also are measured.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Demonstrates superior job knowledge and skills. Consistently provides and applies accurate and appropriate job information/resources. Applies new techniques. | Has thorough knowledge of the job and related resources. Strives to expand knowledge. Frequently recommends changes in procedures and methods as needs dictate. | Has adequate knowledge and skills to completely perform all job responsibilities. Handles inquiries properly. Has some knowledge of related work. | Possesses basic job knowledge but requires some improvement with regard to the technical aspects of the job and/or understanding of resources, policies and procedures. | Demonstrates a lack of basic job knowledge and or skills to perform job as detailed in comments. |

Comments: THE CAPT HAS A BROAD BASE OF KNOWLEDGE CONCERNING THE OPERATIONAL ASPECTS OF THE DEPT. THIS EXPERIENCE HAS ALLOWED HIM TO MANAGE THE SYSTEMS AND PROCESS RELI_ FUNCTION WITH GREAT OVERSIGHT. HE IS CONSTANTLY LOOKING FOR WAYS TO IMPROVE DEPT. OPERATIONS.

### 2. WORK RESULTS
This factor measures the employe's demonstrated ability to meet established expectations of quality and quantity within established time frames.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Work consistently exceeds the expected quality, quantity and timeliness requirements. | Work frequently exceeds the expected quality, quantity and timeliness requirements. | Work meets the expected quality, quantity and timeliness requirements. | Occasionally has difficulty meeting the expected quality, quantity and/or timeliness requirements. | Consistently fails to meet expected quality, quantity and/or timeliness requirements. |

Comments: I HAVE OBSERVED NOTHING BUT QUALITY AND EFFICIENCY WHILE REVIEWING THE WORK OF THE SPR DIVISION. IT IS A PLEASURE TO "SIGN OFF" ON THEIR PROJECTS.

### 3. COMMUNICATIONS
This factor measures the employe's demonstrated ability to exchange information with others clearly and concisely, to provide information to others on a timely basis within and outside the organization, and to listen, organize, and present thoughts logically and in a clear, concise manner, both orally and in writing.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Particularly adept at organizing and presenting facts and ideas. Exceptionally skilled in soliciting and clarifying information to ensure understanding. Promotes easy exchange of information. Writes and speaks clearly, concisely and is articulate. | Initiates and encourages timely and effective exchange of information. Proficient in organizing and presenting facts and ideas orally and in writing. Seeks and provides appropriate feedback. | Effectively exchanges relevant information. Speaks and writes clearly. Keeps others informed as needed. Listens with understanding. | Occasionally lacks clarity of expression orally or in writing. Inconsistent in keeping others informed and at times fails to listen effectively. | Frequently is difficult to understand. Is vague orally or in writing. Often does not keep others informed. Is an ineffective listener and/or frequently interrupts. |

Comments: THE CAPT HAS DEMONSTRATED AN OUTSTANDING ABILITY TO COMMUNICATE BOTH ORALLY AND IN WRITING.

### 4. INITIATIVE/PROBLEM SOLVING
This factor measures the employe's demonstrated ability to perform work without specific instruction beyond that normally provided by a supervisor and within established limits of responsibility and authority. It also assesses the employe's ability to determine what needs to be done within available resources and to pursue appropriate means of accomplishing tasks.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Regularly takes the initiative to identify and resolve work unit/agency problems. Perceives full dimension of problems and limitations. Develops corrective solutions and follows through to conclusion. Requires minimal supervision. | Frequently assumes responsibility for identifying solutions and methods to resolve concerns. Adept at defining and analyzing complex problems and solutions. Requires moderate supervision. | Recognizes problems and suggests and/or assists in developing solutions. Carries through solution implementation. Requires normal supervision. | Resolves routine problems. Exhibits little initiative in identifying problems or solutions. Needs to improve ability to recognize potential problems and evaluate solutions and their impact. Requires more than normal supervision. | Fails to recognize or seek help in resolving routine problems. Requires frequent reminders of what needs to be done. |

Comments: I WAS IMPRESSED WITH THE CAPTS INITIATIVE TO UNDERTAKE A COMPLETE REVISION_ _OM 7-4 THIS CHANGE WILL PROVE VALUABLE TO THE ENTIRE DEPT. THE CAPT ALSO CONVINCE_ _E TO INITIATE A LINE INSPECTION PROGRAM WITHIN THE BUREAU.

EMPLOYE NAME:  OBER,  DARRELL G.    EMPLOYE NUMBER 099820    020 7320

## JOB FACTORS

### 5. INTERPERSONAL RELATIONS/AFFIRMATIVE ACTION
This factor measures the employe's demonstrated ability to develop and maintain positive and constructive internal/external relationships. Consideration should be given to the employe's demonstrated willingness to function as a team player, give and receive constructive criticism, resolve conflicts, recognize needs and sensitivities of others and treat others in a fair and equitable manner. Supervisors also are to be assessed on their demonstrated commitment to Affirmative Action.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Consistently promotes and maintains harmonious work environment. Exhibits understanding of needs of others that is reflected in attitude in dealing with them. Is respected and trusted. Actively promotes/adheres to Affirmative Action program activities/ requirements. | Maintains cooperative and positive work relationships. Handles conflict constructively. Promotes team work and cooperation, and fair and equitable treatment of others. Promotes/adheres to Affirmative Action program activities and requirements. | Interacts in a cooperative, positive manner. Avoids disruptive behavior. Deals appropriately with anger, frustration, conflict etc. Treats others fairly and equitably. Adheres to Affirmative Action policy/administrative requirements. | Usually gets along with others. Allows personal bias to affect job relationships. Requires occasional reminders regarding needs and sensitivities of others. Does not consistently adhere to Affirmative Action policy/administrative requirements. | Interpersonal relationships are counter productive to work unit functions as described in comments. Generally ignores Affirmative Action policy/administrative requirements. |

Comments:  I HAVE RECEIVED NOTHING BUT POSITIVE FEEDBACK REGARDING THE CAPT'S RELATIONSHIP WITH PEOPLE. HE IS HIGHLY REGARDED BY BOTH PEERS AND SUBORDINATES. THE CAPT SEEMS COMMITTED TO THE DEPT'S AFFIRMATIVE ACTION PLAN AND WORKS HARD TO TREAT ALL PEOPLE IN A FAIR AND EQUITABLE MANNER.

### 6. WORK HABITS
This factor measures the employe's demonstrated ability to utilize proper conduct, speech and ethical behavior in the work environment. Compliance with Commonwealth/agency/work unit policies and procedures such as attendance, punctuality, safety, security, housekeeping and other norms are assessed, as well as proper care and maintenance of assigned equipment.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Work is planned/ organized to cover all phases of job assignments. Work meets/ exceeds deadlines and future steps are anticipated. Equipment and supplies are cared for wisely and in accord with procedure. Employe serves as role model for other employes with regard to work rules. | Work is planned/organized to accomplish job assignments effectively and in a timely manner including those of unusual nature. Scheduled meetings/deadlines are met with few exceptions. Personal care is taken in use of equipment, with minimal waste. Employe adheres to organizational rules and procedures. | Work is planned to meet routine volume and timeliness. Employe adheres to organizational work rules and procedures with rare exceptions. Appropriate care is taken in use of equipment. | Organization and planning of work is infrequently demonstrated. Work often requires revisions resulting in decreased productivity or missed deadlines. Employe needs improvement in complying with rules, regulations and/or care of equipment. . | Employe regularly fails to meet expected work results due to lack of effective organization, use of equipment or adherence to established rules/regulations. |

Comments:  I HAVE FOUND THE CAPT TO BE A SELF STARTER AND A DEDICATED WORKER YOU CAN COUNT ON HIM TO WORK THROUGH A PROJECT WITH A MINIMUM OF GUIDANCE HE UTILIZES HIS RESOURCES TO THEIR POTENTIAL AND LOOKS FOR WAYS TO MAXIMIZE PRODUCTIVITY.

### 7. SUPERVISION/MANAGMENT
(Required for all supervisors/managers)  This factor measures the supervisor's demonstrated ability to assign work responsibility and authority to subordinates, establish monitoring activities and systems to ensure work progresses to completion, ensure compliance with established procedures/regulations, and take corrective action when necessary. It also assesses the supervisor's adherence to or completion of personnel/administrative requirements, i.e. timely performance evaluations, appropriate discipline, managment of overtime, leave etc.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [X] | [ ] | [ ] | [ ] | [ ] |
| Manages/supervises employes and work activities to consistently achieve a smooth/timely work flow, high level of quality and quantity. Continuously strives to improve operations, staff and instills team spirit. Consistently complies with personnel/ administrative requirements. | Manages/supervises employes to achieve effective and timely work products. Delegates work effectively and appropriately to achieve maximum results. Provides adequate direction and training. Complies with personnel and administrative requirements. | Manages/supervises employes adequately to achieve satisfactory or normal work production and effectiveness. Meets personnel and administrative requirements. | Inconsistent effective supervision or management of staff. At times, fails to direct/train staff within existing means. Less than adequate quality and quantity of production. Inconsistent adherence to personnel and administrative requirements. | Ineffective supervision or management of staff. Fails to establish appropriate monitoring/control activities. Production is poor in quality and/or quantity. Often ignores personnel and administrative requirements. |

Comments:  THE CAPT IS A HIGHLY EFFECTIVE MANAGER. HE LEADS BY EXAMPLE IN THE EXAMPLE IS HONORABLE. HIS DIVISION RUN SMOOTHLY AND EFFICIENTLY GREAT FUTURE AHEAD OF HIM

EMPLOYE NAME. OBER, DARRELL G.    EMPLOYE NUMBER    099820    020 7320

## OVERALL RATING

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |

TRAINING AND DEVELOPMENT RECOMMENDATIONS:

CONTINUED PARTICIPATION IN "NETWORKING" TYPE SEMINARS RELATED TO THE SYSTEMS PROCESS REVIEW FUNCTION.

## COMMENTS AND SIGNATURES    (Attach additional 8 1/2 x 11 paper if necessary)

RATER COMMENTS: (This section should comment on any aspect(s) of employe's performance not covered elsewhere and should explain overall rating).

THE CAPT HAS HELPED TO MAKE MY TRANSITION TO THIS COMMAND A PAINLESS EXPERIENCE. I SEE HIM AS ONE OF THE OUTSTANDING YOUNG LEADERS OF OUR DEPT AND I EXPECT HE WILL MAKE MANY POSITIVE CONTRIBUTIONS ALONG THE WAY.

RATER SIGNATURE: _____    DATE  3/18/97

REVIEWER COMMENTS:

REVIEWER SIGNATURE: _____    DATE 3/18/97

EMPLOYE COMMENTS:

☒ I AGREE WITH THIS RATING        ☐ I DISAGREE WITH THIS RATING

☐ I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER

☐ DISCUSSION WITH MY REVIEWING OFFICER OCCURRED _____
(DATE_

☐ I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR; MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

COMMENTS:

EMPLOYE'S SIGNATURE: Captain Darrell G. Ober    DATE 3/20/97

JOB DESCRIPTION

NAME OF EMPLOYE LAST NAME FIRST                                    2 SOCIAL SECURITY NUMBER                  3 REQUEST INITIATED BY

Ober, Darrell G.                                                   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                              ☐ EMPLOYE
                                                                                                            ☒ AGENCY
                                                                                                            ☐ OFFICE OF
                                                                                                               ADMINISTRATION

DEPARTMENT                              BUREAU                              DIVISION                         HEADQUARTERS
PSP Professional Responsibility        Systems and Process Review          DHO

PRESENT CLASS TITLE                                                        POSITION NUMBER
Captain

| REGULAR SCHEDULE OR HOURS OF WORK | | | | | | | | WORK IS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DAY → | MON | TUES | WED | THURS | FRI | SAT | SUN | ☒ FULL-TIME ☐ PART-TIME | ☐ PERMANENT ☐ TEMPORARY | | |
| HOURS FROM | | | 8:00 | | | | | LENGTH OF LUNCH PERIOD | 1/2 hour | EXPLAIN ROTATION OF SHIFTS (IF ANY) | |
| TO | | | 4:00 | | | | | TOTAL HOURS PER WEEK | 40 | | |

7. Describe in detail the work you do, listing the most important duties first. Try to explain your work in a way that someone unfamiliar with your job can understand. (If you use machines or equipment, please list them and the approximate amount of time you use them.) Use as much additional paper (8½ x 11) as you need.

50%    1.    Supervises review teams to ensure compliance with review guidelines and procedures; ensures reviews and reports are complete and submitted in a timely fashion, assists in the review process by participating in the review.

05%    2.    Conducts pre-review interviews with Troop/Bureau Commanders, collects material for reviews and makes arrangements for overnight accommodations at review sites; inspects statistical data and computer generated reports to isolate specific areas of interest to review team members; interviews local officials to assess the performance of the State Police locally and the degree of cooperation with local departments and agencies.

05%    3.    Monitors submission of the Line Inspection Reports and examines them to identify areas that impact upon the Department or warrant the attention of the Systems and Process Review Division; maintains files for the Line Inspection/Systems and Process Review Reports and purges outdated reports per regulations.

05%    4.    Directs the administrative responsibilities of the Division, including budget and contract management, approvals and authorization equipment management by conferring with superiors and subordinates, completing assignments, responding to requests, solving problems and making decisions as required.

05%    5.    Coordinates intra-department activities by responding to inquires and providing information as requested; attending staff meetings, command conferences, etc.

10%    6.    Maintains necessary knowledge and skills by keeping current on changes in Department policies and regulations, law enforcement procedure and management principles; attending training as needed and reading professional literature; adapts review procedures as needed to address changes in rules and regulations and to accommodate efficiency in the review process.

05%    7.    Ensures effective flow of information from and through the Division by communicating clearly, both orally and in writing, holding staff meetings as needed and providing an atmosphere which encourages accurate and efficient communication.

CERTIFICATION:

I certify that to the best of my knowledge all statements shown above are correct.

_Captain Dall G Ob_                                    9/8/95
SIGNATURE OF EMPLOYE                                    DATE

the majority of the work assignment is accomplished through scheduled activities on an annual or biennial rotation.  Special assignments are conveyed either orally or in written form.  The completed work project is then submitted for review.

Prepare an organization chart and identify your supervisor and all employes whose performance rating you sign by names and class titles.  If you are not supervisor, your supervisor must complete this part and identify his supervisor and all his subordinates.



3
_____ Total number subordinates reporting to you

9. Describe the kind of supervision you give the employes on the above chart by explaining the type of work assigned and the type of work review exercised. If you are not a supervisor, your supervisor must complete this part for all employes shown above.

Supervision is provided the members listed in Sections 1 through 3 by ensuring adherance to an established schedule of inspections, by reviewing the reports generated through those inspections and by personnally observing performance during the inspection process.

11. FOR THE EMPLOYE'S IMMEDIATE SUPERVISOR.  Review your subordinate's statements.  You may make any comments or include any information you feel is appropriate or would be helpful.  Use additional paper if needed.

EMPLOYE'S IMMEDIATE
SUPERVISOR'S SIGNATURE     Paul J Woodring     CLASS TITLE   MAJOR               DATE  9-12-95

◆ TO BE COMPLETED BY THE CLASSIFYING AUTHORITY ◆

APPROVED POSITION CLASSIFICATION

REVIEWING ANALYST'S SIGNATURE                                          DATE

STD-370, Job Description
Page two

05%        8.    Ensures effective working relationships with external agencies and organizations by maintaining a professional Department image, and an atmosphere of cooperation with the general public, media, other law enforcement agencies and the courts, and public and private organizations.

10%        9.    Performs other duties as required, including serving on boards, conducting investigations, attending ceremonies, drafting Department regulations, evaluating special equipment and reviewing legislation, suggestions and proposed regulations for the purpose of making recommendations.

563L  (Rev. 3-94)   EMPLOYE PERFORMANCE REVIEW   020 7320

| GENERAL INFORMATION | TYPE REPORT | | |
|---|---|---|---|
| | ☒ ANNUAL | ☐ PROBATIONARY | ☐ INTERIM |

| EMPLOYE NAME | AGENCY | EMPLOYEE NUMBER |
|---|---|---|
| ⁞R,   DARRELL G. | 020 STATE POLICE | 099820 |

| TITLE | SUPERVISOR | STATUS |
|---|---|---|
| LC CAPT | ☐ SUPERVISOR ☐ NON-SUPERVISOR | ☐ CIVIL SERVICE  ☒ NO⁞ |

| ORGANIZATION | RATING PERIOD |
|---|---|
| 7320   SIS & PROC REV DIV | FROM 03/97         TO 03/98 |

## GENERAL INSTRUCTIONS

Verify/Complete General Information.  Indicate whether employe is a supervisor or non-supervisor.

Review the employe's job description for the rating cycle.  Review/discuss job standards (expectations/objectives/duties), to ensure appraisal relates to the specific responsibilities, job assignments and standards which have been conveyed to the employe for the rating cycle.  Update the job description and essential job functions for the next rating cycle.

Indicate when you conveyed job standards to the employe and when progress review(s) was conducted.

Base the appraisal on the employe's performance during the entire review period, not isolated incidences or performance prior to current review period.

The comments sections should be used to: support performance ratings, indicate problem areas and provide guidance to employes on how to improve performance.  Comments MUST be provided for outstanding, needs improvement and unsatisfactory rating, but are highly recommended for all other ratings.  (ATTACH ADDITIONAL 8 1/2 X 11 PAPER IF NEEDED.)

## PERFORMANCE RATING DEFINITIONS

**Outstanding:**   Results are achieved on a consistent basis and significantly surpass job standards.

**Commendable:**   The employe clearly exceeds job standards on a regular basis and demonstrates a high degree of initiative and quality of work.

**Satisfactory:**   The employe meets the standards of the employe's job in a fully adequate manner.

**Needs Improvement:**   The employe meets many of the standards of the employe's job in a satisfactory manner.  Improvement is expected.

**Unsatisfactory:**   Excessive performance deficiencies exist and must be corrected.

## COMMUNICATION OF PERFORMANCE STANDARDS

1.  Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employe on ___VARIOUS___
      date(s)

2.  Progress Review(s) was conducted on ___VARIOUS___ (at least one during rating cycle)
      date(s)

EMPLOYE NAME: OBER, DARRELL G.    EMPLOYE NUMBER: 099820    020 7320

## JOB FACTORS

### 1. JOB KNOWLEDGE/SKILLS

This factor measures the employe's demonstrated knowledge of relevant job information such as: work practices, procedures, resources, policies, and technical information as well as the relationship of work to the organization's mission. Possession of essential skills required to perform the job also are measured.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [✓] | [ ] | [ ] | [ ] | [ ] |
| Demonstrates superior job knowledge and skills. Consistently provides and applies accurate and appropriate job information/resources. Applies new techniques. | Has thorough knowledge of the job and related resources. Strives to expand knowledge. Frequently recommends changes in procedures and methods as needs dictate. | Has adequate knowledge and skills to completely perform all job responsibilities. Handles inquiries properly. Has some knowledge of related work. | Possesses basic job knowledge but requires some improvement with regard to the technical aspects of the job and/or understanding of resources, policies and procedures. | Demonstrates a lack of basic job knowledge and or skills to perform job as detailed in comments. |

Comments:
*See attached*

### 2. WORK RESULTS

This factor measures the employe's demonstrated ability to meet established expectations of quality and quantity within established time frames.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [✓] | [ ] | [ ] | [ ] | [ ] |
| Work consistently exceeds the expected quality, quantity and timeliness requirements. | Work frequently exceeds the expected quality, quantity and timeliness requirements. | Work meets the expected quality, quantity and timeliness requirements. | Occasionally has difficulty meeting the expected quality, quantity and/or timeliness requirements. | Consistently fails to meet expected quality, quantity and/or timeliness requirements. |

Comments:
*See attached*

### 3. COMMUNICATIONS

This factor measures the employe's demonstrated ability to exchange information with others clearly and concisely, to provide information to others on a timely basis within and outside the organization, and to listen, organize, and present thoughts logically and in a clear, concise manner, both orally and in writing.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [✓] | [ ] | [ ] | [ ] | [ ] |
| Particularly adept at organizing and presenting facts and ideas. Exceptionally skilled in soliciting and clarifying information to ensure understanding. Promotes easy exchange of information. Writes and speaks clearly, concisely and is articulate. | Initiates and encourages timely and effective exchange of information. Proficient in organizing and presenting facts and ideas orally and in writing. Seeks and provides appropriate feedback. | Effectively exchanges relevant information. Speaks and writes clearly. Keeps others informed as needed. Listens with understanding. | Occasionally lacks clarity of expression orally or in writing. Inconsistent in keeping others informed and at times fails to listen effectively. | Frequently is difficult to understand. Is vague orally or in writing. Often does not keep others informed. Is an ineffective listener and/or frequently interrupts. |

Comments:
*See attached*

### 4. INITIATIVE/PROBLEM SOLVING

This factor measures the employe's demonstrated ability to perform work without specific instruction beyond that normally provided by a supervisor and within established limits of responsibility and authority. It also assesses the employe's ability to determine what needs to be done within available resources and to pursue appropriate means of accomplishing tasks.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [✓] | [ ] | [ ] | [ ] | [ ] |
| Regularly takes the initiative to identify and resolve work unit/agency problems. Perceives full dimension of problems and limitations. Develops corrective solutions and follows through to conclusion. Requires minimal supervision. | Frequently assumes responsibility for identifying solutions and methods to resolve concerns. Adept at defining and analyzing complex problems and solutions. Requires moderate supervision. | Recognizes problems and suggests and/or assists in developing solutions. Carries through solution implementation. Requires normal supervision. | Resolves routine problems. Exhibits little initiative in identifying problems or solutions. Needs to improve ability to recognize potential problems and evaluate solutions and their impact. Requires more than normal supervision. | Fails to recognize or seek help in resolving routine problems. Requires frequent reminders of what needs to be done. |

Comments:
*See attached*

EMPLOYE NAME:  OBER,  DARRELL G.                    EMPLOYE NUMBER: 099820        020 7320

## JOB FACTORS

### 5. INTERPERSONAL RELATIONS/AFFIRMATIVE ACTION
This factor measures the employe's demonstrated ability to develop and maintain positive and constructive internal/external relationships. Consideration should be given to the employe's demonstrated willingness to function as a team player, give and receive constructive criticism, resolve conflicts, recognize needs and sensitivities of others and treat others in a fair and equitable manner. Supervisors also are to be assessed on their demonstrated commitment to Affirmative Action.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [✓] | [ ] | [ ] | [ ] | [ ] |
| Consistently promotes and maintains harmonious work environment. Exhibits understanding of needs of others that is reflected in attitude in dealing with them. Is respected and trusted. Actively promotes/adheres to Affirmative Action program activities/ requirements. | Maintains cooperative and positive work relationships. Handles conflict constructively. Promotes team work and cooperation, and fair and equitable treatment of others. Promotes/adheres to Affirmative Action program activities and requirements. | Interacts in a cooperative, positive manner. Avoids disruptive behavior. Deals appropriately with anger, frustration, conflict etc. Treats others fairly and equitably. Adheres to Affirmative Action policy/administrative requirements. | Usually gets along with others. Allows personal bias to affect job relationships. Requires occasional reminders regarding needs and sensitivities of others. Does not consistently adhere to Affirmative Action policy/administrative requirements. | Interpersonal relationships are counter productive to work unit functions as described in comments. Generally ignores Affirmative Action policy/administrative requirements. |

Comments:

*See attached*

### 6. WORK HABITS
This factor measures the employe's demonstrated ability to utilize proper conduct, speech and ethical behavior in the work environment. Compliance with Commonwealth/agency/work unit policies and procedures such as attendance, punctuality, safety, security, housekeeping and other norms are assessed, as well as proper care and maintenance of assigned equipment.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [✓] | [ ] | [ ] | [ ] | [ ] |
| Work is planned/ organized to cover all phases of job assignments. Work meets/ ceeds deadlines and ture steps are ...nticipated. Equipment and supplies are cared for wisely and in accord with procedure. Employe serves as role model for other employes with regard to work rules. | Work is planned/organized to accomplish job assignments effectively and in a timely manner including those of unusual nature. Scheduled meetings/deadlines are met with few exceptions. Personal care is taken in use of equipment, with minimal waste. Employe adheres to organizational rules and procedures. | Work is planned to meet routine volume and timeliness. Employe adheres to organizational work rules and procedures with rare exceptions. Appropriate care is taken in use of equipment. | Organization and planning of work is infrequently demonstrated. Work often requires revisions resulting in decreased productivity or missed deadlines. Employe needs improvement in complying with rules, regulations and/or care of equipment. | Employe regularly fails to meet expected work results due to lack of effective organization, use of equipment or adherence to established rules/regulations. |

Comments:

*See attached*

### 7. SUPERVISION/MANAGMENT
(Required for all supervisors/managers)  This factor measures the supervisor's demonstrated ability to assign work responsibility and authority to subordinates, establish monitoring activities and systems to ensure work progresses to completion, ensure compliance with established procedures/regulations, and take corrective action when necessary. It also assesses the supervisor's adherence to or completion of personnel/administrative requirements, i.e. timely performance evaluations, appropriate discipline, managment of overtime, leave etc.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| [✓] | [ ] | [ ] | [ ] | [ ] |
| Manages/supervises employes and work activities to consistently achieve a smooth/timely work flow, high level of quality and quantity. Continuously strives to improve operations, staff and instills team spirit. Consistently complies h personnel/ ıinistrative ,uirements. | Manages/supervises employes to achieve effective and timely work products. Delegates work effectively and appropriately to achieve maximum results. Provides adequate direction and training. Complies with personnel and administrative requirements. | Manages/supervises employes adequately to achieve satisfactory or normal work production and effectiveness. Meets personnel and administrative requirements. | Inconsistent effective supervision or management of staff. At times, fails to direct/train staff within existing means. Less than adequate quality and quantity of production. Inconsistent adherence to personnel and administrative requirements. | Ineffective supervision or management of staff. Fails to establish appropriate monitoring/control activities. Production is poor in quality and/or quantity. Often ignores personnel and administrative requirements. |

Comments:    *See attached*

EMPLOYE NAME:   OBER, DARRELL G.          EMPLOYE NUMBER    099820    020 7320

## OVERALL RATING

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|:---:|:---:|:---:|:---:|:---:|
| ✓ | ☐ | ☐ | ☐ | ☐ |

TRAINING AND DEVELOPMENT RECOMMENDATIONS:

*See attached*

## COMMENTS AND SIGNATURES          (Attach additional 8 1/2 x 11 paper if necessary)

RATER COMMENTS: (This section should comment on any aspect(s) of employe's performance not covered elsewhere and should explain overall rating).

*See Attached*

RATER SIGNATURE: *R.S. Merryman*          DATE  3/25/98

VIEWER COMMENTS:

REVIEWER SIGNATURE:          DATE  4/2/98

EMPLOYE COMMENTS:

☒ I AGREE WITH THIS RATING          ☐ I DISAGREE WITH THIS RATING

☐ I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER

☐ DISCUSSION WITH MY REVIEWING OFFICER OCCURRED _____
                                                      (DATE_

☐ I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN
   GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR; MY
   SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE
   REPORT.

COMMENTS:

EMPLOYE'S SIGNATURE: *David G. Ober*          DATE  4/3/98

| 1. NAME OF EMPLOYEE (LAST NAME FIRST) | | 2. SOCIAL SECURITY NUMBER | 3. REQUEST INITIATED BY |
|---|---|---|---|
| OBER, Darrell G. | | 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 | ☐ EMPLOYE<br>☒ AGENCY<br>☐ OFFICE OF ADMINISTRATION |

| DEPARTMENT | BUREAU | DIVISION | HEADQUARTERS |
|---|---|---|---|
| ~ate Police | Professional Responsibility | Systems & Process Review | Department Headquarters |

| IENT CLASS TITLE | POSITION NUMBER |
|---|---|
| ~aptain | 128479 |

**6. REGULAR SCHEDULE OR HOURS OF WORK**

WORK IS: ☒ FULL-TIME  ☐ PART-TIME    ☐ PERMANENT  ☐ TEMPORARY

| DAY ➞ | MON | TUES | WED | THURS | FRI | SAT | SUN |
|---|---|---|---|---|---|---|---|
| HOURS FROM | 0800 | 0800 | 0800 | 0800 | 0800 | | |
| HOURS TO | 1600 | 1600 | 1600 | 1600 | 1600 | | |

LENGTH OF LUNCH PERIOD: 0.50

TOTAL HOURS PER WEEK: 40.00

EXPLAIN ROTATION OF SHIFTS (IF ANY)

7. Describe in detail the work you do, listing the most important duties first. Try to explain your work in a way that someone unfamiliar with your job can understand. (If you use machines or equipment, please list them and the approximate amount of time you use them.)  Use as much additional paper (8½ x 11) as you need.

50%    1.   Supervises review teams to ensure compliance with review guidelines and procedures; ensures reviews and reports are complete and submitted in a timely fashion, assists in the review process by participating in the review.

05%    2.   Conducts pre-review interviews with Troop/Bureau Commanders, collects material for reviews and makes arrangements for overnight accommodations at review sites; inspects statistical data and computer generated reports to isolate specific areas of interest to review team members; interviews local officials to assess the performance of the State Police locally and the degree of cooperation with local departments and agencies.

05%    3.   Monitors submission of the Line Inspection Reports and examines them to identify areas that impact upon the Department or warrant the attention of the Systems and Process Review Division; maintains files for the Line Inspection/Systems and Process Review Reports and purges outdated reports per regulations.

05%    4.   Directs the administrative responsibilities of the Division, including budget and contract management, approvals and authorization equipment management by conferring with superiors and subordinates, completing assignments, responding to requests, solving problems and making decisions as required.

05%    5.   Coordinates intra-department activities by responding to inquires and providing information as requested; attending staff meetings, command conferences, etc.

10%    6.   Maintains necessary knowledge and skills by keeping current on changes in Department policies and regulations, law enforcement procedure and management principles; attending training as needed and reading professional literature; adapts review procedures as needed to address changes in rules and regulations and to accommodate efficiency in the review process.

05%    7.   Ensures effective flow of information from and through the Division by communicating clearly, both orally and in writing, holding staff meetings as needed and providing an atmosphere which encourages accurate and efficient communication.

TIFICATION:

I certify that to the best of my knowledge all statements shown above are correct.

_Darrell G. Ober_                                    4/3/98

SIGNATURE OF EMPLOYE                              DATE

STD-370, Job Description
Page two

05%     8.    Ensures effective working relationships with external agencies and organizations by maintaining a professional Department image, and an atmosphere of cooperation with the general public, media, other law enforcement agencies and the courts, and public and private organizations.

10%     9.   Performs other duties as required, including serving on boards, conducting investigations, attending ceremonies, drafting Department regulations, evaluating special equipment and reviewing legislation, suggestions and proposed regulations for the purpose of making recommendations.

10.    Performs other related duties and those duties of a law enforcement officer as required, including, but not limited to interpreting laws and statutes of the Commonwealth, pursuing suspects, effecting arrests; qualifying with and, when necessary, using agency firearms and other self-defense devices; operating vehicles and using equipment in conjunction with law enforcement duties; responding to emergencies, civil disorders and disasters; and performing rescue functions.



# Employe Performance Review
## Captain Darrell G. Ober
### March 97 to March 98

**Job Knowledge/Skills:**    Captain Ober consistently demonstrates superior knowledge concerning the operation of the Systems And Process Review Division and of the Department. He is a resource that many senior level commanders and directors within the Department seek out for assistance.

**Work Results:**    Not only does Captain Ober personally produce excellent work results, he consistently strives to ensure that members of his staff produce quality results. He is challenged by the decentralized nature of his Division; however, he persists in motivating his staff to produce superior work in a timely manner.

**Communications:**    Captain Ober possesses exceptional communications skills. During meetings and in informal discussions, he never fails to make his point or share the relevant information clearly and concisely. His writing skills are also excellent. The documents he has personally prepared are always easy to understand, complete, and to the point. The documents prepared by his staff are also very high quality, I believe because of his careful review of their work. I know he prepares extensively for formal presentations, such as Commanders' Conferences. The results are presentations that I am proud to have done by a representative of this Bureau.

Captain Ober is proficient in sharing information throughout his Division, in spite of its decentralization. He uses a newsletter very effectively. The fact that his staff is well organized and up to speed on the issues is evidence of his attention to detail in communications.

**Initiative/Problem Solving:** Problem solving seems to be a core function of Captain Ober's personality. He is relentless in his efforts to identify and address activities that are less than efficient, effective or meaningful. By virtue of his position, he becomes aware of deficiencies which may be identified anywhere in the Department, and he never fails to utilize appropriate procedures to offer up proposed solutions in conjunction with the problem identification.

**Interpersonal Relations/Affirmative Action:**    Captain Ober is a sincere and very forthright person. He has consistently demonstrated the willingness and the ability to reach out to other persons and effectively conduct the business at hand through a cooperative effort. He is a man of integrity, a fact that has been recognized and respected by his superiors, his peers and his subordinates. He treats others with respect and equality.

**Work Habits:**    Captain Ober always utilizes proper conduct, speech and ethical behavior. His conduct is always consistent with Commonwealth and Department administrative requirements. Captain Ober is well organized. He never fails to complete assignments on time or, early. He finds time to pursue his initiatives for his Division, and is very proactive in seeking





8. Describe how you are supervised by telling how your work is assigned and how your supervisor reviews your work.

The majority of the work assignment is accomplished through scheduled activities on an annual or biannua
tation. Special assignments are conveyed either orally or in written form. The completed work project
then submitted for review.

9. Prepare an organization chart and identify your supervisor and all employes whose performance rating you sign by names and class titles. If you are not a supervisor, your supervisor must complete this part and identify his supervisor and all his subordinates.

<div align="center">

DIRECTOR, BUREAU OF PROFESSIONAL RESPONSIBILITY

DIRECTOR, SYSTEMS AND PROCESS REVIEW DIVISION

COMMANDER      COMMANDER      COMMANDER
EASTERN        CENTRAL        WESTERN
SECTION        SECTION        SECTION

(ALL THREE COMMANDERS ARE LIEUTENANTS)

</div>

3
_____ Total number subordinates reporting to you

Describe the kind of supervision you give the employes on the above chart by explaining the type of work assigned and the type of work review exercised. you are not a supervisor, your supervisor must complete this part for all employes shown above.

Supervision is provided the aforementioned subordinates by ensuring adherance to an established schedule of reviews, by examination of the reports generated through those reviews and by personally observing performance during the review process.

11. FOR THE EMPLOYE'S IMMEDIATE SUPERVISOR: Review your subordinate's statements. You may make any comments or include any information you feel is appropriate or would be helpful. Use additional paper if needed.

EMPLOYEE'S IMMEDIATE
SUPERVISOR'S SIGNATURE _____    CLASS
TITLE _MAJOR_____    DATE _3/31/98_

➡ TO BE COMPLETED BY THE CLASSIFYING AUTHORITY ➡

APPROVED POSITION CLASSIFICATION

WING ANALYST'S SIGNATURE                                    DATE

# EMPLOYE PERFORMANCE REVIEW

363L (Rev. 6/98)

020      5420

| GENERAL INFORMATION | TYPE REPORT | ☐ PROBATIONARY (CS/NCS union covered) ☐ PROBATIONARY (CS non-union) | ☐ INTERIM | ☒ ANNUAL |

| EMPLOYE NAME | AGENCY | EMPLOYE NUMBER |
|---|---|---|
| OBER,  DARRELL  G. | 020 STATE POLICE | 099820 |

| CLASS TITLE | | |
|---|---|---|
| ST PLC CAPT | ☒ SUPERVISOR ☐ NON-SUPERVISOR | STATUS  ☐ CIVIL SERVICE  ☒ NCS  ☐ SMS |

| ORGANIZATION | RATING PERIOD |
|---|---|
| 5420  OPERATIONS DIV | FROM 03/00          TO 03/01 |

## GENERAL INSTRUCTIONS

Verify/Complete General Information.  Indicate whether employe is a supervisor or non-supervisor.

Review the employe's job description for the rating cycle.  Review/discuss job standards (expectations/objectives/duties), to ensure appraisal relates to the specific responsibilities, job assignments and standards which have been conveyed to the employe for the rating cycle.  Update the job description and essential job functions for the next rating cycle.

Indicate when you conveyed job standards to the employe and when progress review(s) was conducted.

Base the appraisal on the employe's performance during the entire review period, not isolated incidents or performance prior to current review period.

The comments sections should be used to: support performance ratings, indicate problem areas and provide guidance to employes on how to improve performance.  Comments MUST be provided for outstanding, needs improvement and unsatisfactory ratting, but are highly recommended for all other ratings.  (ATTACH ADDITIONAL 8 ½ X 11 PAPER IF NEEDED.)

## PERFORMANCE RATING DEFINITIONS

| | |
|---|---|
| Outstanding: | Results are achieved on a consistent basis and significantly surpass job standards. |
| Commendable: | The employe clearly exceeds job standards on a regular basis and demonstrates a high    degree of initiative and quality of work. |
| Satisfactory: | The employe meets the standards of the employe's job in a fully adequate manner. |
| Needs Improvement: | The employe meets many of the standards of the employe's job in a satisfactory manner.  Improvement is expected. |
| Unsatisfactory: | Excessive performance deficiencies exist and must be corrected. |

## COMMUNICATION OF PERFORMANCE STANDARDS

1. Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employe on 8/1/00
   date(s)

2. Progress Review(s) was conducted on  11/1/00  (at least one during rating cycle)
   date(s)

EMPLOYE NAME: **OBER, DARREL G** ● ● EMPLOY ● MBER: 099820    020   5420

## JOB FACTORS

### 1. JOB KNOWLEDGE/SKILLS
This factor measures the employe's demonstrated knowledge of relevant job information such as: work practices, procedures, resources, policies, and technical information as well as the relationship of work to the organization's mission. Possession of essential skills required to perform the job also are measured.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☒ | ☐ | ☐ | ☐ |
| Demonstrates superior job knowledge and skills. Consistently provides and applies accurate and appropriate job information/resources. Applies new techniques. | Has thorough knowledge of the job and related resources. Strives to expand knowledge. Frequently recommends changes in procedures and methods as needs dictate. | Has adequate knowledge and skills to completely perform all job responsibilities. Handles inquiries properly. Has some knowledge of related work. | Possesses basic job knowledge but requires some improvement with regard to the technical aspects of the job and/or understanding of resources, policies and procedures. | Demonstrates a lack of basic job knowledge and or skills to perform job as detailed in comments |

Comments: The only thing keeping Capt. Ober from the outstanding category is that he is relatively new to a position that requires knowledge of laws, processes and procedures largely removed from that normally encountered by a State Police officer. He has shown initiative, resolve and a penchant for creative thinking.

### 2. WORK RESULTS
This factor measures the employe's demonstrated ability to meet established expectations of quality and quantity within established time frames.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Work consistently exceeds the expected quality, quantity and timeliness requirements. | Work frequently exceeds the expected quality, quantity and timeliness requirements. | Work meets the expected quality, quantity and timeliness requirements. | Occasionally has difficulty meeting the expected quality, quantity and/or timeliness requirements. | Consistently fails to meet expected quality, quantity and/or timeliness requirements. |

Comments: Capt. Ober consistently delivers a quality work product in a timely fashion. He is thorough, analytical and direct in his approach.

### 3. COMMUNICATIONS
This fact measures the employe's demonstrated ability to exchange information with others clearly and concisely, to provide information to others on a timely basis within and outside the organization, and to listen, organize, and present thoughts logically and in a clear, concise manner, both orally and in writing.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Particularly adept at organizing and presenting facts and ideas. Exceptionally skilled in soliciting and clarifying information to ensure understanding. Promotes easy exchange of information. Writes and speaks clearly, concisely and is articulate. | Initiates and encourages timely and effective exchange of information. Proficient in organizing and presenting facts and ideas orally and in writing. Seeks and provides appropriate feedback. | Effectively exchanges relevant information. Speaks and writes clearly. Keeps others informed as needed. Listens with understanding. | Occasionally lacks clarity of expression orally or in writing. Inconsistent in keeping others informed and at times fails to listen effectively. | Frequently is difficult to understand. Is vague orally or in writing. Often does not keep others informed. Is an ineffective listener and/or frequently interrupts. |

Comments: Communications is one of Capt Ober's strongest attributes. He is able to use a deft sense of humor combined with good listening skills to promote a ready exchange of information. He is particularly skilled at presenting information , both written and oral, in such a way as to be easily understood.

### 4. INITIATIVE/PROBLEM SOLVING
This factor measures the employe's demonstrated ability to perform work without specific instruction beyond that normally provided by a supervisor and within established limits of responsibility and authority. It also assesses the employe's ability to determine what needs to be done within available resources and to pursue appropriate means of accomplishing tasks.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Regularly takes the initiative to identify and resolve work unit/agency problems. Perceives full dimension of problems and limitations. Develops corrective solutions and follows through to conclusion. Requires minimal supervision. | Frequently assumes responsibility for identifying solutions and methods to resolve concerns. Adept at defining and analyzing complex problems and solutions. Requires moderate supervision. | Recognizes problems and suggests and/or assists in developing solutions. Carries through solution implementation. Requires normal supervision. | Resolves routine problems. Exhibits little initiative in identifying problems or solutions. Needs to improve ability to recognize potential problems and evaluate solutions and their impact. Requires more than normal supervision. | Fails to recognize or seek help in resolving routine problems. Requires frequent reminders of what needs to be done. |

Comments: Capt. Ober recognizes potential problems and takes appropriate action to address them..He reviews all aspects of a problem and then follows a logical course of action to its conclusion.

EMPLOYE NAME:  OBER,  DARRELL ●                    EMPLO ● ●MBER:  099820      020  5420

## JOB FACTORS

### 5.  INTERPERSONAL RELATIONS/EQUAL EMPLOYMENT OPPORTUNITY (EEO)  This factor measures the employe's demonstrated ability to develop and maintain positive and constructive internal/external relationships.  Consideration should be given to the employe's demonstrated willingness to function as a team player, give and receive constructive criticism, resolve conflicts, recognize needs and sensitivities of others and treat others in a fair and equitable manner.  Supervisors also are to be assessed on their demonstrated commitment to Equal Employment Opportunity.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Consistently promotes and maintains harmonious work environment.  Exhibits understanding of needs of others that is reflected in attitude in dealing with them.  Is respected and trusted.  Actively promotes/adheres to EEO program activities/requirements. | Maintains cooperative and positive work relationships.  Handles conflict constructively.  Promotes team work and cooperation, and fair and equitable treatment of others.  Promotes/adheres to EEO program activities and requirements. | Interacts in a cooperative, positive manner.  Avoids disruptive behavior.  Deals appropriately with anger, frustration, conflict, etc.  Treats others fairly and equitably.  Adheres to EEO policy/administrative requirements. | Usually gets along with others.  Allows personal bias to affect job relationships.  Requires occasional reminders regarding needs and sensitivities of others.  Does not consistently adhere to EEO policy/administrative requirements. | Interpersonal relationships are counter productive to work unit functions as described in comments.  Generally ignores EEO policy/administrative requirements. |

Comments:  Capt Ober works hard to promote a harmonious work environment within the Bureau as well as with external customers.  He is sensitive to the work and personal problems of others and is trusted by the Bureau members with whom he deals.

### 6.  WORK HABITS  This factor measures the employe's demonstrated ability to utilize proper conduct, speech and ethical behavior in the work environment.  Compliance with Commonwealth/agency/work unit policies and procedures such as attendance, punctuality, safety, security, housekeeping and other norms are assessed, as well as proper care and maintenance of assigned equipment.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Work is planned/organized to cover all phases of job assignments.  Work meets/exceeds deadlines and future steps are anticipated.  Equipment and supplies are cared for wisely and in accord with procedure.  Employe serves as role model for other employes with regard to work rules. | Work is planned/organized to accomplish job assignments effectively and in a timely manner including those of unusual nature.  Scheduled meetings/deadlines are met with few exceptions.  Personal care is taken in use of equipment, with minimal waste.  Employe adheres to organizational rules and procedures | Work is planned to meet routine volume and timeliness.  Employe adheres to organizational work rules and procedures with rare exceptions.  Appropriate care is taken in use of equipment. | Organization and planning of work is infrequently demonstrated.  Work often requires revisions resulting in decreased productivity or missed deadlines.  Employe needs improvement in complying with rules, regulations and or care of equipment. | Employe regularly fails to meet expected work results due to lack of effective organization, use of equipment or adherence to established rules/regulations. |

Comments:  Capt. Ober is very well organized , conscientious and structured in his work habits.  He freely gives of his own time, is punctual and conveys his expectations of the same type of work habits to others.

### 7.  SUPERVISION/MANAGEMENT  (Required for all supervisors/managers)  This factor measures the supervisor's demonstrated ability to assign work responsibility and authority to subordinates, established monitoring activities and systems to ensure work progresses to completion, ensure compliance with established procedures/regulations, and take corrective action when necessary.  It also assesses the supervisor's adherence to or completion of personnel/administrative requirements, i.e. timely performance evaluations, appropriate discipline, management of overtime, leave etc.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Manages/supervises employes and work activities to consistently achieve a smooth/timely work flow, high level of quality and quantity.  Continuously strives to improve operations, staff and instills team spirit.  Consistently complies with personnel/administrative requirements. | Manages/supervises employes to achieve effective and timely work products.  Delegates work effectively and appropriately to achieve maximum results.  Provides adequate direction and training.  Complies with personnel and administrative requirements. | Manages/supervises employes adequately to achieve satisfactory or normal work production and effectiveness.  Meets personnel and administrative requirements. | Inconsistent effective supervision or management of staff.  At times, fails to direct/train staff within existing means.  Less than adequate quality and quantity of production.  Inconsistent adherence to personnel and administrative requirements. | Ineffective supervision or management of staff.  Fails to establish appropriate monitoring/control activities.  Production is poor in quality and/or quantity.  Often ignores personnel and administrative requirements. |

Comments:  Capt. Ober is a very capable supervisor who delegates  appropriate and ensures that subordinates have the training necessary to accomplish their duties.

# EMPLOYE PERFORMANCE REVIEW

363L (Rev. 6/98)

020    5410

| GENERAL INFORMATION | TYPE REPORT | ☐ PROBATIONARY (CS/NCS union covered) ☐ PROBATIONARY (CS non-union) | | ☐ INTERIM    ☒ ANNUAL |
|---|---|---|---|---|

| EMPLOYE NAME | AGENCY | EMPLOYE NUMBER |
|---|---|---|
| OBER, DARRELL G. | 020 STATE POLICE | 099820 |

| CLASS TITLE | ☒ SUPERVISOR | STATUS | | |
|---|---|---|---|---|
| ST PLC CAPT | ☐ NON-SUPERVISOR | ☐ CIVIL SERVICE | ☒ NCS | ☐ SMS |

| ORGANIZATION | RATING PERIOD | |
|---|---|---|
| 5410 ADMIN. DIVISION | FROM 03/01 | TO 03/02 |

## GENERAL INSTRUCTIONS

Verify/Complete General Information.  Indicate whether employe is a supervisor or non-supervisor.

Review the employe's job description for the rating cycle.  Review/discuss job standards (expectations/objectives/duties), to ensure appraisal relates to the specific responsibilities, job assignments and standards which have been conveyed to the employe for the rating cycle.  Update the job description and essential job functions for the next rating cycle.

Indicate when you conveyed job standards to the employe and when progress review(s) was conducted.

Base the appraisal on the employe's performance during the entire review period, not isolated incidents or performance prior to current review period.

The comments sections should be used to: support performance ratings, indicate problem areas and provide guidance to employes on how to improve performance.  Comments MUST be provided for outstanding, needs improvement and unsatisfactory ratting, but are highly recommended for all other ratings.  (ATTACH ADDITIONAL 8 ½ X 11 PAPER IF NEEDED.)

## PERFORMANCE RATING DEFINITIONS

| Outstanding: | Results are achieved on a consistent basis and significantly surpass job standards. |
|---|---|
| Commendable: | The employe clearly exceeds job standards on a regular basis and demonstrates a high  degree of initiative and quality of work. |
| Satisfactory: | The employe meets the standards of the employe's job in a fully adequate manner. |
| Needs Improvement: | The employe meets many of the standards of the employe's job in a satisfactory manner. Improvement is expected. |
| Unsatisfactory: | Excessive performance deficiencies exist and must be corrected. |

## COMMUNICATION OF PERFORMANCE STANDARDS

1. Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employe on <u>3/1/02</u>
        date(s)

2. Progress Review(s) was conducted on  <u>6/1/02</u>  (at least one during rating cycle)
        date(s)



EMPLOYE NAME: OBER, DARRELL C.      EMPLO NUMBER: 099820      020 541

## JOB FACTORS

### 1. JOB KNOWLEDGE/SKILLS
This factor measures the employe's demonstrated knowledge of relevant job information such as: work practices, procedures, resources, policies, and technical information as well as the relationship of work to the organization's mission. Possession of essential skills required to perform the job also are measured.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTOR |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Demonstrates superior job knowledge and skills. Consistently provides and applies accurate and appropriate job information/resources. Applies new techniques. | Has thorough knowledge of the job and related resources. Strives to expand knowledge. Frequently recommends changes in procedures and methods as needs dictate. | Has adequate knowledge and skills to completely perform all job responsibilities. Handles inquiries properly. Has some knowledge of related work. | Possesses basic job knowledge but requires some improvement with regard to the technical aspects of the job and/or understanding of resources, policies and procedures. | Demonstrates a lack of basic job knowledge and or skills t perform job as detailed in comments |

Comments: In the year since the last evaluation, Captain Ober has broadened what was already an impressive array of knowledge and skill that relate to his assigned duties. In addition, his range of general knowledge makes him very valuable as a source.

### 2. WORK RESULTS
This factor measures the employe's demonstrated ability to meet established expectations of quality and quantity within established tim frames.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTOR |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Work consistently exceeds the expected quality, quantity and timeliness requirements. | Work frequently exceeds the expected quality, quantity and timeliness requirements. | Work meets the expected quality, quantity and timeliness requirements. | Occasionally has difficulty meeting the expected quality, quantity and/or timeliness requirements. | Consistently fails to meet expected quality, quantity and/or timeliness requirement |

Comments: Captain Ober has undertaken a wide range of projects at my direction and has consistently delivered a timely, thorough and analytical work project.

### 3. COMMUNICATIONS
This fact measures the employe's demonstrated ability to exchange information with others clearly and concisely, to provide information to others on a timely basis within and outside the organization, and to listen, organize, and present thoughts logically and in a clear, concise manner, both orally and in writing.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTOR |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Particularly adept at organizing and presenting facts and ideas. Exceptionally skilled in soliciting and clarifying information to ensure understanding. Promotes easy exchange of information. Writes and speaks clearly, concisely and is articulate. | Initiates and encourages timely and effective exchange of information. Proficient in organizing and presenting facts and ideas orally and in writing. Seeks and provides appropriate feedback. | Effectively exchanges relevant information. Speaks and writes clearly. Keeps others informed as needed. Listens with understanding. | Occasionally lacks clarity of expression orally or in writing. Inconsistent in keeping others informed and at times fails to listen effectively. | Frequently is difficult to understand. Is vague orally o in writing. Often does not kee others informed. Is an ineffective listener and/or frequently interrupts. |

Comments: In his role as director of the administrative division, Captain Ober is regularly afforded the opportunity to use his well honed communication skills. He is particularly skilled in organizing and presenting information and ideas in such a way as to make them easily understood. He addresses labor issues in a fashion that the issues are defused thereby encouraged toward resolution.

### 4. INITIATIVE/PROBLEM SOLVING
This factor measures the employe's demonstrated ability to perform work without specific instruction beyond that normally provided by a supervisor and within established limits of responsibility and authority. It also assesses the employe's ability to determine what needs to be done within available resources and to pursue appropriate means of accomplishing tasks.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTOR |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Regularly takes the initiative to identify and resolve work unit/agency problems. Perceives full dimension of problems and limitations. Develops corrective solutions and follows through to conclusion. Requires minimal supervision. | Frequently assumes responsibility for identifying solutions and methods to resolve concerns. Adept at defining and analyzing complex problems and solutions. Requires moderate supervision. | Recognizes problems and suggests and/or assists in developing solutions. Carries through solution implementation. Requires normal supervision. | Resolves routine problems. Exhibits little initiative in identifying problems or solutions. Needs to improve ability to recognize potential problems and evaluate solutions and their impact. Requires more than normal supervision. | Fails to recognize or seek help in resolving routine problems. Requires frequent reminders o what needs to be done. |

Comments: Captain Ober is able to quickly identify work unit problems and steer the involved parties to an amicable resolution that addresses the root problem and prevents a recurrance.

EMPLOYE NAME: OBER, DARRELL G.    EMPLOY    NUMBER: 099820    020 541

## JOB FACTORS

### 5. INTERPERSONAL RELATIONS/EQUAL EMPLOYMENT OPPORTUNITY (EEO)
This factor measures the employe's demonstrated ability to develop and maintain positive and constructive internal/external relationships. Consideration should be given to the employe's demonstrated willingness to function as a team player, give and receive constructive criticism, resolve conflicts, recognize needs and sensitivities of others and treat others in a fair and equitable manner. Supervisors also are to be assessed on their demonstrated commitment to Equal Employment Opportunity.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Consistently promotes and maintains harmonious work environment. Exhibits understanding of needs of others that is reflected in attitude in dealing with them. Is respected and trusted. Actively promotes/adheres to EEO program activities/requirements. | Maintains cooperative and positive work relationships. Handles conflict constructively. Promotes team work and cooperation, and fair and equitable treatment of others. Promotes/adheres to EEO program activities and requirements. | Interacts in a cooperative, positive manner. Avoids disruptive behavior. Deals appropriately with anger, frustration, conflict, etc. Treats others fairly and equitably. Adheres to EEO policy/administrative requirements. | Usually gets along with others. Allows personal bias to affect job relationships. Requires occasional reminders regarding needs and sensitivities of others. Does not consistently adhere to EEO policy/administrative requirements. | Interpersonal relationships are counter productive to work un functions as described in comments. Generally ignores EEO policy/administrative requirements. |

Comments: Captain Ober works daily to establish and maintain an environment conducive to the establishment of good working relationships. He is particularly adept at resolving conflicts and is sensitive to the needs of others.

### 6. WORK HABITS
This factor measures the employe's demonstrated ability to utilize proper conduct, speech and ethical behavior in the work environment. Compliance with Commonwealth/agency/work unit policies and procedures such as attendance, punctuality, safety, security, housekeeping and other norms are assessed, as well as proper care and maintenance of assigned equipment.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Work is planned/organized to cover all phases of job assignments. Work meets/exceeds deadlines and future steps are anticipated. Equipment and supplies are cared for wisely and in accord with procedure. Employe serves as role model for other employes with regard to work rules. | Work is planned/organized to accomplish job assignments effectively and in a timely manner including those of unusual nature. Scheduled meetings/deadlines are met with few exceptions. Personal care is taken in use of equipment, with minimal waste. Employe adheres to organizational rules and procedures | Work is planned to meet routine volume and timeliness. Employe adheres to organizational work rules and procedures with rare exceptions. Appropriate care is taken in use of equipment. | Organization and planning of work is infrequently demonstrated. Work often requires revisions resulting in decreased productivity or missed deadlines. Employe needs improvement in complying with rules, regulations and or care of equipment. | Employe regularly fails to mee expected work results due to lack of effective organization, use of equipment or adherence to established rules/regulations |

Comments: Captain Ober is very organized and demonstrates superior work habits in his posittion. He always has time to assist others and still meet deadlines for special projects I assign him. He is very ethical and demonstrates proper conduct in the work place.

### 7. SUPERVISION/MANAGEMENT
(Required for all supervisors/managers) This factor measures the supervisor's demonstrated ability to assign work responsibility and authority to subordinates, established monitoring activities and systems to ensure work progresses to completion, ensure compliance with established procedures/regulations, and take corrective action when necessary. It also assesses the supervisor's adherence to or completion of personnel/administrative requirements, i.e. timely performance evaluations, appropriate discipline, management of overtime, leave etc.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |
| Manages/supervises employes and work activities to consistently achieve a smooth/timely work flow, high level of quality and quantity. Continuously strives to improve operations, staff and instills team spirit. Consistently complies with personnel/administrative requirements. | Manages/supervises employes to achieve effective and timely work products. Delegates work effectively and appropriately to achieve maximum results. Provides adequate direction and training. Complies with personnel and administrative requirements. | Manages/supervises employes adequately to achieve satisfactory or normal work production and effectiveness. Meets personnel and administrative requirements. | Inconsistent effective supervision or management of staff. At times, fails to direct/train staff within existing means. Less than adequate quality and quantity of production. Inconsistent adherence to personnel and administrative requirements. | Ineffective supervision or management of staff. Fails to establish appropriate monitoring/control activities. Production is poor in quality and/or quantity. Often ignores personnel and administrative requirements. |

Comments: Captain Ober is an outstanding supervisor who works diligently to improve processes related to the day by day operations of the State Police.

EMPLOYE NAME: OBER , DARRELL G.                    EMPLOYE NUMBER: 099820        020 54

## OVERALL RATING

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTOR |
|:-----------:|:-----------:|:------------:|:-----------------:|:-------------:|
| ☒ | ☐ | ☐ | ☐ | ☐ |

**TRAINING AND DEVELOPMENT RECOMMENDATIONS:**  None at this time.

## COMMENTS AND SIGNATURES                    (Attach additional 8 ½ x 11 paper if necessar

RATER COMMENTS: (This section should comment on any aspect(s) of employe's performance not covered elsewhere and should explain overall rating).
Captain Ober is a valuable member of the Bureau whose diverse background allows him to contribute in many ways normally referred to as "outside the box".thinking.  His ability to move these ideas forward to create policy procedures is what seperates him from the field.

**RATER SIGNATURE:** *Phillip L DeWire*                **DATE** 03/04/02

**REVIEWER COMMENTS:**

**REVIEWER SIGNATURE:** *Robert G Werts Esz*            **DATE** 03/28/02

**EMPLOYE COMMENTS:**

☑ **I AGREE WITH THIS RATING**          ☐ **I DISAGREE WITH THIS RATING**

☐ **I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER**

☐ **DISCUSSION WITH MY REVIEWING OFFICER OCCURRED** _____
                                                        (DATE)

☐ **I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN GIVEN AN
OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR;  MY SIGNATURE DOES NOT
NECESSARILY MEAN THAT I AGREE WITH THE REPORT.**

COMMENTS:

**EMPLOYE'S SIGNATURE:** *Darrell G. Ober*            **DATE** 3/4/02

LAW OFFICES
MARKOWITZ & RICHMAN
1100 NORTH AMERICAN BUILDING
121 SOUTH BROAD STREET
PHILADELPHIA, PENNSYLVANIA 19107
—
(215) 875-3100
TELECOPIER (215) 790-0668
DIRECT DIAL

RICHARD H. MARKOWITZ *
STEPHEN C. RICHMAN *
PAULA R. MARKOWITZ
QUINTES D. TAGLIOLI
JONATHAN WALTERS ++
ANTHONY C. BUSILLO II
THOMAS H. KOHN ***
RUTH SKOGLUND
R. MATTHEW PETTIGREW, JR.**
PETER H. DEMKOVITZ +
CHARLES F. SZYMANSKI +
NANCY A. WALKER

* ALSO ADMITTED IN NEW YORK
  AND DISTRICT OF COLUMBIA
+ ALSO ADMITTED IN NEW JERSEY
++ ALSO ADMITTED IN DISTRICT OF COLUMBIA
** ALSO ADMITTED IN NEW JERSEY AND NEW YORK
*** ALSO ADMITTED IN VIRGINIA
    AND DISTRICT OF COLUMBIA

ALLENTOWN OFFICE
SUITE 200 COMMONWEALTH BLDG.
512 HAMILTON STREET
ALLENTOWN, PA 18101-1505
(610) 820-9531

NEW JERSEY OFFICE
211 KINGS HIGHWAY EAST
HADDONFIELD, NJ 08033
(856) 616-2930

NEW YORK OFFICE
880 THIRD AVENUE
NINTH FLOOR
NEW YORK, NY 10022
(212) 752-6761

HARRISBURG OFFICE
27 SOUTH ARLENE STREET
P.O. BOX 6865
HARRISBURG, PA 17112-6865
(717) 541-9475

(215) 875-3119

May 31, 2000

Captain Darrell G. Ober
71 Miller's Gap Road
Enola, PA 17025

Re:    Ober v. Pennsylvania State Police

Dear Darrell:

This is to confirm our conversation of May 24, 2000 wherein you stated that the Law Offices of Bonnie L. Warnken has filed a Complaint in the above-captioned matter on your behalf, and that it has adequate local counsel with which to handle your matters. It is our understanding, given our telephone conversation, that you will not be using this firm to handle the litigation on your case against the Commonwealth and the State Police, and thus we will not be taking any role in this litigation, nor will we be responsible for representing you in any way in this matter. It is, however, our understanding that you should feel free to contact us if you need any further assistance on this matter, or wish further review of any of the legal issues involved in your case. (In such instance, we will then continue to bill you for our services on an hourly basis. It is our understanding that we would be billing you on an hourly basis for the time we spent reviewing and researching the issues involved in your case.)

If you have any questions or concerns, please do not hesitate to contact me. I wish you good luck in your pending litigation.

Very truly yours,

PETER H. DEMKOVITZ

PHD:eb
cc:    Anthony Busillo, Esquire

P291



# National Law Enforcement Officers' Rights Center

of the Police Research and Education Project (PREP)
750 First Street, N.E., Suite 920 • Washington, D.C. 20002-4241
(202) 842-4420 • (800) 322-NAPO • (202) 842-4396 Fax
www.napo.org ~ napo@erols.com

January 30, 2001

Robert T. Scully
*Executive Director*

Stephen R. McSpadden
*General Counsel*

Captain Darrell Ober
71 Millers Gap Road
Enola, PA 17025

Dear Captain Ober:

I am responding to your January 16th letter to Executive Director Robert T. Scully. Both he and I reviewed your letter, read the complaint, and discussed your case again. You have requested that we support your lawsuit by way of an *amicus curiae* brief now. We are not able to file an amicus brief for the following reasons.

With very rare exceptions, amicus briefs are filed at the appellate level, not the trial court level, because amicus briefs address the legal issues before the appellate court and not the combination of factual and legal issues resolved at the trial court level. Federal district court rules reflect and confirm this practice. I checked and verified that the rules of the U.S. District Court for the Middle District of Pennsylvania do not authorize the submission of such briefs. Thus, it is only after the trial court renders a decision in your case (either before or after trial) and an appeal commences, that the National Law Enforcement Officers' Rights Center would become involved by filing an amicus brief.

Whether we would do so then would depend on 1) our current workload at that point in time on any other amicus briefs (for example, U.S. Supreme Court briefs receive priority), 2) the importance of the specific legal issues on appeal and whether the issues are unsettled, including the existence of relevant Third Circuit precedents, and 3) the nature and extent of the decision's negative impact on the rights of other law enforcement officers in those states located within the Third Circuit, including officers belonging to NAPO member organizations, such as the New Jersey State P.B.A.

Consequently, to reiterate, please let us know of the outcome of your lawsuit as soon as one of the parties appeals the eventual result. At that point in time, we will apply the above policy and assess priorities to determine whether to submit a brief in support of your lawsuit.

I am prepared to lend to your attorney on a short term basis some excellent materials (articles and cases cited therein) concerning Section 1983 lawsuits, purchased from the Kent School of Law in Chicago, which holds an annual seminar on the topic. We would ask only that this information be returned to us within one month. Please have Mr. Bailey, contact me to arrange this if he would like to borrow this material. Again, I wish you good luck in your lawsuit!

Sincerely,

Stephen R. McSpadden
General Counsel

*P292*

*PREP is a 501(c)(3) affiliate of the National Association of Police Organizations (NAPO)*



# *Don Bailey, Esq.*
## ATTORNEY AT LAW

GREENSBURG OFFICE:
114 S. MAIN STREET
GREENSBURG, PA 15601
(724) 836-5334 FAX (724) 836-2909

4311 N. 6TH STREET
HARRISBURG, PA 17110
(717) 221-9500 FAX (717) 221-9600

OF COUNSE
SAMUEL C. STRETTO
301 S. HIGH STRE
WEST CHESTER, PA 19381-323
(610) 696-424

January 19, 2001

TO:       Darrell Ober

FROM:     Don Bailey, Esq.

IN RE:    Complaint filed on 1-16-01

Dear Darrell:

Listed below are the costs incurred with the lawsuit that was filed on your behalf:

| | |
|---|---|
| Filing Fee | $150.00 |
| Service on the Defendants | $26.85 |
| | |
| Total due: | $176.85 |

## PAYMENT DUE UPON RECEIPT

## THANK YOU!

P293.



*Don Bailey, Esq.*

Greensburg Office:
114 S. Main Street
Greensburg, PA 15601
(724) 836-5334

4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500   Fax 221-9600
dbailey@pa.net

Of Counsel:
Samuel C. Stretton
Andrew J. Ostrowski

June 28, 2001

Darryl Ober
71 Millers Gap Road
Enola, Pa 17025

Dear Darryl:

## STATEMENT OF ACCOUNT

514 copies of Motion to Dismiss @ .5 cents a copy $25.70

Mailing of Motion to Dismiss $4.52

**Total Due:** **$30.22**

P.S. Daryl is my spare time (ha!) I found the total you have paid-to-date:

#2805 $500.00 -  Retainer
$150.00 -  Filing Fee
(There was a certified cost I'm not sure what? The accountant has our records).
$9.78 -  Mailing Service
$30.22 -  Copies of Motion to Dismiss (still pending)

**Total Paid: $690.00**



*Don Bailey, Esq.*

Greensburg Office:
114 S. Main Street
Greensburg, PA 15601
(724) 836-5334

4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500   Fax 221-9600
dbailey@pa.net

Of Counsel:
Samuel C. Stretton
Andrew J. Ostrowski

May 8, 2001

TO:        Darrell Ober

FROM:    Don Bailey

IN RE:    Costs for Amended Complaint

Dear Darrell:

Enclosed is a copy of the amended complaint that was filed on your behalf. The costs for certified mailing of the amended complaint was $9.78. Please forward at your earliest convenience. Thanks.

Sincerely,

Don Bailey

DB:alb
cc: File

# P.R. VIDEO, INC.

## P.O. BOX 5228
## HARRISBURG, PA 17110
## (717) 234-4055

TO:    Daryl Ober

FROM:    P.R. Video Inc.

Date: February 1, 2002

Depositions held in the case of Daryl Ober vs. Paul Evanko et al. in the Middle District of Pennsylvania, docketed at 1:CV–01–0084.

| | |
|---|---|
| Depositions of: Francis Koselnak dated October 23, 2001 32 pages | $84.80 |
| Walter J. Margeson dated October 23, 2001 72 pages | $190.80 |
| Larry Riley dated October 23, 2001 54 pages | $143.10 |
| Mark Campbell 76 pages | $201.40 |
| Thomas Williams dated October 12, 2001 84 pages | $222.60 |
| Thomas Carr dated October 12, 2001 48 pages | $127.20 |
| Werts          86 pages | $227.90 |
| Total to date: | $1,197.80 pd. |

**PAYMENT DUE UPON RECEIPT OF INVOICE**
**THANK YOU FOR YOUR SERVICE!**

Balance Remaining $2,802.20

FRONT CHECK IMAGE

# Check #2805



**Please Note:** Information written on a check using a Gel Pen may cause the information to not appear as part of the check image.

View both front and back to print.

*Law Offices*
*of*

# BONNIE L. WARNKEN
32 EAST PRESTON STREET
BALTIMORE, MD 21202-2727
(410) 727-5951

January 28, 2000

Darrell Ober
71 Millers Gap Road
Enola PA 17025

|  |  |
|---|---|
| In Reference To: 2000-014 (initial consultation) | Invoice #<br>10836 |

Professional services:

|  |  |  |  | Hours | Amount |
|---|---|---|---|---|---|
| 1/14/00 | BLW | Initial consultation. | | 2.23 | 524.05 |
| | BLW | Draft/revise letter to client and legal services agreement. | | 0.43 | NO CHARGE |
| | JAL | Initial consultation.  Discussion w/ BLW and BMS on plan of action.  Review of material prior to meeting. | | 4.00 | 620.00 |
| | | For professional services rendered: | | 6.66 | $1,144.05 |

| | | |
|---|---|---|
| 1/14/00- | Payment - thank you | ($155.00) |
| 1/14/00- | Credit to reduce bill to initial consultation cap of $155.00 | ($989.05) |

| | |
|---|---|
| Total payments | ($1,144.05) |
| Balance due | $0.00 |

Employee summary

| Employee | Hours | Rate | Amount |
|---|---|---|---|
| Byron L. Warnken-attorney (BLW) | 2.23 | 235.00 | $524.05 |
| James A. Lanier-attorney (JAL) | 4.00 | 155.00 | $620.00 |

*Law Offices*
*of*

# BONNIE L. WARNKEN
32 EAST PRESTON STREET
BALTIMORE, MD 21202-2727
(410) 727-5951

January 28, 2000

Darrell Ober
71 Millers Gap Road
Enola PA 17025

In Reference To: 2000-014

Invoice #
10837

Professional services:

| | | | Hours | Amount |
|---|---|---|---|---|
| 1/17/00 | BLW | Meet w/BMS and JAL to discuss strategy and research for injunction. | 0.32 | 75.20 |
| | BMS | Research issue on basis under Pennsylvania law for an injunction. | 1.33 | 152.95 |
| 1/18/00 | BLW | Plan injunction w/JAL and BMS. | 0.15 | 35.25 |
| | BMS | Research issue of temporary injunction and pro hac vice under Pennsylvania law, necessity of local counsel and underlying cause of action. | 4.12 | 473.80 |
| | JAL | Began drafting injunction.  Met w/ BLW and BMS about research and drafting of injunction. | 5.75 | 891.25 |
| 1/19/00 | BLW | Discuss results of research and formulate strategy for obtaining injunction. | 0.27 | 63.45 |
| | BMS | Research issue determining the necessary elements to support a petition for temporary injunction, Pennsylvania case law on temporary injunctions, Pennsylvania State Police regulations applying to transfers, elements of a writ of Mandamus in Pennsyvania, and Whsitleblower statute. | 6.45 | 741.75 |
| | JAL | Continue drafting/researching injunction/mandamus.  Multiple discussions w/ BMS about research. | 7.00 | 1,085.00 |
| 1/20/00 | JAL | Finished rough draft of mandamus/injunction.  Gave copies to BLW and BMS.  Research.  Discussions w/ BMS and BLW during drafting. | 10.50 | 1,627.50 |
| | BLW | Discuss logistics of injunction hearing, strategy, pleadings, and pro hac vice status w/BMS and analyze merits of the injunction w/JAL. | 0.73 | 171.55 |
| | BMS | Determine necessary procedure for temporary injunction and writ of mandamus in Pennsylvania; verification of form; identify statute and rules of court to be used as support for petition and continue | 5.23 | 601.45 |

Darrell Ober

Page    2

|  |  |  | Hours | Amount |
|---|---|---|---|---|
| 1/20/00 | BMS | Multiple telephone conversations with Court of Common Pleas and subsequently Commonwealth Court to arrange for filing of writ of mandamus and motion for temporary injunction; arrangements form local counsel and for admission as counsel pro hac vice | 2.43 | 279.45 |
|  | BMS | Review preliminary draft of petition and for motion on pro hac vice. | 0.67 | 77.05 |
| 1/21/00 | JAL | Revised rought draft thorugh BMS research and BLW comments.  Review letters mailed by client. Faxed rough draft to client for review over the weekend.  Gave new copies of mandamus and injuction to BLW and BMS for review. | 5.25 | 813.75 |
|  | BLW | Draft/revise pleading for mandamus and injunction. | 1.13 | 265.55 |
|  | BMS | Draft pro hac vice motions with Pa. attorney notice; coordinate filing time with Prothonetary's office; review draft of Mandamus petition. | 2.42 | 278.30 |
| 1/22/00 | BLW | Draft/revise mandamus and injunction. | 0.14 | 32.90 |
| 1/24/00 | BLW | Update from BMS and JAL, review documents, plan logistics, and talk with client. | 0.72 | 169.20 |
|  | JAL | Draft/revised filings.  Spoke w/ client, SA Kush, SA Soohy, and FBI attorney about affidavits. | 6.75 | 1,046.25 |
|  | BMS | Prepare materials for temporary injunction and writ of mandamus | 2.08 | 239.20 |
| 1/25/00 | JAL | Implemented final changes.  Attempted to file - snow closed courthouse. | 3.50 | 542.50 |
|  | BLW | Discuss pleadings w/client and discuss filing logistics w/JAL and BMS. | 0.28 | 65.80 |
|  | BMS | Prepare final version of all materials for submission to the court | 3.25 | 373.75 |
| 1/26/00 | BLW | Call from client; discuss case strategy w/JAL both before and after JAL's discussion w/opposing counsel; call from clerk's office re: hearing; call to client; plan strategy w/JAL. | 0.74 | 173.90 |
|  | BMS | File all papers with the Commonwealth court and with the Pennsylvania State Police. | 5.33 | 612.95 |
|  | JAL | Drafted detailed letter to FBI to get affidavits. Coordinated w/ Clerk's officer the filing of documents.  Spoke to Ms. Joanna Reynolds of PSP to discuss filing/bond/pro hac vice/stay of transfer. Discussed logistics of preparing and arguing prliminary injunction w/ BLW. | 2.25 | 348.75 |

Darrell Ober

Page    3

| | Hours | Amount |
|---|---|---|
| For professional services rendered: | 78.79 | $11,238.45 |

Additional charges:

| | | Amount |
|---|---|---|
| 1/26/00- Filing fee with the Commonwealth Court of Pennsylvania. | | 35.00 |
| Total costs | | $35.00 |
| Total amount of this bill | | $11,273.45 |
| 1/27/00- Payment from escrow to Firm | | ($3,500.00) |
| Balance due | | $7,773.45 |

Employee summary

| Employee | Hours | Rate | Amount |
|---|---|---|---|
| Byron L. Warnken-attorney (BLW) | 4.48 | 235.00 | $1,052.80 |
| James A. Lanier-attorney (JAL) | 41.00 | 155.00 | $6,355.00 |
| Bruce M. Smith-attorney (BMS) | 33.31 | 115.00 | $3,830.65 |

| | Amount |
|---|---|
| Old balance of client escrow account | $0.00 |
| 1/14/00- Escrow payment made by client | $3,500.00 |
| 1/27/00- Payment from escrow to Firm | ($3,500.00) |
| New balance of client escrow account | $0.00 |

*Law Offices*
*of*

# BONNIE L. WARNKEN
32 EAST PRESTON STREET
BALTIMORE, MD 21202-2727
(410) 727-5951

February 15, 2000

Darrell Ober
71 Millers Gap Road
Enola PA 17025

Invoice #
10874

In Reference To: 2000-014

This statement contains time and expense billings through January 31, 2000

Professional services:

| | | | Hours | Amount |
|---|---|---|---|---|
| 1/27/00 | BLW | Return call to court re: attendance of Pennsylvania attorney and obtaining court reporter; negotiate w/opposing counsel; call client w/update. | 0.37 | 86.95 |
| | BMS | Review all case materials in preparation for 1/28 hearing on preliminary injunction. | 1.25 | 143.75 |
| | JAL | Spoke w/ Ms. Reynolds and BLW about stipulation. Drafted Motion to withdraw injunction and expedited hearing request.  Discussion w/ clierk about cancelliation of hearing and filing of documents. Faxed to Ms. Reynolds and Court.  Mailed to all. | 2.00 | 310.00 |
| 1/28/00 | JAL | Reviewed fax from FBI about affidavits. | 0.17 | 26.35 |

For professional services rendered:    3.79    $567.05

Additional charges:

1/31/00- Commonwealth Court of PA - subpoenas.    4.00

Total costs    $4.00

Total amount of this bill    $571.05

Previous balance    $7,773.45

2/15/00- Payment - thank you    ($4,500.00)

Darrell Ober

Amount

2/15/00- Payment - thank you                                    ($3,273.45)

Total payments                                     ($7,773.45)

Balance due                                         $571.05

## Employee summary

| Employee | Hours | Rate | Amount |
|---|---|---|---|
| Byron L. Warnken-attorney (BLW) | 0.37 | 235.00 | $86.95 |
| James A. Lanier-attorney (JAL) | 2.17 | 155.00 | $336.35 |
| Bruce M. Smith-attorney (BMS) | 1.25 | 115.00 | $143.75 |

*Law Offices*
*of*

# BONNIE L. WARNKEN

32 EAST PRESTON STREET
BALTIMORE, MD 21202-2727
(410) 727-5951

March 30, 2000

Darrell Ober
71 Millers Gap Road
Enola PA 17025

Invoice #

In Reference To: 2000-014                                                    10948

This statement contains time and expense billings through February 29, 2000

Professional services:

| | | | Hours | Amount |
|---|---|---|---|---|
| 2/1/00 | JAL | Drafted request for subpoenas. Called Court to get subpoenas. | 0.17 | 26.35 |
| 2/3/00 | JAL | Mailed information and Order from court to client. | 0.03 | NO CHARGE |
| 2/8/00 | BLW | Analyze strategy options w/client. | 0.20 | 47.00 |
| | JAL | Spoke to Ms. Reynolds about settlement. Spoke to client about settlement. Advised BLW. BLW spoke to client and advised me to write response letter to settlement offer. | 1.00 | 155.00 |
| 2/9/00 | JAL | Discussed settlement agreement w/ Ms. Reynolds. Discussed w/ client. Drafted counter-offer for Ms. Reynolds. E-mailed to client for review. | 0.75 | 116.25 |
| | TMD | Organized materials into binders per JAL. | 1.47 | NO CHARGE |
| 2/10/00 | BLW | Analyze settlement proposal letter and correspondence from client and analyze options w/JAL. | 0.23 | 54.05 |
| | JAL | Drafted counteroffer letter. Submitted to client and BLW for review. Edited and faxed to PSP. | 1.00 | 155.00 |
| 2/14/00 | JAL | Spoke to client about status and billing. Gave to CLB for further billing questions. | 0.08 | NO CHARGE |
| 2/15/00 | JAL | Informed client about denial of counter-offer. Advised BLW. Called Mr. Killeen (FBI) about subpoenas. | 0.50 | 77.50 |
| 2/16/00 | JAL | Spoke to client about transfer he found out about through grapevine. Called Ms. Reynoldes and left message. | 0.17 | 26.35 |
| 2/18/00 | TMD | Researched Penns. Rules of Discovery. | 1.50 | 120.00 |

Darrell Ober

Page    2

| | | | Hours | Amount |
|---|---|---|---|---|
| 2/24/00 | JAL | Update call and discussion of strategy w/ client re: media and discovery. | 0.67 | 103.85 |
| 2/28/00 | JAL | Began review of Discovery process/procedure for PA. | 0.75 | 116.25 |
| | | For professional services rendered: | 8.52 | $997.60 |
| | | Previous balance | | $571.05 |
| | | Balance due | | $1,568.65 |

## Employee summary

| Employee | Hours | Rate | Amount |
|---|---|---|---|
| Byron L. Warnken-attorney (BLW) | 0.43 | 235.00 | $101.05 |
| James A. Lanier-attorney (JAL) | 5.01 | 155.00 | $776.55 |
| Thomas M. Donnelly-law clerk (TMD) | 1.50 | 80.00 | $120.00 |

*Law Offices*
*of*

# BONNIE L. WARNKEN

32 EAST PRESTON STREET
BALTIMORE, MD 21202-2727
(410) 727-5951

April 14, 2000

Darrell Ober
71 Millers Gap Road
Enola PA 17025

Invoice #
11001

In Reference To: 2000-014

This statement contains time and expense billings through March 31, 2000

Professional services:

|  |  |  | Hours | Amount |
|---|---|---|---|---|
| 3/2/00 | BLW | Plan strategy w/JAL. | 0.22 | 51.70 |
|  | JAL | Reviewed information from client. Called Court to determine if anything filed. Learned of filing. Called Ms. Reynolds and got copies of filings. Discussed strategy w/ BLW. Researched response to mootness argument. | 3.17 | 491.35 |
| 3/3/00 | BLW | Draft/revise press release. | 0.23 | 54.05 |
|  | BLW | Analyze PSP's pleading and argument for our response. | 0.35 | 82.25 |
|  | JAL | Drafted Reply to State's Preliminary Objections and Application for Dismissal. Research. Discussed w/ client strategy. Drafted press release. Gave all to BLW and/or client for final review and ok. | 5.50 | 852.50 |
|  | TMD | Researched Whistleblower: Penn. Statutes on Westlaw. | 0.83 | 66.40 |
|  | TMD | Researched Whistleblower; Statutes and Administrative Requirements, Statute of Limitations, & case law. | 2.72 | 217.60 |
|  | TMD | Researched Whistleblower; Statutes and Administrative Requirements, Statute of Limitations, & case law. | 0.25 | 20.00 |
| 3/6/00 | TMD | Researched Penns. Civ. Pro. | 1.90 | 152.00 |
|  | TMD | Draft/revise press release for Jim. | 0.83 | 66.40 |
|  | TMD | Researched Whistleblower cases in Penn. | 1.98 | 158.40 |
|  | TMD | Left Message with John Miller Re; Civ.Pro.Rules. Called legal advice line and his Pennsylvania office. | 0.17 | NO CHARGE |

Darrell Ober                                                        Page   2

|  |  |  | Hours | Amount |
|---|---|---|---|---|
| 3/6/00 | JAL | Finished press release. Spoke to various newspapers about press release. Updated client. | 0.67 | 103.85 |
| 3/7/00 | JAL | Revised Reply to Preliminary Objections and filed. Interviewed by Harrisburg Patriot News about press release. Informed client about article in tomorrow's paper. | 1.00 | 155.00 |
|  | BLW | Analyze issues and authority in response and edit response. | 0.48 | 112.80 |
| 3/8/00 | JAL | Informed client why no article in today's paper. Left message for reporter Mr. Shellem. | 0.05 | NO CHARGE |
| 3/9/00 | JAL | Reviewed newspaper article. Spoke to reporter about article. Spoke to client about article. | 0.17 | 26.35 |
| 3/13/00 | JAL | Called clerk to discuss filings/hearing date/docketing statement from court. | 0.17 | 26.35 |
|  | BLW | Update from JAL. | 0.05 | NO CHARGE |
| 3/16/00 | JAL | Drafted "damand letter" to FBI for testimony of SAs Kush and Soohy. Conferred w/ Commonwealth Court of how hearing will work logistically. Updated client. | 0.75 | 116.25 |
| 3/17/00 | TMD | Typed and Mailed FBI subpoenas. | 1.23 | 98.40 |
| 3/21/00 | JAL | Spoke w/ Jeff Killeen (FBI Chief Counsel) about testimony of Special Agents. Informed of need to rewrite "demand" letter. | 0.33 | 51.15 |
| 3/23/00 | JAL | Client update on grievance issues. Confirmed date/time of hearing. | 0.25 | 38.75 |
| 3/28/00 | JAL | Updated client. Informed client that I would inform him about tomorrow's hearing. | 0.08 | NO CHARGE |
| 3/29/00 | JAL | Plan and prepare for motion hearing by phone. Met w/ BLW to discuss argument prior to hearing. Discussed hearing with client afterward. | 4.00 | 620.00 |
|  | BLW | Prepare for and conduct oral argument and call client. | 1.05 | 246.75 |
| 3/30/00 | JAL | Spoke to client about next strategy. Confirmed wish to refile case as whistleblower for damages if no settlement reached. | 0.17 | NO CHARGE |

|  |  | Hours | Amount |
|---|---|---|---|
| For professional services rendered: | | 28.60 | $3,808.30 |
| Previous balance | | | $1,568.65 |
| 4/6/00- Payment - thank you | | | ($1,568.65) |
| Balance due | | | $3,808.30 |

Darrell Ober                                                                 Page    3

## Employee summary

| Employee | Hours | Rate | Amount |
|----------|-------|------|--------|
| Byron L. Warnken-attorney (BLW) | 2.33 | 235.00 | $547.55 |
| James A. Lanier-attorney (JAL) | 16.01 | 155.00 | $2,481.55 |
| Thomas M. Donnelly-law clerk (TMD) | 9.74 | 80.00 | $779.20 |

*Law Offices*
*of*

# BONNIE L. WARNKEN

32 EAST PRESTON STREET
BALTIMORE, MD 21202-2727
(410) 727-5951

May 22, 2000

Darrell Ober
71 Millers Gap Road
Enola PA 17025

Invoice #

In Reference To: 2000-014                                           11086

This statement contains time and expense billings through April 30, 2000

Professional services:

| | | | Hours | Amount |
|---|---|---|---|---|
| 4/3/00 | JAL | Spoke to Ms. Reynolds about settlement.  No settlement offered.  E-mailed client PSP's decision. | 0.17 | 26.35 |
| 4/6/00 | JAL | Left message returning Jon Miller's phone call. | 0.02 | NO CHARGE |
| 4/7/00 | JAL | Spoke to newspaper reporter for Harrisburg Patriot News, Reggie Sheffield.  Informed client and BLW. | 0.33 | 51.15 |
| | TMD | Draft/revise Complaint. | 1.50 | 120.00 |
| 4/10/00 | TMD | Draft/revise Complaint. | 1.17 | 93.60 |
| | TMD | Draft/revise Complaint. | 0.83 | 66.40 |
| | TMD | Draft/revise Complaint. | 0.50 | 40.00 |
| | TMD | Researched at UB library for whistleblower/ deprivation of civil rights/ suing government entities. | 2.10 | 168.00 |
| 4/12/00 | BLW | Analyze Pennsylvania whistle blower options w/TMD. | 0.15 | 35.25 |
| 4/14/00 | TMD | Draft/revise Complaint. | 0.42 | 33.60 |
| | TMD | Draft/revise Complaint. | 1.83 | 146.40 |
| | JAL | Spoke to TD about whistleblower complaint. Reviewed complaint. | 2.00 | 310.00 |
| 4/17/00 | JAL | Draft/revised Whistleblower complaint.  E-mailed to client to review.  Updated BLW.  Called newspapers about article.  Reviewed and began rewriting letter to Mr. Dugan per client request. | 4.25 | 658.75 |
| 4/18/00 | JAL | Reviewed newspaper article. | 0.08 | NO CHARGE |
| 4/24/00 | JAL | Discussed edits with client briefly.  Informed client BLW would need to speak about e-mailed issues. BLW gave update after client conversation.  Edited complaint as per client's request. | 0.67 | 103.85 |
| | TMD | Researched Whistleblower and Exclusive Remedy. | 0.67 | 53.60 |

Darrell Ober

Page  2

|  |  |  | Hours | Amount |
|---|---|---|---|---|
| 4/24/00 | BLW | Discuss options and strategy w/client and analyze Whistle Blower statute w/TMD. | 0.35 | 82.25 |
| 4/25/00 | BLW | Call from client re: PSTA. | 0.05 | NO CHARGE |
|  | JAL | Began review of TD's research into grievance/whstleblower exclusive remedy issue. | 0.58 | 89.90 |
|  | TMD | Researched Res Judicata & Administrative Process/ Judicial Process. | 2.00 | 160.00 |
| 4/26/00 | JAL | Finished review of TD's research.  paged client - no response. | 0.50 | 77.50 |
| 4/27/00 | JAL | Spoke to client about grievances.  Confirmed grievances are not about whistleblower. | 0.17 | NO CHARGE |

|  |  | Hours | Amount |
|---|---|---|---|
| For professional services rendered: | | 20.34 | $2,316.60 |
| Previous balance | | | $3,808.30 |
| 5/16/00- | Payment - thank you | | ($3,808.30) |
| Balance due | | | $2,316.60 |

Employee summary

| Employee | Hours | Rate | Amount |
|---|---|---|---|
| Byron L. Warnken-attorney (BLW) | 0.50 | 235.00 | $117.50 |
| James A. Lanier-attorney (JAL) | 8.50 | 155.00 | $1,317.50 |
| Thomas M. Donnelly-law clerk (TMD) | 11.02 | 80.00 | $881.60 |

*Law Offices*
*of*

# BONNIE L. WARNKEN
### 32 EAST PRESTON STREET
### BALTIMORE, MD 21202-2727
(410) 727-5951

June 30, 2000

Darrell Ober
71 Millers Gap Road
Enola PA 17025

In Reference To: 2000-014

Invoice #
11166

This statement contains time and expense billings through May 31, 2000

Professional services:

| | | Hours | Amount |
|---|---|---|---|
| 5/2/00 JAL | Discussed filing options with client. | 0.17 | 26.35 |
| 5/4/00 JAL | Draft/revised Complaint and filed. Sent letter to Mr. Bob Durgan at request of client. | 2.00 | 310.00 |
| 5/17/00 JAL | Paged client - no return. | 0.02 | NO CHARGE |
| 5/18/00 JAL | Spoke to client about filing of matter. Called Newspaper. Reviewed complaint from Sgt. Roy. Mailed copy to client. | 0.33 | 51.15 |
| 5/26/00 JAL | Updated from client. Informed BLW about PSTA meeting and derisive words from Lightman. | 0.33 | 51.15 |
| 5/31/00 JAL | Spoke w/ Ms. Reynolds. Informed of failure to file "notice of plead." Called John Miller for format. Will fax. Informed by client of "promotion" to Cpt in Liquor Control. | 0.33 | NO CHARGE |

For professional services rendered:  3.18  $438.65

Additional charges:

5/4/00- Filing fee for the Commonwealth Court of Pennsylvania.   35.00

Total costs   $35.00

Total amount of this bill   $473.65

Previous balance   $2,316.60

Darrell Ober

Page    2

Amount

6/12/00- Payment - thank you

($2,316.60)

Balance due

$473.65

| Employee summary | | | |
|---|---|---|---|
| Employee | Hours | Rate | Amount |
| James A. Lanier-attorney (JAL) | 2.83 | 155.00 | $438.65 |

*Law Offices*
*of*

# BONNIE L. WARNKEN

32 EAST PRESTON STREET
BALTIMORE, MD  21202-2727
(410) 727-5951

August 11, 2000

Darrell Ober
71 Millers Gap Road
Enola PA 17025

Invoice #

In Reference To: 2000-014                                        11245

This statement contains time and expense billings through July 31, 2000

Professional services:

| | | Hours | Amount |
|---|---|---|---|
| 6/1/00 JAL | Discussed need for Notice to Defend w/ JM. | 0.08 | NO CHARGE |
| 6/9/00 JAL | Read and answered e-mailed from client. | 0.12 | 18.60 |
| 6/28/00 JAL | Update from client. | 0.25 | 38.75 |
| 6/29/00 JAL | Called Ms. Reynolds.  Left message. | 0.02 | NO CHARGE |
| 7/10/00 JAL | Called and left message for client. | 0.02 | NO CHARGE |
| 7/17/00 JAL | Reviewed fax from client.  Read and responded to client's e-mail. | 0.08 | NO CHARGE |
| 7/24/00 JAL | Reviewed e-mailed from client about response to Respondant's motion and objection. | 0.08 | NO CHARGE |
| JAL | Began response to Respondent's objections.  Called and spoke to Ms. Deal in Judge Kelley's chambers about remark made in Respondent's brief.  Called clerk to find transcripts.  No transcript exists of phone hearing on March 29, 2000. | 0.42 | 65.10 |
| 7/26/00 JAL | Discussed case/update w/ client.  Called J. Kelley about transcripts of telephone hearing.  spoke to Clerk's office about lack of transcripts. | 0.50 | 77.50 |

| | | | |
|---|---|---|---|
| For professional services rendered: | | 1.57 | $199.95 |
| Previous balance | | | $473.65 |
| 7/17/00 Payment - thank you | | | ($473.65) |
| Total payments and adjustments | | | ($473.65) |
| Balance due | | | $199.95 |

Darrell Ober

Page    2

## Employee Summary

| Name | Hours | Rate | Amount |
|------|-------|------|--------|
| James A. Lanier-attorney (JAL) | 1.29 | 155.00 | $199.95 |

*Law Offices*
*of*

# BONNIE L. WARNKEN

32 EAST PRESTON STREET
BALTIMORE, MD 21202-2727
(410) 727-5951

October 06, 2000

Darrell Ober
71 Millers Gap Road
Enola PA 17025

Invoice #

In Reference To: 2000-014
11328

This statement contains time and expense billings through September 30, 2000

Professional services:

| | | | Hours | Amount |
|---|---|---|---|---|
| 8/1/00 | JAL | Draft/revise/Research Reply Brief. | 4.00 | 620.00 |
| 8/2/00 | JAL | Continued drafting Reply. | 0.50 | 77.50 |
| | JAL | Continued drafting Reply. Research. Reviewed Respondents' Memorandum that came today. | 4.25 | 658.75 |
| 8/7/00 | JAL | Finished drafting Reply. Gave to BLW to review. | 3.00 | 465.00 |
| 8/10/00 | JAL | Spoke to client about grievance hearing that was postponed and edits to be made on Reply brief. | 0.17 | 26.35 |
| 8/24/00 | BLW | Draft/revise pleadings. | 1.47 | 345.45 |
| | ELM | Plan and prepare for filing of documents in Commonwealth Court of Pa. | 1.50 | 120.00 |
| | JAL | Draft/revised Reply brief. | 2.67 | 413.85 |
| 8/29/00 | BLW | Advise JAL re: hearing. | 0.12 | NO CHARGE |
| | JAL | Plan and prepare for tomorrow's telephone hearing. | 3.00 | 465.00 |
| 8/30/00 | BLW | Analyze hearing w/JAL. | 0.10 | NO CHARGE |
| | JAL | Represented client during telephone hearing. Updated BLW and client. | 3.00 | 465.00 |
| 9/8/00 | BLW | Analyze court's opinion, statute, and case authority, and call client. | 0.88 | 206.80 |
| 9/11/00 | BLW | Analyze recommended approach w/JAL. | 0.08 | NO CHARGE |
| | JAL | Discussion w/ BLW about Judge's decision on preliminay objections. Spoke to and faxed decision to John Miller for help on procedural matters. | 0.75 | 116.25 |
| 9/12/00 | JAL | Began drafting reconsideration motion. Discussion w/ John Miller about procedural time limits and citations. Discussion w/ BLW about argument and opinion. | 3.00 | 465.00 |
| 9/13/00 | JAL | Spoke to client about status of action. Client informed that he will be filing 3rd Cir. Civil rights action w/ separate local counsel. Requested to stop working on M | 0.50 | NO CHARGE |

Darrell Ober

Page    2

|  | Hours | Amount |
|---|---|---|
| For professional services rendered: | 28.99 | $4,444.95 |
| Previous balance | | $199.95 |
| 8/21/00  Payment - thank you | | ($199.95) |
| Total payments and adjustments | | ($199.95) |
| Balance due | | $4,444.95 |

## Employee Summary

| Name | Hours | Rate | Amount |
|---|---|---|---|
| Byron L. Warnken-attorney (BLW) | 2.35 | 235.00 | $552.25 |
| Elizabeth L. Morris-law clerk (ELM) | 1.50 | 80.00 | $120.00 |
| James A. Lanier-attorney (JAL) | 24.34 | 155.00 | $3,772.70 |

# AITCHISON & VICK, INC.

Attorneys at Law

**Oregon Office:**

3021 N.E. Broadway
Portland, OR 97232
(503) 282-6160
Fax: (503) 282-5877

**Will Aitchison**
Admitted in OR, CA and AK
e-mail: will@aitchison.org

**Washington Office:**

15 South Grady Way
vergreen Building, Suite 414
Renton, Washington 98055
(425) 204-8385
Fax: (425) 277-3610

**Christopher K. Vick**
Admitted in WA
mail: chrisv@nventure.com

**Jeffrey Julius**
Admitted in WA and OH
email: Jeffj@nventure.com

**Lisa C. Vargo**
Admitted in WA and ID
mail: lisav@nventure.com

March 20, 2001

Darrell Ober
71 Millers Gap Road
Enola, PA  17025

Dear Mr. Ober:

I am in receipt of your letter of January 19, 2001. I apologize for the delay in responding.

After reviewing the information you provided me and giving the matter some thought, I am interested in appearing as an expert witness on your behalf. However, I believe the arrangements for such testimony should probably be arranged through your attorney. If you will have your attorney get in touch with me, I will be glad to discuss how I might be of assistance.

Sincerely,

AITCHISON & VICK, INC.

Will Aitchison

Will Aitchison

WA/cg

P294



ACLU Foundation of Pennsylvania
125 South 9th Street, P.O. Box 1161
Philadelphia, PA 19105-1161
(215) 592-1513
*fax:* (215) 592-1343
aclulegis@aol.com

James D. Crawford
*President*

Larry Frankel
*Executive Director*

January 22, 2001

Mr. Darrell Ober
71 Millers Gap Road
Enola, PA 17025

Dear Mr. Ober:

I am in receipt of your letter dated January 16, 2001, in which you request that the ACLU file an amicus curiae brief on your behalf. From our perspective, your request is premature. According to our long established policy, except in very unusual circumstances, we do not file amicus curiae briefs in trial courts.

If this matter eventually winds up in an appellate court, then you could renew your request. At that time, it would be helpful if your attorney could specify what issue or issues he would like us to brief so that our Legal Committee can adequately consider such a request and determine whether this is a matter to which we should devote resources.

Therefore, at this time we will not be involved in your case.

Very truly yours,

Larry Frankel
Executive Director

P295



PENNSYLVANIA
STATE TROOPERS
ORGANIZED 1962    ASSOCIATION

January 26, 2001

Darrell Ober
71 Millers Gap Road
Enola, PA 17025

Dear Capt. Ober:

I received your correspondence regarding the filing of a Federal suit in the Third Circuit Court by your attorney, Don Bailey, on your behalf.

Attorney Lightman was furnished a copy of your suit for his review and legal opinion as to the PSTA filing an Amicus Curiae brief with the court on your behalf.

I will inform you when I receive a response back from Attorney Lightman as to the position of the PSTA in this matter.

Very truly yours,

Louis J. Lazzaro
President

LJL/ls

Pc:    Gary M. Lightman, Esq.

P296

FILE COP

**LIGHTMAN & WELBY**

Gary M. Lightman
James L. Mc Aneny
Sean T. Welby
Eric C. Stoltenberg
Anthony M. Caputo

2705 North Front Street
P.O. Box 911
Harrisburg, Pennsylvania 17108-0911
Telephone 717 234-0111
Facsimile 717 234-8964

January 28, 2001

Louis J. Lazzaro, President
Pennsylvania State Troopers Association
3625 Vartan Way
Harrisburg, PA 17110

Dear President Lazzaro:

Thank you for forwarding to me a copy of the Complaint filed by Captain Darrell Ober against the Pennsylvania State Police. It is my understanding that Captain Ober has requested that the PSTA file an Amicus Brief supporting him.

At the present time, the only documentation that I have seen is the Complaint. There is no legal procedure for the filing an Amicus Brief to a Complaint. There would first have to be some type of legal disposition regarding the case to which parties would then take a supportive or non-supportive position. The earliest possible legal determination could be a Motion for Summary Judgment filed by either side as a result of the Complaint. The Motion for Summary Judgment would raise legal issues regarding the propriety and legality of the Complaint. At that time outside parties or "friends of the court" could file Petitions. Therefore, I would recommend that we monitor this case carefully and once it is in a legal position to take a take position, we should review the various motions filed and make a determination at that time, as to what, if anything, the PSTA should do.

If you have any further questions regarding this matter, please contact me.

Very truly yours,

Gary M. Lightman

GML/jal

P297



RECEIVED
JAN 3 0 2001
PENNSYLVANIA STATE
TROOPERS ASSOCIATION



# P E N N S Y L V A N I A
## S T A T E — T R O O P E R S
ORGANIZED 1962    A S S O C I A T I O N

February 1, 2001

SUBJECT:        Request to PSTA regarding your Complaint

TO:             Captain Darrell Ober

FROM:           Louis J. Lazzaro, President

    I am forwarding to you a copy of Attorney Lightman's opinion regarding your request to the PSTA file an Amicus Brief on your behalf.  If you have any further questions, please do not hesitate to contact me.

*P298*

PSTA  3625 Vartan Way, Harrisburg, PA 17110    (717) 540-5646 • 800-541-9934    Fax (717) 540-5318 • 800-540-5318



**GRAND LODGE**
**FRATERNAL ORDER OF POLICE®**

5900 JEFFERSON NE, SUITE F, ALBUQUERQUE, NEW MEXICO 87109
PHONE 505-344-3159 • FAX 505-342-1004

GILBERT G. GALLEGOS
NATIONAL PRESIDENT

July 2, 2001

Mr. Darrell Ober
71 Millers Gap Road
Enola, PA 17025

Dear Brother Ober:

I received your recent communication regarding the request for funds from the Grand Lodge. Apparently, there was a breakdown in communication because you were never notified that the request was denied by the National Board of Trustees at the March 2001 meeting. I have enclosed a copy of the minutes pertaining to your issue.

You will note the report made by National Trustee Jim Gaudet regarding the request. According to the report, it appears the Pennsylvania State Lodge did not forward the required forms to the committee. I remind you that pursuant to our requirements, members cannot make direct requests for funds from the Grand Lodge. The request must come through the state lodge.

The National Board of Trustees will be meeting during the National Conference in Phoenix, Arizona next month. If you want this reconsidered by the Board, the appropriate "paperwork" must be submitted by the State Lodge of Pennsylvania.

I encourage you to work with the state lodge on this matter if you want a successful resolution by the Grand Lodge.

Sincerely,

Gilbert G. Gallegos
National President

CC:    Lou Lazzaro, Pennsylvania National Trustee
       Mike Lutz, Pennsylvania State President
       Jim Gaudet, chairman, Legal Assistance & Financial Aid Committee

*P299*

# MINUTES

# GRAND LODGE

## Fraternal Order of Police

Spring National Board Meeting
March 23 & 24, 2001
Independence, Ohio

If you see anything wrong, please bring it to our attention.  If not this will be distributed to all the lodges. Secretary Atnip will handle the production of the brochures.  We would like to make a pin with the logo and sell for proceeds to go to the Torch Run or Special Olympics.  We would like to develop an award to the member or state that gives the most to the Torch Run effort.  If approved we will give the artwork to Secretary Atnip and have it made up with the logos for presentation.  We also have a criteria to receive the award.

Trustee Lucente (NY) moves to approve logo design for pin production and use of the logo.  Seconded by Trustee Dunn (SD).  Discussion.  Motion passes.

Trustee Lucente (NY): I would like to introduce Lynn Patton, she is twenty-five years old, she is a Special Athlete from Cuyahoga County, Ohio.  She is a global messenger for Special Olympics for Ohio and has been in Special Olympics since 1989.  She thinks the Torch Run is a wonderful thing.

Lynn Patton addresses the Board and shares her experience as a Special Athlete.

Trustee Lucente (NY): Thank you very much, Lynn.  That was great.  I would like to introduce Mr. John Miller.  He is a retired Delaware State Trooper.  He currently is a special investigator for the office of the Attorney General for Delaware.  He is a member of the International Torch Run Council.  He is Chairman of the Marketing and Development Department of the Torch Run.

Mr. John Miller:  I am here representing International Law Enforcement Torch Run Community and the Council which is the governing body for the Torch Run.

John Miller addresses the Board.  He presents one of the torches that carried the Flame of Hope to open the ceremonies in Alaska to the Grand Lodge, Trustee Lucente (NY) and President Gallegos.  He thanks the committee for all their work over the last few years.

Trustee Lucente (NY): Thanks to everyone, that concludes my report.

Chairman of the Trustees' Peacock moves to accept the report.  Seconded by Trustee Wright (SC). Discussion.  Motion passes.

### Legal Assistance & Financial Aid Committee - James Gaudet

Trustee Gaudet (VA), Chair: We met yesterday and addressed eight requests.  I want to thank the committee members: Trustee Lazzaro (PA), Trustee DeCampli (DE), Thomas Mayer (MO), Trustee Chamberlin (MS), Trustee Burnett (WY), and Trustee Hagler (NC).  Several of the requests we feel should be handled directly through publications put out through the Grand Lodge.

The first is the request of Darrel G. Ober a Captain with Pennsylvania State Police.  This deals with possible political corruption in the cadet program.  Instead of going to the commissioner after the investigation, he went to the Deputy Commissioner.  After it was over and done the commissioner then ordered an internal investigation of this person.  They attempted to transfer him and penalize him through small things.  The problem that developed out of all this was he chose to get his own attorney from Maryland, instead of getting one from standard policy legal defense plan of Pennsylvania.  He has legal expenses of $17,000.  He has lost all of his appeals.  The committee feels that members should use what is available to us through our states first, then if that fails then we go another route.  I just feel that he felt it was not expedient enough for him to go that route so he went on his own.

Committee moves and seconds not to give any assistance.  Discussion.  Motion passes.

Trustee Gaudet (VA): Again, I want to emphasize for an individual to receive any funding from the Grand Lodge there has to be the paperwork filed by the State Lodge to the National Secretary's Office.  Technically, we the committee cannot address issues unless that has been done.  That was not done in this case.  He had two strikes against him.  The paperwork needs to be filed properly.



# FRATERNAL ORDER OF POLICE
## KEYSTONE LODGE NO. 41
### HARRISBURG, PENNSYLVANIA

July 15, 2000

Darrell G. Ober
71 Millers Gap Road
Enola, PA 17025-1008

Dear Brother Ober,

Pursuant to your request for financial aid from Keystone Lodge#41, I set up a committee to look into your request and make a recommendation per the By-Laws of our FOP Lodge. That committee met with you on June 12, 2000 and at the subsequent meeting, the committee made a recommendation to the Lodge. The recommendation was to assist a fellow brother in need and the recommendation was for an amount of between $300.00 and $500.00. The recommendation was not for financial assistance, but was for a member in distress.

The recommendation was read at our regular FOP meeting in June without discussion and then it was brought up at our regular FOP meeting in July. Per our By-Laws, after the recommendation was read for the second time, there could be a discussion and action on the recommendation. V. Pres. Todd Rudy read the recommendation of the committee and during discussion advised the membership it was the committee's position to make a donation. During the discussion, V. Pres. Rudy advised the membership that in the discussions with you, should you be successful in your legal endeavors that you would reimburse the Lodge for the donation.

After the discussion, a motion was made and seconded for a $400.00 donation from Keystone Lodge#41 to you as a member in distress. The motion passed unanimously.

Pursuant to that motion and vote, I have enclosed a check from the Lodge for $400.00 to assist you. Please be assured that the membership of Keystone Lodge#41 wish you the best in a successful conclusion to your challenge.

Fraternally,

Michael A. Ruda
President



SP 3-200 (12-93)

FR 3-3
3/3/99

  

**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE

SUBJECT:    DISCIPLINE

3.01        POLICY

A.    <u>Standard of Behavior</u>: As clearly stated in the Pennsylvania State Police Call of Honor, the mission of the Pennsylvania State Police to enforce the law holds a member to a higher standard of behavior than is required of the general population.

B.    <u>Expectations of Conduct and Performance</u>: The Governor's Code of Conduct, the Pennsylvania State Police Oath of Enlistment, Call of Honor, and Field Regulations set forth, to the extent possible, the Department's expectations of conduct and performance.

C.    <u>Chain of Command</u>:    The Department's system for holding members strictly accountable for their individual behavior is intended to be corrective in nature and fair.    The chain of command is charged with the duty to ensure that supervisory or corrective counselling and/or training will be the initial response to performance behavior inadequacies of a minor nature.

D.    <u>Evaluations</u>: The chain of command and the Pennsylvania State Troopers Association recognize that a fair, equitable, and timely system must exist in order to impose discipline for performance and conduct indiscretions. When misconduct occurs, discipline shall be dealt with in a manner consistent with this regulation. Both aggravating and mitigating factors shall be evaluated prior to the imposition of any discipline.  However, there is certain misconduct which, by its very nature, is not subject to the consideration of mitigating factors.

-1-

P302
10E15

FR 3-3
3/3/99

E.   Interference:  In order to ensure fairness and impartiality of the disciplinary system, no member shall interfere with the process as established by this regulation nor shall they exert or attempt to exert any influence on any participants in the disciplinary process except as permitted by the provisions of this regulation and existing collective bargaining agreements.

3.02   DEFINITIONS

For the purpose of this regulation, the listed terms shall have the following meanings:

A.   Aggravating Factor:  Circumstances which actively make the infraction worse, more serious, or more severe.

B.   Cadets:  All members below the rank of Trooper shall be classified as Cadets.

C.   Court-martial Offense:  Any offense which, if founded, the member is subject to disciplinary action up to and including, but not limited to, dismissal, transfer, reduction in rank, and/or suspension without pay in excess of 30 days.

D.   Mitigating Factor:  Circumstances which actively make the infraction less severe or painful; to cause to become less harsh or hostile.

E.   Probationary Troopers:  Members above the rank of Cadet who have not completed their legal probationary period shall be classified as probationary Troopers.

3.03   APPLICABILITY

The provisions of this regulation apply to all members with the following exceptions:

A.   Cadets:  Cadets are not governed by the procedures of this regulation.

1.   Cadets shall be subject to all other Department rules and regulations, including Academy rules and regulations for Cadet conduct as prescribed by the Director, Bureau

-2-

FR 3-3
3/3/99

of Training and Education, and approved by the Commissioner.

2.    A Cadet may be dismissed from the Department by the Deputy Commissioner of Administration as authorized by the Commissioner, upon recommendation of the Director, Bureau of Training and Education, for violations of any Department or Academy rules and regulations, or for failure to meet the physical, academic, or attitudinal standards set for Cadets.

B.    <u>Probationary Troopers</u>: A probationary Trooper shall be given all the rights contained in this regulation, except that they may be dismissed, at the discretion of the Commissioner, for proper cause.

### 3.04    AUTHORITY

The Commissioner has the ultimate responsibility for the conduct and discipline of members and therefore has the authority to discipline members pursuant to the provisions of this regulation.

### 3.05    RESPONSIBILITY

A.    <u>General</u>:  Members accused of actions that are contrary to statutory requirements or Department rules and regulations pertaining to conduct or performance shall be treated justly, fairly, and timely.  Allegations of violations must be documented or otherwise capable of being shown to have been based on reasonable belief.  Investigations of such allegations shall be conducted in strict accordance with existing policy governing internal investigations and contractual obligations.  Subject to the exercise of legal rights, members shall cooperate in all investigations of their conduct and answer all questions pertaining to their position as a Pennsylvania State Police Officer, completely, truthfully, and to the best of their ability.  Disciplinary action based on arbitrariness, supposition, unfounded or unsubstantiated complaints, personal bias, or prejudice shall not be imposed.  Commanders and Directors shall exercise their responsibility in processing disciplinary action cases promptly and unhesitatingly without favor or prejudice.

-3-



FR 3-3
3/3/99

B.    <u>Commanders, Directors, and Supervisors</u>:    Commanders, Directors, and supervisors are responsible for the conduct and performance of members of their immediate command.  They are charged with the responsibility and authority to initiate investigations relating to allegations of violations of statutes, rules, and regulations which are committed by members of their command.   Commanders and Directors are responsible and expected to take appropriate disciplinary action in accordance with existing policy.

1.    Supervisors are expected to closely monitor and actively supervise the conduct and performance of subordinates. Supervisors are accountable for the proper processing of complaints involving alleged violations of statutes, as well as violations of conduct or performance, regardless of how they are brought to the supervisor's attention.

2.    Commanders and Directors shall not discipline or attempt to discipline a member not of their command.  This does not prevent supervisors or Commanders and Directors from taking immediate corrective action for improper conduct or performance.   Any such misconduct or impropriety should thereafter be reported as soon as practicable, directly to the individual's Commanding Officer or Bureau Director along with the appropriate or necessary correspondence.

3.06    DISCIPLINARY OFFICER

A.    <u>Authority</u>:   The Commissioner shall appoint a Commissioned Officer to perform the functions of Disciplinary Officer.   The Disciplinary Officer has the authority to take any necessary action consistent with the purpose of this regulation.

B.    <u>Duties</u>:  The primary duties of the Disciplinary Officer shall be to:

1.    Coordinate, evaluate, and process all Disciplinary Action Reports  (DARs)  submitted.  Evaluation, as used in this context, shall include the careful examination of all applicable reports to ensure that reasonably adequate facts are contained therein which substantiate and justify any intended disciplinary action.

-4-

FR 3-3
3/3/99

2.    Prior to the imposition of any discipline, review the following documentation in order to determine the appropriate and consistent level of discipline:

   a.    Consideration of the member's written response to the DAR, when such response has been submitted, along with any aggravating or mitigating factors.

   b.    Review the member's official personnel folder for prior disciplinary actions and any other aggravating or mitigating information which may be deemed to have merit in imposing the appropriate level of discipline.

   c.    Review the member's past discipline history, if any.

   d.    Review DAR files of previous cases of violations for similar or like circumstances for the purpose of maintaining consistency in discipline.  It must be understood that it is unlikely that any two cases will ever be exactly alike.  Consistency therefore means that penalties should fit improper conduct and behavior for similar or like infractions to the extent possible.

   e.    Determine the Field Regulation sections violated, if appropriate.

3.    Request further investigation or conduct limited inquiries necessary to appropriately and properly dispose of a DAR.

4.    Impose sanctions ranging from written reprimands to a maximum of 30 days suspension without pay on the basis of a single DAR.

5.    Impose sanctions in excess of 30 days suspension without pay, intertroop transfers, demotions in rank, and dismissal from the Department with the concurrence of the Deputy Commissioner of Administration and by the authority of the Commissioner on the basis of a single DAR, provided, in court-martial cases, the member has elected the grievance procedure rather than a court-martial.

-5-



FR 3-3
3/3/99

6.    Direct, if appropriate, with the concurrence of the Deputy Commissioner of Administration, that a member be court-martialed.

7.    Recommend, when appropriate, to the Deputy Commissioner of Administration, that a probationary Trooper be dismissed.

8.    Perform other duties which are required to ensure that the concept and administration of the discipline system is fair, impartial, timely, and the imposition of discipline is consistent throughout the Department.

9.    Inform the Commissioner, on a continual basis, as to the effectiveness of the concepts and the compliance with the provisions of the disciplinary system on the part of all personnel.

3.07    RIGHTS OF MEMBERS

A.    <u>General</u>:  Members who are formally accused of violating any Department rule or regulation shall be fully informed of the nature of the allegation and the name of the person making the accusation.  If the member is to be questioned in regard to the allegation, they must be given the name, rank, and/or position of everyone present during the questioning.  The use of threats, offensive language, promise of reward, or any denial of a member's rights is prohibited.  Imposition of punishment not in accordance with the provisions of this regulation is also prohibited.

NOTE: Nothing in this regulation is intended to deny members of their constitutional rights or rights as provided under <u>U.S. v. Garrity</u> or <u>U.S. v. Miranda</u> or other applicable law, nor to deny a member of their rights to Pennsylvania State Troopers Association representation or other rights guaranteed through collective bargaining agreements.

B.    <u>Criminal Violations</u>:  Whenever a member appears to have violated a Department rule or regulation which is correspondingly a violation of the criminal statutes of the United States, this Commonwealth, or another state, members engaged in investigating any such matters shall contact the involved member's Commanding Officer prior to any questioning of the member.

-6-

FR 3-3
3/3/99

NOTE:    When the involved member is above the rank of Lieutenant, the next highest ranking officer in the chain of command of the member to be questioned shall be contacted prior to any questioning.

C.    Grievance:  If, after being notified of disciplinary action, a member is dissatisfied with the result of a disciplinary action, they may file a grievance in accordance with the provisions of existing collective bargaining agreements.

D.    Punishment:  If a member elects to file a grievance, the imposition of the punishment will be administered in accordance with the provisions of existing collective bargaining agreements.

3.08    PROCESSING A DISCIPLINARY ACTION

A.    Initiation:  All formal disciplinary actions against a member shall be initiated through the preparation and submission of a DAR. The DAR shall only be initiated by a member's Area or Troop Commander, Bureau or Division Director or as otherwise designated by the Commissioner.  The DAR shall not be used for any other purpose.   The DAR shall not be placed in a member's Troop/Bureau personnel file, or any other file, unless a copy is also submitted in accordance with the provisions of this regulation.

1.    In the event multiple infractions occur stemming from the same set of circumstances, all related misconduct shall be listed on a single DAR.  This shall not be construed to preclude the amendment of a DAR by the member's Troop Commander or Bureau Director, at any time prior to the imposition of penalty by the Disciplinary Officer.

2.    The detailed instructions for completing a DAR are included in Appendage A.

B.    Copies:  Immediately upon initiation of a DAR, the initiating officer shall provide a copy of the DAR to the accused member who shall acknowledge receipt thereof.   The initiating officer shall then forward the original DAR, along with any supporting documents including copies of investigative reports, directly to the Disciplinary Officer.

-7-

FR 3-3
3/3/99

C.  Response:  Any member who has acknowledged receipt of a DAR may within ten days thereafter, submit to their Troop Commander or Bureau Director for forwarding to the Disciplinary Officer, a written response.  The written response shall be made by correspondence, Form STD-501, to the Disciplinary Officer and shall be considered along with all other documentation before any penalty is imposed by the Disciplinary Officer.  All known issues relating to the investigation shall be raised by the member with the investigator or, at the very latest, the pre-disciplinary conference with the Troop Commander or Bureau Director.  The contents of the written response to the DAR shall be limited to expressing defenses, mitigating factors, or extenuating circumstances which the member believes the Department should be aware of prior to any disciplinary penalty adjudication.

D.  Review:  The Disciplinary Officer shall review all documentation as stated in this regulation.  The Disciplinary Officer is also authorized to request any additional investigation or conduct limited inquiries deemed appropriate in order to properly dispose of the DAR.

E.  Final Action:  The Disciplinary Officer shall indicate on the DAR the final action, which may be dismissal of charges, written reprimand, suspension without pay, or dismissal from the Department.  The Disciplinary Officer shall take into account all facts listed on the DAR.

F.  Dismissal:  If a member's misconduct results in their dismissal, the Disciplinary Officer shall ensure the member is advised, in writing, of:

1.  The reason for the dismissal.

2.  The effective date of the dismissal.

3.  Instructions on how to contact the State Employes' Retirement System Office for retirement and health care benefits information.

4.  The fact that the member's official personnel file will indicate that the separation was involuntary and that the particular circumstances of the separation will not be disclosed without the written permission of the member, unless authorized by the Office of Administration, Bureau of Personnel.

-8-

FR 3-3
3/3/99

3.09    TEMPORARY REMOVAL FROM DUTY

A.    Serious Violation:  When a supervisor reasonably believes that a member has violated any rule or regulation which amounts to a serious violation, and determines that it is necessary to inactivate the member pending an investigation, the supervisor may immediately place the member on restricted status pending further action by the Disciplinary Officer, or a determination is made that the allegation is unfounded.    The Deputy Commissioner of Administration shall be notified as expeditiously as possible.  The Disciplinary Officer, with the concurrence of the Deputy Commissioner of Administration, may relieve the member of duty and place them in a SUSPENSION with or without pay status pending further action.  The Commissioner shall be notified as expeditiously as possible.

B.    Notification:  If a member has been accused of a misdemeanor or felony, or violating the Governor's Code of Conduct, and has been placed in a restricted status, the Disciplinary Officer shall be notified as soon as practical to determine the continued duty status of a member.    The Disciplinary Officer, with the concurrence of the Deputy Commissioner of Administration, shall direct the member to return to regular duty status, remain in a restricted status, or be placed in a suspension with or without pay status.

C.    Suspension:  Where removal from duty is required at any time due to the nature of an offense, the Department may suspend a member without pay consistent with provisions of existing collective bargaining agreements.

D.    Conditions:  The following conditions apply when a member is placed on restricted or suspended status:

    1.    Referral to Member Assistance: Whenever a member is placed on a restricted duty or suspended status which requires the surrender of the member's badge, identification card, issued firearm(s), and any other specified equipment, the member's supervisor shall refer the member to the Member Assistance Program. Members are reminded that none of the established standards of confidentiality for the Member Assistance Program will be compromised.

-9-



FR 3-3
3/3/99

2.    Restriction:  Members who have been placed on restricted status shall be subject to any or all of the following conditions, or portions thereof, at the discretion of the superior officer enacting such restriction:

a.    Members may be assigned to perform any police-related duties which in the opinion of their Commander or Director are appropriate.  The Commanding Officer may withdraw powers, authority, and responsibilities of the member to the extent the Commanding Officer deems necessary.

b.    Members may be required to surrender any issued equipment to their Troop Commander or Bureau Director, or to their representative.

c.    Subject to the exercise of legal rights, members shall cooperate in all investigations of their conduct and answer all questions pertaining to their position as a Pennsylvania State Police Officer, completely and truthfully and to the best of their ability.

3.    Suspension With Pay:    Members who have been suspended with pay shall be subject to the following conditions:

a.    They shall immediately surrender their badge, identification card, issued firearm, and any other specified equipment, to their Troop Commander or Bureau Director, or their representative.   A suspended member is not permitted to wear any part of the official uniform, or act in the capacity of, or represent themselves as a Pennsylvania State Police Officer in any manner.

b.    Subject to the exercise of legal rights, members shall participate in all investigations of their conduct and answer all questions pertaining to their position as a Pennsylvania State Police Officer, completely and truthfully to the best of their ability.

c.    Members shall be subject to the direct control of their superiors for an amount of time each day of the suspension, equivalent to that amount of time for which the member is being paid.  The specific

-10-

FR 3-3
3/3/99

time period will be established by their superior officer.

4. Suspension Without Pay: Members who have been suspended without pay shall be subject to the following conditions:

a. They shall immediately surrender their badge, identification card, issued firearm, and any other specified equipment, to their Troop Commander or Bureau Director, or their representative. Suspended members are not to wear any part of the official uniform, or act in the capacity of, or represent themselves as a Pennsylvania State Police Officer in any manner.

b. Members shall report at the specified time and place for all disciplinary proceedings.

c. Any period of suspension without pay imposed to temporarily remove a member from duty shall be taken into consideration in any final administrative action by the Department when a member is found guilty but is not dismissed from the Department.

d. In the event subsequent action determines a member was improperly suspended without pay, the member will be reimbursed the difference between what they earned from other employment while improperly suspended and what they would have earned as a member of the Department.

e. Members shall not interfere with, impede, or attempt to interfere with, or impede the investigation of their conduct.

f. Members placed on suspension without pay may engage in supplementary employment consistent with the provisions of AR 4-17.

g. Subject to the exercise of legal rights, members shall cooperate in all investigations of their conduct to answer all questions pertaining to their position as a Pennsylvania State Police Officer, completely and truthfully and to the best of their ability.

-11-

FR 3-3
3/3/99

APPENDAGE A

DISCIPLINARY ACTION REPORT, FORM SP 3-336

A.    PURPOSE

The Disciplinary Action Report (DAR) shall be submitted when a member is charged with a violation of Department regulations pertaining to improper performance, attitude, or conduct for which formal disciplinary action is recommended.

B.    PREPARATION

The DAR shall be typewritten in original and two copies by the initiating officer.  In the event multiple violations occur stemming from the same set of circumstances, a summary of all violations shall be listed on a single DAR.  This shall not be construed to preclude the amendment of a DAR by the member's Troop Commander or Bureau Director at any time prior to the imposition of a penalty by the Disciplinary Officer.

C.    BLOCK INSTRUCTIONS

1.    NAME:  Enter last name, first name, middle initial, rank, Social Security Number, date of enlistment, and Troop and Station, or Bureau and Division of the member who is the subject of proposed disciplinary action.

2.    INFRACTIONS:

a.    Enter the date, time, place, and a synopsis of the improper conduct, attitude, or performance concerning the violation of Department rules, regulations, etc., for which disciplinary action is being proposed.  For example:  On January 3, 1999, at 0800 hours, Trooper John Q. (MIO) Doe appeared for duty at Troop H Headquarters, Harrisburg, Pennsylvania.  Trooper Doe was observed to become argumentative and disrespectful when assigned an incident by Corporal William J. Public.  Trooper Doe's conduct and attitude are contrary to established rules and regulations.

A.1



FR 3-3
3/3/99

b.  The description of the behavior should be brief but sufficiently detailed to support the violation. The description should be specific in terms of identifying the member's conduct, attitude, or performance. The specific Field Regulation (example: FR 1-1.02) shall <u>not</u> be listed. The applicable Field Regulations sections violated shall be determined by the Disciplinary Officer.

c.  The initiating officer shall enter their signature and date on the line provided.

3.  MEMBER'S NOTICE: In accordance with the provisions of existing collective bargaining agreements, a charged member shall be given notice of their rights as set forth in this regulation, and afforded the option of representation at the presentation of the DAR. The charged member shall sign and date all copies of the DAR, acknowledging their receipt of a copy of the report.

4.  ACTION: This block shall be completed by the Disciplinary Officer and shall include the FINAL DISPOSITION of all charges. In the event discipline is to be imposed, the Disciplinary Officer shall notify the member, in writing, of specific Field Regulation sections violated and of the decision. The member, if they so elect, may at that time file a grievance in accordance with the provisions of existing collective bargaining agreements.

D.  IMPOSITION OF PENALTY: In accordance with existing collective bargaining agreements, the penalty shall not be imposed until one of the following occurs:

1.  The member fails to file a timely grievance.

2.  After filing a grievance, the member elects not to pursue it.

3.  The PSTA Grievance Board withdraws the grievance.

4.  The penalty is upheld or a different penalty is determined by joint committee or the arbitrator.

5.  If the union or the grievant requests a continuance of the arbitration and no continuation is requested by the Commonwealth, the Department may implement the penalty on the 60th day or thereafter following the filing of the grievance for arbitration.

A.2

FR 3-3
3/3/99

E.    SUBMISSION

1.    Whenever a DAR is initiated against a member, a copy of the entire investigative report shall be submitted along with the DAR directly to the Disciplinary Officer.

2.    The copy of the investigative report submitted to the Disciplinary Officer shall be an extra, legible photocopy.  The normal copies of the investigative reports, including any supplemental report and/or endorsements, shall be prepared and submitted in accordance with the provisions of OM 7-2 and shall include the appropriate endorsements.

A.3

FR 3-3

| SP 3-336 (1-99) | 3/3/99 |
|---|---|

**PENNSYLVANIA STATE POLICE**
## DISCIPLINARY ACTION REPORT

| 1. NAME | RANK | SSN | DOE | TROOP/STATION |
|---|---|---|---|---|

2. INFRACTIONS (LIST INFRACTIONS, DATES OF OCCURRENCE, AND DETAILS)

| SIGNATURE (INITIATING OFFICER) | DATE |
|---|---|

3. MEMBER'S NOTICE

IN ACCORDANCE WITH THE PROVISIONS OF THE PSTA CONTRACT, I HAVE BEEN GIVEN NOTICE OF MY RIGHTS AS SET FORTH IN FR 3-3, AND HAVE BEEN AFFORDED THE OPTION OF REPRESENTATION AT THE PRESENTATION OF THIS REPORT.

I ACKNOWLEDGE RECEIPT OF THIS REPORT

| SIGNATURE | RANK | DATE |
|---|---|---|

4. ACTION

| SIGNATURE (DISCIPLINARY OFFICER) | RANK | DATE |
|---|---|---|

A.4

PENNSYLVANIA STATE POLICE
1987 PROMOTIONAL EXAMINATIONS
NOTIFICATION OF RESULTS


OBER        DARRELL    G                    SS#.  204420484
LOCATION:  2350


| EXAMINATION | WRITTEN SCORE | ORAL SCORE | COMBINED SCORE | FINAL RANK |
|---|---|---|---|---|
| CORPORAL | 75 | 71.17 | 73.47 | 8 |


A FINAL RANK BELOW 953 IS NOT-ELIGIBLE FOR PROMOTION
ORAL SCORE IS STANDARDIZIED TO THE WRITTEN SCORE SCALE

P303
1OF6

PENNSYLVANIA STATE POLICE
1990 PROMOTIONAL EXAMINATIONS
NOTIFICATION OF RESULTS

OBER          DARRELL    G                    SS#.   204420484
LOCATION:   5320

| EXAMINATION | WRITTEN SCORE | ORAL SCORE | COMBINED SCORE | FINAL RANK |
|-------------|---------------|------------|----------------|------------|
| SERGEANT    | 85            | 85.79      | 85.35          | 6          |

A FINAL RANK BELOW 227 IS NOT-ELIGIBLE FOR PROMOTION
ORAL SCORE IS STANDARDIZIED TO THE WRITTEN SCORE SCALE

PENNSYLVANIA STATE POLICE
1992 PROMOTIONAL EXAMINATIONS
NOTIFICATION OF RESULTS

OBER        DARRELL     G                    SS#.  204420484
LOCATION:  5320

| EXAMINATION | WRITTEN SCORE | ORAL SCORE | WRITING SCORE | COMBINED SCORE | FINAL RANK |
|---|---|---|---|---|---|
| LIEUTENANT | 85 | 87.05 | 78.68 | 85.19 | 6 |

A FINAL RANK BELOW  65 IS NOT-ELIGIBLE FOR PROMOTION
ORAL SCORE IS STANDARDIZIED TO THE WRITTEN SCORE SCALE
WRITING SCORE IS STANDARDIZED TO THE WRITTEN SCORE SCALE

PENNSYLVANIA STATE POLICE
EXAMINATION FOR STATE POLICE CAPTAIN
CANDIDATE SCORE REPORT - 1994


CANDIDATE NAME : DARRELL G OBER

CANDIDATE ID # :    #054

FINAL SCORE    :  86.58

CATEGORY       :     I

---

## EXERCISE SCORES

|  | Max. Score | Avg. Score | Your Score |
|---|---|---|---|
| WRITTEN - IN-BASKET EXERCISE | 25.00 | 18.67 | 22.18 |
| WRITTEN - CONTINGENCY PLAN | 25.00 | 17.90 | 21.38 |
| ORAL - SUBORDINATE MEETING | 25.00 | 20.11 | 23.20 |
| ORAL - GROUP MEETING | 25.00 | 20.72 | 19.82 |
| OVERALL SCORE | 100.00 | 77.40 | 86.58 |
| CATEGORY |  | I |  |

---

## EXPLANATION

Max. Score          = The highest possible score for this exercise.

Avg. Score          = The average score for this exercise, based on the scores of all 85 candidates.

Your Score          = Your final score for this exercise.

CATEGORY            = The category of the list in which your final score places you.  There are two categories. The top category is designated by a I.  The second category is designated by a II.



PENNSYLVANIA STATE POLICE
EXAMINATION FOR STATE POLICE MAJOR

CANDIDATE SCORE REPORT - 1996


CANDIDATE NAME : DARRELL G. OBER

CANDIDATE ID # :    #134

FINAL SCORE      :      88

CATEGORY         :      I

---

EXERCISE SCORES

|  | Max. Score | Avg. Score | Your Score |
|---|---|---|---|
| WRITTEN - IN-BASKET EXERCISE | 25.00 | 20.01 | 24.18 |
| WRITTEN - CONTINGENCY PLAN | 25.00 | 19.54 | 18.88 |
| ORAL    - SUBORDINATE MEETING | 25.00 | 21.39 | 23.78 |
| ORAL    - ORAL DEFENSE EXERCISE | 25.00 | 20.71 | 21.48 |
| OVERALL SCORE | 100.00 | 81.65 | 88.32 |
| ROUNDED FINAL SCORE | 100 | | 88 |
| CATEGORY | | I | |

---

EXPLANATION

Max. Score        = The highest possible score for this exercise.
Avg. Score        = The average score for this exercise, based
                    on the scores of all 34 candidates.
Your Score        = Your final score for this exercise.

ROUNDED FINAL SCORE = Your score for the four exercises combined,
                    rounded to the nearest whole number.

CATEGORY          = The category of the list in which your final
                    score places you.  There are three categories:

                    Category I  :  Immediately Eligible
                    Category II :  Eligible
                    Category III:  Ineligible

As vacancies occur, promotions will be made from Category I.
If Category I is exhausted, promotions will be made from Category II.

### PENNSYLVANIA STATE POLICE
### ASSESSMENT CENTER FOR STATE POLICE MAJOR
### CANDIDATE SCORE REPORT - 1998

CANDIDATE NAME :   DARRELL G. OBER

CANDIDATE ID # :   #136

FINAL SCORE   :   85

CATEGORY   :   I

---

### EXERCISE SCORES

|  | Max. Score | Avg. Score | Your Score |
|---|---|---|---|
| WRITTEN - IN-BASKET EXERCISE | 25.00 | 20.2 | 21.23 |
| WRITTEN - CONTINGENCY PLAN | 25.00 | 20.2 | 20.10 |
| ORAL - SUBORDINATE MEETING | 25.00 | 19.3 | 23.75 |
| ORAL - GROUP MEETING | 25.00 | 20.3 | 19.62 |
| OVERALL SCORE | 100.00 | 80.0 | 84.70 |
| ROUNDED FINAL SCORE | 100 |  | 85 |
| CATEGORY |  | I |  |

---

### EXPLANATION

Max. Score   = The highest possible score for this exercise.

Avg. Score   = The average score for this exercise, based on the scores of all 40 candidates.

Your Score   = Your final score for this exercise.

CATEGORY   = The category of the list in which your final score places you.  There are three categories:

I    Immediately Eligible
II   Eligible
III  Ineligible

As vacancies occur, promotions will be made from Category I.
If Category I is exhausted, promotions will be made from Category II.