Vol II    Exhibits 304-336

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

**FILED**
HARRISBURG, PA

MAY 2 0 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

DARRELL G. OBER                    :    1: CV – 00-0084
                                   :
         Plaintiff                 :
                                   :
   vs.                             :
                                   :
PAUL EVANKO, MARK                  :    (Judge Caldwell)
CAMPBELL, THOMAS COURY,            :
JOSEPH WESTCOTT,                   :
HAWTHORNE CONLEY                   :
                                   :
         Defendants                :JURY TRIAL DEMANDED

## PLAINTIFF'S EXHIBITS

The following documents have already been provided to the defendant's and are again reproduced and provided:

PLANTIFF 1: Memo dated February 7, 2001 from Evanko to Deputy Commissioner of Staff re: Reconfiguration of Area Commands I and IV.

PLAINTIFF 2: Special Order 98-22, re: Internal Investigations.

PLANTIFF 3: E-mail from Coury to Conley dated February 10, 2000, subject: STD-501.

PLAINTIFF 4: STD-501 from Conley to Commissioner, dated February 18, 2000 re: Captain Ober.

PLAINTIFF 5: E-mails from Ober to Szupinka dated January 12 – 17, 2000, re: State Vehicle.

PLAINTIFF 6: Memo from Ober to Deputy Commissioner of Administration, dated November 10, 1999, re: Northwestern Traffic Institute.

PLAINTIFF 7: Memo from Conley to Division Directors, dated December 15, 1998, re: Ober's Temporary Assignment to Higher Rank.

PLAINTIFF 8:  Memo from Conley to Division Directors, dated October 15, 1998, re: Ober's Temporary Assignment to Higher Rank.

PLAINTIFF 9: E-mail from Conley to Ober, dated August 23, 1999, re: Cell Phone.

PLAINTIFF 10: Bureau of Professional Responsibility Roster, dated July 21, 1999.

PLAINTIFF 11: Record of cell phone usage for cell numbers 717-877-4106 and 717-805-3018.

PLAINTIFF  12: Undated memo from Ober to Director, Bureau of Technology Services, re: Cellular Telephones.

PLAINTIFF 13: E-mail from Conley to Ober, dated December 13, 1999, re: Division Director's Letter.

PLAINTIFF 14: Letter of Commendation to Sergeant Ronald L. Hillegass, dated January 7, 1999 from Ober.

PLAINTIFF 15: Invoice and receipt from Framers' Workshop, dated May 14, 1999.

PLAINTIFF 16: Desk Memorandum, dated December 16, 1999 from Ober to Director, Bureau of Professional Responsibility.

PLAINTIFF 17: General Invoice in the amount of $69.35, dated December 14, 1999.

PLAINTIFF 18: E-mail from Conley to Ober, dated January 26, 2000, re: Return of Bureau of Property.

PLAINTIFF 19: E-mail from Ober to Brown, dated January 26, 2000 re: Return of BPR Vehicle and Equipment.

PLAINTIFF 20: E-mail from Ober to Brown, dated January 26, 2000 re: Return of BPR Vehicle and Equipment.

PLAINTIFF 21: Letter from Major Paul Woodring, dated February 9, 1996, to Mr. Charles Leazier.


PLAINTIFF 22: Copy of investigation ordered by Evanko and conducted by Major's Werts and Williams (IAD 1999-503).

PLAINTIFF 23: Memo from Captain Brown to Captain Oleyniczak, dated May 6, 1999.

PLAINTIFF 24: SP 1-101, subject McCormick, complainant Romano, date of allegation November 25, 1999.

PLAINTIFF 25: Sample General Investigation Report, dated April 21, 1993.

PLAINTIFF 26: Sample Memo from Lieutenant Sample to Commander Area I, dated August 27, 1997.

PLAINTIFF 27: Sample General Investigation Report, dated August 27, 1997.

PLAINTIFF 28: Sample Summary Report from Lieutenant Sample to Trooper Doe, dated August 27, 1997.

PLAINTIFF 29: Bureau of Professional Responsibility 1999 Annual Report.

PLAINTIFF 30: May 25, 1999 interview of FBI Agent Ralph Kush.

PLAINTIFF 31: June 8, 1999 interview of Conley.

PLAINTIFF 32: Undated e-mail from Evanko to Campbell, re: Reorganization.

PLAINTIFF 33: Email from Brown to Ober, dated March 29, 2000, re: Supervisory Inquiry.

PLAINTIFF 34: Email from DeWire to Ober, dated August 8, 2001, re: Supervisory Inquiry.

PLAINTIFF 35: Undated draft Supervisory Inquiry Process regulation.

PLAINTIFF 36: Copy of Investigative Report directed by Coury and conducted by Mrgich (IAD 1999-409).

PLAINTIFF 37: Desk Memo, dated December 3, 1999 from Brown to Deputy Commissioner of Administration.

PLAINTIFF 38: Desk Memo, dated October 5, 1999 from Acting Director, Internal Affairs to Director, Bureau of Professional Responsibility.

PLAINTIFF 39: Desk Memo, dated November 19, 1999, from Director, Bureau of Professional Responsibility to Deputy Commissioner of Administration.

PLAINTIFF 40: Desk Memo, dated October 5, 1999, from Acting Director, Internal Affairs Division to Director, Bureau of Professional Responsibility.

PLAINTIFF 41: Bureau of Professional Responsibility Route Slip, re: IAD 1999-409, dated September 1, 1999.

PLAINTIFF 42: Bureau of Professional Responsibility Route Slip, re: IAD 1999-409, dated November 12, 1999.

PLAINTIFF 43: Undated Desk Memo, from Acting Director, IAD to Director, BPR.

PLAINTIFF 44: Memo, dated February 12, 2001, from Pudliner to Conley re: IAD 1999-409.

PLAINTIFF 45: SP 1-101, dated May 27, 1999, Ober – Subject; Coury – Complainant.

PLAINTIFF 46: Letter to Phil Conti.

PLAINTIFF 47: Letter from Philip Conti to Tom, dated May 22, 1999.

PLAINTIFF 48: Memo from Ober to Director, Bureau of Professional Responsibility, dated September 10, 1999, re: Supervisory Inquiry 1999-409.

PLAINTIFF 49: Pennsylvania State Police Historical, Educational and Memorial Center Board of Directors, dated February 7, 2001.

PLAINTIFF 50: Memo dated October 21, 1999, from Conley to Ober, re: Time and Attendance.

PLAINTIFF 51: Memo from Evanko to Deputy Commissioner of Administration, dated October 4, 1999, re: Time and Attendance.

PLAINTIFF 52: Memo from Conley to Ober, dated July 1, 1999, re: Time and Attendance.

PLAINTIFF 53: STD-929, Time and Attendance Record, for June 12 – 25, 1999 for Ober.

PLAINTIFF 54: Request for Leave, STD-330, for Ober dated May 18, 1999.

PLAINTIFF 55: Request for Leave, STD-330, for Ober dated May 20, 1999.

PLAINTIFF 56: Request for Leave, STD-330, for Ober dated March 5, 1999.

PLAINTIFF 57: STD-929, Time and Attendance Record, for pay period ending March 19, 1999.

PLAINTIFF 58: Police Criminal Complaint, defendant Dennis Jay Bridge, filed September 30, 1999.

PLAINTIFF 59: Affidavit of Probable Cause, dated September 30, 1999, defendant Bridge.

PLAINTIFF 60: Police Criminal Complaint, defendant Kipp Stanton, filed September 30, 1999.

PLAINTIFF 61: Affidavit of Probable Cause, dated September 30, 1999, defendant Stanton.

PLAINTIFF 62: AR Change No. 866, dated February 23, 2001.

PLAINTIFF 63: Memo from Coury to Commissioner, dated June 16, 1999, re: meeting with Commissioner and Hickes.

PLAINTIFF 64: Bureau of Professional Responsibility interview of Coury, dated June 28, 1999.

PLAINTIFF 65: Memo Coury to Ober, dated November 1, 1999, re: Northwestern University Traffic Institute.

PLAINTIFF 66: Memo from Ober to Director, Bureau of Personnel, dated October 19, 1999, re: School of Police Staff and Command.

PLAINTIFF 67: Department Special Order 99-102, dated October 7, 1999.

PLAINTIFF 68: E-mail from Ober to Brown, November 10, 1999, re: Northwestern University Traffic Institute.

PLAINTIFF 69: January 2001 High Performance MoPar magazine article, "Out of Retirement".

PLAINTIFF 70: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from May 18, 1999 meeting.

PLAINTIFF 71: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from January 21, 1998 meeting.

PLAINTIFF 72: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from November 19, 1997.

PLAINTIFF 73: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from September 17, 1997.

PLAINTIFF 74: Pennsylvania State Police Historical, Educational and Memorial Center Committee notes from April 9, 1997.

PLAINTIFF 75: Memo from Evanko to Sarah Shuller, dated August 26, 1998.

PLAINTIFF 76: April 1999 "Communicator", page 5.

PLAINTIFF 77: Retirees' Scoop; May 1999 "Communicator".

PLAINTIFF 78: Memo from Coury to Ober, dated December 23, 1999, re: Supervisory Inquiry IAD# 1999-409.

PLAINTIFF 79: Desk Memo from Acting Director, Internal Affairs Division to Deputy Commissioner of Administration, dated December 3, 1999.

PLAINTIFF 80: Desk Memo from Acting Director, Internal Affairs Division to Director, Bureau of Professional Responsibility, dated October 5, 1999.

PLAINTIFF 81: Desk Memo from Director, Bureau of Professional Responsibility to Deputy Commissioner of Administration, dated November 19, 1999.

PLAINTIFF 82: Desk Memo from Acting Director, IAD to Director, BPR dated October 5, 1999.

PLAINTIFF 83: BPR Route Slip, dated November 12, 1999.

PLAINTIFF 84: Desk Memo

PLAINTIFF 85: E-mail from DeWire to Ober, dated October 4, 2000, re: Chain of Command.

PLAINTIFF 86: E-mail from Ober to Coury, dated May 18, 2001, re: OD Report.

PLAINTIFF 87: Mary Bungo's affidavit dated May 15, 2001.

PLAINTIFF 88: Special Order 2001-24, dated March 21, 2001.

PLAINTIFF 89: Bureau of Research and Development route slip, dated April 11, 2001.

PLAINTIFF 90: Memo from Barbara Christie to Deputy Commissioner Staff, dated April 10, 2001.

PLAINTIFF 91: E-mail from DeWire to Ober re: Chain of Command, dated October 4, 2000.

PLAINTIFF 92: Signature route slip, Commissioner's sign-off dated February 22, 2001.

PLAINTIFF 93: Signature route slip, Deputy/Staff sign-off dated February 17, 2000.

PLAINTIFF 94: Undated, hand-written file notes.

PLAINTIFF 95: AR Manual Change No. 866, dated February 23, 2001.

PLAINTIFF 96: Draft AR 1-1.

PLAINTIFF 97: Project Tracking Summary, date assigned October 10, 2000.

PLAINTIFF 98: Project Tracking Summary, date assigned September 30, 1999.

PLAINTIFF 100: Project Tracking Summary, date assigned August 19, 1999.

PLAINTIFF 101: Project Tracking Summary, date assigned July 17, 1997.


PLAINTIFF 102: Project Tracking Summary, date assigned February 10, 1998.

PLAINTIFF 103: Project Tracking Summary, date assigned July 17, 1997.

PLAINTIFF 104: Reproduction Request, dated February 23, 2001.

PLAINTIFF 105: AR Manual Change No. 866, dated February 23, 2001.

PLAINTIFF 106: AR 1-1; Organization, dated February 23, 2001.

PLAINTIFF 107: Draft AR 1-1.

PLAINTIFF 108: Undated, hand written note.

PLAINTIFF 109: Draft AR 1-1, Change No. 866 Change Sheet.

PLAINTIFF 110: Draft 1-1 text; dated February 23, 2001.

PLAINTIFF 111: Desk Memo from Durante to Dir., Planning Division, dated February 21, 2001.

PLAINTIFF 112: E-mail from Merryman to Margeson, dated February 8, 2001 re: E's.

PLAINTIFF 113: E-mail from Merryman to Margeson, dated January 29, 2001, re: E's.

PLAINTIFF 114: Undated CLEAN Message re: Area Command Reconfiguration.

PLAINTIFF 115: Pennsylvania State Police Organization Chart.

PLAINTIFF 116: Desk Memo from Merryman to Margeson, dated February 13, re: Reconfig of Area Commands.

PLAINTIFF 117: Desk Memo from Coury to Commissioner, dated February 7, 2001, re: Reconfiguration of Area Commands.

PLAINTIFF 118: Memo from Werts to Commissioner, dated February 5, 2001 re: Organization: reconfiguration of Areas.

PLAINTIFF 119: Pennsylvania State Police Location Map, dated October 12, 1994.

PLAINTIFF 120: Pennsylvania State Police Location Map, dated October 12, 1994.

PLAINTIFF 121: Letter from Coury to Ober, dated November 10, 1994.

PLAINTIFF 122: Letter from Coury to Ober, dated January 6, 1995.

PLAINTIFF 123: Handwritten letter from Coury to Ober, dated March 5, 1998.

PLAINTIFF 124: Memo from Coury to Director, Internal Affairs Division, dated May 15, 1996.

PLAINTIFF 125: Memo from Merryman to Bureau Directors, dated June 17, 1999 re: AR 1-1, Organization.

PLAINTIFF 126: FR 7-4, dated December 23, 1996.

PLAINTIFF 127: Ober's grievances (six).

PLAINTIFF 128: Memo from Skurkis to Director, Bureau of Emergency and Special Operations, dated June 29, 2000.

PLAINTIFF 129: Memo from Reynolds to Mullin, dated April 24, 2000 re: Loss of or Damage to State Property Appeal Board.

PLAINTIFF 130: Memo from Mullin to Reynolds, dated May 8, 2000 re: Request to Reopen Proceedings.

PLAINTIFF 131: Memo from Bonney to Director, Staff Services, dated June 26, 2000 re: Final Determination.

PLAINTIFF 132: Memo from Ober to Deputy Commissioner of Administration, dated July 27, 2000 re: Reimbursement Appeal.

PLAINTIFF 133: Memo from Coury to Ober, dated November 1, 1999 re: Northwestern University Traffic Institute.

PLAINTIFF 134: FR 1-2, dated May 16, 2000.

PLAINTIFF 135: AR 4-22, dated September 15, 2000.

PLAINTIFF 136: AR 4-11, dated August 20, 1997.

PLAINTIFF 137: Memo from Ober to Director, Bureau of Liquor Control Enforcement, dated July 27, 2000, re: review of Bureau personnel file.

PLAINTIFF 138: Memo from DeWire to Ober, dated July 28, 2000 re: review of Bureau personnel file.

PLAINTIFF 139: Memo from McDonald to Ober, dated March 27, 2002 re: review of Bureau personnel file.

PLAINTIFF 140: Memo from Ober to Acting Director of LCE, dated March 27, 2002, re: review of Bureau personnel file.

PLAINTIFF 141: AR 1-1; pages 37, 39 and 40, dated July 31, 1997.

PLAINTIFF 142: Bits & Bytes, May 2000.

PLAINTIFF 143: Bits & Bytes, September 2000.

PLAINTIFF 144: Bits & Bytes, April 2000.

PLAINTIFF 145: Bits & Bytes, January 2002.

PLAINTIFF 146: E-mail from Commissioner to all personnel, dated January 8, 2002.

PLAINTIFF 147: E-mail from Wilt to Ober, dated January 31, 2000 re IIMS.

PLAINTIFF 148: Undated e-mail from Schmidt to Ober.

PLAINTIFF 149: E-mail from Shelton to Ober, dated January 20, 2000 re: IIMS.

PLAINTIFF 150: Memo from Ober to OA, dated March 8, 2000 re: Grievance #HQ-172.

PLAINTIFF 151:E-mail from Ober to Hostert, dated March 27, 2000.

PLAINTIFF 152: E-mail from Szupinka to Ober, dated February 4, 2000.

PLAINTIFF 153: E-mail from Ober to Grab, dated January 24, 2000.

PLAINTIFF 154: Memo from McCommons to Ober, dated January 10, 2000.

PLAINTIFF 155: E-mail from Laughlin to Ober, dated March 13, 2000.

PLAINTIFF 156: E-mail from Ober to Mike, dated January 23, 2001.

PLAINTIFF 157: E-mail from Ober to Lazzaro, dated December 7, 2000.

PLAINTIFF 158: E-mail from PSP postmaster to everyone, dated September 1, 2000.

PLAINTIFF 159: E-mail from Ober to Ruth Brown, dated December 6, 2000.

PLAINTIFF 160: E-mail from Ober to Riley, dated August 25, 1999.

PLAINTIFF 161: E-mail from Ober to Brian, dated January 11, 2000.

PLAINTIFF 162: E-mail from Ditzler to Ober, dated January 7, 2000.

PLAINTIFF 163: Letter from Kwiatek to Ober, dated March 27, 2000.

PLAINTIFF 164: E-mail from Ober to Conley, dated September 7, 1999.

PLAINTIFF 165: Letter from Gallegos to Ober, dated January 29, 2001.

PLAINTIFF 166: Letter from Lazzaro to Ober, dated July 27, 2000.

PLAINTIFF 167: E-mail from Ober to Suber, dated April 2, 2001.

PLAINTIFF 168: Letter from Lazzaro to Ober, dated June 9, 2000.

PLAINTIFF 169: Memo from Ober to Commissioner, dated December 24, 1997.

PLAINTIFF 170: Memo from Ober to Deputy Commissioner of Administration, dated October 29, 1996.

PLAINTIFF 171: Undated CALEA Concerns Outline.

PLAINTIFF 172: E-mail from Wilt to Ober, dated May 31, 2000.

PLAINTIFF 173: E-mail from Christensen to Ober, dated March 9, 2000.

PLAINTIFF 174: Letter from Gallegos to Ober, dated January 16, 2001.

PLAINTIFF 175: Letter from Hunter to Ober, dated January 29, 2001.

PLAINTIFF 176: E-mail from Ober to Brown, dated January 25, 2000.

PLAINTIFF 177: E-mail from Ober to Davis, dated January 28, 2000.

PLAINTIFF 178: E-mail from Ober to Davis, dated January 27, 2000.

PLAINTIFF 179: E-mail from Ober to Binker, dated January 17, 2000.

PLAINTIFF 180: E-mail from Ober to Skiles, dated February 14, 2000.

PLAINTIFF 181: E-mail from Waugh to Ober, dated February 10, 2000.

PLAINTIFF 182: E-mail from Waugh to Ober, dated February 15, 2000.

PLAINTIFF 183: E-mail from Ober to Skiles, dated February 21, 2000.

PLAINTIFF 184: E-mail from Waugh to Ober, dated November 12, 1999.

PLAINTIFF 185: Letter from McSpadden to Ober, dated December 22, 2000.

PLAINTIFF 186: Letter from Kwiatek to Ober, dated March 15, 2000.

PLAINTIFF 187: Letter from P.M. Conti to Ober, dated September 4, 1994.

PLAINTIFF 188: Custody Order dated February 5, 1999.

PLAINTIFF 189: E-mail from Infantino to Ober, dated September 3, 1999.

PLAINTIFF 190: E-mail from Davis to Ober, dated February 17, 2000.

PLAINTIFF 191: E-mail from Ober to Davis, dated June 26, 2000.

PLAINTIFF 192: Undated Centennial Book Committee assignment page.

PLAINTIFF 193: E-mail from Ober to Waugh, dated January 11, 2000.

PLAINTIFF 194: E-mail from Waugh to Ober, dated March 16, 2000.

PLAINTIFF 195: CLEAN Message, dated April 20, 1999.

PLAINTIFF 196: May 1999 IIMS Newsletter.

PLAINTIFF 197: RFQC Procurement Project Structure, dated August 30, 1999.

PLAINTIFF 198: Memo from Backenstoss to Wilt, dated January 27, 2000.

PLAINTIFF 199: E-mail from Ober to Wilt, dated February 7, 2000.

PLAINTIFF 200: Memo from Ober to IIMS Program Manager, dated February 10, 2000.

PLAINTIFF 201: E-mail from Wilt to Ober, dated February 15, 2000.

PLAINTIFF 202: Agenda, IIMS Oversight Committee, dated February 22, 2000.

PLAINTIFF 203: IIMS Systems Integrator BAFO Evaluation Results, dated February 21, 2000.

PLAINTIFF 204: Agenda, IIMS Oversight Committee, dated February 14, 2000.

PLAINTIFF 205: IIMS Systems Integrator Committee Contact Information, dated August 30, 1999.

PLAINTIFF 206: Ober's notes from April 6, 2000 debriefing meeting with IBM.

PLAINTIFF 207: Debriefing notes from March 23, 2000 meeting with Andersen Consulting.

PLAINTIFF 208: E-mail from Wilt to Ober dated February 10, 2000.

PLAINTIFF 209: E-mail from Ober to group list, dated February 14, 2000.

PLAINTIFF 210: E-mail from Ober to Stephen, dated January 7, 2000.

PLAINTIFF 211: E-mail from Bucher to DeWire, dated August 22, 2001.

PLAINTIFF 212: Memo from Westcott to Commissioner, dated January 4, 1999.


PLAINTIFF 213: Memo from Werts to Deputy Commissioner of Operations, dated December 28, 1998.

PLAINTIFF 214: Memo to file from Merryman, dated January 26, 2000.

PLAINTIFF 215: CLEAN Message, dated April 7, 1999.

PLAINTIFF 216: Bureau of Research and Development Personnel Order 99-5, dated June 16, 1999.

PLAINTIFF 217: National Governor's Association article.

PLAINTIFF 218: E-mail from PSP Commissioner to Everyone, dated August 9, 2000.

PLAINTIFF 219: Desk Memo from Ober to Director, Bureau of Technology Services, dated January 18, 2000.

PLAINTIFF 220: Memo from Ober to Commissioner dated January 17, 2000.

PLAINTIFF 221:Ober's resume.

PLAINTIFF 222: Pages 6 and 7 of AR 1-1.

PLAINTIFF 223: Memo from Evanko to Infantino, dated August 24, 1999.

PLAINTIFF 224:Memo from Koselnak to Valencic, dated September 2, 1999.

PLAINTIFF 225:Memo from Koselnak to Chief Counsel, date January 13, 2000.

PLAINTIFF 226: Memo from Koselnak to Department Disciplinary Officer, dated September 2, 1999.

PLAINTIFF 227: Memo from Koselnak to Williams, dated September 1, 1999.

PLAINTIFF 228: Memo from Bonney to Williams, dates January 27, 2000.

PLAINTIFF 229: Memo from Koselnak to McDonald, dated May 30, 2000.

PLAINTIFF 230: Newspaper article, March 9, 2000.

PLAINTIFF 231: Memo from Koselnak to Ryan, dated February 17, 2000.

PLAINTIFF 232: Email from Koselnak to Ober, dated February 21, 2000.

PLAINTIFF 233: Memo from Campbell to Bureau Staff, dated February 25, 2000.

PLAINTIFF 234: Memo from Evanko to Bureau Directors, dated February 3, 2000.

PLAINTIFF 235: Memo from Campbell to Commissioner, dated May 8, 2000.

PLAINTIFF 236: CLEAN Message, dated May 16, 2000 re: Lieutenant Vacancies.

PLAINTIFF 237: Email from Szupinka to Ober, dated January 18, 2000.

PLAINTIFF 238: Email from Szupinka to Ober, dated January 26, 2000.

PLAINTIFF 239: Indiana Gazette article, dated April 3, 2001.

PLAINTIFF 240: Post-Gazette article, dated February 9, 2001.

PLAINTIFF 241: Special Order 2000-2, dated January 7, 2000.

PLAINTIFF 242: Workplace Rights and Responsibilities.

PLAINTIFF 243: BPR Handout.

PLAINTIFF 244: Section 5101; Title 18.

PLAINTIFF 245: Letter from Reynolds to Warnken, dated January 27, 2000.

PLAINTIFF 246: Memo from Westcott to Director, LCE, dated April 28, 2000.

PLAINTIFF 247: Memo from Koselnak to Section Commanders, dated March 23, 2000.

PLAINTIFF 248: Memo from Koselnak to Central Section Commander, dated April 18, 2000.

PLAINTIFF 249: Memo from Koselnak to Deputy Commissioner of Operations, dated April 19, 2000.

PLAINTIFF 250: STD-279, dated April 19, 2000.

PLAINTIFF 251: STD-279, dated September 7, 1999.

PLAINTIFF 252: Letter from Lanier to Reynolds, dated February 9, 2000.

PLAINTIFF 253: Ethical Problems for Pennsylvania Litigators.

PLAINTIFF 254: Page Two, "Communicator"; Retirees' Scoops.

PLAINTIFF 255: Page Two, "Communicator"; Retirees' Scoops.

PLAINTIFF 256: Page Four, "Communicator"; Retirees' Scoops.

PLAINTIFF 257: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 258: Page Six, "Communicator"; Retirees' Scoops.

PLAINTIFF 259: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 260: Page Eight, "Communicator"; Retirees' Scoops.

PLAINTIFF 261: Page Three, "Communicator"; Retirees' Scoops.

PLAINTIFF 262: Page Four, "Communicator"; Retirees' Scoops.

PLAINTIFF 263: CLEAN Message dated January 7, 2000.

PLAINTIFF 264: CLEAN Message dated January 11, 2000.

PLAINTIFF 265: FR 1 Preface; Interaction With People, dated February 20, 1998.

PLAINTIFF 266: Personnel Order 00-18; dated August 31, 2000.

PLAINTIFF 267: Envelop to Ober.

PLAINTIFF 268: Management Directive 540.7, dated June 22, 1998.

PLAINTIFF 269: Memo from Ober to Director, BPR, dated May 28, 1998.

PLAINTIFF 270: Desk Memo from Hain to Ober, dated November 25, 1996.

PLAINTIFF 271: Lieutenants Job Description issued to Captain Ober, dated March 7, 2000.

PLAINTIFF 272: Lieutenants Job Description issued to Lieutenant Williams, dated December 17, 1998.

PLAINTIFF 273: Desk Memo from Woodring to Ober, dated March 28, 1995

PLAINTIFF 274: Memo from Hickes to Director, BPR, dated March 28, 1995.

PLAINTIFF 275:Deputy Commissioners Letter of Appreciation, dated January 19, 2000.

PLAINTIFF 276: Bureau Directors Memo from Waugh to Ober, dated January 19, 2000.

PLAINTIFF 277: CLEAN Message dated June 2, 2000.

PLAINTIFF 278: BPR interview of LTC Hickes, dated July 2, 1999.

PLAINTIFF 279: BPR interview of Evanko, dated June 28, 1999.

PLAINTIFF 280: Memo from Hickes to Commissioner, dated May 18, 1999.

PLAINTIFF 281: Memo from Ober to Director, Bureau of Personnel, dated October 19, 1999 with margin note sent to Personnel 10/20/99.

PLAINTIFF 282: FR 1-1, dated March 25, 1992.

PLAINTIFF 283: Evanko's handwritten notes, dated May 20, 1999.

PLAINTIFF 284: FR 3-2, dated April 16, 1996.

PLAINTIFF 285: Special Assignment.

PLAINTIFF 286: AR 4-25, dated September 2, 1993.

PLAINTIFF 287: AR 1-10, page 4 dated September 16, 1997.

PLAINTIFF 288: Undated, handwritten file notes.

PLAINTIFF 289: Undated, handwritten file notes.

PLAINTIFF 290: Ober's Performance Evaluations.

PLAINTIFF 291: Memo from Demkovitz to Ober, dated May 31, 2000.

PLAINTIFF 292: Memo from McSpadden to Ober dated January 30, 2001.

PLAINTIFF 293: Attorney bills.

PLAINTIFF 294: Memo from Aitchison to Ober, dated March 20, 2001.

PLAINTIFF 295: Memo from Frankel to Ober, dated January 22, 2001.

PLAINTIFF 296: Memo from Lazzaro to Ober, dated January 26, 2001.

PLAINTIFF 297: Memo from Lightman to Lazzaro, dated January 28, 2001.

PLAINTIFF 298: Memo from Lazzaro to Ober, dated February 1, 2001.

PLAINTIFF 299: Memo from Gallegos to Ober, dated July 2, 2001.

PLAINTIFF 300: Minutes – Grand Lodge, dated March 23 –24, 2001.

PLAINTIFF 301: Memo from Ruda to Ober, dated July 15, 2000.

PLAINTIFF 302: FR 3-3, dated March 3, 1999.

PLAINTIFF 303: Ober's promotion results.

PLAINTIFF 304: Letters of Appreciation from Citizens/Co-workers.

PLAINTIFF 305: Prior adjudication's.

PLAINTIFF 306: Ober's 2002 Performance Evaluation.

PLAINTIFF 307: Personnel Order 99-16, dated June 30, 1999.

PLAINTIFF 308: Personnel Order 00-07, dated March 10, 2000.

PLAINTIFF 309: 1998 – 2000 Collective Bargaining Agreement between Commonwealth and PSTA.

PLAINTIFF 310: McDonald's Performance Evaluation, dated October 11, 2000.

PLAINTIFF 311: Ober's Commission.

PLAINTIFF 312: Memo from Campbell to Commissioner, dated May 25, 2000.

PLAINTIFF 313: Personnel Order 99-20.

PLAINTIFF 314: Personnel Order 00-04.

PLAINTIFF 315: Management Directive 525.4 Amended, dated November 7, 1996.

PLAINTIFF 316: Receipt from Bailey to Christi, dated April 1, 2002.

PLAINTIFF 317: Arbitration decisions.

PLAINTIFF 318: Acting Bureau Director memo and rosters.



PLAINTIFF 319: Arbitration decision, dated June 16, 1999.

PLAINTIFF 320: CLEAN Message from PSP Postmaster to Everyone, dated March 7, 2000.

PLAINTIFF 321: Letter from Ober to Kwiatek, dated March 17, 2000.

PLAINTIFF 322: E-mail from DeWire to Ober, dated February 6, 2002.

PLAINTIFF 323; Memo from Evanko to Deputy Commissioner of Administration, dated December 18, 1991.

PLAINTIFF 324: IIMS milestones and timeline, dated March 26, 2002.

PLAINTIFF 325: IIMS Meeting agenda, dated February 18, 2000.

PLAINTIFF 326: Memo from Ober to Commissioner, dated January 17, 2000.

PLAINTIFF 327: Memo from Merryman to Commissioner, dated December 16, 1997.

PLAINTIFF 328: Management Directive 205.16 Amended, dated November 22, 1995

PLAINTIFF 329: Management Directive 205.14 Amended, dated February 2, 1998.

PLAINTIFF 330: Management Directive 1980-18, dated May 16, 1984.

PLAINTIFF 331: Memo from Evanko to Wilson, dated November 15, 1999.

PLAINTIFF 332: Memo from Evanko to Christensen, dated July 27, 1999.

PLAINTIFF 333: Ober's Job Description, dated June 2, 2000.

PLAINTIFF 334: Letter from Brown to Ober, dated February 2, 2000.

PLAINTIFF 335: PEMA related messages; various dates.

PLAINTIFF 336: Supervisor's Class Syllabus.

# LETTERS OF APPRECIATION FROM CITIZENS

HCR #71 Box 158-6
HustonTown, PA 17229



ORBISONIA, PA
JUL 17
PM
1985
17249

Trooper Darrell Ober
Pennsylvania State Police
Mc Connellsburg Sub-Station
Rt 522 North
Mc Connellsburg, Pa 17233

To
Thank You
for Your
Expression
of
Sympathy

Trooper Ober,

This is one of the hardest Thank You Notes I've had to write, not only was the bad news of our son a shock for us but it is so hard to hear. I'm sure bringing the news to us was very hard for you to do.

Paul & I want to express our sincere thanks to you for your Kindness, shown, the words of comfort you spoke to us at this tragic time.

Paul Jr was a fine young man & we loved him so very much, we keep asking, why? but this is a word that will never be answered for us.

Paul & I will be raising our Grandson, as his mother doesn't want him, So we have full Court Custody of Paul III.

Darrell, you are a fine gentleman, a fine trooper, and a Credit to the Pa. State Police force. Thanks for your Prayers and continue to Pray for God to give us strength to see us through Paul Jr death & to raise our Grandson to be a good man. Thanks again for Your Kindness

Sincerely

Mr & Mrs Paul Tomlinson Sr.

*Thank you
for your kindness
and your caring...
they meant more
than words can say.*

ALWAYS

LEAVE

THEM

LAUGHING

WHEN

YOU

SAY

GOOD · BYE

MOTHER GOOSE

Since no one thought to
send you a card when you
were ailing I thought I'D
Rectify that situation as you
prepare to leave.

I don't care what anyone
says about you (ha! ha!) you
were a really good supervisor.
Whoever you go they should
consider themselves lucky. We
will miss your strange &
wacky sense of humor.
We will also miss your
help fullness which you provided
willingly & without fail. Whenever
anyone needed it. You were a
supervisor who could be tough
when necessary but you also
have a caring attitude. Tough,
these you supervised, it was
appreciated!

Pam Rodriguez

CONGRATULATIONS
AND
GOOD LUCK!

COMMONWEALTH OF PENNSYLVANIA
OA—302                REV. 70—12                    **DESK MEMORANDUM**

SUBJECT

Commendatory Letter -
Trooper Darrell G. Ober

TO                                          FROM
Station Commander-McConnellsburg C.O., Troop "G", Hollidaysburg

DATE SENT              19 JUL 85         DATE NEEDED

| PLEASE CALL: | | APPROVAL | | SEE ME | |
|---|---|---|---|---|---|
| RETURNED YOUR CALL | | AS REQUESTED | | COMMENT | |
| INFORMATION | | PREPARE REPLY/REPORT | | NOTE AND FILE | |

RECEIVED BY                DATE                TIME

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE

1. Please furnish the attached to Trooper Ober along with
   my compliments.

2. Also, advise him a copy has been placed in his personnel
   file.

EXCELLENT JOB -

July 16, 1985

Mr. and Mrs. Paul D. Tomlinson
HCR #71, Box 1586
Hustontown, PA  17229

Dear Mr. and Mrs. Tomlinson:

Thank you for your letter of July 12, 1985, commending Trooper Darrell Ober, Troop "G", McConnellsburg, for his compassion and assistance in notifying you of the death of your son, Paul, Jr.

It is the source of much encouragement for all of us in the Pennsylvania State Police to receive comments such as yours, and I know Trooper Ober joins me in expressing our appreciation for your thoughtfulness in writing.

A copy of your letter is being forwarded to Trooper Ober's Commanding Officer, who will apprise him of your kind remarks.

Again, thank you for taking the time to commend Trooper Ober in this matter.

Sincerely yours,

Jay Cochran, Jr.

Jay Cochran, Jr.
Commissioner

clm

cc: C.O., Troop "G", Hollidaysburg
    File

RECEIVED

JUL 19 1985

PA. STATE POLICE

By

July 12, 1985

Commissioner J. Cochran
Pa. State Police

Dear Sir:

On June 20, 1985 at approx-
imately 5:00 P.M. One of your
troopers from the McConnellsburg
station, Trooper Ober came to the
Hustontown Fire Co. to notify my wife
and I in regards to the death of
our son, Paul Jr.

Trooper Ober approached me
in a very professional, friendly,
and understanding way. He very
wisely took me to a room where
we were alone, then only then, did
he tell me of the death of our
son. Trooper Ober was very
understanding, very sympathetic.

not once did he leave my side until I left for Maryland to identify my son.

After I left for Maryland Trooper Ober followed my wife and a friend back to our home, he stayed with her until our neighbors were there with her.

We have nothing but the highest regards for this man, this individual, this Pa. State Police Trooper.

If this mans professional actions indicate the type of people we have on our State Police force then there is no doubt in my mind that the Citizens of The Commonwealth of Pennsylvania do have, and can rely upon the finest State Police Force in the Country

Let me say again Trooper
Olera words and actions were
far beyond the call of duty.

My wife and I wish to
express to you and your people
especially Trooper Olier a very
deep heart felt Thank You.

Just knowing your thoughts
were there, and your prayers
were present. Surely helped
us through this tragic time.

With Sincere Regards
and Thank You.

Mr & Mrs Paul Tomlinson

P.S. Please extend our sincere
thanks to the Chain of Command.
and the entire troop at
McConnellsburg, Pa. Station.

8286 East Van Buren Drive
Pittsburgh, Pa. 15237

July 6, 1983

Commanding Officer
Pa. State Police
 Troop S
 Box 2006  R.D.#2
 Mercer, Pa. 16137

Dear Sir:

My husband and I were stopped by Trooper Ober last week on I79 and want you to know that he was most helpful and courteous while pointing out a potential violation.

He was a gentleman, very professional, and a credit to your unit.

Please relay our thanks to him for his assistance and shake the hand of a fine young man.

Very truly yours,

Mrs. Robert E. Barnhart

Mrs. Robert E. Barnhart

SP 3 - 354 S (11 - 79)



**PENNSYLVANIA STATE POLICE**
TROOP "S" – AREA V
INTERSTATE DIVISION
BOX 346
MILESBURG, PA. 16853

(814) 355 - 7545

August 8, 1983

Trooper Daniel G. Ober
Pennsylvania State Police
Troop "S" – Box 2006
Mercer, Pennsylvania

Dear Trooper Ober:

The enclosed letter from Mrs. Diana L. Kiser assures me that you are
providing a favorable impression of the Department through your able
job performance.

The fact that you show personal interest and concern to the public
reflects favorably upon you as an individual, as well as a law
enforcement officer.

I add my thanks to that of Mrs. Kiser for your extra efforts.

Sincerely,

Joseph P. Zuber, Captain
Troop Commander     PSP



July 18, 1983

Lt. Babics
Mercer State Police/2550
R. D. #2, Box 2006
Mercer, Pa.  16137

RE: Incident No. S5-166280

Dear Lt. Babics:

I am writing with thanks and appreciation for
the assistance and conduct of Trooper Daniel G.
Ober, Badge No. 4758.

He performed his duties with diligence and, most
importantly, kindness.  His understanding of our
dilema was genuine.  My 4 year old daughter is
telling of "the nice Policeman who helped us"
instead of her fears of the accident.

It is reassuring to know that our Policemen are
"Real People".

Thanks so much!

Sincerely,

Diana L. Kiser

Diana L. Kiser
188 Evergreen Drive
Franklin, Pa.  16323



STD—501A
(FORMERLY OA—501A)   10—66            1st Endorsement.         COMMONWEALTH OF PENNSYLVANIA

SUBJECT:      Letters of Appreciation.              12 September 1983.

TO:          Station Commander — Mercer.

FROM:       Lieut. Joseph A. SASALA, Acting Troop Commander,
            Troop "D", Butler.

        1.  Forwarded for your information and the attention of Trooper
Darrell G. OBER.

JAS/nrs

SP 3-354 S (11-79)

**PENNSYLVANIA STATE POLICE**
**TROOP "S" — AREA V**
**INTERSTATE DIVISION**
**BOX 346**
**MILESBURG, PA. 16853**

(814) 355-7545

September 8, 1983

Captain Robert E. Palladino
Commanding Officer
Pennsylvania State Police
Troop "D" — P.O. Box 670
New Castle Road
Butler, PA 16001

Dear Captain Palladino:

I am enclosing complimentary correspondence concerning Trooper Darrell G. Ober for your review, since he is now under your command.

You will no doubt want to share the letters from Mr. and Mrs. Mahon, and Mr. Tim Cooper with Trooper Ober, along with Commissioner Dunn's letters of acknowledgement.

I would appreciate it, as well, if you would extend my appreciation to Trooper Ober for his excellent job performance while a member of Troop "S".

With kind regards,

Sincerely,

Joseph P. Zober, Captain
Troop Commander      PSP

August 5, 1983

Tim Cooper
70 & 519 Truck Stop, Inc.
I70 & 519
R. D. #2
Eighty-Four, PA  15330

Dear Mr. Cooper:

Thank you for taking the time to write and commend Trooper Darrell G. Ober, Troop "S", Mercer Station, for offering his assistance to one of your passengers while enroute to Clarion on June 26, 1983.

It is always rewarding to learn when members of the Pennsylvania State Police have performed their duties in a professional, helpful manner as was done by Trooper Ober.

Your letter is being forwarded to his commanding officer, who will apprise Trooper Ober of your kind remarks.

Thank you again for taking the time to write.

Sincerely yours,

Daniel F. Dunn
Commissioner

clm

cc: C. O., Troop S, Milesburg
      File

Commissioner State Police
Dear Sir:

8/1/83

I want to pass thanks to your dept. on the kindness of Trooper Ober, sorry that is all I could see on his name plate. It happened June 26th 19_ Sunday on our way to Clarion Pa.

We pulled over on 79 North ramp, to enter Rt. 80 to Clarion Pa..

One of our passengers had terrible pains from his arthritis & had to get out & limber up. State car came up behind us & on his speaker, asked if he could help us, we thanked him & explained our position & he stayed until we left & even followed us up the ramp.

Thank you for this quality in selecting troopers, if this trooper Ober helped us he must do it all the time.

Sincerely,
Tom Cooper  (owner)

70&519 TRUCK STOP INC.
I 70& 519
R.D. #2
EIGHTY-FOUR, PA. 15330
412-225-9444

P.S. I did not know to send this so I thought (Knew I were (Sorry)
Best to send to you personally

*Thank You*

Trooper Ober,

Thank you so very much for everything that you did for me at the scene of my accident Saturday morning. Thank you for listening when I needed to talk and for putting up with all of my questions and "Mr. Policeman's". - Thank you for being there and being so understanding. I had always wondered how hysterical I would get if I had an accident - now I know! The worst part of the entire accident was telling my father, but, as you had said, he was thankful I wasn't seriously hurt.

I thank God for seat belts and you. Keep up the good work! Sincerely,

Kimberly Philson

4806 Roidel Lane
Bowie, MD 20715
July 17, 1987
(301) 464-2572

Officie Darrell Ober
Pennsylvania State Police
HCR 75, Box 96
Mc Connellsburg, PA 17233

RE: 65-305401

Officer Ober,
        I wish to thank-you so much for
your assistance after the June 27
break in at our summer home. It
was so kind of you to cover the open
area until one of us could get there.
        On July 3, my son boarded the
broken window, temporarily, until
he can get the proper supplies He
also said that nothing was taken.
        Since we can't visit there often,
I really worry about the place. It
has so much sentimental value to
us because my husband, the kids, and
myself built it before his death.
        We can't tell you how much we
appreciate your assistance and
concern. Thank-you.

                    Sincerely,
                    Adrienne Blake
                    & family



**Sergeant William A. Horgas**
Intelligence Section
General Investigation Division
Bureau of Criminal Investigation

February 28, 1996

Captain Darrell G. Ober
Director Systems and Process Review Division
Bureau of Professional Responsibility

Captain,

Thank you for the experience, knowledge gained and memories which I have acquired during my two year tenure with the A-Team. What I have learned from your writing expertise (massaging) is priceless and hope that I can someday emulate you with this talent,  for a guy from Mahaffey it's not too bad.

I wish you further success in your career and I'm sure we'll keep in touch . Remember when B.C.I. is next reviewed we used to work for you.

Sincerely,

Sergeant William A. Horgas

P.S. :  I hope this letter is not too nebulous and I can now spell ~~conteentos concientus~~ conscientious.

Corporal Gary V. Fasy, Jr.
Systems and Process Review Division-Eastern Section
Bureau of Professional Responsibility
8320 Schantz Road
Breinigsville, Pa. 18031

July 23, 1997


Captain Darrell G. Ober
Director, Systems and Process Review Division
Bureau of Professional Responsibility
1800 Elmerton Ave.
Harrisburg, Pa. 17110

Dear Captain Ober,

      I would like to thank you for the tremendous opportunity to serve in the Bureau of Professional Responsibility, Systems and Process Review Division. During my tenure in the Division I have had the unique opportunity to observe numerous segments of the Department's operational and support functions. I have learned an incredible amount about the Department and have acquired a vast amount of knowledge concerning the regulations and operational procedures. I am sure that this knowledge will assist me in my career as I strive to better serve the Department and the citizens of the Commonwealth of Pennsylvania.

      When I entered this Division, your expectations of me were high. This was important to me as I was recognized for my work as a criminal investigator. You recognized not only my skills as an investigator, but also my ability to present myself in a professional manner with both the written and spoken word. I have attempted to meet those expectations via my work product within the Division. I have attempted to represent the Division and myself in a positive and professional light in an effort to improve the image of the Division throughout the Department. I have reviewed components of the Department in a fair, thorough and unbiased manner, even at time when personal issues made this a difficult task. I have made an effort to produce complete, well-written and detailed reports that reflect positively on the Division. It is my hope that I have met at least the minimum of your expectations.

      It is with regret that I leave this Division for both professional and personal reasons. You have treated me in a fair, professional and thoughtful manner. I have enjoyed serving under your command and hope that someday I may have the privilege to serve under you again. I wish you good health and future success in your career.


Sincerely,

Corporal Gary V. Fasy, Jr.
Pennsylvania State Police



March 28, 1998

Capt. Ober,

I know we spoke on the telephone, but I wanted to take this opportunity to thank you. The knowledge I gained during my tenure with SPR has helped me mature as a member of the Department. As I complete my first week back in Troop D, the pace can be a bit hectic, but it is nice to be able to put the knowledge I gained with SPR into practical application.

SPR has come a long way in three years. I credit much of it to your guidance of the Division. I wish to thank you again for the opportunity to serve under your command and hope the opportunity presents itself again.

Sincerely,

Sgt Thomas E. Dubovi

P.S. Since the Western Section is all non-hunters feel free to contact me for updates on "How the West was Won".

SP 3-354 T (3-83)



# PENNSYLVANIA STATE POLICE
### TROOP "T" — AREA V
### P.O. BOX 8531
### HARRISBURG, PA 17105

(717) 939-9551
Ext. 428

May 10, 1988

Corporal Darrell G. Ober
Pennsylvania State Police
Troop "T", Bowmansville Station
P.O. Box 347
Bowmansville, PA  17507

Dear Corporal Ober:

I have reviewed Limited BPR #2587 dated April 20, 1988, submitted by Lieutenant John J. Weirzbicki, on the complaint of Ms. Lisa Braccini.

I have determined that the complaint made against you is completely unfounded.

In Ms. Braccini's complaint, she alleged that you were rude to her in the issuance of the citation.  The investigation did not substantiate this allegation.  The investigation disclosed that the citation-issuance procedure was followed correctly; and you were not rude or discourteous to her.

I am considering this investigation completed, with no further action contemplated.

Sincerely,

George Cyktor, Captain
Commanding Officer

P305
1 of 2



**PENNSYLVANIA STATE POLICE**
DEPARTMENT HEADQUARTERS
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

May 20, 1994

Lieutenant Darrell G. Ober
Pennsylvania State Police
Bureau of Professional Responsibility
Commander, Central Section
Systems & Process Review Division
1800 Elmerton Avenue
Harrisburg, Pennsylvania  17110

Dear Lieutenant Ober:

    Bureau of Professional Responsibility investigation number BPR-8275, in which you were involved, has now been completed.

    After reviewing the investigative report initiated as a result of complaints by members of the Lykens Station relative to the propriety of procedures used by the review team, I have concluded the complaints are unfounded and the actions of you and your review team were appropriate.

    Thank you for your professional conduct in this matter and your cooperation in the investigation.

                Sincerely,

                Captain Phillip L. DeWire
                Director, Systems & Process Review Division
                Bureau of Professional Responsibility

*Buckle Up Pennsylvania*
It's Your Life...
It's Our Law

| Pennsylvania State Troopers | : | |
|---|---|---|
| Association | : | Captain Darrell Ober |
| | : | 00-CI-229 HQ-169; 00-CI-227 HQ-172 |
| | : | 00-CI-305 HQ-174; 00-CI-434 HQ-176 |
| vs. | : | |
| | : | |
| Commonwealth of Pennsylvania | : | |
| Pennsylvania State Police | : | |

### BRIEF FILED BY THE PENNSYLVANIA
### STATE TROOPERS ASSOCIATION ON BEHALF OF
### THE GRIEVANT, CAPTAIN DARRELL OBER

## I.  Facts and Procedural History

The Grievant, Captain Darrell Ober, has been a member of the Pennsylvania State

Police since July of 1981.  Throughout his employment history with the Pennsylvania State

Police, Captain Ober has served with distinction and been duly recognized for his

outstanding performance.

These instant grievances arise from the involvement of Captain Ober, while Director

of the Internal Affairs Division of the Bureau of Professional Responsibility (BPR), in an

FBI investigation of political corruption within the Pennsylvania State Police.  Captain Ober

was told by the FBI to maintain confidentiality in terms of the investigation.

On or about May 1, 1999 the FBI informed Captain Ober that the investigation was

complete and that the FBI did not find agency-wide corruption within the Pennsylvania

State Police.  As a result of this information, Captain Ober and Lt. Col. Hickes briefed Col.

Evanko in regards to the investigation and its result.  After this briefing, Col. Evanko

ordered Captain Ober to submit a detailed memorandum of the investigation and Captain

Ober's involvement in it.  Shortly after the memorandum was received by Col. Evanko,

Captain Ober was ordered to participate in an "administrative inquiry" into his involvement

P306
10 F 8

and actions in regard to the FBI investigation.  As a result of this investigation Captain Ober filed a grievance, HQ-164.

This administrative inquiry was followed by denials of reimbursement requests for the FBI investigation, which had previously been approved, and on January 10, 2000 Captain Ober was informed he was being transferred from his position with the Bureau of Technology back to BPR, and then to Troop B, as the Area III Assistant.  As a result of the transfer, Captain Ober timely filed grievance HQ-169.  In the days before his transfer Captain Ober applied for the vacancy in the position of Director of the Legislative Affairs Office.  While it appears that Captain Ober is the most qualified candidate, his interest in the position never even receives a response from Pennsylvania State Police as to his qualifications or a possible interview.

On January 26, 2000, Captain Ober, through private counsel, filed a mandamus action challenging the transfer in the Commonwealth Court.  On January 27, 2000, the Pennsylvania State Police rescinded the transfer.

Next, on February 19, 2000, Captain Ober was assigned to the Bureau of Liquor Control Enforcement as a section commander.  In the past, this position had always been held by a lieutenant until the assignment of Captain Ober.

The next action occurred in March of 2000, when Captain Ober was denied his request to continue in the capacity as PEMA emergency preparedness team leader.  This position had been held by Captain Ober since 1995.  After this denial, Captain Ober filed grievance HQ-174, which was sustained and he was placed back in his position on the PEMA team.  This reinstatement is short lived and on June 30, 2000 the Pennsylvania State Police removed him again from this position.

Again, Caption Ober filed a timely grievance to this action taken by the Pennsylvania State Police.

In all of Captain Ober's grievances, he alleges that the actions undertaken by the Pennsylvania State Police since his involvement in the FBI investigation have been retaliatory discipline, in violation of the collective bargaining agreement. Specifically Captain Ober alleges violation of the discipline provision of Article 26, the grievance provision of Article 28, and Article 38 Transfers. The Pennsylvania State Police contend that their actions have not been discipline and this is evidenced by the lack of a formal disciplinary notice, investigation, or issuance of a DAR.

Therefore, the question for the arbitrator in this matter is whether the actions of the Pennsylvania State Police in regard to Captain Ober constitute discipline and thereby satisfy the threshold requirement of arbitrability of discipline as contemplated by the contract.

## II. Statement of the Question Presented

**WHETHER THE ACTIONS OF THE PENNSYLVANIA STATE POLICE IN REGARD TO CAPTAIN OBER, IN THE TIME AFTER HIS INVOLVMENT WITH THE FBI INVESTIGATION OF THE PENNSYLVANIA STATE POLICE, CONSTITUTE DISCIPLINE AND ARE, THEREFORE, ARBITRABLE?**

(Suggested Answer in the Affirmative.)
(Suggested Remedy, a Hearing on the Merits.)

## III. Legal Argument

Although there is no specific definition of discipline within in the collective bargaining agreement, Article 28, Section 1, states "grievances are limited to matters involving interpretation of this agreement including all matters of discipline". The collective bargaining agreement, therefore, gives the Pennsylvania State Police Association

the right to grieve "all matters of discipline". As a result of this language, a grievance is arbitrable if its subject encompasses a "matter of discipline".

The word "discipline" is defined by Webster's Dictionary as " treatment or action taken with the intent to correct or punish". When applying this definition to Captain Ober and the circumstances and the situation from which these actions commenced, it is clear that the Pennsylvania State Police intended these actions to punish Captain Ober for his involvement with the FBI investigation.

While the Commonwealth will present a position that in cases of discipline they must follow a strict set of rules and procedures and since in this case none of those procedures were initiated, the actions against Captain Ober were, therefore, not discipline. The Commonwealth will ask the arbitrator, where is the disciplinary action report? Why was the grievant not informed of the initiation of a disciplinary proceeding? Why does the grievant's file not reflect imposition of such discipline? The Pennsylvania State Troopers Association submits that all these question are exactly those the arbitrator should ask of the Commonwealth, when the effect, timing, and reasoning for these actions of the part of Pennsylvania State Police are analyzed.

The presence of discipline may be discerned either objectively, in terms of a defined penalty, or less distinctively and more subjectively in terms of the impact on the affected employee. In another arbitration on this exact question, Arbitrator Talarico wrote that there is nothing in the collective bargaining agreement limiting grievable discipline to only those actions involving a DAR. (AAA Arbitration No. 97- DO-0419). In the case at hand, while there was no DAR, the impact of the actions on Captain Ober clearly reflect the imposition, albeit not formally, of discipline.

Until the investigation of the FBI became knowledge to Colonel Evanko, Captain Ober continued his steady progression of increasing responsibility and rank within the Pennsylvania State Police. Captain Ober had just been placed in the Bureau of Technology to head what was called an "incredibly important" procurement project. Yet after the investigation was known, he was removed from the procurement project, transferred to a new troop across the State as an assistant, and had his reimbursement requests, which were previously approved, denied. Not to mention, Captain Ober was called in for an "administrative inquiry" in regards to his actions throughout the investigation. If this is not conduct undertaken with the intent to correct or punish, the Pennsylvania State Troopers Association is at a loss for what would be. Based on these actions alone, the Pennsylvania State Troopers Association believes the grievances should be deemed arbitrable, yet the actions against Captain Ober do not stop there. In addition, to all the above referenced actions, Captain Ober was also subject to removal from the PEMA emergency preparedness team he headed up for five years and was assigned to a position with the Liquor Control Board, historically occupied by a member of lower rank.

The Pennsylvania State Troopers Association views the combined effect of these acts to clearly constitute discipline and, as such, this matter should proceed to the question of whether just cause for this discipline existed.

The concept of "just cause", as incorporated into the parties' collective bargaining agreement, extends not only to the culpability of a member or the penalty assessed against him or her. "Just cause" is the embodiment of contractual due process rights to which every member of the Pennsylvania State Police bargaining unit is entitled throughout the disciplinary process. In adopting the view of Arbitrator Carol R. Daugherty in Enterprise

Wire Co., 46 LA 359 (Daugherty, 1966), the Commonwealth Court reaffirmed this principle

in AFSCME Council 88 v. City of Reading, 568 A.2d 1352 (Pa. Commonwealth Ct. 1990),

where it held that "just cause" applies not only in the adjudication of discipline, but also in

its investigation, holding that if the answer is "no" to any of seven questions, "just cause"

protections have not been satisfied:

1. **Did the company give to the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employees conduct?**

2. Was the company's rule or managerial order reasonably related to (a) the orderly, efficient, and safe operation of the company's business and (b) the performance that the company might properly expect of the employee?

3. **Did the company, before administering discipline to an employee, make an effort to discover whether the employee did, in fact, violate or disobey a rule or order of management?**

4. **Was the company's investigation conducted fairly and objectively?**

5. At the investigation, did the "judge" obtain substantial evidence or proof that the employee was guilty as charged?

6. **Has the company applied its rules, orders, and penalties even-handedly and without discrimination to all employees?**

7. Was the degree of discipline administered by the company in a particular case reasonably related to (a) the seriousness of the employee's proven offense and (b) the record of the employee in his service with the company?

In the case at hand, the Pennsylvania State Police cannot receive an answer

of "yes" to any of the questions set forth above to satisfy the requirement of "just

cause". In particular, questions 1, 3, 4, and 6 would clearly have to be answered in

the negative.

In response to question 1, the Pennsylvania State Police never suggested to Captain Ober that his actions during the investigation were even worthy of discipline, in fact, the result of the "administrative inquiry" was unfounded. This finding leads directly to the "no" answer for question 3, because, in fact, Captain Ober violated no rule or order of management. The involvement of Captain Ober in the FBI investigation was simply that of a member of "BPR" helping to carry out an investigation where confidentiality was of the essence. These types of investigations are of a reoccurring nature in the area of police internal affairs.

Question 4 in the analysis provides for the most troubling conduct on the part of Pennsylvania State Police. The actions and investigation begun by the Pennsylvania State Police against Captain Ober were undertaken in retaliation for his participation, as was his duty, in an FBI investigation. In order to do his job, Captain Ober simply could not inform possible targets of the investigation, while the basic fact finding efforts were being undertaken. Also, the investigation was not begun by Pennsylvania State Police in an objective manner. It was a witch hunt for any possible mistakes by Captain Ober when, in fact, it was known he did nothing wrong.

In question 6, the area of contractual due process comes to the forefront. The Pennsylvania State Police contract calls for certain procedures, which **must** be followed in order to impose discipline. The member should have the opportunity to respond to charges in a forum when the discipline is unjustified. In this case Pennsylvania State Police knew that they could not impose, in a formal manner, discipline on Captain Ober, because they could never satisfy this very standard of

"just cause". Through his actions, Captain Ober had offended the highest ranking member of the Pennsylvania State Police and he needed to pay. So the Pennsylvania State Police, in order to achieve their aims of discipline, attempted to circumvent Captain Ober's rights and impose discipline through an unconventional manner. It is clear though their actions, that the penalties imposed on Captain Ober were, in a very real manner, discipline for his actions in the investigation.

In short, denying this grievant the forum in which to address these grievances is to allow Pennsylvania State Police to circumvent the requirements and rules laid out so clearly in the collective bargaining agreement.

## IV. Conclusion

For the foregoing reasons these grievances should be deemed arbitrable and this grievance cases should proceed to a hearing on the merits.

Respectfully submitted,

By_____
Gary M. Lightman, Esquire
Attorney for the Pennsylvania
State Troopers Association
3625 Vartan Way
Harrisburg, Pa 17110
717-234-0111



SP 3-200 (12-93)



99-16
Personnel Order
June 30, 1999

  

## PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

**SUBJECT:**        Promotions and Assignments

**TO:**             Area, Troop and Station Commanders
                    and Bureau Directors

**FROM:**           Commissioner

**REFERENCES:**     (a)   Special Order 93-54, Probationary Trooper Evaluations, dated
                          March 31, 1993.

                    (b)   AR 5-2, Field Training Program.

                    (c)   Special Order 95-93, Probationary Trooper Performance Inquiry,
                          dated May 25, 1995.

1.      Contingent upon successful completion of all standards required
        for graduation from the Academy, the following members of the
        104th Cadet class who commenced training during January 1999
        are promoted to Trooper and assigned to their respective Troops,
        effective July 30, 1999:

### Troop B, Washington

| | |
|---|---|
| Kristen J. Beattie | Brian K. Pitchford |
| Chad J. Craig | John J. Reimond |
| Christopher I. Egidi | Michael K. Reinhart |
| Eric V. Erhardt | Carl W. Richards |
| Gregory A. Furin | Timothy G. Schonbachler |
| Frank N. Konek, Jr. | Edgar M. Sherbine |
| Frank J. Lasinsky | Paul J. Termini |
| Joseph A. Loughran | Matthew J. Uram |
| Thomas J. Maher | Jeffrey A. Urban |
| Jason J. McKee | Daniel J. Woods |
| David C. Myers | |

P307
1 of 2

- 2 -

### Troop C, Punxsutawney

Craig M. Erickson          Jason E. Wagner
Wayne C. Kline

### Troop H, Harrisburg

Donald G. Cloak, Jr.      Jason Scholl
Sean M. Duffy             Tracy M. Shull
Terry V. Pennington       Ronald P. Zanella

### Troop J, Lancaster

Walter J. Bell, Jr.       Keith C. Noll
Justin W. Bieber          Chad R. Rarig
Thaddeus J. Binstead      Jason J. Reed
Ty C. Brininger           Chad R. Shultz
James J. Cuttitta         John W. Tinker
Roy J. Eiler, Jr.         Scott K. Torrance
Paul J. Gaspich           Scott D. Worthington

### Troop K, Philadelphia

Kevin M. Allison          Brian R. Hoy
William W. Cawley, Jr.    William R. Mackiw
Vincent K. D'Angelo       Alan McCree
Mark J. Dooling           George C. Murphy
Stephen J. Douthat        Patrick J. Snyder
Erik G. Fisher            Collen J. Young

### Troop L, Reading

George A. Shimko

### Troop M, Bethlehem

Arthur L. Johnson, Jr.    Dennis E. Simms, Jr.
Thomas J. Krempasky       Karen M. Tempinski
Eric L. Reber             Jeffrey S. Yagiello
Brian C. Roberts

### Troop N, Hazleton

Christopher M. King



SP 3-200 (10-99)

 

*Library*

00-07
Personnel Order
March 10, 2000

## PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

SUBJECT:            Promotion and/or Transfers and Rescissions

TO:                Area, Troop and Station Commanders
                   and Bureau Directors

FROM:              Commissioner

REFERENCE:     (a)    Personnel Order 00-05, Promotions and/or Transfers and
                      Rescission, dated February 14, 2000.

1.    The following personnel matters are announced effective
      March 18, 2000:

      Captain Jeffrey B. Miller, Commanding Officer, Troop H,
      Harrisburg, is hereby reassigned to the Executive and
      Administrative Offices and will assume the duties of
      Legislative Liaison.

      Captain Michael J. Marcantino, Commanding Officer, Troop
      L, Reading, is hereby transferred to Troop H and will
      assume command.

      Captain Richard S. Zenk, Commanding Officer, Troop N,
      Hazleton, is hereby transferred to Troop L and will assume
      command.

      Lieutenant John G. Rice, Troop N, Hazleton, is hereby
      promoted to Captain and will assume command.

2.    The following transfer is announced effective April 1, 2000:

      Trooper Patrick C. Stewart, Troop A, Greensburg, to the
      Bureau of Liquor Control Enforcement.

3.    The following transfer is announced effective March 18, 2000:

      Trooper Shawn S. Meenan, Troop N, Hazleton, to Troop R,
      Dunmore.

P 308

PLAINTIFF 309

COLLECTIVE BARGAINING

AGREEMENT BETWEEN

COMMONWEALTH AND

PSTA    1998-2000

EMPLOYE NAME: MCDONALD, LEONARD H.            EMPLOYE NUMBER: 034913        020  5410

## OVERALL RATING

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|:---:|:---:|:---:|:---:|:---:|
| ☒ | ☐ | ☐ | ☐ | ☐ |

**TRAINING AND DEVELOPMENT RECOMMENDATIONS:** I have no training recommendations for Captain McDonald at this time.

## COMMENTS AND SIGNATURES                    (Attach additional 8 ½ x 11 paper if necessary)

RATER COMMENTS: (This section should comment on any aspect(s) of employe's performance not covered elsewhere and should explain overall rating).

Captain McDonalds knowledge and work ethic have made him an extremely valuable asset to the Bureau and in particular, to me during the past three months since I assumed command of BLCE. I would not be as advanced in the transition without his assistance. I have found him trustworthy, intelligent and dedicated to the State Police as a Department . Despite our limited time working togeather, I feel confident in recommending Captain McDonald for promotion to the rank of Major in any position requiring those traits.

RATER SIGNATURE: *Major Phillip L DeWire*                    DATE  10/11/00

REVIEWER COMMENTS:


REVIEWER SIGNATURE: *[signature]*                    DATE  10/7/0C

EMPLOYE COMMENTS:

☑ I AGREE WITH THIS RATING            ☐ I DISAGREE WITH THIS RATING

☐ I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER

☐ DISCUSSION WITH MY REVIEWING OFFICER OCCURRED _____
                                                                    (DATE)

☐ I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR; MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

COMMENTS:

P310

EMPLOYE'S SIGNATURE: *Capt. Leonard N. McDonald*            DATE  10/11/2000

# Commonwealth of Pennsylvania

## Pennsylvania State Police

ACT OF THE LEGISLATURE, MAY 2, 1905 AS AMENDED

## The Commissioner

### To All Who Shall See These Presents, Greeting:

**Know Ye,** *That reposing special trust and confidence in the patriotism, valor, fidelity, and abilities of*

### Darrell G. Ober

*I have appointed and by these presents commission you to be a*

### Captain

*in the Pennsylvania State Police of the Commonwealth of Pennsylvania, to rank as such from the* ___3rd___ *day of* ___MARCH___ *nineteen hundred and* ___NINETY-FIVE___

**You are therefore,** *carefully and diligently to discharge the duties of your office by doing and performing all manner of things thereto belonging. I do strictly charge and require all personnel under your command to be obedient to your orders, and you are to observe and follow such orders and directions as you shall receive from the Governor of the Commonwealth of Pennsylvania or from me or the future Commissioners of the Pennsylvania State Police or other superior Officers set over you, according to the rules and regulations of the Pennsylvania State Police.*

**This Commission** *is to continue in force unless the same shall be otherwise lawfully cancelled.*



**Given** *under my hand and the Seal of the Pennsylvania State Police at the City of Harrisburg, this* ___10th___ *day of* ___MARCH___ *in the year of our Lord, one thousand nine hundred and* ___NINETY-FIVE___

*By the Commissioner* Paul J. Evanko

P311

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

DATE:          May 25, 2000

SUBJECT:       Letter of Complain Regarding the Conduct of Members Assigned
               to the Bureau of Professional Responsibility

TO:            Commissioner (through channels)

FROM:          Captain Alfred Campbell AC
               Director, Division of Administration
               Bureau of Liquor Control Enforcement

REFERENCES:    (a)    Personnel investigation No. IAD 1999-676 (Sexual Harassment
                      Complaint Against Lieutenant Huston Williams).

               (b)    Administrative Regulation AR 4-25.


        1.     This is a formal complaint regarding the conduct of Corporal Robert D
Mrgich of the Bureau of Professional Responsibility and any person(s) in his chain of command who
participated with him in setting up and furthering circumstances which subjected me to disparate,
disrespectful and demeaning treatment on and about May 22 and 23, 2000.

        2.     During the morning of Monday, May 22, 2000, I responded via
telephone to a telephone message from Corporal Mrgich requesting to set up an interview regarding
Reference (a). I agreed to comply with the interview request. However, I did question the Corporal
regarding the efficacy and/or propriety of such an interview, especially since an administrative and
criminal determination was made regarding Lieutenant Williams' conduct as evidenced by the criminal
charges filed against him on or about January 11, 2000. The Corporal responded to my question with
a non-answer suggesting this interview is just part of a routine investigative process. The Corporal
also mentioned that I was not a subject of an investigation. In addition to not truthfully and
forthrightly answering my question, my attention was drawn to the Corporal's insistence that the
interview be conducted at BPR (Bureau of Professional Responsibility) Headquarters. Please note that
in addition to the above stated concerns, the fact remains that I was available to be interviewed in
connection with Reference (a) during all of my duty shifts since the commencement of the
investigation in August or September 1999. Frankly, I cannot think of a legitimate reason as to why I
wasn't interviewed at the onset of the investigation if for no other reason than that I shared the work
environment with the main subjects of the investigation. Notwithstanding the above stated concerns
and issues, I agreed to appear at BPR Headquarters on Tuesday, May 23, 2000 at 0830 hours and
participate in the requested interview process.

3.    At 0830 hours on May 23, 2000, I appeared at BPR Headquarters where I was greeted by Corporal Mrgich, who then introduced me to another Corporal who would also be sitting in on the interview. Without any objection on my part, we entered the intended interview room. I noticed a tape recording device on the interview table and asked Corporal Mrgich whether or not he intended to tape record the interview. When he said yes, I told him that I would not mind the interview being taped provided he provide me with a tape recording device and accommodate a simultaneous recording. I then asked him to obtain a tape recorder from somewhere in his headquarters. The Corporal refused my request and told me that it was my responsibility to furnish my own device. At this point, I ended my participation in the interview and advised the Corporal that I would obtain a tape recorder and that any interview will have to take place at my work location. (Considering the BPR Headquarters location, the tape recording device and the presence of two (2) interviewers, what should have been a simple interview took on the appearance of criminal interrogation. This interview atmosphere, in my estimation, was not only suspicious, but highly inappropriate.) I then left the BPR Headquarters and returned to my work location.

4.    On Tuesday morning, May 23, 2000 and soon after returning to my office, I received a telephone call from Major Hawthorne Conley, the Director of the Bureau of Professional Responsibility. I briefly explained that I had a problem with what had transpired with Corporal Mrgich. Major Conley related to me something to the effect that he saw nothing wrong with the timing and location of the interview, or the fact that two (2) officers were participating in the interview. The Major did acknowledge that I had a right to simultaneously tape record the interview [Refer to Reference (b)]. At some point we agreed to arrange another interview session with Corporal Mrgich. At 1334 hours on the same date, I briefly spoke with Corporal Mrgich and advised him to interview me at my work location. I also informed him that if he tapes the interview, then I will tape the interview. The phone call was then terminated. A short time later I received another telephone call from Major Conley. In that instance, he informed me that he could not allow the interview to be conducted at my work location. I am not sure of the reasons he cited. I believe they related to BPR policy and something to the effect that there are victims and witnesses at my location. In any event, I accepted the Major's reasoning and volunteered to appear at BPR Headquarters before the end of the day (May 23rd) and be interviewed by Corporal Mrgich. It was shortly determined that the Corporal would not be available until 1030 hours on Wednesday, May 24, 2000. I then agreed to report to BPR Headquarters at that time. Prior to terminating the phone call, I made it clear to the Major and the Corporal that I have no problem with being interviewed, but I will not tolerate being toyed with.

5.    On Wednesday, May 24, 2000 at 0815 hours, I reported for duty at my headquarters. In short order I ascertained that a number of Department employes assigned to Bureau of Liquor Control Enforcement Headquarters were interviewed by Corporal Mrgich in connection with Reference (a). Those employes are: Ms. Alice Belmont, Ms. Joellen Coyle, Ms. Pamela Brown, Mrs. Mary Paul, Ms. Connie Davis, Mr. Thomas Ballaron and Corporal Denise Karbowski. All of the named employes were interviewed by Corporal Mrgich, not at BPR Headquarters but at their work locations. Additionally, the interviews were not tape recorded and Corporal Mrgich conducted the interviews alone. The discovery of this information confirmed beyond any doubt that not only was I being treated significantly different than other interviewees, but also more seriously, my intelligence and my credibility as a member of this Department was insulted and my position as a commissioned officer demeaned beyond repair. I determined at this time that I would not allow

myself to be further subjected to such conduct and treatment. At 0955 hours of the same date, I telephoned Major Conley and informed him that I would not be available for the 1030 hours interview, and that I will set forth my reasoning in writing to the Commissioner through channels.

       6.    The foregoing information is self-explanatory and need not be summarized. However, I respectfully submit that any organization that would countenance any employe being treated as I have been in this matter is an organization in serious trouble and one not worthy of much respect.

AC/awb

*ROMEO
ARRESTED
8/12/99*

- 3 -

9.  The following transfers are announced effective September 4, 1999:

Sergeant Steven C. Furlong, Bureau of Criminal Investigation, to Troop K, Philadelphia.

Sergeant Byron L. Locke, Bureau of Professional Responsibility, to the Bureau of Training and Education.

Corporal Kathy A. Kauffman, Troop H, Harrisburg, to the Bureau of Training and Education.

Trooper George F. Buck, Troop T, Highspire, to the Bureau of Training and Education.

Trooper Christopher T. Pushart, Troop K, Philadelphia, to the Bureau of Training and Education.

Trooper Margaret D. Shirley, Troop N, Hazleton, to the Bureau of Training and Education.

10.  The following transfers are announced effective August 21, 1999:

Trooper Robert F. Kelly, Troop K, Philadelphia, to the Bureau of Research and Development.

Trooper Paul B. Roy, Troop H, Harrisburg, to the Bureau of Emergency and Special Operations.

11.  The following transfer is announced effective August 7, 1999:

Sergeant Rodnee J. Williams, Troop E, Erie, to the Bureau of Liquor Control Enforcement.

Corporal George L. Hilf, Troop A, Greensburg, to the Bureau of Emergency and Special Operations.

*P313*

- 3 -

FERENS          JAMES                    Corporal
                                         Troop B, Washington
                                         19720127 Enlisted
                                         20000107 Retired

FERRENCE        NORBERT                  Trooper
                                         Troop D, Butler
                                         19720127 Enlisted
                                         20000107 Retired

FLEAGLE         SHELBY       J           Police Communications Operator
                                         Troop H, Harrisburg
                                         19810105 Appointed
                                         20000107 Retired

FREEMAN         BARBARA      J           Police Communications Operator
                                         Troop B, Washington
                                         19730718 Appointed
                                         20000107 Retired

FURLONG         STEVEN       C           Sergeant
                                         Troop K, Philadelphia
                                         19710729 Enlisted
                                         20000107 Retired

HAGGERTY        DANIEL       M           Corporal
                                         Troop D, Butler
                                         19710729 Enlisted
                                         20000107 Retired

HAWKINS         LUCINDA                  Trooper
                                         Training & Education
                                         19720127 Enlisted
                                         20000107 Retired

HOUSER          BARRY        A           Trooper
                                         Troop G, Hollidaysburg
                                         19730125 Enlisted
                                         20000107 Retired

HOWARD          BERNARD      E           Trooper
                                         Troop G, Hollidaysburg
                                         19680815 Enlisted
                                         20000107 Retired

P314

# MANAGEMENT DIRECTIVE

**525.4 Amended**
Number

COMMONWEALTH OF PENNSYLVANIA
## GOVERNOR'S OFFICE

Subject:

Temporary Assignment in Higher Classification

By Direction Of:

*Thomas G. Paese*
Thomas G. Paese, Secretary of Administration

Date:

November 7, 1996

This directive contains policy and responsibilities for controlling the use of temporary assignments in higher classifications and for processing payments to compensate employes who receive such assignments. This amendment is being reissued, with minor changes, specifically to update this directive.

1. **SCOPE.** Applies to all employes in agencies under the Governor's jurisdiction in all positions in the units shown in Enclosure 1 who work in a position in a higher classification for the specified number of cumulative or consecutive days during a quarter.

2. **OBJECTIVES.**

   a. Provide policy for the assignment of employes to temporarily work in a higher classification.

   b. Set forth eligibility criteria for receiving out-of-class pay.

   c. Promulgate out-of-class pay rules.

   d. Authorize comptrollers to pay employes for temporarily working in a higher classification.

3. **POLICY.** Before an employe is assigned to work in a higher classification, every effort should be made to ensure that such an assignment is absolutely essential and critical to the continued operation of the organizational unit. When it is

essential for employes to work in a higher classification, employes serving in a higher classification will be paid by input via the Time and Attendance/Working Out-of-Class subsystem. Enclosure 1 provides eligibility criteria for receiving out-of-class pay and out-of-class pay rules for all bargaining units effective January 1, 1994. On January 1, 1994, all employes who were eligible for out-of-class pay, • began receiving payments on a biweekly rather than • quarterly basis. Following are specific policy statements for temporary higher classification assignments and payments.

   a. When an employe on a 40 hour work schedule is assigned to work out-of-class in a higher position on a 37½ hour work schedule, the employe's regular biweekly salary and number of work hours will not be changed. The out-of-class pay shall be determined in accordance with the applicable out-of-class pay rules found in Enclosure 1 and the hourly difference will be multiplied by the number of hours worked per day to arrive at the out-of-class compensation.

   b. An employe or employes shall not be temporarily assigned to perform, in general, the duties and responsibilities of a position in a higher rated

## Legend

[1] The consecutive days may begin or end at any time regardless of the quarter.

[2] An employe is eligible for holiday pay at the higher rate if he or she is required to perform the higher level duties on his or her scheduled workday immediately before and immediately after the holiday and is paid out of class on those days.   The holiday does not count toward the minimum number of days required.

[3] For those bargaining units with a "YES" in this column, an eligible employe must be assigned the higher level duties on his or her scheduled workday immediately before and immediately after paid leaves of absence in order to be paid out of class for those days.   Paid leaves of absence do not count toward the required cumulative workdays.

[4] If a member works the majority of hours on a shift, it shall be considered as a full shift at the higher rank.

[5] No minimum except for Liquor Store Clerks 2 who are eligible for out of class pay after 14 days.

[6] For nonexempt employes replacing exempt employes, the eligibility criteria is in excess of 14 consecutive calendar days, retroactive to the first day.   For exempt employes, the eligibility criteria is in excess of 10 consecutive workdays.

[7] This criteria pertains to a calendar year, not a quarter.

[8] Employes in the following classes will be compensated for out of class work according to Higher Class Formula 4: 47755; 02040; 02520; 54240; 98222; 98400; 98410; 98420; 98430; 98440; 98450; 98460; 98470; 98480; 98490; 81520.

[9] Employes in the following class will be compensated for out of class work according to Higher Class Formula 3: 02560; 47230; 47240; 47250; 98600; 98601; 42851; 81530; 81540.

[10] For these bargaining codes, eligibility and criteria will be established on a case by case basis by the Office of Administration, Bureau of Personnel.   Requests should be forwarded, in writing, with complete justification to the Chief of Classification and Pay.

[11] The out-of-rank pay rule is the difference between the regular rate and the rate entitled to upon promotion to the higher rank, which is a rate in the higher pay range at the employe's same step and longevity range.

[12] Payment is to be made in the manner prescribed in *Section 27.41* of *Management Directive 505.7, Personnel Rules.*

[13] Consult appropriate labor agreements or *Management Directive 505.7* to find the specific manner in which higher class rates are calculated.   Higher class pay formula requirements, which depict the manner in which higher class pay rates are calculated, will be described in a Time/Attendance System Manual which is to be published.   Higher Class Eligibility Table, which contains the manner in which higher class rates are calculated, can be accessed via PIP713 for appropriate formulas.

**k.** The pay of an employe temporarily assigned to a higher class who is injured on the job and who qualifies for work-related disability pay or who qualifies under the provisions of *Act 632/534* or provisions of *The Heart and Lung Act*, will be based upon computations made at his or her regular biweekly salary/hourly rate for those days.

**l.** An employe temporarily assigned to a higher class who earns standby time, including T4 and T5 units ON CALL, will be paid at his or her regular biweekly salary/hourly rate for those hours. An employe called back to work in a higher class will be paid the appropriate higher rate for time worked in the higher class. Overtime is paid in accordance with Section 3.p.

**m.** An employe working in a higher class who terminates employment with the required number of cumulative or consecutive days for that bargaining unit will be paid for time worked in the higher class. The agency personnel office will process the out-of-class payment in the normal manner through the Time and Attendance/Working Out-of-Class subsystem.

**n.** An employe working in a higher class who transfers to another agency, and who has accumulated the required number of cumulative or consecutive days for that bargaining unit, will be paid for time worked in the higher class. The agency personnel office will process the out-of-class payment via the Time and Attendance/Working Out-of-Class subsystem.

**o.** All personnel transactions (contract pay increases, longevity increments, etc.) which occur for an employe working in a higher class are to be processed normally on an employe's regular biweekly salary/hourly rate when they become effective. When an employe separates, any leave payoff will be at the employe's regular rate of pay.

**p.** Employes who work overtime while assigned to a higher class are to be paid the appropriate overtime rate (straight time, time and a half, double time) based on their regular hourly rate when the overtime payroll is being processed. The appropriate overtime rate is based on the *Fair Labor Standards Act* code assigned to their current class. An employe who has worked in a higher class for the required minimum number of days applicable to his or her bargaining unit is eligible for overtime payment for work in the higher class and is to be paid for the overtime hours based on the appropriate overtime rate (straight time, time and a half, double time) and the calculated hourly difference. The appropriate overtime rate is based on the *Fair Labor Standards Act* code assigned to the higher class.

**q.** An employe who is demoted without a decrease in pay shall not receive more for working out-of-class than the employe would have received if the employe had not been demoted.

**r.** When an employe is assigned the duties of a higher class which is in a different bargaining unit than that of the employe, the eligibility provisions of the employe's permanent bargaining unit will apply.

**s.** Employes in bargaining units with full or half day requirements must work the full day or full half day to have that time credited for eligibility purposes. Once the minimum day threshold has been met, employes shall be paid out-of-class for all hours worked providing they were assigned to work out-of-class for the full day or full half-day, unless contractual obligations specify otherwise.

**t.** Employes will be compensated for temporary higher classification assignments via the Time and Attendance Working Out-of-Class Subsystem. Form STD-929, Time and Attendance Report, as revised to include working out-of-class data, is used as the official source document to process any payments made through the automated system. It is also used to process manuals, approved by the Chief of Classification and Pay, which cannot be processed through the automated system.

**u.** Eligibility criteria for employes on alternate work schedules will be determined on a case-by-case basis by the Bureau of Personnel, OA. Agencies with employes on alternate work schedules who may be assigned to temporarily work in a higher class should contact the Chief of Classification and Pay for eligibility criteria.

| Barg. Unit Group | Barg. Unit Code | Unit Title | Minimum No. of Days | Type Days | Cumulative/ Consecutive[1] | Work/ Calendar | Holiday Pay[2] | Leave Pay | Pay Rate Higher Class Formula[13] |
|---|---|---|---|---|---|---|---|---|---|
| 97 | J3 | Maintenance and Trades | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 (See Legend #9 for exceptions) |
| 11 | K1 | Law Enforcement (Fish and Game) | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 12 | K2 | Law Enforcement (Fish and Game Laws) (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 97 | K3 | Law Enforcement (Liquor, Fish, and Game Laws) | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 36 | K4 | Law Enforcement (Liquor Laws) | In Excess of 10 | Full | Consecutive | Work | No | No | 2 |
| 37 | K5 | Law Enforcement (Liquor Laws) (Supervisory) | In Excess of 10 | Full | Consecutive | Work | No | No | 2 |
| 97 | K6 | Law Enforcement | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 17 | L1 | State Police | In Excess of 5 | Full[4] | Cumulative | Work | No | No | M[11] |
| 97 | L3 | State Police | One Calendar Month | Full | Cumulative | Calendar | Yes | Yes | M[12] |
| 35 | L4 | Capitol Police | 5 | Full | Cumulative | Work | Yes | No | 5 |
| 15 | M1 | Liquor Store Clerks | 1 | N/A | N/A | N/A | Yes | No | 6 |
| 18 | M2 | Liquor Store Managers (Supervisory) | See Legend #6 | Full | See Legend #6 | See Legend #6 | Yes | No | 6 |
| 97 | M3 | State Stores Management | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 97 | M8 | Liquor Store General Manager | 10 | Full | Consecutive | Calendar | Yes | Yes[3] | 6 |
| 11 | N1 | Human Services | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 12 | N2 | Human Services (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 2 (See Legend #8 for exceptions) |
| 97 | N3 | Human Services | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 (See Legend #9 for exceptions) |

(4) Ensuring that temporary higher classification payments are verified against employe leave usage.

(5) Ensuring that out-of-class payments are properly and timely processed through the Time and Attendance/Working Out-of-Class subsystem.

(6) Establishing monitoring systems within the agency to ensure compliance with the policies and procedures in this directive.

d. **Bureau of Personnel, OA,** is responsible for:

(1) Monitoring working out-of-class assignments to ensure compliance with this directive. Periodic reports may be required from agency personnel offices as well as written justifications for selected working out-of-class assignments. On-site reviews may also occur to ensure that supervisors and managers are critically evaluating the need for temporary assignments in higher classifications.

(2) Reviewing written requests from agency personnel directors for extensions of temporary higher classification assignments beyond the nine month limitation and responding to agency requests by authorizing or denying such extensions.

(3) Informing the State Civil Service Commission of possible instances of merit system abuse, e.g., a Non-Civil Service employe working out-of-class in a Civil Service position.

(4) Publishing periodic reports and statistics which depict the usage of higher classification assignments and payments.

(5) Developing out-of-class pay monitoring reports for use by the Bureau of Personnel and agency Personnel Offices.

e. **Comptrollers** are responsible for:

(1) Processing higher classification payments in a timely manner.

(2) Auditing working out-of-class payments to ensure compliance with this directive.

• Questions regarding out-of-class program administration pertaining to policy and procedure, including assignments and payments, should be addressed to the Classification and Pay Division, OA.

• Questions relating to the use of the Time and Attendance/Working Out-of-Class subsystem should be addressed to the Personnel Systems Division, OA.

Enclosures:

1 — Eligibility Criteria for Working Out-of-Class and Pay Rule

2 — Nine Month Extension Request — Sample Memorandum

**This directive supersedes Management Directive 525.4 dated September 9, 1994.**

## ELIGIBILITY CRITERIA FOR WORKING OUT-OF-CLASS AND PAY RULE

| Barg. Unit Group | Barg. Unit Code | Unit Title | Minimum No. of Days | Type Days | Cumulative/ Consecutive[1] | Work/ Calendar | Holiday Pay[2] | Leave Pay | Pay Rate Higher Class Formula[13] |
|---|---|---|---|---|---|---|---|---|---|
| 11 | A1 | Clerical, Administrative, and Fiscal | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 12 | A2 | Clerical, Administrative, and Fiscal (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 2 (See Legend #8 for exceptions) |
| 97 | A3 | Clerical, Administrative, and Fiscal | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 (See Legend #9 for exceptions) |
| 11 | A4 | Professional, Administrative, and Fiscal | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 94 | A5 | Professional, Administrative, and Fiscal (Supervisory) | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 97 | A6 | Clerical, Administrative, and Fiscal | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 97 | A8 | Executive (Management) | One Calendar Month | Full | Cumulative | Calendar | Yes | Yes[3] | M[12] |
| 11 | B1 | Technical Services | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 12 | B2 | Technical Services (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 97 | B3 | Technical Services and Engineering and Scientific | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 11 | B4 | Engineering and Scientific | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 94 | B5 | Engineering and Scientific (Supervisory) | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 97 | B6 | Technical Services and Engineering and Scientific | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 97 | C3 | Educational and Cultural | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 31 | C4 | Educational and Cultural | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 32 | C5 | Educational and Cultural (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 2 |

| Barg. Unit Group | Barg. Unit Code | Unit Title | Minimum No. of Days | Type Days | Cumulative/ Consecutive[1] | Work/ Calendar | Holiday Pay[2] | Higher Leave Pay | Pay Rate Class Formula[13] |
|---|---|---|---|---|---|---|---|---|---|
| 97 | C6 | Educational and Cultural | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 21 | F1 | Social and Rehabilitative Services | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 22 | F2 | Social and Rehabilitative Services (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 97 | F3 | Social and Rehabilitative Services | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 21 | F4 | Social and Rehabilitative Services | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 22 | F5 | Social and Rehabilitative Services (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 97 | F6 | Social and Rehabilitative Services | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 11 | G1 | Inspection, Investigation and Safety | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 12 | G2 | Inspection, Investigation and Safety (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 97 | G3 | Inspection, Investigation and Safety | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 11 | G4 | Inspection, Investigation and Safety | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 12 | G5 | Inspection, Investigation and Safety (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 13 | H1 | Corrections Officers and Psychiatric Security Aides | 5 | Full | Cumulative | Work | Yes | No | 4 |
| 12 | H2 | Psychiatric Security Aides (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 4 |
| 97 | H3 | Corrections Officers and Psychiatric Security Aides | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 (See Legend #9 for exceptions) |
| 11 | J1 | Maintenance and Trades | 5 | Full | Cumulative | Work | Yes | No | 2 |
| 12 | J2 | Maintenance and Trades (Supervisory) | 5 | Full | Cumulative | Work | Yes | No | 2 (See Legend #8 for exceptions) |

## 4. DEFINITIONS.

**a. Management.** Classes with a number 3 or 8 for supervisory level in the second digit of a bargaining code; e.g., A3, A8.

**b. Quarter.** A calendar quarter that coincides with the pay period end date that falls within the period January to March, April to June, July to September, or October to December.

**c. Employes' regular biweekly salary/hourly rate.** The biweekly salary/hourly rate the employe earns in his or her regular class/position.

**d. Higher class.** A class/position that has a higher minimum hourly rate than the minimum hourly rate of the employe's regular class/position.

**e. Full day.** Seven and one-half or eight hour day.

**f. Half-day.** Three and three quarter or four hours respectively, in a seven and one-half or eight hour workday.

**g. Temporary higher level assignment.** An assignment of higher level work which is distinguishable from an employe's regular job duties and responsibilities by virtue of the circumstances under which it is performed and the frequency with which it is performed. (Questions concerning the determination as to whether work is temporary or permanent are to be addressed to the Classification Grievance Unit, Classification and Pay Division, Bureau of Personnel, Office of Administration.)

## 5. RESPONSIBILITIES.

**a. Supervisors** are responsible for:

(1) Justifying to agency management the need to assign higher level duties to an employe.

(2) Determining, in conjunction with the Personnel Office, whether an employe who will be assigned to work in a higher classification meets the minimum qualifications of the position.

(3) Controlling the use of temporary higher level assignments through the exercise of good judgment and management practices and by ensuring that all other alternate methods have been pursued, such as: reassign essential duties to an employe of the same or his or her level or defer the completion of work.

**b. Agency management** is responsible for:

(1) Ensuring that temporary assignments in higher classifications are made only when they are critical and essential to the continued operation of a particular function.

(2) Initiating appropriate action, including disciplinary action, to discontinue and prevent unnecessary temporary higher classification assignments.

**c. Personnel Directors** of agencies are responsible for:

(1) Ensuring compliance with the policies and procedures contained in this directive and for the establishment of internal procedures to review out-of-class payments for compliance, including those processed by personnel officers of field institutions.

(2) Assisting agency supervisors in determining whether employes who will be assigned to work in a higher classification meet the minimum qualifications. Except in emergency situations, qualification determinations are to be made prior to the assignments of the employe. In those exceptional circumstances when it is necessary to assign an employe who does not meet the qualifications to temporarily perform higher class work, the Personnel Directors must authorize such assignments and be prepared to defend them as being absolutely essential to the agency's operation in addition to following the policies outlined in Section 3.g.

(3) Providing managers and supervisors with training in their role and responsibilities in controlling and monitoring the use of temporary higher classification assignments.

| Barg. Unit Group | Barg. Unit Code | Unit Title | Minimum No. of Days | Type Days | Cumulative/ Consecutive[1] | Work/ Calendar | Holiday Pay[2] | Leave Pay | Pay Rate Higher Class Formula[13] |
|---|---|---|---|---|---|---|---|---|---|
| 97 | P3 | Nursing and Supportive Medical Services | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 19 | P4 | Nursing and Supportive Medical Services | 10 | Half | Cumulative | Work | Yes | No | 2 |
| 20 | P5 | Nursing and Supportive Medical Services (Supervisory) | 10 | Half | Cumulative | Work | Yes | No | 2 |
| 29 | R1 | Security | 10 | Half | Cumulative | Work | Yes | No | 2 |
| 30 | R2 | Security (Supervisory) | 10 | Half | Cumulative | Work | Yes | No | 2 |
| 97 | R3 | Security | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 38 | R4 | Park Rangers | 5 | Full | Cumulative | Work | Yes | No | 7 |
| 97 | S3 | Instructional, Non-Tenured | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 33 | S4 | Instructional, Non-Tenured | 20 | Half | Cumulative | Work | No | No | 3 |
| 94 | S5 | Instructional Non-Tenured (Supervisory) | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 97 | T3 | Physicians and Related Occupations | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 26 | T4 | Physicians and Related Occupations | In Excess of 12 | Full | Consecutive | Work | Yes | No | 2 |
| 27 | T5 | Physicians and Related Occupations (Supervisory) | In Excess of 12 | Full | Consecutive | Work | Yes | No | 2 |
| 97 | T6 | Physicians and Related Occupations | 5 | Full | Cumulative | Work | Yes | Yes[3] | 2 |
| 34 | Z4 | PUC Attorneys | 10[7] | Full | Consecutive | Work | Yes | No | 2 |
|  | 98[10] |  |  |  |  |  |  |  |  |
|  | 99[10] |  |  |  |  |  |  |  |  |

classification for more than nine continuous months or the length of the leave of absence of the employe being replaced, whichever is greater. Agencies are cautioned not to violate this policy by working an employe in a higher class up to the nine month limitation, discontinue the assignment for a short period of time, then resume it.

In those cases where a temporary assignment will exceed the nine month limitation, an exception to this policy must be requested and approved by the Bureau of Personnel, Office of Administration (OA), for the payment to be processed. Enclosure 2 provides a sample memorandum for these types of requests. Exception requests are not required where the nine month limitation occurs due to the length of the leave of absence of an employe being replaced.

**c.** If it is determined that the continued performance of the duties and responsibilities is absolutely critical and essential, priority consideration must be given to accomplishing these duties on a temporary basis and on a non-overtime basis in the following order:

**(1)** Higher level or managerial employes are to be used to absorb the most essential responsibilities when temporarily unstaffed or vacant positions exist for a short period of time.

**(2)** Employes in the same classification or the same pay range are to be temporarily assigned on a rotational basis.

**d.** Employes assigned to work in a higher classification are to be informed, in writing, of the assignment and its temporary nature. Whenever possible, a completion date should be provided.

**e.** For an employe to be compensated for temporarily working in a higher class, the higher class must be an approved existing position on an agency complement for which a temporary replacement is needed or there must be temporary duties in a higher rated class which a permanent employe may perform. Such temporary duties must be separate and distinct from the employe's regular assignment. An employe cannot be compensated for working in a higher classification during the period in which the employe's reclassification is pending approval.

**f.** The out-of-class payment procedure shall not be used to circumvent Civil Service rules and regulations. As an example, Non-Civil Service employes shall not be assigned to work in a higher classification pending their becoming reachable on a Civil Service list. A position may be temporarily filled because the incumbent is on any approved leave with or without pay, suspension, absence without leave, temporary reassignment, or has separated from the position.

**g.** Employes temporarily assigned to work in a higher classification shall meet the minimum experience and training requirements for the higher class. Exceptions to this policy should occur only in exceptional circumstances. In such cases, every attempt should be made to limit the assignment to 30 workdays. An out-of-class assignment shall not entitle an incumbent to preference for the position on a permanent basis. Agencies should be prepared to defend out-of-class assignments to employes who do not meet the minimum experience and training requirements of the higher class by explaining the exceptional circumstances.

**h.** Non-Civil Service employes are not to be temporarily assigned to higher level Civil Service classifications except as provided for on a permanent basis in *Management Directive 580.24, Promotion of Employes in Unskilled Positions Into the Classified Service,* and except where the higher class is Civil Service and the next lower class historically used is Non-Civil Service.

**i.** Paid leaves of absence do not break the consecutiveness of temporary higher level assignments if the days preceding and succeeding the leave are worked in the higher class.

**j.** If an employe is temporarily working in a higher class and is absent due to an official closing of state offices, the day will count toward eligibility requirements and he or she will be paid out-of-class if eligibility requirements are met. If the employe was on scheduled paid leave during the closing, he or she may or may not be paid out of class for that day depending on the bargaining unit criteria listed in Enclosure 1.

## NINE MONTH EXTENSION REQUEST — SAMPLE MEMORANDUM

**SUBJECT:**   Temporary Assignment — Nine Month Extension Request

**TO:**   Honorable Charles T. Sciotto
Deputy Secretary for Employe Relations
Office of Administration

**FROM:**   Personnel Officer

Employe Name: _____

Agency/Bureau Name & Code: _____

Current Class: _____

Higher Class: _____

Date Assignment Began: _____

Date Assignment Will End: _____
(if known)

Extension Date Requested: _____

Reason for Extension Request: _____

_____

_____

_____

_____

OA Approval: _____

Extension Date: _____

Date of Approval: _____



*Don Bailey, Esq.*

**ATTORNEY AT LAW**

GREENSBURG OFFICE:
114 S. MAIN STREET
GREENSBURG, PA 15601
(724) 836-5334 FAX (724) 836-2909

4311 N. 6TH STREET
HARRISBURG, PA 17110
(717) 221-9500 FAX (717) 221-9600

OF COUNSEL:
SAMUEL C. STRETTON
301 S. HIGH STREET
WEST CHESTER, PA 19381-3231
(610) 696-4243

April 1, 2002

TO:        Barbara Christi

FROM:    Don Bailey Esq.

IN RE:    Ober vs. Evanko et al.

Please sign & date and by who accepted these documents for Chief Counsel:

*[signature] Marvin D Kelley*
*4/1/02   4:24 pm*

Thank you,

Don Bailey

*P316*

In the Matter of Arbitration

Between

# COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF STATE POLICE

and

# PENNYSLVANIA STATE TROOPERS ASSOCIATION
### (Troopers Kyle Hartman and Allan Brown, Jr.)

**Before:**
**Ralph H. Colflesh, Jr., Esq.**
**Arbitrator**

<u>Appearances</u>

For the Commonwealth,
Department of State Police:
*Patricia J. Bartkowiak, Esq.*
*Office of Chief Counsel*
*Department of State Police*
*Harrisburg, Pennsylvania*

For the Association:
*Gary M. Lightman, Esq.*
*Lightman and Welby*
*Harrisburg, Pennsylvania*

## DECISION AND AWARD

Pursuant to the Collective Bargaining Agreement ("the Agreement") (Joint Exhibit1) by and between the parties hereto, the Commonwealth of Pennsylvania, Department of State Police ("the Commonwealth" or "the Department") and the

Pennsylvania State Troopers Association ("the Association"), the undersigned Arbitrator was appointed to hear and determine the dispute described below. Upon due notice to the parties, arbitration hearings were held on February 27, March 2, and March 7, 2001 commencing at 10:00 a.m. each day at the Raddison Hotel, Trevose, Pennsylvania. At those times and in that place, both parties had the opportunity to call and confront witnesses, introduce documentary and other non-testimonial forms of evidence, and present arguments in support of their respective positions. At the conclusion of the hearing on March 7, the parties agreed to submit post-hearing briefs in lieu of making oral summations. The briefs were received, and the record closed.

### Background:

This case began the night of November 27-28, 1999 when the two Grievants, Trooper Kyle Hartman and Trooper Allan Brown, Jr., were on patrol duty out of the Department's Trevose Station. The Station is one of several under in Troop M, headquartered in Bethlehem. During their tour of duty, which began at 11:00 p.m. on the 27th and ended, as scheduled, at 7:00 a.m. on the 28th. The Grievants were paired in a single troop car and were to patrol a designated area in the vicinity of the Station. That area did not include any part of the City of Philadelphia.

However, in the very early hours of November 28th, the two entered the City in the neighborhood of Trooper Hartman's residence. Their incursion was prompted by Trooper Hartman's knowledge that young men under the legal drinking age were engaged in a beer party at Fleuhr Park, located near Convent Street and Grant Avenue, near the Hartman home. Not surprisingly, the Troopers located five young men exiting from the closed park. They were carrying a quarter keg of beer with a tap and a cloth satchel containing cans of beer. The Troopers apprehended and detained two of the youths, Stephen R. Passio and Steve Hatch. They also seized the keg and satchel.

Both Mr. Passio and Mr. Hatch were handcuffed and placed in the back of the Troop car while the Troopers drove to the Hartman home to further investigate. There, neighbors told them that youths had been passing between the backs of the houses, apparently on their way to or from the gathering in the park. The Troopers then drove Mr.

JUL.31.2021    2:45PM    OA BUREAU OF LABOR RELATIONS    NO.721    P.4

Hatch home and released him to his father, a City of Philadelphia police officer. Mr. Passio, who lived a few miles away, also was driven home and released to his mother, but not before the Troopers discovered that a truck parked near the spot where the arrests were made was his. Although they had no evidence Mr. Passio's blood alcohol was at the concentration necessary for a driving under the influence conviction and the truck was legally parked, properly tagged, inspected, and registered, the Troopers decided to have the vehicle towed. They gave Mr. Passio's mother the telephone number, although not the name or location, of the towing company. Mr. Passio's father, Stephen M. Passio, later retrieved the truck after paying a $229 towing and storage fee.

After releasing Mr. Passio, the Troopers returned to the Trevose Station where another Trooper, David F. Coyne, was staffing the desk and radio center. Trooper Coyne had earlier run a check on the tag of Mr. Passio's truck and, also at Trooper Brown's request, sent the tow truck. Trooper Coyne issued a report on that action. However, neither Trooper Brown nor Trooper Hartman made any report concerning the apprehension of suspects nor of the property they had seized.

For reasons that differ among the three Troopers, Troopers Brown and Hartman put the keg and satchel into the back of Trooper Coyne's pick up truck. For reasons that are also a matter of controversy among the three, Troopers Brown and Hartman later removed the beer and placed it along a wall outside the back of the station. At some point while in the station and after the encounter with the youths, Trooper Coyne found Troopers Brown and Hartman viewing pornography that they apparently found in Trooper Brown's personal e-mail. The latter had accessed the e-mail through a Department computer after Trooper Coyne allowed him to log on under his password.

Around 6:00 that same morning, November 28th, Sergeant James Raykovitz, then a Corporal assigned to the Trevose Station, overheard all three Troopers discussing what he believed to be a cache of beer that had been seized. Sergeant Raykovitz then walked behind the building and found the keg and satchel where Troopers Brown and Hartman had put them. Returning inside, he asked Trooper Coyne about his find. When Trooper Coyne told him that no incident report had been prepared about the property, Sergeant Raykovitz brought the beer to the attention of Sergeant Timothy J. McDonald, the Trevose Station commander. He and Sergeant McDonald then carried the keg and

satchel back inside the station and placed it in an indoor walkway between two sections of the structure.

The next day the keg and satchel were gone. Several days later, on December 6, 1999, Sergeant McDonald interviewed Troopers Brown and Hartman about the disappearance. According to Sergeant McDonald, Trooper Brown first asked "what keg of beer?" (NT II, 48), then told him he and Trooper Hartman had put the keg in back of the station with the intention that they would "take care of it." (NT II, 50). He then told the Sergeant he and Trooper Hartman "just took it and we threw it out." (NT II, 51). Trooper Hartman' explanation differed. Like Trooper Brown, he first expressed ignorance (NT II, 52) before explaining that he and Trooper Brown had thrown the beer away. However, he quickly changed that account by saying he and Trooper Brown had given it to some unnamed person. (NT II, 54). Sergeant McDonald, who believed that some report should have been made on the seizure of the beer, referred the matter for investigation by the Department's Bureau of Professional Responsibility ("BPR").

The BPR assigned Corporal Robert Murray of the Bureau's Internal Affairs Division to do an investigation. According to Corporal Murray's testimony, Trooper Hartman told him he had told Sergeant McDonald he had given the beer to somebody but claimed he gave that account because he was upset. (NT II, 141). Corporal Murray stated that the Trooper said he told another Trooper, Kenneth Wong[1], that he could take the beer after Trooper Hartman found it had been moved inside the station. However, Corporal Murray said that Trooper Hartman said he did not see Trooper Wong take the beer.

Trooper Brown's version was different. He told Corporal Murray, according to the latter's testimony at hearing, that the two never brought the satchel back to the station but instead gave it to the father of Mr. Hatch. (NT II, 157). He disclaimed any knowledge during his interview with Corporal Murray as to how the keg disappeared. (NT II, 1580159). Corporal Murray said Trooper Brown did not deny using profanity in front of the younger Mr. Passio, saying he did not recall such language, but admitted viewing naked women on a Department computer screen in the station but said the latter occurred

---

[1] The Notes of Testimony refer to this Trooper as Trooper "Long." (NT II at 141-145). However, both the Commonwealth's post-hearing brief and the Arbitrator's notes indicate this Trooper's name is Kenneth Wong.

inadvertently when he checked his home e-mail and unexpectedly found the pictures there. (NT II, 159, 160).

Captain Theodore D. Kohuth, the Commander of Troop M, Bethlehem received the BPR reports and, after reviewing them decided to issue a Disciplinary Action Report ("DAR") on Troopers Brown and Hartman. (Joint Exhibits 4 and 5, respectively.). The DAR's then went to the Department's Disciplinary Officer, Captain Robert Barry Titler, who reviewed the evidence and determined that both Troopers had violated no few than six of the Department's Field Regulations ("FR's").

Those six were:

FR 1-1.03, "Conformance to Laws," which requires that:
Members shall conform to and abide by the laws of the United States, Commonwealth of Pennsylvania, all other states of the United States, and subdivisions thereof.

FR 1-2.23, "Protection of Evidence, Found or Recovered Property," which provides:
A. Evidence: A member shall not, under any circumstances, manufacture, destroy, improperly remove from an incident scene, or convert to their own use, any evidence or other material found or recovered in connection with the investigation of an incident.
B. Found or Recovered Property: Members shall expeditiously transfer to their Custodial or Receiving Officer all evidence, found, or recovered property coming into their possession as a result of any incident.

FR 1-2.18 "Reports," which requires that:
Members shall submit all necessary reports on time and in accordance with existing regulations.  Reports shall be truthful and no member shall knowingly enter or cause to be entered any inaccurate, false, or improper information or date, or misrepresent the facts in any record or report.

5

FR 1-2.02 "Performance of Duty" which requires that:

Members shall conscientiously strive to enforce the laws of the Commonwealth and render service to all citizens within the Commonwealth. Members shall also be held responsible for the proper performance of all duties assigned to them, the appropriate use of delegated authority, and strict adherence to the rules, regulations, or directives promulgated by the Department. Ignorance of the rules, regulations or directives shall not be considered an excuse or justification for any violation of such by a member. Members shall be responsible for their acts and shall not attempt to shift the burden of responsibility for executing or failing to execute a lawful order or police duty. Supervisors shall ensure that members are given commensurate authority necessary for the effective performance of duty.

FR. 1-1.28 "Internal Investigations," which requires, in pertinent part, that:
...all members engaged in such police action [as an internal investigation], hearing, or other inquiry...are required to truthfully and completely answer all questions relating thereto.

FR 1-1.02 "Unbecoming Conduct," which states:
Unbecoming conduct is that type of conduct which could reasonably be expected to destroy public respect for Pennsylvania State Police officers and/or confidence in the Department. Members shall not conduct themselves in a manner which is unbecoming to a police officer.
(Joint Exhibits 6,7)

In addition to these six charges leveled by Captain Titler against both Troopers, Trooper Brown was charged with violation of a seventh, FR 1-2.25, "Use of Equipment and Property." FR 1-2.25, in pertinent part, states:

A. Policy: Management directives prohibit the use of Commonwealth facilities, offices, and property for activities which are not specifically connected with the official business of the Commonwealth...

6

B. Equipment: Members shall utilize Department equipment in the prescribed manner and in accordance with existing regulations and directives. (Joint Exhibit 7).

Captain Titler assessed a thirty-day suspension against Trooper Brown and a 35-day suspension against Trooper Hartman. In addition to the suspensions, Captain Titler transferred Trooper Brown from Troop K, Philadelphia, to which he had voluntarily transferred after this incident, to Troop J, Lancaster. He transferred Trooper Hartman from Troop M, Bethlehem, to Troop L, Reading. (Department Exhibits 25, 26).

The Association grieved the discipline for each Trooper (Joint Exhibits 2,3), and when the parties failed to resolve the dispute under the grievance procedure of the Agreement, the Association made a demand for this arbitration.

## Issue to be Determined:

At hearing, the parties stipulated that the following is the issue to be determined in this case:

Did the Department have just cause for the suspensions and disciplinary transfers administered to the Grievants, Trooper Allan Brown, Jr. and Trooper Kyle Hartman? If it did not, what shall the remedy be?

## Contentions of the Commonwealth:

The Commonwealth's case first focuses on the Troopers' seizure of the keg and beer and their subsequent acts and omissions after taking that property from Mr. Passio and his friends. It then moves to the Troopers' conduct during the Department's internal investigation.

7

Addressing its charge that the Trooper violated FR 1-1.03, "Conformance to Laws," the Commonwealth alleges that the two violated 18 PaCSA 3921, which makes it a theft if a person "…unlawfully takes, or exercises unlawful control over movable property of another with the intent to deprive him thereof." In this part of its case, the Commonwealth does not contest that the Troopers improperly seized keg and beer from Mr. Passio and his friends, but that after they seized the contraband the Troopers treated it as their own property to dispose of as they saw fit. As the Commonwealth views things, the Grievants first transgressed the statute when they put the beer in the back of Trooper Coyne's truck, and later placed it near the wall outside the station instead of securing it in the building. The Commonwealth bolstered its case in this regard by submitting the Pennsylvania Supreme Court's opinion in *In Funds in the Possession of Conemaugh Township Supervisors*, 753 A. 2d 788 (Pa. 2000). There, the Court held that police officers who recover found property have no right to keep the property. Analogizing the funds recovered in that case to the beer seized by Troopers Brown and Hartman, the Commonwealth says that they had no more right to treat the beer and keg as their own than they would had they found money while on duty. The rationale for this standard is the same as the Court stated in *Conemaugh*: allowing an officer to personally retain seized property could lead to police being less than diligent as law enforcers. According to the Commonwealth, the Troopers should have followed the Department and Commonwealth's regulations. It cites Administrative Regulation ("AR") 3-3.08 C. 3 (Department Exhibit 18) which requires that kegs and taps are not to be destroyed but returned to a licensed beer distributor in exchange for a check payable to the Commonwealth. By not complying with this AR, the Troopers effectively dispossessed the Commonwealth of something analogous to an escheat. As for the beer itself, including the seized cans, AR 3-3.08 directs that the station custodial officer is to ensure disposition of property in the presence of a witness.

Regarding FR 1-2.23, "Protection of Evidence, Found or Recovered Property," the Commonwealth argues that the Troopers never took steps to comply with this Regulation, omitting such elementary steps as filling out a Property Record (Department

8

Exhibit 17), which, according to the Department's requirements is to be submitted whenever "[p]roperty is taken into custody during the course of an investigation." (Department Exhibit 17). Nor did the Troopers ever even attempt to contact one of the Troopers in the Station responsible for the maintenance of property seized or recovered in the course of duty, including the Station's custodial officer. These omissions are, in the eyes of the Commonwealth, consistent with a course of action in which the Troopers treated the keg and beer as bounty from their unauthorized raid into Trooper Hartman's neighborhood, particularly in that each Trooper claimed to know this regulation.

FR 1-2.18, "Reports" was violated, the Commonwealth contends, when the Troopers did not submit a report on their actions in regard to the seizure of the beer and keg. The Commonwealth maintains that a report should have been created on the seizure. While Trooper Coyne did issue a report on the towing of Mr. Passio's truck, neither Trooper Brown nor Trooper Hartman made any report regarding the keg, tap and beer they took, an omission which, again, is consistent in the Commonwealth's view of an intent to treat the keg and beer as their own.

Turning to the alleged violations of FR 1-2.02, "Performance of Duty," and FR 1-1.02 "Unbecoming Conduct," the Commonwealth criticizes the Troopers' actions both before and after the seizure of the keg and beer. Specifically, the Commonwealth attacks the Troopers' trip to Philadelphia as a dereliction of their assigned patrol duties and sees the adventure as Trooper Hartman's private vendetta against under-age drinking near his residence. Viewed in that light, both Troopers used their state authority to pursue the private interests of Trooper Hartman as a homeowner. In addition, the Commonwealth sees a violation of both FR's inherent in the remaining allegations of this case, including what the Commonwealth believes to be the Troopers' misdeeds and omissions once they brought the beer and keg back to the station. The Commonwealth contends that conduct violated FR 1-1.02 because it "could reasonably be expected to destroy public respect for Pennsylvania State Police officers and/or confidence in the Department." The Commonwealth posits that this violation is particularly serious, given the crisis in confidence many law enforcement agencies are facing throughout the nation.

The Commonwealth reserves its greatest condemnation for the Troopers' alleged violation of FR 1-1.28, "Internal Investigations," specifically, the portion of that FR that requires Troopers involved in an investigation to "truthfully and completely answer all questions relating thereto." The Commonwealth points to a number of statements made by both Troopers that were inconsistent or evasive in the course of the internal investigation, culminating with their statements to Captain Titler. (Department Exhibits 23, 24).

For example, the Commonwealth points out that while Trooper Hartman said only two men, Mr. Passio and Mr. Hatch, were detained in Philadelphia, Trooper Brown said there were three, (NT II 134, 152, 153,154), notwithstanding the fact that on the night of the incident he had told Trooper Coyne there were only two. (NT II, 155). It also highlights Trooper Brown's assertion to Corporal Murray that the satchel of beer cans was not brought to the station but was given to Mr. Hatch's father in Philadelphia. (NT II, 157), contrasting it with the testimony of Sergeant Raykovitz, Sergeant McDonald and even Trooper Hartman, that the satchel and keg were together at the station. (NT II 156-157).

The Commonwealth also stresses that Trooper Brown was inconsistent about where he and Trooper Hartman placed the keg outside the station. According to Sergeant McDonald's testimony, the Trooper said they placed the beer behind a brick wall in the rear of the station. (NT II, 50). However, Corporal Murray, who did the internal investigation, said that Trooper Brown denied placing the beer behind the wall. (NT II, 158). Meanwhile, Trooper Hartman told Sergeant McDonald that they placed the beer behind the wall and told Corporal Murray that the beer was placed in a position so that it was not visible to station members who were not specifically looking for it. (NT II, 54, 140). However, Trooper Brown submitted photos during the investigation which the Commonwealth asserts falsely indicate the location of the beer in an attempt to show that it was not hidden but readily visible. (Department Exhibits 23, 24).

Finally, the Commonwealth emphasizes statements of both Troopers regarding the mysterious disappearance of the beer from the station. Sergeant McDonald said both Troopers first pretended not to know what keg the Sergeant was asking him about (NT II,

10

48, 52). He also said that Trooper Brown claimed he and Trooper Hartman threw the beer out after finding it in the hallway. (NT II, 51). However, Corporal Murray testified that Trooper Brown told him he never saw the keg again after placing in by the wall outside the station and denied having told Sergeant McDonald they threw the beer away. (NT II, 158-159). Similarly, according to Sergeant McDonald, Trooper Hartman also professed ignorance (NT II, 52) before telling him that he and Trooper Brown threw the beer and keg away. After learning that Sergeant McDonald had fruitlessly searched the Station's trash dumpsters, Trooper Hartman claimed that they gave the property to "someone." (NT II, 54). Corporal Murray said Trooper Hartman's story to him was that they did not actually give the beer to anyone and that his fabrication to Sergeant McDonald about throwing the beer out was "just a statement." (NT II, 141). Trooper Hartman told Corporal Murray, according to the latter, that he last saw the property when he and Trooper Brown placed it by the wall (NTII, 141), but later said that he knew the beer was sitting inside in the hallway when he told Trooper Wong he could take it. (NT II, 142).

Lastly, the Commonwealth asserts that Trooper Brown violated FR 1-2.25, "Use of Equipment and Property," by using the Commonwealth's computer network and one of its terminals to access pornography. Prohibitions on the misuse of Commonwealth equipment and property are spelled out in Management Directive 205.14 (Department Exhibit 19), a Directive given to all Commonwealth employees.

The Commonwealth supported its case through the testimony of several witnesses. Portions of their testimony which were not controverted by the Association are set forth in the Background section, above, of this Decision. In addition, however, the Commonwealth presented additional testimony, as set forth below.

### Summary of Additional Commonwealth Testimony

The **younger Mr. Passio** said that both he and Mr. Hatch were searched by the Troopers and that while handcuffed he was left alone in the backseat of the troop car for

15 minutes while the Troopers searched the backyard of Trooper Hartman's house. He also said that Trooper Brown was insulting, calling his neighborhood a ghetto and his vehicle junk. Mr. Passio admitted to being arrested for DUI by Trooper Brown three months after this incident but after he gave a statement concerning the November 28, 1999 incident to Corporal Murray. He also admitted lying to the Corporal when he told him the youths had found the keg of beer earlier that night. (Department Exhibit 5). Moreover, after initially testifying that he had been intoxicated when the Troopers found him near Fleuhr Park, he later denied being intoxicated at all.

The **elder Mr. Passio** said that when he complained to Trooper Hartman during a telephone conversation late on November 28, 1999 about the bad language his son said had been directed at him, Trooper Harman neither denied the language nor explained it.

**Trooper Coyne** testified that he never asked for nor consented to the keg and beer being placed in the back of his truck and that when he found out it was there he was upset. According to his statement to Corporal Murray and at hearing, he immediately asked Troopers Brown and Hartman to remove the property. (NT I, 101). When they did not, he said, he moved the beer to where Trooper Hartman's car was parked. (*Id.*) He said he had no idea what happened to the beer and keg after that. (NT I, 102). He also recounted that sometime during the night of November 27-28, 1999 Trooper Brown asked to use his pass code to access his home e-mail over the station's computer hardware. Trooper Coyne said he gave it, only to later discover Trooper Brown and Trooper Hartman viewing pornography on one of the station's terminals He said that after he asked Trooper Brown to close the web site, he heard more laughter from the two and then personally took the mouse control and signed off the site. (NT I, 106-107). A Department log of communications activity for that night created by Trooper Coyne shows that Trooper Brown was on the system for 25 minutes toward the end of the 11:00 p.m. –7:00 a.m. shift. (Department Exhibit 7).

Trooper Coyne said he was so upset by the conduct of Troopers Brown and Hartman that night that he asked Sergeant McDonald for a transfer from the 11:00 p.m. to 7:00 a.m. shift so he could avoid further contact with them during those hours. (NT I, 42-

43). On cross-examination, Trooper Coyne said that he believed the keg and beer were "found" property and that if the owner did not claim them, they should have been disposed of by the Trooper who recovered the property. He also said he did not recall falling asleep that night as Trooper Brown and Hartman accused him of doing.

**Sergeant Raykovitz**, a Corporal at the time of the incident, said he was in the station around 6:00 a.m. the morning of November 28, 1999 when he heard Trooper Coyne say, "I don't want it! Get it out of there!" The Sergeant said he thought the "it" was beer. He said that after 7:00 a.m., he went to the rear parking lot of the station and found a keg and satchel filled with beef cans by a wall. When he asked Trooper Coyne about his find, Sergeant Raykovitz said, Trooper Coyne told him that the only report that had been filed was the one Trooper Brown asked him to fill out concerning the towing of Mr. Passio's truck. Later the same day, Sergeant Raykovitz said, he brought the matter to Sergeant McDonald's attention and the two carried the keg and satchel inside the station and placed them in an inside walkway. The following day, November 29, the keg and satchel were both gone.

Sergeant Raykovitz testified that seized contraband may be destroyed a number of ways, but said he was unfamiliar with the actual practice as it related to kegs and beer. Upon seizure of beer from uncharged juveniles, he said, the Trooper taking the beer should log in the material as found property and the beer should be put in an evidence locker under the responsibility of an evidence custodian. Sergeant Raykovitz said that if no custodian was available, the beer should have been handed over to the senior ranking officer on duty. He agreed that he could have called either Trooper the morning of November 28 to discover their intention in not filing a report but did not want to wake them.

As to the general performance of the two Troopers, Sergeant Raykovitz said he felt they were "likeable" but that they required more review than most Troopers did when they worked the 11:00 p.m. to 7:00 a.m. shift, one on which there was no supervisor. He said he had issued evaluations to both, grading Trooper Brown "commendable" and Trooper Hartman "satisfactory."

**Sergeant McDonald**, the station commander at Trevose Station since July 1997, testified to the existence of a "Field Reporting System" guide (Department Exhibit 14), which he described as a guide to report writing issued to all members of the Department while they are in the State police Academy. He also introduced a guide to Incident Reports (Department Exhibit 15); a sample Incident Report form (Department Exhibit 16); Section 10.1 of the Department's Operations Manual regarding "property records" and "property disposal" (Department Exhibit 17); Administrative Regulations 3.3 (Department Exhibit 18); and, the Governor's Management Directive (Department Exhibit 19). Sergeant McDonald testified that he found the keg and satchel when Sergeant Raykovitz showed them to him on November 28. At that time, he said, the keg and satchel were against an outside wall in the rear of the station where they were not visible from most of the building and the building's driveway. After reiterating Sergeant Raykovitz's account of how the two brought the property into the station and placed it in the interior walkway, Sergeant McDonald said he interviewed Trooper Brown and Hartman separately on December 6, 1999.

He said that Trooper Brown, like Trooper Hartman, first asked, "what keg?" (NT II, 48, 52), then told him the two had thrown the beer out (NT II, 51) as did Trooper Hartman (NT II, 54). However, Sergeant McDonald said that after being told that the Sergeant had checked trash bins around the Station and found nothing, Trooper Hartman changed this story and claimed he and Trooper Brown gave the beer to "someone" (NT II, 54).

Even were it not viewed as evidence, Sergeant McDonald said, the seizure should have generated a property report. (NT II, 57-58). He also said there were three custodial officers authorized to take and keep seized property or evidence assigned to the Station at the time of the incident although none was on duty with Troopers Brown and Hartman the night of November 27, 28, 1999. Sergeant McDonald acknowledged however that there was no specific training or guidance provided to Troopers on how to handle beer seized from under-age drinkers who had not been charged.

**Corporal Murray** gave testimony that is key to the Commonwealth's contention that the Troopers violated FR 1-1.28, "Internal Investigations," by making false

statements about the disposition of the beer. The Corporal said that when he interviewed the Troopers on February 2, 2000, Trooper Hartman told him they did not throw the beer out, which was the final version of his account to Sergeant McDonald two months earlier. Instead, he reported that Trooper Hartman told him he gave Trooper Wong permission to take the beer. (NT II, 141). Corporal Murray said Trooper Wong subsequently denied doing so. On the same day as Trooper Hartman's interview, Corporal Murray interviewed Trooper Brown. According to Corporal Murray, Trooper Brown told him that he had no idea what became of the beer and denied telling Sergeant McDonald two months earlier that they had thrown the beer out as Sergeant McDonald testified. (NT II, 158, 159) Further, at this point in the investigation, Trooper Brown for the first time asserted that they did not bring the satchel of beer back to the station, contrary to the testimony of all other witnesses, but gave it to Mr. Hatch's father when they brought Mr. Hatch home the early morning of November 28. (NT II, 157).

Corporal Murray also testified that Trooper Hartman said he had Mr. Passio's vehicle towed despite not knowing whether Mr. Passio was unfit to drive. He also said that Trooper Brown admitted viewing naked females at the Department's terminal in the station, but said he did so inadvertently since he did not expect to find the material on his e-mail. Corporal Murray also recalled that Trooper Brown did not deny using profanity during the arrest and detention of Mr. Passio and Mr. Hatch, but did deny using it in their presence. Corporal Murray further said that Trooper Brown claimed three young men had been taken into custody.

**Captain Theodore D. Kohuth**, the commander of Troop M Bethlehem testified that he issued a Disciplinary Action Reports ("DAR's") on the two Troopers after he received the results of Corporal Murray's investigation. (Joint Exhibits 4,5). The DAR's were reviewed by the Department's Disciplinary Officer, Captain Titler. While a DAR does not contain a recommendation of penalty, that being the province of Captain Titler, Captain Kohuth said he did support Captain Titler's determination, expressed in memoranda of August 3, 2000 (Department Exhibits 25, 26), to impose a disciplinary transfer on both Troopers from the Trevose Station. Captain Kohuth expressed his belief that Trooper Hartman should be transferred for the sake of "station cohesion" and to

15

JUL.31.2021   2:52PM    OA BUREAU OF LABOR RELATIONS



# BUREAU OF LABOR RELATIONS
## OFFICE # (717) 787-5514
## FAX # (717) 783-0430

DATE:  July 31, 2001

| To: | Mark Grab |
|---|---|
| From: | Bill Mullin |
| Message: | |
| | Part 1 – pages 1-15 |
| | Part 2 – pages 16-31 |

Page(s) to Follow:  31

minimize damage to the Trooper's "integrity" in future dealings with the public. He stated his opinion that Trooper Brown should be transferred to maintain symmetry between Trooper Hartman's discipline and his own. (NT 185-187).

**Captain Titler**, the Commonwealth's last witness, testified as to the penalties he issued. He said that the penalties were determined after a consideration of similar cases, the Troopers' past histories including their evaluations and prior disciplinary records, and his consideration of the Department's best interests. Captain Titler said that while Trooper Brown was given a thirty-day suspension, he believed an additional five days of suspension were appropriate for Trooper Hartman because it was he who initiated the foray into Philadelphia. Captain Titler testified that while Trooper Hartman had no prior disciplinary incidents, Trooper Brown had one prior written reprimand for conduct on charges that were not similar to the ones in this case. He said that neither Trooper's record indicated extraordinary service, calling their overall performance ratings as between "satisfactory" and "commendable," a range that the Captain characterized as relatively average for Troopers throughout the Commonwealth.[2]

Captain Titler said that both suspensions and the transfers flowed from what he believed was the Troopers' abuse of power in relation to their going to Philadelphia and what he believed to be their attempt to hide the keg and beer at the station. Severely aggravating the penalty, he said was their evasive and deceptive conduct during the investigation. Captain Titler expressed the view that these actions had damaged the integrity of the Pennsylvania State Police.

The Captain maintained that even had he known that there was no locker large enough at the Trevose Station to store a quarter keg of beer he would have reached the same conclusion that the Troopers should have notified a custodial officer and filed a report. He further said that the area in which Sergeant Raykovitz and Sergeant McDonald placed the satchel and keg was a sufficiently secure area of the Station.

---

[2] According to Captain Titler, Trooper Brown's two "overall" evaluations were both "commendable."

### Contentions of the Association:

The Association concedes that the Troopers "failed to strictly adhere to every Field Regulation they have been charged with violating." (Association brief at page 5). However, the Association argues that a failure to "strictly adhere" to the regulations is not the same as a violation of those same rules and that the evidence adduced by the Commonwealth is insufficient to prove any but the most technical noncompliance. Accordingly, the Association sees the level of discipline imposed in this case as oppressively disproportionate to the Troopers' behavior.

As to FR 1-1.03, "Conformance to Laws," the Association decries the Commonwealth's reliance on 18 PaCSA 3921, pointing out that the Commonwealth has neither direct nor circumstantial proof the Troopers stole the beer, keg and tap. As the Association sees it, the Commonwealth's claim rests on the bare assumption that since the property was missing, Troopers Brown and Hartman must have had something to do with the disappearance, and condemns that allegation as contrary to fundamental fairness.

The Association also attacks the allegation the Troopers violated FR 1.1.23, "Protection of Evidence, Found or Recovered Property." According to the Association, the former charge was based on the Trooper's asserted improper stowage of the beer and keg at the stations. However, the Association replies that the Trevose Station lacked sufficient storage space for the material to be put elsewhere. The Association also contends that the Department has no clear-cut, definitive guideline for the handling of alcohol seized from under-age persons. The handling of the beer and keg by Troopers Brown and Hartman, according to the Association, reflected the "unofficial" manner in which such property was typically treated, a manner that was echoed in the Troopers' dealing with both Mr. Passio and Mr. Hatch when they refrained from issuing citations to them.

Regarding the charge that Troopers Brown and Hartman violated FR 1-2.18, "Reports," the Association underscores what it characterizes as inconsistent opinions among the Commonwealth's witnesses at the hearing as to whether the beer and keg were

17

"evidence" or "found" or "recovered" property and what type of report should have been filed. Given what it sees as confusion in the Commonwealth's case on this point, the Association argues that the Troopers cannot be held to a standard that would require the filing of any particular report, particularly when they had exercised their discretion by handling the matter "unofficially" and had refrained from formally prosecuting the drinkers. The Association urges that this approach, which the Commonwealth did not assert as improper, obviated the need for any report at all.

The Association also denies the Commonwealth's claim that the two violated FR 1-2.02, "Performance of Duty," a charge that appears to be directly based on the Troopers' excursion into Trooper Hartman's Philadelphia neighborhood and derivatively based on their actions after they seized the beer and keg. The Association maintains that Troopers have authority everywhere in the Commonwealth and are issued Philadelphia traffic tickets for use when they see infractions of motor vehicle laws in the City. Moreover, Troopers patrolling out of the Trevose Station must necessarily pass through sections of the City to efficiently move from one patrol area to another. In Trooper Brown's case, a commendation had been issued for police action in the City far from Trevose, the Station he was working out of at the time. Further, the Association says that even if it is true that Mr. Passio was left unattended while handcuffed in the troop car for some interval, an act which Captain Titler testified was in violation of FR 1-2.02, there are no regulations cited by the Commonwealth that would prohibit such an action nor specify how long a suspect could be so detained. The Association also alleges that the Commonwealth did not properly investigate this aspect of the FR 1-2.202 charge since it never attempted to verify Mr. Passio's version of the incident.

Turning to the complaint that the Troopers violated FR 1-2.25, "Unbecoming Conduct," a charge largely derived from the Troopers' alleged violation of FR 1-1.03 "Conformance to Laws," and FR 1-2.23, "Protection of Evidence, Found, or Recovered Property" relating the alleged conversion of the beer and keg to their own possession, the Association answers that there is no evidence that the Troopers did any such thing.

18

Rather, the Association asserts, the Commonwealth has offered no rebuttal to Trooper Hartman's statement that they threw the material away.

The Association also denies the charge that the Trooper Brown violated FR 1-2.25, "Use of Equipment and Property." The Association's perspective is that it is permissible to access one's own e-mail from Commonwealth computers. Given that latitude, the Association argues, Trooper Brown was not in violation of FR 1-2.25 unless the Commonwealth can prove that he opened an "adult" web site or some personal e-mail for the purpose of viewing pornography. The Association emphasizes that there is no evidence that that was Trooper Brown's purpose.

Finally, the Association denies the charges relating to FR 1.1.28, "Internal Investigations" ones which the Commonwealth characterizes as "appalling," "reprehensible" and ones which the Department "cannot tolerate" (Commonwealth's brief at pages 16,18, 19, respectively). The thrust of the Commonwealth's accusation here is that the Troopers were evasive and deceptive during the Department's investigation of this matter. However, the Association contends that the Commonwealth's whole case in regard to this charge rests solely on the subjective belief of its superior officers that the Troopers lied at various points in the investigation than on any objective, corroborative evidence. Such belief, however strongly held and no matter if arrived at in all good faith, does not prove that the Troopers lied to anyone during the investigation, according to the Association.

Exercising the rights of Troopers Brown and Hartman, the Association did not call them to testify at the hearing. It did, however, call Bedminster Township Chief of Police Robert J. Glosson. Chief Glosson, the former station commander at Trevose Station before his retirement in 1996, offered character testimony on behalf of Trooper Brown, whom he supervised for about 18 months at the station. Chief Glosson called Trooper Brown "an excellent Trooper," one who was "very competent," although he conceded he never patrolled with the Trooper and has had no professional interaction with him since retiring. Chief Glosson also testified that any time property is seized by a

Trooper, the seizure is to be documented and the property turned over to a supervisor. He also said that during his tenure as station commander he issued an order to all members and instructed them they had to read and know all rules and regulations. (Department Exhibit 13). On the other hand, the Chief said that Administrative Regulations, unlike Field Regulations, are not given to Troopers although they are responsible for following them.

## Opinion:

In any labor arbitration discipline case, it is the employer's burden to move forward with evidence and prove at least four things. First, the employer must show the existence of a work rule or standard. Second, the employer must demonstrate that the rule or standard was known or should have been known by the accused employee. Third, the employer has to convince the Arbitrator that the rule or standard was reasonably applicable to the employee. And fourth, the employer must prove that the employee violated the rule or standard. Most Arbitrators have held that last requirement demands proof "beyond a reasonable doubt."

In the present case, there is no doubt at all that the Commonwealth has satisfied the first three of these tests. Obviously, the Department has work rules in the form of its Field Regulations, Administrative Regulations, and other pronouncements governing most aspects of member duties, including all of those invoked by the Commonwealth in this matter.

Second, these rules are promulgated in writing and the Grievants here knew of most cited by the Commonwealth. The lone exception is the Department's specific rule at Administrative Regulation 3-3.08 C (Commonwealth Exhibit 18) concerning the disposition of kegs and taps. Despite the testimony of Chief Glosson and his order (Commonwealth Exhibit 13) that members at the Trevose Station know all regulations, directives, and rules, there is some doubt in my mind that Troopers Brown and Hartman knew of the intricacies of AR 3-3.08 C. However, by their own admission (NT II, 133, 159-160) they knew of FR 1-2.23, the Field Regulation regarding seized property generally. Thus, even given the Department's lack of training in the specifics of

20

implementing AR 3- 3.08 C, and even though they may not have been fully cognizant of that AR, both Troopers knew that they could not simply have offered the beer to another member (Trooper Hartman's final version) or abandon the beer in the Station (Trooper Brown's final version). Similarly, both Troopers knew or should have known of FR 1-2.23 relating to "Protection of Evidence, Found or Recovered Property," (Joint Exhibit 7). That FR is amply supplemented by AR 3-3 which begins with a description of the duty owed by Troopers in regard to any evidence, found, or recovered property, before proceeding to the more arcane details of the disposition of beer kegs. FR 1-2.23 is further supplemented by additional directives: OM 7-2 (Commonwealth Exhibit 17), which describes action to be taken in establishing a property record; OM 7-2 "General Responsibilities and Instructions"(Commonwealth Exhibit 14), which describes general responsibilities in completing reports; and, the "Incident Report/Incident Report-Part II" amendments to OM 7-2 (Commonwealth Exhibit 15), which further describes report requirements. In summary, Troopers Brown and Hartman knew or certainly should have known to prepare *some* report on their seizure of the beer, keg, and tap, even though they may have had some question regarding the precise species of report.

Third, there is no question that both Troopers Brown and Hartman were responsible at all times material to this case for obedience to all the various Field Regulations which they are accused of violating. There is nothing in the record that remotely suggests these Troopers were excused or had some justification for not following the FR's. These FR's were also rationally related to the Grievants' duties during the time in question. For those reasons, I believe the Commonwealth has satisfied its burden of showing all the FR's it cites were reasonably applied to these Troopers.

In light of the foregoing, my analysis now turns to the critical issue of whether the Troopers broke the FR's cited by the Commonwealth and, if, so, whether the penalties sought by the Department are appropriate. I shall address each of the allegations separately before turning to the issue of penalty.

21

## FR 1-1.03, Conformance to Laws

The Commonwealth's first allegation is that Troopers Brown and Hartman violated FR 1-1.03, "Conformance of Laws." The Commonwealth maintains that the underlying law the Troopers violated is 18 PaCSA 3921, Pennsylvania's theft statute. That statute makes it a crime for an actor to take or exercise "unlawful control over movable property of another with the intent to deprive him [*sic*] thereof." The Commonwealth also contends that the Troopers violated the holding in *Conemaugh Township Supervisors, supra,* under which Pennsylvania police officers have no right in property they find in the performance of their duties.

I do not believe the allegation concerning FR 1-1.03 has been proven beyond a reasonable doubt.

First, there is no question that the Troopers had the right to seize the beer from Mr. Passio and his under-age friends. Therefore there was no "unlawful" taking from them under the statute. Second, assuming the Troopers could "take" from the Commonwealth, which in the employer's view here became the lawful "owner" of the seized property, I am unconvinced the Troopers took or exercised any control over the beer, keg, and tap after they left the material outside the station in the early morning of November 28. While they may have earlier attempted to give the property to Trooper Coyne and later either thrown it away or offered it to Trooper Wong (depending on which version, if either, one believes), I do not find there is sufficient evidence to conclude that there was any more than a very impermanent or *de minimus* "taking" of or exercise of "unlawful control" over the property within the meaning of 18 PaCSA 3921 or in violation of the the rule of *Conemaugh Supervisors.*

Further, since I have no evidence as to what ultimately became of the property, I cannot conclude the Troopers took the keg and beer, even if I reject all of their various, inconsistent accounts. The Association is correct in its argument that the mere disappearance of the beer and keg does not prove the Grievants took them, and I am without any basis to conclude the Troopers violated the law except the insufficient grounds that they once had the property and that it subsequently vanished.

**FR 1-2.23, Protection of Evidence, etc.**

**and**

**FR 1-2.18, Reports**

The Commonwealth's second and third charges are that the Troopers failed to comply with FR 1.2-23, "Protection of Evidence, Found or Recovered Property," and FR 1-2.18, "Reports."

The Commonwealth produced unrebutted testimony from Captain Titler that both the seizure and the property fell within the scope of both FR's. (NT II, 257-269). Moreover, in light of the Pennsylvania Supreme Court's rationale in *Conemaugh Township Supervisors* that it would be contrary to the interests of law enforcement to allow members of any police force to keep property that came into their possession. It logically follows that the Troopers are required to make a record of and report on all property they recover or seize in the performance of their duties. As described above, that requirement is amplified in the various versions of OM 7-2 (Commonwealth Exhibits 14, 15, 17), all of which provide ample guidance on report writing requirements, and AR 3-3 (Commonwealth Exhibit 18), which unambiguously sets forth the requirements for storing and securing seized property, including the threshold duty of entering the property into the Department's system and notifying the station's custodial officer of the seizure. AR 3-3 also clearly establishes the requirements for disposition of property. Finally, under OM7-2 relating to "Incident Report/Incident Report- Part II (Commonwealth Exhibit 15), the seizure itself should have been reported as an "investigative action resulting from alleged criminal offenses or other police matters" on an Incident Report form (Commonwealth Exhibit 16).

Not only did Troopers Brown and Hartman not comply with any of these extensive requirements, they did not even attempt to do so. Given their failure to present extenuating circumstances that would otherwise excuse them, I must find them in

23

violation of both FR's. Further, as explained below, their lapses in regard to the above FR's also give rise to a derivative violation of FR 1-1.02, "Performance of Duty."

### FR 1-2.02, Performance of Duty

Although FR 1-2.02, "Performance of Duty," can be independently violated, in most cases a charge involving this FR is largely derivative of charges involving violations of other FR's. Here, the Commonwealth particularly cites the alleged violation of FR 1-1.28, "Internal Investigations" as a basis for finding a derivative violation of FR 1.2.02 (*see,* Commonwealth's post-hearing brief, pp. 15-16). In so doing, the Commonwealth demonstrates its belief that if a member fails to maintain one or more other FR's, he or she has also committed a *per se* violation of the "performance of duty" standard. I agree. As discussed elsewhere in this Decision and Award, I find FR 1-2.02 was derivatively violated when the Troopers failed to comply with FR 1-1.23, Fr 1-2.18 and Fr 1.1.28.

The Commonwealth also contends that there was an independent violation of FR 1-2.02. That occurred, the Commonwealth maintains, when the two Troopers left the patrol zone of the Trevose Station to raid the beer party in Trooper Hartman's neighborhood. Again, I agree.

It is obvious from the record that Troopers stationed at Trevose must cross sections of Philadelphia to move from one assigned state patrol area to another and that Troopers are issued blank citations for the City of Philadelphia Traffic Court. There is also a representation, unchallenged by the Commonwealth, that Trooper Brown was once given a commendation for police action he took in Philadelphia, many miles south of the Trevose patrol area. The circumstances of that action and why Trooper Brown got so far into Philadelphia are unclear. However, it is clear that the Trevose patrol area does not include Philadelphia and that the on the night of November 27-28, 1999, Troopers Brown and Hartman had no authority to enforce under-age drinking laws in the City. They did so on their own, and, from the record before me, I am of the opinion that they acted only to protect and advance Trooper Hartman's private interests in the residential area around his home. While pursuing those interests, the Troopers neglected their proper patrol area

24

and thus violated the "performance of duty" standard, FR 1-2.02, independently of any other acts or omissions that constitute violations of other FR's.

I must note that I do not find the Troopers engaged in any acts of official repression. Having encountered the group of under-age drinkers, the Troopers had little choice but to detain the violators, seize the keg and beer, and conduct a further investigation. Although they could have called the Philadelphia police, even the most rapid response from the City could result in the successful flight of the suspects. While the towing of Mr. Passio's truck may be a questionable exercise of discretion, I am persuaded that had a possibly intoxicated Mr. Passio later returned for the truck and an accident ensued, the Troopers could very well be accountable for not having taken action to prevent him from driving the vehicle.

### FR 1-1.02, Unbecoming Conduct

The Commonwealth also asserts a violation of FR 1-1.02, "Unbecoming Conduct." In doing so, the Commonwealth implies that this violation, like that of FR 1-2.02, "Performance of Duty," is both derivative of other violations and can occur independently. However, unlike FR 1-2.02, FR1-1.02 is largely definitional, describing conduct to be unbecoming as "that type of conduct which could reasonably be expected to destroy public respect for Pennsylvania State Police officers and/or confidence in the Department." Because of this definition, I am not persuaded that conduct is "unbecoming," simply because it violates another rule or standard. Rather, the FR seems to be self-limiting to those situations in which persons outside the Department would reasonably be seen as losing "respect" for or "confidence" in the Department and its officers. I am not convinced that occurred in this case.

The Commonwealth's argument is based on what it believes was the Troopers' attempts to misappropriate the beer to themselves. Even were I able to find the Troopers actually took the beer, which the lack of evidence prevents, this argument cannot succeed because of the absence of public perception. Nothing in the record shows that any person outside the Department was aware of the Troopers' actions with the seized property after



they took custody of it. Nor were any persons outside the Department aware of their deplorable behavior during the investigation. As to their actions in Philadelphia, aside from Trooper Brown's alleged use of profanity in the presence of the younger Mr. Passio, something not accented in Mr. Passio's testimony at hearing, I find nothing that would lead me to conclude that any member of the public, aside from Mr. Passsio, his friends, and his father, were or could reasonably have been disapproving of the Troopers' actions. Indeed, I suspect that the arrival of the Troop car in Trooper Hartman's neighborhood probably resulted in a misplaced gratitude among residents that Trooper Hartman and his partner were there to clean up under-age drinking.

## FR 1-2.25, Use of Equipment and Property

The Commonwealth has asserted that Trooper Brown violated FR 1-2.25, "Use of Equipment and Property," by using a Department computer terminal to view pornography. The Commonwealth presented testimony from Trooper Coyne that after he allowed Trooper Brown to use his password to check Trooper Brown's home e-mail, he found both Troopers Brown and Hartman "giggling" while viewing nude women on the internet. After Trooper Coyne asked them to leave the site he heard them laughing again, causing him to take the mouse and sign off. (NT I, 106-107). This testimony was not rebutted by the Association, and, having no reason to doubt Trooper Coyne's veracity, I must credit it.

FR 1-2.25 states that that Commonwealth property is not to be used "for activities which are not specifically connected with the official business of the Commonwealth." (Joint Exhibit 7). That FR is reflective of the Commonwealth's Management Directive 205.14 (amended), issued February 2, 1988 (Commonwealth Exhibit 19). Under the FR and the Management Directive, even the use of the Commonwealth's terminal to review innocuous home e-mail is a technical infraction, albeit one that would most likely by overlooked had it occurred in isolation. However, when taken in conjunction with the perusal of pornography, the act certainly arises to a violation of both the FR and the Management Directive and, derivatively, of FR 1-2.02, "Performance of Duty."

26

### FR 1-1.28, Internal Investigations

The Commonwealth's case that Troopers Brown and Hartman violated FR 1-1.28, "Internal Investigations," is predicated on their actions once Sergeant McDonald began his investigation into the disappearance of the beer from the station. The Commonwealth, calling their conduct "deceptive" and "appalling," presented uncontroverted evidence that the Troopers were duplicitous in their responses during the Department's inquiry. It argues that their conduct did not comply with the mandate in the FR 1-1.28 that members "truthfully and completely answer all questions relating [to the subject of the investigation]." (Joint Exhibit 6). I concur.

As set forth, above, according to Sergeant McDonald's unrebutted testimony, Trooper Brown first denied any knowledge of the beer when Sergeant McDonald questioned him on December 7, 1999, about nine days after the incident, then claimed he and Trooper Hartman threw the beer out. (NT II, 48,51). However, according to Corporal Murray's unrebutted testimony at hearing, Trooper Brown told him on February 2, 2000 that he had no knowledge of what happened to the beer after placing it against the wall outside the rear of the Trevose Station (NT II 158,159), denied telling Sergeant McDonald he and Trooper Hartman had thrown it away (*id*), and claimed for the first time that the satchel they seized had been turned over the Mr. Hatch's father (NT II, 157). Given the unchallenged record created by Trooper Brown's own mutually exclusive statements, I have no choice but to conclude he lied either to Sergeant McDonald or to Corporal Murray.

As for Trooper Hartman, his conduct during the investigation also reveals a failure to "truthfully and completely answer all questions," as required by the FR. The unrebutted testimony of Sergeant McDonald was that Trooper Hartman initially denied knowing what property the Sergeant was asking about (NT II, 52), then told him the two Troopers had thrown the beer away (NT II, 54). However, after having been told the keg and beer were not found in any trash dumpsters at the station, Trooper Hartman asserted they gave the beer to someone. (NT II, 54). Even this story changed somewhat when

27

Trooper Hartman was interviewed by Corporal Murray. According to the Corporal's unrebutted testimony, Trooper Hartman told him he did not participate in throwing the beer away but rather told Trooper Wong he could take the beer, although he said he did not see Trooper Wong actually do so. (NT II, 141). Having no reason to doubt the credibility of either Sergeant McDonald or Corporal Murray, I must conclude that like Trooper Brown, Trooper Hartman's own contradictory statements lead to a finding he violated the FR by not telling the truth at various points to either Sergeant McDonald or Corporal Murray.

The Commonwealth also went to considerable efforts to show that Trooper Brown had tried to deceive Captain Titler when he indicated on photographs the location of the beer after he and Trooper Hartman had placed it along the outside wall in the rear of the station. Additionally, the Commonwealth argues that both Troopers placed the beer so that it would be hidden and then lied to investigators about the location to give the impression the beer was not secreted.

I have reviewed all the photographs purporting to show the location of the beer (Commonwealth Exhibits 9,10,11,20) and closely combed through the testimony of the Commonwealth's witnesses, including Captain Titler. Upon completion of this review, I am unable to conclude beyond a reasonable doubt either that the beer was deliberately hidden by the two Troopers or that either lied about where, precisely, they had placed it. Sergeant Raykovitz first learned of the beer by overhearing conversation in the station between Trooper Coyne and Troopers Brown and Hartman. There is no evidence the two accused Troopers were conducting this communication in any secretive manner. To the contrary, the record indicates the conversation was accessible to any one in the Station. (NT II, 133). Sergeant Raykovitz's finding of the beer without much difficulty, simply on the information he gleaned from the conversation, indicates the beer was hardly well hidden. (NT II, 135) All of this raises doubt in my mind that the Troopers seriously intended to "hide" the beer, although they may have placed it so that it was inconspicuous. Moreover, this doubt is not lifted by the photographic evidence. The pictures do not reveal locations in precise detail, and more importantly, do not give a clear impression of the sight lines from the station toward the wall. This conclusion does

not, of course, mitigate in any way my finding that the Troopers failed to live up to their obligations to be truthful under the "Internal Investigations" FR.

## Summary

Based on the foregoing, I conclude that Troopers Brown and Hartman did violate FR 1-2.23, "Protection of Evidence, Found or Recovered Property;" FR 1.2.18, "Reports;" FR 1-2.02, and FR 1-1.28, "Internal Investigations." In addition, I find they violated "Performance of Duty," both derivatively and substantively. I further find Trooper Brown violated FR 1-2.25, "Use of Equipment and Property."

However, I conclude that Troopers Brown and Hartman did not violate FR 1-1.03, "Conformance to Laws," or FR 1-1.02, "Unbecoming Conduct."

## Penalty

Because I do not find the Troopers guilty of violating FR 1-1.03, "Conformance to Laws, or FR 1-1.02, "Unbecoming Conduct," and the penalty sought by the Department is predicated on guilt as to all violations charged, I will reduce their penalties accordingly. The Department has not indicated a specific number of suspension days for each FR charged, nor has it indicated the extent to which each specific charge is connected a certain number of suspension days. However, I note that in each Trooper's case the total number of days of suspension divided by the number of FR violations charged is equal to five. Thus, there would be some tenuous rationale to reducing the amount of suspensions by five days for each violation that I have found not proven.

However facile that approach would be, it is inappropriate for two reasons. First, it assumes an affirmance of the harshest aspect of the discipline sought by the Department, the involuntary transfers of Troopers Brown and Hartman. Second, it assumes that all the charged violations are of equal severity. Neither of these assumptions holds.

As to the involuntary transfers, as I wrote in *Corporal Kathy J. Stanton* (2001), the effect of an involuntary transfer is unlike any other discipline in that the punitive

JUL.31.2021    3:00PM    OR BUREAU OF LABOR RELATIONS                    NO.722    P.16/17

effects never end and may have far-reaching consequences on a Trooper's family. However, as I also recognized in that case, there are instances where such transfers are quite justified, such as where a Trooper's infractions gained a notoriety among the public served by his or her station or where a Trooper's violations arose from or were the cause of animosity among other Troopers at his or her station. Yet another instance justifying involuntary transfers would be where, as here, two or more young Troopers engaged on the kind of joint misadventure that would suggest they were malign influences on each other's performance. However, I take note that Trooper Brown has since been voluntarily transferred, ironically, to Troop K, Philadelphia, leaving Trooper Hartman at the Trevose Station of Troop M, Bethlehem. Because of my view of involuntary transfers, and because Troopers Brown and Hartman are now separated, I am not convinced that Captain Kohuth's concern for Station coherence will be realized. Further, because I found no public perception of the Troopers' misdeeds, I do not share his concern that Trooper Hartman's effectiveness in the proper Trevose patrol area—which does not include any part of Philadelphia—will be compromised by keeping him at the Station. For those reasons, I will mitigate the Department's transfer orders so that the Department cannot transfer either from their current stations for these offenses but can maintain separation of the two for a lengthy period, hopefully allowing for further professional maturation.

        As to the assumption that all the charged offenses are of equal severity, I agree with the Commonwealth's argument regarding the extreme seriousness of violations of FR 1-1.28, "Internal Investigations." I find that violation far more critical than any of the others I have affirmed here and therefore cannot measure punishment for it as equal to punishment for, say, a violation of FR 1-2.18, "Reports." Violations reflecting a temporary lapse of judgment or an isolated instance of misconduct pale in comparison to lies, evasiveness, and deception practiced in front of superior officers during an internal investigation. It seems a hard lesson for even our public figures to learn, but a failure to acknowledge and attempts to cover up wrongdoing are almost always worse than the original act itself. While the original act may break rules, the later act destroys trust. Because of my conviction concerning the seriousness of this violation, I feel it should be

punished more severely than any of the others. Due to that conviction and because I am mitigating the transfer orders, I will modify the suspension terms only marginally.

## Award:

The grievance is sustained in part and denied in part.

The grievance is **denied** in that the Department had just cause to discipline Troopers Brown and Hartman for violations of FR 1-1.23, Protection of Evidence, Found or Recovered Property;" FR. 1-2.18 "Reports;" FR 1-2.02, "Performance of Duty;" and FR 1-1.28 "Internal Investigations."

The grievance is further **denied** in that the Department had just cause to discipline Trooper Brown for a violation of FR 1-2.25, "Use of Equipment and Property."

The grievance is **sustained** in that the Department did not have just cause to discipline Troopers Brown and Hartman for violations of FR 1-1.03, "Conformance to Laws;" or FR 1-1.02, "Unbecoming Conduct."

The grievance is also **sustained** to the extent that the term of suspension for Trooper Hartman shall be reduced from 30 to 24 days and the term of suspension for Trooper Brown will be reduced from 35 to 29 days.

The grievance is further **sustained** to the extent that the Department cannot involuntarily transfer either Trooper. However, the Department may, in its sole discretion, deny any transfer, promotion, or assignment to or for either Trooper that would result in that Trooper being assigned to the same location or station as the other for a period of three years from the date of this Decision and Award.

7/27/61

Ralph H. Colflesh, Jr., Esq.
Arbitrator

31

## AMERICAN ARBITRATION ASSOCIATION
## VOLUNTARY LABOR ARBITRATION TRIBUNAL

**FRATERNAL ORDER
OF POLICE, Lodge #5**

    **and**

**CITY OF PHILADELPHIA**

**AMERICAN ARBITRATION ASSOCIATION
CASE #14-390-00755-97A**

**ARBITRATION OPINION
AND AWARD**

**GRIEVANCE: Lt. John Thompson
Transfer from IAB to MRD to
18th District.**

**DATE OF AWARD: September 4, 1998**

---

| | |
|---|---|
| Arbitrator: | Kathrine B. Hogan |
| Hearing Date and Location: | June 15, 1998<br>American Arbitration Association<br>230 South Broad Street<br>Philadelphia, Pennsylvania |
| Appearances: | <u>For the Union</u>:<br>Richard C. McNeill, Jr., Esq.<br>Sagot, Jennings & Sigmond<br><br><u>For the City</u>:<br>Karen Elizabeth Rompala, Esq.<br>Deputy City Solicitor<br>City of Philadelphia – Law Department |
| Witnesses: | <u>Called by the Union</u>:<br>Deputy Commissioner John Norris – Internal Affairs Division<br>Chief Inspector Charles A. Farrell – Management Review Bureau<br>Ken Rocks – Vice President, Fraternal Order of Police, Lodge #5<br>Lt. John Thompson – Grievant<br><br><u>Called by the City</u>:<br>Deputy Commissioner Sylvester Johnson – Philadelphia Police Department |

## STIPULATED ISSUE

Did the City violate the Collective Bargaining Agreement (JX #1) when it transferred John Thompson out of the Internal Affairs Bureau?  If so, what shall be the remedy?

\* \* \* \* \*

## BACKGROUND

The Internal Affairs Bureau (IAB) of the City of Philadelphia Police Department exists to investigate citizen complaints against Police and investigate police misconduct and corruption. This Bureau also performs sensitive investigations involving Police Officers, such as verbal or physical abuse and criminal activity.  Lt. John Thompson is a twenty-five (25) year veteran of the Philadelphia Police Department.  He has served in various capacities including assignment to the Park Police, undercover investigator, the EAD (Ethics Accountability Department), highway patrol, Detective and Sergeant.   Prior to his assignment to IAB in November, 1996, Lt. Thompson served from September, 1989, to November, 1996, in the Narcotics Division.

According to Lt. Thompson, at approximately 5:20 p.m. on February 27, 1997, he was informed by Chief Inspector John Maxwell that, as of February 28, 1997, the Grievant was to be moved out of IAB and assigned to the Management Review Bureau (MRB).  Chief Maxwell could not give Lt. Thompson a reason for this action.   On February 27, 1997, Deputy Commissioner Norris was serving as the Inspector in the Internal Affairs Bureau.   According to the Deputy Commissioner, at that time he did not know the basis for the City's action; however, he now knows that the Grievant is the subject of a "confidential investigation" regarding misconduct and corruption (Tr. at 45) being performed by the FBI/City of Philadelphia Task

Force. Lt. Thompson remained in MRB for just one day and then was sent to his current assignment in the 18th District.

It was the testimony of Deputy Commissioner Sylvester Johnson that he became aware of the Grievant at the time when he was an Inspector at IAB assigned to the police corruption investigation being performed by the FBI/City of Philadelphia Police Department Task Force. A request was made by IAB to transfer Lt. Thompson to that Bureau. According to Deputy Commissioner Johnson, there was an active investigation on Lt. Thompson about which the Deputy Commissioner reported to Deputy Police Commissioner James Craig. Although there was a recommendation that the Grievant not be transferred to IAB, the transfer was made anyway. Deputy Commissioner Johnson stated that he went to Police Commissioner Richard Neal and told him that "we don't feel as though Lt. Thompson should be in Internal Affairs because of the type of investigation (we) were doing at that point." The Commissioner agreed and the transfer was rescinded. (Tr. at 95-96).

Deputy Commissioner Johnson's reasoning for the City's action is cited in the following testimony (in pertinent part):

> Basically, he was under an active investigation. It wouldn't be fair even to the Lieutenant. We are not saying the investigation was founded, we are saying it's an active investigation going on. Let the investigation be completed, if the investigation turns up negative he can be transferred anywhere he wants to be transferred but because the FBI, Philadelphia Police Department work hand and hand with the Internal Affairs unit in joint investigation, the possibility, and only a possibility that these accusations were true it can compromise other investigations that Lieutenant Thompson may be been involved in.

The Union filed a grievance on behalf of Lt. Thompson asserting that there has been a violation of the Collective Bargaining Agreement (JX #1), specifically Article XX, Section L, Transfers. Where the parties have been unable to resolve this dispute, the matter has been submitted to final and binding arbitration in accordance with the parties' Agreement (JX #1). The parties stipulated that there were no procedural challenges to this grievance. The record of

hearing includes a transcript of sworn testimony (with the exception of the Grievant), the Collective Bargaining Agreement (JX #1) and the parties' briefs in support of their respective positions.

* * * * *

The Collective Bargaining Agreement (JX #1) states (in pertinent part):

### ARTICLE XX. MISCELLANEOUS PROVISIONS

*L. Transfers*
*a. Transfers shall be for the purpose of maintaining essential manpower requirements. Transfers may be part of the formal disciplinary system that is subject to the procedures contained in Article XIX. Transfers shall not be made on the basis of personal animus. All transfers shall be personally communicated by the transferred employee's commanding officer of the unit from which the employee was transferred.*

* * * * *

### <ins>POSITION OF THE UNION</ins>

The Union contends that the City violated Article XX, Section L, of the Collective Bargaining Agreement (JX #1) when it transferred Lt. John Thompson, initially to MRB, and then to the 18th District where he is currently assigned. In the Union's view, this action was not a detail as asserted by the City, but was instead a transfer and subject to the applicable contractual provision. The Union argues that this point has been resolved citing an Arbitration Award between the parties (AAA Case No. 14-390-00343-97A, *Davis Award*) in which Arbitrator Scott Buchheit defined the difference between a detail and a transfer. In that Award, Arbitrator Buchheit indicated that if an officer is told to report to a new unit for an indefinite period of time to perform the duties of that unit, the officer has been transferred. It asserts that, no matter what

4

the City calls Lt. Thompson's movement from IAB to MRB and then to the 18th District, under the Buchheit definition, the Grievant has been transferred. (Union Brief, page 5).

The Union further contends that the language of Article XX, Section L, lists the acceptable and unacceptable justifications for transfer of bargaining unit members. It cites support for this interpretation to limit the City's transfer of Police Officers only under the circumstances articulated in that section in an Arbitration Award between the parties (AAA Case No. 14-300-01500-97A – *Palmer Award*) rendered by Arbitrator Ira Jaffee on May 27, 1998. Arbitrator Jaffee accepted the Union's position that the City is limited to transferring police officers only under the circumstances contained in Section L. The Union argues that the City's witnesses admitted that the Grievant's transfer was not made to satisfy essential manpower requirements and asserts that the transfer was disciplinary. Where the Contract (JX #1) does not provide for other acceptable circumstances for transfer, its action regarding Lt. Thompson was made in violation of the Collective Bargaining Agreement (JX #1). (Union Brief, pages 5-6).

The Union further submits that, if the City's proposed reason for transferring Lt. Thompson, that being that his integrity was damaged by an ongoing investigation surrounding him, than such reason must be categorized as disciplinary (rather than an essential manpower or personal animus) transfer. Where the City has failed to follow the formal disciplinary procedure of Section L, the Union argues that the Grievant was wrongfully transferred for being under investigation by the FBI and should be reinstated to his former position in IAB. The Union supports its position in this matter relying upon the reasoning in *Palmer* which was predicated upon a similar fact pattern. It notes that in *Palmer* the grievant was transferred from the Narcotics unit to the 18th District based upon her relationship with an ex-con who became her husband. In that case the City also relied on the importance of integrity in the current climate of

drug corruption, argued that no disciplinary charges were brought and argued that the grievant's transfer was necessitated by fear for her credibility during an IAB investigation. The Union also cites *Santiago* (AAA Case No. 14-390-01775-95W dated April 24, 1997) wherein Arbitrator Charles Coleman found that the grievant's transfer out of the PAL Center was punitive and subject to the disciplinary procedures of Article XX, Section L. It argues that this case is similar where Lt. Thompson was under investigation, the transfer cannot be justified for work-related reasons where both Lt. Thompson and the grievant in *Santiago* had good records as Police Officers, and Lt. Thompson, like *Santiago*, should have been subjected to formal disciplinary procedures before being transferred. (Union Brief, pages 7-12).

The Union requests a finding that the City violated Article XX, Section L (JX #1) when it transferred Lt. Thompson. It argues that the *Palmer* remedy is more appropriate than *Santiago* because the Grievant's alleged wrongdoing should be assumed to be less severe than the sexual complaints of minors against *Santiago* since the City could, but refused to, reveal that accusation. Further, the record contains no evidence of even alleged wrongdoing. The Union requests that the grievance be sustained and that the City of Philadelphia be ordered to rescind its transfer of Lt. Thompson from the Internal Affairs Bureau making him whole for any lost wages and overtime opportunities resulting from the transfer. It also requests that the Arbitrator retain jurisdiction over this matter with respect to the implementation of any remedy ordered.

* * * * *

## POSITION OF THE CITY

The City denies a violation of the Collective Bargaining Agreement (JX #1) with respect to its action moving Lt. John Thompson from IAB to Management Review Bureau and ultimately to the 18th District in 1997. The City notes that IAB must aggressively root out corruption and to accomplish this goal it must maintain a high degree of integrity. It contends that officers who are assigned to IAB and are under investigation for misconduct or corruption are moved immediately as opposed to officers in the districts because of the sensitive nature of IAB investigations.

The City argues that the parties' Agreement (JX #1) places only one restriction upon the Police Department's management right to transfer, that being transfers based upon personal animus. Further, transfers for disciplinary reasons must adhere to the Department's disciplinary process. The City cites *Rich* (AAA Case No. 14-390-0147-93J) in which Arbitrator Barbara Tener notes that, "the agreement imposes relatively few constraints on the managerial decision to transfer". It argues that neither restriction is applicable in this case and the Department cannot have an officer, himself under federal investigation for corruption and misconduct, conducting investigations of other police officers for, among other things, corruption and misconduct. The City further argues that the integrity and credibility of an IAB officer must be above reproach in order to command respect and trust of the Department and public. Their testimony must not be subject to question and investigations must not be compromised. The City further cites its responsibility to protect the Grievant as well as the public. It cites *Greek Festival* (AAA Case No. 14-390-1983-93W) in which Arbitrator Alan Symonette commented upon the City's right to make transfers to serve and protect the public.

The City relies upon the testimony of Deputy Commissioner Johnson to establish that the removal of Lt. Thompson from IAB was for reasons other than discipline. It notes that the Union failed to produce any evidence that the transfer was based upon personal animus or was disciplinary in nature. The City distinguishes this matter from *Greek Festival* where in that case there was "no dispute that the grievants were transferred to discipline them for calling off sick" during the Greek Picnic.

The City asserts that the Union has failed to establish a contract violation and respectfully requests that the grievance be denied.

* * * * *

## OPINION AND AWARD

The parties to this Collective Bargaining Agreement (JX #1) have negotiated terms and conditions of employment for bargaining unit members with respect to transfer from their assigned unit. The language contained in Article XX, Section L, clearly and unequivocally indicates that transfers **shall** be for the purpose of maintaining essential manpower requirements, they **may** be part of the formal disciplinary system and subject to due process procedures, and transfers **shall not be** made on the basis of personal animus. This is the totality of the agreement between the parties on this issue and serves to define the rights and responsibilities of Union members and the City where movement of Police Officers takes place.

The facts in this case are not in dispute. There is no doubt that Lt. Thompson was ordered in February, 1997, out of IAB, into MRB, and then to his position in the 18th District. Initially, the City asserts that the Grievant was detailed, as opposed to transferred, from IAB

relieving the City of any obligation under the disputed language.  This issue has been resolved by

Arbitrator Buchheit in *Davis* wherein he states the following:

> The Union has here established, however, that the January 13, 1997 assignment of the Grievant from the 90th District to the 22nd District must be considered a transfer rather than a detail.  The Grievant credibly testified that he was informed by Commanding Officer Kelly as to the circumstances surrounding his reassignment.  Kelly told the Grievant that he was being moved to the 22nd District indefinitely and the action was being taken because of the numerous EEO complaints he had made.  Based upon these admissions by Kelly, the Grievant had no reason to understand that his assignment to the 22nd District was for a limited period of time and would end at some point in the future or after some future occurrence.  Rather, the Grievant had every reason to believe that he would work in the 22nd District for the foreseeable future.

Likewise, Lt. Thompson was given no information regarding the reason for his removal from

IAB or any expectation with regard to time limitations for his alternate assignments.  Therefore,

it must be concluded that the City's action removing Lt. Thompson from IAB represents a

transfer, as opposed to a detail, and must be subject to the terms and conditions of Article XX,

Section L, of the Agreement (JX #1).

The controlling language articulates specifically those circumstances under which

transfers may take place.  Initially a Police Officer must be assigned to a particular location from

which the transfer may occur.  The testimony of Deputy Commissioner Johnson is particularly

instructive in determining the Grievant's status at IAB.  It states (in pertinent part):

> (At) the time I was an inspector . . . assigned to the police corruption investigation with the FBI and we received the report from the Internal Affairs Unit requesting Lieutenant Thompson be transferred to Internal Affairs. . . . At that time it was an active corruption investigation on Lieutenant Thompson.  I informed Deputy Police Commissioner Craig that there was an investigation on there and that he should not be transferred to Internal Affairs.  A couple of days later there was a transfer to Internal Affairs by Lieutenant Thompson and I went to the Police Commissioner Richard Neal at that time and told him that we don't feel as though Lieutenant Thompson should be in Internal Affairs because of the type of investigation that we were doing at that point.  The Commissioner agreed with it and the transfer was rescinded. (Tr. at 95-96).

The foregoing testimony clearly establishes the fact that the City knew when it assigned the

Grievant to IAB that he was under investigation.  Therefore, any transfer from that position is

subject to contractual constraints under Article XX, Section L.

The City asserts that the only restrictions placed upon the Police Department's management right to transfer are transfers based upon personal animus and adherence to the Department's disciplinary process where transfers are made for disciplinary reasons. It contends that neither of these restrictions is applicable in this case. In essence, the City's reasoning removes it from any obligation under this transfer language. It is the opinion of this Arbitrator that such an interpretation far exceeds the bounds of this provision. The parties have negotiated language which encompasses its agreement with respect to transfer actions by the City. Any attempt to broaden the specific terms and conditions contained therein represents an improper extension of the Agreement (JX #1). "Manpower requirements" and "personal animus" are not relevant in this case. Therefore, the only remaining proper consideration is discipline and required adherence to due process. It is instructive to note that it was not until the arbitration hearing that the Grievant and the Union learned that this action was taken due to a "confidential investigation" regarding possible "corruption and misconduct." In essence, there was no reason given for the City's action.

Support for strict and narrow interpretation of this language can be found in *Palmer* where Arbitrator Jaffee reasoned as follows:

> Although the City may not have been motivated to 'punish' the Grievant when it opted to transfer her to a desk job at the 18th District, the City's argument that it was simply attempting to direct the working force in a non-disciplinary way is not persuasive. In many disciplinary situations in which transfer is the preferred sanction, the City's decision might also be characterized as 'non-punitive' and as for allegedly sound business reasons. One can imagine many disciplinary reasons which could also be characterized as non-punitive and designed to minimize potential disruptions to the operation of the department . . . The provisions of Article XX, Section L, while authorizing transfer as one possible sanction for disciplinary matters, also protects affected officers by requiring that formal charges be instituted so that the due process rights of appeal may also be exercised.

In this case the City effectively sought to transfer Lt. Thompson for allegedly "sound business reasons" while characterizing its action as "non-punitive" and therefore not subject to the

transfer provisions of the Agreement (JX #1).  However, this action effectively prevented the Grievant from exercising his contractual right to the procedural safeguards provided by Article XX, Section L.   Where bargaining unit members are entitled to review of all reasons for disciplinary action, the City may not circumvent this right by failing to provide a reason for its transfer action. It is therefore concluded that the City violated Article XX, Section L, when it failed to provide the Grievant with the opportunity to be heard regarding the City's basis for transfer.[1]

The City cites its general managerial responsibility to transfer an employee whose presence in a particular position represents danger to himself and others.  Where there is no evidence that such a danger exists by permitting the Grievant to remain at IAB during the investigative process, there is no basis to permit the City to ignore its contractual obligation. The City merely relies upon its argument that the Grievant's "integrity" may be in question and therefore he should not continue his IAB assignment.  The City is understandably concerned with what *might* be the outcome of such an investigation and *potential* charges which could follow.  These concerns, however, can be addressed by exercising its managerial prerogative to make appropriate work assignments to the Grievant within IAB which do not compromise either Lt. Thompson's contractual rights or the City's investigatory rights.  Until the parties express their intent contractually to make IAB an exception with regard to transfer actions, this Arbitrator has no authority to find that such an exception exists.

The City cites *Rich* asserting that "the agreement imposes relatively few constraints on the managerial decision to transfer."  A careful reading of this award reveals that the transfer in

---

[1] The City argued at the hearing that it would have been impeded its investigation by putting Lt. Thompson on notice regarding the investigation.  There is clearly a difference between giving notice of the existence of an investigation and the substantive content of that investigation.

11

question requires a showing that the "transfer was done for reasons of personal animosity" which is irrelevant to the instant matter. The City asserts that, "Police Officers who are assigned to IAB and are under investigation for misconduct or corruption are moved immediately as opposed to officers in the districts because of the sensitive nature of the investigations at IAB." (City Brief, page 1). There was no substantive evidence to support this claim of action. It must therefore be concluded that this is a case of first impression and that no similarly situated Police Officers have been transferred from IAB during investigations and without receiving reason for such action.

The City further cites *Greek Festival* asserting that management has a right to make transfers to serve and protect the public. A careful reading of this award finds Arbitrator Symonette commenting that, ". . . the City can make transfers to maximize its manpower in order to effectively serve and protect the community." The instant matter is not a manpower issue and therefore the City's assertion that it may make transfers "to serve and protect the public" does not take into account the parties' specific contractual limitations upon such action.

For all the foregoing, it must be concluded that the City violated the Collective Bargaining Agreement (JX #1) when it transferred Lt. John Thompson out of the Internal Affairs Bureau. The transfer of Lt. John Thompson shall be rescinded. He shall return to his position at IAB which he held prior to the City's action. Lt. Thompson shall be made whole for any lost wages and overtime opportunities resulting from the transfer. This Arbitrator shall retain jurisdiction for ninety (90) days from the date of this Award for the sole purpose of resolving any dispute which may arise regarding implementation of the Award.

\* \* \* \* \*

## AWARD

1. The City violated the Collective Bargaining Agreement (JX #1) when it transferred Lt. John Thompson out of the Internal Affairs Bureau. The transfer of Lt. John Thompson shall be rescinded. He shall return to his position at IAB which he held prior to the City's action.

2. Lt. Thompson shall be made whole for any lost wages and overtime opportunities resulting from the transfer.

3. This Arbitrator shall retain jurisdiction for ninety (90) days from the date of this Award for the sole purpose of resolving any dispute which may arise regarding implementation of the Award.

September 4, 1998
Wilmington, Delaware

Kathrine B. Hogan,
Arbitrator

13

2927

In the Matter of Arbitration Between:


# COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF STATE POLICE

## and

# PENNSYLVANIA STATE TROOPERS ASSOCIATION

### (Corporal Kathy J. Stanton)

Before:
Ralph H. Colflesh, Jr., Esq.
Arbitrator

<u>Appearances</u>

For the Commonwealth:
*Patricia J. Goldband, Esq.*
*Senior Counsel*
*Office of Administration*
*Harrisburg, Pennsylvania*

For the Association:
*Gary M. Lightman, Esq.*
*Lightman & Welby*
*Harrisburg, Pennsylvania*


## DECISION AND AWARD


Pursuant to the Collective Bargaining Agreement ("the Agreement") (Joint Exhibit 1)[1] by and between the parties hereto, the Commonwealth of Pennsylvania, Department of State Police ("the Commonwealth" and "the Department") and the Pennsylvania State Troopers Association ("the Association"), the undersigned Arbitrator was appointed to hear and determine the instant dispute. Upon due notice to the parties,

1

an arbitration hearing was convened at 10:00 a.m. on April 10, 2001 in the headquarters of the Association, Harrisburg, Pennsylvania. At that time and place both parties had the opportunity to call and confront witnesses, introduce documentary and other forms of non-testimonial evidence, and present arguments in support of their respective positions. At the conclusion of the evidentiary portion of the hearing, the parties summarized their positions orally in lieu of submitting post-hearing briefs, and the record was closed.

## Background:

The Grievant in this matter, Corporal Kathy J. Stanton, was hired into the Department on July 9, 1984. At all times material to this dispute, she was assigned in her rank of Corporal to Troop T- Turnpike and worked at the Turnpike Communications Center in Highspire, Pennsylvania, just off the East-West portion of the Pennsylvania Turnpike. Staffed largely by civilian employees of the Pennsylvania Turnpike Commission, the Center serves as a central communications point for not only the Commission, but for Troop T- Turnpike of the Pennsylvania State Police. Five nights a week Corporal Stanton worked the 11:00 p.m. to 7:00 a.m. shift as the lone Department presence in the Center. Corporal Stanton's duties consisted of standing by in the event she was needed as Turnpike Commission employees received radio communications from Troopers patrolling the 512 miles of the toll road. In addition she also ran National Crime Information Center checks and other computer look-ups known as CLEAN checks when requested by Troopers investigating persons or vehicles.[2]  Those responsibilities are critical as the Corporal assigned to the 11:00 p.m. to 7:00 a.m. shift in the Center is the only supervisor on duty for the Department the entire length of the Turnpike.

Sometime prior to April 20, 2000, Corporal Stanton's immediate superior, Sergeant Anthony F. De Luca received reports from Turnpike Commission personnel who worked the 11:00 p.m. to 7:00 a.m. shift that Corporal Stanton was difficult to get along with, played a television loudly, was sleeping on duty, not answering the phone,

---

[1] The Agreement is for the term July 1, 2000 through June 30, 2004. The parties have agreed that even though the material events in this case transpired on April 20, 2000, the Agreement controls this matter.
[2] By regulations, only certified police personnel are authorized to access the NCIC and CLEAN systems. Thus, this work is beyond the role of the civilian radio operators.

and not filing what are known as CAD (dispatch) cards. In response to these and other complaints that she was not carrying out the assigned duties listed on her Job Description (Commonwealth Exhibits 2 and 3), Sergeant De Luca issued a "Supervisors Notation," a form of non-punitive counseling, on April 5, 2000. (Commonwealth Exhibit 1). Sergeant De Luca issued another Supervisor's Notation on April 12, 2000 because Corporal Stanton had been absent from her post for a quarter hour. (Commonwealth Exhibit 4). After returning from a sixty-day detachment from his post to another duty, he ultimately decided to visit the Communications Center while the Corporal was on duty.

Sergeant De Luca arrived about 2:00 a.m. the morning of April 20. According to both his unrebutted testimony and written report (Commonwealth Exhibit 5), he found Corporal Stanton seated motionless in a chair with her eyes closed and snoring. She had a blanket covering the lower part of her body, was not armed with her service weapon which turned out have been put by her in an unlocked, unsecured area, and was wearing a non-uniform sweater without her tie. Corporal Stanton remained asleep for slightly more than an hour at which time she was awakened by a phone call. After speaking to her and telling her he would be issuing a report, Sergeant De Luca ordered her to put on her gun, which she did. He then left the Communications Center only to return a few minutes later. On this second visit he found her in the same posture as he had discovered her earlier. After the Corporal realized his presence Sergeant De Luca asked to speak with her. A verbal altercation ensued during which physical contact occurred between the two. Corporal Stanton characterized the contact as a blow, while Officer De Luca described it in his report as occurring when she walked into his arm while attempting to exit the area in which he had ordered her to remain. (Commonwealth Exhibit 5).

As a result of the April 20 incident, Sergeant De Luca filed a report detailing his version of the events. (Commonwealth Exhibit 5). Corporal Stanton filed a complaint against him, alleging that he had verbally and physically abused her during their confrontation. (Commonwealth Exhibit 6). The Department investigation of the complaints determined that Sergeant De Luca's complaint was "founded" while Corporal Stanton's was "not sustained." The Department then imposed a ten-day suspension on Corporal Stanton and ordered a disciplinary transfer to the Bowmansville station. The Association responded by filing a demand for arbitration as authorized by the Agreement.



Neither the suspension nor transfer has been effectuated, as both are pending my Decision and Award in this case.

## Contentions of the Commonwealth:

The Commonwealth holds that Corporal Stanton's conduct on April 20, 2000 violated no fewer than five Field Regulations ("FR's") and that both the ten-day suspension and disciplinary transfer to the Bowmansville station are justified. Specifically, the Commonwealth charges that Corporal Stanton violated FR 1-2.02, relating to performance of duty; FR 1-2.03, relating to obedience of lawful orders; FR 1-1.02 relating to unbecoming conduct; FR 1-1.32, relating to quarreling or fighting with members of the Department; and, FR 1-1.30, relating to proper use of firearms.

To support its case, the Commonwealth called six witnesses, beginning with Sergeant De Luca. Much of his uncontested testimony is stated in the Background section of this Decision and Award, above. The remainder of his testimony, in which he made claims contested by Corporal Stanton, largely had to do with the interaction between him and the Corporal after he initially found her sleeping.

According to Sergeant De Luca, he observed Corporal Stanton for over an hour until she awoke in apparent response to a telephone call. After she took the call, he told her he was going to write a report on what he had observed, to which she sarcastically replied, "You do what you gotta do." He then left the Communications Center, only to return because, he said, he felt the need to counsel her further. He found her in the same position as he had earlier, only this time she roused after about five minutes of observation. He said he then asked her to step away from her work area so they could talk outside the hearing of the civilian Turnpike Commission workers. They proceeded to a separate room where he asked her to sit down. She refused, then loudly berated him for what she contended was unfair treatment. Among other things, according to Sergeant De Luca's report, Corporal Stanton told him "I don't have to discuss [having a blanket across her legs] with you," "I'm not listening to you," "You are nothing to me," and "You're no type of supervisor." When she attempted to leave the room, he said, she bumped into his arm which he had put across the doorway to block her exit. He said that she then began

4

yelling that he had hit her and left the area despite his repeated orders for her to stay. He followed her into a kitchen area where she threatened to accuse him of punching her in the stomach. As reported in his testimony and admitted by Corporal Stanton, at one point she put her hand on her gun.

Apart from the Supervisor's Notations he issued and her prior complaint to him that he had discussed her performance with another Corporal, Sergeant De Luca denied knowing much about Corporal Stanton before this incident. He also asserted he had no personal animosity toward her.

The Commonwealth's second witness was Turnpike Commission employee Harry E. Williams, Jr. Mr. Williams testified that he was on duty the early morning hours of April 20 and saw Sergeant De Luca observing Corporal Stanton. At one point, he said, Sergeant De Luca asked him to observe Corporal Stanton as well, and Mr. Williams opined that she was asleep. He said the Sergeant and Corporal conversed in low voices after she awoke, but their conversation was louder and more animated the second time Sergeant De Luca was in the building. According to Mr. Williams, both the Sergeant and Corporal were upset. Mr. Williams admitted having some unpleasant moments with Corporal Stanton himself prior to April 20 when she criticized his loud breathing and, rightly in his opinion, criticized him for not attending to his own duties. He said Corporal Stanton increased the volume of the television she used to cover the sound of his respiration.

The third Commonwealth witness was Todd Leiss, a former radio operator for the Turnpike Commission in the Communications Center who was on duty April 20. Mr. Leiss said he did not see much of the interplay between Sergeant De Luca and Corporal Stanton that morning, but did hear Sergeant De Luca ask and then order her to leave her work area at one point.

Angela K. Rudie, the Commonwealth's fourth witness and also a Turnpike Commission employee, corroborated much of Sergeant De Luca's testimony concerning his first observations of Corporal Stanton. As Sergeant De Luca had testified, Ms. Rudie said Corporal Stanton remained asleep for about an hour as Sergeant De Luca observed her before awaking. She said about ten minutes after he left the Center, Sergeant De Luca returned and again found the Corporal asleep. Ms. Rudie said during the ensuing

conversation between the two, she heard Corporal Stanton say, "I don't have to listen to you," and "I don't have to talk to you." She said she also overheard Corporal Stanton say, "Don't touch me," and Sergeant De Luca reply, "I didn't touch you."

Captain Richard Stein, the commanding officer of Troop T-Turnpike at the time of the April 20, 2000 incident, also testified for the Commonwealth. Captain Stein said he received the cross-complaints filed by Sergeant De Luca and Corporal Stanton against each other. The Captain said he reviewed the investigations that were performed by Internal Affairs on the complaints and determined that Sergeant De Luca's charges against Corporal Stanton were justified. On the contrary, he said that he could not substantiate Corporal Stanton's claims that Sergeant De Luca had verbally abused her and had struck her because of the lack of any corroboration. Before forwarding the matter of Corporal Stanton's discipline to the Department's Disciplinary Officer, Captain Robert Barry Titler, Captain Stein said he interviewed Corporal Stanton who admitted that she had been sleeping when Sergeant De Luca first found her on April 20. He said that she denied being asleep the second time the Sergeant observed her and made no admissions concerning any of Sergeant De Luca's other allegations.

As to the discipline the Department imposed, Captain Stein said he felt it significant that Corporal Stanton not only had been sleeping on duty but had not been properly attired, had not been wearing her duty weapon, and showed disrespect to Sergeant De Luca before individuals who were not members of the Department. Addressing the issue of her disciplinary transfer, Captain Stein expressed the view that Corporal Stanton displayed an inability to meet the standards of an assignment in which she is not supervised and should be in another post that does not involve midnight shifts. He said he felt that the Bowmansville station would be the best location for her since it was a well-run post with excellent supervision and she would have an assignment that did not require late night work.

Captain David K. Points, the current commander of Troop T- Turnpike testified that he believed Corporal De Luca's disciplinary transfer was necessary because she had lost credibility with the Turnpike Commission employees which whom she would have to work at the Communications Center and because she had shown she could not work at an acceptable level in the Center. During his testimony, Captain Points recounted an incident

6

in which he had heard no response from the Communications Center to a call from a troop car assigned to the Everett Station. Upon investigating, he said, he found that Corporal Stanton was the person who should have responded. When questioned, he said, she explained she had not been aware of the call.

The Commonwealth completed its case by calling Captain Titler, the Department's Disciplinary Officer. After an investigation has been completed and the allegation substantiated, it is Captain Titler's responsibility to impose appropriate punishment, subject to review by the Commissioner of the Pennsylvania State Police.

Captain Titler explained that in ascertaining the penalty to Corporal Stanton, he reviewed each of the Field Regulations that had been violated. He said that by sleeping on the job Corporal Stanton had violated FR 1-2.02, relating to performance of duty, specifically the provision that "[m]embers shall...be held responsible for the proper performance of all duties assigned to them." (Commonwealth Exhibit 7). Captain Titler felt it was obvious that Corporal Stanton could not perform the duties assigned to her if she were asleep, as Sergeant De Luca had found her. He said that by sleeping a second time, Corporal Stanton's failure to meet the requirements of FR 1-2.02 was exacerbated.

Captain Titler also opined that by not following Sergeant De Luca's order to be seated and remain in place while he was remonstrating her Corporal Stanton violated FR 1-2.03, which requires that "[m]embers shall promptly obey and execute any and all lawful orders of a supervisor." (Commonwealth Exhibit 7). Captain Titler further explained his belief that the same FR was violated when Corporal Stanton did not wear her tie or carry her weapon, left the weapon loaded in an unlocked locker to which civilians had access, and wore a non-uniform sweater. As to the location of the gun, Captain Titler found a violation of yet another FR, FR1-1.30, which prohibits "[t]he use or handling of firearms by members in a careless or imprudent manner." (Commonwealth Exhibit 7). He further found this FR violated when Corporal Stanton, as testified to at hearing by Sergeant De Luca, placed her hand on her gun while arguing with him, something he said she admitted in an interview with him.

Further, Captain Titler averred that Corporal Stanton also breached the requirements of FR 1.32, which directs that "[m]embers shall never behave disrespectfully...toward any other member engaged in the execution of their position or

duty" (Commonwealth Exhibit 7) by speaking disparagingly to Sergeant De Luca. Finally, he found her guilty of disobeying FR 1-1.02, which forbids unbecoming conduct, defined as "that type of conduct which could reasonably be expected to destroy public respect for Pennsylvania State Police officers and/or confidence in the Department." This FR is also contains an omnibus "good conduct" requirement, directing that "[m]embers shall not conduct themselves in a manner which is unbecoming to a police officer." (Commonwealth Exhibit 7).

Captain Titler recited the steps he takes to ascertain a proper penalty. They include a review of the offenses of which the member is guilty; an examination of past penalties levied on other, similarly situated members; a perusal of the member's annual performance evaluations; an evaluation of the member's past record of discipline or commendations, if any; and, where a disciplinary transfer is being considered, a weighing of the reasons for and against such a transfer. In Corporal Stanton's case, he said, he was affected by Captain Stein's desire to have the Corporal transferred out of the Communications Center to a post where she would have more supervision and would not be assigned to steady midnights. Captain Titler said that if Corporal Stanton's only offense was sleeping on duty, he would have assessed a three to five day penalty, but that he was influenced by aggravating factors including what the Department and Sergeant De Luca believed was her resumption of sleep after being found the first time and the various other offenses. He acknowledged that historically the penalty for sleeping on duty has ranged from a two to five day suspension and conceded that one Trooper caught sleeping on duty while coaching a new member received only a three- day penalty.

## Contentions of the Association:

The Association does not contest the fact that Corporal Stanton was sleeping on duty when Sergeant De Luca entered the Center the first time. Nor does it dispute that her offense merits a suspension, although not one as lengthy as the Commonwealth would impose. The Association argues that she was not asleep the second time the Sergeant saw her and denies she had any culpability in the contretemps that erupted when Sergeant De Luca sought to speak with her after the second incident. The Association also vehemently

opposes the Corporal Stanton's disciplinary transfer to Bowmansville. It cites the fact that she has three children and resides with her husband in Harrisburg, Pennsylvania. Mr. Stanton is also a member of the Department, assigned to the Department's Chambersburg station. Bowmansville is forty-five minutes to one hour east of the Communications Center. Thus, a transfer would add nearly two hours to Corporal Stanton's daily commute. Moving closer to that station would be difficult due to her husband's assignment in Chambersburg which lies to the west of Harrisburg.

The Association called Corporal Stanton as its only witness. The Corporal testified that she is a seventeen-year veteran of the Department and that she transferred voluntarily into the Communications Center in May 1999. She admitted that on April 20, 2000 she had fallen asleep sometime after 2:00 a.m. and did not awaken until around 3:00 a.m. when she heard her telephone ring. While asleep, she said, she had a small airline-type blanket over her knees and legs to keep her chronically sore knees warm. She recalled that she also may have been wearing a black cardigan sweater at the time.

Corporal Stanton said that after taking care of the call, she and Sergeant De Luca had a brief, quiet conversation. When he told her he was going to write a report, she said she told him to do what he felt he needed to do. At some point subsequent to that conversation, according to her account, Sergeant De Luca reappeared and ordered her to put on her gun. She complied, admitting that the gun had been in an unlocked locker.

Corporal Stanton insisted that after Sergeant De Luca left, she did not sleep again because she was angry. She said she felt she had been "set up," although she did not say by whom. She denied that Turnpike Commission employees could have seen her sleeping because she was in a large, high-backed chair, making observation of her face impossible without walking around the chair. In her opinion, Sergeant De Luca held some resentment toward her before this incident because she had complained to him that he had spoken with another Corporal about her work performance.

When Sergeant De Luca returned to the Center that night, she said, he berated her and began screaming and pointing his finger in her face. She said she got up because his conduct made her even angrier and that Sergeant De Luca shoved her backward. At that point, she said, she put her hand on her firearm and told Sergeant De Luca, "Don't you ever put your hand on me again." She said she then sat back down in her workstation, but

that when Sergeant De Luca asked her to meet with him in a kitchen area of the Center she complied.

## Opinion:

Only two of the factual matters in this case are contested. One is the question of whether Corporal Stanton was sleeping the second time Sergeant De Luca saw her. The other is the nature of the interaction between the two after Sergeant De Luca returned to the Communications Center.

Corporal Stanton's admitted sleeping on duty, her failure to be in required attire, and her improper stowage of her weapon undoubtedly constitute violations of three Departmental Field Regulations, specifically FR 1-2.02, relating to performance of duty in regard to her sleeping; FR 1-2.03, relating to lawful orders in regard to her uniform and firearm requirements; and, FR 1-1.30, relating to use of firearms in regard to placing her weapon in an area where it could be accessed by others. In addition, the violations of these Field Regulations, jointly and severally, support Captain Titler's finding that Corporal Stanton violated FR 1-1.02, the regulation regarding unbecoming conduct, since her sleeping in the presence of Turnpike Commission employees would "reasonably be expected to destroy public respect for Pennsylvania State police officers and/or confidence in the Department," (Commonwealth Exhibit 7).

The sleeping on duty violation alone has historically merited a suspension of two to five days, with Captain Titler testifying that he would have assessed Corporal Stanton three to five days in this case. While there was no testimony as to the Department's historic response to violations of the use of firearms, FR 1-1.30, or lawful orders, FR1-2.03, those misdeeds would be expected to generate suspension days..

The Commonwealth, however, seeks an even greater penalty. It would impose a ten-day suspension *and* a disciplinary transfer. The strength of the Commonwealth's case in regard to the additional suspension time and the transfer depends on my evaluation of whether Corporal Stanton fell asleep a second time and the nature of her interchange with Sergeant De Luca after his return to the Center as well as my view of the appropriateness of the punishment.

10

I have had an opportunity to observe both Sergeant De Luca and Corporal Stanton during their testimony at hearing and have also reviewed their testimony carefully. Based on that observation and review, I have concluded that Corporal Stanton was asleep the second time Sergeant De Luca observed her. This decision has been especially influenced by two things: first, according to Sergeant De Luca's unrebutted testimony, he found Corporal Stanton in the same posture she had been in when he first found her; second, she had earlier been asleep. It is very unlikely that an employee caught sleeping on duty would resume the same position in which she had previously lost consciousness unless (a) she believed her supervisor would not return and (b) she wished to sleep again. Thus, although Sergeant De Luca said he observed her only about five minutes the second time and she roused herself without any external stimulus, the circumstances surrounding his observation and the weight I accord Sergeant De Luca's credibility leads me to conclude that Corporal Stanton did sleep a second time, although perhaps not as deeply as she had been sleeping when the Sergeant first found her. Thus she violated both FR 1- 2.02 and FR1-1.02, relating to performance of duty and conduct unbecoming a member, not only once but twice.

I am also convinced that Corporal Stanton behaved disrespectfully when Sergeant De Luca attempted to speak to her after returning to the Center. I believe Sergeant De Luca was highly agitated himself by the time the heated exchange occurred. He had to inspect her performance at an hour he would normally be sleeping rather than working. She had seemed less than apologetic when she was discovered. And, he found she had resumed her conduct after he had spoken to her earlier. For all those reasons, I think it would be highly likely that Sergeant De Luca was not in a particularly diplomatic mood when he asked to speak with her after returning to the Center. However, even an extremely irritable supervisor is to be obeyed and any anger that may have been exhibited on Sergeant De Luca's part does not excuse Corporal Stanton from being respectful and following lawful orders. I credit the Sergeant's testimony that Corporal Stanton only followed his repeated orders that she meet and continue meeting with him after considerable intransigence. Nothing in the record convinces me that Corporal Stanton's reluctance to follow the orders was justified or excusable. In particular, I do not believe that Sergeant De Luca hit or pushed her. I find that any attempt he made to physically

11

EXHIBIT O

block her exit from an area in which he had already ordered her to remain was passive and did not consist of any active striking or pushing. Thus, I agree with the Commonwealth that FR 1-2.03, requiring obedience of lawful orders, and FR 1-1.32, which requires that members never behave disrespectfully toward other members, were broken by Corporal Stanton. I further believe that there was no justification whatsoever for Corporal Stanton to place her hand on her service weapon, an act which trenches on, if not violates, FR 1-1.32.

Taken with the violations of the other Field Regulations, the FR 1-1.32 and FR 1-2.03 violations aggravate any penalty that would be appropriately levied for the former alone. I am convinced that if the total effect of these violations does not absolutely justify a ten-day suspension, that penalty is not so excessive as to warrant my interference. However, the additional penalty of a disciplinary transfer is a different matter.

Beyond the exercise engaged in by Captain Titler, in which he attempts to give penalties consistent with those in similar cases, it is extremely difficult to quantify punitive measures so that they correspond with the severity and frequency of offenses. The Department here has found ten days *and* a disciplinary transfer to be the correct measure. Traditionally many arbitrators have been unwilling to interfere with discipline, once it is determined that all or substantially all the underlying charges have been proven. Where, however, a punishment is not consistent with the objectives of rehabilitation or necessary to safeguard the employer's interests, it will be viewed as excessive and arbitrators will intervene. I reluctantly do so here.

While the impact of a suspension is finite, a disciplinary transfer to a distant station is like a demotion: the punitive effect never ends. Even more, unlike demotions, which most severely impact income, disciplinary transfers have an impact on one's family by resulting in either a forced relocation of the household or a reduction in time the member would have with his or her family because of a lengthy commute.

That is not to say there are no instances in which such transfers are justified. Examples include cases where a member has committed some localized but highly notorious infraction diminishing the aura of authority he or she would need, as a police officer, in dealing with the public. Another would be where a member's infraction earned him the distrust and hostility of a large contingent of his station. In these types of cases, a



transfer out of the locale or station would be necessary to safeguard the Department's' interests. A disciplinary transfer might also be justified where a member with a history of minor but repeated offenses would likely have a better chance of rehabilitation by being switched from a station with a pervasive history of such problems to another, less problem plagued station with a new commander and co-workers.

The instant case fits neither the "necessary" or "rehabilitative" reasons for transfer. It is unnecessary because there is no evidence that an appropriately disciplined Corporal Stanton would repeat the same offense if left at the Communications Center. And, while Corporal Stanton lost face with her civilian and Departmental counterparts at the Center and her Departmental supervisors, the same could be true any time a member is guilty of some infraction. Carried to its logical extreme, the Department would constantly transfer members each time they had a disciplinary problem.

Nor is a disciplinary assignment required for rehabilitation in this case. While I have carefully considered Captain Points' testimony concerning the unsupervised nature of her work at the Center and the excellent disciplinary environment in the Bowmansville station, the fact is that Corporal Stanton worked for nearly a year without incurring discipline at the Center prior to this incident. As noted above, there is no reason to believe Corporal Stanton, properly chastened by a two- week suspension, would not mend her ways. If she does not and the Department proves she was again inattentive to her duties, or sleeping, or violating other significant standards even one additional time at the Center within twenty-four months from the date of this Decision and Award, a transfer would be appropriate. Further, other proportionate penalties up to and including discharge may be appropriate. However, given its harsh effect and the lack of a clear necessity or need for rehabilitative effect, a forced transfer at this time would be premature.

An Award will be entered sustaining the discipline and the ten-day suspension but vacating the disciplinary transfer, but subjecting Corporal Stanton to future transfer under the circumstances set forth above.

**Award:**

The grievance is denied in part and sustained in part. The grievance is denied in that the Department had just cause to discipline Corporal Stanton on the basis of all its charges relating to April 20, 2000 incident, and the ten-day suspension is justified. The grievance is sustained in that the disciplinary transfer is not justified at this time. However, upon a further incident of sleeping on duty, or inattentiveness to duty, or any other such significant infraction committed by her at the Communications Center within twenty-four months of the date of this Decision and Award, the Department may issue a disciplinary transfer from the Center. This provision of this Award shall not limit the Department from imposing other, additional penalties, up to and including dismissal.

5/19/01

Ralph H. Colflesh, Jr., Esq.
Arbitrator

14

IN THE MATTER OF THE ARBITRATION )     OPINION AND AWARD
                                  )
        Between                   )
                                  )
COMMONWEALTH OF PENNSYLVANIA       )     RONALD F. TALARICO
                                  )     ARBITRATOR
        and                       )
                                  )     PSP No.: 00-DD-264
PENNSYLVANIA STATE TROOPERS        )     PSTA No.: B-208
ASSOCIATION                        )


## GRIEVANT

Sean F. Scott

## ISSUE

Procedural Arbitrability

## HEARING

June 1, 2000
Washington, PA

## POST-HEARING BRIEFS

Received by July 5, 2000

## APPEARANCES

**For the Association**
Gary M. Lightman, Esq.
Lightman & Welby

**For the Commonwealth**
Joanna N. Reynolds, Esq.
Assistant Counsel

## ADMINISTRATIVE

The undersigned Arbitrator, Ronald F. Talarico, Esq., was mutually selected by the parties to hear and determine the issues herein. An evidentiary hearing was held on June 1, 2000 in Washington, Pennsylvania, at which time the parties were afforded a full and complete opportunity to introduce any evidence they deemed appropriate in support of their respective positions and in rebuttal to the position of the other, to examine and cross examine witnesses and to make such arguments that they so desired. Post-hearing briefs were received from both parties by July 5, 2000 at which time the record was closed. No jurisdictional issues were raised.

## PERTINENT CONTRACT PROVISIONS

### ARTICLE 26
### DISCIPLINE

. . .

### Section 7.    Statute of Limitations

In cases of alleged criminal conduct, cases which could reasonably be construed to give rise to court-marital proceedings, alleged violations of the Governor's Code of Conduct, or cases in which a prosecutorial determination is sought, the Department shall complete its investigation and the member advised of the Troop Commander/Bureau director's notice of administrative findings within 120 working days. The 120 working days will commence on the date the member is notified of the complaint, except as provided below:

1.    In cases involving alleged criminal conduct or requests for a prosecutorial determination, the notice of administrative findings shall be issued within 60 working days from the date the

1

Department receives written notice from the member of the disposition/adjudication of the criminal charge or the date the Department receives the prosecutorial determination.

2.  In all other cases the Department shall complete its investigation and the member advised of the Troop Commander/Bureau Director's notice of administrative findings within 90 working days of the date the Department is notified of the complaint.

3.  In court-martial cases the member shall be notified of the adjudicated penalty within 30 working days of the member's selection of the grievance procedure.

4.  If the aforementioned time limits are not met, no discipline in the form of a suspension without pay may be initiated. However, the time limits may be waived by the Department upon a showing of just cause or my mutual agreement of both parties.

Except in cases alleging criminal conduct or cases which give rise to court-martial proceedings, no disciplinary action consisting of a suspension without pay shall be imposed for violations of Department rules and regulations which are discovered more than one year after the date of occurrence unless mandated by the Governor's Code of Conduct. This paragraph shall not apply upon a showing of proof that the member acted to prevent such discovery.

## BACKGROUND

The Grievant, Sean F. Scott, has been employed by the Pennsylvania State Police since November 12, 1991 and at all times pertinent to the within matter was assigned to Troop B - Waynesburg as a Patrol Officer.

2

On November 19, 1998 Cpl. Richard Gluth, a criminal investigator with Troop B, Washington, began a criminal investigation of the Grievant for insurance fraud. On or about November 27, 1998 the Grievant was called to the Washington, Pennsylvania Station and informed he was a suspect in a criminal investigation regarding insurance fraud. It is alleged that on December 20, 1990 the Grievant arranged for the theft of a Chevrolet pick up truck which he owned and subsequently filed an insurance claim with Erie Insurance Company and accepted payment for the value of the truck. This all occurred approximately one year prior to the Grievant's enlistment with the Pennsylvania State Police.

On December 7, 1998 Cpt. Frank H. Monaco, Troop Commander, Troop B - Washington, placed the Grievant on restricted duty status. On December 15, 1998 the Grievant's attorney reimbursed the Erie Insurance Company for the value of the reportedly stolen truck. Shortly, thereafter, the Washington County District Attorney's Office indicated that the matter had been resolved and that no criminal prosecution would be pursued. In a letter dated January 11, 1999 John C. Pettit, Washington County District Attorney, officially advised the Pennsylvania State Police as follows:

> **"To Whom It May Concern:**
>
> **I was previously requested by Sgt. Altman to provide a letter setting forth my opinion concerning the filing of criminal charges against Trooper Scott. This matter has been resolved civilly in accordance with statutory authority, and it is, therefore, my prosecutorial recommendation that it would be inappropriate to file criminal charges."**

charges. At the hearing, Lt. Carnahan of BPR claimed that they were receiving contrary information from the Washington County District Attorney's Office in terms of a prosecutorial determination. He claimed that the District Attorney's Office informed them orally that there was enough evidence to prosecute Tpr. Scott for insurance fraud. Yet, after these conflicting reports, BPR waited until April 27, 1999 to re-initiate contact by letter with the District Attorney's office. The lapse of time from January 14, 1999 to April 27, 1999 is in and of itself a violation of the statute of limitations. Yet, this was not the final delay BPR still waited until July 6, 1999 to issue administrative findings and the Department claimed at the time of the hearing they still have no response from the District Attorney's office which changes the prosecutorial determination received on January 14, 1999.

In response to failing to meet the statute of limitations the Department claims that the circumstances surrounding the request for prosecutorial determination and the contrary reports they claim to have received for the District Attorney's Office provide for a just cause exception to the statute of limitations. It is the position of the Association that the Department waived the just cause exception simply by failing to even initiate subsequent conduct with the District Attorney's Office until after the statute of limitations had already run. Furthermore, it is alleged that the April 27, 1999 correspondence was an attempt to do nothing more than extend the statute of limitations, which the department knew it had already violated.

In the only decision on this issue Arbitrator Mountz applied the statute of limitations strictly against the department saying that the department bears the burden of proof of presenting facts in support of its assertion that an exception exists to the 120 day statute of limitations. In this case the Department bears the burden of proof that just cause existed for violating the sixty (60) day statute of limitations. Yet, the evidence that exists shows a written prosecutorial determination was received,

6

which was not even questioned for over three (3) months, as the Department willfully violated the statute of limitations for no apparent reason.

The Department has clearly failed to meet the burden of the just cause exception, which brings us to the second procedural issue as to whether Article 25, Section 7, (4), applies to dismissals. If as the Association argues Section 26, Section 7 (4) applies all disciplinary action should be dismissed.

The contract provision in question here is the remedy section under Article 26. This section is to kick in when the time limits provided for by the statute of limitations are not met. As discussed above, it is the position of the Association that the Department clearly and willfully violated the statute of limitations. So, the next question is whether the remedy afforded by subsection (4) is applicable in this case.

The Association believes this provision is applicable in this case for two reasons. First, the position of Tpr. Scott in terms of his status with the Department is suspension without pay pending the determination of the Arbitrator as to dismissal. So in fact, Tpr. Scott is in the exact position that the clear language of the section prohibits. The second reason this remedy section applies to Tpr. Scott is that at the time the section was negotiated it was the intent of the parties that the remedy section would be applicable in all severe cases of discipline for which a time period was a part of the disciplinary penalty.

In a letter from Cpt. Frank H. Monaco, Commanding Officer of Troop B, dated January 27, 2000 Tpr. Scott was informed that his duty status was suspension without pay. This suspension without pay began immediately and has remained in effect to this date. As, Article 26, Section 7 (4) above states if the time limits are not met no discipline in the form of suspension without pay may be imposed. It seems clear that this six (6) month status of suspension without pay is discipline. While

7

it is the position of the Association that the statement "suspension without pay" encompasses in a very real manner all sever discipline as could be contemplated by the Department in which a loss of pay is a result, in this case the Department in its own memorandum clearly placed Tpr. Scott on a duty status of suspension without pay. This discipline of suspension without pay came after a clear and willful violation of the statute of limitations and as such all disciplinary action should be dismissed.

While it seems clear the Department has violated the most simple and clear meaning of subsection 94) by placing Tpr. Scott on suspension without pay, which is explicitly not allowed under Article 26, the Association feels it necessary to reach a full and accurate definition of Article 26, Section 7 (4).

At the hearing, the Association presented testimony by Cpl. Paul McCommons, the immediate Past-President of the PSTA, who negotiated with the Department over the language in Article 26, Section 7 (4). Cpl. McCommons testified that in fact this language was intended to deal with discipline that could ultimately lead to dismissal or suspension. The belief from the negotiations was that if the Department violated the time limits, it was a violation of due process and they could impose no more than a written reprimand, certainly they could not impose a stricter penalty than suspension after violating the time limits. The Department through their witnesses even acknowledged that the PSTA is sophisticated when it comes to bargaining over these provisions, and that PSTA's main overriding concern was to cut down on the time these investigations took to be completed especially in the most serious cases. Article 26 clearly contemplates time limits for serious discipline like court martial and to say that the remedy section would not apply to dismissal seems almost ludicrous. If the argument of the Department were to be accepted on this issue, the result would be that the PSTA

8

is of the position that if you violate the time limits you cannot suspend without pay but you can terminate.

The position of the Association is that Article 26 encompasses all discipline for which there is a loss of pay. The time limits provide a guideline to the Department as to what form of discipline it can affect after the statute of limitations has run. This guideline says no discipline in the form of suspension without pay may be imposed if the time limits are not met. Clearly, if the Association would want to prohibit a suspension after the time limits, it would most definitely want to prohibit a dismissal after the time limits expired. If anything allowing the Department to have the leverage to terminate after it violated the time limits seems to violate the entire idea of due process. The Department cannot be in a position to say well we were going to suspend this Trooper, but the time limit has expired so we have to fire him.

Therefore, based on the foregoing, because the Department violated the sixty (60) day statute of limitations to issue findings after receipt of a prosecutorial determination, because they imposed discipline specifically not allowed in the form of a suspension without pay, and because Article 26 clearly contemplates all forms of severe discipline including dismissal in the remedy section, this grievance should be sustained and the appropriate remedy should be granted.

## POSITION OF THE EMPLOYER

The provisions of Section 7, (4) were negotiated between the parties in 1993. Maj. Robert Einsel and Lt. Col. Thomas Coury, who represented the Commonwealth in the negotiations, testified that the parties agreed during these negotiations that dismissals were not covered in the "remedy" language contained in Section 7, (4) of the contract.

When one reads the contract provision in dispute, one can readily see that the agreement of the parties, as testified to by Einsel and Coury, is reflected in the contract language.  The relevant section reads:

> "If the aforementioned time limits are not met, no discipline **in the form of a suspension without pay** may be initiated." (Emphasis added).

The language utilized obviously means that only that discipline that consists of a suspension without pay is barred when the time limitations of an investigation are exceeded, i.e. there is no penalty in the contract if time limitations are exceeded and the penalty to be imposed is a dismissal, demotion or transfer. (i.e. anything other than a suspension without pay.)  To read Section 7, (4) otherwise is to not give effect to the phrase "in the form of a suspension without pay" that follows the word "discipline".  Indeed, if the parties had not modified the word "discipline" in Section 7, (4) the PSTA would have had an excellent argument that no discipline of any type could be initiated. However, that is not the case, and despite former PSTA President Paul McCommons' testimony to the contrary, the modification was obviously placed into the contract to give the Union relief in most cases where time limitations were exceeded (i.e. those involving suspension without pay penalties), but permit the Department to exceed the limitations in more difficult cases, (i.e. dismissal or demotion cases).

The testimony presented by the Department as to the meaning of Section 7, (4) is also more credible than that presented by the Union.  Cpl. Paul McCommons, who was involved in the negotiation of the pertinent language for the PSTA, testified that the language in Section 7, (4), was awarded by Arbitrator Schwartz.  However, the Department clearly showed that this was not the case that, in fact, the language was negotiated by the parties <u>after</u> the Award of the 1992-1995 contract,

10

(i.e. the "DiLauro" Award). Cpl. McCommons also conceded that he may have been wrong about the circumstances under which the language in Section 7, (4) came about. Since Cpl. McCommons had so little recollection of the events surrounding the negotiations of the language, it is only fair to conclude that he was also mistaken about the agreement the parties reached on the issue, particularly given the clear meaning of the language in Section 7, (4).

On the other hand, Maj. Robert Einsel, who testified for the Department, testified convincingly that the language in Section 7, (4) resulted from negotiations between the parties. Maj. Einsel testified that the penalty arrived at by the parties for violating the time limitations was limited to those circumstances where only a suspension without pay was imposed. That is why the word "discipline" in Section 7, (4) was modified by the words "in the form of a suspension without pay." On cross-examination, Maj. Einsel testified again that it was the agreement of the parties that dismissals were not subject to the penalty imposed in Section 7, (4). Col. Coury confirmed Maj. Einsel's recollection about the negotiations, also testifying that the parties reached an agreement that the penalty would stand even though the time limitations had been exceed, in all cases except those involving the penalty of a suspension without pay.

The Department maintains that even though the limitations period contained in Article 26, Section 7, (1), was exceeded, it had just cause for exceeding the time limits. Just cause existed in this case because the Department was trying to clarify a prosecutorial determination it had received from the Washington County DA regarding the criminal case against Tpr. Scott.

As Lt. Carnahan testified and Exhibit "2" demonstrate, the Department had received a prosecutorial determination from a Washington County Assistant District Attorney, Paul Petro, in late 1998 that Tpr. Scott should be charged with insurance fraud. Then less than two months later,

the District Attorney, John Pettit, informed the State Police that the filing of charges would be inappropriate, because Scott's attorney paid Erie Insurance Company the $15,353.00 Scott had received from the Company for his insurance claim. However, the prosecutor was unable to explain why charges could not be filed and could not explain the "statutory authority" upon which he relied for his decision. Therefore, when the BPR investigation was nearing completion, the investigator attempted to obtain clarification from the prosecutor, particularly with regard to the issue of whether there was enough evidence to charge Scott, if restitution had not been paid. The prosecutor agreed to provide this review of the case when he met with a BPR investigator or April 27, 1999, but thereafter would not meet with the investigator or his supervisors, or provide them with a follow-up decision regarding the criminal charges, despite attempts by BPR to arrange a meeting.

Because of the failure of the prosecutor to provide a proper review of the case, the time limitations for completing the BPR investigation and adjudication were exceeded. The attempts by the Department to get a review of the case by the prosecutor, combined with the divergent views of the DA and his assistant regarding the criminal prosecution, and the failure of the DA to explain his decision, taken together constitute just cause for the delay in adjudicating the administrative case against Tpr. Scott.

It should be noted that the argument the Commonwealth advances in this case is different than that advanced in the case of Tpr. Scott Brown, whose arbitration award at No. 98-DS-00678 was submitted by the PSTA into evidence. In Brown, the Commonwealth argued that the case fell within the paragraph no. 1 exception of Section 7. The arbitrator found that the Brown case did not involve "alleged criminal conduct" nor was there a valid "request for a prosecutorial determination . . . ." Here, there is no question that there is alleged criminal conduct and that a prosecutorial determination

12



was sought. However, the Department is requesting that the arbitrator, under paragraph no. 4 of Section 7, make a determination as to whether the circumstances warranted the Department exceeding the time limitations, because of the unusual nature of the prosecutorial determinations here and the questions remaining once they were issued. Because this is a "just cause" question under Section 7, (4), and not a question arising under Section 7, (1), the <u>Brown</u> decision does not apply.

Wherefore, for the above reasons, the Pennsylvania State Police respectfully requests that the Arbitrator rule that this matter is arbitrable in that the penalty provisions of Section 7, (4), do not apply in a dismissal case, or alternatively, that the State Police had "just cause" for exceeding the time limitations contained in Article 26.

## FINDINGS AND DISCUSSION

The issue in the within grievance is a straight-forward matter of contact interpretation. The rule primarily to be observed in the construction of written agreements is that the interpreter must, if possible, ascertain and give effect to the mutual intent of the parties. The collective bargaining agreement should be construed, not narrowly and technically, but broadly so as to accomplish its evident aims. In determining the intent of the parties, inquiry is made as to what the language meant to the parties when the agreement was written. It is this meaning that governs, not the meaning that can possibly be read into the language.

The first issue to be addressed is whether the Commonwealth failed to adhere to the time limitations set forth in Article 26, Section 7. However, there is no need to delve into a detailed analysis as to the various dates on which certain actions occurred inasmuch as the Commonwealth admits that it exceeded those time limitations. It argues instead that it has met its burden of proving

"just cause" existed for a waiver of those time limitations for completion of the BPR investigation. I disagree.

The Commonwealth asserts that it was attempting to secure a clarification of the prosecutorial determination issued by the Washington County District Attorney which is what caused the delay in completing the BPR investigation. The reason cited for the need for clarification was an earlier conversation with Assistant District Attorney, Paul Petro, purportedly stating that he believed the Grievant and two accomplices should be prosecuted for criminal fraud and conspiracy. However, I believe "securing a clarification" is a very poor choice of words for describing the actions of the Commonwealth. What it actually was attempting to do was obtain a totally different result from the District Attorney's office, i.e. a recommendation in favor of prosecution.

Be that as it may, any evidence of conversations with Assistant District Attorney Petro is hearsay, and under these circumstances cannot be admitted under the guise that arbitration follows a more lax interpretation of the rules of evidence. Moreover, it is my experience that Assistant District Attorneys (as well as Assistant U.S. Attorneys) are always much more aggressive in recommending prosecutions then their superiors. They like to prosecute cases, and they do not gain experience or notoriety by declining to prosecute.

More importantly, however, to the extent Mr. Petro actually made the statements attributed to him, he was obviously overruled by his superior, District Attorney Pettit. On December 16, 1998 District Attorney Pettit verbally informed Cpl. Richard W. Gluth that it would be inappropriate to file criminal charges against the Grievant. Then on January 14, 1999 District Attorney Pettit issued a clear and unequivocal written determination to the Commonwealth indicating that he would not prosecute this case. Continuing efforts by the BPR investigators to try and convince the District

14

Attorney to change his mind after he had issued a written determination was, at best, wishful thinking. It is clear that the District Attorney decided to wash his hands of this matter for a variety of reasons and refused to even meet with the BPR investigators. He made his decision on January 14, 1999 and was sticking with it. As such, the failure to complete the BPR investigation in a timely manner did not rest upon any lack of action on the part of the District Attorney but, rather, strictly with the Commonwealth investigators.

Furthermore, while the Commonwealth claims its "clarification" efforts justified a waiver of the time limitations, the evidence reveals that it was not until April 27, 1999 (more than 100 days after District Attorney Pettit issued his written prosecutorial determination) that investigators from BPR first met with him to seek their "clarification" of his decision. This action itself is well beyond the sixty (60) day statute of limitations required for the completion of the investigation and is further justification as to why the Commonwealth has not established just cause for a waiver of the time limitations.

Article 26, Section 7 (4) is a penalty provision that is available to the Association when the time limits provided for in Article 26, Section 7 (1) are not met. The Commonwealth argues, however, that the remedy language is limited strictly to suspensions without pay and inasmuch as the Grievant was "dismissed" there is no penalty in this situation for failing to adhere to the time limitations. I disagree.

The first issue to be addressed is a determination of the Grievant's correct employment status. There are two critical letters that are determinative of this issue. First, on January 27, 2000 Cpt. Titler sent a memorandum to Cpt. Monaco indicating that upon the recommendation of the Disciplinary Officer with the concurrence of the Deputy Commissioner of Administration, the

15

Grievant "shall be dismissed" from the Pennsylvania State Police. However, his letter goes on further to indicate that pending the deadline for filing a timely grievance and if applicable, a subsequent decision by an arbitrator, the Grievant shall be placed in a **"suspension without pay status"** due to the fact that the Commissioner has determined the penalty to be dismissal.

In a memo dated January 27, 2000 Cpt. Monaco specifically advised the Grievant as to his employment status:

> **"You are immediately suspended without pay. This suspension without pay will remain in effect pending final resolution of all of the circumstances surrounding the recent investigation of your conduct."**

Contrary to the Commonwealth's argument, if the Grievant's employment status was strictly a "dismissal" there would have been absolutely no need whatsoever to indicate he was also on a suspension without pay status, or to take any other action. Dismissal is the most final and definitive action an employer can take against an employee. There is no need after dismissing an employee to qualify that status in any fashion, even if the employee has certain rights under the collective bargaining agreement to challenge and eventually overturn that determination.

It is clear, therefore, that the Commonwealth actually viewed the Grievant's employment status to be a "suspension without pay" and, more importantly, that he would remain in that status pending final resolution by an arbitrator. Furthermore, there is no evidence of any action by the Employer ever changing that contingent employment status, even to this date. As such, the clear and unambiguous language of Section 7, (4) prohibits discipline in the form of a suspension without pay from being initiated against the Grievant because the Commonwealth failed to adhere to the stated time limitations for completion of its investigation.

16

Finally, inasmuch as this determination is fully dispositive of the within grievance, there is no need, as the Association requests, for this arbitrator to reach a determination of the additional question of whether Section 7, (4) would also encompass dismissals.

## AWARD

The grievance is sustained.  The Employer is prohibited from imposing discipline in the form of a suspension  without pay against the Grievant arising out of the allegations of insurance fraud.

The Grievant is to be immediately reinstated to his former position together with the payment of all lost wages and benefits.

Jurisdiction shall be retained in order to ensure compliance with this Award.

Date: _Aug. 14, 2000_
     Pittsburgh, PA

_____
Ronald F. Talarico, Esq.
Arbitrator


RECEIVED
AUG 16 2000
PENNSYLVANIA STATE
TROOPERS ASSOCIATION

IN THE MATTER OF ARBITRATION BETWEEN

COMMONWEALTH OF PENNSYLVANIA,
PENNSYLVANIA STATE POLICE

**OPINION AND AWARD**

AND

(Trooper David W. Boggs)
**Specialized Position
Substantive Arbitrability**

PENNSYLVANIA STATE TROOPERS
ASSOCIATION

GRIEVANCE:    **01-CI-108  (David Boggs)
PSTA  State Police  D-201**

HEARING:    **August 16, 2001
Harrisburg, Pennsylvania**

BEFORE:    **Lynne M. Mountz
Impartial Arbitrator**

APPEARANCES:    **Commonwealth of Pennsylvania, Pennsylvania State Police:
Mark Grab
Bureau of Labor Relations**

**Pennsylvania State Troopers Association:
Sean Welby, Esquire
LIGHTMAN & WELBY**

The Parties selected the undersigned Arbitrator to hear and decide the instant dispute. A hearing was held in Harrisburg, Pennsylvania on August 16, 2001, at which time both Parties were afforded full opportunity to present testimony, examine and cross-examine witnesses and introduce documentary evidence in support of their respective positions.

Post-hearing briefs were submitted to the Arbitrator. The briefs were timely filed and received on November 7, 2001 whereupon the record in this matter was closed.

## **Background**

The instant dispute arises from a Grievance filed on September 20, 2000 by Trooper David W. Boggs (Grievant) after he had been removed from his specialized position as a fire marshal. (Joint Ex. 2). The removal is alleged to be a violation of the provisions of the Collective Bargaining Agreement in effect between the Pennsylvania State Police (PSP or Department) and the Pennsylvania State Troopers Association (PSTA).

The Grievant has been a member of the Pennsylvania State Police for almost twenty years. The Grievant has had a long-standing interest in fire and arson investigation and was assigned as an alternate Fire Marshal for Troop D in Butler, Pennsylvania in 1987. In 1991, he applied for and was assigned to a vacancy as a Fire Marshal in Troop D.

Performance evaluations for the Grievant in his capacity as a Fire Marshal have contained overall ratings of "excellent," "commendable" or "outstanding" from 1992 until May 2000, the last time the Grievant was evaluated. (Association Ex. 3). In the summer or early fall of 1999, however, Captain Sidney A. Simon, the Commanding Officer at Troop D, Butler, became aware that Lieutenant Susan Bell, the Crimes Section Supervisor, had some concerns regarding the Grievant's performance.

On February 25, 2000, Lt. Bell issued a Supervisor's Notation to the Grievant advising him that he had violated Department policy and disregarded his chain of command.[1] A second Supervisor's Notation signed by Sergeant Robert Lizik followed

---

[1] The text is as follows: "You recently sent a letter to the 911 center to have them page you directly when a fire company requested the PSP fire marshal. This is contradictory to Troop D's policy and shows total disregard for chain of command. You do not set policy for the State Police. Before you respond to an incident you must get approval from the on duty supervisor.

on May 8, 2000 regarding the Grievant's failure to respond when he was "on-call."[2] Lt.

Bell issued the Grievant a third Supervisor's Notation on August 23, 2000 concerning his

demeanor.[3]    A fourth and final Supervisor's Notation was prepared by Lt. Bell on

September 6, 2000 advising that the Grievant had again failed to respond when he was

the "on-call" Fire Marshal.[4] (Joint Ex. 2, pp. 2 – 3).

    At some point later in the day on September 6, 2000, the Grievant was

called into Captain Simon's office.  Captain Simon informed the Grievant that due to his

ineffectiveness, his services as a Fire Marshal would no longer be necessary.  Captain

---

In the future you will not send any correspondence or issue directives to other agencies without going through the chain of command."

[2] The text is as follows: ". . . according to the Fire Marshal on-call duty roster, you were scheduled to be the on-call Fire Marshal for Armstrong and Butler Counties for the period 6-12 May, 2000.  On 05/06/00, several attempts were made to contact you at the request of Kittaning PD regarding several suspicious fires, both through paging and phoning, but with negative results.  As a result, another Trooper had to be assigned to these incidents resulting in a total of 14 hours overtime.  Please be advised that it is your responsibility to promptly return your work related pages and/or messages when it is your on-call period, or appropriate prior arrangements must be made.  I am certain that this will not occur again, but should it re-occur, appropriate measures will be employed to correct the situation."

[3] The text is as follows: ." You were previously verbally counseled relative to your demeanor when dealing with other members and Fire Departments.  This occurred approximately 14 months ago. (i.e. Tpr. Wilson)

It has recently come to my attention that Fire Chief Skarmack of Sharon related he did not want you back in his area in a Fire Marshal capacity.  Chief Skarmack related you belittled him and displayed a very arrogant attitude.

This is not the first type of complaint I have received relative to your personality and how you express yourselves [sic] to other departments, members and outside agencies.  This is having a negative impact on the operation of the Fire Marshal Unit.  Additionally, you have previously been counseled relative to various other items related to your job.

Since I have never received any other complaints or discussions about any of the other Fire Marshals and Alternates, I find it necessary to reevaluate your effectiveness in this unit.  Effective with the third quarter "Call Out" list for October, November & December, you will not be included.  You are to continue performing your required duties.  If other issues relative to your work and personal conduct arise during this time, your effectiveness in the Fire Marshal Unit will be given a final review."

[4] The text is as follows: "On 09/02/2000 you were the on call fire marshal.  PSP New Castle called you relative to a fire, which occurred near McConnells Mills.  You then made several false statements to the PCO, then you did not respond to the fire.  While your physical response to the fire may or may not have been needed, you did not make any effort to contact the Fire Department requesting the information on the incident or why they called PSP and requested our assistance.

You also told the PCO you were to "only" handle fires in Butler and Armstrong counties, which was not true.  You also stated you were on your way to your son's ball game and you shouldn't have been called.

This incident showed your lack of honesty and desire to perform your assigned job function."

Simon permitted the Grievant to plead his case, but the decision to remove the Grievant from his position was final.

By memorandum dated September 7, 2000, Captain Simon informed Headquarters Staff and Station Commanders of the removal. The subject of the memorandum was listed as "Assignment and Transfer." The reference cited was "FR 3-2, Section 2.04, General Transfers." The body of the memorandum stated that effective September 11, 2000 Trooper David W. Boggs would be transferred and assigned from Butler Headquarters – Fire Marshal to Butler Station – Patrol Unit. (Association Ex. 1).

On September 20, 2000, the Grievant filed the instant Grievance. He alleged a violation of the contract provisions regarding discipline, stating:

> On 09-06-00, the Grievant was informed by Captain Sidney A. Simon that due to his ineffectiveness as a Fire Marshal, his services were no longer required in that capacity. That the last day as a Fire Marshal would be on 09-08-00, and that he would report for duty in the patrol unit of Troop D, Butler on Monday 09-11-00 @ 0800 hrs.
>
> The Grievant was informed that due to his rudeness and demeaning attitude toward fire chiefs and not responding to a fire scene immediately when called out attributed to the Fire Marshal being ineffective.
> (Joint Ex. 2).

The Grievance remaining unresolved between the Parties it proceeded to arbitration.

## Issue

The issue presented is whether the removal of the Grievant from his specialized position as a Fire Marshal is substantively arbitrable.

**Contract Provisions Cited**

ARTICLE 26
DISCIPLINE

(The entire Article is cited and is printed in its entirety in Joint Ex. 1, pp. 30 - 37)

ARTICLE 28
GRIEVANCE PROCEDURE

<u>Section 1.</u>        Scope

Grievances are limited to maters involving interpretation of this Agreement including all matters of discipline.  Matters dealing with Heart & Lung claims and compensation/reimbursement issues will be addressed with limitations as directed in Sections 9 and 10.  (Joint Ex. 1, p. 37).

. . .

<u>Section 8.</u>        Arbitrator Responsibility

Issues concerning timeliness or procedurally defective cases or matters on arbitrability will be decided prior to hearing the merits of the grievance.  The arbitrator shall neither add to, subtract from nor modify the provisions of this Agreement or of the arbitration awards.   The arbitrator shall confine himself/herself to the precise issue submitted for arbitration and shall have no authority to determine any other issues not so submitted to him/her.  (Joint Ex. 1, p. 43).

ARTICLE 37
SPECIALIZED POSITIONS AND TRAINING

(The entire Article is cited and is printed in its entirety in Joint Ex. 1, pp. 53 – 60)

ARTICLE 38
TRANSFERS

. . .

<u>Section 3.</u>        When an involuntary intratroop transfer must be made, the member to be transferred must be the member who has the least seniority in his/her rank in that station (provided he/she has not been moved involuntarily in the previous six months) except in cases of promotion, in conjunction with the imposition of discipline or where there is a need for special skills or specialty.

When the least senior member is transferred under this Section, the Department shall not be required to consider the seniority of any member concurrently or subsequently transferred into that station. (Joint Ex. 1, pp. 60 – 61).

## Cited Field Regulations

### FR 3-2.04  GENERAL TRANSFERS

A.  <u>Applicability</u>:  Any member may be transferred anywhere within the Department whenever it is determined that such transfer(s) is necessary to:

    1.    Fulfill the requirement(s) for additional services.

    2.    Fulfill the need(s) for specific or specialized skills.

    3.    Accomplish any other need(s) of the Department.

B.  <u>Procedures</u>:  All general transfers require one of the following approvals, dependent upon the nature of the transfer:

    1.    Intratroop:  General transfers within Troops may be made at the discretion of the Troop Commander, consistent with the provisions of existing labor agreements in effect and with the approval of the Area Commander.  The exception is for newly-graduated Troopers during their Coach-Trainee period, in which case no such approval is required.

    . . .    (Association Ex. 2)

### FR 3-3.08  PROCESSING A DISCIPLINARY ACTION

A.  <u>Initiation</u>:  All formal disciplinary actions against a member shall be initiated through the preparation and submission of a DAR. . . .

B.  <u>Copies</u>:  Immediately upon initiation of a DAR, the initiating officer shall provide a copy of the DAR to the accused member who shall acknowledge receipt thereof. . . .

C.  <u>Response</u>:  Any member who has acknowledged receipt of a DAR may within ten days thereafter, submit to their Troop Commander or Bureau Director for forwarding to the Disciplinary Officer, a written response. . .

D.  <u>Review</u>:  The Disciplinary Officer shall review all documentation as stated in this regulation. . . .

E.    Final Action:  The Disciplinary Officer shall indicate on the DAR the final action, . . .

F.    Dismissal:  If a member's misconduct results in their dismissal, . . .

## Position of the Parties

PSP

The PSP argues first that this case involves a *reassignment* of the Grievant from his specialized position as a Fire Marshal.  They assert that at the arbitration hearing PSTA raised for the first time an alleged violation of Article 38 involving *transfers*.  The Grievance alleges only a violation of the contractual provisions dealing with discipline.  For this reason alone, no issue regarding transfers should be considered.  However, the PSP asserts that the record establishes that notwithstanding an erroneous reference to FR 3-2, Transfers, in his memorandum, Captain Simon clearly intended to remove the Grievant from a specialized position.  He was not initiating an Intratroop Transfer.

Captain Simon testified that the reference to FR 3-2 was added to the memorandum inadvertently by his administrative staff, who apparently utilized a "form" when the document was prepared.  He further testified that he did not follow the mandates of FR 3-2 because he was not transferring the Grievant.  The Grievant was not removed from his position because of staffing shortages elsewhere within the Department, but because of his ineffectiveness as a Fire Marshal.

The PSP next argues that a reassignment from a specialized position is not substantively arbitrable.  Although two interest arbitration awards did provide contract language dealing with the selection of members for a specialized position, no award or any collective bargaining between the Parties produced contract language governing the

removal from a specialized position[5].  Specifically, there is no language that requires the Department to have cause to remove a member from a specialized position; it is simply within the prerogative of management.  PSTA has attempted to modify the contract language as evidenced by a contract proposal submitted during the period of bargaining that resulted in the current Agreement.  That proposal would add a requirement that the removal of a member from a specialized position be for cause.  (Commonwealth Ex. 2). The requested language was not incorporated within the Agreement and now PSTA is trying to gain through arbitration what it could not achieve through bargaining.

The PSP further notes that for over twenty years they have removed members from specialized positions without protest from PSTA.  Additionally, there is a ten year period of time in which arbitrators have determined that the removal of a member from a specialized position is not arbitrable unless it is linked to a disciplinary action.  There has been no formal discipline initiated or taken against the Grievant, thus the matter can not be found arbitrable on that basis.

<u>PSTA</u>

PSTA first asserts that the issue of substantive arbitrability goes only to the authority of the Arbitrator to decide the merits of the grievance.  It does not encompass whether the requested interpretation of the contract has any merit.  There is a strong presumption in favor of arbitrability and a case should be dismissed for lack of arbitrability only when it is clear that the arbitration clause can not be interpreted to cover the grieved dispute.

---

[5]  Article 37, Section 4 does provide for certain seniority rights when removal from a position is a result of the reduction of personnel in that position or elimination of the specialty.  Neither of these situations is present in the instant matter.

8

The arbitration clause in the Agreement covers "all matters of discipline." The real question presented in this matter is whether the transfer of the Grievant was in fact discipline. The Department can not avoid the "just cause" standard merely by characterizing what is a disciplinary action as something other than discipline.

On September 6, 2000, the Grievant was issued his third Supervisory Notation for violation of the Troop Call Out policy. This action occurred after he had been previously warned that further violations of the policy would result in appropriate measures being taken. In conjunction with the Notation, the Grievant was subject to an involuntary intratroop transfer. Since the Grievant was not the least senior Trooper at the station and there was no demonstrated need for someone of his skills and specialty in the Patrol Unit, the only contractually permissible transfer possible would be one made in conjunction with discipline.

Additionally, according to PSTA, the Grievant's performance evaluations uniformly establish that there were no performance problems in this case. Rather, it was the Supervisor's Notation and the alleged misconduct contained therein that led to the decision to transfer the Grievant. The fact that the Department did not initiate formal disciplinary procedures in the nature of a BPR investigation is irrelevant. In other words just because the Grievant's transfer was initiated in lieu of the formal disciplinary process does not change the character of its disciplinary nature. Accordingly, the Grievant must be afforded the ability to defend himself under the just cause standard.

## Discussion

The essential facts in this matter are not in dispute. The Grievant has been removed from his specialized position as a Fire Marshal in Troop D and returned to patrol duties in the same Troop. Prior to his removal the Grievant had received consistently high performance evaluations from his supervisors. Beginning in the summer or fall of 1999, however, Captain Simon became aware of some issues regarding the Grievant's performance. The Grievant received four (4) Supervisor's Notations in the period of time between February 2, 2000 and September 6, 2000. On the latter date, Captain Simon informed the Grievant that due to his ineffectiveness he would no longer be permitted to serve as a Fire Marshal. The instant Grievance ensued.

The Commonwealth asserts that the Grievance is not substantively arbitrable because removal from a specialized position is within the discretion of management. PSTA contends that the Grievance is arbitrable because the Agreement does cover involuntary intratroop transfers and/or the removal was in fact a disciplinary action even though it was not labeled as such. The Parties submitted fourteen (14) arbitration awards as relevant precedent in this matter.

Article 28.1 of the Agreement states that "grievances are limited to matters involving interpretation of this Agreement including all matters of discipline." This provision expressly defines the scope of the subject matter of the grievance/arbitration procedure. Notwithstanding the general presumption in favor of arbitrability, therefore, unless a matter is one involving interpretation of the Agreement or a matter of discipline, it is not substantively arbitrable by definition.

The Grievant is grieving his removal from a specialized position as a Fire Marshal. Specialized positions are the subject matter of Article 37 of the Agreement. Section 1 of that Article defines a specialized position as "one designated on Troop/Bureau rosters as of January 1, 1997 which requires special training or ability that is not required for basic patrol unit assignments whether the specialized position assignment is performed on a permanent or part time basis."

The language of Article 37 was modified substantially first by the Act 111 Interest Arbitration Award of 1989 issued by Arbitrator Thomas DiLauro (Commonwealth Ex. 1) and again by the Act 111 supplemental Interest Arbitration Award of 1997 issued by Arbitrator Stanley Schwartz (Commonwealth Ex. 1). In 1989, Arbitrator DiLauro provided language regarding seniority rights for selection, the right of the appointing officer to exercise particularized judgment, specialized training, and the opportunity to grieve the interpretation, application and implementation of the sections dealing with seniority, non-selection and training. Arbitrator DiLauro did not, however, provide any language to govern the removal of a member from a specialized position.

In 1997, Arbitrator Schwartz issued language in an Award that essentially modified Article 37 to its current form. Arbitrator Schwartz established a detailed process of testing and evaluation for selection into a specialized position. He also incorporated a procedure to be followed when the Department reduces the number of members in a given specialty or eliminates the specialty in its entirety. Significantly, Arbitrator Schwartz, like Arbitrator DiLauro, also did not provide language to govern the removal of a member from a specialized position.

Clearly, there is no provision in Article 37 or elsewhere in the Agreement that prescribes a procedure that must be followed to remove a member from a specialized position. In particular there is no requirement that cause must be shown before a member can be removed from a specialized position.[6] In reviewing the language of Article 37 and determining the arbitrability of a member who had been removed from two specialized positions because of an injury, Arbitrator Michael E. Zobrak concluded that, "After carefully considering this pertinent language, it is concluded that there is nothing in the Agreement that allows for a grievance to be filed protesting such actions." Commonwealth and PSTA (Dragan), Case Nos. 00-CI-86 and 00-CI-386 (Zobrak, 2000), p. 6. Arbitrator Zobrak noted that such a conclusion was consistent with that of numerous arbitrators who had previously determined that a bargaining unit member's removal from a specialized position was grievable only if it was linked to a disciplinary action.

PSTA attempts first to distinguish this case by arguing that the Grievant was not merely removed or reassigned from a specialized position but that he was in fact involuntarily transferred. Since he was transferred within the same Troop, it is asserted that the action constituted an involuntary intratroop transfer and must comport with Article 38 § 3 of the Agreement. That section requires that when an involuntary intratroop transfer must be made, the member with the least seniority in his/her rank in the station must be transferred unless the transfer is to effect a promotion, disciplinary action or a need for special skills or specialty.

---

[6] A PSTA proposal to add a requirement that removal from specialized positions be for cause submitted during the round of bargaining that led to the current Agreement was not ratified by the Parties. (Commonwealth Ex. 2).

In making this argument, PSTA relies upon the official notice issued by Captain Simon on September 7, 2000, that states that the Grievant would be "transferred and assigned" from the Butler Fire Marshal Unit to the Butler Patrol Unit. That document also references FR 3-2, Section 2.04, General Transfers.

In his testimony, Captain Simon admitted that the use of the word "transferred" and the reference to FR 3-2, Section 2.04 in his notice was erroneous. The Captain testified that he did not draft the notice. The notice was prepared by administrative staff who had simply followed a form that had been used for transfers. Moreover, the Captain stated that it was not uncommon for staff to use the words "reassign" and "transfer" interchangeably without referring to the type of transfer contemplated under Article 38. Captain Simon further testified that he intended only to remove the Grievant from a specialized position and that the word "reassignment" was clearly more appropriate than "transfer."

Notwithstanding this regrettable lapse in the use of terminology, I am persuaded that Captain Simon did not intend or in fact involuntarily transfer the Grievant within the context of FR 3-2, Section 2.04 or Article 38 of the Agreement. Captain Simon expressed familiarity with these provisions and indicated that he had previously followed the procedures set forth therein when he had ordered an involuntary intratroop transfer. That transfer was occasioned by the need to move personnel from one station to another within the Troop. Captain Simon candidly admits that he did not adhere to the provisions of FR 3-2 in this case. The basis for his non-compliance is simply that he never intended to effectuate a "transfer".

13

Additionally, the Grievance does not allege a violation of Article 38. The only contractual violation alleged is one involving discipline.

From all of these factors it is determined that the Grievant was not involuntarily transferred within the Troop. He was removed from his specialized position as a Fire Marshal and assigned to patrol duty. As such, his removal is not grievable under Article 38.

Therefore, consistent with Articles 28 and 37 and numerous arbitral interpretations thereunder[7], the only basis to find this matter arbitrable is if there is evidence that the Grievant's removal from his specialized position was disciplinary in nature.

Turning to the facts of the case, it is noted at the outset that the Department had initiated no formal disciplinary action against the Grievant at or near the time he was removed from his position as a Fire Marshal. The Grievant had not been a subject of a Bureau of Professional Responsibility (BPR) investigation and had not been issued a Disciplinary Action Report (DAR). Nor is there evidence to support a finding that removing the Grievant from his position as a Fire Marshal was de facto discipline in lieu of this formal procedure.

The Grievant had served as a Fire Marshal in Troop D from 1991 until his removal in September 2000. His performance evaluations while serving in this capacity reflect overall ratings of "excellent," "commendable" and "outstanding" through mid-

---

[7] See, for example, Commonwealth of Pennsylvania and PSTA, Cases No. 00-CI-86 and 00-CI-386 (2000, Arbitrator Michael E. Zobrak); Commonwealth of Pennsylvania and PSTA, Case No. 00CI-380 (2000, Arbitrator Ronald F. Talarico); Commonwealth of Pennsylvania and PSTA, Case (Rogers) (1999, Arbitrator Ralph H. Colflesh, Jr.; Commonwealth of Pennsylvania and PSTA, Case No. 97-CI-0213 (1998, Arbitrator John Skonier); Commonwealth of Pennsylvania and PSTA, Case No. 94-CI-725/95-DS-043 (1995, Arbitrator Carl F. Stoltenberg); Commonwealth of Pennsylvania and PSTA, Case No. 95-CI-76

May 2000. Certainly throughout the beginning of his tenure, the Grievant enjoyed not only excellent ratings, but the confidence of his superiors as well. Although the ratings continued to be consistently high, the confidence of his superiors apparently did not. On cross-examination, the Grievant admitted that in 1995 his then supervisor thought about removing the Grievant as the Fire Marshal. The Grievant attributed this difficulty to a personality conflict with the supervisor. According to the Grievant he was retained as a Fire Marshal in spite of the personality conflict because of his excellent work.

Captain Simon testified that sometime in the summer or fall of 1999 he became aware that Lieutenant Bell, Crimes Investigation Supervisor, had performance-related problems with the Grievant. Captain Simon stated that at that time he urged Lt. Bell not to take any action but to give the Grievant an opportunity to succeed because of his record as a Fire Marshal. The concerns about the Grievant's performance continued into the year 2000. The Grievant in fact admitted that Lt. Bell questioned his performance throughout that year.

On February 25, 2000, Lt. Bell issued the first of four Supervisor's Notations to the Grievant, this one for failing to follow the chain of command in responding to a fire. A second Supervisor's Notation was issued by Sgt. Robert Lizik on May 8, 2000 advising the Grievant that he had failed to follow the call-out procedures. Lt. Bell issued a third Supervisor's Notation on August 23, 2000, regarding a complaint she had received from a local fire chief about the Grievant's arrogant attitude. Lt. Bell advised in part, "This is not the first type of complaint I have received relative to your personality and how you express yourselves [sic] to other departments, members and

---

(1995, Arbitrator Richard W. Dissen); and, Commonwealth of Pennsylvania and PSTA, Case No. 93-CI-76 (1993, Arbitrator Lewis R. Amis).

outside agencies.  **This is having a negative impact on the operation of the Fire Marshal Unit. . . .**" (emphasis added).  Lt. Bell further stated that if other issues relative to the Grievant's work and personal conduct arose during the third quarter (October, November and December), his effectiveness in the Fire Marshal Unit would be given a final review.  The fourth Supervisor's Notation, issued by Lt. Bell, followed on September 6, 2000, advising that the Grievant had again failed to follow the Department's call-out procedure.

These Supervisor's Notations are not discipline.  They were issued to the Grievant to advise him of work-related problems.  Captain Simon testified that this is one method a supervisor can utilize to bring performance-related issues to the attention of a member.  Clearly, these documents did just that:  Issues relative to the Grievant's effectiveness as a Fire Marshal and the impact he was having in that Unit are in direct correlation to his ability to perform his job.

The Grievant acknowledged that there had been complaints leveled against him by members of outside fire departments and agencies with whom he had worked. The Grievant assumed as before that these complaints were simply the result of personality conflicts.  He also admitted that he had problems in his working relationship with Lt. Bell.  Perhaps most telling however is the Grievant's testimony that while he especially enjoyed working as a Fire Marshal because it was a position of trust, he realized that he had lost that trust over the last couple of years.  In short, the Grievant's effectiveness as a Fire Marshal had been compromised and his removal was performance-related.

The fact that Lt. Bell believed that she had a basis to commence disciplinary action against the Grievant for some of his alleged misconduct does not alter this conclusion. No investigation was initiated and no disciplinary action followed. Captain Simon, having given the Grievant the benefit of the doubt in 1999, ultimately concluded that the Grievant could no longer perform effectively as a Fire Marshal. Consequently, the Captain removed the Grievant from that position in September 2000. Captain Simon testified that he knew that this decision would be devastating for the Grievant. Accordingly, Captain Simon elected not to seek any disciplinary action for allegations of misbehavior or misconduct. The Grievant's removal/reassignment stands alone and was performance-related. It was not disciplinary action for misbehavior or misconduct, nor was it "part and parcel of" [8] or "married to"[9] the same.

The Grievant has a remarkably impressive background and exceptional credentials. Unfortunately, during the latter part of 1999 and throughout 2000 his ability to perform effectively as a Fire Marshal was seriously doubted by his superiors who elected to remove him from that position. On the record established and in view of the limiting language of Article 28, the Grievant's removal from a specialized position is not within the scope of the Agreement and is not subject to the grievance procedure. Accordingly, I am expressly without jurisdiction to consider the merits of the Grievant's

---

[8] See, for example, Commonwealth of Pennsylvania and PSTA, No. 00-CI-86 (Arbitrator Zobrak, 2000), p. 6.
[9] See, for example, Commonwealth of Pennsylvania and PSTA, No. 94-CI-725/95-DS-043 (Arbitrator Stoltenberg, 1995), p. 10.

removal as a Fire Marshal.  The instant dispute is determined to be substantively not arbitrable.

## AWARD

**The Grievance is Denied.**

Dated: January 7, 2002

Harrisburg, Pennsylvania

Lynne M. Mountz, Esquire
Impartial Arbitrator

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

rE:                          June 7, 2000

SUBJECT:            Acting Director, Bureau of Liquor Control Enforcement

TO:                     Captain Leonard H. McDonald
                            Director, Division of Operations
                            Bureau of Liquor Control Enforcement

FROM:                Major Francis E. Koscelnak
                            Director, Bureau of Liquor Control Enforcement

            1.        You are hereby assigned to serve as Acting Director, Bureau of
Liquor Control Enforcement from 0815 hours on Wednesday, June 7, 2000 through 1615
hours on Thursday, June 8, 2000.

FEK/mp

cc:        Deputy Commissioner of Operations
            Captain Ober
            Section Commanders
            District Office Commanders
            Supervisor, Special Investigations Section
            Bureau Administrative Staff
            Executive Officer
            CSSU
            Legal Unit
            File

P 318
1 of 22

# PENNSYLVANIA STATE POLICE / BLCE / HEADQUARTERS
## WEEKLY DUTY ROSTER

STATION: 5400

WEEK OF: 06/03/00 - 06/09/00

| OFFICER'S NAME | | SATURDAY 3 | SUNDAY 4 | MONDAY 5 | TUESDAY 6 | WEDNESDAY 7 | THURSDAY 8 | FRIDAY 9 |
|---|---|---|---|---|---|---|---|---|
| MAJOR FRANCIS E. KOSCELNAK | | DO | DO | 0900-1700 | 0830-1630 DHQ Conf | 0830-1630 | 0830-1630 | 0700-1500 |
| CAPT. LEONARD MCDONALD | | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 |
| CAPT. DARRELL OBER | | DO | DO | 0800-1300 3HR A | 0730-1530 | 0730-1530 CHOICES1000 | 0730-1530 | 0730-1530 |
| SGT. PEARL SWEETING | | DO | DO | 0730-1530- travel IUP | IUP-MTG& RET HBG | 0730-1530- CHOICES MTG | 0730-1530 | PITTSBURGH MTG |
| ALICE BELMONT | AO 1 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |
| MARY PAUL | CS 3 | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 |
| BAMBI DEIMLER | CT 3 | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 |
| KERRY SWARTZ | * CT 3 | DO | DO | AWS DO | 0700-1615 | 0700-1615 | 0700-1615 | 0700-1615 |
| JENNIFER ANDREE | CT2 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |
| JAMES GROB | ITG 2 | DO | DO | A | A | A | A | A |
| CHAD MILLER | CP 2 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |

* AWS

STD—501. 9—86

COMMONWEALTH OF PENNSYLVANIA

RE:                    June 20, 2000

SUBJECT:               Acting Director, Bureau of Liquor Control Enforcement

TO:                    Captain Leonard H. McDonald
                       Director, Division of Operations
                       Bureau of Liquor Control Enforcement

FROM:                  Major Francis E. Koscelnak
                       Director, Bureau of Liquor Control Enforcement

 

       1.     You are hereby assigned to serve as Acting Director, Bureau of Liquor Control Enforcement from 0815 hours on Wednesday, June 21, 2000 through 1615 hours on Thursday, June 23, 2000.

 

FEK/mp

cc:    Deputy Commissioner of Operations
       Section Commanders
       District Office Commanders
       Supervisor, Special Investigations Section
       Bureau Administrative Staff
       Executive Officer
       CSSU
       Legal Unit
       File

**PENNSYLVANIA STATE POLICE / BLCE / HEADQUARTERS**

**WEEKLY DUTY ROSTER**

STATION: 5400

WEEK OF: 06/17/00 - 06/23/00

| OFFICER'S NAME | | SATURDAY 17 | SUNDAY 18 | MONDAY 19 | TUESDAY 20 | WEDNESDAY 21 | THURSDAY 22 | FRIDAY 23 |
|---|---|---|---|---|---|---|---|---|
| MAJOR FRANCIS E. KOSCELNAK | | DO | DO | 0900-1700 PAUD Conf | 0830-1630 DHQ conf | 0830-1630 | 0830-1630 | 0700-1500 |
| CAPT. LEONARD MCDONALD | | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 |
| CAPT. DARRELL OBER | | DO | DO | A | A | A | A | A |
| SGT. PEARL SWEETING | | 0900-1700-CITY ISLAND | DO | 0600-1400 | 0730-1530 | IUP mtg-ret HBG | LEO PRO-ACA | DO |
| ALICE BELMONT | AO 1 | SDO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |
| MARY PAUL | CS 3 | DO | DO | 0800-1600 | 0800-1600 | 0800-1400 | 0930-1600 | 0800-1600 |
| BAMBI DEIMLER | CT 3 | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | A |
| KERRY SWARTZ | * CT 3 | DO | DO | AWS DO | 0700-1615 | 0700-1615 | 0700-1615 | 0700-1615 |
| JENNIFER ANDREE | CT2 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |
| JAMES GROB | ITG 2 | DO | DO | A | 0815-1615 | 0815-1615 | DO#1 Philadelphia | A |
| CHAD MILLER | CP 2 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | DO#1 Philadelphia | 0815-1615 |

* AWS

STD–501, 9–86

COMMONWEALTH OF PENNSYLVANIA

.TE:                    July 5, 2000

SUBJECT:                Acting Director, Bureau of Liquor Control Enforcement

TO:                     Captain Leonard H. McDonald
                        Director, Division of Operations
                        Bureau of Liquor Control Enforcement

FROM:                   Major Francis E. Koscelnak
                        Director, Bureau of Liquor Control Enforcement


      1.    You are hereby assigned to serve as Acting Director, Bureau of
Liquor Control Enforcement from 0815 hours to 1615 hours on Wednesday, July 5, 2000 and
0815 hours to 1615 hours on Friday, July 7, 2000.


FEK/mp

cc:     Deputy Commissioner of Operations
        Captain Ober
        Section Commanders
        District Office Commanders
        Supervisor, Special Investigations Section
        Bureau Administrative Staff
        Executive Officer
        CSSU
        Legal Unit
        File

# PENNSYLVANIA STATE POLICE / BLCE / HEADQUARTERS
## WEEKLY DUTY ROSTER

STATION: 5400

WEEK OF: 07/01/00 - 07/07/00

| OFFICER'S NAME | | SATURDAY 1 | SUNDAY 2 | MONDAY 3 | TUESDAY 4 | WEDNESDAY 5 | THURSDAY 6 | FRIDAY 7 |
|---|---|---|---|---|---|---|---|---|
| MAJOR FRANCIS E. KOSCELNAK | | DO | DO | AWL | Holiday DHQ Conf | 0900-1700 Wyo | 0830-1630 Wyo | 0830-1630 Wyo |
| CAPT. LEONARD MCDONALD | | DO | DO | P | HOLIDAY | 0800-1600 | 0800-1600 | 0800-1600 |
| CAPT. DARRELL OBER | | DO | DO | A | HOLIDAY | 0745-1545 | 0745-1545 | 0745-1545 |
| SGT. PEARL SWEETING | | DO | DO | 0730-1230-3HRS-A | HOLIDAY | 0800-1600 | 0730-1530 | AWL |
| ALICE BELMONT | AO 1 | DO | DO | 0815-1615 | HOLIDAY | 0815-1400 2 HRS AL | 0815-1615 | 0815-1615 |
| MARY PAUL | CS 3 | DO | DO | 0800-1600 | HOLIDAY | 0800-1600 | 0800-1600 | 0800-1600 |
| BAMBI DEIMLER | CT 3 | DO | DO | 0800-1600 | HOLIDAY | 0800-1600 | 0800-1600 | 0800-1600 |
| KERRY SWARTZ | *CT 3 | DO | DO | AWS | HOLIDAY | A | 0700-1615 | 0700-1615 |
| JENNIFER ANDREE | CT2 | DO | DO | 0815-1615 | HOLIDAY | 0815-1615 | 0815-1615 | 0815-1615 |
| JAMES GROB | ITG 2 | DO | DO | A | Holiday | A | A | A |
| CHAD MILLER | CP 2 | DO | DO | 0815-1615 | HOLIDAY | 0815-1615 | 0815-1615 | 0815-1615 |
| * AWS | | | | | | | | |

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

ᴅᴀTE:                    July 25, 2000

SUBJECT:               Acting Director, Bureau of Liquor Control Enforcement

TO:                    Captain Darrell G. Ober
                       Director, Division of Administration
                       Bureau of Liquor Control Enforcement

FROM:                  Major Phillip L. DeWire
                       Director, Bureau of Liquor Control Enforcement

 

         1.      You are hereby assigned to serve as Acting Director, Bureau of Liquor Control Enforcement from 0815 hours on Monday, August 7, 2000 through 1615 hours on Friday, August 11, 2000 while I am attending the National Liquor Law Enforcement Agency Conference.

 

PLD/mp

cc:    Deputy Commissioner of Operations
       Captain McDonald
       Section Commanders
       District Office Commanders
       Supervisor, Special Investigations Section
       Bureau Administrative Staff
       Executive Officer
       CSSU
       Legal Unit
       File

# PENNSYLVANIA STATE POLICE / BLCE / HEADQUARTERS
## WEEKLY DUTY ROSTER

STATION: 5400

WEEK OF: 08/05/00 - 08/11/00

| OFFICER'S NAME | | SATURDAY 5 | SUNDAY 6 | MONDAY 7 | TUESDAY 8 | WEDNESDAY 9 | THURSDAY 10 | FRIDAY 11 |
|---|---|---|---|---|---|---|---|---|
| MAJOR PHILLIP DEWIRE | | 0900-1700 enroute to colorado | NLLEA convention | NLLEA convention | NLLEA convention | NLLEA convention | Return to PA | DO |
| CAPT. LEONARD MCDONALD | | DO | DO | A | 0800-1600 | 0800-1600 | A | A |
| CAPT. DARRELL OBER | | DO | DO | 0745-1545 | 0745-1545 | 0745-1545 | 0745-1545 | 0745-1545 |
| SGT. PEARL SWEETING | | DO | DO | 0730-1530- | 0730-1530 | 0730-1530-2hrs S | 0730-1230-3hrs-A | A |
| ALICE BELMONT | AO 1 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |
| MARY PAUL | CS 3 | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 |
| BAMBI DEIMLER | CT 3 | DO | DO | OFF | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 |
| JENNIFER ANDREE | CT2 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-615 |
| JAMES GROB | ITG 2 | DO | DO | 0700-1500 | 0700-1500 | 0700-1500 | 0700-1500 | 0700-1500 |
| CHAD MILLER | CP 2 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1145 |

* AWS

STD—501, 9—86

COMMONWEALTH OF PENNSYLVANIA

ATE:                   November 3, 2000

SUBJECT:               Acting Director, Bureau of Liquor Control Enforcement

TO:                    Captain Leonard H. McDonald
                       Director, Division of Operations
                       Bureau of Liquor Control Enforcement

FROM:                  Major Phillip L. DeWire
                       Director, Bureau of Liquor Control Enforcement

       1.    You are hereby assigned to serve as Acting Director, Bureau of Liquor Control Enforcement from 0815 hours on Monday, November 13, 2000 to 1615 hours on Friday, November 17, 2000 while I am on leave.

PLD/mp

cc:    Deputy Commissioner of Operations
       Capt. Ober
       Section Commanders
       District Office Commanders
       Bureau Administrative Staff
       Special Investigations Section
       Report Examination Unit
       CSSU
       Sgt. Sweeting
       Legal Offices
       File

# PENNSYLVANIA STATE POLICE / BLCE / HEADQUARTERS
## WEEKLY DUTY ROSTER

STATION: 5400
WEEK OF: 11-11-00 - 11-17-00

| OFFICER'S NAME | | SATURDAY 11 | SUNDAY 12 | MONDAY 13 | TUESDAY 14 | WEDNESDAY 15 | THURSDAY 16 | FRIDAY 17 |
|---|---|---|---|---|---|---|---|---|
| MAJOR PHILLIP DEWIRE | | DO | DO | A | A | A | A | A |
| CAPT. LEONARD MCDONALD | | DO | DO | 0800-1600 | 0800-1600 OD | 0800-1600 | 0800-1600 | 0800-1600 |
| CAPT. DARRELL OBER | | DO | DO | 0745-1545 | 0745-1545 | 0745-1545 | 0745-1545 | 0745-1545 |
| SGT. PEARL SWEETING | | DO | DO | 0730-1530 | 0730-1530-Mtg-SU | 0730-1530 | 0730-1530 | 0700-1500 |
| ALICE BELMONT | AO 1 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |
| MARY PAUL | CS 3 | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 |
| BAMBI DEIMLER | CT 3 | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 |
| JENNIFER ANDREE | CT2 | DO | DO | OFF | OFF | OFF | OFF | OFF |
| CINDY CRABB | CT2 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |
| JAMES GROB | ITG 2 | DO | DO | 0700-1500 | 0700-1500 | 0700-1500 | 0700-1500 | 0700-1500 |
| CHAD MILLER | CP 2 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |

* AWS

STD—501. 9—86

COMMONWEALTH OF PENNSYLVANIA

TE:                   December 11, 2000

SUBJECT:              Acting Director, Bureau of Liquor Control Enforcement

TO:                   Captain Leonard H. McDonald
                      Director, Division of Operations
                      Bureau of Liquor Control Enforcement

FROM:                 Major Phillip L. DeWire
                      Director, Bureau of Liquor Control Enforcement

       1.    You are hereby assigned to serve as Acting Director, Bureau of Liquor Control Enforcement from 0815 hours on Tuesday, December 12, 2000 to 1615 hours on Friday, December 15, 2000 and 0815 hours to 1615 hours on Monday, December 18, 2000 while I am on leave.

PLD/mp

cc:    Deputy Commissioner of Operations
       Capt. Ober
       Section Commanders
       District Office Commanders
       Bureau Administrative Staff
       Special Investigations Section
       Report Examination Unit
       CSSU
       Sgt. Sweeting
       Legal Offices
       File

# PENNSYLVANIA STATE POLICE / BLCE / HEADQUARTERS
## WEEKLY DUTY ROSTER

STATION: 5400

WEEK OF: 12-09-00 - 12-15-00

| OFFICER'S NAME | | SATURDAY 9 | SUNDAY 10 | MONDAY 11 | TUESDAY 12 | WEDNESDAY 13 | THURSDAY 14 | FRIDAY 15 |
|---|---|---|---|---|---|---|---|---|
| MAJOR PHILLIP DEWIRE | | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |
| CAPT. LEONARD MCDONALD | | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 |
| CAPT. DARRELL OBER | | DO | DO | 0745-1545 | 0745-1545 | 0745-1545 | 0930-1730 | 0745-1545 |
| SGT. PEARL SWEETING | | DO | DO | 0730-1530 | 0730-1530 | 0730-1530 | 0730-1530 | 0730-1400-A-1.5HRS |
| ALICE BELMONT | AO 1 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |
| MARY PAUL | CS 3 | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 |
| BAMBI DEIMLER | CT 3 | DO | DO | 0800-1600 | 0800-1600 | 0800-1600 | 0800-1600 | PERSONAL |
| JENNIFER ANDREE | CT2 | OFF | OFF | OFF | OFF | OFF | OFF | OFF |
| CINDY CRABB | CT2 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |
| JAMES GROB | ITG 2 | DO | DO | 0700-1500 | 0700-1500 | 0700-1500 | 0700-1500 | 0700-1500 |
| CHAD MILLER | CP 2 | DO | DO | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 | 0815-1615 |

* AWS

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:    January 12, 2001

SUBJECT:    Acting Director, Bureau of Liquor Control Enforcement

TO:    Captain Leonard H. McDonald
Director, Division of Operations
Bureau of Liquor Control Enforcement

FROM:    Major Phillip L. DeWire
Director, Bureau of Liquor Control Enforcement

       1.    You are hereby assigned to serve as Acting Director, Bureau of Liquor Control Enforcement from 0815 hours on Tuesday, January 23, 2001 to 1615 hours on Wednesday, January 31, 2001 while I am attending the Area Commanders Conference and on annual leave.

PLD/mp

cc:    Deputy Commissioner of Operations
       Capt. Ober
       Section Commanders
       District Office Commanders
       Bureau Administrative Staff
       Special Investigations Section
       Report Examination Unit
       CSSU
       Sgt. Sweeting
       Legal Offices
       File

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:            March 16, 2001

SUBJECT:         Acting Director, Bureau of Liquor Control Enforcement

TO:              Captain Leonard H. McDonald
                 Director, Division of Operations
                 Bureau of Liquor Control Enforcement

FROM:            Major Phillip L. DeWire
                 Director, Bureau of Liquor Control Enforcement

     1.    You are hereby assigned to serve as Acting Director, Bureau of Liquor Control Enforcement from 0815 hours on Monday, March 19, 2001 to 1615 hours on Thursday, March 22, 2001 while I am attending Training and an Area Commanders Conference.

PLD/mp

cc:     Deputy Commissioner of Operations
        Capt. Ober
        Section Commanders
        District Office Commanders
        Bureau Administrative Staff
        Special Investigations Section
        Report Examination Unit
        CSSU
        Sgt. Sweeting
        Legal Offices
        File

STD—501. 9—86

COMMONWEALTH OF PENNSYLVANIA

DATE:

March 16, 2001

SUBJECT:

Temporary Assignment to Higher Rank or Classification

TO:

Captain Leonard H. McDonald
Director, Division of Operations
Bureau of Liquor Control Enforcement

FROM:

Major Phillip L. DeWire
Director, Bureau of Liquor Control Enforcement

REFERENCES: (a)   Bureau Special Order 99-5, dated February 17, 1999, regarding Subject

(b)   Administrative Regulation 4-11, Temporary Assignment to Higher Rank or Classification

1.   In accordance with the provisions of References (a) and (b), you are hereby notified to assume a temporary assignment of a higher rank/classification, as follows:

(a)   Rank/Classification:        Acting Bureau Director
                                   74070

(b)   Station Code:               5400

(c)   Date and Time Assigned:     03/19/01 - 0815 hours

(d)   Date and Time End:          03/22/01 - 1615 hours

(e)   Remarks:                    The Bureau Director will be
                                  attending training and an Area
                                  Commanders Conference
                                  during the time period indicated.

PLD/mp

cc:   B. Deimler
      File

STD501-X

COMMONWEALTH OF PENNSYLVANIA

**DATE:**          September 14, 2001

**SUBJECT:**       Temporary Assignment to Higher Rank or Classification

**TO:**            Captain Darrell G. Ober
                   Director, Division of Administration
                   Bureau of Liquor Control Enforcement

**FROM:**          Major Phillip L. DeWire
                   Director, Bureau of Liquor Control Enforcement

**REFERENCES:**  (a)    Bureau Special Order 99-5, dated February 17, 1999,
                        regarding Subject

                 (b)    Administrative Regulation 4-11, Temporary Assignment to
                        Higher Rank or Classification

          1.    In accordance with the provisions of References (a) and (b),
you are hereby notified to assume a temporary assignment of a higher
rank/classification, as follows:

|     |     |     |
|-----|-----|-----|
| (a) | Rank/Classification: | Acting Bureau Director 74070 |
| (b) | Station Code: | 5400 |
| (c) | Date and Time Assigned: | 10/26/01 – 0815 hours |
| (d) | Date and Time End: | 11/02/01 – 1615 hours |
| (e) | Remarks: | The Bureau Director will be attending the international Association of Chiefs of Police Conference in Toronto, Canada. |

PLD/jla

STD501-X

COMMONWEALTH OF PENNSYLVANIA

**DATE:**          September 14, 2001

**SUBJECT:**      Acting Director, Bureau of Liquor Control Enforcement

**TO:**           Captain Darrell G. Ober
Director, Division of Administration
Bureau of Liquor Control Enforcement

**FROM:**        Major Phillip L. DeWire
Director, Bureau of Liquor Control Enforcement

       1.      You are hereby assigned to serve as Acting Director, Bureau of Liquor Control Enforcement from 0815 hours on Friday, October 26, 2001 to 1615 hours on Friday, November 2, 2001 while I will be attending the International Association of Chiefs of Police Conference in Toronto, Canada.

PLD/jla

STD501-X

COMMONWEALTH OF PENNSYLVANIA

**DATE:**        September 14, 2001


**SUBJECT:**        Acting Director, Bureau of Liquor Control Enforcement


**TO:**        Captain Leonard H. McDonald
        Director, Division of Operations
        Bureau of Liquor Control Enforcement


**FROM:**        Major Phillip L. DeWire
        Director, Bureau of Liquor Control Enforcement


    1.        You are hereby assigned to serve as Acting Director, Bureau of Liquor Control Enforcement from 0815 hours on Sunday, October 7, 2001 to 1615 hours on Sunday, October 14, 2001 while I am on leave.




PLD/jla

cc:  Deputy Commissioner of Operations
     Capt. Ober
     Section Commanders
     District Office Commanders
     Bureau Administrative Staff
     Special Investigations Section
     Report Examination Unit
     CSSU
     Sgt. Sweeting
     Legal Offices
     File

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:          June 25, 2001

SUBJECT:       Acting Director, Bureau of Liquor Control Enforcement

TO:            Captain Leonard H. McDonald
               Director, Division of Operations
               Bureau of Liquor Control Enforcement

FROM:          Major Phillip L. DeWire
               Director, Bureau of Liquor Control Enforcement


      1.     You are hereby assigned to serve as Acting Director, Bureau of Liquor Control Enforcement from 0815 hours on Wednesday, June 27, 2001 until I return from sick leave.


PLD/mp

cc:   Deputy Commissioner of Operations
      Capt. Ober
      Section Commanders
      District Office Commanders
      Bureau Administrative Staff
      Special Investigations Section
      Report Examination Unit
      CSSU
      Sgt. Sweeting
      Legal Offices
      File

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**

DATE:        December 21, 2001

SUBJECT:     Acting Director, Bureau of Liquor Control Enforcement

TO:          Captain Darrell G. Ober
             Director, Division of Administration
             Bureau of Liquor Control Enforcement

FROM:        Major Phillip L. DeWire
             Director, Bureau of Liquor Control Enforcement

      1.    You are hereby assigned to serve as Acting Director, Bureau of Liquor Control Enforcement from 0815 hours on Saturday, December 22, 2001 to 1615 hours on Tuesday, January 1, 2002.

PLD/mp

STD-501 (9-86)

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:              December 21, 2001

SUBJECT:        Temporary Out of Class Assignment to Higher Rank or Classification

TO:                Captain Darrell G. Ober
                     Director, Division of Administration
                     Bureau of Liquor Control Enforcement

FROM:            Major Phillip L. DeWire
                     Director, Bureau of Liquor Control Enforcement

REFERENCES:   (a)     Bureau Special Order 99-5, dated February 17, 1999,
                              regarding Subject.

                      (b)     Administrative Regulation 4-11, Temporary Assignment to
                              Higher Rank or Classification.

          1.       In accordance with the provisions of References (a) and (b),
you are hereby notified to assume a temporary assignment of a higher
rank/classification as follows:

          a)     Rank/Classification:       Act. Bureau Director
                                                      74070

          (b)     Station Code:                 5400

          (c)     Date and Time Assigned:  12/22/01 - 0815 hours

          (d)     Date and Time End:         01/01/02 - 1615 hours

          (e)     Remarks:                        The Bureau Director will
                                                        be on leave during the
                                                        time period indicated.

PLD/mp

# PENNSYLVANIA STATE POLICE / BLCE / HEADQUARTERS
## WEEKLY DUTY ROSTER

STATION: 5400

WEEK OF: 12-22-01 / 12-28-01

| OFFICER'S NAME | | SATURDAY 22 | SUNDAY 23 | MONDAY 24 HOLIDAY | TUESDAY 25 HOLIDAY | WEDNESDAY 26 | THURSDAY 27 | FRIDAY 28 |
|---|---|---|---|---|---|---|---|---|
| MAJOR PHILLIP DEWIRE | | DO | DO | | HOLIDAY | ANNUAL | ANNUAL | ANNUAL |
| CAPT. LEONARD MCDONALD | | DO | DO | | H | ANNUAL | ANNUAL | ANNUAL |
| CAPT. DARRELL OBER | | DO | DO | | H | 0745-0945 | 0745-1545 | 0745-1345 |
| SGT. PEARL SWEETING | | DO | DO | | HOLIDAY | ANNUAL | 0730-1530 | 0730-1530 |
| ALICE BELMONT | AO 1 | DO | DO | | HOLIDAY | 0815-1615 | 0815-1615 | 0815-1615 |
| MARY PAUL | CS 3 | DO | DO | | HOLIDAY | ANNUAL | ANNUAL | ANNUAL |
| BAMBI DEIMLER | AA1 | DO | DO | | HOLIDAY | ANNUAL | ANNUAL | ANNUAL |
| JENNIFER ANDREE | CT2 | DO | DO | | HOLIDAY | ANNUAL | 0815-1615 | 0815-1615 |
| CINDY CRABB | CT2 | DO | DO | | HOLIDAY | 0815-1615 | 0815-1615 | 0815-1615 |
| JAMES GROB | ITG 2 | DO | DO | | HOLY DAY | PERSONAL | 0700-1500 | 0700-1500 |
| CHAD MILLER | CP 2 | DO | DO | | HOLIDAY | 0815-1615 | 0815-1615 | PERSONAL |
| * AWS | | HOLIDAY FROM GOV. | | | | | | |

# PENNSYLVANIA STATE POLICE / BLCE / HEADQUARTERS
## WEEKLY DUTY ROSTER

STATION: **5400**

WEEK OF: **12-29-01 / 01-04-02**

| OFFICER'S NAME | | SATURDAY 29 | SUNDAY 30 | MONDAY 31 | TUESDAY 1 HOLIDAY | WEDNESDAY 2 | THURSDAY 3 | FRIDAY 4 |
|---|---|---|---|---|---|---|---|---|
| MAJOR PHILLIP DEWIRE | | DO | DO | ANNUAL | HOLIDAY | 0815-1615 | 0815-1615 | 0815-1615 |
| CAPT. LEONARD MCDONALD | | DO | DO | ANNUAL | HOLIDAY | ANNUAL | 0800-1600 | 0800-1600 |
| CAPT. DARRELL OBER | | DO | DO | 0745-1545 | HOLIDAY | 1200-1700 | 0745-1545 | 0745-1545 |
| SGT. PEARL SWEETING | | DO | DO | ANNUAL | HOLIDAY | ANNUAL | PERSONAL | 0730-1530-mtg. |
| ALICE BELMONT | AO 1 | DO | DO | ANNUAL | HOLIDAY | ANNUAL | 0815-1615 | 0815-1615 |
| MARY PAUL | CS 3 | DO | DO | 0800-1600 | HOLIDAY | 0800-1600 | 0800-1600 | 0800-1600 |
| BAMBI DEIMLER | AA1 | DO | DO | ANNUAL | HOLIDAY | ANNUAL | 0800-1600 | 0800-1600 |
| JENNIFER ANDREE | CT2 | DO | DO | 0815-1615 | HOLIDAY | 0815-1615 | 0815-1615 | 0815-1615 |
| CINDY CRABB | CT2 | DO | DO | 0815-1615 | HOLIDAY | 0815-1615 | 0815-1615 | 0815-1615 |
| JAMES GROB | ITG 2 | DO | DO | 0700-1500 | HOLIDAY | 0700-1500 | 0700-1500 | 0700-1500 |
| CHAD MILLER | CP 2 | DO | DO | 0815-1615 | HOLIDAY | 0815-1615 | 0815-1615 | 0815-1615 |
| | | | | | | | | |

* AWS

STD-501 (9-86)

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:            March 18, 2002

SUBJECT:         Acting Director, Bureau of Liquor Control Enforcement

TO:              Captain Leonard H. McDonald
                 Director, Division of Operations
                 Bureau of Liquor Control Enforcement

FROM:            Major Phillip L. DeWire
                 Director, Bureau of Liquor Control Enforcement


        1.    You are hereby assigned to serve as Acting Director, Bureau of
Liquor Control Enforcement from 0815 hours on Thursday, March 21, 2002 to Friday,
March 29, 2002.




PLD/mp

cc:     Deputy Commissioner of Operations
        Director, Division of Administration
        Section Commanders
        District Office Commanders
        Bureau Administrative Staff
        Special Investigations Section
        Report Examination Unit
        CSSU
        Executive Officer
        Legal Offices
        File

COMMONWEALTH OF PENNSYLVANIA
Pennsylvania Labor Relations Board

PENNSYLVANIA STATE TROOPERS        :
ASSOCIATION                        :
                                   :
       v.                          :        Case No. PF-C-98-114-E
                                   :
COMMONWEALTH OF PENNSYLVANIA,       :
PENNSYLVANIA STATE POLICE           :

PROPOSED DECISION AND ORDER

This charge of unfair labor practices was filed with the Pennsylvania
Labor Relations Board (Board) on June 12, 1998 by the Pennsylvania State
Troopers Association (Union) alleging that the Commonwealth of
Pennsylvania, Pennsylvania State Police (Commonwealth) engaged in unfair
labor practices contrary to the provisions of Sections 6(1)(a) and (c) of
the Pennsylvania Labor Relations Act (PLRA) and Act 111.

On July 1, 1998 the Secretary of the Board issued a Complaint and
Notice of Hearing setting forth November 5, 1998 in Harrisburg,
Pennsylvania as the date and time for the hearing. The hearing was held on
that date at which time all parties in interest were afforded a full
opportunity to present testimony, cross examine witnesses and introduce
documentary evidence. Both parties filed post hearing briefs.

The examiner, on the basis of the testimony and exhibits presented at
the hearing and from all other matters and documents of record, makes the
following:

FINDINGS OF FACT

1.     That the Commonwealth is an employer.

2.     That the Union is a labor organization.

3.     That on May 22, 1998 Sergeant Joseph J. Gaughan of the
Pennsylvania State Police spoke with then Captain Francis P. Koscelnak,
commander of Troop R. Gaughan spoke with Koscelnak about his wish to
transfer to a barrack in Troop R. Gaughan had been a corporal assigned to
Troop R for seven years prior to his promotion to sergeant and transfer
last year to Troop P in Luzerne County. (N.T. 17, 22).

4.     That in the course of the May 22 conversation Koscelnak told
Gaughan that Koscelnak did not think Gaughan should return to Troop R.
Koscelnak told Gaughan that Gaughan could not serve two masters -- the
Union and the Pennsylvania State Police. Koscelnak also told Gaughan his
opportunities would be limited if he returned to Troop R. Gaughan is a
member of the Union's negotiating committee, is chairman of the Union's car
utilization study committee, and has been Local Lodge 46 secretary for the
last eight years. As lodge secretary Gaughan was the Union's station
representative and interacted with Koscelnak on a weekly basis to attempt
to work out problems between the Union and the state police in Troop R.
(N.T. 17-20, 24, 25, 61).

5.     That Koscelnak had commanded Troop R for nine and one-half
years. As troop commander, Koscelnak had supervisory and line authority

P319
10F5

over the 220 people who worked in Troop R's four barracks: Gibson, Blooming Grove, Honesdale and Dunmore. Koscelnak directly rated station commanders. (N.T. 34; Union Exhibit 1).

DISCUSSION

Here the Union charges the Commonwealth with violations of Sections 6(1)(a) and (c)[1] of the PLRA and Act 111 when Captain Koscelnak told Sergeant Gaughan that Gaughan would be better off if he did not transfer into Koscelnak's troop. The Union further alleges that Koscelnak told Gaughan that he would not be welcome because of his duties as a Union representative; that Gaughan could not be trusted because of his affiliation with the Union; and that Gaughan's assignment opportunities within Koscelnak's troop would be severely limited. The Commonwealth has violated Section 6(1)(a) of the PLRA and Act 111 because the Commonwealth engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employe rights under the PLRA and Act 111.

In Montgomery County Community College, 15 PPER ¶ 15038 (Final Order, 1984), the Board adopted the standard used by the National Labor Relations Board (NLRB) in deciding an independent violation of Section 8(a)(1) of the National Labor Relations Act, the federal counterpart to Section 6(1)(c). That test also adopted by the fourth, fifth, sixth, seventh, ninth and tenth circuits was set forth in NLRB v. Brookwood Furniture Division of U.S. Industries, 701 F.2d 452 (5th Cir. 1993): " The test for determining whether an employer has violated § 8(a)(1) is whether the employer's questions, threats, or statements tend to be coercive, not whether the employes are in fact coerced. TRW-United Greenfield Division v. NLRB, 637 F.2d 410, 415 (5th Cir. 1981). " 701 A2d at 459. As the court noted in Brookwood the coercive tendencies of an employer's conduct must be assessed within the totality of circumstances surrounding the occurrence at issue. TRW-United Greenfield Division v. NLRB, supra, 637 F.2d at 415-16. This assessment "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of the relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." NLRB v. Gissel Packing Company, 395 U.S. 575, 617, 89 S. Ct. 1918, 1941, 23 L. Ed.2d 547 (1969).

Here, the essence of the Union's proof is a conversation between Koscelnak and Gaughan that took place on May 22, 1998. If Gaughan's rendition of the conversation is taken as true the Commonwealth violated Section 6(1)(a) of the PLRA and Act 111. If Koscelnak's version of the conversation is true then the commonwealth has committed no unfair labor practice. A close reading of the record leads to the conclusion that it is more likely that Gaughan's version of the conversation is true.

In making credibility judgments, the examiner is entitled to consider a witness's appearance, general bearing, conduct on the stand, demeanor, matter of testifying (e.g., candor, frankness, clearness of statements), and certainty of the witness with respect to facts. Ross Township, 23 PPER ¶ 23175 (Proposed Decision and Order, 1992) (citing In re Gaston's Estate, 361 Pa. 105, 62 A.2d 904 (1949)). The demeanor of a witness is the very touchstone of credibility. Robinson v. Robinson, 183 Pa. Super. 574, 133 A.2d 259 (1949). Additionally, the Board has stated that an examiner may simply choose to believe one witness over another without further

---

[1] In its post hearing brief the Union abandons the Section 6(1)(c) charge and only argues for an independent violation of Section 6(1)(a) of the PLRA by the Commonwealth.

explanation.  Upper Southampton Township, PLRB Case No. PERA-C-90-60-E
(Order Directing Remand to Hearing Examiner for Further Proceedings, 1991)
(not reported in PPER).

Koscelnak's testimony in response to questions concerning the
specifics of the May 22 conversation with Gaughan is diaphanous. Gaughan
testified that Koscelnak told Gaughan he could not serve two masters -- the
Pennsylvania State Police and the Union.  While Koscelnak admits he told
Gaughan that Gaughan could not serve two masters, Koscelnak asserts that he
meant the Pennsylvania State Police and Gaughan, himself.  That explanation
does not have the ring of truth.  Gaughan's testimony about the contents of
that conversation is more specific and definite than is Koscelnak's.  While
it is true that Gaughan does not remember the exact words Koscelnak used,
it must be remembered that the May 22 conversation occurred over five
months before the hearing in this matter.  Balancing the witness's general
demeanor, candor, frankness, and clearness of statements, Gaughan's version
of the conversation is taken as true.

The Commonwealth seeks to cast Koscelnak's remarks as merely his
"personal opinion," and not representing the position of the Commonwealth.
However, the NLRB has ruled that casting a supervisor's statements, which
tended to be coercive, as merely a "friendly warning" is no defense to a
violation of the federal counterpart of Section 6(1)(a) of the PLRA.  J.T.
Slocomb Company, 314 NLRB 231, 146 LRRM 1280 (1994).  The Commonwealth
cites York Area Transportation Authority, 10 PPER ¶ 10027 (Final Order,
1979) as support for its assertion that Koscelnak, as a fellow bargaining
unit member, was not acting on behalf of the Commonwealth.  York Area
Transportation Authority, however, is a case decided under the Public
Employe Relations Act, 43 P.S. § 1101.101 et. seq. (PERA).  Under PERA
management employes and supervisors are precluded from membership in the
rank and file bargaining unit. Supervisors are relegated to separate meet
and discuss units.  43 P.S.§ 1101.604(5).  Consequently, those employes who
perform what PERA defines as supervisory duties (i.e. authority to hire,
fire, suspend, layoff, recall, promote, discharge, reprimand or discipline,
or to effectively recommend those actions, 43 P.S. § 1101.301(6)) are
precluded from membership in the rank and file bargaining unit.  That is
not the case however under the PLRA in Act 111.  Only those Act 111
employes who meet the criteria set forth in FOP, Star Lodge No. 20 v.
Commonwealth, PLRB, 104 Pa. Commonwealth Ct. 561, 522 A.2d 697 (1987),
aff'd, 522 Pa. 149, 560 A.2d 145 (1989) are precluded from bargaining unit
membership.  Act 111 has no provision to keep supervisors out of the
bargaining unit.[2]  There is an intrinsic tension in having supervisory
employes in the same bargaining unit with those employes whom they are to
supervise.  Bargaining unit supervisory employes have conflicting
responsibilities with respect to the employer's interests, occasionally to
the detriment of other bargaining unit members.  As supervisory employes
rise in rank their responsibility to represent the employer's interests
increases.  In this case Koscelnak was a captain and troop commander in the
Pennsylvania State Police and as such had the responsibility for line
authority over all of the state police personnel in Troop R, approximately
220 people.  Koscelnak was responsible for four state police barracks:
Gibson, Blooming Grove, Honesdale, and Dunmore.  Koscelnak directly rated
four station commanders (Union Exhibit 1).  Given Koscelnak's position of
responsibility he was surely an employe of such rank that his decisions

---

[2] The Commonwealth's brief inaccurately places the responsibility on the
Board as the body who has determined that supervisors are included in Act
111 bargaining units.  The Commonwealth's argument is, however, with the
Legislature who established the statutory framework, which the Board merely
enforces.

were considered those of the Commonwealth. The Commonwealth cannot place Koscelnak in the position of representing its interest and then disavow Koscelnak's authority to do so. The Commonwealth gave Koscelnak both the authority and responsibility to supervise four barracks and the troopers therein. "An employer is responsible for the acts of its supervisor when he commits an unfair practice." Duquesne City School District, 3 PPER 351b at 352 (Nisi Decision and Order, 1973). See also NLRB v. Sinclair Company, 397 F.2d 157 (1st Cir. 1968), aff'd, 395 U.S. 474 (1970). Consequently, the Commonwealth has committed a violation of Section 6(1)(a) of the PLRA and Act 111.

CONCLUSION

The examiner therefore after due consideration of the foregoing and the record as a whole concludes and finds:

1. That the Commonwealth is an employer within the meaning of Section 3(c) of the PLRA.

2. That the Union is a labor organization within the meaning of Section 3(f) of the PLRA.

3. That the Board has jurisdiction over the parties hereto.

4. That the Commonwealth has committed unfair labor practices within the meaning of Section 6(1)(a) of the PLRA and Act 111.

5. That the Commonwealth has not committed unfair labor practices within the meaning of Section 6(1)(c) of the PLRA and Act 111.

ORDER

In view of the foregoing and in order to effectuate the policies of the PLRA and Act 111, the examiner:

HEREBY ORDERS AND DIRECTS

that the Commonwealth shall:

1. Cease and desist from interfering with, restraining or coercing employes in the exercise of the rights guaranteed in the PLRA in Act 111.

2. Take the following affirmative action which the examiner finds necessary to effectuate the policies of the PLRA in Act 111:

(a) Post a copy of this decision and order within five (5) days from the effective date hereof in a conspicuous place readily accessible to its employes and have the same remain so posted for a period of ten (10 consecutive days; and

(b) Furnish to the Board within twenty (20) days of the date hereof satisfactory evidence of compliance with this decision and order by completion and filing of the attached affidavit of compliance.

IT IS HEREBY FURTHER ORDERED AND DIRECTED

that in the absence of any exceptions filed pursuant to the 34 Pa. Code §
95.98(a) within twenty (20) days of the date hereof, this Decision and
Order shall be and become absolute and final.

SIGNED AND DATED at Harrisburg, Pennsylvania, this sixteenth day of
June, 1999.

PENNSYLVANIA LABOR RELATIONS BOARD

TIMOTHY TIETZE, Hearing Examiner

COMMONWEALTH OF PENNSYLVANIA
Pennsylvania State Labor Relations Board

PENNSYLVANIA STATE TROOPERS            :
ASSOCIATION                            :
                                       :
        v.                             :        Case No. PF-C-98-114-E
                                       :
COMMONWEALTH OF PENNSYLVANIA,          :
PENNSYLVANIA STATE POLICE              :

### AFFIDAVIT OF COMPLIANCE

Commonwealth of Pennsylvania hereby certifies that it has ceased and desisted from its violation of Section 6(1)(a) of the PLRA and Act 111, that it has posted the proposed decision and order as directed therein, and that it has served a copy of this affidavit on the Union at its principal place of business.

_____
Signature/Date

_____
Title

SWORN AND SUBSCRIBED TO before me
the day and year first aforesaid.

_____
Signature of Notary Public

**OBER, DARRELL G**

| | |
|---|---|
| **From:** | PSP Postmaster |
| **Sent:** | Tuesday, March 07, 2000 2:45 PM |
| **To:** | Everyone |
| **Subject:** | IIMS Systems Integrator Announcement |

To Department personnel from Commissioner --

In an effort to keep Department personnel informed of significant events and achievements within the Department, the following information is being provided. The Pennsylvania State Police has embarked upon the institution of a program that will revolutionize the way in which we all carry out our daily duties. This program, known as the Criminal Investigation/Traffic Safety Incident Information Management System, or "IIMS" will affect nearly every facet of this agency.

After several years of strategic planning, design, and acquisition efforts by a wide variety of Department personnel, Lockheed Martin Corporation, Management & Data Systems, headquartered in Valley Forge, PA, has been selected as the IIMS Systems Integrator. We will enter into contract negotiations projected to be completed by June 2000. The processes used by the Department to select and acquire the Systems Integrator are highly innovative and have been lauded by vendors and several state agencies as a future model.

Lockheed Martin Corporation is a $26 billion corporation renowned for its high technology products and capabilities. Lockheed Martin Management & Data Systems employs 2,800 people with $1.5 billion in annual revenues. In addition to the resources brought to bear by Lockheed Martin, they have assembled a world-class consortium to meet the extensive requirements of IIMS. This consortium includes TRW, SAIC, DynCorp, Carnegie Mellon Research Institute, Penn State University, L. Robert Kimball and Associates, and others.

As part of the project, the Department will install computers in patrol vehicles; obtain bar-coding technology for processing of evidence, and utilize computer-aided dispatching and geographic information systems to improve dispatching services. This will enable us to spend less time doing paperwork. IIMS will place the Department at the forefront in the modernization and transformation of law enforcement. Other states have already taken notice and are watching what we are doing as they prepare for similar endeavors.

The IIMS project will be implemented incrementally in two major phases. Phase 1 consists of detailed design work and component selection, and is expected to commence in July 2000. Phase 2 involves the actual roll out of component solutions, taking an additional two years at an estimated total cost of $80 to $110 million to achieve a full implementation.

The Enterprise Network, now fully operational, was formally accepted from IBM by February 15, 2000. The Enterprise Network is performing as specified, but will ultimately grow to meet the future needs of the Department.

Any questions or concerns regarding the contents of this announcement shall be directed to the Information Technology Implementation Coordinator, Bureau of Technology Services, at 717-705-0143 or by e-mail to IIMSINFO address on the Enterprise Network's Global Address List.


P320

1

March 17, 2000

Major Albert F. Kwiateck, Sr.
1222 S. Queen Street
Palmyra, Pennsylvania  17078-3548

Dear Major:

     I cannot begin to express my gratitude to you for your letter and encouraging words.  That you would take the time to do so, replenishes my resolve and is gratefully appreciated.  Your kind remarks are also important to my family who is the ultimate victim of this ordeal.

     It is with great regret I find myself at the center of this latest Department scandal.  I sincerely hope the reputation of the State Police can withstand this controversy.

     Yes, I have taken a stand. That stand is rooted in principle, in personal and Department integrity.  Why my actions have caused such an irrational reaction has yet to be explained to me.  I remain firmly convinced the power and authority of the Commissioner is not boundless.  It is not unlimited.  Nor is it absolute and it can never be used to circumvent due process.  To think that any police organization exists today that would engage in such illegal practices is reprehensible.  Yet, "The First and The Finest" has fallen to this cancer.

     Should you be inclined, I would welcome the opportunity to meet and thank you in person.  My home telephone number is (717) 790-0708; work number (at least this week!) is 540-7443.

     Thank you again.  I remain,

Sincerely,

Captain Darrell G. Ober

*P321*

**Ober, Darrell G**

| | |
|---|---|
| **From:** | Dewire, Phillip L |
| **Sent:** | Wednesday, February 06, 2002 8:36 AM |
| **To:** | Mcdonald, Leonard H |
| **Cc:** | Ober, Darrell G; Belmont, Alice M |
| **Subject:** | FW: Medal of Honor Award Ceremony |

Len, I am meeting with the Philadelphia Courts on Monday. Perhaps it would be good for you to represent us in uniform.
-----Original Message-----
**From:** Quinn, Linette G
**Sent:** Tuesday, February 05, 2002 6:04 PM
**To:** Periandi, Ralph M; Blocker, Tyree C; Zenk, Richard S; Capriotti, John R; Bonney, Linda M; Dewire, Phillip L; Doutt, Kathryn E; Pudliner, Wilfred J; Hackenberg, Ronald J; Merryman, R Dane; Zinsky, Robert J; Waugh, Wesley R; Monaco, Frank H; Szupinka, Lyle H; Waters, Roger N; Tripp, James R (PSP) (PUNXSUTAWNEY); Seilhamer, Terry L; Simon, Sidney A; Conley, Erby L; McDonough, Coleman J; Holmberg, Joseph A; Oleyniczak, Henry D; Marcantino, Michael J; Pawlowski, Frank E; LaCrosse, Thomas J; Transue, Cynthia L; Kovel, Nancy Burkhart; Kohuth, Theodore D; Rice, John G; Koscelnak, Francis E; Altavilla, Carmen; Marut, Joseph T; Points, David K
**Cc:** Allue, Timothy J; Lewis, Jack J; Titler, Robert B (PSP)
**Subject:** Medal of Honor Award Ceremony

Colonel Paul J. Evanko would like to invite you and your staff to an award ceremony honoring Lt. Carl M. Harrison Jr., Department Discipline Office. Lt. Harrison will be receiving the Medal of Honor on February 11, 2002, 0900 hours at the Pennsylvania State Police Academy in Hershey.

In October 2001, Lt. Harrison was traveling on Interstate 81 in Luzerne County and encountered a crash where a van was on fire and a family was trapped inside. Lt. Harrison immediately took control of the scene, then entered the burning van, saving the life of five family members. Shortly after helping everyone out of the van he learned that there was an elderly female still trapped inside. Lt. Harrison entered the van through thick smoke and flames and located the female. As he carried her to safety the van blew up. The elderly female later died.

Governor Mark Schweiker along with the surviving family members will be in attendance to present Lt. Harrison with this prestigious award.

In the end, McDonald calls off sick. Instead of asking me go, he asked LT. Martin. Dewire stated the reason he ask McDonald was face time for promotion.

P-222

1

December 18, 1991


Internal Affairs Investigations


Deputy Commissioner of Administration


Major Paul J. Evanko
Director, Bureau of Professional Responsibility


1.    At the last Western Command Conference, Captain Leonard WASHINGTON, Commanding Officer, Troop A, recommended the BPR process be re-evaluated, utilizing the insight of current Troop Commanders who formerly were assigned to BPR command positions. Those officers are in the unique position of being able to evaluate the system from both a field and "Headquarters" perspective. Consequently, on October 28 and 29, a meeting was held at the Academy. In addition to three Troop Commanders who fit the above criteria, three current BPR investigators who were part of the original BPR complement also attended to give a historical perspective. In all, there were nine participants (five of whom were part of the original BPR complement and assisted in designing the system):

Major Paul J. EVANKO

Captain Kathryn E. DOUTT

*Captain Leonard WASHINGTON, Jr.

Captain Brooke F. YOUNG

*Captain John S. KOTRAN

*Lieutenant Hawthorne N. CONLEY

*Lieutenant Thomas O. MARAKOVITS

*Sergeant Charles J. SKURKIS

Corporal Geoffrey G. MILLER

* Original BPR Complement

2.    The purpose of this meeting was to integrate the BPR historical perspective with the experiences of Troop Commanders who previously held BPR command positions, into an analysis of the present operation. The goal of our analysis was to determine if there was a need to modify the existing BPR system. (The Bureau was officially established six years ago on November 19, 1985, by Special Order 85-179.)

PJE/djb
  cc:  BPR FILE

P323
1of6

Internal Affairs Investigations
Page 2
December 18, 1991

　　　3.　There was a consensus among all participants that: (1) The Complaint Investigation Categories should be expanded to include a specific category of "Rudeness/Discourtesy."

　　　4.　Currently Rudeness/Discourtesy complaints are categorized (along with other types of allegations) as "Verbal Abuse," "Improper Conduct on Duty" or placed in the "Other" category. Thus, there is no way without reviewing every investigation to track incidents of rudeness/discourtesy. With the results of the Strategic Planning Committee's "Department Performance Survey" documenting frequent criticisms on courtesy, I recommend this as a worthwhile change which can be implemented without major changes to the proposed AR 4-25 regulation.

　　　5.　There was significant discussion, ranging from thoughts of a need for wholesale revamping of the BPR system to varying degrees of modification. The Troop Commanders present at this meeting represented the thoughts and opinions of many of the Troop Commanders I have spoken with informally. There was consensus among the Troop Commanders that the large number of BPRs and their endorsements take up an inordinate amount of a Troop Commander's time. Their frustration was evident in comments such as:  "Even when the complaint came in I knew I wouldn't discipline even if it was founded;" or "There are literally days when I get nothing else done but BPR endorsements." The Troop Commanders also unanimously concur that they and their management and supervisory staff should be accepting more responsibility for the actions of their personnel.  They feel stymied with the existing system, which prevents them from dealing directly with citizen complaints in an expeditious manner, especially those in which no disciplinary action would be taken even if it were founded.

　　　　　　　　a.　From an historical perspective, there was an informal five year plan for BPR.  The original concept was to structure the receipt and investigation of all complaints so strictly that no latitude was given to Troop Commanders in handling such incidents.  After the Department had an understanding of where we were (complaint-wise) and where we were headed investigatively on complaints, the grip on Troop Commanders would be relieved, returning their authority to investigate routine day-to-day complaints, such as dissatisfaction with performance of duty and rudeness/discourtesy.  It is significant to note Commissioner COCHRAN's intent was to have a record of every complaint, but not necessarily an investigation of every one.

　　　6.　The following proposal is presented in an effort to address the legitimate concerns of the Troop Commanders, and at the same time protect the integrity of the BPR system.  The proposal will streamline and expedite the processing, investigation and adjudication of most complaints.

Internal Affairs Investigations
Page 3
December 18, 1991

a. The procedure calls for two types of investigations. Currently we have either a full or a limited investigation. I propose these be renamed as Department administrative investigations and Troop/Bureau administrative investigations.

b. All complaints would be categorized into one of these two investigations, based on the potential for disciplinary action.

(1) All complaints would be evaluated by the Director, Bureau of Professional Responsibility. The Director would then confer with the involved Troop Commander or Bureau Director. A complaint sheet would be prepared in all cases with a BPR control number assigned by the Director, Bureau of Professional Responsibility.

(a) All complaints that if founded could reasonably be expected to result in disciplinary action would result in Department administrative investigations. The same procedures as now pertain to full investigations would ensue.

(b) All other complaints, those in which no discipline could reasonably be expected if founded, would result in Troop/Bureau administrative investigations. Similar procedures as now pertain to limited investigations would ensue.

1) The Troop Commander would assign a supervisor in the chain of command to immediately interview the complainant, the Trooper and any witnesses.

2) The investigation would be reported by correspondence, Form STD-501, directly to the Troop Commander for adjudication. (This is the procedure for limited investigations.

Internal Affairs Investigations
Page 4
December 18, 1991

3) Both the complainant and the Trooper would be notified of the Troop Commander's administrative findings in writing.

4) Copies of the investigative report and findings would be forwarded through channels, with endorsements, to the Bureau of Professional Responsibility for centralized recordkeeping.

5) Instead of a one to three month adjudication process, the administrative findings will be expedited and rendered in a more timely fashion, many times within a week. The time lapse between the reception of a complaint and its final adjudication was an issue of significant debate during our meeting. The Troop Commanders were adamant that most complaints could be investigated and adjudicated within a week. They cited cases where the time lapse and adjudication negated the imposition of the proper degree of discipline. The time lapse, in fact, made corrective measures ineffective. This issue has also been raised by the State Troopers' Association.

6) Any time a more serious infraction is uncovered or the Troop/Bureau administrative investigation documents a pattern of founded complaints, the case can be turned into a Department administrative investigation under the authority of the Internal Affairs Division.

c. There are several benefits associated with this system of Troop administrative investigations.

Internal Affairs Investigations
Page 5
December 18, 1991

(1)  Citizens  and  involved  personnel  receive  an
     expeditious adjudication.

(2)  The immediate supervisor (which will be  inter-
     preted  as  the  involved  subject's  Corporal,
     Sergeant  or  Lieutenant)  becomes  directly
     involved in the investigative process.  Respon-
     sibility for  a subordinate  now rests  at  the
     appropriate level.   The supervisor  now has  a
     vested interest in  the conduct  of his  subor-
     dinate.  If he has a subordinate who is  gener-
     ating complaints,  the supervisor  will now  be
     more inclined to address any underlying issues,
     because he  is  now the  investigator  of  such
     complaints.

(3)  There will  be  a  savings  in  the  number  of
     investigative  hours  necessary  to  conduct
     investigations.  The hours will be  minimized
     because we will not have investigators  travel-
     ing from  one  station  to  another  to  conduct
     interviews.

(4)  The review  and  retention  process  of  Troop/
     Bureau  administrative  investigations  will
     remain consistent with existing policies.

(5)  There are  appropriate checks  and balances  in
     the review process in  that the Area  Commander
     and the Director of the Bureau of  Professional
     Responsibility both  review  the  submitted
     reports.  Uniformity of discipline can thus  be
     ensured.

d.  Many of the  complaints that  are now  assigned for  full
    investigations, but will be assigned as Troop administra-
    tive investigations if this  proposal is accepted,  verge
    on being supervisory issues.

    (1)  They are  very often  diminimus in  nature  (as
         compared  to  other  types  of  complaints  we
         investigate).

    (2)  They are very often one on one value judgements
         on the part of the complainant, thus  resulting
         in  many  administrative  findings  being  "not
         sustained."

Internal Affairs Investigations
Page 6
December 18, 1991

(3)   In our present system they take as long as  any
      other complaint to investigate and  adjudicate,
      an average of one to three months, and on  some
      occasions up to six months.

(4)   Many complainants just want a supervisor to  be
      aware of the problem they had.

IIMS - Incident Information Management System                                   Page 1 of 3

---

☒ IIMS - Incident Information Management System

| News | Using This Site | **Schedule** | Registration | RFQC Process | Documents | Q&A | Ask Us | Vendor Directory |

---

☒ Schedule of Events

---

**File last updated: December 22, 1999**

**The following is the most current schedule for the RFQC. Key events, critical dates, and milestones are listed.**

**The Pennsylvania State Police may make changes to this schedule of events at any point during the RFQC Process. The Pennsylvania State Police will update this file as events dictate or as new key events, critical dates, and milestones are added or changed. As a courtesy only, the Pennsylvania State Police will make every attempt to notify registered vendors of significant changes and/or updates to this schedule via e-mail. However, particpating vendors are responsible for being aware of the schedule information contained on this web page.**

**Key Milestones and Timeline for the RFQC Process**

| Event | Start Date | End Date |
|---|---|---|
| Release of Request for Systems Integrator Qualified Contractors (RFQC) | 07/29/99 | |
| Systems Integrator Pre-Proposal Conference | N/A | 08/06/99 |

**Business Case Submission**

| Event | Start Date | End Date |
|---|---|---|
| Development of Business Case Proposals | 07/29/99 | 08/20/99 |
| Deadline to Receive Vendor RFQC Business Case Proposal Questions | 07/29/99 | 08/12/99 |
| Post Final Business Case Proposal Questions and Answers to the IIMS web site | N/A | 08/16/99 |
| Submission of Business Case Proposals | N/A | 08/20/99 |
| Evaluation of Business Case Proposals | 08/20/99 | 09/17/99 |
| Notifications to Primes of Gate 1 Results | | 09/17/99 |
| Post Qualified Primes to the IIMS web site | | 09/17/99 |
| Invitations to Qualified Prime's to submit Initial Proposals | 09/17/99 | |

P 324
1 OF 3

**Initial Proposal Submission**

| Event | Start Date | End Date |
|---|---|---|
| Development of Initial Proposals | 07/29/99 | 10/8/99 |
| Deadline to Receive RFQC Initial Proposal Questions | | 10/ 4/99 |
| Post Initial Proposal Questions and Answers to the IIMS web site | | 10/ 6/99 |
| Submission of Initial Proposals | | 10/ 8/99 |
| Review of Initial Proposals | 10/8/99 | 11/2/99 |

**Continuous Discussion Phase (See notes at bottom of Page)**

| Event | Start Date | End Date |
|---|---|---|
| Schedule Continuous Discussions with Qualified Primes | 10/8/99 | 11/2/99 |
| Conduct Continuous Discussions with Qualified Primes (***See notes) Round 1 | 11/3/99 | 11/5/99 |
| Conduct Further Continuous Discusssions Round 2 | 11/22/99 | 11/24/99 |
| Conduct Continuous Discussions with Qualified Primes Round 3 | 12/14/99 | 12/16/99 |
| Conduct Terms and Conditions Continuous Discussions | 01/04/00 | 01/04/00 |

**Best and Final Offer (BAFO) Proposal Submission**

| Event | Start Date | End Date |
|---|---|---|
| Development of BAFO Proposals | | 01/14/00 |
| Deadline to Receive RFQC BAFO Proposal Questions | | 01/10/00 |
| Post BAFO Proposal Questions and Answers to the IIMS web site | | 01/12/00 |
| Recieve BAFO Proposals | | 01/14/00 NLT 12:00 EST |
| Evaluation of BAFO Proposals and Selection of the IIMS Systems Integrator | 01/14/00 | **TBD |
| Notifications of Gate 3 Results | **TBD | **TBD |
| Post Gate 3 Results to the IIMS web site | **TBD | **TBD |

**Negotiation Phase**

| Event | Start Date | End Date |
|---|---|---|
| Begin Negotiations with Selected Systems Integrator | **TBD | **TBD |
| | | |

IIMS - Incident Information Management System                                    Page 3 of 3

| | | |
|---|---|---|
| Deliver IIMS Master Contract to the Selected Systems Integrator for Signature | *TBD | *TBD |
| Execute IIMS Master Contract | *TBD | *TBD |

**TBD = To Be Determined**

**\*\*All dates so marked are tentative. This page will be updated as the dates for these events are finalized.**

**\*\*\*A random drawing has been conducted to determine the order in which Continuous Discussions will be conducted. The results of the draw are as follows:**

**November 3 - Lockheed Martin**

**November 4 - Andersen Consulting**

**November 5 - IBM**

**Continous Discussion dates, times, and instructions will be posted to the news page, when available. An email with specific instructions will also be sent to Qualified Primes.**

**To ensure consistency, this order will be maintained throughout all phases of the process. Proposal revisions (if any) will be due from each Prime exactly 2 weeks, to the day, after that Prime's scheduled continuous discussion session is completed.**

---

The Pennsylvania State Police reserves the right to change the schedule and/or events listed, at any time during the RFQC Process, as necessary.

PENNSYLVANIA STATE POLICE
IIMS SYSTEMS INTEGRATOR
MEETING - LOCKHEED MARTIN
February 18, 2000

## AGENDA

9:30        Welcome and Introductory Remarks        Captain Ober

### PARTICIPANTS

Lockheed Martin:    Mr. Art Johnson – Corporate Vice President, Strategic
Development

Mr. Marc Hansen – President, Management and Data
Systems

Mr. Tom Carroll – Proposed IIMS Program Manager

State Police:    Lieutenant Colonel Robert C. Hickes – Deputy
Commissioner of Staff

Major Wesley R. Waugh – Director, Bureau of
Technology Services

Major Tyree C. Blocker – Director, Bureau of Drug
Law Enforcement

Mr. Rodney L. Ditzler – Executive Director, Strategic
Development Division

Mr. Ronald C. Wilt – IIMS Program Manager

Mr. Glen R. Grell – Deputy General Counsel, Office of
General Counsel

Mr. George Hogshead – KPMG

Mr. Stephen Shaiman – Contracts Counsel

Sergeant Marcenia M. Robinson – Equal Opportunity
Employment Office

Discussion – Lockheed Martin Corporation Restructuring

11:00        Adjourn

*P325*

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:          January 17, 2000

SUBJECT:       Director, Legislative Affairs Office

TO:            Commissioner
               (Through channels)

FROM:          Captain Darrell G. Ober
               Systems Integrator Procurement Team Leader
               Bureau of Technology Services

1.   This officer kindly requests consideration for the position of Director, Legislative Affairs Office, which was recently vacated due to the retirement of Major Richard D. A. Morris.

2.   I have given careful thought to the duties and responsibilities of this position. Given my variety of experience, administrative background, solid interpersonal and leadership skills, I would make an excellent choice for this position.

3.   By way of reference, I have attached a resume. At your convenience, I am available to further discuss this most important assignment should you deem such action necessary.

4.   Thank you for your consideration.

BTS 1/18/00

P 326

# First Endorsement

**Date:**            December 16, 1997

**Subject:**         Training - School of Police Staff and Command

**To:**              Commissioner

**From:**            Major R. Dane Merryman
                     Director, Bureau of Professional Responsibility

1.   I have reviewed the attached correspondence and resume submitted by Captain Darrell G. Ober and Special Order 97-168, concerning the subject training. Captain Ober meets the qualifications identified within the Special Order.

2.   I enthusiastically support Captain Ober's request for consideration with my strongest recommendation for his selection. As a graduate of the Northwestern "long course," I am familiar with the caliber and quality of the training presented by the Traffic Institute. I can think of no one in the Department who could be a better candidate for this training than Captain Ober.

3.   Captain Ober has already demonstrated his highly developed management and leadership skills. His assignment to the School of Staff and Command will represent an investment in a loyal, proven achiever which will benefit the Department for many years.

4.   While I will personally miss Captain Ober's contributions to the daily operation of this Bureau and his Division, I urge you to select him for this training.

cc: Captain Ober
cc: BPR file

*P 327*

# MANAGEMENT DIRECTIVE

**205.16 Amended**
Number

COMMONWEALTH OF PENNSYLVANIA

GOVERNOR'S OFFICE

Subject:

Compliance with the Whistleblower Law, Act 1986-169

By Direction Of:

*Thomas G. Paese*

Thomas G. Paese, Secretary of Administration

Date:

November 22, 1995

**Agency personnel offices must notify their employes and keep them informed of the protections and obligations under the *Whistleblower Law, Act 1986-169.* This amendment adds the Office of Inspector General to Policy when reporting wrongdoing and contains minor changes.**

**1. SCOPE.** This directive applies to all employes in agencies, boards, and commissions under the Governor's jurisdiction.

**2. POLICY.** *The Act of December 12, 1986 (P.L. 1559 No. 169, 43 P.S. §§1421–1428),* known as the *Whistleblower Law,* was signed into law on December 12, 1986, and became effective on February 10, 1987. The law provides legal protections to public employes who report, in good faith, wrongdoing or waste to their employer or to an appropriate enforcement agency. The law stipulates that:

**a.** Employers may not discharge, threaten, or otherwise engage in employment discrimination against an employe because the employe:

(1) Reports, in good faith, an instance of wrongdoing or waste to the employer, the Office of Inspector General, or to an appropriate enforcement authority.

(2) Is requested by an appropriate enforcement authority to participate in an investigation, hearing, inquiry, or court action.

**b.** Within 180 days after an alleged violation of the *Whistleblower Law,* the affected employe may bring a civil action in court for injunctive relief and/or damages. The employe must show by a preponderance of evidence that, prior to the alleged reprisal, he or she had reported or was about to report an instance or wrongdoing or waste to the employer or to an appropriate law enforcement authority.

**c.** In defending against charges, the employer must provide a preponderance of evidence proving that action against the employe occurred for separate and legitimate reasons.

**d.** Remedies and penalties for violation of the law may include the following:

(1) Reinstatement of an employe, payment of back wages, reinstatement of fringe benefits and seniority rights, actual damages, or a combination of these remedies. The court may also award the complainant attorneys fees and costs of litigation.

Distribution: _____B_____

(Personnel, OA, 717/787-5966)  Page 1 of 2

P.328



Commonwealth of Pennsylvania
**GOVERNOR'S OFFICE**

# MANAGEMENT DIRECTIVE

**205.14 Amended**
*Number*

Subject: **Prohibition of Activities Not Specifically or Directly Connected With the Official Business of the Commonwealth on Commonwealth Property**

By Direction of:

Joseph L. Zazyczny, Secretary of Administration

Date: **February 2, 1988**

**Activities which are not specifically or directly connected with the official business of the Commonwealth are strictly prohibited in Commonwealth facilities and offices. This directive clarifies important policy with respect to the use of Commonwealth property.**

**1. PURPOSE.** To announce policy regarding the use of Commonwealth facilities and offices by State employes, other persons, groups or organizations to conduct activities which are not specifically or directly connected with the official business of the Commonwealth. This policy is being promulgated to enable the Commonwealth to conduct its official business in the least disruptive manner and to protect the privacy and sensitivities of clients, recipients of government benefits, and all members of the public who have legitimate business with the Commonwealth in a Commonwealth facility or office, while promoting nonpartisan voter registration. This policy is not to be construed as a declaration that Commonwealth facilities covered by this policy are public fora.

**2. SCOPE.** This directive is applicable to all agencies, officials, employes, offices, and facilities under the Governor's jurisdiction. It applies to all activity not specifically or directly connected with the official business of the Commonwealth, including but not limited to commercial or retail activities; business activities, whether for profit or nonprofit purposes; the distribution of leaflets and written materials; and all political activity, regardless of the partisan or nonpartisan nature of the activity.

**3. DEFINITIONS.** For purposes of this directive the following phrases shall be defined as:

**a. Commonwealth facilities and offices.** Buildings or parts of buildings owned or leased by the Commonwealth for use by an agency.

**b. Official business of the Commonwealth.** Legally defined or authorized functions of or services provided by an agency, or employment related matters involving Commonwealth employes.

**c. Have legitimate business.** To have business specifically or directly connected with the official business of the Commonwealth, or to be engaged in nonpartisan voter registration activities.

**d. Client service.** The provision of service by employes of the agency in question to members of the public on a routine basis in processing applications for, or receiving, government benefits or assistance.

**4. POLICY.**

**a.** Commonwealth facilities and offices are to be used exclusively for conducting official business of the Commonwealth, or by persons having legitimate business therein.

P329
1 OF 2

Page 1 of 2

Distribution: _____ B _____

b. Commonwealth facilities, offices, and equipment shall be used only by individuals, groups, or organizations who have legitimate business on the premises. These facilities, offices, and equipment shall not be used by employes or the public for purposes not specifically or directly connected with official business of the Commonwealth, or other activity authorized in accordance with this directive.

c. All activity by individuals, groups, or organizations not specifically or directly connected with the official business of the Commonwealth is strictly prohibited in Commonwealth facilities and offices at all times except as authorized in accordance with paragraph d, below. Examples of the kinds of activities prohibited are:

(1) commercial, retail, or business activities, whether for profit or nonprofit purposes, including sales, negotiations, the taking of orders, and displaying of wares;

(2) distribution of leaflets and written materials, except as provided in paragraph d, below; and

(3) the soliciting, harassing, intimidating, coercing, or in any manner invading the privacy of recipients of government services or benefits or individuals who have legitimate business with the Commonwealth.

The above examples are illustrative of the kinds of activities that are prohibited when they are not specifically or directly connected with the official business of the Commonwealth. They do not constitute an exhaustive list of prohibited activities.

d. The Commonwealth will permit persons to enter Commonwealth facilities and offices normally open to the public for client service, during the hours they are open to the public, for the purposes of distributing non-partisan literature or printed material related to voter registration, and to solicit voter registrations and collect completed voter registration mail applications for timely transmittal to the appropriate county voter registration commission. All such solicitations and collections shall be in compliance with the applicable statutory provisions. All voter registration mail applications shall be distributed blank and contain no extraneous markings. Any individual offering or providing assistance in the preparation or delivery of the voter registration application must sign the application in the spaces so provided. Activities conducted by any such persons shall not interfere with normal operation of the office, nor shall they interrupt clients, recipients of government benefits, or other members of the public, in their interactions with the employes or agents of the Commonwealth engaged in official business. Ingress or egress of people using the office or facility shall not be impeded by group members. Any materials discarded within the building shall be picked up by the group and deposited in trash receptacles prior to leaving the office or facility.

5. RESPONSIBILITIES.

a. Heads of agencies are to insure that this policy is disseminated and enforced, and that it is included in agency regulations promulgated pursuant to Section 506 of the Administrative Code. Exceptions to this policy, for unusual situations, may be requested by agency heads from the Secretary of Administration.

b. Supervisors are to insure that activities not specifically or directly connected with the official business of the Commonwealth or otherwise authorized in accordance with this directive are prohibited in Commonwealth facilities and offices. Supervisors who fail to comply with this directive will be subject to appropriate disciplinary action.

c. All State employes are required to comply with this directive. Any State employe who fails to comply with this directive will be subject to appropriate disciplinary action.

6. RESCISSIONS. Management Directive 205.8.

This amended version replaces in its entirety Management Directive 205.14, dated April 9, 1984.



Commonwealth of Pennsylvania
**GOVERNOR'S OFFICE**
**EXECUTIVE ORDER**

| Subject | | Number |
|---|---|---|
| | Code of Conduct | 1980-18 Amended |

| Date | Distribution | By Direction Of |
|---|---|---|
| May 16, 1984 | B | Dick Thornburgh, Governor |

WHEREAS,   there continues to be a need to insure that the citizens of our Commonwealth have complete confidence in those individuals appointed and employed to serve the Commonwealth; and

WHEREAS,   the ability of our Commonwealth to provide governmental services in an efficient fashion is endangered whenever acts of misconduct by appointed officials or employes occur; and

WHEREAS,   the General Assembly of our Commonwealth has from time to time enacted legislation designed to establish standards of conduct applicable to appointed officials and state employes; and

WHEREAS,   the Governor is determined to have all possible measures taken to insure that public confidence is maintained in the Government of our Commonwealth.

NOW, THEREFORE, I, Dick Thornburgh, as Governor of the Commonwealth of Pennsylvania, by virtue of the authority vested in me by the Constitution of the Commonwealth of Pennsylvania and other laws, do hereby promulgate the following Code of Conduct, which shall apply to officials and employes of the Commonwealth as follows:

### PART I

### RESTRICTED ACTIVITIES; CONFLICTS OF INTEREST

No employe, appointee or official in the Executive Branch of the Commonwealth shall:

1.   **Adverse pecuniary interest.**

    a.   Engage directly or indirectly in any business transactions or private arrangement for profit which accrues from or is based upon his or her official position or authority.

    b.   Participate in the negotiation of or decision to award contracts, the settlement of any claims or charges in any contracts, the making of loans, the granting of subsidies, the fixing of rates, or the issuance of permits, certificates, guarantees or other things of value to, with or for any entity in which he or she has a financial or personal interest.

2.   **Representation of interests.**  Represent or act as agent for any private interest, whether for compensation or not, in any transaction in which the state has a direct and substantial interest and which could be reasonably expected to result in a conflict between a private interest of the official or employe and his official state responsibility.

*P330*
*1 oF 9*

Page 1 of 9

3.    **Gifts and favors.**  Solicit or accept for the personal use of himself or herself or another,  any gift,  gratuity,  favor,  entertainment,  loan,  or any other thing of monetary value from a person who:

a.    Is seeking to obtain business from or has financial relations with the Commonwealth.

b.    Conducts operations or activities that are regulated by the Commonwealth.

c.    Is engaged,  either as principal or attorney,  in proceedings before the Commonwealth or in court proceedings in which the Commonwealth is an adverse party.

d.    Has interests that may be substantially affected by the performance or nonperformance of the employe's official duty.

**The only exceptions are limited to:**

(1)    The solicitation or acceptance of something of monetary value from a friend,  parent, spouse,  child or other close relative when the circumstances make it clear that the motivation for the action is a personal or family relationship;

(2)    Acceptance of food and refreshment of nominal value on infrequent occasions in the ordinary course of a luncheon or dinner meeting or other meeting;

(3)    The acceptance of loans from banks or other financial institutions on customary terms of finance for proper and usual activities,  such as home mortgage loans;

(4)    Acceptance of unsolicited advertising or promotional material,  such as pens,  pencils, note pads,  calendars,  and other such items of nominal intrinsic value;

(5)    Receipts of bona fide reimbursement for actual expenses for travel and such other necessary subsistence as is compatible with other restrictions set forth in this part and for which no Commonwealth payment or reimbursement is made.  However,  an employe may not be reimbursed,  and payment may not be made on his or her behalf,  for excessive personal living expenses, gifts, entertainment or other personal benefits nor may an employe be reimbursed by a person for travel on official business under Commonwealth orders;

(6)    Participation in the affairs of or acceptance of an award for a meritorious public contribution or achievement from a charitable,  religious,  professional,  social,  fraternal or nonprofit educational,  recreational,  public service or civic organization;

(7)    A voluntary gift of nominal value or donation in a nominal amount made on a special occasion such as marriage,  illness,  or retirement; and

(8)    A plaque,  memento or gift of nominal value offered as a token of esteem or appreciation on the occasion of a public appearance,  visit,  speech or the like.

4.    **Misuse of information.**   For his or her own personal gain or for the gain of others,  use any information obtained as a result of service or employment with the Commonwealth and not available to the public at large or divulge such information in advance of the time prescribed for its authorized release.

5.    **Misuse of office facilities and equipment.**  Use any Commonwealth equipment,  supplies or properties for his or her own private gain or for other than officially designated purposes.

6. **Supplementary employment.** Engage in or accept private employment or render services for a private interest unless such employment or service is approved in advance by the Head of the Agency to which the affected person is assigned. Supplementary employment may be undertaken only when not in conflict with the conditions of employment regulations promulgated by the Executive Board and, if applicable, the Civil Service Commission. Furthermore, supplementary employment may be undertaken only when not in conflict with the conditions of employment or regulations promulgated by the government agency by which such official or employe is employed. This paragraph shall not prohibit individuals appointed to serve part-time on Boards and Commissions from pursuing their usual occupation; however, they will not perform services or receive compensation from persons or institutions which they regulate or otherwise conduct themselves in a manner inconsistent with the impartial administration of their official duties.

7. **Honoraria.** Accept honoraria, speaking fees, or any other valuable consideration. Nor shall any appointed official or state employe receive compensation for consultation which draws upon ideas or data derived from his or her official duties. However, Commonwealth officials or employes may designate non-profit, charitable organizations to be recipients of honoraria or speaking fees offered to such Commonwealth employes or officials by groups which customarily offer such honoraria to guest speakers. This paragraph shall not apply to individuals appointed to serve on Boards and Commissions who may not, however, accept such honoraria from groups that are regulated by the board or commission on which they serve, or which could otherwise raise a legitimate question about their ability to fairly and impartially perform their official duties.

8. **Political Activity.**

    a.    Engage in any political activity such as campaigning, fundraising, canvassing or poll watching during his or her specified working hours, or which is determined by the Secretary of Administration to conflict or interfere with the ability of the affected official or employe to effectively and efficiently carry out the duties and functions of his or her position.

    b.    In any manner coerce any other person in government service or employ to contribute time, money or services to a political candidate or campaign.

9. **Enforcement.** Officials, appointees or employes who refuse or fail to comply with the regulations set forth herein shall be subjected to disciplinary action including, but not limited to, reprimands, suspensions, and termination.

## PART II

## FINANCIAL DISCLOSURE

1.    **Executive Branch - Statements of Financial Interest.**   The following officials and employes of the Commonwealth shall file Statements of Financial Interest with the personnel office of their respective department, agency, board or commission, or other office as designated hereafter:

    a.    Governor.

    b.    Lieutenant Governor.

    c.    Heads of agencies and departments, their respective deputy secretaries, all Commonwealth officials or employes at the level of division chief and above, and all attorneys, press secretaries, legislative liaisons, and executive and special assistants.

    d.    Chairpersons and members of compensated boards and commissions under the Governor's jurisdiction.

e.    Executive directors, counsel, and administrative secretaries of compensated boards and commissions under the Governor's jurisdiction.

f.    Employes of all classes required by the Office of Administration to file financial disclosure under Act 170, the State Ethics Act.

2.    **Additional Filings.**  The Governor may require other officials or employes of the Commonwealth in the executive branch to file financial disclosure statements.

3.    **Filing Procedure.**  a.  Financial disclosure statements shall be filed on forms promulgated by the Secretary of Administration and provided by the Office of Personnel of the Department or Agency to which the affected official or employe is assigned,  which office shall receive, compile, and maintain copies of such statements.  Personnel offices shall provide necessary assistance in assuring that financial disclosure statements are filed properly, accurately, and completely.  Copies of statements filed shall be forwarded to the Department or Agency Head and their Chief Counsel for review.  If either of them determines a statement is not in compliance with the disclosure requirements of this Order, or that a conflict of interest could exist, copies of the statement shall be forwarded to the Secretary of the Department,  the Secretary of Administration,  and the General Counsel, who shall determine whether such statement is in compliance or whether a conflict exists and take appropriate action.

b.    Cabinet officials,  as well as the Governor and Lt. Governor,  shall submit statements of financial interest to the Secretary of Administration and the General Counsel.  The Secretary and Counsel shall review such statements and take appropriate action to insure compliance and to insure against any conflict of interest.

c.    The Secretary of Administration and the General Counsel shall submit statements to the Governor.

d.    Financial statements filed hereunder shall not be open to persons for commercial purposes; however,  they shall be available,  upon request,  for inspection by accredited reporters employed by general news organizations,  as well as the Secretary of Administration and the General Counsel, and, in the case of the Department of Transportation, the Inspector General.  Persons required to file statements pursuant to this Order shall do so within 30 days from the date he or she assumes office and,  further, shall file such statements on May 1st of each year thereafter (for the preceding calendar year) for the duration of his or her term of office.

e.    In the event any covered person fails or refuses to file a financial statement,  the appropriate official shall notify such person of his or her noncompliance within ten days of the date of notice. Failure of any covered person to comply after receipt of the notice may be a basis for removal from office.  The Head of the Department or Agency involved shall report failure of any person to comply to the Secretary of Administration and the General Counsel.

4.    **Required Disclosures.**   All persons subject to this Order shall disclose the following information, as well as such information as may be required by the State Ethics Commission:

a.    **Real Estate Property Interests.**   All in-state and out-of-state real estate property interests including revenue-producing leased facilities and interests in gas, oil, coal,  or other mineral royalty or lease (home of principal residence is to be excluded).   The required schedule shall include,  as to each disclosed interest:

(1)  The name and nature of the property,  its street or mailing address,  and a description thereof;

(2)  The nature and extent of the interest held,  including any conditions or  encumbrances upon the property interest and partners in the interest;

(3) The identity of the person from whom such interest was acquired, the date thereof, and the manner of the transfer or conveyance; and

(4) The transfer of any real property interest since the last required report was filed or since appointment or election, whichever occurs later. A description of the transferred interest, consideration received therefor, and the identity of the transferee shall be required.

b. **Personal Economic Interest.** All investments (including but not limited to stocks, notes, bonds, consulting arrangements, etc.) in any in-state or out-of-state business entity, whether or not such entity is involved in any transaction involving the Commonwealth. The required schedule shall include as to each such interest:

(1) The name and address of the principal office of the business entity;

(2) The nature of interest held, including conditions and encumbrances; and

(3) The transfer of any interest or portion thereof since the last required report was filed or since appointment or election, whichever is later. A description of the transferred interest and the identity of the transferee shall be required.

c. **Business Interests.** All interests (including but not limited to stocks, notes, bonds, partnerships, joint ownerships, proprietorships, etc.) in any business entity or not-for-profit entity doing business with the Commonwealth (if known). For purposes of this schedule, "interests" shall include not only personal economic interest but also such interests as non-paid memberships on boards of directors of business entities or not-for-profit entities. The required schedule shall include the following as to each such interest:

(1) The name and address of the principal office of the business entity;

(2) The nature and dollar value of interest held including conditions thereto and encumbrances thereon; and

(3) The transfer of any interest or portion thereof since the last required report was filed or since appointment or election, whichever is later. A description of the transferred interest and the identity of the transferee shall be required.

d. **Gifts.** All gifts of a value in excess of $100, including the forgiveness of a debt, received since the last required report was filed or since appointment or election, whichever is later. For the purposes of this section, gifts from family members need not be disclosed. The required schedule shall include:

(1) The nature and value of the gift and

(2) The identity of the person from whom, or on behalf of whom directly or indirectly, the gift was received.

e. **Employment (excluding Commonwealth employment).** All payments, compensation, or consideration of any nature for services rendered or to be rendered. Such payments, compensation, or consideration shall include, but not be limited to offices, directorships, salaried employment, consultant fees, honoraria (travel and related expenses), and other fees earned since the last required report was filed or since appointment or election, whichever is later. This required report shall include:

(1) The name and address of the office of the person for whom such services are or will be rendered;

(2)    The title or nature of the service;  and

(3)    The total amount of compensation or consideration received.

f.    Liabilities.    All liabilities owed to any person or institution since the last required report was filed,  or since appointment or election,  whichever is later,  excluding retail credit accounts,  commercial banks,  savings and loan,  and finance companies.  This required schedule shall include:

(1)    The identity of the person or institution to whom the liability is owed;

(2)    The terms of payment of the liability;

(3)    The amount of liability;

(4)    The manner in which the liability was secured;  and

(5)    Any changes in the nature or amount of any liability since the last required report was filed.

## PART III

## CRIMINAL CHARGES

Procedures to be followed by agencies under the Governor's jurisdiction in regard to employes,  and officials appointed by the Governor,  who are formally charged with criminal conduct:

1.    Definitions.

a.    Agency:    All departments,  boards,  commissions,  and other government units under the Governor's jurisdiction.

b.    Criminal Conduct Related to His or Her Employment with the Commonwealth:  Conduct by an employe in violation of a criminal law arising in the course of or from the performance of an official duty or function;  including,  but not limited to,  violations of law constituting misfeasance or malfeasance in office.

c.    Employe:    Individuals employed by,  or appointed to serve on,  an agency,  board,  commission or department of the Commonwealth.    However,  the term "employe" shall not include those individuals who are members of the Pennsylvania National Guard who are not otherwise employed by the Commonwealth.

d.    Formally Charged with Criminal Conduct:    An employe shall be deemed to be formally charged with criminal conduct when he or she has been arrested or named as a defendant in an indictment or information or,  in the case of a private complaint,  the complaint has been approved by the prosecuting authority.

e.    Sufficient Reason for Disciplinary Action:    "Sufficient reason for disciplinary action" shall be determined by the exercise of discretion of the Head of the Agency which employs such person, or his or her designee;  except that,  to the extent required by statute or contract,  for those employes within the classified service and/or those employes covered by provisions of a collective bargaining agreement,  "sufficient reason" for disciplinary action shall mean "just cause."

2.   **Required Action When an Employe is Formally Charged with Criminal Conduct Related to His or Her Employment with the Commonwealth or which Constitutes a Felony.**  As soon as practicable after an employe has been formally charged with criminal conduct related to his or her employment with the Commonwealth or which constitutes a felony, such employe shall be suspended without pay.  If such charge results in conviction in a court of law,  such employe shall be terminated.

3.   **Required Action When an Employe is Formally Charged with Criminal Conduct other than a Felony and Not Related to His or Her Employment with the Commonwealth.**  As soon as practicable after an employe is formally charged with criminal conduct other than a felony and not related to his or her employment with the Commonwealth, the Head of the Agency which employs such person, or his or her designee,  shall conduct an inquiry and make a preliminary determination as to whether or not the employe should continue to perform his or her duties pending the outcome of the investigation and final determination in accordance with paragraphs 4 and 5, below.

   a.   **Purpose.**   The purpose of the preliminary determination is to allow the agency to minimize the effect which the accusation of the commission of a crime by one of its employees may have upon the agency's ability to function pending an investigation and final determination by the appointed authority or his or her designee as to the existence of sufficient reason for disciplinary action against the employe.

   b.   **Making the Preliminary Determination.**  In making a preliminary determination,  the Agency Head or his or her designee shall select one of the three following alternatives and implement it as regards the employe:

      (1)   Allow the employe to continue to perform duties pending the outcome of the investigation and final determination; or

      (2)   Reassign the employe to other,  less sensitive duties within the agency pending the outcome of the investigation and final determination; or

      (3)   Suspend the employe without pay pending the outcome of the investigation and final determination.

   c.   **Factors to be Considered in Making the Preliminary Determination.**   In making the preliminary determination,  the Agency Head shall consider,  among other factors,  the following:

      (1)   The employe's explanation,  if available;

      (2)   The extent to which allowing the employe to continue in his or her position would be detrimental to the physical well-being of the employe,  his or her fellow workers,  or other persons;

      (3)   The nature of the employe's duties,  including the amount of discretion exercised as part of those duties;

      (4)   The nature,  weight,  basis,  and source of the accusations against him or her;

      (5)   The relationship of the accusations to the employe's duties;

      (6)   The extent to which the employe must deal directly with the public;

      (7)   The extent to which the accusations of wrongdoing may affect the public's trust and confidence in the employe,  the agency,  and state government; and

      (8)   Any undue hardship to the employe which would result from his or her temporary reassignment.

d.  Contact with Law Enforcement Agency.  In considering the nature, weight, and source of the accusations against an employe, the agency shall contact the law enforcement agency involved in the accusations against the employe to verify the charge and to obtain all available information as to the charges against the employe.

e.  Employe Status.  After the preliminary determination is made, employes shall remain in the status selected pending the outcome of the investigation and final determination in accordance with paragraphs 4 and 5, below.  This status shall be temporary, pending the outcome of the investigation by the agency, and shall in no way bear upon the Agency Head's final determination.

4.  **Investigation.**  Any employe formally charged with criminal conduct, as referred to in paragraph 3, shall be subject to an immediate investigation conducted by the Agency Head or his or her designee.

a.  Purpose.  The purpose of this investigation shall be to determine whether sufficient reason exists for disciplinary action including, but not limited to, suspension without pay, demotion, or dismissal.

b.  Conduct of the Investigation.  In the investigation, all the relevant facts shall be promptly gathered and considered.  The agency's chief counsel may assist the Agency Head or his or her designee in making the investigation.  The investigation shall be completed within **twelve (12) working days** from the date on which the Secretary of Administration is notified pursuant to paragraph 6, below.  An extension of this period may be granted only by the Secretary of Administration, in writing, and only on a showing, in writing, by the Agency Head or his or her designee of a conscientious effort to meet the deadline and an explanation of the reasons why that deadline cannot be met.  Only one such extension may be granted, which extension shall not exceed twelve (12) working days.

*(1)  Law Enforcement Agencies.*   In the investigation, the Agency Head or his or her designee may request the assistance of any law enforcement agency involved in the matter; however, this shall not relieve the appointing authority or his or her designee of the responsibility to make an independent evaluation.

*(2)  Employe Contact.*  In the investigation, the Agency Head or his or her designee shall afford the employe an opportunity to explain the accusations made against him or her, and the opportunity to have representation during any meetings which relate to the investigation, if such representation is requested, and the opportunity to submit such additional information as the employe may wish to provide.

5.  Final Determination.  a.  After completion of the investigation, the Agency Head shall have **five (5) working days** to make a final determination as to whether the results of the investigation establish sufficient reason for disciplinary action and, if established, what disciplinary action shall be taken.  The Secretary of Administration and the General Counsel shall review this decision and ratify the decision of the Agency Head absent an abuse of discretion.  An extension of this period may be granted only by the General Counsel or his designee, in writing, and only on a showing, in writing, by the Agency Head of a conscientious effort to meet the deadline and an explanation of the reasons why that deadline cannot be met.  Only one such extension may be granted, which extension shall not exceed five (5) working days.

b.  In determining whether sufficient reason for disciplinary action exists, the Agency Head shall consider, among other factors, all of the following:

(1)  The employe's explanation, if available;

(2)  The extent to which allowing the employe to continue in his or her position would be detrimental to the physical well-being of the employe, his or her fellow workers, or other persons;

(3)  The nature of the employe's duties,  including the amount of discretion exercised as part of those duties;

(4)  The nature,  weight,  and source of the accusations against him or her;

(5)  The relationship of the accusations to the employe's duties;

(6)  The extent to which the employe must deal with the public;  and

(7)  The extent to which the accusations of wrongdoing may affect the public's trust and confidence in the employe,  the agency,  or state government.

c.    If sufficient reason for disciplinary action is determined to exist,  the Agency Head shall immediately take appropriate disciplinary action including,  but not limited to,  suspension of pay, demotion,  or dismissal,  which action shall be reviewed by the Secretary of Administration and the General Counsel and ratified by them absent a finding of abuse of discretion.

d.    If, based on information available at that time, a finding of sufficient reason is not made, the employe shall be notified of the disposition and shall retain or be retroactively reinstated to his or her previous position.

e.    The subsequent availability of pertinent information shall require an appointing authority or his or her designee to reconsider the previous disposition and renew investigation into the conduct at issue.

6.    **Notification of the Secretary of Administration.**    When an employe has been charged with criminal conduct,  the Agency Head or his or her designee shall immediately notify the Secretary of Administration of the name and position of the employe,  the criminal charges against the employe,  and of the initiation of any agency investigation.   Any action taken with regard to the employment status of the employe and the disposition of such criminal charges shall also be reported to the Secretary of Administration.

7.    **Criminal Charges against the Head of an Agency.**    Whenever a criminal charge involves the Head of an Agency,  the steps set forth in this Part shall be followed as in the case of any other agency employe or official,  except that the determinations and actions required shall be performed by the Secretary of Administration and subject to review by the Governor and the General Counsel.

RESCISSIONS.  Executive Orders 1974-6 (4 Pennsylvania Code 7.151) and 1978-7 (4 Pennsylvania Code 7.71) are rescinded.  This amended Order replaces Executive Order 1980-18,  dated September 3, 1980,  and Revisions 1-9 thereto.

 

EXHIBIT K

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

DATE:            November 15, 1999

SUBJECT:         Extension of Evaluation Team Members for the Incident Information Management
                 System (IIMS) Program

TO:              Director, Bureau of Liquor Control Enforcement
                 ATTN: LEO Christopher C. Wilson

FROM:            Colonel Paul J. Evanko
                 Commissioner

    1.    The Department's Mobile Office Evaluation Team has recently completed work on the Request for Qualified Contractor (RFQC) for the Phase 1 Mobile Office. The document has been forwarded to Commonwealth agencies for final review and approval and is expected to be released on November 22, 1999. This release represents a significant milestone in the IIMS Program.

    2.    LEO Wilson has been assigned to the Program since June 10, 1999, and has been intimately involved in the preparation of the RFQC for the Phase 1 Mobile Office Prime Contractor. His input, experience, and expertise have proven to be an invaluable resource for the Department. LEO Wilson has been further assigned to a committee that will examine the portable computing needs of Department personnel unaffected by the Phase 1 Mobile Office deployment. LEO Wilson's assignment to the Bureau of Technology Services has been extended due to his continued involvement in the analysis of the Department's computing needs. Our expectation is that his assignment will continue until April 30, 2000.

    3.    Please accept my personal thanks for your continued support of this most important Program.

    4.    Questions regarding this assignment may be directed to Major Wesley R. Waugh, Director, Bureau of Technology Services, at 717-787-8596 or Mr. Ron Wilt, IIMS Program Manager, at 717-657-4140. Additional information of interest regarding the IIMS Program may be obtained via the Department's web site at http://www.psp.state.pa.us.

cc:   Director, Bureau of Personnel
      Director, Bureau of Technology Services
      Director, Strategic Development Division
      IIMS Program Manager
      Lt. Robert J. Scott

P 331

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

DATE:        July 27, 1999

SUBJECT:     Assignment of Evaluation Team Members for the Incident Information
             Management System (IIMS)

TO:          Director, Bureau of Liquor Control Enforcement
             ATTN: EO3 David Christensen

FROM:        Colonel Paul J. Evanko
             Commissioner

      1.    The Department is preparing to release several Requests for Qualified Contractor (RFQC) documents to begin the procurement phase of the Incident Information Management System (IIMS). The magnitude of IIMS and its importance to the Pennsylvania State Police require a cross section of personnel representing diverse functional areas of the Department to participate in the evaluation process. The success of IIMS is dependent on the evaluation and selection of the right products and services.

      2.    EO3 David Christensen has been selected for a temporary, full-time assignment to the IIMS Project. EO3 David Christensen is assigned to the Bar Coding/Evidence Management systems evaluation committee. The assignment shall begin on August 21, 1999, and is scheduled for completion on February 18, 2000. You will be kept informed if changes to the schedule become necessary.

      3.    During this assignment, evaluation team members shall be assigned to the Bureau of Technology Services. Mr. Ron Wilt, IIMS Project Manager, will provide direction and support to the evaluation team members, to include personnel issues, scheduling, leave approval, and work assignments.

      4.    Much of the required work will take place in the Harrisburg area. Troops and Bureaus shall provide transportation for those members who are currently assigned to work locations outside the Harrisburg area. The Bureau of Technology Services shall be responsible for providing lodging.

      5.    Questions regarding this assignment may be directed to Major Wesley R. Waugh, Director, Bureau of Technology Services, at 717-787-8596 or Mr. Ron Wilt, IIMS Project Manager, at 717-657-4140. Additional information of interest regarding the IIMS Project may be obtained via the Department's web site at http://www.psp.state.pa.us.

P332

COMMONWEALTH OF PENNSYLVANIA
STD-370          REV. 10-96

# JOB DESCRIPTION

| 1. Name of Employe (Last, First, MI) | 2. Employe Number | Position Number |
|---|---|---|
| OBER, DARRELL G. | 099820 | 104177 |

| 3. Department | Bureau | Division | Headquarters | Organization Code |
|---|---|---|---|---|
| PENNSYLVANIA STATE POLICE | LIQUOR CONTROL ENFORCEMENT | ADMINISTRATION | HARRISBURG | 5410 |

| 4. Class Title | Working Title | Class Code |
|---|---|---|
| CAPTAIN | DIRECTOR OF ADMINISTRATION | 74060 |

**5. Regular Work Schedule**

Start Time: 0815    Lunch Length: 30

End Time: 1615    Hours/Week: 40

**Position is:**

[X] Full-Time    [X] Permanent

[ ] Part-Time    [ ] Temporary

**Reports to:**

| Name | Class Title |
|---|---|
| BUREAU DIRECTOR  FRANCIS E. KOSCELNAK | MAJOR |

**Days Worked (check all that apply):**

| S | M | T | W | Th | F | S |
|---|---|---|---|---|---|---|
|   | X | X | X | X | X |   |

**Explain any schedule variations:**

---

6. Describe the work assigned to this position, listing the critical duties and responsibilities first. Explain work in familiar terms and include machines or equipment used. Use additional paper if needed.

17%    Serves as Bureau Labor Relations Coordinator by direct and written communications with five (5) union representatives, the Bureau of Personnel and the Office of Administration. Represents the Bureau at all union contracts negotiations and labor relations hearings. Resolves conflicts and handles grievances from and between union and management.

15%    Directs the administrative responsibilities of the Division, including budget and contract management, approvals and authorizations, facility and equipment management, documentation and record keeping, by conferring with superiors and subordinates, completing assignments, responding to requests, solving problems and making decisions as required.

15%    Ensures proper planning and analysis within the Division by anticipating Department, Bureau and Division needs and requirements in areas such as budget preparation, federal grant development, program analysis, legal analysis, and emergency planning; setting policy and procedures; establishing time schedules; and assigning appropriate personnel to meet requirements.

10%    Supervises and manages personnel by monitoring, documenting, coaching and correcting performance; conducting performance evaluations; resolving personnel problems and conflicts; ensuring compliance with rules and regulations; providing leadership; and ensuring a non-discriminatory work environment.

5%    Provides training to Division personnel by assessing training needs; selecting and approving personnel to attend training, in accordance with regulations; developing training programs, where needed; and evaluating in-service and out-service training programs for usefulness to Division personnel.

5%    Ensures effective flow of information from and through the Division by communicating clearly, both orally and in writing, holding staff meetings as needed, and providing an atmosphere which encourages accurate and efficient communications.

5%    Coordinates intra-department activities by responding to inquiries and providing information as requested; attending staff meetings, Command Conferences, etc.; implementing federal grants, etc.

P333

OBER, DARRELL G.
Job Description (Cont'd)

5%   Ensures effective working relationships with external agencies and organizations by maintaining a professional Department image, and an atmosphere of cooperation with the general public, media, and other law enforcement agencies and the courts, and public and private organizations.

5%   Directs the overall operation of the Report Examination Unit and provides guidance to Unit Supervisor in planning and directing work activity to ensure that all Unit functions are in accordance with the Bureau's objectives.

5%   Maintains necessary knowledge and skills by keeping current on changes in Department policies and regulations, law enforcement procedures, and management principles; attending training as needed; and reading professional literature.

5%   Responds to legislative inquiries on Bureau services and general questions from the public concerning the Bureau.  Includes the preparation of correspondences received on inquiries, surveys or informational requests.

5%   Performs other duties as required, including services on boards, conducting investigations, attending ceremonies, drafting Bureau regulations, evaluating special equipment, and reviewing legislation and making recommendations.

2%   Performs other related duties and those duties of a law enforcement officer as required, including, but not limited to interpreting laws and statutes of the Commonwealth, pursuing suspects, effecting arrests; qualifying with and, when necessary, using agency firearms and other self-defense devices; operating vehicles and using equipment in conjunction with law enforcement duties; responding to emergencies, civil disorders and disasters; and performing rescue functions.

1%   Serves as the security officer for the Bureau.  Plans, coordinates and assists the District Office Commanders with security for their facilities.

7.  Briefly describe how work is assigned to ● position and how the work is reviewed. ●

Work is received directly from the Bureau Director or is self-initiated.  Upon completion of work, all copies are forwarded to the Bureau Director for his review and approval.

8.  If this is a supervisory position, briefly describe how work is assigned to subordinate personnel and how their work is reviewed.  (If this is not a supervisory position, leave blank.)

Work is assigned to the appropriate individual, either orally or by correspondence.  The finished work product is forwarded, through this individual, prior to implementation.  Review of the product is done at that time.

9.  Attach an Organizational Chart identifying all reporting relationships for this position.

10.  Attach a statement identifying the essential functions of the positions.

## CERTIFICATION

I certify that to the best of my knowledge all statements contained within the job description are correct:  This job description consists of _2_ pages.  (count this form as 1 page)

| | | |
|---|---|---|
| Employe's Signature | Class Title  *DIRECTOR ADMINISTRATION DIVISION* | Date 6/2/00 |
| Immediate Supervisor's Signature  *Mefen Tn E. Konaelnall* | Class Title  *DIRECTOR, BLCE* | Date 06/03/00 |
| Reviewing Officer's Signature  *LTC Qkyldth Wertatt* | Class Title  *Dep Ops* | Date 6/6/00 |



## ESSENTIAL JOB FUNCTIONS

1.    Serves as Bureau Labor Relations Coordinator.

2.    Directs administrative responsibilities within the Division of Administration.

3.    Ensures proper planning and analysis within the Division by anticipating needs and requirements.

4.    Supervises and manages personnel.

5.    Provides training to Division personnel and assesses training needs.

6.    Ensures effective flow of information from and through the Division.

7.    Directs overall operation of the Report Examination Unit.

8.    Performs other related duties and those duties of a law enforcement officer as required, including, but not limited to interpreting laws and statutes of the Commonwealth, pursuing suspects, effecting arrests; qualifying with and, when necessary, using agency firearms and other self-defense devices; operating vehicles and using equipment in conjunction with law enforcement duties; responding to emergencies, civil disorders and disasters; and performing rescue functions.

9.    Serves as the security officer for the Bureau.  Plans, coordinates and assists the District Office Commander with security for their facilities.

_Maje A. D. Konalnah_                                    _06/02/2000_

Supervisor's or Manager's Signature                    Date





*John R. Brown*
*6519 Sanibel Dr*
*Harrisburg, PA 17111-6006*

Mr. & Mrs. Darrell Ober
71 Millers Gap Road
Enola, PA 17025



THANK YOU

P 334
1 OF 2

Captain Ober,                                    02/02/00

       Where do I begin. Through
adversity, you stand tall for your
beliefs. You are a winner, let
no one tell you differently.
       I am proud to have
served with you. You taught me,
led me and supported me during
some very difficult times, and have
been a loyal friend.
       You have protected me
and provided me with opportunity.
Thanks Captain, for your trust,
confidence and faith in me
during some difficult times.
I will never forget what you have
done for me. Hopefully, one day
we will work together again.
       I can't begin to tell
you what it meant to me to
see you and Kim at the
ceremony. I'll never forget your
support. Thanks again Captain.
Thanks Kim.
                    Rick

WHT 11-02371 S PMA221-00021 09/24/01 08:06:16 - 09/24/01 07:14:29 BZ13Y9WH65HL
SN PMA221 BES221 P,

FILE 14 PAPSP00E2  STATE POLICE EMERGENCY OPERATIONS CELL, HARRISBURG, PA

SUBJECT:        REACTIVATION OF DEPARTMENT EMERGENCY PREPAREDNESS
                LIAISON TEAM AT PEMA SEOC

TO:             DEPUTY COMMISSIONER OF OPERATIONS
                DEPUTY COMMISSIONER OF STAFF
                AREA, TROOP AND STATION COMMANDERS,
                BUREAU AND OFFICE DIRECTORS

REFERENCE:      (A)  PSP EMERGENCY OPERATIONS PLAN

                1.   THE PENNSYLVANIA STATE POLICE EMERGENCY PREPAREDNESS
                     LIAISON TEAM, AT THE PEMA EMERGENCY OPERATIONS IS
                     REACTIVATED AT 0700 HOURS, MONDAY 9/24/01.
                2.   UNMET NEEDS OR REQUESTS FOR RESOURCES RELATED TO DISASTER
                     RESPONSE SHOULD BE DIRECTED TO PSP EOC AT (717)651-2083.
                3.   THERE IS NO NEED TO ACKNOWLEDGE RECEIPT OF THIS MESSAGE.

P 335
1 OF 40

PAGE 1   OF 2
WHLD11 J2372 C WHLD11-02366 09/24/01 08:06:53 - 09/24/01 08:06:53 7AJ9K9WH6YW3
WHLD11-02366 S PMA221-00019 09/24/01 08:06:14 - 09/22/01 09:16:32 BZ13Y9WF7YRG
SN PMA221 BES221 P,

FILE 14 PAPSP00E3 STATE POLICE EMERGENCY OPERATIONS CELL, HARRISBURG, PA

SUBJECT:        REACTIVATION OF DEPARTMENT EMERGENCY PREPAREDNESS LIAISION TEAM
                PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA) OPERATIONS
                CENTER (EOC)

TO:             DEPUTY COMMISSIONER OF OPERATIONS
                DEPUTY COMMISSIONER OF STAFF
                AREA, TROOP AND STATION COMMANDERS
                AND BUREAU AND OFFICE DIRECTORS

REFERENCE:      (A)  PSP EMERGENCY OPERATIONS PLAN

        1.  THE STATE POLICE CELL AT THE PENNSYLVANIA EMERGENCY OPERATIONS
CENTER HAS BEEN REACTIVATED.  UNTIL FURTHER NOTICE, STATE POLICE PERSONNEL
WILL STAFF THE DEPARTMENT'S CELL AT THE EMERGENCY OPERATIONS CENTER FROM
0700 HOURS THROUGH 2300 HOURS DAILY.

SAN: BZ13Y9WF7YRG                                                    PAGE 2   OF 2

       2.   STATE POLICE UNMET NEEDS OR REQUESTS FOR RESOURCES SHOULD
BE DIRECTED TO THE STATE POLICE CELL AT (717) 651-2082.

       3.   THERE IS NO NEED TO ACKNOWLEDGE THIS MESSAGE.


AUTH/CAPTAIN J R DAVIS/EPLO/JAF

WHLD11-02352 S PMA221-00014 09/20/01 08:07:56 - 09/19/01 22:40:08 BZ13Y9WBLJBX
SN PMA221 P,

FILE 14 PAPSP00E3 STATE POLICE EMERGENCY OPERATIONS CELL, HARRISBURG, PA

SUBJECT:       TEMPORARY DEACTIVATION OF DEPARTMENT EMERGENCY RESPONSE TEAM
               PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA) OPERATIONS CENTER
               (EOC)

TO:            DEPUTY COMMISSIONER OF OPERATIONS
               DEPUTY COMMISSIONER OF STAFF
               AREA, TROOP AND STATION COMMANDERS


REFERENCE:     (A)  PSP EMERGENCY OPERATIONS PLAN



       1.  THE PENNSYLVANIA STATE POLICE EMERGENCY RESPONSE TEAM WILL BE
TEMPORARILY DEACTIVATED FROM WEDNESSAY, SEPTEMBER 19, 2001, 2300 HOURS, TO
THURSDAY, SEPTEMBER 20, 2001, 0700 HOURS.

SAN: BZ13Y9WBLJBX                                          PAGE 2  OF 2
        2.  IN THE INTERIM, STATE POLICE UNMET NEEDS OR REQUESTS FOR
RESOURCES SHOULD BE DIRECTED TO THE PEMA OPERATIONS CENTER AT (717) 651-2001.

        3.  THERE IS NO NEED TO ACKNOWLEDGE THIS MESSAGE.


AUTH/EPLO CAPTAIN WILLIAM E CONWAY

PMA221
PAPSP00E3

02378 S PMA221-00023 09/24/01 11:53:34 - 09/24/01 11:53:24 BZ13Y9WHA6KC
221 BES221 P,


14  PAPSP00E2  SP EMERGENCY OPERATIONS CELL, HARRISBURG PA
CT:   DEACTIVATION OF DEPARTMENT EMERGENCY PREPAREDNESS LIAISON TEAM
      AT PEMA SEOC

      DEPUTY COMMISSIONER OF OPERATIONS
      DEPUTY COMMISSIONER OF STAFF
      AREA, TROOP AND STATION COMMANDERS, BUREAU AND OFFICE
        DIRECTORS

REFERENCE:  (A)  PSP EMERGENCY OPERATIONS PLAN

     1.  THE PSP EMERGENCY PREPAREDNESS LIAISON TEAM AT THE PEMA
EMERGENCY OPERATIONS IS DEACTIVATED FROM THE NATIONAL EMERGENCY.

     2.  QUESTIONS MAY BE REFERRED TO CAPT JEFF DAVIS, BESO, 717-
787-4600.

     3.  THERE IS NO NEED TO ACKNOWLEDGE RECEIPT OF THIS MESSAGE.
AUTH/CAPTAIN MICHAEL R NAGURNY/EPLO      PD

WHLD11-02334 C WHLD11-02329 09/██/01 08:28:05 - 09/18/01 08:2██04 7AJ9K9WA78KM
WHLD11-02329 S PMA221-00002 09/18/01 08:26:49 - 09/17/01 23:08:56 BZ13Y9W9LVSQ
SN PMA221 P,

FILE 14 PAPSP00E3 STATE POLICE EMERGENCY OPERATIONS CELL, HARRISBURG, PA

SUBJECT:        TEMPORARY DEACTIVATION OF DEPARTMENT EMERGENCY RESPONSE TEAM
                PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA) OPERATIONS CENTER
                (EOC)

TO:             DEPUTY COMMISSIONER OF OPERATIONS
                DEPUTY COMMISSIONER OF STAFF
                AREA, TROOP AND STATION COMMANDERS
                AND BUREAU AND OFFICE DIRECTORS

REFERENCE:      (A)  PSP EMERGENCY OPERATIONS PLAN


        1.  THE PENNSYLVANIA STATE POLICE EMERGENCY RESPONSE TEAM WILL BE
TEMPORARILY DEACTIVATED FROM MONDAY, SEPTEMBER 17, 2001, 2300 HOURS, TO

WHLD11-02332 S PMA221-00005 09/⬤/01 08:26:49 - 09/18/01 07:4⬤22 BZ13Y9WA6PVM
SN P BES221 PMA221, FILE 14

SUBJECT: ACTIVATION OF PSP PEMA CELL

PSP PEMA CELL ACTIVATED AT 0700 HOURS BY CAPTAIN DAVIS AND CORPORAL FERSNER AND
WILL REMAIN ACTIVATED TODAY UNTIL 2300 HOURS.


AUTH OIC EMERGENCY OPERATIONS CENTER/CAPTAIN JEFFREY DAVIS        HGF

WHLD11-02332 S PMA221-00005 09/██/01 08:26:49 - 09/18/01 07:██:22 BZ13Y9WA6PVM
SN P BES221 PMA221, FILE 14

SUBJECT: ACTIVATION OF PSP PEMA CELL

PSP PEMA CELL ACTIVATED AT 0700 HOURS BY CAPTAIN DAVIS AND CORPORAL FERSNER AND
WILL REMAIN ACTIVATED TODAY UNTIL 2300 HOURS.


AUTH OIC EMERGENCY OPERATIONS CENTER/CAPTAIN JEFFREY DAVIS        HGF

WHLD11-02334 C WHLD11-02329 09/██/01 08:28:05 - 09/18/01 08:2██04 7AJ9K9WA78KM
WHLD11-02329 S PMA221-00002 09/18/01 08:26:49 - 09/17/01 23:08:56 BZ13Y9W9LVSQ
SN PMA221 P,

FILE 14 PAPSP00E3 STATE POLICE EMERGENCY OPERATIONS CELL, HARRISBURG, PA

SUBJECT:        TEMPORARY DEACTIVATION OF DEPARTMENT EMERGENCY RESPONSE TEAM
                PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA) OPERATIONS CENTER
                (EOC)

TO:             DEPUTY COMMISSIONER OF OPERATIONS
                DEPUTY COMMISSIONER OF STAFF
                AREA, TROOP AND STATION COMMANDERS
                AND BUREAU AND OFFICE DIRECTORS

REFERENCE:      (A)  PSP EMERGENCY OPERATIONS PLAN


        1.  THE PENNSYLVANIA STATE POLICE EMERGENCY RESPONSE TEAM WILL BE
TEMPORARILY DEACTIVATED FROM MONDAY, SEPTEMBER 17, 2001, 2300 HOURS, TO

0560 S HBG221-05265 11/03/00 08:05:33 - 11/02/00 20:57:39 BZ13X9KAJZPM
S221 PEM221,

**PAGE 1 OF 2**

14  PAPSP00E3  STATE POLICE EMERGENCY
IONS CELL
HARRISBURG, PA

JECT: GENERAL EMERGENCY DECLARED AT SUSQUEHANNA STREAM
CTRIC STATION (SSES),
PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA)
ERGENCY
OPERATIONS CENTER (EOC)

TO:  DEPUTY COMMISSIONER OF OPERATIONS;  AREA, TROOP, AND
STATION COMMANDERS

REFERENCE:  (A) PSP EMERGENCY OPERATIONS PLAN.
        ******** THIS IS AN EXERCISE********
AUTH / CO TROOP H HARRISBURG / MICHAEL MARCANTINO / AMM /

WHLD11-00569 S HBG221-05266 11/ /00 08:05:33 - 11/02/00 21: 29 BZ13X9KAK109
SN P BES221 PEM221,
                    **PAGE 2 OF 2**
1. A GENERAL EMERGENCY HAS BEEN DECLARED  FOR
THE SUSQUEHANNA STEAM
    ELECTRIC STATION IN LUZERNE COUNTY.


    2.   AN EVACUATION HAS BEEN ORDERED FOR A 10 MILE
360 DEGREE RADIUS AROUND
    THE SSES.  PSP EGRESS POINTS HAVE BEEN
ACTIVATED.


    3. STATE POLICE UNMET NEEDS OR REQUESTS FOR
RESOURCES SHOULD BE DIRECTED
    TO THE EMERGENCY PREPAREDNESS LIAISON
OFFICER (EPLO) CAPTAIN CHARLES
    SKURKIS.  COMMUNICATIONS CAN BE VIA CLEAN
TERMINAL PEM221 OR TELEPHONE
    717.651.2082 (RECORDED), AND 717.541.7856
(NOT RECORDED).

  *******THIS IS AN EXERCISE*******

WHLD11-00566 S HBG221-05262 11/03/00 08:05:32 - 11/02/00 20:06:02 BZ13X9KAJNT6
SN P BES221 PEM221,

**PAGE 1 OF 2**

 FILE 14  PAPSP00E3  STATE POLICE EMERGENCY
OPERATIONS CELL
      HARRISBURG, PA

 SUBJECT: PROCLAMATION OF DISASTER EMERGENCY AT SUSQUEHANNA
STREAM ELECTRIC STATION,
    PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA)
EMERGENCY
    OPERATIONS CENTER (EOC)

 TO:  DEPUTY COMMISSIONER OF OPERATIONS;  **AREA, TROOP, AND**
STATION COMMANDERS

 REFERENCE:  (A) PSP EMERGENCY OPERATIONS PLAN.
      ********* THIS IS AN EXERCISE*******

AUTH / CO TROOP H HARRISBURG / CAPTAIN MICHAEL MARCANTINO / AMM /

WHLD11-00567 S HBG221-05263 11/03/00 08:05:32 - 11/02/00 20:40:50 BZ13X9KAJR0D
SN P BES221 PEM221,

**PAGE 2 OF 2**

1. THE GOVERNOR HAS SIGNED A PROCLAMATION OF
DISASTER EMERGENCY FOR THE      SITUATION AT THE
SUSQUEHANNA STEAM ELECTRIC STATION IN LUZERNE COUNTY.


   2.   NO ADDITIONAL ACTION IS NECESSARY AT THIS
POINT.


   3. STATE POLICE UNMET NEEDS OR REQUESTS FOR
RESOURCES SHOULD BE DIRECTED
    TO THE EMERGENCY PREPAREDNESS LIAISON
OFFICER (EPLO) CAPTAIN CHARLES
    SKURKIS.  COMMUNICATIONS CAN BE VIA CLEAN
TERMINAL PEM221 OR TELEPHONE
    717.651.2082 (RECORDED), AND 717.541.7856
(NOT RECORDED).

 *******THIS IS AN EXERCISE*******

WHLD11-00565 S HBG221-05255 11█/00 08:05:30 - 11/02/00 19:3█17 BZ13X9KAHTFT PAGE 1 OF 2
SN P BES221 PEM221,
                           **PAGE 2 OF 2**

1. A SITE AREA EMERGENCY HAS BEEN DECLARED AT THE
   SUSQUEHANNA STEAM ELECTRIC
       STATION IN LUZERNE COUNTY.

   2.   TROOP "P" IS NOW IMPLEMENTING THE PROVISIONS OF THE
   RADIOLOGICAL EMERGENCY
       RESPONSE PLAN.

   3. STATE POLICE UNMET NEEDS OR REQUESTS FOR RESOURCES
   SHOULD BE DIRECTED
       TO THE EMERGENCY PREPAREDNESS LIAISON OFFICER (EPLO)
   CAPTAIN CHARLES
       SKURKIS.  COMMUNICATIONS CAN BE VIA CLEAN TERMINAL
   PEM221 OR TELEPHONE
       717.651.2082 (RECORDED), AND 717.541.7856 (NOT
   RECORDED).

   *******THIS IS AN EXERCISE*******

WHLD11-00564 S HBG221-05254 11/■3/00 08:05:30 - 11/02/00 19:■■.37 BZ13X9KAHS7P
SN P BES221 PEM221,                                                    PAGE 1  OF 1
                     **PAGE 1 OF 2**

    FILE 14  PAPSP00E3  STATE POLICE EMERGENCY
    OPERATIONS CELL
          HARRISBURG, PA

    SUBJECT: ESCALATION TO SITE AREA EMERGENCY AT SUSQUEHANNA STREAM
    ELECTRIC STATION,
       PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA) EMERGENCY
       OPERATIONS CENTER (EOC)

    TO:  DEPUTY COMMISSIONER OF OPERATIONS;   AREA, TROOP, AND STATION
    COMMANDERS


    REFERENCE:   (A) PSP EMERGENCY OPERATIONS PLAN.

    ******** THIS IS AN EXERCISE ********

AUTH / CO TROOP H HARRISBURG / CAPTAIN MICHAEL MARCANTINO / AMM /

PRNT:A

PRNT:A

SYS-0125   FUNCTION COMPLETED
WHLD11-00563 S HBG221-05250 11/03/00 08:05:30 - 11/02/00 17:50:36 BZ13X9KAGA2N
SN P BES221 PEM221,
                    **PAGE 2 OF 2**

1. THE PENNSYLVANIA STATE POLICE EMERGENCY PREPAREDNESS
LIAISON TEAM
   HAS BEEN ACTIVATED DUE TO AN ALERT AT THE
SUSQUEHANNA STEAM ELECTRIC
   STATION IN LUZERNE COUNTY.  THE PSP CELL WITHIN THE
PEMA EOC HAS BEEN
   STAFFED BY TEAM RED.

   2. STATE POLICE UNMET NEEDS OR REQUESTS FOR RESOURCES
SHOULD BE DIRECTED
   TO THE EMERGENCY PREPAREDNESS LIAISON OFFICER (EPLO)
CAPTAIN CHARLES
   SKURKIS.  COMMUNICATIONS CAN BE VIA CLEAN TERMINAL
PEM221 OR TELEPHONE
   717.651.2082 (RECORDED), AND 717.541.7856 (NOT
RECORDED).

*******THIS IS AN EXERCISE*******

WHLD11-00559 S BES037-00001 11/○/00 10:25:31 - 11/02/00 10:2○○7 BZ2J39KA8Y53
SN BES037 P,
FILE 14  PAPSP0013    STATE POLICE, HERSHEY, PA

SUBJECT:  SUSQUEHANNA STEAM ELECTRIC STATION BIENNIAL EXERCISE

TO:       DEPUTY COMMISSIONER OF OPERATIONS
          AREA, TROOP AND STATION COMMANDERS

     1.  ON NOVEMBER 2, 2000, THE DEPARTMENT WILL PARTICIPATE WITH
PEMA, OTHER STATE AGENCIES, AND LOCAL GOVERNMENTS IN THE BIENNIAL EXERCISE
FOR THE SUSQUEHANNA STEAM ELECTRIC STATION IN LUZERNE COUNTY.  THE EXERCISE
IS EXPECTED TO BEGIN AT APPROXIMATELY 1630 HOURS.

     2.  AS PART OF THE EXERCISE SCENARIO, DEPARTMENT PERSONNEL AT THE
COMMONWEALTH EMERGENCY OPERATIONS CENTER (EOC) IN HARRISBURG MAY HAVE
OCCASION TO CONTACT TROOP HEADQUARTERS AND STATIONS FOR INFORMATION TO
ASSIST IN THE EXERCISE PLAY.  ALL CONTACTS WILL BE PRECEEDED BY THE PHRASE,
"THIS IS AN EXERCISE."  A CLEAN MESSAGE WILL BE DISSEMINATED FROM THE EOC
AT THE BEGINNING AND END OF THE EXERCISE.

     3.  QUESTIONS CONCERNING THE EXERCISE MAY BE DIRECTED TO THE

SAN: BZ2J39KA8Y53
EMERGENCY OPERATIONS OFFICER A ● 717) 787-4600.                    ●  PAGE 2   OF 2

AUTH/MAJ LEONARD WAS   NGTON JR/DIR., BUR OF EMERG AND SPECIAL OPS/KMS

WHLD11-00570 S PMA221-00001 11⬤/00 08:05:33 - 11/02/00 21:5⬤:24 BZ13Y9KAKVHJ
SN P BES221 PMA221,

FILE 14   PAPSP00E3    STATE POLICE EMERGENCY OPERATIONS CELL
                       HARRISBURG, PA

SUBJECT:      DEACTIVATION OF DEPARTMENT EMERGENCY PREPAREDNESS LIAISON TEAM,
              PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA) EMERGENCY
              OPERATIONS CENTER (EOC)

TO:           DEPUTY COMMISSIONER OF OPERATIONS;  AREA, TROOP, AND
              STATION COMMANDERS

REFERENCE:    (A)  PSP EMERGENCY OPERATIONS PLAN

       1.   THE PENNSYLVANIA STATE POLICE EMERGENCY PREPAREDNESS
            LIAISON TEAM HAS BEEN DEACTIVATED.  THE EXERCISE HAS
            BEEN COMPLETED.

       2.   THANKS TO ALL STATIONS FOR YOUR PARTICIPATION.

AUTH/EPLO  CAPTAIN CHARLES SKURKIS / LMV

WHLD11-06129 S CONV05-00001 07/●/00 07:58:01 - 07/06/00 07:5●4 BZ7A6KX6DNJ1
SN P,   PAPSPAF30   FILE 14   NGA COMMAND POST

TO:   STATION COMMANDERS

FROM:  MAJOR LYLE SZUPINKA, EVENT COORDINATOR

REF:  NATIONAL GOVERNORS ASSOCIATION

THE COMMAND POST AT THE PENN STATER CONFERENCE CENTER IS OPERATIONAL
AS OF 0600 HRS THIS DATE.
TELEPHONE NUMBER   -   814-865-3228
FAX NUMBER         -   814-865-1956

THE SATELLITE COMMAND POST AT THE NITTANY LION INN WILL BE OPERATIONAL
AS OF 1800 THIS DATE.
TELEPHONE NUMBER   -   814-865-3580
FAX NUMBER         -   814-865-3053


AUTH OIC NGACP/MAJOR LYLE SZUPINKA   MGG

```
WHLD11-06160 S CONV01-00062 07/11/00 14:54:38 - 07/11/00 14:54:28 BZ77FKXHSKXG   PAGE  1 OF  1
SN P,   PAPSPAF30   FILE 14   NGA COMMAND POST
```

TO:        STATION COMMANDERS

FROM:      MAJOR LYLE SZUPINKA,  EVENT COORDINATOR

REF:       NATIONAL GOVERNORS ASSOCIATION


THE COMMAND POST AT THE PENN STATER CONFERENCE CENTER IS BEING
DEACTIVATED AS OF 1500 HRS THIS DATE


THE SATELLITE COMMAND POST AT THE NITTANY LION IN WAS DEACTIVATED
AS OF 0800 HRS THIS DATE


AUTH OIC NGACP/MAJOR LYLE SZUPINKA

```
                                                    PAGE  1 OF  1
WHLD11-05169 S PMA222-00003 02/▉▉/00 11:33:17 - 02/25/00 11:3▉.06 BZ2F4KMYLTJT
SN P BES221 PMA221,
```

SUBJECT:    PEMA URBAN UNREST EXERCISE

TO:         DEPUTY COMMISSIONER OF OPERATION ; AREA, TROOP AND STATION COMMANDERS

            1.  THIS EXERCISE IS TERMINATED.  THANK YOU FOR YOUR PARTICIPATION.

AUTH/CAPT. J.R. DAVIS/EMERGENCY OPERATIONS OFFICER/LMV

WHLD11-05167 S PMA222-00002 02/25/00 11:30:01 - 02/25/00 11:29:51 BZ2F4KMYLQKJ    PAGE  1 OF  1
SN P BES221 PMA221,

SUBJECT:   PEMA URBAN UNREST EXERCISE

TO:        DEPUTY COMMISSIONER OF OPERATION ; AREA, TROOP AND STATION COMMANDERS

        1.   THE STATE POLICE EMERGENCY PREPAREDNESS TEAM HAS BEEN ACTIVATED
FOR AN URBAN UNREST EXERCISE IN THE CITY OF HARRISBURG. ******THIS IS ONLY AN
EXERCISE.******

        2.   COMMUNICATIONS WITH THE STATE POLICE CELL AT THE EOC CAN BE
MADE BY TELEPHONE AT 717-651-2082 OR BY CLEAN TO TERMINAL "PMA221".

AUTH/CAPT. J.R. DAVIS/EMERGENCY OPERATIONS OFFICER/LMV

WHLD11-05131 S PMA221-00002 02/12/00 06:59:11 - 02/18/00 17:42:33 BZ27WKMHYCSM
SN PMA221 BES221 DHQ221 P,

PAGE  1 OF  1

FILE 14 PAPSP00E3 STATE POLICE EMERGENCY OPERATIONS CELL, HARRISBURG PA

SUBJECT:    DEACTIVATION OF DEPARTMENT EMERGENCY RESPONSE TEAM, PENNSYLVANIA
            EMERGENCY MANAGEMENT AGENCY (PEMA) EMERGENCY OPERATIONS CENTER (EOC)

TO:         DEPUTY COMMISSIONERS, AREA AND TROOP COMMANDERS

REFERENCE:  (A) PSP EMERGENCY OPERATIONS PLAN

            1.  THE PENNSYLVANIA STATE POLICE EMERGENCY RESPONSE TEAM HAS BEEN
                DEACTIVATED.  TEAM GOLD HAS BEEN RELEASED FROM OUR CELL WITH-
                IN THE PEMA EOC.

            2.  STATE POLICE UNMET NEEDS OR REQUESTS FOR RESOURCES SHOULD BE
                DIRECTED TO THE DEPARTMENT EMERGENCY OPERATIONS OFFICER,
                CAPTAIN JEFFREY R. DAVIS, PAGER # 1-800-895-8177.

AUTH/EPLO CAPTAIN WILLIAM E. CONWAY                          *BLL*

WHLD11-06277 S HBG221-58389 07/31/00 09:12:11 - 07/31/00 09:12:04 BZ27TKYRGSDW
SN PMA221 BES221 DHQ221 P,
FILE 14 PAPSP00E3 STATE POLICE EMERGENCY OPERATIONS CELL, HARRISBURG, PA
SUBJECT: ACTIVATION OF DEPARTMENT EMERGENCY RESPONSE TEAM,
 PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA) EMERGENCY  OPERATIONS CENTER (E
OC)
TO: DEPUTY COMMISSIONER OF OPERATION
DEPUTY COMMISSIONER OF STAFF
COMMANDER, AREA VI
COMMANDER, TROOP M, BETHLEHEM


REFERENCE: (A) PSP EMERGENCY OPERATIONS PLAN


1. THE PENNSYLVANIA STATE POLICE EMERGENCY RESPONSE TEAM HAS
BEEN ACTIVATED DUE TO FLOODING CONDITIONS IN BUCKS COUNTY.  OUR CELL WITHIN THE
PEMA EOC HAS BEEN STAFFED BY TEAM GOLD.
2. STATE POLICE UNMET NEEDS OR REQUESTS FOR RESOURCES SHOULD BE
DIRECTED TO THE EMERGENCY PREPAREDNESS LIAISON OFFICER (EPLO) CAPTAIN WILLIAM E.
 CONWAY.  COMMUNICATION CAN BE VIA TELEPHONE (717) 651-2084 OR 2085, OR PAGER NU
MBER (717) 913-5506.

WHLD11-06277 S HBG221-58389 07/██/00 09:12:14 - 07/31/00 09:1██4 BZ27TKYRGSDW    PAGE  2 OF  2
AUTH/EPLO CAPTAIN WILLIAM E. CONWAY
PMA221
PAPSP00E3

WHLD11-05125 S PMA221-00001 02/18/00 11:54:42 - 02/18/00 11:54:31 BZ27WKMHMF5G
SN PMA221 BES221 DHQ221 P,

FILE 14 PAPSP00E3 STATE POLICE EMERGENCY OPERATIONS CELL, HARRISBURG PA

SUBJECT: ACTIVATION OF DEPARTMENT OF EMERGENCY RESPONSE TEAM, PENNSYLVANIA
         EMERGENCY MANAGEMENT AGENCY (PEMA) EMERGENCY OPERATIONS CENTER (EOC)

TO:      DEPUTY COMMISSIONERS AREA AND TROOP COMMANDERS

REFERENCE:  (A) PSP EMERGENCY OPERATIONS PLAN

         1.  THE PENNSYLVANIA STATE POLICE EMERGENCY RESPONSE TEAM HAS BEEN
             ACTIVATED.  OUR CELL WITHIN THE PEMA EOC HAS BEE STAFFED BY
             TEAM GOLD

         2.  STATE POLICE UNMET NEEDS OR REQUESTS FOR RESOURCES SHOULD BE
             DIRECTED TO THE EMERGENCY PREPAREDNESS LIAISON OFFICER (EPLO)
             CAPTAIN WILLIAM CONWAY.  COMMUNCATION CAN BE VIA C.L.E.A.N.
             TERMINAL PMA221 OR TELEPHONE 717-651-2082(RECORDED), AND 717-
             541-7856 (NOT RECORDED)

W:LD11-05125 S PMA221-00001 02/⬤/00 11:54:46 - 02/18/00 11:54:31 BZ27WKMHMF5G          PAGE  2 OF  2
AUTH/EPLO CAPTAIN WILLIAM CONWAY                                                    *BLL*

PAGE 1 OF 1
WHLD11-05165 S PMA222-00001 02/⬤00 09:30:17 - 02/25/00 09:30⬤4 BZ2F4KMYH9XL
SN P BES221 PMA221,

SUBJECT:  PEMA URBAN UNREST EXERCISE

TO:        DEPUTY COMMISSIONER OF OPERATION ; AREA, TROOP AND STATION COMMANDERS

        1.  THE STATE POLICE EMERGENCY PREPAREDNESS TEAM HAS BEEN ACTIVATED
FOR AN URBAN UNREST EXERCISE IN THE CITY OF HARRISBURG. ******THIS IS ONLY AN
EXERCISE.******

        2.  COMMUNICATIONS WITH THE STATE POLICE CELL AT THE EOC CAN BE
MADE BY TELEPHONE AT 717-651-2082 OR BY CLEAN TO TERMINAL "PMA221".

AUTH/CAPT. J.R. DAVIS/EMERGENCY OPERATIONS OFFICER/LMV

WHLD11-02286 S XPSP82-00006 09/12/01 11:37:22 - 09/12/01 11:37:12 BZ2BY9W49Z51
SN P XPSP82 PMA221, FILE 14  EXECUTIVE AND ADMINISTRATIVE OFFICES

TO: AREA AND TROOP COMMANDERS; BUREAU AND OFFICE DIRECTORS


THE PENNSYLVANIA STATE POLICE (PSP) - DEPARTMENT HEADQUARTERS (DHQ) COMMAND POST
WILL TERMINATE OPERATIONS EFFECTIVE 1400 HOURS, WEDNESDAY, SEPTEMBER 12, 2001.


AFTER THAT TIME, ALL REQUESTS FOR DHQ ASSISTANCE SHALL BE DIRECTED TO THE
APPROPRIATE BUREAU FOR FURTHER ACTION.  ALL INTELLIGENCE INFORMATION SHALL
BE DIRECTED TO THE BUREAU OF CRIMINAL INVESTIGATION.  THE RESPECTIVE BUREAU
DIRECTOR SHALL BE RESPONSIBLE FOR NOTIFYING THE APPROPRIATE DEPUTY COMMISSIONER
CONCERNING ANY SIGNIFICANT EVENTS OR CIRCUMSTANCES.

THIS MESSAGE APPLIES ONLY TO THE PSP DHQ COMMAND POST IN HARRISBURG.  THE
PSP MOBILE COMMAND POST IN THE SOMERSET AREA AND THE PSP CELL AT THE PEMA
EMERGENCY OPERATIONS CENTER WILL CONTINUE TO OPERATE UNTIL FURTHER NOTICE.

AUTH/LT. COLONEL THOMAS K. COURY/DEPUTY COMMISSIONER OF OPERATIONS  :GAP:

Z239 S PMA221-00001 09/11/01 11:09:03 - 09/11/01 11:08:56 BZ13Y9W39K6X
1 BES221 DHQ221 P,     FILE 14   PAPSP00E3  PSP EMERGENCY OPS CELL

:    ACTIVATION OF DEPARTMENT EMERGENCY PREPAREDNESS LIAISON TEAMS,
     PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA) EMERGENCY OPERATIONS
     CENTER (EOC)
     DEPUTY COMMISSIONERS OF OPERATIONS AND STAFF; AREA, TROOP AND STATION
     COMMANDERS
RENCE: (A) PSP EMERGENCY OPERATIONS PLAN

  THE PENNSYLVANIA STATE POLICE EMERGENCY PREPAREDNESS LIAISON TEAM HAS BEEN
TIVATED DUE TO TERRORIST ATTACKS NATIONWIDE AND STATE WIDE.  THE PEMA EOC IS
W STAFFED BY THE RED TEAM.

.   STATE POLICE UNMET NEEDS, REQUESTS FOR RESOURCES, OR SIGNIFICANT DAMAGE
REPORTS SHALL BE DIRECTED TO THE EMERGENCY PREPAREDNESS LIAISON OFFICER (EPLO)
CAPTAINS CHARLES SKURKIS OR WILLIAM CONWAY.  COMMUNICATION CAN BE VIA CLEAN
TERMINAL"PMA221" OR TELEPHONE 717 651 2082 (RECORDED).
**** THIS TELEPHONE NUMBER IS FOR PSP ONLY *******

AUTH/EPLO CAPTAIN  CHARLES J SKURKIS    SAE

WHLD11-02355 S PMA221-00015 09/20/01 09:54:19 - 09/20/01 09:5⬤:12 BZ13Y9WC8H0A
SN PMA221 BES221 P,

FILE 14 PAPSP00E3 STATE POLICE EMERGENCY OPERATIONS CELL, HARRISBURG, PA

SUBJECT:        REACTIVATION OF DEPARTMENT EMERGENCY RESPONSE TEAM
                PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA) OPERATIONS
                CENTER (EOC)

TO:             DEPUTY COMMISSIONER OF OPERATIONS
                DEPUTY COMMISSIONER OF STAFF
                AREA, TROOP AND STATION COMMANDERS
                AND BUREAU AND OFFICE DIRECTORS

REFERENCE:      (A)  PSP EMERGENCY OPERATIONS PLAN

        1.   THE STATE POLICE CELL AT THE PENNSYLVANIA EMERGENCY OPERATIONS
CENTER HAS BEEN REACTIVATED.  UNTIL FURTHER NOTICE, STATE POLICE PERSONNEL
WILL STAFF THE DEPARTMENT'S CELL AT THE EMERGENCY OPERATIONS CENTER FROM
0700 HOURS THROUGH 2300 HOURS DAILY.

        2.   STATE POLICE UNMET NEEDS OR REQUESTS FOR RESOURCES SHOULD

SAN: BZ13Y9WC8H0A                                               PAGE 2   OF 2
BE DIRECTED TO THE STATE POLICE CELL AT (717) 651-2082.

       3.  THERE IS NO NEED TO ACKNOWLEDGE THIS MESSAGE.


AUTH/CAPTAIN J R DAVIS/EPLO/JAF

```
                                                              PAGE 1  OF 2
WHLD11-02345 S PMA221-00008 09/19/01 08:05:20 - 09/19/01 07:   42 BZ13Y9WB6A68
SN P BES221 PMA221, FILE 14  PAPSP00E3 STATE POLICE EMERGENCY OPERATIONS CELL
```

SUBJECT:      ACTIVATION OF DEPARTMENT EMERGENCY RESPONSE TEAM PENNSYLVANIA EMERGE
              MANAGEMENT AGENCY (PEMA) OPERATIONS CENTER

TO:           DEPUTY COMMISSIONER OF OPERATIONS
              DEPUTY COMMISSIONER OF STAFF
              AREA, TROOP, AND STATION COMMANDERS

REFERENCE:    (A)  PSP EMERGENCY OPERATIONS PLAN


        1.  THE PENNSYLVANIA STATE POLICE EMERGENCY RESPONSE TEAM HAS BEEN
REACTIVATED.

        2.  ANY REQUESTS FOR UNMET NEEDS SHOULD BE DIRECTED TO THE PSP CELL
AT PEMA AT 717-651-2082 (OR 2083, 2084, 2085).

        3.  THERE IS NO NEED TO ACKNOWLEDGE THIS MESSAGE.

SAN: BZ13Y9WB6A68
AUTH EPLO EMERGENCY OPERATIONS ●ENTER/CAPTAIN JEFFREY DAVIS ●    PAGE 2   OF 2
                                                                 HGF

PAGE 1  OF 2
WHLD11-02344 S PMA221-00007 09⬤9/01 08:05:20 - 09/18/01 22:⬤27 BZ13Y9WALGNT
SN PMA221 P,

FILE 14 PAPSP00E3 STATE POLICE EMERGENCY OPERATIONS CELL, HARRISBURG, PA

SUBJECT:     TEMPORARY DEACTIVATION OF DEPARTMENT EMERGENCY RESPONSE TEAM
             PENNSYLVANIA EMERGENCY MANAGEMENT AGENCY (PEMA) OPERATIONS CENTER
             (EOC)

TO:          DEPUTY COMMISSIONER OF OPERATIONS
             DEPUTY COMMISSIONER OF STAFF
             AREA, TROOP AND STATION COMMANDERS


REFERENCE:   (A)  PSP EMERGENCY OPERATIONS PLAN



        1.  THE PENNSYLVANIA STATE POLICE EMERGENCY RESPONSE TEAM WILL BE
TEMPORARILY DEACTIVATED FROM TUESDAY, SEPTEMBER 18, 2001, 2300 HOURS, TO
WEDNESDAY, SEPTEMBER 19, 2001, 0700 HOURS.

SAN: BZ13Y9WALGNT                                          PAGE 2  OF 2
          2.  IN THE INTERIM STATE POLICE UNMET NEEDS OR REQUESTS FOR
RESOURCES SHOULD BE DIRECTED TO THE PEMA OPERATIONS CENTER AT (717) 651-2001.

          3.  THERE IS NO NEED TO ACKNOWLEDGE THIS MESSAGE.


AUTH/EPLO CAPTAIN WILLIAM E CONWAY

PMA221
PAPSP00E3

# E.P.L.T. ROTATION SCHEDULE

Teams Change Status at 0800 Hours on Dates Listed

| DATES | JAN 3-10 | JAN 10-17 | JAN 17-24 | JAN 24-31 | JAN 31 FEB 7 | FEB 7-14 | FEB 14-21 | FEB 21-28 | FEB 28 MAR 6 | MAR 6-13 | MAR 13-20 | MAR 20-27 | MAR 27 APR 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PRIMARY | GOLD | RED | GOLD | GOLD | RED | GOLD | GOLD | RED | RED | GOLD | RED | BLUE | GOLD |
| SECONDARY | RED | BLUE | BLUE | RED | BLUE | BLUE | RED | BLUE | BLUE | RED | GOLD | GOLD | RED |

| DATES | APR 3-10 | APR 10-17 | APR 17-24 | APR 24 MAY 1 | MAY 1-8 | MAY 8-15 | MAY 15-22 | MAY 22-29 | MAY 29 JUN 5 | JUN 5-12 | JUN 12-19 | JUN 19-26 | JUN 26 JUL 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PRIMARY | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED |
| SECONDARY | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE |

| TEAM | NAME | WORK PHONE | HOME PHONE | PAGER |
|---|---|---|---|---|
| GOLD EPLO | CAPTAIN WILLIAM E. CONWAY | 717-787-8100 | 717-657-4900 | 717-230-6996 |
| BLUE EPLO | CAPTAIN DARRELL G. OBER | 717-657-4231 | 717-790-0708 | 717-310-0191 |
| RED EPLO | CAPTAIN COLEMAN J. MCDONOUGH | 717-783-5523 | 717-731-5434 | 877-904-3589 |
| | CAPTAIN JEFFREY R. DAVIS | 717-787-4969 | 717-564-3623 | 800-895-8177 |

PSP ACADEMY  Hershey  71●533 1201        12/18 '00 1●4 NO.002  01/01

# E.P.L.T. ROTATION SCHEDULE

Teams Change Status at 0800 Hours on Dates Listed

| DATES | JUL 3-10 | JUL 10-17 | JUL 17-24 | JUL 24-31 | JUL 31 AUG 7 | AUG 7-14 | AUG 14-21 | AUG 21-28 | AUG 28 SEP 4 | SEP 4-11 | SEP 11-18 | SEP 18-25 | SEP 25 OCT 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PRIMARY | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE |
| SECONDARY | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD |

| DATES | OCT 2-9 | OCT 9-16 | OCT 16-23 | OCT 23-30 | OCT 30 NOV 6 | NOV 6-13 | NOV 13-20 | NOV 20-27 | NOV 27 DEC 4 | DEC 4-11 | DEC 11-18 | DEC 18-25 | DEC 25 JAN 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PRIMARY | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD |
| SECONDARY | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED | BLUE | GOLD | RED |

| TEAM | NAME | WORK PHONE | HOME PHONE | PAGER |
|---|---|---|---|---|
| GOLD EPLO | CAPTAIN WILLIAM E. CONWAY | 717-787-8100 | 717-657-4900 | 717-913-5506 |
| BLUE EPLO | CAPTAIN MICHAEL R. NAGURNY | 717-787-1314 | 717-652-7603 | 717-912-0009 |
| RED EPLO | VACANT | | | |
| | CAPTAIN JEFFREY R. DAVIS | 717-787-4969 | 717-564-3623 | 800-895-8177 |

## SUPERVISOR'S CLASS SYLLABUS

The Deal Commission of 1985, under House of Representatives resolution #207, was a special investigative committee that determined:

1. The integrity of the Pennsylvania State Police was damaged, the conduct of the members of the Pennsylvania State Police must be above public reproach

2. There was an unacceptable number of members charged with crimes

3. Allegations of civil rights violations

4. Uneven internal discipline, disparate treatment

Commissioner Jay Cochran established the Bureau of Professional Responsibility and the Internal Affairs Division while mandating the following mission:

*The public has the right to expect efficient, fair and impartial law enforcement and therefore any allegations of misconduct by State Police Officers must be detected, thoroughly investigated and properly adjudicated to maintain the trust placed in the Department by the people of Pennsylvania...*

The Internal Affairs Division acts as a centralized fact finding office. Our sole responsibility is to gather facts pertinent to inquiries being made into the actions of our members.

These facts are gathered for the benefit of the Troop Commanders/Bureau Directors who must make the adjudications on these incidents.

**The Internal Affairs Division Does Not:**

- Determine Guilt or Innocence

- Draw Conclusions or Express Opinions

- Get Involved in the Disciplinary Process

- Interfere with Criminal Investigations

- Reveal Internal Affairs Division Investigative Results to Criminal Investigators

When you are assigned to do an Internal Affairs Division investigation, your only job is to gather the facts.

*P 336*
*1 oF 7*

**SUPERVISOR'S CLASS SYLLABUS**
Page 2

If conflicting information is identified, address it by conducting the necessary investigation or interviews.

While performing the function of field investigator for the Internal Affairs Division, keep in mind, ultimately, the report you submit will be reviewed by many people, including, but not limited to:

- The Director, Bureau of Professional Responsibility

- The Commissioner

- The Deputy Commissioner's

- The Area Commander

- Your Troop Commander

- Possibly Chief Counsel and Civilian Attorneys

- Judges (State and Federal)

The better organized and written your report is, the more benefit it is to the subject member, because:

- It lessens the likelihood that correction/clarification be required thus speeding up the process

- The easier it will be for the Troop Commander/Bureau Director to arrive at his/her adjudication

As a side benefit-the better you will look in the eyes of your superior officers.

Notify the Internal Affairs Division if you are having difficulty in acquiring time to complete the investigation. The Internal Affairs Division will contact Commanding Officer to ensure the investigation gets done timely. Go through your Troop Commander/Bureau Director for extensions. Do not contact the Internal Affairs Division directly.

If you receive a subpoena, notify the Internal Affairs Division and the Office of Chief Counsel. Upon receipt of the investigation, at least make contact with the complainant so they don't contact the Internal Affairs Division assuming nothing is being done. (Read AR 4-25)

SUPERVISOR'S CLASS SYLLABUS
Page 3


INSTRUCTIONS FOR COMPLETING THE INTERNAL AFFAIRS DIVISION REPORT


Block #1   -   Insert only the Internal Affairs Division control number

**DO NOT** take a troop incident number

-   This would be double reporting & is in violation of AR 4-25, 25.10, D 2.

Block #5   -   Reserved solely for the name (s) of subject member (s)

If there is insufficient space, list additional subjects in Block #6

If subject is unknown, identify member and include in Block #5, provide SP1-102

Block #6   -   Generally, paragraphs are not indented and should be short, limiting each to a specific thought or topic.

Double space between each paragraph which makes for easier reading and it's easier to locate information when re-reading.

Watch spelling & grammar

**DO NOT** use abbreviations in the report.    (member's rank, approx. for approximately, etc.)  There are occasions where the reviewer of the report is not familiar with police jargon.  The reviewer would not have to be inconvenienced by contacting the Internal Affairs Division for clarification.


**Reason For Investigation**

-   This is a brief, factual statement furnishing the reason the investigation is being conducted.

**DO NOT** cite AR 4-25 or orders from your captain to conduct the investigation. These are requirements, not reasons

SUPERVISOR'S CLASS SYLLABUS
Page 4

**Synopsis**

This is a concise summary of the investigative details citing the 'High Points' of the case.

Not a complete restatement of details; the particulars are contained in the details section

Usually one or two short paragraphs, but this can depend on the length and complexity of the entire report

**MAY NOT** Include your opinions/conclusions

**MAY NOT** Include information that does not appear under details

**List of Attachments**

Properly label each attachment

SP1-101, Use of Force or Complaint Reception and Processing Worksheet is always attachment #1

Attachment 1, Page 1 of 1

"Enclosure #" on limited investigations (withdrawn)

Read the attachments, investigative leads, witnesses, etc. can be obtained that may have been left off of the worksheet.

Label each different item separately; don't just make them page numbers to just one attachment

Identify all forms by number and name; include the member's name if needed for clarity

**\*Communications** Tapes - Do Not send as an attachment; download to standard or micro cassette; note in report location on tape where information was located. (Track, Channel, Etc.)

\*Label audio tapes, photographs, etc. due to possible separation from the report



**SUPERVISOR'S CLASS SYLLABUS**
Page 5

The attachments cannot stand alone

Intended for clarification only; refer to each, where appropriate, throughout the report

Include all pertinent source documents

Investigative Reports, Radio Logs, Assignment Slips, Incident Memos, Schedules, Medical Records, etc.

The Notification of Complaint is an outdated form, use the Notification of Inquiry, Form SP1-102.

The Complaint Verification, Form SP1-108, is signed by the complainant. Members are not required to complete the Complaint Verification Form. This is a safeguard against false complaints and is used as evidence to initiate criminal proceedings against a complainant when appropriate.

**Details**

An in-depth description of what occurred including all interviews and any information of value

Interviews are shown as summarized statements; refrain from the Question & Answer format; if needed for clarification, include as an attachment

**DO NOT** list race & ethnicity information unless germane to the investigation (Discrimination Complaint)

Interviews are required from all persons involved or mentioned in other interviews as witnesses, etc.

An STD-501 cannot replace an interview; only supplements it

Contrary to what presently appears in AR 4-25, an STD-501 is not required. It is the option of the investigator to request a letter from involved or subject members.

**DO NOT** include your own opinions/conclusions; extract and include pertinent data without expressing your opinion; enter only pertinent data without expressing your opinion; enter only statements of fact; often the same thing you want to say is already incorporated as part of an interview with somebody else.



**SUPERVISOR'S CLASS SYLLABUS**
Page 6

Provide detailed descriptions, or drawings, of sites; e.g., in a legal intervention incident, road width, conditions, traffic, etc.

Whenever practical, or if available, include photographs (assaults, car damage, etc) or drawings (needn't be to scale)

Photographs should be individually labeled to indicate their significance; arrows, circles, etc. are permitted.

**DO NOT** include information about previous Internal Affairs Division investigations done on members (okay to include this information about complainants); this information may be helpful to you as the investigator, but is not allowed in the report.

**DO NOT** include criminal rap sheets in the Internal Affairs Division report. The Internal Affairs Division does not want to become a repository for this information. Okay if appended (part) of crime report that's an attachment.

**DO NOT** reveal information you discover after advising the subject member of the Garrity (Administrative) Warnings to the criminal investigator on any related criminal investigations; anything you learn before the Garrity Warnings may be revealed, or, if you learn the same information from someone other than the subject member, it may be revealed.

At the beginning of each subject member's interview, include a statement that he was provided with the Notification of Inquiry (Not Notification of Complaint) and the Administrative Warnings & refer to the appropriate attachment number.

Note, if the member waived representation by PSTA; if not, give the name of the representative. The PSTA representative cannot advise the member not to answer questions.

**Be sure to address each specified allegation**

Ask the hard question (s) - Did you do it?

**Report Submission**

**DO NOT** submit to the immediate supervisor.

**Full Investigations** are completed on the General Investigation Report

**SUPERVISOR'S CLASS SYLLABUS**
Page 7

Original and one copy (AR 4-25, 25.10, G 1)

Return directly to the Internal Affairs Division via certified mail, return receipt requested

**Limited Investigations** are submitted on an STD-501

Original and one copy (as above)

Submit directly to your Troop Commander/Bureau Director