# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER : NO 1:CV-01-0084

**Plaintiff** :

PAUL EVANKO, MARK : CIVIL ACTION LAW
CAMPBELL, THOMAS COURY :
JOSEPH WESTCOTT, :
HAWTHORNE CONLEY, : (JUDGE CALDWELL)
JOANNA REYNOLDS AND :
SYNDI GUIDO, :
: JURY TRIAL DEMANDED
:
**Defendants** :

FILED
HARRISBURG, PA
MAY 20 2002
MARY E. D'ANDREA CLERK
Per _____ Deputy Clerk

---

## PLAINTIFF'S ADDENDUM TO EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT- DEPOSITION TESTIMONY

Volume 2

1.) Deposition of Paul Evanko

2.) Deposition of Ralph Kush

3.) Deposition of Michael Soohy

4.) Deposition of Darrell G. Ober (Day 1)

5.) Deposition of Darrell G. Ober (Day 2)

6.) Deposition of Thomas Coury (Day 1)

7.) Deposition of Thomas Coury (Day 2)

8.) Deposition of Joseph Westcott

9.) Deposition of Marie Marshall

10.) Deposition of Thomas Williams

11.) Deposition of Mark Campbell

12.) Deposition of Larry Riley

13.) Deposition of Francis Koselnak

14.) Deposition of Walter Margeson

15.) Deposition of Mark Grab

16.) Deposition of Mary Bungo

17.) Deposition of William McAlreavy

18.) Deposition of John Pudliner

19.) Deposition of John (Rick) Brown

20.) Deposition of Mark Carr

21.) Deposition of Robert Werts

22.) Deposition of Robert Hickes

23.) Deposition of Hawthorne Conley

24.) Deposition of R. Dane Merryman

25.) Deposition of Charles Skurkis

Respectfully Submitted,

_____
Don Bailey PA ID# 23786
4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500

IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER          :     1: CV - 00 -0084

    Plaintiff              :

vs.                        :

PAUL EVANKO, MARK          :     (Judge Caldwell)
CAMPBELL, THOMAS           :
COURY, JOSEPH              :
WESTCOTT,                  :
HAWTHORNE CONLEY           :

    Defendants

DATE:                      March 14, 2002

PROCEEDINGS:               Video Deposition
                           Ralph Kush

APPEARANCES:

For the Plaintiff:         Donald Bailey, Esq.
                           4311 N. 6th Street
                           Harrisburg, PA  17110

For the Defendants:        Syndi Guido, Esq.
                           333 Market Street
                           17th Floor
                           Harrisburg, PA  17101

1

---

TONY MARCECA:  Good morning.  Be advised the video and audio is in operation.  My name is Tony Marceca.  My address is 2219 Dixie Drive, York, Pennsylvania 17402.  I have been contacted by PR Video to be the video operator for this deposition.  The case is in the United States District Court of the Middle District of Pennsylvania.  It's titled Darrell G. Ober, plaintiff vs. Paul Evanko, Et, al.  It's a Civil Action law case.  It's 1: CV – 01-0084.  The deposition is taking place at the FBI Headquarters in Pittsburgh, Pennsylvania at 3311 East Carson Street, Pittsburgh, Pennsylvania.  The witness is Kush, K-U-S-H and his deposition is being held on the part of Paul Evanko, Et. al for the State, Commonwealth of Pennsylvania.  Is that correct?

SYNDI GUIDO:       Correct

MR BAILEY:     Yes sir

TONY MARCECA:  The time now is 11:15 a.m. and this is March 14, 2002.  Mr. Kush would you please raise your right hand and swear up to me.  Do you state for the record to swear to tell the truth, the whole truth, so help you God?

MR KUSH:       Yes I do

2

---

TONY MARCECA:  Mr. Bailey, and I'd like to have a sound check.

MR. BAILEY:   Sure, my name is Don Bailey.  I'm an attorney.  I represent the plaintiff in this case, Darrell G. Ober.  My address is 4311 N. 6th Street, Harrisburg, Pennsylvania 17110.  Phone, 717-221-9500.

SYNDI GUIDO:       Governor's Office of General Counsel for the Defense.

JEFF KILLEEN:      Chief Division Counsel, FBI, Pittsburgh Division, 3311 East Carson, Pittsburgh 15203.  Phone, 412-432-4000.

SYNDI GUIDO:       Are we ready?

TONY MARCECA:  Ready

SYNDI GUIDO:       Sir I understand you're retired now?   MR KUSH:     Yes I am.

Q     And how long were you with the FBI?

A     Just over 24 years?

Q     When did you retire?

A     December 31, 2001

Q     And how long were you in the Pittsburgh area or out in Western Pennsylvania?

A     I came here in '85, so that would be about 16 years.

3

---

Q     When did you first receive information about possible political corruption at the Pennsylvania State Police Academy?

A     That was, it's been several years now.  It was approximately, if you have the date it's like '95, '96 maybe.  I was served a search warrant and the individual that we served a search warrant on indicated that he would cooperate with us.  And one of the things that he divulged to us was the fact that someone was trying to buy a position at the State Police Academy.

Q     Could that initial investigation have been as early as 1994, 1995?

A     Sure

Q     When you first got that information, what was the first thing, did you contact somebody at the State Police?

A     Eventually, I didn't realize exactly who we were dealing with at the time.  I subsequently determined through actually police check through the local Allegheny County, Pittsburgh system that the individual that was mentioned to me, was actually a State Police Officer.  There was a report,

4

1 he was a victim in an acc..., hit and run, and I found
2 out he was a State Police Officer at that time.
3  Q   So I'm a little unclear on how that came about.
4 What information did you have that he by name
5 before you knew he was a State Trooper, how did
6 you know he was involved in this?
7  A   The information that we had received was;
8 there was a friend of the individual who was
9 cooperating, he had a friend who wanted to become
10 a State Police Trooper and he was willing to pay for
11 that.  And the amount was $10,000.00 at the time.
12 And he gave me the name of the person who was
13 going to intercede on behalf of the person wanting
14 to become a Trooper.  In fact the State Trooper, at
15 the, that I didn't know that at the time.
16  Q   That's when...
17  A   That person, excuse me....
18  Q   Excuse me. That's when you got the name
19 Kipp Stanton?
20  A   That's right.
21  Q   OK
22  A   And we didn't know and he actually didn't
23 even know that he was a State Trooper.  He thought
24 he was some Police Officer of a local department.  I

5

1 determined through some record checks that he was
2 in fact a State Police Officer.  At that point I
3 contacted the State Police and...
4  Q   Who did you; do you know who you contacted
5 at the State Police?
6  A   I contacted Harrisburg and I can't recall.  I got
7 a little bit of a run around there but eventually I
8 ended up with the Internal Affairs Officer at the
9 time was in Greentree.  If I can remember, if
10 somebody would mention...
11  Q   Does the name Klaus Behrens ring a bell?
12  A   No, not Klaus Behrens.
13  Q   Klaus Behrens?  Somebody else....
14  A   He was in Greentree, yes, he was the Western
15 Pennsylvania OPR.  It may, it may come to me.
16 That's all; I'll give you the name.  Because I was
17 concerned at the time, excuse me, I was concerned
18 at the time that there might have been a State Police
19 sting going on and I didn't want to get in the middle
20 of that thing.
21  Q   Could it have been, could the last name have
22 been Conley?
23  A   No
24  Q   OK, if you remember?

6

1  A   If I remember it...he's recently retired and
2 he's from I think one of the Southern Counties out
3 here now.  But I was concerned at the time that there
4 was a State Police sting going on and I didn't want
5 to get involved in that thing.  He made a check
6 discreetly for it and I basically told him that, what
7 the situation was and if he was receptive to our
8 investigation and he made a discreet check to see in
9 if Kipp Stanton was in fact involved in any kind of
10 undercover operation out in East Liberty section of
11 Pittsburgh.  I told him he wasn't and I had pretty
12 much a green light then to continue on, on that
13 phase as well as other phases, which we were
14 working on at the time.
15  Q   Do you remember when that was?
16  A   It was probably no more than two weeks after
17 I had gotten the initial information.  It had to be
18 within that two-week period, I would think.
19  Q   Did you eventually have discussions with
20 Klaus Behrens about it when he was the, in Internal
21 Affairs in the Western Division in Greentree?
22  A   No
23  Q   You don't remember ever talking to Klaus
24 Behrens about it?

7

1  MR BAILEY:   Behrens is spelled B-E-H-R-
2 E, well sometimes spelling, you know helps, cause
3 the, the....
4  MR KUSH:   Well now is, Klaus, Klaus,
5 Klaus Behren is with the Pennsylvania Attorney
6 General's Office, is he not?
7  SYNDI GUIDO:   No, Klaus Behrens is...
8 you're thinking of Mau Klause, I think.
9  MR KUSH:   Oh gosh. All right yes, those,
10 those names, OK
11  SYNDI GUIDO:   OK
12  MR KUSH:   This guy was a Captain I
13 think or a...
14  Q   Yes, Captain, so the Captain that was in charge
15 of the Greentree IAD....
16  A   OK, then that would've been him.
17  Q   The sting was Klaus Behrens then.
18  A   That's the person I spoke with.  I'd have to
19 look at my file and....
20  Q   I think I know who you're confusing him with
21 Mau Klaus from the Attorney General's Office, OK.
22  A   OK
23  Q   Cause I think he was out at, in that area.
24  A   Yes, he's down the street.

8

1  Q    Right, OK, all right so that's why I was getting
2  confused thinking that had to be him.
3  A    OK, that's better, yes
4  Q    And you, so now that we have that cleared up.
5  When do you think you had the, the conversation
6  with Captain Behrens?
7  A    I would say, like a, probably a week or so after
8  the initial information.  We had, we wanted to
9  develop it as soon as we could to determine if that
10 was a road we should go down or not.  If he were, if
11 the State Police was in there, we weren't going to go
12 down that road.
13 Q    And do you know what checking he did for
14 you?
15 A    He called the barracks, I think where Kipp
16 Stanton was assigned at the time to determine if he
17 was involved.
18 Q    Was that OK with you?
19 A    Sure.  My trust, we have to trust each other in
20 law enforcement and his, you know, I knew he'd be
21 discreet.
22 Q    Did you make, other than asking him to check
23 out whether there was sting operation, did you ask
24 for any other assistance from, I think at the time he

9

1  was a Lieutenant, but Lieutenant or Captain
2  Behrens?
3  A    No
4  Q    Do you know, what was the next contact you
5  would've had?  What, excuse me, did the
6  investigation end there or what happened?
7  A    Well it, it proceeded for a couple of weeks and
8  then because of internal necessities, we had to stop
9  that end of it and it stayed dormant, probably about
10 18 months I would guess or two years, whatever.
11 And then we reactivated it, because there were other
12 things we were addressing at the time.
13 Q    During the time that, during that initial phase,
14 before it went dormant, so the first part, when it was
15 first active.  Did you have any information that
16 anybody within the command structure of the State
17 Police would be involved in selling spots to the
18 State Police Academy?
19 A    No, see if I can back and get this.  I think that
20 first came up, there was a possibility it came up was
21 a result of the tape recording that we had and at that
22 point it was, this investigation was reactivated.  This
23 phase of it was, excuse me and we captured some
24 information.

10

1  Q    Now, did you have, when you talked to, back
2  then, this first phase when you contacted Behrens,
3  did you talk with him about the need for
4  confidentiality or was there any discussion about
5  who within the State Police he could discuss this
6  with?  Anything of that nature?
7  A    He, he knew generally where we were gonna
8  we may go with this case and in fact we really
9  weren't sure where we would go either with it.  At
10 the time, the person was cooperating with us has,
11 had and still, I don't think he has any more, but, had
12 contacts within the judiciary, or not the, well, within
13 the legislative branch.  Some representatives and
14 some State Senators.  So, that, that was the, the, that
15 was the way, direction we were gonna probably go
16 with it and develop the information at that point.
17 Q    Did you give any advice to Lieutenant Behrens
18 about who he should or should not tell in the State
19 Police or did you leave that decision up to him?
20 MR BAILEY:    You mean Captain Ober, I
21 think.
22 SYNDI GUIDO:    No, I'm talking about
23 Lieutenant Behrens.

11

1  MR BAILEY:    You mean, you mean Mr.
2  Behrens, Lieutenant Behrens?
3  SYNDI GUIDO:    He was Lieutenant and
4  he later became Captain.
5  MR BAILEY:    Oh he was?  Oh, OK
6  MR KUSH:    No, I didn't.
7  SYNDI GUIDO:    So whether he was
8  Lieutenant or Captain at that time, did you have a
9  discussion about that issue at all?
10 A    You know, I, he had the information and we
11 were proceeding on an investigation and we were
12 seeking his cooperation and we couldn't dictate to
13 him what he could do with it, but we were going in
14 that direction and he basically, you know at the
15 appropriate time we would tell him where we were
16 and what was going on.
17 Q    OK, then when was the next time you had
18 contact with people at the State Police about the
19 Trooper Stanton situation?
20 A    If you have the date, there was a, like I said it
21 was a several, a year or year and a half gone by and
22 our supervisors had changed and Mike Soohy
23 became a supervisor and when he was reviewing the
24 case he said, "how about this angle, he says let's,

12

1  let's get on with this situation here and see if, if the
2  cooperating witness, you know could reactivate that
3  and see if the guy was still interested in becoming a
4  Trooper. We did that and he said yes in fact he had
5  been contacted about that a couple of times in
6  between.
7  Q    So would the next time that you met, had any
8  meetings or discussions with the State Police about
9  this be in either August or September of 1998 when
10 you met with members of Organized Crime Unit at
11 the State Police?
12 A    That's, that's po...yes, out in Harmarville.
13 Q    Do you remember a meeting like that? I have
14 to see who they were.
15 A    I may have a...
16 Q    Captain Frank Monaco.... I'll give you names
17 or, I'll give you names and see if any of them ring a
18 bell, Lieutenant Jerry Ryan....
19 A    Yes
20 Q    or Corporal Jeffery Shaw, Corporal David
21 Lieberman
22 A    I did meet with them. I can't recall whether I
23 gave them that was before or after I had contacted
24 Harrisburg, OPR. If I in fact I did, I, I know I recall

13

1  talking with those individuals, now if I got into
2  specifics on the case or not, I'm not sure. We talked
3  about a lot of things I think we were at that point we
4  were trying to join up forces with the State Police in
5  addressing some of these areas and just seeing what
6  we could do jointly.
7  Q    Do you remember if you, if they were the
8  ones that made the suggestion that you might want
9  to contact the Internal Affairs Division?
10 A    No, it wasn't them. In fact I think the
11 suggestion came from Mike Soohy. My supervisor
12 says, "hey let's, you know, lets about what had
13 happened was the tape recording that we got was a
14 videotape, I believe, maybe not.... no it was an
15 audiotape, audiotape. And in that tape Kipp Stanton
16 and the guy that was trying to buy the job...excuse
17 me Bridges, yes, Bridges actually discussed the
18 whole process. Bridges had taken an exam and had
19 been put in a different level than what they were
20 actually calling potential Troopers in. I think it was
21 in a "B" class and he needed to be in a "A" class.
22 And so he knew the whole process. He mention
23 names of people who had bought jobs and we were
24 at point where we needed to verify information that

14

1  we were getting plus it was time, you know my
2  supervisor decided it was time to, to bring the State
3  Police back in to this thing. That's where we
4  contacted OPR, their State Police OPR in
5  Harrisburg and I was put in touch with Captain
6  Ober.
7  Q    Do you remember who you first called or how
8  you found out who to call?
9  A    I think I just called the general number and
10 asked for the Internal Affairs and I was directed that
11 way.
12 Q    And, so it was the State Police who told
13 you...somebody at State Police Headquarters that
14 would've said Captain Ober's the person to talk to.
15 A    Yes, I didn't know who Captain Ober was.
16       MR. BAILEY:    Objection in the form of a
17 question, you may respond.
18 Q    Had you ever worked with Captain Ober
19 before?
20 A    No
21 Q    Had you ever heard of him before?
22 A    No
23 Q    Did you know anything about his reputation?
24 A    No

15

1  Q    Did you know anything about his integrity?
2  A    No
3  Q    So you didn't choose him for any of those
4  factors?
5  A    No, I mean, I mean...
6  Q    It was his position, right?
7  A    Yes, with the State Police I mean, we tend to
8  trust everybody.
9  Q    Right, OK, that's what I'm asking, it was his
10 position was the reason you contacted him, not
11 anything you knew about him personally.
12 A    No
13 Q    OK, at the time that you first contacted
14 Captain Ober, had you, did you have any
15 information that anyone in the Lieutenant, any
16 Lieutenant Colonel at State Police or anybody in the
17 Governor's Office was involved in any way in this
18 possible corruption?
19 A    As I said, the tape recording did have that on
20 it, you know that reference to a Lieutenant Colonel
21 who somebody who could intercede. And you
22 know, we'd listen to it but it actually didn't, we
23 didn't pick up on it as hard as we did when we
24 played if for Captain Ober. He, he, he recognized

16

1  that and of course I guess he's more familiar with
2  the whole process and he picked on it real quickly.
3  Q    Now that tape recorder, recording wasn't made
4  until a full week after Captain Ober reported it to his
5  Supervisor.  Then you must've talked, would you
6  have talked to him before that?  In other words if the
7  tape recording was made October 13, but he
8  reported it not to his Supervisor, but to Lieutenant
9  Colonel Hickes on October 5th, I'm just wondering
10  how that could be?
11  A    Well, it's possible if that's the way it was, but,
12  when we actually met in, where was it, out in
13  Bedford, it's between Bedford and Breezewood, we
14  had the recording at that point.
15  Q    OK, but...
16  A    I'm pretty sure we did.  I didn't really check,
17  quite....
18  Q    Do you know when you met with him?  I
19  know....
20  A    When we met, yes...
21  Q    I know it was a long time ago that's why I'm
22  trying to....
23  A    Yes, we met at the barracks there between
24  Breezewood and Bedford.

17

1  Q    And you had the tape recording by then,
2  correct?
3  A    We had tape recordings.  Specifically that one,
4  I can't recall whether we had actually that one or
5  not, because there was many tape recordings we
6  had.  But, I kinda think we did, I think we did have
7  it at that point, I mean that's.
8  Q    At the point that you first contacted him?  I
9  mean, OK, now the tape recordings....
10  A    Could we have, when we came in contact we
11  had it.
12  Q    Right, what I'm getting at is when you very
13  first spoke to Captain Ober about it.  We know,
14  we've established through the course of these things
15  that Captain Ober told Lieutenant Colonel Hickes on
16  October 5 that he had had contact from you and that
17  you were doing this investigation.  We also have all
18  the tape recordings and transcripts unless there's
19  some that you didn't give us....
20  A    No, I don't think so....
21  Q    And it was not until October, I think it's the
22  13th it could be the 12th but the 12th or 13th in which
23  the tape recording was made in which a Lieutenant

18

1  Colonel was mentioned and which the Governor's
2  Office was mentioned.
3  A    OK, yes
4  Q    So what I'm saying is that does that help you
5  at all remember more about your first
6  communications with Captain Ober?
7  A    Well the first communications were
8  telephonic...
9  Q    Yes
10  A    And would've, I would've told him that they
11  were, there was a possibility that, that somebody
12  could buy their way in to the Trooper class by being
13  upgraded in their scores...
14  Q    Did you have any idea how that could happen?
15  A    Well yes, through political, you know,
16  manipulation...
17  Q    But I mean...
18  A    That's what I, what I, I worked political
19  corruption and that was my direction at the time, if
20  that in fact was possible, which these people were
21  saying was possible, for a fee, than that's what I
22  wanted to attack was the corruption at that level.  So
23  yes, I would've told him that, that, that they were
24  seeking, you know, through political means to, to

19

1  change the, what's the thing, is it the level, whatever
2  it was....A level, B, level, C level, so it was to go
3  from a B to an A
4  Q    Bands...
5  A    And they were willing to pay...
6  Q    Bands....
7  A    Bands, excuse me, very good, bands and that
8  was, that was, the whole matter was being upgraded.
9  Q    What I was asking when you said about
10  anything possible, did you know at that time from a
11  logistical perspective how somebody at the State
12  Police could get switched bands or is that why you
13  needed Captain Ober for?
14  A    Well, we needed Captain Ober for, because we
15  had names that came up in the tape recordings the
16  people who have already done this, in fact, it was
17  alleged that one was already in class.  There was a
18  person in the training classes and we needed to
19  verify that, in fact, if that in fact was the case then
20  we were gonna have to open up another
21  investigation on the politician who supposedly was
22  responsible for that.  We weren't, our investigation
23  at that point appeared to be broadening and we
24  needed to determine if there were other players

20



1  involved and we needed to talk to him.  Plus, you
2  know, my supervisor felt that it was time to bring
3  them in, so that they can start taking a look too.
4  Q    So that who can start taking a look?
5  A    The State Police
6  Q    So that they could do their own investigation?
7  A    Sure, yes
8  Q    Did you have any discussions with Captain
9  Ober about whether or not he could tell his Major
10 the, the person in charge of the Bureau of
11 Professional Responsibility about your
12 investigation?
13 A    No
14 Q    Did you any discussions with him about,
15 where you told him he couldn't tell anybody within
16 the State Police about it?
17 A    No, we, we trusted his judgement basically
18 that, you know, here's the information and you
19 know where we're you we're conducting our own
20 investigation here and….
21 Q    Did you essentially leave it up to him to decide
22 who sh, who within the State Police should know
23 about it?
24 A    That's correct

21

1  Q    I'm reviewing information from an interview
2  you gave in May 25th of 1999, although it's not an
3  exact, exact transcript of your interview and one on
4  June 30th of, a follow-up interview on June 30th of
5  1999.  Do you think by reviewing would help you
6  remember any of this, cause I don't want you to
7  think I like have something I'm looking at that you
8  can't?  I don't…
9  A    No that's…
10 Q    Cause it's what I'm looking at, in case you're
11 wondering.
12 A    Ok, that's fine
13 Q    In any event when you were interviewed about
14 this previously by Major Williams of the State
15 Police, back in 1999 you had indicated that when
16 you contacted Captain Ober that the information that
17 you had was that, was that Trooper Stanton wanted
18 to make arrangements through a State Senator or
19 State Representative.
20     MR BAILEY:    Let me object to the form of
21 the question.  Let me suggest that this gentleman
22 should be provided copies of what another person
23 put down as remarks attributed to him.  I …

22

1      SYNDI GUIDO:      I'm gonna rephrase my
2  question.
3      MR BAILEY:    I very much object to
4  characterizations to the effect that you said to a
5  highly qualified professional FBI agent, years of
6  experience and should be able to see what someone
7  wrote down and said that he said before he's
8  questioned about it.
9      SYNDI GUIDO:      I don't think I ever said
10 you couldn't see it, did I?  But, in any event what
11 my question is, if, do you recall telling Major
12 Williams that a State Representative or a State
13 Senator was the person that you had information
14 that they might be able to get?
15     MR KUSH:    That's right, that, that….
16 Q    That sounds right to you?
17 A    Sounds right.
18 Q    OK, so after you had that information, where's
19 the rest of the Pittsburgh where you said…
20 A    Well we really had no jurisdiction in the
21 bribery at that level.  So, I mean, it was no, there's
22 no way we could prosecute Kipp Stanton…
23 Q    What would you have had conviction over?

23

1  A    Any corrupt, corruption, who to contact
2  extortion basically it has to be them extorting
3  money, in other words would be the representative
4  or legislator or public official or whatever, saying,
5  "oh we can do that for you, but we need to have this
6  much money.
7  Q    And I think you said it was, was it Captain
8  Ober who pointed out to you that the mention of a
9  Lieutenant Colonel on the Governor's Office tape?
10 A    Yes, he, when we played that, he keyed in on
11 that real quickly.  Cause we don't know, we did not
12 know what the structure was or how the hierarchy in
13 the Academy was or anything else and we were
14 relying on his expertise to you know, be able to
15 determine if in fact there was somebody in the
16 training class right now whose name we had at the
17 time could verify that information and determine
18 whether this investigation could go further, would
19 expand or whatever.
20 Q    OK, so again that tape wasn't made until
21 sometime in mid October it would've been
22 sometime after mid Oct, at you know…
23 A    Yes, he would not have, yes, if that was, if that
24 was the tape, yes

24



1  Q    That would be the earliest that you would've
2  had this discussion with Captain Ober about
3  possibly a Lieutenant Colonel or somebody in the
4  Governor's Office being involved?
5  A    That's the first time, yes, cause we were
6  dealing mainly at that point with legislators.
7  Q    OK, so at the time you made the first initial
8  contact with Captain Ober did you have any reason
9  to believe based on anything you had from your
10  informant or anything else you had in your
11  investigation to that date that the Command Staff of
12  the State Police or someone in the Governor's
13  Office was involved in this corruption?
14  A    We wouldn't have known.
15  Q    And in the end, was anybody, were you able to
16  establish whether anyone in the Command Staff of
17  anyone in the Governor's Office was involved in
18  political corruption.
19  A    No
20  Q    We talked briefly about a meeting, but I can't
21  remember how much, did you recall, about when
22  you met with the people from Organized Crime, do
23  you remember anything about that discussion?

25

1  A    Not really, we were, we were talking in pretty
2  much generalities about areas that we were
3  looking...
4  Q    Did you have any discussion with them about
5  how something like this might be able to happen?
6  Do you recall?
7  A    No
8  Q    Is that no you didn't or no you don't
9  remember.
10  A    No I don't remember.
11  Q    OK, I just wanted to be clear which one it was.
12  Ok, when you met at the Bedford meeting, can you
13  describe that for me?  When you met at Bedford and
14  you went over tapes....
15  A    Yes, it was one of the meeting rooms they had
16  available for us, we played pretty much if not all the
17  whole tape, that we had and.
18  Q    The meeting room where was that?  I didn't
19  catch?
20  A    In Bedford, it was at the barracks in Bedford
21  or Breezewood whatever you call....
22  Q    Oh, a State Police Barracks
23  A    Yes, it was.
24  Q    OK, I'm sorry

26

1  A    Sorry, and we played it and I believe, I think
2  we gave Captain Ober a copy of the tape at that
3  point.  And I told him; I think we may have had
4  some other ones available.  I told him I would
5  provide him with transcripts and copies of the tapes.
6  Q    Did, did you provide those?
7  A    Yes, I remember writing up communication
8  and sending him transcripts and possibly the tapes
9  that we had, we had transcribed at the time.
10  Q    Did you have at that time, the Bedfo... when
11  you met with the Bedford or wherever that barracks
12  was, did you dis.., have a discussion with Captain
13  Ober about how something from a logistical
14  perspective how something like this could work?
15  A    Yes, we probably did.
16  Q    Do you recall whether you had ideas about
17  how that would work or whether Captain Ober had
18  ideas...
19  A    No, we had, we had no idea how it would
20  work so I mean he was, he was the person who had
21  the knowledge of how the mechanics of the whole
22  process.  You know in fact, it was Kipp Stanton and
23  Bridge knew about the process, it was pretty
24  accurate.

27

1  Q    So was it Captain Ober who suggested to you
2  that somebody in the Governor's Office or
3  somebody a Lieutenant Colonel could possibly have
4  something to do with it, from a logistical
5  perspective.
6  A    Probably, yes I think that that might've come
7  up that it was possible.  That the tests were, the
8  whole process was a, was a controlled process and
9  only certain people could get into the vault or the
10  safe where the exams and the bands and results and
11  everything were kept and it was a restricted thing.
12  And I recall him saying...yes, yes.
13  Q    You mentioned that whatever Captain Ober
14  told you about the process seemed similar to what
15  Skip, Kipp Stanton had been saying about it.  What
16  did Captain Ober tell you about the process and who
17  could potentially change the scores?
18  A    Well, they supposedly weren't ever be able to
19  be changed.  Once they were scored they were
20  scored.  But there was some, I think there was some
21  possible, some possibility that the list maybe or the
22  band could be changed or somebody could be put
23  into another band.  But I don't know if a hard copy

28



existed of the exam or whether it was destroyed or it
was, it was, it was possible, unlikely, but possible.

Q    Did Lieutenant, I mean not Lieutenant, did
Captain Ober, did you discuss, you know what, how
he knew what the process was and whether or not it
was possible?

A    I, no we didn't, no I didn't ask him how he,
how or he or how he knew…

Q    In other words…

A    I don't know that he was an expert in it either,
I mean he knew….

Q    That' s what I'm saying, did you ask him,
"Hey could you check out how it works," and he
came back and said, "Hey I looked into it and this is
how the process works", anything like that?

A    I think he, I think he knew a good deal about
how it worked.  He needed to check the, the people
who were already in the class.  To verify a name.
Because, the, I think there were like, possibly maybe
two different names came up in the investigation
that Troopers who had bought their way in.  So he,
that was aquitable, that we need to have at that
point.

29

Q    When you said that Captain Ober knew how
the process worked.  Do you know the source of his
knowledge about how the process worked?

A    No, I don't.

Q    Did you have any discussions about that?

A    If we did, it didn't, it wasn't important.

Q    Or did he just essentially explain to you his
understanding of how it all worked?

A    I don't, I can't answer how, what, what, you
know, how he knew what he knew…

Q    That's what I'm say….

A    I don't know how he knew what he knew.

Q    And who did Captain Ober suggest might be
able to affect the outcome of who got into the
Academy?

A    There was somebody within the hierarchy, if I
remember correctly.  I think he had more conflict
internally with, with what was, the situation
because, his, his, supervisor, not his direct
Supervisor but ultimately someone up the chain of
command also had responsibility of the Training
classes and the handling of the information, the
banding also, so…there was, I think, my
recollection was there was some concern there, and

30

we, we, we couldn't, we didn't want to get into that.
I mean that wasn't what we were about.  We were
about the public corruption end of it, the Legislators.

Q    The conflict within his chain of command, was
something, that something he described to you?

A    Well, when he heard the, the detail which
these people knew, how the, function, the how the
process worked, and the name that was, was
Lieutenant Colonel, if that's what it was, if that
came up, I think that, you know, caused him some
concern.

Q    I guess, maybe I'm not phrasing my question
right, but what I'm asking is, did you have any
reason other than what he told you to be concerned
or to….

A    No

Q    think there was a conflict?

A    No

Q    In other words that was information was
coming from Captain Ober….

A    That's right.

Q    who was describing such a conflict to you.
And did you have any reason to think that his
immediate Supervisor, the Director of the Bureau of

31

Professional Responsibility, would have any
involvement in such a scheme?

A    No

Q    Did you, Trooper Stanton had come from a
Troop out west.  Did you have any concern that
Trooper Stanton's Troop Commander was somehow
involved?

A    No

Q    Any information along those lines?

A    No

Q    And what information did you… how did
Captain Ober describe somebody in the Governor's
Office could have any role in who got into the
Academy and who didn't?

A    I don't recall that.

MR BAILEY:  You don't recall that he did
so.  Isn't that correct?  And I object to the question.

Q    What I'm asking you is, did you, you
mentioned first of all, he, he said, on the tape that he
was, is, was significant about the Lieutenant Colonel
and the Governor's Office.

MR BAILEY:  Who said on the tape?  Who
said on the tape?

32



1  SYNDI GUIDO:     You mentioned sir that
2  Captain Ober said when he heard the words
3  Lieutenant Colonel or Governor's Office that he was
4  the one pointing out the significance of that to you.
5  So we just talked about the significance of
6  Lieutenant Colonel, now I'm turning to what was
7  the significance of the fact that somebody in the
8  Governor's Office was mentioned on the tape?
9  How did that collapse with the system as Captain
10 Ober described it to you?
11 A     At this point I can't recall when the first
12 mention of the Governor's Office would've
13 occurred. I don't think that it occurred at that first
14 meeting. That's my recollection right now. I don't
15 think it occurred then, but it subsequently it, it did
16 come up but, I can't recall when.
17 Q     And once he described this process again, did
18 you have any conversation with him about, oh well
19 the Lieutenant Colonel could do it or this or that,
20 you know, we don't want you to tell them?  Did you
21 have any discussion about...
22 A     No
23 Q     Did you leave that completely to his
24 discretion?

33

1  A     Yes
2  Q     What else if anything do you recall about the
3  initial meeting at the Barracks in the Bedford area?
4  A     I, I, I came away from the meeting with the
5  feeling that he would not do anything to disrupt our
6  investigation. I think he was, you know, concerned
7  about the whole situation and he was also concerned
8  about our investigation that we, we proceed and that
9  he would do would not disrupt what we were doing.
10 Q     And again you left that to his discretion....
11 A     That's right
12 Q     as to who, who could, might or might not, who
13 should or should not be told?
14 A     That's correct
15 Q     And you didn't give him an, any advice on that
16 subject?
17 A     No, cause I said, I think he was sensitive to our
18 investigation.
19 Q     Right, I understand what you're saying here.
20 OK, thank you.  When's the next time you had any
21 sort of discussion whether in phone or by person
22 with Captain Ober?
23 A     Periodically we would, we would talk on the
24 telephone, just basically work, you know, what was

34

1  going on, not often and I couldn't even tell you how
2  often it would've been and when it would've been.
3  But, we had a subsequent meeting with Captain
4  Ober and that was after we'd done a videotaping.
5  We had two videotapes though and I can't, I can't
6  recall whether we had them both at that, the meeting
7  or not, but we had videotape of a, of the meeting
8  with our cooperating witness, Bridge and Stanton
9  and a witness's place of business.  And there was a
10 payoff made.  I don't recall whether we had both of
11 those at the time, when we, when we spoke with
12 Captain Ober in Indiana, but we showed him
13 videotapes at that point.  We probably, I think we
14 probably had the payoff, I, I cant' say for sure, but I
15 think we probably did.
16 Q     When you met with him in Indiana, where was
17 that meeting at?
18 A     It was a Holiday Inn, I think, maybe.
19 Q     Why was it at Holiday Inn?
20 A     That was selected by Captain Ober.
21 Q     Cause, it, it, this was your investigation
22 correct?
23 A     That's correct.

35

1  Q     From your perspective was there any reason
2  why you couldn't have met at your office to discuss
3  this?
4  A     No, I think we tried to keep it sort of halfway
5  so he didn't have to travel as far, maybe and you
6  know...
7  Q     But I mean, was that, was the meeting being in
8  a Hotel was that based on you, meaning the FBI
9  concerns for confidentiality?
10 A     No, we needed a place where we could play
11 the video basically.
12 Q     And that could've been anywhere that you had
13 videotape?
14 A     Yes
15 Q     Again, do you know why a Hotel room was
16 chosen as to a State Police Barracks?
17 A     No
18 Q     Would you have had an objection as to going
19 to a State Police Barracks?
20 A     No
21 Q     Did you have any other....
22 A     I could comment on that, I, the a place or the
23 person who supposedly bought the job or, and was

36



1 an active Trooper maybe, or in the Academy was
2 from Indiana.
3 Q    OK
4 A    So I think....
5 Q    And could you....
6 A    Maybe you might not wanna do the thing, in,
7 in, in the Indiana Barracks, if you could, probably
8 do some other Barracks.
9 Q    That's what I was gonna ask ...
10 A    Yes
11 Q    I mean, you're in Pittsburgh, he's in
12 Harrisburg, you need some place halfway
13 between...
14 A    Sure
15 Q    Indiana wouldn't really be the most direct
16 route anyway would it?
17 A    No
18 Q    So, it being in Indiana as opposed to where
19 you met the time before, why Indiana?
20 A    I don't know.  I can't recall right now if there
21 was a reason or not.  It, it doesn't seem to be.
22 Q    Ok, you know I'm just thinking if the guy's
23 from Indiana and the reason you're meeting
24 someplace other than Headquarters is because you

37

1 wanna be halfway between, well, you could hop on
2 the Turnpike, seems like there'd be someplace...
3 A    Sure
4 Q    else.  I'm just, how did we wind up in Indiana?
5 You don't know?
6 A    I don't know.
7 Q    Did you choose the place?
8 A    No
9 Q    Who did?
10 A    Captain Ober
11      MR BAILEY:    You could've met in Florida,
12 couldn't you have?
13 Q    Did he make...
14 A    That'd be nice.
15 Q    Did he make, who made the arrangements for
16 the Hotel?
17 A    Captain Ober did.
18 Q    At the, did you have any other conversations
19 with Captain Ober about the investigation?
20 A    As I said, yes, periodically we would talk on
21 the telephone.  I think at one point, when it was
22 flushed out, that, that, there was no, did not appear
23 to be any corruption on the part of any legislator,
24 local legislator, that you know he was advised.  I, I

38

1 can't, I can't recall it was.  What happened at, at the
2 point I was transferred around myself and I, and I
3 think I worked on some other matters and...
4 Q    Did your transfer have anything to do with this
5 case?
6 A    No
7 Q    Did your transfers have any of your transfers
8 have anything to do with the way you handled this
9 case?
10 A    No, I don't think so.
11 Q    Did you, were you ever advised by anyone that
12 Commissioner Evanko was upset about the way the
13 case had been handled?
14 A    I had heard that, or read that in the newspaper
15 and, but I don't believe that I was assigned to the
16 different duties based on that, I think it was be....
17 Q    That's what I'm asking...
18 A    cause the needs of the Bureau basically comes
19 first in my expertise.
20 Q    It didn't have anything to do with how this,
21 how this case turned out or anything like that?
22 A    I don't think so.
23 Q    OK, when were, when did you say you were
24 transferred?

39

1 A    I was assigned to work on, I think there was a,
2 was a First National Bank of Keystone.  I was sent
3 down there to work on that, that Bank failure.  I'm
4 an accountant.
5 Q    OK
6 A    And I think they wanted my expertise down on
7 that and even prior to that I was working on another
8 major political, corrupt, corrupt activity going on in
9 Pittsburgh and they wanted me on that because of
10 my accounting background.  And those two kind of
11 blended together and, and I also was sent, I was
12 transferred out to the surveillance squad.
13 Q    Now there, you said you read it, about it in the
14 paper.  Do you remember what you read in the
15 paper?
16 A    Yes, I, I can't remember exactly but, it was to
17 the effect that both the agents who were involved in
18 this case were transferred.
19 Q    Do you know if it was an, an, an article related
20 to a lawsuit, not this lawsuit, but another lawsuit that
21 had been filed by Captain Ober.
22 A    I can't recall what it was it ...
23 Q    You don't even remember, what kind, what
24 paper it was in?

40

1    A    No

2    MR BAILEY:    Hold one, hold one second

3 please.

4    SYNDI GUIDO:    Sure.

5    MR BAILEY:    Thank you.

6    SYNDI GUIDO:    Prior to the time that

7 this Federal Lawsuit was filed, there was a

8 Whistleblower Lawsuit filed in Pennsylvania

9 Courts. During the timeframe that that lawsuit, did

10 you have any discussions with Captain Ober about

11 the case?

12    MR KUSH:    He had, I think we had a

13 telephone call. I think he had reach out for me, I

14 think.

15    Q    Do you remember what that was about?

16    A    I can't, I can't recall exactly what it was about.

17 I think, mainly I think it might've been because, his,

18 of the lawsuit that he…

19    Q    That he had filed

20    A    he had filed….

21    Q    The State Police investigation was no longer

22 pending was it? Do you know?

23    A    As it regarded Kipp Stanton?

24    Q    Yes

<center>41</center>

1    A    I can't recall.

2    Q    Did, at the time that you spoke with him, do

3 you know whether or not he had been transferred

4 out of Internal Affairs by then?

5    A    Yes, he had mentioned that he had been

6 transferred and he had mentioned that there was,

7 they created a position, I think at the Washington

8 Barracks and they were trying to assign him there

9 and it was a position that was not a Captain's

10 position and he didn't feel good about that.

11    Q    During that conversation, did you at any time

12 imply that your transfer had anything to do with the

13 way that the case was happen, happened or the way

14 that Colonel Evanko was upset about what happened

15 with the case?

16    A    I think that I knew, knew about that allegation

17 or that statement and probably the Captain Ober

18 probably brought that up and, and I told him that

19 there's no way that that, you know, that, that could

20 be, he could affect this organization like that.

21    Q    That's what I was asking.

22    A    Yes

<center>42</center>

1    Q    So you wouldn't have told him that, that you

2 were transferred because of anything that happened

3 with that case.

4    A    No, I would not have said that.

5    Q    Ok and did you, I don't remember whether

6 you said the case had been completed or not

7 completed by the time that you were transferred?

8    A    It was not completed.

9    Q    Who took over the case?

10    A    John Kelly

11    A    John Kelly

12    Q    John Kelly?

13    A    John Kelly, an agent.

14    Q    So would it be after Kelly took over that it was

15 finally decided to close out the investigation and

16 hand it over to State Police?

17    A    That's correct.

18    Q    Did you ever, do you have any recollection

19 with ever discussing your investigation with

20 Sergeant Dana Seifner from Internal Affairs

21 Division?

22    A    She's out in Harmarville, right?

23    Q    I believe so.

<center>43</center>

1    A    Yes, I think, I probably have. It was, you

2 know, late, late in the investigation.

3    Q    Did you know if you provided her with any

4 reports…

5    A    Oh, I think so, yes.

6    Q    Do you remember what?

7    A    No, or maybe she already had 'em. I can't

8 recall. But, she was, she had, yes she had them.

9 Now whether I had, I had given her more or whether

10 John Kelly had, I can't recall, but she had, she had

11 access to them.

12    Q    OK, were you present for a State Police

13 criminal investigation in a criminal investigation,

14 State Police Interview with Trooper Stanton or with

15 your confidential informant?

16    A    Yes

17    Q    Do you know when that was? Does August, I

18 have a date I'll ask you if it rings a bell, August 6 of

19 '99? Does that sound….

20    A    If that's, if that's when we had, I think we did

21 both of them, Bridge first…

22    Q    Oh, together?

<center>44</center>



1  A    No, separate. Bridge was brought into the
2  Harmarville office on some rouse and we confronted
3  him at the time and he...
4  Q    Why...
5  A    Go head...
6  Q    Why...
7  A    And he, and he admitted what was going on.
8  Q    Why were you, both agencies doing this in
9  sort of a in joint interviews or why were you
10 present?
11 A    Well we...I guess to see if anything
12 developed, we, we, you know, if anything else
13 developed out of it we would have an interest in,
14 cause basically at that point it was the State Police's
15 case, was a local, was a local case.
16 Q    How, that, that, I guess that's why I
17 mentioned, it's a little confusing I thought you were
18 transferred before the investigation was.
19 A    I was fluid at the time.  I was....
20 Q    Ok
21 A    moving around and I'm pretty sure I was
22 brought back into the office.  I may have been, but
23 then I would, we were flexible when we, wherever
24 we're needed, we, we, we just, we would go.  It

45

1  could've possibly been I was still assigned to the
2  surveillance unit and I just broke away from that for
3  this, this interview and this situation. I can't recall
4  exactly where I was.
5  Q    But at some point, the FBI case was complete
6  and it was turned over to the State Police.  Is that
7  what happened?
8  A    You know if, John Kelly would be a better
9  person to ask that.  It, it could possibly, I can't recall
10 and that, and I haven't reviewed the case in a long,
11 long time.  It could possibly have been totally
12 flushed out and then again maybe it wasn't.  I can't
13 recall exactly.  I think that the, the legislative that
14 we had in mind, that had been approached and
15 discussed this matter, whether, that had been
16 completely flushed out or not at this point.  I can't
17 say for sure.
18 Q    Who made, do you know who made the
19 decision to give the case to the State Police as
20 opposed to the FBI....
21 A    Well this particular phase of it, well we had
22 no, no jurisdiction in it.  And it might, it's very
23 likely that, that we already had determined that, that
24 there was no political corruption involved and

46

1  that's, why we, we did that. Then again, it's also
2  possible that maybe we were gonna use these people
3  further on, but I don't think so.  We probably, we
4  probably had that completely addressed at that time.
5  And, then this would be the next phase to take
6  down.
7  Q    Well did there come a point where you would
8  have gone to Captain Ober and said, "look we
9  determined that it's just....
10 A    Yes
11 Q.    ...it's just a State Trooper....
12 A    Yes
13 Q.    ...and go ahead and tell, it's ok, fine to tell the
14 Commissioner now about it?  Anything like that?
15 A    Oh, no, we wouldn't, I didn't know who he
16 had told or what had happened at this point in time.
17 Q    So there wasn't no point in time, when you the
18 FBI said, "OK, now you have power....
19 A    No
20 Q.    ...great, you know...
21 A    No
22 Q    our blessing go tell your higher ups if you
23 choose?
24 A    No, we wouldn't try to direct them.

47

1  Q    OK, you weren't really in a position to do
2  that?
3  A    No
4  Q    And then, but there would've, was there a
5  point where you or was it Trooper Kelly that told
6  Captain Ober, OK were done, it's just a Trooper?
7  A    I don't recall.
8  Q    Did you ever have a discussion with Captain
9  Ober about, about Commissioner Evanko contacting
10 Louie Freeh about this situation?
11 A    I think the article even said something there
12 that he called the director or....
13 Q    But did you have any, I mean, or in other
14 words did Captain Ober believed that happened, did
15 he get that information from you?
16 A    No, he wouldn't have gotten it from me.  I
17 would've gotten it from him, if I, if I, if I knew that
18 and....
19 Q    You had no independent knowledge that,
20 about, did you have any independent knowledge
21 whatsoever about who....
22 A    No
23 Q    Colonel Evanko called.
24 A    No, no, no

48



1 Q    Who if anybody?
2 A    He didn't call me.
3 Q    OK, were your superiors ever call you in and
4 say Colonel Evanko called so and so at the FBI and
5 were upset about it?
6 A    I did get, yes, the SAC of our office...
7 Q    And who is that?
8 A    Rick Mosquera
9 Q    OK
10 A   I had a discussion with him....
11 Q   And can you tell me about that discussion...
12 A   regarding that.  I can't, I really, it was not....
13 he was concerned I think he may have gotten a call
14 from Evanko, I think that might have been, I don't
15 recall if anyone else was in that meeting with us or
16 not and.
17 Q   Was the nature of that, I guess I want to know
18 the tone and nature of that meeting.  Was the tone of
19 that meeting such as that you had done something
20 wrong....
21 A   No
22 Q   or just that Colonel Evanko's upset about it?
23 A   I think it was just that he was upset about it
24 and I wasn't reprimanded or anything by Moscera.

49

1 Q    And as a result of Colonel Evanko's call, to
2 your knowledge did that have any bearing on
3 whether the FBI continued or didn't continue to do
4 the investigation to this subject?
5 A    No, no
6 Q    In other words to your know... do you have
7 any knowledge that Colonel Evanko did anything to
8 truncate your investigation?
9 A    No
10 Q   Do you have any knowledge that anybody in
11 the State Police did anything to keep you from doing
12 anything but the fullest ....
13 A   No
14 Q.  ...And most complete investigation possible?
15 A   No
16 Q   Just give me one minute.
17 A   Sure
18 Q   There's just one area I want to follow-up with
19 you a little bit about something I'm not familiar
20 with, so I want to get a little more information if you
21 have it.  And you said that early on in the
22 investigation or early on in your contact with
23 Captain Ober you had the names of some people

50

1 that had supposedly bought their way into the
2 Academy....
3 A    Yes
4 Q    Do you remember who those people were?
5 A    I don't recall the names. I believe there was,
6 there were two names mentioned.  But that was one
7 of the real purposes of meeting Captain Ober, was to
8 verify that and see if in fact somebody had gotten,
9 bought their way in.
10 Q   To see if those two people, were those people
11 that were currently in the Academy?
12 A   That's correct, there was one at the time that
13 we had information on. There was another name
14 subsequently mentioned I don't know that we had at
15 that particular time when we talked with Captain
16 Ober, the first time.  They were from Indiana, I
17 think.
18 Q   The people were from Indiana?
19 A   That's correct.
20 Q   And one of those people from Indiana was in
21 fact in the Academy?
22 A   That's what was, we were led to believe by
23 the, the, I think it was the information was either

51

1 coming directly from Bridge, but was coming from
2 Bridge through Stanton.
3 Q    Was Captain Ober able to tell you whether or
4 not that person was in fact in the Academy?
5 A    He was able to determine that that person was
6 not there.
7 Q    OK, that's where I guess I was getting
8 confused.  I was thinking you said that one of the
9 people actually was in the Academy.
10 A   Yes, we didn't know...
11 Q   So it, in other words it was your informant that
12 said one of the people was in the Academy and
13 somebody else had been in the Academy?
14 A   It was Bridge, I believe who was giving the
15 names of the people and we were getting them
16 directly off the tape.
17 Q   Right, who gave the names of, that John
18 Doe....
19 A   John Doe, sure, whatever
20 Q   John X is there and then you contacted Captain
21 Ober and said, "were those people actually in the
22 Academy and it turned out that neither one was in
23 the Academy?
24 A   That's right.

52



**Page 53**

1 Q    OK, did Captain Ober tell you anything about,
2 what did he tell you if anything, what he did to
3 check that out?
4 A    He did it discreetly.  But exactly how he did it,
5 I don't know.
6 Q    Did you said that was one of your first, one of
7 the reasons you needed his help in the first place?
8 A    Well that was, there was two reasons...
9 Q    Right, I said one of the reasons.
10 A    I mean, he needed, he needed to be brought in
11 and told what was going on and also that particular
12 thing we needed to verify it.
13 Q    Did you ask him about that on the phone, or
14 was that later at a meeting?
15 A    I don't recall, we probably, I probably
16 mentioned the name more than once to him...
17 Q    So
18 A    Could've possibly been on the phone before
19 the meetings.
20 Q    Well, at the meeting is that when he was able
21 to say they weren't in the Academy or was that was
22 a follow-up later?
23 A    I think it was a follow-up.
24 Q    Maybe a phone call?

53

**Page 54**

1 A    Probably
2 Q    Did you have many phone conversations over
3 the course of these months from October to May?
4 A    Yes, yes, we, I couldn't say exactly how many,
5 but, you know, when there, when there, when there
6 was a need we would, we would have
7 communication.  We were still pursuing that, the
8 Legislator.
9 Q    What kind of things would you need to talk to
10 him about?
11 A    Well, as I said the second time, the second
12 name did come up, so we had to verify that.  I don't
13 whether there, the reason, but...
14 Q    All right, you just wondered cause you said....
15 A    maybe just to keep up, keep him updated that
16 there, you know how are case was, was going along.
17 Q    Do you remember other than giving him
18 updates, do you, and, and the instance where you
19 tried to brief to find out whether that person was at
20 the Academy, do you remember any other instances
21 where you needed information from Captain Ober?
22 A    I can't recall right now, no.
23 Q    Hang on a second.  The one thing I don't think
24 I did, I think I didn't clarify, during your initial

54

**Page 55**

1 discussions with, you know whenever you said you
2 felt somebody in their OPR needed to know about
3 this and etc., that was the other reason you got a
4 hold of him, in other words your reasoning being
5 multi faceted one that you needed information, but
6 also that someone there needed to know.  Was there
7 ever a discussion about whether or not State Police
8 should or should not open their own criminal
9 investigation into what either criminal or Internal
10 Affairs investigation into Trooper Stanton's
11 conduct?
12 A    Well, we believed that they would, I mean it's,
13 as soon as we contacted them.
14 Q    OK, that's all I have right now.  Your witness.
15     MR BAILEY:   How are you today Ralph?
16 A    Fine, feeling good are you?
17 Q    Pretty good.
18 A    Are ya?  Me too.
19 Q    A few questions for you.
20 A    Sure
21 Q    I won't take too long.  If you anytime during
22 the period of time that I ask questions have a
23 concern or curiosity about what I'm asking, I want
24 you to feel free, I don't mind your questioning.  It

55

**Page 56**

1 will save us time it will build a better fact record.  I
2 have no desire to get distorted, ambiguous, unsure,
3 conjectural information on the record, OK.  What I
4 wanna get on here is some facts and correct
5 information and get 'em in the proper sequence for
6 that reason I do not mind.  At any time if there is
7 any confusion that you ask and that goes by the way,
8 your Attorney or opposing Counsel, OK?
9 A    Fine
10 Q    All right sir.  Now you had indicated that the
11 original investigation into Mr. Stanton started or
12 arose, I'm sorry, sometime on or about '95 or '96?
13 A    Well, I think that date that she would've, that
14 the Counsel would've mentioned probably is more
15 accurate.
16 Q    What Counsel, what date did she mention?
17 A    I didn't write it down.
18 Q    I didn't either, I thought you said '95 or '96.
19     SYNDI GUIDO:        I said '94 to '95.
20 A    Yes, somewhere in that, in that, in that range.
21     SYNDI GUIDO:        '94 to '95 was the date I
22 mentioned.
23     MR BAILEY:   But not later than '96?
24 Right? Right Ralph?

56



1  A  I can't say that.

2  Q  You don't know that?

3  A  I can't, if I had my file I could give you exact

4  times and dates.

5  Q  OK

6  A  I can remember the situation precisely when it

7  first came up and I can't give you the date.

8  Q  Ralph, do you remember if it was before

9  1998?

10  A  Oh, of course.  It was before that.

11  Q  Sure it was, because you guys more or less

12  dusted this thing off in 199…in other words it came

13  up a Mr. Soohy had come in and he looked at this

14  and said you know it's sorta laying, it's sorta

15  stagnant, let's take a look at it, right?

16  A  Well the other, the other matters that were

17  related to the cooperating witness, those pretty much

18  had fizzled and this was one thing that we should,

19  you know clear up….

20  Q  Right

21  A  and get this resolved.

22  Q  Understood.  Now Ralph who had done that

23  investigation for the FBI, investigations the right

24  word, who had opened the filed, or started the

57

1  inquiry, quiry, whatever you did, prior to 1996?

2  Was it you?

3  A  Yes .

4  Q  OK Well now OK, I'm just curious.  You had

5  notified the State Police?

6  A  I had contacted the State Police.  That, you can

7  consider that notification, I'm sure.

8  Q  What, what would you consider it?

9  A  I needed, I needed their assistance.  I needed

10  Klaus Behrens or, Klaus Behrens?

11  SYNDI GUIDO:    OK

12  MR BAILEY:    Oh I needed to remember that

13  name.  Do you remember that name now Ralph?

14  A  Well let's, yes, that sounds very familiar.

15  Q  Does it?

16  A  Yes, I was led to him.  I contacted State Police

17  in Harrisburg and when I found out that this guy

18  was a Trooper.

19  And I needed to, to talk to someone to find out if in

20  fact there was an investigation going on and we

21  were getting in the middle of it, and, before we

22  could even proceed with this thing.  And I was led to

23  him and I gave him a call, met with him at his, in the

24  Greentree office and we discussed it and he said that

58

1  he could verify if in fact there was a State Police

2  undercover going on.  And, that was a concern

3  to us.

4  Q  OK and you immediately cooperated with the

5  criminal investigation that the State Police began,

6  right?

7  A  I didn't know there was an investigation begun

8  at that point in time.

9  Q  Oh, well, when did you hear Len Bodak's

10  name?

11  A  That name would've come up in my

12  investigation.

13  Q  Well you said you did the earlier one too.

14  A  That's right.  I can't tell you exactly when.

15  The name is not unfamiliar to me.

16  Q  Well let me ask it this way.

17  A  Sure

18  Q  Ralph, do you know whether it was pre 1996

19  or perhaps 1996 or post 1998?

20  A  Oh, it was post '98 of course.

21  Q  Ah, that's good.  That's good Ralph that may

22  help explain some things and reduce a lot of the

23  questions I have to ask you.  When did Joe Preston's

24  name come up?

59

1  A  That name is not unfamiliar to me either, but,

2  as it relates to this matter, probably in

3  '90…probably in '98.  Whenever we resurrected

4  this, this particular phase of the investigation.

5  Q  So prior to 1998 and whatever you discovered

6  after 1998 after you resurrected, with all your

7  terminology the investigation, the Pennsylvania

8  State Police had been told about Mr. Stanton.

9  A  They were aware, Mr. Behre's was aware of

10  Mr. Stanton.

11  Q  Do you know if they opened any files, started

12  any investigations, created any records, any

13  documents?

14  A  I don't know what they did.

15  Q  Do you remember if you gave them any

16  documents?

17  A  No, I didn't.

18  Q  OK, did you talk with Mr. Behrens?

19  A  Yes

20  Q  OK, now, let's, let's move ahead to 1998,

21  OK and let me ask you just a few questions about

22  this. The defendants in this case have a number of

23  questions for you about this first telephone

24  conversation that you had.  Do you remember that?

60

1  A   The very first conversation with…

2  Q   With, with Mr. Ober.

3  A   Yes

4  Q   Do you remember that?

5  A   I can't remember it, but I'll try to.

6  Q   Now you were asked questions on direct about

7  whether there was information imparted to Mr. Ober

8  about whether State Legislators may have been

9  involved. Do you remember that? I'd like to let

10  you know where I'm going, I just wanted to if you

11  can do a chronol it might save some time. If you

12  can do a chronology for us, what I'm looking, OK,

13  is when you became aware that Legislators might be

14  involved. Ok? All right sir, just to save you

15  sometime here.

16  A   OK

17  Q   All of your answers…

18  A   No I, no I

19  Q   It's OK, you go ahead.

20  A   We, well when we first got the initial

21  application I suspected that there would be

22  Legislators involved.

23  Q   Yes, I figured you did.

61

1  A   And, that would of, in any discussion that I

2  would've had with Captain Ober. The first ones, the

3  telephonic ones would probably not be in great

4  detail, but there would be enough detail to give him,

5  you know, a rough idea where we were standing.

6  And then the subsequent face-to-face meetings we

7  would, we would, we would go into more detail.

8  Q   OK, now, is what you're telling us then

9  sometime on or about the first conversation that you

10  had with Darrell Ober, which if I understand

11  correctly, was sometime in very, early October, or

12  am I wrong?

13  A   It, there would've been at least one or more

14  telephone conversations prior to the face to face

15  meeting if the face to face meeting was in October.

16  Q   No, I didn't say that. I, I understand that

17  initially there was a telephone conversation that was

18  initiated by you and that there was a later meeting.

19  We're gonna come to this October 3rd….

20  A   OK

21  Q   …meeting date and the incredible ability of

22  Captain Ober to predict that a CI, I wanna ask you

23  about that, let me, let me, may be a point of

24  departure here.

62

1  MR. KILLEEN: Can I, can I….

2  Q   I'm sorry.

3  MR. KILLEEN: Excuse me. Can I interrupt

4  for a second? I've got an emergency that I have to

5  handle right away.

6  MR BAILEY: OK

7  MR. KILLEEN: Can I, I apologize

8  MR BAILEY: No, no, no

9  MR. KILLEEN: Can I take about two minutes

10  just to…

11  MR. KILLEEN: The only that I'd like is for

12  him to stay here and not …

13  MR. KILLEEN: That's absolutely… he's

14  staying and I'm going. I gotta, I'll be right back.

15  MR BAILEY: Not that I don't trust Mr.

16  Kush. You understand?

17  MR. KILLEEN: I apologize.

18  MR BAILEY: Thank you sir.

19  TONY MARCECA: Are we suspending?

20  MR BAILEY: Yes, why don't we go ahead.

21  TONY MARCECA: It is 12:27; we're going

22  to suspend this deposition of Mr. Kush.

63

1  TONY MARCECA: It is 12:31 and we're

2  resuming the deposition of Special Agent Kush on

3  March 14, 2002.

4  MR BAILEY: Mr. Kush, I'm sorry….

5  MR KUSH: Retired Special Agent.

6  MR BAILEY: Mr. Kush my understanding

7  is that the telephone call that you placed to Mr. Ober

8  sometime on or about, beginning of October 1998,

9  do you have any reason to doubt that?

10  A   1998, No, I don't if that's the, the date, that's

11  probably right.

12  Q   OK, now I thought that Mr. Soohy, very

13  impressive man, that Mr. Soohy said that he had

14  reported to this area in sometime on or about the

15  summer of '98, like August or so.

16  A   Yes

17  Q   Is that right?

18  A   That sounds right.

19  Q   Well does that mean between when he got here

20  and when you called Darrell Ober you picked up

21  this information about Lenny Bodak and Joe Preston

22  and who knows who else?

64

A    You have to understand that I work public
corruption and I'm familiar with names otherwise I
wouldn't be able to work...

Q    You know I have public corruption files; I
have names in it too.

A    But, on one of them, you know, you hear, you
hear allegation and you hear 'em talk, so I was not
unfamiliar with those names. So, I, I, I don't know
exactly when they would have been connected to
this particular phase of the investigation.

Q    Well, hear what I'm asking you Ralph. When
did you first do the wire-tapping? When did you
start the wire-tapping? Was it before you called
Captain Ober?

A    Oh, yes.

Q    Oh, OK

A    I think, I think, he, we did that. Probably it's,
we had, we had an extensive investigation going.
And, you know, dozens of tape recordings and...

Q    Does that mean you had dozens of tape
recordings when you called Captain Ober?

A    Not rela... maybe not related to this particular
matter, but to other things.

Q    OK

65

A    ...in the, in the whole bigger investigation.

Q    All right sir.

A    So, yes, I would've had some tape recordings,
I would guess.

Q    You made a mistake at one point in fact you;
you erroneously erased part of a tape, didn't you?

A    Oh gees...

Q    Oh, didn't you do that?

A    Yes, I, yes absolutely.

Q    Yes, you did. Well, one tape....

A    Well, I mean...

Q    Well, I'm not saying it's a big deal Ralph, I
mean...

A    It is a big deal.

Q    Is it?

A    Sure, it's a big deal.

Q    What did you erase? What part of what tape
did you erase?

A    In the process of duplicating the original
telephone conversation with Kipp Stanton.

Q    OK

A    I put it into the wrong slot in the duplicator.

Q    When did it occur, if you know?

66

A    I can't tell you. It's in the file. If you really
need it, I'm sure we can drag the file out, but, it was,
it was, it was very early in my investigation after we
had done our search warrant and we had start
debriefing the cooperating witness.

Q    Mr. Bridges or Bridge, Bridges whatever his
name is?

A    No, this was the cooperating witness.

Q    Oh, the CI?

A    The CI.

Q    OK, now sir let me ask you, you've already
indicated that the time that you called Captain Ober,
that you, you it was to you, it wasn't Stanton, it was
a public corruption case at that point...

A    Of course

Q    ...that you suspected. Is that right?

A    Yes

Q    All right now, now the Defendants and, I want
to take your mind back to an investigation done by
Major Williams of the Pennsylvania State Police.
Do you remember him talking to ya?

A    Was that the, the name of the officer that I
spoke with out at the Findley Barracks?

Q    A very distinguished gentleman, tall....

67

A    Yes

Q    ...Gray hair, yes that would be him. I guess
that's him.

A    Sounds, probably is.

Q    He, you and me both, tall and good looking.
So it must've been, whoever's best looking, I don't
know, but that sounds like Major Williams. A very,
very, very impressive gentleman. Now, the, this
issue comes up with this date of October 13 where
this interview took place supposedly. Not an
interview, I'm sorry a tape. Where somebody
mentions on this tape whether it's Stanton or the CI
or somebody, mentions on this tape that higher ups
or the Governor's Office, or people in that sort of,
that area might be involved. Now you certainly
remember at some point a reference being made as
to whether it was a Lieutenant Colonel, whether it
was a Colonel, higher ups in the State Police,
whatever, Governor's Office, those words I think
were, you indicated were mentioned, but you
remembered that that occurred at some point right?

A    It was on the tape.

Q    Yes, now in doing in your investigation did
you learn that Darrell Ober was dealing directly

68



1  with your CI? Was he working directly with your
2  CI, do you know of?
3  A    I don't think so.
4  Q    OK, do you know whether he was contacting
5  any of the principles in this thing, in your
6  investigation?
7  A    I don't think so.
8  Q    Well in fact you told us that Mr. Ober was
9  concerned and I believe your predecessor told us,
10  predecessor in providing testimony,
11  A    Ok
12  Q    indicated to us, that in fact Mr. Ober, Captain
13  Ober was concerned about the integrity and
14  propriety of your investigation, to respect it. And
15  you indicated that, didn't you?
16  A    He was sensitive to what we were doing, yes
17  as I would be sensitive to what he, whatever he
18  would be doing.
19  Q    I would hope so.
20  A    Yes
21  Q    As we should all be sensitive as to what we are
22  doing now. Now my understanding is, that you
23  don't recollect during the telephone conversation
24  with Captain Ober whether or not the possibility of

69

1  higher ups in the State Police or Governor's Office
2  was discussed at that point? You don't recollect?
3  A    I don't think, I don't think that was discussed.
4  We were concerned with the Legislature…
5  Q    OK
6  A    …at the time.
7  Q    So, if Captain Ober, before October 13th, says
8  to Colonel Hickes, that perhaps higher ups in the
9  Pennsylvania State Police or the Governor's Office
10  could be involved or something to that affect, he's
11  predicting what the CI's gonna say on the tape
12  recording a week later, right? If that occur, no, if
13  that occurred, I'm, I'm not…
14  A    I'll respond to that, OK.
15  Q    Well sure, you respond to it. How would he
16  know? It's real simple, you're an investigator, well
17  how would he know?
18  A    He would know the process. He would know,
19  and I'm not putting blame or anything on anybody,
20  but he knows that State Police, he knows how they,
21  the Academy works, how the positions are filled in
22  there. And, I would only know how the CI or
23  whoever would be, would, he would have to affect
24  somebody in the process, in the hiring process.

70

1  Now, who that person would be, I wouldn't have
2  any idea, but perhaps Captain Ober knew who, who
3  would have to be affected.
4  Q    Yes, what, what you knew….
5  A    So he, he knows what, basically State Police, I
6  don't know the State Police.
7  Q    But, what you know, what you know and
8  today is altered by the facts you uncovered in an
9  investigation, but what you knew when you called
10  Captain Ober was, as a, as a, at least, at the very
11  least as a common sense matter, was that a Trooper
12  in Southwestern Pennsylvania was not going to be
13  able to single handedly without any help manipulate
14  an Academy appointment up in Harrisburg, right?
15  A    Sure
16  Q    That was only; I mean that's just basic
17  common sense right? He had to have somebody
18  helping him?
19  A    Sure
20  Q    OK, well, you know of any other facts
21  communicated to Captain Ober that would make
22  him aware prior to October 13th that the Governor's
23  Office might be mentioned?
24  A    No

71

1  Q    You don't know, but you feel, feel pretty sure
2  that, that you didn't mention anything like that in
3  that first phone call?
4  A    I wouldn't mention, I, I wouldn't, I would, I
5  would've thought if I would have mentioned
6  anything, that the Legislature. That, that's the only
7  as far as the Governor I, I, that would've been the
8  furthest thing from my mind, maybe at that point. I
9  was focusing more on that area because, that's a
10  fertile area.
11  Q    You, sure, but, it would be the furthest thing
12  from your mind, well, the Governor's office
13  wouldn't be a fertile area or Mr. Ridge's
14  administration wouldn't be. But the Governor's
15  Office, it wouldn't, it wouldn't, necessarily mean
16  much to you in terms of what you were looking at,
17  at the State Police thing, so obviously unless you
18  have information about the Governor's office, in, in,
19  when you first called Darrell Ober, there's no reason
20  you would think to mention to such a thing, and I'm,
21  I, I'm sure that you would not do so, you know for
22  nothing. So obviously if your recollection is the
23  Governor's Office wasn't mentioned, you didn't
24  have information about that when you called

72



1 Captain Ober. Although it did develop later and
2 was mentioned on a tape by a CI, thank God it
3 ended up being untrue, but it was mentioned, right?
4 A    If in fact the Governor's Office was mentioned
5 on a tape, I can't recall that now, to tell you the
6 truth. It might've been on there, it might not. But I
7 recall that, that vividly then it was a Lieutenant
8 Colonel or some high ranking officer, his name, not
9 that the name was mentioned but the position was
10 mentioned.
11 Q    OK now Ralph, that's why, the reason I'm
12 doing this is, I was a little confused by your
13 responses to my? and colleague which, did, did, did
14 you indicate in your responses to her that possibly
15 Mr. Ober had mentioned the Governor's Office?
16 That, he had brought that into this thing? Then how
17 did it come in?
18 A    I don't know.
19 Q    How did it come into it?
20 A    It must've, it certainly didn't come from me,
21 put it that way.
22 Q    Well, I'm sure it didn't come from you sir.
23 A    The Governor's Office, so, it, there was
24 only…

73

1 Q    Now I'm certain it didn't come from you, now
2 that's ridiculous.…
3 A    Yes
4 Q    I'm talking about the fact source. You tell us,
5 you know, you are an experienced FBI agent and if
6 the facts in this case indicates somebody mentions
7 the Governor's Office on the tape and your expertise
8 is political corruption, that didn't ring a bell, raise a
9 flag, your telling us you don't remember?
10 A    I don't know that it's on there. I don't know.
11 I'd have to listen to the tape. It was done, you know
12 the last time I listened to it was years and years ago.
13 I don't, I don't recall it being on there. Possibly it
14 is, maybe it isn't but, it, it, it, as I said, because of
15 the type of person that I was working with, his
16 contact with, be with Legislators as opposed to the
17 Governor's Office.
18 Q    Why?
19 A    Why, because that's where he is. He does,
20 he's here in Pittsburgh and he's not in Harrisburg.
21 Q    Well, Darrell Ober's name came up.
22 A    And Darrell Ober's, and there are Legislators.
23 He's a political; he's a political person.
24 Q    Is he?

74

1 A    Yes
2 Q    OK, well, you do remember discussing or
3 maybe you don't, Governor's Office with Captain
4 Ober? I thought you.…
5 A    If I, if, if we did, if we did, it was not to any, at
6 any length at all, I mean it was, it might've been
7 mentioned. It wasn't discussed in any detail, I can
8 see. Sure it was not, it would've been in passing,
9 that, that, that it was a possibility. I didn't, I, the
10 State Police, I, probably, the Commander of the
11 State Police I'm sure serves at the pleasure of the
12 Governor, so, it's part of the executive branch and
13 so, I mean if it did, you know, I don't…
14 Q    I mean, the Legislators were involved and you
15 might feel that two elected Democrats out in
16 Allegheny County might have an effect on, on
17 Colonel Evanko in a Republican Administration
18 maybe through what, appro… appropriation process
19 the way politics is done you would think that maybe
20 they would have, not necessarily Colonel Evanko,
21 but somebody in that State Police Hierarchy you
22 didn't, you didn't know what the connection could
23 be, but you could envision the possibility.…
24 A    Oh sure

75

1 Q    that these kinds, this kind of corrupt activity
2 could occur, right?
3 A    That's right
4 Q    Alright, but you had, I mean, let's face it when
5 this investigation was done, none of this stuff turned
6 out to be very credible, and, and it sounded, well,
7 from what I can tell when you did the investigation
8 it didn't turn out to …
9 A    We weren't successful in that, in that.…
10 Q    OK
11 A    .…we were successful that the, the individual
12 we thought that might be able to affect it, you know,
13 did not.
14 Q    Yes
15 A    It, it, it would not. That doesn't, it isn't.…
16 Q    That is them?
17 A    No
18 Q    Oh, OK
19 A    No, that's the Legislator, that's not to say there
20 isn't another person out there, or Legislators out
21 there who would try to affect this.
22 Q    Well how closely did you look at the
23 Governor's Office?
24 A    We did not look at the Governor's Office.

76

Q    OK, all right, now the conversation that
occurred on or about February 13, the tape, did, you,
you got that reduced to a transcript at some point,
right?

A    I'm sure most of the significant, you know
parts of the, the, some of them totally were reduced,
yes.

Q    Well, how many transcripts did you give
Captain Ober?

A    I, I don't know.

Q    Well, why wouldn't you give him all of them
sir?

A    Because we, we were still continuing at that
point in time.

Q    Oh, did you give him all of them at the end?

A    The, I didn't have the investigation at the end,
so I don't know.

Q    Right, you were off then, but will get to that in
just a minute, but, the investigation, the part of the
investigation that you did, the reference to, to, was a
Lieutenant Colonel, I think and Governor's Office,
which you're not remembering now…

A    I'd sure like to hear the tape, I could tell you
for sure, but, and look at the transcript, but, the, the

77

Lieutenant Colonel, that position came up, that, that,
the reference to that position came up in the tape.

Q    And you had indicated that, that Captain
Ober's ears perked up when he heard that, is that
right?

A    He was sensitive to that, yes.

Q    You know the feeling I got when I saw that in
Mr. Williams statement, I don't know where that
feeling came from, whether it was Mr. Williams.
Mr. Williams wrote a little statement about what
you told him…

A    OK

Q    I made references. Now I didn't, you know,
when I, when I heard that, it sounded like Captain
Ober took a sudden interest in that sort of thing. But
you seem to be telling me that it wasn't, the tape
wasn't real clear. Are you telling me that the tape
was clear and you had heard the word Lieutenant
Colonel just takes Captain Ober to get interested in
that term if it's connected with selling jobs at the
Academy? I don't understand…

A    OK

Q    Explain it for me.

78

A    If, if I were listening to a tape which Captain
Ober had made, and it was discussing a similar
situation but in reverse order. As soon as he, he,
person would've mentioned the Special Agent of the
FBI. I would've hit on that, I mean even if it was a
little bit garbled or whatever, I would hit on it very
quickly because now it's my organization that's
being, possibly a problem with. And I would be
extremely sensitive to that.

Q    OK

A    And I would imagine if the situation was
reversed and when that, when that happened, when
that, when that, when they position title came up
like that, he hit on it like I would've hit on it as if an
FBI Agent being, being accused of something or
possibly something going on. And I think that's
why he hit on it and, and I would've just, I'm just
listening, I'm listening to, to somebody explain a
process and to me it doesn't really mean anything
because I don't have, I can't attach it to anything
yet, whether it's valid or not.

Q    OK

79

A    But if in fact it was like an allegation
regarding our organization and somebody mentions
and FBI Agent, I would become very interested in it.

Q    OK, now in the, I believe you expressed the
opinion that you would've expected Captain Ober to
maintain confidentiality or respect, I don't know
what words you want, you would use. But respect
for your investigation when you tell him something,
in other words…

A    To handle it in, in, in appropriate manner
whatever he deemed whatever he deemed was the
way to, to go with his, with the information. I don't
know what his requirements were, but he would be
sensitive to what we were doing.

Q    Yes

A    Cause we would be sensitive to what he was
doing.

Q    Now here's, here's where my, where I have,
have a problem. I, I need you to explain, because it
doesn't make, I feel it is a conflict in your
testimony.

A    OK

Q    If at the time you call Captain Ober, your
common sense judgment and experience tell you

80

that Kipp Stanton is not going to be able to engineer
class appointments for the Pennsylvania State Police
and Soohy comes in, in August, you making this call
early October to Mr. Ober and there's mention of
State Legislators or a Senator, at the point that you
call Mr. Ober....

A     Yes

Q     ....I assume you would've passed that on?
That information or that background information
onto Mr., Mr. Ober

A     Ober, sure

Q     So the question that remains is when you first
became aware of higher ups in the State Police,
Lieutenant Colonel in the State Police, somebody in
the State Police above Stanton, if either by rank or
group or something and the Governor's Office, OK,
when you first became aware of that and when you
communicated to that Captain Ober and that's what
I wanna explore, OK?  At some point obviously that
became a piece of the background here.  Now, do
you remember if when you first heard this tape
Lieutenant Colonel, apparently you, you played that
for Mr. Ober, right?

A     Yes

Q     Do you have a transcript with ya?

A     Probably not, I don't, if, if, if in fact we made
that tape like a week or so before we played it for
Captain Ober, it probably was not, we probably
hadn't had parts of it transcribed.  It was probably a
fairly lengthy tape and it would've taken time to get
that done and we, we just didn't get it done.

Q     Well when did you first listen to it after you,
you had it, I mean did you sit there and listen to it
while it was, while you're listening to the
conversation being made?  In other words, was it
transmitted and your listening to it or did you have
your surveillance people do it and you got it after
the fact?

A     No, I probably, I probably got it after the fact.
The times I wouldn't, would have a transmitter also,
but I, at this time I don't think I had a transmitter.  I
think I was just picking it up after, after the fact.

Q     And you didn't like pick up the phone right
away and call Captain Ober and let him know, like,
"Hey don't say anything to anybody because this
might involve some officers high up in the State
Police?"

A     No

Q     Now, when you heard this problem, I mean
heard this thing about possibility of a State Police
hierarchy, Lieutenant Colonel, not many of them are
Pennsylvania State Police, I can tell you, maybe a
handful, and you heard the Governor's Office, if, if
indeed you did, because we're not sure if you even
heard it, because you don't know.  You don't even
know if it was on the tape.  But, I assure you it's on
the tape.

A     OK, good

Q     OK, and if you certainly had heard the
Governor's Office although it wouldn't excite you
or raise a flag in your eyes, maybe, I'm not saying it
should, or and you heard the term Lieutenant
Colonel, you went to, you went to Rick Mosquera
right and said, "Hey, this, this is a touchy thing here,
we need to...

A     No, we didn't go to him.

Q     You didn't do anything like that?

A     No

Q     What, what did you tell him?  What did you
tell Rick Mosquera?

A     I don't know when Mr., Mr. Mosquera got
information about this particular case, but I know

that he did when, when I was called into his office I
would think, I don't know when he would've
learned about it.  I don't know whether Mr. Soohy
discussed it with him or not prior to, I don't know,
can't tell you.

Q     OK, OK, well...May 20th 1999, when I called,
this is Colonel Evanko; when I called FBI Agent
Rick Mosquera who was the SAC in Pittsburgh, this
is when the Captain Evanko learned from the FBI
when, OK, he had been informed by Captain Ober
about this investigation he and Colonel Hickes,
Captain Ober and Colonel Hickes had told the
Commissioner about it and said it's closed and you
know I couldn't do anything, because, you know,
our, that's what they're saying, you know Hickes
and Ober, you know the thing is about not
compromising the investigation, the proper thing to
do.  Anyway, Colonel when were you advised this?
Evanko – May 20th 1999 when I called FBI Agent
Rick Mosquera who was the SAC in Pittsburgh.
Werts – You know if you have it there or if he
gave you this information, did he ever mention to
you the specific date when the Ober was first
advised of this?  He just said it wasn't until October

of '98 that they got around to it and decided to take
a run at it but he didn't mention a specific date, just
around October of '98 and he got that from the Case
Agent. It would've been either Kush or Kelly.
Kush, Kush, Kush. Well, Mr. Evanko knew
something then. Evanko – Kush; Wertz – Did he
ever mention to you a specific that they, if you will,
turned the investigation over to Captain Ober? No,
he never mentioned a specific date. I did tell him
that somebody would be getting a hold of him if he
didn't mind a sit down and get some facts from him.
I'm gonna turn this off for a second for you to read
through your notes, OK?

A    OK

Q    OK resuming the statement. As Special Agent
Mosquera talked to me about this he did tell me that
Captain Ober, Ober was concerned about going,
about "going anywhere" with this information.
What he was implying is as to who he should tell
about this information, who Captain Ober should
tell about this information. Sir I, you know this
statement indicates that the first time that Mr.
Evanko called Mr. Mosquera was May 20, '99 and
that Mr. Mosquera tells him that Ober was

85

concerned about where the investigation would go.
Now who, who would've told, who would've told
Rick Mosquera and why would he remember, if you
know, Captain Ober indicating his concern about
where he should go with the information? I mean
how would Mr. Mosquera know that at that time? If
you, and or Mr. Soohy hadn't discussed it with him
or somebody hadn't made an inquiry before that.
Do you know?

A    Well we probably talked with him, I would
think.

Q    Well, why would you tell, why would you tell
Mr. Mosquera that Mr. Ober had a concern about
who he should tell on the State Police?

A    I think because of the fact that we had, I mean
you had a Lieutenant Colonel's position mentioned.
I would have to think that that would be the reason.
I mean there's a, I don't call his shots, Captain
Ober's and, and, he has to call his own and I, maybe
he just felt uncomfortable, I don't know.

Q    You know, why you don't get excited that
much, because it's, it's, it's the normal course of an
investigation and in your experience people say
these things about a Lieutenant Colonel being

86

mentioned, it's not that you don't get excited or
concerned, I wanna down play it. But it's you
know, you're an experienced guy, you've been
around, used some terms earlier today, been there,
done that, heard this, done that, OK, that type of
thing, OK? Now here's Mr., here's Mr. Moscera
and the first call to the Commissioner, might have
been the second call to the Commissioner talking
about who Captain Ober should tell about this
information. Let me ask you something, this is
words to Mr. Evanko; during the course of your
conversation with the SAC, did the SAC ever
mention to you anything specific with regards to a
particular rank within our Agency? No, he just
talked about Trooper Stanton. OK, he never
mentioned anything with respect to a particular
individual other than Trooper Stanton? No, in fact
not a word he did tell me that it was not systemic.
Yes, that's all I have, that's all I have. What does
not, what does not systemic mean?

A    That it wasn't pervasive throughout the whole
State Police system or the Academy, their, their
training facility. That's what I would imagine.

87

Q    OK…Mr. Williams says at some point when
he talked with you, I think the first time, he had a
number of conversations with you, he must not have
been satisfied or something.

A    Oh really?

Q    Yes, I mean he came back….

A    I don't know, I think there was only one face
to face with him, but….

Q    Oh, OK, well that's interesting. He says here
at this point in time I specifically asked Agent Kush
if he ever asked or stressed the need for discretion
on the part of Captain Ober discussing the case with
one, anyone? Agent Kush stated he does not recall
asking the Captain not to discuss the case but hoped
he would not discuss it. He stated that if Captain
Ober did not discuss this case, he supported his
decision not to do so. Now, how would you do that?

A    What?

Q    Support Captain Ober in not discussing the
case with someone.

A    I mean it's, it's, what would, what would it be,
I mean if I supported or didn't support him? I, I, I
have no control….

Q    I'm not saying it has any consequences…

88

 

1 A    I trust, I would say that I would trust his
2 judgment. That's basically what that means.
3 Q    You wouldn't want him to inform a target or
4 potential target of an investigation that you were
5 looking at them, would you?
6 A    No, but I would hope that he would consider
7 everything.
8 Q    Well sure, you said you supported his decision
9 no to do so. So whatever you were considering, you
10 must've thought he was considering the right
11 things?
12 A    That's his, that was his ballgame there.
13 Q    Ok
14 A    So, I really have to trust his judgment.
15 Q    Kush stated he believed that he met with
16 Captain Ober on two occasions. Any more than two
17 occasions.
18 A    Personally twice.
19 Q    Personally twice. He did not recall specific
20 dates, but the dates may be in his report. On one
21 occasion he and Ober reviewed a tape where Bridge
22 mentioned that if a politician would help him, he the
23 politician....

<center>89</center>

1 A    Oh, I'm sorry, I just remember that, Bridge
2 now saying…go ahead.
3 Q    OK, would apparently have to talk to some
4 Lieutenant Colonel, no name was ever mentioned.
5 Trooper Stanton then replied the person who
6 eyeballs. The rest of the comment was
7 unintelligible. Agent Kush distinctly remembers
8 that when the title of Lieutenant Colonel was
9 mentioned, his ears really perked up. Now see that
10 pronoun, his? Was it your ears or Captain Ober's
11 ears?
12 A    Captain Ober's
13 Q    Captain Ober's. Your ears had already perked
14 up, but they calmed down by that time or did they
15 ever perk up?
16 A    Well actually, as I said before, that, that….
17 Q    What's the big deal …
18 A    ….you know, Lieutenant Colonel did not
19 affect me in anyway shape or form.
20 Q    Right, you said that, you did say that. Wasn't
21 overly…OK
22 A    An FBI Agent would've really perked my ears
23 up, go ahead.

<center>90</center>

1 Q    Now this gentleman over here's a lawyer and
2 I'm sure one of the best in the world because of you
3 ?
4 A    He is.
5 Q    OK, I'm sure he is. Now, I, I, maybe he's not
6 a good example, but the example I would have is
7 somebody comes in here from an outside agency,
8 and some, an agency you respect, an agency on an
9 equal level with you, although there aren't too many
10 of those around. But, you know, and said they're
11 looking at a superior of yours and your contact,
12 you're the OPR Director, are you gonna go tell that
13 person, if there in a group that could be
14 investigated? Would you go tell 'em and inform
15 them?
16 A    I don't know what our requirements are in that
17 regard and you know, I've never done an OPR
18 investigation, so I can't, I can't speak to that. But,
19 I'm sure there's rules and regulations in our
20 organization, I would address it.
21 Q    So on a criminal investigation though,
22 generally speaking at least, you don't think it would
23 be appropriate to inform a target for someone in a

<center>91</center>

1 group that's targeted in an investigation that they're
2 being investigated?
3 A    I would, I'd have to agree with that, yes.
4 Q    OK…Now apparently Fielders, an adult male
5 in the Pittsburgh area with political connections, this
6 is you talking. Fielder either made direct contact
7 with a Pennsylvania State Representative or put
8 Bridge in contact with them. Now where was the
9 public corruption?
10 A    Yes, that wouldn't be Bridge, it would be the
11 contact.
12 Q    So Williams might've made an error there?
13 A    It would've, I would've been the CW.
14 Q    During the above phone call, I want to read
15 this to you, OK? Major Williams asked Agent Kush
16 three specific questions. Questions and answers
17 follow. During your initial telephone conversation
18 with Captain Ober in late September, early October
19 concerning the FBI political corruption investigation
20 in Western Pennsylvania, did you ever discuss the
21 need for confidentiality with him? And this is Mr.
22 Kush, No; I never discussed confidentiality about
23 the case with him. I knew who I was dealing with, a
24 Captain in the PSP, therefore I trusted him. I simply

<center>92</center>

discussed the case with him.  That would be
consistent with your testimony that you would trust
him to use his good judgment based on what he's
told?

A     That sounds right.

Q     OK, during the above phone call did you ever
mention any specific rank within the PSP that may
be involved in this case?  I specifically asked him
about the Colonel or the Lieutenant Colonel rank.
There it is Mr. Kush.

A     Well, I don't know. Well, if it's there, you
know, I believe you....

Q     There's where it is Mr. Kush.  It's in, it's in
the report that Mr. Williams did and talked with
you.

A     OK

Q     Could you possibly be mistaken Mr. Kush?  Is
it possible that you could be in error?

SYNDI GUIDO:       No, wait a minute!

MR BAILEY:

SYNDI GUIDO:          This is wrong, that's the
question you're reading.  Read it accurately!  That is
not his answer, that's the question!  That is the
question, not Agent Kush's answer.

93

---

MR BAILEY:   Agent Kush replied at some
point in time a Lieutenant Colonel rank was
discussed, however he could not remember a date.

MR KUSH:        That's probably accurate, yes.

Q     But you told us the date wasn't before...

A     What...

Q     at the time of the initial phone conversation!

A     What date are you talking about?

Q     The date whenever this Lieutenant Colonel
was mentioned.

A     When it really became an issue was when
Captain Ober heard it.  I mean, if, if, if you heard
the tape, you, you, you would listen to the tape and
all the bombasity of the person that's making all
these statement, that catches your ear and then this
one phrase, boom, Lieutenant Colonel is, is in there
and you wouldn't, you just probably wouldn't pick
up on it unless your very sensitive to that.

Q     You see the issue, the issue is when...

A     And I probably didn't see it the first time.

Q     Probably

A     That I, that I, yes, I would, I would, honestly
and I'm being as honestly possible you can here....

Q     Yes, what's your....

94

---

A     It's the, it's the and I'm trying to impress you
a point there, that it really didn't click until hit on it.
And then, then, then it hit harder. It, it was obvious
to us that if he was going to affect some kind of
change in his status then it would involve somebody
in the process and that process is handled by the
State Police and it would have to be somebody
within that organization.  Now, the, the Lieutenant
Colonel, I don't know, that, that just did not, I knew
it was gonna have to be somebody within State
Police was gonna have to be gotten to by a
Legislator.  Ok, cause a Legislator can't just go in
and tell somebody, "Hey put this guy in class." No,
he's gotta have somebody else along the chain to go
to.

Q     Did you say that to Captain Ober?

A     I won't think we'd have to say that to Captain
Ober. He's... he was an investigator too. He knows
exactly what's gonna have to happen....

Q     Yes, but I wanna know, I, I know when I'm
trying to demean what your, I'm just asking you if
you did?  Do you remember if you did?  Was it
discussed between you?

A     Oh, I don't know, it could've been.

95

---

Q     It could've been?

A     It probably was.  It, it would have to be, I
mean, to some degree, there are certain things you
don't, you don't have to get into detail....

Q     Yes

A     because we know, we both know what's, what,
what...

Q     What's going down, you know what's up
front...

A     In what, in what detail, that's a different story.
He's know more of the detail.  I would, I would
have to believe that there would be somebody
within the organization that would have to be, you
know, compromised.

Q     OK, did you ever talk to Mr. Ober's lawyer,
not, not me, I'm, I'm the, the I'm a ? Lawyer, but a
real, bona fide lawyer....

A     No

Q     before? Did you ever talk to him?

A     I, I...

Q     real high quality lawyer before about Mr.
Ober?

A     If somebody had called, I would've referred
them on to Mr. Killeen.

96



1  Q    So you didn't….

2  A    I, I would say hello and or whatever and then,

3  I'd say I can't

4  Q    So if somebody provided a statement that they

5  had a conversation with you about the situation with

6  Mr. Ober, you'd deny that that occurred?

7  A    I'd like to see it. I don't think that it ever did?

8  Q    OK, well that's fair enough. All we can ask is

9  your recollection and, and, and this has been

10  tremendously helpful. Let me go on in fairness to

11  you now.

12  A    Sure

13  Q    It says, I informed him, meaning you; this is

14  Mr., Major Williams, that the reported conversation

15  between his CI, Bridge and Trooper Stanton in

16  which the rank of Lieutenant Colonel was

17  mentioned was recorded on October 13, 1999, OK?

18  Now, based on this information Agent Kush then

19  stated he could not have know about the Lieutenant

20  Colonel rank during his initial phone call.

21  Therefore, he would not have discussed it. What

22  your saying is, if, if, what you were telling Mr.

23  Williams, was that if the first time it was mentioned

24  was during that October 13th interview, then you

97

couldn't have told Ober about it during the first

2  conversation?

3  A    The recording, the October 13th recording.

4  Q    The recording, if that…

5  A    If that was, yes.

6  Q    But you're not certain when it was first

7  mentioned, are you?

8  A    If, I would be if I heard the tape and saw, and

9  saw the material.

10  Q    Well…

11  A    But my, my recollection is, is, is, is, is a few

12  years.

13  Q    I know, it's difficult and you do a lot of work

14  and….

15  A    And I would give you the exact thing if I

16  could.

17  Q    I'm sure you would. How many tapes did you

18  give, do you know were sent up on the, how many

19  tapes were done, do you know?

20  A    Boy, I, I could, I could only guess it would

21  have to be more than, somewhere in the

22  neighborhood, more than 10. It, it, several.

23  Everything that we had that regarded that particular

24  situation we would have turned them over, because I

98

1  mean, they were trying to prosecute Stanton and we

2  were certainly standing beside them on that. We…

3  Q    Absolutely. Did you, do you remember if they

4  were ever dubbed, the tapes were ever dubbed?

5  A    Well they, I don't, they would've been

6  duplicated, I think they probably got duplicates and

7  then they probably got the originals. I don't know

8  where the originals are right now. I, I can't tell ya.

9  Q    I would assume it's the, FBI would have the

10  originals?

11  A    I can't tell you.

12  Q    Did the attorney, do you recollect if the

13  Attorney General, the Pennsylvania State Attorney

14  General's Office was ever notified.

15  A    Oh yes, I mean they, they, they were involved

16  in the prosecution of Stanton, so they would've

17  known.

18  Q    OK

19  SYNDI GUIDO:    Excuse me.

20  TONY MARCECO:    We're all gonna change.

21  MR BAILEY:    I, I would, everybody's

22  changing, OK, go ahead.

99

1  TONY MARCECO:    It's, it's 1:12 and we are

2  going to change the tape. The date is March 14,

3  2002.

4  MR BAILEY:    The tape is back running

5  gentlemen.

6  TONY MARCECO:    It is March 14, 2002.

7  It's 1:19 p.m. and we're resuming the tape

8  deposition of Mr. Rush…

9  MR KUSH:    Kush

10  TONY MARCECO:    Kush

11  MR BAILEY:    Ok, Ralph another part of the

12  statement that Colonel Evanko did, goes as follows,

13  OK, and I just wanna ask because it, it goes back to

14  this issue of when and what you and Michael

15  discuss with Rick, OK.

16  MR KUSH:    Yes

17  Q    Yes, I also after May 12th called the SAC in

18  Pittsburgh, Rick Moscera. This is Colonel Evanko

19  talking.

20  A    OK

21  Q    Because he's a friend of mine I told him that

22  there something I needed to talk to him. I told you,

23  I tell you what, the date was May 20th of 1999. He

24  mentioned that date further on, I gather. And I told

100



1  him there was something I needed to talk to him
2  about and I prefaced my remarks by saying, that if I
3  ask, if what I ask is gonna interfere in the IA
4  investigation, no I understood that he couldn't
5  respond to any of my questions.  I understood that.
6  And I wanted to, I asked him if either I or the
7  Pennsylvania State Police were the subject of an
8  FBI investigation into "selling Trooper positions" or
9  any other corruption, allegations since October of
10  1998, specifically was I the subject of an
11  investigation or any my, Lieutenant Colonel's of the
12  State Police?  His response to that was, " an
13  investigation out of where" "out of where, out of
14  what office?"   That was his response to my first
15  question.  And he said, I have to plead ignorance in
16  this.  He said sometime ago I remember that there
17  was a case against a specific Trooper, but I'd have
18  to get up to date on it."  I asked, also asked him,
19  "was I the subject of an investigation or any of my
20  Lieutenant Colonels."  His response was, "if you
21  were, I would've been told about it."  He said, " I
22  can only reiterate, that, that, and this is
23  paraphrasing, that I remember something in October
24  of last year or sometime back there about, local

101

1  municipalities and testing.  I'm not really familiar
2  with what you're talking about; I'll have to get back
3  to you.  My notes are a little scattered here.  So, you
4  can turn that off until I, sure he says.  Resuming,
5  then it goes back to that conversation where
6  apparently Rick gets back to him.  He said he'd get
7  back to me, I asked about these preliminary
8  questions.  About 12:37 he gave me a call back and
9  said that there were allegations that had surfaced
10  around January of '97.  He said I didn't get here
11  until June, but the allegations about political
12  corruption surfaced in January of '97.  Now I had
13  asked you questions about when the political
14  corruption came into the, the Stanton thing.
15  A    Yes
16  Q    Now this is, now, I, I, all I can tell you is here,
17  it's in the year 1999, Rick Mosquera is telling
18  Evanko that the political corruption aspect settled,
19  surfaced in January of '97.  I wanna ask you, is there
20  any mention of State Police higher ups or ranking
21  State Police Officers of Governor's Office people as
22  early as 1997?
23  A    You said State Police basically?
24  Q    Yes

102

1  A    Yes, regarding State Police, it, it...
2  Q    Just Stanton's
3  A    It, would've only been, yes...
4  Q    Only been Stanton?
5  A    Yes
6  Q    OK and you seem pretty comfortable with that,
7  pretty sure about that, right?
8  A    Yes, I'd have to check the records, but I, feel
9  comfortable...
10  Q    No, no I understand, it's your recollection, you
11  feel pretty sure about that.
12  A    Yes
13  Q    All right now, part of that alle..., allegation
14  had to do with a State Police Trooper by the name of
15  Stanton, using his position to influence the purchase
16  of State Police positions.  Well, we both know that a
17  Trooper, you know, doesn't have much power in the
18  Pennsylvania State Police, I guess, unless he's got a
19  friend somewhere.  There was a CI involved, a local
20  political official and he went on and talked about
21  Stanton's alleged involvement and talked about
22  Stanton's alleged involvement.  He said the Internal
23  Affairs of the State Police, Captain Ober in
24  particular was notified because the case had, was set

103

1  had been set aside until around October of '98, that
2  Captain Ober was then notified and they told him
3  that they were going to take a run at this.  They
4  mentioned a particular State Representative's name.
5  And this is the information that you obtained from
6  the SAC at Pittsburgh and I read this to you before.
7  You know that nobody that Stanton was involved,
8  it's not stestemic and I asked if the investigation is
9  closed.  He says it is, the investigation is closed, it
10  was turned over to PSP, specifically Captain Ober.
11  Now, now the reason I ask these questions is, you
12  get into this time sequence, fran..., I, quite frankly
13  don't think it has a damn thing to do with this case
14  and what happened, but it's gonna be used as a
15  major, whatever.  Is this time issue of when Ober
16  was notified, OK, by you, of the, that there was this
17  thing going on, we know earlier that, that the
18  Western folks, there's somebody up there at the
19  Organized Crime Division had been talked to and
20  Mr. Behrens in IAD had been talked to.  Well, why
21  didn't he go back to them and talk to them?  Why,
22  why did you go up and call IAD in Harrisburg?
23  What precipitated the change?  You'd already made
24  a contact....

104



1  A    Yes

2  Q    that's, that's of record, you know about it, you

3  made a meeting with the Organized Crime folks up

4  there, there's', you know there's Frank, up there and

5  you met with Mr. Behrens, you know, why, why did

6  you go to Harrisburg all of a sudden in October?

7  Maybe all of a sudden is not right, but it seems to

8  me, up to '97, you know Michael looks at this thing

9  and says "Hey, we should take another look at this,

10  apparently that's not run by Rick, but it's a political

11  corruption case.  I thought all political corruption

12  cases were supposed to be run by the SAC.  That,

13  that was my understanding.  I may be completely

14  wrong of FBI procedure, obviously, I'm wrong.

15  A    I don't think he can be aware of every

16  corruption case, of the initiation of them that he has

17  to, you know, agree to but...

18  Q    That's what I want to ask you.

19  A    This case, this case, this case was running long

20  before that.

21  Q    The, hold right there, OK, cause you just said

22  something that is consistent with my knowledge of

23  FBI practice.

24  A    OK

105

1  Q    Michael just didn't say take, take this case and

2  go with it.  He, this particular case, if it's a political

3  corruption case and Mr. Mosquera says that in '97 it

4  was identified as such, wouldn't, wouldn't Mr.

5  Soohy and or yourself have checked with Rick

6  before you started the corruption....

7  A    It had already....

8  Q    not necessary...

9  A    It had, it had, yes, it had existed, I think, I

10  wanna say, my initial efforts probably started in '94.

11  I mean it's, it was way back.  I mean, it had, it, this

12  case had been around that we needed to re, to, you

13  know, close it, resolve it.  But there was so many

14  angles and so many things that the CI was involved

15  in that we just didn't get to it until that, until that

16  time.

17  Q    OK, all right at....

18  A    And again, there was another thing you;

19  mentioned here which I don't know      that was

20  exactly....

21  Q    Go ahead...

22  A    Right, it had to do with the date that I would

23  have notified Captain Ober.  I think you said it was,

106

1  he was notified before '97.  Well that, that would've

2  been the reference to....

3  Q    No, no, no, I'm sorry...

4  A    Rick Behrens, yes...

5  Q    I'm sorry.

6  A    Yes

7  Q    I did not...

8  A    Ok

9  Q    It was Rick Behrens sir, not Mr. Ober.

10  A    Ok, Ok

11  Q    Yes, I made an error....

12  A    OK

13  Q    I apologize, I, I probably....

14  A    OK

15  Q    But I mean, why did you go back to them?

16  A    Because that....

17  Q    Go ahead...

18  A    That's more in there, in there, ? were coming

19  in, so, it's an OPR matter, it's, it's, it's in Internal

20  Affairs, it's, it's...

21  Q    Wait now according to my....

22  A    That's my judgment.  I mean...

23  Q    Now, we know it's your judgment, let's look

24  for the reason for the judgment.  Now was the

107

1  reason for the judgment because higher ups or

2  Lieutenant Colonel or Governor's Office people

3  were mentioned?  And that's what made you go to

4  Mr. Ober in Harrisburg?  Because what what

5  changed, what intervening facts were known to you,

6  caused you from the '97 perspective to go then to, to

7  Harrisburg in October of '98?  Why did you

8  change?  Why did you approach...

9  A    My initial contact with the State Police was

10  with Darrell, OPR was their Office of Professional

11  Responsibility, whatever, Internal Affairs....

12  Q    Office IAD...

13  A    Was actually I was referred to them by, by

14  Harrisburg.

15  Q    Then why did you go back to them?

16  A    Because that was where it should, I, I felt it

17  should rest.

18  Q    OK...How's surveillance work, is it fun?

19  Pretty boring isn't it?

20  A    No, it's interesting sometimes, it's ups and

21  downs.

22  Q    You're a CPA?

23  A    Yes

108



**Page 109**

1  Q    Were you watching people write numbers as
2  part of your surveillance duties Ralph?
3  A    There's reasons for everything.
4  Q    I don't mean, somebody with your kinda up
5  here and your, what do you do in a sur, I mean if, I
6  mean....
7  A    Well, I have other abilities besides that.
8  Q    You have good eyesight?
9  A    I have good eyesight.  I can work with people,
10 I can, I go the extra mile, I mean, everybody does…
11 Q    Sure
12 A    But, and I'm easy to get along with.
13 Q    OK
14 A    And all those factors, probably led them to
15 send me there.
16 Q    OK, do you know what this is?  I don't know
17 what it is?  I'm trying to find out what it is.
18     SYNDI GUIDO:      ?
19     MR BAILEY:    OK
20     MR KUSH:       It looks like, that's probably
21 my handwriting.  It's an envelope
22 Q    I don' know…
23 A    It's an envelope…

109

**Page 110**

1  Q    I don't, I don't, what it is, I'm just asking, I
2  don't know what it is.  Can you tell me?
3  A    Well, it's an envelope.  It brings up an
4  interesting point, but I wouldn't, when I mailed the
5  things to Captain Ober, he, he wanted me to have
6  them mailed to his home.  I thought it was a little
7  unusual, but then again, that's his decision where he
8  wants to have it mailed because, he wanted to keep
9  it close to his vest, I guess.
10 Q    Did Captain Ober ever mention any, that he
11 was under any orders from Lieutenant Colonel
12 Hickes?
13 A    No
14 Q    So you don't know what orders he was under
15 from the Pennsylvania State Police then, any
16 superior officers of his, do you?
17 A    I don't recall of hearing any.
18 Q    Because he never went over that, never talked
19 to you about it, never did that, right?
20 A    Not that I know of.
21 Q    Did he ever ask you who you reported to in the
22 FBI?
23 A    No, but I think he knew.

110

**Page 111**

1  Q    Did he ever ask you what you did in your, well
2  do you know who the boss of the Pennsylvania State
3  Police is?
4  A    Evanko
5  Q    OK, no question about that is there?
6  A    I think that's pretty much public knowledge.
7  Q    Now with the FBI used to be J. Edgar Hoover
8  and then there's different people that follow
9  along….
10 A    I never, yes
11 Q    There's always somebody at the top though
12 right?
13 A    Yes
14 Q    OK, your eyes lit up when I said J. Edgar
15 Hoover.
16 A    I didn't serve under him.
17 Q    Didn't ya?
18 A    No, I'd would've liked to.
19 Q    Would you…
20 A    No, no I would have, it would've been a
21 pleasure.  I'd a been proud to have.
22 Q    OK, Do you wanna mark that?  Here, she
23 wants it marked.  So, Syndi wants it marked.  I need
24 to get some copies of it.  Give me just a second.

111

**Page 112**

1      SYNDI GUIDO:      ?
2      MR BAILEY:  Whatever she likes, it's her,
3  actually it's her deposition, so…Captain Ober did a
4  supplemental report that is part of the, it's a
5  document that's an issue, not, it's not an issue, but
6  it's part of the fact background in this case.  And I
7  wanna read certain parts to it and I need you to, I
8  need to ask you questions about it.
9      MR KUSH:      OK
10 Q    It begins; I was contacted by telephone in late
11 September or early October 1998 by Federal Bureau
12 of Investigation Special Agent Ralph W. Kush of
13 the Pittsburgh office.  You don't dispute that, do
14 you?
15 A    No
16 Q    Kush stated he was, contuc, conducting an
17 investigation into political corruption in Western
18 Pennsylvania.  You don't deny that?
19 A    No
20 Q    During this investigation, his investi, an
21 individual latel, later identified as Dennis J. Bridges
22 who was seeking assistance in entering the
23 Pennsylvania State Police as a Cadet approached an
24 FBI Confidential Informant, CI, Confidential

112



1  Informant, according to Kush, Bridges had taken the
2  Cadet entrance examination and was in Band B.
3  Bridges was seeking assistance in moving from
4  Band B to Band A through a series of financial
5  payoffs to an unknown political figure.  You don't
6  dispute that?
7  A    No
8  Q    According to Kush, the meeting between
9  Bridges and the CI was arranged by Trooper Kipp
10  Stanton of the Pennsylvania State Police.  During
11  their meeting with the CI, Kush stated that Bridges
12  and Stanton portrayed entrance into the Department
13  through a series of payoffs as commonplace.  Do
14  you disagree with that?
15  A    No
16  Q    OK, due to the nature of the investigation,
17  Kush requested this information be kept
18  confidential.  Do you disagree with that, do you
19  remember, is it possible?
20  A    Well, I mean confidential was to, you know,
21  whatever he needed to do with it?
22  A    All right, so, he, you, you, you wouldn't have
23  said to him, don't tell the Commissioner, don't tell
24  Lieutenant Colonel, don't tell your boss, or anything

113

1  like that?  You just would, because of the nature of
2  this thing say something to the effect that it's
3  sensitive or this is, maybe even the word
4  confidential.  But the point that I think in all of this,
5  that you're trying to get across is that you didn't sit
6  down there and say don't tell this or that person or
7  don't keep it from this particular group of persons?
8  A    Yes
9  Q    Is, is that fair to say?
10  A    Yes, well, we certainly wouldn't want targets
11  to get the information, so.
12  Q    OK that makes a lot of sense to me, but I'm
13  not an FBI Agent.
14  A    You could be.  But you're a little late.
15  Q    What's that?
16  A    I think you're over 27.
17  Q    A little bit.
18  A    37 it is
19  Q    Is that the late...
20  A    That's the late, that's the late date.
21  Q    I missed my calling.  OK, to facilitate their
22  investigation, Kush also requested that I provide
23  resource information on such things as Cadet
24  Entrance Examination Process, Selection Process,

114

1  Cadet Class Schedule dates, etc.  You wouldn't
2  disagree with that?
3  A    No
4  Q    Kush agreed to my request that the Internal
5  Affairs Division of the State Police be permitted to
6  initiate any criminal charges against any member or
7  employee of the Department, should the FBI
8  determine the system had been compromised.  Do
9  you recollect that?
10  A    Well we would've, in that particular situation,
11  I mean...
12  Q    You would've done that anyway.
13  A    We would've, yes, we would've, yes, if, if that
14  would've happened that would've been indictment.
15  They would've been indicted that way too.
16  Q    OK
17  A    I mean, that's where we're going.
18  Q    OK, but, let, just let me, but, but, but I'm
19  asking you, thinking back on the conversation, do
20  you have a recollection whether that was discussed
21  or whether that came up or he said that?  His report
22  says he said it, that, that's what I'm looking at
23  here.

115

1  A    I mean, I mean, we could've said that hey it
2  depends on who goes where, I mean sometimes you
3  may not prosecute somebody...
4  Q    Sure, sure
5  A    in, because of their position, but yet to the
6  State that's a significant prosecution.
7  Q    OK
8  A    You know, you're deal and back and forth, so
9  it's...
10  Q    Right, I understand, it, it, it's a judgment
11  call...
12  A    Sure
13  Q    and based on what you find with the
14  circumstances are anyway.
15  A    Because we wouldn't prosecute somebody,
16  doesn't mean that they wouldn't prosecute
17  somebody.
18  Q    Right
19  A    You know
20  Q    He then says, I informed Lieutenant Colonel
21  Hickes of this investigation in early October of
22  1998.  Do you know whether he talked to, to Hickes
23  about that?
24  A    I don't know.

116



1 Q   Lieutenant Colonel Hickes ordered me to
2 maintain the FBI's request for confidentiality.  Now
3 regardless of what passed between the two of you,
4 you don't have any reason to believe that Captain
5 Ober would come away from that conversation
6 thinking you didn't confidentiality.  I mean
7 obviously, you've already testified that, that was
8 something you would've expected....
9 A   Yes
10 Q   or believed should've been understood?
11 A   Yes
12 Q   Correct? OK, cooperate  to the extent possible
13 with any  requests for assistance by the FBI and
14 keep him informed of any significant developments
15 in the case.  Now you have no way of knowing any
16 of this, because you weren't privy to it and Mr. Ober
17 didn't discuss it with you, is that fair?  Is that
18 correct?
19 A   No, I, I, I wouldn't find that to be shocking, I
20 mean that's...
21 Q   No
22 A   would be just, he's, re, reporting to his
23 superiors what was going on and I would do much
24 the same.

117

1 Q   Right.  I met with Kush and his Supervisor,
2 Michael J. Soohy at Troop T, Everett on October 21,
3 1998.  Kush played an audiotape obtained from a
4 body wire of a conversation between Bridges,
5 Stanton and the CI.  Kush later mailed me a copy of
6 the transcript of the conversation.  Now that
7 would've been the the, thing that's been discussed
8 so much, I believe, as the October 13th...
9 A   OK
10 Q   Is, is, I don't know for sure...
11 A   Yes, it sounds right
12 Q   But I would assume that that's it.
13 A   I would think it is.
14 Q   But that meeting, that first meeting took place
15 at Troop T, Everett?
16 A   Everett, that's, yes that's between...
17 Q   Right
18 A   the two
19 Q   Now, I had sporadic conduct, contact with
20 Kush over the next few months.  Occasionally Kush
21 telephoned me regarding the next scheduled Cadet
22 class date etc.  On occasion I in turn provided class
23 updates to Lieutenant Colonel or, case updates to

118

1 Lieutenant Colonel Hickes.  At least as far as the
2 part that refers to you, is that pretty accurate?
3 A   I don't know whether he, who he was
4 reporting to, but yes, that, that would be because we
5 were still working our end of it and we would need
6 to know when classes were starting because at, it
7 was a certain point, I think they suspended, suspend
8 classes, or the examination is only given once
9 periodically.  So, time, timing was, wasn't because
10 our CI would have to discuss this with the, the
11 individuals involved.
12 Q   Do you know whether Colonel Evanko ever
13 had a class retested or rescheduled to accommodate
14 someone he was interested in?
15 A   No, I don't know that.
16 Q   All right now, sometime in late February or
17 early March of '99, Kush contacted me to report the
18 CI received a payoff of $1000.00, which the FBI
19 captured on videotape between Bridges, Stanton and
20 the CI.  On March 15th, 1999 I met with Kush and
21 Soohy at the Holiday Inn in Indiana.  I viewed the
22 tape at this time.  I provided Lieutenant Colonel
23 Hickes with an update of this development.  Now
24 sir, do, do, do you recollect that?

119

1 A   I don't, the meeting that we had yes, and the
2 viewing the tape...
3 Q   Yes
4 A   but I don't know what, who he advised.
5 Q   Did he order you beverages out there in
6 Indiana?
7 A   Come on, I don't think so.
8 Q   Kush, come clean.  Did he order you
9 beverages?
10 A   I could use one now, but I don't think he...no,
11 I don't think so.
12 Q   Ok, we had some questions here, I mean, I just
13 wanna ask you this.  At, at the time that you guys
14 met in Indiana, OK, at that time...
15 A   Yes, we did have coffee.  We might've had
16 coffee.
17 Q   You didn't have any Amoretto in it, did ya?
18 A   No, all we were drinking was coffee then...
19 Q   Come on Kush.  Hold it just a second.  I have
20 to change a tape.  Now Ralph, at the time, I bring
21 that up because it was, was a big issue made of
22 this in, in a, in a deposition about ordering
23 beverages for the FBI.  I thought, what the Hell's
24 wrong with the FBI, I give him, you know, you

120



1 know, a glass of water or something, I mean nothing
2 about alcohol or impropriety or anything overdoing
3 it. Just, I mean, I, I just thought it was silly and…
4 A  OK
5 Q  wanted to ask you…but here, here, here's my
6 question, if, if, if you were, if, if, you're in a
7 situation let's say or Captain Ober's in a situation
8 where he, there's no question that by the time you
9 met at Indiana that you had come upon information
10 and provided him, him being Captain Ober with
11 information, that, that did indicated that there was at
12 least a possibility that some ranking officer and
13 maybe the Governor's Office, and you don't
14 remember that, but I assure you it's in the transcript
15 and on the tape.
16 A  OK, OK
17 Q  But, you know, the point is though; at that
18 point he received that information. What's wrong
19 with meeting at a private facility so nobody knows
20 you're there?
21 A  Nothing
22 Q  I mean, I've sued FBI Agents. I've helped
23 them with investigations. I think I've been
24 victimized by political influence.

121

1 A  I believe we all have.
2 Q  A victim of, and your Agents get caught in
3 between things, and, and, although I would never
4 reveal it, I, there are some fantastic people in your
5 organization who have helped me and provided me
6 with information, who believe in doing the right,
7 just thing. Can you tell me what is wrong with the
8 Pennsylvania State Police Officer who gets
9 information about public corruption, holding a
10 meeting with two FBI Agents away from and out of
11 PSP facilities because people talk?
12 A  Yes
13 Q  What is wrong with that?
14 A  I don't, I did, you know there's nothing wrong
15 with that and, that, that was his, his call, where he
16 wanted to hold it.
17 Q  And you saw no reason to question that. You
18 cooperated with him. You went and you folks sat
19 down and you did the business that investigators
20 doing their job are supposed to do. Is, is, isn't that
21 correct?
22 A  I think so.

122

1 Q  All right, OK…I probably, if I could get away
2 with it have about 1000 hypothetical questions for
3 you.
4 A  Yes
5 Q  Where I think I could probably learn a great
6 deal, but it's not the place for it, in this deposition.
7 If you would give me just a moment, I'd like to step
8 aside with Captain Ober. I wanna advise
9 everybody. There's no reason to shut this
10 equipment down, it's only gonna be a minute. All
11 Attorneys and people here be advised that these
12 machines are still running. OK, sir, I really, I have
13 one last question and then that's it, I'm done.
14 A  Sure
15 Q  I thought in my review of the materials, and as
16 we went through this I really thought better of
17 asking you to check with Captain Ober just to, to
18 make sure and based upon, he's, he's has an
19 excellent mind for these things. I thought that
20 somewhere else in there, there was a possibility of
21 another Pennsylvania State Police Officer, maybe a
22 Captain being mentioned. Would you please take a
23 moment and think back over the investigation that
24 you and Mr. Soohy did and I know that there's been

123

1 all this talk about the, the higher ups and the
2 Lieutenant Colonel rank being mentioned and the
3 Governor's Office being    mentioned and the, and
4 all of that and you, you know the, the transcripts and
5 the wires will speak for themselves.
6 A  Sure
7 Q  I just seem to remember a Captain somewhere.
8 A  I, I don't know there was a Captain, I think
9 there was reference to, a somebody higher than a
10 Trooper in level, I mean….
11 Q  OK
12 A  who had fixed some cases, some, some,
13 speeding tickets or something and, there was some
14 reference in that. But, again all that was on the
15 tapes and was turned over to, to Captain Ober and
16 he could've done whatever he wanted to do with it.
17 I mean, there was a couple of people…
18 Q  OPR people don't control the criminal
19 investigation process, I think.
20 A  Well it's integrity.
21 Q  Correct
22 A  And then they control that and so I would
23 think that he would, you know, if he felt that that

124



1    was something that needed to be addressed then he
2    would have it addressed.
3    Q   I think he tried to do that.
4    A   OK
5    Q   Anyway, I'd, I'd like to, you know opposing
6    Counsel probably has follow-up questions for you.
7    Thank you very much sir.
8    A   You're welcome.
9    SYNDI GUIDO:    Yes I do. With respect
10   to that last question about the officer who was fixing
11   cases, is, is it possible that was a Corporal and not a
12   Captain?
13   A   Yes, it, that's what I, I didn't think it was a
14   ranking...
15   Q   And I've, gonna have this document marked as
16   Exhibit 2.
17   MR BAILEY:    Why don't we do the whole
18   interview. Do you have an objection?
19   SYNDI GUIDO:    No not really.
20   MR BAILEY:    That's the fairest way to utili,
21   I mean I realize, you know....
22   SYNDI GUIDO:    That's, they're two
23   different interviews is the only reason I separated
24   them out. That's June 30th and this is May 25th, but

125

1    I don't mind putting the whole thing in. It doesn't
2    matter to me.
3    MR BAILEY:    Yes, the tree's already died, I
4    think.
5    MR KUSH:    Yes
6    SYNDI GUIDO:    Here's...
7    MR KUSH:    Oh, OK
8    SYNDI GUIDO:    That's gonna be Exhibit
9    2 when she gets it marked.
10   MR KUSH:    OK, this one.
11   SYNDI GUIDO:    And if you look at the
12   last page there which is the telephone interview that
13   was conducted with you on...
14   MR KUSH:    Yes
15   Q   June 30th 1999. This has already been read to
16   you....
17   A   OK
18   Q   by Mr. Ober's Counsel. If you look at the first
19   que, can you read...
20   A   Sure
21   Q   first of all if you could just read through the
22   first, well why don't you just read through that
23   whole page. That's the portion I'm most interested
24   in.

126

1    MR BAILEY:    Syndi what time do have over
2    there?
3    SYNDI GUIDO:    It's five of two.
4    MR BAILEY:    Thank you. Now while he's
5    reading that, I'm gonna do a motion for
6    enlargement. Barb and Joanna deferred to, deferred
7    to you on that issue. I, I think you, you know, I might
8    ask for another 30 or 60 days. I don't know if you
9    concur or not, can you think about it and let me
10   know?
11   SYNDI GUIDO:    Barbara told you that, I
12   thought Barbara told me she told you we wouldn't
13   concur? Cause I thought she told me that you were
14   gonna already dispute it so she would not concur.
15   MR BAILEY:    She said she wasn't in favor
16   of it but she had to talk to you. That's what she told
17   me. She didn't give me a final. She, she said that,
18   you know, she wouldn't recommend it, but she had
19   to check with you and I said that I'd be bumping
20   into you today I thought, because she wasn't
21   coming.
22   SYNDI GUIDO:    Right, as far as I know,
23   our clients are opposed, I mean...
24   MR BAILEY:    OK

127

1    SYNDI GUIDO:    I could, I believe that
2    they are.
3    MR BAILEY:    And, and what about an
4    investigation into the, the, the wet ink?
5    SYNDI GUIDO:    What do you mean by
6    an investigation?
7    MR BAILEY:    Well I wanna ask the court to,
8    to appoint some investigators to find out when those
9    signatures were put on those?
10   SYNDI GUIDO:    Well, we think it's a
11   waste of time so we're not going to concur.
12   MR BAILEY:    You don't concur in that?
13   SYNDI GUIDO:    Yes, it's a red herring
14   that you're just, but I don't want to get into it in the
15   middle of the deposition, OK? Let's....
16   MR BAILEY:    It's on the record.
17   SYNDI GUIDO:    If you had to chance to
18   read, I don't mind doing it on the record but I don't
19   think we should hold them...
20   MR BAILEY:    I'm teasing you Syndi. I'm
21   teasing you...
22   SYNDI GUIDO:    I'd prefer to have my
23   conversations with you on the record Mr. Bailey.

128



MR BAILEY:    Ahh, now that's, that's so
mean to insult me. Shouldn't say…

SYNDI GUIDO:    No it's absolutely true.
That's the only way I intend to communicate with
you. Now would you, referring back to Exhibit #2.

MR KUSH:    Yes

SYNDI GUIDO:    You had a chance to
look at that? Is all, everything in there accurate?

MR KUSH:    I think, the word, were, were,
were talking about is confidentiality….

SYNDI GUIDO:    First just everything
besides that.

A    Yes

Q    And then will go to that go to…

A    Yes

Q    OK, now is, cause I wanted to ask you the
confidentiality issue. Did you notice anything in
there, else in there that you have a problem with?

A    Well, let me finish here once, I, cause I was
scanning. I read the first part and then I started
scanning.

MR BAILEY:    …doctrine first.

129

SYNDI GUIDO:    We did Exhibit 2. I
already said it's the June 30th telephone interview,
June 30th 1999.

MR BAILEY:    With who?

SYNDI GUIDO:    Between Williams and
Agent Kush.

MR BAILEY:    Oh, I'm sorry, I didn't catch
it.

SYNDI GUIDO:    Sorry, I did when I first
handed him the document.

MR BAILEY:    Can I get one of your cards?
I can always tell somebody I know you.

?:    I just moved out. I can give you the
correct addresses.

MR BAILEY:    Ok, I really appreciate it. I
put them into may, I have an address book I use and
if I ever need to…

MR KUSH:    OK

SYNDI GUIDO:    OK, is that an accurate,
accurate interview with you? Is there anything in
there you want to correct, is my….

A    Well, it's a, the confidentiality, I mean, when I
would've discussed, and I hope that I would've told

130

the Cap, Major Williams the fact that, were dealing
with a sensitive matter.

Q    Right

A    And, and those words would definitely be
used…sensitive matter.    This is, this is a
sensitive situation, it's a sensitive investigation. It's
a significant investigation at this point in time. And
the confidentiality, if he used that word then I would
interpret it to mean the sensitivity of the, of the, of
the situation and that he would, you know, I mean
he would've agreed and I'm sure Captain Ober at
the time and myself, we had a clear understanding
that it was a very sensitive situation and that, you
know…

Q    And…

A    You wouldn't go, you'd be careful with the
information.

Q    Right, now he in his complaint alleged that
you explicitly directed him to maintain strict
confidentiality. Do you remember doing that?

A    No I didn't?

Q    You also, and he says in his amended
complaint that's why he didn't tell his Supervisor or
anybody in his chain of command was because of

131

the FBI's direction to keep this confidential. Do
you remember doing anything like talking to him
about whether he could tell his Supervisors?

A    No

Q    You also when, in response to a question from
Mr. Bailey, you said you know, yes he, when talking
about him telling Lieutenant Colonel Hickes and I
think you said, I understand that he told his
Supervisors and I would do the same thing. Do you
recall that?

A    Repeat that.

Q    In response to a question from Mr. Bailey,

A    Yes

Q    when he was asking you about….

A    Yes

Q    him telling Lieutenant Colonel Hickes….

A    Yes

Q    you said well I don't know but, I do
understand he told his Supervisor and I would do the
same thing.

A    Well, I, I, I didn't, I would, I don't think that's
exactly the way it was said, but, I, I didn't know that
he, who he advised or when he advised them.
Eventually I think he did, well into the thing, he, he

132



1  did mention that he had told someone, a superior.
2  But, I think initially he was concerned because of
3  the, the chain of command basically that he had to
4  deal with, with Internal Affairs and that being also,
5  ultimately under the same person who handled the
6  Academy....
7  Q    OK
8  A    and I think his concern was there...
9  Q    OK, and, and, that's what, I guess I was
10  wanting to clarify your response with you because
11  when you indicated that's him telling his
12  Supervisors I wanted to clarify, you didn't know
13  who Lieutenant Colonel Hickes was...
14  A    No
15  Q    and you didn't know whether he was or was
16  not in his chain of command, correct?
17  A    No
18  Q    And you don't know whether or not within the
19  State Police that was the appropriate person to tell?
20  A    That's right, I don't.
21  Q    You left that completely to his discretion as to
22  who he could trust and be told?
23  A    That's right.

133

1  Q    Excuse me.  OK, thank you.  Then I'd like to
2  have, this is the transcript, the transcript of October
3  13th 1998.  I'd like to have that marked as Exhibit 3.
4      MR BAILEY:   I need those first.  No you can
5  look at them.
6      MR KUSH:      I, I, I don't...
7      MR BAILEY:   You've heard enough about
8  the FBI...
9      MR KUSH:      It's an interesting
10  conversation you should hear it in person.
11      MR BAILEY:   OK
12      MR KUSH:      That's 2.
13      SYNDI GUIDO:      That's 2.
14      MR BAILEY:   Do you want him to look out
15  here.  I guess he wants you to look...
16      SYNDI GUIDO:      No, I'm going to direct
17  his attention to certain pages.  OK
18      MR BAILEY:   It goes underneath.  Well, I'm
19  gonna have to object to this.  Do you have the
20  tape?
21      SYNDI GUIDO:      No.  You, your
22  objections on the record.
23      MR BAILEY:   Well, my objection is on the
24  record and one of the objections is on

134

1  demarcation.  But I'm still waiting for the
2  tapes.  Let me see that.  Let me see that.
3      MR KUSH:      Sure
4      SYNDI GUIDO:      This is my first page.
5      MR KUSH:      The point that I found
6  amusing was the, the fact that Stanton says one
7  of his buddies would be doing the background
8  investigation.
9      MR BAILEY:   You know what I found
10  interesting about this page?  When I saw that, I
11  thought to myself well regardless, all
12  backgrounds go through the main
13  Headquarters.  Well I thought...
14      MR KUSH:      Well, well, they do
15  eventually.
16      MR BAILEY:   You know, well...let's see
17  what we got here....  Federal Judge....
18      MR KUSH:      Oh gees, that's a big ? to hear
19  that.
20      MR BAILEY:   This guy knows everybody....
21  Federal Judges...OK...thank you very much.
22      MR KUSH:      Yes
23      MR BAILEY:   Thank you.

135

1      SYNDI GUIDO:      Sir, if you'll look at
2  Exhibit 3?  Do you recognize that as a copy of
3  the transcript of the, of the tape made October
4  13th, 1998?
5      MR KUSH:      Yes
6  Q    And at the bottom, I believe it indicates, it has
7  your name and a signature.
8  A    Yes
9  Q    What does that mean?
10  A    That's, that's the person who did the
11  transcription.
12  Q    After a tape gets transcribed what procedures
13  if any do you have to verify the accuracy of the
14  transcript?
15  A    I would listen through it after it was
16  transcribed and tried to pick up more and, and adjust
17  any of the names that she may have not picked up or
18  if I picked up more than she did, I would continue to
19  try to upgrade the quality of the transcription.  And
20  at some point in time, I, with our ears in the
21  machine, that we're, we're working with, that's the
22  best we could do.
23  Q    OK, and the, the transcript then that you
24  would've turned over to the State Police would be

136

1 the final form transcript after you had gone through
2 that process?  Is that right?
3 A It would've been the best, yes that I...
4 Q The best that you could...
5 A we could've done at that time.  It may have
6 been looked at again by someone else, but...
7 Q And do, do you recognize Exhibit 3 from
8 today as a copy of that transcript of October 13th?
9 A Yes
10 Q OK, this is still part of it?
11 A Yes, it's all, it's lengthy.
12 Q I knew it was lengthy, I just didn't realize I
13 didn't have it together.  It's out of order.
14  MR BAILEY: Kush did it, I didn't.
15  MR KUSH: I make mistakes.  I'll be the
16 first one to admit it.
17  MR BAILEY: What?
18  MR KUSH: I'll be the first one to admit it.
19  MR BAILEY: You're not supposed to do
20 that in a deposition.
21  MR KUSH: Everybody makes mistakes.
22  MR BAILEY: All right, that's for sure,
23 that's human.

1  MR KUSH: And you're making a mistake
2 if you don't realize it.
3  SYNDI GUIDO: Right now I'm gonna
4 hand you page 49 of that transcript and you'll see
5 the word Lieutenant Colonel highlighted...
6  MR KUSH: OK, yes
7 Q Would you read through that paragraph...
8 A OK
9 Q and tell me, first, just read through it.
10 A OK
11 Q I wanna know is whether or not that's the
12 reference to Lieutenant Colonel...
13 A Yes
14 Q that you're talking about in which Captain
15 Ober picked up on that you...
16 A Yes
17 Q that you hadn't really noticed before?
18 A Yes it is.
19 Q And Captain Brown's going to look through
20 for a little bit and see if he can find the reference to
21 the Governor's Office, but this is, is this tape, we've
22 been all, you've been referring to?
23 A Yes it is, and as I said, we would not have, I, I
24 really doubt whether we would have had this

1 because of the length of it at, at the meeting we had
2 with Captain Ober...
3 Q the transcript?
4 A Yes and he, he was the one, that, that, honestly
5 had, he's the one that really hit on Lieutenant
6 Colonel.
7 Q Cause, it's sort of mentioned in passing,
8 correct?
9 A Yes, it's all, it's all inside of this and if you, if
10 you heard it the guys, he's really verbose, I mean,
11 he, he knew a lot about the system...
12 Q Right
13 A he knew what the process and then he talks
14 about how he was gonna make his payoffs and the,
15 every year he'd make a payoff, I mean he was
16 really...
17 Q And on page 28 would you just read out loud
18 the...
19 A Sure
20 Q the first time that Bridges gives and, and
21 answer.
22 A Bridge?
23 Q Yes

1 A And a lot of people don't like it.  Let's say a
2 Senator or Governor or somebody helps me.
3 Q As far as you know, is that the reference to the
4 Governor to the Governor that we've been talking
5 about?
6 A That would be, yes, that would be a reference,
7 but I don't know if there's an additional...
8 Q Do you know...
9  MR BAILEY: All right, all right, I object.
10  SYNDI GUIDO: Do you know whether
11 there's any other references?
12  MR BAILEY: Now I want to object.  Could
13 I see it sir, just one second?  That's a different
14 reference.
15  SYNDI GUIDO: As soon as he finishes
16 his answer you can.
17  MR BAILEY: That's a different reference.
18 Yes, let's say a Senator or Governor or somebody
19 helps me, correct?
20  MR KUSH: Yes
21  MR BAILEY: That is not the reference to
22 the Governor's Office that I recollect.




SYNDI GUIDO:    If, are you aware of any
other, I'm not gonna ask you to sit and read through
the transcript...
MR KUSH:    Yes
Q    because it speaks for itself.  But, when you, in
response to Mr. Bailey's questions you were talking
about the fact that there had been a lot of tapes.
Were there any wiretaps related to the State Police
Acady, Academy investigation or corruption, that
didn't, were not eventually given to the State
Police?
A    No
Q    So the tapes you were talking about would've
been unrelated tapes.
A    Unrelated, yes, other, other matters.
Q    Do you know whether or not, like, I guess I
don't, it's not really important...
A    Let, let, let me correct, I, Mr. Kelly had the
investigation after I did.  The, the conversations that
we would've recorded with other individuals who
would've been suspect in the process right now, that
could've been something, a mention of the
Academy made there, but I don't think that it was
anything....

141

MR BAILEY:    Are you done with this now...
MR KUSH:    of any significance, it, it
could've been made in passing just to, to develop a
raptor with the person they were dealing with to see
if, if, if they were the ones who were gonna try to
make this thing work.
SYNDI GUIDO:    But, Captain Ober
would've only had knowledge of those things on the
wires for which you gave him...
A    Yes
Q    copies of the tapes or the transcripts, is that
correct?
A    I would think so, yes, that's all I'm aware of.
Q    And to your, do you know, was that term
Lieutenant Colonel or Governor's Office mentioned
on tapes before that October 13th tape?
A    No, not that I can recall.
Q    And you, I think you said that you didn't really
even pick up on it...
A    No, I really didn't yes.
Q    at all until you played for Captain Ober?
A    If you listen to it, it, it's, it's, that guys
rambling on and all of a sudden it's just
psshhh...and ,you know I think him being more

142

sensitive to his positions picked it real, I mean,
picked it right up.
Q    Right and the, and when you played it for him
it was obviously some point after October 13th on
which the tape was made, now does October 21 ring
a bell as possibly the date?
A    It could've been, yes, that, I mean that
could've that could've been the meeting date.
Q    OK, now when you played, when you met
with him at the State Police Barracks and you
played this tape for Captain Ober and he heard the
term Lieutenant Colonel mentioned...
A    Yes
Q    and you had previously talked about the
sensitivity or thought, I had a understanding it was a
sensitive subject...
A    Sure
Q    and you needed to exercise his discretion
A    Yes
Q    and to talk to you.  When he heard that term
Lieutenant Colonel did he give you any indication
or say anything about the fact that he had already
told a Lieutenant Colonel about this, about your
investigation?

143

A    I can't recall, I, I, I can't recall, I just, you
know....
Q    At, but it doesn't stick out in your mind that,
that...
A    No, I mean, I'm not saying that could not have
happened, but it does not, it's not, you know, it's
not, I don't attach any really importance to it if it
happened and I'm, you know, again, I, in law
enforcement you have to trust the person you're
working with...
Q    Right
A    and I was satisfied I could trust Captain Ober.
Q    And, and at that point, at any point in this
investigation, I mean, did Captain Ober or anybody
else ever tell you, Oh, you know, the Lieutenant
Colonel, he went and told the Governor's Office.
Did anybody ever mention anything like that to
you?
A    No
Q    And I, wasn't really anything you were too
concerned about, was it?
A    No
Q    As far as your initial contacts, knowing you
don't have, have your file, it's over here.  Do, did,

144

**Page 145**

1  did you make any notation on, of the date or time or
2  anything when you first contacted him?  Would that
3  exist anywhere?
4  A    I, it's possible, but, I, I, it was only to set up
5  the meeting and the meeting was the important
6  thing.
7  Q    And then, just I'm not sure of things.  When
8  you met, I don't remember if you met with Behrens
9  or you talked to Behrens.
10  A    I met with Behrens.
11  Q    Did, do you remember whether he mentioned
12  the need that he was going to have to talk to his
13  chain of command about this.
14  A    I, I, he led me to believe that he was just going
15  to hold it in advance that I would eventually get
16  back to them.
17  Q    I mean before he got back to you, when you
18  first told him and you said I need to know whether
19  this is a sting operation.  Did he let you know that he
20  was going to go tell other people and get back to
21  you, if you remember?
22  A    No I don't know that he...
23  Q    No, you don't remember or no he didn't do
24  that?

**Page 146**

1  A    I don't, I don't think he, he did not make the
2  calls right there, when I was there.  He did, I'm
3  pretty sure he got back to me, told me there was no
4  sting operation and we needed to know that pretty
5  quickly...
6  Q    Right
7  A    because this, this case was, there was a number
8  of things we had to address and, and in fact I knew
9  that, well I quickly found out that the anytime we
10  run a State Policeman's name or driver's license it
11  was gonna hit in Harrisburg, so we, we had, we had
12  to know that real quick.
13  Q    And I guess my question, I, I probably wasn't
14  clear, but what I meant was, when you told Behre's
15  that you needed this information and you needed it
16  quickly or whatever...
17  A    Yes
18  Q    did he tell you, I'll get it for you but I'll have
19  to tell my Supervisor about this request and...
20  A    Yes, I was under the impression he was not
21  going to tell.
22  Q    OK
23  A    That was my...

**Page 147**

1  Q    Do you remember why you had that
2  impression?
3  A    I think he just made a, a, a, a call, because this
4  early in on the investigation and it was only an
5  allegation.
6  Q    If he did tell his chain of command, did you
7  have any problem with that?
8  A    No
9  Q    And I think just to summarize, make sure I
10  understand, basically as far as who got told within
11  the State Police, within one chain of command,
12  whether it was with Behrens or with the Organized
13  Crime people or with Captain Ober, did you leave
14  that totally to the discretion of the individual officer
15  with whom you were having the communication?
16  A    That's right.
17  Q    That's all the questions I have right now unless
18  they have a follow-up.
19    MR BAILEY:    ?, Mr. Kush and we're
20  finished.  It's a beautiful Friday Evening, you're
21  down at the station square  MR KUSH:    Yes,
22  oh, go ahead
23    MR BAILEY:    and you've had a couple good
24  tall cold ones...

**Page 148**

1  A    Yes
2  Q    and you overhear a conversation behind you
3  and it's two law enforcement officials talking from,
4  I don't know, a couple of other states....
5  A    Yes
6  Q    and they're talking about, talking about
7  information that has to do with FBI officials above
8  you and they are involved in some kind of illicit
9  activity...
10  A    Yes
11  Q    I'd assume in that case that you would go to
12  your Bureau somewhere, you know, you need to
13  report that and not much else you could do with it.
14  You have to report that information, right?
15  A    Correct
16  Q    Something that you heard...
17  A    Yes
18  Q    It maybe nonsense, it might be silly, but you
19  heard it, you'd report it, right?
20  A    Yes
21  Q    Am I correct?  Now if I come to you and I'm
22  with the Pennsylvania State Police and I, I just know
23  you, but I happen to know you're an honest person,
24  I happen to know that you're a good Agent and I



1 live in Pittsburgh and I come to you and I say,
2 Ralph, I have some very, very serious problems
3 here. Dave Malarney used to be down there in
4 Philadelphia, let's use Dave's name, cause he's such
5 a good friend of mine, so Dave's down there in
6 Philadelphia and he's an acting, he's working and
7 you say, look, I'm with the State Police and working
8 your case, our people up there? stumbled on some
9 information in the case of Malarney is directly
10 involved in some kind of illicit drug activity. Now
11 that's absurd, and I wanna make sure the record
12 reflects that. I'm sure it is absurd. But, I it's, I
13 don't know, you know, OK, so, now in that case
14 you're again in a situation where you're an Agent,
15 you're a contact, you can't sit there with that. You
16 need to do something within your organization to
17 report it. So there'd be some proper channel or
18 some way, somewhere to go with that or something
19 to do with that, right?
20 A     Yes
21 Q     Now is it fair to say in that kind of situation,
22 you know maybe you'd go to a superior officer or
23 maybe you'd go to some internal group or

149

1 something like that? I mean that's only normal,
2 right?
3 A     It would be documented.
4 Q     OK
5 A     Yes, documented.
6 Q     OK, alright, now if, if, if you are in charge of
7 the Philadelphia region and somebody comes you,
8 comes to you with information from a sister
9 organization and has to do with higher ups, now
10 bear this in mind, please.  You are not going to
11 report this information to a target. What would you
12 do in that case?  She asked a hypothetical question
13 and you answered it. What would you do, if you
14 were in charge of one of the FBI's major regions in
15 the country and they come to you and they say some
16 official in the front office in Washington is corrupt
17 and I have this big problem with this spy for
18 example?  You know this, recently this guy in the
19 CIA and stuff. What do you do with that? What
20 would you do?  Who would you report it to?
21 A     If I were in charge of the office?
22 Q     Yes, right? I mean I, I, I and that's hard to ask
23 you that off your feet, but I mean, it's pretty tough.
24 What would you do?

150

1 A     Jeff could probably answer the question better,
2 but, you would go to your OPR people.
3 Q     OK
4 A     Internal Affairs
5 Q     Now you as an FBI Agent, in this particular
6 case, like Michael said and I think like you said also
7 satisfied yourself in terms of doing your duty.
8 You're a sister law enforcement agency. You have
9 to work with them from time to time. The proper
10 thing to do was to go to OPR. You don't make a
11 decision for telling who's ever in charge of OPR in
12 this case, but the acronym is BPR. You're not in a
13 position to tell them what to do, it happened to be
14 Captain Ober. It could've been Joe Schmo at the
15 time.
16 A     Yes
17 Q     The reason you went there was because of the
18 position and because the nature of the information,
19 and I correct?
20 A     That's right.
21 Q     All right, and that's a decision that that person
22 has to make. You don't have the power to direct
23 them. You don't have the power to tell them what
24 to do. You, in appropriate circumstances, you, it's

151

1 possible that you could warn or you admonish
2 someone or say, look this is very important, I wanna
3 make it clear to you. Because, if the situation
4 warranted it, you might pass that feeling perhaps.
5 The point in fact is, you cannot control it. You
6 don't have any disciplinary powers; you don't have
7 any authority to control it. Is, isn't that correct?
8 A     That's correct and those people have their
9 procedures that they have to follow.
10 Q     Right and they have to make their judgments
11 and they have to do what they believe is correct
12 under the circumstances because ultimately as
13 opposing Counsel has laboriously pointed out
14 question after question. This was a decision that
15 Captain Ober had to make under the circumstances
16 according to what he believed, what he believed was
17 the, the, the, the rightfully or wrongfully was the
18 best for the Pennsylvania State Police in accordance
19 with the law and was proper ethics for law
20 enforcement officials, correct?
21 A     That's correct.
22 Q     It's all that he could do. Is that right?
23 A     It was his call to make. He had to do what felt.

152



1  Q    Have you ever been disciplined in the FBI,
2  where you made have made an error, maybe you
3  made an error or mistake....
4  A    Yes
5  Q    but you exercised your judgment the best way
6  that you could.  You, if you've been, like, beat up on
7  because you did something somebody didn't like,
8  did that ever happen to you?  I don't know, you
9  know, maybe it has.
10  A    Oh yes.  I mean that, personally that happens
11  of course.  I've never been disciplined.
12  Q    OK, last thing, turn to page 10.
13  A    OK
14  Q    If you wanna read a few sentences before and
15  a few sentences after, but at the top of the page
16  there's reference to where a background is done and
17  it says something about the name Headquarters.
18  A    OK
19  Q    I just wanna ask you if you remember that?
20  A    Well, I mean it's on here, so it would've, it
21  would've occurred.  I would not have put any....
22  Q    Well, I just wanna ask you if you remember it?
23  A    Yes

1  Q    If you remember it that's all?  If it, if it raises a
2  red flag?
3  A    No
4  Q    OK and the other thing is in that transcript in
5  different places would you agree with me that there
6  are different references to Judges, Lord almighty,
7  Federal Judges...
8  A    There was a Federal Judge, I don't recall that
9  one, but, but if it's in here that's, you know.
10  Q    It's, it's, it's in there, but it, my pointing that
11  out doesn't make any difference.  This guy knew
12  what he talking in his puffery and stuff like that,
13  seemed to be talking about just about everything
14  under the sun.  And, and like, you know officials
15  and official positions.  I can do this, I can get that
16  done, I can go to Judges, I can fix this and fix that.
17  Did the FBI investigate; think any of those things
18  were credible or worthy of an investigation?  I
19  realize there's pretty much out there, pretty, pretty
20  far out.  But, I, if you're allowed to comment or if
21  there's some reason you want to, I can understand.
22  A    Well when we, when we got to him and we,
23  we realized what we were dealing with.  Up front
24  you don't know what you're dealing with.

1  Q    Right
2  A    And you have to, you have to....
3  Q    That's all I wanted to know.
4  A    You have to listen to what's going on.  You
5  evaluate where it's coming from eventually and
6  after you confront 'em and you see that the person
7  breaks down and crying in front of you, then
8  probably he was a lot of puffery.
9  Q    Well, the way I read into your reaction, that's
10  probably what occurred here....
11  A    But...
12  Q    The point is, that you said, right up front, you
13  don't know, you don't know...
14  A    Yes
15  Q    So as an investigator you treat it with respect,
16  because you don't know.
17  A    Sure
18  Q    You answered my question, thanks.
19      SYNDI GUIDO:      He was mentioning in
20  Headquarters.  That's where you called isn't it?
21      MR KUSH:      That's where I called, yes,
22  State Police Headquarters.

1      SYNDI GUIDO:      You weren't really
2  concerned with everybody at the State Police
3  Headquarters being corrupt were you?
4      MR KUSH:      No and they didn't know,
5  what I was, what I was after when I finally, I didn't
6  tell them that I had this situation.  I was trying to get
7  referred to an Investigator in that field so that I
8  could discuss the matter with them.  I wouldn't
9  discuss it with just anybody.
10      MR BAILEY:      One last thing, Mr., when Mr.
11  Soohy was here, he said one of his reasons for going
12  to what he called OPR, was that usually the people
13  there are a cut above, in a sense that they're.
14      MR KUSH:      They're charged with a higher
15  responsibility.
16      MR BAILEY:      Thank you sir, thank you very
17  much.  I appreciate you being here today.
18      TONY MARCECO:  Want the edit sir?
19      MR BAILEY:   Yes sir, I'm finished.
20      TONY MARCECO: 2:22 p.m. on March 14,
21  2002 and this deposition is now concluded.
22
23

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF
PENNSYLVANIA

DARRELL G. OBER          :    1: CV – 00-0084

Plaintiff            :

s.                   :

PAUL EVANKO, MARK        :    (Judge Caldwell)
CAMPBELL, THOMAS         :
COURY, JOSEPH            :
WESTCOTT,                :
HAWTHORNE CONLEY         :

Defendants           :JURY TRIAL DEMANDED

DATE:                    March 14, 2002

PROCEEDINGS:             Video Deposition of
                         Michael Soohy, FBI Agent

APPEARANCES:

For the Plaintiff:       Donald Bailey, Esq.
                         4311 N. 6th Street
                         Harrisburg, PA 17110

For the Defendants:      Syndi Guido, Esq.
                         333 Market Street
                         17th Floor
                         Harrisburg, PA 17101

1

---

TONY MARCECA:  Good morning.  Be advised the video is in operation.  My name is Anthony Marceca.  I live at 2219 Dixie Drive, York Pennsylvania.  I've been contacted by PR Video to be the video operator for this deposition.  The case is in The United States District Court for the Middle District of Pennsylvania.  It's captioned, Darrell G. Ober plaintiff vs. Paul Evanko Et al. and it's civil action law and it's entitled 1: CV-01-0084.  The deposition today is being held at 3311 East Carson Street, Pittsburgh, PA.  It is now 10:12 a.m. on March 14, 2002.  The video deposition is being taken on behalf of the plaintiff, Mr. Darrell Ober.  The witness is Michael Soohy.

SYNDI GUIDO:  Actually, we're the ones that notice the deposition.

TONY MARCECA:  Oh, I'm sorry.

SYNDI GUIDO:  That's all right.  The defendants are taking this deposition.

TONY MARCECA:  OK, let the record show that the defendants are taking the deposition of Mr. Michael Soohy, an FBI Agent.  And Mr. Soohy would you please raise your right hand and state after me for the record.  Do you swear to tell the truth, the whole truth so help you God?

MR SOOHY:  I do.

TONY MARCECA:  Thank you.

2

---

MR BAILEY:  Sir my name is Don Bailey.  I represent the plaintiff, Darrell G. Ober.  4311 N. 6th Street, Harrisburg, PA, 717-221-9500.

SYNDI GUIDO:  I represent the defendant.  I'm from the Governor's Office of General Counsel, 333 Market Street, 17th Floor, Harrisburg, PA 17101.

MR BAILEY:  Sir could we get you on there.

JEFF KILLEEN:  I'm the Chief Division Counsel for the FBI, Pittsburgh Division.  The address is 3311 East Carson Street, Pittsburgh 15203.  Telephone, 412-432-4000.

SYNDI GUIDO:  I just get a little confused when we have so many different cameras as to who's doing what.  Are you guys all ready to go?  OK, and are we waiving objections except for the form of a question.

MR BAILEY:  Well, no, no not waiving.  Objections except as the form of a question will be reserved until time of trial, which so stipulates.

SYNDI GUIDO:  That's fine, that's fine.  All right, sir can you tell us what your current position with the FBI is?

3

---

MR SOOHY:  I'm a Special Agent with the FBI right now.

Q    Are you situated here in Pittsburgh area?

A    Actually my office is in Cranberry Twp., Pennsylvania, resident agency.

Q    And we're here to ask you questions today about an interview, excuse me an investigation that the FBI conducted with respect to Trooper Skip, Skip Stanton.  I'm trying to think....

A    Kipp

Q    Kipp.  I was trying to think.  I knew that wasn't the right name.  Kipp Stanton.  Do you recall that?  Are you familiar with the investigation?

A    Yes I am.

Q    When did that investigation first begin?

A    I believe the investigation with Trooper Stanton started prior to the time I got in Pittsburgh.  Maybe, 1998 sometime.

Q    When did you get to Pittsburgh?

A    I got here in August of '98.  The case was ongoing at that time.

MR BAILEY:  If we could clarify.  You meant it began before you got here.

4

1  A    I believe the investigation began before I got
2  to Pittsburgh.  Yes
3  Q    And you got to Pitt, excuse me, Pittsburgh.
4  You arrived in Pittsburgh when?
5  A    I think it was August of 1998.
6  Q    And in the course of that investigation did
7  you have contact with various members, any contact
8  with members of the State Police?
9  A    Yes.
10  Q    Who did you have contact with?
11  A    Captain Darrell Ober
12  Q    Did you have contact with anyone else?
13  A    No, not personally.  I didn't, no.
14  Q    When did you first meet Captain Ober, to the
15  best that you can remember?
16  A    You know I, I, it must've been in, it could've
17  been in '99, it could've been early 2000.  I don't
18  recall we met at the State Police Barracks in Everett,
19  PA, myself & Ralph Kush.
20  Q    What was that meeting about?
21  A    We wanted to inform Captain Ober about an
22  investigation we had ongoing and that we believed
23  that a Trooper Kipp Stanton was involved in some
24  illegal activity and we wanted to inform Captain

5

1  Ober as head of the as a representative of the State
2  Police OPR about what we had found and what,
3  where we were going with it.
4  Q    Did you have any discussion with Captain
5  Ober about the confidentiality of the information
6  that you were providing him?
7  A    Per say no we didn't discuss confidentiality.
8  We discussed the facts of the case, as best we knew
9  em.
10  Q    From your perspective was there any reason
11  that he should not tell his Major about the
12  investigation?
13      MR BAILEY:  Objection, you may respond
14  sir.
15  A    From my perspective I believe that I was
16  informing the State Police OPR about a situation
17  involving one of their employees and possibly more
18  and my position personally was that I'm not gonna
19  get involved and tell anyone what to do with that
20  information.
21  Q    Did you say anything to Captain Ober along
22  the lines of you know, "Do not report this to your
23  superiors or keep this to yourself," anything like
24  that?

6

1  A    I don't recall saying anything like that.
2  Q    Did you from the perspective of the
3  investigation; did you have any reason that his
4  superiors could not know about the investigation?
5      MR BAILEY:  Objection, you may respond
6  sir.
7  A    We don't usually discuss per say who we
8  should or shouldn't tell.  I recall Captain Ober
9  having some concerns, expressing some concerns
10  about who we should tell.
11  Q    Do you remember what he said?
12  A    This investigation involved the possibility that,
13  that people higher up in the State Police might be
14  somehow involved in changing test scores or
15  moving somebody from one bracket to the other.
16  We informed Captain Ober about what the Trooper
17  in question had said on tape.  We let him read the
18  transcripts.  We let him see a videotape.  He had
19  mentioned a few names.  Captain Ober at that point
20  expressed some concerns that about only two or
21  three people in the State Police    hierarchy that
22  would be in a position to do that and that he would
23  have to be careful who he would notify about this.

7

1  Q    So it was Captain Ober, rather than yourself
2  that was expressing the concerns?
3  A    Captain Ober was expressing some concerns
4  about who in the State Police needed to be notified
5  about this because he didn't really want to, he was
6  doing the right thing on our side, he didn't want to
7  compromise anything we had going on.
8  Q    Did he have any, when you say he said two or
9  three people did he mention anybody that possibly
10  could be involved in that?
11  A    He may have mentioned positions.  You know
12  the names wouldn't have meant anything to me.  He
13  may have mentioned names, I'm not sure.
14  Q    Did you tell him anyone that you thought from
15  the course of your investigation higher ups in the
16  State Police that could be involved?
17  A    No, the only name that we had, we had the
18  Trooper and we had provided him with a couple
19  other names of people that the Trooper had told our
20  source about.  And we asked him to determine if
21  these guys were in fact employed by the State
22  Police.  I think one name in particular but I can't
23  recall what it was.

8

1   Q    Did it turn out that those people were
2   employed by the State Police?
3   A    It turned out that they, this person, this one
4   person was not.
5   Q    OK, were any of them employed other than,
6   other than Trooper Stanton was there any other
7   member of the State Police that it turned out they
8   were potentially a target?
9   A    No
10  Q    That meeting that you're discussing do you
11  remember when that was?
12  A    There were two meetings. One was...
13  Q    When was the first meeting?
14  A    One was in Everett. Again, I don't recall
15  when it was. It, I know it was cold outside. It
16  could've been, could've been in January, February,
17  March 2000, 1999, I don't know. The second
18  meeting was
19  Q    By the time that you had that meeting though
20       MR BAILEY:  Please, please he was he
21  started the second meeting.
22       SYNDI GUIDO:  Well let's stick with the first
23  meeting.
24       MR BAILEY:  I don't think he had....

9

1        SYNDI GUIDO:  We're gonna stick with the
2   first meeting.
3        MR BAILEY:  He had...
4        SYNDI GUIDO:  We're sticking with the first
5   meeting, then we'll go on!  You hear my questions.
6   When you have questions, you can ask them!
7        MR BAILEY:  Syndi please,
8        SYNDI GUIDO:  NO!
9        MR BAILEY:  Please,
10       MR BAILEY:  Oh I'm sorry no; no I'll tell
11  you what you know we'll take equipment down
12  here.  Now let's stop acting this way.  He was....
13       SYNDI GUIDO:  That's fine.
14       MR BAILEY:  He was, Ma'am please, please.
15  He was in all due respect, I'm not trying to
16  obviscate your deposition.  He had, was responding
17  to the question he had started to say the second
18  meeting after describing the first.  He has a right to
19  respond.  I'd like to hear his response.
20       SYNDI GUIDO:  Sir my question is about the
21  first meeting.  I didn't ask you a question about the
22  second meeting yet.
23       MR BAILEY:  You don't have the right to cut
24  him off.  He hadn't finished.

10

1        SYNDI GUIDO:  Let's stick to the first
2   meeting!  OK?  Do you have anything else to say
3   about the first meeting?
4        MR BAILEY:  All right, let me place an
5   objection and then I'll back off. I want to object on
6   the record Counsel has intentionally interrupted
7   this witness who was I think in a very relaxed and
8   cooperative way responding to a question that was
9   on the table, on the table.  He had answered to the
10  question and made reference to a second meeting
11  and he was interrupted and Counsel insists, I believe
12  against every rule of Court that we are familiar on
13  letting him finish his answer, which he has every
14  right to do.  I object, thank you.
15       SYNDI GUIDO:  Now as far as the first
16  meeting is concerned, cause that's the one I mean.
17  This is the one in Everett, correct?
18       MR SOOHY:  Right, right.
19  Q    Do you know, do you have any idea at the
20  time you had that meeting did you have all the tapes
21  from the informant?
22  A    We had some. The investigation was still
23  ongoing.
24  Q    Were there more tapes that came later?

11

1   A    Yes, I believe there was at least a videotape
2   afterwards.
3   Q    Now, you were going to mention a second
4   meeting.  Tell me about the second meeting.
5   A    The second meeting was after, after we had
6   obtained a videotape in which Trooper Stanton and
7   another individual by the name of Jay Bridge or
8   Bridges had met with our source and we had video
9   taped a $1000.00 payment from Bridge to Stanton to
10  our source.  At that point we then arranged a second
11  meeting with Captain Ober.
12  Q    And when you say we arranged, who made the
13  arrangements for the meeting?
14  A    Agent Ralph Kush.
15  Q    Where was that meeting held?
16  A    It was in Indiana, PA at a Holiday Inn or
17  something.
18  Q    At a Holiday Inn, did you say?
19  A    It might've been, I believe it was a Holiday
20  Inn. It could've been....
21  Q    Was it Agent, Special Agent Kush that made
22  the arrangements to have the meeting at the Holiday
23  Inn?

12

1  A    I instructed Agent Kush to contact Captain
2  Ober and I believe that it is my understanding that
3  Captain Ober arranged the meeting at the Holiday
4  Inn.
5  Q    Do you know why the meeting was held at a
6  Holiday Inn rather than…was there any reason you
7  couldn't have it at Headquarters?
8  A    It is my understanding that Captain Ober was
9  concerned about who would know that we were
10  meeting with him and he wanted to meet at a
11  location where nobody would, nobody would know
12  what was going on.  He wanted to meet at a Hotel.
13  Q    Was that your concern as well, or just his
14  concern?
15  A    That was his concern.
16  Q    And, do you remember when that meeting was
17  held?  I know it's a long time ago.
18  A    I, it, it was, it was several months after the first
19  meeting is all I can remember.  I don't know the
20  exact date.
21  Q    What was that meeting about?
22  A    Again, we actually… Captain Ober rented a
23  room, we showed the videotape that I just described
24  and we talked a little bit more about the fact that

13

1  Trooper Stanton was still talking about other people
2  in the State Police having basically bought their
3  jobs.
4  Q    How long was the meeting?
5  A    An hour, hour and a half.
6  Q    During that second meeting was there any
7  discussion about confidentiality?
8  A    From our end, no we didn't, we didn't discuss
9  confidentiality.  Again, every time that we met with
10  Captain Ober on the two occasions, he, he always
11  expressed concern about who, who should know
12  about this and who shouldn't know about this.  And
13  again, I believe that, that Captain Ober's intent was
14  to, to make sure that he didn't go somewhere and
15  cause something to compromise what we were
16  doing.
17  Q    When you say he, he expressed concern about
18  that, did he ask for your advice on who he should
19  tell?
20  A    No
21  Q    Did you give him any advice on who he
22  should tell?

14

1  A    No, I don't believe it would be my position to
2  tell State Police OPR what they should do with
3  information.
4  Q    Did you ever speak with Captain Ober again
5  about this?
6  A    You know, I don't believe I did.  I may have
7  had a phone conversation with him just to fill him in
8  on the details of what was happening, since that
9  meeting.  We didn't meet personally and I don't
10  know if we had a phone call or not.  We may have.
11  Q    Just to clarify, you don't have any recollection
12  of any other conversations.
13  A    No, I don't.
14  Q    One moment please.  It's your witness.
15  MR BAILEY:  Thank you very much Syndi.
16  Good morning sir.  Mike I understand you; I'll try to
17  keep this very brief.  I understand you've been up
18  working very hard.  I complement you for that and I
19  want to thank you for coming here today to answer
20  questions.  I have just a few questions for you sir.  I
21  follow a practice, particularly when I'm dealing
22  with someone, who's a skilled professional, that if
23  you want to know where I'm going with a question,
24  whether it's curiosity or concern of any type.  I want

15

1  you to feel free to ask me.  I don't mind.  I have
2  absolutely no interest in any factual distortions, trick
3  questions, or anything like that.  I don't want that to
4  occur.  And there is no reason to expect that in this
5  case, incidentally in terms of your interview here.
6  But I want you to feel free and relaxed to, if you
7  have any curious, curiosity at all to ask me and I'll
8  be very happy to comply.  OK, and that goes for
9  your Attorney too, or for that matter opposing
10  Counsel. I have no objection.  OK, sort of three
11  areas Mike I'd like to ask about.  The first one
12  would be, I understand you came into this particular
13  area of FBI jurisdiction to work sometime on or
14  about August of '98?
15  MR SOOHY:  Yes
16  Q    OK now, when you, when did you first
17  become aware that there was this, can we call it the
18  "Stanton thing?"  I don't know what really quite to
19  call it, for one of a better description, the "Stanton
20  thing", the Stanton matter.  Do you remember when
21  you first became aware of it?
22  A    When I first got here, part of, part of what my
23  job responsibilities were was to find out what was
24  going on and any pending criminal investigations.

16

1    And I took a look at this case that had been going on
2    for a couple of years and I realized that there
3    would've been a couple of occasions when our
4    source had discussed a Trooper, who was interested
5    in possibly doing some kind of business. I wasn't
6    sure at that point, I don't recall at that point if there
7    were any conversation between the Trooper and our
8    source, but, I talked to Agent Kush, and I said look,
9    Ralph, this looks, this looks like potentially we can,
10   we can move this along a little further. Let's, you
11   know let's bring the source in, which we did and we
12   talked to him about his relationship with the Trooper
13   and we basically at that point decided well let's,
14   let's see what transpires. Let's have some
15   conversation with this guy and see what he's
16   interested in and see what he wants to do. And at
17   that point which would have probably been early
18   1999, mid 1999, whatever, we, we directed the
19   source to reach out to this guy and have some
20   additional conversations with him and see what he
21   wanted.
22   Q    OK, now I, I'm, you know, it's not my
23   purpose to testify here and I certainly would yield
24   any corrections by opposing Counsel but, my? Of

17

1    documents have been made available to me
2    indicates the investigation may have begun
3    sometime around or may have been made aware
4    you, the fact that there might have been a problem
5    with Stanton may have come to the FBI's attention
6    sometime on or about 1996. Is, does that refresh
7    you recollection at all?
8    A    It's possible.
9    Q    Possible, OK
10   A    All I remember is that when I came here the
11   case kinda floundered for a while.
12   Q    OK, alright sir and it's my understanding that
13   at sometime there had been a mention of Mr., of a
14   State Representative named Joe Preston, is that
15   possible?
16   A    That's correct.
17   Q    All right sir and that there was a Len Bodak,
18   Senator Len Bodak was also, not to imply that they
19   did anything wrong, by the way. But, that
20   someone, they had been mention.
21   A    That's correct.
22   Q    All right sir. Now, do you have a recollection
23   based on your involvement in the investigation of

18

1    when the State Police were first notified about Mr.
2    Stanton's possible wrongdoing?
3    A    It's my understanding that that Ralph Kush
4    had talked to somebody in the State Police about
5    Mr. Stanton's possible involvement prior to my
6    arriving in Pittsburgh, sometime in '96, '97.
7    Q    Do you have a recollection Mike, if that
8    might've been some folks in the Western office of
9    IAD, if you know?
10   A    I have no idea who, who it was. All, all I
11   remember is that when I instructed Ralph, we, we
12   discovered that, that Trooper Stanton was fairly
13   involved in this and was teetering on criminal
14   activity. I instructed Ralph at that point to contact
15   State Police OPR and arrange a meeting with them
16   because we were we wanted to make sure they were
17   aware of what was going on. At that point I
18   remember him telling me that he had talked to
19   someone previously about this. We didn't go into
20   any other detail about that.
21   Q    OK and Ms. Guido, I think, I think pretty
22   much covered the sequence of events, conversations
23   that you were involved in with Captain Ober, pretty
24   much. So I want to set that aside for just a moment

19

1    and I want you to go back in your mind to the period
2    of time, I think that you said you weren't sure, '99,
3    2000. I mean you just weren't sure. But at some
4    point this thing apparently for purposes of what the
5    FBI was doing came to a conclusion.
6    A    That's correct.
7    Q    And, now here's, here's a few questions I want
8    to ask about that. Let me; let me tell you where I'm
9    going. It's our understanding that after the
10   investigation came to a conclusion, then it forms a
11   major material legal artifice in the current lawsuit,
12   that Captain Ober and another PSP official informed
13   the Commissioner and there's no secret that the
14   Commissioner became upset for whatever reason,
15   you know, he did become upset. After the FBI had
16   closed this investigation initially in other words, I
17   believe, my understanding is at some point you
18   notify Captain Ober that hey, it looks like,
19   something to the effect that it's just Stanton and
20   that's basically it. If that's correct, could you
21   confirm that?
22   A    I don't know at, at what point or if Captain
23   Ober was notified about....
24   Q    OK

20

1   A   I wouldn't, I didn't do that.

2   Q   OK

3   A   So I can't answer that question.

4   Q   Fair, fair enough.  Now sir, after, at some

5   point, although, at some point you probably became

6   aware that the FBI whether it was Mr. Kush or

7   whether it was Rick or somebody, had said you

8   know hey, OK, we're satisfied.

9   A   Right

10  Q   Ok, after that point did you hear anything

11  about the investigation or how it was conducted?

12  A   Yes I, I, I got called into my SAC's Office...

13  Q   Oh

14  A   and was informed that the Commissioner

15  Evanko was not real happy with the, with the, way

16  this thing ended, transpired.

17  Q   OK, well, for what it's worth to you, it's

18  probably not much.  It sure looked to me like you

19  guys did what you were suppose to do.  What was

20  the problem?  What, what had you done wrong or?

21  I'm not saying you did.  What was, what, what,

22  from what you heard and from what was said to you

23  Mike, what was the problem?

21

1   A   That's correct.

2   Q   OK, so your reason for contacting Mr. Ober,

3   you may have, may not have had any specific reason

4   otherwise but as you recollected your reason was, at

5   the time he, based on your information was in

6   charge of BPR or OPR as you put it, right?

7   A   Right

8   Q   So that would've been a proper place to go?

9   A   Correct

10  Q   OK Sir, do you know when Rick, is it

11  Mascara?

12  A   Yes

13  Q   Can you spell it for the record please, if you

14  know?  Can you sir?

15  A   Yes, M-O-S-Q-U-E-R-A

16  Q   OK, I have been misspelling it.  M-O-S-Q-U-

17  E-R-A.  Let me get that down because I have been

18  misspelling it.  Not that it has been a big deal.  Now

19  do you have a recollection Mike, when Rick first

20  became aware of the investigation?

21  A   Not exact date, no.  I don't walk up to the SAC

22  and inform them about every case.  At some point,

23  when this case became, when Stanton got more

24  involved in it, I'm sure at that point I notified him

23

1   A   The problem, from the way it was explained to

2   me is that the Commissioner got blindsided by this

3   and wasn't happy with it.

4   Q   Mike, now you and I both know that I'm an

5   old politician and you're an experienced FBI agent,

6   I would think that if you're investigating something

7   I would assume that a basic axiom of law

8   enforcement procedure is that unless there's some

9   good reason you're not going to tell a target or

10  potential target of an investigation, no matter how

11  unlikely it may seem that it could be true, but you're

12  not going to tell them that you're investigating them

13  do you?

14  A   No

15  Q   Well, that makes sense to me.  Now, you had

16  used the acronym, I believe, OPR.

17  A   Yes

18  Q   Is it possible that what you mean is what you

19  mean is B, the State Police term for it is Bureau of

20  Professional Responsibility.  You're using the, the

21  acronym OPR to mean Office of Professional

22  Responsibility.  Right?

23  A   That's correct.

24  Q   So we are talking about the same thing?

22

1   about it.  But, as far as when, I couldn't tell you

2   when.

3   Q   Mike, is it fair to say, how many years have

4   you been a professional with the FBI?

5   A   Almost 16

6   Q   Is it fair to say that you have a high level

7   respect and trust for your colleagues and that you

8   operate on the assumption that they have a high

9   level of respect and confidence and trust in you?

10  A   Absolutely

11  Q   And is it fair sir, to say that, one of the reasons

12  why you don't go up to Rick with every case is that

13  he's got a lot of work to do, you have a lot of work

14  to do, you guys know what job you have to do and

15  you trust and respect each other to recog... to, to

16  exercise good judgement.

17  A   That's correct

18  Q   Is that right sir?  And would Mr. Mosquera

19  ever want or expect you to notify or inform a

20  potential target?  This may be a very simple sort

21  kindergarten kinda question, but bear with me.  Do

22  you believe that Mr. Mosquera would ever want or

23  expect you as a, as a, as a, obviously qualified and

24  proficient professional to notify a potential target of

24

1  an investigation that there might be some need to be
2  concerned about them?  Would he expect you to do
3  that?
4  A    I don't believe that he would, no.
5  Q    And he wouldn't expect you to ever play
6  politics with your job, would he sir?
7  A    No
8  Q    And, that's not the role and function of the FBI
9  or any law enforcement agency.  It is to investigate
10 in accordance with the law.  Isn't that correct sir?
11 A    That's correct.
12 Q    OK, thank you.  I may be finished.  Just give
13 me one-minute sir.  I'd like everybody to be careful.
14 Please remember that these mikes are always
15 running.  You know, like attorneys, and you need to
16 be aware that you don't say something.  Counsel
17 should be aware of that.  I sometimes forget, that's
18 why I turn them off.  Sir I don't have any additional
19 questions.  I'd like to express my gratitude and also
20 appreciation of Captain Ober for the time you've
21 taken to come in, thank you.
22     SYNDI GUIDO:  I have follow-up, OK.

25

1      TONY MARCECA:  One moment please.
2  Now it is March 14, 2002.  It is 10:40 a.m. and this
3  deposition is now concluded.
4      MR BAILEY:  No, no, no, she has additional
5  questions.
6      TONY MARCECA:  Oh, I'm sorry.
7      MR BAILEY:  It didn't come through.  I could
8  hardly hear it myself.  Why don't you clarify that?
9      SYNDI GUIDO:  I have some follow-up.
10     TONY MARCECA:  Excuse me, we're gonna
11 continue the deposition.
12     SYNDI GUIDO:  You mentioned several
13 times the acronym Bureau SAC.
14 MR SOOHY:  Yes
15 Q    So that the record's clear, what's you SAC?
16 What's SAC stand for?
17 A    A Special Agent in Charge
18 Q    OK, Special Agent in Charge.  What is he in
19 charge of?
20 A    He's in charge of, in this case the Pittsburgh
21 Division of the FBI.
22 Q    So that SAC would be your boss?
23 A    Correct

26

1  Q    And from a business stand point, what was
2  your relationship with Ku...Special Agent Kush?
3  A    I was his immediate supervisor.
4  Q    So, it was Kush's responsibility to report
5  matters to you?
6  A    That's correct.
7  Q    Now, to your knowledge did anyone at the
8  State Police do anything that truncated or shortened
9  your investigation?
10 A    To my knowledge, no.
11 Q    To your knowledge did anybody at the State
12 Police do anything that hampered your
13 investigation?
14 A    No
15 Q    Do you feel that the FBI fully investigated,
16 fully and completely investigated the allegations of
17 possible selling of positions at the State Police
18 Academy?
19 A    Yes, I believe that we had an obligation to
20 follow-up on some of the information that Trooper
21 Stanton was saying on tape, but none of that panned
22 out.
23 Q    But, to your knowledge that, that didn't pan
24 out, the reason it didn't pan out had nothing to do

27

1  with somebody at the State Police, you know,
2  blowing the whistle on your investigation or
3  anything like that?
4  A    Not to my knowledge.
5  Q    OK, why weren't any charges filed by the FBI
6  against Trooper Stanton?
7  A    The case was presented to the United States
8  Attorney's Office and they didn't believe that, that,
9  we had evidence for Federal violation, so the case
10 was then turned over to the Attorney General.
11 Q    What Attorney General?
12 A    State Attorney General's office.
13 Q    And have you followed up on that
14 investigation or had any further contact with it?
15 A    I, you know I read some stuff in the paper
16 about it and I'm not totally up to date with what
17 happened.
18 Q    Just, have you been involved with any of the
19 investigators or any of the attorneys that are
20 currently handling it?
21 A    Not personally, no.
22 Q    Now, you mentioned OPR and you said that's
23 the Office of Professional Responsibility and I think
24 that Mr. Bailey had talked about it being the Bureau

28

1 of Professional Responsibility. Just so we're clear,
2 you, when you said Office of Profession you want to
3 make sure that someone in OPR knew about this,
4 what did you mean?
5 A    We call OPR our organization. All law
6 enforcement agencies have this branch that
7 investigates internal, internal problems, problem
8 employees and employees that have crossed over the
9 line. Once we found out about Trooper Stanton's
10 involvement, we, we, we felt we had an obligation
11 to notify the State Police, and Captain Ober was the
12 most logical person because he was at the time, to
13 my understanding, he was running the Bureau of
14 Professional Responsibility and we wanted to
15 inform somebody in the State Police of that. That
16 was initially why we reached out to him.
17 Q    So at the time that you talked to him, you
18 believed he was the director of the Bureau of
19 Professional Responsibility?
20 A    Not the director, but certainly a person of at
21 least management level, that would take the
22 information and would be aware of what was going
23 on with our investigation, because it did involve at
24 least one member of their department.

29

1 Q    The, were you familiar with the structure of
2 the equivalent to both the PSP's equivalent to OPR?
3 A    NO
4 Q    So you weren't aware that there was an
5 Internal Affairs Division that was just one portion of
6 the Bureau of Professional Responsibility?
7 A    No, I just, it was our belief and my belief at
8 the time that Captain Ober was a Captain in charge
9 of what would be their Bureau of Professional
10 Responsibility.
11 Q    In your office of Professional Responsibility
12 are there different levels?
13 A    Everything of ours has different levels. Yes,
14 there's a Headquarters level that handles most
15 almost all of that stuff and it's filtered out through
16 headquarters in Washington.
17 Q    You said that you were concerned that
18 somebody at the, in the Internal Affairs portion of
19 your Professional Responsibility would know about
20 this. Why were you concerned about that?
21 A    Well, two reasons; one, one, I think when,
22 when somebody in State Police was contacted prior
23 to me getting here. We wanted to make sure that,
24 that they weren't running some sort of operation,

30

1 sting operation using Trooper Stanton as an
2 undercover agent. We wanted to make sure that
3 wasn't happening. When Agent Kush contacted
4 whoever he contacted in the State Police prior to me
5 getting here, that was the purpose of that contact,
6 and Agent Kush from my understanding was told,
7 no, that's not happening. If Stanton's doing
8 something, he's doing it on his own. He's not doing
9 it at the? Of the State Police. The second reason is,
10 obviously just as if a State Trooper would or a State
11 Police person would come into information about
12 and FBI agent doing something illegal, you know
13 we have an obligation to the law enforcement
14 community to, to make their department aware of it.
15 We were fulfilling the obligation of, at least in my
16 mind, of notifying the State Police that we got at
17 least this Trooper and possibly other people
18 involved in doing some illegal activity.
19 Q    By the time you arrived in Pittsburgh had
20 Agent Kush already been in contact with Captain
21 Ober?
22 A    I don't believe he was in contact with Captain
23 Ober. I believe he had contacted somebody else
24 who subsequently was promoted or moved on. I

31

1 don't know who he called, but I do know he talked
2 to somebody. I don't think it was Captain Ober.
3 Q    During the investigation, was the, was, was the
4 Bureau, the Major in charge of the Bureau? Excuse
5 me, let me rephrase that. Was the Major at the State
6 Police who was in charge of the Bureau of
7 Professional Responsibility ever a target of your
8 investigation?
9 A    No
10 Q    And, Major Hawthorne Conley, specifically by
11 name, was he ever a target of your investigation?
12 A    No
13 Q    The Lieutenant Colonel who was in charge of
14 Administration for the State Police, was he ever a
15 target of your investigation?
16 A    No, but what, what I want to say is that if you
17 take what Stanton was saying on tape, he was
18 alleging that people were moving test scores from
19 one block to another. You know, that would imply
20 that, that somebody in a position to do that was
21 involved. Although we never, we never had names
22 of anybody that was doing that. We never had them
23 as a subject of the case. There was always that
24 possibility out there that that was what was

32

occurring if you would take Stanton with what he
was saying.

Q    And that's kinda where I'm trying, going with
this, I'm trying to understand.  You wanted to know
who could, if this was true, who could possibly
manipulate this right?

A    If it was true, yes.

Q    Right, and what information did you receive
that indicated to you that the Lieutenant Colonel in
charge of Administration would be able to do that
kind of...

A    When we first notified Captain Ober, he, he,
he was, he was talking about two or three people in
a position that would be able to do that.  There was
only two or three people in the State Police that
could possibly do that.  And he expressed concerns
at that time that he needs to be careful who he
passes this information on to.

Q    OK, that's what I was trying to understand,
was how you identified who might be able to be in a
position where they could manipulate the test
scores.

A    He may have given us some names of
individuals, three or four individuals that would be

33

in that position to do it.  I don't recall what the
names were.  We certainly didn't make these people
subjects of an investigation.  But, Captain Ober was
concerned that he needs to be very careful about
who he, who he reports this information to, because
he really did not want to compromise potentially
this case going further, to his credit.

Q    But it was, and I understand that, but was it,
but it was Captain Ober that was telling you that
these are the people that I think would be in a
position to do this.

A    But, I mean, I would have no way of knowing
who would be in a position of doing that.

Q    And did you have any information from some,
any other source other than Captain Ober that these
are the people that potentially could do something
like that?

A    No, Captain Ober was, was explaining to us
how the system worked.

Q    All right, and in explaining that, was the
Commissioner of the State Police one of the people
that he identified as somebody that could be in a
position to alter the test scores or do whatever it was
necessary to get someone into the Academy?

34

A    He may have been.  There was certainly some
high level people that he was concerned about, yes.

Q    OK.  Did he ever talk to you; did the name
Lieutenant Colonel Hickes ever come up?  If you
remember?

A    No, no I don't remember.

Q    I know it's a long time ago.

A    You don't understand I wasn't writing this
stuff down.  I was there with Agent Kush and we
were just exchanging information.

Q    And, you were just the Supervisor of Agent
Kush, who was the one doing it, the investigation.

A    That's correct.

Q    My question is if you suspected that the, if you
genuinely suspected that the command staff of the
State Police might be involved in this kind of selling
of slots into the Academy.  Why would you tell
anybody at the State Police about it?

A    Well, when I look at a Captain of OPR or
Bureau of Professional Responsibility, I feel an
obligation that we have to inform that other agency
about an investigation of one of their own.  I mean,
as if, somebody I would expect would notify the
FBI, I would hope if they come across some

35

possible criminal activity by an FBI agent.  So, we
felt an obligation to do it, to talk to somebody and
my position on OPR or Bureau of Professional
Responsibility is that they're, they're one level above
reproach.

Q    Well if, if for example in your office of
Professional Responsibility, someone there got
information that the director of the FBI was
potentially involved in something similar, who
would need to know about that?

A    I don't know exactly who, but it would
probably be somebody down at Headquarters at a
pretty high level.

Q    Can you hang on one minute and let me
confer?

A    Sure

Q    I just have one other thing I would like to ask
you about.  Trooper Stanton was, was a target,
correct?

A    Yes

Q    And he was stationed somewhere here out
West?

A    I think he was in Uniontown.  He might've
been in Indiana, I don't know.  I don't remember.

36

Q    Do you have any recollection of whether
Trooper Stanton's Troop Commander was ever
suspected of being involved in any way?

A    Do I have any information of that?

Q    Yes

A    No I don't.

Q    All right, that's all I have.

MR BAILEY:    Mike you know how these
things go, don't you?

MR SOOHY:    Yes sir we do.

Q    I have just a few follow ups in connection with
what she asked.  The fact is you had some hard data,
which indicated that Mr. Stanton was engaged in
criminal or very close to criminal activity, right?

A    That's correct.

Q    And to very frank about it, in doing your job
you didn't know who above him at whatever level
or rank, if indeed anyone else was, if he wasn't just
blowing off his mouth or whatever.  You, you really
didn't know who above him could be involved in it
just that there were, just that there were references
to indicated that someone above him in the State
Police hierarchy might be involved.  Isn't that fair to
say Mike?

37

A    That's fair to say, yes...

Q    OK sir and if you begin an investigation and
there's indication because of the verbiage used by a
source of information that a particular group, if it's
a, you know somebody says well, there are people in
Pennsylvania that might be involved.  I mean you're
dealing with 12 million people, that's off the wall.
But if you have a group defined like, you know we
read about this Texaco case and stuff and somebody
says, somebody at the board level, you have a, at
least a reasonably identifiably group, right?

A    That's correct.

Q    OK and, and, and, if you don't know who that
is, you're not gonna sit down there and, and point a
finger at so and so and so and so, unless you have
some reason to do so.  Isn't that correct?

A    That's correct.

Q    Sure, OK now, do, do, do you know why, let,
let, let me do this in an offer form so you know
where I'm coming from and it's a curiosity item to
me.  The record seems pretty clear that, that Mr.
Kush at some point contacts Western Office IAD,
shares some information obviously about Stanton,
because one of the questions is, is Stanton, are you

38

guys doing a sting?  Perfectly legitimate, reasonable
thing to do.  But he doesn't go back to the Western
Office of IAD.  Do you know if Mr. Kush was
referred to the head office in Harrisburg, which
ended up being occupied at the time by Mr. Ober or,
whether Mr. Kush did that for some reason that he,
he, he, that he shared with you that he shared with
you that you can tell us?  Do you know why?

A    No I don't, I mean as I said I, I don't know
who Agent Kush contacted prior to...

Q    Right

A    my arriving here and Captain Ober was
contacted, to my understanding that, that, because of
his position.

Q    Right, well then the name Behren's has been
mentioned, in fact it's in some of the product of the
investigation.  B-E-H; R-E-N-S or Behrens, no
reason to imply or suspect any wrong doing on that
gentleman's part, but I believe he may have been in
Western IAD.  Do you have any recollection of that
man?

A    No I don't, I don't know who that...

39

Q    OK, off hand, do you, have a, a, recollection of
how many Colonels, Light Colonels, full, full
Colonels there are in the Pennsylvania State Police.

A    I have no idea.

Q    OK and obviously you didn't have any idea
then and you didn't know how many Majors there
were or anything like that, right?

A    I don't know, no.

Q    And in fairness to you, you don't know even
what rank a Troop Commander has to be or might
be?  Is that fair to say?

A    I don't know the State Police's chain of
command or reporting requirements, none of that
stuff.

Q    Yes sir, and so what you were doing was as a
?, because you have to work in and cooperate with
this agency because typically in police
organizations, you know they put folks that are
pretty much above and apart from any kind of a
problem in, in, into the BPR or OPR position, you
made a judgment as a, as a highly qualified
professional, or excuse me, Mr. Kush did, that this
would be the contact point and it didn't matter if it
was Captain Ober, Santa Claus, the truth, the Tooth

40

1  Fairy or anybody else, it was a professional
2  judgment based upon experience and, and that's
3  why you did it?  Isn't that correct?
4  A     Yes, you would, you would give the
5  information to the logical person of the department
6  that you felt would, would need to know.
7  Q     OK and I think you indicated a number of
8  times that Captain Ober expressed concern about the
9  integrity and respect for your investigation and I
10  don't think there's any need to beat that, to beat that
11  up anymore.  I think you've been very, you
12  mentioned that a number of times.  Do you know
13  how many tapes were turned over after the
14  investigation was over to the Pennsylvania State
15  Police?
16  A     No, exactly no, I don't know the number.
17  Q     Do you know what role the Attorney General
18  played in it, whether they said they didn't want to do
19  the investigation or give it to the State Police?  Let
20  me tell you why I ask that so you, so you know
21  where I'm coming from.  All the information
22  indicates that at some point the FBI product, work
23  product, and this seemed odd to me because I do
24  have some experience with, with the FBI somewhat

41

1  and not all good by the way.  I wanna be honest with
2  you Mike, I mean you got some tremendous people,
3  I think you got a few ringers there too, OK in all
4  fairness, but, that's my opinion.  Now, my
5  investigative work product that included a number
6  of tapes, tape recordings.  Do you know how or why
7  they were turned over to the Pennsylvania State
8  Police after the FBI was done?  The reason I ask is I
9  understand the way the FBI handles evidence is if
10  you have like for example original tapes and that
11  sort of thing they're documented, they're put in a
12  case file, Agents, even the stuff that you do to put
13  your 302's together and all that stuff bundled up put
14  together and even shipped off to Philadelphia or
15  whatever.  Do you know if the original tapes in that
16  matter were turned over to, to the State Police?
17  A     I don't know.  I doubt that the original tapes
18  were turned over, but, I, I know that the information
19  was provided to the Attorney General's Office,
20  because prosecution wasn't going to occur in
21  Federal, under the Federal system.  So the tapes,
22  transcripts, whatever evidence we had against
23  Stanton and, and the other individual, Bridge, were

42

1  turned over to an Attorney for the State Attorney
2  General's Office.  I don't know that, that any
3  information was given to State Police, I mean, it
4  may have been but I don't, other than what we
5  provided Captain Ober with.
6  Q     Do you know whether the matter as far as the
7  State is concerned ended up with a District Attorney
8  in Indiana County?
9  A     Yes, I believe it did.
10  Q     Do you know the powers of the State Attorney
11  General to prosecute?
12  A     Do I know the powers?
13  Q     Yes, do you know what their jurisdiction
14  might be?
15  A     To some extent, yes.
16  Q     See, do you know that Attorney with the
17  Attorney General's Office was?
18  A     It might've been a, a Vaughn Guise.  I'm not
19  sure.  I mean I had, I was responsible for...
20  Q     There is an Attorney Vaughn Guise up there.
21  A     It may have been, that name kinda sounds
22  familiar.
23  Q     Yes, but I'm not so sure he...
24  A     Might've been another case, I don't know.

43

1  Q     Yes, that's for sure.  You know whether the
2  FBI turned over any transcripts to the State Police?
3  A     We gave Captain Ober some transcripts and
4  some tapes.
5  Q     OK, aside from Captain Ober do you know?  If
6  you remember?
7  A     I don't, I, I don't, I don't, personally I don't
8  know if, if anything was given to the State Police
9  other than what we provided to Captain Ober, it may
10  have been.  I don't know.
11  Q     Do you know a Captain Monaco?  Did you
12  ever know a Captain Monaco?
13  A     Frank?
14  Q     Yes,
15  A     Yes, I know him.
16  Q     Do you know whether, we had testimony I
17  guess it was maybe yesterday, day before yesterday?
18  Lieutenant Colonel Coury testified I believe that he
19  had a conversation with Mr. Monaco about Stanton
20  or matters relating to Stanton.  Do you know
21  anything about that?
22  A     No, I know Frank Monaco from things other
23  than the Stanton case.  I've never talked to him
24  about the Kipp Stanton case.

44

Q   Yes, well he's not, I, I, again I don't want to imply that any of these people are suspected of wrongdoing or anything like that. I, I know him and I have a high opinion of him. I have no, you know, that's not the issue. We're just trying to sort of trace down what happened because the Commissioner became so upset over this and we're trying to figure out what happened and why he got so upset. Well again, I'd like to say thank you.

A   You're welcome.

SYNDI GUIDO:    I have, I have something I'd like to ask you and my, Mr. Bailey may have a follow-up on this as well. You mentioned previously when you were talking to Mr. Bailey about a meeting that which your SAC called you in and told you that Evanko was upset.

MR SOOHY:    Right.

Q   Do you remember when that was?

A   Well, it was when Rick, Mosquera was still in Pittsburgh, so I don't know when he left. It wasn't very long afterwards that he left, so. When did he leave, 2000, sometime, I really don't know.

Q   Was there anybody else present at the meeting besides you and the SAC?

45

A   Ralph Kush may have been there. I don't remember. I had so many meetings with the SAC's about so many things; it's hard to remember who's in the room.

Q   In the meeting you were told Commissioner Evanko was upset about it, but was there any, what I'm wondering was there any adverse outcome from that, the fact that the Commissioner was upset? Did it have, did anything happen to the people at the FBI who handled the investigation or?

A   No other than that article in the Harrisburg newspaper that called for my head and Ralph Kush's head, I don't believe there was any adverse...

Q   Which article was that?

A   Somebody showed me an article once, where the Commissioner had said something about he wasn't happy with us.

Q   Do you know if that would, the, if the article you're referring about was the article that was about Plaintiff sued in which the Plaintiff claimed that's how the Commissioner felt?

46

A   I don't remember. I, I know that, that I saw it. I was with somebody from Harrisburg or Philadelphia. They pointed this article out to me.

Q   Was it in the Harrisburg papers?

A   I, could've been a Philadelphia paper, could've been Harrisburg paper, but I'm, I'm still hearing Kush is still here, so I guess there was no...

Q   What I'm saying is so nothing...

A   No

Q   I mean, even if the Commissioner was upset nothing happened to you.

A   No

Q   OK, thank you, that's it.

MR BAILEY:    Well, do you know if the Commissioner ever called Louie Freeh?

MR SOOHY:    I don't know, Louie Freeh never called me.

Q   Whatever, you know for what it may be worth and you, if you recollect this if you recollect this, if, if not, maybe you know; do you ever recollect years ago, there was a situation where I think someone had raised questions about what was going on in the FBI front office? You know, my recollection serves me correctly, there were, there was some

47

investigative work done to the credit of the Bureau and the Agents and people involved and worked on that investigation in spite of the the, the Director's position, and it might be 10, 15, 20 years ago, I'm not sure. But to me that speaks to a very important professional issue and that is if you're an investigator and you're doing an investigation, you have a duty and responsibility professionally to take the leads as they come and follow them where they go. That is your duty and that's, that's a duty you owe to the law and your oath of office. Isn't that correct? Thank you sir. Thank you.

SYNDI GUIDO:    That's it.

TONY MARCECO:  Conclude it?

SYNDI GUIDO:    Yes

TONY MARCECO:  OK it's 11:05 a.m., March 14, 2002. The deposition is now concluded.

48

SHEET 1   PAGE 1

```
 1    IN THE UNITED STATES DISTRICT COURT FOR THE
 2              MIDDLE DISTRICT OF PENNSYLVANIA
 3   DARRELL G. OBER          :        1: CV- 00-0084
 4                            :
 5        Plaintiff          :
 6                            :
 7      Versus               :
 8                            :
 9   PAUL EVANKO, MARK        :
10   CAMBELL, THOMAS COURY,   :
11   JOSEPH WESTCOTT,         :
12   HAWTHORNE CONLEY         :
13                            :
14            Defendants     :
15   DATE:         December 5, 2001
16   PROCEEDINGS:  Video Deposition of
17                 Darrell G. Ober
18   APPEARANCES:
19     For the Plaintiff:
20       Donald Bailey, Esq.
21       4311 N. 6th Street
22       Harrisburg, PA 17110
23     For the Defendant:
24       Syndi Guido
25       Office of General Counsel
26       333 Market Street
27       Harrisburg, PA  17120
```

PAGE 2

```
 1         MR. BAILEY: Testing 1-2-3-4-5. And what is
 2   your name young lady?
 3         A:   Bernadette:
 4         MR. BAILEY:  The recording device is in
 5   operation.
 6         MS. GUIDO: I think we're ready.
 7         MR. BAILEY:  Sir, do you want to do a
 8   sound check on your mikes? Are you Ok? Are you going
 9   to hook up Syndi?
10         MS. GUIDO: I'm Ok. Do you want to swear
11   him in?
12         REPORTER: Do you swear the testimony you
13   are about to give will be the truth, the whole truth
14   so help you God?
15         MR. OBER: Yes I do.
16         VIDEOGRAPHER: My name is Philip Clay. I am
17   employed by Cyrus Court Reporting Services. The date
18   today is December 5, 2001. The time is 8:59 AM. This
19   deposition is being taken at 333 Market Street,
20   Harrisburg, PA. The caption of the page is "In the
21   United States District Court, for the Middle
22   District of Pennsylvania, Darrell G. Ober,
23   Plaintiff, versus Paul Evanko, Mark Campbell, Thomas
24   Coury, Joseph Westcott, Hawthorne Conely,
25   defendants. Case number 1: CV-01-0084. The name of
```

PAGE 3

```
 1   the witness is Darrell G. Ober. This is being taken
 2   on behalf of the defense. The attorneys present
 3   state their names and their parties present after
 4   them.
 5         A:  My name is Don Bailey. I represent
 6   the plaintiff, Darrell G. Ober in this matter.
 7         A:  Syndi Guido, I represent the
 8   defendant.
 9         A:  Joanna Reynolds. I represent the
10   defendants.
11         VIDEOAGRAPHER: The court reporter has
12   already sworn in the witness.
13         A:  My name is Crystal M. Lyde, L-y-d-e.
14   I'm contracted out for PR Video. My address is 4310
15   Hillsdale Road, Harrisburg, PA.
16         MS. GUIDO:  And at the outset I just want
17   to clarify if we are going to have the same
18   stipulations we had before about objections being
19   reserved except as to the form of the question?
20         MR.BAILEY: Yes we can agree. That's fine.
21   A couple of just housekeeping chores: one, we will
22   be responding soon with a modification to the
23   production of documents. And we respectfully take
24   issue, of course, and we'll get that worked out with
25   some of the responses that you made on that document
```

PAGE 4

```
 1   request and some of the restrictions, which are
 2   "honorees." And so we do object to those. Do you
 3   have any idea how long you are going to be today?
 4         MS. GUIDO: Probably most of the day. Ok,
 5   at the beginning Mr. Ober you have already been
 6   sworn. If I ask you any question that you don't
 7   understand please ask me to rephrase it and I'll do
 8   that. If you answer my question then I'll assume
 9   that you have understood my question. Are you under
10   the influence of any kind of drugs or alcohol today?
11         A:  No.
12         Q:  I'm going to start just by going over
13   your background. Just copies, and I'm going to show
14   you Exhibit 1. Do you recognize that as your own
15   resume?
16         A:  Yes, with noting that it's not up to
17   date, but yes, I believe that's generally my work
18   history.
19         Q:  Year 1999. I'll show you you're 2000
20   resume. That's number 2.the 1999 is Exhibit 1.
21   Exhibit 2 is your 2000 resume. Is that right?
22         A:  Correct.
23         Q:  Let's just briefly go over your
24   education. Can you tell us about that?
25         A:  After high school I enrolled in the
```

SHEET 2  PAGE 5

1 Pennsylvania State University where I majored in the
2 administration of criminal justice. I graduated Cum
3 Laude in 1979.
4      Q:   What was your degree? You said your
5 degree was in Criminal Justice?
6      A:   Yes, a Bachelor of Science. I
7 enrolled in the graduate school at Indiana
8 University of Pennsylvania. However upon appointment
9 to the State Police I withdrew from graduate
10 studies.
11      Q:   Ok, what were you going to study at
12 Indiana?
13      A:   Public Administration.
14      Q:   What did you do right after college?
15      A:   Right after college, well actually at
16 the end of my senior year I had made a number of
17 applications in state government in law enforcement
18 related functions. I took a number of tests and for
19 the summer, in the summer of 1979 mostly just worked
20 for my father until being appointed, or was selected
21 to work at the Indiana University of Pennsylvania as
22 a campus police officer. Very shortly after
23 appointment I attended the Pennsylvania Law
24 Enforcement Academy in Scotland Pennsylvania where I
25 graduated number one in my class.

PAGE 6

1      Q:   And what is the Pennsylvania Law
2 Enforcement Academy?
3      A:   Well I don't believe its any longer
4 in existence but at one time it was the training
5 facility for campus police officers and there were
6 some municipal officers although I don't know
7 exactly how many.
8      Q:   Was that put on by the department of
9 education?
10      A:   Yes ma'am.
11      Q:   Now when did you first enlist with
12 the State Police?
13      A:   I enlisted; pardon me, in the State
14 Police on July 20, 1981.
15      Q:   When did you first apply to the State
16 Police Academy, do you recall?
17      A:   I can guess at that one. I believe my
18 first application would have been in the spring of
19 1979.
20      Q:   Do you know how many times you
21 applied before you were accepted to the academy?
22      A:   I applied once, tested twice.
23      Q:   And so you started as a trooper then
24 on July 20, 1981.
25      A:   I started as a cadet.

PAGE 7

1      Q:   As a cadet. And when did you become a
2 trooper?
3      A:   December 5, 1981.
4      Q:   What were your assignments as a
5 trooper?
6      A:   My initial assignment on graduation
7 was to a patrol unit in Troop S. Milesburg was the
8 headquarters. I was assigned to the Mercer Station.
9      Q:   When were you, when did you, were you
10 promoted to Corporal?
11      A:   I was promoted to Corporal on
12 February 18, 1987.
13      Q:   Between the times, while you were a
14 trooper and before you became a corporal, were all
15 your assignments basically patrol?
16      A:   No.
17      Q:   Ok, what, can you outline that, your
18 history for me?
19      A:   I was primarily a patrol trooper
20 while assigned to Troop S. I transferred to Troop D,
21 Butler also at the Mercer Station for two years or
22 so. There I was primarily assigned to a patrol unit
23 but we did criminal investigations as well. I then
24 transferred to Troop G Hollidaysburg. I was assigned
25 to the McConnellsburg Station again in a patrol unit

PAGE 8

1 but I did do a rotating assignment through the
2 criminal investigation unit while I was assigned
3 there.
4      Q:   Ok, thank you. And then once you
5 became a Corporal can you outline your assignments
6 as a Corporal for me?
7      A:   Yes, I accepted a position, a
8 promotion as a Corporal to Troop D, Bowmansville in
9 1987. I was assigned to a patrol unit in Troop D,
10 Bowmansville for about ten months and then I, as I
11 had done in the other instances; I requested a
12 preference transfer back to Troop G and was again
13 assigned to McConnellsburg. And there I was a patrol
14 supervisor.
15      Q:   How often were you, how many times
16 were you at, I guess I'm asking at that time, how
17 often were you at Troop G?
18      A:   Twice.
19      Q:   And about how many years was that?
20      A:   About four years total.
21      Q:   And when were you promoted to
22 Sergeant?
23      A:   I was promoted to Sergeant in March
24 of 1993. No that's not correct, 1991.
25      Q:   And your assignments as Sergeant.

SHEET 3  PAGE 9

1    A:    My assignments as Sergeant? I was
2  assigned originally to Systems and Procedures
3  Section in the Bureau of Research and Development.
4    Q:    What do they do?
5    A:    We missed a transfer. I don't know if
6  you want that or not.
7    Q:    Ok, go ahead.
8    A:    When I was a Corporal I transferred,
9  again I requested a preference transfer to
10  Department Headquarters in 1989. I applied for a
11  specialized position in the Bureau of Research and
12  Development and I was there for, I guess two years
13  or so as a staff writer in the Bureau and then I was
14  promoted to Sergeant in the same section. And to
15  answer your question as to what do they do. The
16  Bureau of Research and Development Systems and
17  Procedures Section is tasked with writing the
18  directives from drafts from departments, researching
19  directives, it's an assignment exclusively related
20  to managing the directive system that runs the State
21  Police.
22    Q:    You became a Lieutenant when?
23    A:    I was promoted to Lieutenant. I
24  believe that was also March of 1993.
25    Q:    Your assignments as a Sergeant, did

PAGE 10

1  you spend all that time in Research and Development
2  or were you elsewhere as well?
3    A:    No I was only in Research and
4  Development.
5    Q:    Ands then when you were promoted to
6  Lieutenant what did you do?
7    A:    I accepted a position with the newly
8  created Systems and Process Review Division in the
9  Bureau of Professional Responsibility.
10    Q:    What did that division do?
11    A:    That division was the former Staff
12  Inspection Division and the mandate for the three
13  Lieutenants who were promoted, myself and two others
14  were to create a system, permanent and ongoing
15  inspection system that had continuity and could
16  comply with the mandates of the accreditation
17  program. So we were tasked with performing staff
18  inspection functions throughout the department.
19    Q:    And the staff inspections those are
20  to make sure that people, the State Police members
21  are complying with all the rules and regulations of
22  the department?
23    A:    Essentially.
24    Q:    And then you became a Captain when?
25    A:    I was promoted to Captain March 3,

PAGE 11

1  1995.
2    Q:    And your first assignment as Captain?
3    A:    I was promoted to the position of
4  Division Director in Systems and Process Review
5  Division.
6    Q:    As Division Director what were your
7  duties?
8    A:    My duties were as Division Director
9  to manage the inspection component of the entire
10  state for the Bureau of Professional Responsibility
11  and supervise three sections that were commanded by
12  Lieutenants.
13    Q:    What were the sections?
14    A:    Where?
15    Q:    What.
16    A:    We have the state divided
17  geographically, east, west and central. And those
18  sections are, as was my former position as the
19  central section commander, those sections are under
20  the supervision of a Lieutenant.
21    Q:    And then what other assignments have
22  you had as a Captain?
23    A:    In 1998 I was asked by Major Merryman
24  to transfer to the Division Director of Bureau of
25  Professional Responsibility, Internal Affairs

PAGE 12

1  Division. In April of 1999 I was detached to the
2  Bureau of Technology Services to the Information
3  Management Systems project, or technology project.
4  As a Captain I also was transferred to the Central
5  Section of the Liquor Enforcement Division in 19--,
6  excuse me, in the year 2000 I was transferred to
7  that Lieutenants position. I eventually was
8  transferred to the position I currently hold which
9  is Director of the Administration in the Bureau of
10  Liquor Control Enforcement.
11    Q:    So not all of the assignments that
12  you receive are made by the Commissioner, is that
13  right? I noticed that you said it was Major Merryman
14  that made you Director of IAD?
15    A:    Well, he requested, asked me to
16  consider accepting that transfer. I told him I would
17  do whatever he asked me to do if it were determined
18  in his mind that that was the best move for the
19  agency.
20    Q:    My question was that was a decision
21  made by Major Merryman rather than the Commissioner?
22    A:    Not to my knowledge. I don't think he
23  made that transfer independent, I don't know, of the
24  Commissioner. I don't really know.
25    Q:    Have you ever turned down any

1  promotions?
2          A:   Yes.
3          Q:   Can you tell me about what promotions
4  you turned down and the reason for that?
5          A:   I turned down promotion to Sergeant
6  in 1990 or so, I don't recall. I believe I turned
7  that down on four occasions, possibly three
8  occasions. The reasons I turned those promotions
9  down is because they would have removed me from my
10  role as caretaker for my then five year old son.
11  They would involve a transfer.
12         Q:   Would they have required you to move?
13         A:   Yes ma'am. It would have impacted on
14  my ability; I have primary custody of my oldest son,
15  which is subject to scrutiny if there is a
16  significant change in my living conditions or living
17  arrangements that have been established for him.
18         Q:   How old is your older son now?
19         A:   My oldest son is fourteen.
20         Q:   So he was, you said around four or
21  five at the time that you were turning down
22  promotions?
23         A:   Yes, he was born in 87 and that was,
24  yes four or five, that's correct, I'm sorry.
25         Q:   You briefly talked about when you

1  were in patrol essentially that you did serve as a
2  criminal investigator some of the time.
3          A:   Yes.
4          Q:   Can you tell me about your
5  investigative experience?
6          MR. BAILEY: I object to the form of the
7  question that you can respond.
8          A:   Well, I'm not sure exactly what
9  you're after but I'll try. I'm not sure I understand
10  what to answer.
11         Q:   Ok, were you ever, that's all right
12  I'll try again. I don't want you to answer if you
13  don't know what I'm getting at. You were never
14  assigned to a criminal investigation unit. Right?
15         A:   No I was assigned to a criminal
16  investigation unit.
17         Q:   When was that?
18         A:   That was when I was in troop G
19  McConnellsburg; again I'm trying to estimate this.
20  It would have been about 1986.
21         Q:   How long were you in the criminal
22  investigation unit?
23         A:   I was full time assigned to that
24  about four months and then part time, I don't even
25  know. Probably until I made corporal. I don't

1  recall.
2          Q:   How long? Can you give me years? Was
3  it years? Months?
4          A:   I made corporal and transferred
5  probably in February of 87, so maybe six months part
6  time. I really don't remember now.
7          Q:   What do you mean by part time?
8          A:   Well that's a very small station. We
9  only had nine patrol troopers. It was not uncommon
10  for many of us to be assigned although we may have
11  been assigned to a patrol, excuse me, although we
12  were assigned to a patrol roster. Except for the
13  time when some of us did serve full time in the
14  criminal unit, it was not uncommon to be assigned
15  follow up or initial investigations on a routine
16  basis.
17         Q:   How many people were in that criminal
18  unit?
19         A:   Two full time.
20         Q:   Can you give me an estimate of how
21  many criminal cases you have investigated?
22         A:   In my career? I would have to say
23  probably hundreds. I don't know.
24         Q:   What kind of cases were they?
25         A:   I've investigated; pardon me, the

1  gambit of criminal cases from summary offenses
2  through homicides.
3          Q:   What homicides were assigned to?
4          A:   I was assigned to, one that I can
5  recall I was assigned to when I was when I was in
6  Troop G McConnellsburg, you'll have to excuse me I
7  can't recall the victims or the suspects name. It
8  was a, I don't recall.
9          Q:   Were you the lead investigator?
10         A:   No.
11         Q:   How many cases, criminal cases were
12  you the lead investigator?
13         A:   Criminal cases?
14         MR. BAILEY: Could you define lead
15  investigator for us?
16         MS. GUIDO: Well, the primary investigator.
17  That it was your responsibility, you're the primary.
18         A:   Again I can only guess at that. I
19  would say probably hundreds. I don't know.
20         Q:   Do you know, can you give me an idea
21  how many felonies?
22         A:   I would have no idea. I would have no
23  way of estimating that for you.
24         Q:   How many corruption cases have you
25  investigated?

1    MR. BAILEY: Do you mean public corruption?
2    MS. GUIDO: Public corruption.
3    A:  Well certainly one. No, as lead
4 investigator none come to mind.
5    Q:  How about just as assisting in the
6 investigation?
7    A:  Other than the issue that is the
8 centerpiece of this lawsuit I don't recall where
9 public corruption was a case that I might have,
10 would investigate. I don't recall.
11    Q:  So the best that you remember being
12 the case, the FBI case that started all this, is the
13 first public corruption case you worked on?
14    A:  I would reserve that opportunity to
15 come back to that one. To tell the truth that is not
16 a question I thought of. There is nothing comes to
17 mind.
18    Q:  How about organized crime. Have you
19 done any organized crime cases?
20    A:  No.
21    Q:  Before September 1998 how many times
22 had you worked on cases with the FBI?
23    A:  On no occasions. I recall a seizure.
24 A seizure, two seizures that I was assigned as a
25 part of a work unit. And that was when I was

1 assigned to Troop G. One was a clandestine lab and
2 another was another drug case but I was a worker
3 bee.
4    Q:  When you talk about seizures, are you
5 talking about seizing drugs, property?
6    A:  Yes. Property. The detail I was
7 assigned to was property seizure.
8    Q:  Would that be property that was, I
9 guess I'm kind of wondering would that be property
10 in anticipation of forfeiture or as evidence?
11    A:  No at that point it was forfeiture
12 proceedings. It was land, equipment so forth.
13    Q:  Ok. So the two cases that you recall
14 working with the FBI prior to September 1998, those
15 were the two cases where you described yourself as a
16 worker bee?
17    A:  Yes. I think I might have missed a
18 question, or an answer that you had asked a question
19 to if I can come back to that also.
20    Q:  Yes.
21    MR. BAILEY: You can do that at any time
22 you want to revisit, want to add to, correct or
23 modify an answer you are totally free to do that.
24    A:  Well if I wrong give me a time out
25 but I believe you were eventually going to get to an

1 issue of training or experience. I was just going to
2 answer that like all troopers, starting in the
3 academy, with academy training I received what was
4 offered both in that academy and certainly in the
5 other police academy. What I was, with respect to
6 criminal investigation, but when I was also assigned
7 to Troop G, McConnellsburg I did attend a two-week
8 criminal investigation course also offered by the
9 Academy.
10    Q:  Would that be here in Harrisburg?
11    A:  In Hershey. And a variety of related
12 in-service classes over the years. I couldn't begin
13 to name all of them.
14    Q:  I'm sure. Skipping back to where we
15 were with the FBI, so you didn't really have any
16 contacts at the FBI?
17    A:  No.
18    Q:  Then it wasn't, as if in September of
19 1998 it wasn't as if you had a close relationship
20 with anybody in the FBI?
21    A  No.
22    Q:  While you were in the Bureau of
23 Research and Development what investigative duties
24 did you have?
25    A:  None.

1    Q:  When you were assigned to the Systems
2 and Process Review Division of the Bureau of
3 Professional Responsibility what investigative
4 duties did you have?
5    A:  I didn't have any investigative
6 duties but for five years our role, one of the
7 primary functions that our division served while I
8 was there was reviewing criminal investigations for
9 erroneous content, predictability of actions, so
10 forth. We were, again I'm not sure what you might or
11 might not know about staff inspections but the
12 compliance and insuring that investigations were
13 conducted, that the logical leads were followed and
14 proper action was taken which was very much an issue
15 at staff inspection and all that when I was assigned
16 there.
17    Q:  How did, I don't know anything about
18 staff inspections so maybe you can explain more to
19 me about how that works. How is, how do you
20 determine what inspections are going to take place?
21 When?
22    A:  How it was set up when I was there
23 was we identified all the various department
24 components and principally that would be Troop and
25 Bureau Operations, Division, Station Locations and

1   we did off a master schedule. I believe initially it
2   was a two-year cycle and then the accreditation
3   requirement changed so it became a three-year cycle.
4   Which means that once every two or three years
5   depending on what the prevailing regulation is that
6   component is inspected for compliance with
7   regulations. We have three officers assigned to a
8   Lieutenant and each of those three officers would
9   each be assigned to a function within that station
10  or division, or location to inspect. That being
11  crime, patrol or staff. And the task of the
12  inspector is to review that entity they are assigned
13  for compliance, make notes and develop a report of
14  findings. The lieutenant, the section commander
15  which is the job that I initially had when I was
16  transferred, was as an oversight, an over viewer of
17  the entire process. Overseer.
18       Q:   What does an inspection entail?
19       A:   The very reason I accepted that
20  position when it was offered to me was what it
21  entailed. What we were asked to do was develop a
22  program that had credibility and served the needs of
23  each department as opposed to being just an exercise
24  in widgetting. There's a part in every inspection
25  that does have an inspection in it's pure form,

1   meaning are things hung the way it's supposed to be
2   and are posters available and what not. The very
3   reason I accepted that position when offered was
4   that I was told I had a chance to be a part of
5   writing a regulation and being an architect of the
6   process that looks beyond that. That looks beyond
7   just are the blocks on the form filled out, or did
8   the trooper actually take the appropriate action,
9   did someone respond to the scene?
10       Q:   As a practical matter how do you do
11  that? You as the inspector as a practical matter how
12  do you make sure that the trooper did as he was
13  supposed to do?
14       A:   For example if we are talking about
15  investigative reports we will take a random sample
16  of reports over an identified period of time, or
17  every report over an identified period of time and
18  look through them, study them, look for
19  discrepancies and in many, many instances make phone
20  calls or personal visits to the victims or
21  witnesses. Identify what our function was and that
22  we are just basically a compliance-monitoring role,
23  for quality assurance and talk to individuals that
24  our troopers have dealt with and see if it we're
25  performing up to the department expectations.

1        Q:   And what if, were you looking at
2   whether, and if it is both, the answer is both fine,
3   and individual state police member was performing up
4   to standards or looking at the station?
5        A:   Actually there are both and
6   additionally we were looking at how the departments
7   were performing. Our first, when we found as an
8   illustration, when we found an area of deficiency
9   our first task was to look to see if the regulations
10  were flawed, or if there was a policy void that
11  existed. If that was the reason for the non-
12  compliance and if that was the case we made
13  recommendations for change.
14       Q:   What kind of problems would you be
15  able to identify?
16       A:   I'm not sure where to begin. The most
17  significant ones if you want me to start there might
18  relate to the handling of evidence, security of
19  evidence, the evidence process, the maintenance of
20  the property management system in its entirety. We
21  would conduct a full and complete inventory in every
22  property room in the state.
23       Q:   What kind of problems might come up
24  in respect, with respect to how evidence was
25  handled?

1        MR. BAILEY: May I impose an objection? Do
2   you want him to continue with the kind of areas he
3   was investigating or do you want him to move on to
4   this question now? The reason is he had not
5   completed responding.
6        MS. GUIDO: Ok, if you didn't complete
7   responding to investigating we can go back to that
8   in a second but right now I just want to finish this
9   question while I'm thinking about it.
10       MR. BAILEY: Objection is noted. You may
11  respond.
12       MS. GUIDO: I don't need lots of them. I
13  just want some examples so I can get an
14  understanding of what you did.
15       A:   In property rooms for example, which
16  was actually a fourth rated component when I was
17  assigned to inspection, or it evolved to a fourth
18  and separately rated component because of its
19  importance. We found a gambit of problems from
20  inadequate storage areas, meaning there was some
21  problem with the facility where our property was
22  being stored up through missing property records,
23  missing property, criminal conduct on the part of
24  our members assigned to those security functions.
25       Q:   I believe Mr. Bailey wanted me to go

SHEET 7  PAGE 25

1  back to my original question because he didn't think
2  you had finished answering it. And my original
3  question was while you were in the Systems and
4  Process Review division what investigative duties
5  you had. I thought that you had said basically none,
6  that it was doing inspections. If you had something
7  to add please do.
8      A:   I had no role as a primary responding
9  officer to a scene to take information from a
10  complaint. But at the same time we were, I was among
11  nine or ten people tasked in the whole entire
12  department with review of criminal investigations
13  for their fairness and content and accuracy and
14  things I believe I've already described.
15      Q:   Yeah, I think I understood your
16  answer. I want to go back to where I was. When you
17  would find a problem, some type of problem during an
18  investigation you had mentioned maybe leads that
19  hadn't been followed up on, what would you do about
20  that?
21      A:   If there was misconduct, if we
22  determined that there was potential misconduct   on
23  the part of a member, or a failure to complete his
24  assigned responsibilities we would, consistent with
25  the processes that exist and are supposed to be

PAGE 26

1  followed we would approach the station commander or
2  unit supervisor, depending on the exact unit we were
3  in. we would give the information to them for
4  further action. In many cases that resulted in a
5  Bureau of Professional Responsibility internal
6  affairs complaint sheet being initiated.
7      Q:   Would that be up to you to initiate
8  that or would the Station Commander take care of it?
9      A:   The Station Commander.
10      Q:   It sounds to me like when you were in
11  the Systems. Such a long name.
12      A:   SPR.
13      Q:   SPR. I keep stumbling over it. I
14  guess that required you to have a very detailed
15  knowledge of the department's rules and regulations?
16      A:   Yes.
17      Q:   And you were assigned, you moved from
18  SPR to Internal Affairs when?
19      A:   May 2, 1998. That's State Police Day.
20      Q:   What's State Police Day?
21      A:   May 2nd.
22      Q:   What's the day?
23  MR. BAILEY: You don't know that?
24  MS. GUIDO: I don't know.
25  MR. BAILEY: That's terrible.

PAGE 27

1  MS. GUIDO: It's terrible but what is it?
2  MR. OBER: It's the day the State Police
3  was created.
4  MS. GUIDO: What year was that?
5  MR. OBER: What year were we created?
6  MS. GUIDO: I think it was 1905.
7  MR. OBER: 1905.
8  MS. GUIDO: Hey, I did have one thing
9  right. I remembered that.
10  MR. OBER: You're educated and our job is
11  finished.
12  MS. GUIDO: And you were transferred there when
13  Major Merryman asked you to transfer from one section of
14  BPR to the other?
15      A:   Yes.
16      Q:   Essentially both of those would be
17  under Major Merryman who is the Bureau Director?
18      A:   Those two divisions comprise BPR,
19  yes.
20      Q:   And when you first went to internal
21  affairs you started there as the director?
22      A:   Yes.
23      Q:   Who was your immediate supervisor?
24      A:   Major Merryman.
25      Q:   How long was Major Merryman your

PAGE 28

1  immediate supervisor?
2      A:   From May 2, wait a minute, yeah, May
3  2, 1998 until he was transferred in September of 98.
4      Q:   Which is when you then became the
5  acting bureau director?
6      A:   Yes.
7      Q:   And he had been he was also your
8  immediate supervisor the entire time you were at
9  SPR?
10      A:   Not the entire time.
11      Q:   At the end of it I guess. How long
12  was he your supervisor at SPR?
13      A:   I don't know when he transferred. He
14  supervised me there but I don't know when. I was
15  already the captain of that division when he came in
16  but I don't know when he was transferred.
17      Q:   Who was the head of the Bureau before
18  him?
19      A:   I'm not sure of the order. We had
20  several. I believe preceding Major Merryman was
21  Major Woodring, Paul Woodring. If it wasn't him, it
22  was Major Amos. I don't remember the sequence now.
23  MR. BAILEY: I think it was Woodring.
24      Q:   So while you were in Internal Affairs
25  the only two supervisors, immediate supervisors

1  would have been Major Merryman and then Major
2  Conely?
3          A:   Correct.
4          Q:   Can you describe for me you duties as
5  director of the Internal Affairs division?
6          A:   As director of the internal affairs
7  division my duties were to, I was the supervisor,
8  division director of the entire internal affairs
9  process. Meaning investigations or complaints
10  received assuring that they were assigned for
11  investigation; investigations were completed, sent
12  to the division and routed to the respective
13  adjudicators.
14          Q:   Did you ever personally conduct the
15  Internal Affairs investigations?
16          A:   Yes.
17          Q:   How many?
18          MR. BAILEY: Maybe we should define a
19  little better what you mean by personally conduct.
20          MS. GUIDO: Were you ever the person
21  assigned to conduct an internal affairs
22  investigation?
23          A:   Yes. Not while I was the director if
24  that's what you mean.
25          Q:   Well let's do both? While you were

1  the director were you? I mean did you ever assign
2  any cases to yourself?
3          A:   I would hope that I was smart enough
4  not to do that. No. Not that I recall.
5          Q:   When were you in Internal Affairs
6  when you weren't the director?
7          A:   I wasn't but I was as a Troop member
8  and as a Bureau Member I was assigned investigations
9  by BPR to complete.
10          Q:   Ok, when you were just, when you were
11  at, not when you were in BPR but when you were
12  basically in the patrol division?
13          A:   Yes when I was a Trooper I was
14  assigned to Troop G I recall one, NS I think I might
15  have been assigned two, but I don't recall. I was
16  also assigned to do an investigation when I was
17  assigned to Research and Development.
18          MR. BAILEY: For the record could I just
19  suggest a little information on the relationship
20  between BPR and Internal Affairs. What they are
21  might help understand this record a little bit
22  better at this point.
23          A:   BPR as I said is comprised of two
24  divisions. I think what the issue might be and I
25  think what we are after is to clarify not all

1  Internal Affairs investigations are assigned to
2  Internal Affairs Division personnel. They are
3  assigned to Troop investigators or Bureau personnel
4  if it is determined by either director that's
5  appropriate and troop commander that's an
6  appropriate assignment to make. So I conducted
7  internal affairs investigations but I wasn't
8  assigned to internal affairs.
9          Q:   Who makes the decision whether it's
10  going to be handled by internal affairs or by a
11  member of the troop?
12          A:   That's a matter that's generally
13  discussed between the troop commander and the
14  director of internal affairs.
15          Q:   If it's handled by the troop does
16  that information eventually make its way to Internal
17  Affairs?
18          A:   The investigation you mean? Yes.
19          Q:   And is it assigned an Internal
20  Affairs number?
21          A:   Yes, according to our procedures
22  internal affairs investigations, complaints when
23  they're received and assigned are assigned a BPR
24  control number. Sequentially at that point yes.
25          Q:   At what point is that done before or

1  after the investigation?
2          A:   That's done when the complaint is
3  received as I recall. Not afterward.
4          Q:   And so the best you remember is that
5  you've done two, maybe three of those kinds of
6  internal investigations?
7          A:   Yes.
8          Q:   Exhibit 3, it's just the complaint.
9  I'll give you a copy. I'm going to hand you Exhibit
10  3. I just wanted to make sure we all had a copy and
11  I'm going to go through your complaint with you. I
12  have some questions about it. And any time you
13  decide you need a break, signal me, you need to go
14  to the men's room anything like that.
15          MR. BAILEY: Syndi, the only thing though
16  to help you plan although I realize there's a lot of
17  time yet, I'm just getting off the flu and I'm
18  probably going to need some time, like around noon
19  or so, get a decent break to get some lunch or broth
20  or something. So just so you can plan on that.
21          MR. OBER: You gave me an extra.
22          MS. GUIDO: Ok, no problem. Like I said.
23  Start on page six, paragraph twenty. It's the very
24  beginning of the operative facts of the complaint
25  and it says in paragraph twenty, Darrell G. Ober on

1  or about September 20, 1998 was one of the brightest
2  and the best, a rising star in the Pennsylvania
3  State Police Organization. Could you explain what
4  you based that assessment on?
5        A:   At that point in time in my career I
6  think I had made captain in twelve years. My work
7  record up and to that point in time was unblemished.
8  For the past three promotions, four promotions exams
9  I finished no lower than sixth in the entire state.
10 I was asked to participate in things that I believe
11 are documented on my resume.
12       MR. BAILEY: Please answer the question
13 fully and completely, please.
14       A:   At that point in my career I was the
15 director of the internal affairs division which in
16 the State Police organization or any police
17 organization is generally thought of, as one of the,
18 at least in my opinion is thought of as one of the
19 most highly sought after divisions and I was asked
20 to transfer to that position based on my track
21 record and my work record. Having completed a five-
22 year tour of the Systems and Process Review division
23 as I mentioned earlier where I was an architect in
24 creating the whole division and running it quite
25 successfully. I had been asked to participate in the

1  legislative budget and finance review committee
2  responses on behalf of the commissioner. I had been
3  asked to serve on cadet review boards, field or not
4  field, background review boards. Actually I
5  volunteered for those assignments. I volunteered to
6  be a part of the Pennsylvania Emergency Management
7  detail. So at that point in my career in comparison
8  to my peers I believe that would be a very accurate
9  statement. Situated as I was in 1998.
10       Q:   Now you mentioned that your career at
11 that point was unblemished. You had had internal
12 affairs investigation conducted on you before,
13 correct?
14       A:   Absolutely.
15       Q:   But they were determined to be
16 unfounded?
17       A:   They were unfounded complaints, yes.
18       Q:   So you ended up being vindicated by
19 those investigations.
20       A:   Yes ma'am.
21       Q:   And then you go on to talk about
22 being cum laude graduate of Pennsylvania State
23 University. Do you remember what your GPA was at
24 Penn State?
25       A:   3.42.

1        Q:   And I think Penn State uses the term
2  "with distinction" as opposed to cum laude?
3        A:   That's correct.
4        Q:   And they have with distinction, with
5  high distinction, with highest distinction?
6        A:   Yes. That's sounds familiar.
7        Q:   Ok. You also mentioned graduating
8  number one from the Pennsylvania Law Enforcement
9  Academy. How many people were in your class?
10       A:   I believe about twenty-five or so.
11       Q:   And you actually graduated second in
12 that class right?
13       A:   No. I have a plaque that says I was
14 the top cop in my class.
15       Q:   Ok. Yeah just mark it. I'm sorry
16 we're kind of at a distance here.
17       MR. BAILEY: Is this number four?
18       MS. GUIDO: Yes, I'm going to hand you
19 Exhibit #4, which is from your official personnel
20 file and it's the official transcript from the Law
21 Enforcement Academy and what does it rank you in the
22 class?
23       A:   This is the, Academic; it says Class
24 Rank 2 of 20.
25       Q:   So there were twenty in the class.

1        A:   Apparently.
2        Q:   And you were, as least according to
3  the transcript you were number two in the class?
4  Pretty good, I mean I just.
5        MR. BAILEY: Well, that's his class rank
6  not his overall grade as a.
7        MS. GUIDO: I'm just asking his class rank,
8  which is two out of twenty.
9        Correct?
10       MR. BAILEY: One moment please. I want you
11 to bring you have a plaque you say?
12       A:   Yes they gave out different awards.
13 Scholastically I was second, I recall who was first.
14 He beat me by 1/100th of a percentage point. It was
15 Brian Hershey.
16       MR. BAILEY: Just a second, hold just a
17 second.
18       END OF SIDE ONE - AUDIOTAPE ONE.
19       MR. BAILEY: You're very kind. Continue
20 please.
21       MR. OBER: They also gave a firearms score,
22 which I believe I was second also. I don't recall
23 that. They gave a physical fitness award, which I
24 don't think I was close. I'll be candid with you.

1  But the most sought after trophy that I can recall
2  many years ago was the top cop award. Which was the
3  overall best candidate which was a member of that
4  class, which was me and I had been given a plaque by
5  the director that said it was the top cop award. I
6  took that.
7          Q:  And that's the name of the award?
8          A:  Yes.
9          MR. BAILEY: Would you make a copy of that
10 please? Provide it to me.
11         A:  I'll be glad to.
12         MR. BAILEY: Thank you.
13         ME. OBER: Can I keep this? I don't have
14 this.
15         Q:  Ok. Sure.
16         MR. BAILEY: You're on the record. I have a
17 copy. That has to go to the court reporter but I
18 have a copy for you and it's marked.
19         MS. GUIDO: Everything that I show you I'll
20 make sure that your attorney gets. Ok?
21         MR. OBER: I don't think that I've ever
22 seen this.
23         MR. BAILEY: I was my OCS leadership
24 graduate. I know what that means.
25         MS. GUIDO:  Now in that same paragraph

1  twenty you mention that your work history was
2  replete with numerous career enhancing achievements,
3  citations, experience qualifications. What citations
4  awards honors etc did you receive as a State
5  Trooper?
6          A:  Oh over the years I have been given
7  numerous letters, appreciation, I don't know if
8  they're called letters of appreciation. Let me back
9  up. I've been given numerous pieces of
10 correspondence from various supervisors
11 acknowledging the work I've performed on behalf of
12 the agency. I quite frankly wouldn't know where to
13 begin. I've had numerous.
14         Q:  Do you still have copies of any of
15 them?
16         A:  Yes. I believe I have copies of some.
17 I don't know if I have them all
18         Q:  Have you ever received a letter of
19 commendation from your troop commander or bureau
20 director?
21         A:  No.
22         Q:  Have you ever received the type of
23 reward or citation or honor that would go into your
24 official personnel file?
25         A:  I have received; well I have received

1  letters of appreciation after the IMS project. I
2  don't know if they went into my file or not.
3          Q:  You have reviewed your personnel file
4  haven't you?
5          A:  Yes. Oh yes.
6          Q:  And when you reviewed your file do
7  you recall seeing any kind of awards, honors,
8  letters of commendation in your file?
9          A:  No.
10         Q:  Did you receive any kind of
11 commendations, awards, achievements, etc while you
12 were a police officer at Indiana University?
13         A:  No.
14         Q:  How long were you there? I can't
15 remember.
16         A:  About two years.
17         Q:  Now on, in paragraph twenty one you
18 say that you were named the director of IAD in May
19 1998 and in September 1998 you became the acting
20 bureau director. And then paragraph twenty-two is
21 something that I think you were alluding to a little
22 bit ago when I asked you about, where you said that
23 this career path is customarily associated in the
24 State Police with advancements to the highest, very
25 highest ranks in the organization including

1  Commissioner. And my question there is when you say
2  this career path are you referring to being the
3  director of the internal affairs division or being
4  the acting bureau director? What's the career path
5  that's associated with being among the highest
6  ranks?
7          A:  Well I would say it probably
8  incorporates both. I think by virtue of selection to
9  internal affairs whether it be an investigator a
10 section commander or a division commander, it's my
11 experience in that in the Police culture and the
12 corporate police world that that's generally thought
13 of as one of the more desirable and lucrative
14 assignments by virtue of the fact that you are
15 placed in a sensitive position managing some of the
16 most critical information about the department and
17 it's personnel. Being, and this was not the first or
18 only time I had ever been the acting bureau
19 director, but being afforded the opportunity to act
20 in that capacity is also an honor. Because it gives
21 that person an opportunity to learn the position of
22 the next rank. In other words you are empowered and
23 given a career opportunity to learn, to perform the
24 activities of the acting director.
25         Q:  Now being the acting director can be

SHEET 11   PAGE 41

1  something for a few weeks as you were or it can be
2  something as temporary as while somebody is on
3  leave?
4         A:   Yes.
5         Q:   Could someone be acting bureau
6  director for as long as a year or something like
7  that or is it more like a temporary like situation?
8         A:   Well I think it's intended to be
9  short term. I suppose it could go for a year. I can
10 think of an instance when it was given to someone
11 for six months or so off the top of my head.
12        Q:   And it's not uncommon for someone to
13 serve as acting bureau director and not ultimately
14 become the bureau director? Correct?
15        A:   Correct.
16        Q:   Not just in BPR but that's in any
17 bureau?
18        A:   Correct.
19        Q:   And as I said that partly because it
20 could be just a very temporary thing such as
21 somebody's on vacation so you're going to be acting
22 while they're gone?
23        A:   Yes.
24        Q:   You also, in saying that it's
25 associated with becoming commissioner, it's

PAGE 42

1  certainly being the director of internal affairs or
2  even being the director of Professional
3  responsibility is certainly no guarantee that you
4  would end up being the commissioner. Correct?
5         A:   Correct.
6         Q:   Or even a deputy commissioner?
7         A:   Correct.
8         Q:   I imagine there have been plenty of,
9  I'll let you finish. It's just that I imagine there
10 have been plenty of people that were the bureau
11 director or the director of IAD that never did make
12 the command staff of the deputy; I mean the
13 commissioner or his deputies. Correct?
14        A:   I lost the first part of that. Let me
15 answer it this way.
16    MR. BAILEY: I object to the form of that
17 question. It's a little bit leading. I wonder if you
18 might be able to break it down just a little bit.
19    MS. GUIDO: Sure.
20    MR. BAILEY: It's a little bit complex.
21    MS. GUIDO: What you're saying in here is
22 that being the director of the internal affairs
23 division is something that is associated with
24 becoming the commissioner and what I'm asking you
25 is, you know, wouldn't there have been lots of

PAGE 43

1  directors of internal affairs that never did make it
2  to be the commissioner or one of his deputies?
3         A:   I don't know if I can agree with the
4  term lots. I would suggest that there is a high
5  percentage, that there is a higher percentage of
6  relationship between advancement from those
7  positions, not just to the commissioner's office or
8  deputy's office but also to other promotions,
9  promotion to the next higher rank. There is a very
10 high correlation in my recollection between members
11 who have been assigned to Internal Affairs, and
12 director of BPR, much more so I would guess than any
13 of the other bureaus
14    MR. BAILEY: Counselor, I would like to
15 bring to your attention the language in paragraph
16 twenty-two is with advancement to the very highest
17 ranks in the organization and underline including
18 commissioner. And so we shouldn't appropriate that
19 as saying that's a necessity or a requirement for
20 that career path.
21    MS. GUIDO: I know I'm just asking, I'm
22 just asking what is meant, I'm trying to get at what
23 you meant by that and I think that you're answering
24 my question quite appropriately.
25    MR. OBER: You can get your ticket punched

PAGE 44

1  on the way to the top by a tour through IAD. Does
2  that help?
3         MS. GUIDO: Um-hmm. And also, it's not a
4  necessity though right? There are people, I think
5  maybe even deputy commissioner Westcott never was in
6  charge of internal affairs or the bureau of
7  Professional Responsibility?
8         A:   That would be correct.
9         Q:   Ok. And while you were the director
10 of internal affairs, as director you would be
11 responsible, would you be responsible for overseeing
12 all of the investigations that would be assigned to
13 that division?
14        A:   Yes.
15        Q:   And would you also be responsible for
16 overseeing all the ones that would be assigned out
17 to the troops as well?
18        A:   Yes.
19        Q:   In doing that would you making, I
20 guess, AR administrative regulation 4-25, is that
21 like the bible of Internal Affairs? If you don't
22 like that characterization you can change it.
23        A:   Yeah, I would not say that but it is
24 the document, the source document for internal
25 affairs.

SHEET 12   PAGE 45

1   Q:   It's pretty much what runs, governs
2   and how internal affairs is.
3        A:   Yes.
4        Q:   And would it be your responsibility
5   as the director to make sure AR 4-25 was complied
6   with?
7        A:   Yes.
8        Q:   Both by people in your division and
9   by people out in the troops?
10       A:   Yes.
11       Q:   You had mentioned that when you had
12   been out in the troops you had done two or three
13   cases. Do you remember what those cases were by name
14   or by subject?
15       MR. BAILEY: Objection to the form of that
16   question. You may respond.
17       A:   The one, there were three subjects, I
18   believe there were three subjects in the one
19   investigation and they were assigned to Troop G
20   Bedford and I believe one of the subjects, and he
21   may, he could have been the only subject, and his
22   name was Gerald Polca. P-o-l-c-a, I think that was
23   how it was spelled. The other one that I can recall
24   that I was assigned when I was in the Bureau of
25   Research and development was assigned to complete an

PAGE 46

1   investigation on Sergeant Byron Lewis. Those are the
2   two that come to mind. There may not have been any
3   others but those are the two that come to mind.
4        Q:   Do you remember if any of those
5   turned out?
6        MR. BAILEY: Incidentally, counsel before
7   you continue if there are any responses that include
8   names, that for any confidential reasons should be
9   redacted I certainly would agree to that. But I
10   think that before you answer her questions fully and
11   completely that maybe we should have that
12   understanding. There may be some confidential issues
13   here and I want to make clear that he's free to
14   answer questions but we need to have an
15   understanding here that there has to be some
16   protection of individuals rights. Darrell do you
17   understand that?
18       A:   Yes.
19       Q:   Do you recall whether those ended up
20   being founded or unfounded, if you recall?
21       A:   I don't believe I would know that. I
22   was the investigator.
23       Q:   The investigator doesn't necessarily
24   find out?
25       A:   Correct. What the ultimate

PAGE 47

1   adjudication was I don't know.
2        Q:   As the investigator, you go out and
3   gather the facts and give it to someone else that
4   makes the decision?
5        A:   Correct.
6        MR. BAILEY: Can I develop one small
7   question that may help that?
8        MS. GUIDO: Sure.
9        MR. BAILEY: Does the investigator in those
10   situations make a recommendation?
11       A:   No.
12       MS. GUIDO: So when you became the director
13   of internal affairs you didn't have a lot of
14   internal affairs experience?
15       A:   Correct.
16       Q:   I suppose that would put you through
17   somewhat of a learning curve, wouldn't it?
18       A:   Yes.
19       Q:   I guess being new to the area of
20   responsibility it would be normal to make mistakes
21   sometimes?
22       A:   I think that's probably an accurate
23   statement.
24       MR. BAILEY: I'll object to both the
25   question and to the response.

PAGE 48

1        MS. GUIDO: Well you certainly made a
2   mistake sometimes didn't you?
3        MR. OBER: I guess, maybe I'm giving you,
4   maybe I'm giving you too much of the benefit of the
5   doubt. I go back to first of all I'm married, so I
6   darn well know I make mistakes all the time. Are we
7   talking about?
8        MS. GUIDO: Now we don't want your wife to
9   think the mistake was getting married.
10       MR. BAILEY: The reason I object to your
11   question is speculation. I don't want you
12   speculating. If we're talking about generic things
13   we can certainly, you know.
14       MR. OBER: Ms. Guido you're deposing me and
15   I know the answer to have I ever made mistakes is
16   yes, not no because that wouldn't be accurate. So
17   does that help?
18       MS. GUIDO: Sure. I'm basically what I'm
19   getting at is, you know like I said, there's a
20   learning curve for you that this was a new area of
21   responsibility for you that you hadn't worked in
22   before right?
23       A:   Yes.
24       Q:   And you started working there in May
25   of 98. Right? Paragraph twenty-three, on or about

SHEET 13   PAGE 49

1  late September, early October 1998 you were
2  contacted by the FBI about a Political Corruption
3  case. How do you pinpoint the date?
4      A:   I didn't pinpoint the date.
5      Q:   Well to September or early October?
6      A:   It was my recollection that it was
7  during the time that I was the acting bureau
8  director.
9      Q:   Ok so that would have had to have
10  been between, when did you become the acting bureau
11  director, was that like September 17, something like
12  that?
13      A:   That sounds correct.
14      Q:   So that would have been after mid-
15  September.
16      A:   That was my recollection. Yes.
17      Q:   And then Connelly was appointed
18  October 3 so it would have to be before that.
19      A:   That's correct.
20      Q:   Can you be more specific about who
21  contacted you?
22      A:   I had a discussion about this issue
23  with Special Agent Ralph Kush. K-u-s-h.
24      Q:   How did he contact you?
25      A:   We spoke by telephone.

PAGE 50

1      Q:   Where was that at? Where were you at?
2      A:   I assume I was in my office. I don't
3  recall being anywhere else.
4      Q:   Did he call you?
5      A:   That's my recollection yes.
6      Q:   Did he say how he got your name?
7      A:   No, I don't recall that he did.
8      Q:   Do you know if he said, did he say
9  whether he contacted you simply because you were the
10  head of the bureau or was there something about you
11  personally? Did he mention?
12      A:   Me personally? No. I don't know
13  Ralph, Agent Kush so I don't recall if he said
14  anything. Well I would just be speculating. I don't
15  know.
16      MR. BAILEY: Don't speculate. Just tell her
17  no.
18      MS. GUIDO:   We are just trying to get at
19  what you remember, what was actually said. If you
20  don't remember or don't know what was said it's ok
21  to say no.
22      MR. BAILEY: Why not just ask him what was
23  then the conversation?
24      MS. GUIDO: Well because I'm asking the
25  questions and I like to ask in this way.

PAGE 51

1      MR. BAILEY: And I don't want to object or
2  I don't want to obviscate your deposition but gees,
3  they're suggestive and
4      MS. GUIDO: Well I didn't necessarily like
5  all your questions either so.
6      MR. BAILEY: I'm giving you a lot of
7  leeway.
8      MS. GUIDO: In any event when Agent Kush
9  contacted you, I think you told us before that, well
10  you didn't know him and you told us before that you
11  never really worked with anybody in the FBI before.
12  Do you, what did he; first of all I do want to ask
13  you what do remember that he told you during that
14  first phone call?
15      A:   What I recall from that conversation
16  is this, Agent Kush told me that the FBI the western
17  office or whatever it's referred to as, was
18  conducting a political corruption case in western
19  Pennsylvania and during that investigation it came
20  to their attention that there was an individual that
21  believed that through a series of payoffs or through
22  exerting political influence that he could gain
23  entry into the State Police Academy as a cadet.
24      Q:   Did he mention any names during that
25  conversation?

PAGE 52

1      A:   My recollection is that in the first
2  conversation he named Trooper Stanton who was
3  subsequently arrested. That trooper Stanton, and I
4  don't know how he described his role but I could
5  characterize it as he described Trooper Stanton
6  being a, inserting himself as a facilitator of this
7  activity or in some middle man role for lack of
8  better terms.
9      Q:   Did he mention Commissioner Evanko
10  either by name or by rank.
11      A:   I can't recall whether Colonel
12  Evanko's name was mentioned specifically. I do it is
13  my recollection that we did discuss ranks or at
14  least positions in the agency.
15      Q:   What was that discussion?
16      A:   Well the heart and soul of the
17  conversation as I recollect was just that as I just
18  described there was an individual who believed it
19  was possible to gain entry into the State Police
20  Academy and I do recall Agent Kush saying that they
21  were looking for someone in the State Police who
22  could provide them with some resource information in
23  order to further continue this investigation of
24  Public Corruption.
25      Q:   Is that what they wanted you for?

SHEET 14   PAGE 53

1   MR. BAILEY: He was not completed with his
2   response. Please let him finish. Go ahead.
3   MR. OBER:  Agent Kush said they were, they
4   needed a contact that could supply information such
5   as when the cadet classes start, exactly what the
6   process is and how the hiring process works and what
7   have you.
8   MS. GUIDO: And my question was, is that
9   what your role was going to be?
10   A:   Apparently.
11   Q:   I mean that was why he was contacting
12   you, in order to get that kind of information?
13   MR. BAILEY: Objection. You can respond if
14   you know what was in his mind.
15   Q:   What did he tell you about why he was
16   calling you?
17   A:   That was what he, what I just
18   described.
19   Q:   Right. So that's why he was calling
20   you. Right? It's not that difficult.
21   A:   Actually, I think it is. I'm not sure
22   why he called me.
23   Q:   Ok.
24   MR. BAILEY: I object.
25   A:   I pick up the phone or I have this

PAGE 54

1   conversation and he's on the other end.
2   Q:   And he didn't tell you why he was
3   calling you?
4   MR. BAILEY: What? If you understand you
5   can respond. Go ahead. I put an objection on the
6   record. It's on the record. Go ahead and respond.
7   MR. OBER: I don't know why he would report
8   this activity. I think you're asking me why did he
9   pick me out of the phone book. I don't know.
10   MS. GUIDO: No, I'm not asking you why he
11   picked you out of the phone book. I'll ask you about
12   that later. What I'm asking you right now is when he
13   spoke to you on the phone did he say if he was
14   calling you to get information or just to give
15   information to you?
16   A:   I don't know if those words were
17   specifically discussed. I think I've answered that.
18   That's what I recall from our conversation.
19   Q:   Did he ask you for any information?
20   A:   On the first phone call I'm not sure
21   because even if he had I don't know that I could
22   have provided any. I don't know. I don't recall.
23   Q:   Did he ask your opinion if it were
24   possible for someone to bribe their way into the
25   State Police Academy?

PAGE 55

1   A:   We talked about the potential of such
2   an allegation. Yes.
3   Q:   What do you remember about that
4   portion of the conversation?
5   A:   I remember, again I'm trying to
6   recall from three years ago and I recall that during
7   the conversation I think we essentially did what I
8   did when I was assigned to internal affairs, which
9   is what we called threshold testing. We had some
10   general discussion about, well if it were true, how
11   would this work or could it work? Or where are there
12   any weaknesses in the agency where this could happen
13   or outside of the agency? And I recall some general
14   discussion.
15   Q:   Did you make any suggestions to him
16   about how it could have happened?
17   A:   I could have I don't remember?
18   Q:   Do you remember whether Coury,
19   Westcott? Well was Coury mentioned during that
20   conversation?
21   A:   I don't recall.
22   Q:   How about Lt. Colonel Westcott?
23   A:   I don't recall.
24   Q:   Lt. Colonel Hickes?
25   A:   I don't recall. I guess.

PAGE 56

1   Q:   I'm sorry. I think I lost my little
2   mike thing too.
3   MR. BAILEY:  Hickes by the way is H-i-c-k-
4   e-s.
5   MS. GUIDO: Major Connelly was he
6   discussed?
7   A:   Not that I recall. No.
8   Q:   Was the State Representative
9   mentioned?
10   A:   In the first phone call I don't
11   believe. Do you mean by name?
12   Q:   Either. Name or by as a State
13   Representative.
14   A:   In general terms he could have been.
15   I don't recall. I believe that was the issue was.
16   There was a belief on their part that this could
17   happen through political influence of some type.
18   Q:   Was the allegation basically that, as
19   best you can recall, that a State Trooper and some
20   political figure were possibly working in cahoots to
21   get some people into the State Police Academy? Is
22   that essentially right?
23   A:   Well on the first phone call I'm not
24   sure that it was that mature yet. As I recall that
25   conversation with Agent Kush, that they at least had

SHEET 15   PAGE 57

1     a subject that believed that and they already had a
2     State Trooper acting in the role of facilitator. I
3     don't recall from the first conversation that it had
4     matured to the point where there had actually been
5     any contact with any State Reps or Senators or what
6     have you but that was at least what the participants
7     believed could happen.
8         Q:  At the time that you reported the
9    matter to Lt. Colonel Hickes had you had more than
10   that first phone call with Special Agent Kush?
11         A:  Not that I can recall.
12         Q:  So you had the first phone call and
13   then you told Lt. Colonel Hickes about it?
14         A:  That's what I recall. Yes.
15         Q:  Did you tell him that right away.
16         A:  I'm not sure what you mean by right
17   away.
18         Q:  Did you, was it, in other words, you
19   get off the phone with Agent Kush, how long a period
20   of time would have elapsed before you went and told
21   Lt. Colonel Hickes about it?
22         MR. BAILEY: Do you mean how much time did
23   elapse between?
24         MS. GUIDO: Um-hmm. Yes.
25         MR. OBER: Well, I don't recall it being

PAGE 58

1   more than a few days but I don't remember. Here's,
2   let me try it this way, Ms. Guido. I took this to be
3   a very serious conversation. The FBI did not contact
4   Trooper Stanton's commanding officer. They did not
5   contact his area commander. They didn't contact the
6   director of personnel. At least they told me they
7   didn't. There was no indication that anybody had
8   been contacted. They didn't contact Colonel Evanko
9   any of the other Colonels. He called me and I took
10   this very seriously and I had been in internal
11   affairs by then long enough to understand what I had
12   described as threshold testing which we used or
13   employed for assignment. Which is believing
14   allegations on their face if they were true what
15   would the next logical step be? So I recall taking
16   some time because I, the mere fact that a State
17   Trooper was already implicated in this kind of
18   activity concerned me a great deal. Understanding at
19   least in generic terms from Agent Kush that there
20   was another political investigation ongoing which I
21   believe we ultimately came to know as the Gigliotti
22   investigation. I took all this very seriously so I
23   did take some time to try to clear my head and
24   understand what would be the next logical thing for
25   me to do.

PAGE 59

1         MR. BAILEY: Before you continue, could I
2   get, just so the record's clear. Mr. Brown. What
3   role is Mr. Brown?
4         MS. GUIDO: He's our investigator.
5         MR. BAILEY: He's your investigator? What
6   is he doing in the deposition here?
7         MS. GUIDO: He's helping us with the
8   documents etc.?
9         MR. BAILEY: Well, I'm not going to, I
10   don't think he has a right to be here. But I'm not
11   going to object to his being here. I do want to
12   bring to your attention that I am going to subpoena,
13   I noticed that he's making, he's got some document
14   from him making notes of testimony of Mr. Ober and I
15   fully expect. I want to see those.
16         MS. GUIDO: Well tell you what, you can
17   object and we can argue about it in front of the
18   judge.
19         MR. BAILEY: Well we will but I'm going to,
20   you know, I don't think he has any.
21         MS. GUIDO: He is assigned to work with
22   counsel.
23         MR. BAILEY: I don't think he has, well; I
24   have no evidence of that. That's not been presented
25   to me.

PAGE 60

1         MS. GUIDO: Well I'm just telling you. In
2   any event can we argue about that later?
3         MR. BAILEY: Well, I'm going to; well you
4   see I haven't finished my sentence yet. I'm going to
5   object that with the understanding that as your
6   investigator I want to have access to what he's
7   doing sitting in here in a deposition taking notes.
8         MS. GUIDO: Well as I said we can argue
9   about that later with the court, about whether or
10   not you can see his notes. But for purposes of now I
11   did have one question.
12         MR. BAILEY: The objection is noted. That's
13   good. Ok, we can go on.
14         MS. GUIDO: The, when you were talking
15   about it, the internal affairs, it made me think of
16   the confidentiality aspect. Internal affairs
17   investigations are confidential?
18         A:  Yes.
19         Q:  And are they confidential, these are
20   the other people in the internal affairs division,
21   in other words can you; can one internal affairs
22   investigator talk over a case with his colleagues?
23   Bounce ideas of them and that kind of thing?
24         A:  I suppose that could occur. I'm not
25   real sure what the question is.

SHEET 16  PAGE 61

1  Q:  Ok if, just see if I can put it in a
2  way that would phrase it better. As a lawyer
3  sometimes when you have a case and you're dealing
4  with it and you're thinking ok here's the facts, ok
5  what should I do. Sometimes it helps to go down the
6  hall and talk to one of your colleagues and say now,
7  here's the facts, you know, what would you do in
8  this situation kind of thing. Are internal affairs
9  investigators allowed to do that with their internal
10  affairs colleagues as opposed to people outside the
11  division? Could one investigator who is assigned a
12  case go to another investigator and say look, here
13  are the facts I'm dealing with, do you have any
14  ideas about how I handle this etc.?
15  MR. BAILEY: Objection to the form of the
16  question. You may respond.
17  MR. OBER: I don't know that there is any
18  prohibition that that can't occur but I'm also
19  probably sure that there are times when information
20  isn't shared.
21  Q:  Isn't.
22  A:  Isn't.
23  Q:  I was just wondering because I know
24  that with confidentiality you couldn't go talk to
25  somebody out in the field about it right? I'm just

PAGE 62

1  trying to understand what the confidentiality is
2  surrounding any particular case.
3  A:  Well, do you want to know what really
4  happens? There isn't too much that's confidential.
5  You want to know something all you have to do is ask
6  somebody.
7  Q:  Theoretically, under the rules.
8  A:  Under the rules.
9  Q:  What would the confidentiality be?
10  A:  Well this is not; I don't believe a
11  difficult issue. As with any investigation there is
12  a needs to know, I suppose may be an accurate way to
13  phrase that and a want to know determination made on
14  discussing cases.
15  Q:  Now in paragraph twenty-four you
16  state that the FBI indicated that a reliable
17  confidential informant had reported that the
18  governor's office and high ranking members of the
19  PSP might be involved in accepting payoffs in return
20  for special consideration for certain applicants on
21  the PSP cadet eligibility list. Did Agent Kush tell
22  you that during your first conversation?
23  A:  In our first conversation as I
24  believe I have testified there was general
25  discussion between the two of us about, well if this

PAGE 63

1  were true what positions or how could something like
2  this happen. I believe and again I believe that
3  conversation was focused around trying to frame up,
4  trying to establish the boundaries about where
5  something like this could or couldn't go.
6  Q:  Did Agent Kush suggest that someone
7  in the governor's office and high ranking members of
8  the PSP might be involved or did you suggest that
9  that might be the case?
10  A:  I think that was an issue that we
11  jointly discussed. I think, my recollection that
12  when we discussed what if someone were to try to
13  influence a legislator that in and of itself would
14  not produce the desired result. You would have to do
15  something with that. There would need to be another
16  action. Where would that person then go? This
17  conversation to my recollection is a conversation,
18  to use your words that two investigators might have
19  in discussing the possibilities and bouncing ideas.
20  That's all I recall.
21  Q:  Right. And one investigator would
22  have to come up with the idea first so I'm just
23  wondering if you remember whose idea was it? Who
24  first had the idea that somebody from the governor's
25  office might have to be involved?

PAGE 64

1  A:  I don't recall that.
2  Q:  Now in paragraph twenty-five you say
3  the FBI expressly and clearly requested that Darrell
4  not divulge this information to potential
5  investigative targets including top PSP officials.
6  Did, when you say the FBI, are you talking about
7  Special Agent Kush?
8  A:  During my conversation with Agent
9  Kush yes.
10  Q:  What did he say exactly?
11  A:  I don't remember what was exactly
12  said.
13  Q:  Well you said expressly and clearly.
14  A:  When we had our discussion, there was
15  no question during that discussion that because of
16  the unknown in this investigation that this was a
17  very sensitive matter. That discretion and
18  confidentiality would be necessary in order to
19  conduct it and what I heard, my perception of our
20  discussion, what I heard and what I was reacting to
21  was the FBI running a political investigation
22  however many investigations or however this thing
23  developed called the Director of the Internal
24  Affairs Division for a support resource. Quite
25  honestly it never occurred to me that this wouldn't

SHEET 17    PAGE 65

1    be a matter that great confidence and care should be
2    exercised and to manage it to its successful
3    outcome.
4         MR. BAILEY: Let me place an objection at
5    this point on the record so I don't interrupt any of
6    your questioning. I want to make it very, very clear
7    that there is a relevancy objection at this point to
8    any of these questions. That they have nothing to do
9    with the complaint the course of action or any of
10   the material facts related to the case. Thank you
11   very much.
12        MS. GUIDO: Did the FBI or did Special
13   Agent Kush expressly and clearly tell you not to
14   divulge the information to potential investigative
15   targets?
16        A:    I believe I have answered that.
17        Q:    No you didn't. You told me that your
18   recollection was that you got the idea that it was
19   confidential. That it never occurred to you that it
20   wasn't confidential. What I want to know id Special
21   Agent Kush expressly tell you do not to repeat this
22   information, do not divulge this information to
23   potential investigative targets?
24        A:    When we discussed this investigation
25   the need for confidentiality, and sensitivity and

PAGE 66

1    discretion or whatever you want to describe it was
2    discussed. And it was jointly agreed and I don't
3    know, I can't recall who said what but I can tell
4    you that I'm not sure what the Webster definition is
5    for expressly and clearly but it was express and
6    clear in my mind that he was telling me that he was
7    telling me in the form and content and context of
8    this conversation the fact that this is a matter of
9    great confidence.
10        MR. BAILEY: Now is your question that he
11   used that word or that verbiage? Because I think
12   he's answered it also but you continue to answer it.
13        A:    I don't know how many other ways to
14   answer it.
15        MR. BAILEY: Well that's all right. We'll
16   just; we'll keep doing that but I.
17        MS. GUIDO: Well you say but, I mean
18   there's a difference between whether or not you
19   intuitively understand that you shouldn't or they
20   don't want you to tell someone else and, I'm trying
21   to explain my question, and somebody saying to you
22   I'm telling you not to divulge this information to
23   anyone else. Do you remember whether or not he
24   specifically told you don't tell this investigation,
25   to anybody else?

PAGE 67

1         MR. BAILEY: Let me place an objection on
2    the record. It has been asked and answered at least
3    two times. One last time you go ahead and answer the
4    question and then I will.
5         MS. GUIDO: Your objection is noted but I
6    would like an answer to the question
7         MR. BAILEY: Ma'am move to
8         MS. GUIDO: An answer to the question,
9    which is did he or did he not tell you, do you
10   remember?
11        MR. BAILEY: Darrell, just wait a minute.
12   She interrupted when I was talking. Move to strike.
13   Darrell my instructions to you are to answer once
14   more, ok? And then if the question comes on again
15   then I'm going to instruct you not to answer again.
16   As you understand the question if she wants to
17   rephrase it, repeat it, please feel free, go ahead
18   and answer one more time and that's it.
19        MS. GUIDO: I'll rephrase the question. I
20   don't think it's a difficult one. Did he
21   specifically tell you do not divulge this
22   information to a potential target?
23        MR. BAILEY: Objection. Asked and answered.
24   Same objection. Go ahead and answer one more time.
25        A:    That's my recollection, Ms. Guido,

PAGE 68

1    but I didn't see myself in a subordinate role to
2    this man so that's the, I'm trying to be as accurate
3    as I can in my response.
4         Q:    Did you discuss, sorry, I didn't mean
5    to cut you off.
6         A:    Well I don't recall this being a
7    situation when he was lording over me by long
8    distance saying you shall do this and not this. What
9    I recall is what I have described to you. I had a
10   clear understanding of what was discussed and the
11   need for great discretion and confidentiality. He
12   certainly never said I'm calling the director of
13   internal affairs and I don't give a rat's behind
14   what you do with the info.
15        Q:    Did you clarify with him what, you
16   know, you weren't supposed to tell potential
17   investigative targets, did you clarify with him who
18   potential investigative targets were?
19        A:    Well in the context of what I have
20   described I think that would have been the by-
21   product of that. In other words, we've discussed
22   what I've termed as threshold testing and if this
23   were true what positions in the agency or out of the
24   agency could be involved in something like this. If
25   you want to phrase them as potential targets. I

SHEET 18   PAGE 69

1  didn't.
2       Q:   Did you make an effort to clarify
3  whether it was something that you would be able to
4  tell Major Connelly?
5       A:   No.
6       Q:   Did you make an effort to clarify if
7  it was something that you would be able to tell Lt.
8  Colonel Coury?
9       A:   No.
10      Q:   How about Colonel Evanko?
11      A:   Not that I can recall in that
12  discussion.
13      Q:   Did you clarify whether you could
14  tell his station, his troop commander?
15      MR. BAILEY: Whose?
16      MS. GUIDO: Stanton's.
17      A:   I don't recall any of that
18  discussion.
19      Q:   And you didn't talk to him about
20  whether you could talk to the area commander?
21      A:   I don't have any recollection of
22  that.
23      Q:   Returning to paragraph twenty-five
24  you say there is no PSP policy or regulation to
25  guide a member on how to conduct a report on alleged

PAGE 70

1  criminal or other misconduct of a high-ranking PSP
2  official such as Commissioner or Deputy
3  Commissioner. For purposes of internal affairs don't
4  the commissioner and deputy commissioners get
5  treated like everybody else?
6       A:   I would certainly hope so.
7       Q:   So when you say that there is nothing
8  to guide you on how to report or conduct an
9  investigation into misconduct by the commissioner or
10  his deputies the AR 4-25 that governs internal
11  affairs wouldn't it apply to them just as well?
12      A:   I think I'm living proof of what
13  happens when you treat them like everyone else.
14      Q:   But wouldn't that apply, don't the
15  same rules apply to them?
16      A:   I think what the intent of that
17  section or sentence is ma'am that the AR 4-25 has a
18  great deal of specificity with respect to lower or
19  subordinate ranks. In the situation that we're
20  describing those reporting requirements and it calls
21  them chain of command requirements, but the
22  reporting requirements don't specifically address
23  how that's to be handled. Should those ranks or
24  those positions be implicated?
25      MR. BAILEY: Hold it for one second.

PAGE 71

1       END OF AUDIOTAPE ONE - SIDE TWO. BEGIN
2  TAPE TWO.
3       MR. BAILEY: Ok. Thank you. Tape two. Thank
4  you.
5       MS. GUIDO: While you were in internal
6  affairs did you have other complaints against
7  Colonel Evanko or his deputies?
8       A:   I recall, yes. I think we did get a
9  complaint. I believe it might have been against
10  Colonel Westcott. I'm not certain.
11      Q:   Do you recall receiving a complaint
12  against Lt. Colonel Westcott in September1998,
13  involving an anonymous letter received by Colonel
14  Evanko?
15      A:   No. If you can help me. I don't
16  recall.
17      MR. BAILEY: While we are doing this and
18  Mr. Brown is helping you can you have him identify
19  himself for the record. State his position and
20  title, please.
21      MR. BROWN: Captain John R. Brown, Director
22  of Internal Affairs for the State Police.
23      MR. BAILEY: You're the investigator on the
24  Ober case?
25      MR. BROWN: Yes.

PAGE 72

1       MS GUIDO: Just for while we are on the
2  record we're clarifying that you are assigned as an
3  attorney work product
4       MR. BROWN: That's correct.
5       MS. GUIDO: We're going to have to get
6       MR. BAILEY: Copies?
7       MS. GUIDO: That's as many as I happen to
8  have.
9       MR. BAILEY: Why don't we suspend for a
10  minute. I need to call my office anyway. You have a
11  phone down here don't you?
12      MS. GUIDO: Sure do. Actually there's one
13  over there. Let's take a five-minute break.
14      MR. BAILEY: Wait. Wait. Wait. Let the
15  video please; sit down until the video operators get
16  a chance to handle their machinery.
17      VIDEOGRAPHER: It's 10:27 AM. Short break.
18      BREAK:
19      MR. BAILEY: Could you repeat that please?
20      VIDEOGRAPHER: It's 10:37 AM. We're back on
21  the record.
22      MR. BAILEY: 10:37 AM. Back on the record.
23  Ok, thank you.
24      MS. GUIDO: Captain, if you'll take a look
25  at Exhibit 5. That's the desk memorandum. Do you

1  recognize you own handwriting at the bottom of it?
2          A:   Yes.
3          Q:   And did you have a chance yet to look
4  over
5          MR. BAILEY: Do you have a copy of that for
6  me?
7          MS. GUIDO: He has it, I'm sorry. I have
8  the original though.
9          MR. BAILEY: Ok, thank you.
10         MS. GUIDO: Did you have a chance to look
11 over it?
12         A:   I think I got the gist of it. To tell
13 you the truth I haven't studied it but I think I got
14 the gist of it.
15         Q:   Is that a complaint that came into
16 Internal Affairs through the commissioner and
17 involved Deputy Commissioner Westcott? Correct?
18         A:   It came; the routing slip is from the
19 commissioner to the deputy of admin ultimately to
20 the director of BPR. Yes.
21         Q:   Who would the deputy of
22 administration be then?
23         A:   Colonel Coury.
24         Q:   So it came from the commissioner to
25 Coury to you?

1          A:   Yes. Apparently.
2          Q:   And is there a date on that?
3          A:   Yes. September 14, 1998.
4          Q:   So this is right about the same time
5  frame that you received the information from the
6  FBI?
7          A:   Yes.
8          MR. BAILEY: Is this Lieutenant Brown the
9  same; is this the same man here?
10         MS. GUIDO: Yes. And you assigned that
11 investigation to Lt. Brown?
12         A:   Yes.
13         Q:   And this notation on there does it
14 say how that is supposed to be handled?
15         A:   It says Tom handle as you normally
16 would. Colonel Evanko.
17         Q:   And then if you'll look at Exhibit 6.
18 Can you tell me what that is, document is?
19         A:   This is a, Exhibit 6, is a use of
20 force or complaint reception and processing
21 worksheet. Indicating the complaint was anonymous
22 for BPR Control Number IAD- 10855.
23         Q:   And what's that form used for?
24         A:   This is the recording document that's
25 used when complaints are made.

1          Q:   Is that the initial document?
2          A:   Yes, it's for complaints made against
3  department personnel.
4          Q:   Is that the same; is that the
5  standard document that would be used for if any
6  other member of the State Police were the subject of
7  an investigation?
8          A:   Yes.
9          Q:   And what did, did you say there was a
10 date on that document?
11         A:   I don't believe I did but it was. It
12 says date received 9/14/98.
13         Q:   Ok, take a look for a second. And I
14 see that it says date assigned. Is there a date when
15 the case was assigned?
16         A:   Yes. 9/16/98.
17         Q:   So the form was filled out relatively
18 close in time. In other words it's like two days
19 after you get it, after it comes in it's assigned a
20 case number?
21         A:   Yes.
22         Q:   And then an investigator was
23 assigned.
24         A:   Yes.
25         Q:   Which goes back to my original point

1  that the commissioner and his deputies for purposes
2  of internal affairs complaints should be treated be
3  treated like everyone else. Correct?
4          A:   I would hope so.
5          Q:   Now paragraph twenty-six of your
6  complaint, if you could just hand those down to the
7  court reporter, it says since Ober was chosen
8          A:   That previous document that you just
9  showed me that went directly to the commissioner's
10 office, I note. Is that correct?
11         Q:   I believe so, if you want to look at
12 it again you can.
13         A:   This is a complaint that was made
14         MR. BAILEY: Make reference to the exhibit.
15         MR. OBER: Exhibit #5 is an unsigned
16 anonymous letter that was sent directly to the
17 commissioner. Apparently, routed to the deputy
18 commissioner of administration and then is
19 ultimately routed down to or through the Bureau of
20 Professional Responsibility for assignment.
21         Q:   And the commissioner's direction on
22 there was to treat him like everybody else, like
23 every other one. Is that right?
24         A:   His direction is "Handle as you
25 normally would."

SHEET 20   PAGE 77

1    Q:   Ok.
2         MR. BAILEY: Now I want to clarify this
3    because she has asked you a question, I don't think
4    this was clear. "Lt. Brown see me, I would like you
5    to handle this investigation." Whose words are
6    those?
7         MR. OBER: Those are mine.
8         MR. BAILEY: Ok.
9         MS. GUIDO: Now paragraph twenty-six of
10   your complaint. Since Ober was chosen by the FBI as
11   a contact, obviously because he was not a target or
12   potential target of the investigation that portion
13   there, is that your assumption that you were chosen
14   because you were not a target or were you told that
15   you were chosen because you were not a target?
16        A:   I don't remember being told I wasn't
17   a target. I knew I didn't do it so, I don't remember
18   that part of the conversation, no.
19        Q:   I think you said this but if you
20   didn't correct me. Did you say that you weren't
21   really sure why they chose you? That they didn't
22   really tell you, Agent Kush didn't tell you why he
23   called you?
24        A:   No. No he didn't.
25        Q:   And next in that paragraph you state

PAGE 78

1    that you felt it was important that you limit your
2    reporting of the information to someone that you
3    were personally certain would not be involved in a
4    unlawful matter and to whom no conflict would
5    present itself but at the same time be someone who
6    was hopefully be a superior in your chain of
7    command. At that time when the FBI contacted you who
8    was in your chain of command?
9         A:   My direct chain of command, would
10   have been, during the time I was the acting bureau
11   director, my direct chain of command would have been
12   Colonel Coury and then Colonel Evanko.
13        Q:   Well who was your immediate
14   supervisor?
15        A:   At that time I was the acting bureau
16   director. I would have been supervised by the Deputy
17   Commissioner of Administration.
18        MR. BAILEY: Who was?
19        A:   Colonel Coury.
20        Q:   As of the date that you told Colonel
21   Hickes about this who was your immediate supervisor
22   as of that?
23        A:   Major Connelly.
24        Q:   And you did not report the matter to
25   Major Connelly. Right?

PAGE 79

1    A:   Correct.
2    Q:   Or to Lt. Colonel Coury?
3    A:   Correct.
4    Q:   Or to Colonel Evanko obviously.
5    A:   Correct.
6    Q:   And you had said you wanted to report
7    it to someone you were personally certain would not
8    be involved in an unlawful matter. So of the people
9    in your direct chain of command, Major Connelly, Lt.
10   Colonel Coury, Colonel Evanko none of those people
11   were people that you could be personally certain
12   would not be involved in an unlawful activity?
13        MR. BAILEY: I'm going to object to the
14   form of the question. You can go ahead and respond.
15        A:   I think what the statement represents
16   to me is my personal knowledge of Colonel Hickes'
17   background and experience and the fact that he by
18   the process of elimination was not a potential
19   target. That's more what the statement means to me.
20        MR. BAILEY: In other words that's what you
21   mean by the statement.
22        A:   Yeah. It was not as though I didn't
23   personally know who Colonel Hickes was or what his
24   background was. I think that is what I took that to
25   mean.

PAGE 80

1         MS. GUIDO: Ok and how well did you know
2    Colonel Hickes at that time?
3         A:   Personally?
4         Q:   Yes.
5         A:   Not well.
6         Q:   Did you have much professional
7    contact with him at that time?
8         A:   No.
9         Q:   Essentially how did you know him?
10        A:   Most of my exposure to Colonel Hickes
11   was through when he was the director, the director
12   of BPR and as the deputy commissioner of operations
13   when I was assigned to the Bureau of Research and
14   Development. He might have been an officer in Troop
15   G when I was stationed there but I don't recall that
16   for sure. But I worked with him on a variety of
17   assignments when I was in R&D.
18        Q:   Why did you feel that Colonel, Lt.
19   Colonel Hickes was someone you could trust and not
20   your own immediate supervisor, Major Connelly?
21        MR. BAILEY: Objection to the form of the
22   question. You may respond.
23        A:   Well I don't know that it was so much
24   as a matter of trust. It was what would be the
25   appropriate thing to do? Who would be the

PAGE 81

1 appropriate individual to report this to and seek
2 any guidance or advice or what have you? And the
3 reason that I thought Colonel Hickes made sense is I
4 think for the reasons I've just described. He is a
5 former director of the Bureau of Professional
6 Responsibility. He is a former deputy commissioner
7 of operations. At that time he was probably and may
8 be still remains one of the most credentialed
9 officers in the entire State Police Organization.
10     Q:   True but wasn't Major Connelly
11 responsible for the entire Bureau of Professional
12 responsibility?
13     A:   On December 5, excuse me on September
14 5th he was. Correct. No disrespect to Major
15 Connelly.
16     Q:   October 5th I think we're talking
17 about.
18     A:   I'm sorry. October 5th.
19     Q:   I just don't want to get you screwed
20 up in your dates. As of October 5th.
21     MR. BAILEY: He was not done responding.
22     A:   I just want. I'm kind of new at this.
23 I'm not sure how much I, what you want from me but I
24 kind of feel like it needs said and I'll say it and
25 I said it before, when I was interviewed, when I was

PAGE 82

1 interrogated before. With no disrespect to Major
2 Connelly I didn't know him. Only conversations I
3 believe I ever had with Major Connelly were by
4 telephone. He was just someone I didn't know.
5     Q:   But as the director of the Bureau
6 wasn't he entitled to know what was going on in his
7 own bureau?
8     MR. BAILEY: Objection. You may respond.
9     A:   With understanding with that first
10 conversation with Agent Rush I believe if my memory
11 serves me correctly, then Captain Connelly would
12 have been Trooper Stanton's Commanding Officer,
13 someone the FBI specifically didn't call. I just
14 extended that logic.
15     Q:   Well when you say specifically didn't
16 call how do you know that it was done specifically?
17 An intentional I'm not going to call that person. I
18 mean that's that the implication is what you're
19 saying that the FBI made a conscious decision not to
20 call his commanding officer?
21     A:   I'm not implying anything ma'am. I'm
22 just saying he wasn't called.
23     Q:   He wasn't called.
24     A:   Or he wasn't notified.
25     Q:   He wasn't notified and from that

PAGE 83

1 you're saying that you inferred that since he wasn't
2 notified that you shouldn't tell him?
3     A:   I didn't feel that I should.
4     MR. BAILEY: I'll object to the form of
5 that question, the leading nature of that question.
6 Did you ask him if he was inferring something is
7 that what it was about there?
8     MS. GUIDO: I think he just told me that
9 but we can repeat or rephrase re-tell me, whatever.
10     MR. BAILEY: But he said he didn't infer.
11     MS. GUIDO: Well, I'm jumping back a few
12 questions when he said to me, in response to my
13 question about why you didn't tell Major Connelly
14 you said because he had been the station commander
15 whatever.
16     MR. BAILEY: He was Stanton's commanding
17 officer. That's what his response was.
18     MS. GUIDO: You had said that you didn't
19 tell Major Connelly because he had been Stanton's
20 Commanding Officer and the FBI had not told him. Did
21 you infer that they intentionally didn't tell him?
22     A:   I don't think I inferred anything
23 from those. I think were losing sight of something.
24 And I think that what we're losing sight of ma'am is
25 that the FBI called me as I testified and they were

PAGE 84

1 conducting this investigation and I'm the recipient
2 of this information wherein this matter of public
3 corruption has already touched the life of a State
4 Trooper. In that conversation that I had with the
5 FBI we conducted that threshold testing as we
6 recognized it would not be sufficient to produce an
7 outcome just to touch base with a, say a legislator
8 for example. So in that conversation there was
9 general discussion about could this come from
10 someone inside the organization? Could there be a
11 point where the organization could be compromised.
12 And my response and I recall this was well I don't
13 know. I don't know exactly how the process works. I
14 can guess and I think I can come fairly close. It
15 could perhaps, this thing, this investigation could
16 reach out to the testing company itself, the people
17 that manage this information potentially. And it was
18 also discussed that well, there are key people in
19 the organization occupying key positions that
20 potentially have that ability. It was also discussed
21 that that influence could come from outside of the
22 organization to include the governor's office or
23 high-ranking officials. I mean this was, in that
24 first conversation we just simply didn't know what
25 the boundaries were. So there was some general

SHEET 22   PAGE 85

1  discussion about those things. That there could, the
2  influence that it might take to produce the result
3  that the individual was looking for, my thought
4  would be, my guess is that is not something that
5  could easily be accomplished and it might take an
6  individual strategically placed.
7      MR. BAILEY: It might take an individual
8  strategically placed to provide access to the
9  Academy improperly.
10     A:   Right. Either in the State Police
11 organization, the governor's office or what have
12 you.
13     MS. GUIDO: I understood all that from your
14 prior answers. What I'm trying to understand as
15 director of the Bureau of Professional
16 Responsibility Major Connelly was not entitled to
17 know about information received by his own director.
18 That's what I'd like to address.
19     MR. BAILEY: Objection. Asked and answered.
20 You may respond again.
21     A:   One of the difficulties that I felt I
22 had ma'am, was I wouldn't be in the position to give
23 orders to a senior officer so the officer that I
24 chose, the individual that I chose to seek guidance
25 and advice from would have to be someone that I had

PAGE 86

1  some way of measuring them, to know something about
2  them. Yes, Major Connelly was the director of BPR
3  but I don't believe my first encounter with Major
4  Connelly occurred until sometime into the middle of
5  October.
6      Q:   Unfortunately, it's not really all
7  that uncommon for internal affairs to get complaints
8  about possible illegal activities by State Troopers
9  is it?
10     A:   Not uncommon? No, sadly I guess.
11     Q:   It is unfortunate but that's a lot of
12 what IAD is investigating.
13     A:   I reluctantly agree with you ma'am.
14     Q:   Oh because you know that you said
15 this matter was, you thought it should be treated
16 somewhat differently because it had already touched
17 the life of at least one State Trooper, Trooper
18 Stanton. Now as director of the Internal Affairs
19 division if one of your subordinates in Internal
20 Affairs had received that phone call would you have
21 expected him to let you know what was going on?
22     A:   No.
23     Q:   You would not have expected him you
24 know?
25     A:   Could you give me that question one

PAGE 87

1  more time?
2      Q:   If rather than calling you
3      A:   If a subordinate of mine received
4  information
5      Q:   Rather than calling you Agent Kush
6  had called one of your subordinates, one of the just
7  investigators in Internal Affairs would you think
8  that investigator had a responsibility to let you,
9  the director of internal affairs know that he had
10 received this information?
11     A:   This is a hypothetical.
12     Q:   Yes.
13     A:   Well I guess that I would expect that
14 internal affairs investigator to be guided by his
15 best judgment and his discretion. I can certainly
16 understand why he wouldn't if we, we are attempting
17 to recreate the environment that I found myself in I
18 can certainly understand why he wouldn't. But I
19 thought your question was if an internal affairs
20 investigator were implicated in wrongdoing would
21 they report that to me?
22     Q:   No, I think you answered my question.
23 Paragraph twenty-seven, you said consequently
24 Captain Ober reported the matter as related by the
25 FBI to Lt. Colonel Robert C. Hickes, newly appointed

PAGE 88

1  deputy commissioner of staff. Captain Ober was
2  confident that Colonel Hickes was of impeccable
3  character and knew because of his position that
4  Hickes could not be involved. I just want to make
5  sure I understand what that allegation is. Is the
6  statement that you knew Colonel Hickes could not be
7  involved because he was of impeccable character or
8  because of the position he held or because of both?
9      MR. BAILEY: Objection. Asked and answered.
10 You may respond.
11     A:   Yes, I believe it's both. He was not
12 as the director of the liquor control enforcement
13 when this allegation surfaced or at least at that
14 time he wouldn't have been in a position to be a
15 potential target of this investigation.
16     Q:   Did you discuss with Agent Kush about
17 when he had first opened his investigation into this
18 political corruption?
19     A:   Not at that time, no.
20     Q:   Did you at any time?
21     A:   Yes.
22     Q:   How long had the investigation been
23 going on?
24     A:   Subsequent to, subsequent to May of
25 1999 I come to find from Agent Kush, no excuse me

SHEET 23   PAGE 89

1  that's not correct. What was your question again?
2  Let me try this again.
3       Q:   My question was did you ever learn
4  how long the FBI had that investigation going on?
5       A:   Yes, yes I did. And I believe there
6  was discussion about that issue later in that month,
7  later in October when I met with the agents. I
8  became aware of this but I can't tell you exactly
9  when. I think that's correct.
10      Q:   Now you said that Lt. Colonel Hickes
11 that you felt he could not have been involved
12 because of his position. Lt. Colonel Hickes had also
13 been a deputy commissioner during the Casey
14 administration. Is that correct?
15      A:   Correct.
16      Q:   And was when Colonel Blaugh was the
17 commissioner. Am I right?
18      A:   Yes, correct.
19      Q:   And at one point wasn't Lt. Colonel
20 Hickes a Major in charge of the Bureau of
21 Professional Responsibility?
22      A:   I believe so. Yes.
23      Q:   At one point he was also the Major in
24 charge of the Bureau of Training and Education. Is
25 that right?

PAGE 90

1       A:   I don't know.
2       Q:   You don't know. Assuming for the sake
3  of argument just for the moment that he was, what
4  does the Major in charge, is the Major in charge of
5  the Bureau of Education and Training responsible for
6  the State Police Academy?
7       A:   I believe that's generally true, yes.
8  Do you mean responsible in as far as training
9  cadets?
10      Q:   Um-hmm.
11      A:   Yes.
12      Q:   So do you have any idea whether Lt.
13 Colonel Hickes was in charge of training at the
14 State Police Academy during the Whelk
15 Administration?
16      A:   I don't remember that he was. I don't
17 know.
18      Q:   Did you make an,  when you talked to
19 the FBI originally did you make an effort to find
20 out how long this supposed corruption at the State
21 Police Academy had been going on?
22      A:   We never talked about corruption at
23 the State Police Academy.
24      Q:   Well, corruption in getting in to the
25 State Police Academy.

PAGE 91

1       A:   Oh, I don't recall there being a
2  discussion about how long this investigation had
3  been occurring, no.
4       Q:   Did Agent Kush tell you at any point
5  that the case had sat around for a few years and his
6  supervisors wanted him to dispose of it one way or
7  the other?
8       A:   Yes. That information was brought to
9  my attention far after this October timeframe.
10      Q:   Well when you made the decision to go
11 to Lt. Colonel Hickes had you considered the
12 possibility that the corruption by virtue of the
13 scheme of trying to buy your way into the State
14 Police Academy may have begun back when Lt. Colonel
15 Hickes was either a Major in charge of training, I
16 guess you said you never knew that or even when he
17 was a deputy commissioner?
18      MR. BAILEY: I'm going to object to the
19 relevancy of these questions and to a total lack of
20 foundation. There are no facts in front of any of us
21 that running the academy has anything to do with
22 someone conjuring up, getting involved in, or
23 providing some kind of illicit appointment to the
24 academy. And I object. You may respond to the
25 question.

PAGE 92

1       MR. OBER: No ma'am and to be clear I don't
2  have any recollection of Colonel Hickes being the
3  director of training and education. I'm not arguing
4  with you. I simply don't know. No, I gave no thought
5  to the fact that this, I gave no thought to the
6  notion that what was being reported to me in 1998
7  could extend prior to 1995, because if you're
8  telling me he was a Major in the Training and
9  Education that would have had to have been, in fact
10 I don't think that could have been in the 90's so
11 no, I never gave that a thought.
12      Q:   Well what about when I guess I made
13 my question compound by accident but did you
14 consider the possibility that, let me break this
15 down. Colonel Evanko and his deputies, well Colonel
16 Evanko, Lt. Colonel Coury and Lt. Colonel Westcott
17 were all new to the command staff with the Ridge
18 Administration, right?
19      A:   Correct.
20      Q:   Lt. Colonel Hickes had been a deputy
21 commissioner in the prior administration as well.
22      A:   Correct.
23      Q:   So I'm wondering if you ever took
24 into consideration as you're making this judgment
25 call, did you take into consideration the fact that

1  this scheme could have been going on even back when
2  Lt. Colonel Hickes was a deputy commissioner under
3  the prior administration?
4            A:   No ma'am I never gave that a thought.
5            Q:   And at that, and it was not until
6  later that you found out that in fact  this
7  investigation had been going on for years?
8            A:   Yes, I, yes, it was a year or two, I
9  don't recall exactly but yes. Later I found that
10  out.
11            END OF VIDEOTAPE ONE
12            MS. LYDE: 11:04 and tape two, deposition
13  of Darrell Ober.
14            MS. GUIDO: Ok you had mentioned that you
15  didn't really know Major Connelly at the point when
16  you had to make a decision about who to tell. If
17  Major Merryman had still been your supervisor would
18  you have told him?
19            MR. BAILEY: Objection calls for
20  speculation. You may respond.
21            A:   See that brings a much different set
22  of facts to the table because of Major Merryman's
23  background I'm a little more familiar with. I don't
24  know if I can answer a hypothetical like that Ms.
25  Guido.

1            Q:   You don't know if you would have
2  trusted Major Merryman with that information?
3            MR. BAILEY: Objection to the form of the
4  question. Objection to the use of the word trust.
5            A:   Yeah that's what I was just going to
6  say.
7            Q:   Do you know if you would have trusted
8  Major Merryman with that information?
9            MR. BAILEY: I'm going to object to the
10  question and instruct you that you don't have to
11  answer it. I would prefer that you do but you don't
12  have to. Answer the question if you can.
13            A:   I believe given a different set of
14  facts, Ms. Guido, I would have made a decision based
15  on what I thought was to the best interest of the
16  agency. I can't sit here today and tell you what I
17  would have done three years ago. To me it was never
18  a matter of trust it was a matter an appropriate
19  decision based on what information I was provided. I
20  think it would be an insult to Major Merryman to sit
21  here and speculate about whether I would have
22  trusted him or not. These are different, much
23  different circumstances. I made a decision at that
24  time based on what I thought was the right thing to
25  do with respect to the agency's needs.

1            Q:   I'm a little confused about you
2  saying about it was never an issue of trust because
3  I thought that was the whole point of talking about
4  the fact that Colonel Hickes was of impeccable
5  character and you knew that he wasn't the kind of
6  person that would be involved in this and you knew
7  his background and you knew had integrity. I mean
8  wasn't that the whole point? Trust?
9            A:   No. I think trust is a key element
10  but the way you're giving it to me I feel like
11  you're making it the only criteria.
12            MR. BAILEY: What paragraph are you on,
13  Syndi?
14            MS. GUIDO: I'm looking to see what
15  paragraph I'm at. Ok, page eight, still paragraph
16  twenty-seven; it's the next to the last sentence.
17  You say you could not inform Evanko or one of his
18  assistants because of the clear and unambiguous FBI
19  directive. Today you don't recall whether there was
20  a clear and unambiguous directive do you?
21            A:   Oh yes I recall there was a very
22  clear and unambiguous directive. Maybe directive is
23  not the best word but there was a very clear and
24  unambiguous understanding between Agent Kush and I
25  about what I have described.

1            Q:   The reason I clarified that was
2  because earlier, and I think you clarified that for
3  me now that it was a clear and unambiguous
4  understanding between you and Agent Kush. It was not
5  necessarily a directive from Agent Kush to you. Is
6  that right?
7            A:   Agent Kush was not in a position to
8  give me orders. There was a request from Agent Kush
9  to keep this matter confidential. It was discussion
10  about as I have already described confidentiality,
11  sensitivity and discretion. I took it in the form of
12  a directive simply because I'm talking to a credible
13  law enforcement agency and it only made sense to do
14  that.
15            Q:   On the last sentence of the same
16  paragraph, upon learning of the FBI probe from Ober,
17  Hickes ordered (you) Ober to maintain
18  confidentiality and keep Hickes informed. Do you
19  remember when you told Colonel Hickes about this?
20            A:   No.
21            Q:   But it was, was it after the first
22  conversation with Agent Kush?
23            A:   Yes, when I was interrogated by ____
24  they produced a document, Wertz and Williams,
25  somehow confirmed for me that it was on October 5th

1   but I honestly don't recall that. I don't know.
2           Q:   Ok. But it was, at that point you had
3   only had the one conversation with Agent Kush?
4           A:   You asked me that. That's what I
5   recall.
6           Q:   Can you tell me, just tell me what,
7   describe the conversation with Hickes. What was
8   said? What did you tell him? What did he tell you?
9           A:   I discussed this with Colonel Hickes,
10  I'm not sure there is a whole lot more than what's
11  here. I informed Colonel Hickes that I had received
12  this information from the FBI about this public,
13  political corruption case of great public interest I
14  was sure ,or I assumed and that they, this
15  information, their information was that there was a
16  State Trooper potentially implicated in a hiring
17  irregularity situation or what have you. I tried to
18  paraphrase as best I could for him what I was told,
19  or the sum and substance of my conversation with
20  Agent Kush.
21          Q:   Did you tell Lt. Colonel Hickes that
22  the FBI told you that the term Colonel had been
23  used?
24          A:   Yes, there were specific discussion
25  with the FBI on; I think I described it trying to

1   frame the boundaries of this investigation.
2           Q:   But what I'm saying is during the,
3   when you first told Hickes about this did you tell
4   him that the FBI had told you that a Colonel could
5   possibly be involved, using that term Colonel?
6           A:   I'm sure that I did again in the
7   context of framing the boundaries of this
8   investigation. As I said many times, positions were
9   discussed, potentials were discussed and it would
10  only make sense that either that if the position
11  weren't referred to by rank, it would have been
12  referred to by title so that's it.
13          Q:   Did you tell Hickes whether it was
14  you or the FBI that brought up the term Colonel?
15          A:   I have no idea. I don't know.
16          Q:   You don't remember?
17          A:   No, I'm relating a conversation. I
18  don't recall.
19          Q:   And you said that you were supposed
20  to keep Hickes informed. Did you in fact keep him
21  informed?
22          A:   Yes.
23          Q:   And by keeping him informed, what
24  does that mean?
25          A:   When I informed Colonel Hickes of

1   this, the FBI's, of the existence of this
2   investigation as the suit states he gave me three
3   orders and one of them was to keep him informed of
4   any significant developments and I did that. He gave
5   me three orders ma'am and I followed them.
6           Q:   In paragraph twenty-eight you alleged
7   that the investigation, that the FBI's investigation
8   may have been compromised even before you learned
9   about it from Agent Kush. What do you mean by that?
10          A:   In a subsequent conversation with
11  Agent Kush I come to find out that Agent Kush
12  revealed to me that they had contacted members of
13  the State Police prior to contacting me.
14          Q:   But you didn't know that at the time
15  you went to Hickes?
16          A:   No I did not.
17          Q:   And according to that same paragraph
18  you deduced that the investigation may have been
19  compromised because Mark Campbell was in the
20  governor's office and Evanko went to Campbell to get
21  permission to do an investigation. Do you see where
22  that says in here? What did you mean? What made you
23  think that Evanko had gone to Mark Campbell to get
24  permission to do the investigation?
25          A:   I was told that was what occurred.

1           Q:   Who told you that?
2           A:   I believe that was either Major
3   Morris or Colonel Hickes but I'm not certain.
4           Q:   Major Morris?
5           A:   Morris, yes ma'am.
6           Q:   And what was Major Morris' role in
7   all this?
8           A:   I don't think he has a role in all
9   this.
10          Q:   Well how did he know that?
11          A:   I don't have any idea. I'll also tell
12  you that's it's been my experience in the last
13  couple of years that that fact or that issue seems
14  to be a matter of institutional knowledge. You know
15  I've heard that from, many different people
16  mentioned that to me. I know.
17          MR. BAILEY: Let's make sure we know what
18  we're talking about, many different people
19  mentioned. You mean that Mr. Evanko went to Mr.
20  Campbell to seek permission for an investigation?
21          MS. GUIDO: Yes. Yes.
22          MR. OBER: Oh, I've heard that from a
23  number of sources.
24          MR. BAILEY: So it appears.
25          MS. GUIDO: Got a name?

1  MR. OBER: Can I come back to that one
2  because I wouldn't want to misspeak. It really just
3  became a source of rumors that that's what occurred.
4      Q:  You don't recall any specific person
5  that told you that?
6      A:  No. Not right now.
7  MR. BAILEY: Beyond Mr. Hickes or Mr.
8  Morris?
9      Q:  Have you ever discussed it with
10  anybody from the governor's office?
11      A:  Discussed what ma'am? This
12  investigation?
13      Q:  Yes.
14      A:  No.
15      Q:  Did anyone from the governor's, do
16  you know, do you remember what there anyone from the
17  governor's office ever said anything to you about
18  Evanko seeking permission from Campbell?
19      A:  No.
20      Q:  You also say in that paragraph that
21  you learned that FBI body wires on the informant
22  mentioned sources in the governor's office, IPSP
23  officials and even a State Senator and State
24  Representative earlier in the investigation. When
25  did you first learn about those FBI body wires?

1      A:  Well the, Agent Kush in our contact,
2  he at some point I mean these things were discussed
3  and he eventually supplied the transcripts of those
4  body wires.
5      Q:  I'm just trying to get an idea of
6  when that would have been.
7      A:  When these things were discussed?
8      Q:  Yes, when you first learned about the
9  FBI body wires.
10      A:  Well I think he mentioned that in the
11  first phone call that this information was developed
12  from employment of body wires. I think that's how
13  this whole investigation started as I recall.
14      Q:  And you would have seen the
15  transcripts of that when? Of the body wires?
16      A:  I don't recall. He sent transcripts
17  on two or three occasions but I just don't remember
18  when I received them.
19      Q:  You said that you learned that
20  another PSP member was informed before Ober was in
21  an earlier attempt at investigation. When did you
22  find that out?
23      A:  I found that out, I had occasion to
24  talk to Agent Kush and I'm trying to remember when
25  that was. It could have been around the time that

1  the whistleblower suit was filed but I'm not certain
2  now. I don't recall exactly when that was. It was
3  after May of 99 but I just don't remember when that
4  was for sure.
5      Q:  I thought you said you found it out
6  from Agent Kush?
7      A:  Oh yes.
8      Q:  And finally you say in that paragraph
9  that only Evanko to whom the FBI personally went
10  knows the answers to these questions. How do you
11  know that Evanko personally went and contacted the
12  FBI?
13      A:  Mr. Campbell and Major Williams have
14  already testified that he did, and Evanko threatened
15  to do that that night and Mr. Kush, Agent Kush told
16  me that he was fairly certain that Evanko called his
17  SAC; his name escapes me at the moment.
18      Q:  When did Agent Kush tell you that
19  Evanko had called his SAC?
20      A:  Well it was during our conversation,
21  the one I just described. I can't recall when that
22  was though.
23  MR. BAILEY: Hold on just a second please.
24  -----END OF SIDE ONE-----

1  MR. BAILEY: Thank you very much.
2  MS. GUIDO: Setting aside what may have
3  been said in subsequent depositions at the time that
4  this complaint was filed what made you think that
5  Evanko had personally gone to the FBI?
6      A:  What made me think that he had
7  personally gone to the FBI? Because he said he was
8  going to, and I subsequently learned from talking to
9  Agent Kush that Agent Kush was of the opinion that
10  he did.
11      Q:  Did Evanko ever talk to Kush
12  personally?
13      A:  I don't know.
14      Q:  Paragraph twenty-nine you say upon
15  information and belief. You believe that a real
16  possibility exists, still exists that the corruption
17  investigation was truncated or otherwise limited
18  because of PSP leadership interests and/or concerns
19  of others. Could you explain what you mean by that?
20      A:  I'll try. I had my, what I mean by
21  that was that I had my concerns. Well upon notifying
22  Colonel Evanko of the investigation's existence, his
23  reaction to that and his threats to call the FBI.
24  That statement is based in part on the eventual
25  outcome of the criminal investigation involving the

1 parties with the two individuals who were arrested.
2 And thirdly as a result of my discussion with Agent
3 Kush when he said that he was transferred which is
4 what Evanko threatened to do when we told him.
5        Q:    Agent Kush told you what about his
6 transfer?
7        A:    He said he was transferred.
8        Q:    But what did he say about the
9 transfer? Anything other that I was transferred?
10       A:    Not that I can recall.
11       Q:    He didn't tell you why he was
12 transferred?
13       A:    Not that I can recall.
14       Q:    So, um.
15       A:    He was not real interested in sharing
16 a lot of the particulars with me ma'am.
17       Q:    So you're pretty much, you're
18 inferring that the transfer had something to do with
19 this investigation?
20       A:    It would certainly appear so.
21       MR. BAILEY: I object. His prior testimony
22 was that Mr. Evanko told him he was going to have
23 him transferred. Course then he's transferred.
24       MS. GUIDO: You don't know why he was
25 transferred, right?

PAGE 106

1        MR. OBER: I was not a part of the decision
2 making that led to Agent Kush's transfer ma'am, no.
3        Q:    So I think my choice of words was
4 accurate, because there's an inference. Based on the
5 facts, you inferred. Is that right?
6        MR. BAILEY: Objection to the form of the
7 question.
8        Q:    Did you infer that from, did you make
9 a deduction that?
10       MR. BAILEY: Yes he deduced it that's
11 correct.
12       MS. GUIDO: I'm asking the witness.
13       MR. BAILEY: He deduced it you're quite
14 right.
15       MR. OBER: I know what the outcome was
16 ma'am. And I know what the drivers were, and perhaps
17 deduction is a correct word but it's something that
18 can be disputed about.
19       Q:    But that's your deduction but you
20 don't know for a fact.
21       A:    I was not part of the decision-
22 making.
23       Q:    Ok.
24       MR. BAILEY: He took Colonel Evanko at his
25 word.

PAGE 107

1        MS. GUIDO: Paragraph thirty-two. I guess
2 that's, now that I look at the paragraph is just
3 the, that's what we were just uncovering and that is
4 that you believe that Colonel Evanko did something
5 inappropriate, had some kind of inappropriate
6 influence over the FBI. Is that right?
7        A:    Yes.
8        Q:    And how do you know that it was
9 inappropriate influence as opposed to perhaps Agent
10 Kush's superiors deciding that he had inappropriate
11 and the investigation inappropriate, I mean
12 something?
13       A:    You're going to have to tighten that
14 one up for me. I'm not sure what you just asked me.
15       Q:    Well you said that Agent Kush's
16 transfer was the result of inappropriate influence.
17       A:    I said I believe that ma'am. Evanko
18 went ballistic when we told him. He said he was
19 going to have the agents transferred tomorrow. And
20 the end result of that was that an agent gets
21 transferred as well as me. I guess I deduced that he
22 followed through on his word. The investigation, the
23 criminal investigation has fallen apart. Just seems,
24 seems to me that that's an accurate statement. Yes,
25 ma'am.

PAGE 108

1        Q:    And when you say that Agent Kush was
2 quickly transferred, do you remember when he was
3 transferred?
4        A:    No.
5        Q:    Do you have any idea when he was
6 transferred?
7        A:    No.
8        Q:    This paragraph thirty-three I just
9 saying that you believe Colonel Evanko sought the
10 personal approval of Mark Campbell again you heard
11 that from other people?
12       A:    Yes.
13       Q:    Paragraph thirty-four you say
14 Campbell and Evanko authorized an investigation even
15 though they both knew Ober had committed no wrong.
16 What makes you think that they knew you had done
17 nothing wrong?
18       A:    I was told that that fact was brought
19 to their attention.
20       Q:    Who told you that?
21       A:    Captain Brown.
22       Q:    When was that?
23       A:    When was I told?
24       Q:    Yes.
25       A:    I would have to again; I believe that

1  was September of 99 or so. It could have been before
2  that though.
3       Q:   That Campbell and Evanko had been
4  told that you did nothing wrong?
5       A:   I was told that there was a meeting
6  conducted that included the investigators, primarily
7  all the defendants, Captain Skirkus and Captain
8  Brown. And the subject of this meeting was how to
9  conduct this witch-hunt and that they were told that
10 there had been no regulations violated.
11      Q:   Who said that to you?
12      A:   I was informed of this fact by
13 Captain Brown.
14      Q:   No I mean who said to you Evanko and
15 Campbell. I'm sorry my question wasn't clear. Who
16 told Campbell and Evanko that you hadn't done
17 anything wrong?
18      A:   I don't know.
19      Q:   You don't know who said that?
20      A:   No.
21      Q:   Whose opinion that was?
22      A:   No.
23      Q:   Now Colonel Evanko wasn't privy to
24 what had transpired between you and the FBI was he?
25      A:   No.

1       Q:   And he also was not privy to what
2  transpired between you and Lt. Colonel Hickes?
3       A:   Correct.
4       Q:   So was it unreasonable for Colonel
5  Evanko to want to now what had happened?
6       MR. BAILEY: Objection. The form of that
7  question calls for the wildest speculation. I really
8  object to that question. I ask counsel please
9  rephrase that.
10      MS. GUIDO: I'm not asking him to
11 speculate. I'm asking your opinion about whether it
12 was reasonable for Colonel Evanko to want to know
13 what had happened.
14      MR. BAILEY: I'm going to object but
15 counsel does make a good point in terms of if you're
16 asking is there any basis for his objection?
17      MS. GUIDO: Oh, I'm going to follow up.
18      MR. BAILEY: If you want to ask the Captain
19 if he knows of any basis for his objection? You can
20 respond.
21      MS. GUIDO: I just want to whether or not,
22 if he thinks it was reasonable or unreasonable and
23 why?
24      MR. OBER: For?
25      Q:   Your opinion about for Colonel

1  Evanko, ok. May 1999 you tell Colonel Evanko for the
2  first time what has happened and Colonel Evanko
3  wanted to know the first time that the FBI contacted
4  you and you told Hickes and that Hickes ordered you
5  not to say anything to anybody else. Now Colonel
6  Evanko he didn't hear what the FBI told you or what
7  you told the FBI. He didn't hear what you said to
8  Hickes or what Hickes said to you or any of that. He
9  wasn't privy to any of that so was it reasonable or
10 unreasonable in your opinion for Evanko to want to
11 get to the bottom of it and find out what happened?
12      MR. BAILEY: Still objection. You may
13 respond.
14      MR. OBER: It was completely unreasonable.
15      MS. GUIDO: On what?
16      A:   Because there was no basis for any
17 further discussion on the matter. He had seen the
18 commanders acting in their capacity as senior
19 commanders and making decisions and he was informed.
20 The investigation would run its' course without his
21 interference or not. There was no, what good would
22 come out of conducting an investigation? For what
23 purpose? What would be the objective in asking
24 anything? He demanded a memo from me that day, which
25 I supplied, that summarizes the thing, there's

1  nothing else to tell.
2       Q:   Well, in the complaint you alleged
3  that Colonel Evanko was upset and
4       A:   I'm alleging was he was enraged.
5       Q:   Well I just, ok, anyway but you said
6  that he was upset because you didn't act with blind
7  loyalty and inform him about the FBI investigation
8  and what I'm asking you on the other hand weren't
9  you expecting, are you asking Colonel Evanko to act
10 with blind loyalty to you and just accept what you
11 told him as true without doing an investigation.
12      A:   There was certainly no reason not to.
13      Q:   So he's supposed to accept what you
14 say, said is true right?
15      A:   There's no reason not to.
16      MR. BAILEY: I object to the form of that
17 question and move to strike but it's already
18 answered.
19      MS. GUIDO: I guess I'm just kind of trying
20 to figure out what the harm would be in an
21 investigation.
22      A:   I'm trying to figure what the good it
23 would be.
24      MR. BAILEY: What investigation are you
25 talking about, are you talking about, counsel, now

1  wait,
2       MS. GUIDO: I'll clarify, I'll be happy to
3  clarify.
4       MR. BAILEY: Oh let me finish my request.
5  Are you talking about an investigation into Captain
6  Ober for not running to the commissioner and telling
7  him there was a potential problem? Or are you
8  talking about the FBI investigation itself into the
9  corruption? Which investigation do you mean?
10      MS. GUIDO:  I said I'd be happy to
11 clarify.
12      MR. BAILEY: Ok. Thank you.
13      Q:  You were upset because Colonel Evanko
14 ordered an administrative inquiry into the facts
15 surrounding the FBI's contact with you, your
16 decision to tell Hickes and Hickes' decision that
17 that should be kept between you and Hickes. Ok then?
18      A:  No. I'm upset that an investigative
19 process was corrupted without any allegation or
20 belief of misconduct.
21      Q:  What I'm asking you though is he
22 asked to have that matter investigated and that's
23 what, and by investigation I'm referring to what
24      MR. BAILEY: What matter?
25      Q:  Major Wertz and Major Williams the

PAGE 114

1  inquiry that they conducted. You were upset that
2  they conducted that inquiry right?
3       MR. BAILEY: What matter investigated?
4       MS. GUIDO: I just said. The Major, we all
5  know that Major Wertz and Major Williams conducted
6  an administrative inquiry, an administrative
7  investigation into the facts surrounding the FBI's
8  contact with you, your report of the matter to
9  Hickes and the decision not to tell anybody else
10 about that. That was the subject of the
11 administrative inquiry and all I'm asking you is.
12      A:  I don't know that I would agree with
13 that ma'am.
14      Q:  Well then tell me what you would;
15 tell me what the investigation was.
16      A:  What I got out of that is that was a
17 witch hunt to scrutinize every detail and look for
18 any place that I tripped up to hammer.
19      Q:  And were you, and that really gets to
20 the bottom of it. Were you upset because you thought
21 that maybe the investigation would reveal some type
22 of error in judgment on your part?
23      A:  I was not worried about my judgment
24 at all, ma'am.
25      MR. BAILEY: Objection. Objection, move to

PAGE 115

1  strike. You can respond.
2       MS. GUIDO:  So that's what I'm trying to
3  understand. You've been the subject of other
4  investigations and you've been vindicated. So if an
5  investigation is going to be conducted one of the
6  results of that can be that you are vindicated.
7       MR. OBER: I have never received an
8  adjudication on this. The heart and soul of an
9  investigative process is an allegation of
10 misconduct. There is none in this case ma'am. I know
11 enough about internal affairs to know that you
12 bastardize and prostitute that process when you
13 willy-nilly start investigating people without any
14 evidence of wrongdoing.
15      Q:  Well sometimes, sometimes you have to
16 do some of the investigation before you can really
17 determine who the subject of the investigation is.
18      A:  I've never heard of that. That's a
19 witch-hunt.
20      Q:  Who the subject is?
21      A:  Um-hmm.
22      MR. BAILEY: Did you ever watch the movie
23 Casa Blanca?
24      A:  Ma'am we had a subject that was me.
25 What the investigation was for was to see if I

PAGE 116

1  committed any wrongdoing which we already know I
2  didn't.
3       MS. GUIDO: Hang on.
4       MR. BAILEY: Remember the usual suspects.
5       MS. GUIDO: Would you hand that down to the
6  Court Reporter to be marked? I forget what Exhibit
7  number that is.
8       REPORTER: Number seven.
9       MR. OBER: Seven.
10      MR. BAILEY: I'd like an offer on this.
11 What's the point here? Well I think if Captain Ober
12 reads his note then we might be able to understand
13 what the point is. On December 4, well, on a memo
14 dated December 4 at the bottom there is handwriting
15 and that is your handwritten note. Is it not?
16      A:  Oh yes.
17      MR. BAILEY: What is the number on this
18 Exhibit?
19      A:  Seven.
20      MS. GUIDO: Seven. And at the bottom of
21 that in your handwriting it says, 'File Note.' It is
22 my position that an investigation should ultimately
23 determine if an individual is a subject or not. I
24 caution against premature determinations.
25      MR. BAILEY: I object.

SHEET 30    PAGE 117

1   MS. GUIDO: Is that the point to that, that
2   sometimes an investigation, it takes an
3   investigation to determine whether there's a
4   subject? Who's the subject?
5   MR. BAILEY: Don't answer. Don't respond
6   until I'm done this trailer. Counsel I think this is
7   the worst kind of travesty and I think it's an
8   absolute disgrace. I'm going to object very strongly
9   to what you're trying to do here. The circumstances
10  are different. You're trying to characterize a
11  different situation, totally different fact
12  situation and mislead and obfuscate this legal
13  process. Very strongly object to what you are doing
14  on ethical grounds. It's unprofessional and I wish
15  MS. GUIDO: Your objection is noted.
16  MR. BAILEY: Well that's alright. I'm going
17  to let you go
18  MS. GUIDO: Your objection is noted.
19  MR. BAILEY: Counsel please, with all due
20  respect I know we respectfully disagree on some
21  things. Try to let me finish when I'm talking and
22  I'll finish up very quickly for you.
23  MS. GUIDO: Well you never finished quickly
24  yet.
25  MR. BAILEY: Alright. Move to strike.

PAGE 118

1   Snide. Irrelevant. Incorrect. And rude comment. Mr.
2   Ober you can go ahead and read and respond to the
3   Exhibit by, I object not only to the question
4   counsel had posited but also to the exhibit itself.
5   You can respond.
6   A:   Well I don't know that the factual
7   background beyond this one item presented to me but
8   I'll assume or deduce that there, at some point in
9   this investigation this IAD number 11029 there was
10  an allegation of misconduct. And an investigation
11  was being conducted and at some point there was
12  discussion about whether or not someone was or
13  wasn't a subject and the investigation continued in
14  order to determine whether there was misconduct
15  occurred or whether this person should or shouldn't
16  be treated as a subject. I guess that's what this is
17  all about. But I don't have any clue as to how it
18  compares to my situation.
19  Q:   Well because my question had been to
20  you that isn't it true that sometimes it takes the
21  investigation, it takes some investigating, some
22  finding out of the facts to determine whether a
23  particular person is or is not the subject of an
24  investigation. And you yourself wrote a note in
25  which you cautioned against making a premature

PAGE 119

1   determination of whether a person is a subject or
2   not.
3   A:   Ma'am
4   MR. BAILEY: Please, I very strenuously
5   object to this. He has testified that there was an
6   underlying, at least based on his limited knowledge,
7   there was an underlying factual situation which
8   brought this investigation or some need to evaluate
9   these facts to the fore. You're taking a situation
10  in which there is absolutely no basis for an inquiry
11  and his terminology in describing that as a witch
12  hunt is correct and I think without providing the
13  documents or some facts on which, you can study the
14  ceiling as long as you wish counsel and when you
15  want to give us a report on it's contents we'd be
16  grateful, but the point in fact is, he can respond
17  to this, but I think you have a duty to place some
18  facts in evidence. You haven't done so. I object to
19  your question. I object to this issue. I think it's
20  decidedly misleading and there are no facts in this
21  record whatsoever to support what the background and
22  this exhibit are. Mr. Ober if you have a
23  recollection of it you can respond but I caution you
24  not to speculate.
25  A:   I have no recollection of the

PAGE 120

1   background or exact circumstances surrounding this
2   document.
3   Q:   I'm not asking you that sir. Maybe I
4   should clarify what my question is.
5   A:   I don't think you need to because
6   your question is comparing apples and oranges. This
7   cart is so far ahead of the horse ma'am. This
8   investigation I'm sure had some element of reporting
9   of misconduct or something and it would appear that
10  there was a need for an investigator to make a
11  determination about a subject's status. That has
12  absolutely nothing to do with the situation I was in
13  whatsoever.
14  Q:   And that's kind of my point. And that
15  is that each case turns on its own facts and its own
16  circumstances.
17  A:   That assumes there is a case, ma'am.
18  Q:   But each case, each situation is
19  unique, isn't it?
20  A:   I don't know what situation.
21  Q:   Well you're trying to say this is
22  apples and oranges because what happened in that
23  case is not like what happened to me. So what I'm
24  saying is cases, all cases are not alike.
25  A:   Yes they are.

1    Q:   How cases may be handled in certain
2  circumstances may be different.
3        A:   All cases are alike in the most
4  critical area I can imagine. That is that they have
5  a report of misconduct as the trigger mechanism. I
6  have never been a part of an investigation where
7  someone said go and investigate something and see
8  what you find and then we'll initiate the internal
9  affairs process. You're trying to mix things up
10 here. There was nothing about what was done to me
11 that resembles what you've described to and
12 including an adjudication. You mentioned earlier
13 I've been the subject of investigation. That's true.
14 Those have been handled in accordance with the
15 department procedures and in accordance with my
16 labor contract and I received an adjudication that
17 it was unfounded.
18       MS. GUIDO: And on paragraph thirty-seven
19 you say that investigations such as was done on
20 Captain Ober have the effect of destroying an
21 officers standing and reputation among his
22 colleagues. Now as of September 1998 you told us you
23 were one of the best and brightest at PSP and that
24 there was no foreseeable limit to your potential but
25 you had been investigated before September 1998

1  right?
2        A:   Yes.
3        Q:   And so the mere fact that an
4  investigation was conducted did not damage your
5  career in any way?
6        A:   Those investigations didn't damage my
7  career to the best of my knowledge that is correct.
8  This one has. Would you care for me to speak to
9  that?
10       Q:   No I think we've gotten and we'll go
11 over the damage in a minute. You said in, I think
12 it's in that same paragraph, you said that one f the
13 purposes of Evanko's investigation was to learn the
14 breadth and depth of your knowledge of the FBI
15 investigation and to learn whether Evanko and
16 someone in the governors office was a target or
17 actually under suspicion. What's wrong with that?
18       A:   Where are you in the complaint ma'am?
19       MS. GUIDO: Page eleven.
20       MR. BAILEY: Page eleven of this. It starts
21 on the third or fourth sentence.
22       MS. GUIDO: You said that there were two.
23       MR. BAILEY: Give him a chance to read it,
24 to refresh.
25       MS. GUIDO: I was just going to tell him

1  where. You look where it says two unlawful reasons,
2  that's where it starts.
3        MR. BAILEY:  Darrell read, go to the
4  beginning. Read the entire paragraph.  Think about
5  it before you answer your question.
6        A:   And what's your question now, ma'am?
7        Q:   My question is when you say that the
8  reasons that Evanko, one of the two reasons that you
9  cite is are that Evanko wanted to learn the breadth
10 and depth of your knowledge about the FBI
11 investigation and whether Evanko and someone in the
12 governors office was actually a target or under
13 suspicion. And what I'm asking you is what's wrong
14 with that? What's wrong with Evanko wanting to find
15 out after the fact whether or not the FBI
16 investigation, he and the Governor's office really
17 were a target of the investigation. What's wrong
18 with that?
19       A:   A number of things. The first thing
20 that comes to mind is that's really a matter that he
21 needs to discuss with the FBI because I wasn't
22 conducting the investigation.
23       Q:   But you reasons for not telling him
24 about the case and your reasons for not letting
25 Major Connelly the Bureau Director know about it was

1  that potential target was high-ranking members and
2  someone supposedly in the governors office. So
3  what's wrong with after you've told Evanko why you
4  didn't tell him, what's wrong with him wanting to
5  know whether that's true or not. What's wrong with
6  him wanting to find out if that's true?
7        A:   Well there's just no follow-up. That
8  is the answer.
9        Q:   I don't get your answer.
10       A:   Looking, managing information
11 clinically,
12       MR. BAILEY: Are you saying wanting to know
13 or to investigate?
14       MS. GUIDO:   I'm saying what's wrong, it's
15 two parts. One what's wrong with him wanting to know
16 whether you're telling the truth? Is there anything
17 wrong with him wanting to know whether you're
18 telling him the truth about what happened?
19       A:   We told him what happened and we gave
20 him a verbal report and gave him a written repot.
21       Q:   Yeah but what's wrong with him
22 wanting to find out whether or not you're telling
23 him the truth?
24       A:   I don't understand the question about
25 truth. That's what happened.

1  Q:  Right. That's what you say happened
2  but what I'm saying, Colonel Evanko wasn't there. He
3  doesn't know what happened. What's wrong with him
4  wanting to know whether what you say happened in
5  fact happened?
6  MR. BAILEY:  You're suggesting that you
7  should investigate someone simply because you don't
8  like hearing what they report. Just to investigate
9  them.
10  MS. GUIDO: That's not what I'm suggesting.
11  What I'm saying is you said that one of the illegal
12  purposes here was to find out whether in fact Evanko
13  and someone in the governor's office was a target.
14  I'm saying you told him he was a target but he
15  didn't know that. So I'm saying what's wrong with
16  Evanko wanting to find out and in fact investigating
17  whether what you said is true so he know whether
18  that's right or not?
19  A:  Well as a practical matter I would
20  think that's something as the Commissioner of the
21  State Police he specifically wouldn't do to avoid
22  the accusation that he has tried to influence.
23  Q:  But the investigation is over so what
24  I'm saying is after the fact if at the time he was
25  trying to do that I might see your point, but case

1  closed. You've gone and told them. The case is
2  closed.
3  A:  I don't know that the case was
4  closed.
5  MR. BAILEY: He doesn't know that the FBI
6  said the case was closed. That's the trouble with
7  too leading of questions here. He never said the
8  case was closed. The FBI said the case was closed.
9  Go to the FBI and find out. Investigate the FBI.
10  MS. GUIDO: Well as part of the
11  investigation they did go to the FBI. That's not
12  what I'm saying.
13  MR. BAILEY: A lot of people ought to
14  investigate the FBI. I'd like to investigate them.
15  MS. GUIDO: What I'm saying is I'm sure you
16  would.
17  MR. BAILEY: I sure would. I'd give
18  anything to get my hands on them.
19  MS. GUIDO: bottom line, just so we
20  understand the bottom line is you told Evanko that
21  such and such happened so he has to take you at your
22  word in your opinion.
23  A:  I don't think that's necessarily the
24  case. He could have, to me, being a, I think, a
25  rational, clinical way to handle it would have been

1  to just call me in and as me. If you have any more
2  questions, ask.
3  Q:  Right and he asked, alright he asked
4  you
5  A:  But what he did was
6  Q:  Wait a second. Before you talk about
7  what he did. What I'm saying is if he doesn't
8  necessarily believe you what's wrong with him asking
9  Major Wertz and Williams go out there, do an
10  investigation, find out what happened, and talk to
11  the FBI find out what they told him. Talk to Hickes
12  talk to all the people that were involved. Find out
13  for me what happened. If he doesn't necessarily
14  believe you then what's wrong with him doing that?
15  A:  Because that's not what he did. I was
16  named as the subject. As the focus of this
17  investigation. This was never about what you just
18  described Ms. Guido. It was never about that and no
19  one can look at this and come to that conclusion. It
20  would be very self-serving for you to believe that
21  now. This investigation was handed to two of the
22  highest-ranking members of the department. I was put
23  in an interrogation. I was named the subject. I was
24  given my rights. This was an internal affairs
25  investigation. This was never an investigation what

1  you've just described so I can't answer that
2  question.
3  Q:  If it was though.
4  A:  I'm not going to answer about what it
5  was. I've had so many hypotheticals I don't know
6  where to start and stop now. That's not what this
7  was.
8  Q:  In your opinion.
9  A:  As a matter of fact ma'am.
10  Q:  In your opinion that's not what this
11  was. Right?
12  MR. BAILEY: Counsel you're being
13  argumentative. He's here as a fact witness. It's not
14  important what he thinks about these things.
15  MS. GUIDO: It is important.
16  MR. BAILEY: No it's not important. It's
17  important what
18  MS. GUIDO: We can argue relevance later,
19  sir.
20  MR. BAILEY: It has nothing to do with
21  relevance. That's not the issue legally or
22  factually.
23  MS. GUIDO: We'll argue about that later.
24  MR. BAILEY: His opinion, the fact is that
25  Mr. Evanko did certain things; certain things were

SHEET 33  PAGE 129

1  done to him. He's testifying to certain fact things
2  and he can respond to those kinds of questions. Its
3  endless speculation to ask him what he thinks about
4  what people's reasons were, and for that matter what
5  legal conclusions were. He's not a lawyer.
6          MS. GUIDO: We'll argue about all that,
7  we'll argue about all that later in court. I'm here
8  to ask him questions. That's it. And we're going to
9  take a break now for lunch.
10         MR. BAILEY: What time do you want to come
11 back?
12         MS. GUIDO: How long do you need?
13         MR. BAILEY: I don't know. Were you hoping
14 to finish up today?
15         MS. GUIDO: Hoping.
16         MR. BAILEY: Hoping. I'm going to have some
17 questions probably. May we need to think about
18 another day?
19         MS. GUIDO: Well I'd like to do it as long
20 as we can today.
21         MR. BAILEY: Yes that's all right. We can
22 do that.
23         MS. GUIDO: Ok, we can do that.
24         MR. BAILEY: Do you have to leave at five?
25 Let me just ask this gentleman here. Do you have

PAGE 130

1  any time constraint on you?
2          VIDEO OPERATOR: No.
3          MR. BAILEY: Crystal?
4          MS. LYDE: No.
5          MS. GUIDO: No, the court reporter can't go
6  past five.
7          MR.BAILEY: I don't see how based on your
8  questions I don't see how you're going to finish up
9  and I'll have time. So why don't we just go ahead
10 and take an hour.
11         MS. GUIDO: That's fine.
12         MR. BAILEY: Is that ok?
13         MS. GUIDO: Yes, I don't have a problem
14 with that.
15         MR. BAILEY: Crystal?
16         MS. LYDE: It's 11:48 AM. We will be taking
17 an hour break for lunch.
18         BREAK
19         MS. LYDE: It's 1:03 PM and we are back on
20 video.
21         REPORTER: You are still under oath, Mr.
22 Ober.
23         MS. GUIDO: This morning at one point you
24 had asked me to come back to, whether or not who
25 you, if you remember if anybody else who told you

PAGE 131

1  that Evanko asked Campbell's permission and I was
2  wondering since you had the lunch break I'd come
3  back to that do you happen to remembered anybody
4  else who may have told you that?
5          A:   No I actually didn't give that any
6  thought but I will try to do that.
7          Q:   And also I did want to follow up one
8  thing on that because I can't remember if I asked
9  you and that was, you heard it from either Major
10 Morris or Lt. Colonel Hickes or perhaps both of them
11 that Evanko had asked for Campbell's permission. Do
12 you remember if they told you how they knew that?
13         A:   No. No I don't recall how they knew
14 that
15         Q:   Ok. Now do we have, I guess we need
16 that. Do you have the Exhibit stuff because I think
17 Exhibit three was what we were?
18         MR. BAILEY: Do you want one run off?
19         MS. GUIDO: I just want to give him the
20 copy of the complaint again so he can follow along.
21         MR. BAILEY: Ok.
22         MS. GUIDO:   Thank you. We left off at
23 paragraph forty-two. And we'll pick up at paragraph
24 forty-two anyway. I think we covered what was in the
25 other paragraphs. And in paragraph forty-two you

PAGE 132

1  talk about the two PSP, you say two PSP Majors
2  conducted a custodial interview of the plaintiff.
3  What do you mean by a custodial interview?
4          A:   I mean that I was called by two PSP
5  Majors, sat down in the deputy commissioner of
6  Administrations office, read my Garrity warning and
7  notification of inquiry and I was told as the
8  documents indicated that I was being compelled to
9  participate in that interview.
10         Q:   What's a Garrity warning?
11         A:   Garrity warnings that are warnings
12 that are issued to subjects of internal affairs
13 investigation that puts the white line between their
14 criminal responsibility and their administrative
15 liability with respect to what statements can be
16 used against them.
17         Q:   And Garrity warnings are given when
18 it is not going to be a criminal investigation, is
19 that right?
20         A:   Right.
21         Q:   And I think that my recollection of
22 Garrity is in fact that anything that you were to
23 say in that compelled interview could not be used
24 later in a criminal proceeding. Is that correct?
25         A:   That's correct.

1  Q: And those Garrity warnings are they
2  given on a standard form?
3  A: Yes.
4  Q: And that form is used in virtually every
5  internal affairs investigation?
6  A: I would assume so yes.
7  Q: And have you conducted those same types of
8  interviews before?
9  A: Yes.
10  Q: Administrative interviews with Garrity
11  warnings?
12  A: I've conducted internal affairs
13  investigations and issued administrative warnings,
14  yes.
15  Q: And you would issue the
16  administrative warnings to everybody you interviewed
17  or to who?
18  A: Subjects.
19  Q: The subject of the investigation?
20  A: The subject of the investigation and
21  anyone who could potentially be a subject.
22  Q: Now you said it's a custodial
23  interview. But you weren't under arrest were you?
24  A: No.
25  Q: Well how were you in custody?

1  A: I was in custody by the mere fact
2  that I was being compelled to participate or face
3  disciplinary action if I didn't. Leaving the room
4  would have not been cooperating.
5  Q: Right. You could have left the room,
6  correct?
7  A: And suffered the administrative
8  consequences, correct.
9  Q: You could have been disciplined for
10  leaving the room?
11  A: I could have been disciplined for not
12  participating in the investigation.
13  Q: But if you had left the room nobody
14  was going to handcuff you and throw you back in the
15  room? Correct?
16  A: After two years ma'am I don't know
17  that I would make that statement.
18  Q: You had no reason at the time to
19  believe you were under arrest did you?
20  A: I was not under arrest.
21  Q: Ok. And you weren't given any kind of
22  Miranda warnings?
23  A: No I was not.
24  Q: Ah, I think you have been interviewed
25  before in other administrative investigations, is

1  that right?
2  A: Correct.
3  Q: And previously been given your
4  Garrity warnings. Correct?
5  A: Yes.
6  Q: What was different about this
7  interview that made it a custodial interview as
8  compared to the other interviews that you went
9  through before?
10  MR. BAILEY: Alright. I'm going to object.
11  You can go ahead and respond. I just want to remind
12  counsel that he is not an attorney and I think you
13  are asking for a legal definition. You go ahead and
14  respond, Mr. Ober.
15  A: I think that was just about where I
16  was going to go.
17  Q: How long have you been a State
18  Trooper?
19  A: Twenty years.
20  Q: And you've done I think you said
21  hundreds of criminal investigations.
22  A: Probably.
23  Q: And you don't understand the term
24  custodial interview?
25  A: I didn't say I didn't understand the

1  term ma'am?
2  Q: Ok I thought that was the object of
3  the term that since you weren't a lawyer you didn't
4  know what the term custodial interview meant. But
5  being a State Trooper all these years you do know
6  what a custodial interview is don't you.
7  A: I believe I do.
8  Q: Were the other interviews that were
9  conducted in the past administrative in which you
10  were subject were those interviews also custodial
11  interviews?
12  MR. BAILEY: Right. Again I'm going to
13  object. Let me just, so I don't have to object
14  anymore, I object to having or at least attempting
15  to elicit from the deponent what amounts to a legal
16  definition. Maybe I don't understand what a
17  custodial interview is but for example in a great
18  deal of school law, custodial interviews can be
19  conducted at schools of children. They are not under
20  arrest but they are coercive in the sense the person
21  is unfree to leave or go. So I would defer you
22  counsel, and I'm not trying to be argumentative or
23  to a court, but I wrote the complaint and he is not
24  an attorney. And with that in mind I just have a
25  standing objection. I won't interrupt you anymore

1  and you may respond to her question.
2        A:   Well in my mind what separated this
3  interview from anyone I've ever been involved in was
4  the whole context of the interview and the from and
5  content of the interview made it a unique experience
6  for me and made it custodial in that sense that I
7  was compelled to participate and had I not
8  participated I would suffer disciplinary actions.
9  That is also true of the other investigations that I
10 was involved in but on this particular one I was
11 being interviewed by two majors in the Deputy
12 Commissioner of Administrations Office without any
13 advanced warning as our regulations and our
14 employment contract affords me the opportunity.
15 Taking all of these things into consideration it was
16 tantamount to a custodial situation in my mind in
17 that I was not free to leave and I was not free to
18 say you have no complaint, see you. And I did raise
19 those objections to the people interviewing me.
20       Q:   You did, every interview you ever
21 conducted for internal type investigations those are
22 always, the member of the State Police is always
23 required to answer. He or she is always required to
24 answer and they'll always be subject to discipline
25 if they aren't and you have conducted many of those

1  kinds of interviews yourself.
2        A:   Yes, but there's a big difference
3  between those ma'am. In every other interview but
4  mine there was a reason to conduct an investigation.
5  There was a complaint; there was an allegation of
6  misconduct. I have never been a part of and never
7  issued warnings to someone willy-nilly simply hoping
8  to find something that they did wrong. Or tell them
9  that we are going to conduct an investigation,
10 review it and if we find misconduct then conduct an
11 internal affairs investigation. That I have never
12 been a part of.
13       Q:   Ok. I think you mentioned something
14 about your union representative. Did you have union,
15 you did have union representation correct?
16       A:   Yes I did. I was not afforded, what I
17 had indicated was that I was not afforded the
18 opportunity to provide one in advance.
19       Q:   Ok how was that supposed to work?
20       A:   It's supposed to work pretty much as
21 I've described unless there's agents and
22 circumstances subjects are to be notified in advance
23 of an interview and afforded the opportunity to
24 provide either a PSTA representative or a counselor.
25       Q:   When were you notified of the

1  interview?
2        A:   That day I received a phone call from
3  Colonel Coury's secretary and said I was at my
4  office at the IMS building, Strategic Development
5  building
6        MR. BAILEY: Is that IIMS?
7        MR. OBER: IIMS, Correct.
8        MR. BAILEY: Ok.
9        MR. OBER:  Which is detached from
10 headquarters and was told to be over Headquarters
11 Colonel Coury's office in ten minutes. Oh excuse me,
12 she asked me how long it would take me to get there.
13 I said I guess ten minutes.
14       Q:   Is that the first that you knew an
15 administrative inquiry that was being conducted?
16       A:   Yes.
17       MR. BAILEY: I've got to, were you told of
18 the purpose to be at the office for?
19       A:   No.
20       MR. BAILEY: Well then.
21       MS. GUIDO: That's what I was getting to.
22       MR.BAILEY: The question was "Was that the
23 first you knew?" obviously at the point when you
24 receive the telephone call you didn't know. Or is
25 your testimony that you didn't know until you got to

1  the office?
2        MR. OBER: That's correct. I was called and
3  told to report.
4        MS. GUIDO: Maybe I'll just have to depose
5  you. It might be easier.
6        MR. BAILEY: That's all right. I'd be very
7  happy to.
8        MR. OBER: I didn't understand what she
9  meant.
10       MR. BAILEY: I know you didn't that why I.
11       MS. GUIDO: Just ask me if you don't
12 understand.
13       MR. OBER: Well, yes, I did I thought. The
14 first time I knew about it is when they sat me down.
15       MS. GUIDO: When they sat you down did
16 they, what happened?
17       A:   They sat me down and told me that I
18 was there, they were ordered by Colonel Evanko to
19 conduct an administrative inquiry into the facts
20 surrounding the FBI probe that was conducted in
21 western Pennsylvania.
22       Q:   At that time did they tell you that
23 you were the subject of the inquiry?
24       A:   I don't recall, yes they did as a
25 matter of fact.

1      Q:   Do you remember who said what about
2    that?
3          A:   Well, there was, what I recall then
4    was my inquiry as to what's the allegation of
5    misconduct? And several times I asked that question
6    and several times I was told there is no allegation
7    of misconduct. And then I said "Then why am I here?"
8    And they said, "Well we're conducting this inquiry."
9    And I said, "Into what? And they repeated basically
10   what I said. And I said, "I've already briefed the
11   Commissioner, Colonel Evanko and I have already
12   briefed him. I already supplied him a memo. I don't
13   know what else, what else there would be to
14   investigate." And they were very persistent. And at
15   one point I said to Major Williams, "I guess you're
16   just doing your job." And he said, "I guess so."
17   Well if you don't have an allegation of misconduct
18   then this is a witch-hunt and you can't do this. I
19   was very emphatic with them. I said you can't do
20   this. You don't have a reason for me to be here and
21   keep me here. And their response was, Major
22   Williams's response was, and Major Wertz, non-verbal
23   head nods. He kept repeating we are not conducting
24   an investigation. We are gathering the facts. We're
25   making no recommendation, we're going to supply that

PAGE 142

1    to Colonel Evanko and if on his review, if he
2    believes misconduct occurred then he is going to
3    order an internal affairs investigation.
4          Q:   Thank you.
5          A:   And I said "This makes no sense. I'm
6    the director." I recall this, of all the things
7    you've asked me to recall, I will tell you I recall
8    this the best because I was absolutely floored. I
9    said, "I'm the Director of the Internal Affairs
10   Division, albeit detached, I'm telling you, you
11   can't do this. You can't interview me; put me in
12   this situation without an allegation." And with that
13   they slipped a "Notification of Inquiry" in front of
14   me that had been custom made to fit this
15   circumstance because the standard reporting
16   procedures and blocks to check off didn't fit so
17   they X'ed out Attorney ____ product value by order
18   of chief counsel and inserted, inserted Commissioner
19   Evanko's, I don't have the here
20         Q:   Let me see if I can find it so you
21   can explain.
22         A:   That would be very helpful. Do you
23   remember when MASH episode when they erase out
24   machine gun and insert a microwave?
25         Q:   I think I've seen almost all of them

PAGE 143

1    and I can't remember that one.
2          A:   Well that's what this reminded me of.
3          Q:   Let me see if I can find that because
4    it would be helpful to me if you can show me what on
5    the form was changed. Now I had it. Thank you.
6    Exhibit 8, the Notification of Inquiry is that the
7    right document that we were discussing?
8          A:   Yes ma'am.
9          MR. BAILEY: You have a number on that, a
10   number on that? Eight?
11         MS. GUIDO: Eight.
12         MR. BAILEY: Thank you.
13         MS. GUIDO: And you were talking about
14   there something being wrong with that. Could you
15   explain what you were talking about?
16         A:   It's easier to understand.
17         -----END OF TAPE TWO-----
18         MR BAILEY: Thank you Sydni. Could you repeat
19   your question please?
20         COUNSEL: Yes, you were saying that the
21   document had been changed or, I was trying, in order to
22   understand your response that you were giving me, I think
23   it's helpful if you point out what you were talking about
24   on the document for me. Which is now exhibit eight.

PAGE 144

1          DARRELL OBER:  YES. Well, I was just
2    noting that when the document was presented to me I could
3    see the obvious alterations to it, in that it had been
4    customized by X'ing out, I think office of chief counsel
5    and inserting commissioner.  Also, note that there is no
6    BPR control number assigned to it and I inquired about
7    that.  When a complaint is received there is a
8    sequential number issued at that point and time when it's
9    received and also noted that by virtue of the fact that
10   this was being presented to me as the note says, a copy
11   is provided to the subject of the investigation and
12   that's what I asked them.  I said what is the allegation
13   of misconduct?  They kept insisting this administrative
14   inquiry had some legitimacy to which I then responded
15   again, I'm the Director of Internal Affairs.  Where is
16   administrative inquiry as processes and my rights
17   defined?  Because I've never heard of it.
18         Counsel: What did they tell you about why
19   there wasn't a BPR number?
20         A:   Well.
21         Q:   You said you asked about the BPR
22   number.
23         A:   I asked and the response that I
24   initially received was, well there not conducting
25   internal affairs investigation.  It's an administrative

1 inquiry.
2          Q:  Do you know whether or not there was
3 in fact there was a BPR number?
4          A:  Yes there was.
5          Q:  Do you know when that was issued?
6          A:  No, I do not.
7          Q:  So you don't recall off the top of
8 your head whether the BPR number was issued before or
9 after this interview was conducted.
10          A:  Well by deduction it was issued
11 considerably after this, because the number that was
12 assigned to it was, I believe 503.   The administrative
13 supervisor inquiry that they put me through three or four
14 more months later was issued 409.  So the number was
15 assigned at least after then.
16          Q:  Okay, 503.
17          A:  I was interviewed in September so it
18 would have most likely been issued some time after then.
19          Q:  I think you were interviewed in June.
20 Weren't you?
21          A:  No I mean for the administrative, the
22 other.
23          Q:  Oh, okay, I'm sorry.  This interview
24 was in June of  ninety-nine.  Right?
25          A:  Yes

1          Q:  Okay.  And so at that point you said,
2 I'm trying to remember what you said.  At the beginning
3 of the interview, you had not been given the notification
4 of inquiry.  Right?
5          A:  Yes, I had been.
6          Q:  Oh, I thought you had said that they
7 talked to you, and then at one point they slipped in
8 under your nose.
9          A:  Well, when we first sat down, all of
10 these things that I have described, this was the exchange
11 between the three of us.
12          Q:  Okay.
13          A:  And when it became obvious that they
14 were going to do this over my objections, and despite my
15 objections, it was okay, lets get started.
16          Q:  Okay.
17          A:  And at that point I asked for a PSTA
18 representative.
19          Q:  At the point that you realized that
20 the interview was going to go forward.
21          A:  At the point where I realized, this is
22 going to happen.
23          Q:  Okay.
24          MR BAILEY:  I think her question was when
25 this exhibit number eight was given to you.

1          DARRELL OBER:  Well it was before the
2 interview.
3          COUNSEL:  Okay.  But then you went, and
4 after you got the exhibit eight, then you asked for a
5 union representative, PSTA, that's the union.  Right?
6          DARRELL OBER:  Yes, well no if would have.
7          COUNSEL:   Is there a difference?
8          DARRELL OBER:   No.  I assume that would
9 have been before because the rep. was there when this was
10 issued.   I'm no sure.
11          COUNSEL:  Oh, okay.  So.
12          DARRELL OBER:  At some point.
13          MR BAILEY:  By this you mean exhibit
14 number eight.
15          DARRELL OBER:  Exhibit number eight.
16          COUNSEL:  That's what I was confused
17 about.
18          MR BAILEY:  Right.
19          DARRELL OBER:  Okay.  I asked for a
20 representative.  One was provided for me.  And then I'm
21 guessing this document was executed because a PSTA reps.
22 name is on here, I signed it also.
23          COUNSEL:  And that would be trooper Thomas
24 Carr.
25          DARRELL OBER:  Correct.

1          Q:  In an administrative interview the
2 number of State Police and this time being you, but as a
3 general rule you don't have a right to have a lawyer
4 there.  Right?
5          A:  I'm sorry.  What was your question?
6          Q:  Do you have a right to have a lawyer
7 in an administrative interview?  You said you had the
8 right to have a union rep.  I was wondering about
9 lawyers.  Do you have.
10          A:  Yes, if the subject request one and a
11 reasonable time is afforded for them to obtain one.
12 I've never known of one that's request has been refused.
13 I don't know that it rises to the level of a right.  I
14 believe if a member would exercise that, he would be
15 entitled to one.  Yes, ma'am.  Had I had any idea what I
16 was in for, I assure you, and been given the opportunity,
17 I would have had counsel.
18          MR BAILEY:  I think the only objection
19 I've ever seen was to, you can't have both.
20          COUNSEL:  Okay.  I didn't know.  I'm
21 just asking you, because I don't know the answer.
22          MR BAILEY:  I'm not sure either.  Maybe
23 Joanne would know.  Do you know whether it's.you don't
24 know.  Okay.
25          COUNSEL:  Before the interview were you,

SHEET 38   PAGE 149

1  at the time of the, were you armed?  In others words
2  did they make you surrender your firearm?
3              DARRELL OBER:  No.  I was not required to
4  surrender any firearms.
5              COUNSEL:  That's what I was wondering.
6              A:  That would have probably been.  I was
7  not required.
8              Q:  And were you told that this was
9  strictly an administrative interview?
10             A:  That's what I was told.  It was an
11 administrative inquiry.
12             Q:  And did you have any concerns that
13 there were somehow criminal allegations at issue.
14             A:  At that point, no.
15             Q:  Okay.
16             A:  When the interview started ma'am.  No.
17             Q:  During the course of the interview,
18 did you become concerned or.
19             A:  At some point and time I became
20 concerned that experiencing what I have experienced, that
21 there could be criminal charges that were at least being
22 evaluated against me.
23             Q:  What caused you to become concerned
24 about that during the interview?
25             A:  The irrational nature of this whole

PAGE 150

1  thing.
2              Q:  What was, why don't you just tell me
3  about the interview itself.  You know, you talked about
4  the nature of the questions etc.  Can you describe in a
5  little bit more specifics for me?
6              A:  Sure.  During the interview it became
7  obvious, well it was obvious at the onset of the
8  interview that any rational explanations were going to be
9  completely overlooked and that this was an exercise in
10 finding wrong-doing.  I was very, I became concerned that
11 in this exercise of conducting this witch hunt for
12 wrongdoing that my, that if given the opportunity that
13 the department might try to conjure up a criminal charge
14 against me.
15             Q:  What were you asked by either Major
16 Wertz or Major Williams that made you think that?
17             A:  The whole interview ma'am.  This
18 whole business is rotten to the core.  I had no assurance
19 and no faith   that this interview, and this process was
20 going to be a fair, objective, and impartial one, and yield an
21 objective result.
22             Q:  Did it have anything to do with either
23 Major Wertz or Major Williams?
24             A:  No.  I viewed their roles as
25 messengers.

PAGE 151

1              Q:  Okay.  Did you know either, both those
2  Majors.
3              A:  Know them in what capacity?  Know who
4  they are?  Yes.  Work with them?  Major Wertz, never.
5  Major Williams, yes.  We shared at least one project that
6  comes to mind.  So, business type relationship, yes
7  ma'am.
8              Q:  My recollection from Major William's
9  deposition, he said that he thought well of you, so
10 that's why I wondered if you knew him from the past.
11             A:  Yes.  We had worked on a project
12 together.  I believe it was the legislative budget and
13 finance committee report.  I think.
14             Q:  And as far as you knew there was any
15 bad blood between you or anything like that.  Was there?
16             A:  Not to my knowledge.
17             Q:  Okay.  You've described this as
18 being different from any other administrative inquiries
19 that you've been involved in, at least as a subject or
20 witness, as opposed to doing the investigation.
21             A:  Yes.
22             Q:  The 1994 investigation that was
23 initiated by Commissioner Walp.  That involved the
24 Lightman station.  Is that correct?
25             A:  Yes.

PAGE 152

1              Q:  What was the, what did that stem from?
2              A:  There was an allegation, this was.
3  Let me start again.  When I was assigned to the systems
4  and process review division, the inspection division.
5  There was an allegation made against, I don't know if
6  there were other subjects than myself or not.   I believe
7  I was the only subject, as I recall.  There was an
8  allegation made by the station commander that I had
9  issued him inappropriate orders and that I had forced his
10 to break open desks or one desk.  That I recall, that's
11 what the essence of the issue was.
12             Q:  And was the basic issue whether or not
13 you had exercised your judgment appropriately during the
14 inspection of that station.
15             A:  No the issue was what I just
16 described, that I gave him an inappropriate order.  This
17 is what I recall from my interview with then Captain
18 Capriotti.  That I ordered him outside of his chain of
19 command, to break open a desk to retrieve items that were
20 missing.  I now recall that there was a second let it to
21 that, I believe, in that I ordered a binder to be returned.
22 When I left the station I inadvertently left a binder
23 behind of information behind.  It was relayed to
24 Harrisburg that I inappropriately ordered him to have
25 that relayed down there by shorting his patrol shifts for

SHEET 39   PAGE 153

1 coverage that night.
2          Q:  Do you remember whether the allegation
3 was that the order, your orders were inappropriate or
4 whether you actually them.   Do you understand the
5 difference?
6          A:   Yes, but you know what would be
7 helpful.  If you have the investigation I could just look
8 at what the allegation was.
9          Q:  Let me see if I do.
10          MR BAILEY:  Let me place an objection on
11 the record, the relevancy.  You may respond.
12          DARRELL OBER: I believe that answers the
13 question then.  There's an allegation of criminal
14 conduct.
15          COUNSEL:  Well what I didn't under, yes
16 but I didn't understand was whether from your answer that
17 you said that it didn't involve your judgment.  I didn't
18 know whether you were saying that the allegation was,
19 because if the question was whether or not it was
20 appropriate for you to order the desk to be opened that
21 would be judgment.  On the other hand if the question was
22 whether you had in fact ordered anyone to open the desk,
23 that would be a factual issue.  So I was wondering if you
24 know whether the issue is, did you really order it, or
25 was it appropriate for you to order it.

---

PAGE 154

1          DARRELL OBER:  Well, what I remember is
2 that was an issue that was explored, the appropriateness
3 of that order because that is governed by regulation.  A
4 headquarters lieutenant would not have the authority to
5 order, without going through that member's chain of
6 command absent exigent circumstances to do much of
7 anything.  I remember that issue being explored.  But now
8 that you've shared this with me, I do recall now the
9 allegation of criminal conduct, which is what apparently
10 triggered the investigation.
11          Counsel:  Okay.
12          MR BAILEY:  What was the dispossession of
13 this counsel?
14          COUNSEL:  Unfounded, that we had
15 established that earlier.
16          MR BAILEY:  I wasn't sure.  I just want to
17 make sure for the record is clear.
18          COUNSEL:  I think, I'm still a little
19 confused.  Did you order the desk to be broken into or
20 not?
21          DARRELL OBER:  No.
22          COUNSEL:  Okay.  That answers my question,
23 that I was having trouble with.  When the desk was
24 opened though, did you find, were their drugs or drugs
25 paraphernalia that was found in the desk.  Do you recall?

---

PAGE 155

1          MR BAILEY:  You ask him to revisit the
2 underlying issues fact?
3          COUNSEL:  Just that one fact.  It's not a
4 big fact.
5          MR BAILEY:  Well, I'm going to place an
6 objection on the record, but I'm going to let him answer
7 it.  You have an investigation that's unfounded.  The
8 investigation his comments speak for themselves.  If you
9 want to let him review the contents of the investigation,
10 let him comment on them, that's fine.  I'm just placing
11 the objection on the record.  I'm going to permit him to
12 respond, if he recollects.
13          DARRELL OBER:  Well, looking at exhibit
14 nine counsel.  I don't recall the details, this was so
15 long ago but the.
16          COUNSEL:  Okay.
17          DARRELL OBER:  But apparently we found
18 drug paraphernalia.  Yes.
19          COUNSEL:  Okay.  And I'm not meaning to
20 imply that you did anything wrong here.  What I was
21 asking you, so the drug paraphernalia was found and then
22 did you report that to someone.
23          A: Yes.
24          Q:  And who would you have reported to?
25          A:  The station commander.

---

PAGE 156

1          Q:  To the station commander there?
2          A:  Yes.
3          Q:  Would you also report that to your
4 immediate supervisor?
5          A:  I'm sure I did.
6          Q:  Okay.  Do you know who was your
7 supervisor at that point and time?
8          A:  Yes.  Major, then Captain Dewire.
9          MR BAILEY:  Could you spell Dewire for the
10 record.
11          DARRELL OBER:  D-E-W-I-R-E
12          MR BAILEY:  Capital W or Small?
13          DARRELL OBER:  Capital W.
14          MR BAILEY:  Thank you.
15          COUNSEL:  Okay now, the interview that was
16 conducted in respect to that investigation.  It differed
17 from this one in what way?
18          MR BAILEY:  Objection.  You may respond.
19          COUNSEL:  The one on June 28th.
20          MR BAILEY:  Objection.  You may respond.
21          DARRELL OBER:  I think I've already
22 answered that.
23          COUNSEL:  Maybe I didn't follow.  I'm
24 sorry.
25          A:  Well maybe we need it read back then.

1  This interview that I. The interview with Wertz and
2  Williams?
3          Q:  Yes.
4          A:   Differed from this and every other
5  investigation interview that I've ever been involved in,
6  in that there was no legitimate rational basis to be
7  there because there was no allegation of misconduct,
8  there was no.
9          Q:  Okay.
10         A:  Complaint sheet indicating there was
11 misconduct.  There was no legal way to put this into an
12 internal affairs environment where my rights are invoked.
13 So there's nothing about this that was the same.
14         Q:  Okay.  Well.
15         A:  There was no nexus for this.
16         Q:  Well I guess.  So what started, what
17 led up to you being investigated was different.  But as
18 far as the just procedural aspects of the interview, the
19 quaranty warnings, the union representation, interview
20 being tape-recorded etc.  Were all the procedural aspects
21 done just like every other administrative interview?
22         MR BAILEY: Objection. Objection.
23 Objection.  You may respond.
24         DARRELL OBER:  No, of course they weren't.
25 I've already testified to that.  I was not given

1  notification in advance, which I was in this case.  In
2  this case Major, then Captain Capriotti called me at; I
3  was at the Milton Station, to arrange a date and a time
4  in advance.
5          COUNSEL:  Okay.
6          DARRELL OBER:  I was afforded then an
7  opportunity to provide a PSTA representative.
8          Q:  Okay.
9          A:  I'm assuming all of the other
10 procedures were followed.  I can't sit here and recall
11 that they were or weren't with respect to issues, of
12 issues of control number and what have you.
13         Q:  Okay.
14         A:  So far, the only thing that we've,
15 that I can tell you was the same, is the fact that I was
16 issued my warnings.
17         Q:  Okay.  Do you know whether as part of
18 the administrative inquire, and I'm this one in the
19 summer of 1999, for which you were being interviewed on
20 that day.  Do you know whether or not Lieutenant Colonel
21 Hickes was also interviewed?
22         A:  Yes, I do know that he was
23 interviewed.
24         Q:  And do you know if any other members
25 in the State Police were interviewed?

1          A:  When I was interview Major Wertz and Williams
2  told me that they had interviewed Hickes and I believe
3  Major Merryman was interviewed, but I don't recall
4  whether they told me that or not.  That's the only ones I
5  know of.
6          Q:  Okay.  Do you know whether or not the
7  commissioner was also subjected to an interview?
8          A:  At that time no.  I'm thinking that,
9  that has come out during this litigation.  But at that
10 time, no, I don't whether he was interviewed or not.
11         Q:  And do you know whether or not
12 Lieutenant Colonel Coury was also interviewed?
13         A:  I don't know.
14         MR BAILEY:  The commissioner interview
15 himself?  I ask that Sydni.  Well exhibit number eight
16 says, request from the commissioner.  So I assumed he
17 requested an interview for himself.
18         COUNSEL:  Exhibit number eight is, oh I
19 see what you're saying, okay.  Now, I'm just asking do
20 you know if he was interviewed.  And you said at that,
21 you said you think you heard, but maybe through this
22 litigation.
23         DARRELL OBER:  Yes, at the time, no I did
24 not know that.  But I'm thinking that came up during a
25 deposition or something during this process.  I think

1  maybe Major Williams mentioned that, I don't recall now.
2          Q:  Now, in paragraph forty-three, you've
3  alleged that Lieutenant Colonel Coury blocked your
4  promotional opportunities.  What promotional
5  opportunities did Lieutenant Colonel Coury block?
6          A:  So far, I would say that he has
7  blocked my promotion, promotional opportunity for Bureau
8  of Professional Responsibility as well as the Bureau of
9  Liquor Control Enforcement.
10         Q:  What promotion to the Bureau of
11 Professional Responsibility?
12         A:  The bureau's director position.  The
13 rank of Major.
14         Q:  Would that be at the time that, you
15 mean to replace Conely.
16         A:  Yes.
17         Q:  Okay.  And do you know when that was?
18 I really don't know how long ago that Colonel Conely was
19 promoted.
20         A:   Well with all dates floating around
21 ma'am, I, I can't recall.
22         Q:  But to give us some context.  Major
23 Conely was still a Major at the time that Colonel Evanko
24 ordered the administrative inquiry in the summer of 1999.
25         A:  98, no you're correct.  You're right.

1      Q: And at some point after that, he was
2 promoted to Lieutenant Colonel.
3           A: Yes.
4           Q: So the Bureau Director position opened
5 up again.
6           A: Yes.
7           Q: And that's the one. You had applied
8 for that?
9      Or what happened?
10          A: No. There was no need to apply. I
11 competed on a, I participated in a competitive exam
12 process.
13          Q: Okay, and how do you know that
14 Lieutenant Colonel Coury blocked your promotional
15 opportunity?  Kept you from being promoted to Director
16 of the BPR.
17          A: Well, by deduction, and having been in
18 this fiasco for two years, as was the case then and now,
19 I'm the only individual on this planet, who has been in
20 charge of both of the divisions that comprise the BPR.
21 So by simple logic, I have to deduce that. The only
22 legitimate reason for me not being offered that
23 promotional opportunity is as a result of the actions to
24 include by the defendants to include Coury. So I'm
25 senior to probably ninety percent of the Captains in this

1 state, right now. I've been a captain for six years,
2 almost seven years.
3           Q: The decision about who to put in
4 charge of that bureau. Would that be Lieutenant Colonel
5 Coury's decision to make?
6           A: Well, I believe that there's,
7 according to what Colonel Coury has told me in the past,
8 there's an exchange of information, there's a discussion
9 amongst the deputies, particularly who is most affected
10 by that position, and a recommendation made.
11          Q: But you have no first hand knowledge
12 that Lieutenant Colonel Coury did anything to prevent you
13 from made the Major of that, the Director of that Bureau?
14          A: Well as in the case of LCE, I'm aware
15 that Colonel Coury sent out a message to his Bureau
16 directors and asked for recommendation from the bureau
17 directors for various promotional, for promotions.
18          Q: So Lieutenant Colonel Coury sent out a
19 message asking basically give me some names of who would
20 be good for this job?
21          A: Yes.
22          Q: And who submitted your name to
23 Lieutenant Colonel Coury as the person who would be great
24 for being the Director.
25          A: I don't think that happened ma'am.

1           Q: Oh, I just wondered, because you said
2 that Lieutenant Colonel Coury asked for recommendations
3 and then you've said that he blocked your promotional
4 opportunities, so I'm trying to figure out what he did.
5 What actions Lieutenant Colonel Coury took.
6           A: Well, what I've testified to earlier
7 is based on my experience in discussing promotional
8 opportunities with Colonel Coury when I was the Director
9 of IA or systems and process review, in that the process
10 is what I've described that the commissioner takes
11 recommendations and.
12          Q: So rather than blocking you
13 essentially he just didn't recommend you?
14          A: That's extremely likely ma'am.
15          Q: Okay. And then over at LCE, that's
16 the Bureau of Liquor Control Enforcement, I think. I
17 should know that one but.
18          A: Correct.
19          Q: Can you tell me what promotion there
20 was blocked?
21          A: The Bureau Director's position.
22          Q: When was that open, do you know?
23          A: I believe Major Dewire was promoted
24 and transferred in July of 2000.
25          Q: Who took his place?

1           A: Captain McDonald. Who took Major's
2 Dewire's place?
3           Q: Yes.
4           A: Captain McDonald.
5           Q: He's the current Bureau Director?
6           A: Major Dewire is the current Bureau
7 Director. Correct?
8           Q: Okay, I'm confused. The opening that
9 you think that you should have gotten was the position
10 that Major Dewire got.
11          A: Yes.
12          Q: Okay, I understand now. And before,
13 so that's where Koscelnik comes in. Was Koscelnik the
14 former Bureau Director?
15          A: Yes.
16          Q: And that was while you were actually
17 working in the Bureau of Liquor Control Enforcement.
18          A: When I was first assigned there, Major
19 Koscelnik was the Bureau Director.  Correct. And then
20 he transferred.
21          Q: Okay. And then that's when Major
22 Dewire was promoted.
23          A: Yes.
24          Q: And again, do you have any first hand
25 knowledge of anything the Lieutenant Colonel Coury

1 actually did to stop you from receiving that promotion?
2         A: Well, by this time I believe Colonel
3 Coury has now moved over to Deputy Commissioner of
4 Operations position whereas before he was the Director of
5 Administration so the rest would logically follow as I've
6 just described, the recommendation, and what have you.
7         Q: And that's because, why?  Why would
8 that logically follow?  I'm sorry you'd have to help me
9 out because I don't really know.
10        A: Well what I just described about the
11 input of the Deputy.
12        Q: Yes.
13        A: As to who gets the position?
14        Q: I think what I don't understand is,
15 what him changing from, because I don't really
16 administration versus operations.
17        A: I'm sorry.    Because the Bureau of
18 Liquor Control Enforcement is in the chain of command
19 relationship under the director of operations, of the
20 deputy of operations.
21        Q: Okay.  So he, when an administration
22 would be under, BPR would be under administration.
23        A: Correct.
24        Q: So that when he was, so that you
25 believe that when he was the deputy commissioner in

1 charge of administration that he could have had you made
2 the Bureau Director of BPR and when he.
3         A: Yes.
4         Q: Okay, and when he moved to operations
5 and an opening came up in the Bureau of Liquor of Control
6 Enforcement he could have made you the Major then.
7         A: Correct.
8         Q: Okay.  Do you know of any other
9 promotional opportunities that we Lieutenant Colonel
10 Coury somehow blocked?
11        A:  Not personally.  No.
12        Q:  What do you mean by not personally?
13        A:  I don't have personal knowledge that
14 he blocked any more, any additional opportunities for me.
15        Q: Do you have some other kind of hearsay
16 knowledge of that?
17        A: Would you consider rumors to be
18 hearsay?
19        Q: Is it just rumors?
20        A: Yes.
21        Q: And what's the rumor?  Taking it for
22 what it is.  It's a rumor but what's the rumor?
23        A: Well that the rumors that surround me,
24 and my opportunities are that I don't have any, and that
25 I was sent to Washington, they attempted to send me to

1 Washington to let me know that my career was over.
2         MR BAILEY:  Washington, Pennsylvania.
3         DARRELL OBER:  Washington, PA.
4    COUNSEL:  Okay.
5         DARRELL OBER:  And that whenever my name
6 was brought up amongst my peers or in a context of
7 rumors, it's generally thought of as quite laughable that
8 they would even think about promoting me because of the
9 actions of these defendants and what they've done to my
10 reputation in this agency.
11        COUNSEL:  And who have heard those rumors
12 from?
13        A: Ma'am I couldn't even begin.  Okay,
14 you want a list; I'll try to come up with a list the best
15 I can. Major Dewire, Captain McDonald, Major Merryman,
16 Major Morris, Major Selhamer, Lieutenant Benedict,
17 subordinates, Corporal Carbouski, Sergeant Sweeting,
18 Sergeant Star, Sergeant Backistos, virtually everyone
19 that I have worked directly with or indirectly with for
20 the past two or three years.
21    Q: Has Lieutenant Colonel Hickes ever told you
22 that?
23        A: No.  Not that I can recall.
24        Q: Okay.  Because he certainly wouldn't
25 have any reason not to think highly of you.  Would he?

1         MR BAILEY:  Objection.  Question was not
2 what these people thought of him.  The question was what
3 was imparted to him by rumor.  Any inference that the
4 people he named ever indicated that they do not think
5 highly of Captain Ober or indicated anything of that sort
6 is objected to.  Mischaracterization.
7         COUNSEL:   That wasn't an inference I was
8 intending to put out there.  That these people didn't
9 think highly of you.  What I was say is Lieutenant
10 Colonel Hickes is part of the command staff .
11        A: Yes.
12    Q: Who could make recommendations etc, about who
13 should be a Major, and I'm saying what you're saying you
14 think that the rumors that your career is over, what I'm
15 saying, well isn't it true that Lieutenant Colonel Hickes
16 would still think quite highly of you?
17        A: It's more than a rumor ma'am.  You
18 just have to look at where I've been for the past two
19 years and that would pretty much come clear to you, I
20 believe.
21        Q: Okay.
22    A: But to answer your question about Colonel
23 Hickes, yes I would expect that he would have a high
24 recommendation for me.  Yes.
25        Q: And then in that same paragraph, you

SHEET 43   PAGE 169

1  said that Lieutenant Colonel Coury launched another
2  totally improper investigation into your personal
3  affairs.  What investigation are you referencing there?
4          A:  He launched a investigation into my
5  collection of PSP memorabilia.
6          Q:  Would that be, that's the
7  investigation you were talking about was IAD 1999-409.
8          A:  Yes.
9          Q:  Okay.  Exhibit number ten would be
10 the forced complaint reception processing worksheet for
11 that investigation IAD-1999-409.  and that's the one that
12 you said that Lieutenant Colonel Coury launched.
13         A:  Yes.
14    Q:  According to the use of forced complaint
15 processing worksheet it indicates that a complaint was
16 received from Philip Conti.
17         A:  Yes.
18         Q:  Correct.  Wouldn't Philip Conti
19 really be the complainant there?
20         A:  He would be the complainant according
21 to the way this is documented.  Yes.
22         Q:  Rather than Lieutenant Colonel  Coury?
23         A:  No.
24         Q:  Lieutenant Colonel Coury.
25         A:  It has Coury listed as the

PAGE 170

1  complainant.
2          Q:  That's what I'm asking.  Help me find
3  the, the complaint information so this is where you keep
4  the, put the complainant's name?
5          A:  Yes ma'am.
6          Q:  Okay.  And he's says that he's
7  initiation this according this document based on
8  complaint received from Philip Conti.
9          A:  Yes.
10         Q:  Now you've indicated in your complaint
11 that this IAD 1999-409 was a completely improper
12 investigation.  What was improper about this
13 investigation?
14         A:  Can I have a moment to review this?
15         Q:  Sure.  Yes you've made an allegation
16 that.
17         A:  I'm sorry there's another letter here.
18 You've answered your own question if you read these
19 letters ma'am but I'll try to clarify if.
20         Q:  I haven't answered my own question.
21 Okay, let me ask the question this way.  With respect to
22 the administrative inquire and I forget the other number,
23 but the one that Colonel Evanko did in June of 1999, the
24 one he ordered that you said was different than all the
25 others that you had been part of.

PAGE 171

1          A:  Yes.
2          Q:  And you said the thing that was really
3  improper about that is that it was launched when there
4  was no allegation of wrongdoing by anybody.  Now in this
5  situation, there is an allegation of wrongdoing, so what
6  is improper about this particular investigation, 1999-
7  409?
8          A:  Well, I've seen more information now
9  about this incident than I've ever been allowed to see so
10 can I change an answer.  This might be the second most
11 improper investigation I've ever seen.  If the one that
12 Wertz and Williams did on me was the first than this
13 might be the second because there is no allegation of
14 misconduct here.
15         Q:  Okay.  And so you're position is there
16 is no allegation of misconduct in 1999-409 so that one is
17 also improper.
18         A:  Can you show me?  Counsel can you
19 steer me to where there's an allegation of misconduct?
20         Q:  I'm just asking you.  Is there or is
21 there not.
22         A:  No, I'm asking, can you point me in
23 the direction.  I'm asking for some help.  I don't see
24 it.  I see a lot of conjecture.
25         Q:  Yes.

PAGE 172

1          A:  By someone.
2          Q:  By someone, meaning who?
3          A:  Well, if enclosure number four is from
4  retired Colonel Conti.  And he even says, he's using his
5  rank and post within a department to give the impression
6  blah, blah,blah.there's no evidence that any of that ever
7  occurred.
8          Q:  But, okay.
9          A:  And he continues to say that if we
10 can't prove it, if we can't prove him doing something
11 criminally of wrong, then I believe he is doing something
12 for which he should be disciplined, but no one seems to
13 know what.
14         MR BAILEY:  Could be disciplined by the
15 department.
16         DARRELL OBER:  And on this basis an
17 investigation of my personal affairs was launched by the
18 department?
19         COUNSEL:  Okay.  But, now at the time Mr.
20 Conti was retired.  Correct?  He wasn't somebody in the
21 State Police.
22         DARRELL OBER:  That's correct.  He would
23 have probably been eighty-two, eighty-three years old.
24         Q:  So someone outside the State Police.
25 Whether there's any facts to back them up or not.

SHEET 44   PAGE 173

1 Someone outside the State Police complained that you had
2 improperly used your position as a State Trooper.
3 Whether that's true or not, I'm not asking you.  What I'm
4 saying  is, see he complained about it, whether facts or
5 no facts, someone outside the department complained that
6 you had improperly used your position as a State Trooper.
7 Is that right?
8          MR BAILEY:  I Object.
9          COUNSEL:  Isn't that what you just read to
10 me, said to me?
11          MR BAILEY:  Counselor are you using a
12 conclusion by someone that he did something wrong as if
13 an investigator or someone who's capable in looking at
14 this material would say, yes there is something wrong
15 there, somebody qualified.
16          COUNSEL:  No, that's not what I mean.
17          MR BAILEY:  Well.
18          COUNSEL:  It's not my implication and
19 that's not what I'm asking you.
20          MR BAILEY:  Well it may not be your
21 implication but your asking us to make an assumption that
22 there is an underlying basis for the complaint by this
23 Phil person.  This Phil Conti.
24          COUNSEL:  No I'm not.  I just.
25          MR BAILEY:  And it's obviously a desire to

PAGE 174

1 get at Mr. Ober because he has some reason to compete
2 with him.  Not that Mr. Ober did anything wrong.
3          COUNSEL:  I'm not asking you that sir.  In
4 fact I'm asking you just the opposite.  Whether there's
5 truth to it or not, to the underlying allegation, the
6 fact is that Mr. Conti did send a complaint in accusing
7 you of this. Right?
8          DARRELL OBER:  I think there's a little
9 more to it than that counsel.
10          COUNSEL:  Okay.  But first, answer that
11 question and then go on to explain.  But he did something
12 in accusing you of that.  Correct?
13          DARRELL OBER:  He sent something to Bill.
14          Q:  Bill?
15          A:  I don't know.  I don't know who Bill
16 is.
17          Q:  Well, whoever the letter.  He's
18 accusing, there's an accusation here.
19          A:  No.  This is not a letter of complaint
20 to the Pennsylvania State Police.  This is a letter to
21 Bill.
22          Q:  Right.  I understand.
23          A: Well.
24          Q:  But, what I'm saying is, he's made a
25 complaint.

PAGE 175

1          A:  If you wrote a letter to your husband
2 and it said something about the State Police would that
3 automatically.
4          Q:  Hand it to me.  Can I see it?
5          A:  Sure.  I'm trying to answer your
6 question.
7          Q:  No you're not.  And I really to try to
8 go through all of this in detail but.
9          MR BAILEY:  Move to strike.  Counsel
10 you're asking him to respond to a conclusitory.
11          COUNSEL:  No I'm not.
12          MR BAILEY:  Comment by someone.  If I
13 wrote a letter to someone and say, please investigate
14 Syndi Guido because didn't she rob a bank the other day.
15 I mean, I'd hope I'd need to have something more.
16          COUNSEL:  There's no, I'm not trying to
17 imply in any shape or form that you did anything wrong
18 here sir, as a matter of fact it was unfounded.  Right?
19          DARRELL OBER:  And ma'am, I'm not taking
20 it as such.
21          COUNSEL:  I think that seems to be.  That
22 people are reading something into my question that's
23 not.what's meant there.
24          MR BAILEY:  No, I'm not reading anything
25 into this.  Just frame the question properly.   Why don't

PAGE 176

1 you simply ask him what he knows about this?
2          COUNSEL:  I am asking the questions.  When
3 you ask the questions, you ask them the way that you want
4 to.
5          MR BAILEY:  Well don't frame them in way
6 that puts him in a box.
7          COUNSEL:  Quit being the obstructionist.
8 You know I've been very patient in letting you make all
9 sorts of comments, speaking objections, telling your
10 client how to answer, answer questions for your client,
11 and this particular issue is not a big complicated
12 question, it's a simple one, and that is, this situation
13 is different than the situation that you're talking about
14 in the summer of 1999 because here there was some outside
15 complaint, right, wrong, false, whatever, that you had
16 done something wrong.  Is that what you were trying to
17 say.
18          MR BAILEY:  Objection of the use of the
19 word complaint.  You may respond.
20          DARRELL OBER:  Here's what I was trying to
21 get to earlier.  This is a letter from Phil Conti to
22 Bill.
23          COUNSEL:  Right.
24          DARRELL OBER:  Okay.
25          COUNSEL:  That somehow makes its way to

1 the State Police.
2          A:  Yes.
3          Q:  Okay.
4          A:  Somewhere in this canyon this ends up
5 in the State Police as a complaint.  According to our
6 regulations one thing that's supposed to happen, and if
7 you have that, I'd be very eager to see it, would be a
8 complaint verification form, where the complainant, if
9 it's Phil or Bill or Tom or whomever, I'd like to see the
10 complaint verification, wherein those people are asked to
11 attest to what it is they're speaking of.  Okay, this is
12 what I'm having trouble with..
13          Q:  I'll have to look for it.I don't know.
14          A:  Okay.
15          Q:  But, I'm getting at the part about
16 what's improper.  I mean, here, this is an investigation
17 that ends of clearing you, ends up vindicating you,
18 what's wrong with having a, I'm trying to understand what
19 could possible be so bad about having somebody out there
20 saying that you did something wrong.  And you didn't do
21 anything wrong.  An investigation is done.  It shows you
22 didn't do anything wrong.  What's so bad about that?
23 That's all I'm trying to find out.
24          A:  The fact that you have to ask the
25 question tells me that you don't understand Ms. Guido, so

1 let me try to explain it to you.
2          Q:  Okay.
3          A:  What's wrong first of all is, my off-
4 duty affairs are not the business of the State Police.
5 Secondly, in this particular instance, I was disciplined
6 for this before I was ever interviewed, and as you have
7 emphatically stated, the investigation was ultimately
8 determined to be unfounded.
9          Q:  Yes.  By Lieutenant Colonel Coury.
10 Right?
11          A:  I found that out eventually.  I was
12 never informed of that.
13          Q:  Well, didn't you get a notice of it?
14          A:  No.
15          COUNSEL:  I want the part that says he was
16 cleared.
17          MR BAILEY:  No there's a notification.  I
18 think to notification Sydni.  You're questioning him on
19 whether he was whether he was ever notified.  His
20 response was, no he was not notified.
21          COUNSEL:  But it was unfounded.  Is my
22 question.
23          DARRELL OBER:  I know the form you're
24 looking for.  It's not important.  I know which one
25 you're looking for.  I did find it, but I, it was never

1 given to me.
2          COUNSEL:  Exhibit eleven.
3          DARRELL OBER:  Yes.
4          COUNSEL:  Is a memo to you dated December
5 23, 1999?  It's from Lieutenant Colonel Coury.  Correct?
6          A:  Yes.
7          Q:  And in paragraph it says, after
8 careful review of enclosure one, I have concluded that
9 the allegation is unfounded.  Correct?
10          A:  Yes.
11          Q:  So Lieutenant Colonel Coury is the
12 person who decided, that in the end, after reviewing the
13 evidence, that the complaint against you was unfounded.
14          A:  Yes.
15          Q:  And.
16          A:  But I was never given this ma'am.
17 This was never presented to me.  I found this, the only
18 way I ever knew this was when I requested to review my
19 troop bureau file, I found a copy of this, well whenever
20 that was, the summer of 2000, I believe.
21          Q:  So in December of 1999, the memo is
22 written to you, but for whatever reason, you didn't
23 receive it.
24          A:  For whatever reason, I didn't receive
25 it.

1          Q:  And you don't know what the reason
2 that you didn't receive it was?
3          A:  No, ma'am.
4          Q:  Whether it got lost or it was
5 intentional.  You don't know one way or the other.
6          A:  No.  I also don't know why Lieutenant
7 Colonel Coury was the adjudicator of this investigation,
8 when in normal circumstances, that would be the troop
9 commander bureau director's responsibility.  At the time
10 I was assigned, during the time when this investigation
11 was conducted through its conclusion, I was not assigned
12 under Lieutenant Colonel Coury's command.  I was under
13 Lieutenant Colonel Hickes.
14          Q:  Well, even if he wasn't the right
15 person to be the final adjudicator, you certainly didn't
16 suffer any harm from that.  Did you?
17          A:  Yes, I most certainly did.
18          Q:  With him finding you unfounded?  How
19 were you harmed by him making a decision, when he found
20 it wasn't founded?
21          MR BAILEY:  Okay Sydni, you're question
22 was how has he been injured?
23          COUNSEL:  Yes, my question is, how were
24 you harmed by Lieutenant Colonel Coury making a decision
25 when he made a decision that was favorable for you?

SHEET 46  PAGE 181

1  DARRELL OBER:  Well, I'd been harmed in the, I go
2  back to the very nexus of this investigation, there was
3  never a threshold, enough threshold standards to even
4  conduct it to begin with.  I'd been harmed, do you have
5  correspondence that was sent to Mrs. Hamen, or Tom, and
6  Phil, and Bill.  That follow up and tell them that I have
7  been vindicated on these accusations and these charges.
8  I was removed from the book committee before I was ever
9  interviewed, as a disciplinary action by Evanko.  I get a
10  letter in my inbox without any conversation with me.  I
11  check no one; no one discussed this with my supervisor,
12  with the project director, with the bureau director, with
13  deputy commissioner Hickes.  The memo said I was
14  basically being kicked off the book committee because I
15  am too busy with my IMS assignment.  And I made inquiries
16  with my supervisors, and I said has there been a problem
17  with me completing my work on time.  Is time management
18  an issue?  And they said were all flabbergasted.  They
19  had no idea what I was talking about.
20  Q:  Okay.  Some of your answers were so
21  long, I need to go back a little bit because you lost me
22  at one point.  About whether the, you were saying that
23  the, you were saying that these people, Phil Conti, over
24  at the, you said that they had or hadn't received
25  correspondence.

PAGE 182

1  A:  I am asking you if they have ever
2  received correspondence from the department clearing me
3  of these charges.
4  Q:  I don't know.  I thought you were
5  telling me that they had or hadn't.  I was clarifying
6  your answer.
7  A:  Well, I certainly hope they have.  And
8  the other harm and damage that's come to me as a result
9  of this improper investigation is my reputation among my
10  peers, I've heard rumors that I've been a criminal
11  suspect in stealing PSP grave markers for God's sakes.
12  Q:  Who said that?
13  A:  Major Dwyer.  A rumor came up out of
14  the northeast.  Phil Conti writes the article for the
15  communicator.  When he broadcast his plea for artifacts
16  and under no circumstances is anyone to turn over
17  anything to a private collector and wrote some very
18  inflammatory things about private collectors, I must have
19  gotten half a dozen phone calls from people who said that
20  Conti's writing about you.
21  Q:  Okay.
22  A:  I also am aware that he made these at
23  museum committee, and then during that museum committee
24  my name.
25  Q:  Conti made the complaints?

PAGE 183

1  A:  Conti made these, Conti and others at
2  the museum committee raised these objections, to which
3  Evanko well write it up in the communicator, or I'll make
4  sure it gets into the communicator, words to that effect.
5  And Coury says without any more info than you have here,
6  just give me their names, and we'll have them
7  investigated.
8  Q:  Have who investigated?
9  A:  Have these collectors investigated.
10  Q:  But Lieutenant, but a, so whether in
11  writing or at these different meetings, you mean there's
12  no doubt that Mr. Conti was going around making
13  accusations against you that were unfounded.  That was
14  Mr. Conti bad mouthing you.
15  A:  Unfortunately he is no longer with us
16  to verify that statement, ma'am, but all I see in the
17  letter from Mrs. Hamen, is I received a letter and visit
18  from Darrell Ober.
19  Q:  How did you know then that he was
20  saying, casting these aspirations against you at the
21  museum committee meetings?
22  A:  Several of the committee members told
23  me that.
24  Q:  Do you remember who?
25  A:  Captain Simmers would be one.  Major

PAGE 184

1  Regain would be another.
2  Q:  Okay.  Now in paragraph forty-four you said that
3  on at least two occasions Lieutenant Colonel also
4  personally violated your rights in carrying out the
5  vindictive, unlawful desires of Colonel Evanko by
6  changing his recommendation for a PEMA appointment,
7  causing the plaintiffs removal and then, there's another
8  part about changing your selection.  Can you just tell me
9  what happened with PEMA?  I don't really understand what
10  the allegation is there.
11  A:  Okay.  Before we get there I need you
12  to also know that Colonel Conti is someone I was familiar
13  with and had talked to on a number of occasions through
14  the years.  Prior to the museum being, the committee
15  forming, and the plans taking shape.  Colonel Conti is
16  someone that I would often go to, to seek assistance in
17  identifying various artifacts.  There was also a point in
18  time that through his retirees column, Colonel Conti
19  advertised not only his own items for sale, precisely his
20  book, but he allowed others to participate, in fact I
21  believe some of those are museum committee members, they
22  on different occasions listed items of PSP memorabilia
23  for sale and on at least one occasion, Colonel Conti put
24  me in touch with someone who had PSP artifacts for sale.
25  Which I subsequently purchased.

SHEET 47   PAGE 185

1    Q:  Okay.

2    A:  On paragraph forty-four.

3    Q:  Yes, I need to understand what the
4  accusation is against the Lieutenant Colonel Westcott.

5    A:  With respect to PEMA, when, after the
6  injunction, The Commonwealth Court Injunction, which
7  stopped the disciplinary transfer of mine to Troop B,
8  Washington, I was subsequently demoted to the rank, to
9  the position of section commander to the Bureau of Liquor
10  Control Enforcement, and excuse me, I forgot a part.
11  When I was first notified or soon after being notified of
12  my transfer to Washington, I had e-mailed Captain Davis
13  and let him know that I would no longer be available for
14  a PEMA assignment.  I don't know how much detail you want
15  about that assignment, but it's a secondary assignment
16  that I participated in for several years.

17    Q:  I think I understand why the PEMA
18  assignment is; I guess that, you getting out the
19  chronology that is what my real question is.  That is you
20  were transferred to LCE and you notified who that you
21  wouldn't be able to do the PEMA assignment?

22    A:  When I was first transferred to Troop
23  B, Washington, I notified Captain Davis, who is the
24  department.

25    Q:  Is he in charge of PEMA.

---

PAGE 186

1    A:  Yes.  We call him Captain disaster. I
2  can't recall .

3    Q:  Just so we're clear.  PEMA is the
4  Pennsylvania Emergency Management Agency. Right?

5    A:  Yes.

6    Q:  And the state polices roll with that
7  agency is what?

8    A:  That's a multi-agency endeavor and
9  PSP's roll is to have on-call an officer and two or three
10  subordinates that comprise that team.  The teams are
11  loosely structured, but in the event of an emergency
12  callout that officer is usually activated by Captain
13  Davis or perhaps the bureau director, but Captain Davis
14  acts in that roll, facilitating to make sure he's a one-
15  man show.  He makes sure that someone is available to
16  staff the cell at the PEMA emergency headquarters.

17    Q:  Okay.  And so if there isn't an
18  emergency such as when the plane went down on September
19  11th.

20    A:  Yes.

21    Q:  Can that be, I mean is it a time
22  consuming role to be a PEMA officer?

23    A:  It can be.

24    Q:  If there's an emergency, It can turn
25  into something that's.

---

PAGE 187

1    A:  It can.

2    Q:  Okay.

3    A:  I'd served on PEMA since at least
4  1993.  When I first went onto that detail, I think the
5  component heads were all lieutenants, I could be wrong on
6  that, but I think I went in as a lieutenant.  I had
7  served in that position as a central section commander of
8  systems and process review division, as a division
9  director of the systems and process review division, as a
10  division director of the internal affairs division, and
11  when I was assigned to the multi-million dollar IMS
12  project, and at no time, no time, was there ever a
13  question on conflict with duty with PEMA, and with
14  respect to my primary duty assignment.

15    Q:  Well, I was just wondering why when
16  you went to a, when you were told of your transfer out
17  west.  Why did you tell Captain Davis you weren't going
18  to be able to be a PEMA liaison anymore?

19    A:  Because I was told by Major Washington, excuse
20  me, by Major Szupinka that I was to report for work and
21  remain during the work day, and in my work day, my
22  duty station of Troop B, Washington, therefore at would
23  make me ineligible for. PEMA is basically a Harrisburg
24  assignment.  Does that help?

25    Q:  Okay.  So if you're not located in

---

PAGE 188

1  Harrisburg area, you can't do PEMA?

2    A:  Correct.

3    Q:  Okay

4    A:  Typically, they, it's been my
5  experience; I'm not saying that it's never been done, but
6  I don't know of an occasion when they use troop members.
7  It's a headquarters assignment.

8    Q:  Okay.  And then, what happened next,
9  getting to the part of where Lieutenant Colonel Westcott
10  got involved, somehow?

11    A:  Well, as you know, the commonwealth
12  courts blocked the promo, the disciplinary transfer, and
13  a short time thereafter, I was devoted to LCE.  That
14  being the case.  I then e-mailed Captain Davis, I think
15  well I'm still here in Harrisburg, so there would be no
16  reason for me not to continue in the assignments that I
17  had been enjoying for several years.  So I e-mailed
18  Captain Davis, words to the effect of, you know, the
19  transfer didn't go through, I'm available.  Is my spot
20  still open, or whatever?  And he responded by saying that
21  I would, that was fine him.

22    Q:  With Captain Davis?

23    A:  Captain Davis and Major Washington,
24  the bureau director, just make sure that it's suitable,
25  or just touch base with my bureau director.  A matter of

SHEET 48  PAGE 189

1 protocol more than anything else. My bureau director
2 being Major Koscelnik.
3          Q: Okay.
4          A: When I approached Major Koscelnik, or
5 I guess the first, I believe the first dialog we had over
6 that issue, was by e-mail, I think, but I did e-mail him
7 on several occasions, but anyway I summarized what I've
8 just said to you in ten words or less, I'd like to
9 continue PEMA now that I am here, and his response was
10 that he would have to check into that and get back to me.
11          Q: And then what happened next?
12          A: The day the newspaper article about
13 my, about the injunction that prohibited the disciplinary
14 transfer to Troop B, Washington, the day after that
15 appeared in the newspaper, I was told that I could not
16 serve on PEMA.
17          Q: Who told you that?
18          A: Major Koscelnik.
19          Q: And did Major Koscelnik say why?
20          A: Yes.
21          Q: What did he say?
22          A: He said he wanted to afford me the
23 opportunity to become fully involved in my new duties.
24          Q: Okay. And how did Westcott come into
25 play there?

PAGE 190

1          A: Initially, he didn't, I subsequently
2 found that Westcott had, well the term front office was
3 used.
4          Q: By Koscelnik?
5          A: No. By Major Dewire. I determined
6 the front office more than likely meant Westcott, if not
7 the whole bunch of them.
8          Q: Okay. And then, so at what point did
9 you, I guess maybe I should just let you go on
10 chronologically. It might be simpler from what happened
11 next with.
12          A: Well I'd also like to.
13          Q: Hang on, we need to change.
14 CHANGE OF TAPE
15 7:15 p.m. tape two
16 COUNSEL: Okay I think we were.
17 DARRELL OBER: Pardon me, before we go.
18 COUNSEL: Oh sure.
19 DARRELL OBER: I believe we were into
20 PEMA. Something occurred to me during the break, I'd
21 like to finish. I think I started this response but
22 didn't finish.
23          Q: On PEMA or a different topic?
24          A: On a different topic.
25          Q: Oh, okay.

PAGE 191

1          A: On the museum investigation.
2          Q: Yes.
3          A: You had talked about damages, and
4 that's affected me. I was a part of a book committee,
5 and there were several other members on that committee,
6 Mark Infantino would be the project chairperson. For
7 lack of better terms.
8          Q: Yes
9          A: In my question, or my observation
10 would be the same with respect to have these, have my
11 fellow committee members ever been notified of this? I
12 was booted off that committee before ever being
13 interviewed regarding this whole matter. Which is a
14 terribly abusive thing to have happen, and, you know, I'm
15 only left to wonder what my fellow committee members have
16 concluded, based on my removal.
17          Q: Do you have any reason to think that
18 they know about this investigation?
19          A: Yes.
20          Q: The 409, 9940?
21          A: Mark Infantino knew about it before I
22 did, he was, the letter was sent to him, that letter
23 booting me off the committee was not even sent to me. It
24 was sent to.
25          Q: Except that letter doesn't mention

PAGE 192

1 about the investigation. Correct?
2          A: Correct. It talks about how busy I am
3 for a project that was forty years from being completed.
4 I was in a six or eight-month detached assignment.
5 That's what the silliness of this matter is, Ms. Guido.
6 The letter articulated that I had to devote my time to
7 this project. I was only ever intended on being there
8 six or eight months.
9          Q: The IMS project?
10          A: Yes ma'am. The centennial book is not
11 even due to be published till the year of two thousand
12 and four or two thousand and five.
13          Q: Okay. Did Mr. Infantino, is it
14 Infantino?
15          A: Infantino, correct.
16          Q: Did he tell you at any point that he
17 believed that you were taken the committee because you
18 had done anything wrong?
19          A: He told me that he knew I had a target
20 on my back and they were out to get me.
21          Q: Okay. And I don't know the answer to
22 your question. Backing up to, or going forward again to
23 PEMA, and I think we were at the point where Captain
24 Dewire told you that, maybe it wasn't Captain Dewire.
25 Major Koscelnik checked with the front office?

1    A: Yes.
2    Q: Okay. Let's go from there. What did
3 find out about what Major Koscelnik did?
4    A: I think we might have left off where
5 Major Koscelnik said that he would check on my inquiry,
6 which by the way, I found odd. All the other bureau
7 directors I had were able to reach a determination almost
8 instantly. But it was almost a couple weeks, if not more
9 than that, till I found out, till Major Koscelnik did get
10 back to be, he came and visited me in my office, and
11 again that was the day after the newspaper article, first
12 newspaper article appeared, and told me that, you know,
13 he needed me there for section duties. He has
14 subsequently testified in these depositions, that the
15 position need was crucial; I believe that was the term
16 that he used. I would just like to tell you that, if
17 that were the case, no one told me about that, but that's
18 a whole another matter, I'm sure.
19    Q: Okay.
20    A: But with respect to PEMA. That's when
21 he told me, I could not perform PEMA duties.
22    Q: Do you know whether or not there are
23 any restrictions that would keep somebody from LCE,
24 assigned to LCE from working on PEMA?
25    A: None. I believe that it's been

1 testified that there may be some budgetary impact. I
2 believe Major Koscelnik might have mentioned that, but
3 that's.
4    Q: Do you know what budgetary.
5    A: He was trying, and I don't recall how
6 he phrased it, he was try to make the inference, or
7 reference that the members assigned to the Bureau of
8 Liquor Control Enforcement come under appropriation code
9 171, The Liquor Board appropriations, and I believe he
10 was lamely trying to justify that as an excuse to boot me
11 off of PEMA, but the reality is, we've had members
12 assigned in long term assignments, in LCE, doing non LCE
13 activities, most recently, two LCE agents assigned to the
14 IMS project for probably a year or so.
15    Q: And that's, I guess, the budgetary
16 thing is so unclear, that's because LCE receives it's
17 funding differently?
18    A: Yes. That's correct. From the board.
19    Q: And so there might be restrictions
20 about how LCE money could be spent, as opposed to general
21 appropriations for the State Police. I mean, general
22 State Police funds as opposed to LCE funds.
23    A: He was trying to advance that
24 argument.
25    Q: Okay.

1    A: But, that's patently incorrect.
2    Q: Okay now. After Koscelnik, after the
3 article came out, then Koscelnik told you, you couldn't
4 be in it, then what happened next, because you said
5 Westcott blocked you on two different times?
6    A: Yes. Along about the time Major
7 Dewire was promoted, and I'm thinking that was the summer
8 of 2000, probably June, or July, of the top of my head.
9 You had made an earlier inquiry about who replace him.
10 Well I knew who replaced him, and his home troop, where
11 he came from was Captain McDonough. Coleman McDonough,
12 who was also one of the PEMA officers. There were three
13 of us. Captain McDonough, myself, and Captain Conway, I
14 believe, but anyway, but knowing that Captain McDonough
15 was now serving in a troop assignment. He previously had
16 served in Bureau of Patrol. I e-mailed Captain Davis,
17 and said basically that, with, in light of Captains
18 McDonough's transfer from the Bureau of Patrol to a troop
19 location, do you find yourself in a position of having an
20 opening on PEMA? And of course, he responded, yes I do.
21 And by the way, after I was booted off the first time,
22 they went ahead and posted the position.
23    Q: Okay.
24    A: For someone new. But bringing you up
25 to the second time, Captain Davis said sure, you know,

1 they would love to have you back on, or words to that,
2 whatever, and just clear with your bureau director, same
3 as before. So I did. I went into Captain, or excuse me,
4 then Major Dewire, who had assumed command, and also
5 previously supervised me as a member of PEMA. Made that
6 request, and he said sounds good to me, is fine with me
7 and he would call, I don't recall whether he initiated
8 the call to Major Washington, who's the bureau director
9 of PEMA, Captain Davis's boss, got it?
10    Q: Okay. Yes
11    A: I don't who initiated what call, but
12 in any event there was a discussion between them,
13 apparently, because after I made the request of Major
14 Dewire, it was, I don't know, it was only a day, it may
15 have been that day, but it was only a day or so, he
16 walked by my office in the morning and gave me the thumbs
17 up, and said do you know your back on the red team, or
18 blue team, or whatever color team you're in charge of,
19 you're back on PEMA. I said okay, thanks.
20    Q: Major Dewire?
21    A: Major Dewire told me this.
22    Q: Okay.
23    A: About four hours later this same day,
24 he came to me and asked me to come over; he wanted to see
25 me in his office. So I went his office, and he said

1  your PEMA career has come to a screeching halt, again.  I
2  said, why?  He said well, Major Washington had just
3  phoned him and said that I was not permitted to resume my
4  duties on PEMA.   Major Dewire said he inquired.  Why?
5  Major Koscelnik, excuse me, Major Washington said, when
6  the request got to the front office, it was denied.
7            Q:  Okay.
8            A:  And Major Dewire said I, Major Dewire
9  said then, I ask why, and Major Washington's comment to
10  him was, just let it go.
11            Q:  Okay, and the front office in this
12  instance, you take that to mean Lieutenant Colonel
13  Westcott and, why is it that Westcott would be the person
14  that you would attribute to putting a stop to it?
15            A:  Well he was the Deputy Commissioner of
16  Operations at that time.
17            Q:  And the Deputy Commissioner of
18  Operations would be the person that would be overseeing
19  PEMA?
20            A:  Yes.  And in this instance, he would
21  have been both of those Major's next supervisor.  You
22  know, next in their chain of command.
23            Q:  Okay.  Now in paragraph forty-five.
24            A:  Could you give me a second.there's
25  something I wanted to mention.I lost my train of thought

1  now.
2            Q:  Well if you think of it, we can stop
3  and go back to it.
4            A:  Yes, I lost my.
5            Q:  In para.
6            A:  Oh, I know what it was.
7            Q:  Okay.
8            A:  Excuse me for interrupting you.  I
9  don't know whether it's important for you to know this or
10  not, or I'm assuming that you do, but in the event that
11  you don't, all of these, or a number of these actions
12  that were taken against me, I was filing grievances, by
13  the way, I don't know if you were aware of that or not,
14  going back to the administrative inquiry, the end result
15  of that witch hunt was denial of my leave and pay, and I
16  grieved that, and I filed another grievance on these PEMA
17  removals.  I filed grievances on those as well.
18            Q:  Okay.  Now on paragraph forty-five
19  where you said that Lieutenant Colonel Conely also
20  performed also performed acts of vengeance for Evanko,
21  and you mentioned stripping of a cell phone and denying
22  you of reimbursements.  Was there anything else beside
23  that, that Colonel Conely ever did, that constitutes one
24  of these acts of vengeance?
25            A:  Yes.  I would say there's probably a

1  number of things that Colonel Conely did in addition to
2  these.  When I, I'll give you an example, when he called
3  me on January 10th to let me know I was being transferred
4  to Troop B, Washington, and I of course asked the obvious
5  question.  Why?  He never did give me an answer.  He
6  meandered around like he's prone to do, but I asked him
7  again, I repeated the question, and he said well you know
8  I didn't want you back in IAD.  So I took that to mean
9  that he had some hand in my removal from internal affairs
10  division.  That would be another instance of an adverse
11  action that comes to mind.
12            Q:  Okay.  Now on the cell phone, that
13  cell phone that you're talking about.  Is that a BPR cell
14  phone?
15            A:  Yes.
16            Q:  And wouldn't the reason that you had
17  to give the cell phone up, is cause you left BPR?
18            A:  At that time I was still detached to
19  BPR.
20            Q:  At the time, well tell me about the
21  cell phone then, maybe I'm just confused about it.
22            A:  I was detached from BPR.  Do you
23  understand detachment?
24            Q:  Yes.
25            A:  I was detached from BPR by way of a

1  clean message, which is a form of a department directive.
2  On April 26th or so, 1999.
3            Q:  That's the IMS?
4            A:  To the IMS project, yes.  As was the
5  case when Colonel Evanko called me in from a day off and
6  interviewed me for the position, the clean message
7  indicates that upon completion of the IMS assignment, I
8  will be returned to the Internal Affairs Division as the
9  director.  Sometime later that summer, along about July
10  or August, as I recall, is when my cell phone was taken
11  from me, so.
12            Q:  Didn't he, I thought he didn't take
13  the cell phone until you were reassigned to the LCE.  The
14  Bureau of Liquor Control Enforcement.
15            A:  No, Ma'am.
16            Q:  Wasn't there a memo or something that
17  went to you saying turn in your property.  Good luck in
18  your next assignment.
19            A:  Yes.  They'd already stripped my cell
20  phone of me by then.
21            Q:  Was the cell phone mentioned in that?
22            A:  I don't believe so.  No.
23            Q:  You don't remember.
24            A:  I remember the e-mail but, no the cell
25  phone had already been turned in by then.  They had

1 already taken it from me.
2          Q:  At what point did the cell phone thing
3 become an issue?  While you were still at IMS?
4          A:  Yes.  Yes, Corporal Leidig called me and
5 said that on behalf of the, you know he was collecting
6 them, on behalf of the bureau director; they were going
7 to be reissued.
8          Q:  Okay.  And he didn't give you any
9 reason about that?
10         A:  Well, at that point, I didn't know I wasn't
11 going to be reissued a phone, and when I followed up a
12 few weeks later, and called him, Corporal Leidig got very
13 nervous about this whole conversation, and I asked him if
14 they had been reissued.  He said yes.  I said well, do
15 you need me to stop over, or words to that effect.  He
16 said, well there, I know there was an issue; you really
17 have to talk to the Major.  Between he and Skurkis, they
18 didn't thing you should have, you know, your cell phone
19 is not reissued to you.
20         Q:  Okay.   Now on the denying
21 reimbursements on the expenses allowed to others.
22         A:  Yes.
23         Q:  What expenses?  What reimbursements
24 for what expenses specifically.
25         A:  Sometime, about this same time August,

1 September, again as I recall.  Possibly October, I don't
2 recall but I made an inquiry of Sergeant Cristi as to
3 the, I had been talking to; I'm sorry, back up.
4 Somewhere along that time frame, I was talking to retired
5 Sergeant Ronald Hiligus.  I think we might have met for
6 lunch or something, but, my former retired Sergeant, and
7 I asked him if he ever received his division directors
8 letter of commendation, which when I left Internal
9 Affairs, we were going frame it for him and give it to
10 him, as a token of his years of service, or retirement
11 gift, or whatever.  He had indicated that he did not
12 receive it, so I made an inquiry of Sergeant Cristi, who
13 is the administrative officer in Internal Affairs.  And
14 pretty much the same reaction as when I talked to
15 Corporal Leidig, it was, ah gee I don't know, you really
16 need to, I know there was a big sting about that, or
17 there was a big issue about that.  I'm like, what; It's a
18 letter of commendation, what's the big deal.  Well you
19 really need to talk to Major Conely.  Okay well, he must
20 not have been around, or whatever, but I e-mailed them.
21 Just basically said, what's the issue, what's the
22 problem, I understand there's some concern, or whatever,
23 and then a.
24         Q:  Is this before the things ever been
25 framed?

1          A:  No, It had already been framed.  It
2 had already been, according to the receipt that I
3 eventually was provided, when they made me pay for it.
4 It had been framed for months.
5          A:  Well I was confused by that.  That's
6 why I, you lost me chronologically.
7          Q:  Okay.  Try to stay with here counsel.
8 I left, Sergeant Hiligus retired in January of 1999, and
9 I awarded him division director letter of commendation,
10 and sometime during his retirement or luncheon that we
11 had for him, I said to him, would you like to have us
12 frame that for you.  He said, sure.  I think this was a
13 big deal.  I tasked that responsibility to our
14 administrative assistant, Ms. Blough, Donna Blough.
15      The only recollection I have after was, I believe
16 she attempted to have it framed in house, and it came
17 back that they couldn't do it because it wasn't formatted
18 correctly on the paper.  I remember some discussion
19 about, you know, we didn't observe some rules of margins.
20 Don't ask me, I don't know.
21      Well if we took it to Framers Workshop, they could do
22 it for about thirty bucks, I remember the cost.
23 Estimate.  Well that sounds fine to me, whatever, so I
24 just, I can't remember these words, but I'm sure I just
25 said, ask Donna to please take care of that.

1          Q:  Yes.
2          A:  Well, subsequently then I was
3 transferred to IIMS, and I just lost track of the whole
4 process, I never really know what happened, I was gone.
5          Q:  But Donna had taken care of getting it
6 framed.
7          A:  Yes.
8          Q:  Okay.
9          A:  At my request.  So anyway, jumping
10 ahead now to when I follow up this conversation with
11 Conely, he sends me back an e-mail.  Well the problem is,
12 unauthorized expenditure of the Commonwealth blah blah,
13 blah.  In order for you to bring resolution to this, you
14 owe the Commonwealth sixty-nine dollars and whatever.
15          Q:  Who actually paid for the, you
16 know physically went over and paid Framers Workshop and
17 picked up the frame?  Maybe that's where I was loosing
18 the story.
19          A:  I'm not sure.  I would assume, Donna,
20 but I don't know if I know that one.  I don't know.
21          Q:  Okay.  But it wasn't, so you were
22 asked to reimburse the Commonwealth for the frame rather
23 than you paying for the frame and asking the Commonwealth
24 to reimburse you?  Do I have that right?
25          A:  You lost me.

SHEET 52   PAGE 205

1       Q:  In others words, you were saying that
2   you were denied reimburse for expenses, so I thought
3   that maybe you had paid for the framing and that they.
4       A:  I did.
5       Q:  You wanted them to reimburse you, as
6   opposed to them saying you owe the Commonwealth sixty
7   nine dollars, or whatever that is.
8       A:  Well I think all that happened.  It
9   was paid for, apparently, which I didn't understand the
10  issue was with that.  It was already paid for.  But when
11  I talked to Conely, he was really ticked about of this.
12  I cost, what's the big deal?  Well in order to make this.
13  I said, you mean to tell me; this hasn't been given to
14  Sergeant Hiligus?  Over sixty nine bucks.  I'll come out
15  and pay for it myself.  He said, well you're going to
16  have to.  So I drove out there, took my checkbook, walked
17  into his office, I said I'm here to pick up, or stopped
18  and they said I could go in, or whatever, and I said I'm
19  here to pick up the commendation.  He said, do you have
20  the money?  You're not even going to let me see it until
21  I give you a check.  He said, no.  I said, well I want a
22  receipt for it then.
23      Q:  Okay.  So you paid the State Police.
24  Somebody else had paid for.
25      A:  I wrote the check out to the

PAGE 206

1   Commonwealth of Pennsylvania.
2       Q:  I get it.
3       A:  In the same office where he has had,
4   probably everything in there framed by the Commonwealth.
5       MR BAILEY:  Did he give you any evidence
6   that the Commonwealth had paid for the sixty-nine
7   dollars?
8       DARRELL OBER:  Yes.  There was a visa
9   receipt, I think, it had been paid for, I remember Donna
10  had signed something, but I would have to  check.
11      COUNSEL:  Okay.
12      DARRELL OBER:  But there was some
13  discussion about all this.  I said, look I'm just trying
14  to understand what the big deal is, because he was really
15  livid with me, about this money, and he said how
16  inappropriate it was, and I said this is a, this is
17  something, this type of thing is quite commend I was
18  suggest.  Did I do something wrong?  Well, blah, blah.
19  Well, are you initiating disciplinary action against me?
20  Well, no.  I said, well then, why all of the sudden after
21  these many months, is this even being an issue?  When
22  then he wanted to talk about the FBI investigation.  And
23  how, in his opinion, I screwed things up, and I should
24  have notified him, and I said, look Major, I don't want
25  to discuss that with you,  Okay, I've already filed a

PAGE 207

1   grievance, and I don't think that's appropriate.  Then he
2   started to try to tell me what a good guy he's been to
3   me, and the fact that he withheld during my performance
4   evaluation, because he didn't want to, he wanted to clear
5   his head, or he wanted to make sure he did it rationally,
6   or whatever.  And I said, well that can't be right.  My
7   performance evaluation was due long before this FBI
8   Investigation ever came due, you just didn't do it, and
9   he had considered.
10      COUNSEL:  Yes, hang on I'll get it.
11      MR BAILEY:  One second Darrell.
12      COUNSEL:  He said he considered?
13      DARRELL OBER:  He considered taking the
14  commendation out of the frame, and then using the frame
15  in some means, in BPR.  Okay, I remember he said that to
16  me.  I said, well if you want to do that, that's fine.  I
17  don't have a problem with that, so I handed to back to
18  him.   And when I did that, he even got angrier.  He
19  said, I changed my mind.  I'm not going to do that.  He
20  was essentially telling me he would consider recycling
21  this, ripping the commendation out, and recycling this in
22  order to keep it there.  And I said, well that's fine.
23  So the end result was, I was forced to pay for that,
24  which I also grieved.
25      Q:  Okay.  And other than the frame, were

PAGE 208

1   there other expenses?
2       A:  Yes.  Oh I'm sorry, on this instance,
3   no.
4       Q:  That Colonel Conely didn't deny any
5   other.
6       A:  Correct.
7       Q:  Okay.
8       A:  And I also have considered Colonel
9   Conely to be a part of these other investigations, in
10  that is the Director of Internal, as the Director of BPR,
11  I assume, I think originally way back was acts of
12  vengeance, and what have you.  I am not forgoing his roll
13  as the Director of BPR, these illegal investigations they
14  were conducting on me as well.
15      Q:  Now, in paragraph forty-six.  They're
16  separated out by letter, so we'll look at forty-six A.
17  you've indicated that the transfer to Washington,
18  Pennsylvania was a hateful attempt to separate you from
19  your children.  And I just was wondering how your
20  children came into any of this.
21      A:  How my children?
22      Q:  Yes.  How did, you know what I'm
23  saying, is like, how did Evanko, what would make Evanko
24  think, if I transfer him, then it's going be a big
25  problem for his children?

SHEET 53   PAGE 209

1  Do you see what I'm saying?  You don't understand my
2  question.
3      A:  Actually, I'm quite shocked Ms. Guido.
4  To be honest with you.  It almost seems like a question
5  you ought to ask him.  The man knows.
6      Q:  Why would your children be part of his
7  motive?  You think his motive, what makes you think he
8  was motivated by a desire to separate you from your
9  children, as opposed to some other motive?
10     A:  Well they would all be equally evil in
11 my mind.
12     Q:  I was just wondering if anybody said
13 anything to you like, you know Evanko wanted to split you
14 away from your kids, he told us, he was laughing about it
15 at the bar.  Whatever, I was wondering if there was
16 anything, you see what I'm saying?
17     A:  Okay.  That's a better question for me
18 to answer.
19     Q:  Okay.
20     A:  No.  No one has ever come up to me a
21 said.  He's looking to separate you from your children.
22 But the end result, as I said before, speaks for itself.
23     Q:  Okay.
24     A:  He knows kids; he knows I have little
25 children.  My kids, when they were three and four and

PAGE 210

1  five years old, we used to take them to have their
2  picture taken with him at the Farm Show, on his horse.
3      A:  So, I apologize for the.inept
4  question.sorry.
5      MR BAILEY:  Let him answer his
6      DARRELL OBER:  And he's autographed those
7  pictures with words to the effect of, my kids being a
8  part of the State Police family.
9      COUNSEL:  Okay.  So back to what I was
10 getting at, and that is, other than the affect of the
11 transfer, being that you would be far from home, you
12 don't have any other, don't know of any other facts, that
13 would show that, that was his motivation.  To separate
14 you from you're kids.
15     A:  I think the act of it's, in and of
16 itself, of the transfer, knowing what I've just described
17 to you, speaks for itself.
18     Q:  Okay.  Now on forty-six B, you've
19 complained about.
20     A:  Can I.
21     Q:  Sure.
22     A:  I feel like we're not on the same
23 page.  With respect to my family, this 210-mile transfer
24 took my life with my family away from me, had they gotten
25 away with it.  At that time, my kids were four, five, and

PAGE 211

1  twelve years old.  I have boys.  I've been very
2  fortunate, and my wife is a stay-at-home mom.  This was
3  taking over my life, this transfer, at transfer that I
4  didn't request.  As opposed to every other transfer I've
5  had in my eighteen, nineteen years at this point.  They
6  were by request, or they were promotional opportunities
7  that I either accepted of I declined, based on family.  I
8  have never been involuntarily transferred anywhere.  This
9  little charade would have taken control of my life.  When
10 I talked to Szupinka that night, he was very specific.
11 He told me, this was January 10th, after Conely called
12 me, he was very specific and told me that I was only
13 going to be entitled to thirty days reimbursement, which
14 is consistent with regulations.  He told me there were no
15 sleeping arrangements in all of area three, which I know
16 to be patently false, but he told me that I would not be
17 permitted, they're none, I would not be permitted to
18 sleep anywhere.
19     Q:  What do you mean by sleeping
20 arrangements?
21     A:  Bedrooms in the barracks.
22     Q:  Oh, okay.
23     A:  He then told me that I would have to
24 seek my own, after my 30 days travel and subsistence ran
25 out, I would have to seek my own living arrangements.

PAGE 212

1  Which they would be generous enough to help me find
2  arrangements.  I was a member of the baseball
3  association, two different boards, I coached my kids, we
4  chose the lifestyle that we lead based on the
5  neighborhood.  You know, typical things that you might
6  expect upper middle class people to choose and enjoy.
7      Q:  Yes
8      A:  This transfer completely turned my
9  life upside down and took control.  This was the
10 department, you know, this is the most hateful thing I've
11 ever seen our department do, and it's a disgrace.  I just
12 want you to know how adamant I am, in the disgraceful,
13 abusive act this was.
14     Q:  I know you, as you've said, you've
15 been fortunate enough have any other transfers that you
16 didn't want.
17     A:  Correct.
18     Q:  But other members of the State Police
19 have been transferred before without wanting the
20 transfer.  Isn't that right?
21     A:  I'm not suggesting I'm the only one
22 that's ever been abused this way ma'am.
23     Q:  Okay.
24     A:  And I do note under our transfer
25 regulations, under the FR33, it specifically states

1 transfers are not to be used in lieu of discipline.
2          Q:  Okay.  Since you brought up the
3 conversation with Major Szupinka on January 10th, I
4 wanted to skip forward to that a little bit.
5          A:  Yes.
6          Q:  And that was when I guess, you called
7 him at home.
8          A:  Yes.
9          Q:  And were you calling out of the blue,
10 or were you returning calls from him?
11          A:  I initiated the call. It's possible
12 that he wasn't there the first time I called, and I
13 either called back or, I initiated this conversation.
14          Q:  That's what I was asking.  I didn't
15 if he called you, and you called him back.
16          A:  No.
17          MR BAILEY:  Who was that with?
18          DARRELL OBER:  Major Szupinka.
19          MR BAILEY:  Mr. Szupinka.  Okay,
20     thank you.
21          COUNSEL:  Just tell me about that
22 conversation.  You told me some of it.
23          DARRELL OBER:  I called Major Szupinka.  I
24 told him I had, the chronology of events on January 10th
25 were this, at 12:30 I had a step one grievance hearing

1 before Conely.  On one of the grievances I filed.  At 16
2 00, or 4:00 p.m., he calls me I'm being transferred to
3 Washington, and I asked him specific questions.  What's
4 my assignment?  I don't know.  How long am I going to be
5 there?  I don't know.  Why am I being transferred?  I
6 don't know.  All I got was vague answers and he referred
7 me to either Major Szupinka or the commissioner.  Well,
8 I figured my best chance to getting and reasonable
9 answers would be out of Szupinka, so I called him at
10 home.  I had his number by virtue of my PEMA assignment.
11 We have contact information for all the command staff.
12 Well, we did.
13          Q:  Yes.
14          A:  So I called him, and I let him know
15 that I was, had received, had this conversation earlier
16 in the afternoon, late afternoon, whatever, with Major
17 Conely, and I wanted to know what my job in Troop B,
18 Washington was supposed to be.  And at that, his response
19 to that was, I have no idea.  I asked, did you ask for me
20 Major?  He said, no he did not.  I said, how, what do you
21 know about this transfer, and he said I got a call last
22 week from Westcott, and he said your getting Ober.  I
23 said, how long am I going to be out there.  And he said,
24 I have no idea.  He said, there's a lot to learn, you
25 know, you can visit stations, and you can learn about

1 being troop commander, and blah,blah,blah and you'll be a
2 good boy, basically, and I'll put in a good word for you.
3          Q:  Did you guys.. oh I'm sorry.
4          A:  I said, wait a minute.  What is my job
5 assignment?  He said, you're just going to assist me, I
6 guess.  He said, we'll work on that when you get here, is
7 what he said.  I said, well I know, we both know what
8 this is all over Major, this is all over that FBI
9 investigation.  He said, I'm not getting in the middle of
10 that.
11          Q:  Did the two of you discuss the
12 National Governors Association at all?
13          A:  He mentioned it in passing.  When he
14 rattled off a number of things about the area, and I
15 believe he said words to the effect of, you know, either
16 Troop B or one of the troops is the largest, or this is
17 the largest area, and he said there are a number of
18 things to learn, and he mentioned that as an incidental.
19 Oh by the way, the NGA is scheduled for this year. That's
20 a large commitment of our resources.  Yes, that was
21 mentioned.
22          Q:  Did he make any offer to let you come
23 in late on Monday's, or go home early of Friday's,
24 anything like that?
25          A:  In that conversation, absolutely not,

1 he was very clear that my time to report was 8:00 Monday
2 morning and departure was, from Troop B Washington, by
3 the way.  In subsequent e-mail, he made an offer for me
4 to be this, I think it was words to the effect of, when
5 my day to report, was whenever that was going to be, I
6 think he said something, his response was, I'll see you
7 at noon.
8          Q:  Were you keeping any notes of your
9 conversation with him?
10          A:  I think I did at the time.
11          Q:  Do you still have any notes of your
12 conversation?
13          A:  I very well could.
14          Q:  Okay.  And did you talk with him
15 again?
16          A:  No, that's the only conversation.no I don't
17 think I ever had that conversation after that.
18          Q:  Okay.
19          A:  We had e-mail dialog but I never had a
20 .
21          Q:  But did you, because I know you were
22 supposed to report there on January 28th.  Did you have,
23 was it e-mail or phone conversation, where you had a
24 conversation with him about taking a few days off?
25          A:  E-mail, yes, we never, I don't think

SHEET 55  PAGE 217

1  we ever spoke after that.  After the tenth.
2              Q:  And so it was then during the e-mail,
3  that he said that he made an offer about coming in late,
4  coming in late, going home early, that kind of thing?
5              MR BAILEY:  Before you respond.
6              TAPE CHANGE
7              DARRELL OBER:  No there was never a
8  discussion about going home late.  There was one e-mail
9  when, I think what had happened was, I put in for a
10  couple days leave.
11             COUNSEL:  Yes.
12             DARRELL OBER:  Right at the beginning of
13  that transfer period.  The transfer would be effective
14  practically speaking, that would affect Monday.  I think
15  I might have had a request for that Monday, or Tuesday.
16  And I e-mailed him, letting him, probably asking
17  permission, or whatever.  I think his response said, Okay
18  or great, see about noon on whatever that next day was.
19  That's the only question, conversation we ever had about
20  reporting times other than I've testified to.
21             COUNSEL:  Were these e-mails going back
22  and forth at work?
23             A:  Yes.
24             Q:  Did you have any discussion with him,
25  by phone or by e-mail about the first week, instead of

PAGE 218

1  coming all the way out to Washington, going and stopping
2  at Troop G?
3              A:  Yes.
4              Q:  And what was that discussion?
5              A:  He, well to back up.  The yo-yo that I
6  was on, I was notified on January 6th by Major Waugh,
7  that I was being returned to Internal Affairs.  After my
8  grievance hearing the same day, then Conely calls me and
9  tells me I'm going to Troop B, Washington, but I was not
10  going there right away.  I was supposed to go back to, I
11  think I skipped that part, I apologize.  He told me, I
12  was supposed to report on back to Internal Affairs on
13  January 24th, that was Monday, for five days, and then I
14  was to report to Troop B, Washington.  So during an e-
15  mail exchange with Major Szupinka, he said that he, in
16  conversation with Mr. Conely, he wanted to know if it
17  would be uncomfortable to go back to Internal Affairs,
18  for that weekend.  If so, I could visit stations in Troop
19  G for that period of time.  To which, I think I
20  responded, Well, if you believe what there saying, there
21  shouldn't be anything uncomfortable, but since we all
22  know what this was really about.  Of course it would be
23  uncomfortable.  I was kicked out of my command for no
24  legitimate reason.  So I said, yes, I would just as soon
25  not report back to Internal Affairs.  But it made no

PAGE 219

1  sense to tell a Captain to go visit stations when you're
2  not the commanding officer.  What do you do?  It's
3  parading me around like the village idiot.  I'm not going
4  to suffer that humiliation if I don't have to, and more
5  importantly, I said to Major Szupinka in those exchanges,
6  in that, with all due respect, it's a far better
7  investment of my time to keep doing what I am doing on
8  the IMS project, since I was being kicked out of there
9  too, before that project was completed.  So I stayed
10  there and kept working on the project that I was
11  originally assigned to do.
12             Q:  No, did you ever have a conversation?
13  You were mentioning about Troop G, and I know that the
14  National Governors Convention was held in State College.
15             A:  Yes.
16             Q:  I think that's around that area.
17  Right?
18             A:  Yes, that would be relative, a lot
19  closer to my home than Troop B, Washington ma'am.
20             Q:  And I was wondering whether you and
21  Szupinka ever discussed you being able to sometimes work
22  out of Troop G.
23             A:  Never.
24             Q:  Do you know what arrangements Major
25  Szupinka may or may not have made in anticipation for

PAGE 220

1  your transfer?  You know, for you to have a workspace.
2  That kind of thing.
3              A:  I know that he said that he would make
4  sure there was a workspace, at Troop B.
5              Q:  Okay.
6              A:  And a parking space, at Troop B,
7  Washington.
8              Q:  And were you going to have a car?
9              A:  Yes.  They didn't take my car.
10             Q:  I didn't know whether, like, have to
11  drive your personal car back and forth, or if you would
12  have.
13             A:  No.  I did take my, Conely did demand
14  that I turn in my Turnpike credit card and wouldn't allow
15  me to use that until I got to Troop B.  Since the officer
16  who replaced me, Captain Brown wouldn't need that card,
17  I, when he sent that list of items that you referred to
18  about turning in.
19             Q:  Yes.
20             A:  I called and said, well can't I at
21  least keep the Turnpike card in order to get me to
22  Washington.  He said, no, pay it out of your pocket and
23  submit for reimbursement.  I said, but the officer coming
24  in, the officer who's here, doesn't need it.  No,
25  absolutely not.

SHEET 56   PAGE 221

1   Q:  And did Major Szupinka ever say
2   anything to you, to the effect of, you know, that he knew
3   that this was going to be a difficult situation for you,
4   because you really didn't want to be out there.
5   Anything like that?
6           A:  Yes.
7           Q:  What was that?  Was that during that
8   first discussion, or a subsequent discussion?
9           A:  No.  We only had one discussion.  The
10  only other discussion we had in this time frame would
11  have been when he chewed me out at the Academy.  He
12  confronted me in April, no that's not right.
13          Q:  April of 2000.
14          A:  No.  Give me a minute here.  In August
15  of 1999.
16          Q:  Okay.
17          A:  Right around that time period, at a IT
18  steering committee meeting, I saluted Major Szupinka when
19  he walked by me, didn't acknowledgement me, only turned
20  and said, I want to talk to you at the break.  And at the
21  break, he ordered me into the officers mess and proceeded
22  to confront me about the FBI investigation, and why I
23  didn't call him, and why he wasn't contacted, and dare I
24  doubt his integrity, and he was all over me, up one side
25  and down the other, about that whole business.

PAGE 222

1           Q:  Was that because he was the area
2   commander in the, where Stanton was located?  I'm
3   wondering what he said to you about why did he thing you
4   should have called him?
5           A:  Because, yes, he would have been the
6   area commander.  As he is now, still the Area 3
7   commander.
8           Q:  So he was the Area 3 commander.
9           A:  Yes.
10          Q:  And Stanton is in Area 3.
11          A:  Not any more.
12          Q:  Who was.
13          A:  Yes.
14          Q:  .at the time.  Okay.
15          A:  I think I lost your question though.
16  You had asked me what?
17          Q:  I may have lost it too.  Because I was
18  just asking about whether or not you had any other
19  conversations, any conversation with him where
20  essentially saying to you, you know, I know it's going to
21  be difficult, but I'll do what I can to help you?
22          A:  That night, on, when I called him that
23  night, he said to me, he realized the position I was in.
24  He wasn't getting into the middle of anything. He knew
25  there was a rift between Evanko and I.   He knew exactly

PAGE 223

1   why I was being sent out there.  And he said, he would do
2   what he can for me, but he was very clear that where I
3   was to report from work, or where I was to report to
4   work, when I was expected to report, how long I was
5   expected to there.  He was very clear about the hotel
6   accommodations, that, that would run out after thirty
7   days.  He was also; I'm sure perceptive enough to know
8   that, according to our own regulations, unless a transfer
9   is a temporary transfer, it indicates otherwise, that by
10  regulation, you're to be considered permanent.  So when
11  that personnel order came out, applying our regulations
12  to that personnel order, that was a permanent transfer.
13          Q:  Is there something different between
14  and transfer and an assignment?  I noticed on a lot of
15  the, the reason I'm asking this question is, I noticed on
16  a lot of the personnel orders, where they have list of
17  people, and some will say, this person's transferred, and
18  others will say, this person's assigned.  There all list,
19  but sometimes they'll use the term transfer, sometimes
20  they use the term assigned.  Is there a difference
21  between those under your regulations or.
22          A:  Not to my knowledge.
23          Q:  Okay.
24          A:  If you go to work on Friday and you're
25  somewhere different on Monday, I guess you've been

PAGE 224

1   transferred.
2           Q:  I just wondered if there was a
3   significance to the State Police that I as a non State
4   Police person would not know between the difference,
5   between, why some of them would say transfer, and some of
6   them say assignment.
7           A:  No.  Never heard that discussion, no.
8           Q:  Okay.  But during your conversation
9   with Major Szupinka, you didn't get the impression that
10  he personally was out to make your life miserable, did
11  you?
12          A:  I got the impression that Major
13  Szupinka was on the receiving end of a phone call, just
14  as exactly as he described, "You're getting Ober".  Now
15  whether he was told exactly how to handle me once I was
16  supposed to get there or not, he didn't say.
17          Q:  And he was polite enough to you?  Was
18  he polite and, you know you said, during that
19  conversation.  I'm trying to get an idea of the tone of
20  the conversation.
21          A:  Major Szupinka was polite to me.  That
22  was a very difficult conversation for me to have ma'am.
23  When I picked up that phone on January 10th and Conely
24  was on the other end, when I, my wife happened to be
25  sitting by my side, and when I told Kim what I had been

1  told, she broke down.
2          Q:  If you want to take a break.  We can.
3  Would that be helpful?
4          A:  And asked me why are they doing this
5  to us?  And I was unable to give her an answer beyond
6  what she already knew.  So the answer to your question
7  about Major Szupinka is, that was a very emotionally
8  charged conversation for me, and he was a professional to
9  me.
10          Q:  Okay.  Now on paragraph forty-six is,
11  you alleged that you suffered demeaning career injuring
12  transfers, and constructive demotions, and that it
13  destroyed your reputation and effectiveness.   So I `d
14  kind of like to break that down a little bit and make
15  sure I understand what transfers and demotions we're
16  talking about.  If there's any transfers or demotions
17  that we have not discussed yet, that are encompassed by
18  that paragraph.  So what were your references there?
19          A:  Well, I don't believe that there are
20  any transfers that we haven't covered.  The career damage
21  and demeaning transfers would start with the first
22  transfer from the IIMS project, back to Internal Affairs,
23  to Troop B, Washington, and then a demotion and a
24  transfer to the central section command of LCE.
25          Q:  And then, how long were you the

1  central section commander in LCE?
2          A:  About four months.
3          Q:  And then since then, your current
4  position, I hate to say.  I know you're the director of
5  something.
6          A:  Administration.
7          Q:  Is that a division of the LCE?
8          A:  Two divisions.  Operations and
9  administration.
10          Q:  Okay.  And I guess, within that then
11  there's the central section, western section.   I think
12  you were telling me about that earlier in the day.  About
13  there being three different regions.
14          A:  In the operations division there are
15  three sections.  Correct.
16          Q:  Okay. And those are broken out
17  regionally.
18          A:  Yes.
19          Q:  All right.  Now, you talk about those
20  transfers, etc, having destroyed your reputation and
21  effectiveness.  In what way do you think that your
22  reputation has been destroyed?
23          A:  It would probably be shorter if we
24  talked about in what ways my reputation hasn't been
25  destroyed.  Do you want to start there, and work

1  backwards?
2          Q:  We could do it that way if it's, you
3  know, easier.
4          A:  Well ma'am you've got to understand.
5  This is a para-military organization and it's run by
6  command personnel who rise through the ranks.  People
7  such as myself.  When I made Captain, I believe I was the
8  youngest Captain in the State, let me backtrack, with the
9  possible exception of Jeff Miller. I think that most
10  folks who know me, and know my work ethic, know my
11  reputation and character understand a whole lot about me
12  and what my abilities are.  And I would like to think
13  that, that was one of the reasons that I was selected to
14  be a part of the IMS project.  When you take someone
15  who's the career path and has the credentials that I
16  have, and you put the title, "special projects" by there
17  name, and put it on a personnel order, whether it's a
18  transfer, or an assignment, or, I don't care what, in our
19  organization, that's the penalty box.   You've just
20  killed their career.  You've just singled them out, and
21  you have told the whole entire 6000 personnel
22  organization, that this persons in the box, they're in
23  trouble, they're a screw up, and you've also told them
24  that if you associate with them, you're likely to meet
25  with the same fate.  And that's what these people did to

1  me.  When I defeated that transfer to Troop B,
2  Washington, I was offered by way of settlement, in
3  exchange for dropping grievances, and any future actions.
4  I was offered the transfer to the LCE central command,
5  which, attorneys being professionals, my response, my
6  word for word response never made it to paper, but it
7  wasn't flattering, and the first words out of my were,
8  that's a demotion, are you telling. Are they out of their
9  minds?  They had a chance to fill that vacancy, Houston
10  Williams, the Lieutenant that was in that position, was
11  arrested on January 10th or January 11th and with all due
12  respect to Major Koscelnik, if it was such critical,
13  important position, I would have expected them to fill
14  that on January 29th along with all the rest of their
15  promotions, when they tried to ship me to Washington.
16  But they didn't.  They left it vacant.  They had no idea.
17  There could have been no way, there could have been no
18  way that they would have been able to predict, they
19  needed to keep that spot open for me.  The people on the
20  project where I was assigned, the IIMS project, from the
21  project executives, right up through and to include
22  Colonel Hickes, all wanted me there, working on the
23  project, completing my assigned duties, which is what I
24  was put there for.  But I was summarily removed from
25  that, and the career damage, and the effect of the

SHEET 58   PAGE 229

1 demotion, not only was indicator to people within the
2 organization, but the people I was dealing with outside
3 of the organization. I was part of project committee,
4 and on that committee were deputy secretary individuals,
5 Barb Shelton, comes to mind, from DGS, Mr. Greenwood, all
6 of the vendors that we dealt with, I was the face of that
7 part of that project, that was the key piece in the
8 technology project, was the systems integrative contract.
9 I was the point of contact. I was the ranking officer.
10 I was that project to those vendors. And when I was
11 removed, it was humiliating, because people would ask the
12 obvious questions. Well why are you being transferred?
13 What's going on?  Some big project out there? What was I
14 supposed to say?  No. No, I'm being sent out there to
15 visit stations. Hell, I was in Troop G for four years.
16 I know where all the stations are. I don't know what I'm
17 to visit. I already know that. So all this was,
18 unbelievably, is a lowest point in my career ma'am. And
19 being sent to a section command. As I said, we're a Para-
20 Military organization. I was a section commander eight
21 or nine years ago, as a Lieutenant. As a Lieutenants
22 position.
23          Q: Oh, okay. I'm sorry. I was thinking
24 area command.
25          A: That's okay. No. No. I was a

PAGE 230

1 section commander.  Our regulations, and I believe it's
2 AR1-11 indicate that sections are to be supervised or
3 commanded by Lieutenants. Not Captains. Not Captains,
4 but Lieutenants. I'm sorry; Sergeants can be acting in
5 that, and in the case of LCE, that's exactly what was
6 occurring. Houston Williams, the former section
7 commander was transferred in September of 99, or there
8 abouts, because an allegation of sexual harassment.
9 Sergeant Balensic, was put in an acting status and ran
10 that section for several months. They didn't feel a need
11 to bring in a Captain then.  They put Sergeant in. And
12 when I left the position, they brought in a new
13 Lieutenant, meaning someone who had been a Sergeant the
14 day before. So there was never was an issue about, is
15 there a need for a Captain.  That section wasn't even
16 created until 1994. It's the smallest section in LCE.
17 When the LCE was first created, there was only an east
18 and a west section.
19          Q: I'd  just like to back up to the
20 special projects officer, because, essentially so that
21 when that's the title that you're given, as special
22 projects officer, that's sort of like the kiss of death
23 on your reputation, or whatever.
24          A: The culture of our organization is, in
25 the instances that I can think of , people that have been

PAGE 231

1 brought in for special projects, are in trouble.
2          Q: Would that be the case with, I think, Cythia
3 Transue, who was sent to Philadelphia as special projects
4 officer to that area commander, around this same time
5 frame.  Was that your information, that, that was some
6 type of punishment for her?
7          A:   If you compare the documents, you'll
8 see the difference. The document that sent me to Troop
9 B, Washington says special projects officer. This myth
10 about the NGA was created after the injunction was filed.
11 The next personnel document, personnel order that was
12 released by the department, then flowered this up. I
13 don't think there's any question that Captain Transue is
14 not in trouble, in fact I would suggest quite the
15 opposite. But they don't compare. I know that the
16 defendants are quite, I'm sure they are very hopeful
17 that, that comparison will hold, but I would love to
18 scratch below the surface of that whole issue with you,
19 because they don't compare, they don't even compare on
20 paper.
21          Q:  Okay. And you think that her
22 paperwork, if I would find that, would be something
23 different. I have not seen her paperwork, so I'm.
24          A:  Oh yes. I'm sure it would be quite
25 different. I mentioned to you the financial this

PAGE 232

1 disciplinary transfer, that was going to have on my
2 family. I also would like you to recognize or at some
3 point understand that the individual who was selected to
4 take my place, received a promotion for that position, by
5 now we know means, it's not required, it's optional. But
6 with that promotion, and his enlistment date, that would
7 mean a $7000.00 a year pay raise for him. I was not
8 going to be the benefactor of such a promotion or
9 windfall.
10          Q:  Now back to the allegation about your
11 reputation was destroyed, and you mentioned about the,
12 you know, special projects officer, and I could see, I
13 understand the point with respect to people that don't
14 necessarily know you, in a organization that large. But
15 other people that know you and worked with you closely on
16 these projects, that you're discussing, your reputation
17 among them would still be good. Wouldn't it?
18          A:  In some cases.
19          Q:  For example, the people that you
20 worked with on the IMS project.
21          A:  Well, I'm not quite sure what the
22 question is, but I'll try it. There's a stigma that's
23 associated with being the one in the box, while privately
24 or in some other area people might, or one on one,
25 acknowledge that you're still a pretty good guy, and all

SHEET 59   PAGE 233

1  of those things.  The reality is, when you have the
2  target on your back, and when they have attached a stigma
3  to you, human nature being what it is, many, many,
4  individuals will make sure that, that association is kept
5  to private or they will make sure that you're ostracized.
6  You go to meetings and you're the person that no one
7  wants to sit with, or there's continual references about
8  that, that just happened to me yesterday at the
9  Peachtree, when I there for lunch.  Oh gee, we didn't
10  know you were going to be here, hope the commissioner
11  doesn't come by.
12               Q:  is the Peachtree a restaurant?
13               A:  Yes, it's a restaurant on Progress
14  Avenue.
15               MR BAILEY:  near the intersection of
16  Walnut Street.
17               COUNSEL:  Not a Harrisburg familiar
18  person, sorry, I'm Cumberland County side.
19               DARRELL OBER:  So that reputation, many
20  folks, or it hasn't been the case, that there hasn't been
21  anyone that still, that believes these things.  As was
22  said to me the other day, this transfer, planned
23  disciplinary transfer, is something that everyone in the
24  agency knew what it was, when they read it in print.
25               Q:  Who said that?

PAGE 234

1               A:  Major Dewire.
2               Q:  Now, in paragraph C, there, of 46.
3  You talk about being denied opportunities for overtime.
4               A:  Yes.
5               Q:   What overtime opportunities were you
6  denied?
7               A:  I have been denied principally through
8  my PEMA assignments.
9               Q:  That's what I was wondering.  Is there
10  anything other than PEMA, because that would give you the
11  opportunity.
12               A:  That would give me the opportunity.
13  I've also been denied the opportunity to act in the role
14  of acting bureau director, since I assent back to a
15  Captain's job in the LC, as the division director of
16  administration.
17               Q:  Hasn't Captain, excuse me, Major
18  Dewire made you acting bureau director a few times?
19               A:  Five days, when Captain McDonald
20  wasn't available.
21               Q:  Okay.
22               A:  Captain McDonald, in the last year, I
23  think the last time I looked at that was actually at the
24  end of October, so give me some leeway, but in the last
25  year Captain McDonald has acted, in acting capacity, I

PAGE 235

1  believe around forty days, maybe forty some.  I've acted
2  in the grand total of five.
3               Q:  Would that be the decision of who to
4  name as acting, would that be Major Dewire's decision?
5               A:  Major Dewire and Colonel Conely, or
6  Colonel Coury, sorry.
7               Q:  Would Major Dewire need to consult
8  with Lieutenant Colonel Conely, I mean, I forget which
9  one you told me.
10               A:  Coury.
11               MR BAILEY:  Coury
12               COUNSEL:  In order to decide who would be
13  the acting director, or could he just do that on his own?
14               DARRELL OBER:  I'm not exactly sure how he
15  does that.
16               Q:  Okay.
17               A:  I just know the, as I said many times.
18  I know the end result.  We have department regulations
19  and there's a governors management directive that says,
20  that is an assignment that is, unless, I can't remember
21  the exact verbiage, peculiar, or some set of
22  circumstances exist, that's an assignment that's to be
23  equalizes among the eligible participants, and it's also,
24  in addition to taking money out of my pocket, there also
25  not affording me the opportunity, the career advancement

PAGE 236

1  opportunity of learning the functions of another
2  position.
3               Q:  Is that is because, do you get some
4  type of pay deferential while you're the acting bureau
5  director?
6               A:  Yes.  Cost me over thirty bucks a day,
7  every time he doesn't name me.
8               Q:  And then to be the reimbursements that
9  you're taking about in that paragraph C, are those
10  different reimbursements than we've discussed before the
11  frame.
12               A:  No.
13               Q:  Okay.  Then with respect to paragraph
14  D, you, said haven't been allowed to get certain
15  educational opportunities.  What were those?
16               A:  I applied for the Police Staffing
17  Command School, in about the fall of ninety-nine, and it
18  was rejected, came back from the deputy director of
19  administration, of the administrations office.  I was
20  denied because it, they said it was received late, that I
21  had missed a deadline.  Well, I never knew until looked
22  through my personnel file, that, that wasn't the case at
23  all.
24               Q:  What did you find in your personnel
25  file?

1      A:   I found a copy, with a note from tech
2  services that said that the thing was sent over on
3  October 20th.  The deadline was October 22nd, and the
4  memo I received back said that it wasn't received until
5  October 28th.  The mail goes once a day.  So it's,
6  there's no possible way that they didn't receive
7  something for eight days when the mail is shuffled over
8  there every day.
9      Q:   Did you know what the deadline was?
10     A:   Yes.  I met the deadline.  I put it,
11  or forwarded it to my bureau on October 20th.
12     Q:   Okay.  Did it need to just get to your
13  bureau director, or who did actually have to get to by
14  the 22nd?
15     A:   As I recall from the personnel, or
16  from the special order, or whatever the directive was, it
17  needed to get to, you're going to have to, it was either
18  the director Bureau of Personnel, or the director of, or
19  the deputy of admin., I don't recall which one.
20     Q:   And you're bureau director at the time
21  that you submitted it to was who?
22     A:   Major Waugh.
23     Q:   And there was certainly, would Major
24  Waugh have had any reason to sit on it?
25     A:   None whatsoever.

1      MR BAILEY:  How do you spell Waugh?
2      DARRELL OBER:  W-A-U-G-H
3      COUNSEL:  Okay, that's the police staff
4  command school 1999.  What other educational
5  opportunities?
6      A:   I had, not long after I was
7  transferred to LCE, Major Koscelnik, now I'm in the
8  section job now, okay.
9      Q:   Yes.
10     A:   Major Koscelnik , well before we do that, can I
11  go back to the preceding paragraph?
12     Q:   Sure.
13     A:   With respect to acting. I'm not sure
14  it it's that's paragraph, but it might be.  With respect
15  to acting duties, I was transferred to the Bureau of
16  Liquor Control Enforcement, as a section commander on, I
17  believe February 18th, now I'm a Captain assigned to a
18  section job, as my grievance said, of the sixty-nine or
19  seventy section commanders in the state.  They're all
20  Lieutenants except for me, now shortly thereafter, within
21  three or four weeks, or two weeks, Captain Campbell, who
22  was the acting. Not the acting.  Who was the director of
23  the  administration division goes on leave.  I was not
24  put in that position.  I'm already a Captain, and have
25  already been a division director, for five years, or four

1  years.  Instead they brought the Lieutenant from the
2  western, from Pittsburgh, across the state, paid him out
3  of class wages, put him in my chain of command as a
4  Lieutenant, and left him sat there for a week.  When I
5  had my first discussion with Major Koscelnik, after I was
6  transferred over there, I asked what I'm sure you would
7  privately say are the obvious questions.  Who do I answer
8  to?  And Major Koscelnik said you answer to Captain
9  McDonald.  So who does my performance evaluations?
10  Captain McDonald.  Who's going to do my leave slips,
11  approve my leave slips?
12     He said Captain McDonald.  He said, incredulously,
13  he said, do you have a problem with that?  I said, yes I
14  have a problem with that.  He's a Captain.
15     Q:   Yes.
16     A:   Okay, so this situation that I was put
17  in, is something I've never seen, and I think some of our
18  witnesses, have already indicated, they haven't in some
19  thirty years experience, on their parts.  When I was in
20  the section command job as a Captain.  Major Koscelnik
21  put out a bureau directive, or a bureau memo, asking for,
22  soliciting for interest in attending a national alcohol
23  symposium conference in Washington, DC.  And I believe
24  that it said, one of the section commanders would attend.
25  I believe that's how it was worded, but in any event, I

1  expressed interest, put in a memo to attend this
2  conference.  LCE had sent individuals, had sent three, or
3  four, or five, individuals the year before.  To the first
4  conference, this was the second one.  That had all been
5  approved.  I submitted a memo to Major Koscelnik, and he
6  approved it.
7      Q:   Yes.
8      A:   Subsequently then the out service
9  training authorizations, and appropriate forms were
10  completed by someone, I guess, the AA, I really don't
11  know, but anyway, that package went over to the deputy of
12  operations, who was defendant Westcott, and basically
13  those of us that had put in for it, and been approved
14  were making plans to go, scheduled preparations and what
15  have you.  I was then about, again, a couple weeks, I
16  have to look at the documents, but a couple weeks or so
17  later, I was called in by Captain McDonald, and he said
18  well, guess what, you're not going to the conference, and
19  neither is anyone else.  Westcott denied them all.  At
20  that point, the other individuals who had been approved,
21  when I see them in the hallway, they kind of snickered
22  and said thanks a lot, and it's because of you, that
23  we're not allowed to go this year.  Corporal Carbouski, I
24  believe, says yes, I guess it would have too obvious to
25  deny you and not everybody else, so they denied

SHEET 61   PAGE 241

1  everybody.
2           Q:  So nobody went to that conference.
3           A:  So nobody went.  They went the year
4  before, when I wasn't there.  The year that I'm there,
5  and requested, we don't go.
6           Q:  You said it would be helpful for you
7  to look at the paperwork from that?
8           A:  Oh yes.  I mean, I could confirm the
9  dates for you.
10          Q:  I'm sure I have it somewhere.
11          A:  Unless I missed something that's.
12          MR BAILEY:  While he's looking at that
13  Sydni.
14          COUNSEL:  Yes.
15          MR BAILEY:  I really hesitate. Are you
16  going to finish by five? I mean you're a paragraph.
17          COUNSEL:  Yes, well I have some other
18  stuff I'd like to cover after that.
19          MR BAILEY:  I'd really like to finish him
20  up today if it's possible to do.
21          COUNSEL:  Well we can see how far we can
22  get.  I don't know if this paperwork is helpful to you at
23  all or not.  In that, this is the only paperwork I've
24  seen about it.  So, at least it gives us a time frame
25  date.  The training was in June 2000.

PAGE 242

1           DARRELL OBER:  Yes.
2           Q:   And as of March 23rd, 2000, there's a
3  memo from Major Koscelnik.
4           A:  Yes.
5           Q:  At that point it looks like everybody submitted
6  paperwork and travel vouchers, etc.
7           A:  Yes.
8           Q:  Does this help you at all in figuring
9  when you were told that the whole deal was off?
10          A:  No, other than it was after April
11  18th.  Is my memo in there.
12          Q:  I'm sorry; I was looking to see what
13  was here.  But, the bottom line is, this wasn't something
14  that you chose not to go to.
15          A:  Oh no.  I expressed interest.  I put
16  in a memo requesting consideration.
17          Q:  Okay.
18          A:  And was approved.  Well here it is,
19  yes this is it.  This is from Koscelnik.
20          MR BAILEY:  That's page two?
21          DARRELL OBER:  Yes. On exhibit twelve,
22  page two; this is from Koscelnik to me.  I was the
23  central section commander.  It says you have been
24  approved.
25          COUNSEL:  Right, and that's what I was

PAGE 243

1  wondering.  Did you get anything after this saying that
2  you had be disapproved?  Or was it a verbal conversation.
3           A:  Well he, excuse me, Captain McDonald
4  reported it to me verbally.  I think there was, I never
5  received anything personally from anybody, no.  But I
6  think there was something generated, although I don't
7  recall what that was.
8           Q:  Okay.  But you didn't receive anything
9  in writing saying that, that had been rescinded, or
10 whatever?
11          A:  I'd have to look to make sure.  I
12 don't think so.
13          Q:  Okay.
14          A:  I don't think anything was directed
15 personally to me.  I think the package was just rejected,
16 as my recollection.
17          Q:  Were there any other educational
18 opportunities that you put in for and were denied?
19          A:  No.  By this point, having no success,
20 candidly, should any come along; I really didn't see the
21 point.
22     And it was clear that I was not going to be selected
23 anyway.  So what's the difference, what's the point?
24          Q:  When Captain McDonald said that no one
25 was going, and if you told me this, I apologize for not

PAGE 244

1  remembering.  Did he say who made that decision?  Or who
2  told him?
3           A:  It's likely that he did.  Koscelnik
4  would have never said a word, but, you see, I think
5  something came from Westcott.  Whether it was a post it,
6  you know, rejected, or whatever, but I was told it was
7  from Westcott.
8           Q:  You were told by Captain McDonald,
9  Westcott said no.
10          A:  That's my recollection.  He would, as
11 a fellow Captain, I can't imagine, you know, it would
12 have come from a subordinate so; he was really the only
13 peer I had to talk to.  Wait a minute, Captain, I'm
14 forgetting; I'm overlooking Captain Campbell.  It could
15 have come from Captain Campbell.
16     I just don't remember.
17          Q:  And Captain McDonald, his position
18 was?
19          A:  Director of Operations.
20          Q:  Okay.  And at that time was Captain
21 Campbell the.
22          A:  Director of Administration.
23          Q:  The job you have now?
24          A:  Yes.
25          Q:   What happened with him?

SHEET 62  PAGE 245

1 Where did he go?

2      A:  He came in April, late April, he came
3 into office on a Monday morning, and said, you know I
4 was, Captain Campbell and I were promoted together, and
5 he came into my office, shut the door and said, you know
6 I was driving back from, I think he has a place in North
7 Carolina, or down south somewhere, he said I was coming
8 back, and I got to the beltway, and I said, you know
9 what, that's it for me, I'm done.  He said I just want
10 you to know that you're one of the reasons I'm retiring.

11      Q:  And what was, did he say more about
12 why?

13      A:  Yes, that was my question.  Someone
14 tells you tells you that, it raises a level of concern.
15 He said that he had twenty-eight years on the job; I
16 think was what he told me, and that in twenty-eight
17 years, he had never seen anybody treated like they've
18 treated me.  He had a great deal of respect for me.  We
19 were promoted together.  We were peers.  Had many
20 occasion to have conversations by virtue of his
21 assignments, as director of operations, and
22 administration, and different points in the Bureau of
23 Liquor Enforcement.   He said he thought what they were
24 doing to me was a disgrace, in that he had been avoiding
25 the commissioner for months, any opportunity he had, he

PAGE 246

1 was avoiding any kind of face to face meeting with him,
2 because his fear was that the commissioner would ask him
3 like, how's things going, and if he were asked that, if
4 he knew anything about Captain Campbell, he would then be
5 obligated to unload with the truth.  And he said he would
6 have just as soon at that point go out now before he blew
7 his leg of at the kneecap.  But he said having seen what
8 they were doing to me was enough for him; he no longer
9 wanted to be a part of this organization.

10      Q:  And then he retired, and then you
11 moved into the position that he had held?

12      A:  Eventually.

13      Q:  How long was the lag time there?

14      A:  Till I was, he put his retirement
15 papers in on May 8th.  On May 30th, a Tuesday as I
16 recall, Major Koscelnik called me, I was at a conference,
17 at a conference that we were putting on.  I was not
18 attending.  I was a participant.  LCU was putting on a
19 conference in Bloomsburg.  He paged me or telephoned me
20 and asked me to meet him at the Bloomsburg Station, and
21 when I met him at the Bloomsburg Station, he said that
22 the purpose of me being called there was that he wanted
23 to offer me the position of the Director of
24 Administration, and wanted to know if I was interested in
25 accepting that.  And when the personnel order came out,

PAGE 247

1 it was backdated to, I believe, May 26th to cover the
2 time that I wasn't, hadn't been offered, or wasn't named
3 as the division director.

4      Q:  Okay.  Let's see, paragraph.

5      MR BAILEY:  Darrell, let me just, while
6 she's checking.  Federal rules provide that we have to
7 make you available for six hours.  Obviously in fairness
8 to opposing counsel, it is a detailed complaint, there's
9 a lot to it, quite frankly I don't see how she's going be
10 able to finish by five, in fairness to her.  I want
11 suggest that we proceed till about four or four fifteen,
12 and you and I talk, and see if there's somewhere where
13 this could break or you, you know, I just can't see pushing
14 on the limita.. I know it's very difficult for you.  I
15 understand that, but you know we are the plaintiff's.
16 It's our story to tell.  With that in mind, I'm just
17 wondering Sydni, if in a few minutes at least, give some
18 thought to where you are in the deposition.  How much
19 time to complete, and maybe we can compromise a few more
20 hours or something for you.

21      COUNSEL:  That would be great.

22      MR BAILEY:  But he's, I know this guy and
23 he's starting to get tired.

24      COUNSEL:  I can see it.  I know I'm very
25 tired too.

PAGE 248

1      MR BAILEY:  You know, it's almost six
2 hours and I mean that's tough on anybody.  You know that
3 so.

4      COUNSEL:  Right.  Just let me know at the
5 end of the deposition whether it's something that we can
6 work out or whether I need to file a motion

7      MR BAILEY:  Okay.  Oh, we'll work it out,
8 you don't need to.

9      COUNSEL:  Okay.  I'm just saying you know,
10 you were just saying about the rules.

11      MR BAILEY:  You know how reasonable I am
12 Sydni.  You know what I'm like.  All we to do is talk
13 about it.  We'll get it work, no problem we'll get it
14 worked out.

15      COUNSEL:  Because I do, I mean, I have a
16 couple hours, several hour more, probably three more
17 hours of questions, so.

18      MR BAILEY:  Yes, that's what I was
19 thinking.

20      COUNSEL:  If you guys want to break and do
21 it another day.  I'm not pushing to do it.

22      MR BAILEY:  Well, you know what I'd to do,
23 I'd like to respectfully, because you're at a hiatus now,
24 between sections, I request a five minute recess.  I'd
25 like to talk with Darrell and get my clients, permission,

 

SHEET 63 PAGE 249

approval, and advice

COUNSEL: That would be fine. That's not a problem.

MR BAILEY: Okay. Thank you.

It's 3:43 p.m.; We'll take a short break.

3:54, we're back on video.

MR BAILEY: Okay, I might as well lead on this, because I'm the one who made the request. Let the record show that during our break we made a request to opposing counsel, or a suggestion should I say that she can respond to in her own words, because she's going to need more time. She'd indicated roughly three hours or so. Traffic conditions. It's been a very long day for Mr. Ober. We break at this point. If an request I would have Sydni, is that we get back together. I don't want a whole lot of time in a break, in his deposition. I have some time available on Friday, and usually halfway decent day for most Attorneys, and I'm wondering if it's possible, if you need him three or four hours, that we get back together on Friday.

COUNSEL: I need to go check my calendar.

MR BAILEY: Okay.

COUNSEL: Is that something I should do now?

MR BAILEY: No. I mean, I can call

PAGE 250

tomorrow morning, but I've got to be out of town all day tomorrow on depositions on another case, but I would just like to make that suggestion, if it's at all possible.

COUNSEL: I'll see if I can, because I do have a bunch of dates during the next two weeks where I am really tied up, because of another case that I have. I don't know off hand what Friday's like. Maybe Friday morning might.

MR BAILEY: That would be great. And if you can voice mail my home phone number, which is in the phone book, so I don't care, we might as well depose me on it. It's 232-7542, and 232-7542. Friday is, at your convenience. Darrell is that okay with you? Is it possible?

COUNSEL: I mean, I can go check real quick..

DARRELL OBER: As far as I know.

MR BAILEY: As far as you know. Okay.

DARRELL OBER: I'm burning leaves so whatever.

COUNSEL: I mean Dorothy will be able to tell me whether I am or am not.

MR BAILEY: Okay.

COUNSEL: I just have to ask her so.

MR BAILEY: All right, if that's, I guess

PAGE 251

we could end this, I got to, you know, I'm going to do a revised document request. We're obviously going to have a disagreement. I am going to suggest that maybe we get with Judge Caldwell.

COUNSEL: Okay

MR BAILEY: On the issue of the document request because again I don't feel that some of your requirements are fair, and you obviously feel they are. We need to work that out.

COUNSEL: It depends on what's, what are you concerned about, relevance issues, or the cost or.

MR BAILEY: Well I can't go into them now. No, it's even some of the mechanics. You know. I mean paying labor twenty fi.we're not paying anybody twenty five dollars an hour to make copies, I mean it's not going to happen, but I don't want to be unreasonable, we'll talk about it now. Okay.

COUNSEL: Okay. Because I'm not sure that we necessarily need to bring up with the judge so.there's certain issues.

MR BAILEY: No, I'm saying if we need to get there, if we can't work it out. I'm going to do some revising, in my request, and what not. And then if we need to, we can just agree in a friendly way, to go to the Judge, and say hay Judge, we disagree about some

PAGE 252

things.

COUNSEL: Okay.

MR BAILEY: I don't have anything further. I'd like to thank you for your co-operation, though.

COUNSEL: No I don't.

MR BAILEY: For today. So the deposition is, it'll be continuing then.

It's 3:57 p.m.; Deposition of Darrell Ober will be continued at a later day.

## P.R. VIDEO, INC

### A

**abbott** [88] 1:1,3,6,8,12,16,18,20,
22,26 2:3,5,7,9,11,13,15,17,19,21,
23,25 3:2,4,7,10,12,14,17,19,22,
24,26 4:2,6,8,10,12,14,16,19,21,
23,25 5:2,4,6,11,13,15,17,22,24,
26 6:2,5,7,12,14,17,19,21,23,25 7:
2,5,10,12,14,18,25 8:2,4,6,10,12,
14,17,19,21,23,25 9:1,3,5,7,16,18
**ahead** [2] 2:22 6:22
**another** [1] 9:13
**arm** [1] 7:3
**around** [1] 4:10

### B

**back** [2] 5:7 9:12
**bags** [1] 1:23
**ball** [15] 1:13 7:21,22,24 8:3,8,15,
17,22 9:2,5,8,9,10,14
**base** [16] 3:9 4:5,6,9,13,18,24 5:3,
9,12,13,19 6:9 7:7 8:3,8
**baseman** [4] 2:14 3:1,5,21
**baseman's** [1] 4:26
**behind** [1] 7:19
**body's** [1] 8:9
**break** [1] 7:3
**brother** [1] 1:17
**buddy** [1] 4:12
**bunts** [1] 7:21,22

### C

**catcher** [3] 7:9,17,22
**catcher's** [1] 7:11
**catching** [1] 7:19
**center** [1] 6:14
**certainly** [3] 1:8 3:2 7:10
**change** [2] 4:10
**changing** [1] 4:11
**coach** [3] 1:4,6 2:4
**collects** [1] 3:15
**comes** [1] 3:15
**costello** [91] 1:1,3,6,9,15,17,19,21,
25 2:2,4,6,8,10,12,14,16,18,20,22,
24 3:1,3,5,8,11,13,16,20,23,25 4:1,
4,7,9,11,13,15,18,20,22,24,26 5:3,
5,7,9,12,14,16,18,21,23,25 6:1,3,6,
8,11,13,16,18,20,22,24,26 7:3,6,9,
11,13,15,17,19,26 8:3,5,8,11,13,
15,18,20,22,24,26 9:2,4,6,8,17
**couple** [1] 7:15
**cousin** [1] 1:19

### D

**daffy** [2] 1:17,18
**darn** [2] 9:15,17
**days** [2] 1:14 7:15
**dean** [3] 1:16,18,22
**different** [1] 8:19
**dizzy** [1] 1:16
**dollar** [2] 3:7,14
**down** [1] 3:15
**drops** [1] 9:9

### E

**easy** [1] 4:12
**end** [1] 9:19

**even** [1] 7:26

### F

**fancy** [1] 7:19
**fellow's** [2] 2:10 3:8
**fellows'** [1] 2:6
**field** [3] 6:1,4,14
**fielder's** [2] 5:23 6:11
**find** [3] 1:25 3:8 4:4
**first** [27] 1:2,23,26 2:8,12,14,17,18
3:1,3,5,9,21 4:5,8,13,18,21 5:2,17
6:2,7 7:3,23,25 8:3,8
**fly** [1] 9:13
**french** [2] 1:19,20
**funny** [1] 1:15

### G

**gave** [1] 1:4
**gets** [3] 5:6,11,13 7:21 9:13
**give** [3] 1:13 9:15,17
**gonna** [3] 2:4 6:26 7:23
**goofe'** [1] 1:21,22
**got** [3] 7:14,15 8:5
**gotta** [5] 3:1 5:21 6:16 7:9 8:9
**guy** [8] 2:12,16 3:11,23 4:13 7:23 9:
9,13
**guy's** [2] 4:18 6:4
**guys** [2] 1:9 4:4

### H

**heavy** [1] 7:20,21
**hits** [1] 9:13
**hitter** [2] 7:20,21

### I

**infield** [1] 6:3
**insist** [1] 5:13

### J

**job** [1] 1:4

### K

**know's** [1] 2:1

### L

**left** [4] 5:23 6:1,4,11
**listen** [1] 7:2
**long** [2] 1:5 9:13
**look** [6] 1:6 3:1,20 5:21 6:16 8:8

### M

**man's** [2] 2:19
**manager** [2] 1:4 2:2
**mean** [2] 1:15 2:10
**mentioned** [2] 4:25,26
**met** [1] 1:9
**money** [2] 3:6,13
**month** [1] 3:5
**must** [1] 1:6

### N

**name** [15] 2:10,19,20 3:8,21 4:4,18,
25,26 5:23 6:4,11,18 7:4,11
**names** [6] 1:10,12,14,15,16 2:6
**names...like** [1] 1:16
**naturally** [11] 8:6,10,12,13,14,16,
18,22,24 9:3,6
**never** [1] 1:9

**new** [1] 1:3
**nobody** [1] 4:11
**not...stay** [1] 6:3
**now-a** [1] 1:13

### O

**ok** [1] 4:15
**one** [1] 4:9
**only** [1] 4:13
**out** [5] 1:25 3:8 4:4 6:3 7:23
**outfield** [1] 5:21

### P

**pause** [12] 2:26 3:18 4:3,17 5:8,20
6:10,15 7:8,16 8:1,7
**pay** [1] 3:5
**peculiar** [1] 1:14
**pet** [1] 1:16
**pick** [2] 7:23 8:15
**picks** [1] 9:10
**pitcher** [1] 6:16
**pitcher's** [2] 6:18 7:4
**pitching** [4] 7:1,2,13,20
**plate** [1] 7:19
**play** [1] 9:13
**players** [3] 1:7,13 4:10
**playing** [8] 1:11 2:16 3:3 5:1,2,12
6:1,2
**putting** [2] 5:13,14

### R

**runs** [1] 9:10

### S

**same** [2] 9:8,8
**saying** [1] 8:21
**second** [13] 1:23,26 4:6,7,19,20 5:
4,15,16 6:5,6 7:5 9:10
**see** [1] 1:22
**seems** [1] 1:13
**shortstop** [1] 9:18
**sign** [3] 3:20,21,25
**signs** [1] 3:26
**sometimes** [1] 3:14
**stay** [1] 5:9
**strange** [1] 1:16

### T

**team** [5] 1:5,11 6:16 7:15,20
**third** [16] 1:24 2:1 4:23,24,26 5:1,6,
7,9,12,13,14,19 6:9 7:7 9:15
**throw** [11] 7:23,24 8:3,8,15,17,22,
23 9:2,5,8
**throws** [3] 9:10,11,12
**today** [3] 6:20 7:12,13
**together** [3] 5:19 6:9 7:7
**tomorrow** [6] 6:19,23,26 9:12
**tomorrow's** [2] 7:13,20
**triple** [1] 9:12
**trying** [2] 3:8 4:4

### U

**up** [6] 3:20 7:21,24 8:15 9:10,13

### W

**wanna** [1] 3:20
**who's** [23] 1:2,11,23,26 2:8,18,20

3:3,16 4:7,8,13,20,21 5:2,12 6:1,2,
6,7,26 7:3 8:5
**whoever** [1] 9:9
**wife** [2] 3:14,16

### Y

**ya** [1] 5:26
**yankee's** [1] 1:4
**york** [1] 1:3

 

P.R. VIDEO, INC

**#**

**#4** [1] 35:19
**#5** [1] 76:15

**$**

**$7000.00** [1] 232:7

**,**

**,or** [1] 97:14

**0**

**00** [1] 214:2

**1**

**1** [3] 2:25 4:14,20
**1-2-3-4-5** [1] 2:1
**1/100th** [1] 36:14
**1:03** [1] 130:19
**10:27** [1] 72:17
**10:37** [1] 72:20,22
**10855** [1] 74:22
**10th** [6] 199:3 211:11 213:3,24
  224:23 228:11
**11:04** [1] 93:12
**11:48** [1] 130:16
**11029** [1] 118:9
**11th** [2] 186:19 228:11
**12:30** [1] 213:25
**14** [1] 74:3
**16** [1] 214:1
**17** [1] 149:11
**171** [1] 194:9
**17110** [1] 11:22
**17120** [1] 11:27
**18** [1] 7:12
**18th** [2] 238:17 242:11
**19** [1] 12:5
**1905** [2] 27:6,7
**1979** [3] 5:3,19 6:19
**1981** [3] 6:14,24 7:3
**1986** [1] 14:20
**1987** [2] 7:12 8:9
**1989** [1] 9:10
**1990** [1] 13:6
**1991** [1] 8:24
**1993** [3] 8:24 9:24 187:4
**1994** [2] 151:22 230:16
**1995** [2] 11:1 92:7
**1998** [15] 11:23 17:21 18:14 19:19
  26:19 28:3 33:1 34:9 39:19,19 49:
  1 74:3 92:6 121:22,25
**1999** [16] 4:19,20 12:1 88:25 111:1
  158:19 160:24 170:23 171:6 176:
  14 179:5,21 200:2 203:8 221:15
  238:4
**1999-409** [3] 169:7 170:11 171:16

**2**

**2** [5] 4:21 26:19 28:2,3 35:24
**2.the** [1] 4:20
**20** [4] 6:14,24 33:1 35:24
**2000** [9] 4:19,21 12:6 163:24 179:
  20 195:8 221:13 241:25 242:2
**2001** [2] 1:15 2:18
**20th** [2] 237:3,11
**210-mile** [1] 210:23

**22nd** [2] 237:3,14
**23** [1] 179:5
**232-7542** [2] 250:12,12
**23rd** [1] 242:2
**24th** [1] 218:13
**26th** [2] 200:2 247:1
**28th** [3] 156:19 216:21 237:5
**29th** [1] 228:14
**2nd** [1] 26:21

**3**

**3** [7] 10:25 32:8,10 49:18 222:6,8,
  10
**3.42** [1] 34:25
**3:43** [1] 249:5
**3:54** [1] 249:6
**3:57** [1] 252:8
**30** [1] 211:24
**30th** [1] 246:15
**333** [2] 1:26 2:19

**4**

**4** [2] 116:13,14
**4-25** [4] 44:20 45:5 70:10,17
**4:00** [1] 214:2
**409** [3] 145:14 171:7 191:20
**4310** [1] 3:14
**4311** [1] 1:21
**46** [1] 234:2

**5**

**5** [5] 1:15 2:18 7:3 72:25 81:13
**503** [2] 145:12,16
**5th** [5] 81:14,16,18,20 96:25

**6**

**6** [2] 74:17,19
**6000** [1] 227:21
**6th** [2] 1:21 218:6

**7**

**7:15** [1] 190:15

**8**

**8** [1] 143:6
**8:00** [1] 216:1
**8:59** [1] 2:18
**87** [2] 13:23 15:5
**8th** [1] 246:15

**9**

**9/14/98** [1] 75:12
**9/16/98** [1] 75:16
**90's** [1] 92:10
**98** [3] 28:3 48:25 160:25
**99** [3] 103:3 109:1 230:7
**9940** [1] 191:20

**A**

**aa** [1] 240:10
**abilities** [1] 227:12
**ability** [2] 13:14 84:20
**able** [3] 23:15 42:18 69:3,7 116:
  12 185:21 187:18 193:7 219:21
  228:18 247:10 250:21
**abouts** [1] 230:8
**absent** [1] 154:6
**absolute** [1] 117:8

**absolutely** [3] 34:14 119:10 120:
  12 142:8 215:25 220:25
**abused** [1] 212:22
**abusive** [2] 191:14 212:13
**academic** [1] 35:23
**academy** [25] 5:24 6:2,16,21 19:3,
  3,4,5,9 35:9,21 51:23 52:20 54:25
  56:21 85:9 90:6,14,21,23,25 91:
  14,21,24 221:11
**accept** [2] 112:10,13
**accepted** [6] 6:21 8:7 10:7 21:19
  22:3 211:7
**accepting** [2] 12:16 62:19 246:25
**access** [2] 60:6 85:8
**accident** [1] 92:13
**accommodations** [1] 223:6
**accomplished** [1] 85:5
**accordance** [2] 121:14,15
**according** [10] 31:21 36:2 99:17
  162:7 169:14,20 170:7 177:5 203:
  2 223:8
**accreditation** [2] 10:16 21:2
**accuracy** [1] 25:13
**accurate** [7] 34:8 47:22 48:16 62:
  12 68:2 106:4 107:24
**accusation** [3] 125:22 174:18 185:
  4
**accusations** [2] 181:7 183:13
**accusing** [3] 174:6,12,18
**achievements** [2] 38:2 39:11
**acknowledge** [1] 232:25
**acknowledgement** [1] 221:19
**acknowledging** [1] 38:11
**across** [1] 239:2
**act** [6] 40:19 112:6,9 210:15 212:
  13 234:13
**acted** [2] 234:25 235:1
**acting** [27] 28:5 39:19 40:4,18,24,
  25 41:5,13,21 49:7,10 57:2 78:10,
  15 111:18 230:4,9 234:14,18,25
  235:4,13 236:4 238:13,15,22,22
**action** [9] 20:14 22:8 26:4 63:16
  65:9 134:3 181:9 199:11 206:19
**actions** [7] 20:9 137:8 161:23 163:
  5 167:9 198:11 228:3
**activated** [1] 186:12
**activities** [3] 40:24 86:8 194:13
**activity** [4] 52:7 54:8 58:18 79:12
**acts** [4] 186:14 198:20,24 208:11
**actually** [20] 6:15 22:8 23:5 24:16
  34:4 35:11 50:19 53:21 57:4 72:
  12 122:17 123:12 131:5 153:4
  164:16 165:1 204:15 209:3 234:
  23 237:13
**adamant** [1] 212:12
**add** [2] 18:22 25:7
**addition** [2] 199:1 235:24
**additional** [1] 166:14
**additionally** [1] 23:6
**address** [3] 3:14 70:22 85:18
**adjudication** [4] 47:1 115:8 121:
  12,16
**adjudicator** [2] 180:7,15
**adjudicators** [1] 29:13
**admin** [2] 73:19 237:19

**administration** [24] 5:2,13 12:9
  73:22 76:18 78:17 89:14 90:15 92:
  18,21 93:3 165:5,16,21,22 166:1
  226:6,9 234:16 236:19 233:23
  244:22 245:22 246:24
**administrations** [3] 132:6 137:12
  236:19
**administrative** [31] 44:20 113:14
  114:6,6,11 132:14 133:10,13,16
  134:7,25 136:9 139:15 140:19
  144:13,16,25 145:12,21 148:1,7
  149:9,11 151:18 157:21 158:18
  160:24 170:22 198:14 202:13 203:
  14
**advance** [5] 138:18,22 158:1,4
  194:23
**advanced** [1] 137:13
**advancement** [3] 43:6,16 235:25
**advancements** [1] 39:24
**adverse** [1] 199:10
**advertised** [1] 184:19
**advice** [3] 81:2 85:25 249:1
**affairs** [84] 11:25 26:6,18 27:21 28:
  24 29:5,6,8,15,21 30:5,20 31:1,2,7,
  8,10,14,17,20,22 33:15 34:12 40:3,
  9 42:1,22 43:1,11 44:6,10,21,25
  45:2 47:13,14 55:8 58:11 60:15,
  16,20,21 61:8,10 64:24 68:13 70:
  3,11 71:6,22 73:16 76:2 86:7,18,
  20 87:7,9,14,19 115:11 121:9 127:
  24 132:12 133:5,12 138:11 142:3,
  9 144:15,25 157:12 169:3 172:17
  178:4 187:10 199:9 200:8 202:9,
  13 218:7,12,17,25 225:22
**affect** [2] 210:10 217:14
**affected** [2] 162:9 191:4
**afford** [1] 189:22
**afforded** [6] 40:19 138:16,17,23
  148:11 158:6
**affording** [1] 235:25
**affords** [1] 137:14
**afternoon** [2] 214:16,16
**afterward** [1] 32:3
**agency** [13] 12:19 38:12 52:14 55:
  12,13 68:23,24 94:16 96:13 167:
  10 186:4,7 233:24
**agency's** [1] 94:25
**agent** [47] 49:23 50:13 51:8,16 52:
  20 53:3 56:25 57:10,19 58:19 62:
  21 63:6 64:7,8 65:13,21 77:22 82:
  10 87:5 88:16,25 91:4 95:24 96:4,
  5,7,8,22 97:3,20 99:9,11,11 102:1,
  24 103:6,15,18 104:9,9 105:2,5
  106:2 107:9,15,20 108:1
**agents** [4] 89:7 107:19 138:21 194:
  12
**ago** [17] 37:2 39:22 55:6 94:17 155:
  15 160:18 229:21
**agree** [6] 3:20 43:3 46:9 86:13 114:
  12 251:24
**agreed** [1] 166:2
**ah** [2] 134:24 202:15
**ahead** [15] 9:7 53:2 54:5,6 67:3,17,
  24 79:14 118:2 120:7 130:9 135:
  11,13 195:22 204:10

## P.R. VIDEO, INC



**albeit** [1] 142:10
**alcohol** [2] 4:10 239:22
**alike** [2] 120:24 121:3
**allegation** [33] 55:2 56:18 88:5,13 113:19 115:9 118:10 138:5 141:4, 6,17 142:12 144:12 152:2,5,8 153: 2,8,13,18 154:9 157:7 170:15 171: 4,5,13,16,19 174:5 179:9 184:10 230:8 232:10
**allegations** [2] 58:14 149:13
**alleged** [5] 69:25 99:6 112:2 160:3 225:11
**alleging** [1] 112:4
**allow** [1] 220:14
**allowed** [6] 61:9 171:9 184:20 201: 21 236:14 240:23
**alluding** [1] 39:21
**almost** [5] 142:25 162:2 193:7,8 209:4 248:1
**already** [29] 3:12 4:5 25:14 28:15 57:1 58:17 84:3 86:16 96:10 103: 14 112:17 116:1 141:10,11,12 156:21 157:25 200:19,25 201:1 203:1,2 205:10 206:25 225:6 229: 17 238:24,25 239:18
**alright** [4] 117:16,25 127:3 135:10
**alterations** [1] 144:3
**although** [5] 6:6 15:10,11 32:16 243:6
**among** [6] 25:10 40:5 121:21 182: 9 232:17 235:23
**amongst** [2] 162:9 167:6
**amos** [1] 28:22
**amounts** [1] 136:15
**and/or** [1] 104:18
**ands** [1] 10:5
**angrier** [1] 207:18
**anonymous** [9] 71:13 74:21 76: 16
**another** [18] 18:2,2 58:20 61:12 63:15 102:20 129:18 169:1 170: 17 184:1,7 193:18 198:16 199:10 236:1 248:21 250:2,6
**answer** [52] 4:8 9:15 14:10,12 18: 18,23 19:2 23:2 25:16 33:12 42: 15 46:10,14 48:15 66:12,14 67:3, 6,8,13,15,18,24 93:24 94:11,12 117:5 123:5 124:8,9 128:1,4 137: 23,24 148:21 153:16 155:6 168: 22 171:10 174:10 175:5 176:10, 10 182:6 192:21 199:5 209:18 210:5 225:5,6 239:7,8
**answered** [12] 54:17 65:16 66:12 67:2,23 85:19 87:22 88:9 112:18 156:22 170:18,20
**answering** [1] 25:2 43:23
**answers** [7] 85:14 103:10 153:12 154:22 181:20 214:6,9
**anticipation** [2] 18:10 219:25
**anybody** [15] 19:20 51:11 58:7 66: 25 101:10 111:5 114:9 130:25 131:3 171:4 209:12 243:5 245:17 248:2 251:14
**anyway** [8] 72:10 112:5 131:24 189:7 195:14 204:9 240:11 243:

23
**apart** [1] 107:23
**apologize** [3] 210:3 218:11 243: 25
**apparently** [8] 36:1 53:10 74:1 76: 17 154:9 155:17 196:13 205:9
**appear** [2] 105:20 120:9
**appearances** [1] 1:18
**appeared** [2] 189:15 193:12
**appears** [1] 100:24
**apples** [2] 120:6,22
**applicants** [1] 62:20
**application** [1] 6:18
**applications** [1] 5:17
**applied** [5] 6:21,22 9:10 161:7 236: 16
**apply** [5] 6:15 70:11,14,15 161:10
**applying** [1] 223:11
**appointed** [3] 5:20 49:17 87:25
**appointment** [4] 5:8,23 91:23 184: 6
**appreciation** [3] 38:7,8 39:1
**approach** [1] 26:1
**approached** [1] 189:4
**appropriate** [11] 22:8 31:5,6 43: 18 80:25 81:1 94:18 153:20,25 207:1 240:9
**appropriately** [2] 43:24 152:13
**appropriateness** [1] 154:2
**appropriation** [1] 194:8
**appropriations** [2] 194:9,21
**approval** [2] 108:10 249:1
**approve** [1] 239:11
**approved** [6] 240:5,6,13,20 242: 18,24
**april** [7] 12:1 200:2 221:12,13 242: 10 245:2,2
**ar** [4] 44:20 45:5 70:10,17
**ar1-11** [1] 230:2
**architect** [2] 22:5 33:23
**area** [12] 23:8 47:19 48:20 58:5 69: 20 121:4 188:1 211:15 215:14,17 219:16 222:1,6,6,8,10 229:24 231: 4 232:24
**areas** [2] 24:2,20
**aren't** [1] 137:25
**argue** [2] 59:17 60:2,8 128:18,23 129:6,7
**arguing** [1] 92:3
**argument** [2] 90:3 194:24
**argumentative** [2] 128:13 136:22
**armed** [1] 149:1
**around** [14] 13:20 32:18 63:3 91:5 102:25 160:20 183:12 199:6 202: 20 219:3,16 221:17 231:4 235:1
**arrange** [1] 158:3
**arrangements** [6] 13:17 211:15, 20,25 212:2 219:24
**arrest** [4] 133:23 134:19,20 136:20
**arrested** [4] 52:3 105:1 228:11
**article** [5] 182:14 189:12 193:11, 12 195:3
**articulated** [1] 192:6
**artifacts** [3] 182:15 184:17,24
**aside** [1] 104:2

**aspect** [1] 60:16
**aspects** [2] 157:18,20
**aspirations** [1] 183:20
**assent** [1] 234:14
**assessment** [1] 33:4
**assign** [1] 30:1
**assigned** [7] 8:7,8,20,22,24 8:2,9, 13 9:2 14:14,15,23 15:10,11,12,14 16:3,4,5 17:24 18:1,7 19:6 20:1, 15 21:7,9,12 24:17,24 25:24 26: 17 29:10,21 30:8,14,15,16,17 31:1, 3,8,19,23,23 43:11 44:12,16 45:19, 24,25 55:8 59:21 61:11 72:2 74: 10 75:14,15,19,23 80:13 144:6 145:12,15 152:3 164:18 180:10, 11 187:11 193:24 194:7,12,13 219:11 223:18,20 228:20,23 238: 17
**assignment** [28] 7:6 8:1 9:19 11:2 31:6 58:13 76:20 181:15 185:14, 15,15,18,21 187:14,24 188:7 192: 4 195:15 200:7,18 214:4,10 215:5 223:14 224:6 227:18 235:20,22
**assignments** [15] 7:4,15 8:5,25 9: 1,25 11:21 12:11 34:5 40:14 80: 17 188:16 194:12 234:8 245:21
**assist** [1] 215:5
**assistance** [1] 184:16
**assistant** [1] 203:14
**assistants** [1] 95:18
**assisting** [1] 17:5
**associate** [1] 227:24
**associated** [5] 39:23 40:5 41:25 42:23 232:23
**association** [3] 212:3 215:12 233: 4
**assume** [7] 4:8 50:2 118:8 133:6 147:8 204:19 208:11
**assumed** [3] 97:14 159:16 196:4
**assumes** [1] 120:17
**assuming** [3] 90:2 158:9 198:10
**assumption** [2] 77:13 173:21
**assurance** [2] 22:23 150:18
**assure** [1] 148:16
**assuring** [1] 29:10
**attached** [1] 233:2
**attempt** [2] 102:21 208:18
**attempted** [2] 166:25 203:16
**attempting** [2] 87:16 136:14
**attend** [3] 19:7 239:24 240:1
**attended** [1] 5:23
**attending** [2] 239:22 246:18
**attention** [5] 43:15 51:20 59:12 91: 9 108:19
**attest** [1] 177:11
**attorney** [5] 37:20 72:3 135:12 136:24 142:17
**attorneys** [3] 3:2 228:5 249:18
**attribute** [1] 197:14
**audiotape** [2] 36:18 71:1
**august** [3] 200:10 201:25 221:14
**authority** [1] 154:4
**authorizations** [1] 240:9
**authorized** [1] 108:14
**autographed** [1] 210:6

**automatically** [1] 175:3
**available** [7] 22:2 185:13 186:15 188:19 234:20 247:7 249:17
**avenue** [1] 233:14
**avoid** [1] 125:21
**avoiding** [2] 245:24 246:1
**award** [4] 36:23 37:2,5,7
**awarded** [1] 203:9
**awards** [4] 36:12 38:4 39:7,11
**aware** [4] 89:8 162:14 182:22 198: 13
**away** [6] 57:15,17 209:14 210:24, 25 218:10

---

### B

**bachelor** [1] 5:6
**back** [62] 8:12 17:15 18:19 19:14 24:7 25:1,16 38:8 48:5 72:20,22 75:25 83:11 91:14 93:1 101:1 129: 11 130:19,24 131:3 134:14 156: 25 172:25 181:2,21 189:10 192: 20 193:10 196:1,17,19 198:3,14 199:8 202:3 203:17 204:11 207: 17 208:11 210:9 213:13,15 217: 21 218:5,10,12,17,25 220:11 225: 22 230:19 232:10 233:2 234:14 236:18 237:4 238:11 245:6,8 249: 6,15,20
**backdated** [1] 247:1
**background** [9] 4:13 34:4 79:17, 24 93:23 95:7 118:7 119:21 120:1
**backing** [1] 192:22
**backistos** [1] 167:18
**backtrack** [1] 227:8
**backwards** [1] 227:1
**bad** [4] 151:15 177:19,22 183:14
**bailey** [224] 1:20 2:1,4,7 3:5 14:6 16:14 17:1 18:21 24:1,10,25 26: 23,25 28:23 29:18 30:18 32:15 33: 12 35:17 36:5,10,16,19 37:9,12,16, 23 42:16,20 43:14 45:15 46:6 47: 6,9,24 48:10 50:16,22 51:1,6 53:1, 13,24 54:4 56:3 57:22 59:1,5,9,19, 23 60:3,12 61:15 65:4 66:10,15 67:1,7,11,23 69:15 70:25 71:3,17, 23 72:6,9,14,19,22 73:5,9 74:8 76: 14 77:2,8 78:18 79:13,20 80:21 81:21 82:8 83:4,10,16 85:7,19 88: 9 91:18 93:19 94:3,9 95:12 100: 17,24 101:7 103:23 104:1 105:21 106:6,10,13,24 110:6,14,18 111: 12 112:16,24 113:4,12,24 114:3, 25 115:22 116:4,10,17,25 117:5, 16,19,25 119:4 122:20,23 123:3 124:12 125:6 126:5,13,17 128:12, 16,20,24 129:10,13,16,21,24 130: 3,12,15 131:18,21 135:10 136:12 139:6,8,17,20 140:6,10 143:9,12, 18 146:24 147:13,18 148:18,22 153:10 154:12,16 155:1,5 156:9, 12,14,18,20 157:22 159:14 167:2 168:1 172:14 173:8,11,17,20,25 175:9,12,24 176:5,18 178:17 180: 21 206:5 207:11 210:5 213:17,19 217:5 233:15 235:11 236:1 241:

P.R. VIDEO, INC

12,15,19 **242**:20 **247**:5,22 **248**:1,7, 11,18,22 **249**:4,7,22,25 **250**:9,18, 23,25 **251**:6,12,21 **252**:3,6
**balensic** [1] **230**:9
**ballistic** [1] **107**:18
**bank** [1] **175**:14
**bar** [1] **209**:15
**barb** [1] **229**:5
**barracks** [1] **211**:21
**base** [2] **84**:7 **188**:25
**baseball** [1] **212**:2
**based** [14] **33**:4,20 **94**:14,19,24 **104**:24 **106**:4 **119**:6 **130**:7 **163**:7 **170**:7 **191**:16 **211**:7 **212**:4
**basic** [1] **152**:12
**basically** [14] **7**:15 **22**:22 **25**:5 **30**: 12 **48**:18 **56**:18 **141**:9 **162**:19 **181**: 14 **187**:23 **195**:17 **202**:21 **215**:2 **240**:12
**basis** [8] **15**:16 **110**:16,19 **111**:16 **119**:10 **157**:6 **172**:16 **173**:22
**bastardize** [1] **115**:12
**beat** [1] **36**:14
**became** [13] **8**:5 **9**:22 **10**:24 **21**:3 **28**:4 **39**:19 **47**:12 **89**:8 **101**:3 **146**: 13 **149**:19 **150**:6,10
**become** [7] **7**:1 **41**:14 **49**:10 **149**: 18,23 **189**:23 **201**:3
**becoming** [2] **41**:25 **42**:24
**bedford** [1] **45**:20
**bedrooms** [1] **211**:21
**bee** [2] **18**:3,16
**begin** [6] **19**:12 **23**:16 **38**:13 **71**:1 **167**:13 **181**:4
**beginning** [5] **4**:5 **32**:24 **123**:4 **146**:2 **217**:12
**begun** [1] **91**:14
**behalf** [5] **3**:2 **34**:2 **38**:11 **201**:5,6
**behind** [3] **68**:13 **152**:23,23
**belief** [3] **56**:16 **104**:15 **113**:20
**believe** [83] **4**:17 **6**:3,17 **9**:24 **13**:6 **18**:25 **21**:1 **24**:25 **25**:14 **28**:20 **33**: 10 **34**:8 **35**:10 **36**:22 **38**:16 **45**:18, 20 **46**:21 **56**:11,15 **58**:21 **62**:10,24 **63**:2,2 **65**:16 **71**:9 **75**:11 **76**:11 **82**: 3,10 **86**:3 **88**:11 **89**:5,22 **90**:7 **94**: 1 **100**:2 **104**:15 **107**:4,17 **108**:9, 25 **127**:8,14,20 **134**:19 **136**:7 **145**: 12 **148**:14 **151**:12 **152**:6,21 **153**: 12 **159**:2 **162**:6 **163**:23 **165**:2,25 **168**:20 **172**:11 **179**:20 **184**:21 **189**: 5 **190**:19 **193**:15,25 **194**:2,9 **195**: 14 **200**:22 **203**:15 **215**:15 **218**:20 **225**:19 **227**:7 **230**:1 **235**:1 **238**:17 **239**:23,25 **240**:24 **247**:1
**believed** [5] **51**:21 **52**:18 **57**:1,7 **192**:17
**believes** [2] **142**:2 **233**:21
**believing** [1] **58**:13
**below** [1] **231**:18
**beltway** [1] **245**:8
**benedict** [1] **167**:16
**benefactor** [1] **232**:8
**benefit** [1] **48**:4
**bernadette** [1] **2**:3

**beside** [1] **198**:22
**best** [15] **12**:18 **17**:11 **32**:4 **33**:2 **37**: 3 **56**:19 **87**:15 **94**:15 **95**:23 **97**:18 **121**:23 **122**:7 **142**:8 **167**:14 **214**:8
**better** [7] **29**:19 **30**:22 **52**:8 **61**:2 **191**:7 **209**:17 **219**:6
**between** [26] **7**:13 **30**:20 **31**:13 **43**: 6,10 **49**:10 **57**:23 **62**:25 **66**:18 **95**: 24 **96**:4 **109**:24 **110**:2 **113**:17 **132**: 13 **138**:3 **146**:11 **151**:15 **196**:12 **201**:17 **222**:25 **223**:13,21 **224**:4,5 **248**:24
**beyond** [5] **22**:6,6 **101**:7 **118**:7 **225**: 5
**bible** [1] **44**:21
**big** [11] **138**:2 **155**:4 **176**:11 **202**:16, 17,18 **203**:13 **205**:12 **206**:14 **208**: 24 **229**:13
**bill** [7] **174**:13,14,15,21 **176**:22 **177**: 9 **181**:6
**binder** [2] **152**:21,22
**bit** [9] **30**:21 **39**:22 **42**:17,18,20 **150**: 5 **181**:21 **213**:4 **225**:14
**blah** [3] **172**:6 **204**:12,12,13 **206**:18, 18
**blah,blah,blah** [1] **215**:1
**blah,blah.there's** [1] **172**:6
**blanca** [1] **115**:23
**blaugh** [1] **89**:16
**blew** [1] **246**:6
**blind** [2] **112**:6,10
**block** [1] **160**:5
**blocked** [3] **160**:3,7 **161**:14 **163**:3, 20 **166**:10,14 **188**:12 **195**:5
**blocking** [1] **163**:12
**blocks** [2] **27**:2 **142**:16
**blood** [1] **151**:15
**bloomsburg** [3] **246**:19,20,21
**blough** [2] **203**:14,14
**blue** [2] **196**:18 **213**:9
**board** [2] **194**:9,18
**boards** [3] **34**:3,4 **212**:3
**body** [6] **101**:21,25 **102**:4,9,12,15
**book** [6] **54**:9,11 **181**:8,14 **184**:20 **191**:4 **192**:10 **250**:11
**boot** [1] **194**:10
**booted** [2] **191**:12 **195**:21
**booting** [1] **191**:23
**born** [1] **13**:23
**boss** [1] **196**:9
**both** [18] **19**:4 **23**:2,2,5 **27**:16 **29**: 25 **40**:8 **45**:8 **47**:24 **88**:8,11 **108**: 15 **131**:10 **148**:19 **151**:1 **161**:20 **197**:21 **215**:7
**bottom** [8] **73**:1 **111**:11 **114**:20 **116**:14,20 **126**:19,20 **242**:13
**bounce** [1] **60**:23
**bouncing** [1] **63**:19
**boundaries** [4] **63**:4 **84**:25 **98**:1,7
**bowmansville** [2] **8**:8,10
**box** [4] **176**:6 **227**:19,22 **232**:23
**boy** [1] **215**:2
**boys** [1] **211**:1
**bpr** [30] **27**:14,18 **30**:9,11,20,23 **31**: 23 **41**:16 **43**:12 **73**:20 **74**:22 **80**:12

**86**:2 **144**:6,19,21 **145**:3,8 **161**:16, 20 **165**:22 **166**:2 **199**:13,17,19,22, 25 **207**:15 **208**:10,13
**breadth** [2] **122**:14 **123**:9
**break** [24] **32**:13,19 **42**:18 **72**:13,17, 18 **92**:14 **129**:9 **130**:17,18 **131**:2 **152**:10,19 **190**:20 **221**:20,21 **225**: 2,14 **247**:13 **248**:20 **249**:5,9,14,16
**brian** [1] **36**:15
**bribe** [1] **54**:24
**briefed** [2] **141**:10,12
**briefly** [2] **4**:23 **13**:25
**brightest** [2] **33**:1 **121**:23
**bring** [6] **36**:11 **43**:15 **59**:12 **204**:13 **230**:11 **251**:19
**bringing** [1] **195**:24
**brings** [1] **93**:21
**broadcast** [1] **182**:15
**broke** [1] **225**:1
**broken** [2] **154**:19 **226**:16
**broth** [1] **32**:19
**brought** [9] **91**:8 **98**:14 **108**:18 **119**: 8 **167**:6 **213**:2 **230**:12 **231**:1 **239**:1
**brown** [14] **59**:2,3 **71**:18,21,21,25 **72**:4 **74**:8,11 **77**:4 **108**:21 **109**:8, 13 **220**:16
**bucks** [3] **203**:22 **205**:14 **236**:6
**budget** [2] **34**:1 **151**:12
**budgetary** [3] **194**:1,4,15
**building** [2] **139**:4,5
**bunch** [2] **190**:7 **250**:5
**bureau** [90] **9**:3,11,13,16 **10**:9 **11**: 10,24 **12**:2,9 **19**:22 **20**:2,25 **26**:5 **27**:17 **28**:5,17 **30**:8 **31**:3 **38**:19 **39**: 20 **40**:4,18 **41**:5,13,14,17 **42**:10 **44**:6 **45**:24 **49**:7,10 **50**:10 **76**:19 **78**:10,15 **80**:13 **81**:5,11 **82**:5,7 **85**: 15 **89**:20,24 **90**:5 **123**:25 **160**:7,8, 10 **161**:4 **162**:4,13,15,16 **163**:16, 21 **164**:5,6,14,17,19 **165**:17 **166**:2, 5 **179**:19 **180**:9 **181**:12 **185**:9 **186**: 13 **188**:24,25 **189**:1 **193**:6 **194**:7 **195**:16,18 **196**:2,8 **200**:14 **201**:6 **234**:14,18 **236**:4 **237**:11,13,18,20 **238**:15 **239**:21,21 **245**:22
**bureau's** [1] **160**:12
**bureaus** [1] **43**:13
**burning** [1] **250**:19
**business** [4] **150**:18 **151**:6 **178**:4 **221**:25
**busy** [2] **181**:15 **192**:2
**butler** [1] **77**:7
**buy** [1] **91**:13
**byron** [1] **46**:1

## C

**cadet** [6] **6**:25 **7**:1 **34**:3 **51**:23 **53**:5 **62**:21
**cadets** [1] **90**:9
**cahoots** [1] **56**:20
**caldwell** [1] **251**:4
**calendar** [1] **249**:21
**call** [28] **50**:4 **51**:14 **54**:20 **56**:10,23 **57**:10,12 **72**:10 **82**:13,16,17,20 **86**: 20 **92**:25 **102**:11 **104**:23 **127**:1

**139**:2,24 **186**:1 **196**:7,8,11 **213**:11 **214**:21 **221**:23 **224**:13 **249**:25
**called** [34] **38**:8 **53**:22 **55**:9 **58**:9 **64**: 23 **77**:23 **82**:22,23 **83**:25 **87**:6 **103**: 16,19 **132**:4 **140**:2 **158**:2 **199**:2 **200**:5 **201**:4,12 **211**:11 **213**:6,12, 13,15,15,23 **214**:9,14 **220**:20 **222**: 4,22 **240**:17 **246**:16,22
**calling** [8] **53**:16,19 **54**:3,14 **68**:12 **87**:2,5 **213**:9
**callout** [1] **186**:12
**calls** [8] **22**:20 **70**:20 **93**:19 **110**:7 **182**:19 **213**:10 **214**:2 **218**:8
**cambell** [1] **1**:10
**came** [23] **28**:15 **51**:19 **58**:21 **73**:15, 18,24 **159**:24 **166**:5 **182**:13 **193**: 10 **195**:3,11 **196**:24 **203**:16 **207**:8 **208**:20 **223**:11 **236**:18 **244**:5 **245**: 2,2,5 **246**:25
**campbell** [18] **2**:23 **99**:19,20,23 **100**:20 **101**:18 **103**:13 **108**:10,14 **109**:3,15,16 **238**:21 **244**:14,15,21 **245**:4 **246**:4
**campbell's** [2] **131**:1,11
**campus** [2] **5**:22 **6**:5
**candid** [1] **36**:24
**candidate** [1] **37**:3
**candidly** [1] **243**:20
**canyon** [1] **177**:4
**capable** [1] **173**:13
**capacity** [4] **40**:20 **111**:18 **151**:3 **234**:25
**capital** [2] **156**:12,13
**capriotti** [2] **152**:18 **158**:2
**captain** [80] **10**:24,25 **11**:2,22 **12**:4 **28**:15 **33**:6 **71**:21 **72**:24 **82**:11 **87**: 24 **88**:1 **108**:21 **109**:7,7,13 **110**:18 **113**:5 **116**:11 **121**:20 **132**:17 **156**: 8 **158**:2 **162**:1 **164**:1,4 **167**:15 **168**: 5 **183**:25 **185**:12,23 **186**:1,12,13 **187**:17 **188**:14,18,22,23 **192**:23,24 **195**:11,13,13,14,16,25 **196**:3,6,9 **219**:1 **220**:16 **227**:7,8 **230**:11,15 **231**:13 **234**:17,19,22,25 **238**:17,21, 24 **239**:8,10,12,14,20 **240**:17 **243**: 3,24 **244**:8,11,13,14,15,17,20 **245**: 4 **246**:4
**captain's** [1] **234**:15
**captains** [3] **161**:25 **195**:17 **230**:3
**caption** [1] **2**:20
**car** [3] **220**:8,9,11
**carbouski** [2] **167**:17 **240**:23
**card** [3] **220**:14,16,21
**care** [7] **26**:8 **65**:1 **122**:8 **203**:25 **204**:5 **227**:18 **250**:11
**career** [23] **15**:22 **33**:5,14 **34**:7,10 **38**:2 **39**:23 **40**:2,4,23 **43**:20 **122**:5, 7 **167**:1 **168**:14 **197**:1 **225**:11,20 **227**:15,20 **228**:25 **229**:18 **235**:25
**careful** [1] **179**:8
**caretaker** [1] **13**:10
**carolina** [1] **245**:7
**carr** [1] **147**:24
**carrying** [1] **184**:4
**cart** [1] **120**:7



## P.R. VIDEO, INC

casa [1] 115:23

case [46] 2:25 17:9,12,12,13 18:2 23:12 49:3 51:18 60:22 61:3,12 62:2 63:9 65:10 71:24 75:15,20 91:5 97:13 115:10 120:15,17,18, 23 123:24 125:25 126:1,3,6,8,8,24 158:1,2 161:18 162:14 188:14 193:17 200:5 230:5 231:2 233:20 236:22 250:2,6

cases [21] 15:21,24 16:1,11,11,13, 24 17:19,22 18:13,15 26:4 30:2 45:13,13 62:14 120:24,24 121:1,3 232:18

casey [1] 89:13

casting [1] 183:20

cause [1] 199:17

caused [1] 149:23

causing [1] 184:7

caution [2] 116:24 119:23

cautioned [1] 118:25

ceiling [1] 119:14

cell [14] 186:16 198:21 199:12,13, 13,17,21 200:10,13,19,21,24 201: 2,18

centennial [1] 192:10

centerpiece [1] 17:8

central [11] 11:17,19 12:4 187:7 225:24 226:1,11 228:4 242:23

certain [14] 62:20 71:10 78:3 79:7, 11 100:3 103:1,16 121:1 128:25, 25 129:1 236:14 251:20

certainly [18] 17:3 19:4 42:1,3,46: 9 48:1,13 68:12 70:6 87:15,18 105:20 112:12 167:24 180:15,17 182:7 237:23

chain [11] 70:21 78:6,8,9,11 79:9 152:18 154:5 165:18 197:22 239: 3

chairperson [1] 191:6

chance [7] 22:4 72:16 73:3,10 122: 23 214:8 228:9

change [7] 13:16 23:13 44:22 171: 10 190:13,14 217:6

changed [4] 21:3 143:5,21 207:19

changing [3] 165:15 184:6,8

character [4] 88:3,7 95:5 227:11

characterization [1] 144:22

characterize [2] 52:5 117:10

charade [1] 211:9

charge [13] 44:6 89:20,24 90:4,4, 13 91:15 150:13 161:20 162:4 166:1 185:25 196:18

charged [1] 225:8

charges [3] 149:21 181:7 182:3

check [10] 2:8 142:16 181:11 189: 10 193:5 205:21,25 206:10 249: 21 250:15

checkbook [1] 205:16

checked [1] 192:25

checking [1] 247:6

chewed [1] 221:11

chief [2] 142:18 144:4

children [9] 136:19 208:19,20,21, 25 209:6,9,21,25

choice [1] 106:3

choose [1] 212:6

chores [1] 3:21

chose [5] 77:21 85:24,24 212:4 242:14

chosen [4] 76:7 77:10,13,15

chronologically [2] 190:10 203:6

chronology [2] 185:19 213:24

circumstance [1] 142:15

circumstances [10] 94:23 117:9 120:1,16 121:2 138:22 154:6 180: 8 182:16 235:22

citation [1] 38:23

citations [2] 38:3,3

cite [1] 123:9

clandestine [1] 18:1

clarified [2] 96:1,2

clarify [13] 3:17 30:25 68:15,17 69: 2,6,13 77:2 113:2,3,11 120:4 170: 19

clarifying [2] 72:2 182:5

class [13] 5:25 35:9,12,14,22,23,25 36:3,5,7 37:4 212:6 239:3

classes [3] 19:12 53:5

clay [1] 12:16

clean [2] 200:1,6

clear [23] 46:13 58:23 59:2 65:6 66: 6 68:10 77:4 92:1 95:18,20,22,23 96:3 109:15 154:17 168:19 186:3 196:2 207:4 216:1 223:2,5 243:22

cleared [1] 178:16

clearing [2] 177:17 182:2

clearly [4] 64:3,13 65:13 66:5

client [1] 176:10,10

clients [1] 248:25

clinical [1] 126:25

clinically [1] 124:11

close [14] 19:19 36:24 75:18 84:14

closed [6] 126:1,2,4,6,8,8

closely [1] 232:15

closer [1] 219:19

clue [1] 118:17

co-operation [1] 252:4

coached [1] 212:3

code [1] 194:8

coercive [1] 136:20

coleman [1] 195:11

colleagues [4] 60:22 61:6,10 121: 22

collecting [1] 201:5

collection [1] 169:5

collector [1] 182:17

collectors [2] 182:18 183:9

college [3] 5:14,15 219:14

colonel [36] 52:11 55:22,24 57:9, 13,21 58:8 69:8,10 71:7,10,12,13 73:23 74:16 78:12,12,19,20 79:2, 4,10,10,16,23 80:2,10,18,19 81:3 87:25 88:2,6 89:10,12,16,19 90: 13 91:11,14 92:2,15,15,16,16,20 93:2 95:4 96:19 97:9,11,21,22 98: 4,5,14,25 100:3 104:22 106:24 107:4 108:9 109:23 110:2,4,12,25 111:1,2,5 112:3,9 113:13 125:2 131:10 139:3,11 140:18 141:11 142:1 158:20 159:12 160:3,5,18,

23 161:2,14 162:4,7,12,15,18,23 163:2,5,8 164:25 165:2 166:9 167: 21 168:10,15,22 169:1,12,22,24 170:23 172:4 178:9 179:5,11 180: 7,12,13,24 184:3,5,12,15,18,23 185:4 188:9 197:12 198:19,23 199:1 200:5 208:4,8 228:22 235:5, 6,8

colonels [1] 58:9

color [1] 196:18

column [1] 184:18

come [33] 17:4,15 18:19 23:23 46: 2,3 63:22 84:9,14,21 88:25 99:11 101:1 111:22 127:19 129:10 130: 24 131:2 159:9 167:14 168:19 182:8 189:24 194:8 196:24 197:1 205:14 209:20 215:22 233:11 243: 20 244:12,15

comes [8] 17:16 67:14 75:19 123: 20 151:6 164:13 199:11 229:5

coming [5] 217:3,4 218:1 220:23 245:7

command [26] 42:12 70:21 78:7,8, 9,11 79:9 92:17 152:19 154:6 165: 18 168:10 180:12 196:4 197:22 214:11 218:23 225:24 227:6 228: 4 229:19,24 236:17 238:4 239:3, 20

commanded [2] 11:11 230:3

commander [32] 11:19 21:14 26:1, 8,9 31:5,13 38:19 40:10,10 58:5 69:14,20 83:14 162:8 155:25 156: 1 180:9 185:9 187:7 215:1 222:2, 6,7,8 226:1 229:20 230:1,7 231:4 238:16 242:23

commanders [4] 111:18,19 238: 19 239:24

commanding [6] 58:4 82:12,20 83:16,20 219:2

commend [1] 206:17

commendation [8] 38:19 39:8 202:8,18 203:9 205:19 207:14,21

commendations [1] 39:11

comment [4] 118:1 155:10 175:12 197:9

comments [2] 155:8 176:9

commissioner [5] 12:12,21,24 34:2 40:1 41:25 42:4,6,13,24 43:2, 18 44:5 52:9 70:2,3,4,9 73:16,17, 19,24 76:1,17,18 78:17 80:12 81: 6 88:1 89:13,17 91:17 92:21 93:2 113:6 125:20 132:5 137:12 141: 11 142:18 144:5 151:23 159:7,14, 16 163:10 165:3,25 181:13 170:3, 8,10 173:22 174:6,19,25 176:15, 19 177:5,8,10 179:13 247:8

commissioner's [3] 43:7 76:9,21

commissioners [1] 70:4

commitment [1] 215:20

committed [2] 108:15 116:1

committee [31] 34:1 151:13 181:8, 14 182:23,23 183:2,21,22 186:10, 21 191:4,5,11,12,15,23 192:17 221:18 229:3,4

commonwealth [10] 185:6 188: 11 204:12,14,22,23 205:6 206:1,4,

6

communicator [3] 182:15 183:3, 4

company [1] 84:16

compare [4] 231:7,15,19,19

compared [1] 135:8

compares [1] 118:18

comparing [1] 120:6

comparison [2] 34:7 231:17

compelled [4] 132:8,23 134:2 137: 7

compete [1] 174:1

competed [1] 161:11

competitive [1] 161:11

complainant [4] 169:19,20 170:1 177:8

complainant's [1] 170:4

complained [4] 173:1,4,5 210:19

complaint [41] 25:10 26:6 32:2,8, 11,24 65:9 71:9,11 73:15 74:20, 21 76:6,13 77:10 104:4 112:2 122: 18 131:20 136:23 137:18 138:5 144:7 157:10 169:10,14,15 170:3, 8,10 173:22 174:6,19,25 176:15, 19 177:5,8,10 179:13 247:8

complaints [9] 29:9 31:22 34:17 71:6 74:25 75:2 76:2 86:7 182:25

complete [6] 23:21 24:6 25:23 30: 9 45:25 247:19

completed [7] 24:5 29:11 33:21 53:1 192:3 219:9 240:10

completely [6] 33:13 46:11 111: 14 150:9 170:11 212:8

completing [2] 181:17 228:23

completion [1] 200:7

complex [1] 42:20

compliance [4] 20:12 21:6,13 23: 12

compliance-monitoring [1] 22: 22

complicated [1] 176:11

complied [1] 45:5

comply [1] 10:16

complying [1] 10:21

component [5] 11:9 21:6 24:16, 18 187:5

components [1] 20:24

compound [1] 192:13

comprise [3] 27:18 161:20 186:10

comprised [1] 30:23

compromise [1] 247:19

compromised [3] 84:11 99:8,19

concern [2] 202:22 245:14

concerned [6] 58:18 149:18,20,23 150:10 251:11

concerns [3] 104:18,21 149:12

concluded [2] 179:8 191:16

conclusion [3] 127:19 173:12 180: 11

conclusions [1] 129:5

conclusiory [1] 175:10

conditions [3] 13:16 249:13

conduct [15] 23:21 24:23 29:14,19, 21 64:19 69:25 70:8 109:9 138:4, 9,10 140:19 153:14 154:9 181:4



## P.R. VIDEO, INC

**conducted** [23] 20:13 31:6 34:12 84:5 109:6 114:1,2,5 115:5 118:11 122:4 132:2 133:7,12 136:9,19 137:21,25 139:15 140:20 145:9 156:16 180:11

**conducting** [9] 51:18 84:1 111:22 123:22 141:8,23 144:24 150:11 208:14

**conely** [22] 2:24 29:2 160:15,18,23 198:19,23 199:1 202:19 204:11 205:11 208:4,9 211:11 214:1,17 218:8,16 220:13 224:23 235:5,8

**conference** [8] 239:23 240:2,4,18 241:2 246:16,17,19

**confidence** [2] 65:1 66:9

**confident** [1] 88:2

**confidential** [9] 46:8,12 60:17,19 62:4,17 65:19,20 96:9

**confidentiality** [9] 60:16 61:24 62:1,9 64:18 65:25 68:11 96:10,18

**confirm** [1] 241:8

**confirmed** [1] 96:25

**conflict** [2] 78:4 187:13

**confront** [1] 221:12

**confronted** [1] 221:22

**confused** [6] 95:1 147:16 154:19 164:8 199:21 203:5

**conjecture** [1] 171:24

**conjure** [1] 150:13

**conjuring** [1] 91:22

**conley** [1] 1:12

**connelly** [19] 49:17 56:5 69:4 78:23,25 79:9 80:20 81:10,15 82:2,3,11 83:13,19 85:16 86:2,4 93:15 123:25

**conscious** [1] 82:19

**consequences** [1] 134:8

**consequently** [1] 87:23

**consider** [4] 12:16 92:14 166:17 207:20

**considerably** [1] 145:11

**consideration** [5] 62:20 92:24,25 137:15 242:16

**considered** [6] 91:11 207:9,12,13 208:8 223:10

**consistent** [2] 25:24 211:14

**constitutes** [1] 198:23

**constraint** [1] 130:1

**constructive** [1] 225:12

**consult** [1] 235:7

**consuming** [1] 186:22

**contact** [14] 49:24 53:4 57:5 58:3,5,5,8 77:11 80:7 102:1 113:15 114:8 214:11 229:9

**contacted** [10] 49:2,21 50:9 51:9 58:8 78:7 99:12 103:11 111:3 221:23

**contacting** [2] 53:11 99:13

**contacts** [1] 19:16

**content** [4] 20:9 25:13 66:7 137:5

**contents** [2] 19:15 155:9

**context** [6] 66:7 68:19 98:7 137:4 160:22 167:6

**conti** [19] 96:16,18 170:8 172:4,20 173:23 174:6 176:21 181:23

**182:**14,25 **183:**1,1,12,14 **184:**12,15,18,23

**conti's** [1] 182:20

**continual** [1] 233:7

**continue** [8] 24:2 36:19 46:7 52:23 59:1 66:12 188:16 189:9

**continued** [2] 118:13 252:9

**continues** [1] 172:9

**continuing** [1] 252:7

**continuity** [1] 10:15

**contract** [3] 121:16 137:14 229:8

**contracted** [1] 13:14

**control** [17] 12:10 31:24 74:22 88:12 144:6 158:12 160:9 163:16 164:17 165:18 166:5 185:10 194:8 200:14 211:9 212:9 238:16

**convenience** [1] 250:13

**convention** [1] 219:14

**conversation** [55] 50:23 51:15,25 52:2,17 54:1,18 55:4,7,20 56:25 57:3 58:3 62:22,23 63:3,17,17 64:8 66:8 77:18 82:10 84:4,8,24 96:22 97:3,7,19 98:17 99:10 103:20 181:10 201:13 204:10 213:3,13,22 214:15 215:25 216:9,12 217:22,23 217:19 218:16 219:12 222:19 224:8,19,20,22 225:8 243:2

**conversation.no** [1] 216:16

**conversations** [3] 82:2 222:19 245:20

**conway** [1] 195:13

**cooperating** [1] 134:4

**cop** [3] 35:14 37:2,5

**copies** [5] 4:13 38:14,16 72:6 251:15

**copy** [10] 32:9,10 37:9,17,18 73:5 131:20 144:10 179:19 237:1

**core** [1] 150:18

**corporal** [14] 7:10,11,14 8:5,6,8 9:8 14:25 15:4 167:17 201:4,12 202:15 240:23

**corporate** [1] 40:12

**correct** [74] 4:22 8:24 13:24 18:22 29:3 34:13 35:3 36:9 41:14,15,18 42:4,5,7,13 44:8 46:25 47:5,15 49:13,19 72:4 73:17 76:3,10 77:20 79:1,3,5 81:14 89:1,9,14,15,18 92:19,22 106:11,17 110:3 119:12 122:7 132:24,25 134:6,8,15 135:2,4 138:15 139:7 140:2 147:25 151:24 160:25 163:18 164:7,19 165:23 166:7 169:18 172:20,22 174:12 179:5,9 188:2 192:1,2,15 194:18 208:6 212:17 226:15

**correctly** [2] 82:11 203:18

**correlation** [1] 43:10

**correspondence** [4] 38:10 181:5,25 182:2

**corrupted** [1] 113:19

**corruption** [17] 16:24 17:1,2,9,13 49:2 51:18 52:24 84:3 88:18 90:20,22,24 91:12 97:13 104:16 113:9

**cost** [4] 203:22 205:12 236:6 251:11

**couldn't** [6] 19:12 61:24 63:5 167:13 195:3 203:17

**counsel** [103] 1:25 46:6 59:22 110:8,15 112:25 117:6,19 118:4 119:14 128:12 135:12 136:22 142:18 143:20 144:4,18 147:3,7,11,16,23 148:17,20,25 149:5 153:15 154:11,13,14,18,22 155:3,14,16,19 156:15,19,23 158:5 159:18 167:4,11 168:7 171:18 172:19 173:9,16,18,24 174:3,9,10 175:9,11,16,21 176:7,23,25 178:15,21 179:2,4 180:23 190:16,18 203:7 206:11 207:10,12 210:9 213:21 217:11,21 233:17 235:12 238:3 241:14,17,21 242:25 247:8,21,24 248:4,9,15,20 249:2,10,21,23 250:4,15,21,24 251:5,10,18 252:2,5

**counselor** [3] 43:14 138:24 173:11

**county** [1] 233:18

**couple** [7] 3:21 100:13 193:8 217:10 240:15,16 248:16

**course** [5] 3:24 19:8 65:9 105:23 111:20 149:17 157:24 195:20 199:4 218:22

**court** [12] 1:1 2:17,21 3:11 37:17 60:9 76:7 116:6 129:7 130:5 136:23 185:6

**courts** [1] 188:12

**coury** [42] 1:10 2:24 55:18,19 69:8 73:23,25 78:12,19 79:2,10 92:16 159:12 160:3,5 161:14,24 162:7,12,15,18,23 163:2,5,8 164:25 165:3 166:10 169:1,12,22,24,25 178:9 179:5,11 180:7,24 183:5 235:6,10,11

**coury's** [4] 139:3,11 162:5 180:12

**cover** [2] 241:18 247:1

**coverage** [1] 153:1

**covered** [2] 131:24 225:20

**create** [1] 10:14

**created** [6] 10:8 27:3,5 230:16,17 231:10

**creating** [1] 33:24

**credentialed** [1] 81:8

**credentials** [1] 227:15

**credibility** [1] 21:22

**credible** [1] 96:12

**credit** [1] 220:14

**crime** [3] 17:18,19 21:11

**criminal** [32] 5:2,5 7:23 8:2 14:2,14,15,21 15:14,17,21 16:1,11,13 19:6,8 20:8 24:23 25:12 70:1 104:25 107:23 132:14,18,24 135:21 149:13,21 150:13 153:13 154:9 182:10

**criminally** [1] 172:11

**cristi** [2] 202:2,12

**criteria** [1] 95:11

**critical** [3] 40:16 121:4 228:12

**crucial** [1] 193:15

**crystal** [3] 3:13 130:3,15

**culture** [2] 40:11 230:24

**cum** [3] 5:2 34:22 35:2

**cumberland** [1] 233:18

**current** [3] 164:5,6 226:3

**currently** [1] 12:8

**curve** [2] 47:17 48:20

**custodial** [2] 132:2,3 133:22 135:7,24 136:4,6,10,17,18 137:6,16

**custody** [3] 13:14 133:25 134:1

**custom** [1] 142:14

**customarily** [1] 39:23

**customized** [1] 144:4

**cut** [1] 68:5

**cv-01-0084** [1] 2:25

**cycle** [2] 21:2,3

**cyrus** [1] 2:17

**cythia** [1] 231:2

### D

**d-e-w-i-r-e** [1] 156:11

**damage** [6] 122:4,6,11 182:8 225:20 228:25

**damages** [1] 191:3

**dare** [1] 221:23

**darn** [1] 48:6

**darrell** [67] 1:3,17 2:22 3:1,6 32:25 46:16 64:3 67:11,13 93:13 123:3 144:1 147:1,6,8,12,15,19,25 149:3 153:12 154:1,21 155:13,17 156:11,13,21 157:24 158:6 159:23 167:3,5 172:16,22 174:8,13 175:19 176:20,24 178:23 179:3 181:1 183:18 190:17,19 206:8,12 207:11,13 210:6 213:18,23 217:7,12 233:19 235:14 238:2 242:1,21 247:5 248:25 250:13,17,19 252:8

**date** [14] 1:15 2:17 4:17 49:3,4 74:2 75:10,12,14,14 78:20 158:3 232:6 241:25

**dated** [2] 116:14 179:4

**dates** [4] 81:20 160:20 241:9 250:5

**davis** [11] 185:12,23 186:13,13 187:17 188:14,18,22,23 195:16,25

**davis's** [1] 196:9

**day** [34] 4:4 26:19,20,22 27:2 111:24 129:18 139:2 158:20 175:14 187:21,21 189:12,14 193:11 196:14,15,15,23 200:5 216:5 217:18 218:8 226:12 230:14 233:22 236:6 237:5,8 248:21 249:13,18 250:1 252:9

**days** [15] 58:1 75:18 211:13,24 216:23 217:10 218:13 223:7 234:19 235:1 237:7

**dc** [1] 239:23

**deadline** [4] 236:21 237:3,9,10

**deal** [9] 58:18 70:18 136:18 202:18 203:13 205:12 206:14 242:9 245:18

**dealing** [3] 61:3,13 229:2

**dealt** [2] 22:24 229:6

**death** [1] 230:22

**december** [6] 1:15 2:18 7:3 81:13 116:13,14 179:4,21

**decent** [2] 32:19 249:18

**decide** [2] 32:13 235:12



P.R. VIDEO, INC

**decided** [1] 179:12
**decidedly** [1] 119:20
**deciding** [1] 107:10
**decision** [2] 12:20 31:9 47:4 82:19 91:10 93:16 94:14,19,23 106:1,21 113:16,16 114:9 162:3,5 180:19,24,25 235:3,4 244:1
**decisions** [1] 111:19
**declined** [1] 211:7
**deduce** [2] 118:8 161:21
**deduced** [4] 99:18 106:10,13 107:21
**deduction** [5] 106:9,17,19 145:10 161:17
**defeated** [1] 228:1
**defendant** [3] 1:23 3:8 240:12
**defendants** [7] 1:14 2:25 3:10 109:7 161:24 167:9 231:16
**defense** [1] 3:2
**defer** [1] 136:21
**deferential** [1] 236:4
**deficiency** [1] 23:8
**define** [2] 16:14 29:18
**defined** [1] 144:17
**definition** [3] 66:4 135:13 136:16
**degree** [2] 5:4,5
**demand** [1] 220:13
**demanded** [1] 111:24
**demeaning** [2] 225:11,21
**demoted** [1] 185:8
**demotion** [3] 225:23 228:8 229:1
**demotions** [3] 12:12,15,16
**denial** [1] 198:15
**denied** [10] 197:6 205:2 234:3,6,7,13 236:20 240:19,25 243:18
**deny** [2] 208:4 240:25
**denying** [2] 198:21 201:20
**department** [24] 6:8 9:10 10:18,22 20:23 21:23 22:25 25:12 40:16 75:3 121:15 127:22 150:13 172:5,15,18 173:5 182:2 185:24 200:1 212:10,11 231:12 235:18
**department's** [1] 26:15
**departments** [2] 9:18 23:6
**departure** [1] 216:2
**depending** [2] 21:5 26:2
**depends** [1] 251:10
**deponent** [1] 136:15
**depose** [2] 140:4 250:11
**deposing** [1] 48:14
**deposition** [13] 1:16 2:19 51:2 59:6 60:7 93:12 151:9 159:25 247:18 248:5 249:16 252:6,8
**depositions** [3] 104:3 193:14 250:2
**depth** [2] 122:14 123:10
**deputies** [7] 42:13 43:2 70:10 71:7 76:1 92:15 162:9
**deputy** [30] 42:6,12 44:5 70:2,4 73:17,19,21 76:17 78:16 80:12 81:6 88:1 89:13 91:17 92:20 93:2 132:5 137:11 165:3,11,20,25 181:13 197:15,17 229:4 236:18 237:19 240:11
**deputy's** [1] 43:8

**describe** [4] 29:4 66:1 97:7 150:4
**described** [26] 18:15 25:14 52:4,5,18 53:18 58:12 68:9,20 81:4 95:25 96:10 97:25 103:21 121:11 127:18 128:1 138:21 146:10 151:17 152:16 163:10 165:6,10 210:16 224:14
**describing** [2] 70:20 119:11
**desirable** [1] 40:13
**desire** [2] 173:25 209:8
**desired** [1] 63:14
**desires** [1] 184:5
**desk** [8] 72:25 152:10,19 153:20,22 154:19,23,25
**desks** [1] 152:10
**despite** [1] 146:14
**destroyed** [5] 225:13 226:20,22,25 232:11
**destroying** [1] 121:20
**detached** [7] 12:1 139:9 142:10 192:4 199:18,22,25
**detachment** [1] 199:23
**detail** [6] 18:6 34:7 114:17 175:8 185:14 187:4
**detailed** [2] 26:14 247:8
**details** [1] 155:14
**determination** [4] 62:13 119:1 120:11 193:7
**determinations** [1] 116:24
**determine** [6] 20:20 115:17 116:23 117:3 118:14,22
**determined** [6] 12:17 25:22 31:4 34:15 178:8 190:5
**develop** [3] 21:13,21 47:6
**developed** [2] 64:23 102:11
**development** [10] 9:3,12,16 10:1,4 19:23 30:17 45:25 80:14 139:4
**developments** [1] 99:4
**device** [1] 2:4
**devote** [1] 192:6
**devoted** [1] 188:13
**dewire** [2] 156:8,9 163:23 164:6,10,22 167:15 190:5 192:24,24 195:7 196:4,14,20,21 197:4,8,8 234:1,18 235:5,7
**dewire's** [2] 164:2 235:4
**dgs** [1] 229:5
**dialog** [2] 189:5 216:19
**differed** [2] 156:16 157:4
**difference** [8] 66:18 138:2 147:7 153:5 223:20 224:4 231:8 243:23
**different** [29] 3:12 93:21 94:13,22,23 100:15,18 117:10,11,11 121:2 135:6 151:18 157:17 170:24 176:13 183:11 184:22 190:23,24 195:5 212:3 223:13,25 226:13 231:23,25 236:10 245:22
**differently** [2] 86:16 194:17
**difficult** [7] 53:20 62:11 67:20 221:3 222:21 224:22 247:14
**difficulties** [1] 85:21
**direct** [3] 78:9,11 79:9
**directed** [1] 243:14
**direction** [3] 76:21,24 171:23
**directive** [11] 9:20 95:19,20,22,22

96:5,12 200:1 235:19 237:16 239:21
**directives** [2] 9:18,19
**directly** [3] 76:9,16 167:19
**director** [111] 11:4,6,8,24 12:9,14 27:17,21 28:5 29:5,6,8,23 30:1,6 31:4,14 33:15 37:5 38:20 39:18,20 40:3,4,19,24,25 41:6,13,14 42:1,2,11,11,22 43:12 44:9,10 45:5 47:12 49:8,11 58:6 64:23 68:12 71:21 73:20 78:11,16 80:11,11 81:5 82:5 85:15,17 86:2,18 87:9 88:12 92:3 123:25 142:6,9 144:15 160:12 161:4,15 162:13,24 163:8 164:5,7,14,19 165:4,19 166:2 181:12,12 186:13 187:9,10 188:24,25 189:1 196:2,8 200:9 201:6 203:9 208:10,10,13 226:4 234:14,15,18 235:13 236:5,18 237:13,18,18,20 238:22,25 244:19,22 245:21 246:23 247:3
**director's** [2] 163:21 180:9
**directors** [5] 43:1 162:16,17 193:7 202:7
**disagree** [2] 117:20 251:25
**disagreement** [1] 251:3
**disapproved** [1] 243:2
**disaster.i** [1] 186:1
**disciplinary** [9] 134:3 137:8 181:9 185:7 188:12 189:13 206:19 232:1 233:23
**discipline** [2] 137:24 213:1
**disciplined** [5] 134:9,11 172:12,14 178:5
**discrepancies** [1] 22:19
**discretion** [5] 64:17 66:1 68:11 87:15 96:11
**discuss** [6] 52:13 68:4 88:16 123:21 206:25 215:11
**discussed** [22] 31:13 54:17 56:6 63:11,12 65:24 66:2 68:10,21 84:18,20 97:9 98:9,9 101:9,11 102:2,7 181:11 219:21 225:17 236:10
**discussing** [5] 62:14 63:19 143:7 163:7 232:16
**discussion** [32] 49:22 52:15 55:10,14 62:25 64:14,15,20 69:12,18 84:9 85:1 89:6 91:2 96:9 97:24 105:2 111:17 118:12 162:8 196:12 203:18 206:13 217:8,24 218:4 221:8,8,9,10 224:7 239:5
**disgrace** [3] 117:8 212:11 245:24
**disgraceful** [1] 212:12
**dispose** [1] 91:6
**dispossession** [1] 154:12
**disputed** [1] 106:18
**disrespect** [2] 81:14 82:1
**distance** [2] 35:16 68:8
**distinction** [4] 35:2,4,5,5
**district** [4] 1:1,2 2:21,22
**divided** [1] 11:16
**division** [53] 10:8,10,11,12 11:4,5,6,8,24 12:1,5,20 22:7,25 21:10 25:4 28:15 29:5,7,8,12 30:12 31:2 33:15,22,24 40:3,10 42:23 44:13 45:

8 60:20 61:11 64:24 86:19 142:10 152:4,4 187:8,8,9,10,10 199:10 200:8 202:7 203:9 226:7,14 234:15 238:23,25 247:3
**divisions** [5] 27:18 30:24 33:19 161:20 226:8
**divulge** [5] 64:4 65:14,22 66:22 67:21
**document** [22] 3:25 44:24,24 59:13 74:18,24 75:1,5,10 76:8 96:24 120:2 143:7,21,24 144:2 147:21 170:7 231:8,11 251:2,6
**documented** [2] 33:11 169:21
**documents** [6] 3:23 59:8 119:13 132:8 231:7 240:16
**doing** [9] 25:6 44:19 59:6 60:7 66:16 71:17 112:11 117:13 127:14 141:16 151:20 172:10,11 194:12 219:7,7 225:4 245:24 246:8
**dollar** [1] 187:11
**dollars** [6] 204:14 205:7 206:7 251:15
**don** [1] 3:5
**donald** [1] 1:20
**done** [24] 8:11 17:19 31:25 32:2,5 45:12 81:21 82:16 94:17 108:16 109:16 117:6 119:18 121:10,19 129:1 135:20 157:21 167:9 176:16 177:21 188:5 192:18 245:9
**donna** [5] 203:14,25 204:5,19 206:9
**door** [1] 245:5
**dorothy** [1] 250:21
**doubt** [3] 48:5 183:12 221:24
**down** [26] 12:25 13:4,5,7,9,21 42:18 51:5 72:11,15 76:6,19 92:15 116:5 132:5 140:14,15,17 146:9 152:25 186:18 212:9 221:25 225:1,14 245:7
**dozen** [1] 182:19
**drafts** [1] 9:18
**drive** [1] 220:11
**drivers** [1] 106:16
**driving** [1] 245:6
**dropping** [1] 228:3
**drove** [1] 205:16
**drug** [3] 18:2 155:18,21
**drugs** [4] 4:10 18:5 154:24,24
**due** [5] 117:19 192:11 207:7,8 219:6 228:11
**during** [35] 25:17 49:7 51:13,19,24 55:6,19 62:22 64:8,15 78:10 89:13 90:14 98:2 103:20 149:17,24 150:6 152:13 159:9,24,25 180:10 182:23 187:21 190:20 203:10 207:3 217:2 218:14 221:7 224:8,18 249:9 250:5
**duties** [14] 11:7,8 19:23 20:4,6 25:4 29:4,7 189:23 193:13,21 197:4 228:23 238:15
**duty** [5] 119:17 178:4 187:13,14,22
**dwyer** [1] 182:13

**E**

**e-mail** [11] 189:6,6 200:24 204:11



## P.R. VIDEO, INC

216:3,19,22,24 **217**:2,8,25

**e-mailed** [6] **185**:12 **188**:14,17 **195**:16 **202**:20 **217**:16

**e-mails** [1] **217**:21

**e-s** [1] 56:4

**each** [6] 21:8,9,23 120:15,18,18

**eager** [1] 177:7

**earlier** [11] 33:23 96:2 101:24 102:21 121:12 154:15 163:6 176:21 195:9 214:15 226:12

**early** [4] 49:1,5 215:23 217:4

**easier** [3] 140:5 143:16 227:3

**easily** [1] 85:5

**east** [2] 11:17 230:17

**educated** [1] 27:10

**education** [6] 4:24 6:9 89:24 90:5 92:3,9

**educational** [3] 236:15 238:4 243:17

**effect** [9] 121:20 183:4 188:18 201:15 210:7 215:15 216:4 221:2 228:25

**effective** [1] 217:13

**effectiveness** [2] 225:13 226:21

**effort** [3] 69:2,6 90:19

**eight** [13] 95:15 143:10,11,24 146:25 147:4,14,15 159:15,18 192:8 229:20 237:7

**eight-month** [1] 192:4

**eighteen** [1] 211:5

**eighty-three** [1] 172:23

**eighty-two** [1] 172:23

**either** [9] 31:4 51:5 52:10 56:12 85:10 91:15 98:10 100:2 131:9 138:24 148:22 150:15,22 151:1 211:7 213:13 214:7 215:15 237:17

**elapse** [1] 57:23

**elapsed** [1] 57:20

**element** [2] 95:9 120:8

**eleven** [3] 122:19,20 179:2

**elicit** [1] 136:15

**eligibility** [1] 62:21

**eligible** [1] 235:22

**elimination** [1] 79:18

**elsewhere** [1] 10:2

**emergency** [6] 34:6 186:4,11,16,18,24

**emotionally** [1] 225:7

**emphatic** [1] 141:19

**emphatically** [1] 178:7

**employed** [2] 2:17 58:13

**employment** [2] 102:12 137:14

**empowered** [1] 40:22

**enclosure** [2] 172:3 179:8

**encompassed** [1] 225:17

**encounter** [1] 86:3

**end** [20] 5:16 28:11 36:18 42:4 54:1 71:1 93:11 103:24 107:20 143:17 179:12 198:14 207:23 209:22 224:13,24 234:24 235:18 248:5 251:1

**endeavor** [1] 186:8

**ended** [2] 34:18 46:19

**endless** [1] 129:3

**ends** [3] 177:4,17,17

**enforcement** [19] 5:17,24 6:2 12:5,10 35:8,21 88:12 96:13 160:9 163:16 164:17 165:18 166:6 185:10 194:8 200:14 238:16 245:23

**enhancing** [1] 138:2

**enjoy** [1] 212:6

**enjoying** [1] 188:17

**enlist** [1] 6:11

**enlisted** [1] 6:13

**enlistment** [1] 232:6

**enough** [9] 30:3 58:11 115:11 181:3 212:1,15 223:7 224:17 246:8

**enraged** [1] 112:4

**enrolled** [2] 4:25 5:7

**entail** [1] 21:18

**entailed** [1] 21:21

**entire** [11] 11:9 21:17 25:11 28:8,10 29:8 33:9 81:9,11 123:4 227:21

**entirety** [1] 23:20

**entitled** [4] 82:6 85:16 148:15 211:13

**entity** [1] 21:12

**entry** [2] 51:23 52:19

**environment** [2] 87:17 157:12

**episode** [1] 142:23

**equalizes** [1] 235:23

**equally** [1] 209:10

**equipment** [1] 118:12

**erase** [1] 142:23

**erroneous** [1] 20:9

**error** [1] 114:22

**escapes** [1] 103:17

**esq** [1] 1:20

**essence** [1] 152:11

**essentially** [10] 10:23 14:1 27:16 55:7 56:22 80:9 163:13 207:20 222:20 230:20

**establish** [1] 63:4

**established** [2] 13:17 154:15

**estimate** [3] 14:19 15:20 203:23

**estimating** [1] 16:23

**etc** [9] 38:4 39:11 59:8 61:14 150:4 157:20 168:12 226:20 242:6

**ethic** [1] 227:10

**ethical** [1] 117:14

**evaluate** [1] 119:8

**evaluated** [1] 149:22

**evaluation** [2] 207:4,7

**evaluations** [1] 239:9

**evanko** [74] 1:9 2:23 52:9 58:8 69:10 71:7,14 74:16 78:12 79:4,10 92:15,16 95:17 99:20,23 100:19 101:18 103:9,11,14,16,19 104:5,11,22 105:4,22 106:24 107:4,17 108:9,14 109:3,14,16,23 110:5,12 111:1,1,2,6,10 112:3,9 113:13 122:15 123:8,9,11,14 124:8 125:2,12,16 126:20 128:25 131:1,11 140:18 141:11 142:1 160:23 170:23 181:9 183:3 184:5 198:20 200:5 208:23,23 209:13 222:3

**evanko's** [3] 52:12 122:13 142:19

**even** [23] 14:24 42:2,6 44:5 54:21

91:16 93:1 99:8 101:23 108:14 167:8,13 172:4 180:14 181:3 191:23 192:11 205:20 206:21 207:18 230:15 231:19 251:13

**event** [6] 51:8 60:2 186:11 196:12 198:10 239:25

**events** [1] 213:24

**eventual** [1] 104:24

**eventually** [4] 12:7 18:25 31:16 102:3 178:11 203:3 246:12

**everybody** [6] 70:5 76:22 133:16 240:25 241:1 242:5

**everyone** [4] 70:13 76:3 167:18 233:23

**everything** [2] 37:19 206:4

**evidence** [11] 18:10 23:18,19,19,24 59:24 115:14 119:18 172:6 179:13 206:5

**evil** [1] 209:10

**evolved** [1] 24:17

**exact** [2] 26:2 120:1 235:21

**exactly** [14] 6:7 14:8 53:5 64:10,11 84:13 89:8 93:9 103:2 222:25 224:14,15 230:5 235:14

**exam** [1] 161:11

**example** [6] 22:14 24:15 84:8 136:17 199:2 232:19

**examples** [1] 24:13

**exams** [1] 33:8

**except** [4] 3:19 15:12 191:25 238:20

**exception** [1] 227:9

**exchange** [4] 146:10 162:8 218:15 228:3

**exchanges** [1] 219:5

**exclusively** [1] 9:19

**excuse** [14] 12:6 15:11 16:6 81:13 88:25 139:11 185:10 187:19 194:10 196:3 197:5 198:8 234:17 243:3

**executed** [1] 147:21

**executives** [1] 228:21

**exercise** [4] 21:23 148:14 150:9,11

**exercised** [2] 65:2 152:13

**exerting** [1] 51:22

**exhibit** [30] 4:14,20,21 32:8,9 35:19 72:25 74:17,19 76:14,15 116:6,18 118:3,4 119:22 131:16,17 143:6,24 146:25 147:4,13,15 155:13 159:15,18 169:9 179:2 242:21

**exigent** [1] 154:6

**exist** [2] 25:25 235:22

**existed** [1] 23:11

**existence** [3] 6:4 99:1 104:22

**exists** [2] 104:16,16

**expect** [4] 59:15 87:13 168:23 212:6

**expectations** [1] 22:25

**expected** [5] 86:21,23 223:4,5 228:13

**expecting** [1] 112:9

**expenditure** [1] 204:12

**expenses** [5] 201:21,23,24 205:2 208:1

**experience** [11] 14:5 19:1 38:3 40:11 47:14 79:17 100:12 137:5 163:7 188:5 239:19

**experienced** [1] 149:20

**experiencing** [1] 149:20

**explain** [6] 20:18 33:3 66:21 104:19 142:21 143:15 174:11 178:1

**explanations** [1] 150:8

**explored** [2] 154:2,7

**exposure** [1] 80:10

**express** [1] 66:5

**expressed** [2] 240:1 242:15

**expressly** [5] 64:3,13 65:13,21 66:5

**extend** [1] 92:7

**extended** [1] 82:14

**extra** [1] 32:21

**extremely** [1] 163:14

## F

**face** [5] 58:14 134:2 229:6 246:1,1

**facilitating** [1] 186:14

**facilitator** [2] 52:6 57:2

**facility** [2] 6:5 24:21

**fact** [43] 40:14 48:16 66:8 79:17 92:5,9,25 93:6 95:4 98:20 100:13 106:20 108:18 109:12 117:11 119:16 122:3 123:15 125:5,12,16,24 128:9,13,24 129:1 132:22 134:1 140:25 144:9 145:3 152:3 155:2,3,4 158:15 174:4,6 175:18 177:24 184:20 207:3 231:14

**facts** [24] 32:24 47:3 61:4,7,13 65:10 91:20 93:22 94:14 106:5 113:14 114:7 118:22 119:9,13,18,20 120:15 140:19 141:24 172:25 173:4,5 210:12

**factual** [3] 118:6 119:7 153:23

**factually** [1] 128:22

**failure** [1] 25:23

**fair** [2] 150:20 251:8

**fairly** [2] 84:14 103:16

**fairness** [3] 25:13 247:7,10

**faith** [1] 150:19

**fall** [1] 236:17

**fallen** [1] 107:23

**false** [2] 176:15 211:16

**familiar** [4] 35:6 93:23 184:12 233:17

**family** [5] 210:8,23,24 211:7 232:2

**far** [12] 90:8 91:9 120:7 151:14 157:18 158:14 160:6 210:11 219:6 241:21 250:17,18

**farm** [1] 210:2

**fate** [1] 227:25

**father** [1] 5:20

**favorable** [1] 180:25

**fbi** [64] 17:12,22 18:14 19:15,16,20 49:2 51:11,16 58:3 62:16 64:3,6, 21 65:12 74:6 77:10 78:7 82:13, 19 83:20,25 84:5 87:25 89:4 90: 19 95:18 96:16 97:12,22,25 98:4, 14 101:21,25 102:9 103:9,12 104: 5,7,23 107:6 109:24 111:3,6,7 112:7 113:8 122:14 123:10,15,21



P.R. VIDEO, INC

126:5,8,9,9,11,14 127:11 140:20 206:22 207:7 215:8 221:22
**fbi's** [4] 99:1,7 113:15 114:7
**fear** [1] 246:2
**february** [3] 7:12 15:5 238:17
**federal** [1] 247:6
**feel** [9] 67:17 80:18 81:24 83:3 95:10 210:22 230:10 251:7,8
**fellow** [3] 191:11,15 244:11
**felonies** [1] 16:21
**felt** [3] 81:25 82:1 89:11
**few** [9] 41:1 58:1 83:11 91:5 201:12 216:23 234:18 247:17,19
**fi.we're** [1] 251:14
**fiasco** [1] 161:18
**field** [3] 34:3,4 61:25
**fifteen** [1] 247:11
**figure** [4] 56:20 112:20,22 163:4
**figured** [1] 214:8
**figuring** [1] 242:8
**file** [11] 35:20 38:24 39:2,3,6,8 116:21 179:19 236:22,25 248:6
**filed** [7] 103:1 104:4 198:16,17 206:25 214:1 231:10
**filing** [1] 198:12
**fill** [2] 228:9,13
**filled** [2] 22:7 75:17
**final** [1] 180:15
**finally** [1] 103:8
**finance** [2] 34:1 151:13
**financial** [1] 231:25
**find** [30] 26:17 46:24 88:25 90:19 99:11 102:22 111:11 121:8 123:14 124:6,22 125:12,16 126:9 127:10,11,12 138:8,10 142:20 143:3 154:24 170:2 177:23 178:25 193:3 195:19 212:1 231:22 236:24
**finding** [3] 118:22 150:10 180:18
**findings** [1] 21:14
**fine** [10] 3:20 23:2 130:11 155:10 188:21 196:6 203:23 207:16,22 249:2
**finish** [13] 24:8 42:9 53:2 113:4 117:21,22 129:14 130:8 190:21,22 241:16,19 247:10
**finished** [5] 25:2 27:11 33:9 60:4 117:23
**firearm** [1] 149:2
**firearms** [2] 36:21 149:4
**first** [62] 6:11,15,18 11:2 17:13 23:7,9 27:20 36:13 40:17 42:14 48:5 51:12,14 52:1 54:20 56:10,23 57:3,10,12 62:22,23 63:22,24 82:9 84:24 86:3 88:17 96:21 98:3 101:25 102:8,11 111:2,3 123:19 139:14,23 140:14 146:9 162:11 164:18,24 171:12 174:10 178:3 185:11,22 187:4 189:5,5 193:11 195:21 213:12 217:25 221:8 225:21 228:7 230:17 239:5 240:3
**fit** [2] 142:14,16
**fitness** [1] 36:23
**five** [19] 13:10,21,24 20:6 33:21 129:24 130:6 192:12 210:1,25 218:13 234:19 235:2 238:25 240:

3 241:16 247:10 248:24 251:15
**five-minute** [1] 72:13
**flabbergasted** [1] 181:18
**flattering** [1] 228:7
**flawed** [1] 23:10
**floating** [1] 160:20
**floored** [1] 142:8
**flowered** [1] 231:12
**flu** [1] 32:17
**focus** [1] 127:16
**focused** [1] 63:3
**folks** [2] 227:10 233:20
**follow** [9] 15:15 110:17 131:7,20 156:23 165:5,8 181:6 204:10
**follow-up** [1] 124:7
**followed** [7] 20:13 25:19 26:1 99:5 107:22 158:10 201:11
**force** [1] 74:20
**forced** [4] 152:9 169:10,14 207:23
**fore** [1] 119:9
**foreseeable** [1] 121:24
**forfeiture** [2] 18:10,11
**forget** [3] 116:6 170:22 235:8
**forgetting** [1] 244:14
**forgoing** [1] 208:12
**forgot** [1] 185:10
**form** [25] 3:19 14:6 21:25 22:7 42:16 45:15 61:15 66:7 74:23 75:17 79:14 80:21 83:4 94:3 96:11 106:6 110:6 112:16 133:2,4 143:5 175:17 177:8 178:23 200:1
**formatted** [1] 203:17
**former** [7] 10:11 11:18 81:5,6 164:14 202:6 230:6
**forming** [1] 184:15
**forms** [1] 240:9
**forth** [4] 18:12 20:10 217:22 220:11
**fortunate** [2] 211:2 212:15
**forty** [3] 192:3 235:1,1
**forty-five** [2] 197:23 198:18
**forty-four** [2] 184:2 185:2
**forty-six** [4] 208:15,16 210:18 225:10
**forty-three** [1] 160:2
**forty-two** [3] 131:23,24,25
**forward** [3] 146:20 192:22 213:4
**forwarded** [1] 237:11
**found** [19] 23:7,8 24:19 87:17 93:6,9 102:23 103:5 154:25 155:17,21 178:11 179:17,19 180:19 190:2 193:6,9 237:1
**foundation** [1] 91:20
**founded** [2] 46:20 180:20
**four** [21] 8:20,13:7,20,24 14:24 33:8 35:17 145:13 172:3 192:12 196:23 209:25 210:25 226:2 229:15 238:21,25 240:3 247:11,11 249:19
**fourteen** [1] 13:19
**fourth** [3] 24:16,17 122:21
**fr33** [1] 212:25
**frame** [18] 63:3 74:5 98:1 175:25 176:5 202:4,9 203:12 204:17,22,23 207:14,14,25 221:10 231:5

236:11 241:24
**framed** [6] 202:25 203:1,4,16 204:6 206:4
**framers** [2] 203:21 204:16
**framing** [2] 98:7 205:3
**frankly** [2] 38:12 247:9
**free** [5] 18:23 46:13 67:17 137:17,17
**friday** [5] 223:24 249:17,20 250:7,12
**friday's** [2] 215:23 250:7
**friendly** [1] 251:24
**front** [6] 59:17 91:20 142:13 190:2,6 192:25 197:6,11
**full** [4] 14:23 15:13,19 23:21
**fully** [4] 33:13 46:10 59:15 189:23
**function** [2] 21:9 22:21
**functions** [5] 5:18 10:18 20:7 24:24 236:1
**funding** [1] 194:17
**funds** [2] 194:22,22
**further** [4] 26:4 52:23 111:17 252:3
**future** [1] 228:3

## G

**gain** [2] 51:22 52:19
**gambit** [2] 16:1 24:19
**garrity** [8] 132:6,10,11,17,22 133:1,10 135:4
**gather** [1] 47:3
**gathering** [1] 141:24
**gave** [14] 32:21 36:12,21,23 92:4,5,11 93:4 99:2,4 124:19,20 152:16 196:16
**gee** [2] 202:15 233:9
**gees** [1] 51:2
**general** [9] 1:25 55:10,13 56:14 62:24 84:9,25 148:3 194:20,21
**generally** [6] 4:17 31:12 33:17 40:12 90:7 167:7
**generated** [1] 243:6
**generic** [2] 48:12 58:19
**generous** [1] 212:1
**gentleman** [1] 129:25
**geographically** [1] 11:17
**gerald** [1] 45:22
**gets** [5] 37:20 107:20 114:19 165:13 183:4
**getting** [17] 14:13 32:17 48:9,19 90:24 91:22 139:21 177:15 185:18 188:9 204:5 210:10 214:8,22 215:9 222:24 224:14
**gift** [1] 202:11
**gigliotti** [1] 58:21
**gist** [2] 73:12,14
**give** [36] 2:13 15:2,20 16:20 18:24 26:3 32:9 47:3 54:14 68:13 85:22 86:25 96:8 119:15 122:23 126:17 131:5,19 160:22 162:19 172:5 183:6 197:24 199:2,5,17 201:8 202:9 205:21 206:5 221:14 225:5 234:10,12,24 247:12
**given** [20] 37:4 38:6,9 40:23 41:10 94:13 127:24 132:17 133:2 134:

21 135:3 146:3,25 148:16 150:12 157:25 179:1,16 205:13 230:21
**gives** [2] 40:20 241:24
**giving** [5] 48:3,4 51:6 95:10 143:22
**glad** [1] 37:11
**god** [1] 2:14
**god's** [1] 182:11
**got** [25] 50:6 59:13 65:18 73:12,13 100:25 114:16 139:17,25 147:4 164:10 180:4 188:10 196:9 197:6 201:12 207:18 214:6,21 220:15 224:12 227:4 245:8 250:1 251:1
**gotten** [4] 122:10 164:9 182:19 210:24
**governed** [1] 154:3
**government** [1] 5:17
**governor's** [12] 62:18 63:7,24 84:22 85:11 99:20 101:10,15,17,22 123:16 125:13
**governors** [6] 122:16 123:12 124:2 215:12 219:14 235:19
**governs** [2] 45:1 70:10
**gpa** [1] 34:23
**grade** [1] 36:6
**graduate** [5] 4:7,9 34:22 37:24
**graduated** [3] 5:2,25 35:11
**graduating** [1] 35:7
**graduation** [1] 17:6
**grand** [1] 235:2
**grateful** [1] 119:16
**grave** [1] 182:11
**great** [12] 58:18 65:1 66:9 68:11 70:18 97:13 136:17 162:23 217:18 245:18 247:21 250:9
**greenwood** [1] 229:5
**grievance** [5] 198:16 207:1 213:25 218:8 238:18
**grievances** [4] 198:12,17 214:1 228:3
**grieved** [2] 198:16 207:24
**grounds** [1] 117:14
**guarantee** [1] 42:3
**guaranty** [1] 157:19
**guess** [39] 6:17 8:16 9:12 16:18 18:9 26:14 28:11 43:12 44:20 47:19 48:3 55:25 84:14 85:4 86:10 87:13 91:16 92:12 107:1,21 112:19 118:16 131:15 139:13 141:15,16 157:16 185:18 189:5 190:9 194:15 213:6 215:6 223:25 226:10 240:10,18,24 250:25
**guessing** [1] 147:21
**guidance** [2] 81:2 85:24
**guide** [2] 69:25 70:8
**guided** [1] 87:14
**guido** [130] 1:24 2:6,10 3:7,16 4:4 16:16 17:2 24:6,12 26:24 27:1,4,6,8,12 29:20 32:22 35:18 36:7 37:19,25 42:19,21 43:21 44:3 47:8,12 48:1,8,14,18 50:18,24 51:4,8 53:8 54:10 56:5 57:24 58:2 59:4,7,16,21 60:1,8,14 66:22 67:17 67:5,8,19,25 69:16 71:5 72:1,5,7,12,24 73:7,10 74:10 77:9 80:1 83:8,11,

 

P.R. VIDEO, INC

18 85:13 93:14,25 94:14 95:14
100:21,25 104:2 105:24 106:12
107:1 110:10,17,21 111:15 112:
19 113:2,10 114:4 115:12 116:3,5,
20 117:1,15,18,23 121:18 122:19,
22,25 124:14 125:10 126:10,15,19
127:18 128:15,18,23 129:6,12,15,
19,23 130:5,11,13,23 131:19,22
139:21 140:4,11,15 143:11,13
175:14 177:25 192:5 209:3
**gun** [1] 142:24
**guy** [3] 207:2 232:25 247:22
**guys** [2] 215:3 248:20

**H**

**h-i-c-k** [1] 56:3
**half** [1] 182:19
**halfway** [1] 249:17
**hall** [1] 61:6
**hallway** [1] 240:21
**halt** [1] 197:1
**hamen** [2] 181:5 183:17
**hammer** [1] 114:18
**hand** [11] 32:9 35:18 76:6 112:8
116:5 153:21 162:11 164:24 175:
4 199:9 250:7
**handcuff** [1] 134:14
**handed** [2] 127:21 207:17
**handle** [7] 61:14 72:16 74:15 76:
24 77:5 126:25 224:15
**handled** [7] 23:25 31:10,15 70:23
74:14 121:1,14
**handling** [1] 23:18
**hands** [1] 126:18
**handwriting** [3] 73:1 116:14,21
**handwritten** [1] 116:15
**hang** [3] 116:3 190:13 207:10
**happen** [10] 55:12 56:17 57:7 63:2
72:7 131:3 146:22 177:6 191:14
251:16
**happened** [31] 55:16 110:5,13
111:2,11 120:22,23 124:18,19,25
125:1,3,4,5 126:21 127:10,13 140:
16 161:9 162:25 184:9 188:8 189:
11 190:10 195:4 204:4 205:8 217:
9 224:24 233:8 244:25
**happens** [2] 62:4 70:13
**happy** [3] 113:2,10 140:7
**harassment** [1] 230:8
**harm** [3] 112:20 180:16 182:8
**harmed** [4] 180:19,24 181:1,4
**harrisburg** [10] 1:22,27 2:20 3:15
19:10 152:24 187:23 188:1,15
233:17
**hate** [1] 226:4
**hateful** [2] 208:18 212:10
**hawthorne** [2] 1:12 2:24
**hay** [1] 251:25
**head** [8] 28:17 41:11 50:10 58:23
141:23 145:8 195:8 207:5
**headquarters** [7] 7:8 9:10 139:10,
10 154:4 186:16 188:7
**heads** [1] 187:5
**hear** [2] 111:6,7
**heard** [12] 64:19,20 100:15,22 108:

10 115:18 131:9 144:17 159:21
167:11 182:10 224:7
**hearing** [3] 125:8 213:25 218:8
**hearsay** [2] 166:15,18
**heart** [2] 52:16 115:8
**held** [3] 88:8 219:14 246:11
**hell** [1] 229:15
**help** [14] 2:14 30:21 32:16 44:2 47:
7 48:17 71:15 165:8 170:2 171:23
187:24 212:1 222:21 242:8
**helpful** [7] 142:22 143:4,23 153:7
225:3 241:6,22
**helping** [2] 59:7 71:18
**helps** [1] 61:5
**hershey** [2] 19:11 36:15
**hesitate** [1] 241:15
**hiatus** [1] 248:23
**hickes** [58] 55:24 56:3 57:9,13,21
78:21 79:23 80:2,10,19 81:3 87:
25 88:2,4,6 89:10,12,20 90:13 91:
11,15 92:2,20 93:2 95:4 96:17,18,
19 97:7,9,11,21 98:3,13,20,25 99:
15 100:3 101:7 110:2 111:4,4,8,8
113:16,17 114:9 127:11 131:10
158:21 159:2 167:21 168:10,15,
23 180:13 181:13 228:22
**hickes'** [2] 79:16 113:16
**high** [7] 4:25 35:5 43:4,10 62:18
63:7 168:23
**high-ranking** [3] 70:1 84:23 124:
1
**higher** [2] 43:5,9
**highest** [3] 35:5 39:24,25 40:5 43:
16
**highest-ranking** [1] 127:22
**highly** [5] 33:19 167:25 168:5,9,16
**hiligus** [3] 202:5 203:8 205:14
**hillsdale** [1] 13:15
**himself** [4] 52:6 71:19 159:15,17
**hiring** [2] 53:6 97:16
**history** [3] 4:18 7:18 38:1
**hold** [5] 12:8 36:16 70:25 103:23
231:17
**hollidaysburg** [1] 7:24
**home** [9] 195:10 210:11 213:7 214:
10 215:23 217:4,8 219:19 250:10
**homicides** [2] 16:2,3
**honest** [1] 209:4
**honestly** [2] 64:25 97:1
**honor** [2] 38:23 40:20
**honorees** [1] 4:2
**honors** [2] 38:4 39:7
**hook** [1] 2:9
**hope** [3] 30:3 70:6 76:4 175:15
182:7 233:10
**hopeful** [1] 231:16
**hopefully** [1] 78:6
**hoping** [4] 129:13,15,16 138:7
**horse** [2] 120:7 210:2
**hotel** [1] 223:5
**hour** [4] 130:10,17 248:16 251:15
**hours** [8] 196:23 247:7,20 248:2,
16,17 249:12,19
**house** [1] 203:16
**housekeeping** [1] 3:21

**houston** [2] 228:9 230:6
**how's** [1] 246:3
**however** [3] 5:8 64:22,22
**human** [1] 233:3
**humiliating** [1] 229:11
**humiliation** [1] 219:4
**hundreds** [3] 15:23 16:19 135:21
**hung** [1] 22:1
**hunt** [4] 114:17 119:12 150:11 198:
15
**husband** [1] 175:1
**hypothetical** [2] 87:11 93:24
**hypotheticals** [1] 128:5

**I**

**i'** [2] 175:5 203:24
**ia** [1] 163:9
**iad** [10] 12:14 39:18 42:11 44:1 74:
22 86:12 118:9 169:7 170:11 199:
8
**iad-1999-409** [1] 169:11
**idea** [18] 4:3 16:20,22 63:22,23,24
65:18 90:12 98:15 100:11 102:5
108:5 148:15 181:19 214:19,24
224:19 228:16
**ideas** [3] 60:23 61:14 63:19
**identified** [3] 20:23 22:16,17
**identify** [3] 22:21 23:15 71:18
**identifying** [1] 184:17
**idiot** [1] 219:3
**iims** [5] 139:6,7 204:3 225:22 228:
20
**illegal** [3] 86:8 125:11 208:13
**illicit** [1] 91:23
**illustration** [1] 23:8
**imagine** [4] 42:8,9 121:4 244:11
**immediate** [6] 27:23 28:1,8,25 78:
13,21 80:20 156:4
**impact** [1] 194:1
**impacted** [1] 13:13
**imparted** [1] 168:3
**impartial** [1] 150:20
**impeccable** [3] 88:2,7 95:4
**implicated** [4] 58:17 70:24 87:20
97:16
**implication** [3] 82:18 173:18,21
**imply** [2] 155:20 175:17
**implying** [1] 82:21
**importance** [1] 24:19
**important** [8] 78:1 128:14,15,16,
17 178:24 198:9 228:13
**importantly** [1] 219:5
**impose** [1] 24:1
**impression** [3] 172:5 224:9,12
**improper** [9] 169:2 170:11,12 171:
3,6,11,17 177:16 182:9
**improperly** [3] 85:9 173:2,6
**ims** [13] 39:1 139:4 181:15 187:11
192:9 194:14 200:3,4,7 201:3 219:
8 227:14 232:20
**in-service** [1] 19:12
**inadequate** [1] 14:20
**inadvertently** [1] 152:22
**inappropriate** [10] 107:5,5,9,10,
11,16 152:9,16 153:3 206:16

**inappropriately** [1] 152:24
**inbox** [1] 181:10
**incident** [1] 171:9
**incidental** [1] 215:18
**incidentally** [1] 46:6
**include** [5] 46:7 84:22 161:24,24
228:21
**included** [1] 109:6
**including** [4] 39:25 43:17 64:5
121:12
**incorporates** [1] 40:8
**incorrect** [2] 118:1 195:1
**incredulously** [1] 239:12
**independent** [1] 12:23
**indiana** [4] 5:7,12,21 39:12
**indicate** [1] 230:2
**indicated** [9] 62:16 132:8 138:17
168:4,5 170:10 202:11 208:17
239:18 249:12
**indicates** [3] 169:15 200:7 223:9
**indicating** [2] 74:21 157:10
**indication** [1] 58:7
**indicator** [1] 229:1
**indirectly** [1] 167:19
**individual** [11] 23:3 51:20 52:18
81:1 85:3,6,7,24 116:23 161:19
232:3
**individuals** [8] 22:23 46:16 105:1
229:4 233:4 240:2,3,20
**ineligible** [1] 187:23
**infantino** [5] 191:6,21 192:13,14,
15
**infer** [2] 83:10,21 106:8
**inference** [4] 106:4 168:3,7 194:6
**inferred** [3] 83:1,22 106:5
**inferring** [2] 83:6 105:18
**inflammatory** [1] 18:22
**influence** [10] 4:10 51:22 56:17
63:13 84:21 85:2 107:6,9,16 125:
22
**info** [2] 68:14 183:5
**inform** [2] 95:17 112:7
**informant** [2] 62:17 101:21
**information** [42] 12:2 25:9 26:3
30:19 31:16 40:16 52:22 53:4,12
54:14,15,19 61:19 64:4 65:14,22,
22 66:22 67:22 74:5 78:2 84:2,17
85:17 87:4,10 91:8 94:2,8,19 97:
12,15,15 102:11 104:15 124:10
152:23 162:8 170:3 171:8 214:11
231:5
**informed** [11] 96:18 97:11 98:20,
21,23,25 99:3 102:20 109:12 111:
19 178:12
**initial** [3] 7:6 15:15 75:1
**initially** [4] 21:1,15 144:24 190:1
**initiate** [2] 26:7 121:8
**initiated** [6] 26:6 151:23 196:7,11
213:11,13
**initiating** [1] 206:19
**initiation** [1] 170:7
**injunction** [4] 185:6,6 189:13 231:
10
**injured** [1] 180:22
**injuring** [1] 225:11



P.R. VIDEO, INC

**input** [1] 165:11
**inquire** [2] 158:18 170:22
**inquired** [2] 144:6 197:4
**inquiries** [2] 151:18 181:15
**inquiry** [26] 113:14 114:1,2,6,11 119:10 132:7 139:15 140:19,23 141:4,8 142:13 143:6 144:14,16 145:1,13 146:4 149:11 160:24 193:5 195:9 198:14 202:2,12
**insert** [1] 142:24
**inserted** [2] 142:18,18
**inserting** [2] 52:6 144:5
**inside** [1] 184:10
**insisting** [1] 144:13
**inspect** [1] 21:10
**inspected** [1] 21:6
**inspection** [11] 10:12,15,18 11:9 20:15 21:18,24,25 24:17 152:4,14
**inspections** [5] 10:19 20:11,18,20 25:6
**inspector** [2] 21:12 22:11
**instance** [6] 41:10 178:5 197:12, 20 199:10 208:2
**instances** [3] 8:11 22:19 230:25
**instantly** [1] 193:8
**instead** [2] 217:25 239:1
**institutional** [1] 100:14
**instruct** [2] 67:15 94:10
**instructions** [1] 67:13
**insult** [1] 94:20
**insuring** [1] 20:12
**integrative** [1] 229:8
**integrity** [1] 95:7 221:24
**intended** [2] 41:8 192:7
**intending** [1] 168:8
**intent** [1] 70:16
**intentional** [2] 82:17 180:5
**intentionally** [1] 83:21
**interest** [5] 94:15 97:13 239:22 240:1 242:15
**interested** [2] 105:15 246:24
**interests** [1] 104:18
**interference** [1] 111:21
**internal** [84] 11:25 26:15,18 27:20 28:24 29:5,6,8,15,21 30:5,20 31:1, 2,7,8,10,14,16,19,22 32:6 33:15 34:11 40:3,9 42:1,22 43:1,11 44:6, 10,21,24 45:2 47:13,14 55:8 58: 10 60:15,16,20,21 61:8,9 64:23 68:13 70:3,10 71:5,22 73:16 76:2 86:7,18,19 87:7,9,14,19 115:11 121:8 127:24 132:12 133:5,12 137:21 138:11 142:3,9 144:15,25 157:12 187:10 199:9 200:8 202:8, 13 208:10 218:7,12,17,25 225:22
**interrogated** [2] 82:1 96:23
**interrogation** [1] 127:23
**interrupt** [2] 65:5 136:25
**interrupted** [1] 67:12
**interrupting** [1] 198:8
**intersection** [1] 233:15
**interview** [48] 132:2,3,9,23 133:23 135:7,7,24 136:4,6,17 137:3,4,5, 20 138:3,23 139:1 142:11 145:9, 23 146:3,20 147:2 148:1,7,25 149:

9,16,17,24 150:3,6,8,17,19 152:17 156:15 157:1,1,5,18,19,21 159:1,7, 14,17
**interviewed** [19] 81:25 133:16 134:24 137:11 145:17,19 158:19, 21,23,25 159:2,3,10,12,20 178:6 181:9 191:13 200:6
**interviewing** [1] 137:19
**interviews** [8] 133:8,10 135:8 136: 8,10,11,18 138:1
**intuitively** [1] 66:19
**inventory** [1] 23:21
**investigate** [10] 17:10 121:7 124: 13 125:7,8 126:9,14,14 141:14 175:13
**investigated** [10] 15:21,25 16:25 113:22 114:3 121:25 157:17 183: 7,8,9
**investigating** [6] 24:3,7 86:12 115:13 118:21 125:16
**investigation** [147] 8:2 14:14,16, 22 17:6 19:6,8 25:18 29:11,22 30: 16 31:18 32:1 34:12 45:19 46:1 51:19 52:23 58:20,22 62:11 64:16, 21 65:24 66:24 70:9 74:11 75:7 77:5,12 84:1,15 88:15,17,22 89:4 91:2 93:7 98:1,8 99:2,7,7,18,21, 24 100:20 101:12,24 102:13,21 104:17,25 105:19 107:11,22,23 108:14 111:20,22 112:7,11,21,24 113:5,8,9,23 114:7,15,21 115:5,16, 17,25 116:22 117:2,3 118:9,10,13, 21,24 119:8 120:8 121:6,13 122:4, 13,15 123:11,16,17,22 125:23 126: 11 127:10,17,21,25,25 132:13,18 133:5,19,20 134:12 138:4,9,11 141:24 142:3 144:11,25 151:20, 22 153:7 154:10 155:7,8,9 156:16 157:5 169:2,3,4,7,11 170:12,13 171:6,11 172:17 177:16,21 178:7 180:7,10 181:2 182:9 191:1,18 192:1 206:22 207:8 215:9 221:22
**investigation's** [1] 104:22
**investigations** [7] 7:23 15:15 20: 8,12 25:12 29:9,11,15 30:8 31:1,7, 22 32:6 34:19 44:12 60:17 64:22 115:4 121:19 122:6 133:13 134: 25 135:21 137:9,21 208:9,13
**investigative** [13] 14:5 19:23 20:3, 5 22:15 25:4 64:5 65:14,23 68:17, 18 113:18 115:9
**investigator** [25] 14:2 16:9,12,15, 16 17:4 40:9 46:22,23 47:2,9 59:4, 5 60:6,22 61:11,12 63:21 71:23 75:22 87:8,14,20 120:10 173:13
**investigators** [5] 31:3 61:9 63:18 87:7 109:6
**investment** [1] 219:7
**invoked** [1] 157:12
**involuntarily** [1] 211:8
**involve** [2] 13:11 153:17
**involved** [22] 62:19 63:8,25 68:24 73:17 78:3 79:8,12 88:4,7 89:11 91:22 95:6 98:5 127:12 137:3,10 151:19,23 157:5 188:10 189:23

**involving** [2] 71:13 104:25
**ipsp** [1] 101:22
**irrational** [1] 149:25
**irregularity** [1] 97:17
**irrelevant** [1] 118:1
**isn't** [11] 61:20,21,22 62:4 82:18 118:20 120:19 168:15 173:9 186: 17 212:20
**issue** [35] 3:24 17:7 19:1 20:14 30: 24 49:22 56:15 62:11 63:10 89:6 95:2 100:13 119:19 128:21 133: 15 149:13 152:11,12,15 153:23,24 154:2,7 176:11 181:18 189:6 201: 3,16 202:17,21 205:10 206:21 230:14 231:18 251:6
**issued** [12] 132:12 133:13 138:7 144:8 145:5,8,10,14,18 147:10 152:9 158:16
**issues** [6] 46:12 155:2 158:11,12 251:11,20
**it'll** [1] 252:7
**it's.you** [1] 148:23
**it.i** [1] 177:13
**item** [1] 118:7
**items** [4] 152:19 184:19,22 220:17
**itself** [9] 63:13 78:5 84:16 113:8 118:4 150:3 209:22 210:16,17

### J

**january** [12] 199:3 203:8 211:11 213:3,24 216:21 218:6,13 224:23 228:11,11,14
**jeff** [1] 227:9
**joanna** [1] 3:9
**joanne** [1] 148:23
**job** [12] 21:15 27:10 141:16 162:20 214:17 215:4 234:15 238:8,18 239:20 244:23 245:15
**john** [1] 71:21
**jointly** [2] 63:11 66:2
**joseph** [2] 1:11 2:24
**judge** [5] 59:18 251:4,19,25,25
**judgment** [7] 87:15 92:24 114:22, 23 152:13 153:17,21
**july** [5] 6:14,24 163:24 195:8 200:9
**jumping** [2] 83:11 204:9
**june** [6] 145:19,24 156:19 170:23 195:8 241:25
**justice** [2] 5:2,5
**justify** [1] 194:10

### K

**k-u-s-h** [1] 49:23
**keep** [16] 26:13 37:13 66:16 96:9, 18 98:20,20 99:3 141:21 170:3 193:23 207:22 219:7 220:21 228: 19
**keeping** [2] 98:23 216:8
**kept** [6] 113:17 141:23 144:13 161: 15 219:10 233:4
**key** [4] 84:18,19 95:9 229:7
**kicked** [3] 181:14 218:23 219:8
**kids** [4] 209:14,24,25 210:7,14,25 212:3
**killed** [1] 227:20
**kim** [1] 224:25

**kind** [29] 4:10 15:24 18:9 23:14,23 24:2 35:16 36:19 39:7,10 53:12 58:17 60:23 61:8 81:22,24 91:23 95:5 107:5 112:19 117:7 120:14 134:21 166:15 217:4 220:2 225: 14 240:21 246:1
**kinds** [3] 32:5 129:2 138:1
**kiss** [1] 230:22
**kneecap** [1] 246:7
**knowing** [2] 195:14 210:16
**knowledge** [14] 12:22 26:15 79: 16 100:14 119:6 122:7,14 123:10 151:16 162:11 164:25 166:13,16 223:22
**known** [6] 148:12
**knows** [6] 103:10 110:19 176:1 209:5,24,24
**koscelnik** [26] 164:13,13,19 189:2, 4,18,19 190:4 192:25 193:3,5,9 194:2 195:2,3 197:5 228:12 238:7, 10 239:5,8,20 240:5 242:3,19,22 244:3 246:16
**kush** [45] 49:23 50:13 51:8,16 52: 20 53:3 56:25 57:10,19 58:19 62: 21 63:6 64:7,9 65:13,21 77:22 82: 10 87:5 88:16,25 91:4 95:24 96:4, 5,7,8,22 97:3,20 99:9,11,11 102:1, 24 103:6,15,15,18 104:9,9,11 105: 3,5 108:1
**kush's** [3] 106:2 107:10,15

### L

**l-y-d-e** [1] 3:13
**lab** [1] 18:1
**labor** [2] 121:16 251:14
**lack** [3] 52:7 91:19 191:7
**lady** [1] 2:2
**lag** [1] 246:13
**lamely** [1] 194:10
**land** [1] 18:12
**language** [1] 43:15
**large** [2] 215:20 232:14
**largest** [2] 215:16,17
**last** [8] 67:3 95:16 96:15 100:12 214:21 234:22,23,24
**late** [8] 49:1 214:16 215:23 217:3,4, 8 236:20 245:2
**later** [17] 54:12 60:2,9 89:6,7 93:6, 9 128:18,23 129:7 132:24 145:14 196:23 200:9 201:12 240:17 252: 9
**laude** [3] 5:3 34:22 35:2
**laughable** [1] 167:7
**laughing** [1] 209:14
**launched** [5] 169:1,4,12 171:3 172:17
**law** [7] 5:17,23 6:1 35:8,20 96:13 136:18
**lawsuit** [1] 17:8
**lawyer** [5] 61:2 129:5 136:3 148:3, 6
**lawyers** [1] 148:9
**lc** [1] 234:15
**lce** [22] 162:14 163:15 185:20 188: 13 193:23,24 194:12,12,13,16,20,

 

## P.R. VIDEO, INC

22 200:13 225:24 226:1,7 228:4 230:5,16,17 238:7 240:2
lcu [1] 246:18
lead [6] 16:9,12,14 17:3 212:4 249:7
leadership [2] 37:23 104:18
leading [3] 42:17 83:5 126:7
leads [2] 20:13 25:18
learn [10] 40:21,23 89:3 101:25 122:13,15 123:9 214:24,25 215:18
learned [5] 99:8 101:21 102:8,19 104:8
learning [4] 47:17 48:20 96:16 236:1
least [22] 33:18 36:2 52:14 56:25 57:6 58:6,19 67:2 86:17 88:13 119:6 136:14 145:15 149:21 151:5,19 184:3,23 187:3 220:21 241:24 247:17
leave [3] 41:3 129:24 136:21 137:17 198:15 217:10 238:23 239:10,11
leaves [1] 250:19
leaving [2] 134:3,10
led [2] 106:2 157:17
leeway [2] 51:7 234:24
left [13] 131:22 134:5,13 152:22,22 191:15 193:4 199:17 202:8 203:8 228:16 230:12 239:4
leg [1] 246:7
legal [5] 117:12 129:5 135:13 136:15 157:11
legally [1] 128:21
legislative [2] 34:1 151:12
legislator [2] 63:13 84:7
legitimacy [1] 144:14
legitimate [5] 67:6 161:22 218:24
leidig [3] 201:4,12 202:15
less [1] 189:8
letter [38] 18 71:13 76:16 170:17 174:17,19,20 175:1,13 176:21 181:10 183:17,17 191:22,22,25 192:6 202:8,18 203:9 208:16
letters [5] 38:7,8 39:1,8 170:19
letting [3] 123:24 176:8 217:16
level [2] 148:13 245:14
lewis [1] 46:1
liability [1] 132:15
liaison [1] 187:18
lieu [1] 213:1
lieutenant [50] 9:22,23 10:6 11:20 21:8,14 74:8 154:4 158:20 159:12 160:3,5 161:2,14 162:4,12,18,23 163:2,5 164:25 166:9 167:16,21 168:9,15 169:1,12,22,24 178:9 179:5,11 180:6,12,13,24 183:10 184:3 185:4 187:6 188:9 197:12 198:19 228:10 229:21 230:13 235:8 239:1,4
lieutenants [8] 10:13 11:12 12:7 187:5 229:21 230:3,4 238:20
life [7] 84:3 86:17 210:24 211:3,9 212:9 224:10

lifestyle [1] 212:4
light [1] 195:17
lightman [1] 151:24
likely [5] 145:18 163:14 190:6 227:24 244:3
limit [2] 78:1 121:24
limita [1] 247:14
limited [2] 104:17 119:6
line [4] 126:19,20 132:13 242:13
liquor [14] 12:5,10 88:12 160:9 163:16 164:17 165:18 166:5 185:8 194:8,9 200:14 238:16 245:23
list [6] 62:21 167:14,14 220:17 223:16,18
listed [2] 169:25 184:22
litigation [2] 159:9,22
little [18] 29:19 30:19,21 39:21 42:17,18,20 56:1 93:23 95:1 150:5 154:18 174:8 181:21 209:24 211:9 213:4 225:14
livid [1] 206:15
living [4] 13:16,16 70:12 211:25
located [2] 187:25 222:2
location [2] 21:10 195:19
locations [1] 20:25
logic [2] 82:14 161:21
logical [3] 20:13 58:15,24
logically [2] 165:5,8
long [32] 4:3 14:21 15:2 26:11 27:25 28:11 39:14 41:6 57:19 58:11 68:7 88:22 89:4 90:20 91:2 119:14 129:12,19 135:17 139:12 155:15 160:18 181:21 194:12 207:7 214:4,23 223:4 225:25 238:6 246:13 249:13
longer [4] 6:3 183:15 185:13 246:8
look [23] 22:18,18 23:9 61:12 72:24 73:3,10 74:17 75:13 76:11 107:2 114:17 123:1 127:19 153:7 168:18 177:13 206:13,24 208:16 240:16 241:7 243:11
looked [2] 234:23 236:21
looking [14] 23:1,4,6 52:21 85:3 95:14 124:10 155:13 173:13 178:24,25 209:21 241:12 242:12
looks [3] 22:6,6 242:5
loosely [1] 186:11
loosing [1] 204:17
lording [1] 68:7
losing [2] 83:23,24
lost [11] 42:14 56:1 180:4 181:21 197:25 198:4 203:6 204:3,25 222:15,17
lot [16] 32:16 47:13 51:6 86:11 97:10 105:16 126:13 171:24 214:24 219:18 223:14,16 227:11 240:22 247:9 249:16
lots [3] 24:12 42:25 43:4
love [2] 196:1 231:17
lower [2] 33:9 70:18
lowest [1] 229:18
loyalty [2] 112:7,10
lt [26] 55:22,24 57:9,13,21 69:7 71:12 74:11 77:4 79:2,9 80:18 87:25

89:10,12,19 90:12 91:11,14 92:16,16,20 93:2 97:21 110:2 131:10
luck [1] 200:17
lucrative [1] 40:13
lunch [6] 32:19 129:9 130:17 131:2 202:6 233:9
luncheon [1] 203:10
lyde [5] 3:13 93:12 130:4,16,19

## M

ma'am [55] 6:10 13:13 34:20 67:7 70:17 82:21 83:24 85:22 86:13 92:1 93:4 99:5 100:5 101:11 105:16 106:2,16 107:17,25 114:13,24 115:10,24 119:3 120:7,17 122:18 123:6 128:9 134:16 136:1 138:3 143:8 148:15 149:16 150:17 151:7 160:21 162:25 163:14 167:13 168:17 170:5,19 175:19 179:16 180:3 183:16 192:10 200:15 212:22 219:19 224:22 227:4 229:18
machine [1] 142:24
machinery [1] 72:16
made [61] 3:25 5:16 12:12,14,21,23 14:25 15:4 23:12 33:6 48:1,15 60:15 62:13 74:25 75:2 76:13 81:3 82:19 91:10 92:12 94:14,23 96:13 99:22 104:4,6 135:7 137:5,6 142:14 150:16 152:5,8 162:10,13 166:1,6 170:15 174:24 180:25 181:15 182:22,25 183:1 195:9 196:5,13 202:2,12 203:3 216:3 217:3 218:25 219:25 227:7 228:6 234:18 244:1 249:8,9
mail [4] 218:15 237:5,7 250:10
maintain [1] 96:17
maintenance [1] 23:19
major [145] 11:23 12:13,21 27:13,17,24,25 28:20,21,22 29:1,1 56:5 69:4 78:23,25 79:9 80:20 81:10,14 82:1,3 83:13,19 85:16 86:2,3 89:20,23 90:4,4 91:15 92:8 93:15,17,22 94:2,8,20 100:2,4,6 103:13 113:25,25 114:4,4,5 123:25 127:9 131:9 141:15,21,22 150:15,16,23,23 151:4,5,8 156:8 158:2 159:1,3 160:1,13,22,23 162:13 163:23 164:6,10,18,21 166:6 167:15,15,16,16 168:13 182:13 183:25 187:19,20 188:23 189:2,4,18,19 190:5 192:25 193:3,5,9 194:2 195:6 196:4,8,13,20,21 197:2,4,5,5,8,8,9 201:17 202:4 206:24 213:3,18,23 214:7,16,20 215:8 218:6,15 219:5,24 221:11,18 224:9,12,21 225:7 228:12 234:1,17 235:4,5,7 237:22,23 238:7,10 239:5,8,20 240:5 242:3 246:6
major's [2] 164:1 197:21
majored [1] 5:1
majors [4] 132:1,5 137:11 151:2
man [5] 52:7 68:2 74:9 186:15 209:5
manage [3] 11:9 65:2 84:17
management [6] 12:3 23:20 34:6

181:17 186:4 235:19
managing [3] 9:20 40:15 124:10
mandate [1] 10:12
mandates [1] 10:16
many [31] 6:7,20 8:15,19 15:10,17,21 16:11,21,24 17:21 22:19,19 26:4 29:17 35:9 37:2 64:22 66:13 72:7 98:8 100:15,18 125:5 137:25 206:21 233:3,3,19 235:17 245:19
march [4] 8:23 9:24 10:25 242:2
margins [1] 203:19
mark [8] 1:9 2:23 35:15 99:19,23 108:10 191:6,21
marked [2] 37:18 116:6
markers [1] 182:11
market [2] 1:26 2:19
married [2] 48:5,9
mash [1] 142:23
master [1] 21:1
material [2] 65:10 173:14
matter [34] 3:6 22:10,11 31:12 57:9 64:17 65:1 66:8 78:4,24 79:8 80:24 84:2 86:15 87:24 94:18,18 96:9 100:14 111:17 113:22,24 114:3,8 123:20 125:19 128:9 129:4 140:25 175:18 188:25 191:13 192:5 193:18
mature [1] 56:24
matured [1] 57:4
mcconnellsburg [5] 7:25 8:13 14:19 16:6 19:7
mcdonald [14] 164:1,4 167:15 234:19,22,25 239:9,10,12 240:17 243:3,24 244:8,17
mcdonough [4] 195:11,11,13,14
mcdonough's [1] 195:18
mean [54] 15:7 17:1 29:19,24 30:1 31:18 36:4 42:12 53:11 56:11 57:16,22 66:17 68:4 79:21,25 82:18 84:23 90:8 95:7 98:24 99:22 100:19 102:2 104:19,20 107:11 109:14 113:9 132:3,4 145:21 147:12 160:15 166:12 173:16 175:15 177:16 183:11 186:21 194:21 197:12 199:8 205:13 211:19 232:7 235:8 241:8,16 248:2,15 249:25 250:15,21 251:13,15
meandered [1] 199:6
meaning [6] 22:1 24:20 29:9 155:19 172:2 230:13
means [5] 21:4 37:24 79:19 207:15 232:5
meant [6] 43:22,23 136:4 140:9 175:23 190:6
measuring [1] 86:1
mechanics [1] 251:13
mechanism [1] 121:5
meet [2] 227:24 246:20
meeting [4] 109:5,8 221:18 246:1
meetings [3] 183:11,21 233:6
member [15] 23:3 25:20 30:7,8 31:11 37:3 69:25 75:6 102:20 137:22 148:14 196:5 212:2
member's [1] 114:5
members [18] 10:20 24:24 43:10

P.R. VIDEO, INC



62:18 63:7 99:12 124:1 127:22 158:24 183:22 184:21 188:6 191:5,11,15 194:7,11 212:18
**memo** [14] 111:24 116:13 141:12 179:4,21 181:13 200:16 237:4 239:21 240:1,5 242:3,11,16
**memorabilia** [2] 169:5 184:22
**memorandum** [1] 72:25
**memory** [1] 82:10
**men's** [1] 32:14
**mention** [5] 38:1 50:11 51:24 52:9 191:25
**mention.i** [1] 197:25
**mentioned** [24] 25:18 33:23 34:10 35:7 45:11 52:12 55:19 56:9 93:14 100:16,19 101:22 102:10 121:12 138:13 160:1 194:2 198:21 200:21 215:13,18,21 231:25 232:11
**mentioning** [1] 219:13
**mercer** [2] 7:8,21
**mere** [3] 58:16 122:3 134:1
**merryman** [15] 11:23 12:13,21 27:13,17,24,25 28:20 29:1 93:17 94:2,8,20 159:3 167:15
**merryman's** [1] 93:22
**mess** [1] 221:21
**message** [4] 162:15,19 200:1,6
**messengers** [1] 150:25
**met** [4] 89:7 202:5 237:10 246:21
**microwave** [1] 142:24
**mid** [1] 49:14
**middle** [7] 1:2 2:21 52:7 86:4 212:6 215:9 222:24
**might** [38] 17:9 18:17 20:10,11 23:17,23 30:14,21,24 42:18 62:19 63:8,9,18,25 71:9 80:14 85:2,5,7 116:12 125:25 140:5 150:13 171:10,13 190:10 193:4 194:2,19 202:5 212:5 217:15 232:24 238:14 249:7 250:8,11
**mike** [1] 56:2
**mikes** [1] 2:8
**milesburg** [1] 7:7
**military** [1] 229:20
**miller** [1] 227:9
**milton** [1] 158:3
**mind** [12] 12:18 17:4,17 46:2,3 53:14 66:6 123:20 136:24 137:2,16 151:6 199:11 207:19 209:11 229:5 247:16
**minds** [1] 228:9
**mine** [4] 77:7 87:3 138:4 185:7
**minute** [8] 28:2 67:11 72:10 122:11 215:4 221:14 244:13 248:24
**minutes** [3] 139:11,13 247:17
**miranda** [1] 134:22
**mischaracterization** [1] 168:6
**misconduct** [22] 25:21,22 70:1,9 113:20 115:10 118:10,14 120:9 121:5 138:6,10 141:5,7,17 142:2 144:13 157:7,11 171:14,16,19
**miserable** [1] 224:10
**mislead** [1] 117:12
**misleading** [1] 119:20

**missed** [4] 9:5 18:17 236:21 241:11
**missing** [3] 24:22,23 152:20
**misspeak** [1] 101:2
**mistake** [2] 48:2,9
**mistakes** [3] 47:20 48:6,15
**mix** [1] 121:9
**modification** [1] 3:22
**modify** [1] 18:23
**mom** [1] 211:2
**moment** [4] 36:10 90:3 103:17 170:14
**monday** [6] 216:1 217:14,15 218:13 223:25 245:3
**monday's** [1] 215:23
**money** [4] 194:20 205:20 206:15 235:24
**month** [1] 189:6
**months** [12] 8:10 14:24 15:3,5 41:1 145:14 192:8 203:4 206:21 226:2 230:10 245:25
**morning** [6] 130:23 196:16 216:2 245:3 250:1,8
**morris** [6] 100:3,4,5 101:8 131:10 167:16
**morris'** [1] 100:6
**most** [16] 4:4 23:16 33:19 37:1 40:16 80:10 81:8 121:3 145:18 162:9 171:10 180:17 194:13 212:10 227:9 249:18
**mostly** [1] 5:19
**motion** [1] 248:6
**motivated** [1] 209:8
**motivation** [1] 210:13
**motive** [3] 209:7,7,9
**mouthing** [1] 183:14
**move** [9] 12:18 13:12 24:3 67:7,12 112:17 114:25 117:25 175:9
**moved** [4] 26:17 165:3 166:4 246:11
**movie** [1] 115:22
**mr.bailey** [3] 3:20 130:7 139:22
**ms** [132] 2:6,10 3:16 4:4 16:16 17:2 24:6,12 26:24 27:1,4,6,8,12 29:20 32:22 35:18 36:7 37:19,25 42:19,21 43:21 44:3 47:8,12 48:1,8,14,18 50:18,24 51:4,8 53:8 54:10 56:5 57:24 58:2 59:4,7,16,21 60:1,8,14 65:12 66:17 67:5,8,19,25 69:16 71:5 72:1,5,7,12,24 73:7,10 74:10 77:9 80:1 83:8,11,18 85:13 93:12,14,24 94:14 95:14 100:21,25 104:2 105:24 106:12 107:1 110:10,17,21 111:15 112:19 113:2,10 114:4 115:2 116:3,5,20 117:1,15 118:23 121:18 122:19,22,25 124:14 125:10 126:10,15,19 127:18 128:15,18,23 129:6,12,15,19,23 130:4,5,11,13,16,19,23 131:19,22 139:21 140:4,11,15 143:1,11,13 177:25 192:5 203:14 209:3
**much** [20] 14 43:12 45:1 48:4 57:22 62:4 65:11 80:6,23 81:23 93:21 94:22 104:1 105:17 138:20 154:6 168:19 185:14 202:14 247:

18
**multi-agency** [1] 186:8
**multi-million** [1] 187:11
**municipal** [1] 6:6
**museum** [7] 182:23,23 183:2,21 184:14,21 191:1
**must** [2] 182:18 202:19
**myself** [7] 10:13 68:1 87:17 152:6 195:13 205:15 227:7
**myth** [1] 231:9

## N

**name** [26] 2:2,16,25 3:5,13 16:7 19:13 26:11 37:7 45:13,22 50:6 52:10,12 56:11,12 100:25 103:17 147:22 162:22 167:5 170:4 182:24 227:17 235:4 236:7
**named** [6] 39:18 52:2 127:16,23 168:4 247:2
**names** [5] 3:3 46:8 51:24 162:19 183:6
**national** [3] 215:12 219:14 239:22
**nature** [4] 83:5 149:25 150:4 233:3
**near** [1] 233:15
**necessarily** [8] 46:23 51:4 96:5 126:23 127:8,13 232:14 251:19
**necessary** [1] 64:18
**necessity** [2] 43:19 44:4
**need** [41] 24:2 32:13,13,18 46:14 63:15 65:25 68:11 72:10 119:8 120:5,10 129:12,17 131:15 156:25 161:10 175:15 181:21 184:11 185:3 190:13 193:15 201:15 202:16,19 220:16,24 230:10,15 235:7 237:12 248:6,8 249:12,19,21 251:9,19,21,24
**needed** [4] 53:4 193:13 228:19 237:17
**needs** [5] 21:22 62:12 81:24 94:25 123:21
**neighborhood** [1] 212:5
**neither** [1] 240:19
**nervous** [1] 201:13
**never** [49] 14:13 42:11 43:1 44:5 51:11 64:25 65:19 68:12 90:22 91:16 92:11 93:4 94:17 95:2 115:7,18 117:23 121:6 126:7 127:17,18,25 138:6,6,11 144:17 148:12 151:4 178:12,25 179:16,17 181:3 188:5 199:5 204:4 211:8 216:19,24 217:7 219:23 224:7 228:6 230:14 236:21 239:17 243:4 244:4 245:17
**new** [7] 47:19 48:20 81:22 92:17 189:23 195:24 230:12
**newly** [2] 10:7 87:25
**newspaper** [4] 189:12,15 193:11,12
**next** [17] 24:4 40:22 43:9 58:15,24 77:25 95:16 188:8 189:11 190:11 195:4 197:21,22 200:18 217:18 231:11 250:5
**nexus** [2] 157:15 181:2
**nga** [2] 215:19 231:10

**night** [5] 103:15 153:1 211:10 222:22,23
**nine** [6] 15:9 25:11 155:14 205:7,14 229:21
**nineteen** [1] 211:5
**ninety** [1] 161:25
**ninety-nine** [2] 145:24 236:17
**nobody** [3] 134:13 241:2,3
**nods** [1] 141:23
**non** [3] 23:11 194:12 224:3
**non-verbal** [1] 141:22
**none** [8] 17:4 19:25 25:5 79:10 115:10 193:25 211:17 237:25
**noon** [3] 32:18 216:7 217:18
**normal** [2] 47:20 180:8
**normally** [2] 74:15 76:25
**north** [1] 245:6
**northeast** [1] 182:14
**nose** [1] 146:8
**not.what's** [1] 175:23
**notation** [1] 74:13
**note** [8] 76:10 116:12,15 118:24 144:5,10 212:24 237:1
**note.'** [1] 116:21
**noted** [6] 24:10 60:12 67:5 117:15,18 144:9
**notes** [6] 21:13 59:14 60:7,10 216:8,11
**nothing** [10] 17:16 65:8 70:7 108:17 109:4 112:1 120:12 121:10 128:20 157:13
**notice** [1] 178:13
**noticed** [4] 12:13 59:13 223:14,15
**notification** [7] 132:7 142:13 143:6 146:3 158:1 178:17,18
**notified** [14] 82:24,25 83:2 138:22,25 178:19,20 185:11,11,20,23 191:11 206:24 218:6
**notifying** [1] 104:2
**noting** [2] 4:16 144:2
**notion** [1] 192:6
**ns** [1] 30:14
**number** [45] 2:25 4:20 5:16,18,25 31:20,24 35:8,17 36:3 74:22 75:20 100:23 116:7,8,17 118:9 123:19 143:9,10 144:6,8,19,22 145:3,8,11,14 146:25 147:14,15 148:2 158:12 159:15,18 169:9 170:22 172:3 184:13 198:11 199:1 214:10 215:14,17 250:10
**numerous** [4] 38:2,7,9,13

## O

**oath** [1] 130:21
**ober** [114] 1:3,17 2:15,22 3:1,6 4:5 27:2,5,7,10 32:21,25 36:21 37:13,21 43:25 48:3,14 53:3 54:7 57:25 59:14 61:17 71:24 76:7,15 77:7,10 87:24 88:1 92:1 93:13 96:16,17 100:22 101:1 102:20 106:1,15 108:15 110:24 111:14 113:6 115:7 116:9,11 118:2 119:22 121:20 130:22 135:14 139:7,9 140:2,8,13 144:1 147:1,6,8,12,15,19,25 149:3 153:12 154:1,21 155:13,17 156:



P.R. VIDEO, INC

11,13,21 **157**:24 **158**:6 **159**:23
**167**:3,5 **168**:5 **172**:16,22 **174**:1,2,
8,13 **175**:19 **176**:20,24 **178**:23
**179**:3 **181**:1 **183**:18 **190**:17,19
**206**:8,12 **207**:13 **210**:6 **213**:18,23
**214**:22 **217**:7,12 **224**:14 **233**:19
**235**:14 **238**:2 **242**:1,21 **249**:14
**250**:17,19 **252**:9
**obfuscate** [1] **117**:12
**object** [32] **4**:2 **14**:6 **42**:16 **47**:24
**48**:10 **51**:1 **53**:24 **59**:11,17 **60**:5
**79**:13 **83**:4 **91**:18,24 **94**:9 **105**:21
**110**:8,14 **112**:16 **116**:25 **117**:8,13
**118**:3 **119**:5,18,19 **135**:10 **136**:2,
13,13,14 **173**:8
**objected** [1] **168**:6
**objection** [41] **24**:1,10 **45**:15 **53**:
13 **54**:5 **60**:12 **61**:15 **65**:4,7 **67**:1,5,
23,24 **80**:21 **82**:8 **85**:19 **88**:9 **93**:
19 **94**:3,4 **106**:6 **110**:6,16,19 **111**:
12 **114**:25,25 **117**:15,18 **136**:25
**148**:18 **153**:10 **155**:6,11 **156**:18,
20 **157**:22,22,23 **168**:1 **176**:18
**objections** [6] **3**:18 **137**:19 **146**:14,
15 **176**:9 **183**:2
**objective** [3] **111**:23 **150**:20,21
**obligated** [1] **246**:5
**observation** [1] **191**:9
**observe** [1] **203**:19
**obstructionist** [1] **176**:7
**obtain** [1] **148**:11
**obvious** [8] **144**:3 **146**:13 **150**:7,7
**199**:4 **229**:12 **239**:7 **240**:24
**obviously** [7] **77**:11 **79**:4 **139**:23
**173**:25 **247**:7 **251**:2,8
**obviscate** [1] **51**:2
**occasion** [4] **102**:23 **184**:23 **188**:6
**245**:20
**occasions** [8] **13**:7,8 **17**:23 **102**:
17 **184**:3,13,22 **189**:7
**occupying** [1] **84**:19
**occur** [2] **60**:24 **61**:18
**occurred** [9] **64**:25 **65**:19 **86**:4 **99**:
25 **101**:3 **118**:15 **142**:2 **172**:7 **190**:
20
**occurring** [2] **91**:3 **230**:6
**ocs** [1] **37**:23
**october** [16] **49**:1,5,18 **81**:16,18,20
**86**:5 **89**:7 **91**:9 **96**:25 **202**:1 **234**:
24 **237**:3,3,5,11
**odd** [1] **193**:6
**offenses** [1] **16**:1
**offer** [5] **116**:10 **215**:22 **216**:3 **217**:
3 **246**:23
**offered** [8] **19**:4,8 **21**:20 **22**:3 **161**:
22 **228**:2,4 **247**:2
**office** [42] **1**:25 **43**:7,8 **50**:2 **51**:17
**62**:18 **63**:7,25 **72**:10 **76**:10 **84**:22
**85**:11 **99**:20 **101**:10,17,22 **122**:16
**123**:12,16 **124**:2 **125**:13 **132**:6
**137**:12 **139**:4,11,18 **140**:1 **144**:4
**190**:2,6 **192**:25 **193**:10 **196**:16,25,
25 **197**:6,11 **205**:17 **206**:3 **236**:19
**245**:3,5
**officer** [25] **5**:22 **25**:9 **39**:12 **58**:4

**80**:14 **82**:12,20 **83**:17,20 **85**:23,23
**186**:9,12,22 **202**:13 **219**:2 **220**:15,
23,24 **229**:9 **230**:20,22 **231**:4,9
**232**:12
**officers** [8] **6**:5,6 **21**:7,8 **81**:9 **121**:
21 **195**:12 **221**:21
**official** [4] **35**:19,20 **38**:24 **70**:2
**officials** [3] **64**:5 **84**:23 **101**:23
**often** [3] **8**:15,17 **184**:16
**ok** [50] **2**:8,10 **4**:4 **5**:11 **7**:17 **8**:4 **9**:7
**14**:11 **18**:13 **24**:6 **30**:10 **32**:22 **35**:
7,15 **37**:15,20 **44**:9 **49**:9 **50**:20 **53**:
23 **60**:13 **61**:1,4,4 **67**:14 **71**:3 **72**:
23 **73**:9 **75**:13 **77**:1,8 **80**:1 **86**:14
**93**:14 **95**:15 **97**:2 **106**:23 **111**:1
**112**:5 **113**:12,17 **129**:23 **130**:12
**131**:15,21 **134**:21 **136**:2 **138**:13,
19 **139**:8
**okay** [145] **145**:16,23 **146**:1,12,15,
16,23 **147**:3,11,19 **148**:20,24 **149**:
15 **151**:1,17 **154**:11,22 **155**:16,19
**156**:6,15 **157**:9,14 **158**:5,8,13,17
**159**:6,19 **160**:17 **161**:13 **163**:15
**164**:8,12,21 **165**:21 **166**:4,8 **167**:4,
13,24 **168**:21 **169**:19 **170**:6,21 **171**:
15 **172**:8,19 **174**:10 **176**:24 **177**:3,
11,14 **178**:2 **180**:21 **181**:20 **182**:
21 **184**:2,11 **185**:1 **186**:17 **187**:2,
25 **188**:3,8 **189**:3,24 **190**:8,16,25
**192**:13,21 **193**:2,19 **194**:25 **195**:2,
23 **196**:10,19,22 **197**:7,11,23 **198**:
7,18 **199**:12 **201**:8,20 **202**:19 **203**:
7 **204**:8,21 **205**:23 **206**:11,25 **207**:
15,25 **208**:7 **209**:17,19,23 **210**:9,
18 **211**:22 **212**:23 **213**:2,19 **216**:
14,18 **217**:17 **220**:5 **221**:16 **222**:
14 **223**:23 **224**:8 **225**:10 **226**:10,
16 **229**:23,25 **231**:21 **234**:21 **235**:
16 **236**:13 **237**:12 **238**:3,8 **239**:16
**242**:17 **243**:8,13 **244**:20 **247**:4
**248**:7,9 **249**:4,7,22 **250**:13,18,23
**251**:5,17,18 **252**:2
**old** [5] **13**:10,18 **172**:23 **210**:1 **211**:
1
**older** [1] **13**:18
**oldest** [2] **13**:14,19
**on-call** [1] **186**:9
**once** [6] **6**:22 **8**:4 **21**:4 **67**:13 **224**:
15 **237**:5
**one** [131] **3**:21 **5**:25 **6**:4,17 **16**:4 **17**:
3,15 **18**:1 **20**:6 **27**:8,13 **30**:14 **33**:1,
17,18 **35**:8 **36**:10,15,18 **39**:17 **40**:
13 **43**:2 **45**:17,18,20,23 **47**:6 **60**:
11,21 **61**:6,11 **63**:21 **67**:3,18,20,24
**70**:25 **71**:1 **72**:12 **76**:23 **81**:8 **85**:
21 **86**:17,19,25 **87**:6,6 **89**:19,23
**91**:6 **93**:11 **95**:17 **97**:3 **99**:3 **101**:1
**103**:21,24 **107**:14 **115**:5 **118**:7
**121**:23 **122**:8,12 **123**:8 **124**:15
**125**:11 **127**:19 **130**:23 **131**:7,18
**137**:10 **138**:18 **141**:15 **143**:1 **146**:
7 **147**:20 **148**:10,11,12,15 **150**:20
**151**:5 **152**:10 **155**:3 **156**:17,19
**158**:18 **161**:7 **163**:17 **169**:11 **170**:
23,24 **171**:11,16 **172**:12 **176**:12

**177**:6 **178**:24 **179**:8 **180**:5 **181**:11,
11,22 **183**:25 **184**:23 **186**:14 **193**:
17 **195**:12 **198**:23 **204**:20 **207**:11
**209**:20 **212**:21 **213**:25 **214**:1 **215**:
16 **217**:8 **221**:9,24 **227**:13 **232**:23,
24,24 **233**:6 **235**:9 **237**:19 **239**:24
**240**:4 **243**:24 **245**:10 **249**:8
**ones** [3] **23**:17 **44**:16 **159**:4
**ongoing** [2] **10**:14 **58**:20
**only** [38] **10**:3 **15**:9 **16**:18 **28**:25 **32**:
15 **40**:18 **45**:21 **82**:2 **95**:11 **96**:13
**97**:3 **98**:10 **103**:9 **118**:3 **148**:18
**152**:7 **158**:14 **159**:4 **161**:19,21
**179**:17 **184**:19 **191**:15 **192**:7 **196**:
14,15 **203**:15 **211**:12 **212**:21 **216**:
16 **217**:19 **221**:9,10,19 **229**:1 **230**:
17 **241**:23 **244**:12
**onset** [1] **157**:10
**open** [6] **152**:10,19 **153**:22 **163**:22
**188**:20 **228**:19
**opened** [4] **88**:17 **153**:20 **154**:24
**161**:4
**opening** [3] **164**:8 **166**:5 **195**:20
**operation** [1] **2**:5
**operations** [15] **20**:25 **80**:12 **81**:7
**165**:4,16,19,20 **166**:4 **197**:16,18
**226**:8,14 **240**:12 **244**:19 **245**:21
**operative** [1] **32**:24
**operator** [1] **130**:2
**operators** [1] **72**:15
**opinion** [12] **33**:18 **54**:23 **104**:9
**109**:21 **110**:11,25 **111**:10 **126**:22
**128**:8,10,24 **206**:23
**opportunities** [13] **160**:4,5 **163**:4,
8 **166**:9,14,24 **211**:6 **234**:3,5 **236**:
15 **238**:5 **243**:18
**opportunity** [20] **17**:14 **40**:19,21,
23 **137**:14 **138**:18,23 **148**:16 **150**:
12 **158**:7 **160**:7 **161**:15,23 **189**:23
**234**:11,12,13 **235**:25 **236**:1 **245**:
25
**opposed** [11] **21**:23 **35**:2 **61**:10
**107**:9 **151**:20 **194**:20,22 **205**:6
**209**:9 **211**:4
**opposing** [3] **247**:8 **249**:10
**opposite** [2] **174**:4 **231**:15
**optional** [1] **232**:5
**oranges** [2] **120**:6,22
**order** [27] **28**:19 **52**:23 **53**:12 **64**:18
**118**:14 **142**:3,17 **143**:21 **152**:16
**153**:3,20,24,25 **154**:3,5,19 **204**:13
**205**:12 **207**:22 **220**:21 **223**:11,12
**227**:17 **231**:11 **235**:12 **237**:16 **246**:
25
**ordered** [11] **96**:17 **111**:4 **113**:14
**140**:18 **152**:18,21,24 **153**:22 **160**:
24 **170**:24 **221**:21
**orders** [7] **85**:23 **96**:8 **99**:3,5 **152**:9
**153**:3 **223**:16
**organization** [20] **33**:3,16,17 **39**:
25 **43**:17 **81**:9 **84**:10,11,19,22 **85**:
11 **227**:5,19,22 **229**:2,3,20 **230**:24
**232**:14 **246**:9
**organized** [2] **17**:18,19
**original** [4] **25**:1,2 **73**:8 **75**:25

**originally** [4] **9**:2 **90**:19 **208**:12
**219**:11
**ostracized** [1] **233**:5
**other** [74] **8**:11 **11**:21 **17**:7 **19**:5 **27**:
14 **40**:22 **43**:8,13 **45**:23 **54**:1 **57**:
18 **58**:9 **60**:20,21 **66**:13 **68**:21 **70**:
1 **71**:6 **75**:6,18 **76**:23 **79**:20 **91**:7
**105**:9 **108**:11 **112**:8 **115**:3 **131**:25
**134**:25 **135**:8 **136**:8 **137**:9 **138**:3
**145**:22 **151**:18 **152**:6 **153**:21 **157**:
4,21 **158**:9,24 **166**:8,15 **170**:22
**175**:14 **180**:5 **182**:8 **191**:5 **193**:6
**207**:25 **208**:1,5,9 **209**:9 **210**:10,12,
12 **211**:4 **212**:15,18 **217**:20 **221**:
10,25 **222**:18 **224**:24 **232**:15,24
**233**:22 **234**:10 **238**:4 **240**:20 **241**:
17 **242**:10 **243**:17
**others** [10] **10**:13 **46**:3 **104**:19 **149**:
1 **170**:25 **183**:1 **184**:20 **201**:21
**205**:1 **223**:18
**otherwise** [2] **104**:17 **223**:9
**ought** [2] **126**:13 **209**:5
**out** [100] **3**:14,24 **18**:24 **22**:7 **36**:8,
12 **44**:16 **45**:9,12 **46**:5,24 **47**:2 **54**:
9,11 **61**:25 **68**:23 **75**:17 **84**:16 **90**:
20 **93**:6,10 **99**:11 **102**:22,23 **103**:5
**111**:11,22 **112**:20 **114**:16 **118**:22
**123**:15 **124**:6,22 **125**:12,16 **126**:9
**127**:9,10,11,12 **142**:17,23 **143**:23
**144**:4 **159**:9 **162**:15,18 **163**:4 **165**:
9 **168**:8 **177**:19,23 **178**:11 **182**:13
**184**:4 **185**:18 **187**:16 **192**:20 **193**:
3,9 **195**:3 **205**:14,16,25 **207**:14,21
**208**:16 **211**:25 **213**:9 **214**:9,23
**218**:1,23 **219**:8,22 **220**:22 **221**:4,
11 **223**:1,6,11 **224**:10 **226**:16 **227**:
20 **228**:7,8 **229**:13,14 **235**:24 **239**:
2,21 **240**:8 **246**:6,25 **248**:6,7,14
**250**:1 **251**:9,22
**outcome** [4] **65**:3 **84**:7 **104**:25 **106**:
15
**outline** [2] **7**:17 **8**:5
**outset** [1] **3**:16
**outside** [9] **55**:13 **61**:10 **84**:21 **152**:
18 **172**:24 **173**:1,5 **176**:14 **229**:2
**over** [38] **4**:12,23 **19**:12 **21**:16 **22**:
16,17 **26**:13 **38**:6 **60**:22 **68**:7 **72**:
13 **73**:4,11 **107**:6 **122**:11 **125**:23
**139**:10 **146**:14 **163**:15 **165**:3 **167**:
1 **168**:14 **181**:23 **182**:16 **189**:5
**196**:24 **201**:15 **204**:16 **205**:14 **211**:
3 **215**:8,8 **221**:24 **236**:6 **237**:2,7
**239**:6 **240**:11
**overall** [2] **36**:6 **37**:3
**overlooked** [1] **150**:9
**overlooking** [1] **244**:14
**overseeing** [3] **44**:11,16 **197**:18
**overseer** [1] **21**:17
**oversight** [1] **21**:16
**overtime** [2] **234**:3,5
**owe** [2] **204**:14 **205**:6
**own** [15] **4**:14 **73**:1 **80**:20 **82**:7 **85**:
17 **120**:15,15 **170**:18,20 **184**:19
**211**:24,25 **223**:8 **235**:13 **249**:11




P.R. VIDEO, INC

## P

p-o-l-c-a [1] 45:22
p.m [4] 190:15 214:2 249:5 252:8
pa [5] 1:22,27 2:20 3:15 167:3
package [2] 240:11 243:15
page [8] 2:20 32:23 95:15 122:19, 20 210:23 242:20,22
paged [1] 246:19
paid [10] 204:15,16 205:3,9,10,23, 24 206:6,9 239:2
paper [3] 203:18 228:6 231:20
papers [1] 196:15
paperwork [6] 231:22,23 241:7,22, 23 242:6
para [2] 198:5 229:19
para-military [1] 227:5
parading [1] 219:3
paragraph [50] 32:23,25 37:25 39: 17,20 43:15 48:25 62:15 64:2 69: 23 76:5 77:9,25 87:23 95:12,15, 15 96:16 99:6,17 101:20 103:8 104:14 107:1,2 108:8,13 121:18 122:12 123:4 131:23,23,25 160:2 168:25 179:7 184:2 185:2 197:23 198:18 208:15 225:10,18 234:2 236:9,13 238:11,14 241:16 247:4
paragraphs [1] 131:25
paraphernalia [3] 154:25 155:18, 21
paraphrase [1] 97:18
pardon [3] 6:13 15:25 190:17
parking [1] 220:6
part [37] 14:24 15:5,7 17:25 21:24 22:4 24:23 25:23 34:6 42:14 56: 16 77:18 104:24 106:1,21 114:22 121:6 126:10 138:6,12 158:17 168:10 170:25 177:15 178:15 184: 8 185:10 188:9 191:4 208:9 209:6 210:8 218:11 227:14 229:3,7 246: 9
participant [1] 246:18
participants [2] 57:6 235:23
participate [6] 33:10,25 132:9 134: 2 137:7 184:20
participated [3] 137:8 161:11 185: 16
participating [1] 134:12
particular [6] 62:2 118:23 137:10 171:6 176:11 178:5
particularly [1] 162:9
particulars [1] 105:16
parties [2] 3:3 105:1
partly [1] 41:19
parts [2] 124:15 239:19
passing [1] 215:13
past [7] 33:8 130:6 136:9 151:10 162:7 167:20 168:18
patently [2] 195:1 211:16
path [5] 39:23 40:2,4 43:20 227:15
patient [1] 176:8
patrol [16] 7:7,15,19,22,25 8:9,13 14:1 15:9,11,12 21:11 30:12 152: 25 195:16,18
paul [3] 1:9 2:23 28:21

pay [7] 198:15 203:3 205:15 207: 23 220:22 232:7 236:4
paying [3] 204:23 251:14,14
payoffs [2] 51:21 62:19
peachtree [2] 233:9,12
peculiar [1] 235:21
peer [1] 244:13
peers [4] 34:8 167:6 182:10 245: 19
pema [36] 184:6,9 185:5,14,17,21, 25 186:3,16,22 187:3,13,18,23 188:1 189:9,16 190:20,23 192:23 193:20,21,24 194:11 195:12,20 196:5,9,19 197:1,4,19 198:16 214: 10 234:8,10
penalty [1] 227:19
penn [2] 34:24 35:1
pennsylvania [19] 1:2 2:22 5:1,8, 21,23,24 6:1 33:2 34:6,22 35:8 51: 19 140:21 167:2 174:20 186:4 206:1 208:18
people [42] 10:20 15:17 25:11 35: 9 42:10 44:4 45:8,9 56:21 60:20 61:10 79:8,10,11 84:16,18 100:15, 18 108:11 115:13 126:13 137:12 137:19 168:2,4,8 175:22 177:10 181:23 182:19 212:6 223:17 227: 6,25 228:19 229:1,2,11 232:13,15, 19,24
people's [1] 129:4
percent [1] 161:25
percentage [3] 36:14 43:5,5
perception [1] 64:19
perceptive [1] 223:7
perform [2] 40:23 193:21
performance [3] 207:3,7 239:9
performed [3] 38:11 198:20,20
performing [4] 10:17 22:25 23:3,7 131:10 186:13
perhaps [5] 84:15 106:16 107:9 131:10 186:13
period [6] 22:16,17 57:19 217:13 218:19 221:17
permanent [3] 10:14 223:10,12
permission [8] 99:21,24 100:20 101:18 131:1,11 217:17 248:25
permit [1] 155:11
permitted [3] 197:3 211:17,17
persistent [1] 141:14
person [8] 29:20 40:21 63:16 82: 17 95:6 101:4 118:15,23 119:1 136:20 162:23 173:23 179:12 180: 15 197:13,18 224:4 233:6,18
person's [2] 223:17,18
personal [7] 22:20 79:16 108:10 166:13 169:2 172:17 220:11
personally [20] 29:14,19 50:11,12 78:3 79:7,11,23 80:3 103:9,11 104:5,7,12 166:11,12 184:4 224: 10 243:5,15
personnel [21] 31:2,3 35:19 38:24 39:3 40:17 58:6 75:3 223:11,12, 16 227:6,17,21 231:11,11 236:22, 24 237:15,18 246:25
persons [1] 227:22
phil [7] 173:23,23 176:21 177:9

181:6,23 182:14
philadelphia [1] 231:3
philip [4] 2:16 169:16,18 170:8
phone [22] 22:19 51:14 53:25 54:9, 11,13,20 56:10,23 57:10,12,19 72: 11 86:20 102:11 139:2 182:19 198:21 199:12,13,14,17,21 200:10, 13,20,21,25 201:2,11,18 216:22 217:25 224:13,23 250:10,11
phoned [1] 197:3
phrase [3] 61:2 62:13 68:25
phrased [1] 194:6
physical [1] 36:23
physically [1] 204:16
pick [5] 53:25 54:9 131:23 205:17, 19
picked [4] 54:11 204:17 224:23
picture [1] 210:2
pictures [1] 210:7
piece [1] 229:7
pieces [1] 38:9
pinpoint [2] 49:3,4
pittsburgh [1] 239:2
place [11] 10:20 65:4 67:1 114:18 119:17 153:10 155:5 163:25 164: 2 232:4 245:6
placed [3] 40:15 85:6,8
placing [1] 155:10
plague [2] 36:11 37:4
plaintiff [5] 1:5,19 2:23 3:6 132:2
plaintiff's [1] 247:15
plaintiffs [1] 184:7
plan [2] 32:16,20
plane [1] 186:18
planet [1] 161:19
planned [1] 233:22
plans [2] 184:15 240:14
plaque [1] 35:13
play [1] 189:25
plea [1] 182:15
please [9] 4:7 25:7 33:12,13 36: 10,20 37:10 53:2 67:17 71:20 72: 15,19 103:23 110:8 117:19 119:4 143:19 175:13 203:25
plenty [2] 42:8,10
pm [1] 130:19
pocket [2] 220:22 235:24
point [67] 18:11 30:22 31:24,25 33: 5,7,14 34:7,11 36:14 57:4 65:5,7 75:25 84:11 89:19,23 91:4 93:15 95:3,8 97:2 102:2 110:15 116:11, 13 117:1 118:8,11 119:16 120:14 125:25 130:23 139:23 141:15 143: 23 144:8 146:1,7,17,19,21 147:12 149:14,19 156:7 161:1 171:22 181:22 184:17 190:8 192:16,23 201:2,10 211:5 229:9,18 232:3,13 240:20 242:5 243:19,21,23 246:6 249:14
points [1] 245:22
polca [1] 45:22
police [11] 5:9,22 6:5,12,14,16 9: 21 10:20 19:5 23:3 26:19,20 27:7 33:3,16,16 39:12,24 40:11,12 51: 23 52:19,21 54:25 56:21 71:22 75:

6 81:9 85:10 90:6,14,21,23,25 91: 14 99:13 125:21 137:22 148:2 158:25 172:21,24 173:1 174:20 175:2 177:1,5 178:4 194:21,22 205:23 210:8 212:18 224:3,4 236: 16 238:3
polices [1] 186:6
policy [2] 23:10 69:24
polite [3] 224:17,18,21
political [9] 49:2 51:18,22 56:17, 20 58:20 64:21 88:18 97:13
portion [2] 55:4 77:12
posited [1] 118:4
position [49] 8:7 9:11 10:7 11:3, 18 12:7,8 21:20 22:3 33:20 40:15, 21 71:19 85:22 88:3,8,14 89:12 96:7 98:10 116:22 160:12 161:4 162:10 163:21 164:9 165:4,13 171:15 173:2,6 185:9 187:7 193: 15 195:19,22 200:6 222:23 226:4 228:10,13 229:22 230:12 232:4 236:2 238:24 244:17 246:11,23
positions [7] 43:7 52:14 63:1 68: 23 70:24 84:19 98:8
possibilities [1] 63:19
possibility [3] 91:12 92:14 104:16
possible [11] 52:19 54:24 86:8 177:19 213:11 227:9 237:6 241: 20 249:19 250:3,14
possibly [4] 13:7 56:20 98:5 202:1
post [2] 172:5 244:5
posted [1] 195:22
posters [1] 22:2
potential [15] 25:22 55:1 64:4 65: 14,23 67:22 68:16,18,25 77:12 79: 18 88:15 113:7 121:24 124:1
potentially [4] 84:17,20 97:16 133: 21
potentials [1] 98:9
pr [1] 3:14
practical [3] 22:10,11 125:19
practically [1] 217:14
preceding [2] 28:20 238:11
precisely [1] 184:19
predict [1] 228:18
predictability [1] 20:9
prefer [1] 94:11
preference [2] 8:12 9:9
premature [2] 116:24 118:25
preparations [1] 240:14
present [3] 3:2,3 78:5
presented [3] 59:24 118:7 144:2, 10 179:17
pretty [7] 36:4 45:1 105:17 138:20 168:19 202:14 232:25
prevailing [1] 21:5
prevent [1] 162:12
previous [1] 176:8
previously [3] 135:3 195:15 196:5
primarily [3] 7:19,22 109:6
primary [6] 13:14 16:16,17 20:7 25:8 187:14
principally [2] 20:24 234:7
print [1] 233:24
prior [8] 18:14 85:14 92:7,21 93:3


Case 1:01-cv-00084-CCC    Document 64    Filed 05/20/2002    Page 133 of 318

P.R. VIDEO, INC

99:13 105:21 184:14
**private** [3] 182:17,18 233:5
**privately** [2] 232:23 239:7
**privy** [3] 109:23 110:1 111:9
**probably** [2] 4:4 14:25 15:5,23
16:19 32:18 40:7 47:22 61:19 81:
7 129:17 135:22 149:6 161:25
172:23 194:14 195:8 198:25 206:
4 217:16 226:23 248:16
**probe** [2] 96:16 140:20
**problem** [15] 24:21 25:17,17 32:22
113:7 130:13 181:16 202:22 204:
11 207:17 208:25 239:13,14 248:
13 249:3
**problems** [3] 23:14,23 24:19
**procedural** [2] 157:18,20
**procedures** [6] 9:2,17 31:21 121:
15 142:16 158:10
**proceed** [1] 247:11
**proceeded** [1] 221:21
**proceeding** [1] 132:24
**proceedings** [2] 1:16 18:12
**process** [27] 10:8 11:4 20:2 21:17
22:6 23:19 25:4 29:9 33:22 53:6,6
79:18 84:13 113:19 115:9,12 117:
13 121:9 150:19 152:4 159:25
161:12 163:9,9 187:8,9 204:4
**processes** [2] 25:25 144:16
**processing** [4] 74:20 169:10,15
**produce** [3] 63:14 84:6 85:2
**produced** [1] 96:24
**product** [3] 68:21 72:3 142:17
**production** [1] 3:23
**professional** [16] 10:9 11:10,25
20:3 26:5 42:2 44:7 76:20 80:6 81:
5,11 85:15 89:21 160:8,11 225:8
**professionals** [1] 228:5
**program** [2] 10:17 21:22
**progress** [1] 233:13
**prohibited** [1] 189:13
**prohibition** [1] 61:18
**project** [28] 12:3,3 39:1 151:5,11
181:12 187:12 191:6 192:3,7,9
194:14 200:4 219:8,9,10 225:22
227:14 228:20,20,21,23 229:3,7,8,
10,13 232:20
**projects** [8] 227:16 230:20,22 231:
1,3,9 232:12,16
**promo** [1] 188:12
**promoted** [18] 7:10,11 8:21,23 9:
14,23 10:5,13,25 11:3 160:19 161:
2,15 163:23 164:22 195:7 245:4,
19
**promoting** [1] 167:8
**promotion** [10] 8:8 13:5 43:9 160:
7,10 163:19 165:1 232:4,6,8
**promotional** [10] 160:4,4,7 161:
14,23 162:17 163:3,7 166:9 211:6
**promotions** [9] 13:1,3,8,22 33:8,8
43:8 162:17 228:15
**prone** [1] 199:6
**proof** [1] 70:12
**proper** [1] 20:14
**properly** [1] 175:25
**property** [12] 18:5,6,7,8,9 23:20,

22 24:15,21,22,23 200:17
**prostitute** [1] 115:12
**protection** [1] 46:16
**protocol** [1] 189:1
**prove** [2] 172:10,10
**provide** [7] 37:10 52:22 85:8 138:
18,24 158:7 247:6
**provided** [5] 54:22 94:19 144:11
147:20 203:3
**providing** [2] 91:23 119:12
**psp** [16] 62:19,21 63:8 64:5 69:24
70:1 102:20 104:18 121:23 132:1,
1,4 169:5 182:11 184:22,24
**psp's** [1] 186:9
**psta** [5] 138:24 146:17 147:5,21
158:7
**public** [9] 5:13 17:1,2,9,13 52:24
84:2 97:12,13
**published** [1] 192:11
**punched** [1] 43:25
**punishment** [1] 231:6
**purchased** [1] 184:25
**pure** [1] 21:25
**purpose** [3] 111:23 139:18 246:22
**purposes** [5] 60:10 70:3 76:1 122:
13 125:12
**pushing** [2] 247:13 248:21
**put** [29] 6:8 47:16 54:5 61:1 127:22
142:11 145:13 157:11 162:3 168:
8 170:4 184:23 215:2 217:9 227:
16,17 228:24 230:9,11 237:10
238:24 239:3,16,21 240:1,13 242:
15 243:18 246:14
**puts** [2] 132:13 176:6
**putting** [2] 197:14 246:17,18

## Q

**qualifications** [1] 38:3
**qualified** [1] 173:15
**quality** [1] 22:23
**question** [107] 3:19 4:6,8,9 9:15
12:20 14:7 17:16 18:18,18 24:4,9
25:1,3 33:12 40:1 42:17 43:24 45:
16 47:7,25 48:11 53:8 60:11,25
61:16 64:15 66:10,21 67:4,6,8,14,
16,19 77:3 79:14 80:22 83:5,5,13
86:25 87:19,22 89:1,3 91:25 92:
13 94:4,10,12 106:7 109:15 110:7,
8 112:17 118:3,19 119:19 120:4,6
123:5,6,7 124:24 128:2 137:1 139:
22 141:5 143:19 146:24 148:5
153:13,19,21 154:22 168:1,2,22
170:18,20,21 174:11 175:6,22,25
176:12 177:25 178:22 180:21,23
185:19 187:13 191:9 192:22 199:
5,7 209:2,4,17 217:19 222:15 223:
15 225:6 231:13 232:22 245:13
**question.sorry** [1] 210:4
**questioning** [2] 65:6 178:18
**questions** [23] 32:12 46:10,14 50:
25 51:5 65:8 83:12 91:19 103:10
126:7 127:2 129:2,8,17 130:8 150:
4 176:2,3,10 214:3 229:12 239:7
248:17
**quick** [1] 250:16

**quickly** [3] 108:2 117:22,23
**quit** [1] 176:7
**quite** [14] 33:24 38:12 43:24 64:24
106:13 167:7 168:16 206:17 209:
3 231:14,16,24 232:21 247:9

## R

**r&d** [1] 80:17
**raise** [2] 137:18 232:7
**raised** [1] 183:2
**raises** [1] 245:14
**ralph** [2] 49:23 50:13
**ran** [2] 211:24 230:9
**random** [1] 22:15
**rank** [11] 35:21,24 36:5,7 40:22 43:
9 52:10 98:11 160:13 172:5 185:8
**ranking** [3] 62:18 63:7 229:9
**ranks** [7] 39:25 40:6 43:17 52:13
70:19,23 227:6
**rat's** [1] 168:13
**rated** [2] 24:16,18
**rather** [6] 12:21 87:2,5 163:12 169:
22 204:22
**rational** [3] 126:25 150:8 157:6
**rationally** [1] 207:5
**rattled** [1] 215:14
**re-tell** [1] 83:9
**reach** [2] 84:16 193:7
**reacting** [1] 64:20
**reaction** [2] 104:23 202:14
**read** [9] 118:2 122:23 123:3,4 132:
6 156:25 170:18 173:9 233:24
**reading** [2] 175:22,24
**reads** [1] 116:12
**ready** [1] 2:6
**real** [5] 60:25 104:15 105:15 185:
19 250:15
**reality** [2] 194:11 233:1
**realize** [1] 132:16
**realized** [3] 146:19,21 222:23
**really** [37] 12:24 15:6 19:15 51:11
62:3 77:21,22 86:6 93:15 101:2
110:7 114:19 115:16 123:16,20
153:24 160:18 165:9,15 169:19
171:2 175:7 184:9 201:16 202:15,
19 204:4 205:11 206:14 218:22
221:4 240:10 241:15,19 243:20
244:12 250:6
**reason** [26] 13:4 21:19 22:3 23:11
24:4 48:10 81:3 96:1 112:12,15
134:18 138:4 141:20 161:22 167:
25 174:1 179:22,24 180:1 188:16
191:17 199:16 201:9 218:24 223:
15 237:24
**reasonable** [6] 110:12,22 111:9
148:11 214:8 248:11
**reasons** [11] 13:8 46:8 81:4 123:1,
8,8,23,24 129:4 227:13 245:10
**reassigned** [1] 200:13
**recall** [99] 6:16 13:6 15:1 16:5,7,8
17:8,10,23 18:13 30:4,14,15 32:3
36:13,22 37:1 39:7 45:23 46:19,
20 50:3,7,13 51:5 52:11,20 54:
18,22 55:6,6,13,21,23,25 56:7,15,
19,24 57:3,11,14,25 58:15 63:20

64:1 66:3 68:6,9 69:11,17 71:8,11,
16 80:15 84:12 91:1 93:9 95:19,
21 97:1,5 98:18 101:4 102:13,16
103:2,21 105:10,13 131:13 140:
24 141:3 142:6,7,7 145:7 152:7,
10,17,20 154:8,25 155:14 158:10
159:3 160:1,21 167:23 186:2 194:
5 196:7 200:10 202:1,2 237:15,19
243:7 246:16
**receipt** [3] 203:2 205:22 206:9
**receive** [10] 12:12 38:4 39:10 139:
24 179:23,24 180:2 202:12 237:6
243:8
**received** [35] 19:3 29:10 31:23 32:
3 38:18,22,25,25 71:13 74:5 75:
12 85:17 86:20 87:3,10 97:11 102:
18 115:7 121:16 139:2 144:7,9,24
169:16 170:8 181:24 182:2 183:
17 202:7 214:15 232:4 236:20
237:4,4 243:5
**receives** [1] 194:16
**receiving** [3] 71:11 165:1 224:13
**recently** [1] 194:13
**reception** [4] 74:20 169:10
**recess** [1] 248:24
**recipient** [1] 184:1
**recognize** [3] 4:14 73:1 232:2
**recognized** [1] 84:6
**recollect** [1] 52:17
**recollection** [19] 43:10 49:6,16 50:
5 52:1,13 63:11,17 65:18 67:25
69:21 92:2 119:23,25 132:21 151:
8 203:15 243:16 244:10
**recollects** [1] 155:12
**recommend** [1] 163:13
**recommendation** [7] 47:10 141:
25 162:10,16 165:6 168:24 184:6
**recommendations** [4] 23:13 163:
2,11 168:12
**record** [21] 30:18,21 33:7,21,21 37:
16 54:6,6 65:5 67:2 71:19 72:2,21,
22 119:21 153:11 154:17 155:6,
11 156:10 249:9
**record's** [1] 59:2
**recording** [2] 2:4 74:24
**records** [1] 24:22
**recreate** [1] 87:17
**recycling** [2] 207:20,21
**red** [1] 196:17
**redacted** [1] 146:9
**reference** [2] 76:14 194:7
**references** [2] 225:18 233:7
**referencing** [1] 169:3
**referred** [5] 51:17 98:11,12 214:6
220:17
**referring** [2] 40:2 113:23
**refresh** [1] 122:24
**refused** [1] 148:12
**regain** [1] 184:1
**regarding** [1] 191:13
**regionally** [1] 226:17
**regions** [1] 226:13
**regulation** [6] 21:5 22:5 44:20 69:
24 154:3 223:10
**regulations** [14] 10:21 21:7 23:9

Sheet 15

prior - regulations





P.R. VIDEO, INC

26:15 109:10 137:13 177:6 211:14 212:25 223:8,11,21 230:1 235:18

**reimburse** [3] 204:22,24 205:5

**reimbursement** [3] 205:2 211:13 220:23

**reimbursements** [5] 198:22 201:21,23 236:8,10

**reissued** [4] 201:7,11,14,19

**rejected** [3] 236:18 243:15 244:6

**relate** [1] 23:18

**related** [5] 5:18 9:19 19:11 65:10 87:24

**relating** [1] 98:17

**relationship** [5] 19:19 30:19 43:6 151:6 165:19

**relative** [1] 219:18

**relatively** [1] 75:17

**relayed** [2] 152:23,25

**released** [1] 231:12

**relevance** [3] 128:18,21 251:11

**relevancy** [3] 65:7 91:19 153:11

**reliable** [1] 62:16

**reluctantly** [1] 186:13

**remain** [1] 187:21

**remains** [1] 81:8

**remember** [51] 15:6 17:11 28:22 32:4 34:23 39:15 45:13 46:4 50:19,20 51:13 55:3,5,17,18 58:1 63:23 64:11 66:23 67:10 77:16,17 90:16 96:19 98:16 101:16 102:17,24 103:3 108:2 116:4 130:25 131:8,12 141:1 142:23 143:1 146:2 153:2 154:1,7 183:24 200:23,24 203:18,22,24 206:9 207:15 235:20 244:16

**remembered** [2] 27:9 131:3

**remembering** [1] 244:1

**remind** [1] 135:11

**reminded** [1] 143:2

**removal** [3] 184:7 191:16 199:9

**removals** [1] 198:17

**removed** [4] 13:9 181:8 228:24 229:11

**rep** [2] 147:9 148:8

**repeat** [5] 65:21 67:17 72:19 83:9 143:18

**repeated** [2] 141:9 199:7

**repeating** [1] 141:23

**rephrase** [5] 4:7 67:17,19 83:9 110:9

**replace** [2] 160:15 195:9

**replaced** [2] 195:10 220:16

**replete** [1] 38:2

**report** [28] 21:13 22:17 54:7 69:25 70:8 78:24 79:6 81:1 87:21 114:8 119:15 121:5 124:20 125:8 140:3 151:13 155:22 156:3 187:20 216:1,5,21 218:12,14,25 223:3,3,4

**reported** [6] 57:8 62:17 87:24 92:6 155:24 243:4

**reporter** [8] 2:12 3:11 37:17 76:7 116:6,8 130:5,21

**reporting** [7] 2:17 70:20,22 78:2 120:8 142:15 217:20

**reports** [2] 22:15,16

**repot** [1] 124:20

**represent** [3] 3:5,7,9

**representation** [2] 138:15 157:19

**representative** [9] 56:8,13 101:24 138:14,24 146:18 147:5,20 158:7

**represents** [1] 179:15

**reps** [2] 57:5 147:21

**reputation** [12] 121:21 167:10 182:9 225:13 226:20,22,24 227:11 230:23 232:11,16 233:19

**request** [20] 4:1 96:8 113:4 148:10,12 159:16 196:6,13 197:6 204:9 211:4,6 217:15 248:24 249:8,9,14 251:2,7,23

**requested** [7] 8:11 9:9 12:15 64:3 159:17 179:18 241:5

**requesting** [1] 242:16

**required** [7] 13:12 26:14 137:23,23 149:3,7 232:5

**requirement** [2] 21:3 43:19

**requirements** [4] 70:20,21,22 251:8

**rescinded** [1] 243:9

**research** [9] 9:3,11,16 10:1,3 19:23 30:17 45:25 80:13

**researching** [1] 19:18

**resembles** [1] 121:11

**reserve** [1] 17:14

**reserved** [1] 3:19

**resolution** [1] 204:13

**resource** [2] 52:22 64:24

**resources** [1] 215:20

**respect** [22] 19:5 23:24,24 70:18 94:25 117:20 132:15 156:16 158:11 170:21 185:5 187:14 191:10 193:20 210:23 219:6 228:12 232:13 236:13 238:13,14 245:18

**respectfully** [3] 3:23 117:20 248:23

**respective** [1] 29:12

**respond** [36] 14:7 22:9 24:11 45:16 53:13 54:5,6 61:16 79:14 80:22 82:8 85:20 88:10 91:24 93:20 110:20 111:13 115:1 117:5 118:2,5 119:16,23 129:2 135:11,14 137:1 153:11 155:12 156:18,20 157:23 175:10 176:19 217:5 249:11

**responded** [4] 144:14 188:20 195:20 218:20

**responding** [5] 3:22 24:5,7 25:8 81:21

**response** [18] 47:25 53:2 68:3 83:12,17 84:12 141:21,22 143:22 144:23 178:20 189:9 190:21 214:18 216:6 217:17 228:5,6

**responses** [3] 3:25 34:2 46:7

**responsibilities** [1] 25:24

**responsibility** [22] 10:9 11:10,25 16:17 20:3 26:5 42:3 44:7 45:4 47:20 48:21 76:20 81:6,12 85:16 87:8 89:21 132:14 160:8,11 180:9 203:13

**responsible** [6] 44:11,11,15 81:11 90:5,8

**rest** [2] 165:5 228:14

**restaurant** [2] 233:12,13

**restrictions** [5] 4:1 193:23 194:19

**result** [12] 63:14 85:2 105:2 107:16,20 150:21 161:23 182:8 198:14 207:23 209:22 235:18

**resulted** [1] 26:4

**results** [1] 115:6

**resume** [4] 4:15,20,21 33:11 197:3

**retired** [6] 172:4,20 202:4,6 203:8 246:10

**retirees** [1] 184:18

**retirement** [3] 202:10 203:10 246:14

**retiring** [1] 245:10

**retrieve** [1] 152:19

**return** [1] 62:19

**returned** [3] 152:21 200:8 218:7

**returning** [2] 69:23 213:10

**reveal** [1] 114:21

**revealed** [1] 99:12

**review** [20] 10:8 11:4 20:2 21:12 25:4,12 33:22 34:1,3,4 138:10 142:1 152:4 155:9 163:9 170:14 179:8,18 187:8,9

**reviewed** [2] 39:3,6

**reviewing** [2] 20:8 179:12

**revised** [1] 251:2

**revising** [1] 251:23

**revisit** [2] 18:22 155:1

**reward** [1] 38:23

**reynolds** [1] 3:9

**ridge** [1] 92:17

**rift** [1] 222:25

**rights** [5] 46:16 127:24 144:16 157:12 184:4

**ripping** [1] 207:21

**rise** [1] 227:6

**rises** [1] 148:13

**rising** [1] 33:22

**road** [1] 3:15

**rob** [1] 175:14

**robert** [1] 87:25

**role** [14] 13:10 20:6 22:22 25:8 52:4,7 53:9 57:2 59:3 68:1 100:6,8 186:22 234:13

**roles** [1] 150:24

**roll** [4] 186:6,9,14 208:12

**ronald** [1] 202:5

**room** [7] 23:22 32:14 134:3,5,10,13,15

**rooms** [1] 24:15

**roster** [1] 15:12

**rotating** [1] 8:1

**rotten** [1] 150:18

**roughly** [1] 249:12

**routed** [3] 29:12 76:17,19

**routine** [1] 15:15

**routing** [1] 173:18

**rude** [1] 118:1

**rule** [1] 148:3

**rules** [6] 10:21 26:15 62:7,8 70:15 203:19 247:6 248:10

**rumor** [6] 166:21,22,22 168:3,17 182:13

**rumors** [8] 101:3 166:17,19,23 167:7,11 168:14 182:10

**run** [4] 111:20 131:18 223:6 227:5

**running** [4] 33:24 64:21 91:21 113:6

**runs** [2] 9:20 45:1

### S

**sac** [2] 103:17,19

**sadly** [1] 86:10

**sake** [1] 90:2

**sakes** [1] 182:11

**sale** [3] 184:19,23,24

**saluted** [1] 221:18

**same** [28] 3:17 9:14 25:10 37:25 67:24 70:15 74:4,9,9 75:4 78:5 96:15 99:17 122:12 133:7 157:13 158:15 168:25 191:10 196:2,23 201:25 202:14 206:3 210:22 218:8 227:25 231:4

**sample** [1] 22:15

**sat** [6] 91:5 132:5 140:14,15,17 146:9

**saying** [50] 41:24 42:21 43:19 52:20 66:21 68:8 82:19,22 83:1 95:2 98:2 108:9 120:24 124:12,14 125:2,11,14,15,24 126:12,15 127:7 143:20 153:18 159:19 168:13,13,15 173:4 174:24 177:20 181:22,23 183:20 188:5,20 200:17 205:1,6 208:23 209:1,16 218:20 222:20 243:1,9 248:9,10 251:21

**says** [32] 25:35:13,23 74:15 75:12,14 76:7 99:22 116:21 123:1 144:10 159:16 170:6 172:4 178:15 179:7 183:5 231:9 235:19 242:23

**scene** [2] 22:9 25:9

**schedule** [1] 21:1

**scheduled** [2] 215:19 240:14

**scheme** [2] 91:13 93:1

**scholastically** [1] 36:13

**school** [5] 4:25 5:7 136:18 236:17 238:4

**schools** [1] 136:19

**science** [1] 5:6

**score** [1] 36:21

**scotland** [1] 5:24

**scratch** [1] 231:18

**screeching** [1] 197:1

**screw** [1] 227:23

**screwed** [2] 81:19 206:23

**scrutinize** [1] 114:17

**scrutiny** [1] 13:15

**second** [16] 24:8 35:11 36:13,16,17,22 70:25 75:13 103:23 127:6 152:20 171:10,13 195:25 207:11 240:4

**second.there's** [1] 197:24

**secondary** [1] 185:15

**secondly** [1] 178:5

**secretary** [2] 139:3 229:4

**section** [31] 9:3,14,17 11:19 12:5 21:14 27:13 40:10 70:17 185:9 187:7 193:13 225:24 226:1,11,11



P.R. VIDEO, INC

229:19,20 **230:**1,6,10,15,16,18
238:8,16,18,19 **239:**20,24 **242:**23
**sections** [7] 11:11,13,18,19 **226:**
15 230:2 248:24
**security** [2] 23:18 24:24
**see** [50] 22:24 23:9 59:15 60:4,10
61:1 68:1 75:14 77:4 93:21 95:14
99:21 115:25 121:7 125:25 130:7,
8 137:18 142:20 143:3 144:3 153:
9 159:19 171:9,23,24 173:4 175:4
177:7,9 183:16 196:24 205:20
209:1,16 216:6 217:18 231:8 232:
12 240:21 241:21 242:12 243:20
244:4 247:4,9,12,13,24 250:4
**seeing** [1] 39:7
**seek** [6] 81:1 85:24 100:20 184:16
211:24,25
**seeking** [1] 101:18
**seems** [6] 100:13 107:23,24 172:
12 175:21 209:4
**seen** [13] 37:22 102:14 111:17 142:
25 148:19 171:8,11 212:11 231:
23 239:17 241:24 245:17 246:7
**seizing** [1] 18:5
**seizure** [3] 17:23,24 18:7
**seizures** [2] 17:24 18:4
**selected** [4] 5:20 227:13 232:3
243:22
**selection** [2] 40:8 184:8
**self-serving** [1] 127:20
**selhamer** [1] 167:16
**senator** [1] 101:23
**senators** [1] 57:5
**send** [2] 166:25 174:6
**sends** [1] 204:11
**senior** [4] 5:16 85:23 111:18 161:
25
**sense** [7] 81:3 96:13 98:10 136:20
137:6 142:5 219:1
**sensitive** [2] 40:15 64:17
**sensitivity** [2] 65:25 96:11
**sent** [20] 29:11 76:16 102:16 162:
15,18 166:25 174:13 181:5 191:
22,23,24 220:17 223:1 229:14,19
231:3,8 237:2 240:2,2
**sentence** [5] 60:4 70:17 95:16 96:
15 122:21
**separate** [4] 208:18 209:8,21 210:
13
**separated** [2] 137:2 208:16
**separately** [1] 24:18
**september** [19] 17:21 18:14 19:18
28:3 33:1 39:19 49:1,5,11,15 74:3
81:13 109:1 121:22,25 145:17
186:18 202:1 230:7
**september1998** [1] 71:12
**sequence** [1] 28:22
**sequential** [1] 144:8
**sequentially** [1] 31:24
**sergeant** [20] 8:22,23,25 9:1,14,25
13:5 46:1 167:17,18,18 202:2,5,6,
12 203:8 205:14 230:9,11,13
**sergeants** [2] 230:3,4
**series** [1] 51:21
**serious** [1] 58:3

**seriously** [2] 58:10,22
**serve** [5] 14:1 15:13 34:3 41:13
189:16
**served** [5] 20:7 21:22 187:3,7 195:
16
**serves** [1] 82:11
**service** [2] 202:10 240:8
**services** [3] 2:17 12:2 237:2
**serving** [1] 195:15
**set** [5] 20:22 93:21 94:13 235:21
239:4
**setting** [1] 104:2
**settlement** [1] 228:2
**seven** [5] 116:8,9,19,20 162:2
**seventy** [1] 238:19
**several** [10] 28:20 141:5,6 183:22
185:16 188:17 189:7 191:5 230:
10 248:16
**sexual** [1] 230:8
**shall** [1] 68:8
**shape** [2] 175:17 184:15
**shared** [3] 61:20 151:5 154:8
**sharing** [1] 105:15
**she'd** [1] 249:12
**she's** [3] 247:6,9 249:11
**sheet** [2] 26:6 157:10
**shelton** [1] 229:5
**shifts** [1] 152:25
**ship** [1] 228:15
**shocked** [1] 209:3
**short** [4] 41:9 72:17 188:13 249:5
**shorter** [1] 226:23
**shorting** [1] 152:25
**shortly** [2] 5:22 238:20
**shouldn't** [5] 43:18 66:19 83:2
118:15 218:21
**show** [9] 4:13,19 37:19 143:4 171:
18 186:15 210:2,13 249:9
**showed** [1] 76:9
**shows** [1] 177:21
**shuffled** [1] 237:7
**shut** [1] 245:5
**side** [6] 36:18 71:1 103:24 221:24
224:25 233:18
**sight** [2] 83:23,24
**signal** [1] 32:13
**signed** [2] 147:22 206:10
**significance** [1] 224:3
**significant** [3] 13:16 23:17 99:4
**silliness** [1] 192:5
**simmers** [1] 183:25
**simple** [2] 161:21 176:12
**simpler** [1] 190:10
**simply** [7] 50:9 84:24 92:4 96:12
125:7 138:7 176:1
**since** [12] 76:7 77:10 83:1 131:2
136:3 187:3 213:2 218:21 219:8
220:15 226:3 234:14
**singled** [1] 127:20
**sir** [5] 2:7 120:3 128:19 174:3 175:
18
**sit** [6] 72:15 94:16,20 158:10 233:7
237:24
**sitting** [2] 60:7 224:25
**situated** [1] 34:9

**situation** [20] 41:7 61:8 68:7 70:
19 97:17 117:11,12 118:18 119:7,
9 120:12,18,20 137:16 142:12
171:5 176:12,13 221:3 239:16
**situations** [1] 47:10
**six** [8] 15:5 32:23 41:11 162:1 192:
4,8 247:7 248:1
**sixth** [1] 133:9
**sixty** [2] 205:6,14
**sixty-nine** [3] 204:14 206:6 238:
18
**skip** [1] 213:4
**skipped** [1] 218:11
**skipping** [1] 19:14
**skirkus** [1] 109:7
**skurkis** [1] 201:17
**sleep** [1] 211:18
**sleeping** [2] 211:15,19
**slip** [1] 73:18
**slipped** [2] 142:13 146:7
**slips** [2] 239:10,11
**small** [3] 15:8 47:6 156:12
**smallest** [1] 230:16
**smart** [1] 30:3
**snickered** [1] 240:21
**snide** [1] 118:1
**so.there's** [1] 251:19
**soliciting** [1] 239:22
**somebody** [10] 41:2 61:25 62:6
63:24 66:21 172:20 173:15 177:
19 193:23 205:24
**somebody's** [1] 41:21
**somehow** [5] 96:25 149:13 166:
10 176:25 188:10
**someone** [8] 22:9 41:5,10,12 47:
3 52:21 54:24 63:6,12 66:20 78:2,
5 79:7 80:19 82:4,13 84:10 85:25
91:22 118:12 121:7 122:16 123:
11 124:2 125:7,13 138:7 155:22
172:1,2,24 173:1,5,12,13 175:12,
13 184:12,16,24 186:15 195:24
227:14 230:13 240:10 245:13
**sometime** [4] 86:4 200:9 201:25
203:10
**sometimes** [11] 47:21 48:2 61:3,5
115:15,15 117:2 118:20 219:21
223:19,19
**somewhat** [2] 47:17 86:16
**somewhere** [6] 177:4 202:4 223:
25 241:10 245:7 247:12
**son** [4] 13:10,14,18,19
**soon** [4] 22:2 185:11 218:24 246:6
**sorry** [2] 13:24 35:15 56:1 68:4
73:7 81:18 109:15 145:23 148:5
156:24 165:8,17 170:17 202:3
208:2 215:3 229:23 230:4 233:18
235:6 242:12
**sort** [2] 168:5 230:22
**sorts** [1] 176:9
**sought** [3] 33:19 37:1 108:9
**soul** [2] 52:16 115:8
**sound** [1] 2:8
**sounds** [5] 26:10 35:6 49:13 196:
6 203:23
**source** [2] 44:24 101:3

**sources** [2] 100:23 101:22
**south** [1] 245:7
**space** [1] 220:6
**speaking** [3] 176:9 177:11 217:14
**speaks** [2] 209:22 210:17
**special** [14] 49:23 57:10 62:20 64:
7 65:12,20 227:16 230:20,21 231:
1,3,9 232:12 237:16
**specialized** [1] 9:11
**specific** [6] 49:20 97:24 101:4 211:
10,12 214:3
**specifically** [11] 52:12 54:17 66:
24 67:21 70:22 82:13,15,16 125:
21 201:24 212:25
**specificity** [1] 70:18
**specifics** [1] 150:5
**speculate** [4] 50:16 94:21 110:11
119:24
**speculating** [2] 48:12 50:14
**speculation** [4] 48:11 93:20 110:
7 129:3
**spell** [2] 156:9 238:1
**spelled** [1] 45:23
**spend** [1] 10:1
**spent** [1] 194:20
**split** [1] 209:13
**spoke** [3] 49:25 54:13 217:1
**spot** [2] 188:19 228:19
**spr** [5] 26:12,13,18 28:9,12
**spring** [1] 6:18
**staff** [15] 9:13 10:11,17,19 20:11,
15,18 21:11 42:12 88:1 92:17 168:
10 186:16 214:11 238:3
**staffing** [1] 236:16
**standard** [3] 75:5 133:2 142:15
**standards** [2] 23:4 181:3
**standing** [2] 121:21 136:25
**stanton** [6] 52:2,3,5 86:18 222:2,
10
**stanton's** [5] 58:4 69:16 82:12 83:
16,19
**star** [2] 33:2 167:18
**start** [9] 4:12 23:17 32:23 53:5 115:
13 128:6 152:3 225:21 226:25
**started** [16] 6:23,25 17:12 27:21
48:24 102:13 146:15 149:16 157:
16 190:21 207:2
**starting** [2] 19:2 247:23
**starts** [2] 122:20 123:2
**state** [84] 3:3 5:1,9,17 6:12,13,15 9:
20 10:20 11:10,16 23:3,22 26:19,
20 27:2 33:3,9,16 34:22,24 35:1
38:4 39:24 51:23 52:19,21 54:25
56:8,12,19,21 57:2,5 58:16 62:16
71:19,22 75:6 77:25 81:9 84:3 85:
10 86:8,17 90:6,14,20,23,25 91:13
97:16 99:13 101:23,23 125:21
135:17 136:5 137:22 148:2 158:
25 162:1 172:21,24 173:1,2,6 174:
20 175:2 177:1,5 178:4 186:6 194:
21,22 205:23 210:8 212:18 219:
14 224:3,3 227:8 238:19 239:2
**stated** [1] 118:7
**statement** [10] 34:9 47:23 79:15,
19,21 88:6 104:24 107:24 134:17



P.R. VIDEO, INC

183:16
**statements** [1] 132:15
**states** [4] 1:1 2:1 99:2 212:25
**station** [22] 7:8,21,25 15:8 20:25 21:9 23:4 26:1,8,9 69:14 83:14 151:24 152:8,14,22 155:25 156:1 158:3 187:22 246:20,21
**stationed** [1] 80:15
**stations** [5] 214:25 218:18 219:1 229:15,16
**status** [2] 120:11 230:9
**stay** [1] 203:7
**stay-at-home** [1] 211:2
**stayed** [1] 219:9
**stealing** [1] 182:11
**steer** [1] 171:19
**steering** [1] 221:18
**stem** [1] 152:1
**step** [2] 58:15 213:25
**stigma** [2] 232:22 233:2
**still** [19] 38:14 81:8 93:17 95:15 104:16 111:12 130:21 154:18 160: 23 168:16 188:15,20 199:18 201: 3 216:11 222:6 232:17,25 233:21
**sting** [1] 202:16
**stipulations** [1] 3:18
**stop** [5] 128:6 165:1 197:14 198:2 201:15
**stopped** [2] 185:7 205:17
**stopping** [1] 218:1
**storage** [1] 24:20
**stored** [1] 24:22
**story** [2] 204:18 247:16
**strategic** [1] 139:4
**strategically** [2] 85:6,8
**street** [4] 1:21,26 2:19 233:16
**strenuously** [1] 119:4
**strictly** [1] 149:9
**strike** [5] 67:12 112:17 115:1 117: 25 175:9
**stripped** [1] 200:19
**stripping** [1] 198:21
**strongly** [2] 117:8,13
**structured** [1] 186:13
**studied** [1] 73:13
**studies** [1] 5:10
**study** [3] 5:11 22:18 119:13
**stuff** [2] 131:16 241:18
**stumbling** [1] 26:13
**subject** [31] 13:15 45:14,21 57:1 75:6 109:8 114:10 115:3,17,20,24 116:23 117:4,4 118:13,16,23 119: 1 121:13 127:16,23 133:19,20,21 136:10 137:24 140:23 144:11 148: 10 151:19 152:7
**subject's** [1] 120:11
**subjected** [1] 159:7
**subjects** [7] 45:17,18,20 132:12 133:18 138:22 152:6
**submit** [1] 220:23
**submitted** [4] 162:22 237:21 240: 5 242:5
**subordinate** [4] 68:1 70:19 87:3 244:12
**subordinates** [4] 86:19 87:6 167:

17 186:10
**subpoena** [1] 59:12
**subsequent** [6] 88:24,24 99:10 104:3 216:3 221:8
**subsequently** [6] 52:3 104:8 184: 25 185:8 190:1 193:14 204:2 240: 8
**subsistence** [1] 211:24
**substance** [1] 97:19
**success** [1] 243:19
**successful** [1] 65:2
**successfully** [1] 33:25
**sudden** [1] 206:20
**suffer** [3] 137:8 180:16 219:4
**suffered** [2] 134:7 225:11
**sufficient** [1] 84:6
**suggest** [8] 30:19 43:4 63:6,8 206: 18 231:14 247:11 251:3
**suggesting** [1] 125:6,10 212:21
**suggestion** [2] 249:10 250:3
**suggestions** [1] 55:15
**suggestive** [1] 51:3
**suit** [2] 99:2 103:1
**suitable** [1] 188:24
**sum** [1] 97:19
**summarily** [1] 228:24
**summarized** [1] 189:7
**summarizes** [1] 111:25
**summary** [1] 16:1
**summer** [5] 5:19,19 158:19 160: 24 176:14 179:20 195:7 200:9
**superior** [1] 178:6
**superiors** [1] 107:10
**supervise** [1] 11:11
**supervised** [4] 28:14 78:16 196:5 230:2
**supervision** [1] 11:20
**supervisor** [16] 8:14 26:2 27:23 28:1,8,12 29:7 78:14,21 80:20 93: 17 145:13 156:4,7 181:11 197:21
**supervisors** [5] 28:25,25 38:10 91:6 181:16
**supplied** [3] 102:3 111:25 141:12
**supply** [2] 53:4 141:25
**support** [2] 64:24 119:21
**suppose** [4] 41:9 47:16 60:24 62: 12
**supposed** [17] 22:1,13 25:25 68: 16 74:14 90:20 98:19 112:13 138: 19,20 177:6 214:18 216:21 218: 10,12 224:16 229:14
**supposedly** [1] 124:2
**surface** [1] 231:18
**surfaced** [1] 88:13
**surrender** [2] 149:2,4
**surround** [1] 166:23
**surrounding** [5] 62:2 113:15 114: 7 120:1 140:20
**suspect** [1] 182:11
**suspects** [2] 16:7 116:4
**suspend** [1] 72:9
**suspicion** [2] 122:17 123:13
**swear** [2] 2:10,12
**sweeting** [1] 167:17
**sworn** [2] 3:12 4:6

**sydni** [3] 143:18 159:15 178:18 180:21 241:13 247:17 248:12 249: 15
**symposium** [1] 239:23
**syndi** [6] 1:24 2:9 3:7 32:15 95:13 175:14
**system** [4] 9:20 10:14,15 23:20
**systems** [14] 9:2,16 10:8 11:4 12: 3 20:1 25:3 26:11 33:22 152:3 163:9 187:8,9 229:8
**szupinka** [12] 87:20 211:10 213: 3,18,19,23 214:7,9 218:15 219:5, 21,25 221:1,18 224:9,13,21 225:7

---

**T**

---

**table** [1] 93:22
**talked** [12] 13:25 55:1 90:18,22 146:7 150:3 184:13 191:3 202:14 205:11 211:10 226:24
**talks** [1] 192:2
**tantamount** [1] 137:16
**tape** [7] 71:2,3 93:12 143:17 190: 14,15 217:6
**tape-recorded** [1] 157:20
**target** [16] 67:22 77:11,12,14,15, 17 79:19 88:15 122:16 123:12,17 124:1 125:13,14 192:19 233:2
**targets** [4] 64:5 65:15,23 68:17,18, 25
**task** [2] 21:11 23:9
**tasked** [4] 9:17 10:17 25:11 203: 13
**team** [4] 186:10 196:17,18,18
**teams** [1] 186:10
**tech** [1] 237:1
**technology** [3] 12:2,3 229:8
**telephone** [3] 49:25 82:4 139:24
**telephoned** [1] 246:19
**tells** [4] 177:25 218:9 245:14,14
**temporary** [4] 41:2,7,20 223:9
**ten** [6] 8:10 25:11 139:11,13 169:9 189:8
**tenth** [1] 217:1
**term** [15] 35:1 41:9 43:4 97:22 98: 5,14 135:23 136:1,3,4 190:2 193: 15 194:12 223:19,20
**termed** [1] 68:22
**terminology** [1] 119:11
**terms** [5] 52:8 56:14 58:19 110:15 191:7
**terrible** [2] 26:25 27:1
**terribly** [1] 191:14
**tested** [1] 6:22
**testified** [9] 62:24 83:25 103:14 119:5 157:25 163:6 193:14 194:1 217:20
**testifying** [1] 129:1
**testimony** [4] 2:12 59:14 105:21 139:25
**testing** [6] 2:1 55:9 58:12 68:22 84:5,16
**tests** [1] 5:18
**thanks** [2] 196:19 240:22
**the.inept** [1] 210:3
**themselves** [1] 155:8

**theoretically** [1] 62:7
**there's** [14] 21:24 32:16 48:19 66: 18 72:12 106:4 111:25 112:15 117:3 124:7 138:2,21 153:13 157: 13 162:6,8,8 170:17 171:19 172: 25 174:4,8,18 175:16 178:17 183: 11 184:7 186:24 198:25 202:22 214:24 225:16 226:11 231:13 232: 22 233:7 235:19 237:6 242:2 247: 8,12
**thereafter** [2] 188:13 238:20
**therefore** [1] 187:22
**they'll** [2] 137:24 223:19
**they've** [2] 167:9 245:17
**thinking** [7] 24:9 61:4 159:8,24 195:7 229:23 248:19
**thinks** [3] 110:22 128:14 129:3
**third** [1] 122:21
**thirdly** [1] 105:2
**thirty** [5] 203:22 211:13 223:6 236: 6 239:19
**thirty-four** [1] 108:13
**thirty-seven** [1] 121:18
**thirty-three** [1] 108:8
**thirty-two** [1] 107:1
**thomas** [3] 1:10 2:23 147:23
**though** [12] 32:15 44:4 73:8 79:22 103:22 108:15 109:2 113:21 128: 3 154:24 222:15 252:4
**thousand** [2] 192:11,12
**threatened** [2] 103:14 105:4
**threats** [1] 104:23
**three** [31] 10:12 11:11 13:7 21:4,7, 8 32:5 33:8 45:12,17,18 55:6 94: 17 99:2,5 102:17 131:17 145:13 146:11 167:20 186:9 195:12 209: 25 211:15 226:13,15 238:21 240: 2 248:16 249:12,19
**three-year** [1] 21:3
**threshold** [6] 55:9 58:12 68:22 84: 5 181:3,3
**throughout** [1] 10:18
**throw** [1] 134:14
**thumbs** [1] 196:16
**ticked** [1] 205:11
**ticket** [1] 43:25
**tied** [1] 250:6
**tighten** [1] 107:13
**till** [5] 192:11 193:9,9 246:14 247: 11
**timeframe** [1] 91:9
**tired** [2] 247:23,25
**title** [4] 71:20 98:12 227:16 230:21
**today** [9] 2:18 4:3,10 94:16 95:19 129:14,20 241:20 252:6
**together** [5] 151:12 245:4,19 249: 15,20
**token** [1] 202:10
**tom** [3] 74:15 177:9 181:5
**tomorrow** [3] 107:19 250:1,2
**tone** [1] 224:19
**took** [15] 5:18 37:6 58:2,9,22 79:24 92:23 96:11 106:24 163:5,25 164: 1 199:8 203:21 205:16 210:24 212:9



P.R. VIDEO, INC

**top** [8] 35:14 37:2,5 41:11 44:1 64:
5 145:7 195:8
**topic** [2] 190:23,24
**total** [1] 8:20 91:19 235:2
**totally** [3] 18:23 117:11 169:2
**touch** [3] 84:7 184:24 188:25
**touched** [2] 84:3 86:16
**tough** [1] 248:2
**tour** [2] 33:22 44:1
**town** [1] 250:1
**track** [1] 33:20 204:3
**traffic** [1] 249:13
**trailer** [1] 117:6
**train** [1] 197:25
**training** [12] 6:4 19:1,3 89:24 90:5,
8,13 91:15 92:3,8 240:9 241:25
**transcript** [2] 35:20 36:3
**transcripts** [3] 102:3,15,16
**transfer** [50] 8:12 9:5,9 11:24 12:
16,23 13:11 27:13 33:20 105:6,9,
18 106:2 107:16 185:7,12 187:16
188:12,19 189:14 195:18 208:17,
24 210:11,16,23 211:3,3,4 212:8,
20,24 214:21 217:13,13 220:1
223:8,9,12,14,19 224:5 225:22,24
227:18 228:1,4 232:1 233:22,23
**transferred** [41] 7:20,24 9:18 12:4,
6,8 15:4 21:16 27:12 28:3,13,16
105:3,7,9,12,23,23,25 107:19,21
108:2,3,6 163:24 164:20 185:20,
22 199:3 204:3 211:8 212:19 214:
2,5 223:17 224:1 229:12 230:7
238:7,15 239:6
**transfers** [8] 212:15 213:1 225:12,
15,16,20,21 226:20
**transpired** [2] 109:24 110:2
**transue** [2] 231:3,13
**travel** [2] 211:24 242:6
**travesty** [1] 117:7
**treat** [2] 70:13 76:22
**treated** [7] 70:5 76:2,3 86:15 118:
16 245:17,18
**tried** [3] 97:17 125:22 228:15
**trigger** [1] 121:5
**triggered** [1] 154:10
**tripped** [1] 114:18
**troop** [53] 7:7,20,20,24 8:8,9,12,17
14:18 16:6 18:1 19:7 20:24 30:7,
14 31:3,5,11,13,15 38:19 45:19
69:14 80:14 179:19 180:8 185:7,
22 187:22 188:6 189:14 195:10,
15,18 199:4 214:17 215:1,16 216:
2 218:2,9,14,18 219:13,19,22 220:
4,6,15 225:23 228:1 229:15 231:8
**trooper** [26] 6:23 7:2,5,14,19 22:8,
12 30:13 38:5 52:2,3,5 56:19 57:2
58:4,17 82:12 84:4 86:17,17 97:
16 135:18 136:5 147:23 173:2,6
**troopers** [4] 15:9 19:2 22:24 86:8
**troops** [4] 44:17 45:9,12 215:16
**trophy** [1] 37:1
**trouble** [6] 126:6 154:23 177:12
227:23 231:1,14
**true** [16] 55:10 58:14 63:1 68:23
81:10 90:7 112:11,14 118:20 121:

13 124:5,6 125:17 137:9 168:15
173:3
**truncated** [1] 104:17
**trust** [7] 80:19,24 94:4,18 95:2,8,9
**trusted** [1] 94:2,7,22
**truth** [12] 2:13,13 17:15 73:13 124:
16,18,23,25 174:5 246:5
**try** [18] 14:9,12 58:2,23 63:12 89:2
104:20 117:21 131:6 150:13 167:
14 170:19 175:7 178:1 194:6 203:
7 207:2 232:22
**trying** [37] 14:19 43:22 50:18 55:5
62:1 63:3,4 66:20 68:2 85:14 91:
13 97:25 102:5,24 112:19,22 115:
2 117:9,10 120:21 121:9 125:25
136:22 143:21 146:2 163:4 175:5,
16 176:16,20 177:18,23 194:5,10,
23 206:13 224:19
**tuesday** [2] 217:15 246:15
**turn** [4] 182:16 186:24 200:17 220:
14
**turned** [9] 12:25 13:4,5,6,8 46:5
200:25 212:8 221:19
**turning** [2] 13:21 220:18
**turnpike** [2] 220:14,21
**turns** [1] 120:15
**twelve** [3] 33:6 211:1 242:21
**twenty** [9] 32:23,25 35:25 36:8 38:
1 39:17 135:19 251:14,14
**twenty-eight** [1] 99:6 245:15,16
**twenty-five** [1] 35:10 64:2 69:23
**twenty-four** [1] 62:15
**twenty-nine** [1] 104:14
**twenty-seven** [2] 87:23 95:16
**twenty-six** [1] 76:5 77:9
**twenty-three** [1] 148:25
**twenty-two** [2] 39:20 43:16
**twice** [2] 6:22 8:18
**two** [58] 7:21 9:12 10:13 15:19 17:
24 18:13,15 21:4 27:18 28:25 30:
15,23 32:5 36:3,8 39:16 45:12 46:
2,3 62:25 63:18 67:3 71:1,2,3 75:
18 93:8,12 102:17 105:1 122:22
123:1,8 124:15 127:21 132:1,1,4
134:16 137:11 143:17 161:18 167:
20 168:18 184:3 186:9 190:15
192:11,12 194:13 195:5 212:3
215:11 226:8 238:21 242:20,22
250:5
**two-week** [1] 19:7
**two-year** [1] 21:2
**type** [9] 25:17 38:22 56:17 114:21
137:21 151:6 206:17 231:6 236:4
**types** [1] 133:7
**typical** [1] 212:5
**typically** [1] 188:4

---

**U**

**ultimate** [1] 46:25
**ultimately** [6] 41:13 58:21 73:19
76:19 116:22 178:7
**um-hmm** [4] 44:3 57:24 90:10 115:
21
**unable** [1] 225:5
**unambiguous** [5] 95:18,20,22,24

96:3
**unauthorized** [1] 204:12
**unbelievably** [1] 229:18
**unblemished** [2] 33:7 34:11
**unclear** [1] 194:16
**uncomfortable** [3] 218:17,21,23
**uncommon** [5] 15:9,14 41:12 86:
7,10
**uncovering** [1] 107:3
**under** [25] 4:9 11:19 27:17 62:7,8
93:2 122:17 123:12 130:21 133:
23 134:19,20 136:19 146:8 153:
15 165:19,22,22 180:12,12 182:16
194:8 212:24,25 223:21
**underline** [1] 43:17
**underlying** [5] 119:6,7 155:2 173:
22 174:5
**understand** [46] 4:7 14:9 30:21
46:17 54:4 58:11,24 62:1 66:19
67:16 85:14 87:16,18 88:5 115:3
116:12 124:24 126:20 135:23,25
136:16 140:8,12 143:16,22 153:4,
16 164:12 165:14 174:22 177:18,
25 184:9 185:3,17 199:23 202:22
205:9 206:14 209:1 225:15 227:4,
11 232:3,13 247:15
**understanding** [9] 24:14 46:12,
15 58:18 60:5 68:10 82:9 95:24
96:4
**understood** [3] 4:9 25:15 85:13
**unfortunate** [1] 86:11
**unfortunately** [2] 86:6 183:15
**unfounded** [3] 34:16,14 46:20
121:17 154:14 155:7 175:18 178:
8,21 179:9,13 180:18 183:13
**unfree** [1] 136:21
**union** [7] 138:14,14,15 147:5,5
148:8 157:19
**unique** [2] 120:19 137:5
**unit** [13] 7:7,22,25 8:2,9 14:14,16,
22 15:14,18 17:25 26:2,2
**united** [2] 1:1 2:21
**university** [5] 5:1,8,21 34:23 39:
12
**unknown** [1] 64:16
**unlawful** [5] 78:4 79:8,12 123:1
184:5
**unless** [4] 138:21 223:8 235:20
241:11
**unload** [1] 246:5
**unprofessional** [1] 117:14
**unreasonable** [5] 110:4,22 111:
10,14 251:16
**unsigned** [1] 76:15
**until** [14] 5:20 14:25 28:3 72:15 86:
4 93:5 117:6 139:25 200:13 205:
20 220:15 230:16 236:21 237:4
**up** [92] 4:16 15:15 20:22 23:25
23:3,23 24:22 25:19 26:7 33:7 34:
18 38:9 42:4 46:19 53:25 63:3,22
81:20 91:22 98:14 107:14 110:17
114:18 117:22 121:9,11 129:14
130:8 131:7,23 150:13 157:17
159:24 161:5 166:5 167:6,14 172:
25 177:4,17 181:6 182:13 183:3

192:22 195:24 196:17 199:17 201:
11 202:3 204:10,17 205:17,19
206:23 209:20 213:2 218:5 221:
24 224:23 227:23 228:21 230:19
231:12 241:20 250:6 251:19
**upper** [1] 212:6
**upset** [6] 112:3,6 113:13,18 114:1,
20
**upside** [1] 212:9
**uses** [1] 35:1
**using** [4] 98:5 172:4 173:11 207:
14
**usual** [1] 116:4

---

**V**

**vacancy** [1] 228:9
**vacant** [1] 228:16
**vacation** [1] 41:21
**vague** [1] 214:6
**value** [1] 142:17
**variety** [2] 19:11 80:16
**various** [4] 20:23 38:10 162:17
184:17
**vendors** [2] 229:6,10
**vengeance** [3] 198:20,24 208:12
**verbal** [2] 124:20 243:2
**verbally** [1] 243:2
**verbiage** [2] 66:11 235:21
**verification** [2] 177:8,10
**verify** [1] 183:16
**versus** [3] 1:7 2:23 165:16
**victims** [2] 16:7 22:20
**video** [7] 1:16 3:14 72:15,15 130:2,
20 249:6
**videoagrapher** [1] 3:11
**videographer** [3] 2:16 72:17,20
**videotape** [1] 93:11
**viewed** [1] 150:24
**viewer** [1] 21:16
**village** [1] 219:3
**vindicated** [4] 34:18 115:4,6 181:
7
**vindicating** [1] 177:17
**vindictive** [1] 184:3
**violated** [2] 109:10 184:4
**virtually** [2] 133:4 167:18
**virtue** [6] 40:8,14 91:12 144:9 214:
10 245:20
**visa** [1] 206:8
**visit** [6] 183:17 214:25 218:18 219:
1 229:15,17
**visited** [1] 193:10
**visits** [1] 22:20
**voice** [1] 250:10
**void** [1] 23:10
**volunteered** [2] 34:5,5
**vouchers** [1] 242:6

---

**W**

**w-a-u-g-h** [1] 238:2
**wages** [1] 239:3
**wait** [9] 28:2 67:11 72:14,14,14
113:1 127:6 215:4 244:13
**walked** [3] 196:16 205:16 221:19
**walnut** [1] 233:16
**walp** [1] 151:23

5

SHEET 1    PAGE 1

```
 1  2
 2        IN THE UNITED STATES DISTRICT COURT FOR THE
 3              MIDDLE DISTRICT OF PENNSYLVANIA
 4  DARRELL G. OBER          :      1: CV- 00 -0084
 5                           :
 6        Plaintiff          :
 7                           :
 8        Versus             :
 9                           :
10  PAUL EVANKO, MARK        :
11  CAMBELL, THOMAS COURY,   :
12  JOSEPH WESTCOTT,         :
13  HAWTHORNE CONLEY         :
14                           :
15        Defendants         :
16  DATE:                    December 6, 2001
17  PROCEEDINGS:             Video Deposition of
18                           Darrell G. Ober
19  APPEARANCES:
20  For the Plaintiff:       Donald Bailey, Esq.
21                           4311 N. 6th Street
22                           Harrisburg, PA 17110
23        For the Defendant:
24                           Syndi Guido, Esq.
25                           333 Market Street
26                           Harrisburg, PA 17101
```

PAGE 2

```
 1        This is the second day of the deposition of
 2  Darrell G. Ober.  The date is December 7, 2001.  The
 3  time is 9:13 a.m.
 4        My name is Crystal M. Lyde, L-Y-D-E.  I'm
 5  contracted out by PR Video, recording for Mr.Ober.
 6        Ok, Cindy, before we begin, I realize it's a
 7  continuation.  Just to get a since it is a second day
 8  though, if we could just get a quick identification of
 9  who's here.  Mr.Ober, the depo is here.  My name is Don
10  Mr. BAILEY, the attorney for the plaintiff Darrell G.
11  Ober.  I believe Colonel Conely is with us today as a
12  defendant.  Uh.Joanna Reynolds of the courts is here.
13  Lieutenant Rick Brown, is Rick ok?
14        Rick Brown:  Yes, that's fine.  My rank's a
15  Captain.
16        Don MR. BAILEY:    Ok.  Pardon me?
17        Rick Brown:   I'm a Captain.
18        Don MR. BAILEY:    You're a Captain now.
19  I'm sorry.I apologize to you.  Sincerely, I meant no.I
20  did not.My error, I'm sorry.
21        Rick Brown:   That's ok.  Ok.
22        Don MR. BAILEY:    And Cindy MS. GUIDO.
23  Cindy, can I get a voice check on you?
24        Cindy:   Uh, yea.  Can you here me?
25        Don MR. BAILEY:   Yup, gotcha.  Thank you
```

PAGE 3

```
 1  very much.  Thanks folks.
 2        Crystal Lyde:  Mr. Ober, I'll remind you
 3  you're still under oath from the other day.
 4        MR.OBER:  Yes.
 5        CINDY MS. GUIDO:    Ok, I'm giving.I put
 6  exhibit three back in front of you.  That's your
 7  complaint and I was going to pick up where we had left
 8  off, which is at the top on paragraph 46-F, on page
 9  fifteen.  And you state in here that you had been, in
10  paragraph 46-F, that you've been subjected to an
11  irrational baseless series of, I don't even know how
12  say the-tu-cro-tive?
13        A:   Thetucrotive.  I'm sorry about that.
14        CINDY MS. GUIDO:     Thank you.of personal
15  attacks on your character.  That's alright; it just
16  shows that my vocabulary's not what it should be.
17  Um.can you tell me who has attacked your character,
18  when and what they've said?
19        MR.OBER:  I believe what's referenced in this
20  subparagraph of counsel is, uh, perhaps as much related
21  to the actions of the defendants taken against me, in
22  addition to perhaps things that have been said or the
23  way I've been treated by this department.  The very act
24  of, excuse me, the, beginning with the interrogation I
25  was subjected to back in June of 99, right up to the
```

PAGE 4

```
 1  present day.  I believe I've.I think I have.covered a
 2  number of those things.  The investigations that have
 3  been taking, or the investigations that have been
 4  conducted on me.  Maybe I can give you an example.
 5  There's a pervasive atmosphere been created in the
 6  department amongst, particularly among the command
 7  staff, that I think is quite significant to discuss.
 8  In believe we might have discussed this on the prior
 9  page, on Wednesday.  If not, I'm sure we'll get to it.
10  We had talked about promotions and you had asked me
11  about Colonel Corey's role in that, and I believe I
12  mentioned to you that I competed on a. or participated
13  in a competitive exam process.
14        CINDY MS. GUIDO:     Yes.
15        MR.OBER:  .whether I could Major.  Colonel
16  Corey sent messages out to, well I'm not sure who they
17  all went to, but at the minimum at least an e-mail
18  message or a phone message or whatever went to my boss,
19  my Major.  When there was a promotion opportunity
20  available, now I had already participated in the
21  process and had been placed on the eligibility list for
22  that rank.  I subsequently come to find, in a
23  conversation with my boss, my Major, that he wanted me
24  to know, he's a stand-up guy.  He called me in.
25        Q:   Would this be Major Dewire?
```

SHEET 2   PAGE 5

1    A:    Major Dewire. And he told me that I was
2  not recommended, he did not recommend me for
3  consideration for a promotion. And I said, "Why? I've
4  already competed on the exam process and I've already
5  been placed on the eligibilty list? I thought that was
6  all that was necessary. I didn't know I had anymore
7  hoops to jump through." And he told me that the reason
8  he didn't recommend me to Colonel Corey for promotion
9  is that, he said, "We both know and everybody in the
10  department knows that you'll never be promoted under
11  this administration."
12    Q:    Now which, excuse me, I just wanted to
13  get some kind of time frame cause I was a little
14  con.I'm not sure which, uh.the other day we had talked
15  about two major spots.one being at LCE and the other
16  one being at BPR. And isn't Major Dewire the one that
17  ultimately got the major spot at LCE?
18    A:    Yes. Yes. This is after the.
19    Q:    Ok, so this is a different.
20    A:    Yeah, this is after he's been, he was,
21  he's my boss now. He's already.
22    Q:    I just assumed that there's another
23  Major position that was opened up.
24    A:    Well, I can't tell you the time frame.
25  I assume it was for the director of BPR. Maybe it was

PAGE 6

1  just
2        Simply moves that they were considering
3  making.I don't know. I guess you would have to ask
4  Major Dewire that. I'm not certain of that, but the
5  substance of this conversation.what I'm trying to
6  illustrate to you is that in that conversation he said
7  to me, "We both know that you're not going to get
8  promoted." And he said that, he said, "Did I sell you
9  out? Yes." He said, "I sold you out." But he said,
10  "It's not going to do me any good to alienate my boss
11  for your benefit when we know you're not going anywhere
12  and everyone else knows you're not going anywhere." He
13  said, "The most I can do for you or the best I can do
14  for you is try to help restore your career, to try and
15  help restore you in some way. I'm not going to be able
16  to accomplish that by alienating Colonel Corey.Corey."
17  Excuse me. And with that the conversation pretty much
18  ended.
19        MS. GUIDO:    Ok. Um.
20        MR.OBER:  As far as my job performance,
21  I'm also aware that his department has tried to, at
22  least.that this conspiracy to.to.that they have
23  conjured up to.in order to damage, damage my career.
24  I'll give you what I consider to be, again, just an
25  evil act on their part. They called Major Dewire over,

PAGE 7

1  Colonel Corey did. This would have been sometime in
2  the spring of this year, perhaps February or March.no,
3  I can tell you exactly when it was. It was after the
4  amended complaint was filed so subsequent to this date.
5  And the purpose of Major Dewire being called over to
6  Corey's office was to engage in a discussion with the
7  department psychologist and Colonel Corey as to my
8  fitness for duty.
9        MS. GUIDO:      Um Hm.
10        MR.OBER:  Our regulations say that
11  that's an action initiated by Troop Commanders and
12  Bureau
13        . And I asked Major Dewire "Is there any
14  reason, any rational basis for you to ever imagine that
15  my fitness for duty needs to be questioned?" And he
16  answered me, "No." Major Dewire is, as I said, a stand-
17  up guy. He's a man with a conscience and he's a man
18  who's going to the right thing and this troubled him
19  greatly.
20    Q:    Do you know who it was who
21  questioned your fitness for duty?
22    A:    Yes.
23    Q:    Who was it?
24    A:    Corey and.well I don't know who
25  extent of the conversation. Corey's the one who

PAGE 8

1  initiated the action. And I would assume, the one who
2  facilitated this meeting. But the purpose of this was
3  to try to attack my fitness for duty, based on my
4  filing and amended complaint on what you folks have
5  done by creating these regulations to further this
6  cover up on all these things that you're doing to me.
7    Q:    You mean subsection C?
8    A:    Subsection C of AR-11. I
9  exercise.pardon me.I, I amended my complaint, as
10  you're well aware, for the reasons that are contained
11  in this complaint and the reaction of the department
12  was to attack my fitness for duty.
13    Q:    Did anyone ever tell you that the
14  reason that they questioned your fitness for duty had
15  to do with your filing the amended complaint?
16    A:    No, maam, but.um..It's sort of; I
17  would say very.it's another one of those coincidences,
18  if you look at the timeline of actions taken against
19  me. That fits very conveniently. It seems as though
20  every time I try to exercise my rights, or exercise my
21  rights either through the court system or the grievance
22  process, something else is done to me. Some other
23  action is taken to try and squelch those attempts.
24  Corey had just signed off on an evaluation for me, I
25  don't remember the date.probably February, where Major

SHEET 3  PAGE 9

1  Dewire gave me an outstanding performance evaluation.
2  And I'm sitting here, as I was in my office then,
3  wondering, "What in God's green earth would ever cause
4  him to think there's a fitness for duty argu.question
5  to be raised on Mr. Ober?"  Although I was cautioned
6  about this a long time ago by my first attorney, having
7  dealt with vindictive police departments, and he told
8  me, "There'll be a time when they try to toss you off
9  the job saying, 'You're unfit.'"  And proved to be
10  correct, I guess.
11          Q:  Ok.um.as far as the time frame that
12  the meeting.what occurred about your fitness for duty
13  and the amended complaint, do you know if that was
14  days?  Weeks?  Months?  After it hap.can you give me a
15  better?
16          A:  Uh, I don't know specifically now.
17  My guess is it was days or weeks.
18          Q:  Ok.  And do you know, um, do you
19  have any personal knowledge of whether Lieutenant
20  Colonel Corey at that time had even received a copy of
21  the amended complaint that you filed?
22          A:  Do I have personal knowledge that
23  he received and reviewed the complaint?  No I don't
24  have personal knowledge of that.
25          Q:  Ok.

PAGE 10

1          MR. BAILEY:   You know his attorneys
2  did.
3          MS. GUIDO:     Oh yes, we can.I meant
4  him personally, as opposed to me, his lawyer.
5          MR. BAILEY:   Yea, ok.
6          MS. GUIDO:   Um, now with respect
7  to the attacks on your job performance.  You just
8  mentioned that Major Dewire had given you.an
9  outstanding job performance evaluation and that
10  Lieutenant Colonel Corey had signed off on that job
11  performance evaluation.
12          MR.OBER:  Yes.
13          Q:  Have you ever received a bad performance
14  evaluation?
15          A:  No.  Not.I'm sorry.  Go ahead.
16          Q:  Now I was.you haven't ever received a
17  bad performance evaluation and so I was wondering, in
18  what other form did attacks on your performance occur?
19          A:  I believe I've testified that at least
20  on two occasions, related to this lawsuit, I've been
21  confronted by Majors who think unkindly with respect to
22  the FBI investigation.  Uh, what have.
23          Q:  Ok.  So, there's attacks that we've
24  discussed of them criticizing you for the way that you
25  handled the FBI investigation?

PAGE 11

1          A:   Correct.
2          Q:   Other than that, other than your
3  handling of the matter that blocked about the lawsuit,
4  have there been other attacks on your job performance?
5          MR. BAILEY:    Objection.  The
6  characterization of the lawsuit.  May respond.
7          A:   Other attacks on, well, actually there
8  were.  Colonel.then Major Conely's attacks on the FBI
9  Investigation were a little broader than that.  He
10  actually made references, I believe his verbage was
11  that I had.he had come to find that I had mishandled a
12  number of things, a number of investigations while I
13  was in.assigned to internal affairs and what have you.
14  And that's the first I had heard about it.  And I, I
15  followed that up with, "Exactly what investigations are
16  you referring to?  What is it that you're alleging that
17  I've done wrong?"  But he was unable to supply me any
18  specifics.  Um, maybe, let me.I think what you're
19  asking me is perhaps something related to today,
20  someone attacking my job performance, and I don't
21  believe so.
22          Q:   Ok.  And you haven't ever been given any
23  kind of reprimand?
24          A:   No.
25          Q:   A counseling session?

PAGE 12

1          A:   Well, other than the two incidences I've
2  described of being confronted, uh, no.  Attacks on my
3  job performance maam, I would still, I would include as
4  a reference to those attacks, the mere fact that I'm
5  being transferred willy-nilly, uh, here and there, and
6  being demoted.  I mean those are certainly attacks on
7  my performance the way I view them.  Because if you put
8  a Captain in the state police in a job that has always
9  and will always be performed by a Lieutenant, and every
10  other like job in the department has a section
11  commander, that's performed by a Lieutenant.  To me, I
12  take that as an attack on my performance.
13          MR. BAILEY:    When you said counseling
14  session, I assume you meant within the typically formal
15  confines as defined by the labor.or management
16  agreement.
17          MS. GUIDO:    Correct.
18          MR.OBER:  Yes.  I'd like to speak to
19  that maam.
20          MS. GUIDO:    Ok.
21          MR.OBER:  I was confronted off the
22  record, so to speak.  And what's troublesome for me
23  throughout this whole ordeal is, I'm well aware by now
24  about that the criticisms of my actions are, what
25  Monday morning quarterbacking, what have you has been

SHEET 4   PAGE 13

1  done with respect to my decision making.  But at no
2  time have I ever been called in.  At no time has anyone
3  ever, in the chain of command, called me in, sat me
4  down face to face and said, "Tell me about what you
5  did.  What your decisions were.  I either liked or I
6  didn't like it."  There was no performance evaluation
7  issued to me where I got a negative evaluation for
8  following regulations that either exist or don't exist.
9  I was never given a supervisory notation.  I was never
10 put in any kind of formal process including the
11 discipline process.  Our discipline process, our
12 discipline system is a very specific document, a very
13 specific design and none of that was done.  In order to
14 circumvent those rules we just jumped to the end of the
15 process and disciplined me.  That's what I have such
16 strenuous objections to.  I had another point, but I
17 lost it.
18           Q:  Just skip up to the next paragraph,
19 paragraph G.  Which is about being denied opportunities
20 to improve your career through promotion or transfer.
21 Is there anything other then what we've already
22 discussed?  In other words, I'm not trying to rehash
23 everything we've discussed before, but if there's other
24 things we haven't covered I need to know that.
25           A:  I think the one area we haven't explored

PAGE 14

1  is I had applied for the legislative liaison, Director
2  of the Legislative Liaison Office position in January.
3           Q:  Of 2001
4           A:  No 200
5           Q:  Okay
6           A:  That position was open when Major Morris
7  retired.  I made an inquiry of Major Morris.  I said
8  well how exactly do you get that position cause I
9  wasn't certain, and he told me that the way he did or
10 how his familiarity with the process was that I would
11 express my interest by way of memo to the Commissioner
12 or the Deputy.  That part I can't recall.  I did that.
13 I'm aware the several other individuals applied for the
14 positions.  I'm aware that several individuals were
15 interviewed or moved along in the process somehow.  I
16 don't know exactly how that works.  I'm also aware that
17 they were supplied background information to prepare
18 them for subsequent  interviewing and whatever that
19 process amounted to.  I applied for that position and I
20 to this day I've never heard anything about whether I
21 was considered, thanks for applying, or no thanks we're
22 never going to consider you.  I have no response what
23 so ever on the behalf of the department.
24           Q:  Do you know who ultimately makes the
25 decision as to who the Legislative Liaison is going to

PAGE 15

1  be?
2           A:  For certain I don't know.  I assume it's
3  the Commissioner.
4           Q:  But you don't really know whose call
5  that is?
6           A:  No maam I wouldn't know that.
7           Q:  And a Legislative Liaison is a person
8  that works with both the legislature and with the
9  Governor's Office.  Is that your understanding of the
10 job?
11          A:  My understanding of the position is I
12 guess in those general terms.  They work primarily with
13 the Legislators and the House and the Senate in that
14 facilitator role bill analyst and what have you.
15          Q:  And that position that had held by a
16 Major when Major Morris retired is now a Captain's
17 position.  Is that right?
18          A:  A Captain is filling the position.  I
19 don't know if that's the same as it's a Captain's
20 position, but a Captain is there, yes.
21          Q:  Okay, and that's Captain?
22          A:  Miller
23          Q:  Miller?
24          A:  Yes
25          Q:  And Captain Miller has never been

PAGE 16

1  promoted to Major in that position, in order to take
2  that position?
3           A:  I'm sure much to his chagrin yes.
4           Q:  Now on paragraph I you made the general
5  allegation of discrimination accusing them of fostering
6  retaliation, resentment, officially sanctioned
7  harassment through petty humiliations, etc.  Is there
8  anything that you're referring to there that you have
9  not already described to me?
10          A:  Probably not.  I suppose, let me read
11 this.  Maybe my answer is best framed in proving
12 another illustration or example.
13          Q:  Okay
14          A:  As I testified to on Wednesday, I'm not
15 afforded the opportunity to perform in the role of
16 acting Bureau Director consistent with my peers.  One
17 of the thing that in addition to the monetary impact
18 from the deprives for myself and my family, in addition
19 to the one of the, I believe I might have testified to
20 generally this affords one a career opportunity to
21 learn the next highest position, help prepare them for
22 advancement.  One of the other things I was thinking
23 about after Wednesday is there is also an opportunity
24 to interact with your peers.  I'll give you an example.
25 During those times when Captain McDonald or whom ever

1  would be the acting they would attend the
2  Commissioner's biweekly staff meetings when they're
3  held.  I guess from where I'm sitting there's just no
4  room for me at that table.  I haven't be allowed or
5  afford the opportunity to attend those staff meeting
6  since this occurred.  I noticed that even when Major
7  Dewire is on duty, meaning not on leave, there has been
8  times, there has been instances that he has been away
9  for maybe other meetings the superseded or there was
10 higher priority for him to be at.  Maybe with the board
11 or whatever I can't sit here and tell you exactly what
12 those meeting were, but there have been times when he
13 was available that Captain McDonald wasn't acting in
14 the acting role that he still sends Captain McDonald to
15 these meeting.  When I tried to describe for you the
16 environment and the reality for me in this department
17 that kind of really sums it up for me.  There's just no
18 room for me at the table.  These defendants have
19 created an environment as I've testified to on
20 Wednesday where I'm shunned, where I'm ostracized.  We
21 have people in this room that where my friends.  People
22 in this room that have been at my house.  I can no
23 longer have a conversation with them, because this is
24 always between us.  So many people have guarded
25 conversations with me.  I was assigned to department

1  headquarters about ten years or so give or take.  My
2  wife retired from the State Police.  She worked at that
3  building for a number of years.  I've tried to describe
4  for you Wednesday and I'll try to describe for you in
5  more detail today if you need me to, what it feels like
6  to go into a building where you know people either
7  don't want you or your moves are being watched.  Or
8  you're made to feel like you don't belong.  I know a
9  good many people in that building.  I know they a lot
10 of them are human beings, being what they are.  Human
11 nature being what they are.  Many of them their first
12 concern is themselves.  They're not willing to put
13 themselves at risk by being seen with me, and that
14 happened with Major Pudliner as I recall.  Going back
15 to an earlier paragraph to illustrate the point.  I
16 attended a e-business meeting at the Bureau of
17 Technology Services.  When was that?  I don't know.  I
18 think it was August of last year.  I can't recall.
19 Major Pudliner had just been promoted or had just
20 received his offer of promotion on of those two, but I
21 was in the hallway with him, he and Major Hackenburg.
22 Major Pudliner have served in a couple troops together.
23 We didn't actually work side by side, but we I know
24 each other from similar troop assignments, and when I
25 saw him I congratulated him on his offer or his new

1  position and we chit chatted a little bit.  The
2  Commissioner walked by.  Of course he knew spoke to
3  Hackenburg and Pudliner, but he didn't acknowledge my
4  existence.  When he turned the corner Major Pudliner
5  and Major Hackenburg started talking.  You know they
6  started joking like " boy it's a good thing the Colonel
7  didn't stumbled on you two talking a week ago or you
8  would never had received that call".  On the subject of
9  these kind of joke.  Like near association with me is
10 not only do I have a career impact, but it could impact
11 someone else's career.  I'm sure these folks don't
12 realize the hurt.
13      MR. BAILEY:  Do you mean by associating with
14 you someone might be harmed?
15      A:  That's just almost word for word what
16 they're telling me.  He's told me "thanks heavens he
17 didn't see me talking to you a week ago".
18      MS. GUIDO:  Do you know whether or not, in
19 your complaint you said these were officially
20 sanctioned actions of harassment etc.  First of all do
21 you know whether or not anyone of the defendants have
22 instructed anyone at the State Police to treat you that
23 way?
24      A:  Well I haven't been setting in the room
25 when those orders have been given, but I am very well

1  convinced that the deeper we get into this suit we'll
2  most likely find that that's occurred.  Maybe I can
3  summarize it best for you like this.  Major Dewire, I
4  was talking to him one time and he said, "You know" he
5  said "it was made very clear to me when I took this
6  position how to treat you"  I don't know who told him
7  that.
8      Q:  Do you know what was told to him,
9      A:  No I don't
10     Q:  about how to treat you?
11     A:  I don't, but I don't need to because
12 there would be no reason to say that to anybody.
13     Q:  I'm asking do you know
14     A:  No
15     Q:  whether or not anybody
16     A:  No.  I didn't mean to challenge you.
17 No, he didn't offer.  I didn't ask.
18     MR. BAILEY:  Give her a little time.
19     A:  Sorry
20     MR. BAILEY:  That's okay
21     MS. GUIDO:  Have you, I don't know if there
22 is an official process for doing these, but have you
23 ever lodged a complaint?  When you say it's officially
24 sanctioned harassment, have you ever lodged a complaint
25 with in the State Police that you're being harassed and

1 then nobody's doing anything about it?

2        A:   I've lodged many complaints in the State

3 Police, maam.  I've filed a total of six grievances.

4 Wait a minute.  I believe that's correct.

5        Q:   Other then those formal grievances that

6 you filed has then been anything like maybe where you

7 sent a memo or just a verbal conversation where you

8 said, "Hey would you tell people to knock off making

9 the jokes about me?" or anything like that?

10       A:   No.  If I thought that action would

11 produce any result what so ever, but by now I'm

12 convinced that the only remedy for me is in the process

13 that we're currently engaged in.  I've tried to exhaust

14 all reasonable attempts to stop the defendants'

15 actions, and that has not occurred.  So I've taken

16 steps that I feel like I need to.

17       Q:   You've mentioned a number of times that

18 you received.  Even during the period, well let me ask

19 you.  Has your pay even been reduced?

20       A:   No.  My salary has never been reduced.

21       Q:   That's what I'm saying.

22       A:   I don't make the money that I would have

23 had I not been booted of for example the PEMA

24 assignment.  Or had acting opportunities to perform the

25 function of the acting Bureau Director, if that were

1 afforded to me.  So I'm not earning the amount if money

2 that I should.

3        Q:   If you had the overtime or the acting.

4 On your actual pay you're never got a salary cut?

5        A:   No, my pay grade or.  I know what you're

6 asking.  The answer is no.

7        Q:   And you've always retained the rank of

8 Captain?

9        A:   In title only.

10       Q:   But it's never been taken from you.

11 Even when you where as a Lieutenant they didn't make

12 you start going by Lieutenant Ober, correct?

13       A:   Officially no, but as you just described

14 I was performing the function of a Lieutenant.

15       Q:   Okay

16       A:   I was permitted to keep my rank title.

17       Q:   And that was for about three or four

18 months?

19       A:   But I wasn't afforded the opportunity to

20 retain the reasonsibilities commenced with a rank of

21 a Captain.  That was for a period of three or four

22 months.  That's correct.

23       Q:   And in sub-paragraph J again you've

24 talked about the numerous actions that were meant, that

25 the defendants have made numerous actions meant to harm

1 you.  Is there anything else other then what we've

2 discussed that's being referenced in that paragraph?

3        MR. BAILEY:  Is it J Snydi?

4        MS. GUIDO:  Yes

5        MR. BAILEY:  Sit back for a moment thinking.

6 That's the last sub-paragraph.  Just so you know

7        MR OBER:  Well when I look at paragraph J,

8 yeah we probably have covered a lot of ground by now.

9 I'm not sure this is the place to discuss this or not

10 ma'am, but I would mention as an example of what I

11 believe we're talking abut here again I can maybe best

12 illustrate what life is like for me in the State Police

13 right now.  In December of 2000 a memo came from the

14 Chief Counsel's Office to our bureau, presumably to our

15 Bureau Director.  I don't recall exactly who it was

16 send to, but I believe that's the routing.  I appointed

17 me as the contact person for a civil suit that had been

18 filed against the department, pardon me, in the

19 Lieutenant Houston William's case, sexual harassment

20 case.  That appointed me to that role cause that's

21 function of the position that I currently have, The

22 Administration Division and the Bureau of Liquor

23 Control Enforcement.  I'm the Labor Relations or Labor

24 Liaison Officer whatever the specific title is, but I

25 manage grievances and again perform the role of contact

1 person like I just described.  This lawsuit was filed

2 the next month of January 2001.  I believe.  A few

3 months ago there was reversal of the department's on my

4 role as a contact person for that lawsuit.  That I

5 could no longer serve in the role of a contact person.

6 Now when that news come to me I have to push myself

7 away from my desk and say "Why not?".  There's no

8 legimate, there's no rational reason for me to not be

9 able to perform a job that I've been empowered to

10 perform.  That's I've been assigned to perform.  I had

11 probably talked to Houston Williams a grand total of

12 six sentences on my entire career.  The victim of this

13 case I don't even know.  I wouldn't know her if she

14 walked through the door.  You know, and I see things

15 like this and I ask myself now these defendants have

16 sat about and charted a course of action that takes

17 practically every meaningful responsibility I use to

18 have away form me, and it's irrational.  There's no

19 legitimate purpose for that, but its gets even worse

20 ma'am.  Now let me please finish.

21       MR. BAILEY:  Let him answer, please.

22       MR. OBER:  This is an example.  When I see

23 paragraph J these are things that come to mind.

24       MS. GUIDO:  I just wanted to clarify your

25 answer.  I wasn't keeping you from fully answering.  I

SHEET 7   PAGE 25

1  just wanted to, but are you moving on from the contact
2  person? Cause I do have some questions about that.
3          MR. BAILEY: I'd like to let him finish
4  please.
5          MR OBER: I'll be happy to come back to it.
6  So I'm removed as the contact person. Now this duty by
7  virtue of the position that I hold, suppose to perform
8  is given to someone else. I assume it was given to
9  Captain McDonald. So now we're taking my work and
10 giving it to someone else. The adjudication comes
11 through, the case is finished, the administrative case
12 is finished following the criminal following the
13 process that's designed by regulation. I'm aware that
14 there was a discussion, I believe it was between
15 Captain Brown I could be wrong. I'm aware there was a
16 discussion between Captain Brown and Major Dewire about
17 the adjudicator. Typically in our bureau the Captain
18 who's the Director of the Operations Division would be
19 the adjudicator in cases emanating from the Operations
20 section, but it would a Captain. Unless one of the
21 Captains were some how implicated, and that's what
22 happened here. Captain McDonald was interviewed in
23 some form of capacity. I have no idea. I wasn't there
24 when all this happened. Don't know anything about what
25 was said, who was said. Son there was apparently a

PAGE 26

1  discussion about whether it served the department's
2  interest or needs to have Captain McDonald adjudicate
3  this case. It was decided that he shouldn't adjudicate
4  it. When I walked in on this conversation I
5  volunteered. I said "Well I'll do it. I'm a Captain.
6  I think I have the background and experience to do
7  that." To me that was the next logical thing to occur,
8  cause that's the role of the Captains and the role that
9  my peers perform. I was told that when that was
10 suggested to whether it was Captain Brown or the Deputy
11 or whom ever that's it was just laughed at.
12         Q:  Who told you that?
13         A:  Major Dewire
14         Q:  Okay
15         A:  Here's the function ma'am. Here's the
16 responsibility that I was volunteering to do, and I was
17 hazard to say probably most of my peers that's not
18 something they enjoy doing. But my point is there's no
19 rational reason in anybody's mind to suggest that I
20 would not do my level best to perform that function in
21 the department's best interest. In other words, these
22 are people that I don't know, I never work with, I
23 wasn't interviewed, I wasn't even there. In fact I
24 would be the ideal candidate, but yet this department
25 tells me I'm not suited for that and I set in here

PAGE 27

1  wondering why. What is it about what they've done to
2  my career that they send that message. Cause when they
3  don't let me do that it's not as though I'm the only
4  one who's aware of this. They create this environment
5  where then other people know. Then I'm subjected to
6  their whatever ideas about me that they're forming,
7  good or bad, but my point is I should never be
8  subjected to any of this. I'm sorry you had some
9  follow up on
10         Q:  Yeah I was wanting to back to the
11 question about the you being the Liaison with the Chief
12 Counsel's Office in that particular lawsuit.
13         A:  Yes
14         Q:  Who would you have to work with on that
15 case? If you were still the Liaison with the Chief
16 Counsel's Office who would that require who to work
17 with?
18         A:  I'm sure someone from either the Chief
19 Counsel's Office and PSP or I believe that case was
20 actually handled by the AG's Office, but I'm not
21 certain. If it was in that memo I just don't recall.
22         Q:  There's not a lot of attorneys in the
23 Chief Counsel's Office, are there?
24         A:  No
25         Q:  Okay

PAGE 28

1          A:  I'm sure they think they don't have
2  enough.
3          Q:  I think there's maybe five, something
4  like that? Does that sound right?
5          A:  That's close sounds close enough.
6          Q:  And certainly one of the senior
7  attorney's in that case is Ms. Reynolds, is that
8  correct?
9          A:  Yes
10         Q:  And Ms Reynolds is the very person that
11 you've accused of engaging in illegal activities and
12 conspiring with her clients to change regulations and
13 perpetrate a fraud on the court, correct?
14         A:  Correct
15         Q:  And you don't think that that would be
16 an uncomfortable situation for you to be the Liaison
17 with the Chief Counsel's Office?
18         A:  I don't see why it would be. It
19 wouldn't propose a problem for me.
20         Q:  You wouldn't be uncomfortable in working
21 with the people that you've accused of engaging in
22 illegal contact. Is that what you're saying?
23         A:  That's essentially what I've been doing
24 for the past two or three years, ma'am.
25         Q:  But don't you think that maybe the

SHEET 8  PAGE 29

1  attorney would have a problem working with you when you
2  don't trust them.  You have so little trust that you
3  think that one of PSP's lawyers would actually conspire
4  to change regulations to perpetrate a fraud on the
5  court.  That's your opinion of the attorney.
6  Wouldn't you think that person might be
7  uncomfortable with you?
8         MR. BAILEY:  Before you respond.  Let me
9  object to the form of that questions as argumentative.
10 We'll be doing a lot of discovery and we'll be getting
11 into some of these issues at a later time.  But I thin
12 that what you're doing counsel is instead of letting
13 him respond you in effect testifying.  You're frame of
14 reference and characterizations of the accusations made
15 in the complaint, which incidentally where drafted by
16 counsel and briefed by counsel not by Mr. Ober, but the
17 allegation certainly was.  The allegation relates to that
18 somebody, and we believe Joanna Reynolds and yourself,
19 inappropriately manipulated information and presented
20 it in a representation to the court.
21        MS. GUIDO:  I understand that.  You know,
22 you're accusing me of testifying.  I'm really objecting
23 to the way you continually.  You rephrase questions in
24 a way that I haven't framed them so that you can signal
25 you're the answer to him etc.

PAGE 30

1         MR. BAILEY:  No
2         MS. GUIDO:  That's all you're doing right
3  now.  It's a very simple question that I'm asking him.
4  He's testified that there is no reason that he can
5  think of why you shouldn't be the Liaison with the
6  Chief Counsel's Office.  All I'm asking you is wouldn't
7  a reasonable person think maybe it would be
8  uncomfortable for these lawyers, who I accused of
9  illegal activity, maybe it would uncomfortable for them
10 to have to work with you.  Yes or no?  It's easy.
11        MR. BAILEY:  First of all counsel, I do have
12 to respond to that.  Your question was compound,
13 prolix, complex, and multi-facetted number one.
14 Secondly it's obviously a personal issue, and I
15 apologize for that.  I also would like to apologize to
16 you if I appear at any time trying to couch or lead
17 my witness and I will double my efforts to refrain from
18 even appearing to do so.
19        MS. GUIDO:  I don't think so
20        MR. BAILEY:  But let me add this.  Regardless
21 of what reasonings may have been behind it from the
22 Captain's point of view in terms of the allegations.
23 This needs to be said on the record directed at you and
24 Joanna Reynolds.  They were based on objective fact
25 gleaned from the recorded, gleaned from written

PAGE 31

1  materials, and gleaned from fact surrounding these
2  proceedings.  There is no reason to believe that a fine
3  lawyer like yourself and a fine lawyer like Joanna
4  Reynolds can not objectively separate themselves
5  whether they be accusations or complaints.
6         MR MS. GUIDO:  Right now you're answering
7  question that I would like the witness to answer.
8         MR. BAILEY:  Alright, I will
9         MS. GUIDO:  He said he can't think of any
10 reason.  You're thinking of reasons for him.  I'm
11 asking you now to do that.  I'm asking the witness to
12 tell me that reason.
13        MR. BAILEY:  He already told you no.
14        MS. GUIDO:  He says he can't think of
15 reasons.
16        MR. BAILEY:  He said he didn't think there
17 was any reason.
18        MS. GUIDO:  I'm asking isn't that a possible
19 reason that it would be uncomfortable to work with you
20 when you think that an attorney, a senior attorney in
21 that small legal office would engage in illegal
22 contact.  You can't think that that would be
23 u8ncomfortable?
24        MR. BAILEY:  Let finished this way.  I'll
25 state the objection this way and then I will just let

PAGE 32

1  you go on, okay.  You're asking him to speculate on
2  what's in your mind or Joanna Reynolds's mind.  He is
3  not competent nor is any other human being on this
4  planet competent to testify to the subjective
5  considerations in the minds of another human being.  I
6  object on those grounds.
7         MS. GUIDO:  Alright
8         MR. BAILEY:  Okay, Mr. Ober
9         MS. GUIDO:  Your objection
10        MR. BAILEY:  My objection's noted.  You go
11 ahead and respond completely and fully.
12        MS. GUIDO:  Can I just say what my question
13 is?
14        MR OBER:  I think I got it.
15        MS. GUIDO:  Okay, you said you can't think of
16 any reason and I'm saying to you, so it's not in a
17 leading fashion
18        MR OBER:  I understand what you're asking.
19        Q:  Okay
20        A:  Maybe I shouldn't be so generous, but I
21 think I get what you're after.
22        Q:  I think we all understand what I'm
23 saying.
24        A:  I've worked with Joanna since some of
25 these actions have been taken.  In other words, the

1 dilemma that you just posed presumably wold have been
2 the same dilemma when she was counsel for me when I
3 testified at the Stackhouse deposition. Whenever that
4 was.

5       Q:   Was that before or after your amended
6 complaint?

7       A:   I'm getting there.

8       Q:   I'm just trying to get a time frame
9 here.

10      MR. BAILEY:  Let him respond please.

11      MS. GUIDO:  Well, we can do that. I think I
12 have aright to clarify my question and your answer.

13      MR. BAILEY:  Well, he has a right to respond
14 to the question that was originally posed

15      MS. GUIDO:  I have a right to clarify what
16 he's answering.

17      MR. BAILEY:  and he can consider your
18 clarification, but that's a separate question. You
19 want to respond fully and completely Captain, please.

20      MS. GUIDO:  And I think I've been allowing
21 you to fully and completely answer your responses and I
22 think that's one of the reasons why we're taking so
23 long. Because I'm trying not to cut you off and let
24 you fully answer questions. But I do have a lot of
25 questions of you as well, and we may never get through

1 them if.

2      MR. BAILEY:  Oh, we'll get through them.
3 We're going to give you time. We're going to get
4 through them.

5      MS. GUIDO:  Okay and long as we have that
6 understanding. I don't have a problem with letting you
7 answer. As long as I get to ask my questions you can
8 tell me as much as you want.

9      MR. BAILEY:  We're not going to be effected
10 by time. Let's go back to it. He knows what you're
11 asking and he was responding.

12      MR OBER:  I was just sort of trying to build
13 a foundation for you. Yest that was before this suit
14 was filed and of course before Ms. Reynolds was named
15 as a defendant in the suit. My point is that, at least
16 as professional as I would imagine that we would be
17 able to work together. I have been subjected to
18 working for this department and doing the best that I
19 can for the past two or three years. In essence
20 working with the defendants in this case. If you have
21 a point, let me try to give you a counter point to
22 that. If Joanna Reynolds has a problem with that how
23 is that then my problem? Because what this whole
24 paragraph is about and a portion of this suit speaks to
25 the fact that the meaningful responsibilities that I've

1 testified to that get stripped from me. There is
2 nothing to suggest, other then what you've pretty much
3 told me, that would be the reason to make a decision to
4 remove me from a job function. That's because she may
5 be uncomfortable. Well, if that's all I got to tell
6 you that's her problem. That shouldn't amount to me
7 now having my duties taken from me because she's got a
8 problem with working with me. This is a phone
9 relationship and I would be very anxious to ask Captain
10 McDonald exactly what did you o anyway. What did this
11 amount to? I don't know what was done, because I
12 wasn't permitted to perform the role, but if it's
13 generally and I can't say specifically or when but
14 generally when someone is appointed in that Liaison
15 role this is a gathering documents. We have a
16 deposition next week and we need this or we need that.
17 It's hard for me to conceive that by December of 2000
18 that this whole case against Houston Williams wasn't so
19 mature that there was really not a whole lot practical
20 to do anyway.

21      Q:   Would you or would you not, I'm asking
22 what you would do. Would you have a problem working on
23 a case with someone who believed that you would do
24 something unethical and illegal?

25      A:   In this situation?

1 them MR. BAILEY:  Objection, you may respond.

2      Q:   If you know someone believed that you
3 would do something that was unethical and illegal, but
4 that you would intentionally something unethical and
5 illegal would you have a problem working with that
6 person?

7      A:   That's such a vague hypothetical, I
8 don't know if I can answer that. What I can answer for
9 you as in this situation that's I've just described.
10 The situation involving my role as a Liaison in this
11 Houston Williams case, I would have no problem working.
12 You've asked me a question I can't possible fathom the
13 answer to, because there's no boundaries to that
14 question. At least in my opinion.

15      Q:   It's just inconceivable to me that you
16 can't answer that question. That if somebody accused
17 you in writing in court of fraud and illegal activity
18 that you would still want to work with them and say no
19 problem we'll still work together. You have no answer
20 to that?

21      MR MR. BAILEY:  Objection

22      MR OBER:  I have answered that.

23      MR MR. BAILEY:  Objection, and I'm going to
24 respond again if he wants to respond. But I think he
25 has already answered the question, which is really

SHEET 10  PAGE 37

1 argumentative anyway.
2         MS. GUIDO:  What makes you think that Ms.
3 Reynolds wrote the brief for which you've accused her
4 of fraud?
5         A:  Ms. Reynolds apparently told my attorney
6 that.  I'm not sure what I'm allowed to say and what
7 I'm not allowed to say.  When there was a discussion
8 about..
9         Q:  So you know it from your attorney?  Do
10 you know it from any other source, is that I'm saying?
11         A:  No
12         Q:  In your brief, excuse me, in your
13 amended complaint you give a date as of March 9, 2001
14 as when Ms. Reynolds sent a draft to me of the brief.
15 How could you possible know on March.? How could you
16 possible come up with the date of March 9th?
17         A:  I believe that that came from you in a
18 discussion with Mr. MR. BAILEY.
19         Q:  You think that I told Mr. MR. BAILEY
20 that Joanna Reynolds sent me a draft on March 9, 2001?
21         A:  That's were I got it from
22         MR. BAILEY:  Counsel I had a conversation.
23 Well, I put it to you straight.
24         MS. GUIDO:  We know the conversation.  I'm
25 saying the date because I didn't know till your amended

PAGE 38

1 complaint came out what the date that I saw anything
2 was.
3         MR. BAILEY:  That's right.  Because I had a
4 conversation with Joanna Reynolds, I believe, or that
5 office and I was told directly when the draft went over
6 to your office because I was complaining about how late
7 it had been delivered to us.  You had a date or there
8 was a date on that draft.  Wait a minute counsel you
9 raised this.
10         MS. GUIDO:  I'm more then happy
11         MR. BAILEY:  Oh, I more then happy
12         MS. GUIDO:  I mean you're testifying.  I'm
13 asking your client.
14         MR. BAILEY:  Your dog gone right, because you
15 were testifying and I'm going to respond to it.
16         MS. MS. GUIDO:  I'm not testifying.
17         MR. BAILEY:  You're not going to use
18         MS. GUIDO:  I'm asking him how he knows March
19 9th.
20         MR. BAILEY:  Counsel
21         MS. GUIDO:  If the answer is I don't know
22 March 9th.
23         MR. BAILEY:  Counsel don't
24         MS. GUIDO:  that's the answer
25         MR. BAILEY:  Please don't interrupt me.  You

PAGE 39

1 posited a question here?
2         MR MS. GUIDO:  No
3         MR. BAILEY:  Alright
4         MS. GUIDO:  I posited a question to you
5 client.
6         MR. BAILEY:  Ma'am would you slow down and be
7 unexcited?  This lady's
8         MS. GUIDO:  We can discuss separate.  If you
9 want to testify, fine.
10         MR. BAILEY:  Now you see what you've just
11 done.  This lady's trying
12         MS. GUIDO:  Yes I see what I've just done.
13         MR. BAILEY:  Well, yeah you're losing your
14 composure.
15         MS. GUIDO:  I think we need a five-minute
16 break,
17         MR. BAILEY:  I think you need a five-minute
18 break.
19         MS. GUIDO:  because I'm not asking you to
20 testify.  I am asking your client questions.
21         MR. BAILEY:  Ma'am let me tell you something.
22 We are going to complete this record.  I object to your
23 activities.
24         MS. GUIDO:  We taking a five-minute break.
25         MR. BAILEY:  I'm telling you you're going to

PAGE 40

1 be in trouble.
2         MS. GUIDO:  We'll go back on the record.
3         MR. BAILEY:  Oh, we're still on the record my
4 tape recorder's still running.  You come back.
5         -----OFF RECORD 9:59 AM-----
6         MR. BAILEY:  Let me respond and I'll try to
7 be very brief.  During the in waiting the brief I had
8 initiated a phone call.  When we received a brief we
9 noticed.
10         MS. GUIDO:  I want to object to counsel
11 testifying at his client's deposition.  I have a strong
12 objection to that.  If that is going to continue all
13 day we're going to have to halt the deposition.  It can
14 not continue that way.
15         MR. BAILEY:  Well
16         MS. GUIDO:  You're couching your client.
17 Your given him the answers, and if the answer is that
18 he don't know how the date came up then the answer is
19 that he doesn't know how they came up with the date.
20 It isn't proper for you to sit here and explain it to
21 him.
22         MR. BAILEY:  Well, I'm not explaining it to
23 him.  You made a series of very very argumentative
24 inquiries of Mr. Ober and he had indicated

SHEET 11   PAGE 41

1  MS. GUIDO:  I already explained that to him.
2  Okay let him leave the room then.
3  MR. BAILEY:  Okay.  Sure.  Darrell
4  MS. GUIDO:  Because you are explaining
5  everything, and if you just want this on the record put
6  it on the record.  I don't care, but I do care about
7  you coaching you client.
8  MR. BAILEY:  Please get unexcited counsel.
9  MS. GUIDO:  Well, then quit doing things that
10  are unethical and improper.
11  MR. BAILEY:  I'm not doing anything unethical
12  at all.  As a matter of fact I think you might have a
13  problem.
14  MS. GUIDO:  Well you may think that, but I
15  think it is completely improper for you to testify at
16  your client's deposition.  If the answer to the
17  question is he doesn't know how anybody came up with
18  the date, that's fine.  That's his answer.  I don't
19  have a problem.  We don't need you to explain how it
20  came about.
21  MR. BAILEY:  Would you be kind enough to just
22  let me finish my sentences then of course you may
23  respond and say whatever you please?
24  MS. GUIDO:  No, because by doing that you put
25  on information.  I've been letting you do that this

PAGE 42

1  whole time.  Every time you keep saying "Well let me
2  finish, let me finish".  While I let you keep coaching
3  your client so that you can finish.  I'm interrupting
4  you so that you'll stop doing it.  So that you'll
5  telling him answers.
6  MR. BAILEY:  You have postured enough.  I'm
7  going to respond.  Why don't you be courteous?
8  MS. GUIDO:  I'm not posturing I'm telling you
9  my position.
10  MR. BAILEY:  Alright, please, please.  I'm
11  respectfully requesting, and luckily we have voice and
12  audio recorders of this proceeding that would show the
13  tenor of my voice and the courtesy I hope to convey to
14  you.  Would you please let me finish.  I'll be very
15  brief.
16  MS. GUIDO:  Please
17  MR. BAILEY:  Okay, thank you very much.  I
18  appreciate that.  I had initiated a telephone
19  conversation.
20  MS. GUIDO:  Would you like to go under oath
21  while you're telling us this?
22  MR. BAILEY:  Well, we're going to.
23  MS. GUIDO:  No I'm serious.  If you think you
24  got to put this on the record I'd like it under oath.
25  MR. BAILEY:  You're going to keep

PAGE 43

1  MS. GUIDO:  This is how you got it.
2  MR. BAILEY:  You're going to keep
3  interrupting me ma'am or are you going to let me
4  finish?
5  MS. GUIDO:  Yes if you're going to put facts
6  on the record that we're supposed to take as fact.
7  MR. BAILEY:  You're dog gone right, I'm going
8  to do that because you have raised implications and
9  apparently you're afraid of the answer.
10  MS. GUIDO:  I'm not afraid of the answer.
11  MR. BAILEY:  Well you must be you keep
12  interrupting me.
13  MS. GUIDO:  I'm just afraid of wasting so much
14  time.  You can tell me that later.  It doesn't matter.
15  MR. BAILEY:  You're wasting the time with
16  endless interruptions.
17  MS. GUIDO:  Well then tell it to us in two
18  minutes.  If you can do that fine.
19  MR. BAILEY:  I may take three.  So you're
20  just going to have to put up with it.
21  MS. GUIDO:  No I don't have to just put up
22  with it.
23  MR. BAILEY:  Well, then why don't you end the
24  deposition.  We can take it all to the judge.
25  MS. GUIDO:  Yeah we may have to do that.

PAGE 44

1  MR. BAILEY:  Originally we discussed this in
2  the case management conference with the judge.  You
3  were obfuscating.  I'm not even getting a chance to
4  finish.
5  MS. GUIDO:  That's ridiculous.
6  MR. BAILEY:  Well you may feel it's
7  ridiculous.  You're the person that raised the issue
8  MS. GUIDO:  I do feel it's ridiculous.
9  MR. BAILEY:  in you motion for sanctions,
10  MS. GUIDO:  I do feel it's ridiculous.
11  MR. BAILEY:  and you're going to have a
12  problem with that.  I've tried to warn you.  It's too
13  late now.
14  MS. GUIDO:  No I'm not having a problem with
15  it.
16  MR. BAILEY:  You're going to to have.
17  MS. GUIDO:  No I don't have a problem with
18  it.
19  MR. BAILEY:  In any event, I initiated a
20  telephone call out to Ms. Reynolds.  I was told by
21  whether it was by her secretary or her in a
22  conversation, in fact I brought it up with you in a
23  later conversation that the draft was sent over.  They
24  told me when the draft was sent over.
25  MS. GUIDO:  Who told you?

SHEET 12   PAGE 45

1       MR. BAILEY:  It was Joanna that told me.
2       MS. GUIDO:  Joanna told you that?
3       MR. BAILEY:  I had a conversation.
4       MS. GUIDO:  You had a conversation with
5  Joanna?
6       MR. BAILEY:  I believe I had a conversation
7  with Joanna.
8       MS. GUIDO:  Or Joanna's secretary?
9       MR. BAILEY:  Regardless of who I had a
10  conversation with, and I believe it was Joanna, I was
11  told that the draft was sent over.  Now it should be
12  easy enough to figure out whether they told me that a
13  draft was sent over to you or you should know whether a
14  draft was sent over to you or whatever.  During the
15  conversation that I had with you
16       MS. GUIDO:  I do.
17       MR. BAILEY:  Oh, good for you.  You can
18  relate what you can relate, and I'll relate what I can
19  relate.  All I know is that when I asked you how that
20  information about sub-section C came to be in there and
21  I was talking about Joanna and who composed it, you
22  said you investigated yourself.  You became very angry.
23       MS. GUIDO:  I didn't say I myself.  I have an
24  investigator.  I didn't investigate myself.
25       MR. BAILEY:  You said you investigated,

PAGE 46

1  that's exactly what you told me in the conversation.
2       MS. GUIDO:  That's not true
3       MR. BAILEY:  Counsel
4       MS. GUIDO:  That's not true.
5       MR. BAILEY:  That's precisely what you told
6  me.
7       MS. GUIDO:  That's not true.
8       MR. BAILEY:  And you were very angry with me
9  like you lost your composure here.
10       MS. GUIDO:  Like I am now.  Yes, exactly.
11  I'm very angry at you for doing improper things.
12       MR. BAILEY:  And you were screaming and
13  hollering, because I was impugning the integrity
14       MS. GUIDO:  Of Ms. Reynolds
15       MR. BAILEY:  according to you
16       MS. GUIDO:  Exactly
17       MR. BAILEY:  based on what happened with sub-
18  section C.
19       MS. GUIDO:  Exactly
20       MR. BAILEY:  And I still assert and as Judge
21  Caldwell very properly said in his memorandum that
22  issue had it been true, would have been dispositive of
23  major portions of this complaint.  I believe it was a
24  fraud.  I believe it was dishonest.  I believe it was
25  manipulated, and I believe it was done knowingly.  And

PAGE 47

1  I stand by that.
2       MS. GUIDO:  Well we know you think that.
3       MR. BAILEY:  I'm now finished ma'am and I
4  thank you for letting me finish this time.
5       MS. GUIDO:  Sure
6       MR. BAILEY:  Although I had to really talk
7  over a few of your addition efforts to interrupt.
8  Thank you.
9       MS. GUIDO:  Can we get Mr. Ober back in here
10  so we can do his deposition rather then Mr. Bailey's?
11       MR. BAILEY:  Well then I would ask you, I've
12  tried to be very courteous and kind about your
13  questioning on this issue, because it's exactly why it
14  makes it difficult sometimes the have issues in a case
15  to defend themselves.  Not to try to use it to posture
16  with Captain Ober about the subjective conciderations
17  that you and/or Ms. Reynolds may have had in the case.
18  Thank you.
19       MS. GUIDO:  Be reasonable.  He said he
20  couldn't think of any reason he couldn't be of contact
21  with the legal office.  Come on.
22       MR. BAILEY:  That's a conclusion for a fact
23  finder.
24       MS. GUIDO:  Come on.
25       MR. BAILEY:  We're just attorneys asking

PAGE 48

1  questions.
2       MS. GUIDO:  Come on.
3       BIALEY:  I'm not sitting here as a judge and
4  jury, Sydni.  I'm just a two-bit lawyer.
5       MS. GUIDO:  I know.  I'm just asking
6       MR. BAILEY:  I'm not a judge.  I'm not a
7  judge.  I'm not a jury.
8       MS. GUIDO:  if he can think of any reason and
9  if he can't think of that reason well.  I think it's
10  probably better if we go to a different subject right
11  for the moment.  We'll come back if you want, but I
12  think we need to talk about something else for a
13  change.  Let's see.  Paragraph 49, before I ask you
14  that question I have one very simple question.  Have
15  ever to this day seen the draft brief that's Ms.
16  Reynolds drafted that's the subject of this?  Have you
17  ever seen it?
18       MR. BAILEY:  I thought you said we're coming
19  back for this.
20       MS. GUIDO:  I said I want to ask one
21  question.
22       MR. BAILEY:  Oh, oh
23       OBER:  You mean that was filed in court.
24       MS. GUIDO:  No, the draft
25       OBER:  Oh, a draft.  No

SHEET 13   PAGE 49

1  MS. GUIDO:  that Ms. Reynolds sent to me.
2  Have you ever seen it?
3      OBER:  No, never.
4      Q:  So do you have any personal knowledge
5  what so ever, of whether she included a single
6  regulation in the draft that she sent me?
7      A:  No.  I've never seen it.  You asked me a
8  question about March 6th and March 9th or whatever.
9  That information was provided to me by Mr. MR. BAILEY.
10 So I don't know anything about draft work.
11     Q:  That's fine, and that's what I was
12 wondering whether you had ever seen the draft that she
13 sent.  And you have no knowledge what so ever of, we're
14 asking do you have any knowledge what so ever whether
15 Ms. Reynolds put any regulation much less the one at
16 issue, whether she put any regulation in that draft at
17 all.  Do you know?
18     MR. BAILEY:  Do don't know who put the sub-
19 section in the draft whether it was Ms M. GUIDO or Ms.
20 Reynolds, both of whom signed the pleading under rule
21 11.
22     MS. GUIDO:  No I signed the pleading.
23     MR. BAILEY:  There you go.  Do you now who
24 put it in?  Would you have any way of knowing?
25     OBER:  Well you're asking about draft work

PAGE 50

1  that I've never seen.
2      MS. GUIDO:  That's what I'm asking.
3      OBER:  We've had testimony; I believe form
4  Sergeant Martison that told us that the AR-11
5  information was supplied to Ms. Reynolds.  So my
6  deduction would be that she did, but I never looked at
7  something that said "draft".  That either you worked on
8  that she worked on.  I believe you filed it so
9      Q:  I did.
10     MR. BAILEY:  By the way neither have I
11 counsel.  I was just told about it.
12     MS. GUIDO:  Did you ever have a discussion
13 with anyone in Ms. Reynolds's office about the brief?
14     A:  No
15     Q:  Have you ever seen any email related to
16 the brief?
17     A:  My email?
18     Q:  Have you ever seen anybody's email in
19 relation to the brief?
20     A:  No.  The first time I saw this brief was
21 when it was filed.
22     MR. BAILEY:  Well.  That's three questions now
23 are you still moving on counsel?
24     MS. GUIDO:  I can ask him the questions that
25 I want to ask him.

PAGE 51

1      MR. BAILEY:  You know you're laying
2  groundwork for a total inquiry into this issue.
3      MS. GUIDO:  Fine
4      MR. BAILEY:  And I want you to know I'm
5  grateful.
6      MS. GUIDO:  Fine.  I don't mind.
7      MR. BAILEY:  Because we are going to follow
8  up.
9      MS. GUIDO:  I don't mind.
10     MR. BAILEY:  and I don't see how the judge
11 is going to deny us the opportunity under the claim of
12 conspiracy we've made.  I'm very grateful to you.
13     MS. GUIDO:  I don't mind.
14     MR. BAILEY:  Pleas ask more questions about
15 it counsel.
16     MS. GUIDO:  I will if I feel like it.  I just
17 want to know whether or not you had seen any email
18 messages?
19     OBER:  No
20     Q:  And you've never had any discussions
21 with anyone in the Chief Counsel's Office?
22     A:  No
23     Q:  You're related to one of the secretaries
24 in the office, correct?
25     A:  Yes

PAGE 52

1      Q:  And you've never had any discussions
2  with her about this case, correct?
3      A:  No, I didn't say that.
4      Q:  Oh you have had discussions with the
5  secretary in the Chief Counsel's Office?
6      A:  Yes.  That would be my cousin by
7  marriage.
8      Q:  Who works for Ms. Reynolds?
9      A:  Yes.  If you're going to leave that I
10 would like to tell you what the summary substance of
11 those conversations generally are.
12     Q:  That's fine.  Certainly.
13     A:  Before this suit was ever filed when I
14 go back to when the injunction was filed.  That was
15 during the girls' basketball season of which my
16 cousin's daughter participates and we follow.  We had
17 face to face specific discussion were we both
18 recognized and maybe this is an example of a prior that
19 we've discussed of the effects of this lawsuit.  You
20 know, she's in a sensitive position.  I'm in a
21 sensitive position and both of our interest is best
22 served if we don't discuss this case.  So from that day
23 till no we don't have many face to face
24     Q:  Okay
25     A:  But it sort of one of those things like

## SHEET 14 / PAGE 53

```
 1   well it's there. I'm not going to say something
 2   hasn't ever been discussed, but we recognize the
 3   problems with that or that could emanate from our
 4   relationship early on.
 5   Q:  Could we have that marked as an exhibit?
 6   MR. BAILEY:  Do you have a copy for me?
 7   MS. GUIDO:  I thought I gave you
 8   one.  Oh that was your copy.
 9   OKER:  Oh, I'm sorry.
10   MS. GUIDO:  Number thirteen is a copy of the
11   letter dated June 12, 2001.  Did you write that letter?
12   A:  Did I?  Yes I wrote this.
13   Q:  Okay, and this is the letter that you
14   sent to your lawyer, right?
15   A:  Yes
16   Q:  And it was attached as an exhibit to a
17   brief, correct?
18   A:  It eventually made it there, yes ma'am.
19   Q:  If you jump down to, do you see where it
20   says paragraph two.  It's not paragraph two but you
21   have got it titled paragraph two.
22   A:  Yes
23   Q:  In it you write "Are they trying to
24   suggest that Reynolds had nothing to do with drafting
25   of this response?  It is a Lie."  Is that you tell your
```

## PAGE 54

```
 1   lawyer that it's a Lie?
 2   A:  Yes.  Ground that I'm sure you covered
 3   when I wasn't here.  Mr. Mr. BAILEY had told me the
 4   essence of his discussions with you and Ms. Reynolds
 5   and I'm say that that would be a lie based on what we
 6   already know.
 7   Q:  Okay
 8   A:  What was already told?
 9   Q:  But you're telling the lawyers a lot.
10   But you're telling Mr. Mr. BAILEY it's a lie is based
11   solely on what Mr. Mr. BAILEY told you?
12   A:  Yes
13   Q:  Okay
14   MR. BAILEY:  I guess that draft will have to
15   speak for its self.
16   MS. GUIDO:  And now paragraph 49 of the
17   complaint.
18   MR. BAILEY:  Of the complaint?
19   MS. GUIDO:  Of the amended complaint.
20   MR. BAILEY:  Are you done with exhibit G?
21   MS. GUIDO:  For now
22   MR. BAILEY:  Okay
23   MS. GUIDO:  You alleged that you were
24   unlawfully removed from a prestigious assignment to the
25   PSP Centennial Book Committee.
```

## PAGE 55

```
 1   A:  Yes
 2   Q:  First of all, what was prestigious about
 3   the assignment?
 4   A:  Well, what I believe was prestigious
 5   about the assignment was that first of all I was asked
 6   to participate.  I didn't seek this assignment out.  I
 7   was asked to participate, and I was asked to
 8   participate because, well let me start there.  Mark
 9   Infantino is the Chairperson of this Centennial Book
10   Committee.  Over the years Mark and I have had many
11   conversations about PSP memorabilia and artifacts.
12   There have been many occasions that he has found
13   something or need something I guess it was fairly
14   obvious.  I remember one occasion he was looking for a
15   particular patch, and he called me or we where
16   discussing it I said "Well I have that patch."  He ask
17   if he could borrow that to photograph it for the book.
18   I said "Sure I would be more then happy to chat".  So
19   eventually this relationship evolved to where he asked
20   my if I would be will to participate, which I thought
21   was a great opportunity and a prestigious
22   A:  Yes
23   Q:  Excuse me Mr. Infantino asked you?
24   MR. BAILEY:  Can you spell his name?
25   A:  I-N-F-A-N-T-I-N-O There was
```

## PAGE 56

```
 1   A:  Yes
 2   correspondence I believe, and I would have to check.
 3   My name has appeared on a couple of pieces of
 4   correspondence namingly to that committee under whose
 5   authority, ultimate authority I can't say, but I know
 6   that those documents exist.
 7   A:  Anyway what's prestigious about it is
 8   that this is a book that's going to document of the
 9   first hundred years of the oldest law enforcement,
10   State Police law enforcement agency in the nation.  I
11   would hope be now that you would have a sense of our
12   pride, our tradition, our history, and the opportunity
13   to participate in the book.  To have a number of my
14   items photographed and used in that book I thought was
15   one of those things that might facilitate me leaving
16   some thumb print on the organization.  I felt this was
17   an assignment that only a handful of people on the
18   planet would ever have the opportunity to participate
19   in.  So it was prestigious in that it was a vehicle by
20   which my department could be honored.  I could
21   contribute to honoring my department.  It had, again
22   I'm not sure what Webster says about prestigious, but
23   if that surfaces for an answer.  That's what I found
24   prestigious about it.  I would suggest probably others
25   would as well.  I think I testified Wednesday that the
```

SHEET 15   PAGE 57
1  scheduled publication date of that book is or was since
2  I've been booted out I don't know if that's changed,
3  but the publication date wouldn't be until late 2004 or
4  2005.  What is completely unjustified and irrational
5  about being booted off of there is this is an
6  assignment that does not going to to be completed for
7  several years.  My participation in this Centennial
8  Book Committee was 90% on my own time.  There was, I
9  can only recall one meeting I went to.  I could be
10 wrong, but I can only recall one meeting that I went to
11 and I believe that was actually held in the Chief
12 Counsel's conference room.  Where we set the frame work
13 for this project up and we made assignments to
14 different participants in the committee, is what I
15 suppose it what it would be called.  Largely this was
16 an off-duty or free time assignment that I was involved
17 in.
18        Q:   Sort of like if you were in school it
19 would be extra curricular?  Similar to an extra
20 curricular activity right?
21        MR. BAILEY:  Objection.  Characterization of
22 testimony, you may respond.
23        OBER:  It was a prestigious extra curricular
24 activity, ma'am
25        Q:   Okay, but I'm saying it wasn't something

PAGE 58
1  that was part of your day to day job as a State Police
2  officer.
3        A:   No, and it had absolutely no impact on
4  my ability to perform in the IIMS project what so ever.
5  I believe as I testified no one ever took the
6  opportunity to even ask anybody.
7        Q:   Okay you've said that you believed that
8  this was a prestigious assignment.  Who else considered
9  it a prestigious assignment other then yourself?
10       A:   I don't know if I can speak for anyone
11 else.  I mean, I don't ever recall have a conversation
12 with someone at the coffee machine and said, "By golly,
13 there's prestigious assignment".  I don't know ma'am.
14 I'm sure that the folks who are involved in the project
15 and I am sure that the benefactors would consider it
16 that, but I can't tell you who that might be.  I would
17 have no idea of know what their evaluation of this
18 might be.
19       Q:   So the other people on the project have
20 you ever discussed with them whether they considered it
21 prestigious?
22       A:   I don't recall that specific discussion.
23 If I could characterize it I would say that we felt, we
24 were all volunteers; I believe all of us felt that this
25 was an extremely important project on which it was an

PAGE 59
1  honor to serve on.  I mean this was not a forced
2  assignment.  To set here and say as I mentioned that
3  around the round table that we said it was prestigious,
4  no.  I think that was pretty much understood and
5  recognized by all of us.
6        Q:   Okay.  In paragraph 50 you talk about
7  the IIMS project.
8        A:   Yes
9        Q:   Which you referred to.  We've talked
10 about, has been mentioned anyway through out your
11 deposition.
12       A:   Yes
13       Q:   When were you assigned onto the IIMS
14 project?
15       A:   April of '99
16       Q:   What is that?  That's the Incident
17 Information Management System, correct?
18       A:   That's why we call it IIMS.  It just
19 mean's that's easier to say.
20       Q:   And what was your specific role in the
21 project?
22       A:   Let me start with how I got the
23 assignment.  As oppose to
24       MR. BAILEY:  Objection, lack of foundation.
25 I would respectfully request counsel would be to ask

PAGE 60
1  him to tell a little about what that program is, what
2  it is's about.
3        MS. GUIDO:  No I would respectfully not look
4  at that right now.
5        MR. BAILEY:  Okay
6        MS. GUIDO:  Could you tell me what your role
7  in the project was?
8        MR. BAILEY:  I withdraw my request.  Thank
9  you Counsel.
10       OBER:  As opposed to the manner and the
11 mechanism that I was summarily transferred to
12 Washington.
13       Q:   We'll get to that later.
14       A:   Well there's a reason Counsel if you'd
15 just let me finish my answer.  I was called in on a day
16 off.  I was on an annual leave day.
17       Q:   That was your role in the project?  See
18 my question is what your role in the project was?
19       MR. BAILEY:  Can we hold until the background
20 noise is, okay we got it.
21       MS. GUIDO:  I don't know what that was, maybe
22 somebody's phone.  My question is and I can ask other
23 questions later.  We can come back to others.  But my
24 question is what was your role in the project?
25       A:   Well I was getting to the part if you'll

SHEET 16    PAGE 61

1  allow me where the Commissioner defined what my role
2  was.
3          Q:   What was your role? Just tell me your
4  role and then we can get to how you got there but what
5  was the role?
6          MR. BAILEY: Mr. Ober you continue to answer
7  the questions thoroughly and completely. You're doing a
8  fine job continue responding to counsels questions. You
9  are doing well.
10         A:   My role, in the discussion I had with
11 Colonel Evanko he defined my role as to be the, to
12 assume the role of the lead contract writer, develop
13 the bid document and get a, this whole project the
14 piece that we were working on was the systems
15 integrator, the IMS project is an all-inclusive
16 technology project that the center piece of that project
17 is the systems integrator. My role was to supervise,
18 manage the RFQC Process and get a systems integrator
19 under contract for the department.
20         MR. BAILEY: What's the number on this one?
21 What was the number on the last one, this June twelfth?
22         MS. GUIDO: Thirteen.
23         MR. BAILEY: Thank you.
24         MS. GUIDO: Keep the numbers in order.
25         MR. BAILEY: This was thirteen? just make sure

PAGE 62

1  because your records is the one that counts.
2          RECORDER: Yes.
3          MR. BAILEY: So this is fourteen? Thank you.
4          MS. GUIDO: I have handed you Exhibit fourteen
5  if you want to take a look at it. Is that the claim
6  message that dispatched you to the IMS Project?
7          A:   Yes it detached me to the project.
8          MS. GUIDO: Sorry if I used the wrong term in
9  that.
10         A:   No, it's okay.
11         Q:   And it, I think it says your function
12 will be as team leader for Systems Integrator B,
13 procurator for incident information management system.
14 Is that right?
15         A:   Well I think there might be some words
16 missing here. Let me see.
17         Q:   You can take a look.
18         A:   Well I am. If you want me guess as to
19 exactly what that says, I mean I don't know. The words
20 are cut off or something but just, I would agree with
21 you that this is the document. I mean one of the
22 documents that indicate that I was detached from BPR.
23         Q:   Do you have another document that shows
24 your detachment?
25         A:   I believe there are a couple of

PAGE 63

1  documents that spoke to that.
2          Q:   You've seen another couple of documents?
3  Do you have them?
4          A:   Um-humm.
5          Q:   And essentially you were the team leader
6  for the Systems Integrator B procurement for the
7  overall Information Management System Phase B of the
8  Department Automation Project. Is that right?
9          A:   I think there are some words missing
10 because I don't recall a phase B. There was no phase B.
11         Q:   Phase B doesn't sound familiar to you?
12         A:   Well some of this, sort of like at the
13 top where the words are cut off. There was a, this is
14 not the copy we see in the field. Do you have, if you
15 don't have it I do. There was a printout of what was
16 actually received at the station.
17         Q:   I'm sorry that's all I have.
18         A:   I'll see if I can get you a better copy,
19 all right? Because I'm not sure what those B's mean.
20 They appear different places in the text so I'm not
21 sure what that is.
22         Q:   So you're not, you don't know that that
23 necessarily means Phase B? You never heard the term?
24         A:   No that wasn't lingo or language that we
25 used. We had phase one and two. Perhaps it could have

PAGE 64

1  been at that time but that's not familiar to me right
2  now.
3          Q:   Now, now I would like you to elaborate
4  on, first I was just asking you what your role was not
5  you can explain that role to me if you would.
6          A:   Certainly. What Colonel Evanko and I
7  discussed, is it all right to start there?
8          Q:   Sure.
9          A:   What Colonel Evanko and I discussed was
10 the fact that the department needed someone to play the
11 team leader role, or however it was described to get
12 the, to a Systems Integrator under contract. That was
13 the driver and it was a significant driver because
14 there was budgetary money at stake. I could be wrong on
15 these figure's and I could even be wrong on the time
16 frame but it's my recollection that at that time there
17 had been, I believe 6 million dollars allocated toward
18 phase one of this project. But the integration of all
19 of this technology simultaneous to, simultaneous
20 projects going on in the department included mobile
21 office development, consolidated dispatch development,
22 evidence processing and what have you but the center
23 piece of all of this as I described is the Integration
24 Project. And to do that was, that was what the Colonel
25 discussed with me and I will tell you that when he

SHEET 17   PAGE 65

1 discussed this with me I asked him if he had the right
2 person because I didn't think I really understood all
3 of this. But he said that he felt that I was the right
4 person for this position, right person for this
5 assignment. and he asked me if I would accept it. and my
6 response was Colonel if that's what you think you, if
7 that's what you want me to do and you think I can do it
8 I will do my very best. And I said I only have one
9 reservation I said I did not want to leave Internal
10 Affairs. At that time we had a number of projects that
11 we were involved in that, that at least most of us that
12 were there at the time thought were going to better the
13 process etc. We had different things we were doing and
14 I didn't want to leave that and at that point the
15 Colonel promised me, I remember him putting up his
16 hands and saying no I'll send you back when this is
17 done. This is just a detached assignment. You're only
18 going to be there maybe six months give or take. The
19 travel distance from that worksite to the Technology is
20 probably three or four miles and with that we had a
21 handshake deal and I said I'm sure words to the effect
22 that `I'll do my best.' I can't recall if I went
23 directly to BPR or I went directly to the Technology
24 Building but I went to both that day, or after our
25 meeting. But when the Colonel talked to me he impressed

PAGE 66

1 upon me the importance of this assignment. He said
2 that, he used the quote that the "eyes of the nation
3 are on Pennsylvania." This is the most mature
4 technology project in existence in the country. He
5 impressed upon me the urgency to get the project
6 finished and he impressed upon me that my assignment
7 was to get a Systems Integrator under contract. That
8 was the mission of this team. This teams function was
9 to write a contract, go through the RFQ procurement
10 process and get an Integrator under contract. That's
11 the first step that has to be done before you can even
12 get to phase one.
13        Q:   And in your complaint you said that, and
14 I think you said today or previously that you were
15 prematurely taken off of that project.
16        A:   Correct.
17        Q:   What was left on the project that needed
18 to be done by you personally?
19        A:   Probably my, one of the most significant
20 contributions that I was supposed to make to that
21 project which was supervise and manage the rating of
22 the best and final offers. I was in a document that to
23 my knowledge the Colonel approved that I develop the
24 Systems Integrator structure, the hierarchy. I'm
25 struggling to think of what the exact word was but

PAGE 67

1 there was a project structure put together wherein it
2 named who the oversight committee was; various
3 committee assignments. To my knowledge that was
4 approved by the Commissioner, I assumed that it was.
5 What my role in that document and my role in that
6 project was, was the contract lead and the critical
7 piece of the project was yet to be resolved which is at
8 the end of all of it; I'm not sure how familiar you are
9 with RFQC process and the gates that you have to work
10 through to get to BAFO, best and final offer but at
11 that point when I was, when they tried to boot me to
12 Washington we hadn't even received the BAFO's yet. I
13 think the, I could be wrong but I'm giving you the best
14 I can from my memory. I believe the BAFO weren't do
15 until January 14. that time period I can recall some of
16 the activity that was occurring during that time period
17 with the team and one of the most critical things we
18 were doing was developing the analysis or rating
19 instrument in order to evaluate these best and final
20 offers. We had develop score sheets and check sheets, I
21 can't recall the verbiage but in any event we developed
22 these, a system that was something that was defendable
23 should we be challenged and there were very, very
24 critical things occurring at that time. The best and
25 final offers were not even due. I was in charge, one of

PAGE 68

1 my assignments were to insure that things were done
2 properly. In other words I had to account for the time
3 that was spent on these projects. I was the gatekeeper
4 of the time clock when we sat down and spoke with
5 Integrators during discovery days, during all the
6 follow-up face to face. If we said we were going to go
7 for two hours, unlike this process, we stopped at two
8 hours. Okay I had to insure fairness. It was stressed
9 to me by Colonel Hickes and the project executives that
10 that's a critical role that the ranking officer
11 performs because we have to be insulated from challenge
12 and there is likely to be challenge. Like I said this
13 is a very, very lucrative project in the world of Law
14 Enforcement Technology. We
15        Q:   Who was in charge of the project? Do you
16 know what
17        A:   Charge in what sense, I mean
18        Q:   Are you sure there's a top person in
19 charge of the project? Was there no top person in
20 charge? Who bore the ultimate responsibility for the
21 project?
22        A:   Where does it stop? Well there was a
23 project executive.
24        Q:   Who was that?
25        A:   Who was Mt. Ditzler he's a division

SHEET 18   PAGE 69

1  director.
2         MR. BAILEY: Can you spell that for me?
3         A:  D-i-t-z-l-e-r. Mr. Ron Whilt, you know
4  I'm not sure what his title is. I think his title was
5  project executive at that time but I could be wrong.
6         MR. BAILEY: W-h-i-l-t?
7         A:  Yes.
8         MS. GUIDO: Those are non- State Police
9  people?
10        A:  Yes. They are civilians. And the Bureau
11 Director is Major Wall and then of course Colonel
12 Hickes and Colonel Evanko so, I'm not sure how to tell
13 you the answer to that other than those are the people.
14 My piece was very specific. My role was very specific.
15 I just wanted to finish by telling that in order to
16 insure fairness we established a due date and time for
17 the BAFO's and I believe it was noon on
18        MR. BAILEY: What's that acronym mean?
19        A:  Best and final offers. We had three
20 Integrators, we had three Integrators at that gate:
21 Lockheed Martin, IBM and Anderson Consulting.
22        Q:  And that was January 14 that the best
23 and final offers had to be in?
24        A:  That's me recollection. I'm pretty sure
25 that's correct. But in order to insure fairness I wrote

PAGE 70

1  a schedule of review amongst the voting team. I was the
2  head of the voting team. We didn't even break those
3  open until January 17. They weren't scheduled even to
4  be looked at until January and I had to manage that
5  process again. We had specific hours devoted to
6  Anderson, specific hours to each one. It had to be. It
7  was stressed be DGS to me on many occasions that this
8  is a process that you have to manage very, very
9  carefully to avoid appearance, any appearance of
10 unfairness.
11        Q:  And I think you may have answered my
12 question by mentioning that Major Wall was the Bureau
13 Director.
14        A:  Correct.
15        Q:  Was Major Wall your supervisor on the
16 project, your immediate supervisor?
17        A:  Yes by virtue of his rank and his
18 position I think the answer is yes. But understanding I
19 had, my working relationship was largely through Mr.
20 Ditzler and Mr. Whilt but certainly they didn't occupy
21 that.
22        Q:  I was trying to understand your Chain of
23 Command during the time you were on the IMS project. So
24 it would be that you reported to Major Wall and Major
25 Wall reported to Lt. Colonel Hickes?

PAGE 71

1         A:  Yes.
2         Q:  When you were taken off the project do
3  you know whether or not either Major Wall or Lt.
4  Colonle Hickes told the Commissioner that there were
5  tasks left on the project that had to be done by you
6  personally?
7         A:  Yes.
8         Q:  And what, which one told you, told him,
9  how do you know etc? Do you follow me? I don't want to
10 be compound on you.
11        A:  I got you. What I know is what I was
12 told and I was told that there was; let me back up for
13 a second. There's a lot of simultaneous activity in
14 this project so that while the team that I was in
15 charge of was tasked with the centerpiece of this,
16 simultaneous to this were other things occurring, the
17 other technology pieces. A very, very important
18 activity that was occurring was the establishment of
19 the project management office because once this army
20 lands, once this integration army lands we need to be
21 prepared to wrap up and staff up in PSP in anticipation
22 of all of this activity. And at some point Major Wall
23 or Major Ditzler, well he would enjoy that Mr. Ditzler
24 talked to me about whether I would be interested in
25 staying on the project. And the reasons they said were

PAGE 72

1  many that number one I was doing very well there. And
2  either both of them or one of them said it's fairly
3  obvious that you are being battered around elsewhere
4  and since I was playing a viable role in the project;
5  actually it I, you know it was Mr. Ditzler I remember
6  asking, I remember this discussion. He asked me how
7  much I liked it whether this is something I wanted to
8  continue. You know if I found it interesting enough to
9  stay with blah, blah, blah. And I said well yes, the
10 way things are going if that opportunity presents
11 itself I would not object. At that point in time the
12 defendants attitude toward me was well established.
13        Q:  When was that? You lost me on the time
14 frame
15        A:  I don't know for sure but I can get to a
16 time frame that I think is more important.
17        MR. BAILEY: No in fairness to her I think she
18 wants to know if you can do that. She's asking you a
19 question I think she wants to know the time frame if
20 you can please.
21        A:  I can only estimate that ma'am. I would
22 say probably December of 1999.
23        Q:  And the reason is in follow up to what
24 you said that he asked you if you would be interested
25 in staying on the project which sounds as if your role

SHEET 19   PAGE 73

1  was about to be finished. So that's why I'm asking you
2  when the conversation was.
3        A:   Yes and my next response I think will
4  clarify that for you. Going back to the project
5  structure that they were developing they knew that my
6  role was at least according to the clean message the
7  directive that came out was to end when the Integrator
8  was under contract. When this project structure was
9  being developed that's when this conversation occurred
10  so I know when the meetings were so that's why I'm
11  guessing December.
12        Q:   The discussion was whether or not you
13  would stay on after your role was finished.
14        A:   After the Integrator was under contract
15  would I consider this. Yes so I was told on January 6,
16  there was a project meeting with the participants. I
17  can recall that it was Colonel Hickes, Colonel Evanko,
18  Mr. Ditzler, Major Wall, Mr. Whilt if there were more
19  I'm not certain. I believe our consultants might have
20  been involved in this but I don't know that to be
21  certain. I wasn't there. There was meeting on January
22  6. with the Commissioner, and the purpose of this
23  meeting was to discuss the staffing requirements for
24  the project office as you might
25        Q  :   Just so I'm clear. Who was at this

PAGE 74

1  meeting?
2        A:   Mr. Whilt, Mr. Ditzler, Major Wall,
3  Colonel Hickes, Colonel Evanko,
4        Q:   And so that I'm clear as you're telling
5  me the story what's the source of your information
6  about the meeting?
7        A:   Mr. Whilt and Mr. Ditzler. They came
8  back at the end of the day, actually I think Major Wall
9  was there too because he was the one that told me the
10  next piece of info but let me get to that
11        Q:   Yeah I think you mentioned that.
12        A:   At the end of the day they came back
13  and said the had made a pitch to Colonel Evanko to
14  assign me to the project permanently after the
15  Integrator was under contract and they said he
16  physically reacted to the mention of my name, that he
17  became visibly agitated that he motioned with his hand
18  or made some reference to the fact that this wasn't
19  going to happen. That he, let me think that I can
20  recall their words exactly. They said something to the
21  effect that he shut that part of the conversation that
22  part of the puts down before it ever got started. There
23  was a follow up meeting then the next day, January 7,
24  it was either the 6th and 7th or the 5th and 6th but
25  that's very close to my recollection. Major Wall then

PAGE 75

1  told me after the meeting that they tried this again.
2  They were very adamant that this project should
3  continue with me on because of the knowledge and
4  experience I had gained particularly as it pertains to
5  policing the Integrators. Major Wall told me that when
6  they mention my name again that Evanko said that
7  Captain Ober is not even to be brought up in this
8  discussion. Don't mention his name. but then he also
9  told me that I don't know if it occurred during that
10  meeting or it occurred afterward but that's when he
11  also told me I was being transferred back to Internal
12  Affairs. So whether it was
13        Q:   When Major Wall told you?
14        A:   Major Wall told me I was going to
15  Internal Affairs.
16        Q:   So then I can understand this I don't
17  exactly, is it, is it your contention with respect to
18  the IMS project that this was an opportunity that was
19  denied you after your systems portion was over that you
20  would have been a good person to go on and do extra. In
21  other words is this something that was denied you or is
22  this something that was assigned and it was being taken
23  away.
24        MR. BAILEY: Objection to the form of the
25  question you may respond.

PAGE 76

1        A:   It's both. I was sent there for a job.
2  Before the job was finished I was booted out.
3        Q:   And what, I guess that's what I was
4  asking you that I didn't, what was left on you
5  assignment  as opposed to other things that you might
6  want to have done later or think you would have been
7  good at. What was left on your particular assignment
8  when you were taken away from the project?
9        MR. BAILEY: I'll withdraw my objection to the
10  former question. That was the basis of my objection.
11  You may respond.
12        A:   What was finished was the contract. What
13  was finished was all those preparations that I
14  described with respect to the voting instruments,
15  developing that voting instruments and designing that
16  process. These are things that we put together on like
17  a Powerpoint. No that's not what it is. We employed
18  technology but I'm not sure what it was now but anyway
19  there was a process.
20        MR. BAILEY: Hold at that point please. It
21  will take me two seconds.
22        ------END OF TAPE-----
23        A:   And I do believe it needs to be put

SHEET 20   PAGE 77

1 on the record what has been said to me on many
2 occasions by several individuals is that, and I think
3 in my heart, this was a real motivation to boot me out
4 of there also was the opportunity that a ranking
5 officer like myself gets with respect to exposure to
6 integration community.  There was never any question in
7 anyone's mind that when Pennsylvania completes this
8 task we will be a showpiece for the Nation.  And those
9 individuals assigned to that would afford them a
10 certain level of visibility in the vendor community and
11 it's my opinion that is one of the things that the
12 defendants wanted to make sure didn't happen.  As I had
13 said before, meaningful responsibilities and
14 visibility, I believe that was part of the motivation
15 to get me out of there.  You couldn't possibly leave me
16 in position where I could receive any more visibility
17 and we have mentioned something else I wanted to finish
18 too on the project, but I don't recall what that was?
19       Q:    The best and final offers were
20 opened on January 17th right?
21       A:    Yes.
22       Q:    And so after January 17th, the only
23 thing left to do on the system integrator portion would
24 be the actual award of the contract to one of those
25 three companies, right?

PAGE 78

1       A:    Did you saw after the 17th?  I
2 missed the first question.
3       Q:    After January 17th.  The only left
4 on this.
5       Bailey:       What year?
6       Q:    Well, tell what year it was?
7       A:    2000.
8       Q:    2000.  Okay.  After January 17th,
9 2000, on the system integrator portion of the IIMS
10 project what was left to be done?
11       A:    The most important piece.
12       Q:    And that was the contract award?
13       A:    Absolutely.  That was whole purpose
14 of the project.
15       Q:    I'm making sure I understand your
16 answer.
17       A:    On January 17th we began the, yeah
18 we were rolling up our sleeves.  This was the final leg
19 of the journey.  To review the baffos, make the
20 announcement and then go right into the negotiations.
21 Now, I would like to speak for a second as to what that
22 cost the department in terms of timeline.
23       Q:    That was going to be my next
24 question.
25       A:    Okay.  Good.  We're right there.

PAGE 79

1       Q:    Um.
2       A:    I was asked as I have testified.
3 The people involved in the project right up though and
4 including Colonel Hikes, specifically requested that I
5 stay on in the project office.  That was denied.  At
6 least I was there to finish my role or least we
7 believed in the contract negotiation lead.  When I was
8 booted out, what happened to the project was they
9 brought Walt over, who had not been involved in this
10 other than in his role as the Bureau Director.  He was
11 on the oversight committee, but his job was to make
12 sure I did my job.  That was it.  Okay.  And you asked
13 me about supervision and the reality is Major Walt
14 pretty much left me alone.  At some point he either
15 knew or I established enough credibility. Whatever
16 needed done, got done.  So, they bring in Major Walt
17 and I would tell you that act alone had to have to cost
18 that project and had to have cost the taxpayer a lot of
19 money because it elongated something that was a pretty,
20 we were on a pretty tight timeline.
21       Q:    Do you know when was the contract
22 finally awarded?
23       A:    I believe it was in August.  But
24 there's also.
25       Q:    August of 2000?

PAGE 80

1       A:    Yeah, I'm not certain about that; I
2 think that's correct.
3       Q:    Okay.
4       A:    But, there's another one of these
5 counterpoints that also needs explaining.  Now so we
6 have a situation when I asked, I was assigned to do
7 this task.  Booted out to bring in a Major to do this
8 and in order to backfill his position, they make a
9 Captain, Mike McGurney, the acting Bureau Director for
10 that period of time.  To me it just makes no sense
11 whatsoever.  There's no rational basis to do this.  All
12 they had to do was leave me there and let me do my job.
13       Q:    And you.
14       A:    And by the way.  Can I finish one
15 more thing?  I am sorry to interrupt you.
16       Q:    Sure.
17       A:    This also had an effect on the
18 vendor community.  In fact, Tom Carroll, who was a
19 project executive on that Lock Key Martin side came up
20 to me and asked what was going on.  They were very
21 nervous about the project lead.  The ranking officer
22 being removed and he told me so, I guess; the word is
23 that you got in a pissing match with the Commissioner
24 and your being booted out.  Well, what am I supposed to
25 say this?  So, well that is how government works

SHEET 21   PAGE 81

1  sometime or whatever, but he's a former military guy.
2  He knew the deal.  These vendors got very nervous when
3  the project lead was removed because they thought that
4  might be a weakness and they had committed.  I know Tom
5  Carroll told me Lock Key Martin probably put a Million
6  Dollars in to this project with respect to their baffo
7  and they got very nervous when State Police starting
8  making these kinds of move.  That's what I was told.
9        Q:   How long had you?  In your planning
10 how long did you think it was going to take from the
11 point that the final offers came in until the contract
12 was awarded?
13       A:   We had not developed that.  We
14 might have.  There was a bar chart of time that I
15 didn't develop that Mr. Wilt did.  I don't recall what
16 that was.  If you had asked me to guess, I would say,
17 you know what there was a budget, again, that was
18 budget driven.  I think our timeline might have been
19 June 30th, but I could be wrong about that.  We were
20 probably.  We should have been able to do that in three
21 months.
22       Q:   So you were expecting that you
23 would be.  Have the contract awarded by June 30th?
24       A:   Well, you're asking me a question
25 that I have not given a lot thought to and I have been

PAGE 82

1  away from for a while.  But, my recollection is that, I
2  could be wrong about this, but my recollection is that
3  we going to allow about three months.  The baffo
4  announcement.  Our baffo voting was conducted on
5  February 18th and when the actual announcement and
6  award came out, I don't recall.
7        Q:   Okay.  And the reason I am asking
8  that is because you have alleged in your Complaint that
9  by taking you off that project there was unconscionable
10 delay and so that is why I am trying to figure out how
11 you calculate what period of time of was, what period
12 of time delay in doing the contract was attributable to
13 you not being part of the project when the final award
14 was made?
15       A:   I would estimate that delay to
16 amount to at least, probably 3 months at least.
17       Q:   And you have also said that it
18 costs countless dollars, I think you have explained the
19 project liability, but as far as costing the taxpayer's
20 money, could you explain to me the dollars that are
21 involved there in having somebody else make the
22 ultimate decision on who got the contract as opposed to
23 you being part of the process?
24       A:   Well, there is some obvious dollars
25 first of all; having Captain McGurney acting in the

PAGE 83

1  role of the Bureau Director, assigning me to a dead end
2  position where I had not responsibility, I would
3  consider to be a waste of taxpayer's dollars for that
4  period of time.  We also, there are indirect costs that
5  may not be obvious such as I had asked Colonel Hikes
6  during a project for the resource support of
7  Specialized Technology Counsel; in other words, with
8  all do respect to Mr. Jacoby back in the Chief
9  Counsel's office, he was unable to keep up with the
10 project.  He was out assigned counsel from Chief
11 Counsel, so we asked for special counsel.  We went
12 through Glen Gurrell, over in general counsel and he
13 was able to secure for us someone from Stevens and Lee
14 and that person as far as I know and my recollection or
15 my understanding that attorney was assigned to the
16 project, throughout, including the negotiations.  So,
17 if that as an example of what your asking me; if that
18 timeline was compromised or unnecessarily elongated by
19 the defendant's actions, that would be an example of a
20 cost.  The attorney fees for that again, three month
21 period or whatever.
22       Q:   And the attorney of Stevens and
23 Lee?
24       A:   Yes.  Steve Shayman was the
25 attorney.

PAGE 84

1        Q:   And Glen Gurrell that you are
2  referring to.  Glen, just so we're clear on the record
3  is a former Deputy General of Counsel here in this
4  office?
5        A:   Yes.
6        Q:   At the end of paragraph 50 and when
7  we are talking about that right after we have talked
8  about the delay that we _ and then the last sentence
9  is:  All of this was to facilitate the personal
10 vengeance of Paul Evanko, in violation of Federal and
11 State law and his own governor's wishes.  The governor
12 you are referring to is?
13       A:   Governor Ridge.
14       Q:   I'm not sure what that, what
15 Governor Ridge; I'm not really sure what that sentence
16 means as far as with respect to Governor Ridge?
17       A:   Okay.  It was reinforced on us
18 involved in the project continually that technology and
19 advancements in technology was of great personal
20 interest to the governor and certainly I would say his
21 record upon leaving reflects that.  We were told that
22 he.  We were told things like, for example; during
23 budget hearings we were given vast sums of money to
24 devote to this project and that was a validation of the
25 project's importance on behalf of the governor and I am

SHEET 22   PAGE 85

1   sure that on a number of occasions he has addressed the
2   importance of this project.  So, I think what that
3   sentence says is, in the Pennsylvania State Police this
4   was recognized as a showpiece of technology and for
5   nothing more than an act of vengeance a spiteful hatred
6   act, this project was put at risk and delayed.  Because
7   of my role that I have described and which would be
8   contrary to his own governor's wish to get this project
9   completed within its budgetary time frame because I
10  mentioned a; I believe what was a Six Million Dollar
11  allocation budget, but there was also a follow up,
12  actually that was hold over money because one of the
13  reasons I was put in there I was told was because it
14  had, the time frames had not been met originally.
15  There was a secondary budget consideration which was
16  the next piece and I can't remember what that was.  I
17  think it was Thirty Million, but this project, no
18  surprise, was charted to be completed in January of
19  2003, which was not a coincidence with the governor
20  leaving office.  In the overall, those were the
21  timeframes that we were working on.
22         Q:   Okay, so when you refer to the
23  governor's wishes, your referring to Governor Ridge's
24  wish that this IIMS project be a successful project?
25         A:   Yes mam.

PAGE 86

1          Q:   And your not meaning to imply that
2   the Governor had a wish about which particular human
3   beings carried out that project?
4          A:   No.
5          Q:   Just that the project itself got
6   taken care of?
7          A:   I would like to clarify one other
8   point about timelines.  When I first received this
9   assignment, which I had no real background in.  One of
10  the questions that I asked and I remember asking
11  Colonel Hikes this question.  I need some kind of
12  benchmark here.  Your asking me to get a contract
13  written, get a systems integrator under that contract.
14  In the industry, how long would take.  You know when
15  you get a new job; you want to know what the last guy
16  did.  He said 18 months and we tried to do it in six.
17  And we did it.  That's the kind of pressure that maybe
18  more than anything else I can think of off the top of
19  my head is representative of get the job done and we
20  need it done soon.
21         Q:   Okay.  I am going to ask you to
22  take a look at Exhibit 13 again and that is the letter
23  to Mr. Bailey.  On page 2, see the letter.  If you go
24  about half way down you will see your reference to
25  paragraph 8 and so that we are clear, I believe your

PAGE 87

1   paragraph reference is referred to paragraphs in my
2   Brief in Support of a Motion to Dismiss.  Is that
3   right?
4          A:   Yes, that all.  Whatever you just
5   said sounds right.
6          Q:   Okay.  So when we are talking about
7   paragraph 8, we are not talking about paragraph 8 of
8   this document, we are talking about paragraph 8 of the
9   Brief that I wrote.  Right?
10         A:   Gotcha.
11         Q:   Just so that's clear, lets put that
12  in too so that we know that I did it.  Would you mark
13  that as an exhibit please?  Now I think we are up to
14  15, right.  Now, my Brief that is marked Exhibit 15.  I
15  notice it does not have paragraph numbers.  Correct?
16         A:   No.
17         Q:   So those are just, you counted up
18  the paragraphs?
19         A:   Yes.
20         Bailey:   Let's just double check and
21  make sure that coincides.
22         A:   It does.
23         Bailey:   Make sure it does.
24         Q:   He just did.
25         Bailey:   Alright.

PAGE 88

1          Q:   I think that is what you were
2   counting, right?
3          A:   Yes.
4          Q:   And so in reference to my paragraph
5   8 at the top of page 3 of Exhibit 15 in Exhibit.
6          A:   Um hum.
7          Bailey:   The first full paragraph on
8   okay.
9          Q:   In Exhibit 13 I think the reference
10  there is to the fact that in my Brief I had written
11  that you stated that there people that shunned,
12  humiliated, ostracized you, but had not named a person
13  who had treated you like that?
14         A:   Yes, I believe that is what that
15  refers to.
16         Q:   Okay.  So, in your letter, Exhibit
17  13, you write.  The defendants will be five examples if
18  I am obligated to supply names, I can, how many would
19  they like.  So, the answer to that question is.  I
20  would like as many names as you can give me?
21         A:   Okay.
22         Bailey:   And we will supplement that of
23  course, after the deposition.
24         Q:   As you can.
25         Bailey:   As you sit here.

SHEET 23   PAGE 89

1          Q:   Yeah.
2          A:   Well, off the top of my head I
3    would start with Captain Brown and Ms. Reynolds.  I
4    would include the defendants.  I would.  Shunned,
5    insulted and ostracized.  Um, Captain Monaco, um.
6          Bailey:   Daryl, if you can, for the
7    Court Reporter's benefit and for counsel's benefit try
8    to spell as many names as you can if they have not
9    appeared in the record already.
10         A:   Okay.  They have Monaco as
11   M.o.n.a.c.o.
12         Q:   I'm sure we can get the spellings
13   for you.  I mean you can go ahead and spell, but I am
14   saying I'm sure we can get the spellings if you need
15   them.
16         A:   Captain Points, Major Casalnack.
17   Um, maybe it would be easier if I went through a
18   roster.  Do you happen to have a roster I can go
19   through?
20         Counsel:   No.
21         A:   Okay.
22         Q:   You can supplement later, if you
23   could just tell me right now who you - .
24         A:   Each and every person that I
25   believe in some form or fashion?

PAGE 90

1          Q:   Well, let's go through just the
2    ones you have named so far as far as shunned, insulted
3    or ostracized you, what?
4          Bailey:   Could you complete the first
5    question first?  If no one minds, please.
6          Counsel:   I thought he was finished.  Go
7    ahead.
8          Bailey:   Sit back for a moment; reflect
9    on, you know the substance, if we answer her question
10   as to people that you recall.  You have already name
11   the defendants and a couple other individuals here,
12   which they are going to supply spelling for, because I
13   think her question is; she is going to want to ask you
14   examples of what they did in each case, so let's try to
15   get the names down first and then go through them.
16         A:   Okay.  Well I have mentioned that.
17         Bailey:   Otherwise we will never back
18   to the list.
19         A:   Yeah.  I believe I have already
20   mentioned as an example where Major Putliner and Major
21   Hackenburg engage in that type of discussion and.
22         Q:   And to clarify; I mean people that
23   we have not discussed what they have done?
24         A:   Okay.
25         Bailey:   Monaco, you mentioned.  You

PAGE 91

1    mentioned Joanna Reynolds and you mentioned Captain
2    Berm.  That's where I am so far.  Okay, thank you.
3          Q:   Captain Points?
4          A:   Captain Points.
5          Bailey:   Points.
6          A:   Let me see if I can go through
7    Bureau by Bureau.  Major Doubt.
8          Q:   Is it easier for you go through
9    names first or to go through incidents?  Which ever way
10   is easier for you to do it?  If it's easier for you to
11   say, Joanna Reynolds and here's what she did, then its
12   okay either way.  Because counsel is right.  What I am
13   getting at is who did what?
14         Bailey:   As long as the understanding
15   is that we can supplement.  I have no objection.
16         Counsel:   Sure.
17         A:   Let's start there.  This could take
18   a while.  I would just offer as an example between Ms.
19   Reynolds and I as I said we have.  She's been a guest
20   in my home and a friend for years, but throughout this
21   litigation; I can't think of one time that Ms. Reynolds
22   has even looked at me.  Looked at me in the eye and has
23   never spoken to me.  So, it's fairly obvious that you
24   know there's something beyond just a professional
25   matter that we are here to discuss that is occurring.

PAGE 92

1    Captain Points, I recall calling him about three or
2    four months ago for some matter and as an example of
3    the treatment that I now get.  Instead of I have known
4    Dave Points for 12 years, 10 years?  I have been to his
5    house; he's been to my house.  So, I am not able to
6    enjoy a conversation that I once had like how is your
7    family, how's Deb, blah, blah, blah.  Now it's Daryl,
8    what's going on?  You can tell, there's a great amount
9    of concern on his part as to why the targeted
10   individual in this department wants to talk to him and
11   most people when they get to; a lot of people when they
12   get the opportunity will avoid that.  Captain Monaco, I
13   remember because of the defendant's actions when it
14   came time to take our last promotion exam, I didn't
15   even feel comfortable taking it in Hershey, which is 20
16   miles down the road from me.  I opted and requested to
17   take it in Greensboro.  I didn't just simply feel
18   comfortable even setting in a room with my peers and
19   being subjected to all of these things while taking a
20   promotion test, which is very important to me.  I
21   wanted to be in a environment where hopefully, I could
22   clear my head and do my best.  So, I opted to drive to
23   Greensburg, which I did.  When I got to Greensburg
24   there was only a couple officers taking the test there,
25   just a handful of lieutenants; there might have been

three captains that I can think of, Captain Cawley, myself, Monaco, maybe Captain Tripp, but I can't remember for sure? But, you notice things, you know again, Frank Monaco is somebody that I have known at least as a phone contact for years, but yet when I walked up to him, I was standing in line to get my test materials, he just turned around and looked at me and didn't even speak to me. Which, again, I go back; I relate directly to absent to defendant's actions that would have never occurred. That's not Frank Monaco's personality to do that, unless there were some other reason.

Q: That makes me. I'm going to let you finish. I just want to make sure you understand my question. And that is. The question is who. Is about people who shunned, insulted or ostracized you because of the Commissioner's inquiry in the summer of 1999?

A: Yes.

Q: Okay. So, for example, when you said that it difficult to be around Ms. Reynolds, is your belief in that respect that Ms. Reynolds treats you a particular way because of the Commissioner conducting an inquiry in the summer of 1999?

A: That was the trigger for the reason was here, mam. That was the trigger mechanism.

Q: Well, that's why I wanted to make sure I understand what you're describing to me?

A: That's okay.

Q: Are you describing people that insulted or ostracized you because the Commissioner had done an inquiry?

Bailey: Shunned.

Q: Shunned. Fine. I think we. As opposed to maybe everything that has happened since then? Do you follow what I am saying?

A: Did you just ask me a question? I'm sorry.

Q: Yes, I did.

A: You lost me.

Q: I'm sorry.

Bailey: Cindy, we need a tape change. What's the time, please?

??: 11:13

Court Reporter: End of tape 1 of 2, day 2.

Bailey: Please be advised that a tape recording device is in operation.

??: 11:51

Court Reporter: Tape 2 of 2, day 2.

A: I believe I was going through a

list.

Q: You were. I just, based. I want to follow. Before we finish the list I want to follow up on your answer about Joanna Reynolds because I am concerned that maybe you don't understand my question. Maybe you do, but maybe you don't? So, in follow up to that. Did that Ms. Reynolds ever shun, insult, ostracize, mistreat you whatever, and prior to the time that you filed a lawsuit accusing her of illegal conduct? If you can think about that for a minute?

A: Um, not that I can recall.

Q: Okay, so the reason I am asking that is because I want to make clear that the question, which is based on the allegation in the Complaint is that it was Commissioner's inquiry as opposed to things that may have happened during the course of a lawsuit or anything else. But, as a result of the Commissioner conducting that inquiry, were you mistreated because he did that? And so, I just want to be clear about that and if your answer still is that Ms. Reynolds mistreated you because the Commissioner conducted an inquiry, that's fine. I just clarify so that we are all on the same wavelength.

A: And I would still respond that it is because that illegal activity was the trigger

mechanism for everything else and why. And it has a great deal to do with why we are here today.

Bailey: Daryl, when you say illegal activity your going back to what Cindy said about the Commissioner's alleged actions and investigation. I think what she is asking you is. If I understand it what your question is up until the Complaint was filed. In that interim between what the Commissioner did and trigger, I understand your definition is triggered. Did Joanna shun or mistreat you in some way. Isn't that what your asking, Cindy?

Counsel: Right, because we're talking about allegations in the Complaint so, as of the day. If they hadn't done it as of the day the Complaint was filed then they can't that couldn't be a person you are talking about, so what I am getting at. Exactly, that's exactly the point I am trying to make. Is that I want to make sure we are on the same wavelength of who mistreated you prior to the time that this document was filed.

A: Okay, I understand.

Counsel: Alright.

A: I believe I mentioned Major Doubt. Now that's an indirect incident, but let me tell what happened.

SHEET 25    PAGE 97

1      Counsel:  Okay.

2          A:   And why I would list that.  In a

3  conversation that she had with Major Merryman, when the

4  transfer was announced or when probably more like when

5  the injunction was announced, but.

6      Bailey:    To Washington.

7          A:   To Washington, yeah.  He may know

8  the time frame better than I.  I'm not sure that I can

9  recall off the top of my head, but in a conversation

10  with Major Doubt, she made a statement to Major

11  Merryman, well he sounds like he got what he deserved.

12      Bailey:   Who is "she"?

13          A:   Major Doubt

14          Q:   And Major Merryman would be the one

15  who told you about the conversation?

16          A:   Yes.  Going through a list, I

17  believe I have already spoken about Majors Zapinko, in

18  the interest of time; this is something I would like to

19  give some more thought to and maybe amend.

20          Q:   Okay

21          A:   I mean if this gives a flavor as an

22  example, those are ones that come to mind.  If there is

23  more, I would have to really think about that.

24          Q:   Okay.  Let's look at paragraph 10,which

25  is just a couple down from there.

PAGE 98

1      Bailey:      This is still Exhibit 13?

2      Counsel:  This would be.  Well,

3  paragraph 10 is on Exhibit 13.

4      Bailey:     Okay.

5      Counsel:  The reference is to Exhibit

6  15.

7      Bailey:      I'm sorry.  We are

8  working off of Exhibit 13, which is his letter of June

9  12, 2001, and you are referring to his language of

10  paragraph 10 on the second page of that exhibit as it

11  refers to your Brief.

12      Counsel:  Right.  So, do you see where I

13  am at?

14          A:   Yes.  You're on page 4 of.

15      Counsel:  I can't really read the page

16  numbers on the bottom of 13.

17          A:   Oh yes, I know where you are.

18          Q:   Where it says paragraph 10 is a

19  blatant lie.  Evanko explained that Captain had been

20  transferred to Washington in order to assist the area

21  commander and coordinating services at the conference

22  of the National Governor's Association.  Evanko or

23  anybody else never explained this to me.

24          A:   Correct.

25          Q:   Now, I would like to look at

PAGE 99

1  paragraph 10, of Exhibit 15, which is the Brief, which

2  says that on February 25, 2000, Colonel Evanko filed a

3  Motion to Dismiss Ober's Man dames Petition as moot in

4  that Motion Colonel Evanko explained that Captain Ober

5  had been transferred to Washington in order to assist

6  the area commander.

7          A:   Yes.

8          Q:   So, what I am asking is when you

9  say paragraph 10 is blatant lie.  Is it a lie that

10  paragraph 10?  Is it a lie that the Motion that was

11  filed on February 25, 2000, explained the reasons for

12  your transfer?

13      Bailey:      Objection.

14          Q:   See what I am trying to get at?

15      Bailey:      Yeah.  Objection to the

16  form of the question.  I think I can I can, counsel

17  save you some time by stipulating to the best of my

18  knowledge at least and I believe my client's knowledge.

19  That Mr. Evanko may very well have represented that in

20  the Motion, but he's taking issue with the accuracy and

21  the completeness of that representation in the Motion,

22  so he is not arguing that it might have been stated in

23  the Motion, in other words, which I think is I think is

24  what your question is?  He's our

25      Counsel:  That's what I am asking.  Your

PAGE 100

1  not saying that it was lie that the.

2          A:   That the first part of that

3  paragraph on February 25th, no I am sure that is all

4  correct.  I don't know. What is a lie?  And actually I

5  have heard termed as the great cover up when I was at

6  headquarters one time.

7          Q:   By whom?

8          A:   By Al Bowman.

9          Q:   Who is Al Bowman?

10          A:   Al Bowman is in the Bureau of Staff

11  Services Procurement section.

12          Q:   He's a civilian person?

13          A:   Yes.

14          Q:   Okay. Go head.

15          A:   What is a lie is this transfer to

16  Washington to coordinate services of the NGA, which was

17  held in State College.

18          Q:   Okay.  I just wanted to make sure I

19  understand what you thought I was lying about, okay?

20      Bailey:      The point is, your taking

21  issue with the substance of the representation.  Your

22  not saying the representation was not made in the

23  Motion?

24          A:   Correct.

25          Q:   Now as far as the substance of that when you

SHEET 26   PAGE 101

1  were never told.  Didn't you tell us on Wednesday that
2  Major Zupinka just you tell you when you talked to him
3  on January 10, 2000, that you would be helping in the
4  National Governor's Association?
5           A:   He never said anything about me
6  helping him.  He said when he was describing what I
7  would call the biography of area 3 in that he mentioned
8  it was either the largest area or had one of the
9  largest troops or whatever and he said there's a lot of
10 activity out here.  There's a lot you can learn and he
11 did say in the context of that conversation, the NGA is
12 begin held.  He never said a word about me helping with
13 the NGA or that was my assignment.  Because if he would
14 have, my first question would have been I am sure "What
15 the hell would I need to be stationed in Washington for
16 an event that's being in State College"?  But, I know
17 that hypothetical.  But, it was never discussed.
18           Q:   Didn't you tell me that you had a
19 conversation, that during your conversation with him,
20 that he told you that the preparations for that
21 conference were almost over?  I thought that's what you
22 said?
23           A:   No, he didn't tell me that, but I
24 did.  Major Merryman told me that he told him that.
25           Q:   Oh, okay, Major Merryman said Major

PAGE 102

1  Zupinka told Major Merryman that?
2           A:   Yes.
3           Q:   Okay, that might be my confusion.
4           A:   Yes.
5           Q:   I don't want to belabor this point.
6  I just want to ask you are you sure you only had one
7  conversation with him?  With Major Zupinka?  Wednesday
8  you had said that you had talked to him on January 10th
9  and that everything else was by email and I just want
10 to without belaboring it.  Are you sure you only had
11 one conversation with him?
12           A:   Now, let me think about this.
13           Bailey:     Could you be more
14 specific counsel about what you mean by; do you mean
15 any conversation or do you mean about the subject?
16           Counsel:  No, about the subject.  And
17 maybe I can.  For example, you know you talked about
18 having a car.  Arrangements had to be made for you to
19 get a car or when you were going to take three days off
20 and arrangements had to be made for the Thursday,
21 Friday.  I am just asking you if your certain that all
22 of those; everything other than the January 10th, was
23 an email message as opposed to actual conversation?
24           A:   Yeah, I don't have any
25 recollections of having a conversation with him about

PAGE 103

1  anything.  It was all done by email.
2           Q:   Did you keep any copies of the
3  email either by electronically storing it somewhere or
4  by printing out hard copies?
5           A:   Yes.
6           Q:   Hard copies or?
7           A:   Yeah, I have hard copies, yes.
8           Q:   Okay.  If you look at page.  On
9  Exhibit 13, if you look flip over to page 7.
10          Bailey:     It's easier to go by what
11 paragraph your referring to.
12          Q:   Yeah, page 7 and then I was going
13 to refer you down to paragraph 43.  And just so we are
14 clear about this, if we look at Exhibit 15, which is my
15 Brief and paragraph 43, which would be the first
16 paragraph of that Brief; that's in which, the basic
17 allegation there is that.
18          A:   Okay.  Excuse me.  Where are we on
19 what page?
20          Q:   On page 15 of the Brief.  The first
21 paragraph, which would end up being the 43rd paragraph.
22          Bailey:     Counsel, your Brief, I
23 remember correctly had a number of exhibits?
24          Counsel:  Yes.
25          Bailey:     Do you have the exhibits,

PAGE 104

1  please?
2           Counsel:  We can get them for you.
3           Bailey:     Because that paragraph.
4  Well.
5           Counsel:  Although, my questions is not
6  going to be related about that so.
7           Bailey:     That's what I was going
8  to say.  I just want to so that you don't get irritated
9  with me.  That does make reference to, I believe AR
10 425, that's subsection C and if I remember correctly,
11 that may have been an exhibit.
12          Counsel:  Oh, it is.
13          Bailey:     Okay, well.
14          Counsel:  I said we can get the
15 exhibits, but I'm not going to discuss; I'm not trying
16 to ask you about regulations right now.  I just wanted
17 to give some context to your comments; because the
18 basic thing in paragraph 43 is that we were saying that
19 you should have gone to your supervisor and Major
20 Connelly.
21          A:   Yes.
22          Q:   Okay.  So, in response to that.
23          Bailey:     Based upon subparagraph C
24 in a 2001.
25          Counsel:  No, I don't think that is

SHEET 27  PAGE 105

1 cited in there, in fact, I happened; this is a Brief on
2 my Motion to Dismiss the Second Amended Complaint.
3 This is not the Brief that has the offensive citation
4 to the regulation and I happen to know that was on page
5 12 of the Brief that I had filed earlier, so.
6             Bailey:     Okay.
7             Counsel:  I'm not; I'm just saying to
8 give context to what you said, we said you have gone to
9 Major Connelly.
10      A:   Yes.
11      Q:   And on page 7, reference to
12 paragraph 43, then you say as an aside, Connelly was
13 unknown to me.  Is that right?
14      A:   Yes.
15      Q:   Was part of the reason that you
16 didn't talk; I am trying to figure out what that means?
17 "Connelly was unknown to me", as part of the reason you
18 didn't tell Major Connelly, the Bureau Director what
19 was happening, because you didn't really know him?
20      A:   Well that's in effect what is true
21 and what I meant; I mean other than know who the man is
22 and have had business related discussions on I don't
23 how many occasions, we never worked together or
24 anything like that.
25      Q:   Okay and then you go on to say

PAGE 106

1 "Cory"; I guess that would be Lieutenant Colonel Cory?
2      A:   Yes, mam.
3      Q:   "told me he was recommending me for
4 the Director of Bureau Professional Responsibilities;
5 it says BPR, but Bureau of Professional Responsibility
6 and not Connelly because Colonel Walt promoted Connelly
7 out of BPR because he was incompetent as a lieutenant?
8 Right?  That's your words.
9      A:   That's what he told me.
10           Bailey:    Now, I.
11      Q:   No, the I mean the words I just
12 read are your words and I'm going to let him clarify.
13           Bailey:    No, no, I am not trying
14 to interrupt, it just that while you back and forth
15 talking over each other, very innocently, I agree, he
16 had voiced a response.  I think he said, "That's what
17 he told me.; and I am not sure that came through on
18 the, yeah I want to make sure.  Is that what you said?
19      A:   Yes.
20           Bailey:    Okay.
21      Q:   So, these are your words, but
22 you're talking about what Colonel Cory told you about
23 what Colonel Walt's decision was?
24      A:   Yes.
25      Q:   When did Colonel Cory tell you

PAGE 107

1 that?
2             A:   That would have been.  Before I
3 answer that, I would like to clarify something.  This
4 document was a letter that I had written to my attorney
5 and I never had any; it was never in my imagination
6 that it would never end up in a public document and
7 being discussed and Colonel Connelly, I am glad you're
8 here today because it affords me an opportunity that I
9 haven't had yet to apologize to you.  Because it was
10 never my intent to put anything to writing to would
11 cause you embarrassment or anxiety or concern in any
12 way and had I known that, having gone what I have gone
13 through; what this department has put me through, I
14 would still conduct myself as a professional.  I don't
15 whether you would accept that apology or not?  But, it
16 is offered.
17           Bailey:       And sir, I also owe you
18 an apology because I included this as an Exhibit.  I
19 should have studied more closely.  My client did not
20 suggest to me.  I did not clear with him putting this
21 in as an exhibit and had I done so, quite frankly, I
22 would have requested permission from my client to do
23 so, so I am at fault and I would have redacted that
24 because it's a hearsay comment, it was not intended for
25 public use and I would like to publicly apologize to

PAGE 108

1 you.
2      Q:   With all that being said, which is
3 appreciated.
4      A:   Yes, Colonel Cory called me up to
5 his office.
6      Q:   Can you give me a time frame?
7      A:   I'm headed right there.
8      Q:   Okay.
9      A:   Sometime after Major Merryman was
10 transferred in September.  He was transferred, I was
11 named as acting.  We at that point in time we were at
12 the end of a promotion list.  In fact the next test for
13 promotion had already been scheduled, which I would
14 like to talk about it a little bit too, which was
15 October 9th, I believe was the exact date.  So, we are
16 at the end of a promotion test period.  I am the acting
17 that kind of sets the environment.  When I was talking
18 to Colonel Cory, he called me up and said "Look I am
19 going to support you for the position of the Director
20 of BPR".
21      Q:   This is while you are acting?
22      A:   Yes, I am acting.  During that two
23 week time period.  The irony is, I suppose of this is
24 that he told me that the two people, there was another
25 individual that he didn't.  There was two openings.

SHEET 28   PAGE 109
1 There was the opening in LCE vacated by Colonel Hikes
2 and BPR and he also mentioned that because of the
3 problems that had been created up in the Northeast by a
4 Captain Casalnick he was of the opinion to get him out
5 of there, he was probably going to be promoted to LCE
6 as the Director of Adman, though I guess was his frame
7 of reference.  He really didn't want to see that happen
8 either, but he did make this comment.  Again, I am not
9 sure.  I am certain that he didn't mean any harm by
10 that either.
11          Q:  Captain Casalnick would be the same
12 person that was ultimately Major Casalnick at the LCE?
13          A:  Correct.  He was _____
14 Dunmore.
15          Q:  Was anybody else present during
16 this conversation that you had with Lieutenant Colonel
17 Cory?
18          A:  No.
19          Q:  So, I take it. Tell me if I am
20 right.  That while you were the acting director of the
21 Bureau, that you were hoping that you might get to
22 actually be the Bureau Director?
23          A:  Of course.
24          Q:  And you were being considered for
25 that promotion?

PAGE 110
1          A:  The biggest horse I had in the race
2 was telling me that.
3          Q:  Okay and I guess where I am leading
4 with this; my question is.  Did the fact that Major,
5 now Lieutenant Colonel Connelly, but the fact that
6 Major Connelly was made the Major in charge of that
7 Bureau rather than you.  Did that have any bearing on
8 your decision not to tell him about the F.B.I.
9 investigation?
10          A:  No, of course not.
11          Q:  And when you said that Colonel Cory
12 had said that Colonel Walt promoted Connelly because he
13 was incompetent as a lieutenant did, when you decided
14 not to tell Colonel Connelly, did a belief as to his
15 incompetence have anything to do with that?
16          A:  No, I didn't know that statement to
17 be accurate or not.  I just remember that it was said.
18 I would have no way of knowing what level of competency
19 now Colonel has on that, I don't know.
20          Q:  Right.  But, the fact that had been
21 said to you, did that have any bearing on your decision
22 making about whether or not to tell?
23          A:  No.
24          Q:  Now, you go on to say "Colonel Walt
25 needed a minority Captain and promoted Connelly into

PAGE 111
1 the Emergency Preparedness Officer's position where he
2 had no staff and couldn't hurt anyone.  Again, is that
3 something that you have any first hand knowledge about?
4          A:  No.
5          Q:  That's just what Cory said to you?
6          A:  Yes.
7          Q:  And then the last sentence is
8 "Hikes will back me up on this".  In that are you
9 referring to Lieutenant Colonel Hikes?
10          A:  Yes.
11          Q:  And which part of that paragraph
12 will Hikes back you up on?
13          A:  Well I assume.  My assumption was;
14 and if I am correct that Hikes, Colonel Hikes would
15 have been the Deputy of Operations and would have been
16 involved in those discussions.  That is what I meant.
17 If Colonel Cory was right in what he was telling me and
18 if it were necessary, and trusts me, at this point in
19 the litigation, this is an issue that I don't even know
20 what the heck I got into for; but that is what he told
21 me.  This is what he said.  My thinking was that if it
22 is being done the way it is now, as I think I testified
23 to on Wednesday, Colonel Cory said that Deputies have
24 input and what have you.  He said Colonel Hikes would
25 know that or would be able to back that up. Again, I

PAGE 112
1 don't know, I was certainly not involved in those
2 decisions.
3          Q:  Okay so when you wrote that you
4 don't have any reason to believe that Lieutenant
5 Colonel Hikes would say that.  I mean you didn't have a
6 discussion with Hikes where he said "Yeah that's all
7 true".
8          A:  No.
9          Bailey:      Could we clarify?
10          Counsel: Um hum.
11          Bailey:      Is your response mean
12 that Hikes is involved in that process.  Not that he
13 substantively participated.
14          A:  Right.  My deduction was he was
15 involved in making that decision whenever it was made
16 during the Walt administration and I meant well Hikes
17 could probably back up that because what Cory was
18 telling me.  I don't know.
19          Q:  Were you upset about Major Connelly
20 getting the promotion as opposed to yourself?
21          A:  Well, I was certainly
22 disappointment that I didn't get promoted.
23          Q:  On that same page.
24          Bailey:      For the record, when was
25 he promoted?  Do you know?

SHEET 29    PAGE 113

```
 1          A:   October of 1998.
 2          Q:   That's October 3
 3          A:   October 3, 1998.
 4          Q:   Okay.  On page 7, drop down under
 5  that just a little bit.  It's under paragraph 44,but
 6  it's the next sentence where you say AR4-25.09A11
 7  states: Investigations conducted at the request of the
 8  Commissioner, however, this regulation does not
 9  supersede either the labor contract or my
10  constitutional rights and I know we have had a number
11  of discussions about constitutional rights.  What
12  provision of the labor contract was violated by the
13  Commissioner in conducting the investigation in the
14  summer of 1999?
15          A:   Well, I think I have already
16  testified off the top of my head to a.  I don't know
17  the Article numbers.  I would say at least some of the
18  probations of Article 26, I believe, which is
19  Discipline as they relate to notification of the
20  interview, representation, the whole contract has been.
21  The whole provisions of transfer and discipline of the
22  contract has been circumvented by not following what I
23  am entitled to by way of issuance of the DAR, a
24  predisciplinary conference.  The opportunity to file a
25  grievance, hear witnesses, have the case heard before a
```

PAGE 114

```
 1  neutral is simply circumvented.  That might jumping to
 2  the end.
 3          Q:   Yes.
 4          A:   If I had the contract in front of
 5  me I would be glad to go through it for you.
 6          Q:   Well I just wanted to understand
 7  the basic premise, which is that in your opinion that
 8  the transfer was discipline that was done without going
 9  through the.
10          A:   Yes.
11          Q:   Okay.
12          A:   Whatever those applicable
13  provisions of the contract were.
14          Q:   Okay, that's the part I was trying
15  to understand.
16          A:   Okay.
17          Q:   Okay, skipping the next sentence
18  and going to the final paragraph on page 7, it says, "I
19  was specifically told an administrative inquiry was
20  being conducted and administrative was not.
21  Administrative investigations are defined, inquires are
22  not".  And I'm not sure, could you explain to me what he
23  distinction is that you are making there between an
24  administrative inquiry and an administrative
25  investigation?  I was asking you what the difference,
```

PAGE 115

```
 1  the distinction that you are trying to make between an
 2  administrative inquiry and an administrative
 3  investigation?
 4          A:   Well, I was trying to make that
 5  distinction too.  I was trying to understand that
 6  distinction when Majors Walt and Williams put me
 7  through that.  They were very specific and as the
 8  notification of inquiry indicates, that this was very
 9  specific that this was an inquiry and not an
10  investigation and I am asking the question or posing
11  the observation that administrative or internal affairs
12  investigations are defined.  There is a number of
13  references in different parts of our regulations I am
14  sure, specifically AR425.  I don't know what an
15  administrative inquiry is.
16          Q:   I'm trying.  Are you trying to say;
17  are you asserting that there is no such thing as an
18  administrative inquiry?
19          A:   I'm asserting that I think with all
20  do respect to the individuals in the room.  I think
21  there was a clear attempt to do a definition of the
22  word "is" here.  Administrative inquires and landscape
23  don't exist.  I am not suggesting that there may no be
24  some off handed reference in our directive buried
25  somewhere, but when we talk about AR425 and we talk
```

PAGE 116

```
 1  about IAD investigations and administrative
 2  investigation.  We are talking about those that are
 3  defined and all the procedures therein.  We don't talk
 4  about inquiries because they don't exist.  And my
 5  opinion and the basis of that statement is that this
 6  was a term that was conjured up in order to cover up
 7  something that didn't exist and to try to provide a
 8  basis to conduct the investigation knowing that no
 9  wrong doing had ever occurred.
10          Counsel:  And could you mark this as an
11  Exhibit.  I forget what number we are up to now; it's
12  16 or something.  The front says Exhibit A but that's
13  because you were concerned about us talking the
14  regulation without the exhibit, that is the Exhibit A,
15  which is a copy of AR425.  So, it's easier to discuss
16  if we have it out, I think.
17          Bailey:       Exhibit 16?
18          Counsel:  Yes.
19          Q:   You talk about the definition of an
20  administrative investigation being defined and on page
21  2, which is 2504(b).  It defines administrative
22  investigation.  And the term administrative
23  investigation is defined as inquires into alleged
24  misconduct by personnel or any inquiry into the actions
25  department personnel required by directives where no
```

SHEET 30  PAGE 117

1  misconduct is alleged.  So, I guess my question is,
2  since an administrative investigation is an inquiry, is
3  there really, in your mind any significance between
4  whether you call it an administrative inquiry or
5  whether you call it administrative investigation?  Is
6  there really any substantive difference in your mind?
7          Bailey:      Objection.  You may
8  respond.
9          A:   Absolutely.
10         Q:   Can you tell me what the difference
11 is?
12         A:   Because we don't find the
13 definition for an administrative inquiry.  The
14 definition describes what it is and yes, obviously, the
15 word "inquiry" is used, but I have yet to see a
16 process; this describes a process and in that
17 definition, this process is defined by regulation. It
18 is referred to in the labor contract and all of the
19 things that.
20         Bailey:      You mean the process of
21 administrative investigation?
22         A:   Yes, the administrative
23 investigation process incorporates all of those things.
24 I am just asking the question or making the observation
25 that the term "administrative inquiry" is not defined

PAGE 118

1  here.
2          Q:   Okay.  Mark that as 17.  I'm going
3  to show Exhibit 17, which is page 33 of the elective
4  bargaining agreement and at the bottom there, under
5  Section _____, it says a member shall be
6  advised of their _____, Miranda rights when
7  applicable.  A member who is the subject of an
8  administrative inquiry or internal investigation shall
9  be advised of and upon request, the afforded PST
10 representation at any interview predisposition
11 conference, DRA issuance or any hearing.  So, I am
12 trying to understand in light of the fact that the
13 collective bargaining agreement gives you certain
14 rights when there is an administrative inquiry.  I
15 guess what the problem with it referring an
16 administrative inquiry, investigation as an inquiry
17 versus an investigation.
18         Bailey:      Objection.  You may
19 respond.
20         A:   Well, I think we are still back to
21 square one.  There is no denying that, and I was aware
22 as I said, I didn't setting here and suggesting that
23 phrase does not appear in the regulations or in the
24 labor contract.  Be that as it may, we are still back
25 to the problem that you folks have is that the basis in

PAGE 119

1  order to conduct whatever you want to call it, doesn't
2  exist.  Now, calling it and trying to water down and
3  call it an inquiry is not going to cut it and isn't
4  going to provide what you need and I know that.  And
5  there is a reference to that here.  You are correct.
6          Q:   Now what is a supervisory inquiry?
7          A:   A supervisory inquiry is a process
8  that I helped.  I was one of the architects when I was
9  in Internal Affairs.  It is a process by which we
10 attempted to.  And again, I would not be able to its
11 success or not at this point.  But, the intent was to
12 develop a process that would help streamline the
13 resolution of what are considered in more of the minor
14 or routine type of complaints against personnel.
15         Q:   And is the term "supervisory
16 inquiry" defined in AR4-25?
17         A:   Nope.
18         Q:   But, it is something that you
19 helped implement?  Correct?
20         A:   Correct.
21         Q:   Did you have a fairly major role in
22 that?
23         A:   Oh, I don't know if I would
24 consider it major.  I was involved, I think that my
25 recollection of its origin is that it came in part out

PAGE 120

1  of my participation in the disciplinary committee
2  meetings.
3          Q:   Did you help draft the special
4  order?
5          A:   Yes.
6          Q:   That would put that into place?
7          A:   That's my recollection, yes.
8          Counsel:  But, before we get into more
9  questions about the supervisory inquiry process.
10 Something that I had noticed I am going to ask you
11 about.
12         Q:   The inquiry that was done into the
13 complaint that.  Do you remember yesterday when we were
14 talking about IAD199-409, which all started apparently,
15 when Mr. Conti wrote a letter to someone?
16         A:   The hearsay Complaint.
17         Q:   Right.  Okay, but you know which
18 one I am talking about with Mr. Conti.  The one that
19 you felt got you kicked off the Museum Committee or
20 Book Committee?
21         A:   Absolutely.
22         Q:   Okay.  Now that was a supervisory
23 inquiry wasn't it?
24         A:   Yes.
25         Q:   So, that was a supervisory inquiry.

SHEET 31  PAGE 121

1  Is that sort of the lowest level of inquiry that you
2  would do in Internal Affairs?
3          A:  Once it gets to Internal Affairs
4  and it is put the system.  Yes, I would say it's fair
5  to characterize that as the, in comparison to its
6  sister, the administrative investigation.  Yes.
7          Q:  Okay and in a supervisory inquiry,
8  can that result in formal discipline?
9          A:  Yes.
10         Q:  The supervisory inquiry itself?
11         A:  Well.  No, I'm sorry.  No.  The
12  process was built with a safety net that should the
13  investigator in conducting a supervisory inquiry and
14  again, I don't that is how its being run now, I really
15  don't know, but I am recalling what the thinking was
16  when, based on my participation is, was.  That if there
17  was a point when the investigator believed that
18  misconduct occurred that warrant an Internal Affairs
19  investigation be conducted, it could result in
20  discipline then there was a jump out point in the
21  process to convert that.
22         Q:  So, a supervisory inquiry would
23  need to be upgraded to a full Internal Affairs
24  investigation before the subject member could actually
25  be subjected to any kind of discipline?

PAGE 122

1          A:  Not necessarily.  That was the
2  intent of what we had developed.  As long as the
3  member's rights have been protected and it has been
4  adjudicated and whatever, you can't just issue a DAR.
5  Well, let me think about that.  To receive certain
6  types of discipline, like a transfer, you would need to
7  be issued a DAR.  But, you could be disciplined.
8          Q:  And a DAR is?
9          A:  Disciplinary Action Report.
10         Bailey:        Is this going to marked
11  as 18?
12         Q:  Yes.  Um, 18 is a copy of a special
13  order regarding AR4-25.  Could you just take a look
14  through and see if it's the special order that you
15  drafted?  Basically I am trying to give you some
16  context as your answering my questions in case you
17  can't remember the answers off the top of your head
18  about supervisory inquiries.  Now under subsection A
19  the definitional section about the supervisory inquiry
20  process and it says complaints which can be resolved by
21  commander's supervisors to the supervisory inquiry
22  process include minor infractions,
23  omissions/commissions, which violate department policy
24  or regulation and performance inadequacies for which if
25  true, would not give rise to formal discipline.  Right?

PAGE 123

1          A:  Um hum.
2          Q:  And it gives some examples.
3  Dissatisfaction of performance of duties, rudeness,
4  discourteousy.
5          A:  Right.
6          Q:  So, in other words, if somebody did
7  something, if somebody that if a commander thought that
8  their subordinate didn't perform their job very well
9  for one reason or another; they could do a supervisory
10  inquiry even if they didn't know if the member had done
11  anything wrong that would, could result in discipline?
12  Is that the idea?
13         A:  No, what you have just described
14  would not be correct.  The 425 in its current form has
15  a provision for dissatisfaction or performance of duty.
16  Now, let me explain that it's my recollection that this
17  was also a more streamlined process or that the ability
18  to streamline that process was also one of the intended
19  goals here.  That's what I recall.  But, what you just
20  said is two different things and your example; maybe
21  you just need to refine that for me.  You said that
22  there was dissatisfaction with the performance.  That
23  would be the trigger mechanism to conduct a supervisory
24  inquiry, not misconduct.
25         Q:  Right, that's what I was asking

PAGE 124

1  you.  The dissatisfaction, not the misconduct is in
2  other words.  You do a supervisory inquiry if you're
3  dissatisfied with the member's performance.  There
4  doesn't necessarily have to be any misconduct.  There
5  could just be a performance inadequacy?  Right?
6          A:  It could be, yes.
7          Q:  Okay.  The supervisory inquiry
8  process that is purely administrative isn't it?
9          A:  As opposed to?
10         Q:  In other words, it's something that
11  is internal to your office; it's not going to resolve
12  in some kind of criminal charges, anything like that
13  later?  It's an administrative process?
14         A:  Yeah, yes.
15         Q:  If you don't understand, fine.
16         Bailey:        No, I object to the form
17  of the question.  You go ahead and respond.
18         A:  Well, this would not be the process
19  we would employ to the threshold testing that I have
20  mentioned several times in my testimony.  I think that
21  is built in here and I think I saw that somewhere, if I
22  can.
23         Counsel:  Yeah, I think if you might
24  look over to; well, maybe not threshold.  Maybe I'm
25  getting ahead of you, so go ahead.

SHEET 32   PAGE 125

1     A:   Well, I don't want to take up a lot
2  of time.
3        Q:   I was thinking. I didn't know if
4  you were talking about the upgrading we discussed
5  before? If you look at paragraph F, that's the
6  upgrading?
7        A:   No, I say something that I think we
8  used as a basis for that initial testing. If I can
9  find it real quick here.
10       Bailey:     The reporting a brief
11 synopsis of the allegation? Is that what you are
12 referring to? A brief synopsis of information obtained
13 from an interview from the Complainant?
14       A:   Oh here it is. No, it's in the
15 first sentence. The definition. Complaints that can
16 be resolved through this process are those that if they
17 were true, again, and that is what I have tried to
18 characterize as some kind of threshold testing, that if
19 the allegation, on its face, were true; would not give
20 rise to formal discipline meaning written reprimand or
21 above.
22       Q:   And I think that is the portion we
23 were talking about that it says, "minor infractions,
24 omissions or commissions that violate policy,
25 performance inadequacies, which if true, would not give

PAGE 126

1  rise to formal discipline". Right?
2        A:   Um hum.
3        Q:   If you did find something during
4  that initial more streamlined process as which you
5  called it. That you thought the member had actually
6  been engaged in misconduct of some type. Then it would
7  be, I believe under subsection F, the supervisory
8  inquiry would then be upgraded to a full investigation?
9        A:   Correct.
10       Q:   And then it would be at only after
11 that full investigation that any kind of discipline
12 would be imposed?
13       A:   That's what supposed to happen.
14       Q:   That's what I am asking?
15       A:   Yes.
16       Q:   Now, if the. In the supervisory
17 inquiry if we look at. Before I get to that, what are
18 the kinds of corrective actions that would be taken in
19 the supervisory inquiry. Since you get a formal
20 discipline, what kind of things could happen at the end
21 of the supervisory inquiry?
22       A:   Well, it wouldn't be formal
23 discipline. It would be the process, it was intended.
24 If the allegations turned out to be true or the matter
25 at hand turned out to be true; the typical outcomes in

PAGE 127

1  that situation, I would guess might be just an issuance
2  of a supervisory notation.
3        Q:   You mentioned that term before.
4  What's a supervisory notation?
5        A:   There's a. It's the process by
6  which members are; not civilians, but members in the
7  State Police are given counseling notes or attaboys or
8  whatever you want to call it. The entire process is
9  defined in the AR. I believe it is 426, but.
10       Q:   But when it's a notation, what is
11 it notated on?
12       A:   It's on a form. A preprinted form.
13 It would say you were late for your duties on such and
14 such of date.
15       Q:   Does that go on your official file?
16 Or not?
17       A:   I think the regulations says they
18 go in a supervisory file and if there are no
19 reoccurrences within a specified period of time, they
20 are to be destroyed, but I could be wrong on that; I
21 could only. I think that is what it says.
22       Q:   On paragraph b at the end of there.
23 It said supervisory inquires are intended to be
24 resolved through counseling, training or other remedial
25 action. Which supervisory notes, citations as you have

PAGE 128

1  explained to me, I guess that's that too. Um, training
2  what would that mean? That you could just teach them
3  how to do their job better or what does that mean?
4        A:   I recall exactly where that came
5  from. Yes. To answer your question succinctly, yes.
6  That came out of the discipline committee meetings. We
7  wanted to instill in our process something that
8  accounted for training or lack of training as the
9  result of. That may play a contributing factor in
10 resulting behavior and the future reoccurrences could
11 be avoided simply by offering training that was where
12 the basis of that language came from.
13       Q:   Now, if a um. During a supervisory
14 inquiry, if we look at subsection (d)2 all subjects of
15 this supervisory inquiry shall be issued a notification
16 of inquiry and an administrative warning? Is that
17 right?
18       A:   Yes.
19       Q:   And the notification of inquiry, is
20 that the same kind of. What I am asking you is this
21 the same type of form that we have been talking about
22 all along?
23       A:   Yes.
24       Q:   Okay and then the administrative
25 warning, by giving you warnings, does that mean your

SHEET 33   PAGE 129

1  garity warnings that we discussed?

2          A:   Yes.

3          Q:   Which is where you're told that
4  anything you say can't be used against you in criminal
5  context, but could be the subject of force of
6  discipline?

7          A:   Correct.

8          Q:   And if a person is a subject of a
9  supervisory inquiry are the required, compelled to
10 attend that interview?

11         A:   Yes.

12         Q:   And if they refuse to answer the
13 questions, then what would happen to them?  Or could
14 happen?

15         A:   They could be subjected to formal
16 discipline.

17         Bailey:        Counsel, I don't mean to
18 be; is there somewhere in any of your documents or
19 paperwork that can help us, what was the allegation?

20    Counsel:  What allegation?

21         Bailey:        Well, this inquiry.  I
22 don't know whether it was supervisory, administrative
23 investigation, administrative inquiry?  What was the
24 allegation?  What has he done wrong?

25    Counsel:  I'm right now just asking him

PAGE 130

1  questions about the supervisory inquiry process so, I
2  understand the difference between you know, you have
3  attached significance to the use of the term
4  "administrative inquiry or administrative
5  investigation" and the fact that administrative inquiry
6  is not defined in AR425. We also have the supervisory
7  inquiry, which is not defined in AR425 so, it can be a
8  little bit confusing once you get all these different
9  kinds of inquiries going on.

10         Bailey:        Let me say this because I
11 am trying to do my best to abide by your concerns in
12 the past.  I will not put any other objections on the
13 record.  I would object to this entire line of inquiry
14 as irrelevant. And I would make a respectful request
15 that at some point, some evidence or basis so that we
16 can.  We are talking about simply a procedure of due
17 process issues I understand, but at some point, I
18 respectfully request that some basis of what the
19 allegation or what the complaint was.  We know who the
20 complainant was.  We're doing great on the procedure of
21 due process.  I object to the relevancy of this.  I
22 will not interrupt you again.  Thank you for your
23 courtesy.

24         Counsel:  Thank you.  As I think we
25 both, you know, understand some of my questions are

PAGE 131

1  designed to find relevant evidence as opposed to saying
2  that it is already found.

3          Bailey:        No, no, and I think your
4  points are well taken, but the underlying relevancy
5  issues that is why I am raising it.  I don't want to
6  interrupt at each question.  I am just saying that I am
7  still in the dark as to what the allegation of
8  misconduct was.  I still don't understand.  But, thank
9  you very much.

10         Q:   Now in a supervisory inquiry, the
11 subject is not given Miranda warnings are they?

12         A:   No.

13         Q:   And they are not told you have the
14 right to have an attorney present, anything like that?
15 Right?

16         A:   No.

17         Q:   Okay.  Now, I want to go back to
18 the summer of 1999, when the commissioner decided to do
19 an inquiry and you said you were specifically told it
20 was administrative investigation and not an
21 administrative inquiry?  Is that right?

22         A:   The other way around.

23         Q:   Oh, you were specifically told it
24 was an administrative investigation and not an
25 administrative?  I'm confused.  What were you

PAGE 132

1  specifically told?

2          A:   It was an inquiry not an
3  investigation.

4          Q:   Okay.  So, you were told this is an
5  administrative inquiry and it's not an administrative
6  investigation?

7          A:   Correct.

8          Q:   Now, back in 1999, if one of your
9  supervisors felt that you handled the F.B.I.
10 investigation inappropriately, then this supervisory
11 inquiry process could have been used to investigate
12 that?  Is that right?

13         Bailey:        Objection.  Objection to
14 the term "administrative inquiry process".

15    Counsel:  I thought I said supervisory
16 inquiry process.  In other words.

17         Bailey:        I may have misheard you.

18         Q:   In other words, I'm getting at.
19 Did they use the wrong process in your mind?

20         Bailey:        I may have misheard you.

21         Q:   Supposed they hadn't conducted what
22 you felt was the improper investigation, but one of
23 your supervisors is unhappy with the way that you
24 conducted the F.B.I. investigation. Would it had been
25 appropriate for them to conduct a supervisory inquiry

SHEET 34   PAGE 133

1 under the procedures that are set out here?
2            A:   Absolutely not.
3            Bailey:        Objection.  You may
4 respond.
5            Q:   Now can you tell me why would that
6 have been inappropriate?
7            A:   Whether we call it a supervisory
8 inquiry or an internal affairs investigation or
9 administrative investigation; what you have just
10 described is not more than someone saying well, I'm not
11 happy with something, I should investigate. I just need
12 to search around and figure out what to call it.  The
13 definition of supervisory inquiry process. The way I
14 read it would not allow them to do or not support what
15 they did anyway.
16           Q:   Well, they said if there were
17 performance inadequacies, that's one of the reasons.
18 What I am saying is if one your supervisors believed
19 that the way that you handled the F.B.I. investigation
20 was inadequate, was bad job performance; wouldn't they
21 be able to do a supervisory inquiry.  And at this
22 moment I am not trying to debate with you whether the
23 inquiry that was done, what kind of an inquiry it was.
24 I'm saying an appropriate way to have handled the
25 situation if one your supervisors thought, say Major

PAGE 134

1 Connelly, thought, you know, I think his performance
2 was inadequate.  He should have told me about this.
3 Could he have asked for a supervisory inquiry? And done
4 it by the books of what a supervisory inquiry supposed
5 to be, but could he have done a supervisory inquiry?
6            Bailey:        Objection.  You may
7 respond.  It's very, very complex.  It is my
8 understanding that the question is that if a.  That the
9 basis is that if Mr. Evanko wanted to know why he
10 wasn't told.
11           Q:   No, I am asking if Mr. Evanko,
12 Lieutenant Colonel Cory, Major Connelly; if any one of
13 your supervisor thought that you handled the F.B.I.
14 investigation inappropriately and that when you were
15 contacted by the F.B.I. that the appropriate, proper
16 good job performance would have been to tell Major
17 Connelly instead of going to Lieutenant Colonel Hikes;
18 wouldn't a supervisory inquiry, that being a minor
19 matter; wouldn't a supervisory, which again, I think
20 you have said repeatedly that there was no misconduct
21 on your part, so I am not talking about misconduct.  I
22 am saying that if they felt that you handled it badly
23 and that in performing your job you have should have
24 done it differently wouldn't it be appropriate thing for
25 them to do would it be appropriate for them to do a

PAGE 135

1 supervisory inquiry?
2            Bailey:        Objection.  You may
3 respond.
4            A:   In my opinion, no.
5            Q:   And why is that?
6            A:   Because there was no basis to go
7 jump to the end.  It's contrary to the whole concept of
8 what we tried to put in place.  The concept that we
9 have tried to put in place is a continuum of action
10 based on what's occurred. And the hypothetical, with
11 all do respect, doesn't make sense because we have
12 already heard testimony and I have already been told
13 that I was the subject of an internal affairs
14 investigation.  So, if there were any questions about
15 that, that could have employed this process or someone
16 might have tried to use it and it is clear that is
17 after the fact thinking, now; the first thing that
18 should have occurred is someone should have just called
19 me and talked to me about it and make some kind of.  If
20 all of those things had happened and you get to some
21 point as a rationale, logical supervisor and say well,
22 I'm not satisfied with what I have seen, you violated
23 something here.  Your performance is inadequate because
24 you didn't follow directions or you didn't follow an
25 understanding or a standing order or a past practice,

PAGE 136

1 perhaps.  But, not of those things have occurred, so I
2 don't know that I could assert that hypothetical
3 because it's missing way too many pieces.
4            Q:   I'm not trying to actually.  It's
5 not that much of a hypothetical.  You have said that
6 you think that they handled this badly.  I mean you
7 know that your supervisors were unhappy with you did,
8 right?  Isn't the whole point of why we are here?
9            Bailey:        No, the whole point of
10 why we are here is why they were unhappy.  Well, your
11 characterizing things.  You have asked us three or four
12 times.  I'm going to let him respond one more time.
13           Counsel:  I want to make sure that you
14 get the question and the answer.  That you understand
15 what I am asking you when give the question.
16           Bailey:        Counsel, with all do
17 respect, and again, I am not being argumentative. He
18 has been asked this during the last day now day and a
19 half; at least a dozen times.  I understand that you
20 may not be getting the response you want, no, I am not
21 doing anything substantive here, interfering or leading
22 you.
23           Counsel:  No, I said.
24           Bailey:        It's just becoming
25 tedious.  I'm going to let him respond again a last

SHEET 35   PAGE 137

1  time. He has already characterized according to
2  procedures, your exhibits, he's been through it. He's
3  an extremely competent, well-informed witness. He has
4  responded accurately and to the point and just not
5  coming up with the magic words to fit the question.
6  Now it's becoming argumentative and I respectfully
7  request that we move on.
8              Counsel: It's noted, but I have not
9  until within the last 20 minutes asked you anything
10 related to what I am asking you now. You had said
11 yesterday, when all this stuff we were talking about
12 what's improper, you explained to us the way they
13 handled it. The inquiry they conducted or the
14 investigation, w which ever it was they called it? Why
15 they felt, why you feel that was improper? What I am
16 asking you and not as a matter of their hind side, but
17 for my own understanding is about what the proper way
18 for them to have handled it was. And what I am saying
19 is since you have characterized the one. That one is
20 improper. If they did do a supervisory inquiry, would
21 that have been proper?
22              Bailey:        Objection to the form of
23 the question. I'm going to let you respond again. You
24 may respond. If you can understand the complexities of
25 that you may respond and don't read any inference into

PAGE 138

1  that, just be careful because it's an extremely
2  complex, multifaceted question.
3              A:  I don't agree in any way shape or
4  form that there was ever any reason or rational basis
5  to put me into any kind of investigative process as a
6  result of my decision-making. The supervisory inquiry
7  process affords, it says what it says. It affords
8  supervisors, commanders and directors a vehicle by
9  which they can resolve minor complaints. That's my
10 answer.
11             Q:  Okay, and one of the types of
12 complaints is rudeness, right?
13             A:  Yes.
14             Q:  So, if you were rude, then it would
15 be okay to do a supervisory inquiry?
16             A:  I would never do that.
17             Q:  I'm saying, but you could because
18 its one of the examples in there, right? I'm just
19 saying. Now, you have said. If you will look back to
20 Exhibit 13, which is a letter.
21             A:  Um hum.
22             Q:  And I will follow up so that you
23 see where I am going with it after I ask you. But,
24 page 4 at the bottom with respect to.
25             A:  I'm sorry, what page?

PAGE 139

1              Q:  Page 4, I think it's a 4. Paragraph
2  28. And what your saying is defendants are trying to
3  set a trap by saying I could not have been acting in
4  the public interest by telling Hikes and being
5  requested by F.B.I. to keep the matter confidential.
6  You had said this theory ignores true facts. One, the
7  F.B.I.'s request not to divulge the existence of the
8  investigation was not a legally binding one. You said
9  that, right?
10             A:  Um hum.
11             Q:  Skip down a little bit and it says
12 "I informed Hikes because I made a judgment call that
13 someone of appropriate rank and authority ought to be
14 made aware and to me, Hikes was an obvious choice"?
15             A:  Correct.
16             Q:  Now, part and parcel of job
17 performance. As a Captain, you're a high-ranking PSP
18 official are you not?
19             A:   In title only.  At the current
20 time, yes.
21             Q:  But, back in 1998, when the F.B.I.
22 contacted you and your were the Director of the
23 Internal Affairs Division, you were a high-ranking
24 member of the State Police?
25             A:  Yes.

PAGE 140

1              Q:  And part of the responsibilities of
2  a high-ranking member, a large part of your
3  responsibility is to exercise judgment?
4              A:  Yes.
5              Q:  So, when we are talking about
6  whether there was a performance inadequacy for which a
7  supervisory inquiry could be conducted, if your
8  supervisors thought that you made a poor judgment call
9  that would be a performance inadequacy?  Right?
10             A:  I don't believe so. There's not
11 regulation that says you shall exercise good judgment
12 or I don't think there is.
13             Q:  No, but don't you think that.
14             A:  Let me try it this way. If my
15 supervisor thought that I had exercised poor judgment
16 and I am sure that has probably occurred over the
17 years, although I don't know off the top of my head
18 when that was. But, if in an instance when they
19 thought I exercised poor judgment is simply what would
20 occur or what you would expect, what would happen is
21 they would just call in and discuss it with you. They
22 would discuss your judgment. What you did wrong,
23 _____ afford that training opportunity and that
24 would be the end of it.
25             Q:  Do I understand your position

SHEET 36   PAGE 141

1  correctly that this, tell me if I am wrong about what I
2  think I hear you saying to me, which is that if a high
3  ranking member or the director of a division exercises
4  bad judgment that is not any type of performance
5  inadequacy?  Is that what your saying to me?
6           A:   I didn't say that never occurs.
7           Q:   No, no I'm not saying whether it
8  occurs. I'm trying to understand since the supervisory
9  inquiry process can be used for performance
10 inadequacies, are you saying that if a person as a
11 director of a division exercises bad judgment that he
12 is still performing his duties adequately?
13          Bailey:      Objection. Counsel, I am
14 going to let this go on for a little while longer.
15          Counsel:  I'm not going to go on too
16 much longer with it.
17          Bailey:      Well, it's not going to
18 go on too much longer, because its just; again I don't
19 want to feed into this, but we are just playing word
20 games and its just being repetitious.  Go ahead and
21 respond Mr. Ober.
22          A:   Well, I feel like your wanting me
23 to give a very binary answer, either yes or no that
24 covers every situation even though that's not
25 specifically what your saying and I'm not trying to be

PAGE 142

1  argumentative or even elusive with mam. It's just that
2  wouldn't that be something that would be decided on a
3  case-by-case basis?  I would think.  It depends on
4  maybe perhaps the outcome or the consequences of that
5  bad judgment.  If I exercise bad judgment in fueling up
6  at Citgo as opposed to the next place down the street
7  that accepts a state credit card, I guess that could be
8  defined as bad judgment because right on the credit
9  card it tells you which stations accept it and which
10 stations do not.  And in that situation my boss would
11 probably just tell me don't do it again.  And if I made
12 the inappropriate expenditure or at least in their
13 mind, they might normally just say, don't do it again.
14          Q:  Okay, so even the bottom line of
15 whether something was a bad judgment call, also,
16 requires someone to exercise their judgment, right? I
17 mean you got to like, if you're the supervisor and
18 somebody made a judgment call and then you, in other
19 words, for Evanko to day I think that you made a bad
20 judgment call, that's him exercising some judgment
21 himself, correct?
22          A:  I guess.
23          Bailey:      Not very subjective, is
24 it?
25          Q:  I'm saying. I'm not trying to get

PAGE 143

1  you to say that you that you made a bad judgment call
2  by going to Hikes, I'm just saying that the way in
3  which a supervisor exercises his own judgment can be.
4  For example, in your, let me find the spot.  Lets look
5  at page 8 of Exhibit 13.  In paragraph 49.  Now
6  paragraph 49 from my Brief. Do you want to take a look
7  at it, which is Exhibit 15.  I believe paragraph 49 was
8  talking about me saying that as the commissioner of the
9  State Police that the.
10          Bailey:      _____.
11          Counsel:  Yeah. I think it's pretty
12 obvious from the context that I was trying to give it
13 you.  There's paragraph 49. At the bottom of page 16.
14 It's talking about whether the commissioner.
15          Bailey:      A reasonable basis for
16 believing?
17          Counsel:  Yeah, for transferring you to
18 a person.  Basically on the page, you have numbered
19 yours paragraph 49, but the argument that we are making
20 here is that the commissioner had to exercise his
21 judgment about where to put you that you would be most
22 useful.  It's up to the commissioner to put members
23 where he thinks.
24          Bailey:      You're talking about the
25 transfer to Washington?

PAGE 144

1           Counsel:  Right.  That's to give some
2  context.  We were arguing that the commissioner
3  exercised his judgment and thought you would be most
4  useful out in Washington. So, in response to that, on
5  page you say "To a position where Evanko felt I would
6  be most useful.  If this is true, this statement
7  indicts Evanko as the world's worst police
8  administrator.  If he really believed the needs of the
9  department would be better served with me being
10 prematurely ripped from a One Hundred Million Dollar
11 technology project and sent two hundred miles to an
12 assignment for which the preparations were already
13 being wrapped up and then having failed in that
14 maneuver, transferring me to replace a sergeant, who
15 was filling in for a lieutenant, he should be removed
16 as a public disgrace".  Right?
17          Bailey:      It says already wrapped
18 up.  The word begin wasn't in there. But, aside from
19 that, we agree with your reading.
20          Counsel:  Sorry about that I wasn't
21 trying to add words in it, but.
22          Bailey:      No, no I don't think you
23 were.
24          Q:   But that's what you have said,
25 right?

SHEET 37   PAGE 145

1        A:   I believe that and I said it.

2        Q:   And that is because you believe
3 that transferring you from the IMS project out there
4 would be, that if Evanko really thought you would most
5 useful that would be a horrendous excise of judgment?

6            Bailey:      Objection.  That's one of
7 a number of things mentioned in that paragraph.  With
8 that _____.

9            Counsel: Okay, what I'm asking. Is some
10 in substance of your paragraph aren't you saying if
11 that's all true, then he's got the world's worst
12 judgment and he shouldn't be the top cop, top, top
13 administrator.  Is that what your saying or not?  And
14 if not, explain to me what you are saying.

15           Bailey:      Objection.  You may
16 respond to what you meant by that paragraph.

17           A:   It says what it says. What else can
18 I say? I believe, you see. The difficulty is and I
19 really am sensitive to the notion that it's obvious,
20 Ms. Guido, that you haven't been; most likely have not
21 been informed of a lot of these things by your clients
22 and this is not personal against you. I know enough
23 about and last couple years have certainly taught me
24 about life lessons about what State Police is really
25 like in some cases. What this statement refers to is in

PAGE 146

1 response to what's in the Brief is that this whole myth
2 was created, the cover up was created and to see this
3 in writing and I am sure you and Joanna probably just
4 wrote what were you told, at least I'm trying to give
5 you that much credit. But, virtually no one believes
6 this.

7            Counsel: Unfortunately, you can't blame
8 Joanna, but go ahead.

9            A:   Well, whoever, I'm trying to be a
10 professional about this.  You know when I make these
11 kind of observations its because of the idiocy and the
12 silliness of this myth that was created after the fact.
13 And when I say, look if his judgment, if you want to
14 use that phrase is that poor because at the root of
15 this is the real intention, which is to discipline me.
16 Okay.  I go back to what was reported to me in that
17 meeting that I spoke of on January 6th or January 7th
18 when the mere mention of name elicited a physical
19 response in this man. I go back and I think about his
20 facial expressions and how irate he was when Colonel
21 Hikes and I informed him and I think, you know,
22 somebody that acts in that capacity.  I'm a taxpayer
23 too in addition to being an officer in this department
24 and you know, I would want to give enough context to
25 that statement to make you understand that, yeah I

PAGE 147

1 wrote that and I believe it.  It says what it says.
2 Somebody who exercises that poor judgment about
3 assigning their personnel, this man has control of a
4 half a billion dollar budget and a department of six
5 thousand people.  I expect more.  I have higher
6 expectations than to bastardize and abuse a process for
7 his own personal vendetta to send me somewhere that
8 doesn't even exist.  To a position that doesn't even
9 exist.

10           Q:   So, in making that judgment call,
11 that would be a performance inadequacy, right?

12           Bailey:      Objection.

13           Q:   Did Colonel Evanko exercise; in
14 other words was he doing, do you see what I am saying?

15           A:   No.

16           Q:   Okay, let me back up then.  It's
17 almost like you don't want to see the obvious.  And
18 that is if a top administrator.

19           Bailey:      I object to that.  Now,
20 lets put a stop to this.  Just ask him a question and
21 let him answer it.

22           Q:   If a top administrator exercises
23 bad judgment.  He's not doing a good job is he?

24           A:   At least in that instance, I would
25 say no.

PAGE 148

1            Q:   Right, that's what I'm saying.

2            A:   No, his judgment was poor.

3            Q:   Okay, and if judgment is poor that
4 could sometimes, exercising poor judgment could be
5 performance inadequacy, right?

6            A:   I'm not sure what kind of
7 supervisory relationship he has with his boss.  I mean
8 if they determine that supervisor performance
9 inadequacy, I don't really know, mam.  I don't know how
10 it works for him.  I don't know who he is accountable
11 to and by what mechanism?  I just have no concept of
12 what you're trying to ask me, so.  We don't have a
13 regular, oops sorry.

14           MR BAILEY:  Okay.

15           COUNSEL:  I'm going to explain my
16 question one last time and whatever you answer is.

17           MR BAILEY:  I tell you Counsel it's
18 really going to be the last time, please.

19           COUNSEL:  Well it's going to be the
20 last time, but not because you're telling me it's going
21 to be the last time.

22           MR BAILEY:  All right.  Not because
23 I'M telling you.  I'm begging you.  I'm begging and
24 pleading to make it the last time.

SHEET 38  PAGE 149:

1      COUNSEL:  The reason I'm making the
2  last time, because it's seems to me that you're just
3  not willing to concede the obvious.  But maybe it's not
4  obvious because you don't understand my question, so
5  I'm going to give you the benefit of the doubt and re-
6  explain it, Okay.
7      MR BAILEY:  No, no, no, you can't,
8  not until you're lawyers done.  Objection, move to
9  strike.  You can go ahead and respond.
10      COUNSEL:  No my question, in case
11  it's not obvious what I'm saying to you is, not, I used
12  Evanco as example, but that's not what, I'm not saying
13  what should happen to Colonel Evanco for have done
14  whatever he did.  I'm saying that any person that is a
15  administrator, that has to run, whether it's the whole
16  department, or a division, or whatever.  A high-
17  ranking person.  That if they exercise there judgment
18  inappropriately, and you said, not if it's something
19  minor, okay, but if they exercise judgment
20  inappropriately, depending on the, how bad that
21  judgment is, it could constitute an inadequate
22  performance.  Couldn't it?
23      MR BAILEY:  Objection.
24      COUNSEL:  If the judgments bad
25  enough.

PAGE 150:

1      MR BAILEY:  Objection.  You may
2  respond.  Objection to the form of the question.
3  Objection to the question, on a number of different t
4  grounds.  You may respond.
5      DARRELL OBER:  I've answered that,
6  I think, several times by now.  I, to tell you the
7  truth, I don't even have a clue of what you just asked
8  me.  I think it sounds like the same thing, because I
9  can't get past one point that you tried to make, or one
10  statement you made, which is an obvious point.
11      I mean, I just want you to know ma'am, what
12  is obvious to you, and obvious to me, is apparently not
13  the same, and I think that's why I'm have trouble
14  getting to your frame of reference.  I can tell you
15  that, the background and substance of the paragraph
16  that I wrote, is in essence the embodiment of what has
17  happened to me up until that point.  In other words if
18  I were talking about somebody in his position being a
19  public disgrace, these are the direct response to what
20  the complaint, the numbered paragraph in the complaint,
21  but with that goes everything else.  The abuse of this
22  process, the abuse of the discipline system, and the
23  transfers, and all the things that we've been
24  discussing at nauseum for a couple days.  And that's
25  really all I, the only way I can think to respond to

PAGE 151

1  you.
2      COUNSEL:  Okay.  In the fall of
3  1998, have you, when I say fall, I'm talking the time
4  frame during which the FBI had contacted you.  Have you
5  heard a rumor that Governor Ridge was unhappy with
6  Colonel Evanco, and that Colonel Evanco was not going
7  to be reconfirmed for the second four years?
8      A:  Are you saying that the
9  election was when?  Would that have been in the fall of
10  ninety-eight?  You know I'm thinking that you're
11  accurate, but you know there's been rumors, it seems to
12  me anyway, there's been rumors surrounding Colonel
13  Evanco almost as far back as I can remember, and I can
14  tell you, in my own experience, I can remember very
15  clearly when that happened for me.  I was out on
16  inspections, in Troop D, Butler.  That would have been
17  a long time ago.  And Charlie Barger came running up to
18  me, and said hey we heard Evanco's leaving us.  Now you
19  know, assuming I'm a headquarters guy, I would know all
20  this; I said I don't know anything about that.  But
21  were there rumors surrounding his possible non-
22  retention?
23      MR BAILEY:  I think the question
24  was, rumors that the Governor was unhappy with him.
25  And he may be on his way out.

PAGE 152

1      DARRELL OBER:  No.
2      COUNSEL:  Well I was actually,
3  after that I was going to break it down for you, since
4  after I asked I realized .compound.
5      DARRELL OBER:  You know that's
6  possible, but I can't sit here and tell you I remember
7  that precisely, but that's very possible.
8      COUNSEL:  Okay.  To break it down
9  for you, so I'm not asking you something compound.
10  First had you heard a, any rumors that the Governor was
11  unhappy with Colonel Evanco?
12      DARRELL OBER:  It's possible.
13      Q:  Okay.  As you sit here right
14  now, can you think of anybody who may have told you
15  that?
16      A:  Oh no.
17      Q:  And the second part then would
18  be, had you heard a rumor that Colonel Evanco might not
19  be reconfirmed for the second time?
20      A:  I don't, I'm going to deny
21  that, that rumor might not have been out there.  I'm
22  just not so sure that I personally have any
23  recollection of that.  If you say so, I don't know.  I
24  don't remember.
25      Q:  No.  I'm not saying so.  I

SHEET 39   PAGE 153

1   just, I'm asking you if you've heard that, ever heard
2   that.  I think you said you heard that Evanco might
3   leave.  But do you remember what time frame you had
4   heard that?
5                A:  Oh that, as I was trying to
6   build some scope to that, I recall that happening when
7   I was still in the inspection division, and that had
8   been years ago.
9                Q:  Okay.  Well, inspection
10  division of BPR?
11               A:  Yes.
12               Q:  Okay.  So that was when you
13  were in that SPR we talked about.
14               A:  Very good.
15               Q:  I get the acronyms eventually.
16  Had you heard anybody, had you heard any rumor, or did
17  anybody tell you, that if Colonel Evanco left for
18  whatever reason, that Lieutenant Colonel Hickes, would
19  be the next commissioner of the State Police.
20               A:  I don't recall that at all.
21               Q:  you hadn't heard that from
22  anyone?
23               A:  Not that I can recall.  I
24  mean, these types of things happen just as they are
25  now, I mean, I sure there's a set of rumors go around

PAGE 154

1   if one of the Colonel's would take a extended vacation
2   for too long, so I don't want to imply that, that isn't
3   possible.  I'm just saying, I don't remember that.
4                Q:  Had you considered that
5   possibility that Lieutenant Colonel Hickes could be the
6   next commissioner?  Whether anybody said it to you,
7   had you personally ever considered in the fall of 1998
8   that Lieutenant Colonel Hickes could be the next
9   commissioner?
10               A:  I don't have any recollection
11  of that personally.  Thought about that, no.
12               Q:  Had you heard from anyone that
13  Lieutenant Colonel Hickes was made a deputy
14  commissioner over the objections of Colonel Evanco?
15               A:  Yes.  My recollection is that,
16  that was one of those kind of institutional rumors that
17  I spoke of on Wednesday.  And I know what your next
18  question is.  Now I'm going to try to think who told
19  me.  I'm going to have to have a mulligan on that one,
20  again that's something that seemed to on a lot of lips
21  on a lot of folks.  I think it had to do with, I think
22  it had to do with, when the position was open, that
23  there were, again these are rumors, I' m not, I was not
24  involved in that circle, close circle of information.
25               Q:  Okay.

PAGE 155

1                A:  My recollection is that Major
2   Caprioti, and another Major, but I believe it might
3   have been Major Waugh,
4                were, the rumor as I recall was that they
5   were requested to apply for the position by the
6   Colonel.  I don't know if that's true.  And the rumor
7   was that Colonel Hickes was not, and that he had put in
8   on his own.  I don't know if that's true.  I never
9   asked him.  He never told me.  It was never a part of
10  our discussions.  I have known idea.
11               Q:  Do you know you would even put
12  into for something like that?
13               A:  Do I know?
14               Q:  Yes.
15               A:  I'm going to find out, but no I
16  don't.
17               Q:  Okay.  Did you, at that time;
18  did you know anybody that worked in the Governors
19  office?
20               A:  No.
21               Q:  Anybody that worked, like that
22  worked in the Governors policy office?
23               A:  No.
24               Q:  Legislative office?
25               A:  No, I don't know any of those

PAGE 156

1   folks.
2                Q:  Okay.  So if anybody knew of
3   you, they wouldn't of, they might have of you from
4   hearing people talk about you, but they didn't know you
5   personally.  Is that right?
6                MR BAILEY:  Objection.  You know
7   when that people that don't you talk about you said.
8   You can respond to that.
9                COUNSEL:  I'm just trying to ask
10  you.
11               DARRELL OBER:  What people ma'am?
12               COUNSEL:  Whether or not.  It
13  wasn't clear what I said.so.  You don't have any
14  personal knowledge of anything, that anybody working in
15  any part of the Governors office, may have said or not
16  said about you.  Do you have any personal knowledge of
17  anything anybody in the Governors office, whether it's,
18  you know, that's why I'm trying to clarify what I meant
19  by Governors office, whether the whole, whether it's
20  the policy office, the legislative office, the
21  counselor's office, do you have any personal knowledge
22  of anything anybody there must have, might have said
23  about you?
24               A:  Someone might have said about
25  me?

SHEET 40  PAGE 157

1          Q:  Or someone did say about you?
2  I'm not trying to be hypothetical here.  I'm trying
3  find out what you actually knew.  If anyone told you,
4  like if Lieutenant Colonel Hicks, for example ever said
5  to you.  Yes, I was talking with Mary Woolley the other
6  day, and said; oh that Captain Ober is terrific.  We
7  should make him.  Do know what I'm saying?  It's like,
8  do you know of anything?
9          MR BAILEY:  Say this sounds great.
10  Do you want to continue with that?
11          COUNSEL:  I'm saying.
12          DARRELL OBER:  No, but I think I've
13  met her.  See I don't know these people ma'am.  I'm
14  not; I'm not the political animal that perhaps some
15  folks are.  I think I've met her, but I can't say for
16  sure.
17          COUNSEL:  Okay.  Do you know Mary
18  Woolley?
19          A:  No.
20          Q:  Okay.  But you just might have
21  met her.  Name sounds familiar.
22          A:  The fact that she's in the
23  pol..see some of these names were tossed about when I
24  was in IIMS.
25          Q:  Okay.

PAGE 158

1          A:  Like Mr. Greenwood, I had
2  mentions, Glen Growl.
3          MR BAILEY:  What's her last name?
4  What's her last name?
5  COUNSEL:  Mary Woolley.
6          MR BAILEY:  Woolley, Woolley, how
7  do you spell.  W-E-L-L.
8          COUNSEL:  W-O-O-L-L-E-Y.  I think
9  that's it.
10          MR BAILEY:  Okay.  Thank you.
11          DARRELL OBER:  I'm doing my level
12  best to give you a correct answer.  I, there's no
13  conversations or anything that I would know of, that I
14  could think of that.  If you have anything specific, to
15  point me in the right direction, but no.
16          COUNSEL:  Do you have, did you
17  ever hear from anyone, including Lieutenant Colonel
18  Hickes, that Lieutenant Colonel Hickes had discussed
19  you and your situation with Mary Woolley?
20          A:  No.
21          COUNSEL:  Okay.  How about Leanne
22  Labecki?
23          A:  No I don't know her.
24          MR BAILEY:  Counsel, can you define
25  for us what you mean by his situation.  It was your

PAGE 159

1  question.
2          COUNSEL:  Sure.
3          MR BAILEY:  Sure.  I'd like to know
4  what that is.  I'd like know his situation.
5          COUNSEL:  When I'm in situation,
6  I'm sorry; I was referring to, back in May of 1999,
7  when you first told Evanco about the FBI investigation,
8  and that Evanco was unhappy, and then subsequently
9  ordered this administrative investigation.  So that's
10  what all my questions are related to, the
11  administrative investigation back in early, you know,
12  May and June of 1999.  Do you know whether, I just
13  wondered if you knew whether that had been discussed?
14  If anybody had told you.  Any source that Mary Woolley
15  had discussed it, and you said no.  And I was asking
16  you about Leanne Labecki.
17          MR BAILEY:  Leanne Labecki?
18          COUNSEL:  Leanne Labecki, L-A-B-E-C-
19  K-I.
20          DARRELL OBER:  Again, I'm going to
21  have to say no, simply because I don't know these
22  people, and there's not, I can't put any substance to
23  comments, or I'm trying to recall, searching my brain
24  for even something said off hand that I could.
25          COUNSEL:  Okay.

PAGE 160

1          A:  It's not that I can recall
2  ma'am.
3          Q:  Okay.
4          MR BAILEY:  Are these people in the
5  Governor's office now?  Woolley and Labecki?  If you
6  know?
7          COUNSEL:  Labecki is now.
8          MR BAILEY:  Okay.
9          COUNSEL:  Woolley is not.  On page,
10  we're still on exhibit 13, you're letter.  Page 5, in
11  reference to my paragraph 29, of exhibition 15.  You
12  had written that's there's nothing significant about me
13  not alleging Evanco retaliated against me, because I
14  knew of independent evidence of corruption.  And you
15  said, this is an interesting statement and one that
16  makes me think they are very nervous.  They have either
17  been listening in, or realize they are vulnerable
18  because of some irregularities I've seen.  I'm
19  wondering what you're talking about there.
20          MR BAILEY:  Counsel, as a humorous
21  aside, I put a note down here just a few minutes ago,
22  do you wonder if they listen to telephones.  So you see
23  I'm paranoid.
24          COUNSEL:  So I'm just kind of
25  wondering what.

SHEET 41   PAGE 161

1            MR BAILEY:  It's really
2  interesting.  Go ahead.paragraph 29, you said.
3            COUNSEL:  It's page 5.
4            MR BAILEY:  Page 5.
5            COUNSEL:  It's in reference to my
6  paragraph 29, which I know in my mind, so I can
7  probably tell you what page its on.
8            MR BAILEY:  Okay.  Thank you.
9            DARRELL OBER:  Page 10.  Am I
10 close?
11           COUNSEL:  Yes, you're close.  Yes
12 you are.  It's the second paragraph.
13           DARRELL OBER:  Starts likewise?
14           COUNSEL:  Yes.
15           DARRELL OBER:  As I recall, in,
16 when I wrote this document to Mr. Bailey, I had
17 recalled that, some of this is.  Can I have a moment?
18 Can I ask my attorney a question?
19           COUNSEL:  Sure.  If you need to go
20 out in the hall, that door opens, but you got to, here
21 let me help you.
22           DARRELL OBER:  Is it near a water
23 fountain and a bathroom?
24           COUNSEL:  No.  If you want to take
25 a minute to do that, that would be fine, go out.I need

PAGE 162

1  to talk to you guys for a second anyway.  It would
2  probably be a good time to do it.
3            MR BAILEY:  I'm sorry.  You want is
4  to go out?  Have we got to.
5            COUNSEL:  I think he wanted to go
6  out to the water fountain.
7            MR BAILEY:  Go out this way?  I we
8  know, I don't know the territory back there.
9            BREAK
10           COUNSEL:  I only have one, other
11 than the question asked him, I only have one other
12 area, so I don't know if you guys would just as soon,
13 just finish that up and then break.
14           MR BAILEY:  Okay.
15           COUNSEL:  I mean.  As opposed to
16 taking a lunch break.  You know what I'm saying,
17 because I've got one other area that.
18           DARRELL OBER:  You mean break as in
19 we're done.
20           COUNSEL:  Yes.
21           CARRELL OBER:  Yes.  I'll vote for
22 that.
23           COUNSEL:  I'm just saying, instead
24 of taking a lunch break, why don't we just finish,

PAGE 163

1  because I don't have a lot more to.
2            MR BAILEY:  Okay.  All right.
3            COUNSEL:  Ask about so..
4            MR BAILEY:  Okay.  Yes, Coun, I'm
5  sorry, yes.
6            12:51 Back on the record.
7            MR BAILEY:  Okay Counsel, I want
8  to, first of all, I appreciate the break, we had a
9  chance to talk.  If you will allow, because of this
10 involves a talk between he and I, so I therefore am
11 going to wave, for the limited purpose of responding to
12 this question only.   I want to make it clear, that
13 we're not, you know, I mean you have to concur on that.
14 I you don't concur.
15           COUNSEL:  Right.  No, I agree.
16           MR BAILEY:  I can't do it.  But I
17 think the only fair way to let him answer your
18 question, is allow him to make reference to some talk
19 that occurred between he and I, that I think will
20 enable him to answer your question.  Because I'm the
21 paranoid guy that sues government officials and always
22 complains about stuff.
23           COUNSEL:  Okay.  I'm not going to
24 assume.  I'm just going to wave..
25           MR BAILEY:  Okay.  For that

PAGE 164

1  limited, yes, for that limited purpose, we'd wave
2  attorney, client privilege, and that will give him an
3  unfettered opportunity to respond to your question, so.
4            COUNSEL:  I missed whether the
5  video people said we were back on or not.  Did you guys
6  take care of that?  Okay.  I just didn't catch, I
7  wasn't listening while you did it, okay.
8            DARRELL OBER:  Well, I think the
9  response, I appreciate the opportunity to confer,
10 because I didn't want to make sure I didn't run into
11 privilege problems in responding.  There was a period
12 of time when Kim and I were experiencing phone
13 problems, and I believe, as Mr. Bailey has just
14 mentioned, he's .
15           MR BAILEY:  He's paranoid.  Mr.
16 Bailey's paranoid. Right? Okay.
17           DARRELL OBER:  When I saw what was
18 in this brief, I reckoned to a conversation that I
19 recall, that he and I had by telephone, in that we were
20 discussing some of the things about this case.  And I
21 recall specifically, in that conversation, using the
22 word irregularity, because I was searching for the
23 right adjective to describe some things, and when I saw
24 that, just made me think that, they might be listening
25 in.  That's what that was a reference to.  Some

SHEET 42   PAGE 165

1 inappropriate telephone interception. I think that's
2 what asked me to explain.
3                 COUNSEL: Oh, when you were saying
4 that there was nothing significant about you not
5 knowing about independent evidence of corruption, then
6 you were talking about other irregularities. You
7 weren't talking about; there weren't any other things
8 in the State Police you were talking about. I guess
9 that's what I was. I was thinking you meant that there
10 were other.
11                 MR BAILEY: Oh, okay. I think her
12 question is, were you making reference to any other
13 irregularities in, about selection. Okay. Well I think
14 you should respond to that sure.
15                 COUNSEL: Other things, other than
16 what we've heard, some other things wrong that you're
17 worried about.
18                 MR BAILEY: Okay. I think we
19 misunderstood you. Okay, go ahead.
20                 DARRELL OBER: Well okay. The
21 basis of that statement, as I just described, I took as
22 a reflection of the conversation I remembered having
23 telephonically with Mr. Bailey, in that we discussed,
24 or I discussed with him some things that I termed
25 irregular about the hiring process in general.

PAGE 166

1                 COUNSEL: Okay. And those, what
2 did you think was irregular about the hiring process in
3 general?
4                 DARRELL OBER: There were a couple
5 of occasions when, and I think I used this word in that
6 conversation as well, because I was trying to be very
7 careful not to say something that I would consider
8 inappropriate, but I saw some what I think I termed as
9 unexpected outcomes to things involving cadet
10 selection.
11                 COUNSEL: Okay. People you thought
12 that should get in that didn't, or something like that.
13                 A: Yes.
14                 Q: Thank you. Okay, now I have
15 one last document I want to talk to you about. I
16 forget what number we're up to. Exhibit 19; is that a
17 supplemental report that you submitted?
18                 A: Yes.
19                 Q: And that's regarding IAD1999-
20 391.
21                 A: Correct.
22                 Q: What's IAD1999-391? Or maybe I
23 should, I think I have that, so that might be easier,
24 hang on. Let's mark this as 20. I think it will be
25 easier about 20 before we talk about 19 just.

PAGE 167

1                 A: Can I put these away?
2                 Q: Sure. Twenty is the use of
3 force complaint worksheet on IAD1999-391, and that's
4 the Kip-Stanton investigation, and I see that you're
5 listed as the complainant. Is that right?
6                 MR BAILEY: I think that's use of
7 force OR complaint.
8                 COUNSEL: I'm sorry. I keep
9 shortening.
10                 MR BAILEY: Yes, I do. I see it,
11 the language the language first. I do the same
12 mistake. It's a complaint form.
13                 COUNSEL:  So this is the complaint
14 reception or processing worksheet. Right?
15                 DARRELL OBER: Yes.
16                 COUNSEL: Okay. So that's number
17 20. Then you're listed as the complainant.
18                 A: Yes
19                 Q: And I see that the date is May
20 19th, 1999.  Correct?
21                 A: Yes.
22                 Q: Okay. Now, when that use of
23 force or complaint worksheet comes in, is that the
24 timeframe when you get the IAD control number up at the
25 top, where it's 1999-391?

PAGE 168

1                 A: Yes.
2                 Q: Okay. Now on the night, now to
3 go to 19, which is a supplemental report, the reason I
4 was asking you about that is, I know that at the top of
5 it, you do have the 1999-391 IAD number.
6                 A: Yes.
7                 Q: But the report itself is
8 undated. So, do you know when, can you tell me about
9 when you submitted the supplemental report?
10                 A: Oh boy.
11                 MR BAILEY: Counselor, I draw to
12 your attention the last paragraph on page two of the
13 exhibit.
14                 COUNSEL: Yes.
15                 MR BAILEY: I just want to draw
16 that to your attention.
17                 DARRELL OBER: Oh yes, there it is,
18 May 19th, thank you.
19                 COUNSEL: What? Well May 19th is
20 the date that you faxed SP1-101 to the internal affairs
21 division, this, is this?
22                 DARRELL OBER: This is the 101.
23                 COUNSEL: That's the, 20, that's
24 the use, that's the complaint worksheet?
25                 A: Yes.

SHEET 43   PAGE 169

1        Q:  Okay.  So you faxed the
2 complaint worksheet to the internal affairs on May
3 19th, but what I was asking you is.  When did you do
4 the supplemental report?
5        MR BAILEY:  That's exhibit 19.
6        COUNSEL:  Yes.
7        MR BAILEY:  I see.  I'd just like
8 to also bring to your attention, there's a, I don't
9 know, there's a fax tag at the top of exhibit 20.
10       COUNSEL:  Yes.  I was just using 19
11 help you place the 20.
12       MR BAILEY:  Yes, I know that.  No,
13 I understand that, but it says, the only concern I had,
14 it says 2 of 2.  There were two pages and I don't know
15 where that second page might be, and I'm wondering if
16 you might have it.  Because it might information.that
17 would help.
18       COUNSEL:  I think would just be the
19 coversheet.  I don't know, do we have what, it says 2of
20 2?    It might have been whatever the fax coversheet
21 was.
22       MR BAILEY:  Well, but if we had it.
23 It might have information that could help.  Maybe even
24 answer the question.  I don't know.
25       COUNSEL:  I don't think it would

PAGE 170

1 help answer the question on when the supplemental
2 report .my question.
3       DARRELL OBER:  Yes.  I really don't
4 remember.
5       MR BAILEY:  That's true.
6       DARRELL OBER:  I don't know.
7       COUNSEL:  Okay.  Do you whether it
8 was before or after were interviewed in June of, on
9 June 28th, I think it was by Wertz and Williams?  In
10 other words, had you already submitted this report at
11 the time that Wertz and Williams interviewed you?
12       DARRELL OBER:  I honestly don't
13 remember ma'am.  I don't know.
14       COUNSEL:  Okay.  There is a
15 standard supplemental report form in the State Police.
16 Isn't there?
17       A:  Yes.
18       Q:  But this is obviously not it.
19 Is it?
20       A:  That's not it.
21       Q:  Do you know of the top of your
22 head what, you guys sometimes know these STD number and
23 all that, so I just wondered what the.
24       A:  I don't know off the top of my
25 head.

PAGE 171

1       Q:  And why was this on a, why
2 isn't this on a standard State Police form?
3       A:  I don't remember why I did it
4 this way, my, what I might have done a cut and paste on
5 the memo that Evanco demanded of me, when we told him.
6 I don't recall.  It may be something as simple as at
7 the Bureau of Tech Services, where I was assigned; they
8 don't have any of those forms.  There are no
9 investigative functions being performed there.  I don't
10 ever recall seeing police reports, investigative forms,
11 available in that building, but I don't re, I don't
12 know.
13       Q:  If it had been on the standard
14 supplemental police report, then it would have a box in
15 there for the date.  Right?
16       A:  Oh, yes.  Sure.
17       Q:  In other words, since this is
18 undated, had it been on a standard police form, then we
19 would know exactly the date.
20       A:  Yes.  I'm sure, I'm sure your
21 correct.
22       Q:  Okay.  That it was submitted.
23 Okay, if you can look in that report.  In the
24 supplemental report state that agent Kush told you, you
25 were conducting an investigation.  Let me see where I'm

PAGE 172

1 looking at here.  Okay, it's just the beginning.  You
2 were contacted by phone, and agent Kush stated he was
3 conducting an investigation into political corruption,
4 Western Pennsylvania.  Now, throughout this entire
5 report, did you ever mention the fact that agent Kush
6 told you that the allegations could go all the way up
7 to PS command staff or the Governors office?
8       A:  Did I mention it here?
9       Q:  Yes. In the supplemental
10 report.
11       A:  No.
12       Q:  And, I think you mentioned that
13 this might have been a cut and paste of the memo that
14 you gave to the commissioner, about this.  Would that
15 be the memo, a memo that you sent on May13th, 1999?
16       A:  Yes.  I don't remember if
17 that's what I did, but I could have.  I don't recall.
18       Q:  Okay.  But you did send a memo
19 to the commissioner on May 13th, 1999?
20       A:  Yes.
21       Q:  Okay.  Prior to the memo you
22 sent to the commissioner, what documentation had you
23 made of your contacts with agent Kush.
24       A:  None.
25       Q:  Do you have any hand written

SHEET 44   PAGE 173

1 notes?

2      A: Not that I can recall. Well, I
3 may have, but through them out, I guess. No I don't
4 recall any.

5      Q: Any documentation of that
6 event. In other words, what I'm trying to get at, was
7 May 13th, 1999, the first time you documented in any
8 way, your contacts with agent Kush.

9      A: Yes. To my recollection, yes.

10      Q: And your contacts with
11 Lieutenant Colonel Hickes, did you document those in
12 any way prior to May, 1999?

13      A: No. He never requested any
14 documentation, and I never provided any.

15      Q: How about when you spoke to him,
16 and told him what was going on, did you take, write any
17 notes either during your conversation, or after your
18 conversation, about what Hickes told you?

19      A: No.

20      Q: And I wanted to follow up one
21 thing you talked about Wednesday because I just forgot,
22 asking something else. But, at one point you had
23 mentioned that during that conversation with Hickes,
24 when he ordered you not to discuss this with anybody
25 else. You had said he told you three things.

PAGE 174

1      A: Yes.

2      Q: During that conversation, and I
3 think, I didn't follow back up on what the other two
4 were.

5      A: Oh, okay. He told me to
6 cooperate with the FBI, to the extent that I was able
7 to keep him informed, and tell no one.

8      Q: Okay. Just get that May13th
9 memo. I just want to ask you something about that. If
10 I can find what I did with it.

11      MR BAILEY: This is exhibit 21?

12      COUNSEL: Exhibit 21 is your May
13 13th memo to the commissioner?

14      DARRELL OBER: Yes.

15      COUNSEL: In the May 13th memo, you
16 did mention that Dennis Bridges was trying to buy his
17 way into the academy through a series of transactions
18 involving a state senator and a unknown, high ranking
19 person in the State Police, at the Governors office.
20 Right?

21      A: Correct.

22      Q: Okay. And then that
23 information did not make it's way into the supplemental
24 report that you filed in the Kip-Stanton internal
25 investigation, which would be exhibit 19.

PAGE 175

1      A: Correct.

2      Q: I'm wondering why it went into
3 the memo to the commissioner, but you wouldn't have
4 thought it was important enough to include in the
5 supplemental report.

6      A: Oh, I don't have any
7 recollection as to why I did that. Did the memo in one
8 way, and the supplemental report, most likely is that,
9 if you're asking me to give me my best opinion, my best
10 opinion is that, most likely because the transcripts
11 that I provided, documented all of the probably better
12 than I could have put it in the supplemental police
13 investigation. There's matters that were discussed
14 regarding a series of payoffs, and financial
15 arrangements, and what have you with the legislatures,
16 were fairly well documented in the transcripts.
17 That's, of the top of my head, that's what I would
18 answer. I don't recall any other reason.

19      MR BAILEY: Counsel, could I help
20 with one small question.

21      COUNSEL: Sure.

22      MR BAILEY: Isn't it correct that
23 the result of the investigation, thank God, were that
24 only a trooper was perhaps involved, and there were not
25 implications of higher ups in the Governors office.

PAGE 176

1      DARRELL OBER: Correct.

2      MR BAILEY: Isn't that correct
3 that, that's what you had, eventually that a dead or
4 mute issue, at that point. Is that correct?

5      DARRELL OBER: Correct.

6      COUNSEL: Have you ever, you said
7 you didn't document, this contact with agent Kush,
8 happened September or October of 1999, and you didn't
9 document it in any way until May, I mean that was
10 ninety-eight, excuse me. September or October of
11 ninety-eight, and you didn't document it in any way
12 until May of 1999. Have you ever criticized other
13 members of the department for not making a
14 contemporaneous record of information, that they
15 receive about possible wrongdoing by, criminal
16 wrongdoing by, members of the state police?

17      MR BAILEY: Objection. You may
18 respond.

19      DARRELL OBER: I don't know. You
20 don't know if you have ever done that?

21      COUNSEL: You don't know if you
22 have ever done that?

23      DARRELL OBER: I don't know if I
24 have ever done that.

25      COUNSEL: Is it possible that you

SHEET 45   PAGE 177

1  have criticized other members of the department for not
2  making contemporaneous records of there, of receiving
3  information about possible wrongdoing by.
4                          A:  Anything's possible.  Yes.
5                          Q:  Do you remember ever doing
6  that?
7                          A:  I've answered that.  No.
8                          Q:  Okay.  If we could just take a
9  minute for me to talk to Ms. Reynolds and the client,
10 Conley and.
11                         MR BAILEY:  I have couple very
12 brief questions.  Do you want me to do those first?  It
13 might be better for you.
14                         COUNSEL:  Sure.
15                         MR BAILEY:  I'll be very brief.
16 Captain Ober, reference to exhibit 19, paragraph 5,
17 quote, " I met with Kush and the supervisor Michael J
18 Suie, at Troop T, Everett, on October 21, 1998.  Kush
19 paid an audio tape obtained from a body wire, a
20 conversation between Bridges, Stanton, and the CICI's
21 confidential informant." " Kush later mailed me a copy
22 of a transcript of the conversation." Sir, to the best
23 of your knowledge and information, were transcripts of
24 those body wires and conversations sent to the
25 Pennsylvania State Police, and are they in Pennsylvania

PAGE 178

1  State Police records?
2                          DARRELL OBER:  Yes.
3                          MR BAILEY:  To the best of
4  recollection did they mention, any of those
5  transcripts, or body wires, mention Governors office,
6  and state legislators?
7                          DARRELL OBER:  Yes.
8                          MR BAILEY:  Now of your own
9  knowledge, do you know if one of them was Senator
10 Bodak, Glenn Bodak?
11                         A:  There were a couple names
12 mentioned.  I believe that was one of them.  I don't
13 know.
14                         Q:  That's all right.  Just your
15 best recollection.  Do you have a recollection of
16 whether one of them was a state representative, the
17 first name Joe, from Allegheny County?
18                         A:  Yes.  There were a couple of
19 first names that seem to be, that were mentioned, Joe,
20 I think was one of them, yes.
21                         Q:  Do you have a recollection of
22 whether those transcripts specifically mentioned body
23 wire?  I'm sorry, those body wire transcriptions,
24 specifically mention Governor's offices?
25                         A:  Yes.

PAGE 179

1                          Q:  Is it your recollection, do you
2  recollect whether or not you, or Mr. Kush came up with
3  the hypothetical idea of Governors office, or state
4  legislators, or Senators, or was that something based
5  on factual information which have been developed by the
6  FBI investigation?
7                          A:  When we first talked about this
8  investigation, Mr. Kush, agent Kush told me, as I've
9  testified to, testified that they were running a
10 political corruption investigation, and this came up
11 during that investigation.  We talked specifically
12 about scope.  I remember that.  I remember, I know this
13 is of great to Ms. Guido, because she questioned me
14 quite extensively about that, and ma'am I have spent
15 the last day and one half trying to pinpoint anything
16 more specific than what I have already testified to,
17 and I really can't.  But I do remember that scope of
18 this, the potential of this kind of investigation was
19 discussed, because on that first phone call, he had
20 already told, was already informing me that trooper
21 Stanton was involved, and he'd had already mentioned,
22 he mentioned that there has already been a offer of
23 money, or an amount of money discussed, and I don't
24 remember whether that was twenty five hundred dollars,
25 or five thousand, or ten thousand, or whatever, but,

PAGE 180

1  and the intended use of that money was to influence a
2  state representative, or a state senator.  And in that
3  discussion, I think Mr. Kush had sort of two, I don't
4  know if I should call them objectives, but two things
5  were discussed.  At two levels, let me use that
6  phrase, two levels of conversation ensued.  One, was
7  basically him say things like, well how do you do that,
8  how does the process work?  That's why he said he
9  called me, as a resource.  A resource individual in
10 this thing, how does this process work, and I'm sure at
11 one point I must have said, well I'm not real sure
12 because it's changed since the time that I came on, but
13 he had a lot of questions about that.  About the
14 process.  How do you, what do you do.   You take a
15 test, and then what?  So some of his questions, and
16 some of our discussion was about that.  But then scope
17 came into question, or came into our discussion and I
18 remember, and I, we talked about, and I said well look,
19 this is not something trooper Skip Stanton can do, it's
20 not something Darrell Ober can do, and as I think I
21 testified on Wednesday, it's not enough to say you're
22 going to influence a state senator, or a
23 representative.  That was not going to achieve the
24 outcome that the target desires.  And in that
25 conversation, where we talked about, okay, who in the

SHEET 46  PAGE 181

1 organization, or what positions in the organization
2 might be able to influence an outcome like that. And
3 the Governor's office, and the ability of the
4 Governor's office to carry that influence to the State
5 Police was discussed. I believe it was agent Kush who
6 mentioned that. I can't say for certain. It's my
7 recollection that, I'm ninety percent certain as a
8 matter of fact, Mr. Bailey, that he mentioned it. But
9 I don't know. We were talking back and forth like
10 people do. We also, I know again, as I come back to
11 our conversation with Ms. Guido on Wednesday, I know
12 the issue of confidentiality was an important one, of
13 great interest to them, again, I struggled Wednesday
14 trying to understand how those exact phrases were used,
15 and how they weren't. I've thought about that. I've
16 given that a lot of though also in the past couple of
17 days. So I realize and recognize that's a significant
18 issue. But I come full circle with that, and I'm
19 really here to just, my testimony is that, the need for
20 confidentially was discussed. I don't remember it
21 being discussed a lot because it was such an obvious
22 point. But whether he said, oh by the way, you don't
23 want to mention this, or it goes without saying, or if
24 he used that verbiage, I can't sit here and tell you,
25 but it was discussed. It was specifically mentioned

PAGE 182

1 that this is an investigation of public corruption, of
2 political corruption, of which the ends were not
3 identified yet.
4          Q: Did it occur to you that if the
5 FBI had felt as a matter of commonalty, that the
6 commissioner should have been notified, that they would
7 have notified the commissioner?
8          A: Absolutely. I thought, if they
9 wanted the commissioner to know, they'd have told him.
10         Q: Did you do any investigative
11 work on this thing yourself, or was it an FBI
12 investigation?
13         A: This was an FBI investigation.
14         Q: Do you have any way of knowing
15 whether the FBI investigation concluded because of
16 pressure from Mr. Evanco? If you know?
17         A: I don't know that specifically.
18 No.
19         Q: Do you have any way of knowing
20 whether the FBI investigation was going on into state
21 senators, or the Governor's office, or state
22 representatives, after Mr. Kush told you that it was
23 shut down, as regards to the Pennsylvania State Police?
24 Let me rephrase that. At some point, I believe you've
25 testified, correct me if I'm wrong, that Mr. Kush had

PAGE 183

1 indicated that the investigation at least as regards to
2 the Pennsylvania State Police was concluded. Is that
3 correct?
4          A: That's correct.
5          Q: All right. Do you have, of
6 your own knowledge, any information indicating whether
7 or not the FBI was continuing to follow up on other
8 implications and leads in that investigation. I.e.
9 Into the state senate, into the state legislature, or
10 into the Governor's office?
11         A: I don't know that personally.
12 No.
13         Q: Do you have any knowledge
14 personally whether or not Mr. Evanco played any roll in
15 actually, calling Louie Freed, transferring anyone, as
16 you allege, he had said he would do, and whether or not
17 there was any follow up on that afterwards? Do you
18 have any personal knowledge?
19         A: I have no personal knowledge.
20 As I mentioned on Wednesday, I just know what the end
21 result of that was. He threatened to do it. Kush was
22 transferred, the invest, the criminal charges against
23 Stanton have been, were dismissed.
24         Q: They were dismissed?
25         A: Yes.

PAGE 184

1          Q: Do you know why they were
2 dismissed?
3          A: Well, I tried to follow this
4 case, I purchased a set of the tra, of the criminal
5 complaint from the Indiana county clerk or courts, and
6 I tried to follow the case as best I could through the
7 on-line news services, and it's my recollection that
8 the case against trooper Stanton was ultimately
9 dismissed on, in Commonwealth Court because the FBI had
10 violated the Federal wire tap, excuse me the state wire
11 tap laws. Evidence against trooper Stanton was
12 dismissed.
13         Q: And we've had this FBI for
14 what, fifty, sixty, seventy years in this country?
15         A: I believe that's correct.
16         DARRELL OBER: I mean that's my recollection, ma'am

1 that's what I recall.

2          COUNSEL:  Okay.  So you don't, I

3 mean you didn't hear that they messed up with following

4 federal law.  Okay.

5          MR BAILEY:  Do you have a

6 recollection of knowing when the, do you know whether

7 this gentleman Mr. Stanton was filed, was even indicted

8 by a Federal Grand Jury?

9          DARRELL OBER:  I don't believe so.

10 I don't have any knowledge, but I don't believe so.

11          MR BAILEY:  So the charges were

12 referred by, to the Pennsylvania State Police, as a

13 matter of commonalty by agent Kush.  Isn't that what he

14 had indicated to you?

15          A:  Yes.

16          Q:  So you don't know as you sit

17 here today, whether or not the Federal government could

18 have brought charges against Stanton and others, do

19 you?

20          A:  No.  I don't know.

21          Q:  You don't if the matter, for

22 that matter was ever even referred  to a grand jury, do

23 you?

24          A:  I don't know.

25          Q:  So you don't know whether or

1 not out there, Mr. Evanco and maybe somebody in the

2 Governors office may have truncated the investigation.

3 You don't know that, do you?

4          A:  No.

5          Q:  You were just doing your duty

6 as a Pennsylvania State Police officer who was supposed

7 to provide resource information on a case.  Is that

8 right?

9          A:  Yes.

10          Q:  As you sit here today Captain

11 Ober, can you tell me whether, knowing everything that

12 has passed, whether you would have reported what Mr.

13 Kush provided to you, whether you would gone to higher

14 ups in the Pennsylvania State Police, that you in your

15 own best judgment perceived, could be potential targets

16 in the investigation?

17          A:  At the time I made that

18 judgment call, it was based on what I, my first and

19 foremost consideration was protecting the needs of the

20 agency.  Making an ethical decision as well as a legal

21 decision.  And I did that because I thought it was the

22 right thing to do.  It's no more complex than that.  I

23 will tell you, Mr. Bailey, having experienced what I've

24 experienced from this agency in the past two years,

25 there reactions to my judgment call, confirm in my mind

1 more than ever, that I made the right decision.  I

2 would never go to potential targets of any

3 investigation, much less one of political corruption.

4          Q:  Therefore sir, Is it your

5 testimony that whether agent Kush had or had not

6 indicated the, a desire or need, either overtly or

7 tacitly for confidentiality, that you would have still

8 conducted yourself in the same manner, based upon your

9 law enforcement officer training and experience.

10          A:  Absolutely.

11          COUNSEL:  One moment.

12          MR. BAILEY:  Sydni, I have one

13 small additional question, and then you can follow-up,

14 okay.

15          COUNSEL:  Okay.

16          MR BAILEY:  Just one very.  I

17 believe in response to some of Ms. Guido's earlier

18 questions, you had indicated that there was some kind

19 of a meeting in Mr. Evanco's office.

20          DARRELL OBER:  Yes.

21          MR BAILEY:  Where Mr., I believe

22 your allegation was that Mr. Evanco was told that

23 investigating you, before this whole, this

24 investigation process, the propriety of which appears

25 to be a major issue in this case, was conducted or

1 began, that there was some kind of meeting, and he was

2 advised not to do it?  Am I correct?

3          DARRELL OBER:  That's correct.

4          Q:  What was your source of

5 information for that?  Who was your source, who or

6 what?

7          A:  Captain Brown, that's who I

8 mentioned on Wednesday, Captain Brown.

9          Q:  Captain Brown, the investigator

10 assigned to this case, to the best of your knowledge

11 and recollection, do you believe he, is it your

12 testimony, he was either privy to or heard information

13 about this meeting.

14          A:  Yes.

15          Q:  What do you mean by yes.  Was

16 he in there?  Or is it something that he allegedly

17 heard somewhere?

18          A:  Well, he told me that, that he

19 was called over to headquarters with Captain Skirkus,

20 himself, and the defendants, and the that the purpose

21 of the meeting was to discuss this investigation and he

22 laughed and he said, they weren't even going to give

23 you your administrative warnings and your notification

24 of inquiry, and he said, I told them you're not going

25 to fool Captain Ober.  He knows better.  You can't do

SHEET 48  PAGE 189

1  this.

2  MR BAILEY:  I don't have any
3  additional questions.

4  COUNSEL:  I have a few follow ups.
5  You said you're having a hard remembering the
6  conversation that you had with agent Kush back in 1998.
7  Is that partly because you didn't write anything down
8  about this case until May of 1999?

9  MR BAILEY:  I want to object to the
10 form of the question.

11 COUNSEL:  In other words if you.

12 MR BAILEY:  He can response at the
13 way that you pose the question.  I just wan to put an
14 objection on the record.  You may respond.

15 DARRELL OBER:  Okay.  You lost me
16 again.

17 MR BAILEY:  She ask you if the
18 reason that you didn't.

19 COUNSEL:  Said what other reason.

20 MR BAILEY:  No, counsel said, and
21 we can have it read back if you want, but I remember it
22 word for word.  Counsel said, you seem to have
23 difficulty remembering the contents of the conversation
24 between you and Mr. Kush, of which I understand there
25 were more than one, but regardless, and she said was

PAGE 190

1  the reason for that because you didn't make any notes
2  until May 19th of the next year?

3  COUNSEL:  It wasn't May 19th but.

4  DARRELL OBER:  Okay well, I don't
5  think so because the significant portions of that
6  conversation, at least what I determined to be
7  significant at the time that it was conducted were
8  clear in my mind.

9  COUNSEL:  Okay.

10 DARRELL OBER:  You know,
11 unfortunately I've been asked to recall things that at
12 the time, that didn't seem to be that significant to
13 me, to record.  If I had it to do over again, I'm
14 certain and I realize that you folks have a great
15 interest in some of these specifics perhaps that would
16 have served me well, but I just, three years ago, I
17 don't remember.

18 COUNSEL:  Now, you had said that
19 you figured, in response to your counsel's question,
20 you said that you figured that if the FBI wanted Evanco
21 to know about this, they would have told him about it.
22 Right?

23 DARRELL OBER:  Sure.

24 Q:  Now you told Hickes about it.

25 Right?

PAGE 191

1  A:  Yes.

2  Q:  And you told us on Wednesday
3  that you never asked the FBI whether it was okay to
4  tell Hickes about it.

5  A:  Correct.

6  Q:  If the FBI wanted Hickes to
7  know about it, wouldn't they have told him about it?

8  A:  I'm sure if they felt, if they
9  wanted to talk to Colonel Hickes, I'm sure they would
10 have called him.

11 Q:  Okay, and you said that you
12 would never tell a potential target about an
13 investigation, but you never asked the FBI whether
14 Lieutenant Colonel Hickes was the target of the
15 investigation.  Did you?

16 A:  When we talked about scope of
17 the investigation.  Hickes would have been among those
18 in a rule out mode.  And by the way, targets of an
19 investigation, I'm specifically referring to, just so
20 we are clear with each other, an ongoing investigation
21 wherein.

22 Q:  Right.

23 A:  The we don't know, the who
24 done it part hasn't been resolved yet.  I have on
25 occasion, and I remember one specifically where

PAGE 192

1  Lieutenant Brown brought to my attention, a weekend
2  situation that he observed some behavior on the part of
3  a Lieutenant possible, or potentially, missing using a
4  vehicle.  I called; this happened to be a friend of
5  mine, when Lieutenant Brown brought this, then
6  Lieutenant Brown brought this information to my
7  attention.  Because of the relationships, I told him
8  that I would take care of it.  I called him and told
9  him personally that this, I didn't want him to feel
10 like he was being blindsided, so yes, in that instance
11 called and let him know but.

12 Q:  Okay.  But as we talked about
13 on Wednesday, Lieutenant Colonel Hickes was Lieutenant
14 Colonel a few years earlier, and you did not discuss
15 with agent Kush, when his investigation had occur, had,
16 the beginning of the investigation.  Right?

17 A:  Correct.

18 Q:  Okay.

19 MR BAILEY:  The Lieutenant Colonel
20 a few years earlier.  I don't understand counsel.

21 COUNSEL:  We went through it at
22 length the other, on Wednesday, and I didn't want to go
23 through it again but.

24 MR BAILEY:  Do you mean in charge
25 of supervising the cadet school.  Is that what meant?

SHEET 49  PAGE 193

1          COUNSEL:  No. He was the deputy
2  commissioner.
3          MR BAILEY:  Oh, oh.
4          DARRELL OBER:  he would have been a
5  deputy commissioner prior.
6          MR BAILEY:  Oh I see, at the time
7  of the discussion.
8          COUNSEL:  You said he was in a rule
9  out mode when you talked to the FBI, but you didn't
10  know when there investigation had started when you
11  talked to the FBI.
12          MR BAILEY:  Yes.  You clarified it,
13  thank you.
14      Thank you.
15          COUNSEL:  Okay.
16          DARRELL OBER:  He was a deputy
17  commissioner prior to 1995.
18          COUNSEL:  Right. Okay.
19          DARRELL OBER:  Is that correct.
20          CHANGE TAPE
21          Tape number three of three, day
22  two, for Darrell Ober, the time is 1:23 p.m.
23          1:27 p.m. back on the record.
24          COUNSEL:  Your attorney was asking
25  you about the FBI transcripts of the body wires, and

PAGE 194

1  some of those weren't body wires, were they?  Weren't
2  some of them just telephone calls as well.  If you
3  remember.
4          DARRELL OBER:  I, th, you could be
5  right. I don't remember.
6          COUNSEL:  But you reviewed the FBI
7  transcripts.
8          DARRELL OBER:  Yes.
9          COUNSEL:  Okay.  Do you remember on
10  how many transcripts the Governors office was
11  referenced?
12          A:  No.
13          Q:  Do you remember on how many
14  transcripts the Lieutenant Colonel; the word lieutenant
15  Colonel was referenced?
16          A:  No.
17          Q:  And how many transcripts the
18  word Colonel alone, not Lieutenant Colonel, but Colonel
19  was used?
20          A:  No.  I don't remember.
21          Q:  Do you remember how many times
22  the commissioner was referenced?
23          A:  No.
24          Q:  Do you remember how many times
25  high-ranking members of the state police were

PAGE 195

1  referenced?
2          A:  No.
3          Q:  Do you know on what date any of
4  the wires, on which the Governor, high ranking state
5  police, etcetera, do you know the date on which any of
6  those wires were made?
7          A:  No.
8          Q:  I just want to confer with my
9  co-counsel.  Be right back.
10          COUNSEL:  Okay, I think that's it.
11  We don't have any more questions.
12          MR BAILEY:  Sydni, during the break
13  when you went out, Mr. Ober had indicated to me there
14  was a couple of, I think they're relatively minor
15  things, that he thought he may have forgotten, that
16  should be brought to your attention.  I told him that
17  he should bring those to your attention.
18          COUNSEL:  Okay.
19          DARRELL OBER:  I don't think this
20  will take but a minute, but somewhere in the complaint,
21  when we were discussing various actions, and I have
22  testified at different points as to what life has been
23  like for me, and some of the things that have happened
24  to me.  There's two other things stand out.  I don't
25  know, this is probably not the end of a list, but there

PAGE 196

1  are two other things that happened to me, I think that
2  are important to get, to speak of, during this
3  deposition.  One would be, when I was assigned to
4  IIIMS, during that time prior and still detached from
5  BPR.  Captain Brown was the acting director of the
6  internal affairs division, and he invited me to attend
7  an internal affairs division meeting.  We did those on
8  some kind of a regular basis, whether they be quarterly
9  or monthly, I don't recall but, well it wouldn't have
10  been monthly, it must have been quarterly, or on an as
11  needed basis.  But he invited me to attend that
12  meeting, which I found to be quite an ordinary request,
13  in as much as I was the division director.  And he made
14  that offer to me, I believe in September, I'd have to
15  double check to be certain, but of course I accepted.
16  A couple of weeks later, we had a conversation and he
17  told me that, that offer was, he said words to the
18  affect that, remember the meeting that we were, that
19  you were, your IAD meeting, yes, he said well, Major
20  Conley doesn't want you to attend that meeting.  And I
21  made an inquiry as to why, again, what's the rational
22  reason to prohibit me from attending a meeting of my
23  own division, and the answer was, well there probably
24  isn't any.  I was barred from attending that meeting.
25  Not too much later, maybe a month or so ago, a month or

SHEET 50   PAGE 197

1  so later, I was scheduled to discuss the Stackhouse
2  Arbitration Case, which I mentioned in prior testimony
3  with a representative from the office of ad, office of,
4  yes, administration, Chris Dunlap, in preparation for
5  my testimony in that deposition, and I don't recall who
6  brought me this information, but I was provided a
7  transcript of the Stackhouse Case, the internal affairs
8  investigation. And subsequently then, OA, I was in, OA
9  did not handle the matter. PSP, our counsel's office
10 retained the lead roll in that, or whatever it's
11 called, but anyway so this is still an ongoing matter.
12 I was then informed by Captain, Lieutenant Brown that
13 Captain Skirkus, based on orders of Colonel Coury, had
14 instructed that, that internal affairs investigation be
15 returned. I was not permitted to have it, and
16 furthermore I wouldn't permitted to testify at that
17 hearing. And again, I was the supervising officer when
18 I was assigned to IAD. I was just curious. It made
19 again, no sense to me whatsoever, that I would be
20 barred, at least at that time, from participating in
21 the arbitration case, so the messenger was sent out,
22 and the investigation was ordered to be returned. The
23 only other thing I have for you, is I did photocopy my
24 Top Cop Award for you.
25           COUNSEL: Okay.

PAGE 198

1           DARRELL OBER: And I hope that
2  clarifies the twenty one year old mystery. I was
3  second academically in that class. I was, this was the
4  award that was presented at the crescendo of the
5  ceremony, and I was awarded the Top Cop Award, and the
6  others received trophies. I was given a plaque.
7           MR BAILEY: I've taken the liberty
8  of marking that exhibit 22.
9           COUNSEL: That's fine.
10          MR BAILEY: And you can just give
11 to.
12          DARRELL OBER: Should desire to see
13 that, I'd be glad to bring it in for you. But I hope
14 that.
15          COUNSEL: Well. I believe that it
16 exists.
17          DARRELL OBER: I hope that
18 satisfies your inquiry.
19          MR BAILEY: Can we stipulate to
20 that, then we won't have to worry about it, or.
21          COUNSEL: What, to the fact.
22          MR BAILEY: Yes.
23          COUNSEL: Yes. Sure, I don't have
24 a problem with that.
25          MR BAILEY: Sydni, Chris Dunlap.

PAGE 199

1  Is that a he or a she?
2           DARRELL OBER: He.
3           MR BAILEY: He. Is he still around
4  or?
5           COUNSEL: Chris Dunlap?
6           MR BAILEY: Dunlap. Is he in your
7  counsel?
8           COUNSEL: I never heard of Chris
9  Dunlap. You might mean Greg Dunlap maybe? Oh okay, I
10 didn't know him, sorry. No offence to him, but..
11          MR BAILEY: No, no, no. Okay, I
12 don't have anything.
13          DARRELL OBER: We won't tell him
14 that you don't know who he is.
15          COUNSEL: I never heard of the guy.
16 Because, I/m thinking, oh I should know.
17          MR BAILEY: I'm sorry. I probably
18 misunderstood what. I don't have anything further.
19          COUNSEL: That's it.
20          MR BAILEY: Okay thank you.
21          COUNSEL: I wanted to make sure I
22 had all the exhibits, but I don't see them all here.
23 There was a folder I think.
24          -----1:36 OFF RECORD-----

P.R. VIDEO, INC

**1**

1 [1] 94:19
1:23 [1] 193:22
1:27 [1] 193:23
1:36 [1] 199:24
10 [9] 92:4 98:3,10,18 99:1,9,10
  101:3 161:9
10,which [1] 97:24
101 [1] 168:22
10th [2] 102:8,22
11 [1] 49:21
12 [4] 53:11 92:4 98:9 105:5
12:51 [1] 163:6
13 [11] 86:22 88:9,17 98:1,3,8,16
  103:9 138:20 143:5 160:10
13th [4] 172:19 173:7 174:13,15
14 [2] 67:15 69:22
15 [9] 87:14,14 88:5 98:6 99:1 103:
  14,20 143:7 160:11
16 [3] 116:12,17 143:13
17 [3] 70:3 118:2,3
17101 [1] 1:25
17110 [1] 1:21
17th [6] 77:20,22 78:1,3,8,17
18 [3] 86:16 122:11,12
18th [1] 82:5
19 [7] 166:16,25 168:3 169:5,10
  174:25 177:16
1995 [1] 193:17
1998 [7] 113:1,3 139:21 151:3 154:
  7 177:18 189:6
1999 [16] 72:22 93:17,23 113:14
  131:18 132:8 159:6,12 167:20
  172:15,19 173:7,12 176:8,12 189:
  8
1999-391 [2] 167:25 168:5
19th [6] 167:20 168:18,19 169:3
  190:2,3

**2**

2 [10] 86:23 94:19,20,24,24,24 116:
  21 169:14,14,20
20 [8] 92:15 137:9 166:24,25 167:
  17 168:23 169:9,11
200 [1] 14:4
2000 [9] 23:13 35:17 78:7,8,9 79:
  25 99:2,11 101:3
2001 [9] 1:15 2:2 14:3 24:2 37:13,
  20 53:11 98:9 104:24
2003 [1] 85:19
2004 [1] 57:3
2005 [1] 57:4
21 [3] 174:11,12 177:18
22 [1] 198:8
25 [2] 99:2,11
2504(b [1] 116:21
25th [1] 100:3
26 [1] 113:18
28 [1] 139:2
28th [1] 170:9
29 [3] 160:11 161:2,6
2of [1] 169:19

**3**

3 [5] 82:16 88:5 101:7 113:2,3

**30th** [2] 81:19,23
33 [1] 118:3
333 [1] 11:24
391 [1] 166:20

**4**

4 [4] 98:14 138:24 139:1,1
425 [2] 104:10 123:14
426 [1] 127:9
43 [4] 103:13,15 104:18 105:12
4311 [1] 1:20
43rd [1] 103:21
44,but [1] 113:5
46-f [2] 3:8,10
49 [7] 48:13 54:16 143:5,6,7,13,19

**5**

5 [4] 160:10 161:3,4 177:16
50 [2] 59:6 84:6
5th [1] 74:24

**6**

6 [4] 1:15 64:17 73:15,22
6th [5] 1:20 49:8 74:24,24 146:17

**7**

7 [7] 2:2 74:23 103:9,12 105:11
  113:4 114:18
7th [2] 74:24 146:17

**8**

8 [6] 86:25 87:7,7,8 88:5 143:5

**9**

9 [2] 37:13,20
9:13 [1] 2:3
9:59 [1] 40:5
90% [1] 57:8
99 [2] 3:25 59:15
9th [7] 37:16 38:19,22 49:8 108:15

**A**

a.m [2] 2:3
abide [1] 130:11
ability [3] 58:4 123:17 181:3
able [4] 6:15 24:9 34:17 81:20 83:
  13 92:5 111:25 119:10 133:21
  174:6 181:2
above [1] 125:21
absent [1] 93:9
absolutely [7] 58:3 78:13 117:9
  120:21 133:2 182:8 187:10
abuse [3] 147:6 150:21,22
abut [1] 23:11
academically [1] 198:3
academy [1] 174:17
accept [3] 66:5 107:15 142:9
accepted [1] 196:15
accepts [1] 142:7
accomplish [1] 6:16
according [3] 46:15 73:6 137:1
account [1] 88:2
accountable [1] 148:10
accounted [1] 128:8
accuracy [1] 99:20
accurate [2] 110:17 151:11
accurately [1] 137:4

accusations [2] 29:14 31:5
accused [5] 28:11,21 30:8 36:16
  37:3
accusing [3] 16:5 29:22 95:9
achieve [1] 180:23
acknowledge [1] 19:3
acronym [1] 69:18
acronyms [1] 153:15
act [5] 3:23 6:25 79:17 85:5,6
acting [6] 16:16 17:1,13,14 21:24,
  25 22:3 80:9 82:25 108:11,16,21,
  22 109:20 139:3 196:5
action [8] 7:11 8:1,23 21:10 24:16
  122:9 127:25 135:9
actions [15] 3:21 8:18 12:24 19:20
  21:15 22:24,25 32:25 83:19 92:13
  93:9 96:5 116:24 126:18 195:21
activities [2] 28:11 39:23
activity [11] 30:9 36:17 57:20,24
  67:16 71:13,18,22 95:25 96:4 101:
  10
acts [1] 146:22
actual [4] 22:4 77:24 82:5 102:23
actually [18] 11:7,10 18:23 27:20
  29:3 57:11 63:16 72:5 74:8 85:12
  100:4 109:22 121:24 126:5 136:4
  152:2 157:3 183:15
ad [1] 197:3
adamant [1] 75:2
add [2] 30:20 144:21
addition [5] 3:22 16:17,18 47:7
  146:23
additional [2] 187:13 189:3
addressed [1] 85:1
adequately [1] 141:12
adjective [1] 164:23
adjudicate [2] 26:2,3
adjudicated [1] 122:4
adjudication [1] 25:10
adjudicator [2] 25:17,19
adman [1] 109:6
administration [4] 5:11 23:22
  112:16 197:4
administrative [47] 25:11 114:19,
  20,21,24,24 115:2,2,11,15,18,22
  116:1,20,21,22 117:2,4,5,13,21,22,
  25 118:8,14,16 121:6 124:8,13
  128:16,24 129:22,23 130:4,4,5
  131:20,21,24,25 132:5,5,14 133:9
  159:9,11 188:23
administrator [3] 144:8 145:13
  147:18,22 149:15
advancement [1] 16:22
advancements [1] 84:19
advised [4] 94:21 118:6,9 188:2
affairs [19] 11:13 65:10 75:12,15
  115:11 119:9 121:2,3,18,23 133:8
  135:13 139:23 168:20 169:2 196:
  6,7 197:7,14
affect [1] 196:18
afford [3] 17:5 77:9 140:23
afforded [4] 16:15 22:1,19 118:9
affords [4] 16:20 107:8 138:7,7
afraid [3] 43:9,10,13
afterward [1] 75:10

afterwards [1] 183:17
ag's [1] 27:20
agency [3] 56:10 186:20,24
agent [12] 171:24 172:2,5,23 173:8
  176:7 179:8 181:5 185:13 187:5
  189:6 192:15
agitated [1] 74:7
ago [10] 9:6 19:7,17 24:3 92:2 151:
  17 153:8 160:21 190:16 196:25
agree [5] 62:20 106:15 138:3 144:
  19 163:15
agreement [3] 12:16 118:4,13
ahead [11] 10:15 32:11 89:13 90:7
  124:17,25,25 141:20 146:8 149:9
  165:19
ahead.paragraph [1] 161:2
al [3] 100:8,9,10
alienate [1] 6:10
alienating [1] 6:16
all-inclusive [1] 161:15
allegation [18] 16:5 29:17,17 95:
  14 103:17 125:11,19 129:19,20,24
  130:19 131:7 187:22
allegations [4] 30:22 96:13 126:
  24 172:6
allege [1] 183:16
alleged [5] 54:23 82:8 96:5 116:23
  117:1
allegedly [1] 188:16
allegheny [1] 178:17
alleging [2] 11:16 160:13
allocated [1] 64:17
allocation [1] 85:11
allow [5] 61:1 82:3 133:14 163:9,
  18
allowed [3] 17:4 37:6,7
allowing [1] 33:20
almost [4] 19:15 101:21 147:17
  151:13
alone [3] 79:14,17 194:18
already [6] 4:20 5:4,4,21 13:21
  16:9 31:13 36:25 41:1 54:6,8 89:9
  90:10,19 97:17 108:13 113:15
  131:2 135:12,12 137:1 144:12,17
  170:10 179:16,20,20,21,22
alright [9] 15:31:8 32:7 39:3 42:
  10 87:25 96:22
although [9] 9:5 47:6 104:5 140:
  17
amend [1] 97:19
amended [11] 7:4 8:4,9,15 9:13,21
  33:5 37:13,25 54:19 105:2
among [2] 4:6 191:17
amongst [2] 4:6 70:1
amount [6] 22:1 35:6,11 82:16 92:
  8 179:23
amounted [1] 14:19
analysis [1] 67:18
analyst [1] 15:14
and.well [1] 17:24
and/or [1] 147:17
anderson [2] 69:21 70:6
angry [3] 45:22 46:8,11
animal [1] 157:14
announced [2] 97:4,5

P.R. VIDEO, INC

**announcement** [3] 78:20 82:4,5
**annual** [1] 60:16
**another** [16] 5:22 8:17 13:16 16:
12 32:5 62:23 63:2 80:4 108:24
123:9 155:2
**answer** [49] 16:11 22:6 24:21,25
29:25 31:7 33:12,21,24 34:7 36:8,
8,13,16,19 38:21,24 40:17,18 41:
16,18 43:9,10 56:23 60:15 61:6
69:13 70:18 78:16 88:19 90:9 95:
4,20 107:3 128:5 129:12 136:2,14
138:10 141:23 147:21 148:16 158:
12 163:17,20 169:24 170:1 175:
18 196:23
**answered** [6] 7:16 36:22,25 70:11
150:5 177:7
**answering** [4] 24:25 31:6 33:16
122:16
**answers** [3] 40:17 42:5 122:17
**anticipation** [1] 71:21
**anxiety** [1] 107:11
**anxious** [1] 35:9
**anybody** [18] 20:12,15 41:17 58:6
98:23 109:15 152:14 153:16,17
154:6 155:18,21 156:2,14,17,22
159:14 173:24
**anybody's** [2] 26:19 50:18
**anyone's** [1] 77:7
**anything's** [1] 177:4
**anyway** [10] 35:10,20 37:1 56:7 59:
10 76:18 133:15 151:12 162:1
197:11
**apologize** [5] 2:19 30:15,15 107:9,
25
**apology** [2] 107:15,18
**apparently** [5] 25:25 37:5 43:9
120:14 150:12
**appear** [3] 30:16 63:20 118:23
**appearance** [2] 70:9,9
**appearances** [1] 1:16
**appeared** [2] 56:2 89:9
**appearing** [1] 30:18
**appears** [1] 187:24
**applicable** [2] 114:12 118:7
**applied** [3] 14:1,13,19
**apply** [1] 155:5
**applying** [1] 14:21
**appointed** [2] 23:16,20 35:14
**appreciate** [3] 42:18 163:8 164:9
**appreciated** [1] 108:3
**appropriate** [6] 132:25 133:24
134:15,24,25 139:13
**approved** [2] 66:23 67:4
**april** [1] 59:15
**ar** [2] 104:9 127:9
**ar-11** [2] 8:8 50:4
**ar4-25** [2] 119:16 122:13
**ar4-25.09a11** [1] 113:6
**ar425** [5] 115:14,25 116:15 130:6,
7
**arbitration** [2] 197:2,21
**architects** [1] 119:8
**area** [7] 13:25 98:20 99:6 101:7,8
162:12,17
**aren't** [1] 145:10

**argu.question** [1] 9:4
**arguing** [2] 99:22 144:2
**argument** [1] 143:19
**argumentative** [6] 29:9 37:1 40:
23 136:17 137:6 142:1
**aright** [1] 33:12
**army** [2] 71:19,20
**around** [8] 59:3 72:3 93:7,20 131:
22 133:12 153:25 199:3
**arrangements** [3] 102:18,20 175:
15
**article** [2] 113:17,18
**artifacts** [1] 55:11
**aside** [3] 105:12 144:18 160:21
**assert** [1] 46:20
**asserting** [2] 115:17,19
**assign** [1] 74:14
**assigned** [12] 17:25 24:10 59:13
75:22 77:9 80:6 83:10,15 171:7
188:10 196:3 197:18
**assigning** [2] 83:1 147:3
**assignment** [21] 24:24 54:2 55:3,
5,6 56:17 57:6,16 58:8,9,13 59:2,
23 65:5,17 66:1,6 76:5,7 86:9 101:
13 144:12
**assignments** [4] 18:24 57:13 67:
3 68:1
**assist** [2] 98:20 99:5
**associating** [1] 19:13
**association** [3] 19:9 98:22 101:4
**assume** [8] 5:25 8:1 12:14 15:2
25:8 61:12 111:13 163:24
**assumed** [2] 5:22 67:4
**assuming** [1] 151:19
**assumption** [1] 111:13
**atmosphere** [1] 4:5
**attaboys** [1] 127:7
**attached** [2] 53:16 130:3
**attack** [3] 8:3,12 12:12
**attacked** [1] 3:17
**attacking** [1] 11:20
**attacks** [8] 3:15 10:7,18,23 11:4,
7,8 12:2,4,6
**attempt** [1] 115:21
**attempted** [1] 119:10
**attempts** [2] 8:23 21:14
**attend** [6] 17:1,5 129:10 196:6,11,
20
**attended** [1] 18:16
**attending** [2] 196:22,24
**attention** [7] 168:12,16 169:8 192:
1,7 195:16,17
**attitude** [1] 72:12
**attorney** [17] 2:10 9:6 29:1,5 31:
20,20 37:5,9 83:15,20,22,25 107:4
131:14 161:18 164:2 193:24
**attorney's** [1] 28:7
**attorneys** [3] 10:1 27:22 47:25
**attributable** [1] 82:12
**audio** [2] 42:12 177:19
**august** [3] 18:18 79:23,25
**authority** [3] 56:4,4 139:13
**automation** [1] 63:8
**available** [5] 4:20 17:13 171:11
**avoid** [2] 70:9 92:12

**avoided** [1] 128:11
**award** [7] 77:24 78:12 82:6,13 197:
24 198:4,5
**awarded** [4] 79:22 81:1,23 198:5
**aware** [11] 6:21 8:10 12:23 14:13,
14,16 25:13,15 27:4 118:21 139:
14
**away** [7] 17:8 24:7,18 75:23 76:8
82:1 167:1

---

## B

**b's** [1] 63:19
**back** [52] 3:6,25 18:14 23:5 25:5
27:10 34:10 40:2,4 47:9 48:11,19
52:14 60:23 65:16 71:12 73:4 74:
8,12 75:11 83:8 90:8,17 93:8 96:4
106:14 111:8,12,25 112:17 118:
20,24 131:17 132:8 138:19 139:
21 146:16,19 147:16 151:13 159:
6,11 162:8 163:6 164:5 174:3 181:
9,10 189:6,21 193:23 195:9
**backfill** [1] 80:8
**background** [5] 14:17 26:6 60:19
86:9 150:15
**bad** [10] 10:13,17 27:7 133:20 141:
4,11 142:5,5,8,15 149:1 147:23
149:20,24
**badly** [2] 134:22 136:6
**baffo** [3] 81:6 82:3,4
**baffos** [1] 78:19
**bafo** [2] 67:10,14
**bafo's** [2] 67:12 69:17
**bailey** [291] 1:19 2:10,16,18,22,25
10:1,5 11:5 12:13 19:13 20:18,20
23:3,5 24:21 25:3 29:8 30:1,11,20
31:8,13,16,24 32:8,10 33:10,13,17
34:2,9 36:1,21,23 37:18,19,22 38:
3,11,14,17,20,23,25 39:3,6,10,13,
17,21,25 40:3,6,15,22 41:3,8,11,
21 42:6,10,17,22,25 43:2,7,11,15,
19,23 44:1,6,9,11,16,19 45:1,3,6,9,
17,25 46:3,5,8,12,15,17,20 47:3,6,
11,22,25 48:6,18,22 49:9,18,23 50:
10,22 51:1,4,7,10,14 53:6 54:3,10,
11,14,18,20,22 55:24 57:21 59:24
60:5,8,19 61:6,20,23,25 62:3 69:2,
6,18 72:17 75:24 76:9,20 78:5 86:
23 87:20,23,25 88:7,22,25 89:6
90:4,8,17,25 91:5,14 94:7,16,21
96:3 97:6,11 98:1,4,7 99:13,15
100:20 102:13 103:10,22,25 104:
3,7,13,23 105:6 106:10,13,20 107:
17,21 130:10 131:3 132:13,17,20
133:3 134:6 135:2 136:9,16,24
137:22 141:13,17 142:23 143:10,
15,24 144:17,22 145:6,15 147:12,
19 148:14,17,22 149:7,23 150:1
151:23 156:6 157:9 158:3,6,10,24
159:3,17 160:4,8,20 161:1,4,8,16
162:3,7,14 163:2,4,7,16,25 164:13,
15 165:11,18,23 166:10 168:11,
15 169:5,7,12,22 170:5 174:11
175:19,22 176:2,17 177:11,15

178:3,8 181:8 185:5,11 186:23
187:12,16,21 189:2,9,12,17,20
192:19,24 193:3,6,12 195:12 198:
7,10,19,22,25 199:3,6,11,17,20
**bailey's** [2] 47:10 164:16
**bar** [1] 81:14
**bargaining** [2] 118:4,13
**barger** [1] 151:17
**barred** [2] 196:24 197:20
**barrow** [1] 55:17
**based** [14] 8:3 30:24 46:17 54:5,10
95:2,14 104:23 121:16 135:10
179:4 186:18 187:8 197:13
**baseless** [1] 3:11
**basic** [3] 103:16 104:18 114:7
**basically** [3] 122:15 143:18 180:7
**basis** [18] 7:14 76:10 80:11 116:5,
8 118:25 125:8 128:12 130:15,18
134:9 136:6 138:4 142:3 143:15
165:21 196:8,11
**basketball** [1] 52:15
**bastardize** [1] 147:6
**bathroom** [1] 161:23
**battered** [1] 72:3
**bearing** [2] 110:7,21
**became** [2] 45:22 74:17
**becoming** [2] 136:24 137:6
**began** [2] 78:17 188:1
**begging** [2] 148:23,23
**begin** [3] 2:6 101:12 144:18
**beginning** [3] 3:24 172:1 192:16
**behalf** [4] 14:23 84:25
**behavior** [2] 128:10 192:2
**behind** [1] 30:21
**beings** [2] 18:10 86:3
**belabor** [1] 102:5
**belaboring** [1] 102:10
**belief** [2] 93:21 110:14
**believe** [74] 2:11 3:19 4:1,8,11 10:
19 11:10,21,16 16:19 21:4 23:1,16
24:2 25:14 27:19 29:18 31:2 37:
17 38:4 45:6,10 46:23,24,24,25
50:3,8 55:4 56:1 57:11 58:5,24 62:
25 64:17 67:14 69:17 73:19 76:23
77:14 79:23 85:10 86:25 88:14 89:
25 90:19 94:25 96:23 97:17 99:18
104:9 108:15 112:4 113:18 126:7
127:9 140:10 143:7 145:1,2,18
147:1 155:2 164:13 178:12 181:5
182:24 184:15 185:9,10 187:17,
21 188:11 196:14 198:15
**believed** [7] 35:23 36:2 58:7 79:7
121:17 133:18 144:8
**believes** [1] 146:5
**believing** [1] 143:16
**belong** [1] 18:8
**benchmark** [1] 86:12
**benefactors** [1] 58:15
**benefit** [4] 6:11 89:7,7 149:5
**berm** [1] 91:2
**best** [29] 6:13 16:11 20:3 23:11 26:
20,21 34:18 52:21 65:8 66:22 67:
10,13,19,24 69:19,22 77:19 92:22
99:17 130:11 158:12 175:9,9 177:
22 178:3,15 184:6 186:15 188:10

## P.R. VIDEO, INC

**best.'** [1] 65:22
**better** [10] 9:15 48:10 63:18 65:12 97:8 128:3 144:9 175:11 177:13 188:25
**between** [13] 17:24 25:14,16 91:18 96:8 114:23 115:1 117:3 130:2 163:10,19 177:20 189:24
**beyond** [1] 91:24
**bialey** [1] 48:3
**bid** [1] 61:13
**biggest** [1] 110:1
**bill** [1] 15:14
**billion** [1] 147:4
**binary** [1] 141:23
**binding** [1] 139:8
**biography** [1] 101:7
**bit** [5] 19:1 108:14 113:5 130:8 139:11
**biweekly** [1] 17:2
**blah** [6] 72:9,9,9 92:7,7,7
**blame** [1] 146:7
**blatant** [2] 98:19 99:9
**blindsided** [1] 192:10
**blocked** [1] 11:3
**board** [1] 17:10
**bodak** [2] 178:10,10
**body** [7] 177:19,24 178:5,22,23 193:25 194:1
**book** [9] 54:25 55:9,17 56:8,13,14 57:1,8 120:20
**books** [1] 134:4
**boot** [2] 67:11 77:3
**booted** [7] 21:23 57:2,5 76:2 79:8 80:7,24
**bore** [1] 68:20
**boss** [6] 4:18,23 5:21 6:10 142:10 148:7
**both** [5] 5:9 6:7 15:8 49:20 52:17,21 65:24 72:2 76:1 130:25
**bottom** [5] 98:16 118:4 138:24 142:14 143:13
**boundaries** [1] 36:13
**bowman** [3] 100:8,9,10
**box** [1] 171:14
**boy** [2] 19:6 168:10
**bpr** [10] 5:16,25 62:22 65:23 106:5,7 108:20 109:2 153:10 196:5
**brain** [1] 159:23
**break** [9] 39:16,18,24 70:2 152:3,8 162:9,13,16,18,24 163:8 195:12
**bridges** [2] 174:16 177:20
**brief** [33] 37:3,12,14 40:7,7,8 42:15 48:15 50:13,16,19,20 53:17 87:2,9,14 88:10 98:11 99:1 103:15,16,20,22 105:1,3,5 125:10,12 143:6 146:1 164:18 177:12,15
**briefed** [1] 29:16
**bring** [5] 79:16 80:7 169:8 195:17 198:13
**broader** [1] 11:9
**brought** [6] 44:22 75:7 79:9 185:18 192:1,5,6 195:16 197:6
**brown** [5] 2:13,14,17,21 25:15,16 26:10 89:3 188:7,8,9 192:1,5,6 196:5 197:12

**budget** [6] 81:17,18 84:23 85:11,15 147:4
**budgetary** [2] 64:14 85:9
**build** [2] 34:12 153:6
**building** [5] 18:3,6,9 65:24 171:11
**built** [2] 121:12 124:21
**bureau** [23] 7:12 16:16 18:16 21:25 23:14,15,22 25:17 69:10 70:12 79:10 80:9 83:1 91:7,7 100:10 105:18 106:4,5 109:21,22 110:7 171:7
**buried** [1] 115:24
**business** [1] 105:22
**but.um..it's** [1] 8:16
**butler** [1] 151:16
**buy** [1] 174:16

### C

**cadet** [2] 166:9 192:25
**calculate** [1] 82:11
**caldwell** [1] 146:21
**call** [25] 15:4 19:8 40:8 44:20 59:18 101:7 117:4,5 119:1,3 127:8 133:7,12 139:12 140:8,21 142:15,18,20 143:1 147:10 179:19 180:4 186:18,25
**called** [20] 4:24 6:25 7:5 13:2,3 55:15 57:15 60:15 108:4,18 126:5 135:18 137:14 180:9 188:19 191:10 192:4,8,11 197:11
**calling** [3] 92:1 119:2 183:15
**calls** [1] 194:2
**cambell** [1] 11:10
**came** [26] 23:13 37:17 38:1 40:18,19 41:17,20 45:20 73:7 74:7,12 80:19 81:11 82:6 92:14 106:17 119:25 128:4,6,12 151:17 179:2,10 180:12,17,17
**can.i** [1] 10:3
**candidate** [1] 26:24
**capacity** [2] 25:23 146:22
**caprioti** [1] 155:2
**captain** [55] 2:15,17,18 12:8 15:18,20,21,25 16:25 17:13,14 22:8,21 25:9,15,16,17,20,22 26:2,5,10 33:19 35:9 47:16 75:7 80:9 82:25 89:3,5,16 91:1,3,4 92:1,12 93:1,2 98:19 99:4,11 110:25 139:17 157:6 177:16 186:10 188:7,8,9,19,25 196:5 197:12,13
**captain's** [3] 15:16,19 30:22
**captains** [2] 25:21 26:8 93:1
**car** [2] 102:18,19
**card** [2] 142:7,9
**care** [4] 1:6,6 86:6 164:6 192:8
**career** [6] 6:14,23 13:20 16:20 19:10,11 24:12 27:2
**careful** [2] 138:1 166:7
**carefully** [1] 70:9
**carell** [1] 162:21
**carried** [1] 86:3
**carroll** [2] 80:18 81:5
**carry** [1] 181:4
**casalnack** [1] 89:16
**casalnick** [3] 109:4,11,12

**case** [33] 23:19,20 24:13 25:11,11 26:3 27:15,19 28:7 34:20 35:18,23 36:11 44:2 47:14,17 52:2,22 90:14 113:25 122:16 149:10 164:20 184:4,6,8 186:7 187:25 188:10 189:8 197:2,7,21
**case-by-case** [1] 142:3
**cases** [2] 25:19 145:25
**catch** [1] 164:6
**cause** [6] 5:13 9:3 14:8 23:20 25:2 26:8 27:2 107:11
**cautioned** [1] 9:5
**cawley** [1] 93:1
**centennial** [3] 54:25 55:9 57:7
**center** [2] 61:16 64:22
**centerpiece** [1] 71:15
**ceremony** [1] 198:5
**certain** [16] 6:4 14:9 15:2 27:21 73:19,21 77:10 80:1 102:21 109:9 118:13 122:5 181:6,7 190:14 196:15
**certainly** [10] 12:6 28:6 29:17 52:12 64:6 70:20 84:20 112:1,21 145:23
**chagrin** [1] 16:3
**chain** [2] 13:3 70:22
**chairperson** [1] 55:9
**challenge** [3] 26:16 68:11,12
**challenged** [1] 67:23
**chance** [2] 44:3 163:9
**change** [5] 28:12 29:4 48:13 94:16 193:20
**changed** [2] 57:2 180:12
**character** [2] 3:15,17
**characterization** [2] 11:6 57:21
**characterizations** [1] 29:14
**characterize** [3] 58:23 121:5 125:18
**characterized** [2] 137:1,19
**characterizing** [1] 136:11
**charge** [8] 67:25 68:15,17,19,20 71:15 110:6 192:24
**charges** [4] 124:12 183:22 185:11,18
**charlie** [1] 151:17
**chart** [1] 181:14
**charted** [2] 24:16 85:18
**chatted** [1] 19:1
**check** [5] 2:23 56:1 67:20 87:20 196:15
**chief** [12] 23:14 27:11,15,18,23 28:17 30:6 51:21 52:5 57:11 83:8,10
**chit** [1] 19:1
**choice** [1] 139:14
**chris** [4] 197:4 198:25 199:5,8
**cici's** [1] 177:20
**cindy** [2] 6:22,23,24 3:5,14 4:14 94:16 96:4,11
**circle** [3] 154:24,24 181:18
**circumvent** [1] 13:14
**circumvented** [2] 113:22 114:1
**citation** [1] 105:3
**citations** [1] 127:25
**cited** [1] 105:1
**citgo** [1] 142:6

**civil** [1] 23:17
**civilian** [1] 100:12
**civilians** [2] 69:10 127:6
**claim** [2] 51:11 62:5
**clarification** [1] 33:18
**clarified** [1] 193:12
**clarifies** [1] 198:2
**clarify** [11] 24:24 33:12,15 73:4 86:7 90:22 95:22 106:12 107:3 112:9 156:18
**class** [1] 198:3
**clean** [1] 73:6
**clear** [16] 20:5 74:4 84:2 86:25 87:11 92:22 95:13,19 103:14 107:20 115:21 135:16 156:13 163:12 190:8 191:20
**clearly** [1] 151:15
**clerk** [1] 184:5
**client** [10] 38:13 39:5,20 40:16 41:7 42:3 107:19,22 164:2 177:9
**client's** [3] 40:11 41:16 99:18
**clients** [2] 28:12 145:21
**clock** [1] 68:4
**close** [3] 28:5,5 74:25 154:24 161:10,11
**closely** [1] 107:19
**clue** [1] 150:7
**co-counsel** [1] 195:9
**coaching** [1] 142:2
**coffee** [1] 58:12
**coincidence** [1] 85:19
**coincidences** [1] 8:17
**coincides** [1] 87:21
**collective** [1] 118:13
**college** [2] 100:17 101:16
**colonel** [27] 2:11 4:11,15 5:8 6:16 7:1,7 9:20 10:10 19:6 61:11 64:6,9,24 65:6,15,25 66:23 68:9 69:11,12 70:25 73:17,17 74:3,3,13 79:4 83:5 86:11 99:2,4 106:1,6,22,23,25 107:7 108:4 109:1,16 110:5,11,12,14,19,24 111:9,14,17,23,24 112:5 134:12,17 146:20 147:13 149:13 151:6,6,12 152:11,18 153:17,18 154:5,8,13,14 155:6,7 157:4 158:17,18 173:11 191:9,14 192:13,14,19 194:14,15,18,18,18 197:13
**colonel's** [1] 154:1
**colonel.then** [1] 11:8
**colonie** [1] 71:4
**come** [14] 4:22 11:11 24:6,23 25:5 37:16 40:4 47:21,24 48:2,11 60:23 97:22 181:10,18
**comes** [2] 25:10 167:23
**comfortable** [2] 92:15,18
**coming** [2] 48:18 137:5
**command** [4] 4:6 13:3 70:23 172:7
**commander** [4] 12:11 98:21 99:6 123:7
**commander's** [1] 122:21
**commanders** [2] 7:11 138:8
**commenced** [1] 22:20
**comment** [2] 107:24 109:8

P.R. VIDEO, INC

comments [2] 104:17 159:23
commissioner [37] 14:11 15:3 19:
2 61:1 67:4 71:4 73:22 80:23 93:
22 94:5 95:17,21 96:8 113:8,13
131:18 143:8,14,20,22 144:2 153:
19 154:6,9,14 172:14,19,22 174:
13 175:3 182:6,7,9 193:2,5,17
194:22
commissioner's [4] 17:2 93:17
95:15 96:5
commissions [1] 125:24
committed [1] 81:4
committee [12] 54:25 55:10 56:3
57:8,14 67:2,3 79:11 120:1,19,20
128:6
commonalty [2] 182:5 185:13
commonwealth [1] 184:9
community [3] 77:6,10 80:18
companies [1] 77:25
comparison [1] 121:5
compelled [1] 129:9
competed [2] 4:12 5:4
competency [1] 110:18
competent [3] 32:3,4 137:3
competitive [1] 4:13
complainant [4] 125:13 130:20
167:5,17
complaining [1] 38:6
complains [1] 163:22
complaint [41] 3:7 7:4 8:4,9,11,15
9:13,21,23 19:19 20:23,24 29:15
33:6 37:13 38:1 46:23 54:17,18,
19 66:13 82:8 95:14 96:7,13,14
105:2 120:13,16 130:19 150:20,
20 167:3,7,12,13,23 168:24 169:2
184:5 195:20
complaints [7] 21:2 31:5 119:14
122:20 125:15 138:9,12
complete [2] 39:22 90:4
completed [3] 57:6 85:9,18
completely [6] 32:11 33:19,21 41:
15 57:4 61:7
completeness [1] 99:21
completes [1] 77:7
complex [4] 30:13 134:7 138:2
186:22
complexities [1] 137:24
composed [1] 145:21
composure [2] 39:14 46:9
compound [4] 30:12 71:10 152:4,
9
compromised [1] 83:18
con.i'm [1] 5:14
concede [1] 149:3
conceive [1] 35:17
concept [3] 135:7,8 148:11
concern [4] 18:12 92:9 107:11
169:13
concerned [2] 95:5 116:13
concerns [1] 130:11
concederations [1] 147:16
concluded [2] 182:15 183:2
conclusion [1] 147:22
concur [2] 163:13,14
conduct [6] 95:10 107:14 116:8

119:1 123:23 132:25
conducted [3] 4:4 82:4 95:21
113:7 114:20 121:19 132:21,24
137:13 140:7 187:8,25 190:7
conducting [6] 93:23 95:18 113:
13 121:13 171:25 172:3
conely [1] 2:11
conely's [1] 11:8
confer [2] 164:9 195:8
conference [6] 44:2 57:12 98:21
101:21 113:24 118:11
confidential [2] 139:5 177:21
confidentiality [2] 181:12 187:7
confidentially [1] 181:20
confines [1] 12:15
confirm [1] 186:25
confronted [3] 10:21 12:2,21
confused [1] 131:25
confusing [1] 130:8
confusion [1] 102:3
congratulated [1] 18:25
conjured [6] 6:23 116:6
conley [3] 1:12 177:10 196:20
connelly [17] 104:20 105:9,12,17,
18 106:6,6 107:7 110:5,6,12,14,25
112:19 134:1,12,17
conscience [1] 7:17
consequences [1] 142:4
consider [8] 6:24 14:22 33:17 58:
15 73:15 83:3 119:24 166:7
consideration [3] 5:3 85:15 186:
19
considerations [1] 32:5
considered [7] 14:21 58:8,20 109:
24 119:13 154:4,7
considering [1] 16:2
consistent [1] 16:16
consolidated [1] 164:21
conspiracy [2] 6:22 51:12
conspire [1] 29:3
conspiring [1] 28:12
constitute [1] 149:21
constitutional [2] 113:10,11
consultants [1] 73:19
consulting [1] 69:21
contact [11] 23:17,25 24:4,5 25:1,
6 28:22 31:22 47:20 93:5 176:7
contacted [4] 134:15 139:22 151:
4 172:2
contacts [3] 172:23 173:8,10
contained [1] 8:10
contemporaneous [2] 176:14
177:2
contention [1] 75:17
contents [1] 189:23
context [8] 101:11 104:17 105:8
122:16 129:5 143:12 144:2 146:
24
conti [2] 120:15,18
continually [2] 29:23 84:18
continuation [1] 2:7
continue [7] 40:12,14 61:6,8 72:8
75:3 157:10
continuing [1] 183:7
continuum [1] 135:9

contract [29] 61:12,19 64:12 66:7,
9,10 67:6 73:8,14 74:15 76:12 77:
24 78:12 79:21 81:11,23 82:12,
22 86:12,13 113:9,12,20,22 114:4,
13 117:18 118:24
contracted [1] 2:5
contrary [2] 85:8 135:7
contribute [1] 56:21
contributing [1] 128:9
contributions [1] 66:20
control [3] 23:23 147:3 167:24
conveniently [1] 8:19
conversation [53] 4:23 6:6,17 7:
25 17:23 21:7 26:4 37:22,24 38:4
42:19 44:22,23 45:3,4,6,10,15 46:
1 58:11 73:2,9 74:21 92:6 97:3,9,
15 101:11,19,19 102:7,11,15,23,
25 109:16 164:18,21 165:22 166:
6 173:17,18,23 174:2 177:20,22
180:6,25 181:11 189:6,23 190:6
196:16
conversation.what [1] 6:5
conversations [5] 17:25 52:11 55:
11 158:13 177:24
convert [1] 121:21
convey [1] 42:13
convinced [2] 20:1 21:12
cooperate [1] 174:6
coordinate [1] 100:16
coordinating [1] 98:21
cop [3] 145:12 197:24 198:5
copies [4] 103:2,4,6,7
copy [9] 9:20 53:6,8,10 63:14,18
116:15 122:12 177:21
corey [8] 4:16 5:8 7:1,7,24 8:24 9:
20 10:10
corey's [3] 4:11 7:6,25
corey.corey [1] 6:16
corner [1] 19:4
correct [52] 9:10 11:1 12:17 21:4
22:12,22 28:8,13,14 51:24 52:2
53:17 59:17 66:16 69:25 70:14 80:
2 87:15 98:24 100:4,24 109:13
111:14 119:5,19,20 123:14 126:9
129:7 132:7 139:15 142:21 158:
12 166:21 167:20 171:21 174:21
175:1,22 176:1,2,4,5 182:25 183:
3,4 184:15 188:2,3 191:5 192:17
193:19
corrective [1] 126:18
correctly [3] 103:23 104:10 141:1
correspondence [2] 56:1,3
corruption [7] 160:14 165:5 172:3
179:10 182:1,2 187:3
cory [13] 106:1,1,22,25 108:4,18
109:17 110:11 111:5,17,23 112:
17 134:12
cost [4] 78:22 79:17,18 83:20
costing [1] 82:19
costs [2] 82:18 83:4
couch [1] 30:16
couching [2] 40:16 41:7
couldn't [6] 47:20,20 77:15 96:15
111:2 149:22
coun [1] 163:4

counsel [169] 3:20 29:12,16,16 30:
11 33:2 37:22 38:8,20,23 40:10
41:8 46:3 50:11,23 51:15 59:25
60:9,14 83:7,10,11,11,12 84:3 89:
20 90:6 91:12,16 96:12,22 97:1
98:2,5,12,15 99:16,25 102:14,16
103:22,24 104:2,5,12,14,25 105:7
112:10 116:10,18 120:8 124:23
129:17,20,25 130:24 132:15 136:
13,16,23 137:8 141:13,15 143:11,
17 144:1,20 145:9 146:7 148:15,
17,19 149:1,10,24 151:2 152:2,8
156:9,12 157:11,17 158:5,8,16,21,
24 159:2,5,18,25 160:7,9,20,24
161:3,5,11,14,19,24 162:5,10,15,
20,23 163:3,7,15,23 164:4 165:3,
15 166:1,11 167:8,13,16 168:14,
19,23 169:6,10,18,25 170:7,14
174:12,15 175:19,21 176:6,21,25
177:14 185:2 187:11,15 189:4,11,
19,20,22 190:3,9,18 192:20,21
193:1,8,15,18,24 194:6,9 195:10,
18 197:25 198:9,15,21,23 199:5,7,
8,15,19,21
counsel's [14] 23:14 27:12,16,19,
23 28:17 30:6 51:21 52:5 57:12
83:9 89:7 190:19 197:9
counseling [4] 11:25 12:13 127:7,
24
counselor [1] 168:11
counselor's [1] 156:21
counsels [1] 61:8
counted [1] 87:17
counter [1] 34:21
counterpoints [1] 80:5
counting [1] 88:2
countless [1] 82:18
country [2] 66:4 184:14
counts [1] 62:1
county [2] 178:17 184:5
couple [16] 18:22 56:2 62:25 63:2
90:11 92:24 97:25 145:23 150:24
166:4 177:11 178:11,18 181:16
195:14 196:16
course [10] 19:2 24:16 34:14 41:
22 69:11 88:23 95:16 109:23 110:
10 196:15
court [11] 1:1 8:21 28:13 29:5,20
36:17 48:23 89:7 94:19,24 184:9
courteous [2] 42:7 47:12
courtesy [2] 42:13 130:23
courts [2] 1:2 184:5
coury [1] 1:10 197:13
cousin [1] 52:6
cousin's [1] 52:16
cover [4] 8:6 100:5 116:6 146:2
covered [3] 13:24 23:8 54:2
covers [1] 141:24
coversheet [2] 169:19,20
create [1] 27:4
created [6] 4:5 17:19 109:3 146:2,
2,12
creating [1] 8:5
credibility [1] 79:15
credit [3] 142:7,8 146:5

# P.R. VIDEO, INC

crescendo [1] 198:4
criminal [6] 25:12 124:12 129:4 176:15 183:22 184:4
critical [4] 67:6,17,24 68:10
criticisms [1] 12:24
criticized [2] 176:12 177:1
criticizing [1] 10:24
crystal [2] 2:4 3:2
curious [1] 197:18
current [2] 123:14 139:19
currently [2] 21:13 23:21
curricular [3] 57:19,20,23
cut [7] 22:4 33:23 62:20 63:13 119:3 171:4 172:13

## D

d)2 [1] 128:14
d-i-t-z-l-e-r [1] 69:3
damage [2] 6:23,23
dames [1] 199:3
dar [4] 113:23 122:4,7,8
dark [1] 131:7
darrell [56] 1:3,17 2:2,10 41:3 150:5 152:1,5,12 156:11 157:12 158:11 159:20 161:9,13,15,22 162:18 164:8,17 165:20 166:4 167:15 168:17,22 170:3,6,12 174:14 176:1,5,19,23 178:2,7 180:20 184:16 185:9 187:20 188:3 189:15 190:4,10,23 193:4,16,19,22 194:4,8 195:19 198:1,12,17 199:2,13
daryl [3] 89:6 92:7 96:3
date [23] 11:5 2:2 7:4 37:13,16,25 38:1,7,8 40:18,19,41:18 57:1,3 69:16 108:15 127:14 167:19 168:20 171:15,19 195:3,5
date.probably [1] 8:25
dated [1] 53:11
daughter [1] 52:16
dave [1] 192:4
day [27] 2:1,7 3:3 4:1 5:14 14:20 40:13 48:15 52:22 58:1,1 60:15,16 65:24 74:8,12,23 94:19,24 96:13,14 136:18,18 142:19 157:6 179:15 193:21
days [6] 9:14,17 68:5 102:19 150:24 181:17
dead [2] 83:1 176:3
deal [3] 65:21 81:2 96:2
dealt [1] 9:7
deb [1] 192:7
debate [1] 133:22
december [6] 1:15 2:2 23:13 35:17 72:22 73:11
decided [4] 26:3 110:13 131:18 142:2
decision [11] 13:1 14:25 35:3 82:22 106:23 110:8,21 112:15 186:20,21 187:1
decision-making [1] 138:6
decisions [2] 13:5 112:2
deduction [2] 50:6 112:14
deeper [1] 20:1
defend [1] 47:15
defendable [1] 67:22

defendant [3] 1:22 2:12 34:15
defendant's [3] 83:19 92:13 93:9
defendants [4] 1:14 3:21 17:18 19:21 22:25 24:15 34:20 72:12 77:12 88:17 89:4 90:11 139:2 188:20
defendants' [1] 21:14
define [1] 158:24
defined [12] 12:15 61:1,11 114:21 115:12 116:3,20,23 117:17,25 119:16 127:9 130:6,7 142:8
defines [1] 116:21
definition [8] 96:9 115:21 116:19 117:13,14,17 125:15 133:13
definitional [1] 122:19
delay [4] 82:10,12,15 84:8
delayed [1] 85:6
delivered [1] 38:7
demanded [1] 171:5
demoted [1] 12:6
denied [4] 13:19 75:19,21 79:5
dennis [1] 174:16
deny [2] 51:11 152:20
denying [1] 118:21
department [30] 3:23 4:6 5:10 6:21 7:7 8:11 12:10 14:23 17:16,25 23:18 26:24 34:18 56:20,21 61:19 63:8 64:10,20 78:22 92:10 107:13 116:25 122:23 144:9 146:23 147:4 149:16 176:13 177:1
department's [3] 24:3 26:1,21
departments [1] 9:7
depending [1] 149:20
depends [1] 142:3
depo [1] 2:9
deposition [13] 1:16 2:1 33:3 35:16 40:11,13 41:16 43:24 47:10 59:11 88:23 196:3 197:5
deprives [1] 16:18
deputies [1] 111:23
deputy [8] 14:12 26:10 84:3 111:15 154:13 193:1,5,16
describe [4] 17:15 18:3,4 164:23
described [12] 12:2 16:9 22:13 24:1 36:9 64:11,23 76:14 85:7 123:13 133:10 165:21
describes [2] 117:14,16
describing [3] 94:2,4 101:6
deserved [1] 197:11
design [1] 13:13
designed [2] 25:13 131:1
designing [1] 76:15
desire [2] 187:6 198:12
desires [1] 180:24
desk [1] 24:7
destroyed [1] 127:20
detached [4] 62:7,22 65:17 196:4
detachment [1] 62:24
detail [1] 18:5
determine [1] 148:8
determined [1] 190:6
develop [5] 61:12 66:23 67:20 81:15 119:12
developed [5] 67:21 73:9 81:13 122:2 179:5
developing [3] 67:18 73:5 76:15

development [2] 64:21,21
device [1] 94:22
devote [1] 84:24
devoted [1] 70:5
dewire [14] 4:25 5:1,16 6:4,25 7:5,13,16 9:1 10:8 17:7 20:3 25:16 26:13
dgs [1] 70:7
difference [4] 114:25 117:6,10 130:2
different [10] 5:19 48:10 57:14 63:20 65:13 115:13 123:20 130:8 150:3 195:22
differently [1] 134:24
difficult [2] 47:14 93:20
difficulty [2] 145:18 189:23
dilemma [2] 33:1,2
direct [1] 150:19
directed [1] 30:23
direction [1] 158:15
directions [1] 135:24
directive [2] 73:7 115:24
directives [1] 116:25
directly [4] 38:5 65:23,23 93:9
director [23] 5:25 14:1 16:16 21:25 23:15 25:18 69:1,11 70:13 79:10 80:9 83:1 105:18 106:4 108:19 109:6,20,22 139:22 141:3,11 196:5,13
directors [1] 138:8
disappointment [1] 112:22
disciplinary [2] 120:1 122:9
discipline [22] 13:11,11,12 113:19,21 114:8 121:8,20,25 122:6,25 123:11 125:20 126:1,11,20,23 128:6 129:6,16 146:15 150:22
disciplined [2] 13:15 122:7
discourteousy [1] 123:4
discovery [2] 29:10 68:5
discrimination [1] 16:5
discuss [14] 4:7 23:9 39:8 52:22 73:23 91:25 104:15 116:15 140:21,22 173:24 188:21 192:14 197:1
discussed [14] 4:8 10:24 13:22,23 23:2 44:1 52:19 53:2 58:20 64:7,9,25 65:1 90:23 101:17 107:7 125:4 129:1 158:18 159:13,15 165:23,24 175:13 179:19,23 180:5 181:5,20,21,25
discussing [4] 55:16 150:24 164:20 195:21
discussion [19] 7:6 25:14,16 26:1 37:7,18 50:12 52:17 58:22 61:10 72:6 73:12 75:8 90:21 112:6 180:3,16,17 193:7
discussions [8] 51:20 52:1,4 54:4 105:22 111:16 113:11 155:10
disgrace [2] 144:16 150:19
dishonest [1] 46:24
dismiss [3] 87:2 99:3 105:2
dismissed [3] 183:23,24 184:2,9,12
dispatch [1] 64:21
dispatched [1] 62:6

dispositive [1] 46:22
dissatisfaction [4] 123:3,15,22 124:1
dissatisfied [1] 124:3
distance [1] 65:19
distinction [4] 114:23 115:1,5,6
district [2] 1:1,2
ditzler [8] 68:25 70:20 71:23,23 72:5 73:18 74:2,7
division [14] 23:22 25:18 68:25 139:23 141:3,11 149:16 153:7,10 168:21 196:6,7,13,23
divulge [1] 139:7
document [17] 13:12 56:8 61:13 62:21,23 66:22 67:5 87:8 96:19 107:4,6 161:16 166:15 173:11 176:7,9,11
documentation [3] 172:22 173:5,14
documented [3] 173:7 175:11,16
documents [6] 35:15 56:5 62:22 63:1,2 129:18
dog [2] 38:14 43:7
doing [28] 8:6 20:22 21:1 26:18 28:23 29:10,12 30:2 34:18 41:9,11,24 42:4 46:11 61:7,9 65:13 67:18 72:1 82:12 116:9 130:20 136:21 147:14,23 158:11 177:5 186:5
dollar [1] 85:10 144:10 147:4
dollars [7] 64:17 81:6 82:18,20,24 83:3 179:24
don [2] 9:2,9,16,18,22,25
donald [1] 1:19
done [8] 8:5,22 11:17 13:1,13 27:1 35:11 39:11,12 46:25 54:20 65:17 66:11,18 68:1 71:5 76:6 78:10 79:16,16 86:19,20 90:23 94:6 96:14 103:1 107:21 111:22 114:8 120:12 123:10 129:24 133:23 134:3,5,24 149:8,13 162:19 171:4 176:20,22,24 191:24
door [2] 24:14 161:20
double [3] 30:17 87:20 196:15
doubt [5] 91:7 96:23 97:10,13 149:5
down [19] 13:4 39:6 53:19 68:4 74:22 86:24 90:15 92:16 97:25 103:13 113:4 119:2 139:11 142:6 152:3,8 160:21 182:23 189:7
dozen [1] 136:19
dra [1] 118:11
draft [21] 37:14,20 38:5,8 44:23,24 45:11,13,14 48:15,24,25 49:6,10,12,16,19,25 50:7 54:14 120:3
drafted [3] 29:15 48:16 122:15
drafting [1] 53:24
draw [2] 118:11,15
drive [1] 192:22
driven [1] 81:18
driver [2] 64:13,13
drop [1] 113:4
due [4] 67:25 69:16 130:16,21
dunlap [5] 197:4 198:25 199:5,6,9,9
dunmore [1] 109:14

## P.R. VIDEO, INC

**during** [28] 16:25 21:18 40:7 45:14 52:15 67:16 68:5,5 70:23 75:9 83:6 84:22 95:16 101:19 108:22 109:15 112:16 126:3 128:13 136:18 151:4 173:17,23 174:2 179:11 195:12 196:2,4

**duties** [4] 35:7 123:3 127:13 141:12

**duty** [5] 7:8,15,21 8:3,12,14 9:4,12 17:7 25:6 123:15 186:5

### E

**e-business** [1] 18:16

**e-mail** [1] 14:17

**each** [7] 18:24 70:6 89:24 90:14 106:15 131:6 191:20

**earlier** [5] 18:15 105:5 187:17 192:14,20

**early** [2] 53:4 159:11

**earning** [1] 22:1

**earth** [1] 9:3

**easier** [5] 59:19 89:17 91:8,10,10 103:10 116:15 166:23,25

**easy** [2] 30:10 45:12

**effect** [5] 29:13 65:21 74:21 80:17 105:20

**effected** [1] 34:9

**effects** [1] 152:19

**efforts** [2] 30:17 47:7

**either** [21] 8:21 13:5,8 18:6 27:18 50:7 71:3 72:2 74:24 79:14 91:12 101:8 103:3 109:8,10 113:9 141:23 160:16 173:17 187:6 188:12

**elaborate** [1] 64:3

**election** [1] 151:9

**elective** [1] 118:3

**electronically** [1] 103:3

**elicited** [1] 146:18

**eligibility** [1] 4:21

**eligibilty** [1] 5:5

**elongated** [2] 79:19 83:18

**else's** [1] 19:11

**elsewhere** [1] 72:3

**elusive** [1] 142:4

**email** [8] 50:15,17,18 51:17 102:9,23 103:1,3

**emanate** [1] 53:3

**emanating** [1] 25:19

**embarrassment** [1] 107:11

**embodiment** [1] 150:16

**emergency** [1] 111:1

**employ** [1] 124:19

**employed** [2] 76:17 135:15

**empowered** [1] 24:9

**enable** [1] 163:20

**end** [21] 13:14 43:23 67:8 73:7 74:8,12 76:22 83:1 84:6 94:19 103:21 107:6 108:12,16 114:2 126:20 127:22 135:7 140:24 183:20 195:25

**ended** [1] 6:18

**endless** [1] 143:16

**ends** [1] 182:2

**enforcement** [5] 23:23 56:9,10 68:14 187:9

**engage** [3] 7:6 31:21 90:21

**engaged** [2] 21:13 126:6

**engaging** [2] 28:11,21

**enjoy** [3] 26:18 71:23 92:6

**enough** [12] 28:2,5 41:21 42:6 45:12 72:8 79:15 145:22 146:24 149:25 175:4 180:21

**ensued** [1] 180:6

**entire** [4] 24:12 127:8 130:13 172:4

**entitled** [1] 113:23

**envantino** [1] 55:9

**environment** [5] 17:16,19 27:4 92:21 108:17

**error** [1] 2:20

**esq** [2] 1:19,23

**essence** [3] 34:19 54:4 150:16

**essentially** [2] 28:23 63:5

**established** [3] 69:16 72:12 79:15

**establishment** [1] 71:18

**estimate** [2] 72:21 82:15

**etc** [5] 16:7 19:20 29:25 65:13 71:9

**etcetera** [1] 195:5

**ethical** [1] 186:20

**evaluate** [1] 67:19

**evaluation** [9] 8:24 9:1 10:9,11,14,17 13:6,7 58:17

**evanco** [19] 149:12,13 151:6,6,13 152:11,18 153:2,17 154:14 159:7,8 160:13 171:5 182:16 183:14 186:1 187:22 190:20

**evanco's** [2] 151:18 187:19

**evanko** [22] 1:9 61:11 64:6,9 69:12 73:17 74:3,13 75:6 84:10 98:19,22 99:2,4,19 134:9,11 142:19 144:5,7 145:4 147:13

**even** [37] 3:11 9:20 17:6 21:18,19 22:11 24:13,19 26:23 30:18 44:3 58:6 64:15 66:11 67:12,25 70:2,3 75:7 91:22 92:15,18 93:8 111:19 123:10 141:24 142:1,14 147:8,8 150:7 155:11 159:24 169:23 185:7,22 188:22

**event** [4] 44:19 67:21 101:16 173:6

**eventually** [4] 53:18 55:19 153:15 176:3

**everett** [1] 177:18

**everybody** [1] 5:9

**everyone** [1] 6:12

**everything** [8] 13:23 41:5 94:9 96:1 102:9,22 150:21 186:11

**evidence** [6] 64:22 130:15 131:1 160:14 165:5 184:11

**evil** [1] 6:25

**evolved** [1] 55:19

**exact** [3] 66:25 108:15 181:14

**exactly** [19] 7:3 11:15 14:8,16 17:11 23:15 35:10 46:1,10,16,19 47:13 62:19 74:20 75:17 96:16,17 128:4 171:19

**exam** [4] 4:13 5:4 92:14

**example** [20] 4:4 16:12,24 21:23 23:10 24:22 52:18 83:17,19 84:22 90:20 91:18 92:2 93:19 97:22 102:17 123:20 143:4 149:12 157:4

**examples** [4] 88:17 90:14 123:2 138:18

**excise** [1] 145:5

**excuse** [5] 3:24 5:12 6:17 37:12 55:22 103:18 176:10 184:10

**executive** [3] 68:23 69:5 80:19

**executives** [1] 68:9

**exercise** [10] 8:20,20 140:3,11 142:5,16 143:20 147:13 149:17,19

**exercise.pardon** [1] 8:9

**exercised** [3] 140:15,19 144:3

**exercises** [5] 141:3,11 143:3 147:2,22

**exercising** [1] 142:20 148:4

**exhaust** [1] 21:13

**exhibit** [42] 3:6 53:5,16 54:20 62:4 86:22 87:13,14 88:5,5,9,16 98:1,3,5,8,10 99:1 103:9,14 104:11 107:18,21 116:11,12,14,14,17 118:3 138:20 143:5,7 160:10 166:16 168:13 169:5,9 174:11,12,25 177:16 198:8

**exhibition** [1] 160:11

**exhibits** [5] 103:23,25 104:15 137:2 199:22

**exist** [5] 13:8,8 56:5 115:23 116:4,7 119:2 147:8,9

**existence** [3] 19:4 66:4 139:7

**exists** [1] 198:16

**expect** [2] 140:20 147:5

**expectations** [1] 147:6

**expecting** [1] 81:22

**expenditure** [1] 142:12

**experience** [4] 26:6 75:4 151:14 187:9

**experienced** [2] 186:23,24

**experiencing** [1] 164:12

**explain** [10] 40:20 41:19 64:5 82:20 114:22 123:16 145:14 148:15 149:6 165:2

**explained** [8] 41:1 82:18 98:19,23 99:4,11 128:1 137:12

**explaining** [3] 40:22 41:4 80:5

**explored** [1] 13:25

**exposure** [1] 77:5

**express** [1] 114:11

**expressions** [1] 146:20

**extended** [1] 154:1

**extensively** [1] 179:14

**extent** [2] 7:25 174:6

**extra** [4] 57:19,19,23 75:20

**extremely** [3] 58:25 137:3 138:1

**eye** [1] 91:22

**eyes** [1] 66:2

### F

**f.b.i** [8] 110:8 132:9,24 133:19 134:13,15 139:5,21

**f.b.i.'s** [1] 139:7

**face** [4] 4:52:17,17,23,23 68:6,6 125:19

**facial** [1] 146:20

**facilitate** [2] 56:15 84:9

17 123:20 143:4 149:12 157:4

**examples** [4] 88:17 90:14 123:2 138:18

**excise** [1] 145:5

**excuse** [5] 3:24 5:12 6:17 37:12 55:22 103:18 176:10 184:10

**executive** [3] 68:23 69:5 80:19

**executives** [1] 68:9

**exercise** [10] 8:20,20 140:3,11 142:5,16 143:20 147:13 149:17,19

**exercise.pardon** [1] 8:9

**exercised** [3] 140:15,19 144:3

**exercises** [5] 141:3,11 143:3 147:2,22

**exercising** [1] 142:20 148:4

**exhaust** [1] 21:13

**exhibit** [42] 3:6 53:5,16 54:20 62:4 86:22 87:13,14 88:5,5,9,16 98:1,3,5,8,10 99:1 103:9,14 104:11 107:18,21 116:11,12,14,14,17 118:3 138:20 143:5,7 160:10 166:16 168:13 169:5,9 174:11,12,25 177:16 198:8

**exhibition** [1] 160:11

**exhibits** [5] 103:23,25 104:15 137:2 199:22

**exist** [5] 13:8,8 56:5 115:23 116:4,7 119:2 147:8,9

**existence** [3] 19:4 66:4 139:7

**exists** [1] 198:16

**expect** [2] 140:20 147:5

**expectations** [1] 147:6

**expecting** [1] 81:22

**expenditure** [1] 142:12

**experience** [4] 26:6 75:4 151:14 187:9

**experienced** [2] 186:23,24

**experiencing** [1] 164:12

**explain** [10] 40:20 41:19 64:5 82:20 114:22 123:16 145:14 148:15 149:6 165:2

**explained** [8] 41:1 82:18 98:19,23 99:4,11 128:1 137:12

**explaining** [3] 40:22 41:4 80:5

**explored** [1] 13:25

**exposure** [1] 77:5

**express** [1] 114:11

**expressions** [1] 146:20

**extended** [1] 154:1

**extensively** [1] 179:14

**extent** [2] 7:25 174:6

**extra** [4] 57:19,19,23 75:20

**extremely** [3] 58:25 137:3 138:1

**eye** [1] 91:22

**eyes** [1] 66:2

### F

**f.b.i** [8] 110:8 132:9,24 133:19 134:13,15 139:5,21

**f.b.i.'s** [1] 139:7

**face** [4] 4:52:17,17,23,23 68:6,6 125:19

**facial** [1] 146:20

**facilitate** [2] 56:15 84:9

**facilitated** [1] 8:2

**facilitator** [1] 15:14

**fact** [26] 12:4 26:23 30:24 31:1 34:25 41:12 43:6 44:22 47:22 64:10 74:18 80:18 88:10 105:1 108:12 110:4,5,20 118:12 130:5 135:17 146:12 157:22 172:5 181:8 198:21

**factor** [1] 128:9

**facts** [2] 43:5 139:6

**factual** [1] 179:5

**failed** [1] 144:13

**fair** [2] 121:4 163:17

**fairly** [5] 55:13 72:2 91:23 119:21 175:16

**fairness** [4] 68:8 69:16,25 72:17

**fall** [4] 151:2,3,9 154:7

**familiar** [8] 63:11 64:1 67:8 157:21

**familiarity** [1] 14:10

**family** [2] 16:18 92:7

**far** [10] 6:20 9:11 82:19 83:14 84:16 90:2,2 91:2 100:25 151:13

**fashion** [2] 32:17 89:25

**fathom** [1] 38:12

**fault** [1] 107:23

**fax** [2] 169:9,20

**faxed** [2] 168:20 169:1

**fbi** [39] 10:22,25 11:8 151:4 159:7 174:6 179:6 182:5,11,13,15,20 183:7 184:9,13 190:20 191:3,6,13 193:9,11,25 194:6

**february** [5] 7:2 8:25 82:5 99:2,11 100:3

**federal** [5] 84:10 184:10 185:4,8,17

**feed** [1] 141:19

**feel** [9] 18:18 21:16 44:6,8,10 51:16 92:15,17 137:15 141:22 192:9

**feels** [1] 18:5

**fees** [1] 183:20

**felt** [12] 56:16 58:23,24 65:3 120:19 132:9,22 134:22 137:15 144:5 182:5 191:8

**few** [6] 24:2 47:7 160:21 189:4 192:14,20

**field** [1] 63:14

**fifteen** [1] 3:9

**fifty** [1] 184:14

**figure** [4] 45:12 82:10 105:16 133:12

**figure's** [1] 64:15

**figured** [2] 190:19,20

**file** [3] 113:24 127:15,18

**filed** [21] 7:4 9:21 21:3,6 23:18 24:1 34:14 48:23 50:8,21 52:13,14 95:9 96:7,15,20 99:2,11 105:5 174:24 185:7

**filing** [2] 8:4,15

**filling** [2] 15:18 144:15

**final** [5] 66:22 67:10,19,25 69:19,23 77:19 78:18 81:11 82:13 114:18

**finally** [1] 79:22

**financial** [1] 175:14

P.R. VIDEO, INC

find [11] 4:22 11:11 20:2 117:12 125:9 126:3 131:1 143:4 155:15 157:3 174:10
finder [1] 47:23
fine [16] 2:14 31:2,3 39:9 41:18 43:18 49:11 51:3,6 52:12 61:8 94:8 95:22 124:15 161:25 198:9
finish [19] 24:20 25:3 41:22 42:2,2, 3,14 43:4 44:4 47:6 60:15 69:15 77:17 79:6 80:14 93:14 95:3 162:13,24
finished [11] 25:11,12 31:24 47:3 66:6 73:1,13 76:2,12,13 90:6
first [37] 9:6 11:14 18:11 19:20 30:11 50:20 55:2,5 56:9 64:4 66:11 78:2 82:25 86:8 88:7 90:4,5,15 91:9 100:2 101:14 103:15,20 111:3 125:15 135:17 152:10 159:7 163:8 167:11 173:7 177:12 178:17,19 179:7,19 186:18
fit [1] 137:5
fitness [8] 7:8,15,21 8:3,12,14 9:4, 12
fits [1] 8:19
five [4] 28:3 88:17 179:24,25
five-minute [1] 39:15,17,24
flavor [1] 97:21
flip [1] 103:9
folder [1] 199:23
folks [9] 3:1 8:4 19:11 58:14 118:25 154:21 156:1 157:15 190:14
follow [21] 27:9 51:7 52:16 71:9 72:23 74:23 85:11 94:10 95:3,3,6 135:24,24 138:22 173:20 174:3 183:7,17 184:3,6 189:4
follow-up [2] 68:6 187:13
followed [1] 11:15
following [5] 13:8 25:12,12 113:22 185:3
fool [1] 188:25
force [4] 129:5 167:3,7,23
forced [1] 59:1
foremost [1] 186:19
forget [2] 116:11 166:16
forgot [1] 173:21
forgotten [1] 195:15
form [21] 10:18 24:18 25:23 29:9 50:3 75:24 89:25 99:16 123:14 124:16 127:12,12 128:21 137:22 138:4 150:2 167:12 170:15 171:2, 18 189:10
formal [10] 12:14 13:10 21:5 121:8 122:25 125:20 126:1,19,22 129:15
former [3] 76:10 81:1 84:3
forming [1] 27:6
forms [2] 171:8,10
forth [2] 106:14 181:9
fostering [1] 16:5
found [5] 55:12 56:23 72:8 131:2 196:12
foundation [2] 34:13 59:24
fountain [2] 161:23 162:6
four [6] 22:17,21 65:20 92:2 136:11 151:7

fourteen [2] 62:3,4
frame [17] 5:13,24 9:11 29:13 33:8 57:12 64:16 72:14,16,19 85:9 97:8 108:6 109:6 150:14 151:4 153:3
framed [2] 16:11 29:24
frames [1] 85:14
frank [2] 93:4,10
frankly [1] 107:21
fraud [5] 28:13 29:4 36:17 37:4 46:24
free [1] 57:16
freed [1] 183:15
friday [1] 102:21
friend [2] 91:20 192:4
friends [1] 17:21
front [3] 3:6 114:4 116:12
fueling [1] 142:5
full [5] 88:7 121:23 126:8,11 181:18
fully [5] 24:25 32:11 33:19,21,24 15:20 35:4 62:11 66:8
functions [1] 171:9
further [2] 8:5 199:13
furthermore [1] 197:16
future [1] 128:10

G

gained [1] 75:4
games [1] 141:20
garity [1] 129:1
gate [1] 69:20
gatekeeper [1] 68:3
gates [1] 167:9
gathering [1] 35:15
gave [3] 9:1 53:7 172:14
general [6] 15:12 16:4 83:12 84:3 165:25 166:3
generally [4] 16:20 35:13,14 52:11
generous [1] 32:20
gentleman [1] 185:7
gets [3] 24:19 77:5 121:3
getting [11] 29:10 33:7 44:3 60:25 91:13 96:16 112:20 124:25 132:18 136:20 150:14
girls' [1] 52:15
give [31] 4:4 6:24 9:14 16:24 18:1 20:18 34:3,21 37:13 65:18 88:20 97:19 104:17 105:8 108:6 122:15, 25 125:19,25 136:15 141:23 143:12 144:1 146:4,24 149:5 158:12 164:2 175:9 188:22 198:10
given [13] 10:8 11:22 13:9 19:25 25:8,8 40:17 81:25 84:23 127:7 131:11 181:16 198:6
gives [3] 97:21 118:13 123:2
giving [3] 25:10 67:13 128:25
giving.i [1] 13:5
glad [3] 107:7 114:5 198:13
gleaned [3] 30:25,25 31:1
glen [4] 83:12 84:1,2 158:2
glenn [1] 178:10
goals [1] 123:19
god [1] 175:23

god's [1] 9:3
golly [1] 58:12
got [30] 5:17 13:7 22:4 32:14 35:5, 7 37:21 42:24 43:1 53:21 59:22 60:20 61:4 71:11 74:22 79:16 80:23 81:2,7 82:22 86:5 92:23 97:11 111:20 120:19 142:17 145:11 161:20 162:4,17
gotcha [2] 2:25 87:10
government [3] 80:25 163:21 185:17
governor [13] 84:11,13,15,16,20, 25 85:19,23 86:2 151:5,24 152:10 195:4
governor's [12] 15:9 84:11 85:8, 23 98:22 101:4 160:5 178:24 181:3,4 182:21 183:10
governors [12] 155:18,22 156:15, 17,19 172:7 174:19 175:25 178:5 179:3 186:2 194:10
grade [1] 22:5
grand [3] 24:11 185:8,22
grateful [2] 51:5,12
great [10] 55:21 84:19 92:8 96:2 100:5 130:20 157:9 179:13 181:13 190:14
greatly [1] 17:19
green [1] 19:3
greensboro [1] 92:17
greensburg [2] 92:23,23
greenwood [1] 158:1
greg [1] 199:9
grievance [2] 8:21 113:25
grievances [3] 21:3,5 23:25
ground [2] 23:8 54:2
grounds [2] 32:6 150:4
groundwork [1] 51:2
growl [1] 158:2
guarded [1] 17:24
guess [22] 6:3 9:10,17 15:12 17:3 54:14 55:13 62:18 76:3 80:22 81:16 106:1 109:6 110:3 117:1 118:15 127:1 128:1 142:7,22 165:8 173:3
guessing [1] 73:11
guest [1] 91:19
guido [21] 1:23 2:22 3:5,14 4:14 6:19 7:9 10:3,6 12:17,20 19:18 20:21 23:4 24:24 29:21 30:2,19 31:6, 9,14,18 32:7,9,12,15 33:11,15,20 34:5 37:2,24 38:10,12,16,18,21,24 39:2,4,8,11,15,18,20,21,25 42:2,10,16 41:1,4,9,14,24 42:8,16,20,23 43:1, 5,10,13,17,21,25 44:5,8,10,14,17, 25 45:2,4,8,16,23 46:2,4,7,10,14, 16,19 47:2,5,9,19,24 48:2,5,8,20, 24 49:1,19,22 50:2,12,24 51:3,6,9, 13,16 53:7,10 54:16,19,21,23 60:3, 6,21 61:22,24 62:4,8 69:8 145:20 179:13 181:11
guido's [1] 187:17
gurrell [2] 83:12 84:1
guy [7] 4:24 7:17 81:1 86:15 151:19 163:21 199:15
guys [4] 162:1,12 164:5 170:22

H

hackenburg [4] 18:21 19:3,5 90:21
had.he [1] 11:11
half [4] 86:24 136:19 147:4 179:15
hall [1] 161:20
hallway [1] 118:21
halt [1] 40:13
hand [5] 74:17 111:3 126:25 159:24 172:25
handed [2] 62:4 115:24
handful [2] 56:17 92:25
handle [1] 197:9
handled [10] 10:25 27:20 132:9 133:15,24 134:13,22 136:6 137:13,18
handling [1] 11:3
hands [1] 65:16
handshake [1] 65:21
hang [1] 166:24
hap.can [1] 9:14
happen [12] 74:19 77:12 89:18 105:4 109:7 126:13,20 129:13,14 140:20 149:13 153:24
happened [16] 18:14 25:22,24 46:17 79:8 94:9 95:16 96:25 105:1 135:20 150:17 151:15 176:8 192:4 195:23 196:1
happening [2] 105:19 153:6
happy [5] 25:5 38:10,11 55:18 133:11
harassed [1] 20:25
harassment [4] 16:7 19:20 20:24 23:19
hard [5] 35:17 103:4,6,7 189:5
harm [2] 22:25 109:9
harmed [1] 19:14
harrisburg [2] 1:21,25
hatred [1] 85:5
have.covered [1] 4:1
hawthorne [1] 1:12
hazard [1] 26:17
head [12] 70:2 86:19 89:2 92:22 97:9 100:14 113:16 122:17 140:17 170:22,25 175:17
headed [1] 108:7
headquarters [4] 18:1 100:6 151:19 188:19
hear [4] 113:25 141:2 158:17 185:3
heard [23] 11:14 14:20 63:23 100:5 113:25 135:12 151:5,18 152:10, 18 153:1,1,2,4,16,16,21 154:12 165:16 188:12,17 199:8,15
hearing [3] 118:11 156:4 197:17
hearings [1] 184:23
hearsay [2] 107:24 120:16
heart [1] 77:3
heavens [1] 19:16
heck [1] 111:20
held [5] 15:15 17:3 57:11 100:17 101:12
hell [1] 101:15
help [12] 6:14,15 16:21 119:12 120:

## P.R. VIDEO, INC

3 129:19 161:21 169:11,17,23
170:1 175:19
**helped** [2] 119:8,19
**helping** [3] 101:3,6,12
**hershey** [1] 92:15
**hickes** [23] 68:9 69:12 70:25 71:4
73:17 74:3 153:18 154:5,8,13 155:
7. 158:18,18 173:11,18,23 190:24
191:4,6,9,14,17 192:13
**hicks** [1] 157:4
**hierarchy** [1] 66:24
**high** [4] 141:2 149:16 174:18 195:
4
**high-ranking** [4] 139:17,23 140:2
194:25
**higher** [4] 17:10 147:5 175:25 186:
13
**highest** [1] 16:21
**hikes** [20] 79:4 83:5 86:11 109:1
111:8,9,12,14,14,24 112:5,6,12,16
134:17 139:4,12,14 143:2 146:21
**himself** [2] 142:21 188:20
**hind** [1] 137:16
**hiring** [2] 165:25 166:2
**history** [1] 56:12
**hm** [1] 7:9
**hold** [4] 25:7 60:19 76:20 85:12
**hollering** [1] 46:13
**home** [1] 91:20
**honestly** [1] 170:12
**honor** [1] 59:1
**honored** [1] 56:20
**honoring** [1] 56:21
**hoops** [1] 5:7
**hope** [5] 42:13 56:11 198:1,13,17
**hopefully** [1] 92:21
**hoping** [1] 109:21
**horrendous** [1] 145:5
**horse** [1] 110:1
**hours** [4] 68:7,8 70:5,6
**house** [4] 15:13 17:22 92:5,5
**houston** [4] 23:19 24:11 35:18 36:
11
**how's** [1] 92:7
**however** [2] 64:11 113:8
**hum** [6] 88:6 112:10 123:1 126:2
138:21 139:10
**human** [8] 18:10,10 32:3,5 86:2
**humiliated** [1] 88:12
**humiliations** [1] 16:7
**humorous** [1] 160:20
**hundred** [4] 56:9 144:10,11 179:
24
**hurt** [2] 19:12 111:2
**hypothetical** [6] 36:7 101:17 135:
10 136:5 157:2 179:3
**hypothetically** [1] 136:2

## I

**i'** [1] 154:23
**i've.i** [1] 4:1
**i-n-f-a-n-t-i-n-o** [1] 55:25
**i.e** [1] 183:8
**i/m** [1] 199:16
**iad** [5] 116:1 167:24 168:5 169:19

197:18
**iad199-409** [1] 120:14
**iad1999** [1] 166:19
**iad1999-391** [2] 166:22 167:3
**ibm** [1] 169:21
**idea** [5] 25:23 58:17 123:12 155:10
179:3
**ideal** [1] 26:24
**ideas** [1] 27:6
**identification** [1] 2:8
**identified** [1] 182:3
**idiocy** [1] 146:11
**ignores** [1] 139:6
**iiims** [1] 196:4
**iims** [7] 58:4 59:7,13,18 78:9 85:24
157:24
**illegal** [11] 28:11,22 30:9 31:21 35:
24 36:3,5,17 95:9,25 96:3
**illustrate** [3] 6:6 18:15 23:12
**illustration** [1] 16:12
**imagination** [1] 107:5
**imagine** [2] 7:14 34:16
**immediate** [1] 70:16
**impact** [4] 16:17 19:10,10 58:3
**implement** [1] 119:19
**implicated** [1] 25:21
**implications** [3] 43:8 175:25 183:
8
**imply** [2] 86:1 154:2
**importance** [3] 66:1 84:25 85:2
**important** [8] 58:25 71:17 72:16
78:11 92:20 175:4 181:12 196:2
**imposed** [1] 126:12
**impressed** [3] 65:25 66:5,6
**improper** [7] 41:10,15 46:11 132:
22 137:12,15,20
**improve** [1] 13:20
**impugning** [1] 146:13
**ims** [5] 61:15 62:6 70:23 75:18 145:
3
**in.assigned** [1] 11:13
**inadequacies** [4] 122:24 125:25
133:17 141:10
**inadequacy** [7] 124:5 140:6,9 141:
5 147:11 148:5,9
**inadequate** [4] 133:20 134:2 135:
23 149:21
**inappropriate** [4] 133:6 142:12
165:1 166:8
**inappropriately** [5] 29:19 132:10
134:14 149:18,20
**incidences** [1] 12:1
**incident** [3] 59:16 62:13 96:24
**incidentally** [1] 29:15
**incidents** [1] 91:9
**include** [4] 12:3 89:4 122:22 175:4
**included** [3] 49:5 64:20 107:18
**including** [4] 13:10 79:4 83:16
158:17
**incompetence** [1] 110:15
**incompetent** [2] 106:7 110:13
**inconceivable** [1] 36:15
**incorporates** [1] 117:23
**independent** [2] 160:14 165:5
**indiana** [1] 184:5

**indicate** [1] 62:22
**indicated** [6] 40:24 183:1 185:14
187:6,18 195:13
**indicates** [1] 115:8
**indicating** [1] 183:6
**indicted** [1] 185:7
**indicts** [1] 144:7
**indirect** [2] 83:4 96:24
**individual** [3] 92:10 108:25 180:9
**individuals** [6] 14:13,14 77:2,9 90:
11 115:20
**industry** [1] 86:14
**infantino** [1] 55:22
**inference** [1] 137:25
**influence** [4] 180:1,22 181:2,4
**info** [1] 74:10
**informant** [1] 177:21
**information** [24] 14:17 29:19 41:
25 45:20 49:9 50:5 59:17 62:13
63:7 74:5 125:12 154:24 169:23
174:23 176:14 177:3,23 179:5
183:6 186:7 188:5,12 192:6 197:6
**information.that** [1] 169:16
**informed** [3] 139:12 145:21 146:
21 174:7 197:12
**informing** [1] 179:20
**infractions** [2] 122:22 125:23
**initial** [2] 125:8 126:4
**initiated** [5] 7:11 8:1 40:8 42:18
44:19
**injunction** [2] 52:14 97:5
**innocently** [1] 106:15
**input** [1] 111:24
**inquires** [4] 114:21 115:22 116:23
127:23
**inquiries** [4] 40:24 116:4 122:18
130:9
**inquiry** [88] 14:7 51:2 93:17,23 94:
6 95:15,18,22 114:19,24 115:2,8,9,
15,18 116:24 117:2,4,13,15,25
118:8,14,16,16 119:3,6,7,16 120:9,
12,23,25 121:1,7,10,13,22 122:19,
21 123:10,24 124:2,7 126:8,17,19,
21 128:14,15,16,19 129:9,21,23
130:1,4,5,7,13 131:10,19,21 132:2,
5,11,14,16,25 133:8,13,21,23,23
134:3,4,5,18 135:1 137:13,20 138:
6,15 140:7 141:9 188:24 196:21
198:18
**inspection** [2] 153:7,9
**inspections** [1] 151:16
**instance** [3] 140:18 147:24 192:10
**instances** [1] 17:8
**instead** [4] 29:12 92:3 134:17 162:
23
**instill** [1] 128:7
**institutional** [1] 154:16
**instructed** [2] 19:22 197:14
**instrument** [1] 67:19
**instruments** [2] 76:14,15
**insulated** [1] 68:11
**insult** [1] 95:7
**insulted** [4] 89:5 90:2 93:16 94:5
**insure** [4] 68:1,8 69:16,25
**integration** [4] 64:18,23 71:20 77:

6
**integrator** [15] 61:15,17,18 62:12
63:6 64:12 66:7,10,24 73:7,14 74:
15 77:23 78:9 86:13
**integrators** [4] 68:5 69:20,20 75:5
**integrity** [1] 46:13
**intended** [5] 107:24 123:18 126:
23 127:23 180:1
**intent** [3] 107:10 119:11 122:2
**intention** [1] 146:15
**intentionally** [1] 36:4
**interact** [1] 16:24
**interception** [1] 165:1
**interest** [9] 14:11 26:2,21 52:21
84:20 97:18 139:4 181:13 190:15
**interested** [2] 71:24 72:24
**interesting** [3] 72:8 160:15 161:2
**interfering** [1] 136:21
**interim** [1] 196:8
**internal** [21] 11:13 65:9 75:11,15
115:11 118:8 119:9 121:2,3,18,23
124:11 133:8 135:13 139:23 168:
20 169:2 174:24 196:6,7 197:7,14
**interrogation** [1] 3:24
**interrupt** [6] 38:25 47:7 80:15 106:
14 130:22 131:6
**interrupting** [3] 42:3 43:3,12
**interruptions** [1] 143:16
**interview** [4] 113:20 118:10 125:
13 129:10
**interviewed** [5] 14:15 25:22 26:23
170:8,11
**interviewing** [1] 14:18
**invest** [1] 183:22
**investigate** [3] 45:24 132:11 133:
11
**investigated** [2] 45:22,25
**investigating** [1] 187:23
**investigation** [70] 10:22,25 11:9
96:5 110:9 113:13 114:25 115:3,
10 116:2,8,20,22,23 117:2,5,21,23
118:8,16,17 121:6,19,24 126:8,11
129:23 130:5 131:20,24 132:3,6,
10,22,24 133:8,9,19 134:14 135:
14 137:14 139:8 159:7,9,11 167:4
171:25 173:2 174:25 175:13,23
179:6,8,10,11,18 182:1,12,13,15,
20 183:1,8 186:2,16 187:3,24 188:
21 191:13,15,17,19,20 192:15,16
193:10 197:8,14,22
**investigations** [8] 4:2,3 11:12,15
113:7 114:21 115:12 116:1
**investigative** [4] 138:5 171:9,10
182:10
**investigator** [4] 45:24 121:13,17
188:9
**invited** [2] 196:6,11
**involved** [16] 57:16 58:14 65:11
73:20 79:3,9 82:21 84:18 111:16
112:1,12,15 119:24 154:24 175:
24 179:21
**involves** [1] 163:10
**involving** [3] 36:10 166:9 174:18
**irate** [1] 146:20
**irony** [1] 108:23

P.R. VIDEO, INC

**irrational** [3] 3:11 24:18 57:4
**irregular** [2] 165:25 166:2
**irregularities** [3] 160:18 165:6,13
**irregularity** [1] 164:22
**irrelevant** [1] 130:14
**irritated** [1] 104:8
**is's** [1] 160:2
**isn't** [14] 5:16 31:18 40:20 96:10
 119:3 124:8 136:8 154:2 170:16
 171:2 175:22 176:2 185:13 196:
 24
**issuance** [3] 113:23 118:11 127:1
**issue** [14] 30:14 44:7 46:22 47:13
 49:16 51:2 99:20 100:21 111:19
 122:4 176:4 181:12,18 187:25
**issued** [3] 13:7 122:7 128:15
**issues** [4] 29:11 47:14 130:17 131:
 5
**items** [1] 56:14
**itself** [4] 72:11 86:5 121:10 168:7

**J**

**jacoby** [1] 83:8
**january** [20] 14:2 24:2 67:15 69:22
 70:3,4 73:15,21 74:23 77:20,22
 78:3,8,17 85:18 101:3 102:8,22
 146:17,17
**joanna** [20] 29:18 30:24 31:3 32:2,
 24 34:22 37:20 38:4 45:1,2,5,7,10,
 21 91:1,11 95:4 96:10 146:3,8
**joanna's** [1] 45:8
**job** [29] 6:20 9:9 10:7,9,10 11:4,20
 12:3,8,10 15:10 24:9 35:4 58:1 61:
 8 76:1,2 79:11,12 80:12 86:15,19
 123:8 128:3 133:20 134:16,23
 139:16 147:23
**joe** [2] 178:17,19
**joke** [1] 19:9
**jokes** [1] 21:9
**joking** [1] 19:6
**joseph** [1] 1:11
**journey** [1] 78:19
**judge** [7] 43:24 44:2 46:20 48:3,6,
 7 51:10
**judgment** [36] 139:12 140:3,8,11,
 15,19,22 141:4,11 142:5,5,8,15,16,
 18,20,20 143:1,3,21 144:3 145:5,
 12 146:13 147:2,10,23 148:2,3,4
 149:17,19,21 186:15,18,25
**judgments** [1] 149:24
**jump** [4] 5:7 53:19 121:20 135:7
**jumped** [1] 13:14
**jumping** [1] 114:1
**june** [9] 3:25 53:11 61:21 81:19,23
 98:8 159:12 170:8,9
**jury** [4] 48:4,7 185:8,22

**K**

**k-i** [1] 159:19
**keep** [12] 22:16 42:1,2,25 43:2,11
 61:24 83:9 103:2 139:5 167:8 174:
 7
**keeping** [1] 24:25
**key** [2] 80:19 81:5
**kicked** [1] 120:19
**kim** [1] 164:12

**kind** [27] 5:13 11:23 13:10 17:17
 19:9 41:21 47:12 86:11,17 108:17
 121:25 124:12 125:18 126:11,20
 128:20 133:23 135:19 138:5 146:
 11 148:6 154:16 160:24 179:18
 187:18 188:1 196:8
**kinds** [3] 81:8 126:18 130:9
**kip-stanton** [2] 167:4 174:24
**knock** [1] 21:8
**knowing** [6] 49:24 110:18 116:8
 165:5 182:14,19 185:6 186:11
**knowingly** [1] 46:25
**knowledge** [9] 9:19,22,24 49:4,
 13,14 66:23 67:3 75:3 99:18,18
 111:3 156:14,16,21 177:23 178:9
 183:6,13,18,19 185:10 188:10
**known** [4] 92:3 93:4 107:12 155:
 10
**knows** [5] 5:10 6:12 34:10 38:18
 188:25
**kush** [23] 171:24 172:2,5,23 173:8
 176:7 177:17,18,21 179:2,8,8 180:
 3 181:5 182:22,25 183:21 185:13
 186:3 187:5 189:6,24 192:15

**L**

**l-a-b-e-c** [1] 159:18
**l-y-d-e** [1] 2:4
**labecki** [6] 158:22 159:16,17,18
 160:5,7
**labor** [6] 23:23,23 113:9,12 117:18
 118:24
**labor.or** [1] 12:15
**lack** [2] 59:24 128:8
**lady's** [2] 39:7,11
**lands** [2] 71:20,20
**landscape** [1] 115:22
**language** [5] 63:24 98:9 128:12
 167:11,11
**large** [1] 140:2
**largely** [2] 57:15 70:19
**largest** [2] 101:8,9
**last** [22] 18:18 23:6 61:21 84:8 86:
 15 92:14 111:7 136:18,25 137:9
 145:23 148:16,18,20,21,24 149:2
 158:3,4 166:15 168:12 179:15
**late** [4] 38:6 44:13 57:3 127:13
**later** [12] 29:11 43:14 44:23 60:13,
 23 76:6 89:22 124:13 177:21 196:
 16,25 197:1
**laughed** [2] 26:11 188:22
**law** [6] 56:9,10 68:13 84:11 185:4
 187:9
**laws** [1] 184:11
**lawsuit** [6] 10:20 11:3,6 24:1,4 27:
 12 52:19 95:9,16
**lawyer** [6] 10:4 31:3,3 48:4 53:14
 54:1
**lawyers** [4] 29:3 30:8 54:9 149:8
**laying** [1] 51:1
**lce** [5] 5:15,17 109:1,5,12
**lead** [7] 30:16 61:12 67:6 79:7 80:
 21 81:3 197:10
**leader** [2] 62:12 63:5 64:11
**leading** [3] 32:17 110:3 136:21

**leads** [1] 183:8
**leanne** [4] 158:21 159:16,17,18
**learn** [2] 16:21 101:10
**least** [20] 4:17 10:19 34:15 36:14
 65:11 73:6 79:6,6 82:16,16 93:5
 99:18 113:17 136:19 142:12 146:
 4 147:24 183:1 196:12 197:20
**least.that** [1] 6:22
**leave** [9] 17:7 41:2 52:9 60:16 65:
 9,14 77:15 80:12 153:3
**leaving** [4] 56:15 84:21 85:20 151:
 18
**lee** [2] 83:13,23
**left** [10] 3:7 66:17 71:5 76:4,7 77:
 23 78:3,10 79:14 153:17
**leg** [1] 178:18
**legal** [3] 31:21 47:21 186:20
**legally** [1] 139:8
**legimate** [1] 124:8
**legislative** [6] 14:1,2,25 15:7 155:
 24 156:20
**legislators** [3] 15:13 178:6 179:4
**legislature** [2] 15:8 183:9
**legislatures** [1] 175:15
**legitimate** [1] 24:19
**length** [1] 192:22
**less** [2] 49:15 187:3
**lessons** [1] 145:24
**letter** [11] 53:11,11,13 86:22,23 88:
 16 98:8 107:4 120:15 138:20 160:
 12
**letting** [4] 29:12 34:6 41:25 47:4
**level** [5] 26:20 77:10 110:18 121:1
 158:11
**levels** [2] 180:5,6
**liability** [1] 82:19
**liaison** [14] 14:1,2,25 15:7 23:24
 27:11,15,28 16:30 30:5 35:14 36:10
**liberty** [1] 198:7
**lie** [11] 53:25 54:1,5,10 98:19 99:9,
 9,10 100:1,4,15
**lieutenant** [39] 2:13 9:19 10:10 12:
 9,11 22:11,12,14 23:19 106:1,7
 109:16 110:5,13 111:9 112:4 134:
 12,17 144:15 153:18 154:5,8,13
 157:4 158:17,18 173:11 191:14
 192:1,3,5,6,13,13,19 194:14,14,16
 197:12
**lieutenants** [1] 92:25
**life** [3] 23:12 145:24 195:22
**light** [1] 118:12
**likely** [5] 20:2 68:12 145:20 175:8,
 10
**likewise** [1] 161:13
**limited** [3] 163:11 164:1,1
**line** [3] 93:6 130:13 142:14
**lingo** [1] 63:24
**lips** [1] 154:20
**liquor** [1] 23:22
**list** [9] 4:21 5:5 90:18 95:1,3 97:2,
 16 108:12 195:25
**listed** [2] 167:5,17
**listen** [1] 160:22
**listening** [3] 160:17 164:7,24
**litigation** [2] 91:21 111:19

**little** [11] 5:13 11:9 19:1 20:18 29:2
 60:1 108:14 113:5 130:8 139:11
 141:14
**lock** [2] 80:19 81:5
**lockheed** [1] 69:21
**lodged** [3] 20:23,24 21:2
**logical** [2] 26:7 135:21
**long** [9] 6:33:23 34:5,7 81:9,10
 86:14 91:14 122:2 151:17 154:2
**longer** [5] 17:23 24:5 141:14,16,18
**look** [23] 8:18 23:7 60:3 62:5,17 86:
 22 97:24 98:25 103:8,9,14 108:18
 122:13 124:24 125:5 126:17 128:
 14 138:19 143:4,6 146:13 171:23
 180:18
**looked** [5] 50:6 70:4 91:22,22 93:7
**looking** [2] 55:14 172:1
**losing** [1] 39:13
**lost** [5] 13:17 46:9 72:13 94:14
 189:15
**lot** [21] 18:9 23:8 27:22 29:10 33:
 24 35:19 54:9 71:13 79:18 81:25
 92:11 101:9,10 125:1 145:25 154:
 20,21 163:1 180:13 181:16,21
**louie** [1] 183:15
**lowest** [1] 121:1
**lt** [2] 70:25 71:3
**luckily** [1] 42:11
**lucrative** [1] 68:13
**lunch** [2] 162:16,24
**lyde** [2] 2:4 3:2
**lying** [1] 100:19

**M**

**m.o.n.a.c.o** [1] 189:11
**ma'am** [19] 23:10 24:20 26:15 28:
 24 39:6,21 43:3 47:3 53:18 57:24
 58:13 72:21 150:11 156:11 157:
 13 160:2 170:13 179:14 184:16
**maam** [5] 8:16 12:3,19 15:6 21:3
**machine** [1] 58:12
**made** [37] 11:10 14:7 16:4 18:8 20:
 5 22:25 29:14 40:23 51:12 53:18
 57:13 74:13,18 82:14 97:10 100:
 22 102:18,20 110:6 112:15 139:
 12,14 140:8 142:11,18,19 143:1
 150:10 154:13 164:24 172:23 186:
 17 187:1 195:6 196:13,21 197:18
**magic** [1] 137:5
**mailed** [1] 177:21
**major** [86] 4:15,19,23,25 5:1,15,16,
 17,23 6:4,25 7:5,13,16 8:25 10:8
 11:8 14:6,7 15:16,16 16:1 17:6 18:
 14,19,21,22 19:4,5 20:3 25:16 26:
 13 46:23 69:11 70:12,15,24,24 71:
 3,22,23 73:18 74:2,8,25 75:5,13,
 14 79:13,16 80:7 89:16 90:20,20
 91:7 96:23 97:3,10,10,13,14 101:
 2,24,25,25 102:1,7 104:19 105:9,
 18 108:9 109:12 110:4,6,6 112:19
 119:21,24 133:25 134:12,16 155:
 1,2,3 187:25 196:19
**majors** [3] 10:21 97:17 115:6
**making.i** [1] 6:3
**mam** [5] 85:25 93:25 106:2 142:1

P.R. VIDEO, INC

148:9
man [7] 7:17,17 99:3 105:21 146:19 147:3
manage [5] 23:25 61:18 66:21 70:4,8
management [6] 12:15 44:2 59:17 62:13 63:7 71:19
maneuver [1] 144:14
manipulated [2] 29:19 46:25
manner [2] 60:10 187:8
many [20] 17:24 18:9,11 21:2 52:23 55:10,12 70:7 72:1 77:1 88:18,20 89:8 105:23 136:3 194:10,13,17,21,24
march [8] 37:13,15,16,20 38:18,22 49:8,8
march.no [1] 7:2
mark [7] 1:9 55:8,10 87:12 116:10 118:2 166:24
marked [3] 53:5 87:14 122:10
market [1] 1:24
marking [1] 198:8
marriage [1] 52:7
martin [3] 69:21 80:19 81:5
martison [1] 50:4
mary [5] 157:5,17 158:5,19 159:14
match [1] 80:23
materials [2] 31:1 93:7
matter [16] 11:3 41:12 43:14 91:25 92:2 126:24 134:19 137:16 139:5 181:8 182:5 185:13,21,22 197:9,11
matters [1] 175:13
mature [2] 35:19 66:3
may13th [2] 172:15 174:8
mcdonald [7] 16:25 17:13,14 25:9,22 26:2 35:10
mcgurney [2] 80:9 82:25
me.i [2] 8:9 11:18
mean [45] 8:7 12:6 19:13 20:16 38:12 48:23 58:11 59:1 62:19,21 63:19 68:17 69:18 89:13 90:22 97:21 102:14,14,15 105:21 106:11 109:9 112:5,11 117:20 128:2,3,25 129:17 136:6 142:17 148:7 150:11 153:24,25 158:25 162:15,18 163:13 176:9 184:16 185:3 188:15 192:24 199:9
mean's [1] 159:19
meaning [3] 17:7 86:1 125:20
meaningful [3] 24:17 34:25 77:13
means [3] 63:23 84:16 105:16
meant [12] 2:19 10:3 12:14 22:24,25 105:21 111:16 112:16 145:16 156:18 165:9 192:25
mechanism [5] 60:11 93:25 96:1 123:23 148:11
meeting [28] 8:2 17:5,12,15 18:16 57:9,10 65:25 73:16,21,23 74:1,6,23 75:1,10 146:17 187:19 188:1,13,21 196:7,12,18,19,20,22,24
meeting.what [1] 9:12
meetings [5] 17:2,9 73:10 120:2 128:6
member [7] 118:7 121:24 123:10

126:5 139:24 140:2 141:3
member's [2] 122:3 124:3
members [7] 127:6,6 143:22 176:13,16 177:1 194:25
memo [15] 14:11 21:7 23:13 27:21 171:5 172:13,15,15,18,21 174:9,13,15 175:3,7
memorabilia [1] 55:11
memorandum [1] 146:21
memory [1] 167:14
mention [12] 23:10 74:16 75:6,8 146:18 172:5,8 174:16 178:4,5,24 181:23
mentioned [33] 4:12 10:8 21:17 59:2,10 74:11 77:17 85:10 90:16,20,25 91:1,1 96:23 101:7 109:2 124:20 127:3 145:7 164:14 172:12 173:23 178:12,19,22 179:21,22 181:6,8,25 183:20 188:8 197:2
mentioning [1] 70:12
mentions [1] 158:2
mere [2] 12:4 146:18
merryman [7] 97:3,11,14 101:24,25 102:1 108:9
message [6] 4:18,18 27:2 62:6 73:6 102:23
messages [2] 4:16 51:18
messed [1] 185:3
messenger [1] 197:21
met [5] 85:14 157:13,15,21 177:17
michael [1] 177:17
middle [1] 1:2
might [44] 4:8 16:19 19:14 29:6 41:12 56:15 58:16,18 62:15 73:19,24 76:5 81:4,14,18 92:25 99:22 102:3 109:21 114:1 124:23 127:1 135:16 142:13 152:18,21 153:2 155:2 156:3,22,24 157:20 164:24 166:23 169:15,16,16,20,23 171:4 172:3 177:13 181:2 199:9
mike [1] 180:9
miles [3] 65:20 92:16 144:11
military [1] 81:1
miller [3] 15:22,23,25
million [5] 64:17 81:5 85:10,17 144:10
mind [16] 24:23 26:19 32:2,2 51:6,9,13 77:7 97:22 117:3,6 132:19 142:13 161:6 186:25 190:8
minds [2] 32:5 90:5
mine [1] 192:5
minimum [1] 4:17
minor [7] 119:13 122:22 125:23 134:18 138:9 149:19 195:14
minority [1] 110:25
minute [6] 21:4 38:8 95:10 161:25 177:9 195:20
minutes [3] 43:18 137:9 160:21
miranda [1] 131:11
misconduct [10] 116:24 117:1 121:18 123:24 124:1,4 126:6 131:8 134:20,21
mishandled [1] 11:11
misheard [2] 132:17,20
missed [2] 78:2 164:4

missing [4] 62:16 63:9 136:3 192:3
mission [1] 66:8
mistake [1] 167:12
mistreat [2] 95:8 96:10
mistreated [3] 95:18,21 96:19
misunderstood [2] 165:19 199:18
mobile [1] 64:20
mode [2] 191:18 193:9
moment [6] 23:5 48:11 90:8 133:22 161:17 187:11
monaco [5] 89:10 90:25 92:12 93:2,4
monaco's [1] 93:10
monaco,um [1] 89:5
monday [1] 12:25
monetary [1] 16:17
money [10] 21:22 22:1 64:14 79:19 82:20 84:23 85:12 179:23,23 180:1
month [4] 24:2 83:20 196:25,25
monthly [2] 196:9,10
months [10] 9:14 22:18,22 24:3 65:18 81:21 82:3,16 86:16 92:2
moot [1] 99:3
morning [1] 112:25
morris [3] 14:6,7 15:16
most [16] 6:13 20:2 26:17 65:11 66:3,19 67:17 78:11 92:11 143:21 144:3,6 145:4,20 175:8,10
motion [10] 44:9 87:2 99:3,4,10,20,21,23 100:23 105:2
motioned [1] 74:17
motivation [2] 77:3,14
move [3] 81:8 137:7 149:8
moved [1] 14:15
moves [2] 6:2 18:7
moving [2] 15:1 50:23
mr.ober [10] 2:5,9 3:4,19 4:15 6:20 7:10 10:12 12:18,21
ms [146] 2:22 3:5,14 4:14 6:19 7:9 10:3,6 12:17,20 19:18 20:21 23:4 24:24 28:7,10 29:21 30:2,19 31:6,9,14,18 32:7,9,12,15 33:11,15,20 34:5,14 37:2,2,5,14,24 38:10,12,16,16,18,21,24 39:2,4,8,12,15,19,24 40:2,10,16 41:1,4,9,14,24 42:8,16,20,23 43:1,5,10,13,17,21,25 44:5,8,19,21,22,25 45:2,4,8,16,23 46:2,4,7,10,14,14,16,19 47:2,5,9,17,19,24 48:2,5,8,15,19,22 49:1,1,1,15,19,19,22 50:2,5,12,13,24 51:3,6,9,13,16 52:8 53:7,10 54:4,16,19,21,23 60:3,6,21 61:22,24 62:4,8 69:8 89:3 91:18,21 93:20,21 95:7,20 145:20 177:9 179:13 181:11 187:17
mt [1] 68:25
much [20] 3:1,20 6:17 16:3 34:8 35:2 42:17 43:13 49:15 59:4 72:7 79:14 131:9 136:5 141:16,18 146:5 187:3 196:13,25
mulligan [1] 154:19
multi-facetted [1] 130:13

multifaceted [1] 138:2
museum [1] 120:19
must [4] 43:11 156:22 180:11 196:10
mute [1] 176:4
myself [8] 16:18 24:6,15 45:23,24 77:5 93:2 107:14
mystery [1] 198:2
myth [2] 146:1,12

## N

name [13] 2:4,9 55:24 56:2 74:16 75:6,8 90:10 146:18 157:21 158:3,4 178:17
named [5] 34:14 67:2 88:12 90:2 108:11
names [4] 88:18,20 89:8 90:15 91:9 157:23 178:11,19
namingly [1] 56:3
nation [3] 56:10 66:2 77:8
national [2] 98:22 101:4
nature [1] 18:11
nauseum [1] 150:24
near [2] 19:9 161:22
necessarily [3] 63:23 122:1 124:4
necessary [2] 5:6 111:18
need [29] 13:24 18:5 20:11 21:16 35:16,16 39:15,17 41:19 48:12 55:13 71:20 86:11,20 89:14 94:16 101:15 119:4 121:23 122:6 123:21 133:11 161:19,25 181:19 187:6
needed [5] 64:10 66:17 79:16 110:25 196:11
needs [7] 7:15 26:2 30:23 76:23 80:5 144:8 186:19
negative [1] 13:7
negotiation [1] 179:7
negotiations [2] 78:20 83:16
neither [1] 50:10
nervous [4] 80:21 81:2,7 160:16
net [1] 121:12
neutral [1] 176:3
never [47] 5:10 13:9,9 14:20,22 15:25 19:8 21:20 22:4,10 26:22 27:7 33:25 49:3,7 50:1,6 51:20 52:1 63:23 77:6 90:17 91:23 93:10 98:23 101:1,5,12,17 105:23 107:5,5,6,10 138:16 141:6 155:8,9,9 173:13,14 187:2 191:3,12,13 199:8,15
new [2] 18:25 86:15
news [2] 24:6 184:7
next [19] 13:18 16:21 24:2 26:7 35:16 73:3 74:10,23 78:23 85:16 108:12 113:6 114:17 142:6 153:19 154:6,8,17 190:2
nga [3] 100:16 101:11,13
night [1] 168:2
ninety [1] 181:7
ninety-eight [3] 151:10 176:10,11
no.i [1] 2:19
nobody's [1] 21:1
noise [1] 60:20
non [2] 69:8 151:21
none [2] 13:13 172:24

P.R. VIDEO, INC

noon [1] 69:17
nope [1] 119:17
nor [1] 32:3
normally [1] 142:13
northeast [1] 109:3
not.i'm [1] 10:15
not.my [1] 2:20
notated [1] 127:11
notation [4] 13:9 127:2,4,10
note [1] 160:21
noted [2] 32:10 137:8
notes [5] 127:7,25 173:1,17 190:1
nothing [5] 35:2 53:24 85:5 160:
 12 165:4
notice [2] 87:15 93:3
noticed [3] 17:6 40:19 120:10
notification [5] 113:19 115:8 128:
 15,19 188:23
notified [2] 182:6,7
notion [1] 145:19
number [25] 4:2 11:12,12 18:3 21:
 17 30:13 53:10 56:13 61:20,21 65:
 10 72:1 85:1 103:23 113:10 115:
 12 116:11 145:7 150:3 166:16
 167:16,24 168:5 170:22 193:21
numbered [1] 143:18 150:20
numbers [4] 61:24 87:15 98:16
 113:17
numerous [2] 22:24,25

O

oa [2] 197:8,8
oath [3] 3:3 42:20,24
ober [89] 1:3,17 2:2,11 3:2 9:5 22:
 12 23:7 24:22 25:5 29:16 32:8,14,
 18 34:12 36:22 40:24 47:9,16 48:
 23,25 49:3,25 50:3 51:19 53:9 57:
 23 60:10 61:6 75:7 99:4 141:21
 150:5 152:1,5,12 156:11 157:6,12
 158:11 159:20 161:9,13,15,22
 162:18,21 164:8,17 166:20 166:4
 167:15 168:17,22 170:3,6,12 174:
 14 176:1,5,19,23 177:16 178:2,7
 180:20 184:16 185:9 186:11 187:
 20 188:3,25 189:15 190:4,10,23
 193:4,16,19,22 194:4,8 195:13,19
 198:1,12,17 199:2,13
ober's [1] 99:3
obfuscating [1] 44:3
object [10] 29:9 32:6 39:22 40:10
 72:11 124:16 130:13,21 147:19
 189:9
objecting [1] 29:22
objection [35] 11:5 31:25 32:9 36:
 1,21,23 40:12 57:21 59:24 75:24
 76:9,10 91:15 99:13,15 117:7 118:
 18 132:13,13 133:3 134:6 135:2
 137:22 141:13 145:6,15 147:12
 149:8,23 150:1,2,3 166:6 176:17
 189:14
objection's [1] 32:10
objections [3] 13:16 130:12 154:
 14
objective [1] 30:24
objectively [1] 31:4

objectives [1] 180:4
obligated [1] 88:18
observation [2] 115:11 117:24
observations [1] 146:11
observed [1] 192:2
obtained [2] 125:12 177:19
obvious [5] 55:14 72:3 82:24 83:
 5 91:23 139:14 143:12 145:19
 147:17 149:3,4,11 150:10,12,12
 181:21
obviously [3] 30:14 117:14 170:
 18
occasion [2] 55:14 191:25
occasions [7] 10:20 55:12 70:7
 77:2 85:1 105:23 166:5
occupy [1] 70:20
occur [5] 10:18 26:7 140:20 182:4
 192:15
occurred [15] 9:12 17:6 20:2 21:
 15 73:9 75:9,10 93:10 116:9 121:
 18 135:10,18 136:1 140:16 163:
 19
occurring [5] 67:16,24 71:16,18
 91:25
occurs [2] 141:6,8
october [7] 108:15 113:1,2,3 176:
 8,10 177:18
off-duty [1] 57:16
offence [1] 199:10
offensive [1] 105:3
offer [8] 18:20,25 20:17 67:10 91:
 18 179:22 196:14,17
offered [1] 107:16
offering [1] 128:11
offers [7] 66:22 67:20,25 69:19,23
 77:19 81:11
office [54] 7:6 9:2 14:2 15:9 23:14
 27:12,16,19,20,23 28:17 30:6 31:
 21 38:5,6 47:21 50:13 51:21,24
 52:5 64:21 71:19 73:24 79:5 83:9
 84:4 85:20 108:5 124:11 155:19,
 22,24 156:15,17,19,20,20,21 160:
 5 172:7 174:19 175:25 178:5 179:
 3 181:3,4 182:21 183:10 186:2
 187:19 194:10 197:3,3,9
officer [9] 23:24 58:2 68:10 77:5
 80:21 146:23 186:6 187:9 197:17
officer's [1] 111:1
officers [1] 92:24
offices [1] 178:24
official [3] 20:22 127:15 139:18
officially [4] 16:6 19:19 20:23 22:
 13
officials [1] 163:21
ok [14] 2:6,13,16,21,21 3:5 5:19 6:
 19 9:18,25 10:5,23 11:22 12:20
ok.um.as [1] 9:11
okay [162] 14:5 15:21 16:13 20:20
 22:15 26:14 27:25 32:1,8,15,19
 34:5 41:2,3 42:17 52:24 53:13 54:
 7,13,22 56:6 57:25 58:7 59:6 60:5,
 20 62:10 68:8 78:8,25 79:12 80:3
 82:7 84:17 85:22 86:21 87:6 88:8,
 16,21 89:10,21 90:16,24 91:2,12
 93:19 94:3 95:12 96:21 97:1,20,

24 98:4 100:14,18,19 101:25 102:
 3 103:8,18 104:13,22 105:6,25
 106:20 108:8 110:3 112:3 113:4
 114:11,14,16,17 118:2 120:17,22
 121:7 124:7 128:24 131:17 132:4
 138:11,15 142:14 145:9 146:16
 147:16 148:3,14 149:6,19 151:2
 152:8,13 153:9,12 154:25 155:17
 156:2 157:17,20,25 158:10,21
 159:25 160:3,8 161:8 162:14 163:
 2,4,7,23,25 164:6,7,16 165:11,13,
 18,19,20 166:1,11,14 167:16,22
 168:2 169:1 170:7,14 171:22,23
 172:1,18,21 174:5,8,22 177:8 180:
 25 185:2,4 187:14,15 189:15 190:
 4,9 191:3,11 192:12,18 193:15,18
 194:9 195:10,18 197:25 199:9,11,
 20
old [1] 198:2
oldest [1] 56:9
omissions [1] 125:24
omissions/commissions [1]
 122:23
on-line [1] 184:7
once [5] 71:19,20 92:6 121:3 130:
 8
one [112] 5:16,16 7:25 8:1,17 13:25
 16:16,19,20,22 20:4 25:20 27:4
 28:6 29:3 30:13 33:22 48:14,20
 49:15 51:23 52:25 53:8 55:14 56:
 15 57:9,10 58:5 61:20,21 62:1,21
 63:25 64:18 65:8 66:12,19 67:17,
 25 70:6 71:8 72:1,2 74:9 77:11,24
 80:4,14 85:12 86:7,9 90:5 91:21
 97:14 100:6 101:8 102:6,11 118:
 21 119:8 120:18,18 123:9,18 132:
 8,22 133:17,18,25 134:12 136:12
 137:19,19 138:11,18 139:6,8 144:
 10 145:6 146:5 148:16 150:9,9
 154:1,16,19 160:15 162:10,11,17
 166:15 173:20,22 174:7 175:7,20
 178:9,12,16,20 179:15 180:6,11
 181:12 187:3,11,12,16 189:25
 191:25 196:3 198:2
ones [2] 90:2 97:22
ongoing [2] 191:20 197:11
only [26] 19:10 21:12 22:9 27:3 56:
 17 57:9,10 65:8,17 72:21 77:22
 78:3 92:24 102:6,10 126:10 127:
 21 139:19 150:25 162:10,11 163:
 12,17 169:13 175:24 197:23
oops [1] 148:13
open [3] 14:6 70:3 154:22
opened [2] 5:23 77:20
opening [1] 109:1
openings [1] 108:25
opens [1] 161:20
operation [1] 94:22
operations [2] 25:18,19 111:15
opinion [9] 29:5 36:14 77:11 109:
 4 114:7 116:5 135:4 175:9,10
opportunities [2] 13:19 21:24
opportunity [20] 4:19 16:15,20,23
 17:5 22:19 51:11 55:21 56:12,18
 58:6 72:10 75:18 77:4 92:12 107:

8 113:24 140:23 164:3,9
oppose [1] 59:23
opposed [12] 10:4 60:10 76:5 82:
 22 94:9 95:15 102:23 112:20 124:
 9 131:1 142:6 162:15
opted [2] 92:16,22
ordeal [1] 12:23
order [16] 6:23 13:13 16:1 61:24
 67:19 69:15,25 80:8 98:20 99:5
 116:6 119:1 120:4 122:13,14 135:
 25
ordered [3] 159:9 173:24 197:22
orders [3] 19:25 197:13
ordinary [1] 196:12
organization [3] 56:16 181:1,1
origin [1] 119:25
originally [3] 33:14 44:1 85:14
ostracize [1] 195:8
ostracized [5] 17:20 88:12 89:5
 90:3 93:16 94:5
other [81] 3:3 5:14,15 8:22 10:18
 11:2,2,4,7 12:1,10 13:21,22,23 14:
 13 16:22 17:9 18:24 21:5 23:1 26:
 21 27:5 32:3,25 35:2 37:10 58:9,
 19 60:22 68:2 69:13 71:16,17 75:
 21 76:5 79:10 83:7 86:7 90:1 93:
 11 99:23 102:22 105:21 106:15
 123:6 124:2,10 127:24 130:12
 131:22 132:16,18 142:18 147:14
 150:17 157:5 162:10,11,17 166:6,
 7,10,12,15,15,16 170:10 171:17
 173:6 174:3 175:18 176:12 177:1
 183:7 189:11,19 191:20 192:22
 195:24 196:1 197:23
others [4] 56:24 60:23 185:18 198:
 6
otherwise [1] 90:17
ought [1] 139:13
out [52] 2:5 4:16 6:9,9 38:1 44:20
 45:12 55:6 57:2 59:10 73:7 76:2
 77:3,15 79:8 80:7,24 82:6,10 83:
 10 86:3 101:10 103:4 105:16 106:
 7 109:4 116:16 119:25 121:20
 126:24,25 128:6 133:1,12 144:4
 145:3 151:15,25 162:21 155:15
 157:3 161:20 162:4,6,7 173:3 186:
 1 191:18 193:9 195:13,24 197:23
out.i [1] 161:25
outcome [3] 142:4 180:24 181:2
outcomes [2] 126:25 166:9
outstanding [2] 9:1 10:9
over [22] 6:25 7:5 38:5 44:23,24 45:
 11,13,14 47:7 55:10 75:19 79:9
 83:12 85:12 101:21 103:9 106:15
 124:24 140:16 154:14 188:19 190:
 13
overall [2] 63:7 85:20
oversight [2] 67:2 79:11
overtime [1] 121:8
overtly [1] 187:6
owe [1] 107:17
own [17] 57:8 84:11 85:8 137:17
 143:3 147:7 151:14 155:8 178:8
 183:6 186:15 196:23

P.R. VIDEO, INC

# P

**p.m** [2] 193:22,23
**pa** [2] 1:21,25
**page** [34] 3:8 4:9 86:23 88:5 98:10, 14,15 103:8,9,12,19,20 105:4,11 112:23 113:4 114:18 116:20 118:3 138:24,25 139:1 143:5,13,18 144:5 160:9,10 161:3,4,7,9 168:12 169:15
**pages** [1] 169:14
**paid** [1] 177:19
**paperwork** [1] 129:19
**paragraph** [63] 3:8,10 13:18,19 16:4 18:15 23:2,7 24:23 34:24 48:13 53:20,20,21 54:16 59:6 84:6 86:25 87:1,7,7,8,15 88:4,7 97:24 98:3,10,18 99:1,9,10 100:3 103:11,13,15,16,21,21 104:3,18 105:12 111:1 113:5 114:18 125:5 127:22 139:1 143:5,6,7,13,19 145:7,10,16 150:15,20 160:11 161:6,12 168:12 177:16
**paragraphs** [2] 87:1,18
**paranoid** [4] 160:23 163:21 164:15,16
**parcel** [1] 139:16
**pardon** [2] 2:16 23:18
**part** [9] 6:25 14:12 58:1 60:25 74:21,22 77:14 82:13,23 92:9 100:2 105:15,17 111:11 114:14 119:25 134:21 139:16 140:1,2 152:17 155:9 156:15 191:24 192:2
**participants** [2] 57:14 73:16
**participate** [6] 55:6,7,8,20 56:13,18
**participated** [3] 4:12,20 112:13
**participates** [1] 52:16
**participating** [1] 197:20
**participation** [3] 57:7 120:1 121:16
**particular** [5] 27:12 55:15 76:7 86:2 93:22
**particularly** [2] 4:6 75:4
**partly** [1] 189:7
**parts** [1] 115:13
**passed** [1] 186:12
**past** [7] 28:24 34:19 130:12 135:25 150:9 181:16 186:24
**paste** [2] 171:4 172:13
**patch** [2] 55:15,16
**paul** [2] 1:9 84:10
**pay** [3] 21:19 22:4,5
**payoffs** [1] 175:14
**peers** [5] 16:16,24 26:9,17 92:18
**pema** [1] 1:23
**pennsylvania** [11] 1:2 66:3 77:7 85:3 172:4 177:25,25 182:23 183:2 185:12 186:6,14
**people** [32] 17:21,21,24 18:6,9 21:8 26:22 27:5 28:21 56:17 58:19 69:9,13 79:3 88:11 90:10,22 92:11,11 93:16 94:4 108:24 147:5 156:4,7,11 157:13 159:22 160:4 164:5 166:11 181:10

**perceived** [1] 186:15
**percent** [1] 181:7
**perform** [12] 6:15 21:24 23:25 24:9,10,10 25:7 26:9,20 35:12 58:4 123:8
**performance** [35] 6:20 9:1 10:7,9,11,13,17,18 11:4,24 12:3,7,12 13:6 122:24 123:3,15,22 124:3,5 125:25 133:17,20 134:1,16 135:23 139:17 140:6,9 141:4,9 147:11 148:5,8 149:22
**performed** [3] 12:9,11 171:9
**performing** [3] 22:14 134:23 141:12
**performs** [1] 68:11
**perhaps** [10] 3:20,22 7:2 11:19 63:25 136:1 142:4 157:14 175:24 190:15
**period** [13] 21:18 22:21 67:15,16 80:10 82:11,11 83:4,21 108:16,23 127:19 164:11
**permanently** [1] 74:14
**permission** [1] 107:22
**permitted** [4] 22:16 35:12 197:15,16
**perpetrate** [2] 28:13 29:4
**person** [30] 15:7 23:17 24:1,4,5 25:2,6 28:10 29:6 30:7 36:6 44:7 65:2,4,4 68:18,19 75:20 83:14 88:12 89:24 96:15 100:12 109:12 129:8 141:10 143:18 149:14,17 174:19
**personal** [15] 3:14 9:19,22,24 30:14 49:4 84:9,19 145:22 147:7 156:14,16,21 183:18,19
**personality** [1] 93:11
**personally** [10] 10:4 66:18 71:6 152:22 154:7,11 156:5 183:11,14 192:9
**personnel** [4] 116:24,25 119:14 147:3
**pertains** [1] 75:4
**pervasive** [1] 4:5
**petition** [1] 199:3
**petty** [1] 16:7
**phase** [8] 63:7,10,10,11,23,25 64:18 66:12
**phone** [8] 4:18 35:8 40:8 60:22 93:5 164:12 172:2 179:19
**photocopy** [1] 197:23
**photograph** [1] 55:17
**photographed** [1] 56:14
**phrase** [3] 118:23 146:14 180:6
**phrases** [1] 181:14
**physical** [1] 146:18
**physically** [1] 74:16
**pick** [1] 3:7
**piece** [8] 61:14,16 64:23 67:7 69:14 74:10 78:11 85:16
**pieces** [3] 56:2 71:17 136:3
**pinpoint** [1] 179:15
**pissing** [1] 180:23
**pitch** [1] 174:13
**place** [8] 23:9 120:6 135:8,9 142:6 169:11
**placed** [2] 4:21 5:5

**places** [1] 63:20
**plaintiff** [3] 1:5,19 2:10
**planet** [2] 32:4 56:18
**planning** [1] 81:9
**plaque** [1] 198:6
**play** [2] 64:10 128:9
**played** [1] 183:14
**playing** [2] 72:4 141:19
**pleading** [2] 49:20,22 148:24
**pleas** [1] 51:14
**please** [20] 24:20,21 25:4 33:10,19 38:25 41:8,23 42:10,10,14,16 72:20 76:20 87:13 90:5 94:17,21 100:1 148:18
**point** [39] 13:16 18:15 26:18 27:7 30:22 34:15,21,21 65:14 67:11 71:22 72:11 76:20 79:14 81:11 86:8 96:17 100:20 102:5 108:11 111:18 119:11 121:17,20 130:15,17 135:21 136:8,9 137:4 150:9,10,17 158:15 173:22 176:4 180:11 181:22 182:24
**points** [8] 89:16 91:3,4,5 92:1,4 131:4 195:22
**pol..see** [1] 157:23
**police** [37] 9:7 12:8 18:2 19:22 20:25 21:3 23:12 56:10 58:1 69:8 81:7 85:3 127:7 139:24 143:9 144:7 145:24 153:19 165:8 170:15 171:2,10,14,18 174:19 175:12 176:16 177:25 178:1 181:5 182:23 183:2 185:12 186:6,14 194:25 195:5
**policing** [1] 175:5
**policy** [4] 122:23 125:24 155:22 156:20
**political** [5] 157:14 172:3 179:10 182:2 187:3
**poor** [8] 140:8,15,19 146:14 147:2 148:2,3,4
**portion** [5] 34:24 75:19 77:23 78:9 125:22
**portions** [2] 46:23 190:5
**pose** [1] 189:13
**posed** [2] 33:1,14
**posing** [1] 115:10
**posited** [2] 39:1,4
**position** [15] 5:23 14:2,6,8,19 15:11,15,17,18,20 16:1,2,21 19:1 20:6 23:21 25:7 42:9 52:20,21 65:4 70:18 77:16 80:8 83:2 108:19 111:1 140:25 144:5 147:8 150:18 154:22 155:5
**positions** [2] 14:14 181:11
**possibility** [1] 154:5
**possible** [14] 31:18 36:12 37:15,16 151:21 152:6,7,12 154:3 176:15,25 177:3,4 192:3
**possibly** [1] 77:15
**posture** [1] 147:15
**postured** [1] 42:6
**posturing** [1] 42:8
**potential** [4] 179:18 186:15 187:2 191:12
**potentially** [1] 192:3
**powerpoint** [1] 76:17

**pr** [1] 2:5
**practical** [1] 35:19
**practically** [1] 24:17
**practice** [1] 135:25
**precisely** [2] 46:5 152:7
**predisciplinary** [1] 113:24
**predisposition** [1] 118:10
**prematurely** [2] 66:15 144:10
**premise** [1] 114:7
**preparation** [1] 197:4
**preparations** [3] 76:13 101:20 144:12
**prepare** [2] 14:17 16:21
**prepared** [1] 71:21
**preparedness** [1] 111:1
**preprinted** [1] 127:12
**present** [3] 4:1 109:15 131:14
**presented** [2] 29:19 198:4
**presents** [1] 172:10
**pressure** [2] 86:17 182:16
**prestigious** [14] 54:24 55:2,4,21 56:7,19,22,24 57:23 58:8,9,13,21 59:3
**presumably** [2] 23:14 33:1
**pretty** [8] 6:17 35:2 59:4 69:24 79:14,19,20 143:11
**previously** [1] 66:14
**pride** [1] 56:12
**primarily** [1] 15:12
**print** [1] 56:16
**printing** [1] 103:4
**printout** [1] 63:15
**prior** [10] 4:8 52:18 95:8 96:19 172:21 173:12 193:5,17 196:4 197:2
**priority** [1] 117:10
**privilege** [2] 164:2,11
**privy** [1] 188:12
**probably** [24] 16:10 23:8 24:11 26:17 48:10 56:24 65:20 66:19 72:22 81:5,20 82:16 97:4 109:5 112:17 140:16 142:11 146:3 161:7 162:2 175:11 195:25 196:23 199:17
**probations** [1] 113:18
**problem** [19] 28:19 29:1 34:6,22,23 35:6,8,22 36:5,11,19 41:13,19 44:12,14,17 118:15,25 198:24
**problems** [4] 53:3 109:3 164:11,13
**procedure** [2] 130:16,20
**procedures** [3] 116:3 133:1 137:2
**proceeding** [1] 42:12
**proceedings** [2] 1:16 31:2
**process** [69] 4:13,21 5:4 8:22 13:10,11,11,15 14:10,15,19 20:22 21:12 25:13 61:18 65:13 66:10 67:9 68:7 70:5,8 76:16,19 82:23 112:12 117:16,16,17,20,23 119:7,9,12 120:9 121:12,21 122:20,22 123:17,18 124:8,13,18 125:16 126:4,23 127:5,8 128:7 130:1,17,21 132:11,14,16,19 133:13 135:15 138:5,7 141:9 147:6 150:22 165:25 166:2 180:8,10,14 187:24
**processing** [2] 62:13 167:14
**procurator** [1] 63:13

## P.R. VIDEO, INC

procurement [3] 63:6 66:9 100:
11
produce [1] 21:11
professional [6] 34:16 91:24 106:
4,5 107:14 146:10
program [1] 60:1
prohibit [1] 196:22
project [82] 57:13 58:4,14,19,25
59:7,14,21 60:7,17,18,24 61:13,15,
16,16 62:6,7 63:8 64:18,24 66:4,5,
15,17,21 67:1,6,7 68:9,13,15,19,
21,23 69:5 70:16,23 71:2,5,14,19,
25 72:4,25 73:4,8,16,24 74:14 75:
2,18 76:8 77:18 78:10,14 79:3,5,8,
18 80:19,21 81:3,6 82:9,13,19 83:
6,10,16 84:18,24 85:2,6,8,17,24,
24 86:3,5 144:11 145:3
project's [1] 84:25
projects [3] 64:20 65:10 68:3
prolix [1] 30:13
promised [1] 65:15
promoted [5] 5:10 6:8 16:1 18:19
106:6 109:5 110:12,25 112:22,25
promotion [12] 4:19 5:3,8 13:20
18:20 92:14,20 108:12,13,16 109:
25 112:20
promotions [1] 4:10
prooved [1] 9:9
proper [4] 40:20 134:15 137:17,21
properly [2] 46:21 68:2
propose [1] 28:19
propriety [1] 187:24
protected [1] 122:3
protecting [1] 186:19
provide [1] 76:17 119:4 186:7
provided [5] 49:9 173:14 175:11
186:13 197:6
proving [1] 16:11
provision [2] 113:12 123:15
provisions [2] 113:21 114:13
ps [1] 172:7
psp [6] 27:19 54:25 55:11 71:21
139:17 197:9
psp's [1] 29:3
pst [1] 118:9
psychologist [1] 7:7
public [6] 107:6,25 139:4 144:16
150:19 182:1
publication [2] 57:1,3
publicly [1] 107:25
pudliner [5] 18:14,19,22 19:3,4
purchased [1] 184:4
purely [1] 124:8
purpose [8] 7:5 8:2 24:19 73:22
78:13 163:11 164:1 188:20
push [1] 24:16
put [41] 3:5 12:7 13:10 18:12 37:23
41:5,24 42:24 43:5,20,21 49:15,
16,18,24 67:1 76:16,23 81:5 85:6,
13 87:11 107:10,13 115:6 120:6
121:4 130:12 135:8,9 138:5 143:
21,22 147:20 155:7,11 159:22
160:21 167:1 175:12 189:13
putliner [1] 90:20
puts [1] 74:22

putting [2] 65:15 107:20

### Q

quarterbacking [1] 12:25
quarterly [2] 196:8,10
question [82] 27:11 30:3,12 31:7
32:12 33:12,14,18 36:12,14,16,25
39:1,4 41:17 48:14,14,21 49:8 60:
18,22,24 70:12 72:19 75:25 76:10
77:6 78:2,24 81:24 86:11 88:19
90:5,9,13 93:15,15 94:11 95:5,13
96:7 99:16,24 101:14 110:4 115:
10 117:1,24 124:17 128:5 131:6
134:8 136:14,15 137:5,23 138:2
147:20 148:16 149:4,10 150:2,3
151:23 154:18 159:1 161:18 162:
11 163:12,18,20 164:3 165:12
169:24 170:1,2 175:20 180:17
187:13 189:10,13 190:19
questioned [4] 7:15,21 8:14 179:
13
questioning [1] 47:13
questions [19] 25:2 29:9,23 33:24,
25 34:7 39:20 48:1 50:22,24 51:
14 60:23 61:7,8 86:10 104:5 120:
9 122:16 129:13 130:1,25 135:14
159:10 177:12 180:13,15 187:18
189:3 195:11
quick [2] 2:8 125:9
quit [1] 41:9
quite [4] 4:7 107:21 179:14 196:12
quote [2] 66:2 177:17

### R

race [1] 110:1
raised [4] 9:5 38:9 43:8 44:7
raising [1] 131:5
rank [6] 4:22 22:7,16,20 70:17 139:
13
rank's [1] 2:14
ranking [7] 68:10 77:4 80:21 141:
3 149:17 174:18 195:4
rather [1] 47:10 110:7
rating [2] 66:21 67:18
rational [6] 7:14 24:8 26:19 80:11
138:4 196:21
rationale [1] 135:21
re [2] 149:5 171:11
reacted [1] 74:16
reaction [1] 8:11
reactions [1] 186:25
read [6] 16:10 98:15 106:12 133:
14 137:25 189:21
reading [1] 144:19
real [5] 77:3 86:9 125:9 146:15
180:11
reality [2] 17:16 79:13
realize [5] 2:6 19:12 160:17 181:
17 190:14
realized [1] 152:4
really [26] 15:4 17:17 29:22 35:19
36:25 47:6 65:2 84:15 97:23 98:
15 105:19 109:7 117:3,6 121:14
144:8 145:4,19,24 148:9,18 150:
25 161:1 170:3 179:17 181:19
reason [36] 5:7 7:14 8:14 20:12 24:

8 26:19 30:4 31:2,10,12,17,19 32:
16 35:3 47:20 48:8,9 60:14 72:23
82:7 93:12,24 95:12 105:15,17
112:4 123:9 138:4 149:1 153:18
168:3 175:18 189:18,19 190:1
196:22
reasonable [4] 21:14 30:7 47:19
143:15
reasonings [1] 30:21
reasons [8] 8:10 31:10,15 33:22
71:25 85:13 99:11 133:17
reasonsilibilities [1] 22:20
recall [43] 14:12 18:14,18 23:15 27:
21 57:9,10 58:11,22 63:10 65:22
67:15,21 73:17 74:20 77:18 81:15
82:6 90:10 92:1 95:11 97:9 123:
19 128:4 153:6,20,23 155:4 159:
23 160:1 161:15 164:19,21 171:6,
10 172:17 173:2,4 175:18 185:1
190:11 196:9 197:5
recalled [1] 161:17
recalling [1] 121:15
receive [3] 77:16 122:5 176:15
received [12] 9:20,23 10:13,16 18:
20 19:8 21:18 40:8 63:16 67:12
86:8 198:6
receiving [1] 177:2
reception [1] 167:14
reckoned [1] 164:18
recognize [2] 53:2 181:17
recognized [3] 52:18 59:5 85:4
recollect [1] 179:2
recollection [25] 64:16 69:24 74:
25 82:1,2 83:14 119:25 120:7 123:
16 152:23 154:10,15 155:1 173:9
175:7 178:4,15,15,21 179:1 181:7
184:7,16 185:6 188:11
recollections [1] 102:25
recommend [2] 5:2,8
recommended [1] 5:2
recommending [1] 106:3
reconfirmed [2] 151:7 152:19
record [22] 12:22 30:23 39:22 40:2,
3,5 41:5,6 42:24 43:6 77:1 84:2,
21 89:9 112:24 130:13 163:6 176:
14 189:14 190:13 193:23 199:24
recorded [1] 30:25
recorder [1] 62:2
recorder's [1] 40:4
recorders [1] 42:12
recording [2] 2:5 94:22
records [3] 62:1 177:2 178:1
redacted [1] 107:23
reduced [2] 21:19,20
refer [2] 85:22 103:13
reference [20] 12:4 29:14 74:18
86:24 87:1 88:4,9 98:5 104:9 105:
11 109:7 115:24 119:5 150:14
160:11 161:5 163:18 164:25 165:
12 177:16
referenced [3] 3:19 23:2 194:11,
15,22 195:1
references [2] 11:10 115:13
referred [5] 59:9 87:1 117:18 185:
12,22

referring [12] 11:16 16:8 84:2,12
85:23 98:9 103:11 111:9 118:15
125:12 159:6 191:19
refers [3] 88:15 98:11 145:25
refine [1] 123:21
reflect [1] 90:8
reflection [1] 165:22
reflects [1] 84:21
refrain [1] 30:17
refuse [1] 129:12
regarding [3] 122:13 166:19 175:
14
regardless [3] 30:20 45:9 189:25
regards [2] 182:23 183:1
regular [2] 148:13 196:8
regulation [10] 25:13 49:6,15,16
105:4 113:8 116:14 117:17 122:
24 140:11
regulations [9] 7:10 8:5 13:8 28:
12 29:4 104:16 115:13 118:23
127:17
rehash [1] 13:22
reinforced [1] 84:17
relate [6] 45:18,18,18,19 93:9 113:
19
related [9] 3:20 10:20 11:19 50:15
51:23 104:6 105:22 137:10 159:
10
relation [1] 50:19
relations [1] 23:23
relationship [5] 35:9 53:4 55:19
70:19 148:7
relationships [1] 192:7
relatively [1] 195:14
relevancy [2] 130:21 131:4
relevant [1] 131:1
remains [1] 29:17
remedial [1] 127:24
remedy [1] 21:12
remember [42] 8:25 55:14 65:15
72:5,6 85:16 86:10 92:13 93:3
103:23 104:10 110:17 120:13 122:
17 151:13,14 152:6,24 153:3 154:
3 170:4,13 171:3 172:16 177:5
179:12,12,17,24 180:18 181:20
189:21 190:17 191:25 194:3,5,9,
13,20,21,24 196:18
remembered [1] 165:22
remembering [2] 189:5,23
remind [1] 3:2
remove [1] 35:4
removed [5] 25:6 54:24 80:22 81:
3 144:15
reoccurrences [2] 127:19 128:10
repeatedly [1] 134:20
repetitious [1] 141:20
rephrase [2] 29:23 182:24
replace [1] 144:14
report [17] 122:9 166:17 168:3,7,9
169:4 170:2,10,15 171:14,23,24
172:5,10 174:24 175:5,8
reported [4] 70:24,25 146:16 186:
12
reporter [2] 94:19,24
reporter's [1] 89:7

P.R. VIDEO, INC

reporting [1] 125:10
reports [1] 171:10
representation [6] 29:20 99:21 100:21,22 113:20 118:10
representative [5] 86:19 178:16 180:2,23 197:3
representatives [1] 182:22
represented [1] 99:19
reprimand [2] 11:23 125:20
request [9] 59:25 60:8 113:7 118: 9 130:14,18 137:7 139:7 196:12
requested [6] 79:4 92:16 107:22 139:5 155:5 173:13
requesting [1] 42:11
require [1] 27:16
required [2] 116:25 129:9
requirements [1] 73:23
requires [1] 142:16
resentment [1] 16:6
reservation [1] 65:9
resolution [1] 119:13
resolve [2] 124:11 138:9
resolved [5] 67:7 122:20 125:16 127:24 191:24
resource [4] 83:6 180:9,9 186:7
respect [14] 10:6,21 13:1 75:17 76: 14 77:5 81:6 83:8 84:16 93:21 115:20 135:11 136:17 138:24
respectful [1] 130:14
respectfully [5] 42:11 59:25 60:3 130:18 137:6
respond [41] 11:6 29:8,13 30:12 32:11 33:10,13,19 36:1,24,24 38: 15 40:6 41:23 42:7 57:22 75:25 76:11 95:24 117:8 118:19 124:17 133:4 134:7 135:3 136:12,25 137: 23,24,25 141:21 145:16 149:9 150:2,4,25 156:8 164:3 165:14 176:18 189:14
responded [1] 137:4
responding [4] 34:11 61:8 163:11 164:11
response [16] 14:22 53:25 65:6 73:3 104:22 106:16 112:11 136: 20 144:4 146:1,19 150:19 164:9 187:17 189:12 190:19
responses [1] 33:21
responsibilities [4] 34:25 77:13 106:4 140:1
responsibility [6] 24:17 26:16 68: 20 83:2 106:5 140:3
restore [2] 6:14,15
result [8] 21:11 95:17 121:8,19 123:11 128:9 138:6 175:23 183: 21
resulting [1] 128:10
retain [1] 22:20
retained [2] 22:7 197:10
retaliated [1] 160:13
retaliation [1] 16:6
retention [1] 13:21
retired [3] 14:7 15:16 18:2
returned [2] 197:15,22
reversal [1] 24:3
review [2] 70:1 78:19

reviewed [2] 9:23 194:6
reynolds [35] 2:12 28:7,10 29:18 30:24 31:4 34:14,22 37:3,5,14,20 38:4 44:20 46:14 47:17 48:16 49: 1,15,20 50:5 52:8 53:24 54:4 89:3 91:1,11,19,21 93:20,21 95:4,7,20 177:9
reynolds's [2] 32:2 50:13
rfq [1] 66:9
rfqc [2] 61:18 67:9
rick [5] 2:13,13,14,17,21
ridge [14] 83:6 13,15,16 151:5
ridge's [1] 85:23
ridiculous [4] 44:5,7,8,10
rights [6] 8:20,21 113:10,11 118: 14 122:3
ripped [1] 144:10
rise [3] 122:25 125:20 126:1
risk [2] 18:13 85:6
road [1] 92:16
role [42] 4:11 16:14 16:15 17:14 23: 20,25 24:4,5 26:8,8 35:12,15 36: 10 59:20 60:6,17,18,24 61:1,3,4,5, 10,11,12,17 64:4,5,11 67:5,5 68: 10 69:14 72:4,25 73:6,13 79:6,10 83:1 85:7 119:21
roll [2] 183:14 197:10
rolling [1] 78:18
ron [1] 69:3
room [19] 17:4,18,21,22 19:24 41:2 57:12 92:18 115:20
root [1] 146:14
roster [2] 89:18,18
round [1] 59:3
routine [1] 119:14
routing [2] 23:16
rude [1] 138:14
rudeness [2] 123:3 138:12
rule [3] 49:20 191:18 193:8
rules [1] 13:14
rumor [6] 151:5 152:18,21 153:16 155:4,6
rumors [3] 151:11,12,21,24 152: 10 153:25 154:16,23
run [3] 121:14 149:15 164:10
running [1] 40:4 151:17 179:9

S

safety [1] 121:12
said.so [1] 156:13
salary [2] 21:20 22:4
same [12] 15:19 33:2 95:23 96:18 109:11 112:23 128:20,21 150:8, 13 167:11 187:8
sanctioned [3] 16:6 19:20 20:24
sanctions [1] 44:9
sat [3] 13:3 24:16 68:4
satisfied [1] 135:22
satisfies [1] 198:18
save [1] 99:17
saw [8] 18:25 38:1 50:20 78:1 124: 21 164:17,23 166:8
saying [9] 9:21 28:22 32:16, 23 37:10,25 42:1 57:25 65:16 89: 14 94:10 100:1,22 104:18 105:7

131:1,6 133:10,18,24 134:22 137: 18 138:17,19 139:2,3 141:2,5,7,10, 25 142:25 143:2,8 145:10,13,14 147:14 148:1 149:11,12,14 151:8 152:25 154:3 157:7,11 162:16,23 165:3 181:23
says [27] 31:14 53:20 56:22 62:11, 19 85:3 98:18 99:2 106:5 114:18 116:12 122:20 125:23 127:17,21 138:7,7 139:11 140:11 144:17 145:17,17 147:1,1 169:13,14,19
schedule [1] 70:1
scheduled [4] 57:1 70:3 108:13 197:1
school [2] 57:18 192:25
scope [5] 153:6 179:12,17 180:16 191:16
score [1] 67:20
screaming [1] 46:12
search [1] 133:12
searching [2] 159:23 164:22
season [1] 52:15
second [13] 2:1,7 71:13 78:21 98: 10 105:2 151:7 152:17,19 161:12 162:1 169:15 198:3
secondary [1] 85:15
secondly [1] 30:14
seconds [1] 176:21
secretaries [1] 51:23
secretary [3] 44:21 45:8 52:5
section [7] 12:10 25:20 46:18 49: 19 100:11 118:5 122:19
secure [1] 83:13
see [36] 19:17 24:14,22 28:18 39: 10,12 48:13 51:10 53:19 60:17 62: 16 63:14,18 86:23,24 91:6 98:12 99:14 109:7 117:15 122:14 138: 23 145:18 146:2 147:14,17 157: 13 160:22 167:4,10,19 169:7 171: 25 193:6 198:12 199:22
seeing [1] 171:10
seek [1] 55:6
seem [3] 178:19 189:22 190:12
seemed [1] 154:20
seems [3] 8:19 149:2 151:11
seen [13] 18:14 38:15,17 49:2,7,12 50:1,15,18 51:17 63:2 135:22 160: 18
selection [2] 165:13 166:10
self [1] 54:15
sell [1] 16:8
senate [2] 15:13 183:9
senator [4] 174:18 178:9 180:2,22
senators [2] 179:4 182:21
send [6] 23:16 27:2 65:16 147:7 172:18
sends [1] 17:14
senior [2] 28:6 31:20
sense [5] 56:11 68:17 80:10 135: 11 197:19
sensitive [3] 52:20,21 145:19
sent [19] 4:16 21:7 37:11,24 44:23, 24 45:11,13,14 49:1,6,13 53:14 76:1 144:11 172:15,22 177:24 197:21

sentence [7] 84:8,15 85:3 111:7 113:6 114:17 125:15
sentences [2] 24:12 41:22
separate [3] 31:4 33:18 39:8
september [4] 108:10 176:8,10 196:14
sergeant [2] 50:4 144:14
series [4] 3:11 40:23 174:17 175: 14
serious [1] 42:23
serve [2] 24:5 59:1
served [5] 18:22 26:1 52:22 144:9 190:16
services [6] 18:17 98:21 100:11, 16 171:7 184:7
session [2] 11:25 12:14
set [7] 26:25 57:12 59:2 133:1 139: 3 153:25 184:4
sets [1] 108:17
setting [3] 19:24 92:18 118:22
seventy [1] 184:14
several [6] 14:13,14 57:7 77:2 124: 20 150:6
sexual [1] 23:19
shall [3] 118:8 128:15 140:11
shape [1] 138:3
shayman [1] 183:24
she's [5] 35:7 52:20 72:18 91:19 157:22
sheets [1] 67:20,20
shortening [1] 167:9
shouldn't [5] 26:3 30:5 32:20 35:6 145:12
show [3] 42:12 118:3
showpiece [2] 77:8 85:4
shows [2] 3:16 62:23
shun [2] 95:7 96:10
shunned [7] 17:20 88:11 89:4 90: 2 93:16 94:7,8
shut [2] 74:21 182:23
side [4] 18:23,23 80:19 137:16
signal [1] 29:24
signed [4] 8:24 10:10 49:20,22
significance [2] 117:3 130:3
significant [4] 4:7 64:13 66:19 160:12 165:4 181:17 190:5,7,12
silliness [1] 146:12
similar [2] 18:24 57:19
simple [3] 30:3 48:14 171:6
simply [6] 6:2 92:17 114:1 128:11 130:16 140:19 159:21
simultaneous [4] 64:19,19 71:13, 16
since [13] 2:7 17:6 32:24 57:1 72:4 94:9 117:2 126:19 137:19 141:8 152:3 171:17 180:12
sincerely [2] 12:19
single [1] 49:5
sir [3] 107:17 177:22 187:4
sister [1] 121:6
sit [10] 17:11 23:5 40:20 88:25 90: 8 152:6,13 181:24 185:16 186:10
sitting [3] 9:2 17:3 48:3
situation [14] 28:16 35:25 36:9,10 80:6 127:1 133:25 141:24 142:10



P.R. VIDEO, INC

158:19,25 159:4,5 192:2
**six** [6] 21:3 24:12 65:18 85:10 86: 16 147:4
**sixty** [1] 184:14
**skip** [3] 13:18 139:11 180:19
**skipping** [1] 114:17
**skirkus** [2] 188:19 197:13
**sleeves** [1] 78:18
**slow** [1] 39:6
**small** [3] 31:21 175:20 187:13
**snydi** [1] 23:3
**sold** [1] 6:9
**solely** [1] 54:11
**somebody** [11] 29:18 36:16 82:21 93:4 123:6,7 142:18 146:22 147:2 150:18 186:1
**somebody's** [1] 60:22
**somehow** [1] 14:15
**someone** [20] 11:20 19:11,14 25:8, 10 27:18 35:14,23 36:2 58:12 64: 10 83:13 120:15 133:10 135:15, 18 139:13 142:16 156:24 157:1
**sometime** [3] 7:1 81:1 108:9
**sometimes** [3] 47:14 148:4 170: 22
**somewhere** [7] 103:3 115:25 124: 21 129:18 147:7 188:17 195:20
**son** [1] 25:25
**soon** [2] 86:20 162:12
**sorry** [23] 2:20 3:13 10:15 20:19 27:8 53:9 62:8 63:17 80:15 94:12, 15 98:7 121:11 138:25 144:20 148:13 159:6 162:3 163:5 167:8 178:23 199:10,17
**sorry.i** [1] 2:19
**sort** [7] 8:16 34:12 52:25 57:18 63: 12 121:11 180:3
**sound** [2] 28:4 63:11
**sounds** [7] 28:5 72:25 87:5 97:11 150:8 157:9,21
**source** [5] 37:10 74:5 159:14 188: 4,5
**sp1-101** [1] 168:20
**speaks** [1] 34:24
**special** [4] 83:11 120:3 122:12,14
**specialized** [1] 83:7
**specific** [15] 13:12,13 23:24 52:17 58:22 59:20 69:14,14 70:5,6 102: 14 115:7,9 158:14 179:16
**specifically** [17] 9:16 35:13 79:4 114:19 115:14 131:19,23 132:1 141:25 164:21 178:22,24 179:11 181:25 182:17 191:19,25
**specifics** [2] 11:18 190:15
**specified** [1] 127:19
**speculate** [1] 32:1
**spell** [5] 55:24 69:2 89:8,13 158:7
**spelling** [1] 90:12
**spellings** [2] 89:12,14
**spent** [2] 68:3 179:14
**spiteful** [1] 185:5
**spoke** [6] 19:2 63:1 68:4 146:17 154:17 173:15
**spoken** [2] 91:23 97:17
**spot** [2] 5:17 143:4

**spots.one** [1] 5:15
**spr** [1] 153:13
**spring** [1] 17:2
**square** [1] 118:21
**squelch** [1] 8:23
**stackhouse** [3] 33:3 197:1,7
**staff** [7] 4:7 17:2,5 71:21 100:10 111:2 172:7
**staffing** [1] 73:23
**stake** [1] 64:14
**stand** [3] 7:16 47:1 195:24
**stand-up** [1] 4:24
**standard** [4] 170:15 171:2,13,18
**standing** [2] 93:6 135:25
**stanton** [8] 177:20 179:21 180:19 183:23 184:8,11 185:7,18
**start** [6] 22:12 55:8 59:22 64:7 89: 3 91:17
**started** [3] 19:5,6 74:22 120:14 193:10
**starting** [1] 81:7
**starts** [1] 161:13
**state** [50] 3:9 12:8 18:2 19:22 20: 25 21:2 23:12 31:25 56:10 58:1 69:8 81:7 84:11 85:3 100:17 101: 16 127:7 139:24 142:7 143:9 145: 24 153:19 165:8 170:15 171:2,24 174:18,19 176:16 177:25 178:1,6, 16 179:3 180:2,2,22 181:4 182:20, 21,23 183:2,9,9 184:10 185:12 186:6,14 194:25 195:4
**stated** [3] 88:11 99:22 172:2
**statement** [9] 97:10 110:16 116:5 144:6 145:25 146:25 150:10 160: 15 165:21
**states** [2] 1:1 113:7
**station** [1] 63:16
**stationed** [1] 101:15
**stations** [2] 142:9,10
**stay** [3] 72:9 73:13 79:5
**staying** [2] 71:25 72:25
**std** [1] 170:22
**step** [1] 66:11
**steps** [1] 21:16
**steve** [1] 83:24
**stevens** [2] 83:13,22
**still** [25] 3:3 12:3 17:14 27:15 36: 18,19 40:3,4 46:20 50:23 95:20, 24 98:1 107:14 118:20,24 131:7,8 141:12 153:7 160:10 187:7 196:4 197:11 199:3
**stipulate** [1] 198:19
**stipulating** [1] 99:17
**stop** [4] 21:14 42:4 68:22 147:20
**stopped** [1] 68:7
**storing** [1] 103:3
**story** [1] 74:5
**straight** [1] 37:23
**streamline** [2] 119:12 123:18
**streamlined** [2] 123:17 126:4
**street** [3] 1:20,24 142:6
**strenuous** [1] 13:16
**stressed** [2] 68:8 70:7
**strike** [1] 149:9
**stripped** [1] 35:1

**strong** [1] 40:11
**structure** [4] 66:24 67:1 73:5,8
**struggled** [1] 181:13
**struggling** [1] 66:25
**studied** [1] 107:19
**stuff** [2] 137:11 163:22
**stumbled** [1] 19:7
**sub** [2] 46:17 49:18
**sub-paragraph** [2] 22:23 23:6
**sub-section** [1] 45:20
**subject** [11] 19:8 48:10,16 102:15, 16 118:7 121:24 129:5,8 131:11 135:13
**subjected** [8] 3:10,25 27:5,8 34: 17 92:19 121:25 129:15
**subjective** [3] 32:4 47:16 142:23
**subjects** [1] 128:14
**submitted** [4] 166:17 168:9 170: 10 171:22
**subordinate** [1] 123:8
**subparagraph** [2] 3:20 104:23
**subsection** [6] 8:7,8 104:10 122: 18 126:7 128:14
**subsequent** [2] 7:4 14:18
**subsequently** [3] 4:22 159:8 197: 8
**substance** [6] 6:5 52:10 90:9 100: 21,25 145:10 150:15 159:22
**substantive** [2] 117:6 136:21
**substantively** [1] 112:13
**success** [1] 119:11
**successful** [1] 185:24
**succinctly** [1] 128:5
**sues** [1] 163:21
**suggest** [5] 26:19 35:2 53:24 56: 24 107:20
**suggested** [1] 26:10
**suggesting** [2] 115:23 118:22
**suie** [1] 177:18
**suit** [6] 20:1 23:17 34:13,15,24 52: 13
**suited** [1] 26:25
**summarily** [1] 60:11
**summarize** [1] 20:3
**summary** [1] 52:10
**summer** [4] 93:17,23 113:14 131: 18
**sums** [2] 17:17 84:23
**supersede** [1] 113:9
**superseded** [1] 17:9
**supervise** [2] 61:17 66:21
**supervising** [2] 192:25 197:17
**supervision** [1] 79:13
**supervisor** [10] 70:15,16 104:19 134:13 135:21 140:15 142:17 143: 3 148:8 177:17
**supervisors** [8] 122:21 132:9,23 133:18,25 136:7 138:8 140:8
**supervisory** [52] 13:9 119:6,7,15 120:9,22,25 121:7,10,13,22 122: 18,19,21 123:9,23 124:2,7 126:7, 16,19,21 127:2,4,18,23,25 128:13, 15 129:9,22 130:1,6 131:10 132: 10,15,25 133:7,13,21 134:3,4,5,18, 19 135:1 137:20 138:6,15 140:7

**table** [3] 17:4,18 59:3
**tacitly** [1] 187:7
**tag** [1] 169:9
**talked** [22] 4:10 5:14 22:24 24:11 59:9 65:25 71:24 84:7 101:2 102: 8,17 135:19 153:13 173:21 179:7, 11 180:18,25 191:16 192:12 193: 9,11
**tap** [2] 184:10,11
**tape** [9] 40:4 76:22 94:16,19,21,24 177:19 193:20,21
**target** [3] 180:24 191:12,14
**targeted** [1] 92:9
**targets** [3] 186:15 187:2 191:18
**task** [2] 77:8 80:7
**tasked** [1] 71:15
**tasks** [1] 71:5
**taught** [1] 145:23
**taxpayer** [2] 79:18 146:22
**taxpayer's** [2] 82:19 83:3
**teach** [1] 128:2
**team** [8] 62:12 63:5 64:11 66:8 67: 17 70:1,2 71:14
**teams** [1] 66:8
**tech** [1] 171:7
**technology** [14] 18:17 61:16 64: 19 65:19,23 66:4 68:14 71:17 76: 18 83:7 84:18,19 85:4 144:11
**tedious** [1] 136:25
**telephone** [5] 42:18 44:20 164:19 165:1 194:2
**telephones** [1] 160:22
**telephonically** [1] 165:23
**tells** [2] 26:25 142:9
**ten** [2] 18:1 179:25
**tenor** [1] 42:13
**term** [9] 62:8 63:23 116:6,22 117:

**141**:8 148:7
**supplement** [3] 88:22 89:22 91: 15
**supplemental** [3] 166:17 168:3,9 169:4 170:1,15 171:14,24 172:9 174:23 175:5,8,12
**supplied** [2] 14:17 50:5
**supply** [3] 11:17 88:18 90:12
**support** [4] 83:6 87:2 108:19 133: 14
**suppose** [4] 16:10 25:7 57:15 108: 23
**supposed** [7] 43:6 66:20 80:24 126:13 132:21 134:4 186:6
**surfaces** [1] 56:23
**surprise** [1] 85:18
**surrounding** [3] 31:1 151:12,21
**sydni** [4] 48:4 187:12 195:12 198: 25
**syndi** [1] 1:23
**synopsis** [2] 125:11,12
**system** [10] 8:21 13:12 59:17 62: 13 63:7 67:22 77:23 78:9 121:4 150:22
**systems** [10] 61:14,17,18 62:12 63:6 64:12 66:7,24 75:19 86:13

**T**



P.R. VIDEO, INC

25 119:15 127:3 130:3 132:14
**termed** [1] 100:5 165:24 166:8
**terms** [2] 15:12 78:22
**tens** [1] 30:22
**terrific** [1] 157:6
**territory** [1] 162:8
**test** [6] 92:20,24 93:6 108:12,16
180:15
**testified** [18] 10:19 16:14,19 17:19
30:4 33:3 35:1 56:25 58:5 79:2
111:22 113:16 179:9,9,16 180:21
182:25 195:22
**testify** [5] 32:4 39:9,20 41:15 197:16
**testifying** [6] 29:13,22 38:12,15,
16 40:11
**testimony** [9] 50:3 57:22 124:20
135:12 181:19 187:5 188:12 197:
2,5
**testing** [3] 124:19 125:8,18
**text** [1] 63:20
**th** [1] 194:4
**thanks** [4] 3:1 14:21,21 19:16
**the-tu-cro-tive** [1] 3:12
**themselves** [4] 18:12,13 31:4 47:
15
**theory** [1] 139:6
**there'll** [1] 9:8
**there's** [38] 4:5 5:22 9:4 10:23 13:
23 17:3,17 24:7,8,18 26:18 27:22
28:3 36:13 58:13 60:14 68:18 71:
13 79:24 80:4,11 91:24 92:8 101:
9,10 127:5 140:10 143:13 151:11,
12 153:25 158:12 159:22 160:12
169:8,9 175:13 195:24
**therefore** [2] 163:10 187:4
**therein** [1] 116:3
**thetucrotive** [1] 3:13
**they've** [2] 3:18 27:1
**thin** [1] 29:11
**thinking** [10] 16:22 23:5 31:10 111:
21 121:15 125:3 135:17 151:10
165:9 199:16
**thinks** [1] 143:23
**thirteen** [3] 53:10 61:22,25
**thirty** [1] 85:17
**thomas** [1] 1:10
**thoroughly** [1] 61:7
**though** [7] 2:8 8:19 27:3 79:3 109:
6 141:24 181:16
**thousand** [3] 147:5 179:25,25
**threatened** [1] 183:21
**three** [22] 3:6 22:17,21 28:24 34:
19 43:19 50:22 65:20 69:19,20 77:
25 81:20 82:3 83:20 92:1 93:1
102:19 136:11 173:25 190:16 193:
21,21
**threshold** [3] 124:19,24 125:18
**throughout** [4] 12:23 83:16 91:20
172:4
**thumb** [1] 56:16
**thursday** [1] 102:20
**tight** [1] 79:20
**till** [2] 37:25 52:23
**timeframe** [1] 167:24

**timeframes** [1] 185:21
**timeline** [5] 8:18 78:22 79:20 81:
18 83:18
**timelines** [1] 86:8
**title** [6] 22:9,16 23:24 69:4,4 139:
19
**titled** [1] 53:21
**to.in** [1] 6:23
**to.to.that** [1] 6:22
**today** [2] 2:11 11:19 18:5 66:14 96:
2 107:8 185:17 186:10
**together** [6] 18:22 34:17 36:19 67:
1 76:16 105:23
**tom** [2] 80:18 81:4
**took** [2] 20:5 58:5 165:21
**top** [8] 3:8 63:13 68:18,19 86:18
88:5 89:2 97:9 113:16 122:17 140:
17 145:12,12,12 147:18,22 167:25
168:4 169:9 170:21,24 175:17
197:24 198:5
**toss** [1] 9:8
**tossed** [1] 157:23
**total** [3] 21:3 24:11 51:2
**toward** [2] 64:17 72:12
**tra** [1] 184:4
**tradition** [1] 56:12
**training** [7] 127:24 128:1,8,8,11
140:23 187:9
**transactions** [1] 174:17
**transcript** [2] 177:22 197:7
**transcriptions** [1] 178:23
**transcripts** [10] 175:10,16 177:23
178:5,22 193:25 194:7,10,14,17
**transfer** [8] 13:20 97:4 99:12 100:
15 113:21 114:8 122:6 143:25
**transferred** [6] 12:5 60:11 75:11
98:20 99:5 108:10,10 183:22
**transferring** [4] 143:17 144:14
145:3 183:15
**transfers** [1] 150:23
**trap** [1] 139:3
**travel** [1] 65:19
**treat** [3] 19:22 20:6,10
**treated** [2] 3:23 88:13
**treatment** [1] 92:3
**treats** [1] 93:21
**tried** [16] 6:21 17:15 18:3 21:13 44:
12 47:12 67:11 75:1 86:16 125:17
135:8,9,16 150:9 184:3,6
**trigger** [5] 93:24,25 95:25 96:9
123:23
**triggered** [1] 96:9
**tripp** [1] 193:2
**troop** [4] 7:11 18:24 151:16 177:
18
**trooper** [5] 175:24 179:20 180:19
184:8,11
**troops** [2] 18:22 101:9
**trophies** [1] 198:6
**trouble** [2] 40:1 150:13
**troubled** [1] 7:18
**troublesome** [1] 12:22
**true** [18] 46:2,4,7,22 105:20 112:7
122:25 125:17,19,25 126:24,25
139:6 144:6 145:11 155:6,8 170:5

**truncated** [1] 186:2
**trust** [2] 29:2,2
**trusts** [1] 111:18
**truth** [1] 150:7
**try** [15] 6:14,14 8:3,20,23 9:8 18:4
34:21 40:6 47:15 89:7 90:14 116:
7 140:14 154:18
**trying** [47] 6:5 13:22 20:16 33:8,23
34:12 39:11 53:23 70:22 82:10 98:
17 99:14 104:15 105:16 106:13
114:14 115:1,4,5,16,16 118:12
119:2 122:15 130:11 133:22 136:
4 139:2 141:8,25 142:25 143:12
144:21 146:4,9 148:12 153:5 156:
9,18 157:2,2 159:23 166:6 173:6
174:16 179:15 181:14
**turned** [4] 19:4 93:7 126:24,25
**twelfth** [1] 61:21
**twelve** [2] 167:2 179:24 198:2
**two** [31] 5:15 10:20 12:1 18:20 19:
7 28:24 34:19 43:17 53:20,20,21
63:25 68:7,7 76:21 108:22,24,25
123:20 144:11 168:12 169:14 174:
3 180:3,4,5,6 186:24 193:22 195:
24 196:1
**two-bit** [1] 48:4
**type** [5] 90:21 119:14 126:6 128:21
141:4
**types** [2] 122:6 138:11 153:24
**typical** [1] 126:25
**typically** [2] 12:14 25:17

**U**

**u8ncomfortable** [1] 31:23
**uh.joanna** [1] 2:12
**uh.the** [1] 5:14
**ultimate** [3] 56:4 68:20 82:22
**ultimately** [4] 5:17 14:24 109:12
184:8
**um-hmm** [1] 63:4
**um.can** [1] 3:17
**unable** [2] 11:17 83:9
**uncomfortable** [7] 28:16,20 29:7
30:8,9 31:19 35:5
**unconscionable** [1] 82:9
**undated** [2] 168:8 171:18
**under** [21] 3:3 5:10 42:20,24 49:20
51:11 56:3 61:19 64:12 66:7,10
73:8,14 74:15 86:13 113:4,5 118:
4 122:18 126:7 133:1
**underlying** [1] 131:4
**understand** [30] 29:21 32:18,22
70:22 75:16 78:15 93:14 94:2 95:
5 96:6,9,21 100:19 114:6,15 115:
5 118:12 124:15 130:2,17,25 131:
8 136:14,19 137:24 140:25 141:8
146:25 149:4 169:13 181:14 189:
24 192:20
**understanding** [9] 15:9,11 34:6
70:18 83:15 91:14 134:8 135:25
137:17
**understood** [2] 59:4 65:2
**unethical** [5] 35:24 36:3,4 41:10,
11
**unexcited** [2] 39:7 41:8

**unexpected** [1] 166:9
**unfairness** [1] 70:10
**unfettered** [1] 164:3
**unfit.'** [1] 9:9
**unfortunately** [2] 146:7 190:11
**unhappy** [7] 132:23 136:7,10 151:
5,24 152:11 159:8
**united** [1] 1:1
**unjustified** [1] 57:4
**unkindly** [1] 10:21
**unknown** [3] 105:13,17 174:18
**unlawfully** [1] 54:24
**unless** [2] 25:20 93:11
**unlike** [1] 68:7
**unnecessarily** [1] 83:18
**until** [14] 57:3 60:19 67:15 70:3,4
81:11 96:7 137:9 149:8 150:17
176:9,12 189:8 190:2
**up** [72] 3:7,25 5:23 6:23 7:17 8:6
11:15 13:18 17:17 27:9 37:16 40:
18,19 41:17 43:20,21 44:22 51:8
57:13 65:15 71:12,21,21 72:23 74:
23 75:7 78:18 79:3 80:19 83:9 85:
11 87:13,17 93:6 95:3,6 96:7 100:
5 103:21 107:6 108:4,18 109:3
111:8,12,25 112:17 116:6,6,11
125:1 137:5 138:22 142:5 143:22
144:13,18 146:2 147:16 150:17
151:17 162:13 166:16 167:24 172:
6 173:20 174:3 179:2,10 183:7,17
185:3
**upgraded** [2] 121:23 126:8
**upgrading** [2] 125:4,6
**ups** [3] 175:25 186:14 189:4
**upset** [1] 112:19
**urgency** [1] 66:5
**useful** [4] 143:22 144:4,6 145:5
**using** [3] 164:21 169:10 192:3

**V**

**vacated** [1] 109:1
**vacation** [1] 154:1
**vague** [1] 36:7
**validation** [1] 84:24
**various** [2] 67:2 195:21
**vast** [1] 84:23
**vehicle** [3] 56:19 138:8 192:4
**vendetta** [1] 147:7
**vendor** [2] 77:10 80:18
**vendors** [1] 81:2
**vengeance** [2] 84:10 85:5
**verbage** [1] 11:10
**verbal** [1] 21:7
**verbiage** [2] 67:21 181:24
**versus** [2] 1:7 118:17
**very.it's** [1] 8:17
**viable** [1] 72:4
**victim** [1] 24:12
**video** [3] 1:16 2:5 164:5
**view** [2] 12:7 30:22
**vindictive** [1] 9:7
**violate** [2] 122:23 125:24
**violated** [3] 113:12 135:22 184:10
**violation** [1] 184:10
**virtually** [1] 146:5



P.R. VIDEO, INC

virtue [2] 25:7 70:17
visibility [3] 77:10,14,16
visibly [1] 74:17
vocabulary's [1] 3:16
voice [3] 2:23 42:11,13
voiced [1] 106:16
volunteered [1] 26:5
volunteering [1] 26:16
volunteers [1] 58:24
vote [1] 162:21
voting [5] 70:1,2 76:14,15 82:4
vulnerable [1] 160:17

**W**

w-e-l-l [1] 158:7
w-h-i-l-t [1] 69:6
w-o-o-l-l-e-y [1] 158:8
wait [2] 21:4 38:8
waiting [1] 40:7
walked [4] 19:2 24:14 26:4 93:6
wall [14] 69:11 70:12,15,24,25 71:3,
22 73:18 74:2,8,25 75:5,13,14
walt [8] 79:9,13,16 106:6 110:12,
24 112:16 115:6
walt's [1] 106:23
wan [1] 189:13
wanted [22] 4:23 5:12 24:24 25:1
69:15 72:7 77:12,17 92:21 94:1
100:18 104:16 114:6 128:7 134:9
162:5 173:20 182:9 190:20 191:6,
9 199:21
wanting [2] 27:10 141:22
wants [4] 36:24 72:18,19 92:10
warn [1] 44:12
warning [2] 128:16,25
warnings [4] 128:25 129:1 131:11
188:23
warrant [1] 121:18
was.you [1] 10:16
washington [10] 60:12 67:12 97:6,
7 98:20 99:5 100:16 101:15 143:
25 144:4
waste [1] 83:3
wasting [2] 43:13,15
watched [1] 18:7
water [3] 119:2 161:22 162:6
waugh [1] 155:3
wave [3] 163:11,24 164:1
wavelength [2] 95:23 96:18
way [54] 3:23 6:15 10:24 12:7 14:9,
11 19:23 29:23,24 31:24,25 40:14
49:24 50:10 72:10 80:14 86:24 91:
9,12 93:22 96:10 107:12 110:18
111:22 113:23 131:22 132:23 133:
13,19,24 136:3 137:12,17 138:3
140:14 143:2 150:25 151:25 162:
7 163:17 171:4 172:6 173:8,12
174:17,23 175:8 176:9,11 181:22
182:14,19 189:13 191:18
weakness [1] 81:4
webster [1] 56:22
wednesday [19] 4:9 16:14,23 17:
20 18:4 56:25 101:1 102:7 111:23
154:17 173:21 180:21 181:11,13
183:20 188:8 191:2 192:13,22

week [4] 19:7,17 35:16 108:23
weekend [1] 192:1
weeks [3] 9:14,17 196:16
well-informed [1] 137:3
wertz [2] 170:9,11
westcott [1] 1:11
western [1] 172:4
whatever [25] 4:18 14:18 17:11 23:
24 27:6 41:23 45:14 49:8 79:15
81:1 83:21 87:4 95:8 101:9 114:
12 119:1 122:4 127:8 148:16 149:
14,16 153:18 169:20 179:25 197:
10
whatsoever [2] 80:11 197:19
whenever [2] 33:3 112:15
wherein [2] 67:1 191:21
whether [5] 4:15 9:19 14:20 19:
18,21 20:15 26:1,10 31:5 44:21
45:12,13 49:5,12,14,16,19 51:17
58:20 71:3,24 72:7 73:12 75:12
107:15 110:22 117:4,5 129:22
133:7,22 140:6 141:7 142:15 143:
14 149:15 154:6 156:12,17,19,19
159:12,13 164:4 170:7 178:16,22
179:2,24 181:22 182:15,20 183:6,
14,16 185:6,17,25 186:11,12,13
187:5 191:3,13 196:8
whilt [3] 69:3 70:20 73:18 74:2,7
who's [4] 2:9 7:18 25:18 27:4
whoever [1] 146:9
whole [16] 12:23 34:23 35:18,19
42:1 61:13 78:13 113:20,21 135:7
136:8,9 146:1 149:15 156:19 187:
23
whom [4] 16:25 26:11 49:20 100:7
wife [1] 18:2
will [30] 12:9 30:17 31:8,25 51:16
54:14 55:20 62:12 64:25 65:8 73:
3 76:21 77:8 86:24 88:17,22 90:
17 92:12 111:8,12 130:12,22 138:
19,22 163:9,19 164:2 166:24 186:
23 195:20
william's [1] 23:19
williams [8] 24:11 35:18 36:11
115:6 170:9,11
willing [2] 18:12 149:3
willy-nilly [1] 12:5
wilt [1] 81:15
wire [5] 177:19 178:23,23 184:10,
10
wires [6] 177:24 178:5 193:25 194:
1 195:4,6
wish [3] 85:8,24 86:2
wishes [2] 84:11 85:23
withdraw [2] 60:8 76:9
within [4] 12:14 85:9 127:19 137:9
without [4] 102:10 114:8 116:14
181:23
witness [4] 30:17 31:7,11 137:3
witnesses [1] 113:25
wold [1] 33:1
wonder [1] 160:22
wondered [2] 159:13 170:23
wondering [8] 9:3 10:17 27:1 49:
12 160:19,25 169:15 175:2

woolley [9] 157:5,18 158:5,6,6,19
159:14 160:5,9
word [15] 19:15,15 66:25 80:22
101:12 115:22 117:15 141:19 144:
18 164:22 166:5 189:22,22 194:
14,18
words [32] 13:22 26:21 32:25 62:
15,19 63:9,13 65:21 68:2 74:20
75:21 83:7 99:23 106:8,11,12,21
123:6 124:2,10 132:16,18 137:5
142:19 144:21 147:14 150:17 170:
10 171:17 173:6 189:11 196:18
work [18] 15:12 18:23 25:9 26:22
27:14,16 30:10 31:19 34:17 36:18,
19 49:10,25 57:12 67:9 180:8,10
182:11
worked [6] 18:2 32:24 50:7,8 105:
23 155:18,21,22
working [3] 28:20 29:1 34:18,20
35:8,22 36:5,11 61:14 70:19 85:
21 98:8 156:14
works [5] 14:16 15:8 52:8 80:25
148:10
worksheet [5] 167:3,14,23 168:24
169:2
worksite [1] 65:19
world [1] 68:13
world's [2] 144:7 145:11
worried [1] 165:17
worry [1] 198:20
worse [1] 24:19
worst [2] 144:7 145:11
wrap [1] 171:21
wrapped [2] 144:13,17
write [6] 53:11,23 66:9 88:17 173:
16 189:7
writer [1] 61:12
writing [3] 36:17 107:10 146:3
written [7] 30:25 86:13 88:10 107:
4 125:20 160:12 172:25
wrongdoing [3] 176:15,16 177:3
wrote [10] 37:3 53:12 69:25 87:9
112:3 120:15 146:4 147:1 150:16
161:16

**Y**

yea [2] 2:24 10:5
year [6] 7:2 18:18 78:5,6 190:2
198:2
years [20] 18:1,3 28:24 34:19 55:
10 56:9 57:7 91:20 92:4,4 93:5
140:17 145:23 151:7 153:8 184:
14 186:24 190:16 192:14,20
yesterday [2] 120:13 137:11
you.of [1] 3:14
yourself [7] 29:18 31:3 45:22 58:9
112:20 182:11 187:8
yup [1] 2:25

**Z**

zapinko [1] 97:17
zupinka [3] 101:2 102:1,7

*Thomas Coury*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT

DARRELL G OBER : 1: CV- 01-0084

    Plaintiff :

    VS. :

PAUL EVANKO, :
MARK CAMPBELL, :
THOMAS COURY, :
JOSEPH WESTCOTT, & :
HAWTHORNE :
CONLEY :
    Defendants :

DATE:             MARCH 12, 2002

PROCEEDINGS:      Video Deposition of
                Thomas K. Coury

APPEARANCES:

    For the Plaintiff:  Donald Bailey, Esquire
                    4311 N. 6th Street
                    Harrisburg, PA 17110

    For the Defendant: Barbara Christi
                    Joanna Reynolds
                    1800 Elmerton Ave.
                    Harrisburg, PA 17110

1

---

1     MS. LYDE: Good afternoon ladies and
2 gentlemen. Please be advised the video and audio
3 is in operation. My name is Crystal M. Lyde, L-Y-D-
4 E. My address is 4310 Hillsdale Road, Harrisburg,
5 Pennsylvania, 17112. I've been contracted by P. R.
6 Video to be the operator for this deposition. The
7 case is in the United States District Court for the
8 Middle District of Pennsylvania. The caption is
9 Darrell G. Ober versus Paul Evanko, Mark
10 Campbell, Thomas Coury, Joseph Westcott, and
11 Hawthorne Conley. The docket number is 1: CV-
12 01-0084. The date is March 12, 2002. The
13 deposition is being held at the Pennsylvania State
14 Police Tech Center, Market Place, Harrisburg,
15 Pennsylvania. The video deposition is being taken
16 on behalf of plaintiff Darrel Ober and is also being
17 taken stenographically. The witness' name is Tom
18 Coury. The time is 3:18 P.M. Will you raise your
19 right hand for me please? Will you state your name
20 for the record and spell it?
21     A:   Thomas K. Coury, C-O-U-R-Y.
22     Q:   Do you so swear to tell the truth,
23 the whole truth, so help you God?
24     A:   I do.
25     MS. LYDE: Thank you. Mr. Bailey,

---

1 sound check please.
2     MR. BAILEY: My name is Don Bailey, I'm
3 an attorney. I represent Darrell G. Ober who is the
4 plaintiff in this matter. Barb could you identify
5 yourself and put an address on there?
6     MS. CHRISTI: Sure. Barbara Christi,
7 Chief Counsel, Pennsylvania State Police, office
8 address 1800 Elberton Avenue, Harrisburg, PA,
9 17110. The phone is 717-783-5568.
10     MR. BAILEY: Yeah I'm in error I should
11 be putting my address and phone number in there
12 too. 4311 North 6th Street Harrisburg, PA. This is
13 Don Bailey speaking of course, 717-221-9500.
14 Colonel Coury you had an opportunity to hear the
15 introduction and earlier, do you have any need for
16 me to repeat that?
17     A:   No sir I don't.
18     Q:   Okay in the interest of time I'm
19 going to move forward then. Let the record note or
20 the record show that it's about three twenty and
21 I'm going to have to break about a quarter to five or
22 ten to five. I'm going to have to pick up and expert
23 witness for a trial down in Lebanon tomorrow out
24 at the airport and he is coming in at 5:40. So I'm
25 going to try to get as much of this done Colonel as

---

1 possible and with that in mind you have
2 permission to stop me if you think I'm going on
3 about something okay?
4     A:   Yes sir.
5     Q:   We know all the ground rules let's
6 try to just begin with this. How are you employed
7 sir?
8     A:   I'm currently the vice president of
9 Parson's Corporation in Pasadena California.
10     Q:   And at the times complained of in
11 the complaint how were you employed?
12     A:   I was the Deputy Commission of
13 Administration from 1995, February 1995 to July
14 of 2000 and Deputy Commission of Operations
15 from July of 2000 until January of 2002.
16     Q:   And the position that we are
17 talking about is with the Pennsylvania State Police
18 and your rank was Lieutenant Colonel. Is that
19 correct?
20     A:   Yes sir it was.
21     Q:   And needless to say you retired
22 from that position, or retired from the
23 Pennsylvania State Police right?
24     A:   Yes sir.
25     Q:   Now are you at least generally

familiar with the complaint in this case?

A: The complainant did you say sir or the complaint?

Q: I'm sorry sir the complaint itself. Had you had a chance to review the complaint?

A: Yes sir.

Q: Now there are a number of allegations and complaints in the complaint about you and in order to try to truncate this deposition I have provided you with a copy of a June 16, 1999 memo that you prepared. Are you familiar with that?

A: Yes sir.

Q: Okay I'm going to be asking you some questions about that and I have also provide you with a copy of a statement that you gave on or about June 28, 1999 to a Major Tom Williams and a Major Robert Werts. Are you aware of that?

A: Yes sir.

Q: And you have a copy of that statement I front of you right?

A: Yes sir.

Q: All right what was that investigation about to the best of your knowledge, Colonel?

5

document?

A: Well I'm sure that because the information that the Colonel received on that afternoon is the first time that he had heard any of that information and it was brand new to him. Secondly it involved me to some extent and I think that that was, and this is just you know my own thought process on this, but this is probably one of his first attempts to memorialize gathering all the facts surrounding that investigation.

Q: And what investigation do you mean?

A: I mean the one into the Trooper, Trooper Stanton, and all the facts surrounding that investigation.

Q: And that was an investigation conducted by the FBI?

A: Yes.

Q: I mean the State Police didn't do an investigation did they?

A: I don't, I believe that subsequently the State Police did an investigation.

Q: Agreed but up until May 12, 1999 the State Police had done no investigation.

A: I would characterize that as the

A: It was about the circumstances surrounding an issue of political corruption on the part of one of our State Police members.

Q: And did Captain Ober play a role in that investigation or whatever it was?

A: Yes sir he did.

Q: What role did he play?

A: He was the Acting Director of the Bureau of Professional Responsibility at that time.

Q: And you, this memo that you composed on June 16, 1999, why did you write that memo up?

A: The Commissioner had directed me to write it up.

Q: And does the subject of that memo indicate meeting between the Commissioner and Lieutenant Robert Hickes?

A: Yes sir.

Q: And does it seek to put into written form your recollection of the events of Wednesday afternoon May 12, 1999 where you had a sit down meeting with Colonel Evanko?

A: Yes sir.

Q: Can you be more specific as to why colonel Evanko wanted you to prepare this

6

FBI being the lead investigator in the case.

Q: What role did the Pennsylvania State Police play in that?

A: I believe they provide the FBI with information.

Q: Okay did they investigate? Aside from being a source of information, and I'll ask you about that in a second what did they investigate?

A: What did who investigate sir?

Q: I don't know that's why I'm asking you.

A: My thought would be that providing the information is playing a role in the investigation.

Q: Okay is that investigating? Providing information? I mean you come to me

A: Yeah I thing that is part of the investigation when you're another law enforcement agency.

Q: Why?

A: You're both criminal justice agencies. You're both law enforcement agencies, you're sharing information back and forth.

Q: Well this is an issue about role. What was the Pennsylvania State Police

investigating?

A:    They were investigating along with the FBI the conduct of the Trooper although the FBI was the lead investigative agency.

Q:    All right well let's not mince words.

A:    Okay.

Q:    Now how did the FBI come to do this investigation?

A:    From what I learned on June 16 from information that they had from a confidential informant.

Q:    Okay and what information did they have?

A:    The information that they have and again I'm only recounting this because of what I heard Lieutenant Colonel Hickes say that day in the meeting was that their informant said that they had a Trooper, the confidential informant had a trooper by the name of Kip Stanton who claimed that he could have Cadet applicants moved from Band B which is the lower band to Band A and also help them, get them through the polygraph and the background process and ultimately help get them into the Academy.

Q:    Did he indicate that he had any

9

help? Did the investigation that the FBI did ever indicate that this Stanton had any help doing this? Not that it was accurate but did it ever indicate that?

A:    Not that I was aware of in this June 16th meeting but later during the State Police role the investigation into Stanton I understand that a State Legislators name from western Pennsylvania was also brought up.

Q:    Do you know who that was?

A:    No I don't.

Q:    Doe you know if it was Joe Preston, do you know if it was?

A:    I don't know sir. I've heard the name I don't recall it now.

Q:    Do you know if Leonard Bodack's name came up?

A:    I don't recall sir.

Q:    Do you remember if there was any indication that higher ups in the Pennsylvania State Police might be involved?

A:    I heard that on June the 16th, yes sir.

Q:    So you didn't hear that May 12th

10

from Mr. Hickes?

A:    On June the 6th? On May the 12th, no sir I didn't hear that from anyone.

Q:    Did you hear that on May 12th or 13th from Colonel Evanko?

A:    Let me step back one point just to be clear. Did I hear what on those days sir?

Q:    Did you hear that there had been some, that some issue had been raised about higher ups in the State Police and the governor's office possibly being involved in this scandal?

A:    I heard that on May 12th form Colonel Hickes.

Q:    Well you didn't hear it from Colonel Hickes you heard it from Colonel Evanko according to what you've told us. Do you want to correct that?

A:    On May 12th I believe it was from colonel Hickes' mouth. Both of them were present in the room on May 12th. I believe it was Colonel Hickes that said that.

Q:    Right in fact the June, this June 16th memo, the commissioner is asking you to put in writing what you remember about that

A:    May 12th

Q:    Of May 12th right?

A:    Yes sir.

Q:    And again you have, you don't know specifically know the purpose of why Colonel Evanko was doing that?

A:    Again I believe it was what I said earlier. I believe it was the impetus that, the start of the Colonel gathering facts on all the, all the surrounding facts on that incident.

Q:    Well Williams questioned Cush on the 25th of May didn't he?

A:    I don't know sir. I've never seen that investigation.

Q:    You never looked at it or saw it?

A:    No sir I never have.

Q:    What do you think Ober did wrong? What did Ober do wrong? In your eyes what did he do wrong? In your eyes now. I'm not asking you in the eyes of the State Police, Colonel Evanko, Rick Brown, Mr. Connelly anybody? I want to know, Lt. Colonel Tom Coury, years of experience in the State Police, based on, just on what you know as you sit here today. You tell me please in your eyes what Mr. Ober did wrong.

A:    When the FBI came to Captain

1 Ober I expect, or should say I would have expected
2 that Captain Ober do some background
3 information first. In other words say to the FBI,
4 and I don't know that he didn't but I have no
5 information to say that he did either, "when did
6 this occur?' Who were the Commissioner's and
7 Deputy Commissioners at that time? How good is
8 your informant? Have you talked to anybody else
9 about this previously        ? Why did you come to
10 me? Did you come to me? Did you come to me
11 because I'm the Director of IAD? Am I just the
12 fellow that answered the phone? Is it because I'm
13 the Acting Director? Why did you come to Darrell
14 Ober? How confidential is this? You said that there
15 are high-ups give me the names. Who are you
16 targeting specifically and last of all I would have
17 said to the FBI please give me something in writing
18 for my file to back me up on this thing.
19      Q:    Well.
20      A:    And not having done any of that,
21 and again there is no indication to me that Captain
22 Ober has ever done any of that.
23      Q:    So then he should have questioned
24 the FBI?
25      A:    Yes sir.

13

1      Q:    Have you ever been questioned by
2 the FBI?
3      A:    Sure.
4      Q:    Been investigated by them?
5      A:    no I don't think so.
6      Q:    You've never been investigated by
7 them have you?
8      A:    No sir.
9      Q:    Have you ever sat in on an FBI
10 custodial investigation?
11      A:    No.
12      Q:    Have you ever done a custodial
13 investigation on behalf of the Pennsylvania State
14 Police?
15      A:    Yes.
16      Q:    Okay have you gone out and
17 cooperated with local police on investigations?
18      A:    Yes.
19      Q:    Tell me how you are going to
20 respond to a local Policeman or some lawyer like a
21 Don Bailey let's say when you're doing a custodial
22 investigation and I start questioning you about
23 what you're doing in your investigation, who you're
24 talking about, what information do you have? You
25 tell me the FBI is going to sit there and tell you and

14

1 answer your questions if you start interrogating
2 them?
3      A:    I wasn't under the impression that
4 Captain Ober was the subject of an interrogation
5 from the FBI.
6      Q:    Who was?
7      A:    I don't know who was.
8      Q:    And that perhaps might be the
9 point.
10      A:    But I think when two law
11 enforcement agencies are working together that's
12 not too much to ask.
13      Q:    Okay so if you had been in Captain
14 Ober's shoes you would have done it differently.
15      A:    Yes sir.
16      Q:    And what if the FBI didn't answer
17 your questions sir and they said well that's what
18 we know at this point. That's it.
19      A:    Then they don't know a whole lot
20 and I would have informed my superiors.
21      Q:    Would you?
22      A:    Yeah.
23      Q:    And if they told you that they
24 thought that your superiors might be involved in
25 this you would have told them anyway?

1      A:    Everybody over a Trooper is a
2 superior.
3      Q:    Oh really?
4      A:    Yeah.
5      Q:    Okay.
6      A:    If you're a Trooper everybody from
7 a corporal up is a superior.
8      Q:    Okay but he's a Captain. He's head
9 of IAD.
10      A:    They didn't mention a rank. They
11 didn't say his superior.
12      Q:    Oh?
13      A:    They said in the Administration of
14 the State Police.
15      Q:    Okay well the point is you would
16 have gone and told Colonel Evanko right?
17      A:    If I were Captain Ober no. I would
18 have told my Major.
19      Q:    Well why would he go and tell
20 Colonel Evanko?
21      A:    Because the culture of the State
22 Police is we have a Chain of Command and we
23 operate through it.
24      Q:    Your culture?
25      A:    Yes.

Q:  What's that mean?

A:  Culture is meaning from the day you enlisted into the State Police at the Academy you are taught to go through a Chain of Command. You were in the military Mr. Bailey. You know that.

MR. BAILEY: Yeah I was. Nothing in the military that tells a soldier out there that if in his best judgment he thinks that his Lieutenant isn't doing something right he can't to the company commander and tell them. In fact the 101st Airborne and the 82nd Airborne Division every company commander I ever had had days in fact when they brought soldiers in and talked to them. I was a platoon leader and I never questioned my Captain    and I never questioned my soldiers on what they told my Captain. I just did my job and I assume that is what you're saying and the question here might be; and this is what I'm going to ask you, the Pennsylvania State Police has rules and regulations on how you are supposed to conduct yourself as an Officer and a Trooper? Is that correct?

A:  Yes sir.

Q:  What rules did Captain Ober break in your view? If any, I'm not saying he did. I'm just

17

asking your opinion.

A:  As it relates to what is stated about going through the Chain of Command, none that I'm aware of.

Q:  Any, okay

A:  I think that there may be some FR violations and again this is just off the top of my head, that may be worth more exploring is the fact that Captain Ober didn't put as much paperwork on his findings and according to regulations we are required to file reports. But again that's.

Q:  I thought a copy of this investigation was delivered to the Pennsylvania State Police? It was picked up and delivered to the Pennsylvania State Police.

A:  What investigation?

Q:  Let me lay the foundation this way. I believe that the alleged justification for Lt. Col Hickes, and I believe Captain Ober was with him, I may be wrong on the facts but why they went, why they informed colonel Evanko of what had happened it was based upon they were being told by the FBI that the investigation was closed and it was just Trooper Stanton and no one else involved.

A:  I don't know sir.

18

Q:  Okay have you ever read Major Williams report?

A:  No sir.

Q:  Have you ever read your statement before today?

A:  Yes sir.

Q:  Okay you have reviewed it?

A:  Not recently sir but

Q:  You have a copy in front of you that I have provided. Is that right?

A:  Yes sir.

Q:  All right. Would you take the, there's a real tiny little number, a 138 at the top. Do you see that? It looks like, I don't know what the number is darn it. Well there's numbers in the top right hand corner. It looks to me like

A:  I see numbers. They are kind of hard for me to read sir.

Q:  They are for me too. Okay, anyway the beginning page starts off with all right. Do you see that?

A:  Yes sir.

Q:  Now were you read your rights in this investigation?

A:  Not that I recall.

Q:  And is it fair to say you can't think of any reason why you should have been?

A:  I wouldn't have been surprised either way.

Q:  All right did you, had you learned at some point, I know you have today from my earlier questioning that there was, that this investigation actually had roots with the FBI? With the FBI going back as early as 1996 I think.

A:  Yes.

Q:  When did you first learn that?

A:  When Captain Monaco had called me at some point saying that, you know, I heard there is some question going on about this Trooper Kip Stanton and an FBI investigation and he said I just want you to know that he, meaning Captain Monaco and maybe now retire Captain Klaus Barons knew something about that long before that. And I said I would pass that information on to Major Werts and Williams and that was the sum and substance of it.

Q:  So Captain Monaco called you during the Williams / Werts investigation?

A:  No I didn't say during the Williams / Werts investigation. I don't know at what point

1  he called me but at some point he learned that
2  there was something going on as it relates to
3  Stanton and he called me.
4      Q:    Well you need if you can please to
5  look back for me in your minds eye and tell me
6  when that conversation may have taken place visa-
7  a-vie the fall of 1998. What I'm looking for, what
8  I'm looking for is your earliest knowledge that there
9  might have been some problem with Mr. Stanton.
10  That's what I'm looking for.
11      A:    I honest to God can't remember
12  when that might have been Mr. Bailey but I know
13  that, I know when Monaco called us the first time
14  that I believe I knew that there was something
15  going on with Stanton that the department was
16  aware of before this.
17      Q:    Okay that's what I'm looking for
18  that the department was aware of if. Now do you
19  know if that was before the fall of 1998, before the
20  FBI comes to Mr. Ober or after?
21      A:    Before I knew it or before the FBI
22  talked to Monaco? What?
23      Q:    No, we know if Mr. Cush is telling
24  the truth that the FBI talked to Mr. Baron's back
25  around '96. What I'm looking for obviously is when

21

1  that was communicated up or when there was a
2  record made with the Pennsylvania State Police.
3      A:    I don't know sir.
4      Q:    And you don't know when you first
5  learned about it whether it was before the fall of 98
6  or after?
7      A:    I really don't. I really don't.
8      Q:    Well do you know of any records
9  that exist about that prior contact that the FBI had
10  with Mr. Barons?
11      A:    No I don't.
12      Q:    Did you ever talk to Mr. Barons
13  about it?
14      A:    No I think, he is retired by then
15  I'm sure of that.
16      Q:    Well Captain Monaco knew
17  something about it right?
18      A:    Right.
19      Q:    Well how did he learn about it? He
20  learned about it, you told me that he had learned
21  about it from Mr. Barons or some kind of
22  discussion with Mr. Barons. Is that correct?
23      A:    No, no. I said that he heard that
24  there was something going on with the Stanton
25  case and he related to me that the FBI had spoken

22

1  to him or him and Barons at some point.
2      Q:    But that's my point. When did Mr.
3  Barons retire?
4      A:    I don't know sir.
5      Q:    If I told you that I believe Mr.
6  Barons had been contacted prior to when Mr. Ober
7  was contacted by the FBI that would be consistent
8  with what Mr. Cush said wouldn't it?
9      A:    It could be with, yeah, you would
10  have to look at the dates and compare it all.
11      Q:    I can tell you the dates are pretty
12  plain and they are pretty clear, in the statements I
13  mean. I don't know either I wasn't there. But what
14  I'm trying to get at, what I'm trying to figure out is
15  whether or not Captain Monaco was investigated or
16  the facts surrounding that situation; whether or
17  not Mr. Barons was investigated and the facts
18  surrounding that situation. Because all the
19  excitement I'm seeing here seems to be about
20  Colonel Hickes. Not about Captain Ober. I can't
21  figure it out and I can't understand why. So what
22  I'm trying to learn, what I'm trying to get at is, you
23  know, did you learn anything from Mr. Barons;
24  whether he communicated anything; whether
25  Captain Monaco communicated anything when he

1  learned about it, I want to know what investigation
2  Werts and Williams did into the Barons and being
3  told about this. Was there any investigation into
4  that?
5      A:    I don't know sir.
6      Q:    Well didn't you participate in the
7  investigation into Captain Ober?
8      A:    No sir.
9      Q:    Well the Colonel calls you into the
10  office there and what was it, was it May 12th?
11      A:    Yes.
12      Q:    What did he call you in for? To
13  witness a conversation?
14      A:    Yes. Well I think not to witness a
15  conversation. He had already had a conversation
16  with Captain Ober and Colonel Hickes that wasn't
17  witnessed. He called me in to tell me about the
18  conversation he had with them as it related to me.
19      Q:    Well was Colonel Hickes there?
20      A:    Yes.
21      Q:    Okay so you had a discussion with
22  colonel Hickes and you and Colonel Evanko were
23  there?
24      A:    Yes.
25      Q:    Yeah. Well I mean you

A:    You asked me, the question was had I participated in the investigation on Captain Ober?

Q:    Well you gave a statement according to your definition of participating in an investigation you are a participant in the investigation.

A:    If you look at that that's how I see it.

Q:    Can we break for a second? Thank you.

BREAK

MS. LYDE: It's 3:42 PM and we are back on the video and audio record.

MR. BAILEY: Colonel the, Mr. Williams asked you, it's page five of the interview. He says, "Colonel would you consider this a major incident?" And you said, "Absolutely I consider it a major incident for a number of reasons. First the allegations pointed at the Commissioner and the Commissioner's Cabinet Official. You know all three of us guys in this room is noted for their tight-lip so to speak and I think there would be a great potential for this kind of information to leak out. And I think that that would have been

25

damaging, or possibly damaging to the Commissioner." Were you worried about the Commissioner being embarrassed if somebody popped up and said, "Commissioner I heard this..." Were you worried about public image?

A:    I was worried about the Commissioner being embarrassed by saying I don't have to know, I don't know anything about this. I have no idea what you are talking about.

Q:    Well this seems to indicate it distrusts the FBI.

A:    No it's not distrust. It's just that, you know, in my experience with the FBI I have not known them to be extremely tight-lipped and it would not have surprised me if the word got out. And then my concern would be that somebody would be asking the Commissioner about it and him having to say I don't know what you're talking about.

Q:    So Ober put the Commissioner in a position potentially by not telling him where the Commissioner could be embarrassed if somebody asked him?

A:    I would not say Captain Ober did that exclusively. I think it's Captain Ober and

26

Colonel Hickes.

Q:    Okay well they both did that.

A:    Yes sir.

Q:    They didn't go and tell their commanding officer about an investigation by the FBI and the matters pertaining to the Pennsylvania State Police?

A:    Yes sir.

Q:    And the fact that those matters might involve the Commissioner himself, not that anybody would believe that, but investigation is an investigation. That doesn't concern you? You don't think that Captain Ober and Colonel Hickes did the right thing in that circumstance?

A:    I'm relying on what I heard Colonel Hickes say on May the 12th. He never mentioned anything other than the Administration of the Pennsylvania State Police and the Governor's Office. That is a very, very broad range. He never mentioned anything that either one of them did to narrow or verify any of that information. And he never mentioned that the FBI said keep this confidential, don't tell anybody, keep it quiet. None of that was ever mentioned. So I base this statement on what I heard in that room on May

12th.

Q:    Well okay. Let's say that nothing was ever said by the FBI about confidentiality or even indicated or you know, even remotely suggested by them. If Captain Ober believes that the FBI or maybe some Grand Jury investigation for all anybody knows is going on that might involve the Commissioner and wrong-doing, front office, upper echelon, the Pennsylvania State Police upper echelon you would agree is not a very large group. Is that fair to say?

A:    The term upper echelon was never used but the upper echelon is not very large.

Q:    Higher ups. What does that mean?

A:    It seems to me the terminology used was Administration.

Q:    Okay now if the FBI had mentioned a particular position, let's say your name had been mentioned, would you expect Captain Ober to come and tell you?

A:    No sir.

Q:    Would you expect him to go and tell Colonel Evanko?

A:    Yes sir.

Q:    But your name wasn't used was it?

A: Nor my position.

Q: Well I thought somewhere one of the FBI agents said that the term Lieutenant Colonel was used?

A: It never came up on May 12th that I heard.

Q: Should it have?

A: I think that would have been out there saying right away to the Commissioner. I'd be using, if I had that information I would be saying I didn't come to you boss because they said the Deputy Commissioner, they said the Commissioner or the FBI told me not to. It seems to me I would have been advocating that to the Commissioner to make a real strong point.

Q: Why? Are you afraid the Commissioner the scrutiny of some spurious and frivolous accusation out there? What's to be afraid of? What did he have to be afraid of?

A: Nothing to be afraid of. It's just that knowing the Commissioner and knowing how I am and knowing how the Governor's Office is. They don't like to be surprised. They don't like to have to say I don't know, especially on frivolous matters that have no merit. But it just seems to me

29

that when the Commissioner asked Colonel Hickes three times "Why didn't you tell me?" If it is because the FBI told him not to or because the Commissioner's position was mentioned or my position was mentioned that would be very, very logical appropriate clear answer.

Q: And he didn't say that?

A: No sir.

Q: Are you suggesting he lied?

A: No sir.

Q: No you're not suggesting he lied because you know that those things were mentioned in wiretaps. Weren't they?

A: I don't know that sir.

Q: You don't?

A: No sir.

Q: Well what if I told you they were? What would you say?

A: I don't know what I'd say sir. I mean

Q: Well wouldn't that make Captain Ober and extremely lucky prophet that if it's not mentioned by the FBI to him how would he, unless he is involved with these CI's and all this stuff how is he going to know that they're going to mention

30

the Governor's Office or higher ups in the State Police? How would he know that?

A: He wouldn't.

Q: No he wouldn't. So you don't have any real reason to doubt that Colonel Hickes and Captain Ober were in fact told by the FBI that higher ups, I don't know exactly what the terms would be, higher ups, upper echelon, I don't think that was used either. I agree with you that was my term. But higher up I believe that was a term that may have been used, higher ups, Governor's Office. You know Captain Ober was told about an investigation and he made a decision on how he should inform people on that investigation. Right?

A: Yes.

Q: I mean rightfully or wrongfully that is what he did.

A: Yes sir.

Q: And in your view he was wrong. Is that correct?

A: It was an incorrect decision yes.

Q: It was an error in judgment is that correct?

A: Yes sir.

Q: But it was not one which violated

the rules of the Pennsylvania State Police. Am I correct?

A: At the time I heard that on May 12th there was nothing to indicate that Captain Ober had violated any Field Regulation or regulation of the agency. That is correct.

Q: So what he had done wrong was violate a way of doing things.

A: A principle of culture.

Q: Okay all right. Now let's take it from there. Should he have been punished for that? I'm not saying he was. I am just asking should he have been punished for violating that principle of culture.

A: There is no way to punish or DAR a member unless he violates a regulation of the agency. So the answer is you would not punish him for that sir.

Q: Was the attempt to transfer Mr. Ober to Washington, your counsel described it as something that was later rescinded, I'm talking about the initial attempt to transfer him, rescinded or not, was the attempt to transfer him to Washington, was that punitive in nature?

A: No sir.

Q: Why not?

A: Well I think first of all the Commissioner holds the answer for you but based on my knowledge, that position at that time did not come under me. I was the Deputy Commission of Administration. The lion's share of the decision making there was between the Commissioner and Lt. Colonel Joseph Westcott. I can only tell you what I saw from the sidelines and share with you what I heard on some of the sidebars. That is that just as the Commissioner has assigned someone to work with Major Werts for the Republican National Convention and found it to be going extremely well that he thought he should also assign someone to work with major Serpinca for the National Governors Associations' Conference. What he was looking for was someone who was a darn fine administrator, a good project manager and had those skills. And he thought Captain Ober had those skills.

Q: He had thought very, very highly of Captain Ober?

A: Administrative Skills and project Management yes.

Q: And personally thought very, very

33

Q: So you never had any discussions; I'm sorry were you finished

A: I'm finished.

Q: So you never had any discussions with colonel Evanko where Captain Ober was cussed out, criticized, not that he would cuss I don't mean that literally, in other words I don't mean swear words used. I mean where he was criticized very strongly or in very strong terms for what he did in not divulging the FBI thing? Colonel Evanko never indicated any sentiments like that?

A: Never did that in my presence sir.

Q: Okay well there's an allegation in the complaint that he became very, very angry when he was informed by Captain Ober and Colonel Hickes of the FBI probe and he went into a rage. Was that true?

A: Was it true that he did that?

Q: Yes.

A: I wasn't there sir.

Q: Okay so you simply don't know?

A: I do not know sir.

Q: Well but he did launch, this was Colonel Evanko was the person who launched this investigation into the facts and circumstances to

highly of Captain Ober? I mean I'm not going to take a captain and put him out there with a potential president of the United States, someone as President Bush. In fact it would take a few friends on the Supreme Court. But the point is if you have a guy out there in Pittsburgh who is going to be representing you with a National Governors Conference you want somebody who is really wearing your face and you want to be proud of them. Right?

A: You would not send somebody out there to fail or make the department look bad.

Q: Well I'm sure you could count on Captain Ober regardless of circumstances never to do that and I'm sure Colonel Evanko knew that. But you talked to Colonel Evanko then did you and did he indicate the reason he wanted Captain Ober to go out there is because Captain Ober was such an exceptional officer?

A: I wouldn't say he said he was such an exceptional officer. I would say that in the conversations that I overheard it was because Darrell "A" could do the job; the job needed done and Darrell was a good project manager and administrative officer.

34

borrow your terminology about what occurred in the fall of 1998 with the FBI probe or investigation, whatever you call it?

A: You term it an investigation. Semantics, I term it an inquiry.

Q: The FBI was doing an administrative inquiry? Do you mean?

A: Oh no the FBI was doing a criminal investigation yes. Colonel Evanko launched an Administrative Inquiry.

Q: Right, what you're describing what Colonel Evanko did was an Administrative Inquiry?

A: That's the way I would phrase it sir.

Q: It wasn't a full investigation it was an Administrative Inquiry?

A: Yes sir.

Q: Was it in to Captain Ober?

A: No sir.

Q: Well was it in to colonel Hickes?

A: No sir.

Q: Was Colonel Hickes do you know if he was ever read his rights during the investigation?

A: I don't know sir.

Q:    Well why was Captain Ober read his rights?

A:    I don't sir.

Q:    You didn't make that decision so you don't know.

A:    I don't know sir I was not part of that inquiry process.

Q:    It is my understanding that at some point Colonel Evanko launches what you have referred to as an Administrative Inquiry into the events of 1998. Let's just call it the events of 98 Okay.

A:    Okay.

Q:    So we don't have to waste all that time repeating that verbiage. All right now was there some kind of a meeting where you were present and Colonel Evanko was present, Mr. Brown was present and others were present where this, launching this Administrative Inquiry was discussed?

A:    I can recall that I was in the Commissioners Office sometime after May 12 and I would have to guess within a couple days after May 12th, there were other people in the office. I don't recall who they were. I'm 99.9% sure it wasn't Captain Brown, where the Commissioner

37

was determining how to go about gathering the facts. In other words what is the proper instrument, what is the proper tool to use to go about that and more or less saying what all he wanted to know. So to that extent yes I was present for a conversation.

Q:    Well did anyone at all during that meeting say to Colonel Evanko that you can't do that or you shouldn't do this or that?

A:    I gave the Commissioner, since I was Deputy Commissioner of Administration and BPR fell under me and I had albeit, five to eight years before that being the Director of BPR, I did give him my opinion on how I thought that should go.

Q:    What did you tell him?

A:    I told him that from what I could see that there were no violations of Field Regulations on the part of any member so therefore it shouldn't be BPR personnel type complaint investigation. That if what he wanted was the facts on what's going on as it relates to Stanton is that system foolproof? Is there anyway that anybody could get in and tamper with the Cadet processing as it relates to Captain Ober and the Chain of

38

Command and the information back and forth from the FBI and the information passed from Captain Ober to Colonel Hickes? In as much as there was no indication that any member had violated department rules or regulations that I thought it should be an Administrative Inquiry.

Q:    Well did anybody discuss those feelings of yours with Mark Campbell?

A:    I don't know sir. I didn't have any discussion with Mark Campbell.

Q:    Do you know whether the good Colonel Evanko had any discussions with Mark Campbell?

A:    I know that the Commissioner said to me and I believe it was on that same day, that on that same day he would be discussing that issue with Mark Campbell.

Q:    Do you know whether he did in fact did discuss it with Mark Campbell?

A:    Actually I don't know that.

Q:    I may be mistaken but I think that Mr. Campbell does indicate that there may have been some kind of a discussion early on about that, that the Colonel had called him. Now let's set the month of May aside okay. Do you know

whether there were any further discussions with Mark Campbell about Mr. Ober?

A:    None with me sir.

Q:    No, no but my question is do you know of whether Colonel Evanko, not Colonel Coury, whether colonel Evanko talked with Mr. Campbell after the month of May 1998?

A:    No sir I do not know.

Q:    Do you know whether Colonel Evanko ever discussed the transfer of Captain Ober to Washington?

A:    With Mark Campbell?

Q:    Yes.

A:    No sir I don't know.

Q:    Would you be surprised if he did?

A:    Would I be surprised if he did?

Q:    Yes.

A:    No sir I would not be surprised.

Q:    Why?

A:    Well because as the governor's Deputy Chief of Staff at the time the Commissioner routinely conveyed Administrative type information, personnel information and anything of significance that was going on in the department to Campbell.

Q: Well did Mr. Campbell express an interest and the desire to have Mr. Ober work on this project out there in Washington?

A: I don't think that if the Commissioner relayed that information to Mark Campbell it was so much that he was sending Captain Darrell Ober out there. It's more that he's sending a Captain out there to handled, to help with the NGA and oh by the way it's Captain Ober. So the point was telling Mark Campbell that the issue was relating to the NGA not to Captain Darrell Ober.

Q: Sure and does Mr. Campbell know Mr. Ober do you know?

A: I don't know sir.

Q: Was Darrell needed out there in Washington?

A: A darn good project manager was needed out there.

Q: Surpinco couldn't do the job, wasn't up to the task?

A: I'm sure he was up to the task but everybody needs help.

Q: Well Serpinco was a pretty dog-gone worker in his own right wasn't he?

41

A: So was, and so was Major Werts on the NGA but to be able to assign somebody to that full time makes a big difference.

Q: Well I mean Serpinco had already been underway, had this thing underway and been working on it for about a year, pretty much had it under control didn't he?

A: You would have to ask Colonel Westcott. I don't know. That was under Operations and I wasn't a real part of that.

Q: Well I could be wrong but I don't think that Mr. Serpinco ever requested anybody to help him.

A: No and knowing him he wouldn't. Nor would any Major, nor would any Major.

Q: Okay but who would evaluate that situation, ascertain it and decide that we need, and really there must be a problem here because you need a real good organization man out there and Ober is the guy, who would have decided that we need him out there to do that?

A: It would be the Deputy Commissioner of Operations.

Q: Who was?

A: Colonel Joe Westcott.

42

Q: And here's Colonel Evanko talking to Mr. Campbell about Mr. Ober and Colonel Evanko gets personally involved as the record indicates in the transfer of Mr. Ober to Washington.

A: Right. Only the Commissioner can affect a transfer.

Q: Well did you get involved in that decision?

A: Only cutting, as it relates to maybe cutting the paperwork since personnel came under me. And to say that Captain Ober that was part of my command was going to be transferred and that I had confidence that he could do the job.

Q: Well did you?

A: Yes.

Q: And you talked to Mr. Connelly about him?

A: About?

Q: About Mr. Ober. Mr. Connelly has already testified to that. Didn't you talk to Mr. Connelly about Mr. Ober?

A: Sure. I don't know if it's in relationship to your previous question.

Q: Okay well what would you talk to

Mr. Connelly about Mr. Ober?

A: Captain Ober was a Captain under Major Connelly. I talk to all my Majors about their Captains. Are they doing the job? How are things going? A, B, C, D, E? So that that's not uncommon.

Q: Well did you notice? One thing I noticed about Colonel Connelly's deposition really is a stickler for sticking to that Chain of Command isn't he? I mean he seemed to be.

A: Yes.

Q: He barely had any discussions with Colonel Evanko about Captain Ober.

A: Right.

Q: But he talked with you a lot about that.

A: He talked with me about that. I would not say a lot. If he had something to say about Captain Ober he came to me with it.

Q: Well what did he have to say about Captain Ober that he came to you about?

A: That he had talked with the Captain about a couple of investigations that he thought were dragging on that he thought should have been concluded. He had no faith in the

Captain, no confidence in the Captain after the
Captain after the Captain didn't inform him of this
Stanton investigation, issues such as that.

Q:    And did you say Major Connelly
that went on about Captain Ober he was a good
organization man, he can be trusted. In fact he is
such a superb officer Colonel Evanko is sending
him out to Washington County out there where he
can represent the Pennsylvania State Police, its
public face in interacting with the National
Governors Conference or Association or whatever it
was. And there wasn't any discussion like that?
Did you disagree with Major Connelly?

A:    I can't disagree with somebody's
perception. Yes, I'm sure Major Connelly and I both
agree to Captain Ober's strength as it relates to
Administration. I mean we even had discussion
about switching Captain Ober and Captain Skurkis
because the job of Director Systems and Process
Review is more operational than administration. Or
I'm sorry reverse that. It's more administration
than it is operation and I had asked then Major
Connelly how he would feel about switching and
putting Captain Ober back in SPR and he said it
was an issue that he said he just did not believe

45

that they could work together any longer. So it was
not an issue of his administrative skills.

Q:    All right sir. Give me one second.
END OF SIDE ONE-TAPE ONE

Q:    Well I understand there was a great
urgency and need to get Captain Ober out there to
Washington. Right?

A:    There was a need to get someone
out there. The NGA was going to occur in July.

Q:    So we needed Captain Ober out
there in your eyes or the eyes of Mr. Westcott. Mr.
Serpinca no. so you gave Captain Ober a call or
you had Mr. Connelly give Captain Ober a call to
discuss going out to Washington with him right?

A:    I wouldn't say to discuss it, to tell
him.

Q:    You didn't even ask his opinion
about it?

A:    You know Mr. Bailey, I move a lot
of Majors, captains and Lieutenants; some for good
reasons and some for bad reasons. I never engage
in discussing with them why. I engage with them
what I needed to tell them, where I needed them to
go and let's get it done. No and I don't think I told
Colonel Connelly to discuss it with him either. I

46

mean that's my methodology. That's my
management style. I'm very Chain of Command,
I'm very semi-military. I probably move more
Majors, Captains and Lieutenants than my
predecessors or the Commissioner or Deputies and
I just move them and that was it.

Q:    Do the State Police regulations say
anything about either informing people or giving
them opportunities or options? Does the contract
say anything about it?

A:    There are some contractual
obligations as it relates to the transfers but
generally not for commissioned officers.

Q: Okay so it's your command
methodology to just send a directive to somebody, I
hesitate to call it a courtesy; I don't want to do
that. I've had the privilege of commanding people
and it wasn't my methodology, it doesn't make me
right, but I'm just curious. So you would just issue
an order and then

A:    It wasn't my order. It was relayed
to me from the Commissioner. It's not up for
discussion.

Q:    I understand.

A:    It's really

Q:    Okay you just answered my
question. It's not up for discussion. The
Commissioner says do it, do it. He's the boss right?

A:    Yes and what it boils down to is in
the best interest of the department and the citizens
of the Commonwealth.

Q:    Do you know why Captain Ober
was transferred; I don't know if transferred is the
right word to be honest. In other words he was on
detached leave from the Bureau, BPR to IIMS at
the Commissioners order. That's my
understanding. Is that correct?

A:    Yeah, he wasn't transferred. He
was on detached assignment.

Q:    So he was told, in other words his
detached assignment was ended and he was to
report back to BPR for a period of four days. I
know you've heard testimony here today about
that. But do you recollect that?

A:    What I recollect factually is that the
Commissioner told me that he had assured
Captain Ober that he would be returned to BPR
after the IIMS project was completed and that he
was going to live up to his word to do that.

Q:    And in order to live up to his word

1  to do that he was going to transfer Captain Ober
2  for four days to BPR and from there to Washington.
3      A:    It was actually for, initially it was
4  fro fifteen days or a two week period and somehow
5  it got whittled down to operationally to be four
6  days.
7      Q:    Do you know whether that resulted
8  from the expression of opinion from then Major
9  Connelly?
10     A:    I know that Major Connelly did not
11 want him back in the Bureau.
12     Q:    I'm going to switch gears on you
13 here just a little bit because I think Colonel
14 Connelly has already indicated that he was
15 expressive to you about not wanting to have
16 Captain Ober back in the Bureau and certainly; he
17 expressed that to you.
18     A:    He did yes sir.
19     Q:    And one of the reasons that he
20 gave or one of his concerns was trustworthiness
21 based upon Captain Ober's not revealing the FBI
22 probe or handling that in a proper fashion,
23 however the Colonel described it.
24     A:    That was one of the reasons yes
25 sir.

49

1      Q:    Any other reason?
2      A:    Yeah I think that Colonel Connelly
3  was a little concerned in the manner in which
4  Captain Ober supervised some investigations.
5      Q:    My review indicates that none of
6  that, virtually none of the things that aside from a
7  statement that Colonel Connelly gave during the
8  events of 98, Administrative Inquiry, and none of
9  those were committed to writing. Do you have a
10 recollection of any supervisory inquiries,
11 counseling statements, sessions, or memos where
12 Captain Ober was admonished or anything like
13 that?
14     A:    No. no.
15     Q:    And according to Colonel Connelly
16 that wouldn't be his style anyway.
17     A:    I wouldn't it to be done. It wasn't
18 behavioral issues on the Captains part. It wasn't.
19 There may be some attitude issues there but
20 mostly it was issues of performance and it's not
21 that, in my opinion Captain Ober is very strong
22 administratively but operationally he lacks
23 experience.
24     Q:    What do you mean by
25 operationally? What's the definition, what's the

50

1  Pennsylvania State Police definitional difference
2  between operations and administration?
3      A:    Administration is managing
4  projects, managing staff type work; operationally
5  means to me guiding, directing investigations.
6      Q:    Well who in the name of goodness
7  put him in charge of IAD?
8      A:    I did with the Commissioner's
9  concurrence.
10     Q:    All right sure
11     A:    Because everybody needs a chance.
12 You don't know that until you try. And he had
13 been in Bureau Systems and Process Review or
14 Division Systems Process and Review and did an
15 outstanding job.
16     Q:    You know, not to debate an issue,
17 I'm not so sure how material it is but from my
18 investigation until this fall of 98 thing this was,
19 appeared to me to be an exceptional officer which
20 Major Dewire was on a fast track. I mean a guy
21 who was really a producer for the Pennsylvania
22 State Police and with a real future. Now aside from
23 Major Connelly's comments and unhappiness with
24 him this appears to be an exceptional officer from
25 everything I can see. Would you comment on your,

1  given your knowledge, he was in your Chain of
2  Command. You've already talked about his ability
3  to perform what about his potential? Aside, until
4  987, the fall of 98, what was his potential? How
5  good was this man? How did he look?
6      A:    Comparatively speaking,
7  administratively I think he is probably near the top
8  in officers that can handle administrative matters
9  and issues. Knowing the rules, the regulations,
10 department policies, things like that. As it relates
11 to conducting field operations, things like that I
12 think, he's not near the top of that group. And you
13 know, I think that when you're considering
14 someone, especially for the rank of Major you're
15 comparing him to his peers. So I think
16 administratively compared to his peers he had is
17 very strong, excuse me. Operationally less than the
18 other peers.
19     Q:    And you had indicated that was
20 because he did have experience.
21     A:    That's right.
22     Q:    So you're not saying that you don't
23 believe he couldn't do those things. What you're
24 saying is that for whatever reason he lacked
25 experience at those things.

A: Yes in the grand scheme of things the years that Captain Ober has with the department and the time in grade is relatively, he's relatively a junior officer. I mean when you take a guy, when you take guys like Major Koselnak, Major Serpinca, Major Dewire, they've all got a lot more time in grade, a lot more time on the job and hence a lot more experience.

Q: Now at some point Captain Ober is transferred to LCE?

A: Yes sir.

Q: However counsel and I may respectfully disagree about what happened with this thing in Washington at some point he is transferred To LCE. Was that after the issue with Washington was resolved?

A: Yes.

Q: Well who decided to transfer him to LCE or did he come asking for it?

A: I don't know if he asked for it or not. I wasn't part of that process. My involvement is that the Commissioner had agreed not to send Captain Ober to Washington which and my understanding is he could have made him go, he could have sent him. But believe it or not the

53

Commissioner is a very compassionate individual and cares a lot about people. He elected for whatever reason not to send him to Washington so hence you still need a place for the Captain to be stationed, you have to have a spot for him.

Q: So it's the Commissioner that sent him to LCE?

A: The commissioner has the final say on where everybody goes.

Q: That's not the question. We know he has the final say. Was it the commissioner that sent him to LCE or did somebody else make that suggestion for example?

A: I can't answer that. I did not.

Q: Do you know whether he was put into a Lieutenants position in LCE?

A: Yes he was.

Q: Why?

A: Because Lt. Huston Williams was not present. Lt. Huston Williams I believe at that time he was on suspension without pay and that Captain L. Campbell who's the captain there was going to retire and that gave the department the opportunity to put Captain Ober there so that it would give us some time to transition with Captain

54

Campbell to become a full time position. And I don't know that to be factual. I absolutely don't. That's just what I think, my impression.

Q: Did you have Lieutenants available at that time?

A: I don't know.

Q: Well did you look?

A: I didn't no.

Q: Do you know whether the Colonel looked?

A: I do not know.

Q: Do you know whether MR. Westcott looked?

A: No sir I do not know.

Q: Well how many years had you been on the State Police before you retired?

A: Thirty-three.

Q: And you rose through the ranks to become a Deputy Commissioner?

A: Yes sir.

Q: But for the flip of someone's political wrist who knows? You might have been Commissioner. We don't know that but there's a lot of experience here right?

A: Yes sir.

Q: And how many times has a Captain been put into a Lieutenants' position? Aside from Captain Ober how about sharing it with us?

A: I don't know sir.

Q: I know

A: I don't recall off the top of my head sir and I haven't given it any thought but I don't know of any.

Q: Okay now what's PEMA?

A: Pennsylvania Emergency Management Administration, Agency.

Q: Do you know whether Captain Ober was active with PEMA at all at some point?

A: I believe that he was.

Q: Do you know a gentleman by the name of Koselnak, Major?

A: Yes sir.

Q: Did you ever discuss Darrell Ober with Major Koselnak?

A: In what regards sir? LCE? Or in general or?

Q: LCE.

A: Yes.

Q: And tell us the discussions that you had with Mr. Koselnak about Captain Ober.

A:    I recall telling Major Koselnak that Captain Ober was coming to LCE and that I knew that Major Koselnak was aware of the Administrative Inquiry and I told Major Koselnak was to be treated with due respect the same as he would treat any other Captain.

Q:    Why did you have to tell him that? It seems to me it goes without saying he would be treated that way.

A:    Because I wanted him to know that regardless of what he heard through the rumor mill of consternation between Captain Ober, Colonel Hickes, Colonel Coury, and Colonel Evanko that we weren't singling him out. We didn't want him to be viewed in any other way than a Captain in good standing with the agency.

Q:    Well let's follow up on that just a little wee bit. When you gave your statement to Major Williams did you express a concern about the upcoming election in the fall?

A:    Um-hmm.

Q:    Are you involved in Republican politics at all?

A:    Not really.

Q:    Well what was your concern about

57

the election coming up in the fall?

A:    My concern about the election coming up in the fall was that the Governors office could get a call some morning from the press saying "Listen we heard the FBI is conducting an investigation into your office being involved in a Trooper into the State Police Academy." And the Governor's Office is going to have to say "We have no idea what you are talking about." And that would be embarrassing.

Q:    I don't' mean the Republican Party and I don't mean the FBI any disrespect. I can't conceive of the FBI in Pennsylvania letting a Republican Administration go out on a limb with the press about some pending investigation. I mean I can't conceive of that because I know of their roots and their connections. You're telling me that you actually had a fear, making this comment in your statement about the FBI not being tight-lipped and you have this concern about the election, which I think speaks pretty well of you because it doesn't indicate that you think the FBI has any partiality at all, and I think that speaks well of you in that regard. Obviously you're not into anything like that. My comments notwithstanding,

58

my question is, are there any facts known to you which would indicate that the FBI was going to reveal this information to the press or anything like that?

A:    No and you said a fear. I didn't have a fear, sir. If you want to term it a concern yeah I have a loyalty to the Commissioner and the Governor's Office to keep them from getting blindsided on issues if I have the ability to do otherwise. The FBI I don't know what their political face or allegiance were in and I wasn't; there was also the concern that they wouldn't overtly leak this information. It would accidentally get out. Not that the FBI would call a press conference but it would leak out.

Q:    Fair enough.

A:    When you are dealing with confidential informants and things like that word leaks out.

Q:    Or a democratic State Representative like Joe Preston and a democratic State Senator like Lenny Bodack from Allegheny County you never know.

A:    I didn't even know their political face and I didn't even know their names until

today, so, or that I can recall.

Q:    Do you know whether the FBI ever investigated them on these allegations?

A:    I don't know, sir.

Q:    I wonder if they'll answer questions on whether they investigated them and why not? Do you have any information to indicate that the FBI buried the underlying investigation for any reason?

A:    Do you mean into Trooper Stanton?

Q:    Yeah.

A:    I thought that investigation was turned over to the State Police and Stanton was arrested and plead guilty so I wouldn't see how it could be buried.

Q:    Okay have you ever worked with a grand jury?

A:    Not in many years.

Q:    All right. There is a concern about the election, about public exposure and a loyalty to the Commissioner. Not that they would be based on any real fear but that there would be misinformation, public misinformation that would be embarrassing etc. Are you suggesting that for

those reasons that Captain Ober should have
informed the Colonel and / or yourself or someone
in his Chain of Command of that FBI probe? For
that reason?

A:    Based on that reason alone? Not on
that reason alone.

Q:    Not on it alone.

A:    No.

Q:    But I'm asking if you believe that
should have been a consideration for Captain
Ober?

A:    That should not have been a
consideration of his.

Q:    So apparently if he did not inform
anyone in his Chain of Command and made an
error; you don't have any reason to believe he was
motivated by a political concern do you?

A:    None sir, no.

Q:    Now Colonel Coury have you ever
given any thought to what Mr. Ober possibly could
have gained? See I picture this thing of him being
in a position with great trepidations, okay? Fear,
doubt what do I do? Somebody hands me a hot
potato what do I do? Now as it turns out I don't
know how he is going to win but the point is what

61

possible thing do you think he could have gained
by going to Colonel Hickes and I'm going to ask
you about the arrangements and relationship
between Colonel Evanko and Colonel Hickes.
There's bad politics there, bad blood or whatever.
I'm going to ask you about that in a minute. What
would Captain Ober gain by that? Is he on Hickes
team? Is he a Hickes advocate? Is he a Hickes
supporter? Is he in the politics of being against
Colonel Evanko? I mean I don't know. I keep
looking for reasons for this and I understand what
you're telling me what your reasons were. Now I
want to ask you what you are aware of. Are you
aware of any reason why Captain Ober aside from
his error in judgment about what the FBI told him
or allegedly told him, why he would go to Colonel
Hickes? Colonel Connelly was very offended by the
Captain Ober's admission. Now I'm asking you if
you know of anything that Captain Ober could
have gained by going to Colonel Hickes?

MS. REYNOLDS: Excuse me, I'll object
as to form. If you are asking the question what do
you think the plaintiff could have gained then I
would object in the form as the question would be
speculative. If it's the second question are you

62

aware of any reason why Captain Ober would go to
Colonel Hickes then I have no objection.

MR. BAILEY: Okay let the objection
stand but I'd like the question to stand as it is
because I think asking you if you know of anything
he had to gain I think that is legitimate in any way,
personal, political, administratively, career-wise.
You know I think it's a legitimate question so I
would like the question to stand. And you can
respond.

A:    I have not given that question any
prior thought and as I sit here I can honestly tell
you I don't know what he could have gained.

Q:    Do you believe that he actually
believed that, he being Captain Ober, do you think
that he actually believed that Colonel Evanko was
involved in selling jobs?

A:    I do not know what he believes and
it wouldn't surprise me either way.

Q:    It wouldn't surprise you either
way?

A:    Whether Captain Ober thought he
was or he wasn't involved selling jobs. I don't know
what Captain Ober thought.

Q:    I know you don't know that but

you reacted strongly on that it seemed to me and
said it wouldn't surprise you either way. I can't
conceive of Captain Ober actually believing Colonel
Evanko would be involved in something that petty,
as petty as

A:    And I'm not insinuating that he
did. I guess what I'm referring to is I've seen what I
think are some shortcomings in Captain Ober's
ability to rationalize and look at operational
investigations and issues and so I don't know how
Captain Ober would have viewed it.

Q:    Would you tell a target of a law
enforcement investigation that they were being
investigated?

A:    Are you saying Colonel Evanko was
a target? Is that what you're asking, is that what
you're saying to me?

Q:    Oh no. I'm asking you generally.
You are in a position to pass judgment on his
operational skills so you have given me responses
to numerous questions that indicate to me that
you have strong background in operational skills.
Now my question is real, real simple. It's pretty
kindergartenish as I see it. Would you tell a target
of an investigation that they are being

investigated?

A:    Colonel Evanko was not a target of an investigation. To me a target is a named person.

Q:    I didn't say he was. I asked you if you would tell a target

A:    I would not tell a target nor would I expect Captain Ober to tell a target.

Q:    That's very simple isn't it? Now if I say Governor's Office might be involved in a problem I would think that's pretty scary or pretty heavy stuff. If you know, that's rather getting up there in the scheme of things isn't it?

A:    I guess it depends on your knowledge of the Governor's Office. There are a lot of people in the Governor's Office and you know, there are a lot of secretaries and clerical type positions. Not everybody in the Governor's Office is a high-ranking government official.

Q:    That's true. I'm sure that's true. Neither was Monica Lewinsky or the president's sex habits a political issue but hey, impeach the guy for it. At least some idiots did. Now you know to me if somebody says the Governor's Office is an area where I should be concerned about because somebody might be involved, who should you

65

choose to tell in the Governor's Office? You see because I'm going to assume that if the FBI had come to you that you would have told the Colonel because he wasn't specifically named and I cannot believe the Colonel wouldn't have called the Governor's Office and said hey, because of what you told me about the press and the embarrassment. So who should Colonel Evanko have told if Mr. Ober had told Colonel Evanko, who should he not have told or should he have told anyone?

A:    Well first I think it all gets back to what I initially said about what I thought Captain Ober should have done when the FBI called him. I don't think the Commissioner or myself or anyone else would pick up the phone and call the Governor's Office until we had some answers for them. What is the credibility of the Trooper? I mean had Captain Ober even checked the BPR record of Trooper Stanton? That should have raised a flag of hey we are not dealing with the cream of the crop troopers here. Here's a guy who's got a track record. He's got some previous history and just based on that I would have been asking the FBI other questions. And from the information

66

I gathered is how I would have handled it from that point on. I believe that Colonel Evanko would have said find out A, B, C, D and E. Let's find out what to do with it and when you put that package together you find out that there is not a whole lot there and then I think he would have called the Governor's Office.

Q:    Okay and do you think the FBI should have answered, I mean should have done what you say? I mean really what you're saying, you're saying the FBI, and I mean this is what you would have done. You would have said to the FBI "Hey I want to know what you're investigating, who you're investigating, I want the answers to these questions or I'm telling Colonel Evanko."

A:    We do those things. They haven't refused us. We have a good working relationship with the FBI. I mean if they were concerned about us they wouldn't have gone to Captain Ober in the first place.

Q:    Why didn't they go to Colonel Evanko in the first place? He had friends done there. Rick is his friend.

A:    Well I don't think an agent is going to jump to a Colonel's level. I mean I think we

operate on some operational peer levels.

Q:    Why didn't Louie give him a call?

A:    It just isn't important enough.

Q:    He might be a target and it isn't important enough? He might be a target, the governor's office, Ridge, friend of Bush might be involved, might be involved. I think it's ridiculous, the fact is

A:    It's three years old information.

Q:    What? Geeze, you know that now.

A:    I don't think Louie has a thing to worry about with three year old information and Louie probably knew it then. I mean they knew it was three year old information when they called Captain Ober.

Q:    Well then let Colonel Evanko and his buddy let him down. Let him down, should have picked up the telephone and called him, said "Hey Colonel what's going on in your outfit down there? I think you got you got a bad cop." Didn't you use the term bad cop somewhere? Somebody did. Do you remember that?

A:    Yeah. Um-hmm.

Q:    Probably right. How that then sir? How do you know that when somebody comes to

1  you and says this might be a problem? And there's
2  a State Representative and a State Senator and
3  some guys running around shooting his mouth off
4  on a wire. And sure this stuff probably happens,
5  happens a lot of times. But you know don't you
6  have to treat the information with respect? Don't
7  you have to respect the integrity of the process
8  according to your training?
9      A:   But it doesn't mean that you don't
10  ask questions. Doesn't mean you put blinders on
11  and you just accept whatever the FBI tells you.
12     Q:   Well I wouldn't accept anything the
13  FBI tells me and I admit that. But that's me and
14  you know how paranoid I am. Now I want to ask
15  you this, if you, if the FBI decision to look at this
16  thing at all was revived and the notes indicate that,
17  I mean the comments, the interview with the FBI
18  indicate that this was an old thing that was
19  revived. Do you know any reason why there wasn't
20  a simple contact with the Pennsylvania State Police
21  like a letter or a letter to the Commissioner or
22  something like that saying "Hey we want to look
23  into this? Or we want to meet with you and talk
24  about this?
25     A:   No I don't know.

<center>69</center>

1      A:   I don't know sir.
2      Q:   Do you know whether Colonel
3  Hickes was transferred anywhere?
4      A:   He was not sir.
5      Q:   He wasn't. Well does the
6  Commissioner have the power to transfer him?
7      A:   He is appointed. He's a Cabinet
8  Appointee by the governor so it would take
9      Q:   Who?
10     A:   Colonel Hickes.
11     Q:   Oh does he have friends over
12  there?
13     A:   I don't know sir.
14     Q:   How is it possible to be a
15  Commissioner appointed by the Governor's Office
16  and not have some political punch over there? Is
17  that possible?
18     A:   I don't know sir.
19     Q:   Do you know whether he and
20  Colonel Evanko get along?
21     A:   I've seen them work together and
22  they have a good professional working relationship.
23  All four of us have been in the same company
24  many, many times and it's a good professional
25  working relationship.

1      Q:   Were you ever able to figure out or
2  understand why the contact was made to Captain
3  Ober an IAD?
4      A:   No sir.
5      Q:   One of the troubling things for me
6  Colonel; you didn't read aside from your own
7  statement you didn't read into that report much,
8  you didn't say
9      A:   I have not seen that report sir.
10     Q:   Okay it's silly to even waste your
11  time even asking you any questions about it then.
12  Do you think Lt. Colonel Hickes was wrong in what
13  he did?
14     A:   In not informing the
15  Commissioner? Is that what you're referring to?
16     Q:   Yeah because I'm assuming if you
17  take Darrell Ober out of this we know that a matter
18  of on or about October 5 Lt. Colonel Hickes is told.
19  Okay. I don't know of anything, I don't know of him
20  being read his rights. Maybe he was.
21     A:   I don't know sir.
22     Q:   And you don't know it because
23  you're not that familiar with the investigation. You
24  don't know why Captain Ober would have been
25  read his rights?

<center>70</center>

1      Q:   And the participants Colonel
2  Hickes and Colonel Evanko follow the rules and
3  they perform their professional jobs the way they
4  should right?
5      A:   Yes sir.
6      Q:   Okay. Have you ever seen them in
7  any kind of a political dispute or involved in a
8  political dispute of some type?
9      A:   No I have not sir.
10     Q:   Do you know if Lt. Colonel Hickes
11  has a political contact over in the Governor's
12  office?
13     A:   I don't know sir.
14     Q:   Do you know who he reports to
15  over there if he reports to anybody?
16     A:   No sir I thought he reported to the
17  Commissioner and the Commissioner reports to
18  the Governor's Office.
19     Q:   Do you report to anybody over in
20  the Governor's Office?
21     A:   No sir.
22     Q:   And who does the Commissioner
23  report to over in the Governor's Office?
24     A:   It was Mark Campbell and right
25  now, since I retired in January I'm not sure who

1  the Deputy Chief of Staff is but that's who he
2  would report to. I think it was Lisa Baker I think
3  last time I, I think when I retired. I'm not sure who
4  it is now.
5      Q:   Do you remember I asked you
6  some questions about Major Koselnak?
7      A:   Yes.
8      Q:   And you had a discussion with
9  Major Koselnak and told him not to treat Mr. Ober
10  any differently than anyone else?
11      A:   Yes.
12      Q:   Who brought that subject up?
13  Koselnak or you?
14      A:   I think I did.
15      Q:   And did Koselnak say yeah that
16  was okay?
17      A:   Yes.
18      Q:   Now remember PEMA?
19      A:   Yes.
20      Q:   When I asked you about PEMA?
21  Doesn't PEMA, wouldn't PEMA give Ober some
22  operational experience?
23      A:   No see, I don't see it that way.
24      Q:   September 11th, it wouldn't have
25  given him any operational experience?

73

1      A:   Well it would in an Administrative
2  sense. I mean you're going to be conveying, you're
3  going to be passing messages back and forth from
4  PSP to maybe Department of Transportation,
5  things like that. And yeah there would be some
6  operational benefit to that.
7      Q:   Why was Ober, wasn't Ober
8  interested in serving at PEMA?
9      A:   I don't recall sir.
10      Q:   Do you know why he was refused
11  an opportunity to serve on PEMA?
12      A:   I don't know. I had no involvement
13  in that sir so I'm not familiar with it.
14      Q:   Is there a Major of Colonel
15  Washington?
16      A:   There was a Major Leonard
17  Washington yes.
18      Q:   Leonard Washington, what does he
19  have to do with PEMA?
20      A:   Well that PEMA position is within
21  the Bureau of Emergency and Special Operations
22  and Major Washington was the Bureau Director at
23  that time. And the Bureau of Emergency and
24  Special Operations is functionally located under
25  the Deputy Commissioner of Operations.

74

1      Q:   Who is?
2      A:   It would have been Lt. Colonel
3  Joseph Westcott until July of 2000.
4      Q:   Do you know if Lt. Westcott ever
5  said that Ober wasn't going to be reappointed to
6  PEMA?
7      A:   He never had that discussion with
8  me sir.
9      Q:   I think this will probably be at least
10  for my purposes a very good place to break. Not
11  just time wise. Colonel I am largely through what I
12  wanted to go over with you. I don't think. I might
13  need another hour at the most. We could
14  reschedule that at some point. Where did you say
15  you were headquartered or where do you work?
16      A:   My office is here. My office is here
17  in Harrisburg.
18      Q:   So you're here, to the local area
19  here?
20      A:   Yes sir.
21      Q:   All right if we could, I'll work with
22  your attorney and we'll try to pick that up at a later
23  time okay? I've got to break. Why don't we
24  discontinue the deposition at this point?
25      MS. LYDE: It's 4:42 PM. The deposition

1  of Thomas Coury will be continued at a later date.
2  Thank you.

SHEET 1  PAGE 1

1  1          ALBERT RODRIGUEZ: Ladies and
2  Gentlemen please be advised that video
3  operation is now on. It is April 15, 2002,
4  10:06 a.m. camera time. Today's date as I
5  just said is April 15. My name is Albert
6  Rodriguez, my address is 4126 Spruce Park,
7  Lebanon, Pennsylvania, 17046. I have been
8  hired by PR Video to do this video deposition
9  for the plaintiff. This case is in the
10 United States Court for the Middle District
11 of Pennsylvania. It is docketed at 1-CD: 01-
12 0084. The caption is Darrell G. Ober versus
13 Paul Evanko et. al. The deponee is
14 Lieutenant Colonel Thomas Coury.
15         ALBERT RODRIGUEZ: Lieutenant
16 Colonel please raise your right hand. Do you
17 understand that this is a legal proceeding
18 and do you swear to truthfully answer the
19 questions asked of you?
20         THOMAS COURY: I do.
21         ALBERT RODRIGUEZ: Would counsel
22 please identify themselves and provide their
23 address and phone number for the record.
24         MR BAILEY: Yes my name is Don
25 Bailey. I represent the plaintiff Darrell G.

PAGE 2

1  Ober, in this case. My address is 4311 North
2  6th Street, Harrisburg, PA 17110. Phone
3  number is 717-221-9500 the fax is 9600.
4          BARBARA CHRISTIE: Barbara
5  CHRISTIE, chief counsel, Pennsylvania State
6  Police, my office address is 1800 Elmerton
7  Avenue, Harrisburg, PA 17110. Office number
8  is 717-783-5568.
9          JOANNA REYNOLDS: Joanna Reynolds,
10 I'm the assistant counsel with the State
11 Police. I represent the defendants in this
12 matter and my address and phone number are
13 the same as the Chief Counsel.
14         ALBERT RODRIGUEZ: You may begin.
15         MR BAILEY: Thank you. Good
16 morning Colonel. How are you?
17         THOMAS COURY: Fine, Mr. Bailey.
18 How are you?
19         MR BAILEY: I'm just fine. I want
20 to go back, try to get you out of here as
21 soon as possible. I'm sure counsel concurs,
22 that's beautiful weather out there. Isn't
23 it? So I try to pick up basically where we
24 left off. I'm going to tell you what format
25 I'm going to follow. Do the following

PAGE 3

1  things. I have some questions for you about
2  the museum inquiry.
3          THOMAS COURY: Yes sir.
4          MR BAILEY: Concerning Captain Ober
5  and the museum issue, and your roll in that,
6  and what you know about that. I have some
7  questions having to do with the relationship
8  with, discussions with Colonel Evanko about
9  issues pertaining to the investigation. Just
10 a few follow up questions on that. The
11 investigation of Captain Ober. I want to ask
12 you some also about the, now Lieutenant
13 Colonel Conley, and some of the things that
14 passed through you, between you on, Darrell
15 over there. And lastly, I have a few
16 questions for you just on your knowledge
17 given your years of experience on policy and
18 practices in the Pennsylvania State Police,
19 particularly as they pertain to transfers.
20 So beginning at the beginning, the museum
21 investigation. There's no need to go through
22 that introductory stuff. Is there?
23         A: No sir.
24         Q: Then the deposition is
25 continuing, so I won't waste your time with

PAGE 4

1  anything else. Okay, now if I understand it,
2  sometime on or about May 22nd, 1999, you were
3  the person that directed a supervisory
4  inquiry be conducted on Captain Ober. Is
5  that correct.
6          A: as I recall, yes sir, I'm not
7  sure about the date, but yes sir.
8          Q: Okay. Did you ever? Number
9  one. Did you ever review the results?
10         A: Yes sir.
11         Q: Who adjudicated that? Now
12 supervisory inquiry, they adjudicated an IAD,
13 a formal IAD complaint is adjudicated?
14         A: I've been away from it so long.
15 I'm not sure about all the, if it's
16 adjudicated in the exact same way, but there
17 is an adjudication on it.
18         Q: Okay. Are there any kind of
19 limitations on who may do an adjudication,
20 under what circumstances any particular
21 person may do an adjudication, or can anyone
22 do it?
23 Can a commanding officer do it? Can a,
24 somebody with an interest in the matter do
25 it? Do you know?

1         A:  It's typically done by someone
2  in the member's chain of command.  Certainly
3  higher than the member adjudicated, within
4  that chain of command.   An adjudication can
5  be done by anyone at the direction of the
6  commissioner.  In other words if the persons
7  direct commander might not be able to be
8  objective, or may have played a roll in the
9  investigation, the adjudicator could end up
10 being someone else.
11        Q:  But did you adjudication it?
12        A:   Could I adjudicate it?  Yes
13 sir.
14        Q:  Oh you could?  And did you in
15 this case?
16        A:  I believe I did sir.
17        Q:  And what did you base the
18 adjudication on?
19        A:  The contents of the
20 administrative inquiry report.
21        Q:  Well didn't you initiate the
22 inquiry?
23        A:  Yes sir.
24        Q:  And what was the basis of your
25 initiating the inquiry?

1    A:  As I recall, the museum had, people
2  from the museum, and when I say people from
3  the museum, I more specifically mean retired
4  Major Matt Hunt, retired Lieutenant Colonel
5  Phillip Conti, had mentioned to me on a
6  couple of occasions, where they thought there
7  was a violation of State Police rules and
8  regulations, being committed by Captain Ober,
9  in that Captain Ober would use his badge of
10 office, if you will, to contact recent widows
11 of members in order to obtain State Police
12 memorabilia and artifacts from them.  That
13 was brought to my attention at least on two
14 occasions that I can recall.  Verbally by
15 either Major Hunt or Lieutenant Colonel
16 Conley, and I told them that if they wanted
17 to make, or felt it necessary to make a
18 formal complaint, they should do that in
19 writing, and they submitted correspondence to
20 me.
21        Q:  Okay.  Well, you know, we all
22 know what the purpose of our whole system of
23 jurist prudence is.  You know, that's to
24 avoid, you know accusing somebody by
25 innuendo, and that sort of thing.  So let me

1  ask you some questions having to do with
2  proof in this matter.
3         A:  Sure.
4         Q:  First of all, you indicate
5  that Mr. Conley, and you say Mr. Hunt?
6         A:  Conti.
7         Q:  Conti, oh Phil Conti?
8         A:  Phil Conti.
9         Q:  Made some comments about Mr.,
10 expressed some concerns about Mr. Ober?
11        A:  Yes.
12        Q:  Verbally, you say.
13        A:  Yes.
14        Q:  Well, did Mr. Conley ever
15 submit anything in writing?
16        BARBARA CHRISTIE:  You mean Mr.
17 Conti?
18        THOMAS COURY:  Mr. Conti.
19        MR BAILEY:  Mr. Conti, anything in
20 writing?
21        THOMAS COURY:  Yes he did.
22        Q:  And you mentioned another
23 person, Hunt?
24        A:  Yes.
25        Q:  Who is that?

1         A:  A retired major from the
2  department.
3         Q:  And did he submit things in
4  writing?
5         A:  No.  Only Lieutenant Colonel
6  Conti did.
7         Q:  Did you summarize or submit a
8  statement yourself on what, you know, it
9  might have only been hearsay, on what you had
10 heard on this matter.
11        A:  No sir.
12        Q:  You didn't do that?
13        A:  No.
14        Q:  Did the investigator interview
15 you?
16        A:  I don't recall.  I don't
17 believe so.
18        Q:  You don't believe so?
19        A:  I don't believe so.
20        Q:  Now I was looking through the,
21 some of the enclosures here, that were in the
22 inquiry itself.  And one of them purports to
23 be, if I remember correctly, a letter from
24 Mr. Conti to you do you remember that?
25        A:  I recall a letter form him, sir.

SHEET 3   PAGE 9

1    Q: Do you remember what that letter
2 said?
3        A: Not specifically, no.
4        Q: Do you remember if that letter
5 indicated that Mr. Ober was doing something
6 wrong? I mean, did it contain an accusation?
7        A: I believe it did.
8        Q: How many letters did Mr. Conti
9 send?
10        A: Only one that I can recall, Mr.
11 Bailey.
12        Q: And the letter that he sent you
13 would be included, I mean that's something
14 you would have given to the investigator,
15 right?
16        A: Yes, it would have been an
17 attachment to the investigation.
18        Q: Okay. Now when he sent you this
19 letter, do you have a recollection of whether
20 or not he included any kind of correspondence
21 in it?
22        A: I believe the letter was the
23 correspondence, sir. I mean the letter was
24 making the allegation that he had recited to
25 me on two separate occasions.

PAGE 10

1    Q: Well let me, I don't know
2 where we are with exhibits on your
3 deposition. Do you folks know if we have even
4 had any? I don't think we have even had any.
5        BARBARA CHRISTIE: I don't think we
6 did have any exhibits marked with Colonel
7 Coury.
8        MR BAILEY: Give me just a moment.
9        THOMAS COURY: Yes Sir.
10        MR BAILEY: I didn't expect your
11 response to be what it was. I want to double
12 check something. For councils benefit I am
13 looking at enclosures 3 and 4 supervisory
14 inquiry. There's a letter here, May 22, 1999,
15 would you kindly take a look at that sir?
16        BARBARA CHRISTIE: Could you mark
17 that council and can we get a copy of it?
18        MR BAILEY: Yes, sure. Let the
19 records show it should be enclosure 3, the
20 supervisory inquiry. It's marked down at the
21 bottom.
22        BARBARA CHRISTIE: And are you
23 marking it Coury 1?
24        MR BAILEY: Sure, yes, I don't
25 think...

PAGE 11

1        THOMAS COURY: Yes, Sir.
2        Mr. Bailey: Yes.  Does that
3 letter contain some accusation to Darrell
4 Ober, do you know?  If it does can you point
5 it out to me. Giving you the benefit of the
6 doubt from where I am sitting. My question
7 would be as follows, give me anything there
8 that you can indicate to me, or tell me,
9 indicates Captain Ober is doing something
10 improper, or misrepresenting something, or if
11 its anything other than what might be an
12 improper propitiatory interest on the Conti's
13 part. Who knows, I don't know. What generated
14 that?  Can you tell me?
15        A: What generated this letter?
16        Q: Yes.
17        A: I don't recall what generated
18 this letter from Mr. Conti.  I didn't even
19 recall seeing it till you showed it to me
20 now. I don't recall this being the letter
21 that generated the inquiry. I am not saying
22 it isn't. I don't recall it being the letter
23 that generated the inquiry.
24        Q: So you're saying that there is
25 another letter somewhere?

PAGE 12

1        A: No I'm not saying that, I'm just
2 saying that I don't recall this being the
3 letter that generated that. I thought it was
4 a different letter. It could be this one.
5 But, in any event, and in response to your
6 question is, that the letter would tie into
7 the allegations that Mr. Conti made to me
8 verbally, and so there's a tie...
9        Q: Well, did Mr. Conti give a, you
10 don't know, statement or anything?
11        A: I don't know. I haven't looked
12 at that report since I adjudicated it sir.
13        Q: Well, I may be mistaken but I
14 think that you initiated the use of force or
15 complaint. Do you know, it's a processing
16 form; it was given the BPR control number IAD
17 number 1999-409 on May 27, 1999 at 12:35
18 hours. It was received by Captain Brown. Do
19 you have any reason to believe that is not
20 correct? That this information isn't correct?
21        A: No, sir.
22        Q: Okay, Well..
23        A: I think, Mr. Bailey, in order to
24 accurately answer you questions, what I need
25 to do is look at that entire packet that

1  you're referring to. I mean, it's very
2  difficult for me to accurately answer your
3  questions on bits and pieces sir.
4       **Q: Okay, no problem.  Here you go.**
5       A: Thank you sir. May I have a few
6  to look at this.
7       **Q: Yes, sir.**
8       BARBARA CHRISTIE: Counsel, while
9  your getting a cup of coffee, just a point of
10  procedure, you handed Colonel Coury about a
11  quarter of an inch thick packet of papers
12  witch I expect means your indication of what
13  this supervisory inquiry is. Do you wish to
14  break for the Colonel to review the material,
15  or do you wish him to review while we wait?
16       Mr. Bailey: I say he will be able
17  to go through that very quickly. It's not, a
18  lot of  that stuff is boiler plated I think
19  he will get through. And just so you know,
20  these are documents that I was able to
21  percuer during the document inspection, I
22  believe, if I remember correctly, that you
23  folks provided. You may, if there is more to
24  the file, and I'm not suggesting there is, is,
25  you would have it. So if you need a break or

PAGE 14

1  want a break, whatever. I think it's pretty
2  complete though, to my knowledge.
3       BARBARA CHRISTIE: Are you marking
4  the packet in total, as Coury 2?
5       MR BAILEY: You know what I'm going
6  to do, Barbara, is just ask you to co-
7  operate, to incorporate my reference. You
8  know it is an official document of the, it
9  has got a BPR number, and a supervisory
10  inquiry number, and you two may want to
11  confer, but I though we could, instead of
12  actually copying it, if we could incorporate
13  it by reference as an exhibit.If you want it
14  reproduced.
15       BARBARA CHRISTIE: I have no
16  problem..
17       MR BAILEY: I have no problem with
18  it.  If you want to have it reproduced, but
19  it's going to be cumbersome.
20       BARBARA CHRISTIE:  Right, all
21  right.  I have no problem incorporating it by
22  reference, but in order to do that I would
23  need a copy. We will put it on a high-speed
24  copy, should take a moment to copy it. Once
25  the Colonel has reviewed it.  And then you

PAGE 15

1  will be marking the packet in total as Coury
2  number 2.  Right?
3       MR BAILEY: Sure. No problem at all.
4  Sure.
5       BARBARA CHRISTIE: Okay.
6       MR BAILEY: Now that's all I have of
7  it, to my knowledge.
8       BARBARA CHRISTIE: Now I know that
9  you had to like put pieces of paper together
10  there, so I just want to ensure that we know,
11  by what's attached to the record, what you
12  compiled together as the supervisory inquiry.
13       MR BAILEY: So you know I was just
14  going to use parts of it, but it was the
15  Colonel that felt that he needed the whole
16  thing. And naturally, I am giving him what I
17  have.
18       BARBARA CHRISTIE: Okay.
19       MR BAILEY: So I wasn't planning to
20  do that. To accommodate the Colonel.
21       BARBARA CHRISTIE: Okay.  All right.
22  Well we'll make a quick copy of it so all of
23  us have it. We'll   make a copy for you. We
24  have the exhibit copy and we'll make a copy
25  for us. Okay.

PAGE 16

1       MR BAILEY: Thank you.
2       BARBARA CHRISTIE: Sure.
3       MR BAILEY: Can I get my coffee?
4       BARBARA CHRISTIE: Sure.
5       MR BAILEY: I am going to suggest.
6  We are running tape time up. Why don't we
7  suspend?
8       BARBARA CHRISTIE: Sure.
9       MR BAILEY: And shut down the
10  recording. Because we are just eating up tape
11  time. Now remember when this gentleman reads
12  camera time, our camera, it may differ by a
13  few minutes, it's a continuous run on the
14  camera clock. I noticed that a few of you
15  look at the clock like, oh that's off. And
16  it's on.
17       ALBERT RODRIGUEZ: That's no
18  problem.
19       MR BAILEY: Okay. Go.
20       ALBERT RODRIGUEZ: Suspending video
21  operations.   The time now is 10:27AM.
22  ALBERT RODRIGUEZ:  Video operations are now
23  on. April 15th.  Time now is 1:10 p.m.
24  camera time.
25       MR BAILEY:  Okay.  Thank you very

1 much, and we seem to be chugging away here on
2 this audio. Okay, Colonel, let me just ask a
3 couple question, try to do a little bit of
4 wrap up on the historic, on the Pennsylvania
5 Historic Educational Memorial Center, as it's
6 called. Did a little Internet access work
7 over the noon hour? Over on lunch break
8 here. Finance committee; are you not the
9 chairman of the finance committee, at least
10 as of today?
11        THOMAS COURY: As of today, yes
12 sir, after my retirement.
13        Q: Okay. And I noticed that
14 there's an Earl Hoffman, Edward Cantalone,
15 Kirk Trate, Ernest Spitler. Are any of them
16 active Pennsylvania State Police officers?
17        A: No sir.
18        Q: How about Frank Tully Jr., Dean
19 Hooper, Kurt Zimmerman, James Boyd, Rodney
20 Manning?
21        A: Rodney Manning is sir.
22        Q: Okay. Now Dean Hooper is a
23 friend of your family, is he not?
24        A: No sir. He's my neighbor.
25 He's an acquaintance. I don't know if I

1 would characterize him a friend sir.
2        Q: Well he. I'm sorry.
3        A: He's my neighbor. I know him
4 personally and professionally. I don't know
5 if I would apply the term friend or not.
6        Q: Well he does significant
7 contracting with the Pennsylvania State
8 Police. Doesn't he?
9        A: I wouldn't, I don't know that
10 I'd characterize the significant, but yes he
11 has done contracts with the State Police sir.
12        Q: Well, your bid amount is one
13 hundred thousand dollars?
14        A: I don't know sir.
15        Q: Doesn't he have a number of
16 eighty, ninety thousand dollar contracts? If
17 you know?
18        A: I don't know sir.
19        Q: Okay. He work at AMP?
20        A: He did sir.
21        Q: With your wife?
22        A: No sir. I don't believe they
23 worked at AMP.
24        Q: Okay.
25        A: At the same time or together

1 sir. No.
2        Q: All right. Sales Committee:
3 Frank O'Rork, Min Martin, Arthur Cronin,
4 Joseph Stabler, Joseph Kelley, Gary Mysle.
5 Any of them Pennsylvania State Policemen?
6        A: Currently active, no sir.
7        Q: Okay. Now on the building
8 committee: David Bowser, Michael SelGrab,
9 David Davis, James Boyd, and Edward
10 Cantalone, appears again. Any of them active
11 members of the Pennsylvania State Police? If
12 you know?
13        A: I do. I just, I forget the
14 list of names. It was  Michael Selgrath
15 sir.
16        Q: All right. Artifacts
17 Committee: Matthew Hunt-Chairman, Arthur
18 Cronin, David Points, Mark Infintino, Kirk
19 Trate, William Grooms, James Hazen. Any of
20 those members of the Pennsylvania State
21 Police?
22        A: David Points.
23        Q: Okay. And Simmers - PSP
24 liaison, Captain Michael, I assume they are.
25        A: He would not be a member of any

1 of the committees. He's simply liaison
2 between the department and the museum.
3        Q: Right. Okay. All right.
4 That's the.I'm sorry.
5        A: I was just going to say that,
6 before we went on break, we were discussing
7 that one issue that had to deal with my
8 meeting with Major DeWire, and I just wanted
9 to close the loop on .
10        Q: Yes. No, you go right ahead.go
11 ahead, sure.
12        A: One of your final statements
13 was to me, as I recall, was something about,
14 and did I have any further discussions with
15 Major DeWire about Captain Ober. I don't
16 recall if you put that in the terms of stress
17 or not stress, and I said no that I didn't.
18 I do recall having one subsequent
19 conversation with Major DeWire about Captain
20 Ober, but it wasn't on the stress issue sir.
21        Q: Okay. As a matter of fact, I
22 don't think that. You signed on February
23 27th, 2001, a very, very, highly
24 complimentary performance evaluation. You
25 signed off on it for Captain Ober. Didn't

SHEET 6  PAGE 21

1 you?
2       A:  I don't recall doing it, but I
3 would think that I would have done something
4 like that.
5       Q:  Well don't you review
6 performance.
7       A:  yes sir.  I'm just saying I
8 don't recall doing it.  I had a lot of
9 performance reviews that I signed off at.
10       Q:  I've had, you know, I've done
11 it in the past, and I always took them very
12 seriously, and I know, it's not a reflection
13 on you.  A lot of people take them as
14 boilerplate.  But I used to take them very
15 seriously, and study them.  Do you, what was
16 your methodology.  Did you try, when you had
17 the opportunity to look at them and consider
18 them?
19       A:  I read every one of them and
20 decided whether I concurred with the bureau
21 director's evaluation or not.
22       Q:   If I told you that my best
23 recollection is, my best recollection now,
24 was that the interview that you had with Mr.
25 DeWire and Mr. Walker occurred after the

PAGE 22

1 amended complaint in this case was filed.
2 Does that refresh your recollection at all as
3 to when that discussion took place?
4       A:  No sir.  It does not.
5       Q:  But the one thing that you are
6 fairly certain of is that Mr., and I've been
7 saying it Lezario, it not Lerario is it, it's
8 Lazzaro.
9       A:  Lazzaro.
10       Q:  Lazzaro.  Mr. Lazzaro, and I
11 would like to make a request that the record
12 be corrected where I've mispronounced his
13 name.  If counsel does not object, can I make
14 that request?
15       COUNSEL:  No objections.
16       MR BAILEY:  Thank you.  Mr.
17 Lazzaro called you and, but he called you
18 Colonel, you didn't call him.  Right?
19 About..
20       THOMAS COURY: And it may not have
21 been a phone call as I said before, Mr.
22 Bailey.  It may have been a face-to-face
23 meeting in my office, but that is correct.  I
24 did not initiate the issue.
25       Q:  And I remembered you saying

PAGE 23

1 that.  It was initiated by Mr. Lazzaro.
2 Correct?
3       A:  Yes sir.
4       Q:  Okay.  All right.  Now in the
5 issue, the use of the names, just so the
6 records clear.  I did an Internet pull-up,
7 and I found at the end on the Pennsylvania
8 State Police historical, educational, and
9 memorial center, and by the way on the
10 Internet, I got it by starting, by just
11 punching in the Pennsylvania State Police.  I
12 wanted to see where it went.  It says
13 contributions to the Pennsylvania State
14 Police Center may be made payable to; PSP-
15 HEMC and mailed to Pennsylvania State Police
16 Historical Educational and Memorial Center,
17 1746 East Chocolate Avenue, Hershey, PA,
18 17033-1181.  Are there any facts known to you
19 that would indicate that, that information
20 may not be accurate as it appears on the
21 Internet.
22       A:  I have not looked upon the
23 Internet, but the information you gave me, as
24 far as the name, and the address, sounds
25 accurate.

PAGE 24

1       Q:  Okay.  All right.   I also have
2 a board of directors.  I just want to rapidly
3 go through this.  It's not very long.  As of
4 April 2002, Board President-Major William J
5 Regan, now he's retired you told me.
6       A:  Yes sir.
7       Q:  How about Major Mathew Hunt.
8 Is he retired?
9       A:  Yes sir.
10       Q:  How about Mr. David Bowser
11 senior.
12       A:  Not a member of the department
13 at any time.
14       Q:  Mr. Earl B Hoffman Jr.
15       A:  never a member of the
16 department.
17       Q:  Captain Kirk R. Trate.
18       A:  Retired.
19       Q:  Captain Frank O'Rork.
20       A:  Retired.
21       Q:  Corporal James Boyd.
22       A:  Retired.
23       Q:  Mr. Edward A. Cantalone was not
24 a member.  Right?
25       A:  Was a member for a couple

1  years.  Many.  Many, years, no.
2        Q:  Okay.  Lieutenant Colonel
3  Thomas Coury.
4        A:  Retired.
5        Q:  Sergeant Joseph Stabler.
6        A:  Retired.
7        Q:  Dean Hooper, we've been over,
8  Cronin, Spittler's been mentioned.  The
9  Honorable Lawrence Clark.
10       A:  Retired.
11       Q:  The honorable Frank Tulli Jr.,
12 Pennsylvania House of Representatives.  Was
13 he a former member?
14       A:  Never.  No sir.
15       Q:  Okay.  And James J. Manganell.
16       A:  Never a member sir.
17       Q:  Okay.  Now, counsel if you want
18 to put those in.  Their here.  Do you want
19 to look at this stuff?  These committee, I
20 mean it's off the Internet.
21       BARBARA CHRISTIE:  No I have no
22 need to counsel.
23       MR BAILEY:  Okay.  Do you know when
24 the complaint in this case in this case was
25 filed?

1        THOMAS COURY:  In this lawsuit?
2        MR BAILEY:  Yes.
3        A:  No sir, I don't.
4        Q:  If I told you I believe it was
5  on or about January 16th, 2001, would that be
6  roughly consistent with your knowledge.
7        A:  Gee, I don't even have a time
8  frame on it, Mr. Bailey.  I don't know sir.
9        Q:  Okay.  Well the employee
10 performance review that I'm looking at here,
11 which is Captain Ober's, runs from March
12 3,2000.  I'm sorry, from March 2000 to March
13 2001.  If you want to look at it, that's
14 fine, but do you have a recollection of at
15 least looking at, or reviewing, or becoming
16 aware of a performance evaluation, I suppose
17 would have been done by Major DeWire?
18       A:  Major DeWire would have done
19 it.  As his direct supervisor.  And the next
20 step in the reviewing process after Major
21 DeWire reviewed it, would be, would come to
22 me for my review.
23       Q:  Okay.  There's a date on here
24 of February 27, 2001, and with you signing
25 off on the same day, February 27, 2001,

1  saying you agree with the comments, strike
2  that, yes I'm sorry, that's correct.  That
3  you agree with the comments, with this
4  rating.  Do you have any reason to believe
5  that, that's not accurate?
6        A:  No sir.
7        Q:  All right.  Now, you got a
8  call, you have a recollection of receiving,
9  does this help at all, that you received the
10 call from Mr. Lazzaro prior to the 27th of
11 February, 2001?
12       A:  No, because there would be no
13 connection between that document and the call
14 from Lazzaro.
15       Q:  Okay.  And so you would
16 separate those things out completely, and
17 that sort of thing.  Right?
18       A:  Oh, absolutely sir.
19       Q:  Well, you're familiar, are you
20 familiar with any of the comments in this
21 performance evaluation?
22       A:  No sir.
23       Q:  Did you consider this
24 performance evaluation when you called Mr.
25 DeWire to talk about Mr. Ober?

1        A:  No.  Because I told.
2        BARBARA CHRISTIE:  Excuse me a
3  minute Colonel.  Which conversation are we
4  talking about, the stress conversation, or
5  the one other conversation with Major DeWire
6  that was not about stress.
7        MR BAILEY:  Well obviously, we
8  don't know what it was about, so we'd be
9  talking about the one where Mr. LazzaroE
10 either came personally or called, for the
11 purpose of discussing stress.  That one.
12       THOMAS COURY:  Would you restate
13 your question sir?
14       MR BAILEY:  Yes.  Did you look at
15 any of Captain Ober's performance evaluations
16 when you contacted Mr. DeWire to discuss the
17 issue of stress, which had extensively been
18 relayed to you by Mr. Lazzaro?
19       A:  No sir, I did not.  And the
20 reason for that is, as I had told you
21 earlier.  I told you that the term fitness
22 for duty was not applicable because that has
23 do with performance and everything.  I did
24 not view this as a department performance
25 type issue.  I dealt it more of a personal,

SHEET 8 PAGE 29
1  private type issue.
2         Q:  Okay.  Well, I understand.
3  But, I mean it would have been that would
4  have affected his work habits.  Wouldn't it?
5         A:  That's what I asked Major
6  DeWire about.  It may or may not have.  I
7  don't know.
8         Q:  May I ask why you wouldn't just
9  call DeWire up.  I'm not questioning your
10 methodology, and you can certainly explain
11 it, but why not call Mr. DeWire, and simply
12 say, hey is Ober having any problems or ..
13        A:  It's kind of sensitive.  I
14 don't think you do some of that stuff over
15 the phone sir.
16        Q:  Yes, I agree with that.
17        A:  It's something you don't repeat
18 outside of those doors.
19        Q:  Well, I want to thank Mr. Ober
20 who kindly went to retrieve something I
21 forgot.  I had one note on there, and I
22 couldn't remember in my mind, what it was, on
23 this lousy little scratch sheet of mine here.
24 But I did find it and I just remembered that
25 I had placed it there, and I couldn't

PAGE 30
1  remember what it was, and here I have it.  Do
2  you have a recollection at some point of
3  taking a Mustang, which had been taken
4  procession of by the Pennsylvania State
5  Police and prior to forfeiture running around
6  and using it?  Did you ever do that?
7         A:  I used it.  Yes, sir.
8         Q:  All right.  Does that violate
9  any Pennsylvania State Police regulations at
10 the time?
11        A:  No sir.
12        Q:  It doesn't.
13        A:  No sir.
14        Q:  It was not Pennsylvania State
15 Police property.  It was not government
16 property.  An action in forfeiture runs
17 against an intrium action, in other words,
18 it's against the thing.  Right?  When you do
19 an action in for.  Are you familiar with a
20 forfeiture action?
21        A:  No sir.
22        Q:  Okay.  Well, is it fair to say
23 that when the government does a forfeiture,
24 goes out and goes to acquire a piece of
25 property, it sues the property, it goes after

PAGE 31
1  the property, right, you know that.
2         A:  Yes sir.  Yes sir.
3         Q:  Okay.  Why would you take a
4  piece of property that did not belong to you
5  or the Pennsylvania
6  State Police, and run around in it or use it?
7         A:  A, I certainly don't agree with
8  your term, run around with it.  It was to
9  show the commissioner and to get some photos
10 taken with the vehicle.  And B, that car had
11 been turned over to the Pennsylvania State
12 Police, and we still have the vehicle, as
13 well as another Mustang.
14        Q:  Okay.  So it eventually was
15 subject to a forfeiture proceeding then?
16        A:  It was subject to forfeiture
17 before that sir.  The State Police never took
18 procession of that car, to my knowledge,
19 until all the forfeiture proceedings had been
20 done, and that vehicle was released to the
21 Pennsylvania State Police under agreement, I
22 would imagine from the Attorney Generals
23 office, but that's legalese and a question
24 for the counsel here, at some point.
25        Q:  Well, it's not legalese if the

PAGE 32
1  vehicle was impounded and supposed to be kept
2  somewhere and doesn't legally.
3         A:  That was not the case.  That was
4  not the case, Mr. Bailey.
5         Q:  Who was keeping it?
6         A:  When it was impounded?
7         Q:  Sure, if you.
8         A:  The State Police may have had
9  it during, it was impounded.  I don't even
10 know who seized that vehicle.  Perhaps that
11 vehicle wasn't even seized by the
12 Pennsylvania State Police.  Maybe it was
13 seized by DEA or some DA's office, but the
14 final disposition of that vehicle was given
15 to the State Police to use for community
16 services purposes.
17        Q:  It was?
18        A:  Yes sir.
19        Q:  Who made that decision?
20        A:  That it was going to be used
21 for community services purposes?
22        Q:  Yes.
23        A:  The commissioner.  I recall
24 going to him and asking him, to use that
25 vehicle for community services.

1    Q:  Has the Pennsylvania State
2 Police ever provided information to any
3 legislative committees about the reasons and
4 purposes of forfeiture, and responded to
5 questions about the abuse of forfeiture
6 proceedings in our country?
7         A:  I don't know sir.
8    Q:  Where's that car today?
9         A:  It's at the State Police
10 Academy.
11    Q:  The reason I got into, the
12 reason I asked these questions is, it's my
13 understanding that an acquisition was made
14 for some type of display vehicle.  I start
15 nosing around to try to find out this display
16 vehicle used by the Pennsylvania State
17 Police, some purchase was made for twenty
18 thousand dollars.  If I, maybe I'm mistaken,
19 but did you not okay that?
20         A:  The purchase of what sir?
21    Q:  Of a model of a car to be used
22 in community relations, a little model cars,
23 cast iron cars, you see these; you know these
24 little cast iron models of cars?
25         A:  Yes sir.

1         Q:  Did you, and I may be in error
2 here Colonel, and off on a tangent without
3 even realizing it.  Did you ever play a roll
4 in requesting or signing a contract, or
5 having a contract drawn up, where the State
6 Police would take twenty thousand dollars or
7 so of taxpayer money to purchase a model, a
8 cast iron model of a car for giveaways.
9 Cost about four or five dollars, if I
10 remember correctly.
11         A:  No sir.  The department never
12 entered into any project like that.   The
13 museum had a project, that was not, didn't
14 have anything to do with the State Police.
15    Q:  Okay, let me go back then.  Was
16 it the museum then that did this?
17         A:  yes sir.
18    Q:  Okay.  All right.  Now the
19 museum that you're talking about is the
20 Pennsylvania State Police Historical
21 Educational Memorial Center.
22         A:  Yes sir.
23    Q:  You don't mean the museum
24 downtown.
25         A:  No sir.  It's the Pennsylvania

1 State Police Historical Educational Memorial
2 Center.
3    Q:  So no taxpayer money went into
4 that.
5         A:  No sir.
6    Q:  Excuse me one second.   I could
7 be suffering from misinformation, but I'm
8 going to ask you this question.  Tell us what
9 you know about that, those cars, those little
10 model cars.  I want to know everything you
11 know about it.
12         A:  That the museum had them made
13 to raise funds, to sell to raise funds for
14 the museum sir.
15    Q:  Did the Pennsylvania State
16 Police, any of its members, any of its work
17 product, have anything to do with that
18 project or those cars?
19         A:  Somebody from the museum
20 project probably went up and took pictures of
21 the car to use, to make the model but.
22    Q:  No, I don't mean that, that's
23 certain, I understand, and I don't think, I
24 would be with you, I'm sure, that's no big
25 deal.  No, I'm talking about the purchase or

1 acquisition of the model cars.  Do you know
2 if anybody?
3         A:  No sir.  Not that I'm aware of.
4    Q:  Okay.  All right, I may be
5 mistaken.
6         A:  I could tell you that at one
7 point, the department considered purchasing
8 some of those models from the museum to use
9 for community services giveaways.
10    Q:  Maybe that was it.
11         A:  But that did not occur, because
12 once we looked at it, that would have been a
13 conflict because you should go out on, you
14 shouldn't soul source that.  That should go
15 out for competitive bid, etcetera, etcetera,
16 and that was the end of it.   The department,
17 to my knowledge, never even bought any of
18 those vehicles, to use in community services,
19 as giveaways.
20    Q:  Okay.  What I'm looking at
21 Colonel, so you know where I'm coming from
22 with this line of questioning, when I come up
23 with these things.  It may seem, you know,
24 may not seem related, is I'm trying to look
25 for the standards, in cases where you know

1  about a fact situation appertaining to the
2  Pennsylvania State Police Museum or
3  appertaining to the acquisition of
4  memorabilia, that you know what standards you
5  set for investigating someone or anyone.  My
6  understanding is that you're view of what
7  came to you, you're position is, that what
8  came to you about Darrell Ober allegedly
9  going out and acquiring or trying to acquire
10  memorabilia was looked at simply in terms of
11  somebody communicated some substance of a
12  complaint here, without consideration for
13  what it was about, or who it had to do with,
14  you just did it through channels.  Is that,
15  do I have it correct?  You just did that, I
16  mean you got some information, treated it the
17  way you would any other similar situation,
18  and had it checked out.
19          A:  I think I followed according to
20  what department procedures.
21          Q:  All right.  Now did you discuss
22  that, that matter with Colonel Evanko?
23          A:  I would be very surprised if I
24  did.  It was just not that big of a deal.  It
25  was not something that you would bring to a

1  commissioners attention.
2          Q:  The answer is you don't know.
3  But you would be very surprised if you did.
4          A:  I don't know.  I would be very
5  surprised if I did.
6          Q:  Okay.  Sir there was a memo on
7  training.  Let me see if I can find it.  I
8  want to ask you about something you did on a
9  training request.  Oh, yes.  Let me see if I
10  can go back through this poorly equipped
11  brain of mine and come up with.  Okay, I'm
12  thinking back in terms of some previous
13  questions we have, to a date time group some
14  time in October, I believe, of 1999.  And if
15  I remember correctly on or about October 19,
16  we've had some testimony or documentary
17  evidence that indicates, that on or about
18  October 19th, 1999, Captain Darrel G. Ober
19  makes a request to go to a one-week training
20  thing.  If I am not mistaken, he is told at
21  some point by you, in a memo that you had
22  drafted through, I forget who the individual
23  was who drafted it, Mr. Einsel, is the
24  individual, and that he was late in time.  Do
25  you remember that incident?

1          A:  No sir, I don't.
2          Q:  Well, do you have a
3  recollection of November 1 of 1999, signing a
4  memo to Captain Ober, telling him that his
5  request for specialized training at
6  Northwestern University Traffic Institute,
7  was received after the October 22nd deadline,
8  and that because his memo wasn't received by
9  you until October 28th, 1999.  Before you go
10  on, let me tell you what this is about, so I
11  can bring you and your counsel up to snuff.
12  Give you a little bit of an offer here.  We,
13  when I was looking through these documents
14  that were offered to us as a result of our
15  document request, I found a little thing with
16  a little squib in the corner of it, had to do
17  with this matter here, where a Becky Brown
18  signs this thing about the memo being, coming
19  in from, the request, coming in from Captain
20  Ober with at date of October 20.  Now when
21  your memo comes back to Captain Ober denying
22  him, he's told that his memo was untimely
23  because it didn't arrive until October 29.
24  I'm sorry sir, October 28 of 1999.  Now we
25  know it was in the appropriate office on

1  October 20, documents show that.  Do you have
2  any recollection of sitting on something for
3  a week to either harm him, or to skewer it a
4  little bit to hurt him, or anything like
5  that.  Did you do anything like that?
6          A:  No sir, and the information
7  you're providing to me now about his training
8  and everything, is the first I've heard of
9  anything about any training, that I can
10  recall, about Captain Ober.
11          Q:  Well.
12          BARBARA CHRISTIE:  Counsel can we
13  just, excuse me, clarify, when you say Becky
14  Brown, to my understanding works here, and
15  you say that would be in the appropriate
16  office, do you mean Becky Brown, and when you
17  say his memo, do you mean Colonel Coury's
18  memo, because I think you also indicated that
19  it was authored by, and initialed by Major
20  Einsel.  Just to clarify although I think the
21  witness already answered the question, but
22  because the question contained some confusing
23  recitations in it, I'm just looking for
24  clarification.
25          MR BAILEY:  Sure.  To begin with,

SHEET 11  PAGE 41

1 my recollection, we went over these
2 documents, they were exhibits and questions
3 were raised about them in a number of prior
4 depositions. And that was the document where
5 there was the little hand written portion and
6 I'd raised objections that it was not
7 included in the file. Somebody had purges
8 the file of it. Lord knows who, some Forrest
9 Sprite, from somewhere. But it had been, it
10 was gone, it was out of there, and so we
11 asked about that because it raised a very
12 cogent issue, you know, issued having to do
13 with adverse employment actions. When I
14 researched this issue and let me confer with
15 my client for a minute, to make sure my facts
16 are right, as you know, one of the
17 difficulties with the system is that we have
18 to translate everything through us lawyers,
19 but the fact is, as I recollect it, common
20 parlance, Darrell goes in makes a timely
21 request for training. My understanding and
22 what I've learned over the years in working
23 on Pennsylvania State Police cases, normally
24 this kind of thing would be approved, it's a
25 value to the Pennsylvania State Police, a

PAGE 42

1 value to him, a value to everybody concerned.
2 It's timely received on October 20th.
3        BARBARA CHRISTIE: But where is it
4 timely received? When your saying, it's in
5 the appropriate place, as of Ms. Brown's,
6 whatever you researched, that she indicates
7 by that notation it's in the right place,
8 which I guess is her place, on 10/20, it's to
9 my understanding Ms. Brown is in tech
10 services at that point, not in Colonel.
11        MR BAILEY: Okay.
12        BARBARA CHRISTIE: Office or in
13 Major Einsel, acting for Colonel Coury at
14 that time office.
15        MR BAILEY: All right, her note
16 indicates it was forwarded to personnel on
17 10/20.
18        BARBARA CHRISTIE: To personnel on
19 10/20.
20        MR BAILEY: Yes.
21        BARBARA CHRISTIE: Okay. Just for
22 clarity.
23        MR BAILEY: Well, it has to be
24 approved by Colonel Coury, that's the only
25 thing we know. And we know that he's told,

PAGE 43

1 that Darrell is told, that, you know, we had
2 file notes which was taken out, as I said,
3 okay, somehow it's missing from the files
4 that we were given.
5        BARBARA CHRISTIE: All right.
6 Although the response to that memo was in the
7 file, which referenced that memo.
8        MR BAILEY: Well the response would
9 have indicated that he did not.
10        BARBARA CHRISTIE: So apparently
11 the elves didn't grab both of them. They
12 just took the memo.
13        MR BAILEY: Well the elves have
14 made a number of errors in this case. Very,
15 very significant ones, we think. And that's
16 one of them, because it's not the only case
17 we have of things being missed from the
18 files, you know, but, whatever, you know, the
19 Forrest Sprite did, Smucksy fine ones that
20 they be, the point is they take this stuff
21 from out of the, you know, files, whoever
22 they are.
23        BARBARA CHRISTIE: Do we have a
24 question on the table by the way, counsel,
25 before we engage this conversation. I was

PAGE 44

1 just trying to get..
2        MR BAILEY: yes we do. Yes ma'am.
3 Oh, I'm just giving you a little background
4 information, on this thieving little sneak,
5 whoever it might be. Well here's what our
6 indication is. Darrell Ober goes and he
7 sends in timely fashion, a request, he sends
8 this request in, and anyway it's in time, I
9 think the deadline he's supposed to have it
10 in by is the 22nd. He files it by the 19th.
11 It goes to personnel, on the 20th, it's
12 forwarded, okay personnel receives it, they
13 send it out.
14        BARBARA CHRISTIE: I thought that
15 you just said that the tech services
16 forwarded to personnel on the 20th. And
17 again, I'm just recalling what you said. I
18 don't have those documents in front of me,
19 nor does the witness.
20        MR BAILEY: Yes. Anyway, all we
21 know, is it took eight days to get from
22 personnel to Colonel Coury, and it would have
23 been, you know, he could have gone to the
24 school anyway. But, that's, you know, he was
25 disallowed, and from what I can find, again,

1 just doing my little checking around with
2 folks, these kind of things rarely, I mean
3 even if it somehow lay in a corner somewhere,
4 hidden, or forgotten, or lost for eight days,
5 that, you know these kind of things are not
6 turned down, unless it's impossible to do
7 them.  In this case, a technical date was
8 adhered to, and the information, we know, got
9 there on time.  My question was simply going
10 to be; the documents clearly establish what
11 happened.  All I was going to ask the Colonel
12 was, if he remembers it, and if he did,
13 whether it was ever investigated.  I don't
14 expect him to say he put it in his pocket for
15 eight days, if that's you're asking me.
16         BARBARA CHRISTIE: Well if, okay,
17 if he remembers what though.getting the memo.
18         MR BAILEY:  If remembers the
19 incident, if he remembers anything about it,
20 he would know, you know, in working on this
21 case, it ever came up before him, you know,
22 if he's reviewed documents, has any awareness
23 of it, that sort of thing.
24         THOMAS COURY:  I do not have any
25 recall of Captain Ober putting in for

1 training.  The only thing I would say to you,
2 is you had said that typically these types of
3 training are approved.  I don't know that,
4 that's the case, because I don't even know
5 what type of training we're talking about
6 here.  Not all training is typically
7 reviewed, or approved rather.
8         MR BAILEY:  I didn't mean that.  I
9 didn't mean that all training, I meant that
10 in situations where schools, or trainings
11 don't start, and there's enough time to do
12 them.  That if, certainly when there's a
13 reasonable explanation that some thing either
14 was lost or waylaid through no fault of the
15 requester, whether or not that serves as the
16 basis for getting rid of it.  You know,
17 that's all.  I think you've pretty much
18 answered it, but.  Colonel, I want to ask you
19 just a few questions about a, an Internal
20 Affairs division meeting, dated October 12th,
21 1999.  Do you have any recollection of Major
22 Conley either denying Captain Ober an
23 opportunity to attend that meeting and were
24 you aware of it?
25         A:  I don't recall that at all sir.

1         Q:  Do you have any recollection of
2 Colonel Conley, who probably would have been
3 a Major at that time?  I'm not sure.  October
4 12, 99.   He would have been a Major I
5 guess, still at that time.  Do you have a
6 recollection of Major Conley, in October of
7 1999, discussing Captain Ober or any IAD
8 matter at all, any kind of meeting, with
9 Captain Brown, incidentally, as a go between
10 or somebody that was to deliver information.
11         A:  I don't recall that sir.
12         Q:  Okay.  Now do you know a
13 Leonard Washington?
14         A:  yes sir.
15         Q:  Did you ever have any
16 discussions with Leonard Washington about
17 Captain Ober and PEMA.
18         A:  I don't recall any sir.
19         Q:  Did you ever have any
20 discussions with Captain Skirkis?   I guess
21 he's now a Major.
22         A:  No, he's a Captain, as far as I
23 know sir.
24         Q:  Still a Captain, okay.  Do you
25 ever have any discussions with Captain

1 Skirkis about Darrell Ober?
2         A:  In relationship to.more
3 specifically
4         Q:  PEMA.  In relation to PEMA.
5         A:  Not that I can recall, because
6 PEMA didn't fall under me, so it's not
7 something that, Captain Ober was under my
8 command.  PEMA was not; it was operation
9 stuff, so.
10         Q:  But for somebody to be detached
11 to, or to be available for that duty, would
12 require your permission.  Wouldn't it?
13         A:  No sir.  It would require the
14 commissioner's permission.
15         Q:  Oh.  So you.
16         A:  It depends on the nature, I
17 mean if one of the other deputates wanted a
18 member, usually that would go through the
19 commissioner, in other words if deputy of
20 staff wanted Captain Ober assigned to
21 something, it would go to the commissioner,
22 and the commissioner would say to me, you
23 know, he should be released, and so on and so
24 forth, so it depends on the nature of it, but
25 for PEMA, PEMA didn't come under me.

1          Q: But here's my question. It's a
2 little wee bit different. Do you have a
3 recollection of anybody, whether it was the
4 commissioner, whether it was Mr. DeWire,
5 whether it was Mr. Washington, Koslcenik, Mr.
6 Koslcenik, anybody making a request or an
7 inquiry of you, regarding Darrell Ober, and
8 assignment to PEMA?
9          A: No sir. I do not recall
10 anything to that nature.
11         Q: But you see, Colonel, the way
12 you've explained things, and maybe you can
13 help me clarify it in my mind, because I'm, a
14 little bit confused, just a little bit
15 confused. If somebody wanted, let's say
16 Darrell Ober wants to serve on PEMA and he's
17 out there working for Major DeWire.
18         A: Right.
19         Q: And let's say Major DeWire is
20 in favor of it, and let's say Mr.
21 Washington's in favor of it. Okay?
22         A: Yes.
23         Q: The route that, that request
24 would take, it would actually go to the apex,
25 to the commissioner before it came back to

1 you, from what you're telling us. Or would
2 it go to you first, before it got to the
3 commissioner?
4          A: If Captain Ober put in a
5 request to serve, let's say on PEMA. It
6 would go through Major Washington.
7          Q: yes sir.
8          A: it would come to me and then it
9 would either go over to Colonel Westcott or
10 Colonel, well I ended up taking over
11 operations, so it would have been, it would
12 go to the deputy operations, or to the
13 commissioner. It could go either place. But
14 I couldn't approve it. I can't approve
15 sending somebody to PEMA, when PEMA is not
16 under me, I mean, I would have to go over to
17 deputy of operations and say.
18         Q: I understand.
19         A: Okay.
20         Q: But you would make an initial
21 decision, I mean, let's say.
22         A: I would endorse it.
23         Q: Yes, that's what I mean. Let's
24 say this happened. Let's go though the
25 scenario you painted. Ober say's, I want to

1 serve with PEMA. Okay? So he checks with
2 his Major, fine, good, I'll recommend you or
3 appoint you, whatever, okay. And that's
4 Major DeWire, let's say. Or let's say he's
5 politicking for the position, or asking about
6 it, or whatever it happens. Let's just say
7 that we're at this stage. Mr. Washington
8 plays a roll here, I guess, because he is
9 part of the administration of PEMA, as I
10 understand it. Right?
11         A: Yes.
12         Q: Yes.
13         A: Washington wasn't under me at
14 that time.
15         Q: No sir.
16         A: Okay.
17         Q: Okay. But you know, you're
18 around checking, you need somebody, I want to
19 do this, and, you know, one of the logical
20 things you do. Do you have a need, and hey,
21 if so, can I do that. For example, we heard
22 from Captain Skirkis about how he didn't want
23 to do it. Okay? But we also heard from
24 Captain Ober, that he wanted to do it. So
25 lets say we're at this stage. We've got

1 Captain Ober wanting to do it, making his
2 desires and wishes known. We've got Mr.
3 Washington, who is in favor. We know that
4 for a fact. Okay?
5          A: Yes sir.
6          Q: And we have, either Mr. DeWire
7 or I believe, Mr. Kolsenick. I'm not sure.
8 Yes. Major DeWire, and he's fine. It's okay
9 with him. You seem to be testifying here
10 today, that based on your recollection, as
11 you sit here today. This thing never reached
12 you?
13         A: October of ninety-nine? Is
14 that the time frame, I believe you state?
15         Q: Okay. I may be, let me check
16 on when you became director of office. I
17 think.
18         A: July of 2000.
19         Q: That's when it's occurred.
20 That's when this occurred. And I'm trying to
21 figure out when it fits in the box. The, my
22 understanding sir, is that this issue arises
23 as a request by Captain Ober sometime around,
24 around July of 2000. And I think Mr.
25 Westcott is either leaving, or about to

1  leave, around that time.
2          A:  He left in July of 2000.
3          Q:  Okay.  Did he ever, you know,
4  usually you do this transition thing, I mean,
5  I know the way you fellows do it.  You know,
6  you sit down and hey what's hanging fire,
7  then you come in, okay.  Did you have one of
8  those hanging fire meetings with Mr.
9  Westcott?
10         A:  Yes.
11         Q:  Do you have a recollection of
12  Darrell Ober being mentioned during that
13  discussion?
14         A:  No.  I can recall discussion,
15  and it involved Colonel Westcott, and I
16  recall Darrell's name, and I recall PEMA.
17         Q:  Right.
18         A:  But I don't recall.
19         Q:  What.
20         A:  What, or why, or anything like
21  that, because it just didn't come under me,
22  it wasn't.
23         Q:  Well.  No but you.
24         A:  Didn't involve me sir.
25         Q:  Well, it was, that's what I'm

1  trying to pin down here, and I know you're
2  not being evasive.  It's just, I'm not being
3  clear, because I don't know the system well
4  enough.
5  But it would involve you in the sense that
6  you would have to approve it, because you
7  were technically his boss.
8          A:  Yes.  If somebody came and
9  asked me for him.
10         Q:  Right.  Yes, I understand that,
11  and that's what I'm trying to decipher here.
12  I'm trying to find out what occurred here,
13  because we already have quite a bit of
14  background on this.  The bottom line is, you
15  remember some discussion, but you don't
16  remember the details of the discussion with
17  Captain, or with the then Lieutenant Colonel
18  Westcott about it.
19         A:  Well, I can tell you that no
20  one ever came to me and asked me for Captain
21  Ober and for PEMA.
22         Q:  Okay now, to straiten out he
23  procedural line is that, you're presuming if
24  someone had came, had come to you and asked
25  you, you would have made whatever the

1  appropriate decision would have been at the
2  time.  You would have made that decision.
3          A:  Yes.
4          Q:  You're best recollection is
5  that no one did come to you and ask.  That
6  you can remember.  That you can remember.
7          A:  That's correct sir.  Not that
8  I, I do not recall anyone coming and asking
9  me, for my opinion, or asking for Captain
10  Ober.
11         Q:  Okay.  Do you have any
12  recollection of any kind of meetings or
13  discussions at all where PEMA and Ober were
14  brought up, either with the commissioner or
15  in his presence?
16         A:  No sir, I don't.
17         Q:  Okay.
18         A:  You know, if I could clarify
19  that chain of command issue.
20         Q:  Sure.  Please.
21         A:  Because we had me injected in
22  this whole thing, and everything, but, so
23  lets leave the names out, and just go with
24  positions.
25         Q:  All right.

1          A:  If Captain Ober was under Major
2  DeWire's command, that would have been in
3  operations.  So the channel would have been,
4  Captain Ober to Director of Liquor Control
5  Enforcement, to the Deputy Commissioner of
6  Operations, and .
7          Q:  Which was you at that time.
8          A:  No.  It would have been.
9          Q:  Would have been Mr. Westcott
10  then.
11         A:  No.   It depends on the time
12  and everything.  That's right.
13         Q:  If it was March 2000, it would
14  have been Mr. Westcott.
15         A:  Right.
16         Q:  If it was September 2000, it
17  would have been you.
18         A:  It would have been me.
19         Q:  And this thing seems to be on
20  the cusp.  We don't know where it is.
21         A:  Yes.
22         Q:  Okay.  Remember that, when you
23  and I have been talking about the issues
24  surrounding Mr. Lazzaro's call to you and
25  Captain Ober, allegedly being stressed, or

1  something of that sort.
2          A:  yes sir.
3          Q:  And you had commented about
4  grievances.  That he had filed some
5  grievances.  And you more or less said it
6  just like that, as I recollect.  He had filed
7  some grievances.  Do you have a recollection
8  of how many grievances he filed?
9          A:  No sir.
10          Q:  Do you have a recollect.
11          A:  I'm sorry.  It may in fact,
12  have only been one.  I don't recall.
13          Q:  Okay.  Do you have recollection
14  of whether or not these grievances involved
15  significant amounts of money at the time?
16          A:  I don't recall.
17          Q:  Do you remember one concerning
18  a reimbursement request for a hotel room with
19  some FBI agents?
20          A:  Yes I do.
21          Q:  Tell me what you remember about
22  that.          A:  I can recall that
23  Captain Ober had been on an assignment where
24  he took a, on a day off, went to western
25  Pennsylvania, rented a motel room on a day

1  off, and rented a motel room, and then
2  subsequently sometime after the date that
3  this transpired, meaning months and months
4  and months, retroactively went back and
5  submitted a leave slip to show himself on a
6  working day that day, and expenses to pay for
7  that motel room.
8          Q:  Well, do you have a
9  recollection of whether or not he was denied
10  on that request?  It was a request for
11  reimbursement, right?
12          A:  Yes.
13          Q:  And do you know whether he was
14  denied?
15          A:  No, he was not denied.
16          Q:  He was not denied?
17          A:  He was not denied.
18          Q:  Well then he didn't..
19          A:  You mean originally he was
20  denied.  Yes.
21          Q:  Okay.
22          A:  I thought you meant after the
23  grievance procedure or lost and damaged
24  processes, is what it was, actually.
25          Q:  Yes sir.  I meant.

1          A:  Initially he was denied.
2          Q:  Okay, and your best
3  recollection of the facts that you described,
4  if he was on a day, why was he denied, or
5  why did he win that grievance, if you know?
6          A:  I don't recall.  The board
7  ruled in his favor, and thought that he
8  should be, that the department should pay for
9  that.
10          Q:  And wasn't that the FBI meeting
11  where the information came up that there
12  might be somebody in the Pennsylvania State
13  Police involved with Mr. Stanton, or maybe
14  someone in the Governors office?
15          A:  Yes sir.
16          Q:  Was he denied the reimbursement
17  for that reason, out of anger?
18          A:  No sir.
19          Q:  Did the commissioner play any
20  part in that denial?
21          A:  Not that I recall sir.
22          Q:  Did you?
23          A:  Yes sir.
24          Q:  Well, did the buck stop with
25  you on that occasion or did you discuss it

1  with the commissioner?
2          A:  I don't recall discussing it
3  with the commissioner, so I would say the
4  buck stopped with me.
5          Q:  Okay.  Now, do you specifically
6  remember if you were the person who denied
7  that grievance?  Or whether it was someone
8  below you who, strike that.  Did someone
9  below you in the chain of command recommend
10  denying that grievance before, strike that.
11  I'm sorry.  Let me unravel this for myself.
12  Did anyone below you in the chain of command
13  deny the reimbursement before it got to you?
14          A:  I believe the Director of the
15  Bureau of Professional Responsibility.
16          Q:  And that was at that time Major
17  Conley.  Am I correct?
18          A:  Yes sir.
19          Q:  Okay.  Now did you discuss that
20  with Major Conley?
21          A:  Yes sir.
22          Q:  Well Major Conley indicated
23  similarly, I think, during his deposition,
24  that you folks discussed it.  What were Major
25  Conley's objections to that request for

1 reimbursement?

2          A: That it was done so far after
3 the fact. That Captain Ober had been a
4 member of his command and gone out on a day
5 off and rented a motel room, without ever
6 submitting any reports at that time, or
7 making the Major aware of it, and that's
8 compounded by the fact that, many, many,
9 months afterward, now he submits
10 correspondence, paperwork to change that from
11 a day off to a working day, and to have this
12 room that was put on his, probably his
13 personal credit card, I don't recall how, but
14 to be reimbursed for that.

15          Q: But sir, didn't he have,
16 whether you folks agree, I've already had the
17 discussion with you. There's no reason to
18 visit it, about chain of command, and
19 targets, and who you share information with,
20 and, you know, I have questioned you
21 extensively on that. I don't want to revisit
22 that. There's no need for us to. But do you
23 remember my asking you those kinds of
24 questions?

25          A: Yes sir.

1          Q: Okay. Lets keep those in the
2 back of your mind for a moment, while I ask
3 these follow-up questions. Given that
4 background, those questions, and what we know
5 now, didn't Captain Ober have a good reason
6 for not submitting the reimbursement request
7 right away? In other words, there was a
8 method to what he was doing. There was a
9 reason for it. Was there not?

10          A: Not in my mind.

11          Q: Well, we know that. And I'm
12 sure you already disagree with the
13 arbitration panel, or arbiter, or wherever it
14 was decided. I don't know how far it got
15 there. But eventually, he prevailed, with
16 the, and got the reimbursement. Am I
17 correct?

18          A: Yes sir.

19          Q: All right. So somebody
20 respectfully disagreed with your analysis of
21 that. Correct?

22          A: Yes sir.

23          Q: And in public administration,
24 that happens everyday. Right?

25          A: Absolutely.

1          Q: You win some, you lose some.
2 Right?

3          A: Yes sir.

4          Q: Okay. Now, and even knowing
5 what we know today, does it still bother you
6 or offend you that Mr. Ober won that
7 reimbursement? I know you still feel he
8 shouldn't have won it. I'm sure. You do
9 feel he should not have gotten the
10 reimbursement.

11          A: That's correct. I do feel that
12 way.

13          Q: What's the reasoning?

14          A: What's the reasoning?

15          Q: Knowing what you know now.
16 What's the reasoning?

17          A: That it was put in for after
18 the fact. I think it's improper that a
19 member put in for a vacation day, go out and
20 do department work, pay for it himself, and
21 two years down the, scratch that, not two
22 years, but considerably later.

23          Q: Right.

24          A: Put in for reimbursement. What
25 would have happened, and this is just

1 rhetorical, what would have happened that
2 day, if Captain Ober, on his day off, gets
3 involved in a crash on the Turnpike? Is he
4 going to call the department and say, oh, hey
5 I activated myself and now I want workman's
6 compensation. I want compensated. Where
7 would the buck stop, in other words, after
8 this retroactive submission for annual leave
9 and reimbursement? Could he have also put in
10 documentation and say, and oh by the way, I
11 had overtime that day, and I should have
12 overtime. I have a problem with the length;
13 I have a problem with the length of time that
14 elapse. It's one of the big issues with me.

15          Q: Well, isn't. Okay, isn't it
16 fair to say that you still disagree with
17 Captain Ober, in that you feel originally he
18 should have gone to Major Conley and reported
19 what the FBI had indicated to him? Right?

20          A: I thought he should have
21 reported. Yes.

22          Q: And if not to Major Conley. If
23 he had some reason for that, he should have
24 gone to Major Hickes, or Colonel Hickes, at
25 that time, he should have gone up, it would

1  have been more appropriate in fact to go to
2  you, than Colonel Hickes.
3           A:  It should have been within his
4  chain of command.
5           Q:  And in, isn't it fair to say
6  that the justification that Captain Ober had
7  provided was that, given his view of the FBI
8  roll, and his view of what he needed to do,
9  his responsibilities, we know you disagree
10 with that, but given his view of those
11 things, it was consistent that he would not
12 put in that request for reimbursement, at
13 that time.   And it was consistent with his
14 view, however erroneous it may have been in
15 your eyes, that, you know, going out there
16 and renting a room, and that sort of thing,
17 was consistent with what he felt he had to
18 do, to keep that, keep that situation hidden,
19 as it were.   On Colonel Hickes's orders.
20          BARBARA CHRISTIE:  Objection as to
21 form.        MR BAILEY:  You can respond
22 sir.
23          THOMAS COURY:  It may have been
24 consistent with what Captain Ober thought he
25 should do.  But what Captain Ober thought he

1  should do, does not mean that because he
2  thought it was consistent, that it should
3  become automatically consistent with me.  I
4  don't think it followed department rules and
5  regulations.
6           Q:  Okay.
7           A:  Which doesn't have any impact
8  on what, you know, Captain Ober thought was
9  consistent.  I'm not alleging that there was
10 any malice or forethought, or any contempt in
11 his heart, when he did all this.  It simply
12 didn't follow the fact that we would
13 retroactively put back on a day off and pay
14 them back wages for something that occurred
15 so long ago.
16          Q:  As far as that trip out there.
17 Wasn't he at that time, under Colonel
18 Hickes's orders not to tell anyone?
19          A; I didn't know that.  He was
20 actually under my command, I mean he was
21 detached to, or no, I don't recall what
22 status he was, but I think on the record, he
23 was assigned to BPR, he was under my
24 authority.  I never heard that Colonel Hickes
25 approved that until much, much, after the

1  fact, after I said, it shouldn't be
2  reimbursed.  If fact, only learned that
3  recently, actually.
4           Q:  How could Captain Ober have
5  followed Colonel Hickes's orders, which
6  certainly affected Colonel Evanko and you, if
7  he had, how could Captain Ober have, the
8  question form is very simply, how could
9  Captain Ober have obeyed Lieutenant Colonel
10 Hickes, and made the request for
11 reimbursement the day after it happened.  How
12 could he have done that?
13          A:  I didn't know that Captain Ober
14 had discussed with Colonel Hickes, getting a
15 motel room, putting in for a day off, and
16 taking his own personal car, I didn't know
17 that any of that conversation ever occurred
18 until recently.  And when I concurred with
19 Colonel, when I concurred with Major Conley,
20 about denying the request for reimbursement,
21 I was unaware that, that had previously been
22 approved by Major, or approved by Colonel
23 Hickes or anything like that.
24          Q:  You knew, on or about the
25 twelfth of May, about Colonel Hickes's orders

1  to Captain Ober.
2           A:  That's correct.  But that
3  doesn't, I did not know on that day, that
4  Captain Ober had discussed getting a motel
5  room, using his personal car, retroactively
6  putting in for any of that stuff.
7           Q:  You're missing my question,
8  because I'm not making it clear.  My question
9  really has nothing to do with any of the
10 detailed discussions that Captain Ober may or
11 may not have had with Colonel Hickes.  My
12 question, very, very, simply is, isn't it a
13 very, very, sim.I mean you're quite an
14 articulate and intelligent gentleman, it's a
15 simple deduction, that if Captain Ober is
16 following the orders of Colonel Hickes, he
17 can't go turn in that reimbursement in timely
18 fashion.  He can't do that and follow and
19 respect Colonel Hickes's orders, it's
20 impossible, so it doesn't matter whether
21 there's any details and discussion and
22 approval or not, when Captain Ober turns this
23 thing in, it has to be after the fact, in
24 order to honor, what he, you believe he did
25 erroneously, which was bypass his chain of

1 command, and listen to the orders of Colonel
2 Hickes. Which you certainly don't question
3 that. So, you know, what was he supposed to
4 do? He's between a rock and a hard place.
5 He can't win with your analysis.
6          A: Colonel Hickes's orders to
7 Captain Ober was not to divulge the nature of
8 the ongoing investigation. Colonel Hickes's
9 orders to Captain Ober was not to go out and
10 put in for a day off, not to go out and rent
11 a motel room, and meet with the FBI.
12 Certainly there was an alternative to Captain
13 Ober's method. He could have said to Major
14 Conley, I'd like to check the western offices
15 of internal affairs on a certain day, and he
16 could have went out and met with the FBI in
17 their office. The issue is the day off, and
18 the issue is the motel room, and the
19 retroactive request for payment.
20          Q: Do you have any information to
21 indicate that Captain, and if so, state it
22 for the record, because I can't find a
23 smidgen, any information at all to indicate,
24 that Captain Ober did anything other than go
25 out and do, day off, day on, Pennsylvania

1 State Police business and meet with the FBI.
2          A: Exactly the point, that's
3 correct. There is no other information. So
4 when you're acting on, in the interest, if
5 you're performing Commonwealth business, than
6 you should do it on Commonwealth time, in a
7 Commonwealth vehicle.
8          Q: Well apparently he did. Or at
9 least somebody decided that he did, and he
10 was reimbursed. And we understand that you,
11 very respectfully and strongly disagree with
12 that. Is that correct?
13          A: Yes sir.
14          Q: Okay. And you still do.
15          A: Yes sir.
16          Q: Now did you, are you the person
17 that asked that the binding decision of the
18 special arbitration committee be appealed,
19 challenges, were you the one who did that, or
20 was that Commissioner Evanko? Because
21 somebody directed your attorneys to do that,
22 and I want to know who dir, because I can not
23 conceive of Joanna Reynolds doing that
24 without being directed to do it. So I'd like
25 to know who did. It was either you, or it

1 was Colonel Evanko.
2          A: The appeal of what sir?
3          Q: If I understand, my understand
4 is that your lawyers were, my understanding
5 is Colonel Hickes had approved this thing,
6 the reimbursement, at some point.
7          A: Yes.
8          Q: Okay. My understanding is that
9 it then became disapproved at some point. Is
10 that correct?
11          A: yes.
12          Q: And my understanding is that
13 there's a, you have an agreement with the
14 Pennsylvania State Troopers Association,
15 where there's some kind of a binding
16 arbitration committee in such situations,
17 something of that sort.
18          A: Yes.
19          Q: Okay. And it is my
20 understanding that Captain Ober prevailed
21 there.
22          A: Yes.
23          Q: And it is my, and maybe I'm
24 wrong, I don't know sir, help me if I am, it
25 is my understanding that , that decision was

1 appealed somewhere. Or challenged.
2          A: I don't recall that there is an
3 appeal process to that, but I can certainly
4 tell you that, yes I disagreed with the
5 position, and yes I think I had discussion
6 with office administration, Bill Mullen,
7 wanted to know, is there an appeal process,
8 can this be appealed, so on and so forth so.
9          Q: Look, I'm not saying anything
10 can't be appealed. I once sued a Judge,
11 okay. And by the time I got to the Supreme
12 Court of the United States, myself and the
13 Supreme Court, I mean if you want talk about
14 strong feelings, believe it or not, I more
15 strongly disagree with them, than you do with
16 this decision over this reimbursement, okay,
17 but I lost, there's nothing I can do it, I
18 lost. Now, I appealed that, and I appealed
19 it right up on the line, and finally the
20 Supreme Court says to me, hey Mr. Bailey,
21 we're not going to listen to this thing. I
22 appealed it to the third circuit and they
23 tell me this Judge was acting in a judicial
24 capacity. I don't agree. But hey, I'm
25 nothing by a, you know, I mean Judges tell me

1  to do things, I do them, you know, I'm like
2  anybody else.  Now in this case, what I'm
3  talking about is, let's talk about what Mr.
4  Mullen told you.  Did Mr. Mullen tell you
5  that, what was the advisability of appealing
6  this thing with Mr. Mullen?  What did he say?
7          A:  I don't recall.  But I don't
8  think that it was appeal able; I thought the
9  findings of that board were final, but,
10  again, I'm acting on recollection here.
11          Q:   Well I do to.  Well, you're
12  not a lawyer, and I'm not, these folks
13  probably know more about this stuff than I
14  do, it is my understanding, that's the case.
15  All I'm asking was this appeal just to harass
16  and intimidate Mr. Ober, if it was not, it
17  was not, there was a basis for the appeal.
18  Can you tell me who told you there was except
19  for discussion you might have had with
20  Joanne, or Barbara, or somebody, with one of
21  your lawyers?
22          A:  The question you asked me was
23  two parts, the first part.
24          Q:  Well let me go back.  I'm
25  sorry.

PAGE 74

1          A:  Okay.
2          Q:  You're absolutely right, it was
3  complex.  Mr. Mullen tells you, hey, you
4  know, this is, I mean the word binding means
5  something, this is binding arbitration, this
6  is the kind of thing, you sit down here, you
7  go, and you agree, and that's the way it
8  goes.  Now unless it violated some
9  incredibly, you know unreasonable and
10  outlandish thing, it is my understanding is
11  hey sorry you lose, it's the end of it.  If
12  he lost, they'd you'd have filed sanctions,
13  and come up for, gone back to his bill for
14  that seventeen grand.  But the point, you
15  appealed it, and Mr. Mullen tells you it's
16  not appeal able, but who told your lawyers to
17  appeal it.  You or Mr. Evanko?
18          A:  I don't, I may have had
19  conversations with the attorney about
20  appealing it.  I don't know, but, you know
21  your first question was, was it done to, and
22  I forget, punish or..
23          Q:  Yes.
24          A:  Something to do with Captain
25  Ober.

PAGE 75

1          Q:  Let me go back then.  I asked
2  you, give you a fair chance, and I apologize
3  to you, I did, I had asked you.
4          A:  Yes, I'd like to answer that.
5          Q:  Yes sir, I had asked you if the
6  decision to appeal was made to punish, or
7  harass, or intimidate Captain Ober.
8          A:  It was not.  And my position
9  was, very simply, it really had little to do
10  with Captain Ober, in fact.  In the
11  preparation for that process, if you will.
12  The fact finder, I can't say arbiter, but the
13  advocate for the Commonwealth never came to
14  me and asked me why I wanted to deny it.
15          Q:  Was that Mr. Grab?
16          A:  That was Mr. Grab.  He, if
17  fact, went to Colonel Hickes, and asked
18  Colonel Hickes why he approved it and so on,
19  and so forth.  But no one ever came to me and
20  said, why did you deny it.  Or no one ever
21  said to Major Conley to my knowledge, why did
22  you deny it.  So in my perception, the
23  management side of the department, meaning me
24  and Major Conley, never had an opportunity to
25  be heard, so the facts, the facts of why it

PAGE 76

1  was retroactively approved were heard,
2  Colonel Hickes's position, but the person
3  that actually denied the retroactive claim,
4  was never asked why.  So it really had
5  little, if anything to do with Captain Ober.
6          Q:  Let me take a break for just be
7  thirty seconds.  No reason to shut down the
8  equipment.  Okay.  Did you ever discuss the
9  denial of the reimbursement, I'm not talking
10  about the issue of appeal ability now, I'm
11  talking about the original denial of the
12  reimbursement with the commissioner?
13          A:  I don't believe I did.  No.
14          Q:  Well, I have a document dated,
15  October 4th, 1999, time and attendance,
16  Captain Darrell Ober; it's Deputy
17  Commissioner of Administration, TKC.  You
18  know who TKC is?
19          A:  That isn't me sir.
20          Q:  It says, attention director,
21  Bureau of Professional Responsibility, from
22  Paul J. Evanko, commissioner.  Do you
23  recognize those initials?
24          A:  Yes sir.
25          Q:  And it says, correspondence

1  from Captain Ober, correspondence from Major
2  Hawthorne, and Conley, director, and BPR, you
3  know, IAD division, all that kind of stuff.
4  General invoice reimbursement for Captain
5  Ober.  Number one, I have conducted a full
6  and complete review of the circumstances
7  surrounding Captain Ober's request.  Based on
8  my review Captain Ober's request are denied,
9  therefore the amount of eighty three dollars
10 and seventy four cents shall not be provided
11 to Captain Ober.  Additionally they have
12 March 15th, 199.should remain changed annual
13 leave, please notify Captain Ober, provided
14 with a copy of this correspondence.  Do you
15 have any recollection of that?
16      BARBARA CHRISTIE:  Counsel, are you
17 going to mark that?  Could we mark that,
18 wherever we are, Coury 3.
19      MR BAILEY:  Sure.
20      BARBARA CHRISTIE:  Make copies.
21      THOMAS COURY:  I don't recall it
22 sir.
23      MR BAILEY:  You don't recall it?
24      A:  No.
25      Q:  All right.  Then I'll just have

1  any of this refreshes your recollection at
2  all, in any way, given the fact that you
3  don't remember it, it probably doesn't, but
4  let me ask.  Did Colonel Evanko participate
5  in making the decision to appeal the binding
6  arbitration decision?
7      A:  Based on my recollection, I
8  only recall myself being involved in that
9  process.  I don't recall having any
10 discussions with the commissioner about it.
11 I, in fact, am the one who had taken
12 exception with it, for the reasons I stated;
13 I do not recall the commissioner playing a
14 roll in that.
15      Q:  Okay.  Have you ever seen this
16 document Colonel?
17      BARBARA CHRISTIE:  Can we mark this
18 Coury 4, counsel?
19      MR BAILEY:  Please.  Whatever the
20 number is.
21      BARBARA CHRISTIE:  Strike that.
22 Coury 5, sorry.
23      THOMAS COURY:  I do not recall
24 seeing it, Mr. Bailey.
25      MR BAILEY:  Okay.  Do you have a

1  it admitted, and have it, you know, if you
2  don't recall it, you don't recall it, but
3  we're going leave it there with your, I need
4  a copy of that Ms. O'Brian, when you get a
5  chance.  Now I don't know that you've ever
6  seen this, and, but just tell me if you've
7  ever seen it.  I'd like to have it marked
8  too.  Just tell me if you've seen that.  Could
9  you identify it for us please?
10      A:  It's a time and attendance,
11 it's form 501, it's correspondence dated,
12 July 1st, 1999, subject time and attendance,
13 to Captain Darrell G. Ober, from Major
14 Hawthorne, and Conway.   To the best of my
15 recollection, I have not seen this document
16 before and I note on the bottom that it does
17 not show a CC, going to the Deputy
18 Commissioner of Administration.
19      Q:  Okay.
20      BARBARA CHRISTIE:  Do you want that
21 marked, forty-four.
22      MR BAILEY:  Go ahead and mark it,
23 yes.
24      BARBARA CHRISTIE:  Okay.
25      MR BAILEY:  Now, I don't know if

1  recollection of a investigation into an
2  individual named, "Stackhouse?"
3      A:  Yes sir.
4      Q:  Do you have recollection of who
5  ordered Captain Skirkis to retrieve a copy of
6  the Stackhouse investigation from Ober?
7      A:  Retrieve it when sir?
8      Q:  Oh, it would have been some
9  time in December 1999, by then, Lieutenant
10 Brown.
11      A:  No sir, I don't.
12      Q:  Do you have recollection of
13 your ever giving Mr. Skirkis any instructions
14 that the Stackhouse investigation was to be
15 taken back from, or the copy of the
16 investigation, was to be taken from Captain
17 Ober?
18      A:  I don't recall doing that sir.
19      Q:  Did you play any roll in any
20 decision that would, that directed, that
21 Captain Ober was not to testify in that
22 investigation?
23      A:  None, sir.
24      Q:  Do you know whether Captain
25 Ober was the supervising investigator,

1 promotion, other than Captain Ober, name me
2 somebody else.
3        A: More than, with the qualifier
4 more than two hundred miles.
5        Q: Yes.
6        A: I can't think of anyone.
7        Q: Okay. All right, now the, do
8 you remember what happened with the
9 Stackhouse investigation, how was it, well
10 how was it resolved, do you remember what
11 happened, without telling us, I'm not asking
12 for any kind of confi.
13        A: It was unfounded.
14        Q: It was unfounded. And how long
15 after, well who was it given to, was it given
16 to Captain Skirkis after Captain Ober had it,
17 who, do you know who.
18        A: I don't recall sir. I don't
19 know.
20        Q; Well, did you like, do you know
21 whether somebody called Captain Ober, and you
22 know, gave him a talking to, about how long
23 it was taking, or gave him sort of a, you
24 know, maybe some kind of even a, verbal
25 reprimand, or advised him of how he was being

1 dilatory or something like that?
2        A: Not that I'm aware of, and I
3 don't know why they would give him a verbal
4 reprimand. It's not that it was anything, it
5 wasn't a violation of anything, it wasn't
6 anything inappropriate certainly, it was just
7 a difference of opinion. Management, you
8 know, this things got to end sometime, it's
9 got to be pushed through and concluded,
10 you've chased all the leads that are out
11 there. Lets wrap it up and get it done with.
12        Q: Are you familiar with
13 Management Directive 525.4?
14        A: I would have to see it sir.
15        Q: Well, if you know off the top
16 of your head, cause I don't have a copy of it
17 here. I have a little note here, management
18 directive 525.4, issued by the Governors
19 office, establishes the temporary assignment
20 to, it deals with temporary assignments to
21 higher classification policy for state
22 agencies. Do you know of such a policy? In
23 other words, temporary assignment to fill the
24 shoes, you know, an acting director, that
25 kind of thing.

1        A: I vaguely, I'm familiar with
2 the policy sir.
3        Q: Sure. And, what are the
4 guides, what guides do you employ when you're
5 making a decision like that, you know, the
6 director is going to be gone for fifteen
7 days. Who do you put in?  Who walks in
8 those shoes for that fifteen days?
9        A: It's a, it's a number of
10 different criteria would play into that. How
11 many people you have to choose from. What
12 their time and grade is. What their time on
13 the job is. What their performance is. What
14 their experience is. How long they've been
15 in that bureau or division. There's many,
16 many factors, that can come into play.
17        Q: All right. Well let me just a
18 few little things here that I've asked my
19 client to put together and see if, let me see
20 if I can verbalize them as well as he could
21 here. When a subordinate officer is assigned
22 the duties and responsibilities in the place
23 of a superior officer, it's my understanding,
24 now these are questions that I had asked, do
25 they receive addition monetary compensation,

1 a. Do they receive addition monetary
2 compensation?
3        A: Only for when it's more than
4 five days in any calendar year.
5        Q: Okay. Now does such experience
6 afford that subordinate any certain career
7 growth and development opportunities? Or can
8 it?
9        A: Let me rephrase the first
10 question. I think it's five days in any
11 calendar quarter, I'm not, it's something
12 like that.
13        Q: Okay. All right. Now does the
14 experience afford that subordinate officer, I
15 mean, is it a career plus kind of thing?
16        A: I think it could be, or
17 couldn't be. It depends, I mean, I'd been
18 acting many times myself, and I never saw it
19 as a career plus for me. I've never seen any
20 real benefit to it, but in terms of possibly
21 experience, or depends on how the member
22 views it.
23        Q: Have you ever generated a memo
24 indicating the importance of rotating acting
25 duties among commanders, stressing, "teaching

1 the member to be administratively prepared
2 for the next level?"
3        A:  I don't recall generating it.
4 It does sound familiar to me.
5        Q:  What would your reason, if you
6 did that, what would your reason for it be.
7        A:  In fairness it teaches, it's
8 not to help the member to get ready for the
9 next step or anything, it's to help the
10 member know the duties and responsibilities
11 of the organizational segment that they work
12 in.
13        Q:  Teach people out there, so they
14 have a go at it, and an opportunity to
15 perform, but it's also for the good of the
16 order, isn't it, because it spreads out the
17 experience, in case somebody needs to assume
18 duties for a superior.  Right?
19        A:  It does keep everybody on the
20 page within that bureau.  Uniform leadership.
21        Q:  Now wasn't Captain Ober under
22 your command when you were director of BPR?
23        A:  Yes.
24        Q:   Okay, were there times when
25 you assigned Captain Ober to the acting

1 directors position on your behalf?
2        A:  Yes.
3        Q:  Now, administrative regulation
4 411 sets State Police policy for naming
5 individual for assignment out of class.
6 Isn't that right?
7        A:  Yes.
8        Q:  And then, do you remember the
9 question I'd asked you about management
10 directive 525.4?
11        A:  Yes.
12        Q:  Okay.  Now I have a note here.
13 Both policies state the personnel on the same
14 pay rank or classification or in the same pay
15 range shall be temporarily assigned on a
16 rotational basis, when practical.  Is that
17 also correct?
18        A:  Yes.
19 MR BAILEY: Okay, Do you have a recollection
20 of reviewing some of your subordinate, and
21 the chain of command like Mr. Conley for
22 example. About the acting in place of policy?
23        THOMAS COURY: No, sir.
24        MR BAILEY: Well do you have any
25 recollection of becoming aware of how Mr.

1 Ober was treated in that regard as compared
2 to his colleagues?
3        THOMAS COURY: While in BPR and
4 while under command Major Conley, is that
5 what you're asking me?
6        Q: And then we are going to talk
7 about LCE.
8        A: No I don't think Captain Ober
9 was under Major Conley that long to really
10 get a handle on that.
11        Q: Right. How about LCE?
12        A: I don't know about LCE.
13        Q: When a bureau director is going
14 to appoint someone in their place, do they,
15 I'm sorry sir, when you were deputy
16 commissioner, did they consult with you about
17 that?
18        A: Rarely, I mean probably 50/50.
19 Half of them did half of them didn't.
20        Q: You had no requirement that they
21 did so?
22        A: No, sir.
23        Q: Did you ever indicate to anybody
24 that Captain Ober maybe should not
25 participate in an acting capacity?

1        A: Never, sir.
2        Q: Did you have any request from
3 any subordinate to discuss with you whether
4 Ober should be appointed in acting capacity?
5        A: No, sir.
6        Q: Did you ever have a discussion
7 with Major DeWire about Ober acting a
8 capacity as replacement?
9        A: No, sir. Not about acting in a
10 capacity.
11        Q: About what?
12        A: It was more along the lines of
13 promotional opportunities. Excuse me.
14        Q: Can you tell us about those?
15        A: well at some point I would say
16 it was around the time Major Kolsenik had
17 heart problem and was getting a five-way
18 bypass. And also, Major DeWire was having
19 some health problems. DeWire had come to see
20 me on more than one occasion that I could
21 recall to discuss, what would happen if
22 Kolsenik had to leave his position of area
23 commander of the Northeast. Major DeWire
24 wanted express to me his interest in going to
25 the Northeast. Which would leave a vacancy in

1 the LCE, and if Major DeWire's health were to
2 reach the point that he had to leave the
3 department what would happen to that vacancy
4 in the LCE?
5          Q: And before I ask you the next
6 question in that regard, Ober was named as
7 director of administration division of the
8 LCE on or about May 30, 2000. Is that
9 correct?
10          A: I don't know the dates sir. It
11 would have certainly been before July of
12 2000.
13          Q: And do you know whether or not
14 during period of time that he served as
15 acting director of LCE for a total of about
16 40 hours.
17          A: Before that date? No sir.
18          Q: Yes, during that period of time.
19 You wouldn't know that.
20          A: No, sir I wouldn't.
21          Q: Or that Captain Leonard
22 McDonald, the director of operations in LCE,
23 served in that capacity for a total of 208
24 hours. Five times as many as Captain Ober.
25 You wouldn't know anything about that?

1          A: I wouldn't know anything about
2 it. And are we talking prior to July 2000, or
3 after?
4          Q: No, well July 2000 would fall in
5 there.  We're talking about May 30, 2000 to
6 Sept. 30, 2001, on my figures.
7          A: I don't know the amount of
8 hours, but I do know that Captain McDonald
9 was almost always the acting.
10          Q: Do you ever review that and ask
11 why? I mean do you review that policy as part
12 of your role as a commander, you know as a
13 superior Deputy commissioner? Did you ever
14 have any policy that way, or review it, or go
15 over it with your bureau of directors?
16          A: No, sir.
17          Q: Okay. Well lets go back to this
18 promotional thing, you had a discussion
19 talking about the difficulties, or potential
20 difficulties at least, with the Regional
21 Commander and with the Commander of LCE,
22 because of health problems and Captain Ober
23 somehow fit into those discussions, as I
24 understood you testimony. Could you tell us
25 in what way?

1          A: He fit in, well Major DeWire was
2 discussing with me the potential successor
3 for the director the LCE, should it arise
4 because of DeWire's leaving, or well DeWire's
5 leaving. And he felt that the Commissioner
6 should consider Captain McDonald for that
7 position.
8          Q: Did he say why?
9          A: Yes, he did. Overall experience,
10 time in grade, time on the job, performance,
11 many issues.
12          Q: He ever indicate that he felt
13 that Captain Ober should be passed over
14 because front office was upset with him, or
15 didn't like him, or Colonel Evanko didn't
16 like him?
17          A: Absolutely not. The nature of
18 Major DeWire's conversations was not Captain
19 Ober's shortcomings, but Captain McDonalds
20 strengths, and why Captain McDonald should be
21 considered, not why Captain Ober shouldn't be
22 considered.
23          Q: Well, was Mr. McDonald on the
24 eligibility list?
25          A: At that time he was. This was

1 prior, I believe to a new examination.  On
2 the eligibility list.
3          Q: Do you know whether Major DeWire
4 ever told Ober that he was passing him over
5 or not considering him for some sort of
6 career enhancement move, simply because the
7 attitude of the front office towards Captain
8 Ober was such that Captain Ober could not,
9 wasn't going to do any good to recommend him
10 anyway. Anything like that. Any knowledge of
11 anything like that?
12          A: I'm not aware of anything like
13 that. No sir I don't have any knowledge of
14 anything like that.
15          Q: If that were correct, that's a
16 pretty debilitating thing to occur in
17 someone's career. Don't you think?
18          A: If the Major were to say that?
19 What's the.
20          Q: No, if that were to be the case.
21 I mean the criteria for promoting people, the
22 criteria for giving people promotional
23 opportunities, are objective, honest, descent
24 criteria, that don't have anything to do with
25 personal feelings or prejudices, but have to

1  supervising officer of the Stackhouse
2  investigation?
3        A:  For a while he was, yes sir.
4        Q:  And why was he changed sir?
5        A:  I don't recall why or what
6  point it was changed Mr. Bailey.
7        Q:  Isn't that unusual?
8        A:  I don't know that it's unusual.
9  It rarely happens.  I could see reasons why
10 we would change investigators in the
11 Stackhouse case as it relates to Captain
12 Ober, I just don't recall, I just don't
13 recall when, or by whom.
14        Q:  When was Captain Ober sent out
15 to Washington?  Ordered, sent to Washington?
16        A:  I don't recall.
17        Q:  Was it around December 99,
18 January of .
19        A:  It would have been late 99,
20 early 2000.  I thought it was more like early
21 2000, but again, without having documents in
22 front of me, I do not know.
23        Q:  Any discussions up in the front
24 office about getting rid of Ober.  Send him
25 out to Washington, and how we can pay him

1  I thought was, been called for, if you will,
2  and I supported it, giving it, moving it on
3  to another investigator.
4        Q:  Who called you about that?
5        A:  I don't think anybody called me
6  about it.  I was aware of it, because I
7  tracked the investigation.
8        Q:  You didn't give instructions
9  then, or you did.
10 I'm confused.
11        A:  I don't know if I gave
12 instructions.  No, I don't believe I gave
13 instructions.  I certainly know I concurred
14 with the decision.  To change investigators.
15        Q:  Who would have made that
16 decision?
17        A:  Major Conley would have made
18 that decision. I'm sure Major Conley and I
19 had discussions about that investigation
20 running too long, there were no new leads
21 coming up on that case, and it was time to
22 put that case to rest.
23        Q:  Well, you called Captain Ober
24 and talked to him about it.  Right?
25        A:  I didn't call Captain Ober and

1  back for his acts of disloyalty to Colonel
2  Evanko?
3        A:  Not that I'm aware of sir.
4  None that I took part in.
5        Q:  So if Mr. Brown were called
6  under oath at some point, and asked a
7  question, asked his knowledge about why
8  Skirkis ordered the, not Skirkis ordered, why
9  he was ordered by Captain Skirkis to retrieve
10 the Stackhouse investigation.   There are no
11 facts known to you, should Lieutenant Brown
12 testify that indeed, Captain Skirkis told him
13 to get that investigation.  There are known
14 facts known to you that would indicate that
15 you had any knowledge that was going to
16 occur.  Is that right?  Is that what you're
17 telling us?
18        A:  No sir.  I, you asked me if I
19 directed it to be done.  I said no.
20        Q:  Well, what do you know about
21 it?
22        A:  I know that the Stackhouse
23 investigation was taking entirely too long to
24 complete.  That at one point, there was a
25 little bit more of a fishing expedition than

1  talk to him.
2        Q:  Well, Major Conley did.  Right?
3        A:  I would assume that Major
4  Conley did.  I don't know that he did or not.
5        Q:  Now, earlier I had asked you, I
6  think in the first part of your deposition, I
7  know that I had asked you some questions, and
8  you testified that you transferred people,
9  when it was required, to meet the needs of
10 the organization.
11        A:  Yes.
12        Q:  And you'd indicated that you
13 probably transferred more officers than
14 anyone else in the State Police, possibly.
15 Did you remember saying that?
16        A:  What I meant was, of the three
17 deputies, during our term of administration,
18 I had probably recommend to the commissioner
19 more replacements under my command than the
20 other two deputies had.
21        Q:  Okay.  Other than Captain
22 Ober, who was transferred, or who was an
23 attempt of transfer done on, more than two
24 hundred miles, permanent transfer now,
25 against their will, not in conjunction with a

1 do with rules and regulations, and proper
2 custom practices, and usage in Pennsylvania
3 State Police.   Because the Pennsylvania
4 State Police are above the personal feelings
5 of individual officers or men. Isn't that
6 correct?
7        A: As well as the pool of other
8 eligible candidates.
9        Q: Oh, of course.  That would go
10 without saying, I imagine. Right?   Sir, are
11 you familiar with questions we've asked about
12 subsection C to AR1-1.10, 102 really
13 subsection C, chain of command provision.
14        A: The only way I would have been
15 familiar with that is if I heard it in
16 Colonel Conley's deposition, and I don't
17 recall being present for that part. I don't
18 recall hearing that part, Mr. Bailey.
19        Q: Well one of the issues that has
20 risen in this litigation with some frequency,
21 are amendments to AR1-1, and timeliness of
22 certain amendments 1-101, in particular some
23 changes that were affected when the new AR1-1
24 was signed, the change sheet was signed by
25 the Commissioner by an auto pen via Mary

1 Bungo on or about February 22nd, according
2 the transmittal sheet at 2001. Do you have
3 any recollection looking at the changes to
4 AR1-1? ,  Your signature is on that sheet?
5        A: I don't recall looking at them,
6 Sir.
7        Q: Well, did you ever discuss any
8 of the changes to that document, with anyone,
9 during the year 2001, from January 1, 2001 to
10 February 22, 2001?
11        A: When did the changes come out
12 sir?
13        Q: Well I think they were approved
14 on or about February 22/23, 2001 and ended up
15 being distributed in March of 2001.
16        A: You are asking me if I had any
17 discussions with anyone prior to that date of
18 it being released?
19        Q: Yes, lets say March, 1 March.
20        A: No, Sir.
21        Q: None?
22        A: No, none that I can recall. I
23 have only heard of that issue in context of
24 this case. That's the first time I heard
25 about it.

1        Q: You have a recollection of AR1-1
2 being sent back from the front office to
3 revisions on or about January 19, 2001. Back
4 to R and D.
5        A: No, Sir.
6        Q: Are you familiar with the,
7 Colonel Evanko's policy and the departments
8 desire for accreditation.
9        A: Yes.
10        Q: Was AR1-1 revisions, were they
11 necessary for accreditation.
12        A: I don't know specifically.
13 Accreditation isn't something that came under
14 me. It wasn't one of my areas.
15        Q: What was your policy when AR was
16 submitted to you for review, to approve a
17 change, you know in department regulations.
18 Did you have any set policy? Or did you have
19 an assistant doing that work for you?
20        A: It depends, I never wanted my
21 paper work in the office to sit around, so if
22 I wasn't there, someone was sitting in for
23 the day, or a couple days, or someone was
24 acting, I told them to move the paper, sign
25 it, and move it on. Unless it was something

1 that they really felt uncomfortable doing.
2 Other than that when it came to me with a
3 change sheet, first of all I would look to
4 see who already signed it, was it in my shop
5 or not, in other words, if it was something
6 in, if it was generated by operations, if it
7 had to do with operations, or if, I would
8 read it and sign it, when I was Deputy
9 Operations.  If I saw it was something more
10 staff, and I can give you a prime example, if
11 it was something that was under Deputy of
12 Staff and was resided in his bailiwick, if I
13 saw that Colonel Mark signed it, I typically
14 didn't put much time into it, I mean it was
15 his shop, his business, if it suited him, it
16 should suit me, and typically I would give it
17 just a quick once over, sign it, and move it
18 on.  If the Commissioner signed it ahead of
19 my review, it was certainly good enough for
20 the head of the agency, it was fine with me.
21 I'd give it a quick review, and moved on.
22        Q: Where are you on time on that?
23        THOMAS COURY: 3:00 would be fine.
24        MR BAILEY: Now Colonel this
25 subsection C, that was a provision, I did

1  question you a little bit about it earlier.
2  It had to do with chain of command. Do you
3  ever remember seeing it even during this
4  litigation, looking at it?
5       A: No, I don't.
6       Q: and is it fair to say that you
7  didn't contribute to either the origination,
8  or the drafting, or the implantation of it,
9  beyond what were apparently routine paper
10  functions that you preformed, in the
11  execution of your administrative duties. Is
12  that pretty accurate, is that fair to say?
13       A: That is accurate.
14       Q: Okay, and you have no, as you
15  sit here today, you have no specific
16  recollection of changes or dealing with
17  changes to AR1, during calendar 2001, Fair to
18  say?
19       A: I do not recall it, Sir. I have
20  no recollection of doing anything with AR11.
21       Q: Now without revealing any the
22  substance of any discussion, you may have
23  had, it follows then you had no discussion
24  with department lawyers about it.   Correct?
25       A: I did not.

1       Q: I mean during that period.
2  Remember were doing this period of time.  I
3  don't care about afterwards.
4       A: We're doing.
5       Q: During January 1, 2001, strike
6  that we're going back to October 30 might as
7  well get the whole thing in here. Between
8  October 20, 2000 and February 23, 2001, you
9  had no discussions with anybody about
10  subsection C, the chain of command provision
11  change in AR1-1, that you can recollect.
12  That anybody?
13       A: I cannot recollect any
14  discussions about AR1-1 prior to its release,
15  whatever date it was released.
16       Q: Now you have a computer in your
17  office, don't you?
18       A: Yes, Sir.
19       Q: If you want to look at a
20  Pennsylvania State Police regulation, can you
21  call l it up on you computer?
22       A: No, Sir.
23       Q: Why not?
24       A: I'm not a techie, I don't know
25  the reason why, I just know I can't do it.

1       Q: You know whether they're on
2  there?
3       A: Regulation, no Sir, they're not.
4  Q: So if you want to look at them.
5       A: We have e-mail, that's about it.
6       Q: So if you want to look at them,
7  or look at a regulation, you got to either go
8  down and look at a research file, or go to
9  where they are posted, or call R and D, or
10  maybe one of your lawyers. Fair to say?
11       A: Yes, Sir.
12       Q: Yes, because you can't jump on
13  your Westlaw or jump on you computer, and
14  dial up and look at it. Right?
15       A: Unless someone sends it as an
16  attachment.
17       Q: E-mails it or something, yes. I
18  understood that you had wanted a break at
19  three.
20       A: Yes, Sir.
21       Q: Okay can we suspend please?
22       ALBERT RODRIGUEZ: Suspending video
23  2:52 camera time.
24       ALBERT RODRIGUEZ: Ladies and
25  gentlemen, video is now in operation, camera

1  time is now 3:15.
2       MR BAILEY: Colonel are you at least
3  generally familiar with AR 425, remember you
4  talked about that?
5       THOMAS COURY: Generally familiar
6  with it.  I had been away from it for some
7  time now, but generally.
8       Q: Well 25.4, section 25.07,
9  disposition says a complaint investigations
10  for policy void, indicates that the action of
11  the department or the involved member, or
12  members was not inconsistent with existing
13  department policy, but the complainant still
14  suffered harm. Now you know the
15  administrative investigation, which we
16  contend was ill-conceived and improper and
17  there's a difference between the parties on
18  this issue, conducted by and directed by
19  Colonel Evanko, not so much conducted by him
20  so much, but directed by him. Do you remember
21  that investigation?
22       A: Yes, Sir.
23       Q: Okay.   Now lets assume for the
24  sake of argument, that Captain Ober was
25  somehow wrong in not telling Major Conley and

1 not coming to you as opposed to going to
2 Colonel Hikes, who gave him an order, but
3 lets say that was an error on his part, lets
4 say that. What harm resulted the Pennsylvania
5 State Police? Was it a matter of what could
6 happen to the Pennsylvania State Police?
7          A: More what harm could have
8 happened?
9          Q: Okay. Were the State Police, was
10 the organization, were any of the members of
11 the organization harmed by what Captain Ober
12 did, that you recollect?
13          A: Only the trooper that got
14 arrested.
15          Q: The trooper that got arrested
16 was harmed by what Captain Ober did?
17          A: No sir, not by what Captain Ober
18 did, no.
19          Q: Okay. Now as part of the duties
20 and responsibilities of the director of BPR,
21 under 25.0AB subsection 3, it says, ensure
22 that a record of all investigations is
23 maintained and that all investigations are
24 conducted in a fair prompt thorough and
25 impartial manor. Do you recollect, at least,

1 general language like that?
2          A: Yes, Sir.
3          Q: okay. And that internal
4 investigation reports are kept in a secured
5 area, within the bureau. Reports shall be
6 completed within the time limits established
7 to collect a bargaining agreement, extensions
8 to the initial 40 day investigative time
9 period, shall be based solely on criteria
10 related to the complexity of the
11 investigation and available resources. Do you
12 have recollection of those provisions?
13          A: Yes, Sir.
14          Q: Now, do you know these, either
15 the spirit or letter of special order 98-22
16 revisions to AR 4.25, internal
17 investigations, whether or not the spirit or
18 letter of these provisions were violated, as
19 I have read them to you by the department, t
20 or the investigators, in Captain Boer's case?
21 Or do you think they were pretty much adhered
22 too?
23          A: The museum investigation? What
24 investigation are you referring to?
25          Q: We're still talking about what

1 you call the administrative investigation,
2 into Captain Ober.
3          A: No, I really don't see AR 4.25
4 affecting that, because it was a fact finding
5 administrative inquiry conducted by the
6 Commissioner. It was not launched in any way
7 to, in the context of an internal affairs
8 investigation which could have resulted in
9 discipline to anyone.
10          Q: Okay. Is that why Captain Brown
11 assigned it a BPR # in June, excuse me; I
12 believe it was July 2o, 1999?
13          A: I don't know why he assigned it
14 a number to it. I know that everything has to
15 have some type of number for event tracking.
16          Q: Is that, that investigation has
17 been closed.
18          A: I don't know, Sir.
19          Q: But you never participated in
20 whether or not, telling Captain Ober whether
21 it was closed.   Right?
22          A: No, Sir.
23          Q: Well, let me ask you about
24 something here. I've had a number of cases
25 with the Pennsylvania State Police, where

1 investigations suddenly arose into an
2 individual that I was representing.  After I
3 file a complaint, and we have these
4 investigators appear in the hearings, and
5 depositions, so I want to ask you about some
6 of those in light of document dated February
7 12, 2001, subject supervisory inquiry IAD
8 #1999-409. Now you would agree with me that
9 the cover sheet to Coury #2 is dated December
10 23, 1999, and that the investigation says
11 under enclosure 2, subsection 1, after
12 careful review of enclosure 1, I have
13 concluded that the allegation is unfounded,
14 no additional inquiry, or formal
15 investigation is warranted in this case.
16 Remember that?
17          A: Yes, Sir.
18          Q: Well does that mean the things
19 closed?
20          A: As far as I was concerned, yes
21 Sir.
22          Q: Alright, now would you look over
23 this piece of paper, and then pass it back to
24 me, cause I only have one of these. I am
25 wrong, it's in their page number and I missed

1  it . given it back to me and look at your
2  document.
3           BARBARA CHRISTIE:  And by looking
4  at the document, you're referring to Coury
5  #2?
6           MR BAILEY: Yes. Let me count the
7  pages.
8           BARBARA CHRISTIE: It appears to be
9  page 10 of 67.
10          MR BAILEY: Okay, I have it as page
11  9 or 10, right. You have it in there?  It
12  says February 12, 2001 at the top.  You see
13  it?
14          BARBARA CHRISTIE:  The witness is
15  looking at page 10 of 67 pages, of the
16  exhibit Coury 2, that is the memo dated
17  February 12, 2001. Supervisory inquiry IAD
18  1999-409, is that what you are referring to
19  counsel?  Okay.
20          MR BAILEY: Yes, Colonel Coury how
21  would a document like this find itself into,
22  find its way into this file?
23          THOMAS COURY: I would think that
24  paragraph #3, holds the answer. That
25  apparently, about one month before this

1  letter was generated, which would have been
2  January 2001, Captain Ober contacted Ms.
3  Poso, wanting to know if any the State Police
4  had been around, asking questions about his
5  activities. So Poso, must have contacted
6  Hunt, who contacted the department, and the
7  department probably called to find out what
8  was going on, and obviously it was related
9  back to this investigation.
10          Q: Well, why was it put in the
11  file, without notifying Ober, or his lawyer,
12  or whoever?
13          A: I guess because there was
14  probably nothing to it.  And I mean, I don't
15  know, I `m just making assumptions that I
16  certainly should not. This is more of a
17  question for Major Pudliner to answer as
18  opposed to me.
19          Q: No.   I want to ask you because
20  you're a past BPR director, because you're
21  the head of operations, and because you have
22  great experience, and I just want to know,
23  was it normal policy to add additional
24  documents to a closed file, without notifying
25  the subject of the investigation. I'd like to

1  know if that was a past practice, when you
2  were a Deputy Commissioner with the
3  Pennsylvania State Police.
4           A: I don't think that there is a past
5  practice. Because it rarely happens. It
6  certainly doesn't violate any practice. And
7  seems rather prudent to me, actually.
8           Q: Why? Okay.
9           A: Because he was cleared to it. I
10  mean, and this tends to support those things.
11  Again, it just has to go with tracking and
12  history things.
13          Q: Okay, but this is, why is he not
14  notified about this? Why do we have to, were
15  in a law suit and this things ends up
16  bubbling up in a file, if you'll forgive me,
17  why would there not be, if this is a file
18  concerning a member of the Pennsylvania State
19  Police, you or anybody else, where they have
20  been investigated, understand the file is
21  closed, I understand there may be some value
22  to adding this, lets be hypothetical and say
23  it was a bad letter, indicating a bad thing,
24  indicating there was bad information, and
25  don't read responses, don't read responses,

1  sir, let me ask you if you know of any other
2  situations where a document like this was
3  added to a file and the person wasn't told? I
4  know you said it was prudent cause you
5  thought it was exculpatory, but why wasn't
6  Captain Ober notified?
7           A: Your question was again in two
8  parts, and first part was, asked me if I was
9  aware of it. To the best of my recollection,
10  I'm not aware of any other instances that
11  happened. Quite frankly and honestly, why
12  Captain Ober was not notified is a question
13  for Major Pudliner and Colonel Conley.
14          Q: Okay but as far as the State
15  Police practices are you concerned, do you
16  know of any other instances where there were
17  additions to investigations, an additional
18  investigative inquiry that was added to a
19  file without the person who is the subject of
20  the file being notified?
21          A: I don't recall of any sir.
22          Q: Is Major Hunt out there looking
23  for things to do to Captain Ober? Do you
24  know?
25          A: No, sir I wouldn't think so.

1      Q: Is there a policy of getting
2  even or getting back at Captain Ober, because
3  he had the good fortune of legally
4  prevailing, at least so far, in his
5  relationship with the Department, and the
6  Commissioner?
7      BARBARA CHRISTIE: Just an objection
8  to characterization of legally prevailing, I
9  would take issue to that, based upon the
10  actual record in this case, and the
11  proceeding cases.
12      MR BAILEY: Well, let me restructure
13  the question. Is there some kind of policy
14  out there to get back at or to punish Captain
15  Ober for his. let me tell you why I ask that.
16  Got this thing about his emotional, being
17  emotionally distraught, which you
18  characterize as a duty in a compassionate
19  response, okay, that's fine. We have this
20  issue here, February 12, 2001 and he is not
21  even told about it. You know, down here
22  paragraph three, Miss Poso further indicated
23  retire Captain Ober may have contacted her
24  via telephone, approximately a month ago and
25  made inquiries to whether she had been

1  contacted by any members of the Pennsylvania
2  State Police regarding his activities. Now,
3  you know, as I see it, he has every right to
4  do that, and maybe that's a factually
5  important thing, to go in there, but you
6  know, logically he should be able to respond
7  to that, rightfully or wrongfully. If it's
8  placed in his file and indicates something. I
9  mean it's a career office in the Pennsylvania
10  State Police, and he is allegedly calling
11  somebody to find out whether she had been
12  contacted by members of the Pennsylvania
13  State Police regarding his activities. And we
14  don't even know if he has contacted his
15  lawyers, told he has an outstanding federal
16  civil rights suit. Now my question is, if you
17  take that, this fact here, if you take the
18  issue having to do with the emotional, you
19  know, the transfer to Washington which, Sir,
20  according to your testimony and my research,
21  because it was not specified as temporary, it
22  was a permanent transfer. The only one that
23  you know of in your, widely recognized, as a
24  great reservoir of experience in the
25  Pennsylvania State Police, at a very high

1  level, you have never known it happen to
2  anyone that was transferred that far away
3  from home, without there will. I've had half
4  a dozen witnesses, including you, u who have
5  no evidence to indicate, that any transfer to
6  Lieutenants position, for a Captain ever
7  occurred, Colonel Evanko himself, testified
8  that. He knows of no other.  In light of
9  all those things, I'm asking you, is there a
10  policy or some effort, I don't know if it is
11  a conspiracy, or if it's just agreement, or
12  overt agreement, I don't know, or tacet
13  agreement, to get Captain Evanko, is there
14  any such thing in the Pennsylvania State
15  Police? And my mind always goes back to
16  you're response about the culture of the
17  Pennsylvania State Police.
18      BARBARA CHRISTIE: Do you mean
19  Captain Ober. Right?
20      MR BAILEY:  Is there some desire to
21  get Captain Ober. I am sorry Counsel, you're
22  absolutely right, it was a long preamble. Is
23  there some practice or policy in the
24  Pennsylvania State Police designed to get
25  Captain Ober?

1      A: No, Sir.
2      Q: Okay. And see if I can shake
3  this up for you sir. And March 5, 1998.
4  Darrell, I just wanted share with you how
5  much I appreciate the job your doing, I have
6  received many positive comments from Mary and
7  troop commanders on your outstanding
8  performance. The extra mile you go to
9  cooperate and work with your fellow
10  commanders is dully noted, Needless to say
11  when they are happy it Commissioner and my
12  job easier. Keep up the good work. , Tom,
13  March 5, 1998. Do you remember that? Hand
14  written.
15      A: No, I don't remember. But, when.
16      Q: It's hand written. You're a
17  pretty important fellow in the Pennsylvania
18  State Police. If I'm out working as a Captain
19  and I get a letter from my Lieutenant
20  Colonel, I'd like to have it marked. Is that
21  your handwriting?
22      A: Yes, Sir. It is.
23      Q: Okay.
24      BARBARA: Coury 6
25      MR BAILEY: Okay, based on you

1  knowledge and experience, did Captain Ober go
2  through a change of moral turpitude? Did he
3  go through a significant change in his
4  morality, his conduct in life, between that
5  letter and when you left the Pennsylvania
6  State Police?
7          THOMAS COURY: No, Sir.
8          Q: Aside from the disagreement over
9  his decision, on or about the first week of
10 October 1998, what did Captain Ober in your
11 eyes do wrong. And I'll add to that
12 submitting the, if you think it was a moral
13 decision or moral error, submitting the
14 reimbursement.
15         A: Well first of all, I won't say
16 he did wrong, okay.
17         Q: Okay.
18         A: My comments are strictly, as it
19 relates to lack of good judgment, in being
20 part of that process without his commanders
21 knowing, and the motel, and the day off
22 issue. That is it.
23         Q: Okay, you know reason why I was
24 questioning you about the day off issue,
25 because I was trying to make the argument of

1  course, or get you to make the argument for
2  your testimony, that to be consistent with,
3  whether it's an error in judgment or not, the
4  judgment he had made about the week of
5  October 5th. It would have necessarily
6  followed; that he wouldn't reveal what he was
7  doing until later on. That's all I was trying
8  to do. But if you jumble those things
9  together, is it fair to say that aside from
10 Captain Ober's error around the, and the
11 things connected with it, connected to the
12 October 1998 decision that he made, in your
13 view it was an error, he doesn't think it
14 was, but aside from that, there wasn't
15 anything wrong with what he did, and your not
16 even saying that that was necessarily wrong,
17 it was an error, but my understanding is,
18 that aside from that, you can't point to
19 anything he did in his career, that even
20 indicates an error in judgment , or certainly
21 any kind of wrong doing.  Right?
22         A: It lacks good judgment, there
23 were a couple of minor issues when he was in
24 BPP, and in investigative techniques he used
25 that were not in accords with my management

1  style. But other than those things, that is
2  it, Sir.
3          Q: Okay, and normally in your
4  career, there are going to be disagreements,
5  I mean the Pennsylvania State Police
6  attracts, lets all admit, a very high
7  caliber, you know, a very hard working, and
8  capable type of person. Obviously the
9  qualifications are very high, and the duty
10 requirements are very high. So it is normal
11 during a course of a career in the
12 Pennsylvania State Police, you're going to
13 have disagreements and you're going to make
14 minor mistakes. But fair to say, there's no
15 major error or character flaw that you see,
16 in Captain Ober, during you experience with
17 him. Aside from the October thing, which is
18 an error in judgment, not a character flaw,
19 but an error in judgment. There isn't really
20 anything of a major significance that you can
21 point to?
22         A: No, Sir I cannot point to
23 anything.
24         Q: All right. Now, I want to read
25 something.  This is from Philip DeWire, and

1  it is dated October 4, 2000, 9:29AM, sent to
2  either Darrell Ober, I think it was sent to,
3  but it had to do with a speaking engagement,
4  and some of your words up in State College,
5  Pennsylvania, okay, and it's I think it a
6  letter, subject is chain of command.  I'd
7  like you to look at this first, cause I want
8  to see if you recollect this.
9          A: I, do remember this, Sir?
10         BARBARA CHRISTIE: Can we mark this
11 counsel as Coury 7, I believe?
12         MR BAILEY: Right, yes we can mark
13 it. Let me, I just want to ask you what you
14 mean by certain things.
15         THOMAS COURY:  Sure.
16         Q: I believe in and support
17 communication through the chain of command.
18 Speaks for itself.  I believe it's my duty to
19 support your unity of command. This is you
20 speaking thorough this communiqu,. By
21 communicating with the troop commanders to
22 the area commanders. Only in the case of
23 exigent circumstances, will I deviate from
24 that practice. Well, where in the
25 Pennsylvania State Police regulations, where

1 in law of the Commonwealth of Pennsylvania,
2 is there a statement of what those exigent
3 circumstances are. And what, if you want to,
4 add your own communications in, because I
5 look and I can't find anything.   I need your
6 help.   Where are these exigent circumstances
7 identified and classified?
8          A: There are none. But I think in
9 order to understand that document, you need
10 to understand why it was generated, and that
11 could shed some light on the question you're
12 asking.
13          Q: All right I'll give you a chance
14 to come back to that. I'm going to put in
15 front of you, and then you can respond till
16 your hearts content. In such a case, i.e.
17 exigent circumstances, I will still,
18 subsequently, notify you and not rely solely
19 on the troop commander to apprise you of the
20 communication. Now, I'm not trying to talk
21 down to you, I don't want you to get this
22 wrong.  But did you learn something from
23 Captain Ober here, and try to emulate him.
24          A: It had nothing to do with
25 Captain Ober.

1          Q: Okay.
2          A: Not a thing.
3          Q: Okay, all right, well I wasn't
4 trying to insult you there, but it just
5 seams, it seems to me, seems to me that am
6 exactly what he did.
7          A: Again you don't know the
8 background of it, and that's why you're
9 asking the question.
10          Q: Okay, well you're going to be
11 able to straighten me out here. Said,
12 accordingly, please remember the upward chain
13 of command. Now the reason this sentence says
14 to me, why this communiqu, glared at me, as
15 so important. Is because I didn't know, when
16 you were saying these words, it wasn't real
17 clear to me at first, whether you were
18 talking about something that has to do the
19 top down. But here you say, accordingly,
20 accordingly sir, incorporating by reference
21 what has gone before, please remember the
22 upward chain of command to the Commissioner
23 is through the Deputy Commissioner of
24 Operations. Now, in fairness to you, were you
25 telling them that I might depart from the

1 chain of on the downward look, but you are
2 not to depart from the chain of command on
3 the upward look, even under exigent
4 circumstances, or are you saying, now this is
5 how I', taking this, that exigent
6 circumstances mean, there may be situations
7 where you have to bypass the chain of
8 command, on the way up. That's the way I took
9 it. Am I taking it wrong?
10          A: There may be exigent
11 circumstances, going down and up.
12          Q: That's the way I read it. Okay,
13 now, because you go on to say, unless exigent
14 circumstances exist, where the Commissioner
15 contacts the area Commander or bureau
16 director, directing. Now obviously that's a
17 downward look. If that type of direct
18 communication occurs, I would still
19 appreciate the area commander or bureau
20 director, subsequently contacting me apprize
21 me of the communication as opposed to
22 expecting the Commissioner to advise me of
23 the communication. Now in fairness to you,
24 you're running an outfit, you got 4000
25 people, as a practical matter in running that

1 department on a day to day basis, with police
2 officers, who are sometimes, God forbid,
3 confronting life and death situations,
4 traffic control, all kinds of nuts out there,
5 and irresponsible people, it's a difficult,
6 you know, plus you got the routine stuff you
7 have to do. The law requires you to do. I
8 mean, this is a pretty common, I would call
9 this pretty much, I'm going to ask you, is
10 this just pretty much of a common sense
11 document. On, you know, trying to provide
12 some guidance on how to deal with the
13 requirements of chain of command, so we can
14 run this organization?
15          A: yes, Sir
16          Q: Yes, exactly. Now you tell me
17 how, what those exigent, All right last
18 paragraph, clearly defined expectations, on
19 the issue of chain of command and
20 communication supports all of our operations,
21 and has proven to be the most efficient and
22 effective way of doing business, in Para
23 military organizations. Thank you for your
24 cooperation. Lieutenant Colonel, Tom Coury.
25 Now your very strong today and you've been

1  consistent about your disagreement Captain
2  Ober's behavior. You tell me how Captain
3  Ober's behavior fits into context of what you
4  were sending out to your troops in the field
5  on how to deal with their chain of command
6  problems, on a day-to-day basis. I'd like to
7  know the difference; I'd like to know what it
8  is, if you can tell me.
9          A: Exigent, certainly means more
10 than immediate, life threatening things like
11 that, to me Exigent, means that they've got a
12 barricaded gunman in Norristown, who has a
13 hostage, and my phone at house isn't ringing,
14 so they have to call the commissioner.
15 Downward chain of command, one of the members
16 has been hurt, and the Commissioner needs
17 information, I'm not around so he goes
18 directly to the major. Again you are not
19 familiar with the context of why this letter
20 was generated, and that has an impact on it,
21 because certainly it had nothing to do with
22 Captain Ober, or his behavior, or anything
23 like that sir.
24         Q: If I implied, I probably did,
25 and I didn't mean to, and I profess I didn't

1  mean to sir. I didn't mean to imply, I was
2  asking a question, but did not mean to imply
3  .
4          Q: Okay, let me strike the last
5  question and rephrase it, yes you can mark
6  the document, yes.  What I am asking is,
7  what, you don't explain what exigent
8  circumstances are in that document.  Do you
9  have any other documents, or any other
10 speeches, any other communiqu‚s,
11 communications to members, speeches, speaking
12 opportunities, books, articles, publications,
13 of any type, manor, shape, form, that as a
14 Lieutenant Colonel in the Pennsylvania State
15 Police, that you authored or caused to be
16 generated, which explains what exigent
17 circumstances are, and would explain what you
18 mean in that communiqu‚.
19         A: No, sir I don't believe so.
20         Q: But exigent circumstances to you
21 doesn't mean a situation where your new
22 commander, coming in has a potential conflict
23 of interest with the FBI target, Mr. Stanton.
24 Where there is a recollection, at least as
25 far as Captain Ober is concerned, about the

1  reaches of this FBI investigation, and so he
2  turns to a Lieutenant Colonel, because the
3  Major, in this case Major Conley, was
4  physically not available, but he turns to a
5  deputy commissioner, to ask advise. You don't
6  think that FBI inquiry is exigent
7  circumstances?
8          A: Mr. Bailey, there's no way
9  you'll ever convince me that waiting one more
10 day or two days for Colonel Conley was such
11 critical, was so critical for this FBI
12 investigation that had gone on for some time
13 before, that it was exigent enough that it
14 wouldn't have waited a day or so.
15         Q: What about the potential
16 conflict of Major Conley coming from out
17 West?
18         A: That conflict never came up
19 until somebody talked about it much, much
20 later, after the date, but I don't see any
21 conflict there with Major Conley coming from
22 the west.
23         Q: And you are certain that you're
24 not rationalizing your reasons for objecting
25 Captain Ober's behavior, because it irritates

1  you that someone didn't come to you with
2  something that you thought could be
3  politically threatening to the department.
4  You're not rationalizing that?
5          A: I don't believe so.
6          Q: Okay. I think she needs it
7  there. Would you kindly give me an
8  opportunity to confer with my client, for a
9  moment?  I will be right back. I have no
10 further questions. Do you have any questions
11 Barbara?
12         BARBARA CHRISTIE: Yes, I just have
13 a couple of areas that I would like to
14 clarify. Firstly, Colonel I think you had
15 indicated to counsel as to, Coury 7, that you
16 wish to shed some light on the occasion for
17 generating this particular e-mail. To
18 illustrate its non-relationship to Captain
19 Ober. Could you now so indicate please?
20         THOMAS COURY: Well the exigent part
21 was certainly verbiage added, but the real
22 crux of this whole issue was that at the, I
23 had only been the Deputy Commissioner of
24 Operations for a very short time, a couple of
25 months, taking in July, and during that time

1  I had called the area, the Troop Commander's,
2  on more than one occasion direct. And at the
3  July Area and Troop Commanders Conference,
4  Major Szupinka had mentioned to the Area
5  Commanders, and they had some internal
6  discussion about me calling the troop
7  commanders direct, and they felt I should be
8  going through them as opposed to making
9  direct calls to the troop commanders. That
10  was brought to my attention, and I agreed
11  with it. I had meant to bring it up there at
12  the Area and Troop Commanders Conference,
13  about what my operational position was on
14  chain of command. So, it was strictly an
15  issue between area commanders and troop
16  commanders.
17      A: Okay and I would just suggest, I
18  know you want to talk to me, but talk to the
19  video camera so that we're not off of the
20  Video tape deposition on my question if you
21  wouldn't mind. And the examples you have
22  given of exigent circumstance, although not
23  defined, are examples that deal with a need
24  for urgent transmission of information, such
25  as the barricaded man with hostage situation,

1  and Commissioners immediate need for
2  information, and the Area Commander is not
3  available, and so forth, he goes to the Troop
4  Commander. With regard to immediacy, I think
5  you've indicated that you knew of no, as to
6  the FBI probe, you knew of no need to
7  immediacy of reporting in that particular
8  situation. Is that correct understanding?
9      MR BAILEY: Objection to the form of
10  the question.   You may respond.
11      THOMAS COURY: That's correct. I
12  viewed, when I generated this document to
13  Area and Troop Commanders, it's operations as
14  opposed to administrative issues, I viewed it
15  as more a life threatening issues as opposed
16  administrative issues.
17      BARBARA CHRISTIE: Okay.  So would
18  you view exigent circumstances, basically
19  Colonel, as an excuse to kind of pick and
20  choose who you want to go to, with regard to
21  information, someone in your chain of command
22  who perhaps you don't, for whatever reason,
23  want to go to, as opposed to someone you like
24  better, or whatever and do want to go to with
25  information. Is that within you definition of

1  exigent circumstances?
2      MR BAILEY: Objection to the form of
3  the question. With all do respect, that one
4  had three subparagraphs, you would beat me on
5  that one, Barbara. Anyway I object to the
6  form of the question.
7      BARBARA CHRISTIE: But the witness
8  may answer the question.
9      THOMAS COURY: I guess it could be
10  used that way.
11      Q: But is that what you conceive to
12  be exigent circumstances, that you can pick
13  and choose just who you like better to
14  report.
15      A: Oh no, you can't do that.
16      Q: Okay, all right.   And with
17  regard to the availability of then, Major
18  Conley, I believe counsel indicated that the
19  then Major might have been either
20  unavailable, or perhaps potentially involved,
21  because he came from the West, as opposed to
22  the East, as opposed to the Center of the
23  State. Were you aware at all in the answer to
24  your question of counsel, that the Colonel,
25  then Major Conley had called the plaintiff,

1  on the phone, prior to his reporting this
2  information of the FBI probe to Colonel
3  Hickes, and had asked if basically, if there
4  was anything that he should be aware of, to
5  which the plaintiff replied, no.
6      MR BAILEY: Object
7      BARBARA CHRISTIE: Are you aware of
8  that or were you aware of that, at the time
9  you answered counsel.
10      THOMAS COURY: I.
11      MR BAILEY: Sir, please. I objection
12  to the form of the question, you may respond.
13      THOMAS COURY: I somewhat recall now
14  that you had mentioned it.
15      BARBARA CHRISTIE:  Okay, and if one
16  is going to concerned about someone being in
17  a particular section of the State, or being
18  in a particular command position, would you
19  not, being an exigent circumstance, to not
20  include reporting to that person in that
21  chain of command? Would you not also, expect
22  to be consistent, that the plaintiff would
23  also consider, or that the reporter, of that
24  information would also consider whether or
25  not the repartee, in this instance is Colonel

1  Hickes, had ever been in a position to be a
2  Deputy of Operations during the pertinent
3  time period of the FBI probe.
4         MR BAILEY: Objection, I'm sorry are
5  you not finished
6         BARBARA CHRISTIE: Just to be
7  consistent to be consistent, if your going to
8  be consistent, rather than pick and choose
9  who you want to give information to. Is that
10 a question or a speak. Would you expect to
11 just be consistent that one would also give
12 thought to the position of the person to whom
13 he reports during the entire time of the FBI
14 probe.
15        MR BAILEY: Objection to the form of
16 the question.  You may respond sir.
17        THOMAS COURY: My overall opinion to
18 the exigent issue is, that had Captain Ober
19 done his homework before he knee jerk reacted
20 and went to Colonel Hickes, there couldn't
21 have been any perception to an exigent
22 circumstance.
23        MR BAILEY: Objection to the
24 witness's response.
25        BARBARA CHRISTIE: With regard to

1  this decision of the compensation
2  reimbursement board. Counsel questioned you
3  with regard to whose decision or whether
4  there was a decision or an attempt to take an
5  appeal from the board determination of
6  compensation or reimbursement. To your
7  understanding was this decision a decision to
8  take an appeal, or a decision to ask the
9  board to reopen the record, to receive
10 information that they had not received
11 through the Common wealth Advocate Mr. Grab
12 or elsewhere such as an interview from
13 yourself. The individual who denied this
14 request in the, whatever, at the second place
15 going through the chain of command, after
16 Major Conley.
17        MR BAILEY: Objection to the form of
18 the question. You may respond.   Counsel
19 leading questions are one thing, but you may
20 be setting a record.  I just ask if it's
21 possible to.
22        BARBARA CHRISTIE: I believe we are
23 in deposition counsel. We're not in court.
24        MR BAILEY: That's really not a
25 cogent or.

1         BARBARA CHRISTIE: .at this point
2  are you not.
3         MR BAILEY: I'm objecting.   You may
4  respond.
5         BARBARA CHRISTIE: Do you remember
6  the question at this point?
7         THOMAS COURY: As I responded to Mr.
8  Bailey's question that I didn't feel that
9  there was an appeal process available to the
10 department, so I guess it was more in terms
11 of, what can the department do to get it's
12 position on record, because here you have a
13 board of three people meaning, the P.S.T.A.,
14 which was Bruce Edwards, O.A., which was Bill
15 Mullen, and P.S.P., which is Leonard
16 Washington, Mark Grab, the advocate for the
17 common wealth side.  I wanted to make sure
18 the three-panel board had the information on
19 why I felt it necessary to say it shouldn't
20 be approved, on what my feelings was for
21 rejecting it. You had Colonel Hickes
22 approving it, and the board would have access
23 to that information, through Mark Grab, but
24 who was going to give the board the
25 information on the things they should

1  consider, on why it was initially rejected.
2         BARBARA CHRISTIE: Okay.  And, had
3  you Colonel Conley, strike that, Colonel
4  Coury, or to your knowledge Colonel Conley,
5  either been contacted, for purposes of board,
6  this consideration of request, by the board,
7  or even been aware that this request was in
8  fact being considered by the board. By the
9  request, I mean the request for compensation
10 reimbursement. Until after the board had
11 acted, of course, I am talking.
12        THOMAS COURY: I was never.
13        MR BAILEY: Objection to the form of
14 the question, you may respond.
15        THOMAS COURY: I was never contacted
16 by Mr. Grab.
17        BARBARA CHRISTIE: Okay, so by that,
18 were you ever, if you weren't contacted by
19 Mr. Grab, were you ever aware that the board
20 had even acted on this request, until after
21 the action had occurred?
22        A: No.
23        Q: And with regard to your
24 testimony that Colonel Hickes had been
25 interviewed, or had been spoken to by Mr.

1 Grab, was it your understanding that Colonel
2 Hickes had approved the request for the hotel
3 and the for the reimbursement of the vacation
4 day to a working day before these thing
5 occurred, or was it your understanding that
6 Colonel Hickes basically had indicated that
7 he hadn't approved them before hand, but
8 thinking back on it, retroactively he would
9 have approved it, so it would have been okay
10 with him.
11      MR BAILEY: Objection to the form of
12 the question.  You may respond.
13      THOMAS COURY: I thought that it was
14 retroactive, first of all. Secondly, I had a
15 position on how Colonel Hickes could
16 retroactively, or even proactively approve
17 leave and a hotel room for a member, who
18 actually wasn't even under his command, but
19 was under my command. So I thought there was
20 a due process issue, if you will.
21      BARBARA CHRISTIE: Okay, Did you
22 have any question at all as to why a FBI an
23 investigation in which Captain Ober was
24 apparently participating, a meeting
25 concerning that investigation, could not be,

1 counsel questioned you as to, would it not
2 seem reasonable to you, that Captain Ober
3 would not have documented his comings and
4 goings with regard to meeting with the FBI at
5 the hotel, and documented them
6 contemporaneously, or shortly after those
7 events had occurred.  Do you recall questions
8 the counsel asked you to that effect, that
9 wasn't it reasonable it was not to found out,
10 or it to be confidential that the Captain
11 would not document those events? Until some
12 months later when he made the request for
13 leave reimbursement and hotel reimbursement.
14 Do you recall questions to that effect?  I
15 am only asking if he recalls questions to
16 that effect.
17      MR BAILEY: Objection, objection to
18 the characterization..
19      THOMAS COURY: I recall the
20 question.
21      BARBARA CHRISTIE: Okay.
22      MR BAILEY: Sir, no, no, come on now
23 we have got to play by the rules here.
24 Colonel, I respectfully request, you know
25 what's been going on here, that you do not

1 or was not at an FBI installation, as opposed
2 to a hotel.
3      MR BAILEY: Objection, please.
4 Objection, not only to the form of the
5 question, but I'd also like to state that
6 maybe I can save some time, and just object
7 to this entire line of questioning, various
8 grounds, but objection, and objection to the
9 characterization of the counsels testifying
10 she has been on a number of these questions,
11 I would object, and you may respond, Sir.
12      THOMAS COURY: I think your question
13 gets back to what I had said earlier, that,
14 you know, I wanted the board to have all the
15 information, on the reasons why I did not
16 think it was appropriate to approve the leave
17 day or the hotel day. I think that there was
18 a number of other alternatives available to
19 Captain Ober, prior to resorting to going out
20 and renting a hotel room. Could have met at
21 the FBI office, could have met at a, probably
22 a library, there's probably a lot of places
23 you could have met without going out and
24 renting a hotel room.
25      Q: And with regard, I believe

1 jump in here with an answer, before I have
2 opportunity to re-join, please. I object, I
3 object to the characterizations, I object to
4 the form of the question.   Thank you.
5      BARBARA CHRISTIE: Colonel, would
6 it not seam reasonable that if Captain Ober
7 is in fact going to meet with the FBI, with
8 the approval of Colonel Hickes, at a hotel,
9 on leave time, that he is later going to
10 claim as work time, that even if he didn't
11 document it for anybody else, that he would
12 have least contemporaneously documented this
13 to Colonel Hickes.
14      MR BAILEY: Objection, objection to
15 the form of the question.   Objection to
16 characterizations. You may respond.
17      THOMAS COURY: I am surprised at the
18 fact a man of Captain Ober's caliber, of his
19 ability, of his knowledge of rules and
20 regulations, his attention to detail, that a
21 man with all those talents, didn't have
22 better paper trail of what all took place,
23 during that period of time, from the time the
24 FBI called him until the meeting with Colonel
25 Evanko.

SHEET 36  PAGE 141

1    BARBARA CHRISTIE: And would you agree,
2  Colonel Coury, that that paper trail could
3  have been committed to paper in memos from
4  Captain Ober to Colonel Hickes. During the
5  events, or at or about the time of the
6  events, in question.       MR BAILEY:
7  Objection to the characterizations.
8  Objection. And objection to the form of the
9  question. You may respond, Sir.
10    THOMAS COURY: I believe that there
11  could have been a paper trail generated.
12    BARBARA CHRISTIE: Have you seen any
13  documentation from either Colonel Hickes or
14  from Captain Ober at any point to date, in
15  this law suit indicating that Captain Ober
16  did in fact extemporaneously document those
17  events, if to nobody else, to Colonel Hickes.
18    THOMAS COURY: I have not seen any
19  paper trial, I only by attending some,
20  Colonel Conley's deposition I guess, heard
21  about a few documents being generated.
22    Q: Of course if there were
23  documents to that effect, generating this
24  paper trail, I would assume, would you not
25  assume, that those documents would have been

PAGE 142

1  produced to us, pertinent to a defense
2  request for production of documents, by now?
3    MR BAILEY: Objection to the form of
4  the question.
5    BARBARA CHRISTIE: That's a
6  rhetorical question.  I'll withdraw that
7  question. I have no further questions.
8    Mr. Bailey: I have no further
9  questions.
10    Albert Rodriquez:  It is now 4:03.
11  The deposition of Lieutenant Colonel Thomas
12  K. Coury, is completed. Suspending video.

 

## P.R. VIDEO, INC

### #

# [1] 103:8
#1999-409 [1] 104:4
#2 [2] 104:5,26
#3 [1] 105:19

### 0

0084 [1] 1:12
01 [1] 1:11

### 1

1 [8] 1:1 10:15 37:18 94:15,25 98:7 104:7,8
1-101 [1] 94:3
1-cd [1] 1:11
1:10 [1] 16:9
10 [3] 105:4,6,10
10/20 [3] 40:20 41:3,5
10:06 [1] 1:4
10:27am [1] 16:7
102 [1] 93:19
12 [5] 45:11 104:3 105:7,12 109:11
12:35 [1] 12:7
12th [1] 145:2
15 [2] 1:3,5
15th [2] 16:9 74:13
16th [1] 25:7
17033-1181 [1] 22:23
17046 [1] 1:7
17110 [2] 2:2,7
1746 [1] 22:22
1800 [1] 2:6
19 [2] 37:5 95:8
199.should [1] 74:13
1998 [4] 111:17 112:1,23 113:24
1999 [15] 3:26 10:6 12:7 37:4,8,18, 24 38:13 45:3,14 73:17 75:12 77: 7 103:9 104:6
1999-409 [2] 12:7 105:13
19th [2] 37:8 42:20
1st [1] 75:12

### 2

2 [4] 13:18 14:15 104:7 105:11
2:52 [1] 99:24
20 [3] 38:9,15 98:10
2000 [14] 25:14 50:20,26 51:3 54: 11,14 78:17,18 89:19,23 90:12,14, 15 98:10 115:11
2001 [22] 20:5 25:7,15,26 26:1,12 90:16 94:8,15,15,16,20,21 95:8 97:20 98:7,10 104:3 105:7,12,22 109:11
2002 [2] 1:3 23:8
208 [1] 90:8
20th [3] 40:14 42:21,26
22 [2] 10:6 94:16
22/23 [1] 94:20
22nd [4] 3:26 37:22 42:20 94:7
23 [2] 98:10 104:6
25.07 [1] 100:8
25.0ab [1] 101:20
25.4 [1] 100:8
27 [3] 12:7 25:26 26:1
27th [2] 20:5 26:11

### 3

28 [1] 38:13
28th [1] 37:24
29 [1] 38:12
2o [1] 103:9

### 3

3 [4] 10:5,11 74:19 101:20
3,2000 [1] 25:14
3:00 [1] 97:1
3:15 [1] 100:1
30 [4] 89:19 90:15,16 98:8

### 4

4 [3] 10:5 76:17 115:11
4.25 [2] 102:14,26
4:03 [1] 136:24
40 [2] 90:1 102:6
4000 [1] 119:5
411 [1] 86:18
4126 [1] 1:6
425 [1] 100:3
4311 [1] 1:12
4th [1] 73:17

### 5

5 [3] 76:21 111:17 112:1
50/50 [1] 88:5
501 [1] 75:11
525.4 [3] 83:5,10 86:24
5th [1] 113:17

### 6

6 [1] 112:12
67 [2] 105:4,10
6th [1] 2:2

### 7

7 [2] 115:21 123:17
717-221-9500 [1] 2:3
717-783-5568 [1] 2:8

### 9

9 [1] 105:6
9:29am [1] 115:11
9600 [1] 2:3
98-22 [1] 102:13
99 [3] 45:11 78:14,16

### A

a.m [1] 1:4
ability [2] 73:12 135:9
able [7] 5:4 13:5,9 70:13 71:20 109:22 117:19
above [1] 93:11
absolutely [5] 26:19 60:15 71:6 91:26 111:11
abuse [1] 31:26
academy [1] 32:5
access [2] 16:17 130:17
accommodate [1] 15:7
according [3] 36:10 94:7 110:10
accordingly [1] 117:20 118:1,2
accords [1] 114:11
accreditation [1] 95:13,16,18
accurate [5] 22:25 23:4 26:6 97: 15,16
accurately [2] 12:14,17

accusation [2] 8:25 10:20
accusing [1] 6:20
acquaintance [1] 17:10
acquire [2] 29:22 35:26
acquiring [1] 35:26
acquisition [3] 32:8 34:19 35:20
acted [2] 131:5,14
acting [16] 40:25 67:12 70:3,15 83: 16 85:8,14 86:14 87:10 88:12,16, 19,21 89:26 90:19 96:3
action [8] 29:14,15,17,18 100:10 131:15
actions [1] 39:26
activated [1] 61:19
active [3] 17:1 18:15,19
activities [3] 105:25 109:18 110:3
acts [1] 78:23
actual [1] 109:1
actually [8] 13:26 48:3 56:20 64:6, 14 73:5 106:26 132:11
add [2] 106:17 112:24 116:13
added [3] 107:21 108:10 123:23
adding [1] 107:15
addition [2] 84:16,17
additional [3] 104:10 106:17 108: 9
additionally [1] 74:12
additions [1] 108:9
address [6] 1:6,23 2:1,6,12 23:3
adhered [2] 43:17 102:19
adjudicate [1] 5:9
adjudicated [6] 4:9,10,11,14,26 12:2
adjudication [5] 4:15,17,19 5:1,8, 15
adjudicator [1] 5:6
administration [7] 49:12 60:13 69:12 73:19 75:18 81:11 89:18
administrative [8] 5:17 86:17 97: 14 100:15 102:24 103:2 125:14, 16
administratively [1] 85:16
admit [1] 114:17
admitted [1] 75:1
adverse [1] 39:26
advisability [1] 70:10
advise [2] 119:3 122:8
advised [2] 1:2 82:18
advocate [3] 72:16 129:7 130:11
affairs [3] 45:2 66:24 103:4
affected [3] 28:3 64:17 94:4
affecting [1] 103:1
afford [2] 84:22 85:4
afterward [1] 58:26
afterwards [1] 98:5
agencies [1] 83:14
agency [1] 96:24
agents [1] 55:16
ago [2] 64:1 109:15
agree [4] 26:2,4 28:15 30:4 59:7 70:4 71:11 104:4 135:16
agreed [1] 124:11
agreement [6] 30:18 68:20 102:5 110:26 111:1,2
ahead [3] 19:19 75:22 96:22

ahead.go [1] 19:18
al [1] 1:13
albert [11] 1:1,5,15,21 2:14 16:3,6, 8 99:23,25 136:24
allegation [2] 9:17 104:9
allegations [1] 11:23
allegedly [3] 35:25 54:23 109:26
alleging [1] 63:21
allowed [1] 56:25
almost [1] 90:19
already [5] 39:9 52:13 59:7 60:2 96:8
alright [1] 104:18
alternative [1] 66:21
alternatives [1] 133:10
although [3] 39:8 41:17 124:23
amended [1] 21:7
amendments [2] 94:2,3
among [1] 85:15
amount [3] 17:22 74:10 90:17
amounts [1] 55:12
amp [2] 18:3,7
analysis [2] 60:10 66:14
anger [1] 57:10
annual [2] 61:22 74:13
another [4] 7:17 11:16 30:10 79: 24
answer [10] 1:18 12:14,17 36:18 72:7 105:19 106:11 126:7,22 134: 17
answered [3] 39:9 44:26 127:7
anybody [10] 34:20 47:8,11 70:7 79:26 88:10 98:11,14 107:12 135: 1
anyway [5] 42:18 43:4,8 92:18 126:4
apex [1] 48:3
apologize [1] 72:5
apparently [5] 41:21 67:16 97:12 105:20 132:17
appeal [14] 68:9 69:9,13 70:13,20, 22 71:20,21 72:9 73:12 76:4 129: 1,4 130:4
appealed [8] 67:26 69:7,14,16,24, 24 70:2 71:19
appealing [2] 70:10 71:24
appear [1] 103:26
appears [3] 18:19 22:25 105:3
appertaining [2] 35:18,20
applicable [1] 27:22
apply [1] 117:15
appoint [2] 49:6 88:1
appointed [1] 88:16
appreciate [2] 111:19 118:26
apprise [1] 117:2
apprize [1] 119:1
appropriate [6] 38:14 39:3 40:17 52:26 62:14 133:8
approval [2] 66:6 134:24
approve [6] 48:18,18 52:6 95:21 132:9 133:8
approved [15] 40:11 41:10 44:11, 15 64:11 65:7,7 68:12 72:21 73:3 94:19 130:15 131:21,26 132:2
approving [1] 130:17



## P.R. VIDEO, INC

approximately [1] 109:15

april [4] 1:3,5 16:9 23:8

ar [4] 95:20 100:3 102:14,26

ar1 [1] 97:20

ar1-1 [7] 94:2,4,10 95:6,15 98:13,16

ar1-1.10 [1] 93:19

ar11 [1] 97:23

arbiter [2] 60:3 72:15

arbitration [5] 60:3 67:26 68:23 71:9 76:5

area [2] 89:8 102:3 116:6 118:22,26 124:2,4,5,13,16 125:2,13

areas [2] 95:19 123:15

argument [3] 100:24 113:12,13

arise [1] 91:12

arises [1] 50:24

arose [1] 103:23

around [21] 29:3 30:3,5 32:10 43:10 49:21 50:25,26 51:2 78:14 89:2 95:26 105:24 113:22 120:22

arrested [2] 101:13,14

arrive [1] 38:12

arthur [2] 18:12,26

articles [1] 121:15

articulate [1] 65:24

artifacts [2] 6:8 18:25

aside [5] 112:21 113:21,26 114:4 115:2

assigned [7] 46:26 64:9 84:12 86:14 87:3 103:8,10

assignment [5] 47:13 55:20 83:11,15 86:19

assignments [1] 83:12

assistant [2] 2:10 95:24

association [1] 68:21

assume [6] 19:7 80:23 86:6 100:23 136:13,14

assumptions [1] 106:9

attached [1] 14:24

attachment [2] 9:10 99:17

attempt [2] 81:17 128:26

attend [1] 45:5

attendance [3] 73:17 75:10,12

attending [1] 136:8

attention [5] 6:9 36:17 73:22 124:11 135:10

attitude [1] 92:15

attorney [2] 30:19 71:23

attorneys [1] 68:3

attracts [1] 114:17

audio [1] 16:13

authored [2] 39:7 121:18

authority [1] 64:10

auto [1] 94:6

automatically [1] 63:15

availability [1] 126:16

available [6] 46:17 102:9 122:7 125:3 130:4 133:10

avenue [2] 2:7 22:22

avoid [1] 6:20

aware [17] 25:18 34:21 45:6 58:24 78:25 80:1 82:20 87:13 92:20 108:1,2 126:22 127:2,5,6 131:1,13

awareness [1] 44:5

away [5] 4:12 16:12 59:23 100:6 110:17

### B

back [29] 2:20 33:9 36:26 37:2 38:10 48:4 55:26 59:18 63:25,26 71:3,17 72:4 77:13 78:23 91:1 95:7,8 98:8 104:19,22 106:3 108:19 109:5 111:4 116:23 123:11 132:1 133:5

background [4] 42:13 52:14 59:20 117:16

bad [3] 107:16,16,17

badge [1] 6:5

bailey [88] 1:24,25 2:15,17,19 3:3 7:14 9:4,26 10:2,10,16,19 12:13 13:5,19 14:5,16,19,26 15:6,13,15,17,21 16:5,11 21:22 22:2 24:26 25:4,10 27:7,14 30:26 39:13 40:23 41:1,6,9,19,24 42:12 43:4 44:1,16 63:8 69:26 74:20,24 75:22,25 76:18,23,24 78:3 87:7,12 93:25 97:2 100:2 105:1,5,15 109:3 111:9 112:13 115:22 122:11 125:9 126:1 127:4,9 128:1,12,20 129:13,20,24 131:7 132:4,21 134:8,13 135:4,21 136:17,22

bailey's [1] 130:3

bailiwick [1] 96:16

barbara [65] 2:4,4 7:11 9:23 10:8,14 12:23 13:17,20 14:3,8,18,21 15:5,8,14,16,20 24:24 27:2 38:26 40:15,24 41:4,7,16,21 42:8,24 43:25 63:7 70:25 74:17,21 75:20,24 76:16,20 104:24 105:3,9 108:24 111:7 112:12 115:20 123:13,14 125:17 126:4,6 127:5,13 128:3,22 129:18,22,26 130:22 131:11 132:14 134:12,21 135:16 136:1,19

bargaining [1] 102:5

barricaded [2] 120:17 124:26

base [1] 5:14

based [6] 50:12 74:8 76:6 102:7 108:26 112:13

basically [4] 2:23 125:18 127:1 131:25

basis [6] 5:21 44:24 70:22 87:4 119:7 120:11

beat [1] 126:3

beautiful [1] 2:22

became [2] 50:18 68:16

becky [3] 38:6 39:1,4

become [1] 63:15

becoming [2] 25:17 87:13

begin [2] 2:14 39:13

beginning [3] 3:19,19

behalf [1] 86:15

behavior [4] 120:7,8 121:1 123:2

believe [30] 5:13 8:11,12,13,26 9:15 12:9 13:11 18:6 25:6 26:5 37:4 50:9,16 58:6 66:8 69:20 73:15 80:7 92:9 103:9 115:21,26 116:2 121:22 123:7 126:17 129:18 133:17 135:25

belong [1] 30:1

below [3] 57:26 58:1,4

benefit [3] 10:4,22 85:10

best [6] 21:3,4 53:3 56:23 75:14 108:1

better [3] 125:24 126:12 135:12

between [9] 3:13 19:10 26:14 45:16 66:13 98:9 100:17 112:17 124:16

beyond [1] 97:12

bid [2] 17:22 35:7

big [3] 34:17 36:15 62:2

bill [3] 69:12 71:17 130:9

binding [5] 67:25 68:22 71:8,9 76:4

bit [9] 16:14 38:1,18 47:7,19,19 52:13 79:21 97:4

bits [1] 12:18

board [17] 23:6,8 56:27 70:14 128:24 129:1,5 130:8,13,17,19,25,26 131:2,4,13 133:16

boer's [1] 102:18

boiler [1] 13:7

boilerplate [1] 20:21

books [1] 121:15

boss [1] 52:7

both [4] 41:22 87:1

bother [1] 60:20

bottom [3] 10:13 52:14 75:16

bought [1] 135:9

bowser [2] 18:17 23:14

box [1] 50:23

boyd [3] 17:4 18:18 23:25

bpr [10] 12:6 13:23 64:9 74:3 86:11 87:16 101:19 103:8 106:14 114:10

brain [1] 37:1

break [7] 13:3,14,15 16:18 19:14 73:8 99:19

bring [3] 36:16 37:26 124:12

brought [8] 6:9 53:13 124:11

brown [10] 12:8 38:6 39:2,4 40:21 45:16 77:8 79:1,7 103:7

brown's [1] 40:17

bruce [1] 130:9

bubbling [1] 107:9

buck [3] 57:17,22 61:21

building [1] 18:16

bungo [1] 94:7

bureau [10] 21:1 58:7 73:23 84:6 86:9 87:26 90:25 102:3 118:22,26

business [4] 67:9,13 96:19 120:2

bypass [3] 66:9 89:4 118:14

### C

calendar [3] 84:20 85:1 97:20

caliber [2] 114:18 135:8

call [15] 21:24 22:1 26:9,11,14 28:8,10 54:22 61:18 80:20 98:23 99:12 104:22 119:14 120:19

called [16] 16:17 21:23,23 26:25 27:10 79:1,22,25,26 80:18 82:14 106:1 124:2 126:24 135:14

calling [2] 109:26 124:7

calls [1] 124:10

came [15] 27:10 35:24,25 44:4 48:4 52:8,20,24 57:4 72:16,22 95:18 96:6 122:21 126:20

camera [8] 1:4 15:24,24,26 16:10 99:24,26 124:20

candidates [1] 93:15

cannot [2] 98:15 115:7

cantalone [3] 16:25 18:19 24:1

capable [1] 114:19

capacity [6] 70:4 88:12,16,20,22 90:8

captain [152] 3:3,10 4:2 6:4,5 10:26 12:8 19:7,23 20:1,7 23:21,23 25:13 27:15 37:8,19 38:8,10,24 44:8 45:4,14,16,24 46:1,3,5,6,13,26 48:8 49:25 50:1,3,25 52:17,20 53:8,25 54:2,23 55:20 58:20 59:21 61:16 62:5,19 63:11,12,20 64:15,18,20,24 65:11,14,20,25 66:6,16,18,21 67:4,7 69:11 72:2,10,13 73:7,18 74:2,5,8,9,12,14 75:13 77:3,14,19,22 78:8,11 79:5,8 80:18,20 81:15,20 82:9,9,14 86:10,14 87:21 88:11 90:6,9,18 91:6,15,22 92:1,2,3,4,15,16 100:24 101:10,15,16 102:18,25 103:7,17 105:22 107:24 108:4,15,19 109:5,14 110:21 111:2,8,10,14 112:6,14,23 113:22 115:1 117:6,8 120:6,7 121:1 122:3 123:2,20 128:15 132:16 133:11,19 134:1,22 135:8,19 136:3,4

caption [1] 1:12

car [8] 30:7,15 32:3,16 33:2 34:14 65:1,15

card [1] 59:4

care [1] 98:5

career [9] 84:22 85:5,9 92:14,25 109:25 114:5,15,22

careful [1] 104:8

cars [7] 32:17,18,19 34:2,3,11,19

case [27] 1:9 2:1 5:12 21:7 25:1,1 30:25,26 41:25 42:1 43:16 44:4,12 70:7,19 78:8 80:16,17 86:6 93:2 95:4 102:18 104:11 109:1 116:6,25 122:6

cases [4] 35:17 40:10 103:21 109:2

cast [3] 32:18,19 33:2

cause [4] 83:8 104:20 107:22 115:17

caused [1] 121:18

cc [1] 75:17

center [7] 16:16 22:14,19,21 33:15,21 126:21

cents [1] 74:11

certain [7] 21:12 34:16 66:24 84:22 94:3 115:24 122:26

certainly [17] 4:25 28:9 30:4 44:20 64:17 66:11,21 69:9 80:8 82:24 89:22 96:23 106:10,25 120:14,26 123:23

chain [27] 4:25 5:1 53:18 58:1,4 59:9 62:17 66:9 87:9 93:20 97:5 98:12 115:16 116:1 117:20 118:4,8,9,14 119:19,25 120:10,20 124:

 
15 125:21 127:19 129:11
**chairman** [1] 16:20
**challenged** [1] 69:7
**challenges** [1] 68:1
**chance** [3] 72:5 75:5 116:22
**change** [9] 59:1 78:7 80:9 94:5 95:
22 96:7 98:13 112:15,16
**changed** [3] 74:13 78:1,3
**changes** [6] 94:4,9,14,17 97:19,20
**channel** [1] 54:1
**channels** [1] 36:5
**character** [2] 114:26 115:3
**characterization** [3] 108:25 133:
1 134:9
**characterizations** [3] 134:19 135:
6,22
**characterize** [3] 17:11,20 109:9
**chased** [1] 83:2
**check** [3] 10:4 50:17 66:23
**checked** [1] 36:9
**checking** [2] 43:10 49:21
**checks** [1] 49:4
**chief** [2] 2:5,13
**chocolate** [1] 22:22
**choose** [4] 84:2 125:20 126:12
128:5
**christie** [60] 2:4,5 7:11 9:23 10:8,
14 12:23 13:17 14:3,8,18,21 15:5,
8,14,16,20 24:24 27:2 38:26 40:
15,24 41:4,7,16,21 42:8,24 43:25
63:7 74:17,21 75:20,24 76:16,20
104:24 105:3,9 108:24 111:7 115:
20 123:14 125:17 126:6 127:5,13
128:3,22 129:18,22,26 130:22
131:11 132:14 134:12,21 135:16
136:1,19
**chugging** [1] 116:12
**circuit** [1] 70:2
**circumstance** [3] 124:23 127:17
128:19
**circumstances** [17] 4:18 74:7
116:7,12,15,26 118:11,13,18,21
121:11,20,23 122:10 125:18,26
126:11
**civil** [1] 110:6
**claim** [2] 73:5 134:26
**clarification** [1] 39:12
**clarify** [5] 39:1,8 47:18 53:17 123:
16
**clarity** [1] 41:8
**clark** [1] 24:12
**class** [1] 86:19
**classification** [2] 83:13 87:2
**classified** [1] 116:16
**clear** [4] 22:11 52:3 65:18 117:25
**cleared** [1] 107:2
**clearly** [2] 43:19 119:24
**client** [3] 40:2 84:10 123:10
**clock** [2] 15:26 16:1
**close** [1] 19:17
**closed** [5] 103:14,18 104:15 106:
18 107:14
**co** [1] 113:20
**coffee** [2] 12:24 15:15
**cogent** [2] 39:25 129:21

**colleagues** [1] 87:15
**collect** [1] 102:5
**college** [1] 115:14
**colonel** [101] 1:14,16 2:16 3:7,12 5:
26 6:11 7:25 9:24 12:25 13:3 14:
13 15:2,7 16:13 21:24 24:5 27:3
32:22 35:13 36:13 39:5 40:22,25
41:10 43:6,20 44:26 45:9 47:16
48:13,14 51:16 52:17 62:12,15 63:
6 64:3,10,16,17,20,25 65:4,7,10,
21,26 66:3,10,15,17 68:8,12 72:20,
21 73:4 76:3,15 78:23 91:24 93:
23 95:12 96:17 97:2 100:2,19 101:
1 105:15 108:5 110:22 112:8 120:
4 121:17 122:5,13 123:16 125:19
126:23,26 127:23 128:17 130:16,
23,23,24 131:18,20,25 132:8 134:
15,21,24 135:3,14,17,19 136:2,6,9,
25
**come** [6] 25:23 35:14 37:1 47:5
48:12 51:8,22 52:24 53:4 71:17
84:7 89:5 94:17 116:23 123:3 134:
13
**comes** [1] 38:10
**coming** [9] 35:13 38:7,8 53:7 80:
16 100:26 121:25 122:19,24
**comings** [1] 133:20
**command** [37] 4:25 5:1 46:14 53:
18,26 58:1,4,21 59:9 62:17 64:6
66:10 81:13 86:11 87:9,17 93:20
97:5 98:12 115:16 116:1,3 117:21
118:4,9,15 119:19,25 120:10,20
124:15 125:21 127:16,19 129:11
132:11,12
**commander** [11] 5:4 89:9 90:22
91:5,5 117:2 118:22,26 121:25
125:2,4
**commander's** [1] 124:2
**commanders** [14] 85:15 111:21,
24 113:7 116:5,6 124:4,6,8,10,13,
16,17 125:13
**commanding** [1] 4:21
**commented** [1] 54:26
**comments** [6] 7:4 26:2,4,21 111:
20 113:5
**commissioner** [40] 5:3 30:6 31:
19 46:25 47:1,2,9 48:4,7,17 53:13
54:3 57:12,19,21 68:2 73:14,19,
24 75:18 76:9,12 81:12 88:3 90:
23 91:14 94:6 96:22 103:3 106:21
108:23 111:25 118:4,5,21 119:3
120:19,21 122:8 123:25
**commissioner's** [1] 46:20
**commissioners** [2] 36:17 125:1
**committed** [2] 6:4 135:18
**committee** [8] 16:19,20 18:11,17,
26 24:22 67:26 68:23
**committees** [2] 19:9 31:24
**common** [5] 40:6 119:14,16 129:7
130:12
**commonwealth** [5] 67:13,14,15
72:16 116:10
**communicated** [1] 36:2
**communicating** [1] 116:5
**communication** [6] 116:1 117:3

118:25 119:2,4,26
**communications** [2] 116:13 121:
14
**communiqu,** [4] 116:4 117:22
121:21
**communiqu,s** [1] 121:13
**community** [6] 31:11,17,21 32:17
35:1,10
**compared** [1] 87:14
**compassionate** [1] 109:9
**compensated** [1] 61:20
**compensation** [6] 61:20 84:16,18
128:23 129:2 131:3
**competitive** [1] 35:7
**compiled** [1] 14:25
**complainant** [1] 100:13
**complaint** [8] 4:11 6:14 12:5 21:7
25:1 36:3 100:9 103:25
**complete** [3] 13:16 74:7 79:20
**completed** [2] 102:4 136:26
**completely** [1] 26:17
**complex** [1] 71:7
**complexity** [1] 102:8
**complimentary** [1] 20:6
**compounded** [1] 58:25
**computer** [3] 98:18,23 99:14
**conceive** [2] 68:5 126:10
**concerned** [5] 40:13 104:16 108:7
122:3 127:14
**concerning** [4] 3:3 55:14 107:11
132:18
**concerns** [1] 7:5
**concluded** [2] 83:1 104:9
**concurred** [4] 21:1 65:3,4 80:8
**concurs** [1] 2:21
**conduct** [1] 112:17
**conducted** [6] 4:2 74:6 100:18,19
101:23 103:2
**confer** [2] 13:25 40:1 123:10
**conference** [2] 124:4,13
**confi** [1] 82:5
**confidential** [1] 134:1
**conflict** [5] 35:5 121:25 122:19,21,
24
**confronting** [1] 119:9
**confused** [3] 47:19,20 80:5
**confusing** [1] 39:10
**conjunction** [1] 81:19
**conley** [35] 3:2 6:12,26 7:9 45:4,9,
13 58:9,12,14 62:6,10 65:4 66:23
72:24 73:1 74:3 80:12,13,22,24
87:9,17,22 100:25 108:5 122:6,13,
19,24 126:17,24 129:12 130:23,24
**conley's** [3] 58:17 93:23 136:9
**connected** [1] 113:23,23
**connection** [1] 26:14
**consider** [6] 20:24 26:24 91:15
127:21,22 130:21
**considerably** [1] 61:11
**consideration** [2] 36:3 130:26
**considered** [4] 34:25 92:4,5 131:
2
**considering** [1] 92:13
**consistent** [15] 25:8 62:24,26 63:
4,11,14,15,21 113:14 120:6 127:

20 128:4,4,5,8
**conspiracy** [1] 110:26
**consult** [1] 88:3
**contact** [1] 6:6
**contacted** [11] 27:16 105:22,25,26
109:14,17 110:2,4 130:25 131:9,
12
**contacting** [1] 119:1
**contacts** [1] 118:22
**contain** [2] 8:25 10:20
**contained** [1] 39:10
**contemporaneously** [2] 133:23
135:2
**contempt** [1] 63:22
**contend** [1] 100:16
**content** [1] 116:25
**contents** [1] 5:16
**context** [4] 95:3 103:4 120:8,24
**conti** [14] 6:1 7:1,2,2,3,12,13,14,26
8:18 9:1 11:9,23,25
**conti's** [1] 11:3
**continuing** [1] 3:24
**continuous** [1] 115:25
**contract** [2] 32:24,25
**contracting** [1] 17:17
**contracts** [2] 17:21,26
**contribute** [1] 97:10
**contributions** [1] 22:18
**control** [3] 12:6 54:2 119:10
**conversation** [6] 20:1 27:3,4,5 42:
10 65:2
**conversations** [2] 71:23 92:1
**convince** [1] 122:12
**conway** [1] 75:14
**cooperate** [1] 111:23
**cooperation** [1] 120:4
**copies** [1] 74:21
**copy** [10] 10:9 14:11,12,12 15:9,10,
11,11 74:15 75:4 77:3,13 83:8
**copying** [1] 13:26
**corner** [2] 38:5 43:12
**corporal** [1] 23:25
**correct** [23] 4:3 12:10,10 22:3,7 26:
3 36:6 53:6 58:9 60:7,11,26 65:12
67:11,20 68:17 87:5 89:20 92:23
93:13 98:1 125:8,11
**corrected** [1] 21:18
**correctly** [4] 8:17 13:11 33:4 37:5
**correspondence** [8] 6:15 9:13,16
59:1 74:1,2,15 75:11
**cost** [1] 33:3
**couldn't** [5] 28:21,24 48:18 85:7
128:17
**council** [1] 10:9
**councils** [1] 10:4
**counsel** [39] 1:21 2:5,10,13,21 12:
23 21:19,21 24:20,25 30:21 37:26
38:26 42:9 74:17 76:17 105:14
111:10 115:21 123:17 126:17,23
127:7 128:24 129:14,19 133:18,
25
**counsels** [1] 133:1
**count** [1] 105:1
**country** [1] 32:1
**couple** [7] 6:2 16:14 24:3 96:2



## P.R. VIDEO, INC

114:9 123:15,26
**course** [5] 93:16 113:13 114:22
131:5 136:11
**court** [5] 1:10 69:18,19,26 129:19
**coury** [6] 1:14,20 2:17 3:2 7:13,
16 9:25 10:1,15,18 12:25 13:18
14:14 16:22 21:26 24:6 25:3 27:
12 40:25 41:10 43:6 44:7 63:10
74:19,22 76:17,21,22 87:11,16 97:
1 100:5 104:5,25 105:11,15,18
112:12,20 115:21,25 120:4 123:
17,22 125:11 126:8 127:8,11 128:
14 130:2,24 131:6,9 132:6 133:4
134:10 135:7,17,25 136:7,26
**coury's** [1] 39:5
**cover** [1] 104:5
**crash** [1] 61:17
**credit** [1] 59:4
**criteria** [5] 84:1 93:3,4,6 102:7
**critical** [2] 122:14,14
**cronin** [3] 18:12 19:1 24:11
**crux** [1] 123:24
**culture** [1] 111:5
**cumbersome** [1] 14:7
**cup** [1] 12:24
**currently** [1] 18:15
**cusp** [1] 54:18
**custom** [1] 93:9

### D

**da's** [1] 31:9
**damaged** [1] 56:19
**darrel** [1] 37:8
**darrell** [16] 1:12,25 3:13 10:20 35:
25 40:7 41:12 42:16 46:7 47:12,
21 51:13 73:18 75:13 111:18 115:
12
**darrell's** [1] 51:17
**date** [12] 1:4 4:5 25:25 37:3 38:9
43:16 55:24 90:2 94:23 98:17 122:
23 136:3
**dated** [7] 45:2 73:16 75:11 104:2,5
105:11 115:11
**dates** [1] 89:21
**david** [5] 18:17,18 19:1,5 23:14
**davis** [1] 18:18
**day** [34] 26:1 55:21,22 56:2,2,25
58:21 59:2,2 61:8,16,16,25 63:25
64:22,26 65:13 66:19,24,26 67:8,
8 96:2 102:6 113:8,11 119:7,7
122:13,17 131:23,23 133:9,9
**day-to-day** [1] 120:11
**days** [9] 43:5,13,24 83:24,25 84:20,
26 96:2 122:13
**dea** [1] 31:9
**deadline** [2] 37:22 42:19
**deal** [6] 19:15 34:18 36:15 119:18
120:10 124:24
**dealing** [1] 97:19
**deals** [1] 83:12
**dealt** [1] 27:25
**dean** [3] 17:3,7 24:10
**death** [1] 119:9
**debilitating** [1] 92:24
**december** [3] 77:7 78:14 104:5

**decided** [3] 21:1 60:4 67:17
**decipher** [1] 52:11
**decision** [23] 31:15 48:25 52:26
53:1 67:25 69:22 72:9 76:4,4 77:
18 80:9,11,13 83:22 112:22,26
113:24 128:23,25,26 129:3,3,4
**deduction** [1] 65:25
**defendants** [1] 2:11
**defense** [1] 136:15
**defined** [2] 119:24 124:24
**definition** [1] 125:25
**deliver** [1] 145:17
**denial** [3] 57:13 73:11,13
**denied** [12] 56:5,10,11,12,13,16,22
57:9,24 73:5 74:9 129:9
**deny** [4] 58:5 72:17,23,25
**denying** [4] 38:10 45:4 58:2 65:5
**depart** [2] 118:7,9
**department** [27] 7:22 19:10 23:16,
20 27:24 33:5 34:25 35:8 36:11
57:1 61:9,18 63:16 72:26 89:14
95:22 98:1 100:11,13 102:17 105:
26 106:1 108:22 119:7 123:5 130:
5,6
**departments** [1] 95:12
**depends** [6] 46:22 47:4 54:9 85:7,
11 95:25
**deponee** [1] 1:13
**deposition** [10] 1:8 3:23 9:21 58:
15 80:26 93:23 124:21 129:19
136:9,25
**depositions** [2] 39:17 104:1
**deputates** [1] 46:23
**deputies** [2] 81:11,14
**deputy** [15] 46:25 48:16,21 54:3
73:18 75:17 88:2 90:23 96:12,15
106:21 118:5 122:8 123:25 127:
25
**descent** [1] 93:5
**described** [1] 56:24
**designed** [1] 111:13
**desire** [2] 95:13 111:9
**desires** [1] 50:4
**detached** [2] 46:16 64:7
**detail** [1] 135:10
**detailed** [1] 65:20
**details** [2] 52:16 66:5
**determination** [1] 129:1
**development** [1] 84:23
**deviate** [1] 116:7
**dewire** [26] 19:16,23 20:1 21:6 25:
19,20,23 26:26 27:5,16 28:5,8,10
47:9,22,24 49:7 50:8,10 88:19 89:
4,5,9 91:10 92:11 115:10
**dewire's** [5] 53:26 89:12 91:13,13
92:1
**dial** [1] 99:15
**differ** [1] 15:24
**difference** [3] 82:25 100:17 120:
12
**different** [3] 11:20 47:7 84:1
**difficult** [2] 12:17 119:11
**difficulties** [3] 40:4 91:3,4
**dilatory** [1] 82:19
**dir** [1] 68:4

**direct** [6] 5:4 25:21 118:24 124:3,8,
10
**directed** [7] 4:1 68:3,6 77:18 79:
15 100:18,20
**directing** [1] 118:23
**direction** [1] 5:2
**directive** [3] 83:5,10 86:24
**directly** [1] 120:23
**director** [17] 50:18 54:2 58:6 73:
22 74:3 83:16,23 86:11 87:26 89:
18,26 90:7 91:12 101:19 106:14
118:23 119:1
**director's** [1] 91:2
**directors** [3] 23:6 86:15 90:25
**disagree** [5] 60:2 62:4,22 67:19
69:21
**disagreed** [2] 60:10 69:10
**disagreement** [2] 112:21 120:6
**disagreements** [2] 114:15,24
**disallowed** [1] 43:9
**disapproved** [1] 68:16
**discipline** [1] 103:6
**discuss** [8] 27:16 36:12 57:18 58:
11 73:10 88:15 89:7 94:13
**discussed** [3] 58:16 64:25 65:14
**discussing** [3] 19:14 27:11 45:14
57:20 91:11
**discussion** [14] 21:9 51:14,15 52:
15,16 59:8 66:5 69:11 70:24 88:
18 91:2 97:25,26 124:7
**discussions** [14] 3:7 19:22 45:23
46:1,6 53:12 65:20 76:9 78:20 80:
14 91:7 94:23 98:11,16
**disloyalty** [1] 78:23
**display** [2] 32:9,10
**disposition** [2] 31:10 100:9
**distraught** [1] 109:8
**distributed** [1] 94:21
**district** [1] 1:10
**division** [4] 45:2 74:4 84:6 89:18
**divulge** [1] 66:16
**docketed** [1] 1:11
**document** [22] 13:10,22 26:14 38:
4 39:17 73:16 75:15 76:15 94:14
104:2,23,25 105:16 107:20 116:
18 119:17 121:9,11 125:12 134:2
135:1 136:5
**documentary** [1] 37:6
**documentation** [2] 61:24 136:2
**documented** [3] 133:20,22 135:2
**documents** [14] 13:9 38:2,15 39:
14,23,24 44:5 78:18 106:18 121:
12 136:10,12,14,16
**doing** [17] 8:24 10:26 20:9,15 43:
10 59:24 68:5 77:16 95:24 96:5
97:23 98:4,6 111:19 113:19 114:7
120:2
**dollar** [1] 17:26
**dollars** [5] 17:23 32:13,26 33:3 74:
10
**don** [1] 1:24
**done** [15] 4:24 5:2 17:21 20:10,17
25:19,20 30:17 58:19 64:23 71:25
79:15 81:17 83:3 128:16
**doors** [1] 28:17

**double** [1] 10:3
**doubt** [1] 10:23
**down** [13] 10:12 15:21 43:15 51:7
52:1 61:10 71:10 73:9 99:9 109:
12 117:4 118:1,18
**downtown** [1] 33:18
**downward** [3] 118:8,24 120:20
**dozen** [1] 110:19
**drafted** [2] 37:12,13
**drafting** [1] 97:11
**drawn** [1] 32:25
**due** [1] 132:13
**dully** [1] 111:24
**during** [19] 13:10 31:5 51:13 58:15
81:11 89:25 90:3 94:15 97:6,20
98:3,7 114:22 115:1 124:1 127:25
128:10 135:13,19
**duties** [6] 84:13 85:15,25 86:7 97:
14 101:18
**duty** [5] 27:22 46:17 109:9 114:20
116:2

### E

**e-mail** [2] 99:6 123:19
**e-mails** [1] 199:18
**earl** [2] 16:25 23:18
**earlier** [4] 27:21 80:25 97:4 133:5
**early** [2] 78:17,17
**easier** [1] 111:26
**east** [2] 22:22 126:21
**eating** [1] 15:22
**educational** [5] 16:16 22:13,21
33:15,20
**edward** [3] 16:25 18:18 24:1
**edwards** [1] 19:10
**effect** [4] 133:25 134:5,7 136:12
**effective** [1] 120:1
**efficient** [1] 120:1
**effort** [1] 110:25
**eight** [3] 45:5,13,24
**eighty** [2] 17:26 74:10
**einsel** [3] 37:13 39:8 40:25
**either** [19] 6:11 27:10 38:17 44:21
45:4 48:13,17 50:8 51:1 53:13 68:
7 97:10 99:8 102:12 115:12 126:
18 130:25 136:2
**elapse** [1] 62:2
**eligibility** [2] 92:7,10
**eligible** [1] 93:15
**elmerton** [1] 1:26
**elsewhere** [1] 129:8
**elves** [2] 41:22,24
**emotional** [2] 109:7 110:8
**emotionally** [1] 109:8
**employ** [1] 83:21
**employee** [1] 125:11
**employment** [1] 39:26
**emulate** [1] 117:6
**enclosure** [3] 10:11 104:7,8
**enclosures** [2] 8:15 10:5
**end** [5] 5:6 22:12 35:8 71:15 82:26
**ended** [2] 48:14 94:20
**endorse** [1] 48:26
**ends** [1] 107:8
**enforcement** [1] 54:3




## P.R. VIDEO, INC

engage [1] 42:10
engagement [1] 115:13
enhancement [1] 92:14
enough [4] 44:19 52:4 96:23 122: 16
ensure [2] 14:23 101:20
entered [1] 33:6
entire [3] 12:15 128:10 132:25
entirely [1] 79:19
equipment [1] 73:10
equipped [1] 36:26
ernest [1] 16:26
erroneous [1] 63:1
erroneously [1] 66:9
error [11] 32:21 101:2 112:26 113: 15,22,25 114:3,6,26 115:3,4
errors [1] 41:25
establish [1] 43:19
established [1] 102:4
establishes [1] 83:11
et [1] 1:13
etcetera [2] 35:7,7
evaluation [5] 20:6 21:2 25:18 26: 22,25
evaluations [1] 27:15
evanko [15] 1:13 3:7 36:13 64:17 68:2,8 71:21 73:24 76:3 78:24 91: 24 100:19 110:22 111:2 135:15
evanko's [1] 95:12
evasive [1] 52:2
even [24] 9:21,22 11:9 25:9 31:5,7 32:23 35:9 43:12 44:12 60:19 82: 17 97:6 108:19 109:12 110:4 114: 2,5 118:10 131:1,14 132:9,11 134: 26
event [2] 11:21 103:12
events [5] 133:24 134:2 135:20,21 136:6
eventually [2] 30:11 60:5
everybody [2] 40:13 86:8
everyday [1] 60:14
everything [7] 27:23 34:3 38:22 40:5 53:21 54:10 103:11
evidence [2] 37:7 110:20
exact [1] 4:14
exactly [3] 67:10 117:14 119:22
examination [1] 92:9
example [3] 49:24 87:10 96:14
examples [2] 124:22,24
except [1] 70:23
exception [1] 76:11
exculpatory [1] 107:23
excuse [6] 27:2 33:25 39:1 88:25 103:8 125:19
execution [1] 97:14
exhibit [2] 15:11 105:11
exhibit.if [1] 14:1
exhibits [9] 9:20,24 39:15
exigent [24] 116:7,11,15,26 118:10, 12,17,20 119:23 120:14,16 121:10, 19,23 122:9,13 123:22 124:23 125:18,26 126:11 127:17 128:15, 18
exist [1] 118:21
existing [1] 100:12

expect [5] 10:2 13:1 43:23 127:19 128:7
expectations [1] 119:24
expecting [1] 119:3
expedition [1] 179:21
expenses [1] 56:2
experience [4] 3:16 84:5,21 85:4, 11 86:6 91:18 106:16 110:14 112: 14 115:1
explain [3] 28:9 121:10,20
explained [1] 47:17
explains [1] 121:19
explanation [1] 44:21
express [1] 89:10
expressed [1] 7:5
extemporaneously [1] 136:5
extensions [1] 102:5
extensively [2] 27:17 59:12
extra [1] 111:22
eyes [2] 63:2 112:24

### F

face-to-face [1] 22:2
fact [24] 20:3 35:18 40:6 50:6 55:8 58:20,25 61:7 62:14 63:24 64:12, 13 66:7 72:13,15,20 76:1,10 103: 1 110:7 131:2 134:23 135:8 136:5
factors [1] 84:7
facts [7] 22:23 40:2 56:24 73:2,2 79:7,10
factually [1] 109:20
fair [11] 29:20 62:4,18 72:5 97:9,15, 20 99:11 101:23 113:21 114:25
fairly [1] 121:12
fairness [3] 85:22 118:6 119:4
fall [2] 46:12 90:14
familiar [5] 22:20,21 29:17 83:4, 18 85:19 93:18,22 95:11 100:3,5 120:24
family [1] 17:8
far [10] 23:3 46:3 58:19 60:4 64:2 104:16 108:6,21 110:17 122:3
fashion [2] 42:17 66:2
fault [1] 44:22
favor [4] 47:25,26 50:5 56:28
fax [1] 2:3
fbi [21] 55:16 57:3 62:7,20 66:20, 25 67:9 122:1,4,9,14 125:6 126: 26 127:26 128:10 132:15,19 133: 13,21 134:23 135:14
february [7] 20:4 25:26 26:1,12 94:7,16,20 98:10 104:2 105:7,12 109:11
federal [1] 110:5
feel [5] 60:22,24,26 62:5 130:3
feelings [4] 69:20 93:17,11 130:15
fellow [2] 111:23 112:5
fellows [1] 51:6
felt [6] 13:15,2 63:4 91:14,21 96: 5 124:8 130:14
few [3] 3:9,14 12:20 15:25,26 45:1 84:9 136:10
field [1] 120:9
fifteen [2] 83:23,25
figure [1] 50:23

figures [1] 90:16
file [17] 13:13 39:20,21 41:13,18 99:9 103:25 105:17 106:5,18 107: 9,10,13,21 108:11,12 109:24
filed [6] 21:7 25:2 55:1,3,5 71:16
fill [1] 83:15
final [3] 19:20 31:10 70:14
finally [1] 69:25
finance [2] 16:19,20
find [17] 28:23 32:10 36:23 43:9 52: 12 67:5 105:16,17 106:1 110:1 116:14
finder [1] 72:15
finding [1] 103:1
findings [1] 70:14
fine [9] 2:17,19 25:16 42:4 49:5 50: 10 96:24 97:1 109:10
finished [1] 128:2
fire [2] 51:7,9
first [15] 6:25 38:22 48:6 71:2,25 80:26 84:25 95:4 96:7 107:26 112: 22 113:2 115:17 117:25 132:7
firstly [1] 123:16
fishing [1] 79:21
fit [2] 91:7,10
fitness [1] 27:21
fits [2] 50:23 120:8
five [4] 33:3 84:20,26 90:9
five-way [1] 89:3
flaw [2] 114:26 115:3
flaws [1] 83:16
folks [6] 9:21 13:12 43:11 58:16 59:7 70:17
follow [4] 2:25 3:9 63:24 66:2
follow-up [1] 59:19
followed [4] 36:10 63:16 64:16 113:18
following [2] 2:25 65:26
follows [2] 10:24 97:26
forbid [1] 119:8
force [1] 12:4
forethought [1] 63:22
forfeiture [9] 29:3,14,18,21 30:12, 13,16 31:25,26
forget [1] 18:22 37:12 71:26
forgive [1] 107:9
forgot [1] 28:20
forgotten [1] 43:13
form [10] 8:19 12:6 63:8 64:19 75: 11 121:16 125:9 126:1,5 127:10 128:12 129:13 131:7 132:4,22 134:20 135:5,23 136:7
formal [4] 4:11 6:14 104:10
format [1] 2:24
former [2] 14:16
forrest [2] 39:21 42:4
forth [4] 47:4 69:14 72:22 125:3
fortune [1] 108:20
forty-four [1] 75:21
forwarded [3] 41:2 42:22,26
found [3] 22:12 38:4 133:26
four [2] 33:3 74:11
frame [2] 25:10 50:16
frank [4] 17:3 18:12 23:23 24:14
frankly [1] 108:3

frequency [1] 94:1
friend [3] 17:8,11,15
front [7] 43:2 78:19,20 91:23 92:15 95:7 116:24
full [1] 74:6
functions [1] 97:13
funds [2] 34:6,6
further [5] 19:22 109:13 123:12 136:21,22

### G

gary [1] 18:13
gave [6] 23:2 80:6,7 82:15,16 101: 1
gee [1] 25:9
general [2] 74:5 101:25
generally [3] 100:3,5,7
generals [1] 30:19
generated [15] 11:4,6,8,12,14,19 85:13 96:10 105:21 116:19 120: 25 121:19 125:12 135:26 136:10
generating [3] 85:18 123:19 136: 12
gentleman [2] 15:23 65:24
gentlemen [2] 1:2 99:26
gets [2] 61:16 133:5
getting [8] 12:24 44:24 64:25 65: 14 78:21 89:3 108:18,19
give [15] 9:26 10:24 11:25 38:1 72: 5 80:3 82:21 96:14,20,25 116:22 123:9 128:6,8 130:19
giveaways [3] 33:2 35:1,11
given [8] 3:16 9:7 12:6 31:10 41: 15 59:19 62:20,23 76:1 82:8,8 104:22 124:23
giving [6] 10:22 15:3 42:13 77:11 79:23 93:4
glared [1] 117:22
god [1] 119:8
goings [1] 133:21
got [23] 13:23 22:15 26:8 32:6 36:7 43:17 48:6 50:2,4 58:5 60:4,6 69: 17 82:26 83:1 99:8 101:12,14 109: 7 119:5,12 120:16 134:14
gotten [1] 60:24
government [2] 29:13,21
governors [2] 57:7 83:10
grab [9] 41:22 72:18,19 129:7 130: 11,18 131:10,13,20
grade [2] 84:3 91:19
grand [1] 71:18
great [2] 106:16 110:14
grievance [4] 56:19,26 57:25 58:2
grievances [2] 55:1,2,4,5,11
grooms [1] 119:2
grounds [1] 132:26
group [1] 37:3
growth [1] 84:23
guess [8] 40:20 45:12 46:1 49:11 106:7 126:8 130:5 136:9
guidance [1] 119:18
guides [2] 83:21,21
gunman [1] 120:17

### H

habits [1] 28:3




## P.R. VIDEO, INC

half [3] 88:6,6 110:18
hand [5] 1:16 39:18 112:1,4 131:
 26
handed [1] 12:25
handle [1] 187:23
handwriting [1] 112:9
hanging [2] 51:7,9
happen [4] 89:7,14 101:5 110:16
happened [9] 43:20 49:2 61:14,15
 64:22 82:1,4 101:7 108:3
happens [4] 49:9 60:14 78:6 106:
 24
happy [1] 111:25
harass [2] 70:20 72:10
hard [2] 66:13 114:18
harm [4] 38:17 100:14 101:3,6
harmed [2] 101:10,15
harrisburg [2] 2:2,7
hawthorne [2] 74:3 75:14
hazen [1] 19:2
head [3] 83:8 96:24 106:15
health [3] 89:5,12 91:6
heard [11] 8:4 38:22 49:24,26 64:
 10 73:2,3 93:22 95:3,4 136:9
hearing [1] 93:25
hearings [1] 103:26
hearsay [1] 8:3
heart [2] 63:23 89:3
hearts [1] 116:25
help [5] 26:10 47:18 69:5 85:23,24
 116:15
hemc [1] 22:20
hershey [1] 22:22
hickes [22] 62:12,12,15 64:10,21,
 25 65:8,21,26 66:11 68:12 72:20,
 21 127:1,24 128:17 130:16 131:
 18,21,25 132:8 134:24 135:3,19
 136:2,6
hickes's [8] 63:6 64:4,16 65:10 66:
 3,15,17 73:4
hidden [2] 43:13 63:5
high [4] 110:15 114:17,20,21
high-speed [1] 14:11
higher [2] 4:26 83:13
highly [1] 20:5
hikes [1] 101:1
himself [3] 56:1 61:9 110:22
hired [1] 1:8
historic [2] 16:15,16
historical [4] 22:13,21 33:14,20
history [1] 107:5
hoffman [2] 16:25 23:18
holds [1] 105:19
home [1] 110:18
homework [1] 128:16
honest [1] 93:5
honestly [1] 108:3
honor [1] 66:8
honorable [2] 24:12,14
hooper [3] 17:4,7 24:10
hostage [2] 120:18 124:26
hotel [10] 55:15 131:21 132:10,20
 133:9,12,16,22 134:4,24
hour [1] 16:18
hours [4] 12:8 90:1,9,18

house [2] 24:15 120:18
however [1] 63:1
hundred [3] 17:23 81:18,23
hunt [5] 5:26 6:11,26 7:18 23:11
 105:26 108:14
hunt-chairman [1] 18:26
hurt [2] 38:18 120:21
hypothetical [1] 107:15

### I

i [1] 118:12
i.e [1] 116:25
iad [7] 4:10,11 12:6 45:14 74:4 104:
 3 105:12
identified [1] 116:16
identify [1] 1:22 75:9
ill-conceived [1] 100:16
illustrate [1] 123:20
imagine [1] 30:19 93:17
immediacy [2] 125:4,7
immediate [2] 120:15 125:1
impact [1] 63:19 120:26
impartial [1] 101:24
implantation [1] 97:11
implied [1] 121:3
imply [1] 121:5,6
importance [1] 85:14
important [3] 109:21 112:5 117:
 23
impossible [2] 43:15 66:4
impounded [3] 30:23 31:2,5
improper [4] 11:1,3 61:7 100:16
inappropriate [1] 182:24
inch [1] 12:26
incident [2] 37:15 44:2
incidentally [1] 45:16
include [1] 127:18
included [3] 9:6,13 39:20
including [1] 110:19
inconsistent [1] 100:12
incorporate [2] 13:21,26
incorporating [1] 14:9 118:2
incredibly [1] 71:13
indeed [1] 179:8
indicate [6] 6:25 10:25 22:24 67:
 4,6 79:10 88:10 91:21 110:20 123:
 21
indicated [11] 8:24 39:6 41:20 58:
 14 62:7 81:6 109:13 123:17 125:5
 126:17 131:25
indicates [11] 10:26 37:7 40:18 41:
 2 100:10 109:24 114:6
indicating [4] 85:14 107:16,17
 136:4
indication [2] 13:1 42:16
individual [7] 37:12,14 76:26 86:
 19 93:12 103:24 129:9
infintino [1] 19:1
information [28] 12:10 22:24 23:2
 31:23 36:7 38:20 42:14 43:17 45:
 17 57:4 59:10 67:3,6,11 107:17
 120:22 124:25 125:2,21,25 126:
 26 127:22 128:6 129:6 130:13,18,
 20 133:7
initial [1] 48:24 102:6

initialed [1] 39:7
initially [2] 56:22 130:21
initials [1] 73:25
initiate [2] 5:18 22:4
initiated [2] 12:4 22:6
initiating [1] 5:22
injected [1] 53:20
innuendo [1] 16:21
inquiries [1] 109:16
inquiry [21] 3:1 4:2,10 5:17,19,22
 8:16 10:6,12 11:12,14 13:2,24 14:
 25 47:12 103:2 104:3,10 105:12
 108:10 122:9
inspection [1] 13:10
installation [1] 132:19
instance [1] 127:23
instances [2] 108:2,8
instead [1] 13:25
institute [1] 37:21
instructions [4] 77:11 80:3,7,8
insult [1] 117:12
intelligent [1] 65:24
interest [5] 4:22 11:3 67:12 89:10
 122:1
internal [6] 45:1 66:24 102:1,14
 103:4 124:6
internet [6] 16:17 22:11,15,26 23:
 2 24:23
interview [3] 8:8 21:5 129:8
interviewed [1] 131:19
intimidate [2] 70:21 72:10
intrium [1] 29:15
introductory [1] 3:21
investigated [2] 43:22 107:13
investigating [1] 5:12
investigation [35] 3:8,10,20 5:6 9:
 10 66:17 76:25 77:4,12,14,20,25
 79:6,9,19 80:2,14 82:2 100:15,21
 102:2,9,21,22,24 103:5,13 104:6,
 11 106:3,19 122:4,15 132:16,18
investigations [6] 100:9 101:21,
 22 102:15 103:23 108:9
investigative [3] 102:6 108:10
 114:10
investigator [4] 8:8 9:7 77:23 79:
 24
investigators [4] 78:7 80:9 102:
 18 103:26
invoice [1] 74:5
involve [2] 51:25 52:5
involved [7] 51:16 55:11 57:6 61:
 17 76:7 100:11 126:19
iron [3] 32:18,19 33:2
irresponsible [1] 119:11
irritates [1] 123:2
isn't [15] 2:22 11:13 12:10 62:3,3,
 18 65:22 73:21 78:4 86:5,20 93:
 12 95:18 115:4 120:18
issue [27] 3:4 19:15 20:2 22:4,10
 27:17,25,26 39:25 40:1 50:24 53:
 18 66:26 67:1 73:12 95:3 100:18
 108:26 109:11 110:8 113:9,11
 119:25 123:24 124:16 128:15 132:
 13
issued [2] 39:25 83:10

issues [9] 3:8 54:21 62:2 91:20 93:
 26 114:9 125:14,15,16
itself [3] 8:16 105:16 116:2

### J

james [5] 17:4 18:18 19:2 23:25
 24:18
january [5] 25:7 78:15 94:15 95:8
 98:7 105:22
jerk [1] 128:16
joanna [2] 2:9,9 68:5
joanne [3] 70:25
job [4] 84:4 91:19 111:19,26
joseph [3] 18:13,13 24:8
jr [3] 17:3 23:18 24:14
judge [2] 69:16 70:3
judges [1] 70:5
judgment [7] 113:6,15,16 114:6,8
 115:3,4
judicial [1] 70:3
july [10] 50:20,26 51:3 75:12 89:22
 90:12,14 103:9 124:1,4
jumble [1] 113:20
jump [3] 99:13,14 134:17
june [1] 103:8
jurist [1] 16:19
justification [1] 62:19

### K

keep [5] 59:17 63:5,5 86:8 111:26
keeping [1] 31:1
kelley [1] 118:13
kept [2] 30:23 102:2
kind [18] 4:16 9:13 28:12 40:11 43:
 11,14 45:15 53:11 68:22 71:10 74:
 4 82:5,17 83:17 85:5 109:4 114:7
 125:19
kindly [3] 10:7 28:19 123:9
kinds [2] 59:14 119:10
kirk [3] 16:26 19:1 23:21
knee [1] 128:16
knowing [3] 60:19 61:4 113:8
knowledge [14] 3:15 13:16 14:20
 25:8 30:15 35:9 72:24 79:3,11 92:
 18,21 112:14 130:24 135:9
known [6] 22:23 50:4 79:7,9,10
 110:16
knows [3] 11:4 39:21 110:23
kolsenick [1] 50:9
kolsenik [2] 89:2,8
koslcenik [4] 47:10,11
kurt [1] 17:4

### L

lack [1] 113:6
lacks [1] 114:6
ladies [2] 1:1 99:25
language [1] 101:25
last [2] 119:23 121:7
lastly [1] 3:14
late [2] 37:14 78:16
later [5] 61:11 113:19 122:23 134:
 3,25
launched [1] 103:3
law [4] 107:8 116:10 119:13 136:4
lawrence [1] 24:12



P.R. VIDEO, INC

**lawsuit** [1] 25:3
**lawyer** [2] 70:17 106:5
**lawyers** [7] 40:5 68:11 70:26 71:20 98:1 99:11 110:5
**lay** [1] 43:12
**lazzaro** [9] 21:14,15,16,16,23 22:6 26:11,15 27:18
**lazzaro's** [1] 54:22
**lazzaroe** [1] 27:9
**lce** [10] 87:20,24,25 89:12,15,19,26 90:7 91:5,12
**leadership** [1] 86:9
**leading** [1] 129:15
**leads** [2] 80:15 83:2
**learn** [1] 117:5
**learned** [2] 40:9 64:13
**least** [10] 6:9 16:20 25:17 67:17 91:4 100:2 101:24 108:21 122:2 135:2
**leave** [3] 51:2 53:22 56:1 61:22 74:14 75:3 89:8,11,13 132:10 133:8 134:4,25
**leaving** [3] 51:1 91:13,14
**lebanon** [1] 1:7
**left** [3] 2:24 51:3 112:18
**legal** [1] 1:17
**legalese** [2] 30:20,22
**legally** [3] 30:24 108:20,25
**legislative** [1] 31:24
**length** [2] 61:26 62:1
**leonard** [4] 45:20,23 90:6 130:10
**lerario** [1] 21:13
**less** [1] 55:2
**letter** [26] 8:17,19,20,23 9:5,12,15, 16 10:6,20 11:6,9,11,13,16,19,20, 22 102:13,16 105:21 107:16 112:7,18 115:16 120:24
**letters** [1] 9:1
**level** [2] 85:17 110:16
**lezario** [1] 21:13
**liaison** [2] 19:7,9
**library** [1] 133:14
**lieutenant** [16] 1:14,15 3:11 5:26 6:11 7:25 24:5 52:17 64:20 77:7 79:7 112:7 120:4 121:17 122:5 136:25
**lieutenants** [1] 110:21
**life** [4] 112:17 119:9 120:15 125:15
**light** [4] 104:2 110:23 116:20 123:18
**limitations** [1] 4:17
**limits** [1] 102:4
**line** [5] 35:14 52:14,23 69:25 132:25
**lines** [1] 88:24
**liquor** [1] 54:2
**list** [3] 18:23 92:7,10
**listen** [2] 66:10 70:1
**litigation** [2] 94:1 97:7
**little** [23] 16:14,17 28:22 32:17,19 34:2 38:1,4,5,18 39:18 42:13,14 43:10 47:7,19,19 72:12 73:7 79:21 83:9 84:9 97:4
**logical** [1] 49:22
**logically** [1] 109:22

**long** [10] 4:12 23:7 64:1 79:19 80:15 82:7,15 84:5 87:22 111:11
**look** [24] 10:7 12:15,21 16:1 20:24 24:22 25:15 27:14 35:16 69:15 96:7 98:21 99:5,7,8,9,15 104:18,22 115:17 116:14 118:8,10,24
**looked** [4] 12:1 23:1 35:4 36:1
**looking** [13] 8:14 10:5 25:12,17 35:12 38:2 39:11 94:9,11 97:7 104:24 105:10 108:14
**loop** [1] 19:17
**lord** [1] 39:21
**lose** [2] 60:16 71:15
**lost** [6] 43:13 44:22 56:19 69:23,24 71:16
**lot** [4] 13:7 20:15,20 133:14
**lousy** [1] 28:22
**lunch** [1] 16:18

### M

**ma'am** [1] 42:12
**made** [18] 7:4 11:23 22:19 31:15 32:8,12 34:5 41:25 52:25 53:1 64:21 72:9 80:10,12 109:16 113:16,24 134:3
**mailed** [1] 22:20
**maintained** [1] 101:22
**major** [72] 5:26 6:11 7:21 19:16,23 20:1 23:11 25:19,20,22 27:5 28:4 39:7 40:25 45:3,10,11,13 46:2 47:22,24 48:10 49:5,7 50:10 53:25 58:8,12,14,16,24 62:6,10,12 65:4,7 66:22 72:24 73:1 74:2 75:13 80:12,13,22,23 87:17,22 88:19 89:2,4,9,12 91:10 92:1,11,26 100:25 106:11 108:5,14 114:26 115:5 120:23 122:6,6,19,24 124:5 126:16,18,24 129:12
**malice** [1] 63:22
**man** [3] 124:26 135:8,11
**management** [6] 72:26 82:25 83:5,9 86:23 114:11
**manganell** [1] 24:18
**manning** [2] 17:5,6
**manor** [2] 101:24 121:16
**many** [13] 9:1 24:4,4 55:5 58:25,25 84:2,6,7 85:8 90:9 91:20 111:20
**march** [10] 25:13,14,14 54:11 74:13 94:21,25,25 111:17 112:1
**mark** [12] 10:8 19:1 74:18,18 75:22 76:16 96:17 115:20,22 121:8 130:11,18
**marked** [9] 9:24 10:12 75:7,21 112:8
**marking** [3] 10:15 13:17 14:14
**martin** [1] 18:12
**mary** [2] 94:6 111:20
**material** [1] 13:3
**mathew** [1] 23:11
**matt** [1] 5:26
**matter** [11] 2:12 4:22 6:23 8:4 20:3 36:13 38:6 45:15 66:4 101:4 119:6
**matthew** [1] 18:26
**mcdonald** [5] 90:7,18 91:15 92:3,

6
**mcdonalds** [1] 92:2
**mean** [51] 5:25 7:11 8:25 9:6,16 12:16 24:23 28:2 33:17 34:15 36:7 39:4,5 43:11 44:16,17 46:23 48:20,25 49:1 51:5 56:15 63:13 64:6 65:23 69:19 70:5 71:8 85:5,7 88:5 90:21 93:3 96:18 98:3 104:16 108:8 107:3 109:25 111:7 114:16 115:24 118:13 119:14 121:4,5,5,6,21, 24 131:3
**meaning** [3] 55:25 72:26 130:8
**means** [4] 11:7 11:8 120:14,16
**meant** [5] 44:17 56:18,21 81:10 124:12
**meet** [4] 66:20 67:9 81:3 134:23
**meeting** [9] 19:16 22:3 45:2,5,15 57:3 132:17 133:21 135:14
**meetings** [2] 51:9 53:11
**member** [24] 4:26 19:8 23:16,19 24:2,3,16,19 46:24 58:21 61:8 85:11,16,23,25 100:11 107:11 132:10
**member's** [1] 4:25
**members** [10] 6:7 18:20 19:3 34:9 100:12 101:9 109:17 110:2 120:20 121:14
**memo** [15] 36:22 37:11,19,23 38:7, 10,11 39:5,6 41:17,18,23 43:26 85:13 105:11
**memorabilia** [3] 6:8 35:21 36:1
**memorial** [5] 16:16 22:14,21 33:15,20
**memos** [1] 135:18
**men** [1] 93:12
**mentioned** [6] 6:1 7:17 24:11 51:13 124:5 127:12
**met** [4] 66:25 133:12,13,15
**method** [2] 59:24 66:22
**methodology** [2] 20:23 28:9
**michael** [3] 18:17,23 19:7
**middle** [1] 1:10
**might** [9] 5:4 8:3 11:2 42:15 57:5 70:24 98:8 118:7 126:18
**mile** [1] 111:22
**miles** [2] 81:18,23
**military** [1] 120:3
**min** [1] 118:12
**mind** [6] 28:21 47:18 59:18,26 111:4 124:22
**mine** [2] 28:22 37:1
**minor** [2] 114:9,25
**minute** [2] 27:3 40:2
**minutes** [1] 15:25
**misinformation** [1] 33:26
**mispronounced** [1] 21:18
**misrepresenting** [1] 11:1
**miss** [1] 109:13
**missed** [2] 42:2 104:21
**missing** [2] 41:14 65:17
**mistaken** [4] 12:3 32:13 34:23 37:10
**mistakes** [1] 114:25
**model** [7] 32:16,17 33:1,2 34:3,14, 19
**models** [2] 32:19 34:26

**moment** [4] 9:26 14:12 59:18 123:11
**monetary** [2] 84:16,17
**money** [3] 33:1,22 55:12
**month** [2] 105:20 109:15
**months** [6] 55:25,25,26 58:26 124:1 134:3
**moral** [2] 112:15,25,26
**morality** [1] 112:17
**morning** [1] 2:16
**most** [1] 120:1
**motel** [5] 55:22,23 56:3 58:22 64:26 65:14 66:20 67:1 113:8
**move** [4] 92:14 96:3,4,21
**moved** [1] 96:25
**moving** [1] 79:23
**ms** [4] 40:17,21 75:4 105:22
**much** [13] 16:12 44:25 64:11,11 96:18 100:19,20 102:19 111:19 119:15,16 122:22,22
**mullen** [7] 69:12 70:9,9,11 71:7,19 130:10
**museum** [17] 3:1,4,19 5:23,24,25 19:10 33:7,10,13,17 34:5,7,12,26 35:19 102:21
**must** [1] 105:25
**mustang** [2] 29:1 30:10
**myself** [6] 58:3 61:19 69:18 76:7 85:8
**mysle** [1] 18:13

### N

**name** [6] 1:5,24 21:19 23:3 51:17 81:20
**named** [2] 76:26 89:17
**names** [3] 18:23 22:10 53:22
**naming** [1] 86:18
**naturally** [1] 15:3
**nature** [5] 46:22 47:4,15 66:16 91:26
**necessarily** [2] 113:17 114:2
**necessary** [4] 6:13 95:16 130:14 24:25 49:21,23 59:13 75:3 116:14, 18 124:24 125:1,6
**needed** [2] 15:2 62:21
**needless** [1] 111:24
**needs** [4] 81:3 86:6 120:21 123:8
**neighbor** [2] 17:9,13
**never** [20] 23:19 24:17,19 30:14 33:5 35:9 50:13 64:10 72:16 73:1,6 85:8,9 88:13 95:25 103:16 110:16 122:21 131:6,9
**new** [4] 80:15 92:9 94:4 121:24
**next** [4] 25:21 85:17,24 89:16
**ninety** [1] 17:26
**ninety-nine** [1] 50:15
**nobody** [1] 136:6
**non-relationship** [1] 123:20
**none** [5] 77:21 78:26 95:1,2 116:17
**noon** [1] 16:18
**nor** [1] 43:3
**normal** [2] 106:17 114:21
**normally** [2] 40:10 114:14

P.R. VIDEO, INC

norristown [1] 120:17
north [1] 2:1
northeast [2] 89:9,11
northwestern [1] 37:21
nosing [1] 32:10
notation [1] 40:19
note [5] 28:20 41:1 75:16 83:9 86:26
noted [1] 111:24
notes [1] 41:13
nothing [6] 65:19 69:23 70:5 106:8 117:7 120:26
noticed [2] 15:26 16:24
notified [4] 107:7,24 108:4,12
notify [2] 74:14 117:1
notifying [2] 106:5,16
november [1] 37:18
number [22] 1:23 2:3,7,12 4:6 12:6,7 13:23,24 14:15 17:25 39:16 41:25 74:6 76:19 83:26 103:11,12,21 104:21 133:2,10
nuts [1] 119:10

**O**

o'brian [1] 75:4
o'rork [2] 18:12 23:23
o.a [1] 130:9
oath [1] 79:2
ober [141] 1:12 2:1 3:3,10 4:2 6:4,5 7:5 8:24 10:21,26 19:23 20:2,7 26:26 28:11,18 35:25 37:8,19 38:9, 10,24 42:16 44:8 45:4,14,24 46:7, 13,26 47:12,21 48:8 49:3 50:1,3, 25 51:13 52:21 53:9,12,25 54:2, 23 55:20 58:20 59:21 60:21 61:16 62:5,19 63:11,12,20 64:15,18,20, 24 65:11,14,20,25 66:6,16,18 67:7 69:1 70:21 72:3,10,13 73:7,18 74:2,6,12,14 75:13 77:4,15,19,23 78:9,11,21 80:18,20 81:16,20 82:9,14 86:10,14 87:14,21 88:11,16,19 89:17 90:9 91:6,22 92:4,12,16,16 100:24 101:10,15,16 102:25 103:17 105:22 106:5 107:24 108:4,15, 19 109:6,14 111:8,10,14 112:14, 23 115:1,12 117:6,8 121:1 122:3 123:21 128:15 132:16 133:11,19 134:22 135:19 136:3,4
ober's [11] 25:13 27:15 66:22 74:8,9 92:2 113:22 120:7,8 123:2 135:8
obeyed [1] 64:20
object [8] 21:19 126:4 127:4 132:24 133:3 134:18,19,19
objecting [2] 123:1 129:24
objection [24] 63:7 108:24 125:9 126:1 127:9 128:1,12,20 129:13 131:7 132:4,21,22,26,26 134:8,8 135:4,4,5,22,23,23 136:17
objections [3] 21:21 39:19 58:17
objective [2] 8:5 93:5
obtain [1] 16:7
obviously [4] 27:7 106:2 114:19 118:23
occasion [4] 57:18 89:6 123:18

124:3
occasions [3] 6:2,10 9:18
occur [3] 35:3 79:12 92:24
occurred [10] 21:6 50:21,22 52:12 63:26 65:2 110:22 131:15,24 133:24
occurs [1] 118:25
october [22] 37:4,5,8,22,24 38:9, 12,13,15 40:14 45:2,10,13 50:15 73:17 98:8,10 112:23 113:17,24 115:2,11
offend [1] 60:21
offer [1] 38:1
offered [1] 38:3
office [23] 2:6,7 6:6 22:3 30:20 31:9 38:14 39:4 40:24,26 50:18 57:7 66:26 69:12 78:21 83:11 91:23 92:15 95:7,26 98:19 109:25 133:13
officer [5] 4:21 77:24 84:12,14 85:4
officers [4] 17:1 81:7 93:12 119:8
offices [1] 66:23
official [1] 13:22
okay [129] 3:25 4:6,16 6:17 9:11 12:12,19 14:18 15:5,8,12 16:5,11, 13,24 17:7 18:3,8,16 19:6,11 20:3 22:9 23:5 24:5,18,20,26 25:11,25 26:16 28:1 29:20,26 30:11 32:14 33:9,12 34:22 35:12 36:22 37:1 40:23 41:7,14 42:22 43:25 45:19 46:5 47:26 48:23 49:4,6,19,20,26 50:6,10,17 51:4,8 52:22 53:10,16 54:20 55:10 56:17,23 57:23 58:11 59:17 60:19 62:3 63:18 67:22 68:1 69:5,16 69:17,22 71:5 73:10 75:19, 24 76:14,24 81:15,26 84:21 85:3 86:13,26 87:7 91:1 97:17 99:22 100:23 101:8,18 102:1 103:7 105:5,14 107:1,6 108:6 109:10 111:16 112:11,13 113:3,4,10 114:4 115:15 117:9,11,18 118:19 121:7 123:8 124:18 125:17 126:15 127:13 130:22 131:11 132:1,14 134:12
once [4] 14:12 35:4 69:16 96:21
one [48] 4:7 8:16 9:3 11:20 17:22 19:15,20,26 20:26 21:11 27:5,9, 11 28:20 33:25 34:24 40:3 42:1 46:23 49:22 51:8 52:20 53:4 55:9, 14 62:2 68:1 70:25 72:22,23 74:6 76:10 79:20 89:6 93:26 95:19 99:11 104:20 105:20 110:12 120:20 122:12 124:3 126:2,4 127:13 128:8 129:15
one-week [1] 37:9
ones [2] 41:26 42:4
ongoing [1] 66:17
only [20] 7:25 8:3 9:3 41:10 42:1 44:9 55:9 64:13 76:7 84:19 93:21 95:3 101:12 104:20 110:12 116:6 123:25 132:22 134:6 136:8
operate [1] 13:21
operation [3] 1:3 46:14 99:26
operational [1] 124:14
operations [17] 16:7,8 48:15,16, 21 54:1,4 90:7 96:10,11,13 106:

15 118:6 119:26 123:26 125:13 127:25
opinion [3] 53:8 82:25 128:14
opportunities [4] 84:23 88:25 93:5 121:15
opportunity [6] 20:24 45:5 73:1 86:3 123:10 134:18
opposed [10] 108:26 106:12 119:2 124:9 125:14,15,23 126:20,21 132:19
order [8] 6:7 12:13 14:10 66:8 86:5 101:1 102:13 116:18
ordered [5] 77:3 78:12 79:4,4,5
orders [9] 63:6 64:4,16 65:10,26 66:3,10,15,18
organization [4] 81:4 101:9,10 119:20
organizational [1] 85:26
organizations [1] 120:3
original [1] 73:13
originally [2] 56:15 62:5
origination [1] 97:10
other [27] 5:3 11:22 27:5 29:15 36:8 46:23,25 59:23 61:21 67:7,11 81:14,15,20 83:15 93:14 96:6,9 107:19 108:2,8 110:23 114:12 121:12,12,13 133:10
out [27] 2:20,22 10:22 26:17 29:22 32:10 35:5,7,26 36:9 39:23 41:13 42:6,23 47:22 50:23 52:12,22 53:22 57:10 58:21 61:8 63:2 64:2 66:18,19,25 67:4 78:11,22 83:2 86:2,5,19 94:17 106:1 108:14 109:5 110:1 112:6 117:19 119:10 120:9 122:19 133:11,15,26
outfit [1] 119:5
outlandish [1] 71:14
outside [1] 28:17
outstanding [2] 110:5 111:21
over [12] 3:14 16:18,18 24:10 28:13 30:8 39:14 40:9 48:13,14,20 69:22 90:25 91:22 92:12 96:21 104:18 112:21
overall [2] 91:18 128:14
overt [1] 111:1
overtime [2] 61:25,26
own [2] 65:1 116:13

**P**

p.m [1] 16:9
p.s.p [1] 130:10
p.s.t.a [1] 130:11
pa [3] 2:2,7 22:22
packet [2] 12:15,26 13:18 14:14
page [5] 86:9 104:21 105:4,5,10
pages [2] 105:2,10
painted [1] 49:3
panel [1] 60:3
paper [11] 14:22 95:26 96:3 97:12 104:19 135:12,17,18,26 136:8,13
papers [1] 12:26
paperwork [1] 59:1
para [1] 120:2
paragraph [3] 105:19 109:13 119:24

park [1] 1:6
parlance [1] 40:7
part [14] 11:4 49:12 57:13 71:2 78:26 80:26 90:21 93:24,25 101:2,18 107:26 113:7 123:22
participate [2] 76:3 88:12
participated [1] 103:16
participating [1] 132:17
particular [6] 4:18 94:3 123:19 125:7 127:15,16
particularly [1] 3:18
parties [1] 100:17
parts [3] 15:1 71:2 107:26
pass [1] 104:19
passed [2] 3:13 91:22
passing [1] 92:12
past [4] 20:18 106:14,20,23
paul [2] 1:13 73:24
pay [7] 56:2 57:1 61:9 63:25 78:22 87:2,2
payable [1] 22:19
payment [1] 67:2
pema [17] 45:24 46:10,10,12,14,47 5,5,13,21 48:9,19,19 49:4,12 51:17 52:21 53:12
pen [1] 94:6
pennsylvania [57] 1:7,11 2:5 3:17 16:15 17:1,17 18:14,20 19:3 22:12,16,18,20 24:15 29:2,7,12 30:2,8,18 31:8,22 32:11 33:14,19 34:8 35:19 40:10,12 55:22 57:5 67:8 68:21 93:9,10 98:22 101:3,5 103:22 106:22 107:11 109:17,25 110:2,15 111:3,6,13 112:5,18 114:16,23 115:15 116:9,10 121:17
people [5] 1:5 23,24 20:20 81:2 84:2 86:2 93:3,4 119:6,11 130:8
perception [2] 72:25 128:18
percuer [1] 13:10
perform [1] 86:4
performance [13] 20:6,13,16 25:12,18 26:22,25 27:15,23,24 84:4 91:19 111:22
performing [1] 67:13
perhaps [3] 31:6 125:22 126:19
period [7] 89:25 90:3 98:3,4 102:7 127:26 135:13
permanent [2] 81:18 110:12
permission [2] 46:18,20
person [11] 4:1,19 7:18 57:24 67:24 73:4 107:21 108:11 114:19 127:18 128:9
personal [6] 27:25 59:4 65:1,15 93:7,11
personally [2] 17:14 27:10
personnel [7] 41:2,4 42:21,22,26 43:6 87:1
persons [1] 5:3
pertain [1] 3:18
pertaining [1] 3:8
pertinent [2] 127:25 136:15
phil [2] 7:2,3
philip [1] 115:10
phillip [1] 6:1
phone [7] 1:23 2:2,12 22:1 28:14

P.R. VIDEO, INC

120:18 126:25
**photos** [1] 30:6
**physically** [1] 122:7
**pick** [4] 2:23 125:19 126:11 128:5
134:13
**pictures** [1] 34:13
**piece** [3] 29:22 30:1 104:19
**pieces** [2] 12:18 14:22
**pin** [1] 52:1
**place** [11] 21:9 40:17,19,20 48:17
66:13 84:13 87:10 88:1 129:10
135:12
**placed** [2] 28:24 109:24
**places** [1] 133:14
**plaintiff** [5] 1:9,25 126:24 127:3,
20
**planning** [1] 15:6
**plated** [1] 13:7
**play** [6] 32:23 57:12 77:17 84:1,7
134:14
**played** [1] 5:5
**playing** [1] 76:12
**plays** [1] 149:11
**please** [14] 1:2,16,22 53:19 74:14
75:9 76:18 99:22 117:20 118:3
123:21 127:9 132:21 134:18
**plus** [3] 85:5,9 119:12
**pocket** [1] 43:23
**point** [23] 10:21 11:24 28:26 30:21
34:25 37:11 40:22 42:5 67:10 68:
13,16 71:18 78:3 79:2,20 89:1,13
114:4 115:6,7 129:22 130:1 136:3
**points** [2] 19:1,5
**police** [64] 2:6,11 3:17 6:3,7 17:1,
18,21 18:20 19:4 22:13,16,19,20
29:3,7,13 30:3,9,14,18 31:4,8,11,
23 32:4,12,26 33:8,14,20 34:9 35:
19 40:10,12 57:6 67:9 81:8 86:18
93:10,11 98:22 101:4,5,8 103:22
105:23 106:22 107:12 108:7 109:
18,26 110:3,15 111:4,6,13 112:6,
19 114:16,23 116:9 119:7 121:18
**policemen** [1] 18:14
**policies** [1] 87:1
**policy** [18] 3:16 83:13,14,19 86:18
87:10 90:21,24 95:12,20,23 100:
10,13 106:17 108:18 109:4 110:
25 111:12
**politically** [1] 123:5
**politicking** [1] 49:8
**pool** [1] 93:14
**poorly** [1] 36:26
**portion** [1] 39:18
**position** [15] 35:24 49:8 69:11 72:
11 73:4 86:15 89:8 91:16 110:21
124:14 127:16,24 128:9 130:7
132:8
**positions** [1] 53:23
**positive** [1] 111:20
**poso** [3] 105:23,25 109:13
**possible** [2] 2:21 129:17
**possibly** [2] 81:8 85:10
**posted** [1] 99:10
**potential** [4] 91:3,11 121:25 122:
18
**potentially** [1] 126:19

**pr** [1] 1:8
**practical** [2] 87:4 119:6
**practice** [5] 106:20,24,25 111:12
116:8
**practices** [3] 3:17 93:9 108:7
**preamble** [1] 111:11
**preformed** [1] 97:13
**prejudices** [1] 93:7
**preparation** [1] 72:14
**prepared** [1] 85:16
**presence** [1] 53:14
**present** [1] 93:24
**president-major** [1] 23:8
**presuming** [1] 52:23
**pretty** [9] 13:15 44:25 92:24 97:15
102:19 112:5 119:14,15,16
**prevailed** [2] 60:5 69:1
**prevailing** [2] 108:21,25
**previous** [1] 37:2
**previously** [1] 65:6
**prime** [1] 96:14
**prior** [9] 26:11 29:3 39:16 90:12
92:9 94:23 98:16 126:25 133:11
**private** [1] 27:26
**proactively** [1] 132:9
**probably** [13] 34:13 45:9 59:3 70:
18 76:2 81:7,12 88:5 106:1,8 121:
3 133:13,14
**probe** [4] 125:6 126:26 127:26 128:
11
**problem** [9] 12:19 14:4,5,9,16 16:
4 61:26 62:1 89:3
**problems** [4] 28:11 89:5 91:6 120:
11
**procedural** [1] 52:23
**procedure** [2] 12:25 56:19
**procedures** [1] 36:11
**proceeding** [3] 1:17 30:12 109:2
**proceedings** [2] 30:16 32:1
**process** [6] 25:22 69:9,13 72:14
76:8 113:7 130:4 132:13
**processes** [1] 56:20
**processing** [1] 12:5
**procession** [2] 29:2 30:15
**produced** [1] 136:15
**product** [1] 34:10
**production** [1] 136:16
**profess** [1] 121:4
**professional** [2] 58:7 73:23
**professionally** [1] 17:14
**project** [4] 33:6,7 34:11,13
**promoting** [1] 93:3
**promotion** [1] 81:20
**promotional** [3] 88:25 91:2 93:4
**prompt** [1] 101:23
**proof** [1] 6:23
**proper** [1] 93:8
**property** [6] 29:13,14,23,23,24 30:
1
**propitiatory** [1] 11:3
**proven** [1] 120:1
**provide** [1] 22 119:17
**provided** [5] 13:12 31:23 62:20 74:
11,14
**providing** [1] 38:21

**provision** [3] 93:20 97:3 98:12
**provisions** [2] 102:10,16
**prudence** [1] 6:19
**prudent** [2] 106:26 107:22
**psp** [2] 19:6 22:19
**public** [1] 60:13
**publications** [1] 121:15
**pudliner** [2] 106:11 108:5
**pull-up** [1] 22:11
**punching** [1] 22:16
**punish** [3] 71:26 72:9 109:5
**purchase** [4] 32:12,15 33:1 34:18
**purchasing** [1] 34:25
**purges** [1] 39:20
**purports** [1] 8:16
**purpose** [2] 6:18 27:11
**purposes** [4] 31:12,17,25 130:25
**pushed** [1] 83:1
**put** [20] 14:11,22 19:24 24:21 43:
23 48:8 59:3 61:6,8,13,23 62:25
62:25 66:19 80:17 83:24 84:10 96:
18 106:4 116:23
**putting** [3] 44:8 64:26 65:16

---

### Q

**qualifications** [1] 114:20
**qualifier** [1] 81:22
**quarter** [2] 12:26 85:1
**question** [57] 10:23 11:22 16:14
27:13 30:20 34:1 39:9,10 42:9 43:
18 47:6 64:19 65:17,18,22 66:11
71:1,25 79:3 84:26 86:23 89:17
97:4 106:11 107:25 108:4 109:4
110:6 116:20 117:17 121:6,8 124:
21 125:10 126:5,7,23 127:10
128:7,13 129:14 130:1,3 131:8
132:5,15,23 133:4 134:11,20 135:
5,21,24 136:18,20,21
**questioned** [3] 59:11 128:24 133:
18
**questioning** [4] 28:8 35:14 113:
11 132:25
**questions** [29] 1:19 2:26 3:6,9,15
6:22 12:14,18 31:26 32:7 37:3 39:
15 45:1 59:15,19,20 81:1 84:15
93:18 105:24 123:12,12 129:15
133:2,24 134:5,6 136:21,23
**quick** [3] 15:9 96:21,25
**quickly** [1] 13:6
**quite** [3] 52:13 65:23 108:3

---

### R

**raise** [3] 1:16 34:6,6
**raised** [3] 39:16,19,24
**range** [1] 87:3
**rank** [1] 87:2
**rapidly** [1] 23:6
**rarely** [4] 43:11 78:6 88:5 106:24
**rather** [3] 44:15 106:26 128:5
**rating** [1] 26:5
**rationalizing** [2] 123:1,6
**re-join** [1] 134:18
**reach** [1] 89:13
**reached** [1] 50:13
**reaches** [1] 122:4
**reacted** [1] 128:16

**read** [7] 20:26 96:12 102:17 107:
18,18 115:9 118:19
**reads** [1] 15:23
**ready** [1] 85:23
**real** [3] 85:10 117:24 123:23
**realizing** [1] 32:23
**really** [9] 65:19 72:12 73:6 87:22
93:19 96:5 102:26 115:4 129:20
**reason** [17] 12:9 26:5 27:20 32:6,7
57:10 59:8,21,25 62:11 73:9 86:
20,21 99:1 113:10 117:21 125:22
**reasonable** [4] 44:21 133:19,26
134:22
**reasoning** [1] 61:2,3,5
**reasons** [5] 31:24 76:11 78:6 123:
1 133:7
**recall** [65] 4:4 5:23 6:10 8:10,19 9:
3 11:8,10,11,13,18 19:21,24,26 20:
9,15 31:19 38:24 44:8 45:7,18,25
46:11 47:14 51:15,17,17,19 53:7
55:9,13,19 56:27 57:14,20 59:4
64:7 69:8 70:12 74:22,24 75:2,2
76:7,8,12,22 77:16 78:2,9,10,13
82:11 85:18 89:7 93:24,25 94:11
95:2 97:22 108:13 127:11 133:24
134:5,10
**recalling** [1] 43:1
**recalls** [1] 134:6
**receive** [3] 84:16,17 129:5
**received** [6] 12:8 26:10 37:22,23
40:14,16 111:20 129:6
**receives** [1] 42:22
**receiving** [1] 26:9
**recent** [1] 16:6
**recently** [2] 64:14 65:3
**recitations** [1] 39:11
**recited** [1] 9:17
**recognize** [1] 73:25
**recognized** [1] 110:13
**recollect** [8] 40:6 55:3,7 98:13,15
101:11,24 115:18
**recollection** [39] 9:12 21:4,4,8 25:
16 26:9 28:26 37:18 38:16 39:14
45:3,8,13 47:8 50:12 51:12 53:3,
11 55:4,10 56:5,24 70:15 74:16
75:15,26 76:6,25 77:2,10 87:7,13
94:9 95:6 97:19,23 102:10 108:1
122:2
**recommend** [4] 49:5 58:1 81:12
92:17
**record** [10] 1:23 14:24 21:17 64:8
67:5 101:21 109:1 129:5,16 130:7
**recording** [1] 15:22
**records** [2] 10:11 22:11
**reference** [4] 13:21 14:1,10 118:2
**referenced** [1] 41:18
**referring** [4] 12:16 102:22 104:25
105:13
**reflection** [1] 20:19
**refresh** [1] 21:8
**refreshes** [1] 75:26
**regan** [1] 23:9
**regard** [10] 87:14 89:17 125:4,20
126:16 128:22,25 131:17 133:17,
21

## P.R. VIDEO, INC

regarding [3] 47:12 109:18 110:3
regional [1] 91:4
regulation [4] 86:17 98:22 99:4,8
regulations [7] 6:4 29:7 63:17 93:
8 95:22 116:9 135:10
reimbursed [3] 59:5 64:13 67:18
reimbursement [27] 55:15 56:7
57:9 58:5,18 59:22 60:6,22,25 61:
13,23 62:25 64:22 65:5 66:1 68:
13 69:22 73:11,14 74:5 113:1 128:
24 129:2 131:4,22 134:4,4
rejected [1] 130:21
rejecting [1] 130:16
related [3] 35:16 102:8 106:2
relates [2] 78:8 113:6
relation [1] 46:10
relations [1] 32:17
relationship [3] 3:6 46:8 108:22
relayed [1] 27:18
release [1] 98:16
released [4] 30:17 47:3 94:24 98:
17
rely [1] 117:1
remain [1] 74:13
remember [36] 8:17,18,20,23 13:
11 15:23 28:21,25 33:4 37:5,15
52:15,16 53:5,5 54:20 55:14,18
57:24 59:14 76:2 81:9 82:1,3 86:
22 97:6 98:4 100:3,20 104:12 112:
1,3 115:19 117:20 118:3 129:26
remembered [2] 22:5 28:23
remembers [4] 43:21,26 44:1,2
rent [1] 66:19
rented [3] 55:22,23 58:22
renting [3] 63:3 133:12,16
reopen [1] 129:5
repartee [1] 127:23
repeat [1] 28:16
rephrase [2] 84:25 121:8
replacement [1] 88:20
replacements [1] 181:13
replied [1] 127:3
report [3] 5:17 12:2 126:13
reported [2] 62:6,9
reporter [1] 127:21
reporting [3] 125:7 126:25 127:18
reports [4] 58:23 102:2,3 128:10
represent [2] 1:25 2:11
representatives [1] 24:15
representing [1] 103:24
reprimand [2] 82:18,22
reproduced [2] 14:2,6
request [36] 21:17,20 36:25 37:9,
20 38:4,8 40:8 42:17,18 47:11 48:
2,9 50:25 55:16 56:6,6 58:17 59:
22 62:25 64:21 65:5 67:2 74:8,9
88:14 129:10 130:26 131:1,3,3,14,
21 134:3,15 136:16
requester [1] 44:23
requesting [1] 32:24
require [2] 46:18,19
required [1] 81:3
requirement [1] 88:7
requirements [2] 114:21 119:19
requires [1] 119:13

research [2] 99:9 110:10
researched [2] 40:1,18
reservoir [1] 110:14
resided [1] 96:16
resolved [1] 82:3
resorting [1] 133:11
resources [1] 102:9
respect [2] 66:3 126:2
respectfully [3] 60:10 67:19 134:
15
respond [13] 63:8 109:22 116:24
125:10 127:10 128:13 129:14,25
131:8 132:5 133:3 135:6,24
responded [2] 31:25 130:2
response [4] 10:3 11:21 41:17,19
109:10 111:5 128:21
responses [2] 107:18,18
responsibilities [4] 62:22 84:13
85:25 101:19
responsibility [2] 58:7 73:23
rest [1] 80:17
restate [1] 27:12
restructure [1] 109:3
result [1] 38:3
resulted [2] 101:3 103:5
results [1] 4:7
retire [1] 109:14
retired [1] 5:25,26 7:21 23:9,12,
22,24,26 24:7,9,13
retirement [1] 16:23
retrieve [4] 28:19 77:3,5 79:5
retroactive [4] 61:22 67:2 73:5
132:7
retroactively [6] 55:26 63:25 65:
15 73:3 132:1,9
reveal [1] 113:18
revealing [1] 97:24
review [15] 4:7 13:3,4 20:12 25:12,
24 74:7,9 90:20,21,24 95:21 96:
23,25 104:8
reviewed [4] 14:13 25:23 44:5,15
reviewing [3] 25:17,22 87:8
reviews [1] 20:16
revisions [3] 95:8,15 102:14
revisit [1] 59:12
reynolds [2] 2:9,9 68:5
rhetorical [2] 61:15 136:20
rid [2] 44:24 78:21
rightfully [1] 109:23
rights [1] 110:6
ringing [1] 120:18
risen [1] 94:1
rock [1] 66:13
rodriguez [2] 17:4,6
rodriguez [9] 9:1,15,21 16:3,6,8
99:23,25 136:24
rodriquez [2] 1:6 2:14
role [1] 90:22
roll [7] 3:4 5:5 32:23 49:11 62:21
76:13 77:17
room [14] 55:15,22,23 56:3 58:22
59:3 63:3 64:26 65:15 66:20 67:1
132:10 133:12,16
rotating [1] 85:14
rotational [1] 87:4

roughly [1] 25:8
route [1] 48:2
routine [2] 97:12 119:12
ruled [1] 56:28
rules [5] 6:3 63:16 93:8 134:14
135:9
run [4] 15:25 30:3,5 119:20
running [5] 15:18 29:3 80:15 119:
5,6
runs [2] 25:13 29:14

## S

sake [1] 100:24
sales [1] 18:11
same [6] 2:13 4:14 18:9 26:1 87:1,
2
sanctions [1] 71:16
save [1] 132:24
saw [3] 85:8 96:13,17
say's [1] 49:3
saying [15] 11:12,15,17,18 20:14
21:13 22:5 26:2 40:16 69:15 81:9
93:17 114:2 117:24 118:11
says [3] 22:17 69:26 73:22 74:1
100:9 101:20 104:6 105:7 117:21
scenario [1] 49:3
school [1] 43:8
schools [1] 44:18
scratch [2] 28:22 61:10
seam [1] 134:22
seams [1] 117:13
second [2] 33:25 129:10
secondly [1] 132:7
seconds [1] 73:9
section [2] 100:8 127:15
secured [1] 102:2
see [18] 22:17 32:18 36:23,25 47:
16 78:6 83:6 84:10,10 89:5 96:8
102:26 105:7 109:19 111:16 114:
26 115:18 122:23
seeing [3] 11:10 76:23 97:6
seem [5] 16:12 35:15,16 50:11
133:19
seems [4] 54:17 106:26 117:13,13
seen [3] 75:6,7,8,15 76:14 85:9
136:1,7
segment [1] 85:26
seized [3] 31:6,7,9
selgrab [1] 18:17
selgrath [1] 18:23
seil [1] 34:6
send [3] 9:2 42:23 78:21
sending [2] 48:19 120:9
sends [3] 42:17,17 99:16
senior [1] 23:15
sense [2] 52:5 119:16
sensitive [1] 28:12
sent [7] 9:5,11 78:11,12 95:7 115:
11,12
sentence [1] 117:21
separate [2] 9:18 26:17
sept [1] 90:16
september [1] 54:14
sergeant [1] 24:8
seriously [2] 20:19,22

serve [3] 47:21 48:9 49:4
served [2] 89:25 90:8
serves [1] 44:23
services [7] 31:12,17,21 35:1,10
40:22 42:25
set [2] 35:22 95:23
sets [1] 86:18
setting [1] 129:16
seventeen [1] 71:18
seventy [1] 174:11
shake [1] 111:16
shall [4] 74:11 87:3 102:3,7
shape [1] 121:16
share [2] 59:10 111:18
shed [2] 116:20 123:18
sheet [5] 28:22 94:5,8 96:7 104:5
shoes [2] 83:16,25
shop [2] 96:8,19
short [1] 123:26
shortcomings [1] 92:2
shortly [1] 133:23
shouldn't [5] 35:6 60:23 64:12 92:
4 130:14
show [5] 10:11 30:6 38:15 56:1 75:
17
showed [1] 11:10
shut [2] 15:21 73:9
side [2] 72:26 130:12
sign [3] 96:3,12,21
signed [8] 20:4,7,16 94:5,5 96:8,
17,22
significance [1] 115:5
significant [5] 17:16,20 41:26 55:
12 112:16
signing [3] 25:26 32:24 37:18
signs [1] 38:7
sim.l [1] 65:23
similar [1] 36:8
similarly [1] 58:15
simmers [1] 19:6
simple [1] 65:25
simply [9] 19:9 28:10 36:1 43:18
63:23 64:19 65:22 72:12 92:14
since [1] 12:2
sir [170] 3:2,22 4:4,5,8 5:10,13,20 8:
5,19 9:16 10:1,7,18 12:2,11,18,20,
22 16:23 17:2,6,9,11,24 18:2,4,
6,10,15,24 20:2,14 21:10 22:8 23:
10,13 24:17,19 25:5,10 26:7,19,23
27:13,19 28:14 29:5,9,11,19,25,25
30:14 31:14 32:2,15,20 33:5,11,
16,19,24 34:7,21 36:22 37:16 38:
13,20 45:7,18,21,25 46:4,19 47:14
48:11 49:18 50:7,24 51:25 53:6,
15 54:25 55:6 56:21 57:8,11,14,
16 58:10,13 59:6,16 60:8,12,18
63:9 67:21,23 68:9 69:5 72:8 73:
21,26 74:23 77:1,5,9,16,21,26 78:
1,25 79:14 82:11 83:6,19 87:11
88:2,9,13,17,21 89:21 90:2,5,26
92:21 93:17 94:12,18,26 95:10 97:
22 98:20,24 99:4,12,21 100:22
101:16,26 102:11 103:15,19 104:
13,17 107:19 108:13,17 110:9
111:15,17 112:10,20 114:13 115:

P.R. VIDEO, INC

7,19 118:2 119:21 121:2,5,22 127:
9 128:13 133:3 134:13 135:24
sit [5] 50:13 51:7 71:10 95:26 97:
18
sitting [3] 10:23 38:16 96:1
situation [6] 35:18 36:8 63:5 121:
24 124:26 125:8
situations [5] 44:18 68:23 107:20
118:13 119:9
skewer [1] 38:17
skirkis [10] 46:1,7 49:25 77:3,11
79:4,4,5,8 82:9
slip [1] 56:1
smidgen [1] 67:6
smucksy [1] 42:4
sneak [1] 42:14
snuff [1] 37:26
solely [2] 102:7 117:1
somebody [21] 4:22 6:20 34:12
36:2 39:20 45:17 46:16 47:20 48:
19 49:21 52:8 57:5 60:9 67:17 68:
3 70:25 81:21 82:14 86:6 110:1
122:22
somehow [4] 41:14 43:12 91:7
100:25
someone [15] 4:24 5:7 35:22 52:
24 57:7,25,26 88:1 96:1,2 99:16
123:3 125:21,23 127:14
someone's [1] 92:25
sometime [4] 3:26 50:25 55:24 82:
26
sometimes [1] 119:8
somewhat [1] 127:11
somewhere [5] 11:16 30:24 39:22
43:12 69:7
soon [2] 2:21
sorry [13] 17:12 19:12 25:14 26:3
38:13 55:8 58:3 71:4,15 76:21 88:
2 111:10 128:1
sort [9] 6:21 26:18 44:6 54:24 63:3
68:24 82:16 92:13
soul [1] 35:6
sound [1] 85:19
sounds [1] 23:3
source [1] 35:6
speaking [3] 115:13 116:4 121:14
speaks [1] 116:2
special [2] 67:26 102:13
specialized [1] 37:20
specific [1] 97:18
specifically [5] 5:25 8:22 46:9 57:
23 95:17
specified [1] 110:11
speeches [2] 121:13,14
spirit [2] 102:13,15
spitler [1] 16:26
spittler's [1] 24:11
spoken [1] 131:19
spreads [1] 86:5
sprite [2] 39:22 42:4
spruce [1] 1:6
squib [1] 38:5
stabler [2] 18:13 24:8
stackhouse [8] 76:26 77:4,12,24
78:8 79:6,18 82:2

staff [3] 46:26 96:14,16
stage [2] 49:10 50:2
standards [2] 35:17,21
stanton [2] 57:6 122:1
start [2] 32:9 44:19
starting [1] 22:15
state [73] 2:5,10 3:17 6:3,7 17:1,17,
21 18:14,20 19:3 22:13,16,18,20
29:2,7,12 30:3,8,14,18 31:4,8,11,
22 32:4,11,25 33:8,14,20 34:8 35:
19 40:10,12 50:16 57:5 67:4,9 68:
21 81:8 83:13 86:18 87:1 93:10,
11 98:22 101:4,5,8 103:22 105:23
106:22 107:11 108:6 109:18,26
110:3,15 111:3,6,13 112:6,19 114:
16,23 115:14 116:9 121:17 126:
22 127:15 132:23
stated [1] 76:11
statement [3] 8:2 11:26 116:11
statements [1] 19:20
states [2] 11:10 69:18
status [1] 64:8
step [2] 25:22 85:24
still [11] 30:9 45:12 46:5 60:20,22
62:4 67:22 100:13 102:23 116:26
118:25
stop [2] 57:17 61:21
stopped [1] 57:22
straighten [1] 117:19
straiten [1] 52:22
street [1] 2:2
strengths [1] 92:3
stress [7] 19:24,25 20:2 27:4,6,11,
17
stressed [1] 54:23
stressing [1] 85:15
strictly [2] 113:5 124:15
strike [7] 26:2 57:26 58:2 76:20 98:
7 121:7 130:23
strong [2] 69:20 120:5
strongly [2] 67:19 69:21
study [1] 20:22
stuff [10] 3:21 13:7 24:22 28:13 42:
5 46:15 65:16 70:18 74:4 119:12
style [1] 114:12
subject [7] 30:12,13 75:12 104:3
106:19 108:11 115:16
submission [1] 61:22
submit [3] 7:10,23 8:1
submits [1] 58:26
submitted [3] 6:15 56:1 95:21
submitting [4] 58:23 59:22 112:
25,26
subordinate [5] 84:12,22 85:4 87:
8 88:15
subparagraphs [1] 126:3
subsection [6] 93:19,20 97:3 98:
12 101:20 104:7
subsequent [1] 119:26
subsequently [5] 55:24 117:1
119:1
substance [2] 36:2 97:25
successor [1] 91:11
suddenly [1] 103:23
sued [1] 69:16

sues [1] 29:23
suffered [1] 100:14
suffering [1] 33:26
suggest [2] 15:17 124:18
suggesting [1] 13:13
suit [4] 96:20 107:8 110:6 136:4
suited [1] 96:19
summarize [1] 8:1
superior [9] 84:14 86:7 90:23
supervising [1] 77:23,24
supervisor [1] 25:21
supervisory [9] 4:1,10 10:5,12 13:
2,23 14:25 104:3 105:12
support [3] 107:3 115:26 116:3
supported [1] 79:23
supports [1] 119:26
suppose [1] 25:18
supposed [3] 30:23 42:19 66:12
supreme [3] 69:17,19,26
surprised [3] 36:14,19,21 135:7
surrounding [2] 54:22 74:8
suspend [2] 45:19 99:22
suspending [3] 16:6 99:23 136:
26
swear [1] 1:18
system [3] 6:18 40:4 52:3
szupinka [1] 124:5

**T**

table [1] 42:9
tacet [1] 111:1
talents [1] 135:11
talked [3] 80:19 100:4 122:22
tangent [1] 32:22
tape [3] 15:18,22 124:21
target [1] 122:1
targets [1] 59:10
taxpayer [2] 33:1,22
teach [1] 86:2
teaches [1] 85:22
teaching [1] 85:15
tech [2] 40:21 42:25
techie [1] 98:26
technical [1] 43:16
technically [1] 52:7
techniques [1] 114:10
telephone [1] 109:15
tells [2] 71:7,19
temporarily [1] 87:3
temporary [4] 83:11,12,15 110:11
tends [1] 107:3
term [4] 17:15 27:21 30:5 81:11
terms [5] 19:24 36:1 37:2 85:10
130:5
testified [2] 81:2 110:22
testify [2] 77:19 79:8
testifying [2] 50:11 133:1
testimony [5] 37:6 91:8 110:10
113:14 131:18
the.i'm [1] 19:12
themselves [1] 11:22
there's [18] 3:20 10:6 11:24 16:25
25:25 44:19,20 59:8,13 66:5 68:
20,22 69:23 84:6 100:17 114:25
122:11 133:14

therefore [1] 74:10
they've [2] 84:5 120:16
thick [1] 12:26
thieving [1] 42:14
thinking [2] 37:2 132:1
third [1] 70:2
thirty [1] 73:9
thomas [40] 1:14,20 2:17 3:2 7:13,
16 10:1,18 16:22 21:26 24:6 25:3
27:12 44:7 63:10 74:22 76:22 87:
11,16 97:1 100:5 105:18 112:20
115:25 123:22 125:11 126:8 127:
8,11 128:14 130:2 131:6,9 132:6
133:4 134:10 135:7,25 136:7,25
thorough [2] 101:23 116:4
though [3] 13:16,25 49:2
though.getting [1] 43:26
thousand [4] 17:23,26 32:13,26
threatening [3] 120:15 123:5 125:
15
three [6] 74:10 81:10 99:20 109:13
126:3 130:8
three-panel [1] 130:13
tie [2] 11:22,24
till [2] 11:10 116:24
timeliness [1] 94:2
timely [5] 40:7,14,16 42:17 66:1
tkc [2] 73:19,20
to.more [1] 146:8
today [8] 16:21,22 32:3 50:12,13
60:20 97:18 120:5
today's [1] 1:4
together [5] 14:22,25 18:9 84:10
113:21
tom [1] 120:4
took [10] 20:18 21:9 30:14 34:13
41:23 43:5 55:21 78:26 118:15
135:12
top [3] 83:7 105:7 118:1
total [4] 13:18 14:14 89:26 90:8
towards [2] 92:15
tracked [1] 80:2
tracking [2] 103:12 107:4
traffic [2] 37:21 119:10
trail [4] 135:12,17,26 136:13
training [12] 36:23,25 37:9,20 38:
21,23 40:8 44:9,11,13,14,17
trainings [1] 44:18
transfer [5] 81:17,18 110:9,12,20
transferred [4] 81:2,7,16 110:17
transfers [1] 3:18
transition [1] 51:5
translate [1] 40:5
transmission [1] 124:25
transmittal [1] 94:8
transpired [1] 55:25
trate [5] 16:26 19:2 23:21
treated [2] 36:7 87:14
trial [1] 118:3
trip [1] 64:2
troop [10] 111:21 116:5 117:2 124:
2,4,7,10,13,16 125:3,13
trooper [2] 101:12,14
troopers [1] 68:21
troops [1] 120:9



P.R. VIDEO, INC

truthfully [1] 1:18
try [8] 2:20,23 16:14 20:23 32:10 117:6
trying [12] 35:16,26 42:11 50:22 52:1,11,12 113:12,19 117:3,12 119:17
tulli [1] 24:14
tully [1] 17:3
turn [1] 66:1
turned [2] 30:8 43:15
turnpike [1] 61:17
turns [3] 66:6 122:5,7
turpitude [1] 112:15
twelfth [1] 65:10
twenty [2] 32:12,26
two [11] 6:9 9:18 13:24 61:10,10 71:2 81:14,17,23 107:25 122:13
type [8] 27:25,26 32:9 44:13 103:12 114:19 118:24 121:16
types [1] 44:10
typically [5] 4:24 44:10,14 96:17,20

## U

unavailable [1] 126:19
unaware [1] 65:6
uncomfortable [1] 96:5
under [24] 4:18 30:18 46:12,13 47:5 48:20 49:16 51:22 53:25 64:3,6,9 79:2 81:13 86:10 87:17,22 95:18 96:15 101:20 104:7 118:10 132:11,12
understand [14] 1:17 3:25 28:11 34:16 48:22 49:13 52:10 67:18 68:10,10 107:13,14 116:18,19
understanding [19] 32:8 35:23 39:2 40:8,21 50:24 68:11,15,19 69:1,6 70:19 71:14 84:14 114:3 125:8 129:3 131:20,24
understood [2] 91:8 99:19
unfounded [3] 82:6,7 104:9
uniform [1] 86:9
united [2] 1:10 69:18
unity [1] 116:3
university [1] 37:21
unless [5] 43:15 71:12 96:4 99:16 118:20
unravel [1] 58:3
unreasonable [1] 71:13
until [11] 30:16 37:24 38:12 64:11 65:3 113:19 122:22 131:4,14 134:2 135:14
untimely [1] 38:11
unusual [2] 78:4,5
up [34] 2:23 3:9 5:6 15:18,22 16:15 28:8 32:25 34:13 35:14 37:1,26 44:4 48:14 53:13 57:4 62:13 69:25 71:17 78:20 80:16 83:3 94:20 98:23 99:15 107:8,9 111:17,26 115:14 118:15,18 122:21 124:12
upset [1] 91:23
upward [3] 117:20 118:4,10
urgent [1] 124:25
usage [1] 93:9
using [2] 29:4 65:15

## V

vacancy [2] 89:11,14
vacation [2] 61:8 131:22
vaguely [1] 83:18
value [4] 40:12,13,13 107:14
various [1] 132:25
vehicle [11] 30:7,9,17,23 31:6,7,10,21 32:9,11 67:15
vehicles [1] 35:10
verbal [2] 82:17,21
verbalize [1] 84:11
verbally [3] 6:10 7:7 11:24
verbiage [1] 123:23
versus [1] 1:12
via [2] 94:6 109:15
video [10] 1:2,8,8 16:6,8 99:23,26 124:20,21 136:26
view [8] 27:24 35:23 62:20,21,23 63:1 113:25 125:18
viewed [2] 125:12,14
views [1] 85:12
violate [2] 29:6 106:25
violated [2] 71:12 102:16
violation [2] 6:3 82:23
visit [1] 59:9
void [1] 100:10

## W

wages [1] 63:26
wait [1] 13:4
waited [1] 122:17
waiting [1] 122:12
walker [1] 21:6
walks [1] 83:24
wanted [15] 6:12 19:16 22:17 46:23,26 47:20 50:1 69:13 72:17 89:10 95:25 99:19 111:18 130:12 133:6
wanting [2] 50:3 105:23
wants [1] 47:21
warranted [1] 104:11
washington [12] 45:20,23 47:10 48:10 49:10,16 50:5 78:12,12,22 110:9 130:11
washington's [1] 47:26
waste [1] 3:24
way [21] 4:14 22:14 36:8 42:9 47:16 51:6 61:1,24 71:11 76:1 90:24 91:9 93:21 103:3 105:17 118:15,15,19 120:2 122:11 126:9
waylaid [1] 144:22
wealth [2] 129:7 130:12
weather [1] 2:22
wee [1] 47:7
week [3] 38:17 112:22 113:16
west [3] 122:20,25 126:20
westcott [7] 48:13 51:1,10,16 52:18 54:7,12
western [2] 55:21 66:23
westlaw [1] 99:14
whatever [11] 13:15 40:18 42:3 49:6,9 52:25 76:18 98:17 125:22,24 129:10
where's [1] 32:3
wherever [2] 60:3 74:19

whether [28] 9:12 21:1 43:22 44:23 47:8,9,10 55:11 56:5,9 57:25 59:7 66:4 77:22 82:14 88:15 89:24 92:11 99:2 102:15 103:17,17 109:16 110:1 113:15 117:25 127:22 128:25
whoever [3] 42:6,15 106:6
whole [5] 6:18 15:2 53:21 98:9 123:24
whom [2] 78:10 128:9
widely [1] 110:13
widows [1] 6:6
wife [1] 18:5
will [13] 6:6 13:5,8 14:11,14 72:14 79:22 81:19 110:18 116:7,26 123:11 132:13
william [2] 19:2 23:8
win [3] 56:26 60:16 66:14
wish [3] 13:2,4 123:18
wishes [1] 50:4
witch [1] 13:1
withdraw [1] 136:20
within [6] 4:26 62:16 86:9 102:3,4 125:25
without [14] 32:22 36:3 58:22 68:6 78:18 82:4 93:17 97:24 106:5,18 108:11 110:18 113:7 133:15
witness [4] 39:9 43:3 105:9 126:6
witness's [1] 128:21
witnesses [1] 110:19
won [2] 60:21,23
word [1] 71:8
words [9] 5:3 29:15 46:25 59:23 61:21 83:15 96:9 115:14 117:24
work [11] 16:17 18:3 28:3 34:9 61:9 85:26 95:24,26 111:23,26 134:26
worked [1] 18:7
working [8] 40:9 44:3 47:22 56:2 59:2 112:6 114:18 131:23
workman's [1] 61:19
works [1] 39:2
wrap [2] 16:15 83:3
writing [4] 6:15 7:10,15,24
written [3] 39:18 112:2,4
wrongfully [1] 109:23

## Y

year [2] 84:20 94:15
years [6] 3:16 24:4,4 40:9 61:10,11
yourself [2] 8:2 129:9

## Z

zimmerman [1] 17:4

SHEET 1  PAGE 1

1       IN THE UNITED STATES DISTRICT COURT FOR THE
2              MIDDLE DISTRICT OF PENNSYLVANIA
3    DARRELL G. OBER        :        1: CV- 00-0084
4                           :
5         Plaintiff         :
6                           :
7         Versus            :
8                           :
9    PAUL EVANKO, MARK      :
10   CAMBELL, THOMAS COURY, :
11   JOSEPH WESTCOTT,       :
12   HAWTHORNE CONLEY       :
13   JOANNA REYNOLDS and    :
14   SYNDI GUIDO,  Et al.   :
15              Defendants:
16       DATE:           JANUARY 7, 2001
17       PROCEEDINGS:  Video Deposition of
18                       Joseph Westcott
19       APPEARANCES:
20       For the Plaintiff:    Donald Bailey
21                             4311 N. 6th Street
22                             Harrisburg, PA 17110
23       For the Defendant:    Syndi Guido
24                             333 Market Street
25                             Harrisburg, PA  17101

PAGE 2

1       CRYSTAL LYDE:  Good afternoon ladies and
2    gentlemen.  Please be advised the video and audio is
3    in operation.  My name is Crystal M Lyde, L-Y-D-E.  My
4    address is 4310 Hillsdale Road Harrisburg Pennsylvania,
5    17112.  I've been contracted by PR Video to be the
6    operator for this deposition.  This in The United
7    States District Court for The Middle District of
8    Pennsylvania.  The caption is Darrell Ober vs. Paul
9    Evanko et al.  The docket number is 1;CV-01-0084.  The
10   date is January 7, 2002.  The time is 1:35 p.m.  The
11   video deposition is being taken on behave of plaintiff
12   Darrel Ober, and is also being done stenographicly.
13   The witnesses name is Joseph Westcott.  Will you raise
14   your right hand for me please sir?  Would you state
15   your name for the record and spell it please?
16       MR WESTCOTT:  Joseph H. Westcott,
17   W-E-S-T-C-O-T-T
18            CRYSTAL LYDE:  Do you so swear to
19   tell the whole truth, nothing but the truth so help you
20   God?
21       MR WESTCOTT:  I do.
22       CRYSTAL LYDE:  Could we get a sound check
23   around the room Mr. Bailey?
24       MR BAILEY:  Yes my name is Don Bailey.  I'm

PAGE 3

1    an attorney.  I represent the plaintiff in this action,
2    Darrell G. Ober.  Joann..
3         JOANNA REYNOLDS:  Joanna Reynolds, I
4    represent the defendants in this matter.
5         BARBRA CRISTI:  Barbara Cristi, Chief
6    Counsel, Pennsylvania State Police, Co-councilmen's
7         MR BAILEY:  Okay I know you where here early
8    this.Thank you very much.  There is a stenographer here
9    a present stenographers here on behave of the
10   defendants.  So there'll be a stenographic recording
11   also.  Do you want the video or the video transcript
12   either one of you?
13        JOANNA REYNOLDS:  I think we still.
14        MR BAILEY:  Well let us know later on.
15   Corneal before I begin just a few instructions.  I know
16   you were here this morning, but you may not be familiar
17   with this process.  This deposition is taken by video
18   and audio means.  You do have a right to come here and
19   view.  If you acquire a copy of the paperwork, but you
20   do have a right to come here, in my office I will make
21   available a video of your deposition.  You can sit down
22   and review it.  You have a right to that.  Other wise
23   work with your attorney and whatever arrangements they
24   make on acquiring stuff, that's fine.  I'm going to be
25   asking you questions and during to the process of
26   responding to the questions it's important that you

PAGE 4

1    keep your voice up.  It's also important that you
2    remember that particularly because we have a
3    stenographer that you have to don't talk over my
4    answers and if you find I'm interrupting you,  you make
5    sure you stop me.  Okay?
6         MR WESTCOTT:  I will do that.
7         MR BAILEY:  Alright.  So you get a chance to
8    answer fully and completely.  I want to reemphasize
9    something that I indicated to Mr. Wertz this morning,
10   to Major Wertz this morning.  That is if you have any
11   questions of me during the deposition I don't want you
12   to be bashful about asking me to explain the question
13   or ask me about where I'm going.  I don't know any
14   other attorney that does that, but I wish all of us
15   did.  I don't want any confusion in your mind or a
16   purpose of a question and that includes a couple times,
17   for example, this morning Mr. Wertz took issue with
18   what I was doing with questions or where I was going.
19   I think it makes for a better record if you feel free
20   as a witness to raise objection or ask me to explain.
21   Don't be shy about doing that, okay?  The idea here is
22   to get what you know as fully and completely as
23   possible.  Now you heard the rest of the instructions
24   this morning.  There's no reason to drag this out.  Do
25   you have any questions of me before we begin?
26        MR WESTCOTT:  No

SHEET 2   PAGE 5

1       BARBARA CRISTI:  I assume we're going to
2   reserve all objections except as to form.  And again I
3   would like this witness to review his deposition
4   transcript and
5       MR BAILEY:  Counsel has asked normally if I
6   had ordered, let me explain this for you cause you may
7   not understand what it is.  If I had asked you for a
8   and brought a stenographer like this young lady here.
9   What the rules provide in that case is within thirty
10  days you have a right to be notified an opportunity to
11  review the deposition, and there's a sheet.  It doesn't
12  allow you to change anything, but by page and line you
13  can write down on there an objection, observation,
14  disagreement, correction, redaction, whatever.  With a
15  video deposition the deposition is the deposition.  It
16  is there.  There's no provision for that.  What your
17  counsel has asked, I think it is a good idea and I do
18  not object we will be making a transcript for the video
19  deposition.  You will not be permitted out of or to
20  have them unless it's purchased from the video company
21  cause it's not my property.  I have to buy mine too.
22  What will happen, but you can come here once I get a
23  copy.  Now you'll have your own stenographic copy, but
24  you'll be allowed to come and review it.  Joann had
25  asked that you be allowed to do an aradasheet kind of
26  thing.  I have no objection to that.  That's fine and

PAGE 6

1   we will certainly permit you to do that.  Normally you
2   wouldn't do that with a video deposition, but I have no
3   objections so.
4       MR WESTCOTT:  Good
5       MR BAILEY:  Now the other thing I noticed sir
6   is that you're a little bit soft spoken.  That
7   microphone, that one I must be the other one that's it,
8   pull it just a little bit closer.  Maybe it don't have
9   to be that close, but give me your name again.
10      MR WESTCOTT:  Joseph H. Westcott
11      MR BAILEY:  You can back it up about a foot
12  and a half.  You fine sir.  You're in there good.  Okay
13  that's great.  Okay, Conel is that okay to call you
14  Conel?
15      A:  That's fine.
16      Q:  Conel Westcott my understanding is that
17  you're retired?
18      A:  That's correct.
19      Q:   When did you retire?
20      A:  July 7, 2000?  A year and a half ago.
21  Whatever year that was.
22      Q:  Prior to your retirement how were you
23  employed?
24      A:  I was employed as the Deputy
25  Commissioner for Operations, Pennsylvania State Police.
26      Q:  Can you give us a brief summary of what

PAGE 7

1   your duties and obligations were in that capacity?
2       A:  Sure.  I was responsible for pretty much
3   all of the operations of the department.  That had
4   include the Troop Command, Area Commands, various
5   bureaus, Bureau of Patrol, Bureau of Criminal
6   Investigation, Drug Law, Liquor Control, Emergency
7   Special Operations.
8       Q:  In that capacity do you assign
9   investigations?
10      A:  Yes sir
11      Q:  In what way?  How would you assign an
12  investigation and tell us what that means in the
13  Pennsylvania State Police?
14      A:  Well I would not necessarily assign
15  investigations on daily bases.  Don't misunderstand.
16  The Troop Commands and the Area Commands pretty much
17  respond to incidents that are brought to their
18  attention and they then would of course would advise me
19  of what was going on.  But there was some times when it
20  may be necessary for me to ask an Area Commander, and I
21  always dealt with Area Commanders.  I was a stickler on
22  chain of command.  If there was ever an opportunity
23  that I had to discus something with a Troop Commander I
24  most certainly the first opportunity I would discus it
25  I would advise the Area Commander that I wasn't able to
26  get a hold of him for one reason or the other and I

PAGE 8

1   talked to the Troop Commander about it.  So there are
2   times when I would talk to someone other then an Area
3   Commander, but most always an Area Commander.  I would
4   ask him he would look into this matter, that matter, a
5   report of something, somebody told me something, and
6   could somebody look into it.  So it's not a formal it's
7   sort of a request, listen my neighbor said he had a
8   problem with this or that can you send a patrol over to
9   take a look at it, and that sort of thing.
10      Q:  Well in that kind of a case it's like
11  any organization has to run, particularly a law
12  enforcement organization.  I'm not talking you're
13  always checking in to things.  I assume on the day to
14  day operations of running any outfit as large as the
15  Pennsylvania State Police you got to follow up on a lot
16  of loose ends and dangling participles as part of doing
17  your job.  I'm talking more about the. I'm speaking
18  more for the official type of thing on formally
19  launching or initiating an investigatory process.  Was
20  that one of your jobs?
21      A:  It could be.  It was not very offend.
22      Q:  Well in what way could it be?  I mean,
23  how would you go about doing that?  Maybe I can do this
24  best by example.  I have a limited experience with
25  military organizations with the United States Army.
26  In the United States Army if somebody did something wrong

SHEET 3  PAGE 9

1  out there, even it was witnessed by let's say a Brigade
2  Commander or full Conel, he couldn't initiate or make
3  any kind of disciplinary thing.  He had to go to the
4  Commander and the Commander would investigate that
5  reach a recommendation on discipline with the exception
6  of the Battalion Commander who had a limited so call
7  Article 15 authority.  I'm talking about the formal
8  sense of getting an investigation started were you hear
9  about something out there.  How do you do that?  Do you
10  do a written report?  Can you call up BPR or call up
11  some Area Commander and say I want Joe Blow
12  investigated?
13        A:  No, I wouldn't do something like that of
14  course.  Let's separate out what you're asking here.
15        Q:  Okay
16        A:  Let me give you a couple of examples
17  okay?  As a matter of clarification.  The prison break
18  in Pittsburgh some years ago, well five years ago
19  whatever it was.
20        Q:  I remember who it was who investigated
21  it.  I can tell you how it happened and who started the
22  fire.
23        A:  Five or six, I guess, decided to find
24  some other place to live.  The Troop and Area Command
25  again their investigation is they would normally do
26  based upon receipt of information from Corrections.

PAGE 10

1  When I was advised of that, which was right away cause
2  that's what's required, I then assigned I asked our
3  Director of Criminal Investigation and asked him to
4  assign the people from our Fugitive Apprehension Squad
5  to go out there and assist the Troop.  So in that
6  regard I would make an assignment.  Yes, send your
7  people out there to help out in the Troop.  That's for
8  an investigative sort of thing.  If it's a personnel
9  complaint no I do not assign anybody to do personal
10  complaints, okay.  If I received information about a
11  personal matter then I either refer the complainant,
12  who ever was telling me, to BPR to make the complaint.
13  Or if I received information, for example, from a Troop
14  Commander, Area Commander, or something like that I
15  would direct them to BPR with that matter.  So I would
16  pick up and call BPR and say listen go do this or go do
17  that, no.
18        Q:  And why wouldn't you do it?  Because you
19  started off in response to my question, you started off
20  saying "I wouldn't do anything like that."  And I took
21  note of that.  Why wouldn't you do anything?
22        A:  First of all, it's not appropriate for
23  me or anybody else to pick-up the phone and ask BPR to
24  go do something.  There's a procedure that you follow.
25  There's written forms that you can request that that
26  investigation be conducted.  BPR didn't fall into my

PAGE 11

1  area of responsibility anyway.  So generally what I
2  would do is go see Conel Coury and say listen here's
3  the information that I just received.  I advise these
4  people to contact BPR.
5        Q:  Okay.  Alright sir thank you very much.
6  Now in going back are you familiar with the, at least
7  generally familiar, you may remember reading or talking
8  with the amended complaint in case.  I mean you're a
9  defendant here I want to assume you did, but sometimes
10  people don't.  Have you read over the complaint?
11        A:  I have
12        Q:  I want to ask, most of the questions
13  that I ask today are going to be taken basically from
14  that complaint.  I have a copy here.  I'm gonna set it
15  right in front of you, if your attorneys don't have it,
16  for you to refer to, okay.  Now before I do that just a
17  few more general questions.  You made a comment in
18  response to an earlier question of mine that you were,
19  correct me if I am in error, "a stickler on chain of
20  command".
21        A:  I am
22        Q:  Alright sir can you.Most of the Conels
23  I've _____ here pretty much were too.  I'll tell yah.
24  Can you tell me what that means to you.  You're a
25  defendant in this matter, tell us what "stickler of
26  chain of command" means to you.

PAGE 12

1        A:  That means that I expected the people
2  who worked under my area of command to follow that
3  chain of command up through and advise me accordingly.
4  That also means I would follow that chain of command
5  back down the chain of command as well.  I did not tell
6  them there are exceptions and I'll explain those to
7  you, but I did not talk to a Trooper out on the road
8  because that's not appropriate for a Lieutenant Conel
9  to do that.  I have a lot of friend on the Pennsylvania
10  State Police of all ranks and it doesn't mean I don't
11  talk to them ever.  I certainly talk to them.  If any
12  business discussion is held between me and them then I
13  certainly tell their Commanders and I direct them to be
14  sure that they also do the same thing.  That's what I
15  mean about being a stickler for the chain of command.
16        Q:  When I was in the Army if you were a
17  ground Commander, maybe just a 2nd Lieutenant or
18  Platoon Leader, if you were engaged in ground combat, I
19  don't know if it was ever written down some where, but
20  as the leader engaged in ground combat if you are
21  actually in a fire fight.  You controlled that
22  situation.  A General a Chairmen of the Joint Chiefs of
23  Staff could not come down and interfere with your
24  command if you're involved in that fight.  That meant
25  supporting fires and everything else.  Does the State
26  Police have anything like that?  Can you as a top

1 official in the Pennsylvania State Police become
2 involved in the administration of a unit or in giving
3 orders to people? Let's say if you show up at an
4 incident out on the Pennsylvania Turnpike and it's
5 people are involved in a serious situation can you take
6 over or replace somebody?
7     A:  I suppose I could. I not necessarily
8 would, but certainly could.
9     Q:  Okay it's not quite the same situation,
10 I guess, but if you're a Trooper, now let's reverse the
11 roles, now you're not the Commander in conflict. Let's
12 say you're a Trooper and you're being given orders to
13 do something by your immediate supervisor, who maybe is
14 a Sergeant, and the Conel calls up and tells them to do
15 something else. What are they suppose to do? Should
16 they follow the Sergeant's orders? Or should they
17 follow the Conel?
18     A:  In the first case that would not happen.
19 Not while I was there that would not happen. In the
20 first place I would not, unless it was understood by
21 that commander on scene Commander there that I was now
22 in charge, then that would not happen. I would not
23 tell somebody in that chain of command to go do
24 something.
25     Q:  Is it fair to say the higher you in an
26 organization the more authority you have obviously your

1 orders, provided they're lawful orders recognizably
2 lawful orders, they're going to take president and the
3 person at the top is going to take charge. That's the
4 way the systems runs.  Is that fair to say?
5     A:  Yes, but you have to be very careful and
6 I did my best to be very very careful, but what I said,
7 what came out of my mouth under whatever circumstances
8 did not counter act what this guy's immediate
9 supervisor might have said to him or whatever, okay.
10 You have to be very very careful with it.
11     Q:  Your recognize, in other words, that the
12 integrity and the effectiveness of your outfit depended
13 upon the fact the subordinates through the chain of
14 command it was important that they have respect and
15 that respect be given to their different levels of
16 command. Or else the whole.cause you can't micro-
17 manage the whole organization, right?
18     A:  I don't know if I said that, but that
19 would be accurate.
20     Q:  Isn't that correct? I mean that's
21 really what you're telling us. That that's good. That
22 would be good police, paramilitary, or military
23 practice. Am I correct?
24     A:  That is correct
25     Q:  In a minute, when I get back to it. I'm
26 gonna ask you question related to what we just talked

1 about. Based upon the testimony that you witnessed
2 this morning from Major Wertz and about the situation
3 that Captain Ober was in. Okay?  So I what you to sort
4 of file that away in the back of your mind cause we're
5 going to revisit it in just a couple minutes. Now at
6 some point, you learned about this FBI probe that is
7 one of the underlying material issues in the Ober
8 complaint, is that correct?
9     A:  Yes I did
10     Q:  How  and under what circumstances did
11 you learn of the FBI probe?
12     A:  Conel Corey called me up uh and told me
13 about it. In fact he told me the conversation that
14 Conel Hickes and Captain Ober had with the
15 commissioner.
16     Q:  And what did uh what did Conel Corey
17 tell yah?
18     A:  Well it just it was just general terms
19 that I can recall.  That was that generally the FBI
20 had been conducting an investigation that Captain Ober
21 and Conel Hickes had had knowledge of that and
22 neglected to tell anybody that I know of.
23     Q:  Did he say neglected to tell anybody?
24     A:  I'm not sure. I mean that's my
25 understanding. That's my verbiage there.  They had
26 not told anybody.

1     Q:  That they had failed to or?
2     A:  They had not told anybody.
3     Q:  Was there any indication that they had
4 made an error in not telling anybody?
5     A:  I don't know if there was any innuendo
6 that way at all. It was just he had apparently come by
7 that knowledge and called me up and told me about it.
8     Q:  But why not call you up if you know?
9 Why not call you up, except to say hey I got great
10 news. Gees the FBI was looking into a problem out
11 there and they cleared us and we're okay? Did he say
12 anything like that?
13     A:  No he didn't say anything like that.
14     Q:  He was upset that somebody didn't tell
15 somebody?
16     A:  I can't tell you that he was upset or
17 not. He was yelling on the phone line when he told me
18 that Captain Ober and Conel Hickes had just told the
19 Commissioner that an ongoing investigation had been
20 going on and they hadn't told him about it before but
21 are telling him about it now.
22     Q:  Okay let's talk about this a little bit.
23 I'm gonna underline a word back there. It's sticking
24 out my mind, the word just, J-U-S-T.  Just told the
25 Commissioner, remember saying that?
26     A:  Yes, but that was my word, yes.

SHEET 5   PAGE 17

1    Q:   Why did you.was that the situation?

2    A:   Because that was my understanding.  He

3  had just been told that on that particular day.

4    Q:   Was that a hot item?

5    A:   It was a conversation I had.  You know

6  we were all out at the Academy Awards well I'd have to

7  go back to the office and apparently that conversation

8  would occur.

9    Q:   What else did he tell you in that

10  conversation?

11    A:   Generally that was about it.  I don't

12  remember anything else.

13    Q:   Well, did he indicate how the

14  Commissioner felt about that issue, about this matter?

15    A:   No he did not, that I can recall.

16    Q:   So he called you up to tell you that

17  these guys had just told the Commissioner about it?

18    A:   That's my understanding.

19    Q:   Well how did that strike you?

20    A:   What do you mean?

21    Q:   How did it.you know did you deduce from

22  what he told you?  What did you think about what he

23  said?  Did it effect you in any way?  Did it raise a

24  red flag?  You indicated earlier that you're a stickler

25  for the chain of command.  Did you read anything into

26  it?  You know how did it effect you?

PAGE 18

1    A:   Well neither Conel Hickes or Captain

2  Ober were in my chain of command.  So there was no

3  chain of command issue there as far as I was concerned.

4    Q:   You're Operations you're like a

5  Battalion level Executive Officer.  I mean everything

6  in your chain of command.  Isn't it?

7    A:   Well not necessarily.  I mean certainly

8  from the rank perspective everybody was a lesser rank

9  certainly has that sort of thing, but you are in charge

10  of your area of responsibility.  There were three

11  Deputy Commissioners there.  Each in had their own

12  areas of responsibility.  Those people that worked in

13  those areas reported up to their chains of commands to

14  them.  There was not necessarily a need or requirement

15  to go outside that.

16    Q:   Well then why did you assign Williams.

17  I'm sorry are you done?

18    A:   Uh-huh

19    Q:   Then why did assign Williams and Wertz

20  to do the investigation on this Ober matter, the

21  inquiry?

22    A:   Well because

23    Q:   I'm sorry that was you or?

24    A:   Well yes.  The next day I had a

25  discussion about what had been told to the Commissioner

26  and what little we know at that point.  It was decided

PAGE 19

1  that we needed to know more information and the

2  Commissioner needed to know more information.  So that

3  we should make an inquiry into it and find out what

4  happened.

5    Q:   Well let's stop at that point.  Why not

6  just call our brothers in the FBI and find out what

7  went on?

8    A:   Well if it was just gonna be one type of

9  a conversation maybe you would, but you need to do an

10  inquiry to find out what was involved here.  All

11  anybody knew was, there was some people in the FBI, we

12  didn't know who, there was Captain Ober, and there was

13  Conel Hickes.  What were the circumstances?

14    Q:   Well don't you trust the FBI?

15    A:   I don't think it's a matter of trust at

16  all.

17    Q:   Well the question.

18    A:   I think somebody needs to go out there

19  and talk to them.

20    Q:   Okay but the question is do you trust

21  the FBI?

22    A:   Sure.  Why wouldn't I?

23    Q:   Huh?

24    A:   Why wouldn't I?

25    Q:   You wouldn't want me to answer that

26  cause we don't have enough time.  In seriousness, I

PAGE 20

1  would assume that you would have faith, confidence, and

2  respect generally at least.  I'm not saying everybody

3  in the organization would.  But generally speaking it's

4  fair to say, without being facetious or padoorden about

5  it in any way, it's fair to say that you respect and

6  you work with and you know you have some respect for

7  the FBI or the law enforcement agency.  And obviously

8  they're quite good at what they do, correct?

9    A:   At some things and I have a lot of

10  friends in the FBI that I have the utmost regard for.

11  There are others that I don't care for.

12    Q:   I share lots of bitter views probably.

13  The point is from what I know from my perspective, but

14  the point is I'm asking why couldn't somebody just call

15  the FBI and check with them and ask them what the story

16  here?

17    A:   I don't think you get a full and

18  complete inquiry if you did that.  There are also

19  understand that there are other people that have time

20  to do those things.  Were as I would not necessarily

21  have time to do an inquiry plus everything else that I

22  do every day.  Depends on you don't have no idea where

23  an inquiry may take you may lead you.

24    Q:   You weren't concerned about what the FBI

25  found out where you or were you?

26    A:   All I was concerned about at that point

SHEET 6  PAGE 21

1  was to get an inquiry to find out what the
2  circumstances were. What were the circumstances?
3      Q:   That's what I'm asking.
4      A:   What were they doing? How did that
5  involve the Pennsylvania State Police? Who are the
6  Pennsylvania State Policemen involved? When did it
7  involve them? What did they do with it? Why did they
8  do it that way? And that pretty much was the basis for
9  the requesting inquiry.
10     Q:   Well that's what I'm asking. You did
11  have any knowledge of the Pennsylvania State Police
12  doing their own inquiry, right?
13     A:   Into what?
14     Q:   Into these allegations of public
15  corruption.
16     A:   No I don't think we had an investigation
17  into that.
18     Q:   The information you had was that Captain
19  Ober and Lieutenant Conel Hickes know of the probe, but
20  didn't tell anybody.
21     A:   That was the information I had yes.
22     Q:   And the information you had was that
23  Captain Ober told Conel Hickes, and that told or did
24  you? Did you know that Conel Hickes had told Captain
25  Ober to keep it confidential and not to divulge?
26     A:   I'm not sure I did know that at that

PAGE 22

1  point.
2      Q:   Okay. So in fairness to you at that
3  point you didn't know that, you may not have or you
4  might have, but the point is what you did know at that
5  point. This much we can share with certainty. At the
6  point, that shortly after this point that you got the
7  call from Conel, Lieutenant Conel I'm sorry, yeah
8  Lieutenant Conel Coury. At that point you knew that
9  Mr. Hickes and Mr. Ober had know something and had not
10  immediately informed their superiors, presumably that
11  would be Commissioner Evanko. Am I correct? You know
12  fix that up. Respond to that completely if you can.
13  In other words I'm not trying to lead you in to some
14  culdesac with that. Basically what you know at the
15  time in a nutshell was that Ober and Hickes knew about
16  this and had not reported it. Am I correct?
17     A:   That's correct, yes.
18     Q:   But nobody did it occur to anybody and
19  there was a meeting. Who was at the meeting?
20     A:   Which?
21     Q:   The meeting after Mr. Coury called you.
22     A:   The next morning, I'm sure it was just
23  the Commissioner, Conel Coury, and myself.
24     Q:   Okay, the Commissioner Mr. Evanko, Mr.
25  Coury, and yourself. Anyone else in that meeting?
26     A:   Not that I'm aware of.

PAGE 23

1      Q:   Any other staff meetings you had on this
2  matter where the Commissioner was present?
3      A:   Just at the end when Major Williams and
4  Major Wertz had completed their inquiry and were
5  turning the documents over.
6      Q:   You were present at that time?
7      A:   Well no I don't know that answer to
8  that. I know they came to me at my office and I took
9  them into the Commissioner's office and I'm just not
10  sure whether I stayed in there or whether I left. I'm
11  just not sure. I just don't remember.
12     Q:   Now was Mr. Brown in any of these
13  meetings?
14     A:   I did not meet with Mr. Brown.
15     Q:   Pardon me
16     A:   I did not meet with Mr. Brown.
17     Q:   Well was he in any meetings with the
18  Commissioner about this matter?
19     A:   I don't know
20     Q:   So he could have been in meetings with
21  the Commissioner or somebody else and you don't know
22  that?
23     A:   I don't know that
24     Q:   is that Captain Brown now, by the way?
25     A:   That's my understanding, yes.
26     Q:   Now tell me what went on in this meeting

PAGE 24

1  the next day that you had with the Commissioner and
2  with Mr. Coury.
3      A:   It was sort of just a general meeting in
4  order to find out what went on. I think the
5  Commissioner said the he'd like to know what happened
6  here, what went on here. I said well we need to have
7  somebody get out and do some sort of inquiry into the
8  matter. He said okay let's do that and made the
9  recommendation that Major Wertz and Major Williams be
10  assigned. That was agreed upon and we went out and
11  asked each of them at that point to do that.
12     Q:   Out in Phoenix?
13     A:   Major Wertz I talked to in Phoenix and
14  Major Williams I think I met him up in Mauntoursville.
15     Q:   You met him up there?
16     A:   Yes I believe I did.
17     Q:   What did you go up there for?
18     A:   Well, this is my recollection this was
19  just before we were to leave, it might have a day
20  before we were to leave, to go a CARE Conference in
21  Phoenix.
22     Q:   Well you didn't go up there to talk to
23  him about that.
24     A:   No No Nó No. I went up there
25  specifically to ask him to do this inquiry.
26     Q:   Yeah you drove up there.

SHEET 7   PAGE 25

1       A:   No I flew up.
2       Q:   You flew up?
3       A:   Yes
4       Q:   You flew up to talk to him in
5  Mauntoursville?
6       A:   That's correct
7       Q:   I do not mean to be disrespectful by
8  this question.  What was so God-awful  that you would
9  fly up to see him about finding out what Ober and
10 Hickes did?
11      A:   It was an inquiry that we wanted to get
12 underway, get started.  I was leaving I believe that
13 next morning to go out to Phoenix, Arizona.  In fact I
14 believe that was probably in the afternoon, and in my
15 job I go all over the state and I flew most of the
16 time.  So it was not unusual for me.  Don't put any
17 emphasis on the fact that I flew From Harrisburg to
18 Mauntoursville.  I fly quite a bit.
19      Q:   You fly quite a bit for these things
20 okay.  Well when you flew up there to see Major
21 Williams that was within days then I would assume from
22 you responses within days of when Conel Evanko had been
23 informed by Hickes and Ober about the matter.
24      A:   I would assume that also.  I can't give
25 you a time frame cause I just don't know.  I don't
26 remember the dates.  I don't know the dates that we

PAGE 26

1  went out there.
2       Q:   Would you know the dates of when the
3  CARE Conference was?
4       A:   The only thing I can tell you about that
5  is it was in the spring.  The CARE Conference is always
6  in the spring.
7       Q:   May?
8       A:   I don't know.  I'd be guessing.
9       Q:   But there would be phone records there.
10      A:   It certainly can be checked out I'm
11 sure.
12      Q:   You could easily check out the airplane
13 records.
14      A:   Yeah, exactly
15      Q:   What airport did you go into up there
16 Mauntoursville?
17      A:   It was at Williamsport.
18      Q:   The one at Williamsport.  You're
19 normally headquartered where?
20      A:   Here in Harrisburg
21      Q:   What's your fly time?
22      A:   I don't know about maybe twenty minutes.
23      Q:   Including ground time, taxi time, and
24 all that stuff?
25      A:   I don't know the answer to that.
26      Q:   It that the double engine turbo crop

PAGE 27

1  they use out there?
2       A:   Or a single engine
3       Q:   Single engine?
4       A:   Single engine 182
5       Q:   SE 182.  You make that flight in twenty
6  minutes.
7       A:   I'm guessing it that that's about it is.
8  It's not that far up there by air.  I mean I don't know
9  how long it takes you by car over an hour.
10      Q:   Straight shot an hour and a half at the
11 most, but it's.
12      A:   What are you saying an hour and a half
13 by car?
14      Q:   At the most.  The roads are in quite
15 good shape now.  I know that a lot of you guys.
16      A:   Rule of thumb is flying time is about
17 one third of your driving time.  That's the rule of
18 thumb.
19      Q:   Is that a rule of thumb?  Okay.
20      A:   So twenty minutes may not be bad.
21      Q:   Well you know better then I do.  Let's
22 go back to this situation where you have a meeting with
23 Conel Evanko and Conel Coury.  Who called that meeting?
24 Did the Commissioner call that meeting?
25      A:   I expect he asked us to come in his
26 office yeah.

PAGE 28

1       Q:   You discuss anything else at that
2  meeting?
3       A:   I don't recall.  We certainly could
4  have.  We met on a regular basis on a number of issues.
5       Q:   I would assume that.does he have regular
6  staff meetings?
7       A:   Well, sure.  There are monthly staff
8  meetings with all the staff.  I guess it's every two
9  weeks it's been a lot, maybe it's every two weeks.  I'm
10 not sure.
11      Q:   I was just looking for frequency.  How
12 often, every two weeks that's fine.  But this wasn't a
13 regular scheduled staff.
14      A:   The Commissioner I met every day.  I
15 briefed he every day on what went on out in the field,
16 what was going on.  So it's not unusual for me to met
17 him and meet with him two, three times some days.
18      Q:   So it's not unusual to have meeting, but
19 you went and you had a meeting on this issue and you
20 suggested Mr. Williams and Mr. Wertz, right?
21      A:   That's correct.  They would have been
22 my recommendation.
23      Q:   That was okay and you talked about what
24 the purpose of this inquiry was.  What was the purpose
25 of the inquiry?  Why were you doing this?  I think you
26 said to find out what happened, but why a formal

SHEET 8  PAGE 29

1  inquiry?  What was that about?
2       A:   Well you have to before you can evaluate
3  any kind of a circumstances you have to find out what
4  happened.  It doesn't matter what it amounts to.  If
5  you want that somebody came down the sidewalk here and
6  slipped and fell you have to have somebody look into
7  that.
8       Q:   That's an accident, right?
9       A:   Well whatever it is.  If you are going
10 to evaluated something sir you gonna have to find out
11 what the circumstances are.
12      Q:   Well if a  Trooper hauls off and punches
13 his Sergeant you got to investigated that.
14      A:   Well sure
15      Q:   Nobody punched anyone, no one had an
16 accident.  What were you investigating?
17      A:   We wanted to find out who they what,
18 when they knew it, when they who they told about it.
19      Q:   Why?
20      A:   Well because the Commissioner asked for
21 it and because my opinion chain of command was not
22 followed or they're lying.  Let's find out what it was.
23 Why did he tell Conel Coury?  Why did he tell his
24 Bureau Director?
25      Q:   I don't know
26      A:   I don't know either.

PAGE 30

1       Q:   You look at this and you're a stickler
2  for chain of command and you were consulted by the
3  Commissioner.  Did you ever reach a conclusion why he
4  didn't?  I mean why didn't he do that Conel?
5       A:   I don't the answer to that.  To this day
6  I do not know the answer to that.
7       Q:   Well, I apologize.
8       A:   You have to ask him that.
9       Q:   Yes sir.  I don't mean to ask you to
10 tell us what was in his mind.  That's clearly a
11 speculative on your part, but you have review that
12 "work product" in this matter.  You had the two
13 investigators appointed.  They were appointed on your
14 recommendation.  You gave them the order to march or
15 told them what to do.  We already know that.  What
16 conclusion did you come to as to why Ober and Hickes
17 did this?  In your opinion you said they violated the
18 chain of command.
19      A:   Well in the first place I didn't come to
20 any conclusion.
21      Q:   At all?  Alright, alright.
22      A:   And I told you that I didn't know why he
23 did anything.  To this day I don't why he didn't let
24 Conel Coury know or Major Conely and I want to correct
25 also a comment that you made.  That I had you said I
26 had reviewed this work product.  That is not correct

PAGE 31

1  either.
2       Q:   Okay sorry about that.
3       A:   I had asked those two Majors to take a
4  look at this.  They completed their inquiry.  They come
5  back to me, they said their inquiry is complete and
6  they would like to give it to the Commissioner.  I said
7  okay stop down in my office.  They stopped in to see
8  the Commissioner.  They gave it to the Commissioner.
9       Q:   Okay see that's where I'm a little bit
10 confused.  I thought you had indicated that he violated
11 the chain of command and you told us you were a
12 stickler for the chain of command.  Now you told us
13 didn't review the work product.
14      A:   I'm telling you that.
15      Q:   I'm not trying to trick you now.
16      A:   No, but you're not listening to what I'm
17 telling you exactly.
18      Q:   I don't mean to twist anything.  I don't
19 mean to.
20      A:   What I told you was if the information
21 was correct that we heard at the particular time, the
22 very first initial information was correct then in my
23 opinion he did not follow his chain of command.
24      Q:   Okay
25      A:   Okay now.
26      Q:   He sir.

PAGE 32

1       A:   That was the purpose of an inquiry.  To
2  find out who, what, when, where, why, how, and those
3  sorts of things.
4       Q:   Okay sir I thought you apined and you
5  offered us as part of your response that he didn't tell
6  Coury and he didn't tell Conely.  Now we know he didn't
7  tell Conely, but what's the difference between telling
8  Coury and telling Hickes?
9       A:   Conel Coury was in his chain of command.
10 He was a Deputy Commissioner in charge of what he was
11 doing at the time.  I think he was assigned to BPR and
12 that came under Conel Coury's area of responsibility.
13      Q:   What other regulation that says an
14 officer should not report or share information with a
15 superior officer who is not in his direct chain of
16 command?  I don't mean general supervision, okay?
17      A:   Yeah
18      Q:   I mean direct chain of command.
19      A:   I have to plead ignorance just like
20 earlier with Major Wertz.  I can't tell you what's
21 written and what isn't written.  It's just an
22 understanding.  It's just the chain of command.
23      Q:   Just an understanding, it's the chain of
24 command.  Well now I was in the Army.
25      A:   Well that can be corrected you know,
26 understand.

SHEET 9  PAGE 33

1  Q:   I keep going back to the Army and you're
2  going to have to bare with me please.  This is the only
3  experience I have.  I've never been in a police
4  organization and I understand the Pennsylvania State
5  Police is an exceptionally fine one.  But I don't know
6  how you do business there.  So I can only go on what I
7  do and my opinion on whether or not that would violate
8  an Army rule which I know it would not.  It's
9  meaningless here, but I'm awful proud of the U.S. Army.
10  I'll tell you that, and I was in a couple great
11  outfits.  You know to me, I don't know if you can tell
12  how if it's not written down or you're not sure where
13  it might be written down if it might be.  How does
14  bases on you countless years of experience as a
15  stickler for chain of command how does an inferior
16  violate a chain of command if he shares information
17  with a superior not a collage, not an equal, or not an
18  under to his superior if for no other reason if he
19  trusted them or liked them.  How does that violate any
20  chain of command prerogative in the Pennsylvania State
21  Police?  Now let me tell you what I'm gonna follow this
22  up with.  I'm gonna ask if your not in somebody's chain
23  of command that they trust you, admire you, and like
24  you and they ask your advise.  Just simply ask your
25  advise, I've got to unload this, I've got concerns, I
26  need to ask your advise, and you say you keep it to

PAGE 34

1  your self and don't you talk to anybody else.  I'm
2  gonna come back and ask you what effect that has in
3  this chain of events, because that's a fact and we know
4  it's there.  Everybody admits it's there.  But let's
5  begin so you know where I'm going right.  You know what
6  I'm gonna try and get at here.  So you're not confused
7  or mislead about anything.  My first question would be
8  in this little series of question my first question
9  would be like this.  What rule do I violate, if it's
10  written, what informal rule known to you do I violate
11  if I am a Captain in the Pennsylvania State Police who
12  for any reason knows, likes, respects, or has good
13  solid institutional reasons cause I think they're all
14  there and I go to a Lieutenant Conel and I share
15  information?  What's wrong with that?  Do I have a
16  duty, here's the sub-question so you make sure there's
17  no confusion on this, do I have a duty to go to my
18  immediate superior first?  Is that written?  Is that a
19  rule?  Do I have a duty not to tell anybody in the
20  world until I tell my immediate supervisor?  Can you
21  explain what, in terms of written and unwritten rules
22  of the Pennsylvania State Police, Captain Ober did
23  wrong?
24      JOANNA REYNOLDS:  I object as to form.  There
25  were about five questions in there.
26      MR BAILEY:  There was about ten of them.

PAGE 35

1      JOANNA REYNOLDS:  If the witness understands
2  what he's answering.
3      MR BAILEY:  Right.  Do you understand where
4  I'm coming from I want to ask?
5      MR WESTCOTT:  I think I do, yes.
6      MR BAILEY:  Then can you tell us just in good
7  old common sense way without all my multitude of lawyer
8  question and you're counsel's objection is well taken.
9  Bottom line question is, you know.  What did Captain
10  Ober do wrong here?
11      A:   Captain Ober did not tell his immediate
12  chain of command what had transpired.  I think he had a
13  responsibility to do that.  He did not.  There is a
14  difference in my opinion.  There is a difference in
15  going to somebody else for some advise for some advise
16  on that okay, but I will tell you if Captain Ober came
17  to me with this information, any information that did
18  not pertain to my area of responsibility I would tell
19  him that he needs to get back in there and talk to his
20  Lieutenant Conel about that.  There are time when you
21  sit down and say well my advise to you would be this
22  however you need to talk to Conel Coury about that or
23  you need to talk your Bureau Director about that.
24      Q:   Well that's what you would have done.
25      A:   That's exactly what I would have done.
26      Q:   That wasn't Captain Ober's function was

PAGE 36

1  it?  I mean Captain Ober was not the one said,
2  looked in the mirror and said Captain Ober you're no to
3  talk to anyone.  He was given an order not to talk to
4  anyone by Conel Hickes.  Wasn't he?
5      A:   See Captain Ober in my opinion should
6  have gone right to his Bureau Director first and I
7  agree with Major Wertz about that.  These guys all have
8  pagers.  They have cell phones.  They have home phones.
9  They have phones in their cars.  There's hardly any
10  reason at all why you can't get a hold of somebody.
11      Q:   Well maybe the FBI was listening.  It's
12  a political corruption probe into the Pennsylvania
13  State Police including the Governor's Office.
14      A:   Well if you want me to start on that
15  I'll get started on that.
16      Q:   No I don't want you to start on that.
17  You're not on trial.
18      A:   No I will tell you this much, okay?
19      Q:   Yeah
20      A:   Any investigator most investigators
21  would take a look.  A good investigator would take a
22  look at some information that's received.  First thing
23  they'll ask themselves is, is this information
24  reasonable?  Can this be considered reasonable
25  information?  Someone from outside the department may
26  not know whether the information in this particular

SHEET 10   PAGE 37

1 case, whether somebody within a department was selling
2 job or not, would not know whether that information was
3 reasonable or not.  But it is my opinion that somebody
4 inside our organization, with the experiences that
5 Captain Ober had, should right away recognize that as
6 being not reasonable information. Captain Ober has
7 enough experience within the headquarters, in the
8 Pennsylvania State Police, to know that.  I think it's
9 virtually impossible to predetermine the outcome of any
10 cadet assignment.  Now with that information, with that
11 knowledge, with that experience wouldn't you..
12          -----END OF TAPE ONE/ SIDE ONE-----
13          MR. BAILEY: All right now just a second.
14          MR. WESTCOTT: Well let me just finish what I
15 was going to say. Why would you not tell your Bureau
16 Director under those circumstances? Now if Captain Ober
17 had not had those kinds of experiences, those kinds of
18 experience within the department, that kind of
19 knowledge that he had had in a Headquarters setting,
20 then perhaps I could understand.
21          Q:   Well what I'm asking is are the rules of
22 the Pennsylvania State Police so clear and are they
23 written down? One of the major issues in this case is
24 when a certain Chain of Command subsection was added to
25 regulations. It is a major material issue in this case

PAGE 38

1 and regardless of what the trial judge does with it I'm
2 going to follow through on it and find out when it was
3 promulgated and how it worked up into this case. But
4 I'm going to tell you this I'm going to ask you what
5 State Police regulations and rules and what
6 Pennsylvania State Police informal customs, practices
7 or usage would indicate that he first of all has to go
8 to his immediate supervisor right away before he tells
9 anyone and also disregard an order from a Lt. Colonel
10 that he happens to consult for advice. I don't
11 understand because I have not been able to find them
12 with all due respect and I have some limited experience
13 as I said in a different outfit. But can you tell me
14 what rules were violated?
15          A:   And I don't know if there was any.
16          Q:   You don't know if there was any?
17          A:   I don't know if there was any.
18          Q:   Okay now let me ask you this. You're
19 telling us that based upon the information that Captain
20 Ober received he should have known better. He should
21 have known if the FBI was missing, was making an error
22 or if there wasn't a good reasonable basis. Right?
23          A:   Yes I think so.
24          Q:   Okay have you ever looked into sir the
25 underlying investigation for some of the things that
26 these, that the FBI was given, some of the information

PAGE 39

1 they were given?
2          A:   No I did not.
3          Q:   Well thank God it ended up being,
4 apparently, I don't know. At this stage we don't know
5 if somebody scuttled that investigation. We just don't
6 know but there is a very good reason to believe that
7 there was nothing to the puffings or whatever of some
8 of the folks that were doing wrong things. But you will
9 admit that Captain Ober was given information to
10 indicate that there could be people in the Governor's
11 Office involved right?
12          A:   Right.
13          Q:   And he was given information to believe
14 that there might be people involved in the legislature
15 right? And did you also come on information that
16 indicated that there might be "higher ups" in the
17 Pennsylvania State Police involved? Do you know whether
18 that was ever indicated?
19          A:   I'm sure it was but I can't tell you
20 where that came from, when it came or from whom it came
21 but I guess I'm sure that's correct.
22          Q:   Now your response to me in fairness to
23 you was that Captain Ober should have known enough to
24 know that you couldn't affect the process that way
25 through those people. Right? In other words the FBI may
26 not have known that, and would not have had a way to

PAGE 40

1 know that but Captain Ober should have know that that
2 was just not reasonable.
3          A:   Just not reasonable. That's correct.
4          Q:   Well I maybe have access to a lot more
5 information maybe than Captain Ober does about a lot of
6 things. Weren't there issues in the Pennsylvania State
7 Police about sons or relatives of members being
8 approved even though they weren't being recommended for
9 membership in a cadet class?
10          A:   I don't know anything about that.
11          Q:   Had you ever heard anything about that?
12          A:   Never heard anything about that during
13 the time that I was in the position where I would have
14 heard anything like that.
15          Q:   All right. All right. Fair enough. Fair
16 enough. Let me change direction then, you haven't any
17 knowledge of anything like that. Now lets' return then,
18 you have this meeting and there's a meeting in there
19 where you've got Mr. Coury, yourself and the
20 Commissioner. Do you remember what the Commissioner
21 said, if anything, about Colonel Hickes?
22          A:   No I don't know if he said anything.
23          Q:   Do you know whether there was any
24 discussion about investigation or inquiring into the
25 circumstances surrounding what Colonel Hickes did?
26          A:   That would have been part and parcel to

SHEET 11  PAGE 41

1  a complete inquiry.

2      Q:   Do you know whether Colonel Hickes was
3  ever read his rights at an inquiry? Strike that. We
4  know from this morning and you may not have personal
5  knowledge of this, you know that Captain Ober was
6  addressed from the formal point of here's and inquiry,
7  here's a notice and you're being; you know you have to
8  sit here and answer questions. This is not an informal
9  give and take. This is a formal inquiry, of some kind
10 anyway, we're going to check into this right? You know
11 that happened right?

12     A:   Well I get that from talking, from
13 listening to Major Werts I know that he was
14 interviewed. I didn't know under what, you know, how
15 that was accomplished.

16     Q:   Major Werts indicated that there may
17 have been some other individual that was also given
18 their rights so to speak or read their rights as it
19 comes. Do you know who the other individual was that
20 was given their rights?

21     A:   No I do not.

22     Q:   Sir you were interviewed at one point by
23 the two investigators right?

24     A:   Yes I was. Major Werts said so and I
25 agree. I'm sure they'd have had to.

26     Q:   Do you remember the interview?

PAGE 42

1      A:   No I do not.

2      Q:   Do you remember who was present?

3      A:   I don't remember the interview.

4      Q:   Okay. Aside from flying up to
5  Williamsport to meet with Major Williams and the
6  meeting in Phoenix did you have any other meetings with
7  him, the interview if it took place I understand you
8  don't' remember, did you have any other meetings with
9  Major Williams or Major Werts?

10     A:   I can't be specific about the meeting,
11 what when on in the meeting but there was one that the
12 Commissioner wanted to meet with and shortly after they
13 were assigned, my recollection is that it was shortly
14 after we came back from Phoenix was that he wanted to
15 meet with Major Williams and Major Werts. And I was
16 present at that meeting.

17     Q:   Wasn't Colonel Evanko told he shouldn't
18 do this?

19     A:   I don't know that.

20     Q:   Do you know of anyone that told Colonel
21 Evanko that he didn't have a basis or a right to make
22 an inquiry into Captain Ober?

23     A:   No I don't know if anybody ever told
24 him. Not to my knowledge.

25     Q:   Why not?

26     A:   I never heard that. I would not have

PAGE 43

1  told him that.

2      Q:   So you would not?

3      A:   I wouldn't have done it.

4      Q:   Well if the FBI had come to you and
5  asked you to keep an investigation confidential that
6  they were investigating Colonel Evanko, would you have
7  told Colonel Evanko?

8      A:   I probably would have yes.

9      Q:   Oh boy. Strike that.

10     A:   Depending on the circumstances I
11 probably would have.

12     Q:   Okay. You had indicated that at some
13 point after Major Williams and Major Werts had been
14 assigned the task of making the inquiry into Captain
15 Ober there was meeting with, Colonel Evanko wanted to
16 talk to them.

17     A:   That's correct.

18     Q:   And you were present?

19     A:   I believe I was.

20     Q:   Can you tell us what occurred?

21     A:   The purpose of the meeting was, now I
22 can't tell you exactly verbatim what was said in the
23 meeting but Colonel Evanko wanted to make sure that
24 they just did a fair, thorough inquiry into the matter.
25 That was it. He wanted them, to just give me the facts,

PAGE 44

1  don't editorialize, don't give me any of your opinions.
2  Just give me the facts and let me work them.

3      Q:   Well these are, I've had an occasion, I
4  know Williams from before. I've never met Mr. Werts
5  before, of course both of these officers, I must tell
6  you I am  very impressed with the professionalism and
7  the intelligence and they are articulate. And the
8  Pennsylvania State Police is absolutely fine people and
9  you know, I add you to that list. I mean I'm talking
10 about the professionalism. Why would you need to tell
11 people with the intelligence and the skill and
12 abilities of people like Williams and Werts to do an
13 objective evaluation? Why is it necessary to even tell
14 them that? I assume. I mean these guys are pretty sharp
15 fellows. Why do you need to tell them that?

16     A:   You'll have to ask the Commissioner that
17 I don't know why he wanted to do that.

18     Q:   What did he do?

19     A:   And I think it's to his credit.

20     Q:   Okay and how long was it, this took
21 place sometime after you came back from Phoenix?

22     A:   Yes that's my understanding.

23     Q:   Do you know how long, you know what
24 period of time the inquiry spanss?

25     A:   I do not, I'm sorry. And I'm sure it
26 could be determined factually by looking at some

SHEET 12   PAGE 45

1  documents and things but I don't have that knowledge.
2      Q:   Okay, sir, when you were here this
3  morning you heard Mr. Werts talking about a list. You
4  heard me ask him questions and him respond to a list of
5  witnesses. Do you remember that?
6      A:   Um-Hum.
7      Q:   And I wrote them down so let me tell you
8  what his best recollection was; Colonel Hickes, Major
9  Connelly, Major Merryman, a Sifery or Sifer, does that
10  name mean anything to you?
11      A:   I expect it's Sifert.
12      Q:   Sifert, all right, S-i-f-e-r-t or
13  something like that. That's a guess.
14      A:   That's my guess. Yes supposition.
15      Q:   Colonel Westcott, yourself of course,
16  Colonel Evanko and Colonel Coury. Did you have any
17  input at all into what witnesses would be contacted
18  during the inquiry?
19      A:   No.
20      Q:   Sir do you have a recollection of
21  whether or not Colonel Evanko had any input into
22      A:   I would expect not. Again you hit the
23  nail right on the head there. These are good competent
24  investigators. That's why they were chosen because they
25  were good competent investigators
26      Q:   They are some very sharp people.

PAGE 46

1      A:   And they are going to be fair to
2  everybody that's involved in this thing, to gather the
3  facts accurately. That's why they were chosen. When you
4  have good investigators like that, I mean it was not
5  hard for me to assign them a certain interview or that,
6  or make sure you do this and make sure you do that.
7  They're certainly going to do it. It's going to get
8  done.
9      Q:   Okay no problem. One thing I've
10  experienced with it, I've learned that sometimes when
11  investigative work product is reviewed there are
12  questions like why didn't you interview so and so; and
13  why didn't you ask these questions; did you find out an
14  answer to that? Everybody knows there is no such a
15  thing as a perfect investigation and it's easy to set
16  and guess somebody else's investigation. My question is
17  did Colonel Evanko, you; did Colonel Coury or anyone
18  else discuss the work product of this investigation
19  with these fellows and ask them if they interviewed
20  this person or interviewed that person or for that
21  matter make suggestions during the course of the
22  investigation?
23      A:   I don't believe so. First of all as I
24  said before I did not review the work product so I
25  would not have made any recommendations you know, check
26  with this point, with this person or that point with

PAGE 47

1  that person. I just didn't do that. And I'm reasonably
2  certain that during the course of that inquiry you
3  would talk to these fellows on a daily basis, several
4  times a week if not daily as I did all the area
5  commanders. I'm, other than asking how's things going
6  you know or how are you progressing with this, you know
7  I don't think I had any conversation with them.
8  Certainly not specific you know that they talked to so
9  and so or learned this or that or the other thing. I
10  didn't do that.
11      Q:   Do you have a recollection again about
12  how much time the inquiry spanned?
13      A:   No I don't. As I said we can figure that
14  out  but I don't what kind of a
15      Q:   Yeah I can but I just wondering if that
16  come back to you. If that comes back to you how much
17  time they spent; I remember Mr. Werts indicated that he
18  thought it was you know weeks but he's not sure either.
19  I would appreciate it if you would address that. Now
20  did you ever have a discussion with Colonel Hickes
21  about this matter?
22      A:   I'm not sure.
23      Q:   Is Colonel Hickes a friend of yours? By
24  that I mean, what I mean is I know that both of you are
25  professionals but you know there are friends and there
26  are friends. Okay. Is he a friend of yours in the sense

PAGE 48

1  that you could confide in him or talk with him about
2  things?
3      A:   No I don't do that any, he is not a
4  friend socially. We don't socialize but professionally
5  we dealt with each other in a professional basis
6  everyday. We don't have animosity there's none of that.
7      Q:   It's professional/
8      A:   It's professional.
9      Q:   Professional colleagues in a large
10  organization.
11      A:   It's just that we never developed a
12  friendship through our professional careers. We were
13  never, hardly ever in the same place.
14      COUNSEL: Before we go any further did you
15  want to take breaks?
16      MR. WESTCOTT: I'm fine do far.
17      COUNSEL: If you want to just let him know.
18      MR. BAILEY: Yeah you can go ahead. Okay now
19  did you ever discuss the Ober matter with Colonel
20  Hickes?
21      A:   No I don't recall. I wouldn't know why I
22  would but I don't recall that I did. If colonel Hickes
23  walked in here and said yeah I had this conversation on
24  this date and blah, blah, blah maybe it would jar a
25  recollection but I don't have that recollection at all.
26      Q:   Do you know a Mark Campbell?

SHEET 13   PAGE 49

1       A:   I do know Mark Campbell.
2       Q:   And how long have you known Mr.
3  Campbell?
4       A:   I've known Mr. Campbell since I was
5  assigned as Deputy Commissioner.
6       Q:   And when were you assigned as Deputy
7  Commissioner?
8       A:   I would say probably February of 1995
9  perhaps.
10      Q:   Aside from your own ambition who was
11 responsible for you becoming, and I mean that in a very
12 positive sense, who was responsible for you becoming a
13 Deputy Commissioner? These are appointed positions. How
14 did you get there?
15      A:   Colonel Evanko spoke in my behalf and I
16 don't know who he spoke to. I think he spoke to the
17 Governor but I don't know who else.
18      Q:   Was Mr. Campbell part of that process?
19      A:   I don't know. It would surprise me. He
20 was like assistant Chief of Staff or something to the
21 Governor you know. He's a big guy down there.
22      Q:   That's part of his job and that's the
23 way a government should be run. Please don't read
24 anything into that we're trying to find out some of
25 these connections an about some of these relationships.
26 Do you know, did you ever have any conversations with

PAGE 50

1  Mr. Campbell about the Ober matter?
2       A:   I did not.
3       Q:   Do you know whether Colonel Evanko ever
4  had any conversations with Mr. Campbell about the Ober
5  matter?
6       A:   I do not know.
7       Q:   Did Mr., Colonel Evanko ever indicate
8  any discussions with Mr. Campbell or anyone else in the
9  Governors Office about the Ober matter?
10      A:   I don't recall but I will qualify that
11 by saying that Colonel Evanko was in Mark Campbell's
12 Chain of Command
13      Q:   Okay.
14      A:   So I would expect it would not be
15 unusual that he called him and told him what was going
16 on. I have no knowledge of it.
17      Q:   Okay now at what point did you learn
18 that the FBI had indicated that there might be some
19 connection with this political corruption into the
20 Governor's Office, there might be some connection? I
21 mean I understand that it ended up not being and all
22 that. My question is when did you first learn that the
23 FBI had facts that raised the question about the
24 Governor's Office being involved?
25      A:   That would have been in the first early
26 days here. I'm not sure that Colonel Coury would have

PAGE 51

1  told me about that that day but perhaps the next day.
2       Q:   By that day you mean the day that
3  Colonel Evanko was informed?
4       A:   No that day would be the day after
5  Colonel Evanko was informed.
6       Q:   That's what I mean. That's my error.
7  Okay now do you know Louie Freed?
8       A:   I'm not friends with Louie Freed. I've
9  met him. I've conversed with him. But I do not know
10 him.
11      Q:   Is it fair to say that personal
12 friendship aside, that professionally the Pennsylvania
13 State Police and  Louie Freed at the time was the FBI
14 director, you have to maintain some kind of a
15 relationship. In other words the two organizations, the
16 Pennsylvania State Police and the FBI have to maintain
17 a relationship in the interest of effective law
18 enforcement in the United States, particularly in
19 Pennsylvania. Is that correct?
20      A:   I think that's a fair statement.
21      Q:   Do you know if Colonel Evanko is
22 familiar with Judge Freed, Director Freed on personal
23 basis. In other words are they more than mere
24 professional acquaintances do you know?
25      A:   I don't think so. I don't know though.
26      Q:   The complaint indicates, the allegation

PAGE 52

1  is made in the complaint, I can dig the paragraph out
2  if you want and I'll do that if you need me to or if
3  your attorney wants me to, that Colonel Evanko
4  indicated that he was going to contact Louie Freed over
5  this matter. Do you have a recollection of that?
6       A:   I do not.
7       Q:   Well aside from the complaint if it's
8  mentioned in there did you ever hear if the FBI was
9  contacted about this matter?
10      A:   Certainly they were contacted by
11 Williams and Werts and I think that would have been an
12 Agent Cush I think is what Werts testified to this
13 morning.
14      Q:   Let's set that aside. Do you know if
15 anybody involved Special Agent Werts, or excuse me
16 Special Agent Cush and the FBI was contacted by anyone?
17      A:   I don't know that. I did not and I don't
18 know that anyone else did or not.
19      Q:   Do you know whether Colonel Evanko
20 contacted anyone in the FBI?
21      A:   I do not know.
22      Q:   Do you know where Special Agent Cush is
23 now?
24      A:   I do not.
25      Q:   Mr. Cush is listed as one of your
26 witnesses. Do you know who talked to Mr. Cush aside

SHEET 14   PAGE 53

1 from Werts and Mr. Williams if anyone?
2          A:   I do not.
3          Q:   Do you know whether the lawyers, your
4 lawyers have talked to him?
5          A:   I do not know.
6          Q:   Well do you know where Mr. Cush is now?
7          A:   I do not.
8          Q:   It had indicated that aside from Mr.
9 Werts who says he did not talk with Mr. Cush, by the
10 way. Do you know when MR. Williams I guess it would
11 have been talked to Mr. Cush?
12          A:   I do not know when he did that no.
13          Q:   You were here when Mr. Werts testified
14 that his best recollection was that Mr. William talked
15 to Mr. Cush before Mr. Williams and Mr. Werts talked in
16 Phoenix. Do you remember that?
17          A:   I remember Major Werts talking about
18 that yes.
19          Q:   So when you indicated that Williams and
20 Werts talked to Cush you didn't mean to imply that you
21 had any facts indicating that Mr. talked to him?
22          A:   No, no, no it's just that they were an
23 investigative, I call it an investigative team but they
24 were a team of investigators so I didn't mean to
25 mislead you there.
26          Q:   Well is there an interview in the work

PAGE 54

1 product with Mr. Cush?
2          A:   I don't know that. I'm sure there must
3 be. I would expect them to do that but I did not review
4 it. So I don't, I'm not going to answer your question
5 in the affirmative fashion.
6          Q:   Because you don't know.
7          A:   Because I don't know. I expect however
8 that they would have done that and that it would be
9 written down.
10          Q:   As head of operations do you become
11 involved in transfers, personnel transfers?
12          A:   That's the Commissioners prerogative.
13 Sometimes he asks for recommendations.
14          Q:   Well who sent Mr. Ober out to
15 Washington?
16          A:   What do you mean by sent Mr. Ober out to
17 Washington?
18          Q:   Well I don't know how many verbs we can
19 come up with; sent, transferred, assigned, suggested, I
20 don't know. Any word you want to use.
21          A:   That would have been the Commissioners
22 responsibility to do that.
23          Q:   Well when did you first learn about it
24 from the Commissioner?
25          A:   Well we would have had a meeting. I
26 don't recall the particular meeting we had but I'm sure

PAGE 55

1 we did and it seems to me at the time; well let me back
2 up a little bit and explain how all this gets started I
3 think. I have to be careful. I had just recently been
4 to San Diego California  and met with, in fact Major
5 Werts and I were both out there, met with California
6 Highway Patrol and the San Diego Police Department
7 because they had recently handled security for the
8 Republican National Convention that had been held out
9 there some three to four years prior to this. So we,
10 since that convention was coming to Philadelphia, I
11 went out along with Major Werts to San Diego to discuss
12 what they had done, how they had done it. one of the
13 recommendation that they ran to us and it was a good
14 one is that as time gets closer to the event the, your
15 task force commander needs more and more help because
16 more and more things are beginning to happen as the
17 event gets closer and closer. Now at that time there
18 were two events going on; one the Republican National
19 Convention in eastern Pennsylvania and the National
20 Governor's Association meeting in actually State
21 College but that would come under our Western Area
22 Events. So that having as a background okay I mean
23 think again it's my recollection, I don't want to
24 misstate anything but I think at the time Captain Ober
25 was in between assignments maybe with IMS and BPR and
26 at that point I recommended that he be considered to go

PAGE 56

1 out and assist Major Serpinco with the work for the
2 National Governors Association meeting. Major Werts was
3 the task commander for the Republican National
4 Convention and he had a similar person assigned to his
5 organizational group for doing those preparations. So I
6 thought that that was very important for Major Serpinco
7 to have somebody. Captain Ober was available. He had
8 the skills that he could have been of great help out
9 there. It would have been a good thing because he would
10 have worked under the tutelage of one of our very best
11 area commanders as well. I thought it was a good-good
12 thing, a win-win thing.
13          Q:   A win-win thing? So you went to Captain
14 Ober and you had him come in and discuss it with you?
15          A:   I didn't discuss it at all with Captain
16 Ober. That was my recommendation to the Commissioner
17 that Captain Ober be considered for that position our
18 there. I thought that would be good for the department,
19 it would be good for Captain Ober. It would be good for
20 Major Serpinco.
21          Q:   You didn't do that because you wanted to
22 pay Captain Ober back did you?
23          A:   No sir. Le me clarify that right now
24 before you et any misconceptions. I've know Captain
25 Ober, I don't know how many years, but a number of
26 years. And I have the utmost respect for Captain Ober

SHEET 15   PAGE 57

1 personally and for Captain Obers' abilities,
2 administrative abilities. I supported him 120% if not
3 more so when he was the Director of Systems and Process
4 Review. I think he did a 100% job there. He took that
5 particular division from a period when they were having
6 a tremendous amount of difficulty to a well run
7 division and did very, very well with that. I relied on
8 him immensely to keep me informed of what he was
9 doing or what his folks were finding when they were
10 doing the reviews of the stations. So you know, let me
11 clarify right now that there is no get even. I don't
12 dislike Darrell Ober at all. In fact I have a great
13 deal of respect for his abilities particularly his
14 administrative abilities.
15          Q:   Well there was an emergency need for him
16 out there in Washington right?
17          A:   There was a need out there yes.
18          Q:   Yeah but an emergency need. Wasn't there
19 an emergency need for him out there?
20          A:   Well I don't know if you want to call
21 that; is that your terminology?
22          Q:   Yeah my question is wasn't there an
23 emergency need?  If there wasn't an emergency need
24 qualify the word `need' for me if you will. Respond any
25 way you can.
26          A:   Well I'm not sure emergency is the

PAGE 58

1 correct terminology, if you want to use that that's
2 fine.
3          Q:   No I'm not, is it fair to say there was
4 no emergency need now?
5          A:   Well the convention was a number of
6 months away.
7          Q:   A number of months away?
8          A:   Yeah absolutely.
9          Q:   Well how much notice was he given about
10 his being transferred?
11          A:   I don't know the answer to that.
12          Q:   You don't know the answer to that? You
13 don't know when he was told, when he was told to report
14 or what happened?
15          A:   No I don't know. Again see it was not in
16 my area of responsibility.
17          Q:   You know that he went ot court and the
18 court sided with him on that transfer you know that
19 don't you.
20          A:   I've been told that.
21          COUNSEL: Objection. That is a
22 mischaracterization. I've heard that before in these
23 depositions. The court did not agree with him. The
24 Commonwealth settled his case before to a preliminary
25 injunction hearing. We ultimately won that litigation.
26 The court did not intervene in that we settled the

PAGE 59

1 preliminary injunction. The court did not intervene.
2          MR. BAILEY: Well did you learn at some point
3 that the Commissioner backed off and backed away and
4 Mr. Ober prevailed and did not go to Washington. At
5 least from Mr. Ober's perspective he didn't end up on
6 Washington did he?
7          A:   Mr. Ober did not go to Washington.
8          Q:   No he did not and he stayed in
9 Harrisburg with his family didn't he?
10          A:   That is correct.
11          Q:   Have you ever read Judge Pella Greens
12 opinion?
13          A:   No I have not.
14          Q:   Do you remember when it was that you
15 made this recommendation to the Commissioner that Mr.
16 Ober would be, I guess would have his career enhanced
17 by going to Washington?
18          A:   We met once.
19          Q:   Well would he have had his career
20 advanced by going?
21          A:   In my opinion yeah. It would have been a
22 pretty good thing. I'm not sure and I don't know
23 specifically what Captain Ober's background in the
24 department is but I'm not sure he has had a lot of
25 operational assignments. And he certainly would have
26 been working directly under a good very, very

PAGE 60

1 commander. From a planning and an operational
2 perspective it would have been good.
3          Q:   Well who was that area commander?
4          A:   Major Serpinco.
5          Q:   Well you talked with him about needing
6 Mr. Ober out there or somebody like him?
7          A:   I did yes.
8          Q:   And he told you how badly he needed him
9 right?
10          A:   Well he was reluctant, he did not have
11 benefit of the knowledge that I had at that point. He
12 had not gone to San Diego and he had not been told
13 that. As it turned out I think he would now agree it
14 was important. But at that time you know, I told him
15 that, in fact, that Captain Ober would be coming out
16 and I probably would have given him an effective date;
17 because he probably would have asked me that sort of
18 thing. I don't recall what that was.
19          Q:   Well he knew what to do with Ober right?
20          A:   Yeah. Oh my lands yes.
21          Q:   I mean he put him right to work on this
22 task. It wasn't an emergency, was there an immediate
23 need for Mr. Ober out there?
24          A:   Yeah I can tell you that he would have
25 been put to work immediately. There was any number of
26 details as far as getting ready for the National

SHEET 16   PAGE 61

1  Governors Association Meeting. You have to understand
2  that's pretty massive. That was a pretty massive thing
3  it involved over five hundred Troopers to be assigned
4  to that. So there was an awful, awful lot of work to
5  do; an awful, awful lot of coordinating to do between
6  area commands, in between Troop commands.
7         Q:   Well wouldn't you bring him in to brief
8  him on that?
9         A:   Not in my area, it would not have been
10  my responsibility to do that.
11         Q:   Well at least come in and say Geeze, you
12  know I have a great idea here for you. Go out here to
13  Washington, this is a career enhancing move etc, etc.
14  no discussion or anything like that. You went to the
15  Commissioner with that so do you know if the
16  Commissioner had any meetings with Mr. Ober to discuss
17  that?
18         A:   I do not know.
19         Q:   Now are there any regulations that would
20  govern that transfer?
21         A:   I would expect it would be a general
22  transfer at the direction of the Commissioner.
23         Q:   Well Mr. Ober didn't request it right?
24         A:   I don't believe so.
25         Q:   And once he objected to it he was
26  consulted or his wishes were respected or whatever

PAGE 62

1  right?
2         A:   That is correct. He stayed in the
3  Harrisburg Area. He did not got to Troop B Washington.
4         Q:   That didn't have anything to do with any
5  grievances or any legal
6         A:   About what didn't have anything to do
7  with it?
8         Q:   His staying in Harrisburg didn't have
9  anything to do with the legal process do you know?
10         A:   I don't know. I didn't follow that.
11         Q:   You didn't follow that. You weren't
12  involved in that?
13         A:   I didn't.
14         Q:   Was his transfer in relation to a
15  promotion of any kind?
16         A:   No he was a Captain already and
17  that assignment out there would have been actually a
18  Captain's position.
19         Q:   It wasn't an emergency or hardship
20  right? You already told us it wasn't an emergency.
21         A:   It wasn't an emergency. There were a
22  number of months.
23         Q:   I'm sorry.
24         A:   There were a number of months till the
25  meeting so I, no I can't call that an emergency. An
26  emergency might be for a couple of days.

PAGE 63

1         Q:   In fact a Mr. Young went out there
2  didn't he?
3         A:   Captain Young went out there yes.
4         Q:   How did he happen to go out there?
5         A:   He again he was a good guy. He spent a
6  lot of his career in Bureaus not so much field time. It
7  was the right fit for him as well. He could get there
8  and again help out a pretty good area commander and
9  learn from him.
10         Q:   Well how do you know Mr. Young?
11         A:   I've known Captain Young for years.
12         Q:   Now he was a Lieutenant right?
13         A:   I don't know. Could be I don't know.
14  He's a Captain now.
15         Q:   Did he get a promotion for going out
16  there or anything? Does that have anything to do with
17  it?
18         A:   I have to tell you we wouldn't give
19  somebody a promotion because they went out to Troop B
20  Washington.
21         Q:   You said it called for a Captain though
22  remember?
23         A:   It was a Captain in Eastern Pennsylvania
24  and I would expect it to be a Captain out there.
25         Q:   Well it didn't call for a Captain though

PAGE 64

1  did it?
2         A:   There's no T.O. there involved?
3         Q:   I mean it's not part of your
4  organizational structure.
5         A:   No.
6         Q:   So then Mr. Young, Lieutenant Young did
7  not receive a promotion in exchange for his assignment?
8         A:   I would be very surprised. It's not my
9  job to promote people but you don't promote people for
10  those kinds of reasons.
11         Q:   Well Mr. Young wasn't' ordered to take
12  that position out there was he?
13         A:   I don't know
14         Q:   Was he consulted before he was sent out?
15         A:   I do not know. I'm sorry. I did not talk
16  to him.
17         Q:   Who did?
18         A:   I don't know.
19         Q:   Do you know if the Commissioner did.
20         A:   I don't know. Frankly I just don't know.
21         Q:   You didn't deal with it. You don't know
22  what happened with Mr. Young right?
23         A:   I don't know how it happened that he was
24  told to go out there. I don't know who told him.
25  Ordinarily I would expect I would have because he was
26  in my area of responsibility but I don't recall doing

SHEET 17   PAGE 65

1 it.

2      Q:   Did somebody violate the Chain of
3 Command?

4      A:   I don't know. I didn't tell you. I'll
5 tell you I've hollered at some people for doing that
6 already in my career.

7      Q:   Well what can we do to them if they did?

8      A:   I don't know. What's your
9 recommendation?

10      Q:   Well when my kids do something wrong I
11 say let's tar them and feather them and run them out of
12 town on a rail.

13      A:   That's works pretty good too.

14      Q:   All right well you weren't involved in
15 the Young thing but he was in your area of operations,

16      A:   I said I don't remember doing it. I
17 expect that I would have but I just don't remember
18 doing it unless I was off or something at the time.

19      Q:   What's IIMS? What is that?

20      A:   What is that? Investigative information
21 management system?

22      Q:   I think something like that. Can you
23 tell me about that, what that is?

24      A:   I don't know too much about it other
25 than it is a very important aspect of the department
26 now. It's the computerization of the entire department,

PAGE 66

1 working on that. More specifically than that I can't
2 answer.

3      Q:   It's a very important thing between
4 Police Departments and information and credibility and
5 all that stuff or what?

6      A:   I'm sure that's part and parcel of
7 everything.

8      Q:   Well what was Ober doing when the
9 Commissioner decided he should go to Washington? What
10 was he doing?

11      A:   I don't know that. It was my
12 understanding at the time that he was between jobs. In
13 between regular IMS and BPR but I don't know that.
14 There's other people you could ask.

15      Q:   What position was he going to be
16 assigned once the National Governors Association
17 Conference was over, what was he going to be doing
18 after that?

19      A:   I don't know. I don't know.

20      Q:   do you know if anybody discussed with
21 him what he was going to be doing or what his future
22 was going to be.

23      A:   I don't know. I did not. Again he was
24 not in my area of responsibility so I would not
25 necessarily have those kinds of conversations.

26      Q:   Did Major Connelly ever talk with you

PAGE 67

1 about a desire to have Ober from IA, Internal Affairs?

2      A:   No he did not and would not.

3      Q:   Do you know what Mr. Young's schedule
4 was before he went out there?

5      A:   How do you recall?

6      Q:   What he was doing, what his assignment
7 was or anything like that.

8      A:   He was probably assigned to the Bureau
9 of Criminal Investigation Organized Crime Division
10 would be my guess.

11      Q:   Where is Mr. Young from?

12      A:   He is from the outskirts of
13 Philadelphia.

14      Q:   What's he doing now?

15      A:   He's still at BCI is my understanding.

16      Q:   And what's BCI stand for? What's that
17 Acronym?

18      A:   Bureau of Criminal Investigation, I'm
19 sorry.

20      Q:   Now is he, did he go to the FBI Academy
21 do you know? Mr. Young?

22      A:   I think he did.

23      Q:   He left the Pennsylvania State Police.

24      A:   No, no, no, no. He is still a member he
25 went down to the National Academy for training. The FBI
26 gives training to other agencies.

PAGE 68

1      Q:   Okay. Do you know if Young was assigned
2 any duties at the Republican National Committee or
3 Convention or anything?

4      A:   I don't know. See I was gone, I was
5 retired by that time so I don't know.

6      Q:   Do you know whether he picked up $50
7 worth of overtime in working for the INC in five days?
8 Do you know what happened?

9      A:   No I was retired. I have no idea.

10      Q:   Serpinco, did he request anyone else
11 other that just, well no he didn't request.

12      A:   He didn't request anybody.

13      Q:   He didn't request anybody. Did you give
14 him or did the Colonel, or yourself or anybody else
15 give him anybody else in addition to Ober and then
16 Young?

17      A:   I don't think so. Not while I was there
18 anyway.

19      Q:   Young wasn't, again don't feel insulted
20 by my question but Mr. Young wasn't' chosen to make it
21 look like there was a reason to send Ober out to
22 Washington was he?

23      A:   No there was a need for a person out
24 there. There was a need for somebody to be in that
25 position.

26      Q:   Okay there was a need but that wasn't

SHEET 18   PAGE 69

1 communicated. That came out of your experience out
2 there in San Diego and it was based on your knowledge,
3 your own knowledge of the needs out there in the
4 southwest with what was coming up in Pittsburgh, the
5 National Governors but it wasn't Serpinco asking you
6 fro information or asking you for help.
7     A:   No he did not. It was my understanding
8     Q:   I don't mean to mispronounce his name by
9 the way. I apologize. And then Captain Transea was sent
10 down to Philadelphia right?
11     A:   That's my understanding yes.
12     Q:   And were you responsible for that?
13     A:   That would have, let me just think about
14 that. That probably was a request. Not probably, I'm
15 sure it was a request from Major Werts. I would expect
16 that request to have been after we came back from San
17 Diego, though I'm not sure.
18     Q:   That was a request from Mr. Werts?
19     A:   Yes, he was in San Diego with me.
20     Q:   He was a friend of Transea wasn't he?
21     A:   Yeah they've served in the same area
22 commands, troop commands already together so they knew
23 each other. But I think at the time she was assigned to
24 R&D or something at the time.
25     Q:   R&D?
26     A:   Yeah so again it would not have been. I

PAGE 70

1 wouldn't necessarily have made a recommendation because
2 it was not in my area of responsibility. Colonel Hickes
3 would have had to deal with that.
4     Q:   Well who could you complain to about
5 Young, you being bypassed in the case of Young? I mean
6 you were upset about that right?
7     A:   I'm sorry about what?
8     Q:   That Young was assigned without your
9 knowledge right?
10     A:   Oh I'm not sure if Young was assigned
11 without my knowledge.
12     Q:   Well you were concerned about whether
13 your Chain of Command was bypassed?
14     A:   I never was.
15     Q:   Well you and I were talking about some
16 of these assignments that go by you or got around you
17     COUNSEL: I would just object. I think you
18 brought up that issue not Lt. Westcott he
19 indicated
20     MR. BAILEY: Lt. Colonel Westcott. What did I
21 day?
22     MR. BAILEY: You said Lieutenant Westcott.
23 It's okay it's been a long day.
24     COUNSEL: And my understanding from that
25 exchange that if there was a violation of Chain of
26 Command then something might have to be done but

PAGE 71

1 didn't acknowledge that there was in fact a violation
2 of Chain of Command. That was more your
3     MR. BAILEY: Let's revisit that because I may
4 have misunderstood you. Didn't you indicate that you
5 did not send Mr. Young out to Washington?
6     A:   I don't recall me personally telling him
7 but I very well could have. It would have been in my
8 place to do it. I just don't recall doing it. The
9 Commissioner may have done it also.
10     Q:   Well did you complain to anybody about
11 that happening without your knowledge?
12     A:   No. I'm not sure it was done without my
13 knowledge. I'm sure I knew he was going out there
14 whether I told him he was going out there or whether
15 the Commissioner told him he was going out there. I
16 just don't recall.
17     MR. BAILEY: W ell I did misunderstand. We
18 need to clear this up on the record then because I
19 don't want that to be on the record.
20     MR. BAILEY: You have made an error on the
21 record so counsel raises a good objection here. I was
22 mislead, by myself, not you. Not you. By myself I made
23 an error here. I want to clear it up. You had made the
24 recommendation to the Colonel about sending Mr. Ober
25 out to Washington?
26     A:   Yes.

PAGE 72

1     Q:   You learned after the fact that Mr.
2 Young was sent.
3     A:   No , no, no I probably would have also
4 made
5     Q:   Not probably.
6     A:   Now, now listen. I'm trying to clarify
7 it so that you are not confused. When I learned that
8 Captain Ober was not going out there but somebody else
9 needed to go out there because I had a need for
10 somebody out there I would have recommended Captain
11 Young going out there. I would have recommended that to
12 the Commissioner.
13     Q:   But sir, you would have. The fact is you
14 don't know if you did.
15     A:   I don't, I'm sure I did
16     Q:   You are?
17     A:   I mean I'm sure the Commissioner would
18 have conversed with me about that. Who should we send
19 out there? Who would you like to go out there? And I'm
20 sure I would have given him the answer. Can I remember
21 that specific? No I can not.
22     Q:   Look at this now. You had no request
23 coming up through channels asking to have somebody to
24 go to Washington?
25     A:   That's correct.
26     Q:   You originated this idea because of your

SHEET 19   PAGE 73

1  concern about and your respect for Captain Ober and
2  your perceived need, perceived need to have somebody
3  out there for those purposes, to help.
4            A:   It was the one thing, my personal need.
5  Not whatever Captain Ober was involved with or was not
6  involved with okay. That just happened to be the
7  circumstances at the time. I had a need and he was
8  available okay.
9            Q:   Oh okay well how did you know he was
10 available?
11           A:   I was told he was available.
12           Q:   Who did you ask?
13           A:   Probably the Commissioner or Colonel
14 Hickes, somebody told me that.
15           Q:   Okay and you had this because of your
16 California experiences you had this perceived need that
17 although you didn't check with him, that the area
18 commander out there had need for somebody for the
19 National Governor's conference, is that correct?
20           A:   That's correct.
21           Q:   Now obviously, Mr. Ober, actually while
22 the decision to send him out to Washington was made by
23 the Commissioner
24           A:   That is the Commissioners decision
25 that's correct.
26           Q:   That's his decision, That would be

PAGE 74

1  normal. I assume that's a normal thing.
2            A:   That's normal.
3            Q:   You don't know whether he talked to Mr.
4  Ober or not.
5            -----END OF TAPE ONE-----
6  MR. BAILEY: All right now just a second.
7  MR. WESTCOTT: Well let me just finish what I
8  was going to say. Why would you not tell your Bureau
9  Director under those circumstances? Now if Captain Ober
10 had not had those kinds of experiences, those kinds of
11 experience within the department, that kind of
12 knowledge that he had had in a Headquarters setting,
13 then perhaps I could understand.
14           Q:   Well what I'm asking is are the rules of
15 the Pennsylvania State Police so clear and are they
16 written down? One of the major issues in this case is
17 when a certain Chain of Command subsection was added to
18 regulations. It is a major material issue in this case
19 and regardless of what the trial judge does with it I'm
20 going to follow through on it and find out when it was
21 promulgated and how it worked up into this case. But
22 I'm going to tell you this I'm going to ask you what
23 State Police regulations and rules and what
24 Pennsylvania State Police informal customs, practices
25 or usage would indicate that he first of all has to go

PAGE 75

1  to his immediate supervisor right away before he tells
2  anyone and also disregard an order from a Lt. Colonel
3  that he happens to consult for advice. I don't
4  understand because I have not been able to find them
5  with all due respect and I have some limited experience
6  as I said in a different outfit. But can you tell me
7  what rules were violated?
8            A:   And I don't know if there was any.
9            Q:   You don't know if there was any?
10           A:   I don't know if there was any.
11           Q:   Okay now let me ask you this. You're
12 telling us that based upon the information that Captain
13 Ober received he should have known better. He should
14 have known if the FBI was missing, was making an error
15 or if there wasn't a good reasonable basis. Right?
16           A:   Yes I think so.
17           Q:   Okay have you ever looked into sir the
18 underlying investigation for some of the things that
19 these, that the FBI was given, some of the information
20 they were given?
21           A:   No I did not.
22           Q:   Well thank God it ended up being,
23 apparently, I don't know. At this stage we don't know
24 if somebody scuttled that investigation. We just don't
25 know but there is a very good reason to believe that
26 there was nothing to the puffing or whatever of some of

PAGE 76

1  the folks that were doing wrong things. But you will
2  admit that Captain Ober was given information to
3  indicate that there could be people in the Governor's
4  Office involved right?
5            A:   Right.
6            Q:   And he was given information to believe
7  that there might be people involved in the legislature
8  right? And did you also come on information that
9  indicated that there might be "higher ups" in the
10 Pennsylvania State Police involved? Do you know whether
11 that was ever indicated?
12           A:   I'm sure it was but I can't tell you
13 where that came from, when it came or from whom it came
14 but I guess I'm sure that's correct.
15           Q:   Now your response to me in fairness to
16 you was that Captain Ober should have known enough to
17 know that you couldn't affect the process that way
18 through those people. Right? In other words the FBI may
19 not have known that, and would not have had a way to
20 know that but Captain Ober should have known that that
21 was just not reasonable.
22           A:   Just not reasonable. That's correct.
23           Q:   Well I maybe have access to a lot more
24 information maybe than Captain Ober does about a lot of
25 things. Weren't there issues in the Pennsylvania State
26 Police about sons or relatives of members being

SHEET 20   PAGE 77

1 approved even though they weren't being recommended for
2 membership in a cadet class?
3         A:   I don't know anything about that.
4         Q:   Had you ever heard anything about that?
5         A:   Never heard anything about that during
6 the time that I was in the position where I would have
7 heard anything like that.
8         Q:   All right. All right. Fair enough. Fair
9 enough. Let me change direction then, you haven't any
10 knowledge of anything like that. Now lets' return then,
11 you have this meeting and there's a meeting in there
12 where you've got Mr. Coury, yourself and the
13 Commissioner. Do you remember what the Commissioner
14 said, if anything, about Colonel Hickes?
15         A:   No I don't know if he said anything.
16         Q:   Do you know whether there was any
17 discussion about investigation or inquiring into the
18 circumstances surrounding what Colonel Hickes did?
19         A:   That would have been part and parcel to
20 a complete inquiry.
21         Q:   Do you know whether Colonel Hickes was
22 ever read his rights at an inquiry? Strike that. We
23 know from this morning and you may not have personal
24 knowledge of this, you know that Captain Ober was
25 addressed from the formal point of here's and inquiry,
26 here's a notice and you're being; you know you have to

PAGE 78

1 sit here and answer questions. This is not an informal
2 give and take. This is a formal inquiry, of some kind
3 anyway, we're going to check into this right? You know
4 that happened right?
5         A:   Well I get that from talking; from
6 listening to Major Werts I know that he was
7 interviewed. I didn't know under what, you know, how
8 that was accomplished.
9         Q:   Major Werts indicated that there may
10 have been some other individual that was also given
11 their rights so to speak or read their rights as it
12 comes. Do you know who the other individual was that
13 was given their rights?
14         A:   No I do not.
15         Q:   Sir you were interviewed at one point by
16 the two investigators right?
17         A:   Yes I was. Major Werts said so and I
18 agree. I'm sure they'd have had to.
19         Q:   Do you remember the interview?
20         A:   No I do not.
21         Q:   Do you remember who was present?
22         A:   I don't remember the interview.
23         Q:   Okay. Aside from flying up to
24 Williamsport to meet with Major Williams and the
25 meeting in Phoenix did you have any other meetings with
26 him, the interview if it took place I understand you

PAGE 79

1 don't' remember, did you have any other meetings with
2 Major Williams or Major Werts?
3         A:   I can't be specific about the meeting,
4 what when on in the meeting but there was one that the
5 Commissioner wanted to meet with and shortly after they
6 were assigned, my recollection is that it was shortly
7 after we came back from Phoenix was that he wanted to
8 meet with Major Williams and Major Werts. And I was
9 present at that meeting.
10         Q:   Wasn't Colonel Evanko told he shouldn't
11 do this?
12         A:   I don't know that.
13         Q:   Do you know of anyone that told Colonel
14 Evanko that he didn't have a basis or a right to make
15 an inquiry into Captain Ober?
16         A:   No I don't know if anybody ever told
17 him. Not to my knowledge.
18         Q:   Why not?
19         A:   I never heard that. I would not have
20 told him that.
21         Q:   So you would not?
22         A:   I wouldn't have done it.
23         Q:   Well if the FBI had come to you and
24 asked you to keep an investigation confidential that
25 they were investigating Colonel Evanko, would you have
26 told Colonel Evanko?

PAGE 80

1         A:   I probably would have yes.
2         Q:   Oh boy. Strike that.
3         A:   Depending on the circumstances I
4 probably would have.
5         Q:   Okay. You had indicated that at some
6 point after Major Williams and Major Werts had been
7 assigned the task of making the inquiry into Captain
8 Ober there was meeting with, Colonel Evanko wanted to
9 talk to them.
10         A:   That's correct.
11         Q:   And you were present?
12         A:   I believe I was.
13         Q:   Can you tell us what occurred?
14         A:   The purpose of the meeting was, now I
15 can't tell you exactly verbatim what was said in the
16 meeting but Colonel Evanko wanted to make sure that
17 they just did a fair, thorough inquiry into the matter.
18 That was it. He wanted them, to just give me the facts,
19 don't editorialize, don't give me any of your opinions.
20 Just give me the facts and let me work them.
21         Q:   Well these are, I've had an occasion,
22 and I know Williams from before. I've never met Mr.
23 Werts before, of course both of these officers, I must
24 tell you I am very impressed with the professionalism
25 and the intelligence and they are articulate. And the

SHEET 21  PAGE 81

1 Pennsylvania State Police is absolutely fine people and
2 you know, I add you to that list. I mean I'm talking
3 about the professionalism. Why would you need to tell
4 people with the intelligence and the skill and
5 abilities of people like Williams and Werts to do an
6 objective evaluation? Why is it necessary to even tell
7 them that? I assume. I mean these guys are pretty sharp
8 fellows. Why do you need to tell them that?
9        A:   You'll have to ask the Commissioner that
10 I don't know why he wanted to do that.
11       Q:   What did he do?
12       A:   And I think it's to his credit.
13       Q:   Okay and how long was it, this took
14 place sometime after you came back from Phoenix?
15       A:   Yes that's my understanding.
16       Q:   Do you know how long, you know what
17 period of time the inquiry spans?
18       A:   I do not, I'm sorry. And I'm sure it
19 could be determined factually by looking at some
20 documents and things but I don't have that knowledge.
21       Q:   Okay, sir, when you were here this
22 morning you heard Mr. Werts talking about a list. You
23 heard me ask him questions and him respond to a list of
24 witnesses. Do you remember that?
25       A:   Um-Hmm.
26       Q:   And I wrote them down so let me tell you

PAGE 82

1 what his best recollection was; Colonel Hickes, Major
2 Connelly, Major Merryman, a Sifery or Sifer, does that
3 name mean anything to you?
4        A:   I expect it's Sifert.
5        Q:   Sifert, all right, S-i-f-e-r-t or
6 something like that. That's a guess.
7        A:   That's my guess. Yes supposition.
8        Q:   Colonel Westcott, yourself of course,
9 Colonel Evanko and Colonel Coury. Did you have any
10 input at all into what witnesses would be contacted
11 during the inquiry?
12       A:   No.
13       Q:   Sir do you have a recollection of
14 whether or not Colonel Evanko had any input into
15       A:   I would expect not. Again you hit the
16 nail right on the head there. These are good competent
17 investigators. That's why they were chosen because they
18 were good competent investigators
19       Q:   They are some very sharp people.
20       A:   And they are going to be fair to
21 everybody that's involved in this thing, to gather the
22 facts accurately. That's why they were chosen. When you
23 have good investigators like that, I mean it was not
24 hard for me to assign them a certain interview or that,
25 or make sure you do this and make sure you do that.
26 They're certainly going to do it. It's going to get

PAGE 83

1 done.
2        Q:   Okay no problem. One thing I've
3 experienced with it, I've learned that sometimes when
4 investigative work product is reviewed there are
5 questions like why didn't you interview so and so; and
6 why didn't you ask these questions; did you find out an
7 answer to that? Everybody knows there is no such a
8 thing as a perfect investigation and it's easy to set
9 and guess somebody else's investigation. My question is
10 did Colonel Evanko, you; did Colonel Coury or anyone
11 else discuss the work product of this investigation
12 with these fellows and ask them if they interviewed
13 this person or interviewed that person or for that
14 matter make suggestions during the course of the
15 investigation?
16       A:   I don't believe so. First of all as I
17 said before I did not review the work product so I
18 would not have made any recommendations you know, check
19 with this point, with this person or that point with
20 that person. I just didn't do that. And I'm reasonably
21 certain that during the course of that inquiry you
22 would talk to these fellows on a daily basis, several
23 times a week if not daily as I did all the area
24 commanders. I'm, other than asking how's things going
25 you know or how are you progressing with this, you know
26 I don't think I had any conversation with them.

PAGE 84

1 Certainly not specific you know that they talked to so
2 and so or learned this or that or the other thing. I
3 didn't do that.
4        Q:   Do you have a recollection again about
5 how much time the inquiry spanned?
6        A:   No I don't. As I said we can figure that
7 out but I don't what kind of a
8        Q:   Yeah I can but I just wondering if that
9 come back to you. If that comes back to you how much
10 time they spent; I remember Mr. Werts indicated that he
11 thought it was you know weeks but he's not sure either.
12 I would appreciate it if you would address that. Now
13 did you ever have a discussion with Colonel Hickes
14 about this matter?
15       A:   I'm not sure.
16       Q:   Is Colonel Hickes a friend of yours? By
17 that I mean, what I mean is I know that both of you are
18 professionals but you know there are friends and there
19 are friends. Okay. Is he a friend of yours in the sense
20 that you could confide in him or talk with him about
21 things?
22       A:   No I don't do that any; he is not a
23 friend socially. We don't socialize but professionally
24 we dealt with each other in a professional basis
25 everyday. We don't have animosity there's none of that.
26       Q:   It's professional/

SHEET 22  PAGE 85

1    A:  It's professional.
2    Q:  Professional colleagues in a large
3 organization.
4    A:  It's just that we never developed a
5 friendship through our professional careers. We were
6 never, hardly ever in the same place.
7    COUNSEL: Before we go any further did you
8 want to take breaks?
9    MR. WESTCOTT: I'm fine go far.
10    COUNSEL: If you want to just let him know.
11    MR. BAILEY: Yeah you can go ahead. Okay now
12 did you ever discuss the Ober matter with Colonel
13 Hickes?
14    A:  No I don't recall. I wouldn't know why I
15 would but I don't recall that I did. If colonel Hicks
16 walked in here and said yeah I had this conversation on
17 this date and blah, blah, blah maybe it would jar a
18 recollection but I don't have that recollection at all.
19    Q:  Do you know a Mark Campbell?
20    A:  I do know Mark Campbell.
21    Q:  And how long have you known Mr.
22 Campbell?
23    A:  I've known Mr. Campbell since I was
24 assigned as Deputy Commissioner.
25    Q:  And when were you assigned as Deputy
26 Commissioner?

PAGE 86

1    A:  I would say probably February of 1995
2 perhaps.
3    Q:  Aside from your own ambition who was
4 responsible for you becoming, and I mean that in a very
5 positive sense, who was responsible for you becoming a
6 Deputy Commissioner? These are appointed positions. How
7 did you get there?
8    A:  Colonel Evanko spoke in my behalf and I
9 don't know who he spoke to. I think he spoke to the
10 Governor but I don't know who else.
11    Q:  Was Mr. Campbell part of that process?
12    A:  I don't know. It would surprise me. He
13 was like assistant Chief of Staff or something to the
14 Governor you know. He's a big guy down there.
15    Q:  That's part of his job and that's the
16 way a government should be run. Please don't read
17 anything into that we're trying to find out some of
18 these connections an about some of these relationships.
19 Do you know, did you ever have any conversations with
20 Mr. Campbell about the Ober matter?
21    A:  I did not.
22    Q:  Do you know whether Colonel Evanko ever
23 had any conversations with Mr. Campbell about the Ober
24 matter?
25    A:  I do not know.
26    Q:  Did Mr., Colonel Evanko ever indicate

PAGE 87

1 any discussions with Mr. Campbell or anyone else in the
2 Governors Office about the Ober matter?
3    A:  I don't recall but I will qualify that
4 by saying that Colonel Evanko was in Mark Campbell's
5 Chain of Command
6    Q:  Okay.
7    A:  So I would expect it would not be
8 unusual that he called him and told him what was going
9 on. I have no knowledge of it.
10    Q:  Okay now at what point did you learn
11 that the FBI had indicated that there might be some
12 connection with this political corruption into the
13 Governor's Office, there might be some connection? I
14 mean I understand that it ended up not being and all
15 that. My question is when did you first learn that the
16 FBI had facts that raised the question about the
17 Governor's Office being involved?
18    A:  That would have been in the first early
19 days here. I'm not sure that Colonel Coury would have
20 told me about that that day but perhaps the next day.
21    Q:  By that day you mean the day that
22 Colonel Evanko was informed?
23    A:  No that day would be the day after
24 Colonel Evanko was informed.
25    Q:  That's what I mean. That's my error.
26 Okay now do you know Louie Freed?

PAGE 88

1    A:  I'm not friends with Louie Freed. I've
2 met him. I've conversed with him. But I do not know
3 him.
4    Q:  Is it fair to say that personal
5 friendship aside, that professionally the Pennsylvania
6 State Police and Louie Freed at the time was the FBI
7 director; you have to maintain some kind of a
8 relationship. In other words the two organizations, the
9 Pennsylvania State Police and the FBI have to maintain
10 a relationship in the interest of effective law
11 enforcement in the United States, particularly in
12 Pennsylvania. Is that correct?
13    A:  I think that's a fair statement.
14    Q:  Do you know if Colonel Evanko is
15 familiar with Judge Freed, Director Freed on personal
16 basis. In other words are they more than mere
17 professional acquaintances do you know?
18    A:  I don't think so. I don't know though.
19    Q:  The complaint indicates, the allegation
20 is made in the complaint, I can dig the paragraph out
21 if you want and I'll do that if you need me to or if
22 your attorney wants me to, that Colonel Evanko
23 indicated that he was going to contact Louie Freed over
24 this matter. Do you have a recollection of that?
25    A:  I do not.
26    Q:  Well aside from the complaint if it's

SHEET 23   PAGE 89

1  mentioned in there did you ever hear if the FBI was
2  contacted about this matter?
3          A:   Certainly they were contacted by
4  Williams and Werts and I think that would have been an
5  Agent Cush I think is what Werts testified to this
6  morning.
7          Q:   Let's set that aside. Do you know if
8  anybody involved Special Agent Werts, or excuse me
9  Special Agent Cush and the FBI was contacted by anyone?
10         A:   I don't know that. I did not and I don't
11 know that anyone else did or not.
12         Q:   Do you know whether Colonel Evanko
13 contacted anyone in the FBI?
14         A:   I do not know.
15         Q:   Do you know where Special Agent Cush is
16 now?
17         A:   I do not.
18         Q:   Mr. Cush is listed as one of your
19 witnesses. Do you know who talked to Mr. Cush aside
20 from Werts and Mr. Williams if anyone?
21         A:   I do not know.
22         Q:   Do you know whether the lawyers, your
23 lawyers have talked to him?
24         A:   I do not know.
25         Q:   Well do you know where Mr. Cush is now?
26         A:   I do not.

PAGE 90

1          Q:   It had indicated that aside from Mr.
2  Werts who says he did not talk with Mr. Cush, by the
3  way. Do you know when MR. Williams I guess it would
4  have been talked to Mr. Cush?
5          A:   I do not know when he did that no.
6          Q:   You were here when Mr. Werts testified
7  that his best recollection was that Mr. William talked
8  to Mr. Cush before Mr. Williams and Mr. Werts talked in
9  Phoenix. Do you remember that?
10         A:   I remember Major Werts talking about
11 that yes.
12         Q:   So when you indicated that Williams and
13 Werts talked to Cush you didn't mean to imply that you
14 had any facts indicating that Mr. Werts talked to him?
15         A:   No, no, no it's just that they were an
16 investigative, I call it an investigative team but they
17 were a team of investigators so I didn't mean to
18 mislead you there.
19         Q:   Well is there an interview in the work
20 product with Mr. Cush?
21         A:   I don't know that. I'm sure there must
22 be. I would expect them to do that but I did not review
23 it. So I don't, I'm not going to answer your question
24 in the affirmative fashion.
25         Q:   Because you don't know.
26         A:   Because I don't know. I expect however

PAGE 91

1  that they would have done that and that it would be
2  written down.
3          Q:   As head of operations do you become
4  involved in transfers, personnel transfers?
5          A:   That's the Commissioners prerogative.
6  Sometimes he asks for recommendations.
7          Q:   Well who sent Mr. Ober out to
8  Washington?
9          A:   What do you mean by sent Mr. Ober out to
10 Washington?
11         Q:   Well I don't know how many verbs we can
12 come up with; sent, transferred, assigned, suggested, I
13 don't know. Any word you want to use.
14         A:   That would have been the Commissioners
15 responsibility to do that.
16         Q:   Well when did you first learn about it
17 from the Commissioner?
18         A:   Well we would have had a meeting. I
19 don't recall the particular meeting we had but I'm sure
20 we did and it seems to me at the time; well let me back
21 up a little bit and explain how all this gets started I
22 think. I have to be careful. I had just recently been
23 to San Diego California  and met with, in fact Major
24 Werts and I were both out there, met with California
25 Highway Patrol and the San Diego Police Department
26 because they had recently handled security for the

PAGE 92

1  Republican National Convention that had been held out
2  there some three to four years prior to this. So we,
3  since that convention was coming to Philadelphia, I
4  went out along with Major Werts to San Diego to discuss
5  what they had done, how they had done it. one of the
6  recommendation that they ran to us and it was a good
7  one is that as time gets closer to the event, your
8  task force commander needs more and more help because
9  more and more things are beginning to happen as the
10 event gets closer and closer. Now at that time there
11 were two events going on; one the Republican National
12 Convention in eastern Pennsylvania and the National
13 Governor's Association meeting in actually State
14 College but that would come under our Western Area
15 Events. So that having as a background okay I mean
16 think again it's my recollection, I don't want to
17 misstate anything but I think at the time Captain Ober
18 was in between assignments maybe with IMS and BPR and
19 at that point I recommended that he be considered to go
20 out and assist Major Serpinco with the work for the
21 National Governors Association meeting. Major Werts was
22 the task commander for the Republican National
23 Convention and he had a similar person assigned to his
24 organizational group for doing those preparations. So I
25 thought that that was very important for Major Serpinco
26 to have somebody. Captain Ober was available. He had

SHEET 24    PAGE 93

1 the skills that he could have been of great help out
2 there. It would have been a good thing because he would
3 have worked under the tutelage of one of our very best
4 area commanders as well. I thought it was a good-good
5 thing, a win-win thing.
6           Q:   A win-win thing? So you went to Captain
7 Ober and you had him come in and discuss it with you?
8           A:   I didn't discuss it at all with Captain
9 Ober. That was my recommendation to the Commissioner
10 that Captain Ober be considered for that position our
11 there. I thought that would be good for the department,
12 it would be good for Captain Ober. It would be good for
13 Major Serpinco.
14           Q:   You didn't do that because you wanted to
15 pay Captain Ober back did you?
16           A:   No sir. Le me clarify that right now
17 before you get any misconceptions. I've know Captain
18 Ober, I don't know how many years, but a number of
19 years. And I have the utmost respect for Captain Ober
20 personally and for Captain Ober's' abilities,
21 administrative abilities. I supported him 120% if not
22 more so when he was the Director of Systems and Process
23 Review. I think he did a 100% job there. He took that
24 particular division from a period when they were having
25 a tremendous amount of difficulty to a well run
26 division and did very, very well with that. I relied on

PAGE 94

1 him immensely to keep me informed of what he was
2 finding or what his folks were finding when they were
3 doing the reviews of the stations. So you know, let me
4 clarify right now that there is no get even. I don't
5 dislike Darrell Ober at all. In fact I have a great
6 deal of respect for his abilities particularly his
7 administrative abilities.
8           Q:   Well there was an emergency need for him
9 out there in Washington right?
10          A:   There was a need out there yes.
11          Q:   Yeah but an emergency need. Wasn't there
12 an emergency need for him out there?
13          A:   Well I don't know if you want to call
14 that; is that your terminology?
15          Q:   Yeah my question is wasn't there an
16 emergency need?  If there wasn't an emergency need
17 qualify the word `need' for me if you will. Respond any
18 way you can.
19          A:   Well I'm not sure emergency is the
20 correct terminology, if you want to use that that's
21 fine.
22          Q:   No I'm not, is it fair to say there was
23 no emergency need now?
24          A:   Well the convention was a number of
25 months away.
26          Q:   A number of months away?

PAGE 95

1           A:   Yeah absolutely.
2           Q:   Well how much notice was he given about
3 his being transferred?
4           A:   I don't know the answer to that.
5           Q:   You don't know the answer to that? You
6 don't know when he was told, when he was told to report
7 or what happened?
8           A:   No I don't know. Again see it was not in
9 my area of responsibility.
10          Q:   You know that he went to court and the
11 court sided with him on that transfer you know that
12 don't you.
13          A:   I've been told that.
14          COUNSEL: Objection. That is a
15 mischaracterization. I've heard that before in these
16 depositions. The court did not agree with him. The
17 Commonwealth settled his case before to a preliminary
18 injunction hearing. We ultimately won that litigation.
19 The court did not intervene in that we settled the
20 preliminary injunction. The court did not intervene.
21          MR. BAILEY: Well did you learn at some point
22 that the Commissioner backed off and backed away and
23 Mr. Ober prevailed and did not go to Washington. At
24 least from Mr. Ober's perspective he didn't end up on
25 Washington did he?
26          A:   Mr. Ober did not go to Washington.

PAGE 96

1           Q:   No he did not and he stayed in
2 Harrisburg with his family didn't he?
3           A:   That is correct.
4           Q:   Have you ever read Judge Pella Greens
5 opinion?
6           A:   No I have not.
7           Q:   Do you remember when it was that you
8 made this recommendation to the Commissioner that Mr.
9 Ober would be, I guess would have his career enhanced
10 by going to Washington?
11          A:   We met once.
12          Q:   Well would he have had his career
13 advanced by going?
14          A:   In my opinion yeah. It would have been a
15 pretty good thing. I'm not sure and I don't know
16 specifically what Captain Ober's background in the
17 department is but I'm not sure he has had a lot of
18 operational assignments. And he certainly would have
19 been working directly under a good very, very
20 commander. From a planning and an operational
21 perspective it would have been good.
22          Q:   Well who was that area commander?
23          A:   Major Serpinco.
24          Q:   Well you talked with him about needing
25 Mr. Ober out there or somebody like him?
26          A:   I did yes.

SHEET 25   PAGE 97

1    Q:    And he told you how badly he needed him
2  right?
3         A:    Well he was reluctant, he did not have
4  benefit of the knowledge that I had at that point. He
5  had not gone to San Diego and he had not been told
6  that. As it turned out I think he would now agree it
7  was important. But at that time you know, I told him
8  that, in fact, that Captain Ober would be coming out
9  and I probably would have given him an effective date;
10  because he probably would have asked me that sort of
11  thing. I don't recall what that was.
12    Q:    Well he knew what to do with Ober right?
13    A:    Yeah. Oh my lands yes.
14    Q:    I mean he put him right to work on this
15  task. It wasn't an emergency, was there an immediate
16  need for Mr. Ober out there?
17    A:    Yeah I can tell you that he would have
18  been put to work immediately. There was any number of
19  details as far as getting ready for the National
20  Governors Association Meeting. You have to understand
21  that's pretty massive. That was a pretty massive thing
22  it involved over five hundred Troopers to be assigned
23  to that. So there was an awful, awful lot of work to
24  do; an awful, awful lot of coordinating to do between
25  area commands, in between Troop commands.
26    Q:    Well wouldn't you bring him in to brief

PAGE 98

1  him on that?
2         A:    Not in my area, it would not have been
3  my responsibility to do that.
4         Q:    Well at least come in and say Geeze, you
5  know I have a great idea here for you. Go out here to
6  Washington, this is a career enhancing move etc, etc.
7  no discussion or anything like that. You went to the
8  Commissioner with that so do you know if the
9  Commissioner had any meetings with Mr. Ober to discuss
10  that?
11    A:    I do not know.
12    Q:    Now are there any regulations that would
13  govern that transfer?
14    A:    I would expect it would be a general
15  transfer at the direction of the Commissioner.
16    Q:    Well Mr. Ober didn't request it right?
17    A:    I don't believe so.
18    Q:    And once he objected to it he was
19  consulted or his wishes were respected or whatever
20  right?
21    A:    That is correct. He stayed in the
22  Harrisburg Area. He did not go to Troop B Washington.
23    Q:    That didn't have anything to do with any
24  grievances or any legal
25    A:    About what didn't have anything to do
26  with it?

PAGE 99

1    Q:    His staying in Harrisburg didn't have
2  anything to do with the legal process do you know?
3    A:    I don't know. I didn't follow that.
4    Q:    You didn't follow that. You weren't
5  involved in that?
6    A:    I didn't.
7    Q:    Was his transfer in relation to a
8  promotion of any kind?
9    A:    No he was a Captain already and
10  that assignment out there would have been actually a
11  Captain's position.
12    Q:    It wasn't an emergency or hardship
13  right? You already told us it wasn't an emergency.
14    A:    It wasn't an emergency. There were a
15  number of months.
16    Q:    I'm sorry.
17    A:    There were a number of months till the
18  meeting so I, no I can't call that an emergency. An
19  emergency might be for a couple of days.
20    Q:    In fact a Mr. Young went out there
21  didn't he?
22    A:    Captain Young went out there yes.
23    Q:    How did he happen to go out there?
24    A:    He again he was a good guy. He spent a
25  lot of his career in Bureaus not so much field time. It
26  was the right fit for him as well. He could get there

PAGE 100

1  and again help out a pretty good area commander and
2  learn from him.
3    Q:    Well how do you know Mr. Young?
4    A:    I've known Captain Young for years.
5    Q:    Now he was a Lieutenant right?
6    A:    I don't know. Could be I don't know.
7  He's a Captain now.
8    Q:    Did he get a promotion for going out
9  there or anything? Does that have anything to do with
10  it?
11    A:    I have to tell you we wouldn't give
12  somebody a promotion because they went out to Troop B
13  Washington.
14    Q:    You said it called for a Captain though
15  remember?
16    A:    It was a Captain in Eastern Pennsylvania
17  and I would expect it to be a Captain out there.
18    Q:    Well it didn't call for a Captain though
19  did it?
20    A:    There's no T.O. there involved?
21    Q:    I mean it's not part of your
22  organizational structure.
23    A:    No.
24    Q:    So then Mr. Young, Lieutenant Young did
25  not receive a promotion in exchange for his assignment?

SHEET 26  PAGE 101

1    A:  I would be very surprised. It's not my
2 job to promote people but you don't promote people for
3 those kinds of reasons.
4    Q:  Well Mr. Young wasn't't ordered to take
5 that position out there was he?
6    A:  I don't know
7    Q:  Was he consulted before he was sent out?
8    A:  I do not know. I'm sorry. I did not talk
9 to him.
10    Q:  Who did?
11    A:  I don't know.
12    Q:  Do you know if the Commissioner did.
13    A:  I don't know. Frankly I just don't know.
14    Q:  You didn't deal with it. You don't know
15 what happened with Mr. Young right?
16    A:  I don't know how it happened that he was
17 told to go out there. I don't know who told him.
18 Ordinarily I would expect I would have because he was
19 in my area of responsibility but I don't recall doing
20 it.
21    Q:  Did somebody violate the Chain of
22 Command?
23    A:  I don't know. I didn't tell you. I'll
24 tell you I've hollered at some people for doing that
25 already in my career.
26    Q:  Well what can we do to them if they did?

PAGE 102

1    A:  I don't know. What's your
2 recommendation?
3    Q:  Well when my kids do something wrong I
4 say let's tar them and feather them and run them out of
5 town on a rail.
6    A:  That's works pretty good too.
7    Q:  All right well you weren't involved in
8 the Young thing but he was in your area of operations,
9    A:  I said I don't remember doing it. I
10 expect that I would have but I just don't remember
11 doing it unless I was off or something at the time.
12    Q:  What's IIMS? What is that?
13    A:  What is that? Investigative information
14 management system?
15    Q:  I think something like that. Can you
16 tell me about that, what that is?
17    A:  I don't know too much about it other
18 than it is a very important aspect of the department
19 now. It's the computerization of the entire department,
20 working on that. More specifically than that I can't
21 answer.
22    Q:  It's a very important thing between
23 Police Departments and information and credibility and
24 all that stuff or what?
25    A:  I'm sure that's part and parcel of
26 everything.

PAGE 103

1    Q:  Well what was Ober doing when the
2 Commissioner decided he should go to Washington? What
3 was he doing?
4    A:  I don't know that. It was my
5 understanding at the time that he was between jobs. In
6 between regular IMS and BPR but I don't know that.
7 There are other people you could ask.
8    Q:  What position was he going to be
9 assigned once the National Governors Association
10 Conference was over, what was he going to be doing
11 after that?
12    A:  I don't know. I don't know.
13    Q:  do you know if anybody discussed with
14 him what he was going to be doing or what his future
15 was going to be.
16    A:  I don't know. I did not. Again he was
17 not in my area of responsibility so I would not
18 necessarily have those kinds of conversations.
19    Q:  Did Major Connelly ever talk with you
20 about a desire to have Ober from IA, Internal Affairs?
21    A:  No he did not and would not.
22    Q:  Do you know what Mr. Young's schedule
23 was before he went out there?
24    A:  How do you recall?
25    Q:  What he was doing, what his assignment
26 was or anything like that.

PAGE 104

1    A:  He was probably assigned to the Bureau
2 of Criminal Investigation Organized Crime Division
3 would be my guess.
4    Q:  Where is Mr. Young from?
5    A:  He is from the outskirts of
6 Philadelphia.
7    Q:  What's he doing now?
8    A:  He's still at BCI is my understanding.
9    Q:  And what's BCI stand for? What's that
10 Acronym?
11    A:  Bureau of Criminal Investigation, I'm
12 sorry.
13    Q:  Now is he, did he go to the FBI Academy
14 do you know? Mr. Young?
15    A:  I think he did.
16    Q:  He left the Pennsylvania State Police.
17    A:  No, no, no, no. He is still a member he
18 went down to the National Academy for training. The FBI
19 gives training to other agencies.
20    Q:  Okay. Do you know if Young was assigned
21 any duties at the Republican National Committee or
22 Convention or anything?
23    A:  I don't know. See I was gone; I was
24 retired by that time so I don't know.
25    Q:  Do you know whether he picked up $50
26 worth of overtime in working for the INC in five days?

1  Do you know what happened?

2          A:   No I was retired. I have no idea.

3          Q:   Serpinco, did he request anyone else

4  other that just, well no he didn't request.

5          A:   He didn't request anybody.

6          Q:   He didn't request anybody. Did you give

7  him or did the Colonel, or yourself or anybody else

8  give him anybody else in addition to Ober and then

9  Young?

10          A:   I don't think so. Not while I was there

11  anyway.

12          Q:   Young wasn't, again don't feel insulted

13  by my question but Mr. Young wasn't' chosen to make it

14  look like there was a reason to send Ober out to

15  Washington was he?

16          A:   No there was a need for a person out

17  there. There was a need for somebody to be in that

18  position.

19          Q:   Okay there was a need but that wasn't

20  communicated. That came out of your experience out

21  there in San Diego and it was based on your knowledge,

22  your own knowledge of the needs out there in the

23  southwest with what was coming up in Pittsburgh, the

24  National Governors but it wasn't Serpinco asking you

25  for information or asking you for help.

26          A:   No he did not. It was my understanding

1          Q:   I don't mean to mispronounce his name by

2  the way. I apologize. And then Captain Transea was sent

3  down to Philadelphia right?

4          A:   That's my understanding yes.

5          Q:   And were you responsible for that?

6          A:   That would have, let me just think about

7  that. That probably was a request. Not probably, I'm

8  sure it was a request from Major Werts. I would expect

9  that request to have been after we came back from San

10  Diego, though I'm not sure.

11          Q:   That was a request from Mr. Werts?

12          A:   Yes, he was in San Diego with me.

13          Q:   He was a friend of Transea wasn't he?

14          A:   Yeah they've served in the same area

15  commands, troop commands already together so they knew

16  each other. But I think at the time she was assigned to

17  R&D or something at the time.

18          Q:   R&D?

19          A:   Yeah so again it would not have been. I

20  wouldn't necessarily have made a recommendation because

21  it was not in my area of responsibility. Colonel Hickes

22  would have had to deal with that.

23          Q:   Well who could you complain to about

24  Young, you being bypassed in the case of Young? I mean

25  you were upset about that right?

26          A:   I'm sorry about what?

1          Q:   That Young was assigned without your

2  knowledge right?

3          A:   Oh I'm not sure if Young was assigned

4  without my knowledge.

5          Q:   Well you were concerned about whether

6  your Chain of Command was bypassed?

7          A:   I never was.

8          Q:   Well you and I were talking about some

9  of these assignments that go by you or got around you

10          COUNSEL: I would just object. I think you

11  brought up that issue not Lt. Westcott that he

12  indicated

13          MR. BAILEY: Lt. Colonel Westcott. What did I

14  say?

15          MR. BAILEY: You said Lieutenant Westcott.

16  It's okay it's been a long day.

17          COUNSEL: And my understanding from that

18  exchange that if there was a violation of Chain of

19  Command then something might have to be done but h

20  didn't acknowledge that there was in fact a violation

21  of Chain of Command. That was more your

22          MR. BAILEY: Let's revisit that because I may

23  have misunderstood you. Didn't you indicate that you

24  did not send Mr. Young out to Washington?

25          A:   I don't recall me personally telling him

26  but I very well could have. It would have been in my

1  place to do it. I just don't recall doing it. The

2  Commissioner may have done it also.

3          Q:   Well did you complain to anybody about

4  that happening without your knowledge?

5          A:   No. I'm not sure it was done without my

6  knowledge. I'm sure I knew he was going out there

7  whether I told him he was going out there or whether

8  the Commissioner told him he was going out there. I

9  just don't recall.

10          MR. BAILEY: W ell I did misunderstand. We

11  need to clear this up on the record then because I

12  don't want that to be on the record.

13          MR. BAILEY: You have made an error on the

14  record so counsel raises a good objection here. I was

15  misled, by myself, not you. Not you. By myself I made

16  an error here. I want to clear it up. You had made the

17  recommendation to the Colonel about sending Mr. Ober

18  out to Washington?

19          A:   Yes.

20          Q:   You learned after the fact that Mr.

21  Young was sent.

22          A:   No, no, no I probably would have also

23  made

24          Q:   Not probably.

25          A:   Now, now listen. I'm trying to clarify

26  it so that you are not confused. When I learned that

1 Captain Ober was not going out there but somebody else
2 needed to go out there because I had a need for
3 somebody out there I would have recommended Captain
4 Young going out there. I would have recommended that to
5 the Commissioner.
6         Q:   But sir, you would have. The fact is you
7 don't know if you did.
8         A:   I don't, I'm sure I did
9         Q:   You are?
10        A:   I mean I'm sure the Commissioner would
11 have conversed with me about that. Who should we send
12 out there? Who would you like to go out there? And I'm
13 sure I would have given him the answer. Can I remember
14 that specific? No I can not.
15        Q:   Look at this now. You had no request
16 coming up through channels asking to have somebody to
17 go to Washington?
18        A:   That's correct.
19        Q:   You originated this idea because of your
20 concern about and your respect for Captain Ober and
21 your perceived need, perceived need to have somebody
22 out there for those purposes, to help.
23        A:   It was the one thing, my perceived need.
24 Not whatever Captain Ober was involved with or was not
25 involved with okay. That just happened to be the
26 circumstances at the time. I had a need and he was

PAGE 110

1 available okay.
2         Q:   Oh okay well how did you know he was
3 available?
4         A:   I was told he was available.
5         Q:   Who did you ask?
6         A:   Probably the Commissioner or Colonel
7 Hickes, somebody told me that.
8         Q:   Okay and you had this because of your
9 California experiences you had this perceived need that
10 although you didn't check with him that the area
11 commander out there had need for somebody for the
12 National Governor's conference, is that correct?
13        A:   That's correct.
14        Q:   Now obviously, Mr. Ober, actually while
15 the decision to send him out to Washington was made by
16 the Commissioner
17        A:   That is the Commissioners decision
18 that's correct.
19        Q:   That's his decision, that would be
20 normal. I assume that's a normal thing.
21        A:   That's normal.
22        Q:   You don't know whether he talked to Mr.
23 Ober or not.
24        END OF TAPE ONE
25        MR. BAILEY: You did not, you didn`t speak to
26 him again and you don't' know whether the Colonel did

PAGE 111

1 but he reacted rather quickly to the news that he was
2 going to Washington right?
3         COUNSEL: Who is this you're talking about?
4         MR. BAILEY: This is Mr. Ober.
5         COUNSEL: This is Mr. Ober you're talking
6 about.
7         MR. BAILEY: Mr. Ober reacted very quickly
8 that he was going to Washington.
9         A:   Uh, I presume so. He didn't talk to me
10 at all.
11        Q:   When did you first learn that he was not
12 going to Washington then? I mean how much time after
13 when you told the Commissioner about the need for him
14 out there, and I assume you learned that the
15 Commissioner was sending him out there. Right? Because
16 he's in your operational Chain of Command right?
17        A:   Who was?
18        Q:   Mr. Ober.
19        A:   No he was not.
20        Q:   Oh that may be where the
21 misunderstanding comes. Mr. Young was within your
22 operations.
23        A:   Mr. Young was that's correct.
24        Q:   And you don't remember whether you
25 recommended him or not but you know you recommended Mr.
26 Ober but Mr. Ober is not in your Chain of Command.

PAGE 112

1 That's probably where I got confused.
2         A:   That's correct.
3         Q:   Okay all right that will help. Now did
4 you ever discuss with Mr. Young before or after the
5 fact his going to Washington?
6         A:   Did I ever discuss that with him?
7         Q:   Yeah.
8         A:   I don't know, I probably, I could have.
9 I could have.
10        Q:   Did you know he was available to go out
11 there or was he available?
12        A:   I'm sure he was available but he had an
13 assignment. Okay. We would have just borrowed him from
14 that assignment and gave him something else to do.
15        Q:   You would have detached him?
16        A:   That's correct though I'm not sure
17 that's what we; the correct terminology.
18        Q:   It may not be the right word. But Mr.
19 Ober was available. He was floating around?
20        A:   It was my information that he was like
21 in between jobs. He was available.
22        Q:   Well you Ober over to BCE right?
23        A:   I didn't send him anywhere.
24        Q:   You didn't send him there?
25        A:   The Commissioner did that.
26        Q:   Who sent him to BCE?

SHEET 29   PAGE 113

1    A:   The Commissioner did that. Same thing,
2  it's his job to do those transfers not mine.
3         Q:   Well he does them based upon advice
4  right?
5         A:   That's correct.
6         Q:   And who advised that the Commissioner
7  send Mr. Ober to BCE?
8         A:   I may very well could have done that.
9         Q:   But you don't know?
10        A:   I'm not sure whether I would have done
11 that or Colonel Coury would have made that
12 recommendation or even Colonel Hickes. I don't know. I
13 don't know that but I could have.
14        Q:   But you could have. Why? Was that a
15 career enhancing move to send him to LCE?
16        A:   Well again it's my understanding that he
17 was no longer going to Troop B Washington and that he
18 had to put into a Harrisburg assignment and I think
19 that was about the only thing available out there at
20 that time. That's my recollection that that's the only
21 thing available.
22        Q:   Well you described him before as an
23 exceptionally fine officer haven't you? Or am I wrong?
24        A:   I think he has very, very good
25 administrative skills. I think that investigative
26 skills could be honed some. I think there's some

PAGE 114

1  lacking there but he's got some great administrative
2  skills.
3         Q:   Who's Sergeant Valencik?
4         A:   He's a Sergeant, or well he was a
5  sergeant in Liquor Control.
6         Q:   What did he do at the time you were
7  recommending or somebody was recommending, I don't mean
8  you now, somebody was recommending that because you
9  don't have any specific recollection of recommending
10 Mr. Ober for LCE right?
11        A:   I don't have that recommendation but I
12 could have during the discussions.
13        Q:   Yes but Mr. Valencik was out there at
14 BCE, or LCE right?
15        A:   LCE.
16        Q:   He was out there.
17        A:   I believe so.
18        Q:   Where did he go? Did he leave or retire
19 or
20        A:   No I think, I mean I've been retired for
21 a year and a half now but when I retired he was still
22 there. He was a sergeant there which would have made
23 him probably, and I'm guessing without looking at
24 personnel rosters but a sergeant in LCE is generally an
25 office supervisor you know. And I think he might have
26 been filling in. I think we had a Lieutenant vacancy

PAGE 115

1  there so maybe he was an acting. I don't know that. But
2  Valencik, I'm guessing that he would have been a
3  Sergeant and he would have been as an Office
4  Supervisor.
5         Q:   Well the position that Mr. Ober was put
6  into that was a Captain's position wasn't it?
7         A:   What position was he put into out there?
8         Q:   I don't know do you remember? I mean
9  that sincerely I don't know. I don't remember.
10        A:   I don't know. Let me think. You know I
11 don't know if there was a Captain's position there. My
12 guess is and I'm speculating without looking at
13 paperwork, my guess is that I think we had a Lieutenant
14 out there that left and there was a Lieutenant vacancy.
15 And the Lieutenant out there is a section commander; we
16 have three sections out there. And I believe Captain
17 Ober would have gone into one of those section
18 commander's positions.
19        Q:   A lieutenants' position?
20        A:   That would be my understanding yes.
21        Q:   That was career enhancing wasn't it?
22        A:   It was a Harrisburg assignment.
23        Q:   That says Harrisburg is career
24 enhancing. I mean is there geographic prejudice in the
25 system?
26        A:   No.

PAGE 116

1         Q:   Oh a Harrisburg position?
2         A:   That's what we were required to do.
3         Q:   Pardon me?
4         A:   That's what we were required to do.
5         Q:   Oh okay well did Koselnik insist that
6  the position be filled?
7         A:   No I don't know if he did. You know all
8  commanders are anxious to get their vacancies filled
9  but I don't know if we had any conversation around that
10 time for that.
11        Q:   All right how about Lieutenant Williams?
12 Remember when a Lieutenant Williams was transferred to
13 the Bureau of Patrol, August 31, 1999? Does that mean
14 anything to you?
15        A:   Would he have been the one that
16 transferred out that Captain Ober took his spot?
17        Q:   Well there is some issue here; I have a
18 fact list here that he was arrested for something?
19        A:   I don't know that.
20        Q:   And it was his position in 19--, on
21 January 29; I'm just curious, let me ask you this first
22 off. How many Lieutenants do you have in the
23 Pennsylvania State Police?
24        A:   I don't know. Probably around one
25 hundred.
26        Q:   Well did you promote or look at the

1 promotion list for getting somebody in that LCE
2 position and as a Lieutenant, promote somebody into the
3 Lieutenants position in there?
4     A:   At some point I suppose we would have.
5 The Commissioner decides when he wants to make the
6 promotions. So when he wants to do that he asks for
7 recommendations and I would have looked the list over
8 at that point.
9     Q:   So you take Ober and put him out there?
10     A:   Not me.
11     Q:   I hear you. I'm sorry it wasn't you.
12 Have you ever served in a Lieutenants Position while
13 you were a Captain or above?
14     A:   I did not.
15     Q:   Do you know of anybody else besides Mr.
16 Ober that has?
17     A:   I don't know.
18     Q:   How many years have you been in the
19 Pennsylvania State Police?
20     A:   Thirty one.
21     Before you retired thirty one years.
22 Have you ever been supervised by anybody equal to you
23 or below you in rank?
24     A:   I have.
25     Q:   Tell me the circumstances.
26     A:   I was assigned as a Trooper to a white

PAGE 118

1 collar crime unit in eastern Pennsylvania. The
2 supervisor in that unit was a corporal. I was promoted
3 to Corporal and was allowed to stay with that unit. So
4 there were two corporals there. He was the boss, I was
5 the investigator.
6     Q:   Now you wouldn't, is that a standard TO&
7 E position? Standard table organizational and equipment
8 position?
9     A:   No it happens sometimes in Bureaus and
10 specialized positions.
11     Q:   That's not comparable to the situation
12 that Captain Ober is in is it?
13     A:   Probably not, no.
14     Q:   Now you have already answered a question
15 I had for you. Section Commanders typically are
16 Lieutenants. Am I correct?
17     A:   In LCE that's correct. In troop commands
18 that's correct as well.
19     Q:   You are familiar with a regulation AR 1-
20 11?
21     A:   What does it pertain to?
22     Q:   Assigning Captains to a section
23 commander's position.
24     A:   No I don't.
25     Q:   Did the Commissioner tell you that he
26 was going to assign Ober to LCE?

PAGE 119

1     A:   I don't recall. I'm not sure he did.
2     Q:   Did you learn of it before Mr. Ober was
3 assigned to LCE position or after he had been assigned
4 there?
5     A:   I don't, I'm sure it was before because
6 we would have had conversations if he was putting
7 somebody into the operations side of the department
8 though I can't recall a conversation. It would have
9 just been standard procedure that he would have let me
10 know. It would have been standard procedure; I would
11 have even had some input into it.
12     Q:   Thirty one years of experience. How long
13 was it, from 1995 you were in charge of the Operational
14 division of the State Police?
15     A:   That's right.
16     Q:   Give me another situation like Ober's?
17     A:   How do you mean like Ober's?
18     Q:   I want a Captain assigned to a section
19 position out there. Give me another situation.
20     A:   I don't know of any.
21     Q:   You don't know of any?
22     A:   No.
23     Q:   I'm going to change a little bit and ask
24 you some questions about PEMA. Okay?
25     A:   Okay.
26     Q:   First of all very, very quickly so that

PAGE 120

1 anybody that's now familiar reading a record would know
2 what the Pennsylvania Emergency management, what is it?
3 Association? Agency, I'm sorry.
4     A:   Agency. That's a separate agency in the
5 state government that has to with well, it's an
6 Emergency Management Agency.
7     Q:   And is it the Lieutenant Governor who is
8 in charge of that, the head guy?
9     A:   That's correct.
10     Q:   And what role do the Pennsylvania Police
11 take with PEMA?
12     A:   Well certainly as an agency we need to
13 liaison with them but we do have what we call an
14 emergency cell that we man at the PEMA building. When
15 PEMA is "activated" the cells are manned and we man our
16 cell.
17     Q:   What position did Ober play with PEMA?
18     A:   I don't know that.
19     Q:   Any role at all?
20     A:   I don't know that. I don't know if he
21 was ever assigned to PEMA or not.
22     Q:   Did PEMA come under your command?
23     A:   Yes. Yes because it came under the
24 Bureau of Emergency and Special Operations and that
25 came under my area of command.
26     Q:   How do people become, how do

SHEET 31    PAGE 121

1  Pennsylvania State Police officers of any rank become
2  assigned to PEMA?
3          A:   That's done by BESO, Bureau of Emergency
4  and Special Operations.
5          Q:   Do they come under you? Operations?
6          A:   Yes.
7          Q:   So you're telling me that somebody could
8  be assigned to PEMA without your knowledge?
9          A:   By all means.
10         Q:   What it can be?
11         A:   Well yeah. Let me just clarify this.
12 Initially BESO, PEMA, that emergency management thing
13 did not come under the responsibility of the Deputy
14 Commissioner of Operations. That changed probably
15 halfway through my tenure when Colonel March retired,
16 it had come under his areas. So I would not necessarily
17 have had any knowledge as to who actually was on, who
18 manned those cells, specific information as to who
19 manned those cells during that time that Colonel March
20 was there; and in fact not really while I was there
21 other than Captain Davis from BESO. I just had no need
22 to know that, that's all. That's like I don't know who
23 is assigned to every station, you know. I don't know
24 who is assigned to every LCE office. I just don't know
25 that.
26         Q:   You know there is no use in my wasting

PAGE 122

1  your time with questions if you have no knowledge of
2  Captain Ober ever being part of any PEMA team or having
3  a PEMA assignment is there?
4          A:   No I don't know that he did. He might
5  have. I just don't know about it.
6          Q:   Well let's just make sure the record is
7  clear and we'll wrap it up and it will save us a lot of
8  time here. You as you sit here today have no
9  recollection of Captain Ober ever being a member of
10 any, ever having a PEMA assignment?
11         A:   You know I don't know. The only thing I
12 can add to clarify things is that I can say is that I
13 think he wanted to go, had applied for a position at
14 PEMA is my understanding.
15         Q:   Well where did you get that
16 understanding?
17         A:   I'm not sure.
18         Q:   Were you talking to Koselnik about it?
19         A:   And it might have been, it might have
20 been, it might have been BESO. I don't know. I just
21 don't know. And I don't know whether Captain Ober ever
22 had a position there. He very well could have. I just
23 don't know. I don't know if it was or whether he
24 applying to become a part of the PEMA cell. I just
25 don't know.
26         Q:   Well I have a note here. Can I read it

PAGE 123

1  to you?
2          A:   Please.
3          Q:   After serving on PEMA for over five
4  years on March 10, 2000 just one day after a newspaper
5  article appeared in a local paper, Harrisburg down here
6  that discussed Ober's defeat in the Washington
7  transfer, Ober was removed from the PEMA position. Do
8  you know anything about that?
9          A:   No I don't.
10         Q:   How or why or what they are talking
11 about?
12         A:   No. No, no I do not. I'm sorry and in
13 fact I wouldn't have, I can't argue the fact that he
14 was or was not there. I just didn't know. I don't have
15 the knowledge.
16         Q:   That's okay. You didn't know provided
17 it's an honest answer and I'm not questioning it.
18         A:   I mean if you have some other
19 information that can clarify it. I just cannot sit here
20 and tell you that I knew Darrell Ober had been there
21 for five years.
22         Q:   If somebody wanted to serve on PEMA,
23 what's the terms? Is this a sought after position?
24         A:   I don't know that.
25         Q:   I mean apparently you didn't pay much
26 attention to PEMA. Not don't take that wrong you're a

PAGE 124

1  busy man with tremendous responsibilities and I
2  understand that so I don't mean that in a negative way.
3  It's just not the kind of thing you had time to spend
4  much time on apparently.
5          A:   No my involvement there was pretty much
6  was BESO pretty much took care of that okay.
7          Q:   Who is in charge of BESO?
8          A:   Well there's a Major there. At the time
9  it was Major Washington.
10         Q:   Major Washington?
11         A:   Right. And the only involvement I had
12 really was that if, if an emergency had occurred and
13 the PEMA cell was activated the Commander of the PEMA
14 cell would call me and tell me that they were
15 activated. And let me know what the situation was and
16 what was being done. It was strictly an advisory thing.
17 But then see I don't know if anything ever came across
18 my desk asking permission to assign someone to PEMA. I
19 don't know if I have ever seen anything like that.
20         Q:   Five years Ober served on PEMA under you
21 and you're not aware of and have no recollection? I
22 mean just none?
23         A:   No, well it wasn't five years so misread
24 that in there. It was just probably a year and a half
25 after George March, Colonel March retired that
26 would have come under me. But that would have, let me

SHEET 32  PAGE 125

1  tell you something. There are Troopers around that have
2  had assignments for twenty five years and I never knew
3  they had that assignment. And that comes under my area
4  of command. I just didn't have the knowledge of it
5  that's all.
6          Q:   Did Ober ever approach you or express
7  any interest to you about PEMA? Write you a letter, a
8  memo reach your desk anything like that?
9          A:   Not to me.
10         Q:   And you never had any discussions with
11 Major Washington about it is that correct?
12         A:   You know I don't recall. Could have if
13 Major Washington come in here I had this on such and
14 such a day you know I'm not sure. I couldn't say he was
15 wrong. Just don't remember.
16         Q:   Do you know whether Commissioner Evanko
17 personally played any role in Mr. Ober not having a
18 PEMA assignment?
19         A:   I would be surprised if he did.
20         Q:   Okay how about Colonel Coury, do you
21 know if he played any role?
22         A:   I would be surprised there also
23 especially since it comes under my area of
24 responsibility and that's
25         Q:   Well I'm asking a question and I happen
26 to know, I have some background on this. Obviously I'm

PAGE 126

1  not here to testify
2          A:   I understand.
3          Q:   But I'm asking my questions after having
4  done a little bit of research.
5          A:   Well correct me if I'm wrong.
6          Q:   I don't know. I can't do that. I mean
7  it's not right for me to do that.
8          A:   Well tell me if I'm wrong because I'll
9  try to straighten it out. I don't want to tell you
10 something wrong.
11         Q:   Well I agree that's it under your
12 jurisdiction as far as I know. Let me ask you this. How
13 is the front office defined in State Police
14 departments. Who is in the front office?
15         A:   That's the Commissioner's office.
16         Q:   Do you know whether Major Washington had
17 appointed Ober back to PEMA and then had that decision
18 overturned by the front office? Do you know anything
19 about that?
20         A:   I don't know anything about that. Okay
21 well maybe I do know something about that.
22         Q:   Think back on it, take a minute and try
23 to go back in your mind and see what you can tell us
24 okay?
25         A:   Well tell me more.
26         Q:   I can't tell you anymore. I'm not

PAGE 127

1  letting you, you're attorneys will kill me.
2          A:   Well I'm trying to get a recollection
3  here. I don't, I don't, and I can't sit here and told
4  you that Captain Ober was assigned to the PEMA cell. I
5  just did not know that. It seems to me that I did know
6  that he was wanting a position there.
7          Q:   All right let's start there. Lets' start
8  there.
9          A:   Now you're indicating that I'm incorrect
10 in that but that's just.
11         Q:   No I think he was there. I think he was
12 taken off of there. I think he was wanting to go back.
13 I think he was wanted. I think he was ambitious to do
14 it. I think he was qualified and I think he was put
15 back on there and I think somebody in the front office
16 `axed it.' That's what I think. Now if your attorneys
17 want to jump on that they can.
18         COUNSEL: My only objection is that's a
19 statement and not a question.
20         MR. BAILEY: I agree.
21         COUNSEL: To the extent that it may not state
22 the facts
23         MR. BAILEY: See what you got me into? See
24 what you get?
25         MR.WESTCOTT: I'm just trying to be helpful.
26 I'm just trying to clarify the facts here.

PAGE 128

1          MR.BAILEY: I know you are and I don't mind
2  doing that. I just don't like putting ideas in your
3  head. Tell me what you remember.
4          A:   Well certainly if it helps to clarify
5  it would be factual.
6          MR. BAILEY: Okay.
7          A:   I did not know that Captain Ober was
8  assigned to PEMA. I have some recollection that I was
9  asked if he could be put onto PEMA. And I'm not sure
10 why I would have been asked that because that's not
11 something normally that I would do.
12         Q:   Right because you've told us. I
13 understand that something
14         A:   You know that's something that would
15 have been done at the Bureau level. So I don't know
16 where to go with it from that. Did I answer your
17 question at all? You seem to have lost sight of the
18 question I guess.
19         COUNSEL: Yeah I'm lost.
20         MR. BAILEY: You have a vague recollection
21 right?
22         A:   Not that he was on it but that he was
23 asking to be put on it.
24         Q:   Right. So you don't have a recollection
25 of him ever having been there but you do have
26 recollection of him making a request. Do you know if

SHEET 33  PAGE 129

1 indeed he was denied or turned down can you tell us why
2 that would have happened?
3         A:   See I just don't remember. I don't
4 remember making a recommendation. I very well could
5 have.
6         Q:   One way or another?
7         A:   One way or another. In fact if I'm
8 sitting here I probably would have recommended not but
9 see I didn't know all the reasons
10        Q:   Why would you recommend not?
11        A:   Well the reasons, here's why I'm
12 confused here. Because the reasons that I would do that
13 are somewhat a little bit inconsistent because had he
14 been there for five years, okay, the reason I would not
15 have recommended him for that position would have been
16 his lack of operational skills, okay, that I had
17 observed.
18        Q:   That I had advised these
19        A:   Yeah but you're telling me he was there
20 for five years and that's not consistent with what I
21 would have done. That's why I have the confusion.
22        Q:   Oh okay now I get it.
23        A:   Do you understand what I'm saying?
24        Q:   Yeah.
25        A:   Certainly if he had been there for five
26 years he would have been qualified to be there

PAGE 130

1 obviously unless there is somebody that has knowledge
2 that he didn't do a good job there which I don't have
3 that knowledge. But if I were to not recommend him for
4 a position there it would have been because of his
5 operational experience. Okay and that would not be
6 consistent if he had been there for five years. That's
7 what has me confused but at any rate. I'm trying to be
8 honest here and factual.
9         Q:   No I appreciate that. I appreciate that.
10 In front office we know apparently it wasn't you. It
11 wasn't you or you don't have recollection of it; but
12 that would leave Colonel Hickes, Colonel Coury and
13 Commissioner Evanko to say ny'et you can't go. Right?
14        A:   I don't know
15        Q:   Or if he was put on there to actually
16 take him off to punish him.
17        A:   Oh well see I don't know if that
18 happened so.
19        Q:   You don't know if that happened?
20        A:   I don't know.
21 MS. LYDE: Excuse me I have to change tapes.
22 It's 3:32 PM. This is the end of tape one of Joseph
23 Westcott. (NEW VIDEO)
24        MR. BAILEY: Gentleman please be advised of
25 the recording device in operation.
26        MS. LYDE: It's now 3:38 PM January 7, 2002.

PAGE 131

1 This is tape two of the deposition of Joseph Westcott.
2         MR. BAILEY: Thank you Colonel very much. We
3 are back on the record. I want to go back to this IIMS
4 thing. This systems integrator project you say you
5 don't much about that?
6         A:   Very little sir.
7         Q:   Do you know anything about a
8 Bicentennial Book committee?
9         A:   I don't know anything about it. Well I
10 knew there was one but had no involvement at all.
11        Q:   Do you know whether being in a position
12 like that would be a position of prestige or honor?
13        A:   I mean I don't know, I just didn't; it
14 wasn't operational.
15        Q:   What about the idea of collecting the
16 State Police memorabilia. Do you know anything about
17 that?
18        A:   I don't know anything about that. I mean
19 I know the museum is trying to do it but other than
20 that,
21        Q:   Ever have any discussions with Colonel
22 Coury about that?
23        A:   No. well I shouldn't say no, I mean
24 other than that museum come under him so he went out
25 trying to get stuff and so on and so forth.
26        Q:   I'm sorry. Let me be more specific, any

PAGE 132

1 discussions with Colonel Coury where Mr. Ober came into
2 the discussion about the issue of memorabilia of
3 Pennsylvania State Police.
4         A:   I don't recall. I can't say that it
5 didn't but I don't recall it.
6         Q:   Do you know an LCE officer Wilson and
7 Christianson, either one of those two?
8         A:   Wilson? I'm not sure I know Wilson but I
9 do know Christianson.
10        Q:   He is in the Bureau of Technology
11 Services. There's a Bureau of Technology Services.
12        A:   That comes under Colonel Hickes. That
13 has to with all of computers and that sort of thing.
14        Q:   Do you know why LCE with your authority
15 would send those folks over to, detach them over to
16 BTS?
17        A:   Probably because they asked for them to
18 be on some sort of a project action team or something.
19        Q:   Okay well
20        A:   It would be my guess.
21        Q:   Okay they weren't short people or
22 anything were they at LCE?
23        A:   Everybody is short people. But you try
24 to do, if it's an important project for the department
25 you try to suck it up where you have to so that they
26 have the tools they need to get it done.

SHEET 34   PAGE 133

1    Q:   I see. You know, do you have a
2 recollection of Major Koselnik recommending and
3 approving Ober's request to attend training in
4 Washington, D.C., the National Alcoholic ___ Symposium
5 and you turned it down? Do you know why you did that?
6    A:   I don't remember doing that.
7    Q:   Why would you do that?
8    A:   I'm not sure why I would do that. He is
9 assigned to LCE, I'm not sure. The only reason you do
10 you know unless there's some fiscal concerns, which I
11 don't believe there were, the only reason you would do
12 that is if it were not pertinent to his job at hand.
13 But if you put somebody over in LCE you've got to give
14 him the tools to do the job so I'd be surprised if I
15 said no.
16    Q:   Well you did. I can tell you that you
17 did.
18    A:   I don't recall it.
19    Q:   I mean he's approved by Koselnik. It's
20 sent over by the Bureau.
21    A:   I don't know why I did that. Did I give
22 a reason for that? I don't remember doing that I'm
23 sorry.
24    Q:   Well we believe we know the reason but
25 I, you know. Do you know why he was approved one year
26 and not the next?

PAGE 134

1    A:   What, I don't know what conference it
2 was.
3    Q:   Was Ober singled out sir? Was he singled
4 out, you know?
5    A:   No I told you before.
6    Q:   He was never singled out for anything?
7    A:   Certainly not.
8    Q:   All right. Give me thirty seconds. I
9 have some FBI questions, a group of FBI questions and I
10 think I've been through all. Let me check.
11    A:   Okay.
12    Q:   Were there any, was there any
13 investigation into the, you know the public corruption
14 thing that the FBI was looking into? Was there any
15 investigation into that by the Pennsylvania State
16 Police?
17    A:   I don't know that, could be.
18    Q:   Who assigns investigations to the
19 Organized Crime Division?
20    A:   That could, the request for an
21 investigation could come from anywhere. Probably if
22 they were doing something BPR asked them to help them
23 out, my speculation. I would not necessarily know about
24 that.
25    Q:   Do you know what happened to Trooper
26 Stanton?

PAGE 135

1    A:   I do not.
2    Q:   Have you ever been assigned to the
3 Organized Crime Division?
4    A:   I was.
5    Q:   And what Deputy Commissioner has
6 authority over OCD?
7    A:   That come under the Bureau of Criminal
8 Investigation which comes under DEPOPS.
9    Q:   That's you then?
10    A:   That's me.
11    Q:   You don't know if that was ever, that
12 criminal investigation, the underlying political
13 corruption case was ever assigned to the Organized
14 Crime Division, had ever been there or an associated
15 case had ever been there? You don't know anything about
16 that?
17    A:   I don't know. It certainly could have
18 and it would not surprise me if it was. Oftentimes BPR
19 will go to another Bureau for assistance. They
20 oftentimes go to Drug Law Enforcement for example and
21 BCI help them out with investigations, surveillances or
22 whatever they want. But that doesn't necessarily mean
23 that I, in my position would have had knowledge of
24 that.
25    Q:   Well in investigating Ober and what had
26 happened with the FBI coming to the Pennsylvania State

PAGE 136

1 Police wasn't it important to know what the underlying
2 political corruption case was about to see whether Ober
3 had some reason for doing what he did?
4    A:   It was my understanding that it was all
5 over until we even found out about it.
6    Q:   You know, well we'll save that for a
7 later time. Let me just ask you why didn't you just
8 bring Ober in and sit him down and say hey what is this
9 about? If you felt strongly about this thing of
10 Connelly and Hickes why not call both of them in or at
11 least call Ober in and say what is going on?
12    A:   Well, not my job. Ober is not under my
13 area of command. It would have been improper for me to
14 ask him to come up and see me. It would have been
15 improper for me to chastise him if that was the proper
16 thing to do. It just would have been improper for me to
17 do that and I wouldn't do that.
18    Q:   Was it proper for you to handle the
19 assignment of the two investigators? They weren't in
20 your area were they?
21    A:   Oh absolutely because they were
22 operationally linked. The BPR did not come under me
23 they worked for their area commanders. They worked
24 under the operations functions.
25    Q:   They're under their area commanders in
26 normal process but for this inquiry you're not getting

1 completely avoiding this BPR? Were you avoiding them?
2          A:   Well we don't know if there were any
3 violations of anything and BPR kicks in when there are
4 violations.
5          Q:   You didn't know if there were violations
6 of anything? Is that what you said?
7          A:   To my knowledge, I still don't know if
8 there were any violations of department rules and
9 regulations involved. Let me ask you was the BPR
10 investigation ever completed?
11          Q:   Sir, I, if it weren't during deposition
12 I would take some time and answer that and some of my
13 concerns would be like being on a soap box or something
14 and I would probably bore you to death so I won't. I'm
15 sure I'd bore you to death. I don't mean to avoid your
16 question. Do you how Mr. Hickes came to be Lt. Colonel
17 in the Pennsylvania State Police because you know, I
18 think it's common knowledge he wasn't recommended by
19 Colonel Evanko was he?
20          A:   I don't know that.
21          Q:   You don't know that? Do you know who his
22 political patrons are or who supports him?
23          A:   I have no idea.
24          Q:   Do you have a supposition?
25          A:   I have no idea, no idea. No.
26          Q:   Do you know if Colonel Evanko has some

1 political fear or administrative fear of Colonel
2 Hickes?
3          A:   I don't know that you would have to ask
4 him.
5          Q:   Do you ever get involved in the politics
6 of the Pennsylvania State Police at all?
7          A:   I do my very best not to.
8          Q:   The disciplinary process in the
9 Pennsylvania State Police, can you tell us normally,
10 excluding a criminal investigation into allegations
11 whether from inside or out of the organization of
12 criminal misconduct; one of the things we know here
13 there is no question, there is no issue here of
14 criminal misconduct at all so we are talking about some
15 horse of a different color and we're sort of trying to
16 pin down what it is and you may know. You may be able
17 to describe the particular species involved that we're
18 having a problem with. Now the disciplinary process,
19 how does it work? How does it begin? Remember I had
20 some questions with Mr. Werts and we talked about
21 complaint and not and that sort of thing. And we here
22 that piece of paper, that notice of inquiry that was
23 given to Captain Ober it said that the Office of Chief
24 Counsel was "X'ed" out which is normally what goes on
25 the form and the Commissioner was put in there. Now Mr.
26 Werts had never seen a form, he wasn't used to that you

1 may know more about it. Well you may not I just want to
2 ask.
3          A:   I don't.
4          Q:   From your thirty-one years experience
5 how is a disciplinary, how is a disciplinary or the
6 disciplinary initiated within the Pennsylvania State
7 Police?
8          A:   Well there is no disciplinary
9 implemented until an investigation is conducted. That
10 investigation is if there is any allegation of wrong
11 doing that complaint is referred to the Bureau of
12 Professional Responsibility. It is either done by
13 having the complainant go directly to them or there is
14 a form that whoever receives that information can fill
15 out and forward to BPR. At that point BPR assigns an
16 investigator, either one of their own or asking a Troop
17 Command to assign an investigator to it. At that point
18 an investigation is conducted. When it's done to the
19 satisfaction of the people in BPR, it is the
20 investigation I guess is forwarded then to the
21 appropriate commander who makes adjudication. If
22 discipline is appropriate he issues the required paper
23 work and it then goes to a department disciplinary
24 officer and I guess he decides what the discipline is
25 supposed to be. That's a general overview and I
26 probably should not be anymore specific than that

1 because I don't, you know, I'm not that familiar with
2 it.
3          Q:   Well when you met with Commissioner
4 Evanko, regardless of any differences that anyone would
5 have with Commissioner Evanko about anything, no doubt
6 about his intelligence you'd agree with that?
7          A:   Absolutely.
8          Q:   He's a rather bright man. Now you had
9 meetings after this thing came up about Ober and Hickes
10 informing him late, what did he indicate what he
11 thought these guys might have done wrong, particularly
12 Mr. Ober? I mean we know they didn't tell him which is
13 personally offensive. I'm sure that was personally
14 offensive. But aside from that if indeed he even, I not
15 saying he indicated a personal feeling, what did these
16 guys so wrong? I mean what did Ober do wrong? What was
17 the problem?
18          A:   I don't know. Because you heard Major
19 Werts say we were not out looking to see if anybody did
20 anything wrong. We were out looking to see what all the
21 attending facts were. And then bring those facts to the
22 attention of the Commissioner and he could make his
23 decisions based on those, whatever he wants to decide.
24          Q:   So being sent to Washington was not a
25 punishment, at least to your knowledge correct?
26          A:   It certainly was not motivated from my

SHEET 36  PAGE 141

1 part that way.

2    Q:    Being removed from PEMA or not permitted
3 to get back on PEMA or not being able to participate on
4 PEMA regardless of what the underlying scenario is, you
5 said you don't know.

6    A:    And I don't know truly.

7    Q:    And you don't know but to the best of
8 your knowledge and belief that was not a punishment for
9 him?

10    A:    Well I can't comment because I don't
11 know. I don't know what the circumstances are.

12    Q:    All right IIMS, being removed from it,
13 not being allowed to participate in it was not any kind
14 of a punishment or discipline in any way right?

15    A:    I don't know. I had nothing to do with
16 that.

17    Q:    Being assigned to LCE was not a
18 punishment or discipline in anyway?

19    A:    No from my understanding that was a
20 required move.

21    Q:    Young was a Captain when he was sent out
22 to Washington right?

23    A:    I'm not sure. You had said earlier he
24 was a Lieutenant.

25    Q:    I thought he was and by all means if you
26 recollect its what you said counts.

PAGE 142

1    A:    I don't. I don't know. I could stand to
2 be corrected. He could have been a Lieutenant; he could
3 have been a Captain. I don't remember when he went.

4    Q:    Washington and being disallowed the
5 training down there was not retaliation or punishment
6 right?

7    A:    What Washington DC?

8    Q:    The training for the Alcoholic
9 Symposium, now he was at LCE and they had done that
10 training and they continued again but he was disallowed

11    A:    No

12    Q:    You don't remember that

13    A:    I just don't remember, I just don't
14 remember the circumstances.

15    Q:    Being, he was not investigated, you
16 agreed he was not investigated because there was a
17 desire to teach him a lesson, get back at him, or
18 stigmatize him right?

19    A:    I'm sorry.

20    Q:    Investigating Captain Ober of
21 investigating whatever polite euphemism is used to
22 describe it, the investigation or inquiry into the
23 affairs or the conduct of Captain Ober in regards to
24 the FBI probe was not done to stigmatize Captain Ober
25 in any way. Correct sir.

26    A:    That's my understanding that was just to

PAGE 143

1 find the facts. Those were my instructions and let's
2 find out what they are and report them back to the
3 Commissioner.

4    Q:    Now out of those facts did somebody come
5 up with the recommendation that the regulations of the
6 Pennsylvania State Police did not address the need for
7 some sort of regulation defining the Chain of Command
8 and what somebody is supposed to do when they learn
9 something or what ever?

10    A:    I have no idea sir. I'm sorry.

11    Q:    Colonel let me ask you about that last
12 thing just one, a couple of questions. On the, is there
13 a Chain of Command regulation?

14    A:    I don't know that.

15    Q:    See I've never seen that even in the
16 army.

17    A:    I'm not sure I have either but I don't
18 know that's sort of the way I was raised in the
19 department you know.

20    Q:    Yeah I know, I understand it's the way
21 you were sort of raised but do you know any military
22 organization or police organization that has a strict
23 Chain of Command regulation?

24    A:    I don't. I don't know.

25    Q:    Do you know whether accreditation with
26 the national or any national organizations require a

PAGE 144

1 Chain of Command regulation?

2    A:    I don't know.

3    Q:    Do you think there should be a Chain of
4 Command regulation that says to an underling out there
5 you shall only report to you immediate superior and
6 shall not talk to anybody else about a matter of
7 importance, and Lord knows I don't know how you're
8 supposed to decide these things but do you think
9 something like that is a good idea?

10    A:    No I don't think so.

11    Q:    Neither do I. Regulation AR, is it one
12 point one, zero two?  Is it one point one, zero two "C"
13 am I saying that right? One point one zero two "C". Are
14 you familiar with that?

15    A:    No if I could read it perhaps.

16    Q:    No that's okay I don't want, that's not
17 fair to you. You've been retired since July?

18    A:    2000? A year and a half ago.

19    Q:    No that's all right. Do you know whether
20 he, Darrell was removed from the Centennial Book
21 Committee as a you know, who removed him from there and
22 why that was done?

23    A:    I'm sorry I don't know; no knowledge of
24 that.

25    Q:    Do you know whether in September of 1999
26 Mr. Connelly barred Ober from attending an internal

SHEET 37   PAGE 145

1  affairs division meeting?
2          A:  No knowledge.
3          Q:  Have you ever heard of that before?
4          A:  Didn't hear about it until just now.
5          Q:  Do you have a Trooper George Yorgue, I
6  don't know how they pronounce it, do that name mean
7  anything to you?
8          A:  No.
9          Q:  An internal affairs investigation where
10 Captain Brown had investigated a Trooper George Yorgue?
11         A:  No.
12         Q:  Doesn't it strike a responsive cord?
13         A:  No.
14         Q:  Now Captain Ober was where when the
15 decision was made on January 7, 2000 by the
16 Commissioner to send him to Washington? Where was he?
17 Where was he?
18         A:  I don't know. My only recollection is
19 that I was told that he was available. Where he was I
20 don't know. I know he was, he was in BPR and he was in
21 IIMS but which one and when, where I can't tell you
22 that.
23         Q:  Now he's internal affairs division,
24 Bureau of Professional Responsibility, what comes under
25 internal affairs division. Is the Bureau of
26 Professional Responsibility one Bureau that's one

PAGE 146

1  Bureau?
2          A:  Um-hmm.
3          Q:  How many other Bureaus are under IAD?
4          A:  Oh no BPR is a Bureau. IAD is a division
5  and there is another division. Systems and Process
6  Review.
7          Q:  Okay IAD if you're an IAD member and
8  again we have these things spread all over the record
9  and I don't want a judge getting confused reading this
10 stuff. In IAD, if you're in IAD, and BPR and IAD are
11 they the same thing?
12         A:  Yes.
13         Q:  Yes the same thing. Well Lieutenant John
14 Brown he get promoted to Captain when Bogar gets sent
15 out to Washington. Am I right or am I wrong on that?
16         A:  I don't know that.
17         END OF TAPE ONE - SIDE ONE
18         MR. BAILEY: Somebody told you Ober was
19 available. Do you remember who told you Ober was
20 available?
21         A:  It could have been Colonel Hickes, it
22 could have been Colonel Coury, and it could have been
23 colonel Evanko. I don't know.
24         Q:  Well hear this now it is February 14
25 Lieutenant David Young Bureau of Criminal is assigned
26 as special projects officer assisting the commander of

PAGE 147

1  area three. And the assignment of Captain Darrell Ober
2  as special projects officer assisting the commander of
3  area three is rescinded. Well now look here on January
4  7 it looks like Darrell Ober is Director in Internal
5  Affairs division, BPR? And then he is pulled out of
6  that, somebody else is put in and he is sent out there
7  to Washington and then that's rescinded so I wonder
8  what available meant. You don't know? If somebody said
9  he was available, you don't know what availability
10 meant?
11         A:  No I don't?
12         Q:  Now he is assigned to the Bureau of
13 Liquor Control Officer to a Lieutenant's position as
14 Central Section Commander Operations division and that
15 is on February 14 Department Directive form the
16 Commissioner, from the boss. The boss sent him to LCE.
17 Okay. Let me get one final check. Do you two have any
18 questions in there?
19         COUNSEL: I have.
20         MR. BAILEY: Why don't you go ahead and then
21 I'll step out with Darrell and maybe we'll be finished
22 up.
23         COUNSEL: You indicated Colonel Westcott that
24 you didn't have any independent recollection of turning
25 Captain Ober down for a PEMA assignment. Is that
26 correct?

PAGE 148

1          MR. BAILEY: Make it know for the record this
2  is Joanna Reynolds.
3          A:  No I don't.
4          Q:  And you indicated that you don't know
5  who, if anyone in the front office, meaning of the
6  defendants here Colonel Coury, Colonel Evanko would
7  have turned him down for a PEMA assignment if in fact
8  that happened. Is that correct?
9          A:  I don't know if any of those would have.
10         Q:  Do you know then if anyone was seeking
11 to punish him by turning him down for a PEMA
12 assignment? If you don't know who did it would you have
13 any knowledge as to why?
14         A:  What the motivation was? No.
15         COUNSEL: I think that's all I have.
16         MR. BAILEY: Okay can we hold off for, in fact
17 leave the equipment on because I think it's going to
18 take about ten seconds. And please don't talk among
19 yourselves; it's not worth shutting all this down when
20 it's going to take about ten seconds.
21         MR. BAILEY: Colonel Westcott I'd like to
22 express my appreciation for you coming here today and
23 answering questions. I understand you have quite a
24 drive. I think I could probably go on for another hour
25 or hour and a half but I think we're okay. It's four
26 o'clock and I know you wanted to get somewhere so you

SHEET 38   PAGE 149

1  have some daylight. Thank you very much. I appreciated
2  your cooperation sir.
3          A:   Not a problem sir.
4          Q:   **Thank you sir.**
5          MS. LYDE: Should I shut this down?
6          MR. BAILEY: Yes.
7          MS. LYDE: It's 4:04 PM. The deposition of
8  Joseph Westcott is completed. Thank you.
9              -----END OF TAPE-----

P.R. VIDEO, INC

## $

**$50** [2] 68:6 104:25

## 1

**1** [1] 118:19
**1:35** [1] 2:10
**1;cv-01-0084** [1] 2:9
**10** [1] 123:4
**100%** [2] 57:4 93:23
**11** [1] 118:20
**120%** [2] 57:2 93:21
**14** [2] 146:24 147:15
**15** [1] 9:7
**17101** [1] 1:25
**17110** [1] 1:22
**17112** [1] 2:5
**182** [2] 27:4,5
**19** [1] 116:20
**1995** [3] 49:8 86:1 119:13
**1999** [2] 116:13 144:25

## 2

**2000** [4] 6:20 123:4 144:18 145:15
**2001** [1] 1:16
**2002** [2] 2:10 130:26
**29** [1] 116:21
**2nd** [1] 12:17

## 3

**3:32** [1] 130:22
**3:38** [1] 130:26
**31** [1] 116:13
**333** [1] 1:24

## 4

**4:04** [1] 149:7
**4310** [1] 2:4
**4311** [1] 1:21

## 6

**6th** [1] 1:21

## 7

**7** [6] 1:16 2:10 6:20 130:26 145:15 147:4

## A

**abilities** [10] 44:12 57:1,2,13,14 81:5 93:20,21 94:6,7
**able** [7] 25 38:11 75:4 138:16 141:3
**above** [1] 117:13
**absolutely** [6] 44:8 58:8 81:1 95:1 136:21 140:7
**academy** [5] 17:6 67:20,25 104:13, 18
**access** [2] 40:4 76:23
**accident** [2] 29:8,16
**accomplished** [2] 41:15 78:8
**accordingly** [1] 12:3
**accreditation** [1] 143:25
**accurate** [1] 114:19
**accurately** [2] 46:3 82:22
**acknowledge** [2] 71:1 107:20
**acquaintances** [2] 51:24 88:17
**acquire** [1] 3:19
**acquiring** [1] 3:24

**acronym** [2] 67:17 104:10
**across** [1] 124:17
**act** [1] 14:8
**acting** [1] 115:1
**action** [2] 3:1 132:18
**activated** [3] 120:15 124:13,15
**actually** [12] 12:21 55:20 62:17 73: 21 92:13 99:10 110:14 121:17 130:15
**add** [3] 44:9 81:2 122:12
**added** [2] 37:24 74:17
**addition** [2] 68:15 105:8
**address** [2] 4:7 47:19 84:12 143:6
**addressed** [2] 41:6 77:25
**adjudication** [1] 139:21
**administration** [1] 13:2
**administrative** [7] 57:2,14 93:21 94:7 113:25 114:1 138:1
**admire** [1] 133:23
**admit** [2] 39:9 76:2
**admits** [1] 34:4
**advanced** [2] 59:20 96:13
**advice** [3] 38:10 75:3 113:3
**advise** [10] 7:18,25 11:3 12:3 33: 24,25,26 35:15,15,21
**advised** [2] 2:2 10:1 113:6 129:18 130:24
**advisory** [1] 124:16
**affairs** [8] 67:1 103:20 142:23 145: 1,9,23,25 147:5
**affect** [2] 39:24 76:17
**affirmative** [2] 54:5 90:24
**afternoon** [2] 2:1 25:14
**agencies** [2] 67:26 104:19
**agency** [6] 20:7 120:3,4,4,6,12
**agent** [8] 52:12,15,16,22 89:5,8,9, 15
**ago** [4] 6:20 9:18,18 144:18
**agree** [9] 36:7 41:25 58:23 60:13 78:18 95:16 97:6 126:11 127:20 140:6
**agreed** [2] 24:10 142:16
**ahead** [3] 48:18 85:11 147:20
**air** [1] 27:8
**airplane** [1] 26:12
**airport** [1] 26:15
**al** [2] 1:14 2:9
**alcoholic** [2] 133:4 142:8
**allegation** [3] 51:26 88:19 139:10
**allegations** [2] 21:14 138:10
**allow** [1] 6:12
**allowed** [4] 5:24,25 118:3 141:13
**already** [10] 30:15 62:16,20 65:6 69:22 99:9,13 101:25 106:15 118: 14
**alright** [5] 4:7 11:5,2 30:21,21
**although** [2] 73:17 110:10
**ambition** [2] 49:10 86:3
**ambitious** [1] 127:13
**amended** [1] 11:8
**among** [1] 148:18
**amount** [2] 57:6 93:25
**amounts** [1] 29:4
**animosity** [2] 48:6 84:25
**another** [7] 119:16,19 129:6,7 135:

19 146:5 148:24
**answer** [23] 4:8 19:25 23:7 26:25 30:5,6 41:8 46:14 54:4 58:11,12 66:2 72:20 78:1 83:7 90:23 95:4,5 102:21 109:13 123:17 128:16 137: 12
**answered** [1] 118:14
**answering** [2] 35:2 148:23
**answers** [1] 4:4
**anxious** [1] 116:8
**anybody** [33] 10:9,23 15:22,23,26 16:2,4 19:11 21:20 22:18 34:1,19 42:23 52:15 66:20 68:12,13,14,15 71:10 79:16 89:8 103:13 105:5,6, 7,8 108:3 117:15,22 120:1 140:19 144:6
**anyway** [6] 11:1 41:10 68:18 78:3 105:11 141:18
**apined** [1] 32:4
**apologize** [3] 30:7 69:9 106:2
**apparently** [7] 16:6 17:7 39:4 75: 23 123:25 124:4 130:10
**appearances** [1] 1:19
**appeared** [1] 123:5
**applied** [1] 122:13
**applying** [1] 122:24
**appointed** [5] 30:13,13 49:13 86:6 126:17
**appreciate** [4] 47:19 84:12 130:9, 9
**appreciated** [1] 149:1
**appreciation** [1] 148:22
**apprehension** [1] 10:4
**approach** [1] 125:6
**appropriate** [4] 10:22 12:8 139:21, 22
**approved** [4] 40:8 77:1 133:19,25
**approving** [1] 133:3
**ar** [2] 118:19 144:11
**aradasheet** [1] 5:25
**area** [54] 7:4,16,20,21,25 8:2,3 9: 11,24 10:14 11:1 12:2 18:10 32: 12 35:18 47:4 55:21 56:11 58:16 60:3 61:6,9 62:3 63:8 64:26 65:15 66:24 69:21 70:2 73:17 83:23 92: 14 93:4 95:9 96:22 97:25 98:2,22 100:1 101:19 102:8 103:17 106: 14,21 110:10 120:25 125:3,23 136:13,20,23,25 147:1,3
**areas** [3] 18:12,13 121:16
**argue** [1] 123:13
**arizona** [1] 25:13
**army** [8] 8:25,26 12:16 32:24 33:1, 8,9 143:16
**around** [7] 2:23 70:16 107:9 112: 19 116:9,24 125:1
**arrangements** [1] 3:23
**arrested** [1] 116:22
**article** [2] 9:7 123:5
**articulate** [2] 44:7 80:25
**aside** [15] 42:4 49:10 51:12 52:7, 14,26 53:8 78:23 86:3 88:5,26 89: 7,19 90:1 140:14
**asks** [3] 54:13 91:6 117:6
**aspect** [2] 65:25 102:18

**assign** [12] 7:8,11,14 10:4,9 18:16, 19 46:5 82:24 118:26 124:18 139: 17
**assigned** [46] 10:2 24:10 32:11 42: 13 43:14 49:5,6 54:19 56:4 61:3 66:16 67:8 68:1 69:23 70:8,10 79: 6 80:7 85:24,25 91:12 92:23 97: 22 103:9 104:1,20 106:16 107:1,3 117:26 119:3,3,18 120:21 121:2,8, 23,24 127:4 128:8 133:9 135:2,13 141:17 146:25 147:12
**assigning** [1] 118:22
**assignment** [21] 10:6 37:10 62:17 64:7 67:6 99:10 100:25 103:25 112:13,14 113:18 115:22 122:3, 10 125:3,18 136:19 147:1,25 148: 7,12
**assignments** [7] 55:25 59:25 70: 16 92:18 96:18 107:9 125:2
**assigns** [2] 134:18 139:15
**assist** [2] 10:5 56:1 92:20
**assistance** [1] 135:19
**assistant** [2] 49:20 86:13
**assisting** [2] 146:26 147:2
**associated** [1] 135:14
**association** [6] 55:20 56:2 61:1 66:16 92:13,21 97:20 103:9 120:3
**assume** [12] 5:1 8:13 11:9 20:1 25: 21,24 28:5 44:14 74:1 81:7 110: 20 111:14
**attend** [1] 133:3
**attending** [2] 140:21 144:26
**attention** [3] 7:18 123:26 140:22
**attorney** [5] 3:1,23 4:14 52:3 88: 22
**attorneys** [3] 11:15 127:1,16
**audio** [2] 2:2 3:18
**august** [1] 116:13
**authority** [4] 9:7 13:26 132:14 135: 6
**availability** [1] 147:9
**available** [21] 3:21 56:7 73:8,10, 11 92:26 110:1,3,4 112:10,11,12, 19,21 113:19,21 145:19 146:19,20 147:8,9
**avoid** [1] 137:15
**avoiding** [2] 137:1,1
**awards** [1] 17:6
**aware** [2] 22:26 124:21
**away** [11] 10:1 15:4 37:5 38:8 58:6, 7 59:3 75:1 96:24 107:21 146:20
**awful** [9] 33:9 61:4,4,5,5 97:23,23, 24,24
**axed** [1] 127:16

## B

**back** [36] 6:11 11:6 12:5 14:25 15: 4 16:23 17:7 27:22 31:5 33:1 34:2 35:19 42:14 44:21 47:16,16 55:1 56:22 69:16 79:7 81:14 84:9,9 91: 20 93:15 106:9 126:17,22,23 127: 12,15 131:3,3 141:3 142:17 143:2
**backed** [1] 59:3,3 95:22,22
**background** [5] 55:22 59:23 92: 15 96:16 125:26

P.R. VIDEO, INC

**bad** [1] 27:20
**badly** [2] 60:8 97:1
**bailey** [44] 1:20 2:23,24,24 3:7,14 4:7 5:5 6:5,11 34:26 35:3,6 37:13 48:18 59:2 70:20,22 71:3,17,20 74:6 85:11 95:21 107:13,15,22 108:10,13 110:25 111:4,7 127:20,23 128:6,20 130:24 131:2 146:18 147:20 148:1,16,21 149:6
**barbara** [2] 3:5 5:1
**barbra** [1] 3:5
**bare** [1] 33:2
**barred** [1] 144:26
**based** [8] 9:26 15:1 38:19 69:2 75:12 105:21 113:3 140:23
**bases** [2] 7:15 33:14
**bashful** [1] 4:12
**basically** [2] 11:13 22:14
**basis** [12] 21:8 28:4 38:22 42:21 47:3 48:5 51:23 75:15 79:14 83:22 84:24 88:16
**battalion** [2] 9:6 18:5
**bce** [4] 112:22,26 113:7 114:14
**bci** [6] 67:15,16 104:8,9 135:21
**become** [6] 13:1 54:10 91:3 120:26 121:1 122:24
**becoming** [4] 49:11,12 86:4,5
**begin** [4] 3:15 4:25 34:5 138:19
**beginning** [2] 55:16 92:9
**behalf** [2] 49:15 86:8
**behave** [2] 2:11 3:9
**belief** [1] 141:8
**believe** [17] 24:16 25:12,14 39:6, 13 43:19 46:23 61:24 75:25 76:6 80:12 83:16 98:17 114:17 115:16 133:11,24
**below** [1] 117:23
**benefit** [2] 60:11 97:4
**besides** [1] 117:15
**beso** [6] 121:3,12,21 122:20 124:6,7
**best** [10] 8:24 14:6 45:8 53:14 56:10 82:1 90:7 93:3 138:7 141:7
**better** [4] 4:19 27:21 38:20 75:13
**between** [15] 12:12 32:7 55:25 61:5,6 66:3,12,13 92:18 97:24,25 102:22 103:5,6 112:21
**bicentennial** [1] 131:8
**big** [2] 49:21 86:14
**bit** [11] 6:6,8 16:22 25:18,19 31:9 55:2 91:21 119:23 126:4 129:13
**bitter** [1] 20:12
**blah** [6] 48:24,24,24 85:17,17,17
**blow** [1] 9:11
**bogar** [1] 146:14
**book** [2] 131:8 144:20
**bore** [2] 137:14,15
**borrowed** [1] 112:13
**boss** [3] 118:4 147:16,16
**both** [7] 44:5 47:24 55:5 80:23 84:17 91:24 136:10
**bottom** [1] 35:9
**box** [1] 137:13
**boy** [2] 43:9 80:2
**bpr** [25] 9:10 10:12,15,16,23,26 11:

---

4 32:11 55:25 66:13 92:18 103:6 134:22 135:18 136:22 137:1,3,9 139:15,15,19 145:20 146:4,10 147:5
**break** [1] 9:17
**breaks** [2] 48:15 85:8
**brief** [3] 6:26 61:7 97:26
**briefed** [1] 28:15
**brigade** [1] 9:1
**bright** [1] 140:8
**bring** [2] 61:7 97:26 136:8 140:21
**brothers** [1] 19:6
**brought** [5] 4:8 7:17 70:18 107:11
**brown** [6] 23:12,14,16,24 145:10 146:14
**bts** [1] 132:16
**building** [1] 120:14
**bureau** [28] 7:5,5 29:24 35:23 36:6 37:15 67:8,18 74:8 104:1,11 116:13 120:24 121:3 128:15 132:10, 11 133:20 135:7,19 139:11 145:24,25,26 146:1,4,25 147:12
**bureaus** [7] 5:7 63:6 99:25 118:9 146:3
**business** [2] 12:12 33:6
**busy** [1] 124:1
**buy** [1] 5:21
**bypassed** [4] 70:5,13 106:24 107:6

---

## C

**cadet** [3] 37:10 40:9 77:2
**california** [6] 55:4,5 73:16 91:23, 24 110:9
**call** [23] 6:13 9:6,10,10 10:16 16:8, 9 19:6 20:14 22:7 27:24 53:23 57:20 62:25 63:25 90:16 94:13 99:18 100:18 120:13 124:14 136:10,11
**called** [9] 15:12 16:7 17:16 22:21 27:23 50:15 63:21 87:8 100:14
**calls** [1] 13:14
**cambell** [1] 1:10
**came** [14] 7 23:8 29:5 32:12 35:16 39:20,20,20 42:14 44:21 69:1, 16 76:13,13,13 79:7 81:14 105:20 106:9 120:23,25 124:17 132:1 137:16 140:9
**campbell** [16] 48:26 49:1,3,4,18 50:1,4,8 85:19,20,22,23 86:11,20, 23 87:1
**campbell's** [2] 50:11 87:4
**cannot** [1] 123:19
**capacity** [2] 7:1,8
**captain** [111] 15:3,14,20 16:18 18:1 19:12 21:18,23,24 23:24 34:11, 22 35:9,11,16,26 36:1,2,5 37:5,6, 16 38:19 39:9,23 40:1,5 41:5 42:22 43:14 55:24 56:7,13,15,17,19, 22,24,26 57:1 59:23 60:15 62:16 63:3,11,14,21,23,24,25 69:9 72:8, 10 73:1,5 74:9 75:12 76:2,16,20, 24 77:24 79:15 80:7 82:7,26,9 93: 6,8,10,12,15,17,19,20 96:16 97:8 99:9,22 100:4,7,14,16,17,18 106:2 109:1,3,20,24 115:16 116:16 117:

---

13 118:12 119:18 121:21 122:2,9, 21 127:4 128:7 138:23 141:21 142:3,20,23,24 145:10,14 146:14 147:1,25
**captain's** [4] 62:18 99:11 115:6,11
**captains** [1] 118:22
**caption** [1] 2:8
**car** [2] 27:9,13
**care** [5] 20:11 24:20 26:3,5 124:6
**career** [13] 59:16,19 61:13 63:6 65:6 96:9,12 98:6 99:25 101:25 113:15 115:21,23
**careers** [2] 48:12 85:5
**careful** [5] 14:5,6,10 55:3 91:22
**cars** [1] 36:9
**case** [18] 5:9 8:10 11:8 13:18 37:1, 23,25 38:5 58:24 70:5 74:16,18, 21 95:17 106:24 135:13,15 136:2
**cause** [5] 6:21 10:1 15:4 19:26 25:25 34:13
**cell** [7] 36:8 120:14,16 122:24 124:13,14 127:4
**cells** [3] 120:15 121:18,19
**centennial** [1] 144:20
**central** [1] 147:14
**certain** [6] 37:24 46:5 47:2 74:17 82:24 83:21
**certainly** [23] 6:1 7:24 12:11,13 13:8 18:7,9 26:10 28:3 46:7 47:8 52:10 59:25 82:26 84:1 89:3 96:18 120:12 128:4 129:25 134:7 135:17 140:26
**certainty** [1] 22:5
**chain** [12] 7:22 11:19,26 12:3,4,5, 15 13:23 14:13 17:25 18:2,3,6 29:21 30:2,18 31:11,12,23 32:9,15,18, 22,23 33:15,16,20,22 34:3 35:12 37:24 50:12 65:2 70:13,25 71:2 74:17 87:5 101:21 107:6,18,21 111:16,26 143:7,13,23 144:1,3
**chains** [1] 18:13
**chairmen** [1] 12:22
**chance** [1] 4:7
**change** [5] 5:12 40:16 77:9 119:23 130:21
**changed** [1] 121:14
**channels** [2] 72:23 109:16
**charge** [7] 13:22 14:3 18:9 32:10 119:13 120:8 124:7
**chastise** [1] 116:13
**check** [11] 2:22 20:15 26:12 41:10 46:25 73:17 78:3 83:18 110:10 134:10 147:17
**checked** [1] 26:10
**checking** [1] 83:18
**chief** [4] 3:5 49:20 86:13 138:23
**chiefs** [1] 12:22
**chosen** [5] 45:24 46:3 68:20 82:17, 22 105:13
**christianson** [2] 132:7,9
**circumstances** [18] 14:7 15:10 19:13 21:2,2 29:3,17 38:16,20,25 43:10 73:7 74:9 77:18 80:3 109:26 117:25 141:11 142:14
**clarification** [1] 9:17

---

**clarify** [11] 56:23 57:11 72:6 93:16 94:4 108:25 121:11 122:12 123:19 127:26 128:4
**class** [2] 40:9 77:2
**clear** [7] 37:22 71:18,23 74:15 108:11,16 122:7
**cleared** [1] 16:11
**clearly** [1] 30:10
**close** [1] 6:9
**closer** [7] 6:8 55:14,17,17 92:7,10, 10
**co-councilmen's** [1] 3:6
**collage** [1] 133:17
**collar** [1] 118:1
**colleagues** [2] 48:9 85:2
**collecting** [1] 131:15
**college** [2] 55:21 92:14
**colonel** [47] 38:9 40:21,25 41:2 42:17,20 43:6,7,15,23 45:8,15,16,16, 21 46:17,17 47:20,23 48:19,22 49:15 50:3,7,11,26 51:3,5,21 52:3,19 68:14 70:2,20 71:24 73:13 75:2 77:14,18,21 79:10,13,25,26 80:8, 16 82:1,8,9,14 83:10,10 84:13, 16 85:12,15 86:8,22,26 87:4,19,22, 24 88:14,22 89:12 105:7 106:21 107:13 108:17 110:6,26 113:11, 12 121:15,19 124:25 125:20 130: 12,12 131:2,21 132:1,12 137:16, 19,26 138:1 143:11 146:21,22,23 147:23 148:6,6,21
**color** [1] 138:15
**combat** [2] 12:18,20
**come** [37] 3:18,20 5:22,24 12:23 16:6 27:25 30:16,19 31:4 34:2 39: 15 43:4 47:16 54:19 55:21 56:14 61:11 76:8 79:23 84:9 91:12 92: 14 93:7 98:4 120:22 121:5,13,16 124:26 125:13 131:24 134:21 135: 7 136:14,22 143:4
**comes** [10] 41:19 47:16 78:12 84:9 111:21 125:3,23 132:12 135:8 145:24
**coming** [11] 35:4 55:10 60:15 69:4 72:23 92:3 97:8 105:23 109:16 135:26 148:22
**command** [58] 7:4,22 9:24 11:20, 26 12:2,3,4,5,15,24 13:23 14:14, 16 17:25 18:2,3,6 29:21 30:2,18 31:11,12,23 32:9,16,18,22,24 33: 15,16,20,23 32:9,16,18,22,24 33: 3 70:13,26 71:2 74:17 87:5 101: 22 107:6,19,21 111:16,26 120:22, 25 125:4 136:13 139:17 143:7,13, 23 144:1,4
**commander** [35] 7:20,23,25 8:1,3, 3 9:2,4,4,6,11 10:14,14 12:17 13: 11,21,21 55:15 56:3 60:1,3 63:8 73:18 92:8,22 96:20,22 100:1 110: 11 115:15 124:13 139:21 146:26 147:2,14
**commander's** [2] 115:18 118:23
**commanders** [7] 7:21 12:13 47:5 56:11 83:24 93:4 116:8 118:15 136:23,25

P.R. VIDEO, INC

**commands** [13] 7:4,16,16 18:13 61:6,6 69:22,22 97:25,25 106:15, 15 118:17
**comment** [3] 11:17 30:25 141:10
**commissioner** [96] 6:25 15:15 16: 19,25 17:14,17 18:25 19:2 22:11, 23,24 23:2,18,21 24:1,5 27:24 28: 14 29:20 30:3 31:6,8,8 32:10 40: 20,20 42:12 44:16 49:5,7,13 54: 24 56:16 59:3,15 61:15,16,22 64: 19 66:9 71:9,15 72:12,17 73:13, 23 77:13,13 79:5 81:9 85:24,26 86:6 91:17 93:9 95:22 96:8 98:8,9, 15 101:12 103:2 108:2,8 109:5,10 110:6,16 111:13,15 112:25 113:1, 6 117:5 118:25 121:14 125:16 130:13 135:5 138:25 140:3,5,22 143:3 145:16 147:16
**commissioner's** [2] 23:9 126:15
**commissioners** [7] 18:11 54:12, 21 73:24 91:5,14 110:17
**committee** [4] 68:2 104:21 131:8 144:21
**common** [2] 35:7 137:18
**commonwealth** [2] 58:24 95:17
**communicated** [2] 69:1 105:20
**company** [1] 5:20
**comparable** [1] 118:11
**competent** [4] 45:23,25 82:16,18
**complain** [4] 70:4 71:10 106:23 108:3
**complainant** [2] 10:11 139:13
**complaint** [14] 10:9,12 11:8,10,14 15:8 51:26 52:1,7 88:19,20,26 138:21 139:11
**complaints** [1] 10:10
**complete** [4] 20:18 31:5 41:1 77: 20
**completed** [4] 23:4 31:4 137:10 149:8
**completely** [4] 4:8,22 22:12 137:1
**computerization** [2] 65:26 102: 19
**computers** [1] 132:13
**concern** [2] 73:1 109:20
**concerned** [5] 18:3 20:24,26 70: 12 107:5
**concerns** [3] 33:25 133:10 137:13
**conclusion** [3] 30:3,16,20
**conduct** [1] 142:23
**conducted** [3] 10:26 139:9,18
**conducting** [1] 15:20
**conel** [34] 6:13,14,16 9:2 11:2 12:8 13:14,17 15:12,14,16,21 16:18 18: 1 19:13 21:19,23,24 22:7,7,8,23 25:22 27:23,23 29:23 30:4,24 32: 9,12 34:14 35:20,22 36:4
**conels** [1] 11:22
**conely** [3] 30:24 32:6,7
**conference** [8] 24:20 26:3,5 66: 17 73:19 103:10 110:12 134:1
**confide** [2] 48:1 84:20
**confidence** [1] 20:1
**confidential** [3] 21:25 43:5 79:24
**conflict** [1] 13:11

**confused** [8] 31:10 34:6 72:7 108: 26 112:1 129:12 130:7 146:9
**confusion** [3] 4:15 34:17 129:21
**conley** [1] 1:12
**connection** [4] 50:19,20 87:12,13
**connections** [2] 49:25 86:18
**connelly** [6] 45:9 66:26 82:2 103: 19 136:10 144:26
**considered** [5] 36:24 55:26 56:17 92:19 93:10
**consistent** [2] 129:20 130:6
**consult** [2] 38:10 75:3
**consulted** [5] 30:2 61:26 64:14 98: 19 101:7
**contact** [3] 11:4 52:4 88:23
**contacted** [10] 45:17 52:9,10,16, 20 82:10 89:2,3,9,13
**continued** [1] 142:10
**contracted** [1] 2:5
**control** [3] 7:6 114:5 147:13
**controlled** [1] 12:21
**convention** [12] 55:8,10,19 56:4 58:5 68:3 92:1,3,12,23 94:24 104: 22
**conversation** [11] 15:13 17:5,7,10 19:9 47:7 48:23 83:26 85:16 116: 9 119:8
**conversations** [7] 49:26 50:4 66: 25 86:19,23 103:18 119:6
**conversed** [4] 51:9 72:18 88:2 109:11
**cooperation** [1] 149:2
**coordinating** [2] 61:5 97:24
**copy** [4] 3:19 5:23,23 11:14
**cord** [1] 145:12
**corey** [2] 15:12,16
**corneal** [1] 3:15
**corporal** [2] 118:2,3
**corporals** [1] 118:4
**correct** [53] 6:18 11:19 14:20,23, 24 15:8 20:8 22:11,16,17 25:6 28: 21 30:24,26 31:21,22 39:21 40:3 43:17 51:19 58:1 59:10 62:2 72: 25 73:19,20,25 76:14,22 80:10 88: 12 94:20 96:3 98:21 109:18 110: 12,13,18 111:23 112:2,16,17 113: 5 118:16,17,18 120:9 125:11 126: 5 140:25 142:25 147:26 148:8
**corrected** [2] 32:25 142:2
**correction** [1] 5:14
**corrections** [1] 9:26
**corruption** [7] 21:15 36:12 50:19 87:12 134:13 135:13 136:2
**couldn't** [5] 9:2 20:14 39:24 76:17 125:14
**counsel** [24] 3:6 5:5,17 48:14,17 58:21 70:17,24 71:21 85:7,10 95: 14 107:10,17 108:14 111:3,5 127: 18,21 128:19 138:24 147:19,23 148:15
**counsel's** [1] 35:8
**counter** [1] 14:8
**countless** [1] 33:14
**counts** [1] 141:26
**couple** [4] 4:16 9:16 15:5 33:10

**62:**26 99:19 143:12
**course** [10] 7:18 9:14 44:5 45:15 46:21 47:2 80:23 82:8 83:14,21
**court** [12] 1:1 2:7 58:17,18,23,26 59:1 95:10,11,16,19,20
**coury** [29] 1:10 11:2 22:8,21,23,25 24:2 27:23 29:23 30:24 32:6,8,9 35:22 40:19 45:16 46:17 50:26 77: 12 82:9 83:10 87:19 113:11 125: 20 130:12 131:22 132:1 146:22 148:6
**coury's** [1] 132:12
**credibility** [2] 66:4 102:23
**credit** [2] 44:19 81:12
**crime** [6] 67:9 104:2 118:1 134:19 135:3,14
**criminal** [12] 7:5 10:3 67:9,18 104: 2,11 135:7,12 138:10,12,14 146: 25
**cristi** [3] 3:5,5 5:1
**crop** [1] 26:26
**crystal** [3] 2:1,3,18
**culdesac** [1] 22:14
**curious** [1] 116:21
**cush** [22] 52:12,16,22,25,26 53:6,9, 11,15,20 54:1 89:5,9,15,18,19,25 90:2,4,8,13,20
**customs** [2] 38:6 74:24
**cystal** [1] 2:22

# D

**d.c** [1] 133:4
**daily** [5] 7:15 47:3,4 83:22,23
**dangling** [1] 18:16
**darrel** [2] 2:12
**darrell** [10] 1:3 2:8 3:2 57:12 94:5 123:20 144:20 147:1,4,21
**date** [6] 1:16 2:10 48:24 60:16 85: 17 97:9
**dates** [3] 25:26,26 26:2
**david** [1] 146:25
**davis** [1] 121:21
**day** [28] 8:13,14 17:3 18:24 20:22 24:1,19 28:14,15 30:5,23 51:1,1,2, 2,4,4 70:21,23 87:20,20,21,21,23, 23 107:16 123:4 125:14
**daylight** [1] 149:1
**days** [10] 5:10 25:21,22 28:17 50: 26 62:26 68:7 87:19 99:19 104:26
**dc** [1] 142:7
**deal** [8] 57:13 64:21 70:3 94:6 101: 14 106:22
**dealt** [3] 7:21 48:5 84:24
**death** [2] 137:14,15
**decide** [2] 140:23 144:8
**decided** [4] 9:23 18:26 66:9 103:2
**decides** [2] 117:5 139:24
**decision** [6] 73:22,24,26 110:15, 17,19 126:17 145:15
**decisions** [1] 140:23
**deduce** [1] 17:21
**defeat** [1] 123:6
**defendant** [2] 1:23 11:9,25
**defendants** [4] 1:15 3:4,10 148:6
**defined** [1] 126:13

**defining** [1] 143:7
**denied** [1] 129:1
**department** [21] 7:3 36:25 37:1, 18 55:6 56:18 59:24 65:25,26 74: 11 91:25 93:11 96:17 102:18,19 119:7 132:24 137:8 139:23 143: 19 147:15
**departments** [3] 66:4 102:23 126: 14
**depended** [1] 14:12
**depending** [2] 43:10 80:3
**depends** [1] 20:22
**depops** [1] 135:8
**deposition** [16] 1:17 2:6,11 3:17, 21 4:11 5:3,11,15,15,19,19 6:2 131:1 137:11 149:7
**depositions** [2] 58:23 95:16
**deputy** [11] 6:24 18:11 32:10 49:5, 6,13 85:24,25 86:6 112:13 135:5
**describe** [2] 138:17 142:22
**described** [1] 113:22
**desire** [2] 67:1 103:20 142:17
**desk** [2] 124:18 125:8
**detach** [1] 132:15
**detached** [1] 112:15
**details** [2] 60:26 97:19
**determined** [4] 44:26 81:19
**developed** [2] 48:11 85:4
**device** [1] 130:25
**didn`t** [1] 110:25
**diego** [11] 55:4,6,11 60:12 69:2,17, 19 91:23,25 92:4 97:5 105:21 106: 10,12
**difference** [2] 32:7 35:14,14
**differences** [1] 140:4
**different** [4] 14:15 38:13 75:6 138: 15
**difficulty** [2] 57:6 93:25
**dig** [2] 52:1 88:20
**direct** [4] 10:15 12:13 32:15,18
**direction** [4] 40:16 61:22 77:9 98: 15
**directive** [1] 147:15
**directly** [3] 59:26 96:19 139:13
**director** [13] 10:3 29:24 35:23 36: 6 37:16 51:14,22 57:3 74:9 88:7, 15 93:22 147:4
**disagreement** [1] 5:14
**disallowed** [2] 142:4,10
**disciplinary** [8] 9:3 138:8,18 139: 5,5,6,8,23
**discipline** [5] 9:5 139:22,24 141: 14,18
**discus** [2] 7:23,24
**discuss** [15] 28:1 46:18 48:19 55: 11 56:14,15 61:16 83:11 85:12 92: 4 93:7,8 98:9 112:4,6
**discussed** [3] 66:20 103:13 123:6
**discussion** [9] 12:12 18:25 40:24 47:20 61:14 77:17 84:13 98:7 132: 2
**discussions** [5] 50:8 87:1 114:12 125:10 131:21 132:1
**dislike** [2] 57:12 94:5
**disregard** [2] 38:9 75:2

P.R. VIDEO, INC

15 54:11 61:3 62:12 64:2 65:14 73:5,6 76:4,7,10 82:21 87:17 89:8 91:4 97:22 99:5 100:20 102:7 109:24,25 137:9 138:5,17
**involvement** [1] 124:5,11 131:10
**isn't** [3] 14:20 18:6 32:21
**issue** [11] 4:17 17:14 18:3 28:19 37:25 70:18 74:18 107:11 116:17 132:2 138:13
**issues** [7] 15:7 28:4 37:23 40:6 74:16 76:25 139:22
**it.'** [1] 127:16
**it.you** [1] 117:21
**item** [1] 17:4

**J**

**j-u-s-t** [1] 16:24
**january** [6] 1:16 2:10 116:21 130:26 145:15 147:3
**jar** [2] 48:24 85:17
**joann** [2] 3:2 5:24
**joanna** [7] 1:13 3:3,3,13 34:24 35:1 148:2
**job** [14] 8:17 25:15 37:2 49:22 57:4 64:9 86:15 93:23 101:2 113:2 130:2 133:12,14 136:12
**jobs** [4] 8:20 66:12 103:5 112:21
**joe** [1] 9:11
**john** [1] 146:13
**joint** [1] 12:22
**joseph** [8] 1:11,18 2:13,16 6:10 130:22 131:1 149:8
**judge** [7] 38:1 51:22 59:11 74:19 88:15 96:4 146:9
**july** [2] 6:20 144:17
**jump** [1] 127:17
**jurisdiction** [1] 126:12

**K**

**keep** [8] 4:1 21:25 33:1,26 43:5 57:8 79:24 94:1
**kicks** [1] 137:3
**kids** [2] 65:10 102:3
**kill** [1] 127:1
**kind** [16] 5:25 8:10 9:3 29:3 37:18 41:9 47:14 51:14 62:15 74:11 78:2 84:7 88:7 99:8 124:3 141:13
**kinds** [8] 37:17,17 64:10 66:25 74:10,10 101:3 103:18
**knowledge** [45] 15:21 16:7 21:11 37:11,19 40:17 41:5 42:24 45:1 50:16 60:11 69:2,3 70:9,11 71:11,13 74:12 77:10,24 79:17 81:20 87:9 97:4 105:21,22 107:2,4 108:4,6 121:8,17 122:1 123:15 125:4 130:1,3 135:23 137:7,18 140:25 141:8 144:23 145:2 148:13
**knowm** [1] 49:2
**known** [15] 34:10 38:20,21 39:23, 26 49:4 63:11 75:13,14 76:16,19, 20 85:21,23 100:4
**knows** [4] 34:12 46:14 83:7 144:7
**koselnik** [4] 116:5 122:18 133:2, 19

**L**

**l-y-d-e** [1] 2:3
**lack** [1] 129:16
**lacking** [1] 114:1
**ladies** [1] 2:1
**lady** [1] 5:8
**lands** [2] 60:20 97:13
**large** [3] 8:14 48:9 85:2
**last** [1] 143:11
**late** [1] 140:10
**later** [3] 2:14 136:7
**launching** [1] 8:19
**law** [6] 7:6 8:11 20:7 51:17 88:10 135:20
**lawful** [2] 14:1,2
**lawyer** [1] 35:7
**lawyers** [4] 53:3,4 89:22,23
**lce** [18] 113:15 114:10,14,15,24 117:1 118:17,26 119:3 121:24 132:6,14,22 133:9,13 141:17 142:9 147:16
**le** [2] 56:23 93:16
**lead** [2] 20:23 22:13
**leader** [2] 12:18,20
**learn** [15] 11:11 50:17,22 54:23 59:2 63:9 87:10,15 91:16 95:21 100:2 111:11 119:2 143:8
**learned** [10] 15:6 46:10 47:9 72:1,7 83:3 84:2 108:20,26 111:14
**least** [8] 11:6 20:2 59:5 61:11 95:24 98:4 136:11 140:25
**leave** [5] 24:19,20 114:18 130:12 148:17
**leaving** [1] 25:12
**left** [4] 23:10 67:23 104:16 115:14
**legal** [4] 62:5,9 98:24 99:2
**legislature** [2] 39:14 76:7
**lesser** [1] 18:8
**lesson** [1] 142:17
**lets'** [3] 40:17 77:10 127:7
**letter** [1] 125:7
**letting** [1] 127:1
**level** [2] 18:5 128:15
**levels** [1] 14:15
**liaison** [1] 120:13
**lieutenant** [25] 12:8,17 21:19 22:7,8 34:14 35:20 63:12 64:6 70:22 100:5,24 107:15 114:26 115:13, 14,15 116:11,12 117:2 120:7 141:24 142:2 146:13,25
**lieutenant's** [1] 147:13
**lieutenants** [4] 116:22 117:3,12 118:16
**lieutenants'** [1] 115:19
**likes** [1] 34:12
**limited** [4] 8:24 9:6 38:12 75:5
**line** [3] 5:12 16:17 35:9
**linked** [1] 136:22
**liquor** [3] 7:6 114:5 147:13
**list** [14] 44:9 45:3,4 81:2,22,23 116:18 117:1,7
**listed** [2] 52:25 89:18
**listen** [5] 8:7 10:16 11:2 72:6 108:25
**listening** [4] 31:16 36:11 41:13 78:6

**litigation** [2] 58:25 95:18
**little** [12] 6:6,8 16:22 18:26 31:9 34:8 55:2 91:21 119:23 126:4 129:13 131:6
**live** [1] 9:24
**local** [1] 123:5
**long** [10] 27:9 44:20,23 49:2 70:23 81:13,16 85:21 107:16 119:12
**longer** [1] 113:17
**look** [14] 8:4,6,9 29:6 30:1 31:4 36:21,22 68:21 72:22 105:14 109:15 116:26 147:3
**looked** [4] 36:2 38:24 75:17 117:7
**looking** [9] 16:10 28:11 44:26 81:19 114:23 115:12 134:14 140:19, 20
**looks** [1] 147:4
**loose** [1] 8:16
**lord** [1] 144:7
**lost** [2] 128:17,19
**lot** [18] 8:15 12:9 20:9 27:15 28:9 40:4,5 59:24 61:4,5 63:6 76:23,24 96:17 97:23,24 99:25 122:7
**lots** [1] 20:12
**louie** [6] 51:7,8,13 52:4 87:26 88:1, 6,23
**lt** [7] 38:9 70:18,20 75:2 107:11,13 137:16
**lyde** [8] 2:1,3,18,22 130:21,26 149:5,7
**lying** [1] 29:22

**M**

**made** [25] 11:17 16:4 24:8 30:25 46:25 52:1 59:15 70:1 71:20,22, 23 72:4 73:22 83:18 88:20 96:8 106:20 108:13,15,16,23 110:15 113:11 114:22 145:15
**maintain** [4] 51:14,16 88:7,9
**major** [68] 4:10 15:2 23:3,4 24:9,9, 13,14 25:20 30:24 32:20 36:7 37:23,25 41:13,16,24 42:5,9,9,15,15 43:13,13 45:8,9 53:17 55:4,11 56:1,2,6,20 60:4 66:26 69:15 74:16, 18 78:6,9,17,24 79:2,2,8,8 80:6,6 82:1,2 90:10 91:23 92:4,20,21,25 93:13 96:23 103:19 106:8 124:8,9, 10 125:11,13 126:16 133:2 140:18
**majors** [1] 31:3
**man** [4] 120:14,15 124:1 140:8
**manage** [1] 14:17
**management** [5] 65:21 102:14 120:2,6 121:12
**manned** [2] 120:15 121:18,19
**many** [7] 54:18 56:25 91:11 93:18 116:22 117:18 146:3
**march** [6] 30:14 121:15,19 123:4 124:25,25
**mark** [7] 1:9 48:26 49:1 50:11 85:19,20 87:4
**market** [1] 1:24
**massive** [2] 61:2,2 97:21,21
**material** [15] 5:7 37:25 74:18
**matter** [35] 3:4 8:4,4 9:17 10:11,15

11:25 17:14 18:20 19:15 23:2,18 24:8 25:23 29:4 30:12 43:24 46:21 47:21 48:19 50:1,5,9 52:5,9 80:17 83:14 84:14 85:12 86:20,24 87:2 88:24 89:2 144:6
**mauntoursville** [4] 24:14 25:5,18 26:16
**mean** [77] 8:22 11:8 12:10,15 14:20 15:24 17:20 18:5,7 25:7 27:8 30:4,9 31:18,19 32:16,18 36:1 44:9,14 45:10 46:4 47:24,24 49:11 50:21 51:2,6 53:20,24 54:16 55:22 60:21 64:3 69:8 70:5 72:17 81:2,7 82:3,23 84:17,17 86:4 87:14,21,25 90:13,17 91:9 92:15 97:14 100:21 106:1,24 109:10 111:12 114:7,21 115:8,24 116:13 119:17 123:18,25 124:2,22 126:6 131:13,18,23 133:19 135:22 137:15 140:12,16 145:6
**meaning** [1] 148:5
**meaningless** [1] 33:9
**means** [8] 3:18 7:12 11:24,26 12:1,4 121:9 141:25
**meant** [2] 12:24 147:8,10
**meet** [9] 23:14,16 28:17 42:5,12,15 78:24 79:5,8
**meeting** [43] 22:19,19,21,25 23:26 24:3 27:22,23,24 28:2,18,19 40:18,18 42:6,10,11,16 43:15,21,23 54:25,26 55:20 56:2 61:1 62:25 77:11,11 78:25 79:3,4,9 80:8,14,16 91:18,19 92:13,21 97:20 99:18 145:1
**meetings** [13] 23:1,13,17,20 28:6,8 42:6,8 61:16 78:25 79:1 98:9 140:9
**member** [4] 67:24 104:17 122:9 146:7
**members** [2] 40:7 76:26
**membership** [2] 40:9 77:2
**memo** [1] 125:8
**memorabilia** [2] 131:16 132:2
**mentioned** [2] 52:8 89:1
**mere** [2] 51:23 88:16
**merryman** [2] 45:9 82:2
**met** [16] 24:14,15 28:4,14,16 44:4 51:9 55:4,5 59:18 80:22 88:2 91:23,24 96:11 140:3
**micro** [1] 14:16
**microphone** [1] 6:7
**middle** [2] 1:2 2:7
**might** [23] 14:9 22:4 24:19 33:13,13 39:14,16 50:18,20 62:26 70:26 76:7,9 87:11,13 99:19 107:19 114:25 122:4,19,19,20 140:11
**military** [3] 85:25 142:22 143:21
**mind** [6] 4:15 15:4 16:24 30:10 126:23 128:1
**mine** [3] 5:21 11:18 113:2
**minute** [2] 14:25 126:22
**minutes** [4] 15:5 26:22 27:6,20
**mirror** [1] 36:2
**mischaracterization** [2] 58:22 95:15



P.R. VIDEO, INC

**misconceptions** [2] 56:24 93:17
**misconduct** [2] 138:12,14
**mislead** [4] 34:7 53:25 71:22 90: 18
**misled** [1] 108:15
**mispronounce** [2] 69:8 106:1
**misread** [1] 124:23
**missing** [2] 38:21 75:14
**misstate** [2] 55:24 92:17
**misunderstand** [3] 7:15 71:17 108:10
**misunderstanding** [1] 111:21
**misunderstood** [2] 71:4 107:23
**monthly** [1] 28:7
**months** [8] 58:6,7 62:22,24 94:25, 26 99:15,17
**morning** [14] 3:16 4:9,10,17,24 15: 2 22:22 25:13 41:4 45:3 52:13 77: 23 81:22 89:6
**most** [7] 7:24 8:3 11:12 25:15 27: 11,14 36:20
**motivated** [1] 140:26
**motivation** [1] 148:14
**mouth** [1] 14:7
**move** [4] 61:13 98:6 113:15 141: 20
**mr.bailey** [1] 128:1
**mr.westcott** [1] 127:25
**ms** [4] 130:21,26 149:5,7
**much** [26] 3:8 7:2,16 11:5,23 21:8 22:5 36:18 47:12,16 58:9 63:6 65: 24 84:5,9 95:2 99:25 102:17 111: 12 123:25 124:4,5,6 131:2,5 149: 1
**multitude** [1] 35:7
**museum** [1] 131:19,24
**must** [5] 6:7 44:5 54:2 80:23 90:21
**myself** [5] 22:23 71:22,22 108:15, 15

**N**

**nail** [2] 45:23 82:16
**name** [10] 2:3,13,15,24 6:9 45:10 69:8 82:3 106:1 145:6
**national** [5] 55:8,18,19 56:2,3 60: 26 66:16 67:25 68:2 69:5 73:19 92:1,11,12,21,22 97:19 103:9 104: 18,21 105:24 110:12 133:4 143: 26,26
**necessarily** [12] 7:14 13:7 18:7,14 20:20 66:25 70:1 103:18 106:20 121:16 134:23 135:22
**necessary** [3] 7:20 44:13 81:6
**need** [55] 18:14 19:9 24:6 33:26 35: 22,23 44:10,15 52:2 57:15,17,18, 19,23,23 58:4 60:23 68:23,24,26 71:18 72:9 73:2,2,4,7,16,18 81:3, 8 88:21 94:8,10,11,12,16,16,23 97: 16 105:16,17,19 108:11 109:2,21, 21,23,26 110:9,11 111:13 120:12 121:21 132:26 143:6
**need'** [2] 57:24 94:17
**needed** [6] 19:1,2 60:8 72:9 97:1 109:2
**needing** [2] 60:5 96:24

**needs** [6] 19:18 35:19 55:15 69:3 92:8 105:22
**negative** [1] 124:2
**neglected** [2] 15:22,23
**neighbor** [1] 8:7
**neither** [2] 18:1 144:11
**never** [13] 33:3 40:12 42:26 44:4 48:11,13 70:14 77:5 79:19 80:22 85:4,6 107:7 125:2,10 134:6 138: 26 143:15
**new** [1] 130:23
**news** [2] 16:10 111:1
**newspaper** [1] 123:4
**next** [7] 18:24 22:22 24:1 25:13 51: 1 87:20 133:26
**nobody** [1] 29:15
**nobody.did** [1] 22:18
**none** [3] 48:6 84:25 124:22
**normal** [7] 74:1,1,2 110:20,20,21 136:26
**normally** [7] 5:5 6:1 9:25 26:19 128:11 138:9,24
**note** [2] 10:21 122:26
**nothing** [2] 2:19 39:7 75:26 141: 15
**notice** [5] 41:7 58:9 77:26 95:2 138:22
**noticed** [1] 6:5
**notified** [1] 5:10
**number** [14] 2:9 28:4 56:25 58:5,7 60:25 62:22,24 93:18 94:24,26 97: 18 99:15,17
**nutshell** [1] 122:15
**ny'et** [1] 130:13

**O**

**o'clock** [1] 148:26
**ober** [168] 1:3 2:8,12 3:2 15:3,7,14, 20 16:18 18:2,20 19:12 21:19,23, 25 22:9,15 25:9,23 30:16 34:22 35:10,11,16 36:1,2,5 37:5,6,16 38: 20 39:9,23 40:1,5 41:5 42:22 43: 15 48:19 50:1,4,9 54:14,16 55:24 56:7,14,16,17,19,22,25,26 57:12 59:4,7,16 60:6,15,19,23 61:16,23 66:8 67:1 68:15,21 71:24 72:8 73: 1,5,21 74:4,9 75:13 76:2,16,20,24 77:24 79:15 80:8 85:12 86:20,23 87:2 91:7,9 92:17,26 93:7,9,10,12, 15,18,19 94:5 95:23,26 96:9,25 97:8,12,16 98:9,16 103:1,20 105: 8,14 108:17 109:1,20,24 110:14, 23 111:4,5,7,18,26,26 112:19,22 113:7 114:10 115:5,17 116:16 117:9,16 118:12,26 119:2 120:17 122:2,9,21 123:7,20 124:20 125:6, 17 126:17 127:4 128:7 132:1 134: 3 135:25 136:2,8,11,12 138:23 140:9,12,16 142:20,23,24 144:26 145:14 146:18,19 147:1,4,25
**ober's** [9] 35:26 59:5,23 95:24 96: 16 119:16,17 123:6 133:3
**ober's'** [1] 93:20
**obers'** [1] 57:1
**object** [4] 5:18 34:24 70:17 107:10

**objected** [2] 61:25 98:18
**objection** [9] 4:20 5:13,26 35:8 58: 21 71:21 95:14 108:14 127:18
**objections** [2] 5:2 6:3
**objective** [4] 44:13 81:6
**obligations** [1] 7:1
**observation** [1] 5:13
**observed** [1] 129:17
**obviously** [6] 13:26 20:7 73:21 110:14 125:26 130:1
**occasion** [2] 44:3 80:21
**occur** [2] 17:8 22:18
**occurred** [3] 43:20 80:13 124:12
**ocd** [1] 135:6
**offend** [1] 8:21
**offensive** [2] 140:13,14
**offered** [1] 32:5
**office** [26] 3:20 17:7 23:8,9 27:26 31:7 36:13 39:11 50:9,20,24 76:4 87:2,13,17 114:25 116:3 121:24 126:13,14,15,18 127:15 130:10 138:23 148:5
**officer** [9] 18:5 32:14,15 113:23 132:6 139:24 146:26 147:2,13
**officers** [3] 44:5 80:23 121:1
**official** [2] 8:18 13:11
**often** [1] 28:12
**oftentimes** [2] 135:18,20
**okay** [95] 3:7 4:5,21 6:12,13,13 9: 15,17 10:10 11:5,16 13:9 14:9 15: 3 16:11,22 19:20 22:2,24 24:8 25: 20 27:19 28:23 31:2,7,9,24,25 32: 4,16 35:16 36:18 38:18,24 42:4 43:12 44:20 45:2 46:9 47:26 48: 18 50:13,17 51:7 55:22 68:1,26 70:23 73:6,8,9,15 75:11,17 78:23 80:5 81:13,21 83:2 84:19 85:11 87:6,10,26 92:15 104:20 105:19 107:16 109:25 110:1,2,8 112:3,13 116:5 119:24,25 123:16 124:6 125:20 126:20,24 128:6 129:14, 16,22 130:5 132:19,21 134:11 144:16 146:7 147:17 148:16,25
**old** [1] 35:7
**once** [7] 5:22 59:18 61:25 66:16 96:11 98:18 103:9
**one** [63] 3:12 6:7,7 7:26 8:20 15:7 19:8 26:18 27:17 29:15 33:5 36:1 37:12,23 41:22 42:11 46:9 52:25 55:12,14,18 56:10 73:4 74:5,16 78:15 79:4 83:2 89:18 92:5,7,11 93:3 109:23 110:24 115:17 116: 15,24 117:20,21 119:12 123:4 129:6,7 130:22 131:10 132:7 133: 25 138:12 139:16 143:12 144:11, 12,12,13,13 145:21,26,26 146: 17,17 147:17
**one/** [1] 37:12
**ongoing** [1] 16:19
**only** [12] 26:4 33:2,6 113:19,20 122:11 124:11 127:18 133:9,11 144:5 145:18
**operation** [2] 2:3 130:25
**operational** [9] 59:25 60:1 96:18, 20 111:16 119:13 129:16 130:5

131:14
**operationally** [1] 136:22
**operations** [17] 6:25 7:3,7 8:14 18: 4 54:10 65:15 91:3 102:8 111:22 119:7 120:24 121:4,5,14 136:24 147:14
**operator** [1] 2:6
**opinion** [11] 29:21 30:17 31:23 33: 7 35:14 36:5 37:3 59:12,21 96:5, 14
**opinions** [2] 44:1 80:19
**opportunity** [3] 5:10 7:22,24
**order** [5] 24:4 30:14 36:3 38:9 75: 2
**ordered** [3] 5:6 64:11 101:4
**orders** [6] 13:3,12,16 14:1,1,2
**ordinarily** [2] 64:25 101:18
**organization** [12] 8:1,11,12 13:26 14:17 20:3 33:4 37:4 48:10 85:3 138:11 143:22,22
**organizational** [5] 56:5 64:4 92: 24 100:22 118:7
**organizations** [4] 8:25 51:15 88:8 143:26
**organized** [5] 67:9 104:2 134:19 135:3,13
**originated** [2] 72:26 109:19
**ot** [1] 58:17
**other** [48] 3:22 4:14 6:5,7 7:26 8:2 9:24 14:11 20:19 22:13 23:1 32: 13 33:18 39:25 41:17,19 42:6,8 47:5,9 48:5 51:15,23 65:24 66:14 67:26 68:11 69:23 76:18 78:10,12, 25 79:1 83:24 84:2,24 88:8,16 102:17 103:7 104:19 105:4 106: 16 121:21 123:18 131:19,24 146: 3
**others** [1] 20:11
**out** [175] 4:24 5:19 9:1,9,14 10:5,7, 7 12:7 13:4 14:7 16:10,24 17:6 19: 3,6,10,18 20:25 21:1 24:4,7,10,12 25:9,13 26:1,10,12 27:1 28:15,26 29:3,10,17,22 32:2 38:2 46:13 47: 14 49:24 52:1 54:14,16 55:5,8,11 56:1,8 57:16,17,19 60:6,13,15,23 61:12 62:17 63:1,3,4,8,15,19,24 64:12,14,24 65:11 67:4 68:21,23 69:1,1,3 71:5,13,14,15,25 72:8,9, 10,11,19,19 73:3,18,22 74:20 83:6 84:7 86:17 88:20 91:7,9,24 92:1,4, 20 93:1 94:9,10,12 96:25 97:6,8, 16 98:5 99:10,20,22,23 100:1,8,12, 17 101:5,7,17 102:4 103:23 105: 14,16,20,20,22 107:24 108:6,7,8, 18 109:1,2,3,4,12,22 110:11,15 111:14,15 112:10 113:19 114:13, 15 115:7,14,15,16 116:16 117:9 119:19 126:9 131:24 134:3,4,6,23 135:21 136:5 138:11,24 139:15 140:19,20 141:21 143:2,4 144:4 146:15 147:5,6,21
**outcome** [1] 37:9
**outfit** [4] 8:14 14:12 38:13 75:6
**outfits** [1] 33:11
**outside** [2] 18:15 36:25



P.R. VIDEO, INC

**outskirts** [2] 67:12 104:5
**over** [4] 4:3 8:8 11:10 13:6 23:5
25:15 27:9 52:4 61:3 66:17 88:23
97:22 103:10 112:22 117:7 123:3
132:15,15 133:13,20 135:6 136:5
146:8
**overtime** [2] 68:7 104:26
**overturned** [1] 126:18
**overview** [1] 139:25
**own** [8] 5:23 18:11 21:12 49:10 69:
3 86:3 105:22 139:16

**P**

**p.m** [1] 2:10
**pa** [2] 1:22,25
**padoorden** [1] 20:4
**page** [1] 5:12
**pagers** [1] 36:8
**paper** [3] 123:5 138:22 139:22
**paperwork** [2] 3:19 115:13
**paragraph** [2] 52:1 88:20
**paramilitary** [1] 114:22
**parcel** [4] 40:26 66:6 77:19 102:25
**pardon** [2] 23:15 116:3
**part** [16] 8:16 30:11 32:5 40:26 49:
18,22 64:3 66:6 77:19 86:11,15
100:21 102:25 122:2,24 141:1
**participate** [2] 141:3,13
**participles** [1] 8:16
**particular** [9] 17:3 31:21 36:26 54:
26 57:5 91:19 93:24 138:17
**particularly** [7] 4:2 8:11 51:18 57:
13 88:11 94:6 140:11
**patrol** [5] 7:5 8:8 55:6 91:25 116:
13
**patrons** [1] 137:22
**paul** [2] 1:9 2:8
**pay** [3] 56:22 93:15 123:25
**pella** [1] 59:11 96:4
**pema** [35] 119:24 120:11,14,15,17,
21,22 121:2,8,12 122:2,3,10,14,24
123:3,7,22,26 124:13,13,18,20
125:7,18 126:17 127:4 128:8,9
141:2,3,4 147:25 148:7,11
**pennsylvania** [55] 1:2 2:4,8 3:6 6:
25 7:13 8:15 12:9 13:1,4 21:5,6,
11 33:4,20 34:11,22 36:12 37:8,
22 38:6 39:17 40:6 44:8 51:12,16,
19 55:19 63:23 67:23 74:15,24 76:
10,25 81:1 88:5,9,12 92:12 100:
16 104:16 116:23 117:19 118:1
120:2,10 121:1 132:3 134:15 135:
26 137:17 138:6,9 139:6 143:6
**people** [36] 10:4,7 11:4,10 12:1 13:
3,5 18:12 19:11 20:19 39:10,14,
25 44:8,11,12 45:26 64:9,9 65:5
66:14 76:3,7,18 81:1,4,5 82:19
101:2,2,24 103:7 120:26 132:21,
23 139:19
**perceived** [8] 73:2,2,4,16 109:21,
21,23 110:9
**perfect** [2] 46:15 83:8
**perhaps** [7] 37:20 49:9 51:1 74:13
86:2 87:20 144:15
**period** [4] 44:24 57:5 81:17 93:24

**permission** [1] 124:18
**permit** [1] 6:1
**permitted** [2] 5:19 141:2
**person** [13] 14:3 46:20,20,26 47:1
56:4 68:23 83:13,13,19,20 92:23
105:16
**personal** [9] 10:9,11 41:4 51:11,
22 77:23 88:4,15 140:15
**personally** [1] 57:1 71:6 93:20
107:25 125:17 140:13,13
**personnel** [4] 10:8 54:11 91:4
114:24
**perspective** [6] 18:8 20:13 59:5
60:2 95:24 96:21
**pertain** [2] 35:18 118:21
**pertinent** [1] 133:12
**philadelphia** [6] 55:10 67:13 69:
10 92:3 104:6 106:3
**phoenix** [12] 24:12,13,21 25:13 42:
6,14 44:21 53:16 78:25 79:7 81:
14 90:9
**phone** [3] 10:23 16:17 26:9
**phones** [3] 36:8,8,9
**pick** [1] 10:16
**pick-up** [1] 10:23
**picked** [2] 68:6 104:25
**piece** [1] 138:22
**pin** [1] 138:16
**pittsburgh** [3] 9:18 69:4 105:23
**place** [11] 9:24 13:20 30:19 42:7
44:21 48:13 71:8 78:26 81:14 85:
6 108:11
**plaintiff** [4] 1:5,20 2:11 3:1
**planning** [2] 60:1 96:20
**platoon** [1] 12:18
**play** [1] 120:17
**played** [2] 125:17,21
**plead** [1] 32:19
**please** [9] 2:2,14,15 33:2 49:23 86:
16 123:2 130:24 148:18
**plus** [1] 20:21
**pm** [3] 130:22,26 149:7
**point** [39] 15:6 18:26 19:5 20:13,
14,26 22:1,3,4,5,6,6,8 24:11 41:6,
22 43:13 46:26,26 50:17 55:26 59:
2 60:11 77:25 78:15 80:6 83:19,
19 87:10 92:19 95:21 97:4 117:4,
8 139:15,17 144:12,12,13
**police** [55] 3:6 6:25 7:13 8:15 12:
10,26 13:1 14:22 21:5,11 33:3,5,
21 34:11,22 36:13 37:8,22 38:5,6
39:17 40:7 44:8 51:13,16 55:6 66:
4 67:23 74:15,23,24 76:10,26 81:
1 88:6,9 91:25 102:23 104:16 116:
23 117:19 119:14 120:10 121:1
126:13 131:16 132:3 134:16 136:
1 137:17 138:6,9 139:7 143:6,22
**policemen** [1] 21:6
**polite** [1] 142:21
**political** [7] 36:12 50:19 87:12
135:12 136:2 137:22 138:1
**politics** [1] 138:5
**position** [40] 40:13 56:17 62:18 64:
12 66:15 68:25 77:6 93:10 99:11
101:5 103:8 105:18 115:5,6,7,11,

19 116:1,6,20 117:2,3,12 118:7,8,
23 119:3,19 120:17 122:13,22
123:7,23 127:6 129:15 130:4 131:
11,12 135:23 147:13
**positions** [4] 49:13 86:6 115:18
118:10
**positive** [2] 49:12 86:5
**possible** [1] 4:23
**pr** [1] 2:5
**practice** [1] 14:23
**practices** [2] 38:6 74:24
**predetermine** [1] 37:9
**prejudice** [1] 115:24
**preliminary** [4] 58:24 59:1 95:17,
20
**preparations** [2] 56:5 92:24
**prerogative** [3] 33:20 54:12 91:5
18 78:21 79:9 80:11
**president** [1] 14:2
**prestige** [1] 131:12
**presumably** [1] 22:10
**presume** [1] 111:9
**pretty** [18] 7:2,16 11:23 21:8 44:14
59:22 61:2,2 63:8 65:13 81:7 96:
15 97:21,21 100:1 102:6 124:5,6
**prevailed** [2] 59:4 95:23
**prior** [3] 62:5 55:9 92:2
**prison** [1] 9:17
**probably** [36] 20:12 25:14 43:8,11
49:8 60:16,17 67:8 69:14,14 72:5
73:13 80:1,4 86:1 97:9,10 104:1
106:7,7 108:22,24 110:6 112:1,8
114:23 116:24 118:13 121:14 124:
24 129:8 132:17 134:21 137:14
139:26 148:24
**probe** [5] 15:6,11 21:19 36:12 142:
24
**problem** [7] 8:8 16:10 46:9 83:2
138:18 140:17 149:3
**procedure** [3] 10:24 119:9,10
**proceedings** [1] 1:17
**process** [15] 3:17,25 8:19 39:24
49:18 57:3 62:9 76:17 86:11 93:
22 99:2 136:26 138:8,18 146:15
**product** [11] 30:12,26 31:13 46:11,
18,24 54:1 83:4,11,17 90:20
**professional** [13] 48:5,8,9,12 51:
24 84:24 85:1,2,5 88:17 139:12
145:24,26
**professional/** [2] 48:7 84:26
**professionalism** [4] 44:6,10 80:
24 81:3
**professionally** [4] 48:4 51:12 84:
23 88:5
**professionals** [4] 47:25 84:18
**progressing** [2] 47:6 83:25
**project** [3] 131:4 132:18,24
**projects** [2] 146:26 147:2
**promote** [4] 64:9,9 101:2,2 116:26
117:2
**promoted** [2] 118:2 146:14
**promotion** [9] 62:15 63:15,19 64:
7 99:8 100:8,12,25 117:1
**promotions** [1] 117:6

**promulgated** [2] 38:3 74:21
**pronounce** [1] 145:6
**proper** [2] 136:15,18
**property** [1] 5:21
**proud** [1] 33:9
**provide** [1] 5:9
**provided** [2] 14:1 123:16
**provision** [1] 5:16
**public** [2] 21:14 134:13
**puffing** [1] 75:26
**puffings** [1] 39:7
**pull** [1] 6:8
**pulled** [1] 147:5
**punched** [1] 29:15
**punches** [1] 29:12
**punish** [2] 130:16 148:11
**punishment** [5] 140:25 141:8,14,
18 142:5
**purchased** [1] 5:20
**purpose** [6] 4:16 28:24,24 32:1 43:
21 80:14
**purposes** [2] 73:3 109:22
**put** [16] 25:16 60:21,25 97:14,18
113:18 115:5,7 117:9 127:14 128:
9,23 130:15 133:13 138:25 147:6
**putting** [2] 119:6 128:2

**Q**

**qualified** [2] 127:14 129:26
**qualify** [4] 50:10 57:24 87:3 94:17
**question** [32] 4:12,16 10:19 11:18
14:26 19:17,20 25:8 34:7,8,8 35:8,
9 46:16 50:22,23 54:4 57:22 68:
20 83:9 87:15,16 90:23 94:15 105:
13 118:14 125:25 127:19 128:17,
18 137:16 138:13
**questioning** [1] 123:17
**questions** [25] 3:25,26 4:11,18,25
11:12,17 34:25 41:8 45:4 46:12,
13 78:1 81:23 83:5,6 119:24 122:
1 126:3 134:9,9 138:20 143:12
147:18 148:23
**quickly** [3] 111:1,7 119:26
**quite** [6] 13:9 20:8 25:18,19 27:14
148:23

**R**

**r&d** [4] 69:24,25 106:17,18
**rail** [2] 65:12 102:5
**raise** [3] 2:13 4:20 17:23
**raised** [4] 50:23 87:16 143:18,21
**raises** [2] 71:21 108:14
**ran** [2] 55:13 92:6
**rank** [4] 18:8,8 117:23 121:1
**ranks** [1] 12:10
**rate** [1] 130:7
**rather** [2] 111:1 140:8
**reach** [3] 9:5 30:3 125:8
**reacted** [2] 111:1,7
**read** [12] 11:10 17:25 41:3,18 49:
23 59:11 77:22 78:11 86:16 96:4
122:26 144:15
**reading** [3] 11:7 120:1 146:9
**ready** [2] 60:26 97:19
**really** [3] 14:21 121:20 124:12
**reason** [15] 4:24 7:26 33:18 34:12

**outskirts - reason**



P.R. VIDEO, INC

36:10 39:6 68:21 75:25 105:14 129:14 133:9,11,22,24 136:3
**reasonable** [10] 36:24,24 37:3,6 38:22 40:2,3 75:15 76:21,22
**reasonably** [2] 47:1 83:20
**reasons** [6] 34:13 64:10 101:3 129:9,11,12
**recall** [29] 15:19 17:15 28:3 48:21, 22 50:10 54:26 60:18 64:26 67:5 71:6,8,16 85:14,15 87:3 91:19 97: 11 101:19 103:24 107:25 108:1,9 119:1,8 125:12 132:4,5 133:18
**receipt** [1] 9:26
**receive** [2] 64:7 100:25
**received** [6] 10:10,13 11:3 36:22 38:20 75:13
**receives** [1] 139:14
**recently** [4] 55:3,7 91:22,26
**recognizably** [1] 14:1
**recognize** [2] 14:11 37:5
**recollect** [1] 141:26
**recollection** [32] 24:18 42:13 45:8, 20 47:11 48:25,25 52:5 53:14 55: 23 79:6 82:1,13 84:4 85:18,18 88: 24 90:7 92:16 113:20 114:9 122:9 124:21 127:2 128:8,20,24,26 130: 11 133:2 145:18 147:24
**recommend** [2] 129:10 130:3
**recommendation** [20] 9:5 24:9 28:22 30:14 55:13 56:16 59:15 65: 9 70:1 71:24 92:6 93:9 96:8 102:2 106:20 108:17 113:12 114:11 129: 4 143:5
**recommendations** [5] 46:25 54: 13 83:18 91:6 117:7
**recommended** [13] 40:8 55:26 72: 10,11 77:1 92:19 109:3,4 111:25, 25 129:8,15 137:18
**recommending** [5] 114:7,7,8,9 133:2
**record** [13] 2:15 4:19 71:18,19,21 108:11,12,14 120:1 122:6 131:3 146:8 148:1
**recording** [3] 2:10 130:25
**records** [2] 26:9,13
**red** [1] 17:24
**redaction** [1] 5:14
**reemphasize** [1] 14:8
**refer** [2] 10:11 11:16
**referred** [1] 139:11
**regard** [2] 10:6 20:10
**regardless** [4] 38:1 74:19 140:4 141:4
**regards** [1] 142:23
**regular** [5] 28:4,5,13 66:13 103:6
**regulation** [8] 32:13 118:19 143:7, 13,23 144:1,4,11
**regulations** [8] 37:25 38:5 61:19 74:18,23 98:12 137:9 143:5
**related** [1] 14:26
**relation** [2] 62:14 99:7
**relationship** [4] 51:15,17 88:8,10
**relationships** [2] 49:25 86:18
**relatives** [2] 40:7 76:26
**relied** [2] 57:7 93:26

**reluctant** [2] 60:10 97:3
**remember** [5] 4:2 9:20 11:7 16: 25 17:12 23:11 25:26 40:20 41:26 42:2,3,8 45:5 47:17 53:16,17 59: 14 63:22 65:16,17 72:20 77:13 78: 19,21,22 79:1 81:24 84:10 90:9, 10 96:7 100:15 102:9,10 109:13 111:24 115:8,9 116:12 125:15 128:3 129:3,4 133:6,22 138:19 142:3,12,13,14 146:19
**removed** [5] 123:7 141:2,12 144: 20,21
**replace** [1] 13:6
**report** [7] 8:5 9:10 32:14 58:13 95: 6 143:2 144:5
**reported** [2] 18:13 22:16
**represent** [2] 3:1,4
**republican** [8] 55:8,18 56:3 68:2 92:1,11,22 104:21
**request** [25] 8:7 10:25 61:23 68:10, 11,12,13 69:14,15,16,18 72:22 98: 16 105:3,4,5,6 106:7,8,9,11 109: 15 128:26 133:3 134:20
**requesting** [1] 21:9
**require** [1] 143:26
**required** [5] 10:2 116:2,4 139:22 141:20
**requirement** [1] 18:14
**rescinded** [2] 147:3,7
**research** [1] 126:4
**reserve** [1] 15:2
**respect** [13] 14:14,15 20:2,5,6 38: 12 56:26 57:13 73:1 75:5 93:19 94:6 109:20
**respected** [2] 61:26 98:19
**respects** [1] 34:12
**respond** [6] 7:17 22:12 45:4 57:24 81:23 94:17
**responding** [1] 3:26
**response** [5] 10:19 11:18 32:5 39: 22 76:15
**responses** [1] 25:22
**responsibilities** [1] 124:1
**responsibility** [23] 11:1 18:10,12 32:12 35:13,18 54:22 58:16 61:10 64:26 66:24 70:2 91:15 95:9 98:3 101:19 103:17 106:21 121:13 125: 24 139:12 145:24,26
**responsible** [7] 7:2 49:11,12 69: 12 86:4,5 106:5
**responsive** [1] 145:12
**rest** [1] 4:23
**retaliation** [1] 142:5
**retire** [2] 6:19 114:18
**retired** [6] 6:17 68:5,9 104:24 105: 2 114:20,21 117:21 121:15 124: 25 144:17
**retirement** [1] 6:22
**return** [2] 40:17 77:10
**reverse** [1] 13:10
**review** [13] 3:22 5:3,11,24 30:11 31:13 46:24 54:3 57:4 83:17 90: 22 93:23 146:6
**reviewed** [3] 30:26 46:11 83:4
**reviews** [2] 57:10 94:3

**revisit** [3] 15:5 71:3 107:22
**reynolds** [7] 1:13 3:3,3,13 34:24 35:1 148:2
**rights** [6] 41:3,18,18,20 77:22 78: 11,11,13
**road** [2] 2:4 12:7
**roads** [1] 27:14
**role** [4] 120:10,19 125:17,21
**roles** [1] 13:11
**room** [1] 2:23
**rosters** [1] 77:14
**rule** [7] 27:16,17,19 33:8 34:9,10, 19
**rules** [5] 5:9 34:21 37:21 38:5,14 74:14,23 75:7 137:8
**run** [7] 8:11 49:23 57:6 65:11 86: 16 93:25 102:4
**running** [1] 8:14
**runs** [1] 14:4

**S**

**s-l-f-e-r-t** [2] 45:12 82:5
**same** [9] 12:14 13:9 48:13 69:21 85:6 106:14 113:1 146:11,13
**san** [14] 25:4,6,11 60:12 69:2,16, 19 91:23,25 92:4 97:5 105:21 106: 9,12
**satisfaction** [1] 139:19
**save** [1] 122:7 136:6
**saying** [9] 10:20 16:25 20:2 27:12 50:11 87:4 129:23 140:15 144:13
**says** [5] 32:13 53:9 90:2 115:23 144:4
**scenario** [1] 141:4
**scene** [1] 13:21
**schedule** [2] 67:3 103:22
**scheduled** [1] 28:13
**scuttled** [2] 39:5 75:24
**se** [1] 27:5
**second** [2] 37:13 74:6
**seconds** [3] 134:8 148:18,20
**section** [5] 115:15,17 118:15,22 119:18 147:14
**sections** [1] 115:16
**security** [5] 15:5 7 91:26
**see** [23] 11:2 25:9,20 31:7,9 36:5 58:15 68:4 95:8 104:23 124:17 126:23 127:23,23 129:3,9 130:17 133:1 136:2,14 140:19,20 143:15
**seeking** [1] 148:10
**seem** [1] 128:17
**seems** [3] 55:1 91:20 127:5
**seen** [3] 124:19 138:26 143:15
**self** [1] 34:1
**selling** [1] 37:1
**send** [16] 8:8 10:6 68:21 71:5 72: 18 73:22 105:14 107:24 109:11 110:15 112:23,24 113:7,15 132: 15 145:16
**sending** [3] 71:24 108:17 111:15
**sense** [6] 9:8 35:7 47:26 49:12 84: 19 86:5
**sent** [16] 11:13,16,19 64:14 69:9 72:2 91:7,9,12 101:7 106:2 108: 21 112:26 133:20 140:24 141:21

146:14 147:6,16
**separate** [2] 9:14 120:4
**september** [1] 144:25
**sergeant** [8] 13:14 29:13 114:3,4, 5,22,24 115:3
**sergeant's** [1] 13:16
**series** [1] 34:8
**serious** [1] 13:5
**seriousness** [1] 19:26
**serpinco** [12] 56:1,6,20 60:4 68:10 69:5 92:20,25 93:13 96:23 105:3, 24
**serve** [1] 123:22
**served** [4] 69:21 106:14 117:12 124:20
**services** [2] 132:11,11
**serving** [1] 123:3
**set** [4] 46:15 52:14 83:8 89:7
**setting** [2] 37:19 74:12
**settled** [4] 58:24,26 95:17,19
**several** [2] 47:3 83:22
**shall** [2] 144:5,6
**shape** [1] 27:13
**share** [4] 20:12 22:5 32:14 34:14
**shares** [1] 33:16
**sharp** [4] 44:14 45:26 81:7 82:19
**sheet** [1] 5:11
**short** [2] 132:21,23
**shortly** [3] 22:6 42:12,13 79:5,6
**shot** [1] 27:10
**shouldn't** [3] 42:17 79:10 131:23
**show** [1] 13:3
**shut** [1] 149:5
**shutting** [1] 148:19
**shy** [1] 4:21
**side** [3] 37:12 119:7 146:17
**sided** [2] 58:18 95:11
**sidewalk** [1] 29:5
**sifer** [2] 45:9 82:2
**sifert** [4] 45:11,12 82:4,5
**sifery** [2] 45:9 82:2
**sight** [1] 128:17
**similar** [2] 56:4 92:23
**simply** [1] 33:24
**since** [6] 49:4 55:10 85:23 92:3 125:23 144:17
**sincerely** [1] 144:17
**single** [3] 27:2,3,4
**singled** [3] 134:3,3,6
**sir** [30] 2:14 6:5,12 7:10 11:5,22 29: 10 30:9 31:26 32:4 38:24 41:22 45:2,20 56:23 72:13 76:17 78:15 81:21 82:13 93:16 109:6 131:6 134:3 137:11 142:25 143:10 149: 2,3,4
**sit** [9] 3:21 11:14 35:21 41:8 78:1 122:8 123:19 127:3 136:8
**sitting** [1] 129:8
**situation** [12] 12:22 13:5,9 15:2 17:1 27:22 118:11 119:16,19 124: 15
**six** [1] 9:23
**skill** [2] 44:11 81:4
**skills** [6] 56:8 93:1 113:25,26 114: 2 129:16

P.R. VIDEO, INC

**slipped** [1] 29:6
**soap** [1] 137:13
**socialize** [2] 48:4 84:23
**socially** [2] 48:4 84:23
**soft** [1] 6:6
**solid** [1] 34:13
**somebody** [58] 8:5,6,26 13:6,23 16:14,15 19:18 20:14 23:21 24:7 29:5,6 35:15 36:10 37:1,3 39:5 46: 16 56:7 60:6 63:19 65:2 68:24 72: 8,10,23 73:2,14,18 75:24 83:9 92: 26 96:25 100:12 101:21 105:17 109:1,3,16,21 110:7,11 114:7,8 117:1,2 119:7 121:7 123:22 127: 15 130:1 133:13 143:4,8 146:18 147:6,8
**somebody's** [1] 33:22
**someone** [3] 8:2 36:25 124:18
**sometime** [4] 44:21 81:14
**sometimes** [6] 11:9 46:10 54:13 83:3 91:6 118:9
**somewhat** [1] 129:13
**somewhere** [1] 148:26
**sons** [2] 40:7 76:26
**sorry** [22] 18:17,23 22:7 31:2 44: 25 62:23 64:15 67:19 70:7 81:18 99:16 101:8 104:12 106:26 117: 11 120:3 123:12 131:26 133:23 142:19 143:10 144:23
**sort** [16] 8:7,9 10:8 15:3 18:9 24:3, 7 60:17 97:10 132:13,18 138:15, 21 143:7,18,21
**sorts** [1] 32:3
**sought** [1] 123:23
**sound** [1] 2:22
**southwest** [2] 69:4 105:23
**spanned** [2] 47:12 84:5
**spans** [1] 81:17
**spanss** [1] 44:24
**speaking** [3] 8:17 20:3
**special** [11] 7:7 52:15,16,22 89:8,9, 15 120:24 121:4 146:24 147:2
**specialized** [1] 118:10
**species** [1] 138:17
**specific** [10] 42:10 47:8 72:21 79: 3 84:1 109:14 114:9 121:18 131: 26 139:26
**specifically** [5] 24:25 59:23 66:1 96:16 102:20
**speculating** [1] 115:12
**speculation** [1] 134:23
**speculative** [1] 30:11
**spell** [1] 2:15
**spend** [1] 124:3
**spent** [4] 47:17 63:5 84:10 99:24
**spoke** [6] 49:15,16,16 86:8,9,9
**spoken** [1] 6:6
**spot** [1] 116:16
**spread** [1] 146:8
**spring** [2] 26:5,6
**squad** [1] 10:4
**staff** [8] 12:23 23:1 28:6,7,8,13 49: 20 86:13
**stage** [3] 39:4 75:23
**stand** [3] 67:16 104:9 142:1

**standard** [4] 118:6,7 119:9,10
**stanton** [1] 134:26
**start** [4] 36:14,16 127:7,7
**started** [8] 9:8,21 10:19,19 25:12 36:15 55:2 91:21
**state** [54] 2:14 3:6 6:25 7:13 8:15 12:10,25 13:1 21:5,6,11 25:15 33: 4,20 34:11,22 36:13 37:8,22 38:5, 6 39:17 40:6 44:8 51:13,16 55:20 67:23 74:15,23,24 76:10,25 81:1 88:6,9 92:13 104:16 116:23 117: 19 119:14 120:5 121:1 126:13 127:21 131:16 132:3 134:15 135: 26 137:17 138:6,9 139:6 143:6
**statement** [3] 51:20 88:13 127:19
**states** [6] 1:1 2:7 8:25,26 51:18 88: 11
**station** [1] 121:23
**stations** [2] 57:10 94:3
**stay** [1] 118:3
**stayed** [5] 23:10 59:8 62:2 96:1 98: 21
**staying** [2] 62:8 99:1
**stenographer** [3] 3:8 4:3 5:8
**stenographers** [1] 3:9
**stenographic** [2] 3:10 5:23
**stenographicly** [1] 2:12
**step** [1] 147:21
**sticking** [1] 16:23
**stickler** [8] 7:21 11:19,25 12:15 17: 24 30:1 31:12 33:15
**stigmatize** [2] 142:18,24
**still** [7] 3:13 67:15,24 104:8,17 114: 21 137:7
**stop** [3] 4:5 19:5 31:7
**stopped** [1] 31:7
**story** [1] 20:15
**straight** [1] 27:10
**straighten** [1] 126:9
**street** [2] 1:21,24
**strict** [1] 143:22
**strictly** [1] 124:16
**strike** [6] 17:19 41:3 43:9 77:22 80: 2 145:12
**strongly** [1] 136:9
**structure** [2] 64:4 100:22
**stuff** [6] 3:24 26:24 66:5 102:24 131:25 146:10
**sub-question** [1] 34:16
**subordinates** [1] 14:13
**subsection** [2] 37:24 74:17
**suck** [1] 132:25
**suggested** [3] 28:20 54:19 91:12
**suggestions** [2] 46:21 83:14
**summary** [1] 6:26
**superior** [5] 32:15 33:17,18 34:18 144:5
**superiors** [1] 22:10
**supervised** [1] 117:22
**supervision** [1] 32:16
**supervisor** [3] 13:13 14:9 34:20 38:8 75:1 114:25 115:4 118:2
**supported** [2] 57:2 93:21
**supporting** [1] 12:25
**supports** [1] 137:22

**suppose** [3] 13:7,15 117:4
**supposed** [3] 139:25 143:8 144:8
**supposition** [3] 45:14 82:7 137: 24
**surprise** [2] 49:19 86:12 135:18
**surprised** [5] 64:8 101:1 125:19, 22 133:14
**surrounding** [2] 40:25 77:18
**surveillances** [1] 135:21
**swear** [1] 2:18
**symposium** [2] 133:4 142:9
**syndi** [2] 1:14,23
**system** [3] 65:21 102:14 115:25
**systems** [5] 14:4 57:3 93:22 131:4 146:5

**T**

**t.o** [2] 64:2 100:20
**table** [1] 118:7
**talked** [25] 8:1 14:26 24:13 28:23 47:8 52:26 53:4,11,14,15,20,21 60:5 74:3 84:1 89:19,23 90:4,7,8, 13,14 96:24 110:12 138:20
**tape** [7] 37:12 74:5 110:24 130:22 131:1 146:17 149:9
**tapes** [1] 130:21
**tar** [1] 65:11 102:4
**task** [8] 43:14 55:15 56:3 60:22 80: 7 92:8,22 97:15
**taxi** [1] 26:23
**teach** [1] 142:17
**team** [6] 53:23,24 90:16,17 122:2 132:18
**technology** [2] 132:10,11
**tells** [3] 13:14 38:8 75:1
**ten** [3] 34:26 148:18,20
**tenure** [1] 121:15
**terminology** [5] 57:21 58:1 94:14, 20 112:17
**terms** [3] 15:18 34:21 123:23
**testified** [4] 52:12 53:13 89:5 90:6
**testify** [1] 126:1
**testimony** [1] 15:1
**that.does** [1] 36:23
**themselves** [1] 36:23
**there'll** [1] 3:10
**there's** [18] 4:24 5:11,16 10:24,25 34:16 36:9 40:18 48:6 64:2 66:14 77:11 84:25 100:20 113:26 124:8 132:11 133:10
**they'll** [1] 36:23
**they've** [2] 69:21 106:14
**third** [1] 27:17
**thirty** [5] 9:9 117:20,21 119:12 134: 8
**thirty-one** [1] 139:4
**this.thank** [1] 3:8
**thomas** [1] 1:10
**thorough** [2] 43:24 80:17
**though** [12] 40:8 51:25 63:21,25 69:17 77:1 88:18 100:14,18 106: 10 112:16 119:8
**three** [7] 18:10 28:17 55:9 92:2 115:16 147:1,3
**thumb** [3] 27:16,18,19

**till** [2] 62:24 99:17
**to&** [1] 118:6
**today** [3] 11:13 122:8 148:22
**together** [2] 69:22 106:15
**took** [11] 4:17 10:20 23:8 42:7 44: 20 57:4 78:26 81:13 93:23 116:16 124:6
**tools** [2] 132:26 133:14
**top** [2] 12:26 14:3
**town** [2] 65:12 102:5
**training** [8] 67:25,26 104:18,19 133:3 142:5,8,10
**transcript** [3] 3:11 5:4,18
**transea** [4] 69:9,20 106:2,13
**transfer** [9] 58:18 61:20,22 62:14 95:11 98:13,15 99:7 123:7
**transferred** [6] 54:19 58:10 91:12 95:3 116:12,16
**transfers** [5] 54:11,11 91:4,4 113: 2
**transpired** [1] 135:12
**tremendous** [3] 57:6 93:25 124:1
**trial** [3] 36:17 38:1 74:19
**trick** [1] 31:15
**troop** [19] 7:4,16,23 8:1 9:24 10:5, 7,13 61:6 62:3 63:19 69:22 97:25 98:22 100:12 106:15 113:17 118: 17 139:16
**trooper** [6] 12:7 13:10,12 29:12 117:26 134:25 145:5,10
**troopers** [3] 61:3 97:22 125:1
**truly** [1] 141:6
**trust** [4] 19:14,15,20 33:23
**trusted** [1] 33:19
**truth** [2] 2:19,19
**try** [3] 34:6 126:9,22 132:23,25
**trying** [13] 22:13 31:15 49:24 72:6 86:17 108:25 127:2,25,26 130:7 131:19,25 138:15
**turbo** [1] 26:26
**turned** [5] 60:13 97:6 129:1 133:5 148:7
**turning** [3] 23:5 147:24 148:11
**turnpike** [1] 13:4
**tutelage** [2] 56:10 93:3
**twenty** [4] 26:22 27:5,20 125:2
**twist** [1] 31:18
**two** [20] 28:8,9,12,17 30:12 31:3 41:23 51:15 55:18 78:16 88:8 92: 11 118:4 131:1 132:7 136:19 144: 12,12,13 147:17
**type** [2] 8:18 19:8
**typically** [1] 118:15

**U**

**u.s** [1] 33:9
**ultimately** [2] 58:25 95:18
**um-hmm** [3] 45:6 81:25 146:2
**under** [32] 12:2 14:7 15:10 32:12 33:18 37:16 41:14 55:21 56:10 59: 26 74:9 78:7 92:14 93:3 96:19 120:22,23,25 121:5,13,16 124:20, 26 125:3,23 126:11 131:24 132: 12 135:7,8 136:12,22,24,25 145: 24 146:3

P.R. VIDEO, INC

underline [1] 16:23
underling [1] 144:4
underlying [6] 15:7 38:25 75:18
135:12 136:1 141:4
understand [21] 5:7 20:19 32:26
33:4 35:3 37:20 38:11 42:7 50:21
61:1 74:13 75:4 78:26 87:14 97:
20 124:2 126:2 128:13 129:23
143:20 148:23
understanding [26] 6:16 15:25
17:2,18 23:25 32:22,23 44:22 66:
12 67:15 69:7,11 70:24 81:15 103:
5 104:8 105:26 106:4 107:17 113:
16 115:20 122:14,16 136:4 141:
19 142:26
understands [1] 35:1
understood [1] 113:20
underway [1] 25:12
unit [4] 13:2 118:1,2,3
united [6] 1:1 2:6 8:25,26 51:18
88:11
unless [6] 5:20 13:20 65:18 102:
11 130:1 133:10
unload [1] 33:25
until [4] 34:20 136:5 139:9 145:4
unusual [5] 25:16 28:16,18 50:15
87:8
unwritten [1] 34:21
up [62] 4:1 6:11 8:15 9:10,10 10:16
12:3 13:3,14 15:12 16:7,8,9 17:16
18:13 22:12 24:14,15,17,22,24,26
25:1,2,4,9,20 26:15 27:8 33:22 38:
3 39:3 42:4 50:21 54:19 55:2 59:5
68:6 69:4 70:18 71:18,23 72:23
74:21 75:22 78:23 87:14 91:12,21
95:24 104:25 105:23 107:11 108:
11,16 109:16 122:7 132:25 136:
14 140:9 143:5 147:22
ups [2] 39:16 76:9
upset [4] 16:14,16 70:6 106:25
usage [2] 38:7 74:25
utmost [3] 20:10 56:26 93:19

## V

vacancies [1] 116:8
vacancy [2] 114:26 115:14
vague [1] 128:20
valencik [3] 114:3,13 115:2
various [1] 7:4
verbatim [2] 43:22 80:15
verbiage [1] 115:25
verbs [2] 54:18 91:11
versus [1] 1:7
video [13] 1:17 2:2,5,11 3:11,11,17,
21 5:15,18,20 6:2 130:23
view [1] 3:19
views [1] 20:12
violate [7] 33:7,16,19 34:9,10 65:2
101:21
violated [4] 30:17 31:10 38:14 75:
7
violation [4] 70:25 71:1 107:18,20
violations [4] 137:3,4,5,8
virtually [1] 37:9
voice [1] 4:1

vs [1] 2:8

## W

w-e-s-t-c-o-t-t [1] 2:17
walked [2] 48:23 85:16
wanted [20] 25:11 29:17 42:12,14
43:15,23,25 44:17 56:21 79:5,7
80:8,16,18 81:10 93:14 122:13
123:22 127:13 148:26
wanting [2] 127:6,12
wants [5] 52:3 88:22 117:5,6 140:
23
washington [5] 54:15,17 57:16
59:4,6,7,17 61:13 62:3 63:20 66:9
68:22 71:5,25 72:24 73:22 91:8,
10 94:9 95:23,25,26 96:10 98:6,
22 100:13 103:2 105:15 107:24
108:18 109:17 110:15 111:2,8,12
112:5 113:17 123:6 124:9,10 125:
11,13 126:16 133:4 140:24 141:
22 142:4,7 145:16 146:15 147:7
wasn't [4] 64:11 68:20 101:4 105:
13
wasting [1] 121:26
way [29] 7:11 8:22 14:4 16:6 17:23
20:5 21:8 23:24 35:7 39:24,26 49:
23 53:10 57:25 69:9 76:17,19 86:
16 90:3 94:18 106:2 124:2 129:6,
7 141:1,14 142:25 143:18,20
week [2] 47:4 83:23
weeks [5] 28:9,9,12 47:18 84:11
werts [53] 41:13,16,24 42:9,15 43:
13 44:4,12 45:3 47:17 52:11,12,
15 53:1,9,13,15,17,20,21 55:5,11
56:2 69:15,18 78:6,9,17 79:2,8 80:
6,23 81:5,22 84:10 89:4,5,8,20 90:
2,6,8,10,13,14 91:24 92:4,21 106:
8,11 138:20,26 140:19
wertz [11] 4:9,10,17 15:2 18:19 23:
4 24:9,13 28:20 32:20 36:7
wescott [1] 2:15
westcott [29] 1:11,18 2:13,16,21 4:
6,26 6:4,10,10,16 35:5 37:14 45:
15 48:16 70:18,20,22 74:7 82:8
85:9 107:11,13,15 130:23 131:1
147:23 148:21 149:8
western [2] 55:21 92:14
whatever [16] 3:23 5:14 6:21 9:19
14:7,9 29:9 39:7 61:26 73:5 75:26
98:19 109:24 135:22 140:23 142:
21
whether [43] 23:10,10 33:7 36:26
37:1,2 39:17 40:23 41:2 45:21 50:
3 52:19 53:3 68:6 70:12 71:14,14
74:3 76:10 77:16,21 82:14 86:22
89:12,22 104:25 107:5 108:7,7
110:22,26 111:24 113:10 122:21,
23 125:16 126:16 131:11 136:2
138:11 143:25 144:19,25
white [1] 117:26
who's [1] 114:3
whoever [1] 139:14
whole [2] 2:19 14:17
whole.cause [1] 14:16
whom [2] 39:20 76:13

will [19] 2:13 3:20 4:6 5:18,19,22 6:
1 35:16 36:18 39:8 50:10 57:24
76:1 87:3 94:17 112:3 122:7 127:
1 135:19
william [2] 53:14 90:7
williams [31] 18:16,19 23:3 24:9,
14 25:21 28:20 42:5,9,15 43:13
44:4,12 52:11 53:1,10,15,19 78:
24 79:2,8 80:6,22 81:5 89:4,20 90:
3,8,12 116:11,12
williamsport [4] 26:17,18 42:5 78:
24
wilson [2] 132:6,8,8
win-win [4] 56:12,13 93:5,6
wise [1] 3:22
wish [1] 4:14
wishes [2] 61:26 98:19
within [9] 5:9 25:21,22 37:1,7,18
74:11 111:21 139:6
without [13] 20:4 35:7 70:8,11 71:
11,12 107:1,4 108:4,5 114:23 115:
12 121:8
witness [3] 4:20 5:3 35:1
witnessed [2] 9:1 15:1
witnesses [7] 2:13 45:5,17 52:26
81:24 82:10 89:19
won [2] 58:25 95:18
wonder [1] 147:7
wondering [2] 47:15 84:8
word [8] 16:23,24,26 54:20 57:24
91:13 94:17 112:18
words [8] 14:11 22:13 39:25 51:15,
23 76:18 88:8,16
work [25] 3:23 20:6 30:12,26 31:13
44:2 46:11,18,24 53:26 56:1 60:
21,25 61:4 80:20 83:4,11,17 90:
19 92:20 97:14,18,23 138:19 139:
23
worked [6] 12:2 18:12 38:3 56:10
74:21 93:3 136:23,23
working [6] 59:26 66:1 68:7 96:19
102:20 104:26
works [2] 65:13 102:6
world [1] 34:20
worth [3] 68:7 104:26 148:19
wrap [1] 122:7
write [2] 5:13 125:7
written [14] 9:10 10:25 12:19 32:
21,21 33:12,13 34:10,18,21 37:23
54:9 74:16 91:2
wrote [2] 45:7 81:26

## X

x'ed [1] 138:24

## Y

yah [2] 11:23 15:17
year [6] 6:20,21 114:21 124:24 133:
25 144:18
years [9] 9:18,18 33:14 55:9 56:
25,26 63:11 92:2 93:18,19 100:4
117:18,21 119:12 123:4,21 124:
20,23 125:2 129:14,20,26 130:6
139:4
yelling [1] 16:17
yorgue [2] 145:5,10

you.most [1] 11:22
you.was [1] 17:1
young [50] 5:8 63:1,3,10,11 64:6,6,
11,22 65:15 67:11,21 68:1,16,19,
20 70:5,5,8,10 71:5 72:2,11 99:20,
22 100:3,4,24,24 101:4,15 102:8
104:4,14,20 105:9,12,13 106:24,
24 107:1,3,24 108:21 109:4 111:
21,23 112:4 141:21 146:25
young's [2] 67:3 103:22
yourself [7] 22:25 40:19 45:15 68:
14 77:12 82:8 105:7
yourselves [1] 148:19

## Z

zero [3] 144:12,12,13