# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF PENNSYLVANIA

**DARRELL G. OBER**       :    NO 1:CV-01-0084

                   :

**Plaintiff**              :

                   :    **CIVIL ACTION LAW**

**PAUL EVANKO, MARK**      :

**CAMPBELL, THOMAS COURY**   :

**JOSEPH WESTCOTT,**        :    **(JUDGE CALDWELL)**

**HAWTHORNE CONLEY,**       :

**JOANNA REYNOLDS AND**     :

**SYNDI GUIDO,**           :    **JURY TRIAL DEMANDED**

                   :

**Defendants**           :

FILED
HARRISBURG, PA
MAY 2 0 2002
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## PLAINTIFF'S ADDENDUM TO EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT- DEPOSITION TESTIMONY

*Volume III*

1.) Deposition of Paul Evanko

2.) Deposition of Ralph Kush

3.) Deposition of Michael Soohy

4.) Deposition of Darrell G. Ober (Day 1)

5.) Deposition of Darrell G. Ober (Day 2)

6.) Deposition of Thomas Coury (Day 1)

7.) Deposition of Thomas Coury (Day 2)

8.) Deposition of Joseph Westcott

9.) Deposition of Marie Marshall

10.) Deposition of Thomas Williams

11.) Deposition of Mark Campbell

12.) Deposition of Larry Riley

13.) Deposition of Francis Koselnak

14.) Deposition of Walter Margeson

15.) Deposition of Mark Grab

16.) Deposition of Mary Bungo

17.) Deposition of William McAlreavy

18.) Deposition of John Pudliner

19.) Deposition of John (Rick) Brown

20.) Deposition of Mark Carr

21.) Deposition of Robert Werts

22.) Deposition of Robert Hickes

23.) Deposition of Hawthorne Conley

24.) Deposition of R. Dane Merryman

25.) Deposition of Charles Skurkis

Respectfully Submitted,

Don Bailey PAID# 23786
4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500

DARRELL G. OBER ) NO. 1:CV-01-0084
                )
        Plaintiff ) (JUDGE CALDWELL)
                )
    VS          )
                )
PAUL EVANKO,    )
MARK CAMPBELL,  )
THOMAS COURY,   )
HAWTHORNE       )
CONLEY          ) JURY TRIAL DEMANDED
                )
        Defendants )

*COPY*

PROCEEDINGS:    Video Deposition of
                Marie Marshall

PLACE:          Law Office of Don Bailey
                4311 n. 6TH Street
                Harrisburg, PA 17110

DATE::          March 6, 2002

APPEARANCES:

    For the Plaintiff    Don Bailey, Esquire
                         4311 N. 6th Street
                         Harrisburg, PA 17110

    For the Defendants

                         Joanna Reynolds, Esquire
                         Barbara Christi, Esquire
                         1800 Elmerton Avenue
                         Harrisburg, PA 17110

1

1   VIDEO OPERATOR:   Good Afternoon Ladies and
2   Gentleman please be advised that the Video and Audio is in operation
3   it is 12:03 p.m. March 6, 2002. My name is Tony Marceca and my
4   address is 2219 Dixie Drive, York Pennsylvania 17402. I have been
5   contracted my P.R. Video to be the operator in this case. The case is
6   in the United States District Court for the Middle District of
7   Pennsylvania its caption is Darrell G. Ober the plaintiff vs. Paul
8   Evanko et al. 1:CV-01-0084. This deposition is being held at the law
9   office of Mr. Don Bailey at 4311 N. 6th Street, Harrisburg,
10  Pennsylvania 17110. And the time is now 12:04 p.m. ,and with the
11  witness Miss Marie Marshall please raise your right hand? Do you
12  swear to tell the truth the whole truth so help you God?
13      WITNESS: I do.
14      MARCECA:     Thank you. Mr. Bailey can we have a sound
15  check please around the room?
16      BAILEY:   Yes my name is Don Bailey I 'm an attorney and I
17  represent the plaintiff Darrell G. Ober and if the opposing counsel can
18  identify themselves for the record please.
19      REYNOLDS:     My name is Joanna Reynolds and I am
20  assistant counsel with the State Police and I represent the defendant in
21  this matter. My address is 1800 Elmerton Avenue, Harrisburg,
22  Pennsylvania 17110. My phone number is (717) 783-5516.
23      CHRISTY: My name is Barbara Christi, Chief Counsel with
24  the Pennsylvania State Police and my address and phone number are
25  those given my Assistant Counsel Reynolds.

2

1   BAILEY:   Thank you Marie is it alright to address you as
2   Marie?
3       WITNESS: That's fine.
4   BAILEY:    Marie as I indicated my name is Don Bailey I am
5   attorney and I represent Darrell here a law suit that you may heard
6   something about. The captioned was read let me read the whole
7   caption to you so you understand. Darrell G. Ober plaintiff vs. Paul
8   Evanko, Mark Campbell  a gentlemen in the Governors office,
9   Thomas Coury, Joseph Westcott, Hawthorne Conley and this lawsuit
10  has to do with some events that occurred  in various places in the
11  Pennsylvania State Police organization and you're a fact witness in
12  this case. We want you to feel as relaxed as possible unlike the stuff
13  you see on TV no ones gonna be jumping up and down or trying to
14  distort your words or anything like that I try to make people feel as
15  comfortable as possible. It's a video deposition and you can come in
16  by the way and view your video deposition at will. The attorneys here
17  will be acquiring a copy it so your access to it through them also. I'm
18  going to assume your represented by opposing counsel they may have
19  not spoken to you about that or you may not – I'm going to assume
20  that and conduct myself in that way. It really shouldn't effect you very
21  much. One thing I want you to feel comfortable about in particular if
22  you don't understand a question I ask or if you even if your just
23  curious internally about where I'm going or what I'm trying to get at
24  with the question. If it makes you feel better or make you feel more

1   comfortable you please feel free what I'm asking by the question and
2   what I'm trying to get at. Okay.
3       WITNESS: Okay.
4       BAILEY:    I'm not interested in playing games with facts or
5   information here. We want to give you a complete opportunity to
6   answer fully and completely and of course it goes without saying
7   there no issue here that has anything to do with any implication that
8   you've done something wrong or some how a target or something. So
9   please don't – I sorta had a little vibe that you are alittle nervous. I
10  don't want you to feel that way. If at anytime you need a break or at
11  anytime you want to stop or you want to talk to Joanna or Barbara you
12  just let me know. Okay and lastly we shouldn't be very long.
13      REYNOLDS:     We're going to reserve all objections except
14  as to form? Usual Stipulations.
15      BAILEY:   Yeah. From time to time one of the attorneys will
16  make an objection. You'll get a cue from Joanna or Barbara – you
17  know that's just attorneys doing the attorney thing that shouldn't
18  bother you. Yes, we agree to the usual stipulations. Okay with all that
19  mumbo jumbo being said, do you have any questions of me?
20      WITNESS: No not at this time.
21      BAILEY:   One thing your alittle soft spoken.
22      WITNESS: I'm trying to speak up - that's what I said I took a
23  lozenger first to try to get my voice back.

1    BAILEY:   Well if you need water or you need a can of pop as
2  we call it in Western Pennsylvania. I'll get you a can of soda or pop.
3  Okay.
4        Q:   Marie how are you employed otherwards what do you do
5  and where do you work?
6        A:   I work for the Pennsylvania State Police Bureau of
7  Research and Development Programming Division.
8        Q:   Okay can you briefly described your duties there?
9        A:   Well are office is primarily responsible for reviewing
10 regulations and directives to get them ready for Commissioners
11 signature or the Deputies. So my process sometimes is  reviewing
12 those documents to get them ready for a final signing.
13       Q:   Before you came in hear today did you review any of the
14 materials or go over anything in anticipation of this deposition.
15       A:   No I don't know what to review.
16       Q:   Okay. Whose you immediate supervisor?
17       A:   My immediate supervisor is Pam Yamrich.
18       Q:   Okay who is Pam's immediate supervisor?
19       A:   Well right now its Sergeant Margeson whose are acting
20 division director. But it would normally be lieutenant Thurston.
21       Q:   Now research and development you indicated that you
22 review directives and that sort of thing, or review proposed
23 regulations.
24       A:   That's right.
25       Q:   How does that process work?

5

1        A:   You want from the beginning ?
2        Q:   Yeah I don't want to spend a lot of time at it. But just
3  give us an idea of the structure of how it works.
4        A:   Okay. For example maybe another office Bureau would
5  submit a proposed suggestion or a special order that we would review
6  so they would send it through are right now through our e-mail system
7  or it could be on a hard copy and it would come in to our office it
8  would check it in and turned over to Sergeant Margeson and he would
9  assign it a project  number. That project number he would then give it
10 to one of his project people and that would be there project. And then
11 they would work with the originator whoever the other Bureau office
12 would be, whether it's BCI and Drug  Law or the front office who
13 ever it may be, so that project person is responsible for getting that
14 project ready making all contacts making sure they have all the
15 information. They do there actually work on the computer with that
16 project, and once they feel its ready  for at least a first draft then they
17 will submit it to Pam or myself. Right now their giving it Pam and her
18 and I are both doing this. And we both review the process.
19       Q:   So if somebody comes up with an idea and they think its
20 worthy of you know some area Commander out  there comes up with
21 an idea on how a regulation should be changed or how there should be
22 a new regulation and they write up that idea and they submit it. What
23 you folks do is try to look at it in terms of putting it into the proper
24 form and getting it into regulation language.
25       A:   That's correct.

6

1        Q:   As part of that process do you review with legal from
2  time to time.
3        A:   I wouldn't do that the project person maybe involved or
4  Sergeant Margeson but that's not my involvement.
5        Q:   If a new regulation is drafted. Is it reviewed by legal?
6        A:   Sometimes.
7        Q:   Okay. What situations could you describe for me when a
8  new regulation would be drafted and it wouldn't be review by legal?
9        A:   Well for example we had a rush special order this
10 morning that we had to go through and it had to be out to be process
11 and that would go through the normal procedure after my review and
12 it would go up through the chain of command, and the Bureau
13 secretary would look at it, and the Major, and then it would be taken
14 up front , it wouldn't go through legal. Because they felt it didn't
15 involve legal  and if that was okay then it would be sign and
16 sometimes the front office might make that call they may feel that
17 legal needs to look at this?
     BAILEY:   They need an opinion on this,
19       A:   Yes and sometimes that happens that way.
20       Q:   Well one thing that probable that won't happen is that
21 there's wouldn't be a major change in a regulation  without the front
22 office signing off on it.
23       A:   That's correct.

1    BAILEY:   Absolutely not. So where not going to change a
2  major regulation of the PSP unless the front office gives its approval
3  right?
4        A:   I've never seen that. Yes.
5        Q:   Well have you seen it any other way?
6        A:   No.
7        Q:   Alright whose in the front office?
8        A:   Well it may go to the Deputies, it may go to the
9  Commissioner for his signature but it would go through our Deputy if
10 its for the Commissioner. It would be Colonel Hickes or Deputy of
11 staff.
12       Q:   Okay
13       A:   If it affects that field it would probable go through that
14 Deputy?
15       Q:   Okay. And who would that be?
16       A:   Right now Wertz.
17       Q:   Okay. Well – is there some kind of form or some kind of
18 sheet that tells you when its endorsed or okay. Whats that called?
19       A:   Routing project - routing log sheet. It's a form that
20 everyone one of else that reviewed that would sign off on that.
21       Q:   You would sign it for the Commissioner?
22       A:   No no theirs a place for me to sign off that I reviewed it .
23 No I would not sign it for the Commissioner that's only for the
24 Commissioner or his .
25       Q:   Only the Commissioner signs for the Commissioner.

A:    Right. Or for who he has designated it to.

Q:    If he tells somebody to sign for him – I don't know. The Commissioner is the Commissioner. He is the head of the organization right?

A:    That's right sir.

Q:    So if you got a routing slip in there and that routing slip says Commissioner whats that mean whether its checked or signed?

A:    Well there are some regulations that he may not have seen because he has given the authority with his Deputies that he feels it may not be a major policy issue. Like I refer it Directives as special orders there supposedly temporary directives.

Q:    Right. What about a regulation about regulation 1?

A:    That would be signed by the Commissioner.

Q:    Well does the Commissioners secretary have the authority to sign for him?

A:    I don't know sir.

Q:    Only the Commissioner would know that?

A:    Yes.

Q:    Is it possible for the Commissioner to sign off on a regulation and at the same time to have a signature from legal?

A:    I'm not sure what your asking.

Q:    No No either am I. Let me go back to the beginning and try again. There's nothing that you know of in PSP practice and regulation which requires the legal department review and approve it is that fair to say?

9

A:    Yes I believe your right there.

Q:    But certainly that would be the prerogative of the Commissioner. Right?

A:    Yes. I would examine the Commissioner or Deputy who is reviewing it.

Q:    But the routing slip might not indicate that legal has been consulted. In other words the routing slip is something that has something to do with PSP structure and indicate who signed off on it. And its not common for it to reflect legal on it. Is it or isn't it?

A:    Do you mean is Chief counsel on every routing slip? Is that what your asking?

Q:    Yeah some.

A:    No I would says theres some that there not on there.

Q:    And some that there are.

A:    Yeah.

Q:    Alright that's the approval process right – that where talking about.

A:    Yes.

Q:    Is there a thing called a historic file?

A:    Yes there is.

Q:    And what is that?

A:    That is the project when it is completed after it has all its signatures, any comments made from anyone who may have reviewed that in the process. The historical file is included with the way the

10

regulations started whether it was just a AR1. If your using that AR1 what ever regulation you want to talk about, if it comes in a hard copy that should be in that file the way it originated and then you have the process on the way people were working on it and there's a project tracking log to show that if they had meetings regarding any issues that may have come up during that life of that project. That is to be included in there.

Q:    Does every regulation have a historic file?

A:    Yes it does.

Q:    And if I go to every historic file and I looked at each one each one would have an entry posted to the historic file. That would include the regulation – I'm gonna ask you about subsection?

A:    About proposed?

Q:    No no no proposed. It would have the regulation posted in the file. For example. Let me give you an example. Lets pretend theirs a regulation 4. Regulation 4 became a regulation some how some way some time, and its going to have an historic file. Theirs no such thing as a regulation without an Historic file or is there?

A:    Unless its brand new. Unless its brand new regulation that's never been - if its just being created. But it would start with this as soon as this project started that is the history of that file.

Q:    Yeah and at some point if that regulation were accepted or approved by the Commissioner then it would have an effective date right?

A:    That's correct.

Q:    And that would be posted to the file?

A:    Yes.

Q:    Okay. Now if you got a regulation and theirs a copy of the regulation if its exist in the historic file, lets say its been 20 years old this regulation. And there's a proposal to change it and its assign a project number then that historic data is added to the existing historic file correct?

A:    Okay let me see if I understand your question. If a regulation is 20 years old and your thinking that a project file would have that 20 years old regulation as well as this new one in that folder is that what your asking?

Q:    Sure.

A:    If there hasn't been any changes to that sometimes there's some parts of that sub sections are revised and we try to keep what was in that historic file what was in effective at that time before it got signed.

Q:    Well there a question here about are you familiar with the issue that's been raised in this case about subsection C AR1.102 subsection C am I correct on my number?

A:    No I don't know.

Q:    Okay do you remember any project to correct AR1.102.

A:    I wouldn't know exactly because when I see a project you know sometimes I don't see every project that comes through I couldn't tell you what sections, because we see a lot of regulations

1  and I mean if it was in that file, and it was done but I can't say yes it
2  was changed and what was in effect prior to that.
3      Q:    And in that's the reason why you keep a historic file
4  because there so much work and so many different projects and if you
5  don't keep it to according to some structure its not going to mean
6  anything because you don't run around with these things in your head
7  that's what the files are for.
8      A:    To try and give a history of the project.
9      Q:    When there changed right.
10     A:    Yes.
11     Q:    When the last effective date on regulation is. In this case
12 I may be mistaken I remember in my mind sometime around July of
13 1997 I think it was is when the last time when this AR1. This
14 particularly section at least when it had been changed its last effective
15 date. And in our law suit its something that crops up according to
16 documents that we have this regulation had a regulation effective
17 February 2001. And I'm just wondering if you look in the historic file
18 if you going to find a copy of the regulation as it exist.
19     A:    You mean prior to this last change?
20     Q:    Should be part of the file?
21     A:    Yes.
22     Q:    Absolutely and if there's a change its gonna be right up
23 there in the corner right up there in the northeast corner isn't it Marie
24 right up there in the corner?

13

1      A:    Right there a date there should be a date on the regulation
2  when it was last singed and the new date.
3      Q:    Okay I certainly it makes sense to me. Now I want to ask
4  you some questions I'm gonna switch gears here now ask you how
5  historic files are handles how there kepted how there accessed and
6  who has the authority to look at them. Okay. So let me start - in other
7  wards where talking about how those files are physically kepted and
8  who can look at them and if theirs records of who looked at them and
9  all those kinds of things. So lets start and talk about AR1 because I'm
10 interested in AR1.02 subsection C which I believe has an effective
11 date sometime around February 23, of 2001. I want to ask questions
12 about how somebody would come to look at and study and deal with
13 that file. Okay. Lets take the historic file itself, first of all is it kepted
14 electro magnetically, or hard copy on paper is it kepted it both ways.
15 How is a historic file kept over there in the PSP police? What form is
16 it in?
17     A:    Well right now where updating where making electronic
   library for historic files and I think that's been started I'm not
18 in...
19      ...ed in that step my supervisor Pam Yasprich is I think that's been
20 kepted up...  ...last several years. We also had a copy in the computer
21 of the regulation...  ...hen it was signed lets say 3 years ago that is in the
22 computer and then if...  ...mebody makes a change in that there to start
   from there first unless it's a complete rewrite.
24     Q:    Are you familiar with West Law?
25     A:    Yeah.

14

1      Q:    Can you tell me if I go on my little old West law out here
2  in my computer and pull up my soft ware and pull up the State Police
3  regulations?
4      A:    I think you can.
5      Q:    I do to. And if I told you that I think I can do that in right
6  smack dab on that little research project and a date will show up and
7  it will tell me the effective date of that regulation and that sort of
8  thing?
9      A:    Yeah.
10     Q:    Okay. Now on the state police electronically kepted
11 information. Is the historic files proposed revisions and change are
12 they kepted on the electronic form in an electronic form?
13     A:    After its been signed each stage - if I can understand
14 your question.
15     Q:    Let me make it easier for you. We have AR1 the biggie
16 that's your main Bible I guess pretty much close to it organizational
17 AR1 is that fair to say.
18     A:    One of our regulations.
19     Q:    To you that's not fair to say. Okay.
20     A:    That's just one of the regulations.
21     Q:    Yes Mam. AR1 AR1. Now there is a change in AR1,
22 which takes place February 23, 2001. Okay that may have not been
23 the right date but its somewhere in there. Lets say there a date at that
24 time okay. If I consult the historic file that historic file should give
25 me the date of the latest revisions to AR1, and what the date of the last

1  revisions to AR1. In otherwards if I look at the effective dates of the
2  regulations through time it should show a history of when it was
3  revised and when it was changed in the last effective date right?
4      A:    Yes.
5      Q:    Now if I get on my little old West Mate and I access that
6  information I can't go in and change your data can I?
7      A:    No.
8      Q:    And do you give out the historic file can it be removed?
9      A:    The only time that it would be done if there would be a
10 request and we would log it out and most of the time its copies made,
11 if somebody ask for something you know there copies made. There
12 are times when somebody may say I need the file and nobody has said
13 to me no Marie you can't release that file.
14     Q:    Okay lets talk about that alittle bit. If the Commissioner
15 or if a high ranking state police officer wanted to see that file historic
16 file do they have access to that file. Is that fair to say?
17     A:    Yes.
18     Q:    If I'm a trooper with the PSP I'm not saying I can go up
19 to RD and take that Historic file out of there, but I have access to it
20 and I'm allowed to see it. Is that fair to say?
21     A:    Yes.
22     Q:    What if I'm a member of the public and I want to go out
23 and I call you up Marie I want to make and appointment I'm an
24 attorney and I want to look at this file. Can I go out and review it and
25 see it?

1     A:   Um. I wouldn't let anyone from the outside look at that
2 without talking to someone.
3     Q:   Without getting some authority.
4     A:   Someone would have to authorize that.
5     Q:   Has that ever happened that someone has come out to
6 look at a historic file?
7     A:   Not that I'm aware of.
8     Q:   How many years you been there?
9     A:   You mean at RD?
10    Q:   Yeah.
11    A:   Probably about 14 years.
12    Q:   And in 14 years nobody has ever asked to see a Historic
13 file on a regulation?
14    A:   From the general public?
15    Q:   From the general public?
16    A:   I don't trust my memory that long, I won't say it's never
17 been but I don't know of anybody ever asking me.
18    Q:   Alright.
19    A:   They wouldn't have to - they could have asked the
20 Director or whoever was in charge there at that time.
21    Q:   Okay but certainly if a member of the State Police
22 wanted to see it they could see it.
23    A:   Yes.
24    Q:   You know of any situation where legal department within
25 the PSP has signed out, logged out a historic file?

17

1     A:   Yes.
2     Q:   And would the record with the historic file indicate when
3 it was consulted?
4     A:   Yes.
5     Q:   And by who?
6     A:   Yes.
7     Q:   And how long? All things being equal.
8     A:   Hopefully.
9     Q:   Hopefully.
10    A:   Yes.
11    Q:   Now that's a matter of practice with the State Police
12 that's the way things have been done.
13    A:   We try to keep. I'm very, I take the Historical files very
14 seriously. And if I know somebody has it I like to log that somewhere
15 where they're somewhere. If I reviewed it and I filed it away - most
16 of the time somebody will come to me or they'll come to Pam to get
17 that but I know who has access most of the time.
18    Q:   Well is it possible to take that file out of there without
19 you knowing?
20    A:   Are you talking about now?
21    Q:   No. I'm talking about a year ago?
22    A:   Yeah could be.
23    Q:   Could be. Now if I take the file out of there out of the
24 Historic file and lets say I lost it flat out lost it - accident. I was
25 driving down the road and say I am Commissioner Evanko and I want

18

1 to look at the Historic file driving down the road God for bid my car
2 gets stuck in a snow back and somehow the file gets water damaged
3 and the file gets destroyed or lose the car catches fire – I don't know.
4 The files lost. Is the file recorded somewhere? Does it exist anywhere
5 else?
6     A:   The hard copy all the things that are in that historic file.
7     Q:   Let's start there. The hard copy and all the things that are
8 in it. Would it exist anywhere else?
9     A:   It may not if nobody copied it.
10    Q:   Okay. But if its an AR1 its gonna exist on a hard copies
11 because its out there at the State police somewhere. Correct.
12    A:   Correct. It would exist from what was in effect before
13 and whats just been signed.
14    Q:   And its gonna be out there until its revised or changes
15 and once its revised and changed according to protocol then its
16 changed and then its distributed.
17    A:   Yeah
18    Q:   Sometimes the changes are in part and sometime you
19 reprint the whole thing if it changes its loosely isn't it?
20    A:   That's correct.
21    Q:   Okay. And the records in the historic file would indicate
22 when distribution is made is that correct?
23    A:   Yes. There would be a re-pro completed for that project
24 and it would be taken down to reproduction to reproduce and that
25 would be on there and that would no when it was done. And the

1 project person would pick that up and know then when it is
2 distributed.
3     Q:   How long does the distribution process take?
4     A:   From where. Do you mean from when the reproduction is
5 taken down stairs or from the beginning of the project?
6     Q:   No good question. The Commissioner signs it and says
7 its okay. A little routing slip indicates that the Commissioner signs it,
8 its okay. A little routing slip that indicates that he's approved it what
9 ever he does to it. But let's say its ol ay. The routing slip is carried
10 back down to you folks then that ro ing slip?
11    A:   That's correct it's brou ht back to us.
12    Q:   And what happens nex ?
13    A:   Then it would go to Sergeant Margeson and he would check
14 next. Because streets to see what change number would be in effect
15 sheet and numb see all done by change regulations, and a changed
16 then it would be giv it, and he would assign the next number and
17 into the electronic versio ize and then I would type the re-pro and go
18 printed out and a re-pro wou put the date on all that would be
19 they would hand carried it down made to copy and it would be given
20 back to the project person whoev that project person may be, and
21 could be downstairs to re-pro. It could g So at would be like 2 days that
22 longer depending on how many reproductio quickly it may take
23 that's a priority or not. requests we may have if

Q:    And when is it distributed from there. When does legal get their copy?

A:    Okay reproduction makes their copies and then they call upstairs to say it's completed. They'll call the project person and he will go down he'll pick up his copy and review it to make sure that there are no mistakes on it and all the pages are there and then he hand carries it to the mailroom and from there its distributed. The mailroom does the distribution. They have a distribution table that they go by to distribute to all the Bureau offices, and troops.

Q:    Now let's say this thing is change but the Commissioner signs it over February 23. Okay. There's gonna be a document in that historic file, or there better be or hopefully there will be IU guess it would indicate when what that got down there to the Commissioners office right?

A:    Yes it would be on the routing slip when it came back from the Commissioners office. Is that what your asking.

Q:    Yes.

A:    Yes there a date usually that somebody signs it back in that it came back from the front office.

Q:    Okay and you have those records do you?

A:    That –

Q:    Who keeps them Pam or you.

A:    No that would be in the historical file.

Q:    Okay. Now when it comes back your telling me that's when it goes to Sergeant Margeson.

21

from the Commissioner. After the Commissioner signs off on it by the way, unless he directs otherwise it goes back down to Mr. Margeson for his review, right.

A:    Well he doesn't really review it all he does is give it a number. He doesn't to my knowledge he doesn't review it once it comes back from down there.

Q:    Lets be hypothetical it comes down from the Commissioners office on the 23rd. Let's say it gets there that day. Technically I guess it could happen that Mr. Margeson would give it a number that day. Right.

A:    Could.

Q:    Could. So lets assume it got a number that day. Let's follow this through. Did you ever see this little thing on with kids they do on how to make a bill; it's really a neat thing. Legislative process lets follow it through if we can okay. It comes back he gives it to Mr. Margeson he gives it a number now lets say that happens in one day. Lets say there a desire to get this thing done lickity spilt we want to make sure its done right away. So lets make sure it's done. Now he gives it a number and that goes to you and you use a sort of short nice term for something I don't pro something. What is that? Well let's do it this way. He brings you that change sheet sent to you. What do you fill out?

A:    A reproduction.

Q:    A repro. Okay.

A:    Yeah just to give it a change sheet number, he's the one that signs the numbers so we don't get them out of sequence and that type of thing.

Q:    And whats the purpose of that change? What did you call it a change sheet number?

A: A change sheet that how that's our numeric system. It you have a change to AR11, well let me rephrase that. If you had a change to AR all the AR's run consecondly by change sheets what I'm saying is AR1 doesn't have a certain series of numbers AR12 mother one the AR1 is done by change sheets and done consecondley in order the next change is 895 the next change is gonna by 896.

Q:    And that's done to track and keep a calendar sequence when changes take place.

A:    That done to track.

Q:    And to keep a calendar sequence when changes take place. I would assume the reason thats done. Because if you have conflicting things sometimes or different things going on change different parts of a regulation unless you know the calendar sequence it's gonna be hard to deal with subsequive when those changes took or how to integrate them into the regulation. Isn't that fair to say.

A:    That's.

Q:    There's a good reason for it.

A:    Oh sure.

Q:    Absolutely. Now okay. So its February 23 there going to be something to indicate when that document get to the front office

22

A:    Now what is that, that's only part of the process first of all I would go into the electronic version of that regulation and out the header on which, I called given the index number AR11 and that date if it was February 23. And it would have that date on it. It should have that date and all pages of that regulation if the whole thing was revised.

Q:    Or if it was a page subsection C that was an addition and not a change that would be there.

A:    I'm not sure what you're talking about.

Q:    I know what happened in this case naturally you know well AR1.102 there was a subsection C added apparently it had subsections A and B before and there wasn't a change there was an addition and it had to do with a change of command.

A:    Oh okay.

Q:    There wasn't a revision is this particular change to any existing thing there was an add on.

A:    Okay.

Q:    That's the scenario, as I understand it.

A:    Okay.

Q:    So lets say somehow somebody is really interested in this thing and they hand carry it down on February 23 goes to the good Sergeant and he gives it a number  it comes to you and on the 23rd all this stuff could be done. You do the repro.

A:    Could possibly happen that way yes.

**Page 25**

1　　Q:　Would you remember something happened like that if
2　somebody hand carried that and pushing it through would you
3　remember that?
4　　A:　Do I remember ever project no.
5　　Q:　No mam.
6　　A:　No. Would I remember that,  no.
7　　Q:　Do you remember anything about Subsection C?
8　　A:　No.
9　　Q:　Now whats a repro?
10　　A:　Its just a form that we have to go in and get ready for
11　reproduction and that's what we use as a guideline and it has the
12　contact persons name, and whoever the project person is and their
13　phone number. And it would have the phone number and how many
14　copies are needed.  And we would say distribution AR because there a
15　AR distribution and we would list it if there was a whole regulation
16　that was revised, and we would list it item by item, page by page. Lets
17　say there was a table of contents we would list the table of contents on
18　the reproduction, and there are blocks that are already on their that we
19　would check off.  And then once I would do that I would give it to
20　Pam and she would look at it, and  she would initial off.  And that's
21　when she would put it in the electronic library. And then it would go
22　back to the the project person its just a form that we use.
23　　Q:　Old electronic library. Now what would that repro form
24　have on there as far as dates are concerned?

**Page 26**

1　　A:　Most of the time we try to date that reproduction as the
2　same date as I would put on that actual regulation.
3　　Q:　Okay so if I got this repro form, you try to date it
4　whatever that effective date of that revision or change would be.
5　　A:　Right, whatever date that I went in and inserted in the
6　computer on that regulation.
7　　Q:　Right.
8　　A:　Now sometimes it might be a different date but most of
9　the time I always try to match those dates.
10　　Q:　Now on that repro form lets say that repro form has the
11　effective date 2-23-01. Would that repro form have a date on there for
12　the last time AR1.102 was?
13　　A:　No there a separate reproduction done for each revision
14　or update for every regulation.
15　　Q:　And that would have the new effective date on there
16　though. I mean if doesn't matter what the regulation was before your
17　posting this latest revision or change.
18　　A:　Right this is the latest one. If I was typing it in today,
19　today's date would be on there because this is a new history this is a
20　new project.
21　　Q:　New project , new change new revision whatever it might
22　be.
23　　A:　That's correct.
24　　Q:　Now AR1 is a major regulation.
25　　A:　Okay.

**Page 25**

1　　Q:　I'm not asking you to agree with me. Is AR1 does that
2　mean to you. My understanding is that it is a major organizational.
3　　A:　It is your organizational part of the AR. To me all the
4　regulations are important.
5　　A:　I'm sorry. I'm not trying to say that it's important
6　anymore than any of the other ones. I wouldn't do that any different
7　than any of the other ones.
8　　Q:　My question probably kind of implied that somehow it's
9　the first among equals and I didn't mean that. What I was seeking in
10　the question was that AR1 was certainly not some insignificant things,
11　it's a major organizational  after all its AR1 - just that number alone
12　tells me something. It's AR1 it's a my understanding that looking at it
13　its' a main organizational regulation that's what its about. I guess. The
14　fact is when its changed or revised and you do the repro form you put
15　on the date you try to make the date the same as the effective date but
16　in any event its gonna be at least the date when that form is made up.
17　　A:　That's correct.
18　　Q:　Or possible some date in the future possibly. Is that fair
19　to say. Would you do a repro form,  put a date on it if you did it today,
20　and  a date on it from a week from now would you ever do that?
21　　A:　I can't say that I would never have done that if someone
22　said we want to use this date. For example for 2002 we wanted to
23　make sure the AR12 is dated after the first of the year it may have
24　come from the front office and ready to go. But this is a new process
25　of the way we were doing our regulations the whole formatting. So we

**Page 26**

1　wanted to make sure it was dated after January the 1, 2002. I may
2　have received it a week prior to that and dated it for that reason
3　because we wanted to make sure that it was dated after 2002 you
4　know for a lot of reasons and can I say that it never happen. No theirs
5　- that's the only thing that I can think of right now.
6　　Q:　And I'm not implying by the way that it did.
7　　A:　Yeah.
8　　Q:　The point is though that the repro date or the effective
9　date of the change or the revision is an important date? That's part of
10　the history that begins the history that begins the new -
11　　A:　That's part of the file.
12　　Q:　Yeah. Alright.  After you do the repro form where do you
13　do take it then?
14　　A:　There are two pages of the repro request,  that is put in
15　front of the actual regulation. After  I print it from the computer and
16　after I put the date. And I would give it to Pam Amrich who is my
17　supervisor.
18　　Q:　Okay where back on the record. Marie lets see if we can
19　break this down for you.
20　　A:　Okay.
21　　Q:　You responded that you said there were two forms to the
22　-. My understanding is those two pages whatever information there is
23　there, appended to a copy of the new revision itself that's a proof copy
24　I imagine.

A: A reproduction is just a single sheet. Okay yes it is attached to the actual regulation.

Q: And the actual regulation that its attached to would be its new form that's gonna be printed up and distributed and am I correct?

A: That's correct. Getting it ready for a reproduction copy. That's correct.

Q: What happens to it next.

A: Okay I would give it to Pam and she would enter it into the library. She would return it to the project person whoever that is. And that person would hand carry it down to reproduction. And they would lay it on the desk of the Supervisor reproduction there. If it wasn't time sensitive then they would just get to it when they got to it.

Q: About how long does it take to get something printed up any standard amount of time.

A: It varies for every regulation that was very thick, or a complete rewrite. I'm not remembering if that was a whole re-write of AR1.

Q: And I honestly don't know that.

A: It could take a while it depends on what other projects they have in reproduction. Usually we'll say to them when we have an item that is time sensitive this has to be done today and they do it quickly.

Q: Lets assume for the sake of argument that its time sensitive.

A: Okay.

29

historical file, they might not do that immediately because if it has been filed it may take time to go through that historical file. But lets say they were a good project person and stayed on top of it and kepted it organized they would have it ready to go. If they had other projects pending then they maybe wouldn't turn that in right away.

Q: How many project persons do you have?

A: Maybe 9 maybe 9.

Q: Can you name them for us?

A: You mean the ones we have right now?

Q: Yes Mam. Well Marie name the ones that you had on or about the first of last year 2001.

A: Well we just had a Corporal Todd Harmon, Corporal Fresner, Trooper Jack Reese, Corporal David Beard. I'm not sure if Trooper Clemens was there at that time I think he might be there. Corporal McAreavy. I think your gonna . Corporal Todd Feria. I'm not sure I think.

Q: That's fine. Alright it should indicate in the tracking log when the printing was done and when it was turned back over to RD.

A: That's correct

Q: Now does R D then take it over to the mailroom or do they sorta say hey take it over the mailroom kind of thing. Like directing the Sheriff to do it or do you take it over yourself?

A: Well, it's my understanding it's the Project persons responsibility to take it over to the mailroom. If it's a large project

Q: Lets say this thing comes in the Commissioners office on February 23 and lets say the 23 or 24 its laying down there on the printers desk, and they have the capacity to reprint a large AR and get in done in a day.

A: I suppose if they had to they would.

Q: I mean there gonna try—

A: They do what they have to do down there. There very good down there.

Q: Okay what happens next?

A: Once its completed they would probably stack it and call the persons name on the reproduction who ever that project person was that took it down and they would probably say your projects completed. That person would go down pick up there repro master the original one that went down should be the original master down there they would pick that up and they would make sure everything was taken down to the mailroom. And the mailroom would distribute according to its distribution table. And they would have a group that would be for our Bureau for our section that would distribute our copies.

Q: Okay. Now is there any record of that?

A: Yes they should have a project-tracking log that they logged out that it's completed. They would give it Duff and he would — sometimes this process has changed but I think they would give it Duff and he would close out that project, because every project has a number. That projects closed and you know if they had time to go through the

30

may see a hard copy, they may see what was in effect before and I'll go to the historical file and show them what was in effect before they won't physically look into to my knowledge. I've never had anybody ask me to go in and look at the electronic version. They look at a hard copy and say. Oh this is what was in effect this date to this date.

Q: You have a little table and desk down there to read things or something?

A: Just one area, there's a conference room.

Q: Does legal ever come down and take the file out?

A: They may have.

Q: And there suppose to sign for it if they do?

A: Yes.

Q: Does it ever happen that they forget to sign?

A: I really wouldn't know that. It could happen I guess but most of the time if they didn't file for it sign for it somebody would make a notation. I certainly would make a notation. But most of time it's a copy. They actually don't take the file they say can I have a copy of such and such and I would make a copy.

Q: Do you ever know them every taking the file physically out of there?

A: You mean that file or — any file.

Any file. Do you no of any instance where legal physically took a file out of RD?

A: I recall this had been a while back, I remember somebody asking for a copy of everything of that file.

1 they may push a cart maybe on a big cart. If it's a special project they
2 may hand carry it, take it over and say this is ready to be distributed.
3 I'm not directly in that process, but thats the general procedure.
4 Q: And then it would be mailed out distributed?
5 A: Right.
6 Q: Now I'm going to assume, and you tell me if you know
7 that the distribution of an AR change naturally on the distribution list
8 is gonna be legal virtually the legal department on virtually on every
9 change. I can't conceive of them not getting up dated copies of
10 changes to regulations. Right?
11 A: Right. Yes there upon distribution, whether it was given
12 to them, its up to the mailroom they may have miss it or I assume
13 every Bureau, every office, every troop, every area has a library and
14 they should be receiving there AR's in this case.
15 Q: Is there a record kepted on the distribution?
16 A: Yes there's a distribution table. That was just recently
17 revised, theirs always been a distribution table per say.
18 Q: Probable in the private sectors the outfit that maybe's
19 refined the tracking system better than anybody I know of, is Federal
20 Express. Now if Federal Express brings an item here there's a not
21 only do they seek to get it signed, there a notation by the driver where
22 he or she put it and what was done with it. On mail distribution do you
23 know whether there is some notation?

32

1 A: I wouldn't know that, because that involves another
2 Bureau, and I'm not sure what process they have, that would be under
3 Bureau staff services.
4 Q: Who heads up that Bureau?
5 A: Right not its Major Zinsky.
6 Q: Zinski or y.
7 A: sky.
8 Q: Okay. At what stage does the, I think you answers this
9 but what stage does the change get posted electronically?
10 A: When I give it to Pam. Well when I say electronically
11 that's just in our file, that's not open to anybody else at this point
12 Q: That's just you guys down in RD.
13 A: Right. That's part of our historical record file, that's not
14 distributed - nobody can access that from any Bureau or Troop that's
15 just thats just for our Bureau, eventually will be, but not at this point.
16 Do you understand what I'm saying?
17 Q: Yes Mam. I think I do. Now people outside RD can
18 access the historical files, but they can't come in and change it?
19 A: No you asked that people outside the Bureau office can
20 have access to the electronic version? No. It's only on our S drive for
21 the Bureau at this point.
22 Q: Okay. And theirs no way any body from outside that
23 Bureau and come in to and change.
24 A: Not to my knowledge.

33

1 Q: Now let me ask you this. I'm doing my research I want to
2 look at a regulation and I want to look at AR1.102 whatever software
3 you got out there I'm over out in troop A and I imagine there's some
4 kind of computer system or internal network or maybe they use the
5 Internet I don't know. But I come in and I access code whatever I do I
6 come in and research that file. I can't get any information
7 electronically about AR1.102 that RD doesn't post-up under that
8 regulation am I correct?
9 A: That's right my knowledge no one can get into the
10 regulations to review it to read only or anything at this point.
11 Q: Now Marie there's only two ways to access information
12 about AR1.102. I've either got to look at a existing hard copy
13 somewhere or I can pull it up on my computer, and I can look to read
14 what the latest posting to that file is? Correct? By RD.
15 A: I'm not sure if I understand. Where are you when you say
16 I can look into this are you outside the Burero?
17 Q: I'm in Pennsylvania State Police legal. And I look in my
18 files. I look in my hard copy and I want to see if there's any changes
19 since my last posted hard copy, and my last posted hard copy says
20 1997 July 7, 1997 lets say it says that date. I'm not sure if it says that
21 date. And I want to know if there's any changes and I look at my shelf
22 and I haven't had any changes. We call them court opinions; we call
23 them slip opinions. Okay there not yet published, but we can go in and
24 get the latest opinions or pull them up on the computer when there
25 posted. So if I don't have a hard copy change there then the only

1 place there the only place I can go to see if there's a later change is
2 electronically go to RD and see whats in there right?
3 A: They would come down and ask us they wouldn't do it
4 electronically.
5 Q: Oh, they would come down.
6 A: They would come down and ask us for the file, because
7 they don't access to anything only RD has it.
8 Q: Would there be a record of that.
9 A: Yes if it was logged in yes.
10 Q: What if it's wasn't?
11 A: Then there wouldn't be a record.
12 Q: That was a difficult one for me to figure out but – I.
13 A: If someone ask me a lot of times Chief counsel will send
14 something down by e-mail or correspondences or sometimes by phone
15 call and request to see a file. It doesn't always just come through me.
16 It may come through a Sergeant and he may assign a project person to
17 do that. But they in turn get a project number and that's logged.
18 Q: But do they come down?
19 A: Sometimes.
20 Q: They physically come down the lawyer's do?
21 A: Yes they do or the clerical staff.
22 Q: Okay. Do they come in and sit in and look at that file
23 without writing their name down?
24 A: Nobody's really look into the electronically version. I
25 don't know anybody whose looked into the electronic version, they

A: Yes.

Q: Did you charge twenty-five dollars an hour for labor?

A: I don't think so.

Q: Okay.

A: That's part of my job.

Q: Well okay so somebody came down and they got a copy of that that's fairly recent. I'm going back to a year ago or so. You don't know and you don't remember any hullabaloo about AR1.

A: See I don't really. I am involved in reviewing it and passing it on I don't kind of get into it. Unless I'm personally involved in a meeting in which this case I wouldn't have been. I don't know any more specifics in this case. Sometimes its better in my position not to. When somebody asks for information and -.

Q: Leo Tolstoy would agree with you. He's the smartest person. Okay now if – the normal procedure would be however is someone's going to come down and look at that file and study it they may not come down and look at it they may not sign in or sign anything out there. But if they took the file it should be either signed out or but it wouldn't necessarily be logged in if somebody looked at it?

A: We have a log sheet now I know we do, that we have everybody sign in and out.

Q: When did that start?

A: Probably January.

37

Q: All litigation responds good and positive changes some way Marie. All right but if somebody comes down there and there gonna take a look at the file its possible that somebody is going to take a look at the file and then leave.

A: That's correct.

Q: Alright Now is you look at that file and I know this is a silly question don't laugh at me. In most circumstances the last thing in the file is that last entry. If the last entry in the historic file is AR1 the effective date of a change to the regulation that occurs on February 23, 2001 that's gonna by the last thing in the file, right?

A: You mean the final regulation?

Q: Yes.

A: Correct.

Q: And somewhere in the file regardless of any proposed change, pending change, or even latest change is going to be the last copy of the effective face of that regulation?

A: It should be in there that's correct.

Q: Well what excuse is there for missing it then?

A: Missing what?

Q: The date of the regulation? I mean the regulation got a date 1997 its changed in 2001 how do you miss that. A date is a date is a date it's printed right in the darn document isn't it. I've seen them the date is printed right there.

A: I'm not sure if I understand.

38

REYNOLDS:     I'm going to object to the form of the question. I don't understand either.

BAILEY:     Okay.

A: No I'll let you ask your question.

Q: In the historic file things I have been able to see and read about the regulation has a date the last effective date it's printed right on the face of the regulation in large clear numbers well over an eighth of inch high in this corner of the document. That's what I've seen I don't know if that's a standard format, and I'm going to ask you about that next. But what I've seen that's where it's printed.

A: Yeah. That's done as a header alternating header and footer.

Q: Yes mam the header and its standard practice the way you do stuff?

A: Yes.

Q: Yes Mam. It's got a date on there. It's as plain as the nose on your face.

A: See I'm not sure I probably don't know if I should ask this. I'm not sure what the question is about the file.

Q: Well.

A: Then maybe I don't need to know that. You know.

Q: It's not that germane the complaint that we in a nutshell.

A: Can I say something else.

Q: Sure.

A: A historical file is as only as good as the person who did that historical file. Do you know what I'm saying?

Q: Sure.

A: Each project person has a responsibility to keep that up to date. Sometimes different project people are assign to a project if its been around for a while.

Q: Yes.

A: And that happens. As far as what's in there, there should be what was in effect, if it hasn't been changed since 97 then 97 should be in there. What was signed should be in there. That's I don't know what else your asking.

Q: Really I don't think that has anything to do with that. The issue is that when the format that I've seen ultimately has got to be to me the really basic question is the header issue. With the dates on there, that's all I just don't know how you could make a mistake on the dates on there that's all. I just don't know how you could make a mistake on an effective date and effective date on a regulation is a part of the regulation it's either in effect or it's not. And if that's a material issue in a case as it is here, then you look at the regulation in and you look at the date on that. How do you mistake that how do you confuse a 97 from an 01 I don't know. I think that's going to become a fact issue in this case. I'm trying to ascertain all be very honest with you where just looking at who looked at the file and when we know when the plaintiff looked at the file, and we have testimony on that. We don't know who went in and looked at the file. We have sanctions

filed and all that kind of stuff, it serves me well. I want to find out
what happened. That's all I'm asking about and if the historic file is
accessed then I'm trying to find out the procedures that govern how
you access the file when you look at it we know when Darrell Ober
looked at it, and he can testify what he saw and I'm just asking about
procedures when the file was looked at and I you've answered 99
percent of those questions. I just have a couple more. Unless opposing
counsel has any for you. The documents that say when somebody
looks at a file or when a file is changed. Are the all kepted with the
historic file? Let me tell you where I'm coming from. I'm trying to
find out if there are separate records or documents that are kepted
physically apart from?

A:    There may be.

Q:    There may be. So.

A:    So now I know that the form is right in the file because I
think its better that way. Because I can't remember what file
somebody asked me three months ago did somebody look at 401.2 I
don't know you get lots of requests. And I'm trying to ask the project
people if they get signed a project from counsel from someone that
they make sure the feel it out and make an extra copy so we have are
tickler file.

Q:    Alright. Aside from the historic file where might any
documents indicating log in and log out functions.

41

A:    There's a charge out sheet , a yellow charge out sheet
that may have been filled out. That this historical file was pulled out
and this person saw it on this date. If it was in the file.

Q:    Thank you. Just give me 30 seconds.

BAILEY:    Marie at this time I don't have any questions.
Opposing counsel may have some questions for you.

REYNOLDS:    Marie you indicated that I believe that
during your testimony that the regulations, that is internal regulations
of the State Police can be found on a system called West Law?

A:    No. He just asked if I was familiar with West Law. But
we don't have none of our regulations. All I know of is the State. Like
the what is it Title 18, the Crimes Code, the Vehicle Code and those
things, I'm sorry. I'm sorry if you misunderstood me.

Q:    So internal regulations such as AR, FR, OM's special
order that may not be found on a publically access system?

A:    No.

Q:    They would only be available through  hard copy
presently to the Pennsylvania State Police members.

A:    Correct plus it would be through are own share drive
under RD?

Q:    They could get it electronically through RD but again it
would only be accessible by members and employees of the state
police.

A:    Right.

RENOLDS: That's all I have.

42

BAILEY:    Are you saying that regulations that govern the
PSP are not available to the public?

A:    She asked me an electronic version.

Q:    Yes.

A:    Now eventually where working on an electronic library
now that everyone will  have access to what is in effect.

Q:    So if a citizen somewhere got onto Lexis or West Law,
some type of you know there the State. For example my West Law I
have access to Environmental Regulations and you know that public
code, the administrative code, one of the - documents to man. But you
don't really know if electronically they can be accessed or they can't
be accessed as Joanna?

A:    I know they can't because there's no version anywhere
but RD. No I'm sure of that.

Q:    So if I'm out at the Pennsylvania State Police
headquarters and I'm in the legal department I can feel reasonable
assured that opposing attorneys can't punch up on West Law or Lexis
and get at those regulations. Right. I can feel pretty secure about that
wouldn't I because there not out there right. Because I was wrong
wasn't I.

A:    West Law there is. Not are internal regulations and
directors not the West Law that's.

Q:    Lets get this real clear okay.  What Joanna's asking if I'm
right, I want her to come back with some other questions and maybe
lets get this cleared up okay. Your response to her questions if I

understood you correctly that if I wanted to look at AR1 or in this case
AR1.102 I would have to physically go out and look at a copy at the
state police or have cooperation from RD to look at your electronic
posting . Is that correct.

A:    That's correct.

Q:    Where I was in error, I apparently erroneously implied
that if  got on West Law or Lexis that I could access those regulations
and read them. And I'm in error right?

A:    Right. There for internal regulations. Not for PSP
regulations.

Q:    So Joanna is correct. PSP legal would have a copy of the
regulations right there and they could be secure. And comfortable that
Don Bailey couldn't get on his West Law and couldn't get on this
Lexis or whatever he might have, or get on the State net, you know
that little posting out there, or find PSP regulations like  AR1.102
because they aren't there right.

A:    That's my understanding.

Q:    Okay I don't have any additional questions.

MARCECA:    It's not 1:21 p.m. the 6th of March this
deposition is now concluded.

IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL G. OBER | : | CIVIL ACTION LAW |
| Plaintiff | : | 1: CV-01-0084 |
| vs., | : | (JUDGE CALDWELL) |
| PAUL EVANKO, MARK | : | JURY TRIAL DEMANDED |
| CAMPBELL, THOMAS COURY, | : | |
| JOSEPH WESTCOTT, | : | |
| HAWTHORNE CONLEY, | : | |
| JOANNA REYNOLDS and | : | |
| SYNDI GUIDO | : | |
| Defendants | | |

Proceedings:    Video Deposition
Thomas Williams

Date:    October 12, 2001

APPEARANCES:

For the Plaintiff:    Donald Bailey, Esquire
4311 North 6th Street
Harrisburg, PA 17110

For the Defendants:    Syndi Guido, Esquire
333 Market Street
Harrisburg, PA 17101

1

---

1    MR. BAILEY:    This is in operation. Tony you want to go ahead.
2    MR. MARCECA: It's, ah, 13:51 and good afternoon. My name is
3    Anthony Marceca. My address is 2219 Dixie Drive, York,
4    Pennsylvania. I'm employed by PR Video who has been contracted
5    to conduct this video deposition on behalf of the plaintiff. This
6    matter is docketed at 1:CV-01-0084 in the United States District
7    Court in the Middle District of Pennsylvania. And the caption is
8    Darrell G. Ober vs. Paul Evanko, et al. And we are now on tape.
9    Ah, Thomas F. Williams, could I swear you in please?
10    MR. WILLIAMS: Sure.
11    MR. MARCECA: Do you mind raising your hand? State your name.
12    MR. WILLIAMS: Thomas F. Williams.
13    MR. MARCECA: And you swear to tell the truth, the whole truth, so
14    help you God?
15    MR. WILLIAMS: I do.
16    MR. MARCECA: Thank you.
17    MR. BAILEY:    Mr. Williams my name is Don Bailey. I'm an
18    attorney, I know you and I have met before these are formalities I
19    must to go through. I am the attorney for the plaintiff Darrell G.
20    Ober. This is a deposition and just a few preparatory things before
21    we go through this. First of all it is a video deposition. You are
22    invited and you are welcome anytime you want to visit the office to
23    view the video deposition. You have the right under court rules to
24    do that and we will make the office and a TV monitor available to

2

---

1    you for that purpose. There also will be a transcript produced on the
2    audio that we get and that will be available either to your attorney
3    or to you at cost. And, that being said let me go into the technical
4    things that we're going to be doing here today. This is a deposition
5    as I had indicated in Federal Court. It's a Federal underlying case
6    here, in Federal Court, Civil matter. I'll be asking you questions and
7    you'll be responding to various questions as we go through this
8    thing. Just a few ground rules. First of all I want you to feel relaxed.
9    I'm not, no smoking gun questions or trick questions or anything
10    like that. That isn't what we're doing here. If you at some time, this
11    is usually a little different. I'm sure you've been through these kind
12    of things before. If um, I do things a little differently. I do not mind
13    if at any time if you want to ask me where I'm going with a question
14    or a reason why I asked a question, I will be happy to give you and
15    answer. Remember that naturally you're under oath and you have to
16    answer truthfully, you know that. Also know that you have a duty to
17    answer as fully and completely as you can. Now in that regard, if at
18    some time I either interrupt you or I inadvertently as I am fond of
19    telling people make an error, if I do, you don't get a chance to
20    answer fully and completely, make sure you prevail upon me to do
21    that, ok. At some time during this interview, I assume Syndi that the
22    objections except as to the form of the question are reserved until
23    time of trial, the usual stipulations will be in effect. Ah, from time
24    to time, it's unlikely because like I said I'm not much of a believer

3

---

1    in doing contentious depositions, if at some time your attorney has
2    an objection or a reason to stop or interrupt, listen to your attorney
3    and be sure you do whatever. I think for the purposes of these
4    depositions I think we're all agreed, although she may not formally
5    be your attorney that she would act as your attorney through these
6    hearings, even though you're retired. I'm gonna assume that. So if
7    she at some time objects, raise a point, raises a point, please stop
8    and wait until you hear from her before you begin. Ok? Before we
9    got back at it again. You're being videotaped. Our field is relatively
10    small here but sometimes you shift position or get up we'll have to
11    stop at that point. Ah, try to stay in basically the same place that
12    you are. Lastly, at some point you need to suspend, you want to talk
13    to Ms. Guido, use the restroom or whatever please don't be shy or
14    bashful about doing that. We'll suspend and accommodate you.
15    Major, do you have any questions for me before we begin?
16    MR. WILLIAMS: No.
17    MR. BAILEY:    Alright sir, as I said, and a number of questions
18    begin with some personal information first. I understand Major
19    Thomas Williams that you're retired?
20    MR. BAILEY:    When did you retire?
21    MR. WILLIAMS: In July of 2000.
22    Mr. BAILEY:    And how long had you been with the
23    Pennsylvania State Police?
24    A:    Thirty-three plus years.

4

1    Q:    And the last year or so that you were with the Pennsylvania
2          State Police could you just give us a brief description of your
3          duties?
4    A:    Yeah, I was area two commander which is comprised of
5          Troops F, Troop P and Troop R. and basically what I do is I
6          oversee the activities that occur in those troops.
7    Q:          Ok. Now, an area commander there's s number
8          of different troops within that area . I think you indicated that
9    A:    There are three troops in that area.
10   Q:    As of 1999, what were you doing for the State Police at that
11         time?
12   A:    I was area two commander.
13   Q:          Ok. Fine. And ah, as area two commander you
14         have a number of troops under you command and is the, ah, the
15         headquarters of the "s not within your command, at least not
16         some of it's functions but at least the area is, like Troop S and
17         that sort of thing is that within, Troop H within your area?
18   A:    Troop H?
19   Q:    Is Troop H within your area?
20   A:    No, it is not.
21   Q:    Where was your office?
22   A:          My office was in Montoursville.
23   MR. Bailey:    Which would be north of Harrisburg?
24   MR. WILLIAMS: North of Harrisburg, yes.

5

1    MR. BAILEY:    Ok, now do you have a recollection of when you
2          first became aware of Darrell Ober, Captain Darrell Ober?
3    Q:    Yeah when I was working in department headquarters I think
4          it was probably 1993 is when I was assigned down there as
5          the department disciplinary officer. I believe Captain Ober
6          was then Lt. Ober. He worked in BPR.
7    MR. BAILEY: Ok, and ah, what was your function down, what did
8          you do at that time, 1993?
9    MR. WILLIAMS: I was the department disciplinary officer.
10   MR. BAILEY: How long were you department disciplinary officer?
11   A:          From November of 1993 (pause) till I believe January of
12         1996.
13   MR. BAILEY:    When did Mr. Evanko become commissioner
14         of the Pennsylvania State Police?
15   MR. WILLIAMS: I don't recall the exact date.
16   MR. BAILEY:    Had he had any, did he have any background in the
17         Bureau of Professional Responsibility? Had he serve there?
18   MR. WILLIAMS: My understanding is that he did, I never worked
19         down there at that time.
20   Q:          So you didn't know him at that time.
21   A:          No, I don't have, I knew who he was but          that's
22         about all.

6

1    MR. BAILEY:    Alright sir. At, I'm gonna bring you ahead in time
2          now, to the year 1999. Did you recollect when you first saw or
3          talked to Captain Ober in 1999, during that year? At this time
4          you're up as an area commander, your headquarters are in
5          Montoursville, did you at some time in 1999 talk to Captain
6          Ober?
7    MR. WILLIAMS: I, I'm sure at some point in time I did but I'm not
8          sure when it would have been.
9    MR. BAILEY:    Do you remember ever talking with Mr. Evanko
10         about Captain Ober?
11   MR. WILLIAMS: Yes, just prior to being assigned this inquiry.
12   MR. BAILEY:    Have you had an opportunity to read the complaint
13         in this matter? Review it or look it over?
14   MR. WILLIAMS: Which complaint would that be? I          don't
15         know what you're referring to    Mr. Bailey.
16   MR. BAILEY:    Ok, you're here for a deposition, to provide
17         information. I would assume that you are aware there's an
18         underlying complaint that's been filed in Federal Court. Ah, have
19         you ever had the opportunity to read the complaint?
20   A:          I'm sure I have but I don't recall exactly what
21         was in it, though.
22   Q:          Oh no that's alright. I'm just asking if you ever
23         had an opportunity to review it or see it?
24   A:          I'm sure that that would be the case.

7

1    MR. BAILEY: Can you tell me when?
2    MR. WILLIAMS: No I can't. I'm sure it was in 1999 some time but
3          I can't recall exact months of dates/
4    Q:          Ok, well you'd indicated that you spoke with
5          Mr. Evanko about Mr. Ober. Was that by your choice or did the
6          commissioner contact you? How did that come about?
7    A:          You're talking about prior to the investigative
8          inquiry on Captain Ober? Is that what you're talking about?
9    MR. BAILEY:    Sure. I'm talking about the year 1999.
10   MR. WILLIAMS: 1999, if you're talking about Captain Ober, I
11         believe I was contacted by then Lt. Colonel Joe Westcott.
12   MR. BAILEY: Ok.
13   MR. WILLIAMS: Who basically told me he had an assignment for
14         myself and Major Werts.
15   MR. BAILEY:    Ok, where were you when Mr. Westcott contacted
16         you?
17   MR. WILLIAMS: I was probably in Montoursville Headquarters
18         although I can't swear to that. I could have been out visiting
19         somewhere.
20   MR. BAILEY: But it was by telephone?
21   MR. WILLIAMS: As I recall, yes, it was.
22   MR. BAILEY: Who was with you?
23   MR. WILLIAMS: I believe I was by myself.
24   MR. BAILEY: Ok sir. And Mr. Westcott contacted you by, it

8

1    wouldn't have been by radio, it would have been by telephone.
2    You weren't out on somewhere on the road, if you remember, it
3    that right?
4    MR. WILLIAMS: Well, no. we don't communicate back and forth
5    by radio.
6    MR. BAILEY: You don't use the radio for that purpose. Now, ah,
7    so you would have been in an office somewhere?
8    MR. WILLIAMS: Somewhere.
9    MR. BAILEY: You don't remember where but you would have
10    been in an office somewhere.
11    MR. WILLIAMS: Somewhere, yes.
12    MR. BAILEY: Now, Mr. Westcott called you on the telephone and,
13    ah, Tom what did he say to you.
14    MR. WILLIAMS: I don't remember exactly what he said but I
15    remember the general context was he had a, ah, an assignment
16    for myself and Major Wertz and would we come down and
17    discuss it with him and the Commissioner. I believe that's how it
18    went.
19    Mr. WILLIAMS: Ok. Do you remember when that was, when that call
20    took place? What month?
21    MR. WILLIAMS: No, I don't.
22    MR. BAILEY: Now, ah, he wanted you to come down and talk with
23    him, he indicated to you apparently, he had already talked to, or a
24    decision had been made that Major Wertz would be involved in

9

1    this thing, right?
2    MR. WILLIAMS: I believe that's what was mentioned yes.
3    MR. BAILEY: Ok, now, and he wanted you, Mr. Westcott did,
4    wanted you to come down and meet with him and the
5    commissioner? Did that meeting take place?
6    MR. WILLIAMS: Yes it did.
7    MR. BAILEY: Where did it occur?
8    MR. BAILEY: It occurred down in department headquarters in
9    the executive offices.
10    MR. BAILEY: In a conference room or in Mr. Evanko's office?
11    MR. WILLIAMS: I believe Major Wertz and I, you know, based on
12    our schedules we determined a time to go and we were down
13    there and went in and Lt. Colonel Westcott took us over to the
14    Commissioner's office. As I recall anyway.
15    MR. BAILEY: Ok.
16    MR. WILLIAMS: And we all sat down in his office.
17    MR. BAILEY: Ah, Tom who all was in that office?
18    MR. WILLIAMS: Well I know, initially, myself, Major Wertz, the
19    Commissioner, and Colonel Westcott. I don't know whether
20    Colonel Westcott, I don't recall whether Colonel Westcott
21    subsequently left the room or whether he stayed there the whole
22    time.
23    MR. BAILEY: Ok, Mr. Westcott, Mr. Wertz, Mr. Williams, you,
24    Commissioner Evanko, was Mr. Corey in that meeting?

10

1    MR. WILLIAMS: I don't know. I don't recall that he was but he
2    may have been.
3    MR. BAILEY: do you have a recollection of whether any one else
4    was in that meeting, Tom?
5    MR. WILLIAMS: No. Not that I can think of.
6    MR. BAILEY: Do you remember how long the meeting lasted?
7    A:    No, it wasn't a very long meeting, you know.
8    Q:    What? Tell us what transpired. Who said what
9    and in what order. Just tell us what went on.
10    A:    I don't know whether I can tell you who said
11    what. I just remember the overall context of the meeting which
12    was the commissioner wanted myself and Major Wertz to make
13    an administrative inquiry concerning the fact that he was not
14    notified of an investigation that had come about from the FBI
15    from a complaint made to Captain Ober and he was never
16    notified of the complaint it self until some months after the
17    complaint was actually filed.
18    MR. BAILEY: Well, ah, was there any secret about the fact that he
19    had not been notified until some months after. That was a given
20    fact. No one contested that fact did they?
21    MR. WILLIAMS: Not that I'm aware of.
22    MR. BAILEY: Ok, as you sat there that day, would this have been
23    in June or May?
24    MR. WILLIAMS: I'd be guessing. I'd have to review reports.

11

1    MR. BAILEY: Well guesstimate is ok but don't guess wild here.
2    That's correct. Ok, let me ask you some questions about that.
3    And from time to time I may change directions and where I'm
4    going with questions and if I do I'll tell you about that and give
5    you a chance to adjust. Right now, I want to talk about that
6    meeting. What occurred there that day. What was your
7    understanding of what you were supposed to investigate?
8    MR. WILLIAMS: I was just supposed to investigate the
9    circumstances that brought about this complaint.
10    MR. BAILEY: Well, ah, did anybody suggest talking to the FBI.
11    MR. WILLIAMS: I don't know if anybody suggested
12    It's just a course that you do. I know to do that and so,
13    subsequently I did talk to the FBI. I would talk to anybody that
14    had any dealings or
15    whose names were brought up during
16    the course of the inquiry.
17    MR. BAILEY: Sure . Well those are the instructions Mr. Evanko
18    gave you.
19    MR. WILLIAMS: He just as I recall, he just said he wanted us to
20    look into it and put it on paper and then he would review it. And
21    that's what we did.
22    MR. BAILEY: But, see, what I'm asking I understand what he said
23    but what I'm asking for is your perception. You know you're
24    sitting there. He's the Commissioner of the Pennsylvania State

12

1    Police, he's your commander, he's the man who gives the orders,
2    ah, and he wanted you to look. Was he's asking you to look into
3    why he was notified so late? Is that what he was trying to find?
4    MR. WILLIAMS: That was part of it. He wanted to know why
5    Colonel Hickes was notified and just look into the incident and
6    see what you come up with.
7    MR. BAILEY: Do you know whether he had ah, did he indicate
8    that he had just called Captain Ober and ask him? Why was I told
9    late?
10   MR. WILLIAMS: I don't recall. I don't recall that. I'm not saying it
11   wasn't mentioned just I don't recall it.
12   MR. BAILEY: Tom did you ask, I'm not trying to imply that this
13   would not be bold or not so proper, I just don't know. Did you
14   ask the commissioner for a briefing or what he knew about it.
15   MR. WILLIAMS: Well he told us. And that's what I'm saying he
16   told us about the fact, ah, that Colonel Hickes had been notified
17   and not himself or Lt. Colonel Corey.
18   MR. BAILEY: Ok. Well let's explore that for a second. He told
19   you, he told you Colonel Hickes was told before I was told.
20   MR. WILLIAMS: I don't know that it was in those words, but right.
21   The context of the meeting was, yes.
22   MR. BAILEY: Well, do you have a recollection of thinking about
23   why he brought that to your attention?
24   MR. WILLIAMS: No.

13

1    MR. BAILEY: I mean it was a given at the meeting was it not. No
2    question Captain Ober knew about it. Right? And hadn't told the
3    commissioner until some months later.
4    MR. WILLIAMS: That's my understanding, yes.
5    MR. BAILEY: And before you went to that meeting had Mr.
6    Westcott indicated to you why the commissioner was interested
7    in this matter?
8    MR. BAILEY: I don't recall that he did. I can't honestly recall
9    that he did.
10   MR. BAILEY: Ok. Um, now the commissioner indicated that Mr.
11   Hickes, he wondered why Mr. Hickes had been told?
12   MR. WILLIAMS: Why? That was mentioned. I don't know that he
13   wondered why. It was just brought up as I recall that he was
14   notified.
15   MR. BAILEY: Then you don't know what was in his mind.
16   MR. WILLIAMS: No I don't
17   MR. BAILEY: But you know what he said.
18   MR. WILLIAMS: I'm trying to recall everything he said but I can't
19   recall. That's the problem.
20   MR. BAILEY: Well that's, that's normal. Human beings being
21   what we are. Did he, but he did indicate that Colonel, I guess it's
22   Lt. Colonel Hickes had been informed and he did indicate at
23   some point in this conversation that he, Mr. Evanko had not been
24   informed. That, at least those basic facts are pretty clear.

14

1    MR. WILLIAMS: I recall that at a meeting I don't know who said it
2    or how it came about but I recall leaving that meeting. That was
3    part of what was discussed.
4    MR. BAILEY: Did Mr. Evanko indicate that he had at any time
5    talked to the FBI about the matter.
6    MR. WILLIAMS: Yes, I believe at some point in time that did
7    come up but I don't.
8    MR. BAILEY: What did he say about the FBI?
9    MR. WILLIAMS: I'm trying to recall. If I'm not mistaken I think he
10   said something about SAC out there, either the SAC had notified
11   him or somebody had notified him. He had talked to them
12   anyway. I don't know who he talked to or anything. I just
13   remember him saying something that he had a conversation with
14   someone from the FBI.
15   MR. BAILEY: Did he say who the special agent in charge was?
16   MR. WILLIAMS: I don't recall again.
17   MR. BAILEY: It's ok. Alright now, what, we're talking about your
18   mind now. You're sitting there, um what significance or any did
19   you attach to Mr. Evanko indicating that he had talked to the
20   SAC, the Special Agent in Charge, out there?
21   MR. WILLIAMS: I didn't make any assumption. I just know that he
22   talked to somebody out there. I just let that go.
23   MR. BAILEY: OK. What significance, if any, did you attach to the
24   commissioner indicating that Mr. Hickes had known prior to the

15

1    commissioner about this FBI probe?
2    MR. WILLIAMS: I think in my mind, I don't recall that he said
3    this, but I think in my mind I perceived him to wonder why, why
4    that Lt. Colonel Hickes was contacted and he wasn't contacted.
5    Or why Lt. Colonel Hickes didn't tell him about it.
6    MR. BAILEY: Ok. You weren't there that day, at least as you
7    understood it, to make an inquiry into Mr. Hickes though were
8    you?
9    MR. WILLIAMS: No but that would have been part of what we
10   would inquire about because it was mentioned, it was mentioned,
11   I believe that Lt. Colonel Hickes had known about it and
12   certainly I would have interviewed him as part of the inquiry to
13   determine when he knew about it, what he was told, etc.
14   MR. BAILEY: Well you in fact did go and did talk to Mr. Hickes.
15   MR. WILLIAMS: Sure.
16   MR. BAILEY: But when I asked you the questions about Mr.
17   Westcott and you responded you didn't mention Mr. Hickes, you
18   indicated Mr. Ober. Do you want to. Can you..
19   MR. WILLIAMS: No wait a minute..
20   MR. BAILEY: Oh, you didn't?
21   MR. WILLIAMS: I'm missing something here.
22   MR. BAILEY: Let me tell you where I'm coming from. So far to
23   this point, it sounds to me, this is in keeping with the spirit to
24   letting you know where I'm coming from. It sounds to me like,

16

1    you know, you get a call from Mr. Westcott, and you're
2    checking, the commissioner wants to check into something that
3    has to do with Mr. Ober, we don't know exactly what Mr.
4    Westcott said but it was about Mr. Ober. To check into this thing
5    with Mr. Ober. Did Mr. Westcott mention Mr. Hickes when he
6    called you?
7    MR. WILLIAMS: Right. That's what I'm getting to. I'm just
8    looking for the little pieces of brick and mortar in the fact story
9    here to try to understand what people's motivations and thoughts
10    were. And I'm looking in, and what I'm asking you about are
11    those situations and those facts that would indicate so I can learn
12    what the commissioner's thinking and his motivations. I'm trying
13    to fit Mr. Hickes into this picture because during this
14    conversation and now I'm getting to a specific question, during
15    this conversation as I understand it in the commissioners office
16    Mr. Hickes' name came up.
17    MR. WILLIAMS: Yes, but I don't know who mentioned it.
18    MR. BAILEY: But you remember Mr. Ober's name coming up.
19    MR. WILLIAMS: Sure.
20    MR. BAILEY: And you used the words, and you correct me if I'm
21    wrong, when I'd asked you the question about the interest in Mr.
22    Hickes on the behalf of the commissioner you said, I think your
23    words were, would have been part of what you understood you
24    were to do.

17

1    MR. WILLIAMS: I tried to convey the fact that I would have
2    interviewed Lt. Colonel Hickes because that's who Captain Ober,
3    at the time reported that to and I would have wanted to know
4    when he reported it and what was said.
5    MR. BAILEY: Ok, let me go back to my last question then. You
6    didn't understand the inquiry then to be into what happened with
7    Captain, with Mr. Hickes but the inquiry was about why Mr.
8    Ober went to Mr. Hickes.
9    MR. WILLIAMS: Yes, I believe that would be correct.
10    MR. BAILEY: Ok, and did the commissioner offer any thoughts or
11    reflections on why Mr. Ober reported this information to Mr.
12    Hickes as opposed to reporting it to reporting it directly let's say
13    to the commissioner?
14    MR. WILLIAMS: Not that I can recall, he didn't.
15    MR. BAILEY: OK. At the time you were in the commissioner
16    office, what understanding, if any, of what Mr. Ober was
17    supposed to have done at that point?
18    MR. WILLIAMS: It was my understanding that he had supposedly
19    received information some months earlier of a trooper on the job
20    taking a bribe to somehow get a prospective state police
21    applicant moved up on some type of a list or something. Moved
22    to where they were accepted at the academy when in fact they
23    were not eligible to be accepted at the academy.
24    MR. BAILEY: Ok. I'm sorry, you done?

18

1    MR. WILLIAMS: Yes.
2    MR. BAILEY: So what you're telling us there is what you
3    understood the FBI probe to be about, some kind of allegation
4    that somebody had compromised the law, duties under the law, a
5    regulation or whatever, somebody had done something wrong
6    about either hiring or promoting somebody. Is that right?
7    MR. WILLIAMS: It was hiring somebody.
8    MR. BAILEY: And, uh, what I'm asking is did you have an
9    understanding of what Captain Ober was supposed to have done?
10    In other words, being more specific, what was Captain Ober
11    supposed to do once the FBI talked to him?
12    MR. BAILEY: As far as I'm concerned?
13    MR. BAILEY: Oh, ok. Your own thoughts then, as far as you're
14    concerned. What was he supposed to have done?
15    MR. WILLIAMS: I think he should have reported it to his superior.
16    MR. BAILEY: And who was his superior?
17    MR. WILLIAMS: At the time I believe it was Major Connally.
18    MR. BAILEY: Ok and, ah, is that what was discussed there in the
19    room that day?
20    MR. WILLIAMS: Not that I recall, no.
21    MR. BAILEY: Um did Major Connally's name come up?
22    MR. WILLIAMS: I don't recall it coming up.
23    MR. BAILEY: Ah, and were you aware of who Major Connally
24    was at that time?

19

1    MR. WILLIAMS: Sure. I knew who Major Connally was yes.
2    MR. BAILEY: Did Commissioner Evanko say I want to know or I
3    want to find out why Mr. Ober told Mr. Hickes but didn't tell Mr.
4    Connally. I mean you told me Mr. Connally's name didn't come
5    up.
6    MR. WILLIAMS: No, I don't recall it coming up. I can't remember
7    particulars about that meeting. I can only remember the concept.
8    I can't attribute statements to people. I just can't do that.
9    MR. BAILEY: No, and I don't want you to. I can only, and I hate to
10    use this phraseology, but what happens, anytime you asked
11    somebody a question in a deposition, you're trying to learn
12    things, you get an answer. The answer, to use an old metaphor,
13    the answer begs a question, because, you know, you're trying to
14    learn more and add to it. The only place I was trying to go in
15    short was, I'm trying to figure from your recollection, you know,
16    what occurred. Some of these questions may seem strange
17    forgive me for that. Remember I wasn't there so I don't know.
18    I'm just trying to search the corners of your mind and I realize
19    you haven't been questioned before so you don't know either.
20    I'm just trying to learn about it. The point is though, the point is
21    though, and the Commissioner brought up Mr. Hickes' name you
22    didn't, right? You didn't bring up Mr. Hickes' name, the
23    commissioner did.
24    MR. WILLIAMS: I don't know who brought it up. Like I said I'm

20

1  unable to recall exactly whether Lt. Colonel Corey was in that
2  meeting or whether Lt. Colonel Westcott stayed the whole time
3  or whether he left. I just don't recall.
4  MR. BAILEY: Ok, but Mr. Connally's name didn't come up, you
5  know that?
6  MR. WILLIAMS: No, I don't recall that at all.
7  MR. BAILEY: Now, so at that time, at that time, did you know
8  what Mr. Ober's chain of Command was at that time?
9  MR. WILLIAMS: Yes, I would have known.
10 MR. BAILEY: And was Chain of Command the issue?
11 MR. WILLIAMS: I don't know if that was the entire issue. That's
12 part of what the inquiry was about, what was done and how it
13 was done and what the reasons were for it being done.
14 MR. BAILEY: Why'd they need, why did they need you, no
15 reflection on you. I'm sure they chose you because you're a very
16 capable man but why would they need you and anyone else why
17 Mr. Ober, why not ask Mr. Ober why he talked to Mr. Hickes?
18 MR. WILLIAMS: I think probably because there were more than
19 just a few people who had to be interviewed concerning this and
20 they turned to the Majors, that's our job, to look into these things
21 so that they don't get bogged down in it.
22 MR. BAILEY: Who are they?
23 MR. WILLIAMS: The front office. You know as I recall and I don't
24 remember exactly what it was, but it was something about a Lt.

21

1  Colonel's name being mentioned so he wouldn't go to the Lt.
2  Colonel. At least in my estimation he wouldn't if in fact a Lt.
3  Colonel was mentioned. So who else does he go to? He goes to
4  the rest of his senior command, the area commanders.
5  MR. BAILEY: To find out if Mr. Ober had violated some
6  regulation?
7  MR. WILLIAMS: It was, it was based, we were to do the inquiry
8  and then turn that information into the commissioner and then he
9  would make any determination as to Captain Ober's conduct or
10 anything. We didn't do that.
11 MR. BAILEY: You were to gather facts. You were not playing the
12 role of a lawyer. You were not playing the role of a judge.
13 Correct?
14 MR. WILLIAMS: That's correct.
15 MR. BAILEY: So you were just gathering facts and information.
16 And that's what you did.
17 MR. WILLIAMS: That what I did.
18 MR. BAILEY: Alright, now. Mr. Evanko, did Mr. Evanko indicate
19 at any time during this meeting during this meeting that we're
20 discussing what he thought Mr. Ober had done wrong?
21 MR. WILLIAMS: No, if you know the commissioner he's very
22 careful not to try to impose his views on anyone else and I think
23 what he wanted Major Wertz and I to do was just, as you termed
24 it, be fact finders and not prejudice us one way or the other.

22

1  MR. BAILEY: Ok, now did he indicate when he talked with you in
2  this meeting whether he had done any kind of pre-investigation
3  or pre-inquiry into things?
4  MR. WILLIAMS: I don't recall anything like that being said.
5  MR. BAILEY: I'll give you an example. If I'm sitting down
6  somewhere and I have some investigators working with me and I
7  give them a little background of what I'd like them to look into.
8  Did you get any background?
9  MR. WILLIAMS: Do you mean from the commissioner?
10 MR. BAILEY: Yes.
11 MR. WILLIAMS: He basically told us he just wanted this looked
12 into and determine what happened because he wasn't sure what
13 happened. That's the way I looked at it anyway.
14 MR. BAILEY: Did he indicate he didn't know why he wasn't told?
15 MR. WILLIAMS: I, don't, I honestly don't know
16 MR. BAILEY: No I not, these are just questions I have to ask and I
17 understand that you may not know but I just wondered if he
18 indicated why Mr. Ober didn't tell me.
19 MR. WILLIAMS: I don't recall that. Problem is I never took any
20 notes in a meeting like that and it's based solely on my
21 recollection. I guess my recollection isn't all that good
22 sometimes. But it was sometime ago too.
23 MR. BAILEY: Ah, do you know whether anyone took any notes?
24 MR. WILLIAMS: Not that I'm aware of.

23

1  MR. BAILEY: Was the meeting taped or anything like that?
2  MR. WILLIAMS: Not that I am aware of, no.
3  MR. BAILEY: Ah, do you have a recollection of whether you asked
4  any questions?
5  MR. WILLIAMS: No, I think it was just conversation and we were
6  given guidelines to look into it to see what had happened and
7  when it happened.
8  MR. BAILEY: You called this an inquiry. Was that the
9  commissioner's choice of words?
10 MR. WILLIAMS: No, it's probably mine because I didn't term it a
11 quote investigation because there was no official report made up
12 on it. It was a from / to subject letter I believe from myself and
13 Major Wertz to the Commissioner.
14 MR. BAILEY: Did both you guys sign it?
15 MR. WILLIAMS: We both initialed it as I recall.
16 MR. BAILEY: Both initialed it?
17 MR. WILLIAMS: And basically what that report consisted of, as I
18 recall again, was just a very short paragraph telling him that we
19 had finished and the attachments are attached. We didn't make
20 any recommendations or anything. It was just a very brief from /
21 to subject letter to him and what we wanted him to do was draw
22 his own conclusions based on the interviews that were made. So
23 there were a number of interviews attached to that report.
24 MR. BAILEY: Ok. Off the top of your head what interviews were

24

1  attached. We know one, of course, was Captain Ober, we're
2  going to go over that in a minute.
3  MR. WILLIAMS: I believe the commissioner was interviewed,
4  MR. BAILEY: Paul Evanko was interviewed/
5  MR. WILLIAMS: Yes. I believe Lt. Colonel Corey was
6  interviewed. The FBI agent, I'm trying to recall his name, conch
7  or?
8  MR. BAILEY: Cush?
9  MR. WILLIAMS: Cush, Cush, he was interviewed. Major Dane
10  Merryman was interviewed. I believe she was a Lieutenant at the
11  time Dana Sipher. There were a number of interviews in there. I
12  recall those off the top of my head. I have to refresh my memory
13  to come up with any other ones.
14  MR. BAILEY: Ok. Were all those interviews taped
15  electromagnetically, with a tape recorder.
16  MR. WILLIAMS: Yes they were.
17  MR. BAILEY: Now, Tom, five years you were a disciplinary
18  officer?
19  MR. WILLIAMS: No, ah just like two years.
20  MR. BAILEY: Two years. Ah, what, after concluding your
21  investigation did you come to a conclusion as to any regulations
22  that Mr. Ober had violated?
23  MR. WILLIAMS: No I did not. I didn't do that purposely. I just let
24  the interview, the attached interviews speak for themselves.

25

1  MR. BAILEY: Ok, now this meeting you had with the
2  commissioner. Was it the only meeting you had with the
3  commissioner where Mr. Ober was discussed?
4  MR. WILLIAMS: No I believe once I finished the inquiry I
5  believe that Major Wertz and I went back down to department
6  headquarters and hand delivered that from / to subject letter and
7  attachments to him personally.
8  MR. BAILEY: And who was present at that gathering?
9  MR. WILLIAMS: I know the three of us. I don't recall anyone else.
10  MR. BAILEY: Ok, and what was said?
11  MR. WILLIAMS: Basically we just told him the investigation is
12  completed. All the attachments are there. All you have to do is
13  read it and he could make his own mind up.
14  MR. BAILEY: Now at the first meeting when you had gone in to
15  discuss, there were two meetings that you had with the
16  commissioner where Mr. Ober was discussed. Just two now that
17  you can recollect?
18  MR. WILLIAMS: That I can recollect.
19  MR. BAILEY: And ah, at that first meeting was the governor's
20  office discussed?
21  MR. WILLIAMS: I honestly don't recall.
22  MR. BAILEY: Did Mr. Evanko indicate that he had any either
23  instruction or guidance to look into this matter?
24  MR. WILLIAMS: I don't recall that being discussed either.

26

1  MR. BAILEY: Now, ah, I'm not, I don't want you to think I'm
2  toying with words, I'm trying to figure out, and its been going in
3  the back of my mind sort of rattling around since you indicated it,
4  you said this wasn't an investigative inquiry. It was a to / from
5  letter. Do you remember that? Am I right about that? Is that what
6  you said?
7  MR. WILLIAMS: Yeah, I said I didn't determine it to be a quote
8  investigation because there was no formal report written up on it.
9  I didn't determine it to be an internal affairs investigation
10  because in an internal affairs investigation you make up a
11  specific report on it. It was a fact-finding mission and therefore I
12  just put it on a from / to subject letter and sent it, ah gave it to the
13  commissioner.
14  MR. BAILEY:    So you weren't doing an investigation. This is
15  not an investigation.
16  MR. WILLIAMS: I guess it's simply a matter of semantics. I didn't
17  determine it to be that but I guess other people could determine it
18  to be that.
19  MR. BAILEY: What, as somebody with two years as a disciplinary
20  officer, what in you opinion would have or could have caused
21  someone else to view it as an investigation as someone with
22  experience in that field?
23  MR. WILLIAMS: I don't know. I imagine if you asked the average
24  trooper out there, because that's all they do are investigations and

27

1  make investigative reports, they would consider it an
2  investigation. I didn't for the reasons I already told you.
3  MR. BAILEY: Well, did the people that you talked to, that you
4  questioned, were they free not to talk to you? Could they have
5  said "Bye-bye" I don't want to talk to you about this.
6  MR. WILLIAMS: I'm sure they could have.
7  MR. BAILEY: Did you tell them that they could?
8  MR. WILLIAMS: I don't recall that we did. No, as a matter of fact,
9  I would probably say no, we didn't tell them that.
10  MR. BAILEY: Well you're their employer, right?
11  MR. WILLIAMS: I'm not their employer, no.
12  MR. BAILEY: You're their superior officer.
13  MR. WILLIAMS: Sure.
14  MR. BAILEY: You tell them to sit down, do they sit down?
15  MR. WILLIAMS: Sure they do.
16  MR. BAILEY: You tell them to answer a question, do they answer
17  a question?
18  MR. WILLIAMS: Yeah, pretty much.
19  MR. BAILEY: Did you have them all, did you advise them all of
20  their responsibility to answer questions?
21  MR. WILLIAMS: I don't know that I did. I know I did with Captain
22  Ober. I gave him his administrative rights as I recall.
23  MR. BAILEY: And why would he be different that anybody else?
24  MR. WILLIAMS: Because he was, he was kind of the focus, the

28

1    subject.

2    MR. BAILEY: He was the subject.

3    MR. WILLIAMS: Whereas the other people were not.

4    MR. BAILEY: Th other people were not. They were potential

5    witnesses but he was the subject of the inquiry.

6    MR. WILLIAMS: Yeah, I don't know how you would put it any

7    other way, sure.

8    MR. BAILEY: Mr. Hickes, you'd indicated you'd talked to Mr.

9    Hickes.

10    MR. WILLIAMS: Yes.

11    MR. BAILEY: Ok. Was Mr. Hickes the subject of the inquiry?

12    MR. WILLIAMS: No, he was interviewed to make a determination

13    of when he was apprised of what happened, what he was apprised

14    of and I believe we even asked him if he was apprised of it why

15    he didn't notify the commissioner?

16    MR. BAILEY: You're a little brighter than I am. You're a step

17    ahead of me. I may get there. Uh, so you asked him why he

18    didn't tell the commissioner?

19    MR. WILLIAMS: Sure.

20    MR. BAILEY: And what did he say sir?

21    MR. WILLIAMS: I don't know. I'd have to review the report

22    before I could tell you that. I honestly, it seems to me, I'm not

23    gonna say that because I can't be sure that was even mentioned. I

24    was gonna say something about confidentiality but I can't, ah

29

1    MR. BAILEY: You don't recollect why Mr. Hickes said he didn't

2    tell the commissioner? You don't recollect that?

3    MR. WILLIAMS: No because the problem I run into is that, is that,

4    for a lack of a better term, I guess, there was a meeting that I

5    believe Darrell attended along with Colonel Hickes when he

6    advised the commissioner of what took place. And then there was

7    a subsequent, for lack of a better definition, a meeting between

8    Colonel Evanko. Lt. Colonel Corey and Lt. Colonel Hickes. And

9    there were some things said in that meeting that I don't want to

10    overlap into his interview because I'm not sure. I know what the

11    official reasons were he gave to the commissioner and all but I'm

12    not sure exactly what was said in the interview that we talked

13    about.

14    MR. BAILEY: What were the official reasons he gave to the

15    commissioner on why he did not tell the commissioner about the

16    FBI probe when he first heard or shortly thereafter?

17    MR. WILLIAMS: I believe one of them were he was told, I believe

18    by the Captain that it was a confidential investigation and he

19    didn't want to, you know, start putting that type of information

20    out, and I'm not a lawyer again but official oppression might

21    come into play there. I believe he talked about the department

22    itself and he wanted to keep the department clean that it not be

23    tainted in any way. And I believe another reason was, he talked

24    about the fact that if the commissioner didn't know, he couldn't

30

1    be accused of tampering with and investigation or something like

2    that.

3    MR. BAILEY: He, he was protecting the commissioner?

4    MR. WILLIAMS: Yes.

5    MR. BAILEY: And did he indicate that maybe he had a concern or

6    fear that someone might think that they were obstructing justice?

7    MR. WILLIAMS: Yes. But I don't remember when it was

8    discussed as I told you.

9    MR. BAILEY: Yeah that's ok. Did he indicate, we're just talking

10    about his post- explanations or his reasoning anyway so it doesn't

11    matter when it was discussed. But the question that I have is, did,

12    had the FBI indicated they were concerned that this thing be kept

13    confidential.

14    MR. WILLIAMS: Based on my interviews they were not.

15    MR. BAILEY: And who did you interview with?

16    MR. WILLIAMS: I don't remember.

17    MR. BAILEY: Did you say Mr. Cush?

18    MR. WILLIAMS: I believe that's his name.

19    MR. BAILEY: When did you talk to Mr. Cush?

20    MR. WILLIAMS: I talked to him on two different occasions. I

21    remember traveling out to the Finley Station and I talked to him.

22    END SIDE ONE (TAPE ONE) BEGIN SIDE TWO (TAPE

23    ONE)

24    MR. BAILEY: Ok, let me go back and ask that question again. You

31

1    did some interviews with the FBI agent. Is that correct?

2    MR. WILLIAMS: That's correct.

3    MR. BAILEY: He was not concerned about confidentiality?

4    MR. WILLIAMS: That's my understanding, yes.

5    MR. BAILEY: Did he indicate what the investigation was into or

6    who it was into?

7    MR. WILLIAMS: To me? Yeah he told me.

8    MR. BAILEY: Who was it into? What was it about. I mean we

9    know it was about.

10    MR. WILLIAMS: It was about a trooper, a trooper, ah, Stanton, I

11    believe his name was.

12    MR. McGRATH: Can we stop a moment? You're recording, I

13    don't believe you're recording correctly. It's got a bar so can you

14    check your recording device?

15    MR. BAILEY: This one here, oh this here? Just pull that thing on

16    the right. Ok. That wouldn't.

17    MR. MCGRATH: You're blinking for some reason as you're

18    recording. Is the device going?

19    MR. BAILEY: Yeah, it's working.

20    MR. McGRATH: Ok, can you take a second look at you're

21    MR. BAILEY: Sure.

22    MR. McGRATH: Sorry for the interruption, when your tapes

23    popped that started. Got a slash through the recording.

24    MR. BAILEY: I don't know what the reason for that could be. You

32

1   may want to change that cassette in that.

2   MR. MARCECA: Ok, right now we're gonna go offline for a

3   minute. It's 14:40 and we're going offline.

4   **GAP WHILE CASSETTE BEING CHANGED.**

5

6   MR. MARCECA: It's October 12, 2001. The time is 14:41. We just

7   put a new tape in this recorder. One second we're ready to go

8   back online.

9   MR. BAILEY: You're not running.

10   MR. MARCECA: Ok. It's 14:43 and we're back on record.

11   MR. BAILEY: What did he indicate the FBI concerns were, Mr.

12   Cush, about the investigation, if any?

13   MR. WILLIAMS: I don't recall that he, that he voiced any

14   concerns. Like I said before I interviewed him twice. Once at the

15   Finley Station and once by telephone. And the purpose of that

16   phone call was to ask him very specific questions.

17   MR. BAILEY: Um-hmm, like what?

18   MR. WILLIAMS: Uh, did he tell Captain Ober that this was a

19   confidential investigation? My recollection of that was, no, he

20   did not tell him that.

21   MR. BAILEY: What does 'confidential investigation' mean? I mean

22   I would assume all investigations are confidential. What a

23   confidential investigation?

24   MR. WILLIAMS: Well, I guess to me it's an investigation that only

33

1   people with a need to know would know about versus anyone

2   basically knowing about it.

3   MR. BAILEY: Did he indicate whether any State Representatives

4   were involved?

5   MR. WILLIAMS: I don't, I don't recall exactly whether he said

6   that. Somewhere during the inquiry process that was brought up,

7   certainly.

8   MR. BAILEY: What was brought up?

9   MR. WILLIAMS: About the possibilities of a Senator or a State

10   Representative being involved. And it was my understanding, I

11   believe from him that they had determined that was not the case.

12   MR. BAILEY: After the fact?

13   MR. WILLIAMS: Yeah, I guess it would have been after the fact.

14   MR. BAILEY: I'm talking about the time that this gentleman, Mr.

15   Cush, talked to Mr. Ober.

16   MR. WILLIAMS: If you let me read my interview I would have a

17   better

18   MR. BAILEY: Let's go by your recollection cause you talked to an

19   FBI agent twice and twice that FBI agent told you that it wasn't

20   confidential.

21   MR. WILLIAMS: No once he told me.

22   MR. BAILEY: Oh, once he told you it wasn't confidential. Well,

23   MR. WILLIAMS: Because I think I forgot to ask him the first time

24   was the problem.

34

1   MR. BAILEY: Oh, I see. Alright. Well, did he ever indicate there

2   was an interest in the governor's office?

3   MR. WILLIAMS: Not to me he didn't. Not that I recall anyway.

4   MR. BAILEY: Then you don't know why Mr. Evanko would tell

5   the governor's assistant that there was some possibility that this

6   was in the affairs in the governor's office, do you?

7   MR. WILLIAMS: No.

8   MR. BAILEY: Ok. That's interesting. Well, let's talk about these

9   interviews with Mr. Cush. Uh, did you sit down with Mr. Cush?

10   MR. WILLIAMS: Yes, in the first interview I did.

11   MR. BAILEY: And that was out at Finleyville?

12   MR. WILLIAMS: Out at Finley, yes.

13   MR. BAILEY: I'm sorry, Washington county? Wherever it is, out

14   there?

15   MR. WILLIAMS: Yes, it's out west, out west somewhere.

16   MR. BAILEY: Out in God's country. (Laughs) I'm an old

17   southwestern Pennsylvanian. Now who was present when you did

18   that interview?

19   MR. WILLIAMS: Well, I know myself and him and I can't recall

20   whether his supervisor was there or not. Something in my mind is

21   telling me his supervisor was there but I don't recall him saying

22   anything or you, know, I think he was just there. Probably as a

23   support system or something. I don't know.

24   MR. BAILEY: Well the FBI did, they definitely do the support

35

1   system. Do you, do you, ah, do you remember if there had been

2   an inquiry of this type actually prior to when Mr. Cush, by the

3   FBI, prior to when Mr. Cush had told Mr. Ober?

4   MR. WILLIAMS: My understanding there was some kind of

5   investigation that the FBI were doing some time prior to his

6   contacting Captain Ober.

7   MR. BAILEY: And that, ah, did they, the FBI agents ever indicate

8   that they had ever contacted anybody in the State Police about

9   any suck investigation prior to telling Mr. Ober?

10   MR. WILLIAMS: I don't recall that. I'm not saying that it didn't

11   happen but I don't recall that.

12   MR. BAILEY: Well, did Mr. Cush indicate or did Mr. Cush ever

13   say anything to the effect of being concerned about higher-ups in

14   the State Police?

15   MR. WILLIAMS: Like I said again this was brought up by I don't

16   know what part of the inquiry that I learned of this. I know that at

17   one point in time there was a Lt. Colonel, no name mentioned,

18   but there was a Lt. Colonel mentioned. I don't recall what part of,

19   ah, what I was doing in the inquiry, when I came across that.

20   MR. BAILEY: Ok, Tom, let's try to break that down a little bit. I

21   understand that there, we want to be real clear about this now.

22   What you're saying is that at sometime during your fact finding

23   mission, let's call it a fact finding mission, at some time during

24   your fact finding mission it was brought up that there was

36

1    concern about higher-ups in the State Police. Am I right?
2    MR. WILLIAMS: That's correct.
3    MR. BAILEY: Well, did you ever trace that to this gentleman,
4        Captain Ober's, own mind and conclusion or was that based on
5        something else?
6    MR. WILLIAMS: I'm not sure I understand your...
7    MR. BAILEY: Was Captain Ober responsible after you did your
8        fact finding mission for concluding that there were higher-ups in
9        the State Police involved or did that originate with
10       the FBI?
11   MR. WILLIAMS: I believe that that originated with the FBI.
12   MR. BAILEY: Thank you sir. Thank you very much. I appreciate
13       that. Now, when you talked
14   MR. WILLIAMS: Let me clarify this.
15   MR. BAILEY: Sure I want to get this, this point is very important.
16   MR. WILLIAMS: I believe this, I believe it came through an
17       informant of theirs or something telling the FBI. I don't know if
18       the FBI themselves concluded that. But, it, it didn't come from
19       Captain Ober. I mean he was parroting information he was
20       probably given.
21   MR. BAILEY: Alright, sir. The point though is that eventually the
22       investigation itself revealed that there were not higher-ups in the
23       Pennsylvania State Police involved. Am I correct?
24   MR. WILLIAMS: That's correct.

                        37

1    MR. BAILEY: And the investigation, this is by the FBI eventually
2        concluded that there was no one in the governor's office or the
3        front office in state government involved at all. Is that correct?
4    MR. WILLIAMS: Yes sir, to my recollection it is.
5    MR. BAILEY: But your recollection is that the FBI regardless of
6        where they may have gotten it passed on whether it was a
7        concern or information you don't know. But passed that on to
8        Captain Ober who parroted it. Is that correct?
9    MR. WILLIAMS: Yeah. Well, I believe it is. I don't, I don't know I
10       can't recall. I don't have the report in front of me. I can't recall
11       when Captain Ober was given that information but I can recall
12       somewhere along the line that he, that he repeated that
13       information and that's one of the reasons he gave me, or he gave
14       us that he didn't go to any other Lt. Colonel because Lt. Colonel
15       Hickes had just been promoted to that position and could not
16       have been in that position whenever he received that information.
17   MR. BAILEY: Alright sir. Thank you. Now, um, at some point in
18       your, in doing the inquiry, at some you learned that indeed
19       Captain Ober had gone to Lt. Colonel Hickes, right?
20   MR. WILLIAMS: It was my understanding he contacted him by
21       phone.
22   MR. BAILEY: Ah, contacted him by phone. Do you recollect who
23       technically at the time that Mr. Ober contacted Mr. Hickes, who
24       Mr. Ober's superior officer was? Who Darrell Ober's superior

                        38

1        officer was?
2    MR. WILLIAMS: It would have been Major Conley.
3    MR. BAILEY: Ok, Tom where was Mr. Conley at that time? At the
4        time that Mr. Ober picks up this telephone and calls Mr. Hickes,
5        where is Mr. Conley? He should be assuming command. Where
6        is he?
7    MR. WILLIAMS: I can't remember the exact dates. I'm trying to
8        recall. Seemed to me he was on a day off for some reason. Was
9        there a funeral or something? Or
10   MR. BAILEY: He's not allowed. I know you want to ask him but
11       he can't do that. Use your best recollection. And I realize you do
12       not have the report in front of you in fairness to you but as best as
13       you can remember and then we understand that it's been a while.
14       You know where he was, at a funeral, a day off, something
15   MR. WILLIAMS: I'm ah, I'm just not sure.
16   MR. BAILEY: Do you have a recollection though that he was not at
17       his duty station and not available at the job. Do you remember
18       that?
19   MR. WILLIAMS: Something is telling me that's true but I don't
20       remember specific dates to where I could say that the day Darrell
21       got the call was the day that Major Conley was off. I don't recall
22       that.
23   MR. BAILEY: Fine sir. Does October 5 mean anything to you?
24   MR. WILLIAMS: October 5 if I'm not mistaken was the day

                        39

1        Captain Ober received a call from the FBI. Here again, I'm not
2        positive of that either it's just
3    MR. BAILEY: But you have a vague recollection that, but you're
4        not sure why, and you're not certain, but you have a vague
5        recollection that Mr. Conley may not have been available at his
6        duty station.
7    MR. WILLIAMS: May not have.
8    MR. BAILEY: And for a legitimate reason of some type. But that's
9        you recollection, right?
10   MR. WILLIAMS: Yeah. Something is telling me that but I can't pull
11       it out.
12   MR. BAILEY: That's alright. Wasn't it a focal point, I hate that
13       phrase, wasn't that a major of key issue in the inquiry though.
14       You know, why did Mr. Ober go to Mr. Hickes? And we have
15       this thing with the FBI talking about a Lt. Colonel. We have a
16       newly promoted Mr. Hickes. We have Mr. Conley, maybe, now
17       you're not, I realize it's a very, very, very low level of being sure
18       about this, you know, just a lack of complete knowledge of it but
19       a vague recollection that Mr. Conley not being available for some
20       reason. And I will offer to you that I think we can show that he
21       was not. But the point is though, ah, Mr. Ober goes to Mr.
22       Hickes or calls. It was a telephone call right? Calls Mr. Hickes.
23   MR. WILLIAMS: Yes that's my recollection. But I don't remember
24       when he called him. I don't know whether it was October 5th or

                        40

1  sometime after October 5th.
2  MR. BAILEY: Do you have a recollection if it was at a time when
3     Mr. Conley would not have been available?
4  MR. WILLIAMS: Something is telling me yes but I can't
5  MR. BAILEY: But if that is, and I'm not certain I'm correct about
6     that either. You've got to understand I come in from the outside
7     and piece these facts together cause they're gonna be what
8     they're gonna be. Ah, do you have recollection of any other
9     reasons, any other facts known to you should indicate why, or
10    explain why Mr. Ober went to Mr. Hickes or checked with Mr.
11    Hickes?
12 MR. WILLIAMS: Yeah for the reason that I articulated earlier I
13    believe this is what he said, the fact that a Lt. Colonel had been
14    mentioned. The two Lt. Colonels were presently assigned down
15    there, Corey and Westcott, had already been Lt. Colonels for
16    some time. Hickes had just been appointed to the position.
17    Therefore, since a Lt. Colonel was mentioned he would not have
18    been in his position at the time that this occurred.
19 MR. BAILEY: Which clears Mr. Hickes. Right?
20 MR. WILLIAMS: What do you mean clears him. I don't...
21 MR. BAILEY: Well, I mean, which means Mr. Hickes would not
22    have been that person, or Mr. Conley rather.
23 MR. WILLIAMS: That's correct.
24 MR. BAILEY: Ok. But why not tell Mr. Conley? If the

41

1  commissioner wants to know, and it's no secret that the
2     commissioner is not making claim that Mr. Ober violated some
3     rule or regulation, commissioner's not saying that.
4  MR. WILLIAMS: He's not saying it.
5  MR. BAILEY: Well, we're alleging, of course, that mistreated Mr.
6     Ober, that's one of our major allegations here. But to the best of
7     my knowledge I think that I can represent to you that the
8     commissioner is not claiming that Mr. Ober did anything that he
9     can be disciplined for, maybe I'm wrong. But I don't know. I
10    could be mistaken. Was there any claim ever made that you? Any
11    discipline action ever brought against you?
12 MR. OBER: Not by official means, no.
13 MR. BAILEY: Ok. Now if one of the major points of the inquiry is
14    to find out why Mr. Ober goes to Mr. Hickes, or tells Mr. Hickes,
15    I'm sorry sir. Tells Mr. Hickes about this thing. Are there any
16    other facts known to you that you can recollect now that either
17    Mr. Ober advanced or that your inquiry uncovered that would
18    explain why he didn't go to Mr. Conley assuming Mr. Conley
19    was sitting in the next office? Now we don't think he was an
20    that's going to be a factual issue but assume for the sake of
21    argument that Mr. Conley is down the hall, in an office sitting
22    there, available. Do you have a recollection of any facts at all
23    advanced by Mr. Ober, or circumstances or witnesses, which
24    would explain why Mr. Ober didn't go to Mr. Conley?

42

1  MR. WILLIAMS: No. I think he should have if he was sitting down
2     the hall.
3  MR. BAILEY: That's why I asked that. Because you had indicated
4     earlier on that personally, you never said you wrote it down. You
5     never said you pushed the issue or anything like that or presented
6     it. But didn't you indicate that person, you said that Mr. Ober
7     should have gone to was Mr. Conley.
8  MR. WILLIAMS: Well, sure, that would be his superior. And that's
9     generally, not generally, that's what we always do. We report up
10    the chain of command.
11 MR. BAILEY: Why should he have gone to anybody at all?
12 MR. WILLIAMS: Ah, you would have to get into BPR. I don't
13    know what the rules and regulations say concerning the BPR, the
14    running of the office. Or any instructions that Major Conley had
15    ever given Captain Ober concerning investigations. I think that, I
16    think personally overall that Major Conley as the Bureau
17    Director would be responsible for any and all investigations that
18    occur in his Bureau. And should probably be aware of every
19    investigation that's ongoing in that Bureau.
20 MR. BAILEY: Well, did you ever try to find out why the FBI didn't
21    go to Mr. Conley. What did they go to Mr. Ober for? Who's Mr.
22    Ober? I mean why go to Mr. Ober?
23 MR. WILLIAMS: Maybe they called, I mean I don't know this but
24    if you're saying that he was off and he called Darrell would have,

43

1  I don't know if he was in an acting capacity, but he would have
2     been the senior officer there.
3  MR. BAILEY: Well let's, let's explore that. Did you find out what
4     the time constraints were. Was there some immediate need for
5     the FBI to talk to the first person they got on the telephone or,
6     you know. Did you ever find out from the FBI or anybody else
7     why they told Captain Ober?
8  MR. WILLIAMS: No.
9  MR. BAILEY: Have you ever learned from any other source why
10    they told Captain Ober?
11 MR. WILLIAMS: No.
12 MR. BAILEY: As opposed to anyone else?
13 MR. WILLIAMS: No I would assume it's based on the fact that he
14    was the captain of the internal affairs and they had done, I'm
15    trying to think of the terminology they used. I think it was a
16    political corruption investigation and they had determined there
17    was no criminal political construction, or political corruption. So
18    now since a trooper was involved possibly accepting a bribe to
19    get somebody pushed up on the cadet list it would be reported to
20    internal affairs, which was what Captain Ober was in charge of.
21 MR. BAILEY: Well, was Captain Ober in charge of that or was Mr.
22    Conley?
23 MR. WILLIAMS: Captain Ober is in charge of the internal affairs
24    section. Major Conley would oversee both the Systems and

44

1    Processing review and the Internal Affairs.
2    MR. BAILEY: Well in a direct chain of command so would Mr.
3        Corey and so would Mr. Evanko, right?
4    MR. WILLIAMS: Oh sure. But that's a bureau. Everything's
5        contained within the bureau.
6    MR. BAILEY: Understand, I'm just asking if you ever came to any
7        conclusions or found why the FBI went to ah, decided to talk to
8        .Mr. Ober, or why they didn't pick up a telephone and call Mr.
9        Evanko or Mr. Corey or...
10   MR. WILLIAMS: I think that most FBI agents, at least that I'm
11       aware of, are pretty familiar with our operation and they know to
12       call internal affairs if its going to be an investigation of a trooper.
13   MR. BAILEY: So to the FBI because they don't administratively
14       control the Pennsylvania State Police which is a concurrent, you
15       know, a separate and independent law enforcement agency, their
16       protocol might indicate, you're not certain, assuming would
17       indicate they go to internal affairs because that would be the
18       contact person. But weren't there indications here that there was
19       at least an interest, whether it was some misguided informant or
20       not, that there was something above this at a higher level?
21   MR. WILLIAMS: Well, a Lt. Colonel was mentioned but still I can
22       understand them going to internal affairs on it because a State
23       Policeman is a State Policeman in their eyes.
24   MR. BAILEY: Now if an outside agency comes to you about a

45

1    corruption probe into your superior
2    MR. WILLIAMS: My superior?
3    MR. BAILEY: Your superior, you're immediate superior, would
4        you tell your immediate superior?
5    MR. WILLIAMS: No I would not. I would skip him and go to the
6        commissioner.
7    MR. BAILEY: Now they came to you and said we're looking into
8        your superiors. With an (s) on the end. What would you do then?
9    MR. WILLIAMS: I would still go to the commissioner.
10   MR. BAILEY: Now if they came to you and they said we're
11       looking at your superiors, possibly even the commissioner
12       himself. Would you still go to the commissioner?
13   MR. WILLIAMS: I don't know. I'd have to think about that.
14   MR. BAILEY: And what attorney would you hire after you were
15       indicted for obstructing justice?
16   MR. WILLIAMS: Probably you. (Laughter)
17   MR. BAILEY: Probably me. That's a great joke but a very poor
18       response. Alright now. What I'm trying to get at, where I'm
19       going with this. What in the State Police regulation indicate, if
20       you know the answer to this, indicate to you what you're
21       supposed to do if an outside agency says, look we've got a
22       problem we're checking some things out, I'm not saying they're
23       indicating any person, just a generally thing. There are higher-
24       ups, there's a problem here. Now it's axiomatic is it not, this is

46

1    I'm coming, I'll give you what's called an offer of proof on these
2        questions. It's axiomatic that they have entrusted Darrell, excuse
3        me, Darrell G. Ober. Ok?
4    MR. WILLIAMS: I think they probably did.
5    MR. BAILEY: Ok. So base on that and we're not alleging and I'm
6        not saying you have any information to indicate this by the way,
7        but at least based on that they felt comfortable. There had to be
8        some comfort level. So the go to Mr. Ober, to Darrell. It's not to
9        say and we're not alleging that they had any reason not to go to
10       anyone above Mr. Ober in the chain of command. Fact is they
11       went to MR. Ober. Now, I'm going to ask you a different line of
12       questions. Ok? These questions are going to be mixed some of
13       these are going to be based upon your experience, many, many
14       years as a disciplinary officer. Obviously a very capable and
15       successful career officer in the Pennsylvania State Police. And
16       secondly you're going to be based on knowledge or awareness
17       on not just regulations of the State Police but customs and
18       practices the way of doing things. So let me begin this way. Do
19       you know as you sit here today of any regulations. I'm not talking
20       about practices or customs, but regulations that require an officer
21       that acquires information indicating that there may be people in
22       higher positions above that officer involved in public corruption,
23       that that officer has a duty to report awareness of an outside
24       problem? Let me make it a little simpler. I'm a Pennsylvania

47

1    State Police Officer. I become aware, officially, not just by
2        rumor, rumors or a story. But officially I get a report or I get
3        information from outside, a legitimate law enforcement agency,
4        that there may be, there might be a problem with people above
5        me in the chain of command. What are, as you understand it,
6        what are my duties as an Officer in the Pennsylvania State
7        Police?
8    MR. WILLIAMS: I would, based on my experience, I would have
9        done in the past. I always reported to my superior officer.
10   MR. BAILEY: Well, if you knew, you've already responded that if
11       you knew a particular person above you in the chain of command
12       was doing something wrong and there was a probe into that
13       advise them in that situation.
14   MR. WILLIAMS: Repeat the question.
15   MR. BAILEY: Ok. If an outside, the FBI comes to you and says
16       Jane Doe, Joe Smoe, above you in the chain of command is
17       suspected of doing X, Y, and Z. We're investigating them.
18       Maybe they're coming to you as a fact witness and asking you
19       information. You're not going to tell that person up there that
20       that investigation is going on.
21   MR. WILLIAMS: I certainly am.
22   MR. BAILEY: You would?
23   MR. WILLIAMS: Yes, I would.
24   MR. BAILEY: Alright . So you know if any Pennsylvania State

48

1  Police regulation require you to do that.
2  MR. WILLIAMS: I can't think of any offhand. At least while I was
3    on. My son is on the job and he tells me there is a regulation to
4    that. That speaks to the chain of command but I never read it. I
5    don't know what that says now.
6  MR. BAILEY: Well in 1999 you know it was a whole other issue in
7    this lawsuit about that. But in 1999, in or around when, the time
8    when you did this probe do you have any awareness of a
9    Pennsylvania State Police regulation which said if some outside
10   agency comes in here and they're investigating somebody you
11   got to tell us. Have to now.
12 MR. WILLIAMS: I don't know of any regulation. I do know that
13   everybody, virtually everybody, including Captain Ober at the
14   time was aware of the fact that you should notify somebody
15   higher up. And that's obvious because did notify somebody
16   higher up. He wanted to get that off his conscience. He didn't
17   want to be responsible for it.
18 MR. BAILEY: The reason, what is the reason why. He did notify
19   somebody that was higher up. That's correct. But see my
20   question, I'm going to try to commantemalize for you. I'm just
21   asking, and maybe the short answer is you don't know of any
22   written requirement that you do so.
23 MR. WILLIAMS: I don't know of any.
24 MR. BAILEY: By custom, whether it's loyalty, whether it's good

49

1  policy, whatever it might be, at least, speaking for yourself, if the
2    FBI come to you says we're investigating Commissioner Evanko.
3    You would tell Commissioner Evanko.
4  MR. WILLIAMS: I told you I don't know what I would say in that.
5    I would think long and hard and I would probably contact our
6    legal department to get an interpretation of it.
7  MR. BAILEY: That's what I thought and I think I asked a follow on
8    question. And the reason I'm trying to clear that up is that I really
9    think your response to another question I asked like that may
10   have been confused because my question was poor. The point is
11   if the FBI comes to you and says we're investigating
12   Commissioner Evanko you would go and seek advice before you
13   would just go run to Mr. Evanko.
14 MR. WILLIAMS: Certainly I would.
15 MR. BAILEY: Because you would have not only professional and
16   ethical concerns but legal concerns. Am I correct?
17 MR. WILLIAMS: Certainly, I would go to our legal department.
18 MR. BAILEY: If the FBI came to you and they said, Tom, we're
19   really upset about all this and I realize it's a problem but you
20   know, we're checking into Commissioner Evanko on this. Ah, if
21   you, if there's somebody in your chain of command, or even a
22   colleague that you imminently trusted and believed in or knew
23   could not be part of the problem, would you consider confiding
24   in that person?

50

1  MR. WILLIAMS: I guess it would be a consideration but in this
2    particular instance, I think the proper thing to do, and I think as I
3    recall, I think AR-425 is it spells it out that if somebody is in the
4    chain of command above you and you receive a complaint about
5    that person you go to his or her superior. Who would have been
6    the commissioner at that point in time. That's who I would have
7    gone to.
8  MR. BAILEY: Well, um if you're told it's possibly higher-ups or in
9    the governor's office
10 MR. WILLIAMS: The specific rank of Lt. Colonel was mentioned.
11   Not Colonel. Lt. Colonel which would have prohibited Paul
12   Evanko from being involved in it. In my mind.
13 MR. BAILEY: You're very certain about that now?
14 MR. WILLIAMS: Yes. I told you before that a Lt. Colonel was,
15   was mentioned.
16 MR. BAILEY: Ok. Well, do you know whether any other language
17   was used?
18 MR. WILLIAMS: Possibly. But I don't, I don't recall. I recall Lt.
19   Colonel but I don't recall what other language there might have
20   been used.
21 MR. BAILEY: Ok, you consider it disloyal for a Police Officer not
22   to report information the officer acquires about a legitimate probe
23   into public corruption in the Police Department above them. Is
24   that disloyalty?

51

1  MR. WILLIAMS: No, I don't think it's disloyal. I think it's foolish
2    if you do something like that.
3  MR. BAILEY: Why?
4  MR. WILLIAMS: Because, I explained to you. All command
5    people or virtually all command people in the Pennsylvania State
6    Police know that you report those type of things to your superior
7    officers.
8  MR. BAILEY: Well, I'm asking why you have this need or
9    obligation to report to a superior. I mean do you trust the FBI?
10 MR. WILLIAMS: Sometimes.
11 MR. BAILEY: Do you trust the Pennsylvania State Police?
12 MR. WILLIAMS: Most times. I distrust some individuals within
13   the Pennsylvania State Police.
14 MR. BAILEY: Ok. But you didn't indicate that you trust the State
15   Police, we're talking about institutions now, obviously there's
16   always a problem with individuals. But institutionally does the
17   Pennsylvania State Police do better investigations than the FBI?
18 MR. WILLIAMS: I think so.
19 MR. BAILEY: Does the FBI ever do a better investigation than the
20   State Police?
21 MR. WILLIAMS: I'm certain that they do. Depends on the
22   individual.
23 MR. BAILEY: Alright, why do you feel comfortable that as a police
24   officer understands that there is an investigation in the higher-ups

52

1  of there own agency that they have a duty to go and tell them?

2  Isn't that unlawful?

3  MR. WILLIAMS: I didn't say tell those people. I said you by-pass

4  them and go to their superior.

5  MR. BAILEY: Do you bypass and go to the governor's office?

6  MR. WILLIAMS: I told you I would contact the legal department to

7  seek out their advice on a situation like that. If you're using the

8  example that the commissioner did something wrong and some

9  other agency the FBI called and they're doing an investigation on

10  the commissioner I would go to the legal department.

11  MR. BAILEY: and if you don't know, you only know it's higher-

12  ups you take a chance to go to the commissioner.

13  MR. WILLIAMS: I can't, I can't fathom Paul Evanko, you have to

14  now who you're dealing with here and I can't fathom Paul

15  Evanko doing something that would be investigated by the FBI. I

16  just can't.

17  MR. BAILEY: I was never in my life able to fathom people on the

18  Supreme Court interfering with a presidential election.

19  MR. WILLIAMS: Well, you're wrong about that.

20  MR. BAILEY: I'd seen it happen before my eyes.

21  MR. WILLIAMS: Well and I feel that they were correct in doing

22  that. We're on two sides of the fence. I think they were correct in

23  doing that and they should have done that.

24  MR. BAILEY: Ok, now you had indicated with Mr. Cush, you went

53

1  and talked to him on two different occasions?

2  MR. WILLIAMS: No, I talked to him personally one time and

3  telephonically the second time.

4  MR. BAILEY: When you went and talked to him, who was with

5  you the first time?

6  MR. WILLIAMS: I was by myself.

7  MR. BAILEY: How about the second time?

8  MR. WILLIAMS: I called him on the phone. I mean I was in a n

9  office somewhere and he was on the other end of the line.

10  MR. BAILEY: And he indicated that he didn't have a concern

11  about confidentiality.

12  MR. WILLIAMS: That's my recollection.

13  MR. BAILEY: Did you record that phone call?

14  MR. WILLIAMS: I did not.

15  MR. BAILEY: Did you ask him if you could record that phone call?

16  MR. WILLIAMS: No, I did not.

17  MR. BAILEY: Did you ever ask him for his notes, any 302's

18  anything like that?

19  MR. WILLIAMS: I don't recall if I did or I didn't.

20  MR. BAILEY: Um, Tom, you indicated that when you went and

21  gave the results of your investigation to Mr. Evanko, you had

22  statements and what not attached.

23  MR. WILLIAMS: Yes, attachments, statements of the people we

24  interviewed.

54

1  MR. BAILEY: Was Mr. Cush one of those?

2

3  (Cell phone rings)

4

5  MR. MARCECA: We're gonna stop. It's now 3:14. We're gonna

6  take a break and we're gonna change tapes. (Video)

7

8  SHORT BREAK

9  MR. MARCECA: Ok. It's now 15:20 and we're back on live tape.

10  MR. BAILEY: Major, I'm gonna change directions here just a little

11  bit. Let's go back to when you did the interview, now. Ok?

12  MR. WILLIAMS: What interview is that sir?

13  MR. BAILEY: With Mr. Ober. So we're going to go back to

14  actually doing the interview itself. Ok, ah, so you know how Mr.

15  Ober was notified?

16  MR. WILLIAMS: I know Major Wertz and I interviewed at least, I

17  recall it was BPR headquarters, no, it was department

18  headquarters down in Tom Corey's office as a matter of fact. I

19  don't recall how he was notified.

20  MR. BAILEY: Ok, do you remember when you first saw him that

21  day?

22  MR. WILLIAMS: No, I don't.

23  MR. BAILEY: Remember what he said?

24  MR. WILLIAMS: You mean at the interview or?

55

1  MR. BAILEY: Yes sir. Tom, the day when you and Mr. Wertz, we

2  just deposed a few minutes ago Mr. Carr. He was here just before

3  you.

4  MR. WILLIAMS: Um-hmm. He sat in on that interview.

5  MR. BAILEY: Yes sir. I believe he did. So I'm just talking about

6  the interview where you and Mr. Carr, and Mr. Wertz and Mr.

7  Ober, that's what I'm talking about. There was only one

8  interview, right? Am I correct?

9  MR. WILLIAMS: Yes.

10  MR. BAILEY: Ok. That's what I wanted to ask you that. Do you

11  remember seeing or meeting Mr. Ober that day for the first time?

12  MR. WILLIAMS: Oh sure.

13  MR. BAILEY: Where did the interview take place?

14  MR. WILLIAMS: As I recall it was in Tom Corey's office, the

15  Deputy Commissioner of Admin's office. Down in department

16  headquarters.

17  MR. BAILEY: Why was it in the Deputy Commissioner's office?

18  MR. WILLIAMS: I believe we were looking for an office down

19  there that day and he wasn't there and we were able to use his

20  office. Other than that no specific reason that I can recall.

21  MR. BAILEY: How many other inquiries of this type have you

22  done?

23  MR. WILLIAMS: One.

24  MR. BAILEY: When?

56

MR. WILLIAMS: It would have been, I believe like in 96 or 97 I
don't recall exactly the year or the time but it involved Captain
Pat McHenry who was the commander of Troop E here.

MR. BAILEY: Was that a commissioner's inquiry?

MR. WILLIAMS: Yes.

MR. BAILEY: What regulations define what a commissioner's
inquiry is?

MR. WILLIAMS: I don't think there is any.

MR. BAILEY: Does that concern you?

MR. WILLIAMS: It hasn't concerned me. I now that he's the boss
and if he wants an inquiry into something we'll look into it.

MR. BAILEY: Ok. Did Mr. Ober object to the inquiry at all?

MR. WILLIAMS: I can't recall him quote "objecting" saying he
didn't want to participate in it or anything . I think he was, to the
best of my recollection very cooperative.

MR. BAILEY: Ok. Did he ask what it was about?

MR. WILLIAMS: I believe he probably did. I don't remember what
the response was.

MR. BAILEY: Ok, well, was the interview taped?

MR. WILLIAMS: Yes, it was.

MR. BAILEY: Yeah, ah, Mr. Carr had indicated that. Who use the
tape recorder? Who ran it?

MR. WILLIAMS: Probably be either myself of Major Wertz. I may
have set it up and depending on who was asking questions the

57

other person, either myself or Wertz would monitor to see where
it was on the tape, you know that sort of thing.

MR. BAILEY: You indicated another one of these commissioner
inquiries, did you conduct that one?

MR. WILLIAMS: Yes, I did.

MR. BAILEY: And who worked with you on that one.

MR. WILLIAMS: No one, just myself.

MR. BAILEY: Just you. There was no BPR control number
assigned to this because it was not a BPR was it?

MR. WILLIAMS: When I was doing it, I don't know what
happened subsequent to this but when I was doing it, no.

MR. BAILEY: No, I mean the thing with Mr. Ober, you don't have
any knowledge of it being a BPR.

MR. WILLIAMS: No.

MR.: BAILEY: Do you know what was decided by the
commissioner about this matter?

MR. WILLIAMS: No I don't. I never had any discussions with him
after I turned that report in.

MR. BAILEY: Alright, now, do you have a recollection of Mr.
Ober asking for representation at the meeting?

MR. WILLIAMS: I'm sure he did because subsequently I believe it
was Trooper Carr, I wouldn't have remembered his name but he
came up and sat in on the meeting so, I believe he did ask for
representation.

58

MR. BAILEY: When I questioned you earlier you indicated that
Mr. uh, you indicated, I thought you said you read Mr. Ober his, I
thought you said administrative rights. Ok. What's that? What
are administrative rights?

MR. WILLIAMS: I think, and then again it's been some time, I
think it discusses in there the fact that we are not questioning him
concerning a criminal matter. Nor will the information we gain
from that questioning be used in a criminal matter and I believe it
advises him of the fact he can have a PSTA representative there
and that he is to answer the questions, I believe it talks
about truthfulness. If there's anything else in there I can't recall
it.

MR. BAILEY: And, ah, was the tape recording that was taken, was
it transcribed?

MR. WILLIAMS: Was what transcribed?

MR. BAILEY: The tape recording.

MR. WILLIAMS: Yes. Yes it was. It was transcribed.

MR. BAILEY: Ah, did you listen to it afterwards?

MR. WILLIAMS: I don't know that I listened to it afterwards. I
know I listened to it prior to it being transcribed and the read the
transcript. But I don't recall then going back and listening to it
again.

MR. BAILEY: Did you give the transcript to Mr. Evanko?

MR. WILLIAMS: No, I believe I had my secretary at the time, I

59

believe that's how it went, transcribe it.

MR. BAILEY: No, but I mean once it was transcribed and put in
written form do you know whether it was ever provided to Mr.
Evanko?

MR. WILLIAMS: I don't recall whether the tapes were given to
him or whether the tapes were given to our legal department but
the tapes were turned in. I -I

MR. BAILEY: Do you have copies of the tapes?

MR. WILLIAMS: No, I do not.

MR. BAILEY: Do you now where they might be?

MR. WILLIAMS: No, I would imagine somewhere, wherever the
report is. I would guess that that's where they would be.

MR. BAILEY: Did you give a copy of the tape to Mr. Evanko?

MR. WILLIAMS: I don't recall. I don't recall whether we gave the
tapes to the commissioner and he gave them to somebody,
whether he kept them. Or I don't remember whether we gave the
tapes to our legal department. I just don't remember. I just
remember that we turned the tapes in.

MR. BAILEY: Did Mr. Wertz do a written copy of the ah? A
written report like you did or did you guys cosign that thing?

MR. WILLIAMS: Yeah, we cosigned it.

MR. BAILEY: Who composed it ?

MR. WILLIAMS: I believe I did.

MR. BAILEY: Ok, now did you make reference or any citations to

60

1 any department regulations when you did your, uh, summary for
2 Mr. Evanko?
3 MR. WILLIAMS: No, basically all I did was, was, it was just a
4 very, 4 or 5 sentences telling him that we had conclude the
5 administrative inquiry. A copy of all attachments are appended to
6 this from / to subject letter and then just turned it in like that.
7 And let the interviews and attachments speak for themselves. I
8 did not, ah, I did not cite any violations of any rules or
9 regulations or anything alone those lines.
10 MR. BAILEY: In doing your work did you note. Let me tell you
11 where I'm going with this. You're going out, you're asking
12 questions of people and one of the reasons I ask you about your
13 own thoughts about these things is I want to find out what you're
14 looking for. What you're going after as an investigator. Any
15 investigation to a certain degree is a subjective thing no matter
16 how you follow guidelines.
17 MR. WILLIAMS: This was not.
18 MR. BAILEY: I understand that. I mean I understand what your
19 role is to be and your function to be, I understand that. And I also
20 understand your feelings about how you feel an officer is
21 supposed to report things. Agree or disagree doesn't matter. I
22 mean I understand what your viewpoint is. Ah, do you have a
23 recollection of doing any of this where you reached a conclusion
24 that Mr. Ober had violated a department regulation that at least

61

1 you were aware of?
2 MR. WILLIAMS: I can't ah, I can't recall. I'm sure that probably
3 crossed my mind but I can't recall anything that leaps to the
4 forefront. You know, I personally thought he used poor
5 judgement in not notifying the commissioner but it was a
6 subjective call. He did what he felt. He felt he had to do.
7 MR. BAILEY: I understand.
8 END SIDE TWO (TAPE ONE) BEGIN TAPE TWO.
9
10 MR. WILLIAMS: And the only other thing that I can think of off
11 the top of my head is that the portion of the inquiry that revealed
12 that Captain Ober, I can't recall whether I had this right but I
13 think he had submitted a time sheet or something along that line
14 saying that he was on an annual day the particular day the he
15 interviewed or went to meet with the FBI. And subsequent to that
16 he tried to change it and get that day back as I recall and say that
17 he was working that day. So.
18 MR. BAILEY: No. ah, ok, we'll deal with that. You don't offhand.
19 Nothing leaps to mind about any regulation. He used poor
20 judgment in your view. Ah, which means that he didn't do what
21 you would have done.
22 MR. WILLIAMS: That's right.
23 MR. BAILEY: It's a subjective thing. It's on his own. You know,
24 he had to do what he thought was right. Now when you went

62

1 back did you personally hand this report in to Mr. Evanko?
2 MR.: WILLIAMS: Yes, I did. That's my recollection. I
3 did.
4 MR. BAILEY: Was there any give and take discussion at that time.
5 MR. WILLIAMS: I'm sure that we gave him what I would call a
6 Reader's Digest version of what had transpired or what our fact
7 finding mission or what we determined the facts to be and gave
8 him a report. That was basically it.
9 MR. BAILEY: Do you know if anyone ever told him that the
10 inquiry into Captain Ober was not a proper thing to do?
11 MR. WILLIAMS: Do I know? No I don't know of
12 anybody.
13 MR. BAILEY: Did anyone ever indicate to you in the Pennsylvania
14 State Police that "this ain't proper?" You shouldn't be doing this.
15 MR. WILLIAMS: No.
16 MR. BAILEY: Ok. Now you did a write-up on your interview with
17 Mr. Hickes
18 MR. WILLIAMS: A write-up?
19 MR. BAILEY: Well, you reduced it to writing in some
20 form.
21 MR. WILLIAMS: The secretary actually did it as I recall.
22 MR. BAILEY: Then you taped all these things?
23 MR. WILLIAMS: Yes, I did.
24 MR. BAILEY: Ok. So there are transcripts on every one of these.

63

1 MR. WILLIAMS: Every one of the interviews, yes.
2 MR. BAILEY: Did you give those to Mr. Ober?
3 MR. WILLIAMS: No, I don't recall that I did.
4 MR. BAILEY: Ok, now but you did turn those tapes in,
5 right?
6 MR. WILLIAMS: Yes I did.
7 MR. BAILEY: Now sir, do you know of an administrative inquiry
8 that was done into Mr. Hickes by somebody else? Now you
9 didn't do one but did somebody else?
10 MR. WILLIAMS: Not that I know. At least not that I'm aware of.
11 MR. BAILEY: So do you know whether Mr. Hickes and the
12 commissioner ever talked about this matter aside from the time
13 when Mr. Hickes and Mr. Ober told the commissioner about the
14 FBI probe?
15 MR. WILLIAMS: No I don't know if they did or not.
16 MR. BAILEY: Did Mr. Evanko indicate to you at any time that he
17 talked to Judge Freed, Louie Freed?
18 MR. WILLIAMS: I know there was discussion about the FBI but I
19 don't, I don't recall that.
20 MR. BAILEY: Did he ever indicate that he was going to talk to
21 Judge Freed, Louie Freed?
22 MR. WILLIAMS: Not that I recall.
23 MR. BAILEY: Do you know whether Mr. Evanko indicated he was
24 going to talk, I know that there was some talk about the Special

64

1    Agent in Charge, did Mr. Evanko ever indicate that he talked to
2    anybody above the level of the Special Agent In Charge?
3    MR. WILLIAMS: Not to me he didn't.
4
5    (Loud background noise from outside)
6
7    MR. BAILEY: First is there's a train now there's a CH-47. Next
8    thing you know we'll have a couple of eagles coming over here.
9    Ah, alright now, did any of your colleagues, not Mr. Evanko
10   now, any of your colleagues, Fellow State Police officers of any
11   rank indicate to you that the inquiry into Captain Ober was
12   perhaps not correct or perhaps something that should not be
13   done.
14   MR. WILLIAMS: I never recall anyone saying to me personally.
15   MR. BAILEY: Did you ever hear anybody make any comment like
16   that?
17   MR. WILLIAMS: No.
18       MR. BAILEY: Did you ever have any discussions with Mr.
19   Cory about the inquiry into Mr. Ober?
20   MR. WILLIAMS: I would never say no but I can't recall anything.
21   MR. BAILEY: Now according to your recollection, if I'm right in
22   remembering it, Mr. Westcott was at the meeting with Mr.
23   Evanko.
24   MR. WILLIAMS: At least initially.

65

1    MR. BAILEY: At least initially
2    MR. WILLIAMS: I, I'm almost positive that we all walked into his
3    office at the same time. Whether he then left or not I don't recall.
4    MR. BAILEY: When you went in to turn the report in was it just
5    you and Mr. Wertz and the Commissioner?
6    MR. WILLIAMS: I believe so, yes.
7    MR. BAILEY: No one else was there at that time. Do you
8    remember?
9    MR. WILLIAMS: I don't recall.
10   MR. BAILEY: Did you give a copy of the report to Mr. Ober?
11   MR. WILLIAMS: No. I didn't personally.
12   MR. BAILEY: Did you ever have any understanding of the
13   interviews of the report would be given, it wasn't a report. It was
14   a one-page thing on your part, you had no recommendations, no
15   findings aside from the actual interviews. Why?
16   MR. WILLIAMS: Because it wasn't my place to make any
17   recommendations it was, I was just told to be on a fact finding
18   mission which is what I did. And I felt that the best way to handle
19   that was let the interviews speak for themselves.
20   MR. BAILEY: Do you how much, how much time Mr. Ober had to
21   prepare for the ah, for the interview.
22   MR. WILLIAMS: No, no I don't. Something in the back of mind
23   my mind is telling me that that morning he was called and asked
24   to report.

66

1    MR. BAILEY: Why I asked you, and the reason why I asked you is
2    that I talked to Mr. Carr and Mr. Carr indicated that he's at work
3    and he gets a call. We're gonna do this, come up here and
4    represent this guy. He doesn't know Mr. Ober. Mr. Ober doesn't
5    know him. Somebody, Mr. Carr says it was you called
6    MR. WILLIAMS: And it may have been
7    MR. BAILEY: No, I don't attach any significance to that aside from
8    how much advance notice Mr. Ober may have had to prepare for
9    this thing. To know what it was about. What was happening. So
10   you, is it fair to say, Major. To the best of your knowledge Mr.
11   Ober gets a phone call and it's cold turkey. Come on in here and
12   he's gonna have this meeting.
13   MR. WILLIAMS: And that may be a true thing.
14   MR. BAILEY: Ok. Well you don't know. You certainly have,
15   there's no facts known to you that he was given any advance
16   notice.
17   MR. WILLIAMS: I don't recall. I know I never called him and said
18   Darrell on such and such a date we're going to interview you.
19   And I don't recall Major Wertz ever saying that to me. So it's,
20   I'm only trying to deduce that the morning of we probably gave
21   him a call.
22   MR. BAILEY: Ok. Before you came down here today, if you did,
23   who did you talk to about this deposition? Syndi Guido?
24   MR. WILLIAMS: Yes.

67

1    MR. BAILEY: And what did you discuss? What did you talk
2    about?
3    MR. WILLIAMS: Um, we discussed some of the questions that
4    might be asked.
5    MR. BAILEY: I have no interest in that but what kind of responses
6    you gave basically.
7    MR. WILLIAMS: Basically what I'm telling you now.
8    MR. BAILEY: The same kind of things we're going          over
9    her now?
10   MR. WILLIAMS: Well we didn't go anywhere near the
11   detail that you're going into.
12   MR. BAILEY: Well she wouldn't know in advance what
13   I'm going to ask.
14   MR. WILLIAMS: No, exactly.
15   MR. BAILEY: But did you give her any documents?
16   MR. WILLIAMS: No, I did not.
17   MR. BAILEY: Did you refer to any notes, or documents, or tape
18   recordings or anything like that.
19   MR. WILLIAMS: She had a copy of the from / to subject letter and
20   I glanced at that very quickly. And I glanced at a few, I don't
21   recall all but I glanced at a few of the interviews. But other than
22   that I didn't. I didn't read anything line by line.
23   MR. BAILEY: And study it. You didn't study it?
24   MR. WILLIAMS: That's why I'm not familiar with the dates and

68

1   the times and things.

2   MR. BAILEY: Alright, ah, Tom did Captain Ober ask you outright

3   what regulation, what policy did it violate?

4   MR. WILLIAMS: I can't say that he didn't. I can't say that he did. I

5   honestly, I just don't recall.

6   MR. BAILEY: And as you sit here today aside from gathering your

7   facts you don't have a recollection, nothing comes to your mind,

8   realizing or coming upon a violation of any department

9   regulation in any of this which I guess would be pretty much

10   limited to Captain Ober and Mr. Hickes, Colonel Hickes, right?

11   MR. WILLIAMS: Well other than the fact that I told you on the

12   report that he had changed that and very technically that could be

13   considered a falsification of a report.

14   MR. BAILEY: Well why didn't you?

15   MR. WILLIAMS: It wasn't up to me to make any recommendations

16   or impose any discipline. That would be up to the Commissioner

17   to do.

18   MR. BAILEY: Ok. Well, do you know whether the Commissioner

19   did that?

20   MR. WILLIAMS: I have no idea. After I turned that report in to

21   him I had no other conversations with him.

22   MR. BAILEY: Do you think if there had been a violation there he

23   would have done that?

24   MR. WILLIAMS: I don't know what he would have done.

69

---

1   MR. BAILEY: Alright. Did you interview Lt. John Brown?

2   MR. WILLIAMS: I don't recall that I did.

3   MR. BAILEY: How about Ron Heligas? Sergeant Heligas?

4   MR. WILLIAMS: I don't recall his name.

5   MR. BAILEY: Did you and Mr. Werts do all your interviews

6   together or did you do some and he do some?

7   MR. WILLIAMS: I think that with the exception of the time that I

8   went out to Finley we did them all together. And I went out to

9   Finley because as I recollect he was tied up he couldn't make it

10   the particular day that we had set up. So I went out by myself.

11   MR. BAILEY: Aside from talking to Mr. Cush you talked to. Did you talk to any other FBI people, any other

12   you talked to. Did you talk to any other FBI people, any other

13   FBI people other than Mr. Cush?

14   MR. WILLIAMS: I'm not sure with his supervisor or something but

15   it would have been, you know. I can't even recollect what it

16   would be about.

17   MR. BAILEY: Where's Mr. Cush now?

18   MR. WILLIAMS: I don't know.

19   MR. BAILEY: you don't know whether he was transferred do you?

20   MR. WILLIAMS: No I don't.

21   MR. BAILEY: Did he do anything wrong in your view of what the

22   responsibility of what a professional law enforcement officer

23   would do?

24   MR. WILLIAMS: Did he do anything? I wasn't privy to his

70

---

1   investigation. The only thing I know he did was call Darrell Ober

2   and advise him of the fact that there was the possibility of a

3   Trooper and / or a Lt. Colonel either accepting money or trying

4   to manipulate the system of cadet processing.

5   MR. BAILEY: Now did you talk to Mr. Cush after you

6   talked to Mr. Ober or before?

7   MR. WILLIAMS: I have to look at dates on the interviews. I think

8   I talked to Mr. Cush initially before and the I had a subsequent

9   conversation with him but I don't recall the date on that.

10   MR. BAILEY: Let me tell you why I ask. If Mr. Ober told you the

11   FBI said it was in the higher-ups or mentioned the governor's

12   office, alright. Then you would have asked Mr. Cush about that

13   to ascertain if Mr. Ober was being accurate, cause that would be

14   an important point, right?

15   MR. WILLIAMS: I would think so.

16   MR. BAILEY: So, if we look at those interviews in time sequence

17   they should reveal an interest into asking those sort of questions,

18   right? I should.

19   MR. WILLIAMS: I don't know. I don't know what's in those

20   interviews.

21   MR. BAILEY: But you do remember that this Mr. Cush said there

22   was a trooper or whatever and a Lt. Colonel. You remember that.

23   But that's what Mr. Cush indicated.

24   MR. WILLIAMS: I don't, I don't remember necessarily. I think I

71

---

1   said, I spoke that a Lt. Colonel was mentioned sometime during

2   this inquiry but I didn't remember exactly when it was

3   mentioned.

4   MR. BAILEY: You don't remember Mr. Ober mentioning higher-

5   ups and the governor's office do you?

6   MR. WILLIAMS: I think I said before that may have been

7   mentioned but I don't recall it off hand. I would have to look at

8   the transcript. That would reveal whether he said that or not.

9   MR. BAILEY: Well, you didn't tell Mr. Evanko did you about

10   anybody whether it was Mr. Ober, whether it was an informer,

11   whether it was Mr. Cush, whether it was Special Agent in

12   Charge, whether it was Louie Freed. You didn't mention to Mr.

13   Evanko that there was any mention of the governor's office or

14   anything like that?

15   MR. WILLIAMS: I don't recall that.

16   MR. BAILEY: No, I'm not suggesting sir that you did. Don't read

17   that into

18   MR. WILLIAMS: And I'm not saying that I didn't cause I don't

19   remember that particular part. It's been long time.

20   MR. BAILEY: Well when I asked you questions earlier you seemed

21   to be very quick to respond to me that the FBI agent, Mr. Cush,

22   had not indicated any desire or expression or interest in

23   confidentiality then I asked you what confidentiality meant.

24   MR. WILLIAMS: That's because on the follow-up phone call to

72

1　him I specifically asked him questions that I wanted answered.
2　And I specifically remember calling him to ask him had he
3　expressed to Captain Ober the confidentiality aspect and he said
4　no. Now there were some other specific questions that I asked
5　that I don't recall here today. But that I do because that was a big
6　part of what this inquiry was about.
7　MR. BAILEY: If Mr. Cush had called you even if he asked for
8　confidentiality you would have reported that information that Mr.
9　Evanko anyway. You told us that.
10　MR. WILLIAMS: Yes, I would and I think that's exactly what
11　Darrell did. He reported it up also.
12　MR. BAILEY: To Mr. Hickes. See he had this concern or a burden.
13　You're sort of in a bind, in a sense. Right, I mean from the
14　standpoint of it's your work ethic whether it's your loyalty,
15　whether it's personal, whether it's legal. Whatever it is, it's a
16　tough place to be in. That goes without question. Now have you
17　ever punished anyone who was inferior in your command, below
18　you in your chain of command? Because they didn't tell you
19　something and you thought they should have told you.
20　MR. WILLIAMS: I can't, I can't say that I ever-instituted formal
21　discipline but I can say that I have become upset when they
22　didn't do that. I let them know that.
23　MR. BAILEY: What did you do to them.
24　MR. WILLIAMS: I just called them in and counseled them

73

1　concerning it and told them that ah, this would be a counseling
2　session concerning it and if it happened again I would consider
3　formal discipline.
4　MR. BAILEY: Ok. Now have you ever done that when there wasn't
5　a basis for formal discipline?
6　MR. WILLIAMS: Well, it would be, it would be, if you're saying
7　that there's quote no regulations to keep your superiors informed
8　then I probably have. You know.
9　MR. BAILEY: But not intentionally, not to hurt somebody.
10　MR. WILLIAMS: No.
11　MR. BAILEY: Did you ever carry that forward and stop somebody
12　from being promoted or transferred because you didn't like
13　them?
14　MR. WILLIAMS: Absolutely not.
15　MR. BAILEY: Why not Tom, why didn't you?
16　MR. WILLIAMS: Because I don't think it's fair to do that to a
17　person. If it's a mistake in judgement that's one thing, if it's a...I
18　always categorize things as "of sins of the heart and sins of the
19　head." And if something was a sin of the heart .
20　MR. BAILEY: I think I'll use that myself. I like       that.
21　MR. WILLIAMS: If something was a sin of the heart then I would
22　go full tilt. If something was a mistake and something I didn't
23　hold that against a person. Now if they repeated it over and over I
24　might.

74

1　MR. BAILEY: What did you learn about this that indicated it was a
2　sin of the heart on the part of Mr. Ober?
3　MR. WILLIAMS: That was a sin of the heart?
4　MR. BAILEY: Yeah.
5　MR. WILLIAMS: I think he purposely changed or tried to, to get
6　that date back.
7　MR. BAILEY: We'll talk about that. But aside from that we're
8　talking about the issue of informing somebody.
9　MR. WILLIAMS: Informing somebody. Like I said I think AR425
10　speaks to that. At least I believe it does. And if anybody should
11　that AR425 it should be a Captain in Internal Affairs.
12　MR. BAILEY: Well that was you called it an error in judgement
13　before. Are you now changing what you said
14　MR. WILLIAMS: No because
15　MR. BAILEY: No, let me finish my question. What Mr. Ober did
16　was a thing of the heart, one of these errors of the heart
17　MR. WILLIAMS: I don't know as I would quote it a sin of the
18　heart. I guess it was, I said before bad judgment. And I think he
19　thought out the whole situation before he just picked up the
20　phone and called.
21　MR. BAILEY: Do you view it as a matter of good politics to inform
22　you superiors if you learn they're being investigated for public
23　corruption. I mean is it good job politics? Or is that good police
24　practice?

75

1　MR. WILLIAMS: I didn't say I would inform somebody of whether
2　they were investigate. I didn't say that.
3　MR. BAILEY: But you said if you heard something generally you
4　would inform them.
5　MR. WILLIAMS: You were talking in terms of Trooper John Doe
6　is being investigated by the FBI. I would certainly inform my
7　bosses about that. If they said my boss was being investigated I
8　never said I would inform that person.
9　MR. BAILEY: I agree with you. You didn't say that. The question
10　is if the FBI comes to you and says we're looking into the upper
11　echelons of the State Police because we believe they may be
12　involved in drug running you're gonna go and tell the person?
13　MR. WILLIAMS: The first thing I would ask them is who is the
14　upper echelon, and I think that's a fair question to ask them. And
15　they would give me an answer.
16　MR. BAILEY: They would give me an answer.
17　MR. WILLIAMS: Well sure I would assume that if they are willing
18　to call me and tell me about the investigation in general they're
19　gonna tell me about who they were investigating.
20　MR. BAILEY: That's Ok. And it's fair enough. Now what if it's
21　just a suspicion Tom, and it's just a we believe, or we think, or
22　we're concerned that it might be. What so you do in that case,
23　Tom.
24　MR. WILLIAMS: I don't know. That's a hypothetical question that

76

1    I never, I never encountered.
2    MR. BAILEY: Well you never encountered this did you? You
3    never encountered the other questions I asked did you?
4    MR. WILLIAMS: Somewhat sure.
5    MR. BAILEY: Alright. (sigh) I assume if you got a grand jury
6    subpoena you're gonna obey that. Do what that says. If
7    somebody says you can't reveal or talk about that stuff you know
8    you can't do that right? Then that's a matter of law there.
9    MR. WILLIAMS: Sure.
10   MR. BAILEY: What was a, what regulations govern the nature, the
11   parameters, the nature and the extent of an administrative
12   inquiry?
13   MR. WILLIAMS: I don't believe there are any.
14   MR. BAILEY: Ah, does that term appear anywhere in State Police
15   regulations.
16   MR. WILLIAMS: Not that I'm aware of.
17   MR. BAILEY: (long pause) Did you ever transfer someone because
18   you didn't like them?
19   MR. WILLIAMS: No.
20   MR. BAILEY: Did you ever transfer somebody because you didn't
21   like what they did?
22   MR. WILLIAMS: Yes.
23   MR. BAILEY: And in that situation or situations if there was more
24   than one, is that because the person had violated some State

77

1    Police practice of policy or regulation?
2    MR. WILLIAMS: Yeah, well, the one I'm thinking of in particular
3    was a sergeant who was at a station, who, I had put an order out
4    saying thus and so would be done. And he badmouthed that order
5    in front of his troops saying this is ridiculous and we're not going
6    to do it. I transferred him for several other reasons too because he
7    had been warned
8    three or four different times, and when he did this I felt he was not
9    serving me the way he needed to serve me and I removed him
10   from his command.
11   MR. BAILEY: Yeah but isn't the issue there a matter of serving
12   you. Isn't the matter there of him not serving the State Police?
13   MR. WILLIAMS: That's correct.
14   MR. BAILEY: That's not personal. Let's face it. That's
15   insubordinate. There's sixty ways to take a hill bet the platoon
16   leader says you do it way 47 and you get behind it heart and soul.
17   That's what you're saying.
18   MR. WILLIAMS: That's correct.
19   MR. BAILEY: So what he did, I don't have any problem. That's
20   insubordination. That's trying to tell people here you're
21   conveying an order from a superior and you're encouraging folks
22   not to respond properly to those orders.
23   MR. WILLIAMS: That's what I believe.
24   MR. BAILEY: Ok. And that's fine.

78

1    MR. WILLIAMS: But I removed him from his command and I
2    transferred him but I didn't quote 'institute a BPR' and seek
3    formal punishment. Because he serves at my pleasure in the
4    troop. So I have the right that I can remove somebody.
5    MR. BAILEY: You have limited rights in there in terms of your
6    command to do those kind of things.
7    MR. WILLIAMS: So I removed him.
8    MR. BAILEY: Ah, did this individual did he grieve that?
9    MR. WILLIAMS: No, he didn't because he knew he was out and
10   out wrong.
11   MR. BAILEY: Ok, and cause he was wrong he went along with
12   that. Now is that a error not of the heart but of the mind?
13   MR. WILLIAMS: No, I thought it was an error of the heart.
14   MR. BAILEY: Ok. So it wasn't an honest difference of opinion or
15   judgement it was an improper perhaps even vindictive an
16   irresponsible response to a bona fide order from a superior
17   officer. Am I right?
18   MR. WILLIAMS: To me it was.
19   MR. BAILEY: Yes sir. Alright. Ah, Mr. Ober's lawsuit, should you
20   approve that, Mr. Ober's lawsuit, Mr. Evanko, I'm gonna ask you
21   just a series of very quick questions here. Mr. Evanko is a
22   defendant in the lawsuit and Mr. Mark Campbell. You don't
23   know Mr. Mark Campbell do you?
24   MR. WILLIAMS: I know who he is but I never sat down and had a

79

1    discussion with him or anything.
2    MR. BAILEY: And you never discussed anything with him about
3    this. Mr. Ober or anything in this case?
4    MR. WILLIAMS: NO.
5    MR. BAILEY: You indicate in response to some earlier questions
6    that you may have discussed Mr. Ober with Tom Corey. I may be
7    mistaken about that.
8    MR. WILLIAMS: Yeah, I said there was a possibility we discussed
9    some things but I don't have any clear recollection of it. It's
10   entirely possible.
11   MR. BAILEY: Alright. Now, sir, you indicated that Mr. Westcott
12   has called you about Mr. Ober, any other discussions at any time
13   you've had with Mr. Westcott about Mr. Ober?
14   MR. WILLIAMS: I'm sure we has some along the line but it was
15   nothing that "Oh I found this out," or and he did this wrong or he
16   did that wrong. It was just, you know, how are you doing in the
17   investigation. Well, we still have so and so on to interview
18   and things of that nature.
19   MR. BAILEY: Do you know of any other investigations    that
20   were done into Captain Ober?
21   MR. WILLIAMS: No.
22   MR. BAILEY: Is it fair to say you don't know of any BPRs or any
23   criminal investigations?
24   MR. WILLIAMS: Not that I'm aware of.

80

1    MR. BAILEY: No of any other kind of, for lack of a better term
2        administrative inquiries that were done to Mr. Ober?
3    MR. WILLIAMS: No, with the exception of the one we did. Myself
4        and Major Wertz.
5    MR. BAILEY: How about Mr. Conley?
6    MR. WILLIAMS: Mr. Conley? Mr. Hawthorne Conley?
7    MR. BAILEY: Mr. Hawthorne Conley.
8    MR. WILLIAMS: Do I know of any investigations on him?
9    MR. BAILEY: No, discussions, I'm sorry. Let me go back to the
10       original question. I sort of lost it. How about Mr. Conley about
11       Mr. Ober? For example was he interviewed in the administrative
12       inquiry?
13   MR. WILLIAMS: Yes, he was.
14   MR. BAILEY: Aside from the interview and the administrative
15       inquiry did you have any conversations with Mr. Conley about
16       Mr. Ober?
17   MR. WILLIAMS: I'm reluctant to say no because during the course
18       of everyday business you run into somebody and you just talk
19       about different things. There was nothing that was ever planned
20       or I had a mission to give him certain information or something. I
21       just don't recall any.
22   MR. BAILEY: Ok. Let me step out with Mr. Ober.
23   Door closing.
24   Some unrelated conversation going on.

81

1    MR. BAILEY: Major Williams I have nothing further at this time
2        sir and as far as I'm concerned you deposition is concluded. I
3        may have some requests to make of you. Let me just do this in a
4        formal way right now before Syndi takes over. If you have any
5        documents, reports or records which you have taken with you
6        from the State Police, ah, maybe you can tell me right now. Do
7        you have anything that would relate to this?
8    MR. WILLIAMS: Not that, not that I recall. Syndi asked me that
9        this morning and I said that when I was retiring and moving a lot
10       of the personal notes and everything I had over the years, I just
11       got rid of it. I didn't think I was going to need it anymore.
12   MR. BAILEY: As long as the State Police have it.
13   MR. WILLIAMS: I think it's shredded if there was anything.
14   MR. BAILEY: Well, we'll see. Ah, the, well just a little tiny, you
15       did a couple of times you sort of returned to raise persistently
16       about this day which I'm aware of and  know how to deal with
17       because I positively can show there's actually been no wrong-
18       doing or intention of wrong-doing on  behalf of my client for who
19       I have absolutely only the greatest respect. Did you question Mr.
20       Hickes about that leave day? Remember.
21   MR. WILLIAMS: No I can't. Something keeps telling me yes but
22       I'd have to review that transcript.
23   MR. BAILEY: Well do you know if you asked Mr. Hickes if he told

82

1    Mr. Ober to put in for that leave day?
2    MR. WILLIAMS: And again here something is telling me that that
3        answer is yes but I'd have to review that. And I'm just trying to...
4    MR. BAILEY: Not to be facetious but it wouldn't have been a
5        mistake of the heart for Mr. Ober to follow Mr. Hickes
6        instructions on that issue either. Not to be funny is that?
7    MR. WILLIAMS: Ah, yeah.
8    MR. BAILEY: Without knowing more it's hard for you          to
9        say.
10   MR. WILLIAMS: It, it is. Because, I now, I can see where you're
11       coming from but I can also see that if somebody above me told
12       me to do something that I considered wrong,  my ethical standard
13       would not allow me to do that.
14   MR. BAILEY: That's right. You know how you can't conceive of
15       how Mr. Evanko would do something there not a centila of doubt
16       in mind in my mind about the integrity of my client. We have a
17       commitment made.
18   MR. WILLIAMS: I have always thought that and I'm not saying
19       this because I'm on camera or anything else. I always thought
20       very highly of Darrell. He's a very bright, articulate young man.
21   MR. BAILEY: I know you do and I now you voiced those opinions
22       before and I deeply appreciate it. Sir, I have no more questions
23       for you, I'm finished. I thank you very much. I know you are
24       retired and very much appreciate your coming here today.

83

1    MR. WILLIAMS: Not a problem.
2    Mr. MARCECA:  It's now 16:05 and this deposition is now ended.
3        END OF TAPE
4
5

84

*Mark Campbell*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT IF PENNSYLVANIA

DARRELL G. OBER    :  CIVIL ACTION AT LAW
   Plaintiff    :  1:DV-01-0084

vs,        :

PAUL EVANKO, MARK  :  (JUDGE CALDWELL)
CAMPBELL, THOMAS COURY, :
JOSEPH WESTCOTT,   :  JURY TRIAL DEMANDED
HAWTHORNE CONLEY  :
JOANNA REYNOLDS and  :
SYNDI GUIDO    :

   Defendants    :

PLACE:   MAIN CAPITAL
     ROOM 238
     HARRISBURG, PA 17101

PROCEEDINGS: VIDEO DEPOSITION OF *Mark Campbell*

DATE:   OCTOBER 10, 2001

APPEARANCES

For the Plaintiff:  Donald Bailey, Esquire
       4311 North 6th Street
       Harrisburg, PA 17110

Defendant:   Syndi Guido, Esquire
       333 Market Street
       Harrisburg, PA 17101

---

1 MR. BAILEY: What we'll do as soon as, Tony of the State Police, when the young

2     lady is positioned and ready to, we will begin the video deposition. And,

3     uh, we'll go around the table, do a voice check and we'll go from there.

4 REPORTER: Do I need the microphone a little closer to Mark or not?

5 MR. BAILEY: You don't need that believe me. Announce to everybody the video.

6 MR. MARCECA: Good afternoon. My name is Anthony Marceca and my address is

7     2219 Dixie Drive, York, Pennsylvania and I'm contracted by TR Video

8     to conduct this deposition on behalf of the plaintiff. Ah, this matter is

9     docketed 1:CV-01-0084. In the United States District Court of the

10     Middle District of Pennsylvania. The caption is Darrel A Ober

11 MR. OBER: G Ober.

12 MR. MARCECA: Correction on that, Darrel G. Ober versus Paul Evanko et al. Ah,

13     could I take a sound check?

14 MR. BAILEY: Yeah, I'll begin. My name is Don Bailey. I am the attorney for

15     plaintiff. Ah, Mark we can go with you.

16 MR. BAILEY: Mark Campbell.

17 MR. BAILEY: Syndi?

18 MS.GUIDO: Syndi Guido. I'm counsel to the defendants.

19 MS. REYNOLDS: Joanna Reynolds. Counsel for defendants, Pennsylvania State Police.

20 MR. BAILEY: Ok. Ladies and Gentlemen, as I said this is the plaintiff's deposition.

21     The video is now running. Tony, you may want to announce the time

22     and we'll have the court reporter, since they want a transcript we'll

23     have the court reporter swear in the witness.

24 MR. MARCECA: The tape is now running at 14:08 on 10 October.

25

  MR. BAILEY: Miss, would you administer the oath, please.

---

1 REPORTER: Certainly. Would you raise your right hand please? Do you swear the

2     testimony you are about to give in this matter will be the truth, the

3     whole truth, so help you God?

4 MR. CAMPBELL: I do.

5 MR. BAILEY: Ah, Mr. Campbell as I indicated earlier we met very briefly. My

6     name is Don Bailey. I am an attorney. I represent the plaintiff in this

7     matter, Darrell Ober. Darrell is with me and is sitting to my left. This

8     is a video deposition, so, if you at any time need to get up of leave

9     your chair, ah, we'll suspend the video at that point and that way

10     we'll have a complete and total record. During the deposition I'll be

11     asking you various questions ah, it's important that you, ah, I

12     probably don't need to tell you these things. I don't want you to take

13     them as condescending but it's a process I need to go through. Um,

14     I'll be asking you various questions at different times. And, of course

15     it's important particularly because we are taking this record by

16     stenographic means, especially, that you let a little time transpire

17     between when you respond, when I ask a question and you respond.

18     Mark, if I at any step on the toes of your answer, and I assure

19     you, I'll be the one at fault, it's not going to be you. Ah, make sure

20     you correct me. The two fine lawyers there I'm sure are gonna make

21     sure they remind me when I do something they feel is wrong or an

22     error. But, you know, you're the only one who knows, in your mind

23     when you've completed an answer and it is very important that you

24     answer completely and fully. Ah, the law requires not only a truthful

25     answer

---

1     Which I'm sure you know but it also requires a complete and full

2     answer. Now form time to time and my instructions to depones are a

3     little different than most attorneys. I have no interest in any kind of

4     trick questions, smoking gun question or anything like that and I

5     mean that sincerely. Therefore, if at any time during the deposition

6     you are curious about where I'm going with a line of questioning,

7     question, a line of question or with a particular question I want you

8     to feel free to ask me. I'll give you an offer. I'll tell you where I'm

9     coming from, what I mean by a question, ah, etc. The other thing is,

10     you know, you do have to keep your voice up. You do have to be

11     verbal in your responses. You can't gesticulate. With that said, ah,

12     before we begin there's just a couple chores that the attorneys have

13     to clear up. I would ask that...Do you have any questions of me

14     before we...

15 MR. CAMPBELL: No sir.

16

17 MR. BAILEY: To opposing counsel I would assume that the usual stipulations,

18     objections except as to the form of the question be reserved until tie

19     of trial. Is that acceptable?

20 MS. GUIDO: That's what we plan to do.

21 MR. BAILEY: Ok. If everyone's ready we can begin. Ah, one last thing, the other

22     thing I don't object to is if at any time you want to stop and talk to

23     your attorneys or go outside I want you to feel free ah, to do that.

24     Normally, you're not supposed to talk during a deposition but, as I

25     said before, I really don't mind. So if you feel some need, you have

1  to suspend like, don't be afraid to ask. Mark, for the record could
2  you state your full name?
3  MR. CAMPBELL:  Mark Richard Campbell, Junior.
4  MR. BAILEY:  How are you employed?
5  A:  Currently, Chief of Staff to Governor Mark Schweiker.
6  Q:  And, ah, I realize there's been a change of leadership with Mr.
7  Ridge, Governor Ridge going to Washington but, ah, is it fair to say
8  that you previously had worked for Mr. Ridge?
9  A:  I was most recently, before this, chief of Staff to Governor Ridge.
10  Q:  And how long were you Chief of Staff to Governor Ridge?
11  A:  I've been Chief of Staff since January 2001.
12  Q:  Ok. Now, very briefly, what does Chief of Staff do?
13  A:  Chief of Staff serves to, I think as, at least with Governor Ridge and
14  Governor Schweiker to be the
15  Q:  For the sake of just helping you, I think we probably, can do, most, is
16  it fair to say, we can all agree that the events complained of in the
17  complaint all occurred under Governor Ridge? Ok, during his tenure.
18  A:  Sure.
19  Q:  There's no reason to get into Governor Sweiker at all.
20  A:  Ok.
21  Q:  I resolved the fact that you work for him.
22  A:  Yeah.
23  MR. BAILEY:  But it just saves time. Go ahead.
24  A:  Um, primarily served as the governor's liaison to all of his cabinet
25  agencies and to his senior staff and helped ensure that the governor's

1  agenda was, was developed, enacted, uh, and initiated. And that
2  required me to work with, ah, all of our cabinet officers, our senior
3  staff as I mentioned earlier and, um, helped to oversee a 21 billion
4  dollar, 80 thousand employee undertaking.
5  Q:  If, in, sorting through some of the adjectives, descriptive adjectives,
6  you used, is it fair to say your job pretty much amounted to getting
7  things done?
8  A:  Sure.
9  Q:  Facilitating or seeing that policy directives and that sort of thing
10  were carried out?
11  A:  Yes sir.
12  Q:  Are you familiar with the complaint?
13  A:  Um, I am.
14  Q:  Have you been able to review it? Review the complaint?
15  A:  I did, uh, on one occasion. Yes.
16  Q:  Now, in the complaint, um, the, do you know where, let me. The
17  complaint was filed in Harrisburg; this is the amended complaint, on
18  May 2, 2001. Maybe opposing counsel can help me. When was the
19  original complaint filed? Was it in ..?
20  Male voice:  January 16th.
21  MR. BAILEY:  January 16th of 2001. Is that consistent with your..?If you remember.
22  MR. CAMPBELL:  Uh, I don't remember the dates.
23  Q:  Mark, when did you first become aware of it?
24  A:  Of the complaint?
25  MR. BAILEY:  Yes sir.

1  A:  Probably, and taking for granted the January filing date, probably
2  shortly after it was filed.
3  Q:  How did you become aware of it?
4  A:  I believe through our office of General Counsel.
5  MR. BAILEY:  Alright. One thing I, uh, want to point out to you. I'm sure you've
6  already been advised, but if you haven't, from time to time if I ask a
7  question that, I don't want to infringe on attorney/client privilege, if I
8  ask a question where you have discussed something in the presence
9  of your counsel privately, um, that's called privilege. You don't have
10  to respond. Are you an attorney by trade?
11  A:  No, I'm not.
12  MR. BAILEY:  Then I'll make sure I double do these things. So you're not to
13  respond to those. If you have any questions ask your counsel. And if
14  she has a concern I'm sure she's gonna speak right up. Is it fair to
15  say in a given week, um, during the time, right up, let's say the year
16  2000, the year 2001 that you would meet with different heads of
17  various agencies of government that come under the governor's,
18  under the governor's jurisdiction?
19  A:  Yes.
20  Q:  And you pretty much did that on a regular basis?
21  A:  Yes.
22  Q:  Do you keep any kind of calendar or schedule?
23  A:  I have a schedule via my computer. So, yes.
24  Q:  What kind of software do you use? I'm sure it's a windows operating
25  A:  Microsoft. I forget the name of the product.

1  Q:  Is it generic to the governors office or do you have a private
2  computer that you keep these things on?
3  A:  No, it's the computer here in the governor's office.
4  Q:  And do you have a secretary, a private secretary that works only for
5  you?
6  A:  Um, Mary, yes I do.
7  Q:  And what is her name?
8  A:  Mary Quigley.
9  Q:  How long has she been in that position?
10  A:  Um. Mary has been my secretary for probably, um, I don't recall
11  exactly but it's probably been the last two years approximately.
12  Q:  Does she act as a receptionist for you, for receiving incoming calls
13  and helping you schedule appointments?
14  A:  Yes.
15  Q:  Does she make, make any decisions to schedule for you?
16  A:  She will at times.
17  Q:  You're, I assume the final arbiter of what schedule you keep?
18  A:  Umm.
19  MR. BAILEY:  Well, maybe the governor would say...
20  A:  Yeah. Yeah. Right. Yeah. That would be true.
21
22  [ LAUGHTER ]
23
24  MR. BAILEY:  Ok. Sure. Now, Mark, I'm going to be shifting gears a little bit here
25

1    and I want to ask you some more, some more questions that are
2    specific to the complaint. Do you know the Pennsylvania State
3    Police Commissioner Mark, Paul Evanko?
4    Q:    Do I know him? Yes.
5    A:    Since, probably somewhere around the beginning of 1995.
6    Q:    And how did you occasion to first meet Paul Evanko?
7    A:    One of my initial tasks with the governor was to interview potential
8          cabinet secretaries for several agencies, the State Police being one of
9          those agencies. I was a member of a panel that interviewed various
10         candidates and made recommendations to the governor.
11   Q:    Who else was on that panel?
12   A:    Ah, Lieutenant Governor Schweiker and Tom Corbett, and ah. I
13         believe there was a fourth member but I don't recall right now who
14         that would have been.
15   Q:    Now, Mark, uh, do you have a recollection of who recommended
16         Paul Evanko for his position?
17   A:    Colonel Evanko's name was first raised with me and suggested to me
18         by Mike Moreno.
19   Q:    Anyone else that you can remember?
20   A:    No sir.
21   Q:    Did you meet and interview Mr. Evanko?
22   A:    Ah, he came before that group that I mentioned before and was
23         interviewed by the panel. Yes.
24   Q:    Ok. Now, I'm gonna switch gears on you again. Going a little
25         different direction here. Do you have any kind of a reporting, kind of

---

1    a system? Let me explain where I'm coming from on that. Do you have any
2    kind of operating procedure? SOP's as it's commonly referred to where, ah,
3    cabinet officers either report, communicate information to the governor? Or
4    as Chief of Staff, you know, which is in most administrations I've been
5    familiar with. A Chief of Staff is an alter ego and again, in my experience,
6    probably the next most powerful man in the government system, or woman.
7    I've known some women that have held those kind of positions also. I'm
8    asking you if there was any kind of procedure set up where there was a
9    standard way to report or supply information?
10   A:    The only regularly scheduled communication between the governor
11         and the members of his cabinet were through bi-weekly reports,
12         written reports that the cabinet officers would provide to the
13         governor. Other than that the cabinet officers would bring matters to
14         the governor's attention on an 'as needed' basis.
15   Q:    Now, ah, isn't it so that there is some type of cabinet meeting or
16         procedure that deals with personnel matters?
17   A:    Not that I'm aware of. No.
18   Q:    Well, um, take an issue, like on the behalf of a state employee for
19         extended leave. Any issues like that that ever come to the level of a
20         cabinet position where they have to be signed off on, etc.? that you
21         know of.
22   A:    No, not that I'm aware of.
23   Q:    Did you during the period of time complained of in the complaint
24         hold cabinet level meetings with either top staff or cabinet level
25         officials during the period of time that the matters complained of in

---

1    the complaint at a regularly scheduled time?
2    A:    No.
3    Q:    Pennsylvania State Police Commissioner. Is that cabinet level? Or is
4          it sub-cabinet level?
5    A:    That would be cabinet level.
6    Q:    Now, Pennsylvania State Police Commissioner, and it's Mr. Evanko,
7          in this case. Let's go back to square one. How often would you meet
8          with him? On, let's say a monthly, bi-weekly or yearly basis?
9    A:    We didn't have a regularly scheduled series of meetings. I would
10         meet with the colonel as I would meet with other cabinet officers on
11         an 'as needed' basis.
12   Q:    So everything was ad hoc. That's the way you did things. Was there
13         a regular meeting with the governor?
14   A:    No.
15   Q:    Lieutenant Governor?
16   A:    Not that I'm aware of.
17   Q:    Legislative leaders?
18   A:    Not that I'm aware of.
19   Q:    Ok. Um, the chain of command for wants of a better...no pun
20         intended, incidentally in this case. Ah, but the chain of command
21         would essentially be the governor, with your assistance naturally, but
22         the governor to the cabinet level official, right?
23   A:    Yes sir.
24   Q:    Is there any procedure in State government known to you,
25         Pennsylvania State Government, known to you, where investigations

---

1    by other than state authorities are to be reported? Do you understand
2    that question?
3    A:    Sure.
4    Q:    Let me give you a hypothetical one. The FBI is investigating
5          something and uh, somebody out there gets wind of it. Hears of it.
6          They're looking into some aspect or function of state government. Is
7          there any policy, was there any policy in state government to report
8          that information?
9    A:    No. Not that I'm aware of.
10   Q:    Was there any, now there were no written or informal policy 'Hey let
11         me know the FBI is checking into this or that we should know about
12         it'?
13   A:    No.
14   Q:    And by the way, please accept the, again for what it's worth. There is
15         no implication that that's improper. It's our desire to know what's
16         going on out there. Ok. Now there is no particular policy that has to
17         do with reporting, a reporting requirement, no regulation. Do you
18         know of any such regulations in the Pennsylvania State Police?
19   A:    No, I do not. Not aware.
20   Q:    Uh, have you ever had occasion to consider, um, regulations or
21         potential regulations that would require an employee to report
22         knowledge of investigatory activities? Do you understand that
23         question?
24   MR. CAMPBELL:    Have I been aware of any need?
25   MR. BAILEY:    Yes, sir. I'm sorry. Let me rephrase that, it was very awkward. Uh,

**Page 12**

1        do you have knowledge of any considerations, meetings or

2        discussions in state government about a policy where one would

3        encourage, or one of the officials in state government is supposed to

4        report knowledge of investigatory activity?

5   A:     Do I have awareness of any requirement? No, I do not.

6   Q:     Were the any, did you ever have any discussions to that effect?

7   A:     No.

8   Q:     Do you know of any directions or discussions that have been held by

9        anybody at a cabinet level about reporting investigatory activity?

10   A:     No.

11   Q:     Did you, at some time have a meeting with Paul Evanko where, a

12        Mr. Hykus was discussed?

13   A:     Had several meetings with the colonel during the selection process

14        for a new deputy commission during which time Colonel Hykus was

15        one of the candidates for that position.

16   Q:     Do you have a recollection of Mr.Evanko's position on the selection

17        of Mr. Hykus?

18   A:     Um there were several candidates who were considered and as I

19        recall, um, the colonel considered various attributes of all the

20        candidates and ultimately selected Colonel Hykus.

21   Q:     So, it's your testimony here today, to the best of your knowledge that

22        Mr. Evanko chose Mr. Hykus for his position?

23   A:     Yes sir.

24   Q:     Alright. Now, um, did you ever have occasion to discuss any FBI

25        investigations with Mr. Evanko?

**Page 13**

1   A:     No.

2   Q:     Um, is it your testimony here today that you, that Mr. Evanko never

3        informed you of an FBI investigation into the affairs of either the

4        Pennsylvania State Police or certain Pennsylvania State Police

5        officers?

6   A:     Colonel Evanko did inform me, um, in approximately and I know

7        this from having read the complaint, in approximately May of 1999

8        of a what I believe was termed to be a closed FBI investigation, um,

9        regarding activity at the Pennsylvania State Police and potentially in

10        the governors office as well.

11   Q:     Ok. Um, Mark, so you have a recollection of what the substance of

12        that investigation was, what Mr. Evanko. Just tell us what you

13        remember Mr. Evanko told you.

14   A:     Sure. As I recall, the colonel, um, informed me that he had been

15        made aware of a completed FBI investigation regarding allegations

16        regarding the selling of slots, cadet slots at the Pennsylvania State

17        Police Training Academy that may have involved either employees

18        of the commissioner's office or the governor's office.

19   Q:     Ok. How did you feel about that, what was your reaction to that, I

20        mean, it probably, I mean I would assume that that's something of

21        concern. I realize that. So, I'm not looking so much in terms of your

22        visceral or personal reaction. I'm not sure that's a fair question. But

23        I'm looking more in terms of as a professional in your position, what

24        was your reaction? How did you react to that?

25   A:     Ah, my concern at the time was understanding what the allegations

**Page 14**

1        were concerning the governor's office and was told by the colonel at

2        the time that the investigations had been concluded and that the

3        allegations involving the governor's office had been unfounded. So

4        feeling that there was no implication of the governor's office I really

5        didn't have any concerns with going forward.

6   Q:     Ok, Mark. Now after, your best recollection is that Mr. Evanko

7        reported this information to you on or about May of 1999. Am I

8        correct?

9   A:     That's again from my recollection of what the complaint said. Yes.

10   Q:     Ok. Now I want you to think independently. I want you to go back in

11        your minds eye. Set the complaint aside. And do you have any other

12        source of information as you sit here today that would indicate to

13        you, that you could share with us, about when Mr. Evanko brought

14        that information to you?

15   A:     No, I don't.

16   Q:     Did you make any notes?

17   A:     No, I did not.

18   Q:     Um. I would assume that you asked Mr. Evanko some questions.

19   A:     Um, I don't recall what, if any, questions I asked. It was my

20        recollection of the conversation was that it was the colonel that was

21        providing information to me and I, for the most part, listened.

22   Q:     Ok. I think you indicated that he had told you it was a closed

23        investigation?

24   A:     That's my recollection. Yes.

25   Q:     Did he indicate where he got his information?

**Page 15**

1   A:     I don't recall.

2   Q:     Did he at any time indicate to you that the source of the information

3        was the FBI?

4   A:     I don't recall that he indicated that.

5   Q:     Mark, do you remember if he indicated whether or not if he had

6        contacted or intended to contact or talk to Louie Freed. Judge Freed.

7   A:     I believe the Colonel did indicate that he would reach out to the FBI

8        to ascertain exactly the nature of the investigation and its status.

9   Q:     Ok. Now, um did he share any information about how the

10        investigation arose or what triggered it?

11   A:     No. he provided me, as I recall with just the very basic, one to two

12        sentence facts in terms of the allegation itself.

13   Q:     Now you indicated in your response to an earlier question that the

14        standard operating procedure, those are my words, they were not

15        yours, that normally the communication was by memo or email or

16        some sort, typically a report.

17   A:     There was. Yeah, I do. I think the question that was put to me at that

18        time was sort of regularly scheduled communication occurs between

19        the governor and his cabinet. And the one regular form of

20        communication are written reports, that are sent to the governor.

21   Q:     Did Mr. Evanko ever put any of that information into a written report

22        for the governor?

23   A:     I don't know.

24   Q:     Did you ever check to see?

25   A:     No, I did not.

**Page 16**

1    Q:    Have you looked for any communiqués, documentary evidence,
2          email, electromagnetically record, you know, taped evidence or
3          anything like that of Mr. Evanko's communication to you or to the
4          governor's office?
5    A:    No, I have not.
6    Q:    Now, after, and who was present when Mr. Evanko shared this
7          information.
8    A:    I don't believe anyone else was present.
9    Q:    Where did the meeting, I assume it was not, at least by the way you
10         described it, I assume it was a personal meeting?
11   A:    It was a phone call.
12   Q:    It was a telephone call? Do you know where Mr. Evanko was when
13         he made that telephone call?
14   A:    No, I don't.
15   Q:    Do you remember where you were when he made that telephone
16         call?
17   A:    I was in my office.
18   Q:    Do you remember how long that telephone conversation was?
19   A:    I don't remember how long it was. It was no more than a few
20         minutes.
21   Q:    Mark, I want you to think back on that conversation very carefully
22         now, and particularly this question here, during that conversation did
23         Mr. Evanko discuss Mr. Hykus?
24   A:    I don't recall. I don't remember him discussing Colonel Hykus. No.
25   Q:    Have you ever discussed this matter of this issue with Mr.Hykus?

**Page 17**

1    A:    Not that I can recall. No.
2    Q:    Do you have a recollection of ever discussing this litigation with Mr.
3          Evanko?
4    A:    ...ther than acknowledging that the complaint had been filed, no.
5          Nothing beyond that. No.
6    Q:    Do you a recollection of discussing, when you attorneys weren't
7          present, of course, but actually if your attorneys are present, it's not a
8          defendant, it's not privilege. But do you ever have a recollection of
9          discussing, you can tell me if you discussed it and then we'll worry
10         about whether it's privilege or not, when we get to subsequent
11         questions. Did you ever discuss any of the contents of the complaint
12         with any of the other defendants in this matter?
13   A:    No.
14   Q:    Let me make sure. Let me read them for you. Naturally you're a
15         defendant. Mr. Evanko's a defendant, Thomas Corey, did you ever
16         discuss it with him.
17   A:    No.
18   Q:    Do you know Mr. Corey?
19   A:    Yes, I do.
20   Q:    How long have you known Mr. Corey?
21   A:    Um. Approximately the spring of 1995.
22   Q:    Around the same time. Ah, do you know Mr. Westcot?
23   A:    Yes, I do.
24   Q:    Have you ever discussed it with him?
25   A:    No. Never.

**Page 18**

1    Q:    Joanna Reynolds and Susan, ah, Syndi are no longer defendants in
2          this action in this action . Hawthorne Conley ever discussed it with
3          him.
4    A:    No, I haven't.
5    Q:    Mark, there's an allegation in the amended complaint, there was an
6          allegation in the original complaint. Ah, that Mr., and in substance,
7          that Mr. Evanko informed you about this investigation and sought
8          permission to investigate Captain Ober. You answer appears to at
9          least generally deny that allegation. I might change again my
10         direction here a little bit and I'm going to ask you some questions
11         about that. Ok?
12   A:    Um-huh.
13   Q:    Do you know Captain Ober?
14   A:    No, I do not.
15   Q:    Did you know who Captain Ober was before this complaint was
16         filed?
17   A:    No, I did not.
18   Q:    Um, have you ever discussed Captain Ober with Commissioner
19         Evanko?
20   A:    Outside of matters involved in this complaint, um,
21   Q:    We can start there. Outside of matters involved in this complaint.
22         Have you ever discussed Captain Ober with Paul Evanko, um,
23         related or regarding matters having to do with this complaint?
24   A:    I'm not sure what you mean by discuss. I mean I
25   Q:    Any communication between two human beings is a discussion I

**Page 19**

1          guess of some sort, so whether it's by verbal or written means
2    A:    I first heard, and to the extent that I had discussion with Colonel
3          Evanko regarding Mr. Ober it was that the colonel might mention his
4          name as in for instance when the colonel called to inform me, that
5          it's possible that Captain Ober's name may have been mentioned
6          during that conversation. But I don't ah, don't recall specifically.
7    Q:    It's possible that Captain Ober was discussed during the conversation
8          when Mr., if I understand you correctly, during the, it's possible,
9          underline the word possible, that Mr. Ober was discussed during a
10         conversation when Mr. Evanko informed you about the FBI
11         investigation into the potential sales, or the alleged, I don't know
12         exactly what it was, but the closed investigation to the sale of
13         position at the academy. Is that right?
14   A:    I don't recall specifically. I'm sure it's possible.
15   Q:    Alright. Did you ever have any discussions with Mr. Evanko after
16         that initial discussion when he informed you of the FBI interest
17         where Captain Ober was mentioned?
18   A:    Um. I believe I participated in a discussion involving counsel where
19         the result of the colonel's investigation were discussed.
20   Q:    I'm gonna get to it. That's' a whole area. We're gonna get to that.
21   A:    Ok.
22   Q:    Now, I am still concentrating on the original or the initial discussions
23         as to Captain, Ah, I mean, I'm sorry, as to Mr. Evanko informing
24         you.
25   A:    Ok.

**— 20 —**

1 Q: Did Mr. Evanko, when he informed you of what the FBI was doing

2 did he indicate anything to you that caused you to believe that he was

3 going to look into the matter of try to learn more information about

4 the matter?

5 A: The colonel did indicate to me that he planned to initiate an internal

6 investigation over how this matter was handled by the Pennsylvania

7 State Police.

8 Q: [Sigh. Pause] Excuse me. Did Commissioner Ober indicate what he,

9 what he meant by, to borrow your words, how the matter was

10 handled by the Pennsylvania State Police?

11 A: Did he indicate how?

12 Q: Let me explain Mark, where I'm coming from.

13 A: Sure.

14 Q: From what you've told us so far, my understanding is, its easier to

15 understand my line of questions this way. My understanding is that

16 Mr. Evanko called to tell you about this closed investigation. Ok,

17 now he also indicated that he was going to initiate an investigation

18 into how the Pennsylvania State Police handled this matter.

19 A: Yes sir.

20 Q: Now that begs a question and this maybe a few questions. That

21 indicates that Mr. Evanko wanted to know how the FBI handled, or

22 how the Pennsylvania State Police handled the FBI interest, the FBI

23 inquiry, is that fair to say?

24 A: I think that's, you'd have to ask Colonel Evanko that.

25 Q: Well, how did you understand it?

**— 21 —**

1 A: Ah the colonel wanted to better understand how, um, this

2 information was in fact handled by his agency, how, how his agency

3 had perhaps worked with the FBI regarding the investigation.

4 Q: Alright, Mark did he say why he had an interest in that area?

5 A: No. I don't recall him saying what.

6 Q: Did you ask him why he was concerned about the Pennsylvania State

7 Police handled an FBI inquiry?

8 A: I considered it to be, once I ascertained that there was not any

9 involvement on the part of anyone in the governor's office and that,

10 in fact, there was not any involvement of anyone on the part of the

11 State Police, I considered the matter at that point to be a matter for

12 the Colonel to address, um, um, through sort of, you know, the

13 administrative channels of the Pennsylvania State Police.

14 Q: Why would he want to, why did you understand he wanted to

15 address it?

16 A: Why do I understand why he wanted to address..?

17 Q: Let me lay some foundation.

18 A: Sure.

19 Q: The Federal Bureau of Investigation, by reputation, at least, one of

20 the finest law enforcement agencies in the world, would you agree?

21 A: Yes sir.

22 Q: Alright. Just, Ok, Mr. Evanko asks you, or, I'm sorry. Mr. Evanko

23 informed you that, in essence, in effect, the FBI has closed an

24 investigation into something that was going on.

25 A: Yes sir.

**— 22 —**

1 Q: Did Mr. Evanko indicate to you that he was informed _belatedly_ awkwardly

2 about the FBI inquiry?

3 A: I believe he did. I believe that he shared the, you know, that he was

4 sharing the information with me after he as well had been informed

5 that the, the ah, the investigation had been closed, and that he was

6 not aware of the investigation prior to that.

7 Q: Exactly. In other words the investigation had taken place, the

8 investigation had, thank God, and my compliments to you, the

9 governor, and your staff, that thank God the investigation had been

10 closed and Mr. Evanko was informing you that there's no indication

11 that you guys did anything wrong, or we did anything wrong but I

12 just found out about it myself. Right?

13 A: That's what he indicated to me. Yes.

14 Q: Sure. And was he angry, Mark?

15 A: I don't recall that he was angry. I believe that he was concerned, um,

16 that the matter had just been brought to his attention.

17 Q: But didn't you tell us that he said to you that the investigation had

18 been into um, possibly people, um, allegations involving people in

19 the governor's office, or lieutenant governor's may be correct, and I

20 think and the higher ups in the State Police?

21 A: That's what he had indicated to me. Yes.

22 Q: Sure, so when he was telling you that he also indicated to you that he

23 had only learned about this after the investigation was done.

24 A: Yes sir.

25 Q: Did you ask him who had knowledge of the investigation before it

was closed?

**— 23 —**

1 A: No. I did not.

2 Q: Is it, I think you indicated it may have been possible that Mr. Ober

3 was discussed during that conversation but you have no specific

4 recollection. But you do recollect that Mr. Evanko indicated to you

5 that he was going to investigate how, quote/ unquote to use your

6 words, ah, the, ah. Pennsylvania State Police had handled the

7 investigation.

8 A: Yes sir.

9 Q: So that meant that he was going to, that he wanted to investigate how

10 the FBI had dealt with, I'm sorry, how the Pennsylvania State Police

11 had dealt the FBI inquiry.

12 A: I guess that's what the colonel wanted to ascertain. Yes.

13 Q: Mark, didn't that concern you?

14 A: No, it really did not. Um, the way in which the governor's office

15 interacts with its cabinet officers is to leave frankly those kinds of

16 administrative decisions and discretion to the cabinet secretary. My

17 concern as I indicated earlier was ascertaining what, if any,

18 involvement there had been on the part of the governor's office. Ah,

19 once I was informed that in fact the investigation had not found that

20 there was any involvement ah, I frankly, I saw it as the colonel's, ah,

21 it was appropriate for the colonel to follow up in whatever he

22 deemed appropriate. Um, because, and that at that point I viewed it

23 as a matter, an administrative matter, internal to the Pennsylvania

24 State Police.

25 Q: I'm not trying to be facetious or contentious. Do you trust the FBI?

24

1    A:       Do I trust the FBI?

2    MR. BAILEY:    Sure.

3    A:       I don't know the FBI. I have no reason not to trust the FBI.

4    Q:       Let me ask you, um, did you have a concern that Colonel Evanko

5            was upset that he had not known about this, what was going on, the

6            FBI investigation?

7    A:       Did I have a concern? No.

8    Q:       Well, you had understood that the FBI investigation had been into

9            the governor's office, and higher-ups in the State Police, right?

10   A:       That was the allegation. Yeah.

11   Q:       Would you expect the FBI, if they heard such allegations to come

12           and check with your first or to do their investigation first?

13   A:       I would not expect them to come, no, I would not expect them to

14           come to me.

15           Of course not, because they might compromise the investigation,

16           right?

17   A:       Yes sir.

18   Q:       Ok. All of us again, I'm not trying to talk down to you, but I think all

19           of us realize that in a society ruled by laws and not by men that you

20           follow procedures and regardless of what level, a law enforcement

21           agency's got to do it's investigation. right?

22   A:       Yes sir.

23   Q:       Did you ask Colonel Evanko why he was concerned that there be an

24           investigation into how his agency handled a closed FBI

25           investigation? quite frankly, apparently yielded a lot of good results

---

25

1            that were laudatory, at far as the integrity of the governor's office

2            was concerned, at least.

3    A:       No, I do not.

4    Q:       Do you know what a "Whistle Blowers" statute is?

5    A:       I'm generally familiar with the terminology.

6    Q:       Is it fair to say that if you became aware of some issue of apparent

7            corruption in government that you would report it to law

8            enforcement authorities?

9    A:       Yes sir.

10   Q:       You would expect, I'm sure that anyone who works in the

11           governor's office or under you, ah, you'd expect them to do the

12           same. Is that correct?

13   A:       Um-hmm. Yes sir.

14   Q:       And you, you, and this may be an unfair question because having

15           been there and done that to some extent and it's an extremely

16           difficult one, is it fair to say that in doing so, and looking at matters

17           of public corruption the first obligation that you have is to lawfully

18           examine, lawfully report and investigate public corruption and put

19           that ahead of political concerns. Is that correct? Politics second. The

20           law first.

21   A:       Yes.

22   Q:       Were you concerned that Mr. Evanko was personally angry over

23           being informed after the fact about the FBI investigation? Did he say

24           that?

25   A:       Not that I recall. No.

---

26

1    Q:       Did he ask you if you knew anything about it?

2    A:       No.

3    Q:       Did you ask him to find out why it hadn't been, why they had, why

4           you hadn't been informed earlier?

5    A:       No.

6    Q:       You were not upset that you had not been informed before the

7           investigation was done. Is that correct?

8    A:       Yes sir.

9    Q:       Did you have visions going through your mind, you know, have they

10           been tapping my telephone, have they been bugging the office, have

11           they been following people?

12   A:       No.

13   Q:       Alright. Did you ask Mr. Evanko any of those kind of questions?

14   A:       No, I did not.

15   Q:       Mark, there's an allegation, if you give me just a second, I'd like to

16           find the paragraph.

17           [Pause.] let me read this paragraph to you. Its paragraph 43 in the

18           amended complaint, it reads as follows. Very brief, one sentence

19           paragraph.

20           " Subsequent to learning about the FBI investigation, Colonel

21           sought the personal and official approval, (excuse me) of the

22           defendant, Mark Campbell, to begin an investigation into Captain

23           Ober. Campbell was an assistant to the Pennsylvania Governor's

24           Chief of Staff."

25

---

27

1    MR. BAILEY:    Let me correct that, at the time, in May of 1999, precisely what was

2            your position?

3    MR. CAMPBELL:    I was the Governor's Deputy Chief of Staff.

4    Q:       Deputy chief of Staff. Who was chief of staff?

5    A:       Mark Holman

6    Q:       Mark Holman so. Um let's go back to the first sentence, get that

7            out of the way and then go on.

8    A:       Sure.

9    Q:       Is it fair to say that you deny that Mr. Evanko sought any personal or

10           official approval to begin investigation into Captain Ober>

11   A:       Yes sir.

12   Q:       Alright. Now you did not deny that Mr. Evanko mentioned it during,

13           this discussion that he was going to look into or investigate how his

14           department handled the FBI probe. Is that correct?

15   A:       Yes sir.

16   Q:       Mark, why, why would Mr. Evanko call and discuss that with you?

17   A:       I believe that the Colonel felt

18

19           END AUDIOTAPE SIDE ONE. BEGIN SIDE TWO.

20

21   Q:       Just one second. Let me go back and ask the question, we generally

22           do that. It's about the 45-minute mark. Syndi, please keep me

23           apprised of the time when you have to go. Ok? So we...

24   MS. GUIDO:    We're good on time. I don't really need to leave until close to 5.

25

28

| | |
|---|---|
| 1 | MR. BAILEY:     I think we're doing fine. He's being very responsive. I appreciate |
| 2 | that, incidentally Mr. Campbell. Ok, my question was, what I'm |
| 3 | looking for was why Mr. Evanko, now you were Deputy, you're the |
| 4 | you were, you're title was Deputy Chief of Staff, why did Mr. |
| 5 | Evanko, why would he call you with this? |
| 6 | A:     Ah, I'm not sure. There's two different ways to answer your |
| 7 | question. If you're asking me in terms of my job, why me, versus |
| 8 | why would the colonel call me. Um, at the time... |
| 9 | Q:     Mark, let me put it this way. It really is an important question. Let |
| 10 | me tell you where I'm coming from. I'm trying to learn whether |
| 11 | there were personal, political, official custom practice and usage. A |
| 12 | normal way of doing business, you know, sometimes I been in |
| 13 | situations, all of have, you're a staff worker in politics. You develop |
| 14 | a contact in an office. The essence of politics is the flow of |
| 15 | information. Maybe he calls you because he likes you, of he |
| 16 | develops a relationship. This is the way I get access. I don't know. I |
| 17 | want you to explain for us, to the best of your knowledge why Mr. |
| 18 | Evanko would call and talk to you about this. |
| 19 | A:     Sure. Among my responsibilities was to serve as a liaison to several |
| 20 | of the governor's cabinet agencies, ah, including the Pennsylvania |
| 21 | State Police. So I was Colonel Evanko's point of contact within the |
| 22 | governor's office as his deputy chief of staff. Um, and I believe that |
| 23 | the colonel had reached out to me to convey this information to me |
| 24 | because there were allegations involving the possible involvement of |
| 25 | the governor's office that were a part of the investigation. |

29

| | |
|---|---|
| 1 | Q:     Ok. Do you know why he wouldn't simply wouldn't call the FBI and |
| 2 | say, "Jeez, can you tell me about this? I want to see if I have some |
| 3 | bad guys out there in my outfit or something." |
| 4 | A:     I don't. I can't respond to what the colonel either did or didn't do or |
| 5 | why he would not have taken any particular action. |
| 6 | Q:     But you didn't make an inquiry of the FBI or anything like that? |
| 7 | A:     No sir. |
| 8 | Q:     Do you know whether he did? |
| 9 | A:     I don't know. |
| 10 | Q:     (Sigh) Mark, prior to when the complaint in this matter was filed is |
| 11 | there any information known to you which would shed light on Mr. |
| 12 | Evanko's motivations for telling you that he was going to begin |
| 13 | investigating his own agency people to find out what happened in the |
| 14 | handling of the FBI probe. |
| 15 | A:     None that I, none that I'm aware of. |
| 16 | Q:     Do you have a recollection of him indicating who he was going to, I |
| 17 | understand there is no specific recollection of Mr. Ober, although the |
| 18 | name is apparently familiar to you, that's my observation, your |
| 19 | observation, your recollection it counts. Aside from Mr. Ober, |
| 20 | do you have a recollection of him indicating any names, ah, bureaus, |
| 21 | sub-departments, parts of his organization he was going to check |
| 22 | into? |
| 23 | A:     No, he didn't indicate anything like that to me. |
| 24 | Q:     Was anyone else in on that conversation that you recollect? |
| 25 | A:     The conversation with the Colonel? |

30

| | |
|---|---|
| 1 | MR. BAILEY:     Yes sir. |
| 2 | MR. CAMPBELL: Not that I'm aware of. |
| 3 | Q:     And you have indicated that, well, let me put it this way. In it, was |
| 4 | |
| 5 | there anything in Colonel Evanko's words, his phraseology, or |
| 6 | attitude which indicated to you that he sought any kind of ratification |
| 7 | or approval from you to look in to this matter? |
| 8 | A:     No. |
| 9 | Q:     Did he make any comments about it being had politics? |
| 10 | A:     No. |
| 11 | Q:     Did he mention anything about any state representatives that may |
| 12 | have been like that? |
| 13 | A:     No. |
| 14 | Q:     Did he mention any names of anyone that may have been looked at. I |
| 15 | don't mean for his investigation, I mean in the FBI investigation. |
| 16 | A:     No. |
| 17 | Q:     You had indicated the lieutenant governors office. |
| 18 | A:     No. You mentioned it before, I don't recall indicating the lieutenant |
| 19 | governor's office. It was clearly understood by me that the focus of |
| 20 | the FBI investigation, the allegation of the, the FBI allegation |
| 21 | involved the governor's office. Not the lieutenant governor's office. |
| 22 | Q:     So you didn't mention the lieutenant governor's office. Your |
| 23 | recollection... |
| 24 | A:     My recollection was... |
| 25 | MR. BAILEY:     Cause that was mine. Ok. I may have, I don't remember, I honestly, |

31

| | |
|---|---|
| 1 | I'll take your word for it, at this point but I had thought you had |
| 2 | indicated the lieutenant governor's office. I don't know. So I |
| 3 | apologize. I stand corrected. Now, ah, the, your responses to certain |
| 4 | of my questions indicates that subsequent to that discussion you |
| 5 | learned more subsequently about the FBI probe concerned. Where |
| 6 | did you learn that? |
| 7 | A:     I believe |
| 8 | MS. GUIDO:     I'm going to object to discussions that were had with counsel, which |
| 9 | is where we're going here. |
| 10 | MR. CAMPBELL: That's where it was, right. |
| 11 | MR. BAILEY:     Well, ok. First of all that's not for counsel to say. It's for you to say |
| 12 | if they occurred with counsel and if they did, in other words, if your |
| 13 | attorney informed you of those things then they may or may not be, |
| 14 | but let's assume for the sake of it, I would waive any objection to |
| 15 | they're being privilege. I mean if it'sfact information was provided |
| 16 | to you as a source, you do have to tell us. But I'm not interested |
| 17 | in the conversation, subsequent conversation with counsel. It's legal |
| 18 | advice, it's a different matter. But where you learned it from is |
| 19 | important. Aside from counsel, ok, where did you learn about the, if |
| 20 | indeed you did from another source, the substance of what the FBI |
| 21 | probe was about? |
| 22 | A:     I'm not sure how I, the way in which I learned about some substance |
| 23 | of the FBI allegation was, I believe, in a session that involved |
| 24 | counsel where |
| 25 | Q:     Again, I really don't have an interest to go there cause I don't want |

**32**

1         to argue. It doesn't matter to me.

2  A:    Yeah.

3  Q:    Aside from discussion with counsel, or information provide by

4        counsel, what other sources?

5  A:    I don't believe there were any.

6  Q:    Mark, Mr., Evanko called you up told you about this thing and you

7        never, it raised no flags with you as a political operative, something,

8        incidentally, which I admire in this society, I do, I-I-I- it's not a

9        negative thing too. To me politicians and quite frankly, a country

10      has to run itself politically. I accept that and I realize that, I view it as

11      a positive thing. But what, where I'm going with this question, is

12      really quite simple, you know, Pennsylvania State Police

13      Commissioner calls me up, and he says, I'm Mark Campbell, and he

14      says, the FBI did a probe and, ah, you know, I just learned about it,

15      in effect or I found out about it, or whatever, and it's closed, you

16      know, but you don't have any follow up questions about what

17      happened, what the source of this could be because of you know, its

18      just good politics to find out what's, you know this is a potentially

19      explosive public problem. Somebody makes a false allegation, for

20      example, if it's something that comes from a political opponent, a

21      potential political opponent, or somebody that's got an axe to grind. I

22      mean, I think, it is legitimate to try to find out the background. I

23      mean I would want to know. I'd certainly want to know.  I'm just

24      curious why you didn't, what's going on?

25  A:    Maybe, I'm a more casual political staffer that what you probably

---

**33**

1  Q:    No, you're probably a better one.

2  [Laughter]

3  A:    My concern, ah, and to use your word, my political concern was how

4        this might involve the governor. Once I was assured that it did not

5        involve the governor or the governor's office, my concerns ceased to

6        exist. And, in my mind, then became a matter for Colonel Evanko to

7        deal with administratively.

8  Q:    Let me go there next. Because you had indicated earlier, you know,

9        if you, is it fair to say that your reaction or your feeling was, "Phew.

10      Our folks aren't in this." And I'm sure that Governor Ridge would

11      not be part of anything like that. I'm sure that, you know, actually

12      not it. But the point was our office is not involved in this. That's

13      Evanko's problem.

14  A:    Ah

15  Q:    Not saying that you felt that callously about it.

16  A:    The point is, I mean I was not surprised that neither, neither anyone

17      from the governor's office or from the commissioner's office was

18      involved. And as I said, having be assured that that in fact was the

19      case, ah, I really ceased to have any interest in the matter going

20      forward.

21  Q:    Alright. All of that out of the way now that we've covered that

22      ground did it occur to you at the time, were there any question in

23      your mind as why is Mr.Evanko telling me about investigating his

24      own folks?

25  A:    I think that he, it was in the same conversation, where he had

---

**34**

1        informed me that the investigation had been concluded, um, he then

2        went on to inform me that he was going to conduct an internal

3        review of his agency's involvement and actions in the matter. So, it

4        was nothing, nothing more than that.

5  Q:    But you knew quite clearly that that was a check, not in to the

6        substance of who out there may have sold a job but it was in to how

7        we handled the investigation. That was pretty clear to you.

8  A:    It was but it was not a matter that concerned me.

9  Q:    Ok. Alright. Alright now, after, we date that discussion with Mr.

10      Evanko in May of 1999, by the way, about how long if you recollect

11      did that discussion take place.

12  A:    It was no more that a few minutes. Less than five minutes.

13  Q:    Mark, were there any other things that you remember of substance

14      discussed during that conversation?

15  A:    There may have been but I do not recall them at this time.

16  Q:    Is it fair to say that your best recollection is that the purpose of Mr.

17      Evanko's call was essentially about this closed FBI probe?

18  A:    Yes sir.

19  Q:    His voice. Was there an angry tone or edge in his voice?

20  A:    I don't recall that there was.

21  Q:    Do you remember that he was upset in any way? That expressed

22      itself through the tone of his voice, his verbiage, or voice patterns or

23      anything of that sort?

24  A:    No I do not, do not recall.

25  Q:    Did he indicate that he might get back to you?

    A:    No he did not. Not that I recall.

---

**35**

1  Q:    Did you ask him to get back to you?

2  A:    No, I did not.

3  Q:    Do you know of anyone in the administration, by that I mean the

4        governor's office over here as opposed to someone in the State

5        Police who asked Mr. Evanko to do any kind of report or

6        recommendation?

7  A:    I'm not aware of anything like that. No.

8

9  [Sound of papers turning]

10

11  Q:    Have you ever had any discussions with any FBI personnel about the

12      probe?

13  A:    No, I've not.

14  Q:    Have you ever seen any FBI 302's or any FBI reports or information

15      about the probe?

16  A:    No. I've not.

17  Q:    Aside from your lawyers, have you ever received any information

18      about where the probe went or what occurred?

19  A:    No, I've not.

20  Q:    Is there any policy in the administration about how internal

21      investigations are to be conducted into personnel activities?

22  A:    Not that I'm aware of, I can't speak, I don't know, for instance, how,

23      the office of administration handles, you know investigations of state

24      employees, but, I'm not aware of any of those policies.

25  Q:    Aside from Colonel Evanko, did you ever discuss the FBI

36

```
 1              investigation with anyone else?
 2    A:        I believe...
 3    MR. BAILEY:    Your lawyers are excluded from this.
 4    MR. CAMPBELL:  Certainly.  I believe that I had been informed by the colonel I shared
 5                   the information with, uh, Mark Holman, the governors chief of staff,
 6                   with Tim Reeves who was the governors director of communications
 7                   and Paul Difano, the Governors General Counsel.
 8    Q:        Do you know if any of those folks had any discussions with Mr.
 9              Evanko about the probe?
10    A:        I don't know.
11    Q:        Did you ever ask them?
12    A:        No, I did not.
13    Q:        Did they ever tell you?
14    A:        Not that I remember.  No.
15    Q:        Because Mr., ah, do you have any subsequent, I know I asked if you
16              had any subsequent conversations with Mr. Evanko after this
17              complaint was filed.  Between the period of time that Mr. Evanko
18              made this phone call to you and before the complaint was filed did
19              you have any other conversations with Mr. Evanko about the FBI
20              probe?
21    A:        The colonel was present for the one meeting I referred to earlier, I
22              believe, where.
23    Q:        Not with the attorney's
24    A:        Ok.  No this
25    Q:        Let me go back and make sure it's understood.  Before this complaint
```

37

```
 1              was filed and after, you know, the interval, between when Mr.
 2              Evanko first called you, and when you first learned about it the FBI
 3              probe and this complaint was filed did you have any conversations
 4              with Mr. Evanko about the probe?
 5    A:        No, I don't recall any.
 6    Q:        I want you to go back over your awareness of Mr. Ober's name.  I
 7              want you to go back to prior to the complaint.  Prior to the complaint
 8              do you have any awareness of Mr. Ober's name?
 9    A:        At some point, as I indicated earlier, either in the initial conversation
10              with the Colonel or, um, at the time during which we met with
11              counsel, I became aware of Mr. Ober's name.
12    Q:        [sigh] [sound of flipping papers] When was the timing of Mr.
13              Evanko's call to you
14    A:        Timing, as in time of day?
15    Q:        You said it was May of 1999.  Right?
16    A:        Well that's the day, I do believe that's the date that was in the, ah, in
17              the complaint.  I don't, I didn't recall specifically when it was.
18    Q:        Well the May of 19.., incidentally May 12th of 1999 is when, ah, is
19              when Mr. Evanko, the plaintiff that is, the plaintiff that is informed
20              Mr. Evanko about the problem.
21    A:        Um-hmm.
22    Q:        Did you keep any kind of log of telephone calls?
23    A:        No, I do not.
24    Q:        [papers shuffling]  Do you know if Mr. Evanko said when he learned
25              about the FBI probe when he called you?  Remember when he called
```

38

```
 1              you did he say when he learned about it, like, you know, I learned
 2              today, I learned last week...
 3    A:        I don't recall specifically.  I just recall, uh, in general that it was fairly
 4              recent.  I don't know
 5    Q:        Fairly recent.  You had that feeling it was fairly recent.  Did he
 6              indicate whether he had met with any of his staff about it?
 7    A:        He did not indicate that I recall.
 8    Q:        [sigh] [pause] at any time were any kind of disciplinary actions
 9              against Captain Ober or any one else discussed in the context of the
10              FBI probe?  At any time?
11    A:        Not with me.
12    Q:        Do you know if they were discussed with anyone else on your staff?
13              The governor's staff?
14    A:        Not that I'm aware of.
15    Q:        Have you ever seen the results of the FBI investigation?
16    A:        I don't believe I have.  No.
17    Q:        Did you ever, aside anything saving your attorneys, maybe if you have.  I
18              don't know.  Have you ever asked anyone to find out the results of
19              the FBI probe, into the gubernatorial, the allegations of the
20              gubernatorial staff?
21    A:        No, I never asked.
22    Q:        I had asked you before about memos and that sort of thing, do you
23              know of any status reports?
24    A:        No, I do not.
25    Q:        Regarding this matter?
```

39

```
 1    A:        No.
 2    MR. BAILEY:    Do you remember early on I wanted to ask you some questions about
 3                   Colonel Hykus?  Is it Lt. Colonel?
 4    A:        Lt. Colonel Hykus.  Yes.
 5    Q:        Lt. Colonel Hykus.  Um, did you ever have any discussion with Mr.
 6              Evanko in the context of, the FBI probe, where Lt. Colonel Hykus
 7              was discussed?  Do you understand that question?
 8    A:        What I do recollect, and it may be from the complaint, is that I
 9              believe the allegation, or the chain of events it was that at some point
10              Mr. Ober reached out to him Lt. Colonel Hykus to inform him of the
11              FBI investigation.
12    Q:        Well, excluding the complaint, my question was...my question was
13              actually a little different than that.  Um, different than that response
14              would indicate.  My question was did you have any recollection of
15              any discussions with Mr. Evanko, um, Mr. Hykus' name coming up
16              in a context of any discussion of the FBI probe?
17    A:        I believe that, I can't recall where during the series of events that
18              Colonel Evanko did indicate that he was aware that Colonel Hykus
19              had been made aware of the FBI investigation.  um,
20    Q:        Why would he tell, I'm sorry, you hadn't finished.  I apologize.
21    A:        Just to answer any question you were going to ask, um, I think, um,
22              only in terms of trying to provide me with some general overview of
23              how, I mean how the investigation had unfolded.
24    Q:        Ok.  What's the significance of saying I just know and I didn't?
25    A:        You'd have to ask the Colonel that.  I don't know.  He simply sure
```

40

1          that we, at some point..

2  Q:     Do think he was trying to indicate to you that Hykus had stabbed you

3          in the back?

4  A:     You'd have to ask the Colonel. I don't know.

5  Q:     Well, no, I know, I'll, you may rest assured, I will ask the Colonel. But

6          what I'm asking is your impression because you, you lived through the

7          conversations and I was not privy to them. And what I'm asking you is

8          very, very, very simple. And I'm trying to ascertain why Mr. Evanko would

9          mention, you know, Hykus knew anything. Did you attach any significance

10         to Mr. Evanko indicating that?

11  A:    No, I did not.

12  Q:    Is there a political, political staff political differences between Mr.

13         Hykus and Mr. Evanko?

14  A:    Not that I'm aware of.

15  Q:    Did Mr. Hykus enjoy the same political supporters within the

16         administration that Mr. Evanko does or did?

17  A:    Ah, as far as I'm concerned.

18  Q:    How about as far as other folks are concerned not you Mark? Not

19         you, I understand how you feel. The same way towards both of them.

20         How about other folks? Did they enjoy support from other people in

21         different ways?

22  A:    I've never heard anyone indicate that there is any lack of respect or

23         support for either one of them.

24  Q:    Does Lt. Colonel Hykus have a contact person over here in the

25         administration?

41

1  A:    Um, at a, currently? Currently they would deal with the Governor's

2         Deputy Chief of Staff. Who's now Lisa Baker but at the time I would

3         have been the primary point of contact for the commissioner and his

4         deputies.

5  Q:    [pause] Based upon your, how long have you, what was your

6         background before deputy, was your background before you became

7         deputy,

8  A:    I worked for congressman, well, Congressman Tom Ridge for twelve

9         years before that.

10  Q:    And, what's your educational background?

11  A:    I have a Bachelor of Arts from Allegheny College in Meadville, PA.

12  Q:    Ok. Um, do you have knowledge um, of any transgression against

13         any law or regulation that was committed by Captain Ober, any of

14         this?

15  A:    No, I do not.

16  Q:    Has anyone ever brought to your attention or indicated to you in any

17         way that they believe Captain Ober, broke a law, violated a

18         regulation, or ah, acted in some way that was inconsistent with the

19         letter or the spirit of the law or State Police regulations?

20  A:    Not that I'm aware of.

21  Q:    Did Mr. Evanko ever get back to you and say that he felt that Mr.

22         Hykus had done something wrong?

23  A:    No. Not that I can recall.

24  Q:    Was there anything unusual about Colonel Evanko, if he raised Mr.

25         Ober's name, we know that he raised Mr. Hykus's name, was there

42

1          was anything unusual about him raising their names in the context of

2          a probe which had successfully indicated that there was no

3          wrongdoing?

4  A:    Not from my perspective.

5  Q:    Did he indicate whether or not there were charges against a

6         Pennsylvania State Police officer which at been brought as a result of

7         the probe? Is there one officer? One trooper?

8  A:    I don't recall that.

9  Q:    Did you ever learn that, did that ever, is that something that came to

10         your attention somehow.

11  A:    It might have been something that was brought to my attention

12         subsequently.

13  Q:    Not by your lawyers, by somebody else. Anybody else.

14  A:    No, not that I can recall.

15  Q:    Otherwords it would have been your lawyers.

16  A:    I believe so.

17  Q:    So when Mr. Evanko called you, he didn't say the probe indicates

18         there's nothing wrong in the governor's office or high up in the State

19         Police although there is going to be a State Policeman that's going to

20         be charged.

21  A:    No, I don't believe he did.

22  MR. BAILEY:    Never even brought that to your attention.

23  A:    Not that I recall.

24  Q:    How many, let me see, from 1995 on Mr., you were the contact

25         person for Mr. Evanko?

43

1  A:    Through the end of 2000, yes.

2  Q:    Ok. To the end of 2000. Who does it go to then?

3  A:    Ah, Lisa Baker. Governor's Deputy Chief of Staff. Actually, first,

4         initially Duncan Campbell, who was the governor's Deputy Chief of

5         Staff for a short period of time and then Lisa Baker.

6  Q:    Have you ever discussed this litigation with Lisa Baker?

7  A:    No, I did no.

8  Q:    Did she ever indicate that she has discussed it with Mr. Evanko?

9  A:    No, she's not.

10  Q:    Did she ever indicate that she has discussed Mr. Ober with Mr.

11         Evanko?

12  A:    No, she's not.

13  Q:    Did she ever indicate she discussed Mr. Hykus with Mr. Evanko?

14  A:    No, she's not.

15  Q:    Now, the other gentleman, Campbell?

16  A:    Duncan Campbell?

17  Q:    Mr. Duncan Campbell. Have you ever discussed Mr. Evanko's

18         handling of the FBI matter with Mr. Duncan Campbell?

19  A:    No, I have not.

20  Q:    Has Mr. Duncan Campbell ever mentioned any ah, discussed Mr.

21         Ober with you?

22  A:    No, he has not.

23  Q:    Did he ever discuss Mr. Hykus with you.

24  A:    No, he's not.

25  Q:    Have you ever read, does Mr. Ah, Mr. Evanko still send his reports

         over there?

1    A:    Yes he does.

2    Q:    Do you ever read them? You still read them?

3    A:    Of course, unfortunately I don't.

4    Q:    Don't mean to put you on the spot there, Mark. But do you ever read

5            them or look at them.

6    A:    No, I don't.

7    Q:    So, it was rare that Mr. Evanko would call up and talk about an

8            internal matter and about someone under him in the staff in the

9            context of investigating State Police activities then, wasn't it?

10   A:    The Colonel and I talked with, you know, some regularity, um,

11           concerning a whole host of issues involving the State Police. Um, so

12           it was not rare for him to talk to me, um about a matter involving the

13           State Police. Um, as I indicated earlier I don't think it was, uh, I did

14           not find it surprising given the allegation involving the governor's

15           office that he raised this issue with me. Um, I do not recall him

16           contacting me on any other matter involving an internal investigation

17           or an FBI investigation.

18   Q:    So, in five years of talking to Mr. Evanko, you don't have a

19           recollection of any other single instance where he talked about

20           investigating his own staff over a problem, dealing with an external

21           investigation?

22   A:    Not that I can recall but yet that doesn't mean

23   Q:    Doesn't mean it didn't happen.

24   A:    No. No. No. No. Not that I can recall but again I guess, you know I

25           certainly viewed this allegation of the FBI investigation as unique

---

1           given the alleged involvement of the governor's office. So, in my

2           mind that was settled.

3    Q:    Oh, I understand, quite frankly, if Mr. Evanko had now told me there

4           was an investigation in the governor's office, thank God it was

5           closed, and closed on a positive note, I'm not suggesting that that's

6           not something that should be brought to your attention. I'm not

7           talking about that. I'm talking about him going on and telling you,

8           that apparently there was no follow up on that. But going on and

9           telling you there was an investigation that was on staff about how it

10          was handled. At the same time he was telling you, Mr. Hykus knew

11          but I didn't. Did he, do you think he expected you to be angry with

12          Mr. Hykus?

13   A:    I, I don't know what he expected but I was not.

14   Q:    You were not. Did you feel he was inviting or fishing for a response

15          on Mr. Hykus?

16   A:    No, I did not.

17   Q:    So as you sit here this very day you don't know the significance,

18          I'm not saying you don't have your suspicions, we're not asking

19          about that? You might. But why he mentioned Mr. Hykus, you

20          don't...

21   A:    My recollection was that simply there was a brief discussion as to

22          how the information had been handled internally by the State Police

23          and I think at that time it had been brought to Colonel Hykus's

24          attention.

25   Q:    But did you ask him any questions at all or did you just listen?

---

1    A:    No, I just listened.

2    Q:    [pause] Has Mr. Evanko ever discussed Mr. Corey with you?

3    A:    You mean if we had discussions regarding Colonel Corey? Sure.

4    Q:    Not things that Mr. Corey was doing. When I say discuss Mr. Corey

5           with you I mean in terms of personal activity, or even some official

6           activity relating to a personnel matter?

7    A:    Not that I recall.

8    Q:    How about any other staff workers?

9    A:    I really don't recall any.

10   Q:    But he did discuss Mr. Hykus with you about his knowledge of this

11          FBI probe?

12   A:    He did mention it. Yes.

13   Q:    Now did you come with that, come away from that discussion with

14          the impression that he was going to investigate Mr. Hykus's role, in

15          the FB...Mr. Hykus's role, in having knowledge of the FBI probe?

16   A:    I came away with the impression that he was going to investigate

17          how his agency overall handled its interaction with the FBI regarding

18          this investigation.

19   Q:    Let me step out for just a moment. I'm going to leave the video and

20          everything run because of time factors and see if I have any

21          additional questions. Ok?

22   A:    Um-hmm.

23   MR. BAILEY:    Again, please bear in mind that the machine is still on. So be careful

24          what you say.

25   MR. MARCECA:    I'm gonna have to change this in about another 5 minutes.

---

1           (Referencing videotape).

2   MR. BAILEY:    Ok, what you need to do is, need to communicate you're going off

3          camera. Say the time. Shut the camera you're gonna change down

4          first. Shut the other one down second. Announce its time Never do

5          them both at the same time. Then you have to announce when you go

6          back on. You have to run a time, a lapse timer.

7   [Sound of door being shut]

8   [SOME NOISES OF TAPES BEING CHANGED AND CAMERA'S CLICKING

9           SHUT.  Approximately 30isp of audiotape lapse]

10

11  MR. BAILEY:    Let me shut it down until you go back on.

12  MR.MARCECA:  I haven't changed it yet.

13  MR. BAILEY:    Oh, you haven't change anything? Well then lets just finish up. If

14          you haven't done anything. We'll close it down. I'm not supposing

15          counsel has, conceive that you have any questions, but I don't have

16          any additional questions. Mark I'd like to thank you very much for

17          your participation here today, I appreciate it. You're depositions

18          concluded. Tony, ah, just a second, he's gonna do a time check and

19          shut it off.

20  MR.MARCECA:  It's 15:33 and I'm now gonna shut off the cameras.

21  MR. BAILEY:    That's, that's what you get with an old Federal investigator. It's 3:33

22          to us common folks.

23                END TAPE

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Darrell G. Ober,                    Case No.: 1:CV-01-0084

　　　Plaintiff,                    CIVIL ACTION

Paul Evanko, et al  vs.

　　　Defendant

PLACE:              Law Office of DON BAILEY
                    4311 North Sixth Street
                    Harrisburg, PA 17110

PROCEEDINGS:        Video Deposition of
                    Captain Larry Riley

DATE:               October 23, 2001

APPEARANCES:

For the Plaintiff:  Don Bailey, Esquire
                    4311 North Sixth Street
                    Harrisburg, PA 17110

For the Defendant:  Joanna Reynolds, Esquire
                    333 Market Street
                    Harrisburg, PA 17101

---

**2**

1  Good afternoon, it is 2:58 p.m.  My name is Anthony
2  Marcecca.  My address is 2919 Dixie Drive, York,
3  Pennsylvania.  I'm employed by PR Video and they have been
4  contracted to do the video deposition on behalf of the
5  plaintiff.  This matter is documented as 1:CV-01-0084 in the
6  United States District Court for the Middle District of
7  Pennsylvania.  The caption is Darrell G. Ober versus Paul
8  Evanko, et al.  The deposition is now in process.
9      MR. BAILEY:  My name is Don Bailey.  I am an
10 attorney.  I represent the plaintiff in this matter of Darrell
11 Ober.  Mr. Riley, at this time I'm going have the videographer
12 swear you in.
13     MR. MARCECCA:  Captain Larry Riley, do you swear
14 to tell the truth, the whole truth, nothing but the truth, do you,
15 so help you, God.
16     MR. RILEY:  I do.
17     MR. BAILEY:  Okay, Joanna could we get a voice check
18 on you.
19     MS. REYNOLDS:  I am Assistant Counsel with the
20 United States Police, Joanna Reynolds and I represent the
21 defendants in this matter.
22     MR. BAILEY:  Okay, Thank you very much.  Captain
23 Riley, I'm going to be asking you a series of questions here.
24 This is a deposition.  Taken an oath, of course.  I want you to
25 feel relaxed.  I'm going to ask you the questions, from time to
   time if you have any concerns or questions about what I'm
   asking or where I'm going with questions, it might seem a

---

**3**

1  little unusual to you but I want you to feel free to ask, okay?
2  And I'll be very happy to answer your questions and try to
3  deal with any concerns that you might have.  We are after a
4  good fact record here.  We are not here to trick or ask any
5  smoking gun questions or anything like that, okay?  If at any
6  time you feel that you have, you are not allowed to break in
7  the middle of a question, technically, but if you have some
8  desire to speak with your attorney at any time, please don't
9  hesitate to ask and we will accommodate you there, If for any
10 personal reason you might have to need a break if you want
11 one.  It is never comfortable being a witness in matters like
12 this.  We do understand that.  One very important thing that
13 you should bear in mind is that you avail yourself of the
14 opportunity to answer fully and completely any questions that
15 may be raised.  If I interrupt you, or somehow your attention
16 becomes diverted and you don't get an opportunity to answer
17 fully and completely, please make sure that you do so.  Even
18 if it means coming back to something, please take that trouble
19 because we want to get a complete record of it.  The other
20 thing is that if you respond and you need to do so, verbally,
21 don't make gestures, nods of the head, that kind of thing, we
22 need to get a verbal response from you when you answer a
23 question, and Joanna, I assume, the usual stipulation that
24 objections are reserved until time of trial.
25     MS. REYNOLDS:  Yes.

---

**4**

1  Q:  Captain Riley, state your, Captain Larry Riley, is that
2  correct?
3  A:  That's correct.
4  Q:  That's Pennsylvania State Police, how long have you
5  been employed by the Pennsylvania State Police?
6  A:  31 years, sir.
7  Q:  In what capacity?  What job do you have, what do you
8  do?
9  A:  I'm presently the Director of the Administration Division
10 at our Academy in Hershey.
11 Q:  The Pennsylvania State Police Academy?
12 A:  Yes, sir.
13 Q:  Have you had an opportunity to read the complaint in
14 this matter?
15 A:  No I haven't.
16 Q:  Have you heard anything about it aside from discussions
17 you may have had with your attorney?
18 A:  Only while I, the discussion I had with my attorney.
19 Q:  I have a relatively limit area that I want to ask you
20 questions about, okay?  From time to time in going through
21 those questions I may change direction, if I do I'll try to give
22 you an advance notice of that fact if I don't and you become
23 confused you make sure you ask me where I'm going, okay?
24
25

5

A:  I'd like to say I knew a little about the case what I read in the newspaper as well as when I spoke to Joanna Reynolds with, other than that I know nothing about it.

Q:  Okay. Do you play any role in putting the curriculum together at the Academy?

A:  No.

Q:  Who does that?

A:  It would be the training division which is Captain Gallaher, who is Director of the Training Division and Major Einsel is the overall Director at the Academy.

Q:  What function do you perform at the Academy?

A:  As Director of the Administration Division there is several areas of the operation that are in my command. Some of those are equipping the cadets, supplies equipment, the mounted unit, the community services unit, the ceremonial unit, the physical fitness unit. But as far as your question of do I have any input into the cadet curriculum, no I do not. Captain Gallaher and Major Einsel have that.

Q:  Why did you call Sergeant Margeson about a chain of command modification to ARI-1?

A:  Major Washington, who is now retired called me one afternoon, and I don't know if Captain Gallaher wasn't there or if he just called me because he knows me, but he called me and asked me if I knew where it was in the State Police Regulations that said someone had to go through the chain of

6

command and at the time, it seemed like a simple question, and while I had him on the phone, I looked in the FR and the AR and I said I can't find it right now, but he said I've been looking for it, too and he couldn't find it and I told him I would get back to him and he asked me to check with Captain Gallaher and Major Einsel also because he didn't think there was anything in writing. So after hanging up I did some research and I couldn't find anything that specifically said that. I found a few things that kind of inferred that, but I didn't find anything that specifically said one had to go through the chain of command. So I checked with Captain Gallaher, he didn't know of anything. Checked with Major Einsel and Major Einsel said why don't you call Sergeant Margeson in our Bureau of Research and Development because he and I'll quote Major Einsel "is the Department Regulation guru". So I did that, I called Sergeant Margeson and asked him if he knew of regulation and where it was specifically written that one had to go through the chain of command.

Q:  Go through the chain of command for what?

A:  Anything. Meaning that a Corporal couldn't go to the Captain, the Sergeant couldn't go to the Major. There was a chain of command, meaning that troopers went through Corporals, who went through Sergeants, who went through Lieutenants and you followed your chain of command.

7

Q:  How long have been in the Pennsylvania State Police?

A:  Now? 31 years.

Q:  Were you in the military before that?

A:  Yes, sir I was.

Q:  Isn't the idea that you have an immediate supervisor or superior in the military or para-military organization like Pennsylvania State Police pretty basic?

A:  That's why I was sure when I talked with Major Washington that there was probably something in writing because it's almost, it's well known throughout the department that you follow the chain of command. It's drilled into you in the military, as well as in the State Police, you don't go outside your chain of command.

Q:  It's so basic, isn't it. It is one of those things where if you have a chain of command you don't have an organizational structure. You can't function if folks don't follow a chain of command, right?

A:  That's correct.

Q:  Why did it need to be writing?

A:  Major Washington called me that afternoon and I know that he was having personnel problems down there but I didn't delve into his problems. I just answered his questions. It was none of my business to ask him why he wanted to know this, other than what I knew from some previous things that he was

8

having some personnel problems in his bureau, but he didn't offer why he wanted to know it and I didn't ask him.

Q:  You didn't ask it because you are not in the practice of questioning or calling people above you in the chain of command and to call them to task. In other words, if you were cross-examined, if a superior officer calls you, you don't cross-examine him, what they are about or what they are doing, do you?

A:  No. It's none of my business really. None of my business why he wanted to know it.

Q:  What personnel problems was he having down there?

A:  He was having some problems with a lieutenant and sergeant that had been temporarily transferred and I don't know for a fact that that was why he was calling, but I was well aware of those problems and I surmised that that was why he wanted to know it, but I can't say absolutely that that's the reason.

Q:  Why would he call down there to the Academy. I'm not saying that he necessarily he called you. Why would he call the Academy.

A:  Well, we fill a lot of telephone calls from the field regarding department regulations and what we train the cadets to do, and it is not unusual to get calls all the time over anything that we train the cadets.

9

Q: The time that he called you...when was this? When did this call take place?

A: I'm going to say, I didn't record this in writing or anything. I'm going to say it was probably around July or August of 2000.

Q: So he called and he asked this question about the chain of command and is it correct to say that it really hadn't occurred to you before that it would be in writing, never to even look for such a thing before that you took chain of command for granted, is that true to say?

A: No. I thought it was probably in writing somewhere.

Q: That's what I mean. In 30 years, at that time you had about 30 years in?

A: Roughly.

Q: You had never run across a regulation in the Pennsylvania State Police that said you're supposed to, whatever you are supposed to do, stay within your chain of command whatever it is, right?

A: I never recalled reading one, but I was sure that one existed when he called me. I said I know that it exist and as soon as I find it I'll get back to you.

Q: You were wrong weren't you?

A: I was.

Q: 30 years of experience in the Pennsylvania State Police, Pennsylvania State Police, one of the finest admittedly police

10

organization in the entire country that has been in effect since 1905, I think your previous witness told us, or been in existence since then, never had a need for this regulation to tell somebody, well I think it should be obvious, what I think doesn't matter. And you were so sure about it, you were sure it was there, but when you looked it wasn't anything there, so then what did you do after you did some research?

A: There was nothing specific. There's nothing that was actually said what Major Washington was looking for.

Q: What was he looking for more specific?

A: That a sergeant must go through a lieutenant, that a lieutenant must go through a captain. He cannot jump to higher rank.

Q: In doing what?

A: In dealing with your every day duties. If you have a question about how to do something, if you have a question, anything about the department, a trooper goes to the corporal, and if the corporal can't answer the question, then the corporal allows him to go to his sergeant.

Q: Who enforces the chain of command?

A: Supervisors.

Q: Of course. If I'm a sergeant and members of my squad, or members of whatever my little organization is, raise an issue and then come to me. In the State Police, it is trooper, corporal, sergeant, lieutenant, captain, like that, right?

11

A: Correct.

Q: And so if I'm a lieutenant let's say, I'm a section leader somewhere or commander in the Pennsylvania State Police, and troopers are coming to me and they are going by their corporal and their sergeant, do I have a duty to tell them to follow their basic command when they are communicating some sort of request or problem?

A: Yes.

Q: That's just sound organization and pretty basic, right?

A: That's correct.

Q: But there is no captain, there is no regulation that deals with that that says, captain are supposed to tell their troopers to go through their chain of command is there, or is there, maybe there is I don't know.

A: It wasn't in writing at that time. When Major Washington called me I could not find it in writing.

Q: Chain of command, following the chain of command, did you ever use the term "chain emphasis" in the State Police?

A: Command emphasis?

Q: Command emphasis.

A: It's not used commonly, no.

Q: Do you teach chain of command before Subsection C was added to you written regulations. Did you teach chain of command?

A: Yes.

12

Q: Do you know how much instruction time was spent on it or how the program was structure?

A: No I couldn't answer that. It's told to the cadets and when they go out into the field when the cadets graduate from the academy, they go out into the field, there is a field training program and there is a checklist of duties that their coach that they are assigned to insures that they are instructed on all these different areas of the job and one of those areas is the chain of command.

Q: The chain of command has to be followed because the Commissioner can't deal with every personal request and the chain of command is in place so that the organization will run consistently and efficiently, right?

A: Right.

Q: I hesitate to say this, but I don't think the Army has a chain of command provision like the State Police does. Do you know if you ever checked the Army, the Marines Corp, the Navy or the Air Force on whether there's a regulation which is sanctionable against a soldier, airman or marine for not following the chain of command.

A: It was 35 years ago when I was in the Marines Corp and I don't recall any regulations, but I know that that was something that was drilled into us as, in boot camp, as well as my career, not my career but the three years I spent in Marines Corp, and the chain of command was something that

13

1  was very much enforced, and as far as regulations, it was too
2  many years ago, I don't know if there was a regulation or not,
3  but I know it's used and it's enforced in the Marines Corp.
4  Q:   Doesn't it operate though on commanders and not on
5  subordinates, in other words, when I was in the Army, if a
6  captain rifle company commander didn't encourage troops to
7  follow the chain of command, you'd eventually would get in
8  trouble, being the Italian commander on his back, because
9  that's poor leadership.  For example, maybe a lieutenant or a
10  sergeant would complain to the Italian commander, because
11  the captain wasn't following the chain of command.  I don't
12  remember.  I honestly don't that's why I raised the issue if you
13  did any research with it.  I don't remember anything, aside
14  from telling a soldier, you are going to follow the chain of
15  command, you're supposed to respect the chain of command,
16  that's what you are supposed to do.  It was never anything
17  where you got punished if you didn't.  Today, if the
18  Pennsylvania State Police under Subsection C is it
19  insubordination if you don't follow the chain of command?  If
20  you know.  By the way, Captain, if I ask a question, you've
21  got to bear in mind, like again, I don't have your knowledge, I
22  don't know the Pennsylvania State Police the way you do.  I
23  may ask questions from time to time.  If the answer to the
24  question is, you don't know, and that's a complete answer,
25  that's a very, very valid and good answer.  Don't be afraid to

14

1  say, don't guess wildly.  My question is, do you know anyone
2  since Subsection C that has been in effect who has been
3  disciplined because of Subsection C?
4  A:   No.
5  Q:   Do you know if it's ever been involved in an arbitration
6  or an evaluation by any louver volume?
7  A:   I don't know.
8  Q:   Let's go back to Subsection C and let's go back, you
9  didn't have the words at the time, I realize that but Major
10  Washington, he was a Major at the time?
11  A:   That's correct.
12  Q:   He called you and based on your recollection at the time,
13  Major Washington maybe might have had some personnel
14  problems.  Maybe that was the reason why he called you.  You
15  didn't ask him, he didn't tell you, but this chain of command
16  thing came up and he said is there some kind of regulation
17  that affects this, right?
18  A:   That correct.
19  Q:   Now on or about that time, shortly after hearing from
20  Major Washington, you did a little bit of research and you
21  talked with some other folks there at the Academy, I think
22  you mentioned a Captain?
23  A:   Captain Gallaher.
24  Q:   Captain Gallaher, anyone else did you talk with?
25  A:   Major Einsel.

15

1  Q:   Major Einsel.  What did you do then?
2  A:   As I said, we couldn't find anything.  Major Einsel
3  suggested that I check with the department guru who was
4  Sergeant Margeson.  And that's when I called Sergeant
5  Margeson.
6  Q:   And you believe that was sometime around July or...as
7  best as you can remember.
8  A:   July or August of 2000, and as I said that is the best I can
9  remember, it may not be exactly right, but best I can recollect
10  it was some time in that period.
11  Q:   And what did Sergeant Margeson say to you.
12  A:   He thought there would be something in writing too, and
13  he said that he would get back to me.
14  Q:   Did he get back to you?
15  A:   About 2 weeks went by and Major Washington was
16  waiting for me to get back to him, so I called Sergeant
17  Margeson again, and I said, I told him he never got back to
18  me and Major Washington is waiting for an answer and he
19  said it doesn't exist, however, they are revising AR1-1,
20  Administrative Regulation 1-1, and that he thought that this
21  would be a good time to put it in.  As the regulation guru that
22  was something for him to do.  My responsibility at the time
23  was to get back to Major Washington and I did get back to
24  him.
25

16

1  Q:   Do you know who that lieutenant and sergeant that were
2  giving Major Washington a problem?  Who they were, what
3  their names are?
4  A:   Yes.
5  Q:   Who are they?
6  A:   Is that confidential, Joanna?
7  Q:   No, you have to answer that question.  You listen to what
8  she says, but I believe.  I interrupted and I shouldn't have.
9  MS. REYNOLDS:  No.  I was going to tell him to
10  respond.
11  Q:   Thank you.
12  A:   Sergeant Kisthardt and Lieutenant Queen.
13  Q:   As you sit here today and you understanding of what
14  difficulties Major Washington had with them at the time, it
15  was to the best of your recollection, a kind of situation where
16  they may have been circumventing the chain of command.  Is
17  that fair to say?
18  A:   No.
19  Q:   What is fair to say?
20  A:   I knew that they had a problem, where Major
21  Washington said that they were not, that they failed to obey a
22  direct lawful order, and they were temporarily transferred
23  because of that.
24  Q:   But that is insubordinati....  I'm sorry were you finished?
25  A:   That's what I knew about the problem.

17

Q:  How is that a chain of command problem.  That's insubordination isn't it?

A:  I'm not saying that's why Major Washington called me.  I knew that he was having ongoing problems that arose from the failure to obey a lawful order, or direct order.

Q:  So you are speculating that that's the reason he called you, right?

A:  Which is what I said when I...

Q:  You are correct, sir.  I'm just trying to make sure the record is crystal clear.  I agree with you.  I think you said originally that that's something you thought it might have been.  I'm trying to learn how much you knew about that and why you thought that way, and I appreciate the fact that you are answering these questions.  If I may summarize, these 2 individuals that you mentioned ended up being transferred apparently for some discipline or some disciplinary reason, I don't know, but it had to do with them not obeying a lawful order.  But the fact is though, you don't know why as you sit here today, you don't know why Major Washington called you with that particular interest, is that correct?

A:  Correct.

Q:  Did Major Washington ever tell you why he had an interest in that chain of command issue?

A:  No.

18

Q:  Have you ever had an occasion to discuss the Subsection C with Major Washington?

A:  No, Major Washington retired in January of this year.

Q:  I know you indicated that, but sometimes you bump into people, the answer is though you have never had an opportunity to discuss that with him?

A:  I haven't seen him since he retired.  No, nor did I ever discuss it with him, no.

Q:  When you got back to Major Washington you simply told him that you had made a report or recommendation of some type, phone call, whatever it was to Sergeant Margeson, right?  You gave him some type of report or response?

A:  Yes.

Q:  What did he say?

A:  He said that's what he thought, that he couldn't find it either, but he was looking for some help in finding it, because as we discussed earlier, everybody thought it existed, but he said, that's what I thought.  He couldn't find it either and we kind of confirmed what he found out or what he thought on his own, that it didn't exist.

Q:  And Margeson indicated to you that this was a good time, perhaps to bring this thing up.  Is it correct that when you called Margeson, Margeson thought there might be something there.  He didn't know about it.  This guy really knows the regs, he wouldn't have known it was there, right?

19

A:  When I first called him, I think he thought there was one too, but he didn't know exactly where and he said he would get back to me.

Q:  So he thought, you thought that if it wasn't one, there should be because this was an important thing.  I'm not putting that down.  You thought this was something that should be in writing, correct?

A:  I thought that, but when Sergeant Margeson, when I called him the second time...

Q:  Right, that's what I'm going at.

A:  He said that this would be a good time to put it in writing.  And I concurred with him.

Q:  Well, did he indicated that he had checked with anyone or talked with anybody in the meantime?

A:  He indicated that he checked and couldn't find anything.

Q:  Did he indicate that he had talked with anyone in the meantime?

A:  I don't know what he meant by checked, whether he talked with someone or he did it on his own, but he indicated that he checked.

Q:  Do you know if the term "chain of command" appears anywhere outside of Subsection C in Department of Regulations?

A:  Previously, I said that when our cadets graduate they go out in the field and their governed, in the field training

20

program, once they graduate from the Academy, I believe it is field regulation 5-2, that has the field training program and one of the requirements that their coach in the field covers is chain of command.  So that is at least one place that it's mentioned.

Q:  So they are taught to respect and follow the chain of command, right?

A:  Correct.

Q:  And you don't know if anybody has been sanctioned for not following the chain of command, but did you make any other suggestions or recommendations as far as AR1-1 concerns?

A:  At one time I recollect Sergeant Margeson calling me and reading it to me and asking me if I thought that covered what we were looking for.

Q:  Subsection C?

A:  Right.

Q:  Did you think that it did?

A:  Yes.

Q:  Did you discuss it with anyone else?

A:  No, I had already gotten back to Major Washington and told him that it didn't exist.

Q:  Did you call Major Washington and tell him about the language that Sergeant Margeson had shared with you?

21

1  A:   I may have said when I first called him and told him that
2  it didn't exist, that AR1-1 is being revised and they were
3  going to include a revision in there, to include it, but that
4  didn't help him with this problem at that time.
5  Q:   How do you know it didn't if he didn't tell you what the
6  problem was.  How do you know it didn't...
7  A:   He was looking for something to use for something
8  previous to calling me.
9  Q:   How do you know that?
10 A:   Well, again, I am surmising it was because the personnel
11 problems that he was having down there, but again....
12 Q:   Don't surmise.  Tell me, aside from that speculation,
13 what did Major Washington say that made you think it had
14 something to do with some personal thing in his command
15 and his responsibility?
16 A:   He did not say anything and I did not ask.
17 Q:   You had 2 telephone conversations with Major
18 Washington.
19 A:   That's correct.
20 Q:   You had conversation with Gallaher, Captain Gallaher?
21 A:   Captain Gallaher.
22 Q:   Can you spell that just for... G-A-L-L-A-H-E-R?
23 A:   That's correct.
24 Q:   There is someone else you discussed it with, right there
25 in the..

22

1  A:   Major Einsel.
2  A:   Major Einsel.
3  A:   E-I-N-S-E-L.
4  Q:   What is his position?
5  A:   He is the Director of the Academy.
6  Q:   What did he have to say?
7  A:   He suggested that I call up Sergeant Margeson and it was
8  his words that Sergeant Margeson was the department
9  regulations guru.  Those words were from Major Einsel.
10 Q:   What did Captain Gallaher have to say?
11 A:   He didn't know of anything in writing.
12 Q:   Did anybody think it was a bad idea?
13 A:   That what was a bad idea?
14 Q:   Subsection C.  I'm sure you think it's a good idea even
15 today, I'm not challenging your thoughts, I'm wondering if
16 anybody thought that maybe it wasn't a good idea.
17 A:   No one asked specifically if it was a good idea.  Sergeant
18 Margeson read it to me and asked me if I thought that it met
19 the policy void, so to speak and it sounded to me as though it
20 did.
21 Q:   What's policy void?
22 A:   What we have here.  Something that you've...
23 Q:   Forgive me, I don't see it.  I see it differently.  It has been
24 described by previous witnesses, a policy void, I wonder
25

23

1  where you got that term from Mr. Margeson, right, "policy
2  void"?
3  A:   No, I heard that at least one other time in a completely
4  different case.
5  Q:   Do you thing that AR1-1 is the place where Subsection C
6  belongs?  In other words, does it fit in with that regulation do
7  you think?
8  A:   Yes.
9  Q:   Why do you feel it belongs there, if you've given it much
10 thought, you may have never thought much about it.  Let me
11 tell you why I ask that, Captain.  I ask it because Mr.
12 Margeson called back and suggested that AR1-1 was
13 apparently being reviewed or evaluated or changed, or
14 whatever it was marked up, or whatever they call it, and said
15 you know this would be a time to do it, to add it in there, and I
16 just wonder if there was any discussion that AR1-1 is the
17 proper place for this or it is like a rider or amendment on
18 legislative bill.
19 A:   AR1-1 covers our structure, state police structure from
20 what stations fall under what troops, what troops fall under
21 what areas, what units fall under what sections, fall under
22 what bureau, so...
23 Q:   That's why I'm asking if it belongs there.  I can
24 understand it going in field regulation about how you are
25 supposed to behave, a regulation about, do you have some

24

1  kind of written regulation about how you are supposed to
2  process a leave slip, or can I go down to the state trooper, stop
3  at headquarters some day, walk up to the Commissioner's
4  office and turn in a leave slip.  If I do that I'll probably get my
5  behind chewed out, aren't I?
6  A:   If you are member of the department, you mean?
7  Q:   Yes.  I'm a trooper, I do traffic control, I've been on duty
8  for a year.  I'm a trooper, I'm a Pennsylvania State Police
9  trooper.  So I'm driving up the road here on my way home and
10 I want to process a leave slip so I go in and go up to the
11 Commissioner's office to turn in a leave slip.  Is someone
12 going to look at me like I'm crazy, are they going...sure they
13 are going to look at me like I'm crazy, why?  Because that is
14 not the way you process a leave slip, because there is a
15 procedure for doing that.  You take your leave slip, I assume,
16 you begin that process with your immediate supervisor, am I
17 correct?
18 A:   Correct.
19 Q:   What does that have to do with organization?
20 A:   What does the leave slip have to do with organization?
21 Q:   Your feeling is that Subsection C appropriately belongs
22 with AR1-1.  You saw no reason why it was out of place
23 there.  You felt it was an appropriate place for it.
24 A:   That covers the way we are structured, so I didn't see that
25 it was out of place there.

25

1 Q: That's fine, that's what I'm asking. Do you know when
2 Subsection C took effect?
3 A: It wasn't that long ago. This is October, some time the
4 first of the year.
5 Q: Of 2001?
6 A: February or March, I'm saying approximately.
7 Q: How do you know that?
8 A: We got the changes. We make changes in our AR
9 Manual. I recall it was completely revised.
10 Q: AR1-1 was completely revised?
11 A: A complete revision and we are 10 months into the year,
12 so I'm going to say some time during the first of the year,
13 February or March.
14 Q: Have you implemented changes at the Academy for
15 teaching Subsection C?
16 A: (body response?)
17 Q: Why not?
18 A: Because we already taught it verbally.
19 Q: Do you know anything about how a violation of
20 Subsection C is punished?
21 A: No.
22 Q: Did Sergeant Margeson indicate any discussions with
23 anyone about Subsection C?
24 A: Not that I'm aware of.
25

26

1 Q: I've been educated in this process, you frequently learn a
2 lot of things in doing this kind of work and I have been
3 absolutely astound on how easy it is to change a State Police
4 regulation. I never realized it was as easy as it is. The reason
5 I'm asking the question, so you know where I am coming
6 from with these questions is trying to learn how much
7 discussion or review there may have been in making these
8 changes. I used to have, many years ago, he's actually past
9 away, but a friend who was a Pennsylvania State Policeman
10 and he told me a funny story experience one time, he was
11 driving to a certain area and saw a Pennsylvania State Police
12 car turned over in snowy and icy weather on its roof, and lo
13 and behold there was a trooper putting chains on the car, on
14 the tires, remember days ago, you are old enough, you
15 remember what chains are, right. Now, why would the
16 trooper do that. Obviously, because there is a regulation,
17 somebody is going to come and investigate the accident and
18 there's supposed to be chains on the tires, right.
19 A: I wouldn't want to speculate on that...
20 Q: As it turns, that's what I was told why the reason was
21 done, no one was hurt, but it's that kind of a situation. You
22 are the second witness I have talked to about Subsection C.
23 I've also done other investigations. Can you tell me anything
24 about what or how you are cited for if you violate Subsection
25 C. Can you be investigated for it. Does the violation of

27

1 regulations in the Pennsylvania State Police take any kind of
2 set punishment with it that you know of, or is that pretty much
3 an open ended thing...
4 A: No. If a supervisor was unpleased with a subordinate
5 who was violating his chain of command, a supervisor would
6 do, what we call a DPR complaint sheet, real professional
7 responsibility and that complaint sheet would go in and it
8 would be investigated to determine whether he did violate the
9 chain of command and if he did, someone would be assigned
10 to investigate it and do a report, his commanding officer
11 would review the report and determine whether it was
12 sustained, unsustained or unfounded, then it would go to the
13 disciplinary officer who is a captain and he would decide the
14 discipline and it would be appropriate to similar cases so that
15 one trooper in part of the State wasn't discipline more
16 severely for a similar incident as another trooper did in
17 another part of the State. That's briefly the disciplinary
18 process. It's not like that the crimes code where it says, that
19 you'll get...
20 Q: Classification, sentence and all that kind of stuff, maybe
21 I'm barking up the wrong tree there. Your experience as a
22 Pennsylvania State police officer, do you know of anyone
23 ever getting in trouble for violating the chain of command
24 before Subsection C?
25

28

1 A: I can remember a lot people being reprimanded for it. I
2 don't recall, I never have had any experience in the
3 disciplinary officer where I see these cases come in. But
4 throughout my career I can remember people being
5 reprimanded for it. You bypass the chain of command, you
6 are going to make somebody angry, mainly the person you
7 bypassed.
8 Q: It could insubordination....
9 A: If you did it consistently it would be a form of
10 insubordination, if someone did it consistently after they were
11 reprimanded for it.
12 Q: How long did the discussion with Sergeant Margeson
13 take place.
14 A: Not very long, the first telephone call I told him what I
15 was looking for and he said he would get back to me, but
16 maybe a minute, minute and a half.
17 Q: Did you fax him anything, say anything in writing to
18 him?
19 A: No, not that I recall. I didn't have anything to fax him.
20 Q: I'm just asking. Did he call you and read the language to
21 you or did he fax you or send you a copy of the proposed
22 language?
23 A: I think he read it to me. I don't recall a fax but I believe
24 he read it to me.
25 Q: Did you make any recommendations to him for changes?

29

1 A:   No. I think you are misunderstanding my position on this
2 as I'm not the person that was saying we need a regulation
3 change, I was kind of like a middle man between Major
4 Washington and Sergeant Margeson in the Bureau of
5 Research and Development where Sergeant Margeson was,
6 since they had that regulation there, it was their determination
7 that it should be added. I think it was a phone call, if it was a
8 fax, I recall telling Sergeant Margeson that I thought he
9 covered the problem.
10 Q:   Did you ever tell Major Washington that this is
11 something that was handled up there, maybe would he
12 consider calling Mr. Margeson himself, make sure the
13 language is okay? Let me tell you where I'm coming from
14 again. One of my little many offers here. You called
15 Margeson, Sergeant Margeson calls you back and reads now
16 some language to you. You call Major Washington and you,
17 do you repeat verbatim, as you are sitting here today, can you
18 repeat verbatim Subsection C?
19 A:   That ain't the way it happen.
20 Q:   It is probably a little bit rough. That's what I want to
21 learn. To me it's odd and don't get me wrong, Major
22 Washington has this interest. I can understand why he would
23 originally call you at first. He didn't quite know where to go
24 maybe, I don't know how you folks, how well you know your
25 own AR1-1, I guess AR1-1 probably tells you, where you

30

1 should go for that kind of change. You figured it out, you've
2 talked to people around you and they said, the guru is
3 Margeson, Sergeant Margeson let's call him, that's his job,
4 any organization functions that way. You're doing your job
5 and sounds great to me so far. I can't understand though why
6 at some point Major Washington and I'm not saying that there
7 is some big mysterious reason for it either, I just don't know.
8 Why doesn't Major Washington get plugged into Sergeant
9 Margeson, why don't you tell him, because I can't believe that
10 when you called Major Washington, I can't assume that you
11 knew what the language was.
12 A:   I didn't, and I testified to that. When I got back to Major
13 Washington I said, it doesn't exist but they're revising 1-1 and
14 they are going to revise it…
15 Q:   Who's revising it?
16 A:   R&D
17 Q:   So you told him R&D is revising…
18 A:   1-1 to cover it, but I had no idea what the language was
19 going to be.
20 Q:   Did you raise Sergeant Margeson's name in that
21 conversation?
22 A:   Yes.
23 Q:   So he knew that it was Sergeant Margeson at R&D who
24 would be making the changes or drafting maybe the language
25 of Subsection C, cause you told him.

31

1 A:   He knew that it was R&D. I don't know if it was
2 specifically Sergeant Margeson or if it was somebody in
3 R&D….
4 Q:   You said you gave him Sergeant Margeson's name.
5 A:   Right, exactly.
6 Q:   But in any event, you told him it was R&D, and R&D
7 was where these things were done, am I correct?
8 A:   Correct.
9 Q:   Did he say anything in response?
10 A:   He said I didn't think it existed because END OF SIDE
11 ONE
12 Q:   Major Washington indicated that he couldn't find it
13 either. Now at some point you called Major Washington back
14 and told him that Mr. Margeson had given you information
15 though or read you some language, right?
16 A:   (body response)
17 Q:   No. Okay, so that occurred on the second call, this
18 conversation that we are talking about where R&D and
19 Margeson were mentioned that actually occurred during the
20 second call?
21 A:   Correct.
22 Q:   You wouldn't have known what to tell on the first call
23 anyway because you had gone to Gallaher and had a little
24 discussion with Gallaher and Major Einsel, I believe you said
25 was the Director and so that fits in, so then you got this call

32

1 back from Margeson, Margeson reads this language to you,
2 recites it, right. Reads or whatever and gives you some idea
3 of language and so then you call Major Washington…
4 A:   No.
5 Q:   No. Okay, straighten it out for me.
6 A:   When I first called Sergeant Margeson he said he would
7 get back to me. Approximately 2 weeks went by. I called
8 him back, and said you didn't get back to me. He said, I
9 know, we can't find it but we are revising the AR1-1 to
10 include it. At that time I called Major Washington and told
11 him that we couldn't find anything, Sergeant Margeson
12 couldn't find anything, but 1-1 is up there under revision now
13 and they are going to include it. I didn't know what the
14 language was at the time.
15 Q:   That was the last conversation you had with Major
16 Washington?
17 A:   Regarding that, yes.
18 Q:   Regarding that. Did you have any discussions with
19 Margeson in the future then. That would have been when he
20 would have called you and told you…
21 A:   Right, that would have been the third conversation then.
22 Q:   Did you relay that to Major Washington?
23 A:   No.
24 Q:   Did go over it with Major Einsel?
25 A:   No.

33

1  Q:   Captain Gallaher?

2  A:   No.

3  Q:   Actually you didn't go over it with anybody else.

4  A:   No.  It wasn't my job to approve of 1-1.

5  Q:   No.  I'm not suggesting it was, I'm trying to learn how
6  much interest you had in the specific language, or what it did.
7  Apparently, there was discussion about the concept, as I
8  understand what you telling me, the idea of it and nobody
9  could find where it was written down and language was being
10 developed by RD, that's basically it.  And at some point
11 during these different conversations you informed Major
12 Washington that this was RD, at least you would have been
13 communicating to him that this was an R&D function and that
14 Sergeant Margeson was the gentleman who did this kind of
15 thing.  That was his job or whatever, however you put it.  I
16 don't want to put words in...

17 A:   I said it, this is about the fourth time that I said it now,
18 that is exactly the way that it happened.  I called Major
19 Washington back and said, there is nothing in writing, we
20 can't find it, R&D can't find it, however, they are revising 1-1
21 now and they are going to include the revision in 1-1, period.
22 That's what I told him.

23 Q:   And you mentioned Margeson's name?

24 A:   Right.

25

34

1  Q:   Did Margeson seem pretty confident that it would be
2  added to 1-1?

3  A:   (body language)

4  Q:   :Let me tell you why I said that?  Why I ask you that?  I
5  want you to ask me why if you want to know why I am asking
6  you questions.

7  A:   It's not my job to know why you are asking me questions
8  the same as when Major Washington called me, I didn't ask
9  him why.  I just answered his questions.

10 Q:   Somehow I thought you were going to say something
11 like that.  Let me just ask you this though.  I'd ask you if
12 Sergeant Margeson felt confident that it was going to be
13 added.  Did he indicate that he had reviewed Subsection C or
14 some language to that effect, or some type of added regulation
15 with anyone?

16 A:   Not that I recall.

17 Q:   Did he indicate that he had gotten any approval or that he
18 went to the front office with it?

19 A:   Well it doesn't get signed.  It goes to front office for
20 signature and all the changes are highlighted.  So it's not
21 going to get signed.  He's not the one that is just going to
22 make something up and not get it approved, it will go through
23 his chain of command and it'll end up in the Commissioner's
24 office for signature by the Commissioner or one of the
25 Deputies.  I'm not sure who signed it.

35

1  Q:   The fact is that it is the Commissioner who makes the
2  decision or at least has the authority to make the decision on a
3  change and regulations?

4      MS. REYNOLDS:  Are you asking a question?

5  Q:   Yes.  There's a question mark at the end of that.

6  A:   Yes.

7  Q:   Do you use Subsection C, what was that as a major
8  change in the AR1-1?

9  A:   Not a major change in AR1-1, no.

10 Q:   How would you rank it.  Here's 100 years of
11 Pennsylvania State Police history, Majors, and Captains, and
12 Lieutenants who this never occurred to that this wasn't in
13 writing, you are assuming that the reason Major Washington,
14 I understanding you are just guessing or assuming, Major
15 Washington is interested because maybe he had some
16 problems, I going to assume from that you thought he couldn't
17 enforce discipline or do something.  He needed some power
18 to do something about folks that didn't fall in the chain of
19 command.  I'm just assuming.  Somebody is thinking that
20 way.  There is a need for this.  You don't just go out, making
21 changes on major regulations for nothing.  How do you rank
22 at given any knowledge of experience you might have with
23 changes in PSP regulations.  How did you view this
24 Subsection C?

25

36

1  A:   I don't see that it changed very much because we always
2  follow the chain of command anyway.  It's just that now it's
3  in writing.  So I wouldn't say it was major, it's just that every
4  now and then things come up and I'm going to use that term,
5  "policy void", and say hey, there is nothing, everything that
6  we do practically is in writing to cover grievances and all
7  kinds of different things and people often challenge things.  I
8  say well show me why I have to do that in writing.  So when
9  it was discovered through Major Washington's question that it
10 wasn't in writing, it was decided that it should be put in there.
11 But as far as being a major change, I would say, no.

12 Q:   Do you think it was a relatively harmless change maybe
13 one that might not have been necessary?

14 A:   No.  Once we found out that it wasn't in writing, we have
15 everything in writing from all regulations.

16 Q:   That's why I'm asking.  I'm not trying to be silly.  I don't
17 want you to think I'm trying to argue with you.  But why it is
18 so important to be in writing?  You have commanders, you
19 have leaders, you have a way of doing things.  Everybody
20 knows if you don't work and get along and get things done,
21 sooner or later you are going to pay a price.  Any organization
22 in the world functions that way.  How can you possibly put
23 everything that you need to do into writing?  You know, you
24 spend your whole day, maybe you spend your entire career
25 studying regulations.  By the time you get to the end of the

37

¹ book you forget the first part. How do you function? I'm not
² trying to argue with you. But there is this emphasis in other
³ words that things need to be in writing, I understand that.
⁴ A:   It's difficult, everything that we do seems to be
⁵ challenged. The PSDA challenges things all the time. The
⁶ attorneys are hired and they say, why is this, why is that, if it's
⁷ a regulation that…..
⁸ Q:   And that's why I asked you about the procedures with
⁹ enforcement. That's why, not the substantive aspect of the
¹⁰ regulation but the procedure. Did you know, did you ever
¹¹ hear of anything that the front office challenged the regulation
¹² or changed it or contributed to it in any way, Subsection C.
¹³ A:   That's completely out of my area of responsibility. I
¹⁴ know that it goes up there for signature, but whether it went
¹⁵ back and forth for them to change, that is completely out of
¹⁶ my….
¹⁷ Q:   All the years you have been with the Pennsylvania State
¹⁸ Police, you don't know of any committee of officers, you
¹⁹ don't know of any internal organization that deals with a
²⁰ discussion or review of regulation changes, essentially, it's a
²¹ Commissioner's function and authority, is that correct?
²² A:   No. R&D, Bureau of Research and Development which
²³ I keep referring to as R&D for the record, R&D, that's their
²⁴ responsibility. And then it goes up to the front office for
²⁵ signature, approval. I know there is times when things come

38

¹ back as far as this one, I don't have a clue. I'm at the
² Academy in Hershey, it's out of my purview. I don't know
³ what happen other than my conversation with Sergeant
⁴ Margeson.
⁵ Q:   Have you had occasion to contribute your ideas or
⁶ recommendations on other regulation changes in the past?
⁷ A:   Yes, that dealt with what was my responsibility, yes.
⁸ Q:   Have any of those recommended changes or suggestions
⁹ that you made that went to R&D ever came back to you for
¹⁰ review?
¹¹ A:   Yes.
¹² Q:   This one didn't. You never got a draft copy or rough
¹³ copy?
¹⁴ A:   The ones that came back to me for review were ones that
¹⁵ we had input into that we were revising, for instance; we have
¹⁶ a regulation regarding our community services unit which is a
¹⁷ unit under my command. If we are revising a special order or
¹⁸ a command, then we make the revisions, we read them, we
¹⁹ send it up to R&D. Frequently, they call back and say, where
²⁰ are you going with this. We want to word it this way. So
²¹ that's the group. R&D is the group that analyzes all this stuff.
²² Q:   They help with the drafting of it. If you have a
²³ recommendation or attention…
²⁴ A:   We draft it, they improve it…
²⁵

39

¹ Q:   One of the things that Sergeant Margeson told us is that
² they check on whether it conflicts with other regulations so
³ that you don't have two regulations working with cross
⁴ purposes, I suppose, that kind of thing.
⁵ A:   That's correct.
⁶ Q:   But when he, but when Sergeant Margeson got back to
⁷ you, there literally, there was no discussion of any kind of
⁸ conflicts or anything like that, it was just never been done
⁹ before and there is a police void…
¹⁰ A:   I don't know who he ran it by or who he met with, but
¹¹ when he called me that was what they planned to do with it.
¹² Q:   Again, these things seem like odd questions to you.
¹³ What I had originally ask you about Major Washington, and
¹⁴ you indicated that when he called down there to the Academy,
¹⁵ you explained how people call down there not infrequently I
¹⁶ guess cause they don't know where to call.
¹⁷ A:   Right.
¹⁸ Q:   Why would somebody at a level of Major in the
¹⁹ Pennsylvania State Police who is in what Bureau, what was
²⁰ his line of work at that time, what was his authority area?
²¹ A:   He was a Bureau of Director in the Bureau of Emergency
²² and Special Operations.
²³ Q:   What did they do?
²⁴ A:   They handle our SERT unit. Are you familiar with
²⁵ SERT units.

40

¹ Q:   I know what a SERT unit is, in law enforcement,
² generally I know what it is.
³ A:   Our aviation unit is there, our K-9 unit is there, Captain
⁴ Davis is the Department Emergency Operations who works
⁵ very close with PEMA works there for emergencies. They're
⁶ our contact with PEMA whenever there's a state line
⁷ emergency, and there's some other special PEMA basic duties
⁸ that don't come to mind right now. Basically, aviation, K-9,
⁹ emergency operations, SERT.
¹⁰ Q:   They interface with, I know they obviously have to
¹¹ interface with a lot of regulations?
¹² A:   With what?
¹³ Q:   A lot of regulations. I mean those kinds of things aren't
¹⁴ your day to day activities. You are talking about some very
¹⁵ special functions.
¹⁶ A:   Yes.
¹⁷ Q:   But Major Washington didn't know where to call. Didn't
¹⁸ know to call R&D? He called down to the Academy, but he
¹⁹ didn't call for you personally. He just was calling down there
²⁰ and you just happen to the guy that answers the phone?
²¹ A:   No. He had to go through the front desk. But whether
²² he asked for me personally, I don't know.
²³ Q:   Do you know him?
²⁴ A:   Yes.
²⁵ Q:   How long have you known him?

**41**

1  A:   Since about 1985.
2  Q:   Friends?  I understand your professional callings.  Are
3  you friends?  I'm not saying you are unfriendly, when I say
4  friends, let me explain what I mean, because it is ambiguous.
5  It is difficult to, you are in a professional organization
6  together, doesn't mean you aren't respectful and all that sort of
7  thing which you are supposed to be.  You come across as a
8  very affable and congenial man and I compliment you for
9  that.  You are a person that comes across as a very decent and
10  friendly man, so I'm assuming that you are friends with most
11  people or a lot of people.  You have that kind of personality.  I
12  do admire you.  I wish I was like you.  But I want to go a step
13  further than that.  Did you ever socialize with Major
14  Washington?
15  A:   No.
16  Q:   You've known him since 85?
17  A:   That's correct.
18  Q:   Have you ever been through any difficult police
19  experiences with him, problem out in the street, out in the
20  road, emergency, shooting problem, or something, anything
21  like that.
22  A:   I met him when I was in Drug and Law Enforcement.
23  He was in Bureau of Professional Responsibility.  There was
24  a trooper that they suspected to be on drugs and he came to us
25  for help, and I knew of him before that, but I never knew him

**42**

1  well, and we did an investigation which resulted in that
2  trooper getting a urine test and that's how I met him and never
3  worked in the same bureau or troop with him.  That's about…
4  Q:   I'm just having difficult trying to understand why a
5  Major Washington would not know where to call on
6  something like this, and that's why I'm asking.  You don't
7  have any facts known to you that could help me understand
8  why he would 1) call the Academy, or 2) not know how to
9  research it himself or have a subordinate in his own office do
10  that, or 3) why he would not call R&D himself.  And fairness,
11  you don't know the answer to any of those questions.
12  A:   No, you are answering that for me.  1) the Academy
13  teaches regulations, so he would call the Academy thinking
14  we are up on regulations more than….
15  Q:   The average place I would call in the State Police, you
16  would know what is being done.
17  A:   He wouldn't call Troop A or Troop D cause they don't
18  know any more than what he knows, so the Academy teaches
19  regulations, so that's the answer to your first question, he
20  called there, because we teach regulations.
21  Q:   And you told me in response to an earlier question that
22  you teach chain of command.
23  A:   Yes.
24  Q:   You have a written curriculum or written materials
25  there…No.

**43**

1  A:   That is why he was calling to find out what we have in
2  writing and it didn't exist.
3  Q:   You teach chain of command but you don't have any
4  writings or instruction manuals, or any kind of instruction
5  advisories, or any kind of courses that deal with chain of
6  command.  You do have, when you have your representative,
7  your coach out in the field…
8  A:   Right.
9  Q:   I know that's like a probationary period, right?  You have
10  someone that is an advisor to you.  In that kind of situation
11  that person, at least some of the materials they have, I assume,
12  emphasize or indicate the need to talk about chain of
13  command or teach chain of command, right?
14  A:   Correct.
15  Q:   So Major Washington calls and looking for what's taught
16  there, what the instruction materials are, but you don't have
17  any written instruction materials on chain of command that
18  you can think of at the Academy?
19  A:   Correct.
20  Q:   And you couldn't of a regulation, he couldn't think of a
21  regulation, so you weren't really looking at R&D so much
22  because it was a case of finding a regulation as opposed to
23  asking somebody to write up something brand new.  Is that
24  right?
25

**44**

1  A:   When I couldn't find it, I asked Captain Gallaher and
2  Major Einsel if they knew of anything and that was when
3  Major Einsel suggested I call Sergeant Margeson.
4  Q:   Are you familiar with the Museum Committee?
5  A:   Yes.
6  Q:   What is it?
7  A:   The state police are forming an official name that is
8  historical educational memorial center, and there is a
9  committee, a museum committee that filed for a 5013C, as a
10  non-profit organization and they are planning the museum,
11  they are buying property, they are going to build a museum
12  and they are going to display the state police memorabilia
13  from 1905 to the present.
14  Q:   Does Commissioner have any interest in this, is he a
15  promoter, or supporter of it?
16  A:   Yes.
17  Q:   How long has he been a supporter, do you have any
18  idea?
19  A:   Probably ever since he was, I know that the plans were
20  before he was Commissioner, but as far as I know he was
21  supportive of it almost from the beginning, almost from the
22  beginning of his administration as Commissioner.
23  Q:   Is he a member of the committee?
24  A:   No.  I don't think so.
25

45

Q:   Who else in the Pennsylvania State Police hierarchy above you, not necessarily your chain of command, no punt intended, is a member of the museum committee?

A:   Colonel Coury comes to mind, you are talking about active members, not retired members, right?

Q:   I know that Colonel Tom Coury is..

A:   I think he resigned though, it was too much him, but he was for several years.  Major Hayson was but he's retired now, Major Riggan, who is the president, but he's retired.  Most of it is retirees because they were going to raise funds as a non-profit organization and the department didn't want active duty members involved in raising funds so all the active duty members resigned from the committee, not from the committee but from the board of directors, and it's now run by retirees or friends of the State Police; so to speak.

Q:   Are you still a member?

A:   No.

Q:   You can't be because, why is there a concern with conflicts or something?

A:   Well, I'm an active member and we don't want active members soliciting for funds because...

Q:   Okay, I see, any other conflicts you know of beside from fund raising aspect?

A:   With the museum?

Q:   Yes, sir.

46

A:   I haven't attended a meeting in a couple of years but, I mean when you say conflicts, there is...

Q:   Let me be more specific, Captain.  Any conflicts or problems where the perceived interest of the company would collide with private collectors in their interest?  Do you understand what I am asking?

A:   Not exactly.

Q:   Are there any disputes between the folks out there in the private sector to collect things, whether they are State Police members or not, and the committee and it's the committee's purpose?

A:   Well, there are several subcommittees, one is the building fund, one is the building, one is the, one of the groups is the memorabilia committee, who are task with people, almost from the time it was announced we were building a museum, people were calling wanting to donate things.  So there was a committee that was in charge of, or responsible for collecting artifacts.  And there were some retired members that had artifacts that were actually, not to be state property why does this person have this state property when it's really illegal to have it.

Q:   That's a problem for lawyers to sort out, not policemen, isn't it?

A:   You ask for me for conflicts and that's...

47

Q:   I understand the conflict, but who sorts that out?  Who sorts that difficulty out?

A:   There was talk about even if the statute of limitations is long expired on it or somebody bought it at a flea market, how are we going to prove that they stole it.  There were a couple of people...one person comes to mind that had a huge collection of state police memorabilia and it was generally thought that he took that with him when he left the job.

Q:   Who was that?

A:   A retired major.

Q:   Who?

A:   Dayo..

Q:   Was he ever investigated?

A:   The last I heard he was in very poor health and his son had told some people that whenever he dies that son would donate that stuff to the museum and people pretty much thought why harass this person who is in ill health, if he is going to be dying and we are going to be getting this stuff anywhere, so it pretty was put on the table.  We don't even have a building to put the stuff in yet, in storage, it's a problem for these artifacts.

Q:   Was anybody ever investigated over where they acquired, or how they acquired any memorabilia?

A:   Not to my knowledge.

48

Q:   Were any committee meetings devoted to a discussion of private collectors?  Museum committee or subcommittees of the museum committee, ever?  Let me phrase it again.  To your knowledge, were any meetings of the museum committee or any subcommittees of the museum committee ever dedicated to a discussion of memorabilia collectors?

A:   No, not that I attended.

Q:   Did you ever hear about any?

A:   Did I ever hear about any private collectors?

Q:   Hear about discussions or meetings that the museum committee or any subcommittees of the museum committee had where issues regarding private collectors were discussed or dealt with?

A:   I thought I answered that, no.

Q:   I'm sorry, I probably didn't phrase it well.  Do you know whether Captain Ober was ever discussed in any museum committee or museum subcommittee meetings.

A:   No.

Q:   Were you present at any informal, whether they were committee meetings or not, any informal discussions where museum committee work was discussed where Captain Ober was discussed?

A:   The only I ever heard about Captain Ober was Lieutenant Colonel Conti told me one time at the Academy, not at a meeting, we were having lunch, he was at the

49

1  Academy because he was doing, he was coming into the
2  Academy helping catalog artifacts that were donated. He was
3  doing this with Sergeant Trout, and he told me that Captain
4  Ober was a memorabilia collector.
5  Q:   What was the significance of that?
6  A:   I think we were competing against Captain Ober for
7  collecting artifacts.
8  Q:   You know whether that information was ever
9  communicated to Lieutenant Colonel Coury?
10 A:   I don't know.
11 Q:   Do you have any recollection of Colonel Banko, or
12 Lieutenant Colonel Coury suggesting or discussing
13 investigations in the private collector, any private collectors?
14 A:   Know of none.
15 Q:   Never heard of anything like that?
16 A:   No.
17 Q:   You know whether, you have any recollection of
18 whether Captain Ober ever delivered any artifacts or
19 memorabilia to you or to the committee?
20 A:   Now that you have mentioned it, I think that, I do
21 recollect Captain Ober calling me and saying he had some
22 stuff for us, but I think I did find a box of stuff on my desk
23 one day, I wasn't there when he came over and I came in and
24 it had a note on it that said, "for the museum" and had Darrell
25 signed on it.

50

1  Q:   Who did you give that to?
2  A:   I think, I think it was on my desk when I came to work.
3  He told me for several weeks or months that he had
4  something and I came to work and found it.
5  Q:   Who did you give that to?
6  A:   I found it on my desk.
7  Q:   I know you found it on your desk. What did you do with
8  it, I'm sorry, my question was poorly structured. Let me
9  withdraw the question and rephrase it. I understand that you
10 found some memorabilia in a box on your desk. What did
11 you do with it?
12 A:   It was identified from Captain Ober. I gave it to
13 Corporal Ratcliff who was the, I'm trying to think of the
14 official term, custodial officer for museum equipment.
15 Q:   No problem. Do you have any recollection of any
16 newspaper advertisements having to do with the collections of
17 memorabilia?
18 A:   No.
19 Q:   Do you know if any private collectors ever put
20 advertisements in the newspaper regarding memorabilia?
21 A:   I heard that there is things on e-bay, but I don't know of
22 any advertisements in newspapers.
23 Q:   Do you know whether the committee or any
24 subcommittee or any member of the museum committee ever
25

51

1  placed an advertisement in the newspaper or any other
2  commercial media?
3  A:   I don't think the museum is at the point yet, but I can't
4  say that no one ever did, but none to my knowledge.
5  Q:   Captain, I don't know if any of my questions have
6  refreshed any recollections that you might have, but as I sit
7  here today, you have no recollection of any discussion of
8  anyone ever being investigated as to how they acquired or
9  how they may have want to acquire memorabilia?
10 A:   If that was investigated by BPR, everything is so hushed
11 up when BPR does investigation, it's confidential, things leak
12 out, but I don't ever recall ever that. But as I said I haven't
13 been to a museum meeting probably in two years.
14 Q:   Does the Pennsylvania State Police, they're not involved
15 in the business of collecting memorabilia, are they?
16 A:   The State Police, our department?
17 Q:   Sure.
18 A:   No.
19 Q:   But if I come over there with a piece of memorabilia,
20 something that may be of value and donate it, you have a
21 place to put and keep it, right?
22 A:   We give it to the museum, now that we have a museum
23 committee.
24 Q:   But that museum committee is not a part of the State
25 Government. That's essentially a thing that you folks

52

1  volunteered to do on behalf of your history and your
2  comrades, right?
3  A:   It's a private corporation now.
4  Q:   That's what you told us. Right. Now there was time
5  however when the public, I'm not suggesting that's wrong or
6  a problem, but there was a time, apparently when the public
7  purpose and public efforts were sort of mixed and it wasn't
8  real clear that this was a private organization? If that doesn't
9  fit you don't have...
10 A:   I don't quite understand the question.
11 Q:   That's fine. In any event, during the entire experience
12 that you had with the museum committee, you have, your
13 testimony today is that you have no knowledge of the
14 Pennsylvania State Police investigating whether it's a trooper,
15 somebody in the private sector or if anyone else in the
16 Pennsylvania State Police or associated with them, you have
17 no knowledge, you never heard of any information about
18 anyone being investigated to find out how or why or what
19 they collected as memorabilia. Is that correct? That's a
20 blanket, you have no knowledge, you never heard of anything
21 like that?
22 A:   That's correct with one stipulation just on not. There
23 was State Police training cards on e-bay and Colonel, and our
24 training cards are passed out by the community services,
25 which is one the units under my command and Colonel Coury

53

1  sent a note down that he saw these huge amount, huge
2  numbers of training cards on e-bay and we investigated that
3  and found out how they got there, so to speak. As far as your
4  question, I know of no other investigation other than that that
5  we did on e-bay for the training cards.
6  Q:   The situation with e-bay is probably a very proper thing
7  to investigate. There is some indication that, whether there is
8  a Pennsylvania State Police, there is something in the private
9  sector, or indicates that there might be some wrong doing,
10  that's a proper subject of investigative inquiry, is that correct?
11  A:   Training cards are not suppose to handed out except to
12  children, a few at a time. No one should have collections, I
13  believe over a 100. No child could have collected that many,
14  so that was what we were investigating, find out who has
15  these and how he got them.
16  Q:   And it was worth investigating because there was some
17  good probable cause reasons to check it out, right?
18  A:   Correct.
19  Q:   Have you ever known the Pennsylvania State Police of
20  the museum committee or anyone on behalf of the museum
21  committee to have conduct an investigation into anyone, any
22  private collectors' affairs. By private collectors, I guess I
23  mean any individual, into their affairs because of competition
24  with the Pennsylvania State Police or because as a way to
25  pressure individuals?

54

1  A:   None that I know of.
2  Q:   And you have never heard of anything like that? I know
3  you didn't participate in it, that's very, very clear, but you
4  have never heard of anything, rumors or any discussions of
5  anything like that?
6  (silence)
7  Q:   Do you have a recollection of Darrell Ober ever getting
8  in touch with you about photographing Academy items for
9  including in the centennial book?
10  A:   I can recall Mark Insantino calling me for that purpose. I
11  don't recall Darrell calling me for that.
12  Q:   What is this centennial book?
13  A:   We are going to have our 100th anniversary in 2005 and
14  from my understanding they are preparing to have a book
15  with photographs from 1905 to the present, and there is a
16  committee that's doing that book and I know Mark Insantino
17  heads it; and I know he called numerous times to come down
18  to the Academy and take photographs. I know Rick Baker is
19  on it. Darrell may be on it but if he is I'm not...
20  Q:   Do you know if he was ever on it?
21  A:   I can't say for sure.
22  Q:   Do you know whether he was ever on it...Okay. You
23  don't know if he was ever on that committee. You ever been
24  on that committee?
25  A:   No.

55

1  Q:   Is there any honor to be on that committee, is it
2  something that is important to the Pennsylvania State Police.
3  Is it important to you as a Pennsylvania State policeman?
4  A:   It would be nice to have one of those books some day. It
5  takes a lot of work to put one together, and it's all voluntary,
6  so anybody that would be volunteering their time to collect all
7  these artifacts, photograph them, go through books looking
8  for items, it commendable.
9  Q:   Darrell, do you have a minute? What we are going to do.
10  I am pretty much I think at an end. I don't know if your
11  attorney has any last questions. We are going to suspend here
12  for just a second and soon as the videographer suspends we
13  are going aside, we are going to talk to Darrell a little bit.
14  Come back in and if I have any additional questions, I'll ask
15  them at that point.
16      MR. MARCESA:  It is now 4:23, we are going to
17  suspend.
18      MR. BAILEY:  This place is in operation at this time. I
19  would like to thank you very much for coming in today.
20  Thank you for answering questions, I have no additional
21  questions, if your attorney doesn't have anything, the
22  deposition is not concluded.
23      MR. MARCESA:  It is now 4:26 p.m. and it is October
24  23, 2001. This deposition is ended.
25

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL G. OBER | : | CIVIL ACTION LAW |
| Plaintiff | : | 1: CV-01-0084 |
| vs., | : | (JUDGE CALDWELL) |
| PAUL EVANKO, MARK CAMPBELL, THOMAS COURY, JOSEPH WESTCOTT, HAWTHORNE CONLEY JOANNA REYNOLDS and SYNDI GUIDO | : : : : : : : | JURY TRIAL DEMANDED |
| Defendants | : | |

Proceedings:    Video Deposition
                Francis Koselnak

Date:           October 23, 2001

APPEARANCES:

For the Plaintiff:      Donald Bailey, Esquire
                        4311 North 6th Street
                        Harrisburg, PA 17110

For the Defendants:     Syndi Guido, Esquire
                        333 Market Street
                        Harrisburg, PA 17101

1

---

1  MR. BAILEY: You have to move that box of tissues. Major Stillwater. Is
2      there anything I can get for you Joanna?
3  MS.REYNOLDS: No thanks I'm fine.
4  MR. BAILEY: Now Tony we're awaiting you and then we'll move right
5      into this thing and get it done here. Make sure that's run back. You
6      started with a new tape right?
7  MR. MARCECA: Yes sir.
8  MR. BAILEY: Make sure your erase button is where it permits you to; I'll
9      bet that's it. You have to put it on VTR probably to rewind it. It's a
10     different camera, a professional camera; I don't have any control
11     over it.
12  MR. MARCECA: Ok, it's now 11, correction, it's October 23, 2001.
13     Good afternoon my name is Anthony Marceca. My address is 2219
14     Dixie Drive, York, Pennsylvania. I am employed by PR Video who
15     has been contracted to conduct this video deposition on behalf of
16     the plaintiff. This matter is docketed at 1: CV-01-0084 in the
17     United States District Court for the Middle District of
18     Pennsylvania. The caption is Darrell G. Ober versus Paul Evanko et
19     al. and this deposition this afternoon; the witness is Francis
20     Koselnak a Major with the Pennsylvania State Police. And Major
21     could you raise you right hand I would like to swear you in. Do you
22     promise to tell the truth, the whole truth, and nothing but the truth
23     so help you God?
24  MAJOR: I do.
25  MR. MACECA: The time is 1:07 pm and this deposition is now in

2

---

1      progress.
2  MR. BAILEY: Thank you very much. Just on a voice check, Don Bailey,
3      counsel for plaintiff. We already have you Major. Joanna would
4      you?
5  MS. REYNOLDS: My name is Joanna Reynolds. I'm the assistant
6      counsel with the State Police and I represent the defendants in this
7      matter.
8  MR. BAILEY: Ok. I assume that the usual stipulations that objections
9      except as to the form of the question will be reserved until time of
10     trial are ok.
11  MS. REYNOLDS: Yes.
12  MR. BAILEY: Major I'll be very, very brief with just some instructions.
13     We're doing a deposition here. We're going to be asking a number of
14     different questions. From time to time if you become curious or
15     concerned about where I'm going with a question, what I want to
16     get at I want you to feel free to ask me. That's a little different than
17     the usual procedure but we really want to get a good accurate
18     record from you. If at any time you have not had an opportunity to
19     complete your response to a question for any reason, I may step in
20     thinking you have finished or whatever, might intervene. Make sure
21     you that you answer fully and completely because this is a record of
22     course that is going to be of your testimony we want to make sure
23     that it has everything in it and your answers are complete and
24     you're satisfied with that, ok? Remember to keep your voice up,
25     not that you're going to answer with gesticulation, through gestures

3

---

1      we have to have a verbal response you know. Anytime you want a
2      break or you want to break and talk to counsel, you're not allowed
3      to break and talk to counsel in the middle of a question, but
4      certainly I wouldn't object to any break that you want and certainly
5      if you have a personal reason for a break don't hesitate to ask.
6      Before we begin do you have any questions for me at all?
7  MAJOR: No I don't.
8  MR. BAILEY: All right sir. Major state your full name again for the
9      record please.
10  MAJOR: My name is Francis E. Koselnak.
11  MR. BAILEY: I'm just going to refer to you as Major. Is that ok?
12  A:  That's fine.
13  Q:  And you're a Major with the Pennsylvania State Police, and what
14      position do you hold with the Pennsylvania State Police?
15  A:  I'm an Area Commander.
16  Q:  Very briefly tell us what an Area Commander does with the
17      Pennsylvania State Police.
18  A:  Well, the Area Commander is the job description within the
19      administrative regulation. Right now he acts as a liaison actually
20      between the executive office, which is the Commissioner, the
21      Deputy Commissioners, and the field. Certainly I make evaluations
22      to be able to determine how various programs are functioning and
23      operating and I provide advice to the executive office. Certainly I
24      sit in on disciplinary matters, and I guide troop commanders
25      concerning disciplinary matters involving their personnel on a troop

4

**Page 5**

1  wide basis. Certainly I attend meetings, conferences, and seminars
2  to be able to promote certainly the position and to be able to
3  represent the front office.
4  Q:  What's your jurisdiction right now? By that I mean what have you.
5  What's in your Chain if Command underneath you as an Area
6  Commander?
7  A:  As an Area Commander I'm the Area Commander of Area Two.
8  Which is the Northeastern part of the Commonwealth of
9  Pennsylvania and sort of the northern tier. It encompasses Troops
10  F, which is Montoursville, Troop P which is Wyoming and Troop
11  R, which is Dunmar.
12  Q:  Is the LCE under your jurisdiction?
13  A:  No it isn't.
14  Q:  And what is the LCE? Do you know what that is?
15  A:  It's Liquor Control Enforcement.
16  Q:  How long have you been Area Commander of Area Two?
17  A:  Since July of 2000.
18  Q:  Now before July of 2000 what was your jurisdiction?
19  A:  I was the Director of Bureau of liquor Control Enforcement.
20  Q:  How long had you held that position before you were transferred or
21  before you moved on?
22  A:  I held that position from October of 1998 until July of 2000 so it
23  was approximately 19 months.
24  Q:  How did Darrell Ober come to work in your Chain of Command?

5

**Page 6**

1  A:  He was assigned to be able to work at the Bureau I believe it was in
2  February 2000.
3  Q:  Well my question was how did he come to be assigned there?
4  A:  He was assigned there by the department to be able to work at the
5  Bureau of Liquor Control Enforcement.
6  Q:  What does assigned by the department mean?
7  A:  He was transferred. He came over. There was a transfer order that
8  was generated. He came over to the Bureau of Liquor Control
9  Enforcement to be able to be assigned to that position.
10  Q:  And did you play any role in that assignment?
11  A:  No I didn't.
12  Q:  Were you asked about it?
13  A:  I wasn't asked about it.
14  Q:  Now your position, at the time of his transfer, your position was
15  what?
16  A:  I was the Director Liquor Control Enforcement.
17  Q:  And what was your rank?
18  A:  Major.
19  Q:  So you're the director of LCE.
20  A:  The Bureau Director, yes.
21  Q:  And he was transferred to what position?
22  A:  He was transferred into the Bureau. Into the central section
23  command position.
24  Q:  Central Section. How many sections are there?
25  A:  There are three sections of Liquor Control Enforcement.

6

**Page 7**

1  Q:  Three sections. Now he was transferred into that position you say in
2  February of 2000?
3  A:  It was February, I don't know the exact date but it was in
4  February of the year 2000.
5  Q:  Well who commander of the west. Is there central, west, east? Is
6  that how it is?
7  A:  That's right. There was a West there was a Central, which Captain
8  Ober was commanding and of course there was an Eastern section
9  also.
10  Q:  Who commanded the West?
11  A:  Lt. Ryan commanded The West.
12  Q:  Lt. Ryan?
13  A:  Right.
14  Q:  And how about the East?
15  A:  The East was commanded by, you know I tell you what I just forget
16  exactly but it was a Lieutenant that was commanding the East.
17  Q:  What the significance of that, what do you mean a Lieutenant, what
18  do you mean?
19  A:  Well I'm saying that there were, there was a Lieutenant in the East
20  and I don't know his name. That's why I'm referring to him as
21  Lieutenant.
22  Q:  I just wondered why you responded that it was a Lieutenant. Is
23  there some reason?
24  A:  Well it wasn't a sergeant, you know that's his rank and I don't
25  remember his name.

7

**Page 8**

1  Q:  Well the East was commanded by a Lieutenant. The West was
2  commanded by a Lieutenant and the Central was commanded by a
3  Captain. The Central calls for a Captain? It's a bigger job?
4  A:  No, it doesn't call for a Captain.
5  Q:  What does it call for?
6  A:  Generally speaking it calls for a Lieutenant.
7  Q:  Major how did you come to be the Director of the Bureau of LCE?
8  A:  I receive the phone call I guess it was in October of 1998 to be able
9  to come down and be able to be interviewed by Colonel Evanko, to
10  be considered for a promotion.
11  Q:  Ok and you were an Area Commander up in…
12  A:  I was a Troop Commander sir.
13  Q:  I'm sorry sir. Yes sir, up in the Eastern, Northeastern part.
14  A:  Troop R Dunmar.
15  Q:  Dunmar. I know where that is. Lackawanna County?
16  A:  That's right.
17  Q:  Ok sir. So Colonel Evanko is talking to you about a promotion and
18  has you come down to Harrisburg and that was when? It slipped my
19  mind there.
20  A:  It was the early part of October of 1998. I don't remember exactly
21  the date but it was probably the first 10-12 days of the month.
22  Q:  And he asked…I'm sorry sir, I interrupted you. And he asked you
23  or discussed with you your feelings, I'm sure out of respect for you
24  about taking over LCE. Right?
25  A:  No.

8

1  Q:  Ok, no he did not. Ok what happened?

2  A:  He offered the position to me. He said you know the position over

3      at Bureau Liquor Control Enforcement is available and we have a

4      position to be able to promote to Major and I'd like to be able to

5      offer you that. Are you interested I being able to take it.

6  Q:  And what was your rank at the time?

7  A:  Captain.

8  Q:  Now you said yes and you took the position. You agreed to take the

9      position.

10 A:  Right.

11 Q:  After you took that position were there any other changes of

12     command underneath you. By that I mean did Eastern, or Central,

13     or Western Section Commanders change aside from the change that

14     you experienced with Captain Ober?

15 A:  Yes there was a, the Western Section Commander has transferred

16     out and again I don't remember his name and Lt Ryan transferred

17     in. As far as the Command Staff was concerned there was several

18     sergeants that left within that period of time. At least two that I can

19     think of, positions that became available and people that were

20     assigned to the Bureau of Liquor Control Enforcement.

21 Q:  And was Lt. Williams one of those people?

22 A:  Well, Lt. Williams was there at the time.

23 Q:  Did he leave at some point?

24 A:  Yes he did.

25 Q:  Where did he go?

9

1  A:  He went over to the Bureau of Patrol.

2  Q:  Did he request that change?

3  A:  No, he didn't request it.

4  Q:  Who did request it?

5  A:  I guess it's standard procedure under the type of investigation that

6      he was involved in. he would be transferred.

7  Q:  Now the position for West, Central and Eastern Commanders, the

8      Section Commanders. There assigned for you out of the

9      department.

10 A:  Yes they are.

11 Q:  Are you ever consulted about that?

12 A:  On an occasional basis I'm consulted but not all the time, no.

13 Q:  Have there been any changes in those positions since Captain Ober

14     was changed into that position?

15 A:  Yes.

16 Q:  That's what he holds now right?

17 A:  Any posts?

18 Q:  Yeah.

19 A:  I left in July of 2000 so I really don't know if there are any changes

20     since then. I really haven't been keeping in tune with that.

21 Q:  Well who told you that Captain Ober was going to be assigned to

22     that position because you indicated you were told that. You didn't

23     have any part in that decision.

24 A:  No I didn't have a part in that decision.

25 Q:  Well who told you that?

10

1  A:  It was Lt. Colonel Westcott.

2  Q:  Now is he in your Chain of Command?

3  A:  He was the Deputy Commissioner of Operations.

4  Q:  And what did he do? Call you up and tell you you're getting

5      Captain Ober?

6  A:  Yes he did.

7  Q:  Tell us how that conversation went.

8  A:  He called. I don't remember exactly what date it was but in any

9      event it was in February of 2000. And he gave me a call, and it was

10     about 8 o'clock in the morning if I remember correctly. And he

11     called and he says to me that Captain Ober would be assigned to the

12     Central Section in the Bureau of Liquor Control Enforcement.

13 Q:  Did you ask him if that violated Department Regulations?

14 A:  No I did not.

15 Q:  Did you ask him why?

16 A:  No I did not.

17 Q:  Did he offer why?

18 A:  No he didn't.

19 Q:  What other Captains served under you as Section Commanders?

20     Well you've known Captains aside from Captain Ober that have

21     filled those positions, as Section Commanders haven't you?

22 A:  I know the people that fill that position yes. Absolutely. Here was

23     Ryan and Williams.

24 Q:  Well I mean people with rank of Captain. You know others don't

25     you.

11

1  A:  That what? Fill that particular position?

2  Q:  Yes.

3  A:  In my tenure? No.

4  Q:  Were you aware that at some point Captain Ober had filed legal

5      actions in Commonwealth Court?

6  A:  I was familiar with an article that appeared in the paper and to be

7      perfectly honest with you I don't have any recall but I think that the

8      article had indicated that there was some action that was dismissed.

9      And that was, you know to be able to put that into context whether

10     it was pre or post February 2000, I don't remember.

11 Q:  Well was there any scuttlebutt at all in the Pennsylvania State

12     Police about his

13 A:  You know I'll tell you what I do make it a point not to listen to

14     rumors because inevitably when you listen to rumors it's 180

15     degrees the other way.

16 Q:  My understanding of their 70 some, 60 or 70 sections, aside from

17     your tenure and your personal do you know of any that were

18     commanded by a Captain in your experience?

19 A:  You know I would really have to search back but typically I would

20     say no.

21 Q:  Ok, how many years have you spent with the Pennsylvania State

22     Police?

23 A:  I'm in my thirty fourth.

24 Q:  Wow that 's a lot of experience. You don't have a recollection of a

25     Captain other than Captain Ober as a section commander, as you

12

1    think of it?
2  A:  I never made it a point to be able to. You know certainly when
3    you're coming up through the ranks, you're not concerned with
4    what goes on in other troops you're concerned with doing your own
5    job. Certainly when you get in a command phase that's when you
6    become aware through conferences of different troop operations
7    and things of that nature. So in any event, certainly from that time
8    in my recollection I don't, and a field operation you're talking
9    about so you know, I don't have any recall of a Captain performing
10    as a Section Commander.
11  Q:  Do you have recollection of any unique problems in the Central
12    section?
13  A:  What do you mean by problems?
14  Q:  Ah, you just answered the question.
15  A:  In my interpretation, yes, we had problems.
16  Q:  What were they?
17  A:  I needed a Section Commander bad because lt. Williams had been
18    gone, he's been transferred over to the Bureau of Patrol that had
19    been probably in or around September of 1999.and when that
20    happens we need to be able to back fill people. And what happened
21    was the Sergeant who was the District Office Commander at the
22    Harrisburg Office, district office; we needed to make him Acting
23    Section Commander. In his place we needed to be able move up a
24    Liquor Control Officer 3 or Supervisor to be able to be the District
25    Office Commander. And in that place we needed to be able to

13

1    assign a Liquor Enforcement Officer to be able to serve as Liquor
2    Enforcement Officer Supervisor. That was my unique problem that
3    I had. By being able to move Lt. Williams from that position and I
4    recognize the necessity to be able to do that under those
5    circumstances. I had a desperate need to have a section commander.
6    I needed that position filled.
7  Q:  Sure.
8  A:  so consequently every opportunity I had I was looking to be able to
9    promote that, to be able to get that position filled.
10  Q:  Sure. Now did you have something to do with Williams leaving?
11  A:  Personally no.
12  Q:  Who did?
13  A:  The department again based upon current regulations and the
14    circumstances that surrounded his case necessitated him to be able
15    to be transferred and I don't remember who signed the order. It
16    would have to be either the Commissioner or the Deputy
17    Commissioner.
18  Q:  Do you know why?
19  A:  I do know why he was transferred yes.
20  Q:  Why?
21  A:  Because of an allegation of sexual harassment against him. And
22    consistent with the Governors Orders and the Governor's
23    memorandum we needed to make the workplace safe. That's why
24    he was transferred and removed from that position.
25  Q:  All right. Is there some time that you served as head of PEMA?

14

1  A:  That I served as head of PEMA?
2  Q:  Yes.
3  A:  No.
4  Q:  What's PEMA?
5  A:  Pennsylvania Emergency Management Association.
6  Q:  What's that about? I know what the words mean, of course, but can
7    you tell us what it does in the state?
8  A:  Well it's a, it's an agency that is designated to be able to put
9    together emergency operations in the event of a natural or man-
10    made disaster. To be able to pull together all different resources
11    from different state agencies to be able to focus upon the problem.
12  Q:  Is it a priority in the Pennsylvania State Police?
13  A:  Well I don't know if you would call it a priority but certainly we
14    participate.
15  Q:  Who's the director of PEMA?
16  A:  I don't know.
17  Q:  What role does the police, obviously this is not a State Police
18    organization, right
19  A:  That's right.
20  Q:  What role does the Pennsylvania State Police play?
21  A:  We're one of the agencies within PEMA, and we have a desk there.
22    Certainly that's where we bring in the State Police resources into
23    that kind of an emergency situation, where there is direct contact
24    with the State Police and if we need to be able to certainly

15

1    designate some law enforcement services or acquire some
2    information, that kind of immediate resource would be there.
3  Q:  Is it a permanent kind of a position?
4  A:  No its not because I've seen other people come in.
5  Q:  I don't know much about it that why these questions. If I ask
6    questions sometimes that seem to be rather silly it's because I just
7    don't know. It was a very poor question, let me withdraw it. What I
8    should have said is its not so much an as permanent position,
9    Major. It's a position where somebody fills it fulltime for the State
10    Police or is it an additional position or something you do as an
11    additional duty?
12  A:  It's an additional duty. It's an alternate duty that people volunteer
13    for. And they participate representing the State Police within that
14    agency
15  Q:  My understanding is that Captain Ober was at some time or at one
16    time was involved with PEMA  and the State Police. That is from
17    my interviews and investigation into the case. Do you have any
18    knowledge of him being involved with PEMA or being a PEMA
19    representative for the State Police?
20  A:  From what Darrell told me yes.
21  Q:  Ok, what did he tell you?
22  A:  It was in February there whenever he was assigned to the Bureau
23    and he approached me to be able to determine if he could continue
24    his assignment to PEMA. My first reaction was I wanted him to be
25    able to focus on his position there at the Bureau rather than to be

16

1    able to be, you know, certainly than to be accepting responsibilities
2    somewhere. In any event, I says let me give that one some thought.
3    Let me look at it, evaluate it. So in any event he told me he was
4    involved in it. I forget if he said he was involved in it several years
5    from his previous position that he'd been associated as a
6    representative of the State Police over at PEMA.
7  Q:  So you thought about it. You considered it.
8  A:  Yes.
9  Q:  In the process of doing so did you find out that indeed he had been
10      assigned to PEMA?
11 A:  I found out he was assigned to PEMA, yes.
12 Q:  Did you talk to anyone about that?
13 A:  Yes.
14 Q:  Who did you talk with?
15 A:  I spoke with Major Washington who was at the time the Bureau
16      Director at the Bureau of Emergency and Special Operations for the
17      State Police. That's where the emergency operations officer from
18      the State Police is permanently assigned. I don't know if it was
19      Captain Davis at the time but that's who it is now. So I gave Major
20      Washington a call and I said how critical is Captain Ober's position
21      there with PEMA? And he says, you know, as far as Captain Ober
22      is concerned it's not critical for him but it's important that we have
23      somebody there. And I said if he were not available what would
24      you do? And he said we would just post for another Captain. So in
25      any event I says I wanted to really find out if this was going to be a

17

1    significant disadvantage to the State Police by removing Ober or
2    not providing the authorization for him to be able to be involved,
3    and he felt that it was not and he would just post for another
4    Captain. So based upon that we may have had conversation,
5    Captain Ober and I maybe a week, maybe two later and I told him
6    at that time I didn't want him to be able to be involved in that
7    maybe we would consider it maybe six months down the road we
8    would look at it again but at this particular time I really wanted him
9    to be able to focus in on adjusting to the new position as the Section
10   Commander of Liquor Control Enforcement.
11 Q:  How would PEMA interfere with his focusing or adjusting in?
12 A:  Well, ah, if you had any kind of critical event which would have
13      happened where he would have been required to perform his duties
14      over at the Bureau certainly he would have been able to be at two places at
15      the same time. And we would have lost certainly his contribution
16      there at the Bureau. And sometimes you have these events or at
17      least it's been my experience that these events have been prolonged
18      for days and days at a time. I mean regrettably you know that's how
19      it happens; it's not over in an hour or two because certainly it needs
20      to be able to be addressed. So generally, you know, that's the
21      perspective that I was looking at from being the director of the
22      Bureau of Liquor Control Enforcement.
23 Q:  Ok. Now if every director in the Pennsylvania State Police did what
24      you did there wouldn't be any PEMA? Pennsylvania State Police
25      would what, not participate in PEMA? Or do they have a choice?

18

1  A:  Well, I think we could find a Captain someplace to be able to
2      participate. There's no question. It just that I felt to myself with the
3      Bureau, because I felt this was extremely important and for him to
4      be able to get adjusted to the position. Maybe I would have
5      reevaluated six months down the road. There's no question. Maybe
6      we would have looked at it differently. The other factor I needed to
7      look at, but I looked at it specifically from the operational point of
8      view. That's what my decision was based on. The Bureau of Liquor
9      Control Enforcement operates from funds from the Pennsylvania
10     Liquor Control Board and all of those funds and of course and what
11     they support is supposed to be directed to be able to investigate
12     violations of the Liquor Code in the Commonwealth of
13     Pennsylvania. We generally don't have people from the Bureau that
14     are assigned other places because this has got to be dedicated to the
15     process of being able to investigate the Liquor Code. But my
16     primary purpose was strictly from operational reasons.
17 Q:  And did, it was Major Washington at the time?
18 A:  Yes.
19 Q:  Did Major Washington tell you the position would be open six
20     months from the time you were denying Darrell the opportunity to
21     serve?
22 A:  We didn't discuss that.
23 Q:  You didn't discuss that at all. Now did you ask him how Darrell
24     performed in that position?
25 A:  No. No I didn't.

19

1  Q:  You didn't ask him about it?
2  A:  No.
3  Q:  Did he offer?
4  A:  No.
5  Q:  How long was this conversation?
6  A:  Probably around two minutes. Three minutes.
7  Q:  Did you, were you aware that Darrell Ober had held that position
8      before?
9  A:  Yes.
10 Q:  And did you know at that time how long he had held it?
11 A:  No I didn't.
12 Q:  Did you learn how he had lost the position?
13 A:  No I didn't. What you mean lost? I'm assuming he'd lost this
14      position, at the time we had this conversation he was assigned to
15      the Bureau of Liquor Control Enforcement. Is that what you're
16      referring to? So in that respect I know how he lost it.
17 Q:  How did he lose it according to your understanding?
18 A:  Because I denied him the authority to participate.
19 Q:  See my question is as a Bureau Director you had the power,
20      authority to be able to say he couldn't fill that position?
21 A:  Yes, I did.
22 Q:  And then see I asked you a question remember if every Bureau
23      Director did that how would the Pennsylvania State Police come up
24      with anybody fro PEMA?

20

1  A:  Well I considered this position from my perspective as the Director

2        of the Bureau of Liquor Control Enforcement to be to be a

3        very important position for him to be able to become familiar with

4        the operational aspects of that.

5  Q:  Now you've told us that and many times very clearly. But my

6        question is if you're telling me in the Pennsylvania State Police

7        that every Bureau Director has the authority to say no if they have a

8        person that wants to hold a position like that. And my simple

9        question is, I mean you're a Major, a very high level in the State

10       Police. A Major, how does the Pennsylvania State Police fill that

11       position? I mean your response was "Ah they could go find a

12       Captain somewhere." Right?

13  A:  Right.

14  Q:  Don't they need somebody capable or competent to do that or is it

15       just sort of a wasted thing?

16  A:  Well the person should be capable and competent to be able to

17       represent the State Police. Most certainly with the PEMA agency,

18       there's no question about it. But I don't think we were looking at

19       only one person being that competent and that capable to be able to

20       do that. I think there were other people in the department to be able

21       to do that.

22  Q:  One would assume in an organization that large you would have

23       one competent person to be able to do a job like that. Did you learn

24       at anytime how long Darrell had held the position?

25  A:  No I didn't. I don't know how long he held it.

21

---

1  Q:  Did you, did Mr. Williams, Major

2  A:  Washington.

3  Q:  Did Major Washington tell you he had lost the position because he

4       had been unlawfully transferred to Washington Pennsylvania?

5  A:  I didn't know he had lost the position.

6  Q:  Well you had indicated when I'd asked you about what had

7       occurred between you and Darrell Ober that you were going to look

8       into it. I'm just wondering the extent to which you did.

9  A:  I did. That's exactly what I did. I picked up the phone whether it

10       was that day or whether it was the next day when I had the time to

11       be able to do that. I called Major Washington and I wanted to know

12       how critical Captain Ober was to being able to perform these duties

13       as the representative of the State Police. And of course he indicated

14       to me that Captain Ober was not critical, himself as an individual

15       personally to be able to perform those duties. And that anybody

16       else would be able to be trained and to fill that position without too

17       much of a problem.

18  Q:  He told that anybody, a lot of people could do this. It isn't, there

19       isn't anything unique about Captain Ober in the Pennsylvania State

20       Police that we need him for this. Isn't anything personal, there's

21       nothing personal to him that we need Captain Ober for this

22       position? Right?

23  A:  Right.

24  Q:  Who was Captain Ober's immediate superior at the OCE?

25  A:  It would have been Captain McDonald.

22

---

1  Q:  Captain McDonald. And what level was that?

2  A:  He would have been the Division Director.

3  Q:  Division Director?

4  A:  Division Director, right.

5  Q:  Now how many divisions are there in the Bureau?

6  A:  There are two divisions in the Bureau of Liquor Control

7       Enforcement.

8  Q:  I don't know quite how to explain where I'm coming from. When I

9       was in the service I had an opportunity as a Lieutenant to be a

10       Headquarters Company Commander, ok. The battalion commander

11       put me in that position as a First Lieutenant. Now I had

12       Administratively, which means I would look after their

13       administrative needs Captains underneath me. They certainly did

14       not respond to me in terms off orders. You know what I mean?

15       They responded directly to the Battalion Commander who was a Lt.

16       Colonel. This is in the army. Now what I'm trying to understand

17       based upon what I just learned from you. You've got a Captain, is

18       this a case of a Captain giving orders to a Captain?

19  A:  Yes.

20  Q:  That seems, now it's one thing to say you're looking after

21       somebody's administrative needs because you're in a position that

22       requires you to perform just purely administrative duties I guess.

23       But this is a Command position. How does a Captain command a

24       Captain?

25  A:  Very easily.

23

---

1  Q:  Just tells him what to do?

2  A:  Just tells him what to do, exactly.

3  Q:  Thirty-four years in the Pennsylvania State Police?

4  A:  Yes.

5  Q:  Give me another example.

6  A:  I could probably relate it to myself, serving on some committees

7       where there were other Captains.

8  Q:  No, not committees, Major Chain of Command. Give me another

9       example of Chain of Command.

10  A:  You know I would have to be able to really think about that. there's

11       nothing that comes, I mean you're talking a typical field operation.

12  Q:  I'm talking about Chain of Command. I'm not. As I said to you

13       before, I got a Lt. Colonel he says Lieutenant Bailey you're going

14       to do this. I say, "yes sir" and I do it to the best of my ability. Now

15       I've got a senior Captain who is an S-1 let's say or an S-5.

16  A:  I don't know what that is.

17  Q:  Well that's a certain function. You know, Intelligence or

18       Operations or Property Book Officers different things. I didn't give

19       them orders on what to do but I was involved in a lot of

20       administrative tasks. In other words, they reported to the Battalion

21       Commander. Headquarters Company administrative tasks, it's a

22       dual thing. The Chain of Command comes from the Lt. Colonel

23       directly to those section captains so there's no violation of the

24       Chain of Command problem, let's say as a practical matter by

25       having a Lieutenant be the head of the Headquarters Company.

24

1  Now it's a great honor and privilege to serve in that position cause
2  it calls for a senior captain but here you're telling me this is a Chain
3  of Command thing. You've got a captain commanding a captain
4  and that's what got me a little bit, not confused but wondering if
5  that's unusual in the Pennsylvania State Police or how rare it is. I
6  assume it's rare.
7  A:  In a field operation I don't immediately recall you know where
8  there would be that situation. The only thing I can recall in a filed
9  operation of course is where there would be acting. In my absence I
10  would assign a captain acting and of course he would be
11  temporarily in charge of two other captains.
12  Q:  I can understand that certainly.
13  A:  But no. I don't recall in my time.
14  Q:  Any other example.
15  A:  Right.
16  Q:  I had asked you some questions about court activity on Captain
17  Ober's part. Can you tell me if you at anytime, forget the rumors
18  now, the scuttlebutt stuff and I understand that you don't pay
19  attention to that. so you have a recollection of ever learning about
20  Captain Ober's court experiences with the Pennsylvania State
21  Police? More specifically Commonwealth Court and any actions
22  that may have taken place there.
23  A:  No. Just from reading, I want to clarify, just from reading that
24  article in the paper. And I don't remember exactly when that was,
25  whether it was post or pre Captain Ober coming over where that

25

1  suit, I think it was dismissed. I just briefly read the article and you
2  know, time is to valuable to waste in that area. If there is something
3  the department wants me to deal with they'll let me know. And
4  rumors as I say they certainly serve no purpose at all.
5  Q:  Yes sir. Major did you ever wonder why Captain Ober was put in
6  that position?
7  A:  No I didn't.
8  Q:  Did you consider it unusual at all? I understand you had a great
9  need.
10  A:  Exactly.
11  Q:  For somebody in that position and that was an immediate command
12  concern that you had. And that was a source of frustration to you
13  not having somebody in that position. You needed somebody to do
14  that job.
15  A:  That's correct.
16  Q:  But the Pennsylvania State Police has thousands of people in it,
17  better than four thousand I think.
18  A:  About 4200.
19  Q:  All right sir. Now remember when you had called PEMA and you
20  talked to Major Washington and you said you know we need Ober
21  to fill this position at PEMA and you reasoning being I need him
22  here to focus on this. Right?
23  A:  Right.
24  Q:  Are you testifying that the Pennsylvania State Police couldn't find a
25  lieutenant for the section? For the Central section?

26

1  A:  I never made that kind of a search for anybody else. Whenever I
2  was called and said that Captain Ober was going to come over, to
3  be quite frank with you I was elated. That's exactly what I told him.
4  Q:  Should be elated to get and officer of that quality, I would be too.
5  A:  With the experience that I had with him and certainly the respect I
6  had for him that he was going to come over. And from the time Lt.
7  Williams had left, like I said, every opportunity I had I made it a
8  point to mention to Colonel Westcott how important that position
9  was there. And the fact that was that three other
10  people were effected in there positions and that certainly we were
11  compensating, you know those other people also to be able to
12  perform in the higher pay scale. So as I say it was very important to
13  be able to fill that position. So when he called me to be able to
14  assign Captain Ober there certainly I was very satisfied with that.
15  Q:  And you never at any time suggested to Colonel...
16  A:  Colonel Westcott.
17  Q:  Colonel Westcott or anybody above you in the Chain of Command
18  that you needed a captain for that position?
19  A:  I said I needed the position filled.
20  Q:  You just needed somebody. Right. You didn't suggest it be a
21  captain, a sergeant, a lieutenant, a major, a colonel, a commissioner
22  or anything else. You just, I need somebody to do this job because I
23  got work to be done and I need things done.
24  A:  Right.

27

1  Q:  When, how did you first learn that Captain Ober was assigned to
2  you at the LCE?
3  A:  As I say it was in around February, I don't recall the exact date but
4  in any event I received a call from    Lt. Colonel Westcott. It was
5  in the morning I'd say it was someplace around 8 am or someplace
6  in and around that area and he said that Captain Ober would be
7  coming 0ver to be able to fill Lt. Williams position for the Central
8  Section commander. That's how I first learned about it.
9  Q:  And how long was that conversation?
10  A:  Probably around 45 seconds. Less than a minute I'd say.
11  Q:  Holy Cow.
12  A:  It was a matter of him pushing information to me and me certainly
13  me understanding the information.
14  Q:  Sure.
15  A:  And acting, in fact Captain Ober was there that morning. So I
16  assumed he came in to be able to report, which I found out later, he
17  didn't.
18  Q:  All right so that was he called you up and you're not the type of
19  fellow to beat around the bush and ok fine and you were pleased
20  that you had somebody.
21  A:  I was very pleased.
22  Q:  Why were you so happy or pleased? Did you know Captain Ober?
23  A:  Not that I've had that much experience with Captain Ober but
24  certainly we did get a chance to be able to work on a committee

28

1     about four years before where there were about fourteen or fifteen

2     of us.

3   Q:   Was that the museum committee?

4   A:   No. It wasn't the museum committee.

5   Q:   Or what was it?

6   A:   It was the Legislative Reference and Budget Committee. We were

7     reviewing the report and I felt he had done some excellent work

8     there. I was a captain at the time we worked together along with

9     twelve, fourteen other people. And like I said I thought that it was

10    an excellent contribution that was made be everybody and that's

11    when I first really directly worked with Captain Ober?

12   Q:   What was his rank then?

13   A:   He was a Captain.

14   Q:   And your rank was?

15   A:   I was a Captain.

16   Q:   You were a captain and that was before you took the LCE?

17   A:   Yes, I want to be able to think and tell you when that was. I'd have

18    to be able to stretch and don't hold me to it. But it think it was

19    around 1996.

20   Q:   Was Captain Ober the kind of Pennsylvania State Police member

21    that really put his heart and effort into working toward that

22    committee effort that you worked on there?

23   A:   Yes.

24   Q:   And had a good positive attitude about working with his colleagues

25    to get things done?

29

1   A:   I think he had.

2   Q:   In your view was he somebody you were proud to call a colleague?

3   A:   Oh absolutely.

4   Q:   And isn't it fair to say he treated you with the utmost respect as a

5    colleague?

6   A:   I think so.

7   Q:   And hasn't he always treated you with the utmost respect?

8   A:   Absolutely.

9

10    **END OF SIDE ONE - TAPE ONE**

11

12   Q:   Major you did learn at some point that Captain Ober had been sent

13    out to Washington, Pennsylvania. I'm from western Pennsylvania.

14    You're from the hard coal and I'm from the soft coal. And we call

15    it little Washington out there. We don't mean Washington, DC or

16    anything   thing like that but you would know of course because

17    you know the whole state. Did you know why Captain Ober was

18    sent out to Little Washington? Why he was sent out there?

19   A:   No I didn't.

20   Q:   Did you ever have any conversations with anybody either at your

21    level of rank or above you in the Pennsylvania State Police about

22    Captain Ober and any of his personnel experiences or assignments?

23   A:   You know what? I probably did I just don't recall having those kind

24    of. I know probably at the time we worked together in 1996 I

25    probably asked around, you know, who was he? You know, where

30

1    does he come from? I think he was in R&D at the time, you know. I

2    know we shared some stories together. But no I don't make it a

3    point to be able to listen to rumors like I said, really don't.

4   Q:   Right. Well, I know you don't listen to them. But now and then

5    they have a way of imposing themselves on us because we are at

6    the wrong place at the wrong time. Do you remember any rumors

7    about Captain Ober?

8   A:   No.

9   Q:   As someone who, you're his commander at this time are you not?

10   A:   We don't. We're not working directly in the same Chain of

11    Command.

12   Q:   I'm sorry I keep forgetting that you left there. During the time that

13    you were his Commander, his, you were in charge, you were in his

14    direct Chain of Command. Now you're not in his direct Chain of

15    Command now.

16   A:   That's correct.

17   Q:   And forgive me I keep forgetting that you made the change to the

18    area from the Bureau. Anyway during the time that he, let me just

19    use a common phraseology, he worked for you. During the time he

20    worked for you and you were his, you know. Did he perform his

21    duties satisfactorily to you, for you and perform them well to the

22    best of your knowledge?

23   A:   At the time that we directly worked together?

24   Q:   Yes.

25   A:   Yes absolutely.

31

1   Q:   At this time let's suspend and Darrell and I step outside. This is a

2    process I do. I think we're pretty much near the end of this. I need

3    to review a couple of things with him and your attorney may have

4    some questions for you.

5   MR. MARCECA: The time is 1:53 P.M. and we're going to stop the film

6    while the attorney confers.

7   BREAK.

8   MR. BAILEY: Ladies and Gentlemen please be advised that there is a

9    recorder running. We're, at this point, I'm sorry, let me conclude

10    here just for a second on that, please. Major Koselnak I'd like to

11    thank you very much for coming here today and answering

12    questions. At this time I don't have any further questions for you. It

13    would be up to your attorney and I understand, Joanne do you?

14   MS. REYNOLDS: I have no questions.

15   MR. BAILEY: Thank you sir very much. Your deposition is ended. You

16    have to wait here until he shuts down this infernal machine.

17   MR. MARCECA: Ok, it's now 2 P.M. 10/23/01 and this deposition is

18    now concluded. Thank you.

19

20

21

22

23

32

IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER     :    CIVIL ACTION LAW

    Plaintiff    :

    vs.,    :    1: CV-01-0084

    :    (JUDGE CALDWELL)

PAUL EVANKO, MARK    :    JURY TRIAL DEMANDED
CAMPBELL, THOMAS COURY,    :
JOSEPH WESTCOTT,    :
HAWTHORNE CONLEY,    :
JOANNA REYNOLDS and    :
SYNDI GUIDO    :

    Defendants

| | |
|---|---|
| Proceedings: | Video Deposition |
| | Walter J. Margeson |
| Date: | October 23, 2001 |

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Donald Bailey, Esquire |
| | 4311 North 6th Street |
| | Harrisburg, PA 17110 |
| For the Defendants: | Syndi Guido, Esquire |
| | 333 market Street |
| | Harrisburg, PA 17101 |

---

1  MR. BAILEY:  At this time the microphones are live.

2  MR. MARCECA: Tony, whenever you begin we'll go through this

3    process.  And I'll get her done here.

4  MR. MARCECA: We are live and Good Morning my name is

5    Anthony Marceca.  My address is 2219 Dixie Drive, York,

6    Pennsylvania.  I'm employed by PR Video who has been contracted

7    to conduct the deposition on behalf of the plaintiff.  This matter is

8    docketed at 1:CV-01-0084 in the United States District Court for

9    the Middle District of Pennsylvania.  The caption is Darrell G. Ober

10    versus Paul Evanko et al.  If you'd please stand I'd like to swear

11    you in please.

12  MR. BAILEY: Get back so you know who's on the camera.  You can

13    just sit down there.

14  MR. MARGESON: Are you sure?

15  MR. BAILEY:  Yes, I want to keep the thing on you.

16  MR. MARCECA: State your name please.

17  MR. MARGESON: Walter J. Margeson.

18  MR. MARCECA: Do you swear to tell the truth, the whole truth and

19    nothing but the truth so help you, God.

20  MR. MARGESON: Yes sir.

21  MR. MARCECA:  We are now live and it is 10:02 am.

22  MR. BAILEY: Ok, get a sound check.  My name is Don Bailey.  I'm

23    representing the client.  I represent the plaintiff in his matter.

24    Trooper, I think we already have a sound check on you.  Joanna

25    could we get you.

---

1  MS. REYNOLDS: My name is Joanna Reynolds and I represent the

2    defendants in this matter.

3  MR. BAILEY:  We're ready to go, just a conple of preparatory

4    things.  Again I want to advise everybody while we're on the record

5    there are microphones in the room.  They are being used to pick up

6    sounds, etc. if at any time there's a desire for counsel for the

7    witness or the defense counsel or the witness to confer, and I

8    understand for the purposes of this deposition that Ms. Reynolds is

9    representing you sir, my advise would be to make sure before you

10    say something back and forth that you be sensitive to these

11    microphones.  That they can pick up sound, they're quite sensitive

12    and we don't want to interfere with any of your rights or invade any

13    privileges.  I would assume that the usual stipulations that

14    objections except as to the form of the question be reserved until

15    the time of the trial would be acceptable.  Is that all right, Joanna?

16  MS. REYNOLDS: Yes.

17  MR. BAILEY:  Just a few preparatory remarks here.  A little bit of

18    advice before we begin here, Mr. Margeson.  My technique in

19    doing a deposition is I want a witness to feel comfortable.  I do

20    everything in my power not to be confrontational or difficult.  The

21    other thing that I do that is different from most attorneys, at least in

22    my experience, is that I want to encourage you if you have any

23    question about a question that I ask, or you have a question about

24    where I'm going with a group of questions, I

---

1    want you to feel free to ask me.  I do not mind for you or your

2    attorney, I don't mind sharing where I'm going or what I'm about in

3    trying to get a response from you.  I learned a long time ago that tricky

4    TV stuff doesn't work and it doesn't produce a positive desirable result.

5    In that regard if I interrupt you before you finish a question or something

6    else interrupts you, even something in your train of thought and you do

7    not have an opportunity or don't enjoy an opportunity to complete a

8    question, please make sure you either stop me, or correct me or come

16    back to it and get a full and complete answer.  Your oath requires

10    naturally and accurate and an honest answer.  It also requires a full

11    answer.  In generally, if you need to guesstimate or guess something it's

12    all right to condition a response but you should not speculate wildly.  And

13    hypothesizing is ok but again it should be confined to the relevance of the

14    question and it should be limited in scope, and you should say, 'My best

15    recollection' for example is fine.  And lastly, if I ask a question, and some

16    of the questions that I ask is because I haven't walked in your shoes, may

17    seem foolish or may not even seem relevant, do your best to respond and

18    answer them.  Make sure you keep your voice up and make sure you

19    answer verbally.  Ok?  All that gobblety-gook out of the way, do you have

20    any questions for me before we begin?

21  MR. MARGESON: No.

22  MR. BAILEY: First of all, I'd like to welcome you here and thank you

23    very much for coming to respond to questions.  Do you have, Sergeant,

24    you like me to refer to you as sergeant?

25  A: Yeah that's ok.

1   Q:Sergeant Margeson just tell us very briefly where you are employed, for

2     whom and what you do. Just a little bit of background.

3   A:Currently I am the Systems and Procedures Section Supervisor in the

4     Bureau of Research and Development. Basically, what that means is that

5     the department's policies, procedures, regulations, directives come

6     through us on their way to the front office for approval, and we prepare

7     them for dissemination to the field. I mean that's not entirely what we do.

8     I mean we manage the department's accreditation, we have an

9     accreditation program, and we work with them, forms and records

10     management. All those things that deal primarily with the department's

11     regulations and directives.

12   Q:Ok, now I'm going to have some questions for you a little later on about, I

13     put a little quote down here from you about "systems and procedures" and

14     we're going to talk about that. You're a Sergeant, how many years have

15     you been with the Pennsylvania State Police?

16   A:Fifteen years.

17   Q:How many years have you spent in working in this area having to do with

18     regulations, disseminating regulations and the procedures that have to do

19     with adopting and developing regulations?

20   A:I was assigned there, initially as a project person, in June of 1991 and I

21     have been there as the section supervisor since March of 1993.

22   Q:All right now, let me try to get into a few more specific questions having

23     to do with this lawsuit. In that regard, have you read, had the opportunity

24     to read the complaint in this matter?

25   A:No.

5

1   Q:Have you aside from, actually it doesn't make any difference to you as a

2     witness, have you discussed this complaint or this litigation with anyone?

3   A:The fact that it exists and just superficially, not with any specificity but...

4   Q:That's good enough. So you haven't discussed with anyone any specifics,

5     any specific fact or detail or focused on any particular aspect of this

6     litigation. Is that fair to say?

7   A:Yes, like I said, I've had like a couple different people in chief counsel's

8     office and with Darrell, just conversations about what was going on.

9   Q:With Darrell did he have an opportunity to review a file or something, right?

10     Is that correct?

11   A:I don't know.

12   Q:Did he review a regulation in an AR file, having to do with organization

13     or AR I.

14   A:I don't know that. Not while I was on. He didn't get it from me if he did.

15   Q:Ok. Did anyone see that file?

16   A:There's been lots of people see that file lately. It has been pulled by our

17     clerical staff in response to requests from your office to the office of chief

18     counsel for specific information.

19   Q:Has it been, where is the file kept?

20   A:Currently, I have it secured in my office.

21   Q:  I'm an old army guy and also an old auditor general. Where are the,

22     are the files, do they ever leave your office for any reason?

23   A:  Not normally. Normally the historical files and that's what this is, this

24     is an historical file for a regulation that was promulgated out of the

25     Bureau of Research and Development. Normally those files are kept in a

6

1   specific area in our division area. It's a series of filing cabinets and

2   historical information for everything we publish is maintained there by

3   subject matter. This particular file, because of what's going on to insure

4   the security and integrity of the file has been secured in my office for

5   several months.

6   Q:Ok. Now let me ask you this, Sarge. The way your files are kept, are

7     there any security regulations regarding how they're kept? Now let me

8     tell you, let me give you a little offer and tell you where I'm going. What

9     I want to find out is how somebody comes in to access a file, whether

10     somebody can take portions of it out, whether they have to sign it out.

11     You're familiar with concepts like Evidence Rooms; everybody knows

12     what a library does. A library has accountable records that list and

13     provide access to files or books, or publications and you can sign them out

14     and leave. I'm looking for your procedures and whether there are

15     documents that can tell us when and what. What people look at and when

16     they do it, and identify them as to who looked at it.

17   A:The department has a regulation that talks about when you take a file out,

18     generally, anywhere, whether it's an investigative file or any kind of file

19     there's a charge out card that's supposed to be filled out.

20   Q:That's what I'm looking for. Tell me about that.

21   A:Well, that's normally if you're going to take a file from it's location and

22     keep it for any period of time, that's normally the procedure. The

23     historical files, we use that, if in fact that is the case but that is not

24     generally the case with historical files. Normally, what they're reviewed

25     either by myself, the clerical staff or people who are working with the file

7

1   right in that location. They're not removed to any office. They're not

2   kept out for an extended period of time.

3   Q:Can we talk about that for a moment?

4   A:Sure.

5   Q:What you're telling me is that someone can come down to the file room

6     where these files are kept and as in a typical library they can deshelve,

7     they can take a file or a part of a file and sit down at a table and they can

8     look at it. Is that correct?

9   A:If you knew where the file was. Normally the procedure is you ask either

10     me or one of the clerical people. They'll pull the file for you, and you're

11     correct, that you're free then to look through the file. And those are pretty

12     common requests. People from all over various organizational segments

13     who are looking for historical background on why we're doing something

14     a certain way. Why something is changed.

15   Q:Would it have to do with litigation? Could it even have something to do

16     with somebody modifying or changing or speaking to an issue in a file?

17     Right?

18   A:That's exactly right. And there's nothing secretive about the historical

19     files. They merely provide a foundation for why we're doing the things

20     we're doing. And they're open to pretty much anyone who would come

21     in would be able to review a file.

22   Q:For example, Don Bailey would be welcome over there to look at files

23     anytime.

24   A:Well,

8

1  Q:Let me ask you a question. As part of the historic file is there some kind
2  of document that goes along with the historic file that indicates what's
3  done with the file, who looks at it when changes are made to it?
4  A:If I understand what you're asking is after the file is completed as a
5  historical file, is there then some reason to track who looks at it when? Is
6  that what you're asking?
7  Q:Let's go at it bit by bit then try to put it together. In the case of the
8  regulation that we're talking about here, which is AR 1-1, ok? AR 1-1, I
9  am personally familiar with, just based on cursory research that I have
10  done, AR 1-1 has an effective date, or had an effective date of sometime
11  on or about July of 1997. Am I correct?
12  A:The current AR 1-1?
13  Q:No sir. Prior to the latest revision it had an effective... All right what was
14  it?
15  A:I don't know.
16  Q:All right. But when a revision is made to a regulation it must undergo, in
17  order to conform to Pennsylvania State Police procedural regulations, it
18  must undergo a certain process, a review and approval process. is that
19  correct?
20  A:Yes sir.
21  Q:Now for example, let's say someone who is a Lieutenant, a lieutenant in
22  the Pennsylvania State Police goes down and wants to review a historic
23  file, maybe on their day off. Let's assume for the sake of argument
24  there's no reason other than they want to propose a change, a
25  recommendation to a regulation. I would assume they would have access,

9

1  be able to just go in and read and review that. or maybe they're doing it
2  for a course they're taking in school somewhere. That kind of thing.
3  They would be allowed, right?
4  A:Right. I mean there are exceptions to that.
5  Q:Ok, but they certainly would not be allowed to place proposed changes or
6  to authorize changes to that regulation without going through a review
7  and approval process of some type? Is that correct?
8  A:Normally, and again just to follow your line of thought here, at least what
9  I perceive to be your line of thought, is if I were to review a historical and
10  based on my review of that I perceive a need to change a procedure or
11  policy then there's a procedure in place for that to occur, based on my
12  review of that file. However my review of that file is separate from the
13  actual promulgation of that regulation.
14  Q:All right. Let's use your term. Let's use the term promulgation. Now, how
15  to you define promulgation? I define it as what you go through to change,
16  or create or modify an existing regulation. That's promulgation. That's
17  making a regulation or making a change. Right?
18  A:Right. That's the entire process.
19  Q:All right sir. How, can you please give us an outline of that process?
20  A:Well, it can take on several different forms. A regulation can be revised or
21  proposed to be revised. And we need to understand too that not every
22  proposed revision is approved. You know, we use the suggestion program
23  to address policy issues. We use what we call Regulation Revision
24  Requests, which are forms filled out be personnel in the field who are
25  actually using the regulations who say, I think there is a conflict between

10

1  Q:Let's say that proposed change comes to you from a trooper in the field. Is
2  it your duty and responsibility to disseminate that proposal to a certain
3  group of people, decision-makers?
4  A:Depending on what the change is.
5  Q:Well, let's take AR 1-1. Now if I want to add, my understanding is that
6  sometime in February there's a subsection C added to this.
7  A:Correct.
8  Q:Of 2001, February 22-23, I think is when the final authorization was.
9  Let's say I want to make that recommendation. For the sake of these
10  questions you can assume that I have a shallow, not anything that can
11  match your own shallow knowledge of the history of that regulation.
12  Ok? And also that, I think, I have some views certainly on the role of
13  Chain of Command and I've interfaced with a whole lot of laws including
14  Constitutional Issues which I find fascinating. But as far as this particular
15  proposal is concerned, isn't it correct that subsection C would be
16  submitted for some type of legal analysis somewhere is that correct?
17  Within the Pennsylvania State Police?
18  A:Not necessarily.
19  Q:Not necessarily. Ok. But if it were, Sergeant, if it were, would that be
20  reflected in documents in the historic file? And you're going to tell me not
21  necessarily.
22  A:I'm going to tell you it's supposed to be.
23  Q:Supposed to be. By what regulation, custom, practices are you using? Can
24  you tell me?
25  A:That's an internal policy in the division.

12

1  this and this, would you please take a look at it. We'll review it and if
2  there is then we initiate the necessary changes or we contact the content
3  owner for them to address those issues. A change can be made by a
4  content or process owner if, let's just for example say, there's a change in
5  the procedures for the laboratory for the acceptance of evidence. They
6  would initiate that change in the form of a proposed regulation to say
7  0177, they would send that through their Chain of Command to R&D and
8  our job then is to review that for conflict, clarity, content, those kinds of
9  things.
10  Q:Hold it right there. Somebody makes a proposal for a change and the job
11  that you have is not only to see that procedural safeguards are followed
12  but also one of your jobs would be to provide support services in the form
13  of researching and advising. Not that you change anything, not that you
14  assume the responsibility to do that but advising on the wisdom, maybe
15  this proposed changed to subsection B would have the effect of maybe
16  interfacing with or conflicting with subsection C of section D. Something
17  of that sort. Right? And it's sort of like a legislative or drafting bureau
18  function. That's what your job is to do. Right?
19  A:Right.
20  Q:Do you ever get a legal opinion?
21  A:Certainly.
22  Q:Where do you go for the legal opinion on that revision of that proposed
23  change?
24  A:All of our legal opinions come from the Chief Counsel's office.

11

1  Q: Is it written down somewhere?
2  A: Well, it's written down in the form of a, I don't want to call it a handbook
3     because it's only a couple pages long. But it's a procedural outline for...
4  Q: I want to make a note of that. What's it called sir?
5  A: It's not called anything.
6  Q: It's not called anything.
7  A: Yeah, when new people come in, project people, who are going to be
8     working on these regulations, I give them something that I've prepared
9     that just says these are the things you need to check, these are the things
10    that you need to do.
11 Q: Did you prepare it?
12 A: Yes, I did.
13 Q: Thank you sir. I would like to get a copy of that. If Joanne could make a
14    note and we'll be doing a document request. I'd like to look at that.
15 MS. REYNOLDS:  You're going to put that in a document request?
16 MR. BAILEY: Yes, I will.
17 A: And further that is followed up with a, we meet with the project staff on a
18    fairly regular basis, I do. Parts of those meetings are to insure that they're
19    doing, they're capturing the information they need to caption on, and we
20    have what we call project-tracking sheets. It's supposed to be a step by
21    step history of everything that is done with that project whether it's a
22    telephone call or a note, a meeting, correspondence that's received,
23    information that's received relative to that project, e-mails that are
24    transmitted, those are all supposed to be captured. And just like
25    everything else in life including the department, some are more

13

1  conscientious than others at actually capturing those kinds of things that
2  are perceived at the time to be unimportant.
3  Q: Sarge, we need you in Washington. Let me ask you something. The short
4     of it is folks don't always keep or contribute to those records or that
5     tracking history. Right?
6  A: That's correct.
7  Q: That's the truth. But, there is an established policy and requirement that if
8     you're going to remove files from the file room down there you've got to
9     sign them out.
10 A: That's correct.
11 Q: And that's done physically.
12 A: Right.
13 Q: And that's something that is, I would assume, enforced to the best of your
14    ability down there.
15 A: Yes.
16 Q: And that means that even if the Commissioner gets a file, assuming
17    somebody picks it up for him of course, it's going to be signed out or
18    identified as to who picked it up and where it goes? Right?
19 A: Normally anyone like the Commissioner or Command Staff would
20    approach the clerical staff. They would pull the file and they would
21    prepare the card for that. You know, you're not going to ask the
22    Commissioner to "Oh you have to fill out." The Commissioner owns all
23    the records of the State Police.
24 Q: No, no I understand that response.
25 A: Well from my standpoint.

14

1  Q: I understand he's the boss.
2  A: Right, so if he comes to take a record I'm not going to make him sign for
3     it but someone is going to prepare a card that says this was picked up by
4     the Commissioner on this date and put that in there.
5  Q: Ok, and that's a process that's respected. It is an understood procedure by
6     all that work there. And you know if somebody failed to do it but was
7     seen taking a record or a file out, as you said, somebody just came down
8     and you bumped into some problem where somebody picked it up and
9     failed to do it. Efforts are made to keep that file intact in terms of where it
10    is and who has it. Right?
11 A: Right.
12 Q: Are you allowed to come down there and add something to the file
13    without going through you?
14 A: No. Well, actually a historical file you couldn't add anything to unless it
15    were something that you can identify as missing from the file, that should
16    be there. But to come in later and add things to the historical file is not a
17    normal practice.
18 Q: And how do you keep the records of what is in a historic file. Is it hard
19    copy or do you have a computer?
20 A: They're hard copy.
21 Q: And you have no computer track, no computer software that is used to
22    inventory or identify what is in it, like a docket in a court?
23 A: We have a project tracking system that assigns a project number to every
24    assignment. Whether it's AR1-1, or a special order, or a memorandum.
25    They're assigned a number and there are certain basic things, and from

15

1  certain basic information about each project that's maintained, who it's
2  assigned to, who it came from, what type of change it is, you know, the
3  date it's submitted for signature, the date it's signed, the index coding or
4  the number that's assigned to identify that regulation. So those kinds of
5  basic things are kept electronically and just recently the project tracking
6  summaries, those sheets that used to be filled out by hand became part of
7  the project tracking system so that rather now, rather than having a sheet
8  of paper you're supposed to fill out, you're supposed to enter those onto
9  the electronic version of the sheet. And then the historical file would
10 contain a printed copy of that sheet which is the summary when the
11 historical file is submitted.
12 Q: Put a note down there to request a project docketing form. Now, does the
13    person who reviews the file, are they supposed to be identified on the
14    project docketing form?
15 A: Not normally. That's a procedure that occurs while the project is still
16    active. For historical purposes if someone comes in and simply looks
17    through a file there's probably no record of that. If we receive a request
18    for information from a historical file or to research or view several
19    historical files in relation to, say, an action against the department that
20    deals with pursuits, we may receive a request that asks for historical
21    information on everything that deals with pursuits as department policy
22    between a span of dates. And those are tracked as a separate project, a
23    research project. But to say that someone who comes in to look at an
24    historical file to say that that information is recorded. We don't do that.

16

1  Q: Ok, now back to promulgation again. Now if somebody is going to review
2  that file, take part of it out, or make a suggested change that may be
3  reflected but might not be.
4  A: It's probably not. And it may be, you know, depending on the situation.
5  Let's say a Captain for the Bureau of Patrol comes in and wants to FR 610
6  historical file for the most recent change. They may request copies of the
7  information that's contained in there because they are going to submit
8  changes. And they need that information. I was going to say then we
9  would provide them with copies. Depending on the nature and the extent
10  of that interaction there may or may not be a separate research number
11  taken.
12  Q: Let me ask, I want to switch gears here just a little and ask you how the
13  file is organized. Well you have a historic file right? Ok. Now I want to
14  review that historic file. Is it a spaghetti, a plate of spaghetti mess or if I
15  look at the latest effective date is a copy going to be there? Are the history
16  of when other changes were made, are they kept in some kind of time
17  order?
18  A: Each change, let's say since we're talking about AR 1-1 I'll just use that.
19  Every change in AR 1-1 is maintained together but they're filed
20  separately numerically. And within each separate file is the historical for
21  that particular change. Now when you talk about a plate of spaghetti,
22  historical files are supposed to follow a logical sequence so that when I
23  open a file I can look and follow it from back to front.
24  Q: You're supposed to follow a calendar sequence, right?

17

1  A: Well. A calendar sequence or an event sequence. I can follow the history
2  of that project from when it's submitted initially and actually in this case
3  or in the case of regulations, there's a copy of the regulation that's
4  changed. Like, if it's AR 1-1, the original AR 1-1 that's being replaced is
5  the first thing that should in there followed by the proposed changes all
6  the way up through the master copy that's signed by the Commissioner.
7  Q: Are you familiar with how court records are kept? A complaint, an
8  amended complaint?
9  A: No.
10  Q: Ok, now based on my opportunities, I've had different opportunities at
11  different times to see the format, by that I mean the layout of a regulation
12  that are kept in your files. On the upper right hand corner, on the face of a
13  regulation is the effective date. Is that correct?
14  A: Yes.
15  Q: Stares right out at you and it's done in a date/time group. If I remember
16  correctly, I think it's month/day/ year. It may be day/month/year. Ok,
17  how's it go?
18  A: It's month/ day/ year.
19  Q: My memory is serving me correctly. And I would put the type size; oh the
20  letters are at least an eighth of an inch, to me appear to be at least a
21  quarter of an inch in height.
22  A: It's Arial 12.5.
23  Q: Arial 12.5.
24  A: Arial 12 point font.

18

1  Q: Arial 12-point font. You need to change it to 14 for us older fellows but
2  have you ever known any, in your experience, any PSP regulation where
3  there has been a change, that has been affected, that didn't have the date,
4  which is obviously an extremely important part of the regulation so you
5  know what's applicable and what isn't in the upper right hand face corner
6  of the regulation?
7  A: No.
8  Q: Now, is that date/ time group on every page of the regulation? If you
9  know offhand.
10  A: Yes.
11  Q: It is, isn't it?
12  A: Yeah.
13  Q: If you go through that regulation every single page has that affective date
14  on the top. Can you tell me why?
15  A: Well, there may be different dates in a regulation depending on when
16  pages are changed because a regulation may or may not all be changed at
17  one time. And let's say you have a date that's dated today that's one page,
18  the only page in that regulation that reflects today's date would be that
19  page. Everything else would reflect what the current date of that
20  regulation is.
21  Q: And every single page has that date/time group and do you ever put any
22  information on there 'replace this', or that sort of thing that sort of
23  information. You know, for example, I get certain legal publications.
24  They revise them on a yearly basis for which they get paid pernicious
25  amounts of money in excess for what they do and the publishing

19

1  companies get that. So when those changes come through there's a little
2  parenthesis in there, a little indication that says replaces such and such,
3  and so and so. Do you have anything like that on your system?
4  A: I understand what you're talking about and we see them in changes to
5  like, the Rules of Current Procedure, those kinds of things. What we use is
6  a little different. It's not nearly as complex as that indicates on each
7  particular page several amounts of information. What we use is on a
8  Change Sheet. And the Change Sheet is the document that's signed by the
9  Commissioner that distributes and disseminates and actually authorizes
10  the change and it has an instructions portion that tell you, you know.
11  There are several things that it may or may not do. If there is a special
12  order, which is a temporary directive that needs to be rescinded as a result
13  of this change. It will tell you which changes to remove and which pages
14  to replace. So it will have those kinds of instructions. If there is something
15  that needs to be annotated in another regulation it would indicate that. So
16  there's, all the information is contained on what we call a Change Sheet,
17  which also has a date. And that's where the index code is reflected.
18  Q: Do you prepare the Change Sheet or does somebody else?
19  A: We prepare that. It may come in as part of the proposed change but that is
20  what we do, is prepare the Change Sheets.
21  Q: As to AR 1-1, as you sit here today do you have a recollection as to when
22  it was last changed or altered? I'm referring more particularly to 1-1.02
23  subsection C.
24  A: Well, I'm going to presume the Chain of Command section since I don't
25  know that.

20

1  Q: Well you presume correctly.
2  A: that I probably dated particular change through my project person who
3  was working on it with the most recent change, which I believe, was
4  March of 2001. So that's, I mean that's where that change came from and
5  that's how it was promulgated. It was added in response to inquiries I
6  received while we were working on the project.
7  Q: Well, I have a little bit of knowledge about that change and my best
8  recollection is Fall of 2000, September, October, that area in there, there
9  was some discussions about it. about changes, in that Chain of Command
10  thing you're talking about but then my understanding is that's been talked
11  about for years. I mean it raises very, I mean it's beyond the scope of this
12  deposition, raises some extremely serious questions about responsibilities
13  to report and act on behalf of troopers who are in the Chain of Command.
14  What their duties and responsibilities are particularly to conflicts between
15  law, regulation, moral feelings and the duties or responsibilities to report
16  to superiors. So it's to my knowledge it has quite a history of being
17  discussed and looking for wording and trying to strike a balance in there
18  somewhere. Now, let me ask you, since you promulgated the change, do
19  you remember prior to when the inquiries you received, and I'm going to
20  ask you about that in just a minute, when the last activity had been before
21  you received the last set of inquiries that resulted in the change itself.
22  Give a little history there.
23  A: Ok. The AR1-1 as it currently exists is a project that started in July of
24  1997 with a change of some duties in one of the Bureau Patrols Divisions.
25  The department between 1997 and when this actually went out underwent

21

1  numerous organizational changes, changes in geographical construction of
2  troops and areas. So there's a significant amount of information in the
3  AR1-1 that was revised. What we had done is, you know. We prepared a
4  change, and it seemed like every time we would get a change prepared
5  and ready to submit for signature there would be another change. Another
6  reorganization.
7  Q: Are you referring to organizational changes or are you referring to
8  subsection C?
9  A: No, I'm referring to organizational changes.
10  Q: I thought so. Go ahead.
11  A: So those were all completed and finally submitted. We had five different
12  project people work on that project because it took so long people were
13  transferring before we could get it completed. So it was submitted for
14  signature and it got as far as Colonel Hickes and was returned to us
15  indicating that it was not going to proceed until a resolution on a pilot
16  program in several of the troops as it related to troop headquarters
17  organizational structure.
18  Q: Which really does not pertain to subsection C.
19  A: Right. So as we were holding that we started to move closer and closer to
20  the department's accreditation, re-accreditation of the department by
21  KOLEA and we needed the revised AR1-1 in place prior to the
22  department's reassessment.
23  Q: Are you testifying trooper that you needed subsection C for accreditation?
24  You're not saying that, are you?
25  A: No.

22

1  Q: Because that is not correct is it?
2  A: No, the AR1-1 we needed. The organizational structure of the department
3  we had to have in place correctly.
4  Q: To meet that national accrediting standard but not subsection C.
5  A: No.
6  Q:    All right sir. Continue.
7  A: During the period of time when it was returned to us by Colonel Hickes
8  and it was resubmitted for signature with subsection C added I received a
9  call from Captain Reilly.
10  Q: Can you stop there for a moment? Resubmitted with signature?
11  A: For signature.
12  Q: Ok, what does that mean?
13  A: Well that's how they're promulgated. We prepare it and submit it for
14  signature. Submit it through the approval process for the signature of the
15  Commissioner or whatever appropriate authority is indicated.
16  Q: What is the authority?
17  A: Well, on that particular regulation it's the Commissioner.
18  Q: So when you say 'For Signature' when we're reading this deposition in
19  the future. 'For Signature' means the Commissioner's approval.
20  A: Correct in this particular case.
21  Q: With this particular regulation and particularly when you're talking about
22  something like a subsection C. I would think because it's Chain of
23  Command and he's the top of the heap.
24  A: No.
25  Q: Oh, he's not the top of the heap?

23

1  A: Ah, yeah, he's the top of the heap.
2  Q: Go ahead.
3  A: Ok, so I received a telephone call from Captain Reilly and the time period
4  is, you know, before, it was after it had been returned but before it was
5  resubmitted. And his inquiry was a research request for any department
6  regulations that we had that dealt with or specifically indicated that
7  members are supposed to adhere to the Chain of Command. And he
8  indicated that his request came from Major Washington in the Bureau of
9  Special Operations and that he was inquiring because of a situation there
10  and...
11  Q: What situation there?
12  A: I don't know.
13  Q: Mr. Washington did you say?
14  A: Major Leonard Washington.
15  Q: When?
16  A: I don't know.
17  Q: Would it be written down anywhere, when?
18  A: No.
19  Q: Reilly transmitted this information to you?
20  A: Yes. He, off the top of my head I don't know.
21  Q: All right. Thank you sir. Could you continue please?
22  A: So Captain Reilly called me. Asked me if I knew of anything. I couldn't
23  think of anything. I told him I'd research it and get back to him. And I
24  looked and couldn't find anything specifically dealing with Chain of
25  Command anywhere in the department's regulations. So I relayed that

24

1    information to Captain Reilly and we discussed promulgating what was
2    perceived or addressing what was perceived to be a policy void. Which is
3    part of what we do and that we had, you know, the obvious place for that
4    to be was AR1-1, and that we had a change pending for that. We could
5    incorporate that change into our existing work that we were doing.
6  Q:If I might just ask a couple of questions here. You said a "void in policy".
7  A:Right.
8  Q:How many years have we had of Pennsylvania State Police?
9  A:Since 1905.
10  Q:This is a Chain of Custody issue?
11  A:No.
12  Q:I'm sorry. This is a Chain of Command issue? Responsibility within the
13    Chain of Command?
14  A:Yes.
15  Q:It is fair to say there has been a policy void since, what year did you say?
16    19o what?
17  A:Five.
18  Q:1905. Now you researched this because you're the guy that does that. So
19    what you're telling us is that there was a perceived, this is between you
20    and Mr. Washington, a discussion.
21  A: No.
22  Q:Or you and Mr. Reilly. A perceived policy void since 1905. Right?
23  A:Right.
24  Q:Ok and this discussion would have taken place after, at least sometime
25    after October of year 2000. I am correct about that aren't I?

25

1  A:Probably. I don't know.
2  Q:Probably. Could you go back and check that for us and see if you can find
3    out when that conversation may have taken place? With Mr. Reilly?
4  A:I know it was between the time that it was sent back to us by Colonel
5    Hickes which was, the AR1-1 was submitted in the fall of 1999 and was
6    resubmitted then sometime in 2000 and it was eventually signed.
7  Q:So then it might have been prior to October of 2000. Might have been.
8  A:Yes. Could have been.
9  Q:We just don't know. But we do know there was a discussion, not putting
10    you down, but we do know there was a discussion between you and Mr.
11    Reilly and, at least as to the two of you, somebody, somebody suggested,
12    I will assume, unless you correct me as to what went on in that
13    conversation, that it came from Mr. Reilly, that there was a policy void
14    here that needed to be filled.
15  A:Well, I'm not going to attribute that to Captain Reilly. It could very well
16    have been that there was nothing in the regulations and we should
17    probably address that.
18  Q:So what happened next?
19  A:The next thing that happened is when we got ready to resubmit that for
20    signature as part of our accreditation, as a department we had to have that
21    done, I assured Corporal MacAravey, who was the new project person,
22    incorporated language before it went for resubmission for signature.
23  Q:OK. So that we're clear on this. There was a need, an understood need that
24    AR1-1 needed to be revised or changed to meet accreditation
25    requirements that are national type requirements and I think we're all

26

1    aware of the strong Pennsylvania State Police drive to be part of that
2    process and be accredited and all that but subsection C. AR1-1.02
3    subsection C was not a necessity for that accreditation need. And in fact
4    had it not been made a part of the revisions to AR1-1 it would not have
5    effected the accreditation process. Am I correct?
6  A:Most likely.
7  Q:All right, most likely. Why do you say most likely? Did you have any
8    information from the national folks that you need to have a Chain of
9    Command thing in there? Now, we're talking police forces all across the
10    country with duties on behalf of officers, who they report to and what they
11    say.
12  A:  I can't answer whether or not that specific language is used for a proof
13    of compliance within a particular accreditation standard.
14  Q:Tell us who sets the compliance standards? And are they audited by this
15    group?
16  A:The standards are set by the commission COLEA and we have an
17    accreditation manager who insures compliance.
18  Q:Who is that?
19  A:Jerry Jarsicrac.
20  Q:Now to go back you'd indicated I think it was Captain Marjevik, did you
21    say? Who was the Captain or some officer that actually penned…Jerry…
22  A:Pendarsancrat.
23  Q:No, no, not him. There's another individual, a Slavic name, you
24    mentioned it earlier.
25  A:Macaravey.

27

1  Q:Mr.Macaravey is the individual that actually penned the words?
2  A:Well I gave him the words and between us what is currently in place is a
3    collaborative effort of what I told him to put in the regulation.
4  Q:Where did you get the words?
5  A:From, they're my words.
6  Q:So you made them up.
7  A:Yes.
8  Q:This came after you had a discussion with Mr. Reilly?
9  A:Yes.
10  Q:So tell us about your thought processes and thoughts and what input you
11    put into those words.
12  A:After the conversation with Reilly and let me say, that you know, I have
13    conversation with command staff from various bureaus on a regular basis.
14    I meet monthly with the Bureau of Professional Responsibility and those
15    are the types of issues that are discussed and often between Captain
16    Skirlas, you know discussions with him, and his staff there are changes
17    or revisions that are promulgated as a result of those discussions. So based
18    on my conversations with Captain Reilly the perceived need for to address
19    the fact that we're a paramilitary organization that really does not tell
20    everybody, or anybody that they needed to, there were several regulations
21    that alluded to a Chain of Command, that alluded to those types of things.
22    But nothing that definitively said we have a Chain of Command and
23    you're required to use it.
24  Q:Do you know the language off hand of AR1-1.02?
25  A:No I don't.

28

1  Q: Well, what was the purpose that you and Mr. Reilly discussed, is not
2     needed, it's not required, at least at the time you had no knowledge that it
3     was required as part of the needs to revise AR1-1 for national
4     accreditation. What concepts did you two decide or talk about was
5     important to put into that subsection? And what were the reasons for that?
6  A: I don't know that Captain Reilly and I discussed anything other than
7     generically we need to have something in place that indicates that we have
8     a Chain of Command and people are required to use it. As far as the
9     specificity of the language there was no discussion with Captain Reilly on
10    what it should say. It isn't a situation where proposed language was
11    discussed. You know just generically this is what we need to accomplish
12    and...
13 Q:   What were you trying to accomplish? Let me ask you, I'm going to
14    change direction a little bit. Are you having discipline problems in the
15    Pennsylvania State Police?
16 A: Am I having problems? I can't answer that question.
17 Q: Do you know whether the Pennsylvania State police are having discipline
18    problems? Do you know whether Troopers in the Pennsylvania State
19    Police are having difficulties knowing who is in charge and who their
20    immediate supervisors are?
21 A:    I can't answer that.
22 Q:    Do you have any information have you heard any scuttlebutt or
23    rumors about Pennsylvania State Police Troopers not following orders or
24    not listening to their superior officers? Rebellion in the ranks? Mutiny?

29

1     Anything like that? I'm not trying to be facetious. I'm serious and I'm
2     looking for the reason for this thing.
3  A: No, other than the incident Major Washington was trying to address.
4  Q: And what was that?
5  A:    I don't know.
6  Q: You don't?
7  A: only that it was a Chain of Command issue and there was nothing there
8     that definitively spelled that our.
9  Q:   ok so Major Washington didn't tell you?
10 A: No.
11 Q: Oh, I'm sorry. Now you see why it's good to do these depositions this
12    way. I'm not being condescending. I made an assumption. Let me explore
13    my error. Major Washington did not identify what he had in mind when
14    he talked to you about this Chain of Command thing.
15 A: No, I never talked with Major Reilly about Chain of Command.
16 Q: Major Washington talked with Mr. Reilly.
17 A: Yes.
18 Q: So it's not Major Washington, it's Mr. Reilly never told you what the
19    issue was?
20 A: just basically. I mean not specifics as to...
21 Q: Tell me what he said.
22 A: Who was involved and what was involved.
23 Q: Tell me what he said.
24 A: That major Washington was trying to deal with an issue and that he was
25    looking for language that spelled out Chain of Command.

30

1  Q: Sarge can I just, to pin you down. I get into these things and I apologize
2     but I come on strong. Let me back down lower here my intensity gauge. I
3     apologize to you. If I understand, when Mr. Reilly spoke with you, he
4     made reference to Mr. Washington having an interest in this Chain of
5     Command issue. Bu he never identified what it was about or why. Just
6     that there was an interest in something. So t was generic. It was general.
7  A: Yes. And he also indicated that he had researched the training. They teach
8     Chain of Command to the Academy but they didn't have a regulation that
9     they base what they teach on.
10 In other words there was nothing in the regulation that said Chain of
11    Command. So they teach it but there wasn't anything to back that up.
12 Q: How do you teach that? Aren't Pennsylvania State Troopers taught that
13    they are to obey lawful orders?
14 A:  Yes.
15 Q:    From the Geneva Convention through our army, to our paramilitary
16    groups in the United States there's an obvious conflict between an
17    individual's moral feelings of what a lawful order is. Let me give you an
18    example. A US army platoon leader can't order one of his soldiers to
19    execute someone. That's pretty much common sense in our system, right?
20 A: I would hope that's the case.
21 Q: Ok, you get an A+. That's a right answer. Just a second. I have to change
22    a tape here so soon I so I may interrupt you at some point. If I do that's ok?
23 A: Sure.

31

1  Q: ok. But your troopers are taught and every Pennsylvania State Trooper
2     knows and understands that they're going to suffer a consequence of
3     insubordination if they don't follow a lawful order.
4  A: True.
5  Q: And there's no way that you can structure regulations that would cover
6     every hypothetical situation, every possible situation that could arise in a
7     career lifetime that a superior officer, that a superior officer may provide
8     and or order, right?
9  A: That's correct.
10 Q: I mean you can't do that.
11 A: So something that's taught in terms of custom or practice or common
12    sense, our country's entire legal, and social relationship between a
13    subordinate and a superior. Everybody knows if you get a lawful order, go
14    here, do that, do your job, get it done, follow the regulation, it's a
15    lawful order and if you don't do it you're going to suffer insubordination.
16 A: That's correct, however you're confusing a lawful order with Chain of
17    Command. There's nothing that says if you are my supervisor that I have
18    to go to you before I go to your supervisor. So that was the perceived
19    policy void.
20 Q: Ok. How do you know that?
21 A: What?
22 Q: What was the perceived policy void? Tell us about that again. What was
23    the perceived policy void?
24 A: The policy void was that there is that nothing that spelled out the Chain of
25    Command. The fact that it exists and people were required to follow it.

32

1  Q: But if I don't have a good reason for circumventing my Chain of
2     Command, I've got an insubordination problem anyway don't I?
3  A: Not before this regulation. No.
4  Q:     Oh but I got to wait till I talk to my superior now, my immediate
5     superior. And if I go to anybody else that's above me in me Chain of
6     Command, I run the risk of punishment, I'm going to ask you about
7     the punishment if I circumvent that now.
8  A: Well there are instances by regulation when you may circumvent the
9     Chain of Command. Sexual harassment issues, EEO issues, I mean there
10    are regulatory exceptions to the Chain of Command requirements.
11
12 END OF SIDE ONE – TAPE ONE
13
14 MR. BAILEY: Ok. And what are some other exceptions I mean.
15 A:     Off the top of my head I can't think of them, that's what pops in to my
16    head. Obviously if your superior officer sexually harasses you're not
17    required to have to go to that supervisor to make the complaint. You can
18    go to.
19 Q: If you read the opinion of some federal judges you might have to but
20    that's ok. Go ahead.
21 A: Right.
22 Q:     Well is time a factor?
23 A:     I'm not sure I understand.
24 Q: Well I mean if an officer is in a situation where they don't have access, I
25    assume in dealing with your, in doing this thing here, putting this chain of

33

1     command thing in here that there was some consideration given for time
2     and circumstance. I mean what are the allowances. Sexual harassment's
3     an obvious one. What about time, availability, that kind of thing?
4  A:     Well anytime you would have a situation where, let's say that I'm the
5     supervisor and I'm on vacation for two weeks. Obviously there's either
6     going to be a situation where somebody is taking my place or filling in for
7     me or someone is going to go to my supervisor just because that gap is
8     there. So it isn't intended to stifle the system to the point where if you're
9     immediate supervisor isn't there that nothing can proceed.
10 Q: Before we go further with any questions what was the effective date on
11    this subsection C by the way, just for the record?
12 A: Well it was I guess March, when the rest of the 1-1 came out. It was all
13    effective at the same time.
14 Q: And when did the Commissioner approve it? I am going to ask you about
15    your affidavit by the way.
16 A: Ok. Off the top of my head I don't recall. I'm going to say it's some time
17    in March of 2000.
18 Q:     Is it possible it was the third week in February, the third or fourth
19    week.
20 A: That's possible.
21 Q: Maybe like February 22?
22 A: I don't know. Off the top of my head I don't know. I know that from the
23    time, I just know what the regulation is dated and it's dated some time in
24    March I believe.

34

1  Q:     And matter of fact that little date/time group that you and I talked
2     about does in fact indicate March doesn't it?
3  A: As far as I remember yeah.
4  Q: But when the Commissioner signs it. I mean there's some significance
5     about when the Commissioner says this is the regulation. And he's the
6     ultimate authority when he's says it's the regulation. And you have no
7     there are no facts known to you which would indicate that the
8     Commissioner say before the fourth week, the third or fourth week in
9     February approved that change, correct?
10 A: No.
11 Q:     So, what was in effect before subsection C achieved its ignoble birth
12    was 1997. Right?
13 A: Right.
14 Q: Now let's look at this Chain of Command thing. You had indicated that
15    the effect of subsection C is that you need to have some kind of reason if
16    you go outside of your chain of command.
17 A: Yes.
18 Q: Ok. Now when Mr. Riley talked to you, when you and Mr. Riley talked
19    whatever what was said and I do realize you don't remember exactly what
20    was said but you do know that he indicated to you that there was an
21    interest expressed by Major Washington generally, not specifically as to
22    why there needed to be something of this sort. Right?
23 A: Right.

35

1  Q: Sir, sergeant can you tell me when you had this conversation with Mr.
2     Riley did anything come to your mind about the need for this was or why
3     this was necessary?
4  A: No, what struck me was that the fact that there was nothing there. I guess
5     I just always assumed that there was something there. I didn't realize that
6     specifically said that.
7  Q: See that's why I asked you the questions about history since 1905. The
8     Pennsylvania State Police one of the finest Police organizations in the
9     entire country. I don't think anybody questions that. It's out there, it's
10    doing a great job, enjoys a great public reputation and it dawns on you at
11    the end of the century basically, the very end. I mean 95 years later, hey,
12    that's not there. Now a lot of politicians, one law of office is talking about
13    bureaucrats making decisions and doing things when there's not a need.
14    And that's what I want to ask you about. I understand that there wasn't
15    any thing there. My question goes a step further. What's the need? I mean
16    do you trust. I'm not talking about you. Does the Pennsylvania State
17    police trust it's membership to understand and know that it should follow
18    reasonable protocols, reasonable responsibility, stay within it's Chain of
19    Command? I mean there has to be a political sanction or reaction if you
20    abuse your Chain of Command to the point where you're disloyal. Was
21    that what you were thinking of? Disloyalty?
22 A:     No, actually the mark of, and you talk about the Pennsylvania State
23    Police being a great organization. One of the things that make us great is
24    the ability to grow and to recognize our weaknesses and correct those.
25    And that's what this does and I think it's important to understand that

36

1  within the structure of the Pennsylvania State Police we're not all enlisted.
2  So we don't all have that same military rank structure. We have a lot of
3  civilians who don't necessarily agree or believe in or follow the Chain of
4  Command. And until this regulation was put in place there was nothing
5  that said outside of me knowing that someone who works for me is going
6  around me because I'm not going to give them the answer that they want
7  in any particular situation. So they used the fact that there's not really a
8  regulation that specifically says I have to go to my supervisor to ask about
9  this particular issue so I'm going to go to his supervisor because I get then
10  what I want. Well now that's not something that they can do. And outside
11  of me recognizing that and giving a lawful order to get back to what you
12  were saying earlier and saying you are not to do that if you have
13  something you need to discuss, you need to discuss it with me first. Well
14  then if they do it they've disobeyed a lawful order but they, outside of that
15  there's no, prior to this, there was no concrete requirement. And you can
16  talk about political ramifications, you can talk about anything else but the
17  reality is if somebody does it and you want to discipline them for it and
18  they take it to arbitration the chances are the arbitrator is going to say,
19  well what regulation did they violate? They violated the concept that
20  you're not supposed to do that. Well that's not a very concrete block for
21  and arbitrator to make a determination on.
22  Q:Now what are the sanctions if you violate this new subsection "C"?
23  A:I, that's within the disciplinary structure of the department. I don't have
24  anything to do with that. It depends. Discipline is administered by the

37

1  disciplinary officer and it's a case-by-case basis and it's based on the
2  individual and the infraction and so on.
3  Q:    I keep thinking about all these little due processes, protection of the
4  law things. It scares me to death. But I'm just sort of curious if somebody
5  violates the Chain of Command who is the initiating officer on
6  punishment. Is it the immediate supervisor? Could it be the
7  Commissioner? Does it have to be in that person's Chain of Command?
8  For example in the United States Army if some company grade person
9  violates a rule a battalion commander cannot drop out of the sky any more
10  and say punish that person. There's a system of justice and I'm wondering
11  if you know anything about how this thing is enforced, how it's followed?
12  A:Well the enforcement would be for any other department regulation that's
13  violated. And let's say I'm the one who violates it and I go directly to
14  Colonel Hickes with an issue and by pass my Lieutenant and my Major.
15  Well Colonel Hickes may be the one to initiate that change, or Major
16  Merryman or Lt. Thurston may be the one to initiate some action. And it
17  may be in form of a supervisor's notation that says that you know we have
18  a regulation. You really need to follow it. They may initiate a worksheet
19  on me and put me into the BPR process. Do an investigation, adjudicate it
20  and you get a written reprimand, oral reprimand.
21  Q:Well what kind of things do you have to take to your supervisor? So you
22  have to tell them that you're going to the bathroom. Can you seek
23  permission from somebody else to go to the bathroom? To use the
24  restroom in the next building. A report about what happened on the job
25  yesterday. I mean what things does subsection "C" let me know are going

38

1  to carry a punishment if I don't tell my supervisor first. And if I tell my
2  supervisor first, am I allowed to tell anybody else? Does it address those
3  issues? Remember?
4  A:I don't know the specific language.
5  Q:I'm not trying to be silly.
6  A:I understand what you're saying.
7  Q:You know you're putting a person in a position, where at incredible risk it
8  seems to me and I'm just wondering what the parameters are, I'm
9  wondering if you're the person, I'm trying to find out this policy need and
10  what it was to address. You told us that there wasn't anything there. For
11  all these years, a hundred years there wasn't anything there. And we know
12  that this thing has been talked about for years and years, and years some
13  type of language. You didn't know that?
14  A:No, my first conversation about Chain of Command, and the fact that
15  there wasn't anything, like my first realization that there wasn't anything
16  concrete was after my first conversation with Captain Riley. And if there
17  were discussions concerning those types issues previous to that I wasn't
18  involved in those.
19  Q:Do you know if the US Army has a Chain of Command?
20  A:    I spent six years in the US Army.
21  Q:What was your MOS?
22  A:I was a 71 Lima.
23  Q:Let me ask you do you have a recollection that's not MI is it?
24  A:I was in the military intelligence battalion in the 82nd Airborne Division.

39

1  Q:Well if you had been in the 2nd 325 you'd have been in the best regimental
2  history in the whole division. Now let me ask you, do you know if there is
3  any Chain of Command provision in the US Army that you remember?
4  A:Yeah.
5  Q:Ok. What's it say?
6  A:Oh I don't...
7  Q:I wondered if you borrowed from it that's why I was asking.
8  A:    As far as reviewing military doctrine or military regulations to use as
9  a basis to basically plagiarize this language, no.
10  Q:I wouldn't suggest that.
11  A:Maybe subconsciously.
12  Q:I don't think that's plagiarism. I just was wondering where you got your
13  language. You know if you came up with it on your own, if you used
14  some kind of model or where you might have gotten it that's all.
15  A:Well probably based on the model of a paramilitary organization versus a
16  military organization and having a military background and a basic
17  concept of what Chain of Command is.
18  Q:Well, I tell you I have read your language and since you wrote it I'm
19  going to go to the horses mouth and I'm going to ask you. Is there
20  anything in subsection "C" that says you can't tell somebody outside of
21  your Chain of Command something?
22  A:To be honest with you I don't even remember what subsection C says. I
23  don't think I've even looked at it since it's there.

40

1 Q:Was it your purpose in subsection C as the person that created the
2 language but your purpose, was it to control who somebody went and
3 talked to or reported to or what orders that they followed?
4 A:Well the orders part again is a separate issue.
5 Q:Yeah, what was your intent of the language?
6 A:The intent of the language was to insure that without cause or without
7 regulatory exception that people did not circumvent the Chain of
8 Command.
9 Q:Yeah but what does that mean, Sergeant? What does circumvent the
10 Chain of Command mean? Can you give us some examples of what
11 circumvention means? How do you, what's that mean? I'm a trooper out
12 there and I read this thing. What's it supposed to mean to me? I assume
13 we're going to teach it at the Academy and tell people what it means.
14 Have you put together a training guide on that thing yet?
15 A:That's not my job.
16 Q:Has your legal office done that?
17 A:I don't know.
18 Q:Well, what's it supposed to mean to me? What I'm allowed to do and
19 what I'm not allowed to do?
20 A:Again you have to fall back on; you have to use some common sense. Use
21 the example about going to the bathroom.
22 Q:I exaggerated to press the point.
23 A:Well, I understand but my point is it's intended o insure that people don't
24 violate the concept of Chain of Command to circumvent for their own
25 interest, or interests contrary to what... and again it will depend on where

41

---

1 you're stationed if, you know. If you're idea is, and you're assigned to
2 the field, to a patrol unit or you're assigned to work for me and I've told
3 you already, or I've said it's going to be limited as to who can be off on a
4 certain period of time. You don't go ahead of me or above
5 me to get approval to be off when I've already said it's going to be
6 limited. And then I hear secondhand that Corporal MacAravey is, well,
7 I've already approved him to be off.
8 Q:Let's take a real simple example, ok? A subordinate of yours, you're their
9 immediate supervisor, you tell them "No, you cannot take Friday off. I
10 need you here. I'm going to be shorthanded." That person goes to your
11 supervisor and says, "You know Sarge down there says I can't take Friday
12 off "and let's say they are friends. They are social friends and that
13 superior of yours countermands your order.
14 A:    Right.
15 Q:That would, I assume, this subsection "C" would create a right in you to
16 make a complaint?
17 A:No.
18 Q:Oh, it would not?
19 A:No, because they talked with me about that. If someone comes to me and
20 they disagree with what I tell them and they pursue it further then they
21 haven't really circumvented the Chain of Command. They disagree with
22 what the Chain of Command is telling them but they have, they've come
23 to me first and not gone around me first.
24 Q:    Ok. Second situation. I don't come to you. I want Friday off. I'm
25 in the office. We have a general meeting. During the general meeting you

42

---

1 say, "Look, I'm shorthanded. We have six people here. X, Y, and Z are
2 taking off. I can't lose anybody else so please, you know we've got to
3 have folks here." So I go above you after hearing you express those
4 sentiments. Let's say you didn't even put it in order form. It's not an
5 order; it's just like a request or something like that. But I go above you
6 because I know you're not going to ok it. And so I go to your immediate
7 boss and get myself a leave approved. Is that a violation of subsection "C"
8 as you remember it?
9 A:Potentially.
10 Q:Potentially. You have a right to complain about what that subordinate did
11 right?
12 A:    Sure.
13 Q:Do you have any of these revisions at all to AR1-1, which place
14 responsibility on a superior to reprimand or to direct the subordinate
15 because you see that's how the army works, ok?
16 A:Um-hmm. .
17 Q:To go back to their immediate supervisor or immediate superior and either
18 get permission or to go through the Chain of Command.
19 A:Are you asking me if that language is included in what we wrote?
20 Q:Sure. Well, subsection "C" as I recollect places the "illness" on the
21 individual that goes around the Chain of Command up but it doesn't have
22 any repercussions at all for the individuals on the top that breaks the rule.
23 A:That may be another void we need to address.
24 Q:There are all these voids. I hope we get them all addressed. Might be but
25 subsection "C" doesn't address that does it?

43

---

1 A:I don't recall whether it does or not.
2 Q:Ok, we'll have to look real close at that language and see. Who did you
3 consult with besides Mr. Riley if anybody about the language?
4 A:Just this project person, Corporal MacAravey.
5 Q:Mr. MacAravey. What went with you and Mr. MacAravey on the
6 change?
7 A:We discussed the ah, first of all I told him about the conversation with
8 Captain Riley and laid out the basic history and what we wanted to
9 accomplish. We needed to include something that addressed Chain of
10 Command. AR1-1 was the obvious place to do it. I told him to look
11 through the 1-1, find a place that he thought it would best fit and this is
12 basically what I want it to say ad to craft language that addressed that and
13 after a couple of revisions back and forth, the final language was set forth.
14 Q:Is Mr. Riley in your Chain of Command?
15 A:No, not my immediate Chain of Command. No.
16 Q:Mr. Washington in your Chain of Command?
17 A:No.
18 Q:Did you go to your immediate supervisor about whether or not you should
19 make that change?
20 A:No.
21 Q:    Why not?
22 A:Because that's the...
23 Q:    Doesn't subsection "C" apply to you?
24 A:Well subsection "C" at the time didn't exist. And it wasn't...

44

1  Q:You can't go willy-nilly changing. I mean, are there any regulations that
2      govern who you consult with when you make a change?
3  A:No.
4  Q:Is that a void? I'm not being funny now. I'm not trying to be contentious
5      with you. Is that a policy void do you think?
6  A:No.
7  Q:Ok. So they don't have to come from the top down.
8  A:Does that seem self-serving?
9  Q:Well, no. I don't think it seems self-serving. I'm just wondering. I'm
10     looking at the logic of your analysis and of the situation. My
11     understanding is if these recommendations come in, at least from what you
12     testified, they come in to you.
13 A:To me.
14 Q:And one of your jobs is to look for conflicts and consider them, etc. You
15     discussed things with Mr. MacAravey. Your affidavit says, I perceive this
16     as a huge thing by the way. Maybe it's just a minor thing to you. I look at
17     it differently but I'm one of those troublesome lawyers. But you did not
18     go to Joanna Reynolds. You did not go to anybody in the legal office to
19     look about or to ask about the impact or nature of these things on even
20     such things as basic due process or the First Amendment any of those
21     kinds of things. Which, I'm not saying you should even think about that
22     and I'm not suggesting you did. In looking at the process it seems that for
23     such a momentous change, a hundred years. A hundred years. We've got
24     this subsection "C". You talk to Mr. MacAravey about it and then the
25     language goes up. Now in fairness to you that would be the normal

45

1      procedure. In other words these things come in and you would pen
2      changes.
3  A:Right.
4  Q:You wouldn't veto a proposed change. If somebody brought something in
5      and you didn't agree with it, do you have the power to control whether it's
6      reviewed by your superiors?
7  A:Depends on what it is.
8  Q:All right sir. If I'm a trooper and I work up a change to a regulation as a
9      recommendation what I would normally do. Do I have to go through my
10     Chain of Command to get it to you or am I allowed o report it to you?
11 A:That depends. You can use a Regulation Revision Request and send that
12     directly to me.
13 Q:You mentioned that. You did mention that.
14 A:A suggestion goes through the Chain of Command. If you're in another
15     Bureau and you have a change that you want to propose that would go
16     through your Chain of Command and eventually end up where we're at.
17     But let's, to take your example, you may propose language that I know
18     has already been addressed and disapproved. So yeah if you resubmit that
19     the day after I know for example, and I'll make this up. Let's say that
20     someone suggested that we start to wear blue socks and that went to the
21     Commissioner. And the Commissioner says, "Well we're not wearing
22     blue socks. We'll stick with the black socks." And the next day I get
23     another suggestion that says, " I think we should wear blue socks." Well
24     you talk about veto. Well we already know that the Commissioner doesn't
25     want us to wear blue socks so those are the kinds of things.

46

1  Q:So now I go above you and I go to Mr. Corey and I lobby for blue socks.
2  A:Well, I'm not in your Chain of Command though probably so.
3  Q:Ok. What if I work for you?
4  A:Well, if you've addressed it with me, then again, I think there's a
5      fundamental difference between addressing an issue with a supervisor,
6      disagreeing with the resolution and the pursuing that further.
7  Q:Is there a certain amount of time to talk to the supervisor?
8  A:I don't know that that's specified. Again a lot of that depends on the
9      circumstances and the employment of some commons sense.
10 Q:I don't get accused that often of using it.
11 A:To varying degrees our membership uses common sense but again to get
12     back to the sexual harassment complaint, there's a regulation that
13     specifically authorizes you to go to circumvent and go directly to people.
14 Q:We're not talking about sexual harassment. We're talking about a
15     situation where subsection "C" applies. You told us subsection "C" does
16     not apply to sexual harassment. We're talking about a situation where I
17     have to make a judgment. I have to make a judgment. I don't have any
18     choice. I've got a concern. I've got to exercise a judgment. That's why I
19     asked you all the questions that have to do with simply reporting. It has
20     nothing to do with orders. What do I go through my Chain of Command
21     for? Just to tell them something? Just to share information? Or does it
22     have to have something. What if it's just informing them of something?
23     Do I have a duty or obligation to?
24 A:Well the language is the same.
25 Q:Case by case?

47

1  A:Right it's case by case but I mean, you know, you talk about from 1905 to
2      the present we have this in place. What's the need to put it in writing?
3      And my point would be if it's already in place in practice and concept,
4      what's the harm in putting it in writing?
5  Q:I can see it. You and I would disagree on the mischief this can do and the
6      danger of it and it's fundamental weakness. Fact is, the question is what
7      is in place? What is in place is custom, practice, and standard and
8      confidence and people to make decisions. I want to ask you just a couple
9      of questions about your affidavit ok?
10 A:Ok.
11 Q:Subparagraph 6 says subsequent to those discussions and we're talking
12     about Captain Riley, Captain Larry Riley. "I composed the language of
13     AR1-1.02C to respond to the request." Now this is a request that you, in
14     your affidavit says come from Major Washington and Mr. Riley. "The
15     office of Chief Counsel was not consulted regarding this language nor
16     were they requested to review or approve its language prior to its
17     issuance." Can I simply ask you why not? Why not? Earlier in this
18     deposition you said it apparently was not uncommon to run it by legal
19     counsel. And apparently this one seems to me is a rather major issue.
20     Policy void for almost a hundred years and I don't know if you even
21     thought about how long that was?
22 A:No.
23 Q:No you didn't. Well, why didn't you run it by counsel, Chief Counsel?
24 A:There are several reasons. First of all the regulation in its entirety had
25     already been through Chief Counsel, minus that language.

48

Q: When?

A: I don't know. Even if it was just staff in their section there were parts of that that they had reviewed. Now whether they saw the whole thing in total I don't know.

Q: You don't know when it had been up there though?

A: No. I know it was '99. In June of 1999 a staffing request went out to all the organizational segments. As far as the language goes like I say this was something that had to be done in time for the department's accreditation process for timeliness reasons for looking at it for, this was nothing more than putting on paper the departments practice anyway. It wasn't something we just made up. You know for a hundred years the department hasn't had a Chain of Command and now we're making one up.

Q: But that's not what you said a matter of twenty or thirty minutes ago. You said it was a policy void. It wasn't there. It wasn't on paper.

A: Right. It wasn't on paper. That's what I mean by policy void. It wasn't on paper.

Q: And if needed to be on paper so you could punish people for it because of arbitrators and stuff like that?

A: Well I'm just saying that's part of the thought process that goes into addressing anything in the form of a written policy.

Q: So that you can discipline people for it?

A: Well not necessarily. It's to insure the efficient operation of the department.

49

Q: Well that's certainly one way. Now paragraph seven you say, " AR1-1.02," and I'll emphasize for you sir, "C" is in this paragraph, "Was processed in conjunction with all AR1-1 revisions and inconformity with R&D and departmental procedures in order to prepare the department for its Tri-annual Commission on accreditation of Law Enforcement Agencies plea which occurred." Now when I saw that I interpreted that to mean we needed subsection "C" or we would have accreditation problem but you've cleared that up for us and you 're emphasizing again, I'm watching your head, that that was not necessary was it?

A: No, that particular section was not a requirement that I know of for accreditation.

Q: And the accreditation process, the compliance audit or whatever they call it was scheduled from April7 to April 12, 2001. Right?

A: Yes.

Q: And then this sentence appears, "The Change Sheet which accompanied distribution of the official revision of the regulation was auto-penned by the Commissioner rather than signed by him personally." Why is that in your affidavit and what is that supposed to mean?

A: Well the change that, that, the change to theAR1-1 was reviewed by the deputies and through our Chain of Command.

Q: What deputies?

A: Deputy staff.

Q: Who?

A: Colonel Hickes.

Q: Who else?

50

A: I'd have to look at the Change Sheet to be sure but basically what the autopen line means is the Commissioner didn't personally sign. That it was auto-penned.

Q: Why do you remember Colonel Hickes? Is he your immediate supervisor?

A: Yes. Well he's the one we have to get it approved by.

Q: I understand, that explains that. Go ahead.

A: So that's what that line means. The Commissioner didn't personally sign it.

Q: How do you know?

A: Because Corporal MacAravey hand-carried it up. It was auto-penned in his presence and he brought it back.

Q: Well who told him to hand-carry it up?

A: I did.

Q: Why?

A: Well again timeliness was an issue. We needed it.

MR. BAILEY: You told us you didn't need it for the accreditation. You just told us that.

A: We didn't need that section but that section was part of what we did. Aside from subsection "C" we needed AR1-1 in place.

Q: Right. So when this thing was taken up to be signed by Mr. MacAravey subsection "C" was a footnote to a larger number of changes.

A: Absolutely.

Q: Changes that needed to be made, but you seem to be indicating that the Commissioner didn't even review them.

A: Probably not. Not that particular day.

51

Q: Are you familiar with a little Latin term that pops up now and then in court cases? "Void ab initio", I mean you're a pretty bright guy. That's obvious if one talks to you for about one minute. "Void ab initio" obviously means bad from the beginning. "Void ab initio" bad from the initiation. "Void" from the initiation. How can you have a regulation that the Commissioner does not approve? Can you tell me how?

A: The Commissioner, well, uh, depending on the mature of he change. Let's say it's a procedural change with the lab that the Commissioner, its on a Change Sheet but its Colonel Hickes, organizationally Colonel Hickes is the one that actually initiated that change though his Command Staff.

Q: It seems to me that what you're saying given the press of business, a very large organization, a lot of work to do that as a matter of practice and custom, it's a common sense thing, the Commissioner cannot sit down and study every minor change to your regulations. Is that a reasonable input?

A: Well, I don't know because I know Colonel Walt did.

Q: Colonel who did?

A: Colonel Walt. The prior Commissioner, but there are times when they'll authorize, the deputy will authorize if its within their functional area, they'll authorize an auto-pen signature for approval of a regulation.

Q: How do you know?

A: Well because that's what I do.

Q: Well how do you know? We're talking about a group of revisions to a basic, maybe the most basic organizational regulation in the entire department and you're telling me that the authority to put the

52

1 Commissioner's signature on this came from Mary what's-her-name?
2 Bongo? How do you spell it?
3 A:B-u-n-g-o.
4 Q:Mary Bungo is the one who approved this regulation. That's what you're
5 telling me.
6 A:Well that's not. What I said is she's the one that put the autopen signature
7 on it.
8 Q:She's the one that put his signature on it.
9 A:Well she does it with his approval. She doesn't just autopen everything
10 that comes up.
11 Q:Did you ask her if he had reviewed it?
12 A:I didn't talk to her. I just know that he carried it up. She sent it back for
13 some revisions, some questions.
14 Q:Oh she did?
15 A:Yeah, that had reached her office. Now the Commissioner may have
16 reviewed it. Maybe he didn't but I do know that when it came back for the
17 revisions or the questions that she had indicated that Corporal MacAravey
18 hand-carried it it addressed those issues. He made a couple of minor
19 changes, hand-carried it back up.
20 Q:Who is he?
21 A:Corporal MacAravey, and she auto-penned it.
22 Q:So in fairness to you the short answer is you don't know whether the
23 Commissioner reviewed the revisions to the 1997 version of AR1-1.he
24 may have and he may not have, and you don't know whether he

53

1 authorized Mary Bungo to affix his signature, or whether he reviewed or
2 even saw subsection "C" as you sit here today.
3 A:That's correct.
4 Q:Ok. Let's go below the Commissioner. And you know that Joann
5 Reynolds did not review them. Well you don't know that she didn't
6 review them but you know subsection "C" at least was not presented to
7 the legal department for a review. Now, and that its not unusual for
8 changes to be made to be effective via the procedures you have discussed
9 here generally and generously too I might add. Let's go below the
10 Commissioner, the next person behind that is Mr. Corey?
11 A:Yes.
12 Q:Do you now whether Mr. Corey reviewed AR1-1 or any of its
13 revisions after the 1997 version had been effected?
14 A:Personally that he read it? No.
15 Q:Do you know whether he even saw it?
16 A:Off the top of my head I don't know. I don't recall if his signature or his
17 initials are on the route slip indicating that it came through him.
18 Q:Now if you're, if any change is going to be made in a regulation do you
19 submit t to Colonel Hickes for a review. What's your Chain of
20 Command? Who do you answer to? Directly to the Commissioner?
21 A:I have division director, a bureau director; it goes through them to the
22 front office. Depending on the nature of the change determines who
23 reviews it, which staff.
24 Q:Oh ok. Bu this one was Colonel Hickes. After Colonel Hickes and he did
25 review it and apparently approved it and all that sort of thing, or as least it

54

1 was ok with him. Signed off on it for want of a better descriptive term
2 guess. Do you then take it? Where does it go next? Directly to the
3 Commissioner?
4 A:They have in the front office; they do a number of different things. It's not
5 uncommon for Colonel Coury for example to send a proposed regulation
6 to the Bureau that may even have initiated it to VCI or Drug Law and tell
7 them that he wants them to review it and comment back to him on it. It's
8 not uncommon for the front office to send things to the office of Chief
9 Counsel for review when we've already done it. So they use an internal
10 process that is unique to each individual circumstance.
11 Q:Somebody along the line may look at this and decide maybe they want an
12 opinion from legal or maybe to check on something else. It's more or less
13 an open process, and, not to be funny but they wouldn't be violating
14 subsection "C" if they took it sideways somewhere would they? No, I'm
15 not trying to be facetious. I'm trying to look at how this thing works. I
16 mean if Hickes takes this thing and sends it over to legal he's not violating
17 subsection "C" is he?
18 A:No.
19 Q:Ok, well taking it to legal is not fair because that's not really a Chain of
20 Command that's like a support services. Anybody would be normally
21 expected to have a right to do that, review that. Right?
22 A:Well I would hope so.
23 Q:Do you know when subsection "C" got there? We know it wasn't there
24 for pre-approval. We know that right?
25 A:Right.

55

1 Q:We know that, in fact I think the date is sometime around February 21,
2 22, 23, 16, 17 somewhere in that area. I'm pretty sure. I believe at that
3 point Mary Bungo does get the signature fixed by autopen. No reason not
4 to believe that. Now you indicated distribution, that you handled
5 distribution, your office handled distribution. So you have the duty and
6 responsibility to print this thing up. Print this up.
7 A:Well, prepare it to be printed. We have a separate section that actually
8 prints it.
9 Q:Ok, how so you handle distribution? Tell us how that process works.
10 A:Distribution is determined by whatever the regulation is. In this case it's
11 an AR, which determines where it goes, how many copies are reproduced.
12 What we do is we prepare it for reproduction. When it goes up front it will
13 have, where you indicated earlier about the date.
14 Q:The effective date?
15 A:Right. At the top those will just be X's when it goes up front. Our job is to
16 go through, make sure the formatting is correct. Make sure the page ends
17 correctly, insert the date, and, you know, make sure the appendages are
18 labeled if they are there.
19 Q:Wait a minute. When it goes up front and goes through all this process it
20 doesn't have a date on it? It has X's you say?
21 A:Right. When it's submitted for approval it has X's on it and the reason is
22 it can take, I've seen regulations that have been submitted that have been
23 up for signature for issues relating to whatever the issue is in excess of a
24 year, 18 months, 2 years. It just depends. So if that date is on it today, I
25 put today's date on it and I sent it up and it has to go through Darrell to

56

1  get to you. And Darrell says, "I have issues." And it takes eight weeks to
2  resolve there. And you're Commissioner and you approve it. You've
3  approved it and eight weeks later Darrell signs off on it. Well it has an
4  eight-week-old date before you even sign it. So he reason is it has a fresh
5  date on it to account for that processing time.
6  Q: Well you know when it came back from Mary Bungo, Mr. MacArevy;
7  you said Mr. MacArevy hand-carried it up. Why did he do that?
8  A: Cause she, she had questions. And some of the questions, some of the
9  issues that she had flagged throughout the regulation and I don't know
10  what they were off the top of my head, were organizational things
11  apparently. It was apparent from reading her notes or whoever's notes
12  they were but that's who they were addressed with, that those things were
13  that were not understood by the person reading it.
14  Q: And that's in the file?
15  A: Let's hope they're in the file. It should be in the file.
16  Q: Aren't they supposed to be in the file?
17  A: Well they're like little yellow stickies sometimes they...
18  Q: They're supposed to be in the file.
19  A: They should be there. That's what I'm saying. I can't say. I can't tell you
20  definitely.
21  Q: That they actually are?
22  A: Right. They can fall off. I hope they're there. They're supposed to be
23  there. So he addressed those issues with her and it was determined after
24  that review with her, ok, now everything's ok with her except for a couple
25  minor grammatical changes.   Because we needed AR1-1.02 in place for

57

1  accreditation it was agreed that he would, you know, go back make these
2  changes right away. He gave it to me, or he brought it to me, he'd talked
3  to Mary and I told him just take it up. She signed it right then and he
4  handed it back to me signed.
5  Q: And what? You put an effective date on it a week later? Two weeks later?
6  A: Well, the date that goes in is actually the date that the processing of it is
7  finished. It doesn't always coincide with.
8  Q: With the date the Commissioner signs it.
9  A: Right. It's not always that same day.
10  Q: And in this case it was sometime in March.
11  A: Well, I know the regulation is dated in March. I don' know off the top of
12  my head when it actually came back signed.
13  Q: Could it be March 6th, March 7th? Do you know?
14  A: I don't know.
15  Q: Ok, it's got a date. The X's have been replaced by a date. Then what
16  would you do with it?
17  A: Then it is reviewed by clerical staff to make sure that, you know, again we
18  talked earlier about the instruction portion, that if it says remove pages 1-
19  21 and insert pages 1-23 that there's actually 23 pages there. That in the
20  preparing of that for reproduction that now there's not actually 24 pages
21  because computers being what they are, it just kicks it a page down or
22  something. So they check those kinds of things to make sure the format is
23  correct. Then it's taken downstairs to the reproduction section. They
24  reproduce it. When they're finished they call the project person. He goes
25  downstairs and makes sure the pages are printed the way they're supposed

58

1  to be printed. So you don't have the stuff upside down, or repeated that
2  you don't have obvious reproduction mistakes. It's taken to the mailroom
3  and they disseminate it to the field.
4  Q: So dissemination occurs after the final date goes on.
5  A: Yes.
6  Q: Is there any tracking document that displays. That shows when the
7  dissemination date is?
8  A:    The dissemination date is different for every organizational segment.
9  Because of the process that's used, if something is dated today, is you're
10  in Erie, you're not going to get it as fast as Harrisburg. That's just the
11  nature of the system. It can take varying amounts of time depending on
12  where you're stationed to get the information.
13  Q: What's it take on average on a document like AR1-1 from a week to two
14  weeks?
15  A: I would say for everybody to finally get it in the department I would say a
16  week on average. That would be for anything.
17  Q: Now in this particular regulation you had the dates affixed. You're set for
18  accreditation.
19  A: Yes.
20  Q: And you post a copy of it to the file?  The historic file?
21  A: Yes.
22  Q: And that should be reflected in the historic file.
23  A: What should be reflected? The date that the copy is put in?
24  Q: Yeah.

59

1  A: Probably not because we close our file out when we take it to repro. So at
2  that point our file is closed on it.
3  Q: What's the distribution of it?
4  A: You mean how many copies?
5  Q: No, no. Who does it go to?
6  A: Everyone who has an AR manual and all the libraries.
7  Q: And when would it have gone to the Commissioner?
8  A: As far as?
9  Q: The final thing.
10  A: Well it would have been in his normal distribution of all the other changes
11  at that same time. And I don't know what the mailroom delivered, when
12  it's put in his box by his staff. I don't know.
13  Q: Ok, have you personally had a chance to look at the historic files of
14  AR1-1?
15  A: Yes.
16  Q: When?
17  A: I pulled that file and looked through it subsequent to the affidavit and all
18  the surrounding inquiries into, and basically what I'm looking for is to try
19  to make a determination as to the integrity of the file.
20  Q: Is it complete?
21  A: Well, it's thick.
22  Q: Is it complete?
23  A: Complete in what? In what sense? I have no way of knowing. If someone
24  had a conversation and failed to make a note and put it in there. I have no

60

1  way of knowing that. So to say that it's complete, I can't make that
2  statement.
3  Q: Who was the person that looked at it before you did?
4  A: It would have been Marie Marshall and she looked through it as a result of
5  a request from Chief Counsel for information out of it. So she would have
6  been.
7  Q: What's her name?
8  A: Marie Marshall.
9  Q: And who is she?
10  A: She is one of the clerical staff.
11  Q: When did she look through it.
12  A: I don't know the date.
13  Q: Is the date in there, in the file?
14  A: There's a separate date because there was a number taken for or there was
15  a project initiated for the request from Chief Counsel for information. So
16  that's a separate issue.
17  Q: What do you mean that's a separate issue?
18  A: Well it's a separate project from the 1-1. The 1-1as it exists, as a historic
19  file doesn't have, you know, continue to be updated with requests for
20  information from it.
21  Q: Did Marie Marshall's notes indicate what he was looking for in that file?
22  A: I don't recall.
23  Q: Did she remove any parts of the file?
24  A: I believe she photocopied some parts if the file and provided those to
25  Chief Counsel.

61

1  Q: Do her notes indicate what she photocopied?
2  A: I don't know. They probably do but I don't recall.
3  Q: And they indicate when she did this?
4  A: It would indicate depending on the situation there may be correspondence
5  even with whatever was copied attached as an enclosure. There may be a
6  copy of that. Sometimes those are requested, sometimes they're not but I
7  this particular case I just don't know.
8  Q: Did Marie Marshall look at that file after the revisions that occurred in
9  2001 were posted to the file?
10  A: Yes.
11  Q: You don't recollect what she copied?
12  A: No I don't.  I don't know what sections she copied out.
13  Q: Are the copies with the X's on the top ever posted to the historic file?
14  A: Yeah, they're maintained there.
15  Q: They are maintained there. And there's a sub-file which before any
16  changes are posted to the file show the last effective date of the file. For
17  example, there's a file in there showing, in the historic file a copy of
18  the '97.
19  A: Yes, that's correct.
20  Q: And then you would post any revisions. I mean the history, what you go
21  through with revisions, right? And then you would post the dates, any
22  dates of when any revision actually occurs, so then that would be posted
23  to the file. The latest effective dates the actual of any changes to the
24  document.

62

1  A: Right. There's a, the final, there's a copy of a produced version that's
2  distributed that's placed in a file. That's one of the first things you see
3  when you look at it.
4  Q: And that's placed in there after you get it by mail or do you place it in
5  there before?
6  A: Normally Marie will put it in.  What Marie does is she files the historical
7  files and when she, basically they're put in a box for her to go through and
8  prepare for filing. She labels them a certain way, by change number.
9  She's the one who will normally pull a copy of the reproduced version,
10  the one that was disseminated, the Change Sheet attached and she'll put
11  that in. Normally that's the case.
12  Q: Is it posted before it's disseminated or after it's disseminated?
13  A: It would be when we get our copies back. So it would be when we get our
14  copies back and it may be you know, two weeks before she actually goes
15  through and does, you know actually file that historical information. And
16  when she, normally when she does that if it's not there, the project person
17  didn't put it there, she'll ensure that it's there.
18  Q: And if she gets a request for a file from Counsel's Office she's going to
19  check what's in her filing bin I would hope.
20  A: Yes.
21  Q: Absolutely.
22  A: Yes, well the first place she would look is where it should be. It should be
23  filed if its finished and if its not there.
24  Q:   You check your filing bin.

63

1  A: If its not there it could be that the project person failed to submit it. That
2  occasionally occurs too.
3  Q: But you know that copy with the X's on it? That was done quite some
4  time, actually that would have been posted to the file before it went to
5  Hickes and Hickes made some recommended changes.  And before it went
6  up to Mary Bungo and Mary  made some changes.
7  A: There may be numerous copies with X's in there as various changes are
8  made.
9  Q: Absolutely. So the minute that you see.  Do you have time?
10  MR. MARCECA: Yes sir. I have about two minutes left.
11  MR. BAILEY: Ok, let's suspend at this point.
12  MR. MARCECA: We're going to stop the camera and it is now 11:58.
13  MR. BAILEY: Turn this one on so I don't forget.
14  PAUSE WHILE VIDEO TAPE IS BEING CHANGED.
15  MR. MARCECA:  The time is 12:08 pm on October 23, 2001 and we're
16  continuing the deposition of Walter J. Margeson.
17  MR. BAILEY:  Thank you. Mr. Margeson just a couple questions to follow-
18  up on the end of where I was. On the distribution what is the distribution
19  of this regulation ARJ-1 what's the distribution.
20  A: Well its distribution AR and again it goes to everyone that has a set of AR
21  Manuals.
22  Q: You said commanders and libraries I think.
23  A: No it's any one who has an AR Manual and libraries.
24  Q: Its not distributed per capita?
25  A: No.

64

Q: Why did you place subsection "C" in this AR then? Because when I asked
you about this as far as a perceived policy need was concerned you had
indicated some civilian out there that doesn't know this and doesn't know
that. If you're not going to distribute this to them and you're not going to
do a distribution to every member you know, per capita why does it
belong there?

A: Well that's the purpose of the library. It is there for everyone to have
access, and routinely we hold personnel accountable for numerous
regulations that they're not provided a personal copy of.

Q: Was there any discussion among anyone at all about it going in a
different, like in a field manual, or somewhere in a different distribution?

A: You mean that particular section, Chain of Command?

Q: Yes.

A: Again this goes back to my initial conversation with Captain Riley and
my indication to him that we had an active AR1-1 Project and that seemed
to be the logical place to put it. You know the departments organizational
structure seemed the logical place to put something about the command
structure.

Q: Ok. That doesn't seem logical to me but that's ok. I don't walk in your
shoes and I prefer to your expertise. There wasn't some discussion about
this is a convenient vehicle for getting it done right away was there?

A: Well like I said in my mind the AR1-1 was the appropriate place for this
to reside and I had an active project, and its not uncommon when you
have an active project to try and fix or revise as many things as possible

65

so you don't have to make change after change to the same. I mean we try
to do that. We're not always successful with that.

Q: Well was there some urgency with this?

END AUDIOTAPE ONE – SIDE TWO, BEGIN TAPE TWO

MR. BAILEY:  You had indicated that subsection "C", you know, although
there was a perceived policy need, that it was not needed for accreditation
purposes.

A: That's correct.

Q: My question is, was there some sense of urgency and if there was why?

A: Well, I don't know. Again the sense of urgency was for the 1-1in general.
This just happened to be plugged in to that project because we had it open
and that's normally how we do business. You know it became, this
particular section had no urgency other than it was part of something else
that was needed. And I understand what you're trying to say. You want to
know why.

Q: I want to know why you wouldn't

A: You want to know why we felt we had to plug this particular language in
at this particular time and why didn't we wait?

Q: Yes. Again I want to go back to that hundred year wait and the fact that
all of a sudden somebody developed, Major Washington calls Captain
Riley who calls you and why didn't you, why didn't you pick up the
phone and call Major Washington, ask him what he's looking for. Why

66

didn't he send a form into you? I mean, the irony of all this is that we're
dealing with something that has to do with an important procedure and it
just seems to me that's an odd way to proceed.  And I'm not saying it's
improper but it seems odd to me. Nothing is written to you. Nothing is
submitted to you. There are no phone calls. You know it's somebody
looking for a Christmas tree. Something to hang an ornament on for some
ulterior reason. Obviously that's where I'm coming from, clearly. I'm not
saying that's why but it seems to me and I'm asking you if you know
anything about that?  Is there anything in the conversation with Mr. Riley
about when this needed to be done? If it needed to be done quickly why it
went on to AR1-1? If you're looking for accreditation? I would assume
one of their compliance issues just might be the integrity, if you will of
the purposes of a regulation. You don't have some catch all regulation
with all kinds of odd things in it. I'm not saying that this is that odd but I
just don't understand why it went there. Why it wasn't in a field
regulation. One of the basic issues is met with a regulation of this type is
if it's going to apply to every member. And you're the one that raised the
issue of civilian employees. It isn't even distributed to them. Can I ask did
you, was their some kind of advisory sent out to civilian employees about
this new ordinance, this new regulation? Do you know?

A: What do you mean by advisory?

Q: Well, you know. Everybody is, you know the Commissioner sends out an
advisory, here's a policy void. There's a problem we've had. We're going
to add this subsection "C" here. You were advised you're not to
circumvent your Chain of Command, which I would assume everybody

67

knows any way. But the point in fact is, was there any teaching, seminars,
distribution to the 4000 some odd members of the Pennsylvania State
Police about this very important subsection "C"?

A: Well there would. There's a requirement in another regulation that deals
with roll call and staff meetings that requires that new and newly revised
regulations be brought up. Now whether they read those or whether they
just tell people this is something that's new, you need to review it and
trust them to do it on their own but the fact that there's a revision is
required to be brought to everyone's attention.

Q: Every regulation?

A: Yes.

Q: In the Pennsylvania State Police?

A: Yes.

Q: How big is that bin that Miss Marshall has? Does it ever get filled up with
a lot of different changes?

A: Oh yeah. Absolutely.

Q: And they're read at every roll call?

A: No, I didn't say that. I said that there, the fact that there, or the fact that
they're there is to be brought out. If there is something that's particular to
your function, let's say you're a (MIXAP) person and there's a (MIXAP)
regulation that's of particular interest to you, sometimes they'll go over
that at roll call as part of training. But generic types of regulations like the
AR1-1 would be more than likely would be; people would be advised that
there's revision to it and that they're to review the revision.

68

1    Q:Once you came up with the language for the change did you go back to
2        Captain Riley with it?
3    A:I don't recall.
4    Q:How about Major Washington?
5    A:I never talked to Major Washington at all.
6    Q:How much time passed between this phone call from Major Riley and you
7        place the subsection "C" in the revision.
8    A:Well, it was, I don't know off the top of my head the exact time. Again it
9        was nearly a year that it sat idle. So potentially it could have been that
10       long.
11   Q:Major Washington could have called you a year before.
12   A:I'm just saying that it could have been. I don't recall off the top of my
13       head when those conversations took place but that language was added
14       when this was resubmitted. That was not part of what had originally been
15       submitted.
16   Q:When did that occur?
17   A:That was back in '99 when it was sent back by Colonel Hicks because it
18       failed to address…
19   Q:So it was added after that.
20   A:Yes, it was added after that.
21   Q:Yes, after that. We know it was added some time the in the year 2000.
22   A:   Probably.
23   Q:You said it was after1999.
24   A:Right.

69

1    Q:Doesn't leave a whole bunch of space in between. You mean you could
2        have gotten this call in the year 2000?
3    A:No, cause it was resubmitted, right, it was resubmitted in 2000.
4    Q:So you're saying that language was resubmitted somewhere around
5        October.
6    A:When it was resubmitted, whatever date that was, this language was made
7        part of that.
8    Q:If in reviewing a historic file there were some changes that came to you
9        from other persons sometime around September or October is that correct,
10       of 2000?
11   A: Yeah, ah, that's possible.
12   Q:I may be mistaken but I don't think subsection "C" is there. I don't
13       know, I may be wrong.
14   A: I don't know.
15   Q:But if we look at that historic file, and provided it's complete it should
16       show us in written form when that subsection "C" was first recommended
17       right?
18   A:It should.
19   Q:And it's going to show that it came from you, right?
20   A:It should.
21   Q:Do you know of any recommended changes to AR1-1 that were made
22       after the beginning of the year 2001?
23   A:   Not, not, I don't know.
24   Q:You mean you can't tell us if there were not any changes?

70

1    A:It depends on what you mean by changes. I know there were changes that
2        Mary Bungo sent back, grammatical things that she wanted changed. So
3        yeah there were changes  like that.
4    Q:Well do you know whether the language of subsection "C" was in what
5        was given to Mary Bungo?
6    A:Yes it was.
7    Q:How do you know that? You don't know when you got it or the request
8        from Mr. Riley so you don't know when you put the language together.
9    A:Well it was signed when it was taken up front.
10   Q:To Mr. Hickes you mean?
11   A:Yes.
12   Q:When did Mr. Hickes sign it?
13   A:I already told you I don't remember.
14   Q:Subsection "C" was I there when it went to Mr. Hickes?
15   A:Yes.
16   Q: And you don't know when it went to Mr. Hickes?
17   A:No.
18   Q:Ok. Thank you very much. I think that's basically it for me.
19   MS. REYNOLDS:  I just have one question. Mr. Bailey referred to your
20       affidavit. So you recall doing this affidavit?
21   A:In the Chief Counsel's office.
22   Q:Is the information in that affidavit correct?
23   A:As far as I know it's correct.
24   MS. REYNOLDS:  Ok, thank you.

71

1    MR. BAILEY:  Thank You very much for coming here today. Thank you for
2        testifying. I appreciate it. I may have a few material questions for you. If I
3        do I'll submit them to counsel if I have any kind of questions. I mean
4        there are a few dangling participles here, ok? And I'm not going to leave
5        your deposition open for that. There are procedures under Federal rules
6        for witness interrogatories and you are a very key fact witness as I'm sure
7        you sadly realize by now. But the point in fact is well, that's unfortunate
8        but that's the price we pay for living in a society incidentally of laws and
9        not men. No pun intended on subsection "C".  But any way, in all
10       seriousness if I have any additional questions, I may have, I'll get those to
11       Ms. Reynolds and she can communicate those to those you if they're
12       material questions. Thank you very much.
13   A:Sure.
14   MS. REYNOLDS:  I'll go with you.
15   MR. BAILEY:  Wait until he announces time.
16   MR. MARCECA:  It's now 12:23 PM on October 23, 2001 and this
17       deposition is now ended.
18
19   END TAPE TWO
20
21
22
23
24
25

*Mark Grab*

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER                    :1: CV- 00-0084

    Plaintiff                    :

    Versus                    :

PAUL EVANKO, MARK                    :
CAMBELL, THOMAS COURY,                    :
JOSEPH WESTCOTT,                    :
HAWTHORNE CONLEY                    :
JOANNA REYNOLDS and                    :
SYNDI GUIDO,   Et al.                    :
    Defendants                    :

    DATE:                    February 5, 2002

    PROCEEDINGS:        Video Deposition of
                    Mark Grab

    APPEARANCES:
    For the Plaintiff;        Donald Bailey, Esquire
                    4311 N. 6th Street
                    Harrisburg, PA 17110

    For the Defendant;        Joanna Reynolds
                    Barbara Christi
                    1800 Elmerton Avenue
                    Harrisburg PA, 17110

---

1  CRYSTAL LYDE: Be advised the video
2  and audio is in operation.  My name is Crystal M
3  Lyde, L-Y-D-E. My address is 4310 Hillsdale Road
4  Harrisburg Pennsylvania, 17112. I've been
5  contracted by PR Video Incorporated to be the
6  operator for this deposition.  The case is in the
7  United States District Court for The Middle District
8  of Pennsylvania.  The caption is Darrell G. Ober
9  versus Paul Evanko, Mark Campbell, Thomas
10  Coury, Joseph Westcott, and Hawthorne Conley.
11  The docket is 1-CD: 01-0084.  The date is
12  February 5, 2002.  The deposition is being held at
13  the law office of Don Bailey, 4311 North 6th Street
14  Harrisburg Pennsylvania, 17110.  The video
15  deposition is being taken on behave of plaintiff
16  Darrell G. Ober.  The witness's name is Mark Grab.
17  The time now is 1:50 p.m.  Mr. Grab would you
18  raise your right hand for me please?
19    Would you state your name for the
20  record and spell it?
21    MR GRAB: Mark, M-A-R-K, middle
22  initial A, Grab, G-R-A-B
23    CRYSTAL LYDE: Do you so swear
24  to tell the whole truth, nothing but the truth, so
25  help you God?

2

---

1  MR GRAB: I do.
2    CRYSTAL LYDE: Thank you.  Mr.
3  Bailey can we have a sound check please?
4    MR BAILEY: Yes My name Don
5  Bailey, attorney for plaintiff Darrell G. Ober, 4311
6  North 6th Street Harrisburg Pennsylvania, 17110,
7  717-221-9500.  Joanna?
8    JOANNA REYNOLDS: My name is
9  Joanna Reynolds.  I'm Assistant Counsel with the
10  Pennsylvania State Police.  My address is 1800
11  Elmerton Avenue Harrisburg PA, 17110 and I
12  represent the defendants.
13    BARBARA CHRISTI: Barbara Christi,
14  Chief Counsel, Pennsylvania State Police, same
15  address and phone number as those given by
16  Assistant Counsel Reynolds.
17    MR BAILEY: Mr. Grab as indicated this
18  is a video deposition.  The deposition will be
19  recorded here on the videotape which will be
20  available here anytime that you would want to
21  come and look at it.  You have a right to review it if
22  you want to purchase a copy for your own use you
23  can do that.  Of course the attorneys on the other
24  side can do so.  During the deposition if at anytime
25  I should make an error and I'm sure it will be an

---

1  error if I do it okay.  You correct me and stop me if
2  I'm wrong.  But if I should interfere with you or
3  some how make it difficult or impossible to
4  complete an answer make sure you correct me and
5  you provide a full and complete answer so that you
6  can respond fully.  One thing I do that's a little
7  different, I understand that you probably have a lot
8  more experience then I do for that matter,
9  attending legal proceedings and that sort of thing.
10  One of the things I do a little differently then most
11  attorney is I do not mind if you have a question of
12  me about a question or if you want to know were
13  I'm going with a group of questions I don't mind
14  responding to you.  I don't mind giving you an idea;
15  you know something that came to an offer, if you
16  will.  So that you maybe want to cut to the chase
17  or you perceive or have a curiosity for that matter
18  about questions I don't mind that.  If at anytime
19  during the, I don't know if you're being represented
20  by opposing counsel or not I really don't know.  I
21  assume that you're here in an individual capacity if
22  you are at any time you want to take a break for
23  any reason that doesn't matter.  We'd be very very
24  happy to accommodate you.  Counselor I guess the
25  usual stipulations objections except to time will be

reserved except as to the form of the question.  Is that okay?

OPPOSING COUNSEL: Yes

MR GRAB: I guess I should clarify that counsel from PSP does not represent me and while I'm here as an individual. I'm here at your request for deposition.

MR. BAILEY: Alright sir.  There's nothing here that involves your par say then as a fact or information witness. So, I mean, that's correct. Okay, Mark. Is it okay to use it that way?

MR GRAB: Sure

MR BAILEY: Okay, Mark where do you work and what do you do?

A:    Currently I'm with the Governor's Office of Administration, Bureau of Labor Relations. I handle contract negotiations representing the Commonwealth of Pennsylvania for various unions, against various unions. I also handle labor arbitration.

Q:    And how long have you been doing that?

A:    It's been in Labor Relations in Carlisle for eight years.

Q:    Wow

A:    I transferred to the Governor's Office six months ago. All time of Labor Relations prior to that for the Commonwealth was at the State Police.

Q:    Yes I was going to ask you about that. It's my understanding that for some period of time you did, is the correct term Labor Relations?

A:    I was Labor Relations Coordinator for the Pennsylvania State Police.

Q: Okay, and how many years did you do that?

A: Six years

Q:    I don't know if you have, you probably have some type of rumor or general familiarity with a lawsuit that's been filed by Captain Ober. What I'm going to do now I'm going to ask you with your experience it's pretty clear. From time to time I'm going to ask a question. I hope you will bare with me. I have a certain knowledge of the area that you deal with. My expertise is not in that area, but I have knowledge of it. Bare with me because I may ask a question from time to time that may not make sense to you. But if you'll take the time to explain for the record, and remember we are preparing these things  in a

preparation for trail. If you can help. I guess what I'm pleading with you to do is to provide full answers within the spirit of a question sometimes. Because I'm not sure I can exactly ask the right question. If I don't you just get me back on the track. Now let's say Pennsylvania State Police roughly six years. During that period of time did you hear of occasion to be involved in processes which involve Mr. Ober?

A:    Yes I did.

Q:    Okay go ahead.

A:    One of my releases of Labor Relations Coordinator is to review and either respond to or coordinate a response to contract and disciplinary grievances. And I recall receiving one or two grievances maybe more from Captain Ober.

Q:    Alright now in the lawsuit Mark that Mr. Ober filed he makes references to a number of issues. The issues in the lawsuit is a civil rights suit. The issues in the lawsuit refer essentially to a **genre** that have come to be characterized by a District Federal Courts rather as First Amendment violations, adverse employment actions that sort of thing. Specifically

do you a have recollection of a transfer, an effort to transfer Captain Ober to Washington Pennsylvania by the Pennsylvania State Police?

A:    Yes

Q:    Can you tell me, give us a little background as to what was involved there please?

A:    I had no involvement in that. I can not respond to that. I know I heard through the Labor Relations process that this was an intent to transfer Captain Ober somewhere in the western part of the state.

Q:    And do you know what the reason for that transfer was?

A:    No

Q:    Do you know what the transfer entailed? What position he had been in?

A:    I believe I recall Captain Ober was the Director of the Internal Affairs Division and the designated was to be an Executive Officer for an area Commander. If I recall correctly.

Q:    Did Captain Ober have occasion to grieve that situation?

A:    Yes

Q:    And what was the purpose of this grievance? Do you remember?

A:    To contest the utilization of the transfer process by the agency to move him from the eastern part of the state to the western part of the state. Specifically again if I recall correctly, some of the verbiage within the grievance Captain Ober offered the argument that based upon the Collective Bargaining Agreement that in the event of transfer that the least senior member within a given unit was the member to be transferred. Captain Ober's argument was that because he was a Captain that the unit in question, or that unit which was applied within a contract would all those who are so designated as Captains that he was not the least senior Captain in the Pennsylvania State Police and therefore should not have been transferred.

Q:    Did you reach a conclusion or reach an opinion at some point during this process that he was being transferred for disciplinary reasons?

A:    I would not have been pertinent to any information that could cause me to come to that conclusion.

Q:    Have you ever come to that conclusion.

A:    You have to understand that my involvement was abbreviated quickly once actions began to be filed by Captain Ober. Our involvement was essentially removed. My understanding was it was part of the lawsuit and it was being handled elsewhere.

Q:    Part of what lawsuit?

A:    I guess it was an injunction or something that was filed. Captain Ober filed an injunction to stop the transfer. Again I was not that pertinent. I was not within that circle.

Q:    Who was within that circle?

A:    I understood it was being handled through Deputy Commissioner of Administration, Tom Coury and Chief Counsel's Office.

Q:    Now in that circle, you mean the evaluation of Mr. Ober's legal rights?

A:    In the response to those actions filed by Captain Ober.

Q:    Well

A:    Regards to the transfer and any issue after the reimbursement compensation issues that I had handled. Which I believe where the first one or two grievances that were received by the department.

Q:    Yes those were issues that eventually there was some kind of a board, a special appeals board or something.

A:    Well the grievances came into my office. The process is that either myself or my subordinate heiress would review that grievance, conduct an investigation into the allegations the facts of the grievance, we would then met per contract with what's known as the PSTA Grievance Board each month and discuss grievances. At the subsequent months PSTA Grievance Committee meeting, and the big PSTA Grievance Committee is comprised of five members who make up the PSTA Grievance Board and then representatives of the Commonwealth, of one which I was. The following month we had the meeting and at that meeting it was offered that because Captain Ober's issues and those grievances dealt with reimbursement of expenses and or time. That they would be properly handled by the Lost Damage Reimbursement Compensation Appeal Panel. That's outline within the Collective Bargaining Agreement.

Q:    And they eventually made a decision is that right?

A:    Yes

Q:    What was their decision?

A:    The decision was they reimbursed Captain Ober his day of leave. I believe they reimbursed him for the expense of the hotel. I believe they denied the reimbursement of the expense of a picture frame.

Q:    Was that decision appealed?

A:    I'm sorry

Q:    Did you do a good job on that thing Mark? Did you work at it?

A:    I didn't do any job on it.

Q:    You didn't work on it?

A:    No

Q:    Who did?

A:    The way the process is when an action well let me back up. Normally when something goes in front of that panel, let's say you're a State Trooper and you lose a radar unit. That information is reported. That information then goes to the Deputy Commissioner of, gosh I want to say I get those two always confused Operations or Staff. It would have been Lieutenant Colonel Hickes at the time. Lieutenant Colonel Hickes reviews the facts, determines whether or not negligence was involved. If negligence is

1  involved then Lieutenant Colonel Hickes would
2  issue a directive that the member would have to
3  reimburse the Commonwealth of Pennsylvania for
4  the moneys. If the member then decides to appeal
5  that decision it goes in front of this panel. We got
6  this action in a different way. We got it through a
7  grievance, but it was the decision of the ten people
8  present at the monthly PSTA Grievance Committee
9  unanimously that it was a matter best handled in
10  front of the appeal board, this tri-part type panel.
11  Once that decision was made my only
12  responsibility despite believe other wise was to take
13  that grievance file that I had received and...
14       Q:    Belief other wise by who?
15       A:    Apparently by Lieutenant Colonel
16  Coury and Chief Counsel's Office. Is to pass that
17  packet into the LA Representative on the
18  committee and at that point then my involvement
19  ) is done.
20       Q:    Did you do a poor job of that?
21       A:    No I don't believe I did.
22       Q:    Did the Pennsylvania State Police
23  and/or their Chief Counsel's Office think that you
24  did a poor job of that?
25       A:    That's what I was told. Linda

13

1  Bonney, Director of Bureau of Personal, called me
2  into her office at some point after that decision was
3  made.
4       Q:    What did Ms. Bonney tell you?
5       A:    She told me that there is going to
6  be, in her words, there was going to be a tribunal
7  and that Chief Counsel and Lieutenant Colonel
8  Coury were very upset with my shabby handling of
9  the appeal case for the reason.
10       Q:    I don't know you. I have a hard
11  time believing you shoddily handle much of
12  anything. What as your...well tell me what the
13  shoddy handling what you supposedly did was.
14       A:    That's what I ask Mrs. Bonney. At
15  first what I pointed out to her was I did not, what
16  was conveyed to her was that I had not
17  represented the department well in the argument.
18  I pointed out to Mrs. Bonney, in fact I'm surprised
19  she didn't know it, but I pointed to Mrs. Bonney
20  that we don't present an argument in front of this
21  appeal panel. They get the documentation the
22  appeal panel meets and that's it. There is no
23  argument presented, no case presented. So I was
24  more then willing to go and meet with, it was my
25  understanding that I was to meet with Ms.

14

1  Reynolds, Ms. Christi, Linda Bonney, and
2  Lieutenant Colonel Coury.
3       Q:    When you did?
4       A:    I encouraged the meeting. In fact I
5  demanded the meeting at that point.
6       Q:    Why?
7       A:    Because I was insulted.
8       Q:    Why were you insulted?
9       A:    I was insulted for a number of
10  reasons. First of all that I would be accused of
11  mishandling a case for the department,
12  misrepresenting the department. But I was also a
13  little insulted that they weren't aware of what the
14  process was in the department, and I wanted. I
15  mean we're talking about the Deputy
16  Commissioner of Administrations the individual
17  who is in my chain of command. My job is to
18  represent that department. I don't want anyone
19  thinking that I was engaged in nefarious acts. I
20  wanted the opportunity to have "my day in court"
21  and explain to them what the process was and in
22  fact that I had not present any presentation. That
23  no one had present any presentation, but that
24  meeting was never granted.
25       Q:    What was the amount of money or

1  value of services involved?
2       A:    Well it would have been eight hours
3  of annually or personal leave which is in effect a
4  monitory equivalent of one days' pay, at Captain
5  Ober's then current rate. It's a big pay scale.
6       Q:    Whatever it was. It was a base
7  pay.
8       A:    Yeah, it's good money. I'll say that.
9  It's better then I was making at the time. Then
10  the other would have been, I believe it was the cost
11  of a hotel. What average state rate $ 60.00 some
12  where around there?
13       Q:    Okay now was this about an
14  investigation that the FBI was conducting into
15  allegations of..
16       A:    It was connected to it, yes.
17       Q:    Connected to it?
18       A:    Yes
19       Q:    How do you remember it being
20  connected to it Mark?
21       A:    When I investigated the claims that
22  Captain Ober made in his grievance for the
23  reimbursement what I had found was that the FBI
24  had approached Captain Ober as the Director of
25  Internal Affairs Division and advised him that there

1  was an investigation being conducted. That there
2  was an alleged job selling scheme within the
3  Pennsylvania State Police and the indication was it
4  the potential to go high within the department and
5  that they would be coming to him in his capacity
6  as the Director of Internal Affairs from time to time
7  for assistance in the investigation. Captain Ober
8  made the claim within his grievance that he did
9  sell with the concurrence of Lieutenant Colonel
10 Robert Hickes. My role at that point was to
11 validate that allegation. I contacted Lieutenant
12 Colonel Robert Hickes.
13      Q:    And he said, "Yes"
14      A:    He said, "Yes". I told him to
15 cooperate and do whatever they needed.
16      Q:    And that was your job? Your job
17 was essentially to see that a proper presentation of
18 facts and circumstances was before this board.
19      A:    Right
20      Q:    It wasn't an advocacy position per
21 say. It was a position; the term in which we
22 usually refer to in court proceedings is argument,
23 which doesn't mean a damn thing. Your job as a
24 technician was to do a thorough of making sure
25 the facts and circumstances were there, and in fact

17

1  for the Pennsylvania State Trooper's Association.
2  It's my recollection that the one from the State
3  Trooper's Association was Bruce Edwards. Who's
4  now, he's the current president now, and I believe
5  retired Major Leonard Washington for the
6  department. It would have been the Governor's
7  Office job, once it went to this appeal panel, to
8  gather any other purgative fact.
9       Q:    Right
10      A:    My role was simply to turn over
11 what I had.
12      Q:    And you did that?
13      A:    Yes
14      Q:    You weren't ever asked to alter
15 what you turn over were you?
16      A:    No
17      Q:    And that's something you would
18 never consider and contemplate, right?
19      A:    Absolutely not.
20      Q:    What did you do wrong?
21      A:    Excuse me
22      Q:    What did you do wrong?
23      A:    To my knowledge I did nothing
24 wrong.
25      Q:    I don't know what you did wrong.

1  Colonel Hickes said "yes". That's correct, right?
2       A:    But let's not get it confused. My
3  role was to insure that the Pennsylvania State
4  Police, Bureau of Personal, Labor Relations had
5  sufficient information to form an opinion and to
6  argue or resolve the case in front of the PSTA
7  Grievance Committee. My job was not to provide
8  expert consultation and advise to this tri-part type
9  panel. That would have been, this tri-part type
10 panel is comprised of an individual by the name of
11 William Mullin who is from the Governor's Office
12 Administration, Bureau of Labor Relations. He's
13 now my co-worker.
14      Q:    Bureau of Labor Relations?
15      A:    Yes
16      Q:    Do you know his signature?
17      A:    I've seen it enough times.
18      Q:    Is that his signature there?
19      JOANNA REYNOLDS: Let me see the
20 document he's showing you.
21      MR GRAB: To be honest with you I
22 couldn't say. I don't recognize that.
23      MR BAILEY: Okay
24      MR GRAB: Then there are two other
25 representatives. One for the department and one

18

1  I'm just asking.
2       A:    Fair enough
3       Q:    Mark want I'd like to do is change
4  gears just a little bit. I want to ask you questions.
5  These are general or generic questions. They are
6  based upon your knowledge and experience, which
7  is rather unique. There are not a lot of people that
8  do what you do. It's based upon the assumption
9  that during the period of time that you have
10 performed your duties that you've handled a lot of
11 grievances. That you are intimately familiar with
12 the process of how they are handled and what goes
13 into, at least by experience, the evaluation of
14 grievances, the presentation of grievances, and the
15 judicatory process involving grievances. Is that fair
16 to say?
17      A:    Yes
18      Q:    Alright sir. With the Pennsylvania
19 State Police is it proper within Pennsylvania State
20 Police regulations as you recollect them, to make
21 an involuntary transfer for disciplinary reasons?
22      A:    Is it proper? Is that the word you
23 used?
24      Q:    Yes sir. Is it lawful or proper to
25 make it..

A:    That is a practice yes.  They do it.
They're not very successful in arbitration, but they
do form time to time initiate involuntary
disciplinary transfers.  Transfers in conjunction
with disciplinary action.

Q:    Is it proper to say that under
Pennsylvania State Police regulations and proper
practice, if an individual is guilty of misconduct
that fundamental due process standards dictate
that a person be told what they did wrong and that
any discipline meted out is in accordance with
standard by virtue of a contract or by virtue of
established practices within the Pennsylvania State
Police? i.e. Simple terms.  Mark you do something
wrong.  This is what you did wrong.  This is what
we found, and this is what the process brings with
it.

JOANNA REYNOLDS: Before you
answer.  If you're asking about whether
fundamental due process requires that I would
object, because he's not an attorney.  If you're
asking him if certain things are required to be told
of someone in his experience as a Labor Negotiator
or as a person, who handles Labor Negotiations
then I think it is an appropriate question.  I'm not

21

sure.  You did both of those into that question.  So
I think you need to rephrase your question.

MR BAILEY: Let me say this.  First of all
I think questions of what fundamental due process
are, are really common sense things.  I don't think
it takes an expertise of an attorney and I think
there's tons of people out there that understand
those thing as well or better then attorneys.
Number two, cause I really do think they're
common sense things.  Secondly, I also think they
are part of American life and procedure every
where.  The idea of being told you know what you
did an opportunity to confront or respond, and
some type of adjudication according to know or
established standards.  I'm really asking him based
on his experience.  I mean I object to your
objection, but that aside.  I am asking him based
on the extensive experience in dealing with
grievances and practices in the Pennsylvania State
Police.  I admit that the reason I'm asking and why
I brought him in here as a witness to question
about these processes not about individual
knowledge.  Okay that objection is stated, it's on
the record.

JOANNA REYNOLDS:  The question I

22

had is you started out with does it require
fundamental due process protections.  Then you
switched to his experience in his current job and in
his past job. So I guess what I'm asking is are you
asking him about does fundamental due process
require this, which again I think is a legal question
and he's not competent to answer that?  Or are
you asking him in his job as a labor negotiator
does he believe that certain things are entitled to
be given to an individual who's grievance...

MR BAILEY: Let me again say that I
think that's an objection, which under our
stipulation of objection he may respond.  That
objection is taken to time of trail.  The issue of
whether or not he's qualified, which I think he is,
but regardless.  First of all what is due process in a
grievance situation is not for attorneys it's for the
court.  It is a law question.

JOANNA REYNOLDS: That's my point.

MR BAILEY: That doesn't he can't
respond though.  You're not the court.

BARBARA CHRISTI: Are you asking him
Grab to respond as a lay person you know from the
keybe version of what looks like fundamental due
process or are you asking him to respond as the

point of view of what you just said, as a court
decision?

MR BAILEY: Barbara that makes
absolutely no difference.  You can raise that
question with the judge.  Your objection is noted.  I
just want to go on with the deposition and question
him.  You know, you can't tell him not to respond
anyway.  You're not representing him here.  So let's
let me just get on with the deposition.  Your
objection is noted.  I'm not going to spend much
time.....

BARBARA CHRISTI: I think we do have
an interest in the clarity of the questions

MR BAILEY: Barbara

BARBARA CHRISTI: Put to any witness
and I think all we're asking is if you'd clarify.  If
your asking him based upon his expertise in the
field of Labor Relations, or based upon the
Collective Bargaining Agreement, or practice in
president in the State Police during his time and
experience there then certainly there's no objection
there.  But it wasn't clear as to what you were
asking in this prop.

MR BAILEY: I'm gonna say again you've
stated your objection.  It is noted.  It can be taken

up at a later time according to our stipulation. I'm
going to continue on and ask him. This is all this
is doing is delaying us, and our debate here about
the rightfulness or wrongfulness or
appropriateness of the question. Which I have no
doubt in my mind it's an appropriate question, but
be different. If something to be resolved later.

BARBARA CHRISTI: Do you have a
recollection counsel of what the question was?

MR BAILEY: I'm going to go back to it.
I'm just going to tell you that at this time we are
debating something that by stipulation is suppose
to be reserved to time of trial. Let me get back.
Based on your knowledge and your experience,
your understanding as a labor negotiator that the
Pennsylvania State Police are bound by the same
standard of fundamental due process that govern
other legal processes in the United States.

MR GRAB: Due Process as it related to
the concept, which is commonly use within the
field of Labor Relations, every individual has the
right to due process in disciplinary action.

Q: And if the Pennsylvania State
Police if a person for example doesn't do anything
thing wrong, but is transferred involuntarily

25

because someone doesn't like them. Is that a
violation based on your knowledge or experience of
the Pennsylvania State Police Contract or State
Police due process standards.

A: If that were to occur that would, I
believe, a violation and abuse of the authority.
There is a Collective Bargaining in place that
comes to Bargain Unit and dictates how transfers
will and will not work. The language is clearly in
the Collective Bargaining Agreement.

Q: So if having read a lot of grievances
in the Pennsylvania State Police and going over the
Pennsylvania State Police grievances for a matter of
years. If a person is not notified of what they've
done and is not processed in a disciplinary
procedure according to the contract and is
transferred, as a matter as put in the penalty box
punished as it were, that would be a violation of
their rights under the contract. The judge and the
jury will decide whether or not it's a Constitutional
violation, but that would be a violation of contract.
Is that fair to say, Mark?

A: Is your question to me, sir, that if
there was a transfer effected that was not in
conjunction with discipline would it be a violation

26

of contract? Or is your question to me if there
was...

Q: That's me question you just stated
a lot better then I did. That's the question.

A: If there was a transfer effected that
was not part of disciplinary action as long as it
followed the provisions of the Collective Bargaining
Agreement it would not be a violation of the
Collective Bargaining Agreement.

Q: And if it did not follow the
provisions of the Collective Bargaining Agreement?

A: Then obviously it could very well
constitute violation of CBA.

Q: When did you first learn that
Darrell Ober was being transferred to Washington
Pennsylvania?

A: I really don't recall.

Q: Do you remember when you
learned it in that process?

A: If memory serves my it was
sometime after the Reimbursement Compensation
Appeal Panel had met and decided those first two
grievances.

Q: Do you know whether there are any
Pennsylvania State Police regulations, Mark, that

specifically prohibit using transfers in lue of
appropriate disciplinary action? If you know.

A: I don't recall.

Q: You don't recall?

A: They have so many regulations.

Q: You don't recall that one?

A: I'm trying to review in my mind AR-
425. 46, field rank 11. There's a field regulation on
transfers that I have, I could say for sure. Under
oath sir I couldn't say for sure. There is a field
regulation on transfer. It could very well have
language in there to that effect.

Q: What is the term "penalty box"
mean in the State Police departments?

A: The one and only time that I ever
heard it used was when an individual in a
command position had, in some way or another,
done something that...

Q: Fell into disfavor?

A: Sure. They were then placed into a
position to remove them from the position that
they were in.

Q: The position of grace and veneer

A: It was... I heard it in passing one
time, and it was not in Captain Ober's case. But I

1 did get an off-handed comment that a person had
2 been put into the penalty box.
3     Q:   And what were the circumstances
4 that you heard, I mean I understand that it didn't
5 apply to Captain Ober's case, but what
6 circumstances did you heard in part?
7     A:   There was a Major who was placed
8 into an Executive Officer's position for one of the
9 Deputy Commissioners and the comment was he
10 was there because it was the penalty box. I believe
11 it was the individual that was the department
12 disciplinary officer at the time Captain Larry
13 Williams.
14     Q:   Black gentleman, tall?
15     A:   Yes
16     Q:   Him?
17     A:   Yes
18     Q:   So but Larry Williams... he's the
19 one that made the comment?
20     A:   Yes
21     Q:   Know where the state of North
22 Carolina is?
23     A:   Excuse me?
24     Q:   Do you know where the state of
25 North Carolina is?

29

1     A:   Yes
2     Q:   You know if Mr. Williams is there?
3     A:   I don't know. I have no contact
4 with Mr. Williams.
5     Q:   Alright. What Major was this
6 about?
7     A:   I believe it was a Major Peacock.
8 He had been the Director of BR Technology
9 services and there was some issues. Alleged issues
10 between him and the Consultants. They were
11 handling the admission for the department.
12     Q:   Without getting into them. Do you
13 know if Major or Mr. Peacock also had some
14 personal domestic problems that figured in any of
15 that?
16     A:   I wasn't aware that that was the
17 issue. I've become aware of that since, but not
18 that it was necessarily tied to that.
19     Q:   That's okay. Let's disregard that's
20 fine. Just set that aside. Who was this alleged, if
21 it's an infraction let me not refer to it as and
22 infraction. Let me refer to it as an irregularity.
23 Who was the Commissioner at that time?
24     A:   The entire time I was employed by
25 the Pennsylvania State Police Colonel Evanko was

30

1 Commissioner.
2     Q:   Who was the Deputy for
3 Administrations?
4     A:   At that time it was Lieutenant
5 Colonel Tom Coury.
6     Q:   Do you have a recollection of what
7 position Mr. Westcott filed?
8     A:   These are the ones I get confused.
9 He was the Deputy Commissioner of I believe Staff,
10 but I could be wrong. It was either Staff or
11 Operations.
12     Q:   Can you outline for us briefly
13 based on your experience, as you sit here today,
14 the procedure to be followed in initiating a formal
15 disciplinary action against a Member of the State
16 Police?
17     A:   What is it you want?
18     Q:   Can you outline for us that
19 procedure? What's involved?
20     A:   Sure. A complaint is lodged with
21 the Bureau of Professional Responsibility. At the
22 time that it's involved the nature of the complaint
23 is ascertained. A number is cut. An investigator is
24 assigned, and the investigation takes place during
25 which the who, what, when, where, why, and to

1 what extent questions are answered by the
2 investigator interviewing various witnesses to
3 gather information. Once the particular outcome
4 of that process then determines whether or not it's
5 to be deemed a full investigation or a limited
6 investigation. Limited investigations the varies
7 that are reported on subject to from
8 correspondence typical in cases where there's just
9 no grounds for the alleged violation is one of the
10 ways it can be indicated. Full investigation is
11 when there's the need for a general investigative
12 report to be completed. That general investigative
13 report is then forwarded to the Commanding
14 Officer, either the Troop Commander or the Bureau
15 Director, who then reviews then determines
16 whether or not disciplinary action will be taken.
17 That adjudication results in, I believe, one of three
18 finds. Most common sustained, unfounded, or
19 founded. Or not sustained, unfounded, and
20 founded. If the Commanding Officer decides that
21 they're going to initiate disciplinary action they
22 issue a disciplinary action report. Give the
23 member an opportunity to arrange for union
24 representation and/or provide any comments they
25 feel pertinent to the allegations. Then once that

1   DAR is issued it goes to the department
2   Disciplinary Officer, who reviews the general
3   investigative report, the summary that's typically
4   done by the Commanding Officer, and determines
5   whether or not disciplinary actions will take place
6   and if so, to what extent.
7      Q:   Well does the Commissioner... Who
8   appoints investigators to investigate people in the
9   State Police when that situation arises?
10      A:   I believe AR-425 outlines that
11   that's the responsibility of two individuals, either
12   the Director of the Bureau of Professional
13   Responsibility, or the Director of Internal Affairs.
14   And AR-425 invest line authority of the
15   Commissioner to those individuals in making those
16   decisions.
17      Q:   Well if I'm a Regional
18   Commander...what Regional Commander usually
19   make..
20      A:   A Commander?
21      Q:   I'm sorry, Area Commander.  Is
22   that usually a Major?
23      A:   Yes
24      Q:   If I'm a Major, I'm an Area
25   Commander.  Can I come out there and look out

33

1   through my command and take a couple of
2   Lieutenants and tell them they go investigate Joe
3   Some, if he's a member of State Police?
4      A:   Without a complaint being filed?
5      Q:   Yeah no verification or anything
6   like that.
7      A:   No I believe that process calls for
8   very specific action, and that is that first of all a
9   work force complaint and processing, use of force
10   it's a long term, use of force complaint and
11   processing worksheet.  It's called a 101.  Must be
12   filed out, and forwarded as a complaint to the
13   Bureau of Professional Responsibility.  At which
14   time a decision is made as to whether or not the
15   Bureau of Professional Responsibility will
16   investigate that case.
17      Q:   What if the Bureau of Professional
18   Responsibility says no?
19      A:   They would say...
20      Q:   Mark I'm sorry.  I deserted you.
21   Let's say the Bureau of Professional Responsibility
22   says "Hey Major Bailey I understand you're
23   unhappy maybe or whatever, but this person didn't
24   do anything wrong and we're not gonna... You
25   know dipping his cookies in milk is not a violation

34

1   of department regulations." Okay?
2      A:   Okay
3      Q:   Do I have an appeal right?
4      A:   As the Major?
5      Q:   Yeah, the bureau assuming...
6      A:   Do you have an appeal right?  Is
7   there a specifically outlined right to use?
8      Q:   Yes sir. Yes sir.
9      A:   No
10      Q:   No I didn't know of any.  I won't
11   ask or explain.
12      A:   No
13      Q:   Okay so I go to BPR and BPR says
14   there's not a violation here.
15      A:   Which is one of the reasons why a
16   limited investigation would occur.
17      Q:   Okay that's fair enough.  Now how
18   many, in that six years or so you worked for
19   Pennsylvania State Police, how many investigations
20   did you see where a person was investigated to
21   found out if they violated, if they did something?
22      A:   That's typically the case.  There is
23   an allegation if misconduct.  The classic scenario is
24   either misconduct of some sort or performance
25   deficiencies.  The Bureau of Professional

35

1   Responsibility typical does not get involved in the
2   performance deficiencies, but if there is an
3   allegation of wrong doing by a member of the
4   department an investigation at some level is
5   conducted.
6      Q:   Okay and it that that the
7   allegation...I mean is this facetious as it might
8   sound?  What if the allegation it that this
9   individual dips his cookies in milk.  I mean I
10   assume that's not going to be taken seriously.
11      A:   The process would call for the
12   Bureau of Professional Responsibility to first
13   validate the complaint.  If it were an outside
14   complaint that is they'd want a complaint
15   verification form signed by the complainer, and a
16   decision would be issued a correspond would be
17   issued to the complainer that in fact the alleged
18   infraction was not a violation of departmental
19   policy, rules, regulations, and procedures.
20      Q:   What if the Commissioner goes out
21   and appoints two Majors to investigate a Captain
22   and doesn't take it to BPR and just has it
23   conducted?  What happens then?
24      A:   I couldn't tell yah.  That's not in
25   the process.  I couldn't tell yah.

Q: That's not in the process did you say?

A: That's right.

Q: Did I hear you correctly?

A: That's right

Q: Have you ever seen an allegation in the Pennsylvania State Police, by anyone at any level, were there's an object of investigative fancy or someone who wanted someone investigated that an adjudication had been directed or had been influenced by the Front Office? Do you want me to rephrase that? Do you know what I'm asking?

A: I'm searching my memory.

Q: Mark before you respond

A: Your saying that's a policy, and I told her that, of the library

Q: Alright let me see if I can clean my question up then, a little bit

A: Okay

Q: You never indicated to Mrs. Claude that as a police department or as a law enforcement policy you wanted her to gather street addresses or convert Post Office boxes addresses to street addresses for your purposes as a Law Enforcement Official?

37

A: I can only answer the way I've answered, Mr. Bailey. I told her " it was up to her".

Q: Well it is a very important question. I'm gonna try again and maybe it's too complex. You never told her that as a police department you were interested in street addresses as opposed to post office boxes?

A: No

Q: And you never asked her to do anything in order to replace post office box addresses with street addresses?

A: Yes and I think it's important…

Q: Is the answer to that yes?

A: The answer to that is yes. I'm sorry.

Q: That's all right

A: She called me about the issue.

-----------END OF SIDE ONE TAPE ONE-

--------

Q: I think you indicated that you didn't call her she called you. In response to one of my earlier questions you indicated it's not overly burdened among the police to get a street address for a post office box address if necessary. Correct?

38

A: That's correct

Q: You had also indicated I believe that…Strike That! Let me go back to the complaint. There's an allegation and a complaint that certain individuals, in the complaint they're non-Jewish individuals, paragraph 24. It says on July 9, 2001 Karen Beckdul, his address is Gettysburg College Box 101, and Andrew Dangle, his address is Gettysburg College Box

------------NOT INTELLIGIBLE------------

Q: Okay sir

A: No, I can't say that I would have specific knowledge about the Front Office changing the adjudication that I can recall.

Q: Do you remember the Stackhouse case?

A: Diana Stackhouse? I remember that case.

Q: Is there any allegation at any time that an adjudication had been influenced or directed? And my second question to let you know where I'm going Mark is; Did you ever reach a

conclusion in that case that whether there was an allegation made that there had been…give us your decree of certainly. Strong likely hood, likely hood, or you felt certain that there had been an adjudication effected in that case by Mr. Coury.

A: I believe, the Stackhouse case was adjudicated by Colonel Coury. I recall Colonel Westcott had wanted to do it, but he retired prior to that investigation coming to a full stop.

Q: Did you ever confront Mr. Coury with that issue?

A: No sir

Q: Did you ever ask him any questions?

A: No sir. It would not have been within my authority to do so.

Q: Now I know it may not have been within your authority. It's probably not within my authority either, but I could picture myself asking him. My question is; did you ever ask him or discuss it with him?

A: No I did not

Q: Have you ever discussed Captain Ober with Mr. Coury?

A: Not that I can specifically

1  recall. I never had much of an opportunity to sit in
2  audience with Colonel Coury. I had two
3  individuals above me, in between me and that level
4  of supervision.
5      Q:   Well no, I think I'm probably
6  aware of that. The issue though, the question is
7  whether or not you had the discussion. Had there
8  been any discussion at all? It's not so much what's
9  in between.
10     A:   I could not honestly answer
11 one way or the other. I really I don't recall.
12     Q:   Okay
13     A:   I don't recall having a conversation.
14     Q:   No, if that's the correct answer it's
15 fine. Now Mark I want to ask you some question
16 about the LCE. At some point did you come to
17 learn that Captain Ober had been transferred to a
18 Lieutenant's position in LCE?
19     A:   Yes
20     Q:   Do know whether or not Mr. Ober,
21 Captain Ober had filed a grievance?
22     A:   I believe he did, yes.
23     Q:   We've had numerous witness here
24 who indicated that's what they of no circumstance,
25 some what thirty years of experience in the State

41

1  Police, of a Captain being assigned to a
2  Lieutenant's position. So I want to ask you
3  because of your knowledge of the situation a litany
4  of fact questions here.
5      A:   Okay
6      Q:   Did you at any time learn that the
7  position in the LCE to which Captain Ober had
8  been assigned was in fact a Lieutenant's position?
9      A:   To my knowledge it had always
10 been a Lieutenant's position.
11     Q:   Did you...
12     A:   I was involved in the case that
13 created that vacancy.
14     Q:   Alright sir. I understand that. In
15 the years that you worked with the Pennsylvania
16 State Police do you know of other situations where
17 Captains where assigned to Lieutenants's position?
18     A:   That specific example Captain to a
19 Lieutenant's position?
20     Q:   Yeah
21     A:   No I don't.
22     Q:   Now, did you ever reach any...Do
23 you remember a Captain Campbell?
24     A:   Sure. You don't forget Al Campbell
25 once you meet him.

42

1      Q:   Now I understand Mr. Campbell
2  submits his retirement papers sometime around
3  here May of 2000. Is that right?
4      A:   That sounds right.
5      Q:   What's a clean message? You
6  know the acronym C-L-E-A-N.
7      A:   Commonwealth Law Enforcement
8  Assistance Network. A CLEAN message is a
9  message that goes out to the command structure,
10 and it could cover almost any topic.
11     Q:   Do you have a recollection of
12 whether or not the position occupied by Ober as
13 the Central Section Commander whether it was
14 one of the positions listed?
15     A:   Listed where sir?
16     Q:   It was not listed for vacancies for
17 May of 2000.
18     A:   If you're telling me that there's a
19 routine CLEAN message that lists vacancies I'm
20 not aware of that. I would not have had a reason
21 to look at that document, if there was such a
22 document.
23     Q:   During the time that Ober was
24 placed in the Lieutenant's position in LCE do you
25 have a recollection on whether he had active

43

1  grievances and active court actions pending
2  against the department?
3      A:   Yes he did.
4      Q:   Did you become involved in any
5  way in the decision or have any input in the
6  decision to restore Captain Ober to a Captain's
7  position?
8      A:   Formally, no.
9      Q:   Informally?
10     A:   Conversations with I believe it was
11 Bill Mullen at the Governor's Office because of the
12 Labor Relation implications, and the active
13 grievances.
14     Q:   Let me ask you about that Mark. I
15 want to tax that mind of yours it's memory backs
16 that you referred to earlier.
17     A:   They're faulty
18     Q:   Well I don't know how faulty they
19 are. I have a tendency to think that the
20 mechanism in there is very good. So I ask you to
21 just take a moment back in your mind's eye.
22     A:   Sure
23     Q:   Do you ever offer the opinion or say
24 to anybody "If this is done to Ober you mine as well
25 write him a check." or words to that effect? OR

WORDS TO THAT EFFECT.

A:   The only conversation that I recall having concerning that particular action, and again that if memory serves me, it was that there was a Captain's spot available he should have just been slid into that position.

Q:   It was an error not to do that?  It could have dire consequences not to do that?

A:   I believe I may have shown the opinion that it wouldn't look well in light of the pending litigation.

Q:   Why did you feel that way Mark?

A:   Because I believe that came second after the attempt to transfer Captain Ober to western Pennsylvania.  Then there was the action that put him into Lieutenant Houston Williams' vacant position.  There was a position available.  There was active grievances.  One of my roles is not simply to represent grievances, but to look at potential resolutions, and liability assessment.  Certainly not to the extent of the Chief Counsel's Office, but from the labor arbitration stand point.  I was of the opinion, it was shared, that it would be a way to resolve the grievance to put Captain Ober into the Captain's position that was there.

45

Q:   It's fair to say that you were of the opinion, you weren't saying any one was doing anything wrong, but you were very concerned with appearances?

A:   Well sure

Q:   Right.  That's your job.

A:   Yes

Q:   In order for you to properly serve your master at that time to do your job that was a duty and responsibility of you to look at those situations and say "Hey, I'm not here grinding any personal acts.  I'm not saying anyone else is grinding any personal act, but I'm saying an objective analysis of this thing, this could create problems."  It's that fair to say?

A:   Yes, and I believe I shared that opinion with Linda Bonney, Director of Personell.

Q:   And what did Linda say to you sir?

A:   I believe her comment was to stay away for it.

Q:   Did Linda say why she felt you should stay away for it?

A:   No sir.  I did not question her about it.

Q:   It was your duty but to do or die,

46

and not to question why at that time.  Is that right?

A:   That's about it sir

Q:   I understand.  In expressing these view point first of all you were doing your job.  That was your duty and responsibility in a context of a labor negotiator.  Isn't that correct?

A:   Yes

Q:   The client that you were serving it was your duty and responsibility to serve that client, and technically the client was the administration.  Is that fair to say?

A:   Yes

Q:   You did that job and you did it properly and decently.  Isn't that fair to say?

A:   I think that's fair to say, yeah.

Q:   I'm gonna change gears just a little bit, and ask you a few other things here Mark.  You had indicated in response to an earlier question that when you had gone to Colonel Hickes about some issue having do with a grievance filed by Mr. Ober.  That Mr. Hickes had indicated yes I either gave those instruction or said that was okay or prove something rather.  I don't even remember the details.

A:   Okay

Q:   Isn't that fair to say?  That there was something of that sort there.

A:   There was a conversation between Lieutenant Colonel Hickes and myself, yes.

Q:   To prove that you talked Colonel Hickes did you have any knowledge of any rumor or background which would indicate that there was some kind of a personal feud or problem, political problem if you will, between Colonel Hickes and Colonel Evanko?

A:   Yes

Q:   For years I've heard these rumors.  I mean I've been involved in politics a little bit myself, and what not.  I heard these different things.  Is it fair to say,  for whatever value it may have or may not have, that the rumor bill for year that there had been some type of turf battle or difficulty between Mr. Hickes and Mr. Evanko?

A:   What I had heard was that there was some difficulty between the two of them.  I didn't hear anything specific about a turf battle.

Q:   Okay, but there was a difficulty right?

A:   Yes

48

Q:   Did you ever hear the Mr. Evanko attempted to have Mr. Hickes removed as a Deputy after the, I don't know how to call it the Ober incident. I maybe should call it the FBI incident, but whatever you'd call it. The matter where Mr. Ober had been approached by the FBI and then reported that at a later date to Mr. Evanko. Did you ever hear that Mr. Evanko had wanted to get rid of Mr. Hickes over that?

A:   No I didn't hear that.

Q:   Now, disciplinary process in the Pennsylvania State Police. Based testimony you already provided we understand that process starts with an investigation of misconduct.

A:   Um-mum

Q:   My understand is it includes what's called a

Pre-disciplinary Conference?

A:   Yes

Q:   How does that work?

A:   Once the general investigative report is received by the Commanding Officer from the Bureau of Professional Responsibility verification is provided to the member that they had up to three day to arrange to met with the

49

Commanding Officer to respond to the allegations contained with in the investigative report. During which time they have the right to attain union representation. They're also given an opportunity to provide a responds in writing if they so chose. That meeting if it is requested constitutes the Pre-disciplinary Conference.

Q:   I can't say that there was a complaint. Excluding Captain Ober' do you know of complaints or investigations launched by the Commissioner into an action or alleged action or misconduct, call it what you will, of a Pennsylvania State Police Officer at the rank of Captain or above?

A:   Do I personally know of an incident? No, I do not know of an incident. However there would certainly be within the Commissioner's authority to request an investigation be conducted.

Q:   No doubt about that. I don't think, it's probably within my authority to request an investigation be conducted. How does the Commissioner go about requesting that an investigation be conducted?

A:   I would assume just like

50

anyone else. He would have to make contact with the Bureau of Professional Responsibility and file that complaint.

Q:   I'd like to talk with Mr. Ober for just a couple of minutes before we continue.

A:   Sure

Q:   We're just gonna step out of a second. No you don't have to, well if you want to shut things down, but we're only gonna be a minute I think. Is that okay or do you want me to shut down?

JOANNA REYNOLDS: No that's fine.

Q:   We'll only be thirty seconds. Be aware that things running here.

MR BAILEY: You know what? This recorder is still running. Okay let's go back on the record. Do you have any questions?

JOANNA REYNOLDS: I might have one later on.

MR BAILEY: Ladies and gentlemen we're back on the record. It's about 3:00 p.m., go ahead. Why don't you just mark the time on that machine.

CRYSTAL LYDE: Okay, it's 2:59 p.m.

51

We are back on record.

MR BAILEY: You know Mark I very much appreciate you coming here today. I'm grateful to you. I don't have any other questions at this time. The opposing counsel may have some questions.

MR GRAB: Okay

JOANNA REYNOLDS: It's just a clarification question here.

MR GRAB: Sure

Q:   You indicated that to get to the financial reimbursement board that there had to be a meeting of a group of people first. Is that correct?

A:   In Captain Ober's case?

Q:   Yeah, well in order to get to the three member reimbursement board that made the determination in the case as to whether or not he would get reimbursement for certain things

A:   Um-hum

Q:   Regarding the grievance that was filed. You said that, I think it was the Grievance Board, had to meet and you said it was a ten-member board.

A:   The Grievance Committee. PSTA

52

1  Grievance Committee it's called
2        Q:   Okay, and they all had to vote.
3  You said they voted unanimously to send it to the
4  Financial Reimbursement Board.
5        A:   It's not a hand vote Joanna, but we
6  set around the table much like this and we discuss
7  each case that the PSTA put on the docket for each
8  month. We could have five cases. We could have
9  fifty cases, but we discuss the matters of each
10  case. What is discussed it is agreed that what is
11  discussed stays within that room. That is an
12  agreement between the Commonwealth and the
13  association, except the particular outcome of our
14  actions. That's not something that's deemed to be
15  confidential. The PSTA Committee decided that at
16  that point that that issue was best heard in front of
17  the Reimbursement Compensation Panel.
18        Q:   Once that decision is made do you
19  convey that information to anyone? In other
20  words, do you make anyone aware in the
21  administration that that issue is going to go to the
22  Reimbursement Board?
23        A:   Sure. I would let my immediate
24  supervisor be aware of that and I would let our
25  clerical assistant be aware of it because she's the

53

1  one would then schedule the meeting.
2        Q:   Then how are the members...When
3  you say your "immediate supervisor" you're talking
4  about Linda Bonney?
5        A:   Well my immediate supervisor, I
6  believe, at the time was a Brenda Estep, but
7  because Brenda had no prior experience in the
8  field of Labor Relations Linda Bonney had advised
9  me to deal with grievance issues, discipline issues,
10  and Labor Relations philosophical discussions with
11  her. Until such time as Ms. Estep could get up to
12  speed. So yeah in this particular case it would
13  have been Ms. Bonney.
14        Q:   Okay so you would have reported
15  the fact that this was going to the Reimbursement
16  Board to Ms. Bonney?
17        A:   Yes
18        Q:   And then after that you just what?
19  You had to gather information for the
20  Reimbursement Board or?
21        A:   No I had to take...
22        Q:   Why did you go to Colonel Hickes
23  then?
24        A:   I did that before I went to the
25  board.

54

1        Q:   Okay
2        A:   When I received the grievance my
3  job is to investigate and respond to grievances.
4        Q:   So this is before it went to the
5  Grievance Board?
6        A:   My discussion with Colonel
7  Hickes?
8        Q:   Yes
9        A:   It was before the meeting with the
10  ten-member PSTA Grievance Committee, yes.
11        Q:   And that information that you
12  collect, would that also go in the packet over to the
13  Financial Reimbursement Board to consider?
14        A:   The information that comes in with
15  the grievance, yeah. But realize we don't normally
16  get those as grievances.
17        Q:   Okay. What I'm trying to get at is
18  there was no testimony put on before the Financial
19  Reimbursement Board was there?
20        A:   No I believe I stayed at that.
21        Q:   So they would rely on any
22  information they received including the information
23  that you provided in the interview with Colonal
24  Hickes?
25        A:   Yes

1        Q:   Okay. That's all the information I
2  needed.
3        MR BAILEY: I never impeach my own
4  witnesses. I'd like to thank you.
5        CRYSTAL LYDE: It's 3:03 p.m. The
6  deposition of Mark Grab is completed. Thank you.

# INDEX

abuse of the authority, 23
adjudication, 20, 29, 33
administration, 43, 48
allegations, 10, 15, 30, 45
appeal board, 12
AR-425, 25, 30
arbitration, 5, 19, 41

Bonney, 12, 13, 49
BPR, 32, 33
Brenda, 49
Bureau Director, 29
Bureau of Labor
Relations, 5, 16
Bureau of Professional
Responsibility, 28, 30,
31, 32, 33, 45, 46

Campbell, 2, 39
CBA, 25
Chief Counsel, 1, 3, 9, 12
Claude, 34
CLEAN, 39
Collective Bargaining, 22,
23, 24
Commanding Officer, 29,
45
Commissioner, 28, 30, 33,
45, 46
Commonwealth, 5, 10, 11,
39, 48
complaint, 28, 31, 33, 35,
45, 46
complaint and processing
worksheet, 31
Conley, 2
Constitutional violation,
24
Coury, 2, 9, 12, 13, 28, 36,
37
Christi, 1, 3, 13

Deputy, 9, 11, 14, 26, 28,
44

Deputy Commissioner, 9,
11, 14, 28
disciplinary action, 19, 23,
24, 25, 28, 29
disciplinary officer, 26
disciplinary procedure, 24
disciplinary process, 44
disciplinary reasons, 8, 19
due process, 19, 20, 21, 23

Edwards, 17
Estep, 49
Evanko, 2, 28, 44
experience, 3, 6, 18, 19,
20, 22, 23, 28, 38, 45,
49

FBI, 15, 44
Front Office, 33, 35

Governor's Office, 5, 16,
17, 40
grievance, 8, 10, 12, 15,
21, 38, 41, 43, 48, 49,
50
grievances, 6, 9, 10, 18,
20, 24, 25, 40, 41, 50

Hickes, 11, 15, 16, 43, 44,
49, 50

investigation, 10, 14, 15,
29, 32, 36, 45, 46

job selling, 15

labor negotiator, 21, 23,
42
Labor Relations, 5, 6, 7,
16, 22, 23, 49
Labor Relations
Coordinator, 5, 6
lawsuit, 5, 6, 9
LCB, 37, 38, 40

Lieutenant's position, 37,
38, 40
Linda, 12, 13, 42, 49
Linda Bonney, 12, 13, 42,
49
Lost Damage
Reimbursement
Compensation Appeal
Panel, 10

misconduct, 19, 32, 45
Mullin, 16

Ober, 2, 3, 5, 6, 7, 8, 9, 10,
14, 15, 25, 26, 37, 38,
39, 40, 41, 43, 44, 45,
46, 47
objection, 20, 21, 22

Peacock, 27
penalty box, 24, 25, 26
Pennsylvania State Police,
3, 5, 6, 7, 8, 12, 15, 16,
18, 19, 20, 23, 24, 25,
28, 32, 33, 38, 44, 45
Pennsylvania State
Trooper's Association,
17
Pre-disciplinary
Conference, 45
PSTA, 10, 12, 16, 48, 50
PSTA Grievance Board,
10
PSTA Grievance
Committee, 10, 12, 16,
48, 50

reimbursement, 9, 10, 11,
15, 47
Reimbursement Board, 48,
49, 50
Reimbursement
Compensation Appeal
Panel, 25
Reynolds, 1, 3, 13

Stackhouse, 36
State Police, 5, 18, 19, 22,
23, 24, 25, 28, 30, 38,
45
street addresses, 34

the department, 9, 13, 14,
15, 17, 26, 27, 30, 32,
40
transfer, 7, 8, 9, 19, 24,
25, 41
Troop Commander, 29

union representation, 29,
45

violation, 23, 24, 25, 29,
31, 32, 33

Washington, 7, 17, 25
Westcott, 2, 28, 36
western Pennsylvania, 41
Williams, 26, 27

*Mary Bungo*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT

DARRELL G OBER          : 1 : CV- 01-0084

            Plaintiff            :

VS.                              :

PAUL EVANKO,              :
MARK CAMPBELL,          :
THOMAS COURY, AND    :
HAWTHORNE                  :
CONLEY                          :
            Defendants        :

DATE:                    April 10, 2002

PROCEEDINGS:      Video Deposition of
                            Mary Bungo

APPEARANCES:

        For the Plaintiff: Donald Bailey, Esquire
                            4311 N. 6th Street
                            Harrisburg, PA 17110

        For the Defendant: Barbara Christi
                            Joanna Reynolds
                            1800 Elmerton Ave.
                            Harrisburg, PA 17110

1

1   ALBERT RODRIGUEZ: Good morning ladies and
2   gentlemen. Please let me advise you again that video are in
3   operation. Today's date is April 10, 2002. The time now is
4   11:43 a.m. My name is Albert Rodriguez. My address is
5   4146 Spruce Park, Lebanon, PA 17046. I have been hired by
6   P.R. Video to take this video deposition for the plaintiff.
7   This case is in the United States Court for the Middle District
8   of Pennsylvania. It is docketed at number 1-CD: 01-0084.
9   Caption is Darrell G. Ober versus Evanko et.al. The deponee
10  is Mary Bungo. Ms. Bungo, please raise your right hand. Do
11  you understand this is a legal proceeding and do you swear to
12  truthfully answer the questions asked of you?
13      BUNGO:  Yes I do.
14      ALBERT RODRIGUEZ:  Would counsel please
15  identify themselves and provide their address and phone
16  number for the record.
17      MR BAILEY:  Yes sir, my name is Don Bailey.
18  I represent the plaintiff in this matter, Darrell G. Ober. My
19  address is 4311 North 6th Street, Harrisburg, Pennsylvania,
20  17110. My phone number is (717) 221-9500. My fax number
21  is (717) 221-9600.
22      BARBARA CHRISTI:  Chief Counsel of the
23  Pennsylvania State Police I represent the Pennsylvania State
24  Police defendants in this matter. My office address is 1800

1

1   Elmerton Avenue, Harrisburg, PA. 17110. Office phone
2   number is 717-783-5568.
3       JOANNA REYNOLDS: I'm an Assistant
4   Counsel with the State Police representing the defendants in
5   this matter. My address and phone number are those given
6   by the Chief Counsel.
7       RODRIGUEZ:   Very well you may begin.
8       BAILEY:  Any particular way you want me to
9   address you.
10      BUNGO:   Whatever you feel comfortable
11  with. Mary is fine
12      MR BAILEY:  Give us if you would please just
13  a description of the duties you perform let's say in a given
14  week for Commissioner Evanko, indecently who is present
15  with us today.
16      MARY BUNGO:  Well of course general
17  secretarial duties that would be related to any secretarial
18  position but beyond that I receive any document from outside
19  and within the department that would have his name on,
20  either addressed to him or would require his signature. I
21  maintain his schedule for him. I do some authoring for him.
22  I edit correspondence for him as required. I of course handle
23  phone calls things of that nature. Deal with individuals both
24  within and outside the department at various levels and pretty
25  much act as the general assistant to him and as required as

1   I'm directed to do something of for instance like author a
2   document for him letter of condolences or something of that
3   nature.
4       Q:  Do you make policy decisions for the
5   Pennsylvania State Police?
6       A:  Absolutely not.
7       Q  Do you make decisions about the practices in
8   the Pennsylvania State Police on behalf of Commissioner
9   Evanko?
10      A:  No.
11      Q:  Is there any written form of delegation of
12  duties. In other words delegation of power or duty that
13  Commissioner Evanko has given you. Has he ever given you
14  express instruction on what you are authorized to do for him?
15      A:  Well at some point after I began working for
16  Colonel Evanko when we had established a relationship at
17  one point he realized that my nearly thirty years of
18  experience would enable him to give me certain latitudes. He
19  then advised me that I would be able to autopen certain
20  documents providing the deputies had reviewed them. I only
21  do that after they have been reviewed by enlisted members. I
22  do not do that unless they pass thru a chain of command into
23  an order of process. I autopen a lot of correspondence for
24  him but that's letters. Those were generic type letter that go

1  out to perhaps senators or legislatures individuals in the

2  public.

3        Q:  One of the issues in this case as you may

4  know is the autopen of certain letters having to do, excuse me

5  of certain changes in AR 1, which is the major TO&E, table

6  of organizational equipment or table of  organization rather

7  regulation that is utilized by the department.  Are you

8  familiar with AR 1?

9        A:  I am.

10        Q:  When Colonel Evanko was here testifying,

11  he was very emphatic and very firm as I remember it that he

12  had no knowledge of sub-section C this change, which is a

13  material issue in this case.  He had no knowledge of it being

14  added to the AR.  Did you ever discuss sub-section C with

15  Colnial Evanko?

16        A:  No I don't even know what it relates to and I

17  can testify that I don't believe I even saw that

18  administrative regulation until it was autopen and sent

19  because it had passed thru the three deputies.  And I rely very

20  heavily upon their initials or the fact that they have reviewed

21  the document before I would autopen it.  In particular

22  Colonel Hickes and Major Merryman because all of the

23  directives that are written for the department, the bible so to

24  speak, are written within the Bureau of Research and

25  development and his staff of that bureau.  So when I see

4

1  Major Merryman initials and Colonel Hickes who is the

2  deputy of staff than I am very confident that I can autopen

3  because that they reviewed it because that is there shop so to

4  speak.  I don't believe Colonel Evanko saw AR 1 at all

5  because as I recall he was involved in budged preparations

6  and it was an issue to have that moved along because the

7  department was preparing for a colean inspection.  And if

8  passed thru so many many different individuals before it hit

9  my desk.

10        MR BAILEY:  Well we know that the deputies,

11  the different deputies we all know what they thought about it

12  but they certainly initialed having reviewed it.

13        MARY BUNGO:  that indicates that they are in

14  agreement with it.

15        MR BAILEY:  It does?

16        MARY BUNGO:  Yes.  If there would be any

17  changes that they would care to make they would make that

18  thru the process…their changes or revisions on it.  Or any

19  document that would come thru.

20        MR BAILEY:  OK.  But these are changes to

21  AR 1 and you autopen it.  You don't know whether, in fact

22  you 're telling us that of your knowledge that you know that

23  Colonel Evanko didn't even see it?

24        A:  I don't think he saw it until after he signed it

25  because I had autopen it and the deputies had reviewed it.  So

5

1  he relies very heavily on his deputies to handle those sorts of

2  things in his absence.

3        Q:  Hadn't he, wasn't he, didn't he have Colonel

4  Hickes investigated over this matter having to do with

5  Captain Ober though?  You are relying on very heavily on

6  this major change you are telling us.

7        A:  I'm not familiar with the major change.  I

8  actually don't know what major change you are referring to.

9        Q:  Sub section C?

10        A:  I have no idea what that says.

11        Q:  So you autopen Colonel Evanko signature to

12  changes necessary for the accreditation process.  You're

13  telling us…that's your testimony now.

14        A:  Yes.

15        MR BAILEY:  Without the Colonel seeing or

16  approving or hearing about it based upon an apparent

17  approval.  Based on the initials on this document.  By the

18  three deputies.

19        MARY BUNGO:  And the staff and research

20  and development.  And that particular document is staffed

21  out to the different entities within the department for their

22  input.

23        Q:  Like the lawyers, did the lawyers look at it?

24        A:  I don't, I can't speak to that.  They may

25  have.  But to the different bureau's and different troops and I

1  can speak to that because when I had worked in the year

2  previously I had remember portions of that document in

3  previous years being sent to the bureau of operations.  Where

4  those individuals will look at the part that applies to their

5  function.  And approve that.  So many many many

6  individuals within the department had seen that document

7  before it came to my desk.

8        MR BALEY:  Yes but Mary you just told us a

9  couple of minutes ago here that you don't know if that sub

10  section C was about.  You didn't even, all you saw was the

11  document which…

12        MARY BUNGO:  That other people had

13  reviewed.

14        MR BAILY:  Yes the three Colonels had…

15        MARY BUNGO:  Well I know besides the three

16  Colonels had…

17        MR BAILY:  How do you know there were

18  others besides the three Colonels?

19        A:  Because it was initialed.  Because executive

20  officers…it passed thru executive officers hands.  In the case

21  of certain deputies it passed thru secretarial hands, it was

22  staffed in research and development.

23        Q:  OK then how do you know all this?

7

1    A: Because the initials were on there then I can
2 make the determination that the appropriate people had
3 reviewed the document.
4    Q: When is a...I mean, is this the way Colonel
5 Evanko's policy on dealing with organizational changes in
6 the state police that effect major regulations. Did you do this
7 all the time? Did you ever check with him?
8    A: I think you would have to ask him that
9 question, but...
10    MR BAILY: I did.
11    MARY BUNGO: There are times when he does
12 review and sign documents. That particular 1 autopen. But
13 he does rely very heavily on his deputies in his absence to
14 insure that proper procedures are followed and so I do that as
15 well.
16    Q: So when you affixed it'd you, when you
17 autopen this change sheet, did you have a copy there of the
18 changes, did you have them there with you?
19    A: When I autopen it, it was a completed
20 document. It had processed thru the staffing process. It had
21 returned to the bureau of research and development. It was
22 typed and final. When it came to me it was the final
23 document that required a signature. So I did not review it a
24 second time nor would have I remembered a lot of the
25 context.

8

1    MARY BUNGO: I saw in draft form when it
2 had been staffed thru the research and development passed
3 thru the deputies. When some notations had been made.
4 Then I looked at it and read it myself...only for what might
5 have been glaring errors or typographical errors. I did not
6 review for policy or content.
7    MR BAILY: I mean no disrespect but you are
8 probably ten times better than I am at grammar spelling thing
9 and I make arrows like that all the time. And somebody with
10 your skill and your ability that work at your level you have
11 folks out there that can proof read and even computers these
12 days that check on certainly spelling and sometimes even
13 grammatical errors, right? When you are doing that kind of,
14 that's not what your hired and that's not what you do for the
15 commissioner is it? That's a work habit of yours. You're
16 probably highly skilled and you check it for that. But you are
17 telling us that you're going to review and that major revisions
18 to an AR. At the Colonel's level for spelling and
19 grammatical errors mam...is that what you are telling us?
20    A: Yes.
21    Q: You do?
22    A: Yes I do. Because anything with his
23 signature applied on it was my responsibility to insure that it
24 is an appropriate document as far as grammar punctuation
25 goes.

1    Q: Did you set it aside, did you give the Colonel
2 a not and say you need to look at this or double check this or
3 anything?
4    A: I don't recall that I did.
5    MR BAILEY: So a major change required for
6 accreditation, and I know from past work I've done how
7 important it is to Colonel Evanko, this accreditation process.
8 You autopen the approval of these changes based on the
9 initials of the deputy commissioners. The three Lieutenant
10 Colonels. Is that right?
11    A: I autopen it based on the review of the
12 deputy commissioners and any other individual that had
13 reviewed it and signed off on it. Which is an indication to
14 me that they are in approval of it. If they had not been they
15 would have made their intent known and it would have been
16 returned to the bureau of research and development and
17 changes would have been made by the staff there. So when it
18 came to me it was the finished product.
19    Q: Do you know when, did you look up any of
20 the history of this document as to when it was changed, had
21 been reviewed or evaluated?
22    A: I saw it when it first come thru in draft form.
23 What do you mean by the history of it?
24    MR BAILEY: What draft form did you see?

9

1    Q: But not policy?
2    A: But I do not, No. No. And actually most of
3 the directives I never make revisions to because they are
4 staffed in research and development. The documents that I
5 might revise or edit would be personal correspondence or
6 business letters that come up.
7    Q: Yes Mam, but we are talking about this AR.
8 We're talking about a litany of changes that have to do with
9 personnel that have been presented to us you witnesses here
10 in this case as this very significant need to get this document
11 in shape for accreditation. How often does the, what's it
12 called colea?
13    A: Accreditation is colea, every three years. I
14 believe.
15    MR BAILEY: Well you know it is fascinating.
16 I went in and looked at the historic file. I use to be auditor
17 general. We used to audit some of you folks function over
18 here. And I'm very familiar with this thing about this
19 accreditation process. I remember it quite well. Because it
20 reflex certain kinds of audit functions. But you know the last
21 time that AR 1 — One, according to my research had been
22 changed was 1997. Where there any complaints from the
23 folks that do the compliance auditing for the accreditation
24 agency about the status of AR 1 as of ninety seven, ninety

11

1  eight, three years ago would have been nineteen ninety eight.
2  Do you know if there were any existing complaints?
3        A: I don't.
4        Q: But you were concerned about that right.
5  About the accreditation coming up?
6        A: I wasn't.
7        Q: You weren't.
8        A: No I wasn't. I wasn't.
9        Q: You weren't because you know that the
10 Pennsylvania State Police as an organizationally is a fine
11 agency and is a superb police department, correct?
12       A: Without a doubt.
13       Q: Mam, I agree with you. But I'm having a
14 real hard time fitten in this need for accreditation and these
15 changes. Let me tell you why I am and let me ask you more
16 specific question. And maybe you can help dispel my
17 confusion and my problems, OK? When I looked at the
18 project summary, the project-tracking summary, and I'm
19 making reference to an exhibit that is in this case, McAlreavy
20 One. Are you familiar with the project tracking summary?
21       A: Not really. I imagine that's under the bureau
22 of research and development.
23       Q: It is Mam. It's like a history of the different
24 things that happen. It's right here you can look at it, your
25 attorneys have seen it, they know what it is. Now I had

12

1  noted, and I questioned Mr. McAlreavy, and I had noted that
2  there is a, back in October twentieth, a lot of personnel
3  changes to AR 1. In other words changes about titles and
4  positions, that sort of thing. Mr. McAlreavy had indicated
5  that it wasn't in compliance, it didn't match. That AR 1 did
6  not match what was happening in the department. There
7  needs to be changes. He seems very reasonable to me and he
8  certainly has some notes down there about some of those
9  things. And here is an entry, it's October twentieth at twelve
10 fifty pm where this thing was submitted to Pam. And then
11 the next entry is January nineteenth two thousand one ten
12 thirty five, I'm going to assume that's AM. Ten thirty-five
13 hours would be AM. resubmitted to Sharon. Sharon is going
14 to explain this to somebody over there in R and D, OK.
15       MARY BUNGO: Yes, that's an internal bureau
16 function. I have no knowledge of that.
17       MR BAILEY: No Mam, I don't think you do.
18 Do you know when Mr. Ober's lawsuit was filed?
19       A: No.
20       Q: Did you know where it was filed on January
21 sixteenth two thousand and one?
22       A: No.
23       Q: Now it says here, February twelfth two
24 thousand and one, see we looked at the historic file and we
25 couldn't find to many documents to explain this to us, in fact

13

1  we couldn't find any. But is says here, I'm sure they're there
2  I may not be able to read them or something. Here's
3  February twelfth two thousand one receive back for
4  corrections. Now did you play a role in sending it back for
5  like for grammatical or spelling errors?
6        MARY BUNGO: Received back from where?
7  From the executive offices?
8        MR BAILEY: Well, let me explain, I think the
9  next entry explains it. The next entry says  resubmitted to
10 front office. Which indicates that it had been in the front
11 office. OK, all this accruing after Mr. Ober's lawsuit was
12 filed. OK, received back for corrections resubmitted to front
13 office. Do you know anything about that?
14       A: I would assume that that implies, or refers to
15 when it had been staffed thru the front office, to the deputies,
16 to the executive officers and myself, and I do recall one error
17 though I did not locate it in the document. It was the
18 executive service section had been transferred under another
19 deputy. And I indicated that by doing it on a post-it I
20 believe. It was passed thru the deputies back thru the
21 research and development and then it would have been put in
22 the final version. Which I assume that is what that is
23 referring to. After it would have been sent to the executive
24 offices it would have been returned to the bureau of research

1  and development to be put in final form. To be returned
2  again for signature.
3        MR BAILEY: Now Mary, what you are telling
4  us about is that you found a section....
5        MARY BUNGO: No, No, No I believe I found
6  a statement on the first page. Listed under the deputy
7  commissioner of administration. This was one of the actually
8  about the only error that I located. It said that the executive
9  service section, which are the bodyguards of accu protection.
10 Were under the deputy commissioner of administration. That
11 position had changed and that function was moved under the
12 deputy commissioner of operations. So that was an error that
13 I found. And that probably is why it is important to you that
14 even at my level that I continue to review this sort of thing.
15 And so it went and that is one of the notations I made. I even
16 went to as I recall to Lieutenant Alou and brought that to his
17 attention so that he would see what I had seen so that I would
18 not be making changes. Because I am very very personally
19 aware of the importance of directives and policy that the
20 department operates by. And at my level I do not do those
21 sorts of things. That's staffed by enlisted members.
22       MR BAILEY: OK, well you know you turned a
23 page in my mind because I'm going back to the questions
24 that we had of previous witnesses, and that is what I meant
25 about where it's a section or whatever. This duty was

1  assigned it should have been in operations which is Colonel

2  Coury is big on operations right?

3      A: He was...he was at that time.

4      MR BAILEY: He was at that time. And that

5  particular function was missed placed in the document. It

6  was a duty and a very important function on this personal

7  security or bodyguard function that you refer to. Should not

8  have under the deputy in charge of administration and should

9  have been under the deputy in charge of operations. Now,

10  was that a change from AR 1 – One as it existed in July of

11  nineteen ninety-seven?

12      A: I would think so.

13      MR BAILEY: Well, do you remember? You

14  caught that is that one of those personnel functions? Did

15  personnel put that in there or did R and D?

16      A: I have no idea.

17      MR BAILY: OK.

18      MARY BUNGO: You know I wasn't with

19  Colonel Evanko in nineteen ninety-seven.

20      MR BAILEY: OK.

21      MARY BUNGO: So I would not have seen it

22  when it was...I would not have been...I would not have any

23  unprevail One One in nineteen ninety-seven.

24      Q: So you didn't review this regulation, as it

25  existed before you saw this draft?

16

1      A: No.

2      Q: They didn't send over to you or to the good

3  Colonel, they did not send a copy of AR 1 – One as it existed

4  before the proposed changes. You just read the proposed

5  changes. That's all you saw.

6      A: I saw complete document, it may have been

7  the same document from nineteen ninety-seven. It may have

8  had changes incorporated but I don't know. That was the

9  document that was processed thru for completion and that

10  was the document that would have been finalized. I don't

11  know how that was created because that is within the bureau

12  of research and development. Major Merryman's bureau.

13      Q: Did you make notes on there, that this needs

14  to be changed that this provision needs to be under there that

15  it's wrong. And they made those changes?

16      A: Yes.

17      Q: That draft should be in historic file,

18  shouldn't it?

19      A: I have no idea, No, I can't respond to that. I

20  don't know how they maintain historical file. I don't have a

21  historical file. That would be within the bureau of research

22  and development.

23      MR BAILEY: Yes I know. I went over and

24  looked at it. But I'm really curious because you got a copy

17

1  of AR 1 – One and you made a recommended change in it.

2  You told us it was a draft copy you saw?

3      A: On the draft.

4      MR BAILEY: Yes Mam, and it sounds to me,

5  like you made this recommended change and it's obvious that

6  it sounds like good advise to me, with what little I know...

7      MARY BUNGO: It was incorrect.

8      MR BAILEY: It was in error and they corrected

9  it. So the next draft that you saw which you auto penned for

10  the commissioner, that had been corrected wasn't it Mary?

11      A: Yes.

12      Q: Because you were looking for it, right Mary.

13      A: Yes.

14      Q: Yes Mam. And they corrected it, isn't that

15  correct.

16      A: Yes.

17      Q: OK. So you don't know what should be in

18  the historic file, so you don't know why that draft isn't there

19  do you?

20      A: No.

21      Q: All right. Now Mary when did sub section

22  C, this may be an unfair question. By the way, if you don't

23  know an answer to a question or it is not founded in any of

24  your knowledge. Not knowing is clearly the proper answer.

25  When did sub section C first appear in the draft that you saw?

1      A: The draft that I saw was the complete

2  document.

3      Q: The last one?

4      A: No. The first one. The draft. The draft was

5  a complete document for review. I assume it was in that I

6  really don't, I'm not familiar with sub section C or what it

7  relates to.

8      Q: How many change orders did you sign for

9  the Colonel on February twenty third two thousand and one?

10      MARY BUNGO: How many?

11      MR BAILEY: Yes Mam.

12      A: I'm not certain.

13      Q: You're not certain?

14      A: No.

15      Q: Did you sign more than one change order for

16  AR 1 – One on February twenty third thousand one?

17      A: I'm not certain. I know I signed one. But

18  I'm not certain I signed more that one. I have no recollection

19  of that.

20      Q: Well how many drafts did you see on

21  February twenty third two thousand one?

22      A: I didn't see a draft. Is that the date it was

23  signed?

24      MR BAILEY: Yes Mam. I'll show it to you.

19

1       MARY BUNGO:  It would not have been a

2  draft.  I would only autopen a completed document.

3       Q:  A completed document?

4       A:  Yes, ready to be copied.

5       Q:  OK.  No problem.  Mam I would like to

6  show you copies of two documents here one of them is

7  marked McAlreavy number four and the other one is marked

8  McAlreavy number five.  Would you please look at those for

9  me Mary?

10      A:  Certainly.

11      Q:  Thank you.  All right.  Mr. McAlreavy tells

12  us that this document without a signature is prepared in

13  advance.  And my understanding was that it is appended to

14  the final document.  So the Colonels signature can appear and

15  is taken over for repo or what ever.  Is that correct Mam?

16      A:  As far as I know it would be.

17      Q:  All right.  Could you explain these two

18  documents for me?  And do you know which one you auto

19  pen?

20      A:  They both look like they have been autopen

21  to me.

22      Q:  Let me represent to you that I did see the

23  documents in the historic file and they appear to be auto

24  penned to me, the same way.  These are just copies.  They are

25  not as good as the original.

20

---

1       A:  I understand that.  It appears to me

2  that...number five is a different type print.  Maybe a darker

3  print.

4      MR BAILEY:  Yes I agree with you.  It's

5  different.

6      MARY BUNGO:  Different font possibly.

7      MR BAILEY:  I agree.

8      MARY BUNGO:  What was your question?

9      Q:  On February twenty third with the

10  documents that we have looked at, under testimony that

11  we've had.  February twenty third might be the wrong date.

12  Might be the twenty-second.  Here is a document that

13  indicates that...this is McAlreavy number two.  And that has

14  February twenty second...there may be a day or two

15  difference.  We don't know but the change appears to be have

16  signed on the, and we don't know if that has any significance

17  and it probably doesn't.  The one thing that we do know is

18  that there was signature autopen on February twenty third

19  two thousand one.  Or at least a piece of paper that says that.

20      A:  I could be wrong with, about this but; I think

21  some times a date might be placed on a document after.

22      Q:  Mr. Mcarveary may have indicated that the

23  date does get placed on afterwards.

21

---

1       A:  Yes because sometimes the sequence of

2  events another document might be dated and given a number.

3  They don't necessarily run in sequence is my understanding.

4      Q:  Here's what struck me.  Mr. Mcarveary

5  testified that he came over to you personally.

6      A:  Yes he did.

7      Q:  And that you signed...you autopen this

8  change...one of these change orders.  We don't know which

9  one obviously.  For Mr. Evanko.

10      A:  Yes.

11      Q:  He had recollection of seeing another one or

12  another copy.  I am asking you if you had signed two and if

13  so why that would be.  There are other changes; there are

14  other differences on the documents.  If you will notice under

15  instructions insert these pages...one says one thru sixty-six

16  one thru sixty-eight.  I'm not indicating any significance to

17  this.  I'm trying to learn what this is about if you can help

18  me?

19      A:  I can't.

20      Q:  You can't.

21      A:  No.

22      Q:  You see I can't conceive after listening to

23  somebody with your intelligence and skill it is little hard for

24  me to believe that you would sign two change orders on a

---

1  final document and not know it.  I can't picture you doing

2  that.

3      A:  It's conceivable that I may have because in

4  my daily schedule this would not have been a huge issue.  So

5  I may have signed two I may have signed other documents

6  that day and to try to recall a year or more ago what...if I

7  would have signed two I don't...

8      Q:  You remember a year ago you remember

9  corporal came over to have it signed...you remember that.

10      A:  I do.

11      Q:  You are very quick in your response.

12  Obviously you have instant recall.  But you don't remember

13  if you signed a second one.  Such a document, accreditation,

14  the Colonels authority.  I'm not trying to talk down to you.  It

15  seems to me that you would understand... remember that.

16  And I don't understand why you don't remember that.

17      A:  Probably because I would have put my faith

18  in this process that this follows thru.  Again I would have to

19  fall back to the bureau itself.  The bureau of research and

20  development under Major Merryman's command.  And the

21  deputies.  I would have to fall back on that because I have no

22  reason to miss trust that I wouldn't be...shouldn't sign these

23  sorts of things.  I put a lot of faith in the people that I work

24  with in the other bureaus.

23

1    Q: You have to in a big organization…or you
2  can't function…right?
3    A: That's right.
4    Q: OK.
5    A: This looks possible that this could be a
6  different font its very very possible that the corporal may
7  have brought this back to me. My secretarial skills tell me
8  that this is a different font than this AR…
9    APPOSING COUNSEL: It just indicates Mary,
10  when you say this may be a different font you are referring to
11  which exhibit number? McAlreavy five.
12    MARY BUNGO: Five.
13    MR BAILEY: Now you're talking a difference
14  between McAlreavy five and four?
15    A: Yes. It appears to me that that is a different
16  size font or by font I mean print type or print.
17    MR BAILEY: Right.
18    MARY BUNGO: So it is possible that I find
19  those.
20    MR BAILEY: Sure, Mary
21    MARY BUNGO: It would have been me.
22    MR BAILEY: Who else has the AutoCAD? I
23  mean that is an autopen signature apparently. I think the
24  assumption has to be made that it came off the autopen. That
25  autopen signature is it ball point fiber point what is it?

24

1    A: Actually its just standard basic pen comes
2  from central supply. Nothing fancy.
3    Q: I use to have one. Is it like ballpoint? Does
4  it go in blue go in black?
5    A: It is always black.
6    Q: Always black…and is it like one of these…
7    A: It could be…it's basically that type.
8  Actually it can vary. Sometimes we use that type sometimes
9  we'll use the fiber tip. If we don't have that or it doesn't
10  seem to be serving the purpose.
11    Q: We use a ballpoint…I understand what you
12  are saying. Do you have trouble with the ink drying on these
13  things?
14    A: No.
15    Q: No, didn't you have your documents smear
16  up because the ink didn't dry up for a year?
17    MARY BUNGO: Because the ink didn't dry for
18  a year?
19    MR BAILEY: Yes
20    MARY BUNGO: I would think not.
21    Q: Did you have trouble in your office doing
22  things for Colonel Evanko where the documents get smeared
23  up and smear other documents because the autopen signature
24  don't dry for months or a year?
25    A: No.

25

1    Q: OK. Now Mary on the issue of authority.
2  You explained as I understand it you got a document like this
3  here on these changes here things that you would look for as
4  an indication that it's a reliable situation that you could sign
5  the Colonel's signature. You've got the three deputies
6  signing off on it no comments indicating that they approve.
7  So you fell relatively safe that there is not going to be a
8  problem here if I sign this. The Colonel, if he reviews it or if
9  he gets a chance to review it is going to approve it based on
10  everybody looking at this and having sufficient review and
11  endorsement processes that it is reliable and you can go
12  ahead and do it without checking with him personally?
13    MARY BUNGO: Are you speaking of all
14    directives? Or just…
15    MR BAILEY: No, I'm really talking about this
16    particular thing. In this case because of the deputy
17    signing off on it etc…that you felt that it was safe to do
18    this?
19    A: Yes.
20    Q: OK, and that you felt that you didn't have to
21  wait to personally consult with the commissioner on this and
22  I assume that is because of his workload. Is that fair to say?
23    A: That would be fair to say. This time in
24  February usually it's an annual procedure that he is preparing
25  for the budget. Which always takes place in March. My

1  recollection is that is what he would be involved in at that
2  time. Because I believe it was March sixth perhaps that year.
3    Q: You were rushed to get this thing done?
4  This AR 1 – One.
5    A: The folks from research and development
6  indicated to me that they were eager to have it moved along
7  because of the colea inspection that was coming up. I don't
8  know that there was a rush. There was no rush to have me
9  it done.
10    Q: So was it Mr. Margeson who seemed too
11  concerned. Was it Mr. Merryman, or the corporal, who was
12  it?
13    A: I think it was probably the corporal; he was
14  the individual I dealt with that asked to have it moved along
15  because they wanted to have it ready for co lean…
16    Q: So he came over to see you to get the
17  signature. He hand carried over?
18    A: I can't remember at what point he brought it
19  over. He may have brought it over after it went back to
20  research and development after it had been reviewed…
21    Q: I think that's correct…it did go back…
22    A: I'm certain it did. I also recall I had some
23  personal questions that I wanted….
24    Q: He indicated that…

1 McAlreavy four it's remove these pages one thru
2 seventy insert these pages one thru sixty-eight. OK,
3 now those pages to be inserted would they have the
4 portions that are new that are changes, would they be
5 shaded?
6         A: They may not be on this document because I
7 direct your attention to paragraph three that says insure
8 all members review this regulation in its entirety.
9 Which is usually an indication that there may be many
10 changes to a document. If it was a change of a word
11 from should to shall that paragraph might say
12 something like, your attention is directed to shaded
13 areas. So the person does not have to read the entire
14 document if nothing is changed about it. This one
15 because of the size of it there were multiple changes to
16 it. Not made by me necessarily. That would indicate
17 the recipients of this AR should read it in its entirety.
18         Q: In answer to the question you don't know
19 whether the changes in this one were shaded or not?
20         A: I would say not. I do not know.
21         Q: Did you look at the document after it was
22 distributed? Ws a copy sent up to the colonel. I'm
23 sure he has a set there.

32

---

1         A: Actually we keep a set in the library. We do
2 not maintain one back in our offices. We have no need
3 to.
4         Q: Did you look at it?
5         A: No.
6         Q: Did you ever double-check it to see if...
7         A: No.
8         Q: ...to see if it was changed?
9         A: No.
10         Q: Did you bring it to the Colonel's attention
11 and say you need to check on this or anything like
12 that?
13         A: I don't think I did. I don't recall that I did.
14         Q: OK. You indicated that the corporal call you
15 to come over with those changes, you didn't call him
16 or summon him...
17         A: No. He came over to my office after it had
18 been sent back in draft form with my question and
19 other revisions which were made by other persons on
20 it, which I believe, might have been on it. He then
21 returned to my office to answer my questions so I
22 would he comfortable in what I had asked of him for
23 instance the TAM and why my particular function was
24 not...and he came back and answered those questions
25 sati factually. For me. Then it went back to research

33

---

1 and development where it would have been finished in
2 final. What we call final. Which is the final product.
3         Q: That is the one you autopen on or about
4 February twenty third two thousand one.
5         A: Yes.
6         Q: That change order that's affixed to the
7 document, not affixed rather, that's distributed with the
8 document because those instructions and those are
9 orders from the commissioner...right?
10         A: Yes. And you will see here to place this
11 change sheet immediately behind change sheet eight
12 sixty-five. Which is placed in the back of the AR
13 manual so there is a ready reference of any changes
14 that were made. Paragraph five?
15         Q: Yes I saw that.
16         A: And then that would be placed in front of
17 eight sixty-four...
18         Q: In the manual itself would you know what
19 the date of eight sixty-five was?
20         A: No I have no idea.
21         Q: Mary do you have a recollection of any kind
22 of orders or directives by Mr. Evanko to look into the
23 events of the FBI investigation into the state police?
24         A: No I do not.

---

1         Q: Were you privy to any meetings in which
2 issues concerning Captain Ober and Captain Ober's
3 conduct were discussed?
4         A: No. Absolutely not.
5         Q: Let's say on February twenty third two
6 thousand one, one of these changes were, both of these
7 changes are signed...how would you autopen? Do
8 you have a list of what goes out under autopen?
9         A: No.
10         Q: So you wouldn't keep anything...
11         A: No.
12         Q: You would sign, use the autopen sign the
13 colonel's signature give that to them and keep no
14 record of that transaction in your office, nothing.
15         A: No. There is no need to as I see it. It is
16 returned to the bureau of research and development
17 and I guess they maintain copies of all these directives.
18 I don't keep a copy or file of autopen. Was that your
19 question, do I maintain a file of anything I autopen...
20         Q: Yes, I used to have a every document that
21 was autopened. Does the autopen have a counter on it?
22         A: I don't believe so.
23         Q: Does yours take any picture of the document
24 that it is signed anything like that just a mechanical
25 device where you put it in and have it sign?

35

1  A: Yes that is correct.

2  Q: And you don't have a bin or a file where you

3  keep a record of what is autopen?

4  A: No.

5  Q: Who has access to that machine besides you?

6  A: The commissioner's administrative officer,

7  Ms. Ball, she might do some autopening. Her and

8  myself might give permission to receptionist or another

9  clerical person the approval to autopen certificates

10  things of that sort. It's not just accessible to just

11  anyone. It is common knowledge that you just don't

12  use it.

13  Q: Mary where do you get the supplies for your

14  office? By that I mean the paper the pens...

15  A: In our central supply area. Within our

16  building.

17  Q: Do you have any input into the products they

18  carry they use the pens the paper clips...

19  A: No. I could but I don't. It's just what the

20  rest of the department use.

21  Q: None of the pens used in the autopen device

22  are unique...

23  A: No.

36

1  Q: ...are none standard as to the Pennsylvania

2  State Police. You use standard Pennsylvania State

3  Police procurement items pens etc...

4  A: Nothing fancy...low bid.

5  Q: And what ever is in that autopen is the stuff

6  that you folks use, right?

7  A: Absolutely.

8  Q: How many years have you been with the

9  State Police?

10  A: Thirty in July.

11  Q: How many years with Captain Evanko?

12  A: Colonel Evanko two years.

13  Q: Colonel Evanko I'm sorry, I apologize. In

14  the years that you have worked with Colonel Evanko

15  have you ever complained about pens that ink that

16  doesn't dry?

17  A: I don't have ink that doesn't dry.

18  MR BAILEY: I don't have any further question

19  Mary.

20  BARBARA CHRISTI: Nor do we.

21  MR BAILEY: Is your ink dry on you sheets

22  their Barb?

23  BARBARA CHRISTI: Well not if I smudge it

24  with the...

37

1  MR BAILEY: The way your looking it's not

2  smudging...

3  BARBARA CHRISTI: No it is smudging...

4  MR BAILEY: Did it really?

5  BARBARA CHRISTI: It is smudging...it may

6  be the hoagie I had for lunch, oil I have on my fingers

7  with perspiration.

8  MR BAILEY: Mam, before we actually end the

9  deposition let me step outside with Mr. Ober but I

10  think we are finished though. I don't know if opposing

11  council will have any questions?

12  RODRIQUIZ: The time now is 12:43 the

13  deposition of Mary Bungo is completed.

14

15

16

17

18

19

20

21

22

23

24

25

COPY

*William McAlreavy*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT

DARRELL G OBER           : 1: CV- 01-0084

        Plaintiff          :

        VS.                 :

PAUL EVANKO,              :
MARK CAMPBELL,           :
THOMAS COURY, AND        :
HAWTHORNE                :
CONLEY                    :
        Defendants        :

DATE:            April 10, 2002

PROCEEDINGS:     Video Deposition of
                 William McAlreavy

APPEARANCES:

        For the Plaintiff: Donald Bailey, Esquire
                           4311 N. 6th Street
                           Harrisburg, PA 17110

        For the Defendant: Barbara Christi
                           Joanna Reynolds
                           1800 Elmerton Ave.
                           Harrisburg, PA 17110

1

1    MR BAILEY: Ladies and gentlemen
2    please be advised that a recording device is in
3    operation.
4    ALBERT RODRIGUEZ: Good morning ladies
5    and gentlemen. Please let me advise you again that
6    video are in operation. Today's date is April 10,
7    2002. The time now is 9:21. My name is Albert
8    Rodriguez. My address is 4146 Spruce Park,
9    Lebanon, PA 17046. I have been hired by P.R.
10   Video to take this video deposition for the plaintiff.
11   This case is in the United States Court for the Middle
12   District of Pennsylvania. It is docketed at number 1-
13   CD: 01-0084. Caption is Darrell G. Ober versus
14   Evanko Et.al. The deponee is William McAveary.
15   Mr. McAveary, please raise your right hand. Do you
16   understand this is a legal proceeding and do you
17   swear to truthfully answer the questions asked of
18   you?
19   WILLIAM MCAVEARY: Yes I do.
20   ALBERT RODRIGUEZ: Would counsel please
21   identify themselves and provide their address and
22   phone number for the record.
23   MR BAILEY: Yes sir, my name is Don
24   Bailey. I'm privileged to represent the plaintiff of

2

1    this matter, Darrell G. Ober. My address is 4311
2    North 6th Street, Harrisburg, Pennsylvania, 17110.
3    My phone number is 717-221-9500 the fax is 9600.
4    BARBARA CHRISTI: Chief Counsel
5    equally pleased and privileged to represent the
6    Pennsylvania State Police. My office address is
7    1800 Elmerton Avenue, Harrisburg, PA. 17110.
8    Office phone number is 717-783-5568.
9    JOANNA REYNOLDS: I'm an Assistant
10   Counsel with the State Police representing the
11   defendants in this matter. My address and phone
12   number are those given by the Chief Counsel.
13   ALBERT RODRIGUEZ: Counsel is
14   ready. You may begin.
15   MR BAILEY: Thank you sir. Mr.
16   McAlreavy. Do you have a particular way that you
17   would want or prefer for me to address you,
18   Corporal, Mr. McAlreavy, Bill, you know.
19   WILLIAM MCAVEARY: Either one is
20   fine.
21   Q: It doesn't make any difference. Okay,
22   I'll probably just refer to you as Corporal okay. And
23   let me just because you're probably relatively new to
24   these kind of things just talk about some general
25   ground rules that we can observe as we go through

1    this. This is a deposition; of course you're under
2    oath. You understand that, and have a duty and
3    obligation to answer truthfully which I'm sure you
4    realize. In addition to that, it's important that the,
5    that you answer fully and completely and that means
6    not just to the, you know the letter of the question,
7    but to the broader meanings of the question. If you
8    will please. If at any time I interrupt you or
9    something causes an interference with opportunity
10   that you have to answer fully and completely. I want
11   you to please make sure that you insist on your
12   opportunity to do so. And if apology is in order, I
13   assure you, I'll render them because I might from
14   time to time as I get caught up in thought maybe I'll
15   tramp on the toes of one of your answers. If I do
16   that you correct me if your Counsel doesn't catch it,
17   Okay. Now, one thing that I, and I repeat these
18   instructions for all witnesses, one of the things that I
19   do that is a little bit different than most Attorneys do
20   is I encourage you, if you want to know whether it's
21   just curiosity and particularly if it's a matter of
22   dispelling confusion. If you want to know where I
23   am going with a particular question, or group of
24   questions, please feel free to ask me. We have

1  absolutely no interest in trick questions or in

2  distorting the factual record for any reason.  Okay?

3      A:  Yes

4      Q:  And the, so you know I don't mind

5  you're asking me what I'm doing or how I'm you

6  anything like that and that goes for your Attorneys,

7  Okay?  You please feel free to do that.  Now, the,

8  from time to time I'll ask questions going into

9  different areas.  Usually when I do that, when I

10  change a direction, I'll give you what amounts to a

11  sort of an offer; you know an explanation of what

12  we're doing.  If you need a break at some point,

13  don't be afraid to ask, although I don't think we're

14  going to be very long with your deposition hopefully.

15  And with all those things being said I assume

16  Counsel that the usual stipulations with objections

17  reserved until time of trial, you know reserved until

18  time of trial, accept as form of the questions.  Is that

19  okay?

20      BARBARA CHRISTI:  That's, that's

21  acceptable Counsel.

22      MR BAILEY:  All right.  Okay, Corporal

23  lets begin.  Do you have any questions of me?

24      WILLIAM MCAVEARY:  No

5

1  on projects for department regulations, special

2  orders, things of that nature.

3      Q:  Now how long have you been working

4  in that capacity?

5      A:  About two years and four months.

6  The entire time I have been a Corporal.

7      Q:  What were you doing before you

8  assumed those duties?

9      A:  I worked as a trooper assigned to

10  patrol duties.

11      Q:  Did you apply for the position or did

12  you just, were you recruited for it?

13      A:  That was a position offered to me with

14  promotion.

15      Q:  Now, you're in the Bureau of

16  Research and Development.  What does a, you

17  indicated I believe, that you know you talked about

18  special projects etcetera.  In laymen's terms could

19  you describe for us the kind of thing you do there?

20      A:  I work on special orders, department

21  regulations, things like that.  Different areas of the

22  department of manuals and regulations that pertain to

23  their operation.  When they want to make changes to

24  these.  They will submit there proposed changes and

25  the wording to our Bureau, to our section and it's our

1      Q:  All right.  Sir just briefly, how are

2  you employed?

3  A:  I'm employed by the Pennsylvania State Police.

4      Q:  And your rank?

5      A:  Corporal

6      Q:  How long have you been a Corporal?

7      A:  I've been a Corporal two years and

8  approximately four months.

9      Q:  All right.  How long have you been

10  with the Pennsylvania State Police?  Roughly.

11      A:  Seven and one half years.

12      Q:  And where are you from?

13      A:  Originally?

14      Q:  Yes

15      A:  I'm from New Jersey.

16      Q:  Were you from when you joined the

17  Pennsylvania State Police?

18      A:  No, I was a resident of Pennsylvania.

19      Q:  Where?

20      A:  Philadelphia

21      Q:  Philly, all right now Corporal describe

22  for us the duties that you perform for the

23  Pennsylvania State Police.

24      A:  I work in the Bureau of Research and

25  Development as a programming specialist.  We work

6

1  job to put them in proper both format both

2  grammatically and with maybe certain terms,

3  whatever the department uses to check them

4  against other department regulations to look for

5  conflicts or problems.

6      Q:  Okay, so your sort of like a, almost

7  like a legislative drafting bureau.  Someone comes to

8  you with an idea or a recommendation to either

9  originate a new regulation or change an existing one.

10  You give it form and substance.  Is that basically

11  what you do?

12      A:  I'm not sure that that's exactly an

13  accurate depiction.

14      Q:  Okay, well you....

15      A:  Different areas of the department that

16  have the responsibility for those regulations.

17  They're responsible for deciding how they want to

18  run those operations.  We more, like I said, there's

19  certain terms or phrases or the way the department

20  likes to see things worded in regulations.  If they

21  don't have that, we might change some of the

22  wording, if the grammar isn't correct, we check

23  spelling, we use a Gregg reference manual and check

24  punctuation and things like that.  We put it into the

1 format for the correct size of the page, depending on
2 the manual, that type of thing.
3     Q: Well, so if I come to you and I'm a
4 Major out there and I come to you or I call up and I
5 say that, you know I think we need to change our
6 regulations on dealing with vehicles I think we
7 need a regulation which requires certain information
8 to be reported.  And I think that the regulation X,
9 section Y, sub-section Z should be changed by
10 adding the following sentence.  Let's say I come to
11 you with something like that.  What do you do?
12     A: Well that would normally come
13 through the section head, Sergeant Margeson, who's
14 my immediate supervisor, and it would get assigned
15 as a project.  So if it makes it through whatever
16 process that is above me and is assigned as a project
17 than I would look at it.  I would get in touch with
18 contact person who is normally listed to see what the
19 exact intent is that they are looking for with that.  I
20 would check the wording, like I said depending on
21 what it is for; I would check it against other similar
22 regulations to make sure that it's not conflicting with
23 something else that is written somewhere else.  Put
24 the wording in.

9

1     Q: Okay, all right.  Sir let's say that I'm
2 Major Bailey.  I'm in the Pennsylvania State Police
3 and the, you know no reason to change the example I
4 just gave you.  Regulation X, section Y, sub-section
5 Z.  I'd like to change by adding this language and I
6 want to accomplish this purpose.  I either verbally or
7 in writing send this into the bureau or contact the
8 bureau and a decision is made to assign it as a
9 project.  Is that right?
10     A: Yes
11     Q: And that decision is made by the
12 section head.  In this particular case it's Sergeant
13 Margeson.  Is that right?
14     A: I don't know who actually makes that
15 decision.  That's not my area.
16     Q: Okay
17     A: Sergeant Margeson is who assigns me
18 projects.
19     Q: Okay, so at least sometime on or about
20 the late year, late 2000, late 2001, you would have
21 been in a position, if indeed it occurred to be
22 assigned a project by Sergeant Margeson.  Right?
23     A: Yes
24     Q: Yes, okay.  Now, what does assigned
25 a project mean?  Now let me just to save a little time

10

1 here.  I think you've indicated that if Sergeant
2 Margeson had assigned you a project you would get
3 back to, you mentioned contact person and the
4 contact person in my hypothetical would be Major
5 Bailey.  Is that right?  I was the person who came up
6 with this idea and submitted it and when Sergeant
7 Margeson would assign the project to you he would
8 give you the information necessary so you know who
9 to talk to.  Right?
10     A: When the project is assigned to you,
11 you get the information as it came to you from the
12 originating area and the name of the contact person.
13 In some cases the contact person is the Major who's
14 the head of that particular bureau where ever it came
15 from.  But not in every case.  Sometimes it is
16 somebody else assigned to that bureau.
17     Q: In my hypothetical I was the person
18 who did it.  I'm really not concerned with what my
19 rank would be.  I'm going to assume that anyone
20 from a commissioner to a trooper could make a
21 recommendation and if it was worthy of a project
22 assignment in the eyes Mr. Margeson or who ever,
23 you might get assigned that project.  Is that right?
24     A: I'm not sure I understand that
25 question.

1     Q: Well, who's the contact person?
2 What's that word mean?  What's that phrase mean?
3     A: That's the person assigned to the bureau or area
4 where the change, the proposed change came from
5 that you liaison with if you have questions for that
6 bureau or if questions about the regulation or what
7 the intent is.  That's the person that you contact.
8     Q: So the contact person may not be the
9 originator.  Right?
10     A: It may not be.  That would be up to...
11     Q: It usually is.
12     A: That would be up to the bureau.  That
13 originates it.
14     Q: Okay, okay, that's okay sure that
15 would be up to the bureau that originates it or
16 however it's communicated but in any event you're
17 given a contact person, you're given someone to
18 liaison with.  Is that right?
19     A: With most projects yes.
20     Q: With most projects.  Well, do you
21 have an idea of how many projects you've worked on
22 in your what, two years of being there?
23     A: I don't have any kind of solid number.
24 No.

1    Q:  Well, could you tell us the procedures
2  that you follow in terms of how you keep records of
3  your projects, what procedures and practices you
4  utilize?
5    A:  When you are assigned a project, you
6  are given a project folder which list the project
7  number and then, it has your name and the, generally
8  the name of the project on it.  If it for regulation, it
9  will state that regulation.  Inside the project folder
10  you keep a project-tracking sheet and you note
11  significant events or happening while you're working
12  on the project, on the tracking sheet and you keep it
13  as a running log.
14    Q:  Go ahead sir.
15    A:  That's how you track it.
16    Q:  Well, now Corporal McAveary, do
17  you, I mean do you keep notes of what you do?
18    A:  Notes, how?
19    Q:  Well, you get assigned a project to
20  make changes on a regulation.  Now you strike me as
21  a particularly bright and a very articulate person, I'm
22  not blowing smoke.  I mean that's the way you
23  impress me.  Pretty sharp.  You keep all this stuff in
24  your head or do you keep notes of what you do, you
25  know talked to so and so on such a date, so and so

13

the project summery?  Now we're talking about your
2  practices.  I'm not saying that you know, anyone
3  else, we're just talking about Corporal McAveary.
4    A:  Depending on the entry made.  You
5  keep things that would support that.
6    Q:  Do you throw them away?  Do you
7  keep them at home?
8    A:  They go in the project file.
9    Q:  Okay, they go in the project file.
10  Give me a brief description of the kind of things that
11  might be on your notes in different cases that you've
12  done.
13    A:  When you first get it, you would mark
14  that you received it and reviewed it, when you send
15  an e-mail to the contact person, if there is one,
16  notifying them that you have the assigned project
17  person, making a note when you receive the project
18  back signed with a reproduction order to take it down
19  to reproduction.
20    Q:  You, do you keep drafts in there?
21    A:  Normally there's certain copies of
22  drafts in there.  The original draft as it came from an
23  area, if it originated outside the bureau.  The area
24  that originated to proposed change and then changes
25  from a certain level beyond are kept to record.

1  made such a recommendation, if the project called
2  for that.  Do you do anything?
3    A:  That would the type of thing normally
4  you would log on a project tracking sheet.
5    Q:  Well I'm familiar with project
6  tracking summary.  Isn't that what the name of it is?
7  Project summary.
8    A:  It may be.  I'm not sure of the exact
9  name of the ...
10    Q:  Okay, all right.  Well, on a project
11  tracking summery or tracking sheet, just so we make
12  sure we're on the same page.  There's not a
13  difference between a project tracking summery and a
14  project-tracking sheet, that you know of.  Is there?
15    A:  Not that I'm aware of.
16    Q:  Okay, I just want to make sure
17  because I don't want to make a mistake.  This is an
18  important litigation point and I don't want to make a
19  mistake.  Now, on the project tracking summery, it
20  starts off with there's a project number, date
21  assigned, date due, that kind of thing.  Right?
22    A:  Yes sir.
23    Q:  Okay, now do you keep notes,
24  summaries, information of any kind that support or
25  clarify the entries that you make on your project, on

14

1    Q:  You kept your noted on the AR1.
2  That sub-section C?  AR1.102 sub-section C.  Did
3  you keep your notes on that?
4    A:  What is it?
5    Q:  It had to do with chain of command.
6  Do you have any recollection of it?
7    A:  I have a recollection of the
8  recommendation.  Yes
9    Q:  Well, you tell me what you recollect
10  about the regulation and as your memory comes back
11  we can talk about what you did on the project, but if
12  you could tell me about the regulation.  What do you
13  remember about the regulation?
14    A:  That was the regulation written on
15  chain of command.
16    Q:  Now where did it come from?
17    A:  The regulation itself or the AR1-1?
18    Q:  Well, AR1-1 is more or less you basic
19  peonee right; I mean it's your basic organizational
20  regulation.  Right?
21    A:  Yes
22    Q:  And, do you, by the way, when you
23  do your research, do you look at the regulation as
24  existed, as it exist before you go into changing it?
25    A:  Yes

1   Q:  Yes, because, I mean it only makes
2   sense like in a big unation of laws and not men is the
3   saying goes, the idea is that if you going to alter
4   regulation, you have to know what you're building
5   on or what you're changing, or what you're adding.
6   Right?
7            A:  Yes
8            Q:  So if you got a proposed change,
9   language for a proposed change.  What are the issues
10  that you would examine as a project officer would be
11  where to place it, where to put it, right?  Well, let me
12  ask this way sir.  Take AR1, if you get a change.
13  Somebody says I think we need to add something on
14  chain of command.  Do you just staple it to the end
15  of the, the AR or do find the place where it belongs?
16           A:  We try to find the place where it
17  belongs.
18           Q:  And, I can imagine, I don't know
19  because I never walked in your shoes but I can
20  imagine that from time to time sir that might not be
21  so simple a task, you know one would need to know
22  where this would fit in the organization,
23  organizational chart, or into the regulation itself and
24  that might affect things like distribution, what its
25  interaction is with other parts of an AR or other

17

1   AR's themselves.  Right?  You need to know where
2   it goes for that reason.
3            A:  Yes
4            Q:  Okay.  You did that with sub-section
5   C didn't you?  Do you remember sub-section C at
6   all?
7            A:  Yes
8            Q:  Did you do that with sub-section C?
9            A:  Yes, Sergeant Margeson and myself.
10           Q:  Oh, okay see I was confused.  Okay,
11  you worked with Sergeant Margeson on that?
12           A:  Yes
13           Q:  Who else did you work on it with
14  besides Sergeant Margeson?  If anybody, I don't
15  know that you did.
16           A:  Other than the normal proofreading
17  process that all the regulations go through, nobody.
18           Q:  Sergeant Margeson tell you, he
19  worked on it personally with that project?
20           A:  Yes
21           Q:  That's not unusual?
22           A:  Not necessarily.
23           Q:  Not necessarily.  Well, do you
24  remember why if he ever expressed any, shared

18

1   anything with you, why Sergeant Margeson worked
2   with you on that project?
3            A:  Well, the project came up about
4   adding something on chain of command to the
5   regulation.
6            Q:  It did?
7            A:  We were already working on AR1-1
8   when we decided to add that to it.
9            Q:  Yes, yes, and once, before sub-section
10  C was added, do you have a recollection of when the
11  last time you had worked on AR1, on that particular
12  area and who worked on it with you?
13           A:  On the chain of command area or the
14  entire AR1-1?
15           Q:  I would assume that the entire AR1-1
16  probably receives a considerable amount of attention
17  because of its huge breadth and its, many of the
18  issues it deals with.  Right?
19           A:  Yes
20           Q:  Now I did note.  I want you to correct
21  me if I'm wrong now Corporal, but I do note that
22  when I did what little research I could do into it.  I
23  didn't have a whole lot to work with to be quite
24  honest with you.  As it turned out.  But when I
25  started checking on it, I found out that the, before

1   you fellows added sub-section C, the last change to
2   AR1 that I could find.  Certainly the last change
3   having to do with that particular area of AR1 was
4   back in 1997 in the month of July.  Is that consistent
5   with your recollection sir?
6            A:  I don't know off the top of my head.  I
7   would have to review my folder.
8            Q:  Your folder.  Do you have a folder
9   that exist separate and apart from the historical file
10  Corporal?
11           A:  No, I was referring to the historical
12  file.
13           Q:  Oh.  When is the last time you looked
14  at the historical file Corporal?
15           A:  It would have been when the project
16  was completed.  I turned it in.
17           Q:  Okay, okay.  Well, did Sergeant
18  Margeson indicate to you why he was working on
19  that with you?
20           A:  We were trying to come up with some
21  wording for chain of command and trying to decide
22  the best place to put it.
23           Q:  Did he say where he got the
24  suggestion?

1    A: From what I understood discussing it
2  with him. There had been some problems in the
3  department. Particularly from what I heard, I guess
4  it was Major Washington's bureau.
5    Q: Yes
6    A: I believe he was of me so at the time
7  but somebody going outside of normal chain of
8  command and also one of the concerns was in some
9  of the areas of the department you have enlisted
10  members who supervise civilian personnel and that
11  that was a problem there too.
12    Q: Emergency problem, was it?
13    A: I'm sorry.
14    Q: Exigency, Exigent circumstances, an
15  emergency, a real urgent need to jump on that and
16  get it fixed real quick.
17    A: I don't know what type of urgency it
18  was. It was an identified problem so...
19    Q: Okay, well if I remember correctly,
20  the, before, lets look in the year 2000, okay. In the
21  year 2000 from what I could tell, now this is just a,
22  you know, my impression, there was some scattered
23  interest in AR1 maybe about September, October of
24  the year 2000. And I want to be honest with you,
25  when I looked at the historic file, I couldn't find any

21

1  documents at all, nothing, to support how sub-section
2  C the addition popped up, where it came from. And
3  that's why I want to ask you those questions and
4  we're sitting here today. I need you to help me with
5  that okay. Because you're the project officer. Your
6  name is in there. And we talked to Mr. Margeson, so
7  we need to try to find out how this popped up, the
8  way it did, and how it came into the file, and what
9  notes were put in there. Did you put any notes in
10  there sir? Did you put like, you know summaries or
11  conversations, or conversations with contacts, or
12  draft language, or anything like that? That you can
13  recollect. If you can remember.
14    A: I can't recall.
15    Q: Well, do you have any recollection of
16  attaching any particular importance to this sub-
17  section C and by that I mean the affect that it would
18  have, you know, having it reviewed carefully. I
19  mean here's a chain of command section. Right?
20  It's going to affect the relationship between every
21  single subordinate and their superior in the
22  department. Am I correct? That's what it's
23  supposed to do?
24    A: Affect it how?

22

1    Q: Well, doesn't it affect the relationship
2  in terms of providing guidance between you and
3  Sergeant Margeson, you're superior?
4    A: Yes
5    Q: And doesn't it affect by providing
6  guidance to every single trooper and every single,
7  and every one of their superiors, doesn't it affect
8  that relationship and provide guidance by regulation.
9    A: Yes
10    Q: What's your understanding of what it
11  does? You're the project officer and you worked on
12  it. I'm sure you have a recollection of the
13  importance you attach to it and the purpose of it.
14  Would you please share that with us?
15    A: The purpose of the regulation was to
16  provide guidance to all personnel. That when they're
17  performing their normal duties and they have a
18  question or some type of request or whatever, that
19  they are to follow the normal chain of command in
20  other words, if you are a trooper, you would see your
21  Corporal, and then Corporal would see the Sergeant,
22  and so on, and that you couldn't jump around the
23  chain of command, if you were looking for a better
24  answer so to speak.

1    Q: That's your understanding of what it
2  was about. If you were looking for a better answer...
3    A: That's one example.
4    Q: Okay, give me some more, now you
5  gave a lot of thought to this because I assume you
6  and Sergeant Margeson worked on this so give us
7  your recollection of the, I mean hear you have a four
8  thousand member department that's been running
9  since 1905. Mr. Evanko refers to it at least as a Para
10  military organization. It's obviously one of the
11  finest Police organizations in the United States if not
12  the world and we're deciding in year 2000 that we
13  need to tell our members what the chain of command
14  means. And I'm trying to find out, you know
15  thought and effort, because they apparently don't
16  know or don't understand so I'm trying to find the
17  thought process that, you know you and Sergeant
18  Margeson. What you went through and what you
19  talked about in terms of what this thing was
20  supposed to mean. Did you draft the language by the
21  way Corporal?
22    A: Sergeant Margeson and I drafted the
23  language. Were in conjunction on that.
24    Q: Okay. Well, aside from you Sergeant
25  Margeson who did you discuss the language with?

1  I'm sorry sir.  Aside from Sergeant Margeson and I
2  want to get back to the purposes again.  I don't want
3  to leave that.  Aside from Sergeant Margeson who
4  did you discuss the language with?
5      A: I don't recall discussing it with
6  anybody.  I would have to check the project folder to
7  be sure.
8      Q: Well, would the project tracking
9  summery have who you talked to about on it?
10     A: Normally, yes.
11     Q: Normally, would it?  Now, in the, you
12  know, how about you looking over this project.
13  Would you look over this project summery for me?
14  And I want you to look for things like sub-section C,
15  lan.., I going to, you know, you're the project
16  officer, you look that for me sir. Let your counsel
17  look at it...
18     BARBARA CHRISTI:  Are you marking
19  the documents Counsel?
20     MR BAILEY:  Oh, I might, you know, I
21  will, sure, might do that.
22     BARBARA CHRISTI:  Are you going to
23  identify it some how?
24     MR BAILEY:  Well, why don't we have
25  your first trial witness identify it and then we'll, you

25

1  know, I want to, if you let him look at it first I'll do
2  those things.
3      BARBARA CHRISTI:  You're handing
4  the witness eight pages, each of which to my brief
5  review here captioned " Project Tracking Summery."
6  Witness will review the pages.
7      MR BAILEY:  Yes, that's what we've
8  asked.  Appreciate that very much.  In fact may I
9  make a suggestion and respectfully ask that you
10 make a copy of that so he and I can use it together.
11     BARBARA CHRISTI:  And are you going
12 to be marking the copy for the witness so that we
13 have it for the record?
14     MR BAILEY:  Sure
15     BARBARA CHRISTI:  That you're going
16 to be questioning him on it?
17     MR BAILEY:  Yes
18     BARBARA CHRISTI:  Okay do to take a
19 break in order to make that copy or do you want the
20 witness to continue reading while the depo.  is in
21 session?
22     MR BAILEY:  I, you know we'll do
23 whatever pleases you.  I don't know how long it will take
24 you to get a copy.  I thought we could just jump out
25 hear and get a copy pretty quick.

26

1      BARBARA CHRISTI:  Right.  Are you
2  making the copy from what the witness is reading?
3  So what I'm saying.  Do you want to take a break
4  while we make the copy and then the witness can
5  continue reading?
6      MR BAILEY:  Well we probably could
7  have done it by now but if you think it's okay.  I
8  don't think we need a break.  We can stay on camera.
9      BARBARA CHRISTI:  Okay
10     MR BAILEY:  Rick could run out and
11 make a copy.  It would take what, two seconds?
12 Take about half a minute.  Could you give that to
13 him sir and let him make a copy then. Thank You.
14 Well why don't you make a couple copies so that the
15 counsel can have one too.
16     BARBARA CHRISTI:  Thank you.
17     MR BAILEY:  Okay, do you have the
18 project tracking summery in front of you?
19     BARBARA CHRISTI:  Counselor are we
20 marking this...
21     MR BAILEY:  Yes, lets, can you identify
22 it for us sir?  Tell us what that is.
23     WILLIAM MCAVEARY:  Yes, that's the
24 project tracing summery from the AR1-1 project.

1      Q: Okay, and just for the record how
2  many pages?
3      A: There are eight pages here.
4      Q: Okay, and let's just mark as
5  "McAveary One", okay.  Okay look on the first page
6  there.  It says March 6th, 01.  See that entry down
7  there?  That's the last entry, right?
8      A: Yes
9      Q: It says from reproduction and
10 distributed.  Project completed.  Do you see that?
11     A: Yes
12     Q: Who made that entry?
13     A: I did.
14     Q: Now what can you tell me about that?
15 Who brought that back to you?
16     A: I'm sorry.  Who brought what back to
17 me?
18     Q: How did you end up getting that
19 thing?
20     A: When you drop a project at
21 reproduction, when it's done, they call you and let
22 you know.  You go down, you look at it, make sure
23 that it looks like what you submitted.  You carry the
24 marked copies over to the mailroom for distribution.
25 You bring the copies for the Bureau of Research and

1  Development upstairs.  Distribute them to the
2  members and things in the bureau.  Clean up the file
3  and then mark the project completed.
4       Q:  Okay, so what says is in pick up from
5  repro. that last thing that happened, that's after,
6  that's where the project had been taken to have it
7  printed up once it was completed.  Right?  So it
8  could be distributed out to the members, what not.
9       A:  Yes
10      Q:  Well, who does it get distributed to?
11      A:  This particular regulation goes to
12  distribution AR.  Goes everywhere that there is an
13  AR.
14      Q:  Okay, now you say everywhere there's
15  an AR.  That means everywhere where that particular
16  regulation is kept as per the practices and regulations
17  of the Pennsylvania State Police.  So would AR1,
18  where is it kept?  Where is it going, where's is this
19  going to be, where's this change going to be
20  distributed to?
21      A:  I'm not intimately familiar with AR
22  distribution table.  You know, there's a table that list
23  who has to keep AR's and how many.
24      Q:  Well, does an AR1 go to every trooper
25  out there?

29

1       A:  Received back signed with repro.
2  order delivered to repro.  You're the project guy and
3  you did that.  Right?
4       A:  Yes
5       Q:  Well who was it signed by?
6       A:  The regulation itself?
7       Q:  Yes
8       A:  The signature on it was Colonel
9  Evanko's, but it was auto-penned.
10      Q:  The signature on it was Colonel
11  Evanko's?
12      A:  Yes, but it was auto-penned.
13      Q:  Oh was it?
14      A:  Yes
15      Q:  Well, you remember it was auto-
16  penned?
17      A:  Yes
18      Q:  Why do you remember that?
19      A:  I was there when it was auto-penned.
20      Q:  Oh.  Well, who else was there when it
21  was auto-penned?
22      A:  Ms. Bungo.  She's the person that
23  auto-penned it.
24      Q:  Now, how many folks work over in
25  Research and Development?

1       A:  No, every individual does not have a
2  copy of the AR.
3       Q:  Well how would the average trooper
4  out there, how many troopers you got out of this
5  group?  Fifteen hundred, two thousand, three
6  thousand, I don't know.
7       A:  Out working the road, do you mean?
8       Q:  Yes sir.
9       A:  I don't know the exact number.
10  There's a substantial number.
11      Q:  Okay, How would they get the word.
12      A:  There's library copies of the AR.
13  Normally the patrol Sergeant in the station and the
14  station commander has a copy.  They are available to
15  them on their stations.
16      Q:  You know of any efforts to teach
17  them, to go out there and talk about this with them
18  and notify them about this thing.
19      A:  That's not really my area.
20      Q:  Not your area.  Now it says, February
21  27, 01 at 9:45.  Do you see that?
22      A:  Yes
23      Q:  Now looks like the same writing and I
24  assume that's you.
25      A:  Yes

30

1       A:  In the entire bureau?
2       Q:  Yes.  Your having, struggling with
3  that which means you probably just don't know.
4       A:  I don't know exactly.
5       Q:  All right.  How did you come to be
6  over there when it was auto...  Were you hand
7  carrying this?
8       A:  I hand carried that back.  As you can
9  see there was questions from the front office on the
10  regulation.  I took them back.  They were questions
11  and notes on the regulation from Ms. Bungo so I took
12  it back and I discussed it with her.
13      Q:  Well what questions did she have?
14      A:  I don't remember them all exactly.
15  One of them that does stick is there was a question
16  like the regulation is written as, I'm sure you've
17  seen in an outline format.  And the TAM was listed
18  under the same type of level that the troop
19  administrative manager, as the troop commander, and
20  she just had a question.  Should be over one, I don't
21  remember if it was a letter or number, you know,
22  because she falls under the troop commander, is it all
23  right, and I explained it, that it was done that way
24  because of their duties, to list their duties, and things
25  like that.

Q: See, I don't understand what that
means. Is this something that affected the language
in the sub-section?

A: In sub-section C?

Q: Yes

A: No

Q: Well, did this affect distribution?

A: Ms. Bungo's questions?

Q: Yes

A: No

Q: Well, what does this TAM, what does
it mean? I don't understand...

A: A TAM is a Troop Administrative
Manager.

Q: Okay

A: That's a civilian position within the
troop.

Q: And she wanted to know if it affected
them?

A: She just wanted to know if it was in
the right place.

Q: Whether sub-section C was in the
right place.

A: No, whether the thing for the TAM
was in the right place.

33

Q: Well, we may come back to that. I'm
still having a hard time understanding that, but, what
that means. What other questions did she ask you?

A: Like I said. I don't remember them
all specifically but she had some questions, you
know, about operational things within the
department. How it was listed in AR1-1.

Q: Anybody else there when she was
asking these questions?

A: No

Q: And where did those request take
place? These questions take place?

A: Well the project was received back
with notes on it and I took the project back over and
then and discussed it with Ms. Bungo in her office.

Q: Oh, it had notes on it?

A: Yes

Q: And did you put that in the historic
file?

A: I put that it was received back for
corrections.

Q: Well what did you do with the notes
and corrections?

A: They would be in the historical file.

34

Q: Sir, are you testifying here today that
those notes and corrections were placed in the
historical file you?

A: They would normally be in the
historical file.

Q: Sir that's not my question and I'm not
being tough on you now please bear with me okay
cause I pride myself on not being argumentative with
witnesses. I never do that. This is very important.
You're testifying here this morning that the
regulation, I'm sorry sir, at this stage it would have
been a proposed regulation change, sub-section C.
We know, we have an understanding of what that
means. Right? That correct sir?

A: Yes

Q: Okay. That it came back to you.
Strike that question and rephrase it. Sub –section C
came back as I understand from your testimony from
the front office.

A: No

Q: From Ms. Bungo?

A: No. The AR1-1 came back. Sub –
section C did not come back.

Q: Okay, an AR1-1 came back from Ms.
Bungo?

A: Yes

Q: With recommendations or corrections
or some kinds of notes or questions, describe what
was on it.

A: They were questions.

Q: And they had nothing to do with sub-
section C?

A: No

Q: They had to do with AR1.

A: The entire AR yes.

Q: The entire AR. But you are that they
didn't have to do with sub-section C. You're certain
about that.

A: Yes, Ms. Bungo didn't have any
questions about that.

Q: She didn't have any questions about
sub-section C?

A: No

Q: Well, you put into the historic file
then. Those corrections or questions are in the
historic file because you put that in there didn't you?

A: No

Q: Well, what did you do with it?

A: With the questions?

Q: Sure

1

2       A: If no changes were made, I wouldn't

3  have done anything with them. I would have just

4  answered her question.

5       Q: Well, do you answer them in writing?

6       A: No, I would have answered them with

7  her. Because no changes would have been necessary

8  to the regulation then.

9       Q: And, you wouldn't have made any

10  notes about that inquiry or anything like that.

11       A: Just where I put that I received it

12  back. And that it was resubmitted.

13       Q: Okay, so there were other changes to

14  AR1 at the same time that sub-section C was being

15  changed.

16       A: The entire regulation was being

17  revised, yes.

18       Q: The entire regulation was being

19  revised.

20       A: And had been for some time, as you

21  can see from the project-tracking summary.

22       Q: Well, I'm looking at the project-

23  tracking summary and it indicates here that at

24  February 27th, 1901 or 2001, I'm sorry, that 9:45,

25  received back signed with repro. order. So now we

37

1  go back before that to February 22, 01. It says

2  resubmitted to front office. Well, what was it

3  resubmitted to the front office for?

4       A: That's when I took it back up to Ms.

5  Bungo.

6       Q: You're telling me that there were all

7  kinds of recommended changes to AR1 at that time

8  and that there was a whole, the whole dog-gone ball

9  of wax was being reconsidered?

10       A: No, I'm telling you that there were

11  notes on there with questions.

12       Q: But they're not in the... well. None of

13  this, none of these proposed changes or questions

14  were in the historic file sir?

15       A: They wouldn't necessarily be, no.

16       Q: Well would none of them be? You're

17  the project officer on this sir and I've got to tell you

18  I reviewed that file. I examined it. And I want to

19  ask you a lot of questions between what occurred

20  from October of 2000 until February of 2001. Sir,

21  I'm being honest with you. Captain Ober was with

22  me. We were in Mr. Brown's presence. There's

23  nothing in that file. Did you clean that file out sir?

24       A: No

25       Q: Do you know if someone else did?

38

1       Q: No, no, not the new one's. Of the

2  his... well the historic has a history of the whole

3  regulation. It's there. That's going to be there.

4  Correct? The regulation is going to be there. The

5  last regulation distributed, the copy of it's going to

6  be there. That's part of the historic file.

7       A: Correct.

8       Q: Okay. Now, as I move on into the

9  future and there are recommendations made to the, to

10  change the regulation, etcetera. Calendar wise

11  they're just added on as you move forward. Right?

12  In time.

13       A: The, I'm sorry.

14       Q: Well, you know, I changed this thing

15  and I post the distribution that include all the

16  changes to the regulation, let's say, let's say, by

17  March 10th, 2001. The new AR1-1 is distributed on

18  the sixth of March and let's say within a week, the

19  change is posted. The new regulation is posted. A

20  copy of it would be posted to the historic file.

21  Okay? Is that fair to say?

22       A: Yes

23       Q: Yes. It might be a week. It might be

24  a little more. Might be a little less. But whatever

1  of stuff. They put the list there. You know what I'm

2  talking about?

3       A: Yes

4       Q: All right. How is set forth in AR?

5  I'm sorry, I'm sorry. How is that set forth in the

6  historic file in an AR? Let me try to redefine it this

7  way sir. If I go to an AR historic file, the last entry

8  in that file, I assume, let's say that on March 7th,

9  2001. The last entry in that historic file of AR1,

10  assuming it's been posted up to date, you know,

11  within a day or two. All right. Would be the version

12  of when it was changed. Right? The version of the,

13  of the regulation.

14       A: One of the things that's required to be

15  in a historical file is the regulation prior to the

16  change that, that file makes. So for the AR1-1 then,

17  one of the things that should be in the file is AR1-1,

18  as it appeared the regulation prior to this change.

19       Q: Okay, now, Corporal let's say I

20  change AR1-1 in July of 1997, okay. And let's say I

21  get the recommended changes and they're all

22  approved and it's distributed. A copy of that is

23  supposed to be in the historic file. Am I correct?

24       A: Of the new one or of the old one?

1   the time, the process physically takes. That's what's
2   done. Right?
3       A: Yes
4       Q: All right, now anytime any change is
5   made to that regulation, that AR, however it's
6   altered, has to be, that change, has to be posted to
7   the historical file. At least it's supposed to be, if no
8   errors are made. Is that correct?
9       A: The new changes in the historical file
10  for what you did and also how the regulation existed
11  before this change should be in every historical file.
12      Q: Yes. Should be there. Right?
13      A: Yes
14      Q: And that's standard procedure with
15  the Pennsylvania State Police on the way historic
16  files are kept. Am I right sir?
17      A: Yes
18      Q: Do you have any... Strike that. Are
19  there any facts known to you which indicate from
20  your work with the historic file AR1-1, that parts of
21  it were ever missing or taken out of the file before
22  you dealt with the changes in the winter of 2000,
23  2001?
24      A: No

52

1       Q: Now, do you remember when you last
2   looked at the historic file of AR1-1?
3       A: As I said earlier. It would have been
4   when I closed the project out. When the project was
5   completed.
6       Q: Did it include a copy of the AR1-1, as
7   it existed, as it had last existed in July of 1997
8   before it was changed by these changes?
9       A: It should have. I don't know exactly
10  if it did. I can't remember back that far. Exactly
11  everything that would have been in the file.
12      Q: Okay. Now, let's go back to the
13  project summery. And I'm go to number these pages
14  as they go back in time. Let's go back to page
15  number one. Okay? The entry at the top is October
16  10, 2000. And all it says up there at 0 900 hours is
17  received and reviewed. Now I don't know sir if that
18  goes with the next parts of this or what it is but
19  would you explain this entry cause underneath that
20  says  0 900 to 0 915. Okay? Now that also appears
21  to be your handwriting. Am I correct?
22      A: Yes
23      Q: Would you review that and describe
24  those entries for me.
25      A: That was the date the tenth of October

53

1       Q: Yes
2       A: When I got the new project number
3   for this.
4       Q: Okay, and that...
5       A: Are you familiar with where the
6   project number is on the sheet sir?
7       Q: That would be, just a second, oh yes,
8   pages are out of order. That would be project
9   number 970343.
10      A: That was the old project number.
11      Q: Okay
12      A: The new project number was 0547,
13  000547.
14      Q: I see it. Two thousand.
15      A: Yes
16      Q: 0547. So...
17      A: I was marking this sheet for this new
18  project number.
19      Q: Now do you know when, it says, I just
20  want to ask you this now, see it says original source
21  RD.
22      A: Yes
23      Q: What's that?
24      A: That's normally where the project
25  originates.

1       Q: And what does that mean, RD?
2       A: It means the Bureau of Research and
3   Development.
4       Q: Okay. Well, does that have anything
5   to do with Mr. Washington, Leonard Washington; I
6   mean that wouldn't say that. In other words, if this
7   idea changed, originated with him, it wouldn't say
8   that. It wouldn't have his name. Would it?
9       A: It wouldn't his name there. It would
10  have his Bureau.
11      Q: But it doesn't have his Bureau, does
12  it?
13      A: No
14      Q: It has RD. Right?
15      A: Yes
16      Q: And that's Research and Development.
17  Right?
18      A: Yes
19      Q: That doesn't indicate that it came
20  from outside of Research and Development, does it?
21      A: No
22      Q: Now would you look at date assigned
23  for me, please? Would read for the record what it
24  says on date assigned.
25      A: 10/10/2000

1    Q: Now that's October, anyway you read
2  that one, that date time group as got to be October 10
3  of 2000.  Right?
4    A: Yes
5    Q: You know why it was assigned then?
6    A: As I said, that's just when the number
7  was reassigned.
8    Q: Okay
9    A: It's given a newer number.
10    Q: Then it says date due, 10/31/2000.
11  See that?
12    A: Yes
13    Q: Okay.  Now, let's go now down to
14  your entries and let's look at 10/10/2000.  See that?
15    A: Yes
16    Q: Checked with Rose Pollack.  Who's
17  Rose Pollack?
18    A: She works in the Bureau of Human
19  Resources and Management; she's a division
20  director.
21    Q: And that had to do with those
22  personnel changes you and I talked about.  Right?
23    A: Yes
24    Q: Okay.  Who's Stan Berkholder?
25    A: He also works in that same Bureau.

56

1    Q: And that has to do with the changes
2  that you and I talked about earlier that came from
3  personnel.  Right?
4    A: Yes
5    Q: Okay.  Now how about Brenda Ester.
6  Who is she? Estep, I'm sorry sir.
7    A: E-Step.
8    Q: Estep.  I'm sorry sir.  Brenda Estep.
9    A: She works in the same Bureau.
10    Q: And that has to do with what we
11  talked about.  Right?
12    A: Yes
13    Q: And that has to do with the personnel
14  changes.  Right?
15    A: Yes
16    Q: Okay, now Ann Shawnee Smith.
17    A: Yes
18    Q: Okay.  She also works in personnel,
19  I'm going to assume.
20    A: Yes
21    Q: And it has to do with the following,
22  concerning changes to Bureau of Personnel in AR1-
23  1.  Will attempt to locate new sections.  See that?
24    A: Yes

57

1    Q: So that has to do with all of those
2  personnel things.  Right?
3    A: Yes
4    Q: Let's go to October 16, 2000, 15 15
5  hours.  See that?
6    A: Yes
7    Q: Received appropriate new sections
8  from Lieutenant Benedict.  I'm going to guess that
9  that has to do with personnel matters.  And if not,
10  explain to me what it's about.
11    A: I don't remember exactly what those
12  were from Lieutenant Benedict.
13    Q: Who is Lieutenant Benedict?
14    A: He is a Division Director in the
15  Bureau of Research and Development.
16    Q: Oh.  And you don't remember what
17  the appropriate new sections were that came from
18  Lieutenant Benedict though?  Or does that make, is
19  that making reference if you remember sir, try to
20  think back to the personnel changes above.
21    A: I don't remember exactly which
22  sections Lieutenant Benedict gave to me.
23    Q: Okay, okay.  Now it says, now there's,
24  now we're there, October 20, 2000, 12:50.  It says
25  submitted to Pam.

1    A: Yes
2    Q: See that?  Who's Pam?
3    A: Pam Yandridge.
4    Q: Yes
5    A: She's a civilian employee.
6    Q: Yes, she's a civilian employee that
7  works in R and D.  Am I correct?
8    A: Yes
9    Q: Okay.  Now why would that be
10  submitted to Pam, Corporal?
11    A: She proofreads the projects.
12    Q: Okay, all right.  Now let's go to 01,
13  now this, now we're in January 19,2001, 10 35
14  hours.  Resubmitted to Sharon.  What's that about?
15    A: At some point I would have gotten the
16  project back for corrections from Sharon.  So I
17  resubmitted it to her with the corrections made.
18    Q: Okay.  Is there any mention so far of
19  sub-section C or you and Mr. Margeson working on
20  anything together?
21    A: No, not on the project tracking
22  summery.
23    Q: Does Margeson's name appear there
24  anywhere on this?
25    A: No, it does not.

1   Q: Anything about chain of command or
2 any bureau outside of R and D appear there.
3   A: No
4   Q: Okay. Now, then we have, we're
5 going, now we're down into February 12, 2001, 14
6 30 hours. Received back for corrections. Explain
7 that to me.
8   A: That is when I would gotten the
9 project back from the front office.
10   Q: From the front office. Now, by that
11 time was sub-section C in there? Do you know?
12   A: Yes
13   Q: Well let's go back up to 01, 19 01.
14 January 19, 01, 10 35 hours. Resubmitted to Sharon.
15 Was sub-section C in there?
16   A: Yes
17   Q: Let's go back up to October 20, 12:50.
18 Submitted to Pam. Was sub-section C in there?
19   A: It should have been. I don't recall
20 exactly, as I said, when Sergeant Margeson
21 approached me about adding that to the project.
22   Q: Well, when I looked at the historic
23 file, I couldn't find any, I mean I submit to you sir,
24 you know, I could not find any draft language, any
25 draft paragraphs, any notes, as the conversations,

60

1   Q: Yes, okay. Now, it was resubmitted to
2 Sharon. Now, it says that, now let's go to February
3 12 again 14 30. Received back for corrections.
4 What corrections?
5   A: Those would have been the questions
6 from Ms. Bungo. That were on there.
7   Q: But they're not in the historic file
8 either and you wouldn't have put those in either.
9 That was your practice? Not to put, I mean you get
10 corrections back from the front office, were they
11 correction personnel lists or what. I mean, what
12 were they correcting? Do you remember?
13   A: As I said, they were questions that she
14 had.
15   Q: About the civilian officers or
16 something. About the civilian managers.
17   A: Yes. She had several questions about
18 areas in there.
19   Q: Well, and now thanks to your kind
20 help here I'm beginning to understand a little bit,
21 those are about personnel and personnel categories
22 and changes. Right?
23   A: Yes
24   Q: Yes, okay. Now February 22, 2001.
25 Resubmitted to front office.

1 meetings with Mr. Margeson or anything like that.
2 Do you have a recollection whether you put any kind
3 of references in there at all or this thing just, you
4 know it almost looks like it dropped out directly into
5 the, and I'm saying it did, I just don't know.
6   A: When we agreed on the wording. I
7 would have just put it right into the regulation. I
8 wouldn't have made up copies specifically for the
9 file. I would have just put it right into the
10 regulation to go through the proofreading process
11 and the approval process.
12   Q: You would have.
13   A: I did.
14   Q: Oh, you did?
15   A: Yes. I just put it, as I stated earlier, I
16 put it into the regulation.
17   Q: And, will you remember that now. I
18 mean remember that you did that. Right? When did
19 you do that?
20   A: When did I...
21   Q: Put it right into the regulation.
22   A: As I said, after we would have agreed
23 on the language. You know, when you asked me if I
24 typed it up, and I said yes I typed it into the
25 regulation. I just put it right into the regulation.

61

1   A: Yes
2   Q: Would there be like aside from just
3 these sheets, would there be any record of
4 resubmitted changes to...I mean see here's what I'm
5 having trouble with. Here's my problem sir. It's
6 very, very simple. I can't find in looking at the
7 historic file that's been given to me by your lawyers
8 in the Pennsylvania State Police. I can't find where
9 these changes were made, what they were, if
10 anything was added. Did you make any corrections
11 that the front office recommended? If I'm
12 understanding what happened here, they sent it back
13 with questions but they had no recommended
14 changes then. Is that right?
15   A: Correct.
16   Q: Okay. So everything that you had sent
17 over here, on or about...Who's Sharon?
18   A: Sharon is the Major's secretary in the
19 Bureau of Research and Development. Sharon
20 Alstop.
21   Q: Okay, Estep or Alstop, whatever you
22 told me. Now, you know here's where I'm having,
23 it's a little sort of a gap here. It says resubmitted to
24 front office. It didn't tell me when it went to front

1 office in the first place. Should that be there? Did
2 somebody leave that out by error or something?
3        A: I wouldn't know that. When I submit
4 the projects and they go through.
5        Q: Yes
6        A: When it receives the Major's
7 approval, the Major's office forwards it. Sharon has
8 a log.
9        Q: Okay
10       A: That she keeps of correspondence in
11 and out.
12       Q: All right. So it could have gone over
13 there without you knowing.
14       A: Right. I wouldn't know.
15       Q: Okay. But you remember it coming
16 back with questions and you remember talking to
17 Mary Bungo.
18       A: Yes
19       Q: To answer questions. Right?
20       A: Yes
21       Q: Okay. And that it was resubmitted on
22 February 22 to the front office. Right?
23       A: That's when I took it over and
24 discussed it with her and answered her questions.
25       Q: But you didn't discuss sub-section C?

64

1        A: She didn't have any questions about
2 that.
3        Q: Sub-section C was really important
4 because of accreditation? Did you need it for
5 accreditation? Did the Pennsylvania...
6        A: Oh I'm sorry. I don't know that it
7 was a project required for accreditation.
8        Q: Sergeant Margeson didn't tell you
9 that?
10       A: I don't recall that being part of our
11 conversation.
12       Q: Sir, I may be mistaken but I think I
13 have in black and white from your lawyers that it
14 was necessary and important for accreditation. Now
15 you, I don't know if I'm right about that. I need you
16 to clarify something.
17       BARBARA CHRISTI: Before the witness
18 answers if you're going to state what you have from
19 the lawyers then I ask that you produce it for the
20 witness to see because my recollection is, if you're
21 talking about the affidavit of Sergeant Margeson,
22 that Sergeant Margeson indicated that the entire
23 AR1-1. Not sub-section C or any portion thereof
24 was needed to be completed and processed for
25 accreditation purposes. But you know, I'll stand by

65

1 whatever you're referring to if you'll just produce it
2 for the witness to see.
3        MR BAILEY: Now Corporal tell me you,
4 and Sergeant Margeson talked about the need for
5 AR1 for accreditation purposes.
6        WILLIAM MCAVEARY: AR1-1 yes.
7        Q: AR1-1, Okay. Well tell me about
8 those discussions.
9        A: I'm, that the discussion that AR1-1
10 needed to be signed and out for accreditation.
11       Q: And sub-section C was part of that
12 needed for accreditation. Because I think, you know,
13 I think there is going to be an issue about it whether
14 a federal judge thought that there was a need for sub-
15 section C. But your telling us that, I want to ask
16 you, did you and Sergeant Margeson talk about the
17 need for sub-section C in the scheme of, in a context
18 of AR1-1 being needed for accreditation?
19       A: I'm not sure I understand the scope of
20 the question. Are you asking, was sub-section C
21 necessary for accreditation?
22       Q: Yes
23       A: We did not discuss that sub-section C
24 was necessary for accreditation.

1        Q: Okay, that's good enough. Now, on
2 February 22, 2001, 12:35 p.m., AR1-1 was
3 resubmitted to the front office. Correct?
4        A: Yes
5        Q: Okay. Now, when did you go over
6 and sign it with Mary Bungo?
7        A: I did not sign it. That would have
8 been the twenty-second. Then would have been
9 when I took it over to Mary Bungo to see about her
10 questions.
11       Q: And, so February 22, is when the
12 Commissioner's signature was add by autopen.
13       A: Yes
14       Q: And, you witnessed that.
15       A: Yes. The auto-penning.
16       Q: So, now bear with me on these
17 questions sir, if you will. Okay? If you're going
18 over to the front office, had you gone over to the
19 front office prior to the February 23,2001 to have
20 things signed? Or is this a first for you? Let me
21 repeat the question so I make it clear okay. You
22 want me to try to break it down, is it...
23       A: I'm just trying to think so I can give
24 an accurate answer.

Q: Oh, I'm sorry sir. I thought the question was.

A: I don't recall personally picking projects that were prior to that.

Q: Well were you personally requested to come over on this one?

A: No

Q: How did you come up? Did you just need a break? I'm not being facetious, it happens, it's a lot of stress in these kind of jobs and you know.

A: No. The AR1-1 was a priority project. The entire project. For accreditation.

Q: Okay.

A: So I took it over personally to see about the questions that see about the questions that she had on there.

Q: Yes

A: So that we could get this through the process and out the field as quickly as possible.

Q: Sir, are you saying, please pay attention to this please, it's very important. Are you telling us that AR1-1 as it existed, because I've already researched this and I honestly, you know, I, it's really confounding me. Are you testifying here

68

today that AR1-1 as it existed in it's July 1997 form was an obstacle to accreditation. Is that what your telling us?

A: I don't know that I can speak exactly what's needed of accreditation. I'm not involved in that area.

Q: Who told you that, who first told you that AR1-1 was needed for accreditation?

A: That would have been Sergeant Margeson.

Q: And do you remember when he first told you that Corporal?

A: I don't remember exactly when we first told me that.

Q: Would it have been after the project was assigned to you though?

A: Yes

Q: I would assume. That's only reasonable that it would have been after that. Right?

A: Yes

Q: Did he tell you there was urgency of getting it done?

A: When it was first assigned? Or when I was working on it during this time frame that you're questioning about?

69

Q: It would have been, you know, from when, you know from when you were assigned to it until you went over to have it signed.

A: At some point there was an urgency. Yes.

Q: Oh, at some point there was an urgency. Before or after sub-section C popped up?

A: I honestly don't recall.

Q: Don't remember?

BARBARA CHRISTI: Counsel?

MR BAILEY: Yes

BARBARA CHRISTI: Kids would like a five-minute break or so. Can we break?

MR BAILEY: I tell you what. You know it would help me out if you let me just, I can just finish section here. Couple minutes. Would that be okay? Or do you need it immediately?

BARBARA CHRISTI: I think the witness would prefer it before the question.

MR BAILEY: Okay, well I'm going to caution everybody. Generally, I don't object to this but want no discussion with counsel in the middle of this deposition. None. Okay.

BARBARA CHRISTI: Well excuse me counsel, but I thing that...

MR BAILEY: No, well I make it you know...

BARBARA CHRISTI: entitled to confer with counsel at any point and time during the deposition.

MR BAILEY: Actually, that's not correct. I just want to note my objection for the record in this case. Okay? It's all right, you go ahead and do what you want to do, but you know we'll, would you please suspend.

ALBERT RODRIGUEZ: The time 10:49 a.m. Suspending the video.

MR BAILEY: Albert do you want to go ahead and get it started.

ALBERT RODRIGUEZ: Ladies and gentlemen please be advised we're coming on video. Video recording is now on. Time now is 11:01.

MR BAILEY: All right. Mr. McAveary, you notice that doc. might, you have previously identified and document that I did mark here, like to have marked as "McAveary One" and it is the project tracking summery, as I know it to be. Eight pages, I don't know if there's more to it or not, to be honest with you. But it's copies that were made when I did a document inspection. And so I would liked to have

1 it marked. It is marked and I will give it to the video
2 people. Now, the, I'd asked you, how many times,
3 how did you come to go over to Mary Bungo to get
4 this thing signed.
5        WILLIAM MCAVEARY: As I said, we
6 were trying to get the project approved for the
7 upcoming accreditation. So I took it over to answer
8 any questions she might have and get it through the
9 process.
10        Q: Who told you that, was it Mr.
11 Margeson that told you that there was some kind of
12 urgency to this accreditation thing?
13        A: That the project was needed for
14 accreditation. Yes.
15        Q: Do you know how that process of
16 accreditation occurs?
17        A: Generally, not in great detail.
18        Q: Well, do you know what's required,
19 whether it requires a process, or whether it requires
20 and process that can deal with compliance or change,
21 or whether you have to meet certain basic
22 requirements in the substance of your table of
23 organization?
24        A: I wouldn't know anything like that.

72

1        Q: Okay, so you don't know what this,
2 you were led to believe that the substance of AR1
3 had to be changed in order to meet accreditation.
4 Right?
5        A: Yes. Because at the time AR1-1 did
6 not match the department.
7        Q: How, in what way?
8        A: Well, as I said, you know, you use the
9 personnel example, there was different divisions, I
10 believe the last AR change only had three divisions
11 listed. For the Bureau of Personnel. There was four
12 now with different names.
13        Q: But as you sit hear today and we
14 understand that you and Mr. Margeson didn't discuss
15 it. There are no facts known to you, which would
16 indicate that sub-section C had anything to do with
17 that accreditation project or process. Isn't that
18 correct?
19        A: Not that I'm aware of.
20        Q: Okay. Now, let's go back to the auto-
21 penning. Do you ever, was this the first time you'd
22 ever gone over to the front office to get something
23 signed?
24        A: I believe this was.

73

1        Q: Well, who told you go over there and
2 do this. Somebody had to tell you. You didn't do it
3 on your own.
4        A: Nobody told me to go over there.
5        Q: Nobody told you?
6        A: No sir.
7        Q: Well how do know it was going to
8 happen?
9        A: I didn't know that it was going to
10 happen. I went over answer Ms. Bungo's questions
11 that she had on the project.
12        Q: Oh, okay you went over to handle her,
13 answer her questions on the project and she auto-
14 signed it in front of you?
15        A: Yes, after we had discussed her
16 questions.
17        Q: Well do you know if the commissioner
18 ever approved of these changes?
19        A: I really can't speak about the
20 commissioner's duties or what he knows.
21        Q: Well did you ask Ms. Bungo if the
22 commissioner approved this?
23        A: No I did not.
24        Q: Well you're the project officer. I
25 assume you would want to know if the, here's this

1 secretary in the office, I mean you weren't violating
2 sub-section C were you? There's not a chain of
3 command problem here is there? Do you out rank
4 Mary Bungo?
5        A: That would be a question I can't
6 answer.
7        Q: Is she a civilian employee in the
8 department?
9        A: Yes she is.
10        Q: You don't know whether you out rank
11 her?
12        A: Certain civilian positions within the
13 department hold authority.
14        Q: Well, where is the authority in, did
15 you before; she's here signing a document with the
16 commissioners signature on it. Did you ever
17 ascertain what role she filled or played in the table
18 of organization to have that kind of authority?
19        A: Well that would be between her and
20 the commissioner. Whether or not he gives her that
21 authority.
22        Q: Well, wouldn't it be between the
23 regulations, which, aren't the regulations above the
24 commissioner? I mean, the laws and regulations in
25 this country are above people that hold positions. I

75

1  would assume that AR1 controls what the
2  commissioner does and not vice-versa.  I could be
3  wrong, but isn't that so?
4         A:  I'm not sure I understand.
5         Q:  Does the commissioner have a right to
6  violate AR1 when he wants to?
7         A:  No
8         Q:  Does Mary Bungo have a right to
9  violate AR1 when she wants to?
10        A:  No
11        Q:  Do you have a right to violate AR1
12  when you want to?
13        A:  No
14        Q:  Did you ask Mary Bungo on whose
15  authority she was affixing the commissioners
16  signature to the, to these proposed changes, I believe
17  866.
18        A:  No
19        Q:  All right.  But it was, but in fairness
20  to you in kind of situation, you were assuming that
21  she had the commissioner's authority.  Is that
22  correct?
23        A:  Yes
24        Q:  Do you know whether the
25  commissioner testified in his deposition that he had

76

1  no knowledge at all of sub-section C or what it was
2  about?
3         A:  I don't see how possibly know what
4  the commissioner testified to in his deposition.
5         Q:  Well, I'm wondering if someone told
6  you.
7         A:  No
8         Q:  Okay.  Now what did you do with that,
9  when you got that off the autopen.  Do you
10 remember, do you remember what the signature was
11 like, in other words was it signed like a, was it a
12 fiber pen that's used, is it an ink-jet, do you know
13 how the machine, did you look at the machine?
14        A:  I saw it, but really didn't take note of
15 what kind of pen was in there.
16        Q:  Is it ink-jet or do you know...
17        A:  As I said, I didn't take note of what
18 kind of pen was in there.
19        Q:  Well you were concerned that the ink
20 be dry weren't you.  You know, you don't smearing,
21 I mean usually you get a document like that fresh
22 off, you know.  Let me go back again, make sure that
23 we cover this.  Did you look at the document at all
24 when Mary Bungo gave it to you?
25        A:  Look at it how?

77

1         Q:  Well, look at it with those handsome
2  eyes of yours, just look at it and see the signatures
3  that was on it.  You know, observe it.
4         A:  Yes
5         Q:  The way, I mean it's in our hand,
6  conditions, there's light and everything, you look at
7  it, you see it and you see the signature there, and it
8  was the, I'm sure you looked at it to see if it was the
9  commissioners signature.
10        A:  Yes
11        Q:  All right.  Do you remember whether
12 the ink was wet or dry right away or anything, the
13 condition of the document.
14        A:  No, I don't recall.
15        Q:  And how many of those did she
16 autopen sir?
17        A:  It's one.  It's the change sheet.
18        Q:  Is that right?  So you observed Mary
19 Bungo sign one change sheet in front of you.  Right?
20        A:  Yes
21        Q:  Did you observe Mary Bungo sign
22 more than one change sheet?
23        A:  No

1         Q:  Well how many change, signed
2  change sheets were there in the historic file when
3  you looked at it?
4         A:  I don't recall.
5         Q:  Well, sir isn't it fair to say that you're
6  the guy that had that change sheet.  You took it back
7  and you put it in the historic file.  Right?
8         A:  Actually, when I took back signed.  I
9  have to give it to Pam who does the reproduction
10 order.
11        Q:  Okay
12        A:  Regulation with the change sheet
13 attached.
14        Q:  I see.  Did Pam have another signed
15 change sheet?
16        A:  Not that I'm aware of.
17        Q:  Well, do you know any reason why the
18 commissioner would sign more than one change
19 sheet?  Well, actually we know he didn't sign any
20 because he told us that.  That's his testimony.  How
21 many change sheets do you get signed.
22        A:  Normally just one.
23        Q:  So you didn't play any roll in signing
24 more than one change sheet.  Did you?
25        A:  I don't recall.

1    Q: You don't have any recollection of
2  there being more than one. Do you?
3    A: No
4    Q: And the one change sheet that you...
5  I'm going to try and find here a couple of signed
6  copies, of a couple of signed change sheets. Now
7  see if you can tell me which one you saw. Okay?
8  That you got from Mary Bungo on February 22,
9  2001. The other one the signature is up higher.
10  Could you take a look at this sir?
11    BARBARA CHRISTI: Are you marking
12  this counsel? Is this "McAveary Two?"
13    MR BAILEY: I'd be happy to mark it for
14  you. Does that look familiar to you?
15    WILLIAM MCAVEARY: It looks like
16  a...
17    Q: Before I ask you that question, in
18  fairness to you. What I'm looking for is just a
19  recollection. I don't expect you to be able to
20  identify it, you know, after this time. Is that familiar
21  with you in the sense that it looks like the change
22  sheet that was signed or do you have any reason to
23  believe it's not the one? Let me do it this way. It's
24  awkward because I don't think, you know, I don't
25  want to ask you an unfair question. I will represent

80

to you sir that I got of that from the historic file and
I got a copy of another piece of paper just like that
from the historic file that was done on a different
machine, different typing obviously, mentions the
same change, and it's auto-penned. It appears to be
auto-penned but the signature in a different place.
I'm telling you, that's why I'm asking you these
questions, if you have recollection of that. Okay?
Did you have recollection of seeing something like
that? Can you be certain whether that's the one you
saw? You don't know?
    A: I couldn't be certain.
    Q: Okay, that's fair enough. It's been
quite some time. Right? Is that fair to say?
    A: Yes
    Q: Now sir, have you ever had any
experiences with change sheets coming back from
the front office and the ink not being completely dry
more than a year later. Have you ever had that
happen?
    A: I wouldn't see the change sheets a
year later.
    Q: Okay
    A: Normally.

81

1    Q: But in terms of autopen signatures of
2  your own experiences, you don't know if the ink
3  takes more than a year to dry.
4    A: I'm not aware of that, no.
5    Q: Okay. Please return that to me and
6  I'll see if I can find the other one. Counsel is aware
7  it, we pointed out to them on that day but I don't
8  think it's fair to you...
9    BABARA CHRISTI: I'm sorry counsel,
10  excuse me. Can we just mark that one before you
11  produce or look for the other one?
12    MR BAILEY: Well let me hold it here
13  until we can find the other one and then we'll redo it.
14  Okay? But they are the two documents I showed that
15  day when you were doing the document inspection.
16  On the, my understanding is that from your sheet
17  here, that on... there's something odd. I just want to
18  ask you about something. Okay? If you go back to
19  the first page of "McAveary One" it says on 01-19-
20  01, 10:35 it was resubmitted to Sharon. See that?
21    WILLIAM MCAVEARY: Yes
22    Q: You don't know if Sharon sent it back
23  to the front office, how long it took her to send it.
24  Right?
25    A: After I had resubmitted it to her?

1    Q: Yes
2    A: No
3    Q: I want to show you this document, if
4  you can help me, help sort these things out. Could
5  you take a look at those two forms for me? And
6  have those marked as, the one that says sent January
7  22 as "McAveary Two", and the other one as
8  "McAveary Three."
9    BARBARA CHRISTI: Which one is
10  "McAveary Two?"
11    MR BAILEY: The one that says sent
12  January 22nd. Now I saw the agitation in co-counsel
13  Reynolds. At some concern. If there's a concern I
14  do have that second copy. Now if there's some
15  concern about doing that first, I don't mind.
16    JOANNA REYNOLDS: The only concern
17  I had counsel is that if you show a document to the
18  witness. It should be marked. And I don't want,
19  because you already indicated that there were two
20  change sheets so I don't want you to show you a
21  change sheet then substitute another change sheet
22  then we don't know what change sheet was shown to
23  him and the fact that there are two so...

1  MR BAILEY: Okay, let's do this. Can
2  you return those to me right now and we're going
3  those next.
4  BARBARA CHRISTI: Are you canceling
5  out McAveary two and three?
6  MR BAILEY: No, you can mark them two
7  and three. Let's clean it up this way since you've
8  marked those.
9  BARBARA CHRISTI: All right.
10  MR BAILEY: Now counsel expressed
11  some ... you can set them right there sir...Counsel
12  expressed some concern about the, incidentally those
13  documents there, two and three are not change
14  sheets. But here are two changes sheets. I'm going
15  to give this back to you sir. Okay? And I want you
16  to look at these and please. And I would like them
17  marked "Four" and "Five." Now, for purposes of
18  four and five. We'll mark number four, one of them
19  say through sixty-eight? And one of them say
20  through sixty-six?
21  OPPOSING COUNSEL: Yes for inserting
22  the pages.
23  MR BAILEY: Okay, and would you want
24  to mark those Barbara.

84

1  Q: Would you agree with me where it
2  says change number 866, and change number 866,
3  and the date were typed on different machines.
4  A: Yes
5  Q: Okay. Can you explain what they,
6  why there's two different changes? Did see just one
7  of those things signed? Do you know which one?
8  A: I
9  Q: Which one did you see signed?
10  A: I can't tell you which one I saw
11  signed.
12  Q: Why are there two?
13  A: I can't explain that.
14  Q: If I told you that the ink was wet on
15  those and not completely dry on those based on my
16  observations over a year later. If you, and again,
17  you may not have any familiarity with the autopen
18  signatures from the commissioners office. Could
19  you explain that to me?
20  A: No, I could not.
21  Q: Now what that change order is all
22  about is they're instructions that go with the
23  proposed change to the AR that goes out in a
24  distribution and says take these pages out the AR
25  manual, which is usually on a ring binder. Right?

1  BARBARA CHRISTI: Yes, which one are
2  you marking the one through sixty-six as four?
3  MR BAILEY: Let's see with one. You
4  the what, the way I identify them is one with the
5  close signature and the one with the far signature so
6  we're going take the one that says one through six-
7  eight will be four, and the one that says one through
8  sixty-six as five. Sir can you explain the difference
9  in those two documents to me? If it has any meaning
10  to you. In fairness to you, it may not. But would
11  you explain it to me? You mind if I look over your
12  shoulder while you do that?
13  WILLIAM MCAVEARY: No.
14  Q: Okay. Thanks.
15  A: You mean like what differences exist
16  between the two or...
17  Q: Well I don't think you need to tell us
18  the different, can you explain them for me?
19  A: Explain them how?
20  Q: Are they two different documents?
21  A: It's essentially the same document but
22  with differences on the two form of it.
23  Q: Okay, what date do they have on
24  them?
25  A: They both have February 23, 2001.

85

1  A: Yes
2  Q: And it says insert these new changes
3  in there. Right?
4  A: Yes
5  Q: Okay. Do you know if there's any
6  relationship between those two documents and sub-
7  section C that we've been discussing?
8  A: No, not to my knowledge.
9  Q: You don't know one way or another?
10  A: No
11  Q: All right. Sir, could you set those
12  aside, well just actually, put them up in front of you,
13  put them up there, and then take these two
14  documents here which are "McAveary Two" and
15  "McAveary Three." Now one of those documents
16  has a date sent of January 22, 2001 and then one has a
17  date sent of February 17, 2000? Do you see that?
18  A: Yes
19  Q: And what is the regu..Can you...I
20  mean...I don't understand those two documents if I, I
21  mean...are they different projects? Are they dealing
22  with AR1-1? What are they about? Do you know?
23  A: Well, they're the project route slip for
24  the AR1-1 project.
25  Q: Okay.

1    A: This, as I said AR1-1 was an ongoing
2  project...

3    Q: Right

4    A: For a couple of years. This was a
5  route slip prior to my receiving the project.

6    BARBARA CHRISTI: For this, which
7  number are you referring to?

8    MR BAILEY: That's number five. Or
9  number three.

10    WILLIAM MCAVEARY: And it has
11  Corporal Robert F. Kelly's name on it as one of the
12  contact people.

13    Q: Right. Now the one has penned in on
14  the top up there. Change number 866.

15    A: Yes

16    Q: And that one has your name on it.
17  Right?

18    A: Yes

19    Q: And that one has a date up there of
20  10/30, which is October 30th of the year 2000.
21  Right?

22    A: Yes

23    Q: Now, who's initials?

24    A: That is Marie Marshall.

25    Q: And where does Marie Marshall work?

88

1    A: I would assume...

2    Q: Is that Mr. Westcott, do you know. Is
3  that Mr. Coury? Do you know that is?

4    A: No, I don't know.

5    Q: Deputy of the Administration. Do you
6  know those initials?

7    A: No

8    Q: But as the date there under Deputy of
9  Administration, 2/12. Do you see that?

10    A: Yes

11    Q: Now look over in the left at the x's.
12  Do you see that?

13    A: Yes

14    Q: Do you know when those are placed in
15  those boxes?

16    A: The x's?

17    Q: Yes

18    A: Yes I do.

19    Q: And is that placed in there to indicate
20  where the document should be routed? Where it's
21  supposed to be sent.

22    A: Yes

23    Q: Okay. Now, over on "McAveary
24  Three" under the x's it has numbers 3,3,and 3. Do
25  you see that?

1    A: In the Bureau of Research and
2  Development.

3    Q: Okay. And down at the bottom of
4  "McAveary Two" I see something that has a date on
5  it says 10/30 and then...Programming Division.
6  What does that mean?

7    A: Programming Division is the division
8  I work in.

9    Q: Okay

10    A: Those are Sergeant Margeson's
11  initials. That would have been when he reviewed it
12  and signed off on the regulation in forwarded to the
13  next person.

14    Q: Okay. And what does it have for the
15  date sent there?

16    A: Over here?

17    Q: Yes

18    A: January 22, 2001.

19    Q: And then down below it says deputy
20  staff. Right?

21    A: Yes

22    Q: Is that Robert Hickus 123?

23    A: I would assume.

24    Q: Okay and underneath that who's that
25  one under there? Deputy Operations.

89

1    A: Yes

2    Q: And, it has Deputy Staff and it says,
3  RCH. Is that Hickus?

4    A: Again, I would assume.

5    Q: Okay. And then it has an x Director
6  Bureau of R and D. Do you see that reference?

7    A: Yes

8    Q: Okay, yes. Can you explain why in
9  the one case we're going through all Deputy
10  Administrators or Deputy, you know the Lieutenant
11  Colonel's, the group of Deputy Administrators, and
12  why in the other case it's to Mr. Hickus and the back
13  over, in the case of the Kelly project?

14    A: I wouldn't know. That was prior to
15  my being assigned to the project.

16    Q: Do don't know why that's different or
17  what that's for?

18    A: No sir.

19    Q: Okay, okay. Let me have those back
20  and let me look at them one more minute and see if I
21  have questions on them. Okay? I'll hand them right
22  back to you. You know what page or where sub-
23  section D appears?

24    A: Where sub-section D appears?

1    Q:  Yes.  Sub –section C, I'm sorry, the

2    AR1-1.02?

3    A:  No, not off the top of my head.  I

4    don't.

5    Q:  Okay.  I want to ask you something

6    Corporal, do you, these change sheets.  Who types

7    them up?

8    A:  The change sheet is done as part of

9    the project by the project person.  In this case it

10    would have been me.  It's done on a computer.

11    Q:  Did you type these?  McAveary four

12    and five.  Did you type them?

13    A:  They look like the change sheets that

14    were done for the project, I don't...

15    Q:  Change sheets... underline "S" plural.

16    A:  Well you have two change sheets there

17    sir.

18    Q:  And I have two autopen signatures,

19    they're exactly the same, and you submitted one.

20    You say you don't know where the second one came

21    from.  They have the same date.  And I'm just asking

22    if you have different typewriters or different, you

23    know.

24    A:  The date is not on there when the

25    change sheet is submitted with a project.

92

1    Q:  Who puts it on?

2    A:  Pam does.  Miss Yandridge.  As well

3    as change number.

4    Q:  Okay.  I'm going to leave the Rec.

5    Room.  Darrell do want to step out for just a

6    minute?  Barb could you make me copies of those

7    exhibits.

8    BARBARA CHRISTI:  Sure

9    MR BAILEY:  I don't have any other

10    questions.  I'd like to thank you Corporal, it's never

11    pleasant witness.  I would to express my appreciation

12    for the courtesy that you've shown me and coming in

13    here today to answer questions.  Thank you.  Yes sir.

14    BARBARA CHRISTI:  Do you want to

15    take a break counsel so I can make these copies then

16    that you may need them for the next witness or what

17    do you suggest.

18    MR BAILEY:  Yes, well we all need

19    copies for our files and then I got to give him one so.

20    BARBARA CHRISTI:  All right so we'll

21    make set of these, also a set of copies of these eight

22    pages of "McAveary One."

23    MR BAILEY:  I don't to do that one.

24    Caption Brown has already done those.  I think right

93

1    now, Corporal you sit there till he shuts the

2    deposition down.  Then we're done.

3    WILLIAM MCAVEARY:  Okay

4    ALBERT RODRIGUEZ:  Okay, It is now

5    11:30 a.m.  The deposition of Corporal McAveary is

6    completed.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Project Tracking Summary

PRIORITY: ☑

Project No.: 2000 0547    Orig. Source:  RD    Contact Person:

Date Assigned: 10/10/2000    Assigned By:  MCAREAVY, W

Date Due:  10/31/2000    Index Code:

Date Signed:

Subject:  AR 1-1 RESUBMISSION

| DATE/TIME | REMARKS |
|---|---|
| 10/10/00  0800  And 0915 | RECEIVED AND REVIEWED CHECKED WITH ROSE POLEK, STAN BURKHOLDER, BRENDA ESTEP, AND SHAWNEE SMITH CONCERNING CHANGES TO AREA OF PERSONNEL IN AR 1-1. WILL ATTEMPT TO LOCATE NEW SECTIONS. |
| 10/16/20  1515 | RECEIVED APPROPRIATE NEW SECTION FROM LT. BENSDICK. |
| 10/29/20  1250 | SUBMITTED TO PAM. |
| 1/17/01  1035 | RESUBMITTED TO SHARON. |
| 03/30/01  1430 | RECEIVED BACK FOR CORRECTIONS. |
| 03/31/01  1230 | RESUBMITTED TO FRONT OFFICE. |
| 03/27/01  0945 | RECEIVED BACK SIGNED. W/ REPRO ORDER. DELIVERED TO REPRO. |
| 03/16/20 | PICKED UP FROM REPRO. DISTRIBUTED. PROJECT COMPLETED. |

*John Pudliner*

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER                    :    1: CV- 00-0084

          Plaintiff               :

                                  :

Versus                            :

                                  :

PAUL EVANKO, MARK                 :
CAMBELL, THOMAS COURY,            :
JOSEPH WESTCOTT,                  :
HAWTHORNE CONLEY                  :
MS. REYNOLDS and                  :
SYNDI GUIDO,   Et al.             :
          Defendants              :

**ORIGINAL**

DATE:              February 25, 2002

PROCEEDINGS:       Video Deposition of
                   Wilfred Pudliner

APPEARANCES:

For the Plaintiff:       Donald Bailey, Esquire
                         4311 N. 6th Street
                         Harrisburg, PA 17110

For the Defendant:       Joanna Reynolds, Esq.
                         Barbara Christi, Esq.
                         1800 Elmerton Avenue,
                         Harrisburg PA, 17110

1

---

1    CYRSTAL LYDE:  Good afternoon ladies
2    and gentlemen.  Please be advise the video and
3    audio is in operation.  My name is Crystal. M.
4    Lyde, L-Y-D-E.  My address is 4310 Hillsdale Road
5    Harrisburg Pennsylvania, 17112.  I've been
6    contracted by PR Video Incorporated to be the
7    operator for this deposition.  The case is in the
8    United State District Court for the Middle District
9    of Pennsylvania.  The caption is Darrell G. Ober vs.
10   Paul Evanko, Mark Campbell, Thomas Coury,
11   Joseph Westcott, and Hawthorne Conley.  The
12   docket number is 1: CV-01-0084.  The date is
13   February 25, 2002.  The deposition is being held at
14   the law office of Don Bailey, 4311 North 6th Street,
15   Harrisburg Pennsylvania, 17110.  The video
16   deposition is being taken on behave of plaintiff
17   Darrell Ober.  The witness's name is Major
18   Pudliner.
19        MR. PUDLINER: That the way most
20   people pronounce it.  I pronounce it (pood-line-er),
21   but Pudliner is fine.
22        LYDE: Okay the time is 1:02 p.m.
23   Would you raise your right hand for me please?
24        MR PUDLINER: Yes

2

---

1         MS. LYDE: Would you state your name
2    for the record, your full name, and spell it please?
3         MR PUDLINER: My full name is Wilfred
4    W-I-L-F-R-E-D, John J-O-H-N, Pudliner
5    P-U-D-L-I-N-E-R, Junior.
6         MS. LYDE: Do you so swear to tell the
7    whole truth, and nothing but the truth so help you
8    God?
9         MR PUDLINER: I do
10        MS. LYDE: Thank you.  Mr. Bailey can
11   we have a sound check around the room please?
12        MR BAILEY: Yes, my name is Don
13   Bailey.  I'm an attorney.  I represent the plaintiff,
14   Darrell G. Ober in this matter.  Address 4311
15   North 6th Street, Harrisburg PA, 17110, and 717-
16   221-9500.  Ms. Reynolds?
17        MS. REYNOLDS: Ms. Reynolds, I'm
18   assistant counsel with the Pennsylvania State
19   Police.  I represent the defendants in this matter.
20   My address is 1800 Elmerton Avenue, Harrisburg
21   PA, 17110.  Phone number is 717-783-5568.
22        BARBARA CHRISTI: Barbara Christi,
23   Chief Counsel, Pennsylvania State Police.  Same
24   address and telephone as those given by Assistant
25   Counsel Reynolds.

---

1         MR BAILEY: Okay Major Pudliner, my
2    name is Don Bailey as indicated and I'm an
3    attorney here.  We're going to be conducting a
4    deposition.  This is a video deposition so it's
5    important to make sure we keep our voice up at all
6    times etc.  Very very simply instructions.  If I step
7    on the toes of one of your answers make sure that
8    you correct me, and make sure you answer fully
9    and completely so you get a complete answer in,
10   that sort of thing.  I don't mind you asking me
11   what I mean by a question although this deposition
12   is probably going to be quite brief.  I don't mind
13   you asking me where I'm going with a group of
14   questions or where I'm going with a question or
15   what I mean by a particular question at all.  Please
16   feel free to do so.  Take a break at anytime, but
17   again I don't think it's gonna last very long.  You've
18   done depositions before haven't you?
19        MR PUDLINER: Yes I've done
20   depositions years ago.  It's many years since I've
21   done any, but I've testified at many of arbitration
22   hearings.
23        MR BAILEY: Okay, do you have any
24   questions for me?
25        MR PUDLINER: No sir I don't.

MR BAILEY: Let's just get to it then. The usual stipulations? Objections reserved, except just to form of question, till time of trial.

MS. REYNOLDS: Yes

MR BAILEY: Okay. Major Pudliner I'm just gonna refer to you as Major. Is that okay just Major?

MR PUDLINER: Major's fine. John's fine.

MR BAILEY: Major, in what capacity do you serve with the Pennsylvania State Police today?

A:    I'm currently the Director of the Bureau of Professional Responsibility.

Q:    And how long have you served in that capacity?

A:    Since September 2nd of 2000.

Q:    Now in the capacity of...just very briefly tell us what you do as Director of BPR.

A:    As a Director of the Bureau of Professional Responsibility I oversee two divisions. The Internal Affairs Division and also the Systems and Process Review Division.

Q:    Now, how long have you served in the Pennsylvania State Police?

5

them through the Governor's Office. We get them by telephone. We get them by letter. Normally what we do if we receive one that's not a signed document, then we send out a complaint verification form.

Q:    That's what I'm talking about, a complaint verification form.

A:    Okay. We send out a complaint verification form to that individual. Ask them to give us details of the circumstances of what their complaint is, and to sign that complaint verification form and send it back in.

Q:    Well that's done no matter who... I mean if the President of the United States complained you'd ask for a complaint verification form, because it's part of your process isn't it?

A:    We would either ask for it initially or when the investigator went out we would ask him at that point to sign a complaint verification form, yes.

Q:    Well the investigator, but that investigator would be known to you. I mean, whether it came by the virtue of a Troop Commander or whether it came by virtue of the internal procedures of BPR, you'd know who that

A:    I just completed thirty years on January 27th of this year.

Q:    During that period of time, have you had occasions to be appointed as an investigator?

A:    Yes

Q:    Well if you're an appointed investigator who appoints you? I mean is it the Commissioner, the Deputy Commissioners, the BPR? Who appoints BPR investigators?

A:    The ultimate responsibility for overseeing the investigations is the Director of the Bureau of Professional Responsibility, but often times as a Troop Commander I would appoint the investigator and call BPR and say, okay Corporal Jones is going to be the investigator on this. It's done at various levels, but basically with the approval of the Director of BPR.

Q:    Okay, when an investigation is contemplated how is it initiated? In other words, if somebody wants investigated do they just call you up or do they fill out a complaint or fill out a form. Is there a form process?

A:    Well actually we get complaints in many ways. We get then through e-mail. We get

6

investigator was and you would ask them to get that paperwork completed as part of them doing their job, right?

A:    Yes, it would be part of the process.

Q:    Absolutely. Now let me ask you, do you have any familiarity with the investigation into Captain Ober? Any BPR in relationship to Captain Ober.

A:    Direct knowledge of any, no. I know that obviously going on right now, and there's an attorney work product being done. Other then that I have no direct knowledge of what's occurring.

Q:    So you never been involved in any investigation of Captain Ober about the subject of this lawsuit, anything to do with that? Have you?

A:    Involved? I mean I'm involved here today as being deposed, but I've conducted an investigation on Captain Ober. I don't believe I've ever been interview as a witness or a complainant in any investigation involving Captain Ober.

Q:    That's what I mean. Aside from administrative duties as by virtue of your position with BPR, you have not been involved as an

1  investigator or a fact witness in any BPRs
2  regarding Captain Ober.
3       A:  That's correct
4       Q:  As Director of BPR, any open BPRs
5  on Captain Ober as we sit here today?
6       A:  There would be an attorney work
7  product that's associated with the lawsuit, but
8  other then that I'm not aware of any.
9       Q:  Well the attorney work product
10  that's part of this lawsuit, that's not part of a BPR
11  about that had to do with whether or not Captain
12  Ober should have or did report an FBI
13  investigation directly to the Commissioner.  It's not
14  the same thing.
15       A:  Well the two intermingled from
16  what I understand, the lawsuit and that.  I don't
17  know of any investigation that open on Captain
18  Ober dealing with his, I forget how you'd phrased
19  it, dealing with the FBI reporting an incident to
20  him.
21       Q:  Yeah if there is an attorney work
22  product thing that's something that would have
23  been initiated after he filed his lawsuit, right?
24       A:  That's correct

9

1       Q:  I always been fascinated by the
2  Pennsylvania State Police and the attorney work
3  product deal.  You know, but that's maybe a legal
4  issue for another day.  As far as the... Was there
5  ever a BPR that was begun on Captain Ober on the
6  issue involving the reporting the FBI investigation?
7       A:  I don't know sir
8       Q:  Well, so if there was one are you
9  telling us it would have been closed by now?  Or
10  you tell us that it might still be open?  Their might
11  one still be open.
12       A:  I don't know of any being initiated
13  since I got their September 2nd of the year 2000.
14  Whether or not there are any out there from
15  previous I have no idea.
16       Q:  Okay
17       A:  I don't know
18       Q:  You didn't look at the BPRs
19  regarding Ober before we came over here today?
20       A:  No sir I did not.
21       Q:  Okay.  Now, so at least since you
22  have been the head of BPR no BPRs on Ober have
23  been closed.  The only thing that's happened
24  during your ten-year is that a "attorney work
25  product" has been opened.  Is that right?

10

1       A:  As far as I know, yes.
2       Q:  Who keeps the records on the
3  attorney work product you or the attorney?
4       A:  When you say the records, the
5  actual report that is done?
6       Q:  Yeah.  I mean I assume this is a
7  privileged creature.
8       A:  Actually on the attorney work
9  product there's a copy maintained at BPR.  There
10  is a copy also furnished to Chief Counsel.
11       Q:  Well we just had some testimony
12  here earlier, by on of your predecessors, that
13  there's limited access to a BPR file, right?
14       A:  Yes
15       Q:  But that certainly the
16  Commissioner has access, right?
17       A:  The Commissioner would certainly
18  have access, yes.  If he called me and wanted to
19  see a particular BPR, yes he would have access to
20  that.
21       Q:  So the Commissioner has access
22  to the attorney work product file?
23       A:  If he requests it, I would imagine.  I
24  can't speak for the attorney's side, but
25       Q:  No, no.

1       A:  If the Commissioner called and
2  said I want to see all the BPRs on Major Pudliner,
3  we would dig out all the BPRs on Major Pudliner
4  and send them to the Commissioner.
5       Q:  Yeah, but this is litigation.  This is
6  attorney work product, right?
7       A:  Yes
8       Q:  And it's privileged so whatever the
9  means to you.  Anyway how about Joe Westcott,
10  Hawthorne Conley, Mark Thomas do they have
11  access?  Mark Thomas is in the Governor's Office.
12  Does he have access to the attorney work product?
13       MS. REYNOLDS:  Do you Mark
14  Campbell?
15       MR BAILEY:  Yeah Mark Campbell.
16  What did I say?
17       BARBARA CHRISTI:  Mark Thomas or
18  Thompson
19       MR BAILEY:  Oh gees where'd I get that?
20       MR PUDLINER:  Mark Campbell or Mark
21  Thomas, neither would have access to them from
22  me.
23       Q:  Okay, but the Commissioner
24  would?
25       A:  Yes the Commissioner would.

Q:    By virtue of his being Commissioner?

A:    Yes

Q:    Now, and that would that would go for Mr. Coury would have. Is Mr. Westcott still with the State Police? He retired isn't he? Yeah.

A:    No sir. He's retired.

Q:    Yeah, he wouldn't have access then.

A:    No sir

Q:    If you, you've been in the State Police how long?

A:    Thirty years

Q:    Thirty years, have you seen incises where the Commissioner or a Deputy Commissioner have assigned investigators to go out and investigate people and read them their rights? You've seen that before haven't you?

A:    Yes sir, I have.

Q:    And how many times have you seen that?

A:    We're going back thirty years. I've really couldn't give you a specific number. I know that there have been times where we've had people detached. In fact when I worked in Troop A. We

13

had two people detached to the Commissioner's office to do an investigation.

Q:    Into somebody?

A:    Yes, into an individual, yes.

Q:    And was that run through BPR?

A:    No it was a criminal investigation.

Q:    Oh okay. A criminal investigation?

A:    Yes sir

Q:    Do you know whether Captain Ober's ever been investigated for criminal activities?

A:    I don't know.

Q:    BRP isn't for conducting criminal investigations is it?

A:    We sometimes conduct criminal investigation. We try to stay away from that part of it, but sometimes we do get involved in the criminal aspect of it.

Q:    Well the only opportunity I see to see a BPR investigation if there's a criminal allegation made it's referred to a Prosecutor for evaluation.

A:    That's correct

Q:    Okay. Well what's the purpose of BPR? To investigate allegations of misconduct as a

14

Pennsylvania State Policemen or criminal allegations?

A:    The purpose of it in regulation just refers to investigation. Our main purpose is to conduct administrative investigations, and also any other investigation that are requested by the Commissioner.

Q:    So the Commissioner does an investigation he doesn't have to fill out a verification form?

A:    It depends on what your talking, if there is going to be a full investigation done, somebody is going to fill out a complaint verification form and we're going to do SP 101 or we call it a worksheet, a complaint processing worksheet. If it's an inquiry there may not be a worksheet done.

Q:    What's an inquiry as opposed to an investigation?

A:    Well an inquiry can be anything. It could be like, who drove that car last night on that shift and didn't fill it up with gasoline at the end of the shift. Or we do what we term supervisor inquiry is when a complaint will right in. Often times you can tell it's just a disgruntled motorist

who received a traffic citation or whatever and they're unhappy that they received citation. We'll do an inquiry. Have the supervisor do an inquiry who they intern give to the Troop Commander and the Troop Commander makes a determination as to whether or not we should do a full investigation. Or whether or not we should terminate it at that point.

Q:    Well that's when you're evaluating an investigation, whether to go forward with an investigation or not.

A:    Whether or not to go forward with one, yes.

Q:    Yeah that's what I mean. In other words, I mean, once you decide to go forward with an investigation there's a number assigned and you go through the procedures that the regulations call for. I assume.

A:    Yes

Q:    Of Course

A:    Yes

Q:    Now criminal investigations the State Police are conducting aside. I assume that you probably conduct criminal investigations all the time, right? I mean...

1    A:    BPR it's self?

2    Q:    No, no the State Police

3    A:    Oh, State Police, yeah

4    Q:    Absolutely. It's part of one of the

5    major jobs, I assume.

6    A:    Yes

7    Q:    A major function that you would

8    perform. Now when you're looking into an officer,

9    one of you collages that you may have a duty to do.

10    That complaint process can be initiated by

11    anybody at any level by sending a complaint in. Is

12    that correct?

13    A:    That's correct

14    Q:    And they can send it in maybe it's

15    one of their superiors that might refer it. They can

16    send it directly to BPR, right?

17    A:    Yeah, there's certain circumstances

18    where they can direct to BPR.

19    Q:    And what if you determine that

20    there isn't any actionable offence there? What do

21    you do?

22    A:    We would probably send it out to

23    the Troop Commander for like a supervisory

24    inquiry. Determine the fact and give us your

25    recommendation as to whether or not we should

17

1    proceed with a full investigation or whether we

2    should close the matter. Then the Troop

3    Commander would make the recommendation and

4    send it in to us.

5    Q:    What regulations govern

6    administrative inquiries?

7    A:    Administrative regulation 425 is

8    the main one.

9    Q:    425?

10    A:    Yes

11    Q:    It defines and expresses

12    administrative inquiries?

13    A:    I don't know that it uses the term

14    inquiry in it.

15    Q:    Alright. What about the word

16    administrative investigation?

17    A:    I believe it defines administrative

18    and investigation as two separate words. I don't

19    know that administrative investigation per say is

20    defined.

21    Q:    Well regulations would govern two

22    investigators appointed by the Commissioner to

23    investigate somebody in the Pennsylvania State

24    Police? What regulation would govern their

25    conduct or behavior in dealing with that?

18

1    A:    No, I think that is a pretty wide

2    open question. It would depend on what

3    behavior....

4    Q:    It's a very wide open question, but

5    the answer, I'm wondering if there's a definitive

6    answer to it.

7    A:    It depends if it is a criminal

8    investigation, if it's administrative, it could be a

9    drug law investigation. In which case it would go

10    to Drug Law. If it was criminal it would go to BCI

11    or it could go out to the troop level to be

12    investigated. If it was administrative it could be

13    done by the Bureau of Professional Responsibility

14    or it could be assigned to members of the troop.

15    Q:    Well, no this is a case where the

16    Commissioner and the Front Office assigned two

17    Majors to do an investigation into the Captain.

18    That's the situation complained about here. How

19    many situations have you seen with no BPR

20    number? It's not being done by BPR sir, okay, and

21    it's not being done by a trooper. How many of

22    those have you seen in your twenty some, thirty

23    years?

1    A:    I'm not sure I understand what

2    you're saying. You're saying two Majors were sent

3    to investigate a Captain.

4    Q:    Right

5    A:    Investigate or make an inquiry?

6    Q:    Well you know that's an

7    interesting term of art, investigate or make an

8    inquiry.

9    A:    Yeah

10    Q:    In all the anneals of law

11    enforcement I don't who's be able to divide those

12    up and put orange icing on one and white icing on

13    the other. I don't know.

14    A:    Well...

15    Q:    I'm asking you this. Do you know

16    any situations where two investigators, in this case

17    two Majors, where directed/assigned and

18    investigation, which was managed by the Front

19    Office into a Captain and BPR was not given a

20    number or consulted on it? That's all. If you know

21    of any.

22    A:    I don't know many administrative

23    investigations, full investigations that would have

24    been done.

Q:    Okay.  Now an administrative investigation is probably, I mean you're talking about something that in the normally course of business of the Pennsylvania State Police, probably go on a pretty regular basis.  I mean that just means we're superiors checking something out I'd imagine.  Right is that?

A:    An inquiry, yes

Q:    An inquiry, now in your mind sir when does an inquiry yield to what you call, I think you referred to it full investigation?

A:    Well I think, for one thing we document them differently, okay?

Q:    Okay

A:    An inquiry would be documented on what we refer to as a "subject to/from letter". Okay, and it would normally go form the supervisor, from who ever was doing the inquiry, okay?

Q:    That's what I...

A:    To the person requesting the inquiry.

Q:    This is a supervisory inquiry, right?

A:    Yes

Q:    That's what I thought.  Okay.

21

Q:    Okay?

A:    Yeah I understand what you're saying now.  So a supervisory inquiry is handled at a certain stage if it yields to a full investigation that's one thing.  If it's resolved without the need for full investigation, then it's resolved.

A:    Yes

Q:    I wasn't quite sure when you talking inquiry.  I was thinking in terms of the regulations also, and the word supervisory inquiry.

A:    Okay

Q:    Yeah, I do understand what you meant now.  At first I didn't know what you meant, because you weren't using the word supervisory I didn't know quite what you meant.

A:    Okay

Q:    But it's the full term you're referring to?

A:    Yes, although there are inquiries that don't amount to documentation.

Q:    That was gonna be my next question, yeah

A:    Yeah, there are those that don't amount to documentation.  They're generally things where I just need to know a little bit more

22

information.  I can think of instances where I called troopers in and said why did you do this particular action.

Q:    Right

A:    And when I first heard what they did I was livid and I would talk to them and find out what they did.  They would give me a complete justification for why they did things the way they did they, and I said okay that works for me.

Q:    Yeah

A:    It ended at that point with no number, no supervisory investigation, and full investigation.

Q:    I think we're reading from the same page.  You got a situation where you as a supervisor are curious about something.  You bring the person in, or it may be the way someone's conducting an investigation.  You have a concern about plugging up a hole in an investigation maybe, so why wasn't an interview done or something like that.

A:    Yeah

Q:    You bring the person in and you question them, and you say why did you do this,

why did you do that, or what's the reason for this, right?

A:    Yes

Q:    Okay

A:    That would be one way of doing it.

Q:    Now if you suspected there was a major violation of departmental regulations and that if the person violated those regulations there could be serious discipline then you're into doing the full investigation you talked about, right?

A:    Not necessarily, no.

Q:    Not that either?

A:    No because I've already done the inquiry into things.  A specific example where we had people who were involved in selling lottery chances on a home.  Okay not your normal pay two dollars, and you win one hundred if the number hits.  They were chancing off a house, and we did further inquiry to make sure one, that it was our personal that were actually involved and number two that there were actually involved. Before we initiated a full investigation.

Q:    Yeah that was to ascertain who was involved.

A:    It was ascertained who and in fact if they were involved.

Q:    Right, but there wasn't any question that that wasn't your run of the mill lottery.

A:    Right

Q:    Not a run of the mill little small chance some two-dollar ticket jobs.

A:    Right

Q:    Okay. What if you have a situation that it's clear to you there is no regulation violated? What do you do then?

A:    I'm not following you, because if there is no regulation violated I don't know what I'd be inquiring about.

Q:    Me either, but you don't know of situations where there was no regulation violated and you just went ahead and investigated do you? You've never done anything like that have you Major?

A:    Where I knew that there were no regulations. Not that I can think of, no.

Q:    That wouldn't be right would it?

A:    I can't say that, because I'm trying to think. I may have even possible done that

25

where there was an allegation that something possible could have been violated. Okay, but I felt that there weren't violations but I made further inquiry to make sure that I determined that.

Q:    Remember the National Governor's Conference or whatever the hell it was?

A:    Yes sir, very well.

Q:    Probably a lot of work for you poor guys I'd imagine.

A:    It was a very rewarding experience.

Q:    Sure it was. Where was the held?

A:    It's out in State College

Q:    You do a lot of planning for it?

A:    About two years worth of planning, yes.

Q:    What were you doing at the then?

A:    My full-time job?

Q:    Uh-huh

A:    Was the Commanding Officer of Troop A, Greensburg

Q:    Westmoreland County?

A:    There you go

Q:    There you go

A:    Well right next to Broads Country, Cambria

26

Q:    Awe be-Jesus. Well, who did you work with on that at your level?

A:    I worked with, as far as State Police wise, I worked for Major Serpinko and for Captain Hornberg and I also worked Captain Monico, Captain Young. We did some work with the Deputy Commissioner on occasion was there. The Commissioner on occasion was there. BCI, I mean there was some meeting were we had as many as seventy to eighty people in a meeting. We also had outside agencies FBI, NGA Officials, NGA Security Association Officials. We work with Penn Dot. We work with a myriad of different entities Secret Service. A lot of people we work with through out that Penn State University Officials, Penn State Police Department, and State College Burro Police Department.

Q:    You put a lot of planning into it?

A:    Yes sir

Q:    What role did you play in the planning Process?

A:    I was the Administrative Coordinator, which meant that I had over all responsibility for the command post and communications.

Q:    Where was that set up?

A:    That was set up in the Penn Stator Conference Center Hotel

Q:    Where was this conference held?

A:    In State College

Q:    I thought it was held in Washington Pennsylvania.

A:    No sir

Q:    It wasn't held in Washington Pennsylvania?

A:    No sir

Q:    It wasn't held in Pittsburgh?

A:    No sir

Q:    Holidaysburg or Altoona?

A:    No sir

Q:    Tyrone?

A:    No sir. You're getting closer.

Q:    Oh boy, held up in State College?

A:    Yes sir

Q:    Where was the command post?

A:    Well the command post during the actual event was in the Penn Stator Conference Center Hotel in State College. That's during the actual event, but the planning stages we to Saint-

1  Louis.  We went to Washington D.C.  I'm trying to
2  think if we had meetings anywhere else.
3      Q:    California?
4      A:    Not for that.  I believe the
5  Republican National Convention may have gone to
6  California for that.  Saint Louis, I went on two
7  occasions.  I think there were three trips to Saint-
8  Louis, numerous trips to State College.  I can't
9  remember where else we held meetings.  We also
10  periodically we would have meetings of the Major
11  and the Captains that were involved and those
12  were generally held in either Greensburg or
13  Washington Pa.
14      Q:    Where was Major Serpinko?  Where
15  was he out of?
16      A:    His headquarters is in Washington
17  Pa.
18      Q:    Okay I don't think I have any
19  further questions.
20      MS. REYNOLDS:  No I don't have any
21  questions.
22      MR BAILEY:  Yeah, just one final.  Did
23  you ever discus Captain Ober's transfer with Mr.
24  Serpinko

29

1      A:    I don't know if you would call it a
2  discussion.  He called me one day, I don't know if
3  you would call it two-way discussion let me
4  rephrase that.
5      Q:    Only from him to you?
6      A:    Yeah he called me at one point for
7  informational purposes.  That we were getting an
8  additional Captain, to be assigned to area three
9  and to assist with the NGA.  That probably would
10  have been back right at the time about the initial
11  assignment.  I don't recall the time frame.  It
12  probably would have been right after he was
13  notified.
14      Q:    Why did he call you?
15      A:    Well because I was one of the
16  coordinators and I'm sure he, well I can't speak for
17  him, but I would assume he called the other two
18  Captains also and advised them.
19      Q:    Well what did he say to you?
20      A:    What did he say to me?
21      Q:    Uh-huh
22      A:    Basically that Captain Ober was
23  being transferred out to assist with the NGA and
24  that's what he would be doing assisting with the
25  NGA.  I think he also talked about some training

30

1  issues that he would be working on.  That was
2  pretty much the extent of the conversation.  It
3  really didn't surprise me because I know on the
4  Republican National Convention they had detached
5  a Captain to work for the Area Commander or
6  Taskforce Commander for the Republication
7  National Convention they had detached a Captain
8  full time.
9      Q:    Who was that Transue?
10      A:    Transue, yes.
11      Q:    When did they do that?
12      A:    When?
13      Q:    Yeah when
14      A:    I don't know the exact date, but it
15  was prior to the time Captain Ober was assigned.
16      Q:    About a year before that?
17      A:    I would be guessing.  My point is
18  all of us were doing this as a second job.  In other
19  words while I was away at NGA I was still
20  responsible for Troop A.
21      Q:    Right
22      A:    We did have people come in and fill
23  in for me, or for Joe Hornberger, for Frank Monico,
24  or anybody else.  Were as Captain Transue and
25  Captain Ober that pretty much would have been

1  their full time job.  They wouldn't have been doing
2  the job that they came from and this job in
3  addition.
4      Q:    How many years in the
5  Pennsylvania State Police?
6      A:    Me sir
7      Q:    Yeah
8      A:    Thirty
9      Q:    How many times have you seen a
10  Captain doing a Lieutenant's job in that thirty
11  years?
12      A:    Captain doing a Lieutenant's job?
13  I've done it.
14      Q:    Where?  When?
15      A:    I done it not on a regular basis.
16      Q:    Only in a regular assignment is
17  what I mean.
18      A:    I've never done it as a regular
19  assignment.
20      Q:    Who has?
21      A:    No one that I'm aware of.
22      Q:    What were these temporary jobs
23  you did?  Where were they?
24      A:    Well, I'm talking about just when I
25  was a CO in Troop A or Troop G if the Staff

1  Lieutenant happened to be gone for the day and
2  something staff wise needed done.  I would take
3  care of it.
4        Q:    Of course.  I thought...
5        A:    No, no not assigned
6        Q:    Yeah, not assigned to a position.
7        A:    No
8        Q:    No you just performed the duties or
9  picked up some slack, right?
10       A:    Yes
11       Q:    Yeah, but you weren't assigned?
12       A:    No
13       Q:    Well who was?  Give me a situation
14 on somebody else.  Thirty years you've certainly
15 seen it, haven't you?
16       A:    No
17       Q:    You haven't?  I don't have any
18 other questions.
19       MS. LYDE:  1:38 p.m. the deposition a
20 Major Pudliner has concluded.

33

## INDEX

access, 10, 11, 12
administrative, 8, 13,
  16, 17, 19
attorney work
  product, 7, 8, 9, 10,
  11

BPR, 5, 6, 7, 8, 9, 10, 12,
  13, 15, 16, 18
Bureau of
  Professional
  Responsibility, 5, 17

Commissioner, 5, 8, 10,
  11, 12, 13, 14, 17, 18,
  24
complaint, 6, 7, 14, 16
complaint verification
  form, 6, 7, 14
complaints, 6
Conley, 2, 11

Deputy
  Commissioner, 12

FBI, 8, 9, 25
Front Office, 18

inquiries, 16, 17, 20
inquiry, 14, 16, 17, 18,
  19, 20, 22, 23
investigate, 12, 13, 17,
  18
investigation, 6, 7, 8, 9,
  12, 13, 14, 15, 16, 17,
  18, 19, 20, 21, 22
investigator, 5, 6, 7, 8

lawsuit, 7, 8, 9
Lieutenant's job, 29

NGA, 25, 27, 28

Ober, 2, 3, 7, 8, 9, 13, 27,
  28, 29

Penn Stator
  Conference Center
  Hotel, 25, 26

Republican National
  Convention, 26, 28

Saint-Louis, 26
Serpinko, 24, 27
State College, 24, 25,
  26
State Police, 3, 4, 5, 9,
  12, 15, 17, 19, 24, 29
subject to/from letter,
  19
supervisory inquiry,
  20

transfer, 27
Troop Commander, 6,
  7, 14, 16

Westcott, 2, 11, 12

*John R. Brown*

19

IN THE UNITED STATES DISTRICT COURT FOR
MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER : 1: CV- 00-0084

    Plaintiff :

     :(JURY TRIAL DEMANDED)

    Versus :

PAUL EVANKO, MARK :
CAMBELL, THOMAS COURY, :
JOSEPH WESTCOTT, :
HAWTHORNE CONLEY :
JOANNA REYNOLDS and :
SYNDI GUIDO, Et al. :
    Defendants :

*COPY*

DATE:        March 5, 2001

PROCEEDINGS:    Video Deposition of
            John R. Brown

APPEARANCES:

For the Plaintiff:    Donald Bailey, Esquire
               4311 N. 6th Street
               Harrisburg, PA 17110

For the Defendants:    Joanna Reynolds Esq.
               Barbara Christie Esq.
               1800 Elmerton Avenue
               Harrisburg Pa. 17110

1

---

1 TONY MARCECA: Good morning be advised the video
2 and audio is in operation. My name is Tony Marceca.
3 My address is 2219 Dixie Drive York Pennsylvania,
4 17402. I have been contracted by PR Video to be the
5 video operator for this deposition. The case is in the
6 United States District Court of the Middle District of
7 Pennsylvania. Could I have a caption sir?
8     MR BAILEY: I'm sorry did I take from you?
9     TONY MARCECA: And the caption is Darrell G.
10 Ober plaintiff versus Paul Evanko, Mark Campbell,
11 Thomas Coury et al. It's in a civil action in
12 1: CV-01-0084.
13     MR BAILEY: You gonna swear him in?
14     TONY MARCECA: Today's date is March the
15 5th, and it is now 9:14 a.m. The deposition is taking
16 place in the law office of Don Bailey at 4311 North 6th
17 Street Harrisburg Pennsylvania, 17110. The video
18 deposition is being taken on behalf of the plaintiff, Mr.
19 Ober. The time now is 9:14. Would you please state
20 your name for the record and raise you right hand?
21     MR BROWN: John R. Brown
22     TONY MARCECA: Do you swear to tell the
23 truth, the whole truth so help you God?
24     MR BROWN: Yes I do.
25     TONY MARCECA: Thank you. Mr. Bailey could

2

---

1 we have a sound check please?
2     MR BAILEY: Yeah, sorry. Yeah, my name is
3 Don Bailey. I'm attorney for the plaintiff, Darrell G. Ober
4 in this case. And if we possibly could have the attorneys
5 present identify themselves and give their official address
6 and phone number for the record. Makes this easier for
7 the transcriber.
8     JOANNA REYNOLDS: My name is Joanna
9 Reynolds. I'm an Assistant Counsel with the State Police.
10 I represent the defendants in this action. My address is
11 1800 Elmerton Avenue Harrisburg Pa. 17110, which is
12 Pennsylvania State Police Headquarters. My phone
13 number is 717-783-5568.
14     BARBARA CHRISTI: My name is Barbara
15 Christi, Chief Counsel Pennsylvania State Police, and my
16 address and telephone number are the same as those
17 given by Assistant Counsel Reynolds.
18     MR BAILEY: Okay Rick can I refer to you as
19 Rick? Is that okay?
20     MR BROWN: Absolutely that's my nickname,
21 yes.
22     MR BAILEY: I'm Don. What we're going to be
23 doing here today Rick. I know you've sat in on some of it.
24 Let me very quickly go through it cause now you're a fact
25 witness and it's a little different when your in your

---

1 position and I realize that. It's a video deposition. We
2 maintain a copy here. You are invited and welcomed to
3 come here anytime and review the video deposition. We
4 will be making a transcript of the deposition. They are
5 available to your counsel that they can work out with
6 Tony, for the same price, as they are available to me.
7 That's number one. Number two, as we go through the
8 deposition from time to time if I inadvertently, I assure
9 you it will be an error on my part, if I inadvertently
10 interfere with your response or don't give you a complete
11 chance to finish I want you to make sure you catch me or
12 you stop me and answer fully and completely if your
13 attorneys don't catch me in the mean time. You have two
14 very capable lawyers here to represent you. Now it's
15 important you stay within the camera range. If not the
16 operator, Mr. Marceca, will let you know. You need to
17 keep your voice up. I don't assume we're going to have
18 any kind of a problem with that. And the last question
19 and this goes for your attorneys also. If at any time
20 during the deposition you want to ask me what I mean by
21 a question or where I'm going with a group of questions.
22 We're not here to trick you. We're not to create a
23 distorted fact record. We want to get everything down. I
24 do not mind giving you an offer on a question. I do not
25 mind responding to you if you a question of me about

where I'm going or what I'm trying to do.  I won't be
offended by that at all.  I invited you to do that.  That
being said, do you have any questions to me?

    MR BROWN: No sir

    MR BAILEY:  Okay, Rick.  Oh, usual
stipulations I guess, objections except to form of the
question reserved until time of trial.  Is that Okay?

    JOANNA REYNOLDS: Yes, fine

    MR BAILEY:  Okay Rick now how are you
employed?

    A:    I'm employed as a Captain with the
Pennsylvania State Police.  I'm currently assigned to the
Internal Affairs Division of the Bureau of Professional
Responsibility.

    Q:    You in fact replaced Mr. Ober at the
position.  Didn't you?

    A:    That's correct

    Q:    When did that occur?

    A:    January 29th of 2000 was when I was
promoted.

    Q:    Now my understand is, I was at an earlier
deposition there was an indication from one of your
attorneys.  I think it was Syndi Guido however no the two
attorneys who are here.  That you were appointed to
some kind of a position as an investigator in this case.  Is

5

    A:    Yes sir.  That's my understanding.

    Q:    Do you have a recollection for your
knowledge what Mr. Ober was doing at the time.  In other
words, what position was he in?

    A:    My recollection he was Director of
Internal Affairs, but I think he was acting Bureau
Director for the Bureau of Professional Responsibility.

    Q:    Now the Bureau of Professional
Responsibility has essentially two divisions.  Is that
correct?

    A:    That's correct

    Q:    What are those two divisions?

    A:    One being the Internal Affairs Division,
and the other division if the System and Process Review
Division.

    Q:    Mr. Ober while he was acting capacity
and in temporary capacity, apparently as Bureau
Director was at the same time the Director of IAD.  Is
that correct?

    A:    That's correct

    Q:    Have you ever learned or come across any
information that explains why the FBI went to Captain
Darrell Ober at that time?

    JOANNA REYNOLDS: I'm gonna object to this
question.  If the witness only knows about this

that correct?

    A:    That's correct

    Q:    Was that by virtue of your capacity in IAD
or do you know?

    A:    I don't know

    Q:    What I want to ask you about is a little
bit different than that, okay.  I have no desire to ask you
at least this time about the investigation.  Although I will
ask you some procedure questions, like if you produced
reports or done interim reports and what you gave them
to.  Mostly what I want to ask you is something that's
quite different.  These are gonna be fact questions about
your knowledge, we believe to be your knowledge, about
sequences of event or situations, or conversations that
may have occurred that are relevant to this lawsuit.  In
that regard have you seen or have you had an
opportunity to at least review or look at the complaint
and the amended complaint in this matter?

    A:    Yes sir

    Q:    Let's go back to the with some
background about why we're here today.  I'm gonna be
asking you about what you may have learned about why
or how we came to be here today.  It is my understanding
that at sometime the FBI or some FBI members had come
to Mr. Ober about a federal investigation.  Is that correct?

6

information from the investigation that he's done for us,
because that would be attorney work product information
and we would object.  I would instruct the witness not to
answer that, unless he knows it outside that
investigation.

    MR BAILEY: I'm not gonna pollute the record
with objections at this point, but this one is very special.
I need to respond to it.  I don't agree with that analysis.  I
don't believe an attorney can extent any privilege of work
product to as investigators be like a DA saying that he
doesn't have to talk about what some police officer
investigated.  So you would object to that, but you of
course follow your attorney's instructions.  At this time I
just want to place an objection to the objection.

    JOANNA REYNOLDS: Don, just so the witness
is clear on this.  If he knows that information outside
that investigation at the attorney's request, he may
answer the question.  If he does not then he should not
answer the question.

    MR BAILEY: Rick let me do it this way.  When
did the attorneys, any of them come to you and say you
are now an attorney or investigator or whatever the hell it
is?  Tell me when that occurred.

    A:    I want to say March or April.  I think
April of 2001.

Q:    That was after this lawsuit began.  Is that correct?

A:    Yes sir

Q:    With my objection standing, but out of respect for opposing counsel's interactions to you, which I respect and disagree with.  Why don't we agree that unless I specify other wise so that your attorney has notice, that none of my questions should be considered as addressing anything that may have happened after March or April of 2001.  Can we agree with that, and that will solve our problem I think?

JOANNA REYNOLDS: The problem, no it's not gonna solve our problem, because some of these events occurred before March or April 2001 but the witness only learned of them because he was doing this investigation.  In other words he was investigating events...

MR BAILEY: Let me

JOANNA REYNOLDS: That happened before March or April of 2001.

MR BAILEY: Let me clear this up, because I did not make myself clear.  Again with the understanding that I disagree with counsel, that she can not cloak you with her privilege.  It's not her work product at all it's your work product.  If she wants to go investigate she can do it.  It might take her out of some immunities, not that

9

I'd love to see that happen, but point and fact is I don't think she can give you her immunities.  So let's understand that we're talking about when you learned of it, okay?  Is that alright?  Okay, so with that understanding and the fact that you know what the oath is and what your duties and obligations are, if you need to think about that or something when I ask you a question you think about that.  Okay?

A:    Okay

Q:    Cause the things I have to ask you about in all honesty are fact issues that really would be what you knew before then anyway.  So from a technical point of view I don't agree with your attorney.  From a practical point of view I don't think it should interfere with this deposition at this time, okay?

A:    Okay

Q:    Alright sir.  So we're talking about things that you learned up to or on or before March or April of 2001, okay?  Understood?

A:    Yes Sir

Q:    Alright now until you replaced Captain Ober and that was January 29, 2000, what had you been performing?  What were you doing?

A:    Well I was in acting role.  When Captain Ober went to the IIMS project I was assigned as the

10

acting Director of Internal Affairs to perform his duties.  That would have been April 26 of 1999.  That lasted until I was promoted.  During that time period even though I was doing the duties of a Captain I still had my Lieutenant duties to perform.  I was still the Central Section Commander in the Internal Affairs Central Section, and responsible for scheduling, redoing reports, and giving assignments.  So I still have that.  Also when Captain Ober went to IIMS I picked up, he was involved in the discipline committee.  Which was a committee that the department and the union, the PSTA had together to look at revising the current regulations in regards to internal investigation, discipline, so on and so forth, and I pick up going to his meetings and ended up following it all the way to when I'm at with it now.

Q:    Until Captain Ober went over to IIMS, and by the way what does IIMS stand for?  Do you know what the acronym stands for?

A:    To the best of my knowledge it's the Incident Information Management System or something like that.  It's an automation project.

Q:    And what's that about?

A:    As far as I know, I not the most technology oriented person around, but as far as I know it's automating the department as far as forms and

having a centralized.  Let me say this.  I was called in to get an Internal Affairs perspective by the people involved, the contracted people, and they were saying what could Internal Affairs use in this automation project?  We could help you out with your forms, your reports, and that sort of thing.  So I imagine at some point and time you'll be able to sit at a computer and do everything and get rid of the paper.  You know the actual physical paper.

Q:    The idea behind IIMS is to lessen the number of human errors in using a database that would boost productivity investigatory, record keeping, and administrative productivity.  Isn't that basically the idea?

A:    That's basically it, but always keep in mind too those sort of things are only good as what you put in them.

Q:    Right, and this is a project that...who had assigned Captain Ober tot he IIMS project?  Wasn't that Commissioner Evanko?

A:    I recall seeing a CLEAN message on his status of going over there, and I believe it was from the Commissioner.  But as far as how he came to that I don't know.

Q:    IIMS was a very high priority for the Commissioner as I understand it.  Is that correct?

A:    Like I said that's outside of my realm.  I

don't know what is was on the Commissioner's plate.

Q:    But the Commissioner, to the best of your knowledge, had assigned Darrell to that position in sometime in April of '99 you indicated.

A:    Yes sir. I believe it would have been, I think he went there effective April 26th of '99. Cause that was the day that I became the acting Director of Internal Affairs.

Q:    Yes sir. Now when did the FBI come to Darrell?

A:    To my knowledge it would have been late September, early October of '98.

Q:    Now did you at some time learned when Darrell had informed the Commissioner about the FBI's request?

A:    What I recall sir is Captain Ober

JOANNA REYNOLDS: Again I would caution the witness if you learned of that after you began the investigation in this case, then it's attorney work product and you should not testify to that.

MR BAILEY: Mr. Brown, we know that you knew about it before you, you know, okay?

MR BROWN: Okay

MR BAILEY: I know that. I know that from a variety of sources. Let me say this to you. You're a very

13

intelligent person we know that. You're very skilled. Let me repeat the groundwork so we don't have to go through this every time there is a question where counsel gets nervous, okay? Cause I want to get through this deposition. The understanding is that if you learned about it from investigatory activities or any activities I guess, that occurred after March or April 2001, you know sit back and think when I ask these questions okay?

A:    Yes sir

Q:    Or you want to confer with counsel do that. We know what the ground rules are. You know what the ground rules are?

A:    Yes sir

Q:    Okay let's see if we can get through this. Okay now, when do you recollect first learning that Captain Ober had told the Commissioner about the FBI coming to him in the fall of '98?

A:    Back in 1999 I did not, I'm not aware of any contact that Captain Ober had with the Commissioner. As I knew is what Captain Ober forwarded to me. He faxed me a complaint sheet, and it said on there that in October of '98 somewhere early October of '98 he was informed by the FBI that this Trooper Stanton may have been involved in some type of job selling or political corruption scheme of some sort.

14

And I think he actually, he called me to make sure I was at the office is what I'm remembering. Then he faxed me the complaint form from where ever he was at that day. He faxed it to me cause I would have been the person to receive it, but as far as any communications he had I'm not aware of any.

Q:    Okay. Now so it's you testimony as you sit here today that you were never aware prior to March or April of 2001. Now we're talking about the entire year of '99 and 2000. That you were never aware, until you did your investigation obviously or assigned to this so called attorney's investigation, that you were never aware that the Commissioner had been, let's lay a foundation this way, had been advised of the FBI interest.

A:    The only thing that I can say during that time was that my knowledge, I mean I don't know what communications occurred between Captain Ober and the Commissioner. I know I was told by my Major, who at the time was Major Conley, that the Commissioner requested an investigation into the circumstances surrounding the FBI probe or whatever you want to call that. So all that behind the scenes stuff I

Q:    Okay let's start there. At some time Major Conley tells you that the Commissioner was interested in some type of investigation into what was

behind the FBI interest.

A:    Right

Q:    Can you remember what Major Conley said to you?

A:    The only thing I can remember Major Conley saying was that the Commissioner requested an investigation into the circumstances surrounding the FBI, I don't know if it was the FBI investigation or the FBI probe or how it was handled or something to that effect. In my position as the acting, keep in mind I had only been acting for about three, four weeks maybe. No not even quite four weeks.

Q:    So this would have been June of '99?

A:    Well no this would have been May.

Q:    May of '99

A:    I'm thinking around May 20th or so.

Q:    Of '99?

A:    Yes sir

Q:    So May 20th. Let's make sure we keep calendar in front of us. Sometime on or about May of 1999 Major Conley tells you that the Commissioner requested an investigation into the FBI probe?

A:    To get all the facts.

Q:    To get all the fact?

A:    Yes sir. Get all the facts involved with

16

what occurred? What happened here?

Q:    Well at that point either yourself or Major Conley assigned a BPR number, right?

A:    No

Q:    Oh, oh you didn't do that?

A:    No I didn't do that no.

Q:    Did Major Conley do that?

A:    Not to my, no

Q:    Okay, I'm not trying to be cute now. I jumped to quick on that question. So let me, I apologize to you. Let me go back. Sometime on or about May roughly the 20th or so, you're not sure, Conley say to you, Major Conley says to you the Commissioner requested an investigation. Did Major Conley indicate...Strike that. Did Major Conley during that conversation provide any other detail?

A:    No, no sir

Q:    Okay

A:    I didn't have any kind of document in front of me either.

Q:    Right

A:    I mean I wasn't given like a form or anything.

Q:    No just a verbal thing from

A:    Yes

17

Q:    And was anyone else present at that time?

A:    Not to my, no sir, I can't, no

Q:    Now didn't you end up at a meeting where the Commissioner was present? Coury was present. Conley was present. Who all was present at the meeting where this issue of this investigation was discussed?

A:    Not me

Q:    You weren't there?

A:    No sir. I was never at a meeting with the Commissioner, Colonel Coury, who else did you say?

Q:    I'm trying to learn from the meeting. Let's do it this way. Did you ever learn of a meeting were the Commissioner was present and Mr. Conley, Major Conley, was present? Colonel Coury was present, and others were present where the investigation was discussed?

A:    No

Q:    You never learned of that from anyone?

A:    No

Q:    Okay. Alright now when Major Conley told you, let's go back to this sometime on or about May of 1999, okay. Maybe around May 20th or so of 1999. When Major Conley discussed this with you what did you do? In other words, you recollect whether he asked you

18

do anything? Were you suppose to do any follow-up action, do something? Do you remember anything like that? What I'm gonna do here, let me tell you where I'm going with this. I'm gonna try, I'm gonna ask you questions having to do with, you know why Major Conley would say this to you. Since the conversation, the way you've described it so far was relatively brief and there was not a lot of information in it, I'm gonna try ascertain what his purpose was and you know if there was any follow-up acting. Can you tell us let's say for the remainder of May, let's do it this way. That's my offer. That's where I'm coming from. For the remainder of May '99 do you have a recollection of anything that you did in regard to this comment by Major Conley?

A:    Only other thing that I recall was that Major Williams and Major Wertz's were mentioned as the people that were gonna be gathering the facts on the inquiry.

Q:    Was that discussed during this conversation?

A:    I don't recall if it was discussed. You mentioned that to me the first time, cause see Major Conley's office and where I was working out of is very close proximity and that could have just. I don't if he said that the first time or if he told me later in the week

19

or whatever that they were going to be doing, gathering the facts.

Q:    Rick the important thing is that Major Conley, who's head of BPR, tells you this.

A:    Right

Q:    You're at least at this time, acting Director. You weren't actually appointed to that position of January 29th of 2000. You were acting Director of IAD.

A:    Correct

Q:    And you weren't involved in that investigation?

A:    No

Q:    You were never asked to assign it a number, do any paperwork on it, or to log it in, or anything like that?

A:    What happened there sir I can explain that to you.

Q:    Yeah that's fine. Sure, please.

A:    What had happened was that when I got the complaint sheet for Captain Ober the first thing I needed to do was assign someone from Internal Affairs to look into this Stanton thing. So I contacted our western office, I think it was Lieutenant Carnahan assigned Sergeant Dana.

Q:    Could you spell those names for the

20

record?

A: Yes, Carnahan is C-A-R-N-A-H-A-N, first name Donald, D-O-N-A-L-D. The Lieutenant was Dana, D-A-N-A, Seifner, S-E-I-F-N-E-R I think is the correct spelling of her name.

Q: Okay

A: And what I did was she was assigned to contact the FBI and get whatever information that they were gonna turn over to us. So we could pursue, properly pursue what we needed to pursue with Stanton. So what end up happening she end up getting a box of tapes and reports that she forwarded in to the office. I needed to get those transcribed so there was some down time while these were being transcribed. I know that that information, Major Wertz and Major Williams at times would pop into the BPR office unannounced and had never called and said hey I'm stopping by or something. They just would come though. Just routine during the day the people would stop through there. I remember a conversation I had, a brief conversation I had with I believe it was Major Wertz. He made a comment to me that a number hadn't been taken. He said something like "Oh, an oversight here. There wasn't a number taken for this." or something to that effect, and I said " Well I'll double check.". I said something to Major Conley

21

Q: Yep he's your boss. I know how the systems work. I've been in the Army, and the Army runs a little different maybe. Let me just. I very affectionately look back on those days. The best thing that's ever happened to me in my life, but let me tell you me problem with this one okay. What is a complaint verification form? Can you tell me what that is?

A: A complaint verification form is a form that we use to verify citizens' complaints. It is a form we send to citizens who haven't completed, like say for intense we can receive complaints form a citizen. They write a detailed letter and they sign it. That is a verification of complaint. Not ever complaint that we receive in the bureau has to be on our form. Like for intense if you wanted to file a complaint you being an attorney you have access to notaries. You could swear at an affidavit and send it in and that could serve as the complaint verification.

Q: Well who did the affidavit in this case?

A: There wouldn't be one cause this was an internally generated complaint, not an externally generated complaint.

Q: Oh, okay

A: That's the difference.

Q: So IAD can go off and investigate a

23

just brief I said "Hey is what there, is this doing the investigation at the request of the Commissioner?", and he said yeah. So I wrote up the worksheet at that time. I wrote up the complaint sheet and that would have been in June of '99. Yeah it would have been June of '99. I wrote up the worksheet and assigned it a number and provided that to them.

Q: You didn't check with the Commissioner on that?

A: No. I never talked to the Commissioner.

Q: So you wrote up, you on your own, wrote up a complaint sheet for the Commissioner based upon hear say comments made to you by Major Conley, and apparently some generals made by Mr. Williams and Mr. Wertz. Is that correct, some awareness of what they were doing?

A: Yeah I think it was, my recollection is Major Wertz said they needed a number for it or something. There wasn't a number taken and I checked with Major Conley who is the Bureau Director and he said this is being done at the request of the Commissioner. And I just said I'll make up the sheet based on it.

Q: Okay Rick

A: That's my boss

22

Trooper based upon some verbal communication by somebody and just investigate a Trooper, their career, their activities, etc. Is that right?

A: There's a provision in our regulations AR-425 that for investigative criteria that the Commissioner can request an investigation.

Q: Rick you never talked to the Commissioner. Didn't you tell me that?

A: That's right

Q: And you received nothing written from the Commissioner?

A: That's correct

Q: Did you get a phone call from the Commissioner?

A: No I didn't

Q: Did you get piece of paper form the Commissioner?

A: No I didn't

Q: Any electromagnetically recorded massage like a tape-recorded message?

A: Nope

Q: Or anything of that type?

A: No sir

Q: So your telling us you weren't requested to fill out this form. You did this on your own.

24

A: That's

Q: Are you protecting someone sir? Now I'm not insulting you.

A: No

Q: Don't be upset with me. Are you protecting someone?

A: No sir. My Conversation with Major Conley was that this wasn't done, and would do it.

Q: Okay

A: I mean I've written up worksheets on other things.

Q: Alright sir. I'm not saying you haven't, and I'm just trying to delve into some of the reasons here, okay?

A: Uh-mum

Q: Why was it important to fill out this? I mean, why do this? Let me tell you were I'm coming from first. Cause I don't want, again I'm not interested in leading you down a blind alley. I just want to know what happened here.

A: Okay

Q: What I'm gonna ask you is a group of questions here that have to do with the form. Why it was important to assign this a number after? And I'm gonna ask you question about when this investigation began,

25

because everything I've heard so far indicates that it was underway when this was done. That this was done after the fact. So I'm gonna ask you about that, okay?

A: Okay

Q: I'm gonna ask you why that was important. I'm gonna ask you about the procedures connected with it. So first question, why was it important to fill that out, you know assign it a number, fill out that form? What's the meaning of that? If you could just go investigate somebody, which you've told me you can, why is it important to give it a number, or assign it some number, or complaint, whatever it is. I need you to explain that to me.

A: It use to be called the BPR control number, but it's called the IAD control number now, and that was something Captain Ober instituted when he was Director. The control number it's self is for tracking purposes. So that any report that is generated from an inquiry or investigation can be tracked years down the road. It's for our filling system and it's also entered into a computer database. Cause we have to do a statistical report at the end of the year on how many complaint, how many investigation, how many this or that. We do a statistical summery of everything that come to our bureau.

26

Q: Yes. Yes sir I understand that. Okay, so it's important for that reason. Are there any other reasons why it's done?

A: Just an indexing and tracking number

Q: Well if I use the term "off the books", okay. Let me use that term. If I'm coining a term let me try to explain to you what I mean by that. If an investigation's going on or occurs and it's not identified in the system as a existent valid investigation I want to find out if it indeed is an investigation and what controls there may be on it, what perimeters govern it, or whatever. Because I assume that in an organization of over four thousand people this folks can't just go off investigating folks without some type of conformance to regulation or administrative practices. That's where I'm coming from. So let me ask you some questions there. You told us that the IAD control number is essentially designed for tracking purposes and in order to make sure that information is kept in one place so it can be entered into a database and be referred to and use. That sort of thing. Why didn't at the time...Strike that. At the time the issue came up of this not having a number, I think you described it sort of as a "ut-o" by Mr. Wertz or Mr. Williams. "Ut-o" there's no number here. How long at that time had Mr. Williams and Mr. Wertz been in the

27

Pennsylvania State Police? Do you know?

A: I don't know, but I know Major Williams was close to retirement. So I would imagine he had thirty years. Major Wertz I think he was close to thirty years.

Q: So when they started their investigative activities they didn't open it kind of complaint. You know what they were told, what was said to them anything like that?

A: No sir, I don't know any of those, what they were told. The only thing that I recall Major Wertz, it's either Major Wertz or Major Williams. I don't remember which one. Or it might have been both. They had asked me about the supervisory inquiry. You know doing a supervisory inquiry, the documentation and I explain to them that this was something that Captain Ober initiated that we were using in the Internal Affairs Division. They want to use that type of process. I just told them basically what was required and drafted a special order that Captain Ober made. Bits and pieces of it, I didn't go through the whole thing.

Q: Okay, well what is involved in this supervisory inquiry, any documentation there?

A: Yes sir. They do, it's done on correspondence which is called an STD-501. Which is subject, to/from letter.

28

Q: Can you stop there for just a second?

A: Yes sir

Q: Supervisory inquiry is initiated by a supervisor, am I correct?

A: It can be initiated by a supervisor or a Commander.

Q: Somebody, authority individual in the chain of command.

A: Yes sir

Q: Now you weren't above Captain Ober in the chain of command at that time. Were you?

A: No

Q: Well did what you initiated in June of 1999 was what you initiated at that time was that a supervisory inquiry? Is that what you're telling us?

A: To the best of my knowledge, yes.

Q: Well how? What knowledge, what facts know to you initiate that that was a supervisory inquiry?

A: That was what Major, I think it was Wertz told me that they were gonna use.

Q: That they were gonna use?

A: They mean the process that they were gonna use to document.

Q: Right, that's the process they were gonna use to define of describe this investigation.

29

A: Correct

Q: Where's the to/from letter?

A: Say again

Q: Where's the to/from letter? Is there any to/from letter? Did the Commissioner, did he write up some letter? Did he write anything down?

A: I'm misunderstanding you. The to/from letter from the Commissioner?

Q: Sure. He doesn't have

A: No, see maybe I can clarify this for you.

Q: Yeah

A: Like if I'm assigned to do a supervisory inquiry, I would document what information I gathered during the course of the inquiry on a subject, to/from. So that would be the responsibility of the person assigned to investigate it.

Q: Well, there is a file on this then, right? There's a file on, there's a BPR on this then?

A: Well there was a control number issued on that, correct.

Q: Well have you seen it? Do you have it there in your files?

A: No

Q: You don't have the investigation?

A: Well let me talk to my attorneys.

30

Q: No, no, no

A: I'm gonna talk to my counsel about it.

Q: Look I'm gonna object. Now wait.

OPOSING COUNSEL: No

MR BAILEY: There's a question on the table. That's alright. I'm not gonna stop you can talk to her.

MR BROWN: I understand sir

MR BAILEY: I have to do my job. All I'm asking you I'm not asking you what's in it.

OPPOSING COUNSEL: No the issue

MR BAILEY: Please let finish my

OPPOSING COUNSEL: The issue is where that's part of attorney work product. That's the issue.

MR BAILEY: You're now claiming, are you now claiming counsel that an investigation done before March of 2001 is part of attorney work product?

OPPOSING COUNSEL: No

MR BAILEY: You're not serious are you?

OPPOSING COUNSEL: That his knowledge of it would have been post March of 2001, and you asked him about his knowledge of it "Do you have it in your file?".

MR BAILEY: Now wait a minute.

OPPOSING COUNSEL: That's part of attorney work product.

MR BAILEY: Now wait a minute. How do you

31

know he would have been, and he hasn't been told that has he?

OPPOSING COUNSEL: Because I've talked to him about it.

MR BAILEY: Have you? Okay let's put the question this way. Prior, cause this is our groundwork at all times here. Prior, and I again strongly object to the use of this attorney work product artifice which is what I believe it to be. But prior to March or April 2001 were you aware of the existence of any BPR or investigative file on this matter?

A: I didn't see

Q: It's smart to be quiet sir

A: No, let me tell. You know I did not see. I know that Major Williams and Major Wertz were assigned to look into it. What documentation or what ever they end up doing I had no knowledge of at that time.

Q: So as you sit here today, your testimony is that prior to March or April of 2001 you don't have any fact to indicate that there was a file physically composed that was placed into IAD or BPR files. That's what you're telling us.

A: What I'm telling you the only thing that I had in BPR is the complaint sheet that I wrote up with the number on it. Nobody ever came and said here's a

32

1  report. I never, all I had was that worksheet that's it.
2  Q:    Let's go back to, you had indicated that
3  at various times during before this number was assigned
4  and you indicated that it was apparently a supervisory
5  inquiry number.
6  A:    Well the control number, maybe I can
7  explain this to help out here.
8  Q:    What is a control number?
9  A:    It's a sequential number. It use to be
10  just one through whatever, and at some point and time I
11  don't know if it was Captain Ober if he changed it or if it
12  was even before him. I don't know. I don't remember
13  this, but we started doing it by year. So it would be like
14  1999-1 and then up through to the end of the year.
15  Q:    Do you remember the number of this file,
16  the number, the control number?
17  A:    I'm thinking it's 1999-503.
18  Q:    And at the end of 1999 what was the last
19  number you remember?
20  A:    '99 I think we were over a thousand I
21  think. I'm think like a thousand something.
22  Q:    Alright sir go back. You were explaining
23  to me the way this control number was assigned.
24  A:    Oh, and maybe I can clarify. I've been in
25  the Internal Affairs Division since 1994. So I've seen

33

some changes in processes along the way. When I first
2  came to Internal Affairs complaints that would come in
3  that didn't rise to the level of where a Commanding
4  Officer was seeking disciplinary action
5  Q:    Can you hold one-second sir?
6  A:    Yes sir
7  Q:    Thank you
8  MR BAILEY: Okay you were at a point were
9  you had indicated. I just made a little change there. You
10  were at a point were you had indicated that it was not a
11  situation where a Commanding Officer was looking at a
12  disciplinary
13  MR BROWN: Right as I said it was a deminis
14  complaint, something very minor. It would come in or
15  even if we had a complaint from a citizen, and it was like,
16  let me think of a good example.
17  Q:    Chewing bubble gum in my face.
18  A:    Well not even that. Just the trooper
19  when he pulled me over was intimidating. Well you
20  know, the uniform it's self would be intimidating to
21  people, but that didn't in it's self describe misconduct.
22  But yet, what we would do is I would send the
23  information with just a note saying handle anyway you
24  deem appropriate. Which may mean do nothing. Which
25  may mean call the guy in and say hey be a little less

34

1  aggressive or whatever that may be. That information
2  was stored and kept in a separate database and it was
3  given what we called an event tracking number. It did
4  not go into the, it was not given a BPR or an IAD control
5  number. It was given a separate number because it was
6  deminins and it didn't get kicked in the system of
7  something that may be warranting a formal action, a
8  formal discipline. I don't know if Captain Ober started
9  this or not or if it was started right before he took over,
10  but when I took over as acting the supervisory inquiry
11  process was already in place and up and running.
12  Everything, the way it use to be done we didn't put IAD
13  numbers on things that were going back to the troops to
14  handle how they saw fit. Now everything got a number
15  so of course the numbers went up, and I think that's why
16  they categorized it. I think the decision was made to get
17  the year and just go sequentially from there.
18  Q:    Well then why didn't they complaint
19  forms instead of you? Why you'd do them?
20  A:    I just thought I was...just record keeping.
21  There's no
22  Q:    Well did they indicate they were gonna do
23  it?
24  A:    Who's they?
25  Q:    Mr. Williams and Mr. Wertz. You're the

35

1  guy that initiated the formal process of giving this thing a
2  number, right?
3  A:    I gave it the...I put the...well as far as
4  Major Conley told me in May that the Commissioner
5  requested an investigation. So I didn't initiate that that
6  was already
7  Q:    The investigation began
8  A:    Okay I don't know when they actually
9  started working on it.
10  Q:    Let's go back to your testimony. You
11  indicated that at some point at least, Mr. Wertz and Mr.
12  Williams came in to look at the Stanton investigation,
13  product, stuff that came in.
14  A:    Right
15  Q:    Let me ask you a few questions about
16  that before we move on. What gave Mr. Wertz and Mr.
17  Williams authority to look at the Stanton stuff? Where
18  did they get the authority to do that?
19  A:    I don't know.
20  Q:    Well
21  A:    As investigators they're required to
22  investigate. I mean I
23  Q:    Well
24  A:    They're Majors they were given an
25  assignment. It was for me to be in their way.

36

Q: Okay. Well if I understand correctly, Captain Ober had sent in some kind of complaint sheet

A: Correct

Q: on Mr. Stanton.

A: Correct

Q: You know when that came in?

A: My recollection is, he faxed that to me on or about May 19th of '99. I'm thinking is when it was, the 19th of May.

Q: And at that time he was, is the word detached to IIMS?

A: I believed that's what he has described, yes.

Q: Okay whether he was or not he was doing IIMS stuff.

A: That's correct

Q: And to the best of your, well your not sure, but to the best to your knowledge that was either directly or indirectly at the Commissioner's request. Is that correct?

A: It was indirectly...

Q: Either directly or indirectly to the best of your knowledge at the Commissioner's request.

A: That, we were talking about the complaints

37

Q: Of Mr. No of Mr. Ober being with IIMS

A: Oh, oh that. Okay I'm sorry I misunderstood you. Yes as far as I know. I recall seeing a CLEAN message.

Q: Okay. Alright. So Mr. Ober sends you a complaint as to Stanton. Did you call him or talk to him or ask him why?

A: Who? To Captain Ober?

Q: Captain Ober, yeah. Captain Ober sent you, faxed you some type of complaint thing having to do with Stanton, right?

A: Right

Q: Okay, did you call Captain Ober? Did you talk to him why or ask him any questions? You just more or less handled it the standard procedure.

A: Yeah pretty much. I think he practiced sending that to me with a phone call. I think he called to make sure I was there to get it, and then it came in by a fax.

Q: Okay but

A: Just handled it. I mean that would be something that the assigned investigator in our western section would be responsible for doing as a part of their investigation.

Q: Did you ever seen any communications

38

from the Commissioner to look into Stanton?

A: From the Commissioner, no.

Q: How about Mr. Coury?

A: No

Q: How about Mr. Williams?

A: No

Q: How about Mr. Wertz?

A: No

Q: How about Mr. Westcott?

A: No

Q: How about Mr. Conley?

A: No. I just processed that and that would be one that because of the serious nature that the Internal Affairs Division would want to look at.

Q: Well Captain Ober was out at IIMS, right?

A: Correct

Q: Until Captain Ober notified you of Stanton you didn't have any idea that the FBI had been looking at Stanton, right?

A: That's correct

Q: Okay so you get this thing from Captain Ober to take a look at Stanton. Did you ask any questions or say that the FBI conducted? I mean what did that thing say?

A: My recollection of the complaint sheet

39

that he sent me was that he got information from an agent Kush from the FBI that the subject was involved in some type of, I don't know if it was worded "job selling" or "political corruption" or something like that. I think it had on there something to the effect it was being turned over to us to move forward with it.

Q: Okay

A: Something to that effect.

Q: Now under Pennsylvania State Police regulations are investigations into political or public corruption treated in any kind of a special way?

A: Treated in a special way as far as what sir?

Q: I'm saying like an organized crime inquiry or something like that?

A: Oh, they could be yes organized crime. We have, the Bureau of Criminal Investigation. The Organized Crime Division of that bureau looks into that sort of thing. That's who ended up investigated into Stanton.

Q: They ended up investigating Stanton?

A: Yes

Q: So somebody evaluated that thing, that complaint from Captain Ober.

A: Absolutely

40

Q:    And it was, well do you know who did?

A:    It would be the western office of the Organized Crime Division. I think it was Corporal Jeff Shall was the primary investigator on the criminal allegations against Stanton, and then the Internal Affairs western office handled the administrative end of it.

Q:    Were you familiar with field regulation 7-4 effective date 12-23-96 titled Pennsylvania State Police department directive subject, undercover, vice drug, and organized crime operations?

A:    I know it exist, but I'm not familiar with it. I mean I'm not, I can't sit here and spout all the things that they have to do.

Q:    Of course. Okay now, do you know whether Mr. Wertz and Mr. Williams were aware that the Stanton thing had been assigned to the Organized Crime Division?

A:    I don't know if they were aware of that?

Q:    Well what were the records on and the Stanton stuff doing up at, was it Harrisburg? Is that were they came by? Is that were your office was? Let me tell you were I'm coming from so you know again. See here's Captain Ober now, he sends in this communication sometime on or about the 19th of May. It's about public corruption. It's about FBI probed, job

41

selling, something of that sort. Mentions in fact the FBI agent Cush. I'm gonna ask you in a minute if you ever called Mr. Cush and talked to him. Now, it's sometime in June when this number gets assigned to, I don't know what else to call it, the Ober investigation I guess. Well the investigation into these events. What events I'm not quite sure, but in any event the FBI probe. I mean this is a probe into a probe. I wonder if that calls for an exponent, but the point is that Mr. Williams and Mr. Wertz come in and they drop by. They don't announce and they're just checking on, on what? Why isn't this investigative product out with the Organized Crime Group or is it being copied into Harrisburg? Can you tell me why you have. If the Stanton stuff is an Organized Crime issue, which according to PSP regulations I've looked at it should have been and apparently was and that's sent out to western Pennsylvania what's all that stuff doing in Harrisburg? What's going on?

A:    What I recall when I got the complaint sheet from Captain Ober my biggest concern was what do we have. I mean what really do we have, and the only way to know what we had was to get information from the FBI. So I can't remember, I think it would have, sometime at the end of May or early June I know that Lieutenant or not Lieutenant, Sergeant Sifner met with

42

the FBI and they turned over like a box. I mean they gave the stuff to her. A box of tapes and I think there was some reports in there, and she, I don't remember. I think she ended up driving them in and was like this is what they gave me now what do I do with this stuff. I was like well we don't know what's really there. We're gonna get some transcript done up and that sort of thing. Somewhere along the line

Q:    You're telling me the FBI gave you this. Now I don't mean that directed at you. Forget it.

A:    I understand

Q:    I'm thinking about the FBI. The FBI give you a box of stuff and you don't know whether they had reduced it to transcription.

A:    No we ended up doing our own. We ended up transcribing it ourselves. They didn't give us transcripts.

Q:    Did somebody stop this investigations in process?

A:    Stop what investigation? Which one?

Q:    Stanton and this public corruption.

A:    No

Q:    Do you know if anyone every interfered with it?

A:    No

43

Q:    Do you know if the Commissioner ever interfered with it?

A:    No

Q:    Do you know if anyone in the FBI ever interfered with it? No that they would ever do such a thing.

A:    No

Q:    Okay. Well, do you know whether there are state politicians mentioned in that investigations? Elected Officials sir. Do you know whether there was a Pennsylvania State Senator mentioned in that investigation?

A:    I have to think about that one for a minute sir.

Q:    Do you know a Senator Leonard Bodack sir?

A:    I don't know him. No sir.

Q:    Do you know whether he was mentioned in that investigation?

A:    I think he might have been.

Q:    Okay. Do you have a recollection of any state representatives that may have been mentioned in that investigation?

A:    I think there was a referenced made to a Representative from the Pittsburgh area, but I don't know

44

the name.

Q:    Preston, something like that?  Do you know?

A:    Could have been.

Q:    Well when this FBI product came in you say there was some tapes and stuff in there and you had to do your own transcription?

A:    Well what ended up happening I think there was like twenty-one or twenty-four tapes, and the administrative officer in our, well the administrative assistant typed some of them up and I think there was another secretary that was involved in typing those up.

Q:    Why?

A:    Why?

Q:    Yeah

A:    To have a transcript of what's on the tape.

Q:    Why didn't you send it out to the Organized Crime Division?  I mean so if I understand what you've told me correctly, somebody from the Organized Crime Group brought it up to Harrisburg and into your office.

A:    No, Internal Affairs brought it.  The FBI turned it over to Internal Affairs and they brought it to me.

45

Q:    Okay

A:    It was dropped on my lap.

Q:    I see

A:    More like, here's this box of stuff

Q:    That must have been fun.

A:    and the FBI's out of it kind of thing. Yeah, and I'm like what the heck do we have here.

Q:    Okay.  So in order for you to properly evaluate it you needed to look at this FBI work product, investigatory product.

A:    Right

Q:    Now do you know at that point whether Mr. Stanton was aware that he had been investigated?

A:    I don't know that.

Q:    You didn't listen to the tapes you had them transcribed?

A:    Right

Q:    Did you call up Mr. Kush?

A:    No

Q:    You did not.  Did you talk to any FBI agents?

A:    No

Q:    May I ask, I'm not suggesting you should have by the way, I don't know.  Is there some reason why not or would there have been any

46

reason?

A:    Well the reason being as the acting Director and running my section I don't have the time.  That was delegated to the Internal Affairs West.  They would have to arrange, this was western Pa.  They would have to arrange a meeting with them, getting information, and documenting what's going on with the Stanton thing.

Q:    Okay.  Did Mr. Wertz or Mr. Williams come in and review any of this stuff?

A:    Review any of this?

Q:    Sure

A:    Yes, the transcripts that we made from the FBI tapes, yes.

Q:    Okay.  Alright, when did you get this box? Is it Dana brought it up?  Sergeant?

A:    Sergeant Seifner

Q:    Seifner, Dana Seifner.

A:    And she's now retired.

Q:    God bless her.  Did Sergeant Seifner she brought these up to Harrisburg, and do you remember when that was?

A:    Not to my recollection on that sir.  It would have been like late May early June.

Q:    And it was before the control number was

put on to the investigation into Mr. Ober, right?

A:    Before Mr. Ober, yes

Q:    Okay.  Now how long did it take you to transcribe these tapes?

A:    It was a time line probably of, I'm thinking a week to two weeks.

Q:    Okay

A:    I know it was like, I think it was like mid-June before they were done.

Q:    So before the control number, well let me ask a question.  Did Mr. Wertz and Mr. Williams come in and look at this stuff before a control number into Ober was put on it?

A:    I'm not sure of that sir.  They could have. I'm not sure.

Q:    Well some time on

A:    I mean they didn't like tell me when they were doing things.  You know, I know the tapes were done, were typed up.  When they actually looked at those I'm not sure.

Q:    Okay.  That's alright.

A:    I'm sorry

Q:    That's okay.  If you don't know you don't know.  Now, so at the time that this FBI investigatory product comes in to the department up to your office.

48

There are really two investigations in progress. One into
Stanton initiated by a complaint that came from Captain
Ober.

    A:    Correct

    Q:    and one into Captain Ober.

    A:    Correct

    Q:    Well, did anybody every tell you what
Ober had supposedly done wrong that warranted an
investigation? Did you ever ask? Did anybody ever say
what the Commissioner wanted to investigate him for?

    A:    No, the only thing that Major Conley told
me was that the Commissioner wanted an investigation
to get the facts on what happened with this FBI,
whatever you want to call it, probe or FBI investigation
into Stanton kind of thing. I wasn't a part of any
meetings or anything like that. That was just told to me
by my boss.

    Q:    Well did you ever tell any of these people
that what they were doing was wrong?

    A:    No

    Q:    Did you ever express any opinion to
them?

    A:    I mean I didn't have the facts. I mean

    Q:    I'm not say you should have sir.

    A:    I understand

49

    Q:    I'm not saying you did.

    A:    But no

    Q:    It's not my role. I'm not sitting here in
judgement of you. I'm just asking questions here.

    A:    I mean I don't know what was done.

    Q:    Yes sir. I don't want you to think that I
have, I'm probably, I'm not good enough of a lawyer I
guess that I can't hide feelings about things very well and
I apologize to you for that. But I don't want you to think
I'm sitting here being critical to you.

    A:    I'm not taking it that way.

    Q:    Okay. I just have to ask these questions
it's my job. Okay, did you ever have, do you have a
recollection Rick or having a conversation with Darrell
Ober about the investigation into him or anything
relating to the investigation into him?

    A:    Yes I had a conversation with him it was
very brief. I think it was over at the IIMS building, and
Captain Ober and this happened more then one occasion.
I'm think maybe twice. He said to me just hey I didn't do
anything wrong, and I just, my response to that would be
well then what are you worried about. If you didn't do
nothing wrong don't. I know he's still gonna be my
Captain. I'm still his subordinate. We work together. I'm
encouraging the men. Hey if you didn't do nothing wrong

50

don't worry about it. Everything will take care of it's self,
and I know I mentioned to him that I had talked with the
investigator briefly. I was kind of making light of the
situation caused I had mentioned to him they weren't
gonna give him the legerity warnings or something to that
effect. I kind of ended it there and I left it alone cause I
thought we both, you know we both, and Captain Ober
went out of his way to keep me out of this. So it was
kind of like bits and pieces of conversation. I had kind of
chuckled when I mentioned that because Major Wertz
and Major Williams were Area Commanders, and as Area
Commanders I don't know how long since they did an
investigation but the process they were using was created
by Captain Ober. The process called garidy warnings.
This was an agreement to my understanding he made
with the union. I kind of chuckled because you're gonna
have to follow the process that he made.

    Q:    Okay, but what. Okay I understand that.
And you're passing this on to Captain Ober more or less.

    A:    Right

    Q:    I guess what you're describing to us to
some extent speaking in tongues.

    A:    Yes

    Q:    Sort of the way the people do when they
don't want to address and tip-toe around the point more

or less.

    A:    Right

    Q:    Is that fair to say?

    A:    Yes sir it was kind of that. It was kind of

    Q:    Awkward

    A:    Right it was very awkward, and I could
tell it was awkward for him too.

    Q:    Okay. How did it come up?

    A:    I think it came up like I said initially he
said to me I didn't do anything wrong.

    Q:    He sees you. He passes you. Let me lay
a little foundation. Captain Ober at all time has always
treated you with respect and with, you know respect and
affection. It's fair to say that the two of you were not just
in a relationship were he had title and position and you
had title and position, but obviously between the two of
you there was a decent honest proper repore that was a
good healthy thing. Is that fair tot say?

    A:    Yes sir.

    Q:    Okay

    A:    In both ways, absolutely.

    Q:    Yes sir, and he had certainly never been
anyone who had obstructed or harmed you or interfered,
and you never had the impression that he would interfere
with your career plans or anything like that.

52

A: No sir.

Q: And put frankly those kinds of feelings, that feeling of respect was reciprocal. You felt the same way towards him.

A: Absolutely

Q: Alright, and has someone's who's obviously a sensitive and intelligent individual you had your ambitions and you had your proper respect for duties and indented to perform you job correctly. Correct?

A: Correct

Q: And you would expect no less of him?

A: Correct

Q: Is that fair to say?

A: Yes sir

Q: Alright now with that situations people who are decent respectful friends and respect each other in an organization which is how it should probably ideally be at all times. How did this I didn't do anything wrong, I mean did anything preface this comment I didn't do anything wrong? What or how did it come up? I mean after all he

A: Well you know what I'm thinking.

Q: Go ahead

A: I'm thinking it came up cause Captain

53

---

Ober, I'm gonna go back to, I'm gonna say May, June. I think he gave me a videotape. I think he gave me a videotape and he had given me something. I don't recall exactly all what it was. Maybe part of a report, an FBI report, a tape. There was a couple items he gave to me.

Q: What was that about?

A: I think that had in relation to Stanton, to the Stanton issue and also he had said to me that he was gonna give me a supplemental report. I think that might have been what prompted this conversation, because I was over at the IMMS building and I don't remember if I was something from him something else, but I know he gave a report. It wasn't on an Official State Police form. He had put the Stanton control number and it was typed up. It wasn't dated, and it talked about his contact with the FBI so on and so forth and I got that from him. I'm thinking that might have been you know I didn't do anything wrong kind of thing.

Q: Okay, but that would have been something that occurred after Williams and Wertz?

A: After?

Q: Sure. After you will aware that Williams and Wertz were looking into the case.

A: Oh that, yes

Q: Okay and it would have been after Mr.

54

---

Conley talked to you.

A: Yes

Q: Alright so what did you do with that stuff?

A: What I did with the paper?

Q: No, your recollection is he gave you something.

A: Right

Q: And it's not clear to me yet why he did that, but it's your testimony he did that. What did you do with what he gave you?

A: I put it in with the file.

Q: Well didn't you call Mr. Williams or Mr. Wertz and say here?

A: Yes. I did that too, yes.

Q: Okay and what did they say to you?

A: Nothing

Q: Did they ask you what Ober said?

A: No

Q: Did you make an admission, did Mr. Ober make an admission against interest?

A: No

Q: Nothing like that?

A: No. I think what I did with that is when Captain Ober, cause by regulation he's required to

55

---

document this sort of thing, and I think he was fulfilling his obligation by preparing this report to make it a part of the investigation into Stanton. When I got that I remember sending a copy to Major Williams, I believe it was.

Q: In other words what he was doing was he faxed this complaint form in. So what he's doing is giving you what he's got whatever it might be that is connected to or would support this complaint form.

A: Well the worksheet he submitted was very, it was just a paragraph.

Q: Okay

A: What he gave me, I think it was two pages. Or at least a page and a half to two pages of information that wasn't on the complaint sheet.

Q: Right

A: But it was more specific stuff.

Q: Sure, but it was a follow-up to the complaint sheet

A: Yes

Q: Right that he faxed you.

A: Correct

Q: Alright. So there was nothing secret or improper on either on of your parts. That's something that was obviously become part of the Stanton thing,

56

1  right?

2      A:   Correct

3      Q:   Okay.

4      TONY MARCECA:  5th of March, 2002, we're

5  back on camera.  The break was from 10:15 to 10:40.

6      MR BAILEY:  In this box that came up, how

7  many tapes were in this box?  If you remember.  You said

8  something like about dozen.  Something like a dozen or

9  something.

10      MR BROWN:  It was, I'm not sure of the exact

11  number, but I would say between twenty and twenty-

12  four.

13      Q:   Okay

14      A:   Somewhere in there.

15      Q:   Why were there two investigations?  If

16  you know that answer to this of course.  Why were there

17  two investigations an investigation into Ober and an

18  investigation into Stanton now at this point?

19      A:   The Stanton investigation, well at the

20  time, we didn't know what we really had.  So there was

21  gonna be an investigation into that.  Then the other, my

22  understanding is that the investigation or inquiry was at

23  the request of the Commissioner as far as the facts and

24  circumstances surrounding the FBI thing.

25      Q:   Now at some point was there a BPR done

1  on Stanton?

2      A:   Oh, yes sir.

3      Q:   And that was initiated when?

4      A:   What had end up happening is that when

5  Captain Ober on it, try to gather some information.  BCI

6  ends up investigating it.  When the criminal prosecution

7  then the administrative kicked in.  The administrative

8  investigation was done, I don't recall when it was done

9  sir, but it was completed.

10      Q:   Now Stanton ended up, I hate to use the

11  term "beat the charges," but Stanton prevailed based on

12  certain technical defenses as I understand it.

13      A:   Yes sir.  That's my understanding.

14      Q:   Did those technical defenses have to do

15  with the way evidence was handled by the FBI or the

16  State Police?  Do you know?

17      A:   From what I understand of this is that

18  the FBI did wiretaps under federal standards and then

19  when they turned it over our Pennsylvania Constitution

20  or something to that effect give more right and privileges

21  in that area.  We could not use their wiretaps in a state

22  prosecution I think is how it went.

23      Q:   Okay, and that had to do with the wires

24  that were wore by informants and that sort of thing

25  Pennsylvania's warrant standards etc.

1      A:   To the best of my knowledge sir, yes.

2      Q:   Okay.  Well do you know why the Feds

3  didn't prosecute Mr. Stanton?

4      A:   I don't know

5      Q:   Do you know whether they ever did?

6      A:   The only thing I know is that our BCI

7  brought, Bureau Criminal Investigation, Organized Crime

8  Division brought Charges against Stanton.

9      Q:   You do know if the FBI ever investigated

10  him?

11      A:   Stanton?

12      Q:   Yeah.  I don't mean investigated, ever

13  charged him.  If he were charged on a federal, did any

14  Federal Grand Jury ever bring him in?

15      A:   Not to my knowledge, no.

16      Q:   Do you know whether the Federal Grand

17  Jury ever investigated or the FBI ever investigated the

18  Pennsylvania Elected Officials involved?

19      A:   No.  I don't know that sir.

20      Q:   Did you ever come to learn if the Federal

21  Bureau of Investigation did any investigation into, a

22  broader investigation into the Stanton matter then just

23  whether Stanton was involved.  In other words, into

24  practices in the Pennsylvania State Police Academy

25  appointment process anything like that.

1      A:   That the FBI did?

2      Q:   Yeah

3      A:   No

4      Q:   Did you ever become aware of why the

5  FBI shut down the investigation or ended it better yet?

6      A:   I think I got that.  That was on the

7  complaint sheet that Captain Ober summated.  That they

8  were done and was turning it over.  I think that's, I was

9  under the assumption that they were through with it

10  that's why he was...

11      Q:   Right, but my question is do you know

12  why they were through with it?

13      A:   Oh, no

14      Q:   Why the FBI concluded it without

15  prosecuting?

16      A:   No sir, I don't.

17      Q:   Do you know if there were ever any

18  conversations between Mr. Evanko and Louie Freed?

19      A:   No I'm not aware of that sir.

20      Q:   I may be miss, I can't remember.  You did

21  or did not have conversations with the FBI agents

22  involved?

23      A:   I did not speak to the FBI agents.

24      Q:   Do you whether Mr. Williams did?

25      A:   I'm not sure if he did or not.

Q:    How about Mr. Wertz?  Do you know whether he did?

A:    They may have, but I can't say with certainty.

Q:    Okay.  You had indicated some knowledge or experience with the evaluation process when a complaint arises.  Let me more specific.  A Complaint arise from a citizen.

A:    Correct

Q:    and let's say it's one of these things you refer to as a demininis.  You know the officer intimidated me.  So you know out of respect for the civilian inquiry you do some checking into it or whatever.  That's a process that has to do with evaluating the complaint, right?

A:    Correct

Q:    Now, initially on it's face there are probably many circumstances where you can tell that something is you know, general and rather demininis by nature.  In other word a complaint comes in and it says the officer intimidated me and that's all it says.  You pay it a proper respect and you check it out, right?

A:    Well if it's from a citizen we'll send them the complaint verification.  I've seen in my experience that when the complaint verification it is more specific

61

then what we had, and it may articulate something that requires an investigation.

Q:    But if somebody wrote into you and say the officer opened up the door, and I'm not suggesting anyone ever did this, but the officer opened up the door and pulled me out and slapped me and threw me back in the car.  Now obviously prime affection right up front you're going to look at that and say if this is true that's serious, right?  All other things being equal.  If it's just a traffic stop for speed, and I swore at the officer and called him a name.  He dragged me out of the car and slapped me and threw back in the car.  Now you know, people shouldn't swear at police officers obviously, but that wouldn't justify, in a hypothetical situation now, wouldn't justify dragging them out of the car and slapping them and throw them back in the car, right?

A:    That's correct.

Q:    Okay, now.  So if you look at a complaint like that on the face of it, one the officer intimidated me.  You know it might be demininis and probably is.  But if he says he struck me, hit me, or assaulted me, or something like that obviously you look at that and say hey you know,  all things being equal if there isn't some reason for the use of force like that that's not proper and that's more serious.  Am I correct?

62

A:    Correct

Q:    Okay.  Now what reasons, as you sit here today now remember we're not suppose to be talking after March of 2001.

A:    Right

Q:    But you know, which I object to but that's alright.  Before March of 2001 what were the reasons as you sit here today?  What were the reasons that occurred to you that justified looking into Captain Ober?  What was it about?  Use your own language.  Tell us what it was about.  What has he done?

A:    Back then sir all I know is that Major Conley told me that the Commissioner wanted a gathering of the facts, get the information on what occurred.  I missed the second part of your

Q:    Yeah what was the reason for it?

A:    Oh

Q:    I mean, you're a bright guy you've been around for awhile you're a police officer.  You're very articulate gentlemen, and you're a career officer.  You're in the Pennsylvania State Police.  That's your career and your life.

A:    Right

Q:    You carry a lot of pride in that don't you?

A:    Uh-mum

Q:    Cause you should.  Fine organization and you take pride in that, right?

A:    Correct

Q:    They're checking into a Captain over what?  I mean, this is supervisory inquiry sir.  You told us about that.  You told us about those BPR things.  You know, you investigate people for reasons.  I'm trying to find the reasons, and then through all this litigation, I want to confess to you, I haven't found a reason.  So I'm asking if you could tell me what the reason was.

A:    Like I said sir I was given the comment from Major Conley as far as what others.  I mean, I don't who all was involved.  I mean, I don't know sir.

Q:    Up until March at least, we don't know what you may have learned since then.  Up until March 2001 you didn't know the reason the Commissioner wanted Mr. Ober investigated.  Is that fair to say?

A:    Well

Q:    If so tell us.

A:    Right, the fair way to say

Q:    Yeah

A:    is that the Commissioner wanted to ascertain the facts.

Q:    Okay.  Now do you know if there was any written information provided by the FBI as to why they

64

did the investigation?  What originated it?

    A:   On Stanton?

    Q:   Yeah into Stanton

    A:   Yes I got a copy of their FBI report. Whether or not it's everything that they have I'm not sure of, but I mean I have some stuff.  There was some stuff, some documentation provided by the FBI to Lieutenant, or Sergeant Seifner excuse me.

    Q:   Well, do you know whether or not anyone ever ask the FBI why they went to Captain Ober as opposed to directly to the Commissioner?

    A:   I don't have any knowledge.  I mean I didn't talk to the FBI. I don't know what

    Q:   When the FBI does an investigation and informs the Pennsylvania State Police what procedure do they usually follow?

    A:   Well it depends on what, I'll give an example.  When I was a criminal investigator in Troop H I worked with the FBI on some bank robberies.  It's just law enforcement agencies working together.  We were familiar with the special agent in charge here in Harrisburg when I worked in the crime room, and if we had a criminal investigation.  I can think of one case in particular.  It was a bank robbery.  We got information there was gonna be a bank robbery, and the suspects

65

were from Pennsylvania, leaving Pennsylvania to go to Maryland, and we did surveillance.  We contacted the FBI.  There was nothing special about the working relationship.  We were just fellow officers, and we did end up making arrests on it.

    Q:   Well in this case do you have any information known to you that the FBI had some reason to go to IAD?

    A:   No sir

    Q:   Well, I mean you don't have any facts known to you, which would indicate that the FBI for personal reasons because they just liked him?  It was by virtue of the fact that he's sitting there as Director of IAD.  Is that correct?

    A:   How the hell they came up with him is unbeknownst to me.  All I know is at the time is what he put on that work sheet was that he was contacted by the FBI in '98.

    Q:   Well when you evaluated the Stanton stuff when it came in you learned that there were potentially elected officials involved that the FBI had some probable to look at that, and didn't they mention the Governor's Office?

    A:   I don't recall any mentioning of the Governor's Office.

66

    Q:   Well, do you know whether Mr. Evanko ever indicated that there was an interest in the Governor's office when he talked to Mr. Campbell or people in the Governor's Office?

    A:   I don't know who Colonel Evanko talked to.  I had no discussions with him.

    Q:   Okay.  Did you read the FBI 302's?

    A:   You say the 302's is that their report?

    Q:   Yeah they do a

    A:   Okay

    Q:   The FBI you know, the most modern investigative agency in the greatest nation on Earth.  They don't tape inquiries.  They don't tape interviews.  What they do is they take two agents and they sit down with somebody and they take notes, and everybody in the world wonders why they do that.  No one can figure it out of course, but there's no record.  So you rely on what the FBI says was said.  That's what happens, and then they do a 302.  Then of course if you try to get their notes to back up their 302 they fight against them.  Some day the law in the Unites States will change.  Who knows, but at this time they do 302s, and their 302's are a form that they use and that form is like the agent's, like a report that you do.  Do you have a recollection of reading the 302s in this matter when this stuff came up for Stanton?

    A:   I have a recollection of looking through it yes.

    Q:   And you don't recollect any mention of the Governor's Office?

    A:   No I don't

    Q:   Now do you have a recollection of the 302s mentioning elected officials?

    A:   When you mentioned earlier about Bodack, I remember that name I think being mentioned.  I can't remember if it was in the FBI 302 or the transcript of the intercept.

    Q:   Do you remember in any of the intercept or any of the wire?  Let's do it the easy way.  You don't have a recollection of the Governor's Office being mentioned anywhere.

    A:   No I don't

    Q:   Now if that had been mentioned would that have triggered any bureaucratic response?  If the Governor's Office had been mentioned.

    A:   A bureaucratic response?

    Q:   In other words, would it effect how you would evaluate the information you had in front of you?

    A:   I would think so yes

    Q:   I mean it would certainly throw up a red flag that ut-oh what is this about because you know not

that there is any reason to expect at that time or now
would we do anything improper. That's a pretty high level
thing. That's a pretty potent kind of an allegation I would
suspect.

A:   Yes. If I had saw something like that my
first inclination would be to check with the FBI. Because
my experience with the FBI would be why would they
turn something like that over. If they got a high ranking
official that they could be bringing charges against
they're certainly not going to give it to the State Police or
local law enforcement to pursue. The FBI's gonna take it
cause they can get a lot of media coverage out of it.

Q:   Rogue leftovers of J. Edgar Hoover I
guess. Now let me ask you this. Do you have a
recollection about any language about higher ups in the
State Police being mentioned? Now not by name now,
but that there could possibly could have been, you know
that there were implications or allegations that maybe
higher ups in the State Police were involved?

A:   My recollection is I think it was
mentioned "Lieutenant Colonel".

Q:   Okay anything else?

A:   I think that's it. I think it was
mentioned one time or something.

Q:   And your best recollection is that... What

69

degree of certainty would you attach to that that it said
"Lieutenant Colonel" as opposed to the question I asked
you and the phrase "higher ups"?

A:   Higher ups in the State Police?

Q:   Yes

A:   I don't remember anything saying "higher
ups". I do remember Lieutenant Colonel is what's
sticking out in my mind sir.

Q:   Now what's a target, if you understand?
You've worked with the FBI, what do they mean when
they say "target"?

A:   The focus of an investigation

Q:   Based on your knowledge and experience
it could mean a wide variety of things, but is it fair to say
that it means that at least there's some interest and there
may be some reason to investigate someone. If someone
were a target of an investigation it doesn't mean that
they did anything wrong, but it means, doesn't it, that
there is a valid investigatory reason to look at them?

A:   You asking me about the FBI?

Q:   Yes the FBI

A:   I would assume there would be. My
experience with them is that they never lay all their cards
on the table. I mean we work with them. I never sit
down and say this is why we're doing this. Whatever.

70

Q:   You don't want my response to that.
Okay now, what's a target of an investigation? What
does that mean based on you experience as a trained
police officer and an experienced investigator? What is a
target of an investigation?

A:   Like I said earlier, a focus. Someone that
you're looking at for well like just use the Stanton thing.
Stanton was supposedly involved in something, and he
was targeted by the FBI.

Q:   if you indicated to a fellow investigator
that someone or some entity was the target of
investigation, would you go and inform them that they
were the end of an investigation?

A:   No I wouldn't.

Q:   Why not?

A:   Well you might be compromising the
integrity of the investigation.

Q:   Could you possible being exposing
yourself to criminal liability yourself depending on what
you did?

A:   Depending on what you did and what's
being investigated

Q:   Okay. Now then this FBI work product
came up to you. It was brought up to you by Dana
Seifner. You had it transcribed. You had everything

done to it. At some time, I think you indicated that Mr.
Williams and/or Mr. Wertz and they looked at that.

A:   Yes

Q:   Can you tell us sir, would that had been
before June 1999?

A:   I think the transcripts were done like
mid-June so they would have been available at that time.
So it's possibly that they might have.

Q:   But you don't know.

A:   It's going on three years sir, I don't know

Q:   Yeah

A:   if they looked at it before hand or if it was
the end of the month or middle of the month. I'm not
sure.

Q:   Now I want you to listen real close to this
question. Is there any form, piece of paper or in other
words, which would indicate when and who would look at
that investigative product or can they just walk in their
look at it and leave?

A:   There's no form, No, no sir. The only
thing, I could give you an example. If a Bureau Director
wanted to look at a report about something that occurred
a couple years ago involving the operation of their bureau
or whatever they could come over and look at it and the
confounds of BPR, but we don't have them like sign in or

sign out.  Or you might have an occasion where
somebody might jot down on the file that somebody had
an interest in it, but there's no formal process of doing
that.

Q:    Well if Mr. Williams or Mr. Wertz or
anyone else came in there to look at that FBI work
product are they allowed to remove it?  Can they take it
somewhere to look at it?  Are they monitored?  You know,
is there any kind of internal control or check keep on?

A:    Well, yeah we kinda keep that
information.  Like for instance if your gonna look at the
file you're gonna look at it in BPR.  Like to give you an
example of something and maybe this will help clarify it.
You might have, say for instance I left the State Police
and I wanted to apply for a job with the FBI.  They would
have me sign a release to obtain information about my
background, to include any disciplinary actions or
internal things that I might have been involved in.  So
then the FBI

Q:    I'm sorry

A:    That's okay, would do their background
investigation and would want to access the file and look
at my files.  Well I've given them permission to do that
and it protects the department.  The FBI is not allowed to
make copies.  Their not allowed to take any reports with

them.  What they do they can come in and look at the
information and then they don't take nothing with them.

Q:    Well how do you know they don't take
something with them?

A:    Well we have, we put them in an office
there.  They sit in an office right outside of our office.  We
can see them.  They don't make copies of anything.

Q:    Well who watched Williams and Wertz.
I'm not suggesting they would do anything improper.
Don't read that into the question, but who watched them
when they came in and went through those files?

A:    I didn't

Q:    Do you know anyone who did?

A:    No

Q:    Well they're Majors in the Pennsylvania
State Police and you're not gonna challenge their
integrity, right?

A:    I had no reason

Q:    I'm not suggesting that you did.  Now
aside from Mr. Williams and aside from Mr. Wertz do you
know anyone else that came in and went through those
files?  If you do please tell me who.

A:    I don't know of anybody else sir.

Q:    Well would you know if they did, if
someone else did and if so?

A:    Not with...Well I know that when those
transcriptions were done Sergeant Siefner had a set of
them for the internal.  I mean she had them for her
internal investigation.

Q:    Why not have Sergeant Seifner check into
if there were questions.  Cause you see we have this big
question out there, what's the reason for this.  Now if
there were questions, Lord knows what they were, but if
there were questions about Mr. Ober and the FBI
investigation why not have the BPR assigned person do
it?

A:    I would think that would be an
uncomfortable position to put the Internal Affairs
investigator in, in light of the fact that Captain Ober he
was detached but he was still the Captain for IAD.  It
would have been more appropriate to someone outside of
Internal Affairs investigate that.  That would be like my
Lieutenant investigating me.  We work together.  They
know me, and all of the sudden their gonna be like.  It
makes for an uncomfortable situation.

Q:    Okay

A:    So what we have to ask them to do is go
outside of that.

Q:    Okay.  Now do you know if the FBI's role
in investigating Stanton was ever looked at?

A:    The BCI do all that.  I don't know if that
was a part of their criminal investigation or riot.

Q:    Well do you know of any questions ever
raised about a lack of probable cause on the part of the
FBI to do an investigation?

A:    No sir

Q:    It's fair to say is it not, although there
were legal objections that sustained a dismissal of the
charges against Mr. Stanton that factually at least given
what was know to you he was certainly involved in
talking about trading money for influence.  Is that fair to
say?

A:    That's fair to say.

Q:    Do you know what happened to Mr.
Stanton?

A:    Mr. Stanton, after the criminal charges?

Q:    After the criminal charges were dropped
and the after the State Police did it's internal.

A:    Okay the last knowledge I have of him
we're still in the process.  There's still administrative
action pending.  I think in the form of arbitration and I
believe, I'm not 100% sure on this, but I believe he's
suspended without pay.

Q:    Okay

A:    So he's not working

Q:    Okay.  Now are you familiar with the...
Strike that.  Chain of command in the Pennsylvania State
Police.  Did you ever contribute of have a discussion with
anyone about submission of a change in the PSP
regulations regarding chain of command?

A:    No sir

Q:    Let me get back just a little bit Rick if I
can to the conversation.  You had a conversation, first of
all you indicated that arose between you and Captain
Ober where he said I didn't do anything wrong.  I had
asked you some question about that originated, how the
subject came up.  Is it fair to say you don't remember
how it came up?

A:    I don't remember exactly how we got on
the subject, but it came up.

Q:    Alright

A:    Briefly

Q:    But you don't remember how?

A:    No I can remember

Q:    Alright.  Now during that conversation
did you ever indicated that you had related to Major
Williams and/or Major Wertz that you know you guys
aren't doing this right or you can't do that?  Something to
that effect.  Just something to that effect.

A:    No

77

Q:    Well do you remember when I asked you
the few questions about the supervisory thing that some
how Captain Ober had put this supervisory thing in
place?

A:    Right

Q:    Now did you have a discussion with Mr.
Williams and Mr. Wertz about this supervisory
investigation?

A:    I recall speaking to Major Wertz, I believe,
about the supervisory inquiry process.

Q:    Well was he asking you questions about
it?

A:    Yeah, he just said...  Maybe I did get a
chance to clarify before.  Remember I was tell you that
before we started this supervisory inquiry process we had
this other database and these other numbers.  I think
that was the process the Major Wertz and Major Williams
was familiar with as far as dealing with supervisory
issues.  So I was explaining to him.  I think one of the
questions he asked me was about administrative
warnings.  The administrative warnings Captain Ober
developed this, and to my knowledge this was something
he agreed with the Union.  That in new supervisory
inquiries that these notices or warnings would be
provided to effected personal.  I explained that to him.

78

Q:    So when do you not use an
administrative warning process?

A:    If you're just like, say for instance you're
out doing an investigation say a shooting incident and
there are troopers there that wasn't actually the shooter.
Well you wouldn't give them an administrative warning.
Just the person that was involved in the shooting.  Cause
basically all you're letting them know is that the
information that you're getting from them can't be use
against them in their criminal proceeding.  It's strictly an
administrative matter of the State Police.

Q:    Yeah, but you told me that there's an
issue here of whether or not the Commander intends to
look at discipline.

A:    And maybe I can clarify this for you

Q:    Sure

A:    When a supervisory, the way it's been
done since I've been cause I was at them after him, was if
their was a complaint that came in and it said the
Trooper was belligerent on the traffic stop.  Under normal
circumstances the Commanding Officer, put of my job is
to communicate with Commanders, and I would say hey
let's do it as a supervisory inquiry.  I'll call the guy and
let him know.  I'll tell him to be more careful when he's
talking to citizens.  But the Commander may say you

know this is the fourth type complaint.  So maybe he is
being a little over baring maybe we need to make a full
investigation out of it.

Q:    Well a full investigation though Rick is
not a supervisory inquiry.  I have loads of testimony on
that.  Right?

A:    Right

Q:    But how was Ober turned into a full
investigation?

A:    Well, let me finish my answer there.

Q:    I'm sorry

A:    What the Commander is doing is he or
she has made a determination that he is going to
consider formal discipline in the matter with the
repetitive conduct.  So now instead of it being the normal
we'll handle it at the Troop level now it's assigned to an
IAD investigation.  A full investigation cause that's what
the disciplinary officer has to act on when it comes in.

Q:    Yeah, but you know that in ever single on
of the examples you're given me, every single one of
them, you've mentioned that the individual allegedly did
something.

A:    No I didn't

Q:    No?

A:    No, no.  There are investigations done

were there is no misconduct alleged by directive, and there we have a category for non-complaint investigations. Non-complaint investigation are, I'll give you an example of one that I was involved in. When I was a criminal investigator I had a rape suspect. I had a warrant for, and he was suicidal and he fired a shoot in the direction of me and some other police officers. I never unholstered my gun. Then later on he ended up drawing done on us. Well the mere fact that I was present when that shoot was fired required an internal investigation. No one alleged I did anything, but the Troop commander at that time and determined that my actions were justified. But certainly one of the things investigations are designed to do are point out safety issues.

Q:     Just find out the facts.

A:     Right and there might be a training issue that results from that, a safety issue. Not only that a well being issue. Maybe one of us might have been effect physiologically about being close to gunfire. So there are investigation, I'll give you an example of another one, prisoner escapes. We got a prisoner in custody and some how the equipment malfunctions, the handcuffs brake, the guy slugs you in the head, and escapes. Well the police officer is basically a victim of an assault here, but

we do an internal investigation.

Q:     Same thing with the incident. Am I correct?

A:     Right

Q:     Investigating a fact situation or a incident. Did somebody explain at some time what the incident was about the FBI coming to Ober that Ober should be investigated for?

A:     Not to me

Q:     Did you ever hear of any reason?

A:     No sir

Q:     And the fact is as you sit here today you don't know of any reason. Do you Rick?

A:     I don't know what the powers above me, whatever reasons they had. I don't know that. I just know I was told that the Commissioner wanted an investigation into the facts of what occurred.

Q:     Well okay, into the facts of what occurred.

A:     Or the circumstance of what occurred.

Q:     In other words the circumstances of what occurred in the communications between Mr. Ober and the FBI.

A:     I mean that's an assumption

Q:     Well

A:     I don't know this sir

Q:     I don't do fishing exhibitions. I gotta have reasons to file complaints, and I'm asking if you know if this was an incident. If this was an investigation into an incident was it into communication between Captain Ober and the FBI? Now, you may not know. Was that the incident or the facts that were being investigated?

A:     Like I said I never discussed it with Major Wertz and Williams. I don't know what instructions they may have had sir. They didn't share that with me.

Q:     Did you ever any discussions about this incident or this investigation or whatever it was with Colonel Coury?

A:     No sir

Q:     How about with, is it Colonel Westcott?

A:     Nah, I would never discuss anything. He was Deputy of Operations. No discussions with him no.

Q:     Well do you know who chose, did Mr. Williams or Mr. Wertz indicate who chose them to do the investigation? Or the did they say we're here at the direction of the Commissioner or something like that?

A:     I think I was informed that they were investigating. I think Major Conley informed me that they would be conducting the inquiry.

Q:     For the Commissioner

A:     Right

Q:     Okay. That's interesting

A:     They're gonna be assigned to gather the facts.

Q:     So he didn't say for the Commissioner?

A:     I don't him saying it. I just recall I know Major Conley told me that the Commissioner wanted an investigation. At some point and time, I don't know if it was then or days later whatever, but at some point he mentioned to me that Major Wertz and Major Williams would be doing it. I don't know all that other verbiage.

Q:     I understand. In other words he didn't use the words " for the Commissioner".

A:     Right

Q:     That you can recollect.

A:     Right

Q:     Fair enough. Do you recollect if....Strike that. Did Mr. Conley indicate the he had spoken with Mr. Evanko?

A:     I don't recall him telling me that.

Q:     Okay do you have a recollection of him ever indicating that he was relaying this information to you in effect from the Commissioner himself or somebody close to the Commissioner?

A:    I don't know he got informed of what was gonna be done. Cause the Major in BPR comes under the Deputy of IAD. So I don't know who he discussed it with sir. I know he told me the Commissioner wanted an investigation.

Q:    Okay. Why did you go talk to Mr. Merryman?

A:    Why did who?

Q:    You

OPPOSING COUNSEL: Uh

MR BAILEY: All no that's not privileged. No, no no come one. Mr. Merryman is an individual that you went and investigated and talked to. There's nothing privileged about that conversation. It's not an attorney, you don't represent him.

OPPOSING COUNSEL: The reason that he spoke to Mr. Merryman was again part of the investigation that was directed by the attorneys.

MR BAILEY: I strongly object. Obviously I don't want to get into a contentious thing about this you. I'm asking you to please consider, if your gonna tell this man that I can't ask him about conversations that he had or for that matter, under proper circumstances even ask you if the circumstances were relevant. But your gonna instruct him that he doesn't not have to answer

85

questions about conversations he had with Mr. Merryman?

OPPOSING COUNSEL: If it was part of the investigation that we requested him to do, yes that's what I'm directing.

MR BAILEY: Alright well, I very strongly object. Let me ask you some of the things you did as opposed to what you discussed did you deliver a affidavit form to Mr. Merryman?

OPPOSING COUNSEL: He doesn't have to answer that.

MR BAILEY: That's what he did. I'm not asking what he said.

OPPOSING COUNSEL: I think investigation details would cover action as well as word.

MR BAILEY: I think that you people are trying to hide and obviously escape this lawsuit. I think what you're doing is highly improper and I don't think you can run around and protect yourselves and protect your clients by taking some investigator and calling that attorney product or work product or whatever you call it. Cause I don't think it is, and then when that person goes and talks to somebody allegedly I can't question your investigator about it. I think that's

OPPOSING COUNSEL: Alright Counsel with

86

all due courtesy, attorney work product the was certainly not created or born with this particular litigation, but is a process and procedure of long standing in the department. Secondly, you recall of course that Major Merryman and was deposed with regard to his choice to testify concerning what if anything he said to or was asked by Captain Brown. So therefor you have not been excluded sir.

MR BAILEY: That's what takes this privilege away. Even if it existed.

OPPOSING COUNSEL: That's takes it away as to the Attorney/ Client Privilege with regard to Major Merryman. This is a total different doctrine of Attorney Work Product. So our objection remains, and it remains as to acts as well as conversation. Just to answer your

MR BAILEY: Well when you went and talked... Okay well I disagree with you. When you went and talked to Mr. Merryman where any of the attorneys present?

OPPOSING COUNSEL: Again the same objection.

MR BAILEY: The question is whether or not the attorneys were present. I think you have to answer that. Just tell me if they were present.

OPPOSING COUNSEL: He doesn't have to

answer any questions regarding anything he did at our direction. I already told you that that was at our direction. He doesn't have to answer questions about that.

MR BAILEY: Are you denying that you went and questioned Mr. Merryman?

OPPOSING COUNSEL: He's not answering the question.

MR BAILEY: Are you denying that you had any conversations with Mr. Merryman?

OPPOSING COUNSEL: Same objection

MR BAILEY: And are you denying that during the conversation you had with Mr. Merryman, are you indicating that the attorney where or where not present?

OPPOSING COUNSEL: Same objection

MR BAILEY: Now I want to hear you tell me that you're not answering those cause you've been instructed by counsel. She's not testifying here. She's not under oath. Is it fair to say, and you have to answer this and if you don't I'm gonna call the judge. Is it fair to say that the group of question that I just asked you a few minutes ago, and I need a verbal response, you have not answered these questions on advice of these attorney here today. Is that correct?

MR BROWN: That is correct sir.

88

1  Q:  Okay.  I'm gonna move on to some other

2  areas.

3      TONY MARCECA:  Mr. Bailey before we move

4  on can we take this minute and change both tapes.

5      MR BAILEY:  Okay.  Just take five minutes

6      TONY MARCECA:  It's 11:26 and we're going to

7  go off camera to change the tapes.

8      TONY MARCECA:  It's 11:26 on March 5,

9  2002.  We put a new tape in and we are continuing

10  the deposition of Captain Brown.

11      MR BAILEY:  Rick I'm gonna a change.

12  Completely change direction here one more time.  I'm

13  gonna go in the area of what I refer to, and I know you'll

14  know what I'm talking about, the museum investigation.

15  Okay?

16      A:  Oh, okay

17      Q:  Artifacts or whatever

18      A:  Okay

19      Q:  Just maybe.  Cause your counsel had

20  asked me how much more time.  I think we can finish up

21  in less then thirty minutes here.  What do you know

22  about that?  My understanding is a background, I'll give

23  you an offer here.  That there was some type of

24  investigation into Captain Ober about either PSP

25  Museum of potential museum items etc.  What can you

89

1  tell me about that?

2      A:  What I recall about the was that there

3  was a representation that some how that Captain Ober

4  has used his position with the department to secure

5  artifacts, State Police artifact, for his own private

6  collection.  That the people he was contacting were lead

7  to believe were going to the museum Commissioner not

8  to him personally.

9      Q:  Okay

10      A:  Something along that line

11      Q:  Yeah, and before we go in to, I have a lot

12  of question about this area by the way.  Although I think

13  they're rather perfunctory.  Is it fair to say that the

14  investigation yielded, in fact Captain Ober had not done

15  anything wrong and it was unfounded?

16      A:  That's correct to my knowledge.

17      Q:  Okay let me go back.  Did you do that

18  investigation?

19      A:  Me personally?

20      Q:  Yeah

21      A:  No

22      Q:  Who did?

23      A:  Corporal Robert Mrgich from the Internal

24  Affairs Division.

25      Q:  And that's M-R-

90

1      A:  M-R-G-I-C-H

2      Q:  Mrgich, I think it Ukrainian.  I had a

3  friend named Grgich one time, a fine family.  Okay, I'm

4  gonna ask you, if my research serves me correctly

5  Corporal Mrgich was an IAD guy.

6      A:  Correct

7      Q:  Where was Captain Ober at the time this

8  investigation was done?

9      A:  He would have been at the IIMS project.

10      Q:  He in other words was detached.

11      A:  Correct

12      Q:  You know Judge Rambo, a very highly

13  respected federal judge with a great deal of experience, I

14  believed in certain cases indicated that detachment is not

15  a permanent kind of thing you're still part of an

16  organization.  Am I correct?  In other words if you're

17  detached to some duty you are still assigned to a certain

18  place at least for administrative purposed, although you

19  may not be there physically work.  That's really were

20  you're organization home is, i.e. sent out to some other

21  sort of duty.  It might not be even be related to what you

22  do, but he's attached from.  In other words, he's actually

23  IAD, but he's detached to IIMS.  Is that correct

24      A:  Correct

25      Q:  Okay

1      A:  That's sounds right.

2      Q:  Alright.  Why was Corporal Mrgich who

3  was with IAD investigating Captain Ober who was with

4  IAD.

5      A:  The only thing I can... Each situation is a

6  little different.  This wasn't something, this was done as a

7  supervisory inquiry.  There wasn't allegations that

8  Captain Ober committed any crimes.  It was a low-level

9  kind of thing.  Were as the other situation, who knows

10  what could have came out of that.

11      Q:  Yeah

12      A:  it could have been a bad, I mean I don't.

13  The supervisory into the museum thing was low grade.

14      Q:  Compared to the FBI thing?

15      A:  Right

16      Q:  What could Ober have done?  Was he

17  disloyal to their Commissioner?

18      A:  I don't know what he did.

19      Q:  Is there a crime called disloyalty in the

20  Pennsylvania State Police?

21      A:  Not to my knowledge.  I think there is

22  something about disloyalty to the department, but I don't

23  know where that is exactly.

24      Q:  No pun intended and I mean that.  It

25  almost sounds distopalistic  doesn't it?  I mean disloyalty

92

to the leader or something.

    A:    Like I said, I don't recall anything anywhere saying loyalty to the Commissioner. I think it's loyalty to agency, organization, department.

    Q:    Okay. What facts come to your mind when you say to me as response to a question, the museum thing is a minor little thing compared to that other thing, the other investigation into Ober? What was going through your mind?

    A:    About the museum?

    Q:    Yeah. What comparison were you doing?

    A:    Really I wasn't doing any comparison that I can recall.

    Q:    No you probably weren't. Now to you the gravity of those two things was significantly different wasn't it? That's what you told us.

    A:    Well the thing is the Commissioner requested an inquiry. However two Majors got assigned. The deal with the museum, if my memory serves me right, I think Major Conley told me it would be best done as a supervisory inquiry.

    Q:    Well

    A:    I mean it was something, I mean me personally, I mean I know Captain Ober collected thing. You know maybe it was a misunderstanding.

93

    A:    It's a little different thing.

    Q:    Admittedly it that would be different. I'll withdraw the question. It wouldn't have any basis, I agree. Now do you know had initiated the investigation on the museum thing?

    A:    What I recall of that is, he's a retired I don't if he was a Colonel or a Lieutenant Colonel, but he's a retired guy, Trooper named Phil Conty. He sent correspondence to Lieutenant Colonel Coury. Then Lieutenant Colonel Coury, I think at that time, referred it over to BPR and then it came to me from Major Conley. I think that's how it went.

    Q:    Do you know whether anyone just called Captain Ober up and asked him what was going on?

    A:    Oh, no I don't that.

    Q:    You don't know how it was conducted or?

    A:    How the inquiry was conducted?

    Q:    Yeah

    A:    I know that Corporal Mrgich interviewed Phil Conty and interviewed a couple of the women and I'm pretty sure he interviewed Captain Ober.

    Q:    Okay. Was there a, I'm having a hard time understanding why in the museum situation it was a... Well I guess actually your response to questions. I'm think of, let me stop doing that. I'm messing up this

    Q:    Okay

    A:    So I wasn't looking at it like, Oh my God Captain Ober's getting artifacts.

    Q:    Well if someone misrepresented their roles of State Police Officer that could be a crime though. Am I correct?

    A:    It depends on the situation of how they represent themselves. I mean he's a police officer. So he's not misrepresenting himself if he say I'm a Captain in the State Police. He is representing himself.

    Q:    Well it would be misrepresentation if you say this is for some particular organization and it's for him personally. Don't you have an individual being investigated for that right now in the southwestern part of the state?

    A:    For doing what?

    Q:    For allegedly misrepresenting their role in purcuring artifacts or something or am I mistaken?

    A:    There is a member that was arrested for, it wasn't to my knowledge securing, like what Captain Ober was doing. What he was actually doing was removing State Police property,

    Q:    Wow

    A:    and selling it for a profit.

    Q:    Okay

94

record. The museum investigation you had indicated that there was some decision made at some point that it was a supervisory inquiry kind of thing, whatever that is, right?

    A:    Right

    Q:    Alright hold on just one second.

    MR BAILEY: Okay, it's a supervisory inquiry. What' an administrative inquiry?

    MR BROWN: Administrative inquiry is not defined in our AR-425. We don't have definition that says administrative inquiry. What it says is administrative investigation are inquiries.

    Q:    Right

    A:    Administrative inquiries into allegations of misconduct or into investigations by directive, such as the Commissioner's request, where no misconduct is alleged.

    Q:    I wonder what's so special about, I mean who's the... I don't mean any disrespect.

    A:    I understand sir. I don't take any.

    Q:    Yeah. What's so special about the Commissioner? You know, if I'm in the Army and the Chairmen of the Joint Chief of Staffs comes down and he says he want some private investigated on a fire base somewhere, he has no more authority none, zero, and

96

1   believe me he doesn't under the Army's system, okay.
2   Has no more authority, no more weight, as a matter or
3   fact he has less authority and weight then that private's
4   Commander to initiate and investigation or even to
5   punish. Can you tell me what, in the FBI investigation,
6   what it had to do with Colonel Coury? I mean, I'm sorry,
7   with Colonel Evanko. Do you know? I mean, that's an
8   honest question. As you sit here today do you know
9   what it had to do with him?
10          A:   No
11          Q:   Okay. On the museum investigation
12          A:   Did I answer your question on that sir?
13          Q:   Yes sir, you did. No you did. You did.
14  You answered it perfectly. That's what I expected you to
15  tell me. From what I know, I don't know what it had to
16  do with him. I don't know what he was doing ask for this
17  investigation. I don't know what lead to it. I don't want
18  he asked. Do you know whether and questioned, you
19  know just simply got a hold of Captain Ober and said
20  Captain come on in here, tell me about this. What went
21  on?
22          A:   No
23          Q:   Do you know when that ever occurred?
24          A:   No
25          Q:   Okay. Did anyone ever indicate to you

1   the Mr. Conty was trying to encourage or looking for
2   complaints against Captain Ober? Did anybody ever
3   indicate that to you?
4          A:   No
5          Q:   What about Colonel Coury? Did Colonel
6   Coury become involved in the museum investigation at
7   all?
8          A:   The only recollection I have of him
9   besides, I think Phil Conty sending the correspondence to
10  him. I think he would have been the adjudicator. I think
11  he was the adjudicator of that.
12          Q:   Is that proper?
13          A:   Well I mean, normally if, I'll give you an
14  example. If I'm a Troop Commander and someone in my
15  command had an investigation on them, normally the
16  Troop Commander would be the adjudicator. Unless
17  they're somewhat involved in the investigation or
18  complaint or some sort. I've seen situations where
19  depending on what was under investigation, I think the
20  Deputy Commissioner of Administration can designate
21  someone to adjudicate a case. So I mean it's not hard
22  and fifth and in every situation it's gotta be this person or
23  that person. There occasions where Deputy Admin. Can
24  say that this person is gonna adjudicate this particular
25  case.

1          Q:   Well was Mr. Mrgich assigned by Colonel
2   Coury?
3          A:   No. I probably gave that to him.
4          Q:   You had a Corporal investigating a
5   Captain? Is that normal?
6          A:   Well you know in IAD they can
7   investigate.
8          Q:   I understand they can, but how normal
9   or?
10          A:   It happens.
11          Q:   It happens?
12          A:   Yes it happens.
13          Q:   Okay. The supervisory inquiry is a
14  creator of regulation, defined and described by
15  regulation, right?
16          A:   No
17          Q:   It's not.
18          A:   No
19          Q:   Supervisory inquiry isn't?
20          A:   No sir. This was something that what I
21  recall, I'm pretty sure this was Captain Ober's brainchild.
22  It was something that was gonna be part of a special
23  order. Cause when he went to IIMS I has to pick up on it
24  to try to finish it. So it never, I mean it never got signed
25  and put in to practice, but it was being field tested during

1   that time.
2          Q:   Well
3          A:   I mean there's been a couple hundred of
4   them.
5          Q:   Supervisory inquiries?
6          A:   Well back when that was going on, I
7   think back around that time we had like a hundred and
8   some of them.
9          Q:   Do they have number assigned?
10          A:   Yes sir
11          Q:   Because when you told us this
12  investigation that was done at the Commissioner's
13  request until this I guess some how by accident or in
14  passing the issue of ut-oh there's no number here, until
15  that come up it didn't even have a number from what you
16  told me.
17          A:   Right and as far as ut-oh I don't think
18          Q:   Okay. Can I take my ut-oh back?
19          A:   Supervisory inquiries?
20          A:   Well back when that was going on, I
21  think back around that time we had like a hundred and
22  some of them.
23          Q:   Do they have number assigned?
24          A:   Yes sir
25          Q:   Because when you told us this

investigation that was done at the Commissioner's
request until this I guess some how by accident or in
passing the issue of Ut-oh there's no number here, until
that come up it didn't even have a number from what you
told me.

A:    Right and as far as ut-oh I don't think

Q:    Okay.  Can I take my ut-oh back?

A:    Yeah Major Wertz kind a said

Q:    Did he us the word "whoa"?

A:    Well no

Q:    He didn't?

A:    Well I don't remember using a whoa, but I
think what it was, the context of the conversation was I
don't think we took a number for this.  Then I said
something the Major Conley about what they were doing,
and he says it an investigation at the request of the
Commissioner.  I wrote it up, put the number on it and
gave it to them.  So that the Tracking would be there.

Q:    Well

A:    Whether I was right or wrong, that's for
somebody else to judge.

Q:    No, no

A:    I thought I was doing the right thing.

Q:    I certainly not in question whether you
were right of wrong.  At least somebody put it in the

system.  But you seem to be telling me now, if I
understand you, and not that it's different from anything
that you said.  I'm not impeaching you here.  My
understanding is then you did this, was it at the request
of Mr. Conley?

A:    Which?

Q:    To fill out that form.

A:    No he didn't request me.  I just did it.

Q:    Cause it was the right thing to do?

A:    Right

Q:    So you weren't asked to do it by Williams.
You were not asked to do it by Wertz and you were not
asked to do it by Conley.  You were not asked to do it by
Coury.  You were not asked to do it by Westcott.  You
were not asked to do it by Evanko.

A:    Sitting here

Q:    There was no request.  It was just you
being a responsible person in that position and said I
better do this.

A:    That's basically what happened.

Q:    Okay.  Right now, do you know whether
there a complaint verification on the museum thing?

A:    I don't think there was a complaint
verification form, but there was a complaint verified in
written by Mr. Conty.  Which is our policy to except

those.

Q:    Well did somebody get back to Mr. Conty
and ask him why he said this and what it was about?

A:    I'm pretty sure Corporal Mrgich
interviewed him.  I think he was interviewed about his
complaint letter.

Q:    Okay.  Do you remember, if you recollect
what his response was?

A:    Oh no I don't.

Q:    But that would be in the file, if we ever
get them.  I mean that would be in there, right?

A:    Right

Q:    Okay.  In a supervisory inquiry...Strike
that.  Full investigation, full you know the big jobby.

A:    Okay

Q:    The big one.  In a full investigation can
the individual say I refuse to respond or answer?

A:    They can, yes

Q:    At that point can the investigator say
okay and read you your so called administrative
warnings or rights whatever.  Then if the person still
refuses to answer technically it can be insubordination
and they can even be dismissed.  Am I correct?

A:    Well

Q:    Correct me on that.  Tell me

A:    What would have to happen is the
investigator would have to report that to somebody like
me, and then what may be the next step in the process
would be to get in touch with the individual's
Commanding Officer and have an order issued.  A written
order saying you will cooperate with the investigation.
Then once that's done and they're served with it and they
didn't comply then there could be an investigation for
insubordination, well there could be a lawful order.  I
mean this would be a very simple investigation, here's the
lawful order he did comply, and discipline could result of
it.  Whether or not it would be termination or not the way
our system is set up that would go before an arbitrator
and the arbitrator would decide whether the person.  I
mean the department can move to dismiss, but it's up to
the arbitrator whether or not the person's actually
dismissed.

Q:    Do you know whether Mr. Wertz and Mr.
Williams interviewed Captain Ober at sometime?

A:    Oh yes

Q:    Okay.  Now did you ever listen to that
tape of that interview?

A:    No

Q:    Was it taped?

A:    I believe so.  I believe so cause I think he

1 asked to barrow a tape recorder.  I think Major Wertz or
2 Williams asked to barrow a tape recorder from either me
3 or one of my guys.
4     Q:    Where did they do the interview?
5     A:    You know I'm not sure.  I'm not sure
6 where they did his interview.
7     Q:    Do you know that the... I remember
8 reading State Police regulations abut supervisory
9 inquiries.  Did you say that that wasn't written into the
10 regulations?
11     A:    Let me give a little background.
12     Q:    Yeah
13     A:    First of all AR-425?
14     Q:    Right
15     A:    It came out in '93.  When I first came to
16 BPR in '94 my Captain, Sam Gore at the time, was like
17 we got to rewrite 425.  This thing has be in the revision
18 stage for nine years now, and even with the discipline
19 committee we're try to hammer out these different things.
20 So what happened with the supervisory inquiry when
21 Captain Ober left I pick up on it.  I basically had a meet
22 with the Union.  It was a monthly meeting, and kind of
23 hammered out, just fine-tuned it a little bit and it was
24 getting ready to go to press.
25     Q:    But it had been in the

105

1     A:    It was being worked yes.  It was being
2 worked
3     Q:    Well but my question sir, not to interrupt
4 you.  But my question is was it in writing in some form in
5 426 before you put it in?
6     A:    No
7     Q:    Okay
8     A:    It's still not in writing in 425.
9     Q:    Where is it in writing?
10     A:    Just the draft that Captain Ober gave me
11 and then what I ended up continuing to put together.
12 But it was never
13     Q:    Then other then a full investigation what
14 were the regulations that governed the actions of Mr.
15 Williams and Mr. Wertz in the early summer of 1999?
16     A:    Well AR-425 and basically what I
17 informed them about the process that Captain Ober
18 developed.  I don't know if Captain Ober had got some
19 authorization from the Major or from the Deputy or
20 whoever, but that was something that was being done
21 and still being done to this day.
22     Q:    Are you telling us that Captain Ober
23 developed the process that was used to interrogate him?
24 Is that what you're telling me?
25     A:    He developed the supervisory, I think it

106

1 was his idea.
2     Q:    So did he deserve what he got then?  Is
3 that what you're telling me?
4     A:    Well I'm not telling you at all.  I just
5 saying that he developed the process, and that was the
6 process to my knowledge that they choose to follow.
7     Q:    Well where was the process written
8 down?
9     A:    It was written down in a draft form.  We
10 had a draft.
11     Q:    Okay
12     A:    Of a special order
13     Q:    Okay
14     A:    But it had, matter of fact it did go to
15 Research and Development.  It did go over there.
16     Q:    Okay.  When?
17     A:    I want to say,  when did it go over?
18 During this time frame I had a lot going on and I'm trying
19 to remember.  Cause it did have a whole lot to do.  I met
20 with the PSTA.  They hammered it out.  I'm think the
21 later part of the year of '99 maybe.  It may have went over
22 there, cause Major Merryman, I recall seeing a blank slip
23 with Major Merryman's name on it.  I thought, and
24 something in the later part of '99 maybe.  But then what
25 happened, what in effect happened, I was at the

1 discipline committee meeting and the Union in the new
2 process we're developing wanted to do away with the
3 supervisory inquiry.  Says yeah we never, it's not in the
4 regulations.  Just do away with it.  We're gonna come up
5 with a new system.  So that's the reason it wasn't
6 pursued any further to my knowledge, but the Troop
7 Commanders that I deal with they like it.  They like it for
8 dealing with for dealing with minor stuff.
9     Q:    Well
10     A:    I've been told not to use it.  Put it that
11 way.
12     Q:    Okay.  Who appointed Wertz and
13 Williams?
14     A:    Appointed them?
15     Q:    Uh-hum
16     A:    To the investigation?  You mean assigned
17 them?
18     Q:    Yeah assigned them
19     A:    I don't know who made that decision sir.
20 I wasn't a part of any.  Nobody consulted me about
21 whether they should be the ones to do the inquiry or
22 whatever.  I was not a part of any of that.
23     Q:    Well how many other investigation like
24 that do you know of?
25     A:    Do I know as far as?

Q:   Where somebody appointed investigator to investigate somebody and it's not its not done through IAD?

A:   Well maybe I can clear this up for you.

Q:   Sure

A:   The Director of the Bureau of Professional Responsibility retains supervisory authority for all of investigations assigned to the bureau.  My job as the Director is to pick that up in his absence or unless he delegates me to do that, but really it's his responsibility.

Q:   I'm not talking about responsibility.  I'm talking about what's been done.  What was done.

A:   I guess the point I'm trying to make is if the Director of BPR has talked to a Troop Commander, say for instance, about a complaint and he calls me in the office and he says "hey I want this investigation done.  I talked to the CO and I want this person to do it."  It shall be done.

Q:   Okay.  Are you tell us that Major Conley assigned Wertz?

A:   That I don't know.  I don't know.  I don't know how...

Q:   What situations, here's what my question was.  What situations other then Captain Ober and/or IAD assigned investigators?  Strike that.  Let me rephrase

109

A:   Let me and hopefully this clarifies it.  Not all complaints

Q:   Yeah, do you know of any other situations?

A:   I mean I don't know.  I mean the people from the field, I mean Internal Affairs isn't the only entity that does investigations.

Q:   Into Pennsylvania State Police internal

A:   Right

Q:   Who does?

A:   Well you have field non-commissioned officers in the field and even up to Lieutenants.  Depending

Q:   To appoint investigators?  Take people and say this is your duty to go investigate.

A:   Right.  Say for instance if a Troop Commander calls me and says I have a complaint on Rick Brown in my troop.  I've assigned, he would tell, I've assigned Sergeant Joe Smith to do the investigation and I will just pen that information right on to the file.

Q:   Yeah you enter it.

A:   But that CO decided who was gonna investigate it.  They don't ask me if it's okay.  They say this is who I want to do it.  The only time that I get to pick an investigator in my daily wick is when it's

that.  What situations do you know of other then Ober where BPR and/or IAD did not assign investigators?  I'd like to know.  Then I'm gonna ask you question on what authority an Area Commander has, Colonel Coury has to assigning investigators to investigate people.  Cause I want to know where it is in your regulations cause I can't find it.

A:   Let me just say this about AR-425.  It's not all inclusive of everything and every circumstance or situation you could come across.

Q:   Okay, but that's not what I'm asking you.

A:   Okay

Q:   I'm not asking you, now wait.  Wait Rick.

A:   Okay

Q:   I'm just asking you aside from Captain Ober.

A:   Okay

Q:   Do you know of, cause see all of us can read 425 and try to figure out what it says.  Ultimately a judge is going to decide.  We're not gonna decide that the judge is gonna decide what it says.  My question is aside from the investigation into Captain Ober What other situations do you know of where investigators where appointed outside of BPR or IAD and an investigation was done somebody?  That's all I'm asking.

110

assigned to the Internal Affairs Division where I have control of those investigators.  Now when I was a Lieutenant I would designate which one of the investigator under me would do it, but as the Director I give it to their section Commander.  They look at caseload or whatever and they determine who gets the work.  I leave that up to their judgement.

Q:   You leave that up to them?

A:   Yes.  I mean if there's something the comes in, I'm not gonna say that's 100% of the time.  If something comes in and I think, and I say this is something that I have a guy

Q:   So a field Commander can take some people assign them to investigate one of his people.  They don't even have to call you or tell you.  Right?

A:   Well they can actually do an inquiry before calling us, absolutely.

Q:   Well, no no no.  I'm talking about assigning investigators and have them go out and investigate somebody without letting you know.  They don't even have to tell you, right?

A:   Well I'm trying to think the best way to answer this.  If a Commanding Officer gets a complaint and it's vague they may assign someone to go out and track down some additional information.

Q: Sure

A: And you can call that an investigation or whatever, but it may be just trying to get some additional facts to determine whether it should come to us.

Q: If they get some information?

A: Right

Q: So Colonel Evanko can tell us, he's the guy that started this, he got to be able to tell us why and for what reason he did this right?

A: You have to ask him that.

Q: Yeah, cause he'd be, I guess nobody else knows. He has to be the guy that knows right?

A: Yeah, he didn't consult with Rick Brown.

Q: Okay. No he didn't consult with you. Which attorney assigned you the so-called Attorney Work Product investigation that's been discussed here? Who was it?

OPPOSING COUNSEL: I don't have a problem with it.

MR BROWN: It would be Chief Counsel

MR BAILEY: Barbara? Okay. Who told you to take the copy of the Stackhouse investigation from Captain Ober? Who told you to do that?

A: I don't remember if it was. Would I have talked to Captain Skurkis about that. I don't know if

113

Q: But why was it taken back? Do you know what it was for? Why was it taken back? Why was it retrieved from him?

A: Well actually he could have looked at it there anytime. We had no problem with him coming over to BPR and looking at that file.

Q: Do you know the defendants in this case?

A: Do I know them?

Q: Sure

A: Yes

Q: Did you ever have any discussions with them regarding Mr. Ober's transfer to Washington Pennsylvania?

A: No

Q: Or purported transfer that never. I guess, what's the penalty box? What is that?

A: That's just a term I think that's an organizationally thing. You know guy's talk. I think that, I'm just trying to think. If somebody perceives that you did something wrong and you're assigned here or you're doing something different that might be perceived as you're in the penalty box.

Q: Does that mean you're held in disfavor, you're ostracized?

A: No

Captain Skurkis was acting or if it was the Major.

Q: Well didn't you tell Captain Skurkis or were you ordered by Skurkis to take the copy from Ober. Do you remember?

A: I don't recalled per say. See there was things going on with Stackhouse that other people need to see the report. Like the investigator, Sergeant Rain. So for him to just be able to keep if for an indefinite time period would not be, I mean

Q: Well somebody told you to go get it or do you have your own?

A: Well I think it was Captain Skurkis.

Q: Why?

A: Cause there was coming up with her. Through the Union they had filled a lawsuit, and there was gonna be depositions and other people had to review to refresh themselves on what they did so they could be prepared for their deposition. That's recalling it the time frame. I remember Sergeant Rain coming to me saying "Hey am I gonna be able to look at the report", and that was the only, I think he had the original which was the only copy of it at that time.

Q: Did somebody say that Ober wasn't to testify in that matter or wasn't to be involved in it?

A: No

114

Q: What does it mean?

A: Well to me, what it means to me is really it doesn't have a lot of meaning to me because I treat everybody. Well, like in Captain Ober's case

Q: Well no, I'm not indicated it has anything to do with you personally.

A: I mean I can't speak for other people.

Q: I'm not asking you to speak for other people. I'm asking you, Rick Brown, to give me an honest definition of penalty box means. I mean being in the doghouse. Is it like being in the doghouse?

A: I cause you could say that.

Q: Well what would you say?

A: Could be in the doghouse.

Q: Alright. Do you have any recollection of any discussion with any of the defendants regarding Mr. Ober's transfer to LCE?

A: No

Q: Did you do an Internal Affairs investigation into allegations of misconduct involving Lieutenant Colonel Westcott and Trooper Mark George?

A: Yes

Q: What was the complaint about?

A: It was an anonymous compliant number one, and it worded in such that it was implied that it

1 could be criminal. It had to do with supposedly Colonel
2 Westcott was in the process of getting his pilot's license,
3 and Mark George was a pilot. The allegations were that
4 using state time to fly, and become licensed while he's
5 working kind of thing.

6   Q: Alright

7   A: Something to that effect

8   Q: Okay. Did Westcott and George know

9 each other in fact?

10   A: To my knowledge they knew each other

11 yes.

12   Q: Did you ever have any problem arranging

13 an interview with George?

14   A: With George?

15   Q: Yeah

16   A: No

17   Q: Okay

18   A: He was stationed up in like around

19 Wyoming.

20   Q: Did you ever discover any facts indicating

21 that George had been tipped off by Mr. Westcott?

22   A: Tipped off about?

23   Q: Anything

24   A: About the complaint?

25   Q: Whatever

117

1 I know all the facts.

2   Q: Well do you have any opinions? You're

3 aware of the efforts made by the Pennsylvania State

4 Police which failed obviously to transfer Mr. Ober to

5 Washington County, correct? You were.

6   A: Yes

7   Q: You're aware that he was assigned to a

8 Lieutenant position in LCE. You're aware of that aren't

9 you?

10   A: Yes

11   Q: You're aware of some of the grievance

12 issues over like expenses and his telephone, aren't you?

13   A: I heard

14   Q: Some awareness

15   A: Yeah some awareness

16   Q: Right. Is Captain Ober going anywhere in

17 the Pennsylvania State Police?

18   A: Is he doing what?

19   Q: Is he going anywhere? Is he pretty much

20 at his career end do you think?

21   A: I certainly don't think he's at his career

22 end. He's a Captain already. He's got one more jump to

23 make to Major and even with his time on him. He came

24 in a couple classes after me so he's got probably twenty-

25 one years on. Close to twenty-one years or He'll have

1   A: No

2   Q: You have recollection of learning or

3 receiving information that a group of cadets was retested

4 at the academy cause a applicant named Colleen Young

5 failed her physically testing portion of the process?

6   A: I don't, like I said hear say kind of thing.

7 I don't know how mentioned it, but I did hear that

8 somebody was retested, but I don't know who it was and

9 why.

10   Q: No, that a whole group was retested to

11 protect the person.

12   A: A whole group?

13   Q: Yeah

14   A: I just hear about some retests but I don't

15 know who they were and why.

16   Q: Do you know who Colleen Young is?

17   A: No

18   Q: Do you think that, do you have an

19 opinion as to whether Darrell Ober is acting properly in

20 bring this complaint? Do you have an opinion about

21 that, a personal opinion as a colleague and as a

22 Pennsylvania State Police Officer?

23   A: You mean bring the lawsuit?

24   Q: Yeah

25   A: I kinda, my opinions will be formed when

118

1 twenty-one years. Who knows he might be friends with

2 the next Governor and be the Commissioner. So I don't

3 think his career's over.

4   Q: You ever indicate to any body that he was

5 over doing it? You know he's lost control or anything like

6 that. Did you ever say that to anybody?

7   A: Not that I recall, no.

8   Q: I'm gonna read you a letter. It's got a

9 date on it, which is before March of 2001 okay. It says:

10 Captain Ober where do I begin. Through adversity you

11 stood talk for your beliefs. You're a winner. Let know

12 one tell you differently. I'm proud to have serve with you.

13 You taught me, lead me, and supported me through

14 some very difficult times and have been a loyal friend.

15 You have protected me and provided me with

16 opportunity. Thanks Captain for your trust, confidence,

17 and faith in me during some difficult times. I will never

18 forget what you have done for me. Hopefully one day we

19 will work together again. I can't begin to tell you what it

20 meant to me to see you and Kim at the ceremony. I'll

21 never forget your support. Thanks again Captain.

22 Thanks Kim, Rick. You write that letter?

23   A: I recall that, yes

24   Q: Why? Why did you write that letter?

25   A: Well through out this time period, when

1  Captain Ober before he went to IIMS he offered me
2  training opportunities. Well he did things a boss would
3  do.
4      Q:  Okay. I'm not trying to embarrass you.
5      A:  I don't feel embarrassed
6      Q:  No, but I just want you to know I'm not.
7  Let me just do this this way. Did Captain Ober ever do
8  anything to harm you?
9      A:  No
10     Q:  Alright. Is it fair to say that you believe
11  that if you did something wrong and were deserving of
12  discipline that Captain Ober would discipline you?
13     A:  Oh, yes. I believe so.
14     Q:  And you're probably the kind of person if
15  you look in a mirror, is it fair to say the you believe that if
16  someone who were within your command or you had a
17  duty to supervise if they did something wrong you would
18  treat them fairly?
19     A:  Correct
20     Q:  And how many years you've been in the
21  Pennsylvania State Police?
22     A:  Twenty-one years
23     Q:  Based upon knowledge you have was it
24  fair to send Captain Ober to Washington Pennsylvania?
25  Based upon what you know.

121

1      A:  But that's just it. I didn't know much. I
2  don't know what the reason was.
3      Q:  Well what do you know today, Rick?
4      A:  Well, I don't know all the facts.
5      Q:  You don't know all the facts?
6      A:  No
7      Q:  Well I'll tell you what, I'll wrote you a
8  letter when all the fact are known and I'll ask you the
9  question again. Okay?
10     A:  That's fine
11     Q:  You and I will have an agreement,
12  alright?
13     A:  That's fine
14     Q:  Alright. Now what about assigning
15  Captain Ober to LCE? Was that fair, Rick? Do you know
16  enough facts about that to give us an opinion based upon
17  your years with the State Police?
18     A:  Nah
19     Q:  Was it fair?
20     A:  I don't have an opinion on that. Cause I
21  know there was some court action on
22     Q:  Alright. That's fine. I understand you've
23  stressed your opinion. Now let me ask you this question
24  sir. Can you tell me how many years in the State Police?
25  I may not have heard you correctly.

122

1      A:  Twenty-one
2      Q:  Twenty-one. Twenty-one years in the
3  Pennsylvania State Police. How many times has a
4  Captain been assigned to a Lieutenant's position in the
5  Pennsylvania State Police during your twenty-one years
6  that you can tell me?
7      A:  I don't know
8      Q:  Have you ever know of that?
9      A:  Me personally I haven't, no.
10     Q:  You have no knowledge of that ever
11  happening aside from Captain Ober? Now you're not
12  questioning that it happened to Captain Ober?
13     A:  No, no, no, no. I'm just say, you said
14  except him.
15     Q:  Right
16     A:  Nah I
17     Q:  Except for him you don't know of that
18  ever happening.
19     A:  No
20     Q:  Alright I don't have any more of you.
21  Your attorneys may have some questions of you.
22     OPPOSING COUNSEL:  I don't have any.
23     MR BAILEY:  Rick I'd like to express, he's
24  gonna shut the investigation. The investigation they we
25  go. He gonna shut the camera down and the deposition.

123

1  I'd like to express my gratitude to you for coming in here
2  and answering questions the best that you can. I
3  sincerely appreciate your cooperation. Thank you.
4      MR BROWN:  Thank you sir.
5      MR BAILEY:  Tony you want to end this?
6      TONY MARCECA:  The time is 12:20 and it's
7  the 5th of March. This now concludes this deposition of
8  Mr. Brown.
9
10
11              **INDEX**
12
13

425: 24, 96, 106, 107, 110, 111

Artifacts, 90
attorney work product, 8, 13, 31, 32, 87

BPR, 17, 20, 21, 26, 30, 32, 35, 58, 64, 73, 75, 85, 95, 106, 110, 111, 115
BPR number, 17
Bureau of Professional Responsibility, 5, 7, 109

Captain, 5, 7, 10, 11, 12, 13, 14, 15, 20, 26, 28, 29, 33, 35, 37, 38, 39, 41, 42, 49, 50, 51, 52, 54, 56, 58, 60, 63, 64,

65, 75, 77, 78, 79, 83, 87, 89, 90, 91, 92, 94, 95, 96, 98, 99, 100, 105, 106, 107, 110, 111, 114, 115, 116, 120, 121, 122, 123, 124
CLEAN message, 12, 38
Commissioner, 12, 13, 14, 15, 16, 17, 18, 22, 24, 30, 36, 37, 39, 44, 49, 58, 63, 64, 65, 83, 84, 85, 90, 93, 94, 97, 99, 101, 102, 120
Conley, 15, 16, 17, 18, 19, 20, 21, 22, 25, 36, 39, 49, 55, 63, 64, 84, 85, 94, 95, 102, 103, 110
Coury, 2, 18, 39, 83, 95, 97, 98, 99, 103, 110

department, 11, 41, 49, 74, 87, 90, 93, 105

Director, 7, 11, 13, 20, 22, 26, 47, 66, 73, 109, 110, 112
discipline, 11, 35, 79, 80, 105, 106, 108, 122

Evanko, 2, 12, 60, 67, 85, 97, 103, 111

FBI, 6, 7, 13, 14, 15, 16, 21, 39, 40, 42, 43, 44, 45, 46, 47, 49, 54, 58, 59, 60, 61, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 82, 83, 93, 97
full investigation, 81

George, 117, 118

IAD, 6, 7, 20, 23, 26, 27, 32, 35, 66, 75, 81, 85, 91, 92, 99, 109, 110, 111

124

IIMS, 10, 11, 12, 37, 38, 39, 50, 91, 92, 100, 121
Incident Information Management System, 11
Internal Affairs, 5, 7, 11, 12, 13, 20, 28, 33, 39, 41, 45, 47, 75, 91, 111, 112, 117

investigation, 6, 8, 9, 11, 13, 15, 16, 17, 18, 20, 22, 24, 25, 26, 27, 29, 30, 31, 36, 39, 42, 43, 44, 48, 49, 50, 51, 56, 57, 58, 60, 62, 65, 66, 70, 71, 72, 74, 75, 76, 78, 79, 80, 81, 82, 83, 84, 85, 86, 90, 91, 93, 95, 96, 97, 98, 99, 101, 102, 104, 107, 109, 110, 111, 112, 113, 114, 117, 124

lawsuit, 6, 9, 87, 115, 119
LCE, 117, 119, 123

Merryman, 85, 86, 87, 88, 108
misconduct, 34, 81, 97, 117
misrepresentation, 94
Mrgich, 91, 92, 96, 99, 103
museum, 90, 92, 93, 94, 95, 96, 98, 103

Ober, 2, 3, 5, 6, 7, 10, 11, 12, 13, 14, 15, 20, 26, 28, 29, 33, 35, 37, 38, 39, 41, 42, 48, 49, 50, 51, 52, 54, 55, 56, 57, 58, 60, 63, 64, 65, 75, 77, 78, 79, 80, 82, 83, 90, 91, 92, 93, 94, 95, 96, 98, 100, 105, 106, 107, 110, 111, 114, 115, 116, 117, 119, 120, 121, 122, 123, 124
object, 7, 8, 31, 32, 63, 86

objection, 8, 9, 87, 88

Pennsylvania State Police, 3, 5, 28, 40, 41, 60, 64, 65, 75, 77, 93, 111, 119, 120, 122, 123
position, 4, 5, 7, 13, 16, 20, 52, 75, 90, 103, 119, 123
PSTA, 11, 108

Rick, 3, 5, 8, 20, 22, 24, 50, 77, 80, 82, 89, 111, 112, 114, 116, 121, 122, 123, 124

Siefner, 75
State Police, 3, 54, 58, 69, 70, 73, 77, 79, 90, 94, 95, 105, 123
Supervisory inquiry, 29, 100
System and Process Review Division, 7

warnings, 51, 79, 104
Westcott, 39, 84, 103, 117, 118

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| DARRELL G. OBER | : | CIVIL ACTION LAW |
| Plaintiff | : | 1:CV-01-0084 |
| | : | |
| | : | |
| PAUL EVANKO, MARK | : | (JUDGE Caldwell) |
| CAMPBELL, THOMAS COURY, | : | |
| JOSEPH WESTCOTT, | : | |
| HAWTHORNE CONLEY | : | JURY TRIAL DEMANDED |
| JOANNA REYNOLDS, and | : | |
| SYNDI GUIDO | : | |
| Defendants | | |


PLACE:          MAIN CAPITAL
                HARRISBURG, PA 17101

PROCEEDINGS:    VIDEO DEPOSITION
                THOMAS CARR

DATE:           OCTOBER 12, 2001


APPEARANCES:

For the Plaintiff:      Donald Bailey, Esquire
                        4311 North 6th Street
                        Harrisburg, PA 17110

Defendant:              Syndi Guido, Esquire
                        333 Market Street
                        Harrisburg, PA 17101

BEGIN TAPE ONE

MR. BAILEY:    Testing 1-2-3.  Testing,
testing, testing.  Very quickly,
because Syndi's getting used to it I
guess.  But Trooper, so you know
what we're going to do here today,
ah, I do all of my depositions by
videographer.  We're going to do a
videotape here today. We're making
an audio recording that will be
available to you or your counsel.  I
failed to tell the gentleman
yesterday but your attorney knows,
of course, the video is available to
view if you want to.  Yesterday
there was a stenographer.  Today
there will not be.  Ah, but if you
have any question.  We're going to
swear you in. Tony will ask you do
you swear to tell the whole truth
nothing but the truth.  You'll be
sworn in. we'll go through the
deposition.  I'll ask you question
and that sort of thing, I try to do

2

things in a pretty relaxed was and, ah, maybe we'll wait till we stare the deposition because it will be transcribed. Then these things will be there and available for you to read, ok? Tony, why don't you do your thing and then.

MR. MARCECA: Why don't you let me swear you in first?

MR. BAILEY: Is that camera running?

MR. MARCECA:    No. Are we recording?

MR. BAILEY:    No. You have to record that. Then you have to state the time on that thing. I have 12:25, but I might be fast.

MS. GUIDO:    No it's 12:15.

MR. BAILEY: I am fast. Go by your watch then. That just runs elapsed time.

MR. MARCECA: Can I? I just want to do a radio check here. Don, is this camera running?

MR. BAILEY: (Sigh) Just a second.

MR. MARCECA: Mine's recording. I just want to…

3

MR.   BAILEY:  No, it's ok.  Alright use this one.  Put that on standby.

MR.   MARCECA:    It is, hold it a second.  Let's put a tape in there.

MR. BAILEY:  Sometimes that helps. That's why it wasn't reading. Trooper you look handsome, you're a good-looking man.  Never trust a lawyer who says that.  Now just push this right here.

MR.   MARCECA: Gotcha.

MR.   BAILEY:  Ok.  It's recording now. It will do the elapsed time just like your professional model does. Ok?

MR.   MARCECA: The time is 12:15 and it has begun to video record this deposition.  And good morning, ah, one moment.  My name is Anthony Marceca, and my address is 2219 Dixie Drive and I'm employed by PR Video and the have been contracted to conduct this video deposition on behalf of the plaintiff.  This matter is docketed at 1:CV-01-0084,

4

in the United States District Court,
for the Middle District of
Pennsylvania.  The caption is
Darrell A.

MR.  BAILEY: "G"

MR.  MARCECA: Sorry.  "G" Ober versus
Paul Evanko et al. And now we should
swear you in.  Do you profess to
tell the truth, the whole truth, and
nothing but the truth, so help you
God?

TROOPER CARR:  Yes.  I do.

MR.  MARCECA:  Thank you.

MR.  BAILEY:  Ok.  Trooper we're going to
be doing a deposition here today.
I'm going to be asking you question.
I want you to feel free at any time,
if you have a question that you want
to ask me about something I'm asking
you or where I'm going with the
questions I want you to feel free to
question me.  Don't be afraid to ask
me.  I don't mind that.  That's a
little unusual but I think it will
get us through any deposition more

5

quickly and it will make you feel
more comfortable.

TROOPER: Yes sir.

MR.   BAILEY: I don't have the slightest
interest in any trick question.  We
don't want to mislead you and for
that reason I think it's very, very
important that you answer fully and
completely.  You do have an
obligation to do that but I think
it's more important that you know
for your own benefit to answer fully
and completely.  And that means if I
inadvertently, and I assure you if I
do it, it will be inadvertent, if I
interrupt you before you completed
your thoughts or your response.  Or
you want to respond more fully,
please don't hesitate to correct me
and stop me.  Make sure you answer
to your satisfaction.  Ah, from time
to time that doesn't seem relevant
or don't seem important.  If they go
beyond any kind of an extreme
boundary your attorney will step in.

6

ah, she will object and she will
look after your interest.  If that
occurs at any time make sure you
follow your attorney's advice and
stop, so she can finish.  Ah, Syndi
I assume the usual stipulation as to
objections, except as the form of
the question be reserved till time
of trial.  Is that ok?

MS. GUIDO: Yes, we will.

MR.  BAILEY: Ok.  Now trooper for the
record your full name and your
official address.

A:  My name is Thomas G. Carr.  My rank
is Trooper.  I'm a member of the
Pennsylvania State Police currently
assigned to the Bureau of Forensic
Services at 1800 Elmerton Avenue,
Harrisburg, PA.

Q:  Can you for us briefly describe your
duties?

A:  Ah, I am a latent print examiner.  I
compare unknown latent prints that
are lifted and preserved from crime
scenes to known fingerprints in an

1   attempt to identify those latent

2   prints and I also work with our

3   states Automated Fingerprint

4   Identification System where I can

5   scan the image of that fingerprint

6   using the AFIS workstation and I

7   send an image of that print off for

8   a search against a known data base.

9   Q:   Alright.  Sir, where do you perform

10      these duties?

11  A:   I perform these duties at the

12      Harrisburg Regional Crime Lab at

13      Elmerton Avenue.

14  Q:   Ok, and is that where you were

15      working on or about June/July on

16      1999?

17  A:   Yes sir.

18  Q:   And, ah, Tom do you, how long have

19      you been with the Pennsylvania State

20      Police?

21  A:   Nearly eighteen years.

22  Q:   Are you active with the Pennsylvania

23      State Troopers Association at all?

24  A:   Yes sir.

25

8

Q:    In what capacity aside from I assume
      being a member?

A:    I'm also, um, in addition to being a
      member I'm also a Lodge Official of
      my local FOP Lodge, State Police
      Lodge.

MR.   BAILEY: Ok, that brings me, ok, Tom
      from time to time I may change a
      little bit my line of questioning.
      When I do I'll give you a warning
      about that so it doesn't surprise
      you. You know sitting and being a
      witness isn't the easiest thing in
      the world and I understand that. So
      now I want to ask you some
      questions. I'm going to go back in
      time. And I want to take you back to
      1999 and specifically to June 1999.
      Now is it fair to say that sometime
      in late June, I have a date of June
      28, 1999 that you participated in
      some sort of a meeting in which
      Captain Ober was questioned.  Is
      that correct?

A:       Yes sir.

9

Q:    Now, Tom prior to June 28, 1999 did
      you now Darrell Ober?

A:    I knew who Darrell Ober was.  I knew
      he was the Captain.  I would greet
      him in the hallways at department
      headquarters.  I would salute him in
      the morning, ah, and I, ah.  I
      didn't know him personally but from
      working out of DHQ I knew him.

Q:    And, ah, had you ever had any
      official dealings with Mr. Ober.
      And by that I mean did you ever play
      any part or role in any
      investigations in which he was
      involved or work with him on any ad
      hoc, ah, you know, project or
      something?

A:    Only on one occasion, um, Captain
      Ober and I believe Major Merriman
      came down stairs into the crime lab
      regarding, it was regarding an
      internal investigation of one of our
      members where latent print evidence
      was taken from an item that was
      seized as evidence in the course of

this investigation. and there was a
latent fingerprint that was searched
through AFIS and, I didn't do the
report but I was there in the office
while the work was being done and I
remember that Captain Ober was in
the office and I can remember having
a friendly conversation with him
while we were waiting for the search
to come back.

Q:    Ok so it's fair to say that there
was no time when you had any kind of
a conflict or problem nor for that
matter did you socialize with or
have any kind of a non-official
relationship, friendship with
Captain Ober. Is that fair to say?

A:    Yes sir that's fair.

Q:    Do you recollect how you came to be
summoned, contacted or called,
whatever it was to, just explain the
circumstances for us to participate
in the meeting June 28, 1999?

A:    As I recall it was ah, it was around
11 o'clock or 11:30 and I believe I

was in the middle of eating my
lunch, um, I remember taking a call
from Major Williams who asked if I
was a PSTA Rep, representative and
he ask me if I could come up to
Captain Corey's office up in the
Commissioner's complex and represent
Captain Ober during a proceeding.

Q:     Ok.  Tom, how many times, I can call
you Tom?

A:     Sure.

Q:     I'm Don.  I'm glad when I get called
Don so I'll stay with that.  Prior
to June 28, 1999 had you had many
occasions to participate in many
meetings in your role as FOP
representative?

A:     On several occasions.  PSTA. I'm
sorry.  On several occasions you
have.  What role do you play when
you perform that function?  What's
that about?  What do you do as a
PSTA in one of these meetings?

A:     Ah, basically I sit in with the
officer of member who there has been

an allegation of, ah, like a
regulation a violation, something
like this and we sit in, or I sit
in. the whole purpose of me being
there is to: number one serve as a
witness and, ah, number two just to
make sure the members rights aren't
being violated.  And that a now we
have a contract, just to make sure
the contract is being followed.

Q:    Ah, yeah, ok.  Your role then is to
      be an observer.  Is it fair to say,
      not that one would expect this of
      course, but you're there to see that
      the rules and procedures are
      followed?

A:    Yes.

Q:    What's an administrative inquiry,
      administrative investigation?

A:    Well, we have a lot of regulations,
      um, governing code of conduct and
      also, ah, the way we conduct work.
      And, um, we have a lot of
      responsibilities.  There's been
      allegations, ah, you know, members

13

from time to time they, there's
allegations made, that they, they
didn't do this right or there's
something they could have done that
they didn't do and then the
department takes action against
them. Disciplinary action usually.

Q:  Ok, I'm curious. That's an inquiry
of some sort, ok? Who conducts
inquiries?

A:  There's an officer assigned to
conduct those. Sometimes an officer
is assigned from the Bureau of
Professional Responsibility and
sometimes it's an officer who is
assigned right from the troop where
that this occurred in. and, ah, this
officer would be, in other words, a
Pennsylvania State Policeman?

A:  Yes.

Q:  But what's an administrative, I'm
still confused. I'm looking for a
definition for this administrative
inquiry. Is there any special

14

meaning for what an administrative inquiry is?

A:  Well the only thing that comes to mind is, ah, that there's a regulation that the member might not have followed and that the department is checking into. Something like that.

Q:  Do you, like, can you cite me sort of some kind of definition or something in your regulations or maybe in your contract that deals with that?

A:  No, I'm sorry.  I'd have to refer to the contract.

Q:  That's ok.  I don't expect you to know these things off the top of your head.  You did a number of these things in the past?

A:  Several, yes.

Q:  Several.  Can I just…tell you what, stay on camera.  I'll be back in one second.  Let the listeners know that somebody's knocking on the door.  My

15

help had to go home sick.  So hold
on.

(Background noises)

MR.  BAILEY:  Thank you ladies and gentlemen.
I greatly appreciate that.  Now,
Tom, what I'm looking for, let me
try to ask a few different ways if I
can.  BRP, what's BRP?

A:     It's an acronym for Bureau of
Professional Responsibility.  It's
like an internal investigative tool
that our department has.

Q:     Is there an Internal Affairs
Division in the Pennsylvania State
Police?

A:     Yes, and that's what it is.  They,
they refer to it as BRP.

Q:     And if somebody does a  BPR on you,
what that means, I have a little
experience with the State Police,
what that means is perhaps for some
reason there's a need to investigate
facts or circumstances surrounding

16

something and they, ah, convene or
they conduct what they call a BRP.

A:    Yes.

Q:    And that's the acronym that you
referred to.  Was it a BRP with
Captain Ober?

A:    I don't believe it was, no.

Q:    What was it?

A:    It was an inquiry.

Q:    An inquiry?

A:    It was some kind of inquiry that was
ordered by the commissioner I
believe.

Q:    Did you say some kind of inquiry?
That's what I'm looking for, Tom.
What kind of inquiry?

A:    A Commissioner's inquiry.

Q:    Oh, ok.

A:    But I'm not sure.  It was some kind
of an inquiry but I'm not sure of
the exact terminology.

Q:    Ok.  I now. I understand that.  Why
did you refer to it as a
Commissioner's inquiry?

A:     Because I was under the impression
       that it was something that the
       Commissioner asked to be done.

Q:     Let me try to lay a foundation.  Let
       me go at it another way.  Before
       June 28, 1999 had you participated
       in any other Commissioner's
       Inquiries?

A:     No.

Q:     Before June 28, 1999 how many, if
       you can give us a figure, ah, of
       these gatherings, meetings whatever
       you call these things had you
       participated in as a Pennsylvania
       State Troopers Association
       Representative?

A:     I would have to say, ah,
       approximately five or six, something
       like that over a five or six year
       period.  I actually haven't sat in
       on very many.

Q:     Ok, now where did you gain the
       impression or on what facts do you
       base the, ah, your use of

18

Commissioners Inquiry.  What led you
to use that term?

A:    Cause I remember Major Williams, it
was Major Williams, Major Wertz and
Captain Ober who were in Lt. Corey's
office and I remember ah, I'm not
sure if it was Major Williams or
Wertz used the word inquiry and
words to the effect of 'by the
Commissioner" something like this.

Q:    Ok, I'm an old army guy and the way
the army works, at least, in my mind
if you can answer a few questions
about this, this way.  In the army,
if there's an inquiry, ok?  They
have a system of justice and they
have a thing called an Article XV,
uniform code, but the only person
that can punish someone is their
Commanding Officer.  See a General
can't come in and say "Hey, I'm
gonna punish this guy."  He has to
go and ask that guy's commander.
Can the Commissioner of the State
Police, if you know the answer to

19

this, can the Commissioner of the
State Police personally direct an
investigation into somebody
internally? If you know?

A:  I'm not sure I know the answer to
that. He is the head of a large
department who has many people under
him. I'm not sure how to answer or
what the answer is.

Q:  Ok. Do you have knowledge of or
have you ever seen any regulation of
the Pennsylvania State Police, which
gives the Commissioner the power to
direct that someone be investigated?

A:  (sigh) I'm not sure.

Q:  Tom, ah, can the Commissioner of the
State Police, he's riding down the
Turnpike. Let's say he observes a
police officer doing something he
doesn't like I'm not suggesting
something criminal or even a civil
wrong. Just something he doesn't
like. Does he have the power to
dismiss that officer from his job?

A:  No, not without due course.

Q:     Not without due process of law.  As
       you sit her today, in fairness to
       you then, you don't know of any rule
       or regulation, custom or practice,
       there may be one, but you don't know
       of any rule, regulation, custom or
       practice that the Commissioner of
       the Pennsylvania State Police can
       order someone be investigate and
       respond to questions?

A:     I don't know of any.

Q:     Now is it fair to say that the
       Pennsylvania State Police could set
       in motion from a complaint a BRP or
       something of that sort a properly,
       I'm not saying the other way isn't
       proper, but a procedure whereby
       someone would be investigated and
       questioned in a normal way.

A:     Possibly.

Q:     Do you know how that's done.  I'm a
       citizen out here, I assume, I've
       represented Police Officers, but I
       as a citizen out here I write to the
       State Police and complain that an

21

|   |   |                                                                    |
|---|----|--------------------------------------------------------------------|
| 1 |    | officer did something um, low would                                |
| 2 |    | that complaint be processed?                                       |
| 3 | A: | Well a supervisor would take that                                  |
| 4 |    | complaint, assure this person that                                 |
| 5 |    | it will be followed up on and, ah,                                 |
| 6 |    | in most cases the complaint, that we                               |
| 7 |    | have a FACE sheet it's called, a Use                               |
| 8 |    | of Force and Complaint Reception                                   |
| 9 |    | Worksheet.  And when that's filled                                 |
| 10 |   | out it does through channels and                                   |
| 11 |   | then, ah, the Troop Commander then                                 |
| 12 |   | makes a decision whether it's to go                                |
| 13 |   | on to the Bureau of Professional                                   |
| 14 |   | Responsibility for follow-up or he                                 |
| 15 |   | can assign a member of his own troop                               |
| 16 |   | to do the investigation and that's                                 |
| 17 |   | usually the was it goes.                                           |
| 18 |   |                                                                    |
| 19 | Q: | Ok.                                                                |
| 20 | A: | I believe the more serious                                        |
| 21 |   | allegations go to a BRP                                            |
| 22 |   | investigator.  Where the more, the                                 |
| 23 |   | more minor allegations are handled                                 |
| 24 |   | within the troop.  That's usually                                  |
| 25 |   | the way it goes.                                                   |

Q:      When you have, this excludes Mr.
        Ober now, when you have fulfilled
        your role as an observer at these
        kinds of meetings do you do any
        paperwork?  Do you make out any kind
        of report or anything of that sort?

A:      No sir.  I didn't make out any
        report regarding this.  I remember
        that it was a taped interview.

Q:      It was taped?

A:      I remember I was there to serve as
        witness but, ah, I did not go up to
        Lt. Colonel Corey's office with any
        notepad or pen or anything like
        that.  I was asked to go up there
        and I went up.

Q:      Ok.  Now you say it was taped.  Who
        taped it?

A:      I believe it was major Wertz.

Q:      Major Wertz. Did you see Major Wertz
        turn on the tape recorder?

A:      Yes, ah I believe it was Major Wertz
        but the interview was conducted by
        both Majors Wertz and Williams, the
        two of them.

23

Q:    Alright and do you remember at what
      point in the procedure the tape was
      turned on?

A:    I remember that there was not much
      conversation before the tape was
      turned on.  I remember it being
      turned on very early in the
      interview process.  I know that
      there was some words said before the
      tape was turned on.  I don't recall
      what those words were.  I think it
      was, they were a formality.  It was
      a conversation like that.  I
      remember the tape recorder being
      activated very early in the
      interview.

Q:    Ok.  Do you remember who was there
      when you got there?

A:    I remember walking into Colonel
      Corey's office and I remember seeing
      Captain Ober, and, ah, Major Wertz
      and Major Williams.

Q:    Anyone else?

A:    Beside myself it was just the four
      of us.

24

Q:      Ok, do you remember roughly what
        time of day that was?

A:      As I recall it was either, I just
        broke out my lunch, I was in the
        middle of it or just finishing up so
        it was around 11:30 or so, or ten
        after or quarter after something
        like that.

Q:      Do you remember how long that
        meeting lasted?

A:      Oh, it went, um, I would say it was
        over an hour.

Q:      Maybe an hour and twenty minutes,
        something like that?  Approximately.
        Ok, do you remember if there were
        any interruptions during the
        meeting, phone calls, anyone left
        the room and came back in?

A:      I remember, uh, towards the end of
        the interview I asked, if it would
        be ok with everyone present if, ah,
        they'd take a minute's break so that
        I can use the men's room.  Then I
        came back and then I remember it was
        activated, the recorder was

25

activated again and shortly after
that the interview came to an end.

Q:     Alright.  Do you have a recollection
at any time during your presence
either Mr. Wertz or Mr. Williams
making any telephone calls or
receiving any telephone calls?

A:     No, I don't recall that.

Q:     Ah, most of the meetings that you've
attended other than the one with
Captain Ober were they done in the
Commissioner's office or the Deputy
Commissioner's Office?

A:     Ah, no.

Q:     You seem to be reacting strongly.
Where did you?  where did you do
them?

A:     I can remember representing a member
when I was stationed at Troop
Headquarters.  I remember, ah,
sitting in an interview there. Ah,
in the past I sat in on interviews
at Troop h. but this is the first
time I ever sat in on an interview
in the Commissioner's Complex.

26

Q:      Ok. Where is the Commissioner's
        Complex?

A:      The third floor of departmental
        headquarters building.

Q:      And your best recollection is that
        you were contacted by Mr. Williams?

A:      Yes, I believe it was Major
        Williams.

Q:      Um, do you remember what Mr.
        Williams said to you when he called
        you in on the telephone beyond
        asking you if you were a PSTA
        Representative?

A:      I remember him asking me if I could
        come up to Lt. Colonel Corey's
        office, to, I'm not sure if he used
        the words to sit in on and interview
        or to witness an interview an
        interview of Captain Ober.  I
        remember him saying words to the
        effect of Captain Ober is requesting
        I believe he said PSTA
        representation.  I believe that's
        what he said or words to that
        effect.

Q:      Um, did Captain Ober have to attend
        this thing?  Couldn't he have just
        walked out or walked away?

A:      I don't know.

Q:      I'm not trying to be funny.  Like if
        it would really be wise to do such a
        thing.  I'm asking if, you know, in
        a context of what his rights were.
        And I'm asking that because I'm
        still trying to understand, I'm
        being very honest with you.  Let you
        know where I'm coming from.  I'm
        trying to understand what the nature
        of this proceeding was.  You know
        what it was for.  What I do
        understand it was a Commissioner's
        Inquiry but, uh, you know, I'm
        trying to figure out…


PAUSE WHILE DOOR IS ANSWERED


TROOPER: Could you repeat the question
        please?

Q:      Sure.  Do you remember whether
        Captain Ober had to be there?  Did

1              he have to attend this thing?  Do

2              you know if he had any choice?

3    A:  When I appeared at Colonel Corey's

4              office they were all in there.  Now

5              I'm not sure what transpired before

6              I got there.  Um, I don't know what

7              they told him I, uh, I didn't get

8              the impression he was being held

9              there against his will.  Um, they

10             were there to conduct an interview

11             and they conducted it.  And he had,

12             Captain Ober asked for someone t

13             witness it and I went up there to do

14             that.  Before I got there I don't

15             know what transpired.

16

17    Q:  You have a, uh, recollection of...let

18             me return to a question I asked

19             earlier about the Commissioner's, ah

20             about the Commissioner's inquiry.

21             Did Major ah, did Mr. Williams or

22             Mr. Wertz indicate why the

23             Commissioner wanted this inquiry

24             done?

25    A:  From their line of questioning

            Captain Ober I was able to surmise

there was an investigation that
Captain Ober was involved in. they
were asking him detail questions
about this investigation and I
recall that they asked him detailed
pointed questions as to why, ah, the
chain of command wasn't followed and
why the commissioner wasn't
informed?  Questions I can't, I
can't recall verbatim of how these
questions were worded but I can, I
got the impression that these were
the kind.  It was an investigation
the Commissioner was ah, he wasn't
informed of this investigation or
that the chain of command wasn't
followed and that's why this inquiry
was taking place.  This was my
impression.

Q:  Do you remember if any regulations
were cited?

A:  I can't.  I don't know I can't
recall.

30

Q:   Um, your best recollection is that
     the Commissioner, why the
     Commissioner was not informed?

A:   Um-hmm.

Q:   Did you learn from your attendance
     in this meeting what, ah, the
     commissioner was not informed about?

A:   It was an investigation that dealt,
     I believe the FBI was involved in
     this investigation.  Ah, there were
     allegations that there was
     corruption, I remember that.  I
     remember Captain Ober being asked
     why he didn't follow the chain of
     command in notifying his superiors
     as to what he learned, he learned
     after he was contacted by the FBI.

Q:   Do you have recollection of how Mr.
     Ober responded?

A:   See, I can't remember exactly, um
     just that his Major wasn't there.  I
     remember that and I believe he
     reported to Lt. Colonel Hykus but
     I'm not sure about that.  I remember
     him answering that there was

31

conflict.  He wasn't sure who to contact.  That his Major wasn't present in Harrisburg.  His Major was out of town and that the next person was Lt. Colonel Hykus.  I believe that's how he answered.

Q:  And, um, do you, do you have a recollection of when, when the Commissioner found out?  Or how the commissioner found out, if indeed he did about this investigation?

A:  No, no I don't.

Q:  Ok.  Did you sit in on any other meetings connected to this inquiry?

A:  No sir.  This was the only one.

Q:  Ok did, ah, did Mr. Wertz or Mr. Williams ever comment as to what regulation Captain Ober had broken or may have broke?

A:  I remember them referring to Chain of Command, Chain of Command and making the implication that the Chain of Command wasn't followed.  I remember that I know there's a regulation for it.  I just can't

remember to spout it from the top of
my head.   I know we have one.   But I
remember that.   They were asking him
questions about the Chain of
Command.

Q:   Ok.   Now did they say, did they
indicate why the Commissioner wanted
to do this?   Why he had a personal
interest, if indeed he did in this
investigation?

A:   It was my impression after listening
to these two men ask questions that,
ah, I got the impression, my own
feeling is that the commissioner was
left out and ah, he was not happy
about it.   That was my impression.

Q:   Do you have a recollection of there
being any discussion about what this
FBI investigation was supposed to be
into aside from public corruption.
Let me be more specific.   Was there
any discussion of this probe being
into people in high places as
opposed to a run of the mill

33

          complaint about a Trooper or
something like that?

A: I remember it had to do with hiring
practices in the Pennsylvania State
Police. Um, I remember Captain Ober
saying that he was informed ah, he
was told it dealt with some maybe
high level officers in the State
Police. He wasn't sure whom and,
ah, that's the gist of what I
remember.

Q: Do you remember what Captain Ober's
position was with the State Police
at that time Tom?

A: I believe Captain Ober was at thiis
time in the Bureau of Tech Services.
I believe and it's either Tech
Services or ah, I believe it was
Tech Services. Just prior to that
he was in the Bureau of Professional
Responsibility as a supervisor, as a
commander.

Q: You ever hear anything more about
this inquiry after June 28, 1999?

34

And that would include scuttlebutt and rumors.

A: Well, I recall it wasn't too long after this interview, I'm not sure exactly how long after but I remember that it came, it was published in the Harrisburg Patriot and prior to that I was told by order of the Commissioner not to discuss any of this and I didn't I didn't even tell anyone from my lodge.

Q: Ok how was the order of the Commissioner not to, how was this order of confidentiality communicated to you?

A: By Majors Williams and Wertz.

Q: When?

A: About an hour after the interview concluded I was back in my office working and, ah, the Majors walked into the office and they said Trooper Carr, just so that you're aware by order of the Commissioner you're not to talk about or discuss,

um, this with anyone, or words to
the effect.  I said "Yes Sirs" and
well, I didn't.

Q:  You obeyed those orders.

A:  Yes sir I did.

Q:  You have a recollection of any
inference whatsoever that Mr. Ober
had committed a crime?

A:  That he committed a crime?

Q:  Yes sir.  Trying to look, I'll tell
you where I'm going.  I'm trying to
look for why this confidentiality.

A:  At no time did I get the impression
that Captain Ober committed any
crime.  This was a, an in house
inquiry having nothing to do with
criminal activity.

Q:  Do you have a recollection of there
being any discussions or question
which inferred that criminal charges
might be brought against any member
of the Pennsylvania State Police
regarding it?

A:  No.

36

Q:   Did you ever learn that there had
      ever been charges brought against a
      Pennsylvania Police member regarding
      this matter or related matters?

A:   You mean State Police Members?

Q:   Yes sir.

A:   No.

Q:   Did you learn what the underlying
      FBI probe was about?

A:   It was I believe it was a concerned
      the western part of our state.
      There was an investigation into the
      hiring practices in our department.
      And as I recall, um, I might be
      wrong about this but somebody was
      arrested but it wasn't a
      Pennsylvania State Police Officer or
      anybody connected with our
      department.  It was a, it was a
      civilian I believe.

Q:   Ok did the FBI ever talk to you
      about any matter concerning this?

A:   No sir.

Q:   Aside from the June 28, 1999 meeting
      did you have any discussions with

any, discussions with anyone else
concerning this matter?  Let me
explain what I mean by that.  I know
that you didn't breach the
confidentiality.  I'm not trying to
trip you up on that.  I understand
that you did not breach
confidentiality.  My question has to
do with whether you received any
other inquiries, or any other
inquiries, or any other contacts
from anyone in your Chain of Command
or any Superior Officer of the
Pennsylvania State Police about the
matter?

A:   No.

Q:   You never heard about it again?

A:   I heard about it after it was
published in the paper and at that
time a fellow lodge member asked me,
after it became public knowledge,
had I sat in on this interview and I
told him I did.  But that was the
extent of that.

38

Q:  What were the feelings of the person
    that asked you about that?  What did
    they feel about this thing?  Did
    they express an opinion or feelings
    about it?

A:  Um, no not particularly, no.

Q:  Ok.  Ah, after the June 28, 1999
    interview was done of Captain Ober
    did you ever talk to Mr. Williams or
    Mr. Wertz again?

A:  No sir.

Q:  And, ah, you were never asked for
    any kind of reports or information?

A:  No sir.

Q:  During the meeting itself was the
    governor's office ever mentioned?

A:  I don't believe so.  I don't
    remember, I don't remember that
    being said.

Q:  Ok.  Ah, I think now would be a good
    time.  I'm just gonna reverse this
    tape.  It will take a few seconds.

    END OF SIDE ONE - TAPE ONE

39

MR.   BAILEY: Ok, now, ah, do you have any
            recollection of Mr. Wertz or Mr.
            Williams telling you Mr. Evanko was
            going to review the findings of this
            inquiry?

A:        Yes, I believe that was said.  Not
          to me bur I recall, I remember words
          to that effect being conveyed to
          Captain Ober.

Q:        Now, ah, was Mr. Corey discussed
          during that meeting at all?

A:        He may have been.  I can't recall,
          ah, it's possible.  I just can't
          recall.

Q:        Did you ask any question during the
          interview?

A:        No sir.  I don't believe I did.

Q:        Um, you said this interview lasted
          maybe over an hour.

A:        Yeah.

Q:        And that it was taped.

A:        Yeah.

40

Q:      Ok.  Now was there a review done on
        the meeting or did you leave when it
        was over?

A:      I left when it was over.

Q:      Was Captain Ober still in there when
        you left or did he leave when you
        left or before you left.

Q:      I believe we both walked out of the
        room at the same time and then I
        believe I walked out of the
        Commissioner Complex by myself and I
        went downstairs to my office.

A:      Uh, let's suspend there for just one
        second.  Let me talk to Captain Ober
        out here.

MR.  MARCECA: You want me to stay on camera
        sir?

MR. BAILEY:  Yes, just let it run it'll be
        only two seconds.


        (DOOR CLOSING)


MR.  BAILEY: Ok, do you have recollection of
        Mr. Wertz or Mr. Williams telling

41

1           you that Mr. Evanko was going to

2           review the findings of this inquiry?

3   A:   Yes I believe that was said.  Not to

4           me but I recall, I remember words to

5           that effect being conveyed to

6           Captain Ober.

7   Q:   Now, ah, was Mr. Corey discussed

8           during that meeting at all?

9   A:   He may have been.  I can't recall,

10         ah, it's possible.  I just can't

11         recall.

12   Q:   Did you ask any questions at the

13         interview?

14   A:   No sir.  I don't believe I did.

15   Q:   And you say this interview lasted

16         maybe over an hour?

17   A:   Yeah.

18   Q:   And that it was taped.

19   A:   Yeah.

20   Q:   Ok.  Now was there any review done

21         on the meeting or did you leave when

22         it was over?

23

24   A:   I left when it was over.

25

42

Q:      Was Captain Ober still in there when
        you left or did he leave when you
        left or before you left?

A:      I believe, we both walked out of the
        room at the same time and then I
        believe I walked out of the
        Commissioner's Complex by myself and
        I went downstairs to my office.

MR.  BAILEY: Uh, let's suspend there for just
        one second.  Let me talk to Captain
        Ober.  Let me talk to Captain Ober
        out here.

MR.  MARCECA: You want me to stay on camera
        sir?

MR.  BAILEY: Just let it run, it'll be only
two seconds.

                (Door closing)

Mr. BAILEY: One last question, I didn't think
        this would take very long as I told
        you.

(Lawyers exchange as to time of next witness)

MR.  BAILEY: Tom, I just have on other
        question.  I want to show you

43

1          something and ask if you've ever

2          seen this and then to have you

3          describe it for us.

4          (pages turning)

5   A:     Sure.

6   Q:     Before you comment could you please

7          give it to Ms. Guido?

8   A:     Sure.

9   MR.  BAILEY: Let her look at it first before

10         you say anything.  I'll make you a

11         copy.  It's a simple form.

12  MS. GUIDO: I've got a copy.

13  Q:     Tom, I'd like you first to describe

14         what you're looking at, there are

15         two pages right?

16  A:     Yes.

17  Q:     Ok, and describe for us please.

18  A:     The first one is ah, an

19         administrative warning form SP 1-

20         104.  An administrative warning and

21         the member employee Captain Darrell

22         G. Ober. Interviewers are listed as

23         Major Thomas F. Williams and Major

24         Robert G. Wertz. It's dated June 28,

25         1999.  Looks like the form was made

44

out on the 22nd and then it was
signed on June 28th.  That's the way
it looks.  The other one is a
Notification of Inquiry.  The
subject of inquiry is indicated as
Captain Darrell G. Ober of the
Bureau of Professional
Responsibility.  Do you want me to
read it?

MR.  BAILEY: Please.

A:       "By order of the State Police
Commissioner Paul J. Evanko, I have
been assigned to make inquiry into
you knowledge of the facts or
circumstances surrounding the
political corruption investigation
that was conducted by the FBI in
western Pennsylvania."
Signed Major Thomas F. Williams,
signature of investigator.  Signed
by Captain Ober and signed by
myself.

Q:       The document you just read from by
the was I'm going to have marked as
Carr2, the document referred to

45

previously Tom for the record is
going to be marked Carr1 and the
will be exhibits to you deposition.
Can I have Carr1 for just a moment?
Ok.  I'm not going to mark these
originals, by the way, I'll copy
them and I will mark the copies.
Syndi's already seen it.

Ah, in the first paragraph here
it indicates I believe, you just
looked at it, correct me if I'm
wrong, that these concerns are
administrative matters.  As you
properly testified, it was not about
a criminal prosecution and they're
quite forward about that saying that
they're not interested in any kind
of criminal  conduct and it's a, it
provides sort of a Fifth Amendment
protection here you know, which I
don't think that's relevant.  I
think you pretty much know that.  It
says here since this is an
administrative matter within the
Pennsylvania State Police you are

46

required to answer questions truthfully and completely or you may be subjected to administrative action. You do have the right to have a union representative with you during said questioning. I had asked you a question of the voluntariness of Mr. Ober being at this gathering, whether he had a right to walk out or walk away. Upon reviewing Carr1 and thinking back to signing this form do you still think he was free to just walk out or walk away from this or is it your impression had a responsibility, was under orders to answer questions?

A:    It was my impression that there was a responsibility there that they were asking him these questions and he had a responsibility to respond to them.

Q:    Ok. Um and then there's a sentence here about a union representative, you have the right to a union

47

representative during questioning
which would be the Troopers
Association and that's where you,
that's why you came into this,
right?

A:      Yes.

MR.   BAILEY: I don't have any further
questions and I'll put that back
there.  I'll make copies of that
when we're done.  Ms. Guido may have
some questions.

MS. GUIDO: No, I don't.

MR.   BAILEY: Ok.  I'd like to thank you.
Trooper Carr do you have any
questions of me?

A:      No sir.

MR.   BAILEY: Ok.  I'd like to thank you very
much for coming here today.  If you
have any desire, counsel has any
desire, I don't know.  We'll be
making a transcript.  I don't know
if you want a copy of the transcript
or the video.  The video is here.
Under the court rules you have a
right to come here and view it.  You

48

1           might want to extend that

2           invitation.  Feel free to do that at

3           any time.  If you want a copy of the

4           transcript, this is not a

5           stenographic transcript but it would

6           have to be purchased.  Or if Ms.

7           Guido wants a copy, PR Video will

8           provide one to her at whatever the

9           same cost it is to us.  Ok?

10    A:     Ok.

11    MR.  BAILEY: Thank you sir very much.  Wait,

12          you have to, sit down just one

13          second.  He has to end the

14          deposition and announce time.

15    MR.  MARCECA: The conclusion of this video is

16          13:08 on 10/12/2001.

17

18

19

20

21

22

23

24

25



IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER          :     CIVIL ACTION LAW

   Plaintiff          :

   VS.          :     1:CV-00-0084

         :

PAUL EVANKO, MARK          :
CAMPBELL, THOMAS COURY          :
JOSEPH WESTCOTT,          :     (JUDGE CALDWELL)
HAWTHORNE CONLEY          :
JOANNA REYNOLDS and          :
SYNDI GUIDO, et al.          :     (JURY TRIAL DEMANDED)

DATE:          January 7, 2002

PROCEEDING:          Video Deposition
            Robert G. Werts

APPEARANCES:

   For the Plaintiff          Don Bailey, Esq.
             4311 N. 6th Street
             Harrisburg, Pa 17110

   For the Defendants

             Joanna Reynolds Esq.
             333 Market Street
             Harrisburg, Pa 17101

---

1     MS. LYDE: Good Ms. Reynolds and gentlemen.
2  Please be advised the video and audio is in operation. My
3  name is Crystal M. Lyde, L-y-d-e. My address is 4310 Hillsdale
4  Road, Harrisburg, PA, 17112. I've been contracted out by PR
5  Video to be the operator for this deposition. The case is in the
6  United States District Court for the Middle District of
7  Pennsylvania.  The caption is Darrell Ober vs. Paul Evanko et
8  al. Al. the docket number is 1:CV-01- 0084. The date is
9  January 7, 2002. The time now is 11 o'clock AM. The
10  deposition is being held at the law offices of Don Bailey, 4311
11  North 6th Street, Harrisburg, Pennsylvania, 17110. The video
12  deposition is being taken on behalf of plaintiff Darrel Ober.
13  The witness' name is Robert G. Werts. Will you raise your right
14  hand please? Please state your name for the record and spell
15  it, please.
16     MR. WERTS:  Robert G. Werts, W-e-r-t-s.
17     MS. LYDE: Do you so swear to tell the whole truth,
18  and nothing but the truth so help you God?
19     A:    I do.
20     MS. LYDE: Thank you. Mr. Bailey I need a sound
21  check around the room.
22     MR. BAILEY: Yes, my name is Don Bailey, I'm an
23  attorney. I represent the plaintiff, Darrel G. Ober, in this
24  matter. The witness, the deponent has already had an
25  opportunity to check and he does ok on the audiometer.

---

1  Joanna could we go and just go on down the line here.
2     A:    My name is Joanna Reynolds and I represent
3  the defendants in this matter.
4     A:    Paul Evanko, Commissioner of the
5  Pennsylvania State Police.
6     MR. BAILEY: Commissioner
7     A:    Joe Westcott.
8     MR. BAILEY: That's Colonel, Lieutenant Colonel?
9     A:    Yes.
10     MR. BAILEY: Ladies and gentlemen again I want to
11  caution everyone, this is a video deposition. This is to let you
12  know, Mr. Werts, you can come here anytime if you want to
13  view the video. Your attorney has already indicated the desire
14  to acquire a copy, which she will do through PR Video. The
15  rules dictate that we all pay the same price for that and it's
16  very reasonable but by the same token you do have a right to
17  come here and you can view the video when you please, when
18  you want to. We'll make it available to you under court rules.
19  Now what we're going to be doing is a deposition here today. I
20  want you to be relaxed. I'm not interested in any smoking gun
21  questions; you know that trick stuff you see on TV. Although
22  you are an experienced police officer it's a different story
23  sometimes when you are a witness. I want to try to put you at
24  ease. One of the things that I do differently than most
25  attorneys do, I have no objection at any time for you or your

---

1  attorney or for that matter any of the other defendants that
2  may want to through the attorney, ask me where I'm going
3  with a question, what I mean by a question. I don't mind that.
4  I'll give you what's called an offer or an explanation, that sort
5  of thing. So don't feel bashful about that. Again we want a
6  good factual record. As you know your duty under your oath is
7  to answer as fully and completely as you can. That means that
8  from time to time you may have a response to a question that
9  you want to quantify it or you want to put limits on your
10  degree of certainty, is what I call it, and say well I'm almost
11  certain or 90% or whatever.  Feel free to do that so that we
12  know the degree of knowledge and understanding that you
13  have about a particular fact question. By the same token you
14  don't speculate or guess wildly. If you're just guessing off the
15  top of your head, make sure you make, you understand that
16  you explain that to us because that's really not a response
17  that should be taken as indicative of your knowledge of fact or
18  circumstances or that kind of thing. If during the course of the
19  deposition you have any need for any kind of a break, you
20  need to talk to your attorney or anything like that, I want you
21  to feel free to do that. Ok? If you want a break, you want to
22  talk to your attorney, you need a moment to refresh or
23  something like that, don't avoid doing that. The other thing is,
24  providing there's not a question on the table; if you want a
25  break to talk to your attorney just ask. I don't object to that.

1 There's no problem with that. Ok? The only thing is and
2 usually with police officers I don't have this problem because
3 you're all very professional. When you're responding to a
4 question don't gesticulate, make sure that you respond
5 verbally, etc. Now with that being said do you have any
6 questions of me?
7     A:   No.
8     MR. BAILEY: Joanna, general stipulations,
9 objections reserved to time of trial except as to form of
10 question. Is that acceptable?
11     MS. REYNOLDS: That is acceptable. I would like
12 him to read and sign the written form of the video when it
13 comes in.
14     MR. BAILEY: Ok I'm glad you brought that up. In a
15 video deposition, there is, it's an odd thing. These rules are
16 rather different. There really is not a read and sign issue. She
17 is a notary but regardless of what any of us say at this
18 meeting that video governs because the camera doesn't lie. It
19 shows a complete continuous record. I have, let me say this
20 for the record, I have no object to any kind of errata sheet that
21 you want to file with or add to the transcription. But you have
22 the video and, you know, the video unlike the stenographic
23 record, the video is the video, it more or less governs. So I have
24 no objections if you want to place some kind of errata with it.
25 Yeah sure. But there is no pre-approval the way you do with

1 the stenographic thing where there are the rules that provide
2 for an errata sheet being checked. This makes no difference
3 because it's right there, it's recorded. It's an actual recording
4 so it's a little different; the rules are a little different. All right if
5 everybody, if we're ready to go let's get at it. Are you ready to
6 go?
7     A:   Yes.
8     Q:   Do you have any idea, Major, any feelings as to
9 how I should address you? Major?
10     A:   Major is fine.
11     Q:   Major, the primary focus of the deposition here
12 today is going to be on the investigation that you did, ok? And
13 I assume that you are pretty much familiar with that or at
14 least have a general familiarity with the complaint. Is that
15 correct?
16     A:   I have a general knowledge of what the
17 complaint has to say.
18     Q:   Sir, have you ever read the complaint?
19     A:   No.
20     Q:   Well, let me approach it a little differently then.
21 When did you first learn or when did you first become aware
22 that the FBI had done an investigation into the Pennsylvania
23 State Police, or a member of the Pennsylvania State Police,
24 rather, let me correct that, where Mr. Ober was involved?
25 When did you first learn of that?

5

6

1     A:   I was traveling from Pennsylvania to I believe
2 Phoenix for a conference.
3     Q:   Phoenix, Pennsylvania down in Montgomery?
4     A:   No that's Phoenixville. Phoenix, Arizona.
5     Q:   Ok.
6     A:   At Pittsburgh, I met Colonel Westcott who
7 asked, once I got into the hotel and checked in to give him a
8 call. And he had something to discuss with me. When I got
9 into Phoenix, I got to the hotel. I checked in. I called him and I
10 met him in the lobby. At that point Major Tom Williams was
11 also there and it was at that point that Colonel Westcott
12 advised me as to the inquiry that they wanted done.
13     Q:   Why were you going to Phoenix, Arizona?
14     A:   Conference.
15     Q:   And the nature of which was?
16     A:   I believe it was a CARE conference but I'm not
17 sure.
18     Q:   What is a CARE conference?
19     A:   It has to do patrols and how we augment our
20 patrol function, dealing with accidents basically.
21     Q:   All right sir. Major Williams was also at the
22 conference?
23     A:   Yes.
24     Q:   Colonel Westcott was not at that conference.
25 You were to contact him be telephone? Or was he at the

1 conference?
2     A:   He was there.
3     Q:   He was there?
4     A:   I met him in the lobby of the hotel.
5     Q:   All right well bear with me. Remember I don't
6 have your knowledge of things so don't be upset with me. I'm
7 not trying to trick you. I'm trying to piece things together. In
8 other words you and Major, would it have been Major
9 Williams?
10     A:   Correct.
11     Q:   And Colonel Westcott had traveled to Phoenix
12 for a CARE Conference.
13     A:   Correct.
14     Q:   And you had traveled independently?
15     A:   Correct.
16     Q:   And you met
17     A:   At least until I got to Pittsburgh. Colonel
18 Westcott and I were on the same plane but not seated
19 anywhere near one another.
20     Q:   All right well let's go to Pittsburgh. Did you
21 meet before you got on the airplane?
22     A:   Yes.
23     Q:   And how much time was there between when
24 you got on the airplane and when you met Colonel Westcott
25 out there in Pittsburgh? How much time did you have on the

1 ground before you boarded the plane and sat in different
2 spots.
3     A:   A few minutes.
4     Q:   Now having traveled to the west coast
5 numerous times I'm aware that that's a lengthy flight. Was it a
6 'red-eye' or what time of day was it? Do you remember?
7     A:   It was in the middle of the day I believe.
8     Q:   Great, you're a lucky man. Now did you make
9 any changes? In other words did your flight? You probably
10 stopped for fuel somewhere, Kansas or someplace like that?
11 Maybe not or was it a direct flight?
12     A:   It was a direct flight.
13     Q:   And how full was it?
14     A:   I have no idea.
15     Q:   Well during that flight did you and the Colonel
16 move seats? I've had these experiences myself so bear with me
17 and sit down and talk?
18     A:   No.
19     Q:   Never talked during that entire flight?
20     A:   No.
21     Q:   Now Major Williams was on a different flight?
22     A:   I have no idea.
23     Q:   Well he wasn't on your flight was he?
24     A:   Not to my knowledge.
25     Q:   You got to Phoenix, get to the airport. And

9

1 what time of the year was this?
2     A:   I'm not sure.
3     Q:   You don't know what time of year it was?
4     A:   I'm not sure.
5     Q:   All right, when you got off the airplane did you
6 get together again? Did you talk again? Or did you meet or
7 whatever? Did you come together, you and the Colonel?
8     A:   The next meeting was in the lobby of the hotel,
9 after I checked in.
10     Q:   Did you travel from the airport to the hotel
11 together?
12     A:   I do not believe that we did. If we did I do not
13 remember it.
14     Q:   All right so you got to the hotel and you had
15 been given a message beforehand that he wanted to talk to
16 you. Right?
17     A:   Colonel Westcott told me that.
18     Q:   Yeah, I'm sorry. Colonel Westcott wanted to
19 talk to you. And had he given you any indication what he
20 wanted to talk to you about?
21     A:   No.
22     Q:   And let's get to this first meeting in the lobby
23 of the hotel. Had Major Williams arrived by that time?
24     A:   The three of us were in the lobby of the hotel.
25     Q:   And so you sat down, at a table somewhere,

10

1 maybe to rest a little bit. And tell me what was said during
2 that conversation.
3     A:   As best I can remember it Colonel Westcott
4 informed me that some information had become available
5 through a meeting with Captain Ober, Colonel Hickes, and I
6 believe Colonel Evanko regarding an investigation that had
7 taken place in western Pennsylvania with respect to a trooper
8 who allegedly was selling positions within the organizations to
9 applicants to be moved on the list to be selected for a cadet
10 vacancy. And that the FBI had been involved in this
11 investigation or had made some inquiries in the investigation.
12 That the bureau had contacted Captain Ober, that Ober had
13 informed Colonel Hickes of this inquiry, of this federal
14 investigation.
15     Q:   In sum Colonel Westcott says that the FBI had
16 done some kind of investigation of influence peddling of some
17 sort, some allegation of influence peddling and that the FBI
18 contacted Mr. Ober. And was Ober a captain at that time?
19     A:   I don't know.
20     Q:   And that Mr. Ober had told Mr. Hickes?
21     A:   That is correct.
22     Q:   And that the Colonel, being Colonel Evanko,
23 had been made aware of that and then, is that the sum of
24 what he told you?
25     A:   That Colonel Evanko had been made aware of

1 that at some point after, exactly when I didn't know. And yes
2 that's about it.
3     Q:   Well can we focus on that word 'after that you
4 just mentioned there, that just came out of you?
5     A:   Yes.
6     Q:   I want you to try to do something. I want you
7 to go back to that meeting and I want you to go into your
8 mind, into your thought process at that time. Ok? Colonel
9 Westcott tells you this. Did it occur to you, was there a
10 question in your mind of "So what, what did Ober do or what
11 is this about?" I mean did you ask any questions about that?
12     A:   I think the crux of the issue was the Colonel
13 Evanko had not been notified of this federal investigation or
14 this inquiry by the federal authorities into the department,
15 within a reasonable time frame.
16     Q:   How did you know that?
17     A:   That's pretty much what was conveyed to me.
18     Q:   Ok so Colonel Westcott also told you that there
19 was an issue of Captain Ober telling Colonel Hickes and not
20 telling Commissioner Evanko in a timely fashion. Is that what
21 you're telling us?
22     A:   Yes.
23     Q:   Well let's talk about that? Now let's explore
24 that, just for a little bit.
25     A:   Go back in your mind's eye to that conference,

1    to that meeting. And you say that Mr. Williams was there also?

2        A:   I believe so, yes.

3        Q:   Now Mr. Williams is the gentleman that also

4    did the investigation with you. Right?

5        A:   That's correct.

6        Q:   Did he display any prior knowledge of what

7    this was about?

8        A:   It's my recollection that at that point Major

9    Williams had already spoken to the FBI agent that was

10   conducting this investigation when we got to Phoenix.

11       Q:   Ok. Sir, do you remember that agent's name?

12       A:   Cush, something like that.

13       Q:   I can represent to you that I believe that is, or

14   it may well be his name. Were there any other FBI agents

15   mentioned that you can recollect?

16       A:   No.

17       Q:   During the course of your involvement in this

18   matter, you know, the review, analysis, investigation whatever

19   you want to call with Captain Ober, were any other FBI agents

20   or personnel mentioned at all?

21       A:   If they were

22       Q:   Think carefully on that.

23       A:   If they were I do not recollect that at all.

24       Q:   During the course of your involvement in this

25   matter, when I say in this matter it's the subject of this

13

1    deposition here. If you have any questions about that or your

2    attorney does please feel free to question me on it. During you

3    involvement in this matter did you talk to anybody with the

4    FBI or anybody with any federal agency?

5        A:   No.

6        Q:   Was Louie Freed ever mentioned?

7        A:   Not to me.

8        Q:   Was he ever mentioned by title? You know who

9    he is of course, I think we all do.

10       A:   Yes.

11       Q:   Was he ever mentioned by title or position?

12       A:   Not that I recollect.

13       Q:   So it's fair to say that the only FBI person or

14   Federal agent or person of any type connected with any of this

15   that you can recollect being mentioned would have been

16   Special Agent Cush. Right?

17       A:   That's me recollection. That's the only one that

18   I remember.

19       Q:   Thank you sir. Now let's go back again to this

20   meeting in the lobby of this hotel. Now did Mr. Williams

21   indicate anything that he may have learned from Mr. Cush at

22   that point?

23       A:   I don't believe it was at that point, no.

24       Q:   We'll get to that then. Let's stick to the meeting

25   so we don't take you out of the chronology here, make it a little

14

1    easier for you. All right at that meeting did Colonel Westcott

2    indicate that the Commissioner was unhappy with Mr. Ober

3    telling Mr. Hickes?

4        A:   I don't specifically recall him saying that the

5    Commissioner was unhappy. His directions to us were to look

6    into the facts and report them back.

7        Q:   Did he ask you to find out why Mr. Ober had

8    talked to Mr. Hickes as opposed to Colonel Evanko at that

9    point?

10       A:   My instructions, as I remember them from

11   Colonel Westcott was to gather the facts regarding what had

12   occurred, when they had occurred, reduce it to writing and

13   submit that information to Colonel Evanko.

14       Q:   Did Colonel Westcott say anything about Mr.

15   Ober and by that I mean, you know, here you have some very

16   highly placed officers in the Pennsylvania State Police

17   admittedly the one of the finest police forces if not the best

18   State Police force in the country. You all have a lot of

19   experience, very professional officers. Was there any

20   discussion as to what Mr. Ober should have done

21   professionally or why he proceeded as he did?

22       A:   No. Not from Colonel Westcott.

23       Q:   Was there from anybody at anytime?

24       A:   There was no discussion if you will. The only

25   discussion that I would have had would have been with Major

1    Williams.

2        Q:   I'm going to get to the discussions with Mr.

3    Williams later, ok. But I don't want to that right now

4    because my understanding is we are still at this meeting.

5    Did, at any point did either you or Mr. Williams ask

6    Colonel Westcott, I understand what the focus is. Did you

7    even question like what this was about? What were you

8    doing?

9        A:   I think the directions were clear that we were

10   to look into this matter and gather the facts.

11       Q:   Well the facts you were supposed to gather

12   though begs a major question I assume and that is 'why

13   did Mr. Ober do what Mr. Ober did? Right? I mean there

14   are two questions if I understand it. When you are

15   gathering the facts here and I've done investigations too.

16   In gathering facts, I mean, you have to have a reason to

17   go. There's a presumption that underlies any

18   investigation, not that you reach a conclusion about it.

19   But did it occur to you what the issue was here? In other

20   words was Colonel Westcott asking you to find out why

21   Mr. Ober went to Mr. Hickes as opposed to Mr. Evanko?

22       A:   Well I think the, as I remember, the

23   instructions were to find out exactly what occurred. To

24   me that would have answered the question why.

25       Q:   Ok, all right. Now the background information

1  given to you by Colonel Westcott was that Colonel,
2  excuse me, was that Captain Ober had gone to Colonel
3  Hickes and had not gone to Colonel, and had not gone to
4  Colonel Evanko initially. Is that correct?
5      A:  The information that was given to me was that
6  Captain Ober had gained information during the course
7  of an inquiry that he made or whatever it was. He was
8  contacted by the FBI, that he took that information to
9  Colonel Hickes and there was some period of time that
10  elapsed before either Colonel Hickes or Captain Ober
11  discussed this with Colonel Evanko.
12      Q:  And Colonel Westcott, and in fairness to
13  Colonel Westcott who I'll be deposing later today, he
14  made you aware of all that? I mean those are the things
15  he made you aware of.
16      A:  Those were in the conversation in the lobby of
17  the hotel.
18      Q:  Did he have any documents with him, he being
19  Colonel Westcott?
20      A:  If he did I don't remember them.
21      Q:  How long did that get together last there in the
22  lobby?
23      A:  Fifteen, twenty minutes maybe. Half-hour at
24  the very most I'd say.
25      Q:  Ok. Now what did you do after that meeting

17

1  was over.
2      A:  Sat down with, at some point thereafter I sat
3  down with Major Williams and we discussed the direction
4  we would take in the investigation.
5      Q:  Now you sat down with Major Williams and
6  discussed the direction. We're going to get to that. Now
7  that took place in Phoenix?
8      A:  There was an initial meeting between the two
9  of us in Phoenix as I remember.
10      Q:  In lounge? Hotel room?
11      A:  I don't remember where we met at.
12      Q:  But it was just you and he?
13      A:  That's correct.
14      Q:  All right. What did Major Williams say at that
15  meeting?
16      A:  At that point he explained that he had already
17  spoken to the Special Agent from the Federal Bureau of
18  Investigation. He informed me as to what the particulars
19  were that Agent Cush had given to him. That is pretty
20  much what he told me at that point.
21      Q:  What did he relate that Mr. Cush had said or
22  anything?
23      A:  Basically that he had contacted Captain Ober
24  and that, or that there was contact between Captain
25  Ober and Special Agent Cush and that the, I mean as far

18

1  as particulars go I don't remember anything beyond the
2  fact that he had spoken with him. And he has spoken
3  with him as I remember by phone.
4      Q:  Major, did Major Williams say when he had
5  spoken to Agent Cush in relation to when you had this
6  meeting. In other words how much time had passed?
7      A:  He mentioned when he had spoken to him but
8  I don't know what the time span was between that and
9  when we were meeting.
10      Q:  But your best recollection is that he had
11  indicated that he had spoken to him by telephone?
12      A:  Yes.
13      Q:  Did there come a time when he ever, that he
14  sat down with Mr. Cush? Or you sat down with Mr.
15  Cush?
16      A:  I never did.
17      Q:  Do you know if Mr. Williams did?
18      A:  I do not know that.
19      Q:  And you've already indicated that that's the
20  only FBI person, in the federal law enforcement official
21  that you have a recollection of being talked to about this?
22  Right?
23      A:  That I have a recollection of, yes.
24      Q:  Major Williams had no documents?
25      A:  I do not recall him having any documents. He

1  may have had notes regarding the conversation with
2  Cush but I don't specifically recall those.
3      Q:  Did you ever develop an appreciation or
4  develop any knowledge of when the, this meeting in
5  Phoenix, you don't remember when this meeting in
6  Phoenix was?
7      A:  No sir I don't. I went back through a calendar
8  to try to find out when we went out there but I can't find
9  it.
10      Q:  Now in that regard, aside from meeting with
11  Joanna or Syndi Guido have you discussed this
12  deposition or coming here with anyone in the
13  Pennsylvania State Police?
14      A:  No sir.
15      Q:  You haven't gone over it with Colonel Evanko
16  or Colonel Westcott?
17      A:  No sir I have not.
18      Q:  Or anyone else? Is that right?
19      A:  That's correct.
20      Q:  Why did you consult a calendar about when
21  that meeting in Phoenix was?
22      A:  Well I knew I was coming here for a deposition.
23      Q:  And you figured you'd be asked that question?
24      A:  And you would want to know when I found out
25  about it?

Q: About how much time did you Colonel, I'm sorry sir, I keep bouncing around with the ranks, how much time did you and Major Williams spend on that meeting out there in Phoenix?

A: I'd say we probably put in a half hour, forty-five minutes discussing what he had already found out and what we were going to do.

Q: That's my next question. What had he already found out and how had he been working on the matter, if working on the matter is a proper description? I'm not saying it is.

A: I don't know how much time he had spent on the issue. It was my understanding that he did make the inquiry by telephone. I'm sorry. What was the second part of the question?

Q: Yeah, what information did he develop? I mean he calls Mr. Cush. Had he spoken to the Commissioner? I mean what other inquiries had made.

A: To the best of my knowledge the only one that he had spoken to with regard to the investigation at that point was Cush. And Cush had informed him as to times and what the substance of the conversation was between Cush and Captain Ober.

Q: Times and substance. Well did he say who authorized him to call Mr. Cush? I mean he certainly

21

wouldn't have called Mr. Cush without the Colonel's approval cause that's the whole reason why we're checking into Mr. Ober. Right?

A: It was my understanding that he had received that information from Colonel Evanko but, excuse me, Colonel Westcott.

Q: Colonel Westcott. Let's make sure the record is clear. I'll give you a chance to make that clear.

A: Colonel Westcott.

Q: What you're telling us is, that Mr. Williams you're best recollection is that Mr. Williams indicated, for want of a better word, that authorization, and I'm not saying that's the perfect word, the impetus or the initiative that caused him to call Mr. Cush was transmitted to Mr. Williams, Major Williams via Colonel Westcott. Am I correct?

A: Yes.

Q: And not Colonel Evanko, make sure the record's clear.

A: That's correct.

Q: All right sir. Well what did he say that Colonel Westcott had told him? In other word what did Mr. Williams say, Major Williams say that Colonel Westcott had told him?

A: He basically, we didn't get into that

22

conversation other than what I've already explained to you, that Cush had made contact with Captain Ober or there was contact between them and that there was information given to Captain Ober.

Q: And that then that Major Williams had called Mr. Cush prior to the meeting in Phoenix?

A: As best I can remember Major Williams had spoken to Cush prior to that meeting. That is my recollection of it.

Q: And at the behest of Colonel Westcott?

A: That's correct.

Q: Please don't, forgive me; please don't take this question the wrong way. I have some military experience; it's in the army. I have never had the privilege of serving in the Pennsylvania State Police, but it is frequently referred to as a paramilitary organization. Is that correct?

A: That's correct.

Q: Is it out of place to ask a colleague why you're doing something or why we're doing something? Why are we doing this or why does Colonel Westcott have an interest? Or why does Colonel Evanko have an interest? Or is that a no-no, don't you do that? I don't mean that to be an argumentative question but I'm just wondering if at some point out there in Phoenix you say, you know you sort of think out loud and talk with your colleague

and say, "Hey what's this about? What's going on here?" Was there any discussion like that at all?

A: I don't believe there was a necessity for that discussion. We were told to gather the facts of this particular incident and that's what we were doing. I believe that the question why would have been answered when the investigation was completed.

Q: Well you weren't investigating Colonel Evanko were you?

A: No.

Q: Well he is the one, either he or Colonel Westcott were the one's that were initiating this inquiry so the question as to why you were doing this rests with them. Not with Captain Ober. I mean the why questions as to Captain Ober's conduct that you are establishing through a factual investigation. Why you're doing the investigation itself, which I what I'm asking if it ever occurred to you or to Major Williams if you ever discussed that, like you know why are we doing this? What's this about? What's the problem here?

MS. REYNOLDS: I object. Asked and answered already.

MR. BAILEY: You can respond sir. It's ok.

A: It seemed obvious to me why we were doing it. We were told to.

1  Q:   Ok. All right now do you know whether Mr.
2  Williams, its Larry Williams isn't it?
3  A:   No sir.
4  Q:   What's his first name right there?
5  A:   Tom.
6  Q:   I'm sorry. Thomas Williams had he indicated
7  whether he had had any discussion with Colonel Evanko
8  before coming to Phoenix?
9  A:   No sir he did not.
10  Q:   Did he say how Colonel Westcott had
11  contacted him? In other words had he called him? Had
12  they met?
13  A:   No sir he did not.
14  Q:   Did he at any time ever indicate attendance at
15  a meeting at a meeting where Colonel Evanko was
16  present or the issue of Mr. Ober was discussed?
17  A:   Not that I'm aware of.
18  Q:   And I think you indicated that you don't
19  recollect him having any kind of documents or any kind
20  of files or anything like that with him?
21  A:   If he had anything, it would have been notes
22  regarding the conversation he had with Cush. That would
23  have been all. If he in fact had them and I'm not sure
24  that he did.
25  Q:   Have you ever had an investigation initiated by

                              25

1  one of your superiors when you're off doing a conference
2  or doing something of this manner or are you usually
3  called in the office and sat down while you're at home
4  working on something?
5  A:   I don't know if the fact that we were going to a
6  conference had anything to do with the assignment. I
7  think the assignment had come at a particular time and
8  it happened to be at the same time that we were traveling
9  to this conference. And in my opinion that was the only
10  reason that was discussed at that point.
11  Q:   Well you weren't given a memo. You said there
12  are no documents. There wasn't a memo, some
13  assignment sheet or any kind of order or anything; or you
14  don't deal with written orders in the State Police?
15  A:   It was verbally conveyed to both myself and
16  Major Williams as to what we were.
17  Q:   In Phoenix Arizona in at a meeting?
18  A:   That's how it was conveyed to me.
19  Q:   Well it obviously had been conveyed to Mr.
20  Williams.
21  A:   I don't know when.
22  Q:   You don't know when.
23  A:   No sir I don't.
24  Q:   Did you ever learn how much time had passed
25  between when Mr. Evanko learned about what Captain

                              26

1  Ober had done in going to Colonel Hickes in this meeting
2  in Phoenix? You know was it month's afterwards? Was it
3  six months?
4  A:   Did I ever learn that?
5  Q:   Yeah.
6  A:   Yes.
7  Q:   How long was it?
8  A:   I don't know, don't remember.
9  Q:   Do you remember whether it was month or
10  was it days?
11  A:   I don't remember sir.
12  Q:   And you don't know when the Phoenix meeting
13  was? And you don't know how much time transpired?
14  And you don't know how much time had gone by between
15  the Phoenix meeting and when Colonel Westcott had
16  talked to Colonel, or to Major Williams about it. Right?
17  A:   I was never told that.
18  Q:   All right let's move those out of the way now.
19  A:   In relation to this matter what's the next? Did
20  you have any other meetings in Phoenix with anybody,
21  any more discussions with anybody regarding this
22  matter?
23  A:   No sir.
24  Q:   Did you make any calls back to Pennsylvania
25  about the matter?

1  A:   No sir.
2  Q:   Do you remember how long that meeting in
3  Phoenix was, the conference was?
4  A:   It was a few days.
5  Q:   And after the conference was over you
6  returned to Pennsylvania?
7  A:   Correct.
8  Q:   What happens next in regards to this matter,
9  let's call it the Ober matter ok? What happens next
10  regarding the Ober matter?
11  A:   Major Williams and I spoke to each other on
12  the phone. Sort of rehashed what we had gone over in
13  Phoenix and began to set up times for the interviews that
14  we were going to conduct.
15  Q:   All right do you have any notes or documents
16  about any of this?
17  A:   Not at this point no.
18  Q:   At that point you did not have any?
19  A:   That's correct.
20  Q:   Were you both in Harrisburg, where were you
21  when you had this phone conversation after you got
22  back?
23  A:   I was in Bethlehem. I have an office in
24  Bethlehem. And I believe Major Williams was in his office,
25  I believe in Montoursville. I'm not certain of that.

Q:    Now did you record that conversation? Do you know whether you took notes during that conversation at all?

A:    On the telephone with Major Williams?

Q:    Well I mean at least take notes. I don't expect you to record it unless both of you wanted to. I'm not implying that you did or would but did you take notes? Anything of that conversation?

A:    No sir. We merely set some dates as to when we were going to get together to conduct interviews.

Q:    Well the reason I'm asking that is so, you know, you're talking about who you are going to interview or were you just talking open dates or you just discussing actual people you were going to talk to?

A:    We had discussed specific people that we were going to talk to.

Q:    Tell us who you talked about talking to?

A:    Well we wanted to talk to Captain Ober.

Q:    Naturally. Ok Captain Ober.

A:    Colonel Hickes.

Q:    Colonel Hickes. Go ahead.

A:    At the time Major Conley, Major Merryman, I may mispronounce his name, Sypher, I'm not sure how it's pronounced. He was working for BPR at the time. Colonel Westcott.

29

Q:    Ok.

A:    Colonel Evanko and Colonel Coury, to be interviewed.

Q:    So you're talking 1-2-3-4-5-6-7-8 witnesses to learn the facts about Captain Ober going to Colonel Hickes. Do you know whether Colonel Evanko ever talked to Colonel Hickes about this issue or this matter at all?

A:    At that point did I know?

Q:    Yeah.

A:    No I did not know that. We had not conducted any interviews.

Q:    I'm not saying you did. Don't infer.

A:    I'm not saying I did either, sir. You asked me if I knew if he had contacted and the answer is no.

Q:    I know you're not, I just think I asked a very poor question and I'm trying to clarify it because I don't want to be unfair to you. Have you ever learned that prior to the conclusion of your, can you call it an investigation, a fair word I think given the facts?

A:    An inquiry.

Q:    I thought you'd come up with that. If you're comfortable with that we'll call it an "Inquiry" ok. Prior to the conclusion of your inquiry, did you learn that at any time prior to the conclusion of your inquiry whether

30

Colonel Evanko had simply gone to Colonel Hickes to discuss this matter?

A:    Prior to the conclusion?

Q:    Yeah.

A:    Yes.

Q:    So Colonel Evanko had gone to Colonel Hickes to discuss this matter?

A:    It's my understanding that they had spoken. Who had gone to whom? I don't believe that it was Colonel Evanko that had gone to Colonel Hickes. I think it may have been the other way around.

Q:    Ok so your best recollection is that Colonel Hickes went to Colonel Evanko to discuss this matter and that doesn't mean the meeting where Colonel Ober, Colonel Evanko and Captain Ober were together with Colonel Evanko does it? I mean we're talking about something different than that aren't we?

A:    It's my recollection I believe that Captain Ober was at that meeting.

Q:    Ok aside from that meeting, that being the meeting when Colonel Hickes and Captain Ober first informed Colonel Evanko of the FBI probe, aside from that are there any facts known to you which would indicate that Colonel Evanko and Colonel Hickes discussed this Ober matter?

A:    I believe there was one other meeting between them where, if I'm not mistaken Colonel Coury may have been present.

Q:    And do you know what happened at that meeting. I mean during your inquiry I'm assuming that you made notes and investigated that.

A:    It was part of the report.

Q:    It was ok. Well tell me what you found out.

A:    Basically that there was that meeting. The specifics I do not recall.

Q:    You don't know what happened in that meeting or during that meeting.

A:    It was discussed as to why Colonel Evanko wasn't informed.

Q:    Well was it discussed if Colonel Hickes should be disciplined do you know?

A:    At that meeting?

Q:    Yeah.

A:    Not to my knowledge.

Q:    Were you ever asked to investigate Colonel Hickes?

A:    I wasn't asked to investigate anyone in particular. We were just asked to gather the facts regarding how this information got to the department and what was done with it and what was not done with it.

1  Q:  Well when you did your inquiry you read some
2  warnings or some advisory rights of some type to Captain
3  Ober didn't you?
4  A:  Yes.
5  Q:  What other witnesses did you do that with?
6  A:  I don't recall. Possibly one other but I'm not
7  sure who.
8  Q:  Who might that be? You don' t recall?
9  A:  No sir I'm not sure who.
10  Q:  Well was it Colonel Hickes?
11  A:  It possibly could have been but I don't recall.
12  Q:  Do you have a copy of any notes or what not
13  that you did during the, you know personal notes that
14  you did during the "Inquiry?"
15  A:  No sir.
16  Q:  So you turned everything in right?
17  A:  I-kept nothing sir.
18  MR. BAILEY: Hole in minute please.
19  **END OF AUDIOTAPE SIDE A- TAPE ONE**
20  MR. BAILEY: Did you in fact end up interviewing
21  Captain Ober?
22  A:  Yes.
23  Q:  Did you end up interviewing Colonel Hickes?
24  A:  Yes.
25  Q:  But you don't remember whether you read

33

1  warnings to anyone except Captain Ober?
2  A:  I know there was at least one other person that
3  was, warnings were read. I don't recall who that is.
4  Q:  You interviewed Major Connelly. Right?
5  A:  Correct.
6  Q:  And you interviewed Major Merryman?
7  A:  Correct.
8  Q:  There's a Sypher or Slipher or something like
9  that who was working in BPR at the time that you
10  interviewed. Is that right?
11  A:  Correct.
12  Q:  And you interviewed Colonel Westcott, Colonel
13  Evanko, and Colonel Coury?
14  A:  I believe so.
15  Q:  Why did you interview Colonels Westcott,
16  Commissioner, I guess full Colonel Evanko, and
17  Lieutenant Colonel Coury, why did you?
18  A:  To determine exactly when they had discovered
19  this information or when it was related to them. So that
20  there would be a complete report as to when the
21  information came in, what was done with it and when
22  they were advised of that information?
23  Q:  Well who was present when colonel Hickes and
24  Captain Ober told Colonel Evanko?
25  A:  I don't remember that.

34

1  Q:  Do you have a recollection of anyone else being
2  present?
3  A:  I don't remember who was there sir.
4  Q:  Do you have a recollection of how long these
5  interviews lasted?
6  A:  What interviews sir?
7  Q:  Interview with Major, or with Colonel Evanko?
8  A:  No sir. Not a very long time.
9  Q:  And how about Colonel Westcott?
10  A:  Same.
11  Q:  And Colonel Coury?
12  A:  Same.
13  Q:  Did you read them any rights?
14  A:  No sir I don't believe so.
15  Q:  Fact is that Colonel Evanko was the
16  complaining party was he not?
17  A:  I don't know if there complainant on it. The
18  only information that I had came from Colonel Westcott
19  at Phoenix.
20  Q:  Well when you start an investigation or an
21  inquiry or whatever you have some type of mandate don't
22  you, some kind of direction to do something or begin
23  something. Is that right?
24  A:  Yes sir and that came from Colonel Westcott.
25  Q:  And you have a duty if somebody is the object

1  of the inquiry to give them notice. Right?
2  A:  That depends on basically what it is that's
3  being done. I mean we weren't looking at a criminal type
4  of a matter if you will.
5  Q:  Why not?
6  A:  At this point we didn't feel that there were any
7  crimes violated.
8  Q:  I mean was there a possibility that Captain
9  Ober was covering for somebody below and didn't want to
10  tell the top authorities about it or something?
11  A:  It did not appear to be.
12  Q:  Never received any facts like that?
13  A:  It did not appear to be that Captain Ober had
14  conducted anything that was of a criminal nature at the
15  time that we conducted the interview with him.
16  Q:  Well had he conducted? What had he done
17  wrong?
18  A:  We didn't know. That's why we were
19  conducting the interview. We had no information that he
20  had conducted anything in a criminal manner.
21  Q:  Well did anybody anytime tell you we think he
22  did this wrong or that wrong?
23  A:  That's what we were asking. Basically to find
24  out what it was that he received, what information he
25  received, what he did with that information.

Q:   Now I don't want to offend you and I've asked you probably that question in a different form maybe a dozen times?

A:   Yes sir.

Q:   You're getting tired of it aren't you? Right? I mean its, you know. I'm not trying to irritate you but I'm going to try to change gears a little bit ok? Were you on a fishing expedition? I mean have asked you that question about what this was about a dozen times or better at least. What was this about? You know, were you on a fishing expedition? Is that what you were doing?

A:   I don't believe so.

Q:   Well you've told me at least a dozen times I think in fairness to you and in fairness to me that you're there to find out the facts.

A:   That's correct.

Q:   You know as a trained police officer and I know as a lawyer in this constitutional system that before we read people rights, sit down and ask them questions, make notes on what they do, order them to do things, etc that you have reasons to do that. I'm looking for the reasons.

A:   Reasons were that we were instructed to gather the facts regarding Captain Ober obtaining this information and what he did with it.

37

Q:   And the underlying fact is nobody ever told you why you were doing this, did they? Or did they?

A:   Gather the facts.

Q:   Well we lie , all right sir, we know that they told you to gather the facts. Now my question again is no one told you why you were supposed to gather these facts. Now if they did you tell me. I don't know the answer to that question and I'm not trying to be unfair to you and I'm not trying to irritate you. I'm still looking for the answer to that question.

A:   I believe I've answered that question.

Q:   You do?

A:   Yes sir I do. We were told to gather the facts and you can say why were you told to gather the facts and you can say why were you told to gather the facts obviously to inform Colonel Evanko as to what occurred. Now you can continue ask why and why and why but I've answered the question that you've asked.

Q:   Now when you and Mr. Williams, Major Williams talked on the telephone that day after you got back from Phoenix you'd indicated a number of witnesses that you talked about scheduling witnesses. In other words in order to do a schedule you had, who came up with this list of witnesses.

A:   I'm not sure that the, that entire list was

38

discussed if you will in that phone call. To the best of my recollection those were the people that were eventually interviewed. Whether we had all of those people at the time I can't be sure. Eventually that's who we did talk to.

Q:   Major, give this question; I want you to sit back in your mind and go back over this. I want you to give this question your utmost attention, please. After you came back from Phoenix, until you and Major Williams completed the inquiry, the investigation, whatever you want to call it, ok.  Inquiry. Ok until you completed the inquiry to use your word, did you or Major Williams check with or discuss the progress of your inquiry with any superior officers at all? And if so, when and who? Now think carefully please. I really want to know the answer to this.

A:   I can only answer for myself and the answer to that question is no.

Q:   All right. I assumed, I was hoping that was going to be your answer. Now because as I understand it, it would have been inappropriate to do otherwise or would it not have been? Let me put the question this way. Would have been inappropriate for you to have discussed the progress of your inquiry with Colonel Evanko? You told us that he was going to be a witness about this procedure and I want to know if, you also

Colonel Westcott was supposed to be a witness, a fact witness in this inquiry and what I'm looking for is during the course of this inquiry into Mr. Ober's affair in reporting to Colonel Hickes I want to know if you discussed the inquiry, what you were learning or what you should check into with Mr. Evanko or Mr. Westcott?

MS. REYNOLDS: I object as to form but witness can answer.

MR. BAILEY: You may respond.

A:   To the best of my knowledge this with either Colonel Westcott or Colonel Evanko.

Q:   Is it fair to say that during the course of the inquiry aside from doing the things that you do during an inquiry, you know questioning people and gathering information, your investigation or your inquirization or whatever it is that the only person that you discussed the progress and nature with would have been Major Williams?

A:   To the best of my recollection that's the only one I ever spoke to.

Q:   Now, Major Werts, during the course of the investigation did Mr. Williams ever indicate that he had discussed the progress of the investigation or the inquiry with Mr. Evanko or Mr. Westcott or anyone above him in the chain of command?

1   A:   Beyond the preliminary instructions?

2   Q:   Yeah beyond Phoenix of course.

3   A:   Not to my knowledge, I don't particularly recall
4   him ever telling me that he spoke to anyone.

5   Q:   Ok, all right. So it was either you and, or it
6   was you or, Major Williams that originated the idea of
7   interviewing the witnesses that you had mentioned here.
8   Is that fair to say?

9   A:   Yes.

10   Q:   Now when you went to see Captain Ober didn't
11   you present him with a piece of paper or something
12   saying that this is what this things about?

13   A:   There was I believe an administrative warning.

14   Q:   Does this look like it right here. Want to take a
15   look at that? Let her take a look at that.

16   A:   I believe this is a copy of that form.

17   Q:   Ok do you have a recollection of whether you
18   gave Captain Ober anything else? When you went to talk
19   to him.

20   A:   I do not have a recollection of that no. Would
21   you agree with me that this is a form entitled
22   Pennsylvania State Police Notification of Inquiry? I'm
23   trying to get the form number off here. This is what age
24   does to you here. SP 1-102 with a date of 8/93. Is that a
25   form you are familiar with? And it may not be. Don't

41

1   A:   I'm sorry I don't understand what it is you're
2   getting at.

3   Q:   Under box three looks to me when I saw it and
4   I may be missing something here, that there's a, it says
5   office of Chief Counsel is "Xed" out and Commissioner is
6   typed in.

7   A:   Yes sir.

8   Q:   Am I in error?

9   A:   No.

10   Q:   I am correct? Rarely that I am except for these
11   kinds of cases. Ok now who crossed out Office of Chief
12   Counsel and substituted, typed in Commissioner?

13   A:   I believe it was Major Williams but I'm not
14   sure.

15   Q:   You're not certain.

16   A:   No sir.

17   Q:   Now do you know when he did that?

18   A:   No sir I do not.

19   Q:   And underneath that it says by order of the
20   Pennsylvania State Police Commissioner, Paul J. Evanko,
21   I have been assigned to make inquiry into your
22   knowledge of the facts or circumstances surrounding the
23   political corruption investigation that was conducted by
24   the FBI in western Pennsylvania. See political corruption
25   there?

1   separate those if you can but please take a look at that.
2   Your eyes look like they're better than mine. Look at that
3   in the upper right hand corner. Just identify that for me.

4   A:   SP 1-102. 8 of 93. Pennsylvania State Police
5   Notification of Inquiry.

6   Q:   Is that a standard form do you think? Or do
7   you know?

8   A:   If it has that number on it there's more of
9   them and we didn't make it up.

10   Q:   Ok you can hold it for a second there. If you
11   look I the third box there, the third box that's checked. It
12   got an 'X' in it. See that?

13   A:   Ok, read what follows that box.  An
14   administrative investigation is being conducted pursuant
15   to a request from the Commissioner. Your involvement
16   has been identified as follows.

17   Q:   Now somebody 'Xed' that out right?

18   A:   Yes they did.

19   Q:   And what's underneath that on that form
20   normally?

21   A:   Some type of an explanation as to why we're
22   conducting the investigation or inquiry.

23   Q:   And who does it say is, some kind of an
24   explanation as to why. And what's in replace of it? What's
25   "Xed" out and put in replace of it?

42

1   A:   Yes.

2   Q:   Well who decided this was a political
3   corruption investigation?

4   A:   That this was a political corruption
5   investigation? That's not what that says.

6   Q:   This wasn't a political corruption investigation
7   was it?

8   A:   This inquiry was not a political corruption
9   investigation.

10   Q:   Well what was this inquiry?

11   A:   This was an inquiry into the facts of how
12   Captain Ober got information regarding a political
13   corruption investigation in western Pennsylvania.

14   Q:   There wasn't any question on how he got the
15   information was there? That was known wasn't it?

16   A:   Your first question related to this being a
17   political corruption investigation. This is not a political
18   corruption investigation.

19   Q:   Ok in fairness to you what you're trying to say
20   to me is the facts and circumstances surrounding the
21   underlying investigation right?

22   A:   The investigation?

23   Q:   Right.

24   A:   Yes.

25   Q:   And there's an acknowledgement here

1  apparently or an idea that this underlying investigation
2  was a political corruption investigation. Right? That was
3  the underlying thing that Mr. Ober had been contacted
4  about.
5      A:   The political corruption investigation was the
6  investigation that the FBI was looking into in western
7  Pennsylvania.
8      Q:   And do you know, did you ever look at any of
9  the materials involved in that underlying investigation?
10     A:   Yes there were statements that were, at some
11 point supplied to us.
12     Q:   And who supplied them to you?
13     A:   My understanding is the FBI.
14     Q:   Ok, who in the FBI supplied them to you?
15     A:   The only individual I know was Cush.
16     Q:   What did he provide to you?
17     A:   There was recording of statements between the
18 Trooper and I believe an informant and an applicant.
19     Q:   Was the governor's office ever mentioned sir?
20     A:   The Trooper I believe at some point during one
21 of these tapes mentioned the governor's office.
22     Q:   Well was any state senator ever mentioned?
23     A:   I believe the Trooper mentioned that.
24     Q:   Well the Trooper we're talking about was one of
25 the subjects of the underlying political corruption

45

1  investigation wasn't he?
2      A:   That's correct.
3      Q:   All right sir. Was a state representative ever
4  mentioned?
5      A:   I don't know if it was a Senator or a
6  Representative or both but there was.
7      Q:   Well I can tell you I think it was both. I want
8  you to think back and tell me though because you saw
9  these documents. If you remember was it both or just
10 one, but you do remember the governor's office right?
11     A:   The governor's office, not anyone in particular
12 was mentioned and there was either a state
13 representative or senator that was mentioned.
14     Q:   Or both?
15     A:   That's possible. I don't recall it.
16     Q:   Well I can assure you it was both. Now so
17 there was never any question that rightfully or wrong
18 fully there was a bona fide political corruption
19 investigation whether justified or not regardless of what
20 the outcome was, being conducted by the FBI right?
21     A:   Being conducted by the FBI yes.
22     Q:   And the State Police were not, aside from
23 Captain Ober being notified were not involved in that
24 investigation. Am I correct?
25     A:   That's correct.

46

1      Q:   All right. Do you have any recollection or any
2  knowledge why the office of chief counsel was "Xed" out
3  and Commissioner was substituted? Not who did it but
4  why that was done?
5      A:   No sir.
6      Q:   Did you ever discuss that with Major Williams?
7      A:   No sir.
8      Q:   Do you know whether, were you present when
9  the interview was done with Colonel Evanko?
10     A:   Yes.
11     Q:   Now was that before or after the interview with
12 Captain Ober?
13     A:   After.
14     Q:   So after Colonel Evanko had ordered an
15 investigation into the conduct of Captain Ober you sat
16 down with Colonel Evanko as a fact witness in this
17 matter? A decision that was made to the best of your
18 knowledge by you and Major Williams?
19     A:   Correct.
20     Q:   Sir if we can, I'm going to try to change gears
21 on you just a little bit. I'd like to go to the interview. I
22 want you to go back and sort of get your mind in a sort of
23 a change-up here. I want to ask you some questions now
24 about the interview with Captain Ober.
25     A:   Yes sir.

1      Q:   One last question before I get there. Do you
2  know who prepared this form here? The notification of
3  inquiry form?
4      A:   No sir I do not.
5      Q:   You know you didn't though?
6      A:   Yes sir.
7      Q:   And you know that you didn't cross out the
8  office of chief counsel and substitute commissioner?
9      A:   That's correct.
10     Q:   How many of these inquiries have you done in
11 the past? Just a few more questions and then we'll move
12 on to the investigation, the interview. How many of these
13 kinds of things have you done?
14     A:   Never.
15     Q:   Never?
16     A:   If you're talking about something other than a
17 BPR investigation,
18     Q:   No I know that most of you
19     A:   Because a BPR investigation, I've conducted a
20 number of those.
21     Q:   Yeah, I don't think there's probably an officer
22 that I know of in the State Police above the rank of
23 Captain, or Captain or above who hasn't been assigned
24 that duty. And I'm sure it's not a pleasant one but I know
25 that you do it. You have to do it. I did want to ask that

1  because up there, do you see the block up there? Look at
2  the upper right hand block. You see the little letters BPR
3  and then a dash?
4      A:   Yes.
5      Q:   What's that block for?
6      A:   There's a number put in there by BPR when
7  its' an internal affairs investigation.
8      Q:   But there's no number here?
9      A:   That's correct.
10     Q:   Do you know why?
11     A:   To the best of my knowledge at the time it was
12  not an internal affairs investigation.
13     Q:   Was it an external affair, I mean is there a
14  term external affairs investigation?
15     A:   No sir there is not.
16     Q:   What's an administrative investigation? I mean
17  let me tell you. These three blocks here: complaint
18  investigation, a non-complaint investigation in
19  accordance with department directives and an
20  administrative investigation. What's the difference
21  between those, if you know what those things are?
22     A:   A complaint investigation normally comes from
23  a member of the public who is complaining about the
24  conduct of a Trooper. You have a complaint. A non-
25  complaint investigation there are certain actions

49

1  violated, that you know of, that you can recollect.
2      A:   As I recollect there was regulations within the
3  bureau that required members of the Bureau to report
4  specific investigations to the Bureau Director so that that
5  information could be given to the necessary deputy
6  commissioner or commissioners if that in fact was
7  needed. It is my understanding that Captain Ober failed
8  to do that.
9      Q:   Ok, well who decided that he failed to do that?
10  Is that your conclusion?
11     A:   That's my conclusion based on the information
12  that came out of my investigation.
13     Q:   Is that a chain of command violation or?
14     A:   It could fall under that label if you will.
15     Q:   Well what regulation deals with chain of
16  command?
17     A:   There's a host of regulations about reporting
18  information.
19     Q:   Like?
20     A:   You're required to report information when it
21  comes to you attention. There's a regulation within the
22  Bureau of Professional Responsibility that you are to
23  report information regarding an investigation to the
24  Bureau Director.
25     Q:   So this was a political corruption investigation

1  sometimes committed by Troopers that require an
2  investigation even though there is no complaint. Firing a
3  gun
4      Q:   A gun is discharged.
5      A:   That's right.
6      Q:   There's a need to, go ahead.
7      A:   And an administrative inquiry or investigation
8  as this was is looking into facts regarding possible
9  violations of regulations, looking at the way things were
10  done to insure that things were done either correctly or
11  was there an error committed by anyone.
12     Q:   What were the possible violations of
13  regulations, if there were any? I'm not saying there were
14  any. Do you know of any?
15     A:   The possibility existed. At what point do you
16  want me to answer this question?
17     Q:   When I'd asked you this you told me, I'm not
18  being argumentative with you, I want you to know I think
19  you are an extremely professional witness and I think
20  that you appear to be making every effort to me to be
21  making every possible effort to be truthful and open. I
22  want to tell you I respect that in you. I'm not being
23  argumentative. It comes back to the same difficulty that
24  I'm having though, ok? At any point what were the
25  possible regulations that this man, that Mr. Ober

50

1  and Captain Ober had a duty to report it right on up the
2  chain of command, huh?
3      A:   Well he was supposed to report it at least to
4  his supervisor.
5      Q:   And who was his supervisor?
6      A:   It could have been one of two people. Major
7  Merryman, however I think major Merryman had already
8  left the Bureau and was replaced by Major Conley.
9      Q:   Well now as I understand it your inquiry, of
10  course Mr. Ober had indicated this, Mr. Ober had gone to
11  Mr. Hickes. Right? Colonel Hickes.
12     A:   That's correct.
13     Q:   What was Colonel Hickes title?
14     A:   Deputy Commissioner of Staff I believe.
15     Q:   That doesn't cover you when you're reporting?
16  I mean that doesn't
17     A:   The staff Deputy Commissioner is certainly not
18  in his chain of command.
19     Q:   Ok, where's the regulation that deals with the
20  chain of command that you have to report in the chain of
21  command?
22     A:   There's an organizational chart that shows you
23  what your chain of command is.
24     Q:   Yeah but what's your violation if you, you
25  know. Let's say you have a problem with your immediate

supervisor. Are you telling me that regulations preclude you from going around that supervisor?

MS. REYNOLDS: Already asked and answered.

MR. BAILEY: You can respond sir. I don't agree with that by the way but you may respond.

A: What's the problem we're talking about?

Q: I haven't heard a regulation yet. I want to know if there is a regulation, which says, I'm having a problem with my immediate supervisor in the Pennsylvania State Police. I want to know the regulation, which says I cannot go collaterally, either around or above an immediate supervisor. I mean I see tons of these cases. I deal with them all the time.

A: Yes but you have to stay within your chain of command. Lt. Colonel Hickes is not in Captain Ober's chain of command at the time.

Q: Ok and what's the regulation that say's you have to stay in the chain of command. That's what I'm looking for. In fact we could solve all of this if you just give me that regulation.

A: I don't know what it is.

Q: Well you investigated this matter Major, and again I'm not being argumentative. You investigated this. You just finished telling us that in your view what this man did wrong, what Captain Ober did wrong was that

53

be any more specific than that. He said that several times.

MR. BAILEY: So you reached the conclusion that he violated a regulation but you don't know what the regulation is. Right? Right?

A: I've told you that there was a regulation within the Bureau. To quote it, I cannot do that.

Q: Well does it appear in your report. Did you put 'Subsection C' in his report, in your report? 'Subsection C' of who knows what regulation?

A: No.

Q: No? Any reason why not?

A: We didn't, that, we didn't determine what regulations specifically were violated. You asked me

Q: Exactly

A: Excuse me?

Q: I'm sorry.

A: You asked me what me opinion was on what he had violated. I gave you my opinion. Did I put it in the investigation? No.

Q: I didn't ask you what your opinion was. I asked you what you based your conclusion on sir. And I'm still waiting.

A: My conclusion is based on the information that I determined to be or that Major Williams and I

he went to Hickes and violated, apparently, his chain of command. Now all I want to know is what the regulation is that he violated.

A: I can't be specific. I can tell you that during the course of the investigation it was determined that there was written regulation within the Bureau that said that said that members of the Bureau are to report investigations up through the chain of command to the Bureau Director. Now that being said you're going off on something else if I have a problem with my supervisor do I go around it and I don't think that has anything really to do with what we're talking about here.

Q: Sir, you told me, your words were, not you can redact it, you can change it, you can correct me if I misunderstood you. If I mischaracterize you, you straighten me out. You said you reached the conclusion that you said he had not gone through his chain of command, which you said was Major Conley.

A: That's correct.

Q: All I'm asking you is what the regulation is that he violated. Now if you're saying it's a custom of practice and usage or the way you do things.

MS. REYNOLDS: I'm going to object at this point in time. He's already answered that question. He said it was a regulation within the Bureau and he said he couldn't

54

determined to be a regulation within the Bureau that said you had to report investigations that come to your attention up through the chain of command to the Bureau Director.

Q: Well did you consult any of the, you have excellent legal staff in the Pennsylvania State Police, did you consult any of them about what the, what regulation he had violated? I mean I know you don't remember it but I'm asking you

A: No.

Q: You did not? Why not? I'm not saying you should have. I'm just asking why not?

A: Didn't see there was a necessity to do that.

Q: Is it fair to say that if I go back and look at the investigative or the product of the inquiry, the final result of the inquiry that it will indicate the regulation or the rule that he violated, that Captain Ober violated?

A: I believe there's something in, contained in the statements that we reduced to writing regarding reporting that information.

Q: Ok sir. Do you remember if that information came from a witness or if this was a conclusion reached by you and Major Williams?

A: It is my understanding that during the course of the interview, I'm not sure with who, that that

1    information became available to us.

2        Q:    All right let me see if I can understand your

3    response. What you're saying is that your best

4    recollection is that there was a regulation violated by

5    Captain Ober came from the interview of a witness?

6        A:    To the best of my knowledge, yes.

7        Q:    Fine sir. Sir do you remember what witness

8    that may have been?

9        A:    No sir I do not.

10       Q:    Do you have a recollection of whether or not

11   that information is included in your report? I mean do

12   you remember if it was like noted in there or cited in

13   there like, here's what I mean sir. So you have a

14   recollection whether or not your report would say Colonel

15   Westcott, Colonel Evanko, Captain "X", Lieutenant "Y",

16   indicated that this violated or may have violated rule X,

17   Y, or Z. do you understand what m saying?

18       A:    Yes sir.

19       Q:    Do you know whether that's in there, anything

20   like that?

21       A:    There is nothing in there like that. Basically

22   the report that was submitted are the statements of the

23   witnesses and only the statements of the witnesses,

24   verbatim.

25       Q:    See that's why I asked that. That's when, in

57

1    was what?

2        A:    He was presently the Director of the Bureau of

3    Professional Responsibility.

4        Q:    And I'm going to assume that a related reason

5    for representing Colonel Hickes was what?

6        A:    The reason for interviewing Colonel Hickes?

7        Q:    Sure.

8        A:    Was that Captain Ober had gone to Colonel

9    Hickes

10       Q:    Because Colonel Hickes was neither one of

11   those things. He wasn't the immediate supervisor before

12   or after of Captain Ober right?

13       A:    Your statement is correct.

14       Q:    That's right. So you went to Hickes to find out

15   from Hickes why Mr. Ober went to Hickes, to see what

16   Hickes knew about that. Right?

17       A:    Well basically to find out what Captain Ober

18   had informed him, when he informed him of it and then

19   what Colonel Hickes did with that information.

20       Q:    That's where I really, I need some help with

21   this case. Forget the why. We know that Captain Ober

22   goes to Colonel Hickes right?

23       A:    Correct.

24       Q:    You indicated you're trying to find out what

25   Captain Ober told Colonel Hickes right?

1    fairness, again I'm not interested in trick questions and

2    so counsel was here so maybe she can help me. When we

3    interviewed Mr. Williams, I think Mr. Williams said

4    something basically pretty much the same. That the

5    report was basically these facts or whatnot, these

6    interviews and that sort of conclusions together. That's

7    why I'm asking you the question about where the source

8    of this, ok? Because if you didn't come up with it and

9    obviously it doesn't sound to me like you originated it. It

10   doesn't sound to me like Major; do you understand why

11   I'm asking that now?

12       A:    Yes sir.

13       Q:    Ok, I mean we'll just have to check those

14   things to see. But when you do this kind of an inquiry,

15   do this kind of an investigation you don't reach some

16   conclusion like I recommend a punishment or anything

17   like that? That has nothing to do with it right?

18       A:    That's correct. No recommendations were

19   made.

20       Q:    The purpose in interviewing Major Merryman

21   was what? The purpose now, I know he's down there as a

22   witness. What was the reason?

23       A:    He had been the Director of the Bureau of

24   Professional Responsibility.

25       Q:    And the purpose of investigating Major Conley

58

1        A:    Well we'd already interviewed Captain Ober so

2    we have an idea of basically what he's told them.

3        Q:    Well you have an idea of what he recollects

4    telling them.

5        A:    That's correct.

6        Q:    What were you going to learn from Colonel

7    Hickes?

8        A:    What he recollected, what he was told and

9    why.

10       Q:    But was there any question about what was

11   said? Let me tell you where I'm coming from so you

12   understand. Before you interviewed Ober and before you

13   interviewed Hickes, before you interviewed Merryman

14   and before, if I understand you correctly, you knew that

15   an FBI agent had provided materials to Ober that raised

16   questions about the governor's office. Now if I'm wrong on

17   my time line you correct me, ok. So please pay attention.

18   My understanding is that you had information about

19   possibly the governor's office and you don't remember if it

20   was one or the other but a state senator or a state

21   representative and I chimed in that it was both. You

22   knew that the background was a political corruption

23   investigation ok? Now you go to Hickes on what, what did

24   you need to ask him? I mean you knew that there was no

25   secret that Ober had gone to Hickes. They had come

together and told Colonel Evanko that correct? Am I
right?

    A:   That's correct.

    Q:   Sure. That was a known fact. What did you
want to learn or why did you want to learn what Ober
said to Hickes?

    A:   Well, number one it completes the
investigation.

    Q:   It's just dangling there.

    A:   You verify number one what Captain Ober has
told us that he has said with the individual that he has
said it to. And in addition we wanted to find out what
Colonel Hickes had done with that information and
when.

    Q:   Were you investigating Colonel Hickes?

    A:   I wasn't investigating anyone in particular to
the best of my knowledge. I was sent to gather facts.

    Q:   Well I saw this form here that you gave to Mr.
Ober and that's a, I mean that's into him. That inquiry is
into him, he's read rights and everything you know.

    A:   That advises him as to what his rights are. It
seemed to me that he's the first one that we spoke to that
he should know what his rights are and that's why he
was told these things.

    Q:   Did Colonel Hickes violate any regulations? Do

61

you remember?

    A:   I'm not sure of that.

    Q:   Do you recollect whether Colonel Hickes that
Mr. Ober may have, during an interview may have
violated a regulation or a rule?

    A:   To the best of my knowledge he did not.

    Q:   Well did Commissioner Evanko ever give you;
did you ever see any notice from Commissioner Evanko
to check in to what Colonel Hickes did?

    A:   Specifically no.

    Q:   No. Did Mr. Hickes indicate that he had given
Mr. Ober any orders about the information?

    A:   Basically he told, if I remember his statement
he told Captain Ober that he was to keep the information
confidential at that point.

    Q:   Now what if Mr. Ober had not obeyed that
order and had then gone to Mr. Conley? Does that, or I
mean would that have violated a rule, if you know, and
I'm given that you may not know?

    A:   That didn't occur.

    Q:   No it didn't occur, apparently didn't occur.
Apparently Captain Ober followed orders but if he had,
would that have violated a rule?

    A:   Possibly.

    Q:   Did you ask Captain Ober if he intended to go

62

and talk to Mr. Conley? Did you even ask him?

    A:   I think the question, and again I am trying to
recall exactly what transpired during the interview. I
believe the question was asked as to why it wasn't
discussed with his supervisor.

    Q:   But you knew, you knew when Mr. Conley
came on station didn't you? You checked that out
because you investigated this. You know when he came
on to his duty station right?

    A:   When he came on to the duty station, I don't
understand that concept.

    Q:   Sure wasn't he newly assigned? Wasn't there a
change?

    A:   Oh yes, yes.

    Q:   That's why you went to Mr. Merryman wasn't
it. There was a change. Right? It was Mr. Merryman or
Mr. Conley right?

    A:   Yes.

    Q:   Ok. Now in terms of violating these rules, what
I'm curious to know is if Captain Ober goes to a Lt.
Colonel in the Pennsylvania State Police that says keep it
confidential and Captain Ober doesn't go and tell Mr.
Conley, I mean is there a timeline when you're supposed
to tell somebody something? Let me do it this way sir
because I don't want to be unfair to you. If I go to my

immediate supervisor and tell them about something that
happened that I think is important and of interest to the
Pennsylvania State Police ok. And at the same time I go
to a Lt. Colonel in the Pennsylvania State Police and tell
them about it. What department rule or regulation have I
violated there. Does the rule say "Thou shalt only speak
to thine immediate supervisor period under penalty of." I
mean that if Captain Ober goes to Colonel Hickes says 'be
quiet' and there's a change of command going on, Mr.
Conley isn't there, did you develop any facts or any
information to indicate that Captain Ober intended and
was not going to go and talk to Mr. Conley? That's all I'm
asking.

    A:   That he was not going to go to Mr. Conley?

    Q:   Yeah.

    A:   He had the opportunity to and he didn't. You
know you mentioned before about this being a
paramilitary organization.

    Q:   Yeah.

    A:   Then clearly understand. We know who our
bosses are and we know how to get I touch with them.
Captain Ober failed to do that.

    Q:   He was ordered by Lt. Colonel

    A:   Afterwards.

    Q:   After he had the opportunity of discussing it

1 with his supervisor.

2     Q:   What's the rule say, what's the rule that says

3 you have to go to your supervisor first and by the way

4 have you ever been in the military, in the service.

5     A:   Yes sir I have.

6     Q:   Which branch?

7     A:   I was a Navy Corpsman with the Second

8 Marine Division.

9     Q:   Ok, well I've been in the United States Army. I

10 don't know how you do things in the Marine Corp. I know

11 of absolutely no rule in the United States Army that

12 limits me to telling my Captain something if I'm a

13 Lieutenant and I can't mention it to my Lt. Colonel who is

14 my battalion commander.

15     A:   You're turning this around.

16     MS. REYNOLDS: I'm going to object. This is _____

17     MR. BAILEY: Well let me not turn things around.

18 Let's look at the facts. Ok? Are you saying that Captain

19 Ober should have told Mr. Conley first?

20     A:   That's all he had to do was tell Mr. Conley.

21     Q:   First?

22     A:   That who was his supervisor.

23     Q:   No. My question is 'first,' did he have to tell

24 him first?

25     A:   He should have gone up the chain of

65

1 command. That's who he should have told first. Yes.

2     Q:   And by going up the chain of command you

3 can't go outside that chain of command. You're not

4 supposed to tell anybody outside that chain of command.

5     A:   Well

6     Q:   No. No what's the rule that prevents him from

7 telling Colonel Hickes? That's all I'm asking.

8     A:   I don't believe there is a rule that prevents him

9 from telling Colonel Hickes.

10     Q:   Neither do I.

11     A:   What I'm saying is that he violated the order,

12 or the regulation within the Bureau that says you're to

13 notify his supervisor. Now he knows who his supervisor

14 is and that's who he should have gone to.

15     Q:   So he should not, he should sit on information

16 until he can tell his supervisor?

17     A:   I don't see any reason he had to sit on it. He

18 could have notified him immediately.

19     Q:   Well did you check into the duty assignments

20 of Major Conley before he was Captain Ober's supervisor?

21     A:   The duty assignments? I know he had been

22 recently transferred in there.

23     Q:   Sir this piece of paper, Exhibit, well it's Exhibit

24 A on this document. You can disregard that. But this

25 notification of inquiry that went to Captain Ober says

66

1 that there was a political corruption investigation. Right?

2     A:   Yes.

3     Q:   And you knew that that political corruption

4 indicated that there was a

5 **END OF AUDIOTAPE ONE – BEGIN AUDIOTAPE TWO**

6     MR. BAILEY: You knew when you did the investigation,

7 some background of the investigation. Mr. Williams had

8 talked to Mr. Cush, you were aware that there was a

9 political corruption investigation, the governor's office

10 was mentioned, perhaps someone in the legislature and

11 that these influence peddling was being, these references

12 were being made by a Pennsylvania State Police Trooper.

13 You knew that.

14     A:   A Trooper, yes.

15     Q:   A Trooper. Now I assume that in fairness to the

16 integrity of the investigation that you searched for

17 reasons or facts that would have lead Captain Ober to go

18 to Mr. Hickes and not to Mr. Conley if you had felt that

19 he had done something wrong in not going to Mr. Conley.

20 In other words, was there any reason that he shouldn't

21 have gone to Mr. Conley that you knew of? I'm not saying

22 there was. I'm just saying do you know any reason why

23 he shouldn't have?

24     A:   I know of no reason why he shouldn't have gone to

25 Conley.

1     Q:   Ok, well should he have gone straight to Colonel

2 Evanko and not told anybody? Would that have been

3 proper?

4     A:   My opinion on this is according to the regulation

5 contained within the Bureau; he should have gone to the

6 Bureau director. That's where he should have gone to

7 first. He shouldn't have jumped to a Deputy

8 Commissioner; he certainly shouldn't have gone to the

9 Commissioner. He should have gone to his supervisor,

10 who is the director of the Bureau of Professional

11 Responsibility.

12     Q:   Did you ever ask the FBI why they went to

13 Captain Ober?

14     A:   They apparently were seeking information that

15 they thought could be obtained through the Bureau of

16 Professional Responsibility.

17     Q:   Well here you have the FBI

18     A:   And I didn't ask that question. I never spoke to

19 Cush.

20     Q:   Well if you know if anybody ever asked Cush

21 why they would not notify out of courtesy the

22 Commissioner first?

23     A:   No sir I don't.

24     Q:   Head of the Pennsylvania State Police, you got

25 the FBI down there highly touted as a great law

1  enforcement agency, one of the best in the world. They
2  still don't tape interviews; they use agent's notes. But,
3  you know, I'm just curious why as a courtesy the FBI
4  wouldn't tell the Pennsylvania State Police that, you
5  know, what they were doing and say you know go
6  through the Commissioner's office as a professional
7  courtesy.
8      A:  That's a question you would have to ask him
9  sir.
10      Q:  I intend to. I certainly intend to. But you didn't
11  and you don't know whether Mr. Williams did. Right?
12      A:  Did what sir?
13      Q:  Ask the FBI or anybody in the FBI why they
14  didn't say 'Hey why didn't you folks come in here and
15  contact the Commissioner and let us know?' you're here
16  checking into our affairs and you didn't tell the
17  Commissioner.
18      A:  I never asked that question sir.
19      Q:  Well do you have a recollection of how long
20  after Captain Ober heard from the FBI that he went to
21  Colonel Hickes?
22      A:  A short period of time. How long I don't exactly
23  know.
24      Q:  Do you know whether Major Conley was even
25  available?

69

1      A:  What do you mean by available?
2      Q:  Well you're opinion was that Captain Ober
3  apparently should have held this information until he
4  could tell his supervisor.
5      A:  No sir that's not my opinion. My opinion is
6  that he should have notified his Bureau director by any
7  means possible regarding this investigation. Find him.
8  Pick up the phone and call him if he's not there.
9      Q:  Instead he told Colonel Hickes, a Lt. Colonel a
10  top administrator of the Pennsylvania State Police that
11  comes directly under the Commissioner.
12      A:  Yes sir.
13      Q:  And who orders him not to tell anybody else
14  and you're telling me that's the way a military outfit runs
15  or that's the way the State Police run and there's a
16  regulation that says that violates the rules?
17      A:  No sir that's not what I said. What I said was
18  there was a regulation within the Bureau of Professional
19  Responsibility and the regulation requires a Captain to
20  notify the Bureau Director. He failed to do that. He went
21  to Colonel Hickes. Colonel Hickes issued and order for
22  him not to say anything.
23      Q:  See that's where you and I
24      A:  That's. That's the order in which this occurred.
25      Q:  Yeah, I'm sorry. What information do you have

70

1  that indicates that, you know this word instead, that he
2  decide to go to, and I'm saying he didn't. I'm not saying
3  he was wrong. I'm not, you know, I don't know. But did
4  he exercise some judgment to exclude Conley and go to
5  Hickes because you already told us he didn't break any
6  rule by telling Hickes but we know that Hickes ordered
7  him to keep it confidential. Now what's he supposed to do
8  now? Do to the Commissioner to say do I have
9  permission to talk, cause the Colonel, Lieutenant Colonel
10  told me not to talk to anybody.
11      A:  The fact is that he failed to notify his Bureau
12  Director. Now you can't turn this around and say ok now
13  why after Hickes tells him not to go back did he not go
14  back and tell Conley. It was already too late to do that.
15  He failed to do that to begin with and went to Hickes.
16      Q:  You've answered my question.
17      A:  Thank you.
18      Q:  He failed to do that. Ok. Do you know where
19  Mr. Conley was at the time that Mr. Ober was told?
20      A:  I believe he was, I believe there was some type
21  of a, either a death in the family or a death in or the
22  death of a friend and he was in western Pennsylvania.
23      Q:  Do you know when he came into the office?
24      A:  It was the next day.
25      Q:  What date was that?

1      A:  I don't know sir. I don't have those dates and I
2  don't remember.
3      Q:  Isn't it, but you investigated that?
4      A:  I believe it's in the report.
5      Q:  Now you had indicated that the interviews with
6  Mr. Evanko and Mr. Westcott and Colonel Coury didn't
7  last very long. Correct? Did you at any time ask them,
8  the Commissioner what he was complaining about?
9      A:  I don't believe that question was asked.
10      Q:  How about Colonel Coury? Did you ever ask
11  Colonel Coury what he was complaining about or was
12  Colonel Coury complaining at all? Did he complain at all?
13      A:  They were asked what knowledge they had of
14  the incident, how it occurred and how it came to their
15  attention and when it came to their attention.
16      Q:  Is it fair to say that Colonel Coury professed
17  that he didn't know anything about it?
18      A:  I don't know if he didn't know anything about
19  it. I don't believe that's accurate.
20      Q:  Well who did he learn about it from?
21      A:  I don't know.
22      Q:  Well you found out that Colonel Hickes had
23  told Mr. Ober that you're to keep it confidential, right?
24      A:  That's correct.
25      Q:  And apparently, apparently Captain Ober



obeyed that order and didn't tell Major Conley.

A: Yes.

Q: Who, you say, he should have told first before he told Colonel Hickes even though there's no rule that says you have to tell your immediate supervisor first. But what about Colonel Westcott, did he indicate where he learned about this matter from?

A: No I don't believe he did. He had the information that he gave to me and to Major Williams. I believe that at some point he said the information came from Colonel Evanko.

Q: Exactly what I'm looking for.

A: Isn't it true that Colonel Coury and Colonel Westcott learned what they knew about this incident from Colonel Evanko?

A: I don't know where Colonel Coury obtained the information sir.

Q: Colonel Westcott learned it from Colonel Evanko.

A: I believe that's where that information came from.

Q: Did you talk to Lt. Brown about this at all?

A: Lt Brown? Brown may have been interviewed.

Q: Why did you interview Brown?

A: I don't know. I don't know if we did interview

73

him. I don't remember.

Q: Oh, I'm sorry. I thought, ok, you don't know whether he was interviewed?

A: I don't remember sir.

Q: Did you ever talk to him about though that was my question?

A: If he wasn't interviewed he wasn't spoken to, not to me about it.

Q: Ok, how long did your interview go with Major Merryman?

A: That was a very short interview.

Q: Merely asked him if Captain Ober told him anything about it right?

A: That was asked. We got into when he was transferred, what his duties were with respect to the Bureau, that sort of thing.

Q: By the way where did Major Conley, what had his command been prior to coming into?

A: I believe he was a Troop Commander.

Q: Where?

A: I don't know what Troop it was.

Q: Do you know whether it was the Troop where the Trooper was involved?

A: No sir I don't.

Q: Did you ever check out and see?

74

A: That may be included in his statement.

Q: Well do you know whether he came from the western part of the state or the eastern part?

A: He came from the western part of the state.

Q: Do you know whether he came from the southwest, the northwest regions?

A: I'm not sure.

Q: Now who notified Captain Ober of the inquiry?

A: Specifically who told him?

Q: Yes sir.

A: I don't know. I know I didn't contact him.

Q: How much notice did he have? How much time did he have?

A: I don't know.

Q: Can you please go back and tell us everything you recommend, you recollect, I'm sorry, everything you recollect about that interview? And I mean everything from when it was first scheduled to you fellows, to what you did to go there, who took care of, everything that you remember about it up to the point where you started asking Captain Ober questions and then we're going to stop there. But go ahead and tell me what you know.

A: Without any information in front of me all I can tell you is that the interview was scheduled at some point at department headquarters. The meeting was held,

to the best of my information in the office, of the time Deputy Commissioner of Administration who was not in. Captain Ober came into the office and it was myself, Major Williams and Captain Ober asked for a representative from PSTA to be present. That was afforded him. He was advised of the administrative warnings or notification of inquiry and the interview began.

Q: Did he ask for a representative do you know to be present from the Pennsylvania State Troopers Association?

A: Yes sir I just said that.

Q: I'm sorry did he ask for a specific person to be there with him?

A: I don't remember if he asked for a specific person or if he just asked for a representative.

Q: The reason I ask, and forgive my error, the reason o asked this is who picked the person who came in? That's what I'm asking you here.

A: I have no idea. I know I didn't know the Trooper that was there so I know I didn't pick him.

Q: Ok do you know if that person was picked by Captain Ober or how that person came to be the representative there?

A: No sir I don't.



Q: Did you come at some point to learn of how much notice or how much time that Captain Ober had?

A: I don't recall.

Q: Did you tape record that interview?

A: Yes sir.

Q: My compliments to you. If you can get the FBI to learn from you maybe we'll get, even do some more for law enforcement in America. Do you remember at what point the taped interview started? Did you, you know, have the discussion with Captain Ober and that sort of things or did you just start it when the question was asked.

A: I'd have to look at the report. I'm not exactly sure when it happened. I believe the recording begins by telling him that obviously as we do that it's being recorded. I'm not sure if his notification was given prior to that or subsequent to the tape being turned on.

Q: Did he have any discussion with you about why you were there, what a (you're court reporter is here) why, you know what this thing was about that or anything like that. Did he raise any questions or question it?

A: Not that I recall. He was told basically why we were there.

Q: Was he free to leave?

77

A: I think there was probably some discussion as to introductions and that sort of thing.

Q: But the formal part of things don't begin until the representative gets there.

A: That's correct.

Q: And that's probably when the tape starts.

A: That's my recollection.

Q: Ok, now this was conducted, where was the interview with Captain Ober conducted and why if you can tell me?

A: It was in the office of the Deputy Commissioner of Administration. That office was available.

Q: That would be Mr. Coury, Colonel Coury. No I'm sorry, is it Coury?

A: Yeah, at the time I guess it was.

Q: Ok, is he retired by the way Mr. Coury?

A: Yes.

Q: And what's the date of his retirement if you know?

A: Here you go, fourth of January.

Q: Ok so it's conducted. Do you know why his office was chosen as a place to conduct an interview?

A: It was available.

Q: Where is it from Colonel Evanko's office?

A: No.

Q: Ok and did he at some point indicate to you that this was not proper or ask what this was about or what it was being done for or anything like that?

A: Not to my recollection, no sir.

Q: But if so would that have been on the recorded portion?

A: I don't know.

Q: Was there any kind of prior, obviously you folks are part of a family there and obviously you're doing a job that certainly it's not a personal issue for you. Right? You're doing a job.

A: That's correct.

Q: And trying to be as professional about it as you can. Correct? So when you get there, all I'm saying that when your discussions with Captain Ober start, as an attorney for example I take a caution before I start some interview or talk to anybody, or address you for example. I want to make sure that everything is running so your attorney is happy and she's protecting your rights and you know. All I'm saying when you come in there and you start talking to Captain Ober is there a pre-interview discussion if you recollect, or is it pretty much a case of when you walked in that door everything was on tape?

78

A: Down a hallway beyond a number of secretaries etc.

Q: Now who was present with you? You had the state association representative, you had Captain Ober, yourself, Major Williams, Major Werts an who else was there?

A: No one to my knowledge.

Q: That recording was filed with the report?

A: Yes sir.

Q: Do you have a copy of it?

A: Do I? No sir.

Q: Do you ever listen to it?

A: I believe what I did was, if you're asking me if I sat and listened to the entire recording?

Q: Sure.

A: No.

Q: Did you review it, go through it or anything?

A: I think basically, I sort of read the report after it was transcribed, listening to the tape. Just to sit and listen to the tape? No.

Q: How long have you been a member of the Pennsylvania State Police?

A: Just over thirty-three years.

Q: What did Colonel Evanko indicate to you during his interview about what he had been told?

 

A:    He indicated the meetings that took place and what information he got at those meetings.

Q:    Well let's talk about those meetings. We know that there were meetings ok? Now when you did the interview with Colonel Evanko, did he indicate who was present at those meetings?

A:    If he did it's in his statement sir. I don't recall.

Q:    Did he indicate if a gentleman by the name of Brown was in the meeting? One of the meetings?

A:    I don't recall sir.

Q:    Did he ever indicate whether he had discussed this matter with the people in the governor's office?

A:    I don't recall.

Q:    Did he indicate, did he ever talk about a gentleman by the name of Campbell, Mark Campbell?

A:    The name has been mentioned but I don't know if the name was mentioned in association with this.

Q:    Do you have a recollection whether that name was mentioned during the process of your inquiry into these matters or afterwards?

A:    I'm sorry I don't understand what your question is.

Q:    Sure. You indicated a degree or some degree of familiarity with the name Mark Campbell.

A:    Yes.

81

Q:    Do you recollect becoming aware of the name, Mark Campbell prior to the conclusion of your inquiry into the Ober matter?

A:    I was familiar with the name Mark Campbell prior to this ever starting.

Q:    In what connection, what regard?

A:    Basically in setting up some of the things that had to be done with respect to some of the assignments we had which involved the governor and knowing that Mr. Campbell worked for the governor's office.

Q:    Ok, any connection between Mark Campbell and the inquiry in the Ober matter?

A:    I don't recall if Mr. Campbell's name was mentioned specifically or not? There was some people in the governors office

Q:    We know that, we know that and I'm going to go there next but right now specifically I want you to think back if you would please and see if you can put Mark Campbell into that context.

A:    If he was mentioned sir during the course of an interview it is in those reports.

Q:    Did you tape all of the interviews?

A:    Yes sir we did.

Q:    And you filed all of them with the report?

A:    There is no report sir.

82

Q:    I'm sorry. Your product, your finished

A:    There's statements from every one that was interviewed.

Q:    What do you call it by the way? I mean

A:    It was an inquiry.

Q:    You see a report to me is not a pejorative term so I don't mean it to mean something. What do you call it?

A:    Basically there was an inquiry we went out, we taped recorded statements.

Q:    What do you call the end products?

A:    Verbatim and those statements were turned over to the Colonel.

Q:    But what is the, what's it called. I mean do you call it a work product? Do you call it a report? Do you call it just a

A:    Well there's no report or any writing if you will beyond the statement so it's a work product.

Q:    I understand. All right let's call it, so we don't have to waste time. Let's call it a work product. So report can be a misleading term. Let's call it and in this context let call it work product. All right you turned, and in that pork product you don't recollect if Mr. Campbell was mentioned, any other governor's office personnel mentioned in that work product.

A:    Not to my knowledge.

Q:    And you're not saying Mr. Campbell is. You're just not certain. Is that fair to say?

A:    That's correct.

Q:    Is that fair to say?

A:    That's correct.

Q:    Is there any of that work product that indicates that Colonel Evanko communicated with, got in touch with, met with, anything of that sort with the governor's office over this matter?

A:    If Colonel Evanko mentioned that during his statement it's in that. It's in his statement.

Q:    Did you interview anybody from the governor's office?

A:    No sir I did not.

Q:    Now you say you turned this work product over to Colonel Evanko?

A:    Yes sir.

Q:    Did you do that personally?

A:    Both myself and Major Williams were present when the work product was turned over to Colonel Evanko?

Q:    Who else was present?

A:    I don't know if anyone else was present.

Q:    Well was there a discussion at that point?

A:    If there was it was short. Basically that we had completed the assignment and this was the product.

Q:    Did Colonel Evanko say anything or ask any questions?

A:    He thanked us for doing it and I don't really recall much of a discussion beyond that.

Q:    How long did it take you to do this gathering of interviews and investigations into the facts?

A:    I would say weeks at least.

Q:    Now did, was Colonel Westcott in the meeting when you turned the work product over?

A:    If he was sir I don't recall it. Don't recall him being there.

Q:    How about Colonel Coury?

A:    If he was there I don't recall it.

Q:    Did you here anything about the work product that you did after you turned the work product to Colonel Evanko?

A:    Beyond this suit being filed I don't believe I did.

Q:    Now who first told you that the suit was filed? Where did you learn that from?

A:    I don't remember that.

Q:    Do you remember discussing anything about it?

85

A:    No sir.

Q:    Let's step out for a minute ok?

MS. LYDE: Do you want to go off camera?

MR. BAILEY: Yes just go off. Speak up, Crystal, cause I can't pick you up on this.

MS. LYDE: 12:55, we'll take a short break.

MS. LYDE: We're back on.

MR. BAILEY: We're back on? Why don't you resume and then I'll go. Go ahead and announce and then I'll go ahead.

MS. LYDE: Ok it is now 1:02 PM, the deposition of Major Werts is concluded. Thank you.

MR. BAILEY: I'd like to thank you. The videographer is correct. We're done with the deposition at this time. Do you have any?

MS. REYNOLDS: I have nothing.

MR. BAILEY: Major I realize that these experiences are unpleasant. If I've cause any irritation or displeasure I want to apologize to you. I want to thank you. I want to thank you very much for you cooperation and your response to the questions here today. I appreciate them very much as a professional. Thank you.

A:    You're welcome sir.

MR. BAILEY: And we're done. That's it very much.

86

22

IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER          :   1: CV- 00-0084

          Plaintiff      :
          VS             :
PAUL EVANKO, MARK        :
CAMBELL, THOMAS          :
COURY, JOSEPH            :
WESTCOTT,                :
HAWTHORNE CONLEY         :
          Defendants     :

DATE:        March 25, 2002.

WITNESS:     Robert Hickes

PLACE:       2629 Market Place
             Harrisburg, Pennsylvania

APPEARANCES:
                 Syndi Guido
                 Barbara Reynolds
                 Joanna Reynolds
                 1800 Elmerton Ave.
                 Harrisburg, PA 17101

                 Don Bailey
                 4311 N. 6th Street
                 Harrisburg, PA 17110

1

---

SOLOMAN:    My name is Michael Solomon. I am employed by Sergeant's Court Reporting Services. Today is March 25, 2002. The time is approximately 9:25 a.m. This deposition is taken at 2629 Market Place, Harrisburg, Pennsylvania. Case No. 1CV-01-008. Daryl G. Ober, Plaintiff versus Paul Evanko, Mark Campbell, Thomas Coury, Joseph Westcott, Hawthorne Conley Defendant. The name of the witness is Robert Hickes. For the attorney present, state your name and who you represent.

RESPONSE:    Cindy Guido, Defendants. Barbara Christie Chief Counsel, Pennsylvania State Police, Joanna Reynolds, Assistant Counsel, Pennsylvania State Police, Defendants. Don Bailey, I represent the Plaintiff, Daryl G. Ober, 4311 North Sixth Street, Harrisburg, Pennsylvania, 17110. (717) 221-9500.

SOLOMAN:    The Court Reporter may now finish the oath.

COURT REPORTER:    Right before we get to that Barbara the usual stipulations for the record.

COUNSEL:    Yes, counsel, I just wanted to note for the record that Lieutenant Colonel

2

---

Coury is here at present, pursuant to our continuing offer. I believe I sent you a letter to this affect on Friday to make Colonel Coury available for what you stated on March the 12th was another hour of deposition. That would date of which Colonel Coury started to my recollection of that 3:15 afternoon. We wish to go straight through, you had other commitments. You left at approximately, I think we adjourned at approximately 10:05, you indicated that maybe you need another hour of Lieutenant Colonel Coury and at one point, it indicated that you would be amendable to completing Colonel Coury's deposition to my recollection today. Hearing nothing from you on the letter from Friday. Colonel Coury is available here, this morning. Along with Colonel Hickes, of course, and we are willing to exceed one hour of deposition of Colonel Hickes in order to complete Colonel Coury's deposition.

BAILEY:  Counsel, I'm use to self-serving letters with all do respect to you from defense attorneys and I am also use to posturing and I am also use to various unsundry, manipulations of the discovery process for strategic purposes and I will

3

---

respond as follows. I may need Lieutenant Colonel Coury for more than an hour, I am really not sure. And if so, I will take the appropriate amount of time or I certainly will procure it. I did have a written response coming to the communications that you faxed on Friday, I am not prepare to do Lieutenant Colonel Coury today; we have for some time as you know, have had Lieutenant Colonel Robert C. Hickes scheduled and I will work with you to the extent that I can on getting the continuing deposition of Colonel Coury scheduled. We've stated our positions. I am not prepared to do Mr. Coury right now and I would suggest that we move along.

COUNSEL:    Okay counsel I just wanted to note our continuing goal for the record based upon your estimate on Friday that you needed Colonel Coury another hour.

BAILEY:  Well, it was...

COUNSEL:    We have been here; we're willing to offer another hour...

BAILEY:  Counsel, you're wasting.

COUNSEL:    And Colonel Hickes, if I may finish, is gracious enough to - Colonel Coury for an hour of that deposition.

4

1    BAILEY: There's no...

2    COUNSEL:    I just want the record to

3    show that pursuant to what we thought was

4    understanding, we do have Colonel Coury here.

5    But, I hear your response.

6    BAILEY: I think it's wonderful that you

7    have Lieutenant Colonel Coury here. I always

8    like to see him and Colonel Coury I am happy to

9    see you here today. I wondering now if we can

10   begin with Mr. Hickes, if you don't mind.

11   COURT REPORTER:    Sir, I am going

12   to swear you in. Raise your right hand please. Do

13   you swear that the testimony you are about to give

14   will be the truth, the whole truth and nothing but

15   the truth?

16   HICKES: Yes, I do.

17   Q:    Thank you. Lieutenant Colonel, would

18   you state your name for the record and your

19   current position with the State Police.

20   A:    My name is Robert Claire Hickes. I

21   am Deputy Commissioner of Staff at

22   Pennsylvania State Police.

23   Q:    And is your rank Lieutenant Colonel?

24   A:    Yes it is.

5

1    Q:    How long have you been appointed to

2    your current position?

3    A:    I was appointed to my current position

4    in October of 1998, I believe.

5    Q:    Do you remember the exact date?

6    A:    The first or the third, I am not

7    positive?

8    Q:    The first or the third of October?

9    A:    Correct.

10   Q:    And you said that you're a Deputy

11   Commissioner. Are all of the Lieutenant Colonels

12   in the State Police Deputy Commissioners?

13   A:    Yes they are.

14   Q:    Can you be a Deputy Commissioner

15   and not be a Lieutenant Colonel?

16   A:    I don't know. Obviously, things

17   change, but during my tenure, all Deputy

18   Commissioners have been Colonels.

19   Q:    I just wondered if the title goes hand in

20   hand with being a Deputy Commissioner because,

21   if I am not mistaken, you were a Deputy

22   Commissioner before?

23   A:    Yes I was.

24   Q:    So, I am just trying to get the

25   explanation of the gap of that one time your were

6

1    a Lieutenant Colonel and then you were a Major,

2    is that right? And then a Lieutenant Colonel

3    again?

4    A:    Yes.

5    Q:    When were you a Lieutenant Colonel

6    previously?

7    A:    I was a Lieutenant Colonel from 1991.

8    I was in an acting capacity from January to April

9    and then I was appointed by Governor Casey to be

10   Lieutenant Colonel for a Deputy Commissioner of

11   Operations from April of 1991 until December of

12   1994. At the end of the administration I requested

13   the Commissioner to refer to my previous rank,

14   which was Major and then I was Acting Deputy

15   Commissioner of Operations until a new Deputy

16   Commissioner appointed and I believe that was

17   February of 1995.

18   Q:    Is that because of the. At the level of

19   man staff being the Deputy Commissioner, those

20   are pretty much gubernatorial decisions?

21   A:    Yes, a Deputy Commissioner is

22   appointed by the Governor.

23   Q:    So, as governor's change; that would

24   not be any reflection on you, it would just be that

7

1    as a governor changes, they change the Deputy

2    Commissioner sometimes?

3    A:    They sometimes do. The reason for

4    dropping back is more of a benefits issue, up to

5    and including the rank of Major within the State

6    Police as a member of PSA Bargaining Unit and

7    retirement from - Unit affects your benefits. If

8    you retire from the Bargaining Unit or not.

9    Q:    I see. When you were a Deputy

10   Commissioner previously, I think you said

11   starting in 1991? Was that right? I didn't write

12   that down?

13   A:    Yes.

14   Q:    You said it was Operations?

15   A:    Yes.

16   Q:    What does the Deputy Commissioner

17   of Operations do?

18   A:    He has command responsibility for the

19   field forces of the Pennsylvania State Police,

20   which is the troops and area commanders as well

21   as Bureaus for Liquor Enforcement, Criminal

22   Investigation, Patrol and Drug Law Enforcement.

23   Currently he also has Bureau of Emergency and

24   Special Operations also.

25   Q:    Does the...

8

1    A:   I did not while I was there.

2    Q:   You did not have Bureau of

3    Emergency?

4    A:   No.

5    Q:   Did you have any involvement with

6    the State Police Academy in your capacity as the

7    Deputy Commissioner of Operations?

8    A:   No, I did not.

9    Q:   Have you ever had any involvement

10    with the; did  your responsibilities ever relate to

11    the State Police Academy?

12    A:   Yes, they have.

13    Q:   When was that?

14    A:   1987 to very early of 1998.

15    Q:   What was your role?

16    A:   I was the Director of the Bureau of

17    Training and Education.

18    Q:   The Director of the Bureau of Training

19    and Education, who do they report to?

20    A:   Currently, they report to Deputy

21    Commissioner of Administration.

22    Q:   Was that case back when you were a

23    Deputy Commissioner as well?

24    A:   In 1987, I don't believe we had a

25    Deputy Commissioner of Administration yet.

9

1    That organization change came a little later and at

2    that time they would report to the Chief of Staff.

3    Q:   When you were the Deputy

4    Commissioner the first time; were you ever a

5    Deputy Commissioner of Administration?

6    A:   No, I was not.

7    Q:   Are you the Deputy Commissioner of

8    Administration now?

9    A:   No, I am the Deputy Commissioner of

10    Staff.

11    Q:   Have you ever been Deputy

12    Commissioner of Administration?

13    A:   No I have not.

14    Q:   Have you ever been Deputy

15    Commissioner of Operations?

16    A:   Yes I have.

17    Q:   And when was that?

18    A:   1991 to 1995.

19    Q:   Since you have been Deputy

20    Commissioner since October of 1998, have you

21    always been the Deputy Commissioner of Staff?

22    A:   Yes.

23    Q:   What does a Deputy Commissioner of

24    staff do?

10

1    A:   Our responsibilities included the

2    Bureau's staff services, the Bureau of Forensic

3    Services, Bureau of Research and Development,

4    Bureau of Technology Services and the Bureau of

5    Records and Identification.  The staff function

6    within the Pennsylvania State Police are those

7    entities that support the field administrative

8    functions in the various capacities, whether it's

9    facilities, fleet management, the fiscal

10    responsibilities, maintenance of the records, those

11    kinds of things.

12    Q:   What does the Deputy Commissioner

13    for Operations do?

14    A:   He is responsible for field forces of the

15    Pennsylvania State Police as well as the Bureaus

16    of Control, Criminal Investigation, Liquor

17    Enforcement, Drug Law Enforcement, Emergency

18    and Special Operations.

19    Q:   The Bureau of Professional

20    Responsibility, where does that fit in the scheme

21    of things?

22    A:   The personnel related issues fall under

23    the Deputy Commissioner of Administration.

24    That would be the Bureau of Professional

25    Responsibility, the Bureau of Training and

1    Education, the Bureau of Human Resources and

2    the Office - .  Don't quote me on that one; I am

3    not sure whether the office of Equal Employment

4    falls under the Deputy of Administrator or the

5    Director of Operations I would have to look at a

6    table.

7    Q:   In October of 1998, who was the

8    Deputy Commissioner of Administration?

9    A:   In October of 1998, Lieutenant Coury

10    was the Deputy Commissioner of Administration.

11    Q:   Who's the current Deputy

12    Commissioner of Administration?

13    A:   Lieutenant Colonel  Hawthorne

14    Conley.

15    Q:   How long have you known the

16    plaintiff, Captain Ober?

17    A:   I've been aware of Captain Ober, I

18    believe, since he was a Corporal on the job.  He

19    was assigned to the Bureau of Research and

20    Development.  I believe.

21    Q:   If you said the year, I didn't catch it.

22    A:   I have no idea what the year was.  I

23    would have to be speculating at this point that it

24    would be in the 1980, eight eighty, nine, ninety

25    time frame.

1    Q:   The late eighties, early nineties?

2    A:   Yeah.

3    Q:   Can you describe that relationship?  In

4  other words, is it a personal relationship, a

5  professional relationship or some of both?

6    A:   It's a professional relationship.

7    Q:   I think you said the Bureau of

8  Technology Services falls under the Deputy

9  Commissioner of Staff, is that correct?

10    A:   Yes it does.

11    Q:   And in that capacity, would you be

12  familiar with the IIMS Project?

13    A:   Yes I am.

14    Q:   What is the IIMS Project?  What does

15  it stand for?

16    A:   IIMS is Incident Information

17  Management System.

18    Q:   Will you explain what that is?

19  Basically just explain the project for me?

20    A:   The department had a strategic plan

21  prepared by KPMG to view our processes and

22  determine a course for solving a lot of the

23  business processes for the department.  IIMS is

24  the result of that plan, which would modernize

25  and streamline the business processes of the

13

1  department as it deals with a patrol trooper and

2  the IIMS will centralize our dispatch function.

3  Put a records management system in place.  Put

4  mobile data terminals in the patrol cars for

5  troopers and in essence, takes the aspect of

6  investigation evidence information gathering and

7  by technology and solve the problems so that

8  troopers can work more efficiently.

9    Q:   Can you give me an example of the

10  kind of problem that might be solved through the

11  IIMS?

12    A:   Currently, in a paper based system, if a

13  trooper investigates an incident, he may be

14  required to fill out multiple reports for that.  An

15  example might be a car theft.  That he has a

16  vehicle report.  He may have a vehicle recovery

17  report, filed an incident report.  He'll have

18  evidence; IIMS will allow him to do the

19  investigation, enter the information one time into

20  the records management system and then the

21  records management system will populate the

22  various reports so that he doesn't have to have

23  duplicate entries multiple times in continuing to

24  do his work.

14

1    Q:   You said that this sprung from a

2  strategic plan that was prepared by KPMG?

3    A:   Yes.

4    Q:   When was that plan prepared?

5    A:   I believe that they were on board with

6  the department in 1995.  I am not certain when

7  they finished their strategic plan?  It...

8    Q:   Do you know what prompted having

9  the strategic plan done?

10    A:   Yeah, the evaluation of where we were

11  as a department and how we use technology

12  because both Commissioner Evanko and the

13  previous Commissioner Waltz  believed that there

14  were more efficient and effective ways to do that.

15    Q:   Had this analysis that was done on the

16  department's process etc.; had that started under

17  Commissioner Waltz or did that start new with the

18  current administration?

19    A:   I believe, Commissioner Waltz started

20  or at least had gone out and contracted with

21  KPMG and the vendor was selected, but he left

22  shortly after the vendor was selected.  I don't

23  know whether they had done any work or not?

24    Q:   Now this IIMS Project.  Is it part of a

25  larger project?

1    A:   IIMS is the larger project.  It's got a

2  number of subsets.

3    Q:   Can you identify some of those subsets

4  for me?

5    A:   A subset would be the mobile data

6  computing that puts terminals in patrol cars for

7  the officers to use.  A subset would be a records

8  management system.  A subset would be the

9  centralization of the dispatch function and with

10  that would come computerized dispatch and

11  automatic vehicle locator and technologies to go

12  with considated -.

13    Q:   So those are all basically smaller

14  projects within a larger project called IIMS?

15    A:   Yes.

16    Q:   The IIMS Project; is that still ongoing

17  or is it complete?

18    A:   It's still ongoing.

19    Q:   Do you have an estimated time that it

20  will be actually done?  The whole thing?

21    A:   The phase II contracting is underway

22  right now.  Part of the phase II contracting is to

23  have the vendor provide their reasonable effort for

24  when this would be completely finished.  At the

1  outside, I would say that it would be about 42
2  months, but it should be shorter than that.
3      Q:   For phase II?
4      A:   To be completed, yes.
5      Q:   And how many phases will there be
6  total into the project?
7      A:   Two.
8      Q:   Two phases.  So, what was Phase I?
9      A:   Phase I was the detailed design.
10     Q:   Can you elaborate for me?  I'm sort of
11 technologically impaired?
12     A:   The detailed design, Lock Key Martin
13 was the successful vendor on the IIMS contract.
14 Phase I provided that they and their consortium
15 would do a detailed design of how the various
16 components would be designed and then
17 integrated and that's it.
18     Q:   The various components, are you
19 talking about those different, smaller projects we
20 were talking about?
21     A:   Yes.
22     Q:   And so for the whole project to be
23 completed through Phase II will be at least three
24 or four more years from now?
25     A:   Possibly three or four more years.

17

1      Q:   During these two phases of the project,
2  had there been a lot of different members of the
3  State Police Organization that have rotated in and
4  out of assisting with the project?
5      A:   There has been some rotation in and
6  out of the project, yes.
7      Q:   And as the project is being completed,
8  will that rotation, in and out continue to occur?
9      A:   It's possible that there could be
10 additional locations in and out.
11     Q:   At one point, I believe, Captain Ober,
12 since it's part of this lawsuit; Captain Ober was
13 part of the IIMS project.  Can you explain what
14 his role was in the project?
15     A:   His role was the Team Leader for the
16 request for qualified quotation for the vendors that
17 were under evaluation to be the systems
18 integrator.
19     Q:   Request for qualified?
20     A:   RFQC contractor.  Request for
21 qualified contractor.
22     Q:   Okay.  Can you explain what that
23 process is?
24     A:   That's a rather in depth evaluation of
25 the corporate bidders for the contract to determine

18

1  which bidder submits the most comprehensive
2  beneficial package for the Commonwealth.
3      Q:   So, the end result of that is that portion
4  of the program would be that a vendor would be
5  selected to be the system's integrator?
6      A:   Correct.
7      Q:   And that I think you said was Lock
8  Key Part?
9      A:   Correct.
10     Q:   And Captain Ober's assignment to the
11 IIMS Project was solely to accomplish that phase,
12 selection system integration?
13     A:   Correct.
14     Q:   Do you know how he was chosen for
15 that role?
16     A:   The Commissioner chose him for that
17 role.
18     Q:   Did you have any input in that at all?
19     A:   The Commissioner asked whether I
20 was agreeable to Captain Ober being the project
21 team leader on the RFQ.  I had right of denial, I
22 suppose.
23     Q:   In his lawsuit, Captain Ober has
24 indicated this is a hundred million dollar project
25 that has suffered greatly and caused the taxpayers

19

1  a lot more money because he was transferred into
2  another position.  That particular portion, the
3  system integrator portion of the project; that part
4  was not a hundred million dollar project was it?
5      A:   The overall project is going cost over a
6  hundred million dollars.  Lock Key Martin and the
7  system's integrator have the responsibility for
8  bringing that all together, so the nature of the
9  procurement in this particular instance isn't that
10 the Commonwealth goes out and buys the various
11 parts and says to Lock Key Martin, here it is, put
12 it together.  But, that we contract with Lock Key
13 Martin, who is then the prime contractor to
14 assemble the various parts that we have identified
15 that need to be in this, purchase them and
16 assemble it.  So, in a large way, Lock Key Martin
17 is involved in over a hundred million dollars
18 because they become the prime.
19     Q:   But, Captain Ober's team put together
20 the Phase I design contract and that totaled 8.8
21 Million Dollars.  Is that right?
22     A:   That's correct.
23     Q:   Did Captain Ober fulfill his
24 assignment with the IIMS Project?
25     A:   Yes he did.

20

Q: And in fact, he voted on the final selection of Lock Key Martin. Is that right?

A: Yes he did.

Q: What role does Major Waugh play in the IIMS Project. His name has come up a bunch, so I thought you could explain that for me.

A: Major - was the Director of Technology Services and this project, because it's a technology project is being administered and led out of the Bureau of Technology Services. So, he has oversight responsibility for the project generally, and for members of the project teams, specifically.

Q: So, the project team leaders, do they report to Major - , directly?

A: Yes.

Q: And then Major - would report to you?

A: Yes.

Q: Ron Wilt, what does he play in the IIMS Project?

A: He's currently the project manager for IIMS.

Q: What does the project manager do?

A: Have you ever been project ? I'm sorry.

21

---

Q: No I haven't that's why I'm asking you.

A: The project manager has responsibilities for all aspects of the project from scheduling to brisk mitigation to evaluating what the Commonwealth wants in determining that we a: get what we wanted; b: get what we paid for; he has responsibilities, liaison responsibilities with the various vendors; he's the point of contact for vendors, so he's literally the hub of the wheel on a project.

Q: Is he a civilian or a member of the State Police?

A: He's a civilian employee with the State Police.

Q: Lieutenant Brian Ackens. Is he involved in the IIMS project?

A: Yes.

Q: And what role does he play?

A: I am not certain exactly what Lieutenant Ackens title is. His responsibilities are to ensure that the ended product with IIMS satisfies the needs of the enlisted members of the Pennsylvania State Police.

22

---

Q: Do you know when Lieutenant Ackens was brought into tech services?

A: I don't recall.

Q: Do you know whether that was before or after Captain Ober was there?

A: I believe it would have after, but I'm again, not certain.

Q: And Lieutenant Ackens, he has a strong technological background, is that right?

A: He had been involved in the computer crimes unit before and so, he does know technology.

Q: Are you aware of any amounts of money that; in other words, Captain Ober here has said that it cost the taxpayers lots of money and delay and expense because he was taken off the project. Are you aware of any expense to the taxpayers, etc., that has come about because Captain Ober has not been able to be on the project?

A: I'm not aware of any direct expense, no.

Q: And has the projects continued to move forward successfully?

A: Yes.

23

---

Q: And your satisfied with the direction it is going and the work that is being completed, etc.?

A: Yes I am.

Q: Now as far as the; I want to talk to you about. Captain Ober has told us in the past that he had applied for a position as the Legislative Liaison when the former Legislative Liaison had left. I am trying to remember that gentleman's name. Um Captain Morris, or something?

BAILEY: Colonel Hickes before you respond, Cindy, perhaps we should agree that we employed to stipulations in the past as to objections being deferred as to the form of the question to time of trial. Do you agree to that stipulation?

COUNSEL: Yes.

BAILEY: Okay from time to time, Colonel, I may object. Unless I state additional information on the record, I may say to you "objection you may continue", okay. By the way are you representing him at this deposition or is he here as a Freelancer?

COUNSEL: I mean we represent the whole command staff so.

24

1    BAILEY:  Well, I assume you consulted
2  with him and talked with him and that you
3  represent him as a witness here today and that's
4  all right.  I just object; note an objection to the last
5  question, but you may respond sir.
6    Q:    Actually since then, Captain Brown
7  was kind enough to give me the name I was
8  looking for, which was Major Richard Morris.
9  Do you remember when he was legislative
10  liaison?
11    A:    I remember when he was legislative
12  liaison; I think he's been retired two or three
13  years?
14    Q:    And did you know that Captain Ober
15  applied for the position as legislative liaison when
16  Major Morris left?
17    A:    Yes I did.
18    Q:    Can you tell me what you know about
19  Captain Ober's application for that position?
20    A:    I believe at the time he was still within
21  the Bureau of Technology Services and he
22  submitted his application through channels to the
23  commissioner.
24    Q:    Would you have been one of those
25  channels?

25

1    A:    Yes, it would have gone to, I believe to
2  Major Waugh  and then to me.
3    Q:    From Major Waugh to you for
4  approval or disapproval?  What would your role
5  be?
6    A:    The legislative liaison works, I believe
7  it reports to the commissioner so, my role would
8  have been to pass it on.
9    Q:    Did you recommend one way or the
10  other whether Captain Ober would be good for
11  that spot?
12    A:    I don't recall whether I can put an
13  endorsement on it or not?
14    Q:    When you say put an endorsement,
15  what does that mean?
16    A:    Within the State Police
17  correspondence process an endorsement on
18  correspondence is your opinion of it and/or just a
19  note of transmittal.  I don't know whether I
20  endorsed that one or not?
21    Q:    But, you would have been able to
22  endorse it if you wanted to?
23    A:    Right.
24    Q:    Would that be your choice?
25    A:    Yes, I could have if I wanted to.

26

1    Q:    But we know that the story has been
2  established that Captain Oger told you about the
3  FBIs investigation and plasibe corruption the state
4  police have had on October 5 1998. Do you recall
5  that?
6    A.I don't recall that it was into the state
7  police academy. My recollection is that it was into
8  the ability to have, to get hired by the state police
9  and circumvent the hiring process.
10    Q. How do you get hired by the state police?
11    A. My best, I've got to tell you my best
12  notion of this and if I am wrong in any way it's
13  because I am not in humant resources but one
14  apply to Pennsylvania state police if there
15  between the requist age and are a resident of PA
16  and they have the resigit education then there is an
17  examination that is given and are places the
18  candidates on a list of eligible, once they are
19  placed on the list of eligible they are require to
20  subsequently undergo a polygraph examination,
21  background investigation, probly there is a
22  phsyreactric examination, but don't quote me on
23  that one  and they continue through this process
24  until the list gets dwindled down then human
25  recourses simply goes down the list and picks the

27

1  top candidates and invites them to the police
2  academy where they begin training. I believe that
3  is the way it is currently.
4    Q: In your understanding of the FBI's
5  investigation was that it was looking into what
6  part of that process?
7    A: That... My understanding was that they
8  had information that one could circumvent that
9  process and or an amount of money if you and at
10  the time when I believe they gave the exam they
11  were banding it in other words there was a band A
12  of the most eligible people and a band B of the
13  next group eligible. I think initially that if you
14  paid money you could move from band B to band
15  A and if at any where through process you failed
16  one of these, either the physical testing or the
17  polygraph examination money could be paid to
18  get that made to look like a good test.
19    Q: Who figures out the banding?
20    A: It's all done in the bureau of the human
21  resources. Actually it was the bureau of personnel
22  at the time. Test contractors.
23    Q. Who's in charge of the bureau of Human
24  resources?
25    A: That would be currently Linda Bonnie

28

Q: Is she a civilian employee?

A: Yes she is

Q: Was she... Do you know if she was in charge of it back in Oct. of 98?

A: I am not certain Mr. Wayne Dowling retired at some point in time and I am not sure who and when.

Q: Rings a bell for you. And he was a civilian employee also?

A: Yes he was.

Q: The director of personnel?

A: Correct.

Q: Who would he report to?

A: He would have reported, earlier in his 10 years to the Chief of Staff then after the reorganization to Deputy Commissioner of administration.

Q: Who was the chief of staff?

A: Well that pre dates all of this and that was Colonel Dilarcphie and then upon his retirement I believe Frank Lynch was the Chief of staff for a while.

Q: You said that there was not a Chief of staff at the time that these events occurred at this time in October of 98.

29

A: During Colonel Sharrp administration he did a reorganization of the department witch created the Deputy commissioner of administration and redistributed the responsibilities.

Q. Would that have gone back as far as lets back up to say 1994 in the Walp administration. Had it already been changed buy then?

A: It had been changed by then yes.

Q. And in the Walp administration who would be director of personal would have reported to?

A. The Deputy of commissioner of Administration.

Q: Do you know what role if any the Deputy Commissioner of Administration plays in that process that you just described?

A: I don't know.

Q: Do you know what role if any the Deputy Commissioner of operations would play in that process?

A: I don't know.

Q: How about, does the Governers office have anything to do with that? Process?

A: Not that I know of

30

Q: And do you know whether or not the active commissioner gets involved in that?

A: I don't know.

Q: When Captain Ober talked to you about the FBI's investigation on October 5 1998 you had just started as Deputy commissioner staff is that right?

A: Yes I had.

Q: Been there or two?

A: What day of the week is the fifth?

Q: I believe it's a Monday.

A: My first day I think, I don't have the dates but I think I was notified of my appointment on a Friday.

Q: Do you recall Commissioner I mean Captain Ober talking to you about... Do you recall when he first talked to you about the FBI investigation?

A: I recall him telling me about it yes.

Q: Can you tell us about that conversation that you had with him?

A: I'm not certain exactly where it took place it was in department headquarters I believe it was the third floor it may had been a corridor conversation.

31

Q: But it was face to face?

A: Yes it was face to face . Captain Ober approached me about an issue that he had had concerning the FBI contacting him relative to this information that one could buy ones way onto the Pennsylvania Sate police. He indicated to me that the FBI had contacted him in confidence and had asked him not to reveal this information to anyone else. That this was a political corruption investigation that they had been investigating previously and that this information had been a segment of that that they had kind of allowed to lay dormant for a while. And they were tying up loose ends, if you will. And they wanted to continue this investigation. And the, that the, had need information concerning the process of how one does get hired onto the Pennsylvania State Police. And that they did not know, obviously who might be involved in this. I believe this information was that they the term colonel had been used and that there were suspicions that it may have go to the Governors office.

Q: Now, the processing, the process that was something you weren't very familiar with, is that right?

32

1  A: It has changed over the years how one
2  gets accepted to the Pennsylvania State Police.
3  Q: At that time did he mention anything to
4  you about Trouper Stanton?
5  A: I don't believe so.
6  Q: I think you said backing up you
7  mentioned that he said that they said not to tell
8  anybody else about it. Did you have any
9  discussion with him about why he was not telling
10  his major the head of Bureau profession was your
11  responsibility?
12  A: He indicated from me that he was in a
13  quandary about what to do. Who to tell on this.
14  That it was information that he felt was serious
15  enough that he needed to commutate it to
16  somebody but really wasn't sure based on the fact
17  the term Colonel had been used who he would be
18  able to talk to and he decided that I was the person
19  that he should tell because I had not been a
20  Colonel and other than in the previous
21  administration hadn't been there in a number of
22  years and certainly wasn't in a position to
23  influence the hiring process.

33

1  Q: What did he tell you about what the FBI
2  said about whether he could tell anybody else
3  within the department?
4  A: He said that the FBI had asked for the
5  strictest of confidence and that he had responded
6  to the FBI that he needed to tell someone and that
7  they had indicated that they would let that up to
8  him to do but that it was a very sensitive matter
9  and that he was to tell no one about this.
10  Q: And your response to him was?
11  A: I asked him whether they were asking us
12  to perform any investigative task or whether they
13  were just seeking background information. He
14  indicated that it was background information only.
15  We discussed very briefly the remoteness of this
16  probably being true. That it was probably not true
17  because of the number of individuals that would
18  have to be involved in it. Then we kind of
19  reasoned that it technically it would only have to
20  be like 5 or 6 if they were the right individuals.  ← he hadn't finished
21  Q: Who were the 5 or 6?
22  Mr. Bailey: Please he hadn't even finished I
23  would like to hear the end of his question.
24  Counsel: Can you clarify for me who the
25  five or six are?

34

1  Mr. Bailey: No I
2  Counsel: Your objection is noted he can
3  finish his Question after he has answered mine.
4  Mr. Bailey: No...No.... No.. Look you
5  interrupted he was answering a question that was
6  highly improper. I want to hear the end of that.
7  Council: its noted Mr. Bailey
8  Mr. Bailey: Noted my behind ma'am.
9  Council: It's noted
10  Mr. Bailey: No it's not noted and I am not
11  going to stop objecting He was answering a
12  question, a very very important one. He was in the
13  middle of that question you interrupted him with
14  another question. I am respectfully requesting that
15  you allow him to answer that question in fact  I'd
16  like to have it read back that's an extremely
17  material question in this law suit. Are you going
18  to let it be read back?
19  Council: No not if you are not going to let
20  him answer my question.
21  Mr. Bailey: Let me put something on the
22  record right now.
23  Council: Go ahead
24  Mr. Bailey:  You interrupt this witness one
25  more time and prevent him from answering a

35

1  material question I am taking my client and were
2  leaving we will go to the judge.
3  Council: Okay.
4  Mr. Bailey: Now you are not allowed to
5  interrupt a response to a question. That was an
6  extremely important one I want him to be allowed
7  to finish. I'm going to let you get away with it this
8  time. I respectfully request, I am asking that you
9  do not do that again. You will disrupt this
10  deposition and your going to destroy the flow of
11  information. It sends messages, it's wrong.
12  Council: If you would just...
13  Mr. Bailey: He was answering.... He was
14  answering.. No you're not allowed... no ma'am
15  I'm not allowed to do it either.
16  Council: It is up to you if you choose to
17  leave.
18  Mr. Bailey: I am telling you I am going to
19  leave this deposition if you do that again.
20  Council: well that is your choice. Lutenant
21  Colonel. I have kind of totally lost track now of
22  what you were responding to but I believe you
23  were explaining that you and Captain Ober had at
24  first thought it was a bunch of people and than
25  that would have to be involved and then narrowed

36

1 it down to if they were the right people maybe
2 five or six people and then perhaps you were
3 going to say something else. I don't know. But
4 could you first tell me the five or six people that
5 you narrowed it down to and then if there was
6 something else you wanted to add feel *free* to do
7 that.
8 　　　Lieutenant Colonel: Technically in my
9 opinion at the time personal bureau personnel
10 cadet processing unit. And that would have been
11 Rose Polic and Julie Farthing. It could be
12 individuals who, I don't know if anyone looks at
13 the list after they say these are the cadets that are
14 on it and these are the people who should start the
15 academy and these are the people we process. I
16 am not sure where the oversight is. So obviously
17 those two people in the cadet processing unit if
18 there is oversight then your director of personnel
19 clearly could be someone who could be involved.
20 And then obviously someone ranked higher than
21 that would influence to have them manipulate
22 something. Could be someone that could do this.
23 That could be the Commissioner or any of the
24 Deputies or Governors office.

37

1 　　　Q: And was there something else you
2 wanted to add to that?
3 　　　A: I recall that, and this was my recollection,
4 I recall that was answering you had asked what
5 Captain Ober and I  had discussed and why he
6 might not have gone to Lieutenant Colonel
7 Conley actually Major Conley now. I don't know
8 but, he did ask me what do I do I've been sworn
9 to confidentiality and I have a boss, I am telling
10 you this is supposed to be a secret what do I do?
11 And that I responded to Captain Ober, I here by
12 direct you, I order you not to divulge this
13 information to anyone. And made that quite
14 sta...in the -.
15 　　　A: Excuse me, Thank you.
16 　　　Mr. Bailey: One second........Colonel I
17 didn't catch the tail end of you response if you
18 would be kind enough to repeat it?
19 　　　Lieutenant Colonel: As I said Captain Ober
20 was concerned about his bosses and he had come
21 to me witch was outside of his chain of command
22 and I told him that the FBI had requested
23 Confidentiality this was there investigation and
24 that I gave him a direct order not to divulge the

38

1 information to anyone till they have completed
2 there investigation.
3 　　　Mr. Bailey: Thank you sir.
4 　　　Counsel: When you were listing the five or
5 six people, the people you thought might be able
6 to be involved in the changing the banding etc...
7 Would the Director of the Bureau of Professional
8 Responsibility have any involvement in that
9 process?
10 　　　Lieutenant Colonel: Probably not.
11 　　　Q: The Director of the Bureau of
12 Professional Responsibility was then Major
13 Conley?
14 　　　A: He had just gotten promoted, yes.
15 　　　Q:  And he would have been the person that
16 was immediate supervisor of Captain Ober.
17 　　　A: That's correct.
18 　　　Q: Now you mentioned in you response that
19 you ordered Caption Ober not to tell anybody else
20 about it. And then you mentioned that it was
21 because he had said that he had sworn to
22 confidentiality. Was it your understanding from
23 Captain Ober that the FBI had been explicate in
24 requesting that confidentiality?
25 　　　A: Yes, It was.

*former*
*Troop B Commander*
*Commander of Stanton*

39

1 　　　Q: And that the FBI had been explicate in
2 asking him not to disclose this information to
3 other people.
4 　　　A: Yes
5 　　　Q: Did you ever personally speak with
6 anyone from the FBI about the investigation?
7 　　　A: No, I did not.
8 　　　Q: Did you ever personally speak with
9 anyone from the FBI about the need to keep this
10 confidential from other people within the state
11 police?
12 　　　A: No I did not.
13 　　　Q: So is the bottom line basically that you
14 made your decision about what to order Captain
15 Ober to do based on the facts as he represented
16 them to you?
17 　　　A: That is correct.
18 　　　Q: And you didn't have any personal
19 knowledge of whether the facts that he told you
20 were true or weren't true. Is that right?
21 　　　A: That is correct.
22 　　　Counsel: I'm going to ask Captain Brown, to
23 be so kind as to, here is a copy, one for the
24 witness and there's one for Mr. Bailey, if you
25 could just have the court reporter, hand that to the

40

1 court reporter and let her mark it as exhibit one,
2 Colonel, You just let her mark it and you can have
3 it back.
4     Lieutenant Colonel: Okay
5     Counsel: Okay exhibit one, do you
6 recognize the document?
7     Lieutenant Colonel: Yes I do.
8     Q: And can you describe it for me? So I can
9 apply it.
10     A: It's a correspondence from me to the
11 commissioner providing him the facts as I new
12 knew them to be based upon his request this
13 information after we disclosed to him that the FBI
14 had conducted the Investigation.
15     Q: In your memo, just a moment ago I had
16 asked you and you had said that you didn't have
17 any personal knowledge this was all based on
18 what Captain Ober had told you on October 5.
19 does your memo on May 18th 1999 document
20 what Captain Ober told you?
21     A: Yes it does.
22     Q: Now did I think you said that on that first
23 meeting that Captain Ober did not mention
24 anything about Trouper Standon being involved?
25     A: I don't believe he did at the time, no.

41

1     Q: Do you know when he told you about
2 that?
3     A: Our meeting weren't formal. In fact if I
4 had an occasion to talk to the Captain I may
5 inquire if he had heard anything. At some point
6 He raised the name Standon as being someone
7 that had facilitated as involved in the meeting .
8 But I don't know when.
9     Q: Did Captain Ober ever tell you that, That
10 Trouper Standon had indicated during the course
11 of this investigation that he knew people that had
12 bought there way into the academy.
13     A: Repeat the question again.
14     Q: Did Captain Ober ever tell you that
15 during the course of the FBI investigation, Was he
16 giving you updates about this about the FBI
17 investigation at all?
18     A: Yes, if something happened that was
19 significant, yes he would.
20     Q: So, As part of this update, was what I
21 was wanting to know is weather Captain Ober
22 ever told you that Standon had said during this
23 FBI investigation that he actually knew people
24 who had bought there way into the State Police
25 Academy.

42

1     A: I believe he had..
2     Mr. Bailey: Objection to the form of the
3 question. He may respond here.
4     Lieutenant Colonel: I believe he did, had
5 said that.
6     Counsel: And did, Excuse me, Captain Ober
7 ever tell you that the FBI gave him the names of
8 two people that had supposedly bought there way
9 into the academy and had him go check to see if
10 they really were in the academy?
11     A: I'm not certain on that.
12     Q: Do you know, Did Captain Ober ever tell
13 you any of his efforts to find out more about the
14 process of getting into the academy?
15     A: no not that I recall.
16     Q: Did he ever give you any update about
17 what he told the FBI about the process of getting
18 into the academy?
19     A: not that I recall.
20     Q: Did Captain Ober ever mention to you
21 that when the FBI spoke with him that they left it
22 completely up to him who to tell at the State
23 Police about this information?
24     Mr. Bailey: Objection to the form of the
25 question. Sir you may respond.

43

1     Lieutenant Colonel: My recollection of the
2 conversation is that he indicated that he need to
3 tell someone else and they said they would leave
4 it to him. If that answers you question.
5     Counsel: Well did he ever tell you that they
6 really didn't care who he told within the State
7 Police.
8     A: No.
9     Mr. Bailey: Let me note that the witness has
10 the tendency to answer questions very very
11 quickly. Witch is fine. Not a problem there. But I
12 would like to not an objection to the previous
13 question.
14     Counsel: Did you know it was captain Ober
15 who suggested to the FBI that a lieutenant
16 Colonel would have to be involved to have
17 something like that occurs?
18     Lieutenant Colonel: No.
19     Q: We have already established that in a
20 prior disposition with the FBI that it was on
21 October 13, 1998 that a wire tape first, first time
22 Colonel was used in a wire tap, and that that was
23 actually Lieutenant Colonel rather than Colonel.
24 Did you know that the FBI……

44

1   Mr. Bailey: Let me, place an objection to
2   characterization of the of testimony let me place
3   and objection to the reference to the question.
4       Counsel: Did you know with that in mind
5   Did  you know that the FBI agents had not even
6   picked up on the use of the word Lieutenant
7   Colonel on that tape until it was pointed out to
8   them by Captain Ober?
9       Mr. Bailey: Objection to the characterization
10  of testimony. Objection to a lack of foundation.
11  Objection to the following question. You may
12  respond sir.
13      Lieutenant Colonel: No.
14      Counsel: Were you ever, Did you ever now
15  through the FBI or Captain Ober that prior to
16  speaking to Captain Ober about the FBI
17  investigation the FBI agents had already talked to
18  people within the organized crime section about
19  the investigation?
20      A: No.
21      Q: Did you know that they had already
22  talked to someone out in the western internal
23  affairs office about the investigation?
24      A: no

45

1   Q: Again you were operating under the
2   premise that the FBI had specifically asked
3   Captain Ober for no one else in the state Police to
4   know about this. Is that correct?
5       A: Correct.
6       Q: And if in fact that was not the case would
7   you advice to Captain Ober be the same?
8       Mr. Bailey: Objection. You may respond sir.
9       Lieutenant Colonel: You need, If what was
10  not the case?
11      Counsel: In other words if you knew at the
12  time Captain Ober came to you with this
13  information you had known that the FBI agents
14  had already gone to organized crime unit and said
15  we have this investigation into people that may be
16  able to buy into the academy, can you imagine
17  how this could have happened and they had a
18  whole discussion about it and if the people had
19  said you better go tell you know the Bureau of
20  Professional responsibility they can help you out.
21  Would your advice have still been the same to
22  Captain Ober about not telling anybody else not
23  telling his Major.....
24      Mr. Bailey: Objection to the form of the
25  question. You may respond.

46

1       Lieutenant Colonel: Confidentiality is
2   prefaced on the fewest number of people knowing
3   about it as possible if the information were
4   already fairly widely disseminated, or at least
5   disseminated by them to a wider audience then
6   there would be less need for confidentiality.
7       Counsel: And that might have changed what
8   you decision process was.
9       Lieutenant Colonel: It might have, yes.
10      Q: So again you were basing your decision
11  on what Captain Ober told you.
12      A: Correct.
13      Q: Now did you know that Captain Ober
14  meet with the FBI in Indiana, PA at a Holiday inn
15  to watch a video tape?
16      A: I believe, I am not sure what city it was,
17  but I know that he went to western PA to meet
18  with the FBI relative to the video, yes.
19      Q: What did he tell you about, Did he tell
20  you about the meeting ahead of time?
21      A: Yes he did.
22      Q: And what did he tell you about it?
23      A: I believe he contacted me telling me the
24  FBI had a video tape and that he, they wanted him
25  to travel to western PA to meet with them. Now

47

1   again I believe that this was the circumstance. He
2   indicated that he wanted to do that but in order to
3   maintain confidentiality he felt that he should take
4   a day off. And should use his own vehicle rather
5   than to have people ask a lot of questions. I
6   approved that he would do that and authorized
7   him to use his own car and I believe I specifically
8   said subsequently to this then because this is a
9   work assignment that you should get your day
10  back. And following the meeting I believe that he
11  came to my house with the video tape and I
12  viewed part of it.
13      Q: What did he tell you about why they had
14  to meet at the holiday Inn?
15      A: I don't recall.
16      Q: Did he tell you about why he was the
17  person who had to pay for the room at the Holiday
18  Inn?
19      A: No.
20      Q: Did he ever tell you that the FBI agents
21  really just wanted to meet him somewhere half
22  way that would be more convenient for both
23  parties?
24      A: I believe he mentioned that yes.

48

1  Q: And did he ever tell you that the FBI
2  agents left it up to him where to meet?
3  A: I believe he indicated that it was a mutual
4  decision.
5  Q: Did he tell you that they would have been
6  just as happy for him to come to FBI
7  headquarters?
8  Mr. Bailey: Objection. You may respond.
9  Lieutenant Colonel: Not that I recall.
10  Counsel: Did he tell you that they would be
11  willing to meet him in the State Police barracks?
12  A; Not that I recall.
13  Q: Did you know that a prior meeting that
14  he had when he listened to body wires before had
15  been held Bedford Barracks/
16  A: I don't recall.
17  Q: So was is, your decision or Captain
18  Ober's decision that this hotel room should be
19  rented in Indiana to watch the video tape?
20  A: That would have been his decision.
21  Q: Now when, Then again you were relying
22  on facts as he represented to you.
23  A: Correct.
24  Q: You did not call the FBI and say what do
25  you need to meet with Captain Ober about?

49

1  A: No, I did not.
2  Q: Or ask them where do you guys need to
3  meet or anything like that?
4  A: No.
5  Q: You just trusted him and left everything
6  to him.
7  A: Correct.
8  Q: Who finally, How long was this all going
9  on in confidential mood?
10  A: it was from October 5th until some time
11  in late April or early May I am not certain of the
12  date.
13  Q: Who finally made the decision that
14  Colonel Evanko should know about the
15  investigation?
16  A: I had been inquiring of Captain Ober
17  when the FBI concludes or reaches the point
18  where they have gone far enough in the
19  investigation that confidentiality no longer
20  applies. We need to inform me so we let the
21  Commissioner know.
22  Q: I want to back up just a little bit because I
23  just realized that there was something I had
24  passed over. When Captain Ober was first
25  contacted back in October and you told him not to

50

1  tell anybody else did you also order him not to put
2  anything, not to document this in any way? The
3  contact.
4  A: Not that I recall.
5  Q: Do you recall if you ever ordered him or
6  directed him not to fill out a IAD complain
7  worksheet or anything like that?
8  A: We had a brief discussion relative to at
9  what point that would be appropriate to fill out a
10  IAD worksheet in the event that ultimately TSP
11  officers were involved. I don't recall what
12  meeting that was that that would have occurred.
13  Q: Did you ever tell Captain Ober that he
14  should have the FBI send things to his home
15  relevant to this?
16  A: Not that I recall, no.
17  Q: And I think that had brought us up
18  forward to where you were saying that you had
19  been waiting for updates from Captain Ober about
20  when you were released from confidentiality.
21  A: Correct.
22  Q: And when was that?
23  A: As I said sometime in late April or early
24  May. I am not certain of the date.

51

1  Q: Then I guess in answer to my question
2  was it you that decided that the Colonel Evanko
3  should know about the investigation?
4  A: Well I think that we both from the
5  inception knew that Colonel Evanko needed to
6  know about the investigation upon releasing
7  confidentiality. It was a matter of because my
8  knowledge of this was so limited having a time
9  and a place where we were both together and the
10  Commissioner was accessible to us that we could
11  advise him.
12  Q: And then that, when you told him about it
13  was Wednesday May 12th, 1999. Was that right?
14  A: I believe that is correct.
15  Q: And your May 18th memo witch is
16  exhibit one was written down after that, correct?
17  A: Correct.
18  Q: Basically just documenting what has
19  occurred?
20  A: Correct.
21  Q: When Ober finally came to you and said,
22  Okay were released from confidentiality what was
23  said during that conversation?
24  A: I don't recall.
25  Q: Do you recall any of it?

52

1    A: No, I would be speculating what was
2    said.
3    Q: When did you learn about Trooper
4    Stanton's involvement?
5    A: I believe when the video tape was
6    presented. He may have in a previous meeting
7    indicated his name somewhere along the line.
8    Q: Where you ever told that the FBI had
9    determined that Trouper Stanton was the only
10   member of the State Police involved? The only
11   member and that could be turned over to the State
12   Police to handle.
13   A: Repeat the question.
14   Q: Were you ever advised buy by Captain
15   Ober or anybody else that the FBI ultimately
16   determined that Trouper Stanton was the only
17   member of the state police that had engaged in
18   criminal conduct and that the investigation had
19   then been turned over to the State Police to
20   handle.
21   A: Captain Ober would have advised me of
22   that at some point.
23   Q: Do you know if that was, would have
24   been before or after the FBI released him from
25   confidentiality?

53

1    Q: Tell us about that.
2    A: We explained to the commissioner as
3    best we can, my recollection of what we talked
4    about here today and Captain Ober explained his
5    involvement in this. And what the outcome was.
6    And.. to the Commissioner.
7    Q: What reason did you give Colonel
8    Evanko for not telling him about that earlier?
9    A: the same reason I've described today.
10   The request for confidentiality.
11   Q: The FBI had requested that?
12   A: Correct.
13   Q: Did you have a subsequent meeting with
14   Colonel Evanko and Lieutenant Colonel Coury?
15   A: Lieutenant Colonel Coury was in an
16   adjacent office the Commissioner asked him to
17   come into the room and then Captain Ober and I
18   then explained it to Lieutenant Colonel Coury
19   then also.
20   Q: So it was kind of one meeting he was to
21   come in?
22   A: Correct.
23   Q: And did you the reiterate with Colonel
24   Coury there that the FBI had directed Captain
25   Ober not to disclose this information to anybody.

55

1    A: It would have been conjunctive with that
2    in my mind, but I don't have a way of saying yah
3    that is actually when that occurred.
4    Q: I understand. Where where you, first of
5    all were Captain Ober together when you talk to
6    Colonel Evanko about the investigation?
7    A: Yes we were.
8    Q: And where was that, where did this
9    conversation take place?
10   A: I believe it was in the Director of Bureau
11   of Training Education office that we had the
12   conversation.
13   Q: How did that come about?
14   A: I had been at the academy with the
15   Commissioner and the other Deputies for a
16   session a consecutive session of command staff I
17   am not certain why Captain Ober was at the
18   academy that day. But he was. And I took the
19   opportunity of having the three of us together to
20   ask the commissioner if we might have a few
21   minutes of his time to explain.
22   Q: Well tell us about that meeting you had.
23   Was this just with Captain Ober, you and the
24   Commissioner?
25   A: Yes.

54

1    A: Correct
2    Q: Now you talk to…. Now that was on
3    May 12th. On May 13th you talk to Barbara
4    Christi, Chief Council with the State Police about
5    the FBI investigation. That was….
6    Mr. Bailey: What date was that?
7    Counsel: May 13th 1999
8    Mr. Bailey: Please repeat the end of that
9    question I missed it.
10   Counsel: I'll just repeat the question. On
11   May 13th 1999 the day after you disclosed this to
12   the Commissioner you also talked to Barbara
13   Christi, Chief Counsel of State Police about this
14   FBI investigation and I said I was curious as to
15   what prompted you to do that.
16   A: The Commissioners response to the
17   information was such that, I mean that he was
18   very agitated he was obviously displeased, He
19   initially verbally questioned, rhetorical questions,
20   why wouldn't the FBI tell me about this?, Why
21   wouldn't Louie Freeh tell me about this?, Louie
22   Freeh is a personal friend of mine . He then
23   indicated that he would have the FBI agents
24   transferred for not coming to him with this. The
25   next day Commissioner, again the Deputies met

56

1  he asked me to explain to Lieutenant Colonel
2  Westcott who was in that meeting at that time
3  what had occurred and then I went through the
4  story again. That point he directed that we should
5  have an investigation that there should be a couple
6  Majors assigned to this to find out what the facts
7  of this were. Miss Christi is the department Chief
8  Counsel I need to run the circumstances past her
9  as I new them to see whether my decisions were
10 reasonable. Also through this process on my mind
11 was if based on the information I had if we
12 disclosed this information are we interfering with
13 a federal case and federal investigation? Is that
14 thinking correct or was I off base?
15     Q: Again based on you belief that they did
16 not want you to tell anyone.
17     A: Correct.
18     Q: Who else did you discuss this situation
19 with?
20     A:  After the release of confidentiality and
21 our meeting with the commissioner I discussed it
22 with a lot of people.
23     Q: Can you give me a few names.
24     A: Yes, I have discussed it with all of my
25 Bureau directors, I have discussed it with  Mary

57

1      Q: Do you have any idea Charles Sodd the
2  Governors Director of Policy would have found
3  out?
4      A: Not that I know of.
5      Q: How about Pete Tartline, the Governors
6  Deputy policy Director.
7      A: I don't believe so.
8      Q: Do you have any idea Leann Labickie
9  who replaced Tartline as Director of Policy would
10 have found out about it in March of 1999?
11     Mr. Bailey: Counsel can I respectfully
12 request you to spell these names for us? I want to
13 make sure I get the spelling correct.
14     Counsel: I'll spell them but not right at this
15 moment.
16     Mr. Bailey: Well she needs them too.
17     Counsel: Well I'll get them for her.
18     Mr. Bailey: Well you make sure I get them.
19     Counsel: We will.
20     Mr. Bailey: Okay. Was that Deanne
21     Counsel: Leanne
22     Mr. Bailey: Leanne, I thought, see I didn't
23 hear that.

59

1  Woley from the Governors office I discussed it
2  with Leann Lebickie I believe Major Selihamer. A
3  number of people.
4      Q: Do you have any idea how any of those
5  people would have found out about the FBI
6  investigation as early as March of 1999?
7      A: No.
8      Q: Let me just go over a couple of them to
9  see if you have any idea of how they might have
10 known.
11     Mr. Bailey: Are you representing that they
12 knew counsel?
13     Counsel: Yes, I am.
14     Mr. Bailey: We may have to depose you.
15     Counsel: Well you may have to depose then.
16     Mr.: Bailey: I will depose you before it is
17 over anyhow.
18     Counsel: In any event for now regardless of
19 the bases of this I want to know what you knew.
20 Do you know how Nan McGlocklin the Deputy
21 Chief of Staff for the Governor, knew about the
22 FBI investigation in March of 1999?
23     A: No.

58

1      Counsel: And if they found out this
2  information from Mary Woley, you don't know
3  how she knew it?
4      Lieutenant Colonel: Not March of 1999.
5      Counsel: right March of 1999
6      A: No I do not.
7      Q: But you would have talked to her about it
8  then after you had talked to the Colonel about it.
9      A: I did not talk to Miss Woley about it until
10 released from confidentiality by the FBI.
11     Q: But that would have been around the
12 same time that you talked to Colonel Evanko
13 about it?
14     A: Correct.
15     Q: If Mary Woley was also trying to discuss
16 the issue with Barbara Christi for example she
17 would know because you had just told her.
18     A: Correct.
19     Q: Now the administrative inquiry that was
20 done you said that Major Werts, maybe you didn't
21 say but we know that eventually Major Werts and
22 Major Williams did an investigation in the
23 summer of 1999. Did you ever find out when that
24 investigation was completed?

60

1    A: The commissioner had a conversation
2    with me I believe it was the last Wednesday of
3    Sept. of 1999.
4    Q: And he told you it was over?
5    A: Yes, he did.
6    Q: Did he tell you anything about the
7    outcome of that?
8    A: He told me that Captain Ober had
9    misrepresented the facts as he provided them to
10   me and as far as the investigation that is really all
11   he told me about the investigation.
12   Q: Did you ever tell Captain Ober that the
13   investigation was over?
14   A: I don't recall whether I did or not, I
15   believe I did.
16   Q: Do you recall if you mentioned that to
17   Major Wall as well?
18   A: I'm not certain.
19   Q: I want to take about five minutes break
20   because I want to make sure I don't have any
21   more questions for you.
22   A: Okay.
23   Q: So if we could all take five minutes?
24
25   Mr. Bailey: Were back in operation.

61

1    A: It converted our, As I understand it
2    converted our clean system from gum terminals
3    and dedicated lines to TCPIP configuration that
4    allowed you to transmit information more easily
5    and also built our, our e-mail process but desktops
6    on peoples desks preliminary the use of computer
7    technology throughout the department.
8    Q: So as part of that first project the
9    enterprise network you would have, the
10   department had to buy a lot of computers I guess
11   and a lot of hardware.
12   A: Yes, we did.
13   Q: And so that would have been a large
14   portion of that hundred million dollars of that
15   project wouldn't it be?
16   A: No, that contract was let prior to Mike
17   coming on the job. In fact many of those
18   computers had already been expended before I got
19   my job as Deputy Commissioner of Staff.
20   Q: Do you know for certain the price of
21   those computers ext.... are not part of the over all
22   one hundred million dollars. Whenever you hear
23   one hundred million dollar project.....
24   A: I am very sure that it's not at the
25   enterprise network project as it were cost thirty

63

1    Albert Rodriguez: 10:58AM  Back on
2    record.
3    Counsel: Okay, I just want to clarify one
4    thing back to the IMS Project. There was I think I
5    was trying to ask you but I didn't really
6    understand it that well at the time, but there was a
7    larger technology that was comprised of not only
8    the  IMS project but also the Enterprise
9    Network. Is that right?
10   A: Well technically Enterprise Network is a
11   component of IMS. It was the first thing that
12   needed to be completed in order to create the
13   foundation upon witch IMS was built. The
14   contract for the enterprise network had been
15   already been let I believe it was in June of 1998 to
16   IBM and it was in process when I got my job.
17   Q: Oh when you got your job. You kind of
18   trailed off so I was…
19   A: When I got my job as Deputy, That
20   contract was already signed and IBM was the
21   prime contractor on it.
22   Q: The Enterprise network would that, I
23   guess that was the foundation witch everything
24   else can come from.

62

1    five million dollars. I believe that IMS the total
2    bottom line on IMS is going to come closer to
3    hundred twenty to hundred thirty million. And
4    that did not count I believe that did not count the
5    enterprise network.
6    Q: Who would know that for certain?
7    A: I would ask is Mr. Drumand is our
8    physical officer would probably know and Mr.
9    Heartly who is in information technology plans
10   and controls and handles the contracting for the
11   technology initiative would probably know.
12   Q: Mr. Drumand  is the physical guy he
13   would take care of the budget and things like that?
14   A: Yes, he would.
15   Q: Okay, alright, thank you.
16   Mr. Bailey: Okay Colonel now it is my turn.
17   I, first of all want to thank you for your responses
18   to my opponents, opposing councils questions.
19   And I have a serious of questions for you. Now
20   my methodology is a little bit different. What we
21   are out to do here is to establish as completely as
22   we can a good fact record. And in that regard I
23   would invite and in fact encourage you if at any
24   time when I ask a question not to reframe from or
25   feel shy and I am not suggesting that you would to

64

1 ask me what I mean by a question and even more
2 because I think it will save us time. Where I am
3 going with a question. So I will be pleased to give
4 you an offer of you know not just what I mean by
5 a particular If it seams awkward  or its
6 misdirected but also about where I want to go
7 generally. I also like to move around in different
8 areas and structure my depositions and in that
9 regard I will try to inform you where I am going
10 when I do a change of direction to give you a
11 chance to do a mental change. Okay. Where I
12 would like to begin is in the area the fall of 1998
13 where Captain Ober comes  to talk about things. I
14 don't mean to be facetious with this question I
15 mean it as a very serious question. Have you ever
16 known ever had any experiences that would
17 indicate to you that Captain Ober might be, don't
18 laugh at me know, clairvoyant or prophetic able to
19 for tell the future or have some connection with
20 some sort of physic power ability that may have
21 enable him to for tell the future?
22     Lieutenant Colonel: No.
23     Q: Well I think if I understand the testimony
24 correctly as well as the char iteration of testimony
25 that were in gendered in questions to you by

65

1 opposing counsel. Mr. Ober came to you on or
2 about Oct. 5th of 1998  is that correct some time
3 around that date?
4     A: yes
5     Q: and at that time subsequently he
6 indicated to you that there was information
7 allegedly imparted to him by the FBI. If it didn't
8 ascend from above that there might be a colonel
9 or somebody of that rank involved in this terrible
10 thing that the FBI was investigating. Now am I
11 correct?
12     A: Yes he said that the term Colonel had be
13 used.
14     Q: So here's Captain Ober and it's October
15 the 5th it's 1998 and one of the things as part of
16 this burden he is carrying is this portent that
17 somebody with this rank of Colonel could
18 possibly be apart of it. Is that correct.
19     A: Yes.
20     Q: Incidentally, Was Captain Ober you
21 know was he relishing this or was he upset and
22 concerned about the seriousness of this?
23     A: At no time did Captain Ober give the
24 impression that he was relishing this. He seamed
25 generally concerned about it, and somewhat

66

1 caught in the middle of it. What do I do. But he
2 never relished his role or having this information.
3     Q: Now I am not, I don't profess to be an
4 overly religious person, but are you familiar with
5 the Gacenimity or the Garden of Gacenimity, let
6 the cup pass from me, metaphor from the Bible?
7     A: You would have to explain it.
8     Q: That's all right. Is it fair to say that
9 Captain Ober was burdened and concerned that
10 this information came to me. Like here I have this
11 thing in my hands what do I do?
12     A: That would be a correct assessment.
13     Q: Okay and my very capable opponent  had
14 indicated in characterization of testimony that I
15 believe I'd object to at the time that on or about
16 the 13th Oct. of 1998 to the Ernst while efforts of
17 the FBI some sort of tape recording had been
18 made or some information had come to the FBI
19 that the word Colonel was used. Is that correct?
20     A: That's what I am lead to believe, yes.
21     Q: Okay now let me ask you something
22 Colonel Hickes are there any facts known to you
23 that Captain Ober worked with the CI's in that
24 case or worked directly in basic investigation of
25 this matter?

67

1     A: No, he did not.
2     Q: Okay, well I think you already answered
3 the question that you don't know of any prophetic
4 or fortune telling abilities on Captain Obers part.
5 Let me ask you, go back again, I want to go back
6 that conversation that occurs sometime in early
7 October  around the 5th or so in October when
8 Captain Ober came to you. Do you remember now
9 where Colonel Conley was.
10     A: When I received my appointment as
11 Deputy of staff witch I believe would have been
12 the Friday before I believe that Lieutenant
13 Colonel Conley was promoted Captain to Major
14 he would have been troop commander I believe
15 troop B Washington up until Friday and then
16 Monday he was promoted. I believe that was the
17 sequence of events.
18     Q: So the sequence of event you know they
19 may be jumbled just a little bit I mean that was a
20 little while ago. Is that here was then Major
21 Conley how was then moving into head of what
22 BPR.
23     A: Correct.
24     Q: Of witch IAD is a division.
25     A: Correct.

68

1    Q: IAD was where Captain Ober was, right?

2    A: Correct.

3    Q: And that Major Conley had come from

4  troop commander of troop B.

5    A: Correct.

6    Q: Did you ever find out where Mr. Standon

7  was from?

8    A: I believe he was troop B.

9    Q: Did you ever find out, did you ever come

10  to learn that Major Conley was aware of or knew

11  certain political figures in Allegheny County?

12    A: I'm am not familiar with whether he is or

13  is not associated with.

14    Q: Okay. Did any information ever come to

15  you to indicate that Major Conley knew a fella by

16  the name of Doc Feilder?

17    A: No, not that I know of.

18    Q: Okay that is fine. Do you know who Doc

19  Feilder is ?

20    A: No I don't.

21    Q: Do you know who Lenny Bodeck is?

22    A: No I don't.

23    Q: Joe Preston?

24    A: I believe Mr. Preston was a legislator, I

25  am not sure whether he still is.

69

---

1    Q: Joe Preston is still a legislator. Now

2  getting back to that, these events that surround

3  this first week in October it indicated that you had

4  the responsible opposing counsel's question that

5  you had a direct meeting of some type, your not

6  certain of where it was, with Captain Ober. Is that

7  correct?

8    A: Correct.

9    Q: Now prior to that, prior to that Colonel

10  Hickes had you had had any knowledge about

11  these allegations that the FBI had concerning the

12  hiring process within the PA State Police?

13    A: Not that I recall.

14    Q: Now at this juncture I am going to come

15  back now, okay to where we are, again I am going

16  to do one of my little change of directions here.

17  Okay. Have you ever known of an academy class

18  to have been retested by order of the

19  commissioner?

20    A: no I haven't..

21    Q: Do you have any knowledge of any

22  favoritism of hiring of troupers sons taking place

23  within the PA State Police?

24    A: I have no knowledge, no.

70

---

1    Q: Are there internal audits procedures in

2  the PA State Police in the compliance internal

3  compliance with regulations and regulations

4  processes.

5    A: The system is in process review division

6  of professional responsibility has responsibility

7  for I'll call it an internal audit on unit policies and

8  procedures.

9    Q: On compliance type issues adhere

10  processes and program efficiency and maybe that

11  type of thing?

12    A: Generally speaking, yes.

13    Q: Okay sir. Now do you know whether or

14  not there's ever been an internal evaluation in the

15  PA State Police in the hiring process?

16    A: I don't know.

17    Q: Okay. Now it is my understanding in

18  response to questions on direct you indicated that

19  your recollection is there was some type of issue a

20  fact issue with moving from Band B to Band A

21  that that would somehow make you more

22  available for the hiring process. Is that correct

23  there is some sort of sorting process?

24    A; That's my recollection yes.

71

---

1    Q: Okay. Now I am going to take you back

2  now again to the Oct 5th time when captain Ober

3  is talking to you there. Did Captain Ober indicate

4  at any awareness of a previous investigation

5  having been done by the FBI in this thing?

6    A: No

7    Q: And of you own knowledge whether by

8  rumor or by virtue of some official document had

9  you been aware of any investigation done by the

10  FBI?

11    A: no, I had not.

12    Q: Well who is head of the Western

13  organized crime group out there?

14    A: I have no idea right now.

15    Q: Frank Monico?

16    A: He's the troop commander in troop A

17  Greensburg currently. I don't know what his

18  capacity was in 1998.

19    Q: Do you know Frank was in charge of the

20  organized crime division on or about 96 or 97 in

21  that area there 95?

22    A: he may have been I don't know for sure.

23    Q: Okay. Do you know who was in charge

24  of Western AID, Western PA Park I don't know

25  what your term is of IAD at that time.

72

**[Page 73]**

1    A: No I don't recall.

2    Q: Have you ever had the opportunity

3    ...Strike the form on that. Do you know whether

4    the FBI had ever gone to Western division of the

5    organized crime unit or IAD with information

6    about Mr. Standon?

7    A: I don't have any first hand knowledge of

8    that no.

9    Q: And do you know whether or not that

10    information was ever communicated quote

11    unquote front office?

12    A: I don't know.

13    Q: Do you know if lieutenant Colonel

14    Quarey had ever received any information from

15    Western AID or from the organized crime

16    division out there in Western PA about Mr.

17    Standon and his activities?

18    A: No I don't.

19    Q: Do you ever talk to FBI agent Suley

20    about what occurred out there.

21    A: No, I did not.

22    Q: Do you know whether the Mr. ~~Monago~~ Monico

23    may have at some time called Colonel Coury prior

24    to when the FBI....Colonel Hickes let me strike

25    the previous question let me rephrase it this way.

73

**[Page 74]**

1    Do you know whether Lieutenant Coury had ever

2    gone to Colonel Evanko with information about

3    some FBI investigation into the practices of Mr.

4    Standon, his activities.

5    A: No I don't.

6    Q: Did you ever hear of Mr. Standon and his

7    alleged involvement in criminal activity or alleged

8    criminal activity prior to when Captain Ober had

9    come to you?

10    A: No not that I recall.

11    Q: Do you know of any investigations into

12    the activities of Mr. Standon prior to when the

13    FBI came to Captain Ober?

14    A: Not that I recall, no.

15    Q: Well, Mr. Coury has testified, I think the

16    opposing counsel will agree with me that he got a

17    call from Monogo about Mr. Standon sometime

18    prior to Oct. 1998. Do you know what Lieutenant

19    Colonel Coury ever did with that information?

20    Counsel: Excuse me counsel. That's a

21    statement of testimony. First I would object to the

22    question as to form and also object to it as to even

23    being in existence with regards to that being the

24    testimony of the partial deposition of Colonel

25    Coury. So is not to mislead Colonel Hickes in his

74

**[Page 75]**

1    answer to whatever you question is. I would just

2    object to the form of the question in whether or

3    not that was in fact ever information provided by

4    Colonel Coury in a deposition.

5    Mr. Bailey: Well I hope you enjoy reading it

6    as much as I do.

7    Counsel: I am looking forward to it.

8    Mr. Bailey: Let me ask you this way. Point

9    and fact is that you don't know of any such thing

10    do you?

11    Lieutenant Colonel: No I don't.

12    Q: And you don't know of the FBI....In fact

13    let me ask you something Sir. Colonel Hickes

14    until today where you have heard via these

15    questions implications that there was a prior

16    awareness by the PA State Police of Mr. Standons

17    activities. Prior to today, if that were the case and

18    Lieutenant Colonel Coury deposition will speak

19    for itself, you didn't know anything about that

20    prior to that today did you. Whether there had

21    been any information available to the PA State

22    Police if indeed there was. Did you?

23    A: I had no official knowledge of that no.

24    Q: Any rumor knowledge of it?

75

**[Page 76]**

1    A: Captain Ober had indicated to me that

2    may have been the case.

3    Q: When did Captain Ober indicate that to

4    you. Was it after October 5th 1998?

5    A: Oh yes that would have been maybe a

6    year ago.

7    Q: Okay. So about a year ago Captain Ober

8    makes some reference that hey there was some

9    prior investigation.

10    A: Correct.

11    A: And to the best of your knowledge as you

12    sit here today the PA State Police if indeed

13    Colonel Coury himself was told did absolutely

14    nothing to internally do anything to investigate

15    whether or not trouper Standon was involved in

16    some sort of job selling scheme. Am I correct.

17    A: I don't know.

18    Q: Do you know whether the FBI ever

19    expressed any concern that the lack of activity by

20    the PA State Police on the prior impart of the

21    information to the organized crime route and

22    western AID, IAD I'm sorry, whether that played

23    any role in bringing that to information to Captain

24    Ober?

25    A: I don't know.

76

Q: You have no way of knowing that. Only the FBI would know that. Is that correct?

A: I would assume so yes.

Q: I would too. Now if I understand it correctly when Colonel Coury testified he indicated some concerns about the FBI ability. Not that it would ever be intentional.

A: No.

Q: But at their ability to keep there mouth shut. I act in a political way I just can't imagine the FBI doing that but I want to ask you I'm just curious from you knowledge and experience do you have any knowledge of experience that would indicate that the FBI would be loose with information? That you know of.

A: Not that I know of.

Q: Aside from reading in the newspaper watching TV or reading book that sort of thing. As a professional you have information known to you that would indicate to you that the FBI has loose lips. Is that fair to say?

A: That's correct.

Q: Alright. Now counsel has asked questions about this issue surrounding Mr. Ober telling you that the FBI wanted confidentiality. I

77

fairness to counsel I believe she characterized FBI testimony, at least to some extent, as not being consistent to that. Now let me ask you a series of questions based upon your knowledge and experience as a professional police officer. Is it ok to tell a target that you are investigating them? I mean should you, would you go and inform a target that someone was investigating them? Unless there was some need or request to.

A: Generally speaking, no.

Q: Okay. And if, how many Colonels are there in the PA State Police Department?

A: There is one full Colonel.

Q: One full Colonel?

A: And three Lieutenant Colonels.

Q: You ever been in the Army or Navy or Army recur. Whatever.

A: No

Q: Okay. Well when you talk about call somebody lets say, you're a Lieutenant Colonel correct. Right?

A: Correct.

Q: Do they say hey Lieutenant Colonel or hey Colonel?

A: Hey Colonel.

78

Q: Hey Colonel. Well we can blame that on the French I guess. But point and fact is when someone address you by that title witch is a very respectable positions of course your reference is Lieutenant Colonel or full bird it's Colonel right?

A: Yes

Q: It's Colonel. Okay. So if you take all those Lieutenant Colonels and the Colonels in the PA State Police and you added them up on Oct. 5th 1998 can you tell us how many there were.

A: 4

Q: had the number changed dramatically as of Oct. 13th 1998?

A: No.

Q: So if there was a prophecy there the prophecy on how many Lieutenant Colonels or Colonels there were total wouldn't have exceeded 4? In the fall of 1998. Am I correct 4 people.

A: Correct.

Q: Now if that group was a potential target of an FBI investigation would you go and tell them?

A: I would not.

Q: Okay. Now the I believe the FBI testimony was that there wasn't any recollection

79

of asking for confidentiality but it was expected. Now based on that and I believe that came from agent Kush and I make that representation to you based upon my recollection of the record and I will yield to counsel comments if they agree with me. Now my understanding of the initial discussion between you and Captain Ober was that he expressed and awareness that by definition you could not have been include in that category at the time this was going on. Am I correct?

A: He expressed that there was an interval of time between 1995 and 1998 that I was not in a position to either a. to be a lieutenant Colonel or because I was in the Bureau of liquor enforcement probably influence the hiring process he did acknowledge I had been a lieutenant Colonel before and if this thing predated 1995 then I was a lieutenant Colonel then also but the did express by his reasoning I was not one who would have been involved in the colonel.

Q: And was Colonel Evanko, when you eventually told Colonel Evanko my understanding was that he exhibited I think you used the term agitation that he was very agitated. I think that is the way you describe it.

80

A: Yes I did.

Q: Okay. Now do you know if Colonel ever said to Captain Ober. Captain you did the right thing. Did he ever say that to him?

A: Not that I know of.

Q: Well you know Colonel Hickes being a witness is not a pleasant thing, but it is a question I have to ask. Did you do the right thing?

A: I think I did base on the information I had at the time.

Q: Well for what it is worth so do I. And that's not worth anything I am not a witness here. I think you did too. You know that's just an opinion. Now what when Colonel Evanko expressed agitation upon first being informed, He said things about Louie Freeh. How do you spell Louie Freeh's last name. Do you know how to spell it.

A: I am not certain. I think it is Freeh.

Q: Okay.

A: I am not positive.

Q: And he expressed upset about the FBI. I'm there friend and they didn't tell me. Is that correct?

A: Yes

81

Q: Well

A: Let me rephrase that he did not use those words.

Q: No you use your own words and they will stand for themselves. I am just going back in my mind to your testimony and of course what my client has told me naturally. But the point and fact is that bottom line is that he expressed disappointment that the FBI had not informed him or had not brought this matter to his attention. Right?

A: That is correct.

Q: Okay. Now you know whether the FBI had brought other investigations to God forbid the PA State Police or law enforcement to Colonel Evanko attention.

A: I don't know.

Q: Did Colonel Evanko ever say anything May 12th the day that you told him that you know did they suspect me?

A: I think he did utter those words or something similar, yes.

Q: Well did he ever say to you Carl Hickes, Bob, Colonel, Mr. Hickes did you think I was involved in this? Did he ever ask you that.

82

A: I don't recall.

Q: Do you have a recollection that he said to captain Ober Captain Ober do you think I would be apart of this thing?

A: not that I recall.

Q: Colonel Hilkes, did Captain Ober ever indicate to you that he believed that Colonel Evanko was involved in this somehow?

A: No he did not.

Q: Did Captain Ober to the best of your knowledge as a consummate professional trying as best he could to show respect for an official investigation and the purposes of an official investigation.

A: In all his dealings with me I would say that is a fair characterization, yes.

Q: Alright. Now there has been as we moved through this lawsuit an implication made that Captain Ober misrepresented what the FBI may have said. Based upon your knowledge of the facts, what I struggle with and my question is if captain Ober had either misunderstood what the FBI had said or wanted or even misstated the extent of there interest in confidentiality or misstated any expression of FBI interest in

83

confidentiality what possible difference, Colonel Hickes would it have made?

A: I don't know if it would have made any difference or not.

Q: No sir because you as a deputy commissioner and someone I think is quite clear to me at least is an incredibly confident professional. And that's meant sincerely and not just to blow smoke. Because when you looked at the facts in front of you is it fair to say that given the focus intent purpose and what facts were about the FBI investigation that a command decision needed to be made on who to inform and that a decision was made by Captain Ober apparently concurred in by you in terms of reasoning I am not talking words of an order in terms of reasoning that confidentiality was important to maintain investigation integrity and it should not go beyond the FBI until they say or indicated its okay no matter where it might go.

A: That would be a correct annalist.

Q: Alright sir. Colonel Hickes my understanding when Major Werts and Major Williams preformed the investigation that was

84

1 ordered by Colonel Evanko that you were
2 interviewed. Am I that correct sir?
3    A: That's correct.
4    Q: You read your rights?
5    A: I don't recall.
6    Q: Well If you were read your rights its fair
7 to say that any probably statement or tape
8 recordings would indicate that is that correct.
9    A: Yes, that is correct.
10    Q: Do you have a recollection of ever
11 listening to the tape recording of your interview?`
12    A: I was given a video or an auto cassette in
13 micro cassette form I've never seen a transcript
14 and I have never listened to the audio.
15    Q: Were you ever indicated it was a, do you
16 have an understanding of this investigation that
17 was ordered into the events of the fall of 1998 was
18 that investigation into you?
19    A: I purposed that question of Major Werts
20 and of Major Williams in advance of my
21 interview and my recollection is there response
22 was that there investigation was into the
23 circumstances of the FBI investigation of this
24 matter.
25    Q: So it could have been into you?

85

1    A: My understanding of what they said was
2 that it was the FBI's investigation not...
3    Q: So they weren't, were they investigating
4 what the FBI did?
5    A: yes.
6    Q: Well let's go back to May 12th 1999. And
7 Colonel Evanko made the statement I'll have the
8 agent transferred. Do you remember that.
9    A: Yes I do.
10    Q: Now do you know whether any request
11 was made of the FBI to transfer or punish the
12 agent involved?
13    A: No, I don't.
14    Q: Why if you know the answer to this. Do
15 you know why...strike that. Did Colonel Evanko
16 ever indicate why he was so upset?
17    A: No, he did not.
18    Q: I mean, Do you know why he would be,
19 if there was any information out there that might
20 indicate that he would be involved do you know
21 why he would be upset that someone didn't tell
22 him that they were checking on the possibility of
23 his being involved in something?
24    A: You've got me....

86

1    Q: Well did Colonel Evanko ever indicate
2 that jeeze I glad I didn't tell me that way they
3 know that you know I clean and not involved in
4 such a thing.
5    A: No he did not.
6    Q: I mean did it ever occurred to you at
7 some point that maybe he should have been
8 pleased? That he wasn't informed and it was a
9 clean investigation and that was done without any
10 interference and without any appearance of any
11 interference.
12    A: That certainly would have been a
13 possibility, yes.
14    Q: All right now let me move to a different,
15 I am going to shift gears on you again. Okay. Lets
16 move to the questions that counsel that Miss
17 Guido asked about these folks over in the Governs
18 office she went through so many dog gone names
19 I'll be honest with you I did not get them all. I
20 didn't get them all. But she had indicated that at
21 some point or I think you had responded that at
22 some point around the Captain.. strike that...
23 Colonel Evanko, That around the time Colonel
24 Evanko was informed by you an Captain Ober

87

1 that you may have had some discussions with
2 some folks in the Governs office?
3    A: Correct.
4    Q: Do you know if Colonel Evanko would
5 have used you as some kind of political or career
6 threat? I am sorry to have to ask you these
7 questions. And you may not know the answers but
8 answer as succinctly as  you can please. Do you
9 know if he would have used you in that way.
10    A: Not that I am aware of.
11    Q: Is he afraid of you?
12    A: Not that I an aware of.
13    Q: Who does he go over to talk to at the
14 Governs office. Who is his contact?
15    A: I don't know who all. He certainly talks
16 to a lot of people in the Governess office. There
17 are a lot of people.
18    Q: That is part of his job. Right?
19    A: Yes it is.
20    Q: I mean I would hope that as a PA Sate
21 Police Commissioner I would certainly applaud
22 him in effort to communicate with political
23 leaders because that's the way our system runs,
24 civilian leadership. Right?
25    A: Correct.

88

Q: Okay. Now do you know whether he ever
went over there talking about Captain Ober about
what Captain Ober did?

A: No I don't

Q: Do you know if he ever want over
they're talking about Colonel Hickes and about
what Colonel Hickes did?

A: No I don't.

Q: Do you know whether Captain Ober was
ever read his rights on this thing, whatever it is
called.

A: I don't know.

Q: I'm going to change gears on you again
for just a little bit, okay? During conversation an
during your responses to Miss Guido's question
you had... I'm worried about time too, we'll get
you out of here. You had used the term chain of
command  do you remember that?

A: Yes I do.

Q: And I think you had eluded, I think your
response was in the nature of, well you were not
in Captain Ober's chain of command. Do you
remember that?

A: Yes.

89

Q: Awkward question, let me withdraw it, I
am not sure what I am asking either. Good
objection. Were going to have to change tapes
here in just a second so I am going these
gentlemen here who just informed me of that. Do
you just want to change right now maybe and that
will give were going to shut this down for just a
minute. Please lets not go anywhere and....

Albert Rodriguez-7:39AM

Albert Rodriguez-7:49AM

Mr. Bailey: Alright sir we had just changed
tapes. I want I have a few question a few brief
questions about this chain of command thing.
Okay, one of the issues that's arisen in this case
are some very very serious questions about when
changes in the PSP regulation AR one may have
taken place. Now as a foundation question for
some questions that I have about that change
when those things took place who did them and
what they did. I'd like to go back to some
questions that Miss Guido was asking you about
the about your job, what you do. Now I want to
take you, go back in you minds eye to December
2000, January 2001, and Feb. 2001. What were
you doing at that time?

91

Q: Okay. Now given all the facts a
circumstances here to me based on what I know
about this I can't understand on even why that's
even an issue. Can you tell me why  that would be
an issue. And maybe I lay a foundation just a
little bit better. Well you go ahead and respond I
am changing questions. Go ahead sir.

A: The circumstances as I understood them
to be at the time, in my mind, gave Captain Ober
the ability to circumvent the chain of command
because of the limited information presented to
me and I believe was presented to him at the time.
Therefore I don't see chain of command being as
important of an issue, but other may. And they
may be able to articulate why it is I don't know.

Q: Okay. The fact is that the information
available at the time indicated that chain of
command adhering to it at least in terms of
reporting it let alone the obvious reasons
implications you have already attested to about
confidentiality did not for any apparent reason.
Demand that we adhere to or report to some chain
of command. Is that fair to say.

A: I am not sure what you asking.

90

A: I was Deputy Commissioner of staff of
State Police.

Q: Well give me put a little meat on those
bones for me Colonel.

A: That was, generally speaking the
December time frame of the year is a little bit
slow in the staff function of law enforcement. And
generally I take a weeks vacation around the
holidays. But when I come back for the
January/February time frame you have to get
prepared for budget hearings. And budget hearing
are annually February/ March time from for both
the house and the senate and a large portion
budget hearings is budget prep particular in my
shop because it does involve the budget and as
well as the large expenditures in technology so I
would speculate that I was involved in that.

Q: All right now, You are familiar with AR
one at least generally?

A: My recollection is AR one is a table of
organization of the department.

Q: Yea and I don't think Albert Einstine
could sit down and repeat everything that is in it.
It's rather gloominess kind of thing. Right?

A: Correct.

92

1    Q: Now does anyone ever come to you at
2    different times about purposed changes in PSP
3    regulations.
4    A: I'm not sure what you mean.
5    Q: Do you ever receive notifications or
6    information in through you official channels or
7    what not about purposed changes, you know
8    whether or not asking your advise or soliciting an
9    opinion or have you maybe on your own made
10   recommendations in how regulations can or
11   should be changed.
12   A: Not that I recall. If I had it would have
13   been rare. I do see the changes when they are
14   finished by the Bureau of research and
15   Development. And they're being submitted
16   through for approval so changes or proposed
17   changes would cross my desk. And I have the
18   opportunity to make comments on them at that
19   time if I see an issue with it.
20   Q: Well let's talk about that. I am going to
21   ask a few questions about this process and AR
22   1.102 subsection C am I stating that correctly sir?
23   Subsection C. Are you familiar with that?
24   A: No, I am not.

93

1    Q: Well, subsection C has to do with the
2    chain of command. Now if there was a major
3    change in definition or the responsibilities each
4    member would have to the chain of command.
5    And now that were going review and change
6    process would you like to think that you would be
7    asked an option or an opportunity to review it /
8    A: Again I would need more information.
9    The process doesn't always work. that everyone
10   gets an opportunity to comment before hand but I
11   should be able to see the change as it comes
12   through for approval.
13   Q: Let me ask about that. As again I haven't
14   walked in your shoes so I don't know what it is
15   like to be where you are make the decisions that
16   you make and process the information that you
17   have to process to do your job. Are you saying
18   that if I as a research and development folks there
19   and I've got somebody, you know captain Ober
20   comes to me and says we need to change this dog
21   gone section here or we need to add a section on
22   the chain of command. We have too many cases
23   where these folks out there are circumventing the
24   chain of command and we've got to put
25   something in here to make sure they follow the

94

1    straight and narrow. Now you know obviously I
2    am certainly embellishing that and what not but it
3    seams to me that you have indicated that if there
4    were a significant change in a regulation at least
5    the proposal process the propose change process
6    would likely come to you? I not saying it have to
7    but it would likely come to you.
8    A: They, the proposed change when it's
9    approved and done in final form or what the
10   bureau and development believes is final form has
11   to go through the signature process. Generally the
12   deputies would sign off on that. That they have
13   read it, they understand it, and they generally
14   approve it.
15   Q: And subsection C didn't come to you did
16   it?
17   A: I, these come to me all the time I don't
18   have any specific recollection of that.
19   Q: And in fairness you my not have. Is that
20   right?
21   A: Well I don't know I don't know if had
22   come  to me or not is the point. Typically they do
23   come to me and I would have to assume it did but
24   I would need to review I would initial off on that
25   if it had.

95

1    Q: Well if you didn't initial off on that, then
2    obviously that means it didn't come to you.
3    Right?
4    A: If I didn't initial off then that means that I
5    did not see it I on occasion have people sitting my
6    capacity acting in my steed. There is a possibility
7    that it came to one of them. I don't know.
8    Q: Okay. What's a historic file? What's
9    that?
10   A: I believe that the file the bureau of
11   research and development keeps on the directives
12   within the Pennsylvania State Police.
13   Q: Is it supposed to contain information
14   about that the process of changing a regulation,
15   like what suggested changes there were, who saw
16   that who contributed to it where it went here
17   where it went there.
18   A: Candidly I know idea what all is in the
19   historic files. I don't know what all the
20   information is in it.
21   Q: Okay. But you don't have any, you are a
22   deputy commissioner and as you sit here  today
23   you don't have a recollection off the top of your
24   head, not to say it didn't happen, but you don't
25   have a recollection as you sit here today about a

96

1 change in AR I specifically adding a section that
2 purports to address a definition and the
3 responsibilities of chain of command.
4     A: No, I don't have a recollection of that.
5     Q: Have you ever looked at a historic file?
6     A: No, I have not.
7     Q: A few things on IMS. I have gotten a
8 hold of a some documents that indicate to me that
9 captain Ober was on some sort of voting comity
10 there. Like a procurement comity. Now I not
11 familiar how you folks do thing in the PA State
12 Police so bare with me because my questions may
13 not be the most well informed. And I don't have
14 advantages that your attorneys do of access to the
15 kind of information that they have. So my
16 questions are sort of dumb in common terms bare
17 with me. Was Captain Ober involved in a
18 procurement process?
19     A: Yes he was.
20     Q: Now in a pecurement process in most
21 contract acquisitions systems that I am familiar
22 with. US Military and things I have done in a
23 former life. You have to gather as much
24 information as you can and you go through a lot
25 of different evaluation processes before you make

97

1 a decision on number one whether your going to
2 do this thing, that would be first. Right? I mean
3 you evaluate it and see if I'm going to use it and if
4 it can do the job for us.
5     A: Yes, generally speaking that would all be
6 included in the evaluation process.
7     Q: Okay and then you make some kind of
8 decision, I guess, and start finding out who can do
9 it because you want to find out what it is going to
10 cost, and goes into doing it. Is that correct?
11     A: Yes, it is.
12     Q: Now I understand that Captain Ober
13 played a rather central role in some of those
14 decisions in term of bringing people together
15 bringing information together and making
16 decisions that insured that this evaluation process
17 has been done correctly. Am I correct?
18     A: Yes
19     Q: Why was he taken out of there?
20     A: To the best of my recollection the
21 accusation process had concluded and we were
22 moving to the contracting process. I other words
23 they had selected the appropriate vendor and that
24 part of the project was finished.

98

1     Q: Okay and what part of the process was
2 he working on?
3     A: He had worked as the team leader for the
4 request for qualified contractor to evaluate
5 proposals and swore those proposals and makes a
6 recommendation of who the successful bidder
7 should be.
8     Q: Well what's the voting comity? What's
9 that do?
10     A: Well that's the portion of the team that
11 had the roll of scoring the proposals and then
12 rendering the vote on the best solution or the best
13 company that had made there proposal.
14     Q: Well in order to contribute to or make
15 that decision you have to have a comprehensive
16 grasp of the technology It's capability and its cost
17 don't you? I mean how do you that if you don't
18 have that information? Let me read something to
19 you Voting comity is responsible for evaluating
20 the RFQC draft and vendor proposals. The voting
21 comity will make recommendations in the form of
22 an executive summery to the executive oversight
23 comity. Could you expound on that for me please.
24     A: Executive oversight comity is a group of
25 top level executives from various elements of

99

1 state government who asked as an oversight to
2 IIMS procurement. The voting comity was
3 responsible for evaluating and scoring the various
4 proposals or submitted and then making a
5 recommendation to the executive oversight
6 committee. Concerning witch vendor they believe
7 would do the best job for the common wealth.
8     Q: Do you know when the review of the QC
9 proposals when that began or when that was.
10     A: It would have been the Fall and into
11 winter of 1999 I don't have the exact dates.
12     Q: And if I told you they might be Jan. It
13 might be the process took place in Jan. and Feb.
14 of 2000. Would that make sense to you? Or would
15 you have some reason to think that might not be
16 correct?
17     A: I think that the process went into Jan. I
18 believe Captain ober was transferred out of the
19 team in Jan. I'm not certain of that, so I would
20 think that it would have been Jan.
21     Q: But I am not trying to be argumentative
22 and I apologize if I sound that way. I think your
23 testimony or your response to on of my questions
24 is that process was over at least I may have
25 misheard you.

100

1  A: That's my point.

2  Q: Could you be in error or was he still

3  working on that proposal process? My research

4  indicates he was.

5  A: I believe that the RFQ portion had been

6  done and they were moving into the contracting

7  phase. I believe.

8  Q: I answer you are actually providing

9  information to make a decision on how to spend

10  all that money. Isn't it? Isn't that what it's about?

11  A: Pardon me?

12  Q: I Feb. they were going to be making or

13  trying to make some decisions about have you are

14  going to spend all that money. Who you're going

15  to be spending all that money with? At least begin

16  that process of evaluation.

17  A: The Feb. time frame, if my recollection is

18  correct, is when you would sit down with the

19  vendor that would get the award and negotiate the

20  nuts and bolts of exactly what you are going to be

21  getting for the money your spending.

22  Q: And you folks are going to go out and

23  spend for all tax payers over a hundred thirty

24  million dollars. Is that what you have testified to?

101

1  A: I testified that I b

2  not been submitted yet by

3  phase two and my expecta

4  hundred twenty to hundre

5  Q: Now remember v

6  billion here a billion there

7  about real money. In state

8  sizable piece of money. Is

9  A: Yes it is.

10  Q: Okay, say Colon

11  years have you been with the PA State Police?

12  A: 29

13  Q: A lot of experience. Now you have seen a

14  lot of times where Captains have been put into

15  Lieutenants positions haven't you?

16  A: The only one I can recall is Captain Ober.

17  Q: 29 years Colonel Hickes, the only

18  Captain you know that was assigned to a

19  Lieutenants position was Captain Darrel G. Ober.

20  Is that correct.

21  A: To the best of my knowledge, yes.

22  Q: So are you, you served as either director

23  in IAD or BPR haven't you.

24  A: Yes, I have.

25  Q: I know Colonel Evanko has, hasn't he?

102

1  A: Yes he has.

2  Q: Captain Ober has I know acting director

3  BPR but he's been director IAD.

4  A: Yes

5  Q: Sir is it fair to say that in the PA State

6  Police that the people that rise to the top career

7  wise, I'm not saying its iron clad but typically at

8  least have some exposure or some experience with

9  BPR in one of these two divisions is more

10  common that not? If you know.

11  A: I think your characterization is that it has

12  occurred on a number of occasions I don't know

13  whether that's because going through BPR is a

14  track that would make you more attractive for

15  promotion hire or that we tend to put quality

16  people in BPR. But it is not an iron clad there

17  are people that have been elevated higher than and

18  never gone to BPR.

19  Q: Well you know FBI agent Kush, now I

20  am not saying that all the folks in the PA state

21  Police have a high opinion of the FBI. But FBI

22  agent Kush when I questioned him about why

23  after they had gone to Western AID and Western

24  crime, organized crime division or group, I don't

25  quite know how there info structured, but why

103

1  they went up to Harrisburg, made a decision to go

2  to Harrisburg Captain Ober had IAD at that time.

3  Okay. Said that because IAD is a cut above, those

4  are his words, cut above, Is, do you expect that a

5  higher slandered of performance of professional

6  responsibility from somebody? I don't know if

7  Mr. Kush if that is something expected in the

8  State Police but, he said that was one of their

9  reasons. Because you expect them to be a cut

10  above.

11  A: I think that all of the PA State Police has

12  a standard that we expect offices to adhere to. I

13  believe that internal affairs you're privileged to

14  work there is scrutinized more severely that

15  you're privileged to work in other places of the

16  department depending upon the integrity issue.

17  Q: And is that because the very very core

18  issue the integrity of the organization itself, it's

19  ability to cleans itself, to look at itself, to be

20  honest with itself. Is at issue in internal affairs and

21  investigation.

22  A: I believe that would be a fair assessment,

23  yes.

24  Q: Okay, Your asked questions about this

25  thing with Indianan, What's wrong with meeting

104



1 for the sake of convenience somewhere between
2 Harrisburg and Pittsburgh, meeting at a hotel
3 about an investigation of this type? I don't,
4 forgive me but I don't understand what's wrong
5 with that.
6     A: When Captain Ober requested that the
7 authorization to go to Western PA using his own
8 car and on his own time, so to speak, putting in a
9 leave slip, I questioned him about, Did he really
10 feel he needed to do that? That was, was he that
11 concerned about this that he had to do that? And
12 he expressed that he was he felt that.... (tape end)
13     Q: Okay you had said that he expressed
14 concern about it being a work day and...
15     A: That it would raise questions in the office
16 that he really didn't what to have to explain.
17 Based upon his concern and his explanation, I saw
18 no problem authorizing him to do what he wanted
19 to do. After all he's the investigator he's the
20 individual who is working this and has the
21 information and if that's his best estimate of what
22 he should do then I authorize it.
23     Q: And if got to the hotel and you ordered a
24 cup of coffee witch is my understanding is that the
25 FBI ordered beverages Colonel Conley had

105

1 testified that
2 there were b
3 agent Kush t
4 was a cup of
5 up but you kr
6 ordering a cu
7 agents? Whe
8 something of
9 of that?
10     A: Non
11     Q: Sir o
12 the end resul
13 grievance pro
14 know what happened there?
15     A: I believe he prevailed in getting that
16 reimbursement, but I am not certain.
17     Q: Thank you sir. Now you have been
18 asked, Miss Guido had asked you questions about
19 a Mark, strike that, Miss Guido had asked you
20 about a May 13 meeting 1999 meeting with
21 Barbara Christi, do you remember that?
22     A: Yes, I do.
23     Q: Why did you go over to see Barbara
24 Christi?

106

1     A: As I said I think I explained that the
2 Commissioners reaction to being informed about
3 the investigation and the capacity of the
4 circumstances, I sought out Miss Christi to find
5 out whether in her prospective had used good
6 judgment and much of anything else to advise her
7 of what had transpired.
8     Q: Colonel Hickes, your probably a man of
9 uncommon courage. And I don't mean to
10 embarrass you with this question but truth and
11 fact is the commissioner reacted so strongly it
12 scared you a little didn't it.
13     A: A little bit, yes.
14     Q: All right. So you go to the department lea
15 gel beagle and on the 13th to get her advise,
16 interesting waver of privileges by the way , and
17 you asked Barbara Christi in affect did I do
18 something that would subject me to discipline or
19 break the law?  Is that basically it?
20     A: I don't think discipline was an issue with
21 my position. But I did want to run the
22 circumstances past her and get her take on it.
23     Q: Well. Do you know what obstruction of
24 justice is?
25     A: Yes, I do.

107

1     Q: Now what if you had run up to captain, I
2 am sorry Colonel Evanko and told him about
3 investigation and he called the Governors office
4 and somebody over there calls Joe Preston or
5 Lenny Bodack because in fact this terrible thing
6 had some truth to it. Do you think you could
7 through grand jury could have edited you, sir.
8     A: I don't know I am obviously not a lawyer
9 but I would say that it is a possibility.
10     Q: And did you talk with bar bra about the
11 legal ramifications about what you had done or
12 not done? Your acts or remissions.
13     A: Yes, I did.
14     Q: And what did she say?
15     A: She said that based upon the
16 circumstances as I presented to her that appeared
17 to her that I was reasonable in my judgment.
18     Q: Do you know whether and admission of
19 counsel is an admission of party, do you know?
20     A: I don't know.
21     Q: You don't know that. Sir in response to
22 one of Cindy Guido's other questions you had
23 indicated that after you talked to Colonel Evanko
24 that you had, that Colonel Evanko had called
25 Colonel Coury into the room. Now am I correct?

108

A: Yes.

Q: Now sir is I correct that you had indicated that Captain Ober was in the room at the same time or did I miss something?

A: I believe he was yes.

Q: You know I am going to ask it is very important what was the conversation after Colonel Coury came onto the room? Take a second or to and think back and tell us everything you can recollect about the conversation. Let me tell you what I am looking for I'm looking for whether there was any discussion of investigations any discussions of actions that the Colonel was going to take I am going to assume that this was after he had made the comments about Louie Freeh and about removing the agent or whatever the heck he said. But could you please, after Colonel Coury came into the room what went on?

A: I have very little recollection of the conversation my recollection is that the Commissioner wanted Captain Ober and I to explain the circumstances to Colonel Conley and advise him whether….

Q: Conley?

109

A: I'm sorry I apologize Colonel Coury, and we did that but as far as any specific dialog following that I don't have recollection. I don't know if he did as you suggesting.

Q: Okay. I think we have had some testimony from Colonel Coury that at some point he had done a statement or something for Mr. Evanko about what occurred during conversation where you were present. I must represent to you sir I honestly don't remember if it had indicated Captain Ober being there or not. I'm just not sure My question is did Colonel Coury ever show you a statement or tell you about a statement that Colonel Evanko had asked him to provide about what had occurred during conversation with you?

A: No.

Q: So as you sit here today you don't know you did not know until today that ledged that Mr. Evanko had asked Mr. Coury to do a memo about the conversation that occurred on or about 12th or 13th or whenever it was.

A: Correct.

Q: When Mr. William and Mr. Werts came to you and inquired of you about this so called investigation, we think it's an investigation, we

110

think it was an investigation ant they call it an inquiry. The point is that did they indicate that they had a statement form Colonel Coury about the events of that day?

A: No.

Q: Did show you any statements or read them to you?

A: No.

Q: Do you know who made the decision, strike that. Do you know who made the decision to select Werts and Williams for this job?

A: Not for certain on the 13th with Lieutenant Colonel Coury, Westcott the commissioner and myself there was a discussion about a need to do an investigation and who likely investigate towards investigate of was, because I was so deeply involved in the issue that they were going to investigate so I did not contribute to that discussion although I was present. My recollection is that there was no resolution at that time and although the name were Williams and or Werts were brought up I don't recall that they made a decision then and there to make an assignment then

111

Q: Have you ever know a Deputy Commissioner to jump in an airplane and to fly off tell a major to go and investigate something.

A: No.

Q: Do you have a recollection of the conversation to witch you were privy of anyone saying to Colonel Evanko or Colonel you shouldn't do that you don't have the authority to do that?

A: I don't I didn't question the commissioners authority he certain is the Commissioner of the State police he can do what he wants to do, but I did question the value of the investigation as it relates to if he needed information I was available to provide what I knew. But only in the context of that.. I really didn't..

Q: Well as commission of the PA State police if he wants to can he call a trouper up and tell him to go and search your house?

A: No he can not.

Q: If he wanted to can he go outside and get on the telephone and tell a couple of trouper to come in here a and escort you out and start

112

1 questioning you about something? Could he do
2 that? If you know you may not know.
3    A: Within his authority to determine the
4 circumstances surrounding a legitimate state
5 police process I think he does have broad
6 authority to conduct inquiries.
7    Q: Okay now Werts we know in this case
8 Werts and Williams came in and questioned
9 Captain Ober during this inquire right? Well I can
10 tell you that they did and they read him his rights
11 do you have any facts or any knowledge  about
12 how made the decision to read Captain Ober his
13 rights?
14    A: No I don't.
15    Q: Do you know where the inquiry excuse
16 me where the questioning of Captain Ober took
17 place?
18    A: no I don't.
19    Q: Wants a supervisory inquiry as opposed
20 to a full investigation if you know?
21    A: A full investigation would be and
22 investigation that bureau of professional
23 responsibilities would enter into or have a
24 professional responsibility  index number that
25 would determine all the facts. Supervisory I

113

1 would have to look up the definition I can't
2 distinguish I can't tell you what it is right now.
3    Q: Well you not suggesting to use that the
4 Commissioners power to go and do all of these
5 investigations can be done off the books are you?
6    A: No, I would suggest that it should have
7 had some reference number somewhere along the
8 line.
9    Q: Right, right. Well do you know when the
10 inquiry into the facts and circumstances of Oct. of
11 1998 or the FBI whatever this investigative who
12 this preacher was. Okay. Do ever know if it was
13 assigned a BPR number?
14    Q: Do you have a recollection of ever seeing
15 one?
16    A: I would not, no.
17    Q: Well how many investigations like the
18 one of Werts and Williams have you seen in you
19 29 years? You must have seen a lot of them
20 haven't you?
21    A: I have seen a few I can not say I have
22 seen a lot.
23    Q: You say they constitute a practice in the
24 PA State Police?

114

1    A: No I wouldn't characterize them that
2 way.
3    Q: The fact is in the way your tainted in
4 most the things you do are accounted for by
5 number and memorandum and forms and there
6 strutted and done according to regulation. Am I
7 correct?
8    A: Yes.
9    Q: Well tell me the regulations that govern
10 the investigation of witch lead Captain Ober at
11 least being read his rights. Do you know what the
12 regulations are that govern that?
13    A: I'm not familiar enough with exactly
14 what direction they were given to know but no.
15    Q: Okay. But your belief is as a Deputy
16 commissioner is that the commissioner would
17 have broad powers to investigate things anyway
18 as a part of his job and as a role as a
19 commissioner certainly that would make common
20 sense, right?
21    A: Now..
22    Q: Any chance we could take a five minute
23 break?
24    A: I'm just I don't think I am going to be but
25 Five more minutes if you just want to, hopefully, I

115

1 don't know if the other side has any questions so
2 in fairness maybe we better break.
3    Counsel: I only have about five or ten
4 minutes I need.
5    Lieutenant Colonel: Can we just use the
6 restroom?
7    Mr. Bailey: Yes sir. Let him take this off
8 record.
9    VIDEO OPERATOR: 12:14P.M. Off record
10    Mr. Bailey: Ladies and gentleman please be
11 advised that a recording advise is operating.
12    VIDEO OPERATOR: 12:29P.M. tape two
13 back on record.
14    Mr.: Bailey: Okay, I think by enlarge I am
15 probably finished. I had a few little follow-up
16 questions, maybe Cindy if you want to finish up
17 now. I may even dispense based on the interview
18 that you did with Major Werts and Williams. It
19 was both of them are that correct?
20    A: That's Correct.
21    Q: That's it for right now. Let me just run
22 over this very quickly. I don't think I am going to
23 have any more. Do you want to go ahead Cindy?
24    Counsel: Colonel, Mr. Bailey was asking
25 you about a change to AR-1-1 and whether or not

116

1    you had signed off on the routing. I would like
2    you to think back to a year ago. Do you remember
3    Captain Brown providing you with copy of the
4    routing slip and the change sheet, and the
5    regulation of 1-1, for you review?
6        A: I was interviewed by Captain Brown
7    relative to that. I don't have specific recollection
8    of that.
9        Q: You don't remember if he showed you a
10   copy of the change sheet?
11       A: He did I believe but again I don't recall..
12   nothing stands out in my mind about it.
13       Q: So as of that date of that interview
14   though the change sheet did exist already?
15       A: I don't recall. He showed me something I
16   can't say specifically what it was.
17       Q: Okay. And if your initials are on the
18   routing sheet with the date what would that mean?
19       A: Well that means that's the date that I
20   reviewed a signed off.
21       Q: But the change that we've been talking
22   about and Mr. Bailey had asked about significant
23   changes, there was nothing so significant to the
24   change that it sticks out in your mind today?

117

1        A: No there's nothing, it doesn't sick out in
2    my mind today. And as I said as it comes through
3    me for approval if there is something that I would
4    look at and say wait a minute what's this all
5    about, I have the opportunity at that point to
6    question either through Major Maryman he's the
7    director of the bureau of research and
8    development, where did this thing come from, I
9    don't recall doing that.
10       Q: With respect to Captain Obers request to
11   be considered for Legislative liaison position
12   there was one part of you answer that I was
13   unclear about as they brought it up. And I just
14   wanted to clarify. You said that you past that on to
15   Commissioner Evanko.
16       A: Yes.
17       Q: Do you remember I guess from a
18   logistical physical perspective how that occurred?
19   Whether you spoke to Commissioner Evanko you
20   put it in his box you put it in interoffice mail...
21       A: I don't recall.
22       Q: Do you remember ever talking to Colonel
23   Bago about it?
24       A: No, I don't recall.

118

1        Q: No when the, Captain Ober came to you
2    and talked to you about the FBI's investigation
3    when you just became a Lieutenant Colonel did
4    you have any reason to believe that Major Conley
5    the new director of Bureau of Professional
6    Responsibility would be a target of the FBI
7    investigation.
8        A: The information at the time was so
9    sketchy as to not really have any idea exactly
10   what the FBI was investigating or that there was
11   any target if you will of that. So I've got to
12   answer almost the neutral in that there was not
13   target or not target.
14       Q: Did Captain Ober happen to mention to
15   you that now Lieutenant Colonel Conley but then
16   Major Conley at when you became director of the
17   Bureau had already before Captain Ober came to
18   take to you about this had already contacted
19   Captain Ober as director of IAD and asked him
20   whether or not there was anything significant that
21   he should know about.
22       A: Not that I recall.
23       Q: And as the director
24       Mr. Bailey: I want to place a very strong
25   objection on the record there. I don't know if I

119

1    understood what counsel said but I do not have a
2    record of that characterization at all. I could be
3    mistaken but I place an objection.
4        Counsel: Now, I'm side tracked, Alright as
5    director of the Bureau of Professional
6    responsibility it wouldn't be unreasonable for
7    Major Conley to want to know about something
8    like this would it.
9        Lieutenant Colonel: no, it would not be
10   unreasonable for him to want to know about this.
11       Q: And did you know that one of the main
12   reasons that the FBI contacted Captain Ober in
13   addition to needing some logistical information
14   about the process is that one of main reasons they
15   contacted him is because they felt that PA State
16   Police's Bureau of Professional Responsibility
17   should know that there were members of the State
18   police that were possible involved in this kind of
19   corruption. Did you know that?
20       A: I'm not sure what you're asking. My
21   assumption would be that's why they contacted
22   Captain Ober to let someone in the PA State
23   Police know about this. I did not know that they,
24   If it were their intent that more people would be
25   known of this.

120

Q: Okay I guess where I was going then previously when I was asking you questions you said that it was you understanding that the reason that Captain Ober was contacted was so that they could get some investigative help and find out how the process of getting into the academy works. So what I was asking you is whether you knew that in addition to that one of there primary reasons was to make sure that the Bureau of Professional Responsibility had this information and investigate if they sought fit.

Mr. Bailey: I object. I strongly object counsel to what you're doing in characterizing in testimony. You can ask a direct question if he knew something. What your doing is presenting the facts scenario and implying to him that the FBI had this reason. And I don't believe that that's correct. I disagree with the characterizing and strongly object to the form of the question. In fact it's not even a question.

Counsel: That's fine the FBI testimony speaks for it's self. I been patient while you have done very similar questioning. So.....

Mr. Bailey: I was delighted with the FBI's testimony. I am just asking, absolutely delighted

121

with it, but I'm just asking if a direct question could be asked. That's all.

Counsel: I think I did ask a direct question. My question is did you know, I was trying to clarify because earlier today you had said you thought the reason they contacted  - about the process and asking if you knew that there primary motivation was because they wanted to make sure somebody , that the Bureau of Professional Responsibility, they kept calling it OPR but it would be the equivalent to our BPR knew about it.

Mr. Bailey: I repeated my objection, you may respond.

Lieutenant Counsel: My information is that they contacted the Bureau of Professional Responsibilities so that someone in the State Police would know, I was aware of that. I also believed that they had requested confidentiality that it not go beyond that point until they had concluded their investigation. They did not, my understanding of the time they were not asking us to assist them in an investigation simply to provide information and....

122

Counsel: with that response your answer brought me too another thing I wanted to ask you because I want to make sure that I understand your responses to Mr. Baileys question, at what you had just now mentioned that you believed that they have requested confidentiality and that there not going any further. In response  to one of Mr. Bailey's questions you seemed that you were saying that even if the FBI had not requested confidentiality and even if you know lots of other people knew in the State Police about this that you would have still done the same thing. Is that right?

Mr. Bailey: Sir please don't say anything I strong, counsel you are mischaracterizing you put an add on in there this is wrong to do this. You are abusing this witness's rights.

Counsel: I am not abusing anyone's rights.

Mr. Bailey: You are characterizing his testimony and then you arte also telling him what his response was. And that's....

Counsel: then he can correct me if I am wrong, But your objecting is on the record and I would like a response…

Mr. Bailey: Well he is your client you told us.

123

Counsel: I would like a response.

Mr. Bailey: I don't believe that, that was his response , I very strongly object to what you are doing. Thank you.

Counsel: Do you understand where I am going?

Lieutenant Colonel: No, I am lost now. So…and one question at a time…

Counsel: My understanding of what you said, and that is what I am try to clarify make sure I understood what you said.

A: Okay

Q: Mr. Bailey as I understood it was asking you another words first you had said that it was your understanding that the FBI had requested the confidentiality.

A: Correct.

Q: And the way I understood Mr. Bailey's question witch the record will speak for itself later but the way I understood his question was, but even if they hadn't wouldn't have still been the same, to witch I believe you said….

A: Let me answer that one, If they had not requested confidentiality and yet all of the other information that Captain Ober had brought to me

124

1  was it that's all I've got then my answer would
2  have been the same that in light of the fact that
3  they were investigating a public corruption case in
4  Western Pennsylvania in light of the fact that this
5  was there investigation and that they had not
6  asked us for assistance and in light of the fact that
7  the term Colonel had been used I would have said
8  we need to maintain confidentiality here we need
9  to look out for the integrity of the PA State Police
10 so tell no one about this. Now the next question
11 please.
12     Q: Now if we add in the factor, Because that
13 is what I wasn't certain about if you were talking
14 this into consideration also, If you add in the
15 factor that the FBI had already contacted other
16 members of the State Police about the
17 investigation and sot there input, advise ext…
18 about it, would that make a difference?
19     A: I think that changes the equation. Clearly
20 if the FBI, if you have that information you can go
21 back to the FBI and say who all did you tell? And
22 once from the source and you find out that they
23 have told X Yand Z I think that at that point you
24 say well this information is out in the private
25 domain in the agency domain and I can't control

125

1  who does or doesn't say anything about it. The
2  way you keep a secret about it is tell no one.
3  Hence that drove my decision at the time. But if a
4  lot of people know then your not going to be able
5  to keep a secret and that certainly would have
6  been part of the decision if I was aware at the time
7  this had been out there.
8     Q: Okay, that was the part I was confused
9  about. Now do you know whether or not Captain
10 Ober made any effort to find out if there were
11 other people in the State Police had this
12 information.
13     A: I don't know.
14     Q: And he didn't say anything to you about
15 that.
16     A: No
17     Q: And in response, Mr. Bailey was asking
18 some questions about whether or not you knew
19 anything about Captain Ober being read his rights
20 during the investigation. Just to clarify that it's not
21 unusual to give a member of the State Police their
22 administrative warnings when there interviewed is
23 it?
24     A: I don't know. I.…
25     Q: Supposed to Miranda?

126

1     A: Yes, a supposed to Miranda I'm not sure
2  if there is a consistent policy or not on whether
3  you do or don't I've been out of BPR for way too
4  long to have any recollection of that nor do I
5  know of there current practices.
6     Q: But the administrative warnings, tell me
7  if this is correct don't they, as part of the
8  administrative warning, don't you actually tell the
9  member of the State Police that anything they say
10 wouldn't be used against them in any criminal
11 proceedings?
12     A: My recollections is that an administrative
13 warning is based in a legerity decision that the
14 fabricates the criminal and the administrative
15 process and so legerity decisions if you get that
16 warning your warned that you must tell the truth
17 or suffer the consequences of loosing you job but
18 what you say can be used against you criminally.
19     Q: And I don't remember if you said this in
20 response to Mr. Baileys question but if the ad.., I
21 don't remember whether you said Captain Ober
22 was or was not aware the fact that FBI
23 investigation actually dated back to 1994 or 1995?
24     A: I have no knowledge of that

127

1     Q: Okay. So you did mention something
2  about that later so I wasn't sure what you were
3  saying.
4     A: He did indicate to me that they had been
5  investigating a public corruption and that this had
6  come up and they had allowed it to lay dormant
7  until they finished the larger segment and then
8  they were ting up loose ends. But I do not have
9  any knowledge of what date this was all
10 occurring.
11     Q: Now if there had been any truth to this
12 witch fortunately it turns out nobody was doing
13 this. At least, if there had been any truth in the
14 allegations dated all the way back in 1994 and
15 1995 if it involved in the command staff you
16 could have been the only person that could have
17 been involved at the command level, previously
18 when it first started .
19     A: Correct, I would be one of the two people
20 left and employed in the department that who
21 would have been Lieutenant Colonel at that time
22 Major Robert Inssole is the Director of Bureau
23 training of education and he was also a head
24 Colonel of that administration

128

1    Q: So as far as the Lieutenant Colonels and
2    Colonel Evanko who were in place at the time of
3    this information came up none of them could have
4    been involved as a Lieutenant Colonel back in
5    94/95.
6    A: 94 correct 95 I believe that they came
7    into office of Feb. 1995.
8    Q: Okay. So later in 95 they would have.
9    A: After Feb., yes.
10   Q: Okay. I have one more thing in following
11   something Mr. Bailey was asking you about the
12   different people I had asked about were Colonel
13   Evanko the first person that you told about the
14   FBI investigation?
15   A: I believe I informed Miss. Woley ever so
16   slightly before the Commissioner in the matter of
17   days.
18   Q: Okay. In a matter of days would that be
19   weeks days, would it be less that a week?
20   A: I would say less that a week .
21   Q: Okay. One seconded. I think there might
22   be.... Okay that's all I have.
23   Mr. Bailey: Well your going to be leaving
24   here in just a brief period of time. What
25   conceivable or possible advantage could Captain

129

1    Ober have gleamed as you look back on this? If
2    he had purposely not informed Colonel Evanko
3    and what could he possible have gained from it?
4    Lieutenant Colonel: I have never been able
5    to rationalize that there would be any advantage to
6    that.
7    Q: And what yourself. What possible
8    possible advantage could you have ever gained
9    from with holding something that you knew
10   would come to his attention eventually?
11   A: No advantage at all.
12   Q: Is it fair to say that there is even some
13   trepidation that attaches to having this information
14   and not want to have the responsibility of holding
15   it close to the breast so to speak.
16   A: That would be a correct assessment.
17   Q: So there was absolutely no intention
18   known to you, no intention on you part no
19   intention on Captain Obers part to hurt or injure
20   the commissioner or the front office in any way
21   A: Well there was no intention on my part I
22   can't fathom a motive that Captain Ober might
23   have. I can't speak for him.
24   Q: You ever been between a rock  and a
25   hard place Colonel?

130

1    A: Many times.
2    Q: And no matter what you do there's no
3    way to win. Let me ask you this do you think that
4    Colonel Evanko would have been happy if
5    Captain Ober would have gone and reviled this
6    investigation?
7    A: I don't know whether he would be happy
8    or not.
9    Q: Your view that Captain Ober and indeed
10   yourself because he put you in the soup when he
11   told you had at least some concern about
12   obstruction. If indeed you revealed this
13   information and it turned out to be even and
14   implication of complicity by someone in the from
15   office.
16   A: That thought did cross my mind yes.
17   Q: Colonel Hickes do you have a duty did
18   you take an oath of office?
19   A: Yes, I did.
20   Q: Is you duty to the constructional law
21   above your duty to the people and persons?
22   A: I would have to look at the oath again, I
23   heart it often enough, but generally it's to the
24   constitution and the law, and...

131

1    Q: Is it fair to say that loyalty to the leader
2    secondary to loyalty to the law and your ethical
3    responsibilities.
4    A: I think that is certainly how the oath
5    reads. I don't believe that the oath puts the
6    attributes of values into that.
7    Q: All right now when colonel Coury
8    testified he talked about a culture. I think he had
9    indicated that he would have gone to Colonel
10   Evanko. Because there is a culture. I think that's
11   out here in the private sector we call it the blue
12   line. The press calls it the blue line. Do you have a
13   culture in the PA State Police to disregards the
14   law if necessary and display loyalty to your
15   leaders above you ethical and and legal
16   responsibilities?
17   Counsel; Alright Counsel, I do have to
18   object. If your talking about Colonel Coury's
19   deposition. I don't recall anything and again we
20   will let the records speak for itself but since we
21   seam to be debating about people miss
22   characterizing deposition testimony I would just
23   state for the record I recall no testimony Colonel
24   Coury in the deposition that we would have been
25   able to indubitability to date. Indicating that there

132

1 was a culture to, with you would be enforced to
2 report things. I recall a number of other things that
3 Colonel Coury said that one was investigative in
4 field experience we do to further pursue this mater
5 but again I don't witch to prime this question but I
6 do object to you priming that question. Based
7 upon what I do not recall, being in Colonel
8 Coury's deposition testimony.
9       Mr. Bailey: And as a curtsey to you. I will
10 withdraw the question and ask it this way. Do you
11 know if Captain ober violated a culture? I had
12 asked Colonel Coury what Captain Ober did
13 wrong. He didn't say he knew of any regulation.
14 That's true he's not going to disagree with me
15 about that for law Captain Ober broke. But he
16 violated a culture of the state police. Well let me
17 ask you know it captain Ober violated a culture
18 quote unquote of the PA State Police?
19       Counsel: That's the same question you just
20 withdrawal. And counsel now your going to ask it
21 again?
22       Mr. Bailey: No no it's very different.
23       Counsel: My objection as to the form of the
24 repeated question. For the reasons I stated earlier.
25 That I don't want to repeat.

133

1       Mr. Bailey: I don't want to keep you here
2 and waste anybody's time. But I don't think I
3 repeated the question at all. I am going to ask very
4 simply. I think we have been able to establish in
5 these depositions I think anybody would be
6 foolish to disagree that there have been no
7 violation of regulation or law by captain Ober. My
8 question is as I put it to Colonel Coury, my
9 question is did Captain Ober violate a culture a
10 value of the culture of the PA State Police in what
11 he did. And did you? That's going to be my next
12 question.
13       Lieutenant Colonel: Not that I am aware of,
14 to both.
15       Counsel: Just one thing I like to put on the
16 record to your last question just to say that, when
17 you said that nobody in the room thinks that
18 Captain Ober violated any regulation of the State
19 Police that's not the defendants position. The
20 defendants position is that he did violate
21 regulations of the state police. So I just wanted to
22 say without any implications there. Just for the
23 record.

134

1       Lieutenant Colonel: And my response to the
2 question was based on the culture loyalty as
3 opposed to anything else.
4       Mr. Bailey: Well let me ask you about
5 anything else you shouldn't have said anything. I
6 might not have remembered the question. But you
7 did so. What regulation did he violate?
8       Lieutenant Colonel: I didn't know that he
9 did.
10       Q: What law did he violate?
11       A: I don't know.
12       Q: If he violated a regulation should he have
13 been punished for it? Should he have been
14 disciplined for it? Strike that. If you violate a
15 regulation should you be at least be counseled or
16 disciplined for it?
17       A: generally speaking that is one recourse
18 that you can take, there are…
19       Q: Well you could ignore it couldn't you?
20       A: Correct.
21       Q: Of course. Now if a trooper violates the
22 criminal laws of the common wealth does the PA
23 State Police have a duty ad responsibility to the
24 state and to our citizens to investigate and
25 prosecute that misconduct?

135

1       A: I would say that that we have a duty to
2 investigate and present to the district attorney for
3 prosecutorial decision. I would agree with that.
4       Q: Your correction is well stated. It would
5 be to investigate and provide information to a
6 proper prosecutorial authority to deal with. Right?
7       A: Correct.
8       Q: How do you spell Standons name?
9       A: I believe it is S T A N T O N  but I am
10 not positive.
11       Q: Okay. Do you remember this question on
12 page six, the interview of Lieutenant Colonel
13 Robert Hickes on July second on July 2, 1999.
14 (Hickes: ask that again please; Williams: Sure in
15 any conversation you had with Commissioner
16 Evanko did either you or Captain Ober ever tell
17 him that the allegations of influence were not
18 specific as to a Colonel in the PSP or someone in
19 the Governess office but rather that the trooper
20 claimed to have contacts with high ranking
21 officials in the agency and the administration.) Do
22 you remember that question?
23       A: Not specifically but…
24       Q: Does that question seem to say that these
25 two fine majors who did this fine investigation

136

1    learned that in fact there were some allegations

2    against some higher ups in the agency and higher

3    ups in the Governors office. Is that the way you

4    took that?

5        A: I'd have to read that again but….

6        Q: It speaks for itself. It certainly does. And

7    I don't have any additional questions for you sir.

8    And I would like to express my part and my

9    clients part in gratitude in coming here to

10   answered questions. Thank you.

11       Counsel: That's all I have.

12       Mr. Bailey: It's there till they shut it down.

13       VIDEO OPERATOR: 12:52 P.M. this

14   deposition is concluded.

15

16

17

18

19

20

21

22

137




23

**Column 1 (Page 1)**

```
1   IN THE UNITED STATES DISTRICT COURT FOR
2          THE MIDDLE DISTRICT OF PENNSYLVANIA
3
4
5
6   DARRELL G. OBER        )CIVIL ACTION LAW
7                          )
8                          )
9          Plaintiff       )
10                         )NO. 1:CV-01-0084
11     VS.                 )
12                         )
13  PAUL EVANKO, MARK      )
14  CAMPBELL, THOMAS COURY )
15  JOSEPH WESTCOTT,       )
16  HAWTHORNE CONLEY,      )
17         Defendants      )(JUDGE CALDWELL)
18
19  VIDEO DEPOSITION: ROBERT DANE MERRYMAN
20  DATE:    February 25, 2002
21  PLACE:   4311 N. 6TH STREET
22           HARRISBURG, PA 17110
23
24  APPEARANCES:
25
25       JOANNA REYNOLDS ESQ
26       BARBARA CHRISTI ESQ.
27       1800 ELMERTON AVENUE
28       HARRISBURG, PA 17110
29
30       DON BAILEY ESQ.
31       4311 N. 6TH STREET
32       HARRISBURG, PA 17110
33
34
```

1

**Column 2 (Page 2)**

1   Lyde: Good morning ladies and gentleman please be
2   advised the video and audio is in operation. My name is
3   Crystal M. Lyde. My address is 4310 Hillsdale Road,
4   Harrisburg, Pennsylvania 17112. I have been contracted out
5   by P. R. Video to be the operator for this deposition. The case
6   is in the United States District Court for the Middle District of
7   Pennsylvania. The caption is Daryl G. Ober versus Paul
8   Evanko, Mark Campbell, Thomas Coury, Joseph Wescott and
9   Hawthorne Conley. The docket number is 1:CV-01-0084.
10  The date is February 25, 2002, the deposition is being held at
11  the Law Office of Don Bailey, 4311 North Sixth Street,
12  Harrisburg, Pennsylvania 17110. The video deposition is
13  being taken on behalf of Plaintiff, Daryl Ober. The witness'
14  name is Robert Dane Merryman. The time is 9:06 a.m. Mr.
15  Merryman will you raise your right hand for me please? Will
16  state your name for the record and spell it?
17      Merryman: First name Robert. Middle name Dane.
18  Last Name Merryman. M.e.r.r.y.m.a.n.
19      Lyde: Do you so swear to tell the whole truth, nothing
20  but the truth, so help you god?
21      Merryman: I do.
22      Lyde: Thank you. Mr. Bailey, may I have a sound
23  check around the room, please?
24      Bailey:      Yes, my name is Don Bailey; I'm attorney
25  for the Plaintiff, Daryl G. Ober and if we can have attorneys

2

**Column 3 (Page 3)**

1   identify themselves for the record, it makes our transcription
2   easier and will also lead them prepare official address and if
3   they can, phone number down please.
4      Reynolds:   My name is Joanna Reynolds; I am the
5   Assistant Counsel with the State Police. I represent the
6   Defendants in this matter. My address is 1800 Elmerton
7   Avenue, Harrisburg, Pennsylvania 17110. And the business
8   phone is (717) 783-5568.
9      Christi:     My name is Barbara Christi, Chief Counsel
10  for the Pennsylvania State Police and the business address and
11  phone number are the same as given by Assistant Counsel,
12  Reynolds.
13     Bailey:      Thank you very much. Let the record
14  show that the Commissioner of the Pennsylvania State Police,
15  the Honorable Paul Evanko is present here with us today.
16  Okay, Major Merryman, this is hopefully going to be a relaxed
17  deposition. I like to run my depositions that way. I do things
18  a little different than some other lawyers do. I'm going to
19  very, very quickly over with you what we are doing here.
20  First of all, this is a video deposition and that means that if
21  you want to at any, you have a right to come to this office, I
22  have a duty to maintain a copy of the video and you can come
23  and you can view. If you have any desire to purchase the
24  video for individual use or what not; you can check with
25  Crystal and work it out with her. And your counsel can also.

3

**Column 4 (Page 4)**

1   It's important during the deposition that not gesticulate. I
2   know a little bit of you and I know that you are very
3   professional so, I don't think these kind of things are going to
4   be a problem, you know keeping your voice up and
5   articulating answers as opposed to gesiculating answers.
6   From time to time should I commit the error of either
7   commenting or bringing in another question before you have
8   an opportunity or introducing another question before you
9   have an opportunity to finish? I want to make sure that you
10  correct me and stop me and get your complete answer down.
11  It's very, very important that you answer fully and completely
12  as well as accurately and I am sure you're aware of that. From
13  time to time, if you do need, if you want to break, you want an
14  opportunity to talk with your attorneys, normally during a
15  deposition there's not an interruption while there is a question
16  on the table, but I don't really care; if it serves your needs or
17  you have some reason to ask a question, that's fine, but that
18  should be with counsel only. It should not be with another
19  witness or a party, okay. The other thing I do just a wee little
20  bit different, I don't mind if at some point, I think it develops a
21  better fact record. If at any point you feel that you would like
22  to get a, some kind of an offer from me; where I am going
23  with questions. I would like to do that because it just saves a
24  lot of time. I want you feel free to ask me what I mean by a
25  question, where I am going with a question, what I mean by a



1  group of questions from time; for example, I may change a
2  direction on a group of questions and when I do that I will
3  give you a little of what's called an offer so, that you have
4  some idea where I am going and what I want to get at. Okay.
5      Merryman: That's fine.
6      Bailey      And if you ever get curious you just ask
7  me. I don't mind. Most attorneys, they don't like being
8  questioned by witnesses, but I don't care, it's okay. That
9  being said, do you have any questions for me before we
10 begin?
11     Merryman: No, I'm ready to go.
12     Counsel:    I assume we are going to reserve
13 objections, except as to form for trial.
14     Bailey:     Very good. Also from time to time during
15 the deposition, an attorney may place an objection on the
16 record. 99.9 times out of 100 that's going to be, it's going to
17 refer to a stipulation that we have, I assume for this
18 deposition; that is objections, exceptus to the form of question
19 where there may be some dispute and usually those get
20 resolved. The objections will be reserved until time of trial.  If
21 we do otherwise, you know you have to get somebody to rule
22 on the objection and you'll never get down with the
23 deposition, so that may occur, but it's typically someone will
24 say objection. I may even object to answer and then just say

                                5

1  you may respond and you just go ahead. I assume he's
2  represented by you folks here?
3      Counsel:    Um hum.
4      Bailey:     Okay, so then you just do whatever they
5  tell you to do.
6      Merryman: Okay.
7      Bailey:     Okay, that makes it a lot easier.
8      Q:      Major Merryman, how are you. Do you have any
9  particular way you want me to refer to you?
10     A:      Whatever works for you, I'm fine.
11     Q:      Okay. Major, how are you employed?
12     A:      I am a member of the Pennsylvania State Police.
13     Q:      And where are you employed?
14     A:      I am the Director of the Bureau of Research and
15 Development and that's in Department Headquarters.
16     Q:      All right, and now I am going to have some
17 questions today about that area and some of the things that you
18 do there. The second. When did you become Director of
19 Research and Development?
20     A:      I believe it was in September of 1998.
21     Q:      And you...
22     A:      I'm not really great on dates and I don't have
23 them written down, but I believe that's when it was.
24     Q:      Okay, now have you been continuously Director
25 of R & D since then?

                                6

1      A:      Yes I have.
2      Q:      And is the title Director?
3      A:      Yes, it is.
4      Q:      What position did you hold previously?
5      A:      I was Director of the Bureau of Professional
6  Responsibility.
7      Q:      Commonly known as; referred to the acronym
8  BPR?
9      A:      That's correct.
10     Q:      I understand BPR is divided into two divisions.
11 Is that correct?
12     A:      Yes it is.
13     Q:      One of them is what, inspections?
14     A:      Assistance and Process Review, which is in fact,
15 inspections.
16     Q:      Assistance and Process Review. And the other
17 one is?
18     A:      Internal Affairs.
19     Q:      All right, I am going to have questions for you on
20 the Internal Affairs Division and that is generally
21 referred to as IAD?
22     A:      Yes.
23     Q:      All right. How long in the fall of 98 had you
24 been the BPR Director?

                                7

1      A:      I was there, I believe, just short of two years,
2  again, I am not sure of dates, but it was the neighborhood of
3  just under two years when I left. In the fall of 98.
4      Q:      Okay. Now, I'm going to give you some more
5  specific questions later, but I am going to ask you some
6  questions now that have to do with the procedures and the
7  process of how complaints would come to IAD. For example, one of the
8  were treated procedurally in IAD. For example, one of the
9  material issues in this case that I want to question you about is
10 a word called Administrative Inquiry. We have had testimony
11 for example, from Captain Ober that there is no; and I am
12 going to question you about this; that's there no such technical
13 thing. That its sort of a morphosis thing that's referred to, but
14 there's no, and I need to get some more definition to that for
15 the record. So, I am going to start there and then I am going to
16 go into some specific questions that might bear on the current
17 litigation. Before we do that, have you ever had an
18 opportunity to review at least a Complaint in this case or the
19 Amended Complaint to at least read it or review it at all?
20     A:      I don't recall that I did.
21     Q:      Okay, let me go back now to the issues with. An
22 Administrative inquiry, I have looked through PSP
23 Regulations and what not. Is there an official thing called an
24 PSP inquiry that is governed by regulation or substance being
25 governed by regulation or procedures?

                                8



**[Page 9]**

1    A:   I don't I'm familiar with any defined term of that

2  nature.

3    Q:   If in the Pennsylvania State Police, now I am

4  talking generically here, I am not talking about anyone's case

5  here. In the Pennsylvania State Police, lets be hypothetical

6  and say that Colonel is unhappy with something and he

7  therefore wants IAD to look into it; how does he initiate that

8  process. Again, my understanding is from prior testimony in

9  this case, it is supposed to be by written complaint. If there's

10  not a written complaint. So lets save our time with that one.

11  Let's assume a written complaint comes to you and I'll ask

12  you some questions there. Can you initiate through IAD, an

13  investigation just verbally on verbal words?

14    A:   The way of administrative regulation that defines

15  the process for BPR and how investigations and their

16  processes are initiated and how that whole thing works,

17  defines it and those procedures really depend on the initiation

18  through a written complaint. We have allegations of

19  misconduct and that's the process for looking into.

20    Q:   So, if one is initiate a complaint process; that

21  complaint process through IAD is supposed to be based upon

22  a written complaint. That's supposed to be in the record

23  whether it's anonymous, whether it's from somebody outside,

24  somebody inside; whatever it may say. It's supposed to be

25  initiated by and maybe complaint not even the right word, but

**[Page 10]**

1  at least some kind of writing that is a form that referred to that

2  used as the basis of the process? Am I correct?

3    A:   In my experience the only time we looked into

4  any kind of allegations, that investigative process was initiated

5  through a written complaint.

6    Q:   So, if somebody called you up and said, Major, or

7  Director, whatever. I want you to investigate somebody.

8  What would; first of all, did that ever happen to you?

9    A:   I don't recall that ever happening to me. If I

10  could clarify that, sometimes verbal complaints are made and

11  we had a reception form that we would fill out, but we had a

12  complaint verification process that is provided for in the

13  regulation so we would take that reception form, we would

14  provide the complaint verification form to that person who

15  was making a verbal complaint and ask them to write that

16  down and sign it and resubmit it to us.

17    Q:   I understand you're not a lawyer, but what's the

18  reason for that? Is there a due process reason for that or is this

19  a way to keep control of an investigation or is it a concern for

20  people's rights? What's the reason for doing it procedurally

21  that way?

22    A:   I was not in the Bureau at the time that practice

23  was initiated so I can't really talk with great authority about

24  the reason that was implemented, but I always looked at it in

25  terms of maintaining integrity of the process, accountability of

**[Page 11]**

1  everyone that was involved in the process. So, we didn't lose

2  anything between the cracks and we didn't have people that

3  were making frivolous complaints against department

4  personnel because it was easy just to call up and make a verbal

5  complaint to someone.

6    Q:   Would that also prevent off the book

7  investigations? I mean investigations, if one is going to

8  conduct an investigation and read people their right and do

9  those kinds of things, it should be based on established

10  procedure and not just on whim or caprice? Is that fair to say?

11    A:   I have to go back to my experience again, and say

12  that while I was there, we paid strict attention to the process

13  and by following a process and by following written

14  regulation, we ensured integrity in that process and there's

15  accountability for everyone that works in the Internal Affairs

16  Division and in the Bureau and it really ensures that the

17  complaints were legitimate complaints.

18    Q:   Who assigns investigators?

19    A:   The general rule to who gets assigned to do what

20  investigation would be the Director of IA, but there are three

21  sections in that division and each section has associated so,

22  there would be involvement of a section commander on who

23  amongst his immediate staff might have the investigation, I

24  suppose it's not outside the realm, the possibility to think that

25  the Director of BPR might make an assignment that is

**[Page 12]**

1  particularly high profile or sensitive complaint investigation as

2  well. So, I guess I am saying that here you might have a

3  general practice, but you also have involvement from section

4  commanders and the Bureau Director as well.

5    Q:   Have you ever assigned investigator in a case

6  before the case was docketed or given a BPR number?

7    A:   I can't...

8    Q:   Let me tell you were I am coming from. I would

9  imagine. I don't want to provide any implications as to really,

10  I don't want to testify; but I would imagine you get a phone

11  call or an inquiry or if you get a complaint initiated by writing,

12  a normal thing that comes in, maybe from a citizen out there

13  about something. That there is some kind of an initial

14  evaluation process that is done? Is that fair, I mean I don't see

15  how anything could ever start without that. Is that fair to say?

16    A:   Yes, because some of them are obviously,

17  without merit. Some of them may represent a supervisory

18  issue between a member and their immediate supervisor or

19  that type of thing, so you make some determinations about the

20  allegations to determine the course that you are going follow

21  within the process.

22    Q:   Because you have. Roughly how many BPRs are

23  launched? Officially launched in a year? 600-1,000? 700,

24  800?

25    A:   No, I really don't know at this point.



Q:   Can't tell.  So, a decision is made.  You have to
make a decision because you don't infinite resources I assume,
so, you got to look at whose available, who's doing what; and
you have to make a decision should this thing go forward.  Is
that right? I mean if you get an inquiry of some sort, the initial
thing is should we give this thing a number and go forward.  Is
that correct?

A:   There is some consultation that occurs with the,
like Trooper Commander, for example, if it was somebody
from a troop and you know you talk about and you apply
certain criteria.  If this is true, is this a disciplinary type issue
or is it a supervision issue, those types of things.

Q:   Let's talk about that.  A hypothetical situation,
something comes to you; you're the Director and you look at
that; let's say on its face.  I was driving down the highway,
trooper X came up, he was chewing bubble gum.  This is
outrageous.  It's bad for our teeth and I would like you do
something to discipline this guy.  Possible something like that
might be frivolous or the kind of thing that you send a polite
response back to the citizen or whatever, but I would assume
by regulation there's not a whole lot you can do except say
don't chew gum or you know say something maybe.  Another
case, I saw your trooper the other day and he was, let's say
there's some really outrageous or egregious conduct and he
was in badge and the kind of thing, let's say where there's an

13

accusation that he beat somebody up or something like that.
He or she beat someone up.  Aside from all of the other
investigations involved, I assume in that case if you got a
complaint maybe from a commander, from a fellow trooper,
from a superior or that sort of thing your going to say hey,
these are serious allegations, here.  We got to look into that.  Is
that fair to say?

A:   Yes.

Q:   Okay.  What happens in that serious case?  What
do you; it comes through the door, it comes to you by, its
initiated quite properly by some sort of written complaint.
What do you do in the process?  How do you handle that?

A:   Well, in the example you used, Mr. Bailey, you
included criminal conduct…

Q:   Okay, let me take that out of there.  Let's assume
that its not criminal conduct, but it raises a serious question of
insubordination or something of that sort.  It's not otherwise
criminal.  What would you do?

A:   Okay, the scenario as I understand it described as
a case of serious misconduct coming from a credible ranking
individual within the department?

Q:   Yes sir.

A:   First of all, I need to know if I am responding as a
Bureau Director or who responds in that scenario because in
the chain of command we have the Director of Internal

14

Affairs, who is a key player in that scenario.  As a Bureau
Director, I would expect to be aware of it and if it's a high
profile incident, you know certainly briefed periodically.  The
Director of the Internal Affairs Division plays a key role there
in terms of initiating the investigation, getting an investigator
assigned through the section of command and getting the ball
rolling on the case.

Q:   Who assigns investigators?

A:   I think we talked about that?  Again section
commanders, division directors.

Q:   Let me do this, let me go back because your quite
right.  Let me attack that issue because its an important one in
this case, I believe; from a different angle.  Aside from the
bureaucracy responsible, the jurisdiction, which is in BPR,
who can assign investigators?  Let me do it this way.

A:   Okay.

Q:   Can Colonel Evanko assign investigators to go
out and investigate somebody if he doesn't like something?

A:   I would say that is not in the scope of AR425,
which is our regulation that defines the internal affairs
process.

Q:   That's the way I read it.  If.  On the other hand, if
Colonel Evanko has a complaint about something or about
someone, again I just draw from my Army experience
somewhat and from reading; because most of these things are

15

modeled pretty much together in these kinds of organizations.
He should report to the proper internal source or bureaucracy,
the jurisdictional area like BPR and say I'm making a
complaint about something.  He shouldn't because of his
position, as I understand it; he shouldn't control the
investigation?  He should not control the appointment of
investigators and I'm going to ask you questions about
adjudication in a few minutes.  So, my question is a very, very
simple one.  Does a commander at any level in the
Pennsylvania State Police have the authority to select and appoint investigators
surrounding internal affairs?

A:   I have to go back to the regulation for me that's
been the guiding principle for me and all that I have done and
it provides for a very specific procedure in the internal affairs
process.  I would say that anything that occurs through the
internal affairs process needs to follow the provisions of that
regulation.  If it's outside of those provisions, then I would not
consider it an internal affairs process.

Q:   Okay, in other words, the regulations of the
Pennsylvania State Police, neither the regulations of the
Pennsylvania State Police or the custom practice and usages in
the Pennsylvania State Police as known to you provide for a
commander or supervisor at any level going off on their own,
appointing investigators and having people investigated

16



1   without going through; without conforming to the regulation?
2   Is that fair to say?
3      A:   I'm not aware of any procedure or process as you
4   just described, sir.
5      Q:   Okay. When in the process of an. I'm going to
6   speak generically in investigations. I have to assume that
7   there are a lot of investigations or inquires that don't make it
8   to a BPR complaint where for example, nothing prevents a
9   supervisor from calling someone on the carpet who is one of
10  their subordinates and saying "Hey, I don't want you acting
11  that way" and this is a typical command function, I assume
12  and this is the way things are normally handled on the job. Is
13  this fair to say?
14     A:   Yes.
15     Q:   Okay. Now, have you ever known of an
16  investigation in the Pennsylvania State Police where an
17  individual was read rights in the administrative or criminal of
18  any stage and investigated without there being a procedurally
19  proper, in other words, according to regulation; an initiated
20  BPR investigation? Do you understand my question? Let me
21  go back. I'm going to make it clear, because I realize it's
22  rather lengthy. Do you know of any situations in your
23  experience where an individual is investigated, read their
24  rights whether it be for purposes of administrative, union
25  contract or criminal purposes without the investigation being

17

1   initiated through regulation by according to regulation through
2   BPR?
3      A:   I have been interviewed in a scenario where I
4   was given my rights. I interviewed...
5      Q:   I'm going to question you. Can I interrupt you?
6      A:   Sure.
7      Q:   Never mind, you finish, sir.
8      A:   I was just going to say and although at that time I
9   inquired when I was, during the course of my interview, the
10  nature of the allegations and who the subject was and those
11  types questions I was told that, I cant' remember exactly what
12  I was told, but it was sort like; well, don't really have a subject
13  right now. We are looking into this so, it sounds although I
14  was given rights and those types of things, signed forms and
15  so forth that would be my experience in a situation where it
16  sounded like, it felt like an IA investigation, although in terms
17  of allegations and subjects and things like that didn't appear to
18  be anything - at that point.
19     Q:   This is one of those very scary moments for a
20  lawyer when you ask a question and your not sure of the
21  answer, but I am going to take the risk. Were you questioned
22  about anything having to with Mr. Ober's case?
23     A:   Ah with his lawsuit or I mean?

18

1      Q:   Anything having to do with Mr. Ober's case. I'm
2   not going to ask you a substantial question yet we'll see where
3   we go with that?
4      A:   During the course of my. In one of those
5   interviews, Captain Ober's name was not mentioned, it was
6   really questions related to process and procedure, how things
7   are done.
8      Q:   Well, that was going to be in my R&D section.
9   There is a major issue in this case in terms of AR, regulation
10  how the regulation was modified and it involves a function of
11  R & D and I am going to ask you questions about that so, I am
12  going to assume on that one that there was some questions of a
13  different nature, but I am not talking about that. Um, were
14  you, is it, were you interviewed more than once about matters
15  either pertaining to or having to do with Mr. Ober?
16     A:   Yes.
17     Q:   All right, can you tell me, sir when the first time
18  may have been?
19     A:   I honestly don't know. Ah. I can't. I'm trying to
20  put it in context with something else. I really can't. I am
21  going to say it's probably been two years ago some where
22  there abouts, but um.
23     Q:   When was the last time?

19

1      A:   The last time I would say was probably within the
2   last, again, its very difficult. I'm going to say probably within
3   the last six or eight months.
4      Q:   Okay, just a moment. I'm going to gather my
5   thoughts. Would the last six or eight months have to do with
6   in any connection with the R & D functions?
7      A:   Yes.
8      Q:   I'm going to go to the earlier. Okay, you say a
9   couple years?
10     A:   I'm really speculating. I don't know for sure.
11     Q:   Did that interview take place before you became
12  the R & D Director?
13     A:   No. I was not in R & D at the time.
14     Q:   So, it was after the fall of was it 99? 98. When
15  you left. In the fall of 98 you were...
16     Counsel:   Before we get into the line of questioning
17  because I think there's an attorney work product issue here. I
18  would like a chance to confer with the Chief Counsel about
19  this issue. I was not aware you were going to get into some of
20  these issues today, so I want a chance to talk with her about
21  this because there's a legal issue involved here so whether or
22  not you can get into these areas.
23     Bailey:   Okay, just one thing when you two go and
24  talk, I understand and we can certainly take a break. I'm
25  obviously, I found something here I want to pursue. I can

20

1   barely contain myself, but here's the thing I just want to say to
2   you. Normally, in the procedure, and in this case because of
3   the nature of this case; I would like to follow this. Naturally,
4   you can confer with the client. I want to state for the record,
5   that if I am going to make if need be, a constitutional issue of
6   the interpretation of professional rules where corporate
7   managers in affect are shut up or are prevented from
8   answering questions based upon some phony and purported
9   concept in our court rules which were written obviously, in
10  corporate boardrooms whereby there is an attempt to use
11  privilege as a way to prevent an individual from disclosing
12  information where that individual has no individual right at
13  stake, i.e., where the attorney/client privilege is between the
14  organization and the attorney and not the individual and the
15  attorney. I think it is a public interest farce, these rules. I am
16  just doing this for the record, by the way, folks. Just so you
17  understanding I am preserving objections and preserving
18  issues for appeal, if need be. Because I'm going, damn it, I'm
19  going everywhere with this thing, I am getting tired of this
20  stuff. I don't believe that an individual in the public sector
21  addressing an issue of public concern should be prevented
22  from speaking out, unless that individual, this man's character
23  by reputation is impeccable and he obviously has not interest
24  at stake other than telling the truth and my client does have an
25  interest in the truth coming out, so I want to very strongly

21

1   object to any effort made to delimit his testimony. I would
2   also object on the basis that in the case management
3   scheduling conference with Judge Caldwell, the issue was
4   discussed over representations to the Court and about
5   modifications to the regulation which as Judge Caldwell, I
6   don't want you think I didn't figure this would come up today.
7   Made specific reference to Plaintiff's Complaint that the
8   matters in the Motion to Dismiss the Brief in Support of the
9   Motion to Dismiss were case dispositive. Making them
10  crucial and material to my client's complaint that efforts were
11  made to subvert the legal process and I realize there are
12  differences of opinion respectfully we have with the Court or
13  the applicability of abuse of process, concepts and law. Now,
14  that being said. I would like to thank opposing counsel for
15  your patience. Let's suspend. You can confer with counsel. I
16  do want you to know that I am going to ask the questions and
17  you can, you know, if you make a decision at some point that
18  you are going interpose privilege, you may do so, but I am
19  going to ask the questions to get them down. I know of no
20  other way to do this? I can't leave that realm unvisited, as you
21  probably know. With that being said. Crystal, would you
22  please for the record.
23      Lyde: It's 9:39 a.m. We will take a short break.
24      Lyde: It's 10:07 a.m. we're back on record.

22

1       Bailey:     Before we put anything on the record, I
2   would like to incorporate in this area of the Brief, page 4 of
3   the Court's Opinion of August 13, 2001, um Plaintiff filed his
4   Complaint on January 16, 2001 on March 16, 2001, the
5   Defendant's filed a Motion to Dismiss in which they cited to
6   State Police Regulation AR1.102 subsection C to argue the
7   Plaintiff had not properly followed his chain of command in
8   reporting the F.B.I. investigation. This could justifiably,
9   arguably, correction, this could arguably justify the PSP
10  investigation of Ober. That police regulation, as noted by
11  Plaintiff in his opposing Brief, was not in effect at the time of
12  the events about which he complained. I don't think there's
13  any need to go on further. The judge has since ruled that the
14  attorneys, at least for the time being are out of the case
15  because there's no abuse of process being the necessary injury
16  or actions being taken. There was no abuse of process issue.
17  We maintain, of course, that these are evidentiary matters
18  relevant to the First Amendment claims and that a frivolous
19  Rule 11 Motion is still in the case by choice of the Defendants
20  and as noted in the Case Management Conference that we
21  have the right to explore those issues as we have pointed out
22  there. That being said, I want to make sure that the ground are
23  stated on the record that we feel these issues are certainly
24  relevant and that they are discoverable and they do not relate
25  to the issue of privilege. If there is any privilege, it would be

23

1   waived and secondly, that those rules, more specifically, I
2   believe its Rule 4.2 of the Rules of Professional Conduct
3   should not prevent my being allowed to question Major
4   Merryman on matters of public concern. Privileges not apply.
5   Thank you very much. Joanne.
6       Counsel:     Major Merryman has been advised of his
7   attorney/client privilege with regard to some of the areas that
8   you might be questioning about. Moreover, if you get into
9   areas of the attorney work product investigation, we will be
10  reserving the right to object any documents you might be
11  requesting that relate to areas that Major Merryman may
12  testify to, but we are not going object on the basis of attorney
13  work product with regard to him answering questions
14  regarding any investigation that we did that are within his
15  knowledge. That does not mean that we waive the objection
16  with regard to the documents you may request or with regard
17  to that argument being made with regard to future witnesses.
18      Bailey:     Okay, let me just say that the idea of
19  attorney investigation is something which not only is a
20  morphus and not clearly defined, but I don't think its protected
21  in any way whatsoever. Secondly, your privilege is not the
22  attorneys; the privileges belong to the individual. They are
23  waivable in any event. The issue here implicated of course,
24  would be the Pennsylvania State Police Organization, who I
25  want everyone to note, is not a Defendant in this action. They

24



1  are not a Defendant in this action. Were the Pennsylvania
2  State Police a Defendant in this action, I could understand
3  some objections. They are not. The Defendants in this case
4  are all individuals; the issues involved in this case are all
5  violations of federally guaranteed rights by virtues of
6  individuals acting under color of state law unlawfully. There
7  can by definition be no privilege which would prevent me
8  from questioning this witness, I don't believe that attorneys
9  can pick their witnesses anywhere and use rules that don't
10  apply to cut off the witnesses' testimony. Again, pointing out
11  Pennsylvania State Police are not a Defendant in this case.
12      Counsel:    All right counsel. Wait a minute. Since
13  your making statements to me, the presence of an attorney
14  work product investigation does not depend upon whether the
15  Pennsylvania State Police is a Defendant in this litigation. An
16  attorney work product investigation can and does occur with
17  individual defendants as well as with the Pennsylvania State
18  Police as an organizational defendant in a case. So, with
19  regard to that point, which I understand you are making for the
20  record, we would just respond to that point also for the record.
21  Although, it was indicated Ms. Reynolds, Major Merryman
22  has been advised as to the attorney/client privilege and the
23  decision is to waive ability of said.
24      Bailey:    Our opinion and the bottom line very
25  simply, Barbara, is there is no attorney/client privilege here. It

25

1  is a construct being used to prevent us, I'm not saying you are
2  using it, but I mean potentially being raised as a way to
3  prevent us from talking to this individual. You're not
4  representing him or never represented him in this capacity as a
5  Defendant. The organization is not a Defendant here. That's
6  the basis what I was saying.
7      Counsel:    Well, I don't - defendant or that the
8  organization need be made a defendant. Major Merryman
9  certainly can be represented as a witness.
10      Bailey:    It's probably not his choice. I mean I think
11  he's here by virtue of the actions of the employer. He's not
12  here by virtue of - .
13      Counsel:    Actually, counsel, he's here by virtue of
14  your Notice to depose.
15      Bailey:    Yeah, but he's not having a choice of. I
16  mean, I don't know if you wanted to comment on this, but I
17  doubt very much that he doesn't have a private attorney and
18  hasn't by choice. I'm willing to bet that he's been told that
19  you're representing him because you made a decision to
20  represent him, not because he made a request. And if it's
21  otherwise, that's fine. But, the capacity is the issue. And the
22  capacity is that you are Pennsylvania State Police attorneys
23  and you represent the organization. He is an individual who is
24  a material witness pertaining the defendants in this case.

26

1      Counsel:    Well, yeah counsel, not to belabor the
2  point, but representing the organization, the organization being
3  a creature of accomplishment obviously encompasses
4  management individuals in that organization. But, in any
5  event, I believe Major Merryman has been appropriately
6  advised and I would certainly leave it to... as appropriate.
7      Bailey:    We don't have any desire to sue the
8  Pennsylvania State Police because under current law in the
9  eleventh amendment, they're not defendants here. Who
10  knows what changes may occur out there someday? May the
11  present Supreme Court right move on, but that's the way it is
12  now and we play by those rules.
13      Q:    Okay, Major let me get back to where we were
14  quite some time ago. My understanding is that you were
15  interviewed about matters pertaining to Mr. Ober on at least
16  two different occasions?
17      A:    Yes.
18      Q:    On one of those occasions you were read your
19  rights, you had indicated. I thought. Is that correct?
20      A:    Yes.
21      Q:    Can you tell which occasion that was the first or
22  the second? I understand the first to be something that
23  occurred sometime on or about the fall of 98 or strike that.
24  Did the first investigation come after June of 1999?

27

1      A:    I can't say with any degree of certainty when that
2  did occur. I'm sorry.
3      Bailey:    One of the things that we have to go over
4  by the way is some of the document requests. Some stuff we
5  requested ought to be provided. We'll go over that later. It's
6  been out there since October you know.
7      Counsel:    I didn't think you had yet elected by what
8  means wish the information provided.
9      Bailey:    That was only appertaining to certain
10  documents, as I understood. There's a lot of stuff there that
11  obviously you have a duty to provide of you know of a
12  personnel nature that we would like to get, but we'll go over
13  that after.
14      Counsel:    I believe the question is by what method
15  you wish to inspect. You wish copies, copy costs and so forth.
16  That's my understanding. Again, if things have progressed
17  beyond that stage, perhaps we can discuss those after depos.
18      Bailey:    I think your response on the documents is
19  meant to - . I respectfully disagree with what you have done.
20  We'll talk about that later. I realize that. But, we need to get
21  that resolved now because we are getting near the end.
22      Q:    Sir, Major Merryman, lets go back to the first
23  interview that was done. Was this done, if you know during
24  the period of time that Mr. Ober was being investigated, but
25  prior to when he had filed his complaint in this matter?

28

 

A:    Sequentially, I can't really tell you where that fell. When I was interviewed, I was told not to discuss this and I respected that directive. So, in terms of what else was happening around and as I mentioned earlier in that first interview, Captain Ober's name was not specifically mentioned.

Q:    Who interviewed you?

A:    I was interviewed by Majors Tom Williams and Robert Werts.

Q:    Was anyone else present?

A:    I don't believe so.

Q:    Where did that interview take place?

A:    In the offices of the Bureau of Professional Responsibility.

Q:    Were there any recordings made? You know, tape recorder, electronic recording?

A:    I don't recall whether it was recorded or not?

Q:    Were notes taken by Mr. Werts and/or Mr. Williams?

A:    I'm reasonably sure they were taking notes as we talked.

Q:    Do you recollect how long the interview lasted?

A:    I would say probably about an hour.

Q:    Now, where you read your rights during that interview?

29

A:    It's been some time. I can't say for certain. So, it's somewhat speculative.

Q:    Is it fair to say that you were read your rights during the second interview?

A:    Yes, for certain.

Q:    Can you tell me what explanation was given to you for reading you your rights during the second interview?

A:    No, sir. I can't.

Q:    Who conducted the second interview?

A:    Captain Brown. John R. Brown.

Q:    Any lawyer present?

A:    No sir.

Bailey:    Okay, I'm going to revisit the second interview in just a minute. I want to go back to the first interview.

Q:    Do you have a recollection of the questions that you were asked during the first interview? Let me strike the previous question. Let me go back and restate it. It is my understanding that you had an interview with Mr. Williams and Mr. Werts that it was the first interview sequentially and your not sure if it was prior to when Mr. Ober filed his complaint, but and your not certain whether your rights were read to you during that interview. The question is can you just tell you in simple words what questions you were asked that you can remember as you sit here today?

30

A:    The. I can describe the nature of the questions. They dealt with procedural questions. Um, in other words, it was presented to me in theoretical scenario to say for example, if certain things occurred, what would be the right way to follow up with that. What do regulations require of someone when they come to possess certain types of knowledge. Those types of questions.

Q:    Lets explore that for a moment, if I may, sir. I think you had indicated in response to an earlier question that Mr. Ober's name was not mentioned during that interview. What facts known to you caused you to offer the opinion, if you will, that it had to do with Mr. Ober.

A:    The scenarios that were described in terms of who would have had information and what could or should be done with that information really implied that the individual at the center of the scenario would have been in; I inferred it to mean in the Director of IAD position.

Q:    Now, for the record. This might be a good point to do this. Do you know whether Captain Daryl Ober ever served as the head of IAD? The Division of IAD within BPR?

A:    Yes he did.

Q:    Do you have a recollection of when? Can you give us a rough idea as to when?

31

A:    If I left BPR in the fall of 98, I'm without saying with great deal of certainty; I believe it was in the spring of 98 when he was put in that position.

Q:    Okay, so when you.

A:    Earlier that year.

Q:    Earlier that year. So, to the best of your knowledge and recollection, Mr. Ober had somewhere on or about the spring of 98 come into the position of the head of IAD?

A:    Yes.

Q:    And when you left BPR, Mr. Ober was still the head of the Division IAD?

A:    Yes.

Q:    And who succeeded you?

A:    Hawthorne Conley.

Q:    And do you understand that Mr. Conley is also a defendant in this lawsuit? You may not have know that?

A:    You had mentioned it earlier today, I believe.

Q:    I just want to make you aware of that fact. When Mr. Williams, lets get back to the interview now. Do you have a recollection of whether Mr. Williams or Mr. Werts were asking you um, opinions based on your expertise or was the focus on the gathering of facts. I'm looking for the purpose of this interview. It's hard for me to understand what the purpose of it is? I realize you can't speculate, but you

32



1  were there. You remember the tones, you remember the
2  voices, you remember the words, the way it came through. I
3  mean what was the purpose of this interview?
4      A:    The nature of the questions suggested to me that
5  they were looking for process clarification to use your term to
6  ask me questions based on my knowledge of BPR and Internal
7  Affairs procedures.
8      Q:    Well, weren't they the assigned investigators to
9  this investigation. I mean, sir, was it billed as an investigation
10  to you? Was it represented to you as an investigation?
11      A:    It was um. I asked a few questions about what
12  were allegations, who was the subject, was there a subject?
13  And it was really treated very umm. I was not given specific
14  information in response to those types of questions. Umm, I
15  was told that they were just you know, looking for some
16  clarification on issues or trying to make some determinations.
17  Develop some information, but it wasn't characterized to me.
18  I mean when I asked for specific allegations and who was the
19  subject, if there was a subject and there were none provided to
20  me, I guess I would say that it was characterized in very
21  general terms. Just an information gathering process? I
22  guess? That was my understanding of the way it was
23  presented.
24      Q:    What was Mr. Williams' rank at that time?
25      A:    He was a Major.

33

1      Q:    So you got a full Major. How about Mr. Werts?
2  What was his rank?
3      A:    He was also a Major.
4      Q:    So, you've got two Majors sitting in front of you
5  asking you questions. Apparently, it was not accusatory; it did
6  not appear to be aimed at you.
7      A:    Correct.
8      Q:    And their asking you questions about. Can you
9  remember some of the individual questions? I'm at a loss, but
10  I understand.
11      A:    None of the questions concerned whether, if I
12  possessed information about allegations of misconduct when
13  or where I would take up the chain of command. The
14  circumstances under which I would take information up the
15  chain of command. That was a very specific area of interest
16  for them. In other words, if you were told this or told that,
17  would you go up the chain of command with this information?
18      Q:    Well, does the Pennsylvania State Police
19  regulations make that perfectly and abundantly clear when
20  you're supposed to go up the chain of command with
21  something?
22      A:    Well, I think they make it clear under certain
23  circumstances, but you know my position on this is the same
24  today as it was then. It depends on what types of information
25  comes to you and what the circumstances are surrounding it.

34

1  So, in some cases it would seem like a no brainer that you
2  would take it up the chain of command and certain other
3  circumstances it may require that you don't immediately do
4  that.
5      Q:    Did they ask you if there were a bonafide
6  external, external for the Pennsylvania State Police criminal
7  investigation into your superiors if you had a duty to go and
8  tell your superiors that they were being investigated?
9      A:    Certain parts of this I remember with clarity.
10  They kept asking me in very generic terms, what if, what if
11  and I said look, I don't know what the source of this
12  theoretical information is that you keep presenting to me and
13  at that point, Major Werts says the F.B.I. and then the question
14  was if it came from the F.B.I., would you take it up the chain
15  of command and the scenario included allegations of criminal
16  conduct. And my response was it depends on who the
17  subjects of the investigation are. So, um, you know it doesn't
18  really matter necessarily what the source was, it also depends
19  on the circumstances surrounding the type of misconduct and
20  the subject of the investigation.
21      Q:    So, the point is there is no Pennsylvania State
22  Police regulation that tells you blindly regardless of what
23  comes in from; I can't conceive as such a thing existing
24  anyway, I'm not trying to insult your intelligence. Believe me
25  or your professional integrity, believe me so, please don't read

35

1  that into this question. So there is obviously, I would assume,
2  there is no Pennsylvania State regulation and I am going to ask
3  you a question about customer practice in a second. But, there
4  is no Pennsylvania State Police regulation which says that if
5  an outside agency to include the F.B.I. is investigating higher
6  ups then you have a duty to go and report to the higher ups.
7  That they have made an inquiry?
8      A:    Are you referring to the higher ups who may
9  potentially be the subject of the allegations?
10      Q:    Absolutely. Thank you very much. That's
11  exactly what I am referring to. If the F.B.I. comes to you and
12  they say we are looking into allegations of some kind of illicit
13  and unlawful activity, which on its face, would include the
14  power and authority of let us say, the commissioner, and they
15  were looking into the possibility of the higher ups, which by
16  definition will include the commissioner in that case into
17  wrong doing. Is there a Pennsylvania State Police regulation
18  which requires you to go and tell the commissioner that the
19  F.B.I. has indicated they might be investigating him or people
20  at a high level?
21      A:    I know of such regulation.
22      Q:    Now, understandably as you say, decisions that
23  have to do with when or where you go. When or where you
24  go up the chain of command, under the circumstances? Is that

36

1    correct?  By definition they have to vary according to
2    circumstance?
3        A:    Yes.
4        Q:    Okay.  And you know of no regulation, which
5    provides specific guidance as to that?
6        A:    Under the circumstance we have just been
7    discussing, No.
8        Q:    Now during the period of time that Mr. Ober
9    worked for you in the sense that he was a subordinate of
10   yours.  Do you have a recollection of the manner and way in
11   which he performed his duties?
12       A:    Yes.
13       Q:    Could you share them with us please?
14       A:    I found Captain Ober to be extremely meticulous,
15   driven in his commitment to do the best possible job that he
16   could do.  Very detail orientated.  Very committed to the
17   ideals of the department.  A man of what I believe in my
18   observation, high moral character.
19       Q:    Have you ever seen Captain Ober act in
20   disrespectful or disloyal; I mean there is a value to loyalty, of
21   course, in any organization and for whatever that term would
22   mean I realize it is highly subjective in a professional sense.
23   Do you have any recollection of Captain Ober ever acting in a
24   disloyal or disrespectful fashion to the Commissioner, Colonel
25   Paul Evanko?

37

1        A:    No, I can't say that I did.
2        Q:    So, it appeared to you that these were two
3    individuals that were assigned a job to do and were doing the
4    job?
5        A:    Yes.
6        Q:    Now, let me ask you about procedure.  I want to
7    go back now, change direction a little bit.  I want to go back to
8    the issue of procedures.  Did you ever learn or ever become
9    aware that there was a BPR done on Captain Ober about the
10   same inquiry that Major Williams and Major Werts talked to
11   you about.  By rumor or otherwise?
12       A:    Well, there was a lot of talk around.  A lot of
13   speculation and again, you know I was directed that this was
14   not to be a topic of discussion and I didn't seek out people to
15   discuss it with for that reason.  You hear things.  The nature of
16   whatever followed on with Captain Ober.  I really can't say
17   with any; I really don't know.  I know that interviews were
18   conducted, but who all was interviewed and the specific
19   direction of the process.  Whether there is a IA number
20   attached to the General Investigative Report; I don't know
21   those things.
22       Q:    How were the numbers assigned?  For example,
23   it's the way the Court docketing system works and practically
24   every system I am familiar with.  They start with the year and
25   then they sequentially number them as they come in.  So, if

39

1        A:    No, I have not.
2        Q:    And you know of no such circumstances?
3        A:    No, I don't.
4        Q:    All right now, did you ask Major Werts and
5    Major Williams, generically, what's this all about?  To me it
6    sort of a basic question.  We all get curious, of course, being
7    questioned by two very, you know a Major is very high,
8    powerful position.  So, your being questioned by two Majors
9    and you have indicated, not in an accusatory way; it doesn't
10   appear to be aimed at you, but obviously from what you have
11   described, your sitting there trying to figure out what's the
12   method or reason for this.  And you reach your conclusions
13   that you have shared with us; there is no reason to retrace that.
14   Did you ever, on the other hand; overtly say to them, what's
15   this about?  What are you fellows doing, what's occurring
16   here?
17       A:    I believe at the conclusion of the interview, I said
18   I really don't what this is about, but I will tell you I don't like
19   it.
20       Q:    And what was their response?
21       A:    Pretty much noncommittal, well, you know,
22   that's just the way it is.
23       Q:    Did you denote in either Mr. Williams or Mr.
24   Werts any personal ominous directed at the subject of their
25   questions?

38

1    you're the first one in the door on January 1st or I guess
2    January 2nd of the year 2002, you get the number 1.  If you're
3    case 2000 of that year its you know, 2002.  How are BPR
4    numbers assigned?
5        A:    I would have to say I'm really not sure at this
6    point.  I know at one time we had a book like where the
7    numbers were recorded and the case was listed and I don't
8    think that we even started on the new year.  I don't know.  I
9    think it's done by computer now and whether it resets on the
10   first of the year, I don't know.
11       Q:    But they are done sequentially?
12       A:    Yes.
13       Q:    They are numbered as they come in?
14       A:    Yes.
15       Q:    Okay, so whether it begins on the first of the year
16   or not.  The point is that as far as the numbers go, its as you
17   come through the door and as their assigned an investigation
18   or a number?
19       A:    Yes.
20       Q:    Do you know that if at the time Mr. Williams and
21   Mr. Werts were talking to you and interviewing you in your
22   office over at BPR.  Whether a BPR had begun on Captain
23   Ober?
24       A:    I don't know.

40

1    Q:   When you left, the Bureau of Professional
2  Responsibility on or about the fall of 1998, were there any
3  open BPR on Captain Ober?
4    A:   No.
5    Q:   Do you know?  How is a BPR processed once a
6  decision is reached?
7    A:   Once a decision to conduct an investigation is
8  made?
9    Q:   No, once the investigation is done.  Once it has
10  been adjudicated; the decision is made.  What happens?
11    A:   Well, I want to be sure that I understand your
12  question.
13    Q:   Okay, I can make it a lot simpler.  When an
14  investigation is done.  When a BPR investigation is
15  begun.  It is assigned a number and the investigation
16  has then begun.  Is that correct?
17    A:   Yes.
18    Q:   When a decision is made as to a recommendation.
19  I understand what BPR does is eventually at some point
20  through the end of the process, there is a some kind of a
21  recommendation made whether its unfounded whether its
22  some sort of disciplinary recommendation or whatever, that
23  sort of thing.  That's eventually the end of the process.  Is that
24  correct?
25    A:   That's not quite accurate.

41

1    Q:   Okay, tell me how it works?
2    A:   I view the internal affairs process as one where
3  facts are collected and presented in the investigative report.  It
4  is up to the adjudicator to read it.  There is no recommendation
5  for any action made in the IA case.
6    Bailey:   I'm sorry.  Your right.  I stand corrected.
7  Sorry.
8    A:   So, the adjudicator makes a determination on
9  whether or not its sustained or unfounded or not sustained.
10    Q:   Okay.  Now, can you do a.  I'm in the
11  Pennsylvania State Police.  Can you do a BPR on me;
12  investigate me, close it out and I'm never told anything?
13    A:   I don't believe that would be consistent with the
14  regulations and practice.
15    Q:   So, if you want to investigate me, you got a duty
16  to tell me?
17    A:   Yes.
18    Q:   Okay, now if the investigation comes to a
19  conclusion of some type, any type, a report or whatever is
20  done.  Do you have a duty to tell me?
21    A:   Yes.
22    Q:   And do you know of any open investigations on
23  Captain Ober as we sit here today?
24    A:   No sir, I don't.

42

1    Q:   Let me ask you.  There were no investigations
2  pending on Captain Ober when you left BPR.  Is that correct?
3    A:   Yes.
4    Q:   As you sit here today, do you know of any open
5  BPRs or, investigations on Captain Ober?  Is that fair?  I
6  should stop using BPRs, I guess maybe and just say
7  investigations? So you know of no investigations on Captain
8  Ober as we sit here today?
9    A:   No, I don't know.
10    Q:   Do you know if there was any investigation done
11  on Captain Ober concerning a museum or Penn State historic
12  items and that sort of thing?  If there was ever an investigation
13  done him over that?
14    A:   I recall.  I don't know if it was rumor, but I do
15  remember that.
16    Q:   Can you share with me what you recollect about
17  that?  That you might know?  By rumor or otherwise; rumors
18  can be very valuable things in collecting information in
19  lawsuits, so if you have any information all rumor or
20  otherwise, would you share it with us, please?
21    A:   Well, with the understanding that it may be based
22  on rumor.
23    Q:   Yes sir, that's fine.
24    A:   My recollection is that he had been accused of
25  using his position to acquire State Police memorabilia from a

43

1  citizen or citizens that possessed them and um, the out come
2  of which was the determination that he had not used his
3  position inappropriately.
4    Q:   Okay and is it your; again, I understand that its by
5  rumor.  But, is your understanding that?  Do you have any?
6  Are there any facts known to you that would indicate that he
7  was advised of that BPR?
8    A:   I don't have any knowledge.
9    Q:   Investigation, I'm sorry.
10    A:   Yes.
11    Q:   Do you know whether he was ever advised that it
12  had come to an end?
13    A:   I have no knowledge.
14    Q:   You just don't know?
15    A:   Right.
16    Q:   Were you ever questioned about that one?
17    A:   No, I was not.
18    Q:   Captain John Brown, at some point you had
19  indicated you were read your rights and that Mr. Brown was
20  the individual who read you your rights?
21    A:   Um huh.
22    Q:   Did Mr. Brown tell you why he was doing that?
23    A:   Why he read me my rights?
24    Q:   Yeah?
25    A:   Not at the time.

44



1  Q:    I think you had indicated that during that
2  interview Mr. Ober was mentioned.  Is that correct?
3  A:    Yes.
4  Q:    How in that manner, substantively, how and what
5  was said about him if you remember?
6  A:    There was a question about how Captain Ober
7  had obtained information regarding administrative regulation
8  11 and its revision and Captain Brown indicated that his
9  investigation was to determine how Captain Ober may have
10  come to possess that information.
11  Q:    You have to forgive me.  I would assume
12  information having to do with R & D issues is available to
13  every Pennsylvania State Police member.  I would assume
14  that?
15  A:    Our historical files in the Bureau of R & D have
16  been open access for anyone who ever wanted to look at them,
17  historically.
18  Q:    And I may be mistaken, but based upon a proper
19  request and scheduling to the convenience of the Pennsylvania
20  State Police that they are even open to the public to reporters,
21  legislatures, etc.?
22  A:    I don't know if that has ever been broached?  I'm
23  not aware of any of those.
24  Q:    Well, I did do some checking and for example,
25  there is a Pennsylvania State Troopers, an association that

45

1  represents the troopers. It is my understanding that they have
2  access to those files on request or am I mistaken?  If you
3  know?
4  A:    I don't know with certainty, but as I said here, if
5  there was a legitimate need or a desire or interest; I mean
6  those historical files basically show the origins and
7  development of documents and regulations and we routinely
8  share information regarding the development; in fact we
9  jointly develop regulations some times or least work on
10  developing regulations jointly with the PSTA.  So, from a
11  prospective of possibilities, I would not see a problem with
12  working with PSTA on that type of scenario.
13  Q:    I was just told by an attorney over there for what
14  its worth; go out and make a request and they couldn't think of
15  any reason why they would not be honored, but I don't know?
16  I guess I didn't ask them the last time they did one, or did
17  request an access. Mr. Brown, I understand questioned you
18  about how Captain Ober had come to have knowledge about a
19  historic file?
20  A:    Yes sir.
21  Q:    Which file?
22  A:    Administrative regulation.
23  Q:    Do you remember which one?
24  A:    11.
25  Q:    Was it 1.102 subsection C in particular?

46

1  A:    I don't know.
2  Q:    You mean you don't know that off the top of your
3  head?
4  A:    I'm afraid not, Mr. Bailey.
5  Q:    You just remember it was AR1-1?
6  A:    Um huh.  Just organization and structure.
7  Q:    Did it have to do with the issue of chain of
8  command?
9  A:    Yes.
10  Q:    As you sit here today, do you remember the last
11  time AR1.1 was modified as to any provisions, which may
12  deal with. I realize it's a large regulation.
13  A:    Yes, it's a large regulation.
14  Q:    As you sit here today, do you have a recollection
15  of when AR-1.1 was last modified on matters pertaining to
16  chain of command?  If you know?
17  A:    I don't know.
18  Q:    Okay, that's fair enough.  A lot of times questions
19  like this, you simply don't guess wildly.  You can qualify
20  answer to your degree of certainty, but.
21  A:    We change regulations all the time.  It's one of
22  the things we do in the Bureau.
23  Q:    Now when you have a regulation.  The effective
24  date of the regulation, I thought, was printed in the upper right
25  hand corner of the front of the regulation.  Am I correct?

47

1  A:    That's correct.
2  Q:    Why would you do that?  Why would want to
3  make sure that whoever saw a regulation would see Bingo
4  right on the front, the effective day of the regulation.
5  A:    It's not only on the front, its on each page of the
6  regulation and um.
7  Q:    So why is that done?
8  A:    I would say that it's to ensure clarity and
9  accuracy in dealing with regulations.  When you process as
10  many directives as we do and we have as many changes as we
11  do, it's not inconceivable to think that certain manuals; and we
12  have many sets of regulations throughout the department.  It
13  could be that a manual did not get updated as it should have
14  and so, if your looking at regulation and your looking at yours
15  and your looking at mine, we want to be sure were looking at
16  the same document without reading every word by knowing
17  the last revision date, you know exactly what your looking at.
18  Q:    The term expo facto?  Do you know what that
19  means?
20  A:    Well, I have heard of the term, but I wouldn't
21  want to define it for you.
22  Q:    I wouldn't either, to be honest with you.  But, if I
23  pass a law today, do you know whether I can pass a law or
24  regulation making something you did yesterday illegal?
25  A:    I believe that 's possible.

48



Q:   I mean it doesn't even fit in too well with common sense too well does it?

A:   No in my view.

Q:   And there have been a few political systems on earth were they do that, but we don't do that in America. I don't believe. The Constitution said we can't do it. So, if you have a regulation which prohibits, which defines and prohibits certain conduct, it has an effective date, you can't reach into the past and say what you did back then is unlawful by virtue of this regulation we passed today and we are going to punish you for that, right?

A:   I don't believe they would do that.

Q:   Okay, now in modifying a regulation, its modified. How is that communicated to the people it is supposed to reach?

A:   When we modify a regulation, the top page on the revision is page that we call a chain sheet. It has a number on it so that they can be tracked. Of course, it's dated. It is signed by appropriate authority and the package was the chain sheet and the revised regulation are distributed through; we have a structured distribution of all regulations at the Bureau. We can show you who gets copies of every document that we produce. Every regulation that we produce and so that change is distributed based on the distribution table.

49

command or a new organizational segment is developed and established and those type of things and all that information exists within AR1.1. So we had actually had a hard time catching up to where we were functionally with that regulation. The regulation was not current and were having a hard time getting there because of the reoccurring or routinely occurring changes that affected it. So, in the case of AR1.1, there were multiple changes that occurred in that regulation and that would impact on how we would distribute, what we reproduce and what we would distribute.

Q:   Bottom line as you sit here today, your not sure whether an entire reprint was necessary or needed to be done, but it depends on each situation and it varies whether you would reprint the old regulation or just post a change or whatever? Is that right?

A:   I can say certainly that it was more than a one page change. There were multiple revisions and there were multiple pages involved in the revision.

Q:   When Mr. Brown came to talk to you, do you remember; what was he getting at with how Mr. Ober found out about a change in a regulation? Strike that because I'm not sure Mr. Ober did find out. I'm not so sure his lawyer didn't see this problem, but I want to ask you do you know if I come down to R & D and I'm a Pennsylvania State Trooper or I am Officer, you know a higher ranking Officer. Is there any

51

Q:   Okay. I'm going change direction a little bit. I want to ask you some questions about distribution. I purchase a number of civil rights books, those big red books up their and every year I pay for changes. They come through. It's loose leaf and certain pages are changed in there and then their dated as to when the day of that change. Now lets say you change Section 1.102 subsection C of AR1.1. Lets say you change that. Now when I distribute the change, do I reprint the entire regulation or do I just send out the change with that cover sheet and say this is to be substituted? Is that what I do? Or do I print the entire regulation over every change?

A:   It depends. There is not a quick and easy answer. It's not the same in every case.

Q:   In the case of, if you know. In the case of 1.102 subsection C, which I believe was changed some time on or about February of the year 2001. Okay and I may be wrong about that, that's just what I suspect. Do you know whether the entire regulation was changed or do you know whether there was just a. And then I'm going to ask you about distribution whether there was just like one page or?

A:   We, in our Bureau had been working on changes to AR1.1 for quite some time. There had been numerous organizational changes within the department over a period of time and I am referring to things like where one organizational segment is moved from chain of command to another chain of

50

prohibition on my inquiring about what is happening with changes in a regulation or what its status may be?

A:   There is no prohibition.

Q:   So, if Colonel Evanko went down and he wanted to ask about what's happening with a change in a regulation, the staff there would answer his questions of course, naturally he's commissioner and everything, but they would answer his questions, right?

A:   Yes.

Q:   And if a Pennsylvania State Trooper came in, and just inquired, provided I'm assuming it's convenient to the staff and the work they're doing, they would answer the questions, right? It's not a big secret? Is that right?

A:   Correct.

Q:   Now what stage in distribution. Strike that. In cases of a changed AR1.1, what would the distribution be? In other words, would it be to the trooper level, region area, front officer, whatever, front office meaning the commissioner's office, the top area there. What would the distribution be?

A:   We have distribution codes for everything and this was a change to the administrative regulations, so it would be distribution AR and we have ARs in all the libraries and all the department facilities and command level people have their own personal sets of ARs. So, on a given installation, there might be multiple sets of Ares and we would distribute copies

52



**Page 53**

1  of the change to everywhere where we knew there was a copy
2  of the AR s.
3      Q: Does the counsel's office get notified of the change?
4  Are they on the distribution?
5      A:    I'm sure they must be. I'm sure they have copies.
6  I don't personally know, but I can't imagine that there would
7  not be administrative regulations on the distribution for chief
8  counsel.
9      Q:    Now when that distribution goes out, that change
10  sheet goes with it, right?
11      A:    Correct.
12      Q:    Does that change sheet say among other things,
13  does it indicate when the affective date of the change is? The
14  revision is? Let me tell you why I asked that. Let me tell you
15  where I am coming from. If you're going to change a
16  regulation and it going to affect people perhaps in a
17  disciplinary way. Hey, from this point on you must do X, Y
18  or Z. There has to be an effective date so they know when the
19  rule applies. Am I correct?
20      A:    Yes.
21      Q:    And that's on that change sheet. Right?
22      A:    Upper right hand corner.
23      Q:    Now the change sheet, does it mention what the
24  regulation was before? I mean these are sort of mundane
25  simple questions. I assume a change sheet says what the

53

**Page 54**

1  regulation is. Does it indicate when the regulation was last for
2  example, June of 97 or July of 97 when it was last changed or
3  anything like that?
4      A:    No. The change sheet might have some general
5  language that would say this regulation has been revised or
6  entirely or extensively, things like that and personnel are
7  directed to review the new document in its entirety. That is on
8  example. Another example may be where it lists specific
9  pages that are revised and it tells you to take out this page and
10  replace it with the new page. That would be the two different
11  ways that we generally put those out.
12      Q:    Now lets go back to the historic file. The historic
13  file means what the historic file means. It shows that
14  regulation as it has moved through time with the changes
15  posted to it. Am I correct?
16      A:    Yes.
17      Q:    Do you know if the counsel's office and the front
18  office are always given changes? I can't conceive of a change
19  to a regulation without the front office and probably the
20  counsel's office being copied on that or distributed on that.
21  Do you know of any situations where a regulation has changed
22  and the front office is not notified?
23      A:    Whether or not they receive these changes, I can't
24  say, but I can tell you that our distribution is what it is, so we
25  don't personally distribute these from our Bureau. They are

54

**Page 55**

1  distributed through office services types of operation so, in
2  terms of what we would anticipate for who would receive
3  copies we base that on what the distribution list says. Whether
4  or not they receive it, I don't know.
5      Q:    How long does it take to distribute? Do you
6  know? In other words if you get a change this week, how long
7  does it take to get them out? Do they have to be printed?
8  Strike that. Let me lay foundation. I assume at some point
9  you get authority to change a regulation from the front office?
10      A:    That's correct.
11      Q:    And in the case of AR1.1, do you remember
12  when the authority to change AR1.1 came through from the
13  front office?
14      A:    I don't recall.
15      Q:    Do they have any kind of a paper or form that
16  tells you that the commissioner's authority is behind the
17  change?
18      A:    First of all, the commissioner would sign the
19  change sheet.
20      Q:    He would sign the change sheet? Okay. Well,
21  I'm going to ask you some questions about that in a minute
22  too. All right, now that means that you can't go; I mean I
23  hope you can't through the Pennsylvania State Police
24  changing regulations without the commissioner's authority. If
25  the top guy doesn't change the authorities or the top lady

55

**Page 56**

1  doesn't change the authorities nothing going to get changed,
2  right?
3      A:    Unless he had delegated authority to one of the
4  deputies for example.
5      Q:    Okay, lets talk about that. Do you know whether
6  he delegated authority? AR1.1 to me is like your fundamental
7  organization; it's like the basic structure from my reading. Do
8  you know whether Commissioner Evanko has delegated the
9  authority to make changes in AR1.1 to anyone else?
10      A:    I don't know.
11      Q:    Do you know whether he delegated it to his
12  secretary?
13      A:    I don't know.
14      Q:    Do you know of any circumstances where he
15  delegated it to Mr. Coury or Mr. Wescott or his secretary?
16      A:    As a regard to this specific regulation, I don't
17  know.
18      Q:    You had indicated that AR1.1 that there had been
19  a multitude of changes. I think you had indicated its always
20  going through changes. Is that correct?
21      A:    I think that is what I said or to that effect.
22      Q:    Do you have a recollection of changes about the
23  or debates about the issue of chain of command?
24      A:    No.

56



1  Q: Who's in your office? You're the head, you're
2  the Director?
3  A: Um huh.
4  Q: Who's your immediate subordinate?
5  A: I have three direct reports. One is an
6  Administrative Assistant, her name is Sharon Ottstott, I have
7  two Division Directors, one is Lieutenant Wesley Thurston
8  and one is Lieutenant Gary Benedict.
9  Q: Do you know who worked on the changes to
10  subsection? Do you know who worked on the changes on
11  AR1.102 subsection C the provisions having to do with, we
12  had one gentlemen in here as a witness earlier on this issue the
13  issue dealing with the chain of command. Do you know who
14  worked in your shop on that?
15  A: I don't know of specific. Let me clarify work is
16  assigned to project people.
17  Q: Right.
18  A: And this particular regulation my understanding
19  as I said was in process for quite a while, I'd say a couple of
20  years at least and their were multiple project people who had
21  their hands on that project over time, but my understanding is
22  the last project person that worked on it was Corporal
23  McAlreavy, William McAlreavy specifically what language
24  he worked on in that documentation I can't say with certainty.
25  Q: Have you read 1.102 subsection C?

1  A: I have read it.
2  Q: Do you have an opinion on it I'm just curious as a
3  Major in the Pennsylvania State Police if you ever thought
4  about it enough to have an opinion about it?
5  A: Well it's pretty much, its boiler plate language
6  it's formally documents the organizational structure and the
7  administrative higher Hierarchy of the organization. It's a
8  document that we that you would want to have for a large
9  complex agency its' a document that where required to have in
10  terms of the accreditation of law enforcement agency.
11  Q: I want to ask you some questions of
12  Accreditation. Now specifically as to Subsection C of section
13  102 of AR1 do you have an opinion on that? Are you familiar
14  with that the chain of command language?
15  A: I'm familiar with that but I couldn't quote it for
16  you.
17  Q: Do you have any opinions have you given it any
18  thought to it?
19  A: I think its language is essentially formalized what
20  we all understand to believe is the way we operate in a
21  somewhat military environment in terms of keeping your
22  chain of command informed and advised that kind of thing.
23  Q: Is there anything in 1.102 Subsection C that
24  indicates to you that if the FBI comes and lets say by virtue of
25  their research says Merryman's an honest man we believe we

1  can trust him we have some procedural questions whatever
2  and we will get an opportunity to talk to those gentlemen from
3  our federal government. Lets say that they come to you and
4  where investigating higher ups the front office lets say, or the
5  governs office is there anything in 1.102 subsection C as you
6  sit here today which would require you to take that
7  information to a potential target of an FBI investigation and
8  inform them because they were in your chain of command? I
9  mean I read it and I don't see it that way. But how you see it
10  your ahead of RD how do you see that?
11  A: I'd have to re-read it very carefully Mr. Bailey
12  before I could answer that question.
13  Q: Well lets say it says that lets say it's determined
14  by the PSP that regulation requires you if you were contacted
15  by the FBI they come to you their doing an investigation and it
16  required you to report that to the targets lets say the PSP say
17  that that's what requires you to report that to the targets lets
18  say the PSP say that's what is required or they interpret it that
19  way. Based on your knowledge as a law enforcement official
20  is that lawful? And if you want me to re-structure that let me
21  strike that and ask this question here. What do you understand
22  obstruction of an investigation to be?
23  A: Well if I were to talk about an obstruction of an
24  investigation it would be taking action, which would confound
25  or defeat the purpose of the investigation.

1  Q: Or impede the investigation?
2  A: Yes.
3  Q: So if an FBI investigator comes to you rightfully
4  or wrongfully comes to you and says were investigating a
5  public corruption case and rightfully or wrongfully we believe
6  the front office might be involved higher ups I'm sorry.
7  Higher ups in the PSP might be involved. And if you
8  understood that to me, not that you would want to believe, not
9  that it wouldn't even offend you viscerally because you knew
10  in your very heart that it wouldn't be true .The point is in
11  doing your duties as a law enforcement official would that be
12  obstruction to go to a potential target and tell them the FBI is
13  investigating public corruption that they might be target of?
14  A: I think that's a matter of common sense.
15  Q: It is to me. Now if you were the target you have
16  been a commander for many years is that correct?
17  A: I guess it depends on what many years is. A
18  while.
19  Q: Well more years than I was. The point is you
20  have a lot of experience in handling people and making
21  decision whether it" administering discipline or counseling or
22  advising you had people that you had a responsibility to them
23  as a leader institutionally it's that correct?
24  A: Yes sir.




Q:    Alright is one of your people came to you after the fact and said sir a number of months ago I was contacted by the FBI and they thought it was possible that you had done something wrong and I felt I couldn't share that with you. I can understand how it might hurt. I guess would you discipline that person or would you mistreat them over it?

A:    For what reason are you suggesting that I might do that?

Q:    You answered the question. You answered the question very well. Thank you. I can't think of any reason would you say to the person you did the right thing perhaps would you consider saying that to them?

A:    Well where really talking theoretical here?

Q:    Yes we are.

A:    Well I'd probably say you did what you had to do.

Q:    Okay and I would assume you wouldn't take action to harm that person?

A: In the scenario you described I don't believe there would be a reason to.

Q:    Okay.  Do you know whether Darrell Ober had ever served in any kind of RD Capacity?

A:    Yes he did.

Q:    And can you tell us in what way?

61

A:    He was a section supervisor in the programming division his primary responsibilities would included managing the directive system changes to the directives special orders regulations those things?

Q:    Can you tell us a little more about what that means, what that entails?

A:    Well revisions come - in some background on the function are role is to facilitate the process in providing direction to the department. We function I view it as an extension to the front office in that we by managing directives we are the vehicle by which the Executive office tell are people what to do and what not to do. And having said that you have organizational segments who are responsible for various functions in program areas within the department. And those organizational segments through their chain of command, and through their process generate draft regulations, draft orders those things. They come to us we process them for form and format content and we determine whether they conflict with other existing regulations and directives whether they make sense whether their common sense whether the average trooper on the street would understand them and that's really the work of the program division and that particular section of where Captain Ober was assigned and was a Sergeant at the time they received the draft regulations they he would have assigned it to a project person

62

he would have monitor the progress he would have done whatever management was necessary between that project person, and the originating organization segments. He would have signed off on the document as it started up the chain of command for approval I think that probably summarizes it.

Q:    Okay. Now during the time of when he performed those functions do you have a recollection of him ever coming to you with information that he felt should be passed on to the Commissioner to protect the Commissioner for potential embarrassment?

A:    Well he would not have been in my chain of command at that time?

Q:    Do you know whether he ever did in anything like that?

A:    I don't know if he ever did or not.

Q:    Well a short question is do you recollect any instances when Ober recommended any department short comings be personally brought to the Commissioners attention?

A:    No.

Q:    Do you know why you were moved out of BPR?

A:    I was told that there was an opening for a Director in RD and felt that I was the guy to go over there.

Q:    Did you ever have any conflicts with the front office on how to do things?

63

A:    Well in an organization you always have differing always from time to time different opinions on how things are done occur. I take orders as every one takes orders and you know I always followed the orders that were given. Just to add to that I believe in senior management you have a responsibility to your commanders to share your concerns about how things are done and that's the function of command on how to things are done based on the input they receive. Once that decisions made it's your responsibility to follow the order.

Q:    You remember the case called the Stackhouse case?

A:    Yes sir.

Q:    Was there any violations in that situation of the adjudicatory process?

A:    I really don't know how that involved that case was not completed at the time that I left the Bureau and so my knowledge on how that thing processed through adjudication whatever occurred after that I don't know.

Q:    Do you know whether that adjudication had any information rather, which would indicate that that adjudication in that case was directed or influenced?

A:    I don't have any direct knowledge of that.

Q:    Do you have any indirect knowledge?

A:    No I really don't.

64



Q:    Captain Brown came to you and he asked you my understanding is he asked you about Captain Ober how Captain Ober got information how and when he got information?

A:    Yes.

Q:    How long have you known Captain Brown?

A:    I'm trying to go back, I've known him pretty long.

Q:    What capacities has he served in the PSP if you can recall?

A:    I know he was a criminal investigator in Troop H. I known that he came to the Bureau of Responsibility in a staff position I believe when he first came up there he was a Corporal. And made Sergeant and stayed, he made Lieutenant and stayed in the Bureau and became a section commander. And of course now he's Captain and Division Director there. That's what I have knowledge of that relates to his career.

Q:    In BPR.

A:    Yes sir.

Q:    Do you know whether he has ever gone down to RD to look at the history of a regulation?

A:    I don't know.

Q:    Did he ever tell you why you were read your rights in a case where open information was available to anybody to look at what the investigation was about?

65

A:    I asked him that question directly subsequent to the day he interviewed me.

Q:    And what did he say?

A:    He said that he read me my rights as to the way I reacted to him telling me he was going to interview me as part of an investigation.

Q:    Because you reacted?

A:    Yes.

Q:    How did you react?

A:    Well we had talked about Captain Brown came to my office and we visited in a social way for a few minutes. Major I'm here on business. I said okay what's up. And he said I have to I think he might of said something like you may or may not be aware that Captain Ober has a suit filed and he has accessed information from the Historical files from RD and I have to find out how that occurred. And I said that's easy.

Q:    That's a no brainer right?

A:    I said – I shared that information with him. And he was surprised and he said I have to interview you for my – I don't recall exactly what said if it was for my investigation or have to interview you on the record, whatever you know I have to interview you. And I really said this almost jokingly should I call for representation. Because that's

66

sort of like when we investigate subjects for alleged misconduct they have that union right.

Q:    Right.

A:    And it's almost like I said I said it like a joke, because my level in the organization and view of the conduct he was going to question me on why would I need that in my mind. But I said it because that's sometimes what people say. Because investigators are suppose to offer that as a right to members under the contract under members who are being interviewed and so if he was going to do that as a matter of a joke I said that to him. When I had asked him later he said and essentially I interpreted him I understood him to mean that that because I raised the issue asking for representation that I must have something serious that on my mind that, I would ask for representation and he said that is why he gave me my rights.

Q:    And what did you tell him about Captain Ober's coming in.

A:    Just that you know that he had wanted to know the origins of the change and I shared the content of that file with him essentially.

Q:    Which you would had done with anybody in the PSP from the bottom to the Commissioner is that fair to say?

A:    Yes.

67

Q:    Because that is the nature of the file, and that is the nature of the responsibility, and that's the nature of PSP custom practice and usage isn't that so?

A:    Yes.

Q:    So you were questioned and you were read your rights how long did that interview last?

A:    I honestly don't know.

Q:    Did Captain Brown ask you any other questions aside from the questions about how Captain Ober looked at the historical file?

A:    I don't recall anything else.

Q:    Did he ask to see the historical file?

A:    I don't recall that he made that request of me.

Q:    You know whether he came in in doing his investigation and reviewed the historical file?

A:    I really don't' know specifically what he may or may not have done in pursing that. He told me that he had interviewed other staff and would be interviewing others but that's all I know.

Q:    He was interviewing staff over looking at the historical file?

A:    Yes sir.

Q:    Do you know who sent him?

A:    Do I know who sent Captain Brown?

Q:    Yeah who sent him down there on this mission.

68



A:    No sir I don't. Correction I do he indicated to me that he was doing his investigation as an attorney work product, which is something IAD do routinely in civil suits. They gather information for Office of Chief Counsel for the purpose of defending the Department. And he did tell me that at the time. I had forgotten about that.

Q:    So he in order to conduct a civil suit, he's reading your rights and asking you how Ober acquired knowledge of an open file that everybody can review and see? That's what he was there for?

A:    Yes.

Q:    Do you know what other members of the staff he talked to?

A:    I said to him you can verify everything I'm telling you everything with Process and Procedures with Sergeant Margeson who's the Section Commander.

Q:    Sergeant Margeson I think we had him in here.

A:    Yes. And he indicated that he had already spoken to Sergeant Margeson.

Q:    So he went to Sergeant Margeson before he came to you?

A:    Correct.

Q:    Did he ever check to see if that violated AR1.102 Subsection C. Just alittle joke Major.  Probably a poor one at

69

this stage. He indicated that he talked to Mr. Margeson, did he indicate that he talked to any other staff down there at RD?

A:    I don't think he mentioned anybody else at that time. We might had discussed who in the Bureau is involved in things procedurally who handles files and things like that. But I don't recall that he mentioned anyone else especially at that time.

Q:    Sir do you know whether he interviewed Mr. Margeson before Mr. Margeson gave his deposition here in this office?

A:    I don't know. I didn't know Mr. Margeson or Sergeant Margeson had been to be honest with you.

Q:    Well sir I can tell you that he has. But you don't' know if Mr. Brown interview Mr. Margeson before he was here or after he was here?

A:    No I don't.

Q:    We've had testimony that Mr. Wescott jumped in an airplane and went up and talked to Mr. Williams I don't know, Mr. Werts whatever and told him they were going to conduct this investigation and or pointed them to do this investigation into Mr. Ober's whatever Mr. Ober did. Do you know whether that was cleared with or reported to BPR before Mr. Wescott did that?

A:    No sir I don't.

70

Q:    Now you wouldn't have been in BPR at that time by virtue of rumor you don't' know that?

A:    No.

Q:    During the period of time that you served as the Director of the Bureau of Professional Responsibility do you know of any circumstances that somebody went out to a couple of the Majors of the PSP you go investigate somebody out there. Have you ever heard of that happening out there?

A:    No sir.

Q:    I had asked you at the beginning of the depositions some questions about some Administrative Inquiry remember that?

A:    Yes.

Q:    If I remember your response correctly it was that I don't know it was a termed that's used but it doesn't have any particularly definition. Is that fair to say?

A:    Yes.

Q:    Have you ever known an investigation two Majors or high-ranking officers - Captain or above reading people their rights and its call an administrative inquiry have you ever seen that animal before?

A:    I've not personally seen that before.

Q:    Now I have bumped into this term called supervisory inquiry can you tell us what that is?

71

A:    Well it's a situation where allegations of behavior or conduct are made. They're of a minor nature their concerning activity that are properly addressed between a supervisor and their subordinate. They may represent a activity even if true there would not be discipline applied and it would be a conversation between supervisor and subordinate and you know just supervisory monitoring those types of things. But not a situation where it doesn't merit a formal investigation it would not merit a full investigation it would not merit a disciplinary action those types of things.

Q:    Cause everything that happens in the PSP might be alittle bit out of order or what not can't rise to some level justify a formal BR investigation? You'd never get done I guess?

A:    I would agree with that.

Q:    So a supervisory inquiry is a good and proper procedural device to maintain discipline and commend control within the organization is that fair to say?

A:    Yes.

Q:    Knowing what a supervisory inquiry is and that we have given it some form here in the record and obviously there's a lot of form on this record given to a BPR a full fledge official BPR investigation. What can you describe or help us what an administrative inquiry is what that means?

72

1    LYDE:    It's 11:31 a.m. it's the end of tape 1 of 2

2    for Robert Dane Merryman.

3    LYDE:    This is tape 2 of the deposition of Robert

4    Dane Merryman it is 11:49 a.m. February 25, 2002. Thank

5    you.

6    Q:    Very quickly process I had asked you some

7    process questions about a BPR investigation you had corrected

8    me I believe their isn't a recommendation done with a BPR

9    investigation it is a fact gathering process?

10    A:    Correct.

11    Q:    Can you explain the adjudicatory side for me what

12    occurs?

13    A:    Sure. The commanding officer of the individual

14    who is the subject reviews the document makes a

15    determination whether he's going to sustain it unfounded or

16    not sustain it. I can clarify those determination by definition is

17    that would be helpful to you.

18    Q:    It would help.

19    A:    Sustain of course you believe it happened the

20    allegations are in fact did happen. Unfounded means your

21    determination didn't absolutely didn't happen. And not

22    sustained indicates that it couldn't be proven either way.

23    Q:    Now those are factual evaluations?

24    A:    Yes.

73

1    Q:    What do you do in a situation that yeah the facts

2    occurred but nothings wrong how's that handled. Is that the

3    adjudicators job?

4    A:    Well you know.

5    Q:    Let me make it easier for you. Darrell Ober was

6    contacted by the FBI the FBI had indicated a certain kind of

7    investigation whatever, Darrell Ober reported that information

8    or shared that information with or however we want to

9    describe it with Colonel Hickes. And Mr. Ober was told that

10    you know just keep doing what he was doing or whatever he

11    was told by Mr. Hickes who I think it going to be in this

12    process anyway. And I don't think there's much of a

13    disagreement on the facts that I know them. And I don't know

14    if any determination was made that Mr. Ober did anything

15    wrong. I don't' know of any. Do you have a recollection of a

16    situation that okay and individual did what the individual did

17    but that's not an error or violation of rules? Have you ever

18    bumped into that kind of situation?

19    A:    Well if I had an allegation that came to me and I

20    determined that if it were true it was not a violation of rules or

21    law we wouldn't have investigated in the first place.

22    Q:    As usual you're a step or two ahead of me.

23    A:    To get to that point.

24    Q:    So the fact is the evaluation process in BPR one

25    of the reasons for the evaluation process in BPR I would

74

1    assume is to weed out that very type of thing. For example is it

2    a violation of it might be you know as you sit here. Is it a

3    violation of PSP regulation for a police officer to chew gum

4    while writing a citation to somebody and giving it to them at a

5    traffic stop? I mean do you know if it is?

6    A:    I don't think it is. I'm not aware of that.

7    Q:    Lets assume that it's not.  And you know I'm

8    having a little fun with this because I had a federal judge one

9    time tell me I was chewing gum in the courtroom, he was

10    going to put me out of the courtroom. But I wasn't chewing

11    gum. I was innocent. Now if you lets assume the police

12    officers doing this and a citizen writes in and that reaches you,

13    its not just enough to say this is silly it might be. But the point

14    in fact is you're a processional and you look at that and say

15    well you know technically speaking you know this is not a

16    good PR thing or something. But the officer isn't breaking any

17    regulation therefore we can't continue. That may be a normal

18    process I guess any prosecutor, DA, anybody in evaluation

19    process exercised that discretion. So its fair to say if a

20    situation comes to you and that situation isn't on its face a

21    violation of any department regulation or doesn't represent

22    egregious behavior or outrageous behavior of some type, your

23    going to look at that and say gez we can't go forward. Because

24    jurisdictionally we don't have a reason or a bases to go

25    forward if that fair to say?

75

1    A:    I think you need to be aware you can't lose sight

2    that we have a process for supervisory review in a situation

3    not knowing all the facts in your scenario, and if the guys

4    chewing bubble gum,  and blowing bubbles in the face of the

5    person he's talking to you might say that that's very

6    unprofessional but it's not a violation of the regulation but it is

7    something that the supervisor needs to have a talk with this

8    guy.

9    Q:    That's an example, you did something that is a

10    perfect example of what I mean. When you do that evaluation

11    process the officer says I have a cold alittle piece of dentine in

12    the back of my mouth. I wasn't cracken or popping gum I

13    wasn't being - or anything like that but I was quickly chewing

14    a piece of gum. Now a piece of bubble gum and blowing

15    bubbles and cracken bubbles in the face of a person that's start

16    in to get to be offensive behavior maybe insulting or

17    demeaning behavior like that. It does depend on the

18    circumstances,  but it's that what the evaluation process is for

19    when you have a Bureau BPR that suppose to serve the

20    purpose of saying hey you know this is the nature of the

21    violation if any, if these facts are true, this is the violation, or

22    this maybe a violation isn't it what the process it for?

23    A:    Yes.

24    Q:    Now you had indicated at one point Major Williams and

25    Major Werts is I remember correctly had made some

76



1  comments about we don't know yet if there's a violation but
2  where looking and where looking at things, something like
3  that. I don't' remember what your words were, I don't know if
4  I'm para-phrasing it correctly. Do you remember something
5  like that?
6       A:   I don't' recall saying that to Mr. Brown.
7       Q:   Do you have any recollection. I'm not trying to
8  trick you and I apologize here I don't want you to think that
9  about me.
10      A:   No I'm not concerned.
11      Q:   I remember early in the investigation in the
12 deposition and maybe it's something that passed through my
13 mind subjectively. Was there any time when Mr. Williams or
14 Mr. Werts had indicated that they didn't know whether there
15 was a violation I'd asked you some question about what you
16 thought the interview was about. They didn't know what the
17 violation was or they didn't know if there was one, but they
18 were checking. Something to that effect, do you remember
19 anything like that?
20      A:   I'm not sure how exactly I might had put it but
21 you know my perception then and now is that they there
22 mission was to gather information about something. And to be
23 candid they weren't being extremely straightforward about
24 what that might be.

77

1       Q:   Did you ever get an impression during the
2  interview that they were trying to find out what you knew if
3  you knew anything? What you knew?
4       A:   I don't know if they were or not. I can't
5  speculate on that.
6       Q:   Did it seem they were interested in finding out
7  what was known by who about the FBI investigation as
8  opposed to what Captain Ober had done wrong. Do you
9  understand that question?
10      A:   No. But I'd like you to rephrase it.
11      Q:   I'm asking a question that different then all the
12 other questions I've asked you. I'm asking you if you had any
13 impression from Majors Williams and Werts if they appeared
14 to have an interest in the interview with you in finding out
15 what was known about the FBI investigation as opposed to
16 looking at some alleged wrong on Mr. Obers part?
17      A:   The whole way through that interview process all
18 the questions were very generic, very theoretical, and you
19 know in each instance when I would be asked a question I
20 would have to say your not giving the information that I need
21 to respond to the questions that your asking. So whether or not
22 there was some intent to see if I had background knowledge I
23 can't know that . I don't' know. I just know the questions
24 presented in the way that they were - were somewhat generic

78

1  and vague and based on what I was given I had a hard time
2  answering the questions.
3       Q:   Were they on a fishing expedition?
4       A:   Um. I don't know if they were or not.
5       Q:   How are BPR files maintained? How are they
6  kepted and maintained?
7       A:   I know how they are maintained when I left I
8  don't know how they are maintained now. The short answer is
9  that there are files that are maintained on sight with BPR and
10 there by subject of individuals and any case involving that
11 individual is in that folder and I don't' know if they have the
12 retention schedule on those files at this point in time or not.
13      Q:   Who can read a BPR file?
14      A:   That's a very restricted access. It's pretty much I
15 would characterize it as a need to know.
16      Q:   Does that include the Commissioner of the PSP?
17      A:   I don't' think there would be any restriction on
18 the Commissioner in reviewing a file. I wouldn't the
19 Commissioner signs all the regulations so he has the authority
20 to change a regulation. Do you understand what I'm saying?
21      BAILEY:   Yes sir.
22      A:   If the Commissioner says I want to read that
23 particular investigative report I wouldn't' turn him down.
24      Q:   Have you ever known an investigation to be
25 conducted by officers at in the PSP where they were out

79

1  investigating and reading peoples rights then reporting to the
2  front office to discuss the process of the investigation and the
3  witnesses involved? Have you ever seen such a thing in the
4  PSP?
5       A:   Not in my personal experience no.
6       Q:   How many years you been in the PSP?
7       A:   I finished 27 in March.
8       Q:   How many of those years were spent in BPR?
9  A:   I was there twice, I would say accumulative I probably
10 have 2 2 1/2 years they're now.
11      Q:   Including a stint as Director?
12      A:   Yes sir.
13      Q:   Have you ever known in the PSP as a Captain to
14 serve in a Lieutenants position?
15      A:   Well I'm aware that Captain Ober was.
16      Q:   Aside from Captain Ober do you known of any
17 situation in the PSP in 27 years where a Captain was assigned
18 to serve in a Lieutenants position?
19      A:   No sir.
20      Q:   Sir you executed an affidavit do you remember
21 that in regards to AR1-1.02 Subsection C?
22      A:   Yes.
23      Q:   Do you know what was done with that affidavit?
24      A:   No I don't.
25      Q:   Do you know what it was used for?

80

1    A:   No I don't.

2    Q:   Do you know if it was used to make

3  representations to a Federal District Court Judge about the RD

4  process and anything to do with the RD process approval

5  process of ARD1.102- C?

6    A:   I haven't discussed what was done with that

7  document with anybody.

8    Q:   Did you compose it or was it composed for you?

9  A:   I provided input to the document?

10    Q:   But it wasn't prepared by you was it?

11    A:   I didn't type it.

12    Q:   No sir that's what I mean.

13    A:   No.

14    Q:   Did you write it in long hand?

15    A:   Probably portions of it.

16    Q:   AR1.102 C is it a per capital distribution?

17    A:   No.

18    Q:   Other than the two times you were interviewed

19  one time generally were the issues you believe to be related to

20  Captain Ober and the second time by name they did. Have you

21  been interviewed or counseled or conferenced with regarding

22  Captain Ober any other times than those two times.

23    A:   I don't believe so.

24    Q:   When Captain Brown let me make an offer to

25  you. One of the things in years I represent PSP I also have

81

1  been involved in a number of lawsuits against PSP. One of the

2  things that have concerned me over the years is are people

3  being sent for mental evaluations. Fitness for duty evaluations.

4  And where this is very shocking but the PSP evaluator says

5  they have a problem of some sort you know. When MR.

6  Brown came into talk to you did he raised any fitness for duty

7  issues with you at all? I want you to think very carefully about

8  this because I have noted this as a pattern in the work I do.  So

9  it's a question I try to ask all the time. Strike as to Mr. Brown.

10  Where there any Officer, Superior of Captain Obers, Mr.

11  Brown, or colleagues of Mr. Ober was there ever any

12  suggestion made to you to discuss  not you that indicated that

13  any consideration was being given to looking at Mr. Ober in a

14  fitness for duty context. Like he was not behaving rationally or

15  reasonable or something of that sort?

16    A:   I don't recall anything specifically suggesting that

17  he was not competent.

18    Q:   Do you have a recollection of any comments or

19  suggestions that may have been exploratory in the sense that

20  they were feeling you out as to how you would react to a

21  challenge or interest in his competency? Let me tell you why I

22  ask that question. Every time I have bumped into a case where

23  somebody sues the state police its almost like the attitude of

24  you got to be nuts and you start looking at like something is

25  wrong with them. And I'm just asking if you have any

82

1  recollection or any comments any behavior by anybody in the

2  front office or any investigators Williams- any if you recollect

3  an investigator or anybody in the front office or any superior

4  of Captain Ober's indicated that there was any thought be

5  given or maybe exploring your reaction. That maybe he

6  wasn't competent or not acting reasonably?

7    A:   I recall only one comment that related to Captain

8  Ober's actions in this case . It didn't reflect on him or his

9  mental capacity but was an observation related to the actions

10  pursuing a suit of this nature.

11    Q:   Okay. But there was nothing that was said to you

12  or nothing that was inferred or suggested to you by anyone at

13  anytime that would indicated there might be a desire to

14  investigate or look at or gather data to challenge Mr. Ober's

15  you know fitness for duty anything like that?

16    A:   I don't recall that.

17    Q:   That's good to hear. I don't think that I have

18  anymore. Do you ladies have anymore?

19  COUNSEL: I have a couple.

20    Q:   Mr. Merryman you indicated that you at some

21  point showed Captain Ober the file with regard to AR1-1 is

22  that correct?

23    A:   Yes.

24    Q:   Now did you show that to Captain Ober in the

25  ARD area or did you show that to him somewhere else?

83

1    A:   Somewhere else.

2    Q:   And where was that location?

3    A:   I took it in my car and met him at a school

4  parking lot, it's about a mile from headquarters.

5    Q:   And why did you go to the parking lot to show it

6  to him?

7  A:   I invited Captain Ober into the Bureau to take a look at

8  it and he indicated that he was uncomfortable with coming

9  into the building, and I agreed to meet him that way.

10    Q:   Have you ever taken a file of RD of this nature

11  historical file outside of police headquarters before?

12    A:   No.

13    Q:   Did he tell you why he was uncomfortable going

14  into the Bureau to look at that file?

15    A:   Just in a general sense that he felt it was a hostile

16  place for him to be and he just didn't' like coming into the

17  building.

18    Q:   Did he tell you that he wanted to review the file

19  because he needed it for his pending litigation?

20    A:   No.

21    Q:   Were you aware that he was utilizing the file for

22  his pending litigation when you showed it to him?

23  A:   I didn't discuss his purpose

24  BAILEY:   I'm going to object but you can respond.

25  COUNSEL: He already did respond.

84

1    BAILEY:   I know but I'm objecting.

2    Q:   When you presented the information to him in the

3    parking lot of Susquehanna school what was his reaction to

4    the file?

5    A:   I think he was like amazed, or surprised of the

6    contents.

7    Q:   Did he indicate to you any time that he believed

8    there was conspiracy with regard to him?

9    A:   Yes he did.

10   Q:   Okay. And what specifically was his language if

11   you recall with regard to that item?

12   A:   That there was the language regarding the chain

13   of command that we talked about in that AR was placed in the

14   regulation to be used against him.

15   Q:   And did he make any comments about any

16   individuals that were supposedly involved in this conspiracy?

17   A:   I don't know you know there's a lot of general

18   conversation but I really don't recall that he specifically

19   identified anyone.

20   Q:   And did you respond to him when he indicated

21   that that one was specifically put in there for that purpose?

22   A:   I told him I didn't agree.

23   Q:   And do you recall your specific words?

24   A:   I don't recall my specific words.

85

1    Q:   And did he say after you told him that you didn't

2    agree with him did he have any reaction of that?

3    A:   Words to the effect if it were true it would be an

4    ugly thing.

5    Q:   Did you have any further conversations about that

6    at all?

7    A:   No.

8    Q:   When the Director of IAD Rick Brown came

9    down to talk with you did he interview you about the attorney

10   work product?

11   A:   Yes.

12   Q:   Did he tell you that he was investigating

13   allegations in Ober's lawsuit?

14   A:   I think he just said to me he was trying to

15   determine how Ober had obtained access to the historical file.

16   To my knowledge that's what he said.

17   Q:   Did he ask you any questions with regards to if

18   anyone had tampered with the file?

19   A:   I don't recall if he did or not.

20   Q:   So he didn't ask you in your recollection he asked

21   you nothing except questions about Ober's access to the file

22   he didn't ask you any other questions?

23   BAILEY:   Objection. Objection to the form of the

24   question you may respond.

86

1    A:   I don't recall specifically, but it was the interview

2    was taped. I really don't know.

3    BAILEY:   You said the interview was taped?

4    A:   Yes.

5    Q:   Now you indicated you were interviewed by

6    Majors' Williams and Werts as a part of this what we would

7    call an administrative inquiry do you recall that?

8    A:   Yes.

9    Q:   You recall testifying about that earlier in your

10   deposition?

11   A:   Yes.

12   Q:   If I were to tell you that you were interviewed

13   sometime after May 19, 1999 do you recall talking to Captain

14   Ober about the subjects that Majors' Williams and Werts

15   asked you in that interview prior to you being interviewed?

16   A:   No.

17   BAILEY:   Joanna was that question if he talked to

18   Captain Ober about the matters raised in the interview prior to

19   the interview?

20   REYNOLDS:   Right.

21   Q:   Did you have any conversation with either - well

22   did you have any conversations with Darrell Ober before you

23   gave this testimony today about this subject matter of his

24   lawsuit?

25   A:   No. I tried to stay away from that.

87

1    Q:   Did you have any conversations with either Mr.

2    Captain Ober or Mr. Bailey or an investigator with Mr. Bailey

3    with what you were going to testify to hear today?

4    A:   No.

5    Q:   I believe that you indicated that you were not

6    aware of any other investigations that were similar to the type

7    that was conducted by Williams and Werts with you career in

8    the state police?

9    A:   Right.

10   Q:   You've never served as a Deputy Commissioner

11   or the Commissioner of the State Police have you?

12   A:   No I have not.

13   Q:   So if another Commissioner had ordered an

14   administrative investigation you wouldn't be in a position to

15   know about that would you?

16   A:   That's correct.

17   BAILEY:   I'm going to object to the form of the

18   question.

19   Q:   Now you indicated that if someone was named as

20   a target by the FBI that you wouldn't, if that person wasn't in

21   your chain of command - that you would not report it to that

22   person. If someone was in your chain of command, however

23   lets say you as Director as BPR would you expect the Director

24   of IA to notify you of a pending investigation by the FBI

88



1  against a trooper unless you were specifically named as a
2  target?
3      BAILEY:    Objection to the form of the question. You
4  may respond.
5      A:    Well I want to be sure I understand.
6      BAILEY:    Can I respectfully ask I mean I know that
7  it's to him not to me, but I honestly don't understand can you
8  rephrase it.
9      Q:    Well I'll rephrase it. You indicated that the chain
10  of command regulation basically put into effect what was an
11  understanding of the state police about how the chain of
12  command is followed?
13      BAILEY:    Do you mean 1.102 subsection C.
14      REYNOLDS:    Yes.
15      Q:    When you were the Director of BPR if the FBI
16  had come to someone in your chain of command about a
17  trooper who was being investigated by them. If they had come
18  to the Director of IA or the Director of Systems Process and
19  told them about an investigation of this trooper would you had
20  expected unless you were a target of that investigation by
21  them. If they had come to the Director of IA or the  Director of
22  System Process and told them about an investigation about
23  this trooper would you had expected unless you were target of
24  that investigation unless you were the trooper or the target or
25  somehow or other the target of the investigation would you

89

1  have expected the Director of IA who got this information to
2  report it to you?
3      A:    Yes I would.
4      Q:    That's all I have.
5      BAILEY:    You sir are to be commended for putting
6  up with all these questions on such a sunny day. I would like
7  to thank you very much for your cooperation and demeanor
8  and I appreciate it as an attorney and I want to thank the
9  Pennsylvania State Police for making you available today.
10  Thank you sir I don't have any thing further.
11      WITNESS:  Yes sir.
12      VIDEO OPERATOR:    12:18 p.m. the deposition of
13  Robert Dane Merman has concluded thank you.
14
15
16
17
18
19

90

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DARRELL G. OBER | CIVIL ACTION LAW |
| Plaintiff | 1: CV-01-0084 |
| | : |
| vs., | (JUDGE CALDWELL) |
| | : |
| PAUL EVANKO, MARK | JURY TRIAL DEMANDED |
| CAMPBELL, THOMAS | : |
| COURY, JOSEPH | : |
| WESTCOTT, | : |
| HAWTHORNE CONLEY | : |
| JOANNA REYNOLDS and | : |
| SYNDI GUIDO | : |
| Defendants | : |

ORIGINAL

Proceedings:     Video Deposition
                 Charles Skurkis

Date:            March 5, 2002

APPEARANCES:

For the Plaintiff:       Donald Bailey, Esquire
                         4311 North 6th Street
                         Harrisburg, PA 17110

For the Defendants:      Joanna Reynolds Esquire
                         1800 Elmerton Avenue
                         Harrisburg, PA  17110

1

---

1   TONY MARCECA: Good afternoon ladies and
2   gentlemen, it's 1:15, 5 March 2002.  Be advised the video
3   and audio is in operation.  My name is Tony Marceca.
4   My address is 2219 Dixie Drive, Yo . Pennsylvania,
5   17402.  I've been contracted by PR Video to be the video
6   operator for this deposition.  The case is the United
7   States District Court, Middle District of Pennsylvania. It's
8   caption C: 01 correction 00-0084.
9       MR BAILEY: Yeah let's make sure, that's 1:CV-
10  01-0084.
11      TONY MARCECA: Thank you.
12      MR BAILEY: That's okay.
13      TONY MARCECA: This deposition is being held
14  at the law office of Mr. Don Bailey at 4311 N. 6th Street,
15  Harrisburg Pennsylvania, 17110.  The video deposition is
16  being taken on behalf of the plaintiff Mr. Darrell Ober.
17  The witness name is Captain. Charles Skurkis.
18      MR BAILEY: Ah, SKURKIS
19      TONY MARCECA: SKURKIS?
20      MR.BAILEY: SKURKIS
21      TONY MARCECA: And the time now is 1:16.
22  And Captain would you please raise you're a right hand
23  and state your name.
24      CAPTAIN. SKURKIS: Charles Skurkis
25      TONY MARCECA: And you do swear to tell the

2.

---

1   truth, the whole truth so help you God.
2       CAPTAIN. SKURKIS: I do.
3       TONY MARCECA: And thank you. Mr. Bailey
4       MR BAILEY: Yes
5       TONY MARCECA: Could we have a sound
6   check around the room please?
7       MR BAILEY: Yep, yeah.  First of all just make
8   sure the record, Captain that's S-K-U-R-K-I-S right?
9       CAPTAIN. SKURKIS: That's correct.
10      MR BAILEY: Skurkis, Capt. Charles Skurkis.
11  Okay, yeah my name's Don Bailey.  I'm attorney for
12  plaintiff Darrell G. Ober.  Joanna if you and Barb could
13  put your name and official address on the record and a
14  phone number would help too.
15      JOANNA REYNOLDS: My name is Joanna
16  Reynolds.  I'm an assistant counsel with the State Police.
17  I represent the defendant in this action.  My address is
18  1800 Elmerton Avenue, Harrisburg PA, 17110 and my
19  phone number; my office phone number is 717-783-
20  5568.
21      BARBARA CHRISTI: Barbara Christi, Chief
22  Counsel Pennsylvania State Police. My address and
23  phone number are as given by assistant counsel Joanna
24  Reynolds.
25      MR BAILEY: Okay, Captain what we're going to

---

1   do here this is a video deposition.  The videotape will be
2   maintained here, although your counsel's already
3   indicated that they're going to be getting a copy of it.
4   Under the rules it has to be maintained here for you to
5   come and look at it if you want to. That's up to you, and
6   as I said they've indicated they're going to pursue a copy
7   anyway. We will be making a transcript. We'll have a
8   transcript made from the tape. During the deposition I'm
9   gonna be asking you a series of questions and that sort
10  of thing. Let me just give you a few pointers which I give
11  to everyone in these kind of situations. If, make sure you
12  get an opportunity to answer fully and completely. If
13  some how perchance I interrupt you or you don't get a
14  chance to finish, make sure you either stop me or make
15  sure that you get a more complete answer, okay?  I won't
16  be doing it on purpose, but you know maybe
17  unintentional something these kind of things you get lost
18  in thought or whatever happens. I don't know. Now also
19  during the process from time to time there might be an
20  objection raised by an attorney. Stop, the attorneys may
21  have something to say. You go by the advice of your
22  lawyers here. I assume the attorneys here will be
23  representing you for purpose of this deposition. Counsel,
24  I guess, are we okay with objections except those formal
25  requests reserved the time of trail?

BARBARA CHRISTI: That's fine.

MR BAILEY: That's acceptable. I can't think of much else. I don't think we'll be too long with you anyway. The last thing, if you don't understand a question make sure that you ask me to explain it. If you even for that matter, get curios about where I'm going with questions or why I'm asking questions. I like to develop a good rappore and maintain a good rappore of the witness so you feel free to answer in a relaxed way. We get a better fact record that way. So if I'm going somewhere with questions and you're even curios sometimes witness, you know, cause it's a tough position to be in they'll be concerned or they'll want to know what your getting that sort of thing. I don't mind you asking me. I have no trick questions in mind. I have no interest in that kind of nonsense. Okay? I just want to try and learn what I can from you and that sort of thing. Do you have any questions that you want to ask of me or that you can think of?

CAPTAIN. SKURKIS: Not at this time.

MR BAILEY: All right well, don't be afraid if you do. If you need a break or something like that just tell your lawyers and your fine. Okay captain how are you employed and where do you work and what do you do for I assume the Pennsylvania State Police. But tell

5

me what you do for them and where you work, where you're assigned, and that sort of thing real quick.

CAPTAIN. SKURKIS: Currently I'm the Director of the Systems and Process, the new division Bureau of Professional Responsibility. Basically I oversee three inspection teams which travel to all the installations through out the state and inspect the facilities for compliance and regulation and department policy.

QUESTION: And the other division within BPR is Internal Affairs, IAD it's called.

ANSWER: That's correct.

QUESTION: So you got the two divisions and you're heading up one division and they're both with in the Bureau of Professional Responsibility. Right?

ANSWER: That's correct.

QUESTION: And who's the head guy for Professional Responsibility? Is that Major Conley?

ANSWER: Currently, it's

QUESTION: I'm sorry.

ANSWER: Currently it's Major John Pudliner.

QUESTION: Oh that's right. That's right. And Mr. Conley you see he's been promoted. Right?

ANSWER: That's correct.

QUESTION: I'm sorry, sir.

ANSWER: He's the Deputy of Administration

6

for the department.

QUESTION: Okay so he's moved on from BPR there. He was at BPR before Mr. Pudliner. Right?

ANSWER: That's correct.

Question: Okay, now my research indicates that you've also served in IAD.

ANSWER: That's correct.

QUESTION: And you were an Administrative Sergeant, a Lieutenant. Section Commander, and as a Captain. Is that right?

ANSWER: That's correct.

QUESTION: Now when did you first find out about the investigation into Captain. Darrell Ober? You know what I mean by investigation into Captain Darrell Ober?

ANSWER: No I don't.

QUESTION: You know, you're familiar with the lawsuit that's been filled in this case?

ANSWER: Yes, I have been.

QUESTION: This is a copy of the complaint, the amended complaint have you had an opportunity to read it?

ANSWER: No I have not.

QUESTION: Do you want to just take a look at the caption? You can keep it

ANSWER: I've seen, I notice two appear here. I've seen the defendant's name.

QUESTION: Do you know what the lawsuit is about, at least generally?

ANSWER: What I read in the newspaper. That's what I know and it has something to do with a treatment regarding a transfer. The impropriety of a transfer and some other ill treatment.

ANSWER: Okay, now Captain Skurkis. How long have you known Darrell Ober?

ANSWER: I would estimate, I remember knowing him as a Sgt. in Research and Development. So that was probably the end of the 80's beginning of the 90's.

QUESTION: Now did you become aware at some point that he had been approached or I guess a better word would be informed by the FBI about some sort of investigation that may have involved the State Police?

ANSWER: Yes I am aware of that.

QUESTION: When did you learn about that? In other words, when did you learn that the FBI had approached or you know come to Captain. Ober. Who at the time, I'm sure we both know this anyway, who at the time I believe was the Director of IAD.

ANSWER: Okay, I'm aware that I knew in June. It was probably earlier than June, about a month earlier than June of 1999.

QUESTION: All right now, is it fair to say that sometime in the fall of 1998 the FBI had come to Captain. Ober and indicated that they where doing some kind of investigation that might or might not implicate the State Police in some way?

ANSWER: I had heard that, but I don't know if that's factual.

QUESTION: What did you learn? What do you recollect learning in the spring of 1999?

ANSWER: That there was a question of Captain Ober having information and not properly passing it on to his superiors.

QUESTION: Who did you learn that from?

ANSWER: It may have been Major Conley, probably Major Conley.

QUESTION: Do you remember what Major Conley said at the time?

ANSWER: No. There may have been several conversations regarding this over a period of time. I don't know what was said in what conversation. I know the issues where in my capacity as Director of IAD what I had felt, it had come upon myself to pass this

9

information on to my Major. If the information was delivered to me. Whether or not I was aware of any regulation regarding the requirement to pass this information on.

QUESTION: Okay, now you say, I may have misunderstood your response. Were you saying this is what you were thinking or is this what Major Conley discussed with you? And I didn't make my question clear. What you have just shared with me was that something that you were thinking, questions that occurred to you or where these things that Major Conley had raised with you?

ANSWER: They were at the very least questions I have in my mind. They were probably predicated on issues that Major Conley brought up. I wasn't persuaded to exactly what had happened or how it had happened. So if I had heard basically what you had said now the first question in my mind would be well I was in that position what would I do with the information if I learned it from the FBI.

QUESTION: Right and you would have passed it on?

ANSWER: Yes I would have passed it on, sure.

QUESTION: Would you have investigated to see if the person you were passing it on to were a target

10

or a potential target?

ANSWER: I would have to consider what the information is other wise if it was information that a trooper stopped someone on the interstate and was verbally abusive. I would assume it wasn't my Major. Especially if it happened in Lackawanna County.

QUESTION: And what if it was your Major that stopped some body? What if the FBI came to you and said your Major was suspected of stopping some body on the highway and stealing money from them? You'd go tell the Major that the FBI was investigating him for that?

ANSWER: No

QUESTION: Well why wouldn't you do that?

ANSWER: Because there would be a question of whether or not investigatively would that be the proper time to let the subject of the investigation know the information you have.

QUESTION: And that's a matter not only of training, but I mean its common sense?

ANSWER: Correct.

QUESTION: And particular if it wasn't your investigation right? I mean if it's an outside agency that you respect like the FBI doing an investigation. You're going to respect the prerogatives of letting them conduct their investigation without interference. Am I correct?

ANSWER: Well, I would question why did they tell me if they didn't want me to do anything with it.

QUESTION: Would you second-guess why they would tell you? Or would you wonder why they would tell you? Know the difference?

ANSWER: Well I would probably ask them then why are sharing this with me.

QUESTION: Oh okay. And if they indicated that there may be any number people above you in the chain of command involved in a problem would you assume well I must not be a suspect, but there may be somebody up there who is.

ANSWER: If the information that was passed on to me involved the possibility likely hood that someone in my chain of command was involved then I would have to evaluate the likely hood of that being possible. Now a lot of times people aren't familiar with the Hierarchy of the State Police and become confused or they think that our captains and majors drive around on the road stopping vechiles. So without having all the information there would be an evaluation process depending upon what information I receive.

MR BAILEY: Absolutely. And would you respond to that outside agency if it were the FBI out of blind loyalty or would you. You just told us that you

would use an evaluative process to do what's right. That would include if the information seemed justified not to compromise the investigation. That's your first duty. That's what you sort of told me.

ANSWER: I think I covered that, yeah.

QUESTION: Yes sir, absolutely. Now, at the time that you indicated that some time on or about June of 1998 you had heard something about Captain. Ober. I don't want to mischaracterize your words. I thought you'd indicated something that Mr. Conley, that's why I asked you this question about whether it was you thinking or what Mr. Conley had thought about it or was saying. But that some time on or around June 1999 a question on whether or not Mr. Ober had properly handled information he received form the FBI. Is that a fair way to say it? If not tell me the way to say it.

ANSWER: The circumstances of Captain Ober possibly not properly handling information. I don't know if it was a question.

QUESTION: Can you stop right there? That's exactly what you said. I'm sorry I interrupted you. I remember now that is what you said about properly handling. What do you mean by that sir? Tell us Captain what in terms of responding to my question, what do you mean by that?

13

consider that a third party.

QUESTION: I mean interns of a target? See if a potential wrong doer is a state policemen or member of the state police, my question is IAD might be a logical place for an outside investigative agency to contact. Right?

ANSWER: Correct.

QUESTION: So the issue then becomes with that out of the way. The issue then becomes; in this case it was Captain. Ober, whether or not he handled that information properly. Right? That's what you told us. Isn't it?

ANSWER: Correct

QUESTIONS: What do you remember were the questions about whether he handled it properly? I'd like to know what the facts were. Did he, how he could have mishandled it.

ANSWER: What did he do with the information would be, that was the issue. Our regulation AR 4.25 basically dictates that a member regardless of their rank upon a receipt of a complaint of misconduct against an individual that's a member of the department, that they prepare a worksheet and forward it to the Director of the Bureau of Professional Responsibly.

QUESTION: Let's stop right there. This wasn't

ANSWER: By?

QUESTION: Well properly handling information. What do you mean? There must have been surrounding facts or circumstances that cause you to remember this in that context. There must have been a question in other words of whether Captain. Ober properly handled information. I'd like you to tell me what you recollect about that

ANSWER: As a Director of the Internal Affairs Division it is not outside the realm of possibility that you would receive information regarding complaints of misconduct against members of the department.

QUESTION: Yes sir exactly. You would be a logical place wouldn't it?

ANSWER: Well at some point. You're usually at the end of the series of notification, but you could be the first person contacted. That's possible.

QUESTION: But you are a logical person to contact in a circumstance where allegations might involve state police members himself or herself. Right? As apposed to third parties outside the state police.

ANSWER: I'm assuming the third party outside the state police is that's the shoe into the state police. I mean they're the one sharing the information. How does that information get to the state police? Well I would

14

about an internal complaint or a complaint form outside the agency about misconduct. Wasn't this about a criminal investigation being conducted by the Federal Bureau of Investigation?

ANSWER: I don't know.

QUESTION: So you're saying that rule, you're saying that, are you telling us that in your view rule 4.25 governed how Captain Ober should have handled the information form the FBI?

ANSWER: Not necessarily Captain Ober, but any member. What do they do with the information once they receive it?

QUESTION: And you're saying that Captain. Ober should have open an IAD investigation on it?

ANSWER: I still don't know what the information is. There are cases where you receive information and it has nothing to do with a member of the state police. Then there is no activity.

QUESTION: No IAD action.

ANSWER: Right.

QUESTION: But in this case you don't know?

ANSWER: Exactly, I do not know.

QUESTION: Okay, so what I'm asking you then and I can understand that. What I'm asking you then is what you recollect you might have heard that Captain

1    Ober may have done incorrectly?  Let's use the word
2    incorrectly.  What did you hear at the time that you can
3    recollect that Captain. Ober may have done incorrectly.
4    Here's where I'm going.  For example, did Major Conley,
5    at that time it was Major Conley.  Right?  Did Major
6    Connelly say to you, CPT Skurkis Ober did this and
7    should have done that? Or COL. Coury thinks he did
8    this and should have done that?  Or the Commissioner
9    thinks this or that?  What was said?  Do you remember?
10   ANSWER: Nah, it was more of a, you have to
11   remember that I remember that I started with the
12   Internal Affairs Division.  When we started the Internal
13   Affairs Division I was on the ground floor of that.  I have
14   the experience of, up to that point, fourteen years of
15   dealing with complaints and procedures in headquarter.
16   And his query was one of how would it  expect to have
17   been handled if information was provided by an outside
18   police agency regarding member misconduct.
19   QUESTION: How are you defining member
20   misconduct?
21   ANSWER: Well a member violation.  Violating
22   either rule or regulations of the department or a violation
23   of Pennsylvania or Federal Law.
24   QUESTION: So Member misconduct you
25   would include let's say a formal FBI investigation?  Or for

17

1    that matter a US Grand Jury investigation?
2    ANSWER:  If a member were an active
3    participant in whatever's being investigated, yes?
4    QUESTION:  Well and if a member were a
5    target?
6    ANSWER: Again assuming if the FBI or
7    another federal agency is conducting an investigation it
8    would be a mater of a criminal violation.  And yes if they
9    where a target I would assume there is some level of
10   allegation that this member was engaged in criminal
11   conduct.
12   QUESTION: What if the potential targets or
13   expressly stated targets where member of a group in the
14   Pennsylvania State Police?  Can I give you a example of
15   what I mean by that?  So you know what I mean
16   ANSWER: Please do.
17   QUESTION: Let's say that the FBI comes in
18   and says somebody.  We have reason to believe that
19   somebody involved in your Inspections Division of BPR
20   might be connected with a, it was some criminal activity,
21   but we don't know who.  We've got some information from
22   a CI and we don't know who.  Would you call a meeting of
23   the Inspections Division and say the FBI came in today,
24   facetiously of course, the FBI came in today and one of
25   your folks might be doing this?  I mean obviously you're

18

1    not gonna do that?
2    ANSWER: No. No.
3    QUESTION: Now what if the FBI come in and
4    says higher ups might be involved in this?  What would
5    you do then?  Do you think?
6    ANSWER: Try to determine what they mean by
7    higher ups.  Like I said a lot of times people just don't
8    understand our rank structure.  Coming from the FBI I
9    would say they would have a better understanding of it
10   than John Q. Citizen does, but even so that's very loosely
11   defined higher ups.
12   QUESTION: Sure it is, but you know it's above
13   you don't you?
14   ANSWER: To a trooper on the road a Corporal
15   is a higher up.  So if they can equate they're talking to
16   me as a Captain and they're saying higher ups of mine or
17   someone higher in rank then I am.  Then of course it
18   would be a superior of mine.
19   QUESTION: How many Majors in the state
20   police?
21   ANSWER:  I believe seven-teen.
22   QUESTION: Not a huge number is it sir?
23   ANSWER: No.
24   QUESTION: And you have a very small number
25   of Lieutenant Colonels.  Right?

1    ANSWER: That's correct.
2    QUESTION:  And the top guy or lady what ever
3    the case might be or might be in history we don't know.
4    That would be a Colonel?
5    ANSWER: Commissioner yes.
6    QUESTION: Commissioner, well
7    commissioner's a Colonel. Right?  But I mean they don't
8    have higher, you know like a Generals or Lieutenant
9    Generals and stuff like that.  Right?
10   ANSWER: No.
11   QUESTION: So you're talking about a Colonel,
12   one the only one Colonel in the state police?
13   ANSWER: That's correct.
14   QUESTION: A couple of Lt. Colonels. Right?
15   And you have seven-teen Majors might be give or take
16   one or two at some time.  And then you remember Major,
17   of course you got Captains, Lieutenants, and you know
18   sort of like the military.  But not completely, but I mean
19   you have Corporals and Troopers and that sort of thing,
20   Sergeants.  Now, you only have one rank Lieutenant
21   right?
22   ANSWER: Yes.
23   QUESTION: Not a first or second or anything
24   like that.  Okay now how many Lieutenants you have?
25   ANSWER: A hundred thirty.

QUESTION: A hundred thirty?

ANSWER: Yes.

QUESTION: And Captain significantly less, but you might have a hundred Captains at some time or close to it. Right?

ANSWER: No.

QUESTION: Sixty, Seventy, Eighty? Maybe? If you know.

ANSWER: I don't know.

QUESTION: I don't either. I confess. Okay but anyway. But when you get to Major and above. You're not talking about more then twenty-five people are you?

ANSWER: I would say not.

QUESTION: It's fall. It's 1998. Sometime on or about early October of 1998. Late September early October of 1998. Was Major Conley assigned to be the head of BPR at that time? Sometime around there?

ANSWER: I believe his promotion and assignment was in the early part of October of 1998.

QUESTION: Okay and where was he previously?

ANSWER: He was a Troop Commander, Troop B, Washington.

QUESTION: Jurisdictionally? Geographic jurisdiction, what does Troop B cover?

21

ANSWER: I don't know the exact counties, but it would be a section of South Western Pennsylvania.

QUESTION: Well how far East would it come?

ANSWER: I'm not sure.

QUESTION: Do you know how far North it would go?

ANSWER: You put me on the West Side of the Susquehanna River and I'm confused as to counties and bounties and excreta etc.

QUESTION: That's okay. You don't know where Westmoreland County, Mother Westmoreland County as I know it?

ANSWER: Yes I do.

QUESTION: Mother Westmoreland is just east of Allegheny County right?

ANSWER: Right.

QUESTION: And Allegheny County is a county that's plum in the middle lies the city of Pittsburgh right?

ANSWER: Right.

QUESTION: And Washington County borders Allegheny County to the South and South West right?

ANSWER: I would probably guess.

QUESTION: You know where Indiana County is?

ANSWER: Somewhere North of there.

22

QUESTION: Maybe northeast of Westmoreland County and joining Westmoreland County along maybe like the Connemaugh River or Kiskiminitus Rivers. Do you know?

ANSWER: I'm not certain.

QUESTION: Well but it might.

ANSWER: It might.

QUESTION: Do you know where Indiana County is jurisdictionally? What troop it's in?

ANSWER: I believe Troop A.

QUESTION: Troop A, and where's Troop A headquartered?

ANSWER: Greensburg

QUESTION: And where is a.... Troop B is Washington.

ANSWER: Correct

QUESTION: And is Allegheny a different troop?

ANSWER: I believe Allegheny is part of Troop B, but I'm not certain on that.

QUESTION: Well... Now... Anyway Captain. or Major Conley had come from you said Troop B you believe right?

ANSWER: I believe its Troop B, yes.

QUESTION: And he came in to be the Director of Bureau Professional Responsibility right?

ANSWER: Correct.

QUESTION: Now have you ever learned what Ober supposedly did wrong if indeed he did anything wrong regarding that FBI investigation?

ANSWER: At some point I learned that the information that he had received either was not shared or it was shared at a much later date with his superiors.

QUESTION: Was he punished for that?

ANSWER: Not that I'm aware of.

QUESTION: Well if he did something wrong he should have been punished for it. Don't you think? I would think he should be.

ANSWER: Well a lot of people on our job do things wrong and they're not punished for it. It's not necessarily a case of... like I said... What do you mean by punishment?

QUESTION: I'm going to ask you that in a minute.

ANSWER: I know when someone says don't do that again. I don't consider that a punishment. I consider that direction and possibly counseling, but I wouldn't consider it a punishment.

QUESTION: Okay that's fair enough I'm sure. Well if you're put in a penalty box what's penalty box? What's that?

ANSWER: My opinion of what they meant by penalty box, I haven't heard it for years, but it use to be an assignment to the academy. Basically you don't, you have an office and a phone and you're given some type of a project to work on. It could be something statistical, review policy, something to that effect. But you're basically without a staff and alienated to the point where you're not interacting with other members of the department.

QUESTION: Your sort of an administrator without a portfolio.

ANSWER: That's one way to put it.

QUESTION: Now do you have a recollection of Captain. Ober being transferred down to or an attempt at least being made transferring to Washington County? Cause you had mentioned that on an earlier question.

ANSWER: I don't know.

QUESTION: In response to an earlier question of mine I think you had... I may not remember correctly so it's your memory that counts okay? I thought you had made a reference to a transfer.

ANSWER: I did to transfer, but I don't know if it was Washington County. I thought it was to assist the Area Commander with his efforts in developing the plans for the National Governor's Association meeting up in

25

State College.

QUESTION: Who is that Area Commander?

ANSWER: Major Szupinka.

QUESTION: He needed help out there did he?

ANSWER: It was a large plan. I know it involved several Troop Commanders.

QUESTION: If I told you we developed information which indicates that he didn't need help or didn't request help would that surprise you? Do you have any fact to support, give any knowledge of that?

ANSWER: No I don't know either way.

QUESTION: All right. Are you telling us that you had heard that Captain Ober was sent to help Mr. Szupinka?

ANSWER: Yes

QUESTION: And is it your understanding that Captain. Ober requested that opportunity to go and help Mr. Szupinka.

ANSWER: No I don't know that he requested it.

QUESTION: Is it your understanding that he didn't request it?

ANSWER: Yes. Well I don't know.

QUESTION: Well you said yes sir. Now something popped up there. Something popped into the front of the that very fertile mind of yours and said you

26

know, yes. Why? What prompted that?

ANSWER: You had asked I believed the question before that was, was I aware that he had been requested. No and then you said something..

QUESTION: That he didn't

ANSWER: Did he request it.

QUESTION: No. I'd indicate that he didn't want it.

ANSWER: That he didn't want it, exactly. I don't know.

QUESTION: Did you hear anything about it?

ANSWER: After the fact I believed I had.

QUESTION: Tell me what you heard after the fact?

ANSWER: This is maybe again predicated on I believed there was newspaper article challenging the appropriateness of his transfer.

QUESTION: Okay, well you know he fought it right?

ANSWER: He what?

QUESTION: He fought it. You know that he fought it in court?

ANSWER: Yes. Yes.

QUESTION: Cause you read a newspaper

article.

ANSWER: Yes.

QUESTION: And you know that the State Police defended their actions. Be it unsuccessfully, but they defended their actions right?

BARBARA CHRISTI: Just for the record again because this keeps coming up. The State Police agreed not to transfer Captain. Ober. We successfully defended that action; in fact we won that action. It was dismissed on preliminary objections. Just so the witness, the attorney, everyone understands we agreed not to transfer him and there where certain stipulations that we're going to run into as a result of that. We did not lose that action. We successfully defended that action and in fact were granted a dismissal of that case.

MR BAILEY: Is it your understanding that the State Police in an act of grand and uncompromising generosity backed away from having Captain. Ober transferred to Washington. Is that your understanding?

CAPTAIN SKURKIS: My understanding is that the transfer was rescinded. I don't know if it was mandatory. I don't know if it was out of...

QUESTION: You don't know if they were encouraged to do so by any opinions or actions in the legalsphere.

ANSWER: Well I assumed based on

QUESTION: Or there was an act of love. You don't know?

ANSWER: No I don't know that.

QUESTION: So it could have been an act of love and kindness?

ANSWER: It could have been.

QUESTION: Could have been. But in any event we do know that Captain. Ober did not go to Washington. Is that correct?

ANSWER: I don't know if he went for a short period of time. I don't know. I don't know. I know eventually the transfer was rescinded. I don't know if it had already been effected and he was traveling and it dissipated. I don't know.

QUESTION: Now Captain Ober, he had been with IAD. Is that right?

ANSWER: That's correct.

QUESTION: And at some point he was working on an innovative technology project for the Pennsylvania State Police wasn't he? A information management kind of system?

ANSWER: Right he was detached to that position. I don't know what exactly his assignment was.

QUESTION: Well did he...I'm sorry.

29

you can hear it when...

ANSWER: Well I might have heard all kinds of things. I don't know really. I don't subscribe to rumor to the point where it's in one ear and out the other. There has to be something more than that. So I don't know of his application for the LCE, but I do know ultimately that's where he was assigned.

QUESTION: Do you know what he was assigned to do over...I'm sorry. Do you know what he was assigned to do over at LCE?

ANSWER: I believe there was a Lieutenant that was either under suspension at the time for misconduct, and Captain. Ober was assigned to that division. My guess is to take over the responsibilities of the Lieutenant.

QUESTION: Okay. Now um forgive because I was asking those LCE question and I got mixed up in my own mind about certain thing. You, you, different, one of those different questions forgive me. You know? You replaced Captain. Ober at something right? As I recollect.

ANSWER: Replaced him at something?

QUESTION: At some kind of duty or function? I can't remember off the top of my head what is was.

ANSWER: Yes

ANSWER: He was assigned over to our Bureau of Technology Services.

QUESTION: Well at some point he became disengaged from the IIMS Project right?

ANSWER: Yes.

QUESTION: And he was sent back to IAD as Mr. Evanko had promised him right?

ANSWER: I know he was at... I don't remember. If he was it probably wasn't for a very long period of time. I don't remember.

QUESTION: Okay. Do you have a recollection of him requesting an opportunity to serve the Pennsylvania State Police in LCE?

ANSWER: No.

QUESTION: Do you have a recollection of him being transferred or assigned to LCE?

ANSWER: Yes.

QUESTION: And do you have a recollection of what he was assigned to do with LCE?

ANSWER: To take a step back, you asked if I have a recollection of his requesting. Unless Captain. Ober told me that he had requested it. I am not in that chain of command. I would be unaware of any request. That's not something that would be publicized.

QUESTION: Well the people talk and you know

30

QUESTION: Okay. What was that?

ANSWER: In May of 1998, ah prior to May of 1998 I was Director of Internal Affairs. Captain Ober was the Director of the Systems and Process of Review BPR Division. In May of 1998 our Bureau Director reassigned CPT. Ober to Internal Affairs and myself to the Assistant and Process of BPR Division. So effectively we swapped jobs.

QUESTION: Did you ever replace him at anything else?

ANSWER: No.

QUESTIONS: Where you ever appointed to PEMA?

ANSWERS: Yes.

QUESTIONS: Did you see him there?

ANSWERS: Yes.

QUESTIONS: Well how did you come to PEMA in place of Captain. Ober?

ANSWER: I was approached I would say around May of 2000. By one of my subordinates Corporal Marlin Leidig who was assigned to PEMA. And he encouraged me to apply for a vacancy at PEMA. I explained to him that back when I first made captain then Joseph Blackburn who was the Director of the Bureau of Inspectoral Emergency Operations asked me

to go into PEMA and I turned it down then. I wasn't
interested and I said I wasn't interested now to Leidig.
And he said he enjoys working with me. He thinks I
would find it interesting. He filled me in a little bit about
the details of what the job encompasses which at that
point I really wasn't aware of exactly what was being
done over there. I told him I would think about it and
the matter dropped for several weeks. And he
approached me and said hey have you made a decision
yet? Actually I told him my decision was no, and we
discussed a little further. And he said look you can put
in if you don't like it. You can just get out. There's no
strings attached it's free to go. I told him find out about
what I would have to do to obtain the position. And he
came back several days later and told me to do
correspondence to the Director of the Bureau of
Emergency Inspection Operations and express and
interest in it along with some personal data.

    QUESTION: Who was that?

    ANSWER: That would have been, at the time
Major Leonard Washington.

    QUESTION: Colonel or excuse me. Is Mr.
Wescott involved in that at all?

    ANSWER: I don't believe so.

    QUESTION: Do you ever talk with Mr. Wescott

33

about it?

    ANSWER: No.

    QUESTION: Do you know if Mr. Washington
ever talked with Mr. Wescott about it?

    ANSWER: No I don't.

    QUESTION: Well one of the problems with
PEMA is that it causes you a lot of unreimbursable out of
pocket expenses though. Doesn't it?

    ANSWER: There it taxes your getting your job
done. Then you get paid don't you?

    QUESTION: But you get paid. If you get paid
do you get any overtime pay for that or anything?

    ANSWER: In the event of an activation,
depending on the duration of the activation there's a
potential for overtime yes.

    QUESTION: How long have you been on
PEMA?

    ANSWER: I believed I never received any type
of correspondence as far as a starting date. But I got a
phone call from Captain. Davis, who was the department
Emergency Operations Officer sometime in June saying
that I was selected, approved for. I don't what the term
he used for PEMA. And would I be interested in going to
a one day training exercise at PEMA, which was
scheduled for the later part of that month.

34

Accompanying him to that training, and I said yes.

    QUESTION: All right. Well what do you... have
you ever had gotten anytime in on PEMA that you were
paid for? Anytime that you gave to it?

    ANSWER: Yes I did.

    QUESTION: Okay. How much for the year?
You know let's say the first year we're there. How much
money did PEMA put in their pocket?

    ANSWER: The first year I was there I had a
total of four hours overtime.

    QUESTION: Not much uh?

    ANSWER: No.

    QUESTIONS: Okay. What about since then?

    ANSWER: Since September 11th I would
estimate somewhere between thirty and forty hours of
overtime.

    QUESTION: Okay. Is that largely due to the
September 11th events?

    ANSWER: Right. And I consider that very
abnormal.

    QUESTION: Yeah I thought you would say...

    ANSWER: In fact I didn't appreciate the
amount of time I had to spend over there. It wasn't
worth it to me let's put I that way.

    QUESTION: Would you say that the kind of

person that works for PEMA is somebody that's typically
motivated or interested in that type of duty? That's a
sacrifice to some extent?

    ANSWER: I believe it is a sacrifice.

    MR BAILEY: Hold on just one-second sir.

    QUESTION: Okay. In what ways is it a
sacrifice?

    ANSWER: Well for one thing you're sharing a
lot of your work time. Basically simulating additional
work and not getting any extra pay for it. And when I say
work I mean going to training, attending informational
meetings, just being on call two weeks out of three
weeks. I'm somewhat restricted as to where I can go and
what I can do because I'm on an on call status with
PEMA.

    QUESTION: So the on balance, assisting with
PEMA on balance is a sacrifice that you do for the good of
the State Police because you care about the organization
which you're a part. Is that what you're telling us? I
mean are you in effect saying that....

    ANSWER: In my case?

    QUESTION: Sure in your Case. Why do you do
it? Do you do it because you care? Do you do it because
you want the overtime? Do you do it for both reasons?
Obviously there's not much overtime. Why do you do it?

ANSWER: Well in my case, there's a concern for the department of course, but also I find that interesting. I wanted to learn more about emergency operations. And as a department, headquarters with a department or headquarters assignment you don't get the exposure to field activities that a Troop Commander, a Captain of in the field would get. This is the closest thing that I can personally experience without transferring into a troop. As far as an operation field operation?

QUESTION: Well its career enhancing in the sense that it's a good qualification and experience to have on your career resume. Isn't it? I mean it certainly has to be positive to some degree in that regard or does it hurt you?

ANSWER: I don't think.... I don't know that anyone would consider it further into your career saying well that person. We have two people here that are the same in all respects, except the person was assigned to PEMA. Let's choose that person. I don't think it's going to help there. Now possibly if you sought employment outside of the department. That's something on a resume would enhance your stature.

QUESTION: But you do it because you want to have the experience that it offers you. And because based upon your knowledge and experiences with the

37

Pennsylvania State Police it gives you an exposure to things that you want to do. But you feel enhance your opportunity to enjoy your employment experience. Now that's what you've just described for me or am I incorrect?

ANSWER: I think what you're....

QUESTION: I'm looking for your reasons.

ANSWER: Look my reasons are I find it interesting.

QUESTION: Captain you originally started telling me how reluctant you were to do this.

ANSWER: Right.

QUESTION: That you considered it a burden and that you had a friend and somebody who had admired you and respected you. And I'm not over doing it, but I mean. Said hey you'll be good at this and apparently believed that you where need there or they would have approached you and thought that you would be a good person for that job. And also thought that once you were exposed to it you would like it. How long have you been there?

ANSWER: It will be two years in June.

QUESTION: How many times have you asked to quit, resign, or be transferred from it?

ANSWER: I have not been.

QUESTION: No. Because you have found it to

38

be something that you have enjoyed. And you find it to be something that has in fact been a learning experience for purposes of your Pennsylvania State Police career. Am I correct? Or am I wrong? I'm not trying to blow it out of...

ANSWER: I think you're wrong with that. I've never looked at it as a career enhancing. In fact I'll be frank, I don't expect to ever go beyond the rank of Captain. That's not... I see people

QUESTION: You're not ambitious to go beyond the rank of Captain.

ANSWER: Well I see a lot of people that are ambitious ultimately do a disservice to the department.

QUESTION: Why?

ANSWER: Because their motivation is simply to take care of themselves. That's not my motivation everything I do...

QUESTION: Is that common with in the state police?

ANSWER: Yes I would say it is common.

QUESTION: Why? Why Captain? Who's built that environment into the Pennsylvania State Police?

ANSWER: I don't know.

QUESTION: Had it been the leadership or has it been the troopers out there that did it?

ANSWER: I think it's common sense. It's not the State Police. I don't know that the State Police is any different in a comparative ratio then IBM.

QUESTION: Captain Skurkis is Evanko responsible for it at all?

ANSWER: Responsible for what?

QUESTION: Captain. Skurkis is it too much politics involved in the job in the State Police? Is that what you are trying to tell us?

ANSWER: No just I have no aspiration to go beyond the rank of Captain.

QUESTION: I don't mean you sir. I'm talking about your observations about the State Police and what happens. Is there a problem internal in the Pennsylvania State Police with too much political infighting?

ANSWER: As I began to say before, I personally do the things I do for the department strictly for the bettering of the department. I'm not looking to favor myself,

QUESTION: I don't question that. I don't question that sir.

ANSWER: Well that's what I was trying to say.

QUESTION: Did you pick it up from?

ANSWER: What I am saying is that I don't have motivation like whole lots of others may have. I'm gonna

1  do this cause I'm gonna be in a better light to get
2  promoted.
3      QUESTION: Precisely and I believe you sir.
4  And if I understand you correctly what that means is you
5  seen people.  You know by the way I'm gonna let you off
6  the hook cause I'm not gonna ask you who.  But you're
7  telling me and the fact that you have seen this kind of
8  ambition within the State Police has perhaps done harm
9  to the organization.  That's what you seem to say to me.
10  Is that correct?
11      ANSWERING: I'm saying that I don't know it if
12  has done harm.  I'm saying though in my case that's not
13  my motivation.
14      QUESTION: It's not for you.
15      ANSWER: Right it is not for me.
16      QUESTION: It's not for you.  And you did say
17  and you did indicate however that there are problems in
18  the State Police or have been with that type of thing?
19      ANSWER: No I'm saying that there are people
20  in the State Police that probably would find a motivation
21  for promotion to be a overriding career incentive.
22      QUESTION: Okay.  And is it your view that
23  people that put their duty and responsibility second.
24  They set that aside and instead advance their personal
25  interest.  That that's a wrong thing to do?

41

1      ANSWER: Well some people can do it.  It can
2  be beneficial to both.  But I find that I know in my case
3  strict dedication to the job.  No concern about am I gonna
4  step on someone toes?  Am I gonna say something wrong
5  to someone?  I'm not concerned about that.  I'm gonna do
6  my job and I'm doing it the best.  I'll tell people if they're
7  wrong if I feel they're wrong, and not worry that there's
8  gonna be repercussions of hey you can't tell that Major
9  that.  Hey, if the Major's wrong I'm gonna tell the major I
10  feel in my opinion that what he's doing is wrong
11      QUESTIONS: That's called candor right?
12      ANSWER: True.
13      QUESTION: It's called being open and being
14  honest right?  And that's what you meant when you had,
15  in response to earlier questions, indicated that in a
16  situation where somebody came to you and revealed the
17  contents of an investigation.  Where you said your duty
18  and responsibility would be not to inform a target of an
19  investigation.  Because that might violate a law or that
20  might compromise the integrity of an investigation.
21  That's the same type of thing isn't it?  The right thing to
22  do.  Isn't it Capt. Skurkis?
23      ANSWER: If you're saying that one has
24  knowledge that an individual is a target of investigation
25  and to intentionally go to that target and share

42

1  information that you know about the investigation.  Yes
2  that's wrong.
3      QUESTION: Or even that the investigation
4  exists, tipping them off.
5      ANSWER: Correct
6      QUESTION: Yes sir exactly right.  I'm right
7  with you.  Okay.  Now you've been with PEMA roughly two
8  years?
9      ANSWER: Yes.
10      QUESTION: And in that two year period of time
11  if we were not going to include those maniacs on that
12  September 11th if that's excluded and that's out of the
13  way.  Aside from that particular tragedy, you may be
14  talking less then ten hours of PEMA activity a year.  You
15  think or..
16      ANSWERS: When you say ten hours you mean
17  ten hours of..
18      QUESTION: I really don't know that much
19  about it to be honest with you.
20      ANSWER: Well a nah there's more.  I would
21  say more like...
22      QUESTION: Let's say on a given month.  Is
23  there an average on a month?
24      ANSWER: No it basically amounts to training
25  and whether you want to avail yourself to that training.

1  Those training meeting exercise at Three Mile Island
2  tomorrow night.  There's gonna be an exercise at Three
3  Mile Island is in peril.  Would you be available to go to
4  training?  If you chose to do that it would be an eight-
5  hour shift.  That's eight hours right there.
6      QUESTION: Of additional time?
7      ANSWER: No.
8      QUESTION: Is that additional or promised?
9  Like a flex kind of thing.
10      ANSWER: No. No. So in other words instead of
11  my working in my office that day, seven to three, or
12  eighty to four.  I'd be working at PEMA from three to one.
13  So it would be eight hours away from my office, but not
14  in any additional premium pay.
15      QUESTION: Thank you.  Okay.  I under stood
16  that after you explained that.
17      ANSWER: And as I said if you excluded Sept
18  October 11th.  In two years my overtime happened to be
19  four hours.
20      QUESTION: Alright.  So in a word it's not
21  required?
22      ANSWER: What's not required?
23      QUESTION: The training the different things.
24  They're elective.  In other word you can choose to go.
25      ANSWER: Yes.  I don't know of anything that

1    says you must go to this or go to that. It's a question of
2    do you want to fool of yourself in the event something
3    happens and your totally out there with no direction at
4    all. I don't want to be in that position so I will go to the
5    training when it's available. I don't go to every training,
6    but I've probably gone to four exercises over this two-year
7    period so far.
8          QUESTION: Okay. Who makes the ultimate
9          assignment to PEMA within the Pennsylvania State
10         Police? I mean if PEMA is an outside state police
11         organization right?
12         ANSWER: Right.
13         QUESTION: Headed up by the Governor or
14    somebody. But the point is that it's outside the
15    Pennsylvania State Police. You'd be like a Pennsylvania
16    State Police Participant or designee or something of that
17    sort right?
18         ANSWER: The technical term is liaison.
19         QUESTION: Okay, liaison
20         ANSWER: From the Pennsylvania State Police
21    to other representatives to PEMA.
22         QUESTION: I see. Who appoints to that
23    position? Is it the Commissioner ultimately? Or who
24    does that?
25         ANSWER: Actually I thought it was Captain

45

1    QUESTION: Is a person as the object of a BPR
2    investigation suppose to be informed when it's closed or
3    done?
4          ANSWER: You mean the subject of the
5    investigation? You said the..
6          QUESTION: Subject object yah whatever.
7    Subject that's a good word go ahead.
8          ANSWER: The subject of the investigation
9    upon adjudication is notified. The adjudication is not to
10   me an investigative step. You asked the question about
11   when is the investigation over. The investigation's over
12   when the report's done. There are additional
13   administrative steps that we take after that. Which
14   require outside of the room of the Internal Affairs
15   Division.
16         QUESTION: I understand. In other words
17   there's an investigation, but let me then withdraw my
18   question and come back with a different question. After
19   the adjudication is a person suppose to be told?
20         ANSWER: The results of an adjudication
21   should be communicated to the subject in the best case.
22   Yes.
23         QUESTION: Is there any duty or obligation to
24   inform a person. This might be a rather silly question. I
25   assume most of this investigation are internal Issue they

1    Davis and his Major the Director of the Bureau of
2    Emergency Inspection Operations.
3          QUESTION: But you don't know for sure?
4          ANSWER: No I don't.
5          QUESTION: Now normally in BPR, a BPR
6    number is assigned when an investigation arises right? I
7    mean whenever there's an investigation launched or what
8    not.
9          ANSWER: When a well... What by launched?
10   Knowingly it's just lined after a complaint worksheet is
11   prepared.
12         QUESTION: Okay.
13         ANSWER: It is not normally assigned until that
14   worksheet is prepared, because that's the tracking
15   number.
16         QUESTION: Yes that's a worksheet. And when,
17   I wanna just ask you a couple questions. I wanna keep
18   your investigation closed down. How does it close down?
19   What happens?
20         ANSWER: Closes down?
21         QUESTION: Yeah. When it closes down.
22   When it stops.
23         ANSWER: The investigation is terminated upon
24   the last relevant interview and the preparation of the
25   report.

46

1    can interview a person so they're going to know anyway,
2    but is there any formal process of notifying. That
3    requires notifying a person that they're being investigated
4    or going to be investigated?
5          ANSWER: The regulations indicate that if an
6    individual is identified as the subject of an investigation.
7    That they are to be provided with a notification of inquiry.
8    That document basically tells the individual that an
9    investigation is being conducted, and it may touch on
10   areas of their conduct, which are subject to the inquiry.
11   Now the regulations say that shall be presented to the
12   subject as soon as possible. Normally it occurs at the
13   time of the interview. When the person shows up for the
14   interview after direction of the investigator. They're given
15   this piece of paper which is the Notification of Inquiry.
16   There it's laid out the fact that there's an investigation
17   being conducted and that whatever interview of their
18   participation or non-participation in this conduct is
19   what's being looked at.
20         QUESTION: And it has a number on it right? I
21   mean, the number's a sign they put on there and they're
22   given it right?
23         ANSWER: There's a provision for the number,
24   but I know of cases where let's say a shooting happens in
25   the night. I'm going to respond as an investigator and

interview the participants. I don't have a number but I'm gonna give them that document telling them that this is why I'm talking to you and this is why we're speaking. So I would say no it's not an absolute.

QUESTION: What position do you hold now?

ANSWER: Corrector of System and Process Review Division.

QUESTION: Do you know of any outstanding BPR's on Captain. Ober? As we sit here today?

ANSWER: No I do not.

QUESTION: But you wouldn't necessary know if there where one?

ANSWER: That's no I wouldn't. You're correct?

QUESTION: Have you ever seen an investigation into somebody in the Pennsylvania State Police without a reason? Now this may be rather basic to you so you don't please don't rebel, in the sense that. You know have you ever seen an investigation done just to get something on somebody without having a reason to do it?

ANSWER: No.

QUESTION: That's pretty basic to any investigator, to any member of a democratic society with a small bee. That's pretty much common sense. Well maybe it's not?

ANSWER: Well nah I'll say this. Being on

49

board with BPR since day one I'd like to support the fact that that's why BPR was created.

QUESTION: To prevent that kind of abuse right?

ANSWER: Right

QUESTION: And to provide a procedure so that members of the Pennsylvania State Police know that there is a policy and procedure that governs investigations into them and their rights as a member of the organization of Pennsylvania State Police right? That's what it's about. Isn't that correct.

ANSWER: That's part of it.

QUESTION: And the organization has been in existence I guess formally for…it's only been about ten years or so? Maybe ten fifteen years?

ANSWER: Ah 2002 would be the sixteenth year.

QUESTION: It's not really that old. The sixteenth okay. It's not really that old. Given the fact that the agency was one of the first. And admittedly I'd be the first one to doubt your reputation on the street corner. One of the finest state departments of it's type since what 1905?

ANSWER: That correct.

QUESTIONS: So it's not a place that is

50

designed to foster or tolerate abusive people, particularly members right. And that's one of the reasons BPR came into existence. As you told us.

ANSWER: That's one of the reasons.

QUESTION: Additionally there are probably three overriding reasons. The one that you had mentioned. The second is protection of the public. And the third is protection of the department. And the protection of department is something that's frequently over looked, but I believed it spelled right in 425 that's it's to determine the process helps to determine the performance inadequacies that occur at different levels What I've in past and know again being partly an author of 425. What is meant by that there are instances that may not raise to the level of misconduct. Yet the department has invested interest in investigating it

QUESTION: Sure incident for example.

ANSWER: Pardon me?

QUESTION: Incident for example. Let's say there… Well can I can I give you an example? There's been a discharge of a firearm.

ANSWER: Right okay there again there nothing wrong but the person

QUESTION: Well we don't know that..

ANSWER: You don't know that, but

QUESTION: But it's an incident.

ANSWER: We are investigating it to look into the fact. Was this shooting legal? Was it in accordance with regulation? And then, of course, there's an overriding interest in gathering evidence at the time in the event that some civil action is taken later on. You what to get whatever is available and preserve that to whether it answers you defense or actually serves to prove that the shooting was in fact a proper and the victim was in the shooting.

QUESTION: Okay would you know how requested if indeed anybody did the investigation into CPT. Ober?

ANSWER: Do I ah…

QUESTION: Where did it originate?

ANSWER: No I've never seen. Normally that information would be a part of the complaint worksheet. In the complaint block. I've never seen the worksheet so I don't know and nor have I have seen the investigation for that matter. So I don't the actual complaint is. Well I don't know that. There was an investigation done really. There was. I don't know if it was IAD investigation? I don't if it was a criminal investigation? I don't know if it was a supervisory type of investigation? I know something was looked at, but I don't know ultimately

1 exactly what.

2     QUESTION: Were you ever interviewed in

3 connection with CPT. Ober's, I know I still don't know

4 what to call it. After three or four months of depositions I

5 don't know what to call it yet. Whatever it was. You

6 have a recollection of discussing the investigation of

7 Captain. Ober with anyone? Now for example go down

8 the list of defendants very quickly if I may? Is it fair to

9 say you probably never a... Have you the issue of

10 Captain. Ober with Mr. Evanko?

11     ANSWER: No.

12     QUESTION: Have you ever discussed Captain.

13 Ober with Mr. Wescott?

14     ANSWER: No.

15     QUESTION: How about Mr. Williams or Mr.

16 Wertz?

17     ANSWER: Yes.

18     QUESTION: Tell me about it.

19     ANSWER: Sometime of 1999 Major Williams

20 and Major Wertz were at the BPR offices here in

21 Harrisburg. I don't know what their agenda was. I don't

22 even know why they were there except they were in our

23 kitchen/ conference room reviewing reports. I believe

24 they may have been transcripts. In Fact that's what I

25 subsequently found out that they were there to look at

53

1 transcripts. In any event, I had gone into the room to get

2 a cup of coffee and Major Williams asked me a question

3 regarding investigative procedure for IAD. Now again he

4 was aware that I had been in IAD for fourteen years and

5 that I would be familiar with it. Where as a I think he

6 joked that his only involvement was in his addictions.

7 And he really had never conducted any IAD

8 investigations. I don't know how said what, I remember

9 that my advise to them was that an investigation, an IAD

10 investigation could be conducted into the circumstances

11 of an incident. One member misconduct is involved. Or

12 number two if the commissioner, well three I guess it

13 was. If the commissioner directed IAD to look into

14 something. Or number three if department directive

15 dictated that IAD investigated certain circumstances.

16     QUESTION: Stop right there. If existing

17 regulations indicated that the IAD is to check into

18 something I assume that IAD's gonna check into it if it's

19 brought to their attention. Right?

20     ANSWER: Again it depends on what is and

21 who brings it to their attention.

22     QUESTION: Okay but the fact is that if

23 regulation provide that IAD either evaluates or initiate

24 some action it's fair to assume you follow the regulations.

25 Right?

54

1     ANSWER: Right. Correct.

2     QUESTION: So that was the one incident, and

3 there are one incident and where you pointed that out

4 right?

5     QUESTION: Where did regulations give the

6 Commissioner power to initiate and direct investigations?

7 I'd like to know that is.

8     ANSWER: Direct investigations?

9     QUESTION: Well I don't know what he's doing.

10 You told me you told them. I want to know what that

11 means because let me tell you where I'm coming from.

12 I've looked till I'm blue in the face and I'm sort of an

13 ideologue on issues ilike Constitutional Rights. I'm a

14 idealist on these kinds of things and I study them a lot,

15 probably more then most. I don't know where the

16 Commissioner gets this power that you mentioned

17 towards the Williams. And I'd like to know where it is.

18 And I'm not saying it isn't there I honestly don't know.

19 Can you tell me where it is?

20     ANSWER: Actually I again I think I was

21 somewhat instrumental in getting that authority to

22 commissioner. It was Commissioner Cochran at the

23 time. When we were developing. There was a special

24 order anywise eighty-five....

25     QUESTION: Now what's a special order?

1     ANSWER: A special order is a department

2 directive, which provide guidance with regard to what

3 action to be taken under certain circumstances. And

4 what actions not to be taken under certain

5 circumstances.

6     QUESTION: Okay what's the number on this

7 special order?

8     ANSWER: It was I think it was 85111.

9     QUESTION: 85111 okay now you say were... I

10 mean how do you give the commissioner power? If I

11 understood you correctly. How do you do that?

12     ANSWER: Well we have meeting in the

13 development of the Bureau of Professional Responsibility.

14 We needed a document that gave us the authority.

15 Basically the creation of the Bureau of the Professional

16 Responsibility. It can't just appear from no where. So it

17 was created by virtue of this special order. And I

18 remember on of Colonel Cochran's concerns he was not a

19 member of the state police prior to being appointed

20 commissioner. He came form the FBI into the

21 department.

22     QUESTION: Who a this is Commissioner

23 Cockren?

24     ANSWER: Correct. What he found was there

25 were a lot of issues. For example a lawsuit being filed

1 about conduct that members where involved in a year
2 before two years or whatever the time limitations allowed.
3 And that when he would go to find information regarding
4 what had occurred there's no record. There's no
5 investigation. None of this was ever looked at.
6      QUESTION: Say what's that? Okay,
7      ANSWER: I don't think that has to do... Well
8 he was concerned that as Commissioner he should be
9 aware of what's going the department.
10      QUESTION: Absolutely.
11      ANSWER: And if he's not made aware of it.
12 Then it should be investigated and preserved in a report
13 somewhere that in the event three years from now this
14 becomes an issue it can be retrieved and the information
15 has already been recorded. I would say that was the
16 major impetus for the creation of the Bureau
17 Professional Responsibility/ Internal Affairs Division. In
18 drafting this special order
19      QUESTION: Can we explore that for just a
20 momment?
21     ANSWER: Okay we're gonna lose.
22     QUESTION: All right then you go ahead.
23      ANSWER: I think we've been cut in to four or
24 five times here. That I don't know. I'm not answering
25 your questions from way back.

57

1 to him, and we did. In any event that was then. Today
2 we have AR-4.25.
3      QUESTION: Before we leave the Bud Dywer
4 thing we'll come back. Well ah we'll come back to that
5 Bud Dywer thing.
6      ANSWER: Well I'm giving that to you as that
7 this thing hasn't been created overnight. This authority
8 of the Commissioner. It was invested back then, but it
9 is codified in AR-2.45.
10      QUESTION: What do you mean it's an
11 authority of the commissioner?
12      ANSWER: Again, I'm not answering your
13 question. You keep changing the question. The
14 questions here where does this authority for the
15 commissioner do this? I'm about to get there.
16     QUESTION: It's still the question
17     ANSWER: Okay
18     QUESTION: Okay that's all I'm asking.
19     ANSWER: AR-4.25 I don't have copy with me
20 and I don't know the section off hand, but it identifies
21 criteria under which an investigation would be
22 conducted. And one of those issues I think it's the last
23 very last thing. Is at upon request of the commissioner.
24     QUESTION: Of who?
25     ANSWER: Internal Affairs well it say. I believe

1      QUESTION: Okay that's fair enough. You go
2 ahead?
3      ANSWER: With the creation of the Bureau
4 Professional Responsibility there were circumstances
5 outlined where an investigation must be conducted on
6 member conduct. That is misconduct, violation of rules
7 and regulations, and shooting in cities. There was also
8 determined that there would be citations where the
9 Commissioner would like to know the circumstances of
10 what occurred even though it doesn't necessarily fall into
11 the realm of those two perimeters. Meaning shooting
12 incidents or misconduct. One example that comes to my
13 mind was the suicide of Bud Dwyer. Commissioner
14 Cochran called over and asked then myself and then
15 Captain. Shaffer go down to the capitol and look into the
16 events that occurred down there. And we did. And that
17 would have been in my opinion under the authority
18 granted by that special order, and to take it a step
19 further AR-4.25 replaced a special order.
20      QUESTION: What occurred in Bud Dwyers
21 death that would cause the commissioner know what
22 happened?
23      ANSWER: I don't know. All I know is he
24 directed us to go down there and make our presents
25 know. Then look into what was going on and report back

58

1 that the caption's under an administrative investigation
2 shall be conducted when, and then lists, ten or eleven
3 items the last one of which is upon the request of the
4 commissioner.
5     QUESTION: So.
6      ANSWER: So to me that's one of the accepted
7 of the administrative investigation can be conducted even
8 though on it's face there isn't or there isn't a shooting
9 incident or an accidental death or there are a lot of other
10 criteria, but
11      QUESTION: So if the commissioner wants to
12 investigate, why Bud Dwyer killed him self over
13 something astensably Mr. Tornburn had supposively
14 done he can look into it. He can say I want you guys to
15 go check it out. Right? If that's what his reasoning is.
16      ANSWER: Well I don't know what his
17 reasoning was.
18      QUESTION: Exactly sir. And that's why I
19 asked the question the way I did. Not to offend.
20      ANSWER: But the regulations don't require
21 him to tell us what his reasoning was.
22     QUESTION: Thank you.
23      ANSWER: But it gives him the authority to
24 request one.
25      QUESTION: He has the authority to do it if he

1 wants too?  Whether that thing gives him authority or
2 not?  Now what are you going to do if you don't think, if
3 you're sitting their sir.  Captain.  Skurkis you're sitting
4 there and let's say you don't think the commissioner has
5 authority to ask you to go down and investigate the
6 assignation of John F. Kennedy, but he tells you do did
7 it.  Now You're gonna do aren't yah?
8        ANSWER:  As an Internal Affairs investigation
9 or as an investigator?
10       QUESTION: I don't know sir.
11       ANSWER: Well I'm not asking a Internal Affairs
12 investigator absent that caption in the regulation that
13 says he's allowed to ask for one.  I would say no.  Then it
14 would only be done on the cases of misconduct or
15 department directory.
16       QUESTION: Exactly
17       ANSWER: That extra thing allows him to make
18 a request and that the process be
19       QUESTION:  Well he doesn't have to come to.
20       BARBARA CHRISTI: Excuse me could the
21 witness just finish his answer cause I think... I don't
22 know maybe you were finished.
23       ANSWER:  Well no I'm not.
24       MR. BAILEY: I'm sorry
25       ANSWER: I also believe that the ah...We

61

1 certainly when we incorporated the into the regulation we
2 did not expect that so purifies investigations would be
3 done.  I mean if the commissioner requested it then he
4 can use the resources of the Internal Affairs for a reason
5 other then an obvious misconduct investigation or an
6 obvious investigation that's required to be a Director.
7       QUESTION: You done?
8       ANSWER: Yes.
9       QUESTION: What do you mean by that?  I
10 don't understand what you mean?  Do you mean that if
11 the commissioner wanted to come and ask to use
12 Internal Affairs Division resources to investigate some on
13 or something?  He doesn't have to give you a reason.  He
14 can just ask you to do it and you'll do it.  It that what you
15 mean?
16       ANSWER: No. I think that would have to be
17 some type of bases behind the request.
18       QUESTION: Sir I can't tell yah how I appreciate
19 that response, and I apologize to you because the times
20 that I have interrupted you I was trying to jump to that.  I
21 sort of thought that all that process that you were talking
22 about was for that reason and I apologize to you for
23 interrupting you.
24       ANSWER: You go ahead.
25       QUESTION: Do you have something else you

62

1 want to say.
2       ANSWER:  Yeah I do.  Now let me give you an
3 example of that.  Of course if the commissioner, if this
4 investigation would be in some way determined to an
5 illegal investigation.  In other words go wiretap, my wife
6 is having an affair.  I want you to go and follow this guy
7 around. No. That would be excluded.  I would say that it
8 would mean coming upon him to show that somehow the
9 department either is, that this has to impact somehow on
10 the department, this investigation.  In other words for the
11 good or for the bad that there are some repercussions
12 some event that has taken place or should have taken
13 place that didn't and as a result ultimately is plenty
14 impact upon the operation of department.
15       QUESTION: Yes sir, absolutely.  And what you
16 meant in the sort of a additional response you do just a
17 minute ago, we know what meant was, I assume, that the
18 commissioner can't come to you for example the
19 wiretapping example that you gave.  The commissioner
20 can't come to you and say hey Skurkis ah I don't have a
21 warrant or anything.  I want you to do me a favor.  Go
22 wiretap my wife's phone cause I want to find out want
23 he's doing.  I mean the bottom line there is in a
24 ridiculous hypothetical, you would be.  The request
25 would be made or you to do something illegal or even

1 criminal and therefore it's improper, and you don't have
2 to do that right?  In fact you wouldn't do it.  Absolutely
3 Not!
4       ANSWER: And I'll tell you that if you look in
5 4.25 the word is request.  It doesn't say at the direction
6 of.  It says at the request of.  That allows the Internal
7 Affairs Division to evaluate the propriety of is this
8 investigation in anyway germane to the operation of the
9 department.  Or is this at the personal pleasure of the
10 commissioner or something else.  Again it adds at that
11 level of checks or balances there.  That the commissioner
12 can't just order you that he may request that the Internal
13 Affairs Division initiate a new investigation.
14       QUESTION:  Well at the time, I'm sorry where
15 you done?
16       ANSWER: And one time the fact what he does
17 makes it more then just his decision.  You know he may
18 be the cabalist, but other superiors would have to be in
19 agreement with conduction this investigation.  I mean
20 he's the Director of the Bureau Professional
21 Responsibility.
22       QUESTION: Okay so what your telling me then
23 Major Conley appointed Mr. Wertz and Mr. Willaims to be
24 investigated.
25       ANSWER: Uh I don't know that.

QUESTION: Well you would assume that he did

ANSWER: No not necessarily.

QUESTION: Well then the commissioner appointed them? Could he appoint them?

ANSWER: I don't know what appoint, assign is usually the term we don't ever appoint people to do an investigation, we assign them.

QUESTION: I'm sorry sir. I'll use the use the word assignment

ANSWER: And the assignment like in the case of a troop let's say the troop member does something wrong. The troop commander may assign the investigation. It would be at the concurrence of the Director of BPR, but the Director of BPR doesn't miss so he assigned investigator.

QUESTION: So as you sit here today you're assuming that Mr. Evanko concurred consulted and there was a concurrence with Major Conley to appoint, I'm sorry assign Mr. Wertz and Mr. Williams, the investigators, in the Ober matter. Now you're assuming that.

ANSWER: No I'm not assuming that cause I don't know if the commissioner had anything to do with it. I don't how the investigation started.

65

QUESTION: I know. Sir, I realize that, bare with me.

ANSWER: We've taken quantum leaps here, that apparently things you're saying, I don't really know that to be a fact.

QUESTION: I'm not amnesia? You're child of BPR. You're a lot of years of experience with BPR and you're a fact witness here. I'm asking you those question. I'm not assuming you know the answers to those things. I happen to maybe know some things that maybe you don't hear.

ANSWER: I guess you do?

QUESTION: Well okay, in fairness to me now. The reason I'm asking the question to learn from somebody who has more expertise then I do about BRP and how it functions

ANSWER: And that's fine.

QUESTION: The assignment, you don't know how Mr. Williams and how Mr. Wertz came to be assigned.

ANSWER: No I do not.

QUESTION: Now could Colonel Coury assign them to investigate Captain Ober without the concurrence of BPR?

ANSWER: It's possible. Do I know that is ever

66

been done the past? No I don't

QUESTION: You don't know that it hasn't been done

ANSWER: No I don't. Well I know that up until May of 98 I think I'm quite formulary with IAD operated and BPR. And during that ten years I don't know of any case where the commissioner or any deputies assigned investigators. Now the subject of the investigation has a lot to do with whose being assigned. Normally it's at least an equal rank; well I shouldn't say that often is an equal rank or a superior person being investigated. MR BAILEY: Okay sir. Thank you.

MR BAILEY: Okay. Captain Skurkis, your now running an investigation of the book? Is there any such term?

ANSWER: Running it off the book?

MR BAILEY: Yeah.

ANSWER: I don't know ...

QUESTION: Well you have made reference to the possibility, at least at a relatively low level, that there can be some type of investigation. I hesitate to use that word, maybe inquiry or something. Let's say a Field Commander of a situation that won't necessarily, and remember I've used the word launched and you had corrected me, launched or started or initiated a BPR

investigation? I've used the term full investigation, and you had corrected me. You'd come in with a concept of adjudication and that sort of thing. You know, you're educating me to this process this is one of my questions. I may not be exactly perfect. What I want to ask you about now are questions about the process. And what happens from an initial inquiry stage to where an investigation becomes fully involved? I guess that's the best way I know how to describe it. Okay. Let's say that there is a, probably on a daily basis, commanders look into and evaluate things that sometimes include what people in their command do. Is that fair to say it's a normal part of running a large organization?

ANSWER: Yes.

QUESTION: Okay. At some point in response to questions I' asked you've made reference to having a reason. You know, for want of a better description, I don't know how else to say this, to actually launching or getting involved in, or initiating a full blown inquiry or investigation; that there should be a reason for that.

ANSWER: Sure.

QUESTION: I mean that goes without saying. That's common sense. And that one of the reasons that BPR was created to prevent abuse in situations where there wasn't a good reason, to investigate someone



1  activities. That sort of thing, but that was one of reasons
2  that BPR got started to create a process, a predictable
3  process.
4          ANSWER: Correct.
5          QUESTION: Okay. Now aside from the
6  investigation do you know of any other....Strike that
7  because I don't think in fairness to you. Did you at some
8  time since the fall of 1998 and the spring of 1999, have
9  you at some time learned that it was the commissioner
10  who requested that Captain Ober be investigated?
11          ANSWER: Since then I had heard that. Let me
12  put it that way. I don't know. You know again I'm a
13  person of evidence. I want to see the document. I want
14  to read what the report says. I don't want to hear it,
15  because what you hear and what become fact are two
16  different things.
17          QUESTION: I sure agree with you.
18          ANSWER: I don't know that to be certain
19  because I haven't seen any documentation on it, but
20  that's what I had heard. Yes.
21          QUESTION: The reason I asked you that
22  question is that you had related an experience where you
23  went into the conference room kitchen on an occasion
24  where Mr. Williams and Mr. Werts were reviewing
25  transcripts. Do you remember your response?

69

1          ANSWER:  Yes
2          QUESTION: And there was an inquiry about
3  you, a general a generic inquiry of you, about procedures
4  of BPR tech?
5          ANSWER: Well I don't know what was asked of
6  me. I don't know if it even had anything to do with my
7  response, but that is what I remember saying and I
8  believe that was one part we got cut off. The other part of
9  my direction to them was that whichever avenue is
10  expressed, if its done as an Internal Affairs investigation
11  then that you are to utilize the documentation that
12  Internal Affairs has incorporated in to 4-.25, in other
13  words administrative rights, notification inquiry, as well
14  as the format of investigation. If you do not do it as an
15  Internal Affairs investigation then you do not use the
16  documents that are in 4-25. Don't mix apples with
17  oranges was my direction to them.
18          QUESTION: Now you had mentioned an issue
19  there about where we had got cut off. What you are
20  referring to is that I had interrupted you at that point
21  right?
22          ANSWER: I never finished that statement, for
23  whatever. I can't remember why.
24          QUESTION: With my bad manners I'm now
25  returning to it, my apologies. At the time, when I was

70

1  thinking, when you raised that issue was that you had
2  also made reference at one point to use the word request,
3  the role of the word request from the commissioner.
4  Remember? And you used that actually a little later on
5  after I had interrupted you right? And is what you meant
6  by request is that the commissioner cannot direct? The
7  commissioner can only request BPR to investigate
8  something.
9          ANSWER: I view request as being less of a
10  concrete term. Direct means this is the ways it's going to
11  be. You're going to do this. A request is something, is
12  something that you ask and then I think it usually is
13  accompanied by reasons for the request. Direction
14  means I just tell you; you don't need a reason. Request
15  means that I would like you to do this because.
16          QUESTION: Agreed. Now can the
17  commissioner direct BPR to investigate something?
18  Order them? You will investigate this.
19          ANSWER: If it's misconduct, yes. If there's a
20  situation of misconduct or perceived misconduct, yes.
21  But that's invested in the regulation 4-25. You going do
22  it either way.
23          QUESTION: But 4-25 does not permit you to
24  go on a fishing expedition. If I remember 4-25,
25  engendered in the regulation is an assumption that there

1  is stated ground for the investigation.
2          ANSWER: Well no those are my words. In other
3  words, those are my words behind what, when 425 was
4  written, what was expected, but that's not what's in the
5  regulation. The regulation says at the request of. And I
6  would fall back on my expectations, or our expectations
7  at the time we wrote that is that the commissioner would
8  have to in some way, have to believe whatever's being
9  investigated is really related to the department, will
10  impact it you know, even from the standpoint he used
11  the word witch hunt. Let's say a gun comes up missing
12  out of the station. We don't know why it's missing. We
13  don't know if the cleaning lady took it. We certainly can't
14  say that one of the members stole it. We don't know
15  that. So there may be an investigation conducted and
16  when you're done with the interviewing of every member
17  on that station trying to find out what his or her
18  involvement may have been, people at the station would
19  probably say he's conducting a witch hunt. They're trying
20  to pin this on somebody here. Well as commissioner, I'd
21  be saying I've got to find out what's going on at that
22  station. Why is this gun missing? So it's an
23  investigation that's being conducted, but some people
24  may view it as a witch hunt. And I view it as managerial
25  response to an activity that in someway shape or form I

1  may have to account for later. IE that that gun is used in
2  a homicide, and traced back to the State Police. In one
3  respect there is a very fine line there between categorizing
4  an investigation as a witch hunt verses a total review of
5  the circumstances. So I fall back on what is the
6  relationship of this investigation to the department? If
7  there's a relationship there and the commissioner wants
8  it done, if he can show that relationship, I'd be hard
9  pressed as a captain or a major in BPR to say we're not
10 doing it.
11      QUESTION: Can you envision a circumstance
12 where you'd say we're not doing it?
13      ANSWER: The example I gave was if someone
14 said I believe my wife's having an affair. I'd like you to
15 follow so and so around. I'm not going do it sir.
16      QUESTION: Do you know of any actual
17 circumstance where a commissioner come down and
18 asked BPR or made a request to BPR to do something
19 that was superfluous not any interest of the bureau or
20 was politically motivated let's say?
21      ANSWER: So far I think we've been blessed
22 with commissioners that have been above board and that
23 go by the book.
24      QUESTION: And if a commissioner comes in
25 here and doesn't have a good reason for doing something

73

1  then that might change your mind
2      ANSWER: Yes, if he doesn't have the reason.
3      QUESTION: If he doesn't have the reason you
4  might change your mind. Now, I had also asked you
5  some questions and you had indicated that there were
6  circumstances where a commissioner would make a
7  request, and I'm not really clear on it,  that there would
8  need for BPR to concur in that decision before the
9  accrual process of investigation began. Let me tell you
10 where I'm coming from to explain what I mean by that
11 end part. It is my understand, in this situation,  that
12 indeed some investigators were assigned by the
13 Pennsylvania State Police without any kind of; this is my
14 understanding it doesn't make me right. I don't want you
15 to; I want you to understand that in my making this offer
16 to you I'm reflecting what I can best remember. And I'll
17 ask you a question based on that, but don't assume that
18 I'm correct in my assumptions. I'll just tell you what I
19 have come to believe and understand. It is my, Don
20 Bailey's understanding I'm not testifying here. These are
21 not documents in front of you as blurted out, not very
22 appropriately referred to earlier, you know with being the
23 best situation. I can just give you what I remember. My
24 understanding is that investigators at the request of the
25 commissioner, deputies, or close assistants of his had

74

1  went and appointed investigators. That's my
2  understanding. You used the word assigned. I don't
3  know if I agree with that term. My understanding is that
4  they were just told to do this. I may be wrong. It is my
5  understanding, based on the facts that I know, there was
6  no consulting with rules, regulations of BPR, no asking of
7  BPR of anything, no request or permission from BPR to
8  do anything. Okay, and I'm not saying that BPR or the
9  Director of BPR would be in a position to tell the
10 commissioner no. I don't know the answer to that. From
11 a political point of view I have a tendency to think that
12 that would take an awful lot of courage in a real
13 repugnant situation. I can't even imagine it arising. I
14 can't, but I don't know of any; I know of no facts we
15 haven't interviewed Major Conley yet and we're going to
16 see what he has to say. Although I think I know the
17 answers. We'll see, but I don't know any going
18 through what I would refer to normally as the proper
19 correct channels. Okay, that I know of, I'm not saying
20 what the commissioner did was wrong. I just don't know
21 of any. My understanding is these guys started
22 investigating at the direction of his deputies. At some
23 point, to my understanding, yes it comes to the attention
24 of BPR. I'm talking about as a bureaucracy. It comes to
25 it's attention. My question would be as follows. If I am

1  correct about that, this thing took a direction, that it
2  started, that it's under way, this investigation, and then
3  organizationally; Sir I was using BPR, I should be saying
4  IAD okay. So I'm at fault there. I didn't mean BPR. I
5  meant the attention of IAD. I don't know whether
6  something can initiate at, you know here's BPR. I view
7  them as the top and then view organizationally on an
8  organizational sheet. I view IAD and I view your division.
9  Now at some point it comes to the attention of IAD after
10 it's started. My understanding from your testimony and
11 the others testimony is that might not mean much of
12 anything, because there may be an initial inquiry stage
13 or evaluation stage where something is looked at. When
14 it's final, maybe it takes on a form that there is a
15 suspicion you know a mere suspicion or that kind of
16 thing then it becomes more formal. Okay at some point
17 it takes on a bureaucratic form and it gets and it starts to
18 tracks and all that sort of stuff. Is that correct? Is that
19 the way things could get started? Is it possible that these
20 deputies can go and assign a couple of majors to
21 investigate Captain Ober and they learn something and
22 say -. He maybe did this and then it gets a
23 bureaucratically assigned number, but something like
24 that happen? Can you envision that?
25      ANSWER: Yes. It happens quite often on the

1 lower levels. That there is a cursory inquiry conducted to
2 some allegation. At some point it's determined..... Let me
3 give an example. Someone calls into the troop
4 commander and says one of your cars ran me off the
5 road responding to an incident. The commander
6 contacts a corporal. This Corporal is looking at us. The
7 Corporal looks into it and finds out it was not a state
8 police car, but it was an East Pennsboro Police car.
9 That's the end of it. We're not going any further now.
10 This is not a State Police issue. Maybe we'll forward the
11 information to East Pennsboro. Refer it I don't know, but
12 as far as IAD goes that's over. At the same time the
13 Corporal may find out there was a robbery taking place
14 and the State Police send in nine cars. Yes, it's likely
15 that one of our cars ran this poor elderly lady off the
16 road. We're going to do an Internal Affairs investigation
17 to determine who did, who was driving the car, which car
18 was it? So circumstances could be looked at in a
19 preliminary determination as to whether the Internal
20 Affairs process should become involved.
21 QUESTION: So you expect that some point
22 before this became a formal investigation, a more formal
23 investigation, that there's some hiatus event or cursory
24 review, yielded information which would indicate that a
25 further or full investigation was justified. Before you

77

1 ANSWER: Correct.
2 QUESTION: Do you know if that happened in
3 Captain Ober's case?
4 ANSWER: No I do not.
5 QUESTION: You don't know if it's ever been
6 adjudicated?
7 ANSWER: No. I'm not certain of that. I don't
8 know that. I know something was done because I know
9 interviews were conducted, but I don't know in what
10 shape or form that ultimately was documented.
11 QUESTION: Or if it was.
12 ANSWER: Well I'm assuming because there
13 were interviews. At least there were transcript or tapes.
14 That record I'm sure exists, but I don't know what
15 beyond that.
16 QUESTION: Who would have this?
17 ANSWER: The investigators.
18 QUESTION: Who is the adjudicator? If there
19 was any adjudicator on Captain Ober. Do you know?
20 ANSWER: It depends on where he was
21 assigned at the time that the investigation was
22 completed. It would be his commanding officer. So
23 whoever his commanding officer was.
24 QUESTION: Koselnak? He's in LCE I guess
25 he...

1 assign the number and go through with it.
2 ANSWER: Well there could similarly be
3 circumstances where this Corporal doesn't know which
4 way to go.
5 QUESTION: Doesn't know which way to go?
6 ANSWER: Doesn't have the resources. Doesn't
7 have the time and it's decided hey we got to be on the
8 safe side and it's investigated. Contact Internal Affairs
9 get a number, do a worksheet, and have an investigation
10 conducted.
11 QUESTIONS: Could you hold at that one
12 point? I think we need; All right let me see if I can finish
13 this one. Okay let's say there's a number's assigned that.
14 There's some kind of intervening information or
15 additional information or information has developed
16 sufficient to make this a situation where okay we need to
17 investigate and go forward. And it's a formal IAD or BPR
18 investigation. I know so let's say it's a BPR. Once that
19 process is completed, as I understand it, there's a report
20 written that is essentially is a factual summary. Am I
21 correct? It doesn't make recommendations on what to do
22 or anything like that. It's a factual summary.
23 ANSWER: That's correct.
24 QUESTION: Okay. Then it goes to
25 adjudication, what you referred to as adjudication.

78

1 ANSWER: Okay LCE. Then would he have
2 been in the bureau?
3 QUESTION: I guess.
4 ANSWER: Well if he was there.
5 QUESTION: Major Wall, IMMS
6 ANSWER: Okay if he was assigned there then
7 he was assigned to Technology Services. The Bureau of
8 Technology Services. The Bureau Director is Major Wall.
9 He would responsible for Technology
10 QUESTION: And if it wasn't him, and he's
11 assigned to LCE then it's going to be Mr. Koselnak.
12 ANSWER: If Major Koselnak was the Bureau
13 Director at the time. There's a different Bureau Director
14 at the time.
15 QUESTION: Would it be anybody above that?
16 ANSWER: As a Captain assigned to a Bureau it
17 should be the Bureau Director that makes the
18 adjudication. I don't know of any circumstances where
19 that's been other than that.
20 QUESTION: Once they do the adjudication
21 what do they do then? Let me take that back. What if
22 the facts don't suggest the person did anything wrong?
23 ANSWER: Well if the person had been
24 provided with a notification of inquiry in writing. That
25 spells out an issue. That issue should be communicated



1  to them where it's adjudicated as to... I don't know what
2  it said, but addressing whatever the notification of
3  inquiry said.
4          MR BAILEY: You know what. I'm going to try
5  and pack this in to this two hour tape if I can. Can we
6  suspend?
7          MR. MARCECA: Yes we can. It's 3:04. We're
8  now going to suspend the deposition.
9          MR. MARCECA: It's 3:08. We're back on
10 camera and deposition.
11         MR BAILEY: Is that one on down below?
12         MR. MARCECA: Yes sir.
13         MR BAILEY: All right. Captain Skurkis I'd like
14 to thank you very much for you coming here today. I
15 very much appreciate you cooperation. I have no further
16 questions for you. I again apologize sometimes it's hard.
17 Your answers are very involved and technical. I think I
18 interrupted you a couple times. I apologize for that. I
19 think we were able to get back to them though. Is there
20 anything you'd like to add or any questions I asked that
21 you'd like explained. If not we're done.
22         A: In response to one of your comments. You
23 drew this scenario about you thought is was, what was
24 the term you used. You believed it's next to impossible
25 that if the commissioner came to someone and asked

81

1  them to do an investigation that they wouldn't go ahead
2  and do it. I know how you used the term there. Anyway,
3  what I would like to say is you're looking at it from that
4  kind of standpoint. From my standpoint I can... I think
5  what you said was unfathomable. That they would not
6  go ahead with the investigation.
7          MR BAILEY: If there was a reason for it. I
8  mean a good reason for it.
9          A: Oh okay
10         MR. BAILEY: I did not mean to imply if I
11 implied that someone would say to the commissioner,
12 you know, like go into some detailed question or question
13 the commissioner in a case where let's say that the
14 commissioner came with a totally frivolous request. Now
15 I have difficulty envisioning a situation where most of the
16 State Police members I've talked to if a commissioner
17 came with a outlandishly frivolous or an irrelevant kind
18 of a personal request let's say that was obvious. One of
19 the examples you raised I think was an improper
20 wiretapping situation. Now I assume that most of you
21 would say oh no I'm not going to do that. Although we
22 have had testimony here where some of the staff
23 members have indicated that if they knew that the
24 commissioner himself was target of an investigation I
25 believed that they indicated that they said yes out of

82

1  loyalty they would tell him. I disagree with that. Most of
2  the members that have testified here I think would have
3  disagreed with that. I have not asked you that question.
4  I don't intend to. I don't see any reason to. I don't think
5  it's relevant, but you're not a defendant here. For what
6  it's worth I have had a response like that which sort of
7  shocked me. I maybe didn't hear it right, and maybe the
8  question wasn't understood properly either.
9          A: We're clear now.
10         MR BAILEY: I, we're on the straight and
11 narrow. We're reading from the same page. Again I'd like
12 to thank you for being here. And I'd like to thank you
13 very much for your courteous responses. Any questions
14 before we go?
15         TONY MARCECA: It's 3:12 on 5 march 2002.
16 The video deposition is now completed.
17
18
19
20
21