IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL G. OBER, | : | |
| | : | |
| Plaintiff | : | No. 1:CV-01-0084 |
| | : | (Judge Caldwell) |
| v. | : | |
| | : | CIVIL ACTION – LAW |
| PAUL EVANKO, MARK | : | |
| CAMPBELL, THOMAS | : | JURY TRIAL DEMANDED |
| COURY, JOSEPH | : | |
| WESTCOTT, HAWTHORNE | : | |
| CONLEY | : | |

FILED
HARRISBURG, PA

MAY 2 ? 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## EXHIBITS TO THE DEFENDANTS' BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**VOLUME 1**

| AFFIDAVITS: (Listed Alphabetically) | EXHIBIT NO. |
|---|---|
| Klaus Behrens | 1 |
| Linda M. Bonney | 2 |
| Captain John R. Brown | 3 |
| Mark R. Campbell | 4 |
| Lt. Col. Hawthorne N. Conley | 5 |
| Thomas Coury | 6 |
| Major Phillip L. DeWire | 7 |

Major Robert R. Einsel                           8

Col. Paul J. Evanko                              9

Marc J. Infantino                               10

Major Francis E. Koscelnak                      11

Lee Ann Labecki                                 12

Captain Frank Monaco                            13

Captain Charles J. Skurkis                      14

Joseph Westcott                                 15

Mary Woolley                                    16

Captain David F. Young                          17

**DEPOSITIONS:**
**(Listed Alphabetically)**

John Brown                                      18

Mark Campbell                                   19

Hawthorne Conley                                20

**VOLUME 2**

Thomas Coury                                    21

Phillip DeWire                                  22

**VOLUME 3**

Paul Evanko                                     23

Robert Hickes                                   24

**VOLUME 4**

Francis Koscelnak                                    25

Ralph Kush                                           26

Louis Lazzaro                                        27

**VOLUME 5**

Darrell Ober                                         28

Charles Skurkis                                      29

Michael Soohy                                        30

**VOLUME 6**

Joseph Westcott                                      31

**OTHER REFERENCES:**

Administrative Regulation 4-25                       32

Collective Bargaining Agreement, Article 38          33

O.M. 7-9, dated 5/8/98                               34

Petitioner's Motion to Withdraw, Dated 1/27/00
    Filed to No. 35 MD 2000, Commonwealth Court      35

Special Order 85-198                                 36

Pennsylvania State Police Field Regulation 3-2.05    37

Pennsylvania State Police Field Regulation 1-1.28    38

Pennsylvania State Police Field Regulation 1-1.17    39

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                          :
                                          :
            Plaintiff                     :   No. 1:CV-01-0084
                                          :   (Judge Caldwell)
        v.                                :
                                          :   CIVIL ACTION – LAW
PAUL EVANKO, MARK                         :
CAMPBELL, THOMAS                          :   JURY TRIAL DEMANDED
COURY, JOSEPH                             :
WESTCOTT, HAWTHORNE                       :
CONLEY                                    :

---

**EXHIBITS TO DEFENDANTS' BRIEF IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
VOLUME 1**

---

STATE OF     Pennsylvania

COUNTY OF Dauphin

<u>AFFIDAVIT</u>

I, Klaus Behrens, swear and affirm the following:

1.   My name is Klaus D. Behrens and I am a retired Pennsylvania State Police (PSP) Captain.  Just prior to my retirement in 1998, I served as the Administrative Director for the Bureau of Drug Law Enforcement.

2.   Before being assigned to the Bureau of Drug Law Enforcement, I was the Western Section Commander for the Bureau of Professional Responsibility (BPR), Internal Investigation Unit.  I served in that capacity from the beginning of 1996 until June 28, 1997.  My office was located in Greentree, Pennsylvania.

3.   During the time I spent as Western Section Commander with BPR, I was contacted by FBI Agent Ralph Kush on January 30, 1997, relative to an investigation the FBI was conducting involving a PSP Trooper, Kipp Stanton, and a job-selling scheme.

4.   Agent Kush told me that they had information to believe that Trooper Kipp Stanton had approached an individual and offered to pay him ten thousand dollars to get a friend into the Pennsylvania State Police.  Agent Kush wanted to know if the State Police were involved in any type of political sting investigation that Stanton might be involved with and he asked me to make appropriate inquiries to determine if this were so.

5.   Pursuant to Agent Kush's request, I determined that Trooper Stanton was assigned to Troop A.  I then contacted Captain Pudliner, who was the Troop Commander of Troop A at the time to ascertain if Stanton might be involved in any type of sting or undercover investigation.  I also spoke to Lieutenant McKnight, the Crime Section Commander at Troop A, and Jean Reidenbaugh, a Trooper assigned to the General Investigations Section of the Bureau of Criminal Investigation about the same topic.

6.   On February 3, 1997, I contacted Kush and informed him that the State Police was not involved in any sting or other investigation regarding Trooper Stanton.   I also spoke to Captain Geoff Miller, my supervisor in BPR, to inform him of the FBI investigation.

7.    Special Agent Kush mentioned only the name of Trooper Kipp Stanton as being involved in the illegal job-selling scheme. He did not mention that anyone else in the Department was involved in this scam, nor did he mention anyone from the Governor's office, a Deputy Commissioner, or any high-ranking officer of the Pennsylvania State Police as having possible involvement in this job-selling scheme.

8.    Special Agent Kush did not request me to keep the information on Trooper Stanton "top secret" or "highly confidential."

9.    I had no further contact with Agent Kush regarding this investigation.

10.    I considered the call from Agent Kush as a request to assist a federal agency with its investigation and once I made the contacts described above, I had no further involvement in this matter.


_Klaus D. Behrens_

Captain Klaus D. Behrens
(PSP, Retired)

Sworn to and subscribed before me this

_17_ Day of _May_ 2002

Notary Public
My Commission Expires:

> Notarial Seal
> Deborah D. Lukacs, Notary Public
> Cumberland Twp., Greene County
> My Commission Expires Jan. 23, 2004
> Member, Pennsylvania Association of Notaries

2

COMMONWEALTH OF PENNSYLVANIA        :
                                    : ss.
COUNTY OF DAUPHIN                    :


AFFIDAVIT OF LINDA M. BONNEY


I, LINDA M. BONNEY, swear and affirm the following:

1.     I am currently the Director of the Bureau of Human Resources for the Pennsylvania State Police.

2.     I am a records custodian for all personnel records of the Pennsylvania State Police.

3.     In preparation for this affidavit, I reviewed Capt. Darrell Ober's personnel file, including his job description and the identification of his essential job functions, when he was the Director of the Internal Affairs Division of the Bureau of Professional Responsibility.  Copies of both the job description and the essential job functions are attached hereto and identified as Attachments (a) & (b).

4.     Block 6 of Capt. Ober's job description describes his work when he was the Director of the Internal Affairs Division, and lists his critical duties and responsibilities first.  Part of the information in this block reads as follows:  "The Division is responsible for the investigation of internally and externally generated complaints regarding personnel conduct and performance; non-complaint investigations; assisting

the Office of Chief Counsel <u>and conducting other investigations as directed by the Commissioner</u>". (emphasis added).

5.    On page three of Capt. Ober's job description when he was Director of the Internal Affairs Division, there is a table of organization which explains who the supervisor is for the Director of the Internal Affairs Division. This chart verifies that Capt. Ober was to report directly to the Director of the Bureau of Professional Responsibility. This reporting information is also found in block five of the first page of the job description, which indicates that Capt. Ober reported to Major R. Dane Merryman, who was the Director of the Bureau of Professional Responsibility at the time this job description was prepared.

6.    In the document labeled "Identification of Essential Job Functions", which was prepared to identify the essential job tasks for Capt. Ober when he was the Director of the Bureau of Professional Responsibility, paragraph (1) reads as follows: "Supervises the Internal Affairs Division, responsible for the investigation of internally and externally generated complaints regarding personnel conduct and performance; non-complaint investigations; assisting the Office of Chief Counsel, <u>as well as conducting other investigations as directed by the Commisisoner.</u>" (emphasis added).

7.    Capt. Ober would have been aware of the duties and responsibilities of his job as Internal Affairs Director, because he was required to sign his job description, and in fact did so on June 8, 1998.

LINDA M. BONNEY
Director, Bureau of Human Resources
Pennsylvania State Police

Sworn to and subscribed

before me this ___17th___ day

of May, 2002

Notary Public

NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003

COMMONWEALTH OF PENNSYLVANIA
STD-800A

# JOB DESCRIPTION

| 1. Name of Employe (Last, First, MI) | | | 2. Employe Number | Position Number |
|---|---|---|---|---|
| OBER, Darrell G. | | | 099820 | 104566 |

| 3. Department | Bureau | Division | Headquarters | Organization Code |
|---|---|---|---|---|
| State Police | Professional Responsibility | Internal Affairs | DHQ | 7310 |

| 4. Class Title | Working Title | Class Code |
|---|---|---|
| Captain | Division Director | 74060 |

**5. Regular Work Schedule**

Start Time: 0815    Lunch Length: 0.50

End Time: 1615    Hours/Week: 40.00

**Position is:**

[X] Full-Time    [X] Permanent

[ ] Part-Time    [ ] Temporary

**Reports to:**    Name: R. Dane Merryman    Class Title: Major

**Days Worked (Check all that apply.):**

| S | M | T | W | TH | F | S |
|---|---|---|---|---|---|---|
| | X | X | X | X | X | |

Explain any schedule variations:

**6. Describe the work assigned to this position, listing the critical duties and responsibilities first. Explain work in familiar terms and include machines or equipment used. Use additional paper if needed.**

This position is responsible for directing the work of the Internal Affairs Division, Bureau of Professional Responsibility. The Division is responsible for the investigation of internally and externally generated complaints regarding personnel conduct and performance; non-complaint investigations; assisting the office of Chief Counsel and conducting other investigations as directed by the Commissioner.

1.     Ensures proper planning and analysis within the Division.

15%    Ensures proper planning and analysis within the Division by anticipating Department, Bureau and Division needs and requirements in areas such as budget preparation, federal grant development, program analysis, legal analysis, and emergency planning; setting policy and procedures; establishing time schedules; and assigning appropriate personnel to meet requirements.

2.     Directs administrative responsibilities of Division.

10%    Directs the administrative responsibilities of the Division, including budget and contract management, approvals and authorizations, facility and equipment management, documentation and record keeping, by conferring with superiors and subordinates, completing assignments, responding to requests, solving problems, and making decisions as required.

3.     Supervises and manages subordinate Division personnel.

15%    Supervises and manages personnel by monitoring, documenting, coaching and correcting performance; conducting performance evaluations; resolving personnel problems and conflicts; ensuring compliance with rules and regulations; providing leadership; and ensuring a non-discriminatory work environment.

7.  Briefly describe how work is assigned to this position and how the work is reviewed.

The majority of assigned duties are defined by Administrative Regulation 4-25. Ancillary assignments are usually directed by correspondence and personal meetings. Supervisor reviews work by direct involvement or examination of final product.

8.  If this is a supervisory position, briefly describe how work is assigned to subordinate personnel and how their work is reviewed. (If this is not a supervisory position, leave blank.)

Subordinates' major job function concerns the supervision of investigations into allegations of personnel misconduct. Daily interaction with subordinates via phone or in person ensures continuous updates and opportunities to provide additional guidance. Scope and direction of investigation are closely monitored and adjusted if necessary. Review of completed investigative reports allows for final evaluation of subordinates' functions.

9.  Attach an Organizational Chart identifying all reporting relationships for this position.

10. Attach a statement identifying the essential functions of the positions.

CERTIFICATION

I certify that to the best of my knowledge all statements contained within the job description are correct. This job description consists of _____ pages. (Count this form as 1 page.)

Employe's Signature _____  Class Title _CAPTAIN_  Date _6/8/98_

Immediate Supervisor's Signature _____  Class Title _MAJOR_  Date _6/8/98_

Reviewing Officer's Signature _T.K. C___  Class Title _LTC._  Date _6/10/98_

STD-370, Job Description
Page two

4.  **Supervises investigation of personnel complaints.**

25%  Reviews all investigative reports to ensure they are conducted in a fair, prompt, thorough and impartial manner. Provides necessary advice and support to field and Division personnel to ensure uniformity of procedure and product.

5.  **Ensures effective flow of information.**

10%  Ensures effective flow of information from and through the Division by communicating clearly, both orally and in writing, holding staff meetings as needed, and providing an atmosphere which encourages accurate and efficient communication.

6.  **Coordinates intra-department activities.**

05%  Coordinates intra-department activities by responding to inquiries and providing information as requested; attending staff meetings, Command Conferences, etc.; implementing federal grants, etc.

7.  **Assesses training needs of Division personnel.**

05%  Provides training to Division personnel by assessing training needs; selecting and approving personnel to attend training, in accordance with regulations; developing training programs, where needed; and evaluating in-service and out-service training programs for usefulness to Division personnel.

8.  **Maintains necessary knowledge and skills.**

05%  Maintains necessary knowledge and skills by keeping current on changes in Department policies and regulations, law enforcement procedures, and management principles; attending training as needed; and reading professional literature.

9.  **Performs other duties as required.**

05%  Performs other duties as required, including serving on boards, conducting investigations, attending ceremonies, drafting Department regulations, evaluating special equipment, and reviewing legislation and making recommendations.

10.  **Ensures effective working relationship with other agencies.**

05%  Ensures effective working relationships with external agencies and organizations by maintaining a professional Department image, and an atmosphere of cooperation with the general public, media, other law enforcement agencies and the courts, and public and private organizations.

11.  Performs other related duties and those duties of a law enforcement officer as required, including, but not limited to interpreting laws and statutes of the Commonwealth, pursuing suspects, effecting arrests; qualifying with and, when necessary, using agency firearms and other self-defense devices; operating vehicles and using equipment in conjunction with law enforcement duties; responding to emergencies, civil disorders and disasters; and performing rescue functions.

STD-370, Job Description
Page three

Director, Bureau of Professional Responsibility

Director, Internal Affairs Division

Eastern Section    Central Section    Western Section    Administrative Unit
Commander          Commander          Commander          Supervisor

AR 4-22
1/30/98

## IDENTIFICATION OF ESSENTIAL JOB FUNCTIONS/ADA

**Name:** OBER, Darrell G.

**Classification:** Captain - Director, Internal Affairs Division

**Essential Job Functions:**

1. Supervises the Internal Affairs Division, responsible for the investigation of internally and externally generated complaints regarding personnel conduct and performance; non-complaint investigations; assisting the office of Chief Counsel, as well as conducting other investigations as directed by the Commissioner.

2. Directs administrative responsibilities of the Division.

3. Maintains knowledge and skills by keeping current on changes in Department policies and regulations, law enforcement procedure and management principles.

4. Performs required duties, such as serving on boards, conducting investigations, drafting Department regulations, reviewing legislations.

5. Performs other related duties of a law enforcement officer as required, including, but not limited to: interpreting laws and statutes of the Commonwealth; pursuing suspects; effecting arrests; qualifying with and, when necessary, using agency firearms and other self-defense devices; operating vehicles and using equipment in conjunction with law enforcement duties; responding to emergencies, civil disorders and disasters; and performing rescue functions.

_____         5/22/98
**Supervisor Signature**                **Date**

C.3

3

COMMONWEALTH OF PENNSYLVANIA    :
                                       : ss.

COUNTY OF DAUPHIN                     :


## AFFIDAVIT OF CAPTAIN JOHN R. BROWN


I, CAPTAIN JOHN R. BROWN, swear and affirm the following:

1.     I am currently the Director of the Internal Affairs Division of the Bureau of Professional Responsibility.

2.     I am familiar with the procedure for conducting administrative interviews, because I have conducted numerous administrative investigations and inquiries myself and because I currently supervise 13 investigators who do such investigations. Moreover, I am familiar with the procedures for conducting interviews in criminal cases, because I was a criminal investigator and supervisor for over 10 years with Troop K, Philadelphia and Troop H, Harrisburg.

3.     I have reviewed the transcript of the interview of Capt. Darrell Ober in the administrative inquiry conducted by Majors Thomas Williams and Robert Werts, as well as the entire administrative inquiry. As a result of that review, I can state that the interview of Capt. Ober was done as an administrative interview, pursuant to State Police Administrative Regulation 4-25. That regulation and the Collective Bargaining Agreement, Article 6, Section 5, provide that Administrative/Garrity warnings must be

given, when appropriate, and the member must be permitted to have a union representative present if he desires.    Ober was given Administrative/Garrity warnings and provided with a union representative.  Ober was not in custody at the time of the interview, and was not subject to criminal sanctions if he would have refused to answer questions.  Ober was required to answer the questions directed to him, pursuant to F.R. 1-1.28, but if he refused to answer, he was only subject to employment sanctions.  As long as he was willing to risk employment sanctions, Ober could have left the interview at any time.

4.    I am certain that Capt. Ober understood the nature of administrative interviews, because he was the former Director of the Internal Affairs Division, the position I now hold.

5.    As the Director of the Internal Affairs Division, my job responsibilities require me to direct the work of the Internal Affairs Division, which includes the conducting of investigations as directed by the Commissioner.  This would include the administrative inquiry conducted by Majors Williams and Werts.

6.    It is my understanding, from reviewing Capt. Ober's deposition transcript, that he testified that he did not know the proper procedure for investigating an allegation against a Deputy Commissioner, Commissioner, or other top management of the Pennsylvania State Police.  This is false, because he assigned me to conduct an investigation of an allegation of misconduct made regarding Lt. Col. Westcott on September, 16, 1998.  The Commissioner and deputy commissioners and other top management of the State Police are investigated in the same manner as any other member of the Pennsylvania State Police.

7.    Capt. Ober has also accused me of shunning or harassing him in some manner.  I have never shunned, harassed, or ostracized Capt. Ober in any manner, nor have I ever insulted him, verbally or non-verbally.   None of the defendants have ever directed or requested me to shun, ostracize, harass or insult Capt. Ober in any manner.

*Capt. John R. Brown*

CAPTAIN JOHN R. BROWN
Director, Internal Affairs Division
Bureau of Professional Responsibility
Pennsylvania State Police

Sworn to and subscribed
before me this _17th_ day
of May, 2002

*Vickie A. Bucher*
Notary Public

NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003

4

COMMONWEALTH OF PENNSYLVANIA    :
                                     : ss.

COUNTY OF DAUPHIN                           :

## AFFIDAVIT OF MARK R. CAMPBELL

I, Mark R. Campbell, swear and affirm the following:

1.      I am presently Governor Mark Schweiker's Chief of Staff.

2.      In May, 1999, I was Governor Tom Ridge's Deputy Chief of Staff.

3.      I do not personally know Capt. Darrell Ober.

4.      If Capt. Ober has ever been shunned, ostracized, or harassed, or subjected to insults of any kind, it was not at my direction, or behest.

5.      I have never personally shunned, ostracized or harassed Capt. Ober or subjected him to insults of any kind.

_Mark R. Campbell_
MARK R. CAMPBELL

Sworn to and subscribed

before me this __16th__ day

of May, 2002

_Vickie A. Bucher_
Notary Public

NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003

5

COMMONWEALTH OF PENNSYLVANIA          :
                                       : ss.
COUNTY OF DAUPHIN                      :

### AFFIDAVIT OF LT. COL. HAWTHORNE N. CONLEY

I, Lt. Col. Hawthorne N. Conley, swear and affirm the following:

1.     I am currently the Deputy Commissioner of Administration for the Pennsylvania State Police.

2.     Just prior to being appointed to my current position, I served as the Director of the Bureau of Professional Responsibility, at the rank of major.

3.     I was Capt. Darrell Ober's direct supervisor for a period of time in the Bureau of Professional Responsibility.

4.     I have never personally shunned, ostracized or harassed Capt. Ober or subjected him to insults of any type.

5.     If Capt. Ober was shunned, ostracized, harassed or subjected to insults of any type, it was not at my direction or behest.

_____
LT. COL. HAWTHORNE N. CONLEY
Deputy Commissioner of Administration
Pennsylvania State Police

Sworn to and subscribed

before me this _16th_ day

of May, 2002

_____
Notary Public

NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003

6

COMMONWEALTH OF PENNSYLVANIA        :
                                     : ss.
COUNTY OF DAUPHIN                     :

## AFFIDAVIT OF THOMAS COURY

I, Retired-Lt. Col. Thomas Coury, swear and affirm the following:

1.      I am currently retired from the Pennsylvania State Police, and am employed by the Parsons Corporation as vice-president.

2.      Prior to my retirement from the Pennsylvania State Police, I served as Deputy Commissioner of Operations, and just prior to that, as Deputy Commissioner of Administration.

3.      As Deputy Commissioner of Administration, Capt. Darrell Ober reported to me through his supervisor, then-Major Hawthorne N. Conley.

4.      I have never personally shunned, ostracized, or harassed Capt. Ober at any time, nor have I ever subjected him to any kind of insults.

5.      I have never directed or requested anyone to shun, ostracize, harass or insult Capt. Ober.

LT. COL. THOMAS COURY
Retired-Pennsylvania State Police

Sworn to and subscribed

before me this _17th_ day

of May, 2002

Notary Public

NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003

7

COMMONWEALTH OF PENNSYLVANIA          :
                                      : ss.
COUNTY OF DAUPHIN                     :

## AFFIDAVIT OF MAJOR  PHILLIP L. DEWIRE

I, MAJOR PHILLIP L. DEWIRE, swear and affirm the following:

1.      I am currently the Director of the Bureau of Liquor Control Enforcement.

2.      Since I have been the Director of the Bureau, Captain Darrell Ober has served as the Director of the Administration Division of the Bureau.  I am Captain Ober's direct supervisor.

3.      I was aware of the fact that Captain Ober filed this lawsuit against Colonel Evanko, Lieutenant Colonel Conley, former Lieutenant Colonel Coury, former Lieutenant Colonel Westcott, and the Governor's former Chief of Staff Mark Campbell.

3.      In order to minimize the contact between the Commissioner and the other defendants in this lawsuit, I personally made the decision to keep Captain Ober out of situations where they would be present.  This decision was mine alone.  I did not consult any of the defendants about this decision, and no one ever instructed me to exclude Captain Ober from activities in which they were involved.

4.      Shortly after I became the Director of the Bureau of Liquor Control Enforcement, Captain Ober requested a PEMA assignment.  I had no objection to that assignment.  Major Leonard Washington, Director of the Bureau of Special Operations, initially told me it was okay for Captain Ober to be assigned to PEMA.  However, he subsequently refused to consider him for the position.  I did not discuss the matter regarding the PEMA assignment with the Commissioner or any of the other defendants

in this lawsuit.  I do not know why Major Washington changed his mind about assigning

Captain Ober to the PEMA position.

*Phillip L. DeWire*

MAJOR PHILLIP L. DEWIRE
Director, Bureau of Liquor Control Enforcement
Pennsylvania State Police

Sworn to and subscribed

before me this _17th_ day

of May, 2002

*Vickie A. Bucher*
Notary Public

NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003

*8*

COMMONWEALTH OF PENNSYLVANIA          :
                                      : ss.
COUNTY OF DAUPHIN                      :


## AFFIDAVIT OF MAJOR ROBERT R. EINSEL

I, Major Robert R. Einsel, swear and affirm the following:

1.      I am currently the Director of the Pennsylvania State Police, Bureau of Training and Education.

2.      I have reviewed Captain Ober's training records at the Pennsylvania State Police Academy in preparation for this affidavit.   As a result of that review, I have determined that Captain Ober became a Pennsylvania State Police Trooper on December 5, 1981.

3.      As a condition of employment with the Pennsylvania State Police, all Pennsylvania State Police officers must sign an oath of office promising to abide by Pennsylvania State Police regulations.  Captain Ober signed such an oath on July 20, 1981.

4.      On July 21, 1981, while at the State Police Academy, Captain Ober received training on the meaning of Pennsylvania State Police Field Regulations, including FR 1-1.

5.     After graduating from the Academy, all members are required to review changes to state police regulations as those changes are issued and disseminated. Members are required to maintain Field Regulation changes in their issued Field Regulations Manual.

6.     Pennsylvania State Police Field Regulation FR 1-1.17(B) states as follows:   "Members shall promptly report to their supervisor any information which comes to their attention and which tends to indicate that any other member or employee has violated any law, rule, regulation or order."

7.     FR 1-1.17(B) became effective March 25, 1992.

8.     Moreover, while Captain Ober was a cadet at the State Police Academy, he received training on the Department's chain of command and its significance in the paramilitary structure of the Pennsylvania State Police.   The importance of reporting matters through his chain of command was emphasized during Captain Ober's instruction at the Academy.

MAJOR ROBERT R. EINSEL
Director, Bureau of Training & Education
Pennsylvania State Police

Sworn to and subscribed

before me this _17th_ day

of May, 2002

Notary Public

NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003

9

COMMONWEALTH OF PENNSYLVANIA        :
                                    : ss.
COUNTY OF DAUPHIN                   :

## AFFIDAVIT OF COLONEL PAUL J. EVANKO

I, Colonel Paul J. Evanko, swear and affirm the following:

1.      I am presently the Commissioner of the Pennsylvania State Police.

2.      I promoted Captain Darrell Ober to the rank of Captain early in my
administration.

3.      As Commissioner of the State Police, I have the sole discretion to
promote a member to the rank of Major.  This authority is addressed in the State Police
Operations Manual 7-9, "Career Development and Promotion Testing," 3.2.  None of the
deputy commissioners has the authority to promote a captain to the rank of major.

4.      With the exception of the commissioner and three deputy commissioners,
the rank of major is the highest enlisted rank in the Pennsylvania State Police.  There
are only 18 majors in the State Police.  Consequently, there are seldom vacancies for
positions at the rank of major.

5.      When a position becomes available at the rank of major, I am provided
with a list of captains who are eligible for promotion.  I carefully evaluate all of the
eligible captains to determine who is best suited to fill the particular vacancy.  In making
my decision, I do not consider the individual captains' test scores.

6.    Captain Ober became eligible for promotion to major in December 1996. Since then, there have been 44 other captains who were also eligible for promotion;  I have promoted 15 of those captains to major.  Whenever there has been a vacancy at that rank, I carefully considered every eligible captain, including Captain Ober, for the position.  Each time, I have determined that someone else was best qualified to fill the vacancy.

7.    Captain Ober continues to remain eligible to be promoted to the rank of major.  I always consider all eligible captains when I make my determination as to who is best suited to fill a particular vacancy.

COL. PAUL J. EVANKO
Commissioner
Pennsylvania State Police

Sworn to and subscribed

before me this _17th_ day

of May, 2002

Notary Public

NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003

/b

COMMONWEALTH OF PENNSYLVANIA          :
                                      : ss.
COUNTY OF DAUPHIN                      :


## AFFIDAVIT OF MARC J. INFANTINO

I, MARC J. INFANTINO, swear and affirm the following:

1.      I am currently the Director of the Fiscal Division in the Bureau of Staff Services, Pennsylvania State Police.

2.      I suggested to the Pennsylvania State Police Commissioner that the Department publish a pictorial history of the State Police for the 100th Anniversary of the organization.  My suggestion was approved in 1996, and I was advised to formulate a committee, made up of volunteers, to work on the project.

3.      I had heard that Captain Darrell Ober collected PSP memorabilia and might be willing to provide pictures of items in his collection for our book.  Consequently, I asked Captain Ober if he would volunteer to work on the Centennial Book Committee, and he agreed.

4.      Membership on the committee is strictly voluntary.   The committee members receive no salary for their work on the committee, although the committee occasionally meets during work hours.

5.      On August 20, 1999, the Colonel Evanko informed me that Captain Ober could no longer serve on the committee because he was assigned to an important

project, the Incident Information Management System, which needed Captain Ober's full-time commitment.

_____
MARC J. INFANTINO
Director, Fiscal Division
Bureau of Staff Services
Pennsylvania State Police

Sworn to and subscribed

before me this _16_th_ day

of May, 2002

_____
Notary Public

```
NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003
```

/1

COMMONWEALTH OF PENNSYLVANIA          :
                                      : ss.
COUNTY OF DAUPHIN                      :


### AFFIDAVIT OF MAJOR FRANCIS E. KOSCELNAK

I, MAJOR FRANCIS E. KOSCELNAK, swear and affirm the following:

1.    I am currently the Pennsylvania State Police Area II Commander, which includes three troop commands.  Prior to this assignment, I was the Director of the Bureau of Liquor Control Enforcement.

2.    While I was the Director of the Bureau of Liquor Control Enforcement Bureau Director, Captain Ober was transferred into the Bureau.  For a short period of time, Captain Ober served as the Bureau's Central Section Commander.

3.    During the time Captain Ober was the Central Section Commander, he asked for permission to assume duties with the Pennsylvania Emergency Management Agency (PEMA).  Captain Ober had never been assigned to the Bureau of Liquor Control Enforcement before, and I felt it was important for Captain Ober to focus his time and attention on his new duties.  I spoke to Major Leonard Washington, who was then the Director of the Bureau of Emergency & Special Operations (BESO) to make sure that his Bureau would not suffer a hardship if I did not permit Captain Ober to participate in PEMA.  (The Emergency Operations Officer, who coordinates the

Pennsylvania State Police involvement in PEMA is contained within BESO).   Major Washington assured me it would not be a problem, and I decided not to allow Captain Ober to take on the added responsibilities of a PEMA liaison.  I never spoke with the Commissioner or any of the Deputy Commissioners about whether to permit Ober to participate in PEMA.  As Captain Ober's Bureau Director, I felt it was my decision to make, and I chose not to allow him to take on that added responsibility.

4.      Although my primary reason for refusing Captain Ober's request was my desire to have him concentrate on adjusting to his new duties, there was another reason I did not allow Captain Ober to serve as a PEMA liaison.  Normally, PEMA liaisons are paid for their service out of funds allocated to the Bureau in which the officer is assigned on a full-time basis.  However, the Bureau of Liquor Control Enforcement is specially funded, and its funds cannot legally be used to compensate its members for serving in the additional capacity of a PEMA liaison.

MAJOR FRANCIS E. KOSCELNAK
Area II Commander
Pennsylvania State Police

Sworn to and subscribed

before me this _17th_ day

of May, 2002

Notary Public

NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003

/2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |  |
|---|---|---|---|
| DARRELL G. OBER, | Plaintiff | : : : | NO. 1: CV-01-0084 (Judge Caldwell) |
| vs. |  | : : | CIVIL ACTION - LAW |
| PAUL EVANKO, MARK CAMPBELL, THOMAS COURY, JOSEPH WESTCOTT, HAWTHORNE CONLEY, |  | : : : : : | JURY TRIAL DEMANDED |
|  | Defendants | : |  |

**AFFIDAVIT OF LEE ANN LABECKI,
DIRECTOR, GOVERNOR'S POLICY
COMMONWEALTH OF PENNSYLVANIA**

I, Lee Ann Labecki, being duly sworn according to law, depose and say that all of the facts set forth in this affidavit are true and correct to the best of my personal knowledge or information and belief.

1.     I am currently the Director of the Pennsylvania Governor's Policy Office.  I was appointed to this position on April 1, 2001.

2.      From February 1989 through January 1998, I worked at the Department of Corrections in the Division of Planning, Research, and Statistics.  That Division was later restructured as the Bureau of Management Information Services.  From January 1995 through January 1998, I was the Director of that Bureau.

3.      In January 1998, I began working in the Governor's Policy Office as an Executive Policy Specialist in the Criminal Justice Policy Office.  On March 1, 1999, I was promoted to Deputy Director of the Governor's Policy Office.

4.      Shortly after I was promoted, our Criminal Justice Policy Officer, Mary Woolley, advised me that Lieutenant Colonel Hickes told her the FBI was investigating allegations regarding a job-selling scheme at the Pennsylvania State Police Academy. According to my recollection, Ms. Woolley implied that other top executives at the Department were not told of the FBI investigation due to concerns that they might be involved in the scheme.

5.      From my years at the Department of Corrections, I was conscious of the need to report matters that might result in criminal charges up through the chain of command.  For that reason, I told Charles Zogby and Nannette McLaughlin about the FBI's investigation.  At the time, Mr. Zogby was Director of the Governor's Policy Office, and Ms. McLaughlin was Deputy Chief of Staff to the Governor, who handled personnel matters for the Governor's Office.

6.    A couple of months later, I heard that Colonel Evanko had learned of the FBI investigation and was upset that he had not been informed of it earlier.

7.    I subsequently learned that the Pennsylvania State Police conducted an inquiry into the facts and circumstances of the FBI investigation.

Lee Ann Labecki
Director, Governor's Policy Office
Commonwealth of Pennsylvania

Sworn to and subscribed before me this

28th day of March, 2002.

Notarial Seal
Carol K. Moyer, Notary Public
Harrisburg, Dauphin County
My Commission Expires Feb. 17, 2004

3

*13*

STATE OF    Pennsylvania

COUNTY OF Dauphin

## AFFIDAVIT

I, Captain Frank Monaco, swear and affirm the following:

1.  My name is Frank H. Monaco, and I am currently the Troop Commander for Troop A, Greensburg, holding the rank of Captain with the Pennsylvania State Police (PSP).

2.  From 1995 through the latter part of 1998, I was assigned as the Director of the Organized Crime Division of the Bureau of Criminal Investigation in Harrisburg.

3.  In August or September, 1998, I and other members of the Pennsylvania State Police were contacted by Special Agent Ralph Kush of the FBI, regarding a job-selling investigation the FBI was doing involving a Trooper.  Present at the meeting with Agent Kush and other members of the FBI, were myself and Sergeant Jerry Ryan, Corporal Lieberum and Corporal Shaw.  We met in the Western Task Force Commander's Office.

4.  The FBI asked us at this meeting if it was possible for a Trooper to "buy" enlisted positions with the Pennsylvania State Police. I told the FBI that it was possible that a Clerk in the Bureau of Personnel could change a PSP applicant's score, but there were so many people involved in the PSP application process, that I didn't see any other scenario where it could happen.

5.  I then informed Agent Kush if he needed additional information, he could contact the Bureau of Professional Responsibility.

6.  At no time during my discussion with the FBI on this matter did it ever appear to me that the FBI was accusing anyone high-ranking in the Department, or in the Governor's Office, of being involved in a job-selling scheme.

7.  At no time did the FBI indicate that this job-selling investigation was "top secret" or highly confidential.  To my mind, the FBI was only asking for information relative to a criminal investigation they were conducting on a Trooper, and I directed them to BPR to get that information and perhaps so that BPR could conduct a parallel administrative investigation.

8.    Based on my extensive experience working with the FBI, it is my opinion that if the FBI believed that a high-ranking member of the Department or the Governor's Office were involved in a criminal job-selling scheme, they would never have contacted me or any other member of the PSP to get information.

Captain Frank H. Monaco

Sworn to and subscribed before me this

*17th* Day of *MAY* 2002

Notary Public
My Commission Expires:

NOTARIAL SEAL
DONA M. QUEISER, Notary Public
Hempfield Township, Westm'd Cty., PA
My Commission Expires September 27, 2005

14

COMMONWEALTH OF PENNSYLVANIA        :
                                    : ss.
COUNTY OF DAUPHIN                    :


### AFFIDAVIT OF CAPTAIN CHARLES J. SKURKIS


I, CAPTAIN CHARLES J. SKURKIS, swear and affirm the following:

1.      I am currently the Director of the Systems and Process Review Division of the Bureau of Professional Responsibility (BPR).  Just prior to serving in this position, I was the Director of the Internal Affairs Division in BPR.  As part of my job description as the Director of the Internal Affairs Division, I was required to supervise investigations requested by the Commissioner.

2.      I have been the chief investigator in numerous BPR investigations and helped write the Administrative Regulations governing the operations of the Bureau.

3.      Since the inception of BPR, the Commissioner has had the authority to request administrative inquiries and investigations, even absent a complainant or allegation of misconduct.  Moreover, it is not unusual to conduct an initial investigation or inquiry into the facts and circumstances to determine whether a full internal affairs investigation is warranted.

4.    I am familiar with instances in the past where former Commissioners have requested or ordered administrative inquiries or investigations of the nature described in paragraph 3.

CAPTAIN CHARLES J. SKURKIS
Director, Systems & Process Review
Division
Bureau of Professional Responsibility
Pennsylvania State Police

Sworn to and subscribed

before me this _16th_ day

of May, 2002

Notary Public

NOTARIAL SEAL
VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
My Commission Expires June 25, 2003

15

COMMONWEALTH OF PENNSYLVANIA      :
                                : ss.

COUNTY OF DAUPHIN                     :

### AFFIDAVIT OF LT. COL. JOSEPH WESTCOTT

I, Retired-Lt. Col. Joseph Westcott, swear and affirm the following:

1.      I am currently retired from the Pennsylvania State Police.

2.      Just prior to my retirement, I served as the Deputy Commissioner of Operations for the Pennsylvania State Police.

3.      I have never personally shunned, ostracized, or harassed Capt. Darrell Ober or subjected him to insults of any type.

4.      If Capt. Ober was shunned, ostracized or subjected to any type of insult, it was not done at my direction, nor did I request anyone else to do such things.

_LT. COL. JOSEPH WESTCOTT_
(Retired-Pennsylvania State Police)

Sworn to and subscribed

before me this _17th_ day

of May, 2002

_Vickie A. Bucher_
Notary Public

```
            NOTARIAL SEAL
   VICKIE A. BUCHER, Notary Public
Susquehanna Township, Dauphin County
   My Commission Expires June 25, 2003
```

16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,         :
             Plaintiff   :    NO.  1: CV-01-0084
                      :    (Judge Caldwell)
                      :
       vs.              :    CIVIL ACTION - LAW
                      :
PAUL EVANKO, MARK     :
CAMPBELL, THOMAS COURY, :    JURY TRIAL DEMANDED
JOSEPH WESTCOTT,      :
HAWTHORNE CONLEY,    :
                      :
          Defendants :

---

## AFFIDAVIT OF MARY WOOLLEY, FORMER DIRECTOR
## GOVERNOR'S CRIMINAL JUSTICE POLICY OFFICE
## COMMONWEALTH OF PENNSYLVANIA

---

    I, Mary Woolley, being duly sworn according to law, depose and say that all of the facts set forth in this affidavit are true and correct to the best of my personal knowledge or information and belief.

    1.    From July 1995 through December 2000, I served as the Director of the Governor's Criminal Justice Policy Office.  In that capacity, I was liaison to the Pennsylvania State Police on criminal justice policy issues.

    2.    Until March 1, 1999, my immediate supervisor was Pete Tartline.  At the time, Mr. Tartline was the Deputy Director of the Governor's Policy Office.

3.    On March 1, 1999, Lee Ann Labecki became my immediate supervisor when she replaced Pete Tartline as Deputy Director of the Governor's Policy Office.

4.    As Director of the Criminal Justice Policy Office, it was my duty to interact on a regular basis with the Deputy Commissioner for Staff within the Pennsylvania State Police. In late February or early March 1999, I was in regular contact with Lieutenant Colonel Robert Hickes, Deputy Commissioner for Staff. During that timeframe, Lieutenant Colonel Hickes and I discussed a number of issues, including the Pennsylvania Justice Network, the statutory cap on the State Police complement, the State Police laboratories, and the Insta-check System.

5.    During one of our conversations in late February or early March 1999, Lieutenant Colonel Hickes told me that an officer in the State Police Internal Affairs Division had been working with the FBI on an investigation into allegations regarding potential criminal conduct of a trooper in relation to the State Police Academy. The Internal Affairs officer told Hickes that the FBI believed the investigation might "go all the way to the top." Hickes told me that he had directed the Internal Affairs officer to cooperate with the FBI and that the existence of the FBI's investigation had not been reported to anyone else in the chain of command.

6.     Based on my conversation with Lieutenant Colonel Hickes, it was my understanding that Colonel Evanko and Lieutenant Colonels Westcott and Coury did not know about the FBI investigation.

7.     Within a day or so, I reported the information to my supervisor, Lee Ann Labecki.  Ms. Labecki and I then informed Charles Zogby and Nannette McLaughlin about the FBI's investigation.  At the time, Mr. Zogby was Director of the Governor's Policy Office, and Ms. McLaughlin was Deputy Chief of Staff to the Governor.

8.     At some point later, I learned that Colonel Evanko had been told about the FBI investigation and was upset that he had not been informed of it earlier.

Mary Woolley

Sworn to and subscribed before me this

24th day of April 2002

Notarial Seal
Sharon L. Hutton, Notary Public
Upper Allen Twp., Cumberland County
My Commission Expires Oct. 2, 2003
Member, Pennsylvania Association of Notaries

3

1  intelligent person we know that.  You're very skilled.  Let
2  me repeat the groundwork so we don't have to go through
3  this every time there is a question where counsel gets
4  nervous, okay?  Cause I want to get through this
5  deposition.  The understanding is that if you learned
6  about it from investigatory activities or any activities I
7  guess, that occurred after March or April 2001, you know
8  sit back and think when I ask these questions okay?

9       A:    Yes sir

10      Q:    Or you want to confer with counsel do
11  that.  We know what the ground rules are.  You know
12  what the ground rules are?

13      A:    Yes sir

14      Q:    Okay let's see if we can get through this.
15  Okay now, when do you recollect first learning that
16  Captain Ober had told the Commissioner about the FBI
17  coming to him in the fall of '98?

18      A:    Back in 1999 I did not, I'm not aware of
19  any contact that Captain Ober had with the
20  Commissioner.  As I knew is what Captain Ober
21  forwarded to me.  He faxed me a complaint sheet, and it
22  said on there that in October of '98 somewhere early
23  October of '98 he was informed by the FBI that this
24  Trooper Stanton may have been involved in some type of
25  job selling or political corruption scheme of some sort.

14

1    And I think he actually, he called me to make sure I was

2    at the office is what I'm remembering.  Then he faxed me

3    the complaint form from where ever he was at that day.

4    He faxed it to me cause I would have been the person to

5    receive it, but as far as any communications he had I'm

6    not aware of any.

7        Q:    Okay.  Now so it's you testimony as you

8    sit here today that you were never aware prior to March

9    or April of 2001.  Now we're talking about the entire year

10   of '99 and 2000.  That you were never aware, until you

11   did your investigation obviously or assigned to this so

12   called attorney's investigation, that you were never aware

13   that the Commissioner had been, let's lay a foundation

14   this way, had been advised of the FBI interest.

15       A:    The only thing that I can say during that

16   time was that my knowledge, I mean I don't know what

17   communications occurred between Captain Ober and the

18   Commissioner.  I know I was told by my Major, who at

19   the time was Major Conley, that the Commissioner

20   requested an investigation into the circumstances

21   surrounding the FBI probe or whatever you want to call

22   that.  So all that behind the scenes stuff I

23       Q:    Okay let's start there.  At some time

24   Major Conley tells you that the Commissioner was

25   interested in some type of investigation into what was

15

1    behind the FBI interest.

2            A:    Right

3            Q:    Can you remember what Major Conley

4    said to you?

5            A:    The only thing I can remember Major

6    Conley saying was that the Commissioner requested an

7    investigation into the circumstances surrounding the

8    FBI, I don't know if it was the FBI investigation or the FBI

9    probe or how it was handled or something to that effect.

10   In my position as the acting, keep in mind I had only

11   been acting for about three, four weeks maybe.  No not

12   even quite four weeks.

13           Q:    So this would have been June of '99?

14           A:    Well no this would have been May.

15           Q:    May of '99

16           A:    I'm thinking around May 20th or so.

17           Q:    Of '99?

18           A:    Yes sir

19           Q:    So May 20th.  Let's make sure we keep

20   calendar in front of us.  Sometime on or about May of

21   1999 Major Conley tells you that the Commissioner

22   requested an investigation into the FBI probe?

23           A:    To get all the facts.

24           Q:    To get all the fact?

25           A:    Yes sir.  Get all the facts involved with

16

1    what occurred?  What happened here?

2         Q:    Well at that point either yourself or Major

3    Conley assigned a BPR number, right?

4         A:    No

5         Q:    Oh, oh you didn't do that?

6         A:    No I didn't do that no.

7         Q:    Did Major Conley do that?

8         A:    Not to my, no

9         Q:    Okay, I'm not trying to be cute now.  I

10    jumped to quick on that question.  So let me, I apologize

11    to you.  Let me go back.  Sometime on or about May

12    roughly the 20th or so, you're not sure, Conley say to you,

13    Major Conley says to you the Commissioner requested an

14    investigation.  Did Major Conley indicate...Strike that.

15    Did Major Conley during that conversation provide any

16    other detail?

17         A:    No, no sir

18         Q:    Okay

19         A:    I didn't have any kind of document in

20    front of me either.

21         Q:    Right

22         A:    I mean I wasn't given like a form or

23    anything.

24         Q:    No just a verbal thing from

25         A:    Yes

1         Q:   And was anyone else present at that

2  time?

3         A:   Not to my, no sir, I can't, no

4         Q:   Now didn't you end up at a meeting were

5  the Commissioner was present?  Coury was present.

6  Conley was present.  Who all was present at the meeting

7  where this issue of this investigation was discussed?

8         A:   Not me

9         Q:   You weren't there?

10        A:   No sir.  I was never at a meeting with the

11  Commissioner, Colonel Coury, who else did you say?

12        Q:   I'm trying to learn from the meeting.

13  Let's do it this way.  Did you ever learn of a meeting were

14  the Commissioner was present and Mr. Conley, Major

15  Conley, was present?  Colonel Coury was present, and

16  others were present where the investigation was

17  discussed?

18        A:   No

19        Q:   You never learned of that from anyone?

20        A:   No

21        Q:   Okay.  Alright now when Major Conley

22  told you, let's go back to this sometime on or about May

23  of 1999, okay.  Maybe around May 20th or so of 1999.

24  When Major Conley discussed this with you what did you

25  do?  In other words, you recollect whether he asked you

18

1  do anything?  Were you suppose to do any follow-up

2  action, do something?  Do you remember anything like

3  that?  What I'm gonna do here, let me tell you where I'm

4  going with this.  I'm gonna try, I'm gonna ask you

5  questions having to do with, you know why Major Conley

6  would say this to you.  Since the conversation, the way

7  you've described it so far was relatively brief and there

8  was not a lot of information in it, I'm gonna try ascertain

9  what his purpose was and you know if there was any

10  follow-up acting.  Can you tell us let's say for the

11  remainder of May, let's do it this way.  That's my offer.

12  That's where I'm coming from.  For the remainder of May

13  '99 do you have a recollection of anything that you did in

14  regard to this comment by Major Conley?

15          A:    Only other thing that I recall was that

16  Major Williams and Major Wertz's were mentioned as the

17  people that were gonna be gathering the facts on the

18  inquiry.

19          Q:    Was that discussed during this

20  conversation?

21          A:    I don't recall if it was discussed.  You

22  mentioned that to me the first time, cause see Major

23  Conley's office and where I was working out of is very

24  close proximity and that could have just.  I don't if he

25  said that the first time or if he told me later in the week

1   or whatever that they were going to be doing, gathering

2   the facts.

3           Q:    Rick the important thing is that Major

4   Conley, who's head of BPR, tells you this.

5           A:    Right

6           Q:    You're at least at this time, acting

7   Director.  You weren't actually appointed to that position

8   of January 29th of 2000.  You were acting Director of IAD.

9           A:    Correct

10          Q:    And you weren't involved in that

11  investigation?

12          A:    No

13          Q:    You were never asked to assign it a

14  number, do any paperwork on it, or to log it in, or

15  anything like that?

16          A:    What happened there sir I can explain

17  that to you.

18          Q:    Yeah that's fine. Sure, please.

19          A:    What had happened was that when I got

20  the complaint sheet for Captain Ober the first thing I

21  needed to do was assign someone from Internal Affairs to

22  look into this Stanton thing.  So I contacted our western

23  office, I think it was Lieutenant Carnahan assigned

24  Sergeant Dana.

25          Q:    Could you spell those names for the

20

1    record?

2    A:    Yes, Carnahan is C-A-R-N-A-H-A-N, first

3    name Donald, D-O-N-A-L-D.  The Lieutenant was Dana,

4    D-A-N-A, Seifner, S-E-I-F-N-E-R I think is the correct

5    spelling of her name.

6    Q:    Okay

7    A:    And what I did was she was assigned to

8    contact the FBI and get whatever information that they

9    were gonna turn over to us.  So we could pursue,

10   properly pursue what we needed to pursue with Stanton.

11   So what end up happening she end up getting a box of

12   tapes and reports that she forwarded in to the office.  I

13   needed to get those transcribed so there was some down

14   time while these were being transcribed.  I know that that

15   information, Major Wertz and Major Williams at times

16   would pop into the BPR office unannounced and had

17   never called and said hey I'm stopping by or something.

18   They just would come though.  Just routine during the

19   day the people would stop through there.  I remember a

20   conversation I had, a brief conversation I had with I

21   believe it was Major Wertz.  He made a comment to me

22   that a number hadn't been taken.  He said something

23   like "Oh, an oversight here.  There wasn't a number

24   taken for this." or something to that effect, and I said "

25   Well I'll double check.".  I said something to Major Conley

21

1   just brief I said "Hey is what there, is this doing the

2   investigation at the request of the Commissioner?", and

3   he said yeah.  So I wrote up the worksheet at that time.  I

4   wrote up the complaint sheet and that would have been

5   in June of '99.  Yeah it would have been June of '99.  I

6   wrote up the worksheet and assigned it a number and

7   provided that to them.

8   　　　　Q:    You didn't check with the Commissioner

9   on that?

10   　　　　A:    No. I never talked to the Commissioner.

11   　　　　Q:    So you wrote up, you on your own, wrote

12   up a complaint sheet for the Commissioner based upon

13   hear say comments made to you by Major Conley, and

14   apparently some generals made by Mr. Williams and Mr.

15   Wertz.  Is that correct, some awareness of what they were

16   doing?

17   　　　　A:    Yeah I think it was, my recollection is

18   Major Wertz said they needed a number for it or

19   something.  There wasn't a number taken and I checked

20   with Major Conley who is the Bureau Director and he

21   said this is being done at the request of the

22   Commissioner.  And I just said I'll make up the sheet

23   based on it.

24   　　　　Q:    Okay Rick

25   　　　　A:    That's my boss

1    Q:    Yep he's your boss.  I know how the

2    systems work.  I've been in the Army, and the Army runs

3    a little different maybe.  Let me just. I very affectionately

4    look back on those days.  The best thing that's ever

5    happened to me in my life, but let me tell you me

6    problem with this one okay.  What is a complaint

7    verification form?  Can you tell me what that is?

8    A:    A complaint verification form is a form

9    that we use to verify citizens' complaints.  It is a form we

10   send to citizens when they haven't completed,  like say

11   for intense we can receive complaints form a citizen.

12   They write a detailed letter and they sign it.  That is a

13   verification of complaint.  Not ever complaint that we

14   receive in the bureau has to be on our form.  Like for

15   intense if you wanted to file a complaint you being an

16   attorney you have access to notaries.  You could swear at

17   an affidavit and send it in and that could serve as the

18   complaint verification.

19   Q:    Well who did the affidavit in this case?

20   A:    There wouldn't be one cause this was an

21   internally generated complaint, not an externally

22   generated complaint.

23   Q:    Oh, okay

24   A:    That's the difference.

25   Q:    So IAD can go off and investigate a

1    Trooper based upon some verbal communication by

2    somebody and just investigate a Trooper, their career,

3    their activities, etc.  Is that right?

4          A:    There's a provision in our regulations

5    AR-425 that for investigative criteria that the

6    Commissioner can request an investigation.

7          Q:    Rick you never talked to the

8    Commissioner.  Didn't you tell me that?

9          A:    That's right

10          Q:    And you received nothing written from

11    the Commissioner?

12          A:    That's correct

13          Q:    Did you get a phone call from the

14    Commissioner?

15          A:    No I didn't

16          Q:    Did you get piece of paper form the

17    Commissioner?

18          A:    No I didn't

19          Q:    Any electromagnetically recorded

20    massage like a tape-recorded message?

21          A:    Nope

22          Q:    Or anything of that type?

23          A:    No sir

24          Q:    So your telling us you weren't requested

25    to fill out this form.  You did this on your own.

1        A:    That's

2        Q:    Are you protecting someone sir?  Now I'm

3  not insulting you.

4        A:    No

5        Q:    Don't be upset with me.  Are you

6  protecting someone?

7        A:    No sir.  My Conversation with Major

8  Conley was that this wasn't done, and would do it.

9        Q:    Okay

10       A:    I mean I've written up worksheets on

11  other things.

12       Q:    Alright sir. I'm not saying you haven't,

13  and I'm just trying to delve into some of the reasons here,

14  okay?

15       A:    Uh-mum

16       Q:    Why was it important to fill out this?  I

17  mean, why do this?  Let me tell you were I'm coming from

18  first.  Cause I don't want, again I'm not interested in

19  leading you down a blind alley.  I just want to know what

20  happened here.

21       A:    Okay

22       Q:    What I'm gonna ask you is a group of

23  questions here that have to do with the form.  Why it was

24  important to assign this a number after?  And I'm gonna

25  ask you question about when this investigation began,

1    because everything I've heard so far indicates that it was

2    underway when this was done.  That this was done after

3    the fact.  So I'm gonna ask you about that, okay?

4           A:     Okay

5           Q:     I'm gonna ask you why that was

6    important.  I'm gonna ask you about the procedures

7    connected with it.  So first question, why was it

8    important to fill out that, you know assign it a number,

9    fill out that form?  What's the meaning of that?  If you

10   could just go investigate somebody, which you've told me

11   you can, why is it important to give it a number, or

12   assign it some number, or complaint, whatever it is.  I

13   need you to explain that to me.

14          A:     It use to be called the BPR control

15   number, but it's called the IAD control number now, and

16   that was something Captain Ober instituted when he was

17   Director.  The control number it's self is for tracking

18   purposes.  So that any report that is generated from an

19   inquiry or investigation can be tracked years down the

20   road.  It's for our filling system and it's also entered into

21   a computer database.  Cause we have to do a statistical

22   report at the end of the year on how many complaint,

23   how many investigation, how many this or that.  We do a

24   statistical summery of everything that come to our

25   bureau.

26

1     Q:    Yes.  Yes sir I understand that.  Okay, so

2  it's important for that reason.  Are there any other

3  reasons why it's done?

4     A:    Just an indexing and tracking number

5     Q:    Well if I use the term "off the books",

6  okay.  Let me use that term.  If I'm coining a term let me

7  try to explain to you what I mean by that.  If an

8  investigation's going on or occurs and it's not identified in

9  the system as a existent valid investigation I want to find

10 out if it indeed is an investigation and what controls

11 there may be on it, what perimeters govern it, or

12 whatever.  Because I assume that in an organization of

13 over four thousand people that folks can't just go off

14 investigating folks without some type of conformance to

15 regulation or administrative practices.  That's where I'm

16 coming from.  So let me ask you some questions there.

17 You told us that the IAD control number is essentially

18 designed for tracking purposes and in order to make sure

19 that information is kept in one place so it can be entered

20 into a database and be referred to and use.  That sort of

21 thing.  Why didn't at the time...Strike that.  At the time

22 the issue came up of this not having a number, I think

23 you described it sort of as a "ut-o" by Mr. Wertz or Mr.

24 Williams.  "Ut-o" there's no number here.  How long at

25 that time had Mr. Williams and Mr. Wertz been in the

1  Pennsylvania State Police?  Do you know?

2          A:    I don't know, but I know Major Williams

3  was close to retirement.  So I would imagine he had thirty

4  years.  Major Wertz I think he was close to thirty years.

5          Q:    So when they started their investigative

6  activities they didn't open it kind of complaint.  You know

7  what they were told, what was said to them anything like

8  that?

9          A:    No sir, I don't know any of those, what

10 they were told.  The only thing that I recall Major Wertz,

11 it's either Major Wertz or Major Williams.  I don't

12 remember which one.  Or it might have been both.  They

13 had asked me about the supervisory inquiry.  You know

14 doing a supervisory inquiry, the documentation and I

15 explain to them that this was something that Captain

16 Ober initiated that we were using in the Internal Affairs

17 Division.  They want to use that type of process.  I just

18 told them basically what was required and drafted a

19 special order that Captain Ober made.  Bits and pieces of

20 it, I didn't go through the whole thing.

21         Q:    Okay, well what is involved in this

22 supervisory inquiry, any documentation there?

23         A:    Yes sir.  They do, it's done on

24 correspondence which is called an STD-501.  Which is

25 subject, to/from letter.

28

1    Q:    Can you stop there for just a second?

2    A:    Yes sir

3    Q:    Supervisory inquiry is initiated by a

4    supervisor, am I correct?

5    A:    It can be initiated by a supervisor or a

6    Commander.

7    Q:    Somebody, authority individual in the

8    chain of command.

9    A:    Yes sir

10   Q:    Now you weren't above Captain Ober in

11   the chain of command at that time.  Were you?

12   A:    No

13   Q:    Well did what you initiated in June of

14   1999 was what you initiated at that time was that a

15   supervisory inquiry?  Is that what you're telling us?

16   A:    To the best of my knowledge, yes.

17   Q:    Well how?  What knowledge, what facts

18   know to you initiate that that was a supervisory inquiry?

19   A:    That was what Major, I think it was

20   Wertz told me that they were gonna use.

21   Q:    That they were gonna use?

22   A:    They mean the process that they were

23   gonna use to document.

24   Q:    Right, that's the process they were gonna

25   use to define of describe this investigation.

1    A:    Correct

2    Q:    Where's the to/from letter?

3    A:    Say again

4    Q:    Where's the to/from letter?   Is there any

5    to/from letter?  Did the Commissioner, did he write up

6    some letter?  Did he write anything down?

7    A:    I'm misunderstanding you.  The to/from

8    letter from the Commissioner?

9    Q:    Sure.  He doesn't have

10   A:    No, see maybe I can clarify this for you.

11   Q:    Yeah

12   A:    Like if I'm assigned to do a supervisory

13   inquiry, I would document what information I gathered

14   during the course of the inquiry on a subject, to/from.

15   So that would be the responsibility of the person

16   assigned to investigate it.

17   Q:    Well, there is a file on this then, right?

18   There's a file on, there's a BPR on this then?

19   A:    Well there was a control number issued

20   on that, correct.

21   Q:    Well have you seen it?  Do you have it

22   there in your files?

23   A:    No

24   Q:    You don't have the investigation?

25   A:    Well let me talk to my attorneys.

1    Q:    No, no, no

2    A:    I'm gonna talk to my counsel about it.

3    Q:     Look I'm gonna object.  Now wait.

4    OPOSING COUNSEL: No

5    MR BAILEY: There's a question on the table.

6    That's alright.  I'm not gonna stop you can talk to her.

7    MR BROWN: I understand sir

8    MR BAILEY: I have to do my job.  All I'm

9    asking you I'm not asking you what's in it.

10    OPPOSING COUNSEL: No the issue

11    MR BAILEY: Please let finish my

12    OPPOSING COUNSEL: The issue is where

13    that's part of attorney work product.  That's the issue.

14    MR BAILEY: You're now claiming, are you now

15    claiming counsel that an investigation done before March

16    of 2001 is part of attorney work product?

17    OPPOSING COUNSEL: No

18    MR BAILEY: You're not serious are you?

19    OPPOSING COUNSEL: That his knowledge of it

20    would have been post March of 2001, and you asked him

21    about his knowledge of it "Do you have it in your file?".

22    MR BAILEY: Now wait a minute.

23    OPPOSING COUNSEL: That's part of attorney

24    work product.

25    MR BAILEY: Now wait a minute.  How do you

1 know his would have been, and he hasn't been told that

2 has he?

3        OPPOSING COUNSEL: Because I've talked to

4 him about it.

5        MR BAILEY: Have you?  Okay let's put the

6 question this way.  Prior, cause this is our groundwork at

7 all times here.  Prior, and I again strongly object to the

8 use of this attorney work product artifice which is what I

9 believe it to be.  But prior to March or April 2001 were

10 you aware of the existence of any BPR or investigative file

11 on this matter?

12        A:    I didn't see

13        Q:    It's smart to be quiet sir

14        A:    No, let me tell.  You know I did not see.  I

15 know that Major Williams and Major Wertz were assigned

16 to look into it.  What documentation or what ever they

17 end up doing I had no knowledge of at that time.

18        Q:    So as you sit here today, your testimony

19 is that prior to March or April of 2001 you don't have any

20 fact to indicate that there was a file physically composed

21 that was placed into IAD or BPR files.  That's what you're

22 telling us.

23        A:    What I'm telling you the only thing that I

24 had in BPR is the complaint sheet that I wrote up with

25 the number on it.  Nobody ever came and said here's a

1    report.  I never, all I had was that worksheet that's it.

2          Q:    Let's go back to, you had indicated that

3    at various times during before this number was assigned

4    and you indicated that it was apparently a supervisory

5    inquiry number.

6          A:    Well the control number, maybe I can

7    explain this to help out here.

8          Q:    What is a control number?

9          A:    It's a sequential number.  It use to be

10   just one through whatever, and at some point and time I

11   don't know if it was Captain Ober if he changed it or if it

12   was even before him.  I don't know.  I don't remember

13   this, but we started doing it by year.  So it would be like

14   1999-1 and then up through to the end of the year.

15         Q:    Do you remember the number of this file,

16   the number, the control number?

17         A:    I'm thinking it's 1999-503.

18         Q:    And at the end of 1999 what was the last

19   number you remember?

20         A:    '99 I think we were over a thousand I

21   think.  I'm think like a thousand something.

22         Q:    Alright sir go back.  You were explaining

23   to me the way this control number was assigned.

24         A:    Oh, and maybe I can clarify.  I've been in

25   the Internal Affairs Division since 1994.  So I've seen

1   some changes in processes along the way.  When I first

2   came to Internal Affairs complaints that would come in

3   that didn't rise to the level of where a Commanding

4   Officer was seeking disciplinary action

5          Q:     Can you hold one-second sir?

6          A:     Yes sir

7          Q:     Thank you

8          MR BAILEY: Okay you were at a point were

9   you had indicated.  I just made a little change there.  You

10  were at a point were you had indicated that it was not a

11  situation where a Commanding Officer was looking at a

12  disciplinary

13         MR BROWN: Right as I said it was a demininis

14  complaint, something very minor.  It would come in or

15  even if we had a complaint from a citizen, and it was like,

16  let me think of a good example.

17         Q:     Chewing bubble gum in my face.

18         A:     Well not even that.  Just the trooper

19  when he pulled me over was intimidating.  Well you

20  know, the uniform it's self would be intimidating to

21  people, but that didn't in it's self describe misconduct.

22  But yet, what we would do is I would send the

23  information with just a note saying handle anyway you

24  deem appropriate.  Which may mean do nothing.  Which

25  may mean call the guy in and say hey be a little less

1    aggressive or whatever that may be.  That information

2    was stored and kept in a separate database and it was

3    given what we called an event tracking number.  It did

4    not go into the, it was not given a BPR or an IAD control

5    number.  It was given a separate number because it was

6    demininis and it didn't get kicked in the system of

7    something that may be warranting a formal action, a

8    formal discipline.  I don't know if Captain Ober started

9    this or not or if it was started right before he took over,

10   but when I took over as acting the supervisory inquiry

11   process was already in place and up and running.

12   Everything, the way it use to be done we didn't put IAD

13   numbers on things that were going back to the troops to

14   handle how they saw fit.  Now everything got a number

15   so of course the numbers went up, and I think that's why

16   they categorized it.  I think the decision was made to get

17   the year and just go sequentially from there.

18          Q:    Well then why didn't they complaint

19   forms instead of you?  Why you'd do them?

20          A:    I just thought I was...just record keeping.

21   There's no

22          Q:    Well did they indicate they were gonna do

23   it?

24          A:    Who's they?

25          Q:    Mr. Williams and Mr. Wertz.  You're the

1  guy that initiated the formal process of giving this thing a

2  number, right?

3        A:   I gave it the...I put the...well as far as.

4  Major Conley told me in May that the Commissioner

5  requested an investigation.  So I didn't initiate that that

6  was already

7        Q:   The investigation began

8        A:   Okay I don't know when they actually

9  started working on it.

10        Q:   Let's go back to your testimony.  You

11  indicated that at some point at least, Mr. Wertz and Mr.

12  Williams came in to look at the Stanton investigation,

13  product, stuff that came in.

14        A:   Right

15        Q:   Let me ask you a few questions about

16  that before we move on.  What gave Mr. Wertz and Mr.

17  Williams authority to look at the Stanton stuff?  Where

18  did they get the authority to do that?

19        A:   I don't know.

20        Q:   Well

21        A:   As investigators they're required to

22  investigate.  I mean I

23        Q:   Well

24        A:   They're Majors they were given an

25  assignment.  It was for me to be in their way.

1        Q:    Okay. Well if I understand correctly,

2  Captain Ober had sent in some kind of complaint sheet

3        A:    Correct

4        Q:    on Mr. Stanton.

5        A:    Correct

6        Q:    You know when that came in?

7        A:    My recollection is, he faxed that to me on

8  or about May 19th of '99.   I'm thinking is when it was,

9  the 19th of May.

10       Q:    And at that time he was, is the word

11  detached to IIMS?

12       A:    I believed that's what he has described,

13  yes.

14       Q:    Okay whether he was or not he was doing

15  IIMS stuff.

16       A:    That's correct

17       Q:    And to the best of your, well your not

18  sure, but to the best to your knowledge that was either

19  directly or indirectly at the Commissioner's request.  Is

20  that correct?

21       A:    It was indirectly...

22       Q:    Either directly or indirectly to the best of

23  your knowledge at the Commissioner's request.

24       A:    That, we were talking about the

25  complaints

1    Q:    Of Mr. No of Mr. Ober being with IIMS

2    A:    Oh, oh that.  Okay I'm sorry I

3    misunderstood you.  Yes as far as I know.  I recall seeing

4    a CLEAN message.

5    Q:    Okay.  Alright.  So Mr. Ober sends you a

6    complaint as to Stanton.  Did you call him or talk to him

7    or ask him why?

8    A:    Who?  To Captain Ober?

9    Q:    Captain Ober, yeah.  Captain Ober sent

10   you, faxed you some type of complaint thing having to do

11   with Stanton, right?

12   A:    Right

13   Q:    Okay, did you call Captain Ober?  Did

14   you talk to him why or ask him any questions?  You just

15   more or less handled it the standard procedure.

16   A:    Yeah pretty much.  I think he practiced

17   sending that to me with a phone call.  I think he called to

18   make sure I was there to get it, and then it came in by a

19   fax.

20   Q:    Okay but

21   A:    Just handled it.  I mean that would be

22   something that the assigned investigator in our western

23   section would be responsible for doing as a part of their

24   investigation.

25   Q:    Did you ever seen any communications

1   from the Commissioner to look into Stanton?

2   A:   From the Commissioner, no.

3   Q:   How about Mr. Coury?

4   A:   No

5   Q:   How about Mr. Williams?

6   A:   No

7   Q:   How about Mr. Wertz?

8   A:   No

9   Q:   How about Mr. Westcott?

10  A:   No

11  Q:   How about Mr. Conley?

12  A:   No.  I just processed that and that would

13  be one that because of the serious nature that the

14  Internal Affairs Division would want to look at.

15  Q:   Well Captain Ober was out at IIMS, right?

16  A:   Correct

17  Q:   Until Captain Ober notified you of

18  Stanton you didn't have any idea that the FBI had been

19  looking at Stanton, right?

20  A:   That's correct

21  Q:   Okay so you get this thing from Captain

22  Ober to take a look at Stanton.  Did you ask any

23  questions or say that the FBI conducted?  I mean what

24  did that thing say?

25  A:   My recollection of the complaint sheet

1  that he sent me was that he got information from an

2  agent Kush from the FBI that the subject was involved in

3  some type of, I don't know if it was worded "job selling" or

4  "political corruption" or something like that.  I think it

5  had on there something to the effect it was being turned

6  over to us to move forward with it.

7          Q:    Okay

8          A:    Something to that effect.

9          Q:    Now under Pennsylvania State Police

10  regulations are investigations into political or public

11  corruption treated in any kind of a special way?

12          A:    Treated in a special way as far as what

13  sir?

14          Q:    I'm saying like an organized crime inquiry

15  or something like that?

16          A:    Oh, they could be yes organized crime.

17  We have, the Bureau of Criminal Investigation.  The

18  Organized Crime Division of that bureau looks into that

19  sort of thing.  That's who ended up investigated into

20  Stanton.

21          Q:    They ended up investigating Stanton?

22          A:    Yes

23          Q:    So somebody evaluated that thing, that

24  complaint from Captain Ober.

25          A:    Absolutely

40

1   Q:   And it was, well do you know who did?

2   A:   It would be the western office of the

3   Organized Crime Division.  I think it was Corporal Jeff

4   Shall was the primary investigator on the criminal

5   allegations against Stanton, and then the Internal Affairs

6   western office handled the administrative end of it.

7   Q:   Were you familiar with field regulation

8   7-4 effective date 12-23-96 titled Pennsylvania

9   State Police department directive subject, undercover,

10  vice drug, and organized crime operations?

11  A:   I know it exist, but I'm not familiar with

12  it.  I mean I'm not, I can't sit here and spout all the

13  things that they have to do.

14  Q:   Of course.  Okay now, do you know

15  whether Mr. Wertz and Mr. Williams were aware that the

16  Stanton thing had been assigned to the Organized Crime

17  Division?

18  A:   I don't know if they were aware of that?

19  Q:   Well what were the records on and the

20  Stanton stuff doing up at, was it Harrisburg?  Is that

21  were they came by?  Is that were your office was?  Let me

22  tell you were I'm coming from so you know again.  See

23  here's Captain Ober now, he sends in this

24  communication sometime on or about the 19th of May.

25  It's about public corruption.  It's about FBI probed, job

41

1    selling, something of that sort.  Mentions in fact the FBI

2    agent Cush.  I'm gonna ask you in a minute if you ever

3    called Mr. Cush and talked to him.  Now, it's sometime in

4    June when this number gets assigned to, I don't know

5    what else to call it, the Ober investigation I guess.  Well

6    the investigation into these events.  What events I'm not

7    quite sure, but in any event the FBI probe.  I mean this is

8    a probe into a probe.  I wonder if that calls for an

9    exponent, but the point is that Mr. Williams and Mr.

10   Wertz come in and they drop by.  They don't announce

11   and they're just checking on, on what?  Why isn't this

12   investigative product out with the Organized Crime

13   Group or is it being copied into Harrisburg?  Can you tell

14   me why you have.  If the Stanton stuff is an Organized

15   Crime issue, which according to PSP regulations I've

16   looked at it should have been and apparently was and

17   that's sent out to western Pennsylvania what's all that

18   stuff doing in Harrisburg?  What's going on?

19            A:    What I recall when I got the complaint

20   sheet from Captain Ober my biggest concern was what do

21   we have.  I mean what really do we have, and the only

22   way to know what we had was to get information from

23   the FBI.  So I can't remember, I think it would have,

24   sometime at the end of May or early June I know that

25   Lieutenant or not Lieutenant, Sergeant Sifner met with

42

1   the FBI and they turned over like a box.  I mean they

2   gave the stuff to her.  A box of tapes and I think there

3   was some reports in there, and she, I don't remember.  I

4   think she ended up driving them in and was like this is

5   what they gave me now what do I do with this stuff.  I

6   was like well we don't know what's really there.  We're

7   gonna have to get some transcript done up and that sort

8   of thing.  Somewhere along the line

9         Q:   You're telling me the FBI gave you this.

10  Now I don't mean that directed at you.  Forget it.

11         A:   I understand

12         Q:   I'm thinking about the FBI.   The FBI give

13  you a box of stuff and you don't know whether they had

14  reduced it to transcription.

15         A:   No we ended up doing our own.  We

16  ended up transcribing it ourselves.  They didn't give us

17  transcripts.

18         Q:   Did somebody stop this investigations in

19  process?

20         A:   Stop what investigation?  Which one?

21         Q:   Stanton and this public corruption.

22         A:   No

23         Q:   Do you know if anyone every interfered

24  with it?

25         A:   No

1    Q:    Do you know if the Commissioner ever
2    interfered with it?

3    A:    No

4    Q:    Do you know if anyone in the FBI ever
5    interfered with it?  No that they would ever do such a
6    thing.

7    A:    No

8    Q:    Okay.  Well, do you know whether there
9    are state politicians mentioned in that investigations?
10   Elected Officials sir.  Do you know whether there was a
11   Pennsylvania State Senator mentioned in that
12   investigation?

13   A:    I have to think about that one for a
14   minute sir.

15   Q:    Do you know a Senator Leonard Bodack
16   sir?

17   A:    I don't know him.  No sir.

18   Q:    Do you know whether he was mentioned
19   in that investigation?

20   A:    I think he might have been.

21   Q:    Okay.  Do you have a recollection of any
22   state representatives that may have been mentioned in
23   that investigation?

24   A:    I think there was a referenced made to a
25   Representative from the Pittsburgh area, but I don't know

1   the name.

2          Q:    Preston, something like that?  Do you

3   know?

4          A:    Could have been.

5          Q:    Well when this FBI product came in you

6   say there was some tapes and stuff in there and you had

7   to do your own transcription?

8          A:    Well what ended up happening I think

9   there was like twenty-one or twenty-four tapes, and the

10  administrative officer in our, well the administrative

11  assistant typed some of them up and I think there was

12  another secretary that was involved in typing those up.

13         Q:    Why?

14         A:    Why?

15         Q:    Yeah

16         A:    To have a transcript of what's on the

17  tape.

18         Q:    Why didn't you send it out to the

19  Organized Crime Division?  I mean so if I understand

20  what you've told me correctly, somebody from the

21  Organized Crime Group brought it up to Harrisburg and

22  into your office.

23         A:    No, Internal Affairs brought it.  The FBI

24  turned it over to Internal Affairs and they brought it to

25  me.

1   Q:   Okay

2   A:   It was dropped on my lap.

3   Q:   I see

4   A:   More like, here's this box of stuff

5   Q:   That must have been fun.

6   A:   and the FBI's out of it kind of thing.

7   Yeah, and I'm like what the heck do we have here.

8   Q:   Okay.  So in order for you to properly

9   evaluate it you needed to look at this FBI work product,

10  investigatory product.

11  A:   Right

12  Q:   Now do you know at that point whether

13  Mr. Stanton was aware that he had been investigated?

14  A:   I don't know that.

15  Q:   You didn't listen to the tapes you had

16  them transcribed?

17  A:   Right

18  Q:   Did you call up Mr. Kush?

19  A:   No

20  Q:   You did not.  Did you talk to any

21  FBI agents?

22  A:   No

23  Q:   May I ask,  I'm not suggesting you

24  should have by the way, I don't know.  Is there

25  some reason why not or would there have been any

1    reason?

2          A:    Well the reason being as the acting

3    Director and running my section I don't have the

4    time.  That was delegated to the Internal Affairs

5    West.  They would have to arrange, this was

6    western Pa.  They would have to arrange a meeting

7    with them, getting information, and documenting

8    what's going on with the Stanton thing.

9          Q:    Okay.  Did Mr. Wertz or Mr.

10   Williams come in and review any of this stuff?

11         A:    Review any of this?

12         Q:    Sure

13         A:    Yes, the transcripts that we made

14   from the FBI tapes, yes.

15         Q:    Okay.  Alright, when did you get this box?

16   Is it Dana brought it up?  Sergeant?

17         A:    Sergeant Seifner

18         Q:    Seifner, Dana Seifner.

19         A:    And she's now retired.

20         Q:    God bless her.  Did Sergeant Seifner she

21   brought these up to Harrisburg, and do you remember

22   when that was?

23         A:    Not to my recollection on that sir.  It

24   would have been like late May early June.

25         Q:    And it was before the control number was

47

1   put on to the investigation into Mr. Ober, right?

2          A:   Before Mr. Ober, yes

3          Q:   Okay.  Now how long did it take you to

4   transcribe these tapes?

5          A:   It was a time line probably of, I'm

6   thinking a week to two weeks.

7          Q:   Okay

8          A:   I know it was like, I think it was like

9   mid-June before they were done.

10         Q:   So before the control number, well let me

11  ask a question.  Did Mr. Wertz and Mr. Williams come in

12  and look at this stuff before a control number into Ober

13  was put on it?

14         A:   I'm not sure of that sir.  They could have.

15  I'm not sure.

16         Q:   Well some time on

17         A:   I mean they didn't like tell me when they

18  were doing things.  You know, I know the tapes were

19  done, were typed up.  When they actually looked at those

20  I'm not sure.

21         Q:   Okay.  That's alright.

22         A:   I'm sorry

23         Q:   That's okay.  If you don't know you don't

24  know.  Now, so at the time that this FBI investigatory

25  product comes in to the department up to your office.

1    There are really two investigations in progress.  One into
2    Stanton initiated by a complaint that came from Captain
3    Ober.

4            A:    Correct

5            Q:    and one into Captain Ober.

6            A:    Correct

7            Q:    Well, did anybody every tell you what
8    Ober had supposedly done wrong that warranted an
9    investigation?  Did you ever ask?  Did anybody ever say
10   what the Commissioner wanted to investigate him for?

11           A:    No, the only thing that Major Conley told
12   me was that the Commissioner wanted an investigation
13   to get the facts on what happened with this FBI,
14   whatever you want to call it, probe or FBI investigation
15   into Stanton kind of thing.  I wasn't a part of any
16   meetings or anything like that.  That was just told to me
17   by my boss.

18           Q:    Well did you ever tell any of these people
19   that what they were doing was wrong?

20           A:    No

21           Q:    Did you ever express any opinion to
22   them?

23           A:    I mean I didn't have the facts.  I mean

24           Q:    I'm not say you should have sir.

25           A:    I understand

1    Q:   I'm not saying you did.

2    A:   But no

3    Q:   It's not my role.  I'm not sitting here in
4    judgement of you.  I'm just asking questions here.

5    A:   I mean I don't know what was done.

6    Q:   Yes sir.  I don't want you to think that I
7    have, I'm probably, I'm not good enough of a lawyer I
8    guess that I can't hide feelings about things very well and
9    I apologize to you for that.  But I don't want you to think
10   I'm sitting here being critical to you.

11   A:   I'm not taking it that way.

12   Q:   Okay.  I just have to ask these questions
13   it's my job.  Okay, did you ever have, do you have a
14   recollection Rick of having a conversation with Darrell
15   Ober about the investigation into him or anything
16   relating to the investigation into him?

17   A:   Yes I had a conversation with him it was
18   very brief.  I think it was over at the IIMS building, and
19   Captain Ober and this happened more then one occasion.
20   I'm think maybe twice.  He said to me just hey I didn't do
21   anything wrong, and I just, my response to that would be
22   well then what are you worried about.  If you didn't do
23   nothing wrong don't.  I know he's still gonna be my
24   Captain.  I'm still his subordinate.  We work together.  I'm
25   encouraging the men.  Hey if you didn't do nothing wrong

1   don't worry about it.  Everything will take care of it's self,

2   and I know I mentioned to him that I had talked with the

3   investigator briefly.  I was kind of making light of the

4   situation caused I had mentioned to him they weren't

5   gonna give him the legerity warnings or something to that

6   effect.  I kind of ended it there and I left it alone cause I

7   thought we both, you know we both, and Captain Ober

8   went out of his way to keep me out of this.  So it was

9   kind of like bits and pieces of conversation.  I had kind of

10  chuckled when I mentioned that because Major Wertz

11  and Major Williams were Area Commanders, and as Area

12  Commanders I don't know how long since they did an

13  investigation but the process they were using was created

14  by Captain Ober.  The process called garidy warnings.

15  This was an agreement to my understanding he made

16  with the union.  I kind of chuckled because you're gonna

17  have to follow the process that he made.

18          Q:    Okay, but what.  Okay I understand that.

19  And you're passing this on to Captain Ober more or less.

20          A:    Right

21          Q:    I guess what you're describing to us to

22  some extent speaking in tongues.

23          A:    Yes

24          Q:    Sort of the way the people do when they

25  don't want to address and tip-toe around the point more

1   or less.

2         A:    Right

3         Q:    Is that fair to say?

4         A:    Yes sir it was kind of that.  It was kind of

5         Q:    Awkward

6         A:    Right it was very awkward, and I could

7   tell it was awkward for him too.

8         Q:    Okay.  How did it come up?

9         A:    I think it came up like I said initially he

10  said to me I didn't do anything wrong.

11        Q:    He sees you.  He passes you.  Let me lay

12  a little foundation.  Captain Ober at all time has always

13  treated you with respect and with, you know respect and

14  affection.  It's fair to say that the two of you were not just

15  in a relationship were he had title and position and you

16  had title and position, but obviously between the two of

17  you there was a decent honest proper repore that was a

18  good healthy thing.  Is that fair tot say?

19        A:    Yes sir.

20        Q:    Okay

21        A:    In both ways, absolutely.

22        Q:    Yes sir, and he had certainly never been

23  anyone who had obstructed or harmed you or interfered,

24  and you never had the impression that he would interfere

25  with your career plans or anything like that.

1    A:    No sir.

2    Q:    And put frankly those kinds of feelings,

3    that feeling of respect was reciprocal.  You felt the same

4    way towards him.

5    A:    Absolutely

6    Q:    Alright, and has someone's who's

7    obviously a sensitive and intelligent individual you had

8    your ambitions and you had your proper respect for

9    duties and indented to perform you job correctly.

10    Correct?

11    A:    Correct

12    Q:    And you would expect no less of him?

13    A:    Correct

14    Q:    Is that fair to say?

15    A:    Yes sir

16    Q:    Alright now with that situations people

17    who are decent respectful friends and respect each other

18    in an organization which is how it should probably

19    ideally be at all times.  How did this I didn't do anything

20    wrong, I mean did anything preface this comment I didn't

21    do anything wrong?  What or how did it come up?  I

22    mean after all he

23    A:    Well you know what I'm thinking.

24    Q:    Go ahead

25    A:    I'm thinking it came up cause Captain

1  Ober, I'm gonna go back to, I'm gonna say May, June.  I

2  think he gave me a videotape.  I think he gave me a

3  videotape and he had given me something.  I don't recall

4  exactly all what it was.  Maybe part of a report, an FBI

5  report, a tape.  There was a couple items he gave to me.

6          Q:    What was that about?

7          A:    I think that had in relation to Stanton, to

8  the Stanton issue and also he had said to me that he was

9  gonna give me a supplemental report.  I think that might

10 have been what prompted this conversation, because I

11 was over at the IMMS building and I don't remember if I

12 was something from him something else, but I know he

13 gave a report.  It wasn't on an Official State Police form.

14 He had put the Stanton control number and it was typed

15 up.  It wasn't dated, and it talked about his contact with

16 the FBI so on and so forth and I got that from him.  I'm

17 thinking that might have been you know I didn't do

18 anything wrong kind of thing.

19         Q:    Okay, but that would have been

20 something that occurred after Williams and Wertz?

21         A:    After?

22         Q:    Sure.  After you will aware that Williams

23 and Wertz were looking into the case.

24         A:    Oh that, yes

25         Q:    Okay and it would have been after Mr.

54

1    Conley talked to you.

2        A:    Yes

3        Q:    Alright so what did you do with that

4    stuff?

5        A:    What I did with the paper?

6        Q:    No, your recollection is he gave you

7    something.

8        A:    Right

9        Q:    And it's not clear to me yet why he did

10   that, but it's your testimony that he did that.  What did

11   you do with what he gave you?

12       A:    I put it in with the file.

13       Q:    Well didn't you call Mr. Williams or Mr.

14   Wertz and say here?

15       A:    Yes.  I did that too, yes.

16       Q:    Okay and what did they say to you?

17       A:    Nothing

18       Q:    Did they ask you what Ober said?

19       A:    No

20       Q:    Did you make an admission, did Mr. Ober

21   make an admission against interest?

22       A:    No

23       Q:    Nothing like that?

24       A:    No.  I think what I did with that is when

25   Captain Ober, cause by regulation he's required to

1　document this sort of thing, and I think he was fulfilling

2　his obligation by preparing this report to make it a part of

3　the investigation into Stanton.  When I got that I

4　remember sending a copy to Major Williams, I believe it

5　was.

6　　　　Q:　In other words what he was doing was he

7　faxed this complaint form in.  So what he's doing is giving

8　you what he's got whatever it might be that is connected

9　to or would support this complaint form.

10　　　　A:　Well the worksheet he submitted was

11　very, it was just a paragraph.

12　　　　Q:　Okay

13　　　　A:　What he gave me, I think it was two

14　pages.  Or at least a page and a half to two pages of

15　information that wasn't on the complaint sheet.

16　　　　Q:　Right

17　　　　A:　But it was more specific stuff.

18　　　　Q:　Sure, but it was a follow-up to the

19　complaint sheet

20　　　　A:　Yes

21　　　　Q:　Right that he faxed you.

22　　　　A:　Correct

23　　　　Q:　Alright.  So there was nothing secret or

24　improper on either on of your parts.  That's something

25　that was obviously become part of the Stanton thing,

1    right?

2         A:    Correct

3         Q:    Okay.

4         TONY MARCECA:  5th of March, 2002, we're

5    back on camera.  The break was from 10:15 to 10:40.

6         MR BAILEY:  In this box that came up, how

7    many tapes were in this box?  If you remember.  You said

8    something like about dozen.  Something like a dozen or

9    something.

10        MR BROWN: It was, I'm not sure of the exact

11   number, but I would say between twenty and twenty-

12   four.

13        Q:    Okay

14        A:    Somewhere in there.

15        Q:    Why were there two investigations?  If

16   you know that answer to this of course.  Why were there

17   two investigations an investigation into Ober and an

18   investigation into Stanton now at this point?

19        A:    The Stanton investigation, well at the

20   time, we didn't know what we really had.  So there was

21   gonna be an investigation into that.  Then the other, my

22   understanding is that the investigation or inquiry was at

23   the request of the Commissioner as far as the facts and

24   circumstances surrounding the FBI thing.

25        Q:    Now at some point was there a BPR done

1   on Stanton?

2        A:    Oh, yes sir.

3        Q:    And that was initiated when?

4        A:    What had end up happening is that when

5   Captain Ober on it, try to gather some information.  BCI

6   ends up investigating it.  When the criminal prosecution

7   then the administrative kicked in.  The administrative

8   investigation was done, I don't recall when it was done

9   sir, but it was completed.

10        Q:    Now Stanton ended up, I hate to use the

11   term "beat the charges", but Stanton prevailed based on

12   certain technical defenses as I understand it.

13        A:    Yes sir.  That's my understanding.

14        Q:    Did those technical defenses have to do

15   with the way evidence was handled by the FBI or the

16   State Police?  Do you know?

17        A:    From what I understand of this is that

18   the FBI did wiretaps under federal standards and then

19   when they turned it over our Pennsylvania Constitution

20   or something to that effect give more right and privileges

21   in that area.  We could not use their wiretaps in a state

22   prosecution I think is how it went.

23        Q:    Okay, and that had to do with the wires

24   that were wore by informants and that sort of thing

25   Pennsylvania's warrant standards etc.

58

1    A:    To the best of my knowledge sir, yes.

2    Q:    Okay.  Well do you know why the Feds

3    didn't prosecute Mr. Stanton?

4    A:    I don't know

5    Q:    Do you know whether they ever did?

6    A:    The only thing I know is that our BCI

7    brought, Bureau Criminal Investigation, Organized Crime

8    Division brought Charges against Stanton.

9    Q:    You do know if the FBI ever investigated

10   him?

11   A:    Stanton?

12   Q:    Yeah.  I don't mean investigated, ever

13   charged him.  If he were charged on a federal, did any

14   Federal Grand Jury ever bring him in?

15   A:    Not to my knowledge, no.

16   Q:    Do you know whether the Federal Grand

17   Jury ever investigated or the FBI ever investigated the

18   Pennsylvania Elected Officials involved?

19   A:    No.  I don't know that sir.

20   Q:    Did you ever come to learn if the Federal

21   Bureau of Investigation did any investigation into, a

22   broader investigation into the Stanton matter then just

23   whether Stanton was involved.  In other words, into

24   practices in the Pennsylvania State Police Academy

25   appointment process anything like that.

1        A:    That the FBI did?

2        Q:    Yeah

3        A:    No

4        Q:    Did you ever become aware of why the

5 FBI shut down the investigation or ended it better yet?

6        A:    I think I got that.  That was on the

7 complaint sheet that Captain Ober summated.  That they

8 were done and was turning it over.  I think that's, I was

9 under the assumption that they were through with it

10 that's why he was...

11        Q:    Right, but my question is do you know

12 why they were through with it?

13        A:    Oh, no

14        Q:    Why the FBI concluded it without

15 prosecuting?

16        A:    No sir, I don't.

17        Q:    Do you know if there were ever any

18 conversations between Mr. Evanko and Louie Freed?

19        A:    No I'm not aware of that sir.

20        Q:    I may be miss, I can't remember.  You did

21 or did not have conversations with the FBI agents

22 involved?

23        A:    I did not speak to the FBI agents.

24        Q:    Do you whether Mr. Williams did?

25        A:    I'm not sure if he did or not.

1      Q:    How about Mr. Wertz?  Do you know
2  whether he did?
3      A:    They may have, but I can't say with
4  certainty.
5      Q:    Okay.  You had indicated some
6  knowledge or experience with the evaluation process
7  when a complaint arises.  Let me more specific.  A
8  Complaint arise from a citizen.
9      A:    Correct
10     Q:    and let's say it's one of these things you
11 refer to as a demininis.  You know the officer intimidated
12 me.  So you know out of respect for the civilian inquiry
13 you do some checking into it or whatever.  That's a
14 process that has to do with evaluating the complaint,
15 right?
16     A:    Correct
17     Q:    Now, initially on it's face there are
18 probably many circumstances where you can tell that
19 something is you know, general and rather demininis by
20 nature.  In other word a complaint comes in and it says
21 the officer intimidated me and that's all it says.  You pay
22 it a proper respect and you check it out, right?
23     A:    Well if it's from a citizen we'll send them
24 the complaint verification.  I've seen in my experience
25 that when the complaint verification it is more specific

1   then what we had, and it may articulate something that

2   requires an investigation.

3        Q:    But if somebody wrote into you and say

4   the officer opened up the door, and I'm not suggesting

5   anyone ever did this, but the officer opened up the door

6   and pulled me out and slapped me and threw me back in

7   the car.  Now obviously prime affection right up front

8   you're going to look at that and say if this is true that's

9   serious, right?  All other things being equal.  If it's just a

10  traffic stop for speed, and I swore at the officer and called

11  him a name.  He dragged me out of the car and slapped

12  me and threw back in the car.  Now you know, people

13  shouldn't swear at police officers obviously, but that

14  wouldn't justify, in a hypothetical situation now, wouldn't

15  justify dragging them out of the car and slapping them

16  and throw them back in the car, right?

17       A:    That's correct.

18       Q:    Okay, now.  So if you look at a complaint

19  like that on the face of it, one the officer intimidated me.

20  You know it might be demininis and probably is.  But if

21  he says he struck me, hit me, or assaulted me, or

22  something like that obviously you look at that and say

23  hey you know,  all things being equal if there isn't some

24  reason for the use of force like that that's not proper and

25  that's more serious.  Am I correct?

1        A:     Correct

2        Q:     Okay.  Now what reasons, as you sit here

3 today now remember we're not suppose to be talking

4 after March of 2001.

5        A:     Right

6        Q:     But you know, which I object to but

7 that's alright.  Before March of 2001 what were the

8 reasons as you sit here today?  What were the reasons

9 that occurred to you that justified looking into Captain

10 Ober?  What was it about?  Use your own language.  Tell

11 us what it was about.  What has he done?

12       A:     Back then sir all I know is that Major

13 Conley told me that the Commissioner wanted a

14 gathering of the facts, get the information on what

15 occurred.  I missed the second part of your

16       Q:     Yeah what was the reason for it?

17       A:     Oh

18       Q:     I mean, you're a bright guy you've been

19 around for awhile you're a police officer.  You're very

20 articulate gentlemen, and you're a career officer.  You're

21 in the Pennsylvania State Police.  That's your career and

22 your life.

23       A:     Right

24       Q:     You carry a lot of pride in that don't you?

25       A:     Uh-mum

1        Q:    Cause you should.  Fine organization and
2  you take pride in that, right?

3        A:    Correct

4        Q:    They're checking into a Captain over
5  what?  I mean, this is supervisory inquiry sir.  You told
6  us about that.  You told us about those BPR things.  You
7  know, you investigate people for reasons.  I'm trying to
8  find the reasons, and then through all this litigation, I
9  want to confess to you, I haven't found a reason.  So I'm
10  asking if you could tell me what the reason was.

11        A:    Like I said sir I was given the comment
12  from Major Conley as far as what others.  I mean, I don't
13  who all was involved.  I mean, I don't know sir.

14        Q:    Up until March at least, we don't know
15  what you may have learned since then.  Up until March
16  2001 you didn't know the reason the Commissioner
17  wanted Mr. Ober investigated.  Is that fair to say?

18        A:    Well

19        Q:    If so tell us.

20        A:    Right, the fair way to say

21        Q:    Yeah

22        A:    is that the Commissioner wanted to
23  ascertain the facts.

24        Q: Okay.  Now do you know if there was any
25  written information provided by the FBI as to why they

1    did the investigation?  What originated it?

2            A:    On Stanton?

3            Q:    Yeah into Stanton

4            A:    Yes I got a copy of their FBI report.

5    Whether or not it's everything that they have I'm not sure

6    of, but I mean I have some stuff.  There was some stuff,

7    some documentation provided by the FBI to Lieutenant,

8    or Sergeant Seifner excuse me.

9            Q:    Well, do you know whether or not anyone

10    ever ask the FBI why they went to Captain Ober as

11    opposed to directly to the Commissioner?

12            A:    I don't have any knowledge.  I mean I

13    didn't talk to the FBI.  I don't know what

14            Q:    When the FBI does an investigation and

15    informs the Pennsylvania State Police what procedure do

16    they usually follow?

17            A:    Well it depends on what, I'll give an

18    example.  When I was a criminal investigator in Troop H I

19    worked with the FBI on some bank robberies.  It's just

20    law enforcement agencies working together.  We were

21    familiar  with the special agent in charge here in

22    Harrisburg when I worked in the crime room, and if we

23    had a criminal investigation.  I can think of one case in

24    particular.  It was a bank robbery.  We got information

25    there was gonna be a bank robbery, and the suspects

65

1    were from Pennsylvania, leaving Pennsylvania to go to

2    Maryland, and we did surveillance.  We contacted the

3    FBI.  There was nothing special about the working

4    relationship.  We were just fellow officers, and we did end

5    up making arrests on it.

6           Q:    Well in this case do you have any

7    information known to you that the FBI had some reason

8    to go to IAD?

9           A:    No sir

10          Q:    Well, I mean you don't have any facts

11   known to you, which would indicate that the FBI for

12   personal reasons because they just liked him?  It was by

13   virtue of the fact that he's sitting there as Director of IAD.

14   Is that correct?

15          A:    How the hell they came up with him is

16   unbeknownst to me.  All I know is at the time is what he

17   put on that work sheet was that he was contacted by the

18   FBI in '98.

19          Q:    Well when you evaluated the Stanton

20   stuff when it came in you learned that there were

21   potentially elected officials involved that the FBI had

22   some probable to look at that, and didn't they mention

23   the Governor's Office?

24          A:    I don't recall any mentioning of the

25   Governor's Office.

1    Q:    Well, do you know whether Mr. Evanko

2    ever indicated that there was an interest in the

3    Governor's office when he talked to Mr. Campbell or

4    people in the Governor's Office?

5    A:    I don't know who Colonel Evanko talked

6    to.  I had no discussions with him.

7    Q:    Okay.  Did you read the FBI 302's?

8    A:    You say the 302's is that their report?

9    Q:    Yeah they do a

10    A:    Okay

11    Q:    The FBI you know, the most modern

12    investigative agency in the greatest nation on Earth.

13    They don't tape inquiries.  They don't tape interviews.

14    What they do is they take two agents and they sit down

15    with somebody and they take notes, and everybody in the

16    world wonders why they do that.  No one can figure it out

17    of course, but there's no record.  So you rely on what the

18    FBI says was said.  That's what happens, and then they

19    do a 302.  Then of course if you try to get their notes to

20    back up their 302 they fight against that.  Some day the

21    law in the Unites States will change.  Who knows, but at

22    this time they do 302s, and their 302's are a form that

23    they use and that form is like the agent's, like a report

24    that you do.  Do you have a recollection of reading the

25    302s in this matter when this stuff came up for Stanton?

67

A: I have a recollection of looking through it yes.

Q: And you don't recollect any mention of the Governor's Office?

A: No I don't

Q: Now do you have a recollection of the 302s mentioning elected officials?

A: When you mentioned earlier about Bodack, I remember that name I think being mentioned. I can't remember if it was in the FBI 302 or the transcript of the intercept.

Q: Do you remember in any of the intercept or any of the wire? Let's do it the easy way. You don't have a recollection of the Governor's Office being mentioned anywhere.

A: No I don't

Q: Now if that had been mentioned would that have triggered any bureaucratic response? If the Governor's Office had been mentioned.

A: A bureaucratic response?

Q: In other words, would it effect how you would evaluate the information you had in front of you?

A: I would think so yes

Q: I mean it would certainly throw up a red flag that ut-oh what is this about because you know not

1    that there is any reason to expect at that time or now

2    would do anything improper.  That's a pretty high level

3    thing.  That's a pretty potent kind of an allegation I would

4    suspect.

5              A:    Yes.  If I had saw something like that my

6    first inclination would be to check with the FBI.  Because

7    my experience with the FBI would be why would they

8    turn something like that over.  If they got a high ranking

9    official that they could be bringing charges against

10   they're certainly not going to give it to the State Police or

11   local law enforcement to pursue.  The FBI's gonna take it

12   cause they can get a lot of media coverage out of it.

13             Q:    Rogue leftovers of J. Edgar Hoover I

14   guess.  Now let me ask you this.  Do you have a

15   recollection about any language about higher ups in the

16   State Police being mentioned?  Now not by name now,

17   but that there could possibly could have been, you know

18   that there were implications or allegations that maybe

19   higher ups in the State Police were involved?

20             A:    My recollection is I think it was

21   mentioned "Lieutenant Colonel".

22             Q:    Okay anything else?

23             A:     I think that's it.  I think it was

24   mentioned one time or something.

25             Q:    And your best recollection is that... What

1   degree of certainty would you attach to that that it said

2   "Lieutenant Colonel" as opposed to the question I asked

3   you and the phrase "higher ups"?

4          A:    Higher ups in the State Police?

5          Q:    Yes

6          A:    I don't remember anything saying "higher

7   ups". I do remember Lieutenant Colonel is what's

8   sticking out in my mind sir.

9          Q:    Now what's a target, if you understand?

10  You've worked with the FBI, what do they mean when

11  they say "target"?

12         A:    The focus of an investigation

13         Q:    Based on your knowledge and experience

14  it could mean a wide variety of things, but is it fair to say

15  that it means that at least there's some interest and there

16  may be some reason to investigate someone. If someone

17  where a target of an investigation it doesn't mean that

18  they did anything wrong, but it means, doesn't it, that

19  there is a valid investigatory reason to look at them?

20         A:    You asking me about the FBI?

21         Q:    Yes the FBI

22         A:    I would assume there would be. My

23  experience with them is that they never lay all their cards

24  on the table. I mean we work with them. I never sit

25  down and say this is why we're doing this. Whatever.

1    Q:    You don't want my response to that.

2    Okay now, what's a target of an investigation?  What

3    does that mean based on you experience as a trained

4    police officer and an experienced investigator?  What is a

5    target of an investigation?

6    A:    Like I said earlier, a focus.  Someone that

7    you're looking at for well like just use the Stanton thing.

8    Stanton was supposedly involved in something, and he

9    was targeted by the FBI.

10    Q:    if you indicated to a fellow investigator

11    that someone or some entity was the target of

12    investigation, would you go and inform them that they

13    were the target of an investigation?

14    A:    No I wouldn't

15    Q:    Why not?

16    A:    Well you might be compromising the

17    integrity of the investigation.

18    Q:    Could you possible being exposing

19    yourself to criminal liability yourself depending on what

20    you did?

21    A:    Depending on what you did and what's

22    being investigated

23    Q:    Okay.  Now then this FBI work product

24    came up to you.  It was brought up to you by Dana

25    Seifner.  You had it transcribed.  You had everything

1    done to it.  At some time, I think you indicated that Mr.

2    Williams and/or Mr. Wertz and they looked at that.

3        A:    Yes

4        Q:    Can you tell us sir, would that had been

5    before June 1999?

6        A:    I think the transcripts were done like

7    mid-June so they would have been available at that time.

8    So it's possibly that they might have.

9        Q:    But you don't know.

10       A:    It's going on three years sir, I don't know

11       Q:    Yeah

12       A:    if they looked at it before hand or if it was

13   the end of the month or middle of the month.  I'm not

14   sure.

15       Q:    Now I want you to listen real close to this

16   question.  Is there any form, piece of paper in other

17   words, which would indicate when and who would look at

18   that investigative product or can they just walk in their

19   look at it and leave?

20       A:    There's no form, No, no sir.  The only

21   thing, I could give you an example.  If a Bureau Director

22   wanted to look at a report about something that occurred

23   a couple years ago involving the operation of their bureau

24   or whatever they could come over and look at it and the

25   confounds of BPR, but we don't have them like sign in or

72

1  sign out.  Or you might have an occasion where

2  somebody might jot down on the file that somebody had

3  an interest in it, but there's no formal process of doing

4  that.

5        Q:    Well if Mr. Williams or Mr. Wertz or

6  anyone else came in there to look at that FBI work

7  product are they allowed to remove it?  Can they take it

8  somewhere to look at it?  Are they monitored?  You know,

9  is there any kind of internal control or check keep on?

10       A:    Well, yeah we kinda keep that

11 information.  Like for instance if your gonna look at the

12 file you're gonna look at it in BPR.  Like to give you an

13 example of something and maybe this will help clarify it.

14 You might have, say for instance I left the State Police

15 and I wanted to apply for a job with the FBI.  They would

16 have me sign a release to obtain information about my

17 background, to include any disciplinary actions or

18 internal things that I might have been involved in.  So

19 then the FBI

20       Q:    I'm sorry

21       A:    That's okay, would do their background

22 investigation and would want to access the file and look

23 at my files.  Well I've given them permission to do that

24 and it protects the department.  The FBI is not allowed to

25 make copies.  Their not allowed to take any reports with

1   them.  What they do they can come in and look at the

2   information and then they don't take nothing with them.

3          Q:    Well how do you know they don't take

4   something with them?

5          A:    Well we have, we put them in an office

6   there.  They sit in an office right outside of our office.  We

7   can see them.  They don't make copies of anything.

8          Q:    Well who watched Williams and Wertz.

9   I'm not suggesting they would do anything improper.

10  Don't read that into the question, but who watched them

11  when they came in and went through those files?

12         A:    I didn't

13         Q:    Do you know anyone who did?

14         A:    No

15         Q:    Well they're Majors in the Pennsylvania

16  State Police and you're not gonna challenge their

17  integrity, right?

18         A:    I had no reason

19         Q:    I'm not suggesting that you did.  Now

20  aside from Mr. Williams and aside from Mr. Wertz do you

21  know anyone else that came in and went through those

22  files?  If you do please tell me who.

23         A:    I don't know of anybody else sir.

24         Q:    Well would you know if they did, if

25  someone else did and if so?

1      A:    Not with…Well I know that when those

2   transcriptions were done Sergeant Siefner had a set of

3   them for the internal.  I mean she had them for her

4   internal investigation.

5      Q:    Why not have Sergeant Seifner check into

6   if there were questions.  Cause you see we have this big

7   question out there, what's the reason for this.  Now if

8   there were questions, Lord knows what they were, but if

9   there were questions about Mr. Ober and the FBI

10  investigation why not have the BPR assigned person do

11  it?

12     A:    I would think that would be an

13  uncomfortable position to put the Internal Affairs

14  investigator in, in light of the fact that Captain Ober he

15  was detached but he was still the Captain for IAD.  It

16  would have been more appropriate to someone outside of

17  Internal Affairs investigate that.  That would be like my

18  Lieutenant investigating me.  We work together.  They

19  know me, and all of the sudden their gonna be like.  It

20  makes for an uncomfortable situation.

21     Q:    Okay

22     A:    So what we have to ask them to do is go

23  outside of that.

24     Q:    Okay.  Now do you know if the FBI's role

25  in investigating Stanton was ever looked at?

75

1     A:     The BCI do all that.  I don't know if that

2     was a part of their criminal investigation or not.

3     Q:     Well do you know of any questions ever

4     raised about a lack of probable cause on the part of the

5     FBI to do an investigation?

6     A:     No sir

7     Q:     It's fair to say is it not, although there

8     were legal objections that sustained a dismissal of the

9     charges against Mr. Stanton that factually at least given

10    what was know to you he was certainly involved in

11    talking about trading money for influence.  Is that fair to

12    say?

13    A:     That's fair to say.

14    Q:     Do you know what happened to Mr.

15    Stanton?

16    A:     Mr. Stanton, after the criminal charges?

17    Q:     After the criminal charges were dropped

18    and the after the State Police did it's internal.

19    A:     Okay the last knowledge I have of him

20    we're still in the process.  There's still administrative

21    action pending.  I think in the form of arbitration and I

22    believe, I'm not 100% sure on this, but I believe he's

23    suspended without pay.

24    Q:     Okay

25    A:     So he's not working

1        Q:    Okay.  Now are you familiar with the...

2    Strike that.  Chain of command in the Pennsylvania State

3    Police.  Did you ever contribute of have a discussion with

4    anyone about submission of a change in the PSP

5    regulations regarding chain of command?

6        A:    No sir

7        Q:    Let me get back just a little bit Rick if I

8    can to the conversation.  You had a conversation, first of

9    all you indicated that arose between you and Captain

10    Ober where he said I didn't do anything wrong. I had

11    asked you some question about that originated, how the

12    subject came up.  Is it fair to say you don't remember

13    how it came up?

14        A:    I don't remember exactly how we got on

15    the subject, but it came up.

16        Q:    Alright

17        A:    Briefly

18        Q:    But you don't remember how?

19        A:    No I can remember

20        Q:    Alright.  Now during that conversation

21    did you ever indicated that you had related to Major

22    Williams and/or Major Wertz that you know you guys

23    aren't doing this right or you can't do that?  Something to

24    that effect.  Just something to that effect.

25        A:    No

1    Q:    Well do you remember when I asked you

2    the few questions about the supervisory thing that some

3    how Captain Ober had put this supervisory thing in

4    place?

5    A:    Right

6    Q:    Now did you have a discussion with Mr.

7    Williams and Mr. Wertz about this supervisory

8    investigation?

9    A:    I recall speaking to Major Wertz, I believe,

10    about the supervisory inquiry process.

11    Q:    Well was he asking you questions about

12    it?

13    A:    Yeah, he just said...  Maybe I did get a

14    chance to clarify before.  Remember I was tell you that

15    before we started this supervisory inquiry process we had

16    this other database and these  other numbers.  I think

17    that was the process the Major Wertz and Major Williams

18    was familiar with as far as dealing with supervisory

19    issues.  So I was explaining to him.  I think one of the

20    questions he asked me was about administrative

21    warnings.  The administrative warnings Captain Ober

22    developed this, and to my knowledge this was something

23    he agreed with with the Union.  That in new supervisory

24    inquiries that these notices or warnings would be

25    provided to effected personal.  I explained that to him.

78

1    Q:    So when do you not use an

2    administrative warning process?

3          A:    If you're just like, say for instance you're

4    out doing an investigation say a shooting incident and

5    there are troopers there that wasn't actually the shooter.

6    Well you wouldn't give them an administrative warning.

7    Just the person that was involved in the shooting.  Cause

8    basically all you're letting them know is that the

9    information that you're getting from them can't be use

10   against them in their criminal proceeding.  It's strictly an

11   administrative matter of the State Police.

12         Q:    Yeah, but you told me that there's an

13   issue here of whether or not the Commander intends to

14   look at discipline.

15         A:    And maybe I can clarify this for you

16         Q:    Sure

17         A:    When a supervisory, the way it's been

18   done since I've been cause I was at them after him, was if

19   their was a complaint that came in and it said the

20   Trooper was belligerent on the traffic stop.  Under normal

21   circumstances the Commanding Officer, put of my job is

22   to communicate with Commanders, and I would say hey

23   let's do it as a supervisory inquiry.  I'll call the guy and

24   let him know.  I'll tell him to be more careful when he's

25   talking to citizens.  But the Commander may say you

1  know this is the fourth type complaint.  So maybe he is

2  being a little over baring maybe we need to make a full

3  investigation out of it.

4          Q:    Well a full investigation though Rick is

5  not a supervisory inquiry.  I have loads of testimony on

6  that.  Right?

7          A:    Right

8          Q:    But how was Ober turned into a full

9  investigation?

10         A:    Well, let me finish my answer there.

11         Q:    I'm sorry

12         A:    What the Commander is doing is he or

13  she has made a determination that he is going to

14  consider formal discipline in the matter with the

15  repetitive conduct.  So now instead of it being the normal

16  we'll handle it at the Troop level now it's assigned to an

17  IAD investigation.  A full investigation cause that's what

18  the disciplinary officer has to act on when it comes in.

19         Q:    Yeah, but you know that in ever single on

20  of the examples you're given me, every single one of

21  them, you've mentioned that the individual allegedly did

22  something.

23         A:    No I didn't

24         Q:    No?

25         A:    No, no.  There are investigations done

1   were there is no misconduct alleged by directive, and

2   there we have a category for non-complaint

3   investigations.  Non-complaint investigation are, I'll give

4   you an example of one that I was involved in.  When I

5   was a criminal investigator I had a rape suspect.  I had a

6   warrant for, and he was suicidal and he fired a shoot in

7   the direction of me and some other police officers.  I

8   never unholstered my gun.  Then later on he ended up

9   drawing done on us.  Well the mere fact that I was

10  present when that shoot was fired required an internal

11  investigation.  No one alleged I did anything, but the

12  Troop commander at that time and determined that my

13  actions were justified.  But certainly one of the things

14  investigations are designed to do are point out safety

15  issues.

16          Q:    Just find out the facts.

17          A:    Right and there might be a training issue

18  that results from that, a safety issue.  Not only that a

19  well being issue.  Maybe one of us might have been effect

20  physiologically about being close to gunfire.  So there are

21  investigation, I'll give you an example of another one,

22  prisoner escapes.  We got a prisoner in custody and some

23  how the equipment malfunctions, the handcuffs brake,

24  the guy slugs you in the head, and escapes.  Well the

25  police officer is basically a victim of an assault here, but

1   we do an internal investigation.

2          Q:   Same thing with the incident.  Am I

3   correct?

4          A:   Right

5          Q:   Investigating a fact situation or a

6   incident.  Did somebody explain at some time what the

7   incident was about the FBI coming to Ober that Ober

8   should be investigated for?

9          A:   Not to me

10          Q:   Did you ever hear of any reason?

11          A:   No sir

12          Q:   And the fact is as you sit here today you

13   don't know of any reason.  Do you Rick?

14          A:   I don't know what the powers above me,

15   whatever reasons they had.  I don't know that.  I just

16   know I was told that the Commissioner wanted an

17   investigation into the facts of what occurred.

18          Q:   Well okay, into the facts of what

19   occurred.

20          A:   Or the circumstance of what occurred.

21          Q:   In other words the circumstances of what

22   occurred in the communications between Mr. Ober and

23   the FBI.

24          A:   I mean that's an assumption

25          Q:   Well

1    A:    I don't know this sir

2    Q:    I don't do fishing exhibitions.  I gotta

3    have reasons to file complaints, and I'm asking if you

4    know if this was an incident.  If this was an investigation

5    into an incident was it into communication between

6    Captain Ober and the FBI?  Now, you may not know.

7    Was that the incident or the facts that were being

8    investigated?

9    A:    Like I said I never discussed it with Major

10    Wertz and Williams.  I don't know what instructions they

11    may have had sir.  They didn't share that with me.

12    Q:    Did you ever any discussions about this

13    incident or this investigation or whatever it was with

14    Colonel Coury?

15    A:    No sir

16    Q:    How about with, is it Colonel Westcott?

17    A:    Nah, I would never discuss anything.  He

18    was Deputy of Operations. No discussions with him no.

19    Q:    Well do you know who chose, did Mr.

20    Williams or Mr. Wertz indicate who chose them to do the

21    investigation?  Or the did they say we're here at the

22    direction of the Commissioner or something like that?

23    A:    I think I was informed that they were

24    investigating.  I think Major Conley informed me that

25    they would be conducting the inquiry.

1          Q:    For the Commissioner

2          A:    Right

3          Q:    Okay.  That's interesting

4          A:    They're gonna be assigned to gather the

5 facts.

6          Q:    So he didn't say for the Commissioner?

7          A:    I don't him saying it.  I just recall I know

8 Major Conley told me that the Commissioner wanted an

9 investigation.  At some point and time, I don't know if it

10 was then or days later whatever, but at some point he

11 mentioned to me that Major Wertz and Major Williams

12 would be doing it.  I don't know all that other verbiage.

13          Q:    I understand.  In other words he didn't

14 use the words " for the Commissioner".

15          A:    Right

16          Q:    That you can recollect.

17          A:    Right

18          Q:    Fair enough.  Do you recollect if....Strike

19 that.  Did Mr. Conley indicate the he had spoken with

20 Mr. Evanko?

21          A:    I don't recall him telling me that.

22          Q:    Okay do you have a recollection of him

23 ever indicating that he was relaying this information to

24 you in effect from the Commissioner himself or somebody

25 close to the Commissioner?

1    A:    I don't know he got informed of what was

2  gonna be done.  Cause the Major in BPR comes under

3  the Deputy of IAD.  So I don't know who he discussed it

4  with sir.  I know he told me the Commissioner wanted an

5  investigation.

6    Q:    Okay.  Why did you go talk to Mr.

7  Merryman?

8    A:    Why did who?

9    Q:    You

10    OPPOSING COUNSEL: Uh

11    MR BAILEY:  All no that's not privileged.  No,

12  no no come one.  Mr. Merryman is an individual that you

13  went and investigated and talked to.  There's nothing

14  privileged about that conversation.  It's not an attorney,

15  you don't represent him.

16    OPPOSING COUNSEL:  The reason that he

17  spoke to Mr. Merryman was again part of the

18  investigation that was directed by the attorneys.

19    MR BAILEY:  I strongly object.  Obviously I

20  don't want to get into a contentious thing about this you.

21  I'm asking you to please consider, if your gonna tell this

22  man that I can't ask him about conversations that he

23  had or for that matter, under proper circumstances even

24  ask you if the circumstances were relevant.  But your

25  gonna instruct him that he doesn't not have to answer

1  questions about conversations he had with Mr.

2  Merryman?

3  OPPOSING COUNSEL:  If it was part of the

4  investigation that we requested him to do, yes that's what

5  I'm directing.

6  MR BAILEY:  Alright well, I very strongly

7  object.  Let me ask you some of the things you did as

8  opposed to what you discussed did you deliver a affidavit

9  form to Mr. Merryman?

10  OPPOSING COUNSEL:  He doesn't have to

11  answer that.

12  MR BAILEY:  That's what he did.  I'm not

13  asking what he said.

14  OPPOSING COUNSEL:  I think investigation

15  details would cover action as well as word.

16  MR BAILEY:  I think that you people are trying

17  to hide and obviously  escape this lawsuit.  I think what

18  you're doing is highly improper and I don't think you can

19  run around and protect yourselves and protect your

20  clients by taking some investigator and calling that

21  attorney product or work product or whatever you call it.

22  Cause I don't think it is, and then when that person goes

23  and talks to somebody allegedly I can't question your

24  investigator about it.  I think that's

25  OPPOSING COUNSEL:  Alright Counsel with

1    all due courtesy, attorney work product the was certainly

2    not created or born with this particular litigation, but is a

3    process and procedure of long standing in the

4    department.  Secondly, you recall of course that Major

5    Merryman and was deposed with regard to his choice to

6    testify concerning what if anything he said to or was

7    asked by Captain Brown.  So therefor you have not been

8    excluded sir.

9           MR BAILEY:  That's what takes this privilege

10   away.  Even if it existed.

11          OPPOSING COUNSEL:  That's takes it away as

12   to the Attorney/ Client Privilege with regard to Major

13   Merryman.  This is a total different doctrine of Attorney

14   Work Product.  So our objection remains, and it remains

15   as to acts as well as conversation.  Just to answer your

16          MR BAILEY:  Well when you went and talked...

17   Okay well I disagree with you.  When you went and

18   talked to Mr. Merryman where any of the attorneys

19   present?

20          OPPOSING COUNSEL:  Again the same

21   objection.

22          MR BAILEY:  The question is whether or not

23   the attorneys were present.  I think you have to answer

24   that.  Just tell me if they were present.

25          OPPOSING COUNSEL:  He doesn't have to

1   answer any questions regarding anything he did at our

2   direction.  I already told you that that was at our

3   direction.  He doesn't have to answer questions about

4   that.

5           MR BAILEY:  Are you denying that you went

6   and questioned Mr. Merryman?

7           OPPOSING COUNSEL:  He's not answering the

8   question.

9           MR BAILEY:  Are you denying that you had

10  any conversations with Mr. Merryman?

11          OPPOSING COUNSEL:  Same objection

12          MR BAILEY:  And are you denying that during

13  the conversation you had with Mr. Merryman, are you

14  indicating that the attorney where or where not present?

15          OPPOSING COUNSEL:  Same objection

16          MR BAILEY:  Now I want to hear you tell me

17  that you're not answering those cause you've been

18  instructed by counsel.  She's not testifying here.  She's

19  not under oath.  Is it fair to say, and you have to answer

20  this and if you don't I'm gonna call the judge.  Is it fair to

21  say that the group of question that I just asked you a few

22  minutes ago, and I need a verbal response, you have not

23  answered these questions on advice of these attorney

24  here today.  Is that correct?

25          MR BROWN:  That is correct sir.

1    Q:    Okay.  I'm gonna move on to some other

2    areas.

3        TONY MARCECA:  Mr. Bailey before we move

4    on can we take this minute and change both tapes.

5        MR BAILEY:  Okay.  Just take five minutes

6        TONY MARCECA:  It's 11:26 and we're going to

7    go off camera to change the tapes.

8        TONY MARCECA:  It's 11:26 on March 5,

9    2002.  We put a new tape in and we are continuing the

10    deposition of Captain Brown.

11        MR BAILEY:  Rick I'm gonna a change.

12    Completely change direction here one more time.  I'm

13    gonna go in the area of what I refer to, and I know you'll

14    know what I'm talking about, the museum investigation.

15    Okay?

16    A:    Oh, okay

17    Q:    Artifacts or whatever

18    A:    Okay

19    Q:    Just maybe.  Cause your counsel had

20    asked me how much more time.  I think we can finish up

21    in less then thirty minutes here.  What do you know

22    about that?  My understanding is a background, I'll give

23    you an offer here.  That there was some type of

24    investigation into Captain Ober about either PSP

25    Museum of potential museum items etc.  What can you

1   tell me about that?

2       A:    What I recall about the was that there

3   was a representation that some how that Captain Ober

4   has used his position with the department to secure

5   artifacts, State Police artifact, for his own private

6   collection.  That the people he was contacting were lead

7   to believe were going to the museum Commissioner not

8   to him personally.

9       Q:    Okay

10      A:    Something along that line

11      Q:    Yeah, and before we go in to, I have a lot

12  of question about this area by the way.  Although I think

13  they're rather perfunctory.  Is it fair to say that the

14  investigation yielded, in fact Captain Ober had not done

15  anything wrong and it was unfounded?

16      A:    That's correct to my knowledge.

17      Q:    Okay let me go back.  Did you do that

18  investigation?

19      A:    Me personally?

20      Q:    Yeah

21      A:    No

22      Q:    Who did?

23      A:    Corporal Robert Mrgich from the Internal

24  Affairs Division.

25      Q:    And that's M-R-

1    A: M-R-G-I-C-H

2    Q: Mrgich,  I think it Ukrainian.  I had a

3 friend named Grgich one time, a fine family.  Okay, I'm

4 gonna ask you, if my research serves me correctly

5 Corporal Mrgich was an IAD guy.

6    A: Correct

7    Q: Where was Captain Ober at the time this

8 investigation was done?

9    A: He would have been at the IIMS project.

10    Q: He in other words was detached.

11    A: Correct

12    Q: You know Judge Rambo, a very highly

13 respected federal judge with a great deal of experience, I

14 believed in certain cases indicated that detachment is not

15 a permanent kind of thing you're still part of an

16 organization.  Am I correct?  In other words if you're

17 detached to some duty you are still assigned to a certain

18 place at least for administrative purposed, although you

19 may not be there physically work.  That's really were

20 you're organization home is, i.e. sent out to some other

21 sort of duty.  It might not be even be related to what you

22 do, but he's attached from.  In other words, he's actually

23 IAD, but he's detached to IIMS.  Is that correct

24    A: Correct

25    Q: Okay

1    A:    That's sounds right.

2    Q:    Alright.  Why was Corporal Mrgich who

3  was with IAD investigating Captain Ober who was with

4  IAD.

5    A:    The only thing I can... Each situation is a

6  little different.  This wasn't something, this was done as a

7  supervisory inquiry.  There wasn't allegations that

8  Captain Ober committed any crimes.  It was a low-level

9  kind of thing.  Were as the other situation, who knows

10  what could have came out of that.

11    Q:    Yeah

12    A:    it could have been a bad, I mean I don't.

13  The supervisory into the museum thing was low grade.

14    Q:    Compared to the FBI thing?

15    A:    Right

16    Q:    What could Ober have done?  Was he

17  disloyal to their Commissioner?

18    A:    I don't know what he did.

19    Q:    Is there a crime called disloyalty in the

20  Pennsylvania State Police?

21    A:    Not to my knowledge.  I think there is

22  something about disloyalty to the department, but I don't

23  know where that is exactly.

24    Q:    No pun intended and I mean that.  It

25  almost sounds distopalistic  doesn't it?  I mean disloyalty

1    to the leader or something.

2            A:      Like I said, I don't recall anything

3    anywhere saying loyalty to the Commissioner.  I think it's

4    loyalty to agency, organization, department.

5            Q:      Okay.  What facts come to your mind

6    when you say to me as response to a question, the

7    museum thing is a minor little thing compared to that

8    other thing, the other investigation into Ober?  What was

9    going through your mind?

10           A:      About the museum?

11           Q:      Yeah.  What comparison were you doing?

12           A:      Really I wasn't doing any comparison that

13   I can recall.

14           Q:      No you probably weren't.  Now to you the

15   gravity of those two things was significantly different

16   wasn't it?  That's what you told us.

17           A:      Well the thing is the Commissioner

18   requested an inquiry.  However two Majors got assigned.

19   The deal with the museum, if my memory serves me

20   right, I think Major Conley told me it would be best done

21   as a supervisory inquiry.

22           Q:      Well

23           A:      I mean it was something, I mean me

24   personally, I mean I know Captain Ober collected thing.

25   You know maybe it was a misunderstanding.

1    Q: Okay

2    A: So I wasn't looking at it like, Oh my God

3 Captain Ober's getting artifacts.

4    Q: Well if someone misrepresented their

5 roles of State Police Officer that could be a crime though.

6 Am I correct?

7    A: It depends on the situation of how they

8 represent themselves.  I mean he's a police officer.  So

9 he's not misrepresenting himself if he say I'm a Captain

10 in the State Police.  He is representing himself.

11    Q: Well it would be misrepresentation if you

12 say this is for some particular organization and it's for

13 him personally.  Don't you have an individual being

14 investigated for that right now in the southwestern part

15 of the state?

16    A: For doing what?

17    Q: For allegedly misrepresenting their role in

18 purcuring artifacts or something or am I mistaken?

19    A: There is a member that was arrested for,

20 it wasn't to my knowledge securing, like what Captain

21 Ober was doing.  What he was actually doing was

22 removing State Police property,

23    Q: Wow

24    A: and selling it for a profit.

25    Q: Okay

1    A: It's a little different thing.

2    Q: Admittedly it that would be different. I'll

3 withdraw the question.  It wouldn't have any basis, I

4 agree.  Now do you know had initiated the investigation

5 on the museum thing?

6    A: What I recall of that is, he's a retired I

7 don't if he was a Colonel or a Lieutenant Colonel, but he's

8 a retired guy, Trooper named Phil Conty.  He sent

9 correspondence to Lieutenant Colonel Coury.  Then

10 Lieutenant Colonel  Coury, I think at that time, referred it

11 over to BPR and then it came to me from Major Conley.  I

12 think that's how it went.

13    Q: Do you know whether anyone just called

14 Captain Ober up and asked him what was going on?

15    A: Oh, no I don't that.

16    Q: You don't know how it was conducted or?

17    A: How the inquiry was conducted?

18    Q: Yeah

19    A: I know that Corporal Mrgich interviewed

20 Phil Conty and interviewed a couple of the women and

21 I'm pretty sure he interviewed Captain Ober.

22    Q: Okay.  Was there a, I'm having a hard

23 time understanding why in the museum situation it was

24 a... Well I guess actually your response to questions.  I'm

25 think of, let me stop doing that.  I'm messing up this

1   record.  The museum investigation you had indicated

2   that there was some decision made at some point that it

3   was a supervisory inquiry kind of thing, whatever that is,

4   right?

5        A:    Right

6        Q:    Alright hold on just one second.

7        MR BAILEY:  Okay, it's a supervisory inquiry.

8   What' an administrative inquiry?

9        MR BROWN: Administrative inquiry is not

10  defined in our AR-425.  We don't have definition that

11  says administrative inquiry.  What it says is

12  administrative investigation are inquiries.

13       Q:    Right

14       A:    Administrative inquiries into allegations

15  of misconduct or into investigations by directive, such as

16  the Commissioner's request, where no misconduct is

17  alleged.

18       Q:    I wonder what's so special about, I mean

19  who's the... I don't mean any disrespect.

20       A:    I understand sir.  I don't take any.

21       Q:    Yeah.  What's so special about the

22  Commissioner?  You know, if I'm in the Army and the

23  Chairmen of the Joint Chief of Staffs comes down and he

24  says he want some private investigated on a fire base

25  somewhere, he has no more authority none, zero, and

1    believe me he doesn't under the Army's system, okay.

2    Has no more authority, no more weight, as a matter or

3    fact he has less authority and weight then that private's

4    Commander to initiate and investigation or even to

5    punish.  Can you tell me what, in the FBI investigation,

6    what it had to do with Colonel Coury?  I mean, I'm sorry,

7    with Colonel Evanko.  Do you know?  I mean, that's an

8    honest question.  As you sit here today do you know

9    what it had to do with him?

10             A:    No

11             Q:    Okay.  On the museum investigation

12             A:    Did I answer your question on that sir?

13             Q:    Yes sir, you did.  No you did.  You did.

14    You answered it perfectly.  That's what I expected you to

15    tell me.  From what I know, I don't know what it had to

16    do with him.  I don't know what he was doing ask for this

17    investigation.  I don't know what lead to it.  I don't want

18    he asked.  Do you know whether and questioned, you

19    know just simply got a hold of Captain Ober and said

20    Captain come on in here, tell me about this.  What went

21    on?

22             A:    No

23             Q:    Do you know when that ever occurred?

24             A:    No

25             Q:    Okay.  Did anyone ever indicate to you

1    the Mr. Conty was trying to encourage or looking for

2    complaints against Captain Ober?  Did anybody ever

3    indicate that to you?

4            A:    No

5            Q:    What about Colonel Coury?  Did Colonel

6    Coury become involved in the museum investigation at

7    all?

8            A:    The only recollection I have of him

9    besides, I think Phil Conty sending the correspondence to

10   him.  I think he would have been the adjudicator.  I think

11   he was the adjudicator of that.

12           Q:    Is that proper?

13           A:    Well I mean, normally if, I'll give you an

14   example.  If I'm a Troop Commander and someone in my

15   command had an investigation on them,  normally the

16   Troop Commander would be the adjudicator.  Unless

17   they're somewhat involved in the investigation or

18   complaint or some sort.  I've seen situations where

19   depending on what was under investigation,  I think the

20   Deputy Commissioner of Administration can designate

21   someone to adjudicate a case.  So I mean it's not hard

22   and fifth and in every situation it's gotta be this person or

23   that person.  There occasions where Deputy Admin. Can

24   say that this person is gonna adjudicate this particular

25   case.

1        Q:    Well was Mr. Mrgich assigned by Colonel

2  Coury?

3        A:    No.  I probably gave that to him.

4        Q:    You had a Corporal investigating a

5  Captain?  Is that normal?

6        A:    Well you know in IAD they can

7  investigate.

8        Q:    I understand they can, but how normal

9  or?

10      A:    It happens.

11      Q:    It happens?

12      A:    Yes it happens.

13      Q:    Okay.  The supervisory inquiry is a

14  creator of regulation, defined and described by

15  regulation, right?

16      A:    No

17      Q:    It's not.

18      A:    No

19      Q:    Supervisory inquiry isn't?

20      A:    No sir.  This was something that what I

21  recall, I'm pretty sure this was Captain Ober's brainchild.

22  It was something that was gonna be part of a special

23  order.  Cause when he went to IIMS I has to pick up on it

24  to try to finish it.  So it never, I mean it never got signed

25  and put in to practice, but it was being field tested during

1   that time.

2           Q:    Well

3           A:    I mean there's been a couple hundred of

4   them.

5           Q:    Supervisory inquiries?

6           A:    Well back when that was going on, I

7   think back around that time we had like a hundred and

8   some of them.

9           Q:    Do they have number assigned?

10          A:    Yes sir

11          Q:    Because when you told us this

12  investigation that was done at the Commissioner's

13  request until this I guess some how by accident or in

14  passing the issue of ut-oh there's no number here, until

15  that come up it didn't even have a number from what you

16  told me.

17          A:    Right and as far as ut-oh I don't think

18          Q:    Okay.  Can I take my ut-oh back?

19          A:    Supervisory inquiries?

20          A:    Well back when that was going on, I

21  think back around that time we had like a hundred and

22  some of them.

23          Q:    Do they have number assigned?

24          A:    Yes sir

25          Q:    Because when you told us this

1   investigation that was done at the Commissioner's

2   request until this I guess some how by accident or in

3   passing the issue of Ut-oh there's no number here, until

4   that come up it didn't even have a number from what you

5   told me.

6          A:   Right and as far as ut-oh I don't think

7          Q:   Okay.  Can I take my ut-oh back?

8          A:   Yeah Major Wertz kind a said

9          Q:   Did he us the word "whoa"?

10        A:   Well no

11        Q:   He didn't?

12        A:   Well I don't remember using a whoa, but I

13   think what it was, the context of the conversation was I

14   don't think we took a number for this.  Then I said

15   something the Major Conley about what they were doing,

16   and he says it an investigation at the request of the

17   Commissioner.  I wrote it up, put the number on it and

18   gave it to them.  So that the Tracking would be there.

19        Q:   Well

20        A:   Whether I was right or wrong, that's for

21   somebody else to judge.

22        Q:   No, no

23        A:   I thought I was doing the right thing.

24        Q:   I certainly not in question whether you

25   were right of wrong.  At least somebody put it in the

1  system.  But you seem to be telling me now, if I

2  understand you, and not that it's different from anything

3  that you said.  I'm not impeaching you here.  My

4  understanding is then you did this, was it at the request

5  of Mr. Conley?

6          A:    Which?

7          Q:    To fill out that form.

8          A:    No he didn't request me.  I just did it.

9          Q:    Cause it was the right thing to do?

10         A:    Right

11         Q:    So you weren't asked to do it by Williams.

12 You were not asked to do it by Wertz and you were not

13 asked to do it by Conley.  You were not asked to do it by

14 Coury.  You were not asked to do it by Westcott.  You

15 were not asked to do it by Evanko.

16         A:    Sitting here

17         Q:    There was no request.  It was just you

18 being a responsible person in that position and said I

19 better do this.

20         A:    That's basically what happened.

21         Q:    Okay.  Right now, do you know whether

22 there a complaint verification on the museum thing?

23         A:    I don't think there was a complaint

24 verification form, but there was a complaint verified in

25 written by Mr. Conty.  Which is our policy to except

1   those.

2       Q:   Well did somebody get back to Mr. Conty

3   and ask him why he said this and what it was about?

4       A:   I'm pretty sure Corporal Mrgich

5   interviewed him.  I think he was interviewed about his

6   complaint letter.

7       Q:   Okay.  Do you remember, if you recollect

8   what his response was?

9       A:   Oh no I don't.

10      Q:   But that would be in the file, if we ever

11   get them.  I mean that would be in there, right?

12      A:   Right

13      Q:   Okay.  In a supervisory inquiry...Strike

14   that.  Full investigation, full you know the big jobby.

15      A:   Okay

16      Q:   The big one.  In a full investigation can

17   the individual say I refuse to respond or answer?

18      A:   They can, yes

19      Q:   At that point can the investigator say

20   okay and read you your so called administrative

21   warnings or rights whatever.  Then if the person still

22   refuses to answer technically it can be insubordination

23   and they can even be dismissed.  Am I correct?

24      A:   Well

25      Q:   Correct me on that.  Tell me

1    A:    What would have to happen is the
2  investigator would have to report that to somebody like
3  me, and then what may be the next step in the process
4  would be to get in touch with the individual's
5  Commanding Officer and have an order issued.  A written
6  order saying you will cooperate with the investigation.
7  Then once that's done and they're served with it and they
8  didn't comply then there could be an investigation for
9  insubordination, well there could be a lawful order.  I
10 mean it would be a very simple investigation, here's the
11 lawful order he did comply, and discipline could result of
12 it.  Whether or not it would be termination or not the way
13 our system is set up that would go before an arbitrator
14 and the arbitrator would decide whether the person.  I
15 mean the department can move to dismiss, but it's up to
16 the arbitrator whether or not the person's actually
17 dismissed.
18    Q:    Do you know whether Mr. Wertz and Mr.
19 Williams interviewed Captain Ober at sometime?
20    A:    Oh yes
21    Q:    Okay.  Now did you ever listen to that
22 tape of that interview?
23    A:    No
24    Q:    Was it taped?
25    A:    I believe so.  I believe so cause I think he

1   asked to barrow a tape recorder.  I think Major Wertz or

2   Williams asked to barrow a tape recorder from either me

3   or one of my guys.

4           Q:    Where did they do the interview?

5           A:    You know I'm not sure.  I'm not sure

6   where they did his interview.

7           Q:    Do you know that the... I remember

8   reading State Police regulations abut supervisory

9   inquiries.  Did you say that wasn't written into the

10  regulations?

11          A:    Let me give a little background.

12          Q:    Yeah

13          A:    First of all AR-425?

14          Q:    Right

15          A:    It came out in '93.  When I first came to

16  BPR in '94 my Captain, Sam Gore at the time, was like

17  we got to rewrite 425.  This thing has be in the revision

18  stage for nine years now, and even with the discipline

19  committee we're try to hammer out these different things.

20  So what happened with the supervisory inquiry when

21  Captain Ober left I pick up on it.  I basically had a meet

22  with the Union.  It was a monthly meeting, and kind of

23  hammered out, just fine-tuned it a little bit and it was

24  getting ready to go to press.

25          Q:    But it had been in the

1      A:    It was being worked yes.  It was being

2   worked

3      Q:    Well but my question sir, not to interrupt

4   you.  But my question is was it in writing in some form in

5   426 before you put it in?

6      A:    No

7      Q:    Okay

8      A:    It's still not in writing in 425.

9      Q:    Where is it in writing?

10     A:    Just the draft that Captain Ober gave me

11  and then what I ended up continuing to put together.

12  But it was never

13     Q:    Then other then a full investigation what

14  were the regulations that governed the actions of Mr.

15  Williams and Mr. Wertz in the early summer of 1999?

16     A:    Well AR-425 and basically what I

17  informed them about the process that Captain Ober

18  developed.  I don't know if Captain Ober had got some

19  authorization from the Major or from the Deputy or

20  whoever, but that was something that was being done

21  and still being done to this day.

22     Q:    Are you telling us that Captain Ober

23  developed the process that was used to interrogate him?

24  Is that what you're telling me?

25     A:    He developed the supervisory, I think it

1     was his idea.

2           Q:     So did he deserve what he got then?  Is

3     that what you're telling me?

4           A:     Well I'm not telling you at all.  I just

5     saying that he developed the process, and that was the

6     process to my knowledge that they choose to follow.

7           Q:     Well where was the process written

8     down?

9           A:     It was written down in a draft form.  We

10     had a draft.

11           Q:     Okay

12           A:     Of a special order

13           Q:     Okay

14           A:     But it had, matter of fact it did go to

15     Research and Development.  It did go over there.

16           Q:     Okay.  When?

17           A:     I want to say,  when did it go over?

18     During this time frame I had a lot going on and I'm trying

19     to remember.  Cause it did have a whole lot to do.  I met

20     with the PSTA.  They hammered it out.  I'm think the

21     later part of the year of '99 maybe.  It may have went over

22     there, cause Major Merryman, I recall seeing a blank slip

23     with Major Merryman's name on it.  I thought, and

24     something in the later part of '99 maybe.  But then what

25     happened, what in effect happened, I was at the

1  discipline committee meeting and the Union in the new

2  process we're developing wanted to do away with the

3  supervisory inquiry.  Says yeah we never, it's not in the

4  regulations.  Just do away with it.  We're gonna come up

5  with a new system.  So that's the reason it wasn't

6  pursued any further to my knowledge, but the Troop

7  Commanders that I deal with they like it.  They like it for

8  dealing with for dealing with minor stuff.

9          Q:     Well

10         A:     I've been told not to use it.  Put it that

11  way.

12         Q:     Okay.  Who appointed Wertz and

13  Williams?

14         A:     Appointed them?

15         Q:     Uh-hum

16         A:     To the investigation?  You mean assigned

17  them?

18         Q:     Yeah assigned them

19         A:     I don't know who made that decision sir.

20  I wasn't a part of any.  Nobody consulted me about

21  whether they should be the ones to do the inquiry or

22  whatever.  I was not a part of any of that.

23         Q:     Well how many other investigation like

24  that do you know of?

25         A:     Do I know as far as?

1    Q:    Where somebody appointed investigator

2    to investigate somebody and it's not its not done through

3    IAD?

4    A:    Well maybe I can clear this up for you.

5    Q:    Sure

6    A:    The Director of the Bureau of Professional

7    Responsibility retains supervisory authority for all of

8    investigations assigned to the bureau.  My job as the

9    Director is to pick that up in his absence or unless he

10    delegates me to do that, but really it's his responsibility.

11    Q:    I'm not talking about responsibility.  I'm

12    talking about what's been done.  What was done.

13    A:    I guess the point I'm trying to make is if

14    the Director of BPR has talked to a Troop Commander,

15    say for instance, about a complaint and he calls me in

16    the office and he says "hey I want this investigation done.

17    I talked to the CO and I want this person to do it."  It

18    shall be done.

19    Q:    Okay.  Are you tell us that Major Conley

20    assigned Wertz?

21    A:    That I don't know.  I don't know.  I don't

22    know how...

23    Q:    What situations, here's what my question

24    was.  What situations other then Captain Ober and/or

25    IAD assigned investigators?  Strike that.  Let me rephrase

1    that.  What situations do you know of other then Ober

2    where BPR and/or IAD did not assign investigators?  I'd

3    like to know.  Then I'm gonna ask you question on what

4    authority an Area Commander has, Colonel Coury has to

5    assigning investigators to investigate people.  Cause I

6    want to know where it is in your regulations cause I can't

7    find it.

8            A:    Let me just say this about AR-425.  It's

9    not all inclusive of everything and every circumstance or

10   situation you could come across.

11           Q:    Okay, but that's not what I'm asking you.

12           A:    Okay

13           Q:    I'm not asking you, now wait.  Wait Rick.

14           A:    Okay

15           Q:    I'm just asking you aside from Captain

16   Ober.

17           A:    Okay

18           Q:    Do you know of, cause see all of us can

19   read 425 and try to figure out what it says.  Ultimately a

20   judge is going to decide.  We're not gonna decide that the

21   judge is gonna decide what it says.  My question is aside

22   from the investigation into Captain Ober What other

23   situations do you know of where investigators where

24   appointed outside of BPR or IAD and an investigation

25   was done somebody?  That's all I'm asking.

1        A:    Let me and hopefully this clarifies it.  Not

2    all complaints

3        Q:    Yeah, do you know of any other

4    situations?

5        A:    I mean I don't know.  I mean the people

6    from the field, I mean Internal Affairs isn't the only entity

7    that does investigations.

8        Q:    Into Pennsylvania State Police internal

9        A:    Right

10        Q:    Who does?

11        A:    Well you have field non-commissioned

12    officers in the field and even up to Lieutenants.

13    Depending

14        Q:    To appoint investigators?  Take people

15    and say this is your duty to go investigate.

16        A:    Right.  Say for instance if a Troop

17    Commander calls me and says I have a complaint on

18    Rick Brown in my troop.  I've assigned, he would tell, I've

19    assigned Sergeant Joe Smith to do the investigation and I

20    will just pen that information right on to the file.

21        Q:    Yeah you enter it.

22        A:    But that CO decided who was gonna

23    investigate it.  They don't ask me if it's okay.  They say

24    this is who I want to do it.  The only time that I get to

25    pick an investigator in my daily wick is when it's

1   assigned to the Internal Affairs Division where I have

2   control of those investigators.  Now when I was a

3   Lieutenant I would designate which one of the

4   investigator under me would do it, but as the Director I

5   give it to their section Commander.  They look at

6   caseload or whatever and they determine who gets the

7   work.  I leave that up to their judgement.

8           Q:    You leave that up to them?

9           A:    Yes.  I mean if there's something the

10  comes in, I'm not gonna say that's 100% of the time.  If

11  something comes in and I think, and I say this is

12  something that I have a guy

13          Q:     So a field Commander can take some

14  people assign them to investigate one of his people.  They

15  don't even have to call you or tell you. Right?

16          A:    Well they can actually do an inquiry

17  before calling us, absolutely.

18          Q:    Well, no no no.  I'm talking about

19  assigning investigators and have them go out and

20  investigate somebody without letting you know.  They

21  don't even have to tell you, right?

22          A:    Well I'm trying to think the best way to

23  answer this.  If a Commanding Officer gets a complaint

24  and it's vague they may assign someone to go out and

25  track down some additional information.

1    Q:    Sure

2    A:    And you can call that an investigation or

3    whatever, but it may be just trying to get some additional

4    facts to determine whether it should come to us.

5    Q:    If they get some information?

6    A:    Right

7    Q:    So Colonel Evanko can tell us, he's the

8    guy that started this thing, he got to be able to tell us

9    why and for what reason he did this right?

10    A:    You have to ask him that.

11    Q:    Yeah, cause he'd be, I guess nobody else

12    knows.  He has to be the guy that knows right?

13    A:    Yeah, he didn't consult with Rick Brown.

14    Q:    Okay.  No he didn't consult with you.

15    Which attorney assigned you the so-called Attorney Work

16    Product investigation that's been discussed here?  Who

17    was it?

18    OPPOSING COUNSEL:  I don't have a problem

19    with it.

20    MR BROWN:  It would be Chief Counsel

21    MR BAILEY:  Barbara?  Okay.  Who told you to

22    take the copy of the Stackhouse investigation from

23    Captain Ober?  Who told you to do that?

24    A:    I don't remember if it was.  Would I have

25    talked to Captain Skurkis about that.  I don't know if

113

1    Captain Skurkis was acting or if it was the Major.

2        Q:    Well didn't you tell Captain Skurkis or

3    were you ordered by Skurkis to take the copy from Ober.

4    Do you remember?

5        A:    I don't recalled per say.  See there was

6    things going on with Stackhouse that other people need

7    to see the report.  Like the investigator, Sergeant Rain.

8    So for him to just be able to keep if for an indefinite time

9    period would not be, I mean

10       Q:    Well somebody told you to go get it or do

11   you have your own?

12       A:    Well I think it was Captain Skurkis.

13       Q:    Why?

14       A:    Cause there was coming up with her.

15   Through the Union they had filled a lawsuit, and there

16   was gonna be depositions and other people had to review

17   to refresh themselves on what they did so they could be

18   prepared for their deposition.  That's recalling it the time

19   frame.  I remember Sergeant Rain coming to me saying

20   "Hey am I gonna be able to look at the report", and that

21   was the only, I think he had the original which was the

22   only copy of it at that time.

23       Q:    Did somebody say that Ober wasn't to

24   testify in that matter or wasn't to be involved in it?

25       A:    No

1      Q:    But why was it taken back?  Do you

2  know what it was for?  Why was it taken back?  Why was

3  it retrieved from him?

4      A:    Well actually he could have looked at it

5  there anytime.  We had no problem with him coming over

6  to BPR and looking at that file.

7      Q:    Do you know the defendants in this case?

8      A:    Do I know them?

9      Q:    Sure

10     A:    Yes

11     Q:    Did you ever have any discussions with

12 them regarding Mr. Ober's transfer to Washington

13 Pennsylvania?

14     A:    No

15     Q:    Or purported transfer that never.  I

16 guess, what's the penalty box?  What is that?

17     A:    That's just a term I think that's an

18 organizationally thing.  You know guy's talk.  I think

19 that, I'm just trying to think.  If somebody perceives that

20 you did something wrong and you're assigned here or

21 you're doing something different that might be perceived

22 as you're in the penalty box.

23     Q:    Does that mean you're held in disfavor,

24 you're ostracized?

25     A:    No

1    Q:    What does it mean?

2    A:    Well to me, what it means to me is really

3    it doesn't have a lot of meaning to me because I treat

4    everybody.  Well, like in Captain Ober's case

5    Q:    Well no, I'm not indicated it has anything

6    to do with you personally.

7    A:    I mean I can't speak for other people.

8    Q:    I'm not asking you to speak for other

9    people.  I'm asking you, Rick Brown, to give me an honest

10    definition of penalty box means.  I mean being in the

11    doghouse.  Is it like being in the doghouse?

12    A:    I cause you could say that.

13    Q:    Well what would you say?

14    A:    Could be in the doghouse.

15    Q:    Alright.  Do you have any recollection of

16    any discussion with any of the defendants regarding Mr.

17    Ober's transfer to LCE?

18    A:    No

19    Q:    Did you do an Internal Affairs

20    investigation into allegations of misconduct involving

21    Lieutenant Colonel Westcott and Trooper Mark George?

22    A:    Yes

23    Q:    What was the complaint about?

24    A:    It was an anonymous compliant number

25    one, and it worded in such that it was implied that it

1    could be criminal.  It had to do with supposedly Colonel

2    Westcott was in the process of getting his pilot's license,

3    and Mark George was a pilot.  The allegations were that

4    using state time to fly, and become licensed while he's

5    working kind of thing.

6                Q:    Alright

7                A:    Something to that effect

8                Q:    Okay.  Did Westcott and George know

9    each other in fact?

10                A:    To my knowledge they knew each other

11   yes.

12                Q:    Did you ever have any problem arranging

13   an interview with George?

14                A:    With George?

15                Q:    Yeah

16                A:    No

17                Q:    Okay

18                A:    He was stationed up in like around

19   Wyoming.

20                Q:    Did you ever discover any facts indicating

21   that George had been tipped off by Mr. Westcott?

22                A:    Tipped off about?

23                Q:    Anything

24                A:    About the complaint?

25                Q:    Whatever

1        A:    No

2        Q:    You have recollection of learning or

3  receiving information that a group of cadets was retested

4  at the academy cause a applicant named Colleen Young

5  failed her physically testing portion of the process?

6        A:    I don't, like I said hear say kind of thing.

7  I don't know how mentioned it, but I did hear that

8  somebody was retested, but I don't know who it was and

9  why.

10       Q:    No, that a whole group was retested to

11  protect the person.

12       A:    A whole group?

13       Q:    Yeah

14       A:    I just hear about some retests but I don't

15  know who they were and why.

16       Q:    Do you know who Colleen Young is?

17       A:    No

18       Q:    Do you think that, do you have an

19  opinion as to whether Darrell Ober is acting properly in

20  bring this complaint?  Do you have an opinion about

21  that, a personal opinion as a colleague and as a

22  Pennsylvania State Police Officer?

23       A:    You mean bring the lawsuit?

24       Q:    Yeah

25       A:    I kinda, my opinions will be formed when

118

1 I know all the facts.

2    Q: Well do you have any opinions?  You're

3 aware of the efforts made by the Pennsylvania State

4 Police which failed obviously to transfer Mr. Ober to

5 Washington County, correct?  You were.

6    A: Yes

7    Q: You're aware that he was assigned to a

8 Lieutenant position in LCE.  You're aware of that aren't

9 you?

10    A: Yes

11    Q: You're aware of some of the grievance

12 issues over like expenses and his telephone, aren't you?

13    A: I heard

14    Q: Some awareness

15    A: Yeah some awareness

16    Q: Right.  Is Captain Ober going anywhere in

17 the Pennsylvania State Police?

18    A: Is he doing what?

19    Q: Is he going anywhere?  Is he pretty much

20 at his career end do you think?

21    A: I certainly don't think he's at his career

22 end.  He's a Captain already.  He's got one more jump to

23 make to Major and even with his time on him.  He came

24 in a couple classes after me so he's got probably twenty-

25 one years on.  Close to twenty-one years or He'll have

1    twenty-one years.  Who knows he might be friends with

2    the next Governor and be the Commissioner.  So I don't

3    think his career's over.

4         Q:    You ever indicate to any body that he was

5    over doing it?  You know he's lost control or anything like

6    that.  Did you ever say that to anybody?

7         A:    Not that I recall, no.

8         Q:    I'm gonna read you a letter.  It's got a

9    date on it, which is before March of 2001 okay.  It says:

10   Captain Ober where do I begin.  Through adversity you

11   stood talk for  your beliefs.  You're a winner.  Let know

12   one tell you differently.  I'm proud to have serve with you.

13   You taught me, lead me, and supported me through

14   some very difficult times and have been a loyal friend.

15   You have protected me and provided me with

16   opportunity.  Thanks Captain for your trust, confidence,

17   and faith in me during some difficult times.  I will never

18   forget what you have done for me.  Hopefully one day we

19   will work together again.  I can't begin to tell you what it

20   meant to me to see you and Kim at the ceremony.  I'll

21   never forget your support.  Thanks again Captain.

22   Thanks Kim, Rick.  You write that letter?

23        A:    I recall that, yes

24        Q:    Why?  Why did you write that letter?

25        A:    Well through out this time period, when

1    Captain Ober before he went to IIMS he offered me

2    training opportunities.  Well he did things a boss would

3    do.

4              Q:    Okay.  I'm not trying to embarrass you.

5              A:    I don't feel embarrassed

6              Q:    No, but I just want you to know I'm not.

7    Let me just do this this way.  Did Captain Ober ever do

8    anything to harm you?

9              A:    No

10             Q:    Alright.  Is it fair to say that you believe

11   that if you did something wrong and were deserving of

12   discipline that Captain Ober would discipline you?

13             A:     Oh, yes.  I believe so.

14             Q:    And you're probably the kind of person if

15   you look in a mirror, is it fair to say the you believe that if

16   someone who were within your command or you had a

17   duty to supervise if they did something wrong you would

18   treat them fairly?

19             A:.    Correct

20             Q:    And how many years you've been in the

21   Pennsylvania State Police?

22             A:    Twenty-one years

23             Q:    Based upon knowledge you have was it

24   fair to send Captain Ober to Washington Pennsylvania?

25   Based upon what you know.

1          A:    But that's just it.  I didn't know much.  I
2  don't know what the reason was.

3          Q:    Well what do you know today, Rick?

4          A:    Well, I don't know all the facts.

5          Q:    You don't know all the facts?

6          A:    No

7          Q:    Well I'll tell you what, I'll wrote you a
8  letter when all the fact are known and I'll ask you the
9  question again. Okay?

10         A:    That's fine

11         Q:    You and I will have an agreement,
12  alright?

13         A:    That's fine

14         Q:    Alright.  Now what about assigning
15  Captain Ober to LCE?  Was that fair, Rick?  Do you know
16  enough facts about that to give us an opinion based upon
17  your years with the State Police?

18         A:    Nah

19         Q:    Was it fair?

20         A:    I don't have an opinion on that.  Cause I
21  know there was some court action on

22         Q:    Alright.  That's fine.  I understand you've
23  stressed your opinion.  Now let me ask you this question
24  sir.  Can you tell me how many years in the State Police?
25  I may not have heard you correctly.

1    A: Twenty-one

2    Q: Twenty-one.  Twenty-one years in the

3 Pennsylvania State Police.  How many times has a

4 Captain been assigned to a Lieutenant's position in the

5 Pennsylvania State Police during your twenty-one years

6 that you can tell me?

7    A: I don't know

8    Q: Have you ever know of that?

9    A: Me personally I haven't, no.

10    Q: You have no knowledge of that ever

11 happening aside from Captain Ober?  Now you're not

12 questioning that it happened to Captain Ober?

13    A: No, no, no, no.  I'm just say, you said

14 except him.

15    Q: Right

16    A: Nah I

17    Q: Except for him you don't know of that

18 ever happening.

19    A: No

20    Q: Alright I don't have any more of you.

21 Your attorneys may have some questions of you.

22    OPPOSING COUNSEL:  I don't have any.

23    MR BAILEY:  Rick I'd like to express, he's

24 gonna shut the investigation.  The investigation they we

25 go.  He gonna shut the camera down and the deposition.

1  I'd like to express my gratitude to you for coming in here

2  and answering questions the best that you can.  I

3  sincerely appreciate your cooperation.  Thank you.

4          MR BROWN: Thank you sir.

5          MR BAILEY:  Tony you want to end this?

6          TONY MARCECA:  The time is 12:20 and it's

7  the 5th of March.  This now concludes this deposition of

8  Mr. Brown.

9

10

# INDEX

11

12

13

425: 24, 96, 106, 107, 110, 111

Artifacts, 90
attorney work product, 8, 13, 31, 32, 87

BPR, 17, 20, 21, 26, 30, 32, 35, 58, 64, 73, 75, 85, 95, 106, 110, 111, 115
BPR number, 17
Bureau of Professional Responsibility, 5, 7, 109

Captain, 5, 7, 10, 11, 12, 13, 14, 15, 20, 26, 28, 29, 33, 35, 37, 38, 39, 41, 42, 49, 50, 51, 52, 54, 56, 58, 60, 63, 64, 65, 75, 77, 78, 79, 83, 87, 89, 90, 91, 92, 94, 95, 96, 98, 99, 100, 105, 106, 107, 110, 111, 114, 115, 116, 120, 121, 122, 123, 124
CLEAN message, 12, 38
Commissioner, 12, 13, 14, 15, 16, 17, 18, 22, 24, 30, 36, 37, 39, 44, 49, 58, 63, 64, 65, 83, 84, 85, 90, 93, 94, 97, 99, 101, 102, 120
Conley, 15, 16, 17, 18, 19, 20, 21, 22, 25, 36, 39, 49, 55, 63, 64, 84, 85, 94, 95, 102, 103, 110
Coury, 2, 18, 39, 83, 95, 97, 98, 99, 103, 110

department, 11, 41, 49, 74, 87, 90, 93, 105

Director, 7, 11, 13, 20, 22, 26, 47, 66, 73, 109, 110, 112
discipline, 11, 35, 79, 80, 105, 106, 108, 122

Evanko, 2, 12, 60, 67, 85, 97, 103, 113

FBI, 6, 7, 13, 14, 15, 16, 21, 39, 40, 42, 43, 44, 45, 46, 47, 49, 54, 58, 59, 60, 61, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 82, 83, 93, 97
full investigation, 81

George, 117, 118

IAD, 6, 7, 20, 23, 26, 27, 32, 35, 66, 75, 81, 85, 91, 92, 99, 109, 110, 111

IIMS, 10, 11, 12, 37, 38, 39, 50, 91, 92, 100, 121
Incident Information Management System, 11
Internal Affairs, 5, 7, 11, 12, 13, 20, 28, 33, 39, 41, 45, 47, 75, 91, 111, 112, 117

investigation, 6, 8, 9, 11, 13, 15, 16, 17, 18, 20, 22, 24, 25, 26, 27, 29, 30, 31, 36, 39, 42, 43, 44, 48, 49, 50, 51, 56, 57, 58, 60, 62, 65, 66, 70, 71, 72, 74, 75, 76, 78, 79, 80, 81, 82, 83, 84, 85, 86, 90, 91, 93, 95, 96, 97, 98, 99, 101, 102, 104, 107, 109, 110, 111, 112, 113, 114, 117, 124

lawsuit, 6, 9, 87, 115, 119
LCE, 117, 119, 123

Merryman, 85, 86, 87, 88, 108
misconduct, 34, 81, 97, 117
misrepresentation, 94
Mrgich, 91, 92, 96, 99, 103
museum, 90, 92, 93, 94, 95, 96, 98, 103

Ober, 2, 3, 5, 6, 7, 10, 11, 12, 13, 14, 15, 20, 26, 28, 29, 33, 35, 37, 38, 39, 41, 42, 48, 49, 50, 51, 52, 54, 55, 56, 57, 58, 60, 63, 64, 65, 75, 77, 78, 79, 80, 82, 83, 90, 91, 92, 93, 94, 95, 96, 98, 100, 105, 106, 107, 110, 111, 114, 115, 116, 117, 119, 120, 121, 122, 123, 124
object, 7, 8, 31, 32, 63, 86

objection, 8, 9, 87, 88

Pennsylvania State Police, 3, 5, 28, 40, 41, 60, 64, 65, 75, 77, 93, 111, 119, 120, 122, 123
position, 4, 5, 7, 13, 16, 20, 52, 75, 90, 103, 119, 123
PSTA, 11, 108

Rick, 3, 5, 8, 20, 22, 24, 50, 77, 80, 82, 89, 111, 112, 114, 116, 121, 122, 123, 124

Siefner, 75
State Police, 3, 54, 58, 69, 70, 73, 77, 79, 90, 94, 95, 105, 123
Supervisory inquiry, 29, 100
System and Process Review Division, 7

warnings, 51, 79, 104
Westcott, 39, 84, 103, 117, 118

COMMONWEALTH OF PENNSYLVANIA      :
                                  : ss.
COUNTY OF DAUPHIN                 :


## AFFIDAVIT OF CAPTAIN DAVID F. YOUNG

I, CAPTAIN DAVID F. YOUNG, swear and affirm the following:

1.      I am presently the Director of the Special Investigations Division of the Pennsylvania State Police Bureau of Criminal Investigation.

2.      On February 12, 2000, Commissioner Paul Evanko promoted me to the rank of Captain and assigned as Special Projects Officer to the Area III Commander, Major Lyle Szupinka.

3.      The Special Projects Officer's position to which I was assigned was the same position to which Captain Ober had previously been assigned.  However, Captain Ober filed a petition for mandamus, requesting a preliminary and permanent injunction, in the Pennsylvania Commonwealth Court.  It is my understanding that Commissioner Evanko voluntarily rescinded Captain Ober's transfer in exchange for Captain Ober's agreement to withdraw his motion for a preliminary injunction.

4.      In my assignment as Special Projects Officer to the Area III Commander, I performed the following duties:

   a.      I wrote the Operations Plan for the National Governors' Association (NGA) 2000 Annual Summer Meeting.  I was required to personally author some sections of the plan; I had to review and correct 17 plans submitted by the various coordinators and then combine all of this information into a comprehensive Operations Plan.

b.      I coordinated several training exercises, including the development of training exercises for riot control and the management of riot training exercises.

c.      I served as liaison officer with the Republican National Convention State Police team to coordinate ideas and training and exchange equipment.

d.      To assist in preparation for future large scale events, I wrote an after-action report critiquing the State Police response to the NGA.

e.      I also assisted the Area III Commander with some of his duties so that he could devote more time to the NGA.  (This included attending meetings on his behalf, coordinating the Area III Training Initiative for Troop ID personnel and their supervisors, and conducting state visits).

5.      I consider my assignment as Special Projects Officer to the Area III Commander as one of the highlights of my entire employment with the State Police. The assignment also allowed me to personally contribute to one of the largest security operations ever handled by the Pennsylvania State Police.  It gave me the opportunity to meet and develop a close working relationship with many top commanders from western Pennsylvania.  I also developed contacts with numerous other state and federal agencies, including the ATF, FBI, and many state police organizations from other states.  These contacts have been invaluable to me in my current position.  I also earned overtime pay in this position.

6.      My office in Washington, Pennsylvania was 308 miles from my personal residence.  I was assigned to this location for approximately six months.  Although it was a hardship to be away from my family, I would not hesitate to accept a similar

position in the future because this assignment was so rewarding to me personally and professionally.

CAPTAIN DAVID F. YOUNG
Director, Special Investigation Division
Bureau of Criminal Investigation
Pennsylvania State Police

Sworn to and subscribed

before me this _17ᵗʰ_ day

of May, 2002

Notary Public

> NOTARIAL SEAL
> VICKIE A. BUCHER, Notary Public
> Susquehanna Township, Dauphin County
> My Commission Expires June 25, 2003

*18*

# IN THE UNITED STATES DISTRICT COURT FOR
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL G. OBER | : | 1: CV- 00-0084 |
| | : | |
| Plaintiff | : | |
| | :(JURY TRIAL DEMANDED) | |
| Versus | : | |
| | : | |
| PAUL EVANKO, MARK | : | |
| CAMBELL, THOMAS COURY, | : | |
| JOSEPH WESTCOTT, | : | |
| HAWTHORNE CONLEY | : | |
| JOANNA REYNOLDS and | : | |
| SYNDI GUIDO, Et al. | : | |
| Defendants | : | |

COPY

DATE:                    March 5, 2001

PROCEEDINGS:             Video Deposition of
                         John R. Brown


APPEARANCES:

For the Plaintiff:       Donald Bailey, Esquire
                         4311 N. 6th Street
                         Harrisburg, PA 17110


For the Defendants:      Joanna Reynolds Esq.
                         Barbara Christie Esq.
                         1800 Elmerton Avenue
                         Harrisburg Pa. 17110

1  TONY MARCECA:  Good morning be advised the video

2  and audio is in operation.  My name is Tony Marceca.

3  My address is 2219 Dixie Drive York Pennsylvania,

4  17402.  I have been contracted by PR Video to be the

5  video operator for this deposition.  The case is in the

6  United States District Court of the Middle District of

7  Pennsylvania.  Could I have a caption sir?

8        MR BAILEY: I'm sorry did I take from you?

9        TONY MARCECA: And the caption is Darrell G.

10  Ober plaintiff versus Paul Evanko, Mark Campbell,

11  Thomas Coury et al.  It's in a civil action in

12  1: CV-01-0084.

13        MR BAILEY: You gonna swear him in?

14        TONY MARCECA: Today's date is March the

15  5th, and it is now 9:14 a.m.  The deposition is taking

16  place in the law office of Don Bailey at 4311 North 6th

17  Street Harrisburg Pennsylvania, 17110.  The video

18  deposition is being taken on behalf of the plaintiff, Mr.

19  Ober.  The time now is 9:14.  Would you please state

20  your name for the record and raise you right hand?

21        MR BROWN: John R. Brown

22        TONY MARCECA: Do you swear to tell the

23  truth, the whole truth so help you God?

24        MR BROWN: Yes I do.

25        TONY MARCECA: Thank you.  Mr. Bailey could

1   we have a sound check please?

2         MR BAILEY: Yeah, sorry.  Yeah, my name is

3   Don Bailey.  I'm attorney for the plaintiff, Darrell G. Ober

4   in this case.  And if we possibly could have the attorneys

5   present identify themselves and give their official address

6   and phone number for the record.  Makes this easier for

7   the transcriber.

8         JOANNA REYNOLDS: My name is Joanna

9   Reynolds.  I'm an Assistant Counsel with the State Police.

10  I represent the defendants in this action.  My address is

11  1800 Elmerton Avenue Harrisburg Pa. 17110, which is

12  Pennsylvania State Police Headquarters.  My phone

13  number is 717-783-5568.

14        BARBARA CHRISTI: My name is Barbara

15  Christi, Chief Counsel Pennsylvania State Police, and my

16  address and telephone number are the same as those

17  given by Assistant Counsel Reynolds.

18        MR BAILEY: Okay Rick, can I refer to you as

19  Rick?  Is that okay?

20        MR BROWN: Absolutely that's my nickname,

21  yes.

22        MR BAILEY: I'm Don.  What we're going to be

23  doing here today Rick.  I know you've sat in on some of it.

24  Let me very quickly go through it cause now you're a fact

25  witness and it's a little different when your in your

1    position and I realize that.  It's a video deposition.  We
2    maintain a copy here.  You are invited and welcomed to
3    come here anytime and review the video deposition.  We
4    will be making a transcript of the deposition.  They are
5    available to your counsel that they can work out with
6    Tony, for the same price, as they are available to me.
7    That's number one.  Number two, as we go through the
8    deposition from time to time if I inadvertently, I assure
9    you it will be an error on my part, if I inadvertently
10   interfere with your response or don't give you a complete
11   chance to finish I want you to make sure you catch me or
12   you stop me and answer fully and completely if your
13   attorneys don't catch me in the mean time.  You have two
14   very capable lawyers here to represent you.  Now it's
15   important you stay within the camera range.  If not the
16   operator, Mr. Marceca, will let you know.  You need to
17   keep your voice up.  I don't assume we're going to have
18   any kind of a problem with that.  And the last question
19   and this goes for your attorneys also.  If at any time
20   during the deposition you want to ask me what I mean by
21   a question or where I'm going with a group of questions.
22   We're not here to trick you.  We're not to create a
23   distorted fact record.  We want to get everything down.  I
24   do not mind giving you an offer on a question.  I do not
25   mind responding to you if you a question of me about

4

1   where I'm going or what I'm trying to do.  I won't be

2   offended by that at all.  I invited you to do that.  That

3   being said, do you have any questions to me?

4          MR BROWN: No sir

5          MR BAILEY:  Okay, Rick.  Oh, usual

6   stipulations I guess, objections except to form of the

7   question reserved until time of trial.  Is that Okay?

8          JOANNA REYNOLDS:  Yes, fine

9          MR BAILEY: Okay Rick, now how are you

10  employed?

11         A:     I'm employed as a Captain with the

12  Pennsylvania State Police.  I'm currently assigned to the

13  Internal Affairs Division of the Bureau of Professional

14  Responsibility.

15         Q:     You in fact replaced Mr. Ober at the

16  position.  Didn't you?

17         A:     That's correct

18         Q:     When did that occur?

19         A:     January 29th of 2000 was when I was

20  promoted.

21         Q:     Now my understand is, I was at an earlier

22  deposition there was an indication from one of your

23  attorneys.  I think it was Syndi Guido however no the two

24  attorneys who are here.  That you were appointed to

25  some kind of a position as an investigator in this case.  Is

1  that correct?

2         A:    That's correct

3         Q:    Was that by virtue of your capacity in IAD

4  or do you know?

5         A:    I don't know

6         Q:    What I want to ask you about is a little

7  bit different then that, okay.  I have no desire to ask you

8  at least this time about the investigation.  Although I will

9  ask you some procedure questions, like if you produced

10  reports or done interim reports and who you gave them

11  to.  Mostly what I want to ask you is something that's

12  quite different.  These are gonna be fact questions about

13  your knowledge, we believe to be your knowledge, about

14  sequences of event or situations, or conversations that

15  may have occurred that are relevant to this lawsuit.  In

16  that regard have you seen or have you had an

17  opportunity to at least review or look at the complaint

18  and the amended complaint in this matter?

19         A:    Yes sir

20         Q:    Let's go back to the with some

21  background about why we're here today.  I'm gonna be

22  asking you about what you may have learned about why

23  or how we came to be here today.  It is my understanding

24  that at sometime the FBI or some FBI members had come

25  to Mr. Ober about a federal investigation.  Is that correct?

1    A:    Yes sir.  That's my understanding.

2    Q:    Do you have a recollection for your

3    knowledge what Mr. Ober was doing at the time.  In other

4    words, what position was he in?

5    A:    My recollection he was Director of

6    Internal Affairs, but I think he was acting Bureau

7    Director for the Bureau of Professional Responsibility.

8    Q:    Now the Bureau of Professional

9    Responsibility has essentially two divisions.  Is that

10    correct?

11    A:    That's correct

12    Q:    What are those two divisions?

13    A:    One being the Internal Affairs Division,

14    and the other division if the System and Process Review

15    Division.

16    Q:    Mr. Ober while he was acting capacity

17    and in temporary capacity, apparently as Bureau

18    Director was at the same time the Director of IAD.  Is

19    that correct?

20    A:    That's correct

21    Q:    Have you ever learned or come across any

22    information that explains why the FBI went to Captain

23    Darrell Ober at that time?

24    JOANNA REYNOLDS: I'm gonna object to this

25    question.  If the witness only knows about this

1    information from the investigation that he's done for us,

2    because that would be attorney work product information

3    and we would object.  I would instruct the witness not to

4    answer that, unless he knows it outside that

5    investigation.

6          MR BAILEY: I'm not gonna pollute the record

7    with objections at this point, but this one is very special.

8    I need to respond to it.  I don't agree with that analysis.  I

9    don't believe an attorney can extent any privilege of work

10    product to an investigators be like a DA saying that he

11    doesn't have to talk about what some police officer

12    investigated.  So you would object to that, but you of

13    course follow your attorney's instructions.  At this time I

14    just want to place an objection to the objection.

15          JOANNA REYNOLDS: Don, just so the witness

16    is clear on this.  If he knows that information outside

17    that investigation at the attorney's request, he may

18    answer the question.  If he does not then he should not

19    answer the question.

20          MR BAILEY: Rick let me do it this way.  When

21    did the attorneys, any of them come to you and say you

22    are now an attorney or investigator or whatever the hell it

23    is?  Tell me when that occurred.

24          A:    I want to say March or April.  I think

25    April of 2001.

1             Q:    That was after this lawsuit began.  Is that

2 correct?

3             A:    Yes sir

4             Q:    With my objection standing, but out of

5 respect for opposing counsel's interactions to you, which

6 I respect and disagree with.  Why don't we agree that

7 unless I specify other wise so that your attorney has

8 notice, that none of my questions should be considered

9 as addressing anything that may have happened after

10 March or April of 2001.  Can we agree with that, and that

11 will solve our problem I think?

12             JOANNA REYNOLDS: The problem, no it's not

13 gonna solve our problem, because some of these events

14 occurred before March or April 2001 but the witness only

15 learned of them because he was doing this investigation.

16 In other words he was investigating events...

17             MR BAILEY: Let me

18             JOANNA REYNOLDS: That happened before

19 March or April of 2001.

20             MR BAILEY: Let me clear this up, because I

21 did not make myself clear.  Again with the understanding

22 that I disagree with counsel, that she can not cloak you

23 with her privilege.  It's not her work product at all it's

24 your work product.  If she wants to go investigate she can

25 do it.  It might take her out of some immunities, not that

9

1    I'd love to see that happen, but point and fact is I don't

2    think she can give you her immunities.  So let's

3    understand that we're talking about when you learned of

4    it, okay? Is that alright? Okay, so with that

5    understanding and the fact that you know what the oath

6    is and what your duties and obligations are, if you need

7    to think about that or something when I ask you a

8    question you think about that.  Okay?

9         A:    Okay

10        Q:    Cause the things I have to ask you about

11   in all honesty are fact issues that really would be what

12   you knew before then anyway.  So from a technical point

13   of view I don't agree with your attorney.  From a practical

14   point of view I don't think it should interfere with this

15   deposition at this time, okay?

16        A:    Okay

17        Q:    Alright sir.  So we're talking about things

18   that you learned up to or on or before March or April of

19   2001, okay?  Understood?

20        A:    Yes Sir

21        Q:    Alright now until you replaced Captain

22   Ober and that was January 29, 2000, what had you been

23   performing?  What were you doing?

24        A:    Well I was in acting role.  When Captain

25   Ober went to the IIMS project I was assigned as the

1  acting Director of Internal Affairs to perform his duties.

2  That would have been April 26 of 1999.  That lasted until

3  I was promoted.  During that time period even though I

4  was doing the duties of a Captain I still had my

5  Lieutenant duties to perform.  I was still the Central

6  Section Commander in the Internal Affairs Central

7  Section, and responsible for scheduling, redoing reports,

8  and giving assignments.  So I still have that.  Also when

9  Captain Ober went to IIMS I picked up, he was involved

10  in the discipline committee.  Which was a committee that

11  the department and the union, the PSTA had together to

12  look at revising the current regulations in regards to

13  internal investigation, discipline, so on and so forth, and

14  I pick up going to his meetings and ended up following it

15  all the way to when I'm at with it now.

16          Q:     Until Captain Ober went over to IIMS,

17  and by the way what does IIMS stand for?  Do you know

18  what the acronym stands for?

19          A:     To the best of my knowledge it's the

20  Incident Information Management System or something

21  like that.  It's an automation project.

22          Q:     And what's that about?

23          A:     As far as I know, I not the most

24  technology oriented person around, but as far as I know

25  it's automating the department as far as forms and

1    having a centralized.   Let me say this.  I was called in to

2    get an Internal Affairs perspective by the people involved,

3    the contracted people, and they were saying what could

4    Internal Affairs use in this automation project?  We could

5    help you out with your forms, your reports, and that sort

6    of thing.  So I imagine at some point and time you'll be

7    able to sit at a computer and do everything and get rid of

8    the paper.  You know the actual physical paper.

9           Q:    The idea behind IIMS is to lessen the

10    number of human errors in using a database that would

11    boost productivity investigatory, record keeping, and

12    administrative productivity.  Isn't that basically the idea?

13           A:    That's basically it, but always keep in

14    mind too those sort of things are only good as what you

15    put in them.

16           Q:    Right, and this is a project that...who had

17    assigned Captain Ober tot he IIMS project?  Wasn't that

18    Commissioner Evanko?

19           A:    I recall seeing a CLEAN message on his

20    status of going over there, and I believe it was from the

21    Commissioner.  But as far as how he came to that I don't

22    know.

23           Q:    IIMS was a very high priority for the

24    Commissioner as I understand it.  Is that correct?

25           A:    Like I said that's outside of my realm.  I

1   don't know what is was on the Commissioner's plate.

2        Q:    But the Commissioner, to the best of your

3   knowledge, had assigned Darrell to that position in

4   sometime in April of '99 you indicated.

5        A:    Yes sir.  I believe it would have been, I

6   think he went there effective April 26th of '99.  Cause that

7   was the day that I became the acting Director of Internal

8   Affairs.

9        Q:    Yes sir.  Now when did the FBI come to

10   Darrell?

11        A:    To my knowledge it would have been late

12   September, early October of '98.

13        Q:    Now did you at some time learned when

14   Darrell had informed the Commissioner about the FBI's

15   request?

16        A:    What I recall sir is Captain Ober

17        JOANNA REYNOLDS: Again I would caution

18   the witness if you learned of that after you began the

19   investigation in this case, then it's attorney work product

20   and you should not testify to that.

21        MR BAILEY: Mr. Brown, we know that you

22   knew about it before you, you know, okay?

23        MR BROWN: Okay

24        MR BAILEY:  I know that.  I know that from a

25   variety of sources.  Let me say this to you.  You're a very

19

1

```
 1    IN THE UNITED STATES DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT

 3             OF PENNSYLVANIA

 4             *  *  *  *  *  *  *

 5    DARRELL G. OBER,    *

 6          Plaintiff    *  No.

 7          vs.          *

 8    PAUL EVANKO, MARK  *

 9    CAMPBELL, THOMAS   *

10    COURY, JOSEPH      *

11    WESTCOTT,          *

12    HAWTHORNE CONLEY,  *

13          Defendants   *

14             *  *  *  *  *  *  *

15

16          VIDEOTAPED DEPOSITION OF

17             MARK CAMPBELL

18          OCTOBER 10, 2001

19

20             ORIGINAL

21

22

23    Any reproduction of this transcript

24    is prohibited without authorization

25          by the certifying agency
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

2

1          VIDEOTAPED DEPOSITION

2                  OF

3

4    MARK CAMPBELL, was taken on behalf

5    of the Plaintiff herein, pursuant to

6    the Rules of Civil Procedure, taken

7    before me, the undersigned, Nicole

8    Susan Montagano, a Court Reporter

9    and Commissioner of Deeds in and for

10   the Commonwealth of Pennsylvania, at

11   the offices of 238 Main Capitol

12   Building, Harrisburg, Pennsylvania,

13   on Wednesday, October 10, 2001, at

14   2:08 p.m.

15

16

17

18

19

20

21

22

23

24

25

3

1              A P P E A R A N C E S

2

3    DON BAILEY, ESQUIRE

4    4311 North 6th Street

5    Harrisburg, PA  17110

6        COUNSEL FOR PLAINTIFF

7

8    SYNDI L. GUIDO, ESQUIRE

9    Governor's Office of General Counsel

10   333 Market Street

11   17th Floor

12   Harrisburg, PA  17101

13       COUNSEL FOR DEFENDANTS

14

15   JOANN REYNOLDS, ESQUIRE

16   1800 Elmerton Avenue

17   Harrisburg, PA  17110

18       COUNSEL FOR STATE POLICE

19

20

21

22

23

24

25

4

                          I N D E X

1

2   WITNESS: MARK CAMPBELL

3   EXAMINATION

4      BY ATTORNEY BAILEY                  9-90

5   CERTIFICATE                            92

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

<u>EXHIBIT PAGE</u>

<u>PAGE</u>

<u>NUMBER</u>      <u>IDENTIFICATION</u>      <u>IDENTIFIED</u>

NONE OFFERED

6

# OBJECTION PAGE

| ATTORNEY | PAGE |
|----------|------|
| GUIDO | 63 |

7

1                P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - -

3              VIDEOGRAPHER:

4              Good afternoon.  My

5         name is Anthony Marcica

6         (phonetic).  And my

7         address is 2219 Dixie

8         Drive, York,

9         Pennsylvania.  And I'm

10        contracted by PR Video to

11        conduct this video

12        deposition on behalf of

13        the Plaintiff.  This

14        matter is docketed at

15        1:CV-01-0084 in the United

16        States District Court for

17        the Middle District of

18        Pennsylvania.  The caption

19        is Darrell A. Ober ---.

20             ATTORNEY BAILEY:

21             G. Ober.

22             VIDEOGRAPHER:

23             Correct on that,

24        Darrell G. Ober versus

25        Paul Evanko, et. al.

8

1    Could I take a sound

2    check, please?

3        ATTORNEY BAILEY:

4        Yes.  My name is Don

5    Bailey.  I'm the attorney

6    for Plaintiff.  Mark, we

7    can go with you.

8        MR. CAMPBELL:

9        Mark Campbell.

10        ATTORNEY BAILEY:

11        Cindy?

12        ATTORNEY GUIDO:

13        Cindy Guido.  I'm

14    Counsel to Defendants.

15        ATTORNEY REYNOLDS:

16        Joanna Reynolds,

17    Counsel for Defendants,

18    Pennsylvania State

19    Police.

20        ATTORNEY BAILEY:

21        Ladies and gentlemen,

22    as I said, this is the

23    Plaintiff's deposition.

24    The video is now running.

25    Tony, you may want to

9

1    announce the time.  And

2    we'll have the Court

3    Reporter --- since they

4    want a transcript, we'll

5    have the Court Reporter

6    swear the witness.

7         VIDEOGRAPHER:

8         The video is now

9    running at 1408 on 10

10   October 2001.

11        ATTORNEY BAILEY:

12        Miss, would you

13   administer the oath,

14   please.

15 - - - - - - - - - - - - - - - - - - -

16 MARK CAMPBELL, HAVING FIRST BEEN

17 DULY SWORN, TESTIFIED AS FOLLOWS:

18 - - - - - - - - - - - - - - - - - - -

19 EXAMINATION

20 BY ATTORNEY BAILEY:

21 Q.        Mr. Campbell, as I had

22 indicated earlier, we met very

23 briefly.  My name is Don Bailey.

24 I'm an attorney.  I represent the

25 Plaintiff in this matter, Darrell

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

10

1  Ober.  Darrell is with me and is

2  sitting to my left.  This is a video

3  deposition, so if you at any time

4  feel the need to get up or to leave

5  your chair, let us know.  We will

6  suspend the video at that point.

7  And that way, we will have a

8  complete and total record.

9          During the deposition, I

10  will be asking you various

11  questions.  It's important that you

12  --- I probably don't need to tell

13  you these things.  I don't want you

14  to take them as condescending, but

15  it is a process I need to go

16  through.

17  A.          Sure.

18  Q.          I will be asking you

19  various questions at different

20  times.  And, of course, it's

21  important particularly because we

22  are taking this record by

23  stenographic means, especially that

24  you let a little time transpire

25  between when you respond --- when I

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

11

```
 1   ask a question and you respond.
 2   A.          Okay.
 3   Q.          Mark, if I at any time
 4   step on the toes of your answer, and
 5   I assure you I will be the one at
 6   fault, it's not going to be, make
 7   sure that you correct me.  You have
 8   two fine lawyers with you.  They're,
 9   I'm sure, going to make sure that
10   they remind me when I do something
11   that they feel is wrong or in
12   error.  But you are the only one who
13   knows in your mind if you completed
14   an answer.  And it is very important
15   for you to answer completely and
16   fully.  The law requires not only a
17   truthful answer, which I assure you
18   know, but it also requires a
19   complete and full answer.
20           Now, from time to time ---
21   and my instructions to deponents are
22   a little different than most
23   attorneys.  I have no interest in
24   any kind of trick questions, smoking
25   gun question or anything like that.
```

12

1    And I mean that sincerely.

2    Therefore, if at any time during the

3    deposition you're curious about

4    where I'm going with that line of

5    questions or with a particular

6    question, I want you to feel free to

7    ask me.  I will give you an offer.

8    I will tell you where I'm coming

9    from ---

10   A.        Sure.

11   Q.        --- what I mean by a

12   question, et cetera.  The other

13   thing is you know you do have to

14   keep your voice up.  You do have to

15   be verbal in your responses.  You

16   can't just stipulate.  With that

17   said, before we begin, just a couple

18   chores that the attorneys have to

19   clear up.  I would ask do you have

20   any questions of me before we ---?

21   A.        No, sir.

22                ATTORNEY BAILEY:

23                To opposing Counsel,

24                I would assume that the

25                usual stipulations,

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

13

1    objections, except as to

2    the form of question would

3    be reserved until the time

4    of trial.  Is that

5    acceptable?

6         ATTORNEY GUIDO:

7         That is what we plan

8    to do, yes.

9         ATTORNEY BAILEY:

10        Okay.  If everyone is

11   ready, we can begin.

12   A.        Sure.

13   BY ATTORNEY BAILEY:

14   Q.        The last thing --- the

15   other thing I don't object to is if

16   at any time you want to stop and

17   talk to your attorneys or go

18   outside, I want you to feel free to

19   do that.  Normally, you are not

20   supposed to talk during a

21   deposition, but as I said before, I

22   really don't mind.  So if you feel

23   some need you have to suspend, don't

24   be afraid to ask.  Mark, for the

25   record, could you state your full

14

1  name?

2  A.        Mark Richard Campbell, Jr.

3  Q.        How are you employed?

4  A.        Currently chief of staff

5  to Governor Mark Schweiker.

6  Q.        And I realize that there

7  has been a change of leadership with

8  Mr. Ridge, Governor Ridge going to

9  Washington.  But is it fair to say

10 that you previously had worked for

11 Mr. Ridge?

12 A.        I was most recently before

13 this, chief of staff to Governor

14 Ridge.

15 Q.        And how long were you

16 chief of staff to Governor Ridge?

17 A.        I've been chief of staff

18 since January of 2001.

19 Q.        Now, very briefly, what

20 does chief of staff do?

21 A.        Chief of staff serves to,

22 I think, at least with Governor

23 Ridge and Governor Schweiker ---.

24 Q.        For the sake of just

25 helping you ---

15

1  A.        Sure.

2  Q.        --- I think we can

3  probably most --- is it fair to say

4  we can all agree that the events

5  complained of in the complaint all

6  occurred under Governor Ridge during

7  his tenure?

8  A.        Sure.

9  Q.        There is no reason to get

10  into Governor Schweiker at all.  I

11  respect the fact that you now work

12  for him.  But just saves time.

13  A.        Sure.

14  Q.        Go ahead.

15  A.        Primarily served as the

16  Governor's liaison to all of his

17  cabinet agencies and to his senior

18  staff, and helped to ensure that the

19  Governor's agenda was developed,

20  enacted and initiated.  And that

21  required me to work with all of our

22  cabinet officers, our senior staff,

23  as I mentioned earlier.  And I

24  helped to oversee a $21 billion

25  80,000 employee undertaking.

16

1  Q.        If in sorting through some

2  of the adjectives, the descriptive

3  adjectives that you used, is it fair

4  to say that your job pretty much

5  amounted to getting things done?

6  A.        Sure.

7  Q.        Facilitating or seeing

8  that policy, directives and that

9  sort of thing were carried out?

10  A.        Yes, sir.

11  Q.        And I may have missed it,

12  but how long --- strike that.

13         Are you familiar with the

14  Complaint in this matter?

15  A.        I am.

16  Q.        Have you been able to

17  review it, review the Complaint?

18  A.        I did on one occasion,

19  yes.

20  Q.        Now, in the Complaint ---

21  do you know when the Complaint ---

22  the Complaint was filed in

23  Harrisburg.  This is the amended

24  Complaint, on May 2nd, 2001.  Maybe

25  opposing Counsel can help me.  The

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

17

1  original Complaint was filed in

2  January 16th of 2001.  Is that

3  consistent with your --- if you

4  remember?

5  A.        I don't remember the

6  dates.

7  Q.        Mark, when did you first

8  become aware of the Complaint?

9  A.        Of the Complaint?

10 Q.        Yes, sir.

11 A.        Probably, and taking for

12 granted the January filing date,

13 probably shortly after it was filed.

14 Q.        How did you become aware

15 of it?

16 A.        I believe through our

17 Office of General Counsel.

18 Q.        One thing I want to point

19 out to you, I'm sure you already

20 been advised, but if you haven't,

21 from time to time if I ask a

22 question that --- I don't want to

23 impinge on attorney-client

24 privilege.  If I ask a question

25 where you have discussed something

18

1  in the presence of your Counsel

2  privately, that's called

3  privileged.  You do not have to

4  respond.  Are you an attorney?

5  A.        No, I'm not.

6  Q.        I will make sure I double

7  do these things.  So you are not to

8  respond to those.  If you have any

9  question, ask your Counsel.  If she

10 has a concern, I'm sure she is going

11 to speak up right away.

12 A.        Right.

13 Q.        Is it fair to say in a

14 given week during the time during,

15 let's say, the year 2000, the year

16 2001, that you would meet with

17 different heads of various agencies

18 of government that come under the

19 Governor's jurisdiction?

20 A.        Yes.

21 Q.        And you pretty much did

22 that on a regular basis?

23 A.        Yes.

24 Q.        Do you keep any kind of

25 calendar or schedule?

19

1   A.        I have a schedule via my

2   computer, so yes.

3   Q.        What kind of software do

4   you use?  I'm sure it's a Windows

5   operating system?

6   A.        Microsoft.  I forget the

7   name of the product.

8   Q.        Is it generic to the

9   Governor's office or do you have a

10  private computer that you keep these

11  things on?

12  A.        No.  It's the computer

13  here in the Governor's office.

14  Q.        And do you have a

15  secretary, a private secretary, that

16  works only for you?

17  A.        Yes, I do.

18  Q.        What is her name?

19  A.        Mary Quigley.

20  Q.        How long has she been in

21  that position?

22  A.        Mary has been my secretary

23  for probably --- I don't recall

24  exactly, but it's probably been the

25  last two years approximately.

20

```
1   Q.        Does she act as a
2   receptionist for you for receiving
3   incoming calls and helping you
4   schedule appointments?
5   A.        Yes.
6   Q.        Does she make any
7   decisions to schedule for you?
8   A.        She will at times.
9   Q.        You're, I assume, the
10  final arbiter to what schedule you
11  keep?  Well, maybe the Governor
12  would be, but ---?
13  A.        Right.
14  Q.        That is fair to say?
15  A.        Yes, that would be true.
16  Q.        Okay, sure.  Now Mark, I'm
17  going to be shifting gears a little
18  bit now.  And I want to ask you some
19  more questions that are specific to
20  the Complaint.  Do you know
21  Pennsylvania State Police
22  Commissioner Paul Evanko?
23  A.        Do I know him?
24  Q.        Yes.
25  A.        Yes.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

21

```
1   Q.        How long have you known
2   Paul Evanko?
3   A.        Since probably somewhere
4   around the beginning of 1995.
5   Q.        And how did you have
6   occasion to first meet Paul Evanko?
7   A.        One of my initial tasks
8   with the Governor was to interview
9   potential cabinet secretaries for
10  several agencies, the state police
11  being one of those agencies that I
12  was a member of a panel that
13  interviewed various candidates and
14  made recommendations to the
15  Governor.
16  Q.        Who else was on that
17  panel?
18  A.        Lieutenant Governor
19  Schweiker and Tom Corbett.  And I
20  believe there was a fourth member,
21  but I don't recall right now who
22  that would have been.
23  Q.        Now, Mark, do you have a
24  recollection of who recommended Paul
25  Evanko for his position?
```

22

1    A.         Colonel Evanko's name was

2    first raised with me and suggested

3    to me by Mike Marino.

4    Q.         Anyone else that you can

5    remember?

6    A.         No, sir.

7    Q.         Did you meet and interview

8    Mr. Evanko?

9    A.         He came before that group

10   that I mentioned earlier, and was

11   interviewed by the panel, yes.

12   Q.         Now, I'm going to switch

13   gears on you again, a little bit

14   different direction here.  Do you

15   have any kind of a reporting kind of

16   a system?  Let me explain what I

17   mean, where I'm coming from on

18   that.  Do you have any kind of

19   operating procedure, SOP, as it's

20   commonly referred to, where cabinet

21   officers either report or

22   communicate information to the

23   Governor or as chief of staff to,

24   which in most administrations, I've

25   been familiar with a chief of staff

23

1    as an alter ego.  And typically,

2    again, in my experience probably the

3    next most powerful man in the

4    government system --- or woman have

5    held those kind of positions also.

6    And I'm asking you if there was any

7    kind of procedure set up where there

8    was a standard way to report or

9    supply information?

10   A.        The only regularly

11   scheduled communication between the

12   Governor and the members of his

13   cabinet were through biweekly

14   reports, written reports that the

15   cabinet officers would provide to

16   the Governor.  Other than that,

17   cabinet officers would bring matters

18   to the Governor's attention on an

19   as-needed basis.

20   Q.        Now, isn't it so that

21   there is some type of a cabinet

22   meeting or procedure that deals with

23   personnel matters?

24   A.        Not that I'm aware of, no.

25   Q.        Well, take an issue like

24

1  on behalf of a state employee for

2  extended leave, any issues like that

3  that ever come to the level of a

4  cabinet position where they need to

5  be signed off on, et cetera, that

6  you know of?

7  A.        No, not that I'm aware of.

8  Q.        Okay.  Do you hold

9  regularly scheduled meetings with

10  cabinet level officials?

11  A.        Do I personally?

12  Q.        Strike that.  Did you

13  during the period of time complained

14  of in the Complaint hold cabinet

15  level meetings with either top staff

16  or cabinet level officials during

17  the period of time of the matters

18  complained of in the Complaint on

19  regularly scheduled time?

20  A.        No.

21  Q.        Now, the kind of meetings,

22  is it fair to say then that the

23  cabinet official aside from ---

24  strike that.

25          Pennsylvania State Police

25

1 Commissioner, is that cabinet level

2 or is that sub cabinet level?

3 A.          It would be cabinet level.

4 Q.          Now, the Pennsylvania

5 State Police Commissioner, and Mr.

6 Evanko in this case, let's go back

7 to square one.  How often would you

8 meet with him in let's say a

9 monthly, biweekly or yearly basis?

10 A.          We didn't have a regularly

11 scheduled series of meetings.  I

12 would meet with the Colonel as I

13 would meet with other cabinet

14 officers on an as-needed basis.

15 Q.          So everything was ad hoc,

16 that is the way you did things?

17 A.          Uh-huh (yes).

18 Q.          Was there a regular

19 meeting with the Governor?

20 A.          No.

21 Q.          The Lieutenant Governor?

22 A.          Not that I'm aware of.

23 Q.          Legislative leaders?

24 A.          Not that I'm aware of.

25 Q.          Now, the chain of command

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

26

1  for one of a better --- no pun

2  intended, incidentally, in this

3  case.  But the chain of command

4  would essentially be the Governor

5  with your assistance, actually, but

6  the Governor to the cabinet level

7  official; right?

8  A.          Yes, sir.

9  Q.          Is there any procedure in

10 state government known to you,

11 Pennsylvania State Government known

12 to you, where investigations by

13 other than state authorities are to

14 be reported?  Do you understand that

15 question?  Let me give you a

16 hypothetical one.

17 A.          Sure.

18 Q.          The FBI is investigating

19 something.  And somebody out there

20 gets wind of it, they're looking

21 into some aspect or function of

22 state government.  Is there any

23 policy --- was there any policy in

24 state government to report that

25 information?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

27

1  A.        No, not that I'm aware of.

2  Q.        Was there any --- now,

3  there were no written or informal

4  policy, hey, let me know the FBI is

5  checking into this or that, we

6  should know about it?

7  A.        No.

8  Q.        And by the way, please

9  accept it for what it's worth.

10  There is no implication that that's

11  improper.

12  A.        Right.

13  Q.        It's a desire to know what

14  is going on out there.

15  A.        Right.

16  Q.        So there is no particular

17  policy that has to do with reporting

18  or reporting requirement, no

19  regulation.  Do you know of any such

20  regulations in the Pennsylvania

21  State Police?

22  A.        No, I do not.

23  Q.        Have you ever had occasion

24  to consider regulations or potential

25  regulations that would require an

28

1  employee to report knowledge of

2  investigatory activities?  Do you

3  understand that question?

4  A.        Have I been aware of any

5  need?

6  Q.        Yes, sir.  I'm sorry.  Let

7  me rephrase that.  It was very

8  awkward.

9  A.        Sure.

10  Q.        Do you have knowledge of

11  any considerations, meetings or

12  discussions, in state government

13  about a policy where one would

14  encourage or one of the officials in

15  state government is supposed to

16  report knowledge of investigatory

17  activity?

18  A.        Do I have awareness of any

19  requirement, no, I do not.

20  Q.        Were there any --- have

21  you ever held any discussions to

22  that effect?

23  A.        No.

24  Q.        Do you know of any

25  directions or discussions that have

29

1  been held by anybody at a cabinet

2  level about reporting investigatory

3  activity?

4  A.        No.

5  Q.        Do you know of the ---

6  strike that.

7           Did you at some time have

8  a meeting with Paul Evanko where a

9  Mr. Hikus (phonetic) was discussed?

10 A.        Had several meetings with

11 the Colonel during the selection

12 process for a new Deputy

13 Commissioner, during which time

14 Colonel Hikus was one of the

15 candidates for that position.

16 Q.        Do you have a recollection

17 of Mr. Evanko's position on the

18 selection of Mr. Hikus?

19 A.        There were several

20 candidates who were considered.  And

21 as I recall, the Colonel considered

22 various attributes of all of the

23 candidates, and ultimately selected

24 Colonel Hikus.

25 Q.        So it's your testimony

30

1  here today, to the best of your

2  knowledge, that Mr. Evanko chose Mr.

3  Hikus for his position?

4  A.          Yes, sir.

5  Q.          Now, did you ever have

6  occasion to discuss any FBI

7  investigations with Mr. Evanko?

8  A.          No.

9  Q.          Is it your testimony here

10 today that you never --- that Mr.

11 Evanko never informed you of an FBI

12 investigation into the affairs of

13 either the Pennsylvania State Police

14 or certain Pennsylvania State Police

15 Officers?

16 A.          Colonel Evanko did inform

17 me in approximately --- and I know

18 this having read the Complaint, in

19 approximately May of 1999 of a ---

20 what I believe was termed to be a

21 closed FBI investigation regarding

22 activity at the Pennsylvania State

23 Police, and potentially in the

24 Governor's office as well.

25 Q.          Mark, do you have a

31

1    recollection of what the substance

2    of that investigation was, what Mr.

3    Evanko --- just tell us what you

4    remember Mr. Evanko told you?

5    A.        Sure.  As I recall, the

6    Colonel informed me that he had been

7    made aware of a completed FBI

8    investigation regarding allegations

9    of the selling of slots, cadet slots

10   at the Pennsylvania State Police

11   Training Academy that may have

12   involved either employees of the

13   Commissioner's office or the

14   Governor's office.

15   Q.        How did you feel about

16   that?  What was your reaction to

17   that at the time --- I mean,

18   currently I would assume that that's

19   something of concern.  I realize

20   that.  So I'm not looking so much in

21   terms of your visceral or personal

22   reaction.  I'm not so sure that is a

23   fair question.  But I'm looking more

24   in terms of as a professional in

25   your position, what was your

32

1  reaction?  How did you react to

2  that?

3  A.        My concern at the time was

4  understanding what the allegations

5  were regarding the Governor's

6  office, and was told by the Colonel

7  at the time that the investigation

8  had been completed, had been

9  concluded, and that the allegations

10 involving the Governor's office had

11 been unfounded.  So feeling that

12 there was no implication of the

13 Governor's office, I really didn't

14 have any concerns going forward.

15 Q.        Mark, now after --- your

16 best recollection is that Mr. Evanko

17 reported this information to you on

18 or about May of 1999; am I correct?

19 A.        That's, again, from my

20 recollection of what the Complaint

21 said, yes.

22 Q.        Now, I want you to think

23 independently.  I want you to go

24 back in your mind's eye.  Set the

25 Complaint aside.

33

1    A.        Okay.

2    Q.        And do you have any other

3    source of information as you sit

4    here today that would indicate to

5    you --- that you could share with us

6    about when Mr. Evanko brought that

7    information to you?

8    A.        No, I don't.

9    Q.        Did you make any notes?

10   A.        No, I did not.

11   Q.        I would assume that you

12   asked Mr. Evanko some questions?

13   A.        I don't recall what, if

14   any, questions I asked.  My

15   recollection of the conversation was

16   that it was the Colonel who was

17   providing information to me.  And I

18   believe I for the most part

19   listened.

20   Q.        And I think you had

21   indicated that he told you it was a

22   closed investigation?

23   A.        That's my recollection,

24   yes.

25   Q.        Did he indicate where he

34

1  got his information?

2  A.          I don't recall.

3  Q.          Did he at any time

4  indicate to you that the source of

5  the information was the FBI?

6  A.          I don't recall that he

7  indicated that.

8  Q.          Mark, do you remember if

9  he indicated whether or not he had

10  indicated or intended to contact.or

11  talked to Lou Freed, Judge Freed,

12  the FBI director?

13  A.          I believe the Colonel did

14  at some point indicate that he would

15  reach out to the FBI to ascertain

16  exactly the nature of the

17  investigation and its status.

18  Q.          Now, did he share any

19  information about how the

20  investigation arose or what

21  triggered it?

22  A.          No.  He provided me, as I

23  recall, with just the sort of very

24  basic one to two sentence facts in

25  terms of the allegation itself.

35

1   Q.          Now, you had indicated in
2   response to an earlier question that
3   the standard operating procedure,
4   those are my words, they were not
5   yours, that normally the
6   communication was by memo or e-mail
7   of some sort, typically a report?
8   A.          There was, yes --- I think
9   the question that was put to me at
10  that time was what sort of regularly
11  scheduled communication occurs
12  between the Governor and his
13  cabinet.  And the one regular form
14  of communication are written reports
15  that are sent to the Governor.
16  Q.          Did Mr. Evanko ever put
17  any of that information into a
18  written report from the Governor?
19  A.          I don't know.
20  Q.          Did you ever check to see?
21  A.          No, I did not.
22  Q.          Have you looked for any
23  communicates, documentary evidence,
24  e-mail, electromagnetic taped
25  evidence or anything like that of

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

36

1  Mr. Evanko's communication to you or

2  to the Governor's office?

3  A.        No, I have not.

4  Q.        Now, who was present when

5  Mr. Evanko shared this information

6  with you?

7  A.        I don't believe anyone

8  else was present.

9  Q.        Where did the meeting ---

10  I assume it was not --- based on the

11  way you described it, I assume it

12  was a personal meeting?

13  A.        It was a phone call.

14  Q.        It was a telephone call.

15  Do you know where Mr. Evanko was

16  when he made that telephone call?

17  A.        No, I don't.

18  Q.        Do you remember where you

19  were when you made that telephone

20  call?

21  A.        I was in my office.

22  Q.        Do you remember how long

23  that telephone conversation was?

24  A.        I don't remember how long

25  it was.  It was no more than a few

37

1    minutes.

2    Q.        Mark, I want you to think

3    back on that conversation very

4    carefully now, and particularly this

5    question here.  During that

6    conversation, did Mr. Evanko discuss

7    Mr. Hikus?

8    A.        I don't recall.  I don't

9    remember him discussing Hikus, no.

10   Q.        Have you ever discussed

11   this matter or this issue with Mr.

12   Hikus?

13   A.        Not that I can recall, no.

14   Q.        Do you have a recollection

15   of every discussing this litigation

16   with Mr. Evanko?

17   A.        Other than acknowledging

18   that the Complaint had been filed,

19   no.  Nothing beyond that, no.

20   Q.        Do you have a recollection

21   of discussing, you know, when your

22   attorneys weren't present, of course

23   --- well, actually if your attorneys

24   are present, it's not a defendant,

25   it's not privileged.  But do you

38

1  ever have a recollection --- you can

2  tell me if you discussed, and then

3  we'll worry about whether it is

4  privileged or not.  We will get the

5  substantive question.  Did you ever

6  discuss any of the contents of the

7  Complaint with any of the other

8  Defendants in this matter?

9  A.         No.

10 Q.         Let me make sure.  Let me

11 read this to you.  You're a

12 Defendant.  Mr. Evanko is a

13 Defendant.  Thomas Coury, did you

14 ever discuss it with him?

15 A.         No.

16 Q.         Do you know Mr. Coury?

17 A.         Yes, I do.

18 Q.         How long have you known

19 Mr. Coury?

20 A.         Approximately the spring

21 of 1995.

22 Q.         Right around the same

23 time?

24 A.         Yes, sir.

25 Q.         Do you know Mr. Westcott?

39

1    A.        Yes, I do.

2    Q.        Have you ever discussed it

3    with him?

4    A.        No.

5    Q.        How about Joanna Reynolds

6    and Cindy Guido are no longer

7    Defendants in this action.

8    Hawthorne Conley, have you ever

9    discussed it with him?

10   A.        No, I've not.

11   Q.        Mark, there is an

12   allegation in the amended Complaint,

13   and there was an allegation in the

14   original Complaint that Mr. --- that

15   in substance that Mr. Evanko

16   informed you about this

17   investigation and sought permission

18   to investigate Captain Ober.  Your

19   answer appears to at least generally

20   deny that allegation.  I'm going to

21   change again direction here a little

22   bit.  And I want to ask you some

23   questions about that.  Okay?

24   A.        Uh-huh (yes).

25   Q.        Do you know Captain Ober?

40

1    A.        No, I do not.

2    Q.        Did you know who Captain

3    Ober was before this Complaint was

4    filed?

5    A.        No, I did not.

6    Q.        Have you ever discussed

7    Captain Ober with Commissioner

8    Evanko?

9    A.        Outside of matters

10   involving this Complaint?

11   Q.        No.  We can start there,

12   outside of matters involving this

13   Complaint?

14   A.        No.

15   Q.        Have you ever discussed

16   Captain Ober with Paul Evanko

17   relating or regarding matters having

18   to do with this Complaint?

19   A.        I'm not sure what you mean

20   by discuss.  I mean, I ---.

21   Q.        Any communication between

22   two human beings is a discussion, I

23   guess, of some sorts, whether it's

24   by verbal or written means.

25   A.        I first heard --- and to

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

41

1    the extent that I had discussions

2    with Colonel Evanko regarding Mr.

3    Ober, it was that the Colonel might

4    mention his name in passing, for

5    instance, when the Colonel called to

6    inform me it's possible that Captain

7    Ober's name may have been mentioned

8    during that conversation, but I

9    don't recall specifically.

10   Q.       It's possible that Captain

11   Ober was discussed during the

12   conversation when Mr. --- if I

13   understand you correctly, it's

14   possible, underlining the word

15   possible, that Mr. Ober was

16   discussed during the conversation

17   when Mr. Evanko informed you about

18   the FBI investigation into the

19   potential sales or the alleged --- I

20   don't know exactly what it was, but

21   the closed investigation into the

22   alleged sale of positions at the

23   Academy; is that right?  Am I

24   correct in that?

25   A.       I don't recall

42

1   specifically.  I'm sure it's

2   possible.

3   Q.        Did you ever have any

4   discussions with Mr. Evanko after

5   that initial discussion when he

6   informed you of the FBI interest

7   where Captain Ober was mentioned?

8   A.        I believe I participated

9   in a discussion involving Counsel,

10  where the result of the Colonel's

11  investigation was discussed.

12  Q.        Well, I'm going to get

13  that.  That is a whole area.  And

14  I'm going to get to that.

15  A.        Okay.

16  Q.        Now, I'm still

17  concentrating on the original or the

18  initial discussions as to Captain

19  --- I mean, I'm sorry, as to Mr.

20  Evanko informing you.

21  A.        Uh-huh (yes).

22  Q.        Did Mr. Evanko when he

23  informed you of what the FBI was

24  doing, did he indicate anything to

25  you that caused you to believe that

43

1  he was going to look into the matter

2  or try to learn more information

3  about the matter?

4  A.        The Colonel did indicate

5  to me that he planned to initiate an

6  internal investigation over how this

7  matter was handled by the

8  Pennsylvania State Police.

9  Q.        Did Commissioner Ober

10 indicate what he meant by, to borrow

11 your words, how the matter was

12 handled by the Pennsylvania State

13 Police?

14 A.        Did he indicate how?

15 Q.        Let me explain, Mark,

16 where I'm coming from.

17 A.        Sure.

18 Q.        From what you told us so

19 far, my understanding is --- it's

20 easy to understand this line of

21 questions this way.  My

22 understanding is that Mr. Evanko

23 called you to tell you about this

24 closed investigation?

25 A.        Uh-huh (yes).

44

```
1   Q.         Now, he also indicated
2   that he was going to initiate an
3   investigation into how the
4   Pennsylvania State Police handled
5   this matter?
6   A.         Yes.
7   Q.         Now, that begs a
8   question.  And this may be a few
9   questions.  That indicates that Mr.
10  Evanko wanted to know how the FBI
11  handled --- or how the Pennsylvania
12  State Police handled the FBI
13  interest --- the FBI inquiry; is
14  that fair to say?
15  A.         I think that's --- you'd
16  have to ask Colonel Evanko that.
17  Q.         How did you understand it?
18  A.         That the Colonel wanted to
19  better understand how this
20  information was, in fact, handled by
21  his agency, and how, I guess, his
22  agency had perhaps worked with the
23  FBI regarding the investigation.
24  Q.         Mark, did he say why he
25  had an interest in that area?
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

45

1  A.        No, I don't recall him

2  saying why.

3  Q.        Did you ask him why he was

4  concerned about how the Pennsylvania

5  State Police handled an FBI inquiry?

6  A.        I considered it to be ---

7  once I had ascertained that there

8  was not any involvement on the part

9  of anyone in the Governor's office,

10 and that, in fact, there was not any

11 involvement on the part of anyone at

12 the state police, I considered the

13 matter at that point to be a matter

14 for the Colonel to address through

15 sort of, you know, the

16 administrative channels of the

17 Pennsylvania State Police.

18 Q.        Why would he want to ---

19 why did you understand he wanted to

20 address that?

21 A.        Why do I understand why he

22 wanted to address ---?

23 Q.        Let me lay some

24 foundation.

25 A.        Sure.

46

1  Q.        The Federal Bureau of

2  Investigation by reputation, at

3  least, one of the finest law

4  enforcement agencies in the world;

5  would you agree?

6  A.        Yes, sir.

7  Q.        Mr. Evanko asked you ---

8  or I'm sorry, Mr. Evanko informed

9  you that the --- in essence, in

10  effect, the FBI had closed an

11  investigation into something that

12  was going on?

13  A.        Yes, sir.

14  Q.        Did Mr. Evanko indicate to

15  you that he was informed belatedly

16  about the FBI inquiry?

17  A.        I believe he did.  I

18  believe that he shared the --- you

19  know, that he was sharing the

20  information with me after he as well

21  had been informed that the

22  investigation had been closed, and

23  that he was not aware of the

24  investigation prior to that.

25  Q.        Exactly.  In other words,

47

1  the investigation had taken place,

2  the investigation had thank God, and

3  my compliments to you and the

4  Governor and your staff, but thank

5  God the investigation had been

6  closed, and Mr. Evanko was informing

7  you that there is no indication you

8  guys did anything wrong or that you

9  did anything wrong?

10  A.        Right.

11  Q.        But I just found out about

12  it myself; right?

13  A.        That's what he indicated

14  to me, yes.

15  Q.        Sure.  And was he angry,

16  Mark?

17  A.        I don't recall that he was

18  angry.  I believe he was concerned

19  that the matter had just been

20  brought to his attention.

21  Q.        But didn't you tell us

22  that he said to you that the

23  investigation had been into possibly

24  people --- or allegations involving

25  people in the Governor's office or

48

1     Lieutenant Governor's office, maybe

2     you corrected me, I think, and

3     higher ups in the State Police?

4     A.        That's what he had

5     indicated to me, yes.

6     Q.        Sure. So when he was

7     telling you that, he was also

8     indicating to you that he had only

9     learned about this after the

10    investigation was done?

11    A.        Yes.

12    Q.        Did you ask him who had

13    knowledge of the investigation

14    before it was closed?

15    A.        No, I did not.

16    Q.        I think you had indicated

17    it might have been possible that Mr.

18    Ober was discussed during that

19    conversation, but you have no

20    specific recollection?

21    A.        Correct.

22    Q.        But you do recollect that

23    Mr. Evanko indicated to you that he

24    was going to investigate how, quote,

25    unquote, to use your words, the

49

1  Pennsylvania State Police had

2  handled the investigation?

3  A.        Yes, sir.

4  Q.        So that meant that he was

5  going to --- that he wanted to

6  investigate how the FBI had dealt

7  with the --- I'm sorry.  How the

8  Pennsylvania State Police had dealt

9  with the FBI inquiry?

10  A.        I guess that's what the

11  Colonel wanted to ascertain, yes.

12  Q.        Mark, didn't that concern

13  you?

14  A.        No, it really did not.

15  The way in which the Governor's

16  office interacts with its cabinet

17  officer is to leave, frankly, those

18  kind of administrative decisions and

19  discretion to the cabinet

20  secretary.  My concern, as I had

21  indicated earlier, was ascertaining

22  what, if any, involvement there had

23  been on the part of the Governor's

24  office.  Once I was informed that,

25  in fact, the investigation had not

50

1  found that there was any

2  involvement, frankly, I saw it as

3  the Colonel's --- that it was

4  appropriate for the Colonel to

5  follow up in whatever way he deemed

6  appropriate.  Because at that point

7  I viewed it as a matter --- an

8  administrative matter internal to

9  the Pennsylvania State Police.

10  Q.        I'm not trying to be

11  facetious or contentious.  Do you

12  trust the FBI?

13  A.        Do I trust the FBI?

14  Q.        Sure.

15  A.        I don't know the FBI.  I

16  have no reason not to trust the FBI.

17  Q.        It's a good thing you are

18  not questioning me today.  You can

19  strike that, by the way.  Let me ask

20  you, did you have a concern that

21  Colonel Evanko was upset that he had

22  not known about this when it was

23  going on, the FBI investigation?

24  A.        Did I have a concern, no.

25  Q.        Well, you had understood

51

1  that the FBI investigation had been

2  into the Governor's office and

3  higher ups in the State Police;

4  right?

5  A.        That was the allegation,

6  yes.

7  Q.        Would you expect the FBI

8  if they heard such allegations to

9  come and check with you first or to

10  do their investigation first?

11  A.        I would not expect them to

12  come, no--- I would not expect them

13  to come to me.

14  Q.        Of course not.  Because

15  they might compromise the

16  investigation; right?

17  A.        Yes, sir.

18  Q.        And all of us --- again,

19  I'm not trying to talk down to you.

20  A.        Sure.

21  Q.        But I think all of us

22  realize that in a society ruled by

23  laws and not by men, that you follow

24  procedures.  And regardless of what

25  level, a law enforcement agency has

52

1  got to do its investigation; right?

2  A.        Yes, sir.

3  Q.        Did you ask Colonel Evanko

4  why he was concerned that there be

5  an investigation into how his agency

6  handled a closed FBI investigation,

7  which quite frankly apparently

8  yielded good results, that were

9  laudatory as far as the integrity of

10 the Governor's office is concerned

11 at least?

12 A.        No, I did not.

13 Q.        Do you know what a whistle

14 blower statute is?

15 A.        I'm generally familiar

16 with the terminology.

17 Q.        Is it fair to say that if

18 you became aware of some issue of

19 apparent corruption in government,

20 that you would report it to law

21 enforcement authorities?

22 A.        Yes, sir.

23 Q.        You would expect, I'm

24 sure, that anyone who works in the

25 Governor's office or under you, you

53

1  would expect them to do the same; is

2  that correct?

3  A.        Uh-huh (yes), yes, sir.

4  Q.        And you --- and this may

5  be an unfair question because I

6  realize, having been there and done

7  that to some extent, that it's an

8  extremely difficult one.  Is it fair

9  to say that in doing so, in looking

10  at matters of public corruption, the

11  first obligation that you have is to

12  lawfully examine and lawfully report

13  and investigate a public corruption

14  and put that ahead of political

15  concerns; isn't that correct?

16  Politics second, law first?

17  A.        Sure.

18  Q.        Were you concerned that

19  Mr. Evanko was personally angry over

20  being informed after the fact about

21  the FBI investigation?  Did he say

22  that?

23  A.        Not that I recall, no.

24  Q.        Did he ask you if you knew

25  anything about it?

54

1    A.        No.

2    Q.        Did you ask him to find

3    out why it hadn't been --- why you

4    hadn't been informed earlier?

5    A.        No.

6    Q.        You were not upset that

7    you had not been informed before the

8    investigation was done; is that

9    correct?

10   A.        Yes.

11   Q.        Did you have visions going

12   through your mind, have they been

13   tapping my telephone, have they been

14   bugging the office, have they been

15   following people?

16   A.        No.

17   Q.        Did you ask Mr. Evanko any

18   of those kinds of questions?

19   A.        No, I did not.

20   Q.        Mark, there is an

21   allegation, if you give me just a

22   second, I would like to find the

23   paragraph.

24   A.        Uh-huh (yes).

25   Q.        Let me read this paragraph

55

1  to you.  It's paragraph 33 in the

2  amended Complaint.  It reads as

3  follows --- it's very brief, one

4  sentence allegation.  Subsequent to

5  learning about the FBI

6  investigation, Colonel Evanko sought

7  the personal and official approval

8  of the Defendant, Mark Campbell, to

9  begin an investigation into Captain

10  Ober.  Campbell was an assistant to

11  the Pennsylvania Governor's chief of

12  staff.  Let me correct that.  At the

13  time in May of 1999, precisely what

14  was your position?

15  A.        I was the Governor's

16  deputy chief of staff.

17  Q.        Who was chief of staff?

18  A.        Mark Holman (phonetic).

19  Q.        Mark Holman was.  Let's go

20  back to the first sentence and get

21  that out of the way, and then go

22  on.

23  A.        Sure.

24  Q.        Is it fair to say that you

25  deny that Mr. Evanko sought any

56

1  personal or official approval to

2  begin an investigation into Captain

3  Ober?

4  A.        Yes, sir.

5  Q.        Now, you do not deny that

6  Mr. Evanko mentioned during this

7  discussion that he was going to look

8  into or investigate how his

9  department handled the FBI probe; is

10  that correct?

11  A.        Yes, sir.

12  Q.        Mark, why would Mr. Evanko

13  call you and discuss that with you?

14  A.        I believe that the Colonel

15  felt that given that there was an

16  alleged FBI investigation or closed

17  ---.

18  Q.        All right.  Just one

19  second.  Let me go back and ask the

20  question.  We can redo that.

21  Incidentally, it is about a 45

22  minute mark.

23              ATTORNEY BAILEY:

24              Cindy, please keep me

25              apprised of the time when

57

1    you have to go.  Okay.

2            ATTORNEY GUIDO:

3        We're good on time.

4    I don't really need to

5    leave until close to

6    5:00.

7            ATTORNEY BAILEY:

8        I think we're fine.

9    BY ATTORNEY BAILEY:

10   Q.        You're being very

11   responsive.  And I appreciate that,

12   Mr. Campbell.

13   A.        Sure.

14   Q.        And my question was what

15   I'm looking for is why Mr. Evanko

16   --- now, you're deputy --- you are

17   the assistant, I'm sorry, to Mr.

18   Holman.  Mr. Holman was the chief of

19   staff.  Your title was deputy chief

20   of staff.  Why did Mr. Evanko ---

21   why would he call you with this?

22   A.        Well, I'm not sure.  There

23   is two different ways to answer your

24   question.  If you are asking me in

25   terms of my job, why me versus why

58

1   did the Colonel call me, at the time

2   - - -.

3   Q.        Mark, let me do it this

4   way.

5   A.        Sure.

6   Q.        It really is an important

7   question.  Let me tell you where I'm

8   going from.  I'm trying to learn

9   whether there were personal,

10  political, official, custom practice

11  and usage, a normal way of doing

12  business.  Sometimes I've been in

13  situations, all of us have, you're a

14  staff worker in politics, you

15  develop a contact in an office, the

16  essence of politics is the flow of

17  information, maybe he calls you

18  because he likes you or he develops

19  a relationship.  This is the way I

20  get access.  I don't know.  I want

21  you to explain for us, to the best

22  of your knowledge, why Mr. Evanko

23  would call and talk to you about

24  this?

25  A.        Sure.  Among my

59

1   responsibilities as the Governor's

2   deputy chief of staff was to serve

3   as a liaison to several of the

4   Governor's cabinet agencies,

5   including the Pennsylvania State

6   Police.  So I was Colonel Evanko's

7   point of contact within the

8   Governor's office as the deputy

9   chief of staff.  And I believe that

10  the Colonel had reached out to me to

11  convey this information to me

12  because there were allegations

13  involving the possible involvement

14  of the Governor's office that were a

15  part of the investigation.

16  Q.        Do you know why he

17  wouldn't simply call the FBI and

18  say, geez, can you tell me about

19  this, you know, I want to see if I

20  have some bad guys out there in my

21  outfit or something?

22  A.        I don't --- I can't

23  respond to what the Colonel either

24  did or didn't do or why he would

25  have done or taken any particular

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

60

1    action.

2    Q.         All right.  But you didn't

3    make an inquiry of the FBI or

4    anything like that?

5    A.         No, sir.

6    Q.         Do you know whether he

7    did?

8    A.         I don't know.

9    Q.         Mark, prior to when the

10   Complaint in this matter was filed,

11   is there any information known to

12   you which would shed light on Mr.

13   Evanko's motivations for telling you

14   that he was going to begin

15   investigating his own agency people

16   to find out what happened in

17   handling the FBI probe?

18   A.         None that I'm aware of.

19   Q.         Do you have a recollection

20   of him indicating who he was going

21   to --- I understand there is no

22   specific recollection of Mr. Ober,

23   although the name is apparently

24   familiar to you, that's my

25   observation.  Your observations,

61

1  your recollection is what counts.

2  Aside from Mr. Ober, do you have a

3  recollection of him indicating any

4  names, bureaus, sub departments,

5  parts of his organization he was

6  going to check into?

7  A.        No, he didn't indicate

8  anything like that to me.

9  Q.        Was anyone else in on that

10 conversation that you recollect?

11 A.        The conversation with the

12 Colonel?

13 Q.        Yes, sir.

14 A.        No, not that I'm aware of.

15 Q.        And you have indicated

16 that --- well, let me put it this

17 way.  Was there anything in Colonel

18 Evanko's words, phraseology or

19 attitude which indicated to you that

20 he sought any kind of ratification

21 or approval from you to look into

22 this matter?

23 A.        No.

24 Q.        Did he make any comments

25 about it being bad politics?

62

1  A.        No.

2  Q.        Did he mention anything

3  about any state representatives who

4  may have been looked at?

5  A.        No.

6  Q.        Did he mention any names

7  of anyone who may have been looked

8  at?  I don't mean for his

9  investigation.  I mean in the FBI

10  investigation.

11  A.        No.

12  Q.        Well, you had indicated

13  the Lieutenant Governor's office?

14  A.        No.  You had mentioned ---

15  I don't recall indicating Lieutenant

16  Governor's office.  It was clearly

17  understood by me that the focus of

18  the FBI investigation --- or the

19  allegation in the FBI allegation

20  involved the Governor's office, not

21  the Lieutenant Governor's office.

22  Q.        So you didn't mention the

23  Lieutenant Governor's office.  Your

24  recollection is that was my ---?

25  A.        Yes.

63

1   Q.        I may have.  I will take

2   your word for it at this point.  But

3   I had thought that you had indicated

4   the Lieutenant Governor's office.  I

5   don't know.  So I apologize.  I

6   stand corrected.  Now, the --- your

7   responses to certain of my questions

8   indicates that subsequent to that

9   discussion you learned more

10  substantively about what the FBI

11  probe concerned.  Where did you

12  learn that?

13  A.        I believe ---.

14                  ATTORNEY GUIDO:

15              I'm going to object

16          to discussions that we had

17          with Counsel.

18  A.        That's where it was,

19  right.

20  BY ATTORNEY BAILEY:

21  Q.        Well, okay.  First of all,

22  that's not for Counsel to say.  It's

23  for you to say that they occurred

24  with Counsel, if they did.  In other

25  words, if your attorney informed you

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

64

1  of those things.

2  A.        Uh-huh (yes).

3  Q.        They may or may not be.

4  But let's assume for the sake of it

5  --- and I will certainly waive any

6  objection to their being

7  privileged.  If it's fact

8  information provided to you as a

9  source, you do have to tell us

10  that.  But I'm not interested in the

11  conversation --- substantive

12  conversation with Counsel.  It's

13  legal advice is a different matter.

14  But where you learned it from is

15  important.  So if --- aside from

16  Counsel, okay, where did you learn

17  about the --- if, indeed, you did

18  from any other source, the substance

19  of what the FBI probe was about?

20  A.        I'm not sure how I -- the

21  way in which I learned about the sum

22  and substance of the FBI allegation

23  was, I believe, in a session that

24  involved Counsel, where ---.

25  Q.        Again, I really don't have

83

1  A.          No, not that I can recall.

2  Q.          In other words, it would

3  have been your lawyers?

4  A.          I believe so.

5  Q.          So when Mr. Evanko called

6  you, he didn't say the probe

7  indicates there is nothing wrong in

8  the Governor's office or high up in

9  the state police, although there is

10  a state policeman that is going to

11  be charged?

12  A.          No, I don't believe he

13  did.

14  Q.          Never even brought that to

15  your attention?

16  A.          Not that I recall.

17  Q.          How many --- let's see.

18  From 1995 on, you were the contact

19  person for Mr. Evanko?

20  A.          Through the end of 2000,

21  yes.

22  Q.          To the end of 2000.  And

23  then who did it go to then?

24  A.          Lisa Baker, the Governor's

25  deputy chief of staff --- well,

84

1   actually Duncan Campbell, who was

2   the Governor's deputy chief of staff

3   for a short period of time.   And

4   then Lisa Baker.

5   Q.        Have you ever discussed

6   this litigation with Lisa Baker?

7   A.        No, I did not.

8   Q.        Did she ever indicate that

9   she discussed it with Mr. Evanko?

10  A.        No.

11  Q.        Did she ever indicate that

12  she discussed Mr. Ober with Mr.

13  Evanko?

14  A.        No, she has not.

15  Q.        Did she ever indicate that

16  she discussed Mr. Hikus with Mr.

17  Evanko?

18  A.        No.

19  Q.        The other gentleman,

20  Duncan Campbell?

21  A.        Duncan Campbell.

22  Q.        Mr. Duncan Campbell, have

23  you ever discussed Mr. Evanko's

24  handling of the FBI matter with Mr.

25  Duncan Campbell?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

85

1    A.         No, I did not.

2    Q.         Has Mr. Duncan Campbell

3    ever mentioned any --- discussed Mr.

4    Ober with you?

5    A.         No, he has not.

6    Q.         Has he ever discussed Mr.

7    Hikus with you?

8    A.         No, he has not.

9    Q.         Have you ever read ---

10   doesn't Mr. Evanko still send his

11   reports or whatever?

12   A.         Yes, he does.

13   Q.         Do you ever read them?  Do

14   you still read them?

15   A.         Unfortunately, I don't.

16   Q.         I don't mean to put you on

17   the spot there, Mark.  Do you ever

18   read them?

19   A.         No, I don't.

20   Q.         So it was rare that Mr.

21   Evanko would call up and talk about

22   an internal matter and about someone

23   under him in the staff in the

24   context of investigating state

25   police activities then; wasn't it?

86

1   A.        Colonel and I talked with,

2   you know, some regularity concerning

3   a whole host of issues involving the

4   state police.  So it was not rare

5   for him to talk to me about a matter

6   involving the state police.  As I

7   indicated earlier, I don't think

8   that it was --- I did not find it

9   surprising, given the allegation

10  involving the Governor's office,

11  that he raised this issue with me.

12  I do not recall him contacting me on

13  any other matter involving an

14  internal investigation or an FBI

15  investigation.

16  Q.        So in five years of

17  talking with Mr. Evanko, you don't

18  have a recollection of any other

19  single instance where he talked

20  about investigating his own staff

21  over a problem dealing with an

22  external investigation?

23  A.        Not that I can recall.

24  But again, that doesn't ---.

25  Q.        Doesn't mean it didn't

87

1  happen?

2  A.        No, no.  Not that I can

3  recall.  But again, I guess, I

4  certainly viewed this allegation of

5  the FBI investigation as unique

6  given the alleged involvement of the

7  Governor's office.  So in my mind

8  that was a significant difference.

9  Q.        No.  I understand that,

10 you know, quite frankly if Mr.

11 Evanko had not told you there was an

12 investigation in the Governor's

13 office, thank God it was closed, and

14 closed in a positive mode, I'm not

15 suggesting that that is not

16 something that should be brought to

17 your attention.  I'm not talking

18 about that.  I'm talking about him

19 going on and telling you that ---

20 apparently there was no follow-up on

21 that.  But going on and telling you

22 that there was an investigation in

23 his own staff about how it was

24 handled.  At the same time he was

25 telling you that Mr. Hikus knew, but

88

1  I didn't.  Do you think he expected

2  you to be angry at Mr. Hikus?

3  A.        I don't know what he

4  expected.

5  Q.        But you weren't?

6  A.        I was not.

7  Q.        You were not.  Did you

8  feel he was inviting or fishing for

9  a response on Mr. Hikus?

10  A.        No, I did not.

11  Q.        So as you sit here to this

12  very day, you don't know the

13  significance --- I'm not saying you

14  don't have your suspicions.  We're

15  not asking about that.  We might.

16  But why he mentioned Mr. Hikus, you

17  don't ---?

18  A.        My recollection was simply

19  that there was a brief discussion as

20  to how the information had been

21  handled internally by the state

22  police.  And I think at that time he

23  indicated to me that it had been

24  brought to Colonel Hikus' attention.

25  Q.        Well, did you ask him any

89

1  questions at all or did you just

2  listen during this thing?

3  A.        No, I just listened.

4  Q.        Has Mr. Evanko ever

5  discussed Mr. Coury with you?

6  A.        I mean, have we discussed

7  Coury, sure.

8  Q.        Not things that Mr. Coury

9  was doing --- when I say discuss Mr.

10  Coury with you, I mean in terms of a

11  personal activity or even some

12  official activity relating to a

13  personnel matter?

14  A.        No, not that I recollect.

15  Q.        How about any other staff

16  members?

17  A.        No, I don't recall any.

18  Q.        But he did discuss Mr.

19  Hikus with you, about this knowledge

20  of this FBI claim?

21  A.        He did mention, yes.

22  Q.        Now, did you come away

23  from that discussion with the

24  impression that he was going to

25  investigate Mr. Hikus' role in the

90

1  --- Mr. Hikus' role in having

2  knowledge of the FBI probe?

3  A.        I came away with the

4  impression that he was going to

5  investigate how his agency overall

6  handled its interaction with the FBI

7  regarding this investigation.

8  Q.        Let me step out for just a

9  moment.  We're going to leave the

10  video and everything run because of

11  the time factors, to see if I have

12  any additional questions.

13  A.        Okay.

14              ATTORNEY BAILEY:

15              Again, please bear in

16          mind that the machine is

17          still on.  Just wait for a

18          second there.

19  SHORT BREAK TAKEN.

20              ATTORNEY BAILEY:

21              Tape recorder is

22          still running.  Let me

23          --- .

24              VIDEOGRAPHER:

25              I haven't changed

91

1    anything.

2                    ATTORNEY BAILEY:

3          Well, then let's just

4    finish up if you haven't

5    done that.  We will close

6    it down, unless opposing

7    Counsel --- I can't

8    conceive of you having any

9    questions, but I don't

10   have any additional

11   questions.  Mark, I would

12   like to thank you very

13   much for your

14   participation here today.

15   Appreciate it.  Thank you

16   three.  The deposition is

17   concluded.

18                    VIDEOGRAPHER:

19         It's 1533.  And I'm

20   now going to shut off the

21   cameras.

22   * * * * * * * *

23   DEPOSITION CONCLUDED AT 3:33 P.M.

24   * * * * * * * *

25

COMMONWEALTH OF PENNSYLVANIA )    SS:
                                                       )
COMMISSIONER OF DEEDS            )

C E R T I F I C A T E

I, Nicole Susan Montagano, Commissioner of Deeds for the Commonwealth of Pennsylvania, do hereby certify:

That the witness was hereby first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was taken in Stenotype by me and reduced to typewriting, and constitutes a true and correct record of the testimony given by the witness.

I further certify that the reading and signing of said deposition were (not) waived by counsel for the respective parties and by the witness.

I further certify that I am not a relative, employee or attorney of any of the parties, nor a relative or employee of counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and stamp this

day of _October 26, 2001_.

NICOLE SUSAN MONTAGANO
Commissioner Of Deeds
Commonwealth of Pennsylvania
My Commission Expires Dec 3, 2004

· PITTSBURGH, PA
· CLEARFIELD, PA
· STATE COLLEGE, PA
· HOLLIDAYSBURG, PA

· ERIE, PA
· OIL CITY, PA
· HARRISBURG, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA 15901

· INDIANA, PA
· GREENSBURG, PA

· PHILADELPHIA, PA
· SOMERSET, PA
· WILKES-BARRE, PA
· CHARLESTON, WV

LAWYER'S NOTES

| Page | Line | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

PITTSBURGH, PA
HARRISBURG, PA
GREENSBURG, PA
ERIE, PA
INDIANA, PA
HOLLIDAYSBURG, PA
STATE COLLEGE, PA



SARGENT'S
COURT REPORTING
SERVICE, INC.

210 MAIN STREET
JOHNSTOWN, PA 15901
(814) 536-8908

PHILADELPHIA, PA
WILKES-BARRE, PA
OIL CITY, PA
SOMERSET, PA
CLEARFIELD, PA
*CHARLESTON, WV*

65

1    an interest to go there because I

2    don't want to argue about it.   It

3    doesn't matter to me.   Aside from

4    discussions with Counsel or

5    information provided by Counsel,

6    what other sources?

7    A.          I don't believe there were

8    any.

9    Q.          Mark, Mr. Evanko called

10   you up, told you about this thing.

11   And you never --- it raised no flags

12   with you as a political operative,

13   something incidentally, which I

14   admire in a society.   I do.   It's

15   not a negative thing to me.

16   A.          Right.

17   Q.          We need politicians.   And

18   quite frankly, a country has to run

19   itself politically.   I accept that.

20   And I view it as a positive thing.

21   But what --- where I'm going with

22   this question is really quite

23   simple, you know.   Pennsylvania

24   State Police Commissioner calls me

25   up and he says, I'm Mark Campbell.

66

1  And calls me up and says the FBI did

2  a probe.  And, you know, I just

3  learned about it in effect or I

4  found out about it or whatever and

5  it's closed and, you know.  But you

6  don't have any follow-up questions

7  about what happened, what the source

8  of this could be?  Because you know

9  it's just good politics to find out

10  what's --- you know, this is a

11  potentially explosive public

12  problem, if somebody makes a false

13  allegation, for example, if it's

14  something that comes from a

15  political opponent, potential

16  political opponent or somebody has

17  got an ax to grind.  I mean, I think

18  it is legitimate to try to find out

19  the background.  I would want to

20  know.  I'd certainly want to know.

21  I'm just curious why you didn't ---

22  you know, what's going on here?

23  A.       Maybe I'm a more casual

24  political staffer than what ---.

25  Q.       No, you are probably a

67

1  better one.

2  A.        No.  As I indicated

3  earlier, my concern --- and to use

4  your word, my political concern was

5  how this might involve the

6  Governor.  Ones I was assured that

7  it did not involve the Governor or

8  the Governor's office, my concerns

9  ceased to exist.  And in my mind,

10  then became a matter for Colonel

11  Evanko to deal with

12  administratively.

13  Q.        Let me go there next.

14  Because you had indicated earlier

15  that, you know, you viewed --- is it

16  fair to say that your reaction and

17  your feeling was, our folks aren't

18  in this.  And I'm sure you knew that

19  Governor Ridge wouldn't be any part

20  of it.  But the point was our office

21  is not involved in this.  That's

22  Evanko's problem?  Not saying you

23  felt that calloused about it, but

24  ---.

25  A.        That cavalier about it.

68

1  But I was not surprised that neither

2  --- neither anyone from the

3  Governor's office or from the

4  Commissioner's office was involved.

5  And as I said, having been assured

6  that that, in fact, was the case, I

7  really ceased to have any interest

8  in the matter going forward.

9  Q.        All of that out of the way

10  now that we have covered that

11  ground.  Did it occur to you at the

12  time --- that there were any

13  questions in your mind, why is Mr.

14  Evanko telling me about

15  investigating his own folks?

16  A.        I just think that he

17  indicated to me and was in the same

18  conversation where he informed me

19  that the investigation had been

20  concluded, he then went on to inform

21  me that he was going to conduct an

22  internal review of his agency's

23  involvement and actions in the

24  matter.  So it was nothing more than

25  that.

69

1    Q.        But you knew quite clearly

2    that that was a check into the

3    substance of who out there may have

4    sold a job, but was into how we

5    handled the investigation.  That was

6    pretty clear to you?

7    A.        It was, but it was not a

8    matter that concerned me.

9    Q.        All right.  Now, after

10   that discussion with Mr. Evanko in

11   May of 1999 --- by the way, about

12   how long, if you recollect, did that

13   discussion take place?

14   A.        It was no more than a few

15   minutes, less than five minutes.

16   Q.        Mark, were there any other

17   things that you remember of

18   substance discussed during that

19   conversation?

20   A.        There may have been, but I

21   do not recall them at this time.

22   Q.        Is it fair to say that

23   your best recollection is that the

24   purpose of Mr. Evanko's call was

25   essentially about this closed FBI

70

1  probe?

2  A.        Yes, sir.

3  Q.        His voice, was there an

4  angry tone or edge in his voice?

5  A.        I don't recall that there

6  was.

7  Q.        Do you remember that he

8  was upset in any way, that expressed

9  itself through the tone of his voice

10  or his verbiage or voice patterns or

11  anything of that sort?

12  A.        No, I do not recall.

13  Q.        Did he indicate that he

14  might get back to you?

15  A.        No, he did not, not that I

16  recall.

17  Q.        Did you ask him to get

18  back to you?

19  A.        No, I did not.

20  Q.        Do you know of anyone in

21  the administration --- by that, I

22  mean the Governor's office over here

23  as opposed to someone in the state

24  police, who asked Mr. Evanko to do

25  any kind of report or

71

1  recommendation?

2  A.        I'm not aware of anything

3  like that, no.

4  Q.        Have you ever had any

5  discussions with any FBI personnel

6  about the probe?

7  A.        No, I have not.

8  Q.        Have you ever seen FBI

9  302s or FBIs reports or information

10  about the probe?

11  A.        No, I have not.

12  Q.        Aside from your lawyers,

13  have you ever received any

14  information about where the probe

15  went or what occurred?

16  A.        No, I have not.

17  Q.        Is there any policy in the

18  administration about how internal

19  investigations are to be conducted

20  into personnel activities?

21  A.        Not that I'm aware of.  I

22  can't --- I don't know how --- for

23  instance, the administration handles

24  investigations of state employees.

25  But I'm not aware of any of those

72

1  policies.

2  Q.          Aside from Colonel Evanko,

3  did you ever discuss the FBI

4  investigation with anyone else?

5  A.          I believe ---.

6  Q.          Your lawyers are excluded

7  from this.

8  A.          Sure.  I believe that

9  after I had been informed by the

10  Colonel, I shared the information

11  with Mark Holman, the Governor's

12  chief of staff, with Tim Reeds, who

13  was the Governor's director of

14  communications, and with Paul DeFino

15  (phonetic), the Governor's general

16  Counsel.

17  Q.          Do you know whether any of

18  those folks had any discussions with

19  Mr. Evanko about the matter?

20  A.          I don't know.

21  Q.          Did you ever ask them?

22  A.          No, I did not.

23  Q.          Did they ever tell you?

24  A.          Not that I remember, no.

25  Q.          Did Mr. --- do you have

73

1  any subsequent --- I know I have

2  asked you if you had any subsequent

3  conversations with Mr. Evanko after

4  this Complaint was filed.  Between

5  the period of time that Mr. Evanko

6  made this phone call to you and

7  before the Complaint was filed, did

8  you have any other conversations

9  with Mr. Evanko about the FBI probe?

10  A.        The Colonel was present

11  for the one meeting that I referred

12  to earlier, I believe, where ---.

13  Q.        Not with the attorneys.

14  A.        No.  Other than that ---.

15  Q.        Let me go back and make

16  sure it's understood.  Before this

17  Complaint was filed and after ---

18  you know, the interval between when

19  Mr. Evanko first called you and when

20  you first learned about the FBI

21  probe and this Complaint was filed,

22  did you have any conversations with

23  Mr. Evanko about the probe?

24  A.        No, I don't recall any.

25  Q.        I want you to go back over

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

74

1    your awareness of Mr. Ober's name.

2    I want you to go back to prior to

3    the Complaint.  Prior to the

4    Complaint, do you have any awareness

5    of Mr. Ober's name?

6    A.       At some point, as I

7    indicated earlier, either in that

8    initial conversation with the

9    Colonel or at the time during which

10   we met with Counsel, I become aware

11   of Mr. Ober's name.

12   Q.       When was the timing of Mr.

13   Evanko's call to you?

14   A.       Timing as in time of day?

15   Q.       You said it was May of

16   1999; right?

17   A.       Well, that's what --- I

18   believe that's what was the date

19   that was in the Complaint.  I didn't

20   recall specifically when it was.

21   Q.       Well, May of ---

22   incidentally, May 12th of 1999 is

23   when the Complaint alleges that the

24   Plaintiff informed Mr. Evanko about

25   the probe?

75

1   A.          Uh-huh (yes).

2   Q.          Do you keep any kind of

3   log of telephone calls?

4   A.          No, I do not.

5   Q.          Do you know if Mr. Evanko

6   said when he learned about this FBI

7   probe?  Do you remember when he

8   called you, did he say when he

9   learned about it, I learned today, I

10  learned last week, I learned last

11  month?

12  A.          I don't recall

13  specifically.  I just recall

14  generally that it was fairly

15  recent.  I don't know.

16  Q.          You had that feeling it

17  was fairly recent?

18  A.          Uh-huh (yes).

19  Q.          Did he indicate whether he

20  met with any of his staff about it?

21  A.          He did not indicate, that

22  I recall.

23  Q.          At any time were any kind

24  of disciplinary actions against

25  Captain Ober or anyone else

76

1  discussed in the context of the FBI

2  probe at any time?

3  A.        Not with me, no.

4  Q.        Do you know if they were

5  discussed with anyone else in your

6  staff, the Governor's staff?

7  A.        Not that I'm aware of.

8  Q.        Have you ever seen the

9  results of the FBI investigation?

10  A.        I don't believe I have,

11  no.

12  Q.        Have you ever, aside from

13  asking your attorneys, maybe if you

14  have, I don't know, have you ever

15  asked anyone to find out the results

16  of the FBI probe, the allegations of

17  the staff?

18  A.        No, never asked.

19  Q.        I had asked you before

20  about memos and that sort of thing.

21  Do you have any knowledge of any

22  status reports?

23  A.        No, I do not.

24  Q.        Regarding this matter?

25  A.        No.

77

1    Q.        Do you remember early on I

2    asked you some questions about

3    Lieutenant Colonel Hikus?

4    A.        Uh-huh (yes).

5    Q.        Did you ever have any

6    discussions with Mr. Evanko in the

7    context of the FBI probe where

8    Lieutenant Colonel Hikus was

9    discussed?  Do you understand that

10   question?

11   A.        What I do recollect, and

12   it may be from the Complaint, is

13   that I believe the allegation or the

14   chain of events was that at some

15   point Mr. Ober reached out to then

16   Lieutenant Colonel Hikus to inform

17   him of the FBI investigation.

18   Q.        Well, excluding the

19   Complaint.  See, my question was ---

20   my question was actually a little

21   different than that response would

22   indicate.  My question was do you

23   have recollection of any discussions

24   with Mr. Evanko, Mr. Hikus' name

25   coming up in a context of any

78

1  discussion about the FBI probe?

2  A.        I believe that --- I can't

3  recall where during the series of

4  events that Colonel Evanko did

5  indicate that he was aware that

6  Colonel Hikus had been made aware of

7  the FBI investigation.

8  Q.        Why would he --- I'm

9  sorry.  You had information.  I

10 apologize.

11 A.        No.  To answer the

12 question I think you were going to

13 ask.  I think only in terms of

14 trying to provide me with some

15 general overview of how the

16 investigation had unfolded.

17 Q.        What was the significance

18 of saying Hikus knew and I didn't?

19 A.        You would have to ask the

20 Colonel that.  I don't know.  He

21 simply shared that with me at some

22 point.

23 Q.        Do you think he was trying

24 to indicate to you that Hikus had

25 stabbed you in the back?

79

1   A.          You would have to ask the

2   Colonel.  I don't know.

3   Q.          Well, no.  You may rest

4   assured I will ask the Colonel.  But

5   what I'm asking is your impression,

6   you know, you lived through the

7   conversations and I was not privy to

8   them.  And what I'm asking very,

9   very, simple.  And I'm trying to

10  ascertain why Mr. Evanko would

11  mention, you know, Hikus knew, I

12  didn't.  Did you attach any

13  significance to Mr. Evanko

14  indicating that?

15  A.          No, I did not.

16  Q.          Is there a political staff

17  --- political differences between

18  Mr. Hikus and Mr. Evanko?

19  A.          Not that I'm aware of.

20  Q.          Does Mr. Hikus enjoy the

21  same political supporters within the

22  administration that Mr. Evanko does

23  or did?

24  A.          As far as I'm concerned.

25  Q.          How about as far as other

80

1  folks are concerned about you,

2  Mark?  How about not you.  I

3  understand how you feel, the same

4  way towards both of them.  How about

5  other folks?  Do they enjoy support

6  from other people in different ways?

7  A.        I've never heard anyone

8  indicate that there is any lack of

9  respect or support for either one of

10 them.

11 Q.        Does Lieutenant Colonel

12 Hikus have a contact person over

13 here in the administration?

14 A.        Well, currently they would

15 deal with the Governor's deputy

16 chief of staff, who is now Lisa

17 Baker.  But at the time, I would

18 have been the primary point of

19 contact for the Commissioner and his

20 deputies.

21 Q.        Based upon your --- how

22 long have you --- what is your

23 background before you became

24 deputy?  What was your background

25 before you became deputy?

81

1  A.        I worked for Congressman

2  Tom Ridge for 12 years before that.

3  Q.        And what is your

4  educational background?

5  A.        I have a Bachelor of arts

6  from Allegheny College,

7  Pennsylvania.

8  Q.        Do you have knowledge of

9  any transgression against any law or

10 regulation that was committed by

11 Captain Ober to any of this?

12 A.        No, I do not.

13 Q.        Has anyone ever brought to

14 your attention or indicated to you

15 in any way that they believe that

16 Captain Ober broke a law, violated a

17 regulation or acted in some way that

18 was inconsistent with the letter and

19 spirit of the law or State Police

20 regulations?

21 A.        Not that I'm aware of.

22 Q.        Did Mr. Evanko ever get

23 back to you and say that he felt Mr.

24 Hikus had done something wrong?

25 A.        No, not that I can recall.

82

1  Q.          Was there anything unusual

2  about Colonel Evanko, if he raised

3  Mr. Ober's name --- we know that he

4  raised Mr. Hikus' name.  Is there

5  anything unusual about him raising

6  their names in the context of

7  checking into a probe which had

8  successfully indicated that was no

9  wrongdoing?

10 A.          Not from my perspective.

11 Q.          Did he indicate whether or

12 not there were charges against a

13 Pennsylvania State Police Officer

14 that would be brought as a result of

15 the probe, one officer, one trooper?

16 A.          I don't recall that.

17 Q.          Did you ever learn that?

18 Did that ever --- is that something

19 that came to your attention at some

20 point?

21 A.          It might have been

22 something that was brought to my

23 attention subsequently.

24 Q.          Not by your lawyers.  By

25 somebody else, anybody else?

20

U.S. DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

DARRELL G. OBER,          \*

    Plaintiff          \*    Case No.

    vs.               \*    1CV-01-0084

PAUL EVANKO,              \*

MARK CAMPBELL,            \*

THOMAS COURY,             \*

JOSEPH WESTCOTT and \*

HAWTHORNE CONLEY,         \*

    Defendants         \*

           \* \* \* \* \* \* \* \*

VIDEOTAPED DEPOSITION OF

HAWTHORNE N. CONLEY

March 12, 2002

ORIGINAL

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

2

1               V I D E O T A P E D

2               D E P O S I T I O N

3                    O F

4    HAWTHORNE N. CONLEY, taken on behalf

5    of the Plaintiff herein, pursuant to

6    the Rules of Civil Procedure, taken

7    before me, the undersigned, Vivian

8    Gratz, a Court Reporter and

9    Commissioner of Deeds in and for the

10   Commonwealth of Pennsylvania, at the

11   offices of Strategic Development

12   Technical Services Center, 2629

13   Market Place, Harrisburg,

14   Pennsylvania, on Tuesday, March 12,

15   2002, beginning at 9:57 a.m.

16

17

18

19

20

21

22

23

24

25

3

1              A P P E A R A N C E S

2

3    DON BAILEY, ESQUIRE

4    4311 North 6th Street

5    Harrisburg, PA  17110

6        COUNSEL FOR PLAINTIFF

7

8    BARBARA L. CHRISTIE, ESQUIRE

9    Chief Counsel

10    Pennsylvania State Police

11    1800 Elmerton Avenue

12    Harrisburg, PA  17110

13        COUNSEL FOR DEFENDANTS

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    I N D E X

2

3     DISCUSSION AMONG PARTIES       7 - 10

4     WITNESS:  HAWTHORNE N. CONLEY

5     EXAMINATION

6         by Attorney Bailey       11 - 127

7     DISCUSSION AMONG PARTIES     129 - 134

8     EXAMINATION CONTINUED

9         by Attorney Bailey      134 - 260

10    DISCUSSION AMONG PARTIES     264 - 273

11    CERTIFICATE                      274

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

<u>E X H I B I T   P A G E</u>

<u>P A G E</u>

<u>N U M B E R</u>     <u>D E S C R I P T I O N</u>          <u>I D E N T I F I E D</u>

One       Portion of Conley

          Interview              117

6

<u>O B J E C T I O N   P A G E</u>

1
2
3    <u>A T T O R N E Y</u>                    <u>P A G E</u>
4    Christie                  188,  264
5    Bailey                         267
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7

```
 1          P R O C E E D I N G S
 2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 3    HAWTHORNE N. CONLEY, HAVING FIRST
 4    BEEN DULY SWORN, TESTIFIED AS
 5    FOLLOWS:
 6    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 7              ATTORNEY BAILEY:
 8              Ladies and gentlemen,
 9         let everyone in the room be
10         informed, please, that there
11         is recording equipment
12         running. There are
13         microphones.  And Counsel, in
14         particular, be advised,
15         there's a microphone right
16         here between your client and
17         I.  And be mindful of that
18         fact in case you want to make
19         comments or stray comments,
20         they might get picked up.
21         Crystal, would you begin,
22         please?
23              VIDEOGRAPHER:
24              Good morning, ladies
25         and gentlemen.  Please be
```

8

advised the video and audio is
in operation.  My name is
Crystal M. Lyde, L-Y-D-E.  My
address is 4310 Hillsdale
Road, Harrisburg, Pennsylvania
17112.  I've been contracted
out by P.R. Video to be the
operator for this deposition.
The case is for the United
States District Court for the
Middle District of
Pennsylvania.  The caption is
Darrell G. Ober versus Paul
Evanko, Mark Campbell, Thomas
Coury, Joseph Westcott and
Hawthorne Conley.  The Docket
number is 1CV-01-0084.  The
date is March 12th, 2002.  The
deposition is being held at
the Pennsylvania State Tech
Center, Market Place,
Harrisburg, Pennsylvania.  The
video deposition is being
taken on behalf of the
Plaintiff, Darrell Ober.  The

9

1      witness' name is Hawthorne

2      Conley.  The time now is 9:58

3      a.m.  Could you raise your

4      right hand for me, please?

5      Please state your name for the

6      record and spell it, please

7                MR. CONLEY:

8                Hawthorne N. Conley,

9      H-A-W-T-H-O-R-N-E, last name

10     is C-O-N-L-E-Y.

11     HAWTHORNE N. CONLEY, CALLED AND SWORN

12     TO TESTIFY

13                VIDEOGRAPHER:

14                Thank you.  Mr. Bailey,

15     we'll now check around the

16     room, please.

17                ATTORNEY BAILEY:

18                Yes, ma'am.  My name is

19     Don Bailey.  I'm attorney for

20     the Plaintiff, Darrell G.

21     Ober.  If we could just have

22     Counsel identify herself for

23     the record, giving her address

24     and phone number.

25                ATTORNEY CHRISTIE:

10

1          Yes.  Barbara Christie,

2    Chief Counsel of Pennsylvania

3    State Police.  My office

4    address is 1800 Elmerton

5    Avenue, Harrisburg, PA 17110.

6    Office number 717-783-5568.

7          ATTORNEY BAILEY:

8          Thank you very much.

9    Just a few housekeeping chores

10    --- did you swear him?  Okay.

11    Just a few housekeeping chores

12    before we begin.  We'd like to

13    renew our objection to the

14    presence of Captain Brown.  He

15    is a fact witness in this

16    case.  It's been represented

17    to us that he's an

18    investigator for the attorneys

19    or something of that sort.

20    Also is with BPR.  Anyways,

21    it's noted for the record and

22    Counsel, I understand you do

23    not concur?

24          ATTORNEY CHRISTIE:

25          That is correct.  We

11

1       renew our response made

2       earlier on the record in the

3       previous deposition at which

4       Captain Brown attended.

5                ATTORNEY BAILEY:

6                Right.  And let the

7       record also show that there is

8       a young lady here who's taking

9       a stenographic record here.

10   EXAMINATION

11   BY ATTORNEY BAILEY:

12   Q.       Colonel --- can I refer to you

13   as Colonel?

14   A.       Yes, sir.

15   Q.       And from time to time ---

16   you're a Lieutenant Colonel; is that

17   correct?

18   A.       That's correct.

19   Q.       Now, from time to time,

20   forgive me if I make an error.  Most

21   of the studying I've done, your

22   Major, you know, in the time frames

23   and different things we're doing.

24   A.       Understood.

25   Q.       So I apologize if at some

12

1   point I just, you know --- it won't

2   be intentional, in other words, if I

3   refer to you by Major, but I'll teach

4   myself into the deposition to make

5   sure it's Colonel. And no disrespect

6   will be meant, I assure you of that,

7   sir. Okay. Before we begin that,

8   just a few instructions.

9   Particularly because there is a

10  stenographic record being taken, sir,

11  it's important that we allow a little

12  time to pass between question and

13  answer. I doubt very much, to the

14  extent that I do, that you would

15  violate that problem or cause a

16  problem that way, but I'm certainly

17  capable. And if I do, if I, in other

18  words, interrupt inadvertently or

19  maybe tag on a question or interrupt

20  an answer of yours with another

21  question, please make sure you

22  correct me, and stop me and that you

23  answer fully and completely the

24  question that's on the table. Okay?

25  A.      Understood.

13

1    Q.    All right, sir.  Now, from

2    time to time, because I do one thing

3    a little differently than most

4    lawyers, I invite your questioning of

5    me.  It's not that I'm encouraging

6    it, it's that I want you to feel free

7    to ask me any questions that you may

8    have about a question that I ask or

9    where I'm going with questions.  We

10   want to get a full and complete fact

11   record.  We're not interested in

12   tricking anyone or any kind of

13   misleading information.  So you make

14   sure that at any time, if you have

15   even a curiosity about where I'm

16   going with a particular line of

17   questions, that you feel free to ask

18   me.  If at any time during the course

19   of the deposition you want to change

20   an answer, you're free to do that,

21   like I remembered this or remembered

22   that, that sort of thing.  The last

23   thing would be a housekeeping chore,

24   again, with Counsel, and that is the

25   usual stipulations, I assume, are

14

1  acceptable, i.e. that objections

2  accepted to the form of a question be

3  reserved until time of trial.  Is

4  that acceptable?

5           ATTORNEY CHRISTIE:

6           That's correct, yes, so

7       it's acceptable.

8           ATTORNEY BAILEY:

9           Okay.  Thank you very

10      much.

11  BY ATTORNEY BAILEY:

12  Q.      Colonel, that being said, are

13  you ready to begin?

14  A.      Yes, sir.

15  Q.      All right.  Do you have any

16  questions at all for me before we

17  start?

18  A.      I do not.

19  Q.      Colonel, what duties, briefly

20  stated --- what duties do you perform

21  for the Pennsylvania State Police

22  today?

23  A.      I'm the Deputy Commissioner of

24  Administration.  In that position I

25  have oversight of the Bureau of Human

15

1   Resources and Management, the Bureau

2   of Training Education, the Office of

3   Discipline, the Office of Equal

4   Employment Opportunity and the Bureau

5   of Professional Responsibility.

6   Q.      Now, what position --- was

7   this a promotion, obviously, to this

8   position?  When did it occur?

9   A.      It's an appointment which

10  occurred in September 2nd the year

11  2000.

12  Q.      Now, what position did you

13  hold prior to September 2nd, 2000?

14  A.      Director of the Bureau of

15  Professional Responsibility.

16  Q.      And, very briefly, what are

17  those duties?

18  A.      That's oversight of the

19  Internal Affairs Division, as well as

20  the Systems and Process Review

21  Division.

22  Q.      So it contains IAD and

23  inspections of two divisions, two

24  basic divisions?

25  A.      That's correct.

16

1    Q.      Now, when were you appointed

2    or, I guess that's the correct word.

3    When were you promoted or ordered or

4    appointed, whatever the correct

5    terminology may be, to assume the

6    duties at BPR?

7    A.      I believe it was October 2nd,

8    1998, effective October 3rd, 1998.

9    Q.      And where were you October

10   3rd, 1998, physically?

11   A.      Pittsburgh, Pennsylvania.

12   Well, actually Monroeville,

13   Pennsylvania.

14   Q.      And prior to October 2nd,

15   1998, what position did you hold with

16   the Pennsylvania State Police?

17   A.      I was a Captain, Troop

18   Commander of Troop B, Washington, PA.

19   Q.      Troop B includes what

20   counties?

21   A.      Allegheny, Washington, parts

22   of Westmoreland, Fayette and Greene

23   County.

24   Q.      Now, how long had you been

25   Troop B Commander prior to October

17

1   2nd, 1998?

2   A.      Ten months.

3   Q.      And where had you been prior

4   to that?

5   A.      I was a Captain in Troop E,

6   Erie.

7   Q.      Troop E, that's Erie?

8   A.      Yes, sir.

9   Q.      And what did you do up there?

10  What were your duties?

11  A.      I was a commanding officer of

12  Troop E.

13  Q.      And how long had you been at

14  Troop E before you went to Troop B?

15  A.      I was in Troop E from April of

16  '96 until December of '97.

17  Q.      Okay.  So Troop E from April

18  of '96 to December of '97.  And

19  December of '97, you went to Troop B

20  for ten months?

21  A.      Let me correct that.

22  Actually, the transfer was effective

23  in January from E to B, January of

24  '98.

25  Q.      Okay.

18

1   A.      Which actually makes that

2   approximately nine months in Troop B.

3   Q.      So you went to --- January of

4   '98 you go to Troop B?

5   A.      That's correct.

6   Q.      You're Troop B for

7   approximately nine months and you're

8   then transferred or --- were you

9   promoted at that point to Major when

10  you went up to BPR?

11  A.      That's correct.

12  Q.      Now, the effective date of

13  your transfer to BPR was October 3,

14  1998.  What was the date of your

15  promotion?  When did you go from

16  being a captain to a major?

17  A.      October 3rd, 1998.

18  Q.      So, coincidental, at the same

19  time that you were promoted to major,

20  you were put in charge of BPR?

21  A.      That's correct.

22  Q.      Well, when did you physically

23  --- where's the BPR, you know ---

24  where do you the work?  I mean, where

25  do you sit down and do the work?

19

1  A.      In October of '98, it was the

2  Departmental Headquarters, located

3  1800 Elmerton Avenue, Harrisburg, PA.

4  Q.      1890 Elmerton Avenue?

5  A.      No, sir.  1800.

6  Q.      Okay.  Sorry.  1800 Elmerton

7  Avenue.  Now, when did you actually

8  go into the office?  It wasn't

9  October 3rd, was it?

10  A.      No, it was not.

11  Q.      When was it?

12  A.      October 6th.

13  Q.      And why did you delay, if

14  indeed you did, or what were the

15  reasons why you went in --- you were

16  notified --- no, strike that.

17         You had to have been notified,

18  I assume, prior to October 3, 1998

19  that you were going to be heading up

20  BPR; am I correct?

21  A.      I was notified the morning of

22  October 2nd.

23  Q.      The morning of October 2nd.

24  Now, who was running BPR at that

25  time?

20

1  A.      Captain Darrell Ober.

2  Q.      He was acting Bureau Director;

3  is that correct?

4  A.      That's correct.

5  Q.      Well, who was responsible for

6  putting him in that position?

7  A.      I would ---.

8  Q.      If you know.  You may not

9  know.

10 A.      I assume it was the

11 Commissioner.

12 Q.      I would also but again

13 --- I mean, you're not certain, but

14 that's the normal --- that would be

15 the normal assumption.  Now, who was

16 responsible for making you the

17 permanent director of BPR?

18 A.      The Commissioner.

19 Q.      That's Commissioner Evanko;

20 right?

21 A.      That's correct.

22 Q.      Now, why the time lag in there

23 until October 6th before you got down

24 to departmental headquarters?

25 A.      October 3rd was a Saturday,

21

1   that was a day off.  October 4th was

2   a Sunday, that was a day off.

3   October 5th, I attended a funeral of

4   my niece.

5   Q.     I'm sorry.

6   A.     I reported Tuesday morning.

7   Q.     And Tuesday morning would've

8   been the 6th?

9   A.     That's correct.

10  Q.     Had you served any time BPR

11  --- strike that.

12         Had you served any time in

13  either IAD or Inspections prior to

14  going down to BPR in your career?

15  A.     I did.

16  Q.     Where and in what capacity?

17  A.     From January 1986 until March

18  of '93, I served in the western

19  office of the Internal Affairs

20  division as both an investigator and

21  a section commander.

22  Q.     As both a what?

23  A.     An investigator and a section

24  commander.

25  Q.     Now, let me ask you some

22

1   questions about that, if I might.  I
2   want to ask you some questions here,
3   there's going to be a group of
4   questions that have to do with the
5   period of time 1986 to 1983.  You're
6   in charge of the western office of I
7   --- I'm sorry.
8   A.      It's '93.
9   Q.      What did I say?
10  A.      I thought you said '83.
11  Q.      I'm sorry, sir.  It would be
12  1986 to 1993?
13  A.      Yes.
14  Q.      If I made an error, thank you.
15  Thank you for correcting me.  In that
16  period of time, roughly four, three,
17  seven years or so, okay?  Now, the
18  western office IAD, you were
19  headquartered in Pittsburgh?
20  A.      Findlay Township.
21  Q.      Is that Allegheny County?
22  A.      Allegheny County.
23  Q.      Findlay Township is not in
24  Washington County?
25  A.      No, sir.

23

1   Q.      Allegheny County.  All right,

2   sir.  Now, during that period of

3   time, did you have any contact with

4   the FBI?  I would assume that you

5   did, but I don't know.  Do you have

6   any recollection of ever interacting

7   with the FBI during that period of

8   time?

9   A.      Yes.

10  Q.      And did you get to know any of

11  the people there?

12  A.      Yes.

13  Q.      Well, name some of the agents

14  that you knew in that seven year

15  period that you got to know, if you

16  remember, you know.  You may not

17  remember, I don't know.

18  A.      I don't recall.

19  Q.      Did you ever meet Mr. Kush?

20  Did you know of him?

21  A.      I know that name.  I don't

22  recall meeting him during that period

23  of time.

24  Q.      How about Mr. --- I think you

25  corrected me earlier today during the

24

```
 1   informal period when you, I and your

 2   attorney were talking --- Mascalus,

 3   Mascalley, Mascara (phonetic)?

 4   A.      Mascara.

 5   Q.      How do you spell that?

 6   A.      I'm not sure.

 7   Q.      Well, you know the Congressman

 8   out there, Frank Mascara?

 9   A.      I'm aware of him.

10   Q.      From Washington County, did he

11   spell it the same way, do you know?

12   A.      I don't believe so.

13   Q.      But you don't know how to

14   spell it.  Do you know him, Mascara,

15   the FBI agent?  Did you ever ---?

16   A.      Rick Mascara?

17   Q.      Yes.  You know Rick, don't

18   you?

19   A.      He was a SAC, a little

20   different ---.

21   Q.      He was a Special Agent in

22   Charge; right?

23   A.      That's correct.

24   Q.      Now, you know him, don't you?

25   A.      Yes.
```

25

1    Q.      I mean, you knew him?

2    A.      Yes.

3    Q.      That's no secret or anything

4    like that.  You should know him, you

5    worked with him.  How long did you

6    know Rick?

7    A.      I don't know.  I met him when

8    I was troop commander at Troop B,

9    Washington.

10   Q.      Well, that's --- now we're

11   talking January '98.  January of '98

12   you became Troop B.  You're telling

13   us you didn't meet Rick between 1986

14   and 1993?  I'm not suggesting you

15   did, by the way, but I'm asking that

16   you didn't meet him during that

17   period of time?

18   A.      I don't recall.

19   Q.      Do you know where he was

20   during that period of time?

21   A.      He was stationed in

22   Pittsburgh.

23   Q.      Rick was?

24   A.      Yes.

25   Q.      How do you know that?

26

1    A.      Because he was a SAC in
2    Pittsburgh.
3    Q.      Well, when was he the SAC in
4    Pittsburgh?
5    A.      During my ten years as troop
6    commander at Washington.
7    Q.      Was he SAC in Pittsburgh
8    during your tenure up in Troop E in
9    Erie?
10   A.      I'm not sure.
11   Q.      Okay.  Well, we know that you
12   were Troop E in Erie from roughly
13   April of '96 to December of '97; is
14   that correct?  Am I correct on that?
15   I may have written down the wrong
16   dates.
17   A.      What dates do you have again?
18   Q.      Yes, sir.  I have Troop E,
19   April '96 to December of '97 and then
20   you changed that in effect on a
21   different question, on a response to
22   a different question --- you changed
23   that to January of '98 when you
24   assumed command of Troop B.  Am I
25   correct, sir?

27

1    A.      That's correct.

2    Q.      All right.  Let's go back now.

3    You're commander of Troop E, it's

4    April 1996, where had you been before

5    that?  Had you been --- in other

6    words, what's the three years in

7    there from '93 through '96, through

8    April of '96.  From March of '93

9    through April of '96, where were you

10   then?

11   A.      I was stationed in Hershey,

12   PA.

13   Q.      And doing what in Hershey?

14   A.      I was the Emergency Operation

15   Officer for the agency.

16   Q.      All right.  Now, let's go back

17   to January of '86 to March of '93.

18   Do you have any recollection of

19   learning since that period of time

20   that Rick was Special Agent in Charge

21   during that period of time?  You

22   don't know.  You know that as of ---

23   when you assumed the commander's

24   position January in '98 of Troop B

25   that Rick was a SAC out there then,

28

1  Special Agent in Charge then?

2  A.      There were two different SACs

3  in Pittsburgh.  John O'Connor and

4  Rick Mascara, during my tenure in

5  Western Pennsylvania as troop

6  commanders in Erie and Washington.  I

7  know that he changed positions, I'm

8  not sure of the time span or the time

9  line.

10  Q.      Well, when is the earliest

11  that you became aware then of --- not

12  of Rick himself, but when is the

13  earliest that you became aware that

14  he was Special Agent in Charge of the

15  FBI in the Western District of

16  Pennsylvania or wherever they define

17  their office out that way?

18  A.      I don't know.

19  Q.      But at some point, you became

20  aware of him; right?

21  A.      That's true.

22  Q.      Now, when is the first time

23  you heard the word or the name

24  Trooper Stanton?  When did you first

25  hear that?  Now, think hard on that,

29

1   please.  I've got a series of

2   questions about that, about him and

3   try to give some real thought to

4   that, sir.

5   A.      Which Trooper Stanton are you

6   referring to?

7   Q.      The gentleman that got himself

8   in a, you know, problem, apparently,

9   over this idea of purportedly selling

10  academy appointments or whatever he

11  did.  That Trooper Stanton.  When did

12  you first hear his name?

13  A.      I'm not sure of the exact

14  date.

15  Q.      Give me a rough idea, sir,

16  please.

17  A.      The spring of 1999.

18  Q.      Now, when is the first time

19  that you heard about the possibility

20  that somebody might be selling

21  positions, their appointments or

22  whatever it would be, to the

23  Pennsylvania State Police Academy?

24  A.      That same time period, spring

25  of 1999.

30

1   Q.      Now, Colonel, prior to the

2   spring of 1999, you had never heard

3   anything, had you, about the FBI

4   receiving information, which would

5   indicate some sort of public

6   corruption, relating to purported

7   influence, improper influence,

8   designed to get somebody an

9   appointment to the State Police

10  Academy?  You never heard of anything

11  like that until the spring of 1999;

12  is that correct?

13  A.      I don't recall hearing

14  anything similar to that prior to

15  1999.

16  Q.      Colonel, you're not --- I

17  understand your answer.  I'm not

18  impugning the integrity of your

19  answer, sir, but you're telling us

20  that you don't recall, prior to the

21  spring of 1999, hearing anything

22  about an FBI interest in Pennsylvania

23  State Police activities at all?  Is

24  that fair to say?

25  A.      So let me ask you where you're

31

1  going with this question, because

2  maybe I can answer it for you?

3  Q.    Sure.  Here's what I'm trying

4  to figure out.  I'm trying to figure

5  out when you, as an individual,

6  Colonel Conley --- when you first

7  learned that the FBI had received

8  information or had a concern about

9  possible public corruption, political

10 corruption, that might involve the

11 State Police.

12         What I want to try to find out

13 is when you first learned about it.

14 I do have some information, I

15 believe, about when the FBI first

16 became aware of it and, you know, I

17 intend to explore.  And if your

18 department hasn't done so already,

19 shame on them, but I'm going to, you

20 know, explore those folks --- when

21 this communication first occurred and

22 what happened.  And your individual

23 role in this is very important.  As

24 you know, you're a Defendant here and

25 I want to try to find out if, you

32

1  know --- when you learned about this

2  for the first time.

3         Now, your testimony so far

4  indicates to me that, if I understand

5  you, that the first time you heard

6  about this at all, anything about it

7  --- now, not just Trooper Stanton,

8  but this idea that there might be

9  some elicit activity going on

10  connected with the Academy and

11  appointments to the Academy, was the

12  spring of 1999.  That's where I'm

13  going.  I'm trying to learn what

14  Captain Major Colonel Conley knew

15  through this time line.  That's where

16  I'm going.  Does that help?

17  A.      That helps.

18  Q.      Can you respond, please, sir?

19  A.      I had no knowledge prior to

20  the spring of 1999.

21  Q.      Yes, sir.  Prior to the spring

22  of 1999, you had never received any

23  information, which indicated or would

24  have indicated that our brethren over

25  there in the Federal Bureau of

33

1    Investigation had any information

2    about potentially improper activities

3    in the Pennsylvania State Police,

4    relating to the Academy at least; is

5    that correct?

6    A.      That's correct.

7    Q.      And isn't it also fair to say,

8    Major, that prior to the spring of

9    1999 and going all the way back to

10   January of 1986, you have no

11   recollection of the FBI indicating a

12   concern about political corruption

13   within the Pennsylvania State Police

14   itself?  Isn't that fair to say?

15   A.      I'm unaware of the FBI looking

16   at the State Police, relating to

17   corruption in appointments of cadets

18   between 1986 and 1999.

19   Q.      Anything else that the FBI

20   ever indicated that they were

21   concerned about some kind of improper

22   political corruption problem that

23   might involve the Pennsylvania State

24   Police or its leadership, that you

25   can remember?

34

1   A.      I don't recall any.

2   Q.      Now, during the period of

3   time, 1986 --- January of 1986 to

4   March of 1993, do you expect you

5   would've heard something if they had

6   such an interest?

7   A.      I don't know.

8   Q.      Well, certainly you wouldn't

9   have heard anything about it if they

10  suspected you, would you?

11  A.      I don't suspect.

12  Q.      Because as a good investigator

13  and as a qualified law enforcement

14  officer, you wouldn't share with a

15  suspected target or target of an

16  investigation what you were doing,

17  would you?  You wouldn't do that,

18  would you?  I mean, that's rather

19  kindergartenish, I realize.  I'm not

20  trying to talk down to you in that

21  question, but isn't that rather

22  basic?

23  A.      Would I share my information

24  with the target of my investigation?

25  Q.      Sure.

35

```
 1   A.      I wouldn't.
 2   Q.      Okay.  And I'm not trying to
 3   be a wise guy with that question.  I
 4   mean, it's just a basic question I
 5   have to ask, but I think it needs to
 6   be asked.  Now, and by the way, I
 7   want to make it very clear for this
 8   record, there is absolutely --- I
 9   have no, you know --- I'm not
10   implying that there was some
11   suspicion of you, okay?  I want to
12   make that clear.  Now, if, from the
13   period of 1986 to March of 1993 ---
14   if your recollection is correct, and
15   I realize that's looking back a few
16   years, and you were not notified of
17   anything or became aware of anything.
18   Between 1986 and the spring of 1999,
19   do you ever remember hearing any
20   rumors that there was some kind of
21   problem with handing out appointments
22   at the Academy or corruption or
23   public officials involved with that
24   kind of problem?  And even a rumor,
25   do you remember hearing even a hint
```

36

1   of a rumor about it?

2   A.      I don't recall.

3   Q.      So, no rumors, no

4   notifications, no informal phone

5   calls, no written materials, until

6   the spring of 1999 you had no

7   knowledge of any FBI interest in

8   corruption that might involve high

9   ranking officials in the Pennsylvania

10  State Police; is that fair to say?

11  A.      That's fair.

12  Q.      All right, sir.  Colonel, did

13  you review the Williams'

14  investigation?

15  A.      What Williams' investigation?

16  Q.      Well, we've been able to

17  establish that Colonel Evanko --- let

18  me describe it for you so it's clear

19  to you.  I'm talking really about the

20  investigation into Captain Ober,

21  performs a major material fact issue

22  in this complaint here.  And what I

23  want to do now --- just let me give

24  you a little description of where I'm

25  going so you know where I'm going.  I

37

1   want to ask you questions about that

2   investigation into Captain Ober, you

3   know.

4          I want to ask you --- I'm

5   going to be asking you questions

6   about discussions that you may have

7   had with investigators, discussions

8   that you may have had with superior

9   officers, discussions that you may

10  have had with colleagues and that

11  sort of thing. Now, there's been

12  quite a body of information developed

13  in this lawsuit already about that

14  investigation. So if you can just

15  take a second here and sort of switch

16  gears, I'm going to ask you a bunch

17  of questions about that area. Okay?

18  A.      Okay.

19  Q.      Yes, sir. Thank you. Now,

20  have you reviewed, and if you have

21  tell me what parts of it you've

22  reviewed, if you've looked at it or

23  reviewed it --- the investigation

24  that --- we already know that it was

25  at Colonel Evanko's direction, but

38

1   what --- did you ever look at the

2   investigation or the work product or

3   anything like that that Major Werts

4   and Major Williams did into Captain

5   Ober in this matter about the FBI

6   interest in the Academy?  Did you

7   ever look at that?

8   A.      Yes.

9   Q.      Now, did you read the

10  interviews that Major Williams did?

11  A.      Yes.

12  Q.      Did you read the interview

13  that he did with Colonel Evanko?

14  A.      Yes.

15  Q.      Now, did you read the

16  statement that you gave to Mr.

17  Williams?

18  A.      Yes.

19  Q.      Now, it's my understanding

20  that, at the time that that

21  investigation was done, you weren't

22  Department Disciplinary Officer or

23  anything, were you?

24  A.      No.

25  Q.      Okay.  And is it fair to say

39

1  that during the time that that

2  investigation was done --- strike

3  that.

4        How much time had Captain Ober

5  spent in your command at the time

6  that that investigation was done?

7  When had you commanded him and where?

8  A.     From October 1998 until April

9  of 1999.

10  Q.     From October of 1999 to April

11  of 1999?

12  A.     Let me change that.

13  Q.     Yes, okay.

14  A.     From October of 1998 until

15  sometime in early 1999.  I'm not sure

16  the date when he left.

17  Q.     That would've been when he

18  left to go to --- is it IIMS?

19  A.     I believe that's correct.

20  Q.     And that's the high technology

21  project that Colonel Evanko had

22  appointed him to; am I correct?

23  A.     That's correct.

24  Q.     So he was detached at that

25  point, in other words, he was

40

1   technically in your command
2   administratively, but he was
3   somewhere else doing other work?
4   A.     That's correct.
5   Q.     All right, sir.  Now, let's go
6   back before October of '98.  How much
7   time had you spent commanding Captain
8   Ober before that?
9   A.     I had never been his commander
10  prior to that.
11  Q.     Well, when did you first meet
12  him?
13  A.     Early 1900s, 1990s.  We worked
14  on detail together in Reading.
15  Q.     In Reading, Pennsylvania doing
16  what?
17  A.     Promotional examinations,
18  assessments.
19  Q.     Describe for us the
20  interactions you may have had with
21  Captain Ober at that time.
22  A.     Conversations.
23  Q.     Now, you reported into BPR ---
24  where's Harmarville, Pennsylvania?
25  Is that in mother (sic) Westmoreland

41

1    or is that across the river in

2    Allegheny County?

3    A.      That's Allegheny County,

4    across the river from Oakmont.

5    Q.      Allegheny River.  Good fishing

6    river, I'll tell you that.  As a kid

7    growing up, I did a lot of fishing at

8    that river.  Do you own any property

9    in Harmarville?

10   A.      Personally?

11   Q.      Yes.

12   A.      No.

13   Q.      Did you ever live there?

14   A.      No.

15   Q.      Have you ever worked out of

16   there, have an office there?

17   A.      No.

18   Q.      Now, you actually reported

19   into BPR in on or about October 6,

20   1998; correct?

21   A.      That's correct.

22   Q.      When did you first see Captain

23   Ober, if you remember?  I realize,

24   you know, we're talking days here and

25   these may not be momentous events.

42

1   So, you know, to be fair to you, just

2   give me the best that you can do.

3   A.      I believe it was October 6th,

4   1998.

5   Q.      And can you describe the

6   circumstances for me?

7   A.      I don't recall specifically.

8   I can tell you what I normally do

9   when I go to a new location.

10  Q.      Yes, sir.

11  A.      I talk to my commanders.  In

12  this case, it would've been Captain

13  Ober and Captain Skurkis.

14  Q.      Now, was he IAD or was he

15  inspections?

16  A.      He being?

17  Q.      Make it the easy way ---

18  Captain Ober at that time was head of

19  IAD and Mr. Skurkis was head of

20  inspections?

21  A.      That's correct.

22  Q.      Okay.  Go ahead.  Tell me what

23  you usually do.

24  Q.      Well, I would come in and I

25  don't change things normally and I

43

1   usually let them know that.  I

2   usually lay out my expectations of

3   them and request what expectations

4   they may have of me.  And I go from

5   there.

6   Q.    Who was there when you met, if

7   indeed anyone else was, when you met

8   with Captain Ober?

9   A.    I usually meet with them

10  separately or alone.

11  Q.    But you do remember that?

12  A.    Yes.

13  Q.    If I indicated to you that I

14  have information, which leads me to

15  believe that you didn't see Captain

16  Ober until almost a week later, would

17  you disagree strongly with that if

18  you revisited your recollection or

19  would you say to me, I'm sure you're

20  wrong or I'm not certain, but, you

21  know --- if I indicated to you that I

22  thought you didn't see Captain Ober

23  until maybe the 10th, 11th, 12th,

24  13th, something like that, what would

25  your reaction to that be?  Am I

44

1    pretty much in error, do you think?

2    A.      I'd be surprised if that was

3    correct.

4    Q.      So you're not absolutely

5    certain, but your best recollection

6    is, based upon your methodology and

7    based upon your independent

8    recollection, you believe it was on

9    or about the 6th when you first came

10   in; is that fair to say?

11   A.      That's correct.

12   Q.      Now, did you do any evaluation

13   reports on Captain Ober?

14   A.      I did not.

15   Q.      Let me take you back to your

16   statement --- well, how many times

17   did you meet with Captain Ober?  I

18   mean, physically meet with him

19   between October of '98 and when you

20   took over in January of '99 when he

21   went out to --- well, up here, I

22   guess, IIMS, this beautiful facility

23   here?

24   A.      I don't know.

25   Q.      Well, do you keep notes?  You

45

1  know, I put a document request out to

2  your folks here at Pennsylvania State

3  Police.  I don't know if I have much

4  about anything from you on your

5  meeting with Captain Ober at all.  Do

6  you have any notes or memos or

7  anything of meeting with Captain

8  Ober?

9  A.     No.

10 Q.     He wasn't insubordinate or

11 disrespectful to you, was he?

12 A.     In my opinion, Captain Ober

13 never come totally on board with me

14 on my command.

15 Q.     Never totally what, sir?

16 A.     Came on board.

17 Q.     He never totally came on board

18 with you?

19 A.     Yes.

20 Q.     Why do you feel that way ---

21 strike that.

22        When you came up here to BPR,

23 how many years had you been with the

24 Pennsylvania State Police?

25 A.     Well, I joined the State

46

1  Police in May of 1969.

2  Q.      Okay.  And you were --- a lot

3  of that time you were pushing troops.

4  In other words, you were a troop

5  commander.  You dealt not just

6  administrative positions, I mean that

7  in a very complementary way.  By the

8  way, I have a, you know, old Army

9  background, which I absolutely love

10  and one of the best experiences I

11  ever had in my life.  So I respect

12  the idea of leading troops, of

13  leading --- you were a Troop B

14  Commander, a Troop E Commander, et

15  cetera; right?

16  A.      That's correct.

17  Q.      And you were out there dealing

18  with troops and everyday problems

19  where the rubber meets the road, so

20  to speak; right?

21  A.      Pretty much.

22  Q.      Okay.  Now, you come up to

23  BPR.  You've had a brief experience

24  back in the --- I think you said

25  early '90s, if I remember correctly,

47

1    with Captain Ober down in Reading,

2    Berks County; right?

3    A.      That's correct.

4    Q.      So, now we're up to October

5    '98, second week --- into the first

6    or second week of October, 1998,

7    you've got Thanksgiving, Christmas,

8    New Year's, Captain Ober's going to

9    IIMS in January of '99, so you and he

10   worked together, essentially, if I'm

11   correct, three-fourths of October,

12   November, December and a couple or

13   part maybe of January.  I don't know

14   when in January.  During that period

15   of time, tell me about the meetings,

16   discussions, experiences with Captain

17   Ober.  Now, you're sitting here and

18   you must have a little bit of a

19   negative recollection.  Now, here's

20   your opportunity to tell us why.

21   Tell us why.  Why do you feel that

22   way?  What did he do, what didn't he

23   do?  But be specific, if you can,

24   give me some facts, if you can.

25   Okay?

48

1    A.        Captain Ober and I, in my

2    opinion, did not communicate well.  I

3    believe Captain Ober wanted to do

4    things his way and not necessarily

5    the way I thought they needed to be

6    done.  I felt that Captain Ober had

7    his own particular rules that he

8    worked by.  One of my expectations of

9    a captain working in headquarters is

10   that he'd be available for the field

11   during normal working hours.  Captain

12   Ober wanted to work 7:00 to 3:00 or

13   some time prior to 8:00.  I would

14   like my captains to be available when

15   the field asks for them, which is

16   only between 8:00 a.m. and 5:00 p.m.

17            Captain Ober had a tendency to

18   leave the office or the building

19   without telling me and we had

20   discussions about that.  And

21   apparently this was going on for a

22   period of time.  I only found out

23   when I was looking for him one day

24   and I was advised by one of the staff

25   members that he had left.  And when I

49

1   had questioned him on it, he

2   indicated he had put a leave slip in

3   my in-basket. That's not good enough

4   for me. I expect my commanders to

5   talk to me directly. A leave slip is

6   appropriate, but unless you come and

7   tell me that you're leaving early, I

8   assume you're in the building.

9   Q.      Did you tell him about that,

10  that that's the way you did things?

11  A.      I did.

12  Q.      All right. What did he do

13  after that? I mean, if he didn't

14  follow your orders after that, I

15  would certainly, you know --- I'd

16  consider that insubordination.

17  A.      Well, you have to understand,

18  Captain Ober had been commanding or

19  acting director of the Bureau for

20  several months before I arrived. I

21  assumed he would get the position.

22  He didn't get the position. I

23  assumed there was some resentment

24  towards me and/or the administration

25  for that.

50

1    Q.      Did you counsel him on that?

2    A.      Well, we talked about it.    If

3    you want to call it counseling, yes,

4    but we talked about it.

5    Q.      And what did he say?

6    A.      Well, actually, the

7    conversation we had actually occurred

8    prior to my arrival to the BPR.    And

9    it was within hours of being notified

10   on October the 2nd that I had been

11   given this position.    I called him on

12   the telephone and we discussed my new

13   position and new appointment, my

14   expectations.    And he was

15   disappointed, but he said that he was

16   willing to work with me.

17   Q.      Okay.

18   A.      And during that period of

19   time, I told him that I wouldn't be

20   in the office until Tuesday, and is

21   there anything that I should be aware

22   of and he says, no.    And ---.

23   Q.      Hold for just one second,

24   please.    Okay, you were at a point

25   where you said, is there anything I

51

1  should be aware of.  You ask him if

2  there's anything ---.

3  A.    I asked if there was anything

4  significant that I should be aware of

5  at that time and he didn't indicate

6  that there was anything that I should

7  be aware of.  And I told him okay, I

8  was looking forward to coming into

9  the Bureau.  I was looking forward to

10 working with him and I was expecting

11 his support.  And I don't know how

12 long the conversation lasts, but it

13 was a telephone conversation.  And I

14 recall it vividly, actually, because

15 I thought it was important that I

16 talk to him because it was new to me,

17 it was a new appointment to me.  And

18 I thought that he was expecting the

19 appointment himself.

20 Q.    Okay.  Well, apparently you

21 came up and aside from the issue ---

22 understand this leave thing, you had

23 told him, I guess at some point, you

24 told him what you wanted from him.

25 Did he follow your orders after that

52

1   or did he disregard them?

2   A.      You know, I think he --- I

3   can't recall specifically.  Sometimes

4   he told me, sometimes he did not.

5   When he did not, I would speak to him

6   about that.  For some investigations

7   that occurred, they were ongoing and

8   we discussed --- I gave him my input

9   on how I thought they should go or

10  get on with the investigations.  And

11  he gave me his input and then we were

12  quite often on a different spectrum

13  --- different positions of the

14  spectrum, but as a Captain, I tried

15  to give him his heads.  I thought

16  that was important.  I thought it was

17  important at that point, at least

18  early on, that I let him do what he

19  thought was necessary as long as it

20  didn't hurt the agency or was too far

21  astray.  I did have some concerns

22  with the directions of some of the

23  investigations though.

24  Q.      Well, what do you mean as long

25  as it didn't hurt the agency?  I

53

1   mean, that's not the IAD's job, is

2   it?  Isn't the job to adhere to the

3   law and Codes of Ethics?  I mean,

4   let's say, sir, let's say it hurts

5   the agency.  Let's say it hurts the

6   agency terribly.  What's your duty,

7   IAD?

8   A.     IAD has the responsibility to

9   investigate complaints of misconduct

10  or inappropriate behavior by a

11  personnel and we have an obligation

12  to conduct fair and thorough

13  investigations in a timely fashion

14  without personal input.  IA is not

15  like the criminal investigation where

16  we conduct investigations and put our

17  own opinions in there.  In IA, the

18  purpose is to conduct your

19  investigations and let the

20  information speak for itself.  Let

21  some impartial or some individual sit

22  down and look at it, and we refer to

23  them as adjudicators, look at that

24  and let the investigation speak for

25  itself.  Let them make a decision,

54

1   not based on what I think, but upon

2   what the evidence lays out for them.

3   Q.      But isn't that what you were

4   doing with Captain Ober?  Disagreeing

5   with --- I mean, he needs to be

6   highly independent to do his job

7   properly; is that correct?

8   A.      No.

9   Q.      No?

10  A.      No.

11  Q.      Well, what comes first, the

12  interest of the Pennsylvania State

13  Police or the law?

14  A.      IA deals more with

15  administrative matters versus the

16  law.

17  Q.      Versus the law?

18  A.      Yes.

19  Q.      What does that mean?  I don't

20  understand what that means.

21  A.      That means we deal with

22  violations of rules and regulations

23  primarily.  We don't deal with the

24  law itself, although on occasion we

25  do.

55

1  Q.      I understand.

2  A.      That's not our --- our

3  primarily responsibility is not to go

4  out and enforce the law.  Quite

5  often, we have the criminal

6  investigators do that or some other

7  agency, if they're looking at us.

8  Q.      In other words, in fairness to

9  you, then, if I understand you ---

10  you're not, you know --- it's not

11  some grand jury agency and it's not a

12  criminal investigative agency.  It's

13  issues that have to do with the

14  Pennsylvania State Police?

15  A.      That's correct.

16  Q.      Now, if in the process of

17  doing your IAD job you bump into

18  criminal activity, I'm sure that

19  happens not infrequently, what do you

20  do about that?

21  A.      Well, we take a look at it and

22  make a determination whether we

23  should retain ownership, that's the

24  IAD itself.  Or refer it to the troop

25  level or some agency who may have

56

1   jurisdiction.

2   Q.      Okay.  Well, you made

3   reference in one of my earlier

4   questions about discussions that you

5   had with Captain Ober that you didn't

6   like some of the direction that those

7   investigations were taking.  And I'd

8   like you to explain that for me,

9   please.  What did you mean by that?

10  A.      The investigation that comes

11  immediately to mind is the

12  investigation involving one of our

13  lieutenants.  It involved an

14  allegation of cheating.

15  Q.      Can you hold one second, sir,

16  just one second?  Let me approach you

17  for just a moment.  I'm getting a

18  sound wave interruption from this

19  thing right here.  That will make all

20  the difference in the world, I assure

21  you, on that mic.  The sound's

22  bouncing over top of that thing

23  there.  I just noticed it.  Okay, go

24  ahead, sir.

25  A.      There was an investigation

57

1    involving one of our lieutenants,

2    where there was an allegation that

3    they may have cheated on a

4    promotional examination.  And it had

5    been an ongoing investigation.  And I

6    took a look at it to see where it was

7    going and in my opinion, looking at

8    it, it probably should've been

9    closed.

10   Q.      Why?  Well, I mean, if ---

11   let's look at that.  Okay.  And

12   Captain Ober kept it open or he was

13   keeping it open or who was?  Who was

14   keeping it open?

15   A.      At the direction of the

16   Captain.

17   Q.      Do you remember why you wanted

18   it closed or --- that's unfair.

19   Let's rephrase that.  Do you remember

20   what facts caused you to think it

21   should be closed?

22   A.      After reviewing the

23   investigation or talking to the

24   Captain Ober and the investigators of

25   that particular case, it wasn't going

58

1    anywhere.  It came to a standstill.

2    Q.      Okay.  And you had a

3    discussion with Captain Ober?

4    A.      We discussed it.

5    Q.      And what happened, as a

6    result?  Did he end it or did he

7    continue it or ---?

8    A.      No, he left it open.  He felt

9    there was something there and it was

10   a need.  And again, I let him keep

11   his head and that is to command the

12   unit and give further directions and

13   pursue the case further.

14   Q.      Okay.  Any other situations

15   you can think of?

16   A.      Off the top of my head, I

17   can't think of anything.  But there

18   were other cases where we disagreed.

19   Q.      Did he ever disagree with you

20   in a disrespectful fashion?

21   A.      Not face to face.  He left my

22   office on occasions and returned to

23   his office and left the building,

24   slamming doors.

25   Q.      When did he do that?

59

1   A.      It occurred --- specifically
2   the case I'm thinking about, it
3   occurred at the Allentown Boulevard
4   office, where they're currently
5   located.
6   Q.      Okay.  So he left and --- he
7   left and he slammed the door?
8   A.      No.  He didn't slam my office
9   door.  He ---.
10  Q.      Oh, no.  I wouldn't think he
11  slammed your office door, I mean the
12  building or whatever.
13  A.      Yes, the building door.
14  Q.      Now, I wouldn't think he'd
15  slam your office door.  That would be
16  pretty bad.  But it's bad enough
17  slamming the building door.
18  A.      It was bad enough.
19  Q.      Okay.  And how long after he
20  left your office did he go out the
21  building door and slam the door?
22  A.      Moments.
23  Q.      Moments?  Did you talk with
24  him about that?
25  A.      No.

60

1    Q.      Why not?

2    A.      Because I was pissed.

3    Q.      I would imagine.  That's why

4    I'm asking if you talked to him about

5    it.

6    A.      No.  I started after him, then

7    I stopped.  It wouldn't have been

8    good.

9    Q.      Now, what --- I assume it's

10   totally unjustified.  What caused

11   that anger, do you know?

12   A.      I don't recall the incident

13   that led up to that.  I know it

14   didn't go his way and he left the

15   office and he was upset.

16   Q.      Did you go after him?

17   A.      Nope.

18   Q.      How do you know it was he that

19   slammed the door?

20   A.      Because I started up ---.

21   Q.      Your office is on the second

22   floor, isn't it?

23   A.      Uh-huh (yes).

24   Q.      And the door you're talking

25   about, I assume, is on the first

61

1   floor?

2   A.     No, sir.

3   Q.     It's on the second floor?

4   A.     Yes, sir.

5   Q.     Well, how do you know it was

6   him?

7   A.     Because he's the only one who

8   went out that door.

9   Q.     Well, how do you know that?

10   A.     I asked my staff member.

11   Q.     Who was?

12   A.     Mrs. Blouch.

13   Q.     Mrs. Blouch?

14   A.     B-L-O-U.  B-L-O-U-C-H.

15   Q.     Okay.  Now, what was this

16   about?  What was this incident about?

17   A.     I don't recall.

18   Q.     You don't recall what he was

19   --- you don't know what he was angry

20   about?  And I'm not saying he was

21   justifiably angry, but what was he

22   angry about?

23   A.     I don't recall.  I know we'd

24   had a conversation, he left my

25   office, went to his office and he

62

1   left the facilities.

2   Q.    Was that after you told him

3   about putting in a leave slip before

4   he left?

5   A.    I don't recall.

6   Q.    So you're telling us that

7   Captain Ober openly defied you?

8   A.    What I'm telling you is

9   Captain Ober didn't like the result

10  of our conversation and he left the

11  facilities.

12  Q.    How many other people have you

13  talked to in your organization that

14  Captain Ober has treated in that

15  fashion?

16  A.    I don't know of any.  I can't

17  think of any.

18  Q.    All right.  Do you recollect

19  whether or not this had anything to

20  do over this discussion with the

21  investigation into this cheating or

22  purported cheating by this lieutenant

23  you were talking about?

24  A.    I don't recall what

25  precipitated that.

63

1    Q.      Yes, I just --- yes, you did

2    say that, but I just thought maybe

3    thinking back.  Aside from the

4    lieutenant, can you remember any

5    other disagreements or major

6    disagreements?

7    A.      We had several disagreements

8    and that's okay.

9    Q.      I would assume that ---.

10            ATTORNEY CHRISTIE:

11            Excuse me.  May I just

12        ask if Colonel Conley had

13        finished his answer?  I don't

14        know, we left off with that's

15        okay before we continue the

16        questioning.  Maybe you were

17        finished with that answer.

18   A.      Actually, I was not.  I mean,

19   that's okay.  There's a process at

20   this level anyway of give and take,

21   and adjusting information and

22   evaluating it before you make a

23   decision.  And just because you get

24   to be in charge doesn't mean you get

25   to make decisions in vacuums.  So I

64

1    like to discuss the information with

2    my commanders, whether it be captains

3    or lieutenants or --- before I make a

4    decision.  So, first to disagree, is

5    not a reason to get upset and it

6    certainly is not a reason for me to

7    get upset with anyone.

8    BY ATTORNEY BAILEY:

9    Q.      Right.  Sir, have you ever

10   directed an IAD director to

11   discontinue or close an

12   investigation?

13   A.      No, I don't recall.

14   Q.      Do you have any recollection

15   of Colonel Coury and/or Colonel

16   Evanko ever directing an IAD director

17   to close or to open an investigation?

18   A.      I'm sure they've required

19   investigations be conducted.  Is that

20   your question?

21   Q.      No, sir, it's not.  My

22   question --- I'll repeat it.  Do you

23   have a recollection of Colonel Coury

24   and/or Colonel Evanko ever directing

25   an IAD director to either close,

65

1   discontinue or open an investigation?

2   A.      I can't think of any.

3   Q.      And if I remember correctly,

4   you have never --- you can't think of

5   any circumstance where you have

6   directed; is that right?

7   A.      No, that's correct.

8   Q.      What caused you to go to

9   Captain Ober --- I don't know the

10  circumstances under which this thing

11  over the lieutenant, this cheating

12  thing, arose.  You may have indicted

13  it was just a review you were doing.

14  Can you tell me the circumstances

15  that caused you to get into a

16  discussion with Captain Ober about

17  that particular investigation?

18  A.      Periodically, I review cases,

19  ongoing cases, cases that have been

20  going on for a lengthy period of

21  time.  I don't recall specifically

22  what got me into that investigation.

23  I know it was an investigation that

24  probably should've been closed early

25  on, but sometimes we get these

66

1    positions where --- we come to a

2    position where we think, I can solve

3    this case, I can bring it to a head

4    and so I continue to work on it and

5    work on it and work on it and it

6    never goes anywhere.

7    Q.        There's always a little smoke,

8    but you never can quite find that

9    flame.  Is it proper for a superior

10   officer, whether it's a BPR director

11   or whether it's someone in the front

12   office, to have a director of IAD

13   start, stop or alter an

14   investigation?  Is that permissible

15   in the Pennsylvania State Police?

16   A.        As a director of BPR, I can

17   order them to conduct an

18   investigation or stop an

19   investigation.  As Commissioner of

20   the Pennsylvania State Police or

21   Deputy Commissioner of

22   Administration, I can make that

23   order.  Do I do that, no.  When I

24   tell them to bring it to a halt, it's

25   because I'm taking a look at it if

67

1  it's not going anywhere.  Have I told

2  anyone to do that, I have not.  I

3  have not been instructed to bring an

4  investigation to a halt.

5  Q.     Okay.  Are you finished with

6  that?

7  A.     I was trying to think.  We let

8  the investigations and information

9  speak for themselves.  When they no

10  longer speak, then it's time to bring

11  it to a halt.

12  Q.     Is the idea to give the

13  investigator as much freedom as

14  possible so that they can do an

15  obstructed free and independent job;

16  is that the idea?

17  A.     Within reason.

18  Q.     Well, what do you mean within

19  reason?  For example, if --- I'm

20  going to create an absurd,

21  hypothetical here, but let's say

22  somebody comes to you and says I want

23  the BPR to investigate so-and-so

24  because he's messing around with my

25  wife.  That's not a proper purpose

68

1    under most circumstances, I would

2    think, for IAD to get involved; is

3    that fair to say?

4    A.      That's correct.

5    Q.      Because it doesn't have

6    anything to do with Pennsylvania

7    State Police business, I would

8    assume?

9    A.      That's correct.

10   Q.      All right.  Well, are there

11   procedures and regulations that

12   govern Pennsylvania State Police

13   investigations, internal

14   investigations?  I'm sorry.

15   A.      Yes, sir.

16   Q.      Off the top of your head, if

17   you know, what are they?

18   A.      There's the FR manual.

19   Q.      Is that 425 or something like

20   that, I think is the first one that

21   comes to my mind, if that's correct?

22   A.      425 is an administrative

23   regulation.

24   Q.      Okay.

25   A.      And it is what's created and

69

1   guides a lot of things that occur

2   within in the Internal Affairs

3   Division.

4   Q.    Okay.  Did you have to have a

5   reason to do an investigation?

6   A.    We usually respond to

7   complaints.

8   Q.    Strike that --- let me go back

9   a different way.  Let me tell you

10  where --- I'm going to get at

11  something, just to give you an idea

12  of where I'm going.  It's akin to

13  exploring reasons, you know, like

14  probable cause, justification for

15  doing things.  That's where I'm

16  going.  I think you correctly

17  ascertained that, with answering that

18  way, but anyway, that's where I'm

19  going.  Okay?

20  A.    Okay.  Before I answer that

21  question, may I take a break?

22  Q.    Yes, sir.  Just a second.  She

23  has to shut it down.

24            VIDEOGRAPHER:

25            11:01 a.m., we'll take

70

1        a short break.

2   OFF VIDEOTAPE

3   BRIEF RECESS TAKEN

4   ON VIDEOTAPE

5            VIDEOGRAPHER:

6            It's now 11:21 a.m.

7        We're back from the break and

8        back on the record and video.

9   BY ATTORNEY BAILEY:

10  Q.      Okay.  11:21 a.m.  Okay.

11  Let's see if I can shorten this up a

12  little bit for you, Colonel.  Now, my

13  understanding is your home is in

14  Allegheny County; is that correct,

15  your permanent residence?

16  A.      That's correct.

17  Q.      I'm going to be asking you

18  some questions about a couple of

19  allegations and a complaint that have

20  to do with decisions you made to deny

21  certain reimbursements and what not

22  to Captain Ober.  Okay?

23  A.      Yes, sir.

24  Q.      That's where I want to be

25  going.  It is my understanding that

71

1   the Pennsylvania State Police are

2   issued, are allowed, are provided

3   free transportation --- free use of

4   the Pennsylvania Turnpike system in

5   doing official duties; is that

6   correct?

7   A.      That's correct.

8   Q.      Do you use that privilege, if

9   I can call it that, when you travel

10  between your home and office?

11  A.      I do.

12  Q.      And so if you're traveling

13  from your home to work on the

14  Pennsylvania Turnpike, you use that

15  privilege?

16  A.      That's correct.

17  Q.      And you don't pay for that or

18  reimburse that; right?

19  A.      I do not.

20  Q.      Why did you deny Captain Ober

21  the opportunity to use that privilege

22  when he was transferred to Washington

23  by the Colonel, by the Commissioner,

24  on or about January of what, 2000, I

25  guess it was, whenever it was then,

72

1   that so called transfer out to

2   Washington.  Why was he denied that

3   privilege?  Or is your testimony you

4   didn't deny him that privilege?

5   A.      I don't know that I did deny

6   him that privilege.

7   Q.      Okay.  So if he testified or

8   documents indicated that you did,

9   they might be in error because you

10  don't remember?

11          ATTORNEY CHRISTIE:

12          Please, just Counsel,

13      which he are you referring to?

14      He testified, meaning who,

15      Captain Ober testified that

16      you did?

17          ATTORNEY BAILEY:

18          Yeah, if Captain Ober

19      testified.  I don't know if

20      you'd get too other many folks

21      around here to testify for

22      him, so I'm going to assume

23      that it's Captain Ober.

24  BY ATTORNEY BAILEY:

25  Q.      But if Captain Ober would've

73

1    testified that he was denied

2    privileges to use the turnpike when

3    he was transferred for that very

4    brief period of time until

5    Commonwealth Court stepped in or the

6    Department agreed, I'm sorry.  One of

7    your attorneys says that it's because

8    the Department agreed.  I don't want

9    to mischaracterize it.  On the

10   transfer issue though, you don't

11   recollect that you denied him the use

12   of turnpike privileges?

13   A.      I did not deny Captain Ober

14   turnpike privileges.

15   Q.      Okay.  And you have never

16   denied a trooper, including yourself,

17   turnpike privileges for traveling

18   between their residence and let's say

19   the start up at the beginning of the

20   week of work; right?

21   A.      I need you to explain that to

22   me, sir.

23   Q.      Sure.  Has the issue ever

24   arisen for you as to whether or not a

25   member of the Pennsylvania State

74

1    Police should be denied Pennsylvania

2    Turnpike privileges in traveling

3    between either duty stations or from

4    home to a duty station, or from a

5    duty station to home?

6    A.      I still heard that and I'm

7    still not sure, so let me give it

8    back to you.

9    Q.      Okay.

10   A.      Well, let me just say this.

11   If an officer is going from home to

12   work in a company car, I wouldn't

13   deny him any use of the turnpike.  Or

14   if he was working going from station

15   to station, I wouldn't deny him

16   access to the turnpike.  Actually, I

17   cannot deny him use of the turnpike.

18   That's open to the public.

19   Q.      Oh, no.  I don't think there's

20   any question you wouldn't deny him

21   use of the turnpike.  That would be a

22   little silly and frivolous.  I agree

23   with you.  We're talking about either

24   reimbursement or the opportunity not

25   to pay out of his pocket for travel

75

1    on the turnpike or to have to seek

2    reimbursement for it as opposed to

3    use a credit card.

4    A.      We issue, we being the

5    Pennsylvania State Police, issue

6    turnpike credit cards to our people

7    for use during official business.

8    And that can be construed going to

9    and from work.  I can tell you that

10   when you go from one duty assignment

11   to the next duty assignment, you'll

12   not necessarily have that privilege.

13   Q.      So you have denied people ---

14   if they requested that privilege,

15   you've denied them on the basis that

16   they're not necessarily entitled to

17   it?

18   A.      I've never denied that

19   privilege.

20   Q.      Has the issue ever come up

21   with you?

22   A.      I don't recall, sir.

23   Q.      Okay.  Telephone.  I believe

24   there was an issue mentioned even in

25   the amended complaint about an issue

76

1   of a telephone.  Can you tell me what

2   that's about?

3   A.      No, sir.  You have to tell me

4   what you're looking for.

5   Q.      I'm looking for taking away a

6   telephone from Captain Ober while he

7   was detached to IIMS.

8   A.      Okay.

9   Q.      Now, tell me what you remember

10  about that.

11  A.      I think I know what you're

12  talking about now.

13  Q.      Okay.

14  A.      And you tell me if I'm

15  correct.  Are you talking about the

16  equipment that we issue our people in

17  their course of the duty, maybe

18  turnpike credit cards, perhaps

19  cellular telephones, gas credit

20  cards, that type of equipment are you

21  referring to and the use of that

22  equipment?

23  Q.      If the telephone falls within

24  that category, yes, sir.  I'm talking

25  about a, you know --- I have never

77

1    walked in your shoes, I've never

2    worked within the Pennsylvania State

3    Police.  I am talking about cellular

4    telephones that are used.  Thank God,

5    I think from what I've been able to

6    study, you folks got onto the use of

7    the cellular phone, a little late,

8    but you did it.  But, be that as it

9    may, I am talking about the use of

10   the cellular telephone, you know, and

11   account and equipment owned by the

12   Pennsylvania State Police provided

13   for an officer to use in the

14   performance of his or her duties.

15   A.      Okay.  I'm going to try to

16   answer your question.  You can stop

17   me if I'm wrong.  And I'll talk about

18   Captain Ober.  When Captain Ober was

19   assigned to the Bureau of

20   Professional Responsibility, he was

21   assigned an automobile.  The

22   automobile included the gasoline

23   credit card, it also included ---

24   issued equipment would've been a

25   turnpike credit card and he was also

78

1    issued a cellular telephone to be

2    used in conjunction with official

3    responsibilities.  During my tenure

4    in BPR, Captain Ober was temporarily

5    transferred to the Bureau of Tech

6    Services and when he did that, he

7    took that equipment with him.  I feel

8    that I'm a team player.  They needed

9    some issues --- some things taken

10   care of over there.  I know his

11   transfer was temporary in nature, so

12   there would be no reason to take that

13   equipment off of him.

14        Now, all of our entities,

15   whether it Bureau of Tech Services,

16   come with budgets and we must operate

17   or manage within those budgets.  Once

18   Captain Ober was transferred from my

19   bureau to some other bureau, then

20   it's that bureau's responsibility to

21   take care of Captain Ober's expenses.

22   Now, once he's transferred, I would

23   request that my equipment, I said

24   equipment that I'm responsible for as

25   bureau director, be returned to me.

79

1    Or if he's troop transferred to some

2    troop or area commander, I would then

3    request that information be returned

4    to me, me being my bureau.

5         And that individual, that

6    entity, whether it be another bureau,

7    another troop or another area

8    command, at that point it's their

9    responsibility to fund Captain Ober's

10   activities.  Because I know during

11   the course of his activities with

12   BTS, Bureau of Tech Services, I

13   reviewed the telephone bills from

14   time to time, the cell bills, and I

15   received a telephone bill from where

16   a call had been made from, I believe

17   it was Virginia, a long distance

18   call.  Those were okay as an official

19   business, you know.  However, that

20   cost me money, it comes out of my

21   budget and I'm held accountable for

22   that.  Is that what you were

23   referring to, sir?

24   Q.       I don't think I'm referring to

25   the rationale you provided, but I am

80

1    referring to the bottom line fact,

2    which as I understand it is, whatever

3    your reasons may have been, there was

4    a time when you asked Captain Ober to

5    turn in equipment and ---.

6    A.      Let me give the answer.  When

7    he no longer worked for me, I asked

8    for that equipment back.

9    Q.      Right.

10   A.      Not before that.

11   Q.      You'd indicated he was

12   transferred temporarily at one point?

13   A.      Detached status, I think he

14   referred to it as.

15   Q.      Okay.  My understanding is, if

16   that's so, why was the equipment

17   taken from him and why would it

18   occur?  If my facts are correct and I

19   may not be, I thought that occurred

20   sometime in July of '99, around the

21   time this investigation was --- that

22   we're going to get to here, was

23   wrapping up.  And it didn't fit fact-

24   wise to me and that's why I ask these

25   questions.

81

1    A.      I don't know specifically what

2    date we're talking about.  I know I

3    supported Captain Ober in his duties

4    until he was no longer responsible to

5    me.

6    Q.      Okay.  All right.  So there's

7    an issue that Captain Ober has raised

8    with the turnpike, a card, and you're

9    telling us that in terms of

10   bureaucratic requirements and

11   budgetary considerations, in order to

12   keep your budget tight, reduce

13   expenses and make sure that costs are

14   appropriately assigned to whoever's

15   administratively responsible.  You

16   made decisions about the availability

17   to Captain Ober of a turnpike card

18   and a telephone.  Have I pretty much

19   subsequently stated it there?

20   A.      It's fair.

21   Q.      Okay.  Now, at some point

22   Major Williams comes to you and Major

23   Williams does an interview with you

24   about Captain Ober during the

25   investigation into Captain Ober; is

82

1    that fair to say?  Do you remember

2    that?

3    A.      I don't know that Major

4    Williams conducted an investigation

5    onto or on Captain Ober.

6    Q.      Okay.  What did he --- what

7    was this investigation?  You know

8    what it was about.  I mean, I hope we

9    don't have to go into that.  You know

10   what investigation I'm talking about,

11   don't you?

12   A.      Yes, sir.

13   Q.      Okay.  Well, what was it about

14   then?  What was it --- in other

15   words, if you take issue that it was

16   about Captain Ober, that's fine.

17   What was it about, based on your

18   knowledge there?

19   A.      I do take issue with that,

20   sir.

21   Q.      Sure, obviously you do.  What

22   was it about, sir?

23   A.      The investigation conducted by

24   Major Williams and Major Werts was

25   conducted upon the direction of the

83

1   Commissioner to determine what went

2   on, what were the circumstances, what

3   precipitated the events that Captain

4   Ober's involved in, to get to the

5   bottom line.  Not into Captain Ober,

6   into what occurred and why it

7   occurred.  And that's not unusual.

8   Q.      Bottom line?  What's that

9   mean?  We know now that it's not into

10  Captain Ober.  We know that your

11  recollection is that it's not into

12  Captain Ober.  Now, what's it into?

13  A.      The investigation, the

14  inquiry, if you will, was to

15  determine what occurred and why did

16  it occur.

17  Q.      What occurred about, you know

18  --- I'm not being facetious, you

19  know. We're talking about something

20  that affects the State Police, okay?

21   So obviously, something that

22  occurred about the State Police and

23  something having to do with the State

24  Police.  Can you elaborate, please?

25  A.      I guess there was --- it

84

1    involves or it centers around why

2    there was an investigation by Captain

3    Ober that no one knew about.  How

4    could that happen?

5    Q.    Absolutely.  I'm with you.

6    Why --- if I understand you

7    correctly, but I think we need to

8    make sure we get this clarified in

9    the record because I don't think it's

10   fair to you.  You're not suggesting,

11   I don't think, that Captain Ober had

12   done some investigation that he

13   didn't tell anybody about.  You don't

14   mean that or do you?

15   A.    I don't think he had told the

16   appropriate people.

17   Q.    Sir, let me go back again

18   because again, I want to make sure

19   this record's clear and I don't think

20   it's fair to you.  Are you suggesting

21   that Captain Ober had done an

22   investigation, like an independent

23   investigation, of his own and he

24   didn't tell somebody?  You don't mean

25   that do you or do you?

85

1    A.    I mean that Captain Ober

2    conducted an investigation without

3    telling me.

4    Q.    Okay. What investigation did

5    he conduct, that you later learned

6    about, that he didn't tell you about?

7    Now, remember you're saying --- sir,

8    you're testifying and that's why I

9    want to make sure it gets clarified

10   because I don't know what your

11   thought process is right now and I

12   want to be fair to you. I don't know

13   as I sit here, sir, honestly, of any

14   issue in this case of Captain Ober

15   conducting an investigation, okay,

16   which he didn't tell anybody about.

17        It's my understanding that

18   Captain Ober angered the Commissioner

19   because he didn't tell the

20   Commissioner about an investigation

21   the FBI was doing. I don't know of

22   any facts --- there's no facts known

23   to me which indicate that Captain

24   Ober did an investigation. Now,

25   you're bringing a new thing into this

86

1   case if you're telling me that your

2   understanding is that Captain Ober

3   did an investigation.  I want to make

4   sure you clear that up because I

5   don't want any confusion there.

6   A.       Okay.

7   Q.       All right, sir.  It's your

8   opportunity to clear that up.  My

9   understanding is the FBI had come and

10  told Captain Ober about something,

11  okay?  And we'll get a chance to talk

12  to our FBI friends, hopefully

13  shortly.  And that the Commissioner

14  was angry because the Commissioner

15  didn't learn about it until May 12th

16  of 1999 and the FBI had come to

17  Captain Ober in the fall of '98.

18  That's my understanding.

19          Now, I don't have anything ---

20  there's nothing known to me that

21  would indicate that Captain Ober,

22  quote, unquote, conducted an

23  investigation. I want to make sure

24  that if that's what you're testifying

25  to that you can explain that because

87

1  honestly, sir, I don't have that

2  understanding. Can you elaborate,

3  please?  Do you understand what I'm

4  asking?

5  A.      I think I do.

6  Q.      All right, sir.  Would you try

7  to answer it, please?

8  A.      Yes.

9  Q.      Yes, thank you.

10  A.      As I reviewed everything that

11  had occurred, sometime in the fall of

12  1998, the FBI came to Captain Ober

13  and they brought an allegation of

14  public corruption, if you will,

15  purchasing or buying your way onto

16  the State Police.  And my

17  understanding is, they were looking

18  at somebody high up in the

19  organization who could influence

20  that.

21      Captain Ober, at that point,

22  has a couple obligations.  One is to

23  notify his superior officer, his

24  immediate supervisor, unless that

25  individual is under suspicion.  He

88

1    also had an obligation to document

2    that contact by making out a

3    complaint sheet or completing a

4    complaint worksheet.

5    Q.      Can I ask you one small

6    question there?  That complaint or

7    worksheet would be for BPR purposes?

8    A.      That's correct.

9    Q.      Okay, sir.  Fine.  Thank you.

10   A.      And then Captain Ober or his

11   superior could do one of two things.

12   They could mirror the investigation

13   and conduct a concurrent

14   investigation and/or they could put

15   the administrative investigation on

16   hold, pending the resolution of the

17   criminal investigation.

18   Q.      Okay.

19   A.      And it's worked both ways over

20   the years and it's still been

21   refined.  Now, the fact that Captain

22   Ober didn't tell anyone about that

23   tells me that one, he decided not to

24   let his superior officer or the guy

25   who supervises in the chain of

89

1    command, he did not let that guy do

2    his job.  In this case, I think it's

3    me.

4    Q.    Okay.

5    A.    It further tells me that

6    Captain Ober retained ownership of

7    that investigation and is conducting

8    it himself.

9    Q.    Okay.  So you view what he did

10   as conducting an investigation,

11   that's what you're calling that?

12   A.    He's gathering information,

13   yes.

14   Q.    He's gathering information?

15   A.    Yes.  Absolutely.

16   Q.    Well, let me ask you this

17   question.  If you had started an

18   investigation into something that was

19   happening within the Pennsylvania

20   State Police and you didn't tell

21   anybody, what rules would you be

22   violating?

23   A.    AR 425 tells me that I need to

24   make out a worksheet, I need to

25   assign an investigator.  And if I do

90

1    not do that immediately, I need to

2    document why I'm not doing anything

3    immediately.

4    Q.        Is that what Colonel Evanko

5    did when he launched the

6    investigation into Captain Ober,

7    which I understand that you don't

8    agree with my words, but let's call

9    it the investigation about --- we

10   need to agree on something to call

11   this thing in the fall, this creature

12   in the fall.  If it's not into

13   Captain Ober, what would you like to

14   call it?

15            I have referred to it, sir, at

16   different times during these

17   proceedings as the investigation into

18   Captain Ober.  No one's really taken

19   issue with that, but you have.  In

20   fairness to you, I want to give it a

21   name that we both can understand that

22   we agree with.  What would you call

23   that thing?  Let's give it your name.

24   In the fall of '98, what was it?  And

25   I'm talking now about the

91

1  investigation that Colonel Evanko

2  ordered.

3  A.      That was an inquiry.

4  Q.      Okay.  For purposes of your

5  deposition here ---?

6  A.      And that's interchangeable ---

7  we're talking semantics, inquiry

8  investigation, I call it inquiry.

9  Q.      Well, why didn't the good

10  Colonel come over here to you and

11  give that thing a number when he

12  wanted to check him out or check into

13  the circumstances surrounding what he

14  did in the fall of '98?  Why didn't

15  the Colonel do that?

16  A.      I don't know he didn't do

17  that.

18  Q.      Okay.  Fair enough.  Now, if

19  he did, would you know about it?

20  A.      I should be aware of it.

21  Q.      Well, then tell me.

22  A.      Tell you?

23  Q.      When he did that?

24  A.      I don't know.

25  Q.      You don't know?  And you don't

92

1    know, sir ---?

2    A.      You want a specific date, I

3    don't have a specific date.

4    Q.      No.  Because he never did

5    that, sir, did he?  Colonel Evanko

6    never came to BPR and never had

7    anybody open a number, assign a

8    number, assign an investigation or

9    fill out a complaint sheet.  Now, if

10   he did that, you tell me and you tell

11   me when he did it, sir, please.

12   A.      I can't.

13   Q.      No.

14   A.      But what I can tell you

15   though, per AR 425 is the

16   Commissioner has the authority to

17   direct IA or anyone else in this

18   agency to look into matters, things

19   he wants answers to.  And that's not

20   unusual.  That's been occurring at

21   least since 1986.  It's occurred

22   prior to that, but under a different

23   --- another number, another name.

24   Q.      Sir, no problem.  Then why did

25   Rick Brown, Captain Brown, sitting

93

1  right over there, give this thing a

2  1999, 503 number on the 20th of July,

3  1999?

4  A.     What's the 503?

5  Q.     That's the number about

6  Captain Ober's activities, or

7  whatever he did or may have done

8  wrong or whatever it may have been,

9  in the fall of 1998.

10  A.     I don't know what you're

11  talking about.  No, seriously.  I

12  don't.

13  Q.     I believe you and that's fine

14  with me.  And I'll tell you what, if

15  the answer to a question is that you

16  don't know, provided it's truthful as

17  I'm sure you know ---.

18  A.     I wouldn't lie to you, sir.

19  Q.     No, sir.  And I'm not saying

20  that you would and I'm not suggesting

21  you would, but if the answer is I

22  don't know, that's fine because

23  that's the truthful answer.  And I

24  believe you.  You don't know.  Now,

25  when did you stop being Director of

94

1    BPR, sir?

2    A.    My last day as Director of BPR

3    would've been September 1st of 2000.

4    Q.    Yes, sir.

5    OFF VIDEOTAPE

6    BRIEF RECESS TAKEN

7    ON VIDEOTAPE

8                VIDEOGRAPHER:

9                It's now 11:45 a.m.

10        We're back on video and audio

11        and record.

12   BY ATTORNEY BAILEY:

13   Q.    Do you know whether, at any

14   time, Captain Ober was named as the

15   subject of an investigation?

16   A.    I don't believe that he was

17   named as a subject of an

18   investigation.

19   Q.    By anyone?

20   A.    No, sir.

21   Q.    That would include Mr. Brown

22   as Director of IAD on or about July

23   of 1999; is that fair to say?

24   A.    I don't believe him to be a

25   subject of the investigation.

95

1    Q.     When you left the Bureau of
2    Professional Responsibility on or
3    about September of the year 2000,
4    were there any open BPRs on Captain
5    Ober?  Any open investigations on
6    Captain Ober or anything having to do
7    with him?
8    A.     I don't recall there being an
9    investigation on Captain Ober.
10   Q.     Okay.  Now, do you know
11   whether he was ever informed of the
12   --- whether the investigation into
13   the events of the fall of 1998 was
14   over or closed?
15   A.     I don't know whether he was
16   told the results of that
17   investigation or not.
18   Q.     Do you know whether it was
19   ever adjudicated, and if so, by whom?
20   A.     I don't know that that should
21   be adjudicated.  That was an inquiry
22   by the Commissioner.
23   Q.     Well, it was assigned a number
24   July 20th, 1999.  The number was
25   1999503 by Captain Brown.  And

96

1   according to his testimony, that was

2   sometime after a discussion with you.

3   And I'm not implying that you asked

4   him to do that.  In fact, I think his

5   testimony was on the contrary.  They

6   did because it was administratively

7   what he felt should be done.  At

8   least somebody assigned it a number

9   and I'm just going to ask you what

10  role you may have played in that.

11  A.      I don't remember the

12  circumstances specifically, but

13  that's not unusual.  Every inquiry or

14  investigation is assigned a number.

15  Q.      Is assigned a number?

16  A.      Yes.

17  Q.      Months after it starts?

18  A.      Generally, it's assigned up

19  front, right on.  If, in fact, it's

20  been discovered that there has been a

21  number or it has not been assigned a

22  number, then the number's assigned a

23  that particular point.

24  Q.      We know that you had a meeting

25  with Commissioner Evanko over in the

97

1   front office in May of 1999 having to
2   do with these events in the fall of
3   '98.  Do you remember that meeting?
4   A.      No, sir.
5   Q.      Did you ever have any meetings
6   with Colonel Evanko about the events
7   of the fall of '98, the FBI inquiry?
8   A.      I don't recall, sir.
9   Q.      Did you ever have any meetings
10  with Colonel Coury?
11  A.      Probably.
12  Q.      Well, tell me about the
13  meetings that you had with Lieutenant
14  Colonel Coury.
15  A.      I can't.  I mean, what do you
16  want specifically, sir?
17  Q.      Colonel Conley, you have
18  described for us a situation --- now,
19  you correct me now if I'm wrong,
20  okay?  You have described for us,
21  have you not, a situation where the
22  command experience with Captain Ober
23  was, at best, unpleasant and there
24  were some problems; is that fair to
25  say?  I'm being very, you know ---

98

1   not exaggerating it or anything like
2   that, you can at least say that there
3   were some problems and you were
4   unhappy with it; is that fair to say?
5   A.      That's fair.
6   Q.      All right.  And you have
7   indicated in response to earlier
8   questions here today that you felt
9   Captain Ober did not act
10  appropriately.  Not to say that he
11  acted criminally or that he deserved
12  discipline or anything like that, but
13  he did not act appropriately in not
14  reporting the FBI inquiry to you.
15  Now, you've told us that; right?
16  A.      Yes, sir.
17  Q.      And I assume the reason you
18  told us that is because Captain Ober
19  was the acting BPR Director and you
20  were coming in at the time --- well,
21  actually, October 3rd, that this
22  would've occurred at some time when
23  you were newly assigned to BPR and he
24  was acting Director and he was
25  Director of IAD.  And that he

99

1   should've reported this to you, the

2   thing about the FBI to you; right?

3   A.      I thought he should've

4   reported to me at least on October

5   2nd.

6   Q.      At least on October 2nd, the

7   moment he heard about it, in fact, he

8   should've reported to you once, two

9   ways, either when he first knew you

10  were in charge or any kind of

11  transfer where you're discussing a

12  change of a leadership position, this

13  is the kind of thing that he was

14  duty-bound to inform you of in your

15  view; correct?

16  A.      That's correct.

17  Q.      Yes, sir.  Now, you're now

18  telling us that you had discussions

19  with Lieutenant Colonel Coury about

20  this ---.

21  A.      I didn't say that.  You said

22  that.

23  Q.      Oh, you didn't have any

24  discussions with Lieutenant Colonel

25  Coury?

100

1    A.      Yes, but I believe your

2    question was did I meet with Colonel

3    Coury.  And I didn't meet with

4    Colonel Coury.

5    Q.      All right.  Well, then let me

6    change my word.  Did you have any

7    discussions with Lieutenant Colonel

8    Coury?  I changed my question.  Did

9    you have any discussions and, by the

10   way, in discussions I mean telephone,

11   meeting, e-mails, letters, whatever

12   --- I mean, it's --- you know.

13   A.      Okay.

14   Q.      You have to be a little bit

15   expansive with these things in doing

16   a deposition, you know.  But my

17   question is, you know, did you have

18   any communications with Lieutenant

19   Colonel Coury in the spring of '99 or

20   summer of '99, let's just use that

21   area to start off with, about Captain

22   Ober?

23   A.      Yes.

24   Q.      Tell us about them.

25   A.      I'm not sure of the exact

101

1   date.  I received a page from the

2   office.  Corporal told me that

3   Colonel Coury was looking for me, he

4   wanted to talk to me and that I

5   should return the call immediately.

6   I'm sure you have this date, but it

7   was right after --- it would've been

8   the same date that Captain Ober and

9   Colonel Hickes ---.

10  Q.      May 12th or 13th.

11  A.      Okay.

12  Q.      Okay.  Go ahead.

13  A.      I remember the time or the

14  occurrence very vividly because it's

15  kind of --- something struck me as

16  something significant was occurring

17  within the Pennsylvania State Police

18  and I was about to become involved in

19  it.  I called Colonel Coury.  His

20  first question was, what do you know

21  about the investigation of corruption

22  or of hiring of people, or hiring of

23  cadets, within the Pennsylvania State

24  Police.  And I had no knowledge

25  whatsoever.  He says there was an

102

1   allegation to that effect or worse to

2   that effect.  And I was on my cell

3   phone, I was traveling west on the

4   turnpike in or about Breezewood area.

5       That's when I said, hold on a

6   second, because I figured we had this

7   investigation that has come to his

8   attention and I was going to ---

9   figured I'd jot down some information

10  so I could call back to the office

11  and get somebody on this

12  investigation immediately.  And I

13  pulled over to the side of the road

14  and I got my pen and paper out and I

15  asked him who specifically.  And I

16  think he might have mentioned Stanton

17  and he went on to tell me that --- I

18  believe, he had learned of this from

19  Captain Ober and Colonel Hickes and

20  that's when I was a little confused

21  at that point because I thought

22  somebody within our organization was

23  selling jobs and that I was aware of

24  it and were we doing an investigation

25  on it.

103

1        But it wasn't 'til that moment

2    that I realized that the allegation

3    may have been against him or thoughts

4    were against him and other members of

5    the front office.  And the

6    conversation was, I have no

7    knowledge, I don't have a clue what

8    you're talking about.  And I think he

9    told me that Captain Ober had

10   initiated something or he was

11   involved in some type of

12   investigation involving State Police

13   and the hiring of cadets for pay.

14        Now, we had subsequent

15   conversations.

16   I don't recall what they --- how they

17   go specifically, but I could see why

18   he would come to me because being the

19   Director of BPR, I should've been

20   aware of that investigation if it was

21   ongoing.  However, I was unaware of

22   it.  They told me that the

23   investigation is now over, I guess,

24   and went from there.

25   Q.      Well, one of the reasons he

104

1    called you was to find out if you

2    knew about, didn't he?

3    A.    That was one of his first

4    questions.  He asked, what do I know

5    about the investigation.

6    Q.    And if it was a litmus test,

7    you passed because you said, I don't

8    know anything about this, didn't you?

9    A.    I had no knowledge of the

10   investigation.

11   Q.    And you told him that you

12   didn't have any knowledge of the

13   investigation?  You were loyal.

14   A.    I was honest.

15   Q.    You were honest.  Okay.  And

16   so his first concern was to find out

17   if you knew anything about it?

18   A.    I think he wanted to know, did

19   I know about it and what I knew about

20   it.

21   Q.    And if you had known about it,

22   would you have told him?  Now, before

23   you answer that, you have testified

24   that he indicated that there was some

25   concern in this matter about whether

105

1    or not he was involved.  Let me tell

2    you where I'm going.

3    A.      No.

4    Q.      You know where I'm going?

5    A.      I'm trying to recall what I

6    testified to, but go ahead.

7    Q.      Well, I'm going to a very,

8    very simple place.  Lieutenant

9    Colonel Coury calls up, in some

10   sequence of questions he wants to

11   find out if you knew about this.  And

12   secondly, he expresses, rightfully or

13   wrongfully at that point, what is his

14   understanding about this FBI inquiry,

15   i.e. that might have involved him or

16   there might have been some fingers

17   pointed at him.  Now, I'll tell you

18   where I'm going, sir.  It sounds to

19   me like this is questioning whether

20   or not you knew anything about this

21   and, you know, what your loyalty was.

22   Would you have told him?

23   A.      I don't know all the

24   circumstances that Captain Ober was

25   provided.  Knowing what I know of ---

106

1  have worked with the FBI and knowing

2  what I know now, I wouldn't have

3  given a lot of validity to it because

4  my ---.

5  Q.    Doesn't say much for the FBI,

6  sir.  I don't mean to be funny.

7  A.    Well, you have to understand.

8  My experience with the FBI is if

9  they're looking at me or someone even

10 close to me, they're not going to

11 tell you.  The fact they even came to

12 Captain Ober, as I understand this

13 thing, they were getting him for

14 information because if they had

15 something within the State Police,

16 Captain Ober would not have been the

17 first to find out, believe me.

18 Q.    Well, maybe they suspected

19 Colonel Evanko?

20 A.    They wouldn't go to Captain

21 Ober.

22 Q.    They wouldn't?  Then why did

23 they?  You just told us.

24 A.    Information, they want

25 information.  I'm sure of that.

107

1    Q.    Did they think he was going to

2    go up and tell Colonel Evanko?

3    A.    I don't know what they were

4    thinking.

5    Q.    Of course not, you don't know,

6    because you weren't there and as you

7    said, you didn't know the

8    circumstances; right?

9    A.    I can only base it on my

10   experience of working with the FBI.

11   Q.    And why, then, are you upset

12   with Captain Ober for not telling you

13   if you don't know the circumstances

14   under which he was informed by the

15   FBI?

16   A.    Because Captain Ober did not

17   give me the opportunity to do my job.

18   Q.    Well, did you ever, ever, sir,

19   at any time, pick up a telephone or

20   sit down with Captain Ober and say,

21   Captain, why didn't you tell me?

22   A.    I told Captain Ober very, very

23   bluntly, in my office one afternoon

24   after 4:00.  I told him, he did not

25   give me, Hawthorne Conley, an

108

1    opportunity to do my job.  He says,

2    sorry about that, or tough,

3    basically.

4    Q.    Now, did he say, that's tough?

5    Now, that's pretty disrespectful.

6    You're not saying --- did he use

7    those words?

8    A.    I'll tell you what --- I don't

9    know what words exactly he used, you

10   know.

11   Q.    Yes, sir.

12   A.    And whatever words he used, he

13   pissed me off.

14   Q.    Okay.  Well, he didn't tell

15   you, that's for sure.

16   A.    No, he did not.

17   Q.    And there was no question

18   about that.  You were right about

19   that.  He did not inform you; is that

20   correct, sir?  I mean, there's no

21   question about that.  I think

22   everybody agrees that he did not

23   inform you; is that correct?

24   A.    That's correct.

25   Q.    Did you --- now, let's go back

109

1  to my question.  My question was and

2  it's very respectively made, sir, did

3  you ask him why?  Now, you told me

4  how you sat him down in his office

5  after 4:00, how you sat down and you

6  told him.  My question is, did you

7  ask him, why didn't you tell me?  You

8  never did that, did you?

9  A.      No, I don't recall.  I know we

10  discussed it.  If that was the

11  question I should've asked, I don't

12  know if I did or did not ask that

13  question.

14  Q.      Sir, I am not going to

15  question a Lieutenant Colonel in the

16  Pennsylvania State Police about why

17  they did or not ask a question.  I

18  assure you that.  That's --- I have

19  too much respect in your experience

20  to do that.  I will say this to you.

21  Based upon my knowledge of this case

22  and my investigation into this case,

23  aside from Captain Ober's statement

24  to Major Williams, no one brought

25  this officer in, sat him down ---

110

1   whether it's Colonel Evanko, whether

2   it's Colonel Coury, whether it's

3   Colonel Conley, then Major Conley,

4   whether it's Captain Rick Brown, head

5   of the IAD --- no one brought him in

6   and just asked a few simple questions

7   that I expect would normally happen

8   in the command structure.  And I'm

9   not faulting anybody for it.  I'm

10  just saying --- what were your

11  reasons for not doing this or not

12  doing that?  Now, his statement with

13  Mr. Williams will stand on its own,

14  but I can tell you, I can't find

15  evidence of your having asked him

16  that and I do have your statement

17  here and I do want to ask you some

18  questions about that.

19  A.      Yes, no problem.  But let me

20  tell you this, though.

21  Q.      Yes, sir.

22  A.      From the time this incident

23  surfaced, Captain Ober and I didn't

24  really converse anymore, any longer.

25  And the conversation that I'm telling

111

1    you about occurred some time later

2    when he was reimbursing the Bureau

3    for inappropriate expenditure.

4    Q.      Okay.  Was that the framing?

5    A.      Yes.

6    Q.      I have a couple questions on

7    that, too.  Sir, do you have a

8    recollection of when this office

9    conversation may have occurred that

10   you're referring to?

11   A.      No, but he should have the

12   check.  So he would know exactly what

13   date that occurred.

14   Q.      It was around that time?

15   A.      He wrote a check out that

16   evening, that afternoon.

17   Q.      Okay.  And that was for --- he

18   had improperly, as I understand it,

19   he had, at least according to

20   yourself or the department, he had

21   sought a reimbursement or something,

22   or he had used a department fund or

23   something like that, to pay for a

24   frame for a commendation to a trooper

25   retiring or something of that sort.

112

1   Am I basically correct?

2   A.      I think he had written a very

3   nice, that a boy, to a returning

4   sergeant and he had it --- my

5   secretary have it framed --- mounted,

6   framed and matted and what have you

7   for presentation.  And he had used

8   the bureau Visa card for that

9   purpose.

10  Q.      Okay.

11  A.      Which does not usually occur.

12  Q.      Okay.  All right.  Now, let me

13  ask you some questions about your

14  statement to Major Williams.  Okay?

15  A.      Yes, sir.

16  Q.      This is Mr. Williams'

17  question. It says, describe your

18  feelings to me, now that you can

19  reflect back on this, as to how you

20  feel in that Captain Ober never

21  informed you of this investigation --

22  - he's talking about the events ---

23  the FBI inquiry, okay?

24  A.      Okay.

25              ATTORNEY CHRISTIE:

113

1        Excuse me, Counsel, do

2    you have a copy for Colonel

3    Conley to look at while you're

4    questioning him from that

5    document, or a copy for me to

6    look at or a copy for both of

7    us to look at?

8        ATTORNEY BAILEY:

9        No, I don't.  I have

10    --- this is his statement.  I

11    assumed that you had it or

12    he's had it.  I can certainly

13    show it to you.  I'll read it

14    and then I'll give it to you.

15        ATTORNEY CHRISTIE:

16    Fine.

17        ATTORNEY BAILEY:

18    Okay.

19    BY ATTORNEY BAILEY:

20    Q.    Conley, oh, well, I'll tell

21    you.  I'm very disappointed, comma,

22    and this has been an ongoing problem

23    since I arrived in the Bureau in

24    October, period.  I made my boss

25    aware of it and I've attempted to

Sargent's Court Reporting Service, Inc.
(814) 536-8908

114

1   work it out.  And I'm going to ask

2   you some questions about that

3   statement, okay?  Because Ober's a

4   Captain with the Pennsylvania State

5   Police, comma, I try to give him a

6   wide girth and let him do what was

7   necessary to get his job done,

8   period.  However, comma, we have

9   continuously failed to communicate

10  effectively.  And then there is a

11  description about the leave slip.

12  Okay?  The incident that you have

13  already described.  We had a

14  conversation, this is a paragraph

15  now, just before he left.  He was

16  detached to the Bureau of Technology

17  Services.  Now, that would be the

18  IIMS project; is that correct, sir?

19  A.      Yes, sir.

20  Q.      All right.  Where again,

21  comma, I thought at this point we had

22  reached a level where we could

23  communication --- that's a typo, I'm

24  sure, given how well spoken you are.

25  But I've about had it --- now, this

115

1   is pretty clear here now.  But I've

2   about had it with him, personally.

3   I've really had it with him.  Now,

4   the date of this interview is June

5   8th, 1999.  And then it goes onto

6   some questions about a hotel room and

7   charging that, which I don't know how

8   relevant that is, but if you want to

9   look at this, that's fine.  I just

10  want to ask about some of these

11  language and some of these

12  conclusions because aside from this

13  leave issue and the door issue, I

14  want to find out if there's anything

15  else.  And then I'm going to ask you

16  some questions about who you meant by

17  your boss and what those discussions

18  were and when that discussion took

19  place.  And I'm going to come back to

20  Lieutenant Colonel Coury and your

21  discussions with him.

22          ATTORNEY CHRISTIE:

23          I'm just going to ask.

24  Counsel, are you marking this

25  or just referring to it?

116

1    ATTORNEY BAILEY:

2         It should be in this        .

3    case as part of the documents

4    you've produced.  In fact, it

5    is.  It's part of the, you

6    know.

7    ATTORNEY CHRISTIE:

8         Right.

9    ATTORNEY BAILEY:

10        If you want to mark it

11   for this deposition, we can do

12   that, sure.  Is that more

13   convenient?

14   ATTORNEY CHRISTIE:

15        I would prefer that you

16   do, that way it's a matter of

17   record as to, at least, what

18   are the two pages, page four

19   and five, of the interview.

20   So if you could do that, I'd

21   appreciate it.

22   ATTORNEY BAILEY:

23        Okay.  I'll ask that

24   they be marked and I'm sure

25   you can make me some copies

117

1    here; right?

2             ATTORNEY CHRISTIE:

3         Yes.

4             ATTORNEY BAILEY:

5         Okay.

6             ATTORNEY BAILEY:

7         You can use that right

8    in front of you. By the way,

9    I'll give you a copy that's

10   unmarked so you don't have to

11   --- okay?

12            ATTORNEY CHRISTIE:

13        Okay. Or you can mark

14   that one if you like, is that

15   Conley One or how are you

16   marking it?

17            ATTORNEY BAILEY:

18        Do it that way, that's

19   fine. Okay. I'm going to

20   mark it Conley One, one of two

21   pages, Conley marked two of

22   two.

23            (Deposition Exhibit

24            Conley One marked for

25            identification.)

118

ATTORNEY CHRISTIE:

    Thank you.

BY ATTORNEY BAILEY:

Q.    You say, I've had a discussion with my boss. Who did you mean?

A.    That would've been Lieutenant Colonel Coury at the time.

Q.    Okay. Now, this interview was done, you will agree with me, on June 8th, 1999?

A.    It's marked June 8th, 1999.

Q.    Now, am I wrong, but on June 8th, 1999, Captain Ober had been, for some considerable period of time, weeks if not months, had been detached to the Bureau of Technology Services; am I correct?

A.    That's correct.

Q.    Meaning no disrespect, why is this such a visceral issue? I mean, I can't find in his records anywhere where you wrote him up, any supervisory notations, any admonitions of this issue of leave, the door slamming incident that you

119

1  related to, which, you know, he has

2  denied to me, but I'm sure that

3  that's your recollection, that's what

4  you believe occurred.  But anyway,

5  you've got that incident there,

6  you've got the leave thing, okay?

7  What --- I really had it with him?  I

8  mean, is that --- years of experience

9  in the Pennsylvania State Police

10 dealing with people, those things had

11 you that angry?  Leave slips and door

12 incident, that's what I've heard so

13 far.  What had this man done?  I've

14 really had it with him.

15 A.    Well, as I said earlier,

16 Captain Ober is someone who likes to

17 do things his way.  And I looked at

18 it, I saw him or he thought he was

19 inventing a new process here.

20 There's nothing new about conducting

21 investigations.  You adhere to the

22 rules and regulations and the law, if

23 you will.  Captain Ober wanted to

24 incorporate opinions into the IA

25 process.  He says they do it in the

120

1   law on a regular basis.  And I think

2   I mentioned it earlier, there's a

3   difference between a criminal

4   investigation and doing an

5   administrative investigation, and I

6   reiterated to him that it's necessary

7   that the evidence speak for himself

8   and that we not speak for it.

9          It's important that IA remain

10  impartial in our investigations.

11  That's how we maintain the respect of

12  the agency itself.  As you know and

13  as I'm sure you're aware of, that IA

14  does not have a real pretty picture

15  in the real world, in other agencies.

16  I think we command a lot of respect

17  because what we've done over a period

18  of years.  I think that Captain Ober

19  wanted to change some of those

20  things.  Now, initially, I have to

21  take a look at it.  I might disagree,

22  but I may have to take a look at it

23  and see, maybe he's absolutely

24  correct.

25          It's just like when he

121

1    invented the supervisory inquiry form

2    and that process.  That's the first

3    thing that jumped at me when I went

4    into the Bureau.  I said, what's this

5    all about, and I think his response

6    was, well, it's an opportunity to

7    quicken the system up and I said,

8    that's a good idea because I think

9    quite often, the system or the

10   process does take too long.  I think

11   it's important that we provide our

12   people, members of the Pennsylvania

13   State Police, members and employees

14   as well, with not only a fair and

15   accurate investigation, but an

16   investigation that's done in a timely

17   fashion.  I think the process takes

18   too long sometimes.  I think we have

19   to be aware of our time constraints.

20   And I think that when we don't do

21   that, we hurt the individual and we

22   hurt the agency as well.

23        I think there was an

24   investigation down in, as I think

25   about it, down in Greene County.  A

122

1   young man that was accused of

2   insurance fraud and I think Captain

3   Ober kept that case going.  There

4   were some issues going on there

5   where, eventually, that case was

6   dismissed.  It didn't go criminally

7   and didn't go administratively.  When

8   it did go administratively, the

9   arbitrator kicked it out because we,

10  Pennsylvania State Police, IA, did

11  not comply or adhere to our time

12  constraints.

13        I think about processes that

14  creates --- where we're criticized.

15  I think we have to be cognizant of

16  that things or people around us and

17  how they will look at us.  We, IA,

18  must be above board and we must

19  adhere to those things --- I mean, I

20  can't tell you do it and not live

21  that same life.  And I think we must

22  do that and I don't think we always

23  did that.

24        I'm definitely not in

25  opposition to being new and

123

1    innovative, but again, within the

2    frameworks that they will permit us

3    to do.  We not only have FR to comply

4    with, we have the AR, which is at 425

5    to comply with, we have the PSTA

6    contract we have to comply with, as

7    well as side letters.  And sometimes

8    you forget those things, they just go

9    by the wayside.  Believe me, they

10   only go by the wayside to get to

11   arbitration, then they bring them

12   right back to you.  And then you

13   remember each and every one of them.

14        I think Captain Ober was

15   trying to do a lot of good things

16   there.  I think he lacked experience

17   in that particular position.

18   Eventually, he might have gotten

19   there, but I think he was just kind

20   of used to doing things his own way.

21   And he wasn't used to people

22   questioning or asking him about

23   things.  What I tried to explain to

24   him and I explain to everyone who's

25   worked for me, it's all right for you

124

1   to be in charge and run your
2   particular division, but remember,
3   I'm the Director of the Bureau, or I
4   am the Troop Commander.
5        When things go wrong and I
6   don't really care if whether it's the
7   trooper that goes wrong or an
8   investigator in IA goes wrong, the
9   Colonel doesn't call that trooper.
10  The Colonel doesn't call that
11  investigator.  He calls Hawthorne
12  Conley if he's the Director of the
13  BPR.  He calls Hawthorne Conley if
14  he's the Troop Commander.  I am held
15  responsible, therefore, I have a
16  right to know.  So tell me.  That's
17  all I asked from this man.  Tell me,
18  communicate with me.  He didn't do
19  that.  I've only given you one or two
20  occasions, but I can tell you it was
21  ongoing.
22       Now, there was a time when we
23  would and I'll tell you, I felt good
24  about some things, but there was a
25  time things did come in.  There was

125

1    other times it didn't happen and I

2    told him about it.  Do I document,

3    have I documented, I have not.  Is

4    that poor on my part, I think so.

5    But that's my particular style.

6    That's just how I do things, I

7    recall.  Now, if I'm at a point where

8    I decide that maybe I should start

9    discipline, yeah, I'll document those

10   things.  It would've been better if I

11   had documented a lot sooner than that

12   point, but I'll start my paper trail

13   when appropriate, very appropriately.

14        I did tell my boss, you know,

15   after this came to light, I was

16   tired.  I was just tired, you know.

17   When he was out of the Bureau at this

18   particular point, I told him I didn't

19   want him back.  I didn't want him

20   back because I couldn't trust the

21   man.  Obviously, he couldn't trust

22   me, so I can't trust him.

23        I'm trying to think of the

24   investigation --- I guess, it still

25   causes the hassles right now, it's of

126

1  the investigation of a young man that

2  they suspected of taking narcotics or

3  some restricted product and say took

4  hair samples.  And our people weren't

5  necessarily trained in conducting,

6  collecting hair samples.  There's a

7  method and manner you do that, you

8  know.  You do it in the proper method

9  and you can track marijuana for up to

10 six months, you know, and if it's

11 some other narcotic, you know you can

12 settle it within several days, you

13 know --- the samples were

14 inappropriately collected, the Union

15 has been on us ever since then.  And

16 I think we're being sued as a result

17 of that case as well.

18 Q.      Given the analysis you've just

19 provided us here in the last few

20 moments, tell us what Colonel Evanko

21 did in his initiating the

22 investigation into the events of the

23 fall of '98 that comply with the

24 procedural safeguards because that's

25 what underlies what you've indicated

127

1   here.   Concerns about procedural

2   safeguards, you know, like procedural

3   due process, cornerstone of our

4   democracy.   How did what the Colonel

5   did --- did he conform with those

6   regulations, guidelines, procedures

7   and customs when he had Mr. --- the

8   events of the fall of 1998

9   investigated?

10  A.      I don't know that he did not.

11  He requested an investigation be

12  conducted.   He requested an

13  investigation be conducted by two

14  senior command members of the

15  Pennsylvania State Police, of who had

16  no knowledge of this.   He brought one

17  in from Eastern Pennsylvania and one

18  in from Northeastern Pennsylvania,

19  who are, hopefully, immune or have no

20  knowledge of this.   I mean, this is

21  collected data.   Collected data and

22  they won't let it speak for itself.

23  And ---.

24  Q.      Why not go to the FBI and

25  collect the data?

128

1    A.    Oh, I'm sure they were

2    interviewed as well.

3    Q.    Do you know whether they had

4    any knowledge of how long they were

5    aware of this alleged problem with

6    influence peddling in the

7    Pennsylvania State Police?  It was

8    alleged, you know, thank God it ended

9    up being unfounded, but --- so don't

10   read anything into that.  But ---.

11   A.    No, but you're referring to

12   the FBI?

13   Q.    Yes, sir.

14   A.    Okay.

15   Q.    Yes.  Do you know how long

16   they were aware of it?

17   A.    It's come to my attention now

18   that this was a small investigation

19   that they kind of revived some new

20   --- revisory agent was in town and

21   says, well, let's clean up the house.

22   That's something we do as well, you

23   know, investigation gets old and

24   becomes stagnant, you know --- just

25   clean it up.  Either something's

129

1   there or it's not there.  If there's

2   something there, let's deal with it.

3   If there's nothing there, let's just

4   get rid of it.

5             VIDEOGRAPHER:

6             I need to switch the

7      tape.

8             ATTORNEY BAILEY:

9             Okay.  Announce what

10     the time is.

11            VIDEOGRAPHER:

12            12:18 p.m.  It's the

13     end of tape one of the

14     deposition of Hawthorne

15     Conley.

16  OFF VIDEOTAPE

17  BRIEF RECESS TAKEN

18  ON VIDEOTAPE

19            VIDEOGRAPHER:

20           It is still 12:18 p.m.

21     This is tape number two of the

22     deposition of Hawthorne

23     Conley.  Do you want to take a

24     break?

25            ATTORNEY BAILEY:

130

1          Yes.  I think while you

2     were changing tapes, there's

3     been a request to have a

4     break.  Let's suggest --- let

5     me ask just a couple of

6     things.  Obviously, this is

7     taking longer than envisioned

8     and we got a very late start

9     due to the stenographer and

10    then due to our technical

11    problems.  We're going to have

12    to McCrevey (phonetic), you

13    know --- hopefully, we can do

14    him today.  But Lieutenant

15    Colonel Coury is next.

16         ATTORNEY CHRISTIE:

17         What do you expect,

18    Counsel?

19         ATTORNEY BAILEY:

20         Can we get a sandwich

21    ---?  Well, I just, you know

22    what I'd like to do?  Just go

23    right through here, you know,

24    put a sandwich down here in

25    front and just keep moving.  I

131

1    want to get these things done.

2    I am going to request --- I

3    understand you don't concur.

4    I am going to --- I definitely

5    decided to request an

6    enlargement of time with the

7    Federal Court.  So we'll deal

8    with that later.  But Barb,

9    could --- it's 12:20, maybe,

10   is there a sandwich place in

11   this building here?  Do you

12   have a snack bar here?

13        ATTORNEY CHRISTIE:

14        Not in the building.

15   There's a snack bar, but it's

16   just the machines.  Let me

17   just --- can I ---?

18        ATTORNEY BAILEY:

19        Well, get something out

20   of the machine then.  Go

21   ahead.

22        ATTORNEY CHRISTIE:

23        Okay.  How much longer

24   do you expect to be,

25   approximately?

132

1    ATTORNEY BAILEY:

2        I think it depends on

3    how his responses go, but I

4    think I could finish it up in

5    an hour or so.

6            ATTORNEY CHRISTIE:

7        In an hour, okay.

8            ATTORNEY BAILEY:

9        I mean, I can try.  I

10   can't promise, but I'll try.

11           ATTORNEY CHRISTIE:

12       Okay.  All right.  And

13   let's see.  At this point, we

14   could back up Corporal

15   McCrevey and your preference

16   is just keep going here and

17   just order out something?

18           ATTORNEY BAILEY:

19       It's just to go.  I'll

20   get something out of the

21   machine, I don't really care.

22   I just think time is such a

23   thing, you know, I'll grab a

24   snack and go, but, you know,

25   I'm not going to do that if

133

1      that's not --- if he's not

2      happy with that.  It's up to

3      him and you.

4              ATTORNEY CHRISTIE:

5              Is that all right with

6      you, Colonel?

7  A.      Give me five minutes.  That's

8  all I need.

9              ATTORNEY BAILEY:

10             All right.  Let's take

11     five minutes --- let's take a

12     break and grab --- take ten

13     minutes, reconvene at 12:30

14     and show me where the vending

15     machine is.  Wait, sorry,

16     Colonel, could you sit down

17     until she ---.

18 A.      Sorry about that.

19             VIDEOGRAPHER:

20             The time is 12:20 p.m.

21     We're going to take a short

22     break.  Thank you.

23 OFF VIDEOTAPE

24 BRIEF RECESS TAKEN

25 ON VIDEOTAPE

134

1          VIDEOGRAPHER:

2               It is now 12:44 p.m.

3          We're going on video, audio

4          and record.

5     BY ATTORNEY BAILEY:

6     Q.     Okay.  Colonel, I don't

7     remember exactly what was on the ---

8     what was there, but let me try to,

9     you know --- the question when we

10    took the break.  But let me rephrase.

11    Are there any facts known to you that

12    would indicate that --- I had asked

13    you a question whether or not Colonel

14    Evanko had followed the rules or

15    procedures and whatnot in the

16    situation where the events in the

17    fall of '98 were looked into and you

18    had indicated that you didn't know

19    that he didn't.  Let me know ask you

20    some follow-up questions to that.

21    You had indicated that you were Troop

22    B Commander from what dates, again?

23    Could you give me the dates again

24    when you were Troop B Commander?

25    A.     Yes, sir.  January of '98 up

135

1  until October 2nd of '98 when I

2  received my notification of my

3  promotion in '98.

4  Q.      Now, you know where Belle

5  Vernon and North Belle Vernon are;

6  right?

7  A.      Yes, sir, I do.

8  Q.      And you know where the

9  Youghiogheny River is; right?

10  A.      Yes, sir.

11  Q.      And you know that part of

12  Westmoreland County, which would be

13  --- which would include Rostraver

14  Township, Monessen, Scottdale, North

15  Belle Vernon, Belle Vernon, Fayette

16  County --- you know that they are

17  part of Troop B; right?

18  A.      Yes, sir.

19  Q.      Where was Stanton --- where

20  was he assigned during the time that

21  you were Commander of Troop B?

22  A.      I don't know.

23  Q.      Well, how many troops did you

24  have --- how many troopers did you

25  have in your command when you were

136

1    Troop B Commander?

2    A.      Troop B is close to 400

3    people.

4    Q.      400 people.  Is it fair to say

5    that if Kip Stanton were one of your

6    troopers, you'd know it?

7    A.      No.

8    Q.      Okay.  Is it possible that Kip

9    Stanton was in your command during

10   the period of time that the FBI was

11   checking into these allegations of

12   public corruption?

13   A.      If they were checking into him

14   between the earlier part of 1998 and

15   if he was in Troop B, then he would

16   be part of my command.  I can tell

17   you I don't know Kip Stanton, if

18   that's one of your questions also.

19   Q.      Well, I believe that you don't

20   know him and I'm not arguing with you

21   whether you knew him or not.  I

22   accept your testimony, you don't know

23   him.  The issue is, have you done any

24   investigation --- let me say this to

25   you, sir.  I may be mistaken, what

137

1    cursory research I have been able to

2    do and again, I'm not a Pennsylvania

3    State Policeman, but what cursory

4    research I have been about to do and

5    I've gleaned this, honestly, just

6    from the --- what investigative ---

7    I'm still waiting, incidentally, for

8    transcripts of the wire taps from

9    your attorneys and I'm very curious

10   to see what those things have to say

11   because my understand is that Kip

12   Stanton was in your command during

13   the period of time that the FBI was

14   gathering information and looking at

15   him.  And if that's so, wouldn't that

16   be a conflict, possibly?

17   A.     No.  Why would that be?

18   Q.     Well, if I'm Darrell Ober and

19   the FBI brings me information and

20   raises concerns and we'll find out

21   what they have to say about certain

22   things, our good friends in the FBI.

23   I'm looking forward to the

24   opportunity to converse with them.

25   To me, does it raise a possibility

138

1   from the standpoint of just ensuring

2   the integrity of an investigation

3   that you be very, very careful that

4   you don't, you know, obstruct or

5   impugn the integrity of that

6   investigation, if you're talking

7   about someone's chain of command.

8   Somebody that's in that chain of

9   command, you know --- bottom line,

10  did Mr. Ober have any reason to be

11  concerned --- not that anyone is

12  doubting your integrity and we're not

13  implying that, but that you were the

14  Commander of Kip Stanton, if indeed

15  that's correct, during the period of

16  time the FBI's looking at him.

17  Should he have had any concerns about

18  that?  If it's a political corruption

19  case and the idea is that it goes up

20  the chain of command somewhere.  No

21  specific reference to you, sir, I'm

22  not implying that.  I want to make

23  sure the record's clear that way, all

24  right?

25  A.      Thank you.

139

1   Q.     Because, you know, we're not

2   here to --- I'm not a believer in

3   dirty politics, okay?  And I don't

4   want to bring any inference of that

5   into this case because it's not what

6   we're after.  My question's a very,

7   very simple one.  You're an FBI

8   investigator, you have certain

9   information, it may not be very

10  precise.  Your concern is that

11  somebody's buying or selling

12  positions, you've got a confidential

13  informant and information there that,

14  you know --- hey, it's not clear, but

15  it's, you know, finger pointing

16  stuff, generally.  And the idea is

17  that this individual and somebody

18  above in the chain of command, okay?

19  Now, you're Troop B Commander and

20  you're the Commander of Stanton, if

21  that's the case at that time.

22  A.     Okay.

23  Q.     I'm in the Pennsylvania State

24  Police, I'm approached for, you know,

25  maybe organizational information,

140

1    whatever the purpose is.  Okay.  I

2    don't know.  The FBI can tell us.

3    They can tell us why their bosses

4    didn't call Colonel Evanko, they're

5    good friend.  But they can explain

6    that.  We just are sitting here with

7    Captain Ober, that's all we know.

8    Should he have come to you, because

9    you're Stanton's Commander, and said,

10   hey, this might involve a guy in your

11   command?  Should he have done that?

12   A.    Can I tell you what we do

13   normally?

14   Q.    No.  Tell me under these

15   circumstances, if you can.

16   A.    Absolutely.

17   Q.    He should have?

18   A.    Absolutely.  He should've

19   called.  Absolutely.  I'll tell you

20   --- you know what?  I'm sorry.  I

21   shouldn't go that way.

22   Q.    No, no.

23   A.    But you know what?  We always

24   tell our Troop Commander what's going

25   on within his troop, without a doubt,

141

1    almost always.  Ninety-nine (99)

2    percent of the time we tell them

3    what's going on in their troop.

4    Q.     I understand how you feel.

5    A.     And he may just tell you that

6    I got something going on already and

7    we just heard something on that.  You

8    know, you've missed so much

9    information when you don't talk to

10   people.

11   Q.     Okay.  Why do you think he

12   didn't do that?

13   A.     I don't have a clue.

14   Q.     Okay.

15   A.     I apologize.

16   Q.     No, don't worry.

17   A.     Yes, I do.

18   Q.     I understand these are very

19   strong feelings and everybody's got

20   strong feelings on something like

21   this because --- look, I understand

22   the motivation.  I'm sure when I talk

23   to Colonel Evanko, you know, he's

24   going to tell us why he was

25   concerned, you're telling us why

142

1   you're concerned and, you know,

2   Captain Ober's explaining why he did

3   what he did.

4   A.      Can I tell you this?  In my

5   experience --- and I don't want to

6   give you too much because I know

7   you're trying to get this over with.

8   I've worked with the FBI even while

9   in the IA, as an investigator, as a

10  commander.  When our people are

11  wrong, we go after them and we take

12  appropriate action.  They've assisted

13  us in those investigations, whether

14  it be the FBI or the ATF or the DEA.

15  We've worked with all those agencies

16  in pursuing troopers that we think

17  may or may not be wrong.  We've never

18  let troop commanders out of the loop

19  on those particular cases.  Quite

20  often, we need their aid, their

21  assistance, in doing that.

22          It just --- I've said it

23  already and I'm going to say it one

24  more time.  It doesn't ring true to

25  me that if the FBI was after the

143

1    Commissioner or the Deputy

2    Commissioner of the State Police,

3    they would go to a captain in IA

4    about that.  They may go to some

5    other agency within --- the Inspector

6    General.  They would go to the

7    Inspector General and say, hey, let's

8    take a look at this perhaps, you know

9    --- they're the ones that could come

10   ---.  We are permitted to investigate

11   ourself, the Pennsylvania State

12   Police, and some other agencies do

13   that to some extent.  But the

14   Inspector General, they have the

15   right to investigate all the state

16   agencies within Pennsylvania.  And

17   they could get that information.  And

18   that's just based on my experience

19   with these folks.

20   Q.      Well, I'm not a fan of the

21   FBI.  I've had experiences where in

22   my view, I've seen the FBI flat out

23   lie.  I tell them that, so I'm

24   telling you that.  I'll tell anybody

25   that.  Furthermore, I'll prove it,

144

 1   but, you know, there's good and bad,

 2   and there's good and bad

 3   investigations.  There's some great

 4   FBI people and there's some people

 5   that aren't so great.  We all know

 6   that's human nature and we know any

 7   of our large organizations has good

 8   or bad.

 9         Here, the issue is, you know

10   --- you really bag a question by your

11   response and it is as follows.  Why,

12   then, did the FBI go to Ober?  I

13   mean, it's clear he had no special

14   relationship with anybody or

15   anything.  Is it possible that they

16   went to Ober simply because maybe

17   they didn't have that concern that he

18   would be involved in something, but

19   secondly, because they needed certain

20   basic information and they needed to

21   contact somebody for information.

22         The issue then becomes, of

23   course, for the Pennsylvania State

24   Police involved, you know, what Mr.

25   Ober did or what decisions he made.

145

1    And that's why this whole thing gave
2    rise, we allege to these things that
3    caused this whole lawsuit. What I am
4    asking is, and I think you've
5    answered it, in your opinion, in your
6    view is that under circumstances
7    where Mr. Stanton was within your
8    command and there's somebody saying
9    the higher ups in the State Police
10   --- at one point there is testimony
11   that a Lieutenant Colonel was
12   mentioned, okay, as a rank. Plus,
13   there's other references, okay? A
14   state senator, we know, was mentioned
15   by name, a state representative by
16   name.
17          Now, there's a question of
18   when, but there's more tantalizing
19   questions as to how that implicates
20   what happened to Captain Ober and
21   whether the FBI is being truthful.
22   So we'll find out about that and they
23   can get their little stuff on the
24   record. But what I want to ask, if I
25   could read this to you. If I can

146

1  read something to you.  This is from

2  the Williams' interview of Agent Kush

3  and this is a quote.

4      Before I start, I'd like to

5  give you some background on this

6  case, this is Agent Kush.  This case

7  actually began approximately five

8  years ago as a bribery case, which

9  occurred in East Liberty.  In January

10 of 1996, I arrested the subject and

11 he immediately told me, I don't think

12 we know this person's name to this

13 day. And he told me, immediately told

14 me, he could give us a police officer

15 who was involved in trying to buy a

16 trooper position for a friend of his.

17     The subject told us that for a

18 certain amount of money, this police

19 officer could get a person into the

20 PSP Academy.  Stopping right there,

21 we don't know who he might be talking

22 about, but he goes on.  The subject

23 told us the police officer was a

24 trooper named Kip Stanton.  I can't

25 give you the name of the above

147

1  subject, as he is now a confidential

2  informant for the FBI.  I did some

3  checking and verified that Kip

4  Stanton was indeed a state trooper.

5  Now, he's a state trooper.  It is

6  absurd to assume that a Pennsylvania

7  State Trooper, at that level, could

8  manage the bureaucracy of the

9  Pennsylvania State Police without

10  help from above, I think you'll agree

11  with me, to get somebody into the

12  academy.  Would you agree with that?

13  How could a Pennsylvania State

14  Trooper on his own get somebody

15  appointed to the State Police Academy

16  without having help internally?  Is

17  that possible, that you can think of?

18  A.     I don't think he can do it

19  even with help from above.

20  Q.     I don't disagree with you,

21  sir.  At least he's saying he can.

22  A.     Not without licit help,

23  anyway.

24  Q.     All right, sir.  But the point

25  is, he's got to look somewhere for

148

1    bureaucratic or managerial help

2    somehow.  He can't just --- a state

3    trooper doesn't have a right to call

4    up and appoint somebody to the

5    academy.  That's only common sense;

6    right?

7    A.      Not since the late '50s.

8    Q.      Now, here's the next

9    paragraph.  I did some checking and

10   verified that Kip Stanton was indeed

11   a state trooper.  I became concerned

12   that perhaps Stanton was working

13   undercover and if that was the case,

14   there would be two agencies bumping

15   into each other.  I subsequently

16   contacted Klaus Barrens (phonetic)

17   and ran this scenario by him.  Who's

18   Klaus Barrens?

19   A.      A retired Captain with the

20   State Police.

21   Q.      And what position did he serve

22   in?

23   A.      At one point, he was the

24   Director of IA, western section.

25   Q.      Well, I'll tell you, you've

149

1  looked at the Williams --- you told

2  us you looked at this investigation;

3  right?  I'm not saying you know it

4  letter crossing Ts and dotting Is,

5  but you reviewed it somewhat or some

6  of it; right?

7  A.      I've read it.  Yes, sir.

8  Q.      Where are the references in

9  Pennsylvania State Police files

10  before this thing came up involving

11  Captain Ober about Barrens and

12  Barrens being contacted by the FBI

13  over Kip Stanton or some guy getting

14  arrested back in '96?  Are there any?

15  Because I don't of any or somebody's

16  withholding information from me.

17  A.      I don't know of any, sir.

18  Q.      I don't either, sir.  But,

19  sir, you know --- it says here,

20  according to the FBI, I subsequently

21  contacted Klaus Barrens and ran this

22  scenario by him.  He checked and

23  verified that the PSP has no

24  undercover case involving our CI, and

25  this is very pregnant with meaning,

150

1   sir, and Trooper Stanton was not

2   working undercover.  Did somebody

3   bury a file somewhere?  I'm not

4   suggesting you did ---.   What

5   happened?  Where is --- he called and

6   checked with somebody, you told us

7   --- now, that this record is replete

8   with your descriptions of how records

9   are to be kept and files are to be

10  and things are supposed to be given

11  numbers and memos and records and

12  stuff like that.  And you're not

13  alone in that.  Every Pennsylvania

14  State Police Officer who's testified,

15  Mr. Brown in this case, all of you,

16  have all indicated the way

17  information is kept.

18          Now, I'd like to ask you, can

19  you give me any explanation of why

20  there is not some background

21  information about Klaus Barrens, an

22  inquiry from --- into the

23  Pennsylvania State Police by Agent

24  Kush, if Agent Kush is telling us the

25  truth.  And I'm sure he'll be glad to

151

1    indicate to us that he's telling us

2    the truth, maybe he'll have a 302

3    laying around somewhere.  But what do

4    you know about this?  What can you do

5    to help me with the background when

6    we get up into 1998 and the FBI

7    contact's over?  Where can you help

8    me?

9    A.     I can't.  I would have to have

10   Captain Klaus Barrens in here to talk

11   to him.  I'd find out what it meant.

12   Q.     Find out what he did, who he

13   talked to, what he said; right?

14   A.     Absolutely.

15   Q.     When did he retire?

16   A.     I don't recall the year, but

17   it's been a couple years now.  He's

18   in Western Pennsylvania.  I know that

19   for a fact.

20   Q.     Well, you know, I check this

21   Williams' thing, I go through this

22   Williams' --- you know, the Evanko

23   investigation, Williams'

24   investigation, Werts' investigation,

25   whatever you want to call it --- by

152

1    investigator name, initiator, subject

2    matter, whatever.  I can't find an

3    interview with Mr. Barrens.  Do you

4    know whether an interview was ever

5    done with Mr. Barrens by the

6    Pennsylvania State Police or even

7    just a request for a voluntary

8    statement, anything?

9    A.      I don't know, sir.

10   Q.      And the fact is and the truth

11   is, Major Conley or Colonel Conley,

12   while you were a major there, you

13   didn't know anything about this until

14   the spring of 1999; am I right?

15   A.      That's correct.

16   Q.      Do you know why Klaus Barrens

17   didn't get a hold of you in 1996,

18   January '96, or your predecessor,

19   maybe?  It would've been your

20   predecessor.

21   A.      In '96 I was someplace else,

22   why did he get a hold of my

23   predecessor and --- I don't know that

24   he did not.  I think if they asked

25   him that question.

153

1   Q.    Fair enough.  He may have done

2   that.  But you don't know of anything

3   in IAD files now or BPR files now, do

4   you, about Mr. Barrens and 1996 and

5   all that kind of stuff?

6   A.    No, sir.  I do not.

7   Q.    But you do admit that if ---

8   although you don't know whether he

9   was, that if Mr. Stanton on or about

10  the year 1998 was assigned to Belle

11  Vernon that that at least would be

12  the jurisdictional area of Troop B?

13  A.    That would've come under my

14  command.

15  Q.    Well, that's the information I

16  have.  I may be wrong, but my

17  understanding is, again, I may be

18  wrong because I can't be certain.  Go

19  ahead, sir.

20  A.    I'm not sure.  I'm not certain

21  of that.

22  Q.    I'm not certain he was

23  assigned to Belle Vernon.  I thought

24  he was.  I mean, that's the

25  information that I have.

154

1   A.      Okay.

2   Q.      And I got that somewhere else

3   from in that investigation.  I read

4   it somewhere, but I'm not --- that's

5   my inability to pick it out for you,

6   I'm not certain.  Maybe you can try

7   to find it for me.

8   A.      I'll just offer this to you.

9   Troop B is made up of Findlay

10  Station, Washington Station,

11  Uniontown Station, Belle Vernon

12  Station, as well as the Waynesburg

13  Station.

14  Q.      Yes.  I'm familiar with the

15  Belle Vernon.  It's right off of 70

16  going down there.

17  A.      And the Belle Vernon station,

18  left North Belle Vernon in 1978 and

19  they moved up to 51 to the Solomon

20  Tuscovich property just south of the

21  --- across from where the Old 20

22  Church is.  And the last ten years

23  they moved up to Sweeney's Corner and

24  that's where they're located.

25  Q.      Great Democratic Country.  I

155

1    know that.  I'm from that area and
2    I'm familiar with a little bit of
3    that.  Later on, in the --- strike
4    that.
5         Did you ever hear of a fellow
6    by the name of Doc Fielder from down
7    in Pittsburgh?
8    A.    Uh-huh (yes).
9    Q.    Do you know Doc Fielder?
10   A.    Not personally.
11   Q.    I know Doc Fielder and could
12   we agree that Doc Fielder is, among
13   other things, a political operative
14   in the Democratic Party in Pittsburgh
15   politics.  Would you agree with that?
16   A.    Yes.
17   Q.    Colonel Conley, when did you
18   learn that Mr. Ober was going to be
19   transferred to Washington County on
20   that project out there?
21   A.    I'm not sure.
22   Q.    Well, didn't you communicate
23   with Colonel Evanko about that?
24   A.    I wouldn't have communicated
25   with Colonel Evanko about that.

156

1    Q.        How about Colonel Coury?  Did

2    you communicate with Colonel Coury?

3    A.        I could've communicated ---

4    it's more likely I would've

5    communicated with Colonel Coury.

6    Q.        Do you remember communicating

7    with him some time in February, in

8    some kind of a written communication,

9    which might indicate that you have

10   knowledge that Mr. Ober was going out

11   to Washington before he was sent out

12   to Washington?

13              ATTORNEY CHRISTIE:

14              Excuse me.  February of

15         what year, Counsel?

16              ATTORNEY BAILEY:

17              2000; is that correct?

18              ATTORNEY CHRISTIE:

19              February of 2000?

20              ATTORNEY BAILEY:

21              Yes, ma'am.

22              ATTORNEY CHRISTIE:

23              Before he was sent out

24         to Washington?

25              ATTORNEY BAILEY:

157

1          No.

2    BY ATTORNEY BAILEY:

3    Q.      Here's my question, do you

4    have a recollection of communicated

5    to either Colonel Evanko or Colonel

6    Coury, you know --- when somebody's a

7    Colonel or Lieutenant Colonel, you

8    call them Colonel; right?

9    A.      Yes, sir.

10   Q.      So when I do that, I'm not

11   interfering in ranks, I mean, I'm not

12   mixing my ranks, just so --- maybe

13   people in the military don't know

14   that in the record.  Now, anyway, do

15   you know of any kind of memos or

16   communication --- the reason I ask

17   you this is to see if you have a

18   recollection of any communication to

19   either Colonel Evanko or Colonel

20   Coury on or about February of the

21   year 2000, which would indicate that

22   you knew that Colonel Ober was going

23   to be transferred out to Washington

24   in January of 2000?  That's why I

25   asked you when you knew.

158

1    A.      Yeah, I don't know

2    specifically.  Did I know that

3    Captain Ober was supposed to be

4    transferred, yes.  When, I'm not

5    sure.

6    Q.      Do you know how long before

7    the transfer you knew?

8    A.      No, sir.  Not off the top of

9    my head.

10   Q.      Well, you called him at home

11   at 1600 hours, didn't you?  After you

12   had met with him in the office, you

13   didn't tell him in the office.  You

14   called him at 1600 hours at home and

15   told him he was being transferred;

16   didn't you, that same day?

17   A.      You know, I did call Captain

18   Ober at his residence and I think I

19   did tell him that he was being

20   transferred.

21   Q.      Yes, but you knew that

22   earlier, sir.

23   A.      I'm not so sure I did.

24   Q.      Do you have a recollection of

25   having known that earlier when he was

159

1  in the office and not telling him?

2  A.     No, I don't.

3  Q.     I know, sir, I wanted to ask

4  you.  Didn't you on or about December

5  of 1998, maybe --- the date in my

6  mind, you know, I'm not the best at

7  this.  I try to put these dates in my

8  mind.  For some reason, December

9  16th, 28th, something like that, did

10  you have Captain Ober appointed as

11  Director of BPR temporarily?  Did you

12  put him charge?

13  A.     I'm sure he was in an acting

14  capacity while I was there.

15  Q.     That's what I mean.

16  A.     I don't know when

17  specifically.

18  Q.     Why did you do that?

19  A.     If I did that it was because I

20  was out of the office.

21  Q.     I mean, why did you trust that

22  to him if you had these difficulties

23  or problems?  Was it just that it was

24  the proper thing to do?  I mean, I

25  don't want to be unfair about that.

160

1  I understand you're very politic

2  about not --- you explain your way of

3  commanding. I'm not here to, you

4  know, say how you're supposed to

5  handle troops and make decisions.

6  And I respect the fact that you're

7  good at doing that. I may disagree

8  with a lot of things, but my opinion

9  doesn't matter. Your reason for

10 doing things does matter.

11      And what I'm asking is I

12 understand that you had difficulties

13 with how Captain Ober was doing

14 things and you explained that to us,

15 no reason to revisit it. But I also

16 understand that during, I think it

17 was December of '98; am I correct on

18 the year? During December of '98

19 that you appointed him as the

20 temporary, you know, replacement for

21 you because of, for whatever reason

22 I'm not sure, but there's a couple

23 weeks in there or a week or two or

24 something like that. Did you do that

25 because you felt secure that he could

161

1  competently do that job?  Is that

2  fair to say or you wouldn't have done

3  it?

4  A.    Captain Ober is a Captain of

5  the Pennsylvania State Police and I

6  think he is competent, as I think

7  most of our Captains are and for me

8  to have done that is not unusual.

9  And I'm assuming that if I did that,

10 then I took time off whether it be

11 vacation or other reasons, but yeah.

12 I mean, that doesn't surprise me that

13 that occurred.

14 Q.    And let me tell you my reasons

15 because, again, I'm not here to set

16 traps or be unfair to people or

17 create misimpressions.  The fact is

18 - - -.

19 A.    I'm only going to tell you the

20 truth.

21 Q.    I understand that and I

22 appreciate the fact that you're being

23 truthful.  The reason I'm asking the

24 question is I understand there were

25 difficulties.  It would not have been

162

1   out of the ordinary for you to ---

2   because it would be, you know, he had

3   been there before.  It would've been

4   the proper thing to do, under the

5   circumstances, even if you had

6   difficulties with certain things.

7   You know, that would be your style.

8   You're not going to not let him do

9   it, put somebody else in there or

10  something like that or create a

11  problem.  So you would appoint him to

12  that position.  That is consistent

13  with your management style; is that

14  fair to say?

15  A.      And if I could just answer

16  that to say not only did Captain Ober

17  have that opportunity to command the

18  Bureau when I was unavailable, but

19  Captain Skurkis as well.

20  Q.      I understand that.

21  A.      And we went back and forth

22  between the two captains and that's

23  normal.

24  Q.      Okay.  But the point is that

25  for some period of time, I understand

163

1    that you put Captain Ober in there.

2    A.      Okay.

3    Q.      I think your record is pretty

4    clear on that.  We can document it,

5    no problem.  But here's the question.

6    The question is, when you did that,

7    did you counsel him in what you

8    wanted him to do, what you didn't

9    want him to do or give him directions

10   as to how he was to manage affairs

11   and make decisions at that time?

12   Because of your concerns, which

13   you've already testified to.

14   A.      I don't believe I did.  What I

15   probably told him that I would like

16   to do --- probably told him to take

17   care of things that needed to be

18   taken care of, then get back to me on

19   the things you took care of.  It's

20   kind of routine, I mean, it's not a

21   big deal there.

22   Q.      All right.  Now, on February

23   18th, 2000 there's a memorandum I

24   have here.  Here, you may want to

25   take a look at this.  Here, show that

164

1    to your attorney.

2    WITNESS COMPLIES

3    BY ATTORNEY BAILEY:

4    Q.      Did you write that?

5    A.      I recall this memo.

6    Q.      Could I see it for just a

7    second?  What was the purpose for

8    reassigning Captain Ober to BPR?

9    What was that about?  Reassigned from

10   where?

11   A.      The IIMS project.

12   Q.      Well, who took him off of

13   IIMS?

14   A.      I don't think anyone did take

15   him off of it.  I think his

16   assignment was completed there.

17   Q.      So you don't know whether he

18   was removed from that position by

19   Colonel Evanko or his just his ---

20   what was it like, his work finished

21   or something?  I'm sorry.

22   A.      That's my understanding.

23   Q.      Well, who gave you to

24   understand that?

25   A.      Well, you know what, I think

165

1   --- as I remember that memo there,

2   his reassignment to the Bureau was to

3   occur after his assignment at IIMS

4   was completed.

5   Q.      And who told him that?  Was

6   that Colonel Evanko that told him

7   that?

8   A.      I don't know, but I would

9   assume that's correct.

10  Q.      It would have to be, wouldn't

11  it?  Colonel Evanko assigned him to

12  IIMS and did anyone ever tell you

13  that Colonel Evanko told him he'd be

14  going back to BPR or his duties were

15  done there or when or if they

16  concluded?

17  A.      I think that was one of, and I

18  think I got this from Captain Ober,

19  that was one of the stipulations when

20  he took the job.  That he would

21  return to IA after it was completed.

22  Q.      Now, remember earlier on one

23  of my questions, you'd indicated,

24  correct me if I'm wrong, that in a

25  discussion with Colonel Coury, you

166

1  told Colonel Coury you didn't want

2  Ober back?

3  A.     That's correct.

4  Q.     Well, does that refresh your

5  recollection at all when you had the

6  conversation with Colonel Coury?

7  A.     It does not.

8  Q.     Well, according to this memo

9  to the Commissioner, the Commissioner

10 personally informed you in some form

11 that Captain Ober would be returning

12 to BPR.  Well, let me tell you where

13 I'm coming from.  If somebody says to

14 the Commissioner, I don't want that

15 man back here, maybe that was you or

16 maybe that never happened or

17 according to what we can tell, this

18 investigation --- although Mr. ---

19 Captain Ober has never been informed

20 of any adjudication that had ended

21 into the events of the fall of 1998.

22 A.     That's not unusual.

23 Q.     It's not unusual you tell us.

24 Okay.  That he gets sent out to

25 Washington or he's told he's got to

167

1  go out to Washington.  Now, was there

2  any discussions between you and

3  Colonel Evanko or Colonel Coury about

4  getting rid of Ober or doing

5  something to him?

6  A.     I know I voiced my objection

7  to Captain Ober coming back to BPR.

8  And I don't know whether --- I voiced

9  my objection to Captain Ober coming

10 back to BPR to my boss at that time,

11 Lieutenant Colonel Coury.  And

12 whether he took it to the

13 Commissioner or not, I do not know or

14 I do not recall.  However, I was told

15 that the Commissioner had made a

16 commitment to Captain Ober that he

17 would return to BPR, IA and that he

18 was going to honor that commitment.

19 Q.     Well, let me read this to you.

20 It says on January 7th, 2000, this is

21 about the Commissioner now, this is

22 directed to the Commissioner.  This

23 is from you, the date's February

24 18th, 2000.  It says on January 7th,

25 2000 you informed me that Captain

168

1    Ober would be reassigned to the
2    Bureau of Professional Responsibility
3    effective January 14th.  After
4    discussion --- now, you know, that
5    means you and Colonel Evanko talked.
6    A.      Okay.
7    Q.      All right.  That's what it
8    says.  After discussion, comma, you
9    adjusted that date to January 24th.
10   Now, I want to read you this next
11   sentence, sir.  This would return
12   Captain Ober to my command for
13   approximately five days.  Well, where
14   was he going?  How did you know he's
15   only coming back for five days?
16   Where was he going?  Yes, sir?
17   A.      I wasn't sure if you were
18   finished or not.
19   Q.      I'm finished, sir.
20   A.      To the best of my
21   recollection, Captain Ober was being
22   reassigned someplace else.  However,
23   it was not taking effect until --- I
24   think you said the 24th?  Can I see
25   the memo again?

169

1    Q.      Yes, sir.  You may see the

2    memo again, sir.

3    A.        Okay.  To the best of my

4    recollection, I had a conversation

5    with my boss, Lieutenant Colonel

6    Coury, and apparently, based upon

7    this memo, I also had a conversation

8    with the Commissioner.  And I was

9    probably trying to reinforce my

10   efforts to not have Captain Ober

11   reassigned or returned to BPR.  The

12   Commissioner overruled me.  He said,

13   he's coming back because I made that

14   commitment to him.  That was a

15   promise he had made to him and I'm

16   only in a position to voice my

17   opposition.  I don't make that

18   decision.

19   Q.      Yes, sir.  He promised him so

20   he sent him back for one week.

21   A.      No.  What it goes on to say

22   here is that it was to be effective

23   the 14th.  However, somewhere along

24   the line there's been a reassignment

25   to Ober, but it wasn't to take place

170

1    until after the 24th, which meant he

2    would still have to come back into

3    the Bureau.  I wasn't happy about

4    that.  I initiated contact with Major

5    Waugh.  Major Waugh was very

6    satisfied with the work of Captain

7    Ober and he didn't want to lose him,

8    he wanted to keep him.  And that was

9    fine with me.  However, the

10   Commissioner had said that or made

11   that promise that Ober would go back.

12   And so I could not --- we couldn't

13   work out a deal there.  I'm not done

14   yet.

15   Q.    Yes, sir.

16   A.    It would've been happy --- I

17   would've been elated to have let

18   Captain Ober go there, but the boss

19   has made his commitment, the boss in

20   this case the Commissioner, and he

21   fulfilled that one.  Also, I talked

22   to Captain or Major Szupinka, who had

23   talked to Captain Ober, who expressed

24   his --- he didn't want to come back

25   to BPR at that point and that was

171

1  fine with me as well.  Any

2  arrangements made after that, based

3  upon that, was between Szupinka and

4  Ober.  And in talking to Major

5  Szupinka, I knew he was going to do

6  his --- everything he could for

7  Captain Ober.  I know he was making

8  arrangements for an office or a

9  computer, a car, a credit card, a

10  cell phone, everything that would

11  have been commensurate with his

12  position as his XO out here.  I know

13  that because we talked about it

14  specifically.  We even talked about

15  letting Captain Ober report to a

16  station closer to his home,

17  McConnellsburg or someplace in Troop

18  G there --- on to his tenure with

19  Major Szupinka.

20  Q.     So he could see his children

21  and his wife?

22  A.     You know, none of us like to

23  be away from home, but that's just

24  part of it, you know.  I've been in

25  Harrisburg, since 1993 and I've been

172

1  on the road since 1983, except for

2  those two years I was in Erie I got

3  to go home twice a week. Other than

4  that, you know, if you want the

5  position, you want to be a captain,

6  you want to be a lieutenant,

7  sometimes you go where the positions

8  are --- where a position --- an

9  agency's supply and demand, that's

10  all. It's what's available to you

11  and you can't always be home. I've

12  made my adjustments. I maintain an

13  apartment in the Harrisburg area up

14  there.

15  Q.     Well, before you learned that

16  Captain Ober didn't tell you about

17  the FBI, you weren't screaming to get

18  him transferred out of the Bureau,

19  were you?

20  A.     Do you know what? I was not

21  and I think I was --- it's a period

22  of adjustment and I knew when I was

23  going in there that it would be a

24  period of adjustment, you know. As

25  we went along, little things kept

173

1    coming up and you start --- which

2    gets your attention and you say,

3    well, you know, I'm not sure this is

4    going to be a good relationship or

5    not.  I'm certain and I can assure

6    you that part of what came out of

7    that influenced my decision not to

8    want him back because obviously he

9    didn't trust me, so why should I

10    trust him?  He showed his distrust

11    for me.

12    Q.    Well, my question is, until he

13    had showed his distrust of you,

14    that's your view, by not telling you

15    about the FBI, you weren't out to get

16    him transferred out of the Bureau.

17    You may not have been happy with

18    certain things, but you weren't out

19    to get him transferred out or denied

20    an opportunity to serve in the Bureau

21    of Professional Responsibility; is

22    that fair to say?

23    A.    Not yet.  Yeah, and I want to

24    be fair about this, you know, because

25    I have to get --- I think Captain

Sargent's Court Reporting Service, Inc.
(814) 536-8908

174

1   Ober is a bright individual.  I think

2   he could be an asset, you know ---.

3   So I have to have an opportunity to

4   evaluate that and I don't think in

5   that short period of time I could

6   have come to that quick conclusion,

7   you know but --- we're like

8   everything else, you know, we'll

9   prove ourself to people one way or

10  the other, you know, whether we want

11  to be there, whether we want to work

12  with you, but we're going to have do

13  things our way.

14  Q.      I know.  You explained many,

15  many times that he wanted to do

16  things his own way.  I understand

17  that.  I'd like to ask ---.

18  A.      I wasn't finished, sir.

19  Q.      Oh, I'm sorry.

20  A.      And I don't mean to be ---

21  it's just that he was headed --- I

22  mean, you could see it.  How we got

23  to this way, got into this location,

24  I don't know, but you could see it

25  headed down that particular path, you

175

1  know. Was this the camel that broke
2  --- was this the straw that broke the
3  camel's back, perhaps it was.
4  Would've it got longer had I not
5  opposed, I don't know.  I didn't give
6  him a long leash, you know --- and
7  I'll only tell you that that's not
8  unusual.  I've done that in the
9  troops I've commanded and in dealing
10 with people, you know ---.

11          See, you've got to give people
12 an opportunity to know you as a
13 commander and sometimes they'll come
14 around, sometimes they won't.  At the
15 time that Captain Ober left the
16 Bureau, he had only been there --- we
17 had only worked together for a couple
18 of months, before we really got where
19 we needed to be and he had --- and
20 I'm not done yet.  And so I knew when
21 I didn't know him, you know, and I
22 can only tell you why he was over
23 there in IIMS though, he still kept
24 his fingers in the till, if you
25 would, at the IA at the time of the

176

1    acting director.  He stepped back and

2    still wanted to command, although he

3    was over here doing something totally

4    different.

5    Q.       Well, you haven't been able to

6    give me any rules that he violated

7    ---.  Let me ask it this way.  You

8    know whether he made the original

9    error, whether it was an error or

10   not, and I want to ask you about

11   that, give you a chance to expound on

12   that.  In not telling you about the

13   FBI and telling Lieutenant Colonel

14   Hicks, remember that?  Remember that

15   he did that?  Remember he went to

16   Lieutenant Colonel Hicks; right?

17   You know that, don't you?

18   A.       I'm aware that occurred, yes.

19   Q.       Sure.  And Lieutenant Colonel

20   Hicks ordered him not to say

21   anything to anybody.  Do you remember

22   that?

23   A.       I've heard that occurred, yes.

24   Q.       Okay.  What was he supposed to

25   do?  Was he supposed to come to you

177

1    after Lieutenant Colonel Hickes told

2    him that he's not supposed to do

3    anything?

4    A.      Why didn't he come to me in

5    the first place?

6    Q.      Well, sir, you know, we've

7    talked about that and you've

8    commented on it many times and you

9    can comment on it again.

10   A.      No, you and I have not talked

11   about that.

12   Q.      Now, let's not argue about it.

13   A.      I don't mean to be

14   argumentative, but you don't put

15   words in my mouth either.

16   Q.      No.  Look, sir, I don't put

17   words in anybody's mouth.  I run the

18   fairest deposition of any lawyer I

19   have ever known.

20   A.      Okay.

21   Q.      You are being treated no

22   differently than anyone else.  I

23   don't put words in anybody's mouth.

24   All right.  Now, let me go back and

25   revisit this.  You know, I have my

178

1    style of doing a deposition.  We have

2    talked, in my view, without ever

3    mentioning the order of Lieutenant

4    Colonel Hickes, to great lengths

5    about how Captain Ober didn't tell

6    you he got this call from Lieutenant

7    Colonel Coury, apparently he didn't

8    tell Lieutenant Colonel --- that

9    looks like a terrific sandwich.  The

10   ones over here in this vending

11   machine look ---.  Now, anyway, and I

12   want to give you a chance to explain

13   that.  Now, admittedly, I think we've

14   --- what I meant was, I'm not trying

15   to put words in your mouth, is that

16   it's very, very clear that in your

17   view of Captain Ober, that you

18   should've been the first person that

19   he sought out before he went to

20   anyone else; is that fair to say?

21   A.      Yes, sir.

22   Q.      And the reason for that is

23   because you were in his direct chain

24   of command and you were the Bureau

25   director?

179

1   A.      Yes, sir.

2   Q.      And you had been assigned to

3   that position on October 2nd and

4   sometime on or about October 5th, I

5   believe it is, he goes to --- is it

6   October 5 Colonel Hickes?  Sometime

7   about October 5 and --- I mean, you

8   can add to if you want to, but it's

9   clear that you feel that what he did

10  was wrong.  I mean, the bottom line

11  is what he did was wrong, in your

12  view; correct?

13  A.      Yes, sir.

14  Q.      All right.  He has explained

15  it as best he can.  It is a major

16  issue in this case, clearly, but I

17  now know what to go to the second

18  part of that question.  He, at some

19  point, goes to Lieutenant Colonel

20  Hickes, we believe it's around

21  October 5th, and Lieutenant Colonel

22  Hickes tells him, you are --- now,

23  Lieutenant Colonel Hickes, I believe,

24  has already told the Commissioner

25  this.  I mean, there's no secret

180

1    about this.  I don't think anybody

2    disagrees with it.  He says to

3    Captain Ober, you don't say a word to

4    anybody.  Ober, I believe would tell

5    you, that he feels a great load come

6    off of his chest, he is not carrying

7    this burden and it's a problem for

8    him because he doesn't --- according

9    to him, now, rightfully or

10   wrongfully, he doesn't know where to

11   go or who to tell or what to do.

12   Okay.  But he goes to where he feels

13   most comfortable and he can describe,

14   you know --- he can testify and has

15   to his own reasons.  Now, all I'm

16   saying is, did you become angry at

17   Colonel Hickes about his order?

18   A.    I think Colonel Hickes' order

19   was inappropriate and I've told him

20   that.

21   Q.    All right, sir.  When did you

22   tell him about it?

23   A.    Oh, on a couple different

24   occasions.  I can't say specifically

25   when.

181

1  Q.    Can you tell me what you said

2  to him?

3  A.    I told him I disagreed with

4  his thoughts, that he would do that,

5  that that occurred.

6  Q.    Did he tell you why he did

7  that?  Sir, can you keep your voice

8  up just a wee little tiny bit?

9  A.    I'm sorry.

10  Q.    That's all right.  Did

11  Lieutenant Colonel Hickes tell you

12  why he gave Captain Ober that order?

13  A.    He gave me a reason.  I don't

14  recall what it was or how it was

15  versed specifically.  But basically,

16  what he did tell me was, he didn't

17  believe this was true either.  And he

18  thought he would just let it run its

19  course and it would be okay.

20  Q.    Well, if it helps, I'm not so

21  sure --- I don't think Captain Ober

22  thought it was true, either.  And I'm

23  not so sure that's ever been the

24  issue.  All I want to ask you is, did

25  --- I'm sorry.

182

1  A.    I'm just telling you what he

2  told me.  That's what he told me,

3  that's all.

4  Q.    And I appreciate that.  I'm

5  sorry ma'am.  Okay.  Now, I very much

6  appreciate that and that's a separate

7  question, you know, what people

8  believed or did not believe.  And I

9  really do not think that --- I can

10  honestly say to you, I don't think

11  Captain Ober ever, in his heart of

12  hearts, believed that, you know ---.

13  But that's not the point, what he

14  believed.  The point is what you do

15  and the procedures you follow, et

16  cetera.  Now, my --- well, that's the

17  way I see it.  That's what the law's

18  about, to be as objective as

19  possible, to follow rules.  And I say

20  that because I don't know --- did you

21  ever recommend a disciplinary action

22  against Captain Ober over the issue

23  of not telling you?

24  A.    No.

25  Q.    Why not?

183

1    A.    I don't know that I was given

2    that opportunity when it came to me.

3    Q.    You have a right to file a

4    complaint.  You told us how the

5    process works.  Why didn't you?

6    A.    Sure.  In the other issue, the

7    other side of the coin is Captain

8    Ober, excuse the pun, was out of my

9    hair.

10   Q.    Pun is accepted.  Good sense

11   of humor, thank you.  Getting there

12   myself now.

13   A.    And so you kind of let things

14   go on, you know ---.  And it's just

15   like this, you know, am I happy with

16   Captain Ober and the way he handled

17   things, did this, no, but he's been

18   --- he'll be in State Police for a

19   long time.  I get over things after a

20   while and once you discipline

21   someone, how long do you hold that

22   against them, you know?  The key here

23   was that the situation kind of

24   resolved itself.  He wanted to be

25   over in IIMS, he was away from the IA

184

1  then, for the most part.  I mean, he

2  did touch back from time to time.

3  And no, I didn't pursue that issue

4  after that.

5  Q.    You prided yourself a number

6  of times in giving truthful answers;

7  is that right?

8  A.    Well, it's not that I pride

9  myself in it, I think that's what

10  it's all about being a law

11  enforcement officer.

12  Q.    The truth, in fact, is it

13  resolved itself because he got

14  punished; isn't it?  Because he got

15  transferred, against his will, to

16  Washington County, he prevailed in

17  that disagreement.  No matter how

18  anybody wants to term it, he

19  prevailed and his career is now dead-

20  ended.  He was assigned to a

21  lieutenant's position.  The fact is,

22  he's been punished.  He's been made

23  to pay, hasn't he, for his sin, his

24  blunder, his error?  Isn't that the

25  truth, Colonel?  I mean, as we sit

185

1    here today, isn't that the truth?

2    A.      I don't agree with your

3    commentary.  I really don't.

4    Q.      I respect your disagreement.

5    A.      And I can tell you why I

6    disagree with it.  I mean, I could

7    give you some thoughts of it anyway.

8    Q.      Sure.  Tell me why you

9    disagree with it.

10   A.      He hasn't lost any money, that

11   I'm aware of.  He hasn't even lost

12   any time, that I'm aware of.  He's

13   still performing at the rank of a

14   captain in the Pennsylvania State

15   Police.  And did he perform a

16   function that we needed done,

17   absolutely.  Was he assigned the rank

18   of a captain at the moment, no, but

19   as soon as a captain's position was

20   available, he was given that

21   position.  I mean, it's not the first

22   time that's occurred, I'm sure.

23   Q.      Do you know what I brought out

24   here with me?  Did you ever see this

25   memorandum written by the Honorable

186

1  William J. Caldwell --- William W.

2  Caldwell, United States District

3  Judge?  Did you ever read the Judge's

4  opinion?  If you haven't, I'm not

5  going to bother you with it.

6  A.      No.  I don't recall.  I don't

7  think I have.

8  Q.      Do you think what you have

9  just stated and recounted for me is

10 what you understand the law to be

11 governing civil rights violations of

12 public officials when they are

13 involved in matters of public concern

14 and express themselves?

15 A.      I know I'm not an expert in

16 law, in civil matters.

17 Q.      I'm not so sure.  It sounded

18 awfully good to me.  But the point

19 is, I guess, that there's a Federal

20 Judge, who rightfully or wrongfully,

21 properly or improperly, however, is

22 going to decide the issues of whether

23 or not his rights were violated.  I

24 didn't mean to ask you that.  I

25 didn't mean to ask you what the law

187

1    says because what I think about the

2    law, what your attorney thinks about

3    the law, what you think about the

4    law, don't really matter.  The court

5    will make the law decisions.  I'm

6    asking you whether or not you

7    believe, based on your knowledge and

8    experience, that Darrell Ober, good

9    or bad guy, mixture of, you know,

10   human frailties and strengths that he

11   carries like all of us, whether you

12   think he's paid a price for his act

13   of disloyalty or error or mistake,

14   whatever you'd want to call it.  Do

15   you think he's paid a price for that?

16   A.      I do not believe Captain

17   Ober's been disciplined.

18   Q.      Okay.  So you think the

19   transfer to Washington was proper and

20   okay, against his will?

21   A.      Certainly within regulations.

22   Q.      Okay.  Well, why do you think

23   it eventually resolved itself in his

24   favor?  Do you know why?

25   A.      No, sir, I do not.

188

1    ATTORNEY CHRISTIE:

2        Objection.  What

3    resolved itself in what favor?

4    The Court did not resolve

5    itself in anybody's favor.

6    The transfer order was

7    rescinded again for the

8    record, and the parties agreed

9    to keep Captain Ober in the

10   Harrisburg area.  That's my

11   recollection. So if you're

12   saying it resolved in his

13   favor, implying that the Court

14   resolved it in his favor,

15   that's not an accurate

16   statement for what happened.

17       With regard to

18   resolving anything in anyone's

19   favor, to my recollection, if

20   I'm not mistaken, I believe

21   the litigation that was

22   ultimately resolved by the

23   Court was resolved in the

24   Department's favor or in the

25   Defendant's favor.  Just to

189

1      clarify for the record.

2   BY ATTORNEY BAILEY:

3   Q.      Are you familiar with the

4   phrase, discretion is the better part

5   of valor?

6   A.      Yes, sir.  I've heard that

7   before.

8   Q.      I just was curious.  Captain

9   Ober didn't go to Washington?  He

10  didn't get transferred out there?

11  A.      I don't think Captain Ober

12  ever reported to Area Three

13  Commander.

14  Q.      Okay.  What did he do next?

15  A.      I'm not sure what he did next.

16  I know he eventually ended up with

17  the Bureau of Liquor Control

18  Enforcement.

19  Q.      And as a Lieutenant Colonel in

20  the Pennsylvania State Police doing

21  your deposition here, it's your

22  testimony that to the best of your

23  knowledge and belief, the way that

24  Captain Ober has been

25  administratively handled by the

190

1    Pennsylvania State Police has been

2    above board, honest, in accordance

3    with regulation in the best interest

4    of the Pennsylvania State Police and

5    Captain Ober; right?  Right?  So if

6    you get an opportunity to tell a

7    jury, you'll testify to that because

8    you believe all of this has been just

9    and proper and right; is that fair to

10   say?  Tell us.

11   A.      I just want to make sure I got

12   everything in my mind, that's all.

13   Q.      Sure.  Go ahead.

14   A.      The short answer is yes.

15   Q.      Okay.  That's the best to

16   conclude depositions, get them

17   wrapped up, with short answers.  Now,

18   I want to show you a memo --- or

19   excuse me, it looks like an e-mail,

20   but I think the top has been changed

21   a little bit.  By the way, do you use

22   an autopen in your work?

23   A.      Me, personally?

24   Q.      Yes.

25   A.      No, sir.

191

1   Q.      Do you know how long it takes

2   the ink to dry on one of those?

3   A.      No, sir.

4   Q.      Just curious.  Will you take a

5   look at this?

6   WITNESS COMPLIES

7   BY ATTORNEY BAILEY:

8   Q.      Do you know who Mark Campbell

9   is?

10  A.      I'm not finished reading this

11  through.

12  Q.      Oh, I'm sorry.  I'm sorry.

13  A.      I just don't read as quickly

14  as some folks, that's all.

15  Q.      No, sir.  It wasn't that, you

16  know, the trouble --- I'm only

17  interested in one little sentence in

18  there and it didn't occur to me that

19  you should want to look at the whole

20  document.  And I apologize to you.

21  I'm in error.

22  WITNESS REVIEWS DOCUMENT

23  A.      Yes, sir.

24  BY ATTORNEY BAILEY:

25  Q.      Okay.  You read part way down

192

1   the middle of that e-mail, that's an

2   e-mail that was provided to us in

3   response to a document request that

4   was provided by Colonel Evanko.

5   There's a sentence that says ---

6   who's that e-mail to?

7   A.     It's to M. Campbell at

8   State.Pa.Us.

9   Q.     Okay.  Read the thing down

10  there, the reference to Captain Ober.

11  Would you, please?

12  A.     I am transferring Captain

13  Darrell Ober, effective January ---

14  I'm sorry, 28 January '00.

15  Q.     Okay.  Do you know anything

16  about that?

17  A.     I know it occurred or was

18  supposed to occur.

19  Q.     The transfer?

20  A.     I don't think it ever did

21  occur.

22  Q.     What's the date of that memo,

23  do you know --- or that e-mail?

24  A.     I don't see a date on here,

25  sir.

193

1    Q.    Can I see that for just a
2    minute?
3    A.    Uh-huh (yes).
4    Q.    There are a number of
5    references in here.  It says, for
6    example, Major Virginia Smith-Elliot,
7    (phonetic) my EEOC officers are
8    retiring in April.  I'm downgrading
9    that position, et cetera.  Up above
10   here it says, Mark, for your
11   information, last night we had
12   another shooting.  This time in
13   Emporium.  Do you remember when that
14   happened?
15   A.    No, sir, not off the top of my
16   head.
17   Q.    Well, I've been doing some
18   checking and it says again, a
19   domestic abuse complaint with the
20   subject because you know, this
21   document, it doesn't have a date on.
22   And all the other documents I got
23   have dates on them.  This one doesn't
24   have a date.  But this does say, M.
25   Campbell at State.Pa.Us.  Isn't that

194

1    the state, the capital e-mail?  I

2    mean the government's ---?

3    A.    That's the State Government.

4    Q.    Yes, it is.  Do you know Mark

5    Campbell?

6    A.    Yes.

7    Q.    When did you last talk to Mark

8    Campbell?

9    A.    I don't recall specifically,

10   but it's been a couple months

11   probably.

12   Q.    Did you ever talk to Mark

13   Campbell about Captain Ober?

14   A.    Never.

15   Q.    Never mentioned his name?

16   A.    Never.

17   Q.    Well, let's shift gears then

18   and let's --- I want to talk, focus

19   on any conversations you had with

20   Commissioner Evanko about Darrell

21   Ober, okay?  Now, I asked you earlier

22   about a meeting over in the front

23   office sometime where Captain Ober

24   was discussed.  And I think your

25   indication was that you didn't

195

1    recollect such a meeting; is that

2    correct?  Or was there a meeting?

3    A.    Well, you know, I may have

4    said that, but since I've said that

5    --- obviously, by this memo here,

6    I've had some discussion with the

7    Colonel about not wanting Ober back.

8    So there has been some meeting and

9    I'm assuming that is what it's about,

10   his not returning to BPR.

11   Q.    Let's go back to May of the

12   year 1999; okay?

13   A.    Okay.

14   Q.    Do you remember any meeting

15   that you attended where Captain Ober

16   and, let's refer to it as his

17   untimely giving of information to the

18   Commissioner, about the FBI probe,

19   inquiry, FBI inquiry?  Did you have a

20   meeting to discuss that sometime on

21   or about May of 1999 in which the

22   Commissioner was present and you were

23   present?

24   A.    No.

25   Q.    Did you have a meeting over in

196

1   the front office in which Colonel

2   Coury was present and you were

3   present where you discussed Captain

4   Ober?

5   A.      No, sir.

6   Q.      Okay.

7   A.      Let me just rephrase that.

8   I'm sure I've had some conversation

9   with Colonel Coury concerning Captain

10  Ober.  Exactly when, I don't know,

11  but I know it didn't occur in May.

12  Q.      How about June?

13  A.      Maybe something in June.

14  Q.      Well, did you have a

15  discussion with the Commissioner in

16  June about Captain Ober?

17  A.      I don't recall discussing

18  Captain Ober with the Commissioner.

19  Q.      At any time before this

20  transfer thing came up?

21  A.      Obviously, we had a

22  conversation based upon this note and

23  I don't even know when this is.  It

24  says somewhere around January 7th we

25  had that, and that would've been the

197

1    year 2000.   Whether we mentioned

2    Captain Ober's name during 1999, I'm

3    sure we did, as for recalling

4    specific meetings.

5    Q.      Now, did you have any meetings

6    with Captain Brown in 1999, let's say

7    between May and July, about Captain

8    Ober?

9    A.      I'm sure I did.

10    Q.      What did you discuss at those

11    meetings?

12    A.      I don't know.

13    Q.      Well, you had the interview

14    with Major Williams.  We know that;

15    right?

16    A.      Yes, sir.

17    Q.      And that was in June.  In

18    fact, it was --- I don't have it in

19    front of me, but it was June 8th of

20    1999.

21    A.      Okay.

22    Q.      Now, who was present during

23    that interview with Mr. Williams?

24    Just you and Mr. Williams?

25    A.      No.  Major Werts was present.

198

1    If you had the front page of this, it

2    would probably tell you who else.  I

3    don't recall who else was there.  I

4    know the two of them were there.  I

5    don't know if anyone else was there.

6    Q.    Were you read your rights?

7    A.    Miranda warning?

8    Q.    Any kind of warnings,

9    administrative, criminal, non-

10   criminal, whatever.  I don't know,

11   any rights.

12   A.    I don't recall being given any

13   type of rights.

14   Q.    You can't recollect any reason

15   to ask you what your rights would've

16   been?  There's no reason to read

17   rights to you; right?

18   A.    We give Miranda warnings in

19   criminal cases.  We want to make sure

20   an individual's telling us the truth.

21   Or if we suspect he may or may not

22   tell us the truth, we give them the

23   Garrity warnings.

24   Q.    What are the Garrity warnings

25   about?

199

1  A.    It's a notice or a flag to an

2  employee that's about to be

3  interviewed that the employer has a

4  right to know and that you should

5  tell them the truth.  And that if you

6  should give up some type of criminal

7  information during that time, that

8  will not be used against you, but

9  you're being compelled to cooperate

10  in an investigation or an inquiry.

11  Q.    I think there was some

12  testimony over there about Mr. Kush.

13  Can I have that back?

14            ATTORNEY CHRISTIE:

15            I don't think you

16        handed that over, Counsel.  I

17        think you read from it.  We

18        only have the page four and

19        five of Colonel Conley's

20        interview, it's the 6/8/99

21        interview.

22  BY ATTORNEY BAILEY:

23  Q.    If I told you that Mr.

24  Williams talked to Ralph Kush on May

25  25th, 1999, do you have any reason to

200

1    doubt that?

2    A.      No, sir.

3    Q.      Did Mr. Williams ever ask you

4    at any time if Kip Stanton was in

5    your chain of command?

6    A.      I don't recall that question.

7    Q.      Well, do you know why a has-

8    been, broken down hack of an old

9    lawyer like me would think of that

10   question when I see this and Major

11   Williams did not?

12   A.      No, sir.

13   Q.      Well, if there was an

14   investigation into the events,

15   justifications and reasons, whatever

16   they might be, about why Captain Ober

17   didn't tell you, which seems to be a

18   major complaint with the Commissioner

19   here, or the Commissioner or Colonel

20   Coury or somebody.  Why wasn't that

21   explored in the investigation, do you

22   know?  Why wasn't that question asked

23   about it?

24   A.      I don't know.

25   Q.      And if Mr. Williams had a

201

1   question, it's not that he doubts.

2   He's an investigator.  It has nothing

3   to do with his personal feelings.

4   Shouldn't he have read your rights

5   and just asked you, did you know

6   anything about what Kip Stanton was

7   doing?

8   A.    I'm sorry ---.

9   Q.    Not the question, you were

10   just talking about the procedures an

11   investigator should follow.  Don't

12   you believe that Mr. Williams

13   should've read you your rights and

14   asked you, based upon what Mr. Kush

15   told Mr. Williams on May 25th, 1999,

16   before he interviewed you on June

17   28th, 1999, that he should've read

18   you your rights and asked you if you

19   knew anything about what Mr. Stanton,

20   sir, had been doing earlier and

21   whether or not Mr. Barrens had

22   informed you of what Mr. Stanton had

23   been doing earlier?

24       I know that you didn't know

25   anything about that.  I believe you

202

1    1,000 percent. I'm just asking,

2    don't you believe that would've been

3    a proper procedure for Mr. Williams

4    to ask if he is investigating what

5    happened in the fall of 1998 and the

6    quality of that investigation and the

7    reason for Captain Ober's actions?

8    Wouldn't that have been a decent

9    question to ask?

10   A.      Not necessarily.

11   Q.      Okay. Why not?

12   A.      You went two different places

13   there. At the very end, you changed

14   up there. I think you started off

15   that saying, why wasn't I given my

16   rights and then you, at the very end,

17   you ask why not --- why he didn't do

18   something, why he didn't ask a

19   specific question.

20   Q.      Let me clarify that.

21   A.      Sure.

22            ATTORNEY CHRISTIE:

23            Could the Colonel just

24   finish his answer before we

25   get another question, Counsel,

203

1          because I think he's trying to

2          answer at least part of your

3          question.

4     A.      I do not know why Major

5     Williams did not ask that question,

6     whoever.  And it's not necessary that

7     he give each and every person, in

8     this case, it would be the Garrity

9     warnings, during the course of an

10    investigation.  I can only tell you

11    that it's only become routine in

12    recent years that that's given

13    routinely.  In past years, we only

14    gave that if we seen an opportunity

15    --- well, not an opportunity, but we

16    see that an individual may or may not

17    be truthful or we want to put him on

18    notice that you need to be truthful

19    in that particular response.

20          You know, there is a portion

21    or section of our field regulations

22    that tells you, you shall cooperate

23    with State Police internal

24    investigations.  Okay.  And so it

25    doesn't have to be given the Garrity

204

1   warning.  And I've done
2   investigations where I've interviewed
3   people and not given the Garrity
4   warning.  If it would become obvious
5   that this guy was not being truthful
6   or he may be taking something in the
7   wrong path and I'd say time out.
8   Let's take a minute, you know, you
9   have an obligation to be truthful
10  here.  And this is --- I'm going to
11  read this to you and I'm going to
12  have this witnessed by your
13  representative that I've given this
14  to you because subsequent to this, if
15  you're not truthful, we might bring
16  discipline if you're not being
17  truthful.  But we, the employer, at
18  that point I represent the employer,
19  have a right to know.  I don't know
20  why Major Williams, at that time, did
21  not ask that question.  I just don't
22  have a clue why he didn't do that.
23  BY ATTORNEY BAILEY:
24  Q.      Well, you told us earlier that
25  the investigation, as you understood

205

1  it, was not --- now, this was your

2  response, you correct me if I'm

3  wrong, was not into Captain Ober.

4  A.      That's true.

5  Q.      Then why was he read his

6  rights?

7  A.      Well, I guess the --- well,

8  the obvious answer is they wanted to

9  make sure that he had to tell the

10  truth.

11  Q.      Did they have some reason to

12  believe that he wouldn't tell the

13  truth?

14  A.      I don't know.

15  Q.      Well, my question to you was

16  because you reviewed this

17  investigation, was a very simple one.

18  Knowing what you know today, wouldn't

19  it have been proper if he wanted to

20  know what went into these

21  circumstances, if he was looking for

22  Captain Ober's reasons, wouldn't it

23  have been proper for him to read you

24  your rights and ask you if you knew

25  anything about Kip Stanton, who was,

206

1   I may be mistaken again, but who was,

2   I believe, in your command at some

3   relevant time?

4   A.      Not necessarily.

5   Q.      What was the date of your

6   interview?  June 26th?  Colonel, let

7   me just double-check something quick.

8   What is the date of your interview

9   there?

10  A.      June 8th, '99.

11  Q.      June 8th.  Okay.  So you had

12  the interview on May 25th with Mr.

13  Kush.  The interview with you, I had

14  said June 28th earlier, I was wrong.

15  That was the date of --- I knew it

16  was afterwards, but I was wrong on my

17  dates.  June 8th would've been the

18  interview with you and then June 28th

19  would be the interview with Captain

20  Ober. Has there been any question at

21  all in any of this, known to you,

22  which would indicate in any way that

23  Captain Ober had done something of a

24  criminal nature?  I realize that he

25  didn't do what you felt he should've

207

1  done as --- allow the chain of

2  command and State Police customs and

3  practices, but what about the issue

4  of criminal misconduct.  Do you know

5  of anything that implicates in any of

6  this that would indicate that Captain

7  Ober had done anything of a criminal

8  nature?

9  A.    I'm not aware of anything if

10  he did anything criminal.

11  Q.    How many other investigations

12  of the type that the Commissioner

13  ordered in this case are you familiar

14  with?  How many other times do you

15  know that that's happened?

16  A.    Well, it's occurred several

17  times.

18  Q.    Give me some idea when.

19  A.    When the Colonel wants answers

20  to issues --- do you want specific

21  incidents?

22  Q.    Sure.

23  A.    I can't give you specific

24  incidents off the top of my head.

25  Q.    Can't give me any?

208

1   A.      But I know it has occurred in

2   the past.

3   Q.      And that would be consistent

4   with your viewpoint that this was not

5   into Captain Ober, this was into the

6   facts of what occurred in the fall of

7   '98; right?

8   A.      Yes, sir.

9   Q.      Now, do you know whether

10  anyone else in the Pennsylvania State

11  Police were read their rights by Mr.

12  Williams and Mr. Werts?

13  A.      You say rights, you're

14  referring to the Garrity warnings?

15  Q.      I guess, yes.  The Garrity

16  rights, I'm sorry.  Yes, I guess

17  that's what they were.

18  A.      I don't know.

19  Q.      Do you know Major Merryman?

20  You know him don't you?

21  A.      Yes.

22  Q.      Impresses me as a pretty fine

23  State Police Officer.  You'd agree

24  with that; right?

25  A.      I don't disagree with that.

209

1    Q.      Do you know if he was read his
2    rights in any of this?
3    A.      I don't know.
4    Q.      Did you ever read people their
5    rights to intimidate them, you know,
6    to scare them, to put them off guard
7    or scare them?  Use it as an
8    investigative tool?
9    A.      I've never used it in that
10   method.
11   Q.      It's not right, is it?  It's
12   not proper to do things that way, is
13   it?
14   A.      Well, that's not true.
15   Q.      Oh, it's not?
16   A.      Let me back up.  I guess your
17   question is it's not correct to knock
18   them off guard or intimidate them, is
19   that what you're saying?  Or it's not
20   right to read them the rights each
21   time?  You probably need to clarify
22   that for me so before I answer that
23   question ---.
24   Q.      Well, okay, you don't know the
25   circumstances under which Major

210

1  Merryman was read his rights; right?

2  A.    Okay.  Just so I'm clear in

3  the future, every time you say

4  rights, you're talking about Garrity

5  warning?

6  Q.    Yes.  I don't know of anybody

7  in this case that was read their

8  Miranda Rights, but, I mean, the idea

9  behind a Garrity right is to say that

10  if you say something that could be

11  criminally used against you, you

12  know, we can't use it against you.

13  But as an employer, we have a right

14  to question you.

15        So the Fifth Amendment has got

16  to take a back seat here because the

17  rights of property come first.  So in

18  America, the rights of property are

19  more important than anything else.

20  So an individual's rights against

21  self-incrimination take a back seat.

22  And you come in and you say to the

23  person, you have to answer.  I'm your

24  employer, I want to check into

25  something here and there's a criminal

211

1   violation we can't use it against

2   you, but I'm going to, you know ---

3   see, I'm searching for why he was

4   read his Garrity rights and I don't

5   know why.  I can't understand why.

6   And I have a tendency to think that a

7   Federal Judge may ask why.  And I'm

8   curious if you know why he was read

9   his Garrity rights and why you

10  weren't in this investigation into

11  the facts, into the facts.  Not into

12  the person Darrell Ober, you told us,

13  into the facts about the fall of

14  1998.  I want to know why Colonel

15  Conley was not read his Garrity

16  rights, but Captain Darrell G. Ober

17  was because I don't know why and I'm

18  hoping you can help me.

19  A.     I guess my question is, was I

20  given the Garrity warning because I

21  just don't recall?

22  Q.     I don't think you were, but

23  I'm curious ---.

24  A.     I don't recall, sir.  I really

25  don't.

212

1    Q.      Do you know of any suspicion

2    of criminal misconduct in any of this

3    on behalf of Captain Darrell G. Ober

4    that you can tell me of?

5    A.      I'm unaware of any criminal

6    conduct on the part of Captain Ober.

7    Q.      No implications that you can

8    think of in that regard?  I can't

9    think of any, I'm being honest with

10   you, but you don't know of any?

11   A.      No.  And if that goes to ---

12   again, where are you going with this?

13   If that goes to being given an

14   administrative warning, it's not to

15   waive any immunity to any criminal

16   allegations, it's to only put the

17   individual on notice because a lot of

18   our folks do not know that they must

19   and they're required to cooperate

20   with internal investigations

21   completely and honestly.  That's why

22   we use the Garrity warning primarily.

23   I mean, it's not to say, if you've

24   got some criminal hanging over here,

25   we'll give immunity to that.  But

213

1    we're saying that, hey, this is an

2    agency and the employer has a right

3    to know and we're putting you on

4    notice that if you don't give us this

5    information, you're going to have a

6    problem with someone lying.  That's

7    what the purpose of giving that

8    within the State Police.

9    Q.      So, for that reason, two

10   majors in the Pennsylvania State

11   Police needed to read Garrity

12   warnings to a past Director of IAD,

13   who, according to you, was the author

14   of the concept of supervisory

15   inquiries, which are used by the

16   Pennsylvania State Police to this

17   very day, which you thought was a

18   good idea.  So Darrell G. Ober had to

19   be told of the consequences and

20   notice.  I mean, he couldn't sit down

21   and say, okay Colonel Evanko wants us

22   to check into this and we want a

23   statement from you, can we record it,

24   what happened, let us question you?

25   A.      Well, I think any time you

214

1  shorten the disciplinary process,

2  that's a good process.  I can tell

3  you that we have not adopted the

4  supervisory inquiry into our

5  regulation.  As of this point they're

6  still being used to some extent here.

7  Q.      I didn't mean to go there, but

8  that's okay.

9  A.      Well, I didn't know.  I

10  thought you were going there.  I

11  didn't know.  I thought I'd give it

12  to you.

13  Q.      I know.  No, I appreciate what

14  you're saying.  Now, Captain Ober's

15  supposed to come back, according to

16  the memo in front of you there by

17  virtue of the orders of the

18  Commissioner, on January 24th, 2000;

19  right?

20  A.      That's the date of his

21  transfer, the 24th.

22  Q.      And according to this memo, if

23  it's correct, that you read here, I

24  mean, all you know he didn't go out

25  there?

216

1    command for approximately five days

2    and that would be January 24th.  He's

3    coming back to the Bureau on the 24th

4    and then five days after that he

5    would be transferred out, which would

6    be the 28th or the 29th.

7    Q.    I don't mean to offend with

8    this question.  I mean, I really

9    don't mean to offend.  I just want to

10   be my real old common self when I ask

11   this question.  Isn't that just

12   jerking him around?  Is that

13   vindictive or mean or what's the

14   purpose?  Can you give me an

15   administrative purpose for that?

16   A.    For?

17   Q.    Can you tell me why Colonel

18   Evanko, against your recommendation,

19   we've established that, you've

20   testified to it, would be saying, no,

21   he's coming there for four days?  Why

22   would you do that?  What's the reason

23   for it?  If you don't know the

24   reason, could you give me --- now,

25   you're a very experienced officer

217

1   with a lot of knowledge of these

2   things, you've controlled troops and

3   stuff like that.  Can you tell me

4   what administrative reason there

5   would be for doing that?

6   A.      If the Colonel felt, and I

7   don't mean to speak for him.

8   Q.      No, sir.  He'll have a chance

9   to testify, you go ahead.

10  A.      But we spoke and we spoke

11  about this.  And the Colonel made

12  Captain Ober a promise he would come

13  back.  So he was fulfilling that

14  promise, that obligation.  I'm sure

15  Captain Ober could've released him of

16  that, but I don't know that he did or

17  did not or even approached the issue

18  with him.  The only reason that I

19  found out that Captain Ober didn't

20  want to come back to the Bureau was

21  after I talked to Waugh and Szupinka.

22  I mean, he wanted to come back to the

23  Bureau.  That's where he saw his

24  niche, where he wanted to be anyway,

25  at this time in history.  It's not

218

1  unusual for the Colonel not to do

2  what I ask, either, you know ---.  I

3  just get to ask the question or

4  request it.

5  Q.      Well, why couldn't or wouldn't

6  Colonel Evanko just call Captain Ober

7  up and say, Captain, I have a job I

8  want you to do for me, you're a great

9  officer, I believe in you the way I

10  do the rest of my troops and I need

11  your help, I want you to do something

12  here and I'd like you to go out there

13  and do this job for me?  Now, that's

14  the way to do it, isn't it?  That's

15  the way you'd do it, isn't it, if you

16  wanted somebody to do some task for

17  you? I'm not saying you'd lay all

18  that kind of stuff on them, but, you

19  know, you might call up and say I

20  need you to do something, I'd like

21  you to go do this duty, I'd like to

22  transfer you to this or sign you to

23  that, you know ---.  Would you

24  consider doing that?  Or if you felt

25  strongly enough, certainly you could

219

1    order them, I guess.  I don't know.

2         But why wouldn't, you know ---

3    you're the one that informed Darrel

4    G. Ober at four o'clock in the

5    afternoon, after you talked with him

6    earlier in the day, that he was going

7    out to Washington; right?  You told

8    us that you're the guy that called

9    him and told him; right?

10   A.    I assumed, only because you're

11   saying that, I don't think it was the

12   same day.

13   Q.    Well, let's assume that it

14   wasn't the same day, but ---.

15   A.    I am the one who called

16   Captain Ober and reported that he

17   would be transferred.

18   Q.    Okay.  Fair enough, sir.  You

19   called him and you told him he's

20   being transferred.  Until the Colonel

21   told you, you didn't know he was

22   needed out there to do those things

23   out west; right?

24   A.    Truthfully, I didn't really

25   give it a thought.

220

1    Q.      And so, at some point,
2    actually, you didn't call Colonel
3    Evanko.  Colonel Evanko called you
4    and told you that Darrell Ober's
5    coming back to the Bureau.
6    A.      I don't know that Colonel
7    Evanko did that.  I'm pretty sure
8    that it was probably Colonel Coury
9    let me know.  I mean, I just didn't
10   deal directly with the Colonel on a
11   regular basis.  I dealt with my
12   supervisor normally.
13   Q.      Yes, sir.  Okay.  So it's
14   Colonel Coury, but the fact is, you
15   didn't originate that call because
16   you didn't know it was coming.  It
17   came from the front office; am I
18   right?
19   A.      You know, I'm assuming it came
20   from the front office, but I don't
21   know.  I may have called and got into
22   that conversation, but he very easily
23   could've called me and gave me
24   directions at the same time.  I just
25   don't know.

221

1    Q.      Well, then you didn't

2    originate it, at least the knowledge

3    of it.  It wasn't something you

4    requested.  You didn't request him to

5    go to Washington, you didn't request

6    to have him come back.  Somebody told

7    you, he's coming back, and there was

8    some kind of discussion where

9    eventually you say, I don't really

10   want this guy back or something to

11   that effect; correct?

12   A.      That's accurate.

13   Q.      Yes.  And, you know, whether

14   you felt strongly enough about it or

15   whatever happened in the discussion,

16   which, you know, you've testified you

17   don't recollect the details of the

18   discussion --- hold on just one

19   second.  During this discussion,

20   whatever it was, you expressed the

21   opinion and Colonel Evanko apparently

22   would not agree and said, he's got to

23   come back there.  Did he in fact say

24   to you, you know, I told him I would

25   send him back there for a while, I

222

1  told him I'd send him back, that was

2  part of an agreement I had?

3       You had indicated earlier that

4  it was Captain Ober who told you

5  about that, that you believed it was

6  Captain Ober who told you that that

7  was a stipulation or agreement, you

8  used the word stipulation.

9  Obviously, you can't stipulate with

10 the Colonel because if you do, he's

11 going to stand by his word, which

12 apparently he was doing. You've also

13 offered that you had recommended that

14 when Captain Ober was to be sent back

15 to BPR that you objected, you didn't

16 want him.  Now, my question is a very

17 simple one.  Did Colonel Evanko tell

18 you why he was insisting Captain Ober

19 be sent back to BPR?  Because you

20 disagreed with that and, in a nice

21 way I'm sure, you said, you know, I

22 don't want this fellow back here.

23 A.     He told me or I was told that

24 Captain Ober was advised that after

25 he finished his assignment he was

223

1    going back to BPR.  Simple as that.

2    He had given that man his word and

3    that's why he came back.

4    Q.    But he hadn't told Captain

5    Ober that yet, had he?  Because you

6    were the guy that told Captain Ober

7    he was going to Washington.

8    A.    Whoa, we're talking about two

9    different things, sir.  Your question

10   to me, and so maybe I answered it

11   incorrectly, your question to me was

12   through my discussion with the

13   Colonel over my objections, he sent

14   him back to BPR.  And my answer to

15   that is yes and he told me why he

16   sent him back to BPR.  And that was

17   that he had promised him he was

18   coming back, he gave his word.  Now,

19   what happened after that, I don't

20   know.  I don't have a clue why he was

21   sent to Washington.

22   Q.    Who was the person who

23   informed Captain Ober he was going to

24   Washington?

25   A.    I believe that was me.

224

1  Q.      Yes.  And did Captain Ober

2  know, when you told him he was going

3  to Washington, that he was going back

4  to BPR for four days?

5  A.      I would suppose so.  I don't

6  know.

7  Q.      You don't know?

8  A.      I don't know.  I would suppose

9  so.  I need some paperwork and I will

10  figure it out for you, but I don't

11  know.

12  Q.      Now, when you called Captain

13  Ober to tell him he was going to

14  Washington, did you tell him he was

15  to report to BPR for four days?

16  A.      What I recall telling Captain

17  Ober was that he was going to be the

18  --- transfer through to Washington to

19  be the XO for the Area Three

20  Commander.  I think he may have asked

21  me why and where and the effective

22  date, I don't recall.  But I told him

23  --- I probably did tell him the

24  effective date.  I would assume I

25  did, I just don't know.  And I think

225

1  he might have asked me for the

2  duration of his assignment.  Again, I

3  did not know.  I knew it was to

4  assist the Area Commander in

5  preparation for the National

6  Government's Association out there.

7  Q.      Do you remember what day you

8  called him, Captain Ober?

9  A.      No, sir.

10  Q.      He indicates to me that you

11  called him on January 10th.  Does

12  that make sense?

13  A.      I don't know.  I'm at your

14  mercy, you give me a date and I don't

15  know.  No, seriously, I'm at your

16  mercy.  If you say so.

17  Q.      All I want to test here is

18  your recollection.  I don't have a

19  document on that one and I'd help you

20  if I could.  His indication is that

21  you called him on January 10th.  I

22  don't know, as I sit here right now,

23  other than his testimony if I would

24  have any documents in support of

25  that.  I want to ask you this.  At

226

1    the time that you called him, was he

2    still at IIMS or was he back with the

3    Bureau?  You would know that.

4    A.    Captain Ober never reported

5    back to the Bureau.  He came in after

6    hours to collect his things.  I only

7    know that because one day they're

8    there and the next day they're not.

9    Q.    Okay.  Just give me a second

10    here.

11    A.    Do you want this?

12    Q.    No, sir, the Mark Campbell

13    paper.  Here's a sentence in here.

14    With your concurrence I'm downgrading

15    the legislative liaison position from

16    major to captain, I have designated

17    Captain Simmers (phonetic), the

18    acting director, effective when Rick

19    retires on the 7th until we can talk.

20    Do you have a recollection of whether

21    Captain Ober knew that he was going

22    to be transferred for four days to

23    BPR before his transfer to Washington

24    would be effective?

25    A.    No, sir.  I knew it would be a

227

1  short period of time and it ended up

2  being a short period of time.  Does

3  that answer your question?

4  Q.    Yes, I think it does.  In

5  other words, you're not sure, you

6  don't know?

7  A.    No, I don't.

8  Q.    No, you answered it.  Now, do

9  you now have a recollection of any

10  investigation into Captain Ober about

11  museum artifacts?

12  A.    I'm aware of an inquiry.

13  Q.    How did you become aware of

14  it?

15  A.    I believe Lieutenant Colonel

16  Coury sent a complaint sheet over,

17  which indicated that perhaps Captain

18  Ober was taking possession of

19  historical things that may have been

20  intended for the museum, but he was

21  taking personal possession of it.

22  And there was a written complaint by

23  one of our retirees.

24  Q.    Philip Conti?

25  A.    Yes, sir, I believe that's

228

1    correct.

2    Q.      Now, did you look at those

3    documents?  Because I looked at them

4    and I don't see them indicating that

5    --- I just don't see anywhere where

6    they indicated that there was any

7    allegation, aside from Mr. Conti's

8    unhappiness, that there was any

9    underlying allegation about Mr. Ober

10   misrepresenting anything.  Do you

11   remember any complaint from a citizen

12   or someone else, which indicated that

13   Mr. Ober misrepresented who he was?

14   A.      As I recall it, the retiree

15   was communicating the concerns of

16   other individuals that this may be

17   occurring.

18   Q.      Mr. Conti?

19   A.      Yes.  And I don't know that

20   --- as a matter of fact, I'm positive

21   that that investigation didn't go

22   anywhere.

23   Q.      Yes, I am, too.  I'm just

24   wondering what spawned it, why it was

25   done.  That's my next question.

229

1  A.     Well, I guess the problem with

2  that is that Mr. Conti wrote us a

3  letter and when we get written

4  correspondence and allegations, we at

5  least take a look at it, unless we

6  see on the face there's just

7  absolutely nothing there.

8  Q.     Well, that's what I saw when I

9  looked at it.  I saw Mr. Conley's

10 concern, he had a very vested

11 interest, had absolutely no contact

12 with Captain Ober at all.  I looked

13 at the underlying documents and I

14 found that a Lieutenant Colonel in

15 the Pennsylvania State Police is

16 having Mr. Ober investigated and I

17 can't figure out why.  And that's

18 what I'm asking you.  Why?  The

19 reason I'm asking you that, so you

20 know where I'm going, is because, you

21 know, you talk about --- what sounded

22 to me like a concern that Captain

23 Ober was overly zealous in

24 investigating things or overdoing

25 things somewhat.

230

1      And I looked at this thing and
2  I couldn't see the basis for it.  I
3  saw the letter from the lady that
4  came in that supposedly caused this.
5  I didn't see any indication that
6  Captain Ober misrepresented anything.
7  But I did see Mr. Conti's letter.  It
8  certainly was a matter of concern, it
9  just wasn't based on anything, but it
10 was certainly a matter of concern
11 from him.
12 A.      Well, we still have to respond
13 to those things.  You have to
14 document.  If we don't document,
15 somewhere along the lines we get
16 problems.  Sometimes some things are
17 not documented that should be
18 documented and then, of course, given
19 the right opportunity we try to
20 document those things.  And this was
21 probably something, if I remember
22 correctly, there was probably several
23 complaints where Mr. Conti or retired
24 Colonel Conti had made those
25 allegations.  It was time to put it

231

1    to bed, if you will, put it to rest.
2    To say either there's something there
3    or there's not anything there.
4    Q.      Here's what I have a problem
5    with and here's my question.  The
6    idea is the Federal Bureau of
7    Investigation comes, they express a
8    concern about possible corruption
9    that might reach up the line
10   somewhere, governor's office, upper
11   part of the State Police.  Captain
12   Ober is expected to go and tell
13   people in his chain of command who
14   might potentially be subjects or
15   targets of the investigation, that's
16   pretty clear.  If he doesn't do that,
17   he's investigated and it's disloyalty
18   and it's whatever.  But we get a
19   letter in from a retiree, the BPR's
20   opened up, a number's assigned,
21   nobody just goes and sits down with
22   Captain Ober or calls him up and
23   says, you know, Phil's made these
24   complaints, are you representing or
25   misrepresenting things.  And it's put

232

1    the bed right there.  What's the

2    difference?  Is there a different

3    standard here?

4    A.    You correct me if I'm wrong,

5    sir, but I did not believe that was a

6    full investigation.  That was the

7    inquiry, supervisory inquiry, where a

8    question was asked here and a

9    question was asked there and if

10   there's nothing to substantiate that,

11   then it's put to bed.  But I don't

12   have that report.  I don't have an

13   opportunity to look at that or lean

14   on that, so ---.

15   Q.    Which one was not a full

16   investigation?  The one at the fall

17   of '98?

18   A.    No, the one involving

19   Lieutenant Colonel Conti.

20   Q.    The one in the fall of '98 was

21   a full investigation; right?

22   A.    I don't know.  I have to look

23   at it.  I'm assuming it was.

24   Q.    You said you looked at it.

25   A.    There was one --- I didn't say

233

1    I looked at it.  I said if I remember
2    correctly, the one involving Conti
3    made an allegation on behalf of a
4    woman, I don't believe there was a
5    full investigation on that.  And you
6    can prove me wrong and I'll stand
7    corrected, but I don't think there
8    was.
9    Q.      I think there was.
10   A.      Okay.
11   Q.      There was a BPR number,
12   there's a guy named Murgich
13   (phonetic) who did the investigation.
14   A.      And you're right.  I'm sure
15   there's a number, we put a number on
16   all of those and it's for tracking
17   purposes, you know ---.  Some of them
18   are short investigations, if you
19   will, and some of them are very
20   lengthy and involved.
21   Q.      Well, I think there was an
22   investigation.  I think it was
23   unfounded.  Isn't a trooper told or
24   excuse me, isn't a member told when
25   they're investigated if the

234

1   investigation leads no where?  Aren't

2   they supposed to be informed?

3   A.     If there's a personnel

4   investigation and Captain Ober or I

5   become the subject of a personnel

6   investigation, that's where this

7   allegation of misconduct or the

8   administrative or law-wise or a self-

9   initiating incident, and those would

10  be those things where we get the fist

11  fights, people injured and taken to

12  the hospital.  But we're always told

13  if there is a investigation, we're

14  always told the result of that

15  investigation.  The only difference

16  with those cases would be if the

17  Commission or a special invest ---

18  let me look into it, tell me what

19  happened, I want the facts.  We don't

20  give guys notice of the

21  investigations then and we don't tell

22  them the results of them because

23  that's not his business.

24         It's the boss' business, what

25  he wants, and if he has to look at

235

1  those facts, review those facts, he

2  may see some allegation of misconduct

3  or something that you really think

4  there is misconduct.  Then he, in

5  fact, orders a personnel

6  investigation.  That's conducted, the

7  guy's given a heads-up, this is

8  coming, and when it's all said and

9  done he's given the results whether

10  it was founded, unfounded, not

11  sustained or their action was

12  justified if it's involving a self-

13  initiated incident.  That's in the

14  rules.  That's written in black and

15  white and if we don't do that, the

16  Union, the PST will hold us

17  accountable or on the other side,

18  AFSCME, they'll hold us accountable.

19  I mean, we're held accountable.  When

20  we don't follow our rules and

21  regulations and don't adhere to the

22  things that we put in effect and the

23  things we agreed to with other

24  agencies or other entities, we're

25  held accountable for that.

236

1    Q.      So the investigation into Ober
2    wasn't an investigation into Ober, it
3    wasn't a full investigation and even
4    though there was a number assigned to
5    it, 1999-503, there apparently was no
6    adjudication because there didn't
7    need to be because it wasn't a
8    personnel investigation.
9    A.      I got you now, 503.  And I
10   come back to 503 again.  Yes, that
11   was not a personnel investigation,
12   that was ordered by the boss to say,
13   what happened here, collect the data
14   and get information. Now, what Conti
15   did, what he requested, that was more
16   personnel related.  This guy's making
17   an accusation against Captain Ober
18   and we're saying hey, is there or is
19   there not.  Captain Ober, I don't
20   know if he was, but he should've been
21   given notification of that.  And if
22   he was not then we're wrong and he
23   should've given the final results or
24   adjudication of that as well.  And if
25   he wasn't, then I accept

237

1   responsibility for that.  That's

2   wrong.

3   Q.    Okay.  Well, let me --- if you

4   could respond to that.  You're saying

5   that if there was a regular

6   investigation over the museum thing

7   that Captain Ober should've been

8   informed, there should've been an

9   adjudication and he should've been

10  told.  And if not, then you're in

11  error?

12  A.    I'm telling you that when

13  there's an allegation of misconduct

14  against you, we always tell the

15  individual.  We don't always tell

16  them up front because sometimes you

17  can lose what you're looking for, but

18  that individual's always told that

19  there's an allegation of misconduct

20  or there is some allegation against

21  you.

22  Q.    And what you did, or excuse

23  me, and what Colonel Evanko did in

24  the fall of '98 events that you say

25  was not an investigation into Captain

238

1    Ober, that was not a personnel

2    investigation?

3    A.    No.

4    Q.    Well, what was the purpose of

5    it then?  What did the Colonel need?

6    I mean, aside from talking to the

7    FBI, it's unfounded, being told right

8    out front by Hickes and Ober what

9    occurred, what do you think was to be

10   gained from this investigation?

11   A.    He wanted more information.

12   He wanted more data.  I mean, to me,

13   that's obvious.  I did see the

14   report, if you will, or investigation

15   that Captain Ober submitted, it was

16   all of a page and maybe a quarter.  I

17   mean, when I looked at that I

18   suspected he was holding something

19   back because this page only

20   encompasses six months of a look-

21   into, but that's just me.  I'm upheld

22   to my opinion as well.

23   Q.    Six months of a look-into by

24   whom?

25   A.    Well, Captain Ober and the

239

1   FBI, to my knowledge, had some kind

2   of relationship, from sometime in

3   October of 1998 up until at least May

4   of 1999, so we're talking six months.

5   He gives this report --- he submits a

6   report of his investigation, which is

7   all of --- here, more than this, sir.

8   So I suspected there was something

9   missing.

10  Q.      I'm not trying to be funny.

11  What do you want him to do in it,

12  recite poetry in it or write a book

13  or what?

14  A.      No, and I respect that, you

15  know ---.  But what I'm saying, you

16  know, this guy's been doing something

17  for six and seven months.  I mean,

18  he's out there, he's meeting with the

19  FBI, he's at different locations,

20  he's renting hotel rooms, he's --- it

21  doesn't amaze me, he's ordering

22  beverages for the FBI, he's doing a

23  number of different things and that

24  comes in on more than one sheet of

25  paper.

240

1       He would not --- I know him as

2   a supervisor working at IA, he would

3   not accept that.  There's got to be

4   more information there.  You've got

5   to put more information than that.

6   I'll put more information I'd just

7   tell him I got in my car, went down

8   the street and come back.  And I

9   don't mean to be facetious, but, you

10  know --- it's just to me ---.

11  Q.      No.  I worked planned

12  protection one time.  I remember what

13  it was to fill up reports sheets

14  because we supposed to fill up a

15  report sheet.  But here, I'm just

16  wondering what ---?

17  A.      And I don't mean to cut you

18  off there, sir.  I just don't believe

19  --- it's hard for me to believe that

20  there is six months information in

21  two paragraphs.  Is it possible,

22  sure.  But I'll tell you what, a lot

23  of time and energy spent there and it

24  just amazes me that that's all I get.

25  I mean, it doesn't even tell me how

241

1  it occurred, why it got started, who

2  was involved in the investigation, it

3  didn't tell me nothing.  As a matter

4  of fact, my thought is at this point,

5  I'm looking at a full and complete

6  investigation of Captain Ober and I

7  don't get that.  I get --- I think it

8  was referred to as a supplemental

9  investigation.  I can't recall when

10  it came in there, but I tell you

11  what, it was lacking information.

12  Q.      What do you think?  He had a

13  deal going with the FBI?  He and Kush

14  had a conspiracy going against the

15  Commissioner?  I mean, what do you

16  think?  Seriously ---.

17  A.      No, no.  You say seriously.

18  Just certain things that I expect,

19  you know ---.  When you conduct an

20  investigation, give me an

21  investigation.  I mean, hell, half

22  the --- excuse my language.  But a

23  sufficient portion of that page is

24  just filled up telling me that I'm

25  Hawthorne Conley and I'm stationed

242

1   here and this is my assignment and

2   this is when the investigation got

3   started, and this is where I went and

4   that's going to be a quarter of the

5   page right there.

6          I mean, I'm telling you and I

7   don't know if you have that or what

8   have you, but it doesn't tell me

9   anything.  I mean, I was disappointed

10  if this was an investigation.  But

11  that was me.  I look at that and it

12  just caught me totally off guard

13  because I'm looking to see some ---

14  not some voluminous document, but

15  several pages anyway, of what

16  occurred and then, you know

17  --- especially in light of the fact,

18  I know later on --- I don't know if

19  you touched on this or not.  I get a

20  request for a reimbursement for a

21  hotel room that he used to have a

22  meeting with the FBI and that's a

23  confidential investigation.  Well,

24  his supervisor at that time, Major

25  Waugh, sent it back to me because he

243

1    said, I don't have a clue what you're

2    talking about, you take a look at

3    this.  Is there any validity to this?

4         Well, I knew what was going on

5    at that point, you know --- I said,

6    again now, we have to have

7    investigations or at least numbers,

8    and there was no number on that form,

9    to justify the expenditure of monies.

10   And it didn't occur, unless it was

11   coming in with the report.  Well,

12   that report didn't bring me anything,

13   either, you know ---.

14   Q.    Well, did you approve the

15   monies that Werts and Williams spent

16   on investigating the fall of '98

17   thing? Did you view those and approve

18   them?

19   A.    What money was expended in

20   that, other than your salary?

21   Q.    Well, I don't know.  Do you

22   know, did you look at it?

23   A.    No.  There's a real difference

24   between me doing my job on a day-to-

25   day basis and receiving my salary and

244

1    me doing my job on a day-to-day basis

2    going out there and renting a hotel

3    room to meet with you.

4    Q.       Well, we know that Mr.

5    Westcott took an airplane up to tell

6    Mr. Werts, I think it was, that, you

7    know --- flew up in an airplane to

8    tell him that he was supposed to do

9    this investigation into Captain Ober.

10   Who justified that?  What was that

11   for?

12   A.       I don't know.  I don't have no

13   knowledge of that whatsoever.  But

14   you know what?

15   Q.       What?

16   A.       I hold myself accountable and

17   I try to hold those folks who work

18   with me accountable.  Sometimes I

19   don't do it as strictly as I possibly

20   can, you know, but that's just my

21   style.  But I can account for

22   Hawthorne Conley and I try to account

23   for those people who work for

24   Hawthorne and with Hawthorne Conley

25   as well.  And guess what?  When those

245

1   folks work for me, then I expect them

2   to follow rules and regulations.

3        Can they miss one thing here

4   or there, absolutely.  If I catch

5   them on it, I try to call them about

6   that and that's what we talk about

7   all day, you know --- whether it's

8   the leaving work early and not giving

9   me a leave slip.  Hey, you work for

10  me, boss, come here and talk to me,

11  you know what I mean?  If you're

12  doing an investigation, do an

13  investigation and submit a report.

14  Just don't go off on your own

15  tangent, do what you want, make your

16  own rules as you go along.

17  Q.     Well, I think --- I'm sorry.

18  A.     I'm not done.  I am done.  I

19  apologize, I am done.

20  Q.     That's all right.

21  A.     It's just you can't do your

22  own thing in this organization.

23  There's rules and regulations.  And I

24  guess you're talking about rules and

25  regulations and what I've heard from

246

1  you so far, everyone has adhered to

2  those rules as written, with the

3  exception of Captain Ober.

4  Q.     Well, how did he violate them?

5  A.     Well, you know what.  First of

6  all --- my opinion?

7  Q.     Sure.  Quote the rule, tell me

8  the rule.

9  A.     The rules say --- you're

10  taught in the academy chain of

11  command, you go to your supervisor.

12  Guess what?  So on October 2nd, I was

13  not his immediate supervisor, but

14  guess what?  Within hours after of me

15  being notified, I told him if it's

16  not today, buddy, it will be the

17  first thing tomorrow morning.  What

18  should I know?  What's he give me?

19  He gave me absolutely nothing.  You

20  know, I come in there and talk to him

21  the following week.  Maybe it wasn't

22  the following week, you've got some

23  information saying otherwise, but we

24  did talk.  He gave me absolutely

25  nothing.  You said because he talked

247

1   to Colonel Hickes, well, he should
2   have never gotten to Hickes.  He
3   didn't give me an opportunity.  He
4   didn't give Hawthorne Conley an
5   opportunity to do his job.  I don't
6   ask for much, just let me do that.
7   If I make a mistake, show me I'm
8   wrong.  He hasn't done that to this
9   day.  He went off and did his own
10   thing, his own way.
11   Q.     Why did he do that?
12   A.     I don't have a clue.  I don't
13   have a clue.
14   Q.     I mean, he betrayed the
15   Colonel, he betrayed the Lieutenant
16   Colonel, he betrayed you and he
17   betrayed the Pennsylvania State
18   Police; right?
19   A.     I don't know he betrayed
20   anybody.  I tell you what, it's not
21   about loyalty, it's doing what's
22   right.
23   Q.     What is the regulation?
24   A.     The regulation says what was
25   the right thing to do, he should've

248

1    told his supervisor.

2    Q.      Then why didn't you discipline

3    him?  Now, this man broke a

4    regulation.

5    A.      Let me finish it.  All right.

6    Now, this has come to my attention

7    five, six, seven months later.  It's

8    out of my control now.  The boss will

9    at least take a look at it.  He took

10   a look at it and he says, I got the

11   circumstances.  You know what, I'm

12   pissed, but he's out of my hair.  I'm

13   done with him.

14   Q.      Well, why didn't the Colonel

15   discipline him?

16   A.      Talk to the Colonel.  Ask the

17   Colonel.

18   Q.      I'm going to ask the Colonel a

19   lot of questions, but I'm going to

20   ask you today.  And I'm not trying to

21   be silly and I'm not trying to be

22   disrespectful, I mean that, I'm not.

23   I'm asking why the man was not

24   disciplined.  I'm not asking why it

25   didn't even result in, sir, it did

249

1   not even end up on as a supervisory

2   notation. Please, sir, let me finish

3   my question.

4   A.      Yes, sir.

5   Q.      You've been very kind to me

6   and I appreciate it and I mean that,

7   but this is one of the most important

8   questions I think I could ask you

9   today. My understanding is that all

10  of this, everything involved in this

11  thing in the fall of '98, never even

12  resulted in bringing Captain Ober in

13  and sitting him down and saying, you

14  shouldn't have done that. The

15  Colonel never called him in and sat

16  him down and said, you were wrong.

17  The Colonel never even brought him

18  down, you didn't, Lieutenant Colonel

19  Coury didn't, and just said, look,

20  you made an error here and this is

21  the error you made.

22          Here's what I know, sir, as a

23  lawyer. I know that subsection C to

24  AR 1.102 was added sometime in

25  February of the year 2001. And as

250

1  I've read and studied it, it does not
2  preclude or justify any discipline
3  against Ober.  So I look for other
4  things.  I honestly, I mean this
5  respectfully, I can't find anything.
6  I'm not trying to inhibit, you know,
7  I'm not trying to impugn your
8  credibility or your knowledge of
9  regulations.
10      I do not know the regulations
11 as well as you people do in the
12 Pennsylvania State Police.  I admit
13 that.  I could not find one place
14 where Captain Ober did anything but
15 uphold the highest traditions of the
16 Pennsylvania State Police in an
17 extreme circumstance that was almost
18 a no-winner for him.  I don't see how
19 he could win.  If he goes and tells
20 you and you're either involved, which
21 I'm sure he didn't believe, but
22 whether you or anybody else in the
23 chain of command is involved, he's
24 diming out the FBI if they end up
25 justifying some investigation, which

251

1   nobody knows.  Maybe this is an error

2   or not, I can't find any regulation

3   that prescribes it.

4        He goes to Lieutenant Colonel

5   Hickes --- and he's coming in here,

6   we're going to be able to question

7   him, too.  I don't know.  Where I'm

8   coming from with this question, I

9   don't know what he did wrong, what

10  Captain Ober did wrong.  My bottom

11  line question is very, very simple.

12       Aside from personally

13  offending his leaders, which is clear

14  that that happened --- aside from

15  personally offending his leaders,

16  what regulation, practice or custom

17  of the Pennsylvania State Police did

18  Captain Ober violate?  I honestly can

19  not find any, I don't know of any and

20  I'm asking you if you know.

21  A.        You know, it's an accepted and

22  common practice with the Pennsylvania

23  State Police that you keep those

24  people above you in your chain of

25  command informed of what's going on.

252

1   That's taught from day one in the

2   Academy.  You want to go back and

3   check the first one, we could do that

4   as well.  I think you quoted

5   subsection 101 and that talks about

6   chain of command and what have you.

7   And I'm sure that was put in place

8   for another reason.  It certainly

9   wasn't put in a public place for

10  Captain Ober, I can tell you that for

11  sure.

12  Q.      How do you know that for sure?

13  A.      Because, you know, if we had

14  another individual get involved in

15  the same thing, insubordination and

16  things on that line.  But, you know,

17  this is paramilitary organization and

18  as Colonel indicated in testimony a

19  week ago, we've maybe gone from the

20  para --- from a military-based

21  facility 100 percent now in the

22  things we have to do, you know ---.

23  And you have to be able to trust the

24  people you work with and for them to

25  trust you.  If they can't, perhaps

253

1 you're in the wrong business here.

2 But, you know, for him not to

3 have done that, and forget about me

4 personally, it's not about me

5 personally. It's about whoever had

6 my position. I mean, I guess the

7 question is had this individual who

8 --- had I have come from Erie or I'd

9 come in from Punxsutawney and had

10 Stanton not been in my chain of

11 command somewhere along the line,

12 would he have done the same thing? I

13 don't know.

14 You know what, I went to that

15 office trying to be fully open with

16 this individual. I said, hey, this

17 is who I am. I know you wanted this

18 job, you didn't get it, all right,

19 unfortunate, you know --- that's not

20 the first time things like that

21 occur. There have been many

22 positions that I've wanted and I

23 haven't gotten also. But, you know

24 what, let's try to work this thing

25 together. I know you've been doing

254

1    it for the last couple of months, but

2    we can work together.  What do I need

3    to know?  And he never told me what I

4    needed to know.  I mean, he didn't

5    even give --- before, as I think

6    about this, and you correct me if I'm

7    wrong, he didn't even talk to Hickes

8    about this at this point because he

9    couldn't.

10   Q.      He sat on it a few days.

11   A.      Absolutely, he did.  And he

12   says, I'm not going to Conley for

13   whatever reason it be.  That was

14   wrong.  He should've never went

15   around Conley.  You know what,

16   because the regulations in AR 45

17   says, you know what, you shall report

18   this thing.  Now, if you suspect that

19   I'm the target now, now you can go

20   around me.  I don't have a problem

21   with that.  And he has never

22   articulated that I'm part of this.

23   Because that man worked for me

24   doesn't mean anything, you know ---.

25   I'll put a racial issue into it as

255

1  well, you know, because Kip Stanton's

2  a black man and folks believe ---.

3  Q.    I didn't know that.

4  A.    Well, he's a black man.  Let

5  me tell you something.  Because he's

6  a black man, there's an assumption

7  that I know him.  I probably don't

8  know none of those black guys hired

9  in the last ten years in the State

10  Police.  There's only 465 of them

11  anyway, so it's a small number;

12  right?  Well, back in ---.

13  Q.    You don't want to get me

14  started on the Pennsylvania State

15  Police and race.

16  A.    Well, anyway, back in 1969 it

17  was ten, I knew all of them.  In 1971

18  ---.

19            VIDEOGRAPHER:

20            Excuse me, I'm all out

21       tape.  I have to switch, okay?

22       Thank you.  It's 2:43 p.m.

23       We're at the end of tape two,

24       deposition of Hawthorne

25       Conley.

256

1    OFF VIDEOTAPE

2    BRIEF RECESS TAKEN

3    ON VIDEOTAPE

4              <u>VIDEOGRAPHER:</u>

5              Sure.  This is tape

6         number three, deposition of

7         Hawthorne Conley.  The time is

8         2:44 p.m.

9    <u>BY ATTORNEY BAILEY:</u>

10   Q.    I apologize for the

11   interruption, but as I told you, I

12   think you indicated the issue of

13   race.  And as I said, you never want

14   to get me started with that issue

15   because you'd probably find more

16   agreement or support than you could

17   ever believe.  Tell me why you think

18   that might be an issue.

19   A.        Well, let me finish my

20   response.  I'm not saying it's race.

21   I'm saying that even if it had been

22   that, that would've been reason to

23   do.  But I'm not saying that.  I have

24   no reason to believe that Darrell is

25   a racist and he held that me against

257

1  me, you know --- not even he knew me

2  that knows Kip Stanton. I don't have

3  a clue. I wish he'd just give me

4  some kind of reason why that would've

5  occurred.

6        And you asked the question,

7  why you didn't sit him down. Well,

8  guess what, once I became aware of

9  it, that was gone from me. Why

10  didn't the boss sit him down, I don't

11  know, but I could tell you something

12  else. He wasn't working for the boss

13  either. He was working to this other

14  major. You don't ask guys questions,

15  you don't call them in and ask them

16  questions why an inquiry's being

17  made. You let the inquiry speak for

18  itself at that point. I ain't done

19  yet, now.

20  Q.     I'm sorry.

21  A.     And I can tell you this. We

22  had this meeting back in whenever me

23  and Darrell sat down and talked about

24  the picture frame and those types of

25  things, I told Darrell he was wrong.

258

1  I told Darrell I thought he was

2  wrong.  And I told Darrell just like

3  I told you right now, he did not give

4  me an opportunity to do my job and

5  whatever response he may have had to

6  me was kind of, well, I don't want to

7  say tough, but that's how it is.

8  Well, okay.  And then you have to

9  live with the way it is.  If that's

10  how it is, then you have to live with

11  that as well.

12       I mean, this isn't no new ball

13  game we're developing here. This is

14  rules that we play by and regulations

15  say that you shall consult with your

16  superiors.  You know what?  Maybe it

17  is just as well he didn't because I

18  could be in trouble, too, but maybe

19  not.  When I say trouble, sitting

20  over you deposing somebody, saying

21  somebody did you wrong.  I don't know

22  that he was done wrong.  I don't know

23  that he's been disciplined.  Should

24  he have been disciplined, perhaps he

25  should've been.  But it didn't happen

259

1   because, you know --- I haven't found

2   anybody in this organization so far

3   to be that vindictive and let's say,

4   hey, let's move on, let's take care

5   of the situation and go someplace

6   else with it.  It's kind of taking

7   care of itself.  Can I have some

8   water, got any water over there?

9   Q.      We can get some in two

10  seconds.  And while you're getting

11  the water, we can break for a second.

12  My next question is going to be ---

13  let me tell where I'm going to go now

14  just very, very briefly and then I'm

15  going to try to wrap this up with

16  you.  I'm going to ask you if

17  Darrell, based upon your knowledge

18  and experience with the Pennsylvania

19  State Police --- this is the question

20  I'll ask you after you get some

21  water.

22  A.      No, go ahead and ask me now.

23  Q.      All right.  Given your

24  knowledge and experience with the

25  Pennsylvania State Police, had

260

1    Darrell informed you of what the FBI

2    was doing, would you have gone to

3    Colonel Evanko and Colonel Coury and

4    reported it to them?

5    A.      You know, I don't ---.

6    Q.      Knowing what you know today,

7    knowing what you know about what the

8    FBI ---?

9    A.      You want me to speculate now?

10   Q.      Well, you know, I think it's

11   possible that you could --- your

12   Counsel could raise an objection, I

13   think you could say it's speculation,

14   but, you know, let me tell you why I

15   don't think it is and why it doesn't

16   fit those rules.  Okay?  You have

17   talked here about what regulations

18   and customs and practices and

19   expectations of what Darrell was

20   supposed to do and what he should've

21   known to do.  And you've talked about

22   it at length and it's come into this

23   deposition a number of different

24   times through the hours that we've

25   done it.

261

1    We talked about discipline, et

2    cetera, we talked about rules and

3    regulations.  You have indicated that

4    you reviewed the investigation to

5    some extent, and you have placed on

6    this record a knowledge that at some

7    point you learned that there was an

8    implication that there might be

9    higher ups in the State Police, I'm

10   not sure of your exact words, or

11   there might be people in the

12   Governor's office --- I think I

13   brought that in, I don't think you

14   mentioned that --- that could be

15   involved.

16   So my question is, and I don't

17   think it calls for speculation at

18   all, according to what you know and

19   understand about standards of

20   conducts and customs and practices

21   and the rules of the Pennsylvania

22   State Police, had Darrell Ober

23   informed you on October 5th of what

24   the FBI had brought to him, would you

25   have reported it to Colonel Evanko

262

1 and/or Colonel Coury?

2 A.      Well, there's a couple of

3 things that you're missing there and

4 information I do not have.  One is, I

5 don't know exactly what the FBI told

6 Darrell Ober and I don't have a clue

7 what Darrell Ober asked the FBI, as

8 to their investigation.  And I think

9 you have to rely on experience to

10 deal with those individuals.  And if

11 I put all those things in to play, I

12 may have a different decision than

13 what Darrell Ober had.

14        And it's hard for me to answer

15 those questions because I was asked

16 him, what you got, bud?  What you

17 hang your hat on? Just like saying

18 one thing, they take something, all

19 right, who's your informant, you

20 know, give your informant's name, let

21 me know what your informant's talking

22 about, let me hear the interview, let

23 me see the surveillance tapes, let me

24 make my own decision because you are

25 saying that our folks have done

263

1    something wrong.

2         Well, first of all, I don't

3    believe that things worked that way.

4    Matter of fact, I know things don't

5    work that way.  I'm sure you are

6    aware that things don't work that

7    way.  Had the FBI had anything --- I

8    said it earlier and I'll say it

9    again, had the FBI had anything on

10   Colonel Evanko, Colonel Coury,

11   Colonel Westcott, the new Colonel

12   Hickes or me or anybody else, they

13   wouldn't have been talking to the

14   State Police at all.  They would've

15   zapped us.  They would've started

16   talking to the State Police as they

17   were talking to our replacements at

18   our arraignment at some federal

19   court.  That's when they would talk

20   to the State Police.  And that's just

21   how things work.  That's the reality

22   of life and if you don't have that

23   experience then things bite you in

24   the butt later on.

25   Q.      Sir, I've seen FBI sit and

264

1  protect people in the highest reaches

2  of the Attorney General's office in

3  drug usage and everything else

4  because they were friends.  I know

5  what the FBI does.  I could sit here

6  and give you a discourse for hours on

7  their conduct and abuse of the grand

8  jury system.  That's not going to get

9  us anywhere.  The issue is this, at

10  one point the FBI had indicated that

11  there might be higher ups.  That's

12  the term that's been often used.  And

13  they indicated there might be people

14  in the Governor's office.  And my

15  question is --- and you had commented

16  that if somebody was a target of an

17  investigation that, you know, you

18  wouldn't inform them.  You've already

19  said that.  That makes sense.

20            ATTORNEY CHRISTIE:

21        Excuse me, Counsel.  I

22      don't think the Colonel said

23      that.  I think the Colonel's

24      full answer stands as it

25      should stand on the record,

265

1    but I think you are asking, as

2    the Colonel's pointed out, for

3    his expertise or his opinion

4    based upon partial

5    information.  He's already

6    indicated he doesn't have the

7    full information and he's

8    already indicated that in the

9    real world of criminal

10   investigation and field

11   experience that you don't just

12   take spoon-fed what you're

13   told without checking into it

14   by like talking to the FBI and

15   doing various and asunder

16   other things that a person of

17   field experience would do.

18        That's sort of what I

19   remember him answering, so I

20   think he's already answered

21   the question or I think you

22   basically sort of

23   misrepresented what that

24   answer was to the prior

25   question.

266

1   ATTORNEY BAILEY:

2       No, I don't think I

3   have.  In fact, what I'll do

4   is ---.

5   ATTORNEY CHRISTIE:

6       Or I think I've lost

7   track of everything that

8   you've been saying for the

9   last couple minutes.

10  ATTORNEY BAILEY:

11      And I think that's

12  convenient, with all due

13  respect for you.  And I think

14  it's ---.

15  ATTORNEY CHRISTIE:

16      Now, at ten of 3:00,

17  Counsel, I don't think it is

18  convenient because, you know,

19  Colonel Conley was due in at

20  what 9:00, to be followed at

21  11:00 by Colonel Coury.  We're

22  now at ten of 3:00, albeit

23  with a bit of a delayed start,

24  our fault, certainly, with

25  regard to part of that delay,

267

1    but, you know, there's nothing

2    convenient about the --- what

3    should I say?  The

4    availability, shall we say

5    extended availability here, of

6    Colonel Conley, as well as

7    Colonel Coury next up, to this

8    time.

9              ATTORNEY BAILEY:

10             Well, let me place ---

11   let me shorten this up.  I'll

12   place an objection on the

13   record to your response.  I

14   don't feel it's responsive.  I

15   don't think there's any

16   difficulty or anything that

17   would've prevented you from

18   answering it at all, aside

19   from not wanting to, which is

20   what I feel and I'm objecting

21   to that.  And I'm objecting to

22   your Counsel's comment.

23             Now, let me address the

24   issue of where we are time-

25   wise.  These things happen and

268

1    it happened in Captain Ober's

2    case, it went into a second

3    entire day. Those things

4    happen.  Part of the process

5    of litigation and I have done,

6    I think, a yeoman's job of

7    restricting depositions and

8    keeping them limited.

9       ATTORNEY CHRISTIE:

10      Counsel, I'm only

11   answering that ---

12       ATTORNEY BAILEY:

13      I know you are.

14       ATTORNEY CHRISTIE:

15      --- with regard to your

16   comment about my convenience,

17   whatever point ---

18       ATTORNEY BAILEY:

19      I'll withdraw that.

20   I'll withdraw that.

21       ATTORNEY CHRISTIE:

22      --- as if to say we've

23   had a shortened day by

24   frequent interruptions.  I

25   think the record would show

269

1    otherwise.  Nobody's talking

2    about your questioning style

3    or length or specificity or

4    anything of that nature.

5         ATTORNEY BAILEY:

6         Okay.  Whatever.  The

7    point is it's --- what time is

8    it, ten 'til 3:00?

9         ATTORNEY CHRISTIE:

10        Well, now it's seven

11   'til 3:00.

12        ATTORNEY BAILEY:

13        Seven 'til 3:00.  Thank

14   you.

15        ATTORNEY CHRISTIE:

16        Time marches on.

17        ATTORNEY BAILEY:

18        Time does and perhaps

19   we're both too loquacious.

20   I'm perhaps being excessively

21   careless in addition to being

22   loquacious.  But the point is,

23   what should we do with the

24   time and, you know, I really

25   think I can finish.  I'm about

270

1    at my end.  I want to visit

2    with my client.  That question

3    was really going to be near

4    the very end of what I was

5    going to do, essentially based

6    upon the Colonel's --- partly

7    on the comments that he's not

8    familiar with the museum

9    investigation, which helps

10    shorten quite a bit of my

11    area.  I want to go out with

12    Captain Ober, but I want to

13    ask you, what do you want ---.

14    Do you want to continue with

15    Lieutenant --- I don't see how

16    we can get Colonel Coury done

17    today.

18        ATTORNEY CHRISTIE:

19        We'd like to keep

20    going.  Colonel Coury is not,

21    as none of us are, easy to get

22    a hold of.  We've got him here

23    now and we don't want to

24    imprison you or anything, but

25    if that's not a problem with

271

1    you, Colonel, we'd like to

2    keep going.

3             ATTORNEY BAILEY:

4             All right.  Well, let

5    me go outside with Captain

6    Ober and I'm just going to go

7    ahead and let the equipment

8    run because we're only going

9    to be about 30 seconds, I

10   think.  Is that okay?

11            ATTORNEY CHRISTIE:

12            Sure.  That's fine.

13            ATTORNEY BAILEY:

14            See if we can finish

15   you up and we'll get on with

16   Colonel Coury, which is fine

17   with me.  Now, that's probably

18   going to probably take us well

19   after six o'clock or into the

20   evening.  Is that okay,

21   Colonel?

22            COLONEL COURY:

23            Yes.

24            ATTORNEY BAILEY:

25            Okay.

272

1    BRIEF RECESS TAKEN

2    BY ATTORNEY BAILEY:

3    Q.        Let me tell you a problem we

4    have.  Actually two problems, the one

5    I'm aware of on my own part because

6    of the litigation that's currently

7    going on in Lebanon County and Sam

8    Stratton (phonetic) is doing a trial

9    down there.  But also Captain Ober

10   indicates that he has to be gone no

11   later than 5:00.  What time do you

12   have to leave here, by 5:00 at the

13   latest?  Let's finish up.  Let's just

14   end.  We're okay --- I think I'm done

15   with Colonel Conley.  Let's start

16   with Colonel Evanko (sic), let's see

17   where we are at 5:00.  A lot of it

18   will depend on how concise he is with

19   his answers.

20              ATTORNEY CHRISTIE:

21         Colonel Coury is here.

22              ATTORNEY BAILEY:

23         I mean Colonel Coury,

24   I'm sorry.  And then let's

25   just end at 5:00.  If we have

Sargent's Court Reporting Service, Inc.
(814) 536-8908

273

1    to continue at that point,

2    we'll pick it up at a

3    convenient time for you later

4    on.  Okay, Colonel?  Actually,

5    a break in a deposition, if

6    I'm a witness, I'd prefer it

7    because it gives me, you know

8    --- it's tough being a

9    witness.  I think we can do it

10   that way.  So if there's no

11   objection, let's just go,

12   okay?

13           ATTORNEY CHRISTIE:

14           That's fine.

15           ATTORNEY BAILEY:

16           Okay.  At this stage,

17   can we end the deposition with

18   Colonel Conley?

19           VIDEOGRAPHER:

20           It's 2:57 p.m.  The

21   deposition of Hawthorne Conley

22   is concluded.  Thank you.

23           * * * * * * *

24   DEPOSITION CONCLUDED AT 2:57 P.M.

25           * * * * * * *

1   COMMONWEALTH OF PENNSYLVANIA)

2   COUNTY OF DAUPHIN              )

3              C E R T I F I C A T E

4       I, Vivian Gratz, a Commissioner of Deeds in and

5   for the Commonwealth of Pennsylvania, do hereby

6   certify:

7       That the witness was hereby first duly sworn to

8   testify to the truth, the whole truth, and nothing

9   but the truth; that the foregoing deposition was

10  taken at the time and place stated herein; and that

11  the said deposition was taken stenographically by me

12  and reduced to typewriting, and constitutes a true

13  and correct record of the testimony given by the

14  witness.

15      I further certify that the reading and signing

16  of said depositions were (not) waived by counsel for

17  the respective parties and by the witness.

18      I further certify that I am not a relative,

19  employee or attorney of any of the parties, nor a

20  relative or employee of counsel, and that I am in no

21  way interested directly or indirectly in this action.

22      IN WITNESS WHEREOF, I have hereunto set my hand

23  and stamp this _19_ day of _April 2002_          .

24

25                          _Vivian Gratz_

                            VIVIAN GRATZ
                        Commissioner of Deeds
                    Commonwealth of Pennsylvania
                My Commission Expires Nov. 7, 2005

Interview/Major Hawthorne N. CONLEY, on 06/08/9?
Page 4

go any further - I will fix it, my way.  That's
what I explained to Captain OBER, and the other
members of this Bureau, repeatedly.

WILLIAMS:       Describe your feelings to me, now that you can
reflect back on this, as to how you feel in that
Captain   OBER   never   informed   you   of   this
investigation and you're the Bureau Director.  Tell
me how you feel about that.

CONLEY:         Oh, well I'll tell you, I'm very disappointed, and
this has been an ongoing problem since I arrived in
the Bureau in October.   I made my boss aware of it
and I've attempted to work it out.  Because OBER's
a Captain with the Pennsylvania State Police, I try
to give him a wide girth and let him do what was
necessary to get his job done.  However, we have
continuously failed to communicate effectively.

An example of that is in the old office, our
offices were side to side, side by side, and he may
want to take the afternoon or take a couple hours
off in the afternoon, rather than coming and tell
me that initially, he would drop a leave slip in my
"IN" basket and then leave the office.  I had to
call him on that and tell him that it was not a big
deal, however, we work in the same office - he can
talk to me.  I may or may not look in my "IN"
basket for the rest of that day, and unless he
tells me he's leaving that building, I assume he's
in that day.  This was something that we talked
about   early   on.    I   don't   have   a   lot   of
documentation on that because he is a Captain and I
try to avoid that.   This is just indicative of
something that's been going on for a long time and
its just about hit its peak now.

We had a conversation just before he left.  He was
detached to the Bureau of Technology Services,
where again, I thought at this point we had reached
a level where we could communication, but I've



EXHIBIT
Conley-1
1062
3-12-02 V6

Interview/Major Hawthorne N. CONLEY, on 06/08/99
Page 5

|  |  |
|---|---|
|  | about had it with him, personally. I've really had it with him. |
| WILLIAMS: | Is it the policy of your Bureau to allow a member to rent a hotel room in order to interview somebody concerning an investigation?    Is that Bureau policy? |
| CONLEY: | There's no Bureau policy written on that, but I don't know that we've ever done that in the past. I returned to the Bureau in October of 1998, but I've served in the Bureau from 86 until 93, and there were occasions when, as an investigator or as a commander within the Bureau, when there was a need to be uh, conducting investigations separate from State installations, State Police installations, and we've done that by making arrangements by going to a State office building and taking a free office, or if it was appropriate, we might conduct the interview several Troops away. We have not, to my knowledge, ever rented a hotel room for interview purposes. I'm not saying that we would never do that, but we would have to discuss it first. |
| WILLIAMS: | And this was not, the rental of this room, which occurred on whatever date it was. . . |
| CONLEY: | I think it was March 15th, 1999. |
| WILLIAMS: | The rental of this room was never discussed with you as the Bureau Director, is that correct? |
| CONLEY: | That's correct. I didn't learn, I never learned of the rental of this room until just recently when I returned from New York, when a General Invoice came into us, into the Bureau, wanting to know how to handle it.    That was forwarded to us from the fiscal officer in the Bureau of Staff Services on June 1st. |

EXHIBIT
Conley-1
2 of 2
3-12-02 VC