IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                          :
                                          :
                Plaintiff                 :    No. 1:CV-01-0084
                                          :    (Judge Caldwell)
        v.                                :
                                          :    CIVIL ACTION – LAW
PAUL EVANKO, MARK                         :
CAMPBELL, THOMAS                          :    JURY TRIAL DEMANDED
COURY, JOSEPH                             :
WESTCOTT, HAWTHORNE                       :
CONLEY                                    :

---

## EXHIBITS TO DEFENDANTS' BRIEF IN SUPPORT
## OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## VOLUME 2

---

FILED
HARRISBURG, PA

MAY 2 0 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

21

U.S. DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

DARRELL G. OBER,          *

    Plaintiff          *    Case No.

    vs.               *    1CV-01-0084

PAUL EVANKO,              *

MARK CAMPBELL,            *

THOMAS COURY,             *

JOSEPH WESTCOTT and *

HAWTHORNE CONLEY,         *

    Defendants          *

* * * * * * * *

VIDEOTAPED DEPOSITION OF

THOMAS K. COURY

March 12, 2002

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

2

1          V I D E O T A P E D

2          D E P O S I T I O N

3                O F

4    THOMAS K. COURY, taken on behalf of

5    the Plaintiff herein, pursuant to the

6    Rules of Civil Procedure, taken

7    before me, the undersigned, Vivian

8    Gratz, a Court Reporter and

9    Commissioner of Deeds in and for the

10   Commonwealth of Pennsylvania, at the

11   offices of Strategic Development

12   Technical Services Center, 2629

13   Market Place, Harrisburg,

14   Pennsylvania, on Tuesday, March 12,

15   2002, beginning at 3:18 p.m.

16

17

18

19

20

21

22

23

24

25

3

1               A P P E A R A N C E S

2

3    DON BAILEY, ESQUIRE

4    4311 North 6th Street

5    Harrisburg, PA   17110

6        COUNSEL FOR PLAINTIFF

7

8    BARBARA L. CHRISTIE, ESQUIRE

9    Chief Counsel

10   Pennsylvania State Police

11   1800 Elmerton Avenue

12   Harrisburg, PA   17110

13       COUNSEL FOR DEFENDANTS

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          I N D E X

2

3    WITNESS:   THOMAS K. COURY

4    EXAMINATION

5        by Attorney Bailey          7 - 102

6    CERTIFICATE                       103

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1

<u>E X H I B I T   P A G E</u>

2

3

4

<u>N U M B E R</u>    <u>D E S C R I P T I O N</u>

5

6

<u>P A G E</u>
<u>I D E N T I F I E D</u>

N O N E   O F F E R E D

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                    OBJECTION PAGE

2

3    ATTORNEY                                    PAGE

4    Christie                                    8 5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1            P R O C E E D I N G S

2   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3   THOMAS K. COURY, HAVING FIRST BEEN

4   DULY SWORN, TESTIFIED AS FOLLOWS:

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6                    <u>VIDEOGRAPHER:</u>

7                    Good afternoon, ladies

8            and gentlemen.  Please be

9            advised the video and audio is

10           in operation.  My name is

11           Crystal M. Lyde, L-Y-D-E.  My

12           address is 4310 Hillsdale

13           Road, Harrisburg, Pennsylvania

14           17112.  I've been contracted

15           by P.R. Video to be the

16           operator for this deposition.

17           The case is in the United

18           States District Court for the

19           Middle District of

20           Pennsylvania.  The caption is

21           Darrell G. Ober versus Paul

22           Evanko, Mark Campbell, Thomas

23           Coury, Joseph Westcott and

24           Hawthorne Conley.  The docket

25           number is 1CV-01-0084.  The

8

1   date is March 12th, 2002.  The

2   deposition is being held at

3   the Pennsylvania State Police

4   Tech Center, Market Place,

5   Harrisburg, Pennsylvania.  The

6   video deposition is being

7   taken on behalf of Plaintiff

8   Darrell Ober and is also being

9   taken stenographically.  The

10  witness' name is Tom Coury.

11  The time is 3:18 p.m.  Would

12  you raise your right hand for

13  me, please?  Please state your

14  name for the record and spell

15  it.

16          MR. COURY:

17          Thomas K. Coury,

18  C-O-U-R-Y.

19  THOMAS K. COURY, CALLED AND SWORN TO

20  TESTIFY

21          VIDEOGRAPHER:

22          Thank you. Mr. Bailey,

23  sound check, please?

24          ATTORNEY BAILEY:

25          Yes.  My name is Don

9

1    Bailey, I'm an attorney.  I

2    represent Darrell G. Ober,

3    who's the Plaintiff in this

4    matter.  Barb, could you

5    identify yourself and put an

6    address on there?

7                ATTORNEY CHRISTIE:

8        Sure.  Barbara

9    Christie, Chief Counsel,

10   Pennsylvania State Police.

11   Office address is 1800

12   Elmerton Avenue, Harrisburg,

13   PA  17110.  Phone is 717-783-

14   5568.

15               ATTORNEY BAILEY:

16       I'm in error.  I should

17   be putting my address and

18   phone number in there, too.

19   4311 North 6th Street,

20   Harrisburg, PA.  This is Don

21   Bailey speaking, of course,

22   717-221-9500.

23   EXAMINATION

24   BY ATTORNEY BAILEY:

25   Q.    Colonel Coury, you had an

10

1    opportunity to hear the introduction

2    earlier.  Do you have any need for me

3    to repeat that?

4    A.      No, sir, I don't.

5    Q.      Okay.  In the interest of

6    time, I'm going to move forward then.

7    Let the record note or let the record

8    show that it's about 3:20.  I'm going

9    to have to break at about a quarter

10   'til 5:00 or ten 'til 5:00.  I have

11   to pick up an expert witness for a

12   trial down in Lebanon tomorrow out at

13   the airport and he's coming in at

14   5:40.  So I'm going to try to get as

15   much of this done, Colonel, as

16   possible.  With that in mind, you

17   have permission to stop me if you

18   think I'm going on about something,

19   okay?

20   A.      Yes, sir.

21   Q.      We know all the ground rules.

22   Let's just try to begin with this.

23   How are you employed, sir?

24   A.      I'm currently the Vice

25   President of Parsons (phonetic)

11

1   Corporation, Pasadena, California.

2   Q.      And at the times complained of

3   in the complaint, how were you

4   employed?

5   A.      I was the Deputy Commissioner

6   of Administration from 1995 ---

7   February of 1995 to July of 2000 and

8   Deputy Commissioner of Operations

9   from July of 2000 until January of

10  2002.

11  Q.      And the position that we're

12  talking about is with the

13  Pennsylvania State Police and your

14  rank was Lieutenant Colonel; is that

15  correct?

16  A.      Yes, sir, it was.

17  Q.      And needless to say, you've

18  retired from that position or retired

19  from the Pennsylvania State Police;

20  right?

21  A.      Yes, sir.

22  Q.      Now, are you at least

23  generally familiar with the complaint

24  in this case?

25  A.      The Complainant, did you say,

12

1    sir, or the complaint?

2    Q.    I'm sorry, sir.  The complaint

3    itself, have you had a chance to

4    review it and read it?

5    A.    Yes, sir.

6    Q.    Okay.  Now, there are a number

7    of allegations and complaints in the

8    complaint about you and in order to

9    try to truncate this deposition, I've

10   provided you with a copy of a June

11   16th, 1999 memo that you prepared.

12   Are you familiar with that?

13   A.    Yes, sir.

14   Q.    I'm going to be asking you

15   some questions about that and I've

16   also provided you with a copy of a

17   statement that you gave on or about

18   June 28th, 1999 to a Major Tom

19   Williams and a Major Robert Werts;

20   are you aware of that?

21   A.    Yes, sir.

22   Q.    And you have a copy of that

23   statement in front of you; right?

24   A.    Yes, sir.

25   Q.    What was that investigation

13

1    about, to the best of your knowledge,

2    Colonel?

3    A.      It was about the circumstances

4    surrounding an issue of political

5    corruption on the part of one of our

6    State Police members.

7    Q.      And did Captain Ober play a

8    role in that investigation or

9    whatever it was?

10    A.      Yes, sir, he did.

11    Q.      What role would he play?

12    A.      He was the acting Director of

13    the Bureau of Professional

14    Responsibility at that time.

15    Q.      And this memo that you

16    composed on June 16th, 1999, why did

17    you write that memo up?

18    A.      The Commissioner had directed

19    me to write it up.

20    Q.      And does the subject of that

21    memo indicate meeting between the

22    Commissioner and Lieutenant Colonel

23    Robert Hickes?

24    A.      Yes, sir.

25    Q.      And does it say to put in

14

1  written form your recollection of the

2  events of Wednesday afternoon May

3  12th, 1999, where you had a sit-down

4  meeting with Colonel Evanko?

5  A.      Yes, sir.

6  Q.      Can you be more specific as to

7  why Colonel Evanko wanted you to

8  prepare this document?

9  A.      Well, I'm sure it's because

10  that the information the Colonel

11  received on that afternoon is the

12  first time he had heard any of that

13  information and it was brand new to

14  him.  Secondly, it involved me, to

15  some extent, and I think that that

16  was, and this is just, you know, my

17  own thought process on this, but this

18  was probably one of his first

19  attempts to memorialize gathering all

20  the facts surrounding that

21  investigation.

22  Q.      And what investigation do you

23  mean?

24  A.      I mean the one into the

25  trooper, Trooper Stanton and all the

15

1   facts surrounding that investigation.

2   Q.      And that was an investigation

3   conducted by the FBI?

4   A.      Yes.

5   Q.      I mean, the State Police

6   didn't do an investigation, did they?

7   A.      I believe that subsequently,

8   the State Police did an

9   investigation.

10  Q.      Agreed, but up until May 12th,

11  1999, the State Police had done no

12  investigation?

13  A.      It's my --- I would

14  characterize that as the FBI being

15  the lead investigator in the case.

16  Q.      Well, what role did the

17  Pennsylvania State Police play in

18  that?

19  A.      I believe they provided the

20  FBI with information.

21  Q.      Did they investigate?  Aside

22  from being a source of information,

23  and I'll ask you about that in a

24  second, what did they investigate?

25  A.      What did who investigate, sir?

16

1   Q.      I don't know, that's why I'm

2   asking you.

3   A.      Well, you know, my thought

4   would be that providing information

5   is playing a role in the

6   investigation.

7   Q.      Is that investigating,

8   providing information?  I mean, you

9   come to me, you're a state policeman

10  ---.

11  A.      Yeah, I think that's part of

12  the investigation when you're another

13  law enforcement agency.  I do.

14  Q.      Why?

15  A.      Well, because you're both

16  criminal justice agencies.  You're

17  both law enforcement agencies.

18  You're sharing information back and

19  forth.

20  Q.      Well, this is an issue about

21  role.  What was the Pennsylvania

22  State Police investigating?

23  A.      They were investigating, along

24  with the FBI, the conduct of the

25  trooper, although the FBI was the

17

1    lead investigative agency.

2    Q.    All right.  Well, let's not

3    mince words.

4    A.    Okay.

5    Q.    Now, how did the FBI come to

6    do this investigation?

7    A.    From what I learned on June

8    the 16th, from information they had

9    from a confidential informant.

10   Q.    And what information did they

11   have?

12   A.    The information they have, and

13   again I'm only recounting this

14   because of what I heard Lieutenant

15   Colonel Hickes say that day in the

16   meeting, was that their informant

17   said that they had a trooper, the

18   confidential informant had a trooper

19   by the name of Kip Stanton who

20   claimed that he could have cadet

21   applicants moved from Band B, which

22   is the lower Band, to Band A and also

23   help to get them through the

24   polygraph and the background process,

25   and ultimately help them get into the

18

1   Academy.

2   Q.      Did he indicate he had any

3   help?  Did this investigation that

4   the FBI did ever indicate that this

5   Stanton had any help doing this?  Not

6   that it was accurate, but did it ever

7   indicate that?

8   A.      Not that I was aware of in

9   this June 16th meeting, but later

10  during the State Police's role of the

11  investigation into Stanton, I

12  understand that a state legislature's

13  name from Western Pennsylvania was

14  also brought up.

15  Q.      Do you know who that was?

16  A.      No, I don't.

17  Q.      Do you know if it was Joe

18  Preston?

19  A.      I don't know, sir.  I've heard

20  the name.  I don't recall it, no.

21  Q.      Do you know if Leonard

22  Bodack's name came up?

23  A.      I don't recall, sir.

24  Q.      Do you remember if there was

25  any indication that higher-ups in the

19

1    Pennsylvania State Police might be

2    involved?

3    A.      I heard that on June the 16th.

4    Yes, sir.

5    Q.      So you didn't hear that on May

6    the 12th from Mr. Hicks?

7    A.      On June the 16th --- on May

8    the 12th, no, sir, I didn't hear that

9    from him.

10   Q.      Did you hear that on May 12th

11   or 13th from Colonel Evanko?

12   A.      Let me step back one point,

13   just to be clear of --- did I hear

14   what on those days, sir?

15   Q.      Did you hear that there had

16   been some issue that had been raised

17   about higher-ups in the Pennsylvania

18   State Police and the Governor's

19   office possibly be involved in the

20   Stanton ---?

21   A.      I heard that on May 12th from

22   Colonel Hicks.

23   Q.      Well, you didn't hear it from

24   Colonel Hicks, you heard it from

25   Colonel Evanko, according to what

20

1    you've told us.  Do you want to
2    correct that?
3    A.      On May 12th, I believe it was
4    from Colonel Hickes' mouth.  Both of
5    them were present in the room on May
6    the 12th.  I believe it was Colonel
7    Hickes that said that.
8    Q.      Right.  In fact, this June
9    16th memo, the Commissioner's asking
10   you to put in writing what you
11   remember about that meeting of May
12   12th; right?
13   A.      Yes, sir.
14   Q.      And again, you don't
15   specifically know the purpose of why
16   Colonel Evanko was doing that?
17   A.      Again, what I had said earlier
18   is I believe it was the impetus at
19   the start of the Colonel gathering
20   facts on --- all the surrounding
21   facts on that incident.
22   Q.      Well, Williams questioned Kush
23   on the 25th of May, didn't he?
24   A.      I don't know, sir.  I've never
25   seen that investigation.

21

1    Q.      You never looked at or saw it?

2    A.      No, sir, I never have.

3    Q.      Well, you know, what do you

4    think Ober did wrong?  What did Ober

5    do wrong, in your eyes?  What did he

6    do wrong in your eyes now?  I'm not

7    asking in the eyes of the State

8    Police, Colonel Evanko, Rick Brown,

9    Mr. Conley, anybody.  I want to know

10   Lieutenant Colonel Tom Coury, years

11   of experience in the State Police,

12   based just on what you know as you

13   sit here today, you tell me, please,

14   in your eyes, what Mr. Ober did

15   wrong.

16   A.      When the FBI came to Captain

17   Ober, I expect or should say that I

18   would've expected that Captain Ober

19   do some background information first.

20   In other words, say to the FBI, and I

21   don't know that he didn't, but I have

22   no information to say that he did.

23   When did this occur, who was the

24   Deputy Commissioners at that time,

25   how good is your informant, have you

22

1    talked to anybody else about this

2    previously, why did you come to me,

3    did you come to be because I'm the

4    Director of IAD, am I just the fellow

5    that answered the phone, is it

6    because I'm the acting Direct, why

7    did you come to Darrell Ober?  How

8    confidential is this, you said that

9    there's higher-ups, give me the

10   names, who are you targeting

11   specifically.

12        And last of all I would've

13   said to the FBI, please give me

14   something in writing for my file to

15   back me up on this thing.  And not

16   having done any of that, and again,

17   there's no indication to me that

18   Captain Ober's ever done any of that.

19   Q.    So he should've questioned the

20   FBI?

21   A.    Yes, sir.

22   Q.    Have you ever been questioned

23   by the FBI?

24   A.    Sure.

25   Q.    Been investigated by them?

23

1  A.      No, I don't think so.

2  Q.      You've never been investigated

3  by them, have you?

4  A.      No, sir.

5  Q.      Have you ever sat in on an FBI

6  custodial investigation?

7  A.      No.

8  Q.      Have you ever done any

9  custodial investigation on behalf of

10 the Pennsylvania State Police?

11 A.      Yes.

12 Q.      Okay.  Have you gone out and

13 cooperated with the local police on

14 investigations?

15 A.      Yes.

16 Q.      Tell me how you're going to

17 respond to a local policeman or to

18 some lawyer, like a Don Bailey let's

19 say, when you're doing a custodial

20 investigation, and I start

21 questioning you about what you're

22 doing in your investigation, who

23 you're talking about, what

24 information you have?  Are you

25 telling me the FBI's going to sit

24

1    there and tell you and answer your

2    questions if you start interrogating

3    them?

4    A.    I wasn't under the impression

5    that Captain Ober was a subject of an

6    interrogation from the FBI.

7    Q.    Who was?

8    A.    I don't know who was.

9    Q.    And that, perhaps, might be

10   the point.

11   A.    But I think when two law

12   enforcement agencies are working

13   together, that that's not too much to

14   ask.

15   Q.    Okay. So if you had been in

16   Captain Ober's shoes, you would've

17   done it differently?

18   A.    Yes, sir.

19   Q.    And what if the FBI didn't

20   answer your questions, sir, and they

21   said, well, that's what we know at

22   this point, that's it?

23   A.    Then they don't know a whole

24   lot and I would've informed my

25   superiors.

25

1    Q.      Would you?

2    A.      Yeah.

3    Q.      And if they told you that they

4    thought that your superiors might be

5    involved in this, you would've told

6    them anyway?

7    A.      Everybody over a trooper is a

8    superior.

9    Q.      Oh, really?

10   A.      Yeah.  If you're a trooper,

11   everybody from the rank of corporal

12   and up is a superior.

13   Q.      Okay.  But he's a captain?

14   A.      Right.

15   Q.      He's head of IAD?

16   A.      They didn't mention a rank.

17   They didn't say his superior.  They

18   said in the administration of the

19   State Police.

20   Q.      Well, the point is you

21   would've gone and told Colonel

22   Evanko; right?

23   A.      If I were Captain Ober, no.  I

24   would've told my major.

25   Q.      Well, why wouldn't you go and

26

1   tell Colonel Evanko?

2   A.      Because the culture of the

3   State Police is we have a chain of

4   command and we operate through it.

5   Q.      Your culture?

6   A.      Yes.

7   Q.      What's that mean?

8   A.      Culture is meaning from the

9   day you enlist in the Pennsylvania

10  State Police at the Academy, you're

11  taught to go through a chain of

12  command.  You were in the military,

13  Mr. Bailey, you know that.

14  Q.      Yes, I was.  Nothing in the

15  military that tells a soldier out

16  there that if in his best judgment,

17  he thinks his Lieutenant isn't doing

18  something right and he can't go to

19  the company commander and tell him.

20  In fact, I was in the 101st Airborne

21  Division and the 82nd Airborne

22  Division, every Company Commander I

23  ever had had days, in fact, when they

24  brought soldiers in and talked to

25  them.  And I was a platoon leader and

27

1  I never questioned my captain and no,

2  I didn't question my soldiers on what

3  they told my captain.  I just did my

4  job and I assume that's what you're

5  saying.  And the question here might

6  be, and this is what I want to ask

7  you, the Pennsylvania State Police

8  has rules and regulations that govern

9  how you're supposed to conduct

10  yourself as an officer and a trooper;

11  is that correct?

12  A.      Yes, sir.

13  Q.      What rules did Captain Ober

14  break in your view, if any?  I'm not

15  saying he did.  Now, I'm just asking

16  you if any.

17  A.      As it relates to what I stated

18  about going through the chain of

19  command, none that I'm aware of.  I

20  think that there may be some FR

21  violations and again, this is just

22  off the top of my head that may be

23  worth more exploring is the fact that

24  Captain Ober didn't put in much

25  paperwork on his findings.  And

28

1    according to regulations, we are

2    required to file reports, but again,

3    that's ---.

4    Q.      I thought a copy of this

5    investigation was delivered to the

6    Pennsylvania State Police, it was

7    picked up and delivered to the

8    Pennsylvania State Police?

9    A.      What investigation, sir?

10   Q.      Let me lay the foundation this

11   way.  I believe that the alleged

12   justification for Lieutenant Colonel

13   Hickes and I believe Captain Ober was

14   with him, I may be wrong on the

15   facts, but why they informed Colonel

16   Evanko of what had happened, that was

17   based upon they were being told by

18   the FBI that the investigation was

19   closed and it was just Trooper

20   Stanton and no one else involved?

21   A.      I don't know, sir.

22   Q.      Okay.  Have you ever read

23   Major Williams' report?

24   A.      No, sir.

25   Q.      Have you ever read your

29

1   statement before today?

2   A.      Yes, sir.

3   Q.      You have reviewed it?

4   A.      Not recently, sir, but ---.

5   Q.      You have a copy in front of

6   you that I've provided; is that

7   right?

8   A.      Yes, sir.

9   Q.      There's a real tiny little

10  number, 138, at the top.  Do you see

11  that?  It looks like --- well 130 ---

12  I don't know what that number is.

13  There's a number in the top right-

14  hand corner.  Looks to me like ---.

15  A.      I see numbers.  They are kind

16  of hard for me to read, sir.

17  Q.      They are for me, too.  Anyway,

18  the beginning page starts off with

19  all right, do you see that?

20  A.      Yes, sir.

21  Q.      Now, were you read your rights

22  in this investigation?

23  A.      Not that I recall.

24  Q.      And is it fair to say that you

25  can't think of any reason why you

30

1  should've been?

2  A.     I wouldn't have been surprised

3  either way.

4  Q.     All right.  Now, have you

5  learned at some point, I know you

6  have today from my earlier

7  questioning, that this investigation

8  actually had roots with the FBI going

9  back as early as 1996, I think it

10  was?

11  A.     Yes.

12  Q.     When did you first learn that?

13  A.     When Captain Monaco called me

14  at some point saying that, you know

15  --- he said, I heard there's some

16  questioning going on about this

17  Trooper Kip Stanton and an FBI

18  investigation.  He said, I just want

19  you to know that he, meaning Captain

20  Monaco, and maybe now retired Captain

21  Klaus Barrens knew something about

22  that long before that.  And I said

23  that I would pass that information on

24  to Major Werts and Williams and that

25  was the sum and substance of it.

31

1   Q.      So Captain Monaco called you

2   during the Williams/Werts

3   investigation?

4   A.      No, I didn't say during the

5   Williams/Werts investigation.  I

6   don't know what point he called me,

7   but at some point he learned that

8   there was something going on, as it

9   relates to Stanton, and he called me.

10  Q.      Well, you need, if you can

11  please, to look back for me in your

12  mind's eye and tell me when that

13  conversation may have taken place,

14  vis-à-vis the fall of 1998.  What I'm

15  looking for is your earliest

16  knowledge that there might have been

17  some problem with Mr. Stanton.

18  That's all I'm looking for.

19  A.      I honest to God can't remember

20  when that might have been, Mr.

21  Bailey, but I know that when Monaco

22  called is the first time that I

23  believe I knew there was something

24  going on with Stanton that the

25  Department was aware of before this.

32

1  Q.      Okay.  That's what I'm looking

2  for.  The Department was aware of it.

3  Now, do you know if that was before

4  the fall of '98, before the FBI comes

5  to Mr. Ober or after?

6  A.      Before I knew it or before the

7  FBI talked to Monaco, what ---?

8  Q.      No, we know if Mr. Kush is

9  telling the truth that the FBI talked

10  to Mr. Barrens back around '96.  What

11  I'm looking for, obviously, is when

12  that was communicated up or when

13  there was a record made with the

14  Pennsylvania State Police?

15  A.      I don't know, sir.

16  Q.      And you don't know when you

17  first learned about it, whether it

18  was before the fall of '98 or after?

19  A.      I really don't.  I really

20  don't.

21  Q.      Well, do you know of any

22  records that exist about that prior

23  contact that the FBI had with Mr.

24  Barrens?

25  A.      No, I don't.

33

1  Q.    Do you ever talk with Mr.
2  Barrens about it?
3  A.    No.  I think --- he was
4  retired by then, I'm sure of that.
5  Q.    Well, but Captain Monaco knew
6  something about it; right?
7  A.    Right.
8  Q.    How did he learn about it?  He
9  learned about it, you told me, that
10 he had learned about it from Mr.
11 Barrens or some kind of discussion
12 with Mr. Barrens; is that correct?
13 A.    No, no.  I said that he heard
14 that there was something going with
15 the Stanton case and he related to me
16 that the FBI had spoken to him or him
17 and Barrens at some point.
18 Q.    But that's my point.  When did
19 Mr. Barrens retire?
20 A.    I don't know, sir.
21 Q.    Well, if I told you that I
22 believe that Mr. Barrens had been
23 contacted prior to when Mr. Ober was
24 contacted by the FBI, that would be
25 consistent with what Mr. Kush said,

34

1    wouldn't it?

2    A.      It could be.  Yeah, you'd have

3    to look at the dates and compare it

4    all, but it could be.

5    Q.      Well, I can tell you the dates

6    are pretty plain.  They're pretty

7    clear in the statements.  I mean, I

8    don't know either, I wasn't there.

9    But, you know, what I'm trying to get

10   at, what I'm trying to figure out is

11   whether or not Captain Monaco was

12   investigated or the facts surrounding

13   that situation, whether or not Mr.

14   Barrens was investigated and the fact

15   surrounding that situation because

16   all the excitement I'm seeing here

17   seems to be Colonel Hickes, not about

18   Captain Ober.  And I can't figure it

19   out.  I don't understand why.  So

20   what I'm trying to learn, what I'm

21   trying to get at is, you know, if you

22   learned anything from Mr. Barrens,

23   whether he communicated anything,

24   whether Captain Monaco communicated

25   anything when he learned about it.  I

35

1  want to know what investigation Werts

2  and Williams did into the Barrens and

3  being told about this.  Was there any

4  investigation into that?

5  A.     I don't know, sir.

6  Q.     Well, didn't you participate

7  in the investigation into Captain

8  Ober?

9  A.     No, sir.

10 Q.     Well, the Colonel calls you

11 into the office there in, what is it,

12 May 12th?

13 A.     Yes.

14 Q.     What's he call you in for, to

15 witness a conversation?

16 A.     Yes.  Well, not to witness a

17 conversation.  He had already had a

18 conversation with Captain Ober and

19 Colonel Hickes that was a witness.

20 He called me in to tell me about the

21 conversation he had with them as it

22 related to me.

23 Q.     Well, was Colonel Hickes

24 there?

25 A.     Yes.

36

1    Q.       Okay.  So he had a discussion

2    with Colonel Hickes and you and

3    Colonel Evanko were there?

4    A.       Yes.

5    Q.       I mean ---.

6    A.       You asked me --- the question

7    was had I participated in the

8    investigation on Captain Ober.

9    Q.       Well, you have a statement.

10   According to your definition of

11   participating in an investigation,

12   you're a participant in the

13   investigation.

14   A.       If you look at it in that

15   light.

16   Q.       Well, that's the way you put

17   it.  Can we break for a second?

18   A.       Sure.

19   Q.       Thank you.

20   OFF VIDEOTAPE

21   BRIEF RECESS TAKEN

22   ON VIDEOTAPE

23              ATTORNEY BAILEY:

24              Back on the record.

25              VIDEOGRAPHER:

37

1           3:42 p.m.  We're back

2        on the video, audio and

3        record.

4    BY ATTORNEY BAILEY:

5    Q.      Okay.  Colonel, did Mr.

6    Williams ask you --- it's page five

7    of the interview.  He says, Colonel,

8    would you consider this a major

9    incident, and you said, absolutely, I

10   consider it a major incident for a

11   number of reasons.  First, the

12   allegations pointed at the

13   Commissioner and the Commissioner's

14   cabinet official.  You know, all

15   three of us guys in this room know

16   that the FBI is noted for their

17   tight-lips, so to speak, and I think

18   that there would be a great potential

19   for this kind of information to leak

20   out and I think that that would've

21   been damaging to possibly damaging to

22   the Commissioner.

23        Were you worried about the

24   Commissioner being embarrassed if

25   somebody popped up and said,

38

1    Commissioner, I heard this, are you
2    worried about public image?
3    A.    I was worried about the
4    Commissioner being embarrassed by
5    saying, I don't know anything about
6    this, I have no idea what you're
7    talking about.
8    Q.    Well, this seems to indicate a
9    distrust to the FBI.
10   A.    No, it's not a distrust.  It's
11   just that, you know --- in my
12   experience with the FBI, I have not
13   known them to be extremely tight-
14   lipped and it would not have
15   surprised me if the word got out.
16   And my concern was that somebody
17   would be asking the Commissioner
18   about it and him having to say, I
19   don't know what you're talking about.
20   Q.    So Ober put the Commissioner
21   potentially in a position by not
22   telling him, where the Commissioner
23   could be embarrassed if somebody
24   asked him?
25   A.    I would not say Captain Ober

39

1   did that exclusively.  I think it's

2   Captain Ober and Colonel Hickes.

3   Q.      Okay.  Well, they both did

4   that?

5   A.      Yes, sir.

6   Q.      They didn't go and tell their

7   commanding officer about an

8   investigation by the FBI and the

9   matters pertaining to the

10  Pennsylvania State Police?

11  A.      Yes, sir.

12  Q.      And the fact that those

13  matters might involve the

14  Commissioner himself, not that

15  anybody would believe that, but an

16  investigation is an investigation,

17  that doesn't concern you?  You don't

18  think that Colonel Hickes and Colonel

19  Ober did the right thing in that

20  circumstance?

21  A.      I'm relying on what I heard

22  Colonel Hickes say on May the 12th.

23  He never mentioned anything other

24  than the administration of the

25  Pennsylvania State Police and the

40

1    Governor's office.  That is a very,

2    very broad range.  He never mentioned

3    anything that either one of them did

4    to narrow or verify any of that

5    information and he never mentioned

6    that the FBI said, keep this

7    confidential, don't tell anybody,

8    keep it quiet.  None of that was ever

9    mentioned.  So I based this statement

10   on what I heard in that room on May

11   the 12th.

12   Q.    Well, you know, let's say that

13   nothing was ever said by the FBI

14   about confidentiality or even

15   indicated, you know, even remotely

16   suggested by them.  If Captain Ober

17   believes that the FBI or maybe some

18   Grand Jury investigation, for all

19   anybody knows, is going on that might

20   involve the Commissioner in

21   wrongdoing, front office, upper

22   echelon.  I mean, the Pennsylvania

23   State Police upper echelon, you would

24   agree, is not a very large group; is

25   that fair to say?

41

1    A.      Yeah, the term upper echelon

2    was never used, but the upper echelon

3    is not very large.

4    Q.      Higher-ups, what does that

5    mean?

6    A.      Seems to me the terminology

7    you use was in administration.

8    Q.      Now, if the FBI had mentioned

9    a particular position, let's say your

10   name had been mentioned, would you

11   expect Captain Ober to come and tell

12   you?

13   A.      No, sir.

14   Q.      Would you expect him to go and

15   tell Colonel Evanko?

16   A.      Yes, sir.

17   Q.      Okay.  But your name wasn't

18   used, was it?

19   A.      Nor my position.

20   Q.      Well, I thought somewhere one

21   of the FBI agents said that the term

22   Lieutenant Colonel was used?

23   A.      Never came up on May 12th,

24   that I heard.

25   Q.      Should it have?

42

1    A.     I think that would have been

2    something I would've been out there

3    saying right away to the

4    Commissioner.  Your position --- I'd

5    be using --- if I had that

6    information I'd be saying, I didn't

7    come to you boss because they said

8    the Deputy Commissioner, they said

9    the Commissioner or the FBI told me

10   not to, seems to me I would've been

11   advocating that to the Commissioner

12   to make a real strong point.

13   Q.     Why?  Are you afraid the

14   Commissioner can't stand the scrutiny

15   of some spurious and frivolous

16   accusation out there?

17   A.     No, because ---.

18   Q.     What would you be afraid of?

19   What do you have to be afraid of?

20   A.     Nothing to be afraid of, it's

21   just that knowing the Commissioner

22   and knowing how I am and knowing how

23   the Governor's office is.  They don't

24   like to be surprised.  They don't

25   like to have to say I don't know,

43

1   especially on frivolous matters that

2   have no merit.   But it just seems to

3   me that when the Commissioner asked

4   Colonel Hickes three times, why

5   didn't you tell me, that if it's

6   because the FBI told him not to or

7   because the Commissioner's position

8   was mentioned or my position was

9   mentioned, that would be a very, very

10  logical appropriate, clear answer.

11  Q.      And he didn't say that?

12  A.      No, sir.

13  Q.      Are you suggesting he lied?

14  A.      No, sir.

15  Q.      No.   You're not suggesting he

16  lied because you know that those

17  things were mentioned in wiretaps,

18  weren't they?

19  A.      I don't know that, sir.

20  Q.      You don't?

21  A.      No, sir.

22  Q.      What if I told you they were,

23  what would you say?

24  A.      I don't know what I would say,

25  sir.   I mean ---.

44

1  Q.      Well, wouldn't that make

2  Captain Ober an extremely lucky

3  prophet that if it's not mentioned by

4  the FBI to him, how would he be ---

5  unless he's involved with these CIs

6  and all this stuff, how's he going to

7  know they're going to mention the

8  Governor's office or higher-ups in

9  the State Police?  How would he know

10 that?

11 A.      He wouldn't.

12 Q.      No, he wouldn't.  So you don't

13 have any real reason to doubt that

14 Colonel Hickes and Captain Ober were,

15 in fact, told by the FBI that higher-

16 ups, I don't know exactly what the

17 term would be, higher-ups, upper

18 echelon, I don't think that was used

19 either.  I agree with you.  That was

20 my term.  But higher-up, I believe,

21 was a term that may have been used,

22 higher-ups, Governor's office, you

23 know ---.  Captain Ober was told

24 about an investigation and he made a

25 decision on how he should inform

45

1  people on that investigation; right?

2  A.      Yes, sir.

3  Q.      I mean, rightfully or

4  wrongfully, that's what he did?

5  A.      Yes, sir.

6  Q.      And in your view, he was

7  wrong; is that correct?

8  A.      It was an incorrect decision.

9  Yes, sir.

10  Q.      It was an error in judgment;

11  am I correct?

12  A.      Yes, sir.

13  Q.      But it was not one which

14  violated the rules of the

15  Pennsylvania State Police; am I

16  correct?

17  A.      At the time that I heard that

18  on May 12th, there was nothing to

19  indicate that Captain Ober had

20  violated any field regulation or

21  regulation of the agency.  That's

22  correct.

23  Q.      So what he had done wrong was

24  violate a way of doing things?

25  A.      A principle of culture.

46

1  Q.      Okay.  All right.  Now, let's

2  take it from there.  Should he have

3  been punished for that?  I'm not

4  saying he was.  I'm just asking,

5  should he have been punished for

6  violating that principle of culture?

7  A.      There is no way to punish or

8  DAR a member unless he violates a

9  regulation of the agency.  So the

10  answer is you would not punish him

11  for that, sir.

12  Q.      Was the transfer to Washington

13  --- strike that.

14          Was the attempt to transfer

15  Mr. Ober to Washington, your Counsel

16  describes it as something that was

17  later rescinded.  I'm talking about

18  the initial attempt to transfer him,

19  rescinded or not.  Was the attempt to

20  transfer him to Washington, was that

21  punitive in nature?

22  A.      No, sir.

23  Q.      Why not?

24  A.      Well, I think first of all,

25  the Commissioner holds the answer for

47

1   you, but based on my knowledge, that

2   position at that time did not come

3   under me.  I was a Deputy

4   Commissioner of Administration.  The

5   lion shared --- the decision making

6   there was between the Commissioner

7   and Lieutenant Colonel Joseph

8   Westcott.  I can only tell you what I

9   saw from the sidelines and share with

10  you what I heard on some of the

11  sidebars, is that just as the

12  Commissioner had assigned someone to

13  work with Major Werts for the

14  Republican National Convention and

15  found it to be going extremely well,

16  that he thought that he should also

17  assign someone to work with Major

18  Szupinka for the National Governor's

19  Association's Conference.  What he

20  was looking for was someone who was a

21  darn fine administrator, a good

22  project manager and had those skills

23  and he thought Captain Ober had those

24  skills.

25  Q.     He had thought very, very

48

1  highly of Captain Ober?

2  A.        Administrative skills and

3  project management, yes.

4  Q.        And personally thought very,

5  very highly of Captain Ober?  I mean,

6  I'm not going to take a Captain and

7  put him out there with a potential

8  President of the United States,

9  someone who's very erudite as

10  President Bush, give or take a few

11  friends on the Supreme Court.  But

12  the point is, if you have a guy out

13  there in Pittsburgh who's going to be

14  representing you with the National

15  Governor's Conference, you want

16  somebody you really --- is wearing

17  your face and you want you be proud

18  of them; right?

19  A.      He would not send somebody out

20  there to fail nor make the Department

21  look bad.

22  Q.        Well, I'm sure you could count

23  on Captain Ober, regardless of

24  circumstances, never to do that.  And

25  I'm sure Colonel Evanko knew that.

49

1   But you talked to Colonel Evanko, did

2   you, and did he indicate that the

3   reason he wanted Captain Ober to go

4   out there is because Captain Ober was

5   such an exceptional officer?

6   A.      I wouldn't say he said he was

7   such an exceptional officer.  I would

8   say that in the conversations I

9   overheard, it was because Darrell, A,

10  could do the job, the job needed done

11  and Darrell was a good project

12  manager and an administrative officer

13  that could get it done.

14  Q.      So you never had any

15  discussions with --- I'm sorry, were

16  you finished?  I interrupted you.

17  A.      I'm finished.

18  Q.      Okay.  So you never had any

19  discussions with Colonel Evanko where

20  Captain Ober was cussed out,

21  criticized --- not that he would

22  cuss, I don't mean that literally.

23  In other words, I don't mean swear

24  words he used.  I mean, you know,

25  where he was criticized very strongly

50

1    or on very strong terms for what he

2    did and not divulging the FBI thing.

3    Colonel Evanko never indicated any

4    sentiments like that?

5    A.      He never did that in my

6    presence, sir.

7    Q.      Okay.  Well, there's an

8    allegation in the complaint that he

9    became very, very angry when he was

10   informed by Captain Ober and Colonel

11   Hickes of the FBI probe and that he

12   went into a rage.  Was that true?

13   A.      Was it true that he did that?

14   Q.      Yes.

15   A.      I wasn't there, sir.

16   Q.      So you simply don't know?

17   A.      I do not know, sir.

18   Q.      Well, but he did launch, this

19   was Colonel Evanko, was the person

20   who launched this investigation into

21   the facts and circumstances, to

22   borrow your terminology, about what

23   occurred in the fall of '98 with the

24   FBI probe or investigation, whatever

25   you call it?

51

1   A.     You term it an investigation,

2   semantics, I term it an inquiry.

3   It's an administrative inquiry.

4   Q.     So the FBI was doing an

5   administrative inquiry, do you mean

6   ---?

7   A.     Oh, no.  The FBI was doing a

8   criminal investigation, yes.  Colonel

9   Evanko launched an administrative

10   inquiry.

11   Q.     Right.  What you're describing

12   what Colonel Evanko did was an

13   administrative inquiry?

14   A.     That's the way I would phrase

15   it, sir.

16   Q.     It wasn't a full

17   investigation, it was an

18   administrative inquiry.

19   A.     Yes, sir.

20   Q.     Was it into Captain Ober?

21   A.     No, sir.

22   Q.     Well, was it into Colonel

23   Hicks?

24   A.     No, sir.

25   Q.     Was Colonel Hicks --- do you

52

1    know whether he was ever read his

2    rights during the investigation?

3    A.      I don't know, sir.

4    Q.      Well, why was Captain Ober

5    read his rights?

6    A.      I don't know, sir.

7    Q.      You didn't make that

8    decision ---

9    A.      No, sir.

10   Q.      --- so you don't know?

11   A.      I don't know, sir.  I was not

12   part of that inquiry process.

13   Q.      Was there ever a meeting where

14   --- before --- strike that.

15        It is my understanding that at

16   some point, Colonel Evanko launches

17   what you have referred to as an

18   administrative inquiry into the

19   events of '98.  Let's just call it

20   the events of '98, sir.

21   A.      Okay.

22   Q.      So we don't have to waste all

23   our time repeating that verbiage.

24   All right.  Now, was there some kind

25   of a meeting where you were present

53

1    and Colonel Evanko was present, Mr.

2    Brown was present or others were

3    present where launching this

4    administrative inquiry was discussed?

5    A.      I can recall that I was in the

6    Commissioner's office sometime after

7    May the 12th and I would have to

8    guess within a couple days after May

9    the 12th.  There were other people in

10   the office, I don't recall who they

11   were.  I'm 99.9 percent sure it

12   wasn't Captain Brown.  Where the

13   Commissioner was determining how to

14   go about gathering the facts, in

15   other words, what is the proper

16   instrument, what is the proper tool

17   to use, to go about that.  And more

18   or less, saying what all he wanted to

19   know.  So to that extent, yes, I was

20   present for a conversation.

21   Q.      Well, did anyone at all during

22   that meeting say to Colonel Evanko,

23   you can't do that or you shouldn't do

24   this or that?

25   A.      I gave the Commissioner ---

54

1    since I was Deputy Commissioner of

2    Administration and BPR fell under me

3    and I had albeit five to eight years

4    before that being the Director of

5    BPR, I did give him my opinion on how

6    I thought that should go.

7    Q.      What did you tell him?

8    A.      I told him that from what I

9    could see, that there was no

10   violations of field regulations on

11   the part of any member.  So,

12   therefore, it shouldn't be a BPR

13   personnel-type complaint

14   investigation.  That if what he

15   wanted was the facts on what's going

16   on, as it relates to Stanton, is that

17   system foolproof, is there any way

18   anybody could get in and tamper with

19   the cadet processing, as it relates

20   to Captain Ober and the chain of

21   command and the information back and

22   forth from the FBI and the

23   information passed from Captain Ober

24   to Colonel Hickes.  That inasmuch as

25   there was no indication that any

55

1  member had violated Department rules

2  or regulations, but I thought it

3  should be an administrative inquiry.

4  Q.    Well, did anybody discuss

5  those feelings of yours with Mark

6  Campbell?

7  A.    I don't know, sir.  I didn't

8  have any discussion with Mark

9  Campbell.

10  Q.    Do you know whether the good

11  Colonel Evanko had any discussions

12  with Mark Campbell?

13  A.    I know the Commissioner said

14  to me, and I believe it was on that

15  same day, that on that same day he

16  would be discussing the issue with

17  Mark Campbell.

18  Q.    Do you know whether he, in

19  fact, did discuss it with Mark

20  Campbell?

21  A.    Factually, I don't know that.

22  Q.    I may be mistaken, but I think

23  Mr. Campbell does indicate there may

24  have been some kind of discussion

25  early on about that, that the Colonel

56

1    had called him.  Now, let's set the

2    month of May aside.  Do you know

3    whether there was any further

4    discussions with Mark Campbell about

5    Mr. Ober?

6    A.       None with me, sir.

7    Q.       No.  But my question is do you

8    know whether Colonel Evanko, not

9    Colonel Coury, do you know whether

10   Colonel Evanko talked with Mr.

11   Campbell after the month of May 1999?

12   A.       No, sir.  I do not know.

13   Q.       Do you know whether Colonel

14   Evanko ever discussed the transfer of

15   Captain Ober to Washington?

16   A.       With Mark Campbell?

17   Q.       Yes.

18   A.       No, sir.  I don't know.

19   Q.       Would you be surprised if he

20   did?

21   A.       Would I be surprised if he

22   did?

23   Q.       Yes.

24   A.       No.  I would not be surprised.

25   Q.       Why?

57

A.    Well, because as the Governor's Deputy Chief of Staff at that time, the Commissioner routinely conveyed administrative-type information, personnel-type information and anything of significance that was going on in the Department to Campbell.

Q.    Well, did Mr. Campbell express an interest and a desire to have Mr. Ober work on this project out there in Washington?

A.    I don't think that if the Commissioner relayed that information to Mark Campbell, it was so much that he's sending Captain Darrell Ober out there. It's more that he's sending a Captain out there to handle, to help with the NGA and, oh, by the way, it's Captain Ober. So the point was telling Mark Campbell that the issue was relating to the NGA, not to Captain Darrell Ober.

Q.    Sure. And does Mr. Campbell know Mr. Ober, do you know?

59

1  Q.      Well, you know, I could be

2  wrong, but I don't think that Mr.

3  Szupinka ever requested anybody to

4  help him.

5  A.      No.  And knowing him, he

6  wouldn't nor would any major.

7  Q.      Okay.  But who would evaluate

8  that situation, ascertain it and

9  decide that we need a really --- I

10 mean, there must be a problem there

11 because you need a real good

12 organization man out there and Ober's

13 the guy.  Who would've decided that

14 we need him out there to do that?

15 A.      It would be the Deputy

16 Commissioner of Operations.

17 Q.      Who was?

18 A.      Colonel Joe Westcott.

19 Q.      And here's Colonel Evanko

20 talking to Mr. Campbell about Mr.

21 Ober and Colonel Evanko gets

22 personally involved, as the record

23 indicates, in the transfer of Mr.

24 Ober to Washington?

25 A.      Right.  Only the Commissioner

60

1    can affect the transfer.

2    Q.    Well, did you get involved in

3    that decision or evaluation ---?

4    A.    Only as it relates to maybe

5    cutting the paperwork, since

6    personnel came under me and to say

7    that Captain Ober, who was a part of

8    my command, was going to be

9    transferred and did I have confidence

10    he could do the job.

11    Q.    Well, did you?

12    A.    Yes.

13    Q.    Now, you talked to Mr. Conley

14    about him?

15    A.    About?

16    Q.    Mr. Ober.  Mr. Conley's

17    already testified to that.  Didn't

18    you talk to Mr. Conley about Mr.

19    Ober?

20    A.    Sure.  I don't know if it's in

21    relationship to your previous

22    question.

23    Q.    Okay.  But what would you talk

24    with Mr. Conley about Mr. Ober ---

25    what ---?

61

1   A.      Well, Captain Ober was a

2   captain under Major Conley.  I talk

3   to all my majors about their

4   captains.  Are they doing the job,

5   how are things going, A, B, C, D, E.

6   So that's not uncommon.

7   Q.      Well, one thing I noticed

8   about Colonel Conley's deposition, he

9   really is a stickler for sticking to

10  that chain of command; isn't he?  I

11  mean, he seemed to be in what he

12  indicated to me.

13  A.      Yes.

14  Q.      He barely had any discussions

15  with Colonel Evanko about Captain

16  Ober.

17  A.      Right.

18  Q.      But he talked with you a lot

19  about that.

20  A.      He talked with me about that.

21  I would not say a lot.  If he had

22  something to say about Captain Ober,

23  he came to me with it.

24  Q.      Well, what did he have to say

25  about Captain Ober that he came to

62

1    you about?

2    A.    That he had talked to the

3    Captain about a couple investigations

4    that were dragging on that he thought

5    should've been concluded.  He had no

6    confidence in the Captain after the

7    Captain didn't inform him of this

8    Stanton investigation, issues such as

9    that.

10    Q.    And did you say, Major Conley,

11    you're wrong about Captain Ober, he's

12    a good organization man, he can be

13    trusted, in fact, he is such a superb

14    officer, Colonel Evanko's sending him

15    out to Washington County out there

16    where he can represent the

17    Pennsylvania State Police, it's

18    public face in interacting with the

19    National Governor's Conference or

20    Association or whatever it was?  I

21    mean, was there any discussion like

22    that?  Did you disagree with Major

23    Conley?

24    A.    I can't disagree with

25    somebody's perception.  Yes, I'm sure

63

1   Major Conley and I both agreed to

2   Captain Ober's strength as it relates

3   to administration.  I mean, we even

4   had a discussion about switching

5   Captain Ober and Captain Scurkis

6   because the job of Director of

7   Systems and Process Review is more

8   operational than administration.  I'm

9   sorry, excuse me, reverse that.  It's

10  more administration that it is

11  operation. And I had asked then Major

12  Conley how he would feel about

13  switching and putting Captain Ober

14  back in SPR and he said it was an

15  issue that he just did not believe

16  that they could work together any

17  longer.  So it was not an issue of

18  his administrative skills.

19  Q.      All right, sir, give me one

20  second.

21  BRIEF INTERRUPTION

22  BY ATTORNEY BAILEY:

23  Q.      Well, I understand that there

24  was a great deal of urgency and need

25  to get Captain Ober out there to

64

1   Washington; right?

2   A.        There was a need to get

3   someone out there.  The NGA was going

4   to occur in July.

5   Q.        So we needed Captain Ober out

6   there and in your eyes or in the eyes

7   of Mr. Westcott, Mr. Szupinka, no.

8   So you gave Captain Ober a call or

9   you had Mr. Conley give Captain Ober

10  a call to discuss going out to

11  Washington with him; right?

12  A.        I wouldn't say to discuss it,

13  to tell him.

14  Q.        You didn't even ask his

15  opinion about it?

16  A.        You know, Mr. Bailey, I've

17  moved a lot of majors, captains and

18  lieutenants, some for good reasons,

19  some for bad reasons.  I never

20  engaged to discussing with them why.

21  I engaged with them what I needed to

22  tell them, where I needed them to go

23  and let's get it done.  No.  And I

24  don't think I told Colonel Conley to

25  discuss it with him either.  I mean,

65

1   that's my methodology, that's my

2   management style. I'm very chain of

3   command, I'm very semi-military.

4   I've probably moved more majors,

5   captains, and lieutenants than my

6   predecessors or the current

7   commissioner or deputies and I just

8   moved them. That was it.

9   Q.    Do State Police regulations

10   say anything about either informing

11   people or giving them opportunities

12   or options? Does the contract say

13   anything about it?

14   A.    There are some contractual

15   obligations as it relates to the

16   transfers, but generally not for

17   commissioned officers.

18   Q.    Okay. So it's your command

19   methodology to just send a directive

20   to somebody --- I hesitate to call it

21   a courtesy, I don't want to do that.

22   I've had the privilege of commanding

23   people and it wasn't my methodology.

24   That doesn't make me right, but I'm

25   just curious. So you would just

66

1    issue an order and that's ---?

2    A.    Well, it wasn't my order, you

3    know ---.  It was relayed to me from

4    the Commissioner.  It's not up for

5    discussion.  It's relayed, you know

6    ---.

7    Q.    There, you just answered my

8    question.  Not up for discussion.

9    A.    Right.

10    Q.    The Commissioner says do it,

11    do it.  He's the boss; right?

12    A.    Yes.  And what it boils down

13    to is the best interest of the

14    Department and the citizens of the

15    Commonwealth.

16    Q.    Do you know why Captain Ober

17    was transferred --- I don't know if

18    transferred is the right word, to be

19    honest.  My understanding is he was

20    on detached leave from the Bureau,

21    BPR, to IIMS at the Commissioner's

22    order.  That's my understanding; is

23    that correct?

24    A.    Yeah.  He wasn't transferred,

25    he was on detached assignment.

67

1    Q.        So he was told ---.   In other

2    words, his detached assignment was

3    ended and he was to report back to

4    BPR for a period of four days?  I

5    know you've heard testimony here

6    today about that, but do you

7    recollect that?

8    A.        What I recollect factually, is

9    that the Commissioner told me that he

10   had assured Captain Ober that he

11   would be returned to BPR after the

12   IIMS project was completed and that

13   he was going to live up to his word

14   to do that.

15   Q.        And in order to live up to his

16   word to do that, he was going to

17   transfer Captain Ober for four days

18   to BPR and from there to Washington?

19   A.        It was actually for ---

20   initially, it was for 15 days or a

21   two week period and somehow it got

22   whittled down to operationally to be

23   four days.

24   Q.        Do you know whether that

25   resulted from the expression of

70

1  operationally?  What's the

2  Pennsylvania State Police definition

3  on the difference between operations

4  and administrations?

5  A.      Administration is managing

6  projects, managing staff type work.

7  Operationally means, to me, guiding,

8  directing investigations.

9  Q.      Well, who in the name of

10 goodness put him in charge of IAD?

11 A.      I did, with the Commissioner's

12 concurrence because everybody needs a

13 chance.  You don't know that until

14 you try.  And he had been in Bureau

15 Systems and Process Review or

16 Divisions Systems and Process Review

17 and did an outstanding job.

18 Q.      You know, not to debate an

19 issue and I'm not so sure how

20 material it is, but from my

21 investigation, until this fall of '98

22 thing, this appeared to me to be an

23 exceptional officer, who Major DeWire

24 describes was on a fast track.  I

25 mean, a guy who was really a producer

71

1    for the Pennsylvania State Police and

2    a real future.  Aside from Major

3    Conley's comments and unhappiness

4    with him, he just appears to be an

5    exceptional officer from everything I

6    can see.  Given your knowledge, he

7    was in your chain of command, you've

8    already talked about his ability to

9    perform.  What about his potential?

10   Until the fall of '98, what was his

11   potential?  How good was this man and

12   how did he look?

13   A.      Comparatively speaking,

14   administratively, I think he is

15   probably near the top in officers

16   that can handle administrative

17   matters and issues, knowing the

18   rules, the regulations, Department

19   policies, things like that.  But as

20   it relates to conducting field

21   operations, things like that, I think

22   he's not near the top of that group,

23   you know.  And I think that when

24   you're considering someone,

25   especially for the rank of major,

72

1    you're comparing him to his peers.

2    So I think administratively compared

3    to his peers, yeah, he is very strong

4    --- excuse me.  Operationally, less

5    than the other peers.

6    Q.      And you had indicated that was

7    because he didn't have experience?

8    A.      That's right.

9    Q.      So you're not saying that you

10   don't believe he couldn't do those

11   things.  You're saying is, for

12   whatever reason, he lacked experience

13   at those things; right?

14   A.      Yes.  I mean, in the grand

15   scheme of things, the years that

16   Captain Ober has with the Department

17   and the time in grade, he's

18   relatively a junior officer.  I mean,

19   when you take guys like Major

20   Koscelnak, Major Szupinka, Major

21   DeWire, they've all got a lot more

22   time in grade, a lot more time in the

23   job, and hence, a lot more

24   experience.

25   Q.      Now, at some point Captain

73

1   Ober's transferred to LCE?

2   A.       Yes, sir.

3   Q.       However, Counsel and I may

4   respectively disagree about what

5   happened with this thing in

6   Washington, at some point he's

7   transferred to LCE.  Was that after

8   the issue with Washington was

9   resolved?

10  A.       Yes.

11  Q.       Well, who decided to transfer

12  him to LCE or did he come asking for

13  it?

14  A.       I don't know if he asked for

15  it or not.  I wasn't part of that

16  process.  My involvement is that the

17  Commissioner had agreed not to send

18  Captain Ober to Washington, which my

19  understanding is he could've made him

20  go, you know, he could've sent him.

21  But believe it or not, the

22  Commissioner is a very compassionate

23  individual and cares a lot about

24  people.  He elected, for whatever

25  reason, not to send him to

74

1   Washington.  So hence, you still need

2   a place for the Captain to be

3   stationed.  You have to have a spot

4   for him.

5   Q.    So it's the Commissioner that

6   sent him to LCE?

7   A.    The Commissioner has the final

8   say on wherever everybody goes.

9   Q.    That's not the question.  We

10  know he has the final say.  Was it

11  the Commissioner that sent him to LCE

12  or did somebody else make that

13  suggestion, for example?

14  A.    I can't answer that.  I did

15  not.

16  Q.    Okay.  Do you know whether he

17  was put into a lieutenant's position

18  at LCE?

19  A.    Yes, he was.

20  Q.    Why?

21  A.    Because Lieutenant Houston

22  Williams was not present.  Lieutenant

23  Houston Williams, I believe at that

24  time, he was on suspension without

25  pay.  And that Captain L. Campbell,

75

1  who's the captain there, was going to

2  retire and that gave the Department

3  the opportunity to put Captain Ober

4  there, so then even give him some

5  quick time to transition with Captain

6  Campbell to become a full-time

7  position. And I don't know that to

8  be factual. I absolutely don't.

9  That's just what I think, my

10 impression.

11 Q.      Okay. Did you have

12 lieutenants available at that time?

13 A.      I don't know.

14 Q.      Well, did you look?

15 A.      I didn't, no.

16 Q.      Do you know whether the

17 Colonel looked?

18 A.      I do not know.

19 Q.      Do you know whether Mr.

20 Westcott looked?

21 A.      No, sir. I do not know.

22 Q.      Well, how many years have you

23 been on the State Police before you

24 retired?

25 A.      Thirty-three (33).

78

1   A.      Because I wanted him to know

2   that regardless of what he heard

3   through the rumor mill of

4   consternation between Captain Ober,

5   Colonel Hickes, Colonel Coury,

6   Colonel Evanko, that we weren't

7   singling him out.  We did not want

8   him to be viewed any other way than a

9   Captain in good-standing with the

10  agency.

11  Q.      Well, let's follow up on that

12  just a little wee bit.  Now, when you

13  gave your statement to Major

14  Williams, did you express a concern

15  about the upcoming election in the

16  fall?

17  A.      Uh-huh (yes).

18  Q.      Are you involved in Republican

19  politics at all? .

20  A.      Not really.

21  Q.      Well, what was your concern

22  about the election coming up in the

23  fall?

24  A.      My concern about the election

25  coming up in the fall was that the

79

1   Governor's office could get a call
2   some morning from the press saying,
3   listen, we heard the FBI's conducting
4   an investigation into your office
5   being involved in a trooper getting
6   people into the State Police Academy
7   and the Governor's office is going to
8   have to say, we have no idea what
9   you're talking about.  And that would
10  be embarrassing.
11  Q.      I don't mean the Republican
12  Party and I don't mean the FBI any
13  disrespect.  I can't conceive of the
14  FBI in Pennsylvania letting a
15  Republican administration go out on a
16  limb with the press about some
17  pending investigation.  I mean, I
18  can't conceive that because I know of
19  their roots and their connections.
20  You're telling me that you actually
21  had a fear, you made this comment in
22  your statement about the FBI not
23  being tight-lipped.  And you have
24  this concern about the election,
25  which I think speaks pretty well of

80

1  you because it doesn't indicate that

2  you think the FBI has any partisan

3  leaning at all and I think that

4  speaks well of you in that regard.

5  Obviously, you don't run into

6  anything like that.  But my comments

7  notwithstanding.  My question is,

8  were there any facts known to you

9  which would indicate that the FBI was

10  going to reveal this information to

11  the press or anything like that?

12  A.    No.  And you said a fear, I

13  didn't have a fear, sir.  If you want

14  to term it a concern, yeah.  I have a

15  loyalty to the Commissioner and the

16  Governor's office to keep them from

17  getting blindsided on issues, if I

18  have the ability to do otherwise.

19  The FBI, I don't know what their

20  political face or allegiance were in.

21  And I wasn't --- there was also the

22  concern that they wouldn't overtly

23  leak this information, it would

24  accidentally get out.  Not that the

25  FBI would call a press conference,

81

1   but that it would leak out.

2   Q.      Fair enough.  Fair enough.

3   A.      I mean, when you're dealing

4   with confidential informants and

5   things like that, word leaks out.

6   Q.      Or a Democratic State

7   Representative like Joe Preston and a

8   Democratic State Senator like Lenny

9   Bodack from Allegheny County, you

10  never know.

11  A.      I didn't even know their

12  political face and I didn't even know

13  their names until today so --- or

14  that I can recall.

15  Q.      Do you know whether the FBI

16  ever investigated them on these

17  allegations?

18  A.      I don't know, sir.

19  Q.      I wonder if they'll answer

20  questions about whether they

21  investigated them and why not.  Do

22  you have any information to indicate

23  that the FBI buried the underlying

24  investigation for any reason?

25  A.      Into Trooper Stanton?

82

1    Q.      Yes.

2    A.      I thought that that

3    investigation was turned over to the

4    State Police and Stanton was arrested

5    and plead guilty.  So I wouldn't see

6    how it could be buried.

7    Q.      Okay.  Did you ever work with

8    the Grand Jury?

9    A.      Not in many years.

10    Q.      All right.  There's a concern

11    about the election, about public

12    exposure, loyalty to the

13    Commissioner, not that they would be

14    based on any real fear, but that

15    there'd be public misinformation that

16    would be embarrassing, et cetera.

17    Are you suggesting that for those

18    reasons, Captain Ober should have

19    informed the Colonel and/or yourself

20    or someone in his chain of command of

21    that FBI probe for that reason?

22    A.      Based on that reason alone?

23    No, not on that reason alone.

24    Q.      Not on it alone, but I'm

25    asking if you believe that should've

83

1    been a consideration for Captain

2    Ober?

3    A.    That should not have been a

4    consideration of his.

5    Q.    So apparently if he did not

6    inform anyone in his chain of command

7    and made an error, you don't have any

8    reason to believe that he was

9    motivated by a political concern; do

10    you?

11    A.    None, sir.  No.

12    Q.    Now, Colonel Coury, have you

13    ever given any thought to what Mr.

14    Ober possibly could have gained?

15    See, I picture this thing of him

16    being in a position with great

17    trepidations, fear, doubt, what do I

18    do.  Somebody hands me a hot potato,

19    what do I do?  Now, as it turns out,

20    I don't know how he's going to win,

21    but the point is, what possible thing

22    do you think he could've gained by

23    going to Colonel Hickes, and I'm

24    going to ask you about the

25    arrangements and relationship between

84

1   Colonel Evanko and Colonel Hickes,

2   was there bad politics there, bad

3   blood, or whatever, I want to ask you

4   about that in a minute.  What would

5   Captain Ober gain by that?  Is he on

6   a Hickes team?  Is he a Hickes

7   advocate?  Is he a Hickes supporter?

8    Is he in the politics of being

9   against Colonel Evanko?  I mean, I

10  don't know.  I keep looking for

11  reasons for this and I understand

12  what you're telling me and what your

13  reasons were.  Now I want to ask you

14  what you're aware of.

15        Are you aware of any reason

16  why Captain Ober, aside from his

17  error in judgement about what the FBI

18  told him or allegedly told him, why

19  he would go to Colonel Hickes?

20  Colonel Conley was very offended by

21  Captain Ober's admission.  Now I'm

22  asking you if you know of anything

23  that Captain Ober could've gained in

24  going to Colonel Hickes?

25        ATTORNEY CHRISTIE:

85

1          Excuse me, Counsel.

2     I'll object as to form.  If

3     you're asking the question,

4     what do you think the

5     Plaintiff could've gained,

6     then I would object in form as

7     the question would be

8     speculative.  The second

9     question, are you aware of any

10    reason why Captain Ober would

11    go to Colonel Hickes, then I

12    have no objection.

13         ATTORNEY BAILEY:

14         Okay.  Well, let the

15    objection stand, but I'd like

16    to question to stand as it is

17    because I think asking you if

18    you know of anything he had to

19    gain, I think that is

20    legitimate in any way,

21    personal, political,

22    administratively, career-wise,

23    you know.  I think that's a

24    legitimate question so I would

25    like the question to stand,

86

1      and you can respond.

2  A.      I have not given that question

3  any prior thought.  And as I sit

4  here, I can honestly tell you I don't

5  know what he could've gained.

6  BY ATTORNEY BAILEY:

7  Q.      Was he wrong in your eyes ---

8  strike that.

9          Do you believe that he

10  actually believed that, he being

11  Captain Ober, do you think that he

12  actually believed that Colonel Evanko

13  was involved in selling jobs?

14  A.      I do not know what he believes

15  and it wouldn't surprise me either

16  way.

17  Q.      It wouldn't surprise you

18  either way?

19  A.      Whether Captain Ober thought

20  he was or he wasn't involved in

21  selling jobs.  I don't know what

22  Captain Ober thought ---.

23  Q.      I know you don't know that,

24  but you reacted strongly on that, it

25  seemed to me, and said it wouldn't

87

1   surprise you either way.  I can't
2   conceive of Captain Ober actually
3   believing Colonel Evanko would be
4   involved in something so petty.
5   A.      And I'm not insinuating that
6   he did.  I guess what I'm referring
7   to is that I've seen what I think are
8   some shortcomings in Captain Ober's
9   ability to rationalize and look at
10  operational investigations and
11  issues.  And so I don't know how
12  Captain Ober would've viewed it.
13  Q.      Would you tell a target of a
14  law enforcement investigation that
15  they were being investigated?
16  A.      Are you saying Colonel Evanko
17  was a target?  Is that what you're
18  saying to me?  I mean ---.
19  Q.      I'm asking you generally, you
20  know --- you are in a position to
21  pass judgment on his operational
22  skills.  So you have given me
23  responses to numerous questions that
24  indicate to me that you have strong
25  background in operational skills.

88

1    Now, my question is real, real

2    simple.   It's pretty kindergartenish,

3    as I see it.

4         Would you tell a target of an

5    investigation that they're being

6    investigated?

7    A.    Colonel Evanko was not a

8    target of an investigation.   To me, a

9    target is a named person.

10   Q.    I didn't say he was.   I asked

11   you if you would tell a target.

12   A.    I would not tell a target nor

13   would I expect Captain Ober to tell a

14   target.

15   Q.    That's very simple, isn't it?

16   Now, if I say Governor's office might

17   be involved in a problem, I would

18   think that that's pretty scary or

19   pretty heavy stuff if, you know ---

20   that's rather getting up there in the

21   scheme of things; isn't it?

22   A.    I guess it depends on your

23   knowledge of the Governor's office.

24   There's a lot of people in the

25   Governor's office, you know, there

89

1   are a lot of secretaries and

2   clerical-type positions.  Not

3   everybody in the Governor's office is

4   a high ranking political official.

5   Q.      That's true.  I'm sure that's

6   true.  And neither was Monica

7   Lewinsky or neither were the

8   President's sex habits a political

9   issue, I guess, but hey, we impeached

10  a guy for it.  At least some idiots

11  did.  Now, to me, if somebody says

12  the Governor's office is an area

13  where I should be concerned about

14  because somebody might be involved,

15  who should you choose to tell in the

16  Governor's office?  See, because I'm

17  going to assume that if the FBI

18  would've come to you, you would've

19  told the Colonel because he wasn't

20  specifically named and I cannot

21  believe the Colonel wouldn't call the

22  Governor's office and say hey,

23  because what you've told me about the

24  press and the embarrassment.

25          So who should Colonel Evanko

90

1    have told if Mr. Ober had told

2    Colonel Evanko?  Who should he have

3    told in the Governor's office or

4    should he not have told anyone?

5    A.        Well, first, I think it all

6    gets back to what I initially said

7    about what I thought Captain Ober

8    should've done when the FBI called

9    him.  I don't think the Commissioner

10   or myself or anyone else would pick

11   up the phone and call the Governor's

12   office until we had some answers for

13   them.  What is the credibility of the

14   trooper, I mean, had Captain Ober

15   even checked a BPR record of Trooper

16   Stanton?  That should raise a flag

17   that, hey, we're not dealing with the

18   cream of the crop troopers here.

19   Here's a guy whose got a track

20   record, he's got some previous

21   history.  And just based on that, I

22   would've been asking the FBI other

23   questions.

24            And from the information I

25   gathered is how I would handle it

91

1    from that point on.  I believe that
2    Colonel Evanko, you know, would've
3    said, find out A, B, C, D and E,
4    let's find out what to do with it.
5    And when you put that package
6    together, you find that there's not a
7    whole lot there and then I would
8    think he would've called the
9    Governor's office.
10   Q.        Okay.  And do you think the
11   FBI should've answered, I mean, done
12   what you say?  I mean, really, what
13   you're saying is saying the FBI --- I
14   mean, this is what you would've done.
15   You would have said to the FBI, hey,
16   I want to know what you're
17   investigating, who you're
18   investigating, I want the answers to
19   these questions or I'm telling
20   Colonel Evanko.
21   A.        We do those things, they
22   haven't refused us.  We have a good
23   working relationship with the FBI.  I
24   mean, if they were concerned about
25   us, they wouldn't have come --- went

92

1  to Captain Ober in the first place.

2  Q.    Then why didn't they go to

3  Colonel Evanko in the first place?

4  He had friends down there.  Rick is

5  his friend.

6  A.    Well, I don't think an agent's

7  going to jump to a Colonel's level.

8  I mean, I think we operate on some

9  operational peer levels.

10  Q.    Why didn't Louie give him a

11  call?

12  A.    It just isn't important

13  enough.

14  Q.    He might be a target, but it's

15  not important enough.  He might be a

16  target, the Governor's office, Ridge,

17  a friend of Bush, might be involved

18  --- I mean, I think it's ridiculous,

19  too, but the fact is ---.

20  A.    It might be.  It's three years

21  old information.

22  Q.    Well, you know that now.

23  A.    I mean, I think Louie's got

24  more important things to worry about,

25  three year old --- and Louie probably

93

1    knew it then.  I mean, they knew it

2    was three year old information when

3    they called Captain Ober.

4    Q.      Colonel Evanko's buddy let him

5    down.  Let him down, should've picked

6    up the telephone and called him, say,

7    hey Colonel, what's going on in your

8    outfit out there, I think you've got

9    a bad cop.  Didn't you use the term

10   bad cop somewhere?  Somebody you did,

11   remember that?

12   A.      Yeah, uh-huh (yes).

13   Q.      Probably right.  But how do

14   you know that then, sir?  How do you

15   know that when somebody comes to you

16   and says, this might be a problem?

17   And there's a State Representative

18   and a State Senator and some guy's

19   running around shooting his mouth off

20   on a wire.  And sure, this stuff

21   probably happens a lot of times, but

22   you know, do you have to treat the

23   information with respect?  Don't you

24   have to respect the integrity of the

25   process according to your training?

1   A.      But it doesn't mean that you

2   don't ask questions.  It doesn't mean

3   you put blinders on and you just

4   accept whatever the FBI tells you.

5   Q.      Well, I wouldn't accept

6   anything the FBI would tell me.  I

7   admit that, but that's me and you

8   know how paranoid I am.  Now, I want

9   to ask you this.  If the FBI decision

10  to look at this thing at all was

11  revived, as the notes indicate that

12  --- I mean, the comments, the

13  interviews with the FBI agents

14  indicate that this was an old thing

15  that was revived.

16          Do you know any reason why

17  there wasn't a simple administrative

18  contact with the Pennsylvania State

19  Police like a letter or a letter to

20  the Commissioner, something like

21  that, saying hey, we want to look

22  into this or we want to meet with you

23  and talk about this?

24  A.      No, I don't know.

25  Q.      Were you ever able to figure

95

1   out or understand why their contact

2   was made to Captain Ober in IAD?

3   A.      No, sir.

4   Q.      Okay.  One of the troubling

5   things for me, Colonel, you didn't

6   read, aside from your own statement,

7   you didn't read into that report

8   much, you didn't see it?

9   A.      I have not seen that report,

10  sir.

11  Q.      Okay.  It's silly to waste

12  your time even asking you questions

13  about it then.  Do you think

14  Lieutenant Colonel Hickes was wrong

15  in what he did?

16  A.      In not informing the

17  Commissioner, is that what you're

18  referring to?

19  Q.      Yeah, because I'm assuming

20  that if you take Darrell Ober out of

21  this, we know that a matter on or

22  about October 5th, Lieutenant Colonel

23  Hickes is told.  I don't know of

24  anything that was, you know --- I

25  don't know of him being read his

58

1    A.      I don't know, sir.

2    Q.      Was Darrell needed out there

3    in Washington?

4    A.      A darn good project manager

5    was needed out there.

6    Q.      Szupinka couldn't do the job,

7    wasn't up to the task?

8    A.      I'm sure he was up to the

9    task, but everybody needs help.

10   Q.      Well, Szupinka was a pretty

11   doggone good worker in his own right,

12   isn't he?

13   A.      And so is Major Werts on the

14   NGA, but to be able to assign to

15   somebody to that full time makes a

16   big difference.

17   Q.      Well, I mean, Szupinka had

18   already been under way, had this

19   thing under way and was working on it

20   for about a year.  He pretty much had

21   it under control, didn't he?

22   A.      You'd have to ask Colonel

23   Westcott.  I don't know.  That was

24   under operations and I wasn't a real

25   part of that.

96

1    rights, maybe he was.

2    A.    I don't know, sir.

3    Q.    And you don't know because

4    you're not that familiar with the

5    investigation.  You don't know why

6    Captain Ober would've been read his

7    rights?

8    A.    I don't know, sir.

9    Q.    Do you know whether Colonel

10   Hickes was transferred anywhere?

11   A.    He was not, sir.

12   Q.    Does the Commissioner have the

13   power to transfer him?

14   A.    He's a cabinet appointee by

15   the Governor.

16   Q.    Who is?

17   A.    Colonel Hickes.

18   Q.    Does he have friends over

19   there?

20   A.    I don't know, sir.

21   Q.    How's it possible to be a

22   Commissioner appointed by the

23   Governor's office and not have some

24   political friends over there?  Is

25   that possible?

97

1   A.      I don't know, sir.

2   Q.      Do you know whether he and

3   Colonel Evanko get along?

4   A.      I've seen them work together

5   and they have a good, professional

6   working relationship.  All four of us

7   have been in the same company many,

8   many times and it's a good,

9   professional working relationship.

10  Q.      And the participants, Colonel

11  Hickes and Colonel Evanko, follow the

12  rules and perform their professional

13  jobs the way they should; right?

14  A.      Yes, sir.

15  Q.      Have you ever seen them in any

16  kind of political dispute or involved

17  in a political dispute of some type?

18  A.      No, I have not, sir.

19  Q.      Do you know if Lieutenant

20  Colonel Hickes has a political

21  contact over in the Governor's

22  office?

23  A.      I don't know, sir.

24  Q.      Do you know who he reports to

25  over there, if he reports to anybody?

98

1    A.    No, sir.  I thought he

2    reported to the Commissioner and the

3    Commissioner reports to the

4    Governor's office.

5    Q.    Do you report to anybody over

6    in the Governor's office?

7    A.    No, sir.

8    Q.    And who does the Commissioner

9    report to in the Governor's office?

10   A.    It was Mark Campbell and right

11   now --- since I retired in January,

12   I'm not sure who the Deputy Chief of

13   Staff is, but that's who he would

14   report to.  It was Lisa Baker, I

15   think, last time I think when I

16   retired.  I'm not sure who it is now.

17   Q.    Remember I had asked you some

18   questions about Major Koscelnak?

19   A.    Yes.

20   Q.    And you had a discussion with

21   Major Koscelnak and told him not to

22   treat Mr. Ober any differently than

23   anyone else?

24   A.    Yeah.

25   Q.    Who brought that subject up,

99

1    Koscelnak or you?

2    A.      I think I did.

3    Q.      And did Koscelnak say, yeah,

4    that was okay?

5    A.      Yeah.  Yes.

6    Q.      Now, remember PEMA, when I

7    asked you about PEMA?

8    A.      Yes.

9    Q.      Doesn't PEMA --- wouldn't PEMA

10   give Ober some operational

11   experience?

12   A.      No.  See, I don't see it that

13   way.  I mean, you're ---.

14   Q.      September 11th, it wouldn't

15   have given him any operational

16   experience?

17   A.      Well, it would in an

18   administrative sense.  I mean, you're

19   going to conveying --- you're going

20   to be passing messages back and forth

21   from PSP to maybe Department of

22   Transportation, things like that.

23   And yeah, there would be some

24   operational benefit to that.

25   Q.      Wasn't Ober interested in

100

1   serving under PEMA?

2   A.      I don't recall, sir.

3   Q.      Do you know why he was refused

4   an opportunity to serve on PEMA?

5   A.      I don't know.  I played --- I

6   had no involvement in that, sir.  So

7   I'm not familiar with it.

8   Q.      Is there a Major or a Colonel

9   Washington?

10  A.      There was a Major Leonard

11  Washington.

12  Q.      Yeah, Leonard Washington.

13  What's he have to do with PEMA?

14  A.      Well, that PEMA position is

15  within the Bureau of Emergency and

16  Special Operations and Major

17  Washington was the Bureau Director at

18  that time.  And the Bureau of

19  Emergency and Special Operations is

20  functionally located under the Deputy

21  Commissioner of Operations.

22  Q.      Who is?

23  A.      It would've been Lieutenant

24  Colonel Joseph Westcott until July of

25  2000.

101

1  Q.      Do you know if Lieutenant

2  Westcott ever said that Ober wasn't

3  going to be reappointed to PEMA?

4  A.      He never had that discussion

5  with me, sir.

6  Q.      I think this would probably

7  be, for my purposes at least, a very

8  good point to break, not just time-

9  wise.  Colonel, I am largely through

10  what I wanted to go over with you.  I

11  don't think --- I might need another

12  hour, at the most. We could

13  reschedule that at some point.  Where

14  did you say you were headquartered or

15  where do you work?

16  A.      My office is here.  My office

17  is here in Harrisburg.

18  Q.      So you're local to the area

19  here?

20  A.      Yes, sir.

21  Q.      All right.  I'll work with

22  your attorney and we'll try to pick

23  that up at a later time, okay?

24  A.      Uh-huh (yes).

25              ATTORNEY BAILEY:

102

1      Why don't we
2      discontinue the deposition at
3      this point, okay?
4              VIDEOGRAPHER:
5              Okay.  It's 4:42 p.m.
6      The deposition of Thomas Coury
7      will be continued at a later
8      date.  Thank you.
9              *  *  *  *  *  *  *  *
10     DEPOSITION CONCLUDED AT 4:42 P.M.
11             *  *  *  *  *  *  *  *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

COMMONWEALTH OF PENNSYLVANIA)

COUNTY OF DAUPHIN              )

C E R T I F I C A T E

I, Vivian Gratz, a Commissioner of Deeds in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness was hereby first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was taken stenographically by me and reduced to typewriting, and constitutes a true and correct record of the testimony given by the witness.

I further certify that the reading and signing of said depositions were (not) waived by counsel for the respective parties and by the witness.

I further certify that I am not a relative, employee or attorney of any of the parties, nor a relative or employee of counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and stamp this __/?__ day of _April 2002_          .

VIVIAN GRATZ
Commissioner of Deeds
Commonwealth of Pennsylvania
My Commission Expires Nov. 7, 2005

· PITTSBURGH, PA

· CLEARFIELD, PA        · ERIE, PA

· STATE COLLEGE, PA     · OIL CITY, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.

· INDIANA, PA

· GREENSBURG, PA

· PHILADELPHIA, PA

· SOMERSET, PA

· WILKES-BARRE, PA

Philip M. Conti
1081 Acri Drive
Harrisburg, Pennsylvania 17111
717-564-8033

May 22, 1999

Dear Tom:

Your attention is invited to the attached exchange of correspondence with Marian Hayman, the widow of Willis J. Hayman, who was one of the most colorful entertainers in our rodeo history. He was an outstanding horseman, and was featured playing his violin while standing on his motorcycle and circling the field.

The other incident was one involving a Stitt, who was and may still be working with Marc Infantino on the pictorial history book. He approached a coal region family, and was given artifacts which we will never see. Unfortunately, I cannot come across my notes. My contacts with the family were by phone, not written.

In my last two columns, I have devoted space to this problem of dealing with private collectors. Since I have taken time to do that, I'm sure the message will get across. So, perhaps it might be best to set this matter aside and see what happens. Should there be a repeat of this nature, I will contact you immediately. Let's hope that does not happen.

It is indeed my pleasure to be working with you on this PSP-HEMC project. Let's hope that we will by the year 2005 have something we can truly be proud of.

Warmest regards,

*Phil*

*Copy #1 (part of #2)*

ENCLOSURE _3_

PAGE _1_ OF _1_

STD-141, 9-86

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:          December 23, 1999

SUBJECT:       Supervisory Inquiry IAD# 1999-409

TO:            Director, Bureau of Professional Responsibility

FROM:          Lt. Colonel Thomas K. Coury
               Deputy Commissioner of Administration

ENCLOSURES: (1)   Supervisory Inquiry, IAD# 1999-409, prepared by Corporal
                  Robert D. Mrgich, Bureau of Professional Responsibility, dated
                  August 23, 1999, with attachments.

            (2)   Notification of result of investigation directed to Director, Bureau
                  of Technology Services, Attn:  Captain Darrell G. Ober, in
                  regards to the above inquiry.

1.    After careful review of Enclosure (1), I have concluded that the
      allegation is unfounded.   No additional inquiry or formal
      investigation is warranted in this case.

2.    It was alleged that Captain Ober had used his position of being
      a member of the Centennial Book Committee to obtain
      Pennsyvlania State Police historical items for his personal use.
      However, examination of the facts and circumstances of this
      investigation indicate that this allegation is not true.

3.    In 1995 Captain Ober corresponded with two Department
      retirees or their caregivers.  He later received historical items
      from these individuals.    Written correspondence to the
      individuals as contained in Enclosure (1) demonstrate that at no
      time did Captain Ober identify himself as a member of the
      museum project or of the Centennial Book Committee.
      Additionally, Captain Ober obtained the historical items in 1995,
      and he did not become a member of the Centennial Book
      Committee until August 1996.

4.    Enclosure (2) was sent to Captain Ober advising him of my
      determination in this case.  Unfortunately, the complainant in
      this case recently past away and no notification of the results of
      the investigation can be made.

*Coury #2* (66pgs)                                    1/67

COMMONWEALTH OF PENNSYLVANIA
STD-502X        REV (11/95)

# DESK MEMORANDUM

**SUBJECT :**

Supervisory Inquiry #1999-409

| TO (NAME & ADDRESS) : | FROM (NAME & ADDRESS) : |
|---|---|
| Deputy Commissioner of Administration | Acting Director, Internal Affairs Division *JRB*<br>Bureau of Professional Responsibility |

| DATE SENT: 12/03/99 | DATE NEEDED : |
|---|---|

| | PLEASE CALL: | | APPROVAL | | SEE ME |
|---|---|---|---|---|---|
| | RETURNED YOUR CALL | | AS REQUESTED | | COMMENT |
| | INFORMATION & FILE | | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| ✓ | NECESSARY ACTION | | SIGNATURE | | |

| RECEIVED BY : | DATE : | TIME : |
|---|---|---|

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| *EO Dep. Admin.* | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**MESSAGE:**

Subject inquiry is forwarded for whatever action you deem appropriate. Attached please find copies of adjudication responses to complainants/members from several Troop Commanders with their Endorsements. Remember your are not restricted to a conclusion of Sustained, Not Sustained or Unfounded. You can word as you feel necessary. Verbiage as "appropriate supervisory action taken", appropriate administrative action was taken", "no further administrative action necessary," etc, will suffice. Also attached find a copy of the Endorsement and Documentation of Action Taken section of the proposed Supervisory Special Order for your information. If you need anything else let me know.

*pls Do AN Admin Finding*

*Copy #2*

*2/67*

COMMONWEALTH OF PENNSYLVANIA
STD-502              REV. 5-97

# DESK MEMORANDUM

**SUBJECT**

Supervisory Inquiry #1999-409

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Director,<br>Bureau of Professional Responsibility | Acting Director, Internal Affairs Division *JRB*<br>Bureau of Professional Responsibility |

| DATE SENT | DATE DUE |
|---|---|
| October 5, 1999 | |

| | | | |
|---|---|---|---|
| | PLEASE CALL | APPROVAL | SEE ME |
| | RETURNED YOUR CALL | AS REQUESTED | COMMENT |
| X | INFORMATION & FILE | PREPARE REPLY/REPORT | NOTE AND RETURN |
| X | NECESSARY ACTION | SIGNATURE | X *Review* |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| *DEP. COM. ADMIN.* | | | | | |
| *Capt points* | *OP* | | | | |
| *Dep Admin* | *TC* | *4/27* | | | |
| *Dir BRR* | *MWC* | *12/04/99* | | | |

**MESSAGE:**

The subject inquiry is being forwarded for your review and any action you deem appropriate.

*FORWARDED FOR YOUR REVIEW, AS PER MAJOR CONLEY,
11/12/99. THIS IS THE ORIGINAL REPORT.*

*Lt. Brown*

cc:    IAD FILE

*For possible violations*

*File*

*Call me*

3/67

BPR File Copy

COMMONWEALTH OF PENNSYLVANIA
STD-502          REV. 5-97

# DESK MEMORANDUM

| SUBJECT | |
|---|---|
| Correspondence from Philip Conti | |

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Deputy Commissioner of Administration | Director, Bureau of Professional Responsibility |

| DATE SENT | DATE DUE |
|---|---|
| 11/19/99 | |

| | | | | | |
|---|---|---|---|---|---|
| | PLEASE CALL | | APPROVAL | | SEE ME |
| | RETURNED YOUR CALL | | AS REQUESTED | | COMMENT |
| X | INFORMATION & FILE | | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| | NECESSARY ACTION | | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

As discussed, we need a Special Order from the Commissioner prohibiting the reference of, "as a Pennsylvania State Police member," when members solicit retirees for artifacts, etc.

COMMONWEALTH OF PENNSYLVANIA
STD-502          REV. 5-97

# DESK MEMORANDUM

SUBJECT

Supervisory Inquiry #1999-409

| TO (NAME & ADDRESS)<br>Director,<br>Bureau of Professional Responsibility | FROM (NAME & ADDRESS)<br>Acting Director, Internal Affairs Division *JRB*<br>Bureau of Professional Responsibility |
|---|---|
| DATE SENT<br>October 5, 1999 | DATE DUE |

| | | | | | |
|---|---|---|---|---|---|
| | PLEASE CALL | | APPROVAL | | SEE ME |
| | RETURNED YOUR CALL | | AS REQUESTED | | COMMENT |
| X | INFORMATION & FILE | | PREPARE REPLY/REPORT | | NOTE AND RETURN |
| X | NECESSARY ACTION | | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| *Dep. Com. Admin.* | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MESSAGE:

The subject inquiry is being forwarded for your review and any action you deem appropriate.

*Forwarded for your review, as per Major Conley,*
*11/12/99.  This is the orginal report.*

*Lt. Brown*

cc:    IAD FILE

5/67

BUREAU OF PROFESSIONAL RESPONSIBILITY

Date _08/01/99_

IAD # _1999-409_

DB # _____

1. Major Hawthorne N. Conley ( ) _HNC_

2. Lieutenant John R. Brown ( ) _JRB_
   1. Determine if OBER gave anything to the Museum

3. Sgt. Lisa S. Christie ( ) _____
   2. Have OBER interviewed

4. Cpl. Noel Ruiz ( ) 3. Looks like Mrs. Poeo wished for gifts to go to museum
   → 4. Check w/Capt. first See if Capt. Ober

5. A.A. Donna J. Blouch ( )
   6. Cpl. Mrgich( ) turned anything over to Museum Committee
   Capt Ober #657-4231. Poeo - 4 yrs. ago.

· LETTER TO BE SENT · _____

Message: Original report submitted. There is additional info. Refer to Attachments # 17 & 18.

The next question is where do we go from here. Capt. Ober told me on 8/31/99 he received a letter from Col. Cvenko removing him from the Museum Committee.

6/67

Have you given any items to the museum
Did promise you would give any items to the museum
WHEN Appointed to board.
When items from _BECKS_/HAYMAN

HOW FIND THE NAMES OF _POSO_/_BECKS_ — HAYMAN
WHEN LAST CONTACT

ANY CONTACT SINCE GOT THESE ITEMS

How did you get items from ~~poso~~ — ~~HAYM~~ BECKS

How did you get items from ~~BECKS~~ HAYMAN

HAVE You Gotten any items for your collection since being on
the museum committee.

1 ST RIGHT        2629 —
                  MARKET PLACE
  from before
    ↓
   TOO FAR

Do you feel it was a conflict when you received the items from
~~conflict of interest~~   BECKS/HAYMAN

    9/7 - ADVISED CAN HAVE A REP. IF WANT ONE

Do you feel you misrepresented himself to _BECKS_/HAYMAN

Both ladies say they have your business card. ~~the card~~
~~they only with it.~~ Why were they included w/ your letter.

DID You PAY FOR THE ITEMS
   IF NOT DID You OFFER TO.

DID YOU KNOW EITHER OF THEM PRIOR TO RECEIVING ITEMS / SPEAKING +
when BECKS MAILED ITEMS AND PAID FOR SHIPPING

7/67

1

Date _11/12/99_

IAD # _1999-409_

DB # _____

1.  Major Hawthorne N. Conley    ( ✓   _HNC_

2.  Lieutenant John R. Brown    ( ✓   _JRB_

3.  Sgt. Lisa S. Christie    ( ✓    _IAD FILE_

4.  Cpl. Noel Ruiz    ( )  _____

5.  A.A. Donna J. Blouch    ( )  _____

6.  C.T. Brenda Stutzman    ( )  _____

- LETTER TO BE SENT -  _____

Message: _Cpl. Rain delivered to_
_Lt. Col. Coury 11/12/99, original_
_copy, file folder still on_
_your desk. ✓_

8/67

8

COMMONWEALTH OF PENNSYLVANIA
STD-502     REV. 2/93

## DESK MEMORANDUM

**SUBJECT**

SUPERVISORY INQUIRY, IAD #1999-409

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| DIR, BPR | ACTING DIR, IAD |

| DATE SENT | DATE NEEDED |
|---|---|
| | |

| | | | |
|---|---|---|---|
| PLEASE CALL: | APPROVAL | SEE ME | |
| RETURNED YOUR CALL | AS REQUESTED | COMMENT | |
| X INFORMATION & FILE | PREPARE REPLY / REPORT | NOTE AND RETURN | |
| X NECESSARY ACTION | SIGNATURE | | |

| RECEIVED BY | DATE | TIME |
|---|---|---|
| | | |

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**MESSAGE:**

The subject inquiry is being forwarded for your review and any action you deem appropriate.

9/67

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:            February 12, 2001

SUBJECT:        Supervisory Inquiry IAD #1999-409

TO:              Lieutenant Colonel Hawthorne N. Conley
                 Deputy Commissioner of Administration

FROM:            Major W. John Pudliner   WJP
                 Director, Bureau of Professional Responsibility

REFERENCES:     (a)    Supervisory Inquiry IAD #1999-409, dated August 23, 1999
                       Submitted by Corporal Robert D. Mrgich, Bureau of Professional
                       Responsibility

1.      On February 12, 2001, I contacted retired Major Matthew Hunt via telephone at
(717) 545-4565. Mr. Hunt related that he had spoken to one Lee J. Poso from Rome, New York approximately
ne week ago. He stated that Captain Darrell Ober had contacted Ms. Poso's friend, retired Corporal James B.
rooks, regarding Pennsylvania State Police memorabilia. Mr. Brooks, who is now deceased, sent three boxes
f memorabilia to Captain Ober. Retired Major Hunt indicated that Ms. Poso told him that Captain Ober had
dicated to Mr. Brooks that he represented himself as a member of the Pennsylvania State Police Museum
ommittee.

2       Ms. Poso had been previously interviewed by Corporal Robert D. Mrgich during
e supervisory Inquiry listed in Reference (a). On august 4, 1999, Ms. Poso submitted a handwritten letter
nclosure 6 of Reference a) to Corporal Mrgich. In the letter, she indicates that Mr. Brooks was aware that
ptain Ober did not represent the Museum Committee.

3.      Ms. Poso further indicated to retired Major Hunt that Captain Ober had contacted
, via telephone, approximately one month ago and made inquiry as to whether she had been contacted by any
mbers of the Pennsylvania State Police regarding his activities.

STD-501, 9-85

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**

DATE:          December 23, 1999

SUBJECT:       Supervisory Inquiry IAD# 1999-409

TO:            Director, Bureau of Technology Services
               Attn: Captain Darrell G. Ober

FROM:          Lt. Colonel Thomas K. Coury *TKC*
               Deputy Commissioner of Administration

REFERENCE:  (a)  Supervisory Inquiry, IAD# 1999-409, prepared by Corporal
               Robert D. Mrgich, Bureau of Professional Responsibility, dated
               August 23, 1999, with attachments.

1.   After careful review of Enclosure (1), I have concluded that the
     allegation is unfounded.  No additional inquiry or formal
     investigation is warranted in this case.

2.   It was alleged that you had used your position of being a
     member of the Centennial Book Committee to obtain
     Pennsyvlania State Police historical items for your personal use.
     However, the facts and circumstances of this investigation
     indicate that this allegation is not true.

3.   In 1995 you corresponded with two Department retirees or their
     caregivers and later received historical items from these
     individuals.  Written correspondence to the individuals as
     contained in Enclosure (1) demonstrate that at no time did you
     identify yourself as a member of the museum project or of the
     Centennial Book Committee.  Additionally, you obtained the
     historical items in 1995, and did not become a member of the
     Centennial Book Committee until August 1996.

4.   No administrative action will be taken and this Supervisory
     Inquiry is closed.



**FILE**

11/67

STD-501X (9-86)

**Commonwealth of Pennsylvania**

**Date:**           August 23, 1999

**Subject:**        Supervisor Inquiry – IAD – 1999-409

**To:**             Lieutenant John R. Brown
                    Acting Director, Internal Affairs Division

**From:**           Corporal Robert D. Mrgich
                    Internal Affairs Division, Central Section

**Enclosures:**

  (1)  SP 1-101, Use of Force or Complaint Reception and Processing
      Worksheet dated 05/27/99.

  (2)  Correspondence to Mr. CONTI from Mrs. HAYMAN.

  (3)  Correspondence to Lieutenant Colonel COURY from Mr. CONTI
      dated May 22, 1999.

  (4)  Correspondence to Major William REGAN (Retired) from Mr.
      CONTI dated July 9, 1999.

  (5)  Correspondence to Corporal MRGICH from Mr. CONTI dated July
      12, 1999.

  (6)  Correspondence to Corporal MRGICH from Ms. Lee POSO dated
      4 Aug 1999.

  (7)  Captain Darrell G. OBER's business card.

  (8)  Correspondence to Mr. BROOKS from Darrell G. OBER dated
      March 31, 1995.

  (9)  Correspondence to Mr. BROOKS from Darrell G. OBER dated
      June 12, 1995.

12/67

12

Supervisory Inquiry
August 12, 1999
Page 2

(10)    Card addressed to Mr. BROOKS from Darrell G. OBER dated 5/18/95.

(11)    Correspondence to Captain OBER from James R. BROOKS dated 5/21/1995.

(12)    Internet results of search for telephone number for W J HAYMAN.

(13)    Correspondence to Mrs. HAYMAN from Darrell G. OBER dated June 28, 1995.

(14)    Correspondence to Mrs. HAYMAN from Darrell G. OBER dated September 21, 1995.

(15)    Correspondence to Mrs. Willis J. HAYMAN from Philip M. CONTI dated March 15, 1999.

(16)    Pennsylvania State Police Pictorial Centennial History Book Project Booklet of General Information.

1.      This investigation was conducted upon receipt of a Use of Force or Complaint Reception and Processing Worksheet, (*Enclosure #1*). Also included is correspondence from Mrs. HAYMAN to Mr. CONTI (*Enclosure #2*) and correspondence from Mr. CONTI to Lieutenant Colonel COURY (*Enclosure #3*). Lieutenant Colonel COURY received all three enclosures from Mr. CONTI and submitted them.

        It is alleged that Captain Darrell G. OBER, while Director, of the Systems and Process Review Division, solicited artifacts from retired personnel and their families by using his rank and post with the Department to give the impression that he was collecting the items for the Museum.

2.      On July 16, 1999, this officer contacted Philip M. CONTI (717) 564-8088. This was in reference to the correspondence (*Refer to Enclosure #4*) he sent Major William J. REGAN, (Retired) concerning Captain OBER's aggressive actions in soliciting and obtaining artifacts from retired personnel and their families.

        Mr. CONTI related that he has corresponded with Marian HAYMAN, widow of retired Trooper Willis J. HAYMAN. Mrs.

13/67

/3

Supervisory Inquiry
August 12, 1999
Page 3

HAYMAN related that in 1995, after her husband died, she gave Captain OBER some rodeo books and pictures *(Refer to Enclosure #2)*.

Mr. CONTI also related on July 9, 1999, that he received a shipment of artifacts from Ms. Lee POSO, surviving partner of retired Trooper James R. BROOKS. Mr. CONTI said Ms. POSO advised him that she had been solicited by and gave assorted uniform items to Captain OBER.

Mr. CONTI stated he has not spoken to either one of the above individuals, but has corresponded with them by mail only. He mailed this officer correspondence with a telephone number of Ms. POSO, but did not have a telephone number for Ms. HAYMAN *(Refer to Enclosure #5)*.

3.    On July 27, 1999, at 0850 hours this officer spoke with Ms. POSO (F-67), (315) 337-1905.  This telephone conversation was in reference to Captain OBER obtaining Pennsylvania State Police Memorabilia from Mr. BROOKS.

Ms. POSO was first asked how Captain OBER identified himself to her when he called and asked to speak to Mr. BROOKS. "I'm not sure, and I do not want to say without being positive. All I remember is him saying his last name."

Ms. POSO related that Captain OBER called Mr. BROOKS in 1995 and spoke to him about the State Police and State Police Memorabilia. "Captain OBER told Jim that he collects old items and would be interested in any items that Jim had. He said that he has a little room in his house where he wanted to display the items. Jim was glad someone took an interest in the items and was happy to give them to him. Captain OBER offered to pay for the items, but Jim did not want anything for them. We then mailed the items to him" *(Refer to Enclosure #6)*.

"Captain OBER invited Jim over to his house so he could see the room where he displays the items, but Jim did not go. After we mailed the items, we received a fruit basket from Captain OBER." Mr. BROOKS had given the memorabilia to Captain OBER before he was aware that the State Police was creating a Museum.  Ms.

14/67

Supervisory Inquiry
August 12, 1999
Page 4

POSO said that when Mr. BROOKS learned of the museum, he said, "I wish the items I gave Captain OBER would go to the museum, but I gave them to him and I won't ask for them back. I gave them to him and he can do with them what he wants."

Ms. POSO was asked if Mr. BROOKS ever told Captain OBER that he wanted the items to go to the Museum. She replied, "No, I'm positive that he did not, he would have liked them to, but he did not." Ms. POSO added, "I wish they could do something, that is where the stuff belongs. Do you think if I offer to pay Captain OBER for the items he would return them to me?" This officer advised that was not something I could answer.

Ms. POSO was asked where she thought the items were going to be displayed. She stated, "I believe his intent was to keep them for himself. He called back after he received the items from Jim and mentioned that he may give them to the museum."

When asked if Captain OBER ever mentioned how he got Mr. BROOKS's telephone number, Ms. POSO related that she wondered the same thing. Ms. POSO did say that Captain OBER mentioned a name of an individual who gave the number to him, but she could not recall the name.

Ms. POSO stated that Captain OBER sent Mr. BROOKS a business card, two letters and a card. Ms. POSO will send this officer the letters so copies can be made and attached to this report.

Ms. POSO ended the conversation by stating, "I don't think he did anything wrong."

This officer received the above mentioned items from Ms. POSO. Included with the above items was a letter written by Mr. BROOKS, which was sent to Captain OBER *(Refer to Enclosures #7, #8, #9, #10 & #11)*.

4.    On July 29, 1999, this officer used the Internet to obtain Mrs. HAYMAN's telephone number (724) 946-3375 (*Refer to Enclosure #12*).

On August 6, 1999, at 0800 hours, this officer spoke with Mrs. Marian HAYMAN (F-89), (724) 946-3375. This was in reference

Supervisory Inquiry
August 12, 1999
Page 5

to her giving State Police Memorabilia to Captain OBER.  This officer made arrangements to meet her at her residence, 284 East Branch Road, Mercer, PA 16137-3308 on August 10, 1999.
On August 10, 1999, at 1035 hours this officer met with Mrs. HAYMAN at her residence.

Mrs. HAYMAN stated that Captain OBER called her house in the spring of 1995, shortly after her husband died.  He spoke to her about the State Police and her late husband, Willis HAYMAN.  "He told me that he worked in Mercer before and that he knew Bill.  I did not recognize his name, but I figured he knew Bill because he had my telephone number."

"He said he was interested in Old State Police items that I would have in the house and if I would be willing to donate them to the Museum they are forming.  He said he would give me time to look through Bill's things and then he would call me back.  When he called back, he arranged to come to the house and pick up the items.  I didn't give him anything real important, just some rodeo books and pictures."

"When he came to the house, he identified himself as Captain Darrell OBER and gave me one of his business cards.  I sent the business card to Mr. CONTI in one of the letters I sent him in March April or May of 1999.  He offered to take to me to lunch, but I didn't go.  He sat and visited for a while.  He seemed very nice."

When asked what she thought was going to happen to the items she gave Captain OBER, she responded, "I thought they were going to be displayed by the State Police somewhere.  Didn't he give the things to the Museum?  Why did he keep them?  What is he going to do with them?"

Mrs. HAYMAN was asked to clarify what she believed Captain OBER intended to do with the items.  She responded, "I am pretty sure he said he was collecting for the museum."

This officer took two letters sent to Mrs. HAYMAN by Captain OBER.  One letter referenced the telephone conversation and the other referenced the meeting and receiving the items from her (Refer to Enclosure #13 & #14).

Supervisory Inquiry
August 12, 1999
Page 6

Mrs. HAYMAN gave this officer a copy of correspondence she received from Mr. CONTI reference photographs she sent to him *(Refer to Enclosure #15).*

5.  This officer received the Pennsylvania State Police Pictorial Centennial History Book Project of General Information from Lieutenant John R. BROWN.  The booklet lists the Project Member names to include Captain Darrel OBER *(Refer to Enclosure #16).*

17/67

STD-501X (9-86)

**Commonwealth of Pennsylvania**

**Date:**        September 1, 1999

**Subject:**     Supervisor Inquiry – IAD – 1999-409 - Supplemental Report

**To:**          Lieutenant John R. Brown
                 Acting Director, Internal Affairs Division

**From:**        Corporal Robert D. Mrgich
                 Internal Affairs Division, Central Section

**Enclosures:**

(17)    Correspondence to Corporal MRGICH from Mr. CONTI dated August 23, 1999.

(18)    Correspondence to Corporal MRGICH from Mr. CONTI dated August 29, 1999.

6.      On August 25, 1999, this officer received Enclosure #17 from Mr. CONTI.

7.      On August 31, 1999, this officer received Enclosure #18 from Mr. CONTI.

PSP-501X

**COMMONWEALTH OF PENNSYLVANIA**

**DATE:**            October 10, 1999

**SUBJECT:**        Supervisory Inquiry - IAD 1999-409 - Supplemental Report

**TO:**             Lieutenant John R. Brown
                    Acting Director, Internal Affairs Division

**FROM:**           Corporal Robert D. Mrgich *RDM*
                    Bureau of Professional Responsibility
                    Internal Affairs Investigator – Central Section

**ENCLOSURES:**     (19) SP 1-104, Pennsylvania State Police Administrative Warning issued to
                    Captain Darrell G. OBER dated September 10, 1999.

                    (20) SP 1-102, Pennsylvania State Police Notification of Inquiry issued to
                    Captain Darrell G. OBER dated September 10, 1999.

                    (21) One Maxell C90 Cassette Tape containing interview of Captain Darrell G.
                    OBER by Corporal Robert D. MRGICH on September 10, 1999.

                    (22) Transcription of Interview with Captain Darrell G. OBER by Corporal
                    Robert D. MRGICH on September 10, 1999.

8.      On September 10, 1999, at 0812 hours, this officer interviewed **Captain Darrell G.
        OBER,** in the Bureau of Technology Services Building, Conference Room number
        one, 2629 Market Place, Harrisburg, PA 17110.  He has been a member of the
        Department for eighteen years.  He is currently assigned as the Systems Integrator
        Procurement Team Leader for Technology Services.

        Captain OBER was advised of his Administrative Warnings *(Refer to Enclosure #19)*
        and Notification of Inquiry *(Refer to Enclosure #20)* of which he both acknowledged
        understanding and signed.  Captain OBER had Corporal Michael A. RUDA present
        acting as his Union Representative.  This officer advised Captain OBER that the
        interview would be tape recorded *(Refer to Enclosure #21)*.  The interview was
        subsequently transcribed.

        Captain OBER stated that he is not a member of the Pennsylvania State Police
        Museum committee and has never been.  He also cited that he never discussed the
        museum with Mr. BROOKS or Ms. HAYMAN.

19/67

Supervisory Inq...
IAD #1999-409
Page 2

"At no time have I ever, in any way, shape or form, ever represented to anyone that I am a member of the Pennsylvania State Police Museum Committee or using any leverage of any source in my association with this Department to add to my private collection."

For details of the interview *(Refer to Enclosure #22).*

SP 1-101 (1-93)

PENNSYLVANIA STATE POLICE
## USE OF FORCE OR COMPLAINT
### RECEPTION AND PROCESSING WORKSHEET

BPR CONTROL NUMBER

IAD 1999-409

**COMPLAINT INFORMATION**

| NAME | FIRST LT. COL. THOMAS | M.I. K | LAST COURU |
|------|------|------|------|

HOME ADDRESS

STREET/P.O. BOX DEPUTY Comm. ADMINISTRATION

| CITY | | STATE | ZIP CODE | HOME PHONE # ( ) |

EMPLOYER — NAME & ADDRESS — WORK PHONE # ( )

**NON-COMPLAINT USE OF FORCE REPORT** ☐ SHOOTING INCIDENT ☐ PHYSICAL FORCE | LEGAL INTERVENTION

**SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)**

| NAME | FIRST DARRELL | M.I. G. | LAST OBER |

| LOCATION | TROOP/BUREAU DHQ | STATION/DIVISION BUR. TECH. SERVICES | JOB ASSIGNMENT CAPTAIN |

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   DOE 7/20/81   ← TO BE COMPLETED IF KNOWN OR AVAILABLE

**DETAILS OF ALLEGATION**

RTE/STREET

| RTE/TWP/BORO | COUNTY | DATE | TIME | DAY |

TYPE OF ALLEGATION (CHECK ONE)

☐ PHYSICAL ABUSE    ☐ IMPROPER CONDUCT ON DUTY
☐ VERBAL ABUSE    ☒ IMPROPER CONDUCT OFF DUTY
☐ CRIMINAL CONDUCT    ☐ DISSATISFACTION WITH PERFORMANCE ON DUTY

☐ OTHER (Please explain)

SYNOPSIS   COMP. RECEIVED CORRESPONDENCE FROM PHILIP M. CENTI AND A LETTER FROM MRS. WILLIS J. HAYMAN THE WIDOWER OF WILLIAM HAYMAN, A DECEASED RETIRED TROOPER FROM THE RODEO DETAIL. INFORMATION CONTAINED THEREIN IS THAT CAPTAIN OBER CONTACTED AND MET WITH HER AFTER HER HUSBAND'S DEATH AND OBTAINED RODEO BOOKS AND PICTURES. THERE IS ALSO MENTION THAT CAPTAIN OBER IS NOT

**RECEPTION DATA**

| DATE RECEIVED 5/27/99 | TIME RECEIVED 1235 | LOCATION RECEIVED | TROOP/BUREAU ①-BPR | STATION/DIVISION |

| RECEIVED BY | NAME LT. JOHN R. BROWN | | SSN |

**FOR BUREAU USE**

| INVESTIGATOR ☒ | NAME CPL. MAGICH, IAD CENTRAL | | SSN | ENCLOSURE |

| CONTROL NO. ISSUED BY SGT. L.S. CHRISTIE | DATE ASSIGNED 5/27/99 | DATE DUE 7/6/99 | SP 1-101A ☐ LIMITED INVESTIGATION | PAGE ___ OF ___ |

ADDITIONAL SUBJECTS OF ALLEGATION/REPORT

| NAME | FIRST | | | M.I. | LAST | |
|---|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | | STATION/DIVISION | | | JOB ASSIGNMENT |
| | – | – | DOE | | ← TO BE COMPLETED IF KNOWN OR AVAILABLE | |

| NAME | FIRST | | | M.I. | LAST | |
|---|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | | STATION/DIVISION | | | JOB ASSIGNMENT |
| | – | – | DOE | | ← TO BE COMPLETED IF KNOWN OR AVAILABLE | |

| NAME | FIRST | | | M.I. | LAST | |
|---|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | | STATION/DIVISION | | | JOB ASSIGNMENT |
| | | | DOE | | ← TO BE COMPLETED IF KNOWN OR AVAILABLE | |

SYNOPSIS (CONT.)

A REPRESENTATIVE OF THE RP MUSEUM PROJECT.

SEE ATTACHED CORRESPONDENCE.

N-43.

Dear Phil Conti -

I'll have to explain for I forgot about in 1995, after Bill died I received a letter & a visit from Darrell Ober & I gave him some things of rodeo books & a picture. You can check with him for I am sorry to have forgot all about it. I had a stroke in '91 & my right side of my head was not too smart at that time -

I think that the pictures in the envelope will help.

I hope you can stop some time & we can meet - Remember I'm 89

Probably maybe we met in the several time we can to Retiree meetings.

It has been very nice talking with you. I have enjoyed reading the Retiree Steps you sent.

**Philip M. Conti**
**1081 Acri Drive**
**Harrisburg, Pennsylvania 17111**
**717-564-8088**

May 22, 1999

Dear Tom:

Your attention is invited to the attached exchange of correspondence with Marian Hayman, the widow of Willis J. Hayman, who was one of the most colorful entertainers in our rodeo history. He was an outstanding horseman, and was featured playing his violin while standing on his motorcycle and circling the field.

The other incident was one involving a Stitt, who was and may still be working with Marc Infantino on the pictorial history book. He approached a coal region family, and was given artifacts which we will never see. Unfortunately, I cannot come across my notes. My contacts with the family were by phone, not written.

In my last two columns, I have devoted space to this problem of dealing with private collectors. Since I have taken time to do that, I'm sure the message will get across. So, perhaps it might be best to set this matter aside and see what happens. Should there be a repeat of this nature, I will contact you immediately. Let's hope that does not happen.

It is indeed my pleasure to be working with you on this PSP-HEMC project. Let's hope that we will by the year 2005 have something we can truly be proud of.

Warmest regards,

*Phil*

ENCLOSURE ___3___
PAGE ___1___ OF ___1___

Philip M. Conti
1081 Acri Drive
Harrisburg, Pennsylvania 17111
717-564-8088

July 9, 1999

Dear Bill:

Today I received another shipment of artifacts from the family of James Brooks. In the accompany correspondence I was informed that Jim, who died last December at the age of 95, had been solicited by Captain Darryl Ober to whom Jim gave some uniform items. These items were not specifically described.

This is another incident in which Ober has approached our aged retirees to solicit artifacts. In each case, he takes pain to identify himself as a State Police captain, showing them his business card indicating his rank and post. To date, I have not been able to prove that he has actually misrepresented himself as an official of PSP-HEMC in seeking items for the museum. But, he is coming close to crossing the line. He is using his rank and post with the Department to give the impression at least that he is somehow connected with our museum effort. If we cannot prove him doing something criminally wrong, I believe he is doing something for which he could be disciplined by the Department.

You, Jim Hazen and I have spoken to him at one time or another about his aggressive actions in obtaining artifacts from our retired personnel and their families. Apparently he chooses to set aside these admonishments.

I understand that he now comes under the command of Lt. Colonel Hickes. I would suggest that you get in touch with Hickes, and let him know that we are not pleased with Ober's competition, especially the method he pursues.

Warmest regards,

*Phil*

ENCLOSURE ____4____

PAGE ___1___ OF ___1___

25/27

Philip M. Conti
1081 Acri Drive
Harrisburg, Pennsylvania 17111
717-564-8088

July 12, 1999

Corporal Robert D. Mrgich
Internal Affairs Division
Pennsylvania State Police
7820 Allentown Boulevard
Harrisburg, Pennsylvania   17112

Dear Corporal:

I received your phone message today, and am sorry I was not at home to talk with you.

Mrs. Willis Hayman last wrote to me on April 12, 1999.  She was then staying with her daughter, Sally MacDonald, 25611 Purple Sage, San Juan Capistrano, California 92675.  Mrs. Hayman (Marian) was 89 her last birthday, I believe, and is not in good health.  So, I have no idea how long she will be in California.

Mrs. Hayman's home address is:  284 E. Branch Road, Mercer, Pa. 16137.  I am sorry to report that I can find no record of her phone number.  Willis J. Hayman died January 10, 1995.

If I can be of any further help to you, please do not hesitate to get in touch.

Sincerely,

Philip M. Conti
Lt. Colonel PSP (Ret.)

ENCLOSURE ___5___
PAGE __1__ OF __1__

4 Aug 1999

To: Corporal Robert D. McGrich
Pennsylvania State Police
7820 Allentown Boulevard
Harrisburg, PA 17112

Thank you for sending me a stamped envelope.

I did mention that Capt Darvell called above and I answered the phone, Mr James B Brook stated that someone had given him his name (Jim's) and told him that Jim had some artifacts of his time in State Police — such as uniforms, hats, badges. He also called me and asked if their was his police badge — but that was pinned in his casket, or were there any jewelry like rings, etc.

Shortly after, Jim sent him 3 large boxes of clothing, hats, etc. Jim said to be me I should have sent them to museum. He wasn't aware that one was in

ENCLOSURE ____ 6

27

## II

progress. He was disappointed, but said very little about it.

I helped Jim pack (3 large boxes or more) and they were heavy & I carried them to the UPS Service to be mailed. He (Jim) had a large foot locker which he had for storage for his police uniforms, clothing, etc. I sent him (I believe) newspaper clipping from Jim's scrap book about Hershey Strike.

If I can be of any further help, please call.

Thank you for taking an interest in Jim's belonging. He was a great person, and was always there when someone was in need.

Ms Lee-Poss

+ (Atch - Ltr dtd 31 Mar 1995
    - Ltr dtd 12 Jun 1995
    - Ltr dtd 13 Aug 1999

ENCLOSURE ____ 6
2 -- 2



**PENNSYLVANIA STATE POLICE**
Bureau of Professional Responsibility
Systems and Process Review Division

**DARRELL G. OBER**
Captain

1800 Elmerton Ave.
Harrisburg, PA 17110
PH:   (717) 783-3729
       (717) 783-5145

ENCLOSURE _____7_____

PAGE ___1___ OF ___1___

29/67

March 31, 1995

Dear Mr. Brooks:


Thank you for taking the time to speak with me yesterday about the Pennsylvania State Police.  Since I began collecting State Police and Highway Patrol memorabilia, I have been afforded many such wonderful opportunities to speak with some of our retirees and their families.

And what a small world it indeed is!  To think that we have both served in some of the same Troops and Stations and that you have patrolled in my hometown on horseback is quite amazing.  I really enjoyed talking with you about your remembrances of the job.  How thankful and proud I am to be part of such a great Department with such tradition and heritage.  I began collecting memorabilia out of my respect and admiration for the days gone by in the department.  I guess you could say I am sort of a preservationist.  My wife recently retired from the State Police as a clerk/typist and enjoys collecting as much as I do.  It truly has become a family hobby.

Thank you so much for being willing to share some of the things you have with me.  I have been on cloud nine since speaking with you.  The patches, spurs, books, bookends, chaps, and helmet medallion all sound extremely interesting.  I collect everything from photographs to guns.  As I said to you, I would be honored to add your things to my collection and will guarantee you they will be proudly displayed and cared for.  I will be more than happy to pay you for these things but you say that is out of the question.  I have an idea in mind that I think will please you as a way to show my appreciation.  I am anxious to hear for you and am enclosing my address, business card and telephone number.

Sincerely,

Darrell G. Ober
71 Millers Gap Road
Enola, Pa.  17025


(717) 790-0708

June 12, 1995

Dear Jim:

As I indicated to you on the telephone, I want to send this letter along to express my sincere thank you for sending the items of memorabilia from the State Police to me.

I feel as if a great honor, and responsibility, has been given to me. Both of which I gladly accept. The honor I feel is from your faith in me by entrusting me with the precious items from our past. The responsibility is keeping alive, and preserving, the proud tradition and heritage of our past. I feel that you have passed on to me items which are not for me to possess, but to appreciate and preserve for future generations. It that sense, I see myself as a caretaker and will be diligent in my efforts. I hope this meets with your approval.

Your letter mentioned that you would answer any questions that I have. I have been so overwhelmed by your generosity that I have not realized any questions, but am sure that I will. You also mentioned your scrapbooks. Yes, they too would be very interesting for me to read. I devour anything related to the State Police. However, I do not want to impose on you anymore than I already have.

As I also have indicated to you, you would be an honored guest, and are welcome, in our home anytime. We would enjoy having you. Should I be able to assist you in any way, please do not hesitate to contact me. Take care of yourself and stay in touch.

Your friend,

Darrell Ober
71 Millers Gap Road
Enola, Pa.  17025

(717) 790-0708

ENCLOSURE 9
PAGE 1 OF 1

5/18/95

DEAR MR. BROOKS,

I WANTED to SEND A follow-
UP NOTE to SEE HOW YOU ARE
DOING & to thank YOU ONCE
AGAIN For SENDING the BOX
of "GOODIES" to me. MY
wife & I REALLY ENJOY LOOKING
At the thINGS YOU SENT.

I trust the fruit basket
ARRIVED O.K. I COULD NOT
think of ANYthing ELSE to
DO At the moment to
EXPRESS my gratitude to
YOU. TAKE CARE of yourself
& thank YOU AGAIN.

Darrell Oler

ENCLOSURE ____10____

PAGE ___1__ OF ___1___

32/67

Captain DARRELL GOBER          5/21/1995
71. Miller Gap Road.
ENOLA, PENN'A, 17025

Dear Captain:

Thank You for your letter of 18 May,
Yes I did receive a beautiful Basket
of Fruit. And I Enjoyed it very much,
I am Glad you enjoy the Articles
I sent, I will be sending you
Another Box, of articles,
I got my Trunk Out of Storage,
And am sure I'll find more
things of intress, to send you,

James B Brooks
408 Ridgewood Driv
Rome, N.Y. 13440

**ENCLOSURE** 11

Switchboard.Find a Person - Result                                              Page 1 of 2





 Find a Person

Last Name: Hayman          First Name:          Show Me How!!

**Switchboard.Find a Person**
Displaying: 91-96

**Missing Persons** | Modify Search | New Search

Switchboard's Giftshop
Send a friend a gift
below:


Find your old friends
on the Net. Click here.

**The TOP Message Boards**

Women NEW!
Music NEW!
Y2K NEW!
Hobbies, Collecting
Entertainment NEW!
Horoscope NEW!
Seniors NEW!
Humor
Relationships
Kennedy Tragedy
Genealogy
General Stuff
Teens
Paranormal
Religion
Star Wars
Gun Forum
Animals
Health, Medical
President Clinton
Civil Rights
Home Business
Computers
Parenting
Natural Disasters
School Issues
Election 2000
Kosovo
Missing Persons
Suggestions

**Hayman, William L**
544 Creekside Ln,
Mount Joy, PA  17552-1602

(717)653-6005
5¢ Long Distance
Email, Maps,and What's Nearby℠

Update  ePhotos  card  flowers  freebie

**Hayman, Wilson B**
250 Park Ave,
Washington, PA  15301-5764

(724)229-0993
5¢ Long Distance
Email, Maps,and What's Nearby℠

Update  ePhotos  card  flowers  freebie

**Hayman, W J**
284 E Branch Rd,
Mercer, PA  16137-3308

(724)946-3375
5¢ Long Distance
Email, Maps,and What's Nearby℠

Update  ePhotos  card  flowers  freebie

**Hayman, Zendrie**
1500 Locust St,
Philadelphia, PA  19102-4329

(215)545-9146
5¢ Long Distance
Email, Maps,and What's Nearby℠

Update  ePhotos  card  flowers  freebie

**Hayman-El, Lois**
1647 N 62nd St,
Philadelphia, PA  19151-3925

(215)878-1835
5¢ Long Distance
Email, Maps,and What's Nearby℠

Update  ePhotos  card  flowers  freebie

**Hayman-Purnell, D**
7137 Chew Ave,
Philadelphia, PA  19119-1817

(215)247-6984
5¢ Long Distance
Email, Maps,and What's Nearby℠

Update  ePhotos  card  flowers  freebie

**Can't find them?**
Try These alternatives:

1. Modify Search
2. New Search
3. Missing Persons Message Board in PA
4. Search Public Records
5. Find Your Old Classmates

ENCLOSURE 12
PAGE 1 OF 1



Search Tip:Too many listings? Click here for help on narrowing your search. No results? Click here for help on broadening your search.

Want to add your email address to your listing? Moved recently? Need to update your information? Click Update next to your listing and personalize today!

3A

June 28, 1995

Dear Mrs. Hayman:

       Thank you for taking the time to speak with me this past Sunday about your husband, the State Police and your remembrances of both.  As I indicated to you, I have been afforded many wonderful opportunities to get to know a number of our retirees and their families.  I have made some very good friends.  Most of them have also been very helpful.  I do, however, regret not getting the chance to meet and get to know Willis.  It certainly sounds as if he had a great career and treasured his time with the State Police.  I look back with fond memories of the time that I spent in Troop D and when I lived in Mercer.

       I also want to thank you for considering me for the State Police items that you may consider parting with.  Collecting State Police items has certainly given me new perspective and apppreciation for our Department.  I assure you that I have great respect for the State Police and the items I collect are appropriately displayed, cared for and appreciated.

       Good luck to you on your planned trip.  I look forward to hearing from you and hopefully, meeting you soon.  Should I be able to assist you in any matters of mutual concern, please do not hesitate to contact me.

Sincerely,

Darrell Ober
71 Millers Gap Road
Enola, Pa.  17025

(717) 790-0708

1

ENCLOSURE  13
PAGE  1  OF  1

35

September 21, 1995

Dear Mrs. Hayman:

Thank you very much for sharing your recollections of your husband and the State Police with me. Especially, thank you for giving me the rodeo books and State Police book. They are interesting, informative and will be of great assistance to me as I try to keep the story alive.

If I can be of any assistance to you, please do hesitate to contact me.

Sincerely,

Darrell Ober

ENCLOSURE __14__

PAGE __1__ OF __1__

Philip M. Conti
1081 Acri Drive
Harrisburg, Pennsylvania 17111
717-564-8088

March 15, 1999

Mrs. Willis J. Hayman
284 E. Branch Road
Mercer, Pennsylvania 16137

Dear Marian:

I received your letter last week and the photographs you enclosed.  I am sending you an official acknowledgment for those items and some others Bill sent to me some time ago.  They will be retained for the our museum.

I regret very much the visit made to your home by Captain Darrell Ober, after Bill's death in 1995.  Captain Ober is a private collector, and is not a representative of our Pennsylvania State Police museum project.  Therefore, those items you surrendered to him, obviously at his pleading, will not be a part of our collection.  If anyone should come to your home soliciting artifacts, please get in touch with me right away; but, give him nothing.

We are still interested in any of Bill's belongings that you may still have for our museum.  If you still have his violin, which he used in his rodeo performances, and the broken Indian Boy statue, we would very much like to have them.  I wanted so much to have some of Bill's carved figures for our museum.  Bill was quite a figure in our history, and I would personally wish to have some display in his memory.   Whatever you can give us for the museum, will be picked up by a trooper from the Mercer Barracks.

I would still like to have the names and addresses of your children, so we can keep in touch with them.  I tried to get your phone number for our artifacts records, but was told by the operator that your phone number is unlisted.  Please send me your phone number, as it will come in handy in trying to contact you.

I pray this letter finds everything going well with you.

Respectfully,

Philip M. Conti
Lt. Colonel PSP (Ret.)

ENCLOSURE  _15_

PAGE  _1_ OF _1_  37/67

# PENNSYLVANIA STATE POLICE
# PICTORIAL CENTENNIAL HISTORY BOOK PROJECT

### *General Information*

The Book Project functions under the Pennsylvania State Police Centennial Committee (Special Order 98-23) as a subcommittee.

Project was authorized on August 6, 1996 by the Commissioner

The Project's mission is to research, organize, and publish a pictorial history of the Department to coincide with the Department's 100th Anniversary in 2005. The purpose is to provide a historically accurate, museum quality publication that will reflect a positive image of the Department both to the public and the entire nation. Since our Department will be the first uniformed State Police organization of it's kind to reach this milestone, it should be our honor and responsibility to share our proud heritage with others by providing them with a documented, visual record.

### Project Members:

*Marc J. Infantino, Chair*
*Richard O. Binker*
*Captain Darrell Ober*
*Trooper Bob Clark*
*Sgt Jim Murphy*
*Lt. Col Phil Conti, retired*
*Charlotte Walters*



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
1800 ELMERTON AVENUE
HARRISBURG, PA 17110

COLONEL PAUL J. EVANKO
COMMISSIONER

August 6, 1996

Mr. Marc J. Infantino
Pennsylvania State Police
Bureau of Staff Services
1800 Elmerton Avenue
Harrisburg, Pennsylvania 17110

Dear Mr. Infantino:

Thank you for the suggestion you submitted to publish a pictorial history of the Department in conjunction with our 95th or 100th anniversary. Your suggestion was identified as Suggestion Number 95-54.

I am pleased to advise you that your suggestion has considerable merit and will be adopted. Organizing and publishing a pictorial history of the Department is a monumental task. I believe we should plan this history to coincide with our 100th anniversary, leaving sufficient time to create an excellent product.

Implementation of your suggestion will require a committee to organize a direction for this project. I would like you to chair that committee. Committee members may be culled from several valuable sources within the Department, e.g., the Public Information Office; Bureau of Laboratory and Communications Services, Photographic Section; Bureau of Staff Services; and the Bureau of Training and Education. Currently, the Director, Bureau of Training and Education is spearheading a project to develop a museum to display the Department's rich history. Additionally, Lt. Col. Philip M. Conti (retired), who contributes retiree information for The Communicator and has published literature on our Department, may be willing to cooperate in the development of this project.

The Bureau of Research and Development will forward a copy of this correspondence with a letter to the aforementioned parties requesting their assistance.

ENCLOSURE _16_

PAGE _2_ OF _9_

Mr. Marc J. Infantino
August 6, 1996
Page 2

     I would like to commend you for taking the initiative to submit this suggestion which will greatly display the Department's proud tradition.  I hope you will continue to submit other suggestions which may be beneficial to the Department.

Sincerely,

Colonel Paul J. Evanko
Commissioner

3 (12-63)

98-23
Special Order
March 5, 1998





## PENNSYLVANIA STATE POLICE
### DEPARTMENT DIRECTIVE

**SUBJECT:**    Pennsylvania State Police Centennial Committee

**TO:**    Area, Troop and Station Commanders, and Bureau Directors

**FROM:**    Commissioner

1.    In order to ensure continuity in planning and management of issues regarding Department anniversary events and projects, a permanent anniversary committee is established.

2.    The committee shall consist of three members assigned coincidental with their position, and two appointed by name by the Commissioner. The committee members are:

    a.    Director, Bureau of Research and Development.

    b.    Director, Bureau of Staff Services.

    c.    Director, Bureau of Training and Education.

    d.    Mary M. Bungo, Bureau of Emergency and Special Operations.

    e.    Marc J. Infantino, Bureau of Staff Services.

3.    The Director, Bureau of Training and Education, shall chair the committee. All subcommittees established by the committee for any purpose shall be chaired by one of the anniversary committee members. Executive direction regarding the committee shall be obtained from the Commissioner or the most appropriate Deputy Commissioner, according to applicable circumstances.

4.    Questions concerning the contents of this special order shall be directed to the office of the Deputy Commissioner of Staff, at (717) 783-5567.

Paul J. Evanko
Colonel    PSP

Distribution "B"

ENCLOSURE _16_

PAGE _4_ OF _9_

# PENNSYLVANIA STATE POLICE
## PICTORIAL CENTENNIAL HISTORY BOOK PROJECT.

## I. PHOTOGRAPHIC/RESEARCH AREAS:

A) <u>Vehicles/Motorcycles/Specialized Vehicles</u> *(Rick Binker)*

- including horse trailers, communications vehicles, scuba vans, etc.
- all vehicle related items: decals, lightbars, radar units, first aid kits etc.

B) <u>Uniforms, Insignia, Accessories</u> *(Marc J. Infantino)*

- Photos of all related uniform items

C) <u>Early PSP Activities</u> *(Darrell Ober)*

- Early State Police Activities

D) <u>Unique Items</u> *(Rick Binker)*

- Examples of Unique items include: first Teletype, PSP radio stations, first radios, radar units, etc.

E) <u>Significant Events</u> *(Darrell Ober)*

- Floods/Commonwealth Disasters, Strikes, Prison Riots (Camp Hill), Man Made Disasters (Three mile island, Airplane crashes)

F) <u>PSP Buildings</u> *(Darrell Ober)*

- Headquarters locations, Training Schools, First Troop Headquarters, including SHP

G) <u>Aviation</u> *(Darrell Ober),*

- Aviation (Fixed / Rotorary)

H) <u>Special PSP Units</u> *(Marc J. Infantino)*

- SERT, Naval Units, Canine

I) <u>Scuba</u> *(Rick Binker)*

- PSP Scuba Teams

J) <u>Rodeo Events / Mounted</u> *(Bob Clark)*

- Rodeo Photos, PSP Mounted

K) <u>General/Misc. Enlisted Activities, Civilian Activities,</u> *(Marc J. Infantino)*

- Civilian, Lab, PSP Action Photos not related to significant events, Etc.

L) <u>State Highway Patrol Activities</u> *(Marc J. Infantino)*

## II. PRIVATE COLLECTIONS/ARTIFACTS *(Darrell Ober)*

- Coordinate with private collectors photographing specific items in their collections
- Coordinate museum items to get photographed

## III. RESEARCH TOPICS *(all members)*

A. Manpower/Cadet Training throughout PSP history

- short history of the development of the Training Schools - Academy
- training schools/academy classes - # started, # graduated, date of graduation
- changes in curriculum over the years
- list of complement increases

B. Photos of all Commissioners/Superintendents, Acting Commissioners, Deputies

C. Photos/Biographies of Officers Killed in Line of Duty

D. List of Medal of Honor, Commendation Medals, Distinguished Service Medal recipients.

E. Organizational structure and changes throughout the history of the Department (including Introduction of Bureaus and new Troop Headquarters)

F. Short Historical Narrative of the Department

G. Short interesting stories of the PSP

H. Photos of hand guns, long guns, and automatic weapons used by PSP. *(Jim Murphy)*

# PSP Centennial Pictorial History Book
# Proposed Layout

## Description

- > 350 pages
- Limited Edition
- Onion Sheet possibly signed by Commissioners
- Dust Cover
- Museum Quality
- Inside front and back cover will have color photos of Patches, Decals, etc.
- Color, Black & White Enhancement, Cut Outs (all captioned)

## Proposed Layout

I.    Brief Historical Narrative by Period (interspersed with photos)

II.   Significant events and activities presented in a comprehensive outline form (interspersed with photos)

III.  Vehicles

   1. Marked Patrol Vehicles:

      a. Include all marked vehicles. Specifically include all color schemes and decal schemes. Include both front, back and side of each vehicle with as many full color photos as available.

      b. Include all models of each marked patrol vehicle as space in the book allows.

      c. Intersperse artifact photos of light bars, decals, first

aid kits with photos

2. Motorcycles:

a. Organize by Department or time frame

3. Specialized Marked Vehicles

IV.   Uniforms

1. Badges and Shoulder Patches

a. Page dedicated to all Department Badges (in color)

b. Page dedicated to all Department Shoulder Patches (in color)

2. PSP Medals, Awards, Insignia

a. Page dedicated to show all medals, ribbons, marksman badges, and insignia (in color)

3. Uniforms by Period

a. Artifacts intermixed with period photos

b. Dress Uniforms/Undress/Headgear

V.   Buildings

1. Photos of Training Sites

2. Original and Current Troop Headquarters

3. Photos of the various Department Headquarters

VI.  Aircraft

  1. Helicopters

     a. Color photos of each color/model scheme

  2. Fixed

     a. Photos of fixed wings

VII.  Specialized Units

  1. Include Mounted, Canine, SERT, Scuba, Academy, Naval, LCE, Civilian, etc.

     a. Page or Two for each specialized unit with a brief paragraph background

VIII.  Photo Essay on the "Original Keystone Cops"

IX.  Appendixes

  1. Photos of Commissioners with their years of service

  2. Photos and brief background of Officers Killed in the Line of Duty

  3. List of PSP Medal of Honor & Commendation Winners

  4. Complement Increases

  5. List of Cadet Graduating Classes (Dates, Numbers)

  6. Charts of Organizational Changes

STD-501X (9-86)                                    **Commonwealth of Pennsylvania**

**Date:**              September 1, 1999

**Subject:**           Supervisor Inquiry – IAD – 1999-409 Supplemental Report

**To:**                Lieutenant John R. Brown
                       Acting Director, Internal Affairs Division

**From:**              Corporal Robert D. Mrgich
                       Internal Affairs Division, Central Section

**Enclosures:**
         (17)    Correspondence to Corporal MRGICH from Mr. CONTI dated
                 August 23, 1999.

         (18)    Correspondence to Corporal MRGICH from Mr. CONTI dated
                 August 29, 1999.

         6.      On August 25, 1999, this officer received Enclosure #17 from Mr.
                 CONTI.

         7.      On August 31, 1999, this officer received Enclosure #18 from Mr.
                 CONTI.

Philip M. Conti
1081 Acri Drive
Harrisburg, Pennsylvania 17111
717-564-8088

August 23, 1999

Corporal Robert D. Mrgich
Bureau of Professional Responsibility
Pennsylvania State Police
7820 Allentown Boulevard
Harrisburg, Pennsylvania.17112

Dear Corporal Mrgich:

Your attention is invited to the copies of letters I've recently received from Lee J. Poso and Marian Hayman, both of whom are known to you.

It is quite evident that both of these elderly women are upset over having had anything to do with Capt. Ober. In all my correspondence with these women, it is strongly evident that Ober identified himself as a PSP captain. He showed them his business card, which in my estimation is tantamount to showing them his badge.

Mrs. Poso's letter reeks with Ober's obvious attempts to con her. Note his story about the book ends. These book ends, by the way, are brass or bronze. The book ends were recently donated to the PSP museum by Mrs. Poso.

I don't have the slightest idea if your investigation is completed and, if so, what your conclusions are. I do know that from what information I've gotten from these two elderly women, Ober, at the very least, has not conducted himself well as an officer of our Department. And, I have no intention of letting this matter drop.

Sincerely,

Philip M. Conti
Lt. Colonel PSP (Ret.)

ENCLOSURE _____ 17
PAGE _____ 1 OF _____ 5

18 Aug 1999

Dear Phil.

Thank you for your of 10 Aug 99. Time
just runs away from me.

Did I mention that Jim's wife neice
wanted some of furneture and picture of
his wifes family. I sent her several package
of Esther (Jim's wifes). The house is full
of treasures here. I guess she wanted about
everything that belonged to her. I asked her
if she would like to have something
out of the house. I meant just an item
or two. She said I would like, this table,
lamps, small table, and she had paid for
a chair she had given (Jim small-caned chair).
Knowing Jim he never accepted anything
unless he paid for it. My nephew said to me
tell her to bring a truck. Her house is full
of antiques.

I had another nice surprise — I found
a book with title of Pennsylvania State
Police — thinking this would nice for the
museum. It was in Jim's bedroom. So I
thought I send that Later as it lay on the

A6

table — I noticed you had written it
I would like to read it. Later if you would like
it for museum — I'll send it to you.

Corporal Robert D. Mrgich, contacted me several
times. He was very pleasant, he asked me
many questions. How did Capt Aber identify
himself by rank or by Mr. Cpl. Mrgich
asked me — did Jim know about the
museum — not until he received his
packages. After Jim sent the packages, late
he found about the museum. Jim was
very disappointed, said little — but
stated his belongs should have gone
to museum. He called me after Jim's
passing — he wanted pictures of Jim.
I sent him 8x10 or larger, and he also wanted
anything concerning Hershey Strike. I paid
$6.00 to have Jim's pictures copied. He later
told me that he was having his office
remodeled, and he was going to put one of
large pictures of Jim in his office. He sent
me sympathy card and I have heard from him since.
I sent him newspaper of the strike. I get
upset when I think of this situation
He was attending a meeting in Albany NY
and inquired how far was Rome from
Albany

A9

II

Comp Mrgich wrote report and sent it to his superiors. He said he probably couldn't do anything — but he sent the report. Comp Mrgich wanted the letters that Capt Ober had sent. Comp Mrgich also sent me a large stamped envelope to put any correspondence that he sent Jim. He had all this tucked away in dresser. I believe he was eager to get letters that Capt Ober sent, because I had waited a couple of days before sending them — so he called me — I told him I had mailed them.

Capt Ober called me one time, he had received a set of book ends, he said one was broken. I doubt very much if it was. So I told him to send me that pair and I would send him a good pair. I mentioned I didn't want Jim's things cast aside. I never heard anymore about the book ends. (My question is were they broken or were they not broken)

I have a picture when he was on the football team. Would this be interest?

May God Bless You. Phone here is 315-337-1905. I took Jim's phone. The number has many memories of when he used to call me.

Philip M. Conti
1081 Acri Drive
Harrisburg, Pennsylvania 17111
717-564-8088

August 29, 1999

Corporal Robert D. Mrgich
Pennsylvania State Police
7820 Allentown Bolevad
Harrisburg, Pennsylvania 17112

Dear Corporal:

This past week I received a phone call from Mrs. Lee J. Poso.  She informed me that she was going to phone you (perhaps she has already done so) and urgently request your help in having Captain Ober turn over to the Academy for the PSP museum all of Jim Brooks' PSP artifacts.  She is still very much upset, as was Jim Brooks, that a footlocker full of artifacts were given to Captain Ober, with the understanding at that time that all items would be given to the Pennsylvania State Police.  I am certain your investigation of this matter has confirmed the underhanded method used by Captain Ober in securing the artifacts.

I told Mrs. Poso that I agreed with her determination that all items go to the Department for the museum, and that I would write to you.  In recent weeks, Mrs. Poso has sent us a number of Jim's artifacts for the museum, which are now stored at the Academy.

I urge you to do whatever you can to pursue this matter of restitution.  I do not think it is fitting for Captain Ober to retain his ill-gotten gains.  He should not only turn over to the Academy all items he secured from Jim Brooks, but also all items he secured from Mrs. Willis J. Hayman.

Sincerely,

Philip M. Conti
Lt. Colonel PSP (Ret.)

ENCLOSURE ___18___

PAGE ___1___ OF ___1___

104 (8-93)

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
**ADMINISTRATIVE WARNING**

ember/Employe  Captain Darrell G. OBER

nterviewer  Corporal Robert D. MRGICH

PR Control No.  1999-409                    Date  September 10, 1999

This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police. I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any pending criminal action. During the course of this questioning, even if you disclose information which indicates you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statement nor its fruits will be used against you in a criminal proceeding.

Since this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action. You do have the right to have a union representative with you during such questioning. If during the course of the interview, you have reason to believe that your statements could result in administrative action being initiated against you, union representation will be provided upon request.

Do you understand what I have just explained to you?    ☑ YES    ☐ NO

Do you have any questions concerning what I have just explained to you?    ☐ YES    ☑ NO

_Captain Dal G. Ob_                         9/10/99
SIGNATURE OF EMPLOYE/MEMBER                  DATE

_Cpl Robert D. Mrgl_    5696    09/10/99
SIGNATURE OF INTERVIEWER                     DATE

ENCLOSURE ___19___
PAGE ___1___ OF ___1___

63

NOTE: INVESTIGATORS SHALL PRE~~~~ AL AND ONE COPY, RETAIN THE ORIGINAL WITH CASE FILE AND ~~VIDE COPY TO THE SUBJECT OF INVESTIGATION. ONE OF THE THREE LISTED INVESTIGATION TYPES SHALL BE CHECKED.

(8-93)

COMMONWEALTH OF ~. ~YLVANIA
PENNSYLVANIA STATE POLICE
NOTIFICATION OF INQUIRY

BPR.
1999–409

Captain
RANK

Darrell G. OBER
NAME

BUREAU OF TECH. SERVICES
TROOP/STATION

YOU ARE HEREBY NOTIFIED OF THE FOLLOWING:

☒ A COMPLAINT INVESTIGATION IS BEING CONDUCTED INTO AN INCIDENT IN WHICH YOU ARE ALLEGED TO HAVE BEEN INVOLVED. THE DETAILS OF THE COMPLAINT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐ A NON-COMPLAINT INVESTIGATION IS BEING CONDUCTED IN ACCORDANCE WITH DEPARTMENT DIRECTIVES. THE DETAILS OF YOUR INVOLVEMENT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐ AN ADMINISTRATIVE INVESTIGATION IS BEING CONDUCTED PURSUANT TO A REQUEST FROM THE OFFICE OF CHIEF COUNSEL. YOUR INVOLVEMENT HAS BEEN IDENTIFIED AS FOLLOWS:

complaint was received that you obtained PSP items from a Mr. BROOKS and Mrs. HAYMAN under

~e pretense that the items were to go to the PSP Museum, but you kept the items for your

~ersonal collection.  The questions pertain to the above incidents.

ENCLOSURE  20
PAGE  1  OF  1

Cpl. Robert O. Myrl  5696
SIGNATURE OF INVESTIGATOR

I ACKNOWLEDGE RECEIPT OF THIS NOTIFICATION AND I AM AWARE OF MY RIGHT TO UNION REPRESENTATION.

Captain Ober
SIGNATURE

156
BADGE/I.D. NO.

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
SOCIAL SECURITY NO.

9/10/99
DATE

0815
TIME

One Maxell C90 Cassette Tape of Interview with Captain Darrell G.
OBER by Corporal Robert D. MRGICH on September 10, 9999

Attached to Original Report

This is Corporal Robert MRGICH from the Internal Affairs Division, Central Section. Today is September 10th, 1999. The time is 0812 hours. I am interviewing Captain Darrell G. OBER of the Bureau of Technology Services. The interview is being conducted in the Bureau of Technology Services building, conference room number one, located at 2629 Market Place, Harrisburg, PA 17110. The interview is regarding investigation 1999-409.

MRGICH:    Captain OBER, at this time I'd like to read you your Administrative Warnings:

*"This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police. I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any pending criminal action. During the course of this questioning, even if you disclose information which indicates you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statement nor its fruits will be used against you in a criminal proceeding.*

*Since this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action. You do have the right to have a union representative with you during such questioning. If during the course of the interview, you have reason to believe that your statements could result in administrative action being initiated against you, union representation will be provided upon request.*

*Do you understand what I have just explained to you?"*

OBER:    Yes.

MRGICH:    Do you have any questions?

OBER:    No. Well yes, I do. Is this being conducted as a IA investigation or a Supervisory Inquiry?

MRGICH:    Supervisory Inquiry.

OBER:    Okay.

MRGICH:    I need you to sign the top line for me, please. That is your copy there.

Captain OBER, now I'd like to read your Notification of Inquiry:

*"A complaint investigation is being conducted into an incident in which you are alleged to have been involved. The details of the complaint are as follows:*

Interview/Captain Darrell G. OBER re: IAD-1999-409
Page 2

A complaint was received that you obtained PSP items from a Mr.
BROOKS and Mrs. HAYMAN, under the pretense that the items were to go
to the PSP museum, but you kept the items for your personal collection."

The questions pertain to the above incidents. What I need you to do now Captain,
is to sign the bottom line for me please. That is your copy there.

Captain OBER, are you aware the interview is being tape-recorded?

OBER:      Yes. Before we begin, I have a — when it's appropriate, I have a question.

MRGICH:    Okay. Captain OBER, you also have union representation with you today.

OBER:      Yes.

MRGICH:    Could you state your full name for me, please?

RUDA:      Corporal Michael RUDA.

MRGICH:    Captain, your question?

OBER:      Just for clarity, are you saying that the two individuals that you mentioned, have
           they filed complaints with the Department?

MRGICH:    No, they have not.

OBER:      Who is the complainant?

MRGICH:    The complainant is Mr. Philip CONTI, retired Lieutenant Colonel.   Captain
           OBER, what was your duty assignment in June and September of 1995?

OBER:      Let me think about this for a second. Uh, I was the Director of Systems and
           Process Review Division.

MRGICH:    When were you assigned to that position?

OBER:      I was assigned to SPR in uh, I think it was March 3rd of 95.

MRGICH:    And when — until when?

OBER:      Until May 2nd of 98.

MRGICH:    And you are currently, your position now?

Interview/Captain Darrell G. OBER re:  IAD-1999-409
Page 3

**OBER:** I'm currently Systems Integrator Procurement Team Leader for Tech Services.

**MRGICH:** And you were assigned that when?

**OBER:** I was assigned here on April 26th of 99.

**MRGICH:** Referring to the incident to the complaint in question with Mr. BROOKS and Mrs. HAYMAN, how did you get their name as far as contacting them?

**OBER:** I believe I was uh, I believe the contact with Mrs. HAYMAN – actually I think I, from being stationed in Mercer, I believe I spoke to uh, Mr. HAYMAN at the barracks a time or two. I was stationed in Mercer from 81 until 85. ·There were a couple of the retirees that used to come out to the barracks and I believe he was one of them. Uh, but I think the manner of introduction to Mrs. HAYMAN was through Willard SCHAUER, who's also a retiree, and I believe he lives out near Pittsburgh somewhere.

**MRGICH:** How do you spell his last name, do you know?

**OBER:** I think its spelled S-C-H-A-U-E-R, Willard SCHAUER.  I believe that's correct.

**MRGICH:** Is that how you got Mrs. HAYMAN's telephone number?

**OBER:** Yes.

**MRGICH:** How about Mr. BROOKS?

**OBER:** You know, I can't recall for sure because I uh, I've spoken to Mr. BROOKS a number of times over the years. I really don't recall how – what led me to Mr. BROOKS. I don't remember. I do remember probably about five years ago or so, he had asked me if I could possibly drive him to the retirees' convention. I think it was in Hershey that year, but he was ill and ended up, he couldn't make it.

**MRGICH:** So prior to receiving the items from both the individuals, you had contact or known them previously?

**OBER:** Uh-huh.

**MRGICH:** Just to clarify this, Mrs. HAYMAN mentioned in the letter – I know you stated this, but Mrs. HAYMAN mentioned that you told that you had known her, her husband, prior to corresponding with her. That would've been through the station while you were stationed there from 81 to 85?

**OBER:** Yes, uh-huh.

54

Interview/Captain Darrell G. OBER re: IAD-1999-409
Page 4

MRGICH:    What items did you receive from Mr. BROOKS?

OBER:    From Mr. BROOKS, uh, he sent me a – let me think about this – an old uniform shirt, a book on care of horses, and I think some photographs. You know, I have to really think about this or look – that's what I recall. I remember that there was a box with clothes – oh, it was a pair of puttees and the leggings, a pair of leggings.

MRGICH:    When did you receive those items from Mr. BROOKS?

OBER:    Well I'm not real sure of that. That's probably four or five, maybe six years ago. He been – he's passed away a couple years ago. I don't really remember.

MRGICH:    If I show you a letter that you wrote to Mr. BROOKS – if I show a letter, can you tell me whether or not you are the author of that letter?

OBER:    I believe I could.

MRGICH:    I'm showing you Enclosure (9), page 1 of 1, dated June 12th, 1995.

OBER:    Yes, I'm sure – I wrote that.

MRGICH:    So that would've been when you received the items?

OBER:    Uh-huh.

MRGICH:    At that time were you a member of the PSP Museum Committee?

OBER:    No.

MRGICH:    How did you receive the items from Mr. BROOKS?

OBER:    He mailed them to me.

MRGICH:    Who paid for the shipping?

OBER:    I believe he did. I don't recall paying them.

MRGICH:    Did he ever ask you to pay for the shipping?

OBER:    No.

MRGICH:    Did you ever offer?

ENCLOSURE ___22___

PAGE ___4___ OF ___11___

Interview/Captain Darrell G. OBER re: IAD-1999-409
Page 5

OBER:   I offered – well, I don't remember if I offered to pay for the shipping, but I offered to pay him for anything that I had and I believe I sent him a fruit basket, as I recall. That's a long time ago.

MRGICH:   I believe if you look at Enclosure – there's a letter in here referencing – I believe it's that one right there, Enclosure (10), referencing the fruit basket. Is that correct?

OBER:   Oh, yeah, okay. I did send it to him. I trust the fruit basket arrived. Yeah, he wouldn't accept any money and I didn't know – in fact, I, now that I think about this, I believe I spoke to his caretaker and asked her what he could eat or what would be appropriate, and uh, I sent him a fruit basket.

MRGICH:   Did you ever promise Mr. BROOKS that the items that you received from him would end up in the museum?

OBER:   Absolutely not. It was never discussed.

MRGICH:   I believe if you refer to Enclosure (8), a letter that you wrote to Mr. BROOKS, dated March 31st, 1995 – could you tell me if you are the author of that letter?

OBER:   Yes, this is my letter.

MRGICH:   Am I correct in reading the line, third paragraph, halfway down, it says, *"As I said to you, I would be honored to add your things to my collection and will guarantee you they will be proudly displayed and cared for. . .*

OBER:   Yes.

MRGICH:   *. . .I will be more than happy to pay you for these things but you say that is out the question."*

OBER:   Yes, that's correct.

MRGICH:   So at no time did you reference the museum?

OBER:   No, absolutely not.

MRGICH:   Ms. POSO, who would be Mr. BROOKS' caretaker. . .

OBER:   Yes.

MRGICH:   . . .mentioned that you had sent her a business card,

ENCLOSURE _____ 22

PAGE ____ 5 ___ OF ___ 11

Interview/Captain Darrell G. OBER re:  IAD-1999-409
Page 6

OBER:       Correct.

MRGICH:    And that was included in one of your correspondences to her.

OBER:       I'm sure that I did.

MRGICH:    What was the reason for that?

OBER:       Just so they had some way of verifying who I am, what I do, what my profession
            is.

MRGICH:    Do you feel you misrepresented yourself to Mr. BROOKS?

OBER:       Absolutely not.

MRGICH:    When was the last time you spoke with Ms. POSO?

OBER:       Oh, I can only take a swack at that, it was probably a year ago.  I'm not real sure.

MRGICH:    Have you donated any of the items that you obtained from Mr. BROOKS to the
            museum?

OBER:       No.

MRGICH:    Okay, now lets talk about Mrs. HAYMAN.  What items did you receive from
            her?

OBER:       As I recall, one book is called, Our State Police, but it's not about Pennsylvania.
            It was, Our State Police book and a rodeo book, and again, maybe – well I don't
            believe I got any photographs.  That's all I can recall off the top of my head.

MRGICH:    When did you get the items from Mrs. HAYMAN?

OBER:       Probably four or five years ago.

MRGICH:    If you refer to Enclosure number (13), dated June 28th, 1995, are you the author of
            that correspondence?

OBER:       Yes.

MRGICH:    Can you explain to me what that letter says, just a quick synopsis?

Interview/Captain Darrell G. OBER re: IAD-1999-409
Page 7

OBER:       Uh, a quick synopsis is this would've most likely been correspondence to follow-up a conversation that we had on the telephone.

MRGICH:     Where you were interested in items that she had?

OBER:       Yes.

MRGICH:     And if you look at Enclosure number (14), dated September 21st, 1995, were you the author of that correspondence?

OBER:       Yes.

MRGICH:     That letter, if I'm not mistaken, if I'm reading it properly, you were thanking her for the recollections of talking with her about her husband and the State Police, and thanking her for the items that she gave you?

OBER:       That's correct.  That's even my typo on there, where it says, *"Please do hesitate to contact me."*  I didn't realize that was a mistake.  Yes, that's correct.

MRGICH:     When you received the items from Mrs. HAYMAN, how did you obtain those?

OBER:       Uh, I visited her personally.

MRGICH:     When you obtained those items, did you promise Mrs. HAYMAN that those items would end up in the museum?

OBER:       Absolutely not, never discussed.

MRGICH:     Again, Mrs. HAYMAN stated that you sent your business card, along with your correspondence.  What was the reason for that?

OBER:       The same as before – simple verification of identity.

MRGICH:     Do you feel you misrepresented yourself to Mrs. HAYMAN?

OBER:       Absolutely not.

MRGICH:     Did you pay for the items?

OBER:       She would not – I offered – she would not accept any payment.

MRGICH:     When was the last time you spoke to Mrs. HAYMAN?

OBER:       Uh, probably four years ago.  I don't recall speaking to her afterward, after. . .

Interview/Captain Darrell G. OBER re:  IAD-1999-409
Page 8

MRGICH:     Were you – I'm sorry – were you a member of the PSP Museum Committee at the
            time you received these items?

OBER:       No.

MRGICH:     Have you donated any of the items you received from Mrs. HAYMAN to the
            museum?

OBER:       No.

MRGICH:     Why would Ms. POSO and Mrs. HAYMAN say that you told them the items that
            they gave you would end up in a museum?  Do you have any idea?

OBER:       I don't have idea.

RUDA:       Excuse me, okay, uh. . .

MRGICH:     I'm going to stop the interview.  It's 0929.

_____

MRGICH:     The interview is started again.  It's 0929 again.

OBER:       Again, I believe your question was, "Do I know why they might say that?"

MRGICH:     Yes.

OBER:       No, I have no idea why they would say that because I want to be very clear about
            this, at no time have I ever, in any way, shape, or form, ever represented to
            anyone that I am a member of the Pennsylvania State Police Museum Committee
            or using any leverage of any source in my association with this Department to add
            to my private collection.  Now if these people are saying that now, it would
            appear to me, based on what I see and what I hear, well – I'm just – I'm not one
            who's going to make those assertions, but I can't answer why they would do that,
            other than the fact of the matter is I've never done that.  I'm the Director of
            Internal Affairs Division.  I've been involved in – assigned to BPR for six years.
            I certainly have more commonsense and more ethics and more integrity than to do
            something like this, and I have never done it.

MRGICH:     Would you be willing to donate the items to the museum?

OBER:       Not at this time.

MRGICH:     When were you appointed to the Museum Committee?

Interview/Captain Darrell G. OBER re: IAD-1999-409
Page 9

OBER:       I'm not on the Museum Committee.

MRGICH:     Let me change that. . .

OBER:       Do you mean the Book Committee?

MRGICH:     The – let me check my attachments here.  The Centennial Committee.

OBER:       Well, see I'm not real sure how that hierarchy works – I'm on the Book
            Committee, which I think is one of the – that thing has been restructured a couple
            times so I'll tell you what I understand or how it's my understanding this works,
            that the Centennial Book Committee is a subcomponent of the Centennial
            Committee.  I believe that's correct.  Uh, I was asked to participate in that oh, two
            years ago or more, three years ago.  I'm not real sure.

MRGICH:     This is dated, I believe, August 6th, 1996.  Would that sound about right?

OBER:       That would sound about right, but I actually did some work before that committee
            was formed for Colonel WALP.  Colonel WALP asked me to go over to State
            Records Center and uh, one of the trips I went was with Colonel EINSEL, then
            yes, then Colonel EINSEL, to kind of access what was there.  And that was kind
            of like before this committee was formed.  So yeah, I think 96 is probably right.

MRGICH:     So you've never been on the Museum Committee?

OBER:       No.

MRGICH:     Have you acquired any items for your own personal use while being a member of
            the Centennial Committee?

OBER:       Absolutely not.

MRGICH:     Have you acquired any items for the Centennial Committee while being a member
            of the Centennial Committee?

OBER:       No.   Wait – what was that question again?

MRGICH:     While being a member of the Centennial Committee, have you acquired any items
            for the committee?

OBER:       For the committee?  No, still no.

MRGICH:     When was the last time you acquired items for your personal collection?

Interview/Captain Darrell G. OBER re: IAD-1999-409
Page 10

OBER:       And that question would relate to what violation?

MRGICH:     It goes into relevance as far as did you pay for the items, was it on your own time,
            the follow-up questions, and did you identify yourself as being a member of the
            committee?

RUDA:       Why don't you just ask him those questions then? He can do anything he wants
            on his own time. So why don't you just ask him those questions?

OBER:       Yeah, we kind of blew by that early on. The nature of the allegation, I understand
            what's being alleged, but the violation for that would be – what, what is the
            violation that I've alleged to have committed, do we know?

MRGICH:     The violation that I'm aware of is misrepresenting yourself as a member of the
            committee, the Museum Committee. . .

OBER:       Well I understand. . .

MRGICH:     . . .while obtaining the things for your own personal.

OBER:       Okay, I understand that that's the allegation, but violation of regulation are we
            talking about?

MRGICH:     Umm, I'm not aware.

OBER:       Okay.

MRGICH:     Let me rephrase. Let me rephrase the question.

OBER:       Okay.

MRGICH:     The items that you received for your own personal use. . .

OBER:       Uh-huh.

MRGICH:     . . .do you offer to pay for those items?

OBER:       Absolutely. Ninety-nine percent of the time, I have to.

MRGICH:     Those items that you receive for your own personal use, is that obtained on State
            time or personal time?

OBER:       Personal time.

Interview/Captain Darrell G. OBER re: IAD-1999-409
Page 11

MRGICH:    Those items you receive for your own personal use, have you ever identified yourself as being a member of the Museum Committee?

OBER:    No. Absolutely not.

MRGICH:    Do you, Captain OBER, have anything to add?

OBER:    I have a lot that I could say. I have a lot of things that I think about this whole Supervisory Inquiry, but those that are around me are going to know that I'm gonna rise to a level of professionalism that's not gonna allow me to be sucked into this whirlpool. I've never done any of these things that are being alleged. It's not even clear to me that there's a violation that exists, but I understand why someone would want to know or clarify this. So I'm just telling you that I've never in any way, shape, or form done any of these things. I could speculate as to why this is being done to me, but I'm not going there. I'm a professional, and I have integrity, and I have some dignity, and I'm not gonna allow this process to suck any of those things out of me. That's all I have to say.

MRGICH:    Corporal RUDA, have any questions?

RUDA:    No.

MRGICH:    Okay, the interview is concluded. The time is 0835 hours.

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

**DATE:**          October 4, 1999

**SUBJECT:**       Time and Attendance -- Captain Darrell Ober
                   General Invoice -- Captain Darrell Ober

**TO:**            Deputy Commissioner of Administration
                   Attn:  Director, Bureau of Professional Responsibility

**FROM:**          Colonel Paul J. Evanko
                   Commissioner

**ENCLOSURES:**    (1)    Correspondence from Captain Darrell G. Ober, Systems
                          Integrator Procurement Team Leader, Bureau of Technology
                          Services, to Director, Bureau of Professional Responsibility,
                          dated July 16, 1999, regarding Time and Attendance.

                   (2)    Correspondence from Major Hawthorne N. Conley, Director,
                          Bureau of Professional Responsibility, to Captain Darrell G.
                          Ober, dated July 1, 1999, regarding Time and Attendance, with
                          Enclosures.

                   (3)    General Invoice -- Reimbursement for Captain Darrell Ober.


                   1.     I have conducted a full and complete review of the
                          circumstances surrounding Captain Ober's requests.  Based
                          on my review Captain Ober's requests are denied.  Therefore,
                          the amount of $83.74 shall not be provided to Captain Ober.
                          Additionally, the date of March 15, 1999, shall remain charged
                          to annual leave.

                   2.     Please notify Captain Ober and provide him with a copy of this
                          correspondence.

STD-501. 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:      July 1, 1999

SUBJECT:   Time & Attendance

TO:        Captain Darrell G. Ober

FROM:      Major Hawthorne N. Conley
           Director, Bureau of Professional Responsibility

ENCLOSURES:  (1)  Time and Attendance Record for pay period ending
                  June 25, 1999.

             (2)  Time and Attendance Record for pay period ending
                  March 19, 1999.

   1.   Upon your temporary detached duty status to the Bureau of
Technology Services, Strategic Development Division on April 26,
1999, your 1999 Record of Absence Form as well as your STD-330,
Request for Leave slips, were forwarded for retention by the
timekeeper for that Division.   Therefore, Enclosure (1) is being
returned for processing through the appropriate timekeeper.

   2.   Enclosure (2), requesting a leave adjustment for March
15, 1999, **shall not** be processed pending resolution of ongoing
administrative inquiry.   Retention of Enclosure (2) will be
maintained by the Bureau of Professional Responsibility.

   3.   If you have questions concerning this correspondence, you
may contact the Director, Bureau of Professional Responsibility.

cc:  Director, Bureau of Technology Services
     BPR FILE

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:          November 10, 1999

SUBJECT:       Northwestern University Traffic Institute

TO:            Deputy Commissioner of Administration
               (Through channels)

FROM:          Captain Darrell G. Ober
               Systems Integrator Procurement Team Leader
               Bureau of Technology Services

ENCLOSURE:     (1)    Correspondence re: Subject.


1.    I am in receipt of your memo re: the subject training.  It would
      appear my non-selection, in part, was based on timeliness of
      my request.

2.    By way of explanation, I submitted my request for
      consideration on October 19, 1999.  I have been unable to
      pinpoint the exact cause of delay so future occurrences may
      be avoided.

3.    Please be assured such tardiness is uncharacteristic of my
      work ethic.



COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

OFFICE OF DEPUTY COMMISSIONER

March 5, 1998

Darrell,

I justed wanted to share with you how much I appreciate the job you are doing. I have received many positive comments from Area & Troop Commanders on your outstanding performance.

The extra mile you go to cooperate & work with your fellow Commanders is duly noted. Needless to say, when they are happy, it makes the Commissioner & my job easier.

Keep up the good work!

Tom

Conry #6

21

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

DARRELL G. OBER,        *

    Plaintiff        *    Case No.

    vs.              *    1:CV-01-0084

PAUL EVANKO,           *

MARK CAMPBELL,         *

THOMAS COURY,          *    ORIGINAL

JOSEPH WESTCOTT,       *

and HAWTHORNE          *

CONLEY,                *

    Defendants       *

* * * * * * * *

VIDEOTAPED DEPOSITION OF

LIEUTENANT COLONEL THOMAS COURY

April 15, 2002

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

2

```
1           VIDEOTAPED DEPOSITION

2                    OF

3    LIEUTENANT COLONEL THOMAS COURY,

4    taken on behalf of the Plaintiff

5    herein, pursuant to the Rules of

6    Civil Procedure, taken before me, the

7    undersigned, Vivian Gratz, a Court

8    Reporter and Commissioner of Deeds in

9    and for the Commonwealth of

10   Pennsylvania, at the Bureau of Tech

11   Service, 2629 Market Place,

12   Harrisburg, Pennsylvania, on Monday,

13   April 15, 2002, beginning at 10:06

14   a.m.

15

16

17

18

19

20

21

22

23

24

25
```

3

1                    A P P E A R A N C E S

2

3      DON BAILEY, ESQUIRE

4      4311 North 6th Street

5      Harrisburg, PA   17110

6           COUNSEL FOR PLAINTIFF

7

8      BARBARA L. CHRISTIE, ESQUIRE

9      Chief Counsel

10     Assistant Counsel

11     Pennsylvania State Police

12     1800 Elmerton Avenue

13     Harrisburg, PA   17110

14          COUNSELS FOR DEFENDANTS,

15          PENNSYLVANIA STATE POLICE

16

17

18

19

20

21

22

23

24

25

4

1          A P P E A R A N C E S

2               (Continued)

3

4    ALSO PRESENT:

5

6    JOHN R. BROWN

7    Director of Internal Affairs for the

8    Pennsylvania State Police

9    Bureau of Professional Responsibility

10   7820 Allentown Boulevard

11   Harrisburg, PA   17701

12

13   ALBERT RODRIGUEZ, PR Video

14

15

16

17

18

19

20

21

22

23

24

25

5

1                          I N D E X

2

3    WITNESS:    LIEUTENANT COLONEL THOMAS

4                    COURY

5    DISCUSSION AMONG PARTIES         8 - 11

6    EXAMINATION

7        by Attorney Bailey        11 - 247

8    EXAMINATION

9        By Attorney Christie     247 - 265

10   CERTIFICATE                         267

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

<u>E X H I B I T   P A G E</u>

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|--------|-------------|-----------------|
| 1 | 5/22/99 Letter | 22 |
| 2 | Packet | 33 |
| 3 | Time and Attendance Sheet 10/4/99 | -- |
| 4 | Time and Attendance Sheet 7/1/99 | 186 |
| 5 | Northwestern University Traffic Institute 11/10/99 | 187 |
| 6 | Handwritten Note | 233 |
| 7 | E-mail 10/4/00 | 237 |

7

1                    <u>O B J E C T I O N   P A G E</u>

2

3    <u>A T T O R N E Y</u>                                    <u>P A G E</u>

4    B a i l e y          3 6 ,   2 5 0 ,   2 5 1 ,   2 5 2 ,   2 5 3 ,

5                         2 5 4 ,   2 5 4 ,   2 5 5 ,   2 5 6 ,   2 5 8 ,

6                         2 5 9 ,   2 6 0 ,   2 6 1 ,   2 6 2 ,   2 6 2 ,

7                         2 6 3 ,   2 6 4 ,   2 6 5

8    C h r i s t i e          6 0 ,   7 7 ,   7 8 ,   1 7 0 ,   2 2 8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

1          P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3              VIDEOGRAPHER:

4              Ladies and gentlemen,

5    please, be advised the video

6    operation is now on.  It is

7    April 15th, 10:06 a.m., camera

8    time.  Today's date, as I just

9    said, is April 15th.  My name

10   is Albert Rodriguez.  My

11   address is 4146 Spruce Park,

12   Lebanon, Pennsylvania 17046.

13   I have been hired by PR Video

14   to do this video deposition

15   for the Plaintiff.

16              This case is in the

17   United States Court for the

18   Middle District of

19   Pennsylvania.  It is docketed

20   at 1:CV-01-0084.  The caption

21   is: Darrell G. Ober versus

22   Paul Evanko, et al.  The

23   Deponee is - - -.

24              ATTORNEY BAILEY:

25              That's Lieutenant

Sargent's Court Reporting Service, Inc.
(814) 536-8908

9

1          Colonel Thomas Coury this

2      morning.

3                  VIDEOGRAPHER:

4              Lieutenant General

5      Coury.

6                  ATTORNEY BAILEY:

7              No, Lieutenant Colonel

8      Thomas Coury.

9                  VIDEOGRAPHER:

10             Lieutenant General

11     Darrell ---.

12                 ATTORNEY BAILEY:

13             No.  Lieutenant Colonel

14     Thomas Coury.  He's not

15     general yet.  He probably

16     wishes he was promoted, but

17     he's not there yet.

18                 VIDEOGRAPHER:

19             Lieutenant General

20     Thomas Coury.

21                 ATTORNEY BAILEY:

22             Lieutenant Colonel.

23                 VIDEOGRAPHER:

24             Lieutenant Colonel ---

25                 ATTORNEY BAILEY:

Sargent's Court Reporting Service, Inc.
(814) 536-8908

10

1                Thomas Coury.

2             VIDEOGRAPHER:

3             --- Thomas Coury.

4             ATTORNEY BAILEY:

5             Correct.

6             VIDEOGRAPHER:

7             Lieutenant Colonel,

8        please, raise your right hand.

9  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10  LIEUTENANT COLONEL THOMAS COURY,

11  HAVING FIRST BEEN DULY SWORN,

12  TESTIFIED AS FOLLOWS:

13  - - - - - - - - - - - - - - - - - - - - - - - - - - - -

14             VIDEOGRAPHER:

15             Will Counsel, please,

16        identify themselves and

17        provide their address and

18        phone number for the record?

19            ATTORNEY BAILEY:

20             Yes.  My name is Don

21        Bailey.  I represent the

22        Plaintiff, Darrell G. Ober in

23        this case.  My address is 4311

24        North Sixth Street,

25        Harrisburg, PA 17110.  Phone

11

1      number is 717-221-9500.  The

2      FAX is 9600.

3              ATTORNEY CHRISTIE:

4              Barbara Christie, Chief

5      Counsel, Pennsylvania State

6      Police.  My office address is

7      1800 Elmerton Avenue,

8      Harrisburg, PA 17110.  Office

9      number 717-73 --- strike that.

10     717-783-5568.

11             ATTORNEY REYNOLDS:

12             Joanna Reynolds.  I'm

13     an Assistant Counsel with the

14     State Police.  I represent the

15     Defendants in this matter and

16     my address as phone number are

17     the same as the Chief

18     Counsel's.

19             VIDEOGRAPHER:

20             Very well.  You may

21     begin.

22             ATTORNEY BAILEY:

23             Thank you.

24  EXAMINATION

25  BY ATTORNEY BAILEY:

12

1    Q.        Good morning, Colonel.  How

2    are you?

3    A.        Fine, Mr. Bailey.  How are

4    you?

5    Q.        Just fine.  I want to go back

6    and try to get you out of here as

7    soon as possible.  I'm sure Counsel

8    concur on that.  It's beautiful

9    weather out there; isn't it.  So I'm

10   going to try to pick up basically

11   where we left off and I'm going to

12   tell you what format I'm going to

13   follow, do the following things.   I

14   have some questions for you about the

15   museum inquiry, - - -

16   A.        Restaurant.

17   Q.        - - - the issue concerning

18   Captain Ober and the museum issue and

19   your role in that and what you know

20   about that.  I have some questions

21   having to do with the relationship

22   with discussions with the - - - Colonel

23   Evanko pertaining to the

24   investigation, just a few

25   follow-up questions on that, the

13

1    investigation on Captain Ober.  I

2    want to ask you some questions also

3    about the now Lieutenant Colonel

4    Conley and some of the things that

5    passed through you and Darrell over

6    there.  And then lastly, I have a few

7    questions for you just on your

8    knowledge, given your years of

9    experience, on policy and practices

10    in the Pennsylvania State Police,

11    particularly as they pertain to

12    transfers.

13         So beginning at the beginning,

14    the museum investigation.  There's no

15    need to go through that introductory

16    stuff; is there?

17    A.      No, sir.

18    Q.      And then the deposition is

19    continuing, so I won't waste your

20    time with anything else.

21    A.      No, sir.

22    Q.      Okay.  Now, if I understand

23    it, sometime on or about May 22nd,

24    1999, you were the person that

25    directed a supervisory inquiry be

14

1  conducted on Captain Ober; is that
2  correct?
3  A.      As I recall, yes, sir.  I'm
4  not sure about the date, but, yes,
5  sir.
6  Q.      Did you ever --- number one,
7  did you ever review the results?
8  A.      Yes, sir.
9  Q.      And who adjudicated that?
10  Now, it's a supervisory inquiry.  Do
11  they adjudicate it the way a formal
12  IAD complaint is adjudicated?
13  A.      I've been away from it so
14  long, I'm not sure if it's
15  adjudicated in the exact same way,
16  but there is an adjudication on it.
17  Q.      Okay.  Are there any kind of
18  limitations on who may do an
19  adjudication, under what
20  circumstances any particular person
21  may do an adjudication or can anyone
22  do it?  Can your commanding officer
23  do it?  Can somebody with an interest
24  in the matter do it; do you know?
25  A.      It's typically done by someone

15

1  in the member's chain of command,

2  certainly higher than the member

3  adjudicated within that chain of

4  command.  An adjudication can be done

5  by anyone at the direction of the

6  Commissioner.  In other words, if the

7  person's direct commander might not

8  be able to be objective or may have

9  played a role in the investigation,

10  the adjudicator could end up being

11  someone else.

12  Q.      But could you adjudicate it?

13  A.      Could I adjudicate it, yes,

14  sir.

15  Q.      You could.  And did you in

16  this case?

17  A.      I believe I did, sir.

18  Q.      And what did you base the

19  adjudication on?

20  A.      The contents of the

21  administrative inquiry report.

22  Q.      Well, didn't you initiate the

23  inquiry?

24  A.      Yes, sir.

25  Q.      And what was the basis of your

16

1    initiating the inquiry?

2    A.      As I recall, the museum had

3    people from the museum.  And when I

4    say people from the museum, I more

5    specifically mean retired Major Matt

6    Hunt and retired Lieutenant Colonel

7    Philip Conti had mentioned to me on a

8    couple of occasions where they

9    thought there was a violation of

10   State Police rules and regulations

11   being committed by Captain Ober, in

12   that Captain Ober would use his badge

13   of office, if you will, to contact

14   recent widows of members in order to

15   obtain State Police memorabilia and

16   artifacts from them.  That was

17   brought to my attention at least on

18   two occasions that I can recall

19   verbally by either Major Hunt or

20   Lieutenant Colonel Conley.  And told

21   them that if they wanted to make or

22   felt it necessary to make a formal

23   complaint they should do that in

24   writing.  And they submitted

25   correspondence to me.

17

1   Q.      Okay.  Well, you know, we all
2   know what the purpose of our whole
3   system of jurisprudence is.  And, you
4   know, that's to avoid, you know,
5   accusing somebody of innuendo and
6   that sort of thing and proof, so let
7   ask you some questions having ---.
8   A.      Sure.
9   Q.      Having to do with proof in
10  this matter.  First of all, you
11  indicate that Mr. Conley and did you
12  say Mr. Hunt?
13  A.      Conti.
14  Q.      Conti.
15  A.      Conti.
16  Q.      This is Phil Conti?
17  A.      Phil Conti.
18  Q.      Made some comments about Mr.
19  --- expressed some concerns about Mr.
20  Ober?
21  A.      Yes.
22  Q.      And verbally you say?
23  A.      Yes.
24  Q.      Well, did Mr. Conley ever
25  submit anything in writing?

18

ATTORNEY CHRISTIE:

You mean Mr. Conti.

A.    Mr. Conti.

BY ATTORNEY BAILEY:

Q.    I mean, Mr. Conti, anything in writing?

A.    Yes, he did.

Q.    And you mentioned another person, Hunt?

A.    Yes.

Q.    Who is that?

A.    A retired major from the Department.

Q.    And did he submit things in writing?

A.    No, only Lieutenant Colonel Conti did.

Q.    Did you summarize or submit a statement yourself on what, even though it might have only been hearsay, on what you had heard on this matter?

A.    No, sir.

Q.    You didn't do that?

A.    No.

19

1   Q.      Did the investigator interview
2   you?
3   A.      I don't recall.  I don't
4   believe so.
5   Q.      You don't believe so?
6   A.      I don't believe so.
7   Q.      Okay.  Now, I was looking
8   through some of the enclosures here
9   that were in the inquiry itself.  And
10  a lot of them purports to be, if I
11  remember correctly, a letter from Mr.
12  Conti to you; do you remember that?
13  A.      I recall a letter from him,
14  sir.
15  Q.      Do you remember what that
16  letter said?
17  A.      Not specifically, no.
18  Q.      Do you remember if that letter
19  indicated that Mr. Ober was doing
20  something wrong?  I mean, did it
21  contain an accusation?
22  A.      I believe it did.
23  Q.      Well, how many letters did Mr.
24  Conti send you?
25  A.      Only one that I can recall,

20

1  Mr. Bailey.

2  Q.    And the letter that he sent

3  you would be included --- I mean,

4  that's something you would have given

5  to the investigator; right?

6  A.    Yes, it would have been an

7  attachment in the investigation.

8  Q.    Okay. Now, when he sent you

9  this letter, do you have a

10  recollection of whether or not he

11  included any kind of correspondence

12  in it?

13  A.    I believe the letter was the

14  correspondence, sir. I mean, the

15  letter was making the allegation that

16  he had recited to me on two separate

17  occasions.

18  Q.    Well, let me --- I don't know

19  where we are with exhibits on your

20  deposition.

21          ATTORNEY BAILEY:

22          Do you folks know if we

23      even had any? I don't think

24      we had any.

25          ATTORNEY CHRISTIE:

21

1           I don't think we did

2      have any exhibits marked with

3      Colonel Coury.

4           ATTORNEY BAILEY:

5           Give me just a moment.

6   A.     Yes, sir.

7           ATTORNEY BAILEY:

8           I didn't expect your

9      response to be what it was.   I

10     want to double check this.

11     For Counsel's benefit, I'm

12     looking at enclosures three

13     and four of the supervisory

14     inquiry.

15  BY ATTORNEY BAILEY:

16  Q.     Were there --- I'm sorry.

17  There's a letter here, May 22nd,

18  1999.  Would you kindly take a look

19  at that, sir?

20          ATTORNEY CHRISTIE:

21          Can you mark that,

22     Counsel, and can we get a copy

23     of it?

24          ATTORNEY BAILEY:

25          Sure.  Yes.  Let the

22

1          record show it should be

2          enclosure three, the

3          supervisory inquiry.  It's

4          marked down at the bottom.

5                    ATTORNEY CHRISTIE:

6                    And are you marking it

7          Coury One?

8                    ATTORNEY BAILEY:

9                    Sure.  Yes.  I don't

10          think we had other exhibits,

11          so that's fine.

12                    (Deposition Coury

13                    Exhibit One marked for

14                    identification.)

15   A.      Yes, sir.

16   BY ATTORNEY BAILEY:

17   Q.      Now, does that letter contain

18   some accusation of Darrell Ober; do

19   you know?  If it does, can you point

20   it out to me.  And giving you the

21   benefit of the doubt from where I'm

22   sitting, my question would be as

23   follows, give me anything there that

24   you can indicate for me or tell me

25   indicates that Captain Ober is doing

23

1   something improper or misrepresenting

2   something or if it's anything other

3   than --- well, it might be an

4   improper proprietary interest on Mr.

5   Conti's part.  Who knows.  I don't

6   know.  But what generated that?

7   A.      What generated this letter?

8   Q.      Yes.

9   A.      I don't recall what generated

10  this letter from Mr. Conti.  I didn't

11  even recall seeing it until you just

12  showed it to me now.  I don't recall

13  that this --- I don't recall this

14  being the letter that generated the

15  inquiry.  I'm not saying it isn't.

16  Q.      Well, if I told you that ---.

17  A.      I'm not saying it isn't.  I

18  don't recall it being the letter that

19  generated the inquiry.

20  Q.      So you're saying there's

21  another letter somewhere?

22  A.      No, I'm not saying that.  I'm

23  just saying I didn't recall this

24  being the letter that generated --- I

25  thought it was a different letter.

24

1    It could be this one.  But in any

2    event, the response to your question

3    is, the letter would tie into the

4    allegations that Mr. Conti made to me

5    verbally and ---.

6    Q.        Well, ---

7    A.        So there's a tie in between

8    those two things.

9    Q.        --- did Mr. Conti give any

10   kind of statement or anything?

11   A.        I don't know.  I haven't

12   looked at that report probably since

13   I adjudicated it, sir.

14   Q.        Well, I may be mistaken, but I

15   think you initiated the use of force

16   of complaint, that's the processing

17   form that you --- it was given a BPR

18   control number of IAD number 1999-409

19   on May 27th, 1999 at 12:35 hours, as

20   received by Captain Brown.  Do you

21   have any reason to believe that's not

22   correct, that this information isn't

23   correct?

24   A.        No, sir.

25   Q.        Okay.  Well ---.

25

1   A.      I think, Mr. Bailey, in order

2   for me to accurately answer your

3   questions, what I need to do is look

4   at that entire packet that you're

5   referring to.  I mean, it's very

6   difficult for me to accurately answer

7   your questions on bits and pieces,

8   sir.

9   Q.      Okay.  No problem.  No

10  problem.  No problem.

11                  ATTORNEY BAILEY:

12                  Whatever you have

13          there, help me put this thing

14          together for the Colonel,

15          please.

16  BY ATTORNEY BAILEY:

17  Q.      Here you go.

18  A.      Thank you, sir.

19  Q.      Yes, sir.

20  A.      May I have a few.

21  Q.      Absolutely.

22  A.      Time to look at this?

23  WITNESS REVIEWS DOCUMENT

24  OFF VIDEOTAPE

25  SHORT BREAK TAKEN

26

1    ON VIDEOTAPE

2              ATTORNEY CHRISTIE:

3              Just a point of

4    procedure, do you think,

5    Colonel Coury, that's a, what,

6    quarter of an inch thick

7    packet of papers which I

8    expect is your indication of

9    what this supervisory inquiry

10   is?  Do you wish to break for

11   the Colonel to review the

12   material or do you wish him to

13   review while we just wait?

14             ATTORNEY BAILEY:

15             I think he'll be able

16   to go through that very

17   quickly.  It's not --- a lot

18   of that stuff is boilerplate.

19   I think he'll zip through.

20             ATTORNEY CHRISTIE:

21             Okay.

22             ATTORNEY BAILEY:

23             And just so you know,

24   these are documents that I was

25   able to procure during the

27

1    document inspection, I

2    believe, if I remember

3    correctly, that you folks

4    provided.  You may, if there

5    is more to the file, and I'm

6    not suggesting there is, you

7    would have it.  So if you need

8    a break or want a break for

9    it, whatever --- I think it's

10   pretty complete, though, to my

11   knowledge.

12             ATTORNEY CHRISTIE:

13        Are you marking the

14   packet in total as Coury Two?

15             ATTORNEY BAILEY:

16        You know what I was

17   going to do, Barb, I was going

18   to just ask you to cooperate

19   to incorporate it by

20   reference.  You know, it is an

21   official document of the ---

22   it's got a BPR number and a

23   supervisory inquiry number and

24   you two may want to confer,

25   but I thought we could,

28

1    instead of actually copying

2    it, if we could incorporate it

3    by reference as an exhibit.

4              ATTORNEY CHRISTIE:

5              Yes.  I have no problem

6    - - - .

7              ATTORNEY BAILEY:

8              I would have no problem

9    with it if you want to have it

10   reproduced, but it's rather

11   cumbersome.

12             ATTORNEY CHRISTIE:

13             Yes.  All right.  I

14   have no problem incorporating

15   it by reference, but in order

16   to do that, I would need it

17   copied.  And we'll put it on a

18   high-speed copy.  It should

19   take a moment to copy it, once

20   the Colonel has reviewed it.

21             ATTORNEY BAILEY:

22             No problem at all.

23   Sure.

24             ATTORNEY CHRISTIE:

25             And then you'll be

29

1    marking the packet in total as

2    Coury Number Two; right?

3            ATTORNEY BAILEY:

4            Sure.  Now, that's all

5    that I have on it to my

6    knowledge.  Darrell, we could

7    maybe ---.

8            ATTORNEY CHRISTIE:

9            Yes.  See, I know that

10   you had to like put a piece of

11   the paper together there, so I

12   just want to ensure that we

13   know, by what's attached to

14   the record, what you complied

15   together as the supervisory

16   inquiry.

17           ATTORNEY BAILEY:

18           Right.  So you know, I

19   was going to use parts of it,

20   but it was the Colonel who

21   felt that he needed the whole

22   thing.  And naturally, I'm

23   giving him what I have.

24           ATTORNEY CHRISTIE:

25           Okay.

30

1          ATTORNEY BAILEY:

2              So I wasn't planning to

3      do that, but to accommodate

4      the Colonel.

5          ATTORNEY CHRISTIE:

6              All right.  Well, we'll

7      make a quick copy of it so

8      that all of us have --- we'll

9      make a copy for you.  We have

10     the exhibit copy.  We'll make

11     a copy for us.  Okay?

12         ATTORNEY BAILEY:

13             Thank you.

14         ATTORNEY CHRISTIE:

15             Sure.

16         ATTORNEY BAILEY:

17             Thank you.  Can I get

18     my coffee now?

19         ATTORNEY CHRISTIE:

20             Yes, sure you can.

21  OFF VIDEOTAPE

22  SHORT BREAK TAKEN

23  ON VIDEOTAPE

24         ATTORNEY BAILEY:

25             We are just running ---

31

1    take time up.  Why don't we

2    suspend and shut down the

3    recording, because we're just

4    eating up tape time and

5    wasting everybody's time.

6    Now, remember when this

7    gentleman reads camera time on

8    our camera, it may differ by a

9    few minutes.  It's a

10    continuous run on the camera

11    clock.  I noticed, Barb, you

12    had looked at the clock like

13    that's off.  And it's off.

14    You know, it varies.

15        ATTORNEY CHRISTIE:

16        That's no problem.

17        ATTORNEY BAILEY:

18        Okay.  Go ahead.

19        VIDEOGRAPHER:

20        Suspending video

21    operations.  The time now is

22    10:27 a.m.

23    OFF VIDEOTAPE

24    SHORT BREAK TAKEN

25        VIDEOGRAPHER:

.32

1          Resuming video.  The

2        time now is, 10:50.

3    ON VIDEOTAPE

4          <u>ATTORNEY BAILEY:</u>

5          All right.  Thank you,

6        everyone.

7    <u>BY ATTORNEY BAILEY:</u>

8    Q.      Okay.  Colonel, we have that

9    back in front of us.  We might as

10   well start with the top form.

11   There's some discussion between

12   Counsel and I, if you remember,

13   during the break.  And the top page

14   here says, date, December 23, 1999.

15   Subject is the supervisory inquiry

16   IAD number 1199409; is that correct?

17   A.      Yes, sir.

18   Q.      Do you know whether

19   supervisory inquiry IAD number, which

20   is marked down as a 409, do you know

21   whether there's a complaint

22   verification form done in that case?

23   A.      I would think not, Mr. Bailey.

24   And the reason I would say that is

25   because of the correspondence that

33

1    was generated from Mr. Conti would

2    serve as a written notification, as a

3    written verification.

4    Q.    Okay. Well, you know, I

5    thought you might say that as let's

6    look at the correspondence generated

7    from Mr. Conley.

8                    (Deposition Coury

9                    Exhibit Two marked for

10                   identification.)

11   BY ATTORNEY BAILEY:

12   Q.    Now, let me say this, this

13   exhibit, by the way, has been marked

14   as Exhibit Number Two, roughly 60

15   some pages. And the pages are not

16   individually marked so, you know, we

17   can go back and do this later, do

18   this at trial if necessary but let's

19   go back to see if we can find that

20   letter and find the letter from Mr.

21   Conti that you had just made

22   reference to. Okay. And it's ---.

23   A.     I found it, sir.

24   Q.    Okay. It would be --- it was

25   probably the original inquiry. It

35

1    Captain Darrell Ober after Bill's

2    death in 1995.  Captain Ober is a

3    private collector and not

4    representative of our State Police

5    museum project.

6    Q.      Well, let's start there.

7    A.      Okay.

8    Q.      Okay.  Because you're the

9    gentleman, are you not, who on May

10   27th ---

11   A.      Yes, sir.

12   Q.      --- initiated this

13   investigation?

14   A.      And as I had said to you,

15   Major Hunt and Colonel Conti had had

16   discussions with me on at least two

17   occasions I can recall and it was

18   mostly Lieutenant Colonel Conti who

19   alleged that he was receiving ---

20   having dialogued with retirees who

21   said that Captain Ober was going to

22   their homes seeking artifacts from

23   their deceased husbands ---.

24   Q.      Just the way Colonel Evanko

25   calls them up or sends them letters,

36

1    too, the same way?  Do you know?

2    A.      I have no knowledge of ---.

3    Q.      Did you launch an

4    investigation into Colonel Evanko's

5    activities in acquiring museum

6    artifacts?

7    A.      I have no knowledge of what

8    you're referring to, Mr. Bailey.

9    Q.      Okay.

10    A.      In any event, ---

11    Q.      Yes.

12    A.      --- between Conti's dialogue

13    with me and the letters from Hayman

14    and the letter of March 22nd --- May

15    22nd, excuse me, what Conti was

16    saying was that Captain Ober was

17    using his ---.

18    Q.      I mean, you mailed this ---.

19    A.      May I finish, sir?

20                    ATTORNEY CHRISTIE:

21                    Let him finish.

22    BY ATTORNEY BAILEY:

23    Q.      All right.  Objection at this

24    point to your response, but you go

25    ahead and finish.

37

1    A.        All I was going to say was

2    that Colonel Conti was alleging that

3    Captain Ober was using his title as a

4    member of the State Police to get

5    these artifacts from the people as

6    well as his position --- as well as

7    he was alleging that he was a part of

8    the State Police museum project.  And

9    they felt, Conti, felt it was

10   inappropriate.  I'm finished, sir.

11   Q.        Okay.  All right.  You're

12   finished.  Now, Mr. Conti's writings

13   will speak for themselves; won't

14   they?

15   A.        Yes, sir.

16   Q.        All right.  And let's go back

17   and let's just sort of, again, let's

18   begin at the beginning and let's look

19   at this second paragraph of the March

20   15th, 1999 letter.  Okay.  And this

21   purports to be a --- this is one of

22   the pieces of correspondence that Mr.

23   Conti sent with you --- or sent along

24   with his May 22nd, 1999 letter to

25   you; is that correct, sir?

38

1    A.      I believe it's correct, sir.

2    I mean, I don't ---.

3    Q.      Well, you're the one that's

4    ---.

5    A.      I don't recall.

6    Q.      Okay.

7    A.      I don't recall.

8    Q.      He refers to an exchange of

9    letters with Marian Hayman; is that

10   right?

11   A.      Yes.

12   Q.      On the March 15th, 1999, isn't

13   the inside greeting address, Mrs.

14   Willis J. Hayman, dear Marian?

15   A.      Yes.

16   Q.      Is that what it says?

17   A.      Yes.

18   Q.      Now, the letter is not signed;

19   is it?

20   A.      No.

21   Q.      And it says up at the top, it

22   says, I received your letter last

23   week and the photographs you

24   enclosed.  That's the first

25   paragraph.  I'm sending you an

39

1   official acknowledgement for those

2   items and some others Bill sent to me

3   some time ago.  What kind of official

4   acknowledgement?  What's that about?

5   A.      I don't know, sir.

6   Q.      Well, where is the

7   Pennsylvania State Police museum,

8   sir?

9   A.      Where is it?  Do you mean

10  physically located or what ---?

11  Q.      Yes, sir.  I'd like to know

12  where it is.

13  A.      There is no --- there's an

14  office in Hershey, Pennsylvania.

15  Q.      Okay.  Who maintains that

16  office?

17  A.      The people from the museum.

18  Q.      Who's on that board, sir, can

19  you tell us?

20  A.      As if this day?  I don't know

21  who was on the board in March of '99.

22  Q.      Has your wife ever served on

23  the board?

24  A.      Yes, sir.

25  Q.      And I cut you off

40

1    inadvertently.  I apologize.  Would

2    you like to go back and finish?  I'm

3    sorry.

4    A.      No.  I was ---.

5    Q.      I cut you off at the question

6    about your wife and you had not

7    finished.  Go ahead, sir.

8    A.      I was just going to say that

9    the current president of the museum

10   is retired Major William Regan and

11   there's a board of about 15, I don't

12   know, 15 people.

13   Q.      Is your wife a member at this

14   time?  I'm sorry, sir.  Was your wife

15   a member on or about March of 1999?

16   A.      She was a member, whether she

17   was a member on or about 1999, I do

18   not know.

19   Q.      Well, wouldn't you have

20   checked those --- I mean, how many

21   years, 30 years experience, and

22   particularly in the operational area

23   of Pennsylvania State Police were,

24   and as an investigator, at least as

25   an investigative police officer,

41

1    don't you check those kind of things

2    out before you launch an

3    investigation into a captain in the

4    Pennsylvania State Police?

5    A.      I would see no connection

6    between the two, Mr. Bailey.

7    Q.      Okay.  Well, let's keep moving

8    along.  Okay.  Now, I'm sending you

9    an official acknowledgement for those

10   items.  What is an official

11   acknowledgement?  And I'd like to

12   know what's official about the museum

13   project, ---

14   A.      Mr. Bailey, ---

15   Q.      --- if you know.

16   A.      --- at this time, I was not

17   part of the museum.  I was not on the

18   museum board.  I would not know.  I

19   would not know, sir.

20   Q.      Sir, please.

21   A.      Yes, sir.

22   Q.      We're talking about an

23   accusation that this gentleman here

24   misrepresented his badge of authority

25   and his position with the

42

1   Pennsylvania State Police.  You told
2   us that?
3   A.      Yes.
4   Q.      Am I correct?
5   A.      Yes.
6   Q.      All right.  Now, it just seems
7   to me, and all I'm asking is, that if
8   you're going to accuse someone of
9   doing something, you've got to know
10  the background of what he's
11  misrepresenting.  So that's why I
12  would expect that you would know the
13  status and the organizational
14  structure and some information about
15  the museum commission.  That's the
16  only reason I'm asking.  If you're
17  telling me you don't know anything
18  about that, I will move on.
19  A.      Well, first let me say, I was
20  not the accuser.  Phil Conti was the
21  accuser.  I submitted the paperwork
22  based on Phil Conti's.
23  Q.      But you see, sir, I've been
24  doing all these depositions and
25  during these depositions I have

43

1    learned a great deal from you folks.

2    I have a lot of respect for how you

3    try to run your organization.  One of

4    the things I've learned about your

5    respect for substantive and secretive

6    process is, there's this thing called

7    a complaint verification form.  Where

8    is it?  I haven't found it in this

9    inquiry yet.  I looked for it,

10   because that's the way we're supposed

11   to do things.  Now, you've already

12   explained to me --- you say, in this

13   case you don't think that would be

14   necessary.

15   A.      In many ---.

16   Q.      I'm sorry, sir.  In many cases

17   Go ahead, sir.  I interrupted you.

18   A.      Well, let me say, if I didn't

19   make it --- did not explain in enough

20   detail that in, as I recall the

21   system, that operationally that when

22   they receive --- when they already

23   have a letter or something in writing

24   of the complaint, they didn't turn

25   around and send the person another

44

1  letter and ask them to fill out a

2  complaint and verification.  So based

3  on my recollection of the system that

4  the letter from Conti would have been

5  the verification required.

6  Q.    Well actually, the letter from

7  Conti, we're going to talk about that

8  in just a moment, but actually, the

9  letter from Conti says, I'm sending

10  you an official acknowledgement.

11  What was Conley's status at that

12  time?

13  A.    Conti's status?

14  Q.    Conti.  I keep --- sir,

15  forgive me.  I keep doing Conley when

16  I mean Conti.  I apologize to you.  I

17  mean, Mr. Conti, Mr. Philip Conti.

18  What was his --- was he --- it says

19  down here, you signed this,

20  Lieutenant Colonel, Pennsylvania

21  State Police Retired.

22  A.    Yes.

23  Q.    Now, up here in this first

24  paragraph he says, I'm sending you,

25  and this is the language he used,

45

1  official acknowledgement. Maybe he's

2  not --- maybe he is a fellow who's

3  misrepresenting in this case. Maybe

4  he's committing a misrepresentation

5  here. That's what I'm trying to

6  learn about. What is this official

7  acknowledgement? I've never seen ---

8  I can't find any paperwork on this

9  museum thing legislatively in

10  regulations. I'd like to know how

11  you fellows set this thing up.

12  A.    We didn't set it up. It is a

13  501(c)(3) private corporation.

14  Q.    Okay. 501(c)(3).

15  A.    Non-profit organization.

16  Q.    Yes, I know what that is. I

17  don't know a whole lot about them. I

18  never set one up, but I know a little

19  bit about them. I, you know, read

20  about them and stuff. But the thing

21  is, 501(c)(3) set up by a public

22  entity, by a public entity, the State

23  Police ---.

24  A.    No, it's not set up by the

25  State Police. It's set up by a group

46

1    of retirees.

2    Q.    A group of retirees.  Okay.

3    Now, can you tell me who gave that

4    group of retirees a --- some sort of

5    proprietary or official interest.  I

6    mean, if I set up at 501(c), what

7    makes my actions official?  I mean,

8    to me official means state authority.

9     Maybe I'm thinking wrong.

10   A.    That's his term.  That's Mr.

11   Conti's determination.  All I can

12   tell you is the Commissioner gave the

13   museum life by allowing them to use

14   the title, Pennsylvania State Police,

15   historical educational memorial.

16   Q.    Who did that?

17   A.    It would be under the

18   Commissioner and the governor's

19   office, but we'd have to get

20   permission to use the title.  But

21   other than that, that's a private

22   organization.  No active member of

23   the department sits on any board of

24   the museum.

25   Q.    Well, does Mr. Evanko, does he

47

1   solicit things in the name of the

2   museum group; do you know?  And if he

3   does, what's his connection with it?

4   I'd like to see, because I haven't

5   been able to learn that either.  Do

6   you know of any?

7   A.      His connection with the

8   museum?

9   Q.      Yes.  I'd like to know his

10  official connection.

11  A.      He does not sit on any board

12  or any committee and the question of

13  his soliciting artifacts is a

14  question for the Commissioner.  I'm

15  not aware of him soliciting

16  artifacts.

17  Q.      Do you know whether he has any

18  in his office?

19  A.      He has memorabilia in his

20  office, yes, sir.

21  Q.      Do you know where he got them,

22  how he got them?

23  A.      No, sir, I've never asked him.

24  Q.      All right.  Let's go to the

25  second paragraph, Colonel.  It says,

48

1    I regret very much the visit made to

2    your home by Captain Darrell Ober

3    after Bill's death in 1995.  Well, do

4    you know what Mr. Conti was doing

5    contacting her after Bill's death?

6    A.      Mr. Conti was on the artifacts

7    committee, so anything other than

8    that would be an assumption on my

9    part.

10    Q.      All right.  So you're assuming

11    that Mr. Conti contacted Marian after

12    Bill's death in 1995?

13    A.      That's obvious from the letter

14    that he contacted her after Bill's

15    death.

16    Q.      I agree with you.  And he says

17    he regrets a visit made by Captain

18    Darrell Ober.

19    A.      Yes.

20    Q.      What possible grounds, if you

21    know, from your investigation of this

22    matter and your review of the

23    investigation that was subsequently

24    done after you launched the official

25    investigation, what possible regret

49

1    could he have for Mr. Ober, and I

2    realize it was unfounded and I credit

3    you for doing the proper thing when

4    it was over, but my question is, what

5    did Mr. Ober do, if you know?  If you

6    know.  Yes.

7    A.      I can tell you what Mr. Conti

8    told me tying the March 15th letter

9    to the May 22nd letter, he said that

10   Captain Ober went to, and I don't

11   recall it being this specific person,

12   I can't say Marian Hayman, but that

13   the nature of the allegation was that

14   Captain Ober was going to the door

15   using the name Captain Darrell Ober

16   of the Pennsylvania State Police and

17   collecting artifacts for the

18   Pennsylvania State Police museum.  So

19   what he's saying is he regrets the

20   fact that Captain Ober went to her

21   home and was collecting artifacts in

22   the name of the Pennsylvania State

23   Police museum.

24   Q.      All right.  Now, we already

25   know that the investigation

Sargent's Court Reporting Service, Inc.
(814) 536-8908

50

1    demonstrated that that was unfounded.

2    A.      That's correct, sir.

3    Q.      All right.  Now, that's fine.

4    Why didn't you at this stage, though,

5    say to Mr. Conti, Bill, assuming he's

6    an old friend or colleague or someone

7    you know, Bill, that's pretty

8    serious, would you get me, you know,

9    before I go out investigating

10   somebody, I mean I'd like to get ---

11   I mean, do you have some kind of an

12   affidavit?  Can you execute some kind

13   of an affidavit or give me something

14   a little more substantive?  Because

15   I'll tell you, sir, as I read the

16   March 15th letter, I do read it

17   differently than you, but it doesn't

18   matter what I see.  My question is,

19   did you ask Mr. Conti to give you

20   something of a more substantive or

21   definitive nature that would indicate

22   that Captain Darrell Ober was

23   misrepresenting himself and/or the

24   Pennsylvania State Police and/or the

25   501(f)(c)(3) you mentioned earlier?

51

1    Did you ask him to do anything like

2    that, Mr. Conti?

3    A.      After the verbal conversations

4    with him, I asked him to put

5    something in writing.

6    Q.      Well, I regret --- is that

7    what produced the letter of --- let

8    me see.  There's a July letter.  Let

9    me see where that is.

10                   ATTORNEY BAILEY:

11                   Can you help me find

12          that?

13                   ATTORNEY CHRISTIE:

14                   Are you talking

15          enclosure number four,

16          Counsel?

17                   ATTORNEY BAILEY:

18                   Is that what it is?

19          That's what it is?

20                   ATTORNEY CHRISTIE:

21                   Yes, July 9th, 1999.

22                   ATTORNEY BAILEY:

23                   You're wonderful,

24          Barbara as usual.  July 9th,

25          1999.

52

```
 1              ATTORNEY CHRISTIE:

 2              Is that the one you're

 3         looking for?

 4              ATTORNEY BAILEY:

 5              Yes.  Yes, that's the

 6         one.  Okay.

 7    BY ATTORNEY BAILEY:

 8    Q.    Now ---.

 9    A.    May I find that document?

10    Q.    Yes, sir, it's right behind

11    the one we just looked at, right

12    behind number three.

13    A.    Okay.

14    Q.    Here it is.

15    A.    I have it, yeah.

16    Q.    Okay.  Now, is that the letter

17    you're referring to?

18    A.    Let me ask you to ask your

19    question again, Mr. Bailey, I sort of

20    lost track.

21    Q.    I may have misunderstood your

22    --- yes, sir, I'm sorry.  I may have

23    misunderstood a response of yours,

24    but you had indicated, I thought you

25    had indicated, now, you correct me if
```

53

1    I'm wrong, and your Counsel, your

2    very able attorney will indicate or

3    correct me if I'm wrong, I thought

4    you had indicted that there was some

5    type of response and written form

6    from Mr. Conti that was more

7    definitive, I may have misunderstood

8    you, and that that was something that

9    you had based a decision on or that

10   affected you in terms of your

11   conduct.

12   A.      In initiating the complaint?

13   Q.      In initiating, sir.

14   A.      No.  It would have been the

15   March 15th letter tied in with his

16   current letter.

17   Q.      Okay.  And the reason you're

18   saying that is that the facts are

19   quite clear that the complaint was

20   initiated on the 27th of May, 1999

21   and this letter is dated July 9,

22   1999; right?  I mean, this is well

23   after the fact; right?

24   A.      This is after the May letter,

25   yes, sir.  This is after the May

54

1    adjudication.  But what it indicates

2    is what Conti had been telling me

3    verbally and that is that he felt

4    that Captain Ober was using his

5    department title.

6    Q.       See, that's what I'm having a

7    real hard time with, you keep telling

8    us that, and we have no way of

9    checking this, because, for the

10   record, Mr. Conti has passed on; is

11   that correct?

12   A.       Yes, sir.

13   Q.       Okay.  So we have no way of

14   confirming that and you're telling us

15   what Mr. Conti has told you verbally,

16   but you at no time asked him to give

17   a statement to somebody.  You asked

18   him at no time to be more definitive

19   in his writings.  And then I'm going

20   to go back to this paragraph that you

21   told us was the reason, we're going

22   to revisit it, and that would be back

23   there, that's the March 22nd letter.

24   And, you know --- May 22nd, I'm

25   sorry, sir.  May 22nd letter that

55

1    refers to enclosure 15, supposedly

2    the March 15th letter, and I'm going

3    to go into that paragraph in the

4    March 15th letter.  My question is

5    real, real simple.  There was no

6    effort made to reduce anything that

7    Mr. Conti said to any kind of

8    verifiable or sworn or declaratory

9    form that could be used as the basis

10    of a complaint?

11    A.      That's the job of the

12    investigator, Mr. Bailey.  According

13    to AR425, when a member receives

14    notification of a possible violation

15    from a member, you know, you fill out

16    the complaint sheet, you pass it on

17    and the investigator does those

18    things, I had two verbal

19    conversations with Conti and I told

20    him to put something in writing.  He

21    put that in writing and I passed it

22    on.  And yes the May 22nd letter said

23    something about forgetting it and

24    moving on.  A member doesn't have the

25    luxury of saying forget it.  I mean,

56

1  once somebody gives you a complaint,

2  it's pretty difficult for them to

3  call and say, I don't want to do

4  anything about it, let's forget it.

5  I mean, now that it's a complaint and

6  you know it, that member's under some

7  obligation to see it's followed

8  through.

9  Q.     Okay.  Well, you referred to

10  it as a complaint.  So let's go back

11  to --- and that's where there may be

12  an honest disagreement here.  Let's

13  go back to enclosure 15.  By the way,

14  was Mr. Conti ever interviewed?

15  A.     I don't recall.  I only

16  thumbed through these to get those.

17  Q.     Sir, please.  You have told us

18  that Mr. Hunt made certain verbal

19  representations to you ---

20  A.     Yes.

21  Q.     --- of a substantive nature

22  about the conduct or alleged conduct

23  of Mr. Ober.  Did I misunderstand

24  you?

25  A.     You just asked me --- you said

57

1    that Mr. Hunt made allegations, but

2    your question to me, was Conti ever

3    interviewed.

4    Q.      And then I misspoke.  I'm in

5    error.  I thought I asked if Mr. Hunt

6    was ever interviewed.  In fact, I

7    thought I read it off the page.  I

8    made a mental error and I'm sorry.

9    A.      I did not see an interview in

10   here from Mr. Hunt.

11   Q.      You verified this thing as

12   unfounded.  Mr. Hunt had told you

13   things.  You reviewed this

14   investigation and you didn't call

15   that investigator up and say, why

16   didn't you investigate or why didn't

17   you talk to Hunt?  Didn't you tell

18   him about Hunt?

19   A.      Mr. Bailey, there was enough

20   facts in here to adjudicate it

21   without Hunt's statement.  Why would

22   you already go back and have him

23   re-interviewed when you know it's

24   unfounded?

25   Q.      Wait a minute, sir.  You told

58

1  me - - -.

2  A.      I mean, I'll - - -.

3  Q.      I'm sorry, sir.

4  A.      No.  I apologize.  Go ahead.

5  Q.      You told me that before you

6  initiated this complaint you had

7  received verbal representation,

8  verbal, your words, verbal, from Mr.

9  Conti and Mr. Hunt, sir.  That's what

10  you told me.

11  A.      Yes.

12  Q.      Now, you're telling me

13  apparently you didn't even pass on in

14  written or verbal form to the

15  investigator that Mr. Hunt had made

16  alleged comments, inculpatory

17  comments, not exculpatory,

18  acquisition-type of comments, against

19  Captain Ober and you never told the

20  investigator or the investigator

21  never interviewed Mr. Hunt or

22  investigated it.  And further you

23  have told me, and then I'll ask you

24  the specific questions, further you

25  have told me, I'm characterizing your

59

1    testimony now and you're to correct

2    me if I'm in error, furthermore you

3    told me that you reviewed this thing

4    and you --- because you told us you

5    adjudicated it.  Okay.

6    A.      Yes, sir.

7    Q.      I mean, I do my homework

8    before I come to these depositions

9    and I know the stage that I've gone

10   through in reviewing this matter and

11   asking you questions.  And you have

12   told us what the record revealed to

13   me that you adjudicated it.  Now, if

14   you initiated the complaint, not

15   formally but according to what you've

16   described to us was a proper form,

17   you provided information either in

18   written or verbal form to the

19   investigators, the investigator, is

20   Mrgich?

21   A.      Yes.

22   Q.      And you indicated Mr. Hunt ---

23   you don't remember Mr. Hunt being

24   interviewed.  I can tell you there's

25   no record of Mr. Hunt being

60

1    interviewed in here, at least that I
2    can find.  If you can find one, you
3    let me know and I could be wrong.
4    Now you told me you reviewed it and
5    you never asked the investigator to
6    check on Mr. Hunt's allegations, now
7    because it was unfounded.  Now, just
8    explain it to me, please.  Explain to
9    me why Mr. Hunt doesn't appear, why
10   he wasn't interviewed.  Just explain
11   that, if you can.

12                    ATTORNEY CHRISTIE:
13                    Objected to as a
14           misstatement you say while Mr.
15           Hunt doesn't appear.  Mr.
16           Hunt's does, in fact, appear
17           on, although it's not listed
18           as an enclosure, a 2/12/2001
19           to, from, from Major Pudliner
20           to Lieutenant Colonel Conley
21           - - -
22                    ATTORNEY BAILEY:
23                    Can you tell me what
24           page that is on?
25                    ATTORNEY CHRISTIE:

61

1           --- as the contact
2    person, let's see, as the
3    contact person to rely
4    information concerning I guess
5    it's Mr. --- or Ms. Poso.
6           ATTORNEY BAILEY:
7           Wasn't that after the
8    adjudication was completed?  I
9    think that's what the Colonel
10    was trying to tell me.  Maybe
11    I'm wrong.  What page are you
12    on there?
13           ATTORNEY CHRISTIE:
14           Well, this page is not
15    marked so I'll just say we're
16    maybe like 12 pages, 14 pages
17    into the packet.
18           ATTORNEY BAILEY:
19           Ms. Poso.  Would you
20    look at the date at the top of
21    that, please?
22           ATTORNEY CHRISTIE:
23           I see the date.
24           ATTORNEY BAILEY:
25           What does it say?

62

1    ATTORNEY CHRISTIE:

2        Well, you said that Mr.

3    Hunt was not mentioned ---

4        ATTORNEY BAILEY:

5        No, I did not.

6        ATTORNEY CHRISTIE:

7        --- in the supervisory

8    inquiry.  He was not mentioned

9    in that context as a relayer

10   of information concerning Ms.

11   Poso's complaint.

12       ATTORNEY BAILEY:

13       All right.  Just a

14   minute.

15       ATTORNEY CHRISTIE:

16       Or Mr. Poso's

17   complaint.

18       ATTORNEY BAILEY:

19       Okay.  Let me just go

20   back to my questions.

21   Incidentally, that's something

22   that was added into this file

23   after the adjudication.  If

24   you look at the adjudication

25   date, the form says, December

63

1          23, 1999. The date that you're

2          talking about there on that

3          thing is February 2001. Right

4          now, let me get back to

5          specific questions if I can

6          and it will clarify it. Okay?

7  BY ATTORNEY BAILEY:

8  Q.       Sir, do you have a

9  recollection of saying to the

10 investigator sharing with the

11 investigator Mr. Hunt's comments or

12 remarks to you about Mr. Ober?

13 A.       I don't recall, Mr. Bailey. I

14 don't.

15 Q.       Okay. Do you have a

16 recollection of making any kind of

17 notes or notations about Mr. Hunt?

18 A.       No, sir, I don't recall.

19 Q.       All right. When you did the

20 adjudication which means you would

21 review the materials in the file, of

22 course. When you did the

23 adjudication, do you have a

24 recollection of being concerned that

25 Mr. Hunt's comments to you were not

64

1    the subject of an inquiry or review

2    or were not in the investigation?

3    A.      Not at all, sir.

4    Q.      Okay.  And so whatever Mr.

5    Hunt may have said, and you're

6    certainly welcome to tell us what he

7    told you, if you'd like to, and I

8    would invite you to do that, if you

9    would care to, if you want to, but

10   the point is that whatever Mr. Hunt

11   may have said, when you reviewed the

12   investigation you were satisfied that

13   it was unfounded, based on what you

14   knew and you did have some factual

15   knowledge, since some of these

16   hearsay allegations have been passed

17   onto you, you were satisfied that it

18   was unfounded; am I correct?

19   A.      Hunt and Conti would have had

20   no factual information.  They would

21   have been relaying what they heard

22   from retirees.  The names of those

23   retirees are known.  The

24   investigators went to those retirees.

25   And that's factual information, so I

65

1  wouldn't need any information from

2  Conti or Hunt to make a proper

3  adjudication.

4  Q.      Okay.  Let's go to enclosure

5  15 then and we'll finish up that

6  second paragraph.  Do you have it in

7  front of you?

8  A.      Yes, sir.

9  Q.      Okay.  I regret very much the

10  visit made to your home by Captain

11  Darrell Ober.  I think I've asked you

12  about that.  I don't know what the

13  regret was for and apparently you've

14  given us the benefit of what you feel

15  that might mean, so the record would

16  speak on that issue.  Now, let's go

17  to the second sentence.  Captain Ober

18  is a private collector and is not a

19  representative of our Pennsylvania

20  State Police museum project.  Sir,

21  you testified to me earlier in that

22  deposition that the museum group and

23  commission was a private 501(c)(3);

24  didn't you?

25  A.      It's a non-profit 501(c)(3)

66

1    yes, sir.

2    Q.      What did these words, our

3    Pennsylvania State Police museum

4    project, did that concern you?  Isn't

5    that a misrepresentation?

6    A.      It's a Pennsylvania State

7    Police historical educational museum

8    project.

9    Q.      Well, you told us that there

10   was some authority given to give it a

11   name.

12   A.      Yes.

13   Q.      To me, now maybe because I'm

14   one of these lawyer types, to me, the

15   idea, our Pennsylvania State Police

16   museum project, are you telling us

17   that that 501(c)(3) is the

18   Pennsylvania State Police museum

19   project or is it a private 501(c)(3)?

20   A.      It's a private 501(c)(3).

21   Q.      All right.  Let's go to the

22   next sentence.

23   A.      All right.

24   Q.      Therefore, those items you

25   surrendered to him, obviously at this

67

1  pleading.  Now, I have a little bit
2  of a distorted copy here, but it
3  looks like that was underlined.  Do
4  you know whether that sentence was
5  underlined there?
6  A.      I can't tell, Mr. Bailey, I
7  don't know.
8  Q.      You don't remember doing that?
9  A.      No, sir, and I don't know why
10  I would.
11  Q.      Okay.  I'm not suggesting that
12  you would or did, I don't know, but I
13  know it was underlined.  Therefore,
14  those items you surrendered to him,
15  obviously at his pleading will not be
16  a part of our collection.  How do you
17  know --- do you know how Mr. Conti
18  reached the conclusion that they ---
19  let me use this underlined word will,
20  will not be a part of our collection.
21  Did you call Captain Ober up?  Did
22  Mr. Conti call Captain Ober up and
23  say, hey, what are you doing out
24  there?  Can you help us?  Would you
25  like to work with us or anything like

68

1   that?

2   A.      I don't know if Mr. Conti ever

3   called Captain Ober or not.  I

4   certainly wouldn't.  I was not part

5   of the museum project.

6   Q.      Now, I want to read this last

7   sentence to you.  And, you know,

8   you're a police officer, a lot of

9   years of experience.  I want you to

10  tell me, you read this letter, given

11  to you by Mr. Conti, before you

12  launched this investigation, if

13  anyone should come to your home

14  soliciting artifacts, please get in

15  touch with me right away but give him

16  nothing?

17  A.      Uh-huh (yes).

18  Q.      On what authority would Mr.

19  Conti be allowed to or be able to

20  make that representation to a private

21  lady who is the widow of an honored

22  Pennsylvania State Police officer

23  with many years of service?  Where

24  does he get --- if you know and I'm

25  not saying you do now, but where

69

1   would he get the authority to say

2   something like that?  Do you believe

3   he has that authority to make that

4   --- to give somebody that advice or

5   say that to somebody that way?

6   A.      He can give anybody advice on

7   anything he wants to, but that

8   doesn't certainly mean he has

9   authority to do so.

10   Q.      Well, that's the issue with

11   Captain Ober.

12   A.      I know what Colonel Conti is

13   referring to here.  I mean ---.

14   Q.      Well, why wouldn't you give

15   Captain Ober that much room, pick up

16   a telephone and call him and say,

17   hey, Captain, you know, this is ---

18   what's going on here, just an

19   explanation?  That's improper.  But

20   Mr. Conti can say, if anyone should

21   come to your home soliciting

22   artifacts, which everybody has a

23   right to do, commonsense tells you

24   that, and you knew it was a

25   501(c)(3), please get in touch with

70

1    me right away, but give him nothing.

2     I mean, didn't you say to Mr.

3    Conley, wait a minute, you know, you

4    can't --- you don't have some --- you

5    know, this is not a State Police

6    function you're performing here.

7    You're not representing the State

8    Police here, sir.  I mean, I'm sure

9    he's a wonderful man, he was a

10    wonderful man, I'm sure and I'm sure

11    he was a great fellow.  But I mean,

12    why can't you --- you know, I know he

13    can say anything he wants to, that's

14    not to say it's legally proper, you

15    know, and I'm not saying he should

16    be, you know, treated in a negative

17    or angry way about it, but shouldn't

18    he have least been informed that

19    that's not

20    --- I mean, that clearly --- he

21    doesn't have the authority to say

22    something like that; does he?  Did

23    you believe at that time that he did

24    have the authority to tell Marian

25    Hayman, if anyone should come to your

71

1   home soliciting artifacts, please get
2   in touch with me right away but give
3   him nothing?
4   A.      Well, he doesn't have the
5   State Police authority to do that.
6   Any other question is a question for
7   the museum group, Mr. Bailey.
8   Q.      But he signed it Philip M.
9   Conti, Lieutenant Colonel PSP
10  retired.
11  A.      Retried, that's right. We
12  have no control whether he uses his
13  title or not after he retires. The
14  Department has no control over
15  retirees. What Colonel Conti is
16  saying here is that here was a lady
17  who thought she was giving her,
18  because she's elderly, she's a widow,
19  she thought she was giving her
20  artifacts to a museum and she gave
21  them to a private collector. He's
22  giving her some advice. In the
23  future, if you don't know. Call me
24  first.
25  Q.      Well, you know ---.

72

1    A.      She thought they were going to

2    end up in the State Police museum,

3    not in somebody's private collection.

4    Q.      You talked to her?

5    A.      No, that's what Colonel Conti

6    told me.  That's what Hunt told me.

7    Q.      That's what Colonel Conti ---

8    did Mrgich tell you that?

9    A.      I don't recall of any

10   discussion with Mrgich.  I read his

11   report.  That doesn't mean I had a

12   discussion with him.

13   Q.      Yes, that's true.

14   A.      I mean, it's in the

15   investigation what the lady believed.

16   Q.      Well, if a private collector,

17   let's say Colonel Evanko sends a

18   letter to somebody and signs it

19   Colonel Evanko, Commissioner

20   Pennsylvania State Police, and is

21   indicating that this person might

22   have some artifacts and might have

23   some --- you know, may want to do

24   something with them or send them into

25   him or for that matter send them to

73

1    the museum.  Why is the 501(c)(3) any

2    more authorized or preferable or

3    profitable in your eyes as an entity

4    to solicit out there in the private

5    domain than a private collector?

6    What gives the Pennsylvania State

7    Police the authority to assist the

8    501(c)(3) or doesn't it have that

9    authority?

10   A.      I don't see where --- no

11   member --- no active --- I guess it's

12   no Commonwealth employee, actually,

13   can solicit.  Solicitation is not

14   part of Commonwealth activities, so

15   that's why there's no active members

16   on any museum committee because of

17   the solicitation of funds,

18   solicitation of artifacts which have

19   value.

20   Q.      Are any of the letters that

21   Colonel Evanko sent out, are they

22   solicitations in nature or ---?

23   A.      I'm not aware of any letters

24   you're referring to, Mr. Bailey.

25   Q.      Yes, and I don't infer or

74

1  think that he would necessarily do

2  that or do that for any improper

3  purpose.  It's just a matter of, you

4  know, what I'm concerned about here

5  is, sir, was this investigation used

6  as a way to punish or to intimidate

7  Captain Ober?  Is that what it was

8  for or about?

9  A.      If that were the purpose, it

10  wouldn't be unfounded.  I guess if I

11  wanted to do that, I could have found

12  a way to make it founded, you know.

13  If you're implying that I would do

14  something like that, then I would

15  have went the whole way and made it

16  founded.

17  Q.      You're getting angry.

18  A.      No, I'm being serious.

19  Q.      I appreciate your seriousness.

20  Now, did you take Captain Ober off ,

21  PREVIOUSLY SWORN, CALLED TO TESTIFY

22  the book committee?

23  A.      I did not, sir.

24  Q.      Who did?

25  A.      That would have had to have

75

1   been the Commissioner, sir.

2   Q.      Why did the Commissioner take

3   him off the book committee?

4   A.      I don't know, sir.  The book

5   committee which was part of the ---

6   Q.      The centennial.

7   A.      --- centennial committee all

8   came under the Deputy of Staff and

9   the Commissioner's office.

10  Q.      And that would be Mr.

11  Westcott?

12  A.      No, that would have been at

13  that time either Colonel March or

14  Colonel Hickes.  I don't recall who

15  it would have been.

16  Q.      I thought, I may be mistaken,

17  but I thought you had indicated in

18  response to an earlier question that

19  it was Colonel Evanko that took him

20  off of that book committee.  I could

21  be mistaken.

22  A.      I think it would have been.

23  Q.      Okay.  Well, I mean, do you

24  know whether it was or not?

25  A.      I don't know.  I don't recall,

76

1  let's put it that way.  I may have

2  known then.  I don't recall now, Mr.

3  Bailey.

4  Q.    Okay.  Wasn't that book

5  committee supposed to produce a

6  product, you know, a report or book

7  or whatever, sometime about 2004,

8  2005?

9  A.    A book was part of that and I

10 guess it would have been for the

11 hundredth --- I guess it would have

12 been for 2004, 2005.

13 Q.    Yes, that's right.  And when

14 did Colonel Evanko take him off of

15 that committee?

16 A.    I don't know, sir.

17 Q.    Well, do you remember the

18 reasons why he was taken off of that

19 committee?

20 A.    Yeah.  I think one of the

21 reasons why was because he was on the

22 IIMS project, now that I think about

23 it and he was on the panel to select

24 the systems integrator.

25 Q.    Yes.  And then he was

77

1   transferred to Washington.

2   A.      After he completed that

3   assignment, yes, sir.

4   Q.      Well, you know, I realize ---

5   you know, your deposition has been

6   continuing here.  Do you know that

7   you've testified that way and the

8   Colonel's testified that way.  And I

9   started reading some documents and

10  start reading when reports were due

11  and start reading some schedules and

12  are you sure that there isn't a

13  material difference here, a fact

14  between the participants in this

15  lawsuit as to when those IIMS

16  schedules and dates were met, what

17  meetings, when the contract was voted

18  on and what Captain Ober's role was?

19                  ATTORNEY CHRISTIE:

20                  I object.  You're

21          asking the witness to make a

22          legal conclusion about a

23          material difference in fact, I

24          don't know, whatever, like a

25          summary judgment motion or

78.

1          something.

2                    ATTORNEY BAILEY:

3                    Well, let me withdraw

4          it and rephrase.

5                    ATTORNEY CHRISTIE:

6                    I would object to that.

7                    ATTORNEY BAILEY:

8                    Let me rephrase.

9     BY ATTORNEY BAILEY:

10    Q.        On what do you base, on your

11    own knowledge, on what do you base

12    your representation under oath in

13    this deposition that Captain Ober's

14    efforts and participation with IIMS

15    for what he was appointed to do, the

16    system integrator that everybody

17    keeps throwing out on the table in

18    front of me, that that was completed

19    at the end of '99 or so.  What was

20    it, '99?  2000, I'm sorry.  2000.

21    Too many facts packed up in my head.

22    I'm sorry.

23    A.        I don't know anything about

24    the dates.  All I can tell you is

25    that when Captain Ober was under my

79

1    command, I was told that he was going

2    to be a part of the IIMS project to

3    select the systems integrator and I

4    know from hearing, I guess it was the

5    Deputy Commissioner of Staff and in

6    conversations with Colonel Evanko

7    that he had completed his portion of

8    selecting the systems integrator.

9    What that selection process is, I

10   don't know.  I don't know what the

11   cut off line is, but certainly the

12   Deputy Commissioner of Staff and the

13   Commissioner felt that he had

14   fulfilled that role.

15   Q.      So you don't know of your own

16   knowledge, you just know that the

17   Commissioner, based on what you've

18   heard, had reached that conclusion;

19   right?

20   A.      That's correct, sir.

21   Q.      Why was he sent back to IAD

22   for like a matter of a few days?  Do

23   you know why that was?

24   A.      I don't recall, sir.

25   Q.      You don't know what the reason

80

1   for that was?

2   A.      I recall the Commissioner had

3   assured Captain Ober that after the

4   IIMS project that he would be

5   returned to BPR.  That was important

6   for Captain Ober to do that.

7   Q.      Well, that was an agreement

8   they'd made that was put in writing?

9   A.      I don't know if it was put in

10  writing or not.  I don't recall, sir.

11  Q.      Well, I can tell you it was

12  put in writing.  I'm representing.

13  A.      I don't recall, sir.

14  Q.      And it probably would have

15  been grievable if the Colonel didn't

16  do it, so the Colonel sent him back

17  for a few days so it wouldn't be

18  grievable, I guess.  Did you ever

19  discuss that with the Colonel, the

20  reason for that?

21  A.      For?

22  Q.      For just sending him back

23  there to IAD for a few days and then

24  sending him out to Washington.

25  A.      I don't believe I had any

81

1   discussions with the Colonel about

2   it.

3   Q.      When you transfer somebody in

4   the Pennsylvania State Police and

5   it's not specified in the transfer

6   order, it is custom practice and

7   usage of the Pennsylvania State

8   Police that it's permanent?  You know

9   that from being in the Pennsylvania

10  State Police; don't you?

11  A.      Well, it depends on what the

12  order says, whether it says it's

13  temporary.  If it doesn't say it's

14  temporary, then it's permanent in

15  nature.

16  Q.      That's what I'm looking for.

17  Okay.  On enclosure 15, that should

18  still be in front you.

19  A.      Yes, sir.

20  Q.      It says, last sentence of the

21  third paragraph, whatever you can

22  give us for the museum will be picked

23  up by a trooper from the Mercer

24  barracks.  What are troopers from the

25  Pennsylvania State Police and the

82

1    Mercer barracks doing on state time

2    with state vehicles going out and

3    picking up stuff for a private

4    501(c)(3) and did you investigate

5    that?

6    A.    I don't know where it says on

7    state time in a state vehicle.

8    Q.    So you figure the trooper,

9    this unnamed trooper, you assumed,

10   was a member of the committee acting

11   on private time, that's what you

12   assumed from reading it?

13   A.    I didn't assume anything about

14   it, Mr. Bailey.  And who would I

15   investigate, Mr. Bailey, Colonel

16   Conti?

17   Q.    Why not?

18   A.    He's not a member of the

19   Department.

20   Q.    Why not ask him?

21   A.    He doesn't fall under those

22   regulations.

23   Q.    But you went out and

24   interviewed Ms. Hayman; didn't you?

25   Didn't somebody go out and interview

83

1   her?

2   A.      Yes.

3   Q.      Well, what's to prevent you

4   from asking your friend, Mr. Conti, a

5   few questions before this horse gets

6   out of the barn?

7   A.      Me?

8   Q.      Sure.

9   A.      Well, that's the

10  investigator's job.  If I do all of

11  that, Mr. Bailey, I'm the

12  investigator.  I'm not an

13  investigator.  According to AR425, we

14  take a complaint, we pass it on to

15  BPR and they conduct the

16  investigation, sir.

17  Q.      Do you ask them ---?

18  A.      The only thing material from

19  me was when I got the letter, passed

20  it on and then adjudicate the

21  findings against Captain Ober.

22  Q.      Against --- you didn't mean

23  that.

24  A.      Well, in reference to Captain

25  Ober, sir.

.84

1    Q.      Okay.  I've got you now.

2    Okay.  I'm going to touch on just a

3    couple more little things.  One of

4    them that's really concerned me that

5    I want to question about is, do you

6    know a Pennsylvania State Police

7    major by the name of Dewire?

8    A.      Yes, I do, sir.

9    Q.      Do you have a high opinion of

10   Mr. Dewire?

11   A.      Yes.

12   Q.      I can tell you he has a high

13   opinion of you.  And how long have

14   you known Mr. Dewire?

15   A.      Probably around ten years.  I

16   mean, I've known of him for 30 some

17   years, but I've known him and worked

18   intermittently with him from 1993 to

19   2002.

20   Q.      Okay, sir.  And around the

21   time complained of in the complaint,

22   what was Mr. Dewire doing?  I mean,

23   what position did he hold for the

24   Pennsylvania State Police?

25              ATTORNEY CHRISTIE:

85

1              Counsel, just for my

2    clarity, which complaint?  Are

3    you still on the museum

4    complaint or are you talking

5    about your client's complaint?

6              ATTORNEY BAILEY:

7              No.  I have a few more

8    questions.  My client is

9    helping me put some things

10   together then I'll come back

11   to that.  Right now, I'm

12   sorry, usually I tell you when

13   I'm shifting.  I'm going to be

14   asking some questions about a

15   challenge to Mr. Ober's

16   fitness for duty.  So I'm in a

17   different category now.

18             ATTORNEY CHRISTIE:

19             So you need to know

20   Major Dewire's whatever, ---

21             ATTORNEY BAILEY:

22             No, no, no, no.

23             ATTORNEY CHRISTIE:

24             --- activities at the

25   time.  When you say of the

86

1          filing of the complaint, are

2          you talking about this lawsuit

3          or back when he had the

4          supervisory inquiry?

5                   ATTORNEY BAILEY:

6                   No, no.  Your question

7          is very well taken and let me

8          clarify.

9                   ATTORNEY CHRISTIE:

10                  Thank you.

11                  ATTORNEY BAILEY:

12                  Yes.  Certainly.

13    BY ATTORNEY BAILEY:

14    Q.      Counsel is quite right.  That

15    was not a very clear transition.  Let

16    me see if I can help.  When Mr., I'll

17    give you a little author, so you know

18    where I'm coming from, when Mr.

19    Dewire did his deposition, he made

20    mention of an inquiry by you about

21    Mr. Ober's fitness for duty.  I want

22    to ask you questions about that;

23    okay?

24    A.      Yes, sir.

25    Q.      Okay.  Did you ever, at any

87

1    point, talk to Mr. Dewire about Mr.

2    Ober's fitness for duty?

3    A.      No, sir.

4    Q.      Did you ever, at any time,

5    invite Mr. Dewire over to your office

6    to ask him about how Captain Ober was

7    getting along or performing his job?

8    A.      Not performing his job, about

9    how he was getting along, yes, sir.

10   Q.      And at that time, did you have

11   a Mr. Larry Walker with you?

12   A.      I believe so, sir.  Not with

13   me, in my office, sir, yes.

14   Q.      Well, where was Captain Ober

15   working at that time, Colonel?

16   A.      Liquor control enforcement.

17   Q.      And that's why you had Mr.

18   Dewire come over; right?

19   A.      Yes, sir.

20   Q.      Well, what caused you to make

21   the inquiry of Mr. Dewire?

22   A.      Let me first go back and say

23   that going back to the early '90s,

24   Captain Dewire --- I was a major,

25   Captain Dewire was a captain,

88

1   Lieutenant Ober was then, I believe,

2   a sergeant. And I'm sure your

3   clients told you, I'm responsible for

4   his promotions. I've certainly been

5   an advocate of his for many years and

6   helped him attain the rank he has. I

7   know that Major Dewire had a lot

8   confidence and support for Captain

9   Ober so I know they know each other

10   well. So now as it turns out, I'm a

11   colonel, Dewire's a major, Captain

12   Ober is under his command. I had

13   heard from the union, and it's

14   certainly probably pretty obvious

15   that Captain Ober was under a lot of

16   stress, he had filed grievances, he

17   was having attorney fees because he

18   was asking that that FOP, the PSTA

19   for money to help with his legal

20   fees. And that the union had

21   mentioned to me, a number of times,

22   you know, about Captain Ober's

23   plight, if you will, against the

24   Department. And in one of those

25   conversations it was mentioned, and

89

1  look, the guy is really under a lot

2  of stress, make sure, you know, you

3  don't have somebody that's going to

4  have some mental difficulties or some

5  problems.  And because of that, who

6  would know better and it would be

7  Major Dewire.  So yes, I had Major

8  Dewire in my office about it.

9  Q.      Who from the union, sir?  Who?

10  A.      It was Lou Lazarro (phonetic)

11  or Paul McCommons.

12  Q.      Paul who, sir?

13  A.      McCommons.

14  Q.      What did they say to you?  Try

15  to think back for a moment and be

16  more specific to what language they

17  used.

18  A.      That he was under stress.

19  Q.      I mean you no disrespect, ---

20  A.      Yes, sir.

21  Q.      --- but I have been privileged

22  since starting my civil rights

23  practice to represent a wide variety

24  of police officers in a wide variety

25  of situations and I'm proud of that.

90

1    And I have learned it may very well

2    be the most stressful occupation in

3    our country and it's taught me a lot

4    learning that.  What would be unique

5    about somebody telling you that a

6    police officer is under stress?  And

7    then we'll get to the reasons why he

8    was allegedly under stress.  What

9    else did they say?  I mean, I

10   understand they told you he was under

11   stress.  That's all they said?

12   A.      Yeah.  And they are the union.

13   That's putting someone on

14   notification.  And I can tell you

15   - - - .

16   Q.      No.  They're bound by - - - they

17   got a contract.  They're taking his

18   dues money to represent him and

19   you're telling me that this guy, Mr.

20   - - - I'm sorry, president of this

21   union, Pennsylvania State Trooper's

22   Association, that was Mr. Lazarro at

23   the time.  Now, you said - - - or Paul

24   McCommons.  Who does Mr. McCommons

25   work for?  I'm sure it wasn't Gary

91

1  Lightman called you up and told you

2  this.  But you say Paul McCommons.

3  Do you know who Paul McCommons is?

4  A.      He was the former president of

5  the PSTA, yes.

6  Q.      So it was either one of those

7  two?

8  A.      Yes.

9  Q.      You don't know which one ---?

10  A.      I think it was Lazarro.

11  Q.      I do, too, sir.  I think it is

12  because of the time frame.  That's

13  the reason why I don't know any other

14  reason.  Did he indicate that he had

15  any kind of personal interactions and

16  discussions with Mr. Ober?

17  A.      I don't recall whether he did

18  or not, sir.

19  Q.      Well, how many grievances did

20  Captain Ober file?  By the way, he

21  didn't lose them all; did he?

22  A.      I don't recall.

23  Q.      Well, I assume that members of

24  the union lose grievances every year?

25  A.      Well, there was a concern that

92

1   --- part of the discussions was that

2   he had put out around $17,000 out of

3   his own pocket for legal costs and

4   that was certainly very stressful in

5   a family situation.

6   Q.      Hey, it goes to show what my

7   clients go through all the time, my

8   police officer clients.  He's getting

9   off easy, he just doesn't know it.

10  Well, let me ask you something, at

11  some point, didn't the Department, in

12  a most unprecedented way, appeal one

13  of those grievance decisions?

14  A.      I don't recall, Mr. Bailey.

15  Q.      Well, who told Joanna Reynolds

16  to appeal?  Somebody had to give her

17  direction.

18  A.      I don't have any recollection

19  of what you're talking about, sir, so

20  I can't answer that question, quite

21  honestly.

22  Q.      Well, I'll dig it out before

23  this deposition is done.  I can

24  assure you of that.  Now, let's go

25  back to Mr. Lazarro.  Mr. Lazarro ---

93

1    now, you said Mr. --- in fairness to

2    you, you said Mr. Lazarro or Paul

3    McCommons, I think we've pretty much

4    been able to sort it out and it's Mr.

5    Lazarro.  Now, maybe this refreshes

6    your recollection.  What did Mr.

7    Lazarro say to you about his union

8    member?

9    A.      The union members have a lot

10   of stress and he felt a Departmental

11   responsibility to make sure that we

12   don't forget that he's under a lot of

13   stress, a compassion, if you will, a

14   caring.

15   Q.      Love in his heart for his

16   member.

17   A.      Let me tell you, obviously you

18   haven't dealt with PSTA.  Yeah, they

19   would often put us on notice.  You've

20   got a responsibility there and don't

21   forget it.  That's their job, Mr.

22   Bailey.

23   Q.      Did he indicate to you that he

24   was calling with Mr. Ober's

25   permission or did he talk to Gary

94

1   Lightman or anything like that?

2   A.       No, not at all.

3   Q.       Okay.  So he, on his own, at

4   least to the extent of your

5   knowledge, it may not have been, you

6   don't know who else he talked to, but

7   he gets on the telephone, he calls

8   you up and --- now, were you talking

9   about Darrell Ober that day?

10  A.       No.  We got over lists of

11  issues.  I mean, we would regularly

12  meet with the union and we would go

13  over a list of their concerns, if you

14  will.  And you said that --- on his

15  own.  Well, I don't know that he did

16  it on his own.  He did it on behalf

17  of his member, whether he talked to

18  his member or not first, I don't

19  know.

20  Q.       Do you applaud him for doing

21  that?

22  A.       Yeah, actually, I do.  I think

23  that's the union's role.  I can't say

24  I applaud him.  It's not usually

25  pleasant meetings with the folks, but

95

1  they're performing their role.

2  Q.     Well, I grew up in a union

3  family and I remember before they had

4  any contracts --- I admit, I'm

5  pro-unionization, but I share with

6  you.  I respect their advocacy, but

7  in this case the only thing we know

8  at this stage right now is Mr.

9  Lazarro calls you up and says that

10  Darrell is under a lot of stress.

11  Did he give you any details?

12  A.     No.  I mean, I recall that

13  there was a significant cash outlay

14  out of Captain Ober's pocket for

15  legal fees because he had been asking

16  for some support from --- it was

17  either the PSTA, the FOP or both and

18  they really felt up against it.

19  Q.     And that hadn't happened in

20  your 30 ---how many, ten years at the

21  State Police, had you ever heard that

22  kind of problem before?

23  A.     Sure.  Well, not that exact

24  kind of problem, but I've heard about

25  members having problems.  Member

·96·

1    assistant was one of the

2    organizational segments that came

3    under me when I was deputy of

4    administration.

5    Q.      What if Mr. Lazarro said he

6    was going to pitch in and give

7    Darrell some money or get somebody to

8    come in and help Darrell, his member

9    that he loved and he was going to

10   help to help him out.  Did he

11   indicate anything like that, Mr.

12   Lazarro; did he?

13   A.      He wouldn't indicate to me.

14   That's internal PSTA stuff.

15   Q.      Well, he told you he had to

16   put money out of --- talking about

17   the man's personal finances and his

18   personal situation and that he had

19   put money in.

20   A.      He wasn't there to tell me

21   what he was going to do.  He was

22   there to tell me I had a

23   responsibility to make sure Darrell

24   was okay.  You know, they have a side

25   letter of agreement about treatment

97

1    and wellness of members and things.

2    That's what he was there to put me on

3    notice for.

4    Q.    Hadn't Darrell, at that time,

5    now, your Counsel objects to these

6    words, one, but hadn't Darrell

7    benefited by a legal action which

8    resulted in the Pennsylvania State

9    Police backing off the transfer?

10   A.    He benefited because the

11   Commissioner backed off the transfer.

12   Q.    Out of --- I don't know.  You

13   were aware when Mr. Lazarro called

14   you that Darrell had transferred ---

15   that Darrell had succeeded at that

16   effort; right, because that's what

17   led to the $17,000 --- I mean, that's

18   what led to the spending of money?

19   A.    I don't recall at what stage

20   that telephone call --- or what

21   sequence that took place in, Mr.

22   Bailey.

23   Q.    Well, do you know when the

24   meeting with Mr. Dewire took place?

25   A.    No.

98

1    Q.      Do you know?

2    A.      I don't recall, sir, no.

3    Q.      And what actions did you take,

4    aside from after Mr. Lazarro called

5    you?

6    A.      You know, to sum it up for

7    you, and to be quite candid actually,

8    I felt that the union had put me on

9    notice.  When they put me on notice,

10   they put the Department on notice.

11   And hence, if we have an employee

12   that goes postal or something like

13   that, and that's not a good term to

14   use certainly, but the Department has

15   liability at that point.  And because

16   of that, you know, because of what

17   --- for liability issues, I felt a

18   reason to address it and secondly

19   from a compassionate point of view.

20   I've had members seek help from them

21   on many, many, many occasions.  I

22   mean, that was something that came

23   under me.  It was something I

24   believed in.  So that's why I had

25   Major Dewire in.

99

1    Q.      Okay.  What you knew at the

2    time was, that Mr. Lazarro told you

3    that Captain Ober was under stress.

4    A.      Uh-huh (yes).

5    Q.      And then he put out --- you

6    used the figure, $17,000, who knows.

7    He put out a lot of money in legal

8    fees and was looking for financial

9    help.  And Mr. Lazarro just made a

10   phone call.  He didn't write you a

11   letter?

12   A.      No.  And he may have done it

13   in person.  We may have been in my

14   office going over lists of issues

15   that he thought the Department should

16   make sure are covered.

17   Q.      Did you generate any internal

18   memos, because I sure didn't get any

19   discovery from you?  Did you ---?

20   A.      No.

21   Q.      Nothing?

22   A.      No.  Nor would I have.

23   Q.      You wouldn't have done that?

24   A.      No, sir.

25   Q.      Well, I mean the Department's

100

1   on notice.

2   A.      Right.

3   Q.      Here's what I'm saying,

4   Colonel.  It's real simple here.  I

5   get a phone call from the head of ---

6   I don't just get a phone call from a

7   shop steward somewhere.  I didn't get

8   a call from a bargaining agent or a

9   business agent, anything like that.

10  I get a call from the president of

11  the Pennsylvania State Trooper's

12  Association who wanted this fantastic

13  contract, politically active,

14  represent a fine group of people,

15  they call up and they put you on

16  notice, you don't even generate a

17  memo, not a note, nothing?

18  A.      Not at that point, no, sir.

19  Q.      Well, did you since then?

20  A.      What's that, sir?

21  Q.      Did you generate something

22  since then?

23  A.      No, sir.

24  Q.      But you felt the Department's

25  on notice?

101

1    A.      Uh-huh (yes).

2    Q.      So --- all right.

3    A.      Well, I'm on notice.

4    Q.      You're on notice, whatever.

5    You're on notice.

6    A.      If I get sued, the Department

7    gets sued; correct, vice versa?

8    Q.      The present Supreme Court, I

9    don't know.  Between the 11th

10   Amendment, that had to be it.

11   Another revolt in the streets before

12   we get our rights back, who knows.

13   But the point is, you get a telephone

14   call from Mr. Lazarro and you don't

15   make any notes, anything like that.

16   Where did you call Mr. Walker for?

17   A.      To ask him if he had had any

18   contact with Captain Ober that he

19   could tell me because there would be

20   the most contact.  He couldn't tell

21   me if he had any because it's so

22   confidential.

23   Q.      What would you call him for?

24   I mean, I understand all that.

25   A.      To ask him that.

102

1  Q.     To ask him if he had a contact

2  with Captain Ober to tell you, but

3  don't tell you what he said because

4  it's confidential.  I don't

5  understand.

6  A.     No.  I asked him if there was

7  any dealings he had with Captain Ober

8  that he could tell me.  And when you

9  said call him, you meant call him to

10  my office?

11  Q.     Whatever, call him on the

12  phone or call him in your office.  I

13  know he was in ---.

14  A.     Probably in my office.

15  Q.     Okay.  And what did he tell

16  you?

17  A.     To the best of my

18  recollection, he had no dealings with

19  Captain Ober that he could discuss

20  with me.

21  Q.     What did you do ---?

22  A.     Which I didn't infer as

23  meaning he did have contact with him.

24  Q.     I understand what you're

25  trying to say.

103

1   A.       All right.

2   Q.       Now, what did you do next?

3   A.       Well, as I recall, I had the

4   wire and Doctor Walker there.  I had

5   directed my attention mostly to Major

6   Dewire.

7   Q.       Sir, give me one second.

8                ATTORNEY BAILEY:

9                How much time do we got

10       left here?

11               VIDEOGRAPHER:

12               About 15 minutes.

13               ATTORNEY BAILEY:

14               About 15 minutes.  I am

15       going to make a suggestion

16       that we continue for about

17       another five, we're going to

18       have to change tapes and stuff

19       anyway, and then take

20       hopefully a brief 35 to

21       45-minute time for lunch.

22               ATTORNEY CHRISTIE:

23               And how much do you

24       think you have left,

25       Counselor, after lunch?

104

1          <u>ATTORNEY BAILEY:</u>

2               Well, I'm going to be

3      honest with you.  I did not

4      think that we were going to be

5      here at this time.  It's just

6      that there's so much

7      information that's coming out.

8      It's really hard to say.  I

9      would hope that I could finish

10      up in an additional hour, hour

11      and a half.  Okay?

12          <u>ATTORNEY CHRISTIE:</u>

13               Fine.

14   <u>BY ATTORNEY BAILEY:</u>

15   Q.     Sir, ---

16   A.     Yes, sir.

17   Q.     --- you had this meeting in

18   your office.  Now sir, do you

19   remember when that meeting was?

20   A.     No, sir, I do not.

21   Q.     Okay.  Don't you have any ---

22   I'm sorry.  Didn't you generate any

23   notes, memos, anything like that,

24   about this meeting?

25   A.     No.  And there's a reason for

105

1    that.

2    Q.      What's the reason?

3    A.      Well, the reason was, if

4    Captain Dewire had any concern or

5    anything about --- Major Dewire, if

6    he had any concern about Captain

7    Ober, I would have put it in writing,

8    but he thought everything was fine,

9    so I didn't think there was any

10   reason to put anything in writing

11   when it was okay.

12   Q.      Are you telling us that the

13   only thing involved in this entire

14   thing was a call came to you from Mr.

15   Lazarro?  You've already, I think,

16   answered in detail everything you

17   remember about that.  We don't have

18   to revisit that.  You then had a

19   conversation with Mr. Walker and you

20   believe that conversation took place

21   in your office so apparently you

22   asked him to come up to your office;

23   is that fair to say?

24   A.      Yeah.

25   Q.      All right.  And at the same

106

1    time, you asked Mr. Dewire to come to

2    your office?

3    A.        Yes, sir.

4    Q.        Do you remember if Mr. Walker

5    was there first and you talked with

6    him before Mr. Dewire got there or

7    maybe Mr. Dewire got there first.  Do

8    you remember who got there?

9    A.        I thought Doctor Walker was

10   there first.

11   Q.        Okay.  Do you remember if you

12   had a discussion with him before Mr.

13   Dewire came?

14   A.        I think I did.

15   Q.        Do you know whether Mr. Walker

16   made any notes or recordings or

17   anything like that?

18   A.        I don't know, sir.

19   Q.        Okay.  Sir, if I told you, and

20   I want your attorneys here to take

21   issue on this if they want to, but if

22   I told you that I distinctly

23   recollect Mr. Dewire feeling that the

24   meeting --- that he had a feeling,

25   that he got an impression that the

107

1   meeting was to indicate that there

2   was an implied threat or a threat

3   there of some type, do you have

4   anything that you can help us with

5   that you recollect, and that's very

6   clearly in his deposition, about the

7   meeting that took place between you

8   and Mr. Dewire and Mr. Walker that

9   could have been interpreted as a - - -

10  as some kind of a desire or artifist

11  to carry a message or an implied

12  threat of some type of Captain Ober?

13  A.    I can think of nothing, Mr.

14  Bailey, and it would really

15  disappoint me greatly in Major Dewire

16  if he took it that way, very much so,

17  sir.

18  Q.    I would invite you to review

19  the deposition and I believe if we go

20  to trial in this matter, which I'm

21  hopeful we will, that you review that

22  deposition because I think that he

23  did make comments.  I don't want to

24  represent them, you know,

25  specifically to you, but I did ask

108.

1   him that question and what his

2   impression was, it's an impression.

3   He never said that he expressed that

4   to you or to anyone else, but that

5   was his impression.  I would invite

6   you to review the deposition.  It

7   might be something important for you

8   to do, because I don't want to

9   misstate it, but I recollect

10  something of that sort.

11          Now, after the meeting was

12  over, the meeting that Mr. Dewire and

13  Mr. Walker --- well, first of all,

14  can you tell us what questions you

15  asked, what you asked Mr. Dewire?

16  A.      Well, first of all, let me say

17  that when you initially opened this

18  line of questioning you had

19  characterized it a fitness for duty.

20  Q.      Okay.

21  A       To me, that's not an accurate

22  term.  I mean, a fitness for duty

23  requires a triggering event.  There's

24  been no triggering event.  And I mean

25  a triggering event in terms of his

109

1    official duty and in terms of his
2    official performance.  There was
3    nothing like that.  The union made
4    their concern known to me.  And as
5    his supervisor, I asked Major Dewire,
6    how is the captain doing?  Do you see
7    any changes in behavior?  Is he okay?
8    Major Dewire told me, yes, he agreed.
9    He thought Captain Ober was under
10   stress.  He said to me that maybe he
11   wasn't as talkative as he used to be,
12   maybe he was holding things a little
13   closer, but that he and Captain Ober
14   had a good rapport and thought that
15   they had a good relationship and that
16   if there was any problems he would
17   know about it.  I asked Major Dewire,
18   please, keep a wire on it.  And, you
19   know, if there's anything you see,
20   you know, if he seems under stress,
21   get in touch with me or get in touch
22   with Doctor Walker or, you know,
23   encourage the captain to go to the
24   member's assistance program.  That
25   was the sum and substance of the

110

1    conversation, sir.

2    Q.     Colonel, given what you have

3    just told us, I would agree with you

4    that I don't find anything in the

5    words that you've represented here

6    being of a threatening nature, that I

7    can tell.  Do you have any idea if

8    you behaved or acted in a way or

9    anything else was said that you can

10   recollect that would have given Major

11   Dewire an impression, cause him to

12   walk away with an impression that

13   there was a --- that this had to do

14   with a threat of some type or a

15   message carrying thing of some type?

16   A.     I can only tell you, Mr.

17   Bailey, that I've heard from a lot of

18   people that I have some strange body

19   language.  And a lot of people read

20   me as being upset or displeased or a

21   lot of things.  And maybe that was

22   the way he read my body language.

23   All I can --- and I can't say I can

24   assure you, but I can say from my

25   heart that there was not a threat

111

1    there.   There was not only A, concern

2    and B, fulfillment of my obligation,

3    as I saw it.

4    Q.        I think we're going to have

5    --- I'll tell you what, I have a

6    couple little questions, and one last

7    thing.  Is this the normal procedure

8    you follow in this kind of situation?

9    A.        I have done that a number of

10   times, sir.

11   Q.        I tell you what, I have a

12   couple little questions, and it's not

13   going to hurt you to think about it.

14   I think because of the tape running

15   out, we ought to break maybe.  How

16   are you doing on tape over there?

17              VIDEOGRAPHER:

18              Okay.

19              ATTORNEY BAILEY:

20              Why don't we break at

21         this point.  Your clock --- I

22         know the camera clock is a

23         little bit slower there.  Your

24         clock says 12:11.  I'm going

25         to recommend that we reconvene

112

1          at 1:00, if no one objects.

2                    ATTORNEY CHRISTIE:

3                    Can we do so?

4    A.      Whatever we need to do, Ms.

5    Christie.

6                    ATTORNEY BAILEY:

7                    Okay.  I suggest that

8          we suspend at this time and

9          reconvene by your clock 1:00,

10         and whatever that thing says,

11         the camera.  What's the camera

12         time on there?

13                   VIDEOGRAPHER:

14                   12:02.

15                   ATTORNEY BAILEY:

16                   Why don't you go ahead

17         and suspend it.

18                   VIDEOGRAPHER:

19                   Suspending video at

20         12:02.

21   OFF VIDEOTAPE

22   SHORT BREAK TAKEN

23   ON VIDEOTAPE

24                   VIDEOGRAPHER:

25                   Video operations are

113

1    now on, April 15th.  The time

2    now is 1:10 p.m. camera time.

3              ATTORNEY BAILEY:

4         Okay.  Thank you very

5    much.  And we seem to be

6    chugging away here on this

7    audio.  Okay.

8    BY ATTORNEY BAILEY:

9    Q.        Colonel, let me just ask some

10   --- try to do a little bit of wrap-up

11   on the historic --- on the

12   Pennsylvania Historic Educational and

13   Memorial Centers, it's called.  I did

14   a little internet access work over

15   the noon hour over on lunch break

16   here.  The finance committee, are you

17   not the chairman of the finance

18   committee at least as of today?

19   A.        As of today, yes, sir, after

20   my retirement.

21   Q.        And I noticed that there's an

22   Earl Hoffman, Edward Cantalone, Kirk

23   Trate, Ernest Spittler.  Are any of

24   them active Pennsylvania State Police

25   officers?

114

1    A.      No, sir.

2    Q.      How about Frank Tulli, Jr.,

3    Dean Hooper, Curt Zimmerman, James

4    Boyd, Rodney Manning?

5    A.      Rodney Manning is, sir.

6    Q.      Now, Dean Hooper is a friend

7    of your family; isn't he not?

8    A.      No, sir.  He's my neighbor,

9    and he's an acquaintance.  I don't

10   know that I'd characterize him as a

11   friend, sir.

12   Q.      I'm sorry.

13   A.      He's my neighbor.  I know him

14   personally and professionally.  I

15   don't know if I'd apply the term

16   friend or not.

17   Q.      Well, he does significant

18   contracting with the Pennsylvania

19   State Police; doesn't he?

20   A.      I don't know that I'd

21   characterize it significant, but yes,

22   he has done contracts with the State

23   Police, sir.

24   Q.      Well, your bid amount is

25   $100,000?

115

1    A.       I don't know, sir.

2    Q.       Doesn't he have a number of

3    $80,000, $90,000 contracts, if you

4    know?

5    A.       I don't know, sir.

6    Q.       Do you work at Amp?

7    A.       He did, yes.

8    Q.       With your wife?

9    A.       I don't believe they worked

10   together --- at the same time

11   together, sir, no.

12   Q.       Sales committee, Frank

13   O'Rourke, Min Martin, Arthur Cronin,

14   Joseph Stabler, Joseph Kelly, Gary

15   Mysel, any of them Pennsylvania State

16   Policemen?

17   A.       Currently, active, no, sir.

18   Q.       Now, in the building

19   committee, David Bowser, Michael

20   Selgrath, David Davis, James Boyd and

21   Edward Cantalone appears again.  Any

22   of them active members of the

23   Pennsylvania State Police, if you

24   know?

25   A.       I do.  I just --- I forget the

116

1  list of names.  It was Michael

2  Selgrath, sir.

3  Q.    Artifacts committee, Matthew

4  Hunt, chairman, Arthur Cronin, David

5  Points, Marc Infantino, Kirk Trate,

6  William Grooms, James Hazen.  Any of

7  those members of the Pennsylvania

8  State Police?

9  A.    David Points.

10 Q.    And Simmers, PSP Liaison,

11 Captain Michael, I assume they are?

12 A.    He would not be a member of

13 any of the committees.  He's simply a

14 liaison between the Department and

15 the museum.

16 Q.    All right.  That's the --- I'm

17 sorry?

18 A.    I was just going to say that

19 before we went on break, we were

20 discussing that one issue that had to

21 deal with my meeting with Major

22 Dewire, and I just wanted to close

23 the loop on that with you.

24 Q.    Go ahead.

25 A.    One of your final statements

117

1  was to me, as I recall, was something
2  about and did I have any further
3  discussions with Major Dewire about
4  Captain Ober.  And I don't recall if
5  you had put that in the terms of
6  stress or not stress.  And I said no,
7  that I didn't.  I do recall having
8  one subsequent conversation with
9  Major Dewire about Captain Ober, but
10 it wasn't on the stress issue, sir.
11 Q.     Matter of fact, I don't think
12 --- you've signed on February 27th,
13 2001 a very, very highly
14 complimentary performance evaluation.
15 You signed off on it for Captain
16 Ober; didn't you?
17 A.     I don't recall doing it, but I
18 would think that I would have done
19 something like that.
20 Q.     Well, don't you review
21 performance ---?
22 A.     Yes, sir.  I'm just saying I
23 don't recall doing it.  I had a lot
24 of performance reviews that I signed
25 off at.

118

1    Q.      I've had --- you know, I've

2    done it in the past.  I've always

3    took them very seriously.  And I know

4    --- that's not a reflection on you.

5    A lot of people take them as

6    boilerplate, but I used to take them

7    very seriously and study them.  Do

8    you --- what was your methodology?

9    Did you try when you had the

10   opportunity to look at them and

11   consider them?

12   A.      I read every one of them, and

13   decided whether I concurred with the

14   Bureau director's evaluation or not.

15   Q.      If I told you that my best

16   recollection is --- my best

17   recollection now was that the

18   interview that you had with Mr.

19   Dewire and Mr. Walker occurred after

20   the amended complaint in this case

21   was filed, does that refresh your

22   recollection at all as to when that

23   discussion took place?

24   A.      No, sir, it does not.

25   Q.      But the one thing that you are

119

1  fairly certain of is that Mr. --- and

2  I've been saying it Lazario.  It's

3  not Lazario; is it, it's Lazarro?

4  A.      Lazarro.

5  Q.      Lazarro?

6  A.      Yes.

7  Q.      And Mr. Lazarro --- and I

8  would like to make a request that the

9  record be corrected where I've

10  mispronounced his name, if Counsel

11  does not object.

12                    ATTORNEY CHRISTIE:

13                    No objection.

14                    ATTORNEY BAILEY:

15                    Thank you.

16  BY ATTORNEY BAILEY:

17  Q.      And Mr. Lazarro called you.

18  But he called you, Colonel, you

19  didn't call him; right, about ---?

20  A.      And it may not have been a

21  phone call, as I said before, Mr.

22  Bailey.  It may have been a face-to-

23  face meeting in his office.  But that

24  is correct, I did not initiate the

25  issue.

120

1   Q.      And I remembered you saying

2   that it was initiated by Mr. Lazarro;

3   correct?

4   A.      Yes, sir.

5   Q.      Now, the issue of use of the

6   names, just so the record is clear,

7   on the --- I did an internet pull-up.

8   And I found that the end of the

9   Pennsylvania State Police Historical,

10  Educational and Memorial Center ---

11  and by the way, from the internet, I

12  got to it by starting by just

13  punching in Pennsylvania State

14  Police.  I wanted to see where it

15  went.  It says contributions to the

16  Pennsylvania State Police Center may

17  be made payable to, semicolon, PSP-

18  HEMC, and mailed to Pennsylvania

19  State Police Historical, Educational

20  and Memorial Center, 1746 East

21  Chocolate Avenue, Hershey, PA 17033-

22  1181.  Are there any facts known to

23  you that would indicate that that

24  information may not be accurate as it

25  appears on the internet?

121

1    A.     I have not looked on the

2    internet.  But the information you

3    gave me, as far as the name and the

4    address sounds accurate.

5    Q.     I also have a board of

6    directors.  I just want to rapidly go

7    through this.  It's not very long.

8    As of April 2002, board president,

9    Major William J. Regan.  Now, he's

10   retired, you told me?

11   A.     Yes, sir.

12   Q.     How about Matthew --- Major

13   Matthew Hunt, is he retired?

14   A.     Yes, sir.

15   Q.     How about Mr. David Bowser,

16   Sr.?

17   A.     Not a member of the Department

18   at any time.

19   Q.     Mr. Earl V. Hoffman, Jr.?

20   A.     Never a member of the

21   Department.

22   Q.     Captain Kirk R. Trate?

23   A.     Retired.

24   Q.     Captain Frank O'Rourke?

25   A.     Retired.

122

1    Q.        Corporal James Boyd?

2    A.        Retired.

3    Q.        Mr. Edward A. Cantalone was

4    not a member; right?

5    A.        Was a member for a couple of

6    years, many, many years ago.

7    Q.        Lieutenant Colonel Thomas

8    Coury?

9    A.        Retired.

10   Q.        Sergeant Joseph Stabler?

11   A.        Retired.

12   Q.        Dean Hooper, we've been over,

13   Cronin, Spittler has been mentioned.

14   The Honorable Lawrence Clark?

15   A.        Retired.

16   Q.        The Honorable Frank Tulli,

17   Jr., Pennsylvania House of

18   Representatives, was he a former

19   member?

20   A.        Never, no, sir.

21   Q.        And James J. Manganell?

22   A.        Never a member, sir.

23                   ATTORNEY BAILEY:

24             Now, Counsel, if you

25        want to put those in, they're

123

1    here.  Do you want to look at

2    this stuff?

3              ATTORNEY CHRISTIE:

4         What stuff?

5              ATTORNEY BAILEY:

6         These committee --- I

7    mean, it's off the internet.

8    I don't ---.

9              ATTORNEY CHRISTIE:

10        No.  I have no need to,

11   Counsel.

12             ATTORNEY BAILEY:

13        Okay.

14   BY ATTORNEY BAILEY:

15   Q.     Do you know when the complaint

16   in this case was filed?

17   A.     In this lawsuit?

18   Q.     Yes.

19   A.     No, sir, I don't.

20   Q.     If I told you I believe it was

21   on or about January 16th, 2001, would

22   that be roughly consistent with your

23   knowledge?

24   A.     Yeah.  I don't even have a

25   time frame on it, Mr. Bailey.  I

124

1  don't know, sir.

2  Q.    Well, the employee performance

3  review that I'm looking at here,

4  which is Captain Ober's, runs from

5  March 3, 2000 to --- I'm sorry, from

6  March 2000 to March 2001.  If you

7  want to look at it, that's fine.  But

8  do you have a recollection of at

9  least looking at or reviewing or

10  becoming aware of a performance

11  evaluation I suppose would have been

12  done by Major Dewire?

13  A.    Major Dewire would have done

14  it as his direct supervisor.  And the

15  next step in the reviewing process

16  after Major Dewire reviewed it would

17  be it would come to me for my review.

18  Q.    There's a date on here of

19  February 27th, 2001, with you signing

20  off on the same day, February 27th,

21  2001, saying you agree with the

22  comments --- strike that.  I'm sorry.

23  That's correct.

24      That you agree with the

25  comments, with this rating.  Do you

125

1    have any reason to believe that

2    that's not accurate?

3    A.      No, sir.

4    Q.      Now, you got a call --- you

5    have a recollection of receiving ---

6    does this help at all that you

7    received a call from Mr. Lazarro

8    prior to the 27th of February, 2001?

9    A.      No.  Because there would be no

10   connection between that document and

11   the call from Lazarro.

12   Q.      And so you would separate

13   those things out completely and that

14   sort of thing; right?

15   A.      Absolutely, sir.

16   Q.      Well, you're familiar --- are

17   you familiar with any of the comments

18   in this performance evaluation?

19   A.      No, sir.

20   Q.      Did you consider this

21   performance evaluation when you

22   called Mr. Dewire to talk about Mr.

23   Ober?

24   A.      No.  Because I ---.

25                ATTORNEY CHRISTIE:

126

1          Excuse me.  Which

2     conversation are we talking

3     about, the stress conversation

4     or the one other conversation

5     with Major Dewire that was not

6     about stress?

7               ATTORNEY BAILEY:

8               Well, obviously we

9     don't know what it was about,

10     so we'd be talking about the

11     one where Mr. Lazarro either

12     came personally or called for

13     the purpose of discussing

14     stress, that one.

15  A.     Would you restate your

16  question, sir?  I'm just unclear.

17  BY ATTORNEY BAILEY:

18  Q.     Yes.  Did you look at any of

19  Captain Ober's performance

20  evaluations when you contacted Mr.

21  Dewire to discuss the issue of

22  stress, which had extensively been

23  relayed to you by Mr. Lazarro?

24  A.     No, sir, I did not.  And the

25  reason for that is, as I had told you

127

1  earlier, I told you that the term

2  fitness for duty was not applicable

3  because that has to do with

4  performance and everything.  I did

5  not view that as a Department

6  performance-type issue.  I dealt it

7  as more of a personal private-type

8  issue.

9  Q.      Well, I understand it's ---

10  but I mean, it would have been

11  something that would have affected

12  his work habits; wouldn't it?

13  A.      It's what I asked Major Dewire

14  about.  It may or may not have.  I

15  don't know.

16  Q.      Can I ask why you wouldn't

17  just call Dewire up?  I'm not

18  questioning your methodology, and you

19  can certainly explain it.  But why

20  not call Mr. Dewire and simply say,

21  hey, does Ober have any problems or

22  ---?

23  A.      It's kind of sensitive.  I

24  don't think you do some of that stuff

25  over the phone, sir.

128

1    Q.      I agree with that.

2    A.      And it's something you don't

3    repeat outside of those doors.

4                    ATTORNEY BAILEY:

5                    Well, I want to thank

6            Mr. Ober, who kindly went to

7            retrieve something I forgot.

8            I had one note on there, and I

9            couldn't remember in my mind

10           what it was on this lousy

11           little scratch sheet of mine

12           here.  But I did find it.  And

13           I just remembered that I had

14           placed it there, and I

15           couldn't remember what it was.

16           Here I have it.

17   BY ATTORNEY BAILEY:

18   Q.      Do you have a recollection at

19   some point of taking a Mustang, which

20   had been taken possession of by the

21   Pennsylvania State Police, prior to

22   forfeiture, running around and using

23   it?  Did you ever do that?

24   A.      I used it, yes, sir.

25   Q.      All right.  Does that violate

129

1   any Pennsylvania State Police

2   regulations at the time?

3   A.      No, sir.

4   Q.      It doesn't?

5   A.      No, sir.

6   Q.      It was not Pennsylvania State

7   Police property, it was not

8   government property.  An action in

9   forfeiture runs against an in rem

10  action, in other words, it's against

11  a thing; right?  When you do an

12  action in --- are you familiar with

13  an forfeiture action?

14  A.      No, sir.

15  Q.      Well, is it fair to say that

16  when the government does a

17  forfeiture, it goes out and goes to

18  acquire a piece of property, it sues

19  the property, it goes after the

20  property; right?  You know that?

21  A.      Yes, sir.

22  Q.      Why would you take a piece of

23  property that did not belong to you

24  or to the Pennsylvania State Police

25  and run around in it or use it?

130

1   A.       A, I certainly don't agree

2   with your term, run around with it.

3   It was to show the commissioner and

4   to get some photos taken with the

5   vehicle.  And B, that car had been

6   turned over to the Pennsylvania State

7   Police.  And we still have that

8   vehicle, as well as another Mustang.

9   Q.       So eventually, it was subject

10  to a forfeiture proceeding?

11  A.       It was subject to forfeiture

12  before that, sir.  The State Police

13  never took possession of that car, to

14  my knowledge, until all the

15  forfeiture proceedings had been done,

16  and that vehicle was released to the

17  Pennsylvania State Police under

18  agreement, I would imagine from the

19  attorney general's office, but that's

20  legalese, and a question for the

21  Counsel here at some point.

22  Q.       Well, it's not legalese if the

23  vehicle was impounded and supposed to

24  be kept somewhere and ---?

25  A.       That was not the case, Mr.

131

1    Bailey.

2    Q.    Well, where was it --- who was

3    keeping it?

4    A.    When it was impounded?

5    Q.    Sure.  If you ---?

6    A.    Well, the State Police may

7    have had it during the time it was

8    impounded. I don't even know who

9    seized that vehicle.  Perhaps that

10   vehicle wasn't even seized by the

11   Pennsylvania State Police.  Maybe it

12   was seized by DEA or some DA's

13   office, but the final disposition of

14   that vehicle was given to the State

15   Police to use for community services

16   purposes.

17   Q.    It was?

18   A.    Yes, sir.

19   Q.    Who made that decision?

20   A.    That it was going to be used

21   for community services purposes?

22   Q.    Yes.

23   A.    The commissioner.  I recall

24   going to him and asking him to use

25   that vehicle for community services.

132

1    Q.      Have the Pennsylvania State

2    Police ever provided information to

3    any legislative committees about the

4    reasons and purposes of forfeiture

5    and responded to questions about the

6    abuse of forfeiture proceedings in

7    our country?

8    A.      I don't know, sir.

9    Q.      Where is that car today?

10   A.      It's at the State Police

11   Academy.

12   Q.      And the reason I got in ---

13   the reason I asked these questions is

14   it's my understanding that an

15   acquisition was made for some type of

16   display vehicle.  I started nosing

17   around to try to find out what this

18   display vehicle used by the

19   Pennsylvania State Police --- some

20   purchase was made for $20,000.  Maybe

21   I'm mistaken, but did you not okay

22   that?

23   A.      Purchase of what, sir?

24   Q.      Of a model of a car to be used

25   in community relations, little model

133

1  cars, cast iron cars. Did you ever

2  see these little cast iron models of

3  cars?

4  A.      Yes, sir.

5  Q.      Did you --- and I may be in

6  error here, Colonel, and off on a

7  tangent without even realizing it.

8  Did you ever play a role in

9  requesting or signing a contact or

10 having a contract drawn up where the

11 State Police would take $20,000 or so

12 of taxpayer money to purchase a model

13 --- a cast iron model of a car for

14 giveaways, it costs about $4 or $5,

15 if I remember correctly?

16 A.      No, sir. The Department never

17 entered into any project like that.

18 The museum had a project. That was

19 not had --- didn't have anything to

20 do with the State Police.

21 Q.      Okay. Let me go back then.

22 Was it the museum then that did this?

23 A.      Yes, sir.

24 Q.      And now, the museum that

25 you're talking is the Pennsylvania

135

1  A.      Somebody from the museum

2  project probably went up and took

3  pictures of the car to use to make

4  the model.  But ---.

5  Q.      I don't mean that.  I

6  understand that.  I don't --- I mean,

7  I would be with you.  I'm sure that's

8  no big deal.  Now, I'm talking about

9  the purchase or acquisition of the

10  model cars.  Do you know if anybody

11  ---?

12  A.      No, sir, not that I'm aware

13  of.

14  Q.      I may be mistaken ---.

15  A.      I could tell you that at one

16  point, the Department considered

17  purchasing some of those models from

18  the museum to use for community

19  services give-aways, but that did not

20  occur because once we looked at it,

21  that would have been a conflict

22  because you should go out on --- you

23  shouldn't sole source that.  That

24  should go out for competitive bid, et

25  cetera, et cetera.  And that was the

136

1   end of it.  So those --- the
2   Department, to my knowledge, never
3   even bought any of those vehicles to
4   use in community services as give-
5   aways.
6   Q.      What I'm looking at, Colonel,
7   so you know where I'm coming from
8   with this line of questioning when I
9   come up these things, it may seem ---
10  you know, it may not seem related, is
11  I'm trying to look for the standards
12  in cases where you know about a fact
13  situation appertaining to the
14  Pennsylvania State Police Museum or
15  appertaining to the acquisition of
16  memorabilia that --- you know, what
17  standards you set for investigating
18  someone or anyone.  My understanding
19  is that your view of what came to you
20  --- or your position, that what you
21  came to you about Darrell Ober
22  allegedly going out and acquiring or
23  trying to acquire memorabilia was
24  looked at simply in terms of somebody
25  communicated some substance of a

138

1    it.  I want to ask you about it.  It

2    was something you did on training

3    request.  Oh, yes.  Let me see if I

4    can go back through this poorly

5    equipped brain of mine and come up

6    with it.  Okay.  I'm thinking back in

7    terms of some previous questions we

8    had to a date, time, group sometime

9    in October, I believe, of 1999.  And

10   if I remember correctly, on or about

11   October 19, you had some testimony or

12   documentary evidence that indicates

13   that on or about October 19th, 1999,

14   Captain Darrell G. Ober makes a

15   request to go to a one-week training.

16   If I am not mistaken, he is told at

17   some point by you in a memo that you

18   drafted through --- I forget who the

19   individual was who had drafted it,

20   Mr. Einsel is the individual, and

21   that he was late in time.  Do you

22   remember that incident?

23   A.      No, sir, I don't.

24   Q.      Well, do you have a

25   recollection on November 1 of 1999,

139

1    signing a memo to Captain Ober

2    telling him that his request for

3    specialized training at Northwestern

4    University Traffic Institute was

5    received after the October 22nd

6    deadline, and that because his memo

7    wasn't received by you until October

8    28th, 1999 ---.  Before you go on,

9    let me tell you what this was about,

10   so I can bring you and Counsel up to

11   snuff, give you a little bit of an

12   offer here.  When I was looking

13   through these documents that were

14   offered to us as a result of our

15   document request, I found that a

16   little thing with a little squib in

17   the corner of it had to do with this

18   matter here, where a Becky Brown

19   signs this thing about the memo being

20   --- coming in from --- the request

21   coming in from Captain Ober with a

22   date of October 20.  Now, when your

23   memo comes back to Captain Ober

24   denying him, he's told that his memo

25   was untimely because it didn't arrive

140

1  until October 29 --- or I'm sorry,

2  sir, October 28th of 1999.  Now, we

3  know it was in the appropriate office

4  on October 20, the documents show

5  that.  Do you have any recollection

6  of sitting on something for a week to

7  either harm him or to skewer it a

8  little bit to hurt him or anything

9  like that?  Did you do anything like

10  that?

11 A.      No, sir.  And the information

12 you're providing to me now about his

13 training and everything is the first

14 I've heard of anything about any

15 training or --- that I can recall

16 about Captain Ober.

17              ATTORNEY CHRISTIE:

18              Counsel, can we just

19              --- excuse me, clarify it.

20              When you say Becky Brown, it's

21              my understanding works here,

22              and you say that would be in

23              the appropriate office, you

24              mean Becky Brown.  And when

25              you say his memo, do you mean

141

1    Colonel Coury's memo, because

2    I think you also indicated

3    that it was authored by and

4    initialed by Major Einsel?

5    Just to clarify, although I

6    think the witness already

7    answered the question, but

8    because the question contains

9    some confusing recitations in

10   it, I'm just looking for

11   clarification.

12            ATTORNEY BAILEY:

13        Sure.  To begin with,

14   my recollection --- we went

15   over these documents.  They

16   were exhibits.  And questions

17   were raised about them in a

18   number of prior depositions.

19   And that was the document

20   where there was the little

21   handwritten portion.  And I

22   had raised objections that it

23   was not included in the file,

24   that somebody had purged the

25   file of it, Lord knows who,

142

1    some forest sprite from
2    somewhere, but it had been ---
3    it was gone. It was out of
4    there. And so we asked about
5    that because it raised a very
6    cogent issue, you know, issues
7    having to do with adverse
8    employment actions. When I
9    researched this issue --- and
10   let me confer with my client
11   for a minute to make sure my
12   facts are right, because you
13   know one of the difficulties
14   with our system is that we
15   have to translate everything
16   through us lawyers. But the
17   fact is, as I recollect it,
18   it's common parlance, Darrell
19   goes in and makes a timely
20   request for training. My
21   understanding and what I've
22   learned over the years in
23   working on Pennsylvania State
24   Police cases, normally this
25   kind of thing would be

143

1    approved, it's a value to the

2    Pennsylvania State Police, a

3    value to him, a value to

4    everybody concerned.  It's

5    timely received on October

6    20th.

7        ATTORNEY CHRISTIE:

8        But where is it timely

9    received?  When you're saying

10   it's in the appropriate place

11   as Ms. Brown's --- whatever,

12   Ms. --- whatever you

13   researched, that she indicates

14   by that notation it's in the

15   right place, which I guess is

16   her place, on 10/20.  To my

17   understanding, Ms. Brown is in

18   text services at that point,

19   not in Colonel Coury's office

20   or in Major Einsel, acting for

21   Colonel Coury at that time

22   offices.

23       ATTORNEY BAILEY:

24       All right.  Her note

25   indicates it was forwarded to

144.

1    personnel on 10/20.

2              ATTORNEY CHRISTIE:

3              To personnel on 10/20?

4         ATTORNEY BAILEY:

5         Yes.

6         ATTORNEY CHRISTIE:

7         Okay.  Just for

8    clarity.

9         ATTORNEY BAILEY:

10        Well, it has to be

11   approved by Colonel Coury.

12   That's the only thing we know.

13   And we know that he's told

14   --- that Darrell is told that

15   --- you know, we had file

16   notes, which was taken --- as

17   I said, somehow it's missing

18   from the files that we were

19   given.

20        ATTORNEY CHRISTIE:

21        Although the response

22   to that memo was in the file,

23   which referenced that memo.

24        ATTORNEY BAILEY:

25        Well, the response

145

1    would have indicated that he

2    did not ---.

3                   ATTORNEY CHRISTIE:

4          So apparently the elf

5    didn't grab both of them.

6    They just took the memo, but

7    not the response to that.

8                   ATTORNEY BAILEY:

9          Well, the elf made a

10   number of errors in this case,

11   and very, very significant

12   ones, we think.  And that's

13   just one of them because it's

14   not the only case we have with

15   things being missed from the

16   file.  But whatever the forest

17   sprites did, schmutzig

18   Schweinhunds that they be, the

19   point is that they take this

20   stuff from out of the, you

21   know, files, wherever they

22   are.

23                   ATTORNEY CHRISTIE:

24         Do we have a question

25   on the table, by the way,

146

1      Counsel, before we engage in

2      this argument?

3          ATTORNEY BAILEY:

4          Yes, we do.  I'm just

5      giving you a little background

6      information as to the

7      deceiving little sneak,

8      whoever it might be.  Well,

9      here's what our indication is.

10     Darrell Ober goes and he sends

11     in a timely fashion a request.

12     He sends this request.  And

13     anyway, it's in timely.  I

14     think the deadline he's

15     supposed to have it in by is

16     the 22nd.  He files it by the

17     19th.  It goes to personnel on

18     the 20th, it's forwarded.

19     Okay.  Personnel receives it,

20     they send it out.

21         ATTORNEY CHRISTIE:

22         I thought you just said

23     that the text services

24     forwarded it to personnel on

25     the 20th.  And again, I'm just

147

1    recalling what you said.  I

2    don't have those documents in

3    front of me, nor does the

4    witness.

5              ATTORNEY BAILEY:

6              Well, anyway, all we

7    know is it took eight days to

8    get from personnel to Colonel

9    Coury.  And it would have been

10   --- you know, he could have

11   gone to the school, anyway.

12   But that's --- you know, he

13   was disallowed.  And from what

14   I can find --- and again, just

15   doing my little checking

16   around with folks, these kind

17   of things rarely --- I mean,

18   even if somehow laying in a

19   corner somewhere hidden or

20   forgotten or lost for eight

21   days, that these kind of

22   things aren't turned down

23   unless it's impossible to do

24   them.  In this case, a

25   technical date was adhered to.

148

1       And the information, we know

2       it got there in time.  My

3       question was simply going to

4       be, the documents clearly

5       establish what happened.  All

6       I was going to ask the Colonel

7       was if he remembers it.  And

8       if he did, whether it was ever

9       investigated.  I don't expect

10      him to say he put it in his

11      pocket for eight days, if

12      that's what you're asking me.

13             ATTORNEY CHRISTIE:

14          Okay.  If he remembers

15      what, though, getting the memo

16      ---?

17             ATTORNEY BAILEY:

18          If he remembers

19      anything about it, he would

20      know --- you know, in working

21      on this case, it ever came up

22      before him, you know, if he's

23      reviewed documents, has any

24      awareness of it, that sort of

25      thing.

149

1  A.      I do not have any recall of

2  Captain Ober putting in for training.

3  The only thing I would say to you is

4  you had said that typically these

5  types of training are approved.  I

6  don't know that that's the case

7  because I don't even know what type

8  of training we're talking about here.

9  Not all training is typically

10 reviewed --- or approved, rather.

11 BY ATTORNEY BAILEY:

12 Q.      I didn't mean that.  I didn't

13 mean that all training --- I meant

14 that in situations where schools or

15 trainings don't start, and there's

16 enough time to do them, that if

17 certainly when there's a reasonable

18 explanation that something either was

19 lost or waylaid through no fault of

20 the requestor, whether or not that

21 serves as the basis for getting rid

22 of it, you know, that's all.  And I

23 think you've pretty much answered it.

24 Colonel, I want to ask you just a few

25 questions about an internal affairs

150

1    division meeting dated October 12,

2    1999.  Do you have any recollection

3    of Major Conley either denying

4    Captain Ober an opportunity to attend

5    that meeting or were you aware of it?

6    A.    I don't recall that at all,

7    sir.

8    Q.    Do you have any recollection

9    of Colonel Conley, who probably would

10   have been a Major at that time, I'm

11   not sure, October 12 of '99, he would

12   have been a Major, I guess, at that

13   time.  Do you have a recollection of

14   Major Conley in October of 1999

15   discussing Captain Ober or any IAD

16   matter at all, any kind of meeting

17   with Captain Brown, incidentally, as

18   a go-between or somebody that was to

19   deliver information?

20   A.    I don't recall that, sir.

21   Q.    Now, do you know a Leonard

22   Washington?

23   A.    Yes, sir.

24   Q.    Did you ever have any

25   discussions with Leonard Washington

151

1    about Captain Ober and PEMA?

2    A.    I don't recall any, sir.

3    Q.    Did you ever have any

4    discussions with Captain Skurcis

5    (phonetic) --- I guess he's now a

6    Major?

7    A.    No.  He's still a Captain, as

8    far as I know.

9    Q.    Still a Captain, okay.  Did

10   you ever have any discussions with

11   Captain Skurcis about Darrell Ober?

12   A.    In relationship to anything

13   specific?

14   Q.    In relation to PEMA.

15   A.    Not that I can recall because

16   PEMA didn't fall under me.  So it's

17   not something that --- Captain Ober

18   was under my command, PEMA was not.

19   It was operation stuff, so ---.

20   Q.    But for somebody to be

21   detached to or to be available for

22   that duty would require your

23   permission; wouldn't it?

24   A.    No, sir.  It would require the

25   Commissioner's permission.  Well, it

152

1   depends on the nature.  I mean, if
2   one of the other deputates wanted a
3   member, usually that would go through
4   the Commissioner.  In other words, if
5   Deputy staff wanted Captain Ober
6   assigned to something, it would go to
7   the Commissioner, and the
8   Commissioner would say to me, you
9   know, you should be released, so on
10  and so forth.  So it depends on the
11  nature of it.  But for PEMA, PEMA
12  didn't come under me.
13  Q.      Here's my question.  It's a
14  little wee bit different.  Do you
15  have a recollection of anybody,
16  whether it was the Commissioner,
17  whether it was Mr. Dewire, whether it
18  was Mr. Washington, Koscelnak, Mr.
19  Koscelnak, anybody making a request
20  or an inquiry of you regarding
21  Darrell Ober and assignment to PEMA?
22  A.      No, sir.  I do not recall
23  anything to that nature.
24  Q.      But you see Colonel Waite, you
25  explain things.  And maybe you can

153

1    help me clarify it in my mind,

2    because I'm a little bit confused,

3    just a little bit confused.  If

4    somebody wanted --- let's say Darrell

5    Ober wants to serve on PEMA, and he's

6    out there working for Major Dewire?

7    A.      Right.

8    Q.      And let's say Major Dewire is

9    in favor of it, and let's say Mr.

10   Washington is in favor of it.  Okay?

11   A.      Yes.

12   Q.      The route that that request

13   would take is actually --- it would

14   actually go to the apex, to the

15   Commissioner before it came back to

16   you, from what you're telling us or

17   would it go to you first before it

18   got to the Commissioner?

19   A.      If Captain Ober put in a

20   request to serve, let's say, on PEMA,

21   it would go through Major Washington,

22   it would come to me, and then it

23   would either go over to Colonel

24   Westcott or Colonel --- well, I ended

25   up taking over operations, so it

154

1  would have been --- it would go to

2  the deputy of operations or to the

3  Commissioner.  It could go either

4  place.  But I couldn't approve it.  I

5  can't approve sending somebody to

6  PEMA when PEMA is not under me.  I

7  mean, I would have to go over to

8  deputy of operations and say ---.

9  Q.      I understand.

10  A.      Okay.

11  Q.      But you would make an initial

12  decision --- I mean, let's say if

13  ---?

14  A.      I would endorse it.

15  Q.      That's what I mean.  Let's say

16  this happens.  Let's go through the

17  scenario that you painted.  Ober says

18  I want to serve with PEMA.  Okay.  So

19  he checks with his Major, fine, good.

20  I'll recommend you or appoint you or

21  whatever.  Okay.  And that's Major

22  Dewire, let's say, or let's say he's

23  politicking for the position or

24  asking about it, however it happens.

25  Let's just say we're at this stage.

155

1   Mr. Washington plays a role here, I
2   guess, because he is part of the
3   administration of PEMA, as I
4   understand it; right?
5   A.      Yes.   Washington wasn't under
6   me at that time.
7   Q.      No, sir.
8   A.      Okay.
9   Q.      But you're around, checking,
10  you need somebody, I want to do this,
11  and --- you know, one of the logical
12  things you do, do you have a need,
13  and hey, if so, could I do that.   For
14  example, we heard from Captain
15  Skurcis about how he didn't want to
16  do it.   Okay.   We also heard from
17  Captain Ober that he wanted to do it.
18  So let's say we're at this stage, we
19  got Captain Ober wanting to do it,
20  making his desires and wishes known,
21  we got Mr. Washington, who is in
22  favor, we know that for a fact.
23  A.      Yes, sir.
24  Q.      And we have either Mr. Dewire
25  or, I believe, Mr. Koscelnak, I'm not

156

1    sure --- yeah, Major Dewire.  And

2    he's fine, it's okay with him.  You

3    seem to be testifying here today that

4    based on your recollection as you sit

5    here today, this thing never meets

6    --- never reached you?

7    A.      October of '99?  Is that the

8    time frame I believe you stated?

9    Q.      I may be --- let me check on

10   when you became director of office.

11   A.      July of 2000.

12   Q.      That's when this occurred.

13   I'm trying to figure out when it fits

14   in the box.  My understanding, sir,

15   is that this issue arises as a

16   request by Captain Ober sometime

17   around July of 2000.  And I think Mr.

18   Westcott is either leaving or about

19   to leave around that time?

20   A.      He left in July of 2000.

21   Q.      Usually you do this transition

22   thing.  I mean, I know the way you

23   fellows do it, you know, you sit down

24   and hey, what's hanging in the fire,

25   and you come in --- did you have one

157

1  of those hanging fire meetings with

2  Mr. Westcott?

3  A.      Yes.

4  Q.      Do you have a recollection of

5  Darrell Ober being mentioned during

6  that discussion?

7  A.      No.  I can recall discussion,

8  and it involved Colonel Westcott, and

9  I recall Darrell's name, and I recall

10 PEMA.  But I don't recall what or why

11 or anything like that because it just

12 didn't come under me.  It wasn't ---.

13 Q.      No.

14 A.      It didn't involve me, sir.

15 Q.      Well, that's what I'm trying

16 to pin down here.  And I know you're

17 not being evasive, it's just I'm not

18 being clear because I don't know the

19 system well enough.  But it would

20 involve you in the sense that you

21 would have to approve it because you

22 were technically his boss?

23 A.      Yes.  If somebody came and

24 asked me for me.

25 Q.      I understand that.  And that's

158

1   what I'm trying to decipher here.

2   I'm trying to find out what occurred

3   here because we already have quite a

4   bit of background on this.  The

5   bottom line is you remember some

6   discussion, but you don't remember

7   the details of the discussion with

8   then Lieutenant Westcott about it?

9   A.      Well, I could tell you that no

10  one ever came to me and asked me for

11  Captain Ober and for PEMA.

12  Q.      Now, to straighten out the

13  procedural line is that you're

14  presuming if someone had come to you

15  and asked you, you would have made

16  whatever the appropriate decision

17  would have been at the time?

18  A.      Yes.

19  Q.      You would have made that

20  decision.  Your best recollection is

21  that no one did come to you and ask?

22  A.      That's correct, sir.

23  Q.      That you can remember?

24  A.      I do not recall anyone coming

25  to me and asking me for my opinion or

159

1  asking for Captain Ober.

2  Q.      Did you have any --- a

3  recollection of any kind of meetings

4  or discussions at all where PEMA and

5  Ober were brought up either with the

6  Commissioner or in his presence?

7  A.      No, sir, I don't.

8  Q.      Okay.

9  A.      You know, if I could clarify

10  that chain of command issue because

11  ---.

12  Q.      Sure.

13  A.      We had me injected in this

14  whole thing and everything, so let's

15  leave the names out and just go with

16  positions.

17  Q.      All right.

18  A.      If Captain Ober was under

19  Major Dewire's command, that would

20  have been an operation.  So the

21  channel would have been Captain Ober

22  to director of Liquor Control

23  Enforcement, to the Deputy

24  Commissioner of Operations.  And ---.

25  Q.      Which was you at that time?

160

1   A.      No, it would have been ---.

2   Q.      Mr. Westcott?

3   A.      It depends on the time and

4   everything, that's right.

5   Q.      If it was March of 2000, it

6   would have been Mr. Westcott?

7   A.      Right.

8   Q.      If it was September of 2000,

9   it would have been you?

10  A.      It would have been me.

11  Q.      And this thing seems to be on

12  the cusp, we don't know where it is?

13  A.      Yes.

14  Q.      Remember when you and I had

15  been talking about the issues

16  surrounding Mr. Lazarro's call to you

17  and Captain Ober allegedly being

18  stressed or something of that sort?

19  A.      Yes, sir.

20  Q.      And you had commented about

21  grievances, that he had filed some

22  grievances?

23  A.      Yes.

24  Q.      And you more or less said it

25  just like that, as I recollect he had

161

1  filed some grievances?

2  A.      Yes.

3  Q.      Do you have a recollection of

4  how many grievances he filed?

5  A.      No, sir.

6  Q.      Do you have a ---?

7  A.      I'm sorry.  It may have, in

8  fact, been only one.  I don't recall.

9  Q.      Do you have a recollection of

10 whether or not these grievances

11 involved significant amounts of money

12 at the time?

13 A.      I don't recall.

14 Q.      Do you remember one concerning

15 a reimbursement request for a hotel

16 room with some FBI agents?

17 A.      Yes, I do.

18 Q.      Tell me what you remember

19 about that.

20 A.      I can recall that Captain Ober

21 had been on an assignment, where he

22 took --- on a day off, went to

23 Western Pennsylvania, rented a motel

24 room on a day off, and rented a motel

25 room.  And then subsequently, some

162

1    time after the date that this

2    transpired, meaning months and months

3    and months, retroactively went back

4    and submitted leave slips to show

5    himself on a working day that day,

6    and expenses to pay for a motel room.

7    Q.      Well, do you have a

8    recollection of whether or not he was

9    denied on that request --- it was a

10   request for reimbursement; right?

11   A.      Yes.

12   Q.      And do you know whether he was

13   denied?

14   A.      No, he was not denied.

15   Q.      He was not denied?

16   A.      He was not denied.

17   Q.      Then he didn't ---?

18   A.      You mean, originally he was

19   denied, yes.  I thought you meant

20   after the grievance procedure or lost

21   and damaged process is what it was,

22   actually.

23   Q.      Yes, sir.  I meant ---.

24   A.      Initially, he was denied.

25   Q.      Okay.  And your best

163

1  recollection of the facts that you

2  described, if he was on a --- why was

3  he allowed or why did he win that

4  grievance, if you know?

5  A.     I don't recall.  The board

6  ruled in his favor, and thought that

7  he should be --- that the Department

8  should pay for that.

9  Q.     And wasn't that the FBI

10 meeting where the information came up

11 that there might be somebody in the

12 Pennsylvania State Police involved

13 with Mr. Stanton or maybe someone in

14 the Governor's office?

15 A.     Yes, sir.

16 Q.     Was he denied the

17 reimbursement for that reason, out of

18 anger?

19 A.     No, sir.

20 Q.     Did the Commissioner play any

21 part in that denial?

22 A.     Not that I recall, sir.

23 Q.     Did you?

24 A.     Yes, sir.

25 Q.     Well, did the buck stop with

164

1  you on that occasion or did you

2  discuss it with the Commissioner?

3  A.    I don't recall discussing it

4  with the Commissioner, so I would say

5  the buck stopped with me.

6  Q.    Now, do you specifically

7  remember if you were the person who

8  denied that grievance or whether it

9  was someone below you who --- strike

10  that.

11       Did someone below you in the

12  chain of command recommend denying

13  that grievance before --- strike

14  that.

15       I'm sorry.  Let me unravel

16  this to myself.  Did anyone below you

17  in the chain of command deny the

18  reimbursement before it got to you?

19  A.    I believe the director of

20  Bureau of Professional

21  Responsibility.

22  Q.    And that was at that time

23  Major Conley; am I correct?

24  A.    Yes, sir.

25  Q.    Now, did you discuss that with

165

1    Major Conley?

2    A.       Yes, sir.

3    Q.       And Major Conley indicated

4    similarly, I think, during his

5    deposition that you folks discussed

6    it.  What were Major Conley's

7    objections to that request for

8    reimbursement?

9    A.       That it was done so far after

10   the fact, that Captain Ober had been

11   a member of his command, and gone out

12   on a day off and rented a motel room

13   without ever submitting any reports

14   at that time or making the Major

15   aware of it.  And that's compounded

16   by the fact that many, many months

17   afterwards, now he submits

18   correspondence, paperwork to change

19   that from a day off to a working day,

20   and to have this motel room that was

21   put on his --- probably his personal

22   credit card, I don't recall how.  But

23   to be reimbursed for that.

24   Q.       But, sir, didn't he have ---

25   whether you folks agree --- I've

166

1   already had the discussion with you,

2   there's no reason to visit it, about

3   chain of command and targets and who

4   you share information with.  And I've

5   questioned you extensively on that.

6   I don't want to revisit that.

7   There's no need for us to.  But do

8   you remember my asking you those

9   kinds of questions?

10  A.      Yes, sir.

11  Q.      Let's keep those in the back

12  of your mind for a moment while I ask

13  these follow-up questions.  Given

14  that background, those questions and

15  what we know now, didn't Captain Ober

16  have a good reason for not submitting

17  the reimbursement request right away?

18  In other words, there was a method to

19  what he was doing, there was a reason

20  for it; was there not?

21  A.      Not in my mind.

22  Q.      Well, we know that.  And I'm

23  sure you already disagree with the

24  arbitration panel or arbiter or

25  whoever it was decided, I don't know

167

1    how far it got there.  But

2    eventually, he prevailed with the

3    --- got the reimbursement; am I

4    correct?

5    A.      Yes, sir.

6    Q.      So somebody respectfully

7    disagreed with your analysis of that;

8    correct?

9    A.      Yes, sir.

10   Q.      And in public administration,

11   that happens every day; right?

12   A.      Absolutely.

13   Q.      You win some, you lose some;

14   right?

15   A.      Yes, sir.

16   Q.      Now, even knowing what we know

17   today, does it still bother you or

18   offend you that Mr. Ober won that

19   reimbursement?  I know you still feel

20   he shouldn't have won it, I'm sure.

21   You do feel he should not have gotten

22   the reimbursement?

23   A.      That's correct.  I do feel

24   that way.

25   Q.      What's the reasoning?

168

1    A.       What's the reasoning?

2    Q.       Knowing what you know now,

3    what's the reason?

4    A.       That it was put in for after

5    the fact, I think, that it's improper

6    that a member put in for a vacation

7    day, go out and do department work,

8    pay for it himself, and two years

9    down the --- well, scratch that, not

10   two years, but considerably later put

11   in for reimbursement.

12   Q.       Right.

13   A.       What would have happened ---

14   and this is just rhetorical.  What

15   would have happened that day if

16   Captain Ober on his day off gets

17   involved in a crash on the turnpike?

18   Is he going to call the Department

19   and say, hey, I activated myself, and

20   now I want Workmen's Compensation, I

21   want compensated.  Where would the

22   buck stop?  In other words, after

23   this retroactive submission for

24   annual leave and reimbursement, could

25   he have also put in documentation

169

1    saying, oh, by the way, I had

2    overtime that day, and I should have

3    had overtime.  I have a problem with

4    the length of time that elapsed is

5    one of the big issues with me.

6    Q.      Isn't it fair to say that you

7    still disagree with Captain Ober, in

8    that you feel originally he should

9    have gone to Major Conley and

10   reported what the FBI had indicated

11   to him; right?

12   A.      I thought he should have

13   reported it, yes.

14   Q.      And if not to Major Conley, if

15   he had some reason for that, he

16   should have to Major Hickes or

17   Colonel Hickes at that time, he

18   should have gone up --- it would have

19   been more appropriate, in fact, to go

20   to you than to Colonel Hickes?

21   A.      It should have been within his

22   chain of command.

23   Q.      And isn't it fair to say that

24   the justification that Captain Ober

25   had provided was that given his view

170

1    of the FBI role and his view of what

2    he needed to do, his responsibilities

3    --- we know that you disagree with

4    that, but given his view of those

5    things, it was consistent that he

6    would not put in that request for

7    reimbursement at that time.  And it

8    was consistent with his view, however

9    erroneous it may have been, in your

10   eyes, that, you know, going out there

11   and renting a room and that sort of

12   thing was consistent with what he

13   felt he had to do to keep that

14   situation hidden, as it were, on

15   Colonel Hickes' orders?

16                    ATTORNEY CHRISTIE:

17                    Objection as to form.

18   BY ATTORNEY BAILEY:

19   Q.       You can respond, sir.

20   A.       It may have been consistent

21   with what Captain Ober thought he

22   should do.  But what Captain Ober

23   thought he should do does not mean

24   that because he thought it was

25   consistent that it should become

171

1   automatically consistent with me.  I

2   don't think it followed Department

3   rules and regulations, which doesn't

4   have any impact on what, you know,

5   Captain Ober thought was consistent.

6   I'm not alleging that there was any

7   malice or forethought or any contempt

8   in his heart when he did all this.

9   It simply didn't follow the fact that

10  we would retroactively put somebody

11  back on a day off and pay them back

12  wages for something that occurred so

13  long ago.

14  Q.     As far as that trip out there,

15  wasn't he at that time under Colonel

16  Hickes' orders not to tell anyone?

17  A.     I didn't know that.  He was

18  actually under my command.  I mean,

19  he was detached to --- I don't recall

20  what status he was.  But I think on

21  the record, he was assigned to DPR.

22  He was under my authority.  I never

23  heard that Colonel Hickes approved

24  that until much, much after the fact,

25  after I said it shouldn't be

172

```
 1   reimbursed.  And, in fact, only
 2   learned that recently, actually.
 3   Q.      Well, how could Captain Ober
 4   have followed Colonel Hickes' orders,
 5   which certainly affected Colonel
 6   Evanko and you, if he had --- how
 7   could Captain Ober have --- a short
 8   question form is very simply, how
 9   could Captain Ober have obeyed
10   Lieutenant Colonel Hickes and made
11   the request for reimbursement the day
12   after it happened?  How could he have
13   done that?
14   A.      I didn't know that Captain
15   Ober had discussed with Colonel
16   Hickes getting a motel room, putting
17   in for a day off and taking his own
18   personal car.  I didn't know that any
19   of that conversation ever occurred
20   until recently.  And when I concurred
21   with Colonel --- when I concurred
22   with Major Conley about denying the
23   request for reimbursement, I was
24   unaware that that had previously been
25   approved by Major --- or approved by
```

173

1    Colonel Hickes or anything like that.

2    Q.      You knew on or about the 12th

3    of May about Colonel Hickes' orders

4    to --- Colonel Hickes' orders to

5    Captain Ober?

6    A.      That's correct.  But that

7    doesn't --- I did not know on that

8    day that Captain Ober had discussed

9    getting a motel room, using his

10   personal car, retroactively putting

11   in for any of that stuff.

12   Q.      You're missing my question

13   because I'm not making it clear.  My

14   question really has nothing to do

15   with any of the detailed discussions

16   that Captain Ober may or may not have

17   had with Colonel Hickes.  My question

18   very, very simply is isn't it a very,

19   very simple --- you're quite an

20   articulate, intelligent gentleman.

21   It's a simple deduction that if

22   Captain Ober is following the orders

23   of Colonel Hickes, he can't go turn

24   in that reimbursement in a timely

25   fashion, he can't do that and follow

174

1   and respect Colonel Hickes' orders,

2   it's impossible.  So it doesn't

3   matter whether there's any detailed

4   discussion or approval or not.  When

5   Captain Ober turns this thing in, it

6   has to be after the fact in order to

7   honor what he --- you believe he did

8   erroneously, which was bypass his

9   chain of command, and listen to the

10  orders of Colonel Hickes, which you

11  certainly don't question that.  So,

12  you know, what was he supposed to do?

13  He's between a rock and a hard place.

14  He can't win with your analysis.

15  A.      Colonel Hickes' orders to

16  Captain Ober was not to divulge the

17  nature of the ongoing investigation.

18  Colonel Hickes' orders to Captain

19  Ober was not to go out and put in for

20  a day off, not to go out and rent a

21  motel room, I mean, with the FBI.

22  Certainly, there was an alternative

23  to Captain Ober's method.  He could

24  have said to Major Conley, I'd like

25  to check the Western Offices of

175

1    Internal Affairs on a certain day,
2    and he could have went out and met
3    with the FBI in their office.  The
4    issue is the day off and the issue is
5    the motel room and the retroactive
6    request for payment.
7    Q.      Do you have any information to
8    indicate that Captain --- and if so,
9    state it for the record, because I
10   can't find a smidgen, any information
11   at all that would indicate that
12   Captain Ober did anything other than
13   go out and do day off, day on,
14   Pennsylvania State Police business
15   and meet with the FBI?
16   A.      That's exactly the point.
17   That's correct.  There is no other
18   information.  So when you're acting
19   in the interest --- if you're
20   performing Commonwealth business,
21   then you should do it on Commonwealth
22   time in a Commonwealth vehicle.
23   Q.      Well, apparently he did --- or
24   at least somebody decided that he
25   did, and he was reimbursed.  And we

176

1  understand that you very respectfully

2  and strongly disagree with that; is

3  that correct?

4  A.      Yes, sir.

5  Q.      And you still do?

6  A.      Yes, sir.

7  Q.      Now, did you --- are you the

8  person that asked that the binding

9  decision of the Special Arbitration

10  Committee be appealed, challenged?

11  Were you the one that did that or was

12  that Commissioner Evanko?  Because

13  somebody directed your attorneys to

14  do that, and I want to know how

15  directed --- because I cannot

16  conceive of Joanna Reynolds doing

17  that without being directed to do it.

18  So I'd like to know who did.  It was

19  either you or it was Colonel Evanko?

20  A.      The appeal of what, sir?

21  Q.      If I understand --- my

22  understanding is that your lawyers

23  were --- my understanding is that

24  Colonel Hickes had approved this

25  thing, the reimbursement, at some

177

1  point?

2  A.      Yes.

3  Q.      My understanding is that it

4  then became disapproved at some

5  point; is that correct?

6  A.      Yes.

7  Q.      And my understanding is that

8  there was a --- you have an agreement

9  with the Pennsylvania State Troopers

10 Association where there's some kind

11 of a binding arbitration committee,

12 something of that sort?

13 A.      Yes.

14 Q.      And it is my understanding

15 that Captain Ober prevailed there?

16 A.      Yes.

17 Q.      And it is my --- maybe I'm

18 wrong.  I don't know, sir.  Help me

19 if I am.  It is my understanding that

20 that decision was appealed somewhere

21 or challenged?

22 A.      I don't recall that there is

23 an appeal process for that, but I can

24 certainly tell you that, yes, I

25 disagreed with the position.  And

178

1    yes, I think I had a discussion with

2    the Office of Administration, Bill

3    Mullen, wanting to know is there an

4    appeal process that --- can this be

5    appealed, so on and so forth.

6    Q.       I'm not saying anything can't

7    be appealed.  I once sued a Judge.

8    And by the time I got to the Supreme

9    Court of the United States, myself

10   and the Supreme Court --- I mean, if

11   you want to talk about strong

12   feelings, believe it or not, I more

13   strongly disagreed with them than you

14   do with this decision over his

15   reimbursement.  Okay.  But I lost.

16   There's nothing I can do about it.  I

17   lost.  Now, I appealed that, and I

18   appealed it right up on the line.

19   And finally, the Supreme Court said

20   to me, hey, Mr. Bailey, we're not

21   going to listen to this.  I appealed

22   it to the Third Circuit, and they

23   tell me this Judge was acting in a

24   judicial capacity.  I don't agree.

25   But hey, I'm nothing but a --- I

179

1    mean, Judges tell me to do things, I
2    do them.  You know, I'm like anybody
3    else.  Now, in this case, what I'm
4    talking about is --- let's talk about
5    what Mr. Mullen told you.  Did Mr.
6    Mullen tell you --- what was the
7    advisability of appealing this thing
8    to Mr. Mullen?  What did he say?
9    A.      I don't recall.  But I don't
10   think it was appealable.  I thought
11   the findings of that board were
12   final.  But again, I'm acting on
13   recollection here.
14   Q.      Well, you're not a lawyer.
15   And I'm not --- these folks probably
16   know more about this stuff than I do.
17   It was my understanding that's the
18   case.  All I'm asking you is was this
19   appealed just to harass and
20   intimidate Mr. Ober?  If it was not,
21   it was not.  There was a basis for
22   the appeal.  Can you tell me who told
23   you there was, except for discussion
24   you might have had with Joanna or
25   Barbara or somebody?

180

1    A.      Well, the question you asked

2    me was two parts.  The first part

3    - - -.

4    Q.      Well, let me go back.  I'm

5    sorry.  You're absolutely right, it

6    was complex.  Mr. Mullen tells you,

7    hey, this is - - - I mean, the word

8    binding means something.  This is

9    binding arbitration.  This is the

10   kind of thing, you sit down there,

11   you go and you grieve, and that's the

12   way it goes.  Now, unless it violated

13   some incredibly, you know,

14   unreasonable and outlandish thing,

15   it's my understanding is, hey, I'm

16   sorry, you lose, that's the end of

17   it.  You know, you'd have filed

18   sanctions and come up with - - - going

19   back to his billfold bag for that

20   $1,700.  But the point is, you appeal

21   it.  And Mr. Mullen tells you it's

22   not appealable.  But who told your

23   lawyers to appeal, you or Mr. Evanko?

24   A.      I don't - - - I may have had

25   conversations with the attorney about

181

1   appealing it.  I don't know.  But

2   your first question was, was it done

3   to --- and I forget the --- to punish

4   or it had something to do with

5   Captain Ober?

6   Q.      Yes.  Let me go back to that.

7   And I'll give you a fair chance ---

8   and I apologize to you.  I did.

9   A.      I'd like to answer that.

10  Q.      Yes, sir.  I had asked you if

11  the decision to appeal was made to

12  punish or harass or intimidate

13  Captain Ober?

14  A.      It was not.  And my position

15  was very simply, it really had little

16  to do with Captain Ober, in fact.  In

17  the preparation for that process, if

18  you will, the fact finder, I can't

19  say arbiter, but the advocate for the

20  Commonwealth never came to me and

21  asked me why I wanted to deny it.

22  Q.      Is that Mr. Grab?

23  A.      It was Mr. Grab.  He, in fact,

24  went to Colonel Hickes and asked

25  Colonel Hickes why he approved it,

182

1    and so on and so forth.  But no one

2    ever came to me and said, why did you

3    deny it or no one ever said to Major

4    Conley, to my knowledge, why did you

5    deny it.  So in my perception, the

6    management side of the Department,

7    meaning me and Major Conley, never

8    had an opportunity to be heard.  So

9    the facts of why it was retroactively

10   approved were heard, Colonel Hickes'

11   position.  But the person that

12   actually denied the retroactive claim

13   was never asked why.  So it really

14   had little, if anything, to do with

15   Captain Ober.

16                ATTORNEY BAILEY:

17            I'm going to take a

18        break for --- it will just be

19        30 seconds.  No reason to shut

20        down the equipment.

21   SHORT BREAK TAKEN

22   BY ATTORNEY BAILEY:

23   Q.      Okay.  Did you ever discuss

24   the denial of the reimbursement?  I'm

25   not talking about the issue of

183

```
 1   appealability now.  I'm talking about
 2   the original denial of the
 3   reimbursement with the Commissioner.
 4   A.     I don't believe I did, no.
 5   Q.     Well, I have a document dated
 6   October 4th, 1999, time and
 7   attendance, Captain Darrell Ober.
 8   It's to Deputy Commissioner of
 9   Administration, T.K.C.  Do you know
10   who T.K.C. is?
11   A.     That is me, sir.
12   Q.     It says, attention director of
13   Bureau of Professional Responsibility
14   from Paul J. Evanko, Commissioner.
15   Do you recognize those initials?
16   A.     Yes, sir.
17   Q.     And it says correspondence
18   from Captain Ober, correspondence
19   from Major Hawthorne and Conley,
20   director.  And DPR, IAD, all that
21   kind of stuff.  General invoice,
22   reimbursement for Captain Ober.
23   Number one, I have conducted a full
24   and complete review of the
25   circumstances surrounding Captain
```

184

1    Ober's request.  Based on my review,

2    Captain Ober's requests are denied.

3    Therefore, the amount of $83.74 shall

4    not be provided to Captain Ober.

5    Additionally, dated March 15th, 1999,

6    changed annual leave.  Please notify

7    Captain Ober and provide him a copy

8    of this correspondence.  Do you have

9    any recollection of that?

10                   ATTORNEY CHRISTIE:

11                   Can we mark that ---

12           could we mark that, wherever

13           we are, 43?

14                   ATTORNEY BAILEY:

15                   Sure.

16                   ATTORNEY CHRISTIE:

17                   And make copies.

18   A.      I don't recall it, sir.

19   BY ATTORNEY BAILEY:

20   Q.      You don't recall it?

21   A.      No.

22   Q.      Well, then I'll just have it

23   admitted and have it --- if you don't

24   recall it, you don't recall it.  But

25   we're going to leave it there with

185

1   your ---.

            ATTORNEY BAILEY:

3           I need a copy of that,

4       though, Mr. Brown, when you

5       get a chance.

            ATTORNEY BROWN:

7           Okay.

8   BY ATTORNEY BAILEY:

9   Q.      Now, I don't know that you've

10  ever seen this.  But just tell me if

11  you've ever seen it.

            ATTORNEY BAILEY:

13          I'd like to have it

14      marked, too.

15  BY ATTORNEY BAILEY:

16  Q.      Tell me if you've ever seen

17  that.  Can you identify it for us,

18  please?

19  A.      It's a time and attendance ---

20  it's form 501.  It's correspondence

21  dated July 1st, 1999, subject time

22  and attendance, to Captain Darrell G.

23  Ober, from Major Hawthorne and

24  Conley.  To the best of my

25  recollection, I have not seen this

186

1   document before.  And I note on the

2   bottom that it does not a cc going to

3   the deputy commission of

4   administration.

5                    ATTORNEY CHRISTIE:

6                    Do you want that marked

7             Four?

8                    (Deposition Coury

9                    Exhibit Four marked for

10                   identification.)

11                   ATTORNEY BAILEY:

12                   Go ahead and mark it,

13            yes.

14   BY ATTORNEY BAILEY:

15   Q.        Now, I don't know if any of

16   this refreshes your recollection at

17   all in any way.  Given the fact that

18   you don't remember, it probably

19   doesn't.  But let me ask.  Did

20   Colonel Evanko participate in making

21   the decision to appeal the binding

22   arbitration decision?

23   A.        Based on my recollection, I

24   only recall myself being involved in

25   that process.  I don't recall having

187

1    any discussions with the Commissioner

2    about it.  I, in fact, am the one who

3    had taken exception with it for the

4    reasons I stated.  I do not recall

5    the Commissioner playing a role in

6    that.

7                    ATTORNEY BAILEY:

8                    Have you ever seen this

9         document, Counsel?

10                    ATTORNEY CHRISTIE:

11                    Do you want me to mark

12        this Coury Four, Counsel?

13                    ATTORNEY BAILEY:

14                    Please.  Whatever the

15        number is.

16                    ATTORNEY CHRISTIE:

17                    Strike that.  It's

18        Coury Five.  Sorry.

19                    (Deposition Coury

20                    Exhibit Five marked for

21                    identification.)

22   A.      I do not recall seeing that,

23   Mr. Bailey.

24   BY ATTORNEY BAILEY:

25   Q.      Okay.  Do you have a

188

1  recollection of an investigation of

2  an individual named Stackhouse?

3  A.      Yes, sir.

4  Q.      Do you have a recollection of

5  who ordered Captain Skurcis to

6  retrieve a copy of the Stackhouse

7  investigation from Ober?

8  A.      Retrieve it when, sir?

9  Q.      It would have been sometime in

10 December of 1999 by then Lieutenant

11 Brown?

12 A.      No, sir, I don't.

13 Q.      Do you have a recollection of

14 your ever giving Mr. Skurcis any

15 instructions that the Stackhouse

16 investigation was to be taken back

17 from --- or the copy of the

18 investigation was to be taken from

19 Captain Ober?

20 A.      I don't recall doing that,

21 sir.

22 Q.      Did you play any role in any

23 decision that would --- that directed

24 that Captain Ober was not to testify

25 in that investigation?

189

1    A.        None, sir.

2    Q.        Do you know whether Captain

3    Ober was the supervising investigator

4    --- supervising officer of the

5    Stackhouse investigation?

6    A.        For a while, he was, yes, sir.

7    Q.        Why was he changed, sir?

8    A.        I don't recall why or what

9    point it was changed, Mr. Bailey.

10   Q.        Is that unusual?

11   A.        I don't know that it's

12   unusual.  It rarely happens.  I mean,

13   I could see reasons why we would

14   change investigators in the

15   Stackhouse case as it relates to

16   Captain Ober.  I just don't recall

17   --- I just don't recall when or by

18   whom.

19   Q.        When was Captain Ober sent out

20   to Washington, ordered sent to

21   Washington?

22   A.        I don't recall.

23   Q.        Was it around December of '99,

24   January of ---?

25   A.        It would have been late '99,

190

1   early 2000.  I thought it was more

2   like early 2000.  But again, without

3   having documents in front of me, I do

4   not know.

5   Q.      Any discussions up in the

6   front office about getting rid of

7   Ober, sending him out to Washington,

8   how we can pay him back for his acts

9   of disloyalty to Colonel Evanko?

10  A.      Not that I'm aware of, sir.

11  None that I took part in.

12  Q.      So if Mr. Brown were called

13  under oath at some point and asked a

14  question as to his knowledge about

15  why Skurcis ordered the --- not

16  Skurcis ordered, why he was ordered

17  by Captain Skurcis to retrieve the

18  Stackhouse investigation, there are

19  no facts known to you --- should

20  Lieutenant Brown testify that,

21  indeed, Captain Skurcis told him to

22  get that investigation, there are no

23  facts that would indicate to you that

24  would indicate that you had any

25  knowledge that was going to occur; is

191

1  that right?  Is that what you're

2  telling us?

3  A.     No, sir.  You asked me if I

4  directed it to be done, I said no.

5  Q.     Well, what do you know about

6  it?

7  A.     I know that the Stackhouse

8  investigation was taking entirely too

9  long to complete, that at one point,

10 there was a little bit more of a

11 fishing expedition than I thought was

12 been called for, if you will.  And I

13 supported it, moving it onto another

14 investigator.

15 Q.     Who called you about that?

16 A.     I don't think anybody called

17 me about it.  I was aware of it

18 because I tracked the investigation.

19 Q.     You didn't give instructions

20 then or you did?  I'm confused.

21 A.     I don't know if I gave

22 instructions.  No, I don't believe I

23 gave instructions.  I certainly know

24 I concurred with a decision to change

25 investigators.

192

1  Q.      Who would have made that

2  decision?

3  A.      Major Conley would have made

4  that decision.  I'm sure Major Conley

5  and I had discussions about that

6  investigation running too long, there

7  were no new leads coming up on that

8  case, and it was time to put that

9  case to rest.

10  Q.      Well, you called Captain Ober

11  to talk to him about it; right?

12  A.      I didn't call Captain Ober and

13  talk to him.

14  Q.      Well, Major Conley did; right?

15  A.      I would assume that Major

16  Conley did.  I don't know that he did

17  or not.

18  Q.      Now, earlier I had asked you,

19  I think, in the first part of your

20  deposition --- I know that I had

21  asked you some questions.  And then

22  you testified that you transferred

23  people when it was required to meet

24  the needs of the organization?

25  A.      Yes.

193

1   Q.      And you had indicated that you
2   probably transferred more officers
3   than anyone else in the State Police
4   possibly.  Do you remember saying
5   that?
6   A.      What I meant was of the three
7   deputies, during our term of
8   administration, I had probably
9   recommended to the Commissioner more
10  replacements under my command than
11  the other two deputies had.
12  Q.      Well, other than Captain Ober,
13  who was transferred or who was an
14  attempted transfer done on more than
15  200 miles --- permanent transfer now,
16  against their will, not in
17  conjunction with a promotion?  Other
18  than Captain Ober, name me somebody
19  else.
20  A.      More than --- with the
21  qualifier more than 200 miles, I
22  can't think of anyone.
23  Q.      Now, do you remember what
24  happened with the Stackhouse
25  investigation, how was it resolved?

194

1   Do you remember what happened?

2   Without telling us --- I'm not asking

3   for any kind of confidential ---.

4   A.      It was unfounded.

5   Q.      And how long after --- well,

6   who was it given to --- was it given

7   to Captain Skurcis after Captain Ober

8   had it?

9   A.      I don't recall, sir.  I don't

10  know.

11  Q.      Well, do you know whether

12  somebody called Captain Ober and, you

13  know, gave him a talking to about how

14  long it was taking or gave him sort

15  of --- you know, maybe some kind of

16  even a verbal reprimand or advised

17  him of how he was being dilatory or

18  something like that?

19  A.      Not that I'm aware of.  And I

20  don't know why they would give him a

21  verbal reprimand.  It's not that it

22  was anything --- it wasn't a

23  violation of anything.  It wasn't

24  anything inappropriate, certainly.

25  It was just a difference of opinion.

195

1  Management thought this thing has got

2  to end sometime, it's got to be

3  pushed through and concluded.  You've

4  chased all the leads that are out

5  there.  Let's wrap it up and get it

6  done with.

7  Q.     Are you familiar with

8  Management Directive 525.4?

9  A.     I would have to see it, sir.

10  Q.     Well, if you know off the top

11  of your head, because I don't have a

12  copy of it here, I have a little note

13  here, management directive 525.4

14  issued by the Governor's office

15  establishes that temporary assignment

16  to --- it deals with temporary

17  assignments to higher classification

18  policy for state agencies.  Do you

19  know of such a policy?  In other

20  words, temporary assignment to fill

21  the shoes --- you know, an acting

22  director, that kind of thing?

23  A.     I'm familiar with the policy,

24  sir.

25  Q.     Sure.  And what are the ---

196

1   what guidance do you employ when
2   you're making a decision like that,
3   you know, the director is going to be
4   gone for 15 days, who do you put in,
5   who walks in those shoes for those 15
6   days?
7   A.      A number of different criteria
8   would play into that.  How many
9   people you have to choose from, what
10  their timing grade is, what their
11  time on the job is, what their
12  performance is, what their experience
13  is, how long they've been in that
14  bureau division.  There's many, many
15  factors that can come into play.
16  Q.      All right.  Well, let me just
17  read a few little things here that
18  I've asked my client to put together,
19  and let me see if I can verbalize it
20  as well as he could here.  It's when
21  a subordinate officer is assigned the
22  duties and responsibilities of acting
23  in the place of a superior officer.
24  It's my understanding --- these are
25  questions that I had asked, that they

197

1    --- do they receive additional

2    monetary compensation, A.  Do they

3    receive additional monetary

4    compensation?

5    A.      Only for when it's more than

6    five days in any calendar year.

7    Q.      Now, does such experience

8    afford that subordinate officer any

9    certain career growth and development

10   opportunities?

11   A.      Let me rephrase the first

12   question.  I think it's five days in

13   any calendar quarter.  I'm not ---

14   something like that.

15   Q.      Now, does the experience

16   afford that subordinate officer --- I

17   mean, is it a career plus kind of

18   thing?

19   A.      And I think it could be or it

20   couldn't be.  It depends.  I mean,

21   I've been acting many times myself,

22   and I never saw it as a career plus

23   for me.  I've never seen any real

24   benefit to it.  But in terms of

25   possibly experience or --- depends on

198

1   how the members view it.

2   Q.    Have you ever generated a memo

3   indicating the importance of rotating

4   acting duties among commanders,

5   stressing, quote, teaching a member

6   to be administratively prepared for

7   the next level, closed quote?

8   A.    I don't recall generating it.

9   It does sound familiar to me.

10   Q.    What would your reason --- if

11   you did that, what would your reason

12   for it be?

13   A.    Well, in fairness.  It's not

14   to help the member get ready for the

15   next step or anything.  It's to help

16   the member know the duties and

17   responsibilities of the

18   organizational segment that they work

19   in.

20   Q.    To teach people out there, so

21   they have a go at it, and an

22   opportunity to perform.  But it's

23   also for the good of the order; isn't

24   it?  Because it spreads out the

25   experience in case somebody needs to

199

1   assume duties for a superior; right?

2   A.      Well, it does keep everybody

3   on the same page within that bureau,

4   uniform leadership.

5   Q.      Now, wasn't Captain Ober under

6   your command when you were a director

7   of BPR?

8   A.      Yes.

9   Q.      Were there times when you

10  assigned Captain Ober to the acting

11  director's position on your behalf?

12  A.      Yes.

13  Q.      Now, administrative regulation

14  411 sets State Police policy for

15  naming individual for assignment out

16  of class; isn't that right?

17  A.      Yes.

18  Q.      And then do you remember the

19  question I had asked you about

20  management directive 525.4?

21  A.      Yes.

22  Q.      Okay.  Now, I have a note

23  here, both policies state the

24  personnel in the same pay rank or

25  classification or in the same pay

200

1   range shall be temporarily assigned

2   on a rotational basis when practical.

3   Is that also correct?

4   A.      Yes.

5   Q.      Okay.  Do you have a

6   recollection of reviewing with some

7   of your subordinates in your chain of

8   command, about the acting in place of

9   policy?

10  A.      No, sir.

11  Q.      Well, do you have any

12  recollection of becoming aware of how

13  Mr. Ober was treated in that regard

14  as compared to his colleagues?

15  A.      Well, in BPR and law under

16  command, Major Conley?  Is that what

17  you're asking me?

18  Q.      And then we're going to talk

19  about LCE?

20  A.      No.  I don't think Captain

21  Ober was under Major Conley that long

22  to really get a handle on that.

23  Q.      Right.  How about LCE?

24  A.      I don't know about LCE.

25  Q.      When a bureau director is

201

```
 1   going to appoint someone in their
 2   place, do they --- I'm sorry, sir.
 3   When you were a deputy Commissioner,
 4   did they consult with you about that?
 5   A.       Rarely.  I mean, probably
 6   50/50, half of them did and half of
 7   them didn't.
 8   Q.       You had no requirement that
 9   they do so?
10   A.       No, sir.
11   Q.       Did you ever indicate to
12   anybody that Captain Ober should not
13   participate in an acting capacity?
14   A.       Never, sir.
15   Q.       Did you have any request from
16   any subordinate to discuss with you
17   whether Ober should be appointed in
18   an active capacity?
19   A.       No, sir.
20   Q.       Did you ever have a discussion
21   with Major Dewire about overacting in
22   a capacity as a replacement?
23   A.       No, sir, not about acting in a
24   capacity.  I was more along the lines
25   of promotional opportunities.
```

202

1    Q.      Tell us about those.

2    A.      Well, at some point, and I

3    would say it was around the time that

4    Major Koscelnek had a heart problem

5    and was getting a five-way bypass.

6    And also Major Dewire was having

7    health problems.  But Dewire had come

8    to see me on at least one occasion I

9    can recall to discuss what would

10   happen if Koscelnek had to leave his

11   position of area commander in the

12   northeast.  Major Dewire wanted to

13   express to me his interest in going

14   to the northeast, which would leave a

15   vacancy in LCE.  And if Major

16   Dewire's health were to reach the

17   point that he had to leave the

18   Department, what would happen to that

19   vacancy in LCE?

20   Q.      And before I ask you the next

21   question in that regard, Ober was

22   named as director of the

23   administration division of LCE on or

24   about May 30, 2000; is that correct?

25   A.      I don't know the date, sir,

203

1 but it would have certainly been

2 before July of 2000.

3 Q.     And do you know whether or not

4 during that period of time that he

5 served as acting director of LCE for

6 a total of about 40 hours?

7 A.     Before that date, no, sir.

8 Q.     During that period of time you

9 wouldn't know that?

10 A.     No, sir, I wouldn't.

11 Q.     Or that Captain Leonard

12 McDonald, the captain of operations

13 in LCE served in that capacity a

14 total of 280 hours, five times as

15 many hours as Captain Ober, you

16 wouldn't know anything about it?

17 A.     I wouldn't know anything about

18 it. And are we talking prior to July

19 of 2000 or after.

20 Q.     Well, July of 2000 would fall

21 in there. We're talking about May

22 30, 2000 until September 30, 2001,

23 from my figures.

24 A.     I don't know the amount of

25 hours, but I do know that Captain

204

1   McDonald was almost always the acting

2   - - -.

3   Q.     Do you ever review that and

4   ask why?  I mean, do you review that

5   policy as part of your - - - as your

6   role as a commander, you know, as a

7   deputy Commissioner?

8   A.     No.

9   Q.     Did you ever have any policy

10  that way or review it or go over it

11  with your bureau director?

12  A.     No, sir.

13  Q.     Okay.  All right.  Why don't

14  you go back to this promotional

15  thing.  You had a discussion, talking

16  about the difficulties, potential

17  difficulties at least, with the

18  regional commander and with the

19  commander of LCE because of health

20  problems.  And Captain Ober was

21  somehow fit into those discussions,

22  as I understood your testimony.  Can

23  you tell us in what way?

24  A.     He fit in while Major Dewire

25  was discussing with me the potential

205

1    successor for the director of LCE

2    should it arise because of Dewire's

3    leaving or --- well, Dewire's

4    leaving.  And he felt that the

5    Commissioner should consider Captain

6    McDonald for that position.

7    Q.      Okay.  Did he say why?

8    A.      Yeah, he did, overall

9    experience, time in grade, time on

10   the job, performance, many issues.

11   Q.      Did he ever indicate that he

12   felt that Captain Ober should be

13   passed over because the front office

14   was upset with him or didn't like him

15   or Colonel Evanko didn't like him?

16   A.      Absolutely not.  The nature of

17   Major Dewire's conversations was not

18   Captain Ober's shortcomings, but

19   Captain McDonald's strengths and why

20   Captain McDonald should be

21   considered, not why Captain Ober

22   shouldn't be considered.

23   Q.      Well, was Mr. McDonald on the

24   eligibility list?

25   A.      At that time, he was.  This

206

1    was prior, I believe, to a new

2    examination or new eligibility list.

3    Q.      Do you know whether Major

4    Dewire ever told Ober he was passing

5    him over or not considering him for

6    some sort of career enhancement move

7    simply because the attitude of the

8    front office towards Captain Ober was

9    such that Captain Ober could not ---

10   it wasn't going to do any good to

11   recommend him anyway, anything like

12   that?

13   A.      I'm not aware of that.

14   Q.      Do you have any knowledge of

15   anything like that?

16   A.      No, sir, I don't have any

17   knowledge of that.

18   Q.      If that were correct, that's a

19   pretty debilitating thing to occur in

20   someone's career; don't you think?

21   A.      If the major were to say

22   that's --- what's the debilitation?

23   Q.      No.  If that were to be the

24   case.  If that were to be the case.

25   I mean, the criteria for promoting

207

1   people, the criteria for giving

2   people promotional opportunities are

3   objective, honest, decent criteria

4   that don't have anything to do with

5   personal feelings or prejudices, but

6   have to do with rules and regulations

7   and proper custom practices and usage

8   of the Pennsylvania State Police

9   because the Pennsylvania State Police

10  are above the personal feelings of

11  individuals, officers or men; isn't

12  that correct?

13  A.      As well as the pool of other

14  eligible candidates.

15  Q.      Of course.  That would go

16  without saying I would imagine;

17  right?  Sir, are you familiar with

18  questions we've asked about

19  Subsection C to AR1-1.10 --- 102

20  really, Subsection C, chain of

21  command provisions?

22  A.      The only way I would have been

23  familiar with that is if I heard it

24  in Colonel Conley's deposition.  And

25  I don't recall being present for that

208

1    part.  I don't recall hearing that

2    part, Mr. Bailey.

3    Q.     Well, one of the issues that

4    has arisen in this litigation with

5    some frequency are amendments to

6    AR1-1 and timeliness of certain

7    amendments to 1-101, in particular,

8    some changes that were on the new

9    AR1-1 assigned --- the change sheet

10   was signed by the Commissioner, by an

11   autopen by a Mary Bungo (phonetic) or

12   about February 22nd, according to the

13   transmittal sheet, of 2001.  Do you

14   have any recollection of looking at

15   the changes to AR1-1?  Your

16   signatures are on that sheet.

17   A.     I don't recall looking at

18   them, sir.

19   Q.     Well, did you ever discuss any

20   changes to that document with anyone

21   during the year 2001 from January 1,

22   2001 to February 22nd, 2001?

23   A.     When did the changes come out,

24   sir?

25   Q.     Well, I think they were

209

1  approved on or about February 22nd,

2  23rd, 2001 and ended up being

3  distributed in March of 2001.

4  A.      So you're asking me if I had

5  any discussions with anyone prior to

6  that date of it being released?

7  Q.      Yes.  Let's say March, one

8  March.

9  A.      No, sir.

10  Q.      None?

11  A.      No, sir, none that I can

12  recall.

13  Q.      Okay.

14  A.      I've only ever heard of that

15  issue in the context of this case.

16  That's the first time I heard of

17  that.

18  Q.      Do you have a recollection of

19  AR1-1 being sent back from the front

20  office to revisions on or about

21  January 19th, 2001, back to R and D?

22  A.      No, sir.

23  Q.      Are you familiar with the ---

24  Colonel Evanko's policy and the

25  Department's desire for

210

1  accreditation?

2  A.       Yes.

3  Q.       AR1-1 revisions, were they

4  necessary for accreditation?

5  A.       I don't know specifically.

6  Accreditation isn't something that

7  came under me.  That wasn't one of my

8  areas.

9  Q.       What was your policy when an

10 AR was submitted to you for review to

11 approve a change, you know, in

12 Department regulations?  Did you have

13 any kind of set policy or did you

14 have an assistant doing that work for

15 you?

16 A.       It would depend.  I never

17 wanted my paperwork in the office to

18 sit around.  So if I wasn't there and

19 someone was sitting in for the day or

20 a couple days or someone was acting,

21 I told them to move the paper, sign

22 it and move it on, unless it was

23 something they really felt

24 uncomfortable doing.  And other than

25 that, when it came to me with a

211

1    change sheet, first of all, I would

2    look to see who already signed it,

3    was it in my shop or not?  In other

4    words, if it was generated by

5    operations and had to do with

6    operations, I would read it and sign

7    it when I was deputy operations.  If

8    I saw it was something that was more

9    staff --- and I can give you a prime

10   example, if it was something that was

11   under the Deputy of Staff and, you

12   know, resided in his --- if I saw

13   that Colonel March signed it, I

14   typically didn't put much time into

15   it.  I mean, it was his shop, his

16   business.  If it suited him, it

17   should suit me and typically I would

18   give it just a quick once over, sign

19   it and move it on.  If the

20   Commissioner signed it ahead of my

21   review, if it was certainly good

22   enough for the head of the agency, it

23   was fine with me and I gave it a

24   quick review and moved it on.

25              ATTORNEY BAILEY:

212

1          Where are we on time on
2    that tape?
3               VIDEOGRAPHER:
4          We have about 45
5    minutes.
6               ATTORNEY BAILEY:
7          Okay.
8    BY ATTORNEY BAILEY:
9    Q.      Now Colonel, this Subsection C
10   I did question you a little bit about
11   early that had to do with chain of
12   command.  But do you ever remember
13   seeing it even during this litigation
14   looking at it?
15   A.      No, I don't.
16   Q.      And is it fair to say that you
17   did not contribute to either the
18   origination or the drafting or the
19   implementation of it beyond what
20   apparently were routine paper
21   functions that you performed in the
22   execution of your administrative
23   duties, pretty accurate and fair to
24   say?
25   A.      That is accurate.

213

1    Q.      And you have no, as you sit

2    here today, specific --- you have no

3    specific recollection of changes or

4    dealing with charges to AR1 during

5    calendar 2001; fair to say?

6    A.      I do not recall it, sir.  I

7    have no recollection of doing

8    anything with AR1-1.

9    Q.      Now, without revealing the

10   substance of any conversation you may

11   have had, it follows them that you

12   had no discussion with the

13   Department's lawyers about it;

14   correct?

15   A.      I do not ---.

16   Q.      After this --- I mean, during

17   that period.  Remember, we're during

18   this period of time.  I don't care

19   about afterward.

20   A.      We're doing ---.

21   Q.      We're doing January 1, 2001.

22   Strike that.

23           We'll go back to October 30.

24   We might as well get the whole thing

25   in here.  Between October 20, 2000

214

1   and February 23, 2001, you had no

2   discussions with anybody about

3   Subsection C, the chain of command

4   provision change in AR1-1 that you

5   can recollection to anybody?

6   A.      I cannot recollect any

7   discussions about AR1-1 prior to its

8   release --- whatever date it was

9   released.

10  Q.      Now, you have a computer in

11  your office; don't you?

12  A.      No, sir.

13  Q.      If you want to look at a

14  Pennsylvania State Police regulation,

15  can you call it up on your computer?

16  A.      Yes, sir.

17  Q.      Why not?

18  A.      I'm not a techie, I don't know

19  the reason why.  I just know I can't

20  do it.

21  Q.      Do you know whether they're on

22  there?

23  A.      Regulations, no, sir, they're

24  not.

25  Q.      Okay.  So if you want to look

215

1    at them ---.

2    A.      We have e-mail, that's about

3    it.

4    Q.      Okay.  So if you want to look

5    at them or look at a regulation,

6    you've got to go down and either look

7    at the research file, go to where

8    they're posted or call R and D or

9    maybe one of your lawyers; fair to

10   say?

11   A.      Yes, sir.

12   Q.      Yes, because you can't like

13   jump on your law or jump on your

14   little old computer and dial it up

15   and look at it; right?

16   A.      Unless somebody sends it as an

17   attachment ---

18   Q.      And e-mails it or something.

19   A.      --- and e-mails it.

20   Q.      I understood that you had

21   wanted to break at 3:00?

22   A.      Yes, sir.

23                   ATTORNEY BAILEY:

24                   Okay.  Can we

25               suspended, please?

216

1          VIDEOGRAPHER:

2              Suspending video, 2:52

3      camera time.

4  OFF VIDEOTAPE

5  SHORT BREAK TAKEN

6          ATTORNEY BAILEY:

7              There is a recording

8      device in operation.

9  ON VIDEOTAPE

10          VIDEOGRAPHER:

11              Ladies and gentlemen,

12      video is now in operation.

13      Camera time is now 3:15.

14  BY ATTORNEY BAILEY:

15  Q.      Colonel, are you at least

16  generally familiar with AR425?   Do

17  you remember you talked about that?

18  A.      Generally familiar with it,

19  I've been away from it for sometime

20  now generally.

21  Q.      Well, Section 25.07

22  disposition says, a complaint

23  investigation four policy void,

24  indicates that the action of the

25  Department or the involved member or

217

1    members was not inconsistent with

2    existing department policy, but the

3    complainant still suffered harm.

4    Now, you know of the administrative

5    investigation which we contend was

6    ill conceived and improper and

7    there's a difference between the

8    parties on this issue conducted by

9    and directed by Colonel Evanko, not

10   conducted by him so much, but

11   directed by him.  Do you remember

12   that investigation?

13   A.    Yes, sir.

14   Q.    Okay.  Now, let's assume for

15   the sake of argument that Captain

16   Ober was somehow wrong in not telling

17   Major Conley and not coming to you as

18   opposed to going to Colonel Hickes,

19   who gave him an order.  But let's say

20   that that was an error in his part,

21   let's say that.  What harm resulted

22   in the Pennsylvania State Police or

23   was it a matter of what harm could

24   happen to the State Police?

25   A.    More what harm could have

218

1  happened.

2  Q.      Now, were the State Police ---

3  was the organization or any members

4  of the organization harmed by what

5  Captain Ober did that you recollect?

6  A.      Only the trooper that got

7  arrested.

8  Q.      The trooper that got arrested

9  was harmed by what Captain Ober did?

10 A.      No, sir, not by what Captain

11 Ober did.

12 Q.      Okay.  Now, as part of the

13 duties and responsibilities of the

14 Director of BPR under 25.08(b)

15 Subsection three, it says, ensure

16 that a record of all investigations

17 is maintained and that all

18 investigations are conducted in a

19 fair, prompt, thorough and impartial

20 manner.  Do you recollect at least

21 general language like that?

22 A.      Yes, sir.

23 Q.      And that internal

24 investigation reports are kept in a

25 secured area within the bureau.

219

1    Reports shall be completed within the

2    time limits established through

3    collective bargaining agreements.

4    Extension to the initial 40-day

5    investigative time period shall be

6    based solely on criteria related to

7    the complexity of the investigation

8    and available resources.  Do you have

9    recollection of those positions?

10   A.      Yes, sir.

11   Q.      Now, do you know whether these

12   --- either the spirit or letter of

13   special order 98-22, revisions to

14   AR425, internal investigations,

15   whether or not the spirit or letter

16   of these provisions were violated as

17   I have read them to you by the

18   Department or its investigators in

19   Captain Ober's case or do you think

20   they were pretty much adhered to?

21   A.      The museum investigation?

22   What investigation are you referring

23   to, sir?

24   Q.      We're still talking about what

25   you call the administrative

220

1    investigation into Captain Ober?

2    A.        No, I really don't see AR425

3    affecting that because it was a fact

4    finding administrative inquiry

5    conducted by the Commissioner.   It

6    was not launched in any way to --- in

7    the context of an Internal Affairs

8    investigation, which could have

9    resulted in discipline to anyone.

10   Q.        Okay.  Is that why Captain

11   Brown assigned it a BPR number in

12   June --- excuse me.  I think it was

13   July 20th, 1999.

14   A.        I don't know why he assigned a

15   number to it.  I know that everything

16   has to have some type of number for

17   event tracking.

18   Q.        Has that investigation been

19   closed?

20   A.        I don't know, sir.

21   Q.        But you never stated whether

22   or not --- telling Captain Ober

23   whether it was closed; right?

24   A.        No, sir.

25   Q.        Well, I'll ask you about

222

1  A.      As far as I was concerned,

2  yes, sir.

3  Q.      All right.  Now, if you'd look

4  over this piece of paper and then

5  pass it back to me because I only

6  have one of these.  I'm wrong.  It's

7  in there.  You don't have any page

8  numbers and I missed that.  Can you

9  give that back to me?

10             ATTORNEY CHRISTIE:

11             And by looking through

12       the document, you're referring

13       to Coury Number Two?

14             ATTORNEY BAILEY:

15             Yes.

16             ATTORNEY CHRISTIE:

17             Just note the page it's

18       on.

19             ATTORNEY BAILEY:

20             Let me get the pages

21       here.

22             ATTORNEY CHRISTIE:

23             It appears to be page

24       ten of 67.

25             ATTORNEY BAILEY:

223

1          Okay.  I had page nine

2     or ten.  Right.

3  BY ATTORNEY BAILEY:

4  Q.     Do you have it in there?  It

5  says, February 12th, 2001 at the top.

6  Do you see it?

7          ATTORNEY CHRISTIE:

8          We're looking at page

9     --- and the witness is looking

10    at page ten of 67 pages of the

11    Exhibit Coury Two.  That is a

12    memo dated February 12th,

13    2001.

14         ATTORNEY BAILEY:

15         Okay.  And that's what

16    I'm looking at.

17         ATTORNEY CHRISTIE:

18         Supervisory inquiry IAD

19    1999-409.  Is that what you're

20    referring to, Counsel?

21         ATTORNEY BAILEY:

22         Yes.

23  BY ATTORNEY BAILEY:

24  Q.     Colonel Coury, how would a

25  document like this find itself into

224

1    --- find its way into this file?

2    A.      I would think that paragraph

3    number three holds the answer, that

4    apparently about one month before

5    this letter was generated, which

6    would have been January 2001, Captain

7    Ober contacted Ms. Poso wanting to

8    know if any of the State Police had

9    been around asking questions about

10   his activities.  So Poso must have

11   contacted Hunt, who contacted the

12   Department and the Department

13   probably called to find out what was

14   going on.  And obviously, it was

15   related back to this investigation.

16   Q.      Well, why was it put in a

17   file, that notifying Ober or his

18   lawyer or whoever?

19   A.      I guess because there's

20   probably nothing to it.  I mean, I

21   don't know this.  I'm just making

22   assumptions that I certainly should

23   not.  This is more of a question for

24   Major Pudliner to answer as opposed

25   to me.

225

1   Q.      No.  I want to ask you because

2   you're past BPR director, because

3   you're the head of operations and

4   because you have great experience.

5   And I just want to know, is it a

6   normal policy to add additional

7   documents to a closed file without

8   notifying the subject of the

9   investigation.  I'd like to know if

10  that was a past practice when you

11  were a deputy Commissioner with the

12  Pennsylvania State Police?

13  A.      I don't think there is an

14  established past practice because it

15  rarely happens.  It certainly doesn't

16  violate any practice.

17  Q.      Why doesn't it violate ---?

18  A.      It seems rather prudent to me

19  actually.

20  Q.      Well, why ---?

21  A.      Because he was cleared of it.

22  And this tends to support those

23  things.  I mean, again, it just has

24  to go with tracking and history

25  things.

226

1    Q.      Okay.  But this is --- why is

2    he not notified about this?  Why do

3    we have to --- we're in a lawsuit and

4    this thing ends up bubbling up in a

5    file.  If you'll forgive me, why

6    would there not be --- if this is a

7    file concerning a member of the

8    Pennsylvania State Police, you or

9    anybody else, where they had been

10   investigating, I understand the file

11   is closed.  I understand there may be

12   some value to adding this.  Let's be

13   hypothetical and say that it was a

14   bad letter indicating a bad thing

15   indicating there was bad information

16   and don't read responses.  Don't read

17   responses, sir.  Let me ask you if

18   you know of any other situations

19   where a document like this was added

20   to a file and a person wasn't told?

21   I know you said it was prudent

22   because you thought it was

23   exculpatory, but why wasn't Captain

24   Ober notified?

25   A.      Your question again was two

227

1   parts ---

2   Q.      I'm sorry.

3   A.      --- and the first part was

4   asking if I was aware of it.  To the

5   best of my recollection, I'm not

6   aware of any other instance that

7   happened.  And quite frankly and

8   honestly, why Captain Ober was not

9   notified is a question for Major

10  Pudliner and Colonel Conley.

11  Q.      Okay.  But as far as the State

12  Police practices are concerned, do

13  you know of any other instances where

14  there were additions to an

15  investigation, an additional

16  investigative inquiry that was added

17  to a file without the person who's a

18  subject of the file being notified?

19  A.      I don't recall any, sir.

20  Q.      Is Major Hunt out there

21  looking for things to do to Captain

22  Ober; do you know?

23  A.      No, sir, I wouldn't think so.

24  Q.      Is there a policy of getting

25  even or getting back at Captain Ober

228

1    because he's had the good fortune of

2    legally prevailing so far in his

3    relationship with the Department and

4    the Commissioner?

5                    ATTORNEY CHRISTIE:

6              Just objection to

7              characterization of legally

8              prevailing.  I would take

9              issue with that based upon the

10             actual record in this case and

11             the preceding cases.

12   BY ATTORNEY BAILEY:

13   Q.      All right.  Well, let me

14   restructure the question.  Is there

15   some kind of policy out there to get

16   back at or to punish Captain Ober for

17   his --- let me tell you why I asked

18   that.  I got this thing about his

19   emotional --- being emotionally

20   distraught, which you characterize as

21   a duty and a compassionate response.

22   Okay.  And that's fine.

23             You have this issue here,

24   February 12th, 2001 and he's not even

25   told about it, you know, but down

229

1   here, paragraph three, Ms. Poso
2   further indicated to retired Major
3   Hunt that Captain Ober had contacted
4   her, via telephone, approximately a
5   month ago and made inquiries to
6   whether she had been contacted by any
7   members of the Pennsylvania State
8   Police regarding his activities.
9   Now, you know, as I see it, he has
10  every right to do that.  And maybe
11  that's a factually important thing to
12  go in there.  But, you know,
13  logically he should be able to
14  respond to that, rightfully or
15  wrongfully, if it's placed in his
16  file and indicates something.  I
17  mean, he's a career officer in the
18  Pennsylvania State Police and he is
19  allegedly calling somebody to find
20  out whether she had been contacted by
21  members of the Pennsylvania State
22  Police regarding his activities.  And
23  we don't know if he's even contacted,
24  his lawyer is told.  He's got an
25  outstanding Federal Civil Rights

230

1    suit.

2         Now, my question is, if you

3    take that, this fact here, if you

4    take the issue having to do with the

5    emotional --- you know, the transfer

6    to Washington, which, sir, according

7    to your testimony and my research,

8    because it was not specified as

9    temporary, was a permanent transfer,

10   the only one that you know of in

11   your, and you're widely recognized as

12   a great, you know, reservoir of

13   experience in the Pennsylvania State

14   Police at a very high level, you'd

15   never known it to happen to anybody

16   who is transferred that far away from

17   home without their will.  I had half

18   a dozen witnesses, including you, who

19   have no evidence to indicate that any

20   transfer to a lieutenant's position

21   for a captain ever occurred.  Colonel

22   Evanko himself testified that he

23   knows of no other.

24         In light of all of those

25   things, I'm asking you, is there a

231

1    policy or some effort, I don't know

2    if it's a conspiracy or if it's just

3    be agreement, by overt agreement, I

4    don't know, or task agreement, to get

5    Captain Evanko.  Is there any such

6    thing in the Pennsylvania State

7    Police?  And my mind always goes back

8    to your response about the culture of

9    the Pennsylvania State Police.

10                   ATTORNEY CHRISTIE:

11                   You mean Captain Ober;

12          right?

13   BY ATTORNEY BAILEY:

14   Q.      Is there some desire to get

15   Captain Ober?

16                   ATTORNEY BAILEY:

17                   I'm sorry, Counsel.

18          You're absolutely right.  It

19          was a long preamble.

20   BY ATTORNEY BAILEY:

21   Q.      Is there some practice or

22   policy in the Pennsylvania State

23   Police designed to get Captain Ober?

24   A.      No, sir.

25   Q.      Okay.  And let me see if I can

232

1    straighten this up for you, sir.

2    March 5, 1998, Darrell, I just wanted

3    to share with you how much I

4    appreciate the job you're doing.  I

5    received many position comments from

6    area and troop commanders on your

7    outstanding performance.  The extra

8    mile you go to cooperate and work

9    with your fellow commanders is duly

10   noted.  Needless to say, when they

11   are happy it makes the Commissioner

12   and my job easier.  Keep up the good

13   work.  Tom.  Marc 5, 1998.  Do you

14   remember that, handwritten?

15   A.      No, I don't remember it, but

16   - - -.

17   Q.      You're a pretty important

18   fellow in the Pennsylvania State

19   Police.  If I'm out there working as

20   a captain and I get a letter from my

21   lieutenant colonel, I'd like to have

22   it marked.  Is that your handwriting?

23   A.      Yes, sir, it is.

24                ATTORNEY CHRISTIE:

25                Coury Six.

233

(Deposition Exhibit

Coury Six marked for

identification.)

BY ATTORNEY BAILEY:

Q.      Okay.  Based on your knowledge

and experience, did Captain Ober go

through a change of moral turpitude?

Did he go through a significant

change in his morality, his conduct

in life, between that letter and when

you left the Pennsylvania State

Police?

A.      No, sir.

Q.      Aside from the disagreement

over his decision on or about the

first week of October 1998, what did

Captain Ober, in your eyes, do wrong?

And I'll add to that, submitting, if

you think it was a moral decision or

moral error, submitting the

reimbursement.

A.      Well, first of all, I won't

say that he did wrong.  Okay.

Q.      Okay.

A.      My comments are strictly as it

234

1   relates to lack of good judgment in
2   being part of that process without
3   his commanders knowing and the motel
4   and the day off issue.  That is it.
5   Q.      Okay.  You know the reason why
6   I was questioning about the day off
7   issue is I was trying to make the
8   argument, of course, or get you to
9   make the argument through your
10  testimony that to be consistent with,
11  whether it's an error in judgment or
12  not, the judgment you made about the
13  week of October 5th, it would have
14  necessarily followed that he wouldn't
15  reveal what he was doing until later
16  on.  That's all I was trying to do.
17  But if you jumble those things
18  together, is it fair to say that
19  aside from Captain Ober's error
20  around the --- and that things
21  connect to the October 1998 decision
22  that he made, that in your view was
23  an error, he doesn't think it was,
24  but aside from that, there isn't
25  anything wrong that he did.  You're

235

1   not even saying that was necessarily

2   wrong.  It was an error but my

3   understanding is that aside from that

4   you can't point to anything that he

5   did in his career that even indicates

6   an error of judgment or certainly any

7   kind of wrongdoing; right?

8   A.      It lacks good judgment.  There

9   was a couple minor issues when he was

10  in BPR and investigative techniques

11  he used were not in accordance with

12  my management style, but other than

13  those things, that it is, sir.

14  Q.      And normally in your career,

15  there are going to be disagreements.

16  I mean, the Pennsylvania State Police

17  attracts, let's all admit, a very

18  high caliber, you know, a very

19  hardworking and capable type of

20  person.  Obviously, the

21  qualifications are very high and the

22  duty requirements are very high.  So

23  it's normal that during the course of

24  a career in the Pennsylvania State

25  Police you're going to have

236

1   disagreements or you're going to make

2   minor mistakes.  But it's fair to say

3   there's no major error or character

4   flaw that you see in Captain Ober

5   during your experience with him,

6   aside from the October thing, which

7   is an error in judgment, not a

8   character flaw, but an error in

9   judgment, there isn't really anything

10  of a major significance that you can

11  point to?

12  A.      No, sir, I cannot point to

13  anything.

14  Q.      All right.  Now, I want to

15  read something.  This is from Philip

16  Dewire and it's dated October 4,

17  2000, 9:29 a.m.  It was sent to ---

18  either Darrell Ober I think it was

19  sent to, but it had to do with a

20  speaking engagement and some of your

21  words up in State College,

22  Pennsylvania.  And it's, I think, a

23  letter.  The subject is chain of

24  command.  I'd like you to look at

25  this first because I want to see if

237

1    you recollect this.

2    WITNESS REVIEWS DOCUMENT

3    A.      I do remember, sir.

4                ATTORNEY CHRISTIE:

5                Can we mark that,

6        Counsel, as Coury Seven, I

7        believe?

8                ATTORNEY BAILEY:

9                Yes.  Right.  Yes.  Why

10       don't we just --- yes, we can

11       mark that.

12                (Deposition Exhibit

13                Coury Seven marked for

14                identification.)

15   BY ATTORNEY BAILEY:

16   Q.      I just want to ask you what

17   you mean by certain things.

18   A.      Sure.

19   Q.      I believe in and support

20   communication through the chain of

21   command.  That speaks for itself.  I

22   believe it's my duty to support your

23   unity of command, this is you

24   speaking through this communiqué, by

25   communicating with the troop

238

1    commanders through the area
2    commanders.  Only in the case of
3    exigent circumstances will I deviate
4    the practice.  Well, where in the
5    Pennsylvania State Police
6    regulations, where in the laws of the
7    Commonwealth of Pennsylvania is there
8    a statement of what those exigent
9    circumstances are?  And if you want
10   to, add your own communications in
11   because I look and I can't find
12   anything.  I need your help.  Where
13   are these exigent circumstances
14   identified and classified?
15   A.      There are none, but I think in
16   order to understand that document you
17   need to understand why it was
18   generated and that could shed some
19   light on the question you're asking.
20   Q.      All right.  Well, I'll give
21   you a chance to come back to that.
22   I'm going to put it in front of you
23   and then you can respond until your
24   heart is content.  In such a case,
25   i.e., exigent circumstances, I will

240

1    important is because I didn't know

2    when you were saying these words, it

3    wasn't real clear to me at first,

4    whether you were talking about

5    something that has to do with the top

6    down.  But here you say accordingly,

7    accordingly sir, incorporating by

8    reference what has gone before,

9    please remember the upward chain of

10   command to the Commissioner is

11   through the Deputy Commissioner to

12   Operations.

13         Now, in fairness to you, were

14   you telling them that I might depart

15   from the chain of command on the

16   downward look but you are not to

17   depart from the chain of command on

18   the upward look, even under exigent

19   circumstances or are you saying, and

20   this is how I'm taking this, that

21   exigent circumstances mean there may

22   be situations where you have to

23   bypass the chain of command on the

24   way up?  That's the way I took it.

25   Am I taking it wrong?

241

1   A.      There may be exigent

2   circumstances going down and up.

3   Q.      That's the way I read it.

4   Now, because you go on to say, unless

5   exigent circumstances exist where the

6   Commissioner contacts the area

7   commander or bureau director

8   directly.  Now obviously, that's a

9   downward look.  If that type of

10  direct communication occurs, I would

11  still appreciate the area commander

12  or bureau director subsequently

13  contacting me will apprise me of the

14  communication as opposed to expecting

15  the Commissioner to advise me of the

16  communication.  Now, in fairness to

17  you, you're running an outfit.

18  You've got 4,000 people.  As a

19  practical matter in running that

20  department on a day-to-day basis with

21  police officers are sometimes, God

22  forbid, confronting life and death

23  situations, traffic control, all

24  kinds of nuts out there and

25  irresponsible people, I mean, you

242

1  know, plus you also got the routine
2  stuff you've got to do, that the law
3  requires you to do.  I mean, this is
4  a pretty common --- I mean, I would
5  call this pretty much a --- and I'm
6  going to ask you, is it just pretty
7  much of a commonsense document on,
8  you know, trying to provide some
9  guidance on how to deal with the
10 requirements of chain of command so
11 we can run this organization?
12 A.      Yes, sir.
13 Q.      Yes.  Exactly.  Now, you tell
14 me how -- what those exigent --- all
15 right.  Last paragraph, clearly
16 defined expectation on the issue of
17 chain of command and communication
18 supports all of our operations and
19 has proven to be the most efficient
20 and effective way of doing business
21 in paramilitary organization.  Thank
22 you for your cooperation, Lieutenant
23 Colonel Tom Coury.  Now, you're very
24 strong today and you've been
25 consistent about your disagreement

243

1    with Captain Ober's behavior.  Could
2    you tell me how Captain Ober's
3    behavior fits in the context of what
4    you are sending out to your troops in
5    the field of how to deal with their
6    chain of command problems on a
7    day-to-day basis?  I'd like to know
8    the difference.  I'd like to know
9    what it is, if you can tell me.
10   A.     Exigent certainly means more
11   than immediate, life threatening,
12   things like that to me.  Exigent
13   means that they've got a barricaded
14   gunman in Norristown who has a
15   hostage and my phone at the house
16   isn't ringing so they have to call
17   the Commissioner.  Downward chain of
18   command, one of the members has been
19   hurt and the Commissioner needs
20   information, I'm not around so he
21   goes directly to the major.  Again,
22   you're not familiar with the context
23   of why this letter was generated and
24   that has an impact on it, because
25   certainly it had nothing to do with

244

1  Captain Ober, his behavior, his

2  conduct or anything like that, sir.

3  Q.     If I implied, I probably did

4  and I didn't mean to, and I confess I

5  didn't mean to, sir, I didn't mean to

6  imply.  I was asking the question,

7  but did not mean to imply that that

8  was in response to anything having to

9  do with Captain Ober.  I want to know

10  - - - .

11              ATTORNEY BAILEY:

12              Let me back this up

13      just a second.  Just a second,

14      please.  Okay.  Let me strike

15      the last question and rephrase

16      it.  Yes, you can mark the

17      document.

18              ATTORNEY CHRISTIE:

19              That's Coury Seven?

20              (Deposition Coury Seven

21      marked for

22      identification.)

23              ATTORNEY BAILEY:

24              Yes.

25  BY ATTORNEY BAILEY:

245

Q.      What I'm asking is what ---
you don't explain what exigent
circumstances are in that document.
Do you have any other documents, any
other speeches, any other
communiqués, communications to
member, speeches, speaking
opportunities, books, articles,
publications of any type, manner,
shape, form that as a Lieutenant
Colonel in the Pennsylvania State
Police that you authored or caused to
be generated, which explains what
exigent circumstances are and would
explain what you mean in that
communiqué?
A.      No, sir.  I don't believe so.
Q.      But exigent circumstances
doesn't mean a situation where your
new commander coming in has a
potential conflict of interest with
the FBI target, Mr. Stanton, where
there is a recollection at least, as
far as Captain Ober is concerned,
about the reaches of this FBI

246

1    investigation, and so he turns to a

2    Lieutenant Colonel, because the

3    Major, in this case Major Conley, was

4    physically not available.  But he

5    turns to a Deputy Commissioner to ask

6    advice.  You don't think that FBI

7    inquiry is exigent circumstances?

8    A.      Mr. Bailey, there's no way

9    you'll ever convince me that waiting

10   one more day or two days for Colonel

11   Conley was such a critical --- was so

12   critical to this FBI investigation

13   that had gone on for some time before

14   that it was exigent enough it

15   wouldn't have waited a day or so.

16   Q.      What about the potential

17   conflict with Major Conley coming

18   from out west?

19   A.      That conflict never came up

20   until somebody talked about it much,

21   much later after the date.  But I

22   don't see any conflict there with

23   Major Conley coming from the west.

24   Q.      And you are certain that

25   you're not rationalizing your reasons

Sargent's Court Reporting Service, Inc.
(814) 536-8908

247

```
 1   for objecting to Captain Ober's
 2   behavior because it irritates you
 3   that someone didn't come to you with
 4   something that you thought could be
 5   politically threatening to the
 6   Department?  You're not rationalizing
 7   that?
 8   A.      I don't believe so.
 9               ATTORNEY BAILEY:
10               I think she needs it
11          there.  Would you kindly give
12          me an opportunity to confer
13          with my client for a moment?
14          I'll be right back in.
15   SHORT BREAK TAKEN
16               ATTORNEY BAILEY:
17               I have no further
18          questions.  Do you have any
19          questions, Barbara?
20               ATTORNEY CHRISTIE:
21               Yes.  I just have a
22          couple of areas that I would
23          like to clarify.
24   EXAMINATION
25   BY ATTORNEY CHRISTIE:
```

248

1    Q.        Firstly, Colonel, I think you

2    had indicated to Counsel as to Coury

3    Seven that you wish to shed some

4    light on the occasion for generating

5    this particular e-mail to illustrate

6    its nonrelationship to Captain Ober.

7    Could you now so indicate, please?

8    A.        Well, the exigent part was

9    certainly verbiage added.  But the

10   real crux of this whole issue was

11   that at the --- I had only been the

12   Deputy Commissioner of operations for

13   a very short time, a couple of

14   months, in July.  And during that

15   time, I had called the --- the troop

16   commanders on more than one occasion

17   direct.  And that the July Arian

18   troop commanders conference, Major

19   Szupinka had mentioned to the other

20   area commanders --- and they had some

21   internal discussion about me calling

22   the troop commanders direct.  And

23   they felt that I should be going

24   through them, as opposed to making

25   direct calls to the troop commanders.

249

1    That was brought to my attention, I

2    agreed with it.  And I had meant to

3    bring it up there at the Arian troop

4    commanders conference about what my

5    operational position was on chain in

6    command.  So it was strictly an issue

7    between Aerie commanders and trooper

8    commanders.

9    Q.      And I would just suggest --- I

10   know you want to talk to me, but just

11   to keep talking to the camera, so

12   that we're not off of the videotape

13   deposition in my questions, if you

14   wouldn't mind.  And the examples

15   you've given of exigent

16   circumstances, although not defined,

17   are examples that deal with a need

18   for urgent transmission of

19   information, such as the barricaded

20   man with hostage situation, and

21   Commissioner's immediate need for

22   information, Arian commander is not

23   available and so forth, it goes to

24   the troop commander.  With regard to

25   the immediacy, I think you've already

250

1   indicated that you knew of no --- as
2   to the FBI probe, you knew of no need
3   for immediacy of reporting in that
4   particular situation.  Is that a
5   correct understanding?
6                    ATTORNEY BAILEY:
7                    Objection to the form
8          of the question.  You may
9          respond.
10  A.       That's correct.  I viewed ---
11  when I generated this document to
12  Arian troop commanders, it's
13  operations as opposed to
14  administrative issues, I viewed it as
15  more life threatening issues as
16  opposed to administrative issues.
17  Q.       So would you view exigent
18  circumstances basically kind of as an
19  excuse to kind of pick and choose who
20  you want to go to with regard to
21  information, vis-à-vis someone in
22  your chain of command who perhaps you
23  don't, for whatever reason, want to
24  go to, as opposed to someone that you
25  like better or whatever and do want

251

1  to go to with information.  Is that

2  within your definition of exigent

3  circumstances?

4                    ATTORNEY BAILEY:

5            Objection to the form

6       of the question.  With all due

7       respect, that one had three

8       paragraphs.  You beat me.  You

9       even beat me on that one,

10       Barbara.  Anyway, I object to

11       the form of the question.

12  BY ATTORNEY CHRISTIE:

13  Q.       The witness may answer the

14  question.

15  A.       I guess it could be used that

16  way.

17  Q.       But is that what you conceived

18  to be exigent circumstances, that you

19  can pick and choose just who you like

20  better to report it to?

21  A.       No, you can't do that.

22  Q.       And with regard to the

23  availability of then Major Conley, I

24  believe Counsel indicated that the

25  then Major might have been either

252

1    unavailable or perhaps potentially

2    involved because he came from the

3    west, as opposed to the east, as

4    opposed to the center of the state.

5    Are you aware at all in the answer to

6    your question of Counsel that

7    Colonel, then Major Conley, had

8    called the Plaintiff on the phone

9    prior to his reporting this

10   information of the FBI probe to

11   Lieutenant Colonel Hickes, and had

12   asked him basically if there was

13   anything that he should be aware of,

14   to which the Plaintiff replied no,

15   are you aware of that or were you

16   aware of that at the time that you

17   answered ---?

18                  ATTORNEY BAILEY:

19                  Objection to the form

20          of the question.  You may

21          respond.

22   A.      I somewhat recall it now that

23   you mentioned it.

24   BY ATTORNEY CHRISTIE:

25   Q.      Okay.  And if one is going to

253

1   be concerned about someone being at a

2   particular section of the state or

3   being at a particular command

4   position, would you not --- as being

5   an exigent circumstance, to not

6   include reporting to that person in

7   the chain of command, would you not

8   also expect to be consistent that the

9   Plaintiff would also consider --- or

10  that the reporter of that information

11  would also consider whether or not

12  the reportee, in this instance,

13  Colonel Hickes, had ever been in a

14  position to have been a deputy of

15  operations during the pertinent time

16  period of the FBI probe?

17                   ATTORNEY BAILEY:

18                   Objection.  I'm sorry.

19       Are you finished?

20  BY ATTORNEY CHRISTIE:

21  Q.       Just to be consistent, is he

22  going to be consistent, rather than

23  pick and choose who you want to give

24  information to?  Was that a question

25  or a statement?  Would you expect it

Sargent's Court Reporting Service, Inc.
(814) 536-8908

254

1    to just be consistent that one would

2    also give thought to the position of

3    the person to whom you report during

4    the entire time of the FBI probe?

5                  ATTORNEY BAILEY:

6                  Objection to the form

7            of the question.  You may

8            respond, sir.

9    A.     My overall opinion of the

10   exigent issue is that had Captain

11   Ober done his homework before he

12   knee-jerk reacted and went to Colonel

13   Hickes, there couldn't have even been

14   any perception of an exigent

15   circumstance.

16                  ATTORNEY BAILEY:

17                  Objection to the

18           witness' response.

19   BY ATTORNEY CHRISTIE:

20   Q.     With regard to this decision

21   of the compensation reimbursement

22   board, Counsel had questioned you

23   with regard to whose decision or

24   whether there was a decision or an

25   attempt to take an appeal from the

255

1   board's determination of compensation

2   or reimbursement.  To your

3   understanding, was this decision a

4   decision to take an appeal or a

5   decision to ask the board to reopen

6   the record to receive information

7   that they had not received through

8   the commonwealth advocate, Mr. Grab,

9   or elsewhere, such as an interview

10  from yourself, the individual who

11  denied the request in the ---

12  whatever, in the second place, I

13  guess, going through the chain of

14  command after Major Conley?

15              ATTORNEY BAILEY:

16              Objection to the form

17      of the question.  You may

18      respond.  Counsel, leading

19      questions are one thing.  But

20      you may be setting a record.

21      I'd just ask if it's possible

22      to not lead.

23              ATTORNEY CHRISTIE:

24              Well, I believe we're

25      in a deposition, Counsel,

256

1      we're not in Court.

2              ATTORNEY BAILEY:

3              That's really not a

4      relevant issue.  Anyway, I'm

5      objecting.  You may ---.

6              ATTORNEY CHRISTIE:

7              And he is your deponent

8      at this point; is he not?

9              ATTORNEY BAILEY:

10             I'm objecting.  You may

11     respond.

12     BY ATTORNEY CHRISTIE:

13     Q.      Do you remember the question?

14     A.      As I responded to Mr. Bailey's

15     question that I didn't feel there was

16     an appeal process available to the

17     Department, so I guess it was more in

18     terms of what can the Department do

19     to get its position on record.

20     Because here you have a board of

21     three people, meaning the PSTA, which

22     was Bruce Edwards, OA, which was Bill

23     Mullen, and PSP, which is Leonard

24     Washington, Mark Grab is the advocate

25     for the Commonwealth's side.  I

257

1  wanted to make sure that the three

2  panel board had the information on

3  why I felt it necessary to say it

4  shouldn't be approved, what my

5  feelings was for rejecting it.  You

6  had Colonel Hickes approving it.  And

7  the board would have access to that

8  information through Mark Grab.  But

9  who was going to give the board the

10  information on the things they should

11  consider on why it was initially

12  rejected.

13  Q.      And have you, Colonel Conley

14  --- strike that, Colonel Coury, or to

15  your knowledge, Colonel Conley,

16  either been contacted for purposes of

17  this board, this consideration of

18  this request by this board, or even

19  been aware that this request was, in

20  fact, being considered by the board?

21  By the request, I mean the request

22  for compensation reimbursement.

23  Until after the board had acted, of

24  course.

25            ATTORNEY BAILEY:

258

1          Objection to the form

2          of the question.  You may

3          respond.

4  A.      I was never contacted by Mr.

5  Grab.

6  BY ATTORNEY CHRISTIE:

7  Q.      So by that, were you ever ---

8  if you weren't contacted by Mr. Grab,

9  were you ever aware that the board

10 had even acted on these requests

11 until after the action had occurred?

12 A.      No.

13 Q.      And with regard to your

14 testimony that Colonel Hickes had

15 been interviewed or had been spoken

16 to by Mr. Grab, was it your

17 understanding that Colonel Hickes

18 approved the request for the hotel

19 and for the reimbursement of the

20 vacation day to a working day before

21 these things occurred or was it your

22 understanding that Colonel Hickes

23 basically had indicated that he

24 hadn't approved them beforehand, but

25 thinking back retroactively, he would

259

1  have approved it, that it would have

2  been okay with him, words to that

3  effect?

4                    ATTORNEY BAILEY:

5              Objection to the form

6         of the question.  You may

7         respond.

8  A.        I thought that it was

9  retroactive, first of all.  Secondly,

10 I had a position on how Colonel

11 Hickes could retroactively or even

12 proactively approve leave and a hotel

13 room for a member who actually wasn't

14 under his command, was under my

15 command.  So I thought there was a

16 due process issue, if you will.

17 BY ATTORNEY CHRISTIE:

18 Q.        Did you have any question at

19 all as to why an FBI investigation in

20 which Captain Ober was apparently

21 participating, a meeting concerning

22 that investigation could not be or

23 was not an FBI installation, as

24 opposed to a hotel?

25                    ATTORNEY BAILEY:

260.

1              Objection, please.

2         Objection not only to the form

3         of the question, but I'd also

4         like to state that --- maybe I

5         can save some time and just

6         object to this entire line of

7         questioning on various

8         grounds.  But objection.  And

9         objection to the

10         characterization of the

11         Counsel's testifying, as she

12         has been on a number of these

13         questions.  I would object.

14         And you may respond, sir.

15 A.      I think your questioning gets

16 back to what I had said earlier,

17 that, you know, I wanted the board to

18 have all the information on the

19 reasons why I did not think it was

20 appropriate to approve the leave day

21 or the hotel day.  I think there was

22 a number of reasons --- other

23 alternatives available to Captain

24 Ober prior to resorting to going out

25 and renting a hotel room.  Could have

261

1    met at the FBI office, could have met

2    at probably a library.  There's

3    probably a lot of places you could

4    have met without going out and

5    renting a hotel room.

6    BY ATTORNEY CHRISTIE:

7    Q.      And with regard --- I believe

8    Counsel had questioned you as to

9    would it not seem reasonable to you

10   that Captain Ober would not have

11   documented his comings and goings

12   with regard to meeting with the FBI

13   at the hotel, and documented that

14   contemporaneously or shortly after

15   those events had occurred.  Do you

16   recall questions that Counsel asked

17   you to that effect, that wasn't it

18   reasonable if it was not to be found

19   out or to be confidential that the

20   Captain would not document those

21   events until some months later when

22   he made the request for leave

23   reimbursement, hotel reimbursement?

24                ATTORNEY BAILEY:

25                Objection ---.

262

1  BY ATTORNEY CHRISTIE:

2  Q.      Do you recall questions to

3  that effect?

4                ATTORNEY CHRISTIE:

5                I'm only asking the

6         Colonel if he recalls

7         questions to that effect.

8                ATTORNEY BAILEY:

9                Objection, objection to

10        the characterization ---.

11 A.      I recall the questions.

12                ATTORNEY BAILEY:

13                Sir, stop.  Come one.

14        Let's go.  We're going to play

15        by the rules here now.

16        Colonel, I respectfully

17        request --- you know what's

18        been going on here, that you

19        please don't jump in with an

20        answer before I have an

21        opportunity to rejoin, please.

22        I object.  I object to the

23        characterization, and I object

24        to the form of the question.

25 BY ATTORNEY CHRISTIE:

263

1    Q.    Colonel, would it not seem

2    reasonable that if Captain Ober is,

3    in fact, going to meet with the FBI,

4    with the approval of Colonel Hickes

5    at a hotel on leave time that he's

6    later going to reclaim as work time,

7    that even if he didn't document it to

8    anybody else, that he would have at

9    least contemporaneously documented

10   this to Colonel Hickes?

11                   ATTORNEY BAILEY:

12                   Objection.  Objection

13        to the form of the question.

14        Objection to the

15        characterization.  You may

16        respond.

17   A.    I'm surprised at the fact that

18   a man of Captain Ober's caliber, of

19   his ability, his knowledge of rules

20   and regulations, his attention to

21   detail, that a man with all those

22   talents didn't have a better paper

23   trail of what all took place during

24   that period of time, from the time

25   the FBI called him until the meeting

264

1   with Colonel Evanko.

2   BY ATTORNEY CHRISTIE:

3   Q.      And would you agree, Colonel

4   Coury, that that paper trail could

5   have been committed to paper in memos

6   from Captain Ober to Colonel Hickes

7   during the events or at or about the

8   time of the events in question?

9                ATTORNEY BAILEY:

10               Objection to the

11          characterizations.  Objection.

12          And objection to the form of

13          the question.  You may

14          respond, sir.

15  A.      I believe there could have

16  been a paper trail generated.

17  BY ATTORNEY CHRISTIE:

18  Q.      Have you seen any

19  documentation from either Colonel

20  Hickes or from Captain Ober at any

21  point to date in this lawsuit

22  indicating that Captain Ober did, in

23  fact, contemporaneously document

24  those events, if to nobody else, to

25  Colonel Hickes?

265

```
 1   A.      I have not seen any paper
 2   trail.  I've only by attending some
 3   of these --- Colonel Conley's
 4   deposition, I guess, heard about a
 5   few documents being generated.
 6   Q.      But, of course, if there were
 7   documents to that effect generating
 8   this paper trail, I would assume that
 9   those --- would you not assume that
10   those documents would have been
11   produced to us pertinent to a defense
12   request for production of documents
13   by now?
14                   ATTORNEY BAILEY:
15                   Objection to the form
16           of the question.
17                   ATTORNEY CHRISTIE:
18                   That's a terrible
19           question.  I'll withdraw that
20           question.  I have no further
21           questions.
22                   ATTORNEY BAILEY:
23                   I have no further
24           questions.
25                   VIDEOGRAPHER:
```

266

1                    It is now 4:03.  The

2          deposition of Lieutenant

3          Colonel Thomas J. Coury is

4          completed.  Suspending video.

5                *  *  *  *  *  *  *  *

6     VIDEOTAPED DEPOSITION CONCLUDED AT

7                4:03 P.M.

8                *  *  *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMMONWEALTH OF PENNSYLVANIA)

COUNTY OF DAUPHIN              )

C E R T I F I C A T E

I, Vivian Gratz, a Commissioner of Deeds in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness was hereby first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was taken stenographically by me and reduced to typewriting, and constitutes a true and correct record of the testimony given by the witness.

I further certify that the reading and signing of said depositions were (not) waived by counsel for the respective parties and by the witness.

I further certify that I am not a relative, employee or attorney of any of the parties, nor a relative or employee of counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and stamp this 25th day of April 2002.

_Vivian Gratz_

VIVIAN GRATZ
Commissioner of Deeds
Commonwealth of Pennsylvania
My Commission Expires Nov. 7, 2003

·PITTSBURGH, PA
·CLEARFIELD, PA
·STATE COLLEGE, PA
·HOLLIDAYSBURG, PA

·ERIE, PA
·OIL CITY, PA
·HARRISBURG, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA  15901
(814) 536-8908

·INDIANA, PA
·GREENSBURG, PA

·PHILADELPHIA, PA
·SOMERSET, PA
·WILKES-BARRE, PA
·CHARLESTON, WV

22

# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER                          :        1: CV- 00-0084
                                         :
           Plaintiff                     :
                                         :
     vs.                                 :
                                         :
PAUL EVANKO, MARK                        :        (Judge Caldwell)
CAMBELL, THOMAS COURY,                   :
JOSEPH WESTCOTT,                         :
HAWTHORNE CONLEY                         :
                                         :
                    Defendants           :JURY TRIAL DEMANDED


           DATE:              March 6, 2002

           PROCEEDINGS:        Video Deposition of
                               Major Phillip DeWire

APPEARANCES:

           For the Plaintiff:  Donald Bailey, Esq.
                               4311 N. 6th Street
                               Harrisburg, PA 17110


           For the Defendants  Joanna Reynolds, Esq.
                               Barbara Christi, Esq.
                                1800 Elmerton Avenue
                                Harrisburg, Pa  17101

1

1    MR BAILEY: Ladies and gentlemen as we

2    begin let me advise everyone that there is a tape

3    recording device in operation.

4    TONY MARCECA: Good morning ladies and

5    gentlemen.  Today is March 6, 2002.  Be advised

6    the video and the audio is in operation.  My name

7    is Tony Marceca.  My address is 2219 Dixie Drive,

8    York Pennsylvania, 17402.  I've been contracted

9    out by PR Video to be the video operator for this

10   deposition.   The case In The United States District

11   Court for the Middle District of Pennsylvania.  The

12   Captain in this is

13   1: CV-01-0084.  The title is Darrell G Ober plaintiff

14   vs. Paul Evanko Et al.  The time is now 9:16 am,

15   and would the witness, Major Philip DeWire, please

16   raise his right hand and swear after me.

17   MR BAILEY: That's DeWire.

18   TONY MARCECA: Oh, I'm sorry DeWire.

19   D-E-W-I-R-E.  Do you swear to tell the truth, the

20   whole truth so help you God?

21   MAJOR DEWIRE: I do

22   TONY MARCECA: Mr. Bailey would you

23   please take a sound check around the room?

24   MR BAILEY: Yes. My name is Don Bailey.  I

25   represent Darrel G. Ober who's the plaintiff in this

2

1    matter.  If the other counsel and attendants could

2    identify themselves giving their address and

3    telephone number for the record please.

4         JOANNA REYNOLDS: My name is Joanna

5    Reynolds.  I'm the assistant counsel with the

6    department and I represent the State Police

7    defendants in this matter.  My address is 1800

8    Elmerton Avenue, Harrisburg PA, 17110.  My

9    phone number is 717-783-5568.

10        BARBARA CHRISTI: My name is Barbara

11    Christi, Chief Counsel, Pennsylvania State Police.

12    Same address and telephone number as those

13    given by Assistant Counsel Reynolds.

14        MR BAILEY: Thank you ladies.  Let me ask.

15    Counsel usual stipulation objections, except less

16    then the form, reserved till the time of trial.   Is

17    that acceptable?

18        BARBARA CHRISTI: Yes

19        MR BAILEY: Major DeWire as indicated my

20    name is Don Bailey.  Just a few instructions or

21    introductory remarks here before we begin.  This is

22    a video deposition.  We are required to maintain a

23    copy of the deposition here.  It's here for you to

24    come and view at your leisure.  You're allowed to

25    do that and naturally we would accommodate you.

1   I assume the attorneys here are representing you
2   here today.  I don't know that.  I'm just gonna
3   conduct myself as if they do.  I assume they do.  So
4   they're going to be getting a copy.  You can work
5   through them if you want to get a copy.  They're
6   going to be getting a copy for the defendant.  So
7   obviously you're not a defendant in this matter.
8   You are in fact a witness here and I'm going to be
9   asking questions and in that regard.  If at some
10  time during the process you have a desire to ask
11  me where I'm going with questions or what I mean
12  by a question for any reason curiosity or confusion
13  makes no difference.  I want you to feel free to do
14  that and that offer extends to opposing counsel as
15  well.  I don't mind in doing that.  I'm not interested
16  in trick questions or distorting the record.  We
17  want to get all the facts, get your complete
18  response to questions, and build a good fact
19  record.  If at anytime you need a break or for some
20  reason counsel would want to talk to you or you'd
21  want to talk to them.  I don't like to yield when
22  there's a question on the table, but I probably
23  would in most cases.  A break for any other reason
24  any other time is fine.  Just request it, okay?  Sir,
25  do you have any questions for me before we begin?

1      MAJOR DEWIRE no.

2      MR BAILEY: Major DeWire do you mind if I

3   just refer to you as Major?

4      MAJOR DEWIRE: That will be fine.

5      MR BAILEY: Okay.  Major can you very

6   quickly tell us how you where employed and in

7   what capacity with the Pennsylvania State Police?

8      MAJOR DEWIRE: I'm employed by the

9   Pennsylvania State Police, as the Director of the

10  Bureau of Liquor Controls Enforcement.

11     Q: And how long have you held that position?

12     A: Since July of 2000.

13     Q: Now can you just give us a brief, I think we

14  all pretty much know what the bureau does, but

15  give us a brief description of the bureau

16  organizationally.  By that I mean some of the

17  divisions, how many people you have in your

18  bureau.

19     A:  The bureau consists of two divisions.  One

20  being the administrative division which is under

21  the guidance of Captain Leonard McDonald.  The

22  other is the administrative division, which is under

23  the supervision and direction of Captain Darrell

24  Ober.

25     Q: Now.  What position did you hold with the

1    Pennsylvania State Police before you assumed the

2    Directorship of LCE?

3        A: I was a Captain and my assignment was

4    the Troop Commander for the Troop AP in

5    Montoursville.

6        Q: Around July of 2000 you became Director

7    of LCE.  Is that correct?

8        A: That's correct.

9        Q: How long have you known Darrell Ober?

10       A: I met Darrell Ober when I was promoted to

11   Captain and transferred to departmental

12   headquarters and placed in charge of a staff

13   inspection unit.  I'm going to make a guess as to

14   what year that was, but I would say that was

15   probably in '94.

16       Q: Now do you have a recollection of when

17   Darrell Ober came to LCE?

18       A: Darrell was in LCE before I arrived.

19       Q: What was he doing there when you

20   arrived?

21       A: When I arrived he was, as he is now, the

22   Director of the Administrative Division.

23       Q: Let the record show I'm being hailed off

24   stage here.  I need a copy of the amended

25   complaint.  I need a copy off the computer.  Now he

1  was in charge of Administration you say?

2  A: The Administrative Division.

3  Q: The Administrative Division. Now during

4  the process of assuming the Directorship of LCE

5  did you ever have opportunity to either promote or

6  I guess technically it would be recommend people

7  for promotion within the bureau?

8  A: I think the opportunity was present to do

9  things of that nature.

10  Q: And that's consistent or normal. I mean

11  that's a part of the command function. I would

12  assume that for time to time in any organization

13  like the Pennsylvania State Police one of your

14  duties is to evaluate personnel and to recommend

15  personnel for promotion. Is that correct?

16  A: That's correct.

17  Q: Major you don't have the authority to

18  promote someone yourself within LCE. That's

19  something that is done according to procedures

20  and policies that are governed by regulation and

21  practices within the department as a whole. Is

22  that correct?

23  A: That's correct.

24  Q: So you don't have the power. You can't

25  just, let's say you have someone who's a real

1  achiever and you can't say to that person, let's say

2  you have a sergeant somewhere a corporal, a

3  trooper, lieutenant, whatever.  You can't just say

4  you know "Jane or Joe" or whatever "you've been

5  working doing just an outstanding job for a couple

6  years I'm promoting you."  You don't have that

7  kind of authority.  Do you?

8      A: Assuming we're talking about enlisted

9  members of the State Police, I do not.

10      Q: Okay.  Now, do you have the authority to

11  promote on the spot?  For example, civilian

12  employees?

13      A: No

14      Q: Do you have the power to promote on the

15  spot an officer who's within your command?

16      A No.

17      Q: Okay.  How are promotions handled within

18  the Pennsylvania State Police?  If you'd just give

19  me a general description.

20      A: Promotion for enlisted members is

21  accomplished through testing procedures and then

22  banding or grouping individuals.  Depending on

23  what rank we're discussing it's at the

24  Commissioners discretion then.

25      Q: So I am going to assume that as a

8

1  Commander you would hopefully, as all
2  Commanders like let's say at your level would
3  have, you would have a significant impact on
4  promoting someone in your command.  Let me give
5  you a little offer about where I'm coming from from
6  that.  I'm just trying to learn from you what effect,
7  in your capacity as a Commander, what effect you
8  would have on promoting someone or
9  recommending someone.  Now I'm sitting here
10  because I've never walked in your shoes, and I
11  don't know how the State Police actually do this.
12  You know, there's objective and subjective rating
13  criteria and that as someone who's a Commander
14  you would have an input in the evaluation process
15  that would include the opportunity to recommend
16  somebody for a promotion.  But that ultimately,
17  that decision is not in your hands.  It's somewhere
18  above you and I'd like you to respond to the
19  question of: What roll do you as a Commander
20  have in the promotion of personal who are within
21  your command and inferior to you in rank?
22      A: Often times its very little roll.  It depends
23  upon the direction that the front office or the
24  Commissioner wants to take.  It may well be that
25  and individual I consider worthy of promotion and

9

1    would recommend for promotion, but that does not

2    seem to fit in to where the administration desires

3    the promotion process to go.  In that case I have

4    very little input.  If they have no predetermined

5    direction or agenda that they want to go then my

6    input and recommendations I think have more

7    weight then.

8        Q: In a situation all things being equal where

9    those above you in the chain of command have no

10   particular interest.  Don't have an eye on a position

11   or eye on a person for a position.  All things being

12   equal it's fair to say then that in that kind of

13   situation your recommendation, you would assume

14   would carry significant weight.  In a situation like

15   that if you wanted someone for a position.

16       A: I would assume that.  Yes

17       Q: Alright.  And in a situation where there

18   was opposition to a person for a particular position

19   and you were aware of that to some extent or some

20   degree it's fair to say because you do not control

21   the process that your recommendation may not

22   have that much impact.  I realize that's sort of a

23   common sense basic question.  But under those

24   circumstances your recommendation,

25   circumstance where those above you who control

1  the process ultimately don't want someone to be

2  promoted, chances are they're not going to be

3  promoted.  Is that fair to say?

4      A: I think that's fair.

5      Q: Major DeWire did you ever indicate to

6  Darrell Ober, meaning him absolutely no

7  disrespect or no dissection, that you had decided

8  that it was perhaps useless or counter productive

9  and you're going to have to explain your thought

10  process if the answer to this is yes.  But did you

11  ever indicate to him that he would not be

12  recommended for promotion because it would be a

13  useless or counter productive gesture something of

14  that sort?

15      A: I don't think I ever indicated to him that I

16  would not recommend him for promotion.  I have

17  indicated to him that...let me step back a moment.

18      Q: Explain in your own words.  Go ahead.  I'm

19  sorry

20      A: One of the legs of promotion or the arms of

21  promotion is in making the individual that I feel

22  should be promoted present or visible to the

23  Commissioner or the front office.  So they can

24  evaluate how he performs and recognize that

25  individual.  Now that is done through a variety of

1    ways.  One of the ways would be, for example

2    would be to send them over representing the

3    bureau in circumstances where there would be

4    other Commanders and the Commissioner present.

5    I have in a conversation indicated to Cpt Ober that

6    I felt that that exercise would not be very valuable

7    in gaining his promotion.

8        Q: Why?

9        A: Because of the atmosphere surrounding

10   Captain Ober and his relationship with the

11   Commissioner, as I understood it to be.  And that

12   was that Captain Ober had initiated a lawsuit

13   against the Commissioner.

14       Q: Are you making reference to this lawsuit?

15       A: Yes

16       Q: Are you referring oh, I'm sorry.  So your

17   testimony here today is that this conversation that

18   you shared with Captain Ober took place after this

19   particular lawsuit was filed?

20       A Yes.

21       Q: And let me, before this lawsuit was filed do

22   you have a recollection of any other legal actions in

23   which Darrell Ober was involved with the

24   department and/or the Commissioner?

25       A: There were, as I understand it a series of

1  legal actions.  I am not that up on the technical

2  terms of it involving Captain Ober and the

3  department.  One of them being a motion he had

4  filed to over turn or declare nol and void a transfer

5  of Captain Ober to Greensburg.  I believe.  There

6  was some legal action filed as a result of that, and

7  there may have been other legal action filed after

8  that that may have ended up dismissed.   I'm not

9  that certain of that.

10  Q: Well.  Why did you assume and if you

11  didn't assume what was it based on that Mr. Ober

12  shouldn't be sent to or provided the opportunity to

13  participate in activities that would make him "

14  visible to the front office"?

15  A: When I took over the bureau I was aware

16  that there was some tension existing between

17  Captain Ober and the front office.  My plan at that

18  time was to minimize the contact between the two,

19  because common sense told me that it would not

20  be a good situation for either individual to be in too

21  direct of contact.

22  Q: So you felt that this was something that

23  was important to the front office?  Let's explore

24  this.  You felt that this was important the front

25  office or that it was important to Darrell Ober or

13

1    that it was important to you?  That your best

2    interest or Darrell's best interest, or the front

3    office's best interest would be served by not

4    making him available.  Could you sort of weigh

5    them or compare them.  Who's interest were you

6    protecting and why?

7         A: The interest that I was protecting was the

8    interest of the front office and the interest of

9    Captain Ober.

10        Q: Okay

11        A: I saw no benefit for me.

12        Q: Okay.  Now with that eliminated let's talk

13   about what. I anticipated I think your response,

14   but let's talk about those two things now.  You're

15   aware of tension; those are the word that you used.

16   Now I don't in fairness to you whether you said you

17   were aware of it, whether there was some in of

18   objective thing, or whether this was something you

19   just assumed on your own.  So that's where I'm

20   gonna go now.  What, I mean you're aware there's

21   a lawsuit that's filed.  Is that correct?

22        A: That's correct.

23        Q: Okay.  Joanna could you hand me, yes.

24   Thanks.  Thank you very much

25        JOANNA REYNOLDS: You're welcome.

14

1    MR BAILEY: You are aware that there's this

2    lawsuit Darrell filed, and we're talking about the

3    current lawsuit in which Colonel Evanko is a

4    defendant, right?

5    A Yes.

6    Q: We're not talking about, and I think you

7    responded to an earlier question, we're not talking

8    about an issue involving a transfer which you

9    thought was Greensburg.  The point is we're not

10   talking about that.  We're talking about this

11   current federal lawsuit, right?

12   A Right.

13   Q: When did you learn about the current

14   federal lawsuit?

15   A: I can't give you a specific date.  It was after

16   I was down here.  Captain Ober advised me that he

17   would be filing that action.

18   Q: Okay.  Have you ever seen the lawsuit

19   before today?

20   A No. I don't think so.

21   Q: Okay.  So you've never read it.  You don't

22   know what goes into it?

23   A: No.  I'm not aware of that

24   Q: Alright.  So how extensive was the

25   discussion that you had with Captain Ober?

1    A: The discussion that I referred to relative to

2  keeping Colonel Evanko and Captain. Ober out of a

3  face to face situation is that what you're referring

4  to?

5    Q: Why would you want to keep them out... I

6  mean he is a Commissioner and Captain Ober is a

7  Captain. They're both hopefully, Hopefully, mature

8  responsible individuals. Lawsuits don't make for

9  good relationships when you sue somebody

10  obviously, but they are adults. They can carry and

11  use weapons, enforce the laws, administer the rule

12  and regulations, and enforce the laws of the State.

13  Why, I'm gonna assume that if they're in a room

14  and Colonel Evanko says to Captain Ober "

15  Captain I'd be grateful if you'd go over there" and

16  say it in a polite way "and sit down in the corner

17  and be quiet." I'm gonna assume Captain Ober... I

18  was in the Army my commanding officer told me to

19  do something I did it. Whether I agreed or not I did

20  it. I would assume that if that situation occurred

21  the boss is Colonel Evanko. There's certainly no

22  question about that, right?

23    A: That's correct.

24    Q: What would give you cause to think there

25  might be a problem with having those two together

1 in a room to avoid, your word was I think a

2 confrontation?  I'm not sure what your words were,

3 but what were you afraid of?

4      A: I don't know that I could characterize it as

5 being afraid of something.  What I was striving to

6 do was to utilize a cooling period.  A cooling off

7 period where tensions would be lessened between

8 the two.  If in fact they existed and it would be

9 logical to assume they did.  Given that Captain.

10 Ober had filed a lawsuit against Colonel Evanko.

11      Q: But did that concern or effect decisions

12 that you made about who to recommend for

13 promotion?

14      A: No

15      Q: You knew that if you did not provide an

16 opportunity for Captain. Ober, for one of a better

17 description, strut his stuff to be visible and appear

18 that chances are he's not gonna be promoted,

19 right?

20      A: I'm not sure that that would have stopped

21 him from being promoted or denied a promotion

22 opportunity.

23      Q: But you also weren't sure that he would be

24 denied a promotional opportunity because he sued

25 the Commissioner.  Is that correct?

1    A No.  I'm not certain that he would have
2    been.  So that is correct.
3        Q: Would you deny someone a promotional
4    opportunity if they felt compelled to confront you
5    in a legal way?  Would you like to think that you
6    would not deny them a fair opportunity, simply
7    because they legally disagreed with you?
8        A: That's a pretty broad statement.
9        Q: I think it's pretty specific, but if it's broad
10    that's okay.   I was wondering how you would
11    react.
12        A: Well I'm talking levels of lawsuit.  There are
13    people who have initiated actions against me that I
14    have in fact encouraged, because it would bring
15    about a resolution to a problem that existed.  I
16    have been aware of lawsuits filed that almost
17    become a personal nature.  When it becomes a
18    personal nature I think it's probably
19    understandable to assume that there would be
20    some animosity attached to it.  I would expect it.
21    So in response to your question, if it were one of
22    those minor events that I've discussed I would
23    certainly not have any objection to promoting that
24    individual.  If it where a major event, it became
25    personal, then I would have to seriously look at

1  whether the fact that this thing became a personal

2  event whether that would have clouded the

3  judgement of the individual to make an

4  assessment in that case.

5      Q: Well in this case is it fair to say that you

6  thought that Mr. Ober's actions might cloud the

7  judgement of the Commissioner?  Is that what

8  you're telling us?

9      A No.  What I am saying is that the

10  Commissioner may have looked upon Captain.

11  Ober and said that his judgement to proceed with

12  this may be indicative of someone I don't want to

13  promote.

14      Q: For that reason your telling us that you

15  didn't make Captain. Ober available for

16  opportunities that might enhance promotional

17  chances.  Is that right?

18      A: I didn't feel those opportunities would

19  enhance Captain. Ober's promotional chances.

20      Q: You did think they would do him any good

21  did you?

22      A: That's correct.  I did not think they would.

23      Q: Because you didn't think they would do

24  him any good you didn't put him in a position to

25  number one be exposed to the front office, as you

1   put it, and secondly you felt it would be best to

2   avoid... I don't know what word you used, and I

3   use the word confrontation.  I think you sort of felt

4   that was maybe to strong.  But that there wasn't

5   much to be gained by having those two together so

6   to speak.  I don't know quite how to describe it.

7   I'm just going from what you told me.

8       A: I think you've described it pretty well.  I

9   saw very little to be gained and I saw the possibility

10  of some harm to be done.

11      Q: That begs a question.  What does that say

12  about your opinion of Colonel Evanko?  I don't

13  understand.  He's the Commissioner of the State

14  Police.  He has duties and responsibilities to his

15  job.  You seem to be describing a conclusion you

16  reached on your part, because you didn't feel that

17  Colonel Evanko could be objective in evaluating

18  Captain. Ober.  Now remember you told us you

19  never read this lawsuit, never saw it.  So I am

20  gonna come back and I'm gonna ask you what you

21  did know underline situation.  Right now I'm going

22  to finish exploring your reasoning and thought

23  process as to why you felt so strongly that had to

24  be avoided.   The reason I ask that, the reason I'm

25  asking these questions is we're talking about a

1 man's career.  We're talking about his right of pay.

2 We're talking about his future his family.  Can you

3 tell me why you would reach that conclusion and

4 not counsel Captain. Ober about it or maybe you

5 did.  Did you counsel Captain. Ober about this?

6     A: About?

7     Q: I'm not gonna recommend you or give you

8 this opportunities.

9     A: No.  I never said that I would not

10 recommend Captain. Ober for promotion, because

11 that would not be correct.  I would recommend him

12 based on his performance.

13     Q: Alright let's stop there.

14     A: Okay

15     Q: Alright you would recommend him based

16 on his performance.  Now obviously what that

17 means is... How many years you been in

18 Pennsylvania State Police?

19     A: I'm in my 35th.

20     Q: So you provided many many years of

21 service.  Is it fair to say you have a positive,

22 obviously you do if you describe in your word... I'm

23 trying to ask a silly question, forgive me, but I

24 mean I got to do this job here.  Obviously you have

25 a positive view on Captain. Ober based on his

1  performance and all things being equal.  You

2  would recommend him or he's someone who you

3  feel can make a very positive contribution to the

4  State Police.  I like you to describe it in your own

5  terms if you would please.

6      A: I consider Captain Ober to be an individual

7  that I would seek out if I were placed in charge of

8  the bureau, and try to recruit him to be there.

9      Q: So that means that this is a man that you

10  have a high opinion of and you feel that he can, he

11  has the ability and the qualifications to serve the

12  Pennsylvania State Police well.  Is that fair to say?

13      A: That accurate yes.

14      Q: What's happened to his career?

15      A:  You're asking me what has happened?

16      Q: Yes sir. You're his Commander and I want

17  an honest opinion from you.  I want to know what's

18  happened to his career.  You did not put him in a

19  position to be promoted, and the bottom line

20  question, and you've explained an awful lot as to

21  why you didn't do. That yet you have a high

22  opinion of Captain Ober and feel he's someone that

23  you'd seek out for these kind of things.  Obviously

24  you're a pretty fine individual.  I mean it comes

25  through.  Obviously you bare absolutely no malice

1   or ill indention towards Captain. Ober that comes

2   through.  Now I'm asking you a different question.

3   I'm getting away from Major DeWire's personal

4   opinions.  Observing all the things that go on

5   around you what's happened to Captain. Ober's

6   career in the Pennsylvania State Police?  Good or

7   bad, maybe nothing's happened, but let's hear

8   what you have to say.

9       A: Captain. Ober was definitely on a fast track

10   through the ranks to where he currently is.   By

11   the same token once you achieve the rank that he

12   is the career opportunities to advance are not there

13   in the same quantity that they are with the lower

14   ranks.   Captain. Ober's career has hit a roadblock

15   and I feel that road block in some part is due to the

16   current legal situation between the Commissioner

17   and Captain. Ober.  Now that's my opinion.

18       Q: Yes sir.  That's what I'm after and I'm

19   grateful to you.  That's all I can ask of you.

20   Alright, let's talk about that for just a little bit.

21   Based upon your knowledge Captain. Ober filed

22   the current lawsuit against the Commissioner after

23   he had already been assigned to LCE.  Am I correct

24   about that?

25       A: Yes

1    Q: And matter of fact, although there's not a

2    date on here, I believe this lawsuit was filed on or

3    about January of the year 2001.  Am I correct with

4    that Darrell?  It was January 16th?  Am I correct?

5    Thank you, sir.  Okay on or about January 16th

6    2001 Darrell files this lawsuit.  You may want to

7    take... As a matter of fact I want to request a five-

8    minute recess.  Tony I'd like to suspend for five

9    minutes.  And I would respectfully ask you to

10   review that and read that lawsuit, okay?

11   A: Okay

12   TONY MARCECA: The time is 9:54 and we are

13   now suspending.

14   MR BAILELY: My tape recorder's running,

15   Tony.

16   TONY MARCECA: It's 10:10 am and we're

17   continuing the deposition with Major Phillip

18   DeWire, on March 6, 2002.

19   MR BAILEY: Okay Major you had had the

20   complaint there and an opportunity to look at it.

21   I'm going to, I might give you just a little bit of a

22   background of some of the allegations.  Remember

23   that these are allegations that are made in this

24   particular case.  You shouldn't except any of the

25   allegations as fact, they're allegations.  They're no

1    going to be proven unless until a fact finder,

2    presumably a jury passes judgement on them.  Did

3    you at sometime ever hear that Darrel Ober had

4    run a file of the Commissioner because he had not

5    handled one of his duties properly or anything like

6    that?

7         A: Yes I did.

8         Q: Where did you hear that?

9         A: I'm not sure where I first heard it, but

10   likely I would say rather confidently it was Major

11   Thomas Williams.

12        Q: Describe for us what Major Williams said.

13        A: I think that Major Williams outlined to me

14   briefly that Captain Ober had gotten involved in a

15   situation where there was an allegation of buying

16   appointments to the State Police and that this

17   information for one reason or another did not get

18   to the Commissioner. I think the main reason is

19   that it was stated that it was to be confidential for

20   Captain. Ober, as I understand.   So Captain. Ober

21   had apparently passed the information to one of

22   the Deputy Commissioners, Lt. Colonel Hickes.

23   Subsequent to that time, sometime after that the

24   information was revealed to the Commissioner and

25   that had expressed his displeasure with the way

1   that information got to him and the timeliness of it.

2       Q: Did Major Williams ever indicate there was

3   a... this was a FBI investigation not a State Police

4   investigation?

5       A: Yes he indicated to me that the information

6   apparently originated from an investigation by the

7   FBI into corruption in Western Pennsylvania.

8       Q: Did Major Williams ever indicate that the

9   FBI confidentiality concern?

10      A: He indicted, as I recall, he indicated to me

11  that there was a request for confidentiality, but at

12  some point I was presented with conflicting

13  statements on that.  In one case they maintained

14  the FBI had requested confidentiality, and on

15  another that there had been no such request for

16  confidentiality.

17      Q:  As understand your testimony was it

18  Major Williams that had indicated that there was a

19  FBI request for confidentiality?

20      A: I can't say that I have a specific recollection

21  of him saying that.

22      Q: Do you recollect who had indicated that

23  there was a FBI interest in confidentiality?

24      A: I don't.  Once again I don't have that

25  specific recollection.

1    Q: That's fine.  Do you recollect what the
2    source of the information was that you indicated
3    that you had received conflicted information?  Do
4    you recollect the source of the information that
5    there was not a FBI request for confidentiality?  Or
6    there may not have been.  Whatever the
7    circumstances were described to you.  Do you
8    remember who that came to you from?
9        A: That may have come to me through
10   Captain. Ober.
11       Q: When did Mr. Williams talk to you about
12   this?
13       A:  It was an ongoing thing.  He was the area
14   Commander which placed him in command
15   ultimately of the area in which my troop was
16   located.   His office was based and we would have
17   frequent conversations.
18       Q: Can you tell us when in time that
19   conversation with Mr. Williams may have been?
20       A: When you say that conversation?
21        Q: Well you had some conversations about
22   this pickle that Ober was in with the
23   Commissioner.  Was Williams doing an
24   investigation at that time or was this just a
25   conversation you had?

1    A: We had many and varied conversations.

2    The first would have been prior to the assignment,

3    I believe, of Major William to the investigation.

4    Q: Was it on or about that time that you were

5    the impression, at least, that there was

6    confidentiality request by the FBI?

7    A: It would have been during those

8    conversations that that information came out.

9    Q: Did Mr. Williams? Did Major Williams ever

10    indicate anything to the contrary?  You said it may

11    have been Mr. Ober who indicated that there may

12    or may not have been a FBI request for

13    confidentiality.  I'm not going to question that.  I

14    mean it's you recollection that counts, but what

15    I'm is about Mr. Williams.  Did Mr. Williams

16    indicate that he felt there was not a FBI request for

17    confidentiality?  I'm not implying that there was.

18    I'm just asking what you recollect.

19    A: Yes, when you say ever, yes.

20    Q: Did Mr. Williams ever indicate that the FBI

21    had a concern that higher ups in the Pennsylvania

22    State Police may have been involved in the alleged

23    public corruption?

24    A: Major Williams told me that the

25    information leading to this investigation was as a

1  result of some wiretaps.  An exchange on one of

2  the wiretaps indicated that this reach to the, I

3  think the quote was "the highest levels of the State

4  Police".

5      Q: Do you remember if Mr. Williams ever

6  indicated to you that that wiretap information also

7  expressed information.  You know that it contained

8  information that the Governor's office might be

9  involved?  I'm not saying they were.  I believed they

10  have been absolved.  I think everyone agrees that

11  they were not.  But the question is what was

12  discussed at the time and what Major Williams

13  may have known or thought at the time.  So that is

14  the question, if he ever indicated anything about

15  the Governor's office.  That's the question.

16      A: I don't recall the Governor's office

17  specifically being named.

18      Q: But it's fair to say, as a State Policeman,

19  when Major Williams expressed this opinion to

20  you, you know this was something that would be of

21  concern.  Because you are a member of an

22  outstanding organization it would be a matter of

23  concern that something like that could be true.

24  Not that either one of you would believe it.  I don't

25  assume that Major Williams expressed any

1   personal opinion about it, but he did indicate that

2   there was this information in a wiretap.  Is that fair

3   to say?

4        A: The information you're discussing is that it

5   may have involved someone at the highest levels of

6   the State Police?

7        Q: yes

8        A: Yes that's fair to say.

9        Q: Sir, better then thirty years at the

10  Pennsylvania State Police?  Does the FBI have any

11  right to give the State Police orders or directions on

12  an investigation?  With all due respect to them and

13  their great reputation.  The point is does the FBI

14  supervise, control, or direct the activities of the

15  Pennsylvania State Police?

16       A: They do not.

17       Q: If the FBI is working on something, an

18  investigation of some sort, and the Pennsylvania

19  State Police are working on an investigation of

20  some sort, the idea is, in a proper situation, the

21  idea is they would work together and cooperate in

22  the interest of furthering the goals of law

23  enforcement in the United States.  Isn't that

24  correct?  In other words it's a mater of comity,

25  cooperating, and working together.  Is that correct?

1   A: That's correct.

2   Q: Now if a Pennsylvania State Policemen in

3   an official capacity is communicating with the FBI.

4   That Pennsylvania State Policemen has to exercise

5   and normally would exercise their own judgement.

6   They don't take orders from the FBI. Is that fair to

7   say?

8   A: That's correct.

9   Q: Is it your understanding then that what

10  was happening here was that someone was

11  questioning Captain. Ober because he made a

12  decision on how to handle this information that did

13  not include going directly to the Commissioner and

14  telling him or what was the beef? I'm asking that

15  sincerely. What was the beef, the problem? He's

16  doing a job and he makes a judgement. What was

17  the beef? What was he suppose to do?

18  A: I think that the beef is the suggestion that

19  the Commissioner might have been involved in

20  some type of corruption.

21  Q: Can you hold on just one second? Thank

22  you; let's explore that a little more. The beef is

23  that Mr. Ober apparently did not reject out of hand

24  even a scintilla of a possibility that Commissioner

25  Evanko could be aware of or involved in something

1   wrong and didn't go tell him about the FBI

2   inquiries.  Is that the beef?

3       A: That's what I would assume it to be.

4       Q: Thirty years in the Pennsylvania State

5   Police.  I know, cause I've dealt with it on the other

6   side, that the Pennsylvania State Police do

7   outstanding investigatory work in your division.

8   LCE gets involved in investigations, don't they?

9       A: We do yes.

10      Q: Is it proper to tell the target of an

11  investigation they're being investigated?  Like

12  maybe they're being wiretapped, they're followed or

13  servailed.  I'm sure it's a very stupid question, but

14  for the record.  Is it proper to tell a target that

15  they're being investigated?

16      A: No it is not.

17      Q: Is it proper to tell a potential target that

18  they're being investigated?

19      A: No

20      Q: Why not sir?

21      A: Because in telling a potential target that

22  they're being investigated you may effect the

23  ultimate outcome of any investigation.  If they're a

24  potential target, the definition of potential to me

25  means the may very well be a target.

1    Q: If you don't know should you take a

2  chance?

3    A: I think at that stage if you don't know you

4  air on the side of not telling.  If it's such a thing as

5  an air.

6    Q: Do you know when Mr. Williams.  Did you

7  become aware at some point that Mr. Williams

8  was, for one of a better word?  I was corrected by

9  Captain. Skurkis yesterday.  I'm gonna use his

10  words, was assigned to be the investigator of.  I'm

11  just going to simply reefer to it as the Ober

12  incident.  I don't what else to call it, but the Ober

13  handling let's say of the FBI inquiry.  I don't know.

14  Did you at some point learn that Mr. Williams had

15  been assigned to investigate Mr. Ober?

16    A: I learned that Major Williams and Major

17    were co-assigned.

18    Q: Do you remember when you learned that?

19    A: No I don't.

20    Q: Did they come and interview you and talk

21  to you about Mr. Ober?

22    A: No.

23    Q: At the time that you... The events that

24  we're talking about i.e. the conversations that you

25  had with Major Williams occurred in the year

1    2001.  I'm correct about that right?

2        A: No I would say not.  Majority of them

3    occurred in 2000 prior to my transfer down here.

4        Q: Where were you at the time that they

5    occurred?  I need to stand corrected you're

6    absolutely right.  I'm thinking I got myself a year

7    ahead.  If we filed the complaint later it would have

8    been.  In fact let's lay it for the sake of the record.

9    Let me get myself straightened out okay?

10        A: Okay

11        Q: It is my understanding and if you happen

12    to know any facts to the contrary I'd invite

13    opposing counsel to correct me.  It is my

14    understanding that the FBI talked to Captain.

15    Ober on or about about this investigation into

16    alleged influence pedaling or whatever it was in the

17    fall of 1998.  Is that square with your recollection

18    calendar?

19        A: I would say that would be pretty accurate.

20        Q: That it was actually the spring of 99 when

21    you have had a conversation with Major Williams

22    about the Commissioner's.  Well about the Ober

23    incident with the FBI.  That would have been that

24    spring early summer of 99.  Is that correct?  Cause

25    you said the year 2000.  We need to try and

1    A: July of 2000 was when I was transferred

2    down to the Bureau of Liquor Control

3    Enforcement.  Prior to that I was the Major or the

4    Captain at Montoursville.  During that time I was

5    Captain at Montoursville I had many conversations

6    with Major Williams about a wide variety of things.

7    That's why I have such a difficulty say in the

8    spring I talked about this thing.

9    Q: You do recollect, you have indicated that

10    least one of those conversations was before he was

11    assigned his investigatory duties as per Captain.

12    Ober.

13    A: Yes.

14    Q: It was during that time you recollected he,

15    he being Major Williams, your best recollection is

16    that he had indicated that there was some kind of

17    confidentiality issue there with the FBI.

18    A: There was a claim that the FBI had

19    requested confidentiality yes.

20    Q: Did Major Williams appear to be

21    questioning that or was he assuming that?  Do you

22    remember how he treated it?  How he appeared to

23    treat that.

24    A: The initial comments on it were simply as a

25    matter of fact as in relating circumstances to a

1    story.

2    Q: Major did he indicate why he came to that

3    conclusion?  In other words where did he get the

4    information?  Did he say he talked to Captain.

5    Ober?  Did he say he talked to the Commissioner,

6    Mr. Coury, Mr. Westcott?  Did he say where he got

7    that?

8    A: It is my understanding that the

9    information came from the Commissioner's office

10    or Deputy Westcott.

11    Q: At any time did Mr. Williams indicate to

12    you that he had talked to the FBI?

13    A: I think that at some point they did speak

14    with the FBI during the course of the investigation.

15    Q: Did Mr. Williams ever indicate to you what

16    the FBI said to him?

17    A: I would feel confident that we discussed it,

18    but I don't have a distinct recollection of it.

19    Q: If I told you that I have information I

20    believe to be highly reliable that the FBI did

21    indicate that they have an expectation of

22    confidentiality are any fact known to you that

23    would be in conflict of that?

24    A: No.

25    Q: Secondly whether the FBI asked for,

1   indicated wanted, expressed, cared about, intoned,

2   implied, or overtly requested or not confidentiality.

3   Are you telling us that as a investigator you believe

4   that a investigator's duty is not to tip off a target or

5   potential target regardless of what anyone else

6   does when you knowledge of an investigation?  Is

7   that fair to say?

8       A: That is fair to say.

9       Q:  They're gonna demote me.  I'm gonna get

10  in trouble. With Major Williams, you had

11  discussions with him after he was assigned to do

12  the investigative work right?

13      A: Yes

14      Q: Did he indicate how he came to be

15  assigned?  How is occurred?  How he learned that

16  he was going to do this job of checking out Mr.

17  Ober?

18      A: My recollection is that he was summoned

19  down to Departmental Headquarter and Colonel

20  Westcott directed an investigation would be

21  conducted headed up by Williams and Wertz.

22      Q: Did you ever talk to Mr. Wertz about he

23  became aware or how he was assigned to this job?

24      A: No never.

25      Q: Did you ever give a statement in the

1  investigation, provide a statement, participate in

2  an interview, or anything like that?

3      A: No

4      Q: Where you ever asked for information

5  about Mr. Ober, yourself?

6      A: At anytime?

7      Q: Sure. I mean did anybody above you in

8  the chain of command or anybody who was

9  investigating Mr. Ober ever ask you for

10  information? I'm not saying it would be improper

11  to do that or implying it would be improper to do

12  that. In fact, I assume that it would probably be

13  good background. I would do it if I were an

14  investigator I know that. I'm just asking if anyone

15  ever came and asked information about Captain.

16  Ober?

17      A: Well late in the process yes I did have on

18  intense.

19      Q: Who was that?

20      A: That was Lt. Colonel Coury.

21      Q: What did he ask you about?

22      A: He asked me first of all he asked me to

23  come over to Departmental Headquarters and met

24  him in his office. Which I did, and he had Dr.

25  Walker, who is the State Police I think he's a

1  Psychologist, so the meeting consisted of Lt.

2  Colonel Coury, Dr. Walker, and me.  During that

3  meeting Lt. Colonel Coury asked me if I was seeing

4  signs of distress and stress because of the suit

5  being displayed by Captain. Ober.  He told me that

6  he was concerned about reports that he was

7  getting of Captain. Ober, and I don't subscribe to

8  this being his words but, cracking under the

9  pressures that were existing.  I don't recall him

10  saying that, but that was the concern.   Now I'd

11  like to...I'm not sure the nature of this context, but

12  I was interviewed by Captain. Brown of BPR

13  regarding the internal investigation.

14       JOANNA REYNOLDS: At this point I think I'd

15  like to go off the record because this does involve

16  an attorney work product investigation and even

17  though I think you can as you did with Major

18  Merryman explore that.  It's after the witness has

19  to be advised of his rights with regard to that. And

20  so I'm going to ask at this time that we go off the

21  record so that we can advise him.

22       MR BAILEY: First of all I do not want to go off

23  the record.  I'm leaving the record open that's

24  number one.   I prefer to do it this way.  Of Course

25  I will yield to you if you want to go talk to him

39

1    that's up to him.  I just want to make sure.... I
2    object.  I believe that this attorney work product
3    thing that has been raised in this case is being
4    used improperly to impede this lawsuit and this
5    proceeding.  I express that opinion respectfully.  I
6    understand that you the opposing counsel that we
7    have a hopefully respectful difference of opinion on
8    this matter.  So the fact situation is clear as my
9    understanding that Mr. Brown was some how
10   selected by someone, and yesterday he said it was
11   Ms. Christi, to be a investigator, supposedly for the
12   attorneys who are employees of the Pennsylvania
13   State Police not Colonel Evanko.  Who is an
14   individual defendant as are the other defendant are
15   here of the Pennsylvania State Police not being a
16   part of this action.  Number two, that the objection
17   is that some how simply because this fact witness
18   is an employee of the Pennsylvania State Police,
19   and there being no organization, corporation, or
20   other wise involved in this lawsuit. That attorney
21   work product is being used as a barrier to my
22   questioning this fact witness, Major DeWire, about
23   conversations and information that he provided to
24   Mr. Brown.  First of all I'll say this and we will
25   break so you can talk to him.  So that you can talk

1    to him.  If what your saying were correct all an
2    attorney would have to do to control litigation
3    would be to go out hire themselves an investigator,
4    and everybody that investigator talked to raise
5    some kind of objection as if it where a privileged
6    conversation.  I don't care if Mr. DeWire had
7    spoken to either one of you two attorneys.  That's
8    not privileged and further more the only rule that I
9    can see that might remotely relate to this issue is a
10   rule that, I've said this to federal judges and I don't
11   mind saying it here, that I think was probably
12   written in an insurance company's corporate
13   boardroom.  But never the less it is a so called rule
14   of professional conduct in Pennsylvania, cradle of
15   liberty, where and individual who is a member of
16   an organization who's statement would constitute
17   an admission against interest or organizational of
18   that organization who is according to the rule 4.2
19   "a party".  That that situation does not exist here.
20   I very much appreciate the opportunity to place
21   this stuff on the record, cause I know we're going
22   to get into a major conflict on it.  If counsel has
23   any rejoinder naturally please respond.  If not we'll
24   break as per your convenience and you can talk to
25   Mr. DeWire.

1    BARBARA CHRISTI: Basically I would like to
2    break at this time to advise him of his rights.
3    TONY MARCECA: It's 10:42 and the 6th of
4    March.  We're taking a break.
5    MR BAILEY: My recorder is on Mr. Marceca.
6    TONY MARCECA: Yes sir.
7    BARBARA CHRISTIE: I would just like
8    MR BAILEY: Wait Wait Wait!  He has to put
9    the time on.
10   TONY MARCECA: It's now 10:46, 6TH Of
11   March 2002.  We are resuming the deposition of
12   Major Phillip DeWire.
13   MR BAILEY: Joanna
14   JOANNA REYNOLDS: I would just like to put
15   on the record that I have advised my client of his
16   attorney client privilege with regard to any
17   interviews that were done in conjunction with an
18   attorney work product investigation in this case.
19   He has indicated that he is willing to wave that
20   privilege and will testify with regard to that.  This
21   does not constitute a waiver by the attorneys for
22   the Pennsylvania State Police and for defendants in
23   this action that we would produce any documents
24   related to that.  We would still object to producing
25   any documents related to that investigation,

42

1   because those are attorney work product

2   documents.  And with that understanding the

3   witness is you're free to examine the witness.

4       MR BAILEY: Just so the facts are clear, cause

5   this going to become part of a declaratory

6   judgement, action, or at least a motion.  I'm gonna

7   ask you this.  At the time the interview took place

8   was there any attorney involved or was this just an

9   investigator, number one?

10      A: Just the investigator.

11      Q: Number two, had you at any time retained

12  or entered into any kind of discussing with any of

13  the attorneys, either Ms. Reynolds or Ms. Christi,

14  asking them to represent you?

15      A: No

16      Q: I understand these counsel for this for

17  your particular testimony waved the objection.  So

18  could you just go ahead and answer the question,

19  and what it was simply what did Mr. Brown ask

20  you and what did you tell him?

21      A: Mr. Brown asked me a series of questions

22  about the referring to as the Ober incident.

23  Basically my response to the questions the only

24  response that was of positive nature.  I know was

25  concerning an incident in July of 2000 at a time

1  where I was working with Major Kolsnick the

2  departing Director of the Bureau of Liquor

3  Enforcement,  prior to my taking over sole

4  command of the bureau.  That event involved

5  Major Washington, and Captain. Ober's request

6  turned out to be assigned to fill a position in the

7  Emergency Management.

8     Q: That's PEMA right?

9     A: PEMA

10    Q: Go ahead.

11    A: I wasn't sure until later how it started, but

12  I had received a phone call from Major Washington

13  asking if it was alright with me if they utilized

14  Captain. Ober in that position with PEMA.  I said

15  that I had no objection to that.  A short time after

16  that, and when I say a short time it may have been

17  an hour maybe longer, I received another phone

18  call from Major Washington who told me not to ask

19  any questions and to forget about the first call.  I

20  responded why what's going on, and he said I told

21  you not to ask any questions and that ended the

22  conversation.

23    Q: Any other questions that Mr. Brown asked

24  and your responses to them.

25    A: There were no other questions that unless

1   they were getting information from me.

2       Q: If I could turn to the issue of Mr. Ober's

3   fitness for duty.  I understand you testified that at

4   some point you were called over to Lt. Colonel

5   Coury's office.

6       A: Yes

7       Q: Did the, for one of a better description, Lt.

8   Colonel Coury indicated that he, I'm gonna barrow

9   your words now correct me if I'm wrong, he had

10  received reports that Captain. Ober may be

11  cracking under the pressure of his lawsuit.  Am I

12  correct that that's pretty much what you had said?

13      A: Pretty much except I don't want to

14  subscribe to the use of the word cracking, but

15      Q: I thought you had used that before.  That's

16  why I

17      A: I did.

18      Q: I'm sorry.

19      A: You would have thinked I had used that as

20  a general generic term to what occurred.

21      Q: That's not a word that he said?

22      A: That's correct.

23      Q: So you were describing more or less what

24  Lt. Colonel Coury was saying, but you're pointing

25  out to me that Lt. Colonel Coury did not use the

1    word crack or cracking.

2        A: That's correct.

3        Q: Did Lt. Colonel Coury indicate where he

4    got that information?  What his sources where?

5        A: No he did not.

6        Q: He hadn't talked to you had he?

7        A: No

8        Q: Cause for what it's worth you get into this

9    business and you get a lot of client, and I sure got

10    a lot of respect for this one.  It's hard for me to

11    picture him cracking.  I'm gonna get away from

12    using that word cause I don't want to be unfair to

13    you.  It's not; did you see any indications that Mr.

14    Ober was some how exhibiting odd, strange,

15    bizarre behavior, or something?

16        A: No I did not.  In fact the contrary, he was

17    continuing to do his job in a professional fashion.

18        Q: At any time during the time that you were

19    in Lt. Colonel Coury's office did Mr. Coury ever

20    indicate what.  I mean we're gonna depose him

21    later on anyway.  So I sure he'll get he word that

22    he's gonna asked this.  So hopefully he can come

23    up with this for us.  Did he ever indicate where he

24    got this information that Captain. Ober was

25    perhaps suffering problems?

1    A: No

2    Q: Did he ever give you the impression that

3    he was trying to solicit cooperation from you in

4    away that you would support this idea?

5    A: No he never.  In fact I left there with the

6    impression that he was expressing a concern for

7    Captain. Ober.

8    Q: A genuine heart felt concern for Captain.

9    Ober.  If that's the way he reacted that's fine.  Is

10    that the way he reacted?

11    A: That's the message that he conveyed to me.

12    Q: Okay thank you.  Was Mr. Walker there?

13    A: Yes

14    Q: Did Mr. Walker ask any questions?

15    A: Yes he did.

16    Q: What did Mr. Walker ask you?  This is

17    Larry Walker right?

18    A: I believe that's his first name.

19    Q: And what did he ask you?

20    A: They were question very similar to what

21    Colonel Coury had expressed to me, and they were

22    concerning how Captain Ober was handling the

23    stress.  Was I seeing...

24    Q: Can we break for just one second.  I think

25    Barb's here and she needs to get in.

1    JOANNA REYNOLDS: I'm sorry I was looking

2  for your camera over here.

3    MR BAILEY: No problem it's okay.

4    JOANNA REYNOLDS: Thanks.

5    MR BAILEY: You can move to put you on

6  camera anytime.  Walk right in.

7    JOANNA REYNOLDS: That's all I need now.

8  You want to break your camera?  Let's avoid that.

9    MR BAILEY: Okay so we were at a point we

10  were talking about Mr. Walker and I ask you a

11  question about Mr. Walker and you were

12  responding.

13    MAJOR DEWIRE: My reaction was that Dr.

14  Walker and Colonel Coury had discussed what

15  would take place in this conversation prior to my

16  arrival.

17    Q: Do you have  recollection of the questions,

18  if any that Mr. Walker  asked?

19    A: I don't, no I don't have specific recollection.

20    Q: As in the side, as a Pennsylvania State

21  Policemen, as an employee with the Pennsylvania

22  State Police, there is a considerable amount of

23  internal telephone traffic.  Is that correct?

24    A: Yes

25    Q: Is it your understanding as and employee

1    that those telephone lines or telephone

2    conversations can be monitored?

3        A: I don't really know.

4        Q: Have you ever received...

5        A: I would think not

6        Q: You would think not?

7        A: Yeah

8        Q: So you have an expectation of privacy in

9    terms of your conversations with other

10   Pennsylvania State Police personal in your office

11   when you're at work.  Is that fair to say?

12       A: Yes

13       Q: So if you pick up the telephone and you

14   call Coronal Coury your expectation is that this is

15   a private, unrecorded, unmonitored telephone

16   conversation.  Is that correct?

17       A: That's correct.

18       Q: Was anyone else in the room with you

19   when Lt. Colonel Coury and Mr. Walker where

20   there?

21       A: I don't believe so.

22       Q: Where any notes taken?

23       A: Not by me.

24       Q: Do you have a recollection of whether Mr.

25   Coury took notes?

1     A: I don't think that he did.

2     Q: Do you have a recollection of whether Mr.

3  Walker took notes?

4     A: I have no idea.

5     Q: There were, I assume there were no tape

6  recorders or anything like that?

7     A: Not that I was made aware of.

8     Q: Do you know anyone else, aside from

9  yourself, who was questioned about Mr. Ober's

10  fitness for duty on or around that time?

11     A: No

12     Q: Do you know whether there's a practice in

13  the Pennsylvania State Police to investigate

14  someone for fitness of duty if they sue the

15  department or a superior?

16     A: I don't think that the filing of the suit

17  triggers an investigation for sanity.  Is that what

18  you were asking?

19     Q: The question is.  I mean I assume that

20  what you're saying is that you don't know of any

21  practice in the Pennsylvania State Police to

22  investigate people simply because they filed a

23  lawsuit.

24     A: Not.  No not to investigate the individual.

25  The filling of a lawsuit would trigger an attorney

1    work client privilege document investigation by

2    Internal Affairs.  That's why I hesitated.

3         Q: That's why I add up.  That begs some

4    question and you're just a little bit ahead of me.

5    Let me ask.  Before being called down to Colonel

6    Coury office had you had any inquiries from any

7    one in your chain above you in the chain of

8    command about Captain. Ober's fitness for duty?

9         A: No

10        Q: So when you went over there to Lt. Colonel

11   Coury's office it was like out of the blue.  I mean

12   you had no idea that Captain. Ober's fitness for

13   duty was going to be discussed.  I assume.

14        A: I had no idea.

15        Q: Have you had similar experiences being

16   called to a Lt. Colonel's office or a Deputy

17   Commissioner's office at that kind of rank and

18   being questioned about a subordinate's fitness for

19   duty?

20        A: No

21        Q: How many years in the Pennsylvania State

22   Police?  Thirty years?

23        A: I'm in my thirty-fifth.

24        Q:  Thirty-fifth year.  Have you ever had cause

25   in your thirty-five years to be concerned about a

51

1   subordinate's fitness for duty?  I don't want you by
2   the way... I'm not gonna ask you for names and I
3   don't want you to state names.  I don't like this
4   kind of thing quite frankly.  The whole type of thing
5   upsets me very much as a civil liberation.  But the
6   point is, what I'm asking you this, have you ever
7   had an occasion.  I'm sure it would have been
8   ligament.  I don't question your motive.  Have you
9   ever an occasion in your thirty-five years to be
10  concerned about the fitness of duty of someone in
11  command?  I would assume that you haven't.

12      A: Yes

13      Q: My question is without listing name, my
14  question is what's the process?  What do you do
15  when that happens?

16      A: Depends on what the concern is.  If it's an
17  immediate concern I have conceivers to take action
18  for an emergency mental commitment for the
19  individual.

20      Q: And there are state laws and regulations
21  that provide for that.  Is that correct?

22      A: That's correct.

23      Q: Okay

24      A: If it's less then emergency situation then
25  we have ordered them to submit for independent

1  psychological or medical evaluations by physicians

2  not connected directly to the department.

3  Q: Is it fair to say that when those situations

4  have arisen they have been based on your own

5  observations?

6  A: a number of them, yes.

7  Q: Is it fair to say that in some situations

8  perhaps information was provided to you from

9  different sources.  Providing you with concerns,

10  cause you know maybe they're hear say

11  information or someone telling you something.  But

12  anyway information is made available to you and

13  you make the best command decision.  Is that fair

14  to say?

15  A: That's correct

16  Q: Who does Captain. Ober report to in LCE?

17  A: He reports to me.

18  Q: I'm informing you right now, that Captain.

19  Ober would wave any objection to your sharing

20  information.  Did anyone in LCE ever come to you

21  and say that Captain. Ober is having emotional or

22  appears to be emotionally distrait?

23  A: No

24  Q: So aside from what Lt. Colonel Coury told

25  you no one said anything to you, or approached

1  you, or communicated with you any information

2  indicating that Captain. Ober was becoming

3  emotionally distrait or emotionally unfit for duty or

4  whatever?

5  A: That's correct

6  Q: When you went over and talked to Lt.

7  Colonel Coury.  I think you already indicated he

8  didn't express any sources of information, but

9  simply said he had received reports.  Is that

10  correct?

11  A: That's correct

12  Q: Well, are you familiar with regulation 1-

13  1.102C?  Do I have the right number?

14  A: I can't tell you what that is no.

15  Q: That's a little outlandish not only a pretty

16  big regulation, but you folks got regulations that I

17  assume cover a few thousand pages, right?

18  A: A few yeah

19  Q: So much for the unfair effects of the

20  constructed notice.  Let me ask this way. Well at

21  chain of command...let's take a hypothetical

22  situation where Lt. Colonel Coury is out on the

23  highway some where and just by virtue of

24  unfortunate events observes Captain. Ober

25  handling a situation.  Okay?

1     A: Okay

2     Q: What should he do with that information?

3     Should he report it to you?  Should he conduct his

4     own investigation?  And let's say he thinks that

5     Captain. Ober is not acting responsible or is not

6     acting reasonable have emotional problems of

7     something.  Screaming and shouting or jumping

8     up and down or something in those lines.  But

9     anyway what should he do?  If you know, what

10    should he do?

11    A: So as I understand the question you're

12    asking what is the responsibility of Colonel Coury?

13    Q: Right

14    A: If he sees Captain Ober acting improperly.

15    Q: Right.  The reason I'm asking that question

16    is and what concerns my about what's occurred is

17    that you're called over there.  Nobody gives you any

18    background or tells you where's this is coming

19    from or asked you any fact questions.  They just

20    ask you a general question about how he's acting.

21    That's what it sounds like to me, and that's what

22    I'm exploring.  That's the reason that I am asking,

23    and what I'm asking is and I'm you know being a

24    little bit trying to be funny I guess.  This

25    subsection C stuff about chain of command that

1    came into this case in a some what strange

2    fashion.  I want to find out if you know, there may

3    not be an answer, if according to Pennsylvania

4    State Police practice or regulation if a superior of

5    yours and Captain. Ober's saw him out there in a

6    bizarre way should they report it to you?  You're

7    his Commander should they report it to you?

8        A: Yes

9        Q: No one reported it to you did they?

10       A: No

11       Q: And when you went over for the discussion

12   with Lt. Colonel Coury and Mr. Williams there was

13   not one bit of information shared with you about

14   any fact situation where Captain Ober had

15   allegedly acted in a less then usual or you know

16   typical matter.  Is that fair to say?

17       A: You said Mr. Williams you mean Dr.

18   Walker or Mr. Walker?

19       Q: Yes I'm sorry, yes

20       A: Yes your statement is correct.  There was

21   no shared information.

22       Q: Did you at anytime ask what's this about

23   or what's this based on?  I'm sorry.  Did you at

24   anytime ask what's this about or what's this based

25   on during that meeting?

1    A: No not that I recall.

2    Q: How long did this meeting last?

3    A: Five minutes probably.

4    Q: Did anybody say to you "We don't want

5  you to tell Captain. Ober that we brought you over

6  here to ask you about this"?

7    A: No

8    Q: Did you tell Captain. Ober?

9    A: Yes I did.

10    Q: Isn't fair to say that as a Commander, I

11  would assume, you felt that was your duty to tell

12  him?

13    A: Yes

14    Q: Correct.  Okay thank you.  And you were

15  not requested not to.

16    A: That's correct.

17    Q: Did it ever occur to you that you were used

18  to carry a message a mailed threat of some type

19  back to Captain. Ober?

20    A: Yes that occurred to me.

21    Q: Now, in the complaint references made,

22  one of the complaints that Captain. Ober is making

23  is that he had requested the opportunity to serve

24  with PEMA.  I'm gonna ask a few more questions

25  about that, because I know you did get a call from

1    Major Washington.  Do you have any recollection of

2    Mr. Ober wanting to, I guess the situation would

3    be reappointed, wanting to be reappointed to

4    PEMA?

5        A: I learned after the phone call that he had

6    expressed the desire to fill that position and that's

7    what had precipitated the chain of events.

8        Q: Okay now here's where I was confused,

9    cause I'm trying to place this PEMA.  These two

10   conversations that you had with Major Washington

11   into a sort of a time frame that related to who

12   Captain. Ober's Commander was.  Because you

13   had mentioned I believe you had mentioned Major

14   Koselnik

15       A: Koselnik

16       Q: Koselnik.  I don't understand.  Had you

17   left?  I mean had you come to LCE or just replace

18   Mr. Koselnik or what occurred there?  How did Mr.

19   Koselnik fit in there?

20       A: Mr. Koselnik was being transferred to the

21   northeast as an area command.

22       Q: Okay

23       A: That position did not open up until

24   approximately a month after I had been promoted

25   to the rank of Major.  So the directive was given to

1  me to do two things.  To work with the guy who

2  was replacing me as a Captain at Montoursville to

3  show him what to do.  And to work with Major

4  Koselnik to learn what he did.

5      Q: Okay that explains for me, answers a lot of

6  questions for me.  Did you ever have any

7  conversations with Major Koselnik about the PEMA

8  thing and Captain. Ober?

9      A: Yes

10      Q: Tell me about those conversations.

11      A: Major Koselnak indicated to me that he

12  had made a mistake in approving Captain Ober for

13  that position.  And that I would be well advised to

14  not appoint him to any position.

15      Q: Why pray tell?

16      A: Well I could only guess as to what his...

17      Q: Well thirty years experience you're entitled

18  sir to express an opinion as to why.  Thirty-five

19  years I'm sorry.

20      A: I felt that he was under some type of a

21  directive not to put Captain. Ober in any position

22  that he really saw, because of the on going lawsuit

23  and the difficulties.

24      Q: He was a Major at that time.  Major

25  Koselnak?

1    A: Yes

2    Q: Did Major Koselnak indicate ever having

3    any conversations with anyone above him in the

4    chain of command about Captain. Ober?

5    A: Not that I recall.

6    Q: How under wise is it possible for you to

7    give us a month.  If not a month a season of the

8    year when this conversation took place with Major

9    Koselnak?

10    A: I would say in July of 2000.

11    Q:  Do you know when the investigation into

12    Captain Ober and the FBI incident when that

13    ended?

14    A: I do not.

15    Q: Do you know if it's ever ended?

16    A: I think that it ended.

17    Q: I mean did it die much like a lead balloon

18    falls slowly over on to it's side and collapses of it's

19    own weigh?  Or did somebody say "Hey this

20    investigation is over."?

21    A: The investigations of this type typically end

22    when all the investigative leads have been

23    answered and just an answer.

24    Q: And a report is done?

25    A: And a report is done.

1    Q: Now we've had some testimony I believe

2    about reporting at least verbal reporting and I

3    believe about maybe there's some written reports.

4    Did you ever see anything?

5    A: No

6    Q: Isn't that unusual?  Let me ask you before

7    you respond sir.  Let me recall let me give you a

8    little offer one to one.  I thought when I interviewed

9    Captain. Skurkis yesterday that as Commanding

10   Officer if thing ended somebody would come back

11   to you confusing your command Ober's in your

12   command and review it with you.  Now maybe

13   that's wrong.  I don't know.  One-second sir I need

14   to change this.

15   MR BAILEY: Thank you sir. Again I would

16   offer opposing counsel to correct me.  My best

17   recollection or to contribute at least, my best

18   recollection Captain. Skurkis who appears to me to

19   have been quite an expert on the some of the

20   procedures over at BPR and that sort of thing IAD

21   and all that. I thought he had indicated that if an

22   officer is being investigated or a member's being

23   investigated for some thing in the Pennsylvania

24   State Police.   When the investigation is concluded

25   that the usual procedure would be to go back to

61

1   their Commanding Officer and review it or at least
2   talk about.  Because the disciplinary decision, if
3   any, would be made by the Commanding Officer.
4   That's what I thought.  I may be wrong about that.
5   I don't know.  Let me just based on your
6   experience ask you.  Number one, for whatever it
7   may be worth, whether it's in accordance with
8   procedure or not whether, I'm right about that I
9   don't know.  You've never had anyone come and
10  review the results of the Ober incident
11  investigation with you.  Is that fair to say?
12      A: That's correct.
13      Q: Would that normally be done if there were
14  no recommendation of. My understanding is
15  there's a fact investigation done and somebody
16  does  adjudicatory process.
17      A: Your understanding...
18      JOANNA REYNOLDS: Just for the record
19  you're assuming that the investigation was
20  completed when Major DeWire was supervising
21  Captain Ober.
22      MR BAILEY: That's correct.  I'm for the sake
23  of argument I am assuming that. In other words I
24  don't know if it was over before that.  I don't know
25  if anybody knows.  God himself may not know.  I

1    don't know, but my question is if it ended during

2    the time that you supervised Captain. Ober would

3    it be reviewed with you?  Is that the way it is

4    suppose to be done?

5        A: It's fair to say that's normal procedure.

6        Q: I think you'd indicated that you assumed

7    the leadership role and thus supervisor

8    responsibility over Captain. Ober sometime on or

9    about June or July something like that of the year

10   2000.  Am I right?

11       A: I would in July probably towards around

12   the 20th or the end of July of 2000.

13       Q: One day before my birthday, good day.

14   Okay the year 2000.  Now do you have any

15   knowledge or recollection of an investigation done

16   into Captain. Ober about museum artifacts?

17       A: I don't have any personal knowledge.  I

18   heard comments made that might be the limit,

19   extent of my knowledge.

20       Q: Do you have any, as a result of the

21   comments or information shared with you, do you

22   have any time frame for when that investigation

23   began or ended?  If you know.

24       A: It seemed to be about the same time as the

25   investigation into the Ober incident.  Join in right

1  along at the same time that other one was being

2  conducted.

3      Q: Tony where are you on time with those?

4      TONY MARCECA: I have about forty minutes

5  sir.

6      MR BAILEY: How many?

7      TONY MARCECA: Forty

8      MR BAILEY: OH!!  Okay. Is it fair to say that

9  if that investigation if it ended didn't end, I mean,

10  you were not consulted about it.  It didn't end

11  during your supervision of Mr. Ober?

12      A: It's fair to say that I didn't even know an

13  official investigation was conducted on the

14  memorabilia issue.

15      Q: Have you ever known of an investigation

16  done off the books?  Does that term mean

17  anything?

18      A: Well it would depend on what type of

19  investigation.

20      Q: Do you know of any investigation where

21  somebody including witnesses were read their

22  rights and the matter was not assigned a BPR

23  number?

24      A: Well in the normal course of investigation

25  of the normal offences that's a pretty regular event.

1   But if you're asking in the context of a BPR

2   Internal Affairs investigation.

3       Q:  Have you ever directed BPR or been in

4   charge BPR or the Bureau of Professional

5   Responsibility or IAD?

6       A: I was assigned as the Director of the Staff

7   Inspection Division.  SPR we called it Staff

8   Inspection we started out.  It's one of two divisions

9   with in BPR.

10      Q: Correct

11      A: Filling that role I occasionally filled in on

12  short term temporary bases for the Director of

13  BPR.   So never as a permeate assignment but.

14      Q: Major did you ever become aware that

15  Colonel Evanko was angry or upset about how Mr.

16  Ober had handled the FBI probe and if so who

17  expressed that opinion that that him?  If you

18  recollect.  Aside from Mr. Williams, we've already

19  talked Mr. Williams.  I think, and I'm not saying

20  that he said that.  Who indicated to you, and I'm

21  not sure I would have to review your testimony,

22  but my question simply is: Did anyone indicate to

23  you that Colonel Evanko was angry about Darrell

24  Ober had handled the FBI probe?

25      A: Other then Major Williams, no not that I

1    recall.

2        Q: Has Colonel Evanko ever discussed Darrell

3    Ober with you?

4        A: No

5        Q: Aside from the incident with Larry Walker

6    has Colonel Coury ever discussed Darrell Ober

7    with you?

8        A: No

9        Q: Has Mr. Westcott?

10       A: No

11       Q: Have you ever had any discussions with

12   Mr. Conley, Hawthorne Conley.  Is he a Lt. Colonel

13   now?

14       A: Yes

15       Q: Did you know, yes go ahead.

16       A: I believe that Lt. Colonel Conley has asked

17   how Darrell was doing on occasion.  Probably no

18   more then once, twice tops.

19       Q: When?

20       A: See I don't have specific dates, but I would

21   say relatively recently.  When I say relatively

22   recently I know that's not very firm.  That's the

23   nature of the inquiry it was just in passing and

24   comment has to how is Darrell doing.

25       Q: And it was that innocuous?  In other

1   words, it was that, you know, how is he doing?

2      A: Yes

3      Q: There wasn't any definitive questions

4   asked?

5      A: No

6      Q: Do you have a recollection of Major

7   Washington ever indicating having a conversation

8   with Colonel Westcott about Darrell Ober?

9      A: No

10     MR BAILEY: Darrell I'm gonna leave the tape

11  running.  Do you just a minute.  Remember folks

12  that equipment is still on.  I'll only be a second.

13     MR BAILEY: Ladies do you have any

14  questions?

15     JOANNA REYNOLDS: We may.

16     MR BAILEY: Doing something else?

17     JOANNA REYNOLDS: Yes.

18     MR BAILEY: Do you want us to suspend or

19  just?  Why don't we just suspend for a minute

20  Tony, cause they maybe want to talk.

21     TONY MARCECA: It's 11:26 a.m..  We are

22  going to suspend.

23     MAJOR DEWIRE: Talking amongst yourselves

24  or do you want me?

25     JOANNA REYNOLDS: No we don't need you

1  Major, thanks.

2       MR BAILEY: Tape recorders are, wait a

3  second.  Tony whenever you're ready.

4       TONY MARCECA: It's 11:32, 6 March 2002.

5  We're going to resume the deposition of Major

6  Phillip DeWire, Dewene, DeWire.

7       MR BAILEY: DeWire

8       JOANNA REYNOLDS: I'm not seeing the

9  monitor coming on back there.

10       MR BAILEY: It records up there anyway so it

11  doesn't matter that's on.

12       TONY MARCECA: I believe the tape is out of

13  that sir

14       MR BAILEY: Okay, do you want to put

15  another one in there?  It doesn't matter.  It's what's

16  in the camera that records it.

17       TONY MARCECA: Let me eject this thing here.

18       MR BAILEY: Here I can do that thing.  It's not

19  on, the light right there.  Is that on? Did that

20  record?

21       TONY MARCECA: Yes sir I'll know what it is

22  in just a second.

23       MR BAILEY: No I want to see is a...

24       TONY MARCECA: That should go through if

25  a...just a second.  It's not recording, and I don't

1    know why.

2       MR BAILEY: Here let me try something.

3       JOANNA REYNOLDS: I think we're going to

4    do this all over again.

5       MR BAILEY: Is that recording?  Is that

6    running?

7       TONY MARCECA: This one

8       MR BAILEY: All set it's going.  Okay sorry.

9       TONY MARCECA: Put a cartridge in that had

10   the tab knocked out of it.

11      JOANNA REYNOLDS: Do you have to do the

12   time?

13      TONY MARCECA: We're recording and it's 11:

14   36 and we have been on camera for five minutes.

15      JOANNA REYNOLDS: Major DeWire, your

16   decision not to have Captain. Ober be more visible

17   to the front office or engage in activities involving

18   personnel from the front office. Is that based on

19   your own determination, your own conclusions, or

20   was it based on something that was told to you by

21   somebody else?

22      A: It was my own conclusion and own

23   determinations.

24      Q: Did anyone including the Deputies or the

25   Commissioner ever tell not to include Captain.

1    Ober in activities in with they were involved in?

2      A: No

3      Q: Now you indicated that when Colonel

4    Coury called you in and asked you about whether

5    or not you noticed any psychological problems with

6    Captain. Ober that you, and I'm not sure how you

7    phrased this.  You can correct me if I have this

8    wrong.  That you reached a conclusion that it may

9    have been a veiled threat that you would carry

10   back to Captain. Ober?

11     A: I think that Mr. Bailey asked if I ever

12   concluded that I was delivering a veiled threat.

13   Several days after the meeting with Colonel Coury

14   and Dr. Walker I made Captain. Ober aware of the

15   event and I did that because I did conclude it may

16   have been a veiled threat.

17     Q: Is it possible that Colonel Coury or Lt.

18   Colonel Coury was talking to you to get an

19   independent opinion of you as his Commander

20   whether or not there were any issues regarding his

21   psychological fitness?

22     A: It's very possible.

23     Q: And if Colonel Coury had been presented

24   with rumors or any information with regard to that

25   wouldn't incumbent to check you as his

1  Commander, to verify whether or not there was any

2  bases to that?

3       A: I would say yes.

4       Q: Why didn't you ask Colonel Coury what

5  information that he had that would indicate that

6  there was a potential issue there with regard to

7  fitness for duty?

8       A: I didn't think that it was an issue for me to

9  involve myself in given that I had noted no

10  problems what so ever.

11      Q: You indicated that Agent Williams told you

12  that in this investigation regarding the FBI

13  investigation and what occurred after that with

14  regard to Troop of Stanton that higher ups in the

15  State Police, there was some indication that higher

16  ups may be involved.  Is that the term that Major

17  Williams used?

18      MR BAILEY: Objection to characterization.

19  You may respond.

20      MAJOR DEWIRE: My recollection was that

21  the corruption had gone to the highest levels of the

22  State Police.

23      JOANNA REYNOLDS: And that's what Major

24  Williams told you?

25      A: That's what I recall yes.

1   Q: Did you yourself ever review the wiretap

2   tapes or review the FBI investigation and confirm

3   exactly the terms that were used in that

4   investigation?

5   A: No

6   Q: Now in response to a question from Mr.

7   Bailey about what the beef was with regard to

8   Captain. Ober, you indicated that the beef was that

9   Mr. Ober apparently didn't reject out of hand a

10  possibility that Evanko would be involved or could

11  be involved in illegal activity.

12  MR BAILEY: Objection to the form of the

13  question.  You may respond.

14  Q: Is that your testimony?

15  A: That's my recollection, yes.

16  Q: And is that your conclusion as to what the

17  beef was?

18  A: That's my conclusion.

19  Q: And that is not something that was related

20  to you by Commissioner Evanko?

21  A: That's correct.

22  Q: And you have not discussed with

23  Commissioner Evanko exactly what his beef was

24  with either Captain. Ober or any other persons

25  that were involved in that investigation?

1    A: That's correct

2    Q: You also indicated that you had a

3    conversation with Major Koselnik when you came

4    into the Bureau of Liquor Control Enforcement or

5    short before you came into the Bureau of Liquor

6    Control Enforcement.

7    MR BAILEY: Objection to the form of the

8    question.  You may respond.

9    Q: Do you recall that conversation?

10   A: Yeah, I had many conversations...

11   Q: Okay specifically do you recall testifying

12   about, in this deposition,  why you shouldn't

13   appoint Captain. Ober to PEMA?

14   A: Yes

15   Q: And you indicated that you reached a

16   conclusion that he was under some directive, I'm

17   sorry.  That Major Koselnik was under some

18   directive not to appoint Captain. Ober to PEMA.  Is

19   that correct?

20   MR BAILEY: Objection to the form of the

21   question.  You may respond sir.

22   A: I think that's essentially correct, yes

23   Q: And again that was your conclusion based

24   on what Major Koselnik told you?

25   A: That's correct.

1    Q: Did Major Koselnik tell you that he was

2    under some directive not appoint Captain. Ober to

3    PEMA?

4    A: No

5    Q: Did anyone tell you including the Deputies

6    or the Commissioner that they issued a directive

7    that Ober was not to be appointed to PEMA?

8    A: No

9    Q: That's all I have

10    MR BAILEY: Major I'd like to express my

11    gratitude for you coming here today and answer

12    question.  I appreciate your courtesy, thank you.

13    MAJOR DEWIRE: I'll stop short of saying it

14    was my pleasure.

15    MR BAILEY: Hold on just one second.

16    TONY MARCECA: It's 11:43 and the

17    deposition of Major DeWire is now concluded.

# INDEX

I

attorney work product, 35, 37

BPR, 34, 55, 58
Brown, 34, 35, 38, 39
bureau, 4, 5, 10, 11, 19, 39
Bureau of Liquor Enforcement, 39

Commander, 4, 7, 19, 24, 50, 51, 52, 64
Commanding Officer, 55
Commissioner, 8, 10, 11, 14, 15, 16, 17, 20, 22, 24, 27, 28, 30, 32, 46, 63, 66, 67
Conelly, 59
Coury, 32, 34, 40, 41, 42, 43, 44, 45, 46, 48, 49, 50, 59, 63, 64

Darrell, 1, 4, 5, 9, 11, 12, 13, 21, 59, 60
Deputies, 63, 67
Deputy Commissioners, 22

Evanko, 1, 13, 14, 15, 17, 28, 35, 59, 65, 66

FBI, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 54, 59, 64, 65
fitness for duty, 40, 45, 46, 64

Hickes, 22

IAD, 55, 58
Internal Affairs, 45, 58

investigation, 22, 23, 24, 25, 26, 27, 28, 29, 30, 32, 33, 35, 38, 45, 49, 54, 55, 56, 57, 58, 64, 65, 66

Koselnik, 52, 53, 66, 67

Merryman, 35

Ober, 1, 4, 5, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 24, 25, 27, 28, 29, 30, 31, 32, 33, 34, 39, 40, 41, 42, 45, 46, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 63, 64, 65, 66, 67
object, 35, 38
objection, 16, 36, 38, 39, 48

PEMA, 39, 52, 53, 66, 67
Pennsylvania State Police, 2, 4, 6, 7, 18, 19, 20, 25, 26, 27, 28, 35, 38, 43, 44, 45, 46, 50, 55
psychological, 47, 63, 64

request for confidentiality, 23, 24, 25

Washington, 39, 52, 60
Wertz, 29, 33
Westcott, 32, 33, 59, 60
Williams, 22, 23, 24, 25, 26, 29, 30, 31, 32, 33, 50, 59, 64, 65
work product investigation, 35, 37