## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                               :
                                               :
        Plaintiff                        :    No. 1:CV-01-0084
                                               :    (Judge Caldwell)
    v.                                       :
                                               :    CIVIL ACTION – LAW
PAUL EVANKO, MARK                              :
CAMPBELL, THOMAS                               :    JURY TRIAL DEMANDED
COURY, JOSEPH                                  :
WESTCOTT, HAWTHORNE                            :
CONLEY                                         :

FILED
HARRISBURG, PA

MAR 2 0 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

---

### EXHIBITS TO DEFENDANTS' BRIEF IN SUPPORT
### OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### VOLUME 3

23

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

DARRELL G. OBER,    *

    Plaintiff       *   Case No.

    vs.             *   1CV-01-0084

PAUL EVANKO, MARK *   (JUDGE CALDWELL)

CAMPBELL, THOMAS  *

COURY, JOSEPH     *

WESCOTT, and      *

HAWTHORNE CONLEY, *

    Defendants       *

           * * * * * * * *


VIDEOTAPED DEPOSITION OF

PAUL EVANKO

March 27, 2002


ORIGINAL


Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

2

1              VIDEOTAPED DEPOSITION

2                        OF

3    PAUL EVANKO, taken on behalf of the

4    Plaintiff herein, pursuant to the

5    Rules of Civil Procedure, taken

6    before me, the undersigned, Jennifer

7    Billstein, a Court Reporter and

8    Commissioner of Deeds in and for the

9    Commonwealth of Pennsylvania, at the

10   Technology Center, Bureau of Tech

11   Services, 2629 Market Place,

12   Harrisburg, Pennsylvania, on

13   Wednesday, March 27, 2002 beginning

14   at 9:10 a.m.

15

16

17

18

19

20

21

22

23

24

25

3

```
 1              A P P E A R A N C E S

 2

 3    DON A. BAILEY, ESQUIRE

 4    4311 North 6th Street

 5    Harrisburg, PA  17110

 6        COUNSEL FOR PLAINTIFF

 7

 8    SYNDI L. GUIDO, ESQUIRE

 9    Deputy General Counsel

10    Governor's Office of General Counsel

11    333 Market Street

12    17th Floor

13    Harrisburg, PA  17101

14        COUNSEL FOR DEFENDANTS

15

16    BARBARA L. CHRISTIE, ESQUIRE

17    Chief Counsel

18    PA State Police

19    1800 Elmerton Avenue

20    Harrisburg, PA  17110

21        COUNSEL FOR DEFENDANTS

22

23

24

25
```

4

1      A P P E A R A N C E S   (C O N T'D)

2

3    JOANNA REYNOLDS, ESQUIRE

4    Assistant Counsel

5    PA State Police

6    1800 Elmerton Avenue

7    Harrisburg, PA  17110

8        COUNSEL FOR DEFENDANTS

9

10   ALSO PRESENT: ANDREW J. OSTROWSKI,

11                ESQUIRE

12                VIDEOGRAPHER FROM PR

13                REPORTING

14                MICHAEL SOLOMON,

15                VIDEOGRAPHER FROM

16                SARGENT'S COURT

17                REPORTING SERVICE, INC.

18

19

20

21

22

23

24

25

5

1          I N D E X

2

3    DISCUSSION AMONG PARTIES          8 - 10

4    WITNESS:  PAUL EVANKO

5    EXAMINATION

6       by Attorney Bailey        10 - 321

7    DISCUSSION AMONG PARTIES    321 - 322

8    CERTIFICATE                      323

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

<u>E X H I B I T   P A G E</u>

<u>P A G E</u>

| NUMBER | DESCRIPTION | IDENTIFIED |
|--------|-------------|------------|
| One | 10/19/99 Letter to Director from Captain Ober | 29 |
| Two | Commissioner's Notes | 116 |
| Three | 11/1/99 Letter | 275 |
| Four | 3/25/92 document | -- |

7

<u>OBJECTION PAGE</u>

| <u>ATTORNEY</u> | <u>PAGE</u> |
|---|---|
| Christie | 48, 143 |
| Guido | 106, 239 |
| Bailey | 116 |

8

```
 1              P R O C E E D I N G S

 2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 3              VIDEOGRAPHER:

 4              Mr. Evanko, would you

 5         please raise your right hand

 6         and state your name for the

 7         record?

 8              MR. EVANKO:

 9              Paul Evanko.

10    PAUL EVANKO, CALLED AND SWORN TO

11    TESTIFY

12              VIDEOGRAPHER:

13              Thank you.  Mr. Bailey,

14         could we have a sound check

15         around the room?

16              ATTORNEY BAILEY:

17              Yes.  My name is Don

18         Bailey.  I represent Darrell

19         G. Ober, who is the Plaintiff

20         in this matter.  My address is

21         4311 North Second --- North

22         Sixth Street, Harrisburg,

23         Pennsylvania 17110.  My phone

24         number is (717) 221-9500.

25              ATTORNEY GUIDO:
```

Sargent's Court Reporting Service, Inc.
(814) 536-8908

9

1          Syndi Guido, Governor's

2     Office of General Counsel.  I

3     represent Colonel Evanko and

4     the other Defendants.

5          <u>ATTORNEY CHRISTIE:</u>

6          Barbara Christie, Chief

7     Counsel, Pennsylvania State

8     Police.  My address is 1800

9     Elmerton Avenue, Harrisburg,

10    PA  17110.  Office number is

11    (717) 783-5568.

12         <u>ATTORNEY REYNOLDS:</u>

13         My name is Joanna

14    Reynolds.  I'm an Assistant

15    Counsel with the state police.

16    I represent the Defendants.

17    And my address and phone

18    number are the same as Ms.

19    Christie's.

20         <u>ATTORNEY BAILEY:</u>

21         I know we have a

22    stenographer here.  If she

23    could identify herself and

24    then put a phone number down.

25    I want to specify that I am

10

1    not ordering a stenographic

2    copy; okay?  But if that would

3    change, I'd need to be able to

4    get in touch with you.

5            COURT REPORTER:

6            Sure.

7            ATTORNEY BAILEY:

8            Could you identify

9    yourself for the record?

10           COURT REPORTER:

11           Jennifer Billstein from

12   Sargent's Court Reporting.

13   Their number is (215) 564-

14   9727.

15           ATTORNEY BAILEY:

16           Thank you, Jennifer,

17   very much.  The witness has

18   been sworn?

19           VIDEOGRAPHER:

20           Yes, sir.

21   EXAMINATION

22   BY ATTORNEY BAILEY:

23   Q.      Colonel, you have been through

24   a number of --- or at least sat

25   through a number of depositions in

11

1  this case; is that correct?

2  A.      Yes, sir.

3  Q.      Well, I'm going to dispense

4  with wasting, you know, the time in

5  going through all of the different

6  preparatory things.  Would that be

7  acceptable?

8            <u>MR. SOLOMON:</u>

9            Excuse me.  If I may

10       interject, I have a

11       preliminary to --- should I

12       state it now or if you're

13       ready to proceed?  I wasn't

14       aware if you had your

15       preliminary, and now it's ---.

16            <u>ATTORNEY GUIDO:</u>

17            He needs to put his

18       preliminary on the record

19       before.

20            <u>MR. SOLOMON:</u>

21            Exactly.

22            <u>ATTORNEY BAILEY:</u>

23            I don't have any

24       objection.  I mean, it's our

25       deposition, but you go right

12

1    ahead.  You're recording by

2    alternative means today?

3              ATTORNEY GUIDO:

4         Yes.

5              ATTORNEY BAILEY:

6         Under the rules.  Okay.

7    That's fine.  Go ahead.

8              MR. SOLOMON:

9         My name is Michael

10   Solomon.  I'm employed by

11   Sargent's Court Reporting

12   Service.  Today's date is

13   March 27th, 2002.  The time is

14   approximately 9:20 a.m.  This

15   deposition is being taken at

16   Technology Center, Bureau of

17   Tech Services, 2629 Market

18   Place, Harrisburg,

19   Pennsylvania 17110.  The

20   caption of this case is in the

21   United States District Court

22   for the Middle District of

23   Pennsylvania.  Darrell G.

24   Ober, Plaintiff, versus Paul

25   Evanko, Mark Campbell, Thomas

13

1    Coury, Joseph Wescott,

2    Hawthorne Conley.  Civil

3    action case number 1CV-010084.

4    The name of the witness is

5    Paul Evanko.  Will the

6    attorneys present state your

7    names and the parties that you

8    represent?

9              ATTORNEY GUIDO:

10             Was that --- did we

11   capture that already?

12             MR. SOLOMON:

13             The court reporter may

14   now administer the oath.

15             ATTORNEY GUIDO:

16             I think we've got that,

17   so we're okay.  Okay.  Thank

18   you very much.  Thank you, Mr.

19   Bailey.

20             ATTORNEY BAILEY:

21             Thank you, sir.  Thank

22   you, Syndi.

23   BY ATTORNEY BAILEY:

24   Q.    Okay.  Colonel, I'm going to

25   --- can I safely dispense with all

Sargent's Court Reporting Service, Inc.
(814) 536-8908

14

1    the preparatories?  I think you've

2    heard them enough times, you're

3    probably sick of hearing them.  Is

4    that fair to say or do you want me to

5    repeat them?

6    A.      I do understand them.

7    Q.      All right, sir.  Have you been

8    practicing for this deposition?

9    A.      Not really.

10   Q.      And doing any on-camera work

11   or techniques and that sort of thing?

12   A.      No, sir.

13   Q.      Okay.  Colonel, what is a

14   Mason?  Who are the Masons?

15   A.      It is a fraternal charitable

16   organization.

17   Q.      Having had some experience

18   with them myself, they do some

19   tremendously good and positive work

20   out there; don't they?

21              ATTORNEY GUIDO:

22              Just one moment.  I'd

23          like to add that we're

24          reserving all objections other

25          than form of the question.

15

1                    ATTORNEY BAILEY:

2               Sure.

3    BY ATTORNEY BAILEY:

4    Q.       I mean, they do some very good

5    and positive things out there; right?

6    A.       Yes, sir.

7    Q.       Okay.  Do you know a guy by

8    the name of, I think it's Oaks

9    (phonetic), Joe Oaks?

10   A.       No, I do not.

11   Q.       John Oaks?

12   A.       No, I do not.

13   Q.       Never heard of anybody by that

14   name?

15   A.       No, sir.

16   Q.       Do you know who PNC Bank is?

17   A.       I know that there's a PNC

18   Bank.

19   Q.       Did you ever activate state

20   police cert teams, both the west and

21   the east, to transfer money for them?

22   A.       For the Masons for PNC.

23   Q.       For PNC?

24   A.       Yes, several years ago I did

25   authorize and escort a large sum of

16

1   money for PNC.

2   Q.      How much money?

3   A.      It was in the vicinity of five

4   to six million dollars in negotiable

5   estimates.

6   Q.      And where was that --- did the

7   Governor approve that?

8   A.      I approved it.

9   Q.      Did you communicate with the

10  Governor's Office about that?

11  A.      I don't remember talking to

12  anybody about it.

13  Q.      Do you remember what you ---

14  did you bill PNC for that?

15  A.      Not that I recall.

16  Q.      Well, let's see.  How many

17  people in the eastern cert team,

18  Pennsylvania State Police Officers?

19  A.      I'm not sure what the number

20  is.  I would guess 15 to 20.

21  Q.      How about in the western team?

22  A.      The same.

23  Q.      Why did you do that?

24  A.      We had a request from PNC Bank

25  to assist in the security of that

17

```
 1   transport of that large money.
 2   Q.      Is it your testimony here
 3   today that that's a cert team
 4   mission?  That's consistent with
 5   their mission?
 6   A.      I think it would be consistent
 7   with their mission, yes.
 8   Q.      You used a helicopter?
 9   A.      I am not sure.
10   Q.      What route did you use?  Was
11   it along the Pennsylvania Turnpike?
12   A.      I do not know.
13   Q.      Do you know if Mr. Wescott
14   played a role in that?
15   A.      He probably coordinated that.
16   Q.      Do you know what that cost
17   taxpayers?
18   A.      No, I do not.
19   Q.      All right.  I hope that you
20   will believe me.  I'm not trying to
21   be facetious or argumentative when I
22   ask this question.  Do you know what
23   a cup of coffee cost in Indiana
24   County, Pennsylvania a couple of
25   years ago?
```

18

1   A.      No, I do not.

2   Q.      Have you ever authorized

3   swimming parties out of the academy

4   pool or some swimming pool or

5   swimming place you have around here?

6   A.      No, I did not.

7   Q.      Did your daughter ever have

8   any people out there for any kind of

9   events?

10  A.      Not that I remember, no.

11  Q.      State police lifeguards were

12  never used at any events that have

13  been held there, that you know of?

14  A.      No, sir.

15  Q.      Okay.  I'm going to ask you a

16  few questions about the academy and

17  any knowledge or experience you may

18  have with the academy; okay?  Are you

19  familiar with a trooper who came from

20  Illinois who had some very severe

21  background problems and who was

22  allowed into or allowed to go to the

23  academy or to become a Pennsylvania

24  State policeman?  I'm not sure of the

25  name.  I think it might be Evans.

19

1   I'm not certain.  Do you have any

2   knowledge of that?

3   A.      I know that we had a case

4   involving Trooper Evans.  He had to

5   be arrested.

6   Q.      And do you know whether he had

7   any prior, before he was arrested ---

8   I don't have a great deal of

9   knowledge of it, I must confess to

10  you, sir, but was he arrested for

11  abusing a female or abusing a woman,

12  or at least accused of that?

13  A.      We arrested and I think

14  convicted him of that.

15  Q.      How did he become a

16  Pennsylvania State Policeman?

17  A.      Probably went through the

18  written examination, the oral

19  interview, the physical fitness

20  tests, et cetera, et cetera.

21  Q.      Did he have any help along the

22  way that you know of?

23  A.      Not that I know of.

24  Q.      Any assistance from you at

25  all?

20

1    A.        None from me.

2    Q.        How about Mr. Coury, if you

3    know?

4    A.        I don't know of any assistance

5    that he had.

6    Q.        Okay.  Thank you.  Did you

7    have that situation investigated?

8    A.        I think we investigated and

9    arrested him.

10   Q.        Well, you investigated the

11   allegations against him for

12   mistreatment of the female citizen;

13   am I correct?

14   A.        I think we both did a BPR

15   investigation and a criminal

16   investigation.

17   Q.        How did the BPR investigation,

18   what did it yield about how he became

19   a Pennsylvania State Police Officer?

20   A.        I wouldn't know unless I

21   looked at that.

22   Q.        Have you ever looked at it?

23   A.        I don't recall.

24   Q.        Does your daughter have a

25   riding instructor?

21

1  A.      Yes, she's had a number of

2  riding instructors.

3  Q.      Do you know the names of any

4  of them?

5  A.      Beth McCann (phonetic) and her

6  last name is Baker.  Those were her

7  two primary riding instructors.

8  Q.      Is one of them a Pennsylvania

9  State Trooper now?

10  A.      No, sir.

11  Q.      Did any of her riding

12  instructors ever become Pennsylvania

13  State Troopers?

14  A.      No, sir.

15  Q.      Have you ever ordered an

16  entire class or group of applicants

17  at the academy retested?

18  A.      In what regard, sir?

19  Q.      Colonel, I don't know, sir.

20  Any regard that might please you.

21  I've been impressed with the --- what

22  your witnesses so far have told us

23  about the powers of the colonel

24  commissioner here.  I don't know what

25  your reasons would have been.  I'm

22

1   going to try to find out.  But did
2   you ever order a group retested?
3   A.    I do not recall ordering any
4   group of applicants retested.
5   Q.    Did you ever make a request
6   that they be retested?
7   A.    If we're talking about the
8   allegations of unfairness and
9   uniformity, the unfairness of the
10  physical fitness testing, the
11  complaint that's filed with us, if
12  that's what we're talking about, I am
13  aware of that and I took a complaint
14  from an individual by the name of
15  Colleen Young, sent the complaint to
16  the Deputy Commissioner of
17  Administration to consult with the
18  Chief Counsel's Office and what to do
19  with that complaint.
20  Q.    Colleen Young?
21  A.    Yes.
22  Q.    Was she ever your daughter's
23  --- a riding instructor for your
24  daughter?
25  A.    No, sir.

23

1    Q.      Did you know her prior to this
2    request?
3    A.      Yes, I did.
4    Q.      And how did you know her, sir?
5    A.      She rode with my daughter.
6    Q.      Do you recollect what her
7    complaint was?
8    A.      She was challenging the
9    uniformity and fairness of the
10   physical fitness testing of the
11   department.
12   Q.      Did you change the test or
13   have the test altered in some way,
14   either as to criteria or format?
15   A.      I don't think so.
16   Q.      So you did at least request
17   that there be a retest or that
18   somebody analyze the situation with
19   an eye to at least considering that
20   there be a retest; is that fair to
21   say?
22   A.      It's fair to say that I
23   received the complaint and I
24   forwarded it to the Deputy
25   Commissioner of Administration to

24

1   consult with the Chief Counsel's

2   Office and evaluate the complaint and

3   do whatever was right.

4   Q.      Colleen Young failed the test

5   the first time; is that right?

6   A.      I believe that she did.

7   Q.      Who else failed it the first

8   time?

9   A.      I don't know.

10  Q.      Well, did you ever have the

11  matter looked into or, you know, to

12  verify it or test it?

13  A.      Other than to receive the

14  complaint and send it to the Deputy

15  Commissioner of Administration.

16  Q.      Do you know whether any

17  Pennsylvania Troopers ever came to

18  your door or came to you over a hit

19  and run incident and a potential DUI?

20  A.      I don't know of any.

21  Q.      You don't recall any?

22  A.      That's correct.

23  Q.      Colonel, do you know of anyone

24  putting documents into or taking

25  documents out of any of the files in

25

1    this matter, this case that we're

2    dealing with here?  Do you know of

3    anyone doing that?  Do you have any

4    knowledge of anyone who --- any of

5    your attorneys or any of your staff

6    doing anything like that?

7    A.      Yes, I do.

8    Q.      And tell me about it, please.

9    A.      I understand that Major

10   Merryman (phonetic), Director of the

11   Bureau of Research and Development,

12   removed files from this bureau and

13   met with Captain Ober in a parking

14   lot somewhere.

15   Q.      Okay.  Aside from Major

16   Merryman, is that the historic file?

17   A.      I think that's the state

18   police record.

19   Q.      Well, what have you done to

20   Major Merryman about that?

21   A.      I haven't done anything.

22   Q.      Well, are you going to punish

23   him?

24   A.      I don't have any intention to.

25   Q.      Well, did he violate a

26

1   regulation?

2   A.      I'm not sure that he did

3   violate a regulation.

4   Q.      Well, do you know of any other

5   circumstances where that historic

6   file was taken out of the --- and

7   it's, I guess, you said removed?  I

8   mean, your words were removed a file.

9   That's what I have as a quote here,

10  removed files.  Any other

11  circumstances where that was removed,

12  that files were removed?

13  A.      And that's the only one that

14  I know of.

15  Q.      How about Captain Ober's

16  personnel files?  Do you have any

17  knowledge of them, where they might

18  be?

19  A.      I would imagine that they're

20  in the vault with all the rest of the

21  personnel files.

22  Q.      Well, sir, I assume that your

23  attorneys have gone over a document

24  request that we have made with you or

25  at least made you aware of them.  Do

27

1    you know where, and operating on that

2    assumption, do you know where Mr.

3    Ober's personnel files are?

4    A.      Again, I would imagine that

5    they're in the vault with the rest of

6    the personnel files.

7    Q.      Well, do you have a file on

8    Captain Ober?

9    A.      No, I do not.

10   Q.      Ever had a file on Captain

11   Ober?

12   A.      No, I have not.

13   Q.      And aside from the e-mail that

14   you provided, you don't have any

15   documents on Captain Ober; is that

16   right?

17   A.      That is correct.

18   Q.      Well, why did you keep that e-

19   mail?

20   A.      It had to do overall with the

21   reorganization, civilianization of

22   the department and we kept a folder

23   on those issues.

24   Q.      All right.  Well, is there a

25   bureau personnel file then on Captain

28

1    Ober?  Would there be a, like a

2    bureau wherever he is, a personnel

3    file with the bureau?

4    A.    I think the bureaus do keep

5    some type of folders on each of their

6    members.

7    Q.    And is there a personnel file

8    somewhere else?

9    A.    Not that I know of, no.

10   Q.    Okay.  Do you have a

11   recollection of Captain Ober wanting

12   to go to a School of Police Staff and

13   Command, which was sent to the Bureau

14   of Personnel on or about October

15   19th, 1999, reference Special Order

16   99-102 dated October 7, 1999?

17   A.    No, I do not.

18   Q.    Well, if I indicated to you

19   that this document ---.

20            ATTORNEY GUIDO:

21            Can we have the

22       document marked if it is going

23       to be shown to the witness?

24            ATTORNEY BAILEY:

25            Sure.  You can mark it.

29

1    A.        Ann Alfono (phonetic) was the

2    other instructor, riding instructor.

3    BY ATTORNEY BAILEY:

4    Q.        Ann Alfono?

5                    ATTORNEY GUIDO:

6                    Exhibit One.

7                    (Deposition Exhibit One

8                    marked for

9                    identification.)

10                   ATTORNEY CHRISTIE:

11                   Do you have a copy,

12   Counsel, for ---?

13                   ATTORNEY BAILEY:

14                   You can have a dozen

15   copies, because we really love

16   you over here.  We'd be happy

17   to give you copies.

18                   ATTORNEY CHRISTIE:

19                   Like right now?

20                   ATTORNEY BAILEY:

21                   No, we don't have any

22   copies right now.

23                   ATTORNEY CHRISTIE:

24                   All right.  Then may we

25   have an opportunity to review

30

1          this before the Commissioner

2          goes ---.

3                ATTORNEY BAILEY:

4                As soon as I'm done, we

5          can, yes.  Yes, you can have

6          an opportunity to review it,

7          sure.

8                ATTORNEY CHRISTIE:

9          Thanks.

10         ATTORNEY BAILEY:

11         Well, that's all right.

12 BY ATTORNEY BAILEY:

13 Q.      Colonel, what would you do to

14 somebody if they altered or took a

15 document out of Mr. Ober's file in

16 order to affect the course of this

17 litigation?  What action would you

18 take?

19 A.      Again, what's the question?

20 Q.      Well, do you know whether Mr.

21 Coury approved or disapproved that

22 action?

23 A.      I don't know.

24 Q.      Do you know if Mr. Coury

25 disapproved that action because he

31

1    indicated to Mr. Ober that it was ---

2    came to the bureau too late?

3    A.      I don't have any idea.

4    Q.      Do you know whether that

5    document as it existed in Captain

6    Ober's file which I will represent to

7    you, sir, he recently checked, had a

8    date notation on the bottom of it,

9    and that that document has been ---

10   was in his file, and that that

11   document has been removed from his

12   file?

13   A.      I have no idea.

14   Q.      I would like to --- I'm

15   representing to you that there was a

16   document in that file with a date

17   notation at the very bottom of that

18   very document that said BTS personnel

19   10/20/99.  Do you know who BTS is?

20   A.      They're probably the

21   abbreviation for Bureau of Technology

22   Services.

23   Q.      Okay.

                ATTORNEY BAILEY:

24

25              I know it wasn't

32

1          provided during discovery.

2    BY ATTORNEY BAILEY:

3    Q.    I would ask, how far would

4    Captain Ober's file be from here?

5    Where would it be from here?

6    A.       Headquarters.

7    Q.       Headquarters?  Oh, geez.

8              ATTORNEY BAILEY:

9              I would like to

10   suspend.  I'd like Captain

11   Ober to go over there.  Maybe

12   Mr. Brown can go with him,

13   since he's the investigator in

14   this case.  And I'd like that

15   file to be looked at to see

16   where that document is and if

17   it has a date proof on the

18   bottom.

19             ATTORNEY GUIDO:

20             We're not going to do

21   that in the middle of the

22   deposition.

23             ATTORNEY BAILEY:

24             You're going to refuse

25   to do that?

33

<u>ATTORNEY GUIDO:</u>

Yes.

<u>ATTORNEY CHRISTIE:</u>

Counsel, you had opportunity to view the Plaintiff's file on March the 8th as among the number of things that were produced for your inspection at headquarters.

<u>ATTORNEY BAILEY:</u>

Well, I'm representing for the record that that document was not in that file, that it was taken out of that file, and it is still out of that file. And that I'm going to repeat accusations I've made in the past that someone has intentionally altered and interfered with the file.

<u>ATTORNEY CHRISTIE:</u>

Well, Counsel, I find it curious --- oh, I'm sorry. Finish. I'm sorry I

34

1    interrupted you.

2            ATTORNEY BAILEY:

3            And we checked that

4    file as of this morning. And

5    we think that somebody has

6    taken documents out of the

7    file.  I don't see how we

8    inconvenience anybody here.  I

9    can understand your being

10   afraid maybe, and I don't know

11   why ---.

12           ATTORNEY GUIDO:

13           We are not afraid, sir,

14   but we're not interrupting

15   this deposition for that

16   purpose.  We provided you with

17   what we provided you.  You

18   know, it will inconvenience

19   people because this is the day

20   for the deposition.  Colonel

21   Evanko's cleared his schedule

22   for it, and if we take time to

23   go to the headquarters it's

24   going to delay the deposition

25   and we're just not going to do

35

1          it.

2                    ATTORNEY BAILEY:

3                    Okay.  Well, we're

4          going to have a lunch break.

5          I want to have Mr. Ober go

6          over and look at his file over

7          the lunch break, Colonel.

8                    ATTORNEY GUIDO:

9                    He can do whatever he

10         likes during lunch.

11    BY ATTORNEY BAILEY:

12    Q.    I want to represent ---.

13                   ATTORNEY BAILEY:

14                   Please, ma'am, please.

15         Do you have an objection to

16         place on the record?

17                   ATTORNEY GUIDO:

18                   I said to your request,

19         yes, he can do what he likes

20         during lunch if that's your

21         representation.

22                   ATTORNEY BAILEY:

23                   Well, it's ---.

24                   ATTORNEY GUIDO:

25                   But what I'm saying is

36

1           let's have the questions of

2           the Colonel.

3                ATTORNEY BAILEY:

4              Let the record show

5           that I deeply appreciate

6           Counsel's permission to do

7           what we want during lunch

8           break.

9   BY ATTORNEY BAILEY:

10  Q.     But what I was going to ask

11 you, Colonel, is would you mind if

12 --- do you have any objection to

13 directing Mr. Brown to go with him?

14 A.     That would be up to my

15 Counsel.

16 Q.     Okay.  So your Counsel direct

17 Mr. Brown.

18             ATTORNEY BAILEY:

19           Well, Counsel, I'll

20         make the request and you can

21         consider it that Mr. Brown go

22         along to look at that file

23         over there today.

24 BY ATTORNEY BAILEY:

25 Q.     And I'm representing to you,

37

1   Colonel, that that file has been

2   interfered with.  But your testimony

3   here today is that you have no

4   knowledge of that; is that correct?

5   A.     That is correct.

6               ATTORNEY CHRISTIE:

7               And might I just note

8           also on the record that,

9           Counsel, you were given an

10          opportunity to review those

11          items which were produced

12          pursuant to the request for

13          production of documents that

14          you made on March the 8th, if

15          I recall.  You spent

16          approximately, what five, six

17          hours there to review, among

18          other things, I'm sure this

19          personnel file.  And I do find

20          it curious that there was no

21          mention, in addition to your

22          green ink mention, there was

23          no mention whatsoever of this

24          document or any other document

25          being missing from the

38

1    Plaintiff's personnel file.

2         But you also, you had

3    opportunity to copy those

4    documents, including that in

5    the personnel file.  I might

6    note also you appear to have a

7    copy of that document here

8    today, which is now marked

9    Exhibit One.

10         ATTORNEY BAILEY:

11         Counsel, let me just

12    provide just a little bit of a

13    rejoinder.  I can't copy what

14    isn't given to me.  That's my

15    response to you, ma'am.

16         ATTORNEY CHRISTIE:

17         Well, I just note,

18    Counsel, again, not to repeat,

19    but you do appear to have a

20    copy - - -

21         ATTORNEY BAILEY:

22         I don't care - - -.

23         ATTORNEY CHRISTIE:

24         - - - of what you contend

25    is missing from the

39

1    Plaintiff's file and certainly

2    there was no such contention

3    made on March the 8th during

4    the time of your inspection of

5    that material.

6         ATTORNEY BAILEY:

7         I don't think I have a

8    duty to catch every little

9    piece of whatever is going on

10   around here on March the 8th,

11   because there's some very

12   strange things.

13        ATTORNEY GUIDO:

14        For all we know Captain

15   Ober or yourself removed it

16   from the file.  Can we get on

17   with the deposition.

18        ATTORNEY BAILEY:

19        No, no, ma'am.  I'm

20   sorry.  You --- first of all,

21   you were not there and I

22   realize you investigated this

23   case to begin with, but you

24   had a representative there at

25   all times and we didn't remove

40

1   anything from the file.

2         ATTORNEY GUIDO:

3         I didn't mean that.

4   You just said that Captain

5   Ober has repeatedly gone and

6   reviewed his personnel file.

7   I'm not talking about March

8   8th necessarily with Captain

9   Ober.

10        ATTORNEY BAILEY:

11        But you're not implying

12   that Captain Ober removed

13   something from the personnel

14   file?

15        ATTORNEY GUIDO:

16        Sure.  I'm implying he

17   possibly did.  I don't know.

18        ATTORNEY BAILEY:

19        Is he allowed to have

20   --- he's allowed to copy his

21   file.  Are you implying that

22   he took things from the file?

23        ATTORNEY GUIDO:

24        You're implying someone

25   took things.

41

1                  ATTORNEY BAILEY:

2             Yes, I am.  Yes, I am.

3                  ATTORNEY GUIDO:

4             What I am saying is

5        someone took them.  For all we

6        know Captain Ober took them.

7                  ATTORNEY BAILEY:

8             Well, for all you know,

9        we're going to find out about.

10       That is a key material issue

11       in this case.  And it's a key

12       material allegation in the

13       case.  So we'll have an

14       opportunity to review these

15       files.  It may be there.  I'll

16       be very curious to find out if

17       it is.  But so far you're

18       refusing us an opportunity to

19       go right now and look at it

20       and I understand that you're

21       taking that position.

22  BY ATTORNEY BAILEY:

23  Q.      Now, Colonel, let me change

24  gears just a little bit here to

25  something else.  Just a second here.

42

1   I'm going to ask you about a series

2   of things.  I'm going to ask you

3   about --- just go over a little bit

4   about ---.

5              ATTORNEY CHRISTIE:

6              Excuse us, Counsel.

7              ATTORNEY GUIDO:

8              We're having a

9         discussion about the document.

10        The document's been handed to

11        the court reporter.  By the

12        end of the day we'll make sure

13        during a break we'll get a

14        copy.  Thank you.

15  BY ATTORNEY BAILEY:

16  Q.      When did you first become

17  aware that there had been an FBI

18  investigation into the academy and

19  the appointment of cadets?

20  A.      May 12th, 1999.

21  Q.      And how did you become aware

22  of that?

23  A.      Through Lieutenant Colonel

24  Hikus (phonetic) and Captain Ober.

25  Q.      And where were you when you

43

1    became aware of that?

2    A.      At the academy in Hershey.

3    Q.      And what was the event?

4    A.      It was a corporal promotion

5    ceremony.

6    Q.      Now, who informed you?

7    A.      Lieutenant Colonel Hikus and

8    Captain Ober.

9    Q.      And is that all?  Only those

10   two were present when they informed

11   you?

12   A.      Yes, sir.

13   Q.      And what did they say to you?

14   A.      They initially asked if they

15   could see me, because they had

16   something they wanted to tell me.  We

17   then went into the Office of the

18   Bureau of Training and Education, we

19   sat down.  Lieutenant Colonel Hikus

20   began by saying that shortly after he

21   was appointed to the position of

22   Lieutenant Colonel, Deputy

23   Commissioner of Staff, that Captain

24   Ober had come to him and asked if he

25   could speak with him and told him

44

1    that while he was acting director of

2    the Bureau of Professional

3    Responsibility in late September or

4    early October an FBI agent from the

5    Pittsburgh office called BPR and

6    talked to him and told him that they

7    were conducting a political

8    corruption investigation and that

9    part of that political corruption

10   investigation involved high-ranking

11   officials or individuals in the state

12   police and/or the Governor's Office

13   or both.

14   Q.      Okay.  And what was your

15   reaction?

16   A.      I listened and let them

17   continue.

18   Q.      You listened and let them

19   continue.  Well, did you say anything

20   at some point?

21   A.      At some point I became very

22   angry at what I was listening to and

23   said that the SAC in Pittsburgh is a

24   friend of mine and I ought to pick up

25   the phone and call him. In fact,

45

1    Director Freeh is a friend of mine.
2    And I picked up the phone and called
3    him and if they were conducting a
4    political corruption investigation
5    into the higher ranks of the state
6    police that SAC ought to be
7    transferred and he hadn't told me.
8    Q.      Why should the SAC be
9    transferred if he's conducting an
10   investigation into possibly you?
11   A.      Because I didn't even think
12   that I was being included in that
13   when they originally briefed me.  It
14   wasn't until the day after May 12th,
15   the day after that, that Lieutenant
16   Colonel Hikus told me that the quote,
17   term, end quote, colonel was used.
18   That was May 13th.
19   Q.      Do you trust your officers to
20   conduct themselves in accordance with
21   good ethical principles in an
22   investigation?
23   A.      That's my expectation.
24   Q.      Were you concerned that if you
25   weren't told that that might be

46

1  embarrassing to you?

2  A.      Rephrase it, please.

3  Q.      Were you concerned that you

4  weren't --- you not being told that

5  that could be embarrassing to you?

6  A.      That was one of my concerns,

7  yes.

8  Q.      Well, what were your other

9  concerns?

10  A.      I had a number of other

11  concerns.  Lieutenant Colonel Hikus

12  was telling me that shortly after he

13  was appointed that Captain Ober comes

14  to him.  I found out that's October

15  5th.  And the very first thing that

16  the newly appointed lieutenant

17  colonel was told by me was that if

18  you have incidents that significantly

19  affect the department or significant

20  initiatives, anything significant

21  about the department, to come to me

22  and keep me informed and up to date

23  of things.  That's the very first

24  thing that I told the lieutenant

25  colonel.  As soon as he started

47

1   talking I said, didn't we have a
2   conversation that very first day to
3   keep me informed.
4        I was also concerned that
5   during their briefing to me they told
6   me that they had received this
7   information from the FBI that it was
8   closed and unfounded two weeks
9   earlier.  And I'm thinking, two weeks
10  earlier, why wasn't I told two weeks
11  earlier?  I was also concerned
12  because the lieutenant colonel had
13  been told again on those first couple
14  days of his command, if you're going
15  to be involved in the other deputy
16  commissioners' commands to make sure
17  that you talk to them, don't do
18  anything unilaterally.  He said,
19  that's my expectation from them and
20  you as well.  And it didn't seem
21  reasonable to me what I was hearing.
22  I said, how can the FBI conduct it
23  themselves, allegedly conducting this
24  inquiry?
25  Q.      Well, so your --- the primary

48

1  reason for your upset was that

2  somebody hadn't told you earlier?

3                    ATTORNEY CHRISTIE:

4              I object.  I don't

5          think that's what the

6          Commissioner said.  What I'm

7          objecting to is to form.

8  BY ATTORNEY BAILEY:

9  Q.      Well, let me ask you.  Is that

10  what you're saying?

11  A.      That was one of four reasons.

12  Q.      Okay.  One of four reasons.

13  So was that the major reason, that

14  you hadn't been informed early

15  enough?

16  A.      That was one of the major

17  reasons, yes.

18  Q.      Okay.  Now, whose duty was it

19  to inform you?

20  A.      Lieutenant Colonel Hikus'.

21  Q.      That's what I took from what

22  you said.  The fact Colonel Hikus had

23  a duty to inform you.  Did Lieutenant

24  Colonel Hikus tell you that he had

25  ordered --- we're going to deal later

49

1   with the issue of Captain Ober's

2   going to Lieutenant Colonel Hikus;

3   okay?  I don't want to cloud this

4   question with that consideration, so

5   I want to be very specific with this.

6   Did Lieutenant Colonel Hikus indicate

7   to you that he had told or ordered

8   Captain Ober not to reveal what

9   Captain Ober knew?

10  A.     Yes, he did.

11  Q.     Okay.  Now, Colonel, is it

12  fair to say that Lieutenant Colonel

13  Hikus told you that on the 12th, the

14  12th or the 13th?  And I want to sort

15  this out, because I understand there

16  were more than one conversation.  I

17  want to make sure we get a real good

18  fact picture here.  So if you'd think

19  for just a moment and answer this

20  question.  Do you recollect whether

21  Mr. Hikus told you on May 12th

22  initially while Captain Ober was

23  present that he had ordered Captain

24  Ober to keep this information close

25  to the vest and report only to him?

50

1    A.       Yes, he did.

2    Q.       Okay.

3    Now, did you respond to Lieutenant

4    Colonel Hikus at the point that he

5    told you that, and if so what did you

6    say?

7    A.       I just listened.

8    Q.       You just listened at that

9    point?

10   A.       Yes, sir.

11   Q.       Now, okay, right now we're

12   still talking about May 12th; okay?

13   A.       I understand.

14   Q.       All right, sir.  Now, Mr. ---

15   did Captain Ober speak at that point?

16   A.       He spoke at some point during

17   this briefing.

18   Q.       Okay.  Can you tell us, will

19   you share with us please what Captain

20   Ober said and if there was any

21   conversation between you and Captain

22   Ober.

23   A.       I can't distinguish between

24   what was told to me by Lieutenant

25   Colonel Hikus and by Captain Ober.

51

1    It was primarily Lieutenant Colonel

2    Hikus that did the talking and

3    Captain Ober periodically said things

4    but I can't distinguish between the

5    two.

6    Q.    Do you have a recollection of

7    asking Captain Ober any questions?

8    A.    I had questions that I asked

9    to both of them.

10   Q.    Now, at the point that Colonel

11   Hikus and Captain Ober told you about

12   the FBI investigation, they had

13   indicated that there were some kind

14   of fears that it had been into upper

15   reaches of the Pennsylvania State

16   Police and maybe the Governor's

17   Office or some Governor's personnel

18   or something like that; is that

19   correct?

20   A.    The term higher-ranking

21   individuals.

22   Q.    Okay.

23   A.    And the state police and/or

24   the Governor's Office or both were

25   used.

52

1  Q.      Now, at that point did you ---
2  you felt that they should have told
3  you earlier; is that correct?
4  A.      Yes, sir.
5  Q.      Why should they have told you
6  earlier?  Now, I want to direct that
7  question to your attention, not over
8  any displeasure that they didn't tell
9  you two weeks earlier, but at the
10 inception of the FBI notification.
11 In other words, sir, you were upset
12 not just because they hadn't told you
13 two weeks earlier that the FBI had
14 told them that it was closed.  You
15 were upset because they had not
16 initially notified you; is that
17 correct?
18 A.      That was part of it, yes.
19 Q.      Okay.  Now, was that a ---
20 remember you sort of said, I think
21 you said four major reasons.  I don't
22 know quite what you meant by that.
23 Would you tell us?
24 A.      I was very angry by the fact
25 that as Lieutenant Colonel Hikus

53

1   started to brief me he said that
2   shortly after he was appointed in his
3   position that Captain Ober had come
4   to him.  And I'm thinking in my mind,
5   shortly after you were appointed we
6   had just sat down and we had talked
7   about my directions to him to keep me
8   informed of significant events in the
9   department, that that was important
10  to me.
11  Q.      Okay.
12  A.      I was also concerned that when
13  he told me, or when Captain Ober told
14  me, whichever one did, that the FBI
15  had called them, called Captain Ober
16  two weeks earlier, I'm thinking two
17  weeks, why has it taken two weeks to
18  sit down with me and to brief me on
19  this?
20  Q.      Is that B, sir?
21  A.      And number third ---.
22  Q.      Okay.  Go ahead.
23  A.      Number third was the fact in
24  the early days with Lieutenant
25  Colonel Hikus, and I'm talking the

54

1  first, second, and third and probably

2  the fourth day as well, had talked

3  about the necessity of not being

4  involved in the other deputy

5  commissioners' commands or if you

6  are, make sure you're talking and

7  coordinating with them, communicating

8  with them, because my expectation

9  from the other deputies is that they

10  won't do that to your command.

11  Number four - - -.

12  Q.    Can I ask one little question

13  right there before you do number

14  four?  Just a little one?

15  A.    Yes, sir.

16  Q.    A deputy commissioner is a

17  colonel or a lieutenant colonel?

18  A.    The deputy commissioners are

19  lieutenant colonels.

20  Q.    They're all lieutenant

21  colonels?

22  A.    Yes, they are.

23  Q.    Okay.  Go ahead, sir, number

24  four.

25  A.    And number four had to do with

55

1    it didn't sound reasonable what I was
2    being told that the FBI had told them
3    or had told Captain Ober.
4    Q.    Okay. Let's talk about didn't
5    sound reasonable first. All right,
6    sir. What didn't sound reasonable to
7    you, Colonel?
8    A.    It didn't sound reasonable
9    that if an FBI office is doing an
10   investigation into the higher ranks
11   of the state police that a SAC would
12   have a street agent pick up the
13   phone, call across the state, talk to
14   an individual in BPR and tell them
15   that they were doing a political
16   corruption investigation into the
17   higher ranks of the state police and
18   not pick up the phone and tell me.
19   Because remember, I didn't learn
20   about the term, colonel, until the
21   following day.
22   Q.    Sir, that's exactly what the
23   FBI did; didn't it?
24   A.    That's what the FBI agent did,
25   yes.

56

1    Q.      As you sit here today

2    answering my questions, you've got to

3    admit based on all of the facts

4    before us, that is precisely what the

5    FBI did; isn't it, sir?

6    A.      An FBI agent did that.

7    Q.      Okay.  So it's not the FBI, it

8    is an FBI agent did that?

9    A.      Let me put it this way.

10   Q.      Sure.

11   A.      It's an allegation or it was

12   portrayed that way by Captain Ober to

13   Lieutenant Colonel Hikus.

14   Q.      Now, all right, that's fair

15   enough.  Now, what facts known to you

16   as we sit here today indicate that

17   that isn't what happened?

18   A.      The issue of high-ranking

19   officials or individuals in the state

20   police and/or the Governor's Office

21   was not told to Captain Ober by the

22   agent that called him.

23   Q.      Wasn't it?

24   A.      No.

25   Q.      You're not, and again, this is

57

1    not meant to be facetious, you're not
2    indicating for us that Captain Ober
3    is clairvoyant or can tell the
4    future; are you?
5    A.      No, I'm not.
6    Q.      Of course not.  I mean, that
7    would be, that would be silly and we
8    don't have any facts on the record to
9    indicate that he has some
10   supernatural ability; right?
11   A.      That is correct.
12   Q.      All right.  But we do know
13   that strangely enough, according to
14   what facts have been shared with us
15   by our FBI friends and your
16   investigators, that indeed on a wire
17   procured with the help of an FBI
18   confidential informant that, in fact,
19   things of that nature were said, but
20   supposedly now, supposedly, if we
21   believe the FBI and your
22   investigator's findings, this
23   occurred a couple of weeks after
24   Captain Ober was told, was initially
25   contacted by the FBI agent; right?

58

1    Is that correct?

2    A.      It is my understanding that on

3    October 21st Captain Ober listened to

4    a videotape or an audiotape with the

5    FBI where a confidential --- where

6    the applicant for the alleged job-

7    selling scheme said that she would

8    have to go to some lieutenant colonel

9    or someone affiliated with the state

10   police.

11   Q.      Okay.  And so you're

12   suggesting that Mr. Cush (phonetic)

13   didn't say anything to Mr. Ober about

14   any lieutenant colonel or any higher-

15   ups or anything like that sometime on

16   or about the beginning of October;

17   right?

18   A.      From reading the reports,

19   that's what my understanding is.

20   Q.      Okay.  Well, why didn't you

21   punish Ober if he --- I mean, he got

22   lucky.  In other words, Ober got

23   lucky that a couple weeks later this

24   CI just happened to mention, at least

25   we know a lieutenant colonel or

59

1    something to that effect, let alone

2    what the FBI agent said or didn't

3    say.  So Ober just got lucky; right?

4    A.    I don't know what happened

5    there.

6    Q.    Well, that's interesting.  You

7    don't know what happened?  Well, if

8    you don't know what happened, can you

9    tell us now, who do you think had the

10   best recollection of that October 5th

11   conversation between Mr. Cush and Mr.

12   Ober?  Have you reached any

13   conclusions about that?

14   A.    No, I have not.

15   Q.    You haven't?  So Mr. Ober must

16   have just gotten lucky and mentioned

17   this to Colonel Hikus that there were

18   some higher-ups or colonels or

19   something of that sort, lieutenant

20   colonel, whatever the rank was, who

21   knows, that this CI mentioned; right?

22   A.    What Colonel Hikus told me was

23   on May 13th that the quote, term, end

24   quote, colonel was used.

25   Q.    Okay.  Well, why didn't you

60

1  punish Ober for that if you --- I
2  mean, do you believe Ober
3  misrepresented what happened on
4  October 5th or early October?
5  A.      I don't know what happened
6  there.
7  Q.      Okay.  Well, so at least as of
8  May 12th you are told that sometime
9  on or about the beginning of October
10  '98 that an FBI agent goes to Mr.
11  Ober and tells him about this FBI
12  investigation; right?
13  A.      Yes, that an FBI agent in late
14  September or early October called BPR
15  and spoke with Captain Ober.
16  Q.      All right.  Now, you found
17  that odd.  And I'm not, you know ---
18  by the way, sir, I do too.  I find it
19  odd.  Did you ever find out why the
20  FBI did that this way?
21  A.      No, I didn't.
22  Q.      Did they suspect you?
23  A.      It was not my understanding
24  that they suspected me.  That's part
25  of the reason that I was concerned

61

1    that I wasn't informed.

2    Q.      You were concerned that they

3    had suspected you; weren't you?  In

4    fact, you said that; didn't you?

5    A.      I was not concerned that I ---

6    in fact, I didn't even think that

7    they suspected me being involved on

8    May 12th.  The only time that that

9    came out was on May 13th when the

10   lieutenant colonel had just mentioned

11   to me that Captain Ober told him the

12   term colonel was used.

13   Q.      Well, then why didn't the FBI

14   call you up and tell you?

15   A.      I don't know.

16   Q.      You don't know to this very

17   day?

18   A.      I would take it from my

19   conversations with the SAC ---.

20   Q.      That's Rick?

21   A.      The special agent in charge,

22   Rick Mascara.

23   Q.      All right.

24   A.      And when I called him on May

25   20th and he didn't know anything

62

1  about the investigation.

2  Q.     Sir, Mr. Mascara told you on

3  May the 20th, 1999 that he didn't

4  know anything about this

5  investigation?

6  A.     I think the words that were

7  used is when I made an inquiry to him

8  over the telephone, he said to me,

9  what inquiry, what investigation?

10  And the quote, I believe, was I have

11  to plead with ignorance here.

12  Q.     Do you believe him?

13  A.     Yes, I do.

14  Q.     Now, if Mr. Mascara's telling

15  the truth, that means that as of May

16  20th, 1999, he had never been made

17  aware by the CIA --- excuse me,

18  please, that a confidential

19  informant, CI, as they're called, I

20  guess, for the FBI had implicated

21  possibly high-ranking officials in

22  either the Governor's Office or a

23  lieutenant colonel by rank or colonel

24  by rank, whatever the CI imparted;

25  okay?  Mr. Mascara didn't --- that

63

1   had not been brought to his attention

2   if what he told you May 20th was

3   true; is that correct?

4   A.      That is correct.

5   Q.      Or he didn't remember it?

6   A.      He told me just that.

7   Q.      Yes, which I would find very

8   hard to believe, but, hey, after all

9   it's an FBI agent.  Now, did you

10  question Mr. Mascara further?

11  A.      Yes, I did.

12  Q.      Well, let's stop and go back

13  to May 12th for a minute.  Did you

14  ever call Louie Freeh?

15  A.      No, I did not.

16  Q.      Did you ever call anyone in

17  his office?

18  A.      No, I did not.

19  Q.      Who in the FBI besides Mr.

20  Mascara did you call, if anyone?

21  A.      Mr. Mascara's the only person

22  who I talked to in the FBI.

23  Q.      Why did you wait until May

24  20th?

25  A.      I can't tell you what else was

64

1   going on between May 12th and May

2   13th.  That was the day I called him.

3   I can't tell you why.

4   Q.     Well, when did you first call

5   Mr. Campbell?

6   A.     I would have called Mr.

7   Campbell the afternoon of May 12th

8   when I got back to headquarters.

9   Q.     Why?

10   A.     To tell him what was just told

11   to me because it allegedly involved

12   high-ranking individuals in the state

13   police and/or the Governor's Office.

14   Q.     And what did Mr. Campbell say?

15   A.     He didn't say much of

16   anything.

17   Q.     How current was the Gigliatti

18   (phonetic) matter at that time?

19   A.     I don't have any idea.

20   Q.     Do you have any knowledge of

21   any of the allegations surrounding

22   Gigliatti in the Governor's Office?

23   A.     No, sir.

24   Q.     Did you ever discuss the

25   Gigliatti matter with Mr. Mascara?

65

```
 1    A.      No, sir.

 2    Q.      How about Mr. Cush?

 3    A.      No, sir.

 4    Q.      Did you ever suspect that the

 5    FBI killed this investigation that

 6    you're talking about?

 7    A.      Killed which investigation?

 8    Q.      The one into this state police

 9    academy thing.

10    A.      That never entered my mind,

11    no.  And nor do I think that.

12    Q.      Could you trust the FBI?

13    A.      Yes, I do.

14    Q.      And they trust you?

15    A.      Yes, they do.

16    Q.      Well, did Mr. Mascara tell you

17    that, that they trust you?

18    A.      No, we didn't discuss the

19    issue of trust.

20    Q.      It's just assumed it's there;

21    right?

22    A.      I assume it's there, yes.

23    Q.      Do you trust your officers in

24    the Pennsylvania State Police?

25    A.      Yes.
```

66

1    Q.      Well, up to that point at

2    least you trusted Mr. Ober; didn't

3    you?

4    A.      Yes.

5    Q.      So on the trust scale you

6    decided in this matter that the FBI

7    was more trustworthy than Mr. Ober or

8    was it vice versa after all this was

9    done?

10   A.      I didn't draw a distinction

11   between the two.

12   Q.      Okay.  Now, you had called Mr.

13   Campbell on the afternoon of the

14   12th.  Was he your contact over there

15   in the Governor's Office?

16   A.      Yes, sir.

17   Q.      Did you ever find out when the

18   Governor's Office or anybody over

19   there was first aware of this FBI

20   interest?

21   A.      My understanding is May 12th

22   when I told them.

23   Q.      So the first time you knew

24   that Mary Woolly (phonetic) had been

25   talked to was when your attorney,

67

1  obviously possessed of this
2  knowledge, asked questions of Mr.
3  Hikus; is that correct, yesterday?
4  A.      The first time that I actually
5  knew about it was in response to
6  Lieutenant Colonel Hikus' response.
7  Then I knew it.
8  Q.      And that was just the other
9  day, Monday; wasn't it?
10 A.      It was earlier this week.
11 Q.      Earlier this week.  Well, you
12 knew it --- is it fair to say the
13 first time you ever knew it was
14 within the last week; right?
15 A.      Yes, sir.
16 Q.      So you didn't know that there
17 were witnesses to this information
18 about Mr. Hikus talking to the
19 Governor's Office until a week ago,
20 somebody in the Governor's Office
21 until a week ago; right?
22 A.      I knew it when Lieutenant
23 Colonel Hikus testified.
24 Q.      And you knew it a little bit
25 before that, but not more than a week

68

1   before that; is that fair to say?

2   A.    I had discussions with my

3   Counsel on that.

4   Q.    Okay.  Well, I'm saying time

5   wise, I'm not asking about

6   discussions with your attorney.  I

7   just want to know when you first knew

8   it.  You first knew it, you know, a

9   week before or less than a week

10  before Hikus responded to those

11  questions; is that fair to say?

12  A.    It would be less than a week.

13  Q.    Okay.  Do you know what

14  voluntary disclosure is under Federal

15  rules in a Civil case?

16  A.    No, I do not.

17  Q.    Okay.  Sir, I want to take you

18  back now to May 12th.  You've talked

19  to Mark Campbell.  Did Mark Campbell

20  give you any instructions or say

21  anything about what he thought you

22  should do or anything like that?

23  A.    No, sir.

24  Q.    Did you ask him for advise on

25  anything?

69

1    A.        No, sir.

2    Q.        So you were merely calling him

3    to inform him; is that correct?

4    A.        Yes, sir.  And I also told him

5    that I was going to conduct an

6    inquiry into the facts of this.

7    Q.        Well, why did you want to

8    conduct an inquiry into the facts of

9    it?  I thought Colonel Hikus had

10   indicated --- strike that.

11            Colonel Hikus had indicated to

12   you that the investigation, the FBI

13   had closed the investigation and that

14   it was, at least as to higher-ups, it

15   was unfounded; is that correct?

16   A.        That is correct.

17   Q.        Okay.  And had Colonel Hikus

18   indicated to you that the extent of

19   the FBI investigation revealed that

20   to the best of their knowledge there

21   was basically one trooper, one

22   Pennsylvania State Police Trooper

23   involved?

24   A.        Either Lieutenant Colonel

25   Hikus or Captain Ober told me that on

70

1    May 12th.

2    Q.       Okay.  All right.  Did you

3    give Colonel Hikus or Captain Ober

4    any directions on May 12th?  By that

5    I mean, you know, asked him to record

6    or asked him to check on something,

7    anything like that?

8    A.       I probably told him on May

9    12th to put it on a piece of paper

10    what they'd just told me.

11    Q.       Okay.  Did you give them any

12    other instructions?

13    A.       None that I recall.

14    Q.       Did you believe that Captain

15    Ober had been disloyal to you?

16    A.       I didn't think about loyalty.

17    Q.       Have you ever thought about

18    loyalty?

19    A.       Not really.

20    Q.       Have you ever carried any

21    personal anger in you over this

22    matter?

23    A.       Over the issue of not being

24    told about the FBI investigation?

25    Q.       Yes, yes.

71

1  A.      And the reasons under that?

2  Q.      Yes, sir.

3  A.      And have I ever been what?

4  Q.      Have you carried any personal

5  anger with you over not being told by

6  Captain Ober when the FBI contacted

7  him?

8  A.      No, sir.

9  Q.      Have you carried any anger in

10  you against Colonel Hikus because he

11  ordered Captain Ober not to tell

12  anyone in October?

13  A.      No, sir.

14  Q.      Have you carried any anger in

15  you against Captain Ober because he

16  didn't tell, now Colonel, then Major,

17  Conley?

18  A.      No, sir.

19  Q.      Did you suspect on May 12th

20  that Captain Ober had violated a

21  Pennsylvania State Police Regulation?

22  A.      I never gave it any thought.

23  Q.      And you never have; have you?

24  A.      No, not really.

25  Q.      How about Colonel Hikus?  Did

72

1  you ever consider that he had
2  violated a Pennsylvania State Police
3  Regulation on May 12th or since May
4  12th, have you --- I assume you
5  haven't thought about that either?
6  A.    I thought about him not
7  following my directives on keeping me
8  informed of significant events that
9  we talked about October 5th, 6th, 7th
10 and 8th.
11 Q.    Sir, why didn't you say, you
12 guys did the right thing?  Didn't
13 they do the right thing, Colonel?
14 A.    No, I think Lieutenant Colonel
15 Hikus should have told me.
16 Q.    Well, did Captain Ober do the
17 right thing?
18 A.    I think Captain Ober should
19 have told his bureau director.
20 Q.    Why?
21 A.    Because I think that's the
22 right thing to do.
23 Q.    But it doesn't violate a
24 regulation; right?
25 A.    No, sir.  It violated a

73

1  practice of the department.

2  Q.     A practice of the department?

3  A.     Yes.

4  Q.     Well, you believe that a ---

5  if the FBI's conducting an

6  investigation and they have reason to

7  believe that there may be higher-ups

8  in the Pennsylvania State Police

9  involved that they should come to

10 you.  You actually believe that?

11 A.     Unless they have strong

12 probable cause to believe that I am

13 involved, yes, I do.

14 Q.     Okay.  Why?  Just so you know

15 and are not embarrassed; is that why?

16 A.     I'm the head of the agency.  I

17 have a responsibility to the agency.

18 Q.     Well, Clinton's President of

19 the United States and we've seen that

20 fiasco.  I mean, not that that

21 necessarily applies here, but I mean,

22 after all he's, you know, President

23 of the United States, not getting

24 into all the politics nonsense

25 surrounding that situation.  I mean,

74

1  if someone is investigating potential

2  wrongdoing, don't they have a duty

3  under basic investigatory principles

4  to try to limit as much as possible

5  the dissemination of information in

6  an investigation or am I wrong about

7  that?

8  A.    I think if the FBI has a

9  criminal investigation into higher-

10  ups in the state police, and I ---

11  and they don't have strong reasonable

12  or probable cause that I'm involved,

13  I think they have a responsibility to

14  come to me as the head of the agency.

15  Q.    Okay.  Well, let's --- and now

16  that is Colonel Evanko's point of

17  view; am I correct?

18  A.    I think that would be any

19  superintendent or commissioner's

20  point of view.

21  Q.    Well, do you know that it is

22  any superintendent's or let's say

23  high-ranking law enforcement

24  official's point of view?

25  A.    I think if you talk to any

75

1   superintendent or commissioner of a

2   state police organization that would

3   be their expectation.

4   Q.      And if somebody doesn't adhere

5   to that expectation should they be

6   punished?

7   A.      I don't have the authority to

8   be punishing an FBI, special agent in

9   charge.

10  Q.      What about your own people?

11  Should they be punished?

12  A.      For what?

13  Q.      I don't know.  Not telling

14  you?  I mean, you're telling me that

15  they --- sir, if I understand you

16  correctly, and I may not.

17  BRIEF INTERRUPTION

18                ATTORNEY BAILEY:

19                We'll suspend for just

20        five minutes.

21                VIDEOGRAPHER:

22                The time is 10:22 a.m.,

23        March 27th, 2002.  We're

24        suspending the deposition.

25  SHORT BREAK TAKEN

76

<u>ATTORNEY BAILEY:</u>

1
2          Ladies and gentlemen,
3   this is Attorney Andrew
4   Ostrowski who's working with
5   me on this matter, is here
6   with us today.
7          <u>VIDEOGRAPHER:</u>
8          It's now 10:34 a.m. and
9   the deposition of Mr. Evanko
10   has resumed.
11   <u>BY ATTORNEY BAILEY:</u>
12   Q.     Okay.  Colonel, thank you very
13   much for the courtesy of allowing me
14   to contact my office and find out
15   that your erstwhile attorneys have
16   told Judge Caldwell that I smeared
17   some documents I'm going to ask you
18   about.  So maybe that will get us a
19   hearing.  Something good comes out of
20   everything, Colonel, in the legal
21   process.  I want to go back, sir, if
22   I may to the questioning that I had
23   about the --- we're talking about
24   your state of mind and your thoughts
25   on the 12th and subsequent to the

77

1    12th, your thoughts about, and
2    conclusions about the conduct, the
3    acts or omissions of Colonel Hikus
4    and/or Captain Ober.  So let me go
5    back to that and finish that up,
6    okay?
7    A.      Yes, sir.
8    Q.      All right, sir.  Thank you.
9    Now, you had indicated that in
10   response to one of my questions that
11   you felt any supervisor in a law
12   enforcement field, unless there were
13   good probable cause to believe that
14   the head of the group were involved,
15   that in that type of scenario
16   generally that the head of the group
17   should be informed or should be told;
18   is that correct?
19   A.      Yes, if the SAC in a field
20   office is doing a corruption
21   investigation of the higher-ups and
22   doesn't have strong probable cause to
23   believe that the head of the agency
24   is involved, it is my statement that
25   he should be calling or she should be

78

1  calling that head.

2  Q.      Well, if BPR and the

3  Pennsylvania State Police receive a

4  complaint about you, Captain ---

5  let's say some captain somewhere, and

6  receives a complaint about you,

7  Colonel Evanko, should BPR tell you

8  before they do the investigation?

9  A.      Give me a circumstance that

10  you are talking about.

11  Q.      Well, in this particular case,

12  let's take this case here.  Captain

13  Ober's recollection is that the FBI

14  had indicated that there were higher-

15  ups or somebody in some rank that was

16  lieutenant colonel or colonel or

17  somebody higher up, maybe in the

18  Governor's Office and maybe in the

19  Pennsylvania State Police, who could

20  be involved in this, and that he

21  passed that on, he passed that on to

22  Colonel Hikus.  Colonel Hikus told

23  him, hey, you don't tell anybody, you

24  keep this information close to the

25  vest, you don't tell anybody but me.

79

1   Now, that's basically what happened;
2   right?
3   A.      Yes, that is.   That is what
4   happened when Captain Ober received
5   information from the FBI.
6   Q.      Right.
7   A.      Went past the hearing
8   commander to Lieutenant Colonel Hikus
9   and told Colonel Hikus.
10  Q.      Okay.  Now, what was Captain
11  Ober's assignment at that time?  What
12  was he doing?  I'm sorry, sir. I cut
13  you off.  I'm sorry.  Go ahead.
14  A.      If that's the end of the
15  question?
16  Q.      Yes, sir.
17  A.      At the time that he went to
18  Lieutenant Colonel Hikus he was the
19  Director of Internal Affairs.
20  Q.      He was, it's called IAD;
21  right?  That division within BPR;
22  correct?
23  A.      Yes, it is.
24  Q.      Now, where was Mr. Conley at
25  that time?

80

1    A.    Where was he physically?

2    Q.    Sure.  Where was he?

3    A.    I believe he was, on October

4    or May 12th, I believe he was at a

5    funeral.

6    Q.    Okay.  And where was he in

7    terms of his assignment?

8    A.    The Director of the Bureau of

9    Professional Responsibility.

10   Q.    Now, is it fair to say that

11   you feel that Captain Ober should not

12   have gone to Colonel Hikus, Captain

13   Ober should have gone to Colonel

14   Conley?

15   A.    Yes, that's what the field

16   regulation states.

17   Q.    Yes.  I'm sorry.  What field

18   regulation?

19   A.    FR 1-1.17.

20   Q.    Okay.  Now, we're going to

21   talk a little while later about

22   AR 1-102(c).  But let me ask you.  At

23   this point, you're telling us then

24   that, assuming Captain Ober had done

25   what you feel was the right thing,

81

1  and had gone to then Major Conley,

2  what should Major Conley have done?

3  A.     Major Conley should have

4  informed the Deputy Commissioner of

5  Administration.

6  Q.     Who was?

7  A.     Lieutenant Colonel Foy

8  (phonetic).

9  Q.     Well, you told us that you

10  trust the FBI; right?

11  A.     Yes.

12  Q.     Do you have concerns that they

13  trust you?

14  A.     No, I do not.

15  Q.     Is it fair to say that you

16  think Mr. Cush messed up, made an

17  error?

18  A.     In what regard do you mean

19  made an error?

20  Q.     What should he have done?

21  Should he have told Rick?  Now,

22  you're telling me he didn't tell Rick

23  because you talked to Rick on May

24  20th and Rick didn't know anything

25  about it.  And you and I both know

82

1    doggone well that if some FBI agent

2    tells Rick that higher-ups at any

3    point, founded or not, that higher-

4    ups in the state police and the

5    Governor's Office are involved,

6    Rick's going to remember that,

7    Colonel.  You and I both know that.

8    But he didn't know anything on May

9    20?  Rick didn't know anything?

10   A.       That's correct.

11   Q.       All right, sir.  Now, does

12   that mean that Mr. Cush screwed up?

13   A.       No, because Mr. Cush, as I

14   remember his statement, said that he

15   did not mention high-ranking

16   individuals in either the state

17   police or the Governor's Office to

18   Captain Ober.

19   Q.       He didn't mention them or he

20   didn't recollect it after Mr.

21   Williams went and talked to him?

22   A.       I believe the words that he

23   used is I don't remember ever

24   mentioning higher-ups in the state

25   police or the Governor's Office.

83

1    Q.    Which brings us back to

2    Captain Ober, if he was correct,

3    being either very lucky or just like

4    an incredible, you know, incredible

5    example of the law of probability I

6    guess if the CI was going to mention

7    this later on.  But the point is that

8    if it involved Mr. Stanton; right?

9    A.    Yes.

10    Q.    If the investigation involved

11    Mr. Stanton, and it was a public

12    corruption investigation, and it

13    involved appointments to the academy,

14    you don't think Mr. Cush messed up

15    because there was no reason to

16    believe that higher-ups were

17    involved, at least in October; right?

18    The beginning of October?

19    A.    First I think it is the

20    applicant to the state police that

21    mentions that someone would have to

22    go to a lieutenant colonel.

23    Q.    Right.

24    A.    Or someone affiliated with the

25    state police.

84

1    Q.      Yes.

2    A.      And I think if Cush had

3    information that quote, higher-ups,

4    or higher-up individuals or officials

5    from the state police or the

6    Governor's Office, he should have

7    reported that to his SAC.

8    Q.      So I ask you, my question was,

9    did Cush mess up?  And you said he

10   didn't mess up.  Now, are you telling

11   me he messed up?

12   A.      Not with the information that

13   he is saying he did not supply to

14   Captain Ober.

15   Q.      But sir, they sat down and

16   listened to the tape together.

17   A.      On October 21st.

18   Q.      Yes, sir.  Now, at that point

19   did Cush screw up?  Did he mess up at

20   that point by not going to Rick?

21   A.      I'm not sure.

22   Q.      You're not sure?

23   A.      Yes.

24   Q.      Now, sir, we know that at

25   least by October 21, 1998 that Mr.

85

1    Cush is sitting right there, of
2    course he's telling Mr. Williams that
3    Mr. Ober's ears perked up.  Mr. Cush
4    is sitting in a room listening to a
5    tape.  Lieutenant colonels in the
6    state police are mentioned on that
7    tape.  You call Rick May 20th of the
8    following year and he doesn't know
9    anything about this.  But you don't
10   have --- you reached no conclusion
11   whether or not Mr. Cush screwed up by
12   not telling Rick?
13   A.      I don't know what significance
14   Mr. Cush gave to the applicant saying
15   that someone would have to go to a
16   lieutenant colonel or someone
17   affiliated with the state police.
18   Q.      Well, now, we have established
19   that one of your reasons for being
20   upset had to do with Hikus ostensibly
21   violating these instructions of yours
22   about stepping outside his area of
23   responsibility; correct?
24   A.      That was one of the concerns I
25   had.

86

1    Q.      Sure.  Now, you've also agreed

2    with me that sometime on or about

3    October of 1998 this FBI CI mentions

4    lieutenant colonels; correct?

5    A.      No.

6    Q.      They didn't?  The tape didn't

7    say that?

8    A.      No.

9    Q.      Your transcript of October

10   doesn't say that, October 13th, '98

11   doesn't say, doesn't use the word

12   lieutenant colonel?

13   A.      Not by the CI, no.

14   Q.      Who by?

15   A.      The applicant, Bridges.

16   Q.      Okay.  But they're mentioned;

17   right?

18   A.      The applicant states again

19   somebody would have to go to a

20   lieutenant colonel or someone

21   affiliated with the state police.

22   Q.      Did Bridges know anybody

23   involved in politics?

24   A.      I don't know.

25   Q.      Do you know who Leonard Bodack

87

1    is?

2    A.      He is a State or was a State

3    Senator.

4    Q.      How about Joe Preston?

5    A.      He is or was a State

6    Representative.

7    Q.      Were they mentioned in any of

8    this FBI investigation?

9    A.      Someone mentioned Bodack in

10   the taped interview or the consensual

11   interview interception.

12   Q.      Now ---.

13   A.      In fact, I think it was the CI

14   that mentioned Bodack.

15   Q.      Okay. Well, do State Senators

16   and State Representatives vote on

17   matters of importance to the Governor

18   of the State of Pennsylvania from

19   time to time? Little things like

20   appropriations and stuff like that?

21   A.      There is an appropriations

22   committee that votes on supporting

23   appropriations, yes.

24   Q.      For the Pennsylvania State

25   Police?

88

1    A.      Yes.

2    Q.      Now, Rick says to you when you

3    talked to him on May 20th, I think

4    your quote was that he pleads

5    ignorance; right?

6    A.      I think that's the quote, got

7    to plead ignorance.

8    Q.      Not to plead ignorance.  Out

9    of where?  Which office?

10   A.      (Inaudible response).

11   Q.      Did you ask Rick to go back

12   and check on these matters?

13   A.      I think he told me and I'm

14   going to have to look at my notes.  I

15   don't know whether I asked him or

16   whether he said I'd have to get back

17   to you.

18   Q.      Well, did he get back to you?

19   A.      Yes, he did.

20   Q.      What did he say when he got

21   back to you?

22   A.      I would have to look at the

23   notes.

24   Q.      Well, tell us as you recollect

25   today.  This is a very important

89

1    matter.  Tell us if you know.

2    A.    He does not cite any high-

3    ranking officials in the state police

4    or the Governor's Office.

5    Q.    He doesn't cite any?

6    A.    I'd have to look at my notes

7    to see what ---.

8    Q.    I'm talking about your

9    recollection now.

10   A.    Okay.

11   Q.    I don't want you to look at

12   your notes.  I want to ask you your

13   recollection as you sit here today.

14   If you don't remember and you don't

15   know, that's fine.  We'll go to the

16   notes at some point if you want to

17   later.  Right now the answer is no.

18   I'd like to just check your

19   recollection.

20   A.    Then I'm saying I do not

21   remember ---

22   Q.    Okay.

23   A.    --- our conversation when he

24   called back later that day.

25   Q.    So you don't remember what

90

1   Rick said when he called back later
2   the 12th as you sit here today?
3   A.      If I were to refresh my memory
4   with my notes I'm sure I would
5   remember.
6   Q.      Well, did you make notes when
7   Mr. Hikus and Mr. Ober came in the
8   room and sat down with you?
9   A.      No, I did not.
10  Q.      As a matter of fact, after
11  that meeting you at one point asked
12  Colonel Coury to come back to you and
13  to make notes about what happened in
14  that meeting; right?
15  A.      I paged Colonel Coury and
16  asked him to come back to the
17  academy.
18  Q.      Yes.
19  A.      I asked him to come in because
20  this involved him and we asked
21  Colonel Coury to listen to what
22  Lieutenant Colonel Hikus had just
23  told me.
24  Q.      Captain Ober wasn't there; was
25  he?

91

1  A.    No, he was not.

2  Q.    And that was on the 12th; was

3  it?

4  A.    Yes, it was.

5  Q.    Do you remember whether Rick

6  got back to you the 12th or the 13th?

7  I'm sorry.  The 20th or after the

8  20th of May?  Did he get back to you?

9  You initially spoke to Rick on the

10  20th of May; correct?

11  A.    Yes, sir.

12  Q.    Okay.  Did he get back to you

13  after that, after the 20th or was it

14  that day?

15  A.    It was on the 20th.

16  Q.    Now, who was in the room with

17  him, sir?

18  A.    I do not know.

19  Q.    Were you on a speakerphone?

20  A.    Not that I know of.

21  Q.    Did he ever indicate whether

22  he had met with Mr. Cush and Mr.

23  Suhy?

24  A.    I drew the conclusion that he

25  had talked to Cush, but I don't know

92

1    if that is an accurate conclusion.

2    Q.      Well, did he tell you anything

3    about the history of this

4    investigation?

5    A.      I think that he talked about

6    the case involving a municipality

7    testing.  Again, I'd have to look at

8    my notes.

9    Q.      Well, do you have a

10   recollection of whether he indicated

11   that he had recorded any parts of

12   this --- and strike that.

13          Do you have a recollection of

14   whether the FBI agents had reported

15   anything about this investigation to

16   the Pennsylvania State Police before

17   going to Captain Ober?

18   A.      Yes, without question he did

19   say that this was an older

20   investigation.

21   Q.      An older investigation?

22   A.      Yes.

23   Q.      Why didn't you know about it,

24   Colonel?

25   A.      Because apparently it did not

93

1    involve higher-ranking officials in
2    the state police.
3    Q.      Oh, I see.  I'm sorry.  Now,
4    I'm beginning to understand.  It
5    involved Pennsylvania State
6    Policemen, but it didn't involve
7    higher-ranking Pennsylvania State
8    Policemen.  So the FBI wouldn't tell
9    you about those; right?
10   A.      No.  They don't have to tell
11   me about a regular investigation on a
12   trooper, no.  But I would expect them
13   to do so if it's into the higher
14   ranks.
15   Q.      Well, they don't have to tell
16   you about anything; do they?
17   A.      They don't have responsibility
18   to do anything beyond the statutes.
19   Q.      Sure.  And if you found an FBI
20   agent doing something wrong and
21   violating a state law and your people
22   were out there investigating them,
23   you wouldn't have any duty to tell
24   them; would you?
25   A.      I think the troop commander or

94

1    the bureau director would tell the

2    SAC that.

3    Q.    So your people could go tell

4    the FBI about an investigation into

5    them without checking with you first?

6    A.    Say it again.

7    Q.    Sure.  The Pennsylvania State

8    Troopers are out there, they're doing

9    an investigation, they find somebody,

10   some FBI personnel is involved, they

11   don't have to come to you, they can

12   go right to the FBI?

13   A.    That is correct.

14   Q.    Oh, okay.  Well, would you

15   expect them to exercise some

16   restraint about notifying targets or

17   potential targets of an

18   investigation?

19   A.    Would I expect an investigator

20   not to talk to an identified target?

21   Q.    Sure.

22   A.    Yes, that would be my

23   expectation.

24   Q.    Not to tip them off?

25   A.    Not to talk to an identified

95

1    target?

2    Q.      Right.

3    A.      Yes.

4    Q.      Unless there was some reason

5    or some advantage to be gained from

6    it of course.  But normally the

7    procedure would be not to tip

8    somebody off if they're being

9    investigated; right?

10   A.      If you have an identified

11   target I would not expect that you

12   would tell that target.

13   Q.      Okay.  How about an

14   unidentified target like a member of

15   a group?

16   A.      Give me an example.

17   Q.      Sure.  Lieutenant colonels in

18   the Pennsylvania State Police.

19   A.      Then I would expect the

20   special agent in charge to come

21   directly to me or call me directly.

22   Q.      But the special agent in

23   charge told you he didn't know, sir.

24   You just told us that.  You talked to

25   him on May 20th and, Colonel, he told

96

1   you I have to plead ignorance, I

2   don't know about this.

3   A.      It's also my understanding

4   that Cush is saying that he never

5   remembers mentioning or didn't

6   mention any high-ranking officials

7   within the state police and/or the

8   Governor's Office.

9   Q.      Yes, Agent Cush.  You were

10  here during Colonel Coury's

11  deposition; right?

12  A.      I did sit in on Colonel

13  Coury's, yes.

14  Q.      Did he express some kind of

15  concern about FBI, not that they

16  would ever do anything intentionally,

17  unpolitical as they are, he never ---

18  he said he had a concern, I thought.

19  I thought he testified that sometimes

20  he had some concern with leaking

21  information from the FBI; do you

22  recollect?

23  A.      I believe he said ---.

24  Q.      Do you have that feeling or

25  concern?

97

1  BRIEF INTERRUPTION

2  BY ATTORNEY BAILEY:

3  Q.    Do you have a concern about

4  that?

5  A.    I don't have a concern that

6  the FBI would intentionally leak

7  information, no.

8  Q.    Okay. Now, did Mr. Cush ever

9  indicate that even though he has no

10  recollection of discussing

11  confidentiality with Captain Ober,

12  that he would expect him to keep the

13  information confidential?

14  A.    I think the words were

15  discretion.

16  Q.    Okay. All right. And did he

17  indicate that he would expect, he

18  would just normally trust the captain

19  in the Pennsylvania State Police to

20  exercise, let's say, use the word

21  discretion as you used, discretion in

22  how you share information; right?

23  A.    I think that's generally

24  accurate.

25  Q.    Okay. Well, does that go for

98

1    an agent in the FBI?

2    A.      What do you mean?

3    Q.      Is that something that you

4    would expect of qualified law

5    enforcement personnel of any rank?

6    A.      To exercise discretion on an

7    investigation?

8    Q.      On notifying people of where

9    an investigation goes?

10   A.      You lost me.

11   Q.      Well, Colonel Hikus had

12   indicated and to me it seems rather

13   basic, of course, but I apologize for

14   my question not being clear.  That,

15   you know, you're doing an

16   investigation, you try to keep the

17   information as limited to as few

18   people as possible, because people

19   talk; correct?

20   A.      That's basically correct.

21   Q.      Did you ever find out why Cush

22   didn't tell Rick?

23   A.      Because there was no

24   investigation into higher-ranking

25   officials in the state police.

99

1    Q.     But there was information to

2    indicate that there might be

3    problems; correct?

4    A.     I don't know what

5    interpretation he made of the

6    statement from Bridges that someone

7    would have to go to a lieutenant

8    colonel or someone affiliated with

9    the state police.

10   Q.     Well, you now know about

11   Bridges.  What did, again, what did

12   Ober know about Bridges then?  What

13   did Cush know about Bridges then?

14   A.     What Lieutenant Colonel Hikus

15   and Captain Ober told me as it

16   related to Bridges or Stanton was

17   that the FBI agent on this phone call

18   in May or early September or early

19   October, told them that they had a

20   confidential informant who knew a

21   trooper by the name of Stanton.  The

22   informant told the agent that Stanton

23   allegedly told him that he could get

24   people into the state police academy.

25   He told the informant that he could

100

1   get them reclassified from an

2   ineligible status, that an eligible

3   status had been made, he could get

4   them through the polygraph

5   examination, that he could get them

6   through the background examination,

7   the physical fitness testing, and I

8   think the psychological examination

9   and that finally he could get them

10  appointed to the academy.

11  Q.      You've done a great job of

12  reviewing all of this, but you don't

13  remember your discussions with Rick.

14  You have to --- you need your notes

15  to do that?

16  A.      Yes, I would.

17  Q.      I applaud in the information

18  you have about the rest of this, but,

19  you know, as far as that tape is

20  concerned, do you have any

21  information known to you to indicate

22  that Mr. Ober would know Bridges or

23  the extent of Bridges' knowledge in

24  October of '98?

25  A.      After October 21st he would

101

1  have.

2  Q.      Well, what would he have known

3  about Bridges after October 21st

4  other than what was in this tape?

5  A.      Nothing.

6  Q.      Well, what about before that?

7  Any information that you have that

8  would indicate that Mr. Ober had

9  information about Bridges before

10 that?

11 A.      I don't think Bridges' name

12 was mentioned to me at all.

13 Q.      Oh, okay.  Well, what about

14 Cush?  What have you learned about

15 Cush's knowledge of Bridges and

16 Bridges' role?

17 A.      I don't remember.

18 Q.      And didn't --- Mr. Cush also

19 said he had some difficulty hearing

20 that word lieutenant colonel; didn't

21 he?

22 A.      I don't recall that, no.

23 Q.      And that, in fact, do you know

24 whether he testified that Mr. Ober

25 pointed out the word lieutenant

102

1    colonel.  Here is this FBI agent

2    sitting here talking about this

3    source.  In fact, he remembered

4    talking to Mr. Williams, the word

5    eyeball, eyeballing somebody, but he

6    didn't remember when he went up in

7    October to talk to Captain Ober what

8    this --- he couldn't hear this term

9    lieutenant colonel, and Captain Ober

10   was the one who picked it out.  Did

11   you ever find anything out about

12   that?

13   A.      No, I didn't.

14   Q.      Do you remember whether Rick

15   had ever indicated that Ober had

16   expressed concern about where to take

17   the information?

18   A.      I know that he expressed that

19   concern to Lieutenant Colonel Hikus.

20   Q.      Do you know whether he ever

21   expressed that concern to Mr. Cush?

22   A.      I'm not sure.

23   Q.      But isn't that a very key

24   issue here?  If we're looking at the

25   credibility, sir, of Mr. Cush and Mr.

103

1  Ober and you're checking the facts

2  about what happened in October of

3  1998, wouldn't reflections of Mr.

4  Ober or comments by Mr. Ober having

5  to do with a concern about where he

6  takes information, wouldn't that be

7  of importance?

8  A.     It was of importance to me as

9  to whether or not the FBI had

10  directed confidentiality in this

11  case.  I would want to know that and

12  take that into consideration.

13  Q.     Well, would you think the FBI

14  would want to know that and take that

15  into consideration?  Hold on a

16  second.  Colonel, let me go over this

17  again and clarify it, okay?  Do you

18  know whether Captain Ober expressed a

19  concern to the FBI about where he

20  should take this information?

21  A.     I don't know if he expressed

22  concern to the FBI.  I know he

23  expressed concern to Lieutenant

24  Colonel Hikus.

25  Q.     Yes, and Colonel Hikus told

104

1   him to be quiet and just report to me

2   and cooperate with them and just

3   report to me; right?

4   A.     That is correct.

5   Q.     So your primary

6   dissatisfaction, if we can term it

7   that, with Captain Ober was the fact

8   that he didn't go to Conley, that

9   instead he went to Hikus; right?

10   A.     Yes, I was concerned about

11   that.

12   Q.     Okay. You know, you're not

13   --- you don't have any concern with

14   Captain Ober following the orders of

15   Colonel Hikus? I mean, Colonel Hikus

16   gave him a lawful order, you do X and

17   Y and Captain Ober followed those

18   orders; right?

19   A.     I --- he did follow those

20   orders, and I have no problem with

21   him following those. In fact, that

22   would be my expectation, and I think

23   that was a mitigating factor as it

24   related to Captain Ober's following

25   those.

105

1  Q.    A mitigating factor is that

2  violating his chain of command.  Are

3  you saying he violated his chain of

4  command?  Is that what you're saying?

5  A.    He violated rule 1.17.  My

6  primary concern was Lieutenant

7  Colonel Hikus.

8  Q.    I must say, sir, I reached

9  that conclusion a long time ago in

10  this matter.  And we'll come to that.

11  But I did review your notes and I

12  thought something was mentioned

13  there, over-concerned about going

14  anywhere with info.  And I thought

15  that was, those were notes that you

16  made in your conversation with Rick.

17  A.    That's correct.

18  Q.    Well, what do you mean?

19  What'd you write down there?  What's

20  that about?

21              ATTORNEY CHRISTIE:

22              Counsel --- sorry.

23              ATTORNEY GUIDO:

24              It's improper to

25          question him without showing

106

1          him the document and letting
2          him put that sentence in the
3          context of his own notes.
4          It's improper to do that and I
5          object.
6     BY ATTORNEY BAILEY:
7     Q.     What do you remember Rick
8     saying about Ober's comments
9     regarding information and what to do
10    with it?
11    A.     The statement that you just
12    read to me from my note, I think what
13    he meant was that he expressed some
14    concern to the agent about who he
15    should go to with this.
16    Q.     Well, did that beg a question
17    to you about whether or not there had
18    been a discussion of confidentiality
19    between Cush and Ober?
20    A.     I think there was an
21    acknowledgement that there was a
22    discussion with the use of
23    discretion.
24    Q.     And who acknowledged that,
25    sir?  Rick; didn't he?

107

1    A.        Captain Ober and Lieutenant
2    Colonel Hikus.
3    Q.        There wasn't an
4    acknowledgement by the FBI of that?
5    A.        According to my notes that
6    must have been something I discussed
7    with the SAC as well.
8    Q.        And the SAC, Mr. Mascara,
9    Rick, your friend, told you that Ober
10   had expressed concern about what to
11   do with the information.
12   A.        That would be correct.
13   Q.        Colonel Evanko, thank you.
14   Now, did Mr. --- I'm sorry, sir.
15   A.        I would put that into context
16   as to what he got from whoever he
17   talked to.
18   Q.        Okay.  Sure.  I mean, that
19   would naturally or those comments or
20   the FBI awareness of Mr. Ober's
21   thoughts would have to exist in a
22   context of whatever passed between
23   Mr. Ober and the FBI agent; right?
24   A.        Yes.
25   Q.        That's what you're saying;

108

1   right?

2   A.      Yes.

3   Q.      Okay.  And I'm not --- I'll

4   be, you know, very foolish to

5   disagree with you on that.  I mean,

6   that's only common sense.  But you in

7   trying to learn, I mean, your

8   justification, and we're going to

9   talk about your investigation in just

10  a moment, but your justification for

11  the investigation has always been

12  termed by the Defendants and by

13  yourself today as into the facts and

14  circumstances surrounding this FBI

15  inquiry; right, sir?

16  A.      Surrounding the whole event.

17  Q.      Surrounding the whole event;

18  right?

19  A.      Yes.

20  Q.      And I asked you questions

21  about who you believed or what you

22  felt that Captain Ober had done wrong

23  and I think you were, you say you

24  just never reached a conclusion about

25  that.  In fairness to you I think

109

1   that's what you testified to; right?

2   A.      I think I testified that it

3   was a --- if I were to look for a

4   violation or identify a violation it

5   would have been a violation of the

6   practice of the department, as well

7   as a violation of reporting to your

8   supervisor an individual who has

9   violated rules and regulations.

10  Q.      Well, you said that Ober

11  violated rule 1.17.  Now, what's that

12  rule?

13  A.      Reporting information to your

14  supervisor.

15  Q.      There's an affirmative duty on

16  the part of an investigator to report

17  to a supervisor an FBI inquiry?

18  A.      If it involves an allegation

19  of a violation of the rules and

20  regulations or law.

21  Q.      Yes.  Okay.  Fair enough.

22  Now, you told me that when you talked

23  to Rick, Rick talked about how old

24  this investigation was; right?

25  A.      Yes.

110

1  Q.     Did Rick ever use the year or
2  mention the year 1997?
3  A.     I believe that he did.
4  Q.     And you heard Colonel Coury's
5  deposition; right?
6  A.     Yes, I did.
7  Q.     Did you hear Colonel Coury
8  testify that he got a call from
9  Captain Monico (phonetic) about
10 Stanton's activities?
11 A.     I don't recall hearing that,
12 no.
13 Q.     You don't recall hearing that?
14 A.     No, sir.
15 Q.     Well, do you know whether Mr.
16 Coury did get any information from,
17 is it Berrings (phonetic)?
18 A.     Not that I know of.
19 Q.     And Monico, you don't know
20 whether they ever told Mr. Coury
21 anything about the previous
22 investigation?
23 A.     I don't recall Colonel Coury
24 testifying to that nor do I know
25 about it.

111

1    Q.      Well, didn't Rick tell you

2    that they had told IAD --- I'm sorry,

3    sir.

4    A.      Go ahead.

5    Q.      No, no, go ahead.

6    A.      I lost it, go ahead.

7    Q.      When you talked to Rick didn't

8    he tell you that this investigation

9    had been around and they went back

10   into it for some reason?

11   A.      I think he did tell me that.

12   Q.      Yes.  And did he ever indicate

13   that they had told the state police

14   and nothing was done?

15   A.      Not that I recall, no.

16   Q.      Well, do you know whether Mr.

17   Cush had indicated that he, in fact,

18   went to the western division IAD and

19   told him about Stanton before?

20   A.      I think Agent Cush had gone to

21   Sergeant Berrings and told him or he

22   asked him to check to see if Trooper

23   Stanton was doing any undercover work

24   into a job selling cadets for

25   appointment to the Academy.

112

1    Q.      Now, did you know whether the

2    organized crime division of western

3    Pennsylvania was ever notified?

4    A.      I don't know.

5    Q.      Well, Rick had indicated to

6    you, did he not, that there had been

7    at least some inquiry to the

8    Pennsylvania State Police prior to

9    ever going to Captain Ober in October

10   of '98; didn't he?  He told you that.

11   A.      He may have, but I know that

12   Cush in his statement said that.

13   Q.      Yes.  Well, why didn't you

14   have that investigated, sir?

15   A.      By the time that I read this

16   entire report it was being

17   investigated administratively and

18   criminally.

19   Q.      Did you assign a couple of

20   majors to it to check out whether

21   Monico, Frank, what he was doing?

22   A.      I'm not sure that I knew

23   anything about Monico, but it was a

24   regular criminal investigation and

25   administrative investigation.

113

1    Q.        Well, why wouldn't that

2    scenario deserve as much

3    investigation as the facts and

4    circumstances surrounding the 1998,

5    the October 1998, incident?

6    A.        I would think that the

7    investigation into the criminal

8    conduct of Stanton was substantially

9    more than the administrative inquiry

10   into the facts and circumstances of

11   this incident.

12   Q.        Sir, aren't they two different

13   things?

14   A.        Yes, they are.

15   Q.        Sure, and the issue that you

16   have told us and your Codefendants

17   have told us time and time again was

18   that you were looking at the facts

19   and circumstances about what occurred

20   in October of '98, not because Ober

21   or Hikus are criminals or anything

22   like that, you wanted to find out

23   what happened in these circumstances

24   as the Commissioner of the

25   Pennsylvania State Police; right?

114

1    A.      That was right.

2    Q.      Well, why didn't you do the

3    same thing in regards to what the

4    breakdown was in '97?

5    A.      Because by the time I found

6    that out by reading the entire

7    administrative inquiry there was

8    already an ongoing criminal and

9    administrative investigation into

10   Stanton.

11   Q.      Okay.  Well, the criminal

12   investigation into Stanton, those

13   standards in a criminal investigation

14   are separate from the kind of

15   interdepartmentally or disciplinary

16   investigations or administrative

17   investigations that you claim were

18   the basis for checking into the

19   events of October '98; right?  I

20   mean, they're two different things?

21   A.      A criminal investigation is

22   different from an internal affairs

23   investigation, yes.

24   Q.      Sure.  And the administrative

25   investigation that you're referring

115

1    to into Mr. Stanton is like a BPR

2    that you're going to do into the

3    conduct or allegations of misconduct

4    of a trooper or an officer in a

5    normal circumstance; right?

6    A.      That is correct.

7    Q.      Sure it is.  But you have

8    never initiated an investigation into

9    the facts and circumstances

10   surrounding FBI reports as early as

11   '96 or '97 to your personnel in

12   western Pennsylvania and how that was

13   handled in communicating information

14   of great importance to the

15   Pennsylvania State Police.  You never

16   really have done the same type of

17   investigation there that you have

18   done in the case involving October of

19   '98 and the incidents relating to Mr.

20   Hikus and Mr. Ober have you?

21   A.      There was an ongoing --- by

22   the time I read the reports, there

23   was an ongoing criminal investigation

24   into the Stanton matter as well as an

25   administrative investigation.

116

1              ATTORNEY BAILEY:

2                   Object to the question

3              as non-responsive to the

4              respect --- object to the

5              response as non-responsive.

6       BY ATTORNEY BAILEY:

7       Q.    Colonel, will you take a look

8       at these, please.  These are your

9       notes.

10              ATTORNEY BAILEY:

11                   Let the record show

12              it's two pages.  We're going

13              to have them marked as Number

14              Two.

15                   (Deposition Exhibit Two

16              marked for

17                   identification.)

18       BY ATTORNEY BAILEY:

19       Q.    Do you have it in front of

20       you, sir?

21       A.    Yes, I do.

22       Q.    The top of the page, does that

23       say Rick Mascara and then a phone

24       number, Pittsburgh SAC, May 20, '99

25       and then your pager number?

117

1    A.       Yes, sir.

2    Q.       Now, sir, I confess that I've

3    tried my best to decipher your notes

4    and I've been able to read a good bit

5    of it, but I need a little bit of

6    help; okay?  So I need you to help me

7    with a few things; all right?  The

8    first sentence, if I understand it,

9    says I was, can you read that

10   sentence for me?  I was advised by,

11   I'm going to try to read it and you

12   correct me if I get it wrong, it will

13   go a little faster.  I was advised by

14   Lieutenant Colonel Hikus recently

15   that we (PSP) were the subject of an

16   FBI investigation into selling

17   trooper positions.  Is that what it

18   says?

19   A.   Yes, it does.  That's partially

20   what it says.

21   Q.       All right.  Now, I have a ---

22   there's a parentheses here and I

23   cannot read, all I can read is the

24   word corruption.  Can you read the

25   rest of that?

118

1  A.      Parentheses, for any other

2  corruption allegation, end

3  parentheses, since October '98, end

4  parentheses.

5  Q.      All right.  Sir, here's my

6  question on that particular.  These

7  are some paraphrases of notes of the

8  things that you said to Rick; right?

9  A.      Yes, sir.

10  Q.      What did you mean by any other

11  corruption allegation since October

12  '98?

13  A.      Into the higher ranks of the

14  state police.

15  Q.      You're asking the FBI agent to

16  tell you whether there are any

17  pending investigations into higher-

18  ups in the Pennsylvania State Police;

19  aren't you?  Isn't that what you're

20  doing there?

21  A.      I think I was doing that in

22  the context of since October '98

23  with the ---

24  Q.      Yes.

25  A.      --- with the preface when I

119

1   talked to the SAC, I think that I

2   asked him or made a statement, if

3   this is going to interfere with an

4   FBI investigation, just don't talk to

5   me or something like that.

6   Q.      Well, what are you asking him

7   for?  I mean, what --- why are you

8   asking him?  Why are you asking the

9   Federal Bureau of Investigation if

10  there are --- do I have anything to

11  fear?  Is that what you're asking

12  him, sir?

13  A.      No.

14  Q.      Then why are you doing this?

15  Is that proper to do this?

16  A.      Why am I asking if there is

17  any other corruption investigation?

18  Q.      Yes, sure.  Yes, sir.  Would

19  you expect him to tell you?

20  A.      Yes, I would unless they had

21  strong probable cause to think that I

22  was involved in it.

23  Q.      All right.

24  A.      Yes, I would expect them to

25  tell me.

120

1    Q.      Okay, sir.  Colonel Evanko,

2    how long have you been a law

3    enforcement officer?

4    A.      As of today?

5    Q.      Yes.

6    A.      Just about 32 years.

7    Q.      All right.  Sir, you've used

8    the term a couple of times unless

9    there's good probable cause.

10   Remember?

11   A.      Yes.

12   Q.      Now, I know legally what the

13   definition of probable cause is, at

14   least I try.  I know it's a judgment

15   call thing, you know, it's sort of

16   like pass defense in football

17   sometimes, you weigh things and

18   whatnot.  Well, what do you mean when

19   you say to me that your expectation

20   is unless there is good probable

21   cause you should be told?  Okay.

22   Unless there's good probable cause.

23   What does that mean?

24   A.      I'm not sure I can explain it

25   any better other than the --- I would

121

1    expect that the SAC, if they had, for
2    example, a wire intercept of me
3    talking to somebody in an illegal
4    fashion, that that would be strong
5    probable cause and obviously I'm
6    involved in something.
7    Q.    Okay.  So that would be the
8    kind of probable cause that would
9    implicate you personally?
10   A.    Yes, sir.
11   Q.    Okay.  And you believe that if
12   an FBI agent is sitting there with
13   some reason to believe that maybe a
14   group of people at the top, somebody
15   at the top, okay, is maybe doing
16   something wrong, that's not good
17   probable cause, so they should tell
18   you; right?  Is that what you're
19   telling me?
20   A.    It's my understanding that the
21   FBI agent is saying that high-ranking
22   individuals in the state police were
23   never mentioned.
24   Q.    Well, that's like Monday
25   morning quarterbacking though; isn't

122

1   it?

2   A.      I think it's the facts.

3   Q.      Known after the investigation

4   is completed; right?

5   A.      We established that or it was

6   established in the record after the

7   investigation was completed.

8   Q.      Well, further on your notes

9   you've already told us that there was

10  this concern that Ober had about who

11  he should share this information

12  with; right?

13  A.      Point that out to me.

14  Q.      Second page, sir, second page.

15  No, no, second page, sir, you have it

16  in your right hand.  Yes, sir.  Right

17  hand, okay.  I want to go through the

18  lines with you now; okay?  The first

19  line has the number 1237.  Do you see

20  that?

21  A.      Yes, sir.

22  Q.      That's one.  Count with me.

23  One, two, three, four, five, and we

24  have a blank line and then we have

25  CI.  Do you see that?

123

1    A.      Yes, sir.

2    Q.      That's six and then we have a

3    blank line and that's seven.  Then we

4    have eight and nine and it says, all

5    I can read is nothing happened, dash.

6    Now, do you want to read your

7    handwriting for me, because maybe I

8    misread it?

9    A.      Ober concerned about going

10   anywhere w/information.

11   Q.      Okay.  That's what you wanted

12   me to show to you.  I showed it to

13   you.  All right, sir.  Now, let's go

14   back to page one; okay?  All right.

15   Now, if you get into an investigation

16   and start an investigation, and the

17   investigation indicates that there's

18   a possibility, not good probable

19   cause, and I think you and I can

20   understand the basic definition of

21   what good probable cause means.  Good

22   probable cause means it would be a

23   good basis to bring a charge; right?

24   A.      Or to conduct an

25   investigation.

124

1    Q.      Okay.  Fair enough.  Or to

2    conduct an investigation.  I would

3    think the threshold to conduct an

4    investigation, particularly in public

5    corruption cases, was pretty low,

6    particularly when it comes to

7    democrats with the FBI.  But that

8    aside, let's say we're talking about

9    a very, very, very low level.  What

10   would that level be to conduct an

11   investigation?

12   A.      Why would the FBI conduct an

13   investigation you mean?

14   Q.      Sure.

15   A.      To get information that they

16   need to see whether or not there's

17   wrongdoing.

18   Q.      I agree with you, sir.  Right

19   now, if we go back in our minds' eye

20   prior to October 1998, we know that

21   Len Bodack, a State Senator, had been

22   mentioned.  You agree that Bodack was

23   mentioned in the earlier

24   investigation phase prior to '97?

25   A.      No, the first that I know of

125

1    Bodack's name being mentioned by the

2    FBI's --- by the FBI's confidential

3    informant, was the intercept

4    disclosed to Captain Ober on October

5    21st.

6    Q.    Well, if there were evidence

7    that would indicate that the FBI knew

8    about Bodack and his name had been

9    mentioned earlier than October of

10   '98, would it change any of your

11   feelings about this?

12   A.    In regards to what?

13   Q.    Whether or not the FBI would

14   have indicated to Mr. Ober a la Ober

15   being concerned about where he goes

16   with the information before October

17   of 1998.

18   A.    You lost me.  I don't know

19   what you mean by the question.

20   Q.    You're telling us that when

21   you're looking at the --- in your

22   review of the information, that Mr.

23   Bodack wasn't mentioned before

24   October of '98 or the FBI didn't know

25   about him before October of '98;

126

1  right?

2  A.    That's the only time that I'm

3  aware of.

4  Q.    Okay.  I asked you if the FBI

5  did mention Mr. Bodack and was aware

6  of Mr. Bodack before October of '98

7  if that would change anything for

8  you?

9  A.    And I don't know what you mean

10  by the question.

11  Q.    Well, if the FBI had suspected

12  Mr. Bodack were involved before

13  October of '98 would that have

14  affected their probable cause to

15  investigate at all?

16  A.    To investigate Bodack, I don't

17  care who they investigate.

18  Q.    Well, if Bodack had indicated

19  that he was getting things out of the

20  Governor's Office as Mr. Gigliatti

21  did, for example, do you think that

22  should have affected the FBI's

23  approach to this investigation?

24  A.    In regards to who they told

25  or ---?

127

1   Q.      Sure.  Who Bodack was

2   contacting, who he may have been

3   trading votes for influence with.

4   A.      I have no idea.

5   Q.      Well, did Mr. Williams or Mr.

6   Wertz (phonetic) check that out?  Do

7   you know if they did?

8   A.      Checked Bodack?

9   Q.      Yes, the pre-October '98

10  aspect of this thing.

11  A.      It's my understanding that

12  when the FBI advised Captain Ober of

13  this case that it was unfounded,

14  there was nothing to it except,

15  quote, a bad trooper.  And that the

16  case was over.

17  Q.      The case was over when the FBI

18  contacted Ober?

19  A.      Yes.

20  Q.      Okay.

21  A.      And that's late September,

22  early October of 1998 or --- no, it's

23  two weeks prior to May 12th that

24  Lieutenant Colonel Hikus told me

25  Captain Ober told him that the FBI

128

1    had called and told him that the

2    investigation was over or unfounded

3    and that the most they could find was

4    that we had a bad trooper or

5    something like that.

6    Q.      Okay. Let's clarify this in

7    fairness to you. You misspoke or

8    maybe I misunderstood you. The FBI

9    had not closed the case in October of

10   '98. That actually occurred later.

11   It was a live investigation until

12   about two weeks before you were told

13   in May; right?

14   A.      That's correct.

15   Q.      That's what you meant to say?

16   A.      That's what I said.

17   Q.      Yes. Okay. Well, I

18   misunderstood you.

19   A.      That's what I said in the

20   second part of that.

21   Q.      Yes. I think you cleared it

22   up. You cleared it up. There was

23   some confusion there. That's fine.

24   It's okay. Now, let's go back to

25   this document here. And go back to

129

1    page one.  These are your notes and

2    it's Evanko Two.  Now, it says, after

3    that first little paragraph there, it

4    says, ASAC.  Is that what it says,

5    ASAC agent?  What does that ---?

6    A.      Assistant special agent in

7    charge.

8    Q.      And what's the name?

9    A.      I can't read it.

10   Q.      One and a half years is all I

11   can make out.  Is that --- do you

12   agree that that's what it says?

13   A.      There is a word before that

14   and then after the one and a half

15   years it appears to say Phoenix

16   Division.

17   Q.      What's that mean?

18   A.      I don't know.

19   Q.      Well, is that something the

20   FBI is saying to you or something

21   you're saying to the FBI?

22   A.      I don't recall anything about

23   that.

24   Q.      It sounds pretty exotic to me,

25   but who knows how important Stanton

130

1   is.  Phoenix Division.  Now, then

2   there's 1200.  What's the

3   significance of the number 1200?

4   A.      I think that was the time that

5   I called.

6   Q.      And then it says out of where,

7   which office.  Who's saying that?

8   That's Mascara asking you where this

9   is coming from.  He didn't know

10  anything about it; right?

11  A.      When I posed the question to

12  him about an investigation into

13  higher-ups of the state police, and

14  he's saying, out of what office, out

15  of where, which office?

16  Q.      Do you remember what you said

17  to him to spark that response, what

18  you may have said, what words you

19  used?

20  A.      I would have asked about any

21  investigation, any corruption

22  investigation, probably in the state

23  police or into the higher ranks of

24  the state police.  That's probably

25  what that means.

131

1   Q.      And then the next line is got

2   to plead ignorance?

3   A.      Yes.

4   Q.      In other words, he didn't know

5   about what you're --- he didn't know

6   what you were talking about?

7   A.      Yes.

8   Q.      Okay.  The third line, I'm

9   sorry, I can't read that.  I see the

10  word seems and the word to.

11  A.      Sometime ago seems to

12  remember.

13  Q.      Okay.  Then what?

14  A.      And the next line is was a

15  case against a specific trooper.

16  Q.      Okay.  So he seemed to

17  remember something about a case

18  against a specific trooper.

19  A.      Yes, sir.

20  Q.      So again, if there were

21  indications that Mr. Bodack, let's

22  say, had been involved or had come

23  up, prior to October '98, that would

24  be news to you at this juncture here;

25  right?  And Rick didn't seem to

132

1    indicate that during this May 20th

2    conversation; is that correct?

3    A.    That I would not have had any

4    knowledge about the name Bodack, I

5    wouldn't have had that until after I

6    reviewed the administrative inquiry

7    and read that in the transcript of

8    the recording that was made in

9    October.

10   Q.    Okay.  Now, what's that next

11   line?

12   A.    I don't know what the first

13   word is, but it appears to be after

14   that w/David.

15   Q.    Who's David?

16   A.    I don't recall.

17   Q.    Young?

18   A.    I don't know who it is.

19   Q.    They're your notes.  You don't

20   know who David is?

21   A.    No, I don't know what that

22   means.

23   Q.    You see there's a little

24   squiggly line there?

25   A.    Yes, I do.

133

1  Q.     What's underneath that?

2  A.     I probably started to write

3  something and stopped and crossed it

4  off.

5  Q.     All right.  Go down to

6  paragraph two.  There's a number two;

7  right?

8  A.     Yes, sir.

9  Q.     As I read that it says, was I,

10  then there's --- is that the word a?

11  A.     A.

12  Q.     Subject of an investigation or

13  any of lieutenant colonels.  Do you

14  remember that?

15  A.     Yes.

16  Q.     Do you see that?  Now, I

17  might be mistaken, but did Mr. Hikus

18  tell you that there was a possibility

19  of a lieutenant colonel or a colonel?

20  Do you remember?

21  A.     Lieutenant Colonel Hikus on

22  May 3rd told me that the, quote,

23  term, end quote, colonel was used.

24  Q.     Where'd you get lieutenant

25  colonel by the 20th?  Who did you

134

1   talk to and what did you learn by
2   then that caused you specifically to
3   ask Rick, L, right there, L. colonel
4   as opposed to colonel then.  Where'd
5   you get that?
6   A.     I'm thinking from what
7   Lieutenant Colonel Hikus and Captain
8   Ober told me that two high-ranking
9   officials, in high ranking there are
10  two potentially lieutenant colonels.
11  Q.     Because you're a colonel, it
12  wouldn't include you; right?
13  A.     I didn't know that ---.
14  Q.     There's only one colonel.  I'm
15  sorry.  There's only one colonel.
16  A.     And your question is?
17  Q.     That colonel, it wouldn't have
18  included you.  You knew that you
19  hadn't been involved in this thing;
20  right?
21  A.     I knew I wasn't involved, yes.
22  Q.     Okay.
23                 ATTORNEY BAILEY:
24             Let me know a minute
25      warning.

135

BY ATTORNEY BAILEY:

1

2    Q.      Okay.  So sir, as you sit here

3    today, your best recollection is that

4    you think that came from Mr. Hikus or

5    conversations with Mr. Hikus?

6    A.      The use of the term colonel?

7    Q.      Yes, I'm just looking at ---.

8    A.      I know it came from Lieutenant

9    Colonel Hikus on the 13th --- May

10   12th.

11   Q.      Okay.  So on May 13th Colonel

12   Hikus had told you that it was the

13   term lieutenant colonel?

14   A.      No ---.

15   Q.      Go ahead.

16   A.      On May 12th when they briefed

17   me there was no discussion at all

18   about a rank.

19   Q.      Okay.

20   A.      It struck me as odd on May

21   13th that he would come to me and say

22   the term, not the rank, but the term

23   colonel was used.

24   Q.      Okay.  Now, he gave a

25   statement, Mr. Hikus did.

136

1          VIDEOGRAPHER:

2          Excuse me, Mr. Bailey,

3    may we suspend for a moment?

4          ATTORNEY BAILEY:

5          Yes.

6          VIDEOGRAPHER:

7          It's now 11:30, March

8    27th, 2002.  We are going to

9    suspend and change tapes on

10   the deposition of Mr. Evanko.

11   SHORT BREAK TAKEN

12         MR. SOLOMON:

13         It's 11:36 a.m., tape

14   two, back on the record.

15         VIDEOGRAPHER:

16         The time is 11:38 a.m.,

17   March 27th, 2002.  We are

18   getting the second tape of Mr.

19   Evanko.

20   BY ATTORNEY BAILEY:

21   Q.    Mr. Evanko, did you hold up

22   the criminal investigation into Mr.

23   Stanton until you investigated the

24   facts and circumstances?  I mean,

25   that's the way you term it and

137

1    actually we look at it differently.

2    There's an honest difference of

3    opinion there.  But the facts and

4    circumstances of the October 5th, '98

5    FBI inquiry.  Do you understand that

6    question?

7    A.      I believe I understand it.  By

8    the time I got the administrative

9    inquiry, the investigation both

10   criminally and administratively into

11   Stanton was ongoing.  But no, I did

12   not order - - -.

13   Q.      But you say the - - - you're

14   talking about the results of your

15   investigation into Mr. Ober.

16   A.      The results of my

17   administrative inquiry about the

18   incident with Lieutenant Colonel

19   Hikus and Captain Ober and the FBI.

20   Q.      Okay.  So your testimony is

21   you didn't hold anything up and that

22   the criminal investigation into Mr.

23   Stanton and the administrative

24   investigation into Mr. Stanton

25   proceeded on a normal basis and a

138

1    normal schedule?  That's what you're

2    telling us; right?

3    A.      Yes, sir.

4    Q.      At least as known to you?

5    A.      Yes, sir.

6    Q.      Okay.  Can we go back to

7    Evanko Two?  Now, I had been asking

8    you about this term lieutenant

9    colonel.  Do you see that there?

10   A.      Yes, sir.

11   Q.      Now, in response to earlier

12   questions I had indicated to you or I

13   had asked you whether you knew Mr.

14   Bodack had been mentioned prior to

15   that --- what that CI or Bridges, I

16   think you had indicated that it was

17   Bridges, had mentioned in October of

18   '98; right?  To the best of your

19   knowledge the first time Bodack was

20   mentioned was October of '98?

21   A.      To the best of my knowledge

22   the confidential informant of the FBI

23   mentioned the name Bodack in October

24   of '98.

25   Q.      Okay.  If I represented to you

139

1    that I think that Bodack was

2    mentioned as early as the beginning

3    of 1998 in FBI documents would that

4    surprise you?

5    A.      I wouldn't know that.

6    Q.      And you wouldn't have any way

7    of knowing it?

8    A.      No, sir.

9    Q.      Because you didn't ask the FBI

10   the extent of the public corruption

11   they suspected, what connections they

12   suspected; right?

13   A.      No, I just took what

14   Lieutenant Colonel Hikus and Captain

15   Ober told me that the FBI

16   investigation was closed, unfounded

17   and the most they could find was a

18   bad trooper.

19   Q.      Well, Colonel Coury told us

20   that the FBI indicated something to

21   him and he'd want to question them on

22   what's this about, you know, what are

23   the details, and how do you think the

24   state police is involved and who do

25   you think is involved, et cetera.

140

1    Now, in fairness to Mr. Coury, that

2    was what he thought his methodology

3    might be, I believe, when I asked him

4    that question.  And in fairness to

5    him it's the way he felt it should

6    have been approached by Captain Ober.

7    Now, with that characterization,

8    that's my recollection, do you

9    remember when he testified to that

10   during his deposition?

11   A.     No, I do not.

12   Q.     Okay.  Well, then I'll just

13   let you go on that question, because

14   you don't remember that.  Now, on

15   line two it says was I a subject of

16   an investigation or any of lieutenant

17   colonels.  So what you're asking Mr.

18   Mascara is, you know, was I or any of

19   my lieutenant colonels the subject of

20   an investigation.

21   A.     Yes.

22   Q.     Okay.  And he said no?

23   A.     Yes.

24   Q.     Did you ask him if you should

25   have been subject to an

141

1   investigation?

2   A.      No, I did not.

3   Q.      Did you ever ask him if the

4   FBI ever had any reasons to believe

5   that you or some of your lieutenant

6   colonels could have been involved?

7   A.      In getting back to the

8   question before that where I said - - -

9   two questions before that where I

10  said - - -.

11  Q.      You go back, sir, it's fine.

12  You go right ahead.

13  A.      Whatever it was.  He would

14  have gotten back when it was, was I

15  the subject of an investigation or

16  lieutenant colonel.  I'm sure your

17  name was never mentioned.  If I were

18  I would have been told is what he

19  told me.

20  Q.      Okay.

21  A.      If you were I would have been

22  told.

23  Q.      Forgive me.  I'm not laughing

24  at you.

25  A.      I'm sure your name was never

142

1   mentioned.

2   Q.      I'm not laughing at you.  I'm

3   not, that laughter --- let me tell

4   you why I laughed because I apologize

5   to you.  It was not at you and I ---

6   that may have come across to you as

7   rude and I don't --- I think you know

8   me enough by now to know that that's

9   one thing I try not to do, I try hard

10  not to be rude.

11          The reason I laughed is

12  because of all of the testimony I've

13  heard from so many people about how

14  you do an investigation and here's my

15  question.  You're absolutely certain

16  that Rick Mascara said to you that if

17  your name had been mentioned he would

18  have told you?

19  A.      Yes, I am.

20  Q.      Isn't that improper?

21  A.      Say it again.

22  Q.      Sir, if we're going to do

23  public corruption investigations in

24  the United States and we put

25  friendship as law enforcement

143

1   officers above the integrity of an

2   investigation, I may not be

3   understanding it properly, that's why

4   I'm asking you this, how are we ever

5   going to get rid of public corruption

6   if we ever can?

7                   ATTORNEY CHRISTIE:

8                   Counsel, I object.

9             Maybe you're not understanding

10            properly because if you're

11            basing --- are you basing that

12            question on the excerpt that

13            the Commissioner just read

14            from there saying that if you

15            were, you, the Commissioner,

16            was the subject of an

17            investigation, I would have

18            been told.  Who's the I that

19            Mascara's talking about?

20                  ATTORNEY BAILEY:

21                  Counsel, you have ---.

22                  ATTORNEY CHRISTIE:

23                  Well, that's where I

24            think you may be misleading.

25                  ATTORNEY BAILEY:

144

1      You have the

2  Commissioner.  He can answer.

3  You're trying to testify and

4  obviously ---.

5          ATTORNEY CHRISTIE:

6          No, you're trying to

7  testify, Counsel.

8          ATTORNEY BAILEY:

9          Yes, you are.  You

10  know, please stop what you're

11  doing.  If you have an

12  objection, state it for the

13  record.

14          ATTORNEY CHRISTIE:

15          I just did.

16          ATTORNEY BAILEY:

17          And let me go back.

18  BY ATTORNEY BAILEY:

19  Q.      Are you telling me ---.

20          ATTORNEY BAILEY:

21          Move to strike.

22  BY ATTORNEY BAILEY:

23  Q.      Are you telling me, sir, that

24  Mr. Mascara is saying in response to

25  your inquiry here that if your name

145

1    had been mentioned he would have told

2    you?

3    A.       That's what he told me.  And

4    it was prefaced with my comments to

5    him when we first started to talk

6    that if this was --- if my questions

7    were going to interfere with any

8    investigation, don't talk to me,

9    don't say anything or something along

10   those lines.

11   Q.       Yes.  But he said if your name

12   --- but his response to that, and I

13   think that's admirable of you to say

14   that to him, I have no problem with

15   that.  But his response to that is,

16   and this is what I'm asking you

17   about.  I'm asking you whether this

18   is proper ethics for a law

19   enforcement official to say, no, if

20   your name had been mentioned I would

21   have told you. That's not proper; is

22   it?  I mean, if he received

23   information that you had done

24   something wrong he should put his law

25   enforcement responsibilities ahead of

146

1   his loyalty to you; shouldn't he?

2   A.      You lost me, but I agree in

3   concept that the issue of loyalty

4   should not be involved in an

5   investigative decision.

6   Q.      Well, then why is he telling

7   you if your name had been mentioned

8   that he would tell you?  I take that

9   to mean that he would have put

10  loyalty to you.  That's what I may

11  not be --- that's why I'm asking

12  about this conversation.

13  A.      I don't know what was in his

14  --- I don't know what he meant by

15  that.  I don't know what was in his

16  mind.  I can just tell those were the

17  words that he used.

18  Q.      Why did you write them down?

19  Why was that important to you?

20  A.      If you were, I would have been

21  told.  I'm sure your name was never

22  mentioned.

23  BRIEF INTERRUPTION

24  BY ATTORNEY BAILEY:

25  Q.      I'm sure your name was never

147

1   mentioned.  Well, did he say that

2   about lieutenant colonels or he said

3   that about your name.  Remember I

4   asked you there's only one colonel;

5   right?

6   A.      That's correct.

7   Q.      And that's the commissioner,

8   that's the way the Pennsylvania State

9   Police are structured.  And at this

10  time the commissioner is you.  You're

11  the colonel.  So when he says your

12  name was never mentioned, you took

13  that to mean by either rank or name;

14  is that fair to say?

15  A.      I think that's fair to say.

16  Q.      Sure, sir.  But he doesn't say

17  lieutenant colonels.  Did you then

18  follow on and say lieutenant colonels

19  or did you take it that he meant

20  lieutenant colonels also?

21  A.      I think he meant lieutenant

22  colonels because I prefaced that, was

23  I a subject of an investigation or

24  any of lieutenant colonels.

25  Q.      But he says if you were

148

1   mentioned I would have been told.
2   You were never mentioned, sure that
3   you were never mentioned.  You think
4   that he's including lieutenant
5   colonels; right?
6   A.      Yes, I do.
7   Q.      But then that isn't correct;
8   is it?  That isn't correct because
9   there was a tape on October 13th,
10  1998 that, in fact, used, at least
11  used the term; am I correct?
12  A.      Yes, there is.  But I don't
13  know what credence the FBI agent or
14  the FBI office gave to that term that
15  was used by the applicant of the job.
16  Q.      But you know that Captain Ober
17  was concerned about who to tell
18  because he was concerned enough about
19  it that he brought it up and the FBI
20  was concerned enough about it for
21  some reason because Rick checked it
22  out and told you that Ober had
23  expressed concern; didn't he?  And
24  that's on page two; right?
25  A.      Yes, he told me that ---

149

1    Q.       Yes.

2    A.       --- Ober was concerned about

3    going anywhere with the information.

4    Q.       Absolutely.  Now, does that

5    mean that you asked Rick what Ober

6    said?  I mean, you said this wasn't

7    into Ober in facts and circumstances

8    and that's fine.  But did you ask

9    Rick if Ober ever mentioned what he

10   was going to do with the information

11   or anything like that?

12   A.       No, I didn't.

13   Q.       Then why did you know --- do

14   you know why Rick would then think it

15   important enough to bring it up and

16   you think it important enough to mark

17   it down on these sheets?

18   A.       I don't know why he brought it

19   up.  But it was what we discussed and

20   I marked it down.

21   Q.       All right, sir.  Thank you.

22   Now, going back, we're still on page

23   one; okay?  Now, I'm the subject of

24   an investigation.  I was never

25   mentioned.  Then it goes, I can't

150

1    read that.  No, is that what that is

2    on the third line there?

3    A.      I think that's a no.

4    Q.      No, dash I, read it, I cannot

5    read it, sir.  I'm sorry.

6    A.      I remotely remember something

7    about an investigation of local

8    municipalities and testing.

9    Q.      Okay.  Do you know whether

10   that was after Rick called you back?

11   A.      No, that was the twelve

12   o'clock phone call, phone

13   conversation.

14   Q.      So Rick really is, without

15   knowing anything about the

16   investigation, carte blanche, saying

17   to you, without knowing what's in the

18   investigation, which he says he's

19   pleading ignorance about, saying to

20   you, if you had been mentioned, I'd

21   have told you?  That's just blind

22   loyalty; isn't it, Colonel Evanko?

23   A.      I don't know what --- I don't

24   know what was in his mind when he

25   made that statement.

151

1    Q.       You said he was your friend.

2    A.       Yes, he was.

3    Q.       How long have you guys been

4    friends?

5    A.       Probably since he went to

6    Pittsburgh and I'm not sure how long

7    that would have been.

8    Q.       Did you ever say you were

9    going to have the agent transferred?

10   Did you ever say you were going to

11   have Mr. Cush transferred, sir?

12   A.       No.

13   Q.       Did you ever say that to

14   anybody?

15   A.       No.

16   Q.       Colonel Hikus is lying about

17   that; right?

18   A.       I never said that to Colonel

19   Hikus or to anybody else.

20   Q.       Do you believe that Colonel

21   Hikus lied about that or are you

22   saying that he, and if he didn't lie

23   about it, he made an error?  Is that

24   what you're saying?

25   A.       One of the two.

152

1    Q.      One of the two.  You feel very
2    strongly about that; don't you?
3    A.      Yes, I do.
4    Q.      Did you ever say you were
5    going to call Mr. Freeh?
6    A.      Yes, I did.
7    Q.      But you didn't?
8    A.      No, I did not.
9    Q.      And you're testifying here
10   today you never placed a call to Mr.
11   Freeh?
12   A.      That is correct.
13   Q.      All right.  Now, sir, after
14   that, do you see you have no and you
15   have that sentence following it
16   there?  But the next sentence says,
17   what are you saying there?
18   A.      Not familiar with this, get
19   back to you.
20   Q.      Okay.  When you talked to Rick
21   do you remember if you were angry?
22   Were you upset?  Did you tell him
23   that you were upset or anything like
24   that? Anything like that?
25   A.      I don't think I was angry.  I

153

1    think I was just calling him to talk

2    to him about this.

3    Q.      Remember I had asked you about

4    the length of time in between, some

5    questions.  I want just a couple

6    little follow-up questions on the

7    length of time.  What occurs between

8    March 12 and --- or I'm sorry, sir.

9    I'm sorry.  May 12 and May 20, I'm

10   sorry.  May 12 and May 20.  On the

11   13th, that was the day that you had

12   --- there was another meeting with

13   Colonel Hikus and you had Colonel

14   Coury come in; right?  Just a second.

15         Colonel, let me go back and

16   unjumble that.  It was very awkward

17   and I apologize for that.  We know

18   that on May 12th, 1999 you had the

19   meeting with Colonel Hikus.  They

20   requested it, Colonel Hikus and

21   Captain Ober. And they initially

22   informed you about the FBI probe;

23   correct?

24   A.      That is correct.

25   Q.      All right.  And there was

154

1   another meeting which occurred on May

2   13th; am I correct?  With Colonel

3   Hikus?

4   A.     It was a 10 to 15-second

5   conversation.

6   Q.     Well, let me tell you why I'm

7   asking, because I think there was

8   later a statement asked of Colonel

9   Coury to give a statement about what

10  was discussed with Colonel Hikus and

11  certainly it took a lot more than 10

12  or 15 seconds, and I'm trying to sort

13  this out.  Let me go back again.

14  Let's try to reconstruct it again.

15  I'm not trying to trip you up.  I

16  want to try to get the facts

17  sequenced.

18         It's May 12, 1999.  Colonel

19  Hikus and Captain Ober have a meeting

20  with you and they request an

21  opportunity to speak with you, and at

22  that time they tell you about this

23  FBI probe.  You admitted Colonel

24  Hikus says you were agitated, you

25  have admitted that you were angry and

155

1    upset.  And you've given us some of

2    the reasons.  My understanding is

3    that at the May 12, 1999 meeting you

4    and Lieutenant Colonel Hikus and

5    Captain Ober were the only three

6    there.  Am I correct?

7    A.    For the first meeting, yes,

8    sir.

9    Q.    All right.  There was another

10    meeting on the 12th then?

11    A.    Yes, sir.

12    Q.    All right.  Now, I'm getting

13    straightened out.  The second meeting

14    on the 12th though, Captain Ober was

15    not there?

16    A.    That is correct.

17    Q.    Okay.  And in the second

18    meeting on the 12th, it was you,

19    Lieutenant Colonel Hikus, and

20    Lieutenant Colonel Coury?

21    A.    That is correct.

22    Q.    Now, Lieutenant Colonel

23    Wescott was not at that meeting;

24    right?

25    A.    No, he wasn't.

156

1    Q.      Now, were there any other

2    meetings that day about this matter

3    that you had where Lieutenant Colonel

4    Hikus was present?

5    A.      There wasn't any other

6    meetings that day, no.

7    Q.      At all about this subject; is

8    that correct?

9    A.      That's correct.

10   Q.      All right.  The next day, May

11   the 13th, 1999, you had another

12   meeting about this subject?

13   A.      Yes, sir.

14   Q.      Now, at that meeting,

15   Lieutenant Colonel Hikus was there;

16   correct?

17   A.      Yes, sir.

18   Q.      Lieutenant Colonel Coury was

19   there?

20   A.      Yes, sir.

21   Q.      And Lieutenant Colonel Wescott

22   was there?

23   A.      Yes, sir.

24   Q.      Who else in addition to those

25   people were there?

157

1   A.      It was just the four of us.

2   Q.      All right.  Where did that

3   meeting take place?

4   A.      I believe that was at the

5   academy.

6   Q.      All right.  Sir, did you take

7   any notes or make any recordings of

8   that meeting?

9   A.      No, I did not.

10  Q.      All right.  Now, do you know

11  whether any of the other gentlemen

12  there made any recordings or notes?

13  A.      I don't believe so.

14  Q.      And certainly that wasn't a

15  15-second meeting?

16  A.      I'm not sure.  There was

17  another meeting with Lieutenant

18  Colonel Hikus and myself where he

19  would then tell me, and I think we

20  were still at headquarters, colonel,

21  the term colonel, was used.

22  Q.      And in --- I'm sorry, sir.

23  A.      In this.

24  Q.      Okay.  Now, you were concerned

25  about that because that impacted you

158

1    personally?

2    A.      That impacted --- directly

3    impacted me.

4    Q.      And that's certainly

5    understandable.  Now, my

6    understanding is, if I recollect

7    correctly, that when Mr. Hikus gave

8    his statement to Mr. Williams during

9    the investigation that you ordered,

10   and we're going to go to that very,

11   very shortly, that Mr. Hikus

12   indicated to Mr. Williams and Mr.

13   Wertz that indeed Mr. Ober had used

14   the word colonel.  Do you remember

15   that?

16   A.      No, I do not.

17   Q.      Okay.  So you don't know

18   whether he --- how Mr. Hikus, and I

19   may be wrong in my characterization

20   by the way, but I'll double-check it.

21   A.      In their briefing to me, no,

22   they did not.

23   Q.      Okay.

24   A.      But I took it that Lieutenant

25   Colonel Hikus got that information

159

1    from Captain Ober.

2    Q.    That's fine.  And I want to

3    also ask you, you are aware that when

4    Mr. Williams and Mr. Wertz

5    interviewed Mr. Hikus, Lieutenant

6    Colonel Hikus, that they taped that

7    interview?

8    A.    Yes, sir.

9    Q.    Now, you have those tapes;

10   right?

11   A.    I do not, but ---.

12   Q.    Your attorneys have them?

13   A.    Yes.

14   Q.    You know that we've requested

15   those tapes and an opportunity to

16   listen to them?

17   A.    I don't know.

18   Q.    And do you know, do you have

19   the tapes of the FBI, that the FBI

20   turned over, at least what they did

21   turn over to your people?  Do you

22   know whether or not your staff has

23   that?

24   A.    I don't know whether we have

25   those tapes or not.

160

1    Q.      Okay.  Have you ever heard any

2    of the tapes in this matter, Colonel?

3    A.      No, sir.

4    Q.      Have you ever read any of the

5    statements in this matter?

6    A.      Yes, I have.

7    Q.      You've read Lieutenant Colonel

8    Coury's statements; is that right?

9    A.      Yes, sir.

10   Q.      Well, before we get to those I

11   want to finish up some questions on

12   this exhibit and then what I'm going

13   to do is I'm going to ask you about

14   that investigation; okay?  The

15   investigation that you ordered by

16   Captain Williams and Lieutenant ---

17   I'm sorry, Major Williams and Major

18   Wertz.  I'll try to get these ranks

19   straightened out.  I'm sorry.  I'm

20   doing my best with them.  Okay.

21   Getting back to you.  That's the end

22   of the first page.  Do you agree with

23   me?

24   A.      Yes, sir.

25   Q.      Okay.  Let's go to the next

161

1    page.    What does 1237 mean?

2    A.        12:37.    It's the time.

3    Q.        Okay.    That's a time thing.

4    Okay.    Now, up above there it says

5    John somebody or other ASAC.    What's

6    that?

7    A.        Maybe it was the ASAC of the

8    Pittsburgh office.

9    Q.        Okay.    Now, it says probably

10   wasn't, what's that say?

11   A.        Briefed.

12   Q.        So that's Rick telling you

13   that he probably wasn't briefed?

14   A.        Yes.

15   Q.        Sir, do you know whether Cush

16   and/or Suhy didn't trust the

17   friendship between you and Rick?

18   A.        I have no idea.    I don't even

19   know if they really knew each other.

20   Q.        And then this sentence here is

21   didn't get here until June.    What's

22   that mean?

23   A..       I think it means that Mascara

24   wasn't assigned to the Pittsburgh

25   office until June.

162

1    Q.     Well, did he ever indicate

2    that when he came into the office

3    that he reviewed active files?  My

4    understanding is that's usually done

5    and I just want to know if he ever

6    mentioned that?

7    A.     No, he never mentioned that.

8    Q.     What if Len Bodack had been

9    mentioned say on February 20th, 1998

10   in the FBI investigation?  Do you

11   think Mr. --- the State Senator,

12   talking about favors in the

13   Governor's Office, do you know

14   whether Mr. Mascara would know

15   anything about that?

16   A.     I don't know.

17   Q.     Second line under probably

18   wasn't briefed.  First, something or

19   other, January '97.  What's that say?

20   A.     First surfaced, I guess that's

21   January or June, I don't know.  I

22   think it's January '97.

23   Q.     Well, your word June up in the

24   first line, I looked at that, because

25   I was interested in that date, the

163

1    word June up in the first line,

2    J-U-N-E is written out and then

3    J-A-N, it looks to me like January

4    '97.

5    A.        It is probably January.

6    Q.        Okay.  It says, now, you bear

7    with me, if I can read this

8    correctly, IAD notified.  And then it

9    says, if I'm reading it correctly,

10   Captain Ober and a dash.

11   A.        Yes.

12   Q.        Now, you knew that Captain

13   Ober hadn't been notified in 1998

14   until October '98; right?

15   A.        That's my understanding, yes.

16   Q.        And it says first notified or

17   something January --- it was first

18   surfaced January '97, IAD notified.

19   A.        Yes.

20   Q.        Well, did you ask Rick, who'd

21   you tell in IAD in '97?

22   A.        No, I didn't.

23   Q.        Sir, can I ask why?  I mean,

24   let me give you an offer why I'm

25   asking you this to give you fairness

164

1    to respond as completely as you can.

2    I understand you're upset about the

3    events of being notified in this,

4    personally and as a professional and

5    as a responsible public official.  I

6    understand that.  Here is an FBI

7    agent who's a friend and also the

8    special agent in charge and he says

9    that it first surfaces in January

10    '97, IAD is notified.  Now, doggone

11    it, Colonel, you didn't know it then.

12    Nobody told you then.  And yet Ober

13    gets told in '98, you're

14    investigating the circumstances under

15    which he was told and you've already

16    told us your primary concern was

17    Hikus and what he had done.  We

18    already know that.  But you're

19    looking at the facts and

20    circumstances.

21         Now, bear in mind, sir, that

22    the facts and circumstances are

23    these.  No matter what Ober did or

24    what Ober knew, we know that Hikus

25    didn't know until the 1st of October

165

1    of 1998.  And we know that you're
2    upset because you weren't told and
3    the chain of command may have been
4    circumvented in your view.  Why
5    didn't you ask Rick?  Here's my
6    question.  That's where I'm going.
7    That's what I'd like to know about.
8    Why wouldn't you ask Rick about the
9    events of how the FBI notified IAD in
10   '97 and why you didn't know?  Can you
11   explain why you wouldn't ask him
12   that?
13   A.      No, I was just listening to
14   his response to my initial questions.
15   Q.      Okay.  Now, here it says,
16   after IAD notified, you didn't ask
17   him any questions.  It says, Captain
18   Ober, then it says, dash, I think it
19   says, I was something aside it looks
20   like to me. What is that?  What does
21   that say?
22   A.      It was set aside.
23   Q.      Okay.  Until October '98.  Do
24   you know why it was set aside?
25   A.      No, I don't.

166

1  Q.     Would you find it odd that it

2  was set aside if indeed Senator

3  Bodack was mentioned as early, if he

4  was, at least as early, if not

5  before, February '98?

6  A.     I wouldn't have any idea why

7  the FBI set it aside.

8  Q.     Did you ever ask them why they

9  set it aside?

10 A.     No.

11 Q.     Did you ever ask them why they

12 took a run at it, these are the words

13 here, your words.  Did you ever ask

14 them why they took a run at it?

15 A.     It was set aside until October

16 '98, took a run at it, political

17 corruption case.  I think from

18 reading the statement of Cush, he had

19 a new supervisor that was helping

20 with his case load.

21 Q.     Suhy, is that Mr. Suhy?

22 A.     I believe it was probably Suhy

23 who told him to get on top of those

24 cases.

25 Q.     Okay.  Then it says, political

167

1  corruption case, then something,

2  looks like to influence SP, but I

3  can't read it.

4  A.      Position I think.  To

5  influence SP positions, dash, a

6  Trooper Stanton.

7  Q.      Well, what did he mean by

8  position?

9  A.      I don't know.

10  Q.      Well, Stanton is a trooper;

11  right?

12  A.      Yes.

13  Q.      In fact, he had been a trooper

14  under Mr. Conley; right?

15  A.      Yes, he was assigned to the

16  same troop.

17  Q.      Yes, he was.  He was under Mr.

18  Conley before Mr. Conley came up and

19  took over BPR; right?

20  A.      He was one of the troopers

21  that were assigned to that troop.

22  Q.      Sir, he could have been one of

23  thousands, millions.  He was under

24  the command of Major Conley before

25  Major Conley came up and assumed the

168

1  command position at BPR.  Am I

2  correct?

3  A.     Yes, you are.

4  Q.     Now, do you know why this word

5  position to influence state police

6  positions, why you put that verbiage

7  down?

8  A.     It would be what the SAC told

9  me and I can speculate as to why he

10  said that.

11  Q.     No, I won't ask you to

12  speculate.  If you want to tell me

13  why --- I'm going to ask you a whole

14  lot of questions about that.  I view

15  that as a very important sentence.

16  I'm going to ask you a lot of

17  questions about it, I admit.  I'll

18  tell you where maybe we can save some

19  time.  It just seems to me it would

20  be common sense that a trooper out

21  there, is it Troop A?  Troop B?

22  Whatever it was.  I know where he was

23  stationed also, but anyway, out there

24  in southwestern Pennsylvania.  But at

25  first glance a trooper out there is

169

1   not going to be able to influence

2   what happens at the academy without

3   some kind of help or conspiracy,

4   somebody to back him up.  That's only

5   common sense.  Would you agree with

6   that?

7   A.    It would have to be not only

8   the academy, but it would have to be

9   systemic in the organization.

10  Q.    And systemic would mean take

11  one or more people and like go up

12  through the organization?

13  A.    It would have to involve

14  psychologists, the academy personnel,

15  background investigators, and

16  probably other people.

17  BRIEF INTERRUPTION

18  BY ATTORNEY BAILEY:

19  Q.    But haven't you played a role

20  in helping relatives or sons of state

21  troopers become state troopers?  I

22  mean, have you played any role in any

23  of that ever?

24  A.    What do you mean?

25  Q.    Either trying to influence or

170

1   recommend or anything like that?  I

2   mean, I would understand you have a

3   large organization, you get a lot of

4   requests.  I'm not indicating it's

5   bad or wrong, but I mean, have you

6   ever recommended at least or done

7   anything at least in trying to help,

8   let's say, the son of a state trooper

9   become a state trooper?

10  A.      I don't remember any.

11  Q.      You don't remember.  Okay.  So

12  when you say that, and I'm asking

13  this question about position to

14  influence SP positions or state

15  police positions, you would agree

16  with me that Stanton, it's not the

17  kind of thing that Stanton out there

18  as a trooper in western Pennsylvania

19  can do on his own, it would involve

20  the confluence of a lot of people and

21  events to make it happen.  That's

22  what you're saying; right?

23  A.      I'm saying that and I'm saying

24  that Trooper Stanton was saying that

25  he could influence positions of

171

1  getting an applicant into the

2  academy.  That's what I think that

3  means, Trooper Stanton said he was in

4  a position to influence state police

5  positions.  That's what I think that

6  means.

7  Q.    Okay.  Now, and thank God as

8  it turned out that was nonsense;

9  right?

10  A.    Right.

11  Q.    It wasn't true; correct?

12  A.    It was not true.

13  Q.    But how do you know that at

14  the time when this thing starts if

15  somebody says something like that,

16  whether or not they have some

17  connection if you don't know?  I

18  mean, if you don't know, the FBI

19  doesn't know, and they believe this

20  guy is making representations like

21  this, don't you have at least a duty,

22  sir, to check it out?

23  A.    I think that's exactly what

24  was done by the FBI.

25  Q.    But why would they come if

172

1  they thought it went up the ladder?

2  You just now told us that it would

3  have had to have been systemic, which

4  means it had to go up through the

5  system.  And you've just got done

6  testifying a few minutes ago that

7  Rick said that if your name had been

8  mentioned they would come to you.

9  Now, you know, you are a human being,

10  you aren't God, so you can make

11  mistakes and you may be subject to

12  making errors of judgment and perhaps

13  even some sort of a defect in

14  character for a moment.  We can all

15  bend.  You know, we're --- we live in

16  a Judeo-Christian society.  People

17  make mistakes, they sin, they make

18  errors.

19       If you're going to investigate

20  something like this and you have

21  information, I want to go back to

22  this thing of probable cause.  My

23  question is if you're an

24  investigator, you get some

25  information out there, the FBI gets

173

1    some information, don't they have a

2    duty to check it out?  And you've

3    just told us it would have to be

4    systemic, so if this guy makes this

5    claim, you've got to check it out;

6    right?  You don't just dismiss it out

7    of hand and come and tell Colonel

8    Evanko; do you?

9    A.      No, I don't think you dismiss

10   it out of hand.  I think you

11   investigate it.

12   Q.      Well, then Captain Ober did do

13   the right thing?

14   A.      In going directly to

15   Lieutenant Colonel Hikus and not

16   telling his bureau director?

17   Q.      Yes.

18   A.      No, I don't believe so.

19   Q.      So he should have told his

20   bureau director, who in this systemic

21   situation, it would have to be, just

22   happened to be Major Conley; right?

23   Isn't that what you told us, it was

24   systemic, and you just told us what

25   the responsibilities are about people

174

1   informing targets and all that.  With

2   all that stuff considered, the FBI is

3   doing an investigation, I got my

4   client sitting there trying to do his

5   job the best way he can, expresses a

6   concern to the FBI about what do I do

7   with this information.  Apparently

8   something was discussed.  We know

9   that.  You've already told us it was,

10  and you made a note on it.  What do

11  you want this man to do, sir?  What

12  do you want Captain Ober to do in

13  light of your charge here today that

14  he violated FR 1-1.17?  Can you

15  explain it to me?

16  A.      Well, first of all I was

17  responding to your question as to

18  whether he had violated any rules and

19  regulations.

20  Q.      All right, sir.

21  A.      And I think that was a

22  violation.

23  Q.      Okay.

24  A.      And I think he should have

25  gone to the Director of the Bureau of

175

1    Professional Responsibility, Major

2    Conley.

3    Q.      Okay.  And that's it.  That's

4    what you think he should have done;

5    right?

6    A.      Yes, I do.

7    Q.      Now, he didn't do that; did

8    he?

9    A.      No, he did not.

10   Q.      And hopefully, if this matter

11   goes to trial, the jury is going to

12   be able to sit there and decide

13   whether or not Captain Ober, all

14   things considered, exercised good

15   judgment and whether or not you're

16   correct in your analysis that he

17   violated FR 1.17, whatever it is.

18   Well, if he violated that thing why

19   wasn't he punished for it?

20   A.      I don't think you have to take

21   every violation of the rule or

22   regulation and put it into the

23   internal affairs process and

24   discipline somebody.  I think the

25   very fact - - -.

176

1   Q.      Fair enough.  The very fact

2   what?

3   A.      That's all.

4   Q.      The very fact what?  Answer my

5   question.  The very fact what?

6   A.      I think the fact that

7   Lieutenant Colonel Hikus gave Captain

8   Ober the orders that he did I think

9   mitigated Captain Ober's involvement

10  in this.

11  Q.      So Captain Ober's lone and

12  singular error was not telling Kip

13  Stanton's commander at the time these

14  things occurred in this, of

15  necessity, systemic situation that

16  the FBI had made an inquiry about

17  selling positions in the state

18  police; agreed?

19  A.      You're going to have to tell

20  me what the question is.

21  Q.      I'm asking if you agree that

22  Captain Ober's error, if any, was

23  that he did not tell Kip Stanton's

24  commander, during the matters

25  complained of here in this systemic

177

1    situation, that the FBI was

2    investigating the selling of

3    positions?  You agree?  You have to

4    agree with me.  You've testified to

5    that; haven't you?

6    A.      First of all, it was not a

7    systemic allegation.  I think we had

8    that on the record with Agent Cush

9    saying that he never mentioned

10   higher-up individuals in the state

11   police or the Governor's Office.  And

12   yes, I do think that Captain Ober

13   should have gone to his bureau

14   director and told him about this

15   phone call from the FBI.

16   Q.      Well, if you believe that

17   Captain Ober never heard this stuff

18   about higher-ups, never heard this

19   stuff about lieutenant colonels or

20   colonels or anybody like that, okay,

21   then Captain Ober is a liar and he

22   should have been punished.  Isn't

23   that correct?  He should have been

24   disciplined for lying.  I mean, this

25   is an incredible lie, if he lied.

178

1    A.      I don't know that the captain

2    lied.  I don't know what was in his

3    mind.  I can just tell you that my

4    focus was on Lieutenant Colonel

5    Hikus.  And to tell you the truth

6    after I came to the conclusions after

7    reading the administrative inquiry

8    and after I advised Lieutenant

9    Colonel Hikus of what my conclusions

10   were, very frankly, I didn't give

11   Captain Ober much of a second

12   thought.

13   Q.      Okay.  All right.  I', going

14   to give you a lot of questions, sir,

15   that I think will demonstrate to the

16   contrary.  I'm going to give you an

17   opportunity to answer those.  Let me,

18   before I get to that, let's finish up

19   the investigation.  You at some point

20   asked somebody to appoint

21   investigators or did you appoint

22   investigators yourself?

23   A.      The investigators aren't

24   appointed, they're assigned.  And on

25   the May 13th meeting with Lieutenant

179

1    Colonel Hikus, Lieutenant Colonel
2    Wescott, Lieutenant Colonel Coury and
3    myself, we discussed this incident
4    again.  And then Colonel Wescott ---
5    well, first of all, Colonel Coury
6    said to me --- the thing I said to
7    him, you mean after Lieutenant
8    Colonel Hikus left on the 13th?
9    Q.      Yes.
10    A.      I said, Tom, assign a couple
11    of BPR investigators and we're
12    talking.  And when the four of us
13    were together, we talked about, I'm
14    going to get somebody to look at
15    these facts.  Colonel Hikus left and
16    then I told Colonel Coury, in fact, I
17    don't even know when Colonel Hikus
18    left.  But I told Colonel Coury get a
19    couple of BPR investigators and we'll
20    find out what the facts are here.
21    Colonel Coury said to me, hey, this
22    isn't a BPR investigation, it's not
23    appropriate to be in the BPR system.
24     And then I think it was at that
25    point that Colonel Wescott and I and

180

1    Colonel Coury decided to have Major

2    Wertz and Major Williams do these

3    interviews.

4    Q.      Why was it not appropriate to

5    be in the BPR system if Mr. Ober had

6    violated field regulation 1.1 ---

7    1-1.17?

8    A.      I was looking at this from a

9    point of view of something that ---.

10   I wasn't making an allegation of

11   misconduct.

12   Q.      Why was he read his rights?

13   Did you tell them to read him his

14   rights?

15   A.      I don't know that he was read

16   his rights.

17   Q.      Merryman was read his rights.

18   What was he read his rights for?

19   A.      I don't know that Merryman was

20   read his rights.

21   Q.      So you didn't talk to these

22   guys about methodology; right?

23   A.      If I talked to them and the

24   only reason I recollect having a

25   conversation with Wertz and Williams

181

1  is just from Lieutenant Wescott's

2  deposition where he said that I met

3  with them.  But no, I would not have

4  given them direction on using

5  administrative rules.

6  Q.     So you don't remember what

7  happened in the meeting you had with

8  Williams and Wertz?

9  A.     No, I don't.

10  Q.     Well, you remember Colonel

11  Wescott jumped in an airplane and

12  flew up to Williams and told him, I

13  got a job for you; right?  You know

14  that?

15  A.     I remember Colonel Wescott

16  stating that in his deposition.

17  Q.     Well, do you remember who

18  initially recommended Williams and

19  Wertz?

20  A.     It was probably Lieutenant

21  Colonel Wescott.

22  Q.     You didn't tell him to go jump

23  in the airplane and go up and talk to

24  him first, don't do it by landline or

25  anything?

182

1    A.      No.

2    Q.      Did you ever have Wescott

3    investigated for wasting Pennsylvania

4    State Police resources in an

5    airplane, flying an airplane up there

6    when he could pick up a telephone and

7    say, come down here?

8    A.      I don't know if, number one,

9    Lieutenant Colonel Wescott did it,

10   and number two, I don't know whether

11   Lieutenant Colonel Wescott went up

12   there for additional business.  I

13   don't know.  No, I did not have him

14   investigated.

15   Q.      Well, I represent --- I, you

16   know, never mind.  I remember his

17   testimony very well.  Were you

18   present during his deposition?

19   A.      Yes, I was.

20   Q.      So you believe it was probably

21   Lieutenant Colonel Wertz (sic) who

22   recommended Williams and Wertz for

23   majors, two majors for this

24   investigation?

25   A.      I think it was probably

183

1   Lieutenant Colonel Wescott who made a

2   recommendation to assign those two

3   majors.

4   Q.      Lieutenant Colonel Coury

5   testified, I know you were here,

6   because I remember your being here,

7   that he had advised you, and I think

8   you've just testified to this, that

9   this wasn't a BPR type of

10  investigation.  But what type was it

11  then?

12  A.      It was an administrative

13  inquiry.

14  Q.      An administrative inquiry.

15  What is that?

16  A.      It's looking into the facts

17  and circumstances of an event.

18  Q.      And you had no predilection at

19  that point to punish or arm anyone

20  over the events of the FBI probe; is

21  that correct?

22  A.      That is correct.

23  Q.      I believe that at some point

24  there was a meeting, a debriefing, if

25  you will, by Mr. Williams and Mr.

184

1    Wertz of the results of their

2    investigation?

3    A.      There was a point in time when

4    they came and gave me the

5    administrative inquiry.

6    Q.      Well, did you read it?  Did

7    you go over it?

8    A.      Yes, I did.

9    Q.      Do you think they did a good

10   job, Williams and Wertz?

11   A.      They answered the questions I

12   needed answered.

13   Q.      And what were the questions

14   that you needed answered?

15   A.      I needed to make an evaluation

16   of the judgment used by Lieutenant

17   Colonel Hikus in informing me as well

18   as Captain Ober too of not going to

19   his major.

20   Q.      Well, one of the things in the

21   investigation as I remember it was

22   this thing about Mr. Ober renting a

23   hotel room and buying some beverages

24   for the FBI out there in Indiana.  Do

25   you remember that?

185

1    A.     Do I remember that as part of
2    the administrative inquiry?
3    Q.     Sure.
4    A.     No.
5    Q.     Do you remember anything about
6    that?
7    A.     I know that he filed a
8    grievance claim and was denied part
9    of that reimbursement.
10   Q.     Well, we'll get to that.  It's
11   okay for two cert teams to be
12   activated to escort assets for PNC
13   Bank across the state of
14   Pennsylvania.  Do you know whether
15   they charged $7.32 for each
16   Pennsylvania State Police vehicle
17   used?
18   A.     I don't know.
19   Q.     Do you know how many
20   Pennsylvania State Police vehicles
21   were used?
22   A.     No, I don't.
23   Q.     Do you know, I'd asked you
24   about the helicopter.  You didn't
25   know whether the helicopter was used.

186

1    And you don't know whether PNC paid

2    for that?

3    A.      I don't know.

4    Q.      Do you know about a

5    Pennsylvania State Police Regulation

6    that says that the Pennsylvania State

7    Police are not supposed to be used to

8    guard money or bank assets for folks?

9    A.      I think there's a provision in

10   there absent exigent circumstances,

11   something like that.

12   Q.      Well, what were the exigent

13   circumstances?

14   A.      Five billion dollars.

15   Q.      Oh, were they dollars,

16   Colonel?

17   A.      Currency, negotiable

18   instruments, whatever.

19   Q.      Well, negotiable instruments.

20   Do you know whether those negotiable

21   instruments, the way that they were

22   put together --- I know a little bit

23   about negotiable instruments.  Do you

24   know whether the way they could have

25   been put together that they could

187

1    have been assaulted or whatever?

2    A.      That they could have been

3    cashed?

4    Q.      Sure, taken and used, yes.

5    A.      It was my understanding that

6    they could, yes.

7    Q.      Well, how much did you

8    investigate that?

9    A.      I didn't investigate it at

10   all.

11   Q.      You just did it?

12   A.      Yes.

13   Q.      Without the Governor's Office

14   knowing anything about it?

15   A.      Yes.

16   Q.      Without Governor Ridge knowing

17   anything about it?

18   A.      Yes.

19   Q.      Were you suspecting terrorism?

20   A.      Five billion dollars I didn't

21   know what to expect.

22   Q.      Well, the number is, you know,

23   five billion dollars.  I know that

24   sounds very impressive and all that

25   sort of thing, you know, but are

188

1    there private companies that

2    specialize in doing that kind of

3    work?

4    A.      I don't know.

5    Q.      Well, did you ask PNC why they

6    didn't go hire people that are

7    qualified and have the kind of

8    vehicles and the kind of equipment to

9    do that sort of thing?

10   A.      I don't believe so.

11   Q.      Five billion bucks, maybe they

12   could have bought a warehouse down in

13   Philadelphia to brick it up for

14   $50,000 and would have saved money

15   and didn't have to transport that

16   stuff. I mean, all you got to do is

17   own it; right?  Isn't it true that

18   they were changing their corporate

19   headquarters from Philadelphia to

20   Pittsburgh or something like that?

21   A.      I'm not sure.

22   Q.      You didn't even check that

23   out?

24   A.      If I did, I don't recall it.

25   Q.      Where do you draw the line on

189

1    whether or not you activate your cert

2    teams in order to help private

3    companies in Pennsylvania move their

4    assets around?

5    A.     I'm not sure what you mean.

6    Q.     Well, how does that compare

7    with the situation Captain Ober was

8    in where he rents a hotel room, okay,

9    and orders a couple cups of coffee

10   for the FBI?  How does it compare in

11   terms of spending my taxpayer's, your

12   taxpayer's, we're all taxpayers, in

13   spending taxpayer money and

14   conforming to Pennsylvania State

15   Police Regulations?  Because he was

16   denied reimbursement for that.

17   A.     I'm not sure what you mean by

18   the question.

19   Q.     I want you to compare the two

20   situations in terms of what you know

21   about Pennsylvania State Police

22   Regulations, Pennsylvania State

23   Police practices and the benefits of

24   using Pennsylvania State Police

25   resources to rent a hotel room on one

190

1    case and order a couple of cups of

2    coffee for two FBI agents in a public

3    corruption investigation as opposed

4    to activating two cert teams, better

5    than 40 people, all kinds of

6    Pennsylvania State Police vehicles

7    with people driving those,

8    helicopters, to help PNC, who's a

9    state depository, move assets from

10   Philadelphia to Pittsburgh.

11   Something they can go and hire Brinks

12   and Wells Fargo and people like that

13   who move billions of dollars every

14   single day in this country.  Now,

15   what compares about those two

16   situations such that this man, my

17   client, has to grieve the

18   reimbursement of a few bucks in doing

19   a public corruption investigation?

20   A.       I don't think they are

21   comparable circumstances.

22   Q.       Sir, back on Evanko Number

23   Two, the second page of Evanko Two,

24   do you see the word CI?

25   A.       Yes.

191

1  Q.     It says Stanton approached
2  him.  And then what does that say
3  there?
4  A.     I can pay you 10K, $10,000 for
5  this.
6  Q.     Okay.  Did they ever tell you
7  who the CI was and what they did?
8  A.     Did Special Agent Mascara tell
9  me that?
10  Q.     Yes.
11  A.     No.  In fact, I don't think
12  they ever revealed the confidential
13  informant.
14  Q.     Okay.  Now, there's an empty
15  line there and then what's the next
16  line, what's that I see?  It looks to
17  me like it's turn over tapes and
18  conversations to Ober.  Is that what
19  it says?
20  A.     Yes, sir.
21  Q.     Then it says, this I cannot
22  read.  What's that statement?
23  A.     Source went to rep and nothing
24  happened, dash, Ober concerned about
25  gong anywhere with info.

192

1    Q.    Okay.  Source went to rep and

2    nothing happened.  Do you understand

3    rep to mean a State Representative?

4    A.    I think that's what he was

5    referring to.

6    Q.    Well, how did the FBI know

7    that nothing happened?

8    A.    I guess they did an

9    investigation.

10   Q.    And you would assume that what

11   that means is that Stanton was not

12   able to deliver; right?

13   A.    I would assume what that meant

14   was that the representative wouldn't

15   get involved in that.  That's what I

16   understand.

17   Q.    You would assume what, that

18   the representative ---?

19   A.    That the representative was

20   not involved in whatever was alleged.

21   Q.    Okay.  We went over the Ober

22   stuff.  Now, go down to the next line

23   here, is investigation closed, is

24   that what you ---?

25   A.    Yes.

193

1  Q.      Didn't you believe what Hikus

2  and Ober had told you or what Cush

3  had told, whether it was Cush or

4  another guy, I think there was a guy

5  Kelly that was actually an FBI agent?

6  A.      I don't know.

7  Q.      So you were asking Rick again

8  now to confirm that the investigation

9  is closed?

10 A.      This is Mascara talking to me.

11 Q.      I'm sorry, sir.  Yes, you're

12 asking Rick Mascara again.  So

13 Mascara is saying to you, is the

14 investigation closed?  You're not

15 saying that to him?

16 A.      No, I'm saying that to him,

17 this investigation is closed.

18 Q.      Right, right.  Dash, case

19 declined, federal prosecutors.

20 A.      Or federal prosecution.

21 Q.      Okay.  Which you took that to

22 mean was that Rick was saying that

23 the feds aren't going to prosecute?

24 A.      Yes, I think that was the

25 case.

194

1   Q.     Then there's a dash, and what

2 does that say, investigation closed?

3   A.      Investigation closed,

4 underneath that, to PSP. Closed,

5 dash, to PSP, underneath that.

6   Q.     Okay. Sir, the next line,

7 what is it, overtime? What is that?

8   A.     What was outcome.

9   Q.     And again, this is what Rick's

10 saying?

11   A.     Yes, sir. Well ---.

12   Q.     I'm sorry.

13   A.     I asked what the outcome was.

14   Q.     Okay. It looks like Stanton

15 is bad, dash, nothing systemic, which

16 you've already explained to us, dash,

17 now what does that say?

18   A.     What's the next line say?

19   Q.     Yes, yes.

20   A.     Nobody else but bad statey is

21 mentioned. Opened two and a half

22 years.

23   Q.     Two and a half or three and a

24 half?

25   A.     Two and a half.

195

1    Q.    Nobody but bad statey

2  involved; right?

3    A.    Yes.  Or bad statey is

4  involved, one of the two.

5    Q.    Okay.  Now, this says opened

6  two and a half years?

7    A.    Yes.

8    Q.    Then it says Major Williams to

9  see you, sort things out.  Do you

10  have any information to indicate that

11  any of these FBI agents at any point

12  have talked to Lieutenant Colonel

13  Hikus?

14    A.    No, I do not.

15    Q.    So you got Williams going out

16  to talk to them about what occurred

17  between the FBI and Captain Ober?

18    A.    Yes, sir.

19    Q.    Did it occur to you that maybe

20  the FBI would think that you didn't

21  trust your own people?

22    A.    No, that never occurred to me.

23    Q.    I mean, did you think that

24  maybe it was embarrassing to you that

25  you have your investigators to go out

196

1  and check what's going on between the

2  FBI and your people?

3  A.    No, I didn't.

4  Q.    Well, your investigators

5  didn't go out and check what had

6  happened with the previous

7  investigation, first surfaced in '97

8  IAD notified you.  You didn't have

9  Mr. Williams checking that out; did

10  you?

11  A.    No, because by the time I got

12  the administrative inquiry, that

13  criminal and administrative

14  investigation was already ongoing.

15  Q.    And I can't figure that out.

16  If you're looking at facts and

17  circumstances and the criminal

18  investigation's into Stanton, who we

19  know is a bad cop, but your concern

20  about Hikus and Ober is totally

21  different.  Although, Ober not much

22  because you knew what he did and he

23  was under orders from Hikus.  You

24  don't see those as two different

25  things?  You see those as the same

197

1    kind of thing, that they're going to

2    yield the same kind of response to

3    the questions you have about what

4    occurred?

5    A.    I'm not sure I understand.

6    Q.    Well, the administrative

7    inquiry into Stanton is going to be

8    what he did as a result of the

9    criminal activity he was involved in;

10   right?

11   A.    It was an internal affairs

12   investigation into Stanton's

13   violation of the law.

14   Q.    Yes.  And you wouldn't let

15   that interfere with a criminal

16   investigation; right?

17   A.    No, it would have been

18   concurrent with the criminal

19   investigation.

20   Q.    But you would never let it

21   interfere with a criminal

22   investigation; right?

23   A.    No, I would not let it

24   interfere.  I would not expect it to

25   interfere with a criminal

198

1   investigation.

2   Q.      Right.  And the FBI told you

3   that they were not going to prosecute

4   Stanton, that they declined to

5   prosecute.

6   A.      I don't know whether it was

7   the FBI that declined the prosecution

8   or if it was the U.S. Attorney's

9   office.

10  Q.      And your testimony here today

11  is that there was no need to check on

12  who at IAD had been told earlier,

13  why that had not been reported to

14  you, why you hadn't been informed.

15  And you don't know when Lynn Bodack

16  (phonetic) was mentioned or any other

17  public official.  And you don't know

18  why this thing sat out there with the

19  FBI.  You figured that the criminal

20  investigation into Stanton and the

21  administrative inquiry into Stanton

22  was underway, and it would yield

23  answers to those questions.  That's

24  what you felt?

25  A.      I guess I thought that the

199

1   criminal investigation would proceed

2   and that they would probably arrest

3   him.

4   Q.      Do you know whether Major

5   Williams ever went out and talked to

6   Mascara?

7   A.      I don't think so.

8   Q.      Why not?

9   A.      I don't know.

10                  ATTORNEY BAILEY:

11                  I'm going to suggest at

12                  this point that we break for a

13                  lunch period.  At least I

14                  would like to.  It's a good

15                  point for me here.  Darrell,

16                  I'd like to you go and check

17                  your personnel file at this

18                  point.  If they want to send

19                  Mr. Brown one, that's fine.

20                  And with that being said,

21                  we'll reconvene at 1:30.

22  SHORT BREAK TAKEN

23                  JUDGE CALDWELL:

24                  The time is 1:37 p.m.

25                  on March 27, 2002 and we're

200

1    resuming the deposition of Mr.

2    Evanko.

3              VIDEOGRAPHER:

4              Back on record.

5    VIDEO RECORD AT 1:37 P.M.

6              ATTORNEY BAILEY:

7              All right.  Ladies and

8    gentlemen, good afternoon.  I

9    would like to inform opposing

10   counsel and Mr. Evanko that we

11   have gone over and looked at

12   Mr. Ober's file, that the

13   document that I was talking

14   about --- and we incidentally

15   did this while the custodian

16   was there with us, naturally.

17   The document that I referred

18   to is not in his file.  This

19   file only exists at one other

20   location that we know of.

21   Where is that, headquarters is

22   what file?

23             MR. OBER:

24             LCE Headquarters.

25             ATTORNEY BAILEY

201

1        LCE Headquarters.  That

2   he has reviewed his file there

3   in the presence of Major

4   Dawire.  He has never reviewed

5   either of these files where he

6   has not been present.  And

7   also the file was supposedly

8   brought over for our

9   inspection during the document

10  inspection that we did.

11       I make the following

12  representations, I'd like to

13  Mr. --- in fact, may get Mr.

14  Ober on tape at the end of

15  Commissioner Evanko's

16  deposition.  I want to refer

17  to that again.  But at no time

18  has he taken anything out of

19  his file except to copy it.

20  He did copy because I had

21  asked him to review his file,

22  this document.

23       He checked that LCEE

24  file again with somebody

25  present this morning.  The

202

1    document is missing from his

2    file.  There's no way in the

3    world he could have taken it

4    out of his file.  The document

5    is missing from his file over

6    at the headquarters.  The

7    document is a key and material

8    piece of evidence in the

9    retaliation and damage portion

10    of the claim, and we are

11    complaining about that fact.

12    That being said, we'll deal

13    with that at the end of this

14    deposition.

15        I would respectfully

16    ask opposing counsel, when you

17    had deposed Mr. Ober, I had

18    indicated there may be times

19    when we need extra time ---.

20    BRIEF INTERRUPTION

21        ATTORNEY BAILEY:

22        Let me say again.

23    There were times when Mr. Ober

24    was deposed, the request had

25    been made of me to make him

203

1      available for additional time.

2      I think it's going to be

3      difficult to complete Colonel

4      Evanko today.  I'll need some

5      additional time, and I'm

6      requesting the same courtesy

7      that I've extended in that

8      same regard.  Would that be

9      okay?  We need a little bit

10     more time.

11          ATTORNEY CHRISTIE:

12          We'll go as late as you

13     can tonight and we can make

14     Colonel Evanko available again

15     tomorrow morning.

16          ATTORNEY BAILEY:

17          Well, okay.  I've got a

18     hearing up around Allentown

19     tomorrow morning, but ---.

20          ATTORNEY CHRISTIE:

21          Then we should go late

22     tonight then.

23          ATTORNEY BAILEY:

24          Well, we'll do our best

25     to do this.  And if we can do

204

```
1      it at another time, I'd

2      appreciate it.  Tomorrow may

3      be ---I'll double-check, when

4      you get a chance to break,

5      just on that.  But I think

6      I'd ---.

7            ATTORNEY CHRISTIE:

8            Colonel Evanko is

9      leaving on Saturday for a

10     couple of weeks.  So that's

11     why we're saying ---.

12           ATTORNEY BAILEY:

13           Okay.  Well, let's try

14     to get at it then.  Colonel,

15     try to get through this as

16     best we can.  Okay?

17 BY ATTORNEY BAILEY:

18 Q.      I want to change gears just a

19 little bit, Colonel, if I can.  Do

20 you have a recollection of the Bureau

21 of Education asking for $20,000 for

22 model cars?

23 A.      No, I don't.

24 Q.      This is 164 scale die cast

25 model 1995 Ford SVT Mustang Cobra at
```

205

1    $4 each. 5,000 was the quantity

2    requested for a total of $20,000,

3    requested by Jane A. First items

4    will be used as special giveaways

5    during the presentation of the

6    full- size model vehicle. Now, the

7    reason I'm asking you is you know

8    where I'm coming from. Apparently

9    these things were to be used during

10   the presentation of drug and alcohol

11   education programs by the department.

12   I just want to ask you if you know

13   whether the vehicles were ever

14   delivered to the department and how

15   they were used, if you know?

16   A.      I don't know.

17   Q.      And do you feel that an

18   expenditure like this is justified as

19   a precautionary measure? Captain

20   Ober has indicated that from a

21   precautionary point of view when he

22   met with the FBI agents, Mr. Cush and

23   I forget who the other gentlemen was,

24   out there in Indiana, that he had

25   rented a hotel room and got some

206

1   coffee.  Do you think that this
2   expenditure here is on an equal level
3   with the judgment that Mr. Ober
4   displayed in renting that hotel room?
5   And what was the purpose for the use
6   of those items?
7   Q.      Items would be used as special
8   giveaways during a presentation of
9   the full scale model vehicle.  A
10  full-size Mustang is used by
11  community service officers to present
12  drug and alcohol education programs
13  throughout the Commonwealth.
14  A.      If this involves school
15  children I think this was the more
16  appropriate of the expenses.  I think
17  if there were any expenses incurred
18  in this investigation they should
19  have been incurred by the FBI.
20  Q.      Do you know whether these
21  giveaway vehicles are ever accounted
22  for?  People know where they are,
23  what's done with them?
24  A.      I don't know because I've
25  never seen any.

207

1    Q.      Have you ever seen museum

2    items for the State Police Museum?

3    A.      I donate things to the State

4    Police Historical Education and

5    Museum Committee.  I don't know

6    anything --- I don't know where

7    you're going for what you mean.

8    Q.      Okay.  Where I'm going is you

9    donated --- for example, there was a

10   typewriter that was given to you by a

11   mistake and then you donated it;

12   right?

13   A.      I don't know if I ever donated

14   that.  I donated a typewriter from

15   the estate of Herm Fialdia

16   (phonetic), yes.

17   Q.      Well, the reason I'm asking

18   you is, it was given to you or sold

19   to you, however you acquired it as an

20   individual, and then you gave it to

21   the state police; right?

22   A.      I gave it to the Historical

23   Educational and Museum Committee,

24   which is separate from the state

25   police department.

208

1    Q.    Okay. That's the state
2    museum; right?
3    A.    No. It's a non-profit
4    organization that's attempting to
5    build a museum for the State Police
6    History Education Research and a
7    memorial center.
8    Q.    You have items of a historic
9    significance in your office that
10   could be defined as Pennsylvania
11   state police memorabilia?
12   A.    I probably do.
13   Q.    Helmets, that kind of thing?
14   A.    Yes.
15   Q.    They're quite prized items;
16   aren't they?
17   A.    Yes, they are.
18   Q.    And do you own any of those?
19   A.    Yes, I do.
20   Q.    How did you acquire them?
21   A.    I got one from my father and I
22   got one from the estate of Herm
23   Fialdia.
24   Q.    Have you ever been
25   investigated for them?

209

1  A.      No.

2  Q.      Do you know whether or not

3  Colonel Coury ever played any role on

4  having Captain Ober investigated for

5  some alleged acquisition of

6  Pennsylvania state police

7  memorabilia?

8  A.      I remember listening to

9  somebody's deposition.  I think it

10 was that an individual by the name of

11 Phil Conti had wrote a letter of

12 complaint.  So I know that.

13 Q.      Yes, sir.  Did you ever read

14 that letter?

15 A.      No, I didn't.

16 Q.      So you don't have a view as to

17 whether or not that letter is a

18 letter of complaint?

19 A.      I don't know.  I haven't read

20 it.

21 Q.      Do you know who did the

22 adjudication in Captain Ober's case?

23 A.      No, I don't.

24 Q.      Do you know if his case was

25 assigned a BPR, what's called a BPR

210

1   number?

2   A.      I don't know.

3   Q.      And do you know if he was ever

4   informed of the finding and results

5   in that case?

6   A.      If it were a internal affairs

7   investigation I would think that he

8   was.

9   Q.      You would think that he was.

10  Do you know if he was, sir?

11  A.      No, I don't.

12  Q.      Sir, do you know whether he

13  was ever informed of the results of

14  the investigation that you ordered

15  Majors Williams and Wertz to do?

16  A.      I know that after I discussed

17  my conclusions with Lieutenant

18  Colonel Hikus, that Lieutenant

19  Colonel Hikus advised Captain Ober.

20  And I know from Lieutenant Colonel

21  Hikus' deposition earlier this week.

22  Q.      Prior to Lieutenant Colonel

23  Hikus testifying in the manner that

24  he did about that issue, had you any

25  knowledge of Captain Ober being told

211

1    anything about that investigation

2    being closed?

3    A.      I didn't know, but I expected

4    that Lieutenant Colonel Hikus would

5    do that because Captain Ober was

6    under his chain of command.

7    Q.      Well, do you know if

8    Lieutenant Colonel Hikus was given

9    the investigation, or given a copy of

10   the investigation?

11   A.      No, sir, he was not.

12   Q.      Do you know if the same is

13   true of the museum investigation?

14   A.      As to whether ---?

15   Q.      If Colonel Hikus was given a

16   copy of that?

17   A.      I don't know.

18   Q.      Okay.  Are there any current

19   BPRs into Captain Ober?

20   A.      Not that I'm aware of.

21   Q.      Going back, though, I'm going

22   to change a little bit the direction

23   we've been going here.  And I want to

24   ask you some questions, some calendar

25   questions about when things --- when

212

1  you made decisions about Captain

2  Ober.  You had already testified that

3  you never gave whether or not he

4  violated a regulation another thought

5  after you learned that Hikus had

6  ordered him not to say anything.  And

7  you've indicated that the primary

8  concern you had in finding out about

9  the facts and circumstances of the

10 FBI probe had to do with Colonel

11 Hikus' behavior and activities.  Have

12 I misstated anything?

13 A.    You misstated the first part.

14 It was after I had advised Colonel

15 Hikus of my conclusions where I made

16 the comment that I didn't give much

17 of a thought to Captain Ober after

18 that.

19 Q.    Okay.  And when was that?

20 A.    Sometime around Labor Day or

21 the last week of August, something

22 like that.

23 Q.    1999?

24 A.    Of 1999.

25 Q.    Okay.  Sometime in April 1999,

213

1    you appointed Captain Ober to IIMS;

2    right?

3    A.    I detached him from the Bureau

4    of Professional Responsibility to the

5    Bureau of Technology Services to work

6    on the IIMS project.

7    Q.    Now, IIMS, very, very briefly

8    --- we have enough on the record, I

9    think, to know what it is.  Why did

10   you put Captain Ober there?

11   A.    Because I thought he would do

12   a good job in that assignment.

13   Q.    And do you know what kind of

14   role he played with that assignment?

15   A.    He was the team leader to

16   develop the selection criteria for

17   the systems integrator for Phase 1,

18   the 13-month project to design

19   the ---.

20   Q.    Keep your voice up just a wee

21   little bit.

22   A.    To design the integration of

23   all the other teams that were working

24   on the mobile office, the mobile

25   applications team, the AVL, the GIS,

214

1    the CAD, the CAD system, the

2    consolidated dispatch centers.

3    Q.      How much was IIMS when it was

4    all completed, going to cost the tax

5    payer, roughly?

6    A.      Just the IIMS program?

7    Q.      Roughly.

8    A.      $100 million.  And that

9    would've included all the building

10   sites for the consolidated dispatch

11   centers, all the telephone, the new

12   telephone equipment, all of the

13   computers, all the personnel.  And

14   that was just the one phase of the

15   automation project.

16   Q.      Now, when you appointed

17   Captain Ober to the IIMS assignment,

18   you made an agreement with him;

19   didn't you?

20   A.      Yes, I did.

21   Q.      And tell us quickly, sir, what

22   was that agreement?

23   A.      I agreed to return him to the

24   Bureau of Professional Responsibility

25   upon completion of his assignment.

215

1    Q.      And Captain Ober felt strongly

2    about that; didn't he?

3    A.      Well, he wanted to go back to

4    the Bureau of Professional

5    Responsibility, yes.

6    Q.      And you had no difficulty with

7    that, because you believed in Captain

8    Ober; didn't you?

9    A.      It was the agreement that I

10   made with him.

11   Q.      You believed in him, you felt

12   that he was a fine and capable

13   Pennsylvania State Police officer;

14   didn't you, sir?

15   A.      When I made that assignment,

16   yes, I did.

17   Q.      When you made that assignment

18   you did?

19   A.      Yes.

20   Q.      And you placed in writing a

21   commitment to return him, him being

22   Captain Ober, to IAD at the

23   completion of his IIMS attachment

24   from the Bureau of Professional

25   Responsibility, the internal affairs

216

1    division to IIMS; correct?  You put

2    that in writing?

3    A.      There is a clean message to

4    that effect.

5    Q.      Now, the assignment that you

6    made of Captain Ober to IIMS was it

7    on April 26, 1999; wasn't it?

8    A.      Yes, sir.

9    Q.      And Captain Ober and

10   Lieutenant Colonel Hikus came in and

11   they told you about this FBI probe,

12   which of course the FBI hadn't

13   informed you of and which Colonel

14   Hikus and Captain Ober had not

15   informed you of and you didn't learn

16   about.  They informed you about it on

17   May 12th, 1999; correct?

18   A.      That is correct.

19   Q.      And your testimony here today

20   indicates that you told Lieutenant

21   Colonel Hikus something to the

22   effect, that the investigation that

23   you had ordered was over sometime on

24   or about Labor Day of 1999; right?

25   A.      That is correct.

217

1    Q.      With the expectation that
2    Lieutenant Colonel Hikus, and you
3    said was in Captain Ober's chain of
4    command, would tell Captain Ober?
5    A.      That is correct.
6    Q.      Well, did you tell Colonel
7    Conley?
8    A.      Did I tell him what?
9    Q.      About the investigation being
10   over?
11   A.      No, I did not.
12   Q.      Why not?
13   A.      Because Captain Ober was
14   detached to the Bureau Technology
15   Services under the command of
16   Lieutenant Colonel Hikus.
17   Q.      On or about November 8th,
18   1999, did Captain Ober file a
19   grievance of some type?
20   A.      On what date?
21   Q.      I believe November 8th.  And
22   then another on December 22nd, 1999?
23   A.      I know that he filed
24   grievances, I don't know what the
25   dates are.

218

1  Q.      Fact is, you have a standing

2  order as Commissioner, you know what

3  grievances are filed.  You're

4  informed of that; isn't that correct?

5  A.      No, that is not correct.  I am

6  not informed of them.

7  Q.      What about EEOC complaints, if

8  somebody complains about an issue of

9  race or invidious discrimination?

10 A.      If it results in a internal

11 affairs investigation normally it

12 would be reported on a weekly report

13 of significant BPR issues.

14 Q.      Well, at some point you had

15 made a decision that Captain Ober was

16 to go to Washington County; right?

17 A.      Yes, I did.

18 Q.      And when did you decide that?

19 A.      Sometime in late December or

20 early January of 2002 --- December of

21 '99 and January of 2000, January

22 2000.

23 Q.      And why did you do that?

24 A.      Because Colonel Wescott was

25 asking for someone to assist Major

219

1   Zipinka in preparation for the

2   National Governors' Association.

3   Q.     Why Captain Ober?

4   A.     He was finishing up his

5   assignment with IIMS, he was

6   available, and Major Conley had asked

7   for him not to be returned to the

8   Bureau of Professional

9   Responsibility.

10  Q.     When did ---?

11  A.     And he could do the job.

12  Q.     And he could do the job.  When

13  did Mr. Conley first tell you he

14  didn't want Mr. Ober back?

15  A.     I think Lieutenant Colonel

16  Coury told me first.  And it would've

17  been end of December, beginning of

18  January.

19  Q.     Well, did you bring Captain

20  Ober in and discuss that with him?

21  A.     No, I didn't.

22  Q.     Any reason why not?

23  A.     I treated him the same way

24  that I treated Captain Transue.

25  Q.     Captain Transue's down around

220

1    Philadelphia?

2    A.      That's where she is now, yes.

3    Q.      Yes.  But where was she when

4    you moved her out?

5    A.      She was in the Bureau of

6    Research and Development.

7    Q.      And you sent her where?

8    A.      To Philadelphia.

9    Q.      For what reason?

10   A.      To assist in the preparation

11   of the troops for the Republican

12   National Convention.

13   Q.      Is that similar to the

14   treatment that Captain Young

15   received?  How was that --- I'm

16   sorry.

17   A.      Go ahead finish your question.

18   Q.      How was Captain Young handled?

19   A.      In what way.

20   Q.      Was he transferred at all?

21   A.      Yes.  After the injunction was

22   filed I assigned Captain --- I

23   promoted Captain Young and

24   transferred him to Major Zipinka to

25   assist in the final preparations of

221

1    the National Governors' Association.

2    Q.      Well, now, Captain Ober had

3    filed a couple of grievances with

4    them; right?

5    A.      It's my understanding that he

6    did.

7    Q.      November and December; is that

8    correct?

9    A.      I don't know when.

10   Q.      In one of those grievances did

11   he write in the grievance that there

12   was an issue of retaliation?

13   A.      I don't know, because I've

14   never read them.

15   Q.      Well, do you know when Captain

16   Ober was informed, first informed,

17   that he was going to Washington?

18   A.      I would imagine the beginning

19   of January.

20   Q.      Do you know who told him?

21   A.      It would have either been

22   Lieutenant Colonel Hikus or Major

23   Conley, one of the two, or Major Walp

24   (phonetic).  I think it was Major

25   Walp that told him.

222

1    Q.      Major Walp say anything to you
2    about moving Captain Ober?
3    A.      After Lieutenant Colonel Hikus
4    told me that Captain Ober's
5    assignment was done, Major Walp did
6    ask if he could be retained on the
7    IIMS assignment.
8    Q.      Now, at some point did you
9    tell Captain Ober that he was going
10   to be leaving IIMS?
11   A.      No, I didn't.
12   Q.      Well, did you cause somebody
13   to tell him that?
14   A.      I would have told either
15   Lieutenant Colonel Hikus --- probably
16   Lieutenant Colonel Hikus.
17   Q.      Now, did Colonel Conley, by
18   this time I guess he's a Colonel,
19   did Colonel Conley inform Mr. Ober on
20   or about January 10th that he was
21   going out to Washington?
22   A.      It would've either been
23   Lieutenant Colonel Hikus or Major
24   Conley, one of the two.
25   Q.      So who consulted with you ---

223

1  you said it was Wescott who consulted

2  with you about this need out in

3  Washington, Pennsylvania?

4  A.    Yes, sir.

5  Q.    What other captains did you

6  consider?

7  A.    I don't think I considered any

8  other captains.  Because Captain Ober

9  was available, I knew he could do the

10 job and his assignment with the IIMS

11 project was done.

12 Q.    Was it done?

13 A.    Yes.

14 Q.    When did they vote on it?

15 A.    I do not know.

16 Q.    Why wouldn't you know that

17 before you reassigned him somewhere

18 else?

19 A.    Because I asked Lieutenant

20 Colonel Hikus if he was done and he

21 told me he was.

22 Q.    Now, Lieutenant Colonel Hikus

23 told you that at that time?

24 A.    The end of December or the

25 beginning of January.

224

1   Q.      Did you discuss Lieutenant

2   Colonel Hikus' testimony with him

3   before he testified the other day?

4   A.      No, I did not.

5   Q.      Did Captain Ober ever return

6   to IAD?

7   A.      No, he did not.

8   Q.      Why not ---?

9   A.      Or he may have returned for a

10  couple days because I did not

11  transfer him back there or if I did

12  it was for a short period of time.

13  Q.      Well, when did you learn that

14  he had filed an action against the

15  department?

16  A.      I'm not sure when that was.

17  Q.      Was it on or about the 26th of

18  January?

19  A.      I don't know.

20  Q.      2000?

21  A.      I don't know.

22  Q.      Well, what was to be his

23  effective date to go back to IAD?

24  A.      I'd have to look at a

25  personnel order.  I don't recall.

225

1  Q.      Well, hadn't you initially

2  assigned him to go back to IAD?

3  A.      At the conclusion of his

4  assignment to Bureau of Technology

5  Services?

6  Q.      Yes.  In other words, sir,

7  hadn't you assigned him back to IAD

8  for like a week or five days or some

9  such thing?

10  A.      I think it was going to be one

11  full pay period.

12  Q.      And what's a full pay period?

13  A.      Two weeks.

14  Q.      Two weeks.  Why did you do

15  that?

16  A.      The formality of doing it.

17  Q.      Sorry.  The formality of doing

18  it, sir?

19  A.      Yes.

20  Q.      You weren't doing it to slap

21  him in the face; were you, Colonel?

22  A.      No, I wasn't.

23  Q.      You weren't doing it to insult

24  him; were you?

25  A.      No, I wasn't.

226

1   Q.      You were not doing it to send

2   him a message; were you?

3   A.      No, I wasn't.

4   Q.      You weren't doing it to teach

5   Mr. Hikus a lesson; were you?

6   A.      Pardon me?

7   Q.      You weren't doing it to teach

8   Mr. Hikus a lesson; were you?

9   A.      No, I was not.

10  Q.      You weren't doing it to punish

11  Captain Ober; were you?

12  A.      No, I was not.

13  Q.      So you, sir, were going to

14  take this career captain in the

15  Pennsylvania State Police who you

16  told us just previously here was a

17  fine officer to do the job.  And as

18  Colonel Coury said and you have now

19  confirmed, it was you who made this

20  decision?

21  A.      Yes, it was.

22  Q.      All by your lonesome with some

23  input from Mr. Wescott, the gentleman

24  that flew up to see Mr. Williams and

25  informant of the decision to

227

1    investigate the events of October 5th
2    of 1998 and what followed.  For
3    purposes of the mere formality of it
4    you were going to assign Captain Ober
5    to one or two weeks, you said a pay
6    period, with IAD before you sent him
7    out to Washington to help with the
8    National Governors' Conference, was
9    that it?
10   A.    That's it.
11   Q.    If I represented to you that
12   to the best of my knowledge, it was
13   January 26th, 2000, that Mr. Ober
14   made known a legal action that he
15   filed in Commonwealth court against
16   the Pennsylvania State Police seeking
17   prospective relief, are there any
18   facts known to you that contradict
19   that as you sit here today?
20   A.    Do you mean contradict when he
21   filed the injunction?
22   Q.    Yes, sir.
23   A.    Not that I'm aware of.
24   Q.    When did you make a decision
25   that he would sit tight at IIMS

228

1    detached from BPR, IAD division and
2    not go to Washington?
3    A.    Probably after the injunction
4    was filed.
5    Q.    Sir, wasn't that after the
6    report date that you had given him to
7    IAD for the formality of just being
8    there for a short while, sir?
9    A.    I don't know what that date
10   is, so I don't know.
11   Q.    You needed him at IIMS; didn't
12   you?
13   A.    To complete that project, yes
14   sir.
15   Q.    Yes, sir, you did.  Yes, sir.
16   I agree with that.  And Mr. Ober
17   never actually went back to IAD; did
18   he, sir?
19   A.    I don't believe that he did.
20   Q.    And, sir, he never went to
21   Washington; did he?
22   A.    He did not.
23   Q.    Now, did he not go to
24   Washington because you are a
25   compassionate man?

229

A.      He did not go to Washington
because of the injunction and the
settlement of the injunction.

Q.      Why did you settle it, sir?

A.      Because I didn't want to
prolong the assignment of an
individual to assist Major Zipinka.
Lieutenant Colonel Wescott was
insistent that somebody get out there
as soon as possible.  He wanted
somebody out there helping him.  And
you have to remember that at the
beginning of December, Seattle
exploded with the World Trade
Organization demonstrations.  States
of emergency were declared, the
National Guard was called out, the
curfews were imposed and Colonel
Wescott was insistent that we not be
caught in the same situation that
Seattle PD was caught in.

Q.      What's that have to do with
Captain Ober?  Mr. Coury's come in
here and testified for about a half
hour, and then we got into some

230

1    different things, but --- about how

2    this gentleman, Captain Ober, was

3    operationally deficit experience

4    wise, not ability wise, but

5    experience wise. So how does that

6    integrate with this alleged need

7    because of Seattle in Washington?

8    A.    Colonel Coury was not Deputy

9    of OPS at that time, Colonel Wescott

10   was. And it was Colonel Wescott's

11   recommendation with my concurrence

12   that the captain go there, that he

13   could do that job working with Major

14   Zipinka.

15   Q.    Okay. Fair to say then that

16   Mr. Wescott may not, I mean, we can

17   only speculate, I guess, but

18   apparently did not entertain

19   viewpoints as to Captain Ober's

20   alleged operational deficiencies,

21   that he didn't feel that way about

22   Captain Ober or he wouldn't have

23   recommended him for that assignment?

24   A.    I'm not sure what he testified

25   to, what his thoughts were. It seems

231

1   to me that they're consistent with

2   Lieutenant Colonel Coury's.

3   Q.      He wanted to get his --- he

4   wanted Captain Ober to get his feet

5   wet in a combat situation then; is

6   that right?

7   A.      He needed somebody out there

8   to work with Major Zipinka to make

9   sure that what happened in Seattle,

10  at least that's my understanding and

11  my feeling, as to what happened in

12  Seattle didn't happen in State

13  College.

14  Q.      You mean Pittsburgh, or ---

15  oh, it was State College.

16  A.      State College.

17  Q.      Well, say Zipinka was really

18  fired up, needed somebody?

19  A.      No.  This was Lieutenant

20  Colonel Wescott's decision.

21  Q.      Yes, but didn't you say

22  Zipinka really needed somebody or did

23  I misunderstand?

24  A.      Zipinka needed somebody

25  according to Lieutenant Colonel

232

1  Wescott's estimation.

2  Q.    Oh, okay.  So Zipinka wasn't

3  making this demand or anything like

4  that?  It was Colonel Wescott's

5  opinion that he needed him?

6  A.    It was Colonel's Wescott's

7  opinion.

8  Q.    So you promoted Young and put

9  Young out there?

10  A.    Yes, I did.

11  Q.    And when did you promote Mr.

12  Young to Captain?  He was a

13  lieutenant; right?

14  A.    Yes, he was.  Probably

15  sometime in January.

16  Q.    And you sent him out there.

17  Did he want to go?

18  A.    I don't know whether he wanted

19  to go or not.

20  Q.    Well, did you talk to him at

21  all before he went?

22  A.    I normally talk to officers

23  that I promote.  If I talked to him I

24  would have offered him the position

25  of captain with the caveat that it

233

1   would be assigned to Major Zipinka to

2   help out there.

3   Q.      That's what I mean.  That's

4   what I'm asking about.

5   A.      And I probably would have

6   talked to him, but I'm not sure.

7   Q.      Okay.  Colonel, are you

8   telling me that if you'd have talked

9   to Mr. Young and Mr. Young had said,

10  not yet, don't want to do that, would

11  you have still promoted him and sent

12  him to Washington against his wishes?

13  A.      I would not have promoted him,

14  no.

15  Q.      Okay.  Darrell Ober files his

16  injunction.  Did that upset you?

17  A.      No.

18  Q.      How did you feel about it?

19  A.      Neutral.

20  Q.      Why did you relent and agree

21  to settle on it?

22  A.      We settled this case because I

23  didn't want to prolong the

24  assignment, somebody going out to

25  assist Major Zipinka.  I didn't know

234

1    how long that court case might take.
2    Q.    Okay.  See, I understand that
3    and I understand you testified to
4    that and I wasn't sure I heard you
5    right.  But I don't understand why
6    the one requires the other one.  In
7    other words, I can understand the
8    following.  This captain, Captain
9    Ober, files this injunctive thing
10   about being transferred out there.
11   Okay?  You don't want to prolong the
12   problem.  Why does agreeing with his
13   injunction have anything to do with
14   prolonging the problem if you're
15   going to get somebody else for it
16   anyway?
17          In other words, you know, go
18   ahead and fight the injunction and
19   win.  It doesn't mean you have to
20   send him, but you can certainly win
21   the legal action being that you can't
22   be prevented from doing it.  It
23   doesn't mean you have to go through
24   with it.  I don't understand why
25   settling that would solve your

235

1   problem with the National Governor's

2   Conference.

3   A.     I wasn't going to put on hold

4   sending somebody out there to work

5   with Major Zipinka.

6   Q.     Of course not.  You don't even

7   know how long the legal wrangling

8   will take.

9   A.     And that's the point of my

10  answer.

11  Q.     I still don't understand but I

12  understand that's your answer.  I

13  don't understand why --- that's your

14  answer, that's your answer.

15  A.     It's the best I can articulate

16  it.

17  Q.     Yes, sir.  Sir, did Captain

18  Ober argue that the transfer was

19  punitive in nature?

20  A.     Not that I know of.

21  Q.     Do you think it was punitive

22  in nature?

23  A.     No.

24  Q.     Do you think it was a career

25  enhancing move?

236

1    A.      I didn't look at it either

2    way, as career enhancing or not.  I

3    knew there was need out there and I

4    agreed with Colonel Wescott.

5    Q.      You don't have a duty to, at

6    all, look at officers in terms of

7    career enhancement?  You look at it

8    in terms of what the needs of the

9    Pennsylvania State Police are; right?

10   A.      That's exactly what I did.

11   Q.      And you're telling us that

12   Ober was needed out there because

13   according to you the IIMS thing had

14   come to a conclusion, which you say

15   you got from Hikus; right?

16   A.      That is correct.

17   Q.      So he's available?

18   A.      That is correct.

19   Q.      Well, after you decided not to

20   prolong the legal thing and gave in

21   --- is it fair to say you gave in on

22   the legal thing?

23   A.      I think we settled the

24   injunction.

25   Q.      Those words are --- you

237

1    settled the injunction.  You choose

2    your words.  You settled the

3    injunction.  And after you settled

4    the injunction Ober's still

5    available; right?

6    A.    Yes, he was.

7    Q.    So you put him in a

8    lieutenant's position in LCE; didn't

9    you?

10   A.    I have a major that is the

11   director of the Bureau of

12   Professional Responsibility that had

13   asked that he not be returned there.

14   And I did the same thing with Captain

15   Ober that I did with Captain Transue.

16   Q.    Put him into a lieutenant's

17   position?

18   A.    Captain Transue was not

19   reassigned to Bureau of Research and

20   Development because Lieutenant

21   Colonel Hikus asked that she not be

22   reassigned there.

23   Q.    Sir, Colonel Evanko, aside

24   from Captain Ober I want you to tell

25   me how many times in your career as

238

1    Commissioner of the Pennsylvania

2    State Police you placed a captain

3    --- because the testimony has been

4    that you made this decision, how many

5    times have you placed a captain in a

6    lieutenant's position?  Tell us.

7    A.      Only one.

8    Q.      Who?

9    A.      Captain Ober.

10   Q.      Yes, sir, that's correct.

11   A.      And it was consistent with the

12   court's decision to keep him in the

13   Harrisburg/Hershey area and there

14   were no captain vacancies in the area

15   at that time.

16   Q.      Well, I may be mistaken but

17   your counsel said --- I mean, they

18   represented at least that you didn't

19   lose that thing.  Yu actually won it,

20   you just settled it or something.  I

21   don't know what the words are, but

22   you didn't lose it.

23                ATTORNEY GUIDO:

24           It was dismissed as

25       moot and it's a matter of

239

1          public record.  You can read

2          the court opinion.  The court

3          dismissed the case as moot.

4          It was the preliminary

5          injunction that was settled.

6          There was no permanent

7          injunction settled, and it was

8          dismissed as moot.

9    BY ATTORNEY BAILEY:

10   Q.      So you're saying --- well,

11   you've heard what your learned

12   attorney just said here.  Your

13   position is that that's consistent

14   with what the court wanted?  Is that

15   the way you looked at it?  I go back

16   to Dan Pellegrini, to Judge

17   Pellegrini, and I say, sir, you

18   wanted Ober kept in Harrisburg so bad

19   that you felt he should have been

20   assigned to a lieutenant's position

21   as a captain in LCE; is that correct?

22             ATTORNEY GUIDO:

23             I object to the

24        question because it totally

25        misconstrues the facts, which

240

1          the court never entertained

2          anything in the case.  The

3          matter was settled, it's of

4          record.  The matter was

5          settled with the Defense

6          Counsel and with the

7          Plaintiff's Counsel, who we

8          agreed that temporary

9          injunction would not be going

10         forward because we would keep

11         the Captain in the Harrisburg/

12         Hershey area as a matter of

13         public record.  And your

14         question is misconstruing

15         those facts.

16    BY ATTORNEY BAILEY:

17    Q.     Okay.  So it wasn't something

18    that the court wanted, it was

19    something that Mr. Ober wanted?

20    A.     I just know that there was an

21    agreement to keep him in the

22    Harrisburg, Hershey area.

23    Q.     So you don't know whether it

24    was something the court wanted?

25    A.     I thought it was something

241

1   that the court wanted, but maybe not.

2   Q.      What's PEMA, FEMA, LEMA ---

3   PEMA, Pennsylvania Emergency

4   Response, or something or other, what

5   is that?

6   A.      Pennsylvania Emergency

7   Management Agency.

8   Q.      I forgot the acronym, I'm

9   sorry.  Do you have a recollection of

10  Captain Ober ever serving with that

11  particular agency?

12  A.      I have a recollection from

13  listening to Lieutenant Colonel

14  Wescott's testimony and your

15  questioning of him, but that's all.

16  Q.      All right.  Colonel Evanko,

17  prior to testimony that you've heard

18  in this case, do you have any

19  recollection of Captain Ober

20  requesting or performing in an

21  assignment to PEMA?

22  A.      No, only through your

23  questioning of Lieutenant Colonel

24  Wescott.

25  Q.      Have you ever discussed

242

1   Captain Ober with Mr. Washington?

2   A.      No, I have not.

3   Q.      I'm sorry, sir.  Leonard

4   Washington, do you know who I'm

5   talking about?

6   A.      I think you're talking about

7   Major Washington?

8   Q.      Yes, sir, I am.

9   A.      No, I have not.

10  Q.      Colonel, from an assignment

11  standpoint, like a responsibility

12  standpoint, was it Colonel Wescott

13  who was responsible for PEMA?

14  A.      It falls under the Lieutenant

15  Colonel of Operations, and Lieutenant

16  Colonel Wescott was in that position

17  in January of 2000.

18  Q.      Okay.  So at the times

19  complained of in the complaint it was

20  Lieutenant Colonel Wescott who was in

21  that position?

22  A.      As Deputy Commissioner of

23  Operations, that's correct.

24  Q.      Well, I'm going to change just

25  a little bit, just a couple little

243

1 things here.  Do you have an auto
2 pen?
3 A.        Yes, I do.
4 Q.        How does it work?  It signs
5 your signature; right?
6 A.        Yes, it does.
7 Q.        Can you describe it for me?
8 You put a piece of paper in it and it
9 signs your name or something?
10 A.        I'm not sure that I've ever
11 seen it operated, but I know that you
12 put a piece of paper down and it
13 traces your signature.  That's it.
14 Q.        Have you ever had occasion to
15 handle any documents that it signed?
16 A.        I would probably get copies of
17 documents like that.
18 Q.        How many shirts have you lost
19 due to being smeared by the ink on
20 your auto pen?
21 A.        Pardon me?
22 Q.        Ever lost any shirts as a
23 result of getting smeared with ink
24 from your auto pen?
25 A.        I don't know of any that I've

244

1   ever lost.

2   Q.      Ever handle documents from

3   your auto pen, gotten ink on your

4   hands?

5   A.      I don't think.  I never did

6   that, no.

7   Q.      Sir, what's the name of your

8   secretary?

9   A.      Mary Bungo.

10  Q.      Can you describe for us the

11  duties that she performs for you.

12  And after you do that, can you tell

13  us what authority she has to make

14  decisions for you?

15  A.      She is my confidential

16  executive secretary and also acts in

17  the capacity of an executive officer.

18  She has the authority to route

19  complaints to decide who will answer

20  certain letters of complaint, for

21  example.  She has the authority to

22  auto pen certain documents, to

23  respond, schedule, to call

24  legislators.  She has a wide range of

25  authority.

245

1    Q.      Does she have the authority to

2    decide the organizational structure

3    of the Pennsylvania State Police?

4    You gave her that authority; didn't

5    you?

6    A.      Tell me what you mean.

7    Q.      Didn't you give Mary Bungo the

8    authority to decide, make the final

9    decision, on how the Pennsylvania

10   State Police will be organized and

11   function?

12   A.      No.

13   Q.      Are you sure about that?

14   A.      Yes.

15   Q.      Well, do you ever get

16   presented with changes for

17   Pennsylvania State Police

18   regulations?

19   A.      Yes.

20   Q.      How do you process those?  I

21   don't care about the rest of the

22   organization, I want to know how

23   Colonel Evanko processes them.

24   A.      I will get them in final

25   format signed off by either the

246

1  appropriate deputy or all three

2  deputies, review it and if I agree

3  with it, sign it.

4  Q.    Mary Bungo doesn't have the

5  authority to make that decision for

6  you?

7  A.    She has the authority of the

8  deputy commissioners have already

9  signed off on it and I'm not

10  available to auto pen it.

11  Q.    Now, after the three have

12  signed off on it, then it comes to

13  you?

14  A.    Yes.

15  Q.    What if it goes back to R&D

16  for some kind of change, do you

17  double-check it?

18  A.    Do I double-check it before it

19  comes back or after it comes back?

20  Q.    Well, here's my question.  If

21  the three commissioners or three

22  deputies --- you have three deputies?

23  A.    Yes, I do.

24  Q.    They're lieutenant colonels?

25  A.    That's correct.

247

1  Q.      If they sign off on an R&D

2  proposal, do they have the authority

3  to send it back without you seeing

4  it?

5  A.      Yes, they do.

6  Q.      Which one of them does?

7  A.      It would depend on whose

8  jurisdiction it fell under.  If it

9  were an operational decision, Deputy

10 of Operations, or staff, Lieutenant

11 Colonel Hikus.  Primarily it would be

12 Lieutenant Colonel Hikus

13 responsibility because the Bureau of

14 Research and Development falls under

15 his authority.

16 Q.      Now, if they go back and they

17 change it and then it comes back to

18 you, you review it?  Or does Mary

19 Bungo review it?

20 A.      If I make a change to it?

21 Q.      Yes.

22 A.      Then it would come back to me.

23 Q.      Who's Sharon?  Do you know who

24 Sharon is in Research and

25 Development?

248

1    A.       It is probably the secretary

2    to the Director of Bureau Research

3    and Development.

4    Q.       Are you familiar with AR-1?

5    A.       Yes, I am.

6    Q.       When's the last time it was

7    changed, that you know of?

8    A.       I know from these proceedings

9    that it was changed within the past

10   year.

11   Q.       Well, let's forget these

12   proceedings.  What do you know of its

13   being changed excluding these

14   proceedings?

15   A.       I don't of any other than

16   through these proceedings.

17   Q.       Colonel, didn't you sign a

18   change order or did you sign a change

19   order regarding AR-1, adding AR-1.102

20   subsection C?  Did you add that?

21   A.       What is it?

22   Q.       It has to do with chain of

23   command.

24   A.       No, I did not.

25   Q.       Who did, sir?

249

1    A.      It was auto-pen need.

2    Q.      On your authority?

3    A.      No.

4    Q.      Whose authority?

5    A.      The three deputy

6    commissioners.

7    Q.      If that regulation up for a

8    change was sent back, was resubmitted

9    on January 19th, '01 to R&D and then

10   received for corrections back to R&D

11   on February 12th, '01, resubmitted to

12   the front office on February 22nd,

13   '01 and then sent back signed with a

14   repo order on February 27, '01, as

15   you sit here today, you'd have to

16   say, Mr. Bailey, I really don't know

17   anything about that.  You don't

18   really know; do you?

19   A.      I don't recall knowing

20   anything about that other than

21   through these procedures.

22   Q.      Sir, was AR-101 subsection C

23   required for accreditation purposes

24   for the --- sorry, sir.  Sometimes I

25   get saved from my own question.

250

1   Colonel Evanko, I believe we've had

2   some representations from somebody in

3   this litigation, I'm not sure who at

4   this stage, that subsection C of

5   AR-1.102 was needed for accreditation

6   purposes having to do with the

7   National Group.  I'm pretty familiar

8   with that.  I've worked on that quite

9   a bit.  I don't know of that need.

10  Can you help me?

11  A.    I don't know of that need

12  either.

13  Q.    You have a reputation

14  nationally, do you not, and certainly

15  in Pennsylvania for being very

16  concerned about PSP credentials and

17  about their accreditation to come up

18  to high standards?  I think you're

19  well known for that; is that fair to

20  say?

21  A.    I think the department is well

22  known, I don't know if I'm well known

23  for it.

24  Q.    I think you are, I think it's

25  to your credit.  But the point is,

251

1  and let's forget you, the department

2  is well known, even nationally, for

3  wanting to meet very high

4  accreditation standards to be known

5  as proficient and efficient and

6  highly qualified, that kind of thing,

7  as a law enforcement agency; isn't

8  that fair to say?

9  A.    I think that's fair to say.

10  Q.    And isn't it fair to say that

11  it's one of your top priorities, one

12  of your top concerns, because

13  obviously it means a great deal

14  about the quality of the State

15  Police.  Isn't that fair to say?

16  A.    It's important to me, my top

17  concern is the safety of my troopers.

18  Q.    All right.  But secondary to

19  the safety of the troopers, that

20  quality control image, credentials,

21  capability, those things are high

22  standards, you set; right?

23  A.    I would say that they're in

24  the top group of what I expect.

25  Q.    So you don't know of

252

1    subsection C being an accreditation

2    requirement?

3    A.      I don't know.

4    Q.      Now, subsection C, do you know

5    what I'm talking about?

6    A.      From you describing it and

7    from these actions.

8    Q.      Okay.  Now, sir, I'm going to

9    ask a series of questions.  I want to

10   let you know where I'm going right

11   now because they're very, very

12   important to this litigation as the

13   Plaintiff sees it.  And they're going

14   to have to do a subsection C and

15   they're going to have to do with this

16   process of changing and approving

17   AR-1, approving changes to it; okay?

18   Now, I want to be very careful of

19   some of the dates and some of the

20   sequences of events here.  When did

21   you first become aware of subsection

22   C?  Was it during this litigation?

23   A.      Yes.

24   Q.      Does Ms. Bungo or anyone in

25   your office give you a list at some

253

```
 1   time --- I used to be auditor
 2   general, I used to be a congressman.
 3   I used to --- my people, from time to
 4   time, were authorized to do different
 5   things on a daily basis and provided
 6   me with a list of things that we did,
 7   of our office product.  I assume, as
 8   a Commissioner of the Pennsylvania
 9   State Police, you are told at
10   periodic times, daily, weekly,
11   whatever, Colonel, we did this, you
12   authorized this, you authorized that,
13   because you can't obviously, sir, you
14   can't do everything.  The fact is you
15   just can't do everything and
16   micromanage everything in a day;
17   correct?
18   A.     That's correct.
19   Q.     Do you get a list from staff
20   on what you authorize or what you do
21   on like a daily or weekly or monthly
22   basis?
23   A.     No.
24   Q.     Do you sit down and talk with
25   Mary Bungo about what goes out under
```

254

1  your signature?

2  A.    I sit down and talk not only

3  her, but also the deputy

4  commissioners on a whole host of

5  things.

6  Q.    Did Colonel Coury tell you

7  about subsection C before you heard

8  about it in this litigation?

9  A.    This is the first time I heard

10  about it, during this litigation.

11  Q.    Okay.  So the answer is that

12  none of the lieutenant colonels, the

13  staff people, the three top staff

14  people told you about it and you

15  heard about it first, subsection C,

16  in this litigation?

17  A.    That is a correct statement.

18  Q.    Colonel Evanko, would you be

19  kind enough, sir, to look at this

20  document for me?  As soon as your

21  attorneys are done, take a moment to

22  look at it.

23         ATTORNEY BAILEY:

24         In fact, while they're

25       looking can we suspend for one

255

1          minute so I can get some

2          water?

3                    VIDEOGRAPHER:

4                    It's 2:32 p.m., we're

5          going to suspend and we're

6          going to change tapes.

7     SHORT BREAK TAKEN

8                    MR. SOLOMON:

9                    2:37, back on record,

10    tape three.

11                   ATTORNEY BAILEY:

12                   Let the record show

13    we're back on the ---.

14                   VIDEOGRAPHER:

15                   It's 2:39 p.m., new

16         tape, on March 27th, 2002,

17         the deposition of Mr. Evanko.

18    BY ATTORNEY BAILEY:

19    Q.     Colonel, I just showed you and

20    your attorneys have looked at a

21    multi-page document.

22                   ATTORNEY GUIDO:

23                   We need it marked.

24    BY ATTORNEY BAILEY:

25    Q.     Is it fair to say that you

256

1    don't know what ---?

2                    ATTORNEY GUIDO:

3                    Before he answers any

4    questions, we want the exhibit

5    marked.

6                    ATTORNEY BAILEY:

7                    Let me finish.

8                    ATTORNEY GUIDO:

9                    Colonel, don't answer

10        until the exhibit is marked.

11                   ATTORNEY BAILEY:

12                   Let me finish.

13   BY ATTORNEY BAILEY:

14   Q.    Is it fair to say that you

15   don't know what this document is?

16                   ATTORNEY GUIDO:

17                   Do not answer until the

18        document has been marked.

19   BY ATTORNEY BAILEY:

20   Q.    Colonel Evanko, we've been

21   given a document that indicates that

22   you did an e-mail to a gentleman

23   named Mark Campbell; is that correct?

24   A.    Yes, I gave that to you.

25   Q.    And it says one, two, three,

257

1    fourth paragraph down, I am

2    transferring Captain Darrell Ober

3    effective 28 January 2000; do you

4    remember that?

5    A.      Yes, I do.

6    Q.      Why were you telling Mark

7    Campbell?

8    A.      Because I was keeping him up

9    to date with preparations for the

10   National Governors' Association.  And

11   I had told him that I was going to

12   send somebody out to assist Major

13   Zipinka in the planning for that

14   event because it was so big.

15   Q.      Okay.  So you had discussed

16   Captain Ober with Mark Campbell?

17   A.      I told him that I was going to

18   send Captain Ober out there to help

19   Major Zipinka.

20   Q.      Did he know who Captain Ober

21   was?

22   A.      I'm not sure that he did.

23   Q.      Was he interested in who was

24   going out there?

25   A.      I don't know if he was

258

1   interested in so much as I was just
2   trying to keep him up to date.
3   Q.      Well, did he ever express an
4   interest in the kind of person you
5   wanted out there or what you wanted
6   them to do?
7   A.      No.
8   Q.      Well, you said you're
9   transferring Captain Ober out there,
10  he knew who Captain Ober was?
11  A.      He probably did because I
12  would have talked to him about
13  somebody going out there to assist
14  and that was probably going to be
15  Captain Ober.
16  Q.      Well, you talked to him about
17  Captain Ober early on, hadn't you,
18  when the issue came up concerning the
19  FBI probe?
20  A.      I probably did use both
21  Captain Ober's name and Lieutenant
22  Colonel Hikus.
23  Q.      Now, have you asked Mr.
24  Campbell whether or not you could or
25  should investigate the matter?

Sargent's Court Reporting Service, Inc.
(814) 536-8908

259

1    A.      No, I did not.

2    Q.      So your testimony is that Mr.

3    Campbell provided no input as to

4    whether or not this matter should be

5    investigated?

6    A.      No, he did not provide any

7    input.

8    Q.      Did you find out at some point

9    that Mr. Hikus had talked to somebody

10   in the Governor's Office about this?

11   A.      Through his testimony, I did.

12   Q.      And you didn't know about it,

13   I think you testified earlier today

14   that you didn't know about it before

15   that?

16   A.      That is correct.

17   Q.      Do you think it was

18   inappropriate for him to do that?

19   A.      Before he talked to me?

20   Q.      Yes.

21   A.      Yes.

22   Q.      So he should not have talked

23   to Mary Woolly before he talked to

24   you; right?

25   A.      Yes.

260

1  Q.     Now, do you know whether Mary

2  Woolly had told Mr. Campbell anything

3  about the discussions that she had

4  with Mr. Hikus?  Do you know whether

5  Mary Woolly told Mr. Campbell

6  anything about any conversations she

7  may have had with Mr. Hikus?

8  A.     I do not know.

9  Q.     Have you talked with Mr.

10  Campbell since then?

11  A.     I'm sure that I have talked to

12  him since then.

13  Q.     Have you talked to him since

14  then about this matter?

15  A.     No, I have not.

16  Q.     Have you talked to him since

17  then about Colonel Hikus' discussions

18  with Mary Woolly?

19  A.     Have I talked to him about the

20  discussions with Woolly?

21  Q.     Sure.

22  A.     No, I have not.

23  Q.     Do you know whether Woolly and

24  Campbell get along?

25  A.     No, I do not.

261

1    Q.      Do you know why ---?

2    A.      I would imagine they do.

3    Q.      Why?

4    A.      Because they work together.

5    Q.      Do you and Hikus get along?

6    A.      Yes, we do.

7    Q.      Well, have you sat down and

8    taken Mr. Hikus to task for going to

9    Mary Woolly?

10   A.      That only happened a couple of

11   days ago, that's the first that I've

12   become aware of it.

13   Q.      You haven't had time to sit

14   down with him and discuss it?

15   A.      I have not had time to sit

16   down with him and discuss it.

17   Q.      Do you plan to sit down with

18   him and discuss it?

19   A.      I'm not sure what I'm going to

20   do.

21   Q.      Are you going to discipline

22   him for that?

23   A.      I'm not sure what I'm going to

24   do in relation to that.

25   Q.      Is that not a violation of

262

1   what you have been concerned about in

2   this case, i.e., a circumvention of

3   the chain of command?

4   A.      Yes, it is.

5   Q.      So Colonel Hikus circumvented

6   the chain of command by reporting a

7   matter of public concern to Mary

8   Woolly in the Governor's Office; am I

9   correct?

10  A.      Before he advised me, yes,

11  sir.

12  Q.      Before he advised you, that's

13  correct?

14  A.      Yes, sir.

15  Q.      Now, what motivated him to do

16  that; do you know?

17  A.      I have no idea.

18  Q.      Is he a supporter of yours?

19  A.      What do you mean a supporter?

20  Q.      Sir, I've been around politics

21  a long time and I think you're a

22  professional.  Lieutenant colonels

23  are chosen for the Pennsylvania State

24  Police not by you but by the

25  Governor; am I correct?

263

1    A.      They are appointed by the

2    Governor but selected by me.

3    Q.      So you selected Hikus?

4    A.      It was my recommendation to

5    the Chief of Staff.  It was my

6    invitation for Colonel Hikus to

7    become involved in the competition

8    for the job and the interview process

9    for the job.

10   Q.      Now, do you have no idea why

11   Colonel Hikus would betray you and go

12   to Mary Woolly in the Governor's

13   Office about such an extremely

14   sensitive matter and not tell you

15   first?  Because it is a betrayal; is

16   it not?

17   A.      I don't know if it's a

18   betrayal or not.  I don't know what

19   was in his mind.  I don't know why he

20   would tell someone outside the

21   department before he told me.

22   Q.      Do you have a recollection of

23   signing a change order for AR-1 on or

24   about February of 2001?

25   A.      No, I do not.

264

1  Q.    Do you know if more than one

2  change order was signed on your

3  behalf?

4  A.    The change orders for

5  regulations are signed all the time,

6  so I don't know.

7  Q.    So you wouldn't know?

8  A.    I don't know.

9  Q.    Do you know if there was a

10  Change 68 and a Change 66?

11  A.    I don't know.

12  Q.    Have you ever had occasion to

13  have the ink smear on one of your

14  signatures on a document that was a

15  year old, if you can recollect?

16  A.    No, I cannot recollect one.

17  Q.    Can I --- the document that

18  you have there, I don't know how the

19  young lady has that marked.  I think

20  it's Number One.

21  A.    Exhibit Number One?

22  Q.    Yes, sir.  Can I ask you some

23  questions about Number One?

24  A.    Yes, sir.

25  Q.    You don't know anything, I

265

1    don't assume, about Special Order

2    99-102 dated October 7, 1999?

3    A.    I'd have to read it and look

4    at it to tell you.

5    Q.    You know you'd probably be

6    talking about hundreds and hundreds

7    and hundreds of those kinds of

8    things.  Isn't that ---?

9    A.    There's an awful lot of them.

10   Q.    Yes.  And this one purports to

11   be a subject about a training

12   opportunity; right?

13   A.    Exhibit One does, yes, sir.

14   Q.    And it purports to be a ---

15   it's routed to the Director of the

16   Bureau of Personnel; right?

17   A.    Yes, it is.

18   Q.    And it purports to be from,

19   and then there's an initial there,

20   Captain Darrell G. Ober; right?

21   A.    No, sir.

22   Q.    What is that?

23   A.    It is a typewritten name but

24   with no initial.

25   Q.    Okay.  And underneath that

266

1    there's a thing that says reference;

2    right?

3    A.      Yes, sir.

4    Q.      And there's subsection A;

5    right?

6    A.      There is a subsection A which

7    is the reference, the special order.

8    Q.      To the special order.  And the

9    enclosure is a résumé of

10   qualifications; right?

11   A.      Yes, sir.

12   Q.      And then it says on your

13   document, I request to be considered

14   for the subject training; right?

15   A.      Yes, sir.

16   Q.      And then it lists the

17   requested information is as follows

18   and it lists some information and it

19   says, enclosure one is a résumé of my

20   qualifications, but there's nothing

21   attached here?

22   A.      That is correct.

23   Q.      And in the lower left-hand

24   corner of that document, there's

25   nothing there; is there?

267

1    A.      No, sir.

2    Q.      Give me just one minute.

3    Colonel, do you know someone named

4    Becky Brown?

5    A.      Yes, I do.

6    Q.      What's she do?

7    A.      She's the administrative

8    officer for the executive offices.

9    Q.      Do you think you'd know her

10   writing?

11   A.      I have no idea what her

12   writing is.

13   Q.      Okay.

14   A.      Mr. Bailey, can I

15   ask --- you'd ask if you can ask me

16   about that.  Can I ask you to go back

17   to this Exhibit Number Two?

18   Q.      Yes.  Just a minute.  Okay.

19   Go ahead.

20   A.      Where it is page, I think your

21   page 7.

22   Q.      Okay.

23   A.      Under number 2?

24   Q.      Yes.

25   A.      And the second sentence under

268

1 that.  The first sentence is, was I a

2 subject of investigation or any of

3 lieutenant colonels.

4 Q. Wait a minute.  I'm not with

5 you.  Yes.

6 A. And right underneath that it

7 says, if you were I would have been

8 told.

9 Q. Right.

10 A. Sure your name was never

11 mentioned.

12 Q. Yes.

13 A. When you were asking me about

14 that --- I just want to make sure

15 that I have the record clear.  When

16 you were asking me about that

17 statement, if you were I would have

18 been told that it's accurate and

19 clear that you understand what I was

20 referring there.  This is Rick

21 Mascara, the SAC's response to my

22 question, was I a subject of

23 investigation or of any lieutenants

24 colonels.  And he said to me, if you

25 were I, Rick Mascara, would have been

269

1  told.  I want to make sure that that

2  was clearly understood.

3  Q.     Yes, for what it is worth, I

4  think that's the way I took it.

5  A.     Okay.  I wanted to make sure.

6  I wasn't sure.

7  Q.     Yes, I mean, I think that's

8  the way that I took it.  And I think

9  that when I had asked you to go back

10 about this area, you go up to the

11 front part of this form, it says, I

12 was advised by Lieutenant Colonel

13 Hikus recently that we, the state

14 police, were the subject of an FBI

15 investigation into selling trooper

16 positions.  Do you remember that?

17 A.     Yes, I do.

18 Q.     And you referred to that when

19 we came down below here, to go to

20 this thing,  you asked him, was I the

21 subject of an investigation on any of

22 the lieutenant colonel's.  I think

23 your response to this, if you were I

24 would have been told.  Your

25 interpretation of that now is not the

270

1   time the way that I took it if I
2   understand what we're talking about
3   here, and I had questioned you rather
4   intensely on this area, is that it
5   would have been improper for him to
6   tell you.  And your response to
7   me --- see, I don't think it makes
8   any difference what Rick meant by
9   that.  Because see, as to Rick, this
10  is hearsay.  I was interested in what
11  your response was.  And my
12  understanding what your response was
13  --- I had questioned you about
14  whether or not that would have been
15  improper.  If Rick meant by that ---
16  if I had heard of that, I would have
17  told you putting loyalty above all
18  things.  Remember when I asked you
19  that?
20  A.      Yes, I do.
21  Q.      Okay.  If I remember
22  correctly, you didn't indicate to me
23  that that would have been wrong
24  unless there was this high degree of
25  probable cause that implicated you

271

1   personally.  That's my memory; am I
2   correct?
3   A.    Yes.  And I just wanted to
4   make sure that you understood that
5   when it said, if you were I would
6   have been told that.  That is
7   Mascara's words.
8   Q.    Oh, I understand, that's
9   Mascara's words.
10  A.    Okay.
11  Q.    I wasn't interested in that.
12  I was interested in what you meant by
13  it and I don't think anything's
14  changed.  What you meant by that, if
15  I understand it correctly --- you
16  better make sure this is clear now
17  because it's an important point to
18  us.  As I understand what you meant
19  about this, it was a case of unless
20  there was this high degree of
21  probable cause about you, in other
22  words, implicating you personally, a
23  well developed --- you know, naming
24  you, that you were a target, you
25  Colonel Evanko you should have been

272

1  told.

2  A.      Or the Commissioner.

3  Q.      Or the Commissioner.  That you

4  should have been told?

5  A.      Yes.

6  Q.      And then I questioned you

7  about an ambiguity about a group,

8  that sort of thing.  And you told me

9  again unless it's about you, you

10  should have been told?

11  A.      Yes.

12  Q.      And I questioned you about

13  what if it could've involved you, and

14  you said unless it's this probable

15  cause, which I defined as a legal

16  standard meaning I can bring charges

17  against you, you should've been told.

18  If I remember correctly, sir, you

19  agreed with me.  Now if you want to

20  change it you can change it now.

21  A.      The only thing I wanted to

22  make sure is that you understood what

23  that ---.

24  Q.      I don't think it makes any

25  difference.  Mr. Mascara isn't around

273

1  for some reason.  I don't know where

2  he is.  Do you know where he is?

3  A.    I have no idea.

4  Q.    When is the last time you

5  talked to him?

6  A.    Probably that day.

7  Q.    No, you talked to him the next

8  day; remember?

9  A.    The day that ---.

10  Q.    Or later that afternoon, you

11  talked to him again.

12  A.    May 20th of 1999.

13  Q.    Okay.  Thanks.  I appreciate

14  the clarification.  Who is Ron Wilt

15  (phonetic)?

16  A.    He is the project manager for

17  the Instant Information Management

18  System.

19  Q.    Was Captain Ober working with

20  the IIMS project as late as April

21  6th, 2000?

22  A.    I don't think so.

23  Q.    How about the end of March

24  2000?  Was he still working with them

25  then?

274

```
 1   A.      I don't know.

 2   Q.      How about February 2000?  Was

 3   he working with them then?

 4   A.      I'm not sure.

 5   Q.      Give me just a second, sir.

 6   Have you ever seen this document

 7   here?

 8                     ATTORNEY GUIDO:

 9                     Can you hand that to

10           the court reporter to mark?

11                     COURT REPORTER:

12                     Marking it as Exhibit

13           Three.

14                     (Deposition Exhibit

15                     Three marked

16                     for identification.)

17   A.      No, I have not.

18   BY ATTORNEY BAILEY:

19   Q.      You don't know what that is?

20   A.      I know what it is but I have

21   not seen it.

22   Q.      Does it say the reason why

23   Ober wasn't given that assignment?

24   A.      Your request, part of this

25   reads, your request was not received
```

275

1    in the Bureau of Personnel by the

2    October 22nd, 1999 deadline.

3    Q.      Any facts known to you that

4    would indicate that that is false on

5    behalf of Mr. Coury?

6    A.      No, sir.

7    Q.      Or an error?

8    A.      No, sir.  In fact, it's not

9    even initialed off by Lieutenant

10   Colonel Coury.

11   Q.      Who is it initialed off by?

12   A.      It appears to be Robert Einsel

13   (phonetic).

14   Q.      Who is Mr. Einsel?

15   A.      Director of the Bureau of

16   Training and Education.

17   Q.      Who does it purport to be

18   from?

19   A.      Captain Darrell G. Ober.

20   Q.      Who is it to?

21   A.      Lieutenant Colonel Thomas

22   Coury.

23   Q.      And who's it from in terms of

24   the response?  Let me see it for just

25   a second.  Did it indicate --- well,

276

1   wait a minute.  I'll give it back to

2   you.  Just a second.  You're not

3   suggesting it didn't come from

4   Lieutenant Colonel Coury and that Mr.

5   Einsel made this up or something; are

6   you?

7   A.      I'm suggesting --- I'm saying

8   that this is signed off on by

9   somebody else other than Colonel

10  Coury.  It has his initials, slash,

11  and it appears to be R.E.

12  Q.      Well, is it possible that it

13  came from Mr. Coury to him and then

14  he initialed it and gave it to

15  somebody?

16  A.      My experience in this is that

17  Major Einsel would have probably have

18  been acting or sitting in for that

19  day and came across his desk as he

20  sat there and signed --- I'm sorry.

21  Q.      That's okay.  We'll talk to

22  Mr. Coury about it and let him see if

23  he can explain it or talk about it.

24  The point is that you don't know

25  anything about it; right?

277

1    A.        That is correct.

2    Q.        What was the --- wasn't it

3    Major Wertz who made a request of you

4    to do the transfer move?

5    A.        Pardon me?

6    Q.        Was there some kind of

7    relationship here between troopers or

8    officers, do you know, a personal

9    type of thing?

10   A.        I'm not sure what you're

11   referring to?

12   Q.        Well, involving Transue.  Is

13   that a she by the way?

14   A.        It is a female, yes.

15   Q.        It is a female.

16   A.        She is a female.

17   Q.        Okay.  All right.  Now, she,

18   the female ---.

19   A.        Captain Transue is a female.

20   Q.        Captain Transue is a female.

21   Well, who did you say first told you

22   about Transue, to maybe put Transue

23   out on this RNC thing?

24   A.        It would have been Lieutenant

25   Colonel Wescott.

278

1   Q.     Did Major Wertz play any role

2   in any of that?

3   A.     I think he requested her

4   assignment or he requested an

5   assignment of an individual to assist

6   him fulltime in the preparation of

7   the RNC.

8   Q.     Did Captain Transue have a

9   love partner or a love friend or

10   something that you know of, with

11   anybody?

12   A.     Not that I know of.  I don't

13   know her that well.

14   Q.     I'm not suggesting you do,

15   sir, and I didn't mean to imply that.

16   But do you know of her friendships

17   with anyone?

18   A.     No, I do not.

19   Q.     And I don't mean that in a

20   negative way.  Transue was --- how

21   long before that RCN get together was

22   she transferred?

23   A.     One year.

24   Q.     Could it have been a year and

25   a half?

279

1    A.      No, I thought it was a year.

2    BRIEF INTERRUPTION

3    BY ATTORNEY BAILEY:

4    Q.      Remember Colonel Wescott

5    testifying about being out in San

6    Diego?

7    A.      Yes, I do.

8    Q.      Did he discuss that with you?

9    A.      About going out there?  Yes.

10   Q.      Yes.  Did he discuss anything

11   about the discussions and talks he

12   had out there?

13   A.      He would have told me that the

14   highway patrol and the San Diego

15   Police, I believe it was, made a

16   recommendation that you have to have

17   a full team of people working in this

18   fulltime, not just part time, because

19   it's so massive.

20   Q.      Who did he talk to?  Was it

21   Arizona or Southern California?  Was

22   it Wertz that he talked to out there

23   about Ober?

24   A.      Pardon me?

25   Q.      He talked to Ober about

280

1  investigating Ober to somebody out

2  there.  Do you remember?

3  A.     In San Diego?

4  Q.     Yes.  Or in Arizona someplace

5  or something?

6  A.     I think Colonel Wescott talked

7  about talking to Major Wertz out west

8  somewhere.

9  Q.     That's what I remember.  I

10  just can't remember the details.  Did

11  you ever take Pennsylvania State

12  Police forces down to Gettysburg?

13  A.     No, sir.

14  Q.     Did you ever ride the

15  battlefield down there with anybody?

16  A.     Yes, sir.

17  Q.     What was that about?  No PSP

18  horses down there?

19  A.     I don't think I've ever taken

20  a Pennsylvania State Police horse

21  down there.

22  Q.     Okay.  Do you remember Colonel

23  Coury, Lieutenant Colonel Coury going

24  to some FBI classes and then hosting

25  an event up at the headquarters or

281

1    something?

2    A.    You'd have to be a little more

3    specific.

4    Q.    Purchase of a barbecue machine

5    or a barbecue device or something.

6    Do you know anything about that?

7    A.    I know that several years ago

8    one was purchased by the academy for

9    events.

10    Q.    Do you know if that was done

11    for Colonel Coury?

12    A.    I don't believe so, but I'm

13    not positive.

14    Q.    Okay.  I think we talked about

15    the swimming events.  You don't know

16    about any swimming events out there,

17    or lifeguards.  I was wondering about

18    --- I don't remember clearly on this,

19    maybe you can help me.  You were

20    present for Mr. Wescott's deposition;

21    right?

22    A.    Yes, I was.

23    Q.    I thought you testified --- I

24    may be mistaken, and I want your

25    attorney to correct me if they

282

1  remember.  I thought he testified

2  that o one would ever be promoted in

3  order to accommodate that National

4  Governors' Association meeting for

5  that purpose, that no one would ever

6  be promoted for that purpose.  Do you

7  have a recollection of him testifying

8  to that?

9  A.      No, I don't.

10  Q.      All right.  Then I withdraw

11  the question, sir.  Strike the

12  withdrawal of that question and let

13  me rephrase it.  Do you remember if I

14  questioned him about that?

15  A.      No, I don't remember if you

16  did or not.

17  Q.      You don't remember whether I

18  questioned him about that or whether

19  he responded; right?

20  A.      No, sir, I don't.

21  Q.      By the way, where does Mr.

22  Young reside?

23  A.      In the Philadelphia area.

24  Q.      Do you know whether Mr. Wertz

25  and Mr. Transue date at all?

283

A.      I do not know.

Q.      So you don't know whether ---
bottom line, you don't know whether
Mr. Wertz had any personal interest?
And I'm not indicating that it's
improper or that we aren't all human.
All I'm asking is whether or not you
know Mr. Wertz if he had any kind of
personal interest in the transfer of
Ms. Transue?

A.      No, I don't.  I don't know
either of them personally that well.

Q.      Okay.  I'm just asking you if
you have any knowledge of that.  And
another thing that's confused me,
Colonel, and maybe you can help me.
When we had Mr. Pudleiner (phonetic)
in, we were asking him different
questions about the NGA.  And when I
questioned you earlier about it, you
indicated that the NGA was actually
centered up in State College; right?

A.      Yes, sir.

Q.      Why was Ober being sent to
Washington to help with the NGA up in

284

1    State College?  I don't mean any ---

2    I've been up to State College

3    recently about an hour and 15 minutes

4    from Harrisburg, roads weren't as

5    good then, I don't think.  But you

6    know, still why would he go out to

7    Washington to help with something up

8    in State College?

9    A.      That's where the area

10   commander is headquartered and that's

11   where the plans were being made.

12   Q.      Well, was there anybody

13   assigned to the NGA from like Altoona

14   or Blairsville or anything?

15   A.      I would imagine there were

16   several commanders assigned to that

17   operation because it was so big.

18   Q.      But you needed Darrell out in

19   Washington, PA; right?  Little

20   Washington as its called.

21   A.      To assist Major Zipinka

22   fulltime, yes.

23   Q.      Do you know whether Mr.

24   Zipinka had an immediate need for

25   Ober out there?  I mean like

285

1    yesterday?

2    A.      I know that Colonel Wescott

3    wanted somebody out there as soon as

4    he could get somebody out there.

5    Q.      Wescott ever tell you why?

6    A.      Because Seattle had exploded

7    with the World Trade Organization

8    demonstrations.  State of emergency

9    declared curfew, National Guard

10   called out and he didn't want to ---

11   make sure that state police reacted

12   the same way as Seattle, wanted to be

13   prepared for it.

14   Q.      Okay.  Was Mr. Ober at one

15   time, on a book committee, some kind

16   of a book committee?

17   A.      Yes, he was.

18   Q.      Why did you take him off?

19   A.      I think Lieutenant Colonel

20   Coury did that.

21   Q.      I may be mistaken, sir, but I

22   think you testified that you did.

23   You're testifying now that he did?

24   A.      Yeah, I think he did.  I think

25   he's the one that --- I probably made

286

1    the decision and then he drafted the

2    correspondence or he made the

3    decision and I agreed with it.  One

4    of the two, I'm just not sure.

5    Q.       Okay.  Can you tell us why?

6    A.       I don't remember the

7    circumstances.  I think as they

8    existed Lieutenant Colonel Hikus was

9    continuing to ask for additional

10   people assigned to the IIMS project,

11   he wanted people assigned full-time.

12   There was a continual request of

13   officers and troopers and employees

14   there and they wanted those people

15   full time.  I think that was the

16   reason.

17   Q.       So the reason to take him off

18   the book committee was he was too

19   busy?

20   A.       I think that's what it was.

21   Q.       IIMS was very important and

22   about --- well, naturally you asked

23   Captain Ober about that; right?  I

24   mean, the book committee is sort of

25   extracurricular so to speak; isn't

287

1   it?

2   A.      I think it's during work

3   hours.

4   Q.      Okay.  Of course, you

5   consulted with Captain Ober, you sat

6   him down and talked with him about

7   that; right?

8   A.      No, I didn't.

9   Q.      Well, when did you take him

10  off the book committee?

11  A.      I don't remember.

12  Q.      No, not you.  If it was you or

13  Mr. Coury together or Mr. Coury and

14  you together or however it went, you

15  don't know when you did that?

16  A.      No, I don't.

17  Q.      Of course, you're putting Ober

18  back on the book committee; aren't

19  you?

20  A.      I don't care if he goes back

21  on the book committee if the head of

22  the book committee wants him back on

23  there.

24  Q.      You consulted with the head of

25  the book committee when you took him

288

1  off; didn't you Colonel?

2  A.     I don't believe that I did.

3  Maybe Colonel Coury did.

4  Q.     Well, Colonel, why don't you

5  tell us when the book's going to e

6  done, when it's going to be printed

7  or when that project finishes up?

8  A.     2005.

9  Q.     To coincide with the 100-year

10  history in one of the finest state

11  police organizations in the entire

12  nation that prides itself on

13  integrity and openness; right, sir?

14  A.     For the 100th anniversary of

15  the state police.

16  Q.     2005; right, Colonel Evanko?

17  A.     That is correct.

18  Q.     Sir, what I would like to do

19  is ask your erstwhile legal eagles if

20  we can take a 10-minute break.  I

21  think I might be able to shorten up

22  what I have to do if I have a chance

23  to reorganize some of this material.

24  Because Syndi wants us out of

25  here --- we all want to be out of

289

1   here by five o'clock at the latest.

2   I know the stenographer does.  So

3   could we take ten?  And would you

4   mind giving me --- shutting off the

5   microphones and giving me this room a

6   little bit or a room to work in with

7   my client?  I can go somewhere else.

8   Is it easier for me to go somewhere

9   else, or you can just shut this stuff

10  off?  You know what, I don't want to

11  be in here with the stuff.  Can you

12  give me a little room here somewhere,

13  Colonel, I can sit in?

14  A.      There are two rooms available

15  right here.

16  Q.      Okay.

17              VIDEOGRAPHER:

18              It is 3:18 p.m. and

19          we're suspending.

20  SHORT BREAK TAKEN

21              VIDEOGRAPHER:

22              It is 3:33 p.m.,

23          3-27-02, and we're continuing

24          with the deposition of Colonel

25          Evanko.

290

BY ATTORNEY BAILEY:

Q.      Colonel, let me ask about
here, find the amended complaint.  I
just want to go through here by
paragraph and read some allegations
and give you the opportunity to
expound on the reasons why you feel
that they're not correct.

        In paragraph 20 --- and bear
in mind that this complaint's
composed by myself, Mr. Ober's
attorney, and that pleading rules
under Federal Rules under Civil
Procedure 8 is as to notice pleading
requirements, which is just called
conclusary pleading.  But there are a
lot of inter-related fact allegations
here and I want to run them by you.
It says on or about September 1998
that Darrell Ober was one of the
brightest and best, a rising star in
the Pennsylvania State Police.  Do
you dispute that or that he had a
very good-looking career there and
was moving along quite well?  Could

291

1   you say that, or was he a

2   subperformer?

3   A.    I think he was comparable to

4   the other captains that we have on

5   the state police.

6   Q.    Okay.  It says in here on May

7   2nd, 1998, Captain Ober was named as

8   Director of Internal Affairs Division

9   and later in early September he was

10  named as acting Bureau Director of

11  the Pennsylvania State Police of

12  Bureau of Professional

13  Responsibility.  Does that square

14  with your recollection?  I'm sorry.

15              ATTORNEY GUIDO:

16              Could you just give us

17       some paragraph reference?

18              ATTORNEY BAILEY:

19              Sure.  Paragraph 21.

20       I'm sorry.

21              ATTORNEY GUIDO:

22              Thank you.

23  BY ATTORNEY BAILEY:

24  Q.    Does that square with your

25  recollection, sir?

292

1   A.      There was a period of 12

2   working days that Captain Ober was

3   the Director of Bureau of

4   Professional Responsibility, but I

5   don't know the dates.

6   Q.      Okay.  Now, it says this

7   career path is customarily associated

8   in the state police with advancement

9   for the various highest ranks in the

10  organization including commissioner.

11  And I've looked at your own career

12  and researched on this case, it seems

13  to be more or less consistent the

14  same way.  Is that a good career

15  path, at least, the kind of

16  experience up until October of 1998

17  that Captain Ober had for advancement

18  or movement?

19  A.      I would not characterize

20  assignment to BPR in that way.

21  Q.      Okay.

22  A.      I would look at assignments to

23  LCE, for example, Colonel Walp was in

24  LCE, Lieutenant Colonel Hikus was in

25  LCE.

293

1    Q.      And you'd look at LCE as a

2    place where a captain filling a

3    lieutenant's position would be an

4    indication of skill and ability?

5    A.      For the three months that he

6    was there until a captain's vacancy

7    opened up in LCE.

8    Q.      Now, in paragraph 31 an

9    allegation is made that I think you

10   responded to at least part of this.

11   On being told that the investigation

12   by Plaintiff and Lieutenant Colonel

13   Hikus, Defendant Evanko exploded in a

14   fit of rage.  Exploded in a fit of

15   rage, is that a description of what

16   you did?

17   A.      No, it is not.  The captain

18   has used at various times, irate,

19   upset, angry and this verbiage here

20   and that is not accurate.

21   Q.      He told Hikus and the

22   Plaintiff, Darrell Ober, that quote I

23   will have Louie Freeh, Director of

24   the FBI on the phone tonight and have

25   the agents involved transferred by

294

1    tomorrow.  Now, that's Captain Ober's

2    allegation.  You heard the testimony

3    of Lieutenant Colonel Hikus.  If I

4    understand your testimony, you didn't

5    say anything like that.

6    A.       That is not true.

7    Q.       So these two Pennsylvania

8    State Police officers, a lieutenant

9    colonel and a captain, have agreed

10   upon a lie and that lie is reflected

11   in this complaint?

12   A.       I'm saying that I never said

13   that and I didn't hear Lieutenant

14   Colonel Hikus say that either.  And I

15   didn't say it.

16   Q.       All right.  What do you

17   remember Lieutenant Colonel Hikus

18   saying then?

19   A.       I'm not sure what it was but

20   it wasn't that.

21   Q.       Paragraph 33 says, subsequent

22   to learning about the FBI

23   investigation, Colonel Evanko sought

24   the personal and official approval of

25   the Defendant Mark Campbell, to begin

295

1    an investigation into Captain Ober.

2    Your testimony is that that is simply

3    not accurate or correct; is that fair

4    to say?

5    A.    That is not true.

6    Q.    Okay.  You don't deny that

7    Campbell was an assistant to the

8    Pennsylvania --- was an assistant or

9    some sort of high staff position on

10   the Pennsylvania Governor Chief of

11   Staff though, that was true?

12   A.    He was a Deputy Chief of

13   Staff.

14   Q.    Deputy Chief of Staff.  Okay.

15   Paragraph 34 says that the time that

16   Campbell and Evanko conferred on

17   investigating Ober you've already

18   indicated that --- well, did you and

19   Campbell talk about investigating

20   Ober, number one, or number two, the

21   circumstances surrounding the FBI

22   problem?

23   A.    I would have told Mr. Campbell

24   that I was going to do an

25   administrative inquiry or inquiry

296

1  into the facts of this.  That would
2  have been the extent of it.
3  Q.    So you wouldn't have said I
4  was going to investigate Hikus or
5  Ober or those fellows or anything
6  like that, you would have told him
7  --- there is a difference between
8  would have and what you remember, but
9  your testimony here today is that you
10 would have told him that you were
11 going to look into the circumstances?
12 A.    That's what I recall talking
13 to him about.
14 Q.    That's different.  Okay.  You
15 do recall talking to him about that
16 and saying that you're going to look
17 into the circumstances?
18 A.    Yes, I do.
19 Q.    Now, at that time did you
20 suspect Ober of having committed a
21 wrong at the time you talked to Mark
22 Campbell?
23 A.    Other than going past his
24 major and BPR, I didn't know what to
25 think.

297

1   Q.      So the allegation here is that

2   you and Campbell, we're really

3   talking about you now or asking about

4   you now, knew that Ober committed no

5   wrong, had broken no law and had

6   violated no regulation practice or

7   custom in the Pennsylvania State

8   Police.  That allegation here is

9   inaccurate because you didn't know

10  what had happened and although it may

11  not have been a violation of

12  regulation you felt that Ober had

13  committed a wrong by circumventing

14  Mr. Conley and going to Hikus?

15  A.      Yes, I did.

16  Q.      Okay.  Do you want to read

17  paragraph 35?  It is not intended to

18  inflame or upset you, please.  It's

19  not meant to be argumentative.  I'm

20  going to read it and I want you to

21  tell me if it's accurate.  Paragraph

22  35, nonetheless, in order to punish

23  Ober because he had followed proper

24  PSP procedure, obeyed the law and

25  conducted himself in a spirit,

298

1    supportive of proper law enforcement

2    duties and practices consistent with

3    his oath as opposed to demonstrating

4    blind devotion, obedience and

5    subservience to the personal and

6    political interest and concerns of

7    the Defendants, both Evanko and

8    Campbell, eliminating Campbell from

9    this now by virtue of assuming the

10   information you've given us is

11   accurate.  So it would read, Evanko

12   decided to use Ober as an example to

13   PSP Officers and members to show that

14   obedience to the political

15   sensitivity of the Pennsylvania State

16   Police leader and his political

17   mentors is a necessity regardless of

18   what the law may require even if that

19   leader himself is a target or

20   potential target of an official law

21   enforcement agency investigation

22   himself.  That is simply untrue?

23   A.     Yes, it is untrue.

24   Q.     Okay.  Now, under the heading

25   investigation on page 10 of the

299

1  complaint, paragraph 37 reads,

2  investigations such as those done on

3  Captain Ober had the effect of

4  destroying an officer's standing and

5  reputation among his colleagues. Do

6  you believe that to be true?

7  A.    No, I don't.

8  Q.    Hey becomes shunned and is

9  subjected to insults and is

10 ostracized. Do you believe that can

11 happen, or have you ever known it to

12 happen?

13 A.    No, I do not know it to have

14 happened. And I don't believe it

15 happened here.

16 Q.    Okay. Why don't you believe

17 it happened here?

18 A.    Because I haven't seen it.

19 Q.    So you don't know whether it's

20 happened here. You just haven't seen

21 it?

22 A.    I haven't seen it, and I don't

23 believe it to have happened.

24 Q.    All right. Plaintiff was

25 subjected to an unlawful and improper

300

1    investigation. It's fair to say you
2    do not agree with that?
3    A.      That is fair.
4    Q.      At the direction of Evanko and
5    Campbell --- Campbell, according to
6    you, didn't order any investigation
7    or approve one but you at least did
8    order an investigation.
9    A.      I ordered an administrative
10   inquiry.
11   Q.      An administrative inquiry.
12   These investigations were conducted
13   for two unlawful reasons.  We know
14   you do not agree with that.  You
15   don't have to respond, of course.
16   You've already denied that.  The
17   first was to learn the breadth and
18   depth of Ober's knowledge about the
19   FBI investigation.  Now, was there
20   any purpose in ascertaining Ober's
21   knowledge about the FBI
22   investigation?
23   A.      I wanted to know all of the
24   circumstances from all of the
25   involved parties in this incident.

301

1    Q.        And whether Evanko and someone
2    in the Governor's Office was a target
3    or actually under suspicion.  Well,
4    you were concerned about that?  The
5    record's replete with numerous
6    references ---.
7    A.        That I was what?
8    Q.        Well, here's the allegations.
9     The first was to learn the breadth
10   and depth of Ober's knowledge about
11   the FBI investigation, you've already
12   responded to that.  And whether
13   Evanko and someone in the Governor's
14   Office was a target or actually under
15   suspicion, that was not a purpose?
16   A.        My concern would have been to
17   try to determine why the FBI or
18   Lieutenant Colonel Hikus didn't tell
19   me.  So I guess in a way that would
20   be accurate.
21   Q.        Thank you.  And the second was
22   to harass and injure Ober as a way to
23   send a signal to others that the
24   Defendants as a leadership cadre
25   require the obedience even the

302

1    unlawful obedience of PSP members,

2    above all other considerations as an

3    unwritten term and condition of

4    employment.  Now, clearly you would

5    not agree with that?

6    A.        I would not agree with that

7    and I will go back to the last

8    question.  I would agree to that as

9    far as I am concerned but not the

10   Governor's Office.

11   Q.        And the last sentence --- I

12   guess that's not real helpful here.

13   Okay.  Now, paragraph 39 reads,

14   towards the end after the meeting

15   that you had in your office, the

16   following.  That the meeting in your

17   office in which --- well, let's clear

18   that up first.  Paragraph 39 says

19   that there was a meeting following

20   Colonel Evanko's meeting with Mark

21   Campbell.  We've already indicated it

22   was a phone call and not a meeting;

23   right?

24   A.        That's correct.

25   Q.        Where Evanko secured

303

1    permission to investigate the
2    Plaintiff.  You already said that did
3    not occur?
4    A.    That did not occur.
5    Q.    Because Evanko proceed to
6    harass Plaintiff have others such as
7    the Defendants Conley, Coury, and
8    Wescott harass him.  Now, clearly you
9    don't agree with that?  That is not
10   correct?
11   A.    That is not correct.
12   Q.    And have him, meaning Ober,
13   officially investigated despite the
14   fact that Evanko was told he should
15   not conduct an investigation.  Now,
16   your investigation into Ober ---
17   strike that.
18         Your investigation into the
19   facts and circumstances as you put
20   it, we feel it was into Darrell Ober
21   and respectfully disagree with you on
22   that.  But we understand your
23   position and assuming your
24   definition, the investigation into
25   the facts and circumstance of the FBI

304

1    probe, the allegation here is that

2    you were told that it was not proper,

3    that investigation.  There being no

4    cause for such an inquiry as required

5    by PSP policies and rules and by both

6    the Pennsylvania and the United

7    States Constitution.  Mr. Coury

8    didn't tell you that?

9    Q.      The only thing Colonel Coury

10   told me was that this is not a ---

11   when I said about assigning BPR

12   investigators?  This is not a BPR

13   issue, it should be an administrative

14   inquiry.

15   Q.      So he was behind the

16   investigation but he said it should

17   be an administrative inquiry?

18   A.      It's not a BPR issue and don't

19   assign BPR investigators to it.

20   Q.      Why did Captain Brown, in July

21   20th, 1999, put a BPR number on it?

22   Why did he do that?  Did you tell him

23   to do that?

24   A.      No, I did not tell him.

25   Q.      Then why did he do it?  Do you

305

1    know why he did it?  Did you ever ask

2    him?

3    A.      No, I never asked him and I

4    don't know why he put a number on it.

5    Q.      Sir, when Mr. Williams talked

6    to Mr. Brown, we've got testimony on

7    this, they talked about this issue,

8    the nature of this inquiry.  We have

9    a deposition from Mr. Brown.  You're

10   welcome to read it.  I assume you

11   have, I don't know.

12   A.      No, I have not.

13   Q.      All right, sir.  Was the thing

14   ever a BPR investigation, Colonel?

15   A.      No, it was not.

16   Q.      It was not?

17   A.      It was not.

18   Q.      It was not, but Captain Brown

19   gave it a BPR number.  Who --- why

20   did he do that?  Who authorized him

21   to do that?  What was the reason for

22   that; do you know?

23   A.      I can speculate as to what it

24   is.

25   Q.      Then tell me.

306

1  A.    As a tracking number.

2  Q.    As a tracking number.

3  A.    That's the only reason I could

4  possibly think of.

5  Q.    It wasn't to cover; was it?

6  A.    Pardon me?

7  Q.    It was to provide cover; was

8  it?

9  A.    I don't know what you mean.

10  Q.    Colonel Conley ever talk to

11  you about this thing as a BPR with a

12  BPR number?

13  A.    No, sir.

14  Q.    Did you ever discuss Captain

15  Ober with Colonel Conley that you can

16  remember?

17  A.    I think anything that I

18  discussed about Captain Ober was with

19  Lieutenant Colonel Coury?  Although

20  Captain Conley has an STD directed to

21  me that he says he talked to me, but

22  I don't recall any direct

23  conversations.

24  Q.    Sir, I'm sorry, what was that

25  again?

307

1    A.      What's the question again?

2              ATTORNEY CHRISTIE:

3              It can be read back if

4       you want the court reporter

5       --- the answer's on the

6       record.

7              ATTORNEY BAILEY:

8              No, no, let me go on to

9       another question.  I'm sorry

10      ma'am.  I'm sorry, I

11      interrupted you.

12             ATTORNEY CHRISTIE:

13             That's all right.

14             ATTORNEY BAILEY:

15             Okay.

16             ATTORNEY CHRISTIE:

17             I'm finished.

18   BY ATTORNEY BAILEY:

19   Q.      Let me go on to another

20   question.  When we talked to Captain

21   Brown, I think, he indicated that he

22   spoke with Major Conley at the

23   request of Commissioner Evanko.

24   Something about the investigation

25   ascertaining facts, no personnel

308

1  action involved.  Do you remember

2  that?

3  A.      No, I do not.

4  Q.      Well, it says on February 14th

5  of '01 that you forwarded a copy of

6  the worksheet to the commissioner.

7  What's that about?  Do you know what

8  that's about, why you requested that?

9  A.      What is it again?

10  Q.      Well, my understand is that

11  sometime on or about the 14th of

12  February of 2001, I want you to bear

13  in mind that the lawsuit was filed on

14  January 14, '01, I think it was.  Why

15  did you request a worksheet from

16  Captain Brown?

17  A.      I don't remember that I did

18  request one.

19  Q.      Okay.  Was this an

20  investigation that went into the

21  events --- was it an investigation

22  into the FBI at all?

23  A.      In so much as what they had

24  told Captain Ober.

25  Q.      In fact that's why Ober is

309

1 mentioned, isn't he, during those

2 notes that you took of the discussion

3 with Mr. Mascara?

4 A.    I'm not sure I know what you

5 mean.

6 Q.    Well, the notes speak for

7 themselves, Captain Ober was

8 discussed.  Paragraph 50, page 16,

9 there's a number of allegations in

10 there, but it erroneously indicates

11 that Ober was returned to IAD as

12 Director of Internal Affairs for five

13 days before transferring him to Troop

14 B, Washington.  Let me tell you why I

15 am asking this question.  You'd

16 indicated it was for a pay period ---

17 at least your recollection is it was

18 a pay period, two weeks?

19 A.    I thought that's what it was,

20 yes.

21 Q.    Okay.  You don't have a

22 recollection of it ever being for a

23 period --- I know it didn't take

24 place, but a recollection of it ever

25 being for five days?

310

1    A.    Other than listening to

2    Lieutenant Colonel Conley during his

3    deposition.

4    Q.    Do historical files have

5    references to the research that's

6    done on them, the recommended

7    changes, drafts of changes and that

8    kind of thing in your experience?

9    A.    I don't have any experience

10    with historical files at all.

11    Q.    Boy, are you lucky.  That's

12    very interesting.  Have you never in

13    terms of any of the changes to

14    Pennsylvania State Police

15    Regulations, you have never reviewed

16    or looked at a historic file?

17    A.    That is correct.

18    Q.    In all of the time that you

19    have been with the Pennsylvania State

20    Police where there has been a change

21    in regulations, have you ever looked

22    at what it was like --- you had done

23    a before and after comparison?

24    A.    Of the actual regulation?

25    Q.    Yes, sir.

311

1   A.      I've probably looked at before

2   and after regulations, what was in

3   existence at a particular time and

4   what a new one would say.

5   Q.      But you don't have a

6   particular recollection of when or

7   which one?

8   A.      Throughout my career I would

9   have done that.

10  Q.      You didn't do it with AR

11  1.102(c), though?

12  A.      After the Amended Complaint or

13  after I found out about it through

14  these procedures I looked at it.

15  Q.      Okay.  And what conclusions

16  did you reach?

17  A.      I didn't reach any.

18  Q.      First darn time you saw them;

19  isn't it?  First time you recollect

20  you seeing those proposed changes or

21  the so-called change that took place;

22  isn't it, Colonel?

23  A.      That is correct.

24  Q.      On page 18, paragraph 55, the

25  allegation is that a representation

312

1    that was made to Plaintiff and his

2    Counsel was false.  And it says that

3    AR 1-1-02 had just been changed on

4    February 22nd, 2001 and was

5    personally approved by the Defendant

6    Evanko according to file documents.

7    The word personally in there is not

8    correct, that is an error?

9    A.      That is incorrect.

10   Q.      All right, sir.  Let's talk

11   about Field Regulation 1-1.17(b).

12   And we can finish this up I think

13   fairly quickly.  I want to read a

14   paragraph to you out of the Amended

15   Complaint appearing on page 19, sir.

16   Reads as follows, additionally FR,

17   Field Regulation, 1-1.17(b) is

18   misrepresented to the court on page

19   12 of the motion to dismiss as quote,

20   requiring members to properly notify

21   their supervisor when they receive

22   any information indicating another

23   member, quote, unquote, might have

24   violated the law.  You have a

25   familiarity with the language --- I

313

1    mean you referred to it here earlier

2    in the deposition a couple of times.

3    Do you remember offhand if --- do you

4    have a commanding knowledge of its

5    verbiage, of the words?

6    A.    I think that's an accurate

7    representation of its contents.

8    Q.    And the word might is

9    underlined.  It says emphasis added.

10   The subject field regulation, this is

11   in the allegation, paragraph 59.  It

12   says, the subject field regulation

13   uses the word and phraseology has,

14   which is underlined, violated any

15   law, rule, regulation or order

16   emphasis added. It does not use the

17   word might.  Do you agree or

18   disagree, or do you know?

19   A.    You lost me on the two

20   different ---.

21   Q.    Well, I'll let you read it.

22   Read paragraph 59 until your heart's

23   content.  If you know the answer ---

24   and if you don't --- I mean, I

25   realize it's a technical question.

314

1    I'm not trying to be unfair, but tell

2    me if you know.

3    A.      I thought it says might have

4    violated the law.  I thought that's

5    the way the regulation says.

6                    ATTORNEY GUIDO:

7                    Well, the regulation

8            speaks for itself.

9                    ATTORNEY BAILEY:

10                   Yes, I mean, it does.

11           It really does.  It doesn't

12           matter what any of us

13           attorneys say.

14   BY ATTORNEY BAILEY:

15   Q.      But it does matter what you

16   recollect.

17   A.      I thought it said might.

18   Q.      You thought it said might?

19   A.      Yes, I thought it says might.

20   Q.      When is the last time you

21   reviewed it?

22   A.      Prior to coming up for this

23   deposition.

24   Q.      Okay.  You don't have a copy

25   handy; do you?

315

1   A.      No, I don't.

2   Q.      See if I could get a copy for

3   just one second, because I may be

4   wrong and I don't want to ---.

5                  ATTORNEY BAILEY:

6                  Just suspend for one

7          minute.

8                  MR. SOLOMON:

9                  It's 3:58 p.m., off

10         record.

11                 VIDEOGRAPHER:

12                 It's 4:00 p.m., we're

13         suspending.

14  SHORT BREAK TAKEN

15                 VIDEOGRAPHER:

16                 It is now 4:04 p.m.,

17         we're back on the record.

18  BY ATTORNEY BAILEY:

19  Q.      Colonel, I'd like to read to

20  you Field Regulation 1-1 ---.

21  BRIEF INTERRUPTION

22                 ATTORNEY BAILEY:

23                 Strike all of my former

24         comments until the

25         stenographer is ready, please.

316

1          We're back on the record now.

2          Please, strike anything

3          in between when we resumed on

4          the record because of my error

5          in not waiting until the

6          stenographer was able to mark

7          the document involved here.

8    BY ATTORNEY BAILEY:

9    Q.      Sir, can you identify for us

10   --- Colonel Evanko, can you identify

11   for us the document that is in front

12   of you?

13   A.      It's a copy of FR 1-1 dated

14   March 25, 1992.

15   Q.      And I just want to read into

16   the record very briefly under 1.1

17   Section 1.17, Recording of

18   Information, Subsection B, which is

19   the part of the field regulation

20   referred to in paragraph 59.  Then I

21   just want to ask you to comment if

22   you would.  It says, members shall

23   promptly report to their supervisor

24   any information which comes to their

25   attention and which tends to indicate

317

1    that any other member or employee

2    has, I want to emphasize the word

3    has, last word, third line, violated

4    any law, rule, regulation or order.

5    I realize I was asking you earlier to

6    comment from memory, which is awfully

7    difficult.  And in light of paragraph

8    59 in that regulation, unless it's

9    been changed, can you tell me if it

10   has?

11   A.      I don't know.  That would be

12   my first question, what was in effect

13   in September October of 1998.

14   Q.      Okay.

15                  ATTORNEY GUIDO:

16              Counsel, we'll

17          stipulate that this is the

18          correct version of the

19          regulation, that this is the

20          one that was in effect.

21          However, I would like the

22          question to be clarified when

23          you're referring to paragraph

24          59.  I don't have the

25          complaint, Amended Complaint,

318

1          in front of me.  My
2          recollection is that you're
3          referring --- the reference is
4          to a brief which I wrote in
5          which I paraphrased what the
6          regulation says, which says
7          that any information which
8          tends to indicate that an
9          employee has violated any
10         laws.  So I just want to make
11         sure the question is clarified
12         as to what the reference in
13         the Amended Complaint is to.
14                  ATTORNEY BAILEY:
15              I'll read paragraph 59
16         into the record then.
17    BY ATTORNEY BAILEY:
18    Q.      It says, additionally FR
19    1-1.17(b) is misrepresented to the
20    Court on page 12 of the Motion to
21    Dismiss.  Here the acronym MTD is
22    used, as requiring, quote, requiring
23    members to promptly notify their
24    supervisor when they receive any
25    information indicating that another

319

1   member might, it is in quotes
2   underlined, have violated the law,
3   closed quote.  Emphasis added,
4   period. The subject field regulation,
5   the acronym FR is used, uses the
6   words and phraseology quote, has,
7   underlined for emphasis, violated any
8   law, rule, regulation or order,
9   closed quote.  Emphasis added,
10  period.  It does not use the word
11  might.
12          Sir, the reason I raise this
13  as an issue is that you'd made
14  reference earlier in the deposition
15  to your belief.  And I'm not asking
16  you to redact or change your
17  testimony at all, not suggesting you
18  should.  But you had made reference
19  to your belief that Colonel Evanko
20  had violated, you thought that he had
21  violated Field Regulation 1-1.17.
22  And that's why I asked you if you
23  knew the wording and that's why I
24  introduced this here to point that,
25  you know, maybe we'll have a

320

1    difference of opinion over that.  The
2    Court will have to decide it, but you
3    still think that he violated it;
4    right?
5    A.     Yes, I do.
6    Q.     Okay.  That's all ---.
7                ATTORNEY GUIDO:
8                Can we clarify that you
9          accidentally said Colonel
10         Evanko violated it?  I
11         believe ---.
12   BY ATTORNEY BAILEY:
13   Q.     No, no, I'm sorry.  Oh, yes,
14   that can clearly be a major blunder
15   on my part.  As Napoleon once said,
16   in war a blunder is worse than a
17   crime.  Of course, we're not involved
18   in a war here, so Colonel Evanko it's
19   not an allegation that you've
20   violated this regulation, but you
21   believe that Captain Ober has?
22   A.     Yes.
23   Q.     Okay.  How do you think he
24   violated it?  Last question, quite
25   frankly, that's the last question I

321

```
 1   have for you.  How do you think he
 2   violated it?
 3   A.     I just think the verbiage
 4   tends to indicate a member violated
 5   it, would be consistent with my
 6   recollection of what he told me.
 7   Q.     Okay.  Sir, I can't --- tell
 8   you what, give me one minute to
 9   double-check with my client and I
10   think I may be done.
11              ATTORNEY BAILEY:
12              Are you going to have
13         any questions, Syndi?
14              ATTORNEY GUIDO:
15              Probably not.
16              ATTORNEY BAILEY:
17              Sir, my client tells me
18         that we're clear to go.  I'd
19         like to thank you very much
20         for your cooperation here
21         today.  I realize being a
22         witness is uncomfortable and I
23         appreciate your courtesy.
24         Thank you.
25   A.     You're welcome.
```

322

1      <u>ATTORNEY GUIDO:</u>

2           We don't have any

3      questions.  I was just

4      clarifying we don't have any

5      questions.

6           <u>MR. SOLOMON:</u>

7           4:08 p.m.  The

8      deposition is now concluded.

9           <u>VIDEOGRAPHER:</u>

10          It is now 4:10 p.m. and

11     the deposition of Commissioner

12     Evanko is now concluded.

13          * * * * * * *

14     DEPOSITION CONCLUDED AT 4:10 P.M.

15          * * * * * * *

16

17

18

19

20

21

22

23

24

25

1  COMMONWEALTH OF PENNSYLVANIA)

2  COMMISSIONER OF DEEDS        )

3              C E R T I F I C A T E

4      I, Jennifer P. Billstein, Commissioner of Deeds

5  for the Commonwealth of Pennsylvania, do hereby

6  certify:

7      That the witness was first duly sworn to testify

8  to the truth, the whole truth, and nothing but the

9  truth; that the foregoing deposition was taken at the

10  time and place stated herein; and that the said

11  deposition was taken stenographically by me and

12  reduced to typewriting, and constitutes a true and

13  correct record of the testimony given by the witness.

14      I further certify that the reading and signing

15  of said depositions were (not) waived by counsel for

16  the respective parties and by the witness.

17      I further certify that I am not a relative,

18  employee or attorney of any of the parties, nor a

19  relative or employee of counsel, and that I am in no

20  way interested directly or indirectly in this action.

21      IN WITNESS WHEREOF, I have hereunto set my hand

22  and stamp this _22_ day of _April 2002_ .

23

24       _Jennifer Billstein_

25

JENNIFER P. BILLSTEIN
Commissioner Of Deeds
Commonwealth of Pennsylvania
My Commission Expires Jan. 4, 2006

· PITTSBURGH, PA                                    PHILADELPHIA, PA
  · CLEARFIELD, PA        · ERIE, PA       SARGENT'S       · SOMERSET, PA
                                        COURT REPORTING
  · STATE COLLEGE, PA     · OIL CITY, PA    SERVICE, INC.   · INDIANA, PA   · WILKES-BARRE, PA
                                          210 Main Street   · GREENSBURG, PA
  · HOLLIDAYSBURG, PA     · HARRISBURG, PA  Johnstown, PA  15901

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

DATE:              October 19, 1999

SUBJECT:           **Specialized Training Opportunity – School of Police Staff and Command**

TO:                Director, Bureau of Personnel

FROM:              Captain Darrell G. Ober

Reference:    (a)    Special Order 99-102, dated October 7, 1999.

Enclosure:    (1)    Resume of Qualifications.

1.    I request to be considered for the Subject training.

2.    The requested information is as follows:

      a.    `RANK:      Captain.
      b.    DOB:       November 16, 1957.
      c.    DOE:       July 20, 1981.
      d.    DOR:       March 3, 1995.

3.    Enclosure (1) is a resume of my qualifications.

Exhibit 1
JB 3/27/02

*John Joyce*
*NSA*

1237

* Probably wasn't briefed — didn't get her until June
1st - surfaced Jan 92 - IM notified, kept dark — drive set aside
until Oct 95 - took a run at it - political corruption case
pointer to influence $ pointers — a Tpr Station

* CJ Station appalled him — I can say you look for this

turned over tapes + conversations to Obra — Source went to Rep a
nothing happened - Obra concerned about going anywhere w/ info -
~~Washington, Washington closed~~ - are declined federal prosecution — we dispatched
TO P5P
whatever criteria — looks like Station is bad - nothing systemic —
nobody, but Station mentioned — appealed 3 1/2 years

Major Williams to see you  —  Sort things out

act 2 him & Bettino

Exhibit-2
JR 3107...

FBI Rick Morgan    Pittsburgh SAC
412 456 9110    MAY/20/99    my pager
1-800-533-2202

1. [illegible] told us recently that we (PSP) were the subject of an FBI investigation into "selling DL posters" (or some other corruption allegation) since Oct 98)

ASK Charlotte 1½ yrs    [illegible]

1200
out 7 where - what office?
[illegible] plead ignorance
Sometime ago seem to remember
was a case agent a specific Trooper
was [illegible] w/ David

2. Was I a subject of an investigation or any of L. Col's
if you were should have been told - [illegible]
no - I vaguely remember something about a investigation
w/ local authorities + [illegible]
not familiar w/this
get back to you

J-501X (9-86)

COMMONWEALTH OF PENNSYLVANIA

**DATE:**      November 1, 1999

**SUBJECT:**   Northwestern University Traffic Institute

**TO:**        Captain Darrell G. Ober
               Bureau of Technology Services

**FROM:**      Lt. Colonel Thomas K. Coury *TKC*
               Deputy Commissioner of Administration


1.      Thank you for your interest in attending the Northwestern University Traffic Institute, School of Police Staff and Command, which is being hosted by the New Jersey State Police. Your request was not received in the Bureau of Personnel by the October 22, 1999, deadline. Your request was received on October 28, 1999, and a selection was already made.

2.      The Department has selected Lt. Timothy J. Allue and Sgt. Timothy J. McDonald to attend the session.

3.      Your desire to improve your managerial skills is indicative of your sound commitment to the established goals and objectives of our Department. Should a similar course be offered in the future, I hope you will again express an interest in attending.

Exhibit J

FR 1-1
3/25/92

1.15  HOLDING OFFICE IN LIQUOR ESTABLISHMENT

Members shall not own, hold office in, or be employed by an
organization or establishment licensed by the Pennsylvania
Liquor Control Board to dispense alcoholic beverages within
the Commonwealth without the approval of the Commissioner nor
shall they do so in any other state.

1.16  REQUIRED RESIDENCY

Members shall reside within the limits of the Commonwealth
and shall maintain a telephone in such residence. Any change
of address or telephone number shall be reported in accor-
dance with AR 4-2.

1.17  REPORTING OF INFORMATION

A.  Members shall report to their supervisor all information
that comes to their attention concerning organized
crime, racketeering, vice conditions or violations of
any laws concerning such activities.

B.  Members shall promptly report to their supervisor any
information which comes to their attention and which
tends to indicate that any other member or employe has
violated any law, rule, regulation or order.

1.18  INTERFERENCE WITH INVESTIGATIONS ASSIGNED TO OTHER MEMBERS

Members shall not interfere with an investigation assigned to
another member for investigation without the consent of the
assignee, except by order of their supervisor; nor shall they
interfere with the operation of any Bureau, Division, Section
or Unit.

1.19  INTERVENTION IN ARREST OR PROSECUTION

Members shall not intervene or interfere in any lawful arrest
or prosecution brought by another member of the Department or
by any other agency or person.

1.20  INTERFERENCE WITH DISCIPLINE

Members shall not exert, or attempt to exert, any influence
on any of the participants in any disciplinary procedure,
except as expressly provided by regulation.

-7-

Exhibit 4

JB 3/27/02

24

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

DARRELL G. OBER,          *

    Plaintiff          *     Case No.

    vs.               *     1:CV-01-0084

PAUL EVANKO,              *

MARK CAMPBELL,            *

THOMAS COURY,             *     *ORIGINAL*

JOSEPH WESTCOTT,          *

HAWTHORNE CONLY,          *

    Defendants         *

            * * * * * * * *

VIDEOTAPED DEPOSITION OF

LIEUTENANT COLONEL ROBERT HICKES

MARCH 25, 2002

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

Sargent's Court Reporting Service, Inc.

(814) 536-8908

CASE

2

```
 1            VIDEOTAPED DEPOSITION

 2                    OF

 3   LIEUTENANT COLONEL ROBERT HICKES,

 4   taken on behalf of the Defendants

 5   herein, pursuant to the Rules of

 6   Civil Procedure, taken before me, the

 7   undersigned, Melissa L. Charlton, a

 8   Court Reporter and Notary Public in

 9   and for the Commonwealth of

10   Pennsylvania, at the offices of

11   Strategic Development, 2629 Market

12   Place, Harrisburg, Pennsylvania, on

13   Monday, March 25, 2002, beginning at

14   9:25 a.m.

15

16

17

18

19

20

21

22

23

24

25
```

3

1              A P P E A R A N C E S

2

3    DON BAILEY, ESQUIRE

4    4311 North 6th Street

5    Harrisburg, PA  17110

6         COUNSEL FOR PLAINTIFF

7

8    SYNDI L. GUIDO, ESQUIRE

9    Deputy General Counsel

10   Governor's Office of General Counsel

11   333 Market Street, 17th Floor

12   Harrisburg, PA  17101

13        COUNSEL FOR DEFENDANTS

14

15   BARBARA L. CHRISTIE, ESQUIRE

16   Chief Counsel

17   Pennsylvania State Police

18   1800 Elmerton Avenue

19   Harrisburg, PA  17110

20        COUNSEL FOR DEFENDANTS,

21        PENNSYLVANIA STATE POLICE

22

23

24

25

4

1                A P P E R A N C E S

2                   (Continued)

3

4    JOANNA N. REYNOLDS, ESQUIRE

5    Assistant Counsel

6    Pennsylvania State Police

7    1800 Elmerton Avenue

8    Harrisburg, PA  17110

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                        I N D E X

2

3    WITNESS:   LIEUTENANT COLONEL ROBERT

4                 HICKES

5

6    DISCUSSION AMONG PARTIES        8  -  14

7    EXAMINATION

8        by Attorney Guido          14  -  93

9    EXAMINATION

10       by Attorney Bailey         94  -  164

11   RE-EXAMINATION

12       by Attorney Guido          164  -  183

13   RE-EXAMINATION

14       by Attorney Bailey         183  -  194

15   CERTIFICATE                          196

16

17

18

19

20

21

22

23

24

25

6

1                    E X H I B I T   P A G E
2
3                                        P A G E
4   N U M B E R    D E S C R I P T I O N      I D E N T I F I E D
5      1          5 / 1 8 / 9 9
6                 Correspondence          6 1
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7

<u>OBJECTION PAGE</u>

<u>ATTORNEY</u>                                          <u>PAGE</u>

Bailey            39, 64, 65, 66, 67, 67,

                  68, 69, 72, 168, 171, 173,

                                          175


Christie              107, 187, 188, 189

8

1          P R O C E E D I N G S

2    OFF VIDEOTAPE

3    OFF RECORD DISCUSSION

4    ON VIDEOTAPE

5              VIDEOGRAPHER:

6              My name is Michael

7        Solomon.  I am employed by

8        Sargent's Court Reporting

9        Services.  The date today is

10       March 25th, 2002.  The time is

11       approximately 9:25 and this

12       deposition is being taken at

13       2629 Market Place, Harrisburg,

14       Pennsylvania.

15              Case number

16       1:CV-01-0084, Darrell G. Ober,

17       Plaintiff, versus Paul Evanko,

18       Mark Campbell, Thomas Coury,

19       Joseph Westcott, Hawthorne

20       Colony, Defendants.  The name

21       of the witness is Robert

22       Hickes.  Will the attorneys

23       present state your names and

24       the parties that you

25       represent?

9

 1          ATTORNEY GUIDO:

 2          Syndi Guido,

 3    Defendants.

 4          ATTORNEY CHRISTIE:

 5          Barbara Christie, Chief

 6    Counsel, Pennsylvania State

 7    Police.

 8          ATTORNEY REYNOLDS:

 9          Joanna Reynolds,

10    Assistant Counsel,

11    Pennsylvania State Police,

12    Defendant.

13          ATTORNEY BAILEY:

14          Don Bailey.  I

15    represent the Plaintiff,

16    Darrell G. Ober, 4311 North

17    6th Street, Harrisburg,

18    Pennsylvania  17110.

19    717-221-9500.

20          VIDEOGRAPHER:

21          The Court Reporter may

22    now administer the oath.

23          ATTORNEY GUIDO:

24          Before we get to that,

25    Barbara had some things she

10

1    wanted to put on the record.

2         ATTORNEY CHRISTIE:

3         Yes.  Counsel, I just

4    wanted to note for the record

5    that Lieutenant Colonel Coury

6    is here and present pursuant

7    to our continuing offer.  And

8    I believe I sent you a letter

9    to this effect on Friday to

10   make Colonel Coury available

11   for what you stated on March

12   the 12th was another hour of

13   deposition.  That was the date

14   on which Colonel Coury, to my

15   recollection, about 3:15 in

16   the afternoon.  We wished to

17   go straight through.  You had

18   other commitments.  You left

19   at approximately --- I think

20   we adjourned at approximately

21   10:05.  You indicated you may

22   need another hour of

23   Lieutenant Colonel Coury and

24   at one point had indicated

25   that you would be amendable to

11

1    completing Colonel Coury's

2    deposition, to my

3    recollection, today.  Hearing

4    nothing from you on the letter

5    on Friday, Colonel Coury is

6    available here this morning,

7    along with Colonel Hickes, of

8    course, and we are willing to

9    seed one hour of our

10    deposition of Colonel Hickes

11    in order to complete Colonel

12    Coury's deposition.

13              ATTORNEY BAILEY:

14              Counsel, I'm used to

15    self-serving letters, with all

16    due respect to you, from

17    Defense attorneys and I'm also

18    used to posturing and I'm also

19    used to various and sundry

20    manipulations of the discovery

21    process for strategic purposes

22    and I will respond as follows.

23    I may need Lieutenant Colonel

24    Coury for more than an hour,

25    I'm really not sure.  And if

12

1      so, I will take the

2      appropriate amount of time or

3      I certainly will procure it.

4           I do have a written

5      response coming to the

6      communications that you FAXed

7      on Friday.  I am not prepared

8      to do Lieutenant Colonel Coury

9      today.  We are doing a --- for

10     some time, as you know, we've

11     had Lieutenant Colonel Robert

12     C. Hicks scheduled and I'll

13     work with you to the extent

14     that I can, on getting the

15     continuing deposition of

16     Colonel Coury scheduled.

17     We've stated our positions.

18     I'm not prepared to do Mr.

19     Coury right now and I would

20     suggest that we move along.

21           ATTORNEY CHRISTIE:

22           Again, we just wanted

23     to note our continuing offer

24     for the record based upon your

25     estimate on Friday that you

13

1   needed Colonel Coury for

2   another hour.

3           ATTORNEY BAILEY:

4           Yeah.  Well, it was

5   - - -.

6           ATTORNEY CHRISTIE:

7           Okay.  So here - - -

8   we've been here.  We're

9   willing to offer another hour.

10          ATTORNEY BAILEY:

11          Counsel, you're wasting

12  - - -.

13          ATTORNEY CHRISTIE:

14          Colonel Hickes, if I

15  may finish, is gracious enough

16  to defer to Colonel Coury for

17  an hour of that deposition.

18          ATTORNEY BAILEY:

19          There's no - - -.

20          ATTORNEY CHRISTIE:

21          We just want the record

22  to show that pursuant to what

23  we thought was an

24  understanding we do have

25  Colonel Coury here, but I hear

14

1          your response.

2               ATTORNEY BAILEY:

3               I think it's wonderful

4          that you have Colonel Coury

5          here.  I always like to see

6          him and Colonel Coury, I'm

7          happy to see you today.  I'm

8          wondering now if we could

9          begin with Mr. Hickes, if you

10         don't mind.

11   OFF RECORD DISCUSSION

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

13   ROBERT HICKES, HAVING FIRST BEEN DULY

14   SWORN, TESTIFIED AS FOLLOWS:

15   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

16   EXAMINATION

17   BY ATTORNEY GUIDO:

18   Q.     Lieutenant Colonel, would you

19   state your name for the record and

20   your current position with the State

21   Police?

22   A.     My name is Robert Clare

23   Hickes.  I'm deputy commissioner of

24   staff for the Pennsylvania State

25   Police.

15

1   Q.     And is your rank lieutenant

2   colonel?

3   A.     Yes, it is.

4   Q.     How long have you been

5   appointed to your current position?

6   A.     I was appointed to my current

7   position in October of 1998, I

8   believe.

9   Q.     Do you remember the exact

10  date?

11  A.     The first or the third, I'm

12  not positive.

13  Q.     The first or the third of

14  October?

15  A.     Correct.

16  Q.     And you said that you're a

17  deputy commissioner.  Are all of the

18  lieutenant colonels in the State

19  Police deputy commissioners?

20  A.     Yes, they are.

21  Q.     Or can you be a deputy

22  commissioner and not be a lieutenant

23  colonel?

24  A.     I don't know.  Obviously

25  things change, but during my tenure,

16

1   all deputy commissioners have been
2   lieutenant colonels.
3   Q.      I just wondered if the title
4   goes hand in hand with being the
5   deputy commissioner because if I'm
6   not mistaken, you were a deputy
7   commissioner before.
8   A.      Yes, I was.
9   Q.      So I'm just trying to get to
10  the explanation of the gap that one
11  time you were a lieutenant colonel.
12  A.      Okay.
13  Q.      And then you were a major; is
14  that right?
15  A.      Yes.
16  Q.      And then a lieutenant colonel?
17  A.      Yes.
18  Q.      Okay.  When were you a
19  lieutenant colonel previously?
20  A.      I was lieutenant colonel from
21  1991.  I was in an acting capacity
22  from January to April and then I was
23  appointed by Governor Casey to be a
24  lieutenant colonel --- or deputy
25  commissioner of operations from April

17

1   of 1991 until December of 1994. At

2   the end of the administration, I

3   requested permission to revert to my

4   previous rank, which was major, and

5   then I was acting deputy commissioner

6   of operations until a new deputy

7   commissioner was appointed. And I

8   believe that was February of 1995.

9   Q.      Is that because at the level

10  of command staff, being a deputy

11  commissioner, those are pretty much

12  gubernatorial decisions?

13  A.      Yes, a deputy commissioner is

14  appointed by the governor. Yes.

15  Q.      So as governor's change, that

16  wouldn't be any reflection on you, it

17  would just be that as the governor

18  changed, they change the deputy

19  commissioner sometimes?

20  A.      They sometimes do. The reason

21  for dropping back is more of a

22  benefits issue. Up to and including

23  the rank of major within the State

24  Police is a member of the PSTA

25  bargaining unit. And retirement from

18

1    the bargaining unit affects your

2    benefits, if you retired from the

3    bargaining unit or not.

4    Q.    I see.  When you were a deputy

5    commissioner previously, I think you

6    said starting in 1991, was I right?

7    A.    Yes.

8    Q.    You said it was operations?

9    A.    Yes.

10   Q.    What does the deputy

11   commissioner of operations do?

12   A.    He has a command

13   responsibility for the field forces

14   of the Pennsylvania State Police,

15   which is the troops and area

16   commanders, as well as the Bureaus of

17   Liquor Enforcement, Criminal

18   Investigation, Patrol and Drug Law

19   Enforcement.  Currently, he also has

20   the Bureau of Emergency and Special

21   Operations also.  I did not when I

22   was there.

23   Q.    You did not have the Bureau of

24   Emergency?

25   A.    No.

19

1    Q.      Did you have any involvement

2    with the State Police Academy in

3    capacity as the deputy commissioner

4    of operations?

5    A.      No, I did not.

6    Q.      Have you ever had any

7    involvement with the ---

8    responsibilities that would relate to

9    the State Police Academy?

10   A.      Yes, they have.

11   Q.      When was that?

12   A.      1987 to very early in 1988.

13   Q.      And what was your role?

14   A.      I was the director of Bureau

15   of Training and Education.

16   Q.      The director of the Bureau of

17   Training and Education, who do they

18   report to?

19   A.      Currently, they report to the

20   deputy commissioner of

21   administration.

22   Q.      Was that the case back when

23   you were a deputy commissioner as

24   well?

25   A.      In 1987, I don't believe we

20

1    had a deputy commissioner of

2    administration yet.  That

3    organizational change came a little

4    later and at that time they would

5    have reported to the chief of staff.

6    Q.    When you were a deputy

7    commissioner the first time, were you

8    ever a deputy commissioner of

9    administration?

10   A.    No, I was not.

11   Q.    And are you the deputy

12   commissioner of administration now?

13   A.    No, I'm the deputy

14   commissioner of staff.

15   Q.    Have you ever been deputy

16   commissioner of administration?

17   A.    No, I have not.

18   Q.    Have you ever been deputy

19   commissioner of operations?

20   A.    Yes, I have.

21   Q.    And when was that?

22   A.    1991 to 1995.

23   Q.    You've got to bear with me.

24   A.    I'm okay.

25   Q.    It's a complicated history.

21

1    And since you've been deputy

2    commissioner since October 1998, have

3    you always been the deputy

4    commissioner of staff?

5    A.     Yes.

6    Q.     What does the deputy

7    commissioner of staff do?

8    A.     My responsibilities include

9    the Bureaus of Staff Services, Bureau

10   of Forensic Services, Bureau of

11   Research and Development, Bureau of

12   Technology Services and the Bureau of

13   Records and Identification.  The

14   staff function within the

15   Pennsylvania State Police are those

16   entities that support the field and

17   administrative functions in the

18   various capacities, whether it's

19   facilities, fleet management, the

20   fiscal responsibilities, maintenance

21   of the records, those kinds of things

22   with the Department.

23   Q.     What does the deputy

24   commissioner for operations do?

25   A.     He's responsible for the field

22

1   forces of the Pennsylvania State
2   Police, as well as the Bureaus of
3   Patrol, Criminal Investigation,
4   Liquor Enforcement, Drug Law
5   Enforcement and Emergency and Special
6   Operations.
7   Q.      The Bureau of Professional
8   Responsibility, where does that fit
9   into the scheme of things?
10  A.      The personnel-related issues
11  fall under the deputy commissioner of
12  administration and that would be the
13  Bureau of Professional
14  Responsibility, the Bureau of
15  Training and Education, the Bureau of
16  Human Resources and the Office of ---
17  don't quote me on that one, and I'm
18  not sure whether the Office of Equal
19  Employment falls under the deputy of
20  administration or directly under the
21  commissioner.  I'd have to look at a
22  table of organization.
23  Q.      In October of 1998, who was
24  the deputy commissioner of
25  administration?

23

1   A.        In October of 1998, Lieutenant
2   Colonel Coury was the deputy
3   commissioner of administration.
4   Q.        Who is the current deputy
5   commissioner of administration?
6   A.        Lieutenant Hawthorne Conly.
7   Q.        How long have you known the
8   Plaintiff, Capitan Ober?
9   A.        I've been aware of Captain
10  Ober, I believe, since he was a
11  corporal on the job.  He was assigned
12  to the Bureau of Research and
13  Development, I believe.
14  Q.        If you said the year, I didn't
15  catch it.
16  A.        I have no idea what the year
17  was.  I would have to be speculating
18  at this point that it would be in the
19  1988, '89, '90 time frame.
20  Q.        Late '80s, early '90s?
21  A.        Yeah.
22  Q.        Can you describe that
23  relationship?  In other words, is it
24  a personal relationship, a
25  professional relationship or some of

24

1  both?

2  A.      It's a professional

3  relationship.

4  Q.      I think you said the Bureau of

5  Technology Services falls under the

6  deputy commissioner of staff;

7  correct?

8  A.      Yes, it does.

9  Q.      And in that capacity you would

10  be familiar with the IIMS project?

11  A.      Yes, I am.

12  Q.      What is the IIMS --- what's it

13  stand for?

14  A.      IIMS is incident information

15  management system.

16  Q.      Can you explain what that is?

17  Basically just explain the project.

18  A.      The Department had a strategic

19  plan prepared by KPMG to view our

20  processes and determine, of course,

21  for solving a lot of business

22  processes for the Department.  IIMS

23  is the result of that plan, which

24  should modernize and streamline the

25  business processes of the Department

25

1    as it deals with a patrol trooper.

2    And the IIMS will centralize our

3    dispatch function, put a records

4    management system in place, put

5    mobile data terminals in the patrol

6    cars for troopers, and in essence

7    take the aspects of investigation,

8    evidence gathering --- information

9    gathering and apply technology to

10   solve the problem so that troopers

11   can work more efficiently and

12   effectively.

13   Q.      Can you give me an example of

14   the kind of program that might be

15   solved through the IIMS?

16   A.      Currently in a paper-based

17   system, if a trooper investigates an

18   incident, he may be required to fill

19   out multiple reports for that.  An

20   example might be a car theft that he

21   has a vehicle report.  He may have a

22   vehicle recovery report and he held

23   an incident report.  He'll have

24   evidence.  IIMS will allow him to do

25   the investigation, enter the

26

1   information one time into the records

2   management system and then the

3   records management system will

4   populate the various reports so that

5   he doesn't have to have duplicate

6   entries multiple times to continue to

7   do his work.

8   Q.     You said that this, I guess,

9   sprung from a strategic plan that was

10  prepared by KPMG?

11  A.     Yes.

12  Q.     When was that plan prepared?

13  A.     I believe that they were on

14  board with the Department in 1995.

15  I'm not certain when they finished

16  their strategic plan.

17  Q.     Do you know what prompted

18  having the strategic plan done?

19  A.     Yeah.  I think that the

20  evaluation of where we were as a

21  department and how we used technology

22  caused both Commissioner Evanko and

23  previous Commissioner Waulp

24  (phonetic) to believe that there were

25  more efficient and effective ways to

27

1  do that.

2  Q.     Had this analysis that was

3  done of the Department's processes,

4  et cetera, had that started under

5  Commissioner Waulp or did that start

6  new with the current administration?

7  A.     I believe Commissioner Waulp

8  started the --- at least had gone out

9  for contracting with KPMG and the

10 vendor was selected, but he left

11 shortly after the vendor was

12 selected.  I don't know whether they

13 had done any work or not.

14 Q.     Now, this IIMS project, is it

15 part of a larger project?

16 A.     IIMS is the larger project.

17 It's got a number of subsets.

18 Q.     Can you identify some of those

19 subsets for me?

20 A.     A subset would be the mobile

21 data computing that puts terminals in

22 the patrol cars for the officers to

23 use.  A subset would be the records

24 management system.  A subset would be

25 the centralization of the dispatch

28

1    function.  And with that would come

2    computer aided dispatch and automatic

3    vehicle locator and the technologies

4    that go with consolidated dispatch.

5    Q.      So those are all basically

6    smaller projects within a larger

7    project ---

8    A.      Called IIMS.

9    Q.      --- called IIMS.

10   A.      Yes.

11   Q.      How long --- I mean, the IIMS

12   project, is that still ongoing or is

13   it complete?

14   A.      It's still ongoing.

15   Q.      Do you have an estimated time

16   that it will be actually done, the

17   whole thing?

18   A.      The phase II contracting is

19   underway right now.  Part of the

20   phase II contracting is to have the

21   vendor provide their reasonable

22   effort for when this would be

23   completely finished.  At the outside,

24   I would say that it would be about 42

25   months, but it should be shorter than

29

1    that.

2    Q.      For phase II?

3    A.      To be completely finished.

4    Q.      And how many phases will there

5    be totally to the project?

6    A.      Two.

7    Q.      Two phases?

8    A.      Yes.

9    Q.      What was phase I?

10   A.      Phase I was the detailed

11   design.

12   Q.      Can you elaborate for me?  I'm

13   sort of technologically impaired.

14   A.      The detailed design, Lockheed

15   Martin was the successful vendor on

16   the IIMS contract.  Phase I provided

17   that they would --- they and their

18   consortium would do a detailed design

19   of how the various components would

20   be designed and then integrated.  And

21   that's it.

22   Q.      The various components, are

23   you talking about those different ---

24   the smaller projects we're talking

25   about?

30

1  A.      Yes.

2  Q.      And so for the whole project

3  to be completed through phase II will

4  be at least three or four more years

5  from now?

6  A.      Possibly three or four more

7  years.

8  Q.      During these two phases of the

9  project, have there been a lot of

10  different members of the State Police

11  organization that have rotated in and

12  out of assisting with the project?

13  A.      There has been some rotation

14  in and out of the project, yes.

15  Q.      And as the project is being

16  completed, will that rotation in and

17  out continue to occur?

18  A.      It's possible that there could

19  be additional rotations in and out.

20  Q.      At one point I believe Captain

21  Ober, since it's part of this

22  lawsuit, Captain Ober was part of the

23  IIMS project.  Can you explain what

24  his role was in the project?

25  A.      His role was a team leader for

31

1  the request for qualified quotation

2  for the vendors that were under

3  evaluation to be the system's

4  integrator.

5  Q.      Request for qualified R ---?

6  A.      RFQC contract or request for

7  qualified contract.

8  Q.      Okay.  Can you explain what

9  that process is?

10  A.     That's a rather in-depth

11  evaluation of the corporate bidders

12  for the contract to determine which

13  bidder submits the most comprehensive

14  beneficial package for the

15  Commonwealth.

16  Q.      So the end result of that is

17  that, that portion of the program,

18  would be that a vendor would be

19  selected to be the system's

20  integrator?

21  A.      Correct.

22  Q.      And that, I think you said,

23  was Lockheed Martin?

24  A.      Correct.

25  Q.      And Captain Ober's assignment

32

1    to the IIMS project was solely to

2    accomplish that phase, selection of

3    system integration; is that correct?

4    A.      Correct.

5    Q.      Do you know how he was chosen

6    for that role?

7    A.      The commissioner chose him for

8    that role.

9    Q.      Did you have any input in that

10   at all?

11   A.      The commissioner asked whether

12   I was agreeable to Captain Ober being

13   the team leader on the RFQ.  I had

14   right of denial, I suppose.

15   Q.      Okay.  Now, in his lawsuit

16   Captain Ober has indicated that this

17   is a $100 million project that has

18   suffered greatly and cost the

19   taxpayers a lot more money because he

20   was transferred into another

21   position.  That particular portion,

22   the system's integrator portion of

23   the project, that part wasn't a $100

24   million project; was it?

25   A.      The overall project is going

33

1  to cost over $100 million.  Lockheed

2  Martin and the systems integrator

3  have the responsibility for bringing

4  that all together.  So the nature of

5  the procurement in this particular

6  instance isn't that the Commonwealth

7  goes out and buys the various parts

8  and says to Lockheed Martin, here it

9  is, put it together, but that we

10  contract with Lockheed Martin, who is

11  then the prime contractor to assemble

12  the various parts that we've

13  identified need to be in this,

14  purchase them and assemble it.  So in

15  a large way, Lockheed Martin is

16  involved in over $100 million because

17  they become the prime.

18  Q.    But Captain Ober's team put

19  together the phase I design contract

20  and that totaled $8.8 million; is

21  that right?

22  A.    That's correct.

23  Q.    Did Captain Ober fulfill his

24  assignment with the IIMS project?

25  A.    Yes, he did.

34

1   Q.      And, in fact, he voted on the

2   final selection of Lockheed Martin;

3   is that right?

4   A.      Yes, I believe he did.

5   Q.      What role does Major Waugh

6   play in the IIMS project? His name

7   has come up a bunch, and so I thought

8   you'd be able to explain that for me.

9   A.      Major Waugh is the Director of

10  the Bureau of Technology Services.

11  And this project, because it's a

12  technology project is being

13  administered and led out of the

14  Bureau of Technology Services.  So he

15  had oversight responsibility for the

16  project generally and for members of

17  the project team specifically.

18  Q.      So the project team leaders,

19  do they report to Major Waugh?

20  A.      Yes, they would.

21  Q.      Directly?

22  A.      Yes.

23  Q.      And then Major Waugh would

24  report to you?

25  A.      Yes.

35

```
1   Q.      Ron Wilt, what role does he
2   play in the IIMS project?
3   A.      He's currently the project
4   manager for IIMS.
5   Q.      What does the project manager
6   do?
7   A.      Have you ever been a project
8   --- I'm sorry.
9   Q.      No, I haven't.  That's why I'm
10  asking you.
11  A.      The project manager has
12  responsibilities for all aspects of
13  the project, from scheduling to risk
14  mitigation to evaluating what the
15  Commonwealth wants and determining
16  that we, A, get what we want, and B,
17  get what we pay for.  He had
18  responsibilities, liaison
19  responsibilities with the various
20  vendors.  He's the point of contact
21  for vendors, so he's literally the
22  hub of the wheel on a project.
23  Q.      Is he a civilian or a member
24  of the State Police?
25  A.      He's a civilian employee with
```

36

1   the State Police.

2   Q.     Lieutenant Brian Acken, is he

3   involved in the IIMS project?

4   A.     Yes, he is.

5   Q.     And what role does he play?

6   A.     I'm not certain exactly what

7   Lieutenant Acken's title is.  His

8   responsibilities are to ensure that

9   the end product with IIMS satisfies

10  the needs of the enlisted members of

11  the Pennsylvania State Police.

12  Q.     Do you know when Lieutenant

13  Acken was brought into tech services?

14  A.     I don't recall, no.

15  Q.     Do you know whether that was

16  before or after Captain Ober was

17  there?

18  A.     I believe it would have been

19  after, but again, I'm not certain of

20  the dates.

21  Q.     And Lieutenant Acken, he has a

22  strong technological background; is

23  that right?

24  A.     He had been involved in the

25  computer crimes unit before and so he

37

1  does know technology pretty well.

2  Q.      Are you aware of any amounts

3  of money that --- in other words,

4  Captain Ober here has said that it

5  costs the taxpayers lots and lots of

6  money because --- and delay in

7  expense because he was taken off the

8  project.  Are you aware of any

9  expense to the taxpayers, et cetera,

10 that has come about because Captain

11 Ober has not been able to be on the

12 project?

13 A.      I'm not aware of any direct

14 expense, no.

15 Q.      And has the project continued

16 to move forward successfully?

17 A.      Yes.

18 Q.      And you're satisfied with the

19 direction in which it's going and the

20 work that's being complete, et

21 cetera?

22 A.      Yes, I am.

23 Q.      Now, as far as the --- I want

24 to talk to you about --- Captain Ober

25 has told us in the past that he had

38

1   applied for a position as the

2   legislative liaison when the former

3   legislative liaison left.  I'm trying

4   to remember that gentleman's name.

5   Captain Morris or something like

6   that.

7               ATTORNEY BAILEY:

8               Colonel Hickes, before

9        you respond, Syndi, perhaps we

10       should agree that we employed

11       stipulations in the past as to

12       objections being deferred,

13       except as to the form of the

14       question, until the time of

15       trial.  Do you agree with that

16       stipulation?

17              ATTORNEY GUIDO:

18              Yes.

19              ATTORNEY BAILEY:

20              Okay.  From time to

21       time, Colonel, I may object,

22       unless I state additional

23       information on the record, I

24       may say to you, objection, you

25       may continue.  So just give

39

1       --- and by the way, are you

2       representing him at this

3       deposition or is he here as a

4       freelancer?

5              ATTORNEY CHRISTIE:

6              He's being represented

7       as far as ---.

8              ATTORNEY GUIDO:

9              I mean, we represent

10      the whole command staff.

11             ATTORNEY BAILEY:

12             Well, I assume ---

13             ATTORNEY GUIDO:

14             I'm letting him go.

15             ATTORNEY BAILEY:

16             --- you've consulted

17      with him and talked with him

18      and that you represent him as

19      a witness here today.  And

20      that's all right.  I just note

21      an objection to the last

22      question, and you may respond,

23      sir.

24             ATTORNEY GUIDO:

25             Actually, since then,

40

1      Captain Brown was kind enough

2      to give me the name I was

3      looking for, which was Major

4      Richard Morris.

5   A.      And - - -.

6   BY ATTORNEY GUIDO:

7   Q.      Do you remember when he was

8   legislative liaison?

9   A.      I remember when he was

10  legislative liaison.  I think he's

11  been retired two or three years.

12  Q.      And did you know that Captain

13  Ober applied for the position as

14  legislative liaison when Major Morris

15  left?

16  A.      Yes, I did.

17  Q.      Can you tell me what you know

18  about Captain Ober's application for

19  that position?

20  A.      I believe at the time he was

21  still within the Bureau of Technology

22  Services and he submitted his

23  application through channels to the

24  commissioner.

25  Q.      Would you have been one of

41

1  those channels?

2  A.     Yes.  It would have gone, I

3  believe, to Major Waugh and then to

4  me.

5  Q.     From Major Waugh to you for

6  approval or disapproval or what would

7  your role be?

8  A.     The legislative liaison within

9  the Department works --- I believe it

10  reports to the commissioner.  So my

11  role would have been to pass it on.

12  I would ---.

13  Q.     Do you recommend one way or

14  the other to the commissioner whether

15  or not Captain Ober would be good for

16  that spot?

17  A.     I don't recall whether I put

18  an endorsement on it or not.

19  Q.     When you say put an

20  endorsement, what does that mean?

21  A.     Well, within the State Police,

22  correspondence, process and

23  endorsement.  On correspondence is

24  your opinion of it and/or just a note

25  of transmittal.  I don't know whether

42

1    I endorsed that one or not.

2    Q.      But you would have been able

3    to endorse it, if you wanted to?

4    A.      Sure.

5    Q.      That would be your choice?

6    A.      I could have if I wanted to.

7    Q.      Now, we know that it's already

8    been established that Captain Ober

9    told you about the FBI's

10   investigation into possible

11   corruption of the State Police

12   Academy on October 5, 1998.  Do you

13   recall that?

14   A.      I don't recall that it was

15   into the State Police Academy.  My

16   recollection was that it was into the

17   ability to have --- to get hired by

18   the State Police and circumvent the

19   hiring process.

20   Q.      How do you get hired by the

21   State Police?

22   A.      My best --- and I'm going to

23   tell you my best notion of this.  And

24   if I'm wrong in any way, it's because

25   I'm not from the Bureau of Human

43

1    Resources.  But one applies to the
2    Pennsylvania State Police, if they're
3    between the requisite age, they're a
4    resident of Pennsylvania and they
5    have the requisite education, then
6    there's an examination that's given
7    that places candidates on the list of
8    eligible.  Once they're placed on the
9    list of eligibles, they're required
10   to subsequently undergo polygraph
11   examination, a background
12   investigation.  I believe there's a
13   psychiatric investigation, but don't
14   quote me on that one.  And they
15   continue through this process until
16   the list gets dwindled down and then
17   the Bureau of Human Resources simply
18   goes down the list and picks the top
19   candidates and invites them to the
20   State Police Academy to begin
21   training.  I believe that's the way
22   it is currently.
23   Q.    And your understanding of the
24   FBI's investigation was that it was
25   looking into what part of that

44

1  process?

2  A.    My understanding was that they

3  had information that one could

4  circumvent that process and for an

5  amount of money, if you --- and at

6  the time, I believe, when they gave

7  the exam they were banding it.  In

8  other words, there was a band A of

9  the most eligible people and then a

10 band B of the next group of

11 eligibles.  I think initially that if

12 you paid money you could move from

13 band B to band A and if at anywhere

14 through the process you failed one of

15 these, either the physical testing or

16 the polygraph examination, money

17 could be paid to get that made to

18 look like you had passed.

19 Q.    Who figures out the banding?

20 A.    It's all done in the Bureau of

21 Human Resources.  Actually, it was

22 the Bureau of Personnel at the time,

23 test contractors.

24 Q.    Who's in charge of the Bureau

25 of Human Resources?

45

1   A.      Currently it's Linda Bonney.

2   Q.      Is she a civilian employee?

3   A.      Yes, she is.

4   Q.      Do you know if she was in

5   charge of it back in October of '98?

6   A.      I'm not certain.  Mr. Wayne

7   Dowling retired at some point in time

8   and I'm not sure who and when it ---.

9   Q.      It rings a bell for you,

10  though.  And he was a civilian

11  employee also?

12  A.      Yes, he was.

13  Q.      Okay.  The director of

14  personnel?

15  A.      Correct.

16  Q.      Who would he report to?

17  A.      He would have reported earlier

18  in his tenure to the chief of staff,

19  and then after the reorganization, to

20  the deputy commissioner of

21  administration.

22  Q.      Who was the chief of staff?

23  A.      Well, that predates all of

24  this and that was Colonel Nick

25  Dellarciprete.  And then upon his

46

1  retirement, I believe Frank Lynch was

2  chief of staff for a while.

3  Q.    But you said that there wasn't

4  a chief of staff at the time that

5  these events occurred in October of

6  '98?

7  A.    During Colonel Sharp's

8  administration, he did a

9  reorganization of the Department

10  which created the deputy commissioner

11  of administration and redistributed

12  roles and responsibilities.

13  Q.    Would that have gone back as

14  far, let's back up to say, 1994 in

15  the Waulp administration, was --- it

16  had already been changed by then?

17  A.    It had been changed by then,

18  yes.

19  Q.    And in the Waulp

20  administration, who would be director

21  of personnel have reported to?

22  A.    The deputy commissioner of

23  administration.

24  Q.    Do you know what role, if any,

25  the deputy commissioner of

47

1   administration plays in that process

2   that you've just described?

3   A.     I don't know.

4   Q.     Do you know what role, if any,

5   the deputy commissioner of operations

6   would play in that process?

7   A.     I don't know.

8   Q.     How about does the governor's

9   office have anything to do with that

10  process?

11  A.     Not that I know of.  I don't

12  know.

13  Q.     And do you know whether or not

14  the commissioner ever gets involved

15  in that?

16  A.     I don't know.

17  Q.     When Captain Ober talked to

18  you about the FBI's investigation on

19  October 5, 1998 you had just started

20  as deputy commissioner of staff; is

21  that right?

22  A.     Yes, I had.

23  Q.     Been there a day or two?

24  A.     What day of the week is the

25  fifth?

48

1    Q.      I believe it's a Monday?

2    A.      It would be my first day.  I

3    don't have the dates, but I think I

4    was notified of my appointment on a

5    Friday.

6    Q.      Do you recall Captain Ober

7    talking to you about the FB --- do

8    you recall when he first told you

9    about the FBI investigation?

10   A.      I recall him telling me about

11   it, yes.

12   Q.      Can you tell us about that

13   conversation that you had with him?

14   A.      I'm not certain exactly where

15   it took place.  It was in department

16   headquarters.  It may have been a

17   corridor conversation.

18   Q.      But it was face to face?

19   A.      Yes, it was face to face.

20   Captain Ober approached me about an

21   issue that he had had concerning the

22   FBI contacting him relative to this

23   information that one could buy one's

24   way onto the Pennsylvania State

25   Police.  He indicated to me that the

49

1   FBI had contacted him in confidence

2   and asked him not to reveal this

3   information to anyone else, that this

4   was a political corruption

5   investigation that they had been

6   investigation previously and that

7   this information had been a segment

8   of that that they had kind of allowed

9   to lie dormant for a while and then

10   they were tying up loose ends, if you

11   will and they wanted to continue this

12   investigation and that they had

13   needed information concerning the

14   process of how one does get hired

15   onto the Pennsylvania State Police

16   and that they did not know,

17   obviously, who might be involved in

18   this.  I believe the information that

19   the term colonel had been used and

20   that there were suspicions that it

21   may go to the Governor's office.

22   Q.    Now, the process, they needed

23   information about the process of

24   getting into the academy and that was

25   something that you weren't really

50

1  familiar with; is that right?

2  A.    This has changed over the

3  years, how one gets accepted onto the

4  Pennsylvania State Police.

5  Q.    At that time, did he mention

6  to you anything about Trooper

7  Stanton?

8  A.    I don't believe so, no.

9  Q.    I think you said --- backing

10 up, you mentioned that he said the

11 FBI said not to tell anyone else

12 about it.  Did you have any

13 discussion with him about why he

14 wasn't telling his major, the head of

15 the Bureau of Professional

16 Responsibilities?

17 A.    He indicated to me that he was

18 in a quandary about what to do and

19 who to tell on this, that it was

20 information that he felt was serious

21 enough that he should communicate it

22 to somebody but really wasn't sure,

23 based on the fact that the term

24 colonel had been used, wasn't sure

25 who he would be able to talk to.  And

51

1    he decided that I was the person he

2    should tell, because I had not been a

3    colonel and, other than in the

4    previous administration, hadn't been

5    there in a number of years, and

6    certainly wasn't in a position to

7    influence the hiring process.

8    Q.    What did he tell you about

9    what the FBI said about whether he

10   could tell anybody else within the

11   Department?

12   A.    He said that the FBI had asked

13   him for the strictest confidence and

14   that he had responded to the FBI that

15   he needed to tell someone and that

16   they had indicated that they would

17   let that up to him to do, but that it

18   was a very sensitive matter and that

19   he was to tell no one about this.

20   Q.    And your response to him was?

21   A.    I asked him whether they were

22   asking us to perform any

23   investigative tasks, or whether they

24   were just seeking background

25   information.  He indicated that it

52

```
 1    was background information only.  We

 2    discussed very briefly the remoteness

 3    of this probably being true, that it

 4    was probably not true because of the

 5    number of individuals that would have

 6    to be involved in it.  Then we kind

 7    of reasoned that technically there

 8    would only have to be like five or

 9    six, if they were the right

10    individuals.

11    Q.      Who were the five or six?

12                   ATTORNEY BAILEY:

13                   Please, he hadn't

14            finished.  I'd like to hear

15            the end of his question.

16    BY ATTORNEY GUIDO:

17    Q.      Can you clarify for me who the

18    five or six are and when you're

19    finished we'll go on?

20                   ATTORNEY GUIDO:

21                   Your objection is

22            noted.  He can finished his

23            question, after he's answered

24            mine.

25                   ATTORNEY BAILEY:
```

53

```
 1            No, no, no, look, you

 2     interrupted.  He was answering

 3     the question and, again, that

 4     is highly improper.  I want to

 5     hear the end of that ---

 6     that's an extremely ---.

 7            ATTORNEY GUIDO:

 8            No, it isn't.  It's

 9     noted, Mr. Bailey.

10            ATTORNEY BAILEY:

11            Noted my behind, ma'am.

12     No, it's not noted and I'm not

13     going to stop objecting.  He

14     was answering a question, a

15     very, very important one.  He

16     was in the middle of that

17     question.  You interrupted him

18     with another question.  Now, I

19     am respectfully requesting

20     that you allow him to answer

21     that question.  In fact, I'd

22     like to have it read back.

23     That's an extremely material

24     question in this lawsuit.  Are

25     you going to let it be read
```

54

1        back?

2                ATTORNEY GUIDO:

3                No, not until he's

4        answered my question who were

5        the five or six?

6                ATTORNEY BAILEY:

7                Counsel, let me tell

8        you --- let me put something

9        on the record right now.

10               ATTORNEY GUIDO:

11               Go ahead.

12               ATTORNEY BAILEY:

13               You interrupt this

14       witness one more time and

15       prevent him from answering a

16       material question, I am taking

17       my client and we are leaving

18       and we will go to the Judge.

19               ATTORNEY GUIDO:

20               That's fine.

21               ATTORNEY BAILEY:

22               Now, you are not

23       allowed to interrupt a

24       response to a question and

25       that was an extremely

55

1      important one.  I want him to
2      be allowed to finish.  I'm
3      going to let you get away with
4      it this time.  I respectfully
5      request --- I am asking that
6      you not do that again, you'll
7      disrupt this deposition and
8      you're going to destroy the
9      flow of information.  It sends
10     messages.  It's wrong.
11            ATTORNEY GUIDO:
12            If you chose to leave,
13     it's up to you.
14            ATTORNEY BAILEY:
15            He was answering ---
16     no, you're not allowed.
17            ATTORNEY GUIDO:
18            It's up to you, if you
19     leave.
20            ATTORNEY BAILEY:
21            No, ma'am, I'm not
22     allowed to do it either.
23            ATTORNEY GUIDO:
24            It's up to you if you
25     chose to leave.

56

1               ATTORNEY BAILEY:

2          I am telling you, I am

3      going to leave this deposition

4      if you do that again.

5               ATTORNEY GUIDO:

6          Well, that's your

7      choice.

8   BY ATTORNEY GUIDO:

9   Q.        Lieutenant Colonel, I've kind

10  of totally lost track now of what you

11  were responding to, but I believe you

12  were explaining that you and Captain

13  Ober had first thought that it was a

14  bunch of people that would have to be

15  involved and then narrowed it down to

16  if they were the right people, maybe

17  five or six people, and then perhaps

18  you were going to say something else,

19  I don't know.  But could you first

20  tell me like the five or six people

21  that you narrowed it down to and then

22  if there was something else you

23  wanted to add, feel free to do that.

24  A.        Technically, in my opinion at

25  the time, personnel --- the Bureau of

57

1    Personnel Cadet Processing Unit.  And

2    that would have been Rose Pollack and

3    Julie Farthing could be individuals

4    who --- I don't know whether anyone

5    looks at the list after they say

6    these or the cadets that are on it

7    and these are the people that should

8    start the academy and these are the

9    people we process.

10        I'm not sure what the

11   oversight is.  So obviously, those

12   two people in the cadet processing

13   unit, if there is oversight, then the

14   Director of the Bureau of Personnel

15   clearly could be someone that could

16   be involved.  And then obviously

17   someone ranked higher than them with

18   influence to have them manipulate

19   something could be someone that could

20   do this.  That could be the

21   commissioner or any of the deputies

22   or the Governor's office.

23   Q.       And was there something else

24   that you wanted to add?

25   A.       I recall that I, and this is

58

1  my recollection, I recall that I was

2  answering --- you were asking what

3  Captain Ober and I had discussed and

4  why he might not have gone to

5  Lieutenant Colonel Conly, actually

6  Major Conly at the time.  I don't

7  know, but he did ask me, what do I

8  do?  I mean, I've been sworn to

9  confidentiality.  I have a boss.  I'm

10  telling you.  This is supposed to be

11  a secret; what do I do?  And at that

12  I responded to Captain Ober, I hereby

13  direct you, I order you, not to

14  divulge this information to anyone

15  and made that --- placed that in the

16  form of an order.

17          ATTORNEY BAILEY:

18          Colonel, I didn't catch

19      the tail end of your response,

20      if you would be kind enough to

21      repeat it.

22  A.      As I said, Captain Ober was

23  concerned about his bosses and he had

24  come to me, which was outside of his

25  chain of command.  And I told him

Sargent's Court Reporting Service, Inc.
(814) 536-8908

59

1    that the FBI had requested

2    confidentiality, this was their

3    investigation and that I gave him a

4    direct order not to divulge the

5    information to anyone until they had

6    completed their investigation.

7                    ATTORNEY BAILEY:

8                    Thank you, sir.

9    BY ATTORNEY GUIDO:

10   Q.        When you were listing the five

11   or six people, the people that you

12   thought might be able to be involved

13   in the changing, the banding, et

14   cetera, would the Director of the

15   Bureau of Professional Responsibility

16   have any involvement in that process?

17   A.        Probably not.

18   Q.        And the Director of the Bureau

19   of Professional Responsibility was

20   then Major Conly?

21   A.        He had just gotten promoted,

22   yes.

23   Q.        And he would have been the

24   person that was the immediate

25   supervisor of Captain Ober?

60

1    A.    That's correct.

2    Q.    Now, you mentioned in your

3    response that you ordered Captain

4    Ober not to tell anybody else about

5    it. And then you mentioned that it

6    was because he had said that he was

7    sworn to you confidentiality. Was it

8    your understanding from Captain Ober

9    that the FBI had been explicit in

10   requesting that confidentiality?

11   A.    Yes, it was.

12   Q.    And that the FBI had been

13   explicit in asking him not to

14   disclose this information to other

15   people?

16   A.    Yes.

17   Q.    Did you ever personally speak

18   with anyone from the FBI about the

19   investigation?

20   A.    No, I did not.

21   Q.    Did you ever personally speak

22   with anyone from the FBI about the

23   need to keep this confidential from

24   other people within the State Police?

25   A.    No, I did not.

61

1    Q.      So is the bottom line

2    basically that you made your decision

3    about what to order Captain Ober to

4    do based on the facts as he

5    represented them to you?

6    A.      That's correct.

7    Q.      And you didn't have any

8    personal knowledge of whether the

9    facts that he told you were true or

10   weren't true; is that right?

11   A.      That's correct.

12                  ATTORNEY GUIDO:

13                  I'm going to ask

14              Captain Brown to be so kind as

15              to --- one for the witness and

16              there's one for Mr. Bailey.

17              If you could just have the

18              Court Reporter --- hand that

19              to the Court Reporter,

20              Colonel, and let her mark it

21              as Exhibit One.  Colonel, just

22              let her mark it and then you

23              can have it back.

24                  (Deposition Exhibit One

25                  marked for

62

1              identification.)

2  BY ATTORNEY GUIDO:

3  Q.    Okay.  Exhibit One, do you

4  recognize that document?

5  A.    Yes, I do.

6  Q.    And can you describe it for

7  me, identify it?

8  A.    It's correspondence from me to

9  the commissioner providing him facts

10 as I knew then to be, based upon his

11 request for this information, after

12 we disclosed to him that the FBI had

13 conducted the investigation.

14 Q.    And in your memo --- well,

15 just a moment ago I had asked you and

16 you had said that you didn't have any

17 personal knowledge, that this was all

18 based on what Captain Ober told you

19 in October 5.  Does your memo of May

20 18th, 1999 document what Captain Ober

21 told you?

22 WITNESS REVIEWS DOCUMENT

23 A.    Yes, it does.

24 BY ATTORNEY GUIDO:

25 Q.    Now, did --- I think you said

63

1  on that first meeting that Captain

2  Ober did not mention anything about

3  Trooper Stanton being involved?

4  A.    I don't believe that he did at

5  the time, no.

6  Q.    Do you know when he told you

7  about that?

8  A.    Our meetings weren't formal.

9  In fact, if I had occasion to talk to

10  the captain, I may inquire, you know,

11  has he heard anything.  At some

12  point, he raised the name Stanton as

13  being someone that had facilitated a

14  meeting or was involved in a meeting,

15  but I don't know when it was.

16  Q.    Did Captain Ober ever tell you

17  that Trooper Stanton had indicated

18  during the course of this

19  investigation that he knew people

20  that had bought their way into the

21  academy?

22  A.    Repeat the question, again.

23  Q.    Did Captain Ober ever tell you

24  that during the course of the FBI

25  investigation --- was he giving you

64

1    updates about the FBI investigation

2    at all?

3    A.    Yes, if something's

4    significant, yes he would.

5    Q.    So as part of those updates,

6    what I was wanting to know is whether

7    Captain Ober ever told you that

8    Stanton had said, during this FBI

9    investigation, that he actually knew

10   people who had bought their way into

11   the State Police academy?

12   A.    I believe he had.

13              ATTORNEY BAILEY:

14              Objection to the form

15        of the question.  You may

16        respond.

17   A.    I believe he did say that.

18   BY ATTORNEY GUIDO:

19   Q.    And did Captain --- excuse me.

20   A.    No.  Go ahead.

21   Q.    Did Captain Ober ever tell you

22   that the FBI gave him the names of

23   two people that had supposedly bought

24   their way into the academy and him go

25   check to see if they really were in

65

1    the academy?

2    A.      I'm not certain on that.

3    Q.      Do you know --- did Captain

4    Ober ever tell you any of his efforts

5    to find out more about the process of

6    getting into the academy?

7    A.      No, not that I recall.

8    Q.      Did he ever give you any

9    updates about what he may have told

10   the FBI about the process of getting

11   into the academy?

12   A.      Not that I recall.

13   Q.      Did Captain Ober ever mention

14   to you that when the FBI spoke with

15   him that they left it completely up

16   to him who to tell the State Police

17   about this information?

18   A.      My recollection ---.

19                   ATTORNEY BAILEY:

20                   Objection to the form

21           of the question.  Sir, you may

22           respond.

23   A.      My recollection of the

24   conversation is that he indicated

25   that he needed to tell someone else

66

1  and they said they would leave it to

2  him, if that answers your question.

3  BY ATTORNEY GUIDO:

4  Q.      Well, did he ever tell you

5  that they really didn't care who he

6  told within the State Police?

7  A.      No.

8              ATTORNEY BAILEY:

9              Let me note the witness

10      has a tendency to answer

11      questions very, very quickly,

12      which is fine, no problem,

13      sir.  But I would like to note

14      an objection to the previous

15      question.

16  BY ATTORNEY GUIDO:

17  Q.      Did you know that it was

18  Captain Ober who suggested to the FBI

19  that a lieutenant colonel would have

20  to be involved in order to have

21  something like that occur?

22  A.      No.

23  Q.      We've already established, in

24  a prior deposition with the FBI, that

25  it was on October 13th, 1998 that a

67

1    wire tap --- first time the word

2    colonel was used on a wire tap and

3    that that was actually lieutenant

4    colonel, rather than colonel.  Did

5    you know that the FB ---?

6                    ATTORNEY BAILEY:

7                    Let me place an

8            objection to the

9            characterization of testimony

10           and let me place an objection

11           on the record to the question.

12   BY ATTORNEY GUIDO:

13   Q.        Did you know, with that in

14   mind, did you know that the FBI agent

15   had not even picked up on the use of

16   the word lieutenant colonel on that

17   tape, until it was pointed out to

18   them by Captain Ober?

19                   ATTORNEY BAILEY:

20                   Objection to the

21           characterization of testimony.

22           Objection to the lack of

23           foundation.  Objection to the

24           form of the question.  You may

25           respond, sir.

68

1    A.      No.

2    BY ATTORNEY GUIDO:

3    Q.      Did you ever know, through the

4    FBI or through Captain Ober, that

5    prior to speaking to Captain Ober

6    about the FBI investigation, the FBI

7    agents had already talked to people

8    within the organized crime section

9    about the investigation?

10   A.      No.

11   Q.      Did you know that they had

12   already talked to someone out in the

13   western internal affairs office about

14   the investigation?

15   A.      No.

16   Q.      Again, you were operating

17   under the premise that the FBI had

18   specifically asked Captain Ober for

19   no one else in the State Police to

20   know about this; is that correct?

21   A.      Correct.

22   Q.      And if, in fact, that was not

23   the case, would your advice to

24   Captain Ober have been the same?

25                  ATTORNEY BAILEY:

69

1              Objection.  You may
2         respond, sir.
3   A.       You need to --- if what was
4   not the case.
5   BY ATTORNEY GUIDO:
6   Q.       In other words, if you knew,
7   at about the time that Captain Ober
8   came to you, if you had known that
9   the FBI agent had already gone to the
10  organized crime unit and said, we
11  have this investigation into people
12  that might be able to buy their way
13  into the academy, can you imagine how
14  something like this happened and they
15  had a whole discussion about it.  And
16  if the people had said, well, you
17  better go tell, you know, the Bureau
18  of Professional Responsibility, they
19  can help you out, would your advice
20  have still been the same to Captain
21  Ober about not telling anybody else,
22  not telling his major?
23              ATTORNEY BAILEY:
24              Objection to the form
25         of the question.  You may

70

1           respond.

2    A.        Confidentiality is prefaced on

3    the fewest number of people knowing

4    about it as possible.  If the

5    information were already fairly

6    widely disseminated or at least

7    disseminated by them to a wider

8    audience, then there would have been

9    less need for confidentiality.

10   BY ATTORNEY GUIDO:

11   Q.        And that might have changed

12   what your decision process was?

13   A.        It might have, yes.

14   Q.        Okay.  So you were basing your

15   decision on what Captain Ober told

16   you?

17   A.        Correct.

18   Q.        Now, did you know that Captain

19   Ober met with the FBI in Indiana,

20   Pennsylvania at a Holiday Inn to

21   watch a videotape?

22   A.        I believe I --- I'm not sure

23   what the city was, but I know he went

24   to Western Pennsylvania to met with

25   the FBI relative to a video, yes.

71

1    Q.      What did he tell you about ---
2    did he tell you about the meeting
3    ahead of time?
4    A.      Yes, he did.
5    Q.      And what did he tell you about
6    it?
7    A.      I believe he contacted me,
8    telling me that the FBI had a
9    videotape and that they wanted him to
10   travel to Western Pennsylvania to
11   meet with them.  Now, I'm again --- I
12   believe that this is the
13   circumstance.  He indicated that he
14   wanted to do that, but in order to
15   maintain confidentiality, felt that
16   he should take a day off and should
17   use his own vehicle, rather than to
18   have people ask a lot of questions.
19   I approved that he would do that and
20   authorized him to use his own car.
21   And I believe I specifically said
22   subsequent to this then because this
23   is a work assignment you should get
24   your day back.  And following the
25   meeting I believe he came to the

72

1  house with the videotape and I viewed

2  part of it.

3  Q.    What did he tell you about why

4  they needed to meet at the Holiday

5  Inn?

6  A.    I don't recall.

7  Q.    Did he tell you anything about

8  why he was the person that had to pay

9  for the room at the Holiday Inn?

10 A.    No.

11 Q.    Did he ever tell you that the

12 FBI agents really just wanted to meet

13 him somewhere halfway that would be

14 more convenient for both parties?

15 A.    I believe he mentioned that,

16 yes.

17 Q.    And did he ever tell you that

18 the FBI agents left it up to him

19 where to meet?

20 A.    I believe he indicated that it

21 was a mutual decision.

22 Q.    Did he tell you that they

23 would have been just as happy for him

24 to come to FBI headquarters?

25           ATTORNEY BAILEY:

73

1              Objection.  You may

2         respond.

3    A.        Not that I recall.

4    BY ATTORNEY GUIDO:

5    Q.        Did he tell you that they

6    would be willing and able to go to

7    the State Police barracks?

8    A.        Not that I recall.

9    Q.        And did you know that a prior

10   meeting that he had had with them,

11   when he had listened to body wires

12   before, had been held at the Bedford

13   barracks?

14   A.        I don't recall.

15   Q.        So was it --- was it your

16   decision or Captain Ober's decision

17   that this hotel room should be rented

18   in Indiana to watch the videotape?

19   A.        It would have been his

20   decision.

21   Q.        Now, when --- and again,

22   you're relying on facts as he

23   represented them to you; correct?

24   A.        Correct.

25   Q.        You did not call the FBI and

74

1    say, what do you need to meet with

2    Captain Ober about?

3    A.    No, I did not.

4    Q.    Or ask them, you know, where

5    do you guys need to meet or anything

6    like that?

7    A.    No.

8    Q.    You just trusted him and left

9    everything to him?

10   A.    Correct.

11   Q.    Who finally --- how long was

12   this all going on in confidential

13   mode?

14   A.    It was from, obviously,

15   October 5th until some time in late

16   April or early May.  I'm not certain

17   of the date.

18   Q.    And do you know who finally

19   made the decision to tell that

20   Colonel Evanko should know about the

21   investigation?

22   A.    I had been inquiring of

23   Captain Ober when the FBI concludes

24   or reaches the point where they've

25   gone far enough in the investigation

75

1  that confidentiality no longer
2  implies you need to inform me so that
3  we can let the commissioner know.
4  Q.    I want to back up just a
5  little bit, because I realize there's
6  something we passed over.  When
7  Captain Ober was first contacted back
8  in October and you told him not to
9  tell anybody else, did you also order
10  him not to put anything --- not to
11  document this in any way, the
12  contact?
13  A.    Not that I recall.
14  Q.    Do you recall that you ever
15  ordered him or directed him not to
16  fill out an IAD complaint worksheet
17  or anything like that?
18  A.    We had a brief discussion
19  relative to at what point it would be
20  appropriate to fill out an IAD
21  worksheet in the event that
22  ultimately PSP officers were
23  involved.  I don't recall what
24  meeting that was that that would have
25  occurred.

76

1    Q.      Did you ever tell Captain Ober

2    that he should have the FBI send

3    things to him home relevant to this?

4    A.      Not that I recall.

5    Q.      And I think then that kind of

6    brought us up to where you were

7    saying that you had been waiting for

8    updates from Captain Ober about when

9    you were released from

10   confidentiality?

11   A.      Correct.

12   Q.      And when was that?

13   A.      As I said, sometime in late

14   April or early May.  I'm not certain

15   of the date.

16   Q.      Then I guess the answer to my

17   question was, was it you that decided

18   that Colonel Evanko should know about

19   the investigation?

20   A.      Well, I think that we both,

21   from the inception, knew that Colonel

22   Evanko needed to know about the

23   investigation upon release of

24   confidentiality.  It was a matter of

25   because my knowledge of this was so

77

1   limited, having a time and a place

2   where we were both together and the

3   commissioner was accessible to us

4   that we could advise him.

5   Q.      And when you told him about

6   it, it was Wednesday, May 12th, 1999;

7   is that right?

8   A.      I believe that's correct.

9   Q.      And your May 18th memo, which

10  was Exhibit One, was written down

11  after that; correct?

12  A.      Correct.

13  Q.      Basically just documenting

14  what had occurred?

15  A.      Correct.

16  Q.      Now, when Ober finally came to

17  you and said, okay, we're released

18  from confidentiality, what was said

19  during that conversation?

20  A.      I don't recall.

21  Q.      Do you recall any of it?

22  A.      No, I would be speculating

23  what was said.

24  Q.      When did you learn about

25  Trooper Stanton's involvement?

78

1    A.    I believe when the videotape

2    was presented.  He may have, at a

3    previous meeting, indicated his name

4    somewhere along the line.

5    Q.    Were you ever told that the

6    FBI had determined that Trooper

7    Stanton was the only member of the

8    State Police involved in --- the only

9    member and that that could be turned

10   over to the State Police to handle?

11   A.    Repeat the question.

12   Q.    Were you ever advised by

13   Captain Ober or anybody else that the

14   FBI ultimately determined that

15   Trooper Stanton was the only member

16   of the State Police that had engaged

17   in criminal conduct and that the

18   investigation was then turned over to

19   the State Police to handle?

20   A.    Captain Ober would have

21   advised me of that at some point.

22   Q.    Do you know if that would have

23   been before or after the FBI released

24   him from confidentiality?

25   A.    It would have been conjunctive

1  with that in my mind, but I don't

2  have any way of saying, yeah, that's

3  exactly when it occurred.

4  Q.     I understand.  Where were you

5  --- well, first of all, were you and

6  Captain Ober together when we talked

7  to Colonel Evanko about the

8  investigation?

9  A.     Yes, we were.

10  Q.     And where was that?  Where did

11  this conversation take place?

12  A.     I believe it was in the

13  Director of Bureau of Training and

14  Education's office at the academy in

15  Hershey.

16  Q.     How did that come about?

17  A.     I had been at the academy with

18  the commissioner and the other

19  deputies for, I'd say, an executive

20  session of the command staff.  I'm

21  not certain why Captain Ober was at

22  the academy that day, but he was.

23  And I took the opportunity of having

24  the three of us together to ask the

25  commissioner if we might have a few

80

1   minutes of his time to explain this.
2   Q.    Well, tell us about that
3   opinion that you have.  Was this just
4   with Captain Ober, you and the
5   commissioner?
6   A.    Yes.
7   Q.    Okay.  Tell us about that.
8   A.    We explained to the
9   commissioner, as best we can, my
10  recollection of what we've talked
11  about here today and Captain Ober
12  explained his involvement in this and
13  what the outcome was and talked to
14  the commissioner.
15  Q.    What reason did you give
16  Colonel Evanko for not telling him
17  about that earlier?
18  A.    The same reason I described
19  today, the request for
20  confidentiality.
21  Q.    That the FBI had requested
22  that?
23  A.    Correct.
24  Q.    Did you have a subsequent
25  meeting then with Colonel Evanko and

81

1   with Lieutenant Colonel Coury?

2   A.      Lieutenant Colonel Coury was

3   in an adjacent office.  The

4   commissioner asked him to come in and

5   the room and then Captain Ober and I

6   then re-explained it to Lieutenant

7   Colonel Coury then also.

8   Q.      So it was kind of one meeting,

9   it's just he was asked to come in?

10  A.      Correct.

11  Q.      And did you then reiterate

12  with Colonel Coury then that the FBI

13  had directed Captain Ober not to

14  disclose this information to anybody?

15  A.      Correct.

16  Q.      Now, you talked to --- that

17  was on May 12th.  On May 13th, you

18  talked to Barbara Christie, the chief

19  counsel of the State Police, about

20  the FBI investigation.  I was curious

21  as to what prompted you to do that.

22              ATTORNEY BAILEY:

23              What date was that,

24      Counsel?

25              ATTORNEY GUIDO:

82

1              May 13th, 1999.

2  BY ATTORNEY GUIDO:

3  Q.        On May 13th, 1999, the day

4  after you disclosed this to the

5  commissioner, you also talked to

6  Barbara Christie, chief counsel of

7  the State Police, about the FBI

8  investigation and I said I was

9  curious as to what prompted you to do

10  that.

11  A.        The commissioner's respond to

12  the information was such that --- I

13  mean, he was very agitated.  He was

14  obviously displeased.  He initially,

15  verbally questioned, rhetorical

16  questions, why wouldn't the FBI tell

17  me about this?  Why wouldn't Louie

18  Freeh tell me about this?  Louie

19  Freeh is a personal friend of mine.

20  He then indicated that he would have

21  the FBI agents transferred for not

22  coming to him with this.  The next

23  day, the commissioner, again, and the

24  deputies met.  He asked me to explain

25  to Lieutenant Colonel Westcott, who

83

1   was in that meeting at that time,

2   what had occurred and then I went

3   through the story of what I knew

4   again.  At that point, he directed

5   that we should have an investigation,

6   but there should be a couple majors

7   assigned to this to find out, you

8   know, what the facts of this case

9   were.  Ms. Christie is the

10  Department's chief counsel.  I needed

11  to run the circumstances past her as

12  I knew them to see whether my

13  decisions were reasonable.  I also,

14  through this process, on my mind was

15  if, based on the information that I

16  had, if we disclose this information,

17  are we interfering with a federal

18  case, a federal investigation, was

19  that thinking correct or, you know,

20  was I off base.

21  Q.      Again, based on your belief

22  that they didn't want you to tell

23  anyone?

24  A.      Correct.

25  Q.      Who else did you discuss the

84

1  situation with?

2  A.     After the release of

3  confidentiality ---

4  Q.     Yes.

5  A.     --- and our meeting with the

6  commissioner, I've discussed it with

7  a lot of people.

8  Q.     Can you give me a few names?

9  A.     Yes.  I've discussed it with

10  all of my bureau directors.  I've

11  discussed it with Mary Woolley, from

12  the Governor's office.  I've

13  discussed it with Lee Ann Labecki, I

14  believe, Major Seilhamer, a number of

15  people.

16  Q.     Do you have any idea how any

17  of those people would have found out

18  about the FBI investigation as early

19  as March of 1999?

20  A.     No.

21  Q.     Let me just go over a couple

22  of them to see if you have any idea

23  how they might have known.

24             ATTORNEY BAILEY:

25             Are you representing

85

1          that they knew, Counsel?

2                ATTORNEY GUIDO:

3                Yes, I am.

4                ATTORNEY BAILEY:

5                We may have to depose

6          you.

7                ATTORNEY GUIDO:

8                No.  We'll have to

9          depose them.

10               ATTORNEY BAILEY:

11               We'll depose you before

12         it's over.

13   BY ATTORNEY GUIDO:

14   Q.     But in any event for now,

15   regardless of the basis for this, I

16   want to you know what you knew.  Do

17   you know how Nan McLaughlin, the

18   deputy chief of staff for the

19   governor, knew about the FBI's

20   investigation in March of 1999?

21   A.     No, I don't.

22   Q.     Do you have any idea how

23   Charles Zogby, the Governor's

24   director of policy, would have found

25   out?

86

1   A.      Not that I know of.

2   Q.      How about Pete Tartline, the

3   Governor's deputy policy director?

4   A.      I'm not aware.

5   Q.      Do you have any idea how Lee

6   Ann Labecki, who replaced Tartline as

7   the deputy director of policy, would

8   have found out about it in March of

9   1999?

10              ATTORNEY BAILEY:

11              Counsel, can I

12      respectfully request that you

13      spell these names for us.  I

14      want to make sure I get the

15      spelling correct.

16              ATTORNEY GUIDO:

17              I'll spell them, but

18      not right at this moment.

19              ATTORNEY BAILEY:

20              But she needs them,

21      too.

22              ATTORNEY GUIDO:

23              Well, I'll get them for

24      her.

25              ATTORNEY BAILEY:

87

1            Okay.  You make sure I

2    get them.

3            ATTORNEY GUIDO:

4            We will.

5            ATTORNEY BAILEY:

6            Was that Deann did you

7    say?

8            ATTORNEY BAILEY:

9            Lee Ann Labecki.

10           ATTORNEY BAILEY:

11           Lee Ann.  I thought so.

12    I didn't hear that.

13  BY ATTORNEY GUIDO:

14  Q.    And if they found out this

15  information from Mary Woolley, you

16  don't know how she knew it?

17  A.    Not in March of 1999.

18  Q.    Right, March of 1999.

19  A.    No, I do not.

20  Q.    But you would have talked to

21  her about it then after you had

22  talked to the colonel about it?

23  A.    I did not talk to Ms. Woolley

24  about it, until release from

25  confidentiality by the FBI.

88

1  Q.      Okay.  But that would be

2  around the same time that you talked

3  to Colonel Evanko about it?

4  A.      Yes.

5  Q.      I mean, if Mary Woolley was

6  also trying to discuss the issue with

7  Barbara Christie, for example, she

8  would know because you had just told

9  her?

10 A.      Correct.

11 Q.      Now, the administrative

12 inquiry that was done, you said that

13 Major Werts, maybe you didn't say,

14 but we know eventually Major Werts

15 and Major Williams did an

16 investigation in the summer of 1999.

17 Did you ever find out when that

18 investigation was completed?

19 A.      The commissioner had a

20 conversation with me, I believe it

21 was the last Wednesday of September

22 of 1999.

23 Q.      And he told you it was over?

24 A.      Yes, he did.

25 Q.      Did he tell you anything about

89

1    the outcome of that?

2    A.    He told me that Captain Ober

3    had misrepresented the facts as he

4    provided them to me --- and as far as

5    the investigation, that's really all

6    he told me about the investigation.

7    Q.    Did you ever ask Captain Ober

8    if that investigation was over?

9    A.    I don't recall whether I did

10   or not.  I believe I did.

11   Q.    Do you know if you mentioned

12   that to Major Waugh as well?

13   A.    I'm not certain.

14              ATTORNEY GUIDO:

15              I want to take about

16         five minutes break, because I

17         want to make sure I don't have

18         anymore questions for you.

19   OFF RECORD DISCUSSION

20              ATTORNEY BAILEY:

21              Colonel, can you sit

22         down for one second.  The way

23         the rules read, we're supposed

24         to suspend this on camera.

25              ATTORNEY GUIDO:

90

1           We did.

2               VIDEOGRAPHER:

3           It's 10:44, 3/25/2002,

4       we're going to suspend.

5   OFF VIDEOTAPE

6   SHORT BREAK TAKEN

7               ATTORNEY BAILEY:

8           Ladies and gentlemen,

9       please, be advised that a

10      recording device is in

11      operation.

12              VIDEOGRAPHER:

13          10:58 a.m., back on the

14      record.

15  ON VIDEOTAPE

16  BY ATTORNEY GUIDO:

17  Q.      Okay.  I just want to clarify

18  one thing.  Back to the IIMS project.

19  I think I was trying to ask you, but

20  I didn't really understand it at all

21  that well at the time, but there was

22  a larger technology initiative that

23  was comprised of not only the IIMS

24  project, but also the Enterprise

25  Network; is that right?

91

1    A.    Well, technically Enterprise

2    Network is a component of IIMS.  It

3    was the first thing that needed to be

4    completed in order to create the

5    foundation upon which IIMS was built.

6    The contract for the Enterprise

7    Network had already been let.  I

8    believe it was in June of 1998 to IBM

9    and it was in process when I got my

10   job.

11   Q.    When you got your job.  You

12   kind of trailed off so I ---.

13   A.    When I got my job as deputy,

14   that contract was already signed and

15   IBM was the prime contractor on it.

16   Q.    The Enterprise Network, I

17   guess that's the foundation for which

18   everything else can come from?

19   A.    It converted our, as I

20   understand it, it converted our clean

21   system from dumb terminals and

22   dedicated lines to a TCP/IP

23   configuration that allows you to

24   transmit information more easily.  It

25   also built our e-mail process, put

92

1  desktops on people's desk,

2  proliferated use of computer

3  technology throughout the Department.

4  Q.    So as part of that first

5  project, the Enterprise Network, the

6  Department had to buy like a lot of

7  computers, I guess, and a lot of

8  hardware?

9  A.    Yes, we did.

10  Q.    And so that would have

11  actually been a large portion of that

12  $100 million for the project,

13  wouldn't it be?

14  A.    No.  That contract was prior

15  to my coming on the job.  In fact,

16  many of those computers had already

17  been expended before I got my job as

18  deputy commissioner of staff.

19  Q.    Do you know for certain that

20  the price of computers, et cetera, is

21  not part of the overall $100 million,

22  whenever you hear $100 million

23  project?

24  A.    I'm very sure that it's not.

25  And the Enterprise Network project,

93

1    as it were, cost $35 million.  The

2    total bottom line on IIMS is going to

3    come closer to $120 to $130 million.

4    And that did not count --- I don't

5    believe it counted the Enterprise

6    Network.

7    Q.      Who would know that for

8    certain?

9    A.      I would ask Mr. Grummet

10   (phonetic) is our fiscal officer, who

11   would probably know.  And Mr.

12   Hartley, who is in information

13   technology plans and controls and

14   handles the contracting for the

15   technology initiatives would probably

16   know.

17   Q.      Mr. Grummet, you said he's the

18   fiscal guy.  Does he like take care

19   of the budget and things like that?

20   A.      Yes, he does.

21   Q.      All right.

22                   ATTORNEY GUIDO:

23                   Thank you.

24                   ATTORNEY BAILEY:

25                   Okay.  Colonel, now

94

1        it's my turn.

2    EXAMINATION

3    <u>BY ATTORNEY BAILEY</u>:

4    Q.      Well, first of all, I want to

5    thank you very much for your

6    responses to my opponents ---

7    opposing Counsel's questions.  And I

8    have a series of questions for you.

9    Now, my methodology is a little bit

10   different.  What we're out to do here

11   is to establish as completely as we

12   can, a good fact record.  And in that

13   regard, I would invite and, in fact,

14   encourage you, if at any time when I

15   ask a question not to refrain from or

16   feel shy, and I'm not suggesting that

17   you would, to ask me what I mean by a

18   question, and even more because I

19   think that will save us time, where

20   I'm going with a question.  So I'll

21   be pleased to give you an offer of,

22   you know, not just what I mean by a

23   particular question.  If it seems

24   awkward or misdirected, but also

25   about where I want to go generally.

95

1    I also like to more around in

2  different areas and structure my

3  deposition.  And in that regard, I'll

4  try to inform you where I'm going

5  when I do a change of direction to

6  give you a chance to do a memory

7  change.  Okay?

8    Where I'd like to begin is in

9  the area --- in the fall of 1998, in

10  that area where Captain Ober comes to

11  --- okay.  I'd like to talk about

12  that.  I don't mean to be facetious

13  with this question.  I mean it as a

14  very serious question.  Have you ever

15  known, had any experiences which

16  would indicate to you that Captain

17  Ober might be, and don't laugh at me

18  now, clairvoyant or prophetic, able

19  to foretell the future or have some

20  connection with some sort of psychic

21  power or ability that might enable

22  him to foretell the future?

23  A.    No.

24  Q.    I think if I understand the

25  testimony correctly, as well as the

96

1  characterization of testimony that

2  were engendered in questions to you

3  by opposing counsel, Mr. Ober came to

4  you sometime on or about October 5th

5  of 1998; is that correct, sometime

6  around that day?

7  A.      Yes.

8  Q.      And at that time

9  substantively, he indicated to you

10  that there was information, allegedly

11  imparted to him by the FBI, if it

12  didn't descend from above, that there

13  might be a colonel or somebody of

14  that rank involved in this terrible

15  thing that the FBI was investigating.

16  Now, am I correct?

17  A.      Yes.  He said that the term

18  colonel had been used.

19  Q.      Okay.  So here's Captain Ober

20  and it's October the 5th.  It's 1998

21  and one of the things that is a part

22  of this burden that he's carrying is

23  this portent that somebody with the

24  rank of colonel could possibly be a

25  part of that; is that correct?

97

1    A.      Yes.

2    Q.      You know, incidentally, was

3    Captain Ober, you know, was he

4    relishing this or was he upset and

5    concerned about the seriousness of

6    this?

7    A.      At no time did Captain Ober

8    give the impression that he was

9    relishing this.  He seemed genuinely

10   concerned about it and somewhat

11   caught in the middle of what do I do?

12   But he never relished having his role

13   or having this information.

14   Q.      I don't profess to be an

15   overly religious person, but are you

16   familiar with the Disseminey --- the

17   let the cup pass from me metaphor

18   from the Bible?

19   A.      You would have to explain it.

20   Q.      That's all right.  Is it fair

21   to say that Captain Ober was burdened

22   and concerned that this information

23   had come to me by here I have this

24   thing in my hands, what do I do?

25   A.      That would be a correct

98

1    assessment.

2    Q.      Okay.  And my very capable

3    opponent had indicated, in a

4    characterization of testimony, that I

5    believe I had objected at the time

6    that it was asked, that sometime on

7    or about the 13th of October 1998,

8    through the erstwhile efforts of our

9    FBI, some sort of tape recording had

10   been made or some information had

11   come to the FBI that the word colonel

12   was used; is that correct?

13   A.      That's what I am led to

14   believe, yes.

15   Q.      Okay.  Now, let me ask you

16   something, Colonel Hickes, are there

17   any facts known to you that would

18   indicate that Captain Ober worked

19   with the CIs in that case or worked

20   directly in the basic investigation

21   in this matter?

22   A.      I have no knowledge that he

23   did, no.

24   Q.      And I think you've already

25   answered the question that you don't

99

1  know of any prophetic or

2  fortune-telling abilities on Captain

3  Ober's part.  Let me ask you and go

4  back again --- I want to go back to

5  that conversation that occurred

6  sometime in early October, around the

7  5th or so of October when Captain

8  Ober came to you.  Do you remember

9  where Colonel, now, Colonel Conly

10 was?

11 A.      When I received my appointment

12 of deputy commissioner of staff,

13 which I believe would have been the

14 Friday before, I believe Lieutenant

15 Colonel Conly was promoted from

16 captain to major and he would have

17 been the trooper commander, I

18 believe, in troop B, Washington, up

19 until Friday and then Monday he was

20 promoted.  I believe that's the

21 sequence of events.

22 Q.      So the sequence of events, you

23 know, they may be jumbled just a

24 little bit.  I mean, a little while

25 ago there was then Major Conly who

100

1    was moving into, what, the head of

2    BPR?

3    A.       Correct.

4    Q.       Of which IAD is a division?

5    A.       Correct.

6    Q.       IAD was where Captain Ober

7    was; right?

8    A.       Correct.

9    Q.       And that Major Conly had come

10   from being troop commander of troop

11   B?

12   A.       Correct.

13   Q.       Did you ever find out where

14   Mr. Stanton was from?

15   A.       I believe he was in troop B.

16   Q.       Did you ever find out, did you

17   ever come to learn that Major Conly

18   was aware of or knew certain

19   political figures in Allegheny

20   County?

21   A.       I'm not familiar with whether

22   he is or is not associated with them.

23   Q.       Okay.  Did any information

24   ever come to you to indicate that

25   Major Conly knew a fellow by the name

101

1  of Doc Fielder?

2  A.      No, not that I know of.

3  Q.      All right.  Fine.  Do you know

4  who Doc Fielder is?

5  A.      No, I don't.

6  Q.      Do you know who Lenny Bodack

7  is?

8  A.      No, I don't.

9  Q.      Joe Preston?

10  A.      I believe Mr. Preston was a

11  legislator.  I'm not sure whether he

12  still is.

13  Q.      Joe Preston is still a

14  legislator.  Now, getting back to

15  that --- to these events that

16  surround this first week in October,

17  you'd indicated that you had the in

18  response to opposing Counsel's

19  questions, that you had a direct

20  meeting of some type, you're not

21  certain where it was, with Captain

22  Ober; is that correct?

23  A.      Correct.

24  Q.      Now, prior to that, prior to

25  that, Colonel Hickes, had you had any

102

1    knowledge about these allegations

2    that the FBI had concerning hiring

3    processes within the Pennsylvania

4    State Police?

5    A.      Not that I recall.

6    Q.      Now, at this juncture, I'm

7    going to come back now to where we

8    are, but what I want to do is, again,

9    I want to do one of my little change

10   of directions here.  Okay.  Have you

11   ever known an academy class to have

12   been retested by order of the

13   commissioner?

14   A.      No, I haven't.

15   Q.      Do you have any knowledge of

16   any favoritism of hiring of troopers'

17   sons taking place within the

18   Pennsylvania State Police?

19   A.      I have no knowledge, no.

20   Q.      Are there internal audit

21   procedure in the Pennsylvania State

22   Police in compliance, internal

23   compliance, with regulations and

24   regulation processes?

25   A.      The systems and process review

103

1    division of the Bureau of

2    Professional Responsibility had

3    responsibility for, I'll call it an

4    internal audit on unit policies and

5    procedures.

6    Q.      On compliance-type issues,

7    adherence to regulations and

8    processes and program efficiency,

9    maybe that type of thing?

10   A.      Generally speaking, yes.

11   Q.      Okay, sir.  Now, do you know

12   whether or not there's ever been an

13   internal evaluation in the

14   Pennsylvania State Police in the

15   hiring process?

16   A.      I don't know.

17   Q.      Okay.  Now, it's my

18   understanding that in response to

19   questions on Direct, that you had

20   indicated that your recollection is

21   that there was some type of an issue

22   here, a fact issue, with moving from

23   band B to band A, that that would

24   somehow make you more available for

25   the hiring processes; is that

104

1  correct, or some sort of sorting

2  process?

3  A.      That's my recollection, yes.

4  Q.      Now, I'm going to take you

5  back now, again, to the October 5th

6  time when Captain Ober was talking to

7  you there.  Did Captain Ober indicate

8  any awareness of a previous

9  investigation having been done by the

10  FBI into this thing?

11  A.      No.

12  Q.      And of your own knowledge,

13  either by rumor or by virtue of some

14  official document had you been aware

15  of any previous investigation by the

16  FBI?

17  A.      No, I had not.

18  Q.      Well, who's head of the

19  western organized crime group out

20  there?

21  A.      I have no idea right now.

22  Q.      Frank Monaco?

23  A.      He's the troop commander in

24  group A, Greensburg, currently.  I

25  don't know what his capacity was in

105

1    1998.

2    Q.      Do you know if Frank was in

3    charge of the organized crime

4    division, on or about '96, '97, that

5    area in there, '95?

6    A.      He may have been.  I don't

7    know for sure.

8    Q.      Okay.  Do you know who was in

9    charge of Western AID (sic) --- the

10   Western Pennsylvania, I don't know

11   what your term is, of IAD at that

12   time?

13   A.      No, I don't recall.

14   Q.      Have you ever had an

15   opportunity --- strike that.  Strike

16   the form on that.

17           Do you know whether the FBI

18   had ever gone to the western division

19   of the crime unit or IAD with

20   information about Mr. Stanton?

21   A.      I don't have any firsthand

22   knowledge of that, no.

23   Q.      And do you know whether or not

24   that information was ever

25   communicated up to the, quote,

106

1   unquote, front office?

2   A.      I don't know.

3   Q.      Do you know whether Lieutenant

4   Colonel Coury ever received any

5   information from Western AID or from

6   the organized crime division out

7   there in Western Pennsylvania about

8   Mr. Stanton and his activities?

9   A.      No, I don't.

10  Q.      Did you ever talk to FBI agent

11  Shooey about what occurred out there?

12  A.      No, I did not.

13  Q.      Do you know whether Mr. Monaco

14  may have at some time called Colonel

15  Coury prior to when the FBI went to

16  Captain Ober about the activities

17  allegedly?

18          Colonel Hickes, let me strike

19  the previous question.  Let me

20  rephrase it this way.

21          Do you know whether Lieutenant

22  Coury had ever gone to Colonel Evanko

23  with information about some FBI

24  investigation into the practices of

25  Mr. Stanton, his activities?

107

1   A.      No, I don't.

2   Q.      Did you ever hear of Mr.

3   Stanton and his alleged involvement

4   in criminal activity or alleged

5   criminal activity, prior to when

6   Captain Ober had come to you?

7   A.      No, not that I recall.

8   Q.      Do you know of any

9   investigations into the activities of

10  Mr. Stanton prior to when the FBI

11  came to Captain Ober?

12  A.      Not that I recall, no.

13  Q.      Well, I mean, Mr. Coury has

14  testified, I think opposing counsel

15  will agree with me, that he got a

16  call from Monaco about Mr. Stanton

17  sometime prior to October of 1998.

18  Do you know what Lieutenant Colonel

19  Coury ever did with that information?

20           ATTORNEY CHRISTIE:

21           Excuse me, Counsel.

22      That's a statement of

23      testimony.  First, I'm going

24      to object to the question as

25      to form and also object to it

108

1          as to even being in existence

2          with regard to that being the

3          testimony of the partial

4          deposition of Colonel Coury,

5          so as to not mislead Colonel

6          Hickes in his answer to

7          whatever your question is.  I

8          would just object to the form

9          of the question, whether or

10         not that was, in fact, ever

11         information provided by

12         Colonel Coury in a deposition.

13                    ATTORNEY BAILEY:

14              Well, I hope you enjoy

15         reading it as much as I do.

16                    ATTORNEY CHRISTIE:

17              I'm looking into it.

18    BY ATTORNEY BAILEY:

19    Q.      Let me ask it this way.  The

20    point, in fact, is that you don't

21    know of any such thing do you?

22    A.      No, I don't.

23    Q.      And you don't know if the FBI

24    --- in fact, let me ask you

25    something, sir.  Colonel Hickes,

109

1  until today, where you heard by these

2  questions implications that there was

3  a prior awareness by the Pennsylvania

4  State Police of Mr. Stanton's

5  activities.  Prior to today, if that

6  was the case, and Lieutenant Colonel

7  Coury's deposition will speak for

8  itself, you didn't know anything

9  about that prior to today; did you,

10  whether there had been any

11  information available to the

12  Pennsylvania State Police if indeed

13  there was; did you?

14  A.      I had no official knowledge of

15  that, no.

16  Q.      Any rumor knowledge of it?

17  A.      Captain Ober indicated to me

18  that that may have been the case.

19  Q.      When did Captain Ober indicate

20  that to you?  Was it after October

21  5th, 1998?

22  A.      Yeah.  It would have been

23  maybe a year ago.

24  Q.      Okay.  So about a year ago

25  Captain Ober made some reference to

110

1  the fact that, hey, there was some

2  prior investigation?

3  A.      Correct.

4  Q.      And to the best of your

5  knowledge, as you sit here today, the

6  Pennsylvania State Police, if indeed

7  Colonel Coury himself was told, did

8  absolutely nothing to internally

9  investigate whether or not Trooper

10 Stanton was involved in some sort of

11 job selling scheme; am I correct?

12 A.      I don't know.

13 Q.      Do you know whether the FBI

14 ever expressed any concern that the

15 lack of activity by the Pennsylvania

16 State Police on the prior in part of

17 information to the organized crime

18 group and Western AID --- IAD, I'm

19 sorry.  Whether that played any role

20 in their bringing information to

21 Captain Ober?

22 A.      I don't know.

23 Q.      You have no way of knowing.

24 Only the FBI would know that; is that

25 correct?

111

1    A.      I would assume so, yes.

2    Q.      I would, too.  Now, if I

3    understand it correctly, when Colonel

4    Coury testified, he indicated some

5    concerns about the FBI ability, not

6    that it would ever be intentional,

7    but their ability to keep their mouth

8    shut, i.e., act in a political way.

9    I mean, I just can't imagine the FBI

10   doing that, but I want to ask you,

11   I'm just curious from your knowledge

12   and experience, do you have any

13   knowledge of experience that would

14   indicate that the FBI might be lose

15   with information, that you know of?

16   A.      Not that I know of.

17   Q.      Aside from reading the

18   newspaper, watching TV, reading

19   books, that sort of thing, as a

20   professional, you have no information

21   known to you that would indicate that

22   the FBI has loose lips; is that fair

23   to say?

24   A.      That's correct.

25   Q.      All right.  Now, Counsel has

112

1   asked questions about this issue

2   surrounding Mr. Ober telling you that

3   the FBI wanted confidentiality.

4   Okay.  In fairness to Counsel, I

5   believe she characterized FBI

6   testimony, at least to some extent,

7   as not being consistent with that.

8   Now, let me ask you a series of

9   questions based upon your knowledge

10  and experience as a professional

11  police officer.  Is it okay to tell a

12  target you're investigating them?

13  Would you go and inform a target that

14  someone was investigating them,

15  unless there were some need or

16  request to?

17  A.      Generally speaking, no.

18  Q.      Okay.  And if --- how many

19  colonels are there in the

20  Pennsylvania State Police?

21  A.      There is one full colonel.

22  Q.      One full colonel.

23  A.      And three lieutenant colonels.

24  Q.      Three lieutenant colonels.

25  Have you ever been in the Army or the

113

1   Navy or the Army, Marine Corp?

2   A.      No.

3   Q.      Well, when you talk about ---

4   call somebody, let's say someone---

5   you're a lieutenant colonel; right?

6   A.      Correct.

7   Q.      Do they say, hey, lieutenant

8   colonel or is, hey, colonel?

9   A.      It's, hey, colonel.

10  Q.      Hey, colonel.  I always blame

11  that on the French, I guess.  The

12  point fact is when someone addresses

13  you by that title, which is, you

14  know, a very respectful position, of

15  course, the reference is lieutenant

16  colonel or full bird, whatever it is,

17  it's colonel; right?

18  A.      Yes.

19  Q.      It's colonel.  Okay.  So if

20  you took all of the lieutenant

21  colonels and all the colonels in the

22  Pennsylvania State Police and you

23  added them up on October the 5th,

24  1998, can you tell us how many there

25  were?

114

1   A.      Four.

2   Q.      Had the number changed

3   dramatically as of October 13th,

4   1998?

5   A.      No.

6   Q.      So if there was a prophecy

7   there, the prophecy on how many

8   lieutenant colonels or colonels there

9   were total all added together,

10  wouldn't have exceeded four in the

11  fall of 1998; am I correct, four

12  people?

13  A.      Correct.

14  Q.      Now, if that group was a

15  potential target of an FBI

16  investigation, would you go and tell

17  them?

18  A.      I would not.

19  Q.      Okay.  Now, the --- I believe

20  the FBI testimony was that there

21  wasn't any recollection of

22  confidentiality but it was expected.

23  Now, based on that --- and I believe

24  that came from Agent Kush.  And I

25  make that representation to you based

115

1   upon my recollection of the record

2   and I will yield to Counsel's

3   comments, if they disagree with that.

4   Now, my understanding of the initial

5   discussion between you and Captain

6   Ober was that he expressed an

7   awareness that by definition you

8   could not have been included in that

9   category at the time this was going

10  on; am I correct?

11  A.      He expressed that there was an

12  interval of time between 1995 and

13  1998 that I was not in a position,

14  either A, to be a lieutenant colonel

15  or, B, because I was in the Bureau of

16  Liquor Enforcement, probably

17  influenced the hiring process.  He

18  did acknowledge that I had been a

19  lieutenant colonel before and if this

20  thing predated 1995, then I was a

21  lieutenant colonel then also.  But he

22  did express by his reasoning I was

23  not one who would have been involved

24  as a colonel.

25  Q.      And was Colonel Evanko, when

116

1  you eventually told Colonel Evanko,

2  my understanding is that he exhibited

3  --- I think you used the term

4  agitation, that he was very agitated.

5  I think that's the way you described

6  it?

7  A.      Yes, I did.

8  Q.      Okay.  Now, do you know if

9  Colonel Evanko ever said to Captain

10  Ober, Captain, you did the right

11  thing?  Did he ever say that to him?

12  A.      Not that I know of.

13  Q.      Well, you know, Colonel

14  Hickes, you know, being a witness is

15  not a pleasant thing, but it's a

16  question I have to ask.  Did you do

17  the right thing?

18  A.      I think I did, based on the

19  information I had at the time.

20  Q.      Well, for what it is worth, so

21  do I and that's not worth anything.

22  I'm not a witness here.  I think, so

23  do I.  That's just an opinion.  Now,

24  when Colonel Evanko expressed

25  agitation upon first being informed,

117

1    he said certain things about Louie

2    Freeh --- how do you spell Louie

3    Freeh's last name?  Do you know how

4    to spell it?

5    A.     I'm not certain.  I think it's

6    F-R-E-E-H.  I'm not positive.

7    Q.     And he expressed upset about

8    the FBI, about I'm their friend or

9    something and they didn't tell me; is

10   that correct?

11   A.     Yes.

12   Q.     Well ---.

13   A.     I don't --- let me rephrase.

14   He didn't use those words.

15   Q.     No, no, no.  You used your own

16   words and they'll stand for

17   themselves.  I'm just going back in

18   my mind to your testimony and, of

19   course, what my client has told me

20   naturally.  But the point in fact is

21   that, bottom line, he expressed

22   disappointment that the FBI had not

23   informed him or not brought this

24   matter to your attention?

25   A.     That's correct.

118

1    Q.       Okay.  Now, do you know

2    whether the FBI had ever brought

3    other investigations into, God

4    forbid, the Pennsylvania State Police

5    or law enforcement in Pennsylvania to

6    Colonel Evanko's attention?

7    A.       I don't know.

8    Q.       Did Colonel Evanko ever say

9    anything on that March 12th --- May

10   12th, the day that you told me, you

11   know, did they suspect me?

12   A.       I think he did utter those

13   words or something similar, yes.

14   Q.       Well, did he ever say to you,

15   Colonel Hickes, did he ever say to

16   you, Bob, Colonel, Mr. Hickes, did

17   you think I was involved in this?

18   Did he ever ask you that?

19   A.       I don't recall.  I really

20   don't.

21   Q.       Do you have a recollection of

22   whether he said to Captain Ober,

23   Captain Ober, do you think I would be

24   part of this thing?

25   A.       Not that I recall.

119

1    Q.      Colonel Hickes, did Captain

2    Ober ever indicate to you that he

3    believed that Colonel Evanko was

4    involved in this thing somehow?

5    A.      No, he did not.

6    Q.      Did Captain Ober approach this

7    thing, to the best of your knowledge,

8    at all times, as a consummate,

9    professional, trying as best he could

10   to show respect for an official

11   investigation and the purposes of an

12   official investigation?

13   A.      In all his dealings with me I

14   would say that that's a fair

15   characterization, yes.

16   Q.      All right.  Now, there has

17   been, as we move through this

18   lawsuit, an implication made that

19   Captain Ober misrepresented what the

20   FBI may have said.  Based upon your

21   knowledge of the facts, what I

22   struggle with and may question is, if

23   Captain Ober had either misunderstood

24   what the FBI said or wanted or even

25   misstated the extent of their

120

1  interest in confidentiality or

2  misstated any expression in

3  confidentiality, what possible

4  difference, Colonel Hickes, would it

5  have made?

6  A.      I don't know that it would

7  have made any difference or not.

8  Q.      No, sir, because you, as a

9  deputy commissioner and someone who

10  I think is quite clear to me, at

11  least, is an incredibly competent

12  professional.  And that's meant

13  sincerely, not to blow smoke, because

14  when you look at the facts in front

15  of you, is it fair to say that given

16  the focus, intent, purpose and what

17  facts were known about the FBI

18  investigation, that a command

19  decision needed to be made on who to

20  inform and that a decision was made

21  by Captain Ober, apparently concurred

22  in by you, in terms of reasoning now,

23  I'm not talking about the words of an

24  order, in terms of reasoning, that

25  confidentiality was important to

121

1  maintain investigation, integrity and

2  it should not go beyond the FBI,

3  until they say, or indicated, it's

4  okay, no matter where it might go?

5  A.      That would be a correct

6  analysis of it, yes.

7  Q.      All right, sir.  Colonel

8  Hickes, my understanding is that when

9  Major Werts and Major Williams

10 performed the investigation that was

11 ordered by Colonel Evanko, that you

12 were interviewed; am I correct, sir?

13 A.      That's correct, sir.

14 Q.      Were you read your rights?

15 A.      I don't recall.

16 Q.      Well, if you were read your

17 rights, it's fair to say probably

18 that any statement or tape recordings

19 made would indicate that; is that

20 correct?

21 A.      Yes, that's correct.

22 Q.      Do you have a recollection of

23 ever listening to the tape recording

24 of your interview?

25 A.      I was given a video --- or an

122

1    audio cassette in microcassette form.

2    I have never seen a transcript and I

3    have never listened to the audio.

4    Q.      Were you ever indicated --- do

5    you have any understanding of this

6    investigation that was ordered into

7    the events of the fall of 1998.  Was

8    that investigation into you?

9    A.      I posed that question of Major

10   Werts and Major Williams in advance

11   of my interview and my recollection

12   is their response was that their

13   investigation was into the

14   circumstances of the FBI

15   investigation of this matter.

16   Q.      So it could have been into

17   you?

18   A.      My understanding of what they

19   said is that it was the FBI's

20   investigation into this matter.

21   Q.      So were they investigating

22   what the FBI did?

23   A.      Ostensively, yes,

24   Q.      Well, let's go back to May

25   12th, 1999.  And Colonel Evanko made

123

1  the statement, I'll have the agent

2  transferred.  Do you remember that?

3  A.      Yes, I do.

4  Q.      Now, do you know whether any

5  requests was ever made of the FBI to

6  transfer or punish the agent

7  involved?

8  A.      No, I don't.

9  Q.      Why, if you know the answer to

10 it, do you know why or did --- strike

11 that.

12         Did Colonel Evanko ever

13 indicate why he was so upset?

14 A.      No, he did not.

15 Q.      I mean --- do you know why he

16 would be --- if there were some

17 information out there that might

18 indicate that he would be involved,

19 do you know why he would be upset

20 that someone didn't tell him that

21 they were checking on the possibility

22 of his being involved in something?

23 A.      You've got me ---.

24 Q.      Well, did Colonel Evanko ever

25 indicate that, geez, I'm glad you

124

1  didn't tell me, that way they know

2  that, you know, I'm clean and not

3  involved in such a thing?

4  A.      No, he did not.

5  Q.      I mean, did it ever occur to

6  you at some point that maybe he

7  should have been pleased but he

8  wasn't informed and it was a clean

9  investigation that was done without

10 any interference or the appearance of

11 interference?

12 A.      That certainly would have been

13 a possibility, yes.

14 Q.      All right.  Now, let me move

15 to a different --- I'm going to shift

16 gears on you, again.  Okay.  Let's

17 move to the questions that Counsel

18 --- that Ms. Guido asked about these

19 folks over in the Governor's office.

20 She went through so many doggone

21 names, I'll be honest with you, I

22 didn't get them all.  But she had

23 indicated that at some point, I think

24 you had responded that at some point

25 around the time that Captain ---

125

1    strike that.

2        Colonel Evanko.  That around

3    the time that Colonel Evanko was

4    informed by you and Captain Ober,

5    that you may have had discussions

6    with some folks in the Governor's

7    office?

8    A.      Correct.

9    Q.      Do you know whether Colonel

10   Evanko views you as some kind of

11   political or career threat?  I'm

12   sorry to have to ask you these

13   questions, but --- and you may not

14   know the answers.  Just answer me as

15   succulently as you can, please.  Do

16   you know whether he views you that

17   way?

18   A.      Not that I'm aware of.

19   Q.      Is he afraid of you?

20   A.      Not that I'm aware of.

21   Q.      Who does he go over and talk

22   to over in the Governor's office, if

23   you know.  Who is his contact?

24   A.      I don't know who all.

25   Certainly he talks to a lot of people

126

1   in the Governor's office, you know.

2   So there are a lot of people over

3   there.

4   Q.      That's part of his job; right?

5   A.      Yes, it is.

6   Q.      I mean, I would hope that as a

7   Pennsylvania State Police

8   commissioner, I would certainly

9   applaud him in efforts to communicate

10  with political leaders, because

11  that's the way our system runs,

12  civilian leadership; right?

13  A.      Correct.

14  Q.      All right.  Now, do you know

15  whether he ever went over there

16  talking about Captain Ober and what

17  Captain Ober did?

18  A.      No, I don't.

19  Q.      Do you know if he ever went

20  over there talking about Colonel

21  Hickes and what Colonel Hickes did?

22  A       No, I don't.

23  Q.      Do you know whether Captain

24  Ober was ever read his rights on this

25  thing, you know, his whatever they're

127

1   called?

2   A.      I don't know.

3   Q.      All right.  I'm going to

4   change gears on you again just a

5   little bit.  Okay.  During

6   conversation --- during your

7   responses to Ms. Guido's questions,

8   you had, don't worry about time,

9   we'll get you out of here, you had

10  used the term, I noticed, chain of

11  command; do you remember that?

12  A.      Yes, I do.

13  Q.      And I think you had alluded to

14  or I think the response was in the

15  nature of --- well, you know, you

16  were not in Captain Ober's chain of

17  command; do you remember that?

18  A.      Yes.

19  Q.      Okay.  Now, given all of the

20  facts and circumstances, based on

21  what I know about this, I can't

22  understand why that's even an issue.

23  Can you tell me why that would be an

24  issue?  And maybe I can lay a

25  foundation this way just a little bit

128

1     better. Well, you go ahead and

2     respond, I'm sorry, before I change

3     the question. I'm sorry.

4     A.     The circumstances as I

5     understood them to be at the time, in

6     my mind, gave Captain Ober the

7     ability to circumvent the chain of

8     command because of the limited

9     information presented to me and, I

10     believe, presented to him at the

11     time. Therefore, I don't see a chain

12     of command being an important issue.

13     But others may and they may be able

14     to articulate why it is, I don't

15     know.

16     Q.     Okay. The fact is that the

17     information available at the time

18     indicated that chain of command

19     adhering to, and at least in terms of

20     reporting, let alone the obviously

21     implications you've already testified

22     to about confidentiality, did not,

23     for any apparent reason, demand that

24     we adhere to and report to some chain

25     of command; is that fair to say?

129

A.     I'm not sure what you're
asking, again.

Q.     Awkward question.  Let me
withdraw it.  I'm not so sure what it
was asking either.

                    ATTORNEY BAILEY:

              We're going to have to
         change tapes here in just one
         second, so I'm going to let
         these gentlemen here --- do
         you want to just change right
         now maybe and that will give
         --- okay.  We're going to shut
         this down for just a second.
         Please, let's not go anywhere.

                    VIDEOGRAPHER:

              11:39 a.m., off record.

OFF VIDEO

SHORT BREAK TAKEN

                    VIDEOGRAPHER:

              11:40 a.m., back on the
         record.

ON VIDEO

BY ATTORNEY BAILEY:

Q.     All right, sir.  We've just

130

1  changed tapes.  I have a few
2  questions, just very few brief
3  questions about this chain of command
4  thing.  Okay.  One of the issues
5  that's arisen in this case are some
6  very, very serious questions about
7  when changes in the PSP regulation
8  AR-1 may have taken place.  Now, as a
9  foundation question for some
10  questions that I have about that
11  chain, when those things took place,
12  who did them and what they did, I'd
13  like to go back to some questions
14  that Ms. Guido was asking you about
15  your job, what you do.  Now, I want
16  to take you --- go back in your
17  mind's eye to December 2000, January
18  of 2001, February 2001, what were you
19  doing at that time?
20  A.     I was the deputy commissioner
21  of staff of the State Police.
22  Q.     Well, give me just --- put a
23  little meat on those bones for me,
24  Colonel.  Generally speaking, the
25  December timeframe of the year is a

131

1   little bit slow in the staff function

2   of law enforcement and generally I

3   take a week's vacation around the

4   holidays, but when I come back for

5   the January, February time frame you

6   have to get prepared for budget

7   hearings.  And budget hearings

8   annually are the February, March

9   timeframe for both the House and the

10  Senate.  And a large portion of the

11  budget hearings is budget prep

12  particularly in my shop because it

13  does involve the budget, as well as

14  the large expenditures of technology.

15  So without looking at my calendar, I

16  would speculate that I was involved

17  in that.

18  Q.     All right.  Now, you're

19  familiar with AR-1 at least

20  generally?

21  A.     My recollection is AR-1 is the

22  table of organization of the

23  department.

24  Q.     Yes.  And I don't think Albert

25  Einstein could repeat everything

132

1    that's in it.  It's a rather

2    voluminous kind of thing; right?

3    A.       Correct.

4    Q.       Now, does anyone ever come to

5    you at different times about proposed

6    changes in PSP regulations?

7    A.       I'm not sure what you mean.

8    Q.       Okay.  Do you ever receive

9    notifications or information in

10   through your official channels or

11   whatnot about proposed changes, you

12   know, either asking your advice or

13   soliciting an opinion or a view that

14   maybe you on your own have made

15   recommendations on how regulations

16   can or should be changed?

17   A.       Not that I recall.  If I have,

18   it would have been rare.  I do see

19   the changes when they are finished by

20   the Bureau of Research and

21   Development and their being submitted

22   through for approval.  So changes or

23   proposed changes would cross my desk

24   and I have the opportunity to make

25   comment on them at that time if I see

133

1    an issue with it.

2    Q.    Well, let's talk about that.

3    I want to ask a few questions about

4    this in AR-1.102, Subsection C.  Did

5    I state it correctly, sir, Subsection

6    C?  Are you familiar with that?

7    A.    No, I'm not.

8    Q.    Well, Subsection C has to do

9    with the chain of command.  Now, if

10    there was a major change in

11    definition or the responsibility each

12    member would have for the chain of

13    command and that were going through a

14    review and change process, would you

15    like to think that you'd be asked for

16    an opinion or an opportunity to

17    review it?

18    A.    Again, I would need more

19    information.  The process doesn't

20    always work that everyone gets an

21    opportunity to comment beforehand,

22    but I should be able to see the

23    change as it comes through for

24    approval.

25    Q.    Well, let me ask about that,

134

1   because, again, I haven't walked in

2   your shoes, so I don't know what it's

3   like to be where you are, make the

4   decisions that you make and process

5   the information that you have to

6   process to do your job.  Are you

7   saying that if I, as a --- let's say

8   I'm the research and development

9   folks there and I've got somebody ---

10  you know, Captain Ober comes to me

11  and he says, we need to change this

12  doggone section here or we need to

13  add a section on the chain of

14  command.  You know, we have too many

15  cases with these folks out there

16  circumventing the chain of command.

17  And we've got to put something in

18  here to make sure they follow the

19  straight and narrow.

20         All right.  You know,

21  obviously, I'm sort of, you know,

22  embellishing that and whatnot. But it

23  seems to me that you've indicated

24  that if there were a significant

25  change in a regulation, at least the

135

1  proposal process, the proposed change

2  process, would likely come to you?

3  I'm not saying it has to, but it

4  would likely come to you?

5  A.    The proposed change, when it's

6  approved and done in final form, or

7  what the Bureau of Research and

8  Development believes is final form,

9  the final form has to go through the

10 signature process.  And generally,

11 the deputies would sign off on that,

12 that they read it, they understand

13 it, they generally approve it.

14 Q.    And Subsection C didn't come

15 to you; did it?

16 A.    These come to me all the time.

17 I don't have any specific

18 recollection of that.

19 Q.    And in fairness you may not

20 have this; is that right?

21 A.    Well, I don't know.  I don't

22 know whether it came to me or not is

23 the point.  You know, typically they

24 do come to me and I would have to

25 assume that it did, but, you know, I

136

1  would need to review.  I would

2  initial off on that, if it had.

3  Q.    Well, if you didn't initial

4  off on it, then obviously that means

5  it didn't come to you; right?

6  A.    If I didn't initial off, it

7  means that I did not see it.  I, on

8  occasion, have people sitting in my

9  capacity acting in my stead.  There's

10  the possibility that it came to one

11  of them.  I don't know.

12  Q.    Okay.  What's a historic file?

13  What's that?

14  A.    I believe that that's the file

15  that the Bureau of Research and

16  Development keeps on the directives

17  within the Pennsylvania State Police.

18  Q.    Is it supposed to contain

19  information about the process of

20  changing a regulation, like what

21  suggestive changes there were, who

22  saw that, who contributed to it,

23  where it went here, where it went

24  there?

25  A.    Candidly, I have no idea what

137

1    all was in it, in a historic file.  I

2    don't know what all information is

3    there.

4    Q.    Okay.  But you don't have any

5    --- you're a deputy commissioner and

6    as you sit here today you don't have

7    a recollection off the top of your

8    head, not to say it didn't happen,

9    but you don't have a recollection as

10   you sit here today about a change in

11   AR-1, specifically adding a section

12   that purports to address a definition

13   and the responsibilities of chain of

14   command?

15   A.    No, I don't have a

16   recollection of it.

17   Q.    Have you ever looked in a

18   historic file?

19   A.    No, I have not.

20   Q.    A few things on IIMS.  You

21   know, I've gotten a hold of some

22   documents that indicate to me that

23   Captain Ober was on some sort of

24   voting committee, now I'm not

25   familiar with how you folks do things

138

1   here in the Pennsylvania State

2   Police, so bear with me because some

3   of my questions may not be the most

4   well informed and I don't have the

5   advantages that your attorneys do

6   with access to the kind of

7   information they have, but my

8   questions are sort of dumb.  In

9   common terms, bear with me.

10          Was Captain Ober involved in

11  the procurement process?

12  A.      Yes, he was.

13  Q.      Now, in a procurement process,

14  in most contract acquisition systems

15  that I'm familiar with, US military

16  and things I've done in a former

17  life, you have to gather as much

18  information as you can and you go

19  through a lot of different evaluation

20  process before you make a decision

21  on, number one, whether you're going

22  to do this thing.  That would be

23  first; right?  I mean, you evaluate

24  it and see if I'm going to use it, if

25  it can do the job for me.

139

1  A.      Yes.  Generally speaking, that

2  would all be included in the

3  evaluation process.

4  Q.      Okay.  And then you make some

5  kind of a decision, I guess, and

6  start finding out, you know, who can

7  do it because  you want to find out

8  what it's going to cost and what goes

9  into doing it; is that correct?

10  A.      Yes, it is.

11  Q.      Now, I understand that Captain

12  Ober played a rather central role in

13  some of those decisions in terms of

14  bringing people together, bringing

15  information together and making

16  decisions that ensured that this

17  evaluation process was done

18  correctly; am I correct?

19  A.      Yes, you are.

20  Q.      Why was he taken out of that?

21  A.      To the best of my

22  recollection, the acquisition process

23  had concluded and we were moving to

24  the contracting process.  In other

25  words, they had selected the

140

1   appropriate vendor and that part of

2   the project was finished.

3   Q.      Okay.  And what parts of the

4   process was he working on?

5   A.      He had worked as the team

6   leader for the request for qualified

7   contractor to evaluate proposals and

8   score those proposals and make a

9   recommendation of who the successful

10  bidder should be.

11  Q.      Well, what's the voting

12  committee?  What's that do?

13  A.      Well, that's the portion of

14  the team that has a role of scoring

15  the proposals and then rendering the

16  vote on the best solution or the best

17  company that has made their proposal.

18  Q.      Well, in order to contribute

19  to or make that decision, you have to

20  have a comprehensive grasp of the

21  technology, it's capability and its

22  costs; don't you?  I mean, how do you

23  do that if you don't have that

24  information?  Let me read something

25  to you.

141

1    A.      All right.

2    Q.      Voting committee is

3    responsible for evaluating the RFQC

4    draft and vendor proposals.  The

5    voting committee will make

6    recommendations in the form of an

7    executive summary to the executive

8    oversight committee.  Could you

9    expound on that for me, please?

10   A.      The executive oversight

11   committee is a group of top level

12   executives from various elements of

13   state government who acted as an

14   oversight to the IIMS procurement.

15   The voting committee was responsible

16   for evaluating and scoring the

17   various proposals that were submitted

18   and then making a recommendation to

19   the executive oversight committee,

20   concerning which vendor they believe

21   would do the best job for the

22   Commonwealth.

23   Q.      Do you know when the review of

24   QC proposals, when that began or when

25   that was ---?

142

1   A.      That would have been the fall

2   and into winter of 1999.  I don't

3   have the exact dates.

4   Q.      And if I told you that you

5   might be into a process that took

6   place in January and February of

7   2000, would that make sense to you or

8   would you have some reason to think

9   that might not be correct?

10  A.      I think that the process went

11  into January.  I believe Captain Ober

12  was transferred out of the team in

13  January.  I'm not certain of that, so

14  I would think that it might have gone

15  into January.

16  Q.      I'm not trying to be

17  argumentive, and I apologize to you

18  if I sound that way, but I think your

19  testimony in response to one of my

20  questions is that that process was

21  over, at least I may have misheard

22  you.

23  A.      That's my point.

24  Q.      Could you be in error or was

25  he still working on that proposal

143

1  process, where my research indicates

2  he was?

3  A.      I believe the RFQ portion had

4  been done and they were moving into

5  the contracting phase, I believe.

6  Q.      And that, sir, you're actually

7  providing information to make a

8  decision on how to spend all of that

9  money; isn't it?  Isn't that what

10 it's about?

11 A.      Pardon me?

12 Q.      In February, they were going

13 to be making or trying to make some

14 decisions about how you're going to

15 spend all that money, who are you

16 going to spend all that money with,

17 at least begin that process of

18 evaluation.

19 A.      The February time frame, if my

20 recollection is correct, is when you

21 would sit down with the vendor that

22 would get the award and negotiate the

23 nuts and bolts of exactly what it is

24 that you're going to be getting for

25 the money that you're spending.

144

1    Q.    And you folks are going to go

2    out and spend it for all taxpayers,

3    over $130 million; is that what you

4    testified to?

5    A.    I testified that I believe the

6    final cost has not be submitted yet

7    by Lockheed Martin for Phase II and

8    my expectation is that it would be

9    $120 to $130 million.

10    Q.    Remember what Dirkson

11    (phonetic) said, a billion here, a

12    billion there, then we start talking

13    about real money.  State governments,

14    that's a sizeable piece of money,

15    though; isn't it, sir?

16    A.    Yes, it is.

17    Q.    All right.  Say, Colonel

18    Hickes, how many years you been with

19    the Pennsylvania State Police?

20    A.    Twenty-nine (29).

21    Q.    A lot of experience.  You've

22    seen a lot of times when captains

23    were put into lieutenant's positions;

24    haven't you?

25    A.    The only one I can recall was

145

1    Captain Ober.

2    Q.      In 29 years, Colonel Hickes,

3    the only captain you know that was

4    assigned to a lieutenant's position

5    was Captain Darrell G. Ober; am I

6    correct?

7    A.      To the best of my knowledge,

8    yes.

9    Q.      So you served as either

10   director in an IAD or BPR; haven't

11   you?

12   A.      Yes, I have.

13   Q.      I know Colonel Evanko has;

14   hasn't he?

15   A.      Yes, he has.

16   Q.      Captain Ober has, I know, been

17   acting director of BPR, but he's been

18   director of IAD?

19   A.      Yes.

20   Q.      Sir, is it fair to say in the

21   Pennsylvania State Police that the

22   people that rise to the top career

23   wise, I'm not saying it's iron clad,

24   but typically at least have some

25   exposure, some experience with BPR in

146

1   one of its two divisions is more

2   common than not, if you know?

3   A.      I think your characterization

4   is that it has occurred on a number

5   of occasions.  I don't know if

6   whether that's because going through

7   BPR is a track that would make you

8   more attractive for promotion higher

9   or that we tend to put quality people

10  in BPR, but it's not an iron clad and

11  there are people that have been

12  elevated higher that have never gone

13  to BPR.

14  Q.      Well, you know, FBI Agent

15  Kush, now I'm not saying that all the

16  folks in the Pennsylvania State

17  Police have a high opinion to the

18  FBI, but FBI Agent Kush, when I

19  questioned him about why after they

20  had gone to Western IAD and the

21  western organized crime division or

22  group, I don't know quite how they're

23  structured, but why they went up to

24  Harrisburg and made a decision to go

25  to Harrisburg and Captain Ober, head

147

1  of IAD at that time, said that
2  because IAD is a cut above.  Those
3  are his words, cut above.  Do you
4  expect a higher standard of
5  performance of professional
6  responsibility from somebody.  You
7  know, I don't know if Mr. Kush, if
8  that's something that's expected in
9  the State Police, but he said that
10 was one of their reasons, because you
11 expect them to be a cut above.
12 A.       I think that all of the
13 Pennsylvania State Police has a
14 standard which we expect officers to
15 adhere to.  I believe that in
16 Internal Affairs your privilege to
17 work there is scrutinized more
18 severely than your privilege to work
19 at other places in the Department,
20 depending upon the integrity issue.
21 Q.       And is that because the very,
22 very core issue, the integrity of the
23 organization itself, it's ability to
24 cleanse itself, to look at itself, to
25 look at itself, to improve itself, to

148

1  be honest with itself, is at issue in

2  internal affairs investigation?

3  A.      I believe that that would be a

4  correct assessment, yes.

5  Q.      Okay.  You were asked

6  questions about this thing with

7  Indiana.  What's wrong with meeting,

8  for the sake of convenience,

9  somewhere between Harrisburg and

10 Pittsburgh, meeting in a hotel in

11 Indiana in an investigation of this

12 type?  Forgive me, but I don't

13 understand what's wrong with that.

14 A.      When Captain Ober requested

15 the authorization to go to Western

16 Pennsylvania using his own car and on

17 his own time, so to speak, putting in

18 a leave slip, I questioned him about,

19 did he really feel he needed to do

20 that that, you know, was he that

21 concerned that he had to do that.

22 And expressed that he was.  He felt

23 that if he made it a work day and

24 simply went out, that it would raise

25 questions - - -.

149

1    Q.    Okay.  You said that he

2    expressed concern about it being a

3    work day.

4    A.    That it would raise questions

5    in the office that he didn't really

6    want to have to explain.  Based upon

7    his concern and his explanation, I

8    saw no problem authorizing that he do

9    what he wanted to do.  After all,

10   he's the investigator.  He's the

11   individual who's working this and has

12   the information.  And if that's his

13   best estimate of what he should do,

14   then I authorized it.

15   Q.    And if you got to the hotel

16   and you ordered a cup of coffee,

17   which is my understanding of what the

18   FBI ordered, beverages, Colonel Conly

19   testified he seemed to be very, very

20   concerned there were beverages

21   ordered for the FBI.  I asked Agent

22   Kush.  It turned out that his

23   recollection was it was a cup of

24   coffee.  So they didn't get all

25   liquored up, but, you know, is there

150

1    something wrong with ordering a cup

2    of coffee for a couple of FBI agents

3    when they're doing an investigation

4    on something that has to ---

5    something of public concern.  What is

6    the problem with that?

7    A.      None that I know of.

8    Q.      Sir, do you have a

9    recollection of what the end result

10    of Captain Ober's efforts by a

11    grievance process to be reimbursed

12    would happen there, if you know?

13    A.      I believe he prevailed in

14    getting reimbursement, but I'm not

15    certain.

16    Q.      All right, sir.  Thank you.

17    Now, you have been asked --- Ms.

18    Guido had asked you questions about a

19    --- strike that.  Correct me.

20          Ms. Guido asked you questions

21    about a May 13 meeting, 1999 meeting,

22    with Barbara Christie; do you

23    remember that?

24    A.      Yes, I do.

25    Q.      Why did you go over to see

151

1   Barbara Christie?

2   A.      As I said, I think that I

3   explained that --- the Commissioner's

4   reaction to being informed about the

5   investigation and the totality of the

6   circumstances.  I sought out Ms.

7   Christie to kind of find out whether

8   in her perspective we had used good

9   judgment and as much as anything

10  else, to advise her of what had

11  transpired.

12  Q.      Colonel Hickes, you're

13  probably a man of uncommon courage.

14  And I don't mean to embarrass you

15  with this question.  The truth of the

16  fact is, the Commissioner reacted so

17  strongly it scared you a little;

18  didn't it?

19  A.      A little bit, yes.

20  Q.      All right.  So you go to the

21  Department legal people on the 13th

22  and get her advice, interesting

23  waiver of privilege issue here by the

24  way, and you ask Barbara Christie, in

25  effect, did I do something that would

152

1    subject me to discipline or break the

2    law; is that basically it?

3    A.    I don't think discipline was

4    an issue with my position, but I did

5    want to run the circumstances past

6    her and get her take on them.

7    Q.    Well, do you know what

8    obstruction of justice is?

9    A.    Yes, I do.

10    Q.    Now, what if you'd run up to

11    Captain --- I'm sorry, excuse me.

12    Colonel Evanko and told him about

13    this investigation and he had called

14    the governor's office and somebody

15    over there calls Joe Preston or Lenny

16    Bodack, because, in fact, this

17    terrible thing had some truth to it.

18    Do you think a little federal grand

19    jury out there could have indicted

20    you, sir?

21    A.    I don't know and I obviously

22    am not a lawyer, but I would say that

23    it's a possibility.

24    Q.    And did you talk with Barbara

25    about the legal ramifications of what

153

1    you had done or not done, your acts

2    or remissions?

3    A.      Yes, I did.

4    Q.      And what did she say?

5    A.      She said that based upon the

6    circumstances as I presented them to

7    her, that it appeared that I was

8    reasonable in my judgment.

9    Q.      Do you know whether an

10   admission of counsel is an admission

11   of a party; do you know?

12   A.      I don't know.

13   Q.      You don't know that.  Sir, in

14   response to one of Syndi Guido's

15   other comments, you had indicated

16   that after you had talked to Colonel

17   Evanko, that you had --- that Colonel

18   Evanko called Colonel Coury into the

19   room; am I correct?

20   A.      Yes.

21   Q.      Now, sir, am I correct that

22   you had also indicated that Captain

23   Ober was in the room at the same time

24   or did I miss something?

25   A.      I believe he was, yes.

154

1    Q.      You know, I'm going to ask ---
2    it's very important.  What was the
3    conversation then after Colonel Coury
4    entered the room?  Try to, you know,
5    take a second or two and think back
6    and tell us everything you can
7    recollect about what was said.  Let
8    me tell you what I'm looking for.
9    I'm looking for whether there was any
10   discussion of investigations, any
11   discussion of actions that the
12   colonel was going to take.  I'm going
13   to assume that this was after he made
14   the initial comments about Louie
15   Freeh and removing the agent or
16   whatever the heck he said.  But, you
17   know, could you, please --- after
18   Colonel Coury came into the room,
19   what went on?
20   A.      I have very little
21   recollection of the conversation.  My
22   recollection is that the Commissioner
23   wanted Captain Ober and I to explain
24   the circumstances to Colonel Conly
25   and advise him ---.

155

```
 1    Q.       Conly?

 2    A.       I'm sorry.  I apologize,

 3    Colonel Coury.

 4    Q.       Okay.

 5    A.       And we did that, but as far as

 6    any specific dialogue following that,

 7    I don't have any recollection.  I

 8    don't know that he did as you're

 9    suggesting.

10    Q.       Okay.  I think we had some

11    testimony from Mr. Coury that at some

12    point he had done a statement or

13    something for Mr. Evanko about what

14    occurred during a conversation where

15    you were present.  I must represent

16    to you, sir, I honestly don't

17    remember whether it indicated Captain

18    Ober being there or not.  I'm just

19    not sure.  My question is, did

20    Colonel Coury ever show you a

21    statement or tell you about a

22    statement that Colonel Evanko had

23    asked him to provide about what

24    occurred during a conversation with

25    you?
```

156

1   A.    No.

2   Q.    So as you sit here today, you

3   don't know --- you did not know until

4   today, I assume, that allegedly Mr.

5   Evanko had asked Mr. Coury to do a

6   memo about the conversation that

7   occurred on or about the 12th or

8   13th, whenever it was?

9   A.    Correct.

10  Q.    When Mr. Williams and Mr.

11  Werts came to you and inquired of you

12  about this so-called --- this

13  investigation or whatever, you know,

14  we think it was an investigation,

15  they want to call it an inquiry, the

16  point is that, did they indicate that

17  they had a statement from Colonel

18  Coury about the events of that day?

19  A.    No.

20  Q.    Did they show you any

21  statements or read them to you?

22  A.    No.

23  Q.    Do you know who made the

24  decision to appoint --- strike that.

25        Do you know who made the

157

1  decision to select Werts and Williams

2  for this job?

3  A.    Not for certain.  On the 13th

4  with Lieutenant Colonel Coury and

5  Westcott, the Commissioner and

6  myself, there was a discussion about

7  a need to do an investigation and who

8  our likely investigators or

9  investigator was, because I was so

10 deeply involved in the issue that

11 they were going to investigate, I did

12 not contribute to that discussion,

13 although I was present.  My

14 recollection is that there was no

15 resolution at that time.  And

16 although the names were Williams

17 and/or Werts were brought up, I don't

18 recall that they made a decision then

19 and there to make an assignment then.

20 Q.    Have you ever known a deputy

21 commissioner to jump in an airplane

22 and fly off to tell a major to go

23 investigate something?

24 A.    No.

25 Q.    Do you have a recollection

158

1  during any of the conversations to

2  which you were privy of anyone saying

3  to Colonel Evanko, Colonel, you

4  shouldn't do that or you don't have

5  the authority to do that?

6  A.    I didn't question the

7  Commissioner's authority.  He

8  certainly is the commissioner of the

9  state police, he can do what he's

10 like to do, but I did question the

11 value of the investigation as it

12 relates to, if he needed information

13 I was available to provide him what I

14 knew, but only in the context of

15 that.  I really didn't participate

16 much.

17 Q.    Well, the commissioner of the

18 Pennsylvania State Police, if he

19 wants to, can he call a trooper up

20 and tell him to go search your house?

21 A.    No, he cannot.

22 Q.    If he wanted to, could he go

23 outside and get on the telephone and

24 tell a couple of troopers to come in

25 here and escort you out and start

159

1   questioning you about something or

2   ---?  Can he do that?  If you know.

3   You may not know.

4   A.      Within his authority to

5   determine the circumstances

6   surrounding a legitimate State Police

7   process, I think that he does have

8   broad authority to conduct inquiries.

9   Q.      Okay.  Now, Werts, you know,

10  we know in this case of Werts and

11  Williams came in and questioned

12  Captain Ober during this inquiry;

13  right?  Well, I can tell you that

14  they did and they read him his

15  rights.  Do you have any knowledge or

16  any facts known to you about who made

17  the decision to read Captain Ober his

18  rights?

19  A.      No, I don't.

20  Q.      Do you know where the

21  questioning of Captain Ober took

22  place?

23  A.      No, I don't.

24  Q.      What's a supervisory inquiry,

25  what's that, as opposed to a full

160

1    investigation, if you know?

2    A.    A full investigation would be

3    an investigation that the Bureau of

4    Professional Responsibility would

5    enter into or would have your

6    professional responsibility index

7    number that would determine all the

8    facts.  Supervisory, I would have to

9    look at the definition.  I can't

10    distinguish.  I can't tell you what

11    it is right now.

12    Q.    Well, you're not suggesting to

13    us that the commissioner's power to

14    go do all of these investigations can

15    be done off the books; are you?

16    A.    No.  I would suggest that it

17    should have had some reference number

18    somewhere along the line.

19    Q.    Right.  Well, do you know when

20    the inquiry into the facts and

21    circumstances of October 1998 or the

22    FBI or whatever, whoever investigated

23    this creature, do you know whether it

24    was ever signed a BPR number?

25    A.    I don't know.

161

1   Q.      Do you have recollection of

2   ever seeing one?

3   A.      I would not, no.

4   Q.      Well, how many investigations,

5   like the one that Werts and Williams

6   did then have you seen in your 29

7   years?  You must have seen a lot of

8   them; haven't you?

9   A.      I've seen a few.  I can't say

10  that I've seen a lot.

11  Q.      Would you say they constitute

12  a practice in the Pennsylvania State

13  Police?

14  A.      No, I wouldn't characterize

15  them that way.

16  Q.      The fact is, the way you're

17  trained most of the things you do are

18  accounted for by number and

19  memorandum and forms and they are

20  structured and they're done according

21  to regulation; am I correct?

22  A.      Yes.

23  Q.      Well, tell me the regulations

24  that govern the investigation, which

25  lead to Captain Ober at least I know

162

1   being read his rights?  Do you know

2   what the regulations are that

3   governed that?

4   A.    I'm not familiar enough with

5   exactly what directions they were

6   given to know, but no.

7   Q.    Okay.  But your belief is as a

8   deputy commissioner that the

9   commissioner would have broad powers

10  to investigate things anyway as a

11  part of his job and his role as a

12  commissioner.  Certainly that would

13  make commonsense; right?

14  A.    Yes.  Any chance we could take

15  a five-minute break, Mr. Bailey?

16              ATTORNEY BAILEY:

17              Yes.  Okay.  That's all

18          right. You know what, I don't

19          think I'm going to be five

20          more minutes.  I'll tell you

21          what, if I tell you --- I

22          don't know if the other side

23          has questions, so in fairness

24          maybe we better break.

25              ATTORNEY GUIDO:

163

```
1              Well, I'll have five or
2         ten minutes, so if you want to
3         take a five-minute break ---.
4   A.    I just want to use ---.
5              ATTORNEY GUIDO:
6              I need it, too.
7   A.    Can we just use the restroom.
8              ATTORNEY GUIDO:
9              Yes, sir.  Let him ---
10        he has to take us off record.
11        Just a second.
12  A.    Okay.
13             VIDEOGRAPHER:
14             12:14, off record.
15  OFF VIDEO
16  SHORT BREAK TAKEN
17             ATTORNEY BAILEY:
18             The record device is
19        operating.
20             VIDEOGRAPHER:
21             12:19 p.m., tape two,
22        back on the record.
23  ON VIDEO
24             ATTORNEY BAILEY:
25             Okay.  I think, you
```

164

1    know, by and large I'm

2    probably finished.  I had a

3    few little follow-up

4    questions.  Maybe, Syndi, if

5    you want to finish up now, I

6    may even dispense with those

7    based on the interview that

8    you did with Majors Werts and

9    Williams.  It was both of

10   them; is that correct?

11   A.    That's correct.

12                   ATTORNEY BAILEY:

13                   That's it for right

14   now.  Let me just run over

15   this very quickly.  I don't

16   think I'm going to have

17   anymore.  Do you want to go

18   ahead, Syndi?

19                   ATTORNEY GUIDO:

20                   Okay.

21   RE-EXAMINATION

22   BY ATTORNEY GUIDO:

23   Q.    Mr. Bailey, was asking you

24   about the change to AR1-1 and whether

25   you had signed off on the routing

165

1   slip, that kind of thing.  I'd like

2   you to think back to a year ago.  Do

3   you remember Captain Brown providing

4   you with a copy of the routing slip

5   and the change sheet and the

6   regulation AR1-1 for your review?

7   A.      I was interviewed by Captain

8   Brown relative to the matter.  I

9   don't have specific recollection of

10  that.

11  Q.      You don't remember if he

12  showed you a copy of the change

13  sheet?

14  A.      He did, I believe, but I don't

15  recall --- nothing stands out in my

16  mind about it.

17  Q.      So as of the date of that

18  interview, though, the change sheet

19  did exist already?

20  A.      I don't recall.  He showed me

21  something.  I can't say specifically

22  what it was.

23  Q.      Okay.  And if your initials

24  are on the routing sheet with a date,

25  what would that mean?

166

1    A.      Well, that means that's the
2    date I reviewed and signed off it.
3    Q.      But the change that we've been
4    talking about and Mr. Bailey had
5    asked you something about significant
6    changes, there was nothing so
7    significant to the change that we're
8    discussing that it sticks out in your
9    mind today?
10   A.      No, there's nothing.  It
11   doesn't stick out in my mind today.
12   And as I said, as it comes through me
13   for approval, if there something that
14   I would look at and say, well, wait a
15   minute, you know, what's this all
16   about, I have the opportunity at that
17   point to question, either through
18   Major Merryman, who's the Director of
19   the Bureau of Research and
20   Development, where did this thing
21   come from and I don't recall doing
22   that.
23   Q.      And then with respect to
24   Captain Ober's request to be
25   considered for the legislative

167

```
1   liaison position, there was one part
2   about your answer that I was unclear
3   about as I thought about it, and I
4   just wanted to clarify.  You said you
5   passed that on, I guess, to
6   Commissioner Evanko?
7   A.      Yes.
8   Q.      Do you remember, I guess from
9   the logistical, physical perspective
10  how that occurred, whether you spoke
11  to Commissioner Evanko, you put it in
12  his inbox, you put it in interoffice
13  mail?
14  A.      I don't recall.
15  Q.      Do you remember ever talking
16  to Colonel Evanko about it?
17  A.      No, I don't recall.
18  Q.      Now, when the --- when Captain
19  Ober came to you and talked to you
20  about the FBI's investigation when
21  you just became a lieutenant colonel,
22  did you have any reason to believe
23  that Major Conly, the new Director of
24  the Bureau of Professional
25  Responsibility, would be a target of
```

168

1  the FBI investigation?

2  A.     The information at the time

3  was so sketchy as to not really have

4  any idea of what the FBI was

5  investigating or that there was any

6  target, if you will, of that.  So

7  I've got to answer almost the neutral

8  in that.  There was no target or not

9  target.

10  Q.     Did Captain Ober happen to

11  mention to you that Lieutenant - - -

12  now Lieutenant Colonel Conly, but

13  then Major Conly, when you became

14  director of the Bureau, had already,

15  before Captain Ober came to talk to

16  you about this, had already contacted

17  Captain Ober as director of the IAP

18  and asked him whether there  was

19  anything significant that the should

20  know about?

21  A.     Not that I recall.

22  Q.     And as the director - - -.

23           ATTORNEY BAILEY:

24           I want to place a very

25  strong objection on the

169

1   record.  I don't know if I

2   understood what the witness

3   has said, but I do not have a

4   recollection of that

5   characterization at all.  I

6   could be mistaken, but I'd

7   place an objection.

8            ATTORNEY GUIDO:

9            Okay.

10  BY ATTORNEY GUIDO:

11  Q.      Now, I've got sidetracked.

12  All right.  As Director of the Bureau

13  of Professional Responsibility, it

14  wouldn't be unreasonable for Major

15  Conly to want to know about something

16  like this; would it?

17  A.      No, it would not be

18  unreasonable for him to want to know

19  about something about this.

20  Q.      And did you know that one of

21  the main reasons that the FBI

22  contacted Captain Ober, in addition

23  to needing some logistical

24  information about the process, but

25  that one of the main reasons they

170

1    contacted him is because they felt

2    that Pennsylvania State Police's

3    Bureau of Professional Responsibility

4    should know that there were members

5    of the State Police that were

6    possibly involved in this kind of

7    corruption; did you know that?

8    A.      I'm not sure what you're

9    asking.  My assumption would be that

10   that's why they contacted Captain

11   Ober, to let someone in the State

12   Police know about this.  I did not

13   know that they --- if it was their

14   intent, that more people would be

15   made known of this.

16   Q.      Okay.  I guess where I was

17   going with it, previously when I was

18   asking the questions you said that it

19   was your understanding that the

20   reason that Captain Ober was

21   contacted was so that they could find

22   --- get some investigative help and

23   find out how the process of getting

24   into the academy works.  So what I

25   was asking you is whether you knew

171

1    that in addition to that one of their

2    primary reason really was to make

3    sure that the Bureau of Professional

4    Responsibility knew --- if they had

5    this information they could

6    investigate if they saw fit.

7              ATTORNEY BAILEY:

8              I strongly object,

9         Counsel, to what you're doing

10        in characterizing testimony.

11        You can ask a direct question,

12        if he knew something.  What

13        you're doing is presenting him

14        with a fact scenario and

15        implying to him that the FBI

16        had this reason and I don't

17        believe that that's correct.

18        And I disagree with the

19        characterization and strongly

20        object to the form of the

21        question.  In fact, it's not

22        even a question.

23              ATTORNEY GUIDO:

24              The FBI testimony

25        speaks for itself and I have

172

1    been patient while you've done

2    very, very similar

3    questioning, so ---.

              ATTORNEY BAILEY:

4

5         I was delighted with

6    the FBI testimony.  I'm just

7    asking, and absolutely

8    delighted with it, but I'm

9    just asking if a direct

10   question can be asked, that's

11   all.

              ATTORNEY GUIDO:

12

13        I think I did ask a

14   direct question.

15   BY ATTORNEY GUIDO:

16   Q.     My question is, did you know

17   --- I was trying to clarify because

18   earlier today you had said that you

19   thought the reason they contacted you

20   was for information on the process.

21   And I'm asking you, did you know that

22   their primary motivation was because

23   they wanted to make sure somebody was

24   --- the Bureau of Professional

25   Responsibility, they kept calling it

173

1    OPR, but they mean --- it could have

2    went to BPR and knew about it.

3                    ATTORNEY BAILEY:

4                    Repeat my objection.

5           You may respond.

6    A.      My information is that they

7    contacted the Bureau of Professional

8    Responsibility so that someone in the

9    State Police would know I was aware

10   of that.  I also believed that they

11   had requested confidentiality that it

12   not go beyond that point until they

13   had concluded their investigation.

14   They did not --- my understanding at

15   the time is they were not asking us

16   to assist them in an investigation

17   simply to provide information.  And

18   --- .

19   BY ATTORNEY GUIDO:

20   Q.      Well, that response --- your

21   answer kind of brought me to another

22   thing I wanted to ask you, but I want

23   to make sure that I understand your

24   responses to Mr. Bailey's question.

25   You had just now mentioned that, you

174

1  know, you believed that they had

2  requested confidentiality and not go

3  any further.  In response to one of

4  Mr. Bailey's questions, it seemed

5  that you were saying that even if the

6  FBI had not requested confidentiality

7  and even if, you know, lots of other

8  people knew in the State Police about

9  this, that you still would have done

10  the same thing; is that right?

11  A.    No.

12          ATTORNEY BAILEY:

13          Sir, please, I'm sorry.

14  I strong --- Counsel, you are

15  mischaracterizing --- he put

16  an add on in there.  This is

17  wrong to do this.  You're

18  abusing this witness' rights.

19          ATTORNEY GUIDO:

20          I'm not abusing

21  anyone's rights.

22          ATTORNEY BAILEY:

23          You're characterizing

24  his testimony and then you're

25  also telling him what his

175

 1      response was.

 2              ATTORNEY GUIDO:

 3              Well then, he can

 4      correct me if I'm wrong, but

 5      your objection is on the

 6      record and I'd like a

 7      response.

 8              ATTORNEY BAILEY:

 9              Well, he's your client

10      you told us.

11              ATTORNEY GUIDO:

12              I'd like a response.

13              ATTORNEY BAILEY:

14              I don't believe that

15      was his response.  I very

16      strongly object to what you're

17      doing.  Thank you.

18      BY ATTORNEY GUIDO:

19      Q.      What I'm asking --- do you

20      understand where I'm going?

21      A.      No.  I'm lost now, so ---.

22      Q.      Okay.  So let me start over.

23      A.      Bring it back.

24      Q.      My understanding.

25      A.      And one question at a time.

176

1   Q.      Right.  My understanding of

2   what you said, and that's where I'm

3   trying to clarify to make sure I

4   understood what you said.  Mr.

5   Bailey, as I understood it, was

6   asking you --- in other words, first

7   you had said that it was your

8   understanding the FBI had requested

9   confidentiality?

10  A.      Correct.

11  Q.      And the way I understood Mr.

12  Bailey's question, which the record

13  will speak for itself later, but the

14  way I understood his question was,

15  but even if they hadn't, wouldn't it

16  have still been the same, to which I

17  believe you said ---.

18  A.      Let me answer that one.  If

19  they had not requested

20  confidentiality and yet all of the

21  other information that Captain Ober

22  had brought to me was it, that's all

23  I've got, then my answer would have

24  been the same, that in light of the

25  fact that they were investigating a

177

1    public corruption case in Western

2    Pennsylvania, in light of the fact

3    that this was their investigation and

4    they had not asked us for assistance,

5    in light of the fact that they the

6    term colonel had been used, I would

7    have said, we need to maintain

8    confidentiality here, we need to look

9    out for the integrity of the

10   Pennsylvania State Police so tell no

11   one about this.  Now, the next

12   question, please.

13   Q.      Now, if you want to add --- if

14   we add in the factor, because that's

15   where I was talking about, ---

16   A.      Correct.

17   Q.      --- if you were taking this

18   into consideration also, if you add

19   in the factors that the FBI had

20   already contacted other members of

21   the State Police about the

22   investigation and sought bear input

23   advice, et cetera, about it, would

24   that make a difference?

25   A.      I think that changes the

178

1  equation.  Clearly, if the FBI --- if

2  you have that information, you can go

3  back to the FBI and say, who all did

4  you tell?  And once from the source

5  you find out that they have told X, Y

6  and Z, I think that at that point you

7  say, well, this information is out in

8  the private domain, in the agency

9  domain, and I can't control who does

10  or doesn't say anything about it.  I

11  mean, the way you keep a secret is

12  tell no one.

13  Q.      Right.

14  A.      Hence --- and that drove my

15  decision at the time.  But if a lot

16  of people know, then you're not going

17  to be able to keep a secret and that

18  certainly would have influenced the

19  decision that if I was aware at the

20  time that this had been out there.

21  Q.      Okay.  That's probably what I

22  was confused about.  Now, do you know

23  whether or not Captain Ober made any

24  effort to find out from the FBI

25  whether other people in the State

1  Police had this information?

2  A.     I don't know.

3  Q.     And he didn't say anything to

4  you about that?

5  A.     No.

6  Q.     And in response --- Mr. Bailey

7  was asking some questions about

8  whether or not you knew anything

9  about Captain Ober being read his

10  rights during the investigation.

11  Just to clarify that, it's not

12  unusual to give a member of the State

13  Police their administrative warnings

14  when they're interviewing; is it?

15  A.     I don't know.

16  Q.     As opposed to Miranda.

17  A.     Yeah, as opposed to Miranda,

18  I'm not sure that there's a

19  consistent policy or not on whether

20  you do or don't.  I've been out of

21  BPR for far too long to have any

22  specific recollection of that, nor do

23  I know what their current practices

24  are.  But the administrative

25  warnings, part and parcel, if you

180

1    know --- I mean, tell me if this is

2    correct, don't they, as part of the

3    administrative warning, don't you

4    actually tell the member of the State

5    Police that anything they say won't

6    be used against them in a criminal

7    proceeding?

8    A.      My recollection is that an

9    administrative warning is based on

10   the Garrity decision that bifurcates

11   the criminal and the administrative

12   process.  And so the Garrity decision

13   said if you get that warning you're

14   warned that you must tell the truth

15   or suffer the consequences of losing

16   your job, but what you say can't be

17   used against you criminally.

18   Q.      And I don't remember if you

19   said this in response to Mr. Bailey's

20   question, but if the --- I don't

21   remember whether you said that

22   Captain Ober was or was not aware of

23   the fact that the FBI investigation

24   actually dated back to May 1994 and

25   1995.

181

1  A.      I have no knowledge of that.

2  Q.      Okay.  So you did mention

3  something about that later, so I

4  wasn't sure what you were saying.

5  A.      He did indicate to me that

6  they had been investigating a public

7  corruption and that this had come up

8  and that they had allowed it to lie

9  dormant until they had finished the

10  larger segment and then they were

11  tying up loose ends, but I don't have

12  any knowledge of what date this all

13  was occurring.

14  Q.      Now, if there had been any

15  truth to this, which fortunately it

16  turned out that nobody was doing it,

17  if there had been any truth in the

18  allegations dated all the way back to

19  1994 and 1995, then of all of the

20  command staff you would be the only

21  person that could have been involved

22  at the command level previously when

23  it first started.

24  A.      Correct.  I would be one of

25  the two people left employed in the

182

1  Department that would have been a
2  lieutenant colonel at that time.
3  Major Robert Einsel is the Director
4  of Bureau of Training and Education
5  and he was also a lieutenant colonel
6  in that administration.
7  Q.    But as far as the lieutenant
8  colonels and Colonel Evanko, who were
9  in place at the time this information
10  came up, none of them could have been
11  involved as a lieutenant colonel back
12  in '94, '95?
13  A.    '94, correct. '95, no. I
14  believe they came into office in
15  February of 1995.
16  Q.    Okay. So later in '95 they
17  would have?
18  A.    After February, yes.
19  Q.    Okay. And then I want to add
20  one more thing. And that is, this is
21  in follow up to something Mr. Bailey
22  was asking you about the different
23  people I had asked you about. I just
24  wanted to clarify. Was Colonel
25  Evanko the first person that you told

183

1  about the FBI investigation?

2  A.      I believe I informed Ms.

3  Woolley ever so briefly before the

4  Commissioner, a matter of days.

5  Q.      Okay.  A matter of days, would

6  that be ---?

7  A.      Same time frame.

8  Q.      One, two, weeks, days, do you

9  know?

10  A.      No.

11  Q.      Would it be less than a week?

12  A.      I would say a week or less

13  and, again, it was the May time

14  frame.

15                  ATTORNEY GUIDO:

16              One second.  I think

17          that might be it.  Okay.

18          That's all I have.

19  RE-EXAMINATION

20  BY ATTORNEY BAILEY:

21  Q.      What conceivable or possible

22  advantage could Captain Ober have

23  gleaned as you looked back on this if

24  he had purposely not informed Colonel

25  Evanko.  I mean, what did he possibly

184

1    gain?

2    A.    I don't --- I've never been

3    able to rationalize that there would

4    be any advantage to that.

5    Q.    And what about yourself, what

6    possible advantage could you ever

7    have gained from withholding

8    something that you knew would come to

9    his attention eventually?

10   A.    No advantage at all.

11   Q.    Is it fair to say that there's

12   even some trepidation that attaches

13   to having this information and not

14   wanting to have a responsibility of

15   holding it goes to the breast, so to

16   speak?

17   A.    That would be a correct

18   assessment.

19   Q.    But there was absolutely no

20   intention known to you, no intention

21   on your part, no intention in Captain

22   Ober's part to hurt or injure the

23   Commissioner or the front office in

24   any way?

25   A.    Well, there was no attention

185

1    on my part.  I can't fathom a motive

2    that Captain Ober would have.  I

3    can't speak for him.

4    Q.      Have you ever been between a

5    rock and a hard place, Colonel?

6    A.      Many times.

7    Q.      And no matter what you do,

8    there's no way to win.  Let me ask

9    you this.  Do you think Colonel

10   Evanko would have been happy if

11   Captain Ober had gone and revealed

12   this investigation?

13   A.      I don't know whether he would

14   be happy or not.

15   Q.      Is it your view that Captain

16   Ober and indeed yourself, because he

17   put in the soup when he told you, had

18   at least some potential to be

19   concerned about obstruction, if

20   indeed you revealed this information

21   and it turned out to be even an

22   implication of complicity by someone

23   in the front office?

24   A.      That thought did cross my

25   mind, yes.

186

1    Q.       Colonel Hickes, do you have a
2    duty --- did you take an oath of
3    office?
4    A.       Yes, I did.
5    Q.       Is your duty to the
6    constitution in the law above your
7    duty to the people and persons?
8    A.       I'd have to look at the oath
9    again I hear it often enough, but
10   generally it's to the constitution
11   and to the law.
12   Q.       Is it fair to say that loyalty
13   to the leader is secondary to loyalty
14   to the law and your ethical
15   responsibilities?
16   A.       I think that that's certainly
17   how the oath reads.  I don't believe
18   that the oath puts the attributes of
19   values into that.
20   Q.       All right.  Now, when Colonel
21   Coury testified he talked about a
22   culture.  I think he had indicated
23   that he would have gone to Colonel
24   Evanko because there's a culture.  I
25   think us out here in the private

187

1   sector we call it the blue line, so

2   to speak.  The press calls it the

3   blue line.  Is there a culture in the

4   Pennsylvania State Police to

5   disregard the law if necessary and

6   display loyalty to your leaders above

7   your ethical and legal

8   responsibilities?

9              ATTORNEY CHRISTIE:

10              Counsel, there I have

11         to object.  You're talking

12         about Colonel Coury's

13         deposition.  I don't recall

14         anything, and again, the

15         record will speak for itself,

16         but we seem to be debating

17         about people mischaracterizing

18         deposition testimony.  I would

19         just state for the record I

20         recall no testimony by Colonel

21         Coury in the deposition.

22         You've been able to do it to

23         date, indicating that there is

24         a culture to the report.  I

25         recall a number of other

188

1     things that Colonel Coury said

2     that one --- with

3     investigative and field

4     experience we do to further

5     pursue this matter.  But

6     again, I don't wish to prod in

7     the question, but I do object

8     to you prodding the question

9     based upon what I do not

10    recall being in Colonel

11    Coury's deposition testimony.

12              ATTORNEY BAILEY:

13              Well, and as a

14    courteously to you, I'll

15    withdraw the question and ask

16    it this way.

17   BY ATTORNEY BAILEY:

18   Q.      Do you know if Captain Ober

19   violated a culture?  See, I had asked

20   Colonel Coury what Captain Ober did

21   wrong.  He said he didn't know of any

22   regulation.  I'm sure he's not going

23   to disagree with me about that, or a

24   law Captain Ober broke.  But he

25   violated a culture of the State

189

1  Police.  Well, let me ask you, if you

2  know, whether Captain Ober violated a

3  culture, quote, unquote, culture of

4  the Pennsylvania State Police?

5          ATTORNEY CHRISTIE:

6          Is that the same

7      question you've just

8      withdrawn, Counsel.

9          ATTORNEY BAILEY:

10         No, it's very

11     different.

12         ATTORNEY CHRISTIE:

13         You just asked it

14     again.

15         ATTORNEY BAILEY:

16         No, no.  It's very

17     different.

18         ATTORNEY CHRISTIE:

19         Well, my objection does

20     stand, I guess, as to the form

21     of the repeated question for

22     the reason that I stated

23     earlier, but I don't want to

24     repeat it.

25         ATTORNEY BAILEY:

190

1           Well, I don't want to
2      keep this all you hear and
3      waste anybody's time, but I
4      don't think I repeated the
5      question at all.  I'm going to
6      ask very simply, I think we've
7      been able to established in
8      this deposition, I think
9      anybody would be foolish to
10     disagree, there have been no
11     violation of regulation or law
12     by Captain Ober.
13 BY ATTORNEY BAILEY:
14 Q.      My question is, and I pointed
15 to Mr. Coury, my question is, did
16 Captain Ober violate a culture, a
17 value of the culture, of the
18 Pennsylvania State Police in what he
19 did and did you?  That's going to be
20 my next question.
21 A.      Not that I'm aware of to both.
22                ATTORNEY CHRISTIE:
23           Just one thing I'd like
24      to put on the record with
25      respect to your last question,

191

1          just to say that, you know,

2          when you said nobody in the

3          room thinks that Captain Ober

4          violated any regulation of the

5          State Police, that's not the

6          Defendant's position.  The

7          Defendant's position is that

8          he did violate regulations of

9          the State Police.  So I just

10         want to clear about any

11         implication there.

12    A.    Yeah.  My response to the

13    question was based on the culture

14    loyalty as opposed to anything else.

15    BY ATTORNEY BAILEY:

16    Q.    Well, let me ask about

17    anything else then.  You shouldn't

18    have said it.  I might not have

19    remembered the question, but you did

20    so what regulation did he violate?

21    A.    I don't know that he did.

22    Q.    What law did he violate?

23    A.    I don't know.

24    Q.    If he violated a regulation,

25    should he have been punished for it,

192

1    should he have been disciplined for

2    it?   Strike that.

3         If you violate a regulation,

4    should he at least be counseled or

5    disciplined for it?

6    A.      Generally speaking, that is

7    one recourse that he can take.   There

8    are --- that's a recourse.

9    Q.      Well, you could ignore it;

10   couldn't you?

11   A.      Sure.

12   Q.      Of course.  Now, if a trooper

13   violates the criminal laws of the

14   Commonwealth, does Pennsylvania State

15   Police have a duty and responsibility

16   to the state and to our citizens to

17   investigate and prosecute that

18   misconduct?

19   A.      I would say we have a duty to

20   investigate and present to the

21   district attorney for prosecutorial

22   decision.  I would agree to that.

23   Q.      Your correction is well

24   stated.  It would be to investigate

25   and provide information to a proper

193

1  prosecutorial authority to deal with;

2  right?

3  A.      Correct.

4  Q.      How do you spell Stanton's

5  name?

6  A.      I believe it's S-T-A-N-T-O-N,

7  but I'm not positive.

8  Q.      Okay.  Do you remember this

9  question on page six, the interview

10  of Lieutenant Colonel Robert Hickes

11  on July 2nd, 1999.  Hickes, ask that

12  again, please.  Williams, sure.  At

13  any conversation you'd had with

14  Commissioner Evanko, did either you

15  or Captain Ober ever tell him that

16  the allegations of influence were not

17  specific as to a colonel in the PSP

18  or someone in the governor's office,

19  but rather the trooper claimed to

20  have contacts with high-ranking

21  officials in the agency and the

22  administration?

23          Do you remember that question?

24  A.      Not specifically, but yeah.

25  Q.      Did that question seem to say

194

1  that these two fine majors who did
2  this fine investigation learned that,
3  in fact, there were some allegations
4  against higher ups in the agency and
5  higher ups in the Governor's office?
6  Is that the way you took that?
7  A.     I'd have to read that again,
8  but ---.
9  Q.     It speaks for itself.  It
10  certainly does.
11              ATTORNEY BAILEY:
12              And I don't have any
13  additional questions for you,
14  sir.  And I would like to
15  express, on my part and my
16  client's part, a gratitude for
17  you coming here today and
18  answering questions.  Thank
19  you.
20              ATTORNEY GUIDO:
21              That's all I have.
22              ATTORNEY BAILEY:
23              Okay.  Sir, until they
24  shut it down.
25              VIDEOGRAPHER:

195

1          12:52 p.m., this

2      deposition is concluded.

3          * * * * * * *

4   VIDEOTAPED DEPOSITION CONCLUDED AT

5          12:52 P.M.

6          * * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMMONWEALTH OF PENNSYLVANIA)

COUNTY OF CAMBRIA              )

C E R T I F I C A T E

I, Melissa L. Charlton, a Notary Public in and
for the Commonwealth of Pennsylvania, do hereby
certify:

That the witness was first duly sworn to testify
to the truth, the whole truth, and nothing but the
truth; that the foregoing deposition was taken at the
time and place stated herein; and that the said
deposition was taken stenographically by me and
reduced to typewriting, and constitutes a true and
correct record of the testimony given by the witness.

I further certify that the reading and signing
of said depositions were (not) waived by counsel for
the respective parties and by the witness.

I further certify that I am not a relative,
employee or attorney of any of the parties, nor a
relative or employee of counsel, and that I am in no
way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand
and stamp this 24th day of April 2002            .

_Melissa L. Charlton_

NOTARIAL SEAL
MELISSA L. CHARLTON, Notary Public
Johnstown, Cambria County, PA
My Commission Expires Dec. 18, 2004

·PITTSBURGH, PA

·CLEARFIELD, PA          ·ERIE, PA

·STATE COLLEGE, PA       ·OIL CITY, PA

·HOLLIDAYSBURG, PA       ·HARRISBURG, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA 15901
(814) 536-8908

·INDIANA, PA

·GREENSBURG, PA

·PHILADELPHIA, PA

·SOMERSET, PA

·WILKES-BARRE, PA

·CHARLESTON, WV

**LAWYER'S NOTES**

| Page | Line | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

PITTSBURGH, PA
HARRISBURG, PA
GREENSBURG, PA
ERIE, PA
INDIANA, PA
HOLLIDAYSBURG, PA
STATE COLLEGE, PA



**SARGENT'S COURT REPORTING SERVICE, INC.**

210 MAIN STREET
JOHNSTOWN, PA 15901
(814) 536-8908

PHILADELPHIA, PA
WILKES-BARRE, PA
OIL CITY, PA
SOMERSET, PA
CLEARFIELD, PA
*CHARLESTON, WV*

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

**DATE:**          May 18, 1999

**SUBJECT:**      FBI Investigation

**TO:**             Commissioner

**FROM:**          Lt. Colonel Robert C. Hickes *RCH*
                    Deputy Commissioner of Staff

1.    This correspondence is submitted in response to your request of May 13, 1999, for information concerning what was known of the FBI investigation relative to political corruption.

2.    During my first week as Deputy Commissioner of Staff, I believe Monday, October 5, 1998, Captain Darrell Ober, Director, Internal Affairs Division, contacted me and asked to speak to me in confidence. Captain Ober advised that while he was Acting Director of the Bureau of Professional Responsibility he was contacted by the Federal Bureau of Investigation, Pittsburgh Office, relative to a political corruption case that they were investigating. The FBI provided the following information to Captain Ober:

    a.    An informant was approached to facilitate buying a candidate's position as a State Police Cadet. This was supposedly a common practice and had been done numerous times in the past.

    b.    Buying a position with the Pennsylvania State Police allegedly was facilitated by political official(s), someone in the Governor's Office, and someone of high rank in the State Police. The term Colonel was used.

    c.    Money was to be paid to move from Band B to Band A and also to progress through each aspect of the hiring process, i.e., polygraph, physical test, background, etc.

    d.    This investigation was furthered by wiretap information.

    e.    The Pennsylvania State Police aspect of the FBI investigation was a minor component in a larger political corruption investigation and had been known for some time.



EXHIBIT
1
PENGAD-Bayonne, N.J.
32502  WC

FBI Investigation
May 18, 1999
Page 2

3. Captain Ober advised that the FBI had requested absolute confidentiality. Captain Ober stated that he told the FBI that he had to advise at least one other person. Upon my promotion, Captain Ober determined that he would advise me, since I had not been a Colonel at the time of the allegation. Based upon the information provided by Captain Ober, I ordered him as follows:

    a. Disclose the information to no one else.

    b. Cooperate with the FBI as requested according to PSP regulations and the law.

    c. Advise me periodically of progress.

4. Over the next five months, I talked to Captain Ober two or three times at his initiation, and he advised that no progress had been made. In mid to late March, 1999, Captain Ober advised that a Trooper Stanton, Troop B, had facilitated a meeting between the prospective candidate and the informant and an amount of money (I believe $1,000) was exchanged. The FBI was to attempt to link the bribe to a member of the Pennsylvania House of Representatives from Pittsburgh, Pennsylvania.

5. At the end of April, early May, Captain Ober advised that the Representative didn't do anything illegal. The Representative talked about helping the candidate become a PCO or "PLCB Officer," but not a Trooper. Captain Ober informed me that we were released from the confidentiality pledge.

6. You were advised by both Captain Ober and myself on Wednesday, May 12, 1999. You were not advised sooner due to your unavailability.