IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                    :
                                    :
            Plaintiff               :    No. 1:CV-01-0084
                                    :    (Judge Caldwell)
      v.                            :
                                    :    CIVIL ACTION – LAW
PAUL EVANKO, MARK                   :
CAMPBELL, THOMAS                    :    JURY TRIAL DEMANDED    FILED
COURY, JOSEPH                       :                          HARRISBURG, PA
WESTCOTT, HAWTHORNE                 :
CONLEY                              :                          MAY 2 0 2002

                                                        MARY E. D'ANDREA, CLERK
                                                        Per _____
                                                                    Deputy Clerk

**EXHIBITS TO DEFENDANTS' BRIEF IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
VOLUME 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL G. OBER | : | CIVIL ACTION LAW |
| Plaintiff | : | 1: CV-01-0084 |
| vs., | : | (JUDGE CALDWELL) |
| PAUL EVANKO, MARK | : | JURY TRIAL DEMANDED |
| CAMPBELL, THOMAS | : | |
| COURY, | : | |
| JOSEPH WESTCOTT, | : | |
| HAWTHORNE CONLEY | : | |
| JOANNA REYNOLDS and | : | |
| SYNDI GUIDO | : | |
| Defendants | | |

Proceedings:        Video Deposition
                    Francis Koselnak

Date:              October 23, 2001

APPEARANCES:

For the Plaintiff:          Donald Bailey, Esquire
                            4311 North 6th Street
                            Harrisburg, PA 17110

For the Defendants:         Syndi Guido, Esquire
                            333 Market Street
                            Harrisburg, PA 17101

1

---

1  MR. BAILEY: You have to move that box of tissues. Major Stillwater. Is
2      there anything I can get for you Joanna?
3  MS. REYNOLDS: No thanks I'm fine.
4  MR. BAILEY: Now Tony we're awaiting you and then we'll move right
5      into this thing and get it done here. Make sure that's run back. You
6      started with a new tape right?
7  MR. MARCECA: Yes sir.
8  MR. BAILEY: Make sure your erase button is where it permits you to; I'll
9      bet that's it. You have to put it on VTR probably to rewind it. It's a
10      different camera, a professional camera; I don't have any control
11      over it.
12  MR. MARCECA: Ok, it's now 11, correction, it's October 23, 2001.
13      Good afternoon my name is Anthony Marceca. My address is 2219
14      Dixie Drive, York, Pennsylvania. I am employed by PR Video who
15      has been contracted to conduct this video deposition on behalf of
16      the plaintiff. This matter is docketed at 1: CV-01-0084 in the
17      United States District Court for the Middle District of
18      Pennsylvania. The caption is Darrell G. Ober versus Paul Evanko et
19      al. and this deposition this afternoon; the witness is Francis
20      Koselnak a Major with the Pennsylvania State Police. And Major
21      could you raise you right hand I would like to swear you in. Do you
22      promise to tell the truth, the whole truth, and nothing but the truth
23      so help you God?
24  MAJOR: I do.
25  MR. MACECA: The time is 1:07 pm and this deposition is now in

2

---

1  progress.
2  MR. BAILEY: Thank you very much. Just on a voice check, Don Bailey,
3      counsel for plaintiff. We already have you Major. Joanna would
4      you?
5  MS. REYNOLDS: My name is Joanna Reynolds. I'm the assistant
6      counsel with the State Police and I represent the defendants in this
7      matter.
8  MR. BAILEY: Ok. I assume that the usual stipulations that objections
9      except as to the form of the question will be reserved until time of
10      trial are ok.
11  MS. REYNOLDS: Yes.
12  MR. BAILEY: Major I'll be very, very brief with just some instructions.
13      We're doing a deposition here. We're going to asking a number of
14      different questions. From time to time if you become curious or
15      concerned about where I'm going with a question, what I want to
16      get at I want you to feel free to ask me. That's a little different than
17      the usual procedure but we really want to get a good accurate
18      record from you. If at any time you have not had an opportunity to
19      complete your response to a question for any reason, I may step in
20      thinking you have finished or whatever, might intervene. Make sure
21      that you answer fully and completely because this is a record of
22      course that is going to be of your testimony we want to make sure
23      that it has everything in it and your answers are complete and
24      you're satisfied with that, ok? Remember to keep your voice up,
25      not that you're going to answer with gesticulation, through gestures

3

---

1  we have to have a verbal response you know. Anytime you want to
2      break or you want to break and talk to counsel, you're not allowed
3      to break and talk to counsel in the middle of a question, but
4      certainly I wouldn't object to any break that you want and certainly
5      if you have a personal reason for a break don't hesitate to ask.
6      Before we begin do you have any questions for me at all?
7  MAJOR: No I don't.
8  MR. BAILEY: All right sir. Major state your full name again for the
9      record please.
10  MAJOR: My name is Francis E. Koselnak.
11  MR. BAILEY: I'm just going to refer to you as Major. Is that ok?
12  A:     That's fine.
13  Q:     And you're a Major with the Pennsylvania State Police, and what
14      position do you hold with the Pennsylvania State Police?
15  A:     I'm an Area Commander.
16  Q:     Very briefly tell us what an Area Commander does with the
17      Pennsylvania State Police.
18  A:     Well, the Area Commander is the job description within the
19      administrative regulation. Right now he acts as a liaison actually
20      between the executive office, which is the Commissioner, the
21      Deputy Commissioners, and the field. Certainly I make evaluations
22      to be able to determine how various programs are functioning and
23      operating and I provide advice to the executive office. Certainly I
24      sit in on disciplinary matters, and I guide troop commanders
25      concerning disciplinary matters involving their personnel on a troop

4

1    wide basis. Certainly I attend meetings, conferences, and seminars
2    to be able to promote certainly the position and to be able to
3    represent the front office.
4 Q:   What's your jurisdiction right now? By that I mean what have you.
5    What's in your Chain if Command underneath you as an Area
6    Commander?
7 A:   As an Area Commander I'm the Area Commander of Area Two.
8    Which is the Northeastern part of the Commonwealth of
9    Pennsylvania and sort of the northern tier. It encompasses Troops
10    F, which is Montoursville, Troop P which is Wyoming and Troop
11    R, which is Dunmar.
12 Q:   Is the LCE under your jurisdiction?
13 A:   No it isn't.
14 Q:   And what is the LCE? Do you know what that is?
15 A:   It's Liquor Control Enforcement.
16 Q:   How long have you been Area Commander of Area Two?
17 A:   Since July of 2000.
18 Q:   Now before July of 2000 what was your jurisdiction?
19 A:   I was the Director of Bureau of liquor Control Enforcement.
20 Q:   How long had you held that position before you were transferred or
21    before you moved on?
22 A:   I held that position from October of 1998 until July of 2000 so it
23    was approximately 19 months.
24 Q:   How did Darrell Ober come to work in your Chain of Command?

5

1 A:   He was assigned to be able to work at the Bureau I believe it was in
2    February 2000.
3 Q:   Well my question was how did he come to be assigned there?
4 A:   He was assigned there by the department to be able to work at the
5    Bureau of Liquor Control Enforcement.
6 Q:   What does assigned by the department mean?
7 A:   He was transferred. He came over. There was a transfer order that
8    was generated. He came over to the Bureau of Liquor Control
9    Enforcement to be able to be assigned to that position.
10 Q:   And did you play any role in that assignment?
11 A:   No I didn't.
12 Q:   Were you asked about it?
13 A:   I wasn't asked about it.
14 Q:   Now your position, at the time of his transfer, your position was
15    what?
16 A:   I was the Director Liquor Control Enforcement.
17 Q:   And what was your rank?
18 A:   Major.
19 Q:   So you're the director of LCE.
20 A:   The Bureau Director, yes.
21 Q:   And he was transferred to what position?
22 A:   He was transferred into the Bureau. Into the central section
23    command position.
24 Q:   Central Section. How many sections are there?
25 A:   There are three sections of Liquor Control Enforcement.

6

1 Q:   Three sections. Now he was transferred into that position you say in
2    February of 2000?
3 A:   It was in February, I don't know the exact date but it was in
4    February of the year 2000.
5 Q:   Well who commander of the west. Is there central, west, east? Is
6    that how it is?
7 A:   That's right. There was a West there was a Central, which Captain
8    Ober was commanding and of course there was an Eastern section
9    also.
10 Q:   Who commanded the West?
11 A: Lt. Ryan commanded The West.
12 Q:   Lt. Ryan?
13 A:   Right.
14 Q:   And how about the East?
15 A:   The East was commanded by, you know I tell you what I just forget
16    exactly but it was a Lieutenant that was commanding the East.
17 Q:   What the significance of that, what do you mean a Lieutenant, what
18    do you mean?
19 A:   Well I'm saying that there were, there was a Lieutenant in the East
20    and I don't know his name. That's why I'm referring to him as
21    Lieutenant.
22 Q:   I just wondered why you responded that it was a Lieutenant. Is
23    there some reason?
24 A:   Well it wasn't a sergeant, you know that's his rank and I don't
25    remember his name.

7

1 Q:   Well the East was commanded by a Lieutenant. The West was
2    commanded by a Lieutenant and the Central was commanded by a
3    Captain. The Central calls for a Captain? It's a bigger job?
4 A:   No, it doesn't call for a Captain.
5 Q:   What does it call for?
6 A:   Generally speaking it calls for a Lieutenant.
7 Q:   Major how did you come to be the Director of the Bureau of LCE?
8 A:   I receive the phone call I guess it was in October of 1998 to be able
9    to come down and be able to be interviewed by Colonel Evanko, to
10    be considered for a promotion.
11 Q:   Ok and you were an Area Commander up in…
12 A:   I was a Troop Commander sir.
13 Q:   I'm sorry sir. Yes sir, up in the Eastern, Northeastern part.
14 A:   Troop R Dunmar.
15 Q:   Dunmar. I know where that is. Lackawanna County?
16 A:   That's right.
17 Q:   Ok sir. So Colonel Evanko is talking to you about a promotion and
18    has you come down to Harrisburg and that was when? It slipped my
19    mind there.
20 A:   It was the early part of October of 1998. I don't remember exactly
21    the date but it was probably the first 10-12 days of the month.
22 Q:   And he asked…I'm sorry sir, I interrupted you. And he asked you
23    or discussed with you your feelings, I'm sure out of respect for you
24    about taking over LCE. Right?
25 A:   No.

8

1  Q:  Ok, no he did not. Ok what happened?
2  A:  He offered the position to me. He said you know the position over
3      at Bureau Liquor Control Enforcement is available and we have a
4      position to be able to promote to Major and I'd like to be able to
5      offer you that. Are you interested I being able to take it.
6  Q:  And what was your rank at the time?
7  A:  Captain.
8  Q:  Now you said yes and you took the position. You agreed to take the
9      position.
10 A:  Right.
11 Q:  After you took that position were there any other changes of
12     command underneath you. By that I mean did Eastern, or Central,
13     or Western Section Commanders change aside from the change that
14     you experienced with Captain Ober?
15 A:  Yes there was a, the Western Section Commander has transferred
16     out and again I don't remember his name and Lt Ryan transferred
17     in. As far as the Command Staff was concerned there was several
18     sergeants that left within that period of time. At least two that I can
19     think of, positions that became available and people that were
20     assigned to the Bureau of Liquor Control Enforcement.
21 Q:  And was Lt. Williams one of those people?
22 A:  Well, Lt. Williams was there at the time.
23 Q:  Did he leave at some point?
24 A:  Yes he did.
25 Q:  Where did he go?

9

1  A:  He went over to the Bureau of Patrol.
2  Q:  Did he request that change?
3  A:  No, he didn't request it.
4  Q:  Who did request it?
5  A:  I guess it's standard procedure under the type of investigation that
6      he was involved in, he would be transferred.
7  Q:  Now the position for West, Central and Eastern Commanders, the
8      Section Commanders. There assigned for you out of the
9      department.
10 A:  Yes they are.
11 Q:  Are you ever consulted about that?
12 A:  On an occasional basis I'm consulted but not all the time, no.
13 Q:  Have there been any changes in those positions since Captain Ober
14     was changed into that position?
15 A:  Yes.
16 Q:  That's what he holds now right?
17 A:  Any posts?
18 Q:  Yeah.
19 A:  I left in July of 2000 so I really don't know if there are any changes
20     since then. I really haven't been keeping in tune with that.
21 Q:  Well who told you that Captain Ober was going to be assigned to
22     that position because you indicated you were told that. You didn't
23     have any part in that decision.
24 A:  No I didn't have a part in that decision.
25 Q:  Well who told you that?

10

1  A:  It was Lt. Colonel Westcott.
2  Q:  Now is he in your Chain of Command?
3  A:  He was the Deputy Commissioner of Operations.
4  Q:  And what did he do? Call you up and tell you you're getting
5      Captain Ober?
6  A:  Yes he did.
7  Q:  Tell us how that conversation went.
8  A:  He called. I don't remember exactly what date it was but in any
9      event it was in February of 2000. And he gave me a call, and it was
10     about 8 o'clock in the morning if I remember correctly. And he
11     called and he says to me that Captain Ober would be assigned to the
12     Central Section in the Bureau of Liquor Control Enforcement.
13 Q:  Did you ask him if that violated Department Regulations?
14 A:  No I did not.
15 Q:  Did you ask him why?
16 A:  No I did not.
17 Q:  Did he offer why?
18 A:  No he didn't.
19 Q:  What other Captains served under you as Section Commanders?
20     Well you've known Captains aside from Captain Ober that have
21     filled those positions, as Section Commanders haven't you?
22 A:  I know the people that fill that position yes. Absolutely. Here was
23     Ryan and Williams.
24 Q:  Well I mean people with rank of Captain. You know others don't
25     you.

11

1  A:  That what? Fill that particular position?
2  Q:  Yes.
3  A:  In my tenure? No.
4  Q:  Were you aware that at some point Captain Ober had filed legal
5      actions in Commonwealth Court?
6  A:  I was familiar with an article that appeared in the paper and to be
7      perfectly honest with you I don't have any recall but I think that the
8      article had indicated that there was some action that was dismissed.
9      And that was, you know to be able to put that into context whether
10     it was pre or post February 2000, I don't remember.
11 Q:  Well was there any scuttlebutt at all in the Pennsylvania State
12     Police about his
13 A:  You know I'll tell you what I do make it a point not to listen to
14     rumors because inevitably when you listen to rumors it's 180
15     degrees the other way.
16 Q:  My understanding of their 70 some, 60 or 70 sections, aside from
17     your tenure and your personal do you know of any that were
18     commanded by a Captain in your experience?
19 A:  You know I would really have to search back but typically I would
20     say no.
21 Q:  Ok, how many years have you spent with the Pennsylvania State
22     Police?
23 A:  I'm in my thirty fourth.
24 Q:  Wow that 's a lot of experience. You don't have a recollection of a
25     Captain other than Captain Ober as a section commander, as you

12

1   think of it?
2   A:   I never made it a point to be able to. You know certainly when
3        you're coming up through the ranks, you're not concerned with
4        what goes on in other troops you're concerned with doing your own
5        job. Certainly when you get in a command phase that's when you
6        become aware through conferences of different troop operations
7        and things of that nature. So in any event, certainly from that time
8        in my recollection I don't, and a field operation you're talking
9        about so you know, I don't have any recall of a Captain performing
10       as a Section Commander.
11  Q:   Do you have recollection of any unique problems in the Central
12       section?
13  A:   What do you mean by problems?
14  Q:   Ah, you just answered the question.
15  A:   In my interpretation, yes, we had problems.
16  Q:   What were they?
17  A:   I needed a Section Commander bad because Lt. Williams had been
18       gone, he's been transferred over to the Bureau of Patrol that had
19       been probably in or around September of 1999 and when that
20       happens we need to be able to back fill people. And what happened
21       was the Sergeant who was the District Office Commander at the
22       Harrisburg Office, district office; we needed to make him Acting
23       Section Commander. In his place we needed to be able move up a
24       Liquor Control Officer 3 or Supervisor to be able to be the District
25       Office Commander. And in that place we needed to be able to

13

1        assign a Liquor Enforcement Officer to be able to serve as Liquor
2        Enforcement Officer Supervisor. That was my unique problem that
3        I had. By being able to move Lt. Williams from that position and I
4        recognize the necessity to be able to do that under those
5        circumstances. I had a desperate need to have a section commander.
6        I needed that position filled.
7   Q:   Sure.
8   A:   so consequently every opportunity I had I was looking to be able to
9        promote that, to be able to get that position filled.
10  Q:   Sure. Now did you have something to do with Williams leaving?
11  A:   Personally no.
12  Q:   Who did?
13  A:   The department again based upon current regulations and the
14       circumstances that surrounded his case necessitated him o be able
15       to be transferred and I don't remember who signed the order. It
16       would have to be either the Commissioner or the Deputy
17       Commissioner.
18  Q:   Do you know why?
19  A:   I do know why he was transferred yes.
20  Q:   Why?
21  A:   Because of an allegation of sexual harassment against him. And
22       consistent with the Governors Orders and the Governor's
23       memorandum we needed to make the workplace safe. That's why
24       he was transferred and removed from that position.
25  Q:   All right. Is there some time that you served as head of PEMA?

14

1   A:   That I served as head of PEMA?
2   Q:   Yes.
3   A:   No.
4   Q:   What's PEMA?
5   A:   Pennsylvania Emergency Management Association.
6   Q:   What's that about? I know what the words mean, of course, but can
7        you tell us what it does in the state?
8   A:   Well it's a, it's an agency that is designated to be able to put
9        together emergency operations in the event of a natural or man-
10       made disaster. To be able to pull together all different resources
11       from different state agencies to be able to focus upon the problem.
12  Q:   Is it a priority in the Pennsylvania State Police?
13  A:   Well I don't know if you would call it a priority but certainly we
14       participate.
15  Q:   Who's the director of PEMA?
16  A:   I don't know.
17  Q:   What role does the police, obviously this is not a State Police
18       organization, right
19  A:   That's right.
20  Q:   What role does the Pennsylvania State Police play?
21  A:   We're one of the agencies within PEMA, and we have a desk there.
22       Certainly that's where we bring in the State Police resources into
23       that kind of an emergency situation, where there is direct contact
24       with the State Police and if we need to be able to certainly

15

1        designate some law enforcement services or acquire some
2        information, that kind of immediate resource would be there.
3   Q:   Is it a permanent kind of a position?
4   A:   No its not because I've seen other people come in.
5   Q:   I don't know much about it that why these questions. If I ask
6        questions sometimes that seem to be rather silly it's because I just
7        don't know. It was a very poor question, let me withdraw it. What I
8        should have said is its not so much as a permanent position,
9        Major. It's a position where somebody fills it fulltime for the State
10       Police or is it an additional position or something you do as an
11       additional duty?
12  A:   It's an additional duty. It's an alternate duty that people volunteer
13       for. And they participate representing the State Police within that
14       agency
15  Q:   My understanding is that Captain Ober was at some time or at one
16       time was involved with PEMA  and the State Police. That is from
17       my interviews and investigation into the case. Do you have any
18       knowledge of him being involved with PEMA or being a PEMA
19       representative for the State Police?
20  A:   From what Darrell told me yes.
21  Q:   Ok, what did he tell you?
22  A:   It was in February there whenever he was assigned to the Bureau
23       and he approached me to be able to determine if he could continue
24       his assignment to PEMA. My first reaction was I wanted him to be
25       able to focus on his position there at the Bureau rather than to be

16

1   able to be, you know, certainly than to be accepting responsibilities
2   somewhere. In any event, I says let me give that one some thought.
3   Let me look at it, evaluate it. So in any event he told me he was
4   involved in it. I forget if he said he was involved in it several years
5   from his previous position that he'd been associated as a
6   representative of the State Police over at PEMA.
7   Q:   So you thought about it. You considered it.
8   A:   Yes.
9   Q:   In the process of doing so did you find out that indeed he had been
10   assigned to PEMA?
11   A:   I found out he was assigned to PEMA, yes.
12   Q:   Did you talk to anyone about that?
13   A:   Yes.
14   Q:   Who did you talk with?
15   A:   I spoke with Major Washington who was at the time the Bureau
16   Director at the Bureau of Emergency and Special Operations for the
17   State Police. That's where the emergency operations officer from
18   the State Police is permanently assigned. I don't know if it was
19   Captain Davis at the time but that's who it is now. So I gave Major
20   Washington a call and I said how critical is Captain Ober's position
21   there with PEMA? And he says, you know, as far as Captain Ober
22   is concerned it's not critical for him but it's important that we have
23   somebody there. And I said if he were not available what would
24   you do? And he said we would just post for another Captain. So in
25   any event I says I wanted to really find out if this was going to be a

17

1   significant disadvantage to the State Police by removing Ober or
2   not providing the authorization for him to be able to be involved,
3   and he felt that it was not and he would just post for another
4   Captain. So based upon that we may have had conversation,
5   Captain Ober and I maybe a week, maybe two later and I told him
6   at that time I didn't want him to be able to be involved in that
7   maybe we would consider it maybe six months down the road we
8   would look at it again but at this particular time I really wanted him
9   to be able to focus in on adjusting to the new position as the Section
10   Commander of Liquor Control Enforcement.
11   Q:   How would PEMA interfere with his focusing or adjusting in?
12   A:   Well, ah, if you had any kind of critical event which would have
13   happened where he would have been required to perform his duties
14   over at the Bureau certainly he would be able to be at two places at
15   the same time. And we would have lost certainly his contribution
16   there at the Bureau. And sometimes you have these events or at
17   least it's been my experience that these events have been prolonged
18   for days and days at a time. I mean regrettably you know that's how
19   it happens; it's not over in an hour or two because certainly it needs
20   to be able to be addressed. So generally, you know, that's the
21   perspective that I was looking at from being the director of the
22   Bureau of Liquor Control Enforcement.
23   Q:   Ok. Now if every director in the Pennsylvania State Police did what
24   you did there wouldn't be any PEMA. Pennsylvania State Police
25   would what, not participate in PEMA? Or do they have a choice?

18

1   A:   Well, I think we could find a Captain someplace to be able to
2   participate. There's no question. It just that I felt to myself with the
3   Bureau, because I felt this was extremely important and for him to
4   be able to get adjusted to the position. Maybe I would have
5   reevaluated six months down the road. There's no question. Maybe
6   we would have looked at it differently. The other factor I needed to
7   look at, but I looked at it specifically from the operational point of
8   view. That's what my decision was based on. The Bureau of Liquor
9   Control Enforcement operates from funds from the Pennsylvania
10   Liquor Control Board and all of those funds and of course and what
11   they support is supposed to be directed to be able to investigate
12   violations of the Liquor Code in the Commonwealth of
13   Pennsylvania. We generally don't have people from the Bureau that
14   are assigned other places because this has got to be dedicated to the
15   process of being able to investigate the Liquor Code. But my
16   primary purpose was strictly from operational reasons.
17   Q:   And did, it was Major Washington at the time?
18   A:   Yes.
19   Q:   Did Major Washington tell you the position would be open six
20   months from the time you were denying Darrell the opportunity to
21   serve?
22   A:   We didn't discuss that.
23   Q:   You didn't discuss that at all. Now did you ask him how Darrell
24   performed in that position?
25   A:   No. No I didn't.

19

1   Q:   You didn't ask him about it?
2   A:   No.
3   Q:   Did he offer?
4   A:   No.
5   Q:   How long was this conversation?
6   A:   Probably around two minutes. Three minutes.
7   Q:   Did you, were you aware that Darrell Ober had held that position
8   before?
9   A:   Yes.
10   Q:   And did you know at that time how long he had held it?
11   A:   No I didn't.
12   Q:   Did you learn how he had lost the position?
13   A:   No I didn't. What you mean lost? I'm assuming he'd lost this
14   position, at the time we had this conversation he was assigned to
15   the Bureau of Liquor Control Enforcement. Is that what you're
16   referring to? So in that respect I know how he lost it.
17   Q:   How did he lose it according to your understanding?
18   A:   Because I denied him the authority to participate.
19   Q:   See my question is as a Bureau Director you had the power,
20   authority to be able to say he couldn't fill that position?
21   A:   Yes, I did.
22   Q:   And then see I asked you a question remember if every Bureau
23   Director did that how would the Pennsylvania State Police come up
24   with anybody fro PEMA?

20

**Page 21**

1  A:  Well I considered this position from my perspective as the Director
2      of the Bureau of Liquor Control Enforcement to be able to be a
3      very important position for him to be able to become familiar with
4      the operational aspects of that.
5  Q:  Now you've told us that and many times very clearly. But my
6      question is if you're telling me in the Pennsylvania State Police that
7      every Bureau Director has the authority to say no if they have a
8      person that wants to hold a position like that. And my simple
9      question is, I mean you're a Major, a very high level in the State
10     Police. A Major, how does the Pennsylvania State Police fill that
11     position? I mean you're response was "Ah they could go find a
12     Captain somewhere." Right?
13 A:  Right.
14 Q:  Don't they need somebody capable or competent to do that or is it
15     just sort of a wasted thing?
16 A:  Well the person should be capable and competent to be able to
17     represent the State Police. Most certainly with the PEMA agency,
18     there's no question about it. But I don't think we were looking at
19     only one person being that competent and that capable to be able to
20     do that. I think there were other people in the department to be able
21     to do that.
22 Q:  One would assume in an organization that large you would have
23     one competent person to be able to do a job like that. Did you learn
24     at anytime how long Darrell had held the position?
25 A:  No I didn't. I don't know how long he held it.

21

**Page 22**

1  Q:  Did you, did Mr. Williams, Major
2  A:  Washington.
3  Q:  Did Major Washington tell you he had lost the position because he
4      had been unlawfully transferred to Washington Pennsylvania?
5  A:  I didn't know he had lost the position.
6  Q:  Well you had indicated when I'd asked you about what had
7      occurred between you and Darrell Ober that you were going to look
8      into it. I'm just wondering the extent to which you did.
9  A:  I did. That's exactly what I did. I picked up the phone whether it
10     was that day or whether it was the next day when I had the time to
11     be able to do that. I called Major Washington and I wanted to know
12     how critical Captain Ober was to being able to perform these duties
13     as the representative of the State Police. And of course he indicated
14     to me that Captain Ober was not critical, himself as an individual
15     personally to be able to perform those duties. And that anybody
16     else would be able to be trained and to fill that position without too
17     much of a problem.
18 Q:  He told that anybody, a lot of people could do this. It isn't, there
19     isn't anything unique about Captain Ober in the Pennsylvania State
20     Police that we need him for this. Isn't anything personal, there's
21     nothing personal to him that we need Captain Ober for this
22     position? Right?
23 A:  Right.
24 Q:  Who was Captain Ober's immediate superior at the OCE?
25 A:  It would have been Captain McDonald.

22

**Page 23**

1  Q:  Captain McDonald. And what level was that?
2  A:  He would have been the Division Director.
3  Q:  Division Director?
4  A:  Division Director, right.
5  Q:  Now how many divisions are there in the Bureau?
6  A:  There are two divisions in the Bureau of Liquor Control
7      Enforcement.
8  Q:  I don't know quite how to explain where I'm coming from. When I
9      was in the service I had an opportunity as a Lieutenant to be a
10     Headquarters Company Commander, ok. The battalion commander
11     put me in that position as a First Lieutenant. Now I had
12     Administratively, which means I would look after their
13     administrative needs Captains underneath me. They certainly did
14     not respond to me in terms off orders. You know what I mean?
15     They responded directly to the Battalion Commander who was a Lt.
16     Colonel. This is in the army. Now what I'm trying to understand
17     based upon what I just learned from you. You've got a Captain, is
18     this a case of a Captain giving orders to a Captain?
19 A:  Yes.
20 Q:  That seems, now it's one thing to say you're looking after
21     somebody's administrative needs because you're in a position that
22     requires you to perform just purely administrative duties I guess.
23     But this is a Command position. How does a Captain command a
24     Captain?
25 A:  Very easily.

23

**Page 24**

1  Q:  Just tells him what to do?
2  A:  Just tells him what to do, exactly.
3  Q:  Thirty-four years in the Pennsylvania State Police?
4  A:  Yes.
5  Q:  Give me another example.
6  A:  I could probably relate it to myself, serving on some committees
7      where there were other Captains.
8  Q:  No, not committees, Major Chain of Command. Give me another
9      example of Chain of Command.
10 A:  You know I would have to be able to really think about that. there's
11     nothing that comes, I mean you're talking a typical field operation.
12 Q:  I'm talking about Chain of Command. I'm not. As I said to you
13     before, I got a Lt. Colonel he says Lieutenant Bailey you're going
14     to do this. I say, "yes sir" and I do it to the best of my ability. Now
15     I've got a senior Captain who is an S-1 let's say or an S-5.
16 A:  I don't know what that is.
17 Q:  Well that's a certain function. You know, Intelligence or
18     Operations or Property Book Officers different things. I didn't give
19     them orders on what to do but I was involved in a lot of
20     administrative tasks. In other words, they reported to the Battalion
21     Commander. Headquarters Company administrative tasks, it's a
22     dual thing. The Chain of Command comes from the Lt. Colonel
23     directly to those section captains so there's no violation of the
24     Chain of Command problem, let's say as a practical matter by
25     having a Lieutenant be the head of the Headquarters Company.

24

1    Now it's a great honor and privilege to serve in that position cause
2    it calls for a senior captain but here you're telling me this is a Chain
3    of Command thing. You've got a captain commanding a captain
4    and that's what got me a little bit, not confused but wondering if
5    that's unusual in the Pennsylvania State Police or how rare it is. I
6    assume it's rare.
7  A:  In a field operation I don't immediately recall you know where
8    there would be that situation. The only thing I can recall in a filed
9    operation of course is where there would be acting. In my absence I
10    would assign a captain acting and of course he would be
11    temporarily in charge of two other captains.
12  Q:  I can understand that certainly.
13  A:  But no. I don't recall in my time.
14  Q:  Any other example.
15  A:  Right.
16  Q:  I had asked you some questions about court activity on Captain
17    Ober's part. Can you tell me if you at anytime, forget the rumors
18    now, the scuttlebutt stuff and I understand that you don't pay
19    attention to that. so you have a recollection of ever learning about
20    Captain Ober's court experiences with the Pennsylvania State
21    Police? More specifically Commonwealth Court and any actions
22    that may have taken place there.
23  A:  No. Just from reading, I want to clarify, just from reading that
24    article in the paper. And I don't remember exactly when that was,
25    whether it was post or pre Captain Ober coming over where that

25

1    suit, I think it was dismissed. I just briefly read the article and you
2    know, time is to valuable to waste in that area. If there is something
3    the department wants me to deal with they'll let me know. And
4    rumors as I say they certainly serve no purpose at all.
5  Q:  Yes sir. Major did you ever wonder why Captain Ober was put in
6    that position?
7  A:  No I didn't.
8  Q:  Did you consider it unusual at all? I understand you had a great
9    need.
10  A:  Exactly.
11  Q:  For somebody in that position and that was an immediate command
12    concern that you had. And that was a source of frustration to you
13    not having somebody in that position. You needed somebody to do
14    that job.
15  A:  That's correct.
16  Q:  But the Pennsylvania State Police has thousands of people in it,
17    better than four thousand I think.
18  A:  About 4200.
19  Q:  All right sir. Now remember when you had called PEMA and you
20    talked to Major Washington and you said you know we need Ober
21    to fill this position at PEMA and you reasoning being I need him
22    here to focus on this. Right?
23  A:  Right.
24  Q:  Are you testifying that the Pennsylvania State Police couldn't find a
25    lieutenant for the section? For the Central section?

26

1  A:  I never made that kind of a search for anybody else. Whenever I
2    was called and said that Captain Ober was going to come over, to
3    be quite frank with you I was elated. That's exactly what I told him.
4  Q:  Should be elated to get and officer of that quality, I would be too.
5  A:  With the experience that I had with him and certainly the respect I
6    had for him that he was going to come over. And from the time Lt.
7    Williams had left, like I said, every opportunity I had I made it a
8    point to mention to Colonel Westcott how important that position
9    was there. And the fact that it was vacant and that three other
10    people were effected in there positions and that certainly we were
11    compensating, you know those other people also to be able to
12    perform in the higher pay scale. So as I say it was very important to
13    be able to fill that position. So when he called me to be able to
14    assign Captain Ober there certainly I was very satisfied with that.
15  Q:  And you never at any time suggested to Colonel...
16  A:  Colonel Westcott.
17  Q:  Colonel Westcott or anybody above you in the Chain of Command
18    that you needed a captain for that position?
19  A:  I said I needed the position filled.
20  Q:  You just needed somebody. Right. You didn't suggest it be a
21    captain, a sergeant, a lieutenant, a major, a colonel, a commissioner
22    or anything else. You just, I need somebody to do this job because I
23    got work to be done and I need things done.
24  A:  Right.

27

1  Q:  When, how did you first learn that Captain Ober was assigned to
2    you at the LCE?
3  A:  As I say it was in around February, I don't recall the exact date but
4    in any event I received a call from      Lt. Colonel Westcott. It was
5    in the morning I'd say it was someplace around 8 am or someplace
6    in and around that area and he said that Captain Ober would be
7    coming 0ver to be able to fill Lt. Williams position for the Central
8    Section commander. That's how I first learned about it.
9  Q:  And how long was that conversation?
10  A:  Probably around 45 seconds. Less that a minute I'd say.
11  Q:  Holy Cow.
12  A:  It was a matter of him pushing information to me and me certainly
13    me understanding the information.
14  Q:  Sure.
15  A:  And acting, in fact Captain Ober was there that morning. So I
16    assumed he came in to be able to report, which I found out later, he
17    didn't.
18  Q:  All right so that was he called you up and you're not the type of
19    fellow to beat around the bush and ok fine and you were pleased
20    that you had somebody.
21  A:  I was very pleased.
22  Q:  Why were you so happy or pleased? Did you know Captain Ober?
23  A:  Not that I've had that much experience with Captain Ober but
24    certainly we did get a chance to be able to work on a committee

28

1     about four years before where there were about fourteen or fifteen
2     of us.
3 Q:   Was that the museum committee?
4 A:   No. It wasn't the museum committee.
5 Q:   Or what was it?
6 A:   It was the Legislative Reference and Budget Committee. We were
7     reviewing the report and I felt he had done some excellent work
8     there. I was a captain at the time we worked together along with
9     twelve, fourteen other people. And like I said I thought that it was
10     an excellent contribution that was made by everybody and that's
11     when I first really directly worked with Captain Ober?
12 Q:   What was his rank then?
13 A:   He was a Captain.
14 Q:   And your rank was?
15 A:   I was a Captain.
16 Q:   You were a captain and that was before you took the LCE?
17 A:   Yes, I want to be able to think and tell you when that was. I'd have
18     to be able to stretch and don't hold me to it. But it think it was
19     around 1996.
20 Q:   Was Captain Ober the kind of Pennsylvania State Police member
21     that really put his heart and effort into working toward that
22     committee effort that you worked on there?
23 A:   Yes.
24 Q:   And had a good positive attitude about working with his colleagues
25     to get things done?

29

1 A:   I think he had.
2 Q:   In your view was he somebody you were proud to call a colleague?
3 A:   Oh absolutely.
4 Q:   And isn't it fair to say he treated you with the utmost respect as a
5     colleague?
6 A:   I think so.
7 Q:   And hasn't he always treated you with the utmost respect?
8 A:   Absolutely.

10     **END OF SIDE ONE - TAPE ONE**

12 Q:   Major you did learn at some point that Captain Ober had been sent
13     out to Washington, Pennsylvania. I'm from western Pennsylvania.
14     You're from the hard coal and I'm from the soft coal. And we call
15     it little Washington out there. We don't mean Washington, DC or
16     anything    thing like that but you would know of course because
17     you know the whole state. Did you know why Captain Ober was
18     sent out to Little Washington? Why he was sent out there?
19 A:   No I didn't.
20 Q:   Did you ever have any conversations with anybody either at your
21     level of rank or above you in the Pennsylvania State Police about
22     Captain Ober and any of his personnel experiences or assignments?
23 A:   You know what? I probably did I just don't recall having those kind
24     of. I know probably at the time we worked together in 1996 I
25     probably asked around, you know, who was he? You know, where

30

1     does he come from? I think he was in R&D at the time, you know. I
2     know we shared some stories together. But no I don't make it a
3     point to be able to listen to rumors like I said, really don't.
4 Q:   Right. Well, I know you don't listen to them. But now and then
5     they have a way of imposing themselves on us because we are at
6     the wrong place at the wrong time. Do you remember any rumors
7     about Captain Ober?
8 A:   No.
9 Q:   As someone who, you're his commander at this time are you not?
10 A:   We don't. We're not working directly in the same Chain of
11     Command.
12 Q:   I'm sorry I keep forgetting that you left there. During the time that
13     you were his Commander, his, you were in charge, you were in his
14     direct Chain of Command. Now you're not in his direct Chain of
15     Command now.
16 A:   That's correct.
17 Q:   And forgive me I keep forgetting that you made the change to the
18     area from the Bureau. Anyway during the time that he, let me just
19     use a common phraseology, he worked for you. During the time he
20     worked for you and you were his, you know. Did he perform his
21     duties satisfactorily to you, for you and perform them well to the
22     best of your knowledge?
23 A:   At the time that we directly worked together?
24 Q:   Yes.
25 A:   Yes absolutely.

31

1 Q:   At this time let's suspend and Darrell and I step outside. This is a
2     process I do. I think we're pretty much near the end of this. I need
3     to review a couple of things with him and your attorney may have
4     some questions for you.
5 MR. MARCECA: The time is 1:53 P.M. and we're going to stop the film
6     while the attorney confers.
7 BREAK.
8 MR. BAILEY: Ladies and Gentlemen please be advised that there is a
9     recorder running. We're, at this point; I'm sorry, let me conclude
10     here just for a second on that, please. Major Koselnak I'd like to
11     thank you very much for coming here today and answering
12     questions. At this time I don't have any further questions for you. It
13     would be up to your attorney and I understand, Joanne do you?
14 MS. REYNOLDS: I have no questions.
15 MR. BAILEY: Thank you sir very much. Your deposition is ended. You
16     have to wait here until he shuts down this infernal machine.
17 MR. MARCECA: Ok, it's now 2 P.M. 10/23/01 and this deposition is
18     now concluded. Thank you.

32

26

1

1    UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT

3            OF PENNSYLVANIA

4        *  *  *  *  *  *  *

5    DARRELL G. OBER,    *

6        Plaintiff      * No.

7        vs.            * 1: CV-01-0084

8    PAUL EVANKO, MARK  * Civil Action-Law

9    CAMPBELL, THOMAS   *

10   COURY, JOSEPH      *

11   WESTCOTT,          * *ORIGINAL*

12   HAWTHORNE CONLEY,  *

13       Defendants     *

14        *  *  *  *  *  *  *

15

16        VIDEOTAPE DEPOSITION OF

17            RALPH W. KUSH

18        MARCH 14, 2002

19

20

21

22

23   Any reproduction of this transcript

24   is prohibited without authorization

25        by the certifying agency

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

# Sargent's Correction Page

| Page | Line | Error | Correction | Reason |
|------|------|-------|------------|--------|
| 100 | 16 | Findley | Findlay ~~Findley mf~~ | spelling |
| 156 | 9 | Bailey | Behrens | ? |
| 159 | 23 | invest | the vest | typo |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

I have read the transcript of my testimony and certify that it is accurate with the above corrections.

Deponent's signature: Ralph Kush

Date of Deposition:  March 14, 2002

Notary Public Signature

Notarial Seal
Roberta M. Klimovich, Notary Public
Pittsburgh, Allegheny County
My Commission Expires July 27, 2002
Member, Pennsylvania Association of Notaries

2

1            VIDEOTAPE DEPOSITION

2                    OF

3    RALPH W. KUSH was taken on behalf of

4    the Defendants herein, pursuant to

5    the Rules of Civil Procedure, taken

6    before me, the undersigned, Denise

7    Jeanne Khorey-Harriman, a Registered

8    Merit Reporter and Notary Public in

9    and for the Commonwealth of

10   Pennsylvania, at the offices of the

11   Federal Bureau of Investigation,

12   3311 East Carson Street, Pittsburgh,

13   Pennsylvania, on Thursday, March 14,

14   2002, at 11:15 a.m.

15

16

17

18

19

20

21

22

23

24

25

3

1              A P P E A R A N C E S

2

3    DON BAILEY, ESQUIRE

4    4311 North 6th Street

5    Harrisburg, PA  17110

6        COUNSEL FOR PLAINTIFF

7

8    SYNDI L. GUIDO, ESQUIRE

9    Deputy General Counsel

10   Governor's Office of General Counsel

11   333 Market Street, 17th Floor

12   Harrisburg, PA  17101

13       COUNSEL FOR DEFENDANTS

14

15   JEFFREY B. KILLEEN, ESQUIRE

16   Chief Division Counsel

17   3311 East Carson Street

18   Pittsburgh, PA  15203

19     COUNSEL FOR SOOHY AND KUSH

20

21   ALSO PRESENT:  DARRELL G. OBER

22                  JOHN R. BROWN

23                  ANTHONY MARCECA

24

25

4

1                        I N D E X

2    WITNESS: RALPH W. KUSH

3    EXAMINATION

4        BY ATTORNEY GUIDO            10-82

5    EXAMINATION

6        BY ATTORNEY BAILEY           81-180

7    RE-EXAMINATION

8        BY ATTORNEY GUIDO            180-212

9    RE-EXAMINATION

10       BY ATTORNEY BAILEY           213-223

11   RE-EXAMINATION

12       BY ATTORNEY GUIDO            224

13   RE-EXAMINATION

14       BY ATTORNEY BAILEY           224-225

15   CERTIFICATE                      226

16

17

18

19

20

21

22

23

24

25

5

1                <u>E X H I B I T   P A G E</u>

2                                               <u>P A G E</u>

3       <u>NUMBER</u>      <u>IDENTIFICATION</u>      <u>IDENTIFIED</u>

4       ONE          PHOTOCOPY            162

5       TWO          DOCUMENT             180

6       THREE        INTERVIEW            194

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

<u>OBJECTION PAGE</u>

<u>ATTORNEY</u>                                        <u>PAGE</u>

BAILEY                              27, 37, 38, 51,

                                   195, 203, 203

7

1                 P R O C E E D I N G S

2         - - - - - - - - - - - - - - - - -

3                     VIDEOGRAPHER:

4                 Good morning.  Be

5         advised the video and

6         audio is in operation.  My

7         name is Tony Marceca.  My

8         address is 2219 Dixie

9         Drive, York, Pennsylvania

10        17402.  I have been

11        contracted by PR Video to

12        be the video operator for

13        this deposition.  The case

14        is: In The United States

15        District Court of the

16        Middle District of

17        Pennsylvania.  It's titled

18        Darrell G. Ober,

19        Plaintiff, versus Paul

20        Evanko, et al.  It's a

21        Civil Action Law Case.

22        It's 1:CV-01-0084.  The

23        deposition is taking place

24        at the FBI headquarters in

25        Pittsburgh, Pennsylvania,

8

1          at 3311 East Carson

2          Street, Pittsburgh,

3          Pennsylvania.  And the

4          witness is Ralph Kush,

5          K-U-S-H.  And his

6          deposition is being held

7          on the part of the Paul

8          Evanko et al., the State,

9          Commonwealth of

10         Pennsylvania.  Is that

11         correct?

12              ATTORNEY GUIDO:

13              Correct.

14              ATTORNEY BAILEY:

15              Yes, sir.

16              VIDEOGRAPHER:

17              The time now is

18         11:15.  And this is March

19         14th, 2002.  And Mr. Kush,

20         would you please raise

21         your right hand and swear

22         after me.

23    RALPH W. KUSH, CALLED AND SWORN TO

24    TESTIFY

25              VIDEOGRAPHER:

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

9

1          Mr. Bailey, may I

2      have a sound check?

3          ATTORNEY BAILEY:

4          Sure.  My name is Don

5      Bailey.  I'm an attorney.

6      I represent the Plaintiff

7      in this case, Darrell G.

8      Ober.  My address is 4311

9      North Sixth Street,

10     Harrisburg, Pennsylvania

11     17110.  Phone,

12     717-221-9500.

13         ATTORNEY GUIDO:

14         Syndi Guido,

15     Governor's Office of

16     General Counsel for the

17     Defense.

18         ATTORNEY KILLEEN:

19         Jeff Killeen, Chief

20     Division Counsel, FBI

21     Pittsburgh Division, 3311

22     East Carson Street,

23     Pittsburgh, 15203, phone

24     412-432-4000.

25         ATTORNEY GUIDO:

10

1          Ready?

2          VIDEOGRAPHER:

3          Ready.

4    EXAMINATION

5    BY ATTORNEY GUIDO:

6    Q.        Sir, I understand you're

7    retired now?

8    A.        Yes, I am.

9    Q.        And how long were you with

10   the FBI?

11   A.        Just over 24 years.

12   Q.        When did you retire?

13   A.        December 31st, 2001.

14   Q.        And how long were you in

15   the Pittsburgh area or out in

16   western Pennsylvania?

17   A.        I came here in '85, so

18   that would be about 16 years.

19   Q.        When did you first receive

20   information about possible political

21   corruption at the Pennsylvania State

22   Police Academy?

23   A.        That was --- it's been

24   several years now.  It was

25   approximately --- if you have the

11

1   date, it's like '95, '96, maybe, we

2   served a search warrant.  And the

3   individual that we served the search

4   warrant on indicated that he would

5   cooperate with us.  And one of the

6   things that he divulged to us was

7   the fact that someone was trying to

8   buy a position in the State Police

9   Academy.

10  Q.        Could that initial

11  information have been as early as

12  1994, 1995?

13  A.        Sure.

14  Q.        And when you first got

15  that information, what was the first

16  thing --- did you contact somebody

17  at the State Police?

18  A.        Eventually.  I didn't

19  realize exactly who we were dealing

20  with at the time.  I subsequently

21  determined through actually a police

22  check through the local Allegheny

23  County Pittsburgh system that the

24  individual that was mentioned to me

25  was actually a State Police

12

1  officer.  There was a report --- he

2  was a victim in an accident --- hit

3  and run.  And I found out he was a

4  State Police officer at that time.

5  Q.          And so that --- I'm a

6  little unclear.  I know that it came

7  about.  What information did you

8  have that he, by name, before you

9  knew he was a state trooper?

10 A.          Sure.

11 Q.          How did you know he was

12 involved in this?

13 A.          The information that we

14 received, there was a friend of the

15 individual who was cooperating.  He

16 had a friend who wanted to become a

17 State Police trooper, and he was

18 willing to pay for that.

19 Q.          Okay.

20 A.          And the amount was $10,000

21 at the time.  And he gave me the

22 name --- the name of the person who

23 was going to intercede on behalf of

24 the person wanting to become a

25 trooper was, in fact, a state

13

1   trooper, but I didn't know that at

2   the time.  That person ---.

3   Q.        That's when you ---?

4   A.        Excuse me?

5   Q.        Excuse me.  That's when

6   you got the name Kipp Stanton?

7   A.        That's right.

8   Q.        Okay.

9   A.        And we didn't know --- and

10  he actually didn't even know he was

11  a state trooper.  He thought he was

12  some police officer in a local

13  department.  I determined through

14  some record checks that he was, in

15  fact, a State Police officer.  And

16  at that point, I contacted the State

17  Police.  And ---.

18  Q.        Who did you --- do you

19  know who you contacted at the State

20  Police?

21  A.        I contacted Harrisburg.

22  And I can't recall.  I got a little

23  bit of the runaround there, but

24  eventually I ended up with --- the

25  Internal Affairs officer at the time

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

14

1   was in Greentree.  And if I could

2   remember, if somebody would mention

3   - - -.

4   Q.        Does the name Claus

5   Behrens ring a bell?

6   A.        No, not Claus Behrens.

7   Q.        Not Claus Behrens.

8   Somebody else in Greentree?

9   A.        Yeah, he was in

10  Greentree.  He was the western

11  Pennsylvania OPR.  It may come to

12  me.  If it does, I'll give you a

13  name.  Because I was concerned at

14  the time - - - excuse me.  I was

15  concerned at the time that there

16  might have been a State Police thing

17  going on.  And I didn't want to get

18  in the middle of that thing.

19  Q.        Could it have been - - -

20  could the last name have been

21  Conley?

22  A.        No.

23  Q.        If you remember - - -?

24  A.        If I remember it, he's

25  recently retired.  And he's from, I

15

1   think, one of the southern counties

2   out here now.  But yeah, I was

3   concerned at the time that there was

4   a State Police sting going on, and I

5   didn't want to get --- be involved

6   in that thing.  He made a check

7   discreetly for us.  I basically told

8   him that --- what the situation

9   was.  And he was receptive to our

10  investigation.  And he made a

11  discreet check to see if Kipp

12  Stanton was, in fact, involved in

13  any kind of undercover operation out

14  in the East Liberty section of

15  Pittsburgh.  He told me he wasn't.

16  And I had pretty much a green light

17  then to continue on that phase along

18  with other phases, which we were

19  working on at the time.

20  Q.       Do you remember when that

21  was?

22  A.       It was probably no more

23  than two weeks after I had gotten

24  the initial information.  It had to

25  be within that two-week period, I

16

1  would think.

2  Q.          Did you eventually have

3  discussions with Claus Behrens about

4  it when he was in the Internal

5  Affairs in the Western Division at

6  Greentree?

7  A.          No.

8  Q.          You don't remember ever

9  talking to Claus Behrens about it?

10               ATTORNEY BAILEY:

11               Behrens is spelled

12               B-E-H-R-E --- well,

13               sometimes spelling, you

14               know, helps because of

15               ---.

16  A.          No.   Claus Behrens is with

17  the Pennsylvania Attorney General's

18  office; is he not?

19  BY ATTORNEY GUIDO:

20  Q.          No.   Claus Behrens is ---

21  you're thinking of Laws Claus, I

22  think.

23  A.          Oh, gosh.   Those names

24  ---.

25  Q.          Okay.   I ---?.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

17

1    A.        Yeah, this guy was a

2    Captain, I think, or ---.

3    Q.        Yes.  The Captain in

4    charge of the Greentree IAD.

5    A.        That would have been him.

6    Q.        If his name was Claus

7    Behrens ---?

8    A.        That's the person I

9    thought of.

10   Q.        Okay.

11   A.        I'd have to look at my

12   file.

13   Q.        I think I know who you're

14   confusing with Laws Claus at the

15   Attorney General's office?

16   A.        Yeah.

17   Q.        Okay.  Because he was in

18   that area years ago?

19   A.        Yeah.  He's down the

20   street.

21   Q.        Okay.  So that's why I was

22   getting confused.

23   A.        Okay.

24   Q.        You were thinking ahead of

25   me here.

18

1    A.        That's better, sure.

2    Q.        So now that we have that

3    cleared up, when do you think you

4    had the conversation with Captain

5    Behrens?

6    A.        I would say like probably

7    a week or so after the initial

8    information we had --- we wanted to

9    develop it as soon as we could to

10   determine if that was a road we

11   should go down or not.  If he were

12   --- if the State Police was in

13   there, we weren't going to go down

14   that road.

15   Q.        And do you know what

16   checking he did for you?

17   A.        He called the barracks, I

18   think, where Kipp Stanton was

19   assigned at the time to determine if

20   he was involved.

21   Q.        Was that okay with you?

22   A.        Sure.  I trust --- we have

23   to trust each other in law

24   enforcement.  And his --- you know,

25   I knew he'd be discreet.

19

1   Q.        Did you make --- other

2   than asking him to check out whether

3   there was a sting operation, did you

4   ask for any other assistance from

5   --- I think at the time he was a

6   Lieutenant, but Lieutenant or

7   Captain Behrens?

8   A.        No.

9   Q.        Do you know, what was the

10  next contact you would have had ---

11  well, excuse me.  Did the

12  investigation end there or what

13  happened with it?

14  A.        Well, it proceeded for a

15  couple of weeks.  And then because

16  of internal necessities, we had to

17  stop that end of it.  And then it

18  stayed dormant probably about 18

19  months, I guess, or two years,

20  whatever.  And then we reactivated

21  it.

22  Q.        During ---?

23  A.        Because there were other

24  things we were addressing at the

25  time.

20

1    Q.        During the time, the

2    initial phase before it went

3    dormant, when it was first active,

4    did you have any information that

5    anybody within the command structure

6    of the State Police would be

7    involved in selling spots to the

8    State Police Academy?

9    A.        No, I --- let me go back

10   here just a second.  I think that

11   first came up --- or the possibility

12   came up, was the result of a tape

13   recording that we had.  And at that

14   point, it was --- this investigation

15   was reactivated or this phase of it

16   was --- excuse me.  And we captured

17   some information.

18   Q.        Now, did you have --- when

19   you talked to --- back then, during

20   this first phase when you contacted

21   Behrens, did you talk with him about

22   the need for confidentiality or was

23   there any discussion about who

24   within the State Police he could

25   discuss this with, anything of that

21

1  nature?

2  A.        He knew generally where we

3  were going to go with this case.

4  And, in fact, we really weren't sure

5  where we would go either with it.

6  At the time, the person that was

7  cooperating with us has --- had and

8  still --- I don't know if he has

9  anymore, but had contacts within the

10 judiciary --- or not --- well,

11 within the legislative branch, some

12 representatives and some state

13 Senators.  And so, that was the

14 method --- that was the way ---

15 direction we were probably going to

16 go with it in developing it.

17 Q.        Did you give any advice to

18 Lieutenant Behrens about who he

19 should or should not tell in the

20 State Police or did you leave that

21 decision up to him?

22              ATTORNEY BAILEY:

23              You mean Captain

24          Ober, I think?

25              ATTORNEY GUIDO:

22

1          No.  I'm talking

2      about Lieutenant Behrens.

3              ATTORNEY BAILEY:

4          Lieutenant Behrens?

5              ATTORNEY GUIDO:

6          He was a Lieutenant,

7          he later became Captain.

8  A.          No, I didn't.

9  BY ATTORNEY GUIDO:

10  Q.          So whether he was

11  Lieutenant or Captain at that time,

12  did you have any discussion about

13  that issue at all?

14  A.          You know, he had the

15  information.  And, you know, we ---

16  we were proceeding on an

17  investigation, and we were seeking

18  his cooperation.  And we couldn't

19  dictate to him what he would do with

20  it, but we were going in that

21  direction.  And he basically --- you

22  know, at the appropriate time, we

23  would tell him where we were and

24  what was going on.

25  Q.          Okay.  Then when was the

23

1  next time you had contact with

2  people at the State Police about the

3  Trooper Stanton situation?

4  A.        If you have the date,

5  there was a --- like I said, there

6  was a --- several, a year, a year

7  and a half had gone by, and our

8  supervisors had changed.  And Mike

9  Soohy became our supervisor.  And

10 when he was reviewing the cases, he

11 said, hey, how about this angle,

12 let's get on with this situation

13 here and see if the cooperating

14 witness, you know, could reactivate

15 that and see if the guy was still

16 interested in becoming a trooper.

17 And we did that.  And he said, yeah,

18 in fact, he had been contacted about

19 that a couple of times in between.

20 Q.        So would the next time

21 that you met, had any meetings or

22 discussions with the State Police

23 about this be in either August or

24 September of 1998 when you met with

25 the members of the organized crime

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

24

1  unit at the State Police?

2  A.        That's possible.  Yeah,

3  out in Harmarville.

4  Q.        Do you remember a meeting

5  like that?  Let's see who they

6  were.

7  A.        I may have ---.

8              ATTORNEY BAILEY:

9              She's going to see

10             who they were.  Who were

11             they?

12             ATTORNEY GUIDO:

13             I'm looking to see.

14             Captain Frank Monaco.

15  A.        Hmm.

16  BY ATTORNEY GUIDO:

17  Q.        I'll give you the names,

18  see if the names ring a bell.

19  Lieutenant Jerry Ryan.

20  A.        Uh-huh (yes).

21  Q.        Or Corporal Jeffrey Shaw,

22  Corporal David Lieberman.

23  A.        I did meet with them.  I

24  can't recall whether I gave them ---

25  if that was before or after I had

25

1  that contact at Harrisburg OPR.  If,

2  in fact, I did, --- I recall talking

3  with those individuals.  Now, if I

4  got into specifics on the case or

5  not, I'm not sure.

6  Q.        Do you ---?

7  A.        We talked about a lot of

8  things.  We were --- at that point,

9  we were trying to join up forces

10  more with the State Police in

11  addressing some of these areas and

12  just seeing what we could do

13  jointly.

14  Q.        Do you remember if you ---

15  if they were the ones that made the

16  suggestion that you might want to

17  contact the Internal Affairs

18  Division?

19  A.        No, it wasn't.  It wasn't

20  them.  In fact, I think the

21  suggestion came from Mike Soohy, my

22  supervisor.  He said, hey, let's ---

23  you know, let's -- well, what had

24  happened was the tape recording that

25  we got was a videotape, I believe,

26

1    maybe not, maybe -- no, it was an

2    audio tape.  It's an audio tape.

3    And in that tape, Kipp Stanton and

4    the guy that was trying to buy the

5    job --- excuse me?

                    ATTORNEY BAILEY:

7                   Bridges?

8    A.          Bridges, yeah.  Bridges

9    actually discussed the whole

10   process.  Bridges had taken the

11   exam, had been put in the different

12   level than what they were actually

13   calling potential troopers in, I

14   think it was the B class.  And he

15   needed to be in A class.  So he knew

16   the whole process.   He mentioned

17   names of people who had bought

18   jobs.  So we were at a point where

19   we needed to verify information that

20   we were getting, plus it was time,

21   you know, my supervisors decided it

22   was time, you know, to bring the

23   State Police back into this thing.

24   And that's when we contacted OPR,

25   their State Police OPR in

27

1  Harrisburg.  And then I was put in

2  touch with Captain Ober.

3  BY ATTORNEY GUIDO:

4  Q.        Do you remember who you

5  first called or how you found out

6  who to call?

7  A.        I think I just called the

8  general number and asked for the

9  Internal Affairs, and I was directed

10  that way.

11  Q.        And so it was the State

12  Police that told you --- somebody at

13  State Police headquarters that would

14  have said Captain Ober's the person

15  to talk to?

16  A.        Yeah, I didn't know who

17  Captain Ober was.

18              ATTORNEY BAILEY:

19              Objection to the form

20              of the question.  You may

21              respond.

22  BY ATTORNEY GUIDO:

23  Q.        Did you ever work with

24  Captain Ober before?

25  A.        No.

28

1    Q.         Had you ever heard of him

2    before?

3    A.         No.

4    Q.         Did you know anything

5    about his reputation?

6    A.         No.

7    Q.         Did you know anything

8    about his integrity?

9    A.         No.

10   Q.         So you didn't choose him

11   for any of those factors?

12   A.         No.  I mean ---.

13   Q.         It was his position;

14   right?

15   A.         He was with the State

16   Police.  We tend to trust everybody.

17   Q.         That's what I'm asking.

18   It was his position was the reason

19   you contacted him, not anything you

20   knew about him personally?

21   A.         No.

22   Q.         At the time that you first

23   contacted Captain Ober, did you have

24   any information that anyone in the

25   --- any Lieutenant Colonel at the

29

1    State Police or anybody in the

2    governor's office was involved in

3    any way in this possible corruption?

4    A.          As I said, the tape

5    recording did have that on it, you

6    know, it had reference to Lieutenant

7    Colonel or somebody who could

8    intercede.  And, you know, we'd

9    listened to it, but it actually

10   didn't --- we didn't pick up on it

11   as hard as we did when we played it

12   for Captain Ober.  He recognized

13   that.  I guess he's more familiar

14   with the whole process, and he

15   picked on it real quickly.

16   Q.          Now, if that tape recorder

17   recording wasn't made until a full

18   week after Captain Ober reported it

19   to his supervisor, then you must

20   have talked --- would you have

21   talked to him before that?  In other

22   words, if the tape recording was

23   made October 13th, but he reported

24   it not to his supervisor, but to

25   Lieutenant Colonel Hickes on October

30

1    5th, I'm just wondering how that can

2    be?

3    A.          Well, it's possible if

4    that's the way it was.  But when we

5    actually met in --- where was it,

6    out in Bedford, it's between Bedford

7    and Breezewood, we had the recording

8    at that point.

9    Q.          Okay.  But ---?

10   A.          I'm pretty sure we did.  I

11   didn't really check my dates on

12   here.

13   Q.          Do you know when you met

14   with him?  I know it's a long time

15   ago.

16   A.          Yeah.

17   Q.          That's why I'm trying to

18   refresh your memory a little bit.

19   A.          We met at the barracks

20   there between Breezewood and

21   Bedford.

22   Q.          And you had the tape

23   recording by then; correct?

24   A.          We had tape recordings.

25   Specifically that one, I can't

31

1   recall whether we actually had that

2   one or not because there was many

3   tape recordings we had.  But I kind

4   of think we did.  I think we did

5   have it at that point.  I mean,

6   that's ---.

7   Q.          At the point that you

8   first contacted him?  I mean ---

9   okay.  Now, the tape recordings ---?

10  A.          When we ---.

11                  ATTORNEY BAILEY:

12                  Let him answer.

13  A.          When we came in contact,

14  we had it.

15  BY ATTORNEY GUIDO:

16  Q.          Right.  What I'm getting

17  at is when you very first spoke to

18  Captain Ober about it.

19  A.          Uh-huh (yes).

20  Q.          We know --- we've

21  established through the course of

22  these things that Captain Ober had

23  told Lieutenant Colonel Hickes on

24  October 5 that he had had contact

25  from you, and you were doing some

32

1  investigation?

2  A.        Okay.

3  Q.        We also have all the tape

4  recordings and transcripts, unless

5  there's some you didn't give us?

6  A.        I don't think so.

7  Q.        And it was not until

8  October, I think it's 13th, it could

9  be the 12th, but the 12th or 13th,

10 in which the tape recording was made

11 in which the Lieutenant Colonel was

12 mentioned, in which the governor's

13 office was mentioned?

14 A.        Okay.  Yeah.

15 Q.        So what I'm saying is does

16 that help you at all remember more

17 about your first communications with

18 Captain Ober?

19 A.        Well, the first

20 communications were telephonic.

21 Q.        Yes.

22 A.        And I would have --- I

23 would have told him that they were

24 --- there was a possibility that

25 --- that somebody could buy their

33

1  way into the trooper class by being

2  upgraded in their scores.

3  Q.        Did you have any idea how

4  that could happen?

5  A.        Well, yeah.  Through

6  political, you know, manipulation.

7  Q.        I mean, that's ---?

8  A.        That's what --- I worked

9  political corruption.  And that was

10  my direction at the time.  I would

11  --- if that, in fact, was possible,

12  which these people were saying was

13  possible for a fee, then that's what

14  I wanted to attack was the

15  corruption at that level.  So yeah,

16  I would have told him that there

17  were -- they were seeking, you know,

18  through political means to change

19  the --- what's the thing I just ---

20  the level, whatever it was, A level,

21  B level, C level, so it was, I

22  believe, from a B to an A.

23  Q.        Bands.

24  A.        Very good.  Bands.  And

25  that was the whole matter was being

34

1    upgraded.

2    Q.        What I was asking was if

3    that would be possible, is did you

4    know at that time from a logistical

5    perspective how somebody at the

6    State Police could get switched

7    bands or is that what you needed

8    Captain Ober for?

9    A.        Well, we needed Captain

10   Ober for --- because we had names

11   that came up in the tape recordings

12   that people who have already done

13   this --- in fact, it was alleged

14   that one was already in class.

15   There was a person in the training

16   classes.  So we needed to verify

17   that.  If that, in fact, was the

18   case, then we were going to have to

19   open up another investigation on the

20   politician who supposedly was

21   responsible for that.  So we weren't

22   --- our investigation at that point

23   appeared to be broadening.  And we

24   needed to determine if there were

25   other players involved, so that we

35

1    needed to talk to him.  Plus, you

2    know, my supervisor felt that it was

3    time to bring them in, so that they

4    can start taking a look, too.

5    Q.        So that who could start

6    taking a look?

7    A.        The State Police.

8    Q.        So that they could do

9    their own investigation?

10   A.        Sure, yeah.

11   Q.        Did you have any

12   discussions with Captain Ober about

13   whether or not he could tell his

14   Major, the person in charge of the

15   Bureau of Professional

16   Responsibility, about your

17   investigation?

18   A.        No.

19   Q.        Did you have any

20   discussions with him about --- where

21   you told him you couldn't tell

22   anybody within the State Police

23   about it?

24   A.        No, we trusted his

25   judgment basically that, you know,

36

1    here's the information and you know

2    where we're going.  We're conducting

3    our own investigation here.  And

4    ---.

5    Q.        Did you essentially leave

6    it up to him to decide who within

7    the State Police should know about

8    it?

9    A.        That's correct.

10   Q.        Now, reviewing information

11   from an interview you gave on May

12   25th of 1999, although it's not an

13   exact transcript of your interview,

14   and one on June 30th of --- a

15   follow-up interview on June 30th of

16   1999, do you think that reviewing

17   that at all would help you remember

18   any of this?

19   A.        Okay.

20   Q.        Because I don't want you

21   to think I have something I'm

22   looking at that you can't.

23   A.        Okay.

24   Q.        That's what I'm looking at

25   in case you were wondering.

37

1    A.        That's fine.

2    Q.        In any event, when you

3    were interviewed about this

4    previously by Major Williams of the

5    State Police back in 1999 ---

6    A.        Okay.

7    Q.        --- you had indicated that

8    when you contacted Captain Ober,

9    that the information you had was

10   that Trooper Stanton wanted to make

11   arrangements through a state Senator

12   or state representative?

13   A.        Uh-huh (yes).

14                    ATTORNEY BAILEY:

15              Let me object to the

16              form of the question.  I

17              suggest that this

18              gentleman should be

19              provided copies of what

20              another person put down as

21              remarks attributed to

22              him.  I ---.

23                    ATTORNEY GUIDO:

24              I'm going to rephrase

25              my question.  Okay?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

38

<u>ATTORNEY BAILEY:</u>

I very much object to characterizations to the effect that you said. He's a highly qualified professional FBI agent with years of experience, he should be able to see what someone wrote down and said that he said before he's questioned about it.

<u>BY ATTORNEY GUIDO:</u>

Q.      I don't think I ever said you couldn't see it; did I?  But in any event, what my question is if you --- do you recall telling Major Williams that a state representative or a state senator was the person that you had information that they might be able to get?

A.      That's right.

Q.      That sounds right to you?

A.      That sounds right.

Q.      . So after you had that

39

1  information --- that fits with what

2  you said.

3  A.          Well, we really had no

4  jurisdiction in the bribery at that

5  level, so there was no --- there was

6  no way we could prosecute Kipp

7  Stanton.

8  Q.          What would you have had

9  jurisdiction over?

10  A.          We were --- any corruption

11  in the contact, extortion.

12  Basically, it has to be them

13  extorting money.  In other words, it

14  would be the representative or the

15  legislator or public official or

16  whatever, saying, oh, we can do that

17  for you, but we need to have this

18  much money.

19  Q.          And I think you said was

20  it Captain Ober who pointed out to

21  you the mention of Lieutenant

22  Colonel in the governor's office?

23  A.          Uh-huh (yes).  When we

24  played that, he keyed in on that

25  real quickly because we don't know

40

1    what --- we did not know what the

2    structure was or how the hierarchy

3    in the Academy was or anything

4    else.  And we were relying on his

5    expertise to be able to determine

6    if, in fact, there was somebody in

7    the training class right now whose

8    name we had at the time, to verify

9    that information and determine

10   whether this investigation would go

11   further, would expand, or whatever.

12   Q.        Okay.  So again, if that

13   tape wasn't made until sometime in

14   mid October, it would have been

15   sometime after mid --- that would be

16   the earliest?

17   A.        He would not have ---

18   yeah.  If that was the tape, yeah,

19   then he would ---.

20   Q.        That would be the earliest

21   that you would have had this

22   discussion with Captain Ober?

23   A.        Oh, sure.

24   Q.        About possibly a

25   Lieutenant Colonel?

41

1   A.        Uh-huh (yes).

2   Q.        Or someone in the

3   governor's office being involved?

4   A.        That's the first time.  We

5   were dealing mainly at that point

6   with legislators.

7   Q.        Okay.  And so at the time

8   you made the first initial telephone

9   contact with Captain Ober, did you

10  have any reason to believe based on

11  anything you had from your informant

12  or anything else you had in your

13  investigation to that date that the

14  command staff of the State Police or

15  someone in the governor's office was

16  involved in this corruption?

17  A.       We wouldn't have, no.

18  Q.       And in the end, was

19  anybody --- were you able to

20  establish whether anyone on the

21  command staff or anybody in the

22  governor's office was involved in

23  political corruption?

24  A.       No.

25  Q.       And we talked briefly

42

1    about a meeting.  I can't remember

2    how much you --- that you recalled

3    about when you met with the people

4    from organized crime.

5    A.        Uh-huh (yes).

6    Q.        Do you remember anything

7    about that discussion?

8    A.        Not really.  We

9    were talking in pretty much

10   generalities about areas that we

11   were looking ---.

12   Q.        Did you have any

13   discussion with them about how

14   something like this might be able to

15   happen; do you recall?

16   A.        No.

17   Q.        Is that no, you didn't or

18   no, you don't remember?

19   A.        No, I don't remember.

20   Q.        Okay.  I just wanted to be

21   clear which one it was.  Okay.  When

22   you met at the Bedford meeting, can

23   you describe that for me, when you

24   met at Bedford and you ---

25   A.        Uh-huh (yes).

43

Q.          --- went over tapes?

A.          Yeah.  It was a --- it's one of the meeting rooms they had available for us.  We played pretty much, if not all, of the whole --- the tape that we had.  And ---.

Q.          The meeting room, where was that?  I didn't catch that.

A.          In Bedford.  It was at the barracks at Bedford or Breezewood, whatever you call it.

Q.          Oh, a State Police barracks?

A.          Yes, it was.

Q.          Okay.  Sorry.

A.          Sorry.  And we played it. And I believe we --- I think we gave Captain Ober a copy of the tape at that point.  And I told him that I would --- as we --- I think we may have had some other ones available. I told him that I would provide him with transcripts and copies of the tapes.

Q.          Did you provide those?

44

1    A.          Yeah, I remember writing

2    up a communication and sending him

3    transcripts and possibly the tapes

4    that we had at that --- we had

5    transcribed at the time.

6    Q.          Did you have at that time

7    --- that's when you met at the

8    Bedford or wherever that barracks

9    was?

10   A.          Uh-huh (yes).

11   Q.          Did you have a discussion

12   with Captain Ober about how

13   something --- from a logistical

14   perspective, how something like this

15   could work?

16   A.          We --- yeah, we probably

17   did, yeah.

18   Q.          And do you recall whether

19   you had ideas about how that would

20   work or whether Captain Ober had

21   ideas?

22   A.          Yeah, we had no --- we had

23   no idea how it would work, so he was

24   the person who had the knowledge of

25   how --- the mechanics of how the

45

1   whole process goes.  And, in fact, I

2   guess what Kipp Stanton and Bridge

3   knew about the process, it was

4   pretty accurate.

5   Q.        So was it Captain Ober who

6   suggested to you that somebody in

7   the governor's office or somebody, a

8   Lieutenant Colonel, could possibly

9   have something to do with it from a

10  logistical perspective?

11  A.        Probably, yeah.  I think

12  it might have come up that the ---

13  that it was possible that the tests

14  were --- and the whole process was a

15  controlled process, and only certain

16  people could get into the vault or

17  the safe where the exams and the

18  bands and the results and everything

19  were kept.  But it was a

20  restrictive thing.  And I recall him

21  saying that, yeah, yeah.

22  Q.        You mentioned that

23  whatever Captain Ober told you about

24  the process seemed similar to what

25  Kipp Stanton had been saying about

46

1  it?

2  A.        Uh-huh (yes).

3  Q.        What did Captain Ober tell

4  you about the process and who could

5  potentially change the scores?

6  A.        Well, they supposedly

7  weren't ever able to be changed.

8  Once they were scored, they were

9  scored.  But there was some --- I

10 think there was some possible ---

11 some possibility that they --- the

12 list maybe or the band could be

13 changed or somebody could be put

14 into another band.  I don't know if

15 a hard copy existed of the exam or

16 whether it was destroyed.  It was

17 possible.  Unlikely, but possible.

18 Q.        Did Lieutenant --- I mean

19 not Lieutenant, did Captain Ober ---

20 did you discuss what --- how he knew

21 about what the process was and

22 whether or not it was possible?

23 A.        No, we didn't know --- I

24 didn't ask him how he knew.

25 Q.        In other words, ---?

47

1    A.        I don't know that he was

2    an expert in it, either.  I mean, he

3    knew it ---.

4    Q.        That's what I'm saying.

5    Did you ask him, hey, could you

6    check out how it works and he came

7    back and said, hey, I looked into

8    it, and this is how the process

9    works, anything like that?

10   A.        I think he knew a good

11   deal about how it worked.  He needed

12   to check the people who were already

13   in the class to verify a name

14   because I think there were like

15   possibly maybe two different names

16   came up in the investigation that

17   --- troopers who had bought their

18   way in.  So he ---.

19   Q.        Were ---?

20   A.        That was a critical thing

21   we needed to have at that point.

22   Q.        When you said that Captain

23   Ober knew how the process worked, do

24   you know the source of his knowledge

25   about how the process worked?

48

1   A.        No, I don't.

2   Q.        Did you have any

3   discussions about that?

4   A.        If we did, it wasn't

5   important.

6   Q.        Or did he just essentially

7   explain to you his understanding of

8   how it all worked?

9   A.        I don't --- I can't answer

10  that.  I don't know how --- what,

11  you know, how he knew what he knew.

12  Q.        That's what I'm asking.

13  A.        I don't know how he knew

14  what he knew.

15  Q.        And who did Captain Ober

16  suggest might have been able to

17  affect the outcome of who got into

18  the Academy?

19  A.        There was somebody within

20  the hierarchy, if I remember

21  correctly.  I think he had a little

22  conflict internally with what was

23  the situation because his --- all

24  his --- supervisor, not his direct

25  supervisor, but ultimately someone

49

1   up the chain of command also had

2   responsibility for the training

3   classes and the handling of the

4   information, the banding and

5   everything else, so there was --- I

6   think my recollection is that there

7   was some concern there, but we

8   couldn't get --- we didn't want to

9   get into that.  I mean, that wasn't

10  what we were about.  We were about

11  the public corruption end of it, the

12  legislators.

13  Q.        The conflict within his

14  chain of command, was that something

15  he described to you?

16  A.        Well, when he heard the

17  detail in which these people knew

18  how the function, the process

19  worked, and the name --- there was a

20  Lieutenant Colonel, if that's what

21  it was, if that came up, I think

22  that, you know, caused him some

23  concern.

24  Q.        I guess maybe I'm not

25  phrasing my question real well.

50

1    What I'm asking is, did you have any

2    reason, other than what he told you,

3    to be concerned?

4    A.         No.

5    Q.         Or to think there was a

6    conflict?

7    A.         No.

8    Q.         In other words, the

9    information was coming from Captain

10   Ober?

11   A.         That's right.

12   Q.         He was describing such a

13   conflict to you?

14   A.         Uh-huh (yes).

15   Q.         And did you have any

16   reason to think that his immediate

17   supervisor, the director of Bureau

18   of Professional Responsibility,

19   would have any involvement in such a

20   scheme?

21   A.         No.

22   Q.         Did you --- Trooper

23   Stanton had come from a troop out

24   west.  Did you have any concern that

25   Trooper Stanton's troop commander

51

1    was somehow involved?

2    A.        No.

3    Q.        Any information along

4    those lines?

5    A.        No.

6    Q.        And what information did

7    you --- how did Captain Ober

8    describe to you that somebody in the

9    governor's office could have any

10   role in who got into the Academy and

11   who didn't?

12   A.        I don't recall that.

13                 ATTORNEY BAILEY:

14             You don't recall that

15             he did so; isn't that

16             correct?  And I object to

17             the question.

18   BY ATTORNEY GUIDO:

19   Q.        What I'm asking you is,

20   did --- you mentioned, first of all,

21   he said on the tape that he was ---

22   was significant about the Lieutenant

23   Colonel and the governor's office?

24                 ATTORNEY BAILEY:

25             Who said on the

52

1    tape?  Who said on the

2    tape?

3  BY ATTORNEY GUIDO:

4  Q.        You mentioned, sir, that

5  Captain Ober said when he heard the

6  words Lieutenant Colonel or

7  governor's office that he was the

8  one who pointed out the significance

9  of that to you.  So we just talked

10  about the significance of the

11  Lieutenant Colonel.  Now, I'm

12  turning to what was the significance

13  of the fact that somebody in the

14  governor's office was mentioned on

15  the tape, how did that coalesce with

16  the system as Captain Ober described

17  it to you?

18  A.        At this point, I can't

19  recall when the first mention of the

20  governor's office would have

21  occurred.  I don't think that it

22  occurred at that first meeting.

23  That's my recollection right now.  I

24  don't think it occurred then, but it

25  --- subsequently it did come up,

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

53

1   but I can't recall when.

2   Q.        And once he described this

3   process, again, did you have any

4   conversation with him about, oh, if

5   the Lieutenant Colonel could do it

6   or this or that, we don't want you

7   to tell them?

8   A.        No.

9   Q.        Did you have any

10  discussion about that?

11  A.        No.  That's ---.

12  Q.        Did you leave that

13  completely to his discretion?

14  A.        Yes.

15  Q.        What else, if anything, do

16  you recall about that initial

17  meeting at the barracks in Bedford

18  --- in the Bedford area?

19  A.        I came away from the

20  meeting with a feeling that he would

21  not do anything to disrupt our

22  investigation.  I think he was, you

23  know, concerned about the whole

24  situation, and he was also concerned

25  about our investigation that we ---

54

1   we perceived that anything he would

2   do would not disrupt what we were

3   doing.

4   Q.        And, again, you left that

5   to his discretion?

6   A.        That's right.

7   Q.        As to who could or might

8   not --- who should or should not be

9   told?

10  A.        That's correct.

11  Q.        And you didn't give him

12  any advice on that subject?

13  A.        No.  As I said, I think he

14  was sensitive to our investigation.

15  Q.        Right.  I understand what

16  you're saying.  When's the next

17  time you had any sort of discussion,

18  whether in phone or by person with

19  Captain Ober?

20  A.        Periodically, we would ---

21  we would talk on the telephone, just

22  basically where --- you know, what

23  was going on.  Not often.  And I

24  couldn't even tell you how often it

25  would have been or when it would

55

 1   have been.  But we had a subsequent

 2   meeting with Captain Ober.  And that

 3   was after we had done a

 4   videotaping.  We had two videotapes

 5   now, and I can't recall whether we

 6   had them both at the meeting or not,

 7   but we had videotape of the meeting

 8   with our cooperating witness, Bridge

 9   and Stanton in the cooperating

10   witness' place of business.  And the

11   --- there was a payoff made.

12   Q.        Yes.

13   A.        Now, I don't recall

14   whether we had both of those at the

15   time when we spoke with Captain Ober

16   in Indiana or not, but we showed him

17   videotapes at that point.  We

18   probably --- I think we probably had

19   the payoff.  I can't say for sure,

20   but I think we probably did.

21   Q.        When you met with him in

22   Indiana, where was that meeting at?

23   A.        It was a Holiday Inn, I

24   think, maybe.

25   Q.        Why was it at a Holiday

56

1  Inn?

2  A.        That was selected by

3  Captain Ober.

4  Q.        Okay.  Because this was

5  your investigation; correct?

6  A.        That's right.

7  Q.        From your perspective, was

8  there any reason that you couldn't

9  have met at your office to discuss

10 this?

11 A.        No.  I think we tried to

12 keep it sort of halfway, so he

13 didn't have to travel as far, maybe,

14 in ---.

15 Q.        But I mean, was that ---

16 with the meeting being in the hotel,

17 was that based on you, meaning the

18 FBI's, concerns for confidentiality?

19 A.        No.  We needed a place

20 where we could play the video

21 basically.  That's all.

22 Q.        And that could have been

23 anywhere that you had a videotape?

24 A.        Uh-huh (yes).  Yes.

25 Q.        Again, do you know why a

57

1  hotel room was chosen, as opposed to

2  the State Police Barracks?

3  A.        No.

4  Q.        Would you have had an

5  objection of going to the State

6  Police Barracks?

7  A.        No.

8  Q.        Did you have any other ---

9  go ahead.

10  A.        I could comment on that.

11  I --- the place or the person who

12  supposedly bought the job and was an

13  active trooper maybe or in the

14  Academy, was from Indiana.

15  Q.        Okay.

16  A.        So I think ---.

17  Q.        And could you ---?

18  A.        Maybe you might not want

19  to do this thing in the Indiana

20  Barracks, but you could probably do

21  it in some other barracks.

22  Q.        That's what I'm asking.

23  A.        Yeah.

24  Q.        You're in Pittsburgh, he's

25  in Harrisburg.  You meet someplace

58

1   in between?

2   A.          Sure.

3   Q.          Indiana wouldn't really be

4   the most direct route, anyway; would

5   it?

6   A.          No.

7   Q.          So it being in Indiana as

8   opposed to where you met the time

9   before, why Indiana?

10   A.          I don't know.  That

11   doesn't --- I can't recall right now

12   if there was a reason or not.

13   Q.          Okay.

14   A.          It doesn't seem there was.

15   Q.          I'm just thinking if the

16   guy's from Indiana and the reason

17   you're meeting some place other than

18   headquarters is because you want to

19   be halfway in between, I mean you

20   could hop on the turnpike, it seems

21   like there could be someplace else.

22   How did it end up in Indiana; do you

23   know?

24   A.          No, I don't know.

25   Q.          Did you choose the place?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

59

1    A.        No.

2    Q.        Who did?

3    A.        Captain Ober.

4    Q.        He did.  Did he make ---?

5              ATTORNEY BAILEY:

6              You could have met in

7         Florida; couldn't you?

8    A.        That would have been

9    nice.

10   BY ATTORNEY GUIDO:

11   Q.        Did he make --- who made

12   the arrangements for the hotel room?

13   A.        Captain Ober did.

14   Q.        Did you have any other

15   conversations with Captain Ober

16   about the investigation?

17   A.        As I said, the --- you

18   know, periodically we would, you

19   know, talk on the telephone.  I

20   think at one point, when it was

21   fleshed out that there was no ---

22   did not appear to be any corruption

23   on the part of any legislator, local

24   legislator, that, you know, he was

25   advised.  I can't recall what was

60

1  --- because what happened at the

2  point I was transferred around

3  myself, and I had --- I worked on

4  some other matters, and I wasn't

5  ---.

6  Q.        Did your transfer have

7  anything to do with this case?

8  A.        No.

9  Q.        Did your transfers have

10  --- any of your transfers have

11  anything to do with the way you

12  handled this case?

13  A.        No, I don't think so.

14  Q.        Did you --- were you ever

15  advised by anyone that Commissioner

16  Evanko was upset about the way the

17  case had been handled?

18  A.        I had heard that or read

19  that in a newspaper and --- but I

20  don't believe that I was assigned to

21  the different duties based on that,

22  that it was because ---.

23  Q.        That's what I'm asking.

24  A.        The needs of the Bureau

25  basically, my expertise.

61

1   Q.        Didn't have anything to do
2   with how this case turned out or
3   anything like that?
4   A.        I don't think so.
5   Q.        Okay.  When were --- when
6   did you say you were transferred?
7   A.        I was assigned to work on
8   a --- I think there was a --- it was
9   the First National Bank of Keystone,
10  I was sent down there to work on
11  that bank failure.  I'm an
12  accountant.
13  Q.        Okay.
14  A.        And I think they wanted my
15  expertise down on that.  And even
16  prior to that, I was working on
17  another major political or corrupt
18  --- corrupt activity going on in
19  Pittsburgh, and they wanted me on
20  that because of my accounting
21  background.  And those two kind of
22  blended together.  And then I also
23  was sent --- I was transferred out
24  to the surveillance squad.
25  Q.        Now, there --- you said

62

1    you read about it in the paper.  Do

2    you remember what you read in the

3    paper?

4    A.        Yeah, I can't remember

5    exactly, but it was to the effect

6    that both of the agents who were

7    involved in this case were

8    transferred.

9    Q.        Do you know if it was an

10   article related to a lawsuit, not

11   this lawsuit, but another lawsuit

12   that had been filed by Captain Ober?

13   A.        I can't recall what it

14   was.  It --- I ---.

15   Q.        You don't even remember

16   what kind --- what paper it was in?

17   A.        No.

18   Q.        That ---.

19              ATTORNEY BAILEY:

20              Hold on.  Hold on a

21          second, please.

22              ATTORNEY GUIDO:

23              Sure.

24              ATTORNEY BAILEY:

25              Thank you.

63

BY ATTORNEY GUIDO:

Q.        Prior to the time that this federal lawsuit was filed, there was a whistle blower lawsuit filed in Pennsylvania courts. During the time frame of that lawsuit, did you have any discussions with Captain Ober about the case?

A.        He had --- I think we had a telephone call.  I think he had reached out for me, I think.

Q.        Do you remember what that was about?

A.        I can't recall exactly what it was about.  I think --- mainly I think it might have been because of his --- of the lawsuit that he ---.

Q.        That he had filed?

A.        That he had filed.  And that ---.

Q.        But the State Police investigation was no longer pending, was it; do you know?

64

1    A.        As it regarded the --- as

2    Kipp Stanton?

3    Q.        Yes.

4    A.        I can't recall.

5    Q.        At the time that you spoke

6    with him, do you know whether or not

7    he had been transferred out of

8    Internal Affairs by then?

9    A.        Uh-huh (yes).  Yeah, he

10   had mentioned that he had been

11   transferred, and he had mentioned

12   that there was a --- they created a

13   position, I think, in the Washington

14   barracks.

15   Q.        Uh-huh (yes).

16   A.        And they were --- they

17   were trying to assign him there, and

18   it was not a position that was a

19   Captain's position.  And he didn't

20   feel good about that.

21   Q.        During that conversation,

22   did you at any time imply that your

23   transfer had anything to do with the

24   way that the case was happening ---

25   happened or the way that Colonel

65

1   Evanko was upset about what had

2   happened with the case?

3   A.        I think that I knew about

4   that allegation or that statement.

5   And probably --- and Captain Ober

6   probably brought that up, and I told

7   him that there's no way that that,

8   you know, that that could be ---

9   that he could affect this

10  organization.

11  Q.        That's what I was asking.

12  A.        Yeah.

13  Q.        So you wouldn't have told

14  him that you were transferred

15  because of anything that happened

16  with that case?

17  A.        No, I would not have said

18  that.

19  Q.        And did you --- I don't

20  remember whether you said the case

21  had been completed or not completed

22  by the time that you were

23  transferred?

24  A.        It was not completed.

25  Q.        Who took over the case?

.66

1   A.        John Kelly.

2   Q.        John Kelly?

3   A.        John Kelly, an agent.

4   Q.        So would it be after Kelly

5   took over that it was finally

6   decided to close out the

7   investigation and hand it over to

8   State Police?

9   A.        That's correct.

10  Q.        All right.  Did you ever

11  --- do you have any recollection of

12  ever discussing your investigation

13  with Sergeant Dana Sifner (phonetic)

14  from Internal Affairs Division?

15  A.        She's out in Harmarville;

16  right?

17  Q.        I believe so.

18  A.        Yeah, I think I probably

19  have.  It was, you know, late ---.

20  Q.        Do you know?

21  A.        Late in the

22  investigation.

23  Q.        Do you know if you

24  provided her with any reports,

25  names, any ---?

67

1  A.        Oh, I think so, yeah.

2  Q.        Do you remember what?

3  A.        Or maybe she already had

4  them.  I can't recall.  But she was

5  --- yes, she had them.  Now, whether

6  I had given her more or whether John

7  Kelly had, I can't recall.  But she

8  had --- she had access to them.

9  Q.        Okay.  Were you present

10 for a State Police criminal

11 investigation --- in a criminal

12 investigation, a State Police

13 interview with Trooper Stanton or

14 with your confidential informant?

15 A.        Yes.

16 Q.        Do you know when that

17 was?  August --- because I have a

18 date, I'll ask you if it rings a

19 bell, August 6th of '99.  Does that

20 sound approximate ---?

21 A.        If that's when we had ---

22 I think we did both of them, Bridge

23 first.

24 Q.        Oh, together?

25 A.        No, separate.

68

1   Q.        Oh.

2   A.        Bridge first was brought

3   into the Harmarville office on some

4   ruse, and we confronted him at the

5   time, and he ---.

6   Q.        Why --- go ahead.

7   A.        And he admitted what was

8   going on.

9   Q.        Why were you --- both

10  agencies doing that in sort of a

11  joint interview or why were you

12  present?

13  A.        Well, we --- I guess to

14  see if anything developed.  We ---

15  you know, if anything else developed

16  out of it that we would have an

17  interest in because basically at

18  that point it was the State Police's

19  case.  It was a local case.

20  Q.        Now, that --- I guess

21  that's why I was actually a little

22  confused.  I thought you were

23  transferred before the investigation

24  was complete.

25  A.         I was fluid at the time.

69

1    I was moving around.  And I'm ---

2    I'm pretty sure I was brought back

3    into the office.  I may have been.

4    But then I would --- we're flexible

5    when we --- wherever we're needed,

6    we just would go.  And it could have

7    possibly been I was still assigned

8    to the surveillance unit, and I just

9    broke away from that for this

10   interview in this situation.  But I

11   can't recall exactly where I was at

12   that ---.

13   Q.        But at some point, the FBI

14   case was complete and ---

15   A.        Uh-huh (yes).

16   Q.        --- it was turned over to

17   State Police; is that what happened?

18   A.        You know, if John --- John

19   Kelly would be a better person to

20   ask that.

21   Q.        Okay.

22   A.        It could possibly.  I

23   can't recall.  And I haven't

24   reviewed the case in a long, long

25   time.  It could possibly have been

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

70

1   totally fleshed out. And then,

2   again, maybe it wasn't. I can't

3   recall exactly. I think that the

4   legislator that we had in mind that

5   had been approached, discussed this

6   matter, whether that had been

7   completely fleshed out or not at

8   this point, I just --- I can't say

9   for sure.

10  Q.        Who made --- do you know

11  who made the decision to give the

12  case to the State Police, as opposed

13  to the FBI handling it?

14  A.        Well, this particular

15  phase of it, we had no --- you know,

16  no jurisdiction in it. And in my

17  --- it's very likely that we ---

18  that we already had determined that

19  there was no political corruption

20  involved, and that's why we did

21  that. Then again, it's also

22  possible that maybe we're going to

23  use these people further on. But I

24  don't think so. We probably --- we

25  probably had that completely

71

1   addressed at that time.  And then

2   this would be the next phase to take

3   down.

4   Q.        Well, did there come a

5   point where you would have gone to

6   Captain Ober and said, look, we've

7   determined that it's just a state

8   trooper?

9   A.        Uh-huh (yes).

10   Q.        And go ahead and tell,

11   it's okay, fine, to tell the

12   Commissioner now about it, anything

13   like that?

14   A.        Oh, no.  We wouldn't.  I

15   didn't know who he had told or what

16   --- what had happened at this point

17   in time.

18   Q.        So there wasn't no point

19   in time when you the FBI said, okay,

20   now you have our ---

21   A.        No.

22   Q.        --- you know, our

23   blessing?

24   A.        No.

25   Q.        Go tell your higher ups,

72

1    if you choose?

2    A.          No, we wouldn't.  We

3    wouldn't try to direct them.

4    Q.          You weren't really in a

5    position to do that?

6    A.          No.

7    Q.          Then but there would have

8    --- was there a point where you or

9    was it Trooper Kelly told Captain

10   Ober, okay, we're done, it's just

11   the trooper?

12   A.          I don't recall.

13   Q.          Did you ever have a

14   discussion with Captain Ober about

15   --- about Commissioner Evanko

16   contacting Louis Freeh about this

17   situation?

18   A.          I think the article even

19   said something there that he called

20   the director or ---.

21   Q.          Did you have any --- I

22   mean, in other words, if Captain

23   Ober believed that happened, did he

24   get that information from you?

25   A.          No, he wouldn't have

73

1   gotten it from me.  I would have

2   gotten it from him if I --- if I

3   knew that and ---.

4   Q.        You had no independent

5   knowledge that about --- did you

6   have any independent knowledge

7   whatsoever about who ---

8   A.        No.  No, I can't ---.

9   Q.        --- Colonel Evanko may

10  have called?

11  A.        No.

12  Q.        Who, if anybody?

13  A.        He didn't call me.

14  Q.        Okay.  Where your

15  superiors ever call you in and say,

16  Colonel Evanko called so and so at

17  the FBI and we're upset about it,

18  anything like that?

19  A.        I did get a --- yeah, the

20  SAC of our office,.

21  Q.        And who was that?

22  A.        Rick Mosquera.

23  Q.        Okay.

24  A.        I had a discussion with

25  him regarding ---.

74

1    Q.        And can you tell me about

2    that discussion?

3    A.        I can't.  I really just

4    --- it was not a --- he was

5    concerned.  I think he may have

6    gotten a call from Evanko.  I think

7    that way --- I don't recall if

8    anyone else was in that meeting with

9    us or not.  And ---.

10   Q.        Was the nature of that ---

11   I just want to know the tone and

12   nature of that meeting.  Was the

13   tone of that meeting such as that

14   you had done something wrong or just

15   that Colonel Evanko was upset about

16   it?

17   A.        No.  I think it was just

18   that he was upset about it.  And I

19   wasn't reprimanded or anything by

20   Mosquera.

21   Q.        And as a result of Colonel

22   Evanko's call, to your knowledge,

23   did that have any bearing on whether

24   the FBI continued or didn't continue

25   to do the investigation into this

75

1  subject?

2  A.        No, no.

3  Q.        In other words, do you not

4  --- do you have any knowledge that

5  Colonel Evanko did anything to

6  truncate your investigation?

7  A.        No.

8  Q.        Do you have any knowledge

9  that anybody at the State Police did

10 anything to keep you from doing

11 anything ---

12 A.        No.

13 Q.        --- but the fullest and

14 most complete investigation

15 possible?

16 A.        No.

17 Q.        Just give me one minute.

18 A.        Sure.

19 Q.        There's just one area I

20 want to follow up with you a little

21 bit about something I'm not familiar

22 with.

23 A.        Okay.

24 Q.        So I want to get a little

25 more information if you have it.

76

1    And you said that at early on in the

2    investigation, early on in your

3    contact with Captain Ober, you had

4    the names of some people that had

5    supposedly bought their way into the

6    Academy?

7    A.          Uh-huh (yes).

8    Q.          Do you remember who those

9    people were?

10   A.          I don't recall the names.

11   I believe there was --- there were

12   two names mentioned.  But that was

13   one of the real purposes of meeting

14   Captain Ober, was to verify that and

15   see if, in fact, somebody had gotten

16   --- bought their way in.

17   Q.          To see if those two people

18   --- were those people that were

19   currently in the Academy?

20   A.          That's correct.  There was

21   one at the time that we had

22   information on.  There was another

23   name subsequently mentioned.  I

24   don't know that we had it at that

25   particular time when we talked with

77

1   Captain Ober the first time.  But

2   they were from Indiana, I think.

3   Q.        The people were from

4   Indiana?

5   A.        That's correct.

6   Q.        And one of those people

7   from Indiana was, in fact, in the

8   Academy?

9   A.        That's what was --- we

10  were led to believe by the --- I

11  think it was the information was

12  either coming directly from Bridge

13  or it was coming from Bridge through

14  Stanton.

15  Q.        Was Captain Ober able to

16  tell you whether or not that person

17  was, in fact, in the Academy?

18  A.        He was able to determine

19  that that person was not there.

20  Q.        Okay.  That's, I guess,

21  where I was getting confused.

22  A.        Yeah.

23  Q.        I was thinking that you

24  said that one of the people actually

25  was in the Academy?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

78

1  A.        Yeah, we didn't know.

2  Q.        So in other words, it was

3  your informant that said one of the

4  people was in the Academy, and

5  somebody else had been in the

6  Academy?

7  A.        It was Bridge, I believe,

8  who was giving the names of people.

9  And we were getting them directly

10  off the tape.

11  Q.        Right.  Who gave the names

12  of John Doe?

13  A.        John Doe, sure.

14  Q.        John X?

15  A.        Uh-huh (yes).

16  Q.        Is there --- and then you

17  contacted Captain Ober and said ---

18  A.        Uh-huh (yes).

19  Q.        --- were those people

20  actually in the Academy.  And it

21  turned out that neither one was in

22  the Academy?

23  A.        That's right.

24  Q.        Okay.  Did Captain Ober

25  tell you anything about --- what did

79

1    he tell you, if anything, about what

2    he did to check that out?

3    A.        He did it discreetly, but

4    exactly how he did it, I don't

5    know.

6    Q.        Okay.  You said that was

7    one of your first --- one of the

8    reasons you needed his help in the

9    first place?

10   A.        Well that --- there was

11   two reasons.

12   Q.        But I said one of the

13   reasons ---?

14   A.        They needed to be brought

15   in and told what was going on.

16   Q.        Okay.

17   A.        And also that that

18   particular thing, we needed to

19   verify it.

20   Q.        Did you ask him about that

21   on the phone or that was later at a

22   meeting?

23   A.        I don't recall.  We

24   probably --- I probably mentioned

25   the name more than once to him.

80

1  Q.        So ---?

2  A.        Could have possibly been

3  on the phone before the meeting.

4  Q.        Well, at the meeting, is

5  that when he was able to say they

6  weren't in the Academy or was that a

7  follow-up later?

8  A.        I think it was follow-up.

9  Q.        Maybe a phone call?

10  A.        Probably.

11  Q.        Did you have many phone

12  conversations over the course of

13  these months from October to May?

14  A.        Uh-huh (yes), yeah.  We

15  --- I couldn't say exactly how

16  many.  But, you know, when there ---

17  when there was a need, we would have

18  communications because we were still

19  pursuing that, the legislator.

20  Q.        What kind of things would

21  you need to talk to him about?

22  A.        Well, as I said, the

23  second name did come up, so we had

24  to verify that.  I don't know

25  whether the reason --- but maybe

81

1  just to keep him updated ---

2  Q.        I was wondering because

3  you said ---?

4  A.        --- you know, how and

5  where the case was going on.

6  Q.        Do you remember, other

7  than giving him updates and the

8  instance where he told you you

9  needed to find out whether that

10 person was in the Academy, do you

11 remember any other instances where

12 you needed information from Captain

13 Ober?

14 A.        I can't recall right now,

15 no.

16 Q.        Hang on a second.  One

17 thing I don't think I --- I think I

18 didn't clarify, during your initial

19 discussions with --- you know,

20 whenever you said you felt somebody

21 in the OPR needed to know about this

22 and et cetera, and that was the

23 other reason that you got ahold of

24 him.  In other words, your reasoning

25 being a multi faceted one that you

82

1    needed information, but also someone

2    there needed to know.  Was there

3    ever a discussion about whether or

4    not the State Police should or

5    should not open their own criminal

6    investigation into --- either

7    criminal or Internal Affairs

8    investigation into Trooper Stanton's

9    conduct?

10   A.        Well, we believed that

11   they would, you know, as soon as ---

12   as soon as we contacted them.

13   Q.        Okay.

14                   ATTORNEY GUIDO:

15             That's all I have

16             right now.  Your witness.

17   EXAMINATION

18   BY ATTORNEY BAILEY:

19   Q.        How are you today, Ralph?

20   A.        Fine.

21   Q.        Feeling good; are you?

22   A.        Pretty good.

23   Q.        Are you?  Me, too.  Few

24   questions for you.

25   A.        Sure.

83

1  Q.        I won't take too long.  If

2  you, at any time during the period

3  of time that I ask questions, have a

4  concern or a curiosity about what

5  I'm asking, I want you to feel free

6  to --- I don't mind your questioning

7  me.  It will save us time.  It will

8  build a better fact record.  I have

9  no desire to get distorted,

10 ambiguous, unsure, conjectural

11 information on the record.  Okay?

12 What I want to get on here are some

13 facts and correct information, get

14 them in the proper sequence.  And

15 for that reason, I do not mind at

16 any time if there's any confusion,

17 that you ask me.  That goes for, by

18 the way, your attorney or opposing

19 Counsel.  Okay?

20 A.        Fine.

21 Q.        All right, sir.  Now,

22 you'd indicated that the original

23 investigation into Mr. Stanton

24 started or arose --- I'm sorry,

25 sometime on or about '95 or '96?

84

1    A.        Well, I think the date

2    that she would have --- the other

3    Counsel would have mentioned

4    probably is more accurate.

5    Q.        What Counsel --- what date

6    did she mention?

7    A.        I didn't write it down.

8    Q.        I didn't either.  I

9    thought you said '95 or ---?

10                  ATTORNEY GUIDO:

11                    '94 to '95?

12   A.        Yeah, somewhere in that

13   range.

14                  ATTORNEY GUIDO:

15                    '94 to 95 was the

16                  date I mentioned.

17   BY ATTORNEY BAILEY:

18   Q.        But not later than '96;

19   right?  Right; Ralph?

20   A.        I can't say that.

21   Q.        You don't know that?

22   A.        If I had my file, I could

23   give you exact times and dates.

24   Q.        Okay.

25   A.        I remember the situation

85

1  precisely when it first came up, but
2  I can't give you the date.
3  Q.        Ralph, do you remember if
4  it was before 1998?
5  A.        Oh, of course, it was
6  before that.
7  Q.        Sure, it was.  Because you
8  guys more or less dusted this thing
9  off in 1998.  In other words, it
10 came up, Mr. Soohy had come in and
11 he looked at this and said, you
12 know, sort of laying sort of
13 stagnant, let's take a look at it;
14 right?
15 A.        Well, the other matters
16 that were related to the cooperating
17 witness ---
18 Q.        Right.
19 A.        --- those pretty much had
20 fizzled, and this was one thing that
21 we should, you know, clear up.
22 Q.        Right.
23 A.        And get this resolved.
24 Q.        Understood.  Now, Ralph,
25 who had done that investigation for

86

1   the FBI, if investigation's the

2   right word, who had opened the file

3   or started the inquiry, whatever you

4   did, prior to 1996?  Was it you?

5   A.         Yes.

6   Q.         Okay.  Well, I --- okay.

7   Now, I'm just curious.  You had

8   notified the State Police?

9   A.         I had contacted the State

10  Police.  That --- you could consider

11  that notification, I'm sure.

12  Q.         What would you consider it

13  for?

14  A.         I needed their assistance.

15  Q.         Oh.

16  A.         I needed the Claus Behrens

17  --- Claus Behrens.  I needed their

18  assistance.

19  Q.         You didn't remember that

20  name.  Do you remember that name

21  now, Ralph?

22  A.         Sounds very familiar.

23  Q.         Does it?  Okay.

24  A.         I had contacted him,

25  because --- actually, I was led to

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

87

1  him.  I had contacted State Police

2  in Harrisburg when I found out that

3  this guy was a trooper.   And I

4  needed to talk to someone to find

5  out if, in fact, there was an

6  investigation going on, and we were

7  getting in the middle of it.  And

8  before we could even proceed with

9  this thing.  And I was led to him.

10  I gave him a call, met with him in

11  his Greentree office, and we

12  discussed it.  And he said that he

13  could verify if, in fact, there was

14  a State Police undercover going on,

15  and that was of a concern to us.

16  Q.        Okay.  And you immediately

17  cooperated with the criminal

18  investigation that the State Police

19  began; right?

20  A.        I didn't know there was an

21  investigation begun at that point in

22  time.

23  Q.        Well, when did you hear

24  Len Bodack's name first?

25  A.        That name would have come

88

1  up in my investigation.

2  Q.        Well, you said you did the

3  earlier one, too?

4  A.        That's right.

5  Q.        When --- okay.  When?

6  A.        I can't tell you exactly

7  when.

8  Q.        Oh.

9  A.        The name is not unfamiliar

10  to me.  And ---.

11  Q.        Okay.  Well, let me ask it

12  this way.

13  A.        Sure.

14  Q.        Ralph, do you know whether

15  it was pre 1996 or perhaps post 1996

16  or post 1998?

17  A.        Oh, it was post '98, of

18  course.

19  Q.        That's good.

20  A.        But the ---.

21  Q.        That's good, Ralph,

22  because that may help explain some

23  things and reduce a lot of questions

24  I had to ask you.

25  A.        Uh-huh (yes).

89

1  Q.        When did Joe Preston's

2  name come up?

3  A.        That name is not

4  unfamiliar to me either.  But as it

5  relates to this matter, probably in

6  '98, probably whenever we

7  resurrected this particular phase of

8  the investigation.

9  Q.        So prior to 1998, and

10  whatever you discovered after 1998,

11  after you resurrected --- borrow

12  your terminology, the investigation,

13  the Pennsylvania State Police had

14  been told about Mr. Stanton?

15  A.        They were aware --- Mr.

16  Behrens was aware of Mr. Stanton.

17  Q.        Do you know if they opened

18  any files, started any

19  investigations, created any records,

20  any documents?

21  A.        I don't know what they

22  did.

23  Q.        Do you remember if you

24  gave them any documents?

25  A.        No, I didn't give them.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

90

1  any.

2  Q.          Okay.  But you talked with

3  Mr. Behrens?

4  A.          Uh-huh (yes).

5  Q.          Okay.  Now, let's move

6  ahead then to 1998.  Okay?  And let

7  me ask you just a few questions

8  about this.  The Defendants in this

9  case have a number of questions for

10  you about this first telephone

11  conversation that you had.  Do you

12  remember that?

13  A.          The very first

14  conversation with ---?

15  Q.          With Mr. Ober.

16  A.          Uh-huh (yes).

17  Q.          Okay?  Remember that?

18  A.          I can't remember it, but

19  I'll try to.

20  Q.          Okay.  Now, you were asked

21  questions on Direct about whether

22  there was information imparted to

23  Mr. Ober about whether state

24  legislators may have been involved.

25  Do you remember that?  And my

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

91

1  question, let you know where I'm

2  going, I just wanted if you can do a

3  chronology, it might save some time,

4  if you can do a chronology for us.

5  What I'm looking for, okay, is when

6  you became aware that legislators

7  might be involved, okay --- now,

8  wait, sir.  Just save you some time

9  here.

10  A.        Okay.

11  Q.        Well, if you're anxious to

12  talk, you go right ahead.

13  A.        Well, no.

14  Q.        That's okay.  You go

15  ahead.

16  A.        We --- when we first got

17  the initial allegation, I suspected

18  that there would be legislators

19  involved.  Now, I --- you know,

20  because ---.

21  Q.        You know, I figured you

22  did.

23  A.        And ---.

24  Q.        Now --- I'm sorry?

25  A.        So that would --- and any

92

1  discussion I would have had with

2  Captain Ober, the first ones, the

3  telephonic ones, would not be in

4  great detail, but there would

5  probably be enough detail to give

6  him, you know, a rough idea where we

7  were standing.  And then at the

8  subsequent face-to-face meetings, we

9  would --- we would go into more

10 detail.

11 Q.        Now, is what you're

12 telling us then that sometime on or

13 about the first conversation that

14 you had with Darrell Ober, which if

15 I understand it correctly was

16 sometime in very early October ---

17 or am I wrong?

18 A.        It --- there would have

19 been at least one or more telephone

20 conversations prior to the

21 face-to-face meeting.  If the

22 face-to-face meeting was in October

23 ---.

24 Q.        No, I didn't say that.  I

25 understand that initially there was

93

1  a telephone conversation?

2  A.        Uh-huh (yes).

3  Q.        That was initiated by you?

4  A.        Uh-huh (yes).

5  Q.        And that there was a later

6  meeting.  We're going to come to

7  this October 13th date.

8  A.        Okay.

9  Q.        And the incredible ability

10  of Captain Ober to predict that a CI

11  --- I'm going to ask you about

12  that.  Let me --- maybe a point of

13  departure here.

14                  ATTORNEY KILLEEN:

15                  Can I ---?

16                  ATTORNEY BAILEY:

17                  I'm sorry.

18                  ATTORNEY KILLEEN:

19                  Can I interrupt for a

20                  second?  I have an

21                  emergency that I have to

22                  handle right away.  I have

23                  to go right away.  I

24                  apologize to the

25                  participants.  Can I take

94

1    about two minutes?

2          ATTORNEY BAILEY:

3          The only thing I'd

4    like is for him to stay

5    here.

6          ATTORNEY KILLEEN:

7          He's staying, I'm

8    going.  I'll be right

9    back.

10          ATTORNEY BAILEY:

11          Not that I don't

12    trust Mr. Kush.

13          ATTORNEY KILLEEN:

14          I apologize.

15          VIDEOGRAPHER:

16          Are we suspending?

17          ATTORNEY BAILEY:

18          Yes, why don't we go

19    ahead.

20          VIDEOGRAPHER:

21          It is 12:27.  We're

22    going to suspend this

23    deposition of Mr. Kush.

24  OFF VIDEOTAPE

25  SHORT RECESS TAKEN

95

1 ON VIDEOTAPE

2                   VIDEOGRAPHER:

3                   It is now 12:31.  And

4            we're resuming the

5            deposition of Special

6            Agent Kush on March 14th,

7            2002.

8 BY ATTORNEY BAILEY:

9 Q.            Mr. Kush --- I'm sorry?

10 A.            Retired special agent.

11 Q.            Mr. Kush, my understanding

12 is that the telephone call that you

13 placed to Mr. Ober occurred sometime

14 on or about the beginning of

15 October, 1998.  Do you have any

16 reason to doubt that?

17 A.            1998?  No, I don't.  I ---

18 if that's the date that --- that's

19 probably right.

20 Q.            Okay.  Now, I thought that

21 Mr. Soohy --- very impressive man,

22 Mr. Soohy said that he had reported

23 to this area sometime on or about

24 the summer of '98, like August or

25 so; is that right?

96

1   A.          Uh-huh (yes), sounds

2   right.

3   Q.          Well, does that mean

4   between when he got here and when

5   you called Darrell Ober, you picked

6   up this information about Lenny

7   Bodack and Joe Preston and who knows

8   who else?

9   A.          You have to understand

10  that I worked public corruption.

11  Q.          Yes.

12  A.          And I'm familiar with

13  names.  Otherwise, I have --- I

14  wouldn't be able to work.

15  Q.          You know, I have public

16  corruption files.  I have names in

17  it, too.

18  A.          But a lot of them, you

19  know, you hear them, you hear

20  allegations, you hear talk.

21  Q.          Sure.

22  A.          So I was not unfamiliar

23  with those names.  So I --- I don't

24  know exactly when they would have

25  been connected to this particular

97

1    phase of the investigation.

2    Q.        Well, here's why I'm

3    asking you, Ralph.  When did you

4    first do the wire tapping?  When did

5    you start the wire tapping?  Was it

6    before you called Captain Ober?

7    A.        Oh, yeah.

8    Q.        Okay.

9    A.        I think.  I think I ---

10   let me go back.

11   Q.        All right.

12   A.        Probably.  It's a ---

13   well, we had an extensive

14   investigation going, and, you know,

15   dozens of tape recordings.

16   Q.        Right.

17   A.        And ---.

18   Q.        Does that mean you had

19   dozens of tape recordings when you

20   called Captain Ober in regard ---?

21   A.        Maybe not related to this

22   particular matter, but to other

23   things.

24   Q.        Okay.

25   A.        In the whole, you know,

98

1    bigger investigation.

2    Q.        All right, sir.

3    A.        So I would have had some

4    tape recordings, I would guess.

5    Q.        You made a mistake at one

6    point.  In fact, you erroneously

7    erased part of a tape; didn't you?

8    A.        Oh, gee.  Let me ---.

9    Q.        Didn't you do that?

10   A.        I absolutely did.

11   Q.        What tape did you erase?

12   A.        I ---.

13   Q.        I'm not saying it's a big

14   deal, Ralph.  I just want to know.

15   A.        It is a big deal.

16   Q.        Is it?

17   A.        Sure, it's a big deal.

18   Q.        Well, what part of what

19   tape did you erase?

20   A.        In the process of

21   duplicating the original telephone

22   conversation with Kipp Stanton ---

23   Q.        Okay.

24   A.        --- I put it into the

25   wrong slot in the duplicator.

99

1   Q.        Okay.  When did it occur,

2   if you know?

3   A.        I can't tell you.  It's in

4   the file.  And if you really need

5   it, I'm sure we can drag the file

6   out.

7   Q.        No.

8   A.        But it was --- it was very

9   early in my investigation after we

10  had done our search warrant, and we

11  had started debriefing the

12  cooperating witness.

13  Q.        Mr. Bridges, or Bridge,

14  Bridges, whatever his name is?

15  A.        No, this was the

16  cooperating witness.  Bridge was the

17  ---.

18  Q.        The CI?

19  A.        The CI.

20  Q.        All right.  Now, sir, let

21  me ask you, you've already indicated

22  that at the time you called Captain

23  Ober ---

24  A.        Uh-huh (yes).

25  Q.        --- that you --- it was to

100

1  you, it wasn't Stanton, it was a

2  public corruption case at that

3  point?

4  A.        That's correct.

5  Q.        That you suspected; is

6  that right?

7  A.        Uh-huh (yes).

8  Q.        All right.  Now, the

9  Defendants --- and I want to take

10  your mind back to an investigation

11  done by Major Williams of the

12  Pennsylvania State Police.  Remember

13  him talking to you?

14  A.        Was that the name of the

15  officer that I spoke with out at the

16  Findley Barracks?

17  Q.        Very distinguished

18  gentleman, tall, gray hair?

19  A.        Uh-huh (yes).

20  Q.        Yes, that would be him.  I

21  guess that would be him.

22  A.        I guess.  Probably is.

23  Q.        You and he are both tall

24  and good looking, so it must have

25  been --- whoever's best looking, I

101

1  don't know.  But that sounds like

2  Major Williams, a very, very

3  impressive gentleman.  Now, the ---

4  this issue comes up with this date

5  of October 13th where this interview

6  took place supposedly --- not an

7  interview, I'm sorry, a tape, where

8  somebody mentions on this tape,

9  whether it's Stanton or the CI, or

10  somebody, mentions on this tape that

11  higher ups or the governor's office

12  or people in that sort of --- that

13  area, might be involved.

14          Now, you certainly

15  remember at some point a reference

16  being made to whether it was a

17  Lieutenant Colonel, whether it was a

18  Colonel, higher ups in the State

19  Police, whatever, governor's office,

20  those words, I think were --- you've

21  indicated were mentioned.  But you

22  remember that that occurred at some

23  point; right?

24  A.          It was on the tape.

25  Q.          Yes.  Now, in doing your

102

1  investigation, did you learn that

2  Darrell Ober was dealing directly

3  with your CI?  Was he working

4  directly with your CI, that you know

5  of?

6  A.        I don't think so.

7  Q.        Okay.  Do you know whether

8  he was contacting any of the

9  principals in this thing, in your

10  investigation?

11  A.        I don't think so.

12  Q.        Well, in fact, you've told

13  us that Mr. Ober was concerned.  And

14  I believe your predecessor told us,

15  predecessor in providing testimony?

16  A.        Uh-huh (yes).  Okay.

17  Q.        Indicated to us that, in

18  fact, Mr. Ober, Captain Ober, was

19  concerned about the integrity and

20  the propriety of your investigation,

21  to respect it, and you indicated

22  that; didn't you?

23  A.        He was sensitive to what

24  we were doing, yes.

25  Q.        He was ---.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

103

1    A.        As I would be sensitive to

2    what he would --- whatever he would

3    be doing.

4    Q.        I would hope so.

5    A.        Uh-huh (yes).

6    Q.        As we should all be

7    sensitive to what we're doing now.

8    Now, my understanding is that you

9    don't recollect during the telephone

10   conversation with Captain Ober,

11   whether or not the possibility of

12   higher ups in the State Police or

13   the governor's office was discussed

14   at that point.  You don't

15   recollect.  Is that ---?

16   A.        I don't think.  I don't

17   think that was discussed.  We were

18   concerned with the Legislature.

19   Q.        Okay.

20   A.        At the time.

21   Q.        So if Captain Ober before

22   October 13th says to Colonel Hickes

23   that perhaps higher ups in the

24   Pennsylvania State Police or the

25   governor's office could be involved

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

104

1  or something to that effect, he's

2  incredibly perceptive because he's

3  predicting what the CI's going to

4  say on a tape recording made a week

5  later; right, if that occurred?

6  Now, if that occurred --- I'm not

7  ---?

8  A.        I'll respond to that,

9  okay.

10  Q.        Well, sure.  You respond

11  to it.  How would he know?  It's

12  real simple.

13  A.        Well ---.

14  Q.        You're an investigator.

15  How would he know?

16  A.        He would know the

17  process.  He would know --- and I'm

18  not putting blame or anything on

19  anybody.  But he knows the State

20  Police.  He knows how they --- the

21  Academy works, how the positions are

22  filled in there.  And I would only

23  know how the CI or whoever it would

24  be would --- he would have to affect

25  somebody in the process, in the

105

1  hiring process.  Now, who that

2  person would be, I wouldn't have any

3  idea.  But perhaps Captain Ober knew

4  who would have to be affected.

5  Q.          Yes, what you knew ---.

6  A.          Basically he knows State

7  Police.  I don't know State Police.

8  Q.          But what you know --- what

9  you know?

10  A.          All right.

11  Q.          And today is altered by

12  the facts you uncovered in an

13  investigation.  But what you knew

14  when you called Captain Ober was, at

15  least at the very least as a common

16  sense matter, was that a trooper in

17  southwestern Pennsylvania was not

18  going to be able to single-handedly

19  without any help manipulate an

20  Academy appointment up in

21  Harrisburg; right?

22  A.          Sure.

23  Q.          That was only --- I mean,

24  that's just basic common sense;

25  right?  He had to have somebody

106

1    helping him?

2    A.        Sure.

3    Q.        Okay.  Well, do you know

4    of any other facts communicated to

5    Captain Ober that would make him

6    aware, prior to October 13th, that

7    the governor's office might be

8    mentioned?

9    A.        No.

10   Q.        You don't know, but you

11   --- you feel pretty sure that you

12   didn't mention anything like that in

13   that first phone call?

14   A.        I wouldn't have

15   mentioned.  I --- I would have

16   thought if I would have mentioned

17   anything, that the Legislature, that

18   that's the only --- as far as the

19   governor, I --- that would have been

20   the furthest thing from my mind

21   maybe at that point.  I was focusing

22   more on that area because that's a

23   fertile area.

24   Q.        Sure.  But it would be the

25   furthest thing from your mind ---

107

1  well, the governor's office wouldn't

2  be a fertile area or Mr. Ridge's

3  administration wouldn't be.  But the

4  governor's office, okay, wouldn't

5  --- it wouldn't necessarily mean

6  much to you in terms of what you

7  were looking at with the State

8  Police thing.  So obviously unless

9  you had information about the

10  governor's office in when you first

11  called Darrell Ober, there's no

12  reason why you would think to

13  mention such a thing.  And I'm sure

14  --- I'm sure that you would not do

15  so just, you know, for nothing.  So

16  obviously, if your recollection is

17  the governor's office wasn't

18  mentioned, you didn't have

19  information about that when you

20  called Captain Ober, although it did

21  develop later and was mentioned on a

22  tape by a CI.  Thank God it ended up

23  being untrue, but it was mentioned;

24  right?

25  A.       If, in fact, the

108

1    governor's office was mentioned on

2    the tape, I can't recall that now to

3    tell you the truth.

4    Q.        All right, sir.

5    A.        It might have been on

6    there, might not.  But I recall

7    vividly that it was a Lieutenant

8    Colonel or some high ranking officer

9    whose name was --- not the name was

10   mentioned, but the position was

11   mentioned.

12   Q.        Okay.  Now, Ralph, that's

13   the reason I was doing this because

14   I was a little confused by your

15   responses to my learned colleague,

16   which --- did you indicate in your

17   responses to her that possibly

18   Mr. Ober had mentioned the

19   governor's office, that he had

20   brought that into this thing?

21   A.        (Indicates).

22   Q.        Well, then how did it come

23   into it?

24   A.        I don't know.

25   Q.        How did it come into it,

109

1  if it did?

2  A.        It must have --- it

3  certainly didn't come from me, put

4  it that way.

5  Q.        I'm sure it didn't come

6  from you, sir.

7  A.        The governor's office.

8  The only ---.

9  Q.        I'm certain it didn't come

10  from you.  That's ridiculous.

11  A.        Yeah.

12  Q.        I'm talking about the fact

13  source.  You tell us --- now, you

14  are an experienced FBI agent.  And

15  if the facts in this case indicates

16  somebody mentioned the governor's

17  office on the tape and your

18  expertise is political corruption,

19  that didn't ring a bell, raise a

20  flag, you're telling us that you

21  don't remember?

22  A.        I don't know that it's on

23  there.  I don't know.  I'd have to

24  listen to the tape that was done.

25  And the last time I listened to it

110

1   was years and years ago.  I don't

2   --- I don't recall it being on

3   there.  Possibly it is.  Maybe it

4   isn't.

5   Q.        Okay.

6   A.        But it --- as I said,

7   because of the type of person that I

8   was working with, his contact would

9   be with legislators as opposed to

10  the governor's office if he ---.

11  Q.        Why?

12  A.        Why?  Because that's where

13  he is.  He doesn't --- he's here in

14  Pittsburgh, and he's not in

15  Harrisburg.  And there are

16  legislators ---.

17  Q.        Well Doc Fielder's name

18  came up; right?

19  A.        And there are legislators

20  --- well, he's a political person.

21  Q.        Is he?

22  A.        Uh-huh (yes).

23  Q.        Okay.  Well, you do

24  remember discussing --- or maybe you

25  don't, governor's office with

111

1  Captain Ober?  I thought in response

2  to opposing Counsel you indicated

3  ---?

4  A.        If we did, it was not to

5  any length at all.

6  Q.        Okay.

7  A.        It was --- it might have

8  been mentioned.  It wasn't discussed

9  in any detail.  I can say for sure

10 it was not.  It would have been in

11 passing that there's a possibility.

12 I --- the State Police --- probably

13 the commander of the State Police,

14 I'm sure, serves at the pleasure of

15 the governor.  So as part of the

16 executive branch.  And so if it did,

17 it --- you know.

18 Q.        I mean, the legislators

19 were involved.  And you might feel

20 that two elected democrats out in

21 Allegheny County might have an

22 effect on Colonel Evanko in a

23 republican administration.  Maybe

24 through what, the appropriation

25 process, the way politics is done,

112

1    do you think that maybe they would

2    have --- not necessarily Colonel

3    Evanko, but somebody in that State

4    Police hierarchy --- you didn't know

5    what the connection could be, but

6    you could envision the possibility

7    ---

8    A.        Oh, sure.

9    Q.        - -- that these kinds ---

10    this kind of corrupt activity could

11    occur; right?

12    A.        That's right.

13    Q.        All right.  But you had

14    --- let's face it, when this

15    investigation was done, none of this

16    stuff turned out to be very

17    credible, and it sounded --- well, I

18    mean, from what I can tell when you

19    did the investigation, it didn't

20    turn out to be ---?

21    A.        We weren't successful in

22    that ---.

23    Q.        Okay.

24    A.        We were successful in

25    determining that the individual that

113

1  we thought might be able to effect

2  it, you know, did not.

3  Q.        Yes.

4  A.        And would not.  That

5  doesn't --- that is ---.

6  Q.        That's not Trooper

7  Stanton?

8  A.        No.

9  Q.        Okay.

10 A.        That's the legislator.

11 That's not to say that there isn't

12 another person out there, another

13 legislator out there, who would try

14 to effect this.

15 Q.        How closely did you look

16 at the governor's office?

17 A.        We did not look at the

18 governor's office.

19 Q.        Okay.  All right.  Now,

20 the conversation that occurred on or

21 about February 13th, the tape, did

22 --- you got that reduced to a

23 transcript at some point; right?

24 A.        Well, I'm sure most of the

25 significant, you know, parts of that

114

1  and some of them totally were

2  reduced, yeah.

3  Q.          Well, how many transcripts

4  did you give Captain Ober?

5  A.          I don't know.  How many

6  there was ---.

7  Q.          Well, why wouldn't you

8  give him all of them, sir?

9  A.          Because was were still

10 continuing at that point in time.

11 Q.          Oh.  Well, did you give

12 him all of them at the end?

13 A.          I didn't have the

14 investigation at the end, so I don't

15 know.

16 Q.          Right.  You were off it.

17 We'll get to that in just a minute.

18 But the investigation --- the part

19 of the investigation that you did,

20 the reference to --- was it

21 Lieutenant Colonel, I think, and

22 governor's office, which you're not

23 remembering --- you're not sure was

24 there?

25 A.          I'd sure like to hear the

115

1   tape, I could tell you for sure, and

2   look at the transcript.  But the

3   Lieutenant Colonel, that position

4   came up that --- that reference to

5   that position came up in the tape.

6   Q.          And you had indicated that

7   Captain Ober's ears perked up when

8   he heard that; is that right?

9   A.          He was sensitive to that,

10  yes.

11  Q.          You know, the feeling I

12  got when I saw that in Mr. Williams'

13  statement --- I don't know where

14  that feeling came from, whether it

15  was Mr. Williams.  Mr. Williams

16  wrote a little statement about what

17  you told him.

18  A.          Okay.

19  Q.          I made reference to it

20  here earlier.  Now, I didn't --- you

21  know, when I heard that, it sounded

22  like Captain Ober took a sudden

23  interest and that sort of thing.

24  But you seem to be telling me that

25  it wasn't --- the tape wasn't real

116

1   clear?

2   A.          Well ---.

3   Q.          Or are you telling me the

4   tape was clear, and you had heard

5   the word Lieutenant Colonel, but it

6   takes Captain Ober to get interested

7   in that term if it's connected with

8   selling jobs at the Academy?  I

9   don't understand.

10  A.          Okay.  I ---.

11  Q.          You explain it for me.

12  A.          If I were listening to a

13  tape which Captain Ober had made,

14  and it was discussing a similar

15  situation but in reverse order, as

16  soon as he --- the person would have

17  mentioned a special agent of the

18  FBI, I would have hit on that.  I

19  mean, even if it was a little bit

20  garbled or whatever, I would have

21  hit on it very quickly because now

22  it's my organization that's being

23  possibly a problem with.  And I

24  would be extremely sensitive to

25  that.

117

1    Q.        Okay.

2    A.          And I would imagine that

3    the situation was reversed.  And

4    when that --- when that happened,

5    when that --- when a position title

6    came up like that, he hit on it like

7    I would have hit on it as an FBI

8    agent being accused of something or

9    possibly something going on.

10   Q.        Raises ---?

11   A.          And I think that's why he

12   hit on it.

13   Q.        Okay.

14   A.          And I would have just ---

15   I'm just listening.  I'm listening

16   to somebody explain a process.  And

17   to me, it doesn't really mean

18   anything because I don't have --- I

19   can't attach it to anything yet,

20   whether it's valid or not.

21   Q.        Okay.

22   A.          But if, in fact, it raises

23   an allegation regarding our

24   organization and somebody mentions

25   an FBI agent, I would be very

119

1    A.        Okay.

2    Q.        If at the time you call

3    Captain Ober your common sense,

4    judgment and experience tell you

5    that Kipp Stanton is not going to be

6    able to engineer class appointments

7    for the Pennsylvania State Police

8    ---

9    A.        Uh-huh (yes).

10   Q.        --- and Soohy comes in in

11   August, you're making this call in

12   early October to Mr. Ober, and

13   there's mention of state legislators

14   or a Senator at the point that you

15   call Mr. Ober ---

16   A.        Uh-huh (yes).

17   Q.        --- I assume you would

18   have passed that on?

19   A.        Passed what?

20   Q.        That information or that

21   background information on to

22   Mr. Ober?

23   A.        Ober, sure.

24   Q.        Okay.  All right.  So the

25   question remains is when --- so the

120

1  question that remains is when you

2  first became aware of higher ups in

3  the State Police, Lieutenant Colonel

4  in the State Police, somebody in the

5  State Police above Stanton, either

6  by rank or group or something, and

7  the governor's office, okay, when

8  you first became aware of that, and

9  then when you communicated that to

10  Captain Ober --- and that's what I

11  want to explore.  Okay?

12          At some point obviously,

13  that became a piece of the

14  background here.  Now, do you

15  remember if when you first heard

16  this tape, Lieutenant Colonel ---

17  apparently you played that for

18  Mr. Ober; right?

19  A.      Uh-huh (yes).

20  Q.      Did you have a transcript

21  with you?

22  A.      Probably not.  I don't ---

23  if, in fact, we made that tape like

24  the week or so before we played it

25  for Captain Ober, it probably was

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

121

1  not --- we probably hadn't had parts

2  of it transcribed because it was

3  probably a fairly lengthy tape.  And

4  it would have taken time to get that

5  done.  And we just didn't get it

6  done.

7  Q.        Well, when did you first

8  listen to it after you had it?  I

9  mean, did you sit there and listen

10 to it while you were listening to

11 the conversation being made?  In

12 other words, was it transmitted and

13 you were listening to it or did you

14 have your surveillance people do it

15 and you've got it after the fact?

16 A.        No, I probably --- I

17 probably got it after the fact.  At

18 times, I would have a transmitter

19 also, but I --- at this time, I

20 don't think I had a transmitter.  I

21 think I was just picking it up after

22 it, after the fact.

23 Q.        And you didn't like pick

24 up the phone right away and call

25 Captain Ober?

122

1    A.          No.

2    Q.          And let him know, like,

3    hey, don't say anything to anybody

4    because this might involve some

5    officers high up in the State Police

6    or something like that?

7    A.          No, no.

8    Q.          Now, when you heard this

9    problem --- I mean, heard this thing

10   about possibility of State Police

11   hierarchy, Lieutenant Colonel, not

12   very many of them in the

13   Pennsylvania State Police, I can

14   tell you, maybe a handful, and you

15   heard the governor's office, if

16   indeed you did, because we're not

17   sure if you even heard it, you don't

18   know.  You don't know if it's even

19   on the tape.  But I assure you it's

20   on the tape.

21   A.          Okay.  Good.

22   Q.          Okay.  And if you

23   certainly had heard the governor's

24   office, although it wouldn't excite

25   you or raise a flag in your eyes

123

1    maybe, I'm not saying it should, or

2    and you heard the term Lieutenant

3    Colonel, you went to Rick Mosquera,

4    right, and said, hey, this is a

5    touchy thing here, we need to ---

6    no?

7    A.        No, we didn't do anything.

8    Q.        You didn't do anything

9    like that?

10   A.        No.

11   Q.        When did you tell him?

12   When did you tell Rick Mosquera?

13   A.        I don't know when

14   Mr. Mosquera got information about

15   the particular case.  But I know

16   that he did when I was called into

17   his office.  I would think --- I

18   don't know when he would have

19   learned about it.  I don't know

20   whether Mr. Soohy discussed it with

21   him or not prior to --- I can't tell

22   you.

23   Q.        Okay.  Well, May 20th,

24   1999, when I called --- this is

25   Colonel Evanko.  When I called FBI

124

1  Agent Rick Mosquera, who is SAC in

2  Pittsburgh, this is when the ---

3  Captain Evanko learned from the FBI

4  when, okay, he had been informed by

5  Captain Ober about this

6  investigation, he and Colonel Hickes

7  had told --- Captain Ober and

8  Colonel Hickes had told the

9  Commissioner about it, and said it's

10 closed, and, you know, I couldn't do

11 anything because, you know, I ---

12 that's what they're saying, you

13 know, Hickes and Ober, you know, the

14 thing is about not compromising the

15 investigation, the proper thing to

16 do.  Anyway, Colonel, when were you

17 advised of this?  Evanko, May 20th,

18 1999, when I called FBI agent Rick

19 Mosquera, who is SAC in Pittsburgh.

20 Wertz, I don't know if you have it

21 there or if he gave you this

22 information.  Did he ever mention to

23 you the specific date when Ober was

24 first advised of this?  He just said

25 that it wasn't until October of '98

125

1    that they got around to it and

2    decided to take a run at it, but he

3    didn't mention a specific date, just

4    around October of '98, and he got

5    that from the case agent.  It would

6    have been either Kush or Kelly.

7    Kush, Kush, Kush.

8         Well, Mr. Evanko knew

9    something then.  Evanko, Kush.

10   Wertz, did he ever mention to you a

11   specific that they, if you will,

12   turned the investigation over to

13   Captain Ober?  No, he never

14   mentioned a specific date.  I did

15   tell him that somebody would be

16   getting hold of him if he didn't

17   mind to sit down and get some facts

18   from him.  I'm going to turn this

19   off for a second for you to read

20   through your notes.  Okay?  Okay.

21   Resuming the statement.  As Special

22   Agent Mosquera talked to me about

23   this, he did tell me that Captain

24   Ober was concerned about, quote,

25   going anywhere, end quote, with this

126

1  information.  What he was implying

2  is as to who he should tell about

3  this information, who Captain Ober

4  should tell about this information.

5  Now, sir, this indicates that the

6  first time that Mr. Evanko called

7  Mr. Mosquera was May 20th, 1999, and

8  that Mr. Mosquera tells him that

9  Ober was concerned about where the

10  investigation would go.  Now, who

11  would have told --- who would have

12  told Rick Mosquera and why would he

13  remember, if you know, Captain Ober

14  indicating his concern about where

15  he should go with the information?

16  How would Mr. Mosquera know that at

17  that time, if you and/or Mr. Soohy

18  hadn't discussed it with him or

19  somebody hadn't made an inquiry

20  before that; do you know?

21  A.        Oh, we probably talked to

22  him, I would think.

23  Q.        Why would you tell --- why

24  would you tell Mr. Mosquera that

25  Mr. Ober had a concern about who he

127

1  should tell in the State Police?

2  A.        I think because of the

3  fact that we had --- I mean, you had

4  a Lieutenant Colonel's position

5  mentioned.  That's --- I would have

6  to think that that would be the

7  reason.  I mean, there's a --- I

8  don't call his shots, Captain

9  Ober's.  And he has to call his

10  own.  And I --- maybe he just felt

11  uncomfortable.  I don't know.

12  Q.        You know, why you don't

13  get excited that much because it's

14  --- it's the normal course of an

15  investigation in your experience,

16  people say these things, about a

17  Lieutenant Colonel being mentioned.

18  It's not that you don't get excited

19  or concerned, I don't want to

20  downplay it, but it's --- you know,

21  you're an experienced guy, you've

22  been around, use of terms earlier

23  today, been there, done that, heard

24  this, done that, okay, that type of

25  thing.  Okay.  And now here's

128

1    Mr. --- here's Mr. Mosquera in the

2    first call to the Commissioner, it

3    might have been the second call to

4    the Commissioner, talking about who

5    Captain Ober should tell about this

6    information.

7            Let me ask you something.

8    This is words to Mr. Evanko.  During

9    the course of your conversation with

10   the SAC, did the SAC ever mention to

11   you anything specific with regards

12   to a particular rank within our

13   agency?  No.  He just talked about

14   Trooper Stanton.  Okay.  He never

15   mentioned anything with respect to a

16   particular individual, other than

17   Trooper Stanton?  No.  In fact, the

18   word --- he did tell me that it was

19   not systemic.  Yeah, that's all I

20   have, that's all I have.  What does

21   not systemic mean?

22   A.         That it wasn't pervasive

23   throughout the whole State Police

24   system or the Academy, their

25   training facility.  That's what I

129

1   would imagine.

2   Q.        Okay.  Mr. Williams says

3   at some point when he talked with

4   you, I think the first time --- he

5   had a number of conversations with

6   you, he must not have been satisfied

7   or something ---?

8   A.        Mr. Williams?

9   Q.        Yes.  I mean, he came back

10  and sort of got ---?

11  A.        I don't know.  I think

12  there was only one face-to-face with

13  him, but ---.

14  Q.        Okay.  Well, that's

15  interesting.  He says here at this

16  point in time, I specifically asked

17  Agent Kush if he ever asked or

18  stressed the need for discretion on

19  the part of Captain Ober discussing

20  the case with one --- anyone.  Agent

21  Kush stated he did not recall asking

22  the Captain not to discuss the case,

23  but hoped he would not discuss it.

24  He stated that if Captain Ober did

25  not discuss this case, he supported

130

1  his decision not to do so.

2              Now, why would you do

3  that?

4  A.        What?

5  Q.        Support Captain Ober in

6  not discussing the case with

7  someone.

8  A.        I mean, it's --- what

9  would it be if I supported him or

10 didn't support him?  I have no --- I

11 have no control ---.

12 Q.        I'm not saying it has any

13 consequence, sir.

14 A.        I trust --- I would say

15 that I trust his judgment.  That's

16 basically what that means.

17 Q.        You wouldn't want him to

18 inform a target or potential target

19 of an investigation that you were

20 looking at him; would you?

21 A.        No.  But I would hope that

22 he would --- that he would consider

23 everything.

24 Q.        Oh, sure.

25 A.        I ---.

131

1  Q.          And you said you supported

2  his decision not to do so.  So

3  whatever you were considering, you

4  must have thought he was considering

5  the right things?

6  A.          That's his --- that was

7  his ball game there.

8  Q.          Okay.

9  A.          So I really have to trust

10 his judgment.

11 Q.          Kush stated he believed he

12 met with Captain Ober on two

13 occasions.  Any more than two

14 occasions?

15 A.          Personally twice.

16 Q.          Personally twice.  He did

17 not recall specific dates, but the

18 dates may be in his report.  On one

19 occasion, he and Ober reviewed a

20 tape where Bridge mentioned that if

21 a politician would help him, he ---

22 the politician ---?

23 A.          Oh --- go ahead.  I'm

24 sorry.  I just remember that Bridge

25 now saying that, go ahead.

132

1   Q.        Okay.  Would apparently

2   have talked to some Lieutenant

3   Colonel.  No name was ever

4   mentioned.  Trooper Stanton then

5   replied, the person who eyeballs.

6   The rest of the comment was

7   unintelligible.  Agent Kush

8   distinctly remembers that when the

9   title of Lieutenant Colonel was

10  mentioned, his ears really perked

11  up.  Now, see that pronoun his.  Was

12  it your ears or Captain Ober's ears?

13  A.        Captain Ober's.

14  Q.        Captain Ober's.  Your ears

15  had already perked up, but they had

16  calmed down by that time or had they

17  ever calmed down?

18  A.        Like I said before ---.

19  Q.        It wasn't a big ---?

20  A.        Lieutenant Colonel did not

21  affect me in any way, shape or form.

22  Q.        You did say that.  It

23  wasn't an overly ---?

24  A.        But an FBI agent would

25  have really perked my ears up hard.

133

1    Go ahead.

2    Q.        Now, this gentleman over

3    here is a lawyer, and I'm sure one

4    of the best in the world because

5    he's your lawyer?

6    A.        He is.

7    Q.        Okay.  I'm sure he is.

8    Now, maybe he's not a good example.

9    But the example I would have is

10   somebody comes in here from an

11   outside agency, an agency that you

12   respect, an agency on an equal level

13   with you, although there probably

14   aren't too many of those around, and

15   said that they're looking at a

16   superior of yours, and your contact

17   --- you're the OPR director.  Are

18   you going to go tell that person if

19   they're in a group that could be

20   investigated?  Would you go tell

21   them and inform them?

22   A.        I don't know what our

23   requirements are in that regard.

24   And, you know, I've never done an

25   OPR investigation, so I can't speak

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

134

1    to that.  But I'm sure there is

2    rules and regulations in that

3    organization how to address it.

4    Q.        So in a criminal

5    investigation, though, generally

6    speaking at least, you don't think

7    it would be appropriate to inform a

8    target or someone in a group that's

9    targeted in an investigation that

10   they're being investigated?

11   A.        I would --- I'd have to

12   agree with that, yeah.

13   Q.        Okay.  Now, apparently

14   Fielder's an adult male in the

15   Pittsburgh area with political

16   connections.  This is you talking?

17   A.        Uh-huh (yes).

18   Q.        Fielder either made direct

19   contact with a Pennsylvania state

20   representative or put Bridge in

21   contact with him?

22   A.        Not Bridge.

23   Q.        That was the public

24   corruption?

25   A.        Yeah, that wouldn't be

135

1   Bridge who would be put in contact.

2   Q.        So Williams might have

3   made an error there?

4   A.        It would have --- that

5   would have been the CW.

6   Q.        During the above phone

7   call --- I want to read this to

8   you.  Okay?

9   A.        Uh-huh (yes).

10  Q.        Major Williams asked Agent

11  Kush three specific questions.

12  Questions and answers follow.

13  During your initial telephone

14  conversation with Captain Ober in

15  late September, early October,

16  concerning the FBI political

17  corruption investigation in western

18  Pennsylvania, did you ever discuss

19  the need for confidentiality with

20  him?  And this is Mr. Kush, no, I

21  never discussed confidentiality

22  about the case with him.  I knew who

23  I was dealing with, the Captain of

24  the PSP.  Therefore, I trusted him.

25  I simply discussed the case with

136

1  him.

2          That would be consistent

3  with your testimony that you would

4  trust him to use his good judgment

5  based on what he's told?

6  A.          Sounds right.

7  Q.          Okay.  During the above

8  phone call, did you ever mention any

9  specific rank within the PSP that

10 may be involved in this case?  I

11 specifically asked him about the

12 Colonel, or Lieutenant Colonel

13 rank.  Here it is, Mr. Kush.

14 A.          I don't know.  If it's

15 there, I believe you're not telling

16 --- I ---.

17 Q.          That's where it is,

18 Mr. Kush.  It's in a report that

19 Mr. Williams did who talked with

20 you.

21 A.          Okay.

22 Q.          Could you possibly be

23 mistaken, Mr. Kush?  Is it possible

24 that you could be in error about

25 events?

137

1      <u>ATTORNEY GUIDO:</u>

2          No, wait a minute.

3      This is wrong.  That's the

4      question you're reading.

5      Read it accurately.  That

6      is not his answer, that is

7      the question.  It is the

8      question, not Agent Kush's

9      answer.

10         <u>ATTORNEY BAILEY:</u>

11         Agent Kush replied at

12     some point in time, a

13     Lieutenant Colonel rank

14     was discussed.  However,

15     he could not remember a

16     date.

17  A.     That's probably accurate.

18  <u>BY ATTORNEY BAILEY:</u>

19  Q.     But you told us the date

20  wasn't before at the time of the

21  initial phone conversation?

22  A.     What date are you talking

23  about?

24  Q.     The date whenever this

25  Lieutenant Colonel was mentioned.

138

1   A.          When it really became an

2   issue was when Captain Ober heard

3   it.  I mean, it --- if you heard the

4   tape, you would listen to the tape,

5   and all the bombacity of the person

6   that's making all these statements

7   ---

8   Q.          Right.

9   A.          --- that catches your

10  ear.  And then this one phrase,

11  boom, Lieutenant Colonel, that is in

12  there.

13  Q.          But ---?

14  A.          And you wouldn't --- you

15  just probably wouldn't pick up on it

16  unless you're very sensitive to

17  that.

18  Q.          But see, the issue is when

19  ---?

20  A.          And I probably didn't say

21  it the first time ---.

22  Q.          Probably didn't?

23  A.          Yeah.  I would honestly

24  --- and I'm being as honest as I

25  possibly can here.

139

1  Q.        Yes, I want you to be.

2  A.        And I'm trying to impress

3  you with that point, though.  That

4  it really didn't click until Captain

5  Ober hit on it.  And then it --- and

6  then it hit harder.  And it was

7  obvious to us that if he was going

8  to effect some kind of change in his

9  status, that it would involve

10 somebody in the process.  And that

11 process is handled by the State

12 Police.  And it would have to be

13 somebody within that organization.

14 Q.        Okay.

15 A.        Now, the Lieutenant

16 Colonel, I don't know.  That just

17 did not --- I knew it was going to

18 have to be somebody within State

19 Police was going to have to be

20 gotten to by a legislator.  Okay.

21 Because a legislator can't just go

22 in and tell somebody, hey, put this

23 guy in class.  No, he's got to have

24 somebody else along the chain to go

25 to.

140

1    Q.        Did you say that to

2    Captain Ober?

3    A.        I don't think we'd have to

4    say that to Captain Ober.

5    Q.        No, but I ---?

6    A.        He was an investigator,

7    too.  And he knows exactly what

8    would have to happen.

9    Q.        No.  I know.  And I'm not

10   trying to demean.  I'm just asking

11   if you did.  Do you remember if you

12   did?  Was it discussed between you?

13   A.        It could have been.

14   Q.        It could have been?

15   A.        It probably was.

16   Q.        Okay.  I'm happy.

17   A.        To some degree.  There are

18   certain things you don't have to get

19   into detail because we know ---.

20   Q.        What's going down.

21   A.        In what detail, that's a

22   different story.  He knows more of

23   the detail.  I would have to believe

24   that there would be somebody within

25   the organization that would have to

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

141

1   be, you know, compromised.

2   Q.          Did you ever talk to

3   Mr. Ober's lawyer, not me?

4   A.          Yeah.

5   Q.          I'm a follow-on lawyer,

6   but a real bona fide lawyer before.

7   Did you ever talk to a real high

8   quality lawyer before about

9   Mr. Ober?

10  A.          If somebody had called, I

11  would have referred them on to

12  Mr. Killeen.

13  Q.          So you didn't ---?

14  A.          I would say hello or

15  whatever, and then say I can't.

16  Q.          So if somebody provided a

17  statement that they had a

18  conversation with you about the

19  situation with Mr. Ober, you'd deny

20  that that occurred?

21  A.          I'd like to see it.  I

22  don't think that it ever did.

23  Q.          Okay.  That's fair

24  enough.

25  A.          Okay.

142

1    Q.        All we can ask is your

2    recollection.  And this has been

3    tremendously helpful.  Let me go on

4    in fairness to you now.

5    A.        Sure.

6    Q.        It says I informed him,

7    meaning you --- this is Mr. Major

8    Williams, that the recorded

9    conversation between his CI, Bridge,

10   and Trooper Stanton, in which the

11   rank of Lieutenant Colonel was

12   mentioned, was recorded on October

13   13th, 1999.  Okay.  Now, based on

14   this information, Agent Kush then

15   stated he could not have known about

16   the Lieutenant Colonel rank during

17   his initial phone call.  Therefore,

18   he would not have discussed it.

19   What you're saying is that if ---

20   what you were telling Mr. Williams

21   ---

22   A.        Uh-huh (yes).

23   Q.        --- was that if the first

24   time it was mentioned ---

25   A.        ·Uh-huh (yes).

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

143

1    Q.        --- was during that

2    October 13th interview, then you

3    couldn't have told Ober about it

4    during the first conversation?

5    A.        The recording, the October

6    13th recording?

7    Q.        Yes, the recording.  If

8    that was the first time?

9    A.        If that was, yeah.

10   Q.        But you're not certain

11   when it was first mentioned; are

12   you?

13   A.        I would be if I heard the

14   tape and saw the material.

15   Q.        Okay.  Well ---?

16   A.        But my recollection is ---

17   it's a few years ago, so ---.

18   Q.        I know.  It's difficult

19   and you do a lot of work.  And

20   there's a lot of details.

21   A.        And I would give you the

22   exact date if I could.

23   Q.        I'm sure you would.  How

24   many tapes did you give --- do you

25   know were sent up --- how many tapes

144

1  were done; do you know?

2  A.        Boy, I could only guess it

3  would have to be more than ---

4  somewhere in the neighborhood of

5  more than ten.  Several.  Everything

6  that we had that regarded that

7  particular ---

8  Q.        Okay.

9  A.        --- situation, we would

10  have turned them over.  Because I

11  mean, they were trying to prosecute

12  Stanton.

13  Q.        Right.

14  A.        And we were certainly

15  standing beside them on that.

16  Q.        Absolutely.  Did you ---

17  do you remember if they were ever

18  dubbed, the tapes were ever dubbed?

19  A.        Oh they --- I don't ---

20  they would have been duplicated.

21  They probably got duplicates, and

22  then they probably got the

23  originals.  I don't know where the

24  originals are right now.  I can't

25  tell you.

145

1    Q.          I would assume the FBI

2    would have the originals?

3    A.          I can't tell you.

4    Q.          Did the attorney --- do

5    you recollect if the Attorney

6    General, the Pennsylvania State

7    Attorney General's office was ever

8    notified?

9    A.          Oh, yeah.  I mean, they

10   --- they were involved in the

11   prosecution of Stanton, so they

12   would have been.

13   Q.          Okay.

14                    VIDEOGRAPHER:

15                    I'm sorry.  I'm going

16                    to change tape, too.

17                    We're all going to

18                    change.

19                    ATTORNEY BAILEY:

20                    Okay.  Go ahead.

21                    VIDEOGRAPHER:

22                    One moment.  It's

23                    1:12 that we're going to

24                    take --- change the tape.

25                    This is --- the date is

146

1          March 14th, 2002.

2    OFF VIDEOTAPE

3    SHORT BREAK TAKEN

4    ON VIDEOTAPE

5              VIDEOGRAPHER:

6              It is March 14th,

7         2002.  It's 1:19 p.m.

8         We're resuming the taped

9         deposition of Mr. Rush

10        ---?

11   A.        Kush.

12             VIDEOGRAPHER:

13             Kush.

14   BY ATTORNEY BAILEY:

15   Q.        Okay.  Ralph, another part

16   of the statement that Colonel Evanko

17   did goes as follow, okay, and I just

18   want to ask because it goes back to

19   this issue of when and what you and

20   Michael discussed with Rick.  Okay?

21   A.        Uh-huh (yes).

22   Q.        Yes.  I also after May

23   12th called the SAC in Pittsburgh,

24   Rick Mosquera.  This is Colonel

25   Evanko talking.

147

```
1   A.        Okay.

2   Q.        Because he's a friend of

3   mine.  I told him there's something

4   I needed to talk to him.  I told you

5   --- I tell you what, the date was

6   May 20th of 19999.  He mentions that

7   date further on again.  And I told

8   him there was something I needed to

9   talk to him about.  And I prefaced

10  my remarks by saying that if what I

11  ask --- if what I ask you was going

12  to interfere in an FBI

13  investigation, no, I understood that

14  he couldn't respond to any of my

15  questions.  And I understood that.

16  And I wanted to ask him if either I

17  or the Pennsylvania State Police

18  were the subject of an FBI

19  investigation into, quote, selling

20  trooper positions, end quote, or any

21  other corruption allegations since

22  October of 1998, specifically was I

23  the subject or investigation or any

24  my --- probably a typo, Lieutenant

25  Colonels or the State Police.
```

148

1  Paragraph.  His response to that

2  was, quote, an investigation out of

3  where.  Quote, out of where, out of

4  what office.  That was his response

5  to my first question.  And he said,

6  I have to plead ignorance in this.

7  He said, some time ago I remember

8  that there was a case against a

9  specific trooper, but I'd have to

10  get up to date on it, closed quote.

11  I asked --- also asked him, quote,

12  was I the subject of an

13  investigation or any of my

14  Lieutenant Colonels, closed quote.

15  And his response was, quote, if you

16  were, I would have been told about

17  it, closed quote.  He said, quote, I

18  can only reiterate that --- and this

19  is paraphrasing, that I remember

20  something in October of last year or

21  sometime back there about local

22  municipalities and testing.  He

23  said, I'm not really familiar with

24  what you're talking about.  I'll

25  have to get back to you.  My notes

149

1  are a little scattered here, so you

2  can turn that off until I --- sure,

3  he says.  Resuming.  And then it

4  goes back to that conversation where

5  apparently Rick gets back to him.

6  He said he'd get back to me.  I

7  asked about these preliminary

8  questions.  About 12:37, he gave me

9  a call back and said that there were

10  allegations that had surfaced around

11  January of '97.  He said I didn't

12  get here until June, but the

13  allegations about political

14  corruption surfaced in January of

15  '97.

16           I'd asked you questions

17  about when the political corruption

18  came into the Stanton thing?

19  A.         Uh-huh (yes).

20  Q.         Now, this is --- all I can

21  tell you is here it's in the year

22  1999, Rick Mosquera is telling

23  Evanko that the political corruption

24  aspect settled --- surfaced in

25  January of '97.  I want to ask you,

150

1    was there any mention of State

2    Police higher ups or ranking State

3    Police officers or governor's office

4    people as early as 1997?

5    A.        You said State Police

6    basically?

7    Q.        Yes.

8    A.        Yeah, regarding State

9    Police.

10   Q.        Just Stanton.

11   A.        It would have only been

12   ---.

13   Q.        Only been Stanton?

14   A.        Yes.

15   Q.        And you seem pretty

16   comfortable about that, pretty sure

17   about that; right?

18   A.        I'd have to check the

19   records, but I feel pretty

20   comfortable.

21   Q.        Yes.  I understand it's

22   your recollection.  You feel pretty

23   sure about it?

24   A.        Uh-huh (yes).

25   Q.        Now, part of that

151

1    allegation had to do with a State

2    Police trooper by the name of --- I

3    think it's Stanton, using his

4    position to influence the purchase

5    of State Police positions.  Well, we

6    both know that a trooper, you know,

7    doesn't have much power in the

8    Pennsylvania State Police, I guess,

9    unless he's got a friend somewhere.

10   There was a CI involved, a local

11   political official.  And he went on

12   and talked about Stanton's alleged

13   involvement.  He said the Internal

14   Affairs of the State Police, Captain

15   Ober in particular, was notified

16   because the case had --- was set ---

17   had been set aside until around

18   October of '98, but Captain Ober was

19   then notified.  And they told him

20   that they were going to take a run

21   at this.  They mentioned a

22   particular state representative's

23   name.  And this is the information

24   that you obtained from the SAC in

25   Pittsburgh.  And I read this to you

152

1  before, you know, that nobody but

2  Stanton was involved, it's not

3  systemic.  And I asked him is the

4  investigation closed.  He said it

5  is, the investigation's closed, it

6  was turned over to PSP, specifically

7  Captain Ober.

8          Now, the reason I ask

9  these questions is we get into this

10  time sequence.  Defendants --- I

11  quite frankly don't think it has a

12  damn thing to do with this case and

13  what happened, but it's going to be

14  used as a major whatever.  Is this

15  time issue of when Ober was

16  notified, okay, by you that there

17  was this thing going on.

18          We know earlier that the

19  western folks, that there's somebody

20  up there at organized crime division

21  had been talked to, and that Mr.

22  Behrens in IAD had been talked to.

23          Ralph, why didn't you go

24  back to them and talk to them?  Why

25  did you go up and call IAD in

153

1   Harrisburg?  What precipitated a

2   change?  You had already made a

3   contact?

4   A.          Uh-huh (yes).

5   Q.          That's of record, we know

6   about it.  You made it a meeting

7   with the organized crime folks up

8   there, there's --- you know, there's

9   Frank up there, and you met with Mr.

10  Behrens.  You know, why did you go

11  to Harrisburg all of a sudden in

12  October --- maybe all of a sudden's

13  not right, but it seems to me up

14  until '97, you know, Michael looks

15  at this thing and says, hey, we

16  should take another look at this,

17  apparently that's not run by --- run

18  by Rick, but it's a political

19  corruption case.  I thought all

20  political corruption cases were

21  supposed to be run by the SAC?  That

22  was my understanding.  I may be

23  completely wrong of FBI procedure.

24  Obviously, I'm wrong.

25  A.          I don't think you can be

154

1  aware of every corruption case.

2  Q.        Okay.

3  A.        Of the initiation of them

4  that he has to, you know, agree to

5  it.  But this case ---.

6  Q.        That's why I want to ask

7  you.

8  A.        But this case was running

9  long before that.

10  Q.        But hold right there.

11  Okay?

12  A.        Okay.

13  Q.        Because you just said

14  something that is consistent with my

15  knowledge of FBI practice.  Michael

16  didn't just say take this case and

17  go with it.  He --- this particular

18  case, if it's a political corruption

19  case, and Mr. Mosquera says that in

20  '97 it was identified as such,

21  wouldn't Mr. Soohy and/or yourself

22  have checked with Rick before you

23  started the corruption ---?

24  A.        It had already ---.

25  Q.        Not necessarily ---.

155

1  A.        It had ---.

2  Q.        It already existed?

3  A.        Yeah.

4  Q.        Okay.

5  A.        I think --- I want to say

6  my initial efforts had probably

7  started in '94.  I mean, it was way

8  back.  And this case had been around

9  long enough that we needed to, you

10  know, close it, resolve it.  But

11  there were so many angles and so

12  many things that the CI was involved

13  in, that we just didn't get to it

14  until that time.

15  Q.        And ---.

16  A.        And there was another

17  thing you mentioned here, which I

18  don't know that it was exactly

19  right.

20  Q.        Go ahead.  Go ahead.

21  A.        And it had to do with the

22  date that I would have notified

23  Captain Ober.  I think you said it

24  was --- he was notified before '97.

25  Well, that would have been the

156

1    reference to Mr. Behrens.

2    Q.        No sorry.  Sorry.  I did

3    not.  Mr. Behrens, sir, not

4    Mr. Ober.

5    A.        Okay.

6    Q.        Yes, I made an error.  I

7    apologize.  I probably --- okay.

8    But why did you go back to them?

9    A.        That's more where Bailey

10   would come in.

11   Q.        Okay.

12   A.        It's an OPR matter.

13   That's Internal Affairs.  That's my

14   judgment.

15   Q.        Wait a minute.  Now,

16   Ralph, we know it's your judgment.

17   Let's look for the reason for the

18   judgment.

19   A.        Okay.  Go ahead.

20   Q.        Now, is the reason for the

21   judgment because higher ups or

22   Lieutenant Colonel or governor's

23   office people were mentioned, and

24   that's what made you go to Mr. Ober

25   in Harrisburg?  Because what had

157

1   changed --- what intervening facts

2   were known to you that caused you

3   from the '97 perspective to go then

4   to Harrisburg in October of '98?

5   A.        I ---.

6   Q.        Why did you change?  Why

7   did you switch?

8   A.        My initial contact with

9   the State Police was with their OPR,

10  with their Office of Professional

11  Responsibility or Internal Affairs.

12  Q.        Western office IAD, Mr.

13  Behrens?

14  A.        Well, actually I was

15  referred to them by Harrisburg.

16  Q.        Then why did you go back?

17  A.        Because that's where it

18  should --- I felt it should rest.

19  Q.        Okay.  How's surveillance

20  work?  Is it fun?  Pretty boring;

21  isn't it?

22  A.        No.  It's interesting

23  sometimes.  It's ups and downs.

24  Q.        You CPA?

25  A.        Uh-huh (yes).

158

1    Q.        Were you watching people

2    write numbers as part of your

3    surveillance duties, Ralph?  I mean,

4    what the hell were they taking

5    somebody with your kind of up here?

6    A.        The reason is for

7    surveillance.

8    Q.        What are you doing, I

9    mean?

10   A.        I have other abilities

11   besides that.

12   Q.        You have good eyesight?

13   A.        I have good eyesight.  I

14   can work with people.  I'll go the

15   extra mile.  I mean, everybody does.

16   Q.        Sure.

17   A.        I mean, I'm easy to get

18   along with.

19   Q.        Okay.

20   A.        And all those factors

21   probably led them to send me there.

22   Q.        Okay.  Do you know what

23   this is?  I don't know what it is.

24   I'm trying to find out what it is.

25             ATTORNEY GUIDO:

159

1            May we mark it as an

2           exhibit, please?

3           ATTORNEY BAILEY:

4           Okay.

5  A.       It looks like --- that's

6  probably my handwriting.  It's an

7  envelope.

8  BY ATTORNEY BAILEY:

9  Q.       I don't know what it is.

10  A.       I'm sure it's an envelope,

11  I guess.

12  Q.       I don't know what it is.

13  I'm just asking.  Can you tell me?

14  A.       Well, it's an envelope.

15  Brings up an interesting point.

16  When I would --- when I mailed the

17  things to Captain Ober, he wanted me

18  to have them mailed to his home.  So

19  other than that --- I thought it was

20  a little unusual.  But then again,

21  that's his decision where he wants

22  to have it mailed because he wanted

23  to keep it close to invest, I guess.

24  Q.       Did Captain Ober ever

25  mention any --- that he was under

160

1    any orders from Lieutenant Colonel

2    Hickes?

3    A.          No.

4    Q.          So you don't know what

5    orders he was under from the

6    Pennsylvania State Police from any

7    superior officers of his; do you?

8    A.          I don't recall of hearing

9    any.

10   Q.          Because he never went over

11   that, never talked to you about it,

12   never did that; right?

13   A.          Not that I know of.

14   Q.          Did he ever ask you who

15   you reported to in the FBI?

16   A.          No, but I think he knew.

17   Q.          Did he ever ask you what

18   you did in your --- well, do you

19   know who the boss of the

20   Pennsylvania State Police is?

21   A.          Evanko.

22   Q.          Okay.  No question about

23   that; is there?

24   A.          I think that's pretty much

25   public knowledge.

161

1    Q.        In the FBI, it used to be

2    J. Edgar Hoover.  And then there's

3    different people that follow on?

4    A.        I never --- yeah.

5    Q.        There's always somebody at

6    the top, though; right?

7    A.        Uh-huh (yes).

8    Q.        Okay.  And your eyes lit

9    up when I said J. Edgar Hoover.

10   A.        I didn't serve under him.

11   Q.        Didn't you?

12   A.        No.

13   Q.        Are you happy?

14   A.        I'd like to --- no, it

15   would have been a pleasure.  I would

16   have been proud to have.

17                   ATTORNEY BAILEY:

18             Okay.  You want to

19             mark that --- here.  She

20             wants it marked so ---

21             Syndi wants it marked.

22             Maybe we can get some

23             copies of it somehow.

24             Give me just a second.

25                   (Deposition Exhibit

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

162

1              Number One marked for

2              identification.)

3    OFF RECORD DISCUSSION

4    BY ATTORNEY BAILEY:

5    Q.        Captain Ober did a

6    supplemental report that is part of

7    the --- it's a document that's at

8    issue --- no, it's not at issue.

9    But it's part of the fact background

10   in this case.  I'm going to read

11   certain parts to it.  And I need you

12   to --- I need to ask you questions

13   about it.

14   A.        Okay.

15   Q.        It begins, I was contacted

16   by telephone in late September or

17   early October 1998 by Federal Bureau

18   of Investigations Special Agent

19   Ralph W. Kush of the Pittsburgh

20   office.  You don't dispute that; do

21   you?

22   A.        No.

23   Q.        Kush stated he was

24   conducting an investigation into

25   political corruption in western

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

163

1   Pennsylvania.   You don't deny that?

2   A.        No.

3   Q.        During this investigation,

4   an individual later identified as

5   Dennis J. Bridges, who was seeking

6   assistance in entering the

7   Pennsylvania State Police as a

8   cadet, approached an FBI

9   confidential informant CI,

10  confidential informant.  According

11  to Kush, Bridges had taken the cadet

12  entrance examination and was in band

13  B.  Bridges was seeking assistance

14  in moving from band B to band A

15  through a series of financial

16  payoffs to an unknown political

17  figure.  You don't dispute that?

18  A.        No.

19  Q.        According to Kush, the

20  meeting between Bridges and the

21  CI was arranged by Trooper Kipp

22  Stanton of the Pennsylvania State

23  Police.  During their meeting with

24  the CI, Kush stated that Bridges and

25  Stanton portrayed entrance into the

164

1    Department through a series of

2    payoffs as commonplace.  Do you

3    disagree with that?

4    A.          Uh-uh (no).

5    Q.          Okay.  Due to the nature

6    of the investigation, Kush requested

7    this information be kept

8    confidential.  Do you disagree with

9    that?  Do you remember that?  Is it

10   possible?

11   A.          Well, I mean, it would be

12   confidential as to --- yeah,

13   whatever he needed to do with it,

14   yeah.

15   Q.          Okay.  All right.  So you

16   wouldn't have said to him, don't

17   tell the Commissioner?

18   A.          No.

19   Q.          Don't tell the Lieutenant

20   Colonel, don't tell your boss,

21   anything like that?

22   A.          Uh-uh (no).

23   Q.          You just would, because of

24   the nature of this thing, say

25   something to the effect it's

165

1  sensitive?

2  A.          Sure.

3  Q.          Or this is maybe even the

4  word confidential.  But the point

5  that I think in all of this that

6  you're trying to get across is you

7  didn't sit down there and say don't

8  tell this or that person or don't

9  keep it from this particular group

10 of persons?

11 A.          Uh-huh (yes).

12 Q.          Is that fair to say?

13 A.          Well, we certainly

14 wouldn't want targets to get the

15 information, so ---.

16 Q.          Okay.  That makes a lot of

17 sense to me.  But I'm not an FBI

18 agent.

19 A.          You could be.  You're a

20 little late.

21 Q.          What's that?

22 A.          I think you're over 27.

23 Q.          A little bit.

24 A.          Or 37 it is.

25 Q.          Is that the late ---?

166

1  A.        That's the late --- that's

2  the late date.

3  Q.        I missed my calling.

4  Okay.  To facilitate their

5  investigation, Kush also requested

6  that I provide resource information

7  to him on such things as cadet

8  entrance, examination process,

9  selection process, cadet class

10  schedule dates, et cetera.  You

11  wouldn't disagree with that?

12  A.        Uh-uh (no).

13  Q.        Okay.  Kush agreed to my

14  request that the Internal Affairs

15  Division of the Pennsylvania --- of

16  the State Police be permitted to

17  initiate any criminal charges

18  against any member or employee of

19  the Department should the FBI

20  determine the system had been

21  compromised.  Do you recollect that?

22  A.        Well, we --- in that

23  particular situation ---.

24  Q.        You would have done that

25  anyway?

167

1   A.          Yeah.  We would --- yeah,

2   if that would have happened, there

3   would have been a Federal

4   indictment.  They would have been

5   indicted in that way, too.  That's

6   where we would have gone.

7   Q.          Okay.  But let me ask you

8   in thinking back on the

9   conversation, do you have a

10  recollection of whether that was

11  discussed or whether that came up or

12  he said that?  His report said he

13  said it.  That's what I'm really

14  asking.

15  A.          I mean, we could have said

16  that, hey, it depends on who goes

17  where.  I mean, sometimes we may not

18  prosecute somebody because of their

19  position.

20  Q.          Fair enough.

21  A.          But yet, to the State,

22  that's significant prosecution.  You

23  know, you deal in back and forth, so

24  that's ---.

25  Q.          Right.  I understand.  I

168

1  mean, it's a judgment call?

2  A.        Sure.

3  Q.        Based on what you find,

4  what the circumstances are, anyway?

5  A.        Because we wouldn't

6  prosecute somebody doesn't mean that

7  they wouldn't prosecute somebody,

8  you know.

9  Q.        Right.  He then says I

10  informed Lieutenant Colonel Hickes

11  of this investigation in early

12  October 1998.  Do you know whether

13  he talked to Hickes about that or

14  not?

15  A.        I don't know.

16  Q.        Lieutenant Colonel Hickes

17  ordered me to maintain the FBI's

18  request for confidentiality.  Now,

19  regardless of what passed between

20  the two of you, you don't have any

21  reason to believe that Captain Ober

22  would come away from that

23  conversation thinking you didn't

24  care about confidentiality.  I mean,

25  obviously, you've already testified

169

1   that that was something you had

2   expected or believed should have

3   been understood?

4   A.        Uh-huh (yes).

5   Q.        Correct?

6   A.        Uh-huh (yes).

7   Q.        Okay.  Cooperate to the

8   extent possible with any requests

9   for assistance by the FBI, and keep

10  him informed of any significant

11  developments in the case.  Now, you

12  have no way of knowing any of this

13  because you weren't privy to it, and

14  Mr. Ober didn't discuss it with you;

15  is that fair?  Is that correct?

16  A.        No, I wouldn't find that

17  to be shocking.

18  Q.        No.

19  A.        I mean, that would be just

20  --- he's reporting to his superiors

21  what was going on.  And I would do

22  much the same.

23  Q.        Right.  I met with Kush

24  and his supervisor, Michael J. Soohy

25  at troop T Everett on October 21,

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

170

1    1998.  Kush played an audio tape

2    obtained from a body wire of a

3    conversation between Bridges,

4    Stanton and the CI.  Kush later

5    mailed me a copy of a transcript of

6    the conversation.

7              Now, that would have been

8    the thing that's been discussed so

9    much, I believe?

10   A.        Uh-huh (yes).

11   Q.        As the October 13th?

12   A.        Okay.

13   Q.        I don't know for sure.

14   A.        Should be, yeah.  It

15   sounds good.

16   Q.        But I would assume that's

17   it?

18   A.        Yeah, I think.

19   Q.        But that first meeting

20   took place in troop T Everett?

21   A.        Yeah, that's --- yeah,

22   that's between the two.

23   Q.        All right.  Now, I had

24   sporadic conduct --- contact with

25   Kush over the next few months.

171

1  Occasionally Kush telephoned me

2  regarding the next scheduled cadet

3  class date, et cetera.  On occasion,

4  I in turn provided class updates to

5  Lieutenant Colonel --- case updates

6  to Lieutenant Colonel Hickes.  At

7  least as far as the part that refers

8  to you, is that pretty accurate?

9  A.        I don't know that he was

10  --- who he was reporting to, but I

11  --- yeah, that would be because we

12  were still working our end of it,

13  and we would need to know when

14  classes were starting, because there

15  was a certain point, I think, they

16  suspended --- they would suspend

17  classes or the examination's only

18  given once periodically, so timing

19  was --- was important because our CI

20  would have to discuss this with the

21  individuals involved.

22  Q.        Do you know whether

23  Colonel Evanko ever had a class

24  retested or rescheduled to

25  accommodate someone he was

172

1  interested in?

2  A.          No, I don't know that.

3  Q.          All right.  Now, sometime

4  in late February or early March of

5  '99, Kush contacted me to report

6  the CI received a payoff of $1,000,

7  which the FBI captured on videotape

8  between Bridges, Stanton and the

9  CI.  On March 15th, 1999, I met with

10 Kush and Soohy at the Holiday Inn in

11 Indiana.  I viewed the tape at this

12 time.  I provided Lieutenant Colonel

13 Hickes with an update of this

14 development.  Now, sir, do you

15 recollect that?

16 A.          The meeting that we had.

17 Q.          Yes.

18 A.          The viewing the tape.  But

19 I don't know what he --- who he

20 advised.

21 Q.          Did he order you beverages

22 out there in Indiana?  Come on Kush?

23 A.          I don't think so.

24 Q.          Come clean.

25 A.          I don't think so.

173

1    Q.        Did he order you ---?

2    A.        I could use one now, but I

3    don't think ---.

4    Q.        No?

5    A.        I don't think he did, no.

6    Q.        Okay.  We had some

7    questions here.  I just want to ask

8    you this.  At the time that you guys

9    met in Indiana, okay, at that time

10   --- give me a second.

11   A.        We did have coffee.  We

12   did have coffee.

13   Q.        Didn't have any Amaretto

14   did it?  Come on, Kush?

15   A.        No.  I think we did have

16   coffee, though.  No.

17   Q.        Hold on a second.  I have

18   to change the tape.  Now, Ralph, at

19   the time --- I bring that up because

20   it was --- a big issue was made of

21   this in a deposition about ordering

22   beverages for the FBI.  And I said

23   what the hell's wrong with the FBI?

24   I'd give them a drink, too.  A glass

25   of water or something.  Nothing

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

174

1  about alcohol or impropriety or

2  anybody overdoing it.  I just

3  thought it was silly and wanted to

4  ask you about it.

5  A.        Okay.

6  Q.        But here's my question.

7  If you're in a situation, let's say,

8  or Captain Ober's in a situation

9  where he --- there's no question

10 that by the time you met at Indiana

11 ---

12 A.        Uh-huh (yes).

13 Q.        --- that you had come upon

14 information and provided him, him

15 being Captain Ober, with

16 information, that did indicate that

17 there was at least a possibility

18 that some ranking officer and maybe

19 the governor's office, you don't

20 remember that, but I assure you it's

21 in the transcript and on the tapes.

22 A.        Okay.

23 Q.        But, you know, the point

24 is, though, at that point he'd

25 received that information.  What's

175

1    wrong with meeting at a private

2    facility so nobody knows you're

3    there?

4    A.        Nothing.

5    Q.        I mean, I've sued FBI

6    agents.  Okay.  I've helped them

7    with investigations.  I think I've

8    been victimized by political

9    influence.  I've ---.

10   A.        I think we all have.

11   Q.        On picking on --- where

12   agents become caught between

13   things.  And although I would never

14   reveal it, I --- there are some

15   fantastic people in your

16   organization who have helped me and

17   provided me with information who

18   believe in doing the right and just

19   thing.

20            Can you tell me what is

21   wrong with a Pennsylvania State

22   Police officer who gets information

23   about public corruption holding a

24   meeting with two FBI agents away

25   from and out of PSP facilities

176

1  because people talk?

2  A.          Uh-huh (yes).

3  Q.          What is wrong with that?

4  A.          I don't --- you know,

5  there's nothing wrong with that.

6  And that was his call, where he

7  wanted to hold it.

8  Q.          Right.  And you saw no

9  reason to question that, you

10  cooperated with him, you went and

11  you folks sat down and you did the

12  business that investigators doing

13  their job are supposed to do; isn't

14  that correct?

15  A.          I think so.

16  Q.          All right.  Okay.  I

17  probably, if I could get away with

18  it, have about 1,000 hypothetical

19  questions for you.

20  A.          Uh-huh (yes).

21  Q.          Or I think I could

22  probably learn a great deal.  But

23  it's not the place for it in this

24  deposition.  If you would give me

25  just a moment, I'd like to step

177

1    aside with Captain Ober?

2    A.        Sure.

3                    ATTORNEY BAILEY:

4                    I want to advise

5              everybody there's no

6              reason to shut this

7              equipment down, it's only

8              going to be a minute.  And

9              all attorneys and people

10             here be advised that these

11             machines are still

12             running.

13   BY ATTORNEY BAILEY:

14   Q.        Okay.  Sir, I really --- I

15   have one last question, and that's

16   it.  I'm done.

17   A.        Sure.

18   Q.        I thought in my review of

19   the materials and as we went through

20   this, I really thought better of

21   asking you.  I checked with Captain

22   Ober just to make sure.  And based

23   upon him, he has an excellent mind

24   for these things, I thought that

25   somewhere else in there there was a

178

1  possibility of another Pennsylvania

2  State Police officer, maybe a

3  Captain being mentioned.  Would you

4  please take a moment and think back

5  over the investigation that you and

6  Mr. Soohy did?  And I know that

7  there's been all this talk about the

8  higher ups and the Lieutenant

9  Colonel rank being mentioned, and

10  the governor's office being

11  mentioned and all of that.  And, you

12  know, the transcripts and the wires

13  will speak for themselves.

14  A.        Sure.

15  Q.        I just seem to remember a

16  Captain somewhere.  If you ---?

17  A.        I don't know there was a

18  Captain.  I think there was

19  reference to a --- somebody higher

20  than a trooper level.  I mean ---.

21  Q.        Okay.

22  A.        Who had fixed some cases,

23  some speeding ---

24  Q.        Something like that?

25  A.        --- tickets or something.

179

1   And there was some reference in

2   that.  But again, all that was on

3   the tapes.  And it was turned over

4   to Captain Ober.

5   Q.        Right.

6   A.        And he could have done

7   whatever he wanted to do with it, so

8   ---.

9   Q.        Yes.

10  A.        There was a couple people

11  ---.

12  Q.        OPR people don't control

13  the criminal investigation process.

14  I think it's ---?

15  A.        It's integrity.

16  Q.        Correct.

17  A.        And they would control

18  that.  And I think if he felt that

19  was something that needed to be

20  addressed, then he would have it

21  addressed.

22  Q.        I think he tried to do

23  that.

24  A.        Okay.

25            <u>ATTORNEY BAILEY:</u>

180

1           But anyway, I'd like

2          to --- opposing Counsel

3          probably has some

4          follow-up questions for

5          you.  Thank you, sir.

6  A.        You're welcome.

7          ATTORNEY GUIDO:

8          Yes, I do.

9  RE-EXAMINATION

10  BY ATTORNEY GUIDO:

11  Q.       With respect to that last

12  question about the officer who was

13  fixing cases, is it possible that

14  was a Corporal and not a Captain?

15  A.       Yeah, that's what I --- I

16  didn't think it was a ranking.

17          ATTORNEY GUIDO:

18          And can we have this

19          document marked as Exhibit

20          Two.

21          (Deposition Exhibit

22          Number Two marked for

23          identification.)

24          ATTORNEY BAILEY:

25          Why don't we do the

181

1      whole interview?  Do you

2      have an objection?

3            ATTORNEY GUIDO:

4            No, not really.

5            ATTORNEY BAILEY:

6            That's the fairest

7      way to you.  I mean, I

8      realize ---.

9            ATTORNEY GUIDO:

10           There are two

11     separate interviews,

12     that's why I separated it

13     out.  This is June 30th

14     and that's May 25th.

15           ATTORNEY BAILEY:

16           Okay.

17           ATTORNEY GUIDO:

18           But I don't mind

19     putting the whole thing

20     in.  It doesn't matter to

21     me.

22           ATTORNEY BAILEY:

23           The tree's already

24     died.

25           ATTORNEY GUIDO:

182

1           Here's --- that's

2       going to be Exhibit Two

3       when she gets it marked.

4  A.        This is ---.

5  BY ATTORNEY GUIDO:

6  Q.        And if you look at the

7  last page there that was a telephone

8  interview that was conducted with

9  you on June 30th, 1999?

10 A.        Uh-huh (yes).

11 Q.        This has already been read

12 to you by Mr. Ober's Counsel?

13 A.        Uh-huh (yes).  Okay.

14 Q.        If you look at the first

15 --- first of all, if you could just

16 through the first --- why don't you

17 read through that whole page?

18 That's the portion I'm most

19 interested in.

20 A.        Okay.

21           ATTORNEY BAILEY:

22           Syndi, what time do

23       you have over there?

24           ATTORNEY GUIDO:

25           It's five of 2:00.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

183

ATTORNEY BAILEY:

Thank you.  While he's reading that, I'm going to do a motion for enlargement.  Barb and Joanna Moore, you know, referred --- deferred to you on that issue.  I think --- I might ask for another 30 or 60 days.  I don't know if you concur or not.  But would you think about it and let me know?

ATTORNEY GUIDO:

I through Barbara told me she told you we wouldn't concur.  Because I thought she told me you were already ---.

ATTORNEY BAILEY:

She said she wasn't in favor of it, but she had to talk to you. That's what she told me.

184

1      She wouldn't give me a

2      final --- she said that

3      she wouldn't recommend it,

4      but she had to check with

5      you.

6           ATTORNEY GUIDO:

7           All right.

8           ATTORNEY BAILEY:

9           And I said I'd be

10     bumping into you today, I

11     thought, because she

12     wasn't coming.

13          ATTORNEY GUIDO:

14          As far as I know, our

15     clients are opposed.  I

16     believe that they are.

17          ATTORNEY BAILEY:

18          Okay.  And what about

19     an investigation into the

20     wedding?

21          ATTORNEY GUIDO:

22          What do you mean by

23     an investigation?

24          ATTORNEY BAILEY:

25          Well, I'm going to

185

1    ask the Court to appoint

2    some investigators to find

3    out when those signatures

4    were put on those Evanko

5    - - -.

6          ATTORNEY GUIDO:

7          Yes.  Well, we think

8    it's a waste of time, so

9    we're not going to concur

10   in that.

11         ATTORNEY BAILEY:

12         You are not going to

13   concur in it?

14         ATTORNEY GUIDO:

15         No.  It's a Red

16   Herring that you - - - but

17   I'm not going to get into

18   it in the middle of the

19   deposition.

20         ATTORNEY BAILEY:

21         It's on the record.

22         ATTORNEY GUIDO:

23         I don't mind doing it

24   on the record, but I don't

25   think we need to hold them

186

1        up.

2                    ATTORNEY BAILEY:

3                    I'm teasing you,

4        Syndi.

5                    ATTORNEY GUIDO:

6                    In fact, I prefer to

7        have my conversations with

8        you on the record,

9        Mr. Bailey.

10                   ATTORNEY BAILEY:

11                   That's a mean

12       insult.

13                   ATTORNEY GUIDO:

14                   No, it's absolutely

15       true.  That's the only way

16       I intend to communicate

17       with you.

18       BY ATTORNEY GUIDO:

19       Q.          Now, referring back to

20       Exhibit Number Two?

21       A.          Uh-huh (yes).

22       Q.          You've had a chance to

23       look at that?

24       A.          Yes.

25       Q.          Is everything in there

187

1  accurate?

2               ATTORNEY BAILEY:

3               Oh, my God.

4  A.          I think the word we're

5  talking about is confidentiality.

6  BY ATTORNEY GUIDO:

7  Q.          First just everything

8  besides that, and then we'll go to

9  ---?

10  A.          Uh-huh (yes).

11  Q.          Now, because I wanted to

12  ask you about the confidentiality

13  issue.  Did you notice anything else

14  in there that you have a problem

15  with?

16  A.          Let me finish scanning it

17  because I read the first part and

18  then I started scanning it.

19               ATTORNEY BAILEY:

20               Could you identify

21          the document for us?

22               ATTORNEY GUIDO:

23               We did.  It's Exhibit

24          Two.  I already said it's

25          the June 30th telephone

188

1    interview, June 30th,

2    1999.

3         ATTORNEY BAILEY:

4    With who?

5         ATTORNEY GUIDO:

6         Between Williams and

7    Agent Kush.

8         ATTORNEY BAILEY:

9         I'm sorry.  I didn't

10   catch it.

11        ATTORNEY GUIDO:

12        I'm sorry.  I did it

13   when I first handed him

14   the document.

15        ATTORNEY BAILEY:

16        Innocent mistake.

17   Geez.  Can I get one of

18   your cards?

19        ATTORNEY KILLEEN:

20        Yes.

21        ATTORNEY BAILEY:

22        I can always tell

23   somebody I know you.

24        ATTORNEY KILLEEN:

25        I'll have to give you

189

1    the correct addresses.

2    <u>ATTORNEY BAILEY:</u>

3    Okay. I really

4    appreciate it. I put them

5    into my --- I have an

6    address book I use if I

7    ever need to.

8  A.    Okay.

9  <u>BY ATTORNEY GUIDO:</u>

10  Q.    Okay. Is the --- is that

11  an accurate interview? Is there

12  anything in there you want to

13  correct is my point?

14  A.    Well, it's --- the

15  confidentiality, I mean it --- when

16  I would have discussed --- and I

17  hope that I would have told Major

18  Williams of the fact that we're

19  dealing with a sensitive matter.

20  Q.    Right.

21  A.    And those words would

22  definitely be used, sensitive

23  matter. This is a sensitive

24  situation. It's a sensitive

25  investigation. It's a significant

190

1   investigation.

2   Q.          All right.

3   A.          At this point in time.

4   And the confidentiality, if he used

5   that word, then I would interpret it

6   to mean the sensitivity of the

7   situation, and that he would, you

8   know, and we --- he would have

9   agreed.  And I'm sure captain Ober

10  at the time and myself had a clear

11  understanding that it was a very

12  sensitive situation, and that, you

13  know ---.

14  Q.          And illustrate ---?

15  A.          He wouldn't go --- he'd be

16  careful with the information.

17  Q.          Right.  Now, he in his

18  complaint alleged that you

19  explicitly directed him to maintain

20  strict confidentiality.  Do you

21  remember doing that?

22  A.          No, I didn't.

23  Q.          You also --- and he says

24  in his amended complaint that that's

25  why he didn't tell his supervisor or

191

1  anybody in his chain of command was

2  because of the FBI's direction to

3  keep this confidential.  Do you

4  remember doing anything like talking

5  to him about whether he could tell

6  his supervisors?

7  A.        No.

8  Q.        You also in response to a

9  question from Mr. Bailey, you said,

10 you know, yes, he --- when talking

11 about him telling Lieutenant Colonel

12 Hickes, and I think you said, yes, I

13 understand that he told his

14 supervisors.  And I would do the

15 same thing.  Do you recall that?

16 A.        Repeat that.

17 Q.        In response to a question

18 from Mr. Bailey.

19 A.        Uh-huh (yes).

20 Q.        He was asking you about

21 him telling Lieutenant Colonel

22 Hickes?

23 A.        Uh-huh (yes).

24 Q.        You said, well, I don't

25 know what he told Lieutenant Colonel

192

1   Hickes?

2   A.         Uh-huh (yes).

3   Q.         But I do understand he

4   told his supervisor. And I would do

5   the same thing. Do you remember

6   saying that?

7   A.         Well, I didn't --- I would

8   --- I don't think that's exactly

9   the way it was said. But I didn't

10  know who he had advised or when he

11  advised them. Eventually, I think

12  he did --- well into the thing, he

13  did mention that he had told

14  someone, a superior. But I think

15  initially he was concerned because

16  of the chain of command basically

17  that he had to deal with, with

18  Internal Affairs, and that being

19  also ultimately under the same

20  person who handled the Academy.

21  Q.         Okay.

22  A.         And I think his concern

23  was there.

24  Q.         And that's what I guess I

25  was wanting to clarify your response

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

193

1    with you because when you indicated

2    that to him telling his supervisors,

3    I wanted to clarify, you didn't know

4    who Lieutenant Colonel Hickes was?

5    A.        No.

6    Q.        And you didn't know

7    whether he was or was not in his

8    chain of command; correct?

9    A.        Right.

10   Q.        And you don't know whether

11   or not within the State Police that

12   was the appropriate person to tell?

13   A.        That's right, I don't

14   know.

15   Q.        You left that completely

16   to his discretion as to who he could

17   trust and who could be told; is that

18   correct?

19   A.        That's right.

20             ATTORNEY GUIDO:

21             And I'd like to have

22             --- this is the

23             transcript, the transcript

24             of October 13th, 1998.

25             I'd like to have that

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

194

1          marked as Exhibit Three.

2                    (Deposition Exhibit

3                    Number Three marked

4                    for identification.)

5                    ATTORNEY BAILEY:

6                    I need that --- no,

7          you can look at it.  I

8          ---.

9    A.          No, I don't need it.

10                   ATTORNEY BAILEY:

11                   You've heard enough

12         about the October 13th

13         transcript?

14   A.          I listened to it.  It's an

15   interesting conversation.  You

16   should hear it in person.

17                   ATTORNEY BAILEY:

18                   Okay.  Do you want

19         him to look at it?  Here I

20         guess she wants you to

21         look.

22                   ATTORNEY GUIDO:

23                   I'm going to direct

24         his attention to certain

25         pages.

195

1        ATTORNEY BAILEY:

2        That goes

3    underneath.

4    A.      Sure.

5        ATTORNEY BAILEY:

6        Well, I'm going to

7    have to object to this.

8    Do you have the tape?

9        ATTORNEY GUIDO:

10       No.

11       ATTORNEY BAILEY:

12       Well, I ---.

13       ATTORNEY GUIDO:

14       Your objection's on

15    the record.

16       ATTORNEY BAILEY:

17       Well, my objection's

18    on the record.  And one of

19    the objections is

20    authentication.  And I'm

21    still waiting for the

22    tapes.  Let me see that.

23    Let me see that.

24    A.      Sure.  The point that I

25    found amusing was the fact that ---.

196

1        ATTORNEY BAILEY:

2            I know what.

3    A.        --- Stanton said one of his

4    buddies would be doing the

5    background investigation.

6        ATTORNEY BAILEY:

7            You know what I found

8            interesting about this

9            page, and I saw that and I

10           thought, this is so ---.

11   A.       Okay.

12       ATTORNEY BAILEY:

13           Well, regardless, all

14           backgrounds go through the

15           main headquarters.  Well,

16           I thought that was ---.

17   A.       Well, they do eventually.

18       ATTORNEY BAILEY:

19           Well, that's more

20           fun, you know.  I know.  I

21           understand.  Let's see

22           what we've got here.

23           Federal judge.  Oh, gee, I

24           bet they'd love to hear

25           that.  This guy knows

197

1          everybody.  I wonder who

2          the federal judge is.

3          Okay.  Thank you very

4          much.

5   A.          Uh-huh (yes).

6               ATTORNEY BAILEY:

7               Thank you.

8   BY ATTORNEY GUIDO:

9   Q.          Sir, if you'll look at

10  Exhibit Three?

11  A.          Sure.

12  Q.          Do you recognize that as a

13  copy of the transcript of the tape

14  made October 13th, 1998?

15  A.          Yes, uh-huh (yes).

16  Q.          And at the bottom, I

17  believe it indicates --- it has your

18  name and a signature.  What does

19  that mean?

20  A.          That's the person who did

21  the transcription.

22  Q.          After a tape gets

23  transcribed, what procedures, if

24  any, do you have to verify the

25  accuracy of the transcript?

198

1    A.         I would listen through it

2    after it was transcribed and try to

3    pick up words and adjust any of the

4    names that she may have not picked

5    up or if I picked up more than she

6    did, I would continually try to

7    upgrade the quality of the

8    transcription.  And at some point in

9    time, I mean with our ears and the

10    machines that we're working with,

11    that's the best we can do.

12    Q.         And the transcript then

13    that you would have turned over to

14    the State Police would be the final

15    form transcript after you had gone

16    through that process; is that right?

17    A.         It would have been the

18    best, yeah.

19    Q.         The best you can ---?

20    A.         That we could have done at

21    that time.  It may have been looked

22    at again by someone else, but ---.

23    Q.         And do you recognize

24    Exhibit Three from today as a copy

25    of that transcript of October 13th?

199

1   A.        Yes.

2   Q.        Okay.

3   A.        There's pages here.

4   Q.        Is this still part of it?

5   A.        Yeah, it's lengthy.

6   Q.        I know it's lengthy.  I'm

7   surprised I didn't have it

8   together.  It's out of order.

9             ATTORNEY BAILEY:

10            Kush did it.  I

11            didn't.

12  A.        I make mistakes.

13            ATTORNEY BAILEY:

14            You did it, Kush.

15  A.        I'll be the first to admit

16  it.

17            ATTORNEY BAILEY:

18            You what?

19  A.        I'll be the first to admit

20  it.

21            ATTORNEY BAILEY:

22            You're not supposed

23            to do that in a

24            deposition.

25  A.        Everybody makes mistakes.

200

1          ATTORNEY BAILEY:

2              That's for sure.  If

3          you're human.

4     A.        And you're making a

5     mistake if you don't realize it.

6          ATTORNEY BAILEY:

7              Yes, that's probably

8          true.

9     BY ATTORNEY GUIDO:

10    Q.        Right now I'm going to

11    hand you page 49 of that

12    transcript.

13    A.        Uh-huh (yes).

14    Q.        And you'll see the word

15    Lieutenant Colonel highlighted.

16    A.        Okay.

17    Q.        Would you read through

18    that paragraph and tell me --- first

19    just read through it?

20    A.        Yeah.

21    Q.        What I want to know is

22    whether or not that's the reference

23    to Lieutenant Colonel that you're

24    talking about in which ---

25    A.        Yes.

201

1  Q.        --- Captain Ober picked up

2  on it and you hadn't really noticed

3  before?

4  A.        Uh-huh (yes).  Yes, it

5  is.

6  Q.        And Captain Brown is going

7  to look through for a little bit to

8  see if he can find the reference to

9  the governor's office.

10  A.        Okay.

11  Q.        But is this the tape we've

12  all --- you've been referring to?

13  A.        Yes, it is.  And as I

14  said, we wouldn't --- I really doubt

15  whether we would have had this

16  because of the length of it at the

17  meeting we had with Captain Ober.

18  Q.        The transcript?

19  A.        Yeah.  And he was the one

20  that --- obviously, he's the one

21  that really hit on Lieutenant

22  Colonel.

23  Q.        It's sort of mentioned in

24  passing; correct?

25  A.        Yeah, it's all --- it's

202

1   all inside of this.  And if you

2   heard it, the guy is --- he's really

3   verbose.  I mean, he knew a lot

4   about the system.

5   Q.        Right.

6   A.        He knew about the

7   process.  And then he talks about

8   how he was going to make his

9   payoffs.  And that every year he'd

10  make a payoff.  He was really ---.

11  Q.        And on page 28, would you

12  just read out loud the first time

13  that Bridges gives an answer?

14  A.        On Bridge?

15  Q.        Yes.

16  A.        And a lot of people don't

17  like it.  Let's say, a Senator or

18  governor or somebody helps me.

19  Q.        As far as you know, is

20  that the reference to the governor

21  that we've been talking about?

22  A.        That would --- yeah, that

23  would be a reference.  I don't know

24  if there's additional ones.

25                ATTORNEY BAILEY:

                                        203

1                    I object.

2    BY ATTORNEY GUIDO:

3    Q.        Do you know if there's any

4    other references?

5                    ATTORNEY BAILEY:

6                    Counsel, you're

7                    mischaracterizing --- I

8                    want to object.  Can I see

9                    that, sir, just one

10                   second?  That's a

11                   different record?

12   A.        Okay.

13                   ATTORNEY GUIDO:

14                   As soon as he

15                   finishes his answer, you

16                   can.

17                   ATTORNEY BAILEY:

18                   That's a different

19                   --- well, that's a

20                   different record.  Yes,

21                   let's say a Senator or

22                   governor or somebody helps

23                   me, right.  That is not

24                   the reference to

25                   governor's office that I

204

1          recollect.

2     BY ATTORNEY GUIDO:

3     Q.          Are you aware of any other

4     --- I'm not going to ask you to sit

5     and read through the transcript

6     because it speaks for itself.

7     A.          Uh-huh (yes).

8     Q.          But when you --- in

9     response to Mr. Bailey's questions,

10    you were talking about the fact that

11    there had been a lot of tapes.  Were

12    there any wire taps related to the

13    State Police Academy investigation

14    of corruption that didn't --- were

15    not eventually given to the State

16    Police?

17    A.          No.

18    Q.          So the tapes that you were

19    talking about would have been

20    unrelated tapes?

21    A.          Unrelated, yeah, other

22    matters.

23    Q.          Do you know whether or not

24    --- like I guess I don't --- that's

25    really --- you said that ---?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

205

1   A.        Let me correct that.  I

2   had --- Mr. Kelly had the

3   investigation after I did.  The

4   conversations that we would have

5   recorded with other individuals, who

6   would have been suspect in the

7   process right now, there could have

8   been something mentioned of the

9   Academy made there, but I don't

10  think that it was anything of any

11  significance.

12                  ATTORNEY BAILEY:

13                  Can I look at this

14          for a minute?

15  A.        It could have been made in

16  passing, just to develop a rapport

17  with the person they were dealing

18  with, to see if they were the ones

19  who were going to try to make this

20  thing work.

21  BY ATTORNEY GUIDO:

22  Q.        Okay.  But Captain Ober

23  would have only had knowledge of

24  those things on the wires for which

25  you gave him copies of the tapes and

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

206

1  transcripts?

2  A.        Uh-huh (yes).

3  Q.        Is that correct?

4  A.        I would think so, yeah.

5  That's all I'm aware of.

6  Q.        And to your --- do you

7  know, was that term Lieutenant

8  Colonel or governor's office

9  mentioned on tapes before that ---

10  that October 13th tape?

11  A.        No, not that I can

12  recall.

13  Q.        And you --- I think you

14  said that you didn't really even

15  pick up on it at all?

16  A.        No, I really didn't, yeah.

17  Q.        Until you played the tape

18  for Captain Ober?

19  A.        Yeah. If you listen to

20  it, it's --- that guy's rambling

21  on.  And all of a sudden it --- I

22  think him being more sensitive to

23  his positions picked it real right

24  up.

25  Q.        Right.  And when you

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

207

1  played it for him, it was obviously

2  some point after October 13th on

3  which the tape was made?

4  A.          Uh-huh (yes).

5  Q.          Does October 21 ring a

6  bell as possibly the date?

7  A.          It could have been, yeah.

8  That could have been --- that could

9  have been the meeting date.

10  Q.          Okay.  Now, when you

11  played --- when you met with him at

12  the State Police Barracks and you

13  played this tape for Captain Ober

14  ---

15  A.          Uh-huh (yes).

16  Q.          --- and he heard the term

17  Lieutenant Colonel mentioned, and

18  you had previously talked about the

19  sensitivity or --- thought --- had

20  an understanding it was a sensitive

21  subject, and he needed to exercise

22  his discretion on who to talk to

23  when he heard that term Lieutenant

24  Colonel, did he give you any

25  indication or say anything about the

208

1   fact that he had already told a

2   Lieutenant Colonel about this, about

3   your investigation?

4   A.        I can't recall it.  I

5   can't recall it.  I just can't.

6   Q.        But it doesn't stick out

7   in your mind that that ---?

8   A.        No.  I'm not saying that

9   it could not have happened, but it

10  does not --- it's not --- I didn't

11  attach any really importance to it

12  if it happened.  And I'm not --- you

13  know, again in law enforcement, you

14  have to trust the person you're

15  working with.

16  Q.        Right.

17  A.        And I was satisfied I

18  could trust Captain Ober.

19  Q.        And at that point, at any

20  point during this investigation, I

21  mean, did Captain Ober or anybody

22  else ever tell you, oh, the

23  Lieutenant Colonel, he went and told

24  the governor's office?

25  A.        No.

209

1  Q.        Did anybody ever mention

2  anything like that to you?  And it

3  wasn't really something you were too

4  concerned about; was it?

5  A.        No.

6  Q.        As far as your initial

7  contacts, knowing you don't have

8  your file, et cetera, here, did you

9  make any notation of the date or

10 time or anything when you first

11 contacted him?  Would that exist

12 anywhere?

13 A.        It's possible, but I ---

14 it was only to set up the meeting.

15 Q.        Yes.

16 A.        And the meeting was ---

17 you know, was the important thing.

18 Q.        And then just a couple

19 extra things.  When you met with ---

20 I don't remember if you met with

21 Behrens or you talked to Behrens?

22 A.        I met with Behrens.

23 Q.        Do you remember whether he

24 mentioned the need that he was going

25 to have to talk to, you know, his

210

1  chain of command about this?

2  A.        He led me to believe that

3  he was just going to hold it in

4  abeyance, and that I would

5  eventually get back to them.

6  Q.        I mean, before he got back

7  to you, when you first told him, you

8  said I need to know whether this is

9  a sting operation, did he let you

10  know that he was going to go tell

11  other people and get back to you, if

12  you remember?

13  A.        No, I don't know that he

14  ---.

15  Q.        No, you don't remember, or

16  no, he didn't do that?

17  A.        I don't think he --- he

18  did not make the calls right there

19  when I was there.  He did --- I'm

20  pretty sure he got back to me, told

21  me there was no sting operation.

22  And we needed to know that pretty

23  quickly.

24  Q.        Right.

25  A.        Because this case was ---

211

1  there were a number of things we had

2  to address and ---.

3  Q.        How long ---?

4  A.          In fact, I knew that ---

5  well, I quickly found out that any

6  time we run a state policeman's name

7  or driver's license, it's going to

8  hit in Harrisburg, so we had to know

9  that real quick and that ---.

10  Q.        I guess my question, it

11  probably wasn't clear, but what I

12  meant was when you told Behrens that

13  you needed this information and you

14  needed it quickly or whatever, did

15  he tell you, okay, I'll get it for

16  you or did he say, I'll tell my

17  supervisor about this request and I

18  ---?

19  A.          Yeah, I was under the

20  impression he was not going to

21  tell.  That was my ---.

22  Q.          Okay.  Do you remember why

23  you had that impression?

24  A.          I think he just made a

25  call because this was early in on

212

1  the investigation.  And it was only

2  an allegation.

3  Q.        If he did tell his chain

4  of command, did you have any problem

5  with that?

6  A.        No.

7  Q.        And I think just to

8  summarize, make sure I understand,

9  basically as far as who got told

10  within the State Police, within what

11  chain of command, whether it was

12  with Behrens or with the organized

13  crime people, or with Captain Ober,

14  did you leave that totally to the

15  discretion of the individual officer

16  with whom you were having the

17  communication?

18  A.        That's right.

19              ATTORNEY GUIDO:

20              That's all the

21              questions I have right

22              now, unless I have any

23              follow up.

24              ATTORNEY BAILEY:

25              A couple quick ones

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

213

1          and we're finished.

2   A.          Sure.

3   RE-EXAMINATION

4   BY ATTORNEY BAILEY:

5   Q.          It's a beautiful Friday

6   evening, you're down at Station

7   Square.  And you've had a couple

8   good tall cool ones.

9   A.          Uh-huh (yes).

10  Q.          And you overhear a

11  conversation behind you.  And it's

12  two law enforcement officials

13  talking from, I don't know, a couple

14  of other states.

15  A.          Uh-huh (yes).

16  Q.          And they're talking about

17  information that has to do with FBI

18  officials above you, and they are

19  involved in some kind of illicit

20  activity.

21  A.          Uh-huh (yes).

22  Q.          I would assume in that

23  case, that you would go to your

24  Bureau somewhere and, you know, need

25  to report that, and not much else

214

1   you could do with it.  You have to

2   report that information; right?

3   A.        Right.

4   Q.        Something that you heard?

5   A.        Uh-huh (yes).

6   Q.        Maybe nonsense, it might

7   be silly, but you heard it and you'd

8   report it; right?

9   A.        Uh-huh (yes).

10  Q.        Is that correct?  Now, if

11  I come to you and I'm with the

12  Pennsylvania State Police, and I

13  just know you, I happen to know

14  you're an honest person, I happen to

15  know you're a good agent, I live in

16  Pittsburgh, I come to you and I say,

17  Ralph, I've got some very, very

18  serious problems here.  Dave

19  Milarney (phonetic) used to be down

20  there in Philadelphia, let's use

21  Dave's name because he's such a good

22  friend of mine.  So Dave's down

23  there in Philadelphia, and he's

24  active, and he's working.  And you

25  say, look, I'm with the Pennsylvania

215

1  State Police, and I'm working a

2  case.  And our people are up there,

3  and we've stumbled on some

4  information that indicates Milarney

5  is directly involved in some kind of

6  illicit drug activity.  Now, that's

7  absurd.  I want to make sure the

8  record reflects that.  I'm sure it

9  is absurd.  But I want to --- okay.

10  So now again in that case you're

11  again in a situation where you're an

12  agent, you're a contact.  You can't

13  sit there with that.  You need to do

14  something within your organization

15  to report it, so there would be some

16  proper channel or some way,

17  somewhere to go with that or

18  something to do with that; right?

19  A.          Uh-huh (yes).

20  Q.          Now, is it fair to say in

21  that kind of a situation, you know,

22  maybe you'd go to a superior officer

23  or maybe you'd go to some internal

24  group or something like that.  I

25  mean, that's only normal; right?

216

1  A.        It would be documented.

2  Q.        Okay.

3  A.        It'd be documented.

4  Q.        All right.  Now, if you

5  are in charge of the Philadelphia

6  region and somebody comes to you

7  with information from a sister

8  organization that has to do with

9  higher ups --- now, bear this in

10  mind, please, you are not going to

11  report this information to a

12  target.  What would you do in that

13  case?  She asked you a hypothetical

14  question.  You answered it.  What

15  would you do if you were in charge

16  of one of the FBI's major regions in

17  the country?

18  A.        Uh-huh (yes).

19  Q.        And they come to you and

20  they say some official in the front

21  office in Washington is corrupt, and

22  we have this big problem with this

23  spy, for example, recently this guy

24  in the CIA and stuff.

25  A.        Uh-huh (yes).

217

1   Q.      What would you do with

2   that kind of --- what would you do?

3   Who would you report it to?

4   A.      If I were in charge of the

5   office?

6   Q.      Yes, right.  I know it's

7   hard to ask you that off your feet.

8   It's pretty tough.  But what would

9   you do?

10   A.      Jeff could probably answer

11   the question better, but you would

12   go to your OPR people, in terms of

13   referring, referral.

14   Q.      Okay.  Now, you as an FBI

15   agent in this particular case, like

16   Michael said, and I think like you

17   said also, satisfied yourself in

18   terms of doing your duty, you have a

19   sister law enforcement agency, you

20   have to work with them from time to

21   time, the proper thing to do was to

22   go to OPR.  You don't make a

23   decision for telling whoever's in

24   charge of OPR, in this case, the

25   acronym is BPR, you're not in a

218

1    position to tell him what to do.  It

2    happened to be Captain Ober.  It

3    could have been Joe Smoe at the

4    time.  The reason you went there is

5    because of the position, and because

6    of the nature of the information; am

7    I correct?

8    A.        That's right.

9    Q.        And that's a decision that

10   that person has to make.  You don't

11   have the power to direct them.  You

12   don't have the power to tell them

13   what to do.  In appropriate

14   circumstances, it's possible that

15   you could warn or you could admonish

16   someone or you could say, look, this

17   is very important, I want to make it

18   clear to you.  Because if the

19   situation warranted it, you might

20   pass that feeling on perhaps, but

21   the point, in fact, is you cannot

22   control it.  You don't have any

23   disciplinary powers, you don't have

24   any authority to control it; isn't

25   that correct?

219

1    A.          That's correct.  And those

2    people have their procedures that

3    they have to follow.

4    Q.          Right.

5    A.          So you can't ---.

6    Q.          And they have to make

7    their judgments?

8    A.          Sure.

9    Q.          And they have to do what

10   they believe is correct under the

11   circumstances.  Because ultimately

12   as opposing Counsel has laboriously

13   pointed out in question after

14   question, this was a decision that

15   Captain Ober had to make under the

16   circumstances, according to what he

17   believed was --- what he believed?

18   A.          Uh-huh (yes).

19   Q.          Was the --- whatever

20   rightfully or wrongfully was the

21   best for the Pennsylvania State

22   Police in accordance with the law

23   and was proper ethics for a law

24   enforcement official; correct?

25   A.          Correct.

220

1    Q.        That's all that he could
2    do; is that right?
3    A.        It was his call to make.
4    He had to do what he felt.
5    Q.        Have you ever been
6    disciplined in the FBI where you may
7    have made an error, maybe you made
8    an error or mistake?
9    A.        Uh-huh (yes).
10   Q.        But you exercised your
11   judgment the best way that you
12   could.  Have you been like beat up
13   on because you did something
14   somebody didn't like?  Did that ever
15   happen to you?  I don't know, maybe
16   it has.  Has that ---?
17   A.        Oh, yeah.  I mean,
18   personally that happens, of course,
19   but not --- I've never been
20   disciplined.
21   Q.        Okay.  Last thing.  Turn
22   to page ten of the transcript.
23   A.        Sure.  Okay.
24   Q.        If you want to read a few
25   sentences before, a few sentences

221

1   after.  But at the top of the page,

2   there's reference to where a

3   background is done, and it says

4   something about the main

5   headquarters.

6   A.        Oh.

7   Q.        Just want to ask you if

8   you remember that?

9   A.        Well, I mean it's on here,

10  so it would have occurred.  I would

11  not have put any ---.

12  Q.        No.  I was just going to

13  ask you if you remembered it.  If

14  you remembered it, that's all.  If

15  it raised a red flag or ---?

16  A.        No, no.

17  Q.        Okay.  The other thing is

18  in that transcript in different

19  places, would you agree with me that

20  there are different references to,

21  you know, judges, Lord all mighty,

22  Federal judges?

23  A.        There was a Federal

24  judge?  I don't recall that one.

25  But if it's in here, it's okay ---..

222

1   Q.        It's in there.

2   A.        Okay.

3   Q.        But my pointing that out

4   doesn't make any difference.  What

5   I'm trying to ask you about is, this

6   guy in doing his talking and his

7   puffery and stuff like that seemed

8   to me to be talking about just about

9   everything under the sun, and, you

10  know, like officials, official

11  positions, I can do this, I can get

12  that done, I can go to judges, I can

13  fix this, fix that.  Did the FBI

14  investigate --- think any of those

15  things were credible or worthy of

16  investigation?  I realize they're

17  pretty much out there, pretty far

18  out.  But if you're allowed to

19  comment or if there's some reason

20  not to, I can understand.

21  A.        Well, when we got to him

22  and we realized what we were dealing

23  with, up front, you don't know what

24  you're dealing with.  And you have

25  to --- you have to ---.

223

1    Q.         That's all I wanted to

2    know.

3    A.         You have to listen to

4    what's going on.  You evaluate where

5    it's coming from eventually.  And

6    after you confront him and you see

7    that the person breaks down crying

8    in front of you, then probably he

9    was a lot of puffery and ---.

10   Q.         Okay.  I read into your

11   reaction that that's probably what

12   occurred here?

13   A.         But ---.

14   Q.         But the point is as you

15   said right up front, you don't

16   know.  You don't know?

17   A.         Uh-huh (yes).

18   Q.         So as an investigator, you

19   treat it with respect because you

20   don't know?

21   A.         Sure.

22              ATTORNEY BAILEY:

23              You answered my

24              question.  Thank you.

25   RE-EXAMINATION

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

224

1    <u>BY ATTORNEY GUIDO:</u>

2    Q.        He was mentioning

3    headquarters.  That's where you

4    called; isn't it?

5    A.        That's where I --- I

6    called, yeah, State Police

7    headquarters, yes.

8    Q.        You weren't really

9    concerned with everybody at State

10   Police headquarters being corrupt;

11   were you?

12   A.        No.  And they didn't know

13   what I was after when I finally ---

14   I didn't tell them that I had this

15   situation.  I was trying to get

16   referred to an investigator in that

17   field, so that I could discuss the

18   matter with them.  I wouldn't

19   discuss it with just anybody.

20   RE-EXAMINATION

21   <u>BY ATTORNEY BAILEY:</u>

22   Q.        One last thing.  Mr. ---

23   when Mr. Soohy was here, he said one

24   of his reasons for going to what he

25   called OPR ---

225

```
 1   A.          Uh-huh (yes).

 2   Q.          --- is that usually the

 3   people there are a cut above in the

 4   sense that they're ---?

 5   A.          They're charged with a

 6   higher responsibility.

 7   Q.          Thank you, sir.

 8               ATTORNEY BAILEY:

 9               Thank you very much.

10               Appreciate your being here

11               today.

12               VIDEOGRAPHER:

13               Is that the end of

14               it?

15               ATTORNEY BAILEY:

16               Yes, sir.  I'm

17               finished.

18               VIDEOGRAPHER:

19               It's 2:22 p.m. on

20               March 14th, 2002.  And

21               this deposition is now

22               concluded.

23               * * * * * * * *

24       VIDEOTAPE DEPOSITION CONCLUDED AT

25               2:22 P.M.
```

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

1   COMMONWEALTH OF PENNSYLVANIA)

2   COUNTY OF CAMBRIA           )

3               C E R T I F I C A T E

4     I, Denise J. Khorey-Harriman, RMR, a Notary

5   Public in and for the Commonwealth of Pennsylvania,

6   do hereby certify:

7     That the witness was first duly sworn to testify

8   to the truth, the whole truth, and nothing but the

9   truth; that the foregoing deposition was taken at the

10   time and place stated herein; and that the said

11   deposition was taken stenographically by me and

12   reduced to typewriting, and constitutes a true and

13   correct record of the testimony given by the witness.

14     I further certify that the reading and signing

15   of said depositions were (not) waived by counsel for

16   the respective parties and by the witness.

17     I further certify that I am not a relative,

18   employee or attorney of any of the parties, nor a

19   relative or employee of counsel, and that I am in no

20   way interested directly or indirectly in this action.

21     IN WITNESS WHEREOF, I have hereunto set my hand

22   and stamp this 26th day of March 2002.

23

24                 _Denise Jeanne Khorey-Harriman_

25

NOTARIAL SEAL
Denise Jeanne Khorey-Harriman, Notary Public
Johnstown, Cambria County, PA
My Commission Expires Mar. 7, 2005

· PITTSBURGH, PA
· CLEARFIELD, PA
· STATE COLLEGE, PA
· ERIE, PA
· OIL CITY, PA
· HARRISBURG, PA
SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA 15901
· INDIANA, PA
· GREENSBURG, PA
· PHILADELPHIA, PA
· SOMERSET, PA
· WILKES-BARRE, PA

LAWYER'S NOTES

| Page | Line | |
|------|------|---|
|      |      |   |

PITTSBURGH, PA
HARRISBURG, PA
GREENSBURG, PA
ERIE, PA
INDIANA, PA
HOLLIDAYSBURG, PA
STATE COLLEGE, PA



SARGENT'S
COURT REPORTING
SERVICE, INC.

210 MAIN STREET
JOHNSTOWN, PA 15901
(814) 536-8908

PHILADELPHIA, PA
WILKES-BARRE, PA
OIL CITY, PA
SOMERSET, PA
CLEARFIELD, PA
*CHARLESTON, WV*



To Be Opened

only by

Capt. Darrell Ober
Pennsylvania State Police

EXHIBIT
DW54
SH-022544

Major Thomas WILLIAMS of the Pennsylvania State Police recontacted Agent Ralph KUSH of the Federal Bureau of Investigation, Pittsburgh Office, on June 30, 1999, at 1155 hours. The purpose of the telephone call was to clarify information Captain Darrell OBER gave to the investigating officers during his June 28, 1999 interview.

Major WILLIAMS asked Agent KUSH three specific questions. The questions and answers follow:

Q.    "During your initial telephone conversation with Captain OBER in late September or early October, concerning the FBI political corruption investigation in Western Pennsylvania, did you ever discuss the need for confidentiality with him?"

A.    "No. I never discussed confidentiality about the case with him. I knew who I was dealing with (a Captain in the PSP); therefore, I trusted him. I simply discussed the case with him."

Q.    "During the above phone call, did you ever mention any specific rank within the PSP that may be involved in this case?" I specifically asked him about the Colonel or Lieutenant Colonel rank.

A.    Agent KUSH replied at some point in time, a Lieutenant Colonel rank was discussed, however, he could not remember a date. I informed him that the recorded conversation between his CI, BRIDGE, and Trooper STANTON, in which the rank of Lieutenant Colonel was mentioned, was recorded on October 13, 1999. Based on this information, Agent KUSH then stated he could not have known about the Lieutenant Colonel rank during his initial phone call, therefore, he would not have discussed it. He stated he remembers that at some point (could not remember date), Captain OBER, Agent SOOHY, and he met to listen to a tape. As he recalls, Captain OBER picked up on the Lieutenant Colonel rank being mentioned. He does not even recall the FBI picking up on the rank until brought to their attention by Captain OBER.

Q.    "During your initial phone call with Captain OBER, did you ever mention to him the possibility of high ranking PSP members, or members of the Governor's Office, possibly being involved in this investigation?"

A.    "As best I can recall, I never mentioned high ranking PSP members, or members of the Governor's Office, in my conversation with Captain OBER."



EXHIBIT
KUSH
Two
3-14-02 DSFH

# BUREAU
# OF
# PROFESSIONAL
# RESPONSIBILITY

## INTERNAL AFFAIRS
## DIVISION

### Interview of
### FBI Agent Ralph KUSH
### May 25, 1999

### Re-Interview of
### FBI Agent Ralph KUSH
### June 30, 1999

The following is a narration of an interview which occurred on May 25, 1999, at the PSP Findlay Station, between Major Thomas F. WILLIAMS of the Pennsylvania State Police and Agent Ralph KUSH of the Federal Bureau of Investigation.

Agent KUSH stated:

"Before I start, I'd like to give you some background on this case. This case actually began approximately five (5) years ago as a bribery case which occurred in East Liberty. In January 1996, I arrested the subject and he immediately told me he could give us a police officer who was involved in trying to buy a Trooper position for a friend of his. The subject told us that for a certain amount of money, this police officer could get a person into the PSP Academy. The subject told us the police officer was a Trooper named Kipp STANTON. I can't give you the name of the above subject, as he is now a confidential informant for the FBI.

I did some checking and verified that Kipp STANTON was indeed a State Trooper. I became concerned that perhaps STANTON was working undercover, and if that was the case there would be two agencies bumping into each other. I subsequently contacted Klaus BEHRENS, and ran this scenario by him. He checked and verified that the PSP had no undercover case involving our CI, and Trooper STANTON was not working undercover.

The political corruption case involved a guy named Dennis Jay BRIDGE. BRIDGE is a friend of Trooper STANTON, and our CI. BRIDGE took the test to get on PSP, however, he placed in Band "B," which made him ineligible. He was willing to pay a politician $10,000.00 to be moved into Band "A," provided he received appointment to the Academy.

Our CI informed us that Trooper STANTON had approached him or phoned him several times and advised him he had a friend named Jay BRIDGE, who would pay $10,000.00 to get an appointment to the PSP Academy. Trooper STANTON wanted our CI to make arrangements through a State Senator or Representative to get his friend appointed to the Academy. For this service, BRIDGE would pay the politician $10,000.00, and make a political contribution to him of $5,0000.00 each year, as long as he held his office. (Numerous phone calls and personal conversations were recorded and transcriptions are attached.)

At some point in time, I believe BRIDGE had a hard time coming up with the $10,000.00. I allowed the case to become stagnant. Last summer my supervisor reviewed my caseload and looked at this case. He told me to get on the case, so I did.

Interview/FBI Agent Ralph KUSH, on 05/25/99
Page 2

In October 1999, I contacted Captain OBER, of the Internal Affairs office. We discussed this case and I brought him up-to-date on our investigation."

Major WILLIAMS notes:

"At this point in time, I specifically asked Agent KUSH if he ever asked or stressed the need for discretion on the part of Captain OBER discussing the case with anyone. Agent KUSH stated he does not recall asking the Captain not to discuss the case, but hoped he would not discuss it. He stated that if Captain OBER did not discuss this case, he supported his decision not to do so.

Agent KUSH stated he believed he met with Captain OBER on two occasions. He did not recall specific dates, but the dates may be in his report. On one occasion, he and OBER reviewed a tape where BRIDGE mentioned that if a politician would help him, he (the politician) would apparently have to talk to some Lieutenant Colonel - no name was ever mentioned. Trooper STANTON then replied, 'The person who eyeballs. . ., the rest of the comment was unintelligible. Agent KUSH distinctly remembers that when the title of Lieutenant Colonel was mentioned his ears really perked up.

Agent KUSH further stated that at one point during the investigation, their CI referred BRIDGE to a man named Doc FEILDER (phonetic spelling). Apparently FEILDER is an influential male in the Pittsburgh area with political connections. FEILDER either made direct contact with a Pennsylvania State Representative or put BRIDGE in contact with him. The State Representative advised he could not get BRIDGE an appointment to the PSP Academy, however, if he was interested in a job as a Liquor Enforcement Officer or a Police Communications Operator, perhaps he could help. BRIDGE apparently advised he was not interested in anything but a Trooper position."



-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    10/14/98

 

The following is a transcription of a recorded conversation which occurred on October 13, 1998, between a Source, who is in a position to testify, Kipp Stanton, a Pennsylvania State Police (PSP) Trooper, and Dennis Jay Bridge:

| | |
|---|---|
| | (Recording in Progress) |
| Source: | "...right down." |
| Tpr. Kipp Stanton: | "Okay, no problem." |
| | (Telephone Dial Tone - Movement - UI Comments - Footsteps - UI Comments - Laughter) |
| Stanton: | "(UI)." |
| Dennis Jay Bridge: | "That's pretty cool." |
| Source: | "The city.  (Laughs)" |
| Bridge: | "You gotta..." |
| Source: | "(Laughs)" |
| | (Sigh) |
| Beidge: | "Tellin' Kipp, wonder when the hell we're gonna be able ta get t'gether." |
| Source: | "Yeah, I kn...I know, it's been a while.  In fact...ta tell you the truth, uh...uh... if you don't come with Kipp, I don't recognize you." |
| Dennis Jay Bridge: | "Oh, really?" |
| Source: | "It's been so long." |

Investigation on   10/13/1998   at  Pittsburgh, PA

File #  194D-PG-58817                Date dictated   10/13/1998

by   SA RALPH W. KUSH/rmk

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FI   ENCLOSURE 3
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____, On 10/13/1998 , Page    2

| | |
|---|---|
| Bridge: | "Oh, yeah.  Well, uh...look at it this way, I would...I didn' eve...I...I didn' even think you were in this neighborhood." |
| Source: | "(Laughter)" |
| Stanton: | "(Laugher)" |
| Bridge: | "I couldn't remember...you know the thing about it right now.  I don't remember how ta get in and outta here." |
| Source: | "Are you serious?" |
| Bridge: | "Oh, if he'd drop me off..." |
| Stanton: | "I took him to my grandmother's house before an' everything, an' he was here before, too." |
| Bridge: | "He dropped me up the street an' I was, like..." |
| Stanton: | "He was, like...he didn't realize it was the same neighborhood." |
| Source: | "Yeah." |
| Bridge: | "I just...he was...he dropped me off..." |
| Stanton: | "I'm okay." |
| | (Movement) |
| Bridge: | "...an' I'd be screwed.  I'd have a heart attack." |
| Source: | "Yeah." |
| Bridge: | "I'd follow the sirens an' look for help." |
| | (Laughter) |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page 3

| | |
|---|---|
| Bridge: | "(UI) with you t'day?" |
| Source: | "What...what...where the heck were you?  Did ya end up in Blairsville?" |
| Bridge: | "Well, what happens, I didn' get off work 'til later..." |
| Source: | "Yeah?" |
| Bridge: | "...an' then, I got in Blairsville...an' Indiana's the capitol of, uh...construction work.  Kipp'll tell ya that." |
| Source: | "Yeah?" |
| Bridge: | "An' there's only so much I can fight through traffic there and they stop you and the...little sign.  Can't go through all of 'em.  I'm just afraid of hittin' somebody." |
| Source: | "Okay.  Yeah." |
| Bridge: | "I just left (UI)." |
| Source: | "Okay.  Umm, Blairsville...how far...how far is Blairsville?" |
| Stanton: | "Indiana County." |
| Source: | "Indiana?" |
| Stanton: | "He works over in Cambria County." |
| Bridge: | "I came from Johnstown." |
| Source: | "Oh...uh, do...d'you do Ohio?" |
| Stanton: | "What's that?" |
| Source: | "Are you familiar with Ohio?  Is that Johnstown, Ohio?  No." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___4___

| | |
|---|---|
| Stanton: | "Ahh..." |
| Bridge: | "Uh, I'm familiar with..." |
| Stanton: | "Cambria County." |
| Bridge: | "...uh, I'm familiar with Ohio, though." |
| Source: | "You know what, um...we have a customer that ...it's in Akron.  How far away is that from Pittsburgh?" |
| Bridge: | "Akron is...let's see...uh, four hours." |
| Source: | "Four hours!!!" |
| Bridge: | "Three and a half, four hours." |
| Stanton: | "Depends on what side (UI)?" |
| Bridge: | "Yeah." |
| | (Short Pause - Movement) |
| Source: | "Where did I have paper...I just...you know, and I had that paper..." |
| | (Paper Shuffled) |
| Stanton: | "Yeah, he works out in, uh, Johnstown, Cambria County." |
| Source: | "...yeah?" |
| Stanton: | "He lives in Indiana County." |
| Source: | "I had that paper, for the longest time.  It's called, um, La...La...La...Louds... Loudsville...La...La...Loundsville? Londsville?" |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page ___5___

| | |
|---|---|
| Bridge: | "(UI).  I used to go out there all the time. When I used to go out my grandpap to, uh, tracks..." |
| Stanton: | "Race tracks." |
| Source: | "That race track?  Bettin' the ponies?  Um... I'm tryin' ta think it out there.  What'd I say, Akron, right?" |
| Bridge: | "Yeah." |
| Source: | "Or Toledo." |
| Bridge: | "(UI), Akron.  I know definitely where Toledo is, my wife's, uh...uncle lives in Toledo." |
| Source: | "It...oh, here it is, here.  Umm, it's, uh... near Akron, Ohio.  It's four hours away?" |
| Bridge: | "Three and a half hours, depending what side he's on." |
| Source: | "Oh, my." |
| Stanton: | "Aquatone." |
| Bridge: | "Must be good service, if he comes that long." |
| Source: | "Oh, jeeze.  Is that right?" |
| Bridge: | "Yeah, you're comin' a good way." |
| Source: | "I've never even dreamt such a thing." |
| Bridge: | "Oh, yeah." |
| Source: | "Is that right?" |
| Bridge: | "Hey, he's goin'...he's goin' the distance." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___6___

| | |
|---|---|
| Source: | "Well...(sighs)...um, here, I...I...I...made couple notes, okay, for myself." |
| | (Paper Shuffled) |
| Source: | "Okay. Now,...okay...it's here...so I don't make any mistakes. Okay, the last time I got a little confused. I got to tell you the truth, I got a little confused..." |
| Bridge: | "Okay." |
| Source: | "...the last time. And I didn't really know what your intents were, you understand?" |
| Bridge: | "Yeah. Well, we got..." |
| Source: | "Okay." |
| Bridge: | "...well, see, the thing about it though... it's, like..." |
| Source: | "Okay. Here, wh...wh...why don't we just do...here...look, le' me put all notes aside. Let me do this here. Jay, here...just, tell me what you want, and I'll write it down. Okay? Now, tell me exactly...so I know. This way, no more mistake, or you..." |
| Bridge: | "All I wanna do is, I wanna get in. Okay? The money's not an object. I don't even have to know the guy's name. I mean...money's not a problem. I...talked to my grandfather before I came down here. He'll be well taken care of." |
| Source: | "Okay, get...get..." |
| Bridge: | "I don't even have to know who he is, if I can do everything through Kipp...I can do everything through you and Kipp...I...matter of fact, I don't...to be totally honest with |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ . On 10/13/1998 . Page ___7___

| | |
|---|---|
| | you, I'd rather not know who he is.  I wanna deal everything in cash, and nothing comes back to me. |
| Source: | "What...what did you...uh, what did you wanna offer 'im?" |
| Bridge: | "Well, I...(UI)...right off the bat...once he gets me goin'...each step he goes...there's five steps you need to go through to get there." |
| Source: | "Okay.  Go 'head.  I'll...I'm...I'm writin'." |
| Bridge: | "I had a buddy that just, uh...he...somebody ...just (UI) him in.  He's in the Academy now." |
| Source: | "Okay." |
| Bridge: | "Five steps you gotta go through.  Each step he gets me through, I'll give him two thousand dollars ($2,000), that's ten thousand dollars ($10,000).  And a five thousand dollar ($5,000) a year donation as long as he's in office...keep in office...I assume he is." |
| Source: | "Okay.  What...what...what...what is Step One?  So...so...so...uh, you know..." |
| Stanton: | "Well, Step..." |
| Source: | "...you've got to tell me." |
| Stanton: | "...Step One would be get...gettin' you in from...Band B to Band A." |
| Bridge: | "And, from Band B to Band A.  You need to go from Band B to Band A." |
| Source: | "Band B..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___ SOURCE _____ , On 10/13/1998 , Page ___ 8 ___

| | |
|---|---|
| Bridge: | "To Band A." |
| Source: | "...to A." |
| Bridge: | "Yeah." |
| Source: | "And this is somethin' that, um...someone that knows this shit would be familiar with, right?" |
| Bridge: | "Oh, yeah." |
| Source: | "(UI) they'll understand the terminology..." |
| Bridge: | "Oh, yeah.  They'll understand it." |
| Source: | "...all right." |
| Bridge: | "Then you gotta go through an interview process." |
| Source: | "Now, where's that done at?" |
| Bridge: | "Greensburg." |
| Source: | "Okay.  Um, that would...that's Step Two?" |
| Bridge: | "That's Step Two." |
| Source: | "That's after you get to A?" |
| Bridge: | "Right." |
| Stanton: | "Yeah." |
| Bridge: | "Once they...once...once you get me in the A, they get interviewed." |
| | (Short Pause) |
| Source: | "Okay, uh..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

| Continuation of FD-302 of | SOURCE | , On 10/13/1998 , Page 9 |

| | |
|---|---|
| Bridge: | "Then you have a..." |
| Source: | "An'...an' it's called an interview, right?" |
| Bridge: | "...right.  You have an interview." |
| | (Short Pause) |
| Bridge: | "Then, after..." |
| Source: | "Okay." |
| Bridge: | "...the interview, you'd have a polygraph exam." |
| Source: | "That's Step Three?" |
| Bridge: | "Yeah." |
| Source: | "Yeah, well, that's something that...that, um, ...no one could help you with that, right?" |
| Bridge: | "No." |
| | (Short Pause) |
| Bridge: | "And it's...that...Four is, uh...yeah, the background check." |
| Source: | "Okay.  Is there any problem there?" |
| Bridge: | "Other than I've been kicked...uh, I was suspended from a university.  I mean, I never (UI)..." |
| Source: | "I don't think that's..." |
| Bridge: | "...no..." |
| Source: | "...Kipp'd...Kipp would know more about that..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page ___10___

| | |
|---|---|
| Stanton: | "Yeah, 'cause whoever did..." |
| Source: | "...(UI)..." |
| Stanton: | "...his background investigation would be one of his buddys anyways." |
| Source: | "Well, what...whatever.  I mean, I...I..." |
| Stanton: | "(UI) from up there.  Yeah, (UI)..." |
| Bridge: | "Yeah." |
| Stanton: | "It wouldn't be a problem." |
| Bridge: | "Well, regardless, all backgrounds go through the main headquarters." |
| Stanton: | "Whoever would actually get assigned to it, would be from, uh..." |
| Bridge: | "Indiana." |
| Stanton: | "Indiana Station, where I used to be in (UI)." |
| Bridge: | "I have nothing...put it this way, I have nothin' that, uh...would...would, uh, hinder me.  You know what?  They discriminate against me for some reason.  Because I might be a white male, or something." |
| | (Thump) |
| Source: | "(Chuckles)" |
| Bridge: | "An' then, uh...the background check the fin..." |
| Stanton: | "(Chuckles)" |
| | (Cough) |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of __SOURCE_____ . On __10/13/1998__ . Page __11__

| | |
|---|---|
| Bridge: | "...that's the final stage and then, uh...getting in would be the last stage. Because no one can help me with the physical. Either you get in or not, I mean, uh...okay, you have...you have the physical, which is no problem, I mean..." |
| Source: | "Okay. A'right. Now, um...okay, now...let... let me make sure. (UI)...okay. Umm..." |
| | (Short Pause) |
| Source: | "...okay. Um..." |
| | (Short Pause) |
| Source: | "...a'right. Um, try not to take...think of, uh...is there any other information...is there anything else that...uh, that you would say (Source's Name)...that you would need this? Or, what...what...what...no, how d'you want me ta approach these people? I mean, um...d'you have an idea who it is?" |
| Bridge: | "No!" |
| Source: | "But, uh...uh, you should know." |
| Stanton: | "You told me the name, but I don't remember but, uh..." |
| Bridge: | "Yeah, don't have a clue...well, all...I assume it's a politician." |
| Source: | "Right." |
| Bridge: | "That's the only thing...that's the only way you can help me in...anywhere in the state." |
| Source: | "Okay." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of _____SOURCE_____ , On _10/13/1998_ , Page ___12___

| | |
|---|---|
| Bridge: | "Y'know, but that...my buddy, he had a... he knew a Senator." |
| Source: | "Okay." |
| Bridge: | "And...uh...and they jerked him in, like..." |
| Source: | "Well, what...what...what district was he from?" |
| Bridge: | "He lives in Indiana.  Well, he's from Marian Center.  But he didn't even come to the B Band.  He was down...down to D Band where the flunkies are." |
| Source: | "Okay." |
| Bridge: | "...and he had a misdemeanor burglary charge." |
| Stanton: | "(UI)." |
| Bridge: | "Yeah." |
| Source: | "When...his...a younger age, or somethin' like that, they'll..." |
| Bridge: | "Three years ago..." |
| Source: | "That's not too young." |
| Bridge: | "So other than, he, uh...I mean, got proof he...his background check went unnoticed." |
| Source: | "Okay." |
| Bridge: | "That's what...was really surprised in Indiana.  The background check went unnoticed." |
| Source: | "Okay." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page ___13___

| | |
|---|---|
| Bridge: | "Next thing they knew, he was in the Academy. He's goin' on..." |
| Source: | "Right." |
| Bridge: | "...to the Academy. Me...I mean, I don't ...I mean, that...uh, the best thing is... y'know, they make the guy feel comfortable." |
| Source: | "Kipp." |
| Bridge: | "'Cause...I don't know nothin'...and I work right through Kipp." |
| Source: | "Kipp, let me ask this here. Did...who d'you feel that I should go to? I mean, uh, he and I have options here. Uh, who d'you feel comfortable with?" |
| Stanton: | "Umm, I don' know the one guy. Not...not Doc, the other guy you're talkin' 'bout." |
| Source: | "Umm...umm, Senator Bodack?" |
| Stanton: | "Yeah." |
| Source: | "Okay. You don't feel comfortable with Doc?" |
| Stanton: | "Well, Doc...I don't know how far down...the Senator, he's higher up." |
| Source: | "Oh, yeah,." |
| Stanton: | "I don't know how much. Doc will probably have to work through somebody...to work through somebody else. Maybe even do something else. Probably better to go directly to Senator Bodack..." |
| Bridge: | "Well, the Senator's gonna...that's who helped him, a Senator, I don't know which one...uh, Senator helped him. You...y'know? An' that's |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page    14

|  |  |
|---|---|
|  | "...how...that's where I (UI).  I told Kipp, That's how he (UI).  How'd he do it?" |
| Source: | "Okay." |
| Bridge: | "He said we went in steps; and that's what we did.  That's...I think a Trooper from Indiana.  Same as Kipp's helped me out, helped him out..." |
| Source: | "Okay." |
| Bridge: | "...hookin' him up with this guy." |
| Source: | "Now...okay, now...now, let...let me know if everything goes okay, when...when you'd be ready?" |
| Bridge: | "Well, I'm ready immediate...I mean, I'm...I'm ready immediately." |
| Stanton: | "Remember, you...you said, things were goin' pretty fast, prob'ly." |
| Source: | "Yeah, I think they are." |
| Bridge: | "I'm ready immediately.  Put it this way, I'll be honest with you...an' Kipp...Kipp knows that...an' this guy don't know this, but Kipp does." |
| Source: | "Yeah." |
| Bridge: | "I mean...I mean, money's...money's not an option.  I mean, the only option...uh, my money...and my family is not exactly the cleanest money..." |
| Source: | "Oh, I don't und...what do you mean?  Oh, okay!  Ahh, well, I...I...I don't know." |
| Bridge: | "My fam...my money comes from Chicago...from my Uncle Vic." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE___ , On _10/13/1998_ , Page ___15___

| | |
|---|---|
| Source: | "Yeah." |
| Bridge: | "And, it's pretty much (UI).  What I wanna buy ...and I buy a thirty thousand dollar ($30,000) truck, I got to pay for it.  I buy it." |
| Source: | "Okay." |
| Bridge: | "(UI) wanna buy...but money's not the problem." |
| Source: | "Okay." |
| Bridge: | "That's not an issue.  He...he can go on that, I mean.  Ahh, he'll be definitely well taken care of, once it's...once I'm in everything's taken care of.  T...his contribution will come from somewhere else, where he won't even know..." |
| Source: | "Well, here..." |
| Bridge: | "...about (UI)." |
| Source: | "...here's what I'm sayin', whe...when I go there...look...okay, listen.  Let's face it, okay?  Thi...what...what...this...this is almost the year 2000..." |
| Stanton: | "Right." |
| Bridge: | "Right." |
| Source: | "Okay?  If I go ta him an' I say, well, I want you ta help a friend o' mine, an' he'll say, who?  (Chuckles)  An' I gotta say, well, the...whatta I...I mean, whatta I got...I mean, where am I at?  (UI)  (Chuckles)" |
| Bridge: | "(Laughs) Yeah, I understand." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ . On _10/13/1998_ . Page ___16___

| | |
|---|---|
| Source: | "I tell 'em, whatta I say?  Well, here he want...I mean, he wants to do this?  I mean, I... I'll say that." |
| Bridge: | "Yeah, he wants ta do this.  I mean, he'll..." |
| Source: | "Yeah." |
| Bridge: | "...I mean, he'll..." |
| Stanton: | "Put it this way, if he wants to meet me, of course, there's no problem." |
| Bridge: | "...yeah.  The thing of it is, I would prefer for...for him...for him bein'...feelin' comfortable for me bein'...feelin' comfortable, we don't need no...no one, other than that one (UI)." |
| Source: | "I...okay." |
| Bridge: | "All I know is, I work through Kipp.  The money'll come through Kipp.  To you, to him. I never see 'im, I don't know nothin'...I don't wanna know.  I mean, the thing about...we just go through them channels.  I mean, all I need ta do is...like I told...all I need him ta do is get me in the Academy.  It's my responsibility ta keep up and stay there." |
| Source: | "Okay.  Well, look, I made a little note.  I described...I...I wro...I...I wrote a scri... uh, it's real scribbly, but I'll...I'll transfer these nice...I made a little card, okay?  For myself, whenever I go down, okay? Or...you know...I'll go...to go to my next step, okay?  Just so you know, okay?" |
| Bridge: | "Okay." |
| Source: | "Now, the thing is...do I go empty-handed? That's the smart thing to do?" |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ____SOURCE_____ , On 10/13/1998 , Page ___17

| | |
|---|---|
| Bridge: | "That's definitely the smart thing to do. Tell 'im at each step I'll give him the money; and...if he wants more money, that's no problem.  See, tell 'im...tell 'im money's not the issue here.  If he can come through, money's not the issue and tell 'im...you know, that as long as he's in office, there'll be contributions coming." |
| Source: | "Um-hum." |
| Bridge: | "I mean, I'm not going to support 'im all his life." |
| Stanton: | "Le' me...le' me...(UI) okay, look...okay, he goes to talk to the guy and says, uh... (UI)...the guy said, uh...okay...what do you want?" |
| Bridge: | "He says okay..." |
| Stanton: | "Let him know what he wants to get started." |
| Bridge: | "...if the guy says, okay, I can help.  All I want is a...is...is the...is the guy is gonna say, well, this is no fuckin' problem.  I can help.  It's a done deal.  Okay?  How much d'you wanna ...how much d'you want me ta get up front... ta get the process started?  Then we'll go (UI).  And then, he tells you that, you tell Kipp, I'll have your cash money in fuckin' hours." |
| Source: | "Okay." |
| Bridge: | "Not a problem.  To be honest with you, if he wanted fifty thousand bucks ($50,000) I can go do that." |
| Source: | "Um-hum." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page    18

| | |
|---|---|
| Bridge: | "That's not a problem.  Money's not a problem. The thing about it is, I just wanna make sure that everything's kept silent.  Kipp's kept out of it, too...ha! it's pretty, uh..." |
| Source: | "Okay.  Well, I..." |
| Bridge: | "...okay?" |
| Source: | "...uh, listen, you have to realize somethin'. I...I ...I'm with you all the way..." |
| Bridge: | "Right." |
| Source: | "...okay.  I just don't wanna go and look foolish and... and then find out that...uh, I make a phone call and...an'...an'...an' you make me look like shit." |
| Bridge: | "No, I'd (UI) you under..." |
| Source: | "Okay?  I'm...already had a...I had a slight experience with that already.  Ahh..." |
| Bridge: | "...Kipp can tell you that..." |
| Source: | "...I mean, I sorta went for...I tried to go for...and...and it sorta...I mean, just come to a halt.  That looks sorta foolish." |
| Bridge: | "...Kipp can tell you that I have no problem with comin' up with the money." |
| Source: | "We...ahh...I...I...I know that.  Bu...but, you...you know that you gotta get..." |
| Bridge: | "Well, you just understand...no one knows no one..." |
| Stanton: | "...(UI)..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____. On 10/13/1998 . Page ___19

Bridge:          "...right.  No one knows no one here.  The
                 thing about it is, though, when you put it
                 this way.  I would never do them intentions
                 known, 'cause I know you and Kipp been
                 friends 'for a long time..."

Source:          "Yeah.  Then..."

Bridge:          "...and, if I wasn't serious...ta be honest
                 with ya, I'd be home, sleeping..."

                 (Cough)

Bridge:          "...I mean, that's what I'm lookin' out for;
                 and, I'm lookin' out for my future..."

Source:          "All right..."

Bridge:          "...I mean, the thing about it is that...I
                 mean, I'd never dick anybody around.  That's
                 not...I mean, that's not who..."

Stanton:         "(UI) got two daughters..."

Bridge:          "...yeah, the thing..."

Stanton:         "...(UI)..."

Bridge:          "...(UI) I call him and bug him every...did
                 youa talk to (Source"s Name)?  Call (Source's
                 Name)..."

Stanton:         "...uh-huh."

Source:          "...Kipp, you have to realize...I mean,
                 let...let... let's face it...you...you know
                 how foolish one can look..."

Bridge:          "...oh yeah, well...well..."

Source:          "...okay, now, you realize the position you're
                 puttin' me in?"

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page __20__

| | |
|---|---|
| Stanton: | "...oh, I...I...I realize..." |
| Source: | "I...I...do...do...do you really?" |
| Bridge: | "...I realize.  And you're definitely gonna be taken care of." |
| Source: | "I...I...na...that's not...forget that..." |
| Bridge: | "But, you gotta be taken care of." |
| Source: | "...no, you...you're missin' the whole point. You're missin' the whole point.  Okay?  I... I'm a committee person, people come to me, okay?" |
| Bridge: | "Right." |
| Source: | "You follow me, okay?  Umm, what I'm tryin' ta say is...okay, I...I...I don't...I mean, do I go there empty the first time... you tell me to do that..." |
| Bridge: | "Yeah.  Yeah." |
| Source: | "...okay." |
| Bridge: | "That way the..." |
| Stanton: | "D'you think it's smart for that?" |
| Source: | "I...I...I don't..." |
| Bridge: | "...well..." |
| Source: | "...I don't wanna say, Kipp." |
| Bridge: | "...well, the guy..." |
| Source: | "I...I...I don't wanna..." |
| Bridge: | "...the...Kipp...." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page 21

| | |
|---|---|
| Source: | "...say, Kipp, because, I'll tell you what. I...I got it...I...I...I...I learned so much already tonight." |
| Stanton: | "...right." |
| Source: | "I never knew about steps. I never knew." |
| Bridge: | "Ahh, there's steps." |
| Source: | "Okay. Could I tell you somethin'? I thought it wa...I though...outta the class they picked and you go. I'd see..." |
| Bridge: | "No, they gotta go through the steps." |
| Source: | "...uh, you know that." |
| Bridge: | "Unless it's a...unless...like this kid. He did his...what he did is...this guy that met...the guy that helped him in..." |
| Stanton: | "Yeah." |
| Bridge: | "...okay, this is exactly how he did it. This guy was a Senator, too." |
| Source: | "Yeah?" |
| Bridge: | "And what he did, he went down and he knew somebody...the guy told him...hey, this kid's willing to p...not...uh, they don't use...he said, never use...give (UI) money. He's willin' to donate a contribution, if you can help him out. And, no names were ever mentioned." |
| Source: | "Okay." |
| Bridge: | "And what he did, he went to the guy,... yeah. And he said this guy willing to give you...this kid willing give you a five |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ____SOURCE_____ , On 10/13/1998 , Page __22__

|  |  |
|---|---|
|  | thousand dollar ($5,000) contribution, that'as what this kid did.  And he (UI) some steps, and the guy said, 'Yeah, that's fine. I can help him out.' Okay, this guy was able to help him out and skip a couple of those steps." |
| Source: | "Okay." |
| Bridge: | "But, see, I don't know how much each power or each (UI)...I don't know if this is Democrat or Republican, I just know this guy was a Republican.  (Laughs)" |
| Source: | "Right, I understand." |
| Bridge: | "But it's all (UI).  I'm kinda niave to it.  I just had...you know, I had a Corporal say to me one night...and I don't let on anything. He said to me, 'Jay, why you fuckin' around?' You got money, make 'em connections, get yourself in.  So...we know it can be done." |
| Stanton: | "(Chuckles) That's a lot.  See, one time (UI)..." |
| Source: | "I didn't hear you say.,...who...who...who said that?" |
| Bridge: | "It's a Corporal, from the State Police Barracks in Indiana." |
| Source: | "I thought you s...I thought you said ma..." |
| Stanton: | "Yeah." |
|  | (Chuckles) |
| Source: | "...oh.  I didn't know he...I...I heard you say a name, I didn't know you said...okay, I'm sorry." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____, On _10/13/1998_ , Page ___23___

| | |
|---|---|
| Bridge: | "Yeah, it's...it's..." |
| Stanton: | "I'll tell you how political the...the state is in that.  Up in Highland Park Borough...a buddy of mine, um, I got him a job as police chief.  One day I was in the office, talkin' ta him and his borough secretary.  And, she asked me...I had sort of a personal question...she said, uh...did you get... d'you have help gettin' on the State Police, or are you on your own?  I said...well, he said...well, most of the guys...a lot of the guys get on the job actually do have help. You know, these politicians get it for 'em. I'm, like, well, no, I got it on my own but it was offered to help me.  But I remember Doc and you approach me about it.  And, I looked at 'er and I said, I'm already in the Aca...I'm already sent to the Acadmey in two weeks." |
| Source: | "Right." |
| Stanton: | "So...and I already been in.  So, when she told me that..." |
| Source: | "I was in...I was in shock when you told me that you...you...you were already on a roll. You were already a done deal." |
| Stanton: | "...yeah." |
| Source: | "I was in shock.  I found it all out afterwards, Kipp.  I didn't know." |
| Stanton: | "(Cough) Right." |
| Source: | "Mem...'member, I said, it's...it's...uh, I... wh...you...you know I was shocked.  I didn't know." |
| Stanton: | "Right." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ____SOURCE_____ , On 10/13/1998 , Page ___24___

| | |
|---|---|
| Source: | "I hadn't seen you for...for a few months. All of a sudden you're a state trooper." |
| Stanton: | "(Chuckles)" |
| Source: | "Uh, it...it seemed like 'at." |
| Stanton: | "Well..." |
| Source: | "It seemed like...when you didn't come around for a couple months and then, I...the next thing you know, he said, well, (Source's Name) I'm a trooper. I said, what? I didn't know. How would I know? Well, he, uh..." |
| Stanton: | "(Chuckles)" |
| Source: | "...yeah, how would I know? I...I..." |
| Bridge: | "This kid told me how his guy approached it. "Cause I...I mean, I did ask him about it." |
| Source: | "...yeah, listen..." |
| Bridge: | "But, uh...here's...here's how this guy..." |
| Source: | "...uh...anything ta smooth this in the thing, uh, you gotta...you..." |
| Bridge: | "...yeah, you gotta...you...here's how he said he said he approached it..." |
| Source: | "...go 'head." |
| Bridge: | "...he said, his buddy knew the Senator; and he just went to the Senator and he said, hey, I got a...a friend that's trying to get in the state police. If you can give him any help, he's willing to make a contribution to your campaign." |
| Source: | "Did you take a test?" |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____. On _10/13/1998_ . Page ___25___

| | |
|---|---|
| Bridge: | "Yeah." |
| Source: | "Did...did...d'you remember...I...wha...d'you know...what'd...what'd...where'd you take it at?" |
| Bridge: | "I took a test in Erie." |
| Source: | "In Erie?" |
| Bridge: | "I tested in Erie and the other...they...they only interviewed the people that were in Band A.  I finished in Band B." |
| | (Short Pause) |
| Source: | "Umm, we...I had your number written...I had your name and stu...stuff written down.  Now, d'you want...here, d'you wanna...write...write all your name and..." |
| Bridge: | "Yeah.  Okay." |
| Source: | "...here...why don't do this here...here, let me get the...here, I'll tell you what..." |
| | (Short Pause) |
| Source: | "...why don't you write everything down, okay?" |
| Bridge: | "I'll write you down my name and everything you need." |
| Source: | "Now, Kipp, do I need Social Security Number? No." |
| Stanton | "Ahh..." |
| Source: | "Or Driver's number?  What do I need? Operator's Number?  What...tell me what I need." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___26___

| | |
|---|---|
| Stanton: | "I'd put...I...I have everything that way, he already has the (UI)...say he wanted to check for himself first, before he did anything... you know, say..." |
| Source: | "Well, he's gonna run a check on 'im, you know that." |
| Stanton: | "...yeah." |
| Source: | "I mean, now, let's face it..." |
| Stanton: | "He's (UI) give him everything, he can do that." |
| Source: | "...give 'im everything...okay. A'right, now..." |
| Stanton: | "(Coughs)  To...to...I'm sure he'll say. Yeah, I can help him and in that case he will come and tell me then, I'll...uh, talk ta him..." |
| Bridge: | "We...I'll tell you what..." |
| Stanton: | "...(UI) get the money..." |
| Bridge: | "...ask 'im...uh, right.  Ask 'im...y'know, when do we think we can get this ball rollin'?  Y'know?   So I have some idea of... y'know, what I...all I wanna do...like I told Kipp before...'cause I need definite direction.  That's all I need.  Uh, I just need...I just need definite direction where I'm goin'; and what's happenin'...what I want ...don't wanna be is, like...well, I wanna be like this...I...I've kinda got spoiled in the way Ben did it, 'cause he knew week to week..." |
| Source: | "Now...now...now, Ben is who?" |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ____SOURCE_____ , On _10/13/1998_ , Page ___27___

| Bridge: | "...Ben's the guy that got pulled in." |
| Source: | "Okay, now..." |
| Bridge: | "He's in (UI)...in there now." |
| Source: | "...okay, now, that...what...now, the...what...what...what section of town was he from originally?" |
| Bridge: | "He was from, um, Marian Center.  That's in Indiana, whatever." |
| Source: | "Marian?  Okay." |
| Bridge: | "But I don't know...that might not have even ...you know, Indiana Senator, I don't know." |
| Source: | "A'right.  Well, I mean, let...let me ask you this here.  You...you...you don't know who is was that helped him?" |
| Bridge: | "No." |
| Source: | "'Cause that...that would be helpful..." |
| Bridge: | "He didn't even know who helped him." |
| Source: | "Okay." |
| Bridge: | "He...see, he was one of these things where he went in blind, too, and that way...you know, under a polygraph...if anybody had asked him about that, no, you don't know... I mean...it's pretty much fair.  It's..." |
| Stanton: | "They probably won't ask you, so many people..." |
| Bridge: | "...I was talkin' to (UI), and somebody..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ____SOURCE_____ , On _10/13/1998_ , Page ___28___

| | |
|---|---|
| Stanton: | "...somebody can get a job without...'cause, that woman...made me realize a lot of people get help..." |
| Bridge: | "...and a lot of people don't like it. Let's say a Senator or governor or somebody helps me..." |
| | (UI Noise) |
| Bridge: | "...they really don't want to be exposed ta lettin' anybody know they helped somebody out. They don't even want that person to know." |
| Source: | "Okay." |
| Bridge: | "That's why everything's done...uh, like, uh...like my grandmother says,..." |
| Source: | "Boy, does it...he's gotta know your name." |
| Bridge: | "...no, no. Well, no, no. I mean, I don't wanna know him, he could know me." |
| Source: | "Oh, yeah, okay." |
| Bridge: | "Well, he's helped me, he has to know everything about me..." |
| Source: | "Yeah." |
| Bridge: | "...but I don't wanna know not'in' about him. That gives him a sense of security." |
| Source: | "Right." |
| Bridge: | "And, uh...y'know, the thing 'bout it is, though...it's, like...and, y'know...another thing I wanna do, I wanna do everything straight up cash and that way there's no money order, no check, nothing to be copied." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____, On _10/13/1998_, Page ___29___

(UI Background Noise)

Bridge:        "Nothing down the road, uh, somebody say,
               hey, this guy pulled ya in..."

               (Cough)

Bridge:        "...and we're terminating ya..."

Source:        "I understand that; but...but, um...you...
               you know I have reservations goin' there.
               Umm...uh, like, uh...I'm gonna do it for you.
               Now, if I look bad, I'm not...I ain't never
               gonna talk to you again."

Bridge:        "You'll never look bad.  I mean...trust me.  I
               mean, you won't...all you haveta...I'll tell
               ya somethin' right now...I'll tell you
               somethin'...you go down 'ere and you get ahold
               of the...and that guy (UI)...and he's
               a...yeah, I can help 'im.  I need some money
               t'day...I'll tell you somethin' right now, I'll
               drive to D.C.  Kipp will page me, I'll go get
               the money...I'll drive right to D.C.  That's
               not a problem."

Source:        "Um-hum."

Bridge:        "The thing about it is...I'd...I wanna get in
               and I wanna get somethin' started, you know?
               I wanna get in...I been tryin' ta get in the
               State Police I mean..."

Source:        "I remember that."

Bridge:        "...y'know..."

Source:        "I remember that."

Bridge:        "...and, the thing about it...and, I mean,
               that's not a problem.  I mean, I'll tell you
               somethin' right now, man.  If that guy been

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of _____SOURCE_____ , On 10/13/1998 , Page 30

> sittin' right here tonight and said, 'Bud, I
> guarantee you I'll get you in and I'll show
> you t'morrow you bring the money...he shows
> me...he's gettin' the money. That's not a
> problem. And all I need...the only thing I
> told Kipp is, I don't wanna go in blind. You
> know? I mean...I wanna go..."

Stanton:        "Not knowin' what's...."

Source:         "Keep this in mind, now you guys sorta sendin'
                me in a little blind; but, I mean... I'll
                know...I'll tell you what, though, I'll go;
                but, sh...I feel better havin' some notes.
                I'll have some information."

Bridge:         "...right."

Source:         "I have some...I have some...somethin'..."

Bridge:         "Right."

Source:         "...to...that we explained to."

Bridge:         "Well, prob'ly what'll happen, it's...from what
                I heard how it happened with this kid, is the
                guy went to the Senator and the Senator..."

Source:         "What was his...what was his name? Now, that
                ...that's the Corporal. Ahh..."

Bridge:         "Oh, no. That's (UI). The kid that...got
                help was Ben Boner."

Source:         "Yeah, okay."

Bridge:         "He's in...he's in the Academy right now.
                They...they pushed him through in, like, four
                months."

Source:         "He...he's through?"

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of    SOURCE _____ , On 10/13/1998 , Page    31

| | |
|---|---|
| Bridge: | "Oh, no, he's in right now.  He's in a class right now.  He just started in September." |
| Source: | "In other words, they're training him to be a trooper?" |
| Bridge: | "Right.  Right now.  Right now." |
| Source: | "Okay, okay.  I'm with you now." |
| Bridge: | "And what they had..." |
| Source: | "Is that the final step?" |
| Bridge: | "...yeah.  Yeah, you're...once you're in the Academy, you're comin' out a trooper." |
| Source: | "Okay, well, I..." |
| Stanton: | "That's all I need to know.  Once you're in the Academy, you're guaranteed a..." |
| Bridge: | "...and, uh..." |
| Source: | "...you know, you didn't mention that to me on my...on my list." |
| Bridge: | "...right." |
| Source: | "That's why I asked." |
| Bridge: | "What they do...they can't...what they did to him is, they had to go to the Senator; and when they went to the Senator, the Senator said, you gotta give me a couple weeks to check and make sure.  I gotta make contacts, see if I can help." |
| Source: | "Okay." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page ___32___

| | |
|---|---|
| Bridge: | "And then, they said, yeah, I could help. And what Ben did, he gave 'im twenty-five hundred bucks ($2,500)." |
| Source: | "Okay." |
| Bridge: | "And then, after he gave 'im the twenty-five hundred bucks ($2,500), then he gave the rest...as soon as he got his letter for appointment." |
| Source: | "Okay." |
| Bridge: | "Okay?  Then, however they worked things out after that I don't know." |
| Source: | "Right, I understand." |
| Bridge: | "But, that's how..." |
| Source: | "But, I'm (UI) this thing kinda let...let's... you know...get...get (UI)." |
| Bridge: | "...let them know where they're goin'...(UI) direction." |
| Source: | "Oh, yeah." |
| Bridge: | "...that's what I told Kipp.  I said, I don't have no...y'know, no...no problem with anything, 'cause I gotta know the direction. I gotta know, like...I gotta...Kipp say everything's in the one trust and I gotta know...if (Source's Name) come back and...like, with this guy and said we can help 'im, we're gonna need ta get money and get things rollin' here.  This is what we need to do.  This is the direction.  A guy what...what...Ben got was direction from the Senator.  The Seantor told him what to do. When to give him the money what to do, how to do it, and everything went smoothly there." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of _____SOURCE_____ , On __10/13/1998__ , Page    33

| Source: | "Okay." |
|---|---|
| Bridge: | "And that's how...that's how...I mean, it went perfectly like that." |
| Source: | "Okay." |
| Bridge: | "And that...and I think that the Senator wants you...uh...uh, whoever you talk to when you go to him and you say hey, this kid's tryin' to get in the State Police, and...he's willin' to make contributions. Any way you can help 'im...'cause he said if we can help in gettin' him goin', we can get things goin' immediately. We needed some direction where to go. Then once we do that, that's no problem. I mean, I...I have a...I have..." |
| Source: | "I had to learn myself, Kipp." |
| Bridge: | "...oh, yeah! Oh, yeah! It's just the... well, the thing about it is...it's...it's really tough, like...it's like in Chicago. If I want to go to Chicago..." |
| Source: | "Yeah." |
| Bridge: | "...to be an Illinois Trooper..." |
| Source: | "If you...yeah." |
| Bridge: | "...their Mafia. I mean, my Uncle Vic could get me in in a second. But the thing about it is, I'm not leavin' Pennsylvania. I mean, that's ...I mean, I wanna stay here (UI)." |
| Source: | "Well, yeah, I know..." |
| Bridge: | "All my friends are here, too." |
| Source: | "...I understand. I...uh, I'm with that a hundred percent. Umm, like, when you said I |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page  34

| | |
|---|---|
| | wanted ta go about...uh, get your...your Pennsylvania emissions license, I...I know where to go for that, follow me...you know..." |
| Bridge: | "Right." |
| Source: | "...you know this, okay?  I know where ta go to be a certified mechanic at.  Where...you know this." |
| Bridge: | "Right." |
| Source: | "This is...this is part of...look, Kipp, this is part of your life, okay?  An'...an'...and, Jay, this is somethin' you...you wanna get into." |
| Bridge: | "Right." |
| Source: | "Yeah.  But, uh..." |
| Bridge: | "This is..." |
| Source: | "...that's right." |
| Bridge: | "...what I've been trying to get into for a while." |
| Source: | "Well...you know..." |
| Bridge: | "(Chuckles)" |
| | (Short Pause) |
| Source: | "...first...I gotta tell ya that I...like... like anything else, okay?  The first couple things...uh, like, I say, I don't wanna go an' ...and make a bad impression...even though there's a rapport, okay...I don't wanna make a bad impression." |
| Bridge: | "Right." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___35___

| | |
|---|---|
| Source: | "Okay?  I...I really don't." |
| Bridge: | "You just wanna know what you're sayin'; not understandin' it..." |
| Source: | "Yeah.  Little bit o' information, um...you, uh...just the gentleman's name, um...uh...he would...he would be most greatful...things that...just follow me." |
| Bridge: | "Right." |
| Source: | "Okay.  And I wanna, like, lead in like that. There...nat...nat...naturally I'm the only kind o' person that, um...I never, uh..." |
| | (Sniffling) |
| Source: | "...I would sorta, like, prepare, like, mentally.  You know what I'm sayin'?  Proper attire when I go there." |
| | (Thorat Cleared) |
| Source: | "Y'know what I'm sayin'?" |
| Bridge: | "Right." |
| Source: | "Even though I know...and, I'm a Committee Person...I have total access, any time I wanna go and see some...uh, you follow me?" |
| Bridge: | "Okay." |
| Source: | "But, this way, I wanna go prepared, okay?" |
| Bridge: | "It's respect." |
| Source: | "It's respect.  And, plus,. I wanna say to 'im ...you know, um...it wasn't so long ago that, um...ahh...I'll also hit him wit' this here ...now...now...uh, I got...you could even |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page   36

| | |
|---|---|
| | tell me how that phrase it.  I'm gonna say, not so long ago there was a Republican Senator from, uh, Indiana...up that way... that helped a young man get started.  So, I...I wanna be able ta say those things and not...y'know what I'm saying?" |
| Bridge: | "All right." |
| Source: | "You know?  I wanna...in case I get, like, hey, (Source's Name), forget about it.  Those days are gone.  Hey...hey...hey...hey, um... uh, this...you follow me?" |
| Bridge: | "That's the key thing right there, ta know he's able to do it.  That's the...I...I..." |
| Source: | "Yeah, I...I...I...and then, um...uh...y'know, I'll just say, was this guy serious?  Well, what did he send with you?  I don't know what ta say." |
| Bridge: | "...well, that's what...right then and there, that's exactly what happened when Ben did it..." |
| Source: | "So, I'm gonna say...he said...said..." |
| Bridge: | "He said he..." |
| Source: | "...here's what I'm gonna say.  I'm gonna say he sent me with information, he sent me...he sent me what...what...what...what...with this progressive pattern of...of...of...of...steps that need to be done, he said...and, as he goes along...he said, before you...before you even hit Step Five, um..." |
| Bridge: | "You'll have all the money..." |
| Source: | "...we...we...what...what...whatever number you want, um..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page __37__

| | |
|---|---|
| Bridge: | "...yeah." |
| Source: | "...it...it'll be done." |
| Bridge: | "Tell...I'll tell you somethin'...ta be better, just tell 'im to name his figure." |
| Source: | "Okay." |
| Bridge: | "And as long as it's not ridiculous, like, a hundred thousand ($100,000)..." |
| Source: | "But then, what...what...what is fair?  You ...you tell me a figure." |
| Bridge: | "I'll give 'im ten grand ($10,000), no questions asked." |
| Source: | "Okay.  Is...is that normal, or is that...is that low?" |
| Bridge: | "That's high.  But, that's..." |
| Source: | "Is it!!?" |
| Bridge: | "...but...oh, that's mo...that's high, but I wanna expedite things.  And if he wants even higher yet, that I'm willin' to give 'im five thousand dollars ($5,000) contribution a year, 'til he retires." |
| | (Short Pause) |
| Bridge: | "I mean, that...that's no problem.  Because that's one thing that he didn't pay and...he can count on it.  Because, what'll happen is...I mean, he'll get contributions...you know, that...it'll be silent and he'll know where it's coming from." |
| Source: | "Okay." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of   **SOURCE**          , On 10/13/1998  , Page   38

| | |
|---|---|
| Bridge: | "I mean, that's gonna be no problem.  Uh, he can be taken care of.  I mean, my family used to padden politicians' pockets.  If it's not in this state.  If I was in Chicago, I'd be in business." |
| Source: | "I understand." |
| Bridge: | "But, the thing about it is, uh...that's... that's not a problem.  I mean...the big problem is...y'know, all I want is...y'know ...the fir...the main thing is, can he help me?  And will he help me?" |
| Source: | "Okay." |
| Bridge: | "The second thing is, if that's not enough money, let me know what is enough money.  The third things is, the minute he tells me he can help me, or if he wants to meet me, or...if he wants...uh, even if he wants my bank account number, I'll give 'im my bank account number.  I mean, that's not a problem.  Yeah, I..." |
| Stanton: | "He...he...we know, it's...before we even do this, it ...it's Step One, you have to give the money first..." |
| Bridge: | "...I can see..." |
| Stanton: | "...you just wanna know if he..." |
| Bridge: | "...well, I..." |
| Stanton: | "...if he can do it first." |
| Bridge: | "...and, I can show 'im...you know, I can show 'im savings accounts..." |
| | (Cough) |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of    SOURCE _____ , On 10/13/1998 , Page    39

| | |
|---|---|
| Bridge: | "...one's twenty-five thousand dollars ($25,000) in it...I mean, it's no...the money's no problem." |
| Source: | "Okay." |
| Bridge: | "And...the thing about it...the...what I just wanna know from him...only thing I want to know from him...Number One, can he help me? And, will he help me?" |
| Source: | "Yeah." |
| Bridge: | "Three, is the money sufficient?  Four, when the hell we can get movin'?" |
| Source: | "Okay." |
| Bridge: | "And as soon as we get movin' on each step, then we go...I mean; the money's gonna come in.  That's gonna be no problem if he wants to meet me, shake hands, that's fine.  If he don't...wants to stay silent, that's...y'know, that's fine and...I'm leavin' it up ta him." |
| Source: | "Okay." |
| Bridge: | "All I wanna know is he can help me.  I don't give a shit about anything, where the money's goin' to, who it's goin' to, as long as I see I'm gettin' help, there's money goin' out." |
| Source: | "Okay." |
| Bridge: | "And that's not a problem." |
| Source: | "All right." |
| Bridge: | "And...I mean, we're talkin' cash money.  I don't wanna deal in any check that...uh, |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___40___

checks, like my grandma, they come back and
bite you in the ass."

Source:          "Okay."

Bridge:          "And I definitely wouldn't...y'know...I mean,
I defintely wouldn't, uh...y'know, put anybody
out on a limb..."

Source:          "Uh."

Bridge:          "...because, if you get caught in the State
of Pennsylvania tryin' to get..."

(Thump)

Bridge:          "...help gettin' in the state police...through
politicians...you can never get in again.
They'll never let you in.  You know..."

Source:          "Ah..."

Bridge:          "...how to use political influence, they
say."

Source:          "Oh."

Stanton:         "That happens all the time."

Bridge:          "It happens all the time.  But you got to
know people; and like my grandma said, 'In
order to know people who gotta do for people,
so they do for you'.  In other words ...I
mean...the bottom line is, you get what you
pay for."

(Sniffling)

Source:          "Hum."

Bridge:          "You pay the money...and you pay the money
quick to the guy.  The guy's gonna get
you...if he can.  And, that's all I wanted to
                    ↑
                  (ui)

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of   __SOURCE_____ , On __10/13/1998__ , Page    41

|  |  |
|---|---|
|  | do. And just to go into it...I just wanted him to know that...that, straight up, he'll get the money then...he'll get the money. He shows me the results, the money's there. That's not a problem." |
| Source: | "Okay." |
| Bridge: | "And I'll give it to 'im in pennies, hundreds, thousands...whatever he wants." |
| Source: | "Huh." |
| Bridge: | "But, we gotta get...you know, we gotta get a direction on where we're goin'." |
| Source: | "Yeah." |
| Bridge: | "That's all I want from him is where we're goin' and if...and I don't even want him to do anything for me, until I give 'im money; but I gotta know if he can? When he can? And how it's gonna go?" |
| Source: | "I see." |
| Bridge: | "'Cause the thing about it is, what I'm dealin' with here is I got a family ta look after... you know...basically my daughter, my wife, I wanna start a career, and this is the way I wanna go." |
| Source: | "All right." |
| Bridge: | "You know? And, this is where I wanna be. If he can help me, that's great he'll be well rewarded. If he can't, we tried. You know, and then we'll...we'll see what happens." |
| Source: | "Um-hum." |
| Bridge: | "But...I mean, I...I think that's fair enough for 'im." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ . On _10/13/1998_ . Page __42__

| Source: | "Right." |
|---|---|

Bridge: "And then, just to see if he can help me and when we get some results. And I don't think the next class goes in 'til March. So, this gives us...I mean, what is it October, November, December, January, February, Ap...a ...February, March."

Stanton: "This...is, like..."

Bridge: "Five months."

Stanton: "...four to five months after you get to the Academy..."

Bridge: "And, if he needs longer, that's fine. But, all I wanna know is...uh, I just wanna know ...like, I wanna...ta...uh...him to say... okay, (Source's Name), me and this guy's not gonna, you know, communicate together and we're gonna let you be the go-between guy. I just...I wanna let you know here's how it's gonna go so this kid's not left in the dark. We're gonna do this..."

Source: "Um-hum."

Bridge: "...he'll get a letter from this. He's gonna find out this. Somebody's gonna call me for this? Y'know? I jus' wanna know, like, maybe ...the criteria where I'm goin' and what I can expect."

Source: "Okay."

Bridge: "And then, once we do that...I mean, that's fine; 'cause, basically, what...what he's doin' with that is...he's showin' me he can and we got trust. And then, after that, I give 'im money...he's knowin' that I'm serious and that we got trust there."

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____, On 10/13/1998 , Page ___43___

| | |
|---|---|
| Source: | "Okay." |
| Bridge: | "And then we're bonded.  Then we know, hey...okay, he can help me.  I know he can help me. He showed me this.  And he's gonna say, hey, this kid (UI) money.  And we know this; but right now we're buyin' trust in one another." |
| Source: | "Um-hum." |
| Bridge: | "And...once we do the blind trust, right off the bat...the first time he...I see he helps me and he sees I'm givin' the money, everything can work good." |
| Source: | "Okay." |
| Bridge: | "I mean, and everything will work good...and, trust me, you...I mean...and...and Kipp can vouch for me.  You ain't gonna look like an idiot.  And once he's (UI) you tell that, it's a done deal." |
| Source: | "All right." |
| Bridge: | "I mean, that's...I mean, that's no problem. I mean..." |
| Source: | "Kipp, you agree with that?" |
| Stanton: | "Yes." |
| Bridge: | "An' tell 'im if he...if he wants...tell 'im if he wants ta...uh, wants a title to hold, I got a title to a twenty-five thousand dollar ($25,000) truck out there.  (Laughs)  'Til I give the money." |
| Stanton: | "(Laughs)." |
| Source: | "Well..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of _____ SOURCE _____ , On 10/13/1998 , Page 44

| Bridge: | "And, it's paid for, too.  I got the pink slip." |
|---|---|
| Source: | "...I understand..." |
| Bridge: | "But, tell him that...that...that's all we need to do, is go see what we can...help..." |
| Source: | "...yeah." |
| Bridge: | "...and where we can go.  I just want a direction.  You know?  I just wanna know what..." |
| Source: | "(UI)." |
| Bridge: | "...if somebody can help me, that's great. We're gonna work on it and they're gonna be rewarded, because I believe in...if somebody out on a limb to help me, they're gonna be helped back." |
| Source: | "...a'right." |
| Bridge: | "Y'know?  I mean...I...that's the...was I bel...that's like I told Kipp, he's gotta take somethin' for this, you'll have ta take something." |
| Source: | "A'right." |
| Bridge: | "One way or another you'll take something, even if you know it or don't know it.  You'll get some...I mean, it's just the way it's gotta work.  Because your time is valuable. Your efforts are valuable and so was Kipp's." |
| Source: | "Okay." |
| Bridge: | "Kipp's even more valuable, 'cause here he is, a state trooper tryin' ta move me in.  I mean, it..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___45___

| | |
|---|---|
| Source: | "Yeah..." |
| Bridge: | "...so...and, tell this guy that I can come up with...right now, I can come up with twenty-five (25) references of state troopers that will give me references.  That's not a problem." |
| Source: | "Okay." |
| Bridge: | "Y'know?  Magistrates.  Judges..." |
| Source: | "I understand.  I understand." |
| Bridge: | "So, yeah...tell 'im that that's fine. Once...but...only thing I told Kipp...and I wanna get to the ball movin' and see..." |
| Source: | "You know any judges from...in Downtown? Not...in Pittsburgh?" |
| Bridge: | "...in Uniontown." |
| Source: | "Yeah, you...you...d'you...is that...(UI)..." |
| Stanton: | "...Uniontown..." |
| Bridge: | "...Franks is..." |
| Stanton: | "...no, Franks..." |
| Bridge: | "...Franks is an uncle to me." |
| Stanton: | "...yeah." |
| Bridge: | "Federal Judge down there." |
| Source: | "Is he a good guy?  Is he...is he nice...I mean, a good guy?" |
| Bridge: | "I think that he could be (UI).  I mean, I think that (UI)." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page ___46___

| | |
|---|---|
| Stanton: | "Most judges in Uniontown are (UI)." |
| Bridge: | "I mean, I think back (UI)..." |
| Source: | "Oh, I see." |
| Bridge: | "...which is...that's normal.  I mean, let's face it, we're in a...we're in a...like my grandmother made me...she made my wife...and you gotta know my wife...ask Kipp.  My wife is straight-laced as could be..." |
| Source: | "Okay." |
| Bridge: | "...my wife is...you don't get 'em any straight-laced.  She don't believe in drinkin', dancin', nothin'." |
| Source: | "I understand." |
| Bridge: | "Even my grandmother'd go over (UI)..." |
| Stanton: | "(Chuckles)." |
| Source: | "I understand.  I'm with ya..." |
| Bridge: | "...she don't like me callin' bookies or bettin', nothin'." |
| Source: | "...I understand.  I understand." |
| Bridge: | "...but she's...I mean, she's pretty straight-laced and I just...my grandmother just able to make her understand that unless you pay for things..." |
| Source: | "Um-hum?" |
| Bridge: | "...you don't get things." |
| Source: | "Yeah." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___47___

| | |
|---|---|
| Bridge: | "Y'know?  And...an'...an' it...an'...an' I hate to say it, we're in ths nineties, but...I mean, if a guy can go in there and get a car painted, he says hey, (Source's Name), I got this insurance job I need done in a week and it's an eight hundred dollar ($800) job, you're gonna make two hundred dollars ($200). And I come around and I say, hey, (Source's Name), I just busted the fuckin' fender in that truck.  About a fifty ($50) job; and I'm gonna give you fuckin' two grand ($2,000), can I get it over night?" |
| Source: | "Ha!" |
| Bridge: | "You're gonna get fuckin' guys on it, you know that." |
| Source: | "Yeah." |
| Bridge: | "That's the way...that's the way the world works..." |
| Source: | "Yeah." |
| Bridge: | "...money talks, bullshit walks." |
| Source: | "Yeah." |
| Bridge: | "But, I've learned that all my life..." |
| Source: | "Yeah." |
| Bridge: | "...I mean, if you want somethin'...I mean, just...for instance, I just bought a big turkey.  And the guy told me...he's tellin' me three hundred an' sixty bucks ($360) ta get it stuffed, which is not bad because, he said it's gonna take eight months." |
| Source: | "Oh, I see." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of    SOURCE _____ . On 10/13/1998 . Page ___48___

| | |
|---|---|
| Bridge: | "I said, how about I give you five hundred an' sixty bucks ($560). How long can that take?" |
| Source: | "Yeah." |
| Bridge: | "He said, I'll have it done for you..." |
| | (Thump) |
| Bridge: | "...in a month." |
| Source: | "Uh..." |
| Bridge: | "So, that's how, I mean...that's how things ...that's how things work." |
| Source: | "How things work." |
| Bridge: | "I mean...another thing...(UI)...I mean, an' I...that's the way I am. I mean, I've...I want something, I'm...I'm not afraid of admittin' it. If I want them, I'll buy it. I'll buy my way into..." |
| Source: | "Yeah." |
| Bridge: | "Whatever I haveta buy into. I don't have any problem..." |
| Source: | "Well, is there an...anything else you think I should know? Anything...any point? An... any information you think I may, ah..." |
| Bridge: | "...no, I gave...let's say, I give you all the information. Like I said, you...you just approach him. You know, make him aware that...we don't want them to do anything without gettin' paid. That's not a problem." |
| Source: | "A'right." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___49___

| | |
|---|---|
| Bridge: | "We just wanted him to know that...we just wanna know if he can help us." |
| Source: | "Okay." |
| Bridge: | "If he can help us, and we know that...definitely he can help us...show he can help us, he got the money, we move on, and we're in business.  Apparently he's gonna have to talk to some Lieutenant Colonel...he's gonna talk with somebody that's affiliated with the State Police...that's gonna know all that." |
| Stanton: | "The person who eyeballs (UI)." |
| Bridge: | "Yeah.  He's gonna talk to somebody that knows all that means and put it all together and they're gonna...sit down and say, 'Hey, Pete, this kid...we can help him out.  But here's how we got to do it.  You gotta tell this kid you gotta do this.  But what he's gotta do...' 'Cause nine times outta ten, they're probably gonna have directions for what I'm gonna haveta do." |
| Source: | "Okay." |
| Bridge: | "And, like Ben.  Ben...Ben did..." |
| Source: | "Ah, Ben...Ben's the Corporal." |
| Bridge: | "...no, Ben's the kid who just got in.  Pol...politician got him in." |
| Source: | "Okay.  Okay." |
| Bridge: | "Yeah.  He's from Indiana." |
| Source: | "A'right." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On __10/13/1998__ , Page ___50__

| | |
|---|---|
| Bridge: | "He can't come back to Indiana for five years." |
| Source: | "Okay." |
| Bridge: | "'Til the whole thing's blown over.  When he gets out of the Academy and at the end of the Academy...they have options of where they can go.  And he has no options, he's goin' to Harrisburg." |
| Source: | "Okay." |
| Bridge: | "He has to stay down there.  Keep everything slow, cool.  Away from every...where he lives; then he comes back." |
| Source: | "I see." |
| Bridge: | "Then he comes back.  Okay?  I mean they're just watchin' (UI)..." |
| Source: | "You think that...you think that that may, uh ...uh...ahh...play in your case?" |
| Bridge: | "...well, that's pro...oh, yeah.  They're not gonna put you anywhere near the people they're gonna ask questions 'til everything..." |
| Stanton: | "The reason why..." |
| Bridge: | "...'til everything kinda blows over." |
| Stanton: | "...the reason why this is like that... because he has that...a misedemeanor burglary and people really question that (UI)..." |
| Bridge: | "Right!  They're gonna wanna know..." |
| Stanton: | "...where..." |

- FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page 51

| | |
|---|---|
| Bridge: | "...how he got in on a burglary." |
| Stanton: | "...where, uh, if he's in Harrisburg, by the time he gets back to Indiana, all those guys will have been promoted...moved on, or whatever." |
| Bridge: | "Right." |
| Stanton: | "So, the guys that know about it won't be as much there...probably, not to mention by that time the report is going to be gone..." |
| Bridge: | "Yeah.  Every...every..." |
| Stanton: | "...purged..." |
| Bridge: | "...everything needs a..." |
| Stanton: | "...if someone sees..." |
| Source: | "(UI)." |
| Stanton: | "...well, we can't...put the report...it's gone." |
| Source: | "Right, it's gone." |
| Bridge: | "...and' they take care...and things are taken ...I mean, put it this way, anytime politicians involved in this..." |
| Stanton: | "Every two years we...every two years we get rid of our reports that are closed." |
| Source: | "Yeah." |
| Bridge: | "Yeah, so..." |
| Stanton: | "(UI) thrown...I mean...shredder." |
| Source: | "Shred it yeah, gone." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___52___

| | |
|---|---|
| Bridge: | "Now, when...when...when d'you suppose, (Source's Name), you'll see this gentleman?" |
| Source: | "Well, first I...I gotta tell ya this here. What I'm gonna do is...okay? Na...nat... naturally go over it in my mind. Not...case I..." |
| Bridge: | "Sure." |
| Source: | "...you told me, okay? Go there with...with a, like, little card. I think an index card, okay? Umm, I'll...I prob'ly will... (clears throat)...I may or may not recopy your name an' stuff like that. I may just leave it just the way it is." |
| Bridge: | "Right." |
| Source: | "Okay? And then, I might just go down and say...you know, um, this is what we need to do. Umm, how's it look? Okay? Something you ask me...how's it look? And what...what's the chances of this happening?" |
| Bridge: | "Right." |
| Source: | "He may say...(clears throat)...I'm... (Source's Name), I'm on my way out, or I'll get back to you, uh...give me the information, that may be his answer." |
| Bridge: | "Right." |
| Source: | "His answer may...may be yes, but say I'll get back to you. D'you follow me?" |
| Bridge: | "Right. Right." |
| Source: | "Well, uh...I...I don't have any answer for what he could...ya know what I'm sayin'? Understand? I on't have an answer right now." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____, On 10/13/1998 , Page ___53___

| | |
|---|---|
| Bridge: | "That's right.  You just don't know what (UI) you're goin' to..." |
| Source: | "...I...I...you (UI).  I...I'm in virgin territory right now.  Y'follow me?" |
| Bridge: | "Right." |
| Source: | "Okay?  Um...uh...I gotta...uh...uh...as I go ...I'm goin' by what you tell me now.  I'm gonna go an' do that this way.  Okay?  I...on the other hand...I have a different, old fashioned way of doing things.  Okay?  You follow me?" |
| Bridge: | "Okay." |
| Source: | "Umm, but the...but, I'll...I'll...I mean, I'm gonna do what you said.  You know?  I'll... I'll...uh, that's fine with me.  I don't have any problem with that.  And yes...yes, they'll have to get ahold of you.  Umm, in fact,...you know what?  Um...where the heck do I have it at?  I have it here." |
| | (Movement - Short Pause) |
| Source: | "I just had..." |
| | (Short Pause) |
| Source: | "...I had it right here, just a little while ago.  I had..." |
| | (Short Pause) |
| Source: | "Kipp's beeper number.  In fact, I had your call...oh!  Look at this.  It was underneath...underneath my check.  Here..." |
| | (UI Background Noise) |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of   **SOURCE**   , On 10/13/1998 , Page   54

| | |
|---|---|
| Source: | "...I...I...I have a way of...of, uh...of reaching you.  Okay?" |
| Bridge: | "And that we just work through Kipp." |
| Source: | "Yes." |
| Bridge: | "And then we'll know everything's goin' on... we'll get...once you get that...now...now when do you...suppose you have an idea of when you're..." |
| | (UI Background Noise) |
| Bridge: | "...gonna go down to see him...or when you'll be in contact with him.  When will your first, initial contact take place?" |
| Source: | "Well, right now...okay...I want you to know this, okay?  But, right now, after I go everything...prob'ly t'morrow sometime.  I'll go through it in my mind.  YOu follow me? Umm, uh ...I get...you know...as...as, uh...as the day progresses I'll have, like, uh...my card, like I told you about." |
| Bridge: | "Okay." |
| Source: | "And then, what I'll do at that time...okay? Call and see if...if...if he's in town.  In other words...I'm gonna get direction.  I'm not gonna do anything without direction." |
| Bridge: | "Right." |
| Source: | "Okay?" |
| Bridge: | "Jus' like we're doin'." |
| Source: | "Exactly what I'm doin'.  Okay, this would... y'know, this is...just some things that... you know, that...that really get said, like, |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On __10/13/1998__ , Page ___55___

|  |  |
|---|---|
|  | 'are we serious here?'  You know, um...'cause it...there was another point and you had pulled out one time." |
| Bridge: | "No, I didn't pull out.  We couldn't get back ahold o'...we couldn't...could not... communicate..I mean, I been on him for how long, a year?  Ever since I come down here I been on him.  So, the whole time." |
| Stanton: | "(UI)..." |
| Bridge: | "I said, get ahold o' (Source's Name).  What the hell's goin' on here?" |
| Stanton: | "...uh, what happened is, the point...time when, I guess he had changed jobs and I had..." |
| Source: | "Yeah." |
| Stanton: | "...'cause we just (UI), uh..." |
| Source: | "We trusted each other..." |
| Stanton: | "...we just, like, trusted each other...you know, uh, just, uh...uh...not like we stopped tryin' ta do it." |
| Source: | "...just faded away, yeah." |
| Bridge: | "He didn't answer beeps..." |
| Stanton: | "(UI)." |
| Bridge: | "...but, no, I haven't given up..." |
| Stanton: | "(UI) answer my phone calls and I call him back..." |
| Bridge: | "...I mean, in all honesty,..." |
| Stanton: | "...(UI)..." |

· FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ . On _10/13/1998_ . Page ___56___

| | |
|---|---|
| Bridge: | "...if I'da had your pho..." |
| Stanton: | "...(UI)..." |
| Bridge: | "...if I'da had your phone call...phone number after that, I'da called you personally." |
| Source: | "Okay." |
| Bridge: | "Yeah. I'd never...put it this way, I've been on him, non-stop since the first I met ya out here. It's, like, everyday. I mean, I...I'm the one that (UI)....call (Source's Name). See if he..." |
| Stanton: | "An' then when I call him back, he's (UI)..." |
| Bridge: | "...call (Source's Name). Call (Source's Name). And, then, uh...I just...just had a newborn about a week ago." |
| Source: | "Oh, congratulations." |
| Bridge: | "So...yeah. And so, it's just been hectic. An' then...y'know, I figured, well...an' I told Kipp. I called about three weeks ago; you get ahold o' (Source's Name)...we're gonna do this. We're gonna do it now. We're gonna get it over with, get it done. Get the ball movin' an' either it's gonna go or it's not gonna go." |
| Source: | "Right." |
| Bridge: | "I said, let's get this thing..." |
| Source: | "Yeah, you're right. Yeah, le...le...le...at least you know what the next step is in your life." |
| Bridge: | "...right! 'Cause I've had my hopes up now for a year." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page 57

| | |
|---|---|
| Source: | "Right." |
| Bridge: | "I'm gonna get it.  I'm gonna get it.  I'm gonna get it.  I'm gonna get it.  I'm gonna get it.  Y'know?  This thing about...uh... (UI) (Source's Name), (UI) that's...can't get ahold o' him, you know?  It's just been...an' the last year..." |
| Source: | "None, none...hey, this, uh...is...is...has too much time passed by to help you?" |
| Bridge: | "...I don't think." |
| Source: | "No, I'm askin' a question, okay?  Ahh, is too much time passed by since your test?" |
| Bridge: | "Oh, no.  The test is good for two years." |
| Source: | "I mean, is that normal?" |
| Stanton: | "Yeah." |
| Bridge: | "Yeah.  Oh!  I need to know that..." |
| Stanton: | "People that are in...there's a few people the class that just started...it..." |
| Source: | "Yes?" |
| Stanton: | "...that took the test back in ninety-four ('94)." |
| Source: | "Okay." |
| Stanton: | "So, I mean, that's how long that test is, they're pullin' people from that test.  So..." |
| Bridge: | "Well, my test is up to date until the year, uh...two thousand (2000)." |
| Source: | "Okay.  Well..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page ___58___

| | |
|---|---|
| Bridge: | "This test I took is up to date." |
| Source: | "...I didn' know.  I just wanna make sure." |
| Bridge: | "Yeah.  The test I just took, that's, like..." |
| Stanton: | "You just took the test last..." |
| Bridge: | "...this is early, last September..." |
| Stanton: | "...that's...just so they know it..." |
| Bridge: | "...we got the results in..." |
| Stanton: | "...yeah." |
| Bridge: | "...in April.  (UI)?" |
| Stanton: | "It's been a year." |
| Source: | "So, that'll be...that'll be in ninety-seven ('97)?" |
| Bridge: | "Yeah, we took the test in ninety-seven ('97)..." |
| Source: | "A'right." |
| Bridge: | "...yeah, it's good to the year two thousand (2000).  But, no, it's..." |
| | (Loud Background Noise) |
| Bridge: | "...no, I never pulled out.  I was waitin' for somet'in' ta move an' wh...I mean, I've been waitin' for the longest time." |
| | (Background Cough) |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___59___

| | |
|---|---|
| Bridge: | "...my gran...finally, my grandmother said to me...I'm gettin' ready ta go outta town... 'cause her parents are still alive (UI)..." |
| Source: | "Well, I didn't know what this...I didn' know what this nut here was doin'.  All of a sudden I heard about his car was chopped an' scratched and marred.  After, what the hell did he do, lose his mind?" |
| Stanton: | "Your shop caught on fire here." |
| Source: | "I did, we...we had a shop fire.  We did.  We just...we got the place back on its, uh, feet the, 'cause I...the last three months." |
| Bridge: | "What happened?" |
| Source: | "It...oh, it was a car...believe me, uh... this stor...this story goes on forever, so I'll tell you another time..." |
| Bridge: | "Much damage?" |
| Source: | "...it...it...it...it's...it was way up there. My...thank God for Nationwide Insurance. Every time I see a Nation...every time I pass a church, I make a sign of the cross...every time I see a Nationwide sign, I make a sign of the cross.  (Laughs)" |
| Stanton: | "(Laugh) couple of years.  So..." |
| Bridge: | "Well, I..." |
| Source: | "But, ah..." |
| Bridge: | "...I know friends that burn buildings to make more money, but..." |
| Stanton: | "Oh, no.  Please." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

| Continuation of FD-302 of | SOURCE | . On 10/13/1998 . Page | 60 |
|---|---|---|---|

Bridge:    "...Poleezze's Clymer (phonetic)."

Source:    "Oh, I'll tell ya what, I...I...just got my
business...I just started ta get...uh,
focused in...real nice an'...deep into it,
okay, you know?  Or...or...y'know what I'm
saying'?  Everything...an'...an' that
happened.  But, that...that's okay...but...it
looks cleaner, better...it looks better than
it did before.  Umm, but...but, uh...y'know
...happy to, uh, say..."

(Cough)

Source:    "...it wasn't, uh..."

Bridge:    "Happy to get back, huh?"

Source:    "...oh, yeah.  Yeah."

(Cough)

Source:    "In fact, a...wh...wh...my men even worked
...my...like in a section o' the garage, he
even...through that muck just to keep
workin'.  It was amaz...it...uh, I don't even
wanna get into it."

Bridge:    "You keep real busy here, (Source's Name)?"

Source:    "Yeah, I think.  Yeah, I do.  I...I...I've
been really blessed with it, it really have
been."

Bridge:    "Yeah, that's good."

Source:    "I have a lot of repeat business.  I have a
lot of good, loyal people, you know what I'm
sayin'?  Umm..."

Bridge:    "Apparently, if they're comin' from Ohio."

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 , Page 61

|              | (Short Pause) |
|--------------|---------------|
| Source:      | "...don't tell me." |
|              | (Chuckles/Laughter) |
| Source:      | "Just one isolated incident." |
| Bridge:      | "That's still one!  That's good." |
| Source:      | "Yeah.  Yeah, yeah." |
| Bridge:      | "I sure in the hell wouldn't go..." |
| Source:      | "(Laughs)" |
| Bridge:      | "...go ta (UI).  I wouldn't go from Pittsburgh ta fuckin' New York if I had a good friend up there to get it done." |
|              | (Laughter) |
| Source:      | "But, that's just a...an isolated thing; but, um...the only thing that, um...uh...like I say, uh...the good news is it's all behind you know?  And, hopefully...you know, they're a scary thing--fires." |
| Bridge:      | "Oh, yeah." |
| Source:      | "Oh, they're a scary thing." |
| Bridge:      | "Oh, yeah." |
| Stanton:     | "(UI)." |
| Source:      | "(UI).  I was standin' on the street that night...the fire department...I...was as helpless as could be...you know, just watchin' everything that..." |
|              | (Telephone Rings) |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page ___62__

| | |
|---|---|
| Source: | "...(UI)..." |
| Bridge: | "Everything you work for burnin' (UI)..." |
| Source: | "...just..." |
| Bridge: | "...to the ground." |
| Source: | "...burst into, like...like you...you...your body, your tears, everything's, like, burstin', uh..." |

(Background Telephone Ringing)

| | |
|---|---|
| Bridge: | "Was...was you, uh...was you here when it burned?  I mean, was you...did they call you up...uh...(UI)?" |

(Sniffling - Background Telephone Ringing)

| | |
|---|---|
| Source: | "No.  I...I...I'm usually in bed by nine, thirty (9:30), ten  (10:00) o'clock, normally, okay?  And I got a phone call...it was around that time...ten (10:00) or eleven (11:00), or somet'in' like that there that said that the shop...ahh, caught fire, all the men were here, they're (UI)...there were so many people the...the street was packed.  I...you know, eve...this....the...this here was like a ghost town.  I...there was cars, people, everywhere." |

(Background Phone Ringing)

| | |
|---|---|
| Bridge: | "That kinda stuff brings people outta the woodwork." |
| Source: | "Well...they all knew me..." |
| Bridge: | "Yeah, the..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On 10/13/1998 . Page  63

| | |
|---|---|
| Source: | "...the people left around here knew me, you know?  The people that..." |
| Stanton: | "...live here." |
| Source: | "...(UI) the...the...they sympathized, my...my wife, uh, everybody...it was a...I don' want ta think about it.  Anyway, listen. Here's the next step.  I'll...I'll, uh...uh ...make sure that I follow the rule here, okay?" |

(Background Telephone Ringing)

| | |
|---|---|
| Bridge: | "And tell him, he don't have to hesitate if he has an aide, or whoever...somebody to call and talk to me..." |
| Source: | "Okay." |
| Bridge: | "...they can call me any time." |
| Source: | "Okay." |
| Bridge: | "And if they need ta get 'hold of...and sit and talk to me...find out some information, or to get more information, they don't need to to hesitate to call me, they can just call me at home, any time." |
| Source: | "Okay.  Umm, I'm tryin' ta think.  Well, listen, why...why...why...well, that's it and then...then we'll go...and, uh...then...then I'll wait...then I'll get direction and then we'll go to Step Two." |
| Bridge: | "Uh,...yeah...well, see, we need to do..." |
| Source: | "No, then...then when Step Two is me, (UI) see.  Y'know what I'm sayin'?" |
| Bridge: | "...right.  (UI)..." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ . On 10/13/1998 . Page 64

| Source: | "...we need information, we need feedback." |
| Bridge: | "...yeah, we need to see what he can do. That's the feedback." |
| Source: | "Okay." |
| Bridge: | "He's the key right now." |
| Source: | "A'right." |
| Bridge: | "Hey, (Source's Name)! I appreciate everything..." |
| Source: | "Okay." |
| Bridge: | "...you're doin' for me, buddy." |
| Source: | "A'right, gentlemen." |
| Bridge: | "I appreciate it." |
| Source: | "Thank you." |
| Bridge: | "Won't regret it; and, uh..." |
| Source: | "I don't know why you look different. What...wha..." |
| Bridge: | "...last time you seen me." |
| Source: | "..I...I...I...if you woulda come in, I woulda recognized you." |
| Bridge: | "(UI) look different.  (UI) I look different. My hair's a lot longer.  I need a hair cut, bad." |
| Stanton: | "He wasn't wearin' a shirt and tie." |
| Bridge: | "I wasn't wearin' a shirt and tie, I...I had a pair of shorts on." |

FD-302a (Rev. 10-6-95)

194D-PG-58817

Continuation of FD-302 of ___SOURCE_____ , On _10/13/1998_ , Page __65__

| | |
|---|---|
| Source: | "Yeah." |
| Bridge: | "I was dressed up in my coke attire... (chuckles)." |
| Stanton: | "(UI) make you wear those white coke shirts ...all. (UI)." |
| Bridge: | "And so does our code, but the supervisors don't haveta wear a coat. I mean wear a white coat. So we're fine. I just go like this...I mean, go like this and drink a lot of coke." |
| | (Phone Ringing in Background) |
| Stanton: | "(Laughs)." |
| Source: | "A'right." |
| Bridge: | "It's small...out there." |
| Stanton: | "(UI)." |
| Bridge: | "(UI)." |
| Source: | "A'right, partner." |
| Bridge: | "...hey, uh..." |
| Source: | "Okay...a'right, I'll walk ya down. I gotta ...I gotta lock the, uh..." |
| Bridge: | "(UI)." |
| | (Phone Ringing in Background) |
| Bridge: | "Yeah, I appreciate it, (Source's Name). As soon as we can find out...." |
| Source: | "You have to leave the phone ring. (UI) the damn thing..." |

27

1

1    U.S. DISTRICT COURT FOR THE MIDDLE

2          DISTRICT OF PENNSYLVANIA

3              * * * * * * *

4    DARRELL G. OBER,    *

5         Plaintiff    * No.

6         vs.          * 1:CV-01-0084

7    PAUL EVANKO, MARK   *

8    CAMPBELL, THOMAS    *

9    COURY, JOSEPH       *

10   WESTCOTT,           *

11   HAWTHORNE CONLEY,   *

12        Defendants    *

13            * * * * * * *

14        VIDEOTAPE DEPOSITION OF

15          LOUIS J. LAZZARO

16          APRIL 22, 2002

17

18

19

20

21

22

23   Any reproduction of this transcript

24   is prohibited without authorization

25       by the certifying agency

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

2

DEPOSITION

OF

LOUIS J. LAZZARO was taken on behalf

of the Defendants herein, pursuant

to the Rules of Civil Procedure,

taken before me, the undersigned,

Susan M. Harshell, a Court Reporter

and Notary Public in and for the

Commonwealth of Pennsylvania, at 114

South Main Street, Third Floor,

Greensburg, Pennsylvania, on Monday,

April 22, 2002, at 11:25 a.m.

3

1           A P P E A R A N C E S

2

3   DON A. BAILEY, ESQUIRE

4   4311 North 6th Street

5   Harrisburg, PA  17110-1614

6        COUNSEL FOR PLAINTIFF

7

8   JOANNA N. REYNOLDS, ESQUIRE

9   Pennsylvania State Police

10  Assistant Counsel

11  Office of Chief Counsel

12  Governor's Office of General Counsel

13  1800 Elmerton Avenue  .

14  Harrisburg, PA  17110

15       COUNSEL FOR DEFENDANTS

16

17  GARY M. LIGHTMAN, ESQUIRE

18  Lightman & Welby

19  2705 North Front Street

20  Harrisburg, PA  17110

21       COUNSEL FOR DEFENDANTS

22

23

24

25

4

I N D E X

WITNESS: LOUIS J. LAZZARO

EXAMINATION

  BY ATTORNEY BAILEY           9-74

EXAMINATION

  BY ATTORNEY REYNOLDS       74-84

CERTIFICATE                   85

5

1        <u>EXHIBIT PAGE</u>

2                                    <u>PAGE</u>

3    <u>NUMBER</u>    <u>IDENTIFICATION</u>    <u>IDENTIFIED</u>

4            NONE OFFERED

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

## OBJECTION PAGE

| ATTORNEY | PAGE |
|----------|------|
| BAILEY | 77 |
| BAILEY | 78 |
| BAILEY | 83 |
| BAILEY | 83 |

7

1          P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - -

3              THE VIDEOGRAPHER:

4          My name is name

5     Michael Solomon.  I'm

6     employed by Sargent's

7     Court Reporting Services.

8     The date today is April

9     22nd, 2002.  The time is

10    11:25 a.m. This deposition

11    is being taken in

12    Greensburg, Pennsylvania.

13          The caption of this

14    case is: In the United

15    States District Court for

16    the Middle District of

17    Pennsylvania, Darrell G.

18    Ober, Plaintiff, versus

19    Paul Evanko, Mark

20    Campbell, Thomas Coury,

21    Joseph Westcott, Hawthorne

22    Conley, Defendants.  The

23    witness is Louis J.

24    Lazzaro.  Would the

25    attorneys present state

8

1     your names and the parties

2     that you represent?

3            ATTORNEY BAILEY:

4            Yes, my name is Don

5     Bailey.  I represent the

6     Plaintiff, Darrell G.

7     Ober.  My address is 4311

8     North Sixth Street,

9     Harrisburg, Pennsylvania

10    17110.  Phone number area

11    code 717-221-9500, FAX

12    9600.

13            ATTORNEY LIGHTMAN:

14            My name is Gary M.

15    Lightman,

16    L-I-G-H-T-M-A-N.  I'm

17    representing the interests

18    of the Pennsylvania State

19    Troopers Association.  My

20    address is 2705 North

21    Front Street, Harrisburg,

22    Pennsylvania 17110.  And

23    my telephone number is

24    717-234-0111.

25            ATTORNEY REYNOLDS:

9

1          My name is Joanna

2      Reynolds.  I'm an

3      Assistant Counsel with

4      Pennsylvania State

5      Police.  I represent the

6      Pennsylvania State Police

7      Defendants in this

8      matter.  My address is

9      1800 Elmerton Avenue,

10      Harrisburg, PA 17110.  And

11      my office telephone number

12      is 717-783-5568.

13          THE VIDEOGRAPHER:

14          The Court Reporter

15      may now administer the

16      oath.

17          COURT REPORTER:

18          Would you raise your

19      right hand, sir?

20  - - - - - - - - - - - - - - - - -

21  LOUIS J. LAZZARO, HAVING FIRST BEEN

22  DULY SWORN, TESTIFIED AS FOLLOWS:

23  - - - - - - - - - - - - - - - - -

24  EXAMINATION

25  BY ATTORNEY BAILEY:

10

1   Q.          Mr. Lazzaro, how are you

2   this morning?

3   A.          Fine, thank you.

4   Q.          Sir, do you have any

5   particular way that you'd like to me

6   address you, Lou or Mr. Lazzaro?

7   A.          Lou is fine.

8   Q.          I'm Don.  I think you know

9   me, we met before so it's not our

10  first meeting.  Let me go over just

11  a few initial instructions here to

12  give you an idea of how I do

13  depositions.  First of all, I want

14  you to know that all I'm interested

15  in is a good fact record.  So

16  contrary either possibly to either

17  other proceeding you've been in or

18  what you've seen on TV, we're not

19  interested in distorting the record

20  or getting you into some cul de sac

21  and twisting things around.  In that

22  regard, this is an invitation that

23  goes not just to you, but to your

24  attorneys.  If at some time you want

25  know where I'm going with a

11

1   question, even if you're just

2   curious or if you want to know,

3   certainly, if you want to know what

4   I mean by a question, I don't want

5   you to be the least bit reticent

6   about asking me.  I'll be happy to

7   explain.  I don't mind you asking me

8   any question at all.  From time to

9   time, I may change direction with a

10  group of questions.  If I do that,

11  I'll certainly let you know and try

12  to give you some warning of that so

13  that your mind can change gears.

14  Now, it's very important so that we

15  get a good record that we let a

16  little bit of time pass between the

17  question and the answer and so that

18  the stenographer can --- you know,

19  can get those things down in

20  particular.  And also, Lou, if I,

21  and I assure it will be error on my

22  part if I do it, if I interrupt you

23  or tramp on the toes of your answer,

24  so to speak, make sure these are

25  fine attorneys representing you, but

12

1   if they don't catc  it, make sure

2   that you finish and complete your

3   opportunity to answer, okay?

4   A.        All right.

5             ATTORNEY BAILEY:

6             Counsel, before we

7        begin, I would assume that

8        the --- what are generally

9        referred to as the, quote

10       unquote, usual

11       stipulations, objections

12       except as to the form of

13       the question reserved to

14       the time of trial is

15       acceptable.  Is that okay

16       Gary and Joanna?

17            ATTORNEY REYNOLDS:

18            That's fine.

19            ATTORNEY LIGHTMAN:

20            That's fine with me.

21  BY ATTORNEY BAILEY:

22  Q.        Lou, do you have at least

23  some --- do you have any questions

24  of me before we begin?

25  A.        No, sir.

13

1  Q.        Are you familiar with the

2  lawsuit that is the object of this

3  deposition here today?

4  A.        Somewhat so, yes, sir.

5  Q.        Tell me what you know

6  about it.

7  A.        I think the lawsuit

8  addresses the issue of adverse

9  treatment by the Department against

10 Captain Ober.

11 Q.        And when did you first

12 learn about that lawsuit?

13 A.        I don't recall.  I don't

14 recall when I first became --- I'm

15 not --- I don't have dates in mind

16 when it was filed and so forth, so

17 I'm vague on dates.

18 Q.        My understanding is that

19 you recently retired from the

20 Pennsylvania State Police; is that

21 correct?

22 A.        That's correct.

23 Q.        And what was your rank

24 when you retired?

25 A.        Corporal.

14

1    Q.        Corporal. Now, Lou,

2    during your service with the

3    Pennsylvania State Police, let's say

4    the two to four years prior to you

5    retiring, my understanding is that

6    you held a position with the

7    Pennsylvania State Troopers

8    Association?

9    A.        That's correct, I was the

10   president.

11   Q.        President of the

12   Association. Now, do you have a

13   recollection of representing --- the

14   Union representing rather, Darrell

15   Ober?

16   A.        Yes.

17   Q.        And now, obviously at

18   least with the Pennsylvania State

19   Police you represent roughly 4,000

20   people?

21   A.        Around 4,200.

22   Q.        4,200. Do you have a

23   recollection at some time of

24   becoming aware that Darrell had some

25   sort of a conflict with the

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

15

1  management of the Pennsylvania State

2  Police?

3  A.        Yes.

4  Q.        Can you tell me when that

5  was to the best of your

6  recollection?

7  A.        It was probably the early

8  part of 2000, I believe.  I think

9  some point in time there, I believe.

10  Q.        And Lou, who did you hear

11  it from?  How did it come to your

12  attention, if I may?

13  A.        I first became aware of

14  Captain Ober --- my recollection was

15  he was going to be assigned out here

16  to the Washington area to coordinate

17  state police personnel for the

18  National Governor's Association

19  meetings in State College in July of

20  2000.

21  Q.        Okay.  Is there something

22  with the Republican Convention and

23  there was something with the

24  National Governor's Association;

25  right?

16

1   A.          This was the National

2   Governor's Association.

3   Q.          Okay.  Am I in error or

4   were you assigned to duties with the

5   National Governor's Association?

6   A.          I was assigned.

7   Q.          You were detached?

8   A.          I was assigned, I wasn't

9   detached.

10  Q.          You were assigned.  What

11  duties were you assigned to with the

12  National Governor's Association?

13  A.          I was assigned to escort

14  the Governor of the Virgin Islands.

15  Q.          Lou, did you at any time

16  ever request Darrell Ober be

17  assigned of those duties or

18  functions with the NGA?

19  A.          No.

20  Q.          When were you assigned

21  those duties?

22  A.          I believe I knew about it

23  in November of '99.  At the time, I

24  went to the Dignitary Protection

25  School, so I kind of knew at that

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

17

1  time.

2  Q.        Okay.  Now, I'm going to

3  change gears a little bit now and go

4  back.

5  A.        Fine.

6  Q.        Yeah.  I want to ask you.

7  You said that at some point you had

8  learned that Darrell had a conflict

9  over coming --- something about

10  coming out to the west or the NGA or

11  something?  Can you tell me ---?

12  A.        Well, not to the NGA, but

13  preparation for the NGA.

14  Q.        Preparation for the NGA?

15  A.        I don't know exactly what

16  the duties were, but I later learned

17  that those were handled by Captain

18  Young.

19  Q.        Well, Captain Young was

20  promoted when he took that

21  assignment; wasn't he?

22  A.        Yes.

23  Q.        Was the --- wasn't the

24  offer to take that assignment,

25  wasn't the promotion part of that

18

1  offer?

2  A.        Well, he went from

3  lieutenant to captain and was

4  assigned here, so I guess it was

5  part and parcel of the assignment,

6  yes.

7  Q.        Now, Lou, you had

8  indicated that you had heard about

9  this conflict, assignment for

10  preparation for the NGA and that

11  Darrell Ober had a conflict.  Where

12  did you first hear about it?  In

13  other words, you know, what was the

14  methodology?  Did you hear it from

15  someone, did you get a piece of

16  paper, your lawyers, you know, where

17  did you hear about it?

18  A.        I'm not quite sure where I

19  heard or who I first heard it from.

20  I'm just trying to think back.  It

21  could been have been from the local

22  lodge in Harrisburg, I'm not quite

23  sure.

24  Q.        Okay.

25  A.        Mike Ruda I talked to I

19

1  know.

2  Q.          R-U-D-A, Mike Ruda?

3  A.          Yeah, R-U-D-A.

4  Q.          Now, Darrell Ober called

5  you about it; isn't that correct?

6  A.          We've talked, yes.  We've

7  called back and forth, I guess.

8  Q.          Did you know about it

9  before Darrell called you?

10  A.          I believe I did.

11  Q.          And that's --- if this

12  helps refresh your recollection at

13  all, do you know --- have a

14  reflection of how long you knew

15  about it and where you learned about

16  it before Darrell called you?

17  A.          I'm not quite sure at what

18  point he called, but I do, --- you

19  know, I do recall that Darrell had

20  enlisted the attorneys from Maryland

21  to represent him following an

22  injunction, so I think I talked to

23  him afterward, after the contact

24  with the initial attorneys that

25  represented him on the injunctions.

20

1  Q.        Okay.

2  A.          I don't think I talked to

3  him before that because I wasn't

4  aware an injunction was being filed.

5  Q.        Okay.  Now, let me ---

6  let's see if we can --- if I can

7  clarify this.  Obviously, I wasn't

8  there, so I need just a little bit

9  of help.  Is it fair to say that

10 your best recollection is that when

11 you first talked to Darrell about

12 it, I'm going to assume that Darrell

13 called you; am I correct?

14 A.        Yes.

15 Q.        Okay.  I mean, you're the

16 president of the union, obviously,

17 he's going to be motivated to call

18 you.  Is it my --- do I understand

19 your testimony correctly that at the

20 time that Darrell Ober called you,

21 your best recollection at this time

22 is that Mr. Ober had already filed

23 the injunction with the union?

24 A.        Yes.

25 Q.        . All right.  Now, Gary

21

1    Lightman is a gentlemen I very much

2    respect, he's here.  I'm going to

3    ask some questions, not to intrude

4    on his toes, but I understand --- so

5    you, you know, understand that

6    comedy among Counsel is a very

7    important thing and I want to make

8    sure I'm going to ask some questions

9    now about a meeting which my client

10   has given me to give you a little

11   bit of an offer here, given me to

12   understand what took place where he

13   was present and you were present,

14   Mr. Lightman was present.  There may

15   have been other people there.

16                  ATTORNEY BAILEY:

17                  That would not ---

18                  Gary, that would not be a

19                  privileged conversation.

20                  ATTORNEY LIGHTMAN:

21                  No, it wasn't.

22   A.         There was only three of us

23   there.

24   BY ATTORNEY BAILEY:

25   Q.    .      Okay, sir.  Lou, where did

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

22

1   that conversation take place?

2   A.          In my office at the PSTA

3   Building.

4   Q.          What was it about?

5   A.          It was about --- it was

6   about the transfer.

7   Q.          Okay.

8   A.          And that's basically what

9   it was about.

10  Q.          Now, what was Mr. Ober's

11  position on the transfer as you

12  remember it --- strike that.  Let me

13  lay a little foundation.

14              Did Mr. Ober present the

15  position that the transfer was

16  punitive and disciplinary in nature?

17  A.          I believe he did.

18  Q.          Did you disagree with

19  that?

20  A.          I think that I may have

21  disagreed with it because the

22  history has been the Commissioner

23  has been able to transfer or assign

24  captains throughout the state at his

25  discretion.

23

1  Q.        Now, did you convey that

2  to Mr. Ober ---

3  A.        Yes.

4  Q.        --- that you remember?

5  Okay.  And was this meeting --- this

6  meeting that took place in your

7  office with you and Gary and Mr.

8  Ober present, that was after Mr.

9  Ober had the injunction filed; is

10  that correct?

11  A.        Yes.

12  Q.        Okay.  Well, what's your

13  understanding of why the

14  Commissioner rescinded the transfer?

15  A.        There was a hearing, I

16  believe, before the Commonwealth

17  Court and whatever happened there, I

18  never was apprised of it, I never

19  attended.  What that agreement was,

20  I was not part of it.  The PSTA

21  wasn't part of it.

22  Q.        Okay?

23  A.        So that's something the

24  Commonwealth can answer better than

25  I can.

24

1    Q.        Yes, sir.  I'm not being

2    facetious here, I'm really not being

3    facetious.  Did you ever come to

4    understand that the Commissioner had

5    rescinded the transfer out of love

6    and compassion?

7    A.        No.

8    Q.        Okay.  Now, going back to

9    that meeting, it is my understanding

10   that Gary objected to the

11   methodology.  Now, I'm going to ---

12   let me do this in fairness to Gary.

13   I don't want to --- you know, he's

14   sitting here, I'm not --- I didn't

15   know he would be here today,

16   incidentally, not that that --- it

17   wouldn't change my questions any.

18   But I'm not here to embarrass

19   attorneys.  And there's nothing that

20   I will ask that would in any way be

21   embarrassing, but it's sort of odd I

22   want Mr. Lightman to know that I'm

23   going to ask you these questions

24   from now on, I'm not going to ask

25   you per se about Mr. Lightman's

25

1    position, but I'm going to ask you

2    --- because I'm going to view it as

3    a union position, so I'm going to

4    ask you if this is a PSTA Decision.

5    Can we agree with that, the

6    Pennsylvania State Troopers

7    Association?

8    A.        Yes.

9    Q.        Was the union position

10   such that they objected to Mr.

11   Ober's methodology?

12   A.        As far as?

13   Q.        All right, sir.  This is

14   my --- let me give you a little

15   offer here.

16   A.        Okay.

17   Q.        It might this being a

18   civil deposition, it might help us

19   move along.  It's my understanding,

20   obviously, from conferring with my

21   client that there were --- the union

22   had expressed some concerns about

23   the methodology used, that the

24   injunction had been filed and the

25   grievance procedure had not be used

26

1   solely.  Now, it's my understanding

2   that at some point at least part of

3   the grievance issues were resolved

4   and rendered moot by virtue of what

5   the state police did, management

6   did; am I correct about that?

7   A.        I believe so.

8   Q.        Something like that.

9   A.        Yes.

10  Q.        Okay.  Whatever the

11  technical things were that sort of

12  amounted to that.  But at this

13  meeting, is it fair to say that the

14  Union did not want Mr. Ober to file

15  the injunction because, quite

16  frankly, from the standpoint of

17  trying to represent an entire union,

18  if everybody went off and did their

19  own thing, that would create

20  problems for the Union; is that fair

21  to say?  If it's not, you can

22  correct it.

23  A.        The first part about not

24  wanting him to file the injunction,

25  I never had the opportunity to

27

1   express one way or the other because

2   it was already filed.  Frankly, that

3   was probably the first time I ever

4   experienced an injunction being

5   filed on one of members or parties

6   part outside of the union.

7   Q.          Okay.  Now, if the

8   union --- had the union already had

9   an injunctive request pending or in

10  the works when Mr. Ober filed the

11  injunctive request ---

12  A.          No.

13  Q.          --- had the private

14  attorneys?

15  A.          No.

16  Q.          Why not?

17  A.          Well, if his transfer was

18  disciplinary in nature, you know, we

19  have a process in the grievance

20  procedure under the contract, you

21  file a grievance.

22  Q.          Okay.  But if you didn't

23  view the transfer as disciplinary in

24  nature, why were you seeking an

25  injunctive ---?

28

1   A.        I didn't say I didn't view

2   as disciplinary.

3   Q.        Oh.

4   A.        I said if he viewed it as

5   disciplinary, then he could file the

6   grievance on it.

7   Q.        And request injunctive

8   relief?

9   A.        Right.  The problem I

10  think that he may have had, he had

11  to take the transfer first before

12  this process would be activated.

13  Q.        Right.  Wasn't it his

14  position that because of his family

15  and et cetera, that that's not a

16  price that he wanted to pay because

17  he did view it as punitive in

18  nature?

19  A.        Yes.

20  Q.        Sir, do you remember what

21  knowledge you had of the underlying

22  problem at that time?  And by that I

23  mean --- well, let's not assume

24  facts not in evidence.  Do you know

25  whether Mr. Ober had even been

29

1    contacted as a courtesy about being

2    transferred prior to being

3    transferred?

4    A.        By.

5    Q.        Anyone, sir.

6    A.        I don't know that.

7    Q.        So he may have been he may

8    not have been, but at that time you

9    didn't know, you didn't know the

10   facts; is that correct?

11   A.        No.

12   Q.        I'm not implying, by the

13   way, that he was not called before

14   he was notified.  And that begs a

15   second question, do you know --- did

16   you know at the time of the meeting

17   between you and Mr. Lightman and Mr.

18   Ober whether Mr. Ober had any

19   choices or was he just called up and

20   notified what was going to be

21   happening to him in a few days?  Did

22   you know any of those facts?

23   A.        I don't know that.

24   Q.        Can you tell me why you

25   assumed then when you first talked

30

1  to him that it was not a punitive or

2  disciplinary transfer or am I wrong

3  in that, you didn't feel that way?

4  A.      I didn't know one way or

5  the other whether it was

6  disciplinary.  Here again, Captain

7  Ober would have to articulate

8  whether it was discipline or not, by

9  his own knowledge of what happened.

10  That would probably come into play

11  had a grievance been filed for him

12  to articulate that, whether it was

13  disciplinary in nature or not.  But

14  he would have had that opportunity

15  to file a grievance if it would have

16  came to a grievance.  Obviously, the

17  injunction and subsequent actions

18  after the injunctions precluded a

19  grievance being filed over the

20  transfer issue, so I don't know what

21  would have happened.

22  Q.      But wouldn't he have had

23  to go through with that transfer

24  until the grievance was processed?

25  A.      Yes.

31

1   Q.        And do you know --- do you
2   have any idea how long, Lou, that
3   would have taken?  Is that just
4   speculation?
5   A.        I have past experience
6   with disciplinary transfers and I
7   know Captain Ober worked for the
8   Bureau.  I kind of suspect it
9   probably would have lasted until at
10  least after the detail was done.
11  Q.        And when was it scheduled
12  for?
13  A.        July.
14  Q.        Lou, there was a grievance
15  filed; wasn't there?
16  A.        Not on the transfer.
17  Q.        There was not?
18  A.        Not to my knowledge.
19  Q.        Okay.  Okay.  Now, if you
20  can tell us, what was the result of
21  the meeting?  I mean, what
22  conclusions were reached, if any,
23  what, you know, --- what did it
24  resolve, if anything?
25  A.        I don't believe anything

32

1  was resolved.  I think it was just

2  expressions of what he had to say

3  and what the position of the PSTA

4  was.

5  Q.        Who had requested the

6  meeting?

7  A.        I think we had talked

8  about it and I says, we can have a

9  meeting.  I don't whether I

10  requested or it was more of an offer

11  than a request and he was amenable

12  to that.

13  Q.        Okay.  During the meeting,

14  did Mr. Ober complain about what the

15  union was doing or how it was

16  handling things?

17  A.        I don't know that he

18  complained.  I don't know that he

19  agreed, but I don't know that he

20  complained.

21  Q.        Okay.  Lou, did Mr. Ober

22  raise the issue of help or payment

23  with his legal costs at the meeting?

24  A.        I'm not quite sure if the

25  legal costs was raised at the

33

1   meeting, but I do know that legal

2   costs came up later on.  Whether it

3   was there or not, I don't recall

4   exactly what point in time the legal

5   costs came up.  I don't know if that

6   was available at that time or not.

7   It could have.

8   Q.          What was the nature and

9   tone of the meeting?  Was it --- I

10  happen to know all three of you and

11  you all seem to be very reasonable

12  people to me.  Was there any kind

13  of --- was there any kind of

14  disagreements, arguments, threats or

15  anything like that?

16  A.          There's no threats.

17  Q.          Matter of fact, it's not

18  in your nature to behave that way;

19  isn't that fair to say?

20  A.          No.

21  Q.          It's certainly not Mr.

22  Lightman's nature to behave that

23  way; is that correct?

24  A.          I'd have to let him speak

25  for himself.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

34

1    Q.        All right, fair enough.

2    You're supposed to back your

3    attorney up, Lou.  Come on.

4    A.        I can't --- I will

5    say ---.

6    Q.        This is an old work horse

7    here.  You're supposed to back him

8    up.  Mr. Ober, to the extent you

9    know Mr. Ober, that's not in his

10   nature; is it?

11   A.        I don't think so.  I know

12   Darrell.

13   Q.        All right, sir.  Now, let

14   me go back to the issue of the

15   request for financial help.  It is

16   my understanding from looking at

17   documents that Mr. Ober made a

18   number of requests for financial

19   help, both to the Department of the

20   Pennsylvania State Police and to the

21   union.  As to the union, do you have

22   a recollection of Mr. Ober making

23   requests for financial help to

24   reimburse him?

25   A.        Yes.

35

1  Q.        And Lou, what can you tell

2  us about it?  I want you to --- if

3  you'll do this for me, sir, sit back

4  and take a moment to reflect and

5  really try to piece this together in

6  your mind.  For reasons that will

7  become apparent through, again, I'm

8  not one of these believers in

9  surprises in depositions, I just

10  want a good solid fact record.  This

11  is an a important material issue.

12  I'd like to ask you to please give

13  it your best thought and reflection,

14  go back and tell us what you can

15  remember about what Mr. Ober did in

16  making requests for --- that you can

17  recollect in making requests for

18  financial assistance and

19  reimbursement.

20  A.        I can speak from the

21  request as the part of the PSTA.

22  I'm not quite sure it was $14,000 or

23  $17,000 that he had incurred in

24  expenses with the attorneys.  My

25  concern at this point was that he

36

1   had gone off on his own and hired

2   his own attorneys outside of the

3   normal process, so it now became an

4   issue of whether the union was going

5   to grant him any financial aid for

6   whatever reasons.  So subsequent to

7   that, I had a board of directors

8   meeting and even had Mr. Ober come

9   before the board of directors to

10  present his case, which was probably

11  out of the norm, but I felt that

12  with that amount of money and also

13  employing his own attorneys when we

14  had our own in-house attorneys.  I

15  had a problem with that.  So he

16  presented his request to the board

17  of directors and subsequent to that,

18  I think there was a motion to grant

19  him $2,500, I don't know if it was

20  $2,500 or $5,000.  So that was my

21  last dealing with the financial end

22  of it.

23  Q.        Lou, was that --- help me

24  sort a few things out.  There's a

25  state --- what an FOP lodge?

37

1    A.         State FOP, yes.

2    Q.         Now, the state FOP, what

3    is the state FOP as opposed to the

4    State Troopers Association?

5    A.         It's basically a separate

6    entity.

7    Q.         Okay.

8    A.         A lot of our members

9    belong to the State FOP, but our

10   association represents our members

11   solely for collective bargaining

12   purposes and grievances.

13   Q.         So you're a --- you're

14   under the laws of United States and

15   for that matter the State of

16   Pennsylvania, whatever NLRB

17   jurisdiction they may fill up,

18   represents the workers, represents

19   them in the lawful capacity as a

20   union representing member?

21   A.         That's correct.

22   Q.         The FOP is an association

23   that apparently, I don't know, for

24   want of a better term, I guess, is

25   an association where policemen from

38

1  all different kinds of places and

2  law enforcement come together to do

3  things?

4  A.        That's correct.

5  Q.        Is there a policy with the

6  PSTA that rec --- in situations

7  where members request financial

8  assistance that they need FPA ---

9  approval or vice versa, do you know?

10  A.        If they're FOP members.

11  Q.        Okay.

12  A.        They have a right to a

13  local lodge, which is the first

14  process to request financial aid.  A

15  lot of times the local lodges will

16  grant aid and then they also will

17  request that the state lodge grant

18  aid, two separate requests for aid.

19  But if they're not FOP members, but

20  PSTA members, that necessarily

21  wouldn't apply because they are not

22  FOP members.

23  Q.        That straightens it out.

24  When Darrell was talking to ---

25  you're talking about to a board,

39

1    that was FOP or was that PSTA?

2    A.          PSTA.

3    Q.          That's where I was getting

4    confused.

5    A.          PSTA.

6    Q.          Now, the PSTA did vote to

7    give Darrell some money?

8    A.          Yes.

9    Q.          All right.  Now, are there

10   minutes of that meeting?

11   A.          Yes.

12   Q.          All right.  Did you speak

13   to --- was there some type of motion

14   to benefit Captain Ober?

15   A.          Yes.

16   Q.          Did you speak to the

17   motion?

18   A.          I can't from the chair.

19   Q.          Okay.  Do you remember who

20   made the motion?

21   A.          I'd be guessing at this

22   point.  I mean, the record will

23   indicate who made the motion.

24   Q.          I'm sure.  Was there a

25   gentleman from the northeast who

40

1  seconded the motion?

2  A.        There again, I'm not quite

3  sure, I'd just be dropping names.

4  Q.        Let me give you a little

5  help here.  Did the gentlemen Sarkis

6  play a role in either one of those

7  two, first or second the motion?

8  A.        He may have.

9              ATTORNEY BAILEY:

10             Off record.

11  COUNSEL AND CLIENT CONFER

12             ATTORNEY BAILEY:

13             Sorry, sir, let me

14             get your mic back.

15  BY ATTORNEY BAILEY:

16  Q.        McCommon, is there

17  somebody named McCommon?

18  A.        McCommons, Paul McCommons.

19  Q.        Paul McCommons.  Did he

20  make the motion?

21  A.        I think that he did.

22  Q.        You had recollected, I

23  think, a request of 14K or $14,000

24  or $17,000?

25  A.        I'm not quite sure of the

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

41

1  figure, but yes.

2  Q.        Do you remember how much

3  the union gave him?

4  A.        I think it was $2,500.

5  Q.        Okay.  Do you know why or

6  how that figure arose?

7  A.        The maker of the

8  motion ---

9  Q.        Okay.

10  A.        --- came up with that

11  figure.  I don't know how he came up

12  with it, there's no discussion on

13  the amounts or anything, in my

14  presence anyway.

15  Q.        Okay.  Do you remember

16  when this meeting took place?

17  A.        As far as date, no.

18  Q.        Okay.  Was there --- did

19  Darrell make any requests of

20  national groups for money?

21  A.        I believe he did, yes.

22  Q.        And do you remember, was

23  it national FOP or something or

24  what, if you remember what it was?

25  A.        National I know he did.

42

1  Q.        Okay.

2  A.        State, I think.  I think,

3  but I'm not ---.

4  Q.        Do you know ---

5  A.        I'm pretty sure he did.

6  Q.        --- if the national ---

7  I'm sorry, I interrupted you, I'm

8  sorry.

9  A.        No, that's ---.

10 Q.        Okay.  You say the

11 national bid or there was something?

12 A.        I know he requested

13 national and I think he did the

14 state.  I'm pretty sure he did

15 because I recall that at one of

16 state board meetings of the FOP I

17 think it came up.

18 Q.        So the $2,500 was the

19 local lodge?

20 A.        No, that was the PSTA.

21 Q.        That was the PSTA?

22 A.        The local lodge would have

23 been local lodge, I believe, 41

24 which is the Harrisburg lodge where

25 he's a member, I believe.

43

1   Q.        Do you know whether they

2   provided any money?

3   A.        I don't know.

4   Q.        Who was the head of was it

5   Mike Lutz?

6   A.        Mike Ruda.

7   Q.        Mike Ruda?

8   A.        Of the local lodge.

9   Q.        Of the local lodge.  Do

10  you know whether they provided any

11  financial support?

12  A.        I think that they did, but

13  I'm not sure.

14  Q.        Did you ever discuss the

15  issue with Mike Lutz?  The issue

16  being Mr. Ober's request for money.

17  Did you ever help to defer his law

18   --- his legal expenses?  Did you

19  ever discuss the issue with Mike

20  Lutz?

21  A.        I don't believe I did.

22  Q.        Now, Mike Lutz at the time

23  would have headed up the State FOP

24  Lodge?

25  A.        Still does, yes, sir.

44

1    Q.         And do you know whether or

2    not Mr. Ober made any request of

3    national or does that require state

4    and local approval?

5    A.         No, he did make a request

6    of national.

7    Q.         Now, I ---?

8    A.         And I believe they --- I

9    don't know what happened.  I think

10   they may have referred it back to

11   the state, because they normally

12   tell you to see what you can do with

13   your state before you come to the

14   national.  So at that point, ---

15   Q.         Okay.

16   A.         --- I don't know whether

17   the state had done anything or

18   whether they ever did anything.  I

19   still don't know to this date

20   whether they did.  But the procedure

21   is, you go to the state first and

22   from the state, it goes to

23   national.  So you can't bypass the

24   state and go straight to the

25   national is what I'm trying to say.

45

1    Q.        Yes, sir, I understand.

2    Lou, prior to Darrell filing this

3    injunction, how many other cases do

4    you know of where Pennsylvania State

5    Police Officers or Troopers filed

6    injunctions on transfers?

7    A.        I don't recall any of

8    them.

9    Q.        Okay.  Typically, they had

10   gone through the union; is that

11   correct?

12   A.        Yes.

13   Q.        And typically whatever

14   course the union set, they had

15   followed; is that correct?

16   A.        Yes.

17   Q.        In this case, is it fair

18   to say that there was a respectful

19   disagreement between the union and

20   Mr. Ober about what to do?  And if

21   you object to the word respectful,

22   tell me how you would characterize

23   it.

24   A.        I believe there was.  I

25   believe there might have been a

46

1   disagreement on it.

2   Q.          Okay.  But the word I was

3   looking for was the word respectful,

4   that there was an honest

5   disagreement; is that fair to say?

6   A.          I don't think --- I think

7   that that's fair.

8   Q.          And that it was not a

9   disagreement characterized by anger,

10  threats or anything of that sort on

11  either side.  It was handled as

12  gentlemen handle differences; is

13  that fair to say?

14  A.          That's fair to say.

15  Q.          Okay.  And that God

16  willing Mr. Ober did succeed in his

17  objections, according to the

18  Commissioner was through compassion

19  and concern.  According to Mr. Ober,

20  it was the hard impact of the law.

21  But the point, in fact, is Mr. Ober

22  did succeed; is that correct?

23  A.          Yes.

24  Q.          All right.  Now, do you

25  have a recollection of ever

47

1  discussing Captain Ober's state of

2  mind with any managers of the

3  Pennsylvania State Police, more

4  specifically the front office?

5  A.          State of mind --- I knew

6  he was upset.  What his state of

7  mind, you know, that's judgmental, I

8  guess, but I know that in my

9  conversations, the fact that he was

10  going clear across the state didn't

11  sit too well, plus being away from

12  the family.  So I would say he was

13  upset.

14  Q.          Well, those things didn't

15  surprise you?

16  A.          No.

17  Q.          If they would have

18  happened to the fine gentleman from

19  Southwestern Pennsylvania named Lou

20  Lazzaro, it might have upset him;

21  isn't that fair to say?

22  A.          Probably so.

23  Q.          Oh, sure.  Any human being

24  on a very short notice of transfer,

25  it wouldn't be?

48

1   A.          Daily routine life

2   changes, yeah.

3   Q.          Absolutely.  You wouldn't

4   expect that he wouldn't be upset.

5   And he fought back the best way he

6   knew how to fight back.  Did you

7   ever tell Lieutenant Coury that

8   Darrell Ober was mentally ill or

9   losing his prospective on life?

10  A.          I don't think so.

11  Q.          Do you tell him anything

12  like that?

13  A.          I knew he was upset.  I

14  might have said he was upset, but I

15  don't think I ever expressed him

16  being mentally ill.

17  Q.          Well, what did you say?

18  A.          I believe I said that

19  Captain Ober is very upset about the

20  course of action that was, you know,

21  involving the transfer.

22  Q.          Did you hear about how

23  Colonel Evanko reacted when Mr. Ober

24  told him the FBI was looking into

25  allegations of unlawful activities

49

1   at the highest level of the State

2   Police?

3   A.        Repeat that again.

4   Q.        Did you ever hear how

5   Captain or how Colonel Evanko

6   reacted when he was informed by

7   Colonel Hickes and Captain Ober that

8   the FBI had expressed a concern

9   about sales of academy positions at

10  possibly the highest level of the

11  State Police or even into the

12  governor's office?

13  A.        I don't how he reacted.

14  Q.        Did you ever hear?

15  A.        The captain may have seen

16  more of a reaction than I did.

17  Q.        He did and he so

18  testified, so has Colonel Hickes.

19  I'm wondering if you heard anything

20  about how Colonel Evanko reacted?

21  A.        I don't recall ever

22  hearing how he reacted.

23  Q.        Okay.  Well, what did Mr.

24  Coury, Lieutenant Colonel Coury say

25  back to you when you told him your

50

1  best recollection is that you didn't

2  say --- well, let me ask some

3  specific questions here, it might be

4  a little more easier, a little more

5  fair for you.  Did you tell

6  Lieutenant Colonel Coury that Mr.

7  Ober's ability to do his work should

8  be investigated?

9  A.        No.

10  Q.        Did you tell Lieutenant

11  Colonel Coury that Captain Ober was

12  losing his grip or losing control?

13  A.        No, I ---.

14  Q.        Let me go through this a

15  little, it's okay.

16  A.        No, I didn't.

17  Q.        That's all right.  I

18  understand that and I very much

19  appreciate your patience, it's just

20  I have to ask these questions.  I'll

21  be very grateful, I realize it might

22  seem odd, but it's something I have

23  to ask, okay.

24          Do you have a recollection

25  of telling Mr. Coury anything that

51

1    would indicate that Darrell Ober was

2    in need of an evaluation for the

3    good of his mental state and mental

4    stability?

5    A.        No.

6    Q.        Okay.  But you did have a

7    conversation with Lieutenant Colonel

8    Coury about Mr. Ober?

9    A.        Probably, it would have

10   came up at some point, yes.

11   Q.        Well, Lou, I want you

12   again to search, you know, through

13   your mind and tell us what you

14   remember about that conversation,

15   please.

16   A.        Other than the fact of him

17   being upset is only thing I recall

18   ever.  But any --- as far as job

19   performance or any other things I

20   had, I just assumed he was doing his

21   job where he was it.  I had no

22   direct supervision.  Of course, he's

23   the captain so he wouldn't have

24   answered to me.

25   Q.        Right.  Okay.  But

52

1    factually going back to that

2    conversation, there wasn't anything

3    known to you that would indicate

4    that Darrell Ober was not performing

5    his job in a proper way; isn't that

6    fair, Lou?

7    A.         Yes.

8    Q.         All right.  And try to

9    remember back --- obviously --- well

10   strike that.

11          The comment that you made

12   about Darrell being upset, was that

13   made in like an offhand manner or

14   were you soliciting a reaction from

15   Lieutenant Colonel Coury to do

16   something about Darrell being upset;

17   do you understand that question?

18   A.         I wasn't ---.

19   Q.         Do you under --- go ahead?

20   A.         Yeah, it was probably more

21   off the wall than it was a

22   direct --- it probably came up

23   during some other business, it

24   wasn't a specific meeting on Darrell

25   Ober.

53

1    Q.          That's what I'm looking

2    for.  But in terms of that

3    discussion, the part of it that

4    dealt with Darrell Ober, in other

5    words, so that --- I want to be very

6    careful that I don't mischaracterize

7    your response.  Are you telling us

8    that there was a discussion about

9    probably a number of things, during

10   the discussion Darrell Ober came up

11   and then in an offhand manner, you

12   recollect saying that he was upset?

13   A.       Yes.

14   Q.          All right, sir.  Now, what

15   are the other things about Darrell

16   Ober that you recollect as you sit

17   here today that you and Lieutenant

18   Colonel Coury discussed?

19   A.          I don't believe we ever

20   got into any discussion at all about

21   him other than the fact that what

22   was taking place with his own

23   issue.  I didn't get into

24   specifically discussions of Darrell

25   Ober of what he was doing.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

54

1    Q.        Lou, do you remember when

2    that discussion took place, just a

3    month and a year?

4    A.        It was probably --- it was

5    sometime after Darrell had came to

6    the PSTA when Gary and I talked to

7    him.

8    Q.        Now, that would have been

9    months and months and months before

10   he filed this lawsuit; wouldn't it,

11   Lou?

12   A.        This lawsuit here?

13   Q.        Yeah.

14   A.        It would probably ---

15   yeah, it was before that.

16   Q.        You're sure?

17   A.        I think so.  I don't think

18   the lawsuit was filed.  I don't

19   recall any discussions about a

20   lawsuit at that point.

21   Q.        Okay.  Do you remember

22   what Colonel Coury --- do you

23   remember what Colonel Coury said in

24   response, if anything, to your

25   offhand comment about Darrell Ober

55

1  being upset over his situation?

2  A.        I don't recall him making

3  any comments at that point.

4  Q.        Forgive me.  So you at no

5  time --- your testimony here as I

6  understand it, you at no time called

7  Lieutenant Colonel Coury to convey a

8  message that you were concerned

9  about the mental or emotional

10  stability of Captain Ober?

11  A.        No, no.

12  Q.        Yes.  You just didn't do

13  that?

14  A.        No.

15  Q.        You didn't do that; did

16  you?

17  A.        I don't recall doing it,

18  no.

19  Q.        Well, do you think if you

20  would have done something like that

21  you would recall it, Lou?

22  A.        I don't recall being

23  concerned about his mental

24  stability.

25  Q.        In that likelihood, I

56

1    guess, you wouldn't call anybody to

2    express concern about it; right?

3    A.          I don't think so.

4    Q.          Excuse me one second,

5    gentlemen.  Do you have a

6    recollection of Lieutenant Colonel

7    Coury making any comments about

8    Darrell's request for financial

9    assistance for help?

10   A.          No.

11   Q.          Lou, do you remember

12   during the time that you had made

13   this offhand comment any connection,

14   does your mind make any connection

15   between Darrell's request for

16   reimbursement for legal expenses of

17   any entity you knew about and your

18   making an offhand comment that

19   Darrell was upset, do you understand

20   that question?

21   A.          Go ahead back with the

22   question.

23   Q.          Yes, sir.  It was a very

24   awkward question, I apologize for

25   it.  It was a rather elongated

57

1    question.  Let me see if I can

2    simplify it a little bit.  In going

3    back in your mind, do you remember

4    any connection during this

5    conversation that we have been

6    speaking of with Mr. Coury where

7    Darrell's request for reimbursement

8    of legal fees was connected to your

9    offhand comment about his being

10   upset over what happened to him?

11   A.        I think it did.

12   Q.        It did.  And that, did Mr.

13   Coury comment at all about what it

14   might be costing Darrell or ---?

15   A.        No.  I had an idea what it

16   was costing him.

17   Q.        Okay.  And was that ---

18   would that have been because of the

19   request that he had made?

20   A.        Yes.

21   Q.        Okay.  Did you convey

22   those to Colonel Coury?

23   A.        I may have.

24   Q.        Did you convey the figure

25   $17,000, do you remember?

58

```
 1  A.          It was either $14,000 or
 2  $17,000, whatever it was.
 3  Q.          Okay.  But the question
 4  is, do you remember whether you
 5  conveyed that to Colonel Coury?
 6  A.          I think I might have.
 7  Q.          You might have.  Do you
 8  remember what Colonel Coury said?
 9  A.          No.
10  Q.          Lou, do you remember any
11  rumors about the front office being
12  out to get Darrell Ober?  Rumors
13  now.
14  A.          I think the first rumor I
15  heard was the people in high places
16  in the state government, or in the
17  State Police and the state
18  government, selling jobs.
19  Q.          All right.
20  A.          That was --- I think
21  that's even before anything else
22  ever happened.
23  Q.          All right.
24  A.          But did I hear the
25  Commissioner was out to get him,
```

59

1  nobody ever told me that

2  specifically, no.

3  Q.        Okay.  Did you have any

4  recollection of following Darrell

5  Ober's career after the recision of

6  the transfer?  By that I mean what

7  he was doing on work assignments?

8  A.        I believe I talked to him

9  after.  I believe he was doing a

10 lieutenant's job at that point.

11 Q.        As a captain?

12 A.        As a captain.

13 Q.        Is it fair to say that the

14 discussions, whether you agreed or

15 disagreed on things between you and

16 Darrell Ober were always cordial and

17 respectful, you treated each

18 other - - -

19 A.        I would say so.

20 Q.        - - - professional?

21 A.        Yes.

22 Q.        Yes, sir.  Okay.  Now,

23 going back to this issue, do you

24 remember where he was doing this

25 lieutenant's position?

60

1    A.        At the Liquor Enforcement.

2    Q.        Okay.  Did that seem odd

3    to you?

4    A.        Yeah, I guess.

5    Q.        Okay.

6    A.        Captain doing a

7    lieutenant's job would be odd, but

8    pay-wise there was no conflict with

9    the union as long you were getting

10   the salary, I guess you can do it

11   but it's not probably normal.  It

12   isn't normal.

13   Q.        So to the best of your

14   knowledge the pay was the same and

15   it's although it's not normal ---

16   what's that mean in terms of the

17   person's place in the organization,

18   their reputation, the duties they're

19   performing, what?

20   A.        As I said, it's not the

21   norm.

22   Q.        But why, Lou?  Why isn't

23   it the norm?

24   A.        Well, ---.

25   Q.        If you know.  I'm not

61

1  saying there's an answer, I'm just

2  asking if you know?

3  A.        I would except if you're

4  doing a captain's job, you'd be paid

5  like a --- if you were getting paid

6  a captain's salary, you'd be doing

7  the captain's work.  If you were

8  doing the lieutenant's, you'd be

9  getting lieutenant's.  More times

10  than not, the lower class performs a

11  higher rank and gets the additional

12  pay.  However, if you're getting a

13  higher pay and working a lesser job,

14  probably economics doesn't make

15  sense there to pay somebody more

16  money than what the jobs calls for.

17  Q.        You've seen tons of that

18  in the State Police; haven't you?

19  A.        Doing lesser work?

20  Q.        Yeah.

21  A.        I don't think.

22  Q.        The fact is, Lou, how many

23  years have you been with the State

24  Police?

25  A.        Thirty-two (32) years and

62

1  eight months.

2  Q.        You never saw that.  If

3  you think that right now --- sit

4  down?

5  A.        I can't think of a

6  specific case.

7  Q.        All right.

8  A.        Now, whether it could have

9  happened or not, it may have.

10  Q.        Well, you don't know?

11  A.        I don't think it was a

12  matter of routine, though.

13  Q.        Well, give me another

14  situation.  Tell me another case.

15  A.        I don't know of any

16  offhand is what I'm saying.  I can't

17  give you a specific case.

18  Q.        I've asked seven or eight

19  witnesses now and you're president

20  of the union for a number of years

21  and the fact is you're sitting here

22  today, you can't think of another

23  situation in the Pennsylvania State

24  Police, at least offhand, where you

25  got a captain doing a lieutenant's

63

1   position or somebody doing an

2   assignment for an extended period of

3   time in a lower pay rate?

4   A.          That's correct.

5                    ATTORNEY BAILEY:

6                    Let me see this right

7               here.  Lou, would you bear

8               with me just a minute, you

9               and the lawyers.  I just

10              want to look at something

11              real quick here.

12   COUNSEL REVIEWS DOCUMENT

13   BY ATTORNEY BAILEY:

14   Q.          Do you know whether

15   Colonel Evanko is a member of the

16   Masons, if you know?

17   A.          I think that he is.

18   Q.          1998, do you think that

19   maybe he became a Mason?

20   A.          I think it might have been

21   something --- there was a function

22   in Philadelphia, I believe there was

23   a couple guys and he was one of

24   them.

25   Q.          You were there, I think;

64

1   weren't you?

2   A.        Me?

3   Q.        Yeah.

4   A.        I don't think so.

5   Q.        Okay.  I'm trying to

6   inject a little humor.

7   A.        I wasn't there.

8   Q.        Okay.

9   A.        But I think there was

10  something public to that effect or

11  something in writing somewhere, I

12  believe it might have been him and

13  another kid named Sotos (phonetic)

14  or there was two or three, I think.

15  Q.        Evans?

16  A.        I don't know.  I think I

17  remember Sotos and it might have

18  been the Commissioner.

19  Q.        Okay.  Well, have you ever

20  given any organization or entity the

21  right to use the Pennsylvania State

22  Police name or logo?

23  A.        No.

24  Q.        Why not?

25  A.        I don't have the

65

1   authority.

2   Q.          Do you know whether the

3   Commissioner has the authority?

4   A.          He may.

5   Q.          Do you assume that would

6   to the state legislature and the

7   governor acting together to have

8   that authority?

9   A.          I'm not quite sure where

10  that falls.

11  Q.          That's okay.  Lou, have

12  you ever been involved with the

13  Pennsylvania State Police Museum

14  Committee?

15  A.          Yes.

16  Q.          Where is it located?

17  A.          Palmyra, I believe is

18  the - - -.

19  Q.          Palmyra - - - Dauphin County

20  or Dauphin or Lebanon, I forget?

21  A.          Might be Lebanon.

22  Q.          Have you ever been there?

23  A.          Yes.

24  Q.          What do they do?  What's

25  the - - -?

66

1    A.        I believe they were

2    organized to see to the inception of

3    a state police museum ---

4    Q.        Okay.

5    A.        --- at some location, I

6    think --- I believe they might have

7    access to ground at the academy.

8    Q.        Okay.  Have you ever

9    worked with Lieutenant Colonel Coury

10   on any museum projects?

11   A.        No, I've been at meetings.

12   Q.        Has he been to some of the

13   meetings?

14   A.        Yes.

15   Q.        Does he take personal

16   interest in the museum or at least

17   appear to?

18   A.        He's there.  What his

19   interest is, that would be something

20   for him to answer.

21   Q.        How about Colonel Evanko,

22   has he taken interest in the museum?

23   A.        I believe he's --- I would

24   characterize my opinion, he's

25   supportive.

67

1  Q.        Okay.  Has he ever been at

2  any of the meetings?

3  A.        Early on, he might have

4  been at one that I've been at, but

5  most of the time he watches.

6  Q.        Do you ever discuss

7  Captain Ober with Colonel Evanko?

8  A.        No.

9  Q.        Have you ever been present

10 when Colonel Evanko discussed

11 Captain Ober?

12 A.        At the museum.

13 Q.        Anywhere?

14 A.        No.

15 Q.        Have you ever discussed

16 Colonel Hickes with Lieutenant

17 Colonel Coury?

18 A.        No.

19 Q.        Do you know Colonel

20 Hickes?

21 A.        Yes, I do.

22 Q.        Do you know anyone in the

23 governor's office?

24 A.        Yes.

25 Q.        Do you know a gentleman

68

1  named Mark Campbell?

2  A.          Yes.

3  Q.          Have you ever

4  discussed --- I know that you've

5  discussed Pennsylvania State Police

6  matters.  Have you ever discuss

7  Darrell Ober with Mark Campbell?

8  A.          No.

9  Q.          Do you know a woman named

10  Mary Woolley?

11  A.          Yes.

12  Q.          Have you ever discussed

13  the Pennsylvania State Police with

14  her?

15  A.          I believe I met her one

16  time she come to my office.  That is

17  my only recollection of this.  This

18  is going way back, probably in '98.

19  Q.          Your testimony is, if I

20  recollect that you never discussed

21  Captain Darrell Ober with Mark

22  Campbell?

23  A.          That's correct.

24  Q.          And you never discussed

25  Captain Darrell Ober with Colonel

69

1    Evanko that you can remember?

2    A.        I don't remember

3    discussing Captain Ober with them.

4    Q.        Do you know a fellow named

5    Dean Hooper?

6    A.        Yes.

7    Q.        How about Ann Coury?

8    A.        Yes.

9    Q.        Is that from the museum

10   work?

11   A.        Yes.

12   Q.        IMMS, does that mean

13   anything to you?

14   A.        INNS?

15   Q.        Yes.

16   A.        That's the technology

17   unit, I guess over the industrial

18   park over there.

19   Q.        Do you have any knowledge

20   of it, Lou, what's it supposed to be

21   about, what it does?

22   A.        I'm not familiar with it.

23   Q.        Do you know whether or not

24   Captain Ober ever worked on that

25   project?

70

1   A.          I believe he did.

2   Q.          Where?

3   A.          Before he went to LC, I

4   believe he did.

5   Q.          Okay.  Where did you learn

6   that?

7   A.          Changes take place.  I

8   don't know how I ever found out

9   about it.

10  Q.          Excluding the lawsuit, it

11  does appear, I think there's some

12  references in the lawsuit, the

13  complaint.  Aside from that, do you

14  have a recollection of where you

15  might have learned that?

16  A.          Of how he went from

17  IMS ---

18  Q.          Yeah.

19  A.          --- to LCE?

20  Q.          Yes, sir.

21  A.          I don't know if there was

22  anything ever on paper.  A lot of

23  times I found out people's

24  reassignments, just the fact that

25  they --- hey, you know so and so is

71

1    working over here.  I don't know how

2    that came about.  But how exactly I

3    found out, I'm not quite sure.

4    Q.        Okay.  All right.  Lou,

5    you know Lieutenant Colonel Conley,

6    Hawthorne Conley quite well?

7    A.        Yes, sir.

8    Q.        You've know ---?

9    A.        He was a classmate of

10   mine.

11   Q.        You've known him for

12   years?

13   A.        Thirty-two (32), plus.

14   Q.        Did you discuss Captain

15   Darrell Ober with Colonel Conley?

16   A.        I recall I think the first

17   time is I sat in on a

18   pre-disciplinary reference with

19   Captain Ober before Major Conley at

20   that time.

21   Q.        Okay.

22   A.        But as far as discussions

23   I didn't have --- I may have talked

24   to him about whether I did or not,

25   but ---.

72

1  Q.         Did Mr. Conley, did

2  Lieutenant Colonel Conley, who then

3  would have been major probably or

4  captain even --- well, major, yeah,

5  I guess.  Did he ever discuss with

6  you what happened with that FBI

7  investigation, how the decisions

8  that Captain Ober made?

9  A.         FBI investigation.

10  Q.         Well, let me do it this

11  way --- strike that, withdraw that

12  former question.

13         And I'll ask you, did Mr.

14  Conley ever complain to you or

15  lament, you know, complain or

16  complain in passing or whatnot, you

17  know, bitch about, for want of a

18  better description Captain Ober

19  going around him, chain of command

20  wise and going to Colonel Hickes

21  about the FBI probe?

22  A.         No.

23         ATTORNEY BAILEY:

24         Excuse me, I'm

25         sorry.  Excuse me.  Let's

73

1    suspend for just a

2    minute.  And can you speak

3    up when you do the

4    suspension so I can get it

5    on this mic.

6         THE VIDEOGRAPHER:

7         12:29 p.m. off

8    record.

9    OFF VIDEOTAPE

10        ATTORNEY BAILEY:

11        Thank you, sir.

12   SHORT BREAK TAKEN

13        THE VIDEOGRAPHER:

14        12:31 p.m. back on

15   record.

16   ON VIDEOTAPE

17        ATTORNEY BAILEY:

18        Before --- I would

19   like to express my

20   gratitude, Mr. Lazzaro,

21   for answering questions.

22   I thank very much for your

23   cooperation.  I don't have

24   anything more.  I

25   understand some of the

74

1           other attorneys may have

2           some things and I might

3           have a follow up or two,

4           but I'd like to thank you

5           again?

6  A.        Thanks.

7  EXAMINATION

8  BY ATTORNEY REYNOLDS:

9  Q.        When you were a union

10 president, PSTA president, did you

11 meet with Colonel Coury on a fairly

12 frequent basis when he was Deputy

13 Commissioner of Administration?

14 A.        I talked to him pretty

15 frequent, whether we spoke over the

16 phone or personal contact ---.

17 Q.        Okay.

18 A.        Yeah, I talked to him on

19 quite a frequent basis.

20 Q.        That was because you were

21 the union representative for the

22 union to discuss issues with

23 management and he would have been

24 the management representative for

25 the State Police; is that correct?

75

1    A.        That's correct.

2    Q.        Okay.  Did you ever

3    discuss member treatment issues with

4    him?  I'm not specifically talking

5    about the Plaintiff here, I'm

6    talking about anyone.

7    A.        Yes.

8    Q.        Okay.  And was that, in

9    fact, something that was of some

10   significance to you if you believed

11   that a member was not being treated

12   correctly or whatever, that you

13   would bring it to his attention?

14   A.        Sure.

15   Q.        Okay.  And, in fact, the

16   union has represented individuals,

17   for example, Corporal Chio where

18   you've obtained injunctions against

19   the State Police if you thought a

20   member was not being treated

21   correctly; ---

22   A.        That's correct.

23   Q.        --- is that correct?

24   A.        Okay.  With regard to the

25   conversation where you indicated

76

1  that at some point in a conversation

2  you told Lieutenant Colonel Coury

3  that you believed that Captain Ober

4  was upset, do you recall what

5  preceded that comment?  If you were

6  talking about member --- other

7  member treatment issues or why that

8  came up in conversation?

9  A.       That maybe --- that might

10  have been just part of just general

11  discussion.  The union, we always

12  had --- we discussed many issues at

13  one gathering.

14  Q.       Do you remember saying

15  anything other than that he was

16  upset?  I mean, did you explain what

17  you meant by that comment?

18  A.       I knew he wasn't happy and

19  he was upset about --- as I said

20  before about moving across the state

21  and having to leave his family.

22  Q.       Did you indicate to

23  Colonel Coury that he had huge

24  attorney's fee bills that he was

25  concerned about?

77

1   A.          I think I might have ---.

2               ATTORNEY BAILEY:

3               Objection to the form

4          of the question.  You may

5          respond, sir.

6   A.          I think it was pretty

7   common knowledge, I probably did.

8   BY ATTORNEY REYNOLDS:

9   Q.          Okay.  And you indicated,

10  I think, that you didn't have a

11  specific recollection of when that

12  conversation occurred; is that

13  correct?

14  A.          No.

15  Q.          Okay.  And I think the

16  only thing you were able to say with

17  regard to that is that you knew it

18  occurred after the first --- after

19  the meeting took place between

20  yourself, Mr. Lightman and Captain

21  Ober?

22  A.          Okay.

23  Q.          Other than that, you can't

24  place it in a month or year?

25  A.          No.

78

1  Q.        Did you represent Captain

2  Ober at the first level of his

3  grievance on reimbursement issues

4  before then Major Conley?

5  A.        Yes.

6                 ATTORNEY BAILEY:

7                 Objection to the form

8         of the question. Can you

9         specify, please, what

10        reimbursement issue?

11                 ATTORNEY REYNOLDS:

12                 Specifically, I'd be

13        happy to do that.

14  BY ATTORNEY REYNOLDS:

15  Q.        The reimbursement issues

16  would be with regard to the

17  reimbursement for the annual leave

18  and the hotel in Somerset to meet

19  with the FBI and there was also an

20  issue with regard to a retirement

21  gift, a framing of a retirement

22  - - - .

23  A.        A plaque, I think.

24  Q.        That's what I meant by the

25  reimbursement issues?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

79

1    A.        Yes, I represented him.  I

2    sat in with him on that.

3    Q.        Is that unusual for the

4    union president to do that?

5    A.        It's unusual, but I was

6    pretty assessable and I thought it

7    was convenient.

8    Q.        Okay.  Is there a specific

9    reason if you recall why you did it

10   on that occasion?

11   A.        I was trying to do it to

12   accommodate Captain Ober, I guess.

13   I was next door and it was

14   convenient to go up and rather than

15   go to the lodge and try to find a

16   representative, for him to have to

17   go to the lodge and find a

18   representative, I just did it.  I've

19   done it before.  It's unusual, but

20   it's not beyond me doing it.

21   Q.        Did the PSTA represent

22   Captain Ober in all of his

23   grievances?

24   A.        Yes.

25   Q.        And did they provide

80

1  counsel for him in arbitration?

2              COURT REPORTER:

3                  For him in what,

4          ma'am?

5  BY ATTORNEY REYNOLDS:

6  Q.          Counsel for him in

7  arbitration, legal counsel?

8  A.          Yes.

9  Q.          Okay.  You indicated that

10  the State PSTA Lodge gave him

11  $2,500?

12  A.          State, it's not PSTA, it's

13  PSTA, not State.

14  Q.          Okay.  It was PSTA ---

15  what was that PSTA Lodge or was it

16  just called the PSTA?

17  A.          Pennsylvania State Trooper

18  Association.

19  Q.          Okay.  And they provided

20  him --- after he made a plea to the

21  board of directors, they provided

22  him with $2,500 to assist him in his

23  legal fees?

24  A.          Yes.

25  Q.           Do you know if any other

81

1   groups --- if any other FOP lodges

2   or national provided him with any

3   fees?

4   A.         I'm not certain if anybody

5   else did.

6   Q.         Did you have any

7   discussions with the local lodge

8   president, Mike Ruda, about Ober's

9   situation?

10  A.         I do recall that I think

11  Mike said that Captain Ober was

12  coming before the lodge for aid.

13  Q.         Okay.  And how did that

14  arise?  How did that

15  conversation ---?

16  A.         Phone call, I believe.

17  Q.         I'm sorry, what?

18  A.         Phone call, I believe.

19  Q.         Did Mr. Ruda bring that to

20  your attention?

21  A.         Yes.

22  Q.         Okay.  I'm sorry, what's

23  his rank?  I don't know that.

24  A.         Sergeant.

25  Q.         Sergeant.  He brought that

82

1   to your attention.  Did he say why

2   he was concerned about that?

3   A.          I don't know that he was

4   concerned about it.  I think he just

5   brought up the fact that the Captain

6   Ober was coming --- was going to be

7   before the lodge to request aid.

8   Q.          Okay.  With regard to the

9   assignment in Liquor Control

10  Enforcement when Captain Ober was

11  assigned to a position that was

12  formally served by a lieutenant, are

13  you aware that the State Police had

14  to keep Captain Ober in the

15  Harrisburg Hershey area as a result

16  of the settlement of his lawsuit

17  before Commonwealth Court?

18  A.          Yes.

19  Q.          Okay.  If the union had

20  seen any harm to Captain Ober as

21  a result of that three-month

22  period when he was assigned as a

23  captain to a position that was

24  formally served by a lieutenant,

25  could they have taken action against

83

1  management?

2              ATTORNEY BAILEY:

3                  Objection.  You may

4              respond.

5  A.        What was the question

6  again?

7  BY ATTORNEY REYNOLDS:

8  Q.            If the union had seen any

9  harm to Captain Ober as a result of

10  him being assigned to what had been

11  a lieutenant's position at a

12  captain's rate of pay, could

13  they --- for a three month period,

14  could they have taken any action

15  against management?

16  A.        Yes.

17  Q.            And why did they choose

18  not to take any action against

19  management?

20              ATTORNEY BAILEY:

21                  Objection to the form

22              of question.  You may

23              respond.

24  A.        Well, although it was

25  unusual, he was still getting a

84

1  higher rate of pay for a lesser rank

2  position.

3  BY ATTORNEY REYNOLDS:

4  Q.        Okay.

5  A.        If it would have been the

6  other way around, we would have had

7  a problem.

8                ATTORNEY REYNOLDS:

9                That's all I have.

10                ATTORNEY BAILEY:

11                I don't have any

12                further questions, Lou.

13                Again, I'd like to thank

14                you very much.  Gary, do

15                you have anything?

16                ATTORNEY LIGHTMAN:

17                No, thank you.  I

18                appreciate being in

19                Greensburg.

20                THE VIDEOGRAPHER:

21                12:39 off the

22                record.

23        * * * * * * * * *

24        VIDEOTAPE DEPOSITION

25        CONCLUDED AT 12:39 P.M.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

COMMONWEALTH OF PENNSYLVANIA)

COUNTY OF WESTMORELAND          )

C E R T I F I C A T E

I, Susan M. Harshell, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness was first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was taken stenographically by me and reduced to typewriting, and constitutes a true and correct record of the testimony given by the witness.

I further certify that the reading and signing of said depositions were (not) waived by counsel for the respective parties and by the witness.

I further certify that I am not a relative, employee or attorney of any of the parties, nor a relative or employee of counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and stamp this 25th day of April 2002 .

_Susan M. Harshell_

NOTARIAL SEAL
SUSAN M. HARSHELL, Notary Public
Greensburg, Westmoreland County, PA
My Commission Expires May 31, 2002

· PITTSBURGH, PA

· CLEARFIELD, PA     · ERIE, PA

· STATE COLLEGE, PA     · OIL CITY, PA

· HOLLIDAYSBURG, PA     · HARRISBURG, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA 15901
(814) 536-8908

· INDIANA, PA

· GREENSBURG, PA

· PHILADELPHIA, PA

· SOMERSET, PA

· WILKES-BARRE, PA

· CHARLESTON, WV