## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                    :
                                    :
              Plaintiff             :    No. 1:CV-01-0084
                                    :    (Judge Caldwell)
       v.                           :
                                    :    CIVIL ACTION – LAW
PAUL EVANKO, MARK                   :
CAMPBELL, THOMAS                    :    JURY TRIAL DEMANDED
COURY, JOSEPH                       :
WESTCOTT, HAWTHORNE                 :
CONLEY                              :

---

### EXHIBITS TO DEFENDANTS' BRIEF IN SUPPORT
### OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### VOLUME 5

---

FILED
HARRISBURG, PA

MAY 20 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

28

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

* * * * * * * *

DARRELL G. OBER,   *

    Plaintiff      *   Civil Action-Law

    vs.            *   Case No.

PAUL EVANKO, MARK  *   1:CV-01-0084

CAMPBELL, THOMAS   *   .

COURY, JOSEPH      *

WESTCOTT and       *

HAWTHORNE CONLEY,  *

    Defendants     *

* * * * * * * *


VIDEOTAPED DEPOSITION OF

DARRELL G. OBER

DECEMBER 5, 2001


ORIGINAL


Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

2

1                 VIDEOTAPED DEPOSITION

2                         OF

3    DARRELL G. OBER, taken on behalf of

4    the Defendants herein, pursuant to

5    the Rules of Civil Procedure, taken

6    before me, the undersigned,

7    Bernadette M. Black, a Court Reporter

8    and Notary Public in and for the

9    Commonwealth of Pennsylvania, at the

10   Office of General Counsel, 333 Market

11   Street, 17th Floor, Harrisburg,

12   Pennsylvania, on Wednesday, December

13   5, 2001, at 9:00 a.m.

14

15

16

17

18

19

20

21

22

23

24

25

3

1               A P P E A R A N C E S

2

3    DON BAILEY, ESQUIRE

4    4311 North Sixth Street

5    Harrisburg, PA  17110

6         COUNSEL FOR PLAINTIFF

7

8    SYNDI L. GUIDO, ESQUIRE

9    Deputy General Counsel

10   Office of General Counsel

11   333 Market Street

12   17th Floor

13   Harrisburg, PA  17101

14        COUNSEL FOR DEFENDANTS

15

16   JOANNA N. REYNOLDS, ESQUIRE

17   Assistant Counsel

18   Pennsylvania State Police

19   1800 Elmerton Avenue

20   Harrisburg, PA  17110

21        COUNSEL FOR DEFENDANTS

22

23

24

25

4

1       A P P E A R A N C E S  (Cont'd.)

2

3    ALSO PRESENT:

4    JOHN R. BROWN

5    Director of Internal Affairs for the

6    Pennsylvania State Police

7    Bureau of Professional Responsibility

8    7820 Allentown Boulevard

9    Harrisburg, PA

10

11   ALSO PRESENT:

12   CRYSTAL M. LYDE

13   PR Video

14

15

16

17

18

19

20

21

22

23

24

25

5

I N D E X

DISCUSSION AMONG PARTIES          9  -   12

WITNESS:   DARRELL G. OBER

EXAMINATION

   By Attorney Guido           12 - 365

DISCUSSION AMONG PARTIES     365 - 376

CERTIFICATE                      377

6

<u>EXHIBIT PAGE</u>

<u>PAGE</u>

| <u>NUMBER</u> | <u>DESCRIPTION</u> | <u>IDENTIFIED</u> |
|---|---|---|
| One | 1999 Resume | 13 |
| Two | 2000 Resume | 13 |
| Three | Amended Complaint | 51 |
| Four | Official Transcript of Darrell Ober | 57 |
| Five | Desk Memorandum | 112 |
| Six | Processing Worksheet, IAD-10855 | 114 |
| Seven | 12/4/98 Memo | 174 |
| Eight | Notification of Inquiry | 216 |
| Nine | Processing Worksheet, BPR-8275A | 231 |
| Ten | Processing Worksheet, IAD 1999-409 | 254 |
| Eleven | 12/23/99 Supervisory Inquiry | 269 |
| Twelve | 3/23/2000 memo | 357 |
| Thirteen | Letter of 6/12/01 | __ |
| Fourteen | Detachment Report | -- |

7

<u>EXHIBIT PAGE</u> (Cont'd.)

1

2

3  Fifteen      Defendant's Brief

4               of 5/29/01                        - -

5  Sixteen      Directive on internal

6               investigations                    - -

7  Seventeen    Section on Garrity/

8               Miranda rights                     - -

9  Eighteen     Internal investigations

10              special order                      - -

11 Nineteen     Supplemental Report                - -

12 Twenty       Processing worksheet,

13              IAD 1999-381                       - -

14 Twenty-one Memo of 5/13/99                      - -

15 Twenty-two Copy of photo of

16              award                              - -

17

18

19

20

21

22

23

24

25

8

## OBJECTION PAGE

ATTORNEY                                              PAGE

Bailey            26, 39, 66, 71, 74, 83

          91, 95, 100, 103, 104, 121

       123, 125, 126, 131, 134, 139

       142, 143, 159, 160, 165, 167

       169, 172, 173, 176, 179, 203

       205, 231, 234, 236, 238, 252

                                   260, 266

Guido                                           91

9

P R O C E E D I N G S

------------------------------------

DARRELL G. OBER, HAVING FIRST BEEN

DULY SWORN, TESTIFIED AS FOLLOWS:

------------------------------------

VIDEOGRAPHER:

My name is Phillip Way.
I'm employed by Sargent's
Court Reporting Service.  The
date today is December 5th,
2001.  The time is 8:59 a.m.
This deposition is being taken
at 333 Market Street,
Harrisburg, Pennsylvania.  The
caption of this case is in the
United States District Court
for the Middle District of
Pennsylvania, Darrell G. Ober,
Plaintiff, versus Paul Evanko,
Mark Campbell, Thomas Coury,
Joseph Westcott, Hawthorne
Conley, Defendants.  Case
Number 1:CV-01-0084.

The name of the witness
is Darrell G. Ober.  This

10

1    deposition is being taken on

2    behalf of the Defendants.

3    Will the attorneys present

4    state their names and the

5    parties they represent?

6            ATTORNEY BAILEY:

7            My name is Don Bailey.

8    I represent the Plaintiff,

9    Darrell G. Ober, in this

10   matter.

11           ATTORNEY GUIDO:

12           Syndi Guido, I

13   represent the Defendants.

14           ATTORNEY REYNOLDS:

15           Joanna Reynolds, I

16   represent the Defendants.

17           VIDEOGRAPHER:

18           The Court Reporter has

19   already sworn in the witness.

20           MS. LYDE:

21           My name is Crystal M.

22   Lyde, L-Y-D-E.  I'm contracted

23   out by PR Video.  My address

24   is 4310 Hillsdale Road,

25   Harrisburg, Pennsylvania.

11

1    Thank you.

2         ATTORNEY GUIDO:

3         And at the outset, I

4    just wanted to clarify if

5    we're going to have the same

6    stipulations we had before

7    about, you know, objections

8    being reserved, except for

9    form of the question?

10         ATTORNEY BAILEY:

11         Yes.  We can agree to

12    just --- yes.  Sure, that's

13    fine.  A couple of just

14    housekeeping chores.  One, we

15    will be responding soon with a

16    Modification to the Production

17    of Documents.

18         ATTORNEY GUIDO:

19         Okay.

20         ATTORNEY BAILEY:

21         And we respectfully

22    take issue, of course, and

23    we'll get that worked out with

24    some of the responses that you

25    made in that document request

12

1    and some of the restrictions

2    which are onerous, so we do

3    object to those.

4              ATTORNEY GUIDO:

5              Okay.

6              ATTORNEY BAILEY:

7              Do you have any idea

8    how long you're going to be

9    today?  Do you have ---?

10             ATTORNEY GUIDO:

11             Probably most of the

12   day.

13             ATTORNEY BAILEY:

14             Okay.

15   EXAMINATION

16   BY ATTORNEY GUIDO:

17   Q.      Okay.  At the beginning,

18   Mr. Ober, you've already been sworn.

19   If I ask you any question that you

20   don't understand, please ask me to

21   rephrase it and I'll do that.  If you

22   answer the question, then I'll assume

23   that you have understood my question.

24   Okay?  Are you under the influence of

25   any kind of drugs or alcohol today?

13

1    A.        No.

2    Q.        I want to start just by going

3    over your background.  Here's just

4    copies for you.  I'm going to show

5    you Exhibit One.  Do you recognize

6    that as your own resume?

7                        (Deposition Exhibit

8                        Number One marked for

9                        identification.)

10   A.        Yes, with noting that it's not

11   up to date.  But, yes, I believe it's

12   generally my work history.

13   BY ATTORNEY GUIDO:

14   Q.        Year 1999.  I'll show you a

15   2000 resume.  That's Exhibit Two.

16   The '99 would be Exhibit One.

17   Exhibit Two is your 2000 resume; is

18   that right?

19                        (Deposition Exhibit

20                        Number Two marked for

21                        identification.)

22   A.        Correct.

23   BY ATTORNEY GUIDO:

24   Q.        Let's just briefly go over

25   your education.  Can you tell us

14

1    about that?

2    A.       After high school, I enrolled

3    in the Pennsylvania State University,

4    where I majored in the administration

5    of criminal justice.  I graduated cum

6    laude in 1979.

7    Q.       Okay.  What was your degree?

8    You said your degree was in criminal

9    justice?

10   A.       Yes, Bachelor's of Science.  I

11   enrolled in graduate school at the

12   Indiana University of Pennsylvania.

13   However, upon appointment to the

14   state police, I withdrew from

15   graduate studies.

16   Q.       What were you going to study

17   at Indiana?

18   A.       Public administration.

19   Q.       And what did you do right

20   after college?

21   A.       Right after college, I, ---

22   well, actually at the end of my

23   senior year, I had made a number of

24   applications in state government in

25   law enforcement-related functions,

15

1    took a number of tests.  And for the

2    summer, I mostly just --- summer of

3    '79, I mostly just worked for my

4    father until being appointed or

5    selected to work at Indiana

6    University of Pennsylvania as a

7    campus police officer.  Shortly after

8    appointment, I attended the

9    Pennsylvania Law Enforcement Academy

10   in Scotland, Pennsylvania, where I

11   graduated number one in my class.

12   Q.      And what is the Pennsylvania

13   Law Enforcement Academy?

14   A.      Well, I don't believe it's any

15   longer in existence.  But at one time

16   it was the training facility for

17   campus police officers and there were

18   some municipal officers, although, I

19   don't know exactly how many.

20   Q.      Now, was that put on by the

21   Department of Education?

22   A.      Yes, ma'am.

23   Q.      Now, when did you first enlist

24   with the state police?

25   A.      I enlisted in the state police

16

1   on July 20th, 1981.

2   Q.      Okay.  When did you first

3   apply to the State Police Academy, if

4   you recall?

5   A.      I can guess at that one.  I

6   believe my first application would

7   have been in the spring of 1979.

8   Q.      Do you know how many times you

9   applied before you were accepted to

10  the academy?

11  A.      I applied once, tested twice.

12  Q.      And so you started as a

13  trooper then on July 20th, 1981?

14  A.      I started as a cadet.

15  Q.      As a cadet.  Okay.  And when

16  did you become a trooper?

17  A.      December 5th, 1981.

18  Q.      What were your assignments as

19  a trooper?

20  A.      My initial assignment on

21  graduation was to a patrol unit and

22  Troop S.  Milesburg was the

23  headquarters.  I was assigned to the

24  Mercer Station.

25  Q.      When were you promoted to

17

1   corporal?

2   A.      I was promoted to corporal on

3   February 18th, 1987.

4   Q.      While you were a trooper and

5   before you were a corporal, were all

6   of your assignments basically patrol?

7   A.      No.

8   Q.      Okay.  Can you outline that,

9   your history for me?

10  A.      I was primarily a patrol

11  trooper while assigned to Troop S.  I

12  transferred to Troop E, Butler, also

13  at the Mercer Station for two years

14  or so.  And there I was primarily

15  assigned to a patrol unit, but we did

16  criminal investigations, as well.  I

17  then transferred to Troop G,

18  Hollidaysburg.  I was assigned to the

19  McConnellsburg Station, again in a

20  patrol unit, but I did do a rotating

21  assignment through the criminal

22  investigation unit while I was

23  assigned there.

24  Q.      Okay.  Once you became a

25  corporal, can you outline your

18

1    assignments as a Corporal for me?

2    A.      Yes.   I accepted a position,

3    promotion to corporal to Troop T,

4    Bowmansville, in 1987.   I was

5    assigned to a patrol unit in Troop T,

6    Bowmansville, for about ten months.

7    And then as I had done in the other

8    instances, I requested a preference

9    transfer back to Troop G and was

10    again assigned to McConnellsburg.

11    And there I was a patrol supervisor.

12    Q.      How many times were you at ---

13    I guess I'm asking, at that point in

14    time how often were you at  Troop G?

15    A.      Twice.

16    Q.      And about how many years was

17    that?

18    A.      About four years total, I

19    suppose.

20    Q.      And when were you promoted to

21    sergeant?

22    A.      I was promoted to sergeant in

23    March of 1993.  No, no.  That's not

24    correct.  1991.

25    Q.      And your assignments as

19

1   sergeant?

2   A.      My assignments as sergeant, I

3   was assigned originally to the

4   systems and procedures section and

5   the Bureau of Research and

6   Development.

7   Q.      What do they do?

8   A.      We missed a transfer.  I don't

9   know if you need to know that or not.

10  Q.      Okay.  Go ahead.

11  A.      As a corporal, I transferred,

12  again, I requested a preference

13  transfer to the Department of

14  Headquarters in 1989.  And I applied

15  for a specialized position in the

16  Bureau of Research and Development.

17  And I was there for, I guess, two

18  years or so, as a staff writer in the

19  bureau.  And then I was promoted to

20  sergeant in the same section.

21          And to answer your question on

22  what do they do, the Bureau of

23  Research and Development, Systems and

24  Procedures Section, is tasked with

25  writing the directives that drive the

20

1    department, research and directives.

2    It's an assignment exclusively

3    related to managing the directive

4    system that runs the state police.

5    Q.       You became a lieutenant when?

6    A.       I was promoted to lieutenant,

7    I believe that was also in March of

8    1993.

9    Q.       Your assignments as a

10   sergeant, did you spend all that time

11   in research and development or were

12   you elsewhere, as well?

13   A.       No.  I was only in research

14   and development.

15   Q.       And then when you were

16   promoted to lieutenant, what did you

17   do?

18   A.       I accepted a position with the

19   newly-created systems and process

20   review division in the Bureau of

21   Professional Responsibility.

22   Q.       What did that division do?

23   A.       That division was the former

24   staff inspection division.  And the

25   mandate for the three lieutenants who

21

1    were promoted, myself and two others,

2    were to create a system, a permanent

3    ongoing inspection system that had

4    continuity and could comply with the

5    mandates of the accreditation

6    program. So we were tasked with

7    performing staff inspection functions

8    throughout the department.

9    Q.      And the staff inspections,

10   those are to make sure that the state

11   police members are complying with all

12   the rules and regulations of the

13   department?

14   A.      Essentially.

15   Q.      Okay. And then you became a

16   captain when?

17   A.      I was promoted to captain on

18   March 3rd, 1995.

19   Q.      And your first assignment as a

20   captain?

21   A.      I was promoted to the position

22   of division director in the systems

23   and process review division.

24   Q.      As division director, what

25   were your duties?

22

1    A.       My duties were, as a division

2    director, to manage the inspection

3    component of the entire state for the

4    Bureau of Professional

5    Responsibility.  I supervised three

6    sections, who were commanded by

7    lieutenants.

8    Q.       What were the sections?

9    A.       Where?

10   Q.       What?

11   A.       Well, we have the state

12   divided geographically, east, west

13   and central.  And those sections are,

14   as was my former position as a

15   central section commander, those

16   sections are under the supervision of

17   a lieutenant.

18   Q.       And then what other

19   assignments have you had as a

20   captain?

21   A.       In 1998, I was asked by Major

22   Merryman (phonetic) to transfer to

23   the division director of the Bureau

24   of Professional Responsibility,

25   Internal Affairs Division.  In April

23

1    of 1999, I was detached to the Bureau

2    of Technology Services to the

3    information management system

4    project, our technology project.  As

5    a captain, I also was transferred to

6    the central section of Liquor Control

7    Enforcement Division.  In the year

8    2000, I was transferred to that

9    lieutenant's position.  And I

10   eventually was then transferred to

11   the position I currently hold, which

12   is the director of administration in

13   the Bureau of Liquor Control

14   Enforcement.

15   Q.      Okay.  So not all of the

16   assignments that you receive are made

17   by the commissioner; is that right?

18   I noticed you said that it was Major

19   Merryman that made you director of

20   IAD?

21   A.      Well, he requested and asked

22   me to consider accepting that

23   transfer.  And I told him that I

24   would do whatever he asked me to do

25   if it were determined in his mind

24

1    that that was the best move for the

2    agency.

3    Q.      My question was, that was a

4    decision made by Major Merryman,

5    rather than the commissioner?

6    A.      Not to my knowledge. I don't

7    believe Major Merryman made that

8    transfer independent, but I don't

9    know for sure. I really don't.

10   Q.      Have you ever turned down any

11   promotions?

12   A.      Yes.

13   Q.      Can you tell me about what

14   promotions you turned down and the

15   reasons for that?

16   A.      I turned down promotions to

17   sergeant in 1990 or so. I don't

18   recall. I believe I turned that down

19   on four occasions, possibly three

20   occasions. The reason I turned those

21   promotions down were because they

22   would remove me from my role as

23   caretaker for my then five-year-old

24   son. They would involve a transfer

25   and it would have impacted ---.

25

1    Q.      It would have required you to

2    move?

3    A.      Yes, ma'am.  It would have

4    impacted on my ability --- I have

5    primary custody of my oldest son,

6    which is subject to scrutiny if

7    there's a significant change in my

8    living conditions or living

9    arrangements that have been

10   established for him.

11   Q.      How old is your son now?

12   A.      My oldest son is 14.

13   Q.      So he was around, you said

14   four or five at the time that you

15   were turning down promotions?

16   A.      Yes.  He was born in '87, and

17   that was, yes, four or five.  That's

18   correct.  Sorry.

19   Q.      Now, you briefly talked about

20   when you were in patrol, essentially,

21   that you did serve as a criminal

22   investigator some of the time?

23   A.      Yes.

24   Q.      Can you tell me about your

25   investigative experience?

26

1    A.      Well, like ---.

2                      ATTORNEY BAILEY:

3                      I'm going to object to

4           the form of the question.  You

5           can respond.

6    A.      I'm not sure exactly what

7    you're after, but I'll try.  I mean,

8    I'm not sure I understand ---.

9    BY ATTORNEY GUIDO:

10   Q.      That's all right.  I'll try

11   again.

12   A.      Okay.

13   Q.      I don't want you to answer if

14   you don't understand what I'm getting

15   at.  You were never assigned to a

16   criminal investigation to the unit;

17   right?

18   A.      No.  I was assigned to a

19   criminal investigation unit.

20   Q.      When was that?

21   A.      Well, it was when I was in

22   Troop G, McConnellsburg.  Again, I'm

23   just going to have to try to estimate

24   this.  It would have been about 1986.

25   Q.      How long were you in the

27

1    criminal investigation unit?

2    A.    I was full time assigned to

3    that unit about four months and then

4    part time, I don't even know,

5    probably until I made corporal.  I

6    don't recall.

7    Q.    Now, can you give me years?

8    Was it years, months?

9    A.    Well, I made corporal and

10   transferred in February of '87.  So I

11   can only guess at that one.  Maybe

12   six months part time.  I really don't

13   remember now.

14   Q.    What do you mean by part time?

15   A.    Well, that's a very small

16   station.  We only had nine patrol

17   troopers.  It was not uncommon for

18   many of us to be assigned, although

19   we may have been assigned to a patrol

20   --- pardon me, although we were

21   assigned to a patrol roster, except

22   for the time that some of us  did

23   serve full time in the criminal unit,

24   it was not uncommon to be assigned

25   follow-up or initial investigations

28

1    on a routine basis.

2    Q.      How many people were in that

3    criminal unit?

4    A.      Two, full time.

5    Q.      Can you give me an estimate of

6    how many criminal cases you've

7    investigated?

8    A.      In my career?

9    Q.      Yes.

10   A.      I would have to say probably

11   hundreds.  I don't know.

12   Q.      What kinds of cases were they?

13   A.      I've investigated, pardon me,

14   a gamut of criminal investigations

15   from summary offenses through

16   homicides.

17   Q.      What homicides were you

18   assigned to?

19   A.      I was assigned to one that I

20   can recall when I was at Troop G,

21   McConnellsburg.  And you'll have to

22   forgive me, I don't recall the victim

23   or the suspect's names.  I don't

24   recall.

25   Q.      Were you the lead

29

1    investigator?

2    A.        No.

3    Q.        How many cases, criminal

4    cases, were you the lead

5    investigator?

6    A.        Criminal cases?

7    Q.        Yes.

8                        ATTORNEY BAILEY:

9                        Could you define lead

10              investigator for us?

11   BY ATTORNEY GUIDO:

12   Q.        Well, the primary

13   investigator, that was your

14   responsibility, you were the primary

15   ---?

16   A.        Again, I can only guess at

17   that.  I'm going to say probably

18   hundreds.  I don't really know.

19   Q.        Do you know --- can you give

20   me an idea how many felonies?

21   A.        I would have no idea.  I have

22   no way of estimating that for you.

23   Q.        How many corruption cases have

24   you investigated?

25                        ATTORNEY BAILEY:

30

1        Do you mean public

2    corruption?

3            ATTORNEY GUIDO:

4            Public corruption, yes.

5    A.    Well, certainly one --- no, as

6    the lead investigator, none come to

7    mind.

8    BY ATTORNEY GUIDO:

9    Q.    How about just as assisting

10   the investigation?

11   A.    Other than the issue that's

12   the centerpiece of this lawsuit, I

13   don't recall where public corruption

14   was a case that I might have

15   supported.  I don't recall.

16   Q.    To the best you can remember,

17   the FBI case that started all of this

18   lawsuit, is the first public

19   corruption case you worked on?

20   A.    I would reserve the

21   opportunity to come back to that one.

22   To tell you the truth, that's not a

23   question I thought of.  There's

24   nothing comes to mind.

25   Q.    Okay.  How about organized

31

1    crime?  Have you done any organized

2    crime cases?

3    A.       No, no.

4    Q.       Before September 1998, how

5    many times have you worked on cases

6    with the FBI?

7    A.       On no occasions.  I recall a

8    seizure or two seizures that I was

9    assigned as a part of a work unit

10   when I was in Troop G.  They were ---

11   one was a clandestine lab and another

12   was another drug case.  But, you

13   know, I was a worker bee.

14   Q.       When you're talking about

15   seizures, are you talking about

16   seizing drugs?

17   A.       Yes.

18   Q.       Property?

19   A.       Yes, property.  The detail I

20   was assigned to was property seizure.

21   Q.       Okay.  Would that be property

22   that was --- I guess I'm wondering if

23   you've got, you know, anticipation of

24   forfeiture ---

25   A.       Yes.

32

1   Q.      --- or as evidence?

2   A.      No, at that point it was

3   forfeiture proceedings.

4   Q.      Okay.

5   A.      It was land, equipment, and so

6   forth.

7   Q.      So the two cases that you

8   recall working with the FBI prior to

9   September 1998, those were cases in

10  which you described yourself as a

11  worker bee?

12  A.      Yes, ma'am.  I think I might

13  have missed a question or an answer

14  that you had asked a question to.  If

15  I could come back to it also.

16  Q.      Yes.

17                  ATTORNEY BAILEY:

18                  You can do that at

19          anytime.  If you want to

20          re-visit or want to add to,

21          correct or modify an answer,

22          you're totally free to do

23          that.

24  A.      Well, you know, if I'm wrong,

25  give me the time out.  But I believe

33

1    you were eventually going to get to

2    an issue of training or experience.

3    And I was just going to answer that,

4    like all troopers starting in the

5    academy with academy training, I

6    received what was offered both in

7    that academy and certainly at the

8    other police academy, with respect to

9    criminal investigations.  But when I

10   was also assigned to Troop G,

11   McConnellsburg, I did attend a two-

12   week criminal investigation course

13   also offered by the academy.

14   BY ATTORNEY GUIDO:

15   Q.      Would that be here in

16   Harrisburg?

17   A.      In Hershey.  And a variety of

18   related in-service classes over the

19   years.  I think I could begin to name

20   all of them but ---.

21   Q.      I'm sure.  Skipping back to

22   where we were with the FBI, you

23   didn't really have any contacts at

24   the FBI?

25   A.      No, no.

34

1    Q.      And it wasn't as if in

2    September of 1998, it wasn't as if

3    you had a close relationship with

4    anybody at the FBI?

5    A.      No.

6    Q.      While you were in the Bureau

7    of Research and Development, what

8    investigative duties did you have?

9    A.      None.

10   Q.      When you were assigned to the

11   Systems and Process Review Division

12   of the Bureau of Professional

13   Responsibility, what investigative

14   duties did you have?

15   A.      I didn't have any

16   investigative duties.  But for five

17   years our role, one of the primary

18   functions that the division served

19   when I was there, was reviewing

20   criminal investigations for

21   thoroughness, content, applicability

22   of actions and so forth.  We were,

23   again, I'm not sure what you might or

24   might not know about staff

25   inspections, but compliance and

35

1    ensuring that investigations were

2    conducted logically, leads were

3    followed and proper action taken.  It

4    was very much an issue that staff

5    inspection followed up on, when I was

6    assigned there.

7    Q.      I don't know anything about

8    staff inspections, so maybe you can

9    explain more to me about how that

10   works.  How do you determine what

11   inspection is going to take place,

12   when?

13   A.      How it was set up when I was

14   there was we identified all of the

15   various department components.  And

16   principally that would be troop and

17   bureau operations, divisions, station

18   locations.  And we developed a master

19   schedule on --- I believe initially

20   it was a two-year cycle.  And then

21   the accreditation requirement

22   changed, so then it became a

23   three-year cycle, which means that

24   once every two or three years,

25   depending on what the prevailing

36

1    regulation is, that component is

2    inspected for compliance with

3    regulations.

4            We have three officers

5    assigned to a lieutenant.  And those

6    three individuals would each be

7    assigned a function within that

8    station or division location to

9    inspect, that being crime patrol or

10   staff.  And the task of the inspector

11   is to review the entity that they are

12   assigned for compliance, make notes,

13   and develop a report of findings.

14   The lieutenant and the section

15   commander, which is a job that I

16   initially had when I was transferred,

17   was as an oversight or an

18   overview of the entire process.

19   Q.      And what does an inspection

20   entail?

21   A.      Well, the very reason I

22   accepted that position when offered

23   to me is what it entailed or what we

24   were asked to do was to develop a

25   program that had credibility and

37

1    served the needs of the department,

2    as opposed to being just an exercise

3    in widgeting.   There's a part of any

4    inspection that does have inspection

5    in its pure form, meaning, are things

6    hung the way they're supposed to be

7    and are various posters available and

8    whatnot.   But the very reason I

9    accepted that position when offered,

10   is I was told that I had a chance to

11   be a part of writing a regulation and

12   being an architect of the process

13   that looks beyond that, looks beyond

14   are just the blocks on the form

15   filled out, did the trooper actually

16   take the appropriate action, did

17   someone respond to the scene.

18   Q.      As a practical matter, how do

19   you do that?  You as the inspector,

20   as a practical matter, how do you

21   make sure that the trooper did what

22   he was supposed to do?

23   A.      For example, if we're talking

24   about investigative reports, we would

25   take a random sample of reports over

38

1  an identified period of time or take

2  every report over an identified

3  period of time, look through them,

4  study them, look for discrepancies,

5  and in many, many instances, make

6  phone calls or personal visits to the

7  victims or witnesses and identify

8  what our function was and that we

9  were just basically a compliance

10  monitoring role.  We were quality

11  assurance.  And we talked to

12  individuals that our troopers had

13  dealt with to see if we were

14  performing up to the department's

15  expectations.

16  Q.     Were you looking at whether an

17  individual --- and maybe it's both.

18  If the answer's both, fine.  Were you

19  looking at whether an individual

20  state police member was performing up

21  to standards or looking at the

22  station or ---?

23  A.     Actually, there's both.  And

24  additionally, we were looking at how

25  the department's performing.  Our

39

1  first --- when we found, as an

2  illustration, when we found an area

3  of deficiency, our first task was to

4  look to see if the regulations were

5  flawed or if there was a policy void

6  that existed that was the reason for

7  the noncompliance. And if that were

8  the case, then we made

9  recommendations for change.

10  Q.      Okay.  What kind of problems

11  would you be able to identify?

12  A.      I'm not sure where to begin.

13  The most significant ones, if you

14  want me to start there, might relate

15  to the handling of evidence and

16  security of evidence and the evidence

17  process, the maintenance of the

18  property management system in its

19  entirety.  We would conduct a full

20  and complete inventory of every

21  property room in the state.

22  Q.      What kind of problems might

23  come up with respect to how evidence

24  was handled?

25              ATTORNEY BAILEY:

40

1          I'm going to pose an

2      objection.  Do you want him to

3      continue with the kinds of

4      areas he was investigating or

5      do you want to move on to this

6      next question you asked?  He

7      had not completed responding.

8  BY ATTORNEY GUIDO:

9  Q.     Okay.  If you didn't complete

10  responding to investigating, we can

11  go back to that in a second.  But

12  right now, I just want to finish this

13  question while I'm thinking about it.

14          ATTORNEY BAILEY:

15          All right.  The

16      objection's noted.  You may

17      respond.

18  BY ATTORNEY GUIDO:

19  Q.     I don't need lots of them, I

20  just want some examples so I can get

21  an understanding of what you did.

22  A.     In property rooms, for

23  example, which was actually a

24  Fourth-rated component when I was

25  assigned to inspections or it evolved

41

1    to a fourth and separately rated

2    component because of its importance,

3    we found a gamut of problems.  From

4    inadequate storage areas, meaning,

5    there was some problem with the

6    facility where our property was being

7    stored, up through missing property

8    records, missing property, criminal

9    conduct on the part of our members

10   assigned to those security functions.

11   Q.      Okay.  And I believe, Mr.

12   Bailey let me go back to my original

13   question because he didn't think you

14   finished answering it.  And my

15   original question was, while you were

16   in the Systems and Process Review

17   Division, what investigative duties

18   you had?  So I thought that you had

19   said basically none, that it was

20   doing inspections.  If you had

21   something to add, please do.

22   A.      I had no role as a primary

23   responding officer to a scene to take

24   information from a complainant.

25   Q.      Okay.

42

1    A.      But at the same time, we were

2    --- I was among nine or ten people

3    tasked in the whole entire department

4    with the review of criminal

5    investigations for their thoroughness

6    and content and accuracy and things I

7    believe I've already described.

8    Q.      Yes.  I think I understood

9    your answer.  I wanted to go back to

10   where I was at when you would find a

11   problem, some type of problem that

12   had been done in the investigation.

13   At one point you mentioned maybe

14   leads that hadn't been followed up

15   on.

16   A.      Yes.

17   Q.      What would you do about that?

18   A.      If there was misconduct, if we

19   determined that there was potential

20   misconduct on the part of a member or

21   a failure to complete his assigned

22   responsibilities, we would,

23   consistent with the processes that

24   exist and are supposed to be

25   followed, we would approach the

43

1    station commander or a unit

2    supervisor, depending on the exact

3    unit we're in.  We would give the

4    information to them for further

5    action.  And in many instances, that

6    resulted in a Bureau of Professional

7    Responsibility, Internal Affairs

8    complaint sheet being initiated.

9    Q.      Would that be up to you to

10   initiate that or would the station

11   commander prepare that?

12   A.      The station commander.

13   Q.      Now, it sounds to me that when

14   you were in the systems and --- it's

15   such a long name --- systems and

16   process ---.

17   A.      SPR.

18   Q.      SPR.  I keep stumbling over

19   it.  I guess that required you to

20   have very detailed knowledge of the

21   department's rules and regulations?

22   A.      Yes.

23   Q.      And you were assigned --- you

24   moved from SPR to Internal Affairs

25   when?

44

1    A.      May 2nd, 1998.  That's State

2    Police Day.

3    Q.      What's State Police Day?

4    A.      May 2nd.

5    Q.      What's the day?

6            ATTORNEY BAILEY:

7            You don't know that?

8            ATTORNEY GUIDO:

9            I don't know.

10           ATTORNEY BAILEY:

11           That's terrible.

12           ATTORNEY GUIDO:

13           It's terrible, but what

14    is it?

15    A.      That's the day the state

16    police was created.

17    BY ATTORNEY GUIDO:

18    Q.      What year was that?

19    A.      What year we were created?

20    1905.

21    Q.      1905.  I did have one thing

22    right.  And you were transferred

23    there when Major Merryman asked you

24    to move from one section of BPR to

25    the other.

45

1  A.        Yes.

2  Q.        Essentially, both of those two

3  would be under Major Merryman, who

4  was the bureau director?

5  A.        Those two divisions comprised

6  BPR, yes.

7  Q.        Okay.  And when you first went

8  to internal affairs, you started

9  there as the director?

10 A.        Yes.

11 Q.        And what was your --- who was

12 your immediate supervisor?

13 A.        Major Merryman.

14 Q.        How long was Major Merryman

15 your immediate supervisor?

16 A.        From May 2nd --- wait a minute.

17 Yes.  From May 2nd, 1998, until he

18 was transferred in September of '98.

19 Q.        Which is when you then became

20 the acting bureau director?

21 A.        Yes.

22 Q.        And he was also your immediate

23 supervisor the entire time you were

24 at SPR?

25 A.        Not the entire time.

46

1    Q.      Okay.  At the end of it, I

2    guess?  How long was he your

3    supervisor at SPR?

4    A.      I don't know when he

5    transferred.

6    Q.      Okay.

7    A.      He supervised me there, but I

8    don't know when --- I was already the

9    captain of that division when he came

10   in.  But I don't know when he was

11   transferred.

12   Q.      Who was the head of the bureau

13   before him?

14   A.      I'm not sure of the order.  We

15   had several.  I believe preceding

16   Major Merryman was Major Woodring

17   (phonetic), Paul Woodring.  But if it

18   wasn't him, it was Major Amos

19   (phonetic).  I don't remember the

20   sequence, though.

21                  ATTORNEY BAILEY:

22                  I think it was

23          Woodring.

24   BY ATTORNEY GUIDO:

25   Q.      So while you were in internal

47

1    affairs, the only two supervisors
2    that you had, immediate supervisors,
3    would have been Major Merryman and
4    then Major Conley?
5    A.       Correct.
6    Q.       And can you describe to me
7    your duties as director of the
8    Internal Affairs Division?
9    A.       As director of the Internal
10   Affairs Division, my duties were to
11   --- I was the supervisor/division
12   director of the entire internal
13   affairs process, meaning,
14   investigations or complaints
15   received, ensuring that they were
16   assigned for investigation and
17   investigations were completed, sent
18   to the division and routed to the
19   respective adjudicators.
20   Q.       Did you ever personally
21   conduct internal affairs
22   investigations?
23   A.       Yes.
24   Q.       How many?
25             ATTORNEY BAILEY:

48

                    Maybe we should define
            a little better what you mean
            by personally conduct.

BY ATTORNEY GUIDO:

Q.      Were you ever the person
assigned to --- conduct an internal
affairs case?

A.      Yes, not while I was the
director, if that's what you mean.

Q.      Let's do both.  While you were
the director; did you?  Or did you
ever assign any cases to yourself?

A.      I would hope I was smart
enough not to do that.  No, not that
I recall.

Q.      Okay.  When were you in
internal affairs when you weren't the
director?

A.      I wasn't.  But I was, as a
troop member and as a bureau member,
I was assigned investigations by BPR
to complete.

Q.      When you were at --- not when
you were in internal affairs, but
when you were basically in the patrol

49

1    division?

2    A.      Yes.   When I was a trooper,

3    assigned to Troop G, I recall one and

4    I think I might have been assigned

5    two, but I don't recall.   I was also

6    assigned to conduct an investigation

7    when I was stationed, when I was

8    assigned to the Bureau of Research

9    and Development.

10                    ATTORNEY BAILEY:

11                    For the record, could I

12           suggest that maybe a little

13           information on the

14           relationship between BPR and

15           internal affairs, what they

16           are, to help understand this

17           record a little better at this

18           point.

19    A.      BPR, as I've said, is

20    comprised of two divisions.   I think

21    what the issue might be and I think

22    what we're after to clarify is, not

23    all internal affairs investigations

24    are assigned to Internal Affairs

25    Division personnel.   They are

50

1    assigned to troop investigators or

2    bureau personnel, if it's determined

3    by either director that that's

4    appropriate and troop commander that

5    that's an appropriate assignment to

6    make.  So I conducted internal

7    affairs investigations but I wasn't

8    assigned to internal affairs.

9    BY ATTORNEY GUIDO:

10   Q.     Who makes the decision about

11   whether it's going to be handled by

12   internal affairs or by a member of

13   the troop?

14   A.     That's a matter that's

15   generally discussed between the troop

16   commander and the director of

17   internal affairs.

18   Q.     If it's handled by the troop,

19   does that information eventually make

20   its way to internal affairs?

21   A.     The investigation, you mean?

22   Q.     Yes.

23   A.     Yes.

24   Q.     And is it assigned an internal

25   affairs number?

51

1    A.      Yes.  According to our

2    procedures, internal affairs

3    investigations, complaints, when

4    they're received and assigned, are

5    assigned a BPR control number,

6    sequentially, at that point, yes.

7    Q.      At what point is that done,

8    before or after the investigation?

9    A.      That's done when the complaint

10   is received, as I recall, not

11   afterward.

12   Q.      And so the best you remember,

13   you've done two, maybe three, of

14   those kind of internal

15   investigations?

16   A.      Yes.

17                   ATTORNEY GUIDO:

18                   I'd like that to be

19              marked as Three.  It's just

20              the Complaint.  I'll give you

21              a copy.

22                   (Deposition Exhibit

23                   Number Three marked for

24                   identification.)

25   BY ATTORNEY GUIDO:

52

1   Q.      I'm going to hand you Exhibit

2   Three.  I just wanted to make sure we

3   all had a copy.  And I'm going to go

4   through your Complaint with you and

5   ask some questions about it.  If at

6   anytime, you know, anytime you decide

7   you need a break, signal me if you

8   need to go to the men's room or

9   anything like that.

10                  ATTORNEY BAILEY:

11              Syndi, the only thing

12          is, so to help you plan,

13          although, I realize there's a

14          lot of time yet, I'm just

15          getting off the flu and

16          probably going to need some

17          time like around noon or so,

18          a decent break, to get some

19          lunch or broth or something.

20          So just so you can, you know,

21          plan on that.

22                  ATTORNEY GUIDO:

23              Okay.  No problem.

24          Like I said ---.  Okay.

25   BY ATTORNEY GUIDO:

53

1    Q.      Start on page six, paragraph

2    20.  That's the very beginning of the

3    operative facts of the Complaint.

4    A.      Yes.

5    Q.      And it says in paragraph 20,

6    Darrell G. Ober, on or about

7    September 1998, was one of the

8    brightest and the best, a rising star

9    in the Pennsylvania State Police

10   organization.  Could you explain what

11   you base that assessment on?

12   A.      At that point in time in my

13   career, I think I had made captain in

14   12 years.  My work record up until

15   that point was unblemished.  On the

16   past three promotion or four

17   promotion exams, I finished no lower

18   than sixth in the entire state.  I

19   was asked to participate in things, I

20   believe, that are documented on my

21   resume.

22               ATTORNEY BAILEY:

23               Answer the question

24          fully and completely, please.

25   A.      At that point in my career, I

54

1    was the director of the Internal

2    Affairs Division, which in state

3    police organizations or any police

4    organizations, is generally thought

5    of as one of the, in my opinion,

6    generally thought as one of the most

7    highly sought after positions.  I was

8    asked to transfer to that position,

9    based on my track record and my work

10   record, having completed a five-year

11   tour of the Systems and Process

12   Review Division, as I've mentioned

13   earlier, where I was an architect in

14   creating the whole division and it

15   was running quite successfully.

16        I had been asked to

17   participate in legislative budget and

18   finance review committee responses on

19   behalf of the Commissioner.  I had

20   been asked to serve on cadet review

21   boards, appeal, --- not appeal

22   boards, but background review boards.

23   Actually, I volunteered for those

24   assignments. I volunteered t be a

25   part of the Pennsylvania Emergency

55

1    Management detail.  So at that point

2    in my career, in comparison to my

3    peers, I believe that would be a very

4    accurate statement, situated as I was

5    in 1998.

6    BY ATTORNEY GUIDO:

7    Q.    Okay.  Now, you mentioned that

8    your career at that point was

9    unblemished.  You had had internal

10   affairs investigations conducted on

11   you before; correct?

12   A.    Absolutely.

13   Q.    But they were just determined

14   to be unfounded?

15   A.    They were unfounded

16   complaints, yes, ma'am.

17   Q.    So you ended up being

18   vindicated by those investigations?

19   A.    Yes, ma'am.

20   Q.    And then you go on to talk

21   about being a cum laude graduate of

22   Pennsylvania State University.  Do

23   you remember what your GPA was at

24   Penn State?

25   A.    3.42.

56

1    Q.      And I think Penn State uses

2    the term, with distinction?

3    A.      Yes, ma'am.

4    Q.      As opposed to cum laude?

5    A.      That's correct.

6    Q.      And adds with distinction,

7    with high distinction, with highest

8    distinction; is that right?

9    A.      Yes.  That sounds familiar.

10   Q.      Okay.  You also mentioned

11   graduating number one from the

12   Pennsylvania Law Enforcement Academy.

13   How many people were in your class?

14   A.      I believe about 25 or so.

15   Q.      And you actually graduated

16   second in that class; right?

17   A.      No.  I have a plaque that says

18   I was the top cop in my class.

19                   ATTORNEY GUIDO:

20                   Just mark that ---

21           sorry, we're kind of at a

22           distance here.

23                   ATTORNEY BAILEY:

24                   Is this Number Four?

25                   ATTORNEY GUIDO:

57

1          Yes.

2          (Deposition Exhibit

3          Number Four marked for

4          identification.)

5   BY ATTORNEY GUIDO:

6   Q.     I'm going to hand you Exhibit

7   Number Four.

8   A.     Uh-huh (yes).

9   Q.     Which is from your official

10  personnel file.  That's the official

11  transcript from the Law Enforcement

12  Academy.  And what does it rank you

13  in the class?

14  A.     This is the --- class rank, it

15  says 2 of 20.

16  Q.     Okay.  So there were 20 in the

17  class?

18  A.     Apparently.

19  Q.     And at least according to the

20  transcript, you were number two in

21  the class?  Pretty good.

22          ATTORNEY BAILEY:

23          Well, that's his class

24          rank.  That's not his overall

25          grade.

58

1  A.      Yeah, they ---.

2  BY ATTORNEY GUIDO:

3  Q.      I'm just asking your class

4  rank, 2 out of 20; correct?

5  A.      Let me explain.

6              ATTORNEY BAILEY:

7              One moment, please.  I

8       want you to bring --- do you

9       have a plaque, you say?

10 A.      Yes.  They gave out different

11 awards.  Scholastically, I was

12 second.  I can recall who was first.

13 He beat me by one hundredth of a

14 percentage point.  It was Brian

15 Hershey.

16              BY ATTORNEY GUIDO:

17              Okay.

18              ATTORNEY BAILEY:

19              Hold just a second.

20              ATTORNEY GUIDO:

21              Okay.

22              ATTORNEY BAILEY:

23              You're very kind.

24       Continue, please.

25 A.      They also gave a firearms

59

1    score, which I believe I was second,

2    also.  I can't recall that.  They

3    gave a physical fitness award, which

4    I don't think I was close, candid

5    with you.  But the most sought after

6    trophy that I can recall many years

7    ago was the top cop award, which was

8    the overall best candidate, which a

9    member of that class, which was me.

10    And I've been given a plaque by the

11    director that says it was the top cop

12    award - - -.

13    BY ATTORNEY GUIDO:

14    Q.    And that's the name of the

15    award?

16    A.    Yes.

17            ATTORNEY BAILEY:

18            Can you make a copy of

19        that, please?

20    A.    I'll be glad to.

21            ATTORNEY BAILEY:

22            And provide it to me.

23        Thank you.

24    BRIEF INTERRUPTION

25            ATTORNEY BAILEY:

60

1          I have a copy for you,

2    Darrell.

3              ATTORNEY GUIDO:

4          He has a copy.  You can

5    keep the copy.

6              ATTORNEY BAILEY:

7          That has to go to the

8    Court Reporter, but I have a

9    copy for you that's marked.

10    Okay?

11   A.    Thanks.

12             ATTORNEY GUIDO:

13         For everything I ask

14    you about, I'll make sure that

15    your attorney gets ---

16   A.    I don't think I've ---.

17             ATTORNEY GUIDO:

18         --- gets a copy.  Okay.

19   BY ATTORNEY GUIDO:

20   Q.    Now, in that same paragraph

21   20, you mention that your work

22   history was replete with numerous

23   career enhancing achievements,

24   citations, experience,

25   qualifications.  What citations,

61

1  awards, honors, et cetera, did you

2  receive as a state trooper?

3  A.      Oh, over the years I've been

4  given numerous letters of

5  appreciation.  Well, I don't know if

6  they're called letters of

7  appreciation.  Let me back up.  I've

8  been given numerous pieces of

9  correspondence from various

10  supervisors acknowledging the work

11  that I've performed on behalf of the

12  agency.  I, quite frankly, wouldn't

13  know where to begin.  I've had

14  numerous ---.

15  Q.      Do you still have copies of

16  any of them?

17  A.      Yes.  I believe I have copies

18  of some.  I don't know if I have them

19  all.

20  Q.      Okay.  Have you ever received

21  a letter of commendation from your

22  troop commander or a bureau director?

23  A.      No.

24  Q.      Have you ever received a kind

25  of award or a citation or honor that

62

1  would go into your official personnel

2  file?

3  A.      Well, I've received letters of

4  appreciation after the IIMS project.

5  I don't know whether they went into

6  my file or not.

7  Q.      And you have reviewed your

8  personnel file; haven't you?

9  A.      Yes.  Oh, yes.

10  Q.      And when you reviewed your

11  file, do you recall seeing any kinds

12  of awards, honors, letters of

13  commendation in your file?

14  A.      No.

15  Q.      Did you receive any kinds of

16  commendations, awards, achievements,

17  et cetera, while you were a police

18  officer at Indiana University?

19  A.      No.

20  Q.      How long were you there?  I

21  can't remember.

22  A.      About two years.

23  Q.      Now, in paragraph 21, you say

24  that you were named the director of

25  IAD in May 1998, and in September

63

1    1998, you became the acting bureau

2    director.  And then paragraph 22   is

3    something that I think you were

4    alluding to a little bit ago and I'll

5    ask you about, where you said that

6    this career path is customarily

7    associated in the state police with

8    advancements to the highest, very

9    highest ranks in the organization,

10   including commissioner.  And my

11   question there is when you say this

12   career path, are you referring to

13   being the director of the Internal

14   Affairs Division or being the acting

15   bureau director?  What's the career

16   path that's associated with being

17   among the highest ranks?

18   A.     Well, I would say it probably

19   incorporates both.  I think by virtue

20   of selection to internal affairs,

21   whether it be as an investigator, a

22   section commander or the division

23   director, it's my experience that in

24   the police culture and the corporate

25   police world that that's generally

64

1    thought of as one of the more

2    desirable and lucrative assignments

3    by virtue of the fact that you are

4    placed in a sensitive position,

5    managing some of the most critical

6    information about the department and

7    its personnel.

8            This was not the first or only

9    time I had ever been the acting

10   bureau director.  But being afforded

11   the opportunity to act in that

12   capacity is also an honor, because it

13   gives that person the opportunity to

14   learn the position of the next rank.

15   In other words, you are empowered and

16   given a career opportunity to learn

17   and perform the activities of the

18   acting director.

19   Q.      And being the acting director

20   can be something for a few weeks, as

21   you were, or it could be something as

22   temporary as while somebody's on

23   leave; correct?

24   A.      Yes.

25   Q.      Could someone be acting bureau

65

1    director for as long as like a year

2    or something like that or is it more

3    of a temporary-type situation?

4    A.    Well, I think it's intended to

5    be short term.  I suppose it could go

6    for a year.  I can think of an

7    instance when it was given to someone

8    for six months or so, off the top of

9    my head.

10   Q.    Okay.  And it's not uncommon

11   for someone to serve as an acting

12   bureau director and not ultimately

13   become the bureau director; correct?

14   A.    Correct.

15   Q.    And not just in BPR, but in

16   any bureau; right?

17   A.    Correct.

18   Q.    And as I said, that's partly

19   because it could just be a very

20   temporary thing, such as somebody's

21   on vacation, so you're going to be

22   acting while they're gone?

23   A.    Yes.

24   Q.    And you also, in saying that,

25   you know, it's associated with

66

1  becoming commissioner, certainly

2  being the director of internal

3  affairs or even the director of the

4  Bureau of Professional

5  Responsibility, is certainly no

6  guarantee that you would end up being

7  the commissioner; correct?

8  A.      Correct.

9  Q.      Or even a deputy commissioner?

10 A.      Correct.

11 Q.      I imagine there have been

12 plenty --- I'll let you finish.  I

13 imagine there have been plenty of

14 people that were the bureau director

15 or the director of IAD that never did

16 make the command staff of the deputy,

17 of the commissioner or his deputy;

18 correct?

19 A.      Well, I lost the first part of

20 that.  Let me answer it this way.

21 Q.      Okay.

22                ATTORNEY BAILEY:

23           I would object to the

24           form of that question.  It's a

25           little bit leading.  I wonder

67

1          if you might be able to break

2          it down just a little bit.

3                    ATTORNEY GUIDO:

4                    Sure.

5                    ATTORNEY BAILEY:

6                    It's complex.

7    BY ATTORNEY GUIDO:

8    Q.       What you're saying in here is

9    that being the director of the

10   Internal Affairs Division is

11   something that's associated with

12   becoming the commissioner.  And what

13   I'm asking you is, you know, wouldn't

14   there have been lots of directors of

15   internal affairs that never did make

16   it to be the commissioner or one of

17   his deputies?

18   A.       I don't know that I can agree

19   with the term lots.  I would suggest

20   that there's a high percentage.

21   There's a higher percentage of

22   relationship between advancement from

23   those positions, not just to the

24   commissioner's office or deputy's

25   office, but also to other promotions,

68

1    promotions to the next higher rank.

2    There's very high correlation in my

3    recollection between members who have

4    been assigned to internal affairs and

5    director of BPR.  There's much more

6    so, I would guess, than any of the

7    other bureaus.

8              ATTORNEY BAILEY:

9              Counsel, I'd like to

10         bring to your attention the

11         language in paragraph 22 is

12         with advancement to the very

13         highest ranks in the

14         organization and underline,

15         including commissioner.

16              ATTORNEY GUIDO:

17              Right.

18              ATTORNEY BAILEY:

19              So we shouldn't

20         appropriate that as saying

21         that that's a necessity or a

22         requirement for that career

23         path.

24              ATTORNEY GUIDO:    I

25         know.

69

1    <u>BY ATTORNEY GUIDO:</u>

2    Q.      I'm just asking what is meant

3    --- I'm trying to get at what you

4    meant by that.  And I think that

5    you're answering my question quite

6    appropriately.

7    A.      You can get your ticket

8    punched on the way to the top by a

9    tour through IAD.  Does that help?

10   Q.      Yes.  And also, it's not a

11   necessity, though; right?  I think

12   that's ---.

13   A.      Not to my knowledge.

14   Q.      There are people --- I think

15   maybe even Deputy Commissioner

16   Westcott never was in charge of

17   internal affairs or the Bureau of

18   Professional Responsibility?

19   A.      That would be correct.

20   Q.      Okay.  And while you were the

21   director of internal affairs, as

22   director, would you be responsible

23   for overseeing all of the

24   investigations that are assigned to

25   that division?

70

1    A.      Yes.

2    Q.      Would you also be responsible

3    for overseeing all of the ones that

4    are assigned out to the troops, as

5    well?

6    A.      Yes.

7    Q.      In doing that, would you be

8    making --- I guess, Administrative

9    Regulation 4-25, is that sort of like

10   the bible of internal affairs?  If

11   you don't like that characterization,

12   you can change it.

13   A.      Yeah.  I would not say that.

14   But it is the document, the source

15   document, for internal affairs.

16   Q.      It's pretty much what governs

17   how internal affairs is ---?

18   A.      Yes.

19   Q.      And would it be your

20   responsibility as the director to

21   make sure that AR 4-25 was complied

22   with?

23   A.      Yes.

24   Q.      Both by people in your

25   division and by people out in the

71

1    troops?

2    A.      Yes.

3    Q.      You had mentioned that when

4    you had been out in the troop, you

5    had done two or three cases.  Do you

6    remember what those cases were by

7    name or by subject?

8                ATTORNEY BAILEY:

9                Objection to the form

10           of that question.  You may

11           respond.

12   A.      The one --- there were three

13   subjects.  I believe there were three

14   subjects in the one investigation.

15   And they were assigned to Troop G,

16   Bedford.  And I believe one of the

17   subjects, maybe he could have been

18   the only subject, was Gerald Polca.

19   P-O-L-C-A, I think is how that was

20   spelled.  The other one that I can

21   recall that I was assigned when I was

22   in the Bureau of Research and

23   Development, was that I was assigned

24   to complete an investigation on

25   Sergeant Byron Lewis.  Those are the

72

1    two that come to mind.  There may not

2    have been any others, but those are

3    the two that come to mind.

4    BY ATTORNEY GUIDO:

5    Q.    Do you remember if those

6    turned out to be ---?

7                    ATTORNEY BAILEY:

8                    And incidentally, just

9            Counsel, before you continue,

10            if there are any responses

11            that include names and for any

12            confidential reasons should be

13            redacted, I certainly would

14            agree to that.  But I think to

15            enable --- you know, you go

16            ahead and answer her questions

17            fully and completely, but

18            maybe we should have that

19            understanding.

20                    There may be some

21            confidential issues here.  And

22            I want to make clear that, you

23            know, he's free to answer

24            questions.  We have to have an

25            understanding here that there

73

```
 1          needs to be some protection of
 2          individuals' rights.  Okay?
 3          Darrell, do you understand
 4          that?
 5   A.     Uh-huh (yes).
 6   BY ATTORNEY GUIDO:
 7   Q.     Do you recall whether those
 8   ended up being founded or unfounded,
 9   if you recall?
10   A.     I don't believe I would know
11   that.  I was the investigator.
12   Q.     The investigator doesn't
13   necessarily find out the ---?
14   A.     Correct.  What the ultimate
15   adjudication was, I don't know if I -
16   ---.
17   Q.     The investigator, you go out,
18   you gather the facts and then you
19   give it to somebody else who makes
20   the decision?
21   A.     Correct.
22                  ATTORNEY BAILEY:
23          Can I follow with just
24          one small question that might
25          help that?
```

74

1                        ATTORNEY GUIDO:

2                        Sure.

3                        ATTORNEY BAILEY:

4                        Does the investigator

5              in those situations make a

6              recommendation?

7  A.          No.

8                        ATTORNEY BAILEY:

9                        Okay.

10 BY ATTORNEY GUIDO:

11 Q.          So when you became the

12 director of internal affairs, you

13 really didn't have a lot of internal

14 affairs experience?

15 A.          Correct.

16 Q.          I suppose that would put you

17 through somewhat of a learning curve;

18 wouldn't it?

19 A.          Yes.

20 Q.          And I guess being new to the

21 area of responsibility, it would be

22 normal to make mistakes sometimes?

23 A.          I think that's probably an

24 accurate statement.

25                        ATTORNEY BAILEY:

75

1          I'm going to object

2          both to the question and to

3          the response.

4   BY ATTORNEY GUIDO:

5   Q.      Well, you certainly made

6   mistakes sometimes; didn't you?

7   A.      Well, I guess I'm giving you

8   --- maybe I'm giving you too much of

9   the benefit of the doubt.  I mean, I

10  go back to --- first of all, I'm

11  married.  So I darn well know I make

12  mistakes all the time.  Are we

13  talking about ---?

14  Q.      Now, we don't want to have

15  your wife think the mistake was

16  getting married.

17          ATTORNEY BAILEY:

18          The reason I'm

19          objecting to the question is

20          speculation.  But I don't want

21          you speculating.  We're

22          talking about generic things

23          and we can certainly, you

24          know ---.

25  A.      Ms. Guido, you're deposing me,

76

1    and I know the answer to have I ever

2    made mistakes - - -

3    BY ATTORNEY GUIDO:

4    Q.      Is yes.

5    A.      - - - is yes, not no, because

6    that wouldn't be accurate.  So does

7    that help?

8    Q.      Sure.

9    A.      Okay.

10   Q.      Basically, what I'm getting at

11   is, you know, like I said, there's a

12   learning curve.  Because this was a

13   new area of responsibility for you

14   that you hadn't worked there before;

15   right?

16   A.      Yes.

17   Q.      And you started working there

18   in May of '98; correct?

19   A.      Yes.

20   Q.      Paragraph 23, on or about late

21   September, early October 1998, you

22   were contacted by the FBI about a

23   political corruption case.  How do

24   you pinpoint the date?

25   A.      I didn't pinpoint the date.

77

1  Q.     It says to September or early

2  October.

3  A.     Well, it was my recollection

4  that it was during the time that I

5  was the acting bureau director.

6  Q.     Okay. So that would have had

7  to be between --- when did you become

8  the acting bureau director? Was that

9  September 17th or something like

10 that?

11 A.     That sounds correct.

12 Q.     So it would have to be after

13 mid September?

14 A.     That was my recollection, yes.

15 Q.     And then Conley was appointed

16 October 3rd. So it would have to be

17 before that; correct?

18 A.     That's correct.

19 Q.     Can you be more specific about

20 who contacted you?

21 A.     I had a discussion about this

22 issue with Special Agent Ralph Kush,

23 K-U-S-H.

24 Q.     How did he contact you?

25 A.     We spoke by telephone.

78

1  Q.      Where was that at?  Where were

2  you at?

3  A.      Well, I assume I was in my

4  office.  I don't recall being

5  anywhere else.

6  Q.      Did he call you?

7  A.      That's my recollection, yes.

8  Q.      Did he say how he got your

9  name?

10  A.      No.  I don't recall that, that

11  he did.

12  Q.      Do you know if he --- did he

13  say whether he contacted you simply

14  because you were the head of the

15  bureau or because of something about

16  you personally; did he mention?

17  A.      Me personally?  No, I don't

18  know Ralph, Agent Kush.  I don't

19  recall.  If he said anything ---

20  well, I would just be speculating.  I

21  don't know.

22          ATTORNEY BAILEY:

23          Don't speculate.

24  BY ATTORNEY GUIDO:

25  Q.      I'm just trying to get at what

79

1    you remember what was actually said.

2    If you don't remember what was said,

3    it's okay to say no.

4              ATTORNEY BAILEY:

5              Why not just ask him

6         what was done in

7         conversation?

8              ATTORNEY GUIDO:

9              Don, because I'm asking

10        the questions.

11             ATTORNEY BAILEY:

12             Well, I know.  But I

13        don't want to object and I

14        don't want to obfuscate, you

15        know, your deposition, but

16        they're suggestive and I'm

17        giving you a lot ---.

18             ATTORNEY GUIDO:

19             Well, I didn't

20        necessarily like all your

21        questions either.

22             ATTORNEY BAILEY:

23             I'm giving you a lot of

24        leeway.

25    BY ATTORNEY GUIDO:

80

1    Q.      In any event, when Agent Kush

2    contacted you, I think you told us

3    before that you didn't --- well, you

4    just said you didn't know him.

5    A.      No.

6    Q.      And you told us before you

7    really hadn't worked with anybody at

8    the FBI before?

9    A.      That's correct.

10   Q.      First of all, I do want to ask

11   you, what do you remember that he

12   told you during that first phone

13   call?

14   A.      What I recall from that

15   conversation is this.  Agent Kush

16   told me that the FBI, the western

17   office or whatever it's referred to

18   as, was conducting a political

19   corruption case in western

20   Pennsylvania.  And during that

21   investigation, it came to their

22   attention that there was an

23   individual who believed that through

24   a series of payoffs or through

25   exerting political influence, that he

81

1    could gain entry into the State

2    Police Academy as a cadet.

3    Q.      Did he mention any names

4    during that conversation?

5    A.      My recollection is in the

6    first conversation he mentioned

7    Trooper Stanton, who was subsequently

8    arrested.  Trooper Stanton --- and I

9    don't recall how he described his

10   role but, you know, I could

11   characterize it as he described

12   Trooper Stanton inserting himself as

13   a facilitator of this activity or in

14   some middleman role, for lack of

15   better terms.

16   Q.      Did he mention Commissioner

17   Evanko, either by name or by rank?

18   A.      I can't recall whether Colonel

19   Evanko's name was mentioned

20   specifically.  I do --- it is my

21   recollection that we did discuss

22   ranks or at least positions in the

23   agency.

24   Q.      What was that discussion?

25   A.      Well, the heart and soul of

82

1  the conversation, as I recollect, was

2  that, as I've just described, there

3  was an individual who believed that

4  it were possible to gain entry into

5  the State Police Academy.  And I do

6  recall Agent Kush saying that they

7  were looking for someone in the state

8  police who could provide them with

9  some resource information in order to

10 further and continue this

11 investigation of public corruption

12 and ---.

13 Q.     Is that what they wanted you

14 for?

                    ATTORNEY BAILEY:

16             He was not completed

17       with his response.  Please,

18       let him finish.  Go ahead.

19 A.     Agent Kush said they needed a

20 contact who could supply information,

21 such as when the cadet classes start,

22 exactly what the process is and how

23 the hiring process works and what

24 have you.

25 BY ATTORNEY GUIDO:

83

1    Q.      And my question was, is that

2    what your role was going to be?

3    A.      Apparently.

4    Q.      I mean, that's why he was

5    contacting you in order to obtain

6    that kind of information?

7                ATTORNEY BAILEY:

8                Objection.  You can

9                respond if you know what was

10               in his mind.

11   BY ATTORNEY GUIDO:

12   Q.      What did he tell you about why

13   he was calling you?

14   A.      That's what I just described.

15   Q.      Right.  So that's why he was

16   calling you; right?  I mean, it's not

17   that difficult.

18   A.      Actually, I think it is.  I'm

19   not sure why he called me.

20   Q.      Okay.

21               ATTORNEY BAILEY

22               All right.  I object.

23   A.      I picked up the phone or I had

24   this conversation and he's on the

25   other end.

84

1    BY ATTORNEY GUIDO:

2    Q.      And he didn't tell you why he

3    was calling you?

4                 ATTORNEY BAILEY:

5                 If you understand, you

6          can respond.  Go ahead.  I

7          object.  I've put an objection

8          on the record, but you can go

9          ahead and respond.

10   A.      I don't believe I do.  I think

11   the why part was to report this

12   activity.  I think you're asking me

13   why did he pick me out of the phone

14   book, I don't know.

15   BY ATTORNEY GUIDO:

16   Q.      No, I'm not asking you why he

17   picked you out of the phone book.

18   I'll ask you about that later.  What

19   I'm asking you right now is, when he

20   spoke to you on the phone, did he say

21   if he was calling you to get

22   information or just to give

23   information to you?

24   A.      I don't know that those words

25   were specifically discussed.  I think

85

1    I've answered that.  That's what I

2    recall from our conversation.

3    Q.     Did he ask you for any

4    information?

5    A.     On the first phone call, I'm

6    not sure.  Because even if he had, I

7    don't know if I could have provided

8    any.  I don't know.  I don't recall.

9    Q.     Did he ask your opinion about

10   whether or not it was possible for

11   someone to bribe their way into the

12   State Police Academy?

13   A.     We talked about the potential

14   of such an allegation, yes.

15   Q.     What do you remember about

16   that portion of the discussion?

17   A.     I remember, again, I'm trying

18   to recall from three years ago

19   exactly what was said.  But I recall

20   that during the conversation, I think

21   we essentially did what I did when I

22   was assigned to internal affairs,

23   which is what we call threshold

24   testing.  We had some general

25   discussion about, well, if it were

86

1    true, okay, how would this work or

2    could it work or are there any

3    weaknesses in the agency where this

4    could happen or outside of the

5    agency.  I recall some general

6    discussion.

7    Q.    Did you make any suggestions

8    to him about how it could have

9    happened?

10   A.    I could have.  I don't

11   remember.

12   Q.    Okay.  Do you remember whether

13   Coury, Westcott --- well, was Coury

14   mentioned during this conversation?

15   A.    I don't recall.

16   Q.    How about Lieutenant Colonel

17   Westcott?

18   A.    I don't recall.

19   Q.    Lieutenant Colonel Hickes?

20   BRIEF INTERRUPTION

21            ATTORNEY BAILEY:

22            Hickes, by the way, is

23         H-I-C-K-E-S.

24   BY ATTORNEY GUIDO:

25   Q.    Major Conley, was he

87

1    discussed?

2    A.        Not that I can recall, no.

3    Q.        Was a State Representative

4    mentioned?

5    A.        In the first phone call, I

6    don't believe.  Do you mean by name?

7    Q.        Either, name or by as a State

8    Representative.

9    A.        Okay.  In general terms, it

10   could have been.  Again, I don't

11   recall.  I believe that was the

12   issue.  There was a belief on their

13   part that this could happen through

14   political influence of some type.

15   Q.        Was the allegation basically

16   that, as best you recall, that a

17   state trooper and some political

18   figure were possibly working in

19   cahoots to get people into the State

20   Police Academy?  Is that essentially

21   right?

22   A.        Well, on the first phone call,

23   I'm not sure it was that mature yet.

24   As I recall that conversation with

25   Agent Kush, it was that they at least

88

1    had a subject who believed that and
2    they already had a state trooper
3    acting in the role of facilitator.  I
4    don't recall from the first
5    conversation that it had matured to
6    the point where there had actually
7    been contact with any state reps or
8    senators or what have you.  But that
9    was, as I recall, what, at least the
10   participants believed could happen.
11   Q.      Okay.  At the time that you
12   reported the matter to Lieutenant
13   Colonel Hickes, had you had more than
14   that first phone call with Special
15   Agent Kush?
16   A.      Not that I can recall.
17   Q.      So you had the first phone
18   call and then you told Lieutenant
19   Colonel Hickes about it?
20   A.      That's what I recall, yes.
21   Q.      Did you tell him that right
22   away?
23   A.      I don't know what you mean,
24   right away.
25   Q.      In other words, you get off

89

1    the phone with Agent Kush, how long a

2    period of time would have elapsed

3    before you went and told Lieutenant

4    Colonel Hickes about it?

5                    ATTORNEY BAILEY:

6                    How much time did

7        elapse between?

8                    ATTORNEY GUIDO:

9                    Yes.

10    A.       Well, I don't recall it being

11    more than a few days, but I don't

12    remember.  Let me try it this way,

13    Ms. Guido.  I took this to be a very

14    serious conversation.  The FBI did

15    not contact Trooper Stanton's

16    commanding officer.  They didn't

17    contact his area commander.  They

18    didn't contact the director of

19    personnel, at least they told me they

20    didn't.  There's no indication that

21    anybody had been contacted.  They

22    didn't contact Colonel Evanko or any

23    of the other colonels.  He called me.

24    And I took this very seriously.  I

25    had been in internal affairs by then

90

1    long enough to understand what I have

2    described as threshold testing, which

3    we used to employ for assignment,

4    which is believing allegations on

5    their face, if they were true, what

6    would the next logical step be.

7          So I recall taking some time.

8    Because the mere fact that a state

9    trooper was already implicated in

10   this kind of activity concerned me a

11   great deal.  Understanding, at least

12   in generic terms, from Agent Kush

13   that there was another political

14   investigation ongoing, which I

15   believe we ultimately came to know as

16   the Gigliotti (phonetic)

17   investigation.  I took all this very

18   seriously, so I did take some time to

19   try to clear my head and understand

20   what would be the next logical thing

21   for me to do.

22                ATTORNEY BAILEY:

23          Before we continue, so

24       the record's clear.  Mr.

25       Brown, what role is Mr. Brown?

91

1    ATTORNEY GUIDO:

2       He's our investigator.

3    ATTORNEY BAILEY:

4       He's your investigator.

5    What's he doing in the

6    deposition here?

7    ATTORNEY GUIDO:

8       He's helping us with

9    the documents, et cetera.

10   ATTORNEY BAILEY:

11      Well, I'm not going to

12   --- I don't think he has a

13   right to be here, but I'm not

14   going to object to his being

15   here.  I do want to bring to

16   your attention and I am going

17   to subpoena --- I notice that

18   he's making --- he's got some

19   document, making notes from

20   testimony of Mr. Ober.  And I

21   fully expect that --- I want

22   to see those.

23   ATTORNEY GUIDO:

24      Well, we'll object to

25   it.  We can argue about it to

92

1    the Judge.

2         ATTORNEY BAILEY:

3         Well, we will.  But I'm

4    going to, you know, I don't

5    think he has any ---.

6         ATTORNEY GUIDO:

7         He's assigned to work

8    with Counsel.

9         ATTORNEY BAILEY:

10        I don't think he has

11   any --- well, I have no

12   evidence of that.  It's not

13   been presented to me.

14        ATTORNEY GUIDO:

15        Well, I'm just telling

16   you.

17        ATTORNEY BAILEY:

18        Well, I'm going to ---.

19        ATTORNEY GUIDO:

20        In any event, we can

21   argue about that later.

22        ATTORNEY BAILEY:

23        I'm going to let him

24   --- see, I haven't finished my

25   sentence yet.  And I'm not

93

1       going to object, with the

2       understanding that, as your

3       investigator, I want to have

4       access to what he's doing

5       sitting in here in a

6       deposition and taking notes.

7                    ATTORNEY GUIDO:

8              Well, as I said, we can

9       argue about that later with

10      the Court, about whether or

11      not you can see his notes.

12      But for purposes of now, let's

13      go on to --- I did have one

14      question.

15                    ATTORNEY BAILEY:

16             The objection is noted.

17      Okay.  You can go on.

18  BY ATTORNEY GUIDO:

19  Q.      You were talking about the

20  internal affairs --- you made me

21  think about it, the confidentiality

22  aspect. Internal Affairs

23  investigations are confidential?

24  A.      Yes.

25  Q.      And are they confidential to

94

1    other people in the Internal Affairs

2    Division?  In other words, can one

3    internal affairs investigator talk

4    over a case with his colleagues,

5    bounce ideas off them, that kind of

6    thing?

7    A.      Well, I suppose that could

8    occur.  I'm not real sure what the

9    question is.

10   Q.      Okay.  If I could put it in a

11   way that would phrase it better.  You

12   know, as a lawyer sometimes if you

13   have a case and you're dealing with

14   it and you're thinking, okay, here's

15   the facts, what should I do.

16   Sometimes it helps to go down the

17   hall and talk to one of your

18   colleagues and say, now, here's the

19   facts, you know, what would you do in

20   this situation, kind of thing.  Are

21   internal affairs investigators

22   allowed to do that with their

23   internal affairs colleagues, as

24   opposed to people outside the

25   division?  Could one investigator

95

1    who's assigned a case go to another

2    investigator and say, look, here are

3    the facts of what I'm dealing with,

4    you know, do you have any ideas about

5    how I could handle this, et cetera?

6                          ATTORNEY BAILEY:

7                          Objection to the form

8               of the question.  You may

9               respond.

10   A.       I don't know that there's any

11   prohibition that that can't occur.

12   But I am also probably sure that

13   there are times when information

14   isn't shared.

15   BY ATTORNEY GUIDO:

16   Q.       Isn't?

17   A.       Isn't, but ---.

18   Q.       I just was wondering because I

19   know that confidentially, you

20   couldn't go and talk to somebody, I

21   guess, out in the field about it;

22   right?  I'm just trying to understand

23   what the confidentiality is

24   surrounding any particular case.

25   A.       Well, do you want to know what

96

1    really happens?  There isn't too much

2    that's confidential.  If you want to

3    know something, all you have to do is

4    ask somebody.

5    Q.    All right.  Theoretically,

6    under the rules, what would the

7    confidentiality be?

8    A.    Well, this is not, I don't

9    believe a difficult issue.  As with

10   any investigation, there's a need to

11   know, I suppose may be an accurate

12   way to phrase that, and a want to

13   know determination made on discussing

14   cases.

15   Q.    Now, in paragraph 24, you

16   state, the FBI indicated that a

17   reliable confidential informant had

18   reported that members of the

19   Governor's office and high-ranking

20   members of the PSP might be involved

21   in accepting payoffs in return for

22   special consideration for certain

23   applicants on the PSP cadet

24   eligibility list.  Did Agent Kush

25   tell you that during your first

97

1    conversation?

2    A.       In our first conversation, as

3    I believe I've testified, there was a

4    general discussion between the two of

5    us about, well, if this were true,

6    you know, what positions or how could

7    something like this happen.  I

8    believe and this is, again, just what

9    I'm trying to recall, I believe that

10   conversation was focused around

11   trying to frame up, trying to

12   establish the boundaries of where

13   something like this could or couldn't

14   go.

15   Q.       Did Agent Kush suggest that

16   someone in the Governor's office and

17   high-ranking members of PSP might be

18   involved or did you suggest that that

19   might be the case?

20   A.       Oh, I think that was an issue

21   that we jointly discussed.  I think

22   my recollection is that when we

23   discussed, well, what if someone were

24   to try to influence a legislator,

25   that in and of itself would not

98

1    produce the desired result.  You have

2    to do something with that.  There

3    would need to be another action,

4    where would that person then go or,

5    again --- this conversation, to my

6    recollection, is a conversation, to

7    use your words, that two

8    investigators might have in

9    discussing possibilities and bouncing

10   ideas.

11   Q.      Right.

12   A.      That's all I recall.

13   Q.      And one investigator would

14   have to come up with the idea first.

15   So I'm just wondering if you remember

16   whose idea it was --- who first had

17   the idea that somebody from the

18   governor's office might have to be

19   involved?

20   A.      I don't remember that.

21   Q.      Now, in paragraph 25 you say,

22   the FBI expressly and clearly

23   requested that Darrell not divulge

24   this information to potential

25   investigative targets, including top

99

```
 1   PSP officials.  When you say the FBI,
 2   are you talking about Special Agent
 3   Kush?
 4   A.      During my conversation with
 5   Agent Kush, yes.
 6   Q.      What did he say exactly?
 7   A.      Oh, I don't remember what was
 8   exactly said.  Again, in ---.
 9   Q.      Well, you said expressly and
10   clearly.
11   A.      When we had our discussion,
12   there was no question during that
13   discussion that because of the
14   unknown in this investigation that
15   this was a very sensitive matter,
16   that discretion and confidentiality
17   would be necessary in order to
18   conduct it.  And what I heard, my
19   perception of our discussion, what I
20   heard and what I was reacting to, was
21   the notion that the FBI running a
22   political investigation, however many
23   investigations or however this thing
24   developed, called the director of the
25   internal affairs division for support
```

100

1   resource.  And quite honestly, it

2   never occurred to me that this

3   wouldn't be a matter that great

4   confidence and care should be

5   exercised and to manage to its

6   successful outcome.

7                    ATTORNEY BAILEY:

8            Let me place an

9        objection at this point on the

10       record so I don't interrupt

11       any of your questioning.  I

12       want to make it very, very

13       clear that there's a relevancy

14       objection at this point to any

15       of these questions, that they

16       have nothing to do with the

17       Complaint, the cause of action

18       or any of the material facts

19       related to the case.

20                    ATTORNEY GUIDO:

21           Okay.

22                    ATTORNEY BAILEY:

23           Thank you very much.

24   BY ATTORNEY GUIDO:

25   Q.       Did the FBI, did Special Agent

101

1    Kush expressly and clearly tell you

2    not to divulge the information to

3    potential investigative targets?

4    A.      I believe I've answered that.

5    Q.      No, you didn't.  You told me

6    that your recollection was that you

7    got the idea that it was

8    confidential.  It never occurred to

9    you that it wasn't confidential.

10   What I want to know is, did Special

11   Agent Kush expressly tell you, do not

12   repeat this information, do not

13   divulge this information to potential

14   investigative targets?

15   A.      When we discussed this

16   investigation, the need for

17   confidentiality and sensitivity and

18   discretion or whatever you want to

19   describe it, was discussed.  And it

20   was jointly agreed or I don't know

21   --- I can't recall who said what.

22   But I can tell you that --- I'm not

23   sure what's the Webster definition of

24   expressly and clearly, but it was

25   express and clear in my mind that he

102

1    was telling me that in the form and
2    content and context of this
3    conversation, the fact that this is a
4    matter of great confidence.
5                    ATTORNEY BAILEY:
6                    Is your question that
7              he used that word or that
8              verbiage? Because I think
9              he's answered it also. But
10             you go ahead and continue to
11             answer it. But I ---.
12   A.       I don't know how many other
13   ways to answer it.
14                   ATTORNEY BAILEY:
15                   Well, that's all right.
16             We'll keep doing that, but I
17             ---.
18   BY ATTORNEY GUIDO:
19   Q.       Well, you say --- there's a
20   difference between whether or not you
21   intuitively understand that you
22   shouldn't --- that they don't want
23   you to tell someone else.
24                   ATTORNEY BAILEY:
25                   All right.

103

1        ATTORNEY GUIDO:

2            I'm trying to explain

3        my question.

4    BY ATTORNEY GUIDO:

5    Q.        And somebody saying to you,

6    I'm telling you not to divulge this

7    information to anyone else.  Do you

8    remember whether or not he

9    specifically told you, don't tell

10   this to investigative ---?

11               ATTORNEY BAILEY:

12           Let me place an

13       objection on the record.  It's

14       been asked and answered at

15       least two times.  One last

16       time, you go ahead and answer

17       the question.  And I will ---.

18               ATTORNEY GUIDO:

19           Your objection's noted.

20       But I'd like an answer, an

21       answer to the question ---

22               ATTORNEY BAILEY:

23           Ma'am, move to ---.

24   BY ATTORNEY GUIDO:

25   Q.        --- which is, did he tell you

104

1    or did he not tell you?  Do you

2    remember?

3                    ATTORNEY BAILEY:

4                    Darrell, just wait a

5            minute.  She interrupted when

6            I was talking.  Move to

7            strike.  Darrell, my

8            instructions to you are to

9            answer once more.  Okay.  And

10           then if the question comes on

11           again, I'm simply going to

12           instruct you not to answer

13           again.  As you understand the

14           question, if she wants to

15           rephrase it, repeat it, please

16           feel free.  Go ahead and

17           answer one more time and

18           that's it.

19   BY ATTORNEY GUIDO:

20   Q.       I'll rephrase the question.  I

21   don't think it's a difficult one.

22   Did he specifically tell you, do not

23   divulge this information to a

24   potential target?

25                    ATTORNEY BAILEY:

105

1              Objection, asked and

2          answered.  Same objection.  Go

3          ahead and answer one more

4          time.

5   A.      That's my recollection,

6   Ms. Guido.  But I didn't see myself

7   in a subordinate role to this man.  So

8   that's the --- I'm trying to be

9   as ---

10  BY ATTORNEY GUIDO:

11  Q.      I understand.

12  A.      --- accurate as I can to my

13  response.  I don't ---.

14  Q.      Did you discuss who was ---

15  I'm sorry.

16  A.      Well, I don't recall this

17  being a situation where he was

18  lording over me by long distance

19  saying you shall do this and not

20  this.  What I recall is what I have

21  described to you.  I had a clear

22  understanding of what was discussed

23  and the need for great discretion and

24  confidentiality.  He certainly never

25  said, I'm calling the director of

106

1    internal affairs and I don't give a

2    rat's behind what you do with the

3    info.

4    Q.    Did you clarify with him what,

5    you know, you weren't supposed to

6    tell potential investigative targets,

7    did you clarify with him who

8    potential investigative targets were?

9    A.    Well, in the context of what

10   I've described, I think that would

11   have been the byproduct of that.  In

12   other words, we discussed what I've

13   termed as threshold testing.  And if

14   this were true, what positions in the

15   agency or out of the agency could be

16   involved in something like this. If

17   you want to phrase them as potential

18   targets, I didn't.

19   Q.    Did you make an effort to

20   clarify whether it was something that

21   you would be able to tell Major

22   Conley?

23   A.    No.

24   Q.    Did you make an effort to

25   clarify whether it was something that

107

1   you would be able to tell Lieutenant

2   Colonel Coury?

3   A.      No.

4   Q.      How about Colonel Evanko?

5   A.      Not that I can recall, I ---.

6   Q.      How about, did you clarify

7   whether or not you could tell his

8   station troop commander, Stanton?

9   A.      I don't recall any of that

10  discussion.

11  Q.      You didn't talk to him about

12  whether you could talk to the area

13  commander?

14  A.      I don't have any recollection

15  of that, ma'am.

16  Q.      Returning to paragraph 25,

17  you say there is no PSP policy or

18  regulation to guide a member on how

19  to conduct or report on an

20  investigation into alleged criminal

21  or other misconduct by a high-ranking

22  PSP official, such as commissioner or

23  deputy commissioner.  For purposes of

24  internal affairs, don't the

25  commissioner and the deputy get

108

1  treated like everybody else?

2  A.      I would certainly hope so.

3  Q.      So when you say there's

4  nothing to guide you on how to report

5  or conduct an investigation into

6  misconduct by the commissioner or his

7  deputies, the AR 4-25 that governs

8  internal affairs, wouldn't it apply

9  to them just as well?

10  A.      I think I'm living proof of

11  what happens when you treat them like

12  everyone else, ma'am.

13  Q.      But wouldn't that apply ---

14  don't the same rules apply to them?

15  A.      I think what the intent of

16  that section or sentence is, ma'am,

17  that the AR 4-25 has a great deal of

18  specificity with respect to lower or

19  subordinate ranks.  In the situation

20  that we're describing, those

21  reporting requirements and I'm

22  hesitant to call them, chain of

23  command requirements, but the

24  reporting requirements don't

25  specifically address how that's to be

109

1   handled, should those ranks or those

2   positions be implicated in wondering.

3                    ATTORNEY BAILEY:

4                    All right.  Hold it for

5       one second.

6   BRIEF INTERRUPTION

7   BY ATTORNEY GUIDO:

8   Q.      While you were in internal

9   affairs, did you have other

10  complaints against Colonel Evanko or

11  his deputies?

12  A.      I recall --- yes, I think we

13  did get a complaint.  I believe it

14  might have been against Colonel

15  Westcott.  I'm not certain now.

16  Q.      Well, do you recall receiving

17  a complaint against Lieutenant

18  Colonel Westcott in September 1998,

19  involving an anonymous letter

20  received by Colonel Evanko?

21  A.      No.  If you can help me, I

22  don't recall.

23                   ATTORNEY BAILEY:

24                   While we are doing

25      this, Mr. Brown is helping

110

1    you.  Could we have him

2    identify himself for the

3    record, state his position and

4    title, please?

5            MR. BROWN:

6            Captain John R. Brown,

7    director of internal affairs

8    for the state police.

9            ATTORNEY BAILEY:

10            Are you the

11    investigator on the Ober case?

12            MR. BROWN:

13            Yes.

14            ATTORNEY BAILEY:

15            Okay.

16            ATTORNEY GUIDO:

17            Just while we're on the

18    record, we're clarifying that

19    you're assigned as an attorney

20    work product; correct?

21            MR. BROWN:

22            That's correct.

23            ATTORNEY GUIDO:

24            We're going to have to

25    get ---

111

1       ATTORNEY BAILEY:

2       Copies?

3       ATTORNEY GUIDO:

4       --- copies made,

5   because I ---.

6       ATTORNEY BAILEY:

7       Well, why don't we

8   suspend for a while.  I could

9   call my office anyway.  You

10  have a phone down here; don't

11  you?

12      ATTORNEY GUIDO:

13      Sure do.  Actually

14  there's one over there.  Let's

15  take a five-minute break.

16      MS. LYDE:

17      10:27 a.m., take a

18  short break.

19  SHORT BREAK TAKEN

20      MS. LYDE:

21      10:37 a.m., back on the

22  record.

23      ATTORNEY BAILEY:

24      10:37 a.m., back on the

25  record.  Okay.  Thank you.

112

1  BY ATTORNEY GUIDO:

2  Q.      Captain, if you'll take a look

3  at Exhibit Five.  That's a desk

4  memorandum.

5                  (Deposition

6                  Exhibit Number Five

7                  marked for

8                  identification.)

9  BY ATTORNEY GUIDO:

10  Q.      Do you recognize your own

11  handwriting at the bottom of it?

12  A.      Yes.

13  Q.      And did you have a chance yet

14  to look over ---?

15                  ATTORNEY BAILEY:

16                  Do you have a copy for

17          me, Counsel?

18                  ATTORNEY GUIDO:

19                  He has it.  Sorry.  I

20          have the original there.

21                  ATTORNEY BAILEY:

22                  Thank you.

23  BY ATTORNEY GUIDO:

24  Q.      Did you have a chance to look

25  over it?

113

1    A.      I think I got the gist of it.

2    To tell you the truth, I haven't

3    studied it, but I think I'm getting

4    the gist of it.

5    Q.      Is that a complaint that came

6    into internal affairs ---

7    A.      Yes.

8    Q.      --- through the commissioner

9    and involved Deputy Commissioner

10   Westcott; correct?

11   A.      It came --- the routing slip

12   is from the commissioner to deputy of

13   admin, ultimately to the director of

14   BPR, yes.

15   Q.      Who would the deputy of

16   administration be then?

17   A.      Colonel Coury.

18   Q.      Okay.  So it came from the

19   commissioner to Coury to you?

20   A.      Yes, apparently.

21   Q.      And is there a date on that?

22   A.      Yes, September 14th, '98.

23   Q.      So this is right around the

24   same time frame that you received the

25   information from the FBI?

114

1  A.      Yes.

2                    ATTORNEY BAILEY:

3                    Is this Lieutenant

4          Brown, is this the same man

5          here?

6                    ATTORNEY GUIDO:

7                    Yes.

8  BY ATTORNEY GUIDO:

9  Q.      You had assigned that

10 investigation to Lieutenant Brown?

11 A.      Yes.

12 Q.      And the notation on there,

13 does it say how that was supposed to

14 be handled?

15 A.      It says, Tom, handle as you

16 normally would, Colonel Evanko.

17 Q.      And then if you look at

18 Exhibit Six.

19                   (Deposition Exhibit

20                   Number Six marked for

21                   identification.)

22 BY ATTORNEY GUIDO:

23 Q.      Can you tell me what this

24 document is?

25 A.      This is a use --- Exhibit Six

115

1    is a use of force or complaint,

2    reception and processing worksheet,

3    indicating a complaint is anonymous.

4    It's for BPR control number IAD-

5    10855.

6    Q.      And what's that form used for?

7    A.      This is the recording document

8    that's used when complaints are made.

9    Q.      Is it the initial document?

10   A.      Yes.  It's for complaints made

11   against the department of personnel.

12   Q.      Is that the standard document

13   that would be used if any other

14   member of the state police was the

15   subject of an investigation?

16   A.      Yes.

17   Q.      And did you say if there was a

18   date on that document?

19   A.      I believe I did.  But it was,

20   it says date received, 9/14/98.

21   Q.      And I see that it says a date

22   assigned.  Is there a date that the

23   case was assigned?

24   A.      Yes, 9/16/98.

25   Q.      So the form gets filled out,

116

1    was filled out relatively close in

2    time?  In other words, it's like two

3    days after you get it?  After it

4    comes in, it got assigned a case

5    number?

6    A.    Yes.  Apparently, yes.

7    Q.    And then an investigator was

8    assigned?

9    A.    Yes.

10   Q.    Which goes back to my original

11   point that the commissioner and his

12   deputies, for purposes of internal

13   affairs complaints, should be treated

14   like everyone else; correct?

15   A.    I would hope so.

16   Q.    Okay.  Now, paragraph 26 of

17   your Complaint --- you can just hand

18   those down to the Court Reporter.  It

19   says, since Ober was chosen by the

20   ---.

21   A.    That previous document you

22   just showed me, that went directly to

23   the commissioner's office, I note; is

24   that correct?

25   Q.    I believe so.  If you want to

117

1  look at it again, you can.

2  A.    This is a complaint that was

3  made - - -.

4                    ATTORNEY BAILEY:

5                    Make reference to the

6        exhibit number.

7  A.    Exhibit Number Five is an

8  unsigned anonymous letter that was

9  sent directly to the commissioner,

10  apparently. Routed through the

11  deputy commissioner of administration

12  and then is ultimately routed down to

13  or through the Bureau of Professional

14  Responsibility for assignment.

15  BY ATTORNEY GUIDO:

16  Q.    And the commissioner's

17  direction on there was to treat him

18  like everybody else or like every

19  other one; is that right?

20  A.    His direction is, handle as

21  you normally would.

22  Q.    Okay.

23                    ATTORNEY BAILEY:

24                    Now, to clarify this,

25        because she's asked you a

118

1              question, I don't think this

2              was clear.  Lieutenant Brown,

3              see me.  I would like you to

4              handle this investigation.

5              Whose words are those?

6     A.        Those are mine.

7                        ATTORNEY BAILEY:

8              Okay.

9     BY ATTORNEY GUIDO:

10    Q.        Now, paragraph 26 of your

11    Complaint, since Ober was chosen by

12    the FBI as a contact, obviously

13    because he was not a target, or

14    potential target of the

15    investigation, that portion there, is

16    that your assumption that you were

17    chosen because you were not a target

18    or were you told that you were chosen

19    because you were not a target?

20    A.        I don't remember being told

21    that I wasn't a target.  I knew I

22    didn't do it, so I guess --- I don't

23    remember that part of the

24    conversation, no.

25    Q.        I think you said this, but if

119

1    you didn't, correct me.  Did you say

2    that you weren't really sure why they

3    chose you, that they didn't really

4    tell you?  Agent Kush didn't tell you

5    why he called you?

6    A.       No.  No, he didn't.

7    Q.       Okay.  And next in that

8    paragraph you state that you felt it

9    was important that you limit your

10   reporting of the information to

11   someone that you were personally

12   certain would not be involved in an

13   unlawful matter and to whom no

14   conflict would present itself, but at

15   the same time, be someone who was,

16   hopefully, a superior in your chain

17   of command.  At that time when the

18   FBI contacted you, who was in your

19   chain of command?

20   A.       My direct chain of command

21   would have been during the time I was

22   the acting bureau director, my direct

23   chain would have been Colonel Coury

24   and then Colonel Evanko.

25   Q.       Well, who was your immediate

120

1    supervisor?

2    A.      At that time, I was the acting

3    bureau director.  I would have been

4    supervised by the deputy commissioner

5    of administration.

6    Q.      On the date - - -.

7                    ATTORNEY BAILEY:

8                    Who was?

9    A.      Colonel Coury.

10                   ATTORNEY BAILEY:

11                   Colonel Coury.

12   BY ATTORNEY GUIDO:

13   Q.      As of the date that you told

14   Colonel Hickes about this, who was

15   your immediate supervisor as of then?

16   A.      Major Conley.

17   Q.      Okay.  And you did not report

18   the matter to Major Conley; right?

19   A.      Correct.

20   Q.      Or to Lieutenant Colonel

21   Coury?

22   A.      Correct.

23   Q.      Or to Colonel Evanko,

24   obviously?

25   A.      Correct.

121

1    Q.      And you had said that you

2    wanted to report it to someone you

3    were personally certain would not be

4    involved in an unlawful matter.  So

5    of the people in your direct chain of

6    command, Major Conley, Lieutenant

7    Colonel Coury, Colonel Evanko, none

8    of those people were people that you

9    could be personally certain wouldn't

10   be involved in an unlawful activity;

11   is that right?

12                   ATTORNEY BAILEY:

13                   I'm going to object to

14          the form of the question, but

15          you can go ahead and respond.

16   A.      Well, I think what the

17   statement represents to me is, my

18   personal knowledge of Colonel Hickes'

19   background and experience and the

20   fact that he, by the process of

21   elimination, was not a potential

22   target.  That's more what the

23   statement means to me.

24                   ATTORNEY BAILEY:

25                   In other words, that's

122

1          what you mean by the

2          statement?

3     A.      Yes.  It is not as though I

4     didn't personally know who Colonel

5     Hickes was or what his background

6     was.  I think that's what I took that

7     to mean.

8     BY ATTORNEY GUIDO:

9     Q.      How well did you know Colonel

10    Hickes at that time?

11    A.      Personally?

12    Q.      Yes.

13    A.      Not well.

14    Q.      Did you have much professional

15    contact with him at that time?

16    A.      No.

17    Q.      Essentially, how did you know

18    him?

19    A.      Most of my exposure to Colonel

20    Hickes was through when he was the

21    director of BPR and as the deputy

22    commissioner of operations when I was

23    assigned to the Bureau of Research

24    and Development.  He might have been

25    an officer in Troop G when I was

123

1    stationed there, but I don't recall

2    that for sure.  But I worked with him

3    on a variety of assignments when I

4    was in R&D.

5    Q.      Why did you feel that

6    Lieutenant Colonel Hickes was someone

7    you could trust and not your own

8    immediate supervisor, Major Conley?

9                    ATTORNEY BAILEY:

10                   Objection to the form

11          of the question.  You may

12          respond.

13   A.      Well, I don't know that it so

14   much was a matter of trust.  It was a

15   matter of what would be the

16   appropriate thing to do or who would

17   be the appropriate individual to

18   report this to and to seek any

19   guidance or advice   or what have

20   you.  And the reason I thought

21   Colonel Hickes made sense is, I

22   think, for the reasons I've just

23   described.  He is the former director

24   of the Bureau of Professional

25   Responsibility and he's a former

124

1   deputy commissioner of operations.

2   At that time he was probably and

3   maybe still remains one of the most

4   credential officers in the entire

5   state police organization.

6   BY ATTORNEY GUIDO:

7   Q.      True.  But wasn't Major Conley

8   responsible for the entire Bureau of

9   Professional Responsibility?

10  A.      On December 5th --- excuse me.

11  On September 5th, he was, correct.

12  No disrespect to Major Conley.

13  Q.      October 5th, I think we're

14  talking about.

15  A.      I'm sorry.  October 5th.

16  Q.      I don't want you to get

17  screwed up in your dates.  As of

18  October 5th ---.

19                ATTORNEY BAILEY:

20                He was not done

21       responding.

22  A.      I just want --- I'm kind of

23  new at this.  I'm not sure how much I

24  --- what you really want from me.

25  But I feel like it needs said and

125

1    I'll say it and I said it before when

2    I was interviewed at --- when I was

3    interrogated before.  But no

4    disrespect to Major Conley.  I didn't

5    know him.  The only conversations I

6    believe I ever had with Major Conley

7    were by telephone.  He was just

8    someone I didn't know.

9    BY ATTORNEY GUIDO:

10   Q.     But as director of the bureau,

11   wasn't he entitled to know what was

12   going on in his own bureau?

13                ATTORNEY BAILEY:

14                Objection.  You may

15        respond.

16   A.     With understanding at that

17   first conversation with Agent Kush, I

18   believe, if my memory serves me

19   correctly, then Captain Conley would

20   have been Trooper Stanton's

21   commanding officer, someone that the

22   FBI specifically didn't call.  And I

23   just extended that logic.

24   BY ATTORNEY GUIDO:

25   Q.     Well, when you say

126

1    specifically didn't call, how do you

2    know that it was done specifically,

3    an intentional, I'm not going to call

4    that person?  And I think that seems

5    to be the implication of what you're

6    saying, that the FBI made a conscious

7    decision not to call this man and

8    ---.

9    A.       I'm not implying anything,

10   ma'am.  I'm just saying he wasn't

11   called.

12   Q.       He wasn't called, but ---.

13   A.       Or he wasn't notified.

14   Q.       He wasn't notified.  And from

15   that, you're saying that you inferred

16   that because he wasn't notified, that

17   you shouldn't tell him?

18   A.       I didn't feel I should ---.

19                    ATTORNEY BAILEY:

20               I'm going to object to

21           the form of that question, the

22           leading nature of that

23           question.  Are you asking him

24           if he was inferring something?

25           Is that what it boils down to?

127

ATTORNEY GUIDO:

I think he just told me that. But you can repeat what you --- you can rephrase, re-tell me, whatever.

ATTORNEY BAILEY:

I think he said he didn't infer. But that's all right.

ATTORNEY GUIDO:

Well, I'm jumping back a couple questions.

ATTORNEY BAILEY:

Okay.

BY ATTORNEY GUIDO:

Q.    When you said to me, in response to my question about why you didn't tell Major Conley, you said because he had been the station commander or whatever ---.

ATTORNEY BAILEY:

He was Stanton's commanding officer. That's what his response was.

BY ATTORNEY GUIDO:

128

1   Q.      You had said that you didn't
2   tell Major Conley because he had been
3   Stanton's commanding officer and the
4   FBI had not told him.  Did you infer
5   that they intentionally didn't tell
6   him?
7   A.      I don't think I inferred
8   anything from this.  I think we're
9   losing sight of something.  And I
10  think what we're losing sight of,
11  ma'am, is the FBI called me, as I've
12  testified, and they were conducting
13  this investigation.  And I'm the
14  recipient of this information,
15  wherein this matter of public
16  corruption has already touched the
17  life of a state trooper.  In that
18  conversation that I had with the FBI,
19  we conducted that threshold testing,
20  because we recognized that it would
21  not be sufficient to produce an
22  outcome just to touch base with a,
23  say a legislator, for example.
24          So in that conversation, there
25  was a general discussion about, okay,

129

1    could this come from someone inside

2    the organization?  Could there be a

3    point where the organization could be

4    compromised?  And my response, and I

5    recall this, was, well, I don't know.

6    I don't know exactly how the process

7    works.  I can guess and I think I can

8    come fairly close.  It could perhaps,

9    this thing, this investigation could

10   reach out to the testing company

11   itself, the people that manage this

12   information, potentially.

13        And it was also discussed

14   that, well, there are key people in

15   the organization, occupying key

16   positions, that potentially have that

17   ability.  It was also discussed that

18   that influence could come from

19   outside of the organization to

20   include the governor's office or

21   high-ranking officials.  I mean, this

22   was --- in that first conversation,

23   we just simply didn't know what the

24   boundaries were.  So there was some

25   general discussion about those

130

1   things.  The influence that it might

2   take to produce the result that the

3   individual was looking for, I

4   thought, would be, my guess is that

5   is not something easily accomplished

6   and it might take an individual

7   strategically placed, whether that be

8   the governor's ---.

9                   ATTORNEY BAILEY:

10                  An individual

11          strategically placed to

12          provide access to the academy

13          improperly?

14  A.      Right.  Either in the state

15  police organization, the governor's

16  office or what have you.

17  BY ATTORNEY GUIDO:

18  Q.      I understood all that from

19  your prior answers.

20  A.      Okay.

21  Q.      What I'm trying to understand

22  is why, as director of the Bureau of

23  Professional Responsibility, Major

24  Conley was not entitled to know about

25  information received by his own

131

1    director.  That's what I would like

2    to address.

3                    ATTORNEY BAILEY:

4                    Objection, asked and

5            answered.  You may respond

6            again.

7    A.      Well, one of the difficulties

8    that I felt that I had, ma'am, was I

9    wouldn't be in a position to give

10   orders to a senior officer.  So the

11   officer that I chose, the individual

12   that I chose to seek guidance and

13   advice from, would have to be someone

14   that I at least had some way of

15   measuring them, know something about

16   them.  Yes, Major Conley was the

17   director of BPR.  But I don't believe

18   my first encounter with Major Conley

19   occurred until sometime in the middle

20   of October.

21   BY ATTORNEY GUIDO:

22   Q.      Unfortunately, it's really not

23   all that uncommon for internal

24   affairs to get complaints about

25   possible illegal activity by state

132

1    troopers; is it?

2    A.      Not uncommon, no.  Sadly, I

3    guess.

4    Q.      Right.  It's unfortunate, but

5    that's a lot of what IAD

6    investigates?

7    A.      I reluctantly agree with you,

8    ma'am.

9    Q.      Okay.  Because, you know, you

10   said that this matter was, you felt

11   it should be treated somewhat

12   differently because it had already

13   touched the life of at least one

14   state trooper, Trooper Stanton?

15   A.      Yes.

16   Q.      Now, as director of the

17   internal affairs division, if one of

18   your subordinates in internal affairs

19   had received that phone call, would

20   you have expected him to let you know

21   what was going on?

22   A.      No.

23   Q.      You would not have expected

24   him to let you know?

25   A.      Could you give me that

133

1  question one more time?

2  Q.    If rather than calling ---.

3  A.    If a subordinate of mine

4  received information ---.

5  Q.    If rather than calling you,

6  Agent Kush had called one of your

7  subordinates, one of the, just

8  investigators in internal affairs.

9  A.    Oh, okay.

10  Q.    Would you think that that

11  investigator had a responsibility to

12  let you, the director of internal

13  affairs, know that he had received

14  this information?

15  A.    And this is a hypothetical?

16  Q.    Yes.

17  A.    Well, I guess I would expect

18  that internal affairs investigator to

19  be guided by his best judgment and

20  his discretion.  I can certainly

21  understand why he wouldn't.  If we're

22  attempting to recreate the

23  environment that I found myself in, I

24  can certainly understand why he

25  wouldn't.

134

1    Q.        Okay.

2    A.        But if the question --- I

3    thought your question was, if an

4    internal affairs investigator were

5    implicated in wrongdoing, would they

6    report that to me.

7    Q.        No.  I think you answered my

8    question.  Paragraph 27, you said,

9    consequently, Captain Ober reported

10   the matter, as related by the FBI, to

11   Lieutenant Colonel Robert C. Hickes,

12   newly appointed deputy commissioner

13   of staff.  Captain Ober was confident

14   that Colonel Hickes was of impeccable

15   character, and knew, because of his

16   position, that Hickes could not be

17   involved.  I just want to make sure I

18   understand what that allegation is.

19   Is the statement that you knew

20   Colonel Hickes couldn't be involved

21   because he was of impeccable

22   character or because of the position

23   he held or because of both?

24                   ATTORNEY BAILEY:

25                   Objection, asked and

135

1          answered.  You may respond.

2     A.       Yes, I believe it's both.  He

3     was not, as the director of liquor

4     control enforcement when this

5     allegation surfaced, or at least at

6     that time, he wouldn't have been in a

7     position to be a potential target of

8     this investigation.

9     BY ATTORNEY GUIDO:

10    Q.       Did you discuss with Agent

11    Kush about when he had first opened

12    his investigation into this political

13    corruption?

14    A.       Not at that time, no.

15    Q.       Did you at anytime?

16    A.       Yes.

17    Q.       How long had the investigation

18    been going on?

19    A.       Subsequent to --- subsequent

20    to May of 1999, I come to find from

21    Agent Kush --- no, excuse me, that's

22    not correct.  What was your question

23    again?  Let me try this again.

24    Q.       My question was, did you ever

25    learn how long the FBI had that

136

1    investigation going on?

2    A.     Yes.  Yes, I did.  I believe

3    there was discussion about that issue

4    later that month, later in October,

5    when I met with the agents.  I became

6    aware of this, but I can't tell you

7    exactly when.  I think that's

8    correct.

9    Q.     Now, you said that Lieutenant

10   Colonel Hickes, you felt that he

11   could not have been involved because

12   of his position.  Lieutenant Colonel

13   Hickes had also been a deputy

14   commissioner during the Casey

15   administration; correct?

16   A.     Correct.

17   Q.     And that was when Colonel Walp

18   was the commissioner; am I right?

19   A.     Yes.  Correct.

20   Q.     And at one point, wasn't

21   Lieutenant Colonel Hickes a major in

22   charge of the Bureau of Professional

23   Responsibility?

24   A.     I believe so.

25   Q.     At one point he was also the

137

1   major in charge of the Bureau of

2   Training and Education; is that

3   right?

4   A.      I don't know.

5   Q.      You don't know?  Assuming for

6   the sake of argument, just at the

7   moment, that he was, what does the

8   major --- is the major that's in

9   charge of the Bureau of Training and

10  Education responsible for the State

11  Police Academy?

12  A.      I believe that's generally

13  true, yes.  Do you mean responsible

14  in as far as training cadets?

15  Q.      Yes.

16  A.      Yes.

17  Q.      So do you have any idea

18  whether Lieutenant Colonel Hickes was

19  in charge of training at the State

20  Police Academy during the Walp

21  administration?

22  A.      I don't remember that he was.

23  I don't know.

24  Q.      Do you make, when you talked

25  to the FBI originally, did you make

138

1    an effort to find out how long this

2    supposed corruption at the State

3    Police Academy had been going on?

4    A.    We never talked about

5    corruption at the State Police

6    Academy.

7    Q.    Well, corruption in getting

8    into the State Police Academy?

9    A.    I don't recall there being a

10   discussion about how long this

11   investigation had been occurring, no.

12   Q.    Did Agent Kush tell you at any

13   point that the case had sat around

14   for a few years and his supervisors

15   wanted him to dispose of it one way

16   or the other?

17   A.    Later, yes.  That information

18   was brought to my attention far after

19   this October time frame.

20   Q.    Well, when you made the

21   decision to go to Lieutenant Colonel

22   Hickes, had you considered the

23   possibility that the corruption by

24   virtue --- the scheme of trying to

25   buy your way into the police academy

139

1    may have begun back when Lieutenant

2    Colonel Hickes was either a major in

3    charge of training, I guess you had

4    said you never knew that, or even

5    while he was a deputy commissioner?

6                    ATTORNEY BAILEY:

7                    I'm going to object to

8            the relevancy of these

9            questions and to a total lack

10           of foundation.  There are no

11           facts before any of us to

12           indicate that running the

13           academy has anything to do

14           with someone conjuring up,

15           getting involved in or

16           providing some kind of illicit

17           appointment to the academy,

18           and I object.

19   BY ATTORNEY GUIDO:

20   Q.      Did you consider the

21   possibility?

22                   ATTORNEY BAILEY:

23                   You may respond to the

24           question.

25   A.      No, ma'am.  And to be clear, I

140

1  don't have any recollection of

2  Colonel Hickes being the director of

3  training and education.  I'm not

4  arguing with you.  I simply don't

5  know.  No, I gave no thought to the

6  factor.  I gave no thought to the

7  notion that what was being reported

8  to me in 1998, could extend prior to

9  1995.  Because if you're telling me

10  he was a major in training and

11  education, that would have had to

12  have been --- in fact, I don't even

13  think that could have been in the

14  '90s.  So, no, I never gave that a

15  thought.

16  BY ATTORNEY GUIDO:

17  Q.      Well, what about when --- I

18  guess I made my question compound by

19  asking it.  But did you consider the

20  possibility that --- let me break

21  this down. Colonel Evanko and his

22  deputies --- well, Colonel Evanko,

23  Lieutenant Colonel Coury and

24  Lieutenant Colonel Westcott were all

25  new to the command staff with the

141

1   Ridge administration; right?

2   A.      Correct.

3   Q.      Lieutenant Colonel Hickes had

4   been a deputy commissioner in the

5   prior administration, as well?

6   A.      Correct.

7   Q.      So what I'm wondering is

8   whether you ever took into

9   consideration as you're making this

10  judgment call, did you take into

11  consideration the fact that this

12  scheme could have been going on, even

13  back when Lieutenant Colonel Hickes

14  was a deputy commissioner in the

15  prior administration?

16  A.      No, ma'am.  I never gave that

17  a thought.

18  Q.      And it was not until later

19  that you found out that, in fact,

20  this investigation had been going on

21  for years?

22  A.      Yes.  Yes, it was a year or

23  two.  I don't recall exactly.  Yes,

24  later I found that out.

25              MS. LYDE:

142

1          Excuse me.  I'm going

2     to change tapes.

3               ATTORNEY GUIDO:

4          Okay.

5               MS. LYDE:

6          It's 11:03 a.m.  The

7     end of tape number one of the

8     deposition of Darrell Ober.

9   BRIEF INTERRUPTION

10              MS. LYDE:

11         11:04 a.m., tape two of

12    the deposition of Darrell

13    Ober.  Thank you.

14  BY ATTORNEY GUIDO:

15  Q.       Okay.  You mentioned that you

16  didn't really know Major Conley at

17  the point that you had to make a

18  decision about who to tell.  If Major

19  Merryman had still been your

20  supervisor, would you have told him?

21              ATTORNEY BAILEY:

22         Objection.  Calls for

23         speculation.  You may respond.

24  A.       See, that brings in a much

25  different set of facts to the table,

143

1    because of Major Merryman's

2    background, I'm a little more

3    familiar with.  I don't know that I

4    can answer a hypothetical like that,

5    Ms. Guido.

6    BY ATTORNEY GUIDO:

7    Q.    You don't know whether you

8    would have trusted Major Merryman

9    with that information?

10            ATTORNEY BAILEY:

11            Objection to the form

12        of the question.  Objection to

13        the use of the word trust.

14    A.    Yes.  I ---.

15    BY ATTORNEY GUIDO:

16    Q.    Do you know whether you would

17    have trusted Major Merryman?  Do you

18    know whether you would have trusted

19    Major Merryman with the information?

20            ATTORNEY BAILEY:

21            I want to object to the

22        question and instruct you that

23        you don't have to answer it.

24        I prefer that you do, but you

25        don't have to.  Answer the

144

1      question, if you can.

2  A.      I believe, given a different

3  set of facts, Ms. Guido, I would have

4  made a decision based on what I

5  thought was the best interest of the

6  agency.  I can't say here today and

7  tell you what I would have done three

8  years ---.  That to me was never a

9  matter of trust.  It was a matter of

10  an appropriate decision, based on

11  what I was --- the information I was

12  provided.  And I think it would be an

13  insult to Major Merryman to sit here

14  and speculate whether I would have

15  trusted him or not.  These are

16  different, much different

17  circumstances.  I made a decision at

18  that time, based on what I thought

19  was the right thing to do with

20  respect to the agency's needs.

21  BY ATTORNEY GUIDO:

22  Q.      I'm a little confused about

23  you saying that it was never an issue

24  of trust, because I thought that that

25  was the whole point of talking about

145

1    the fact that Colonel Hickes was of

2    impeccable character and you knew

3    that he wasn't the kind of person

4    that would be involved in this and

5    you knew his background and you knew

6    he had integrity.  I mean, wasn't

7    that the whole point, trust?

8    A.      No.  I think trust is a key

9    element.  But the way you're giving

10   it to me, I'm feeling like you're

11   making that the only criteria.

12                    ATTORNEY BAILEY:

13                    What paragraph ---?

14                    ATTORNEY GUIDO:

15                    I'm looking to see what

16            paragraph I'm in.

17   BY ATTORNEY GUIDO:

18   Q.      Okay.  Page eight, still

19   paragraph 27, it's next to the last

20   sentence, where you say you could not

21   inform Evanko or one of his

22   assistants because of the clear and

23   unambiguous FBI directive.  Today,

24   you don't recall whether there was a

25   clear and unambiguous directive; do

146

1    you?

2    A.      Oh, yes.  I recall there are a

3    very clear and unambiguous directive.

4    Maybe directive is not the best word.

5    But there was a very clear and

6    unambiguous understanding between

7    Agent Kush and I about what I have

8    described.

9    Q.      The reason I clarified that

10   was because earlier I think and I

11   think perhaps you clarified it for me

12   now is, it was a clear and

13   unambiguous understanding between you

14   and Agent Kush.  It was not

15   necessarily a directive from Agent

16   Kush to you; is that right?

17   A.      Agent Kush was not in a

18   position to give me orders.  There

19   was a request from Agent Kush to keep

20   this matter confidential.

21   Q.      Okay.

22   A.      There was a discussion about,

23   as I've already described,

24   confidentiality, sensitivity and

25   discretion.  I took it in the form of

147

1    a directive simply because I'm

2    talking to a person of a law

3    enforcement agency and it only made

4    sense to do that.

5    Q.        On the last sentence of the

6    same paragraph, upon learning of the

7    FBI probe from Ober, Hickes ordered

8    you, Ober, to maintain

9    confidentiality and to keep Hickes

10   informed.  Do you remember when you

11   told Colonel Hickes about this?

12   A.        No.

13   Q.        Was it after the first

14   conversation with Agent Kush?

15   A.        Yes.  When I was interrogated

16   by IAD, they produced a document.

17   They, Werts and Williams, somehow

18   confirmed for me that it had been on

19   October 5th.  But I honestly don't

20   recall that.  I don't know.

21   Q.        Okay.  But at that point, you

22   had only had the one conversation

23   with Agent Kush?

24   A.        You asked me that.  That's

25   what I recall.

148

1    Q.    Can you tell me, just tell me

2    what --- describe the conversation

3    with Hickes.  What was said?  What

4    did you tell him?  What did he tell

5    you?

6    A.    I discussed this with Colonel

7    Hickes.  I'm sure there's a whole lot

8    more than what's here.  I informed

9    Colonel Hickes that I had received

10   this information from the FBI about

11   this public political corruption case

12   of great public interest.  I was

13   sure, I assumed, and this information

14   --- or their information was that

15   there was a state trooper potentially

16   implicated in a hiring irregularity

17   situation or what have you.  I tried

18   to paraphrase it as best I could for

19   him, what I was told of the sum and

20   substance of my conversation with

21   Agent Kush.

22   Q.    Did you tell Lieutenant

23   Colonel Hickes that the FBI told you

24   that the term colonel had been used?

25   A.    Yes.  There was specific

149

1    discussion with the FBI.  I think

2    I've described it as trying to frame

3    the boundaries of this investigation.

4    Q.      But what I'm saying is, when

5    you first told Hickes about this, did

6    you tell him that the FBI had told

7    you that a colonel could possibly be

8    involved, using that term, colonel?

9    A.      Well, I'm sure that I did,

10   again, in the context of framing the

11   boundaries of this investigation.  As

12   I've said many times, positions were

13   discussed, potentials were discussed.

14   And it would only make sense that

15   either if the position weren't

16   referred to by rank, it would have

17   been referred to by title.

18   Q.      Did you tell Hickes whether it

19   was you or the FBI that brought up

20   the term colonel?

21   A.      I don't know.

22   Q.      You don't remember?

23   A.      No.  I'm relating a

24   conversation.  I don't recall.

25   Q.      And you said you were supposed

150

1    to keep Hickes informed.  Did you, in

2    fact, keep him informed?

3    A.      Yes.

4    Q.      And by keeping him informed,

5    was does that mean?

6    A.      When I informed Colonel Hickes

7    of this FBI's, of the existence of

8    this investigation, as the suit

9    states, he gave me three orders.  And

10   one of them was to keep him informed

11   of any significant developments.  And

12   I did that.  He gave me three orders,

13   ma'am, and I followed them.

14   Q.      In paragraph 28, you allege

15   that the investigation, the FBI's

16   investigation, may have been

17   compromised even before you learned

18   about it from Agent Kush.  What do

19   you mean by that?

20   A.      In a subsequent conversation

21   with Agent Kush, I come to find that

22   Agent Kush revealed to me that they

23   had contacted members of the state

24   police prior to contacting me.

25   Q.      But you didn't know that at

151

1  the time you went to Hickes?

2  A.      No, I did not.

3  Q.      And according to this same

4  paragraph, you deduced that the

5  investigation may have been

6  compromised because Mark Campbell was

7  in the governor's office and Evanko

8  went to Campbell to get permission to

9  do an investigation.  Do you see

10  where that is in paragraph 28?

11  A.      Uh-huh (yes).

12  Q.      What made you think that

13  Evanko had gone to Mark Campbell to

14  get permission to do the

15  investigation?

16  A.      I was told that that's what

17  occurred.

18  Q.      Who told you that?

19  A.      I believe that was either

20  Major Morris or Colonel Hickes, but

21  I'm not certain.

22  Q.      Major Morris?

23  A.      Morris, yes, ma'am.

24  Q.      What was Major Morris' role in

25  all this?

152

1  A.      I don't think he has a role in
2  all of this.
3  Q.      Well, how would he know that?
4  A.      I don't have any idea.  I'll
5  also tell you it's been my experience
6  in the past couple years that that
7  fact or that issue seems to be a
8  matter of institutional knowledge.  I
9  mean, I've heard that from many ---
10  many different people have mentioned
11  that to me right now.
12  Q.      Who?
13                  ATTORNEY BAILEY:
14          Let's make sure we know
15      what we're talking about, many
16      different people mentioned.
17      Do you mean that Mr. Evanko
18      went to Mr. Campbell to seek
19      permission for an
20      investigation?
21                  ATTORNEY GUIDO:
22          Yes, yes.
23  A.      Oh, I've heard that from a
24  number of sources --- number of
25  individuals.

153

1     ATTORNEY BAILEY:

2          Just so we're clear on

3     that.

4 BY ATTORNEY GUIDO:

5 Q.     Their names?

6 A.     Can I come back to that, only

7 because I wouldn't want to misspeak?

8 It just really became a source of

9 rumors that that's what occurred.

10 Q.     You don't recall any specific

11 person that told you that?

12 A.     Not right now, I can't.

13     ATTORNEY BAILEY:

14          Beyond Mr. Hickes or

15     Mr. Morris.

16 BY ATTORNEY GUIDO:

17 Q.     Have you ever discussed it

18 with anybody from the governor's

19 office?

20 A.     Discussed what, ma'am, this

21 investigation?

22 Q.     Yes.

23 A.     No.

24 Q.     Did anyone --- do you remember

25 whether anyone from the governor's

154

1    office ever said anything to you

2    about Evanko seeking permission from

3    Campbell?

4    A.    No.

5    Q.    You also say in that paragraph

6    that you learned that FBI body wires

7    from an informant mentioned sources

8    in the governor's office, high PSP

9    officials and even a state senator

10   and a state representative, earlier

11   in the investigation.  When did you

12   first learn about those FBI body

13   wires?

14   A.    Well, Agent Kush, in our

15   contact, he, at some point --- I

16   mean, these things were discussed.

17   And he eventually supplied me with

18   transcripts of those body wires.

19   Q.    I was just trying to get an

20   idea of when that would have been.

21   A.    When these things were

22   discussed?

23   Q.    Yes, when you first learned

24   about the FBI body wires.

25   A.    Well, I think he mentioned

155

1   that during the first phone call,

2   that there were --- this information

3   were developed from employment of

4   body wires.  I think that's how this

5   whole investigation started, I

6   believe, as I recall.

7   Q.      And then you would have seen

8   the transcripts of that when, of the

9   body wires?

10  A.      I don't recall.  He sent

11  transcripts, I believe, on two or

12  three occasions.  But I just don't

13  remember when I received them.

14  Q.      You said that you learned that

15  another PSP member had been informed

16  before Ober was, in an earlier

17  attempt at investigation.  When did

18  you find that out?

19  A.      I found that out --- I had

20  occasion to talk to Agent Kush and

21  I'm trying to recall when that was.

22  It could have been around the time

23  that the whistleblower suit was

24  filed.  But I'm not certain now.  I

25  don't recall exactly when that was.

156

1    It was after May of '99, but I just

2    don't remember when that was for

3    sure.

4    Q.      But you think you found it out

5    from Agent Kush?

6    A.      Oh, yes.  Yes.

7    Q.      And finally in that paragraph,

8    you say, only the FBI, to whom Evanko

9    personally went, knows the answers to

10   these questions.  How do you know

11   that Evanko personally contacted the

12   FBI?

13   A.      Mr. Campbell and Major

14   Williams have already testified that

15   he did.  And Evanko threatened to do

16   that that night.  And Agent Kush told

17   me that he was fairly certain that

18   Evanko called his SAC --- his name

19   escapes me at the moment.

20   Q.      When did Agent Kush tell you

21   that Evanko had called his SAC?

22   A.      That was during that

23   conversation, the one I've just

24   described.  I can't recall when that

25   was now.

157

1        ATTORNEY BAILEY:

2            Hold on just a second,

3    please. .

4        ATTORNEY GUIDO:

5            Sure.

6    BRIEF INTERRUPTION

7        ATTORNEY BAILEY:

8            Thank you very much.

9    BY ATTORNEY GUIDO:

10    Q.    Setting aside what may have

11    been said in subsequent depositions,

12    at the time that this Complaint was

13    filed, what made you think that

14    Evanko had personally gone to the

15    FBI?

16    A.    What made me think that he had

17    personally gone to the FBI is because

18    he said he was going to.  And I

19    subsequently learned from talking to

20    Agent Kush that Agent Kush was of the

21    opinion that he did.

22    Q.    Okay.  Did Evanko ever talk to

23    Kush personally?

24    A.    I don't know.

25    Q.    Paragraph 29, you say that

158

1    upon information and belief, you

2    believe a real possibility exists,

3    still exists that the corruption

4    investigation was truncated or

5    otherwise limited because of PSP

6    leadership interests and/or concerns

7    of others.  Could you explain what

8    you mean by that?

9    A.      I had --- what I mean by that

10   was my concern upon notifying Colonel

11   Evanko of the investigation's

12   existence, his reaction to that and

13   his threats to call the FBI.  That

14   statement is based in part on the

15   eventual outcome of the criminal

16   investigation involving the parties,

17   the two individuals who were

18   arrested.  And thirdly, as a result

19   of my discussion with Agent Kush when

20   he said that he was transferred,

21   which is what Evanko threatened to do

22   when we told him.

23   Q.      Agent Kush told you what about

24   his transfer?

25   A.      He said he was transferred.

159

1    Q.      But what did he say about the

2    transfer, anything other than I was

3    transferred?

4    A.      Not that I can recall.

5    Q.      He didn't tell you why he was

6    transferred?

7    A.      Not that I can recall.  He was

8    not real interested in sharing a lot

9    of this with me, ma'am.

10   Q.      So you're inferring that the

11   transfer had something to do with

12   this investigation?

13   A.      It would certainly appear so.

14                   ATTORNEY BAILEY:

15                   I object.  His prior

16           testimony was that Mr. Evanko

17           told him he was going to have

18           him transferred.  Kush says

19           he's transferred.

20   BY ATTORNEY GUIDO:

21   Q.      But you don't know why he was

22   transferred; right?

23   A.      I was not a part of the

24   decision making that led to Agent

25   Kush's transfer, ma'am, no.

160

1    Q.      So I think my choice of words

2    was accurate that this was an

3    inference, based on the facts you

4    inferred; is that right?

5                    ATTORNEY BAILEY:

6                    Objection to the form

7            of the question.

8    BY ATTORNEY GUIDO:

9    Q.      Did you infer that from ---

10   did you make a deduction that ---?

11                   ATTORNEY BAILEY:

12                   Yes, he deduced it.

13           That's correct.

14                   ATTORNEY GUIDO:

15                   I'm asking the witness.

16                   ATTORNEY BAILEY:

17                   Yes.  He deduced it.

18           You're quite right.

19   A.      I know what the outcome was,

20   ma'am, and I know what the drivers

21   were.  And perhaps deduction is a

22   correct word but there's certainly no

23   dispute about ---.

24   BY ATTORNEY GUIDO:

25   Q.      And that's your deduction, but

161

1  you don't know for a fact; is that

2  correct?

3  A.    I was not part of the decision

4  making.

5                    ATTORNEY BAILEY:

6                    He took Colonel Evanko

7         at his word.

8  BY ATTORNEY GUIDO:

9  Q.    Paragraph 32, I guess that's

10  --- now that I'm looking at the

11  paragraph, that's what we've just

12  been covering.  And that is that you

13  believed that Colonel Evanko did

14  something --- had some kind of

15  inappropriate influence over at the

16  FBI; is that right?

17  A.    Yes.

18  Q.    And how do you know that it

19  was inappropriate influence, as

20  opposed to perhaps Agent Kush's

21  superiors deciding that he had

22  handled the investigation

23  inappropriate or something?

24  A.    We're going to have to tighten

25  that one up for me.  I'm not sure

162

1    what you just asked me.

2    Q.      Well, you said that Agent

3    Kush's transfer was the result of

4    inappropriate influence ---.

5    A.      I say I believe that, ma'am.

6    Evanko went ballistic when we told

7    him.  He said he was going to have

8    the agents transferred tomorrow.  And

9    the end result of that was that an

10   agent gets transferred, as well as

11   me.  I guess I deduced that he

12   followed through on his word.  The

13   criminal investigation has fallen

14   apart.  It just seems to me that

15   that's an accurate statement, yes,

16   ma'am.

17   Q.      When you say Agent Kush was

18   quickly transferred, do you remember

19   when he was transferred?

20   A.      No.

21   Q.      Do you have any idea when he

22   was transferred?

23   A.      No.

24   Q.      I guess paragraph 33 is the

25   same.  You believe that Colonel

163

1    Evanko sought the personal approval

2    of Mark Campbell again.  You heard

3    that from other people?

4    A.      Yes.

5    Q.      Paragraph 34, you say Campbell

6    and Evanko authorized an

7    investigation, even though they both

8    knew Ober had committed no wrong.

9    What makes you think that they knew

10   you had done nothing wrong?

11   A.      I was told that that fact was

12   brought to their attention.

13   Q.      Who told you that?

14   A.      Captain Brown.

15   Q.      When was that?

16   A.      When was I told?

17   Q.      Yes.

18   A.      I would have to again --- I

19   believe that was September of '99 or

20   so.  It could have been before then.

21   Q.      Said that Campbell and Evanko

22   had been told that you had done

23   nothing wrong?

24   A.      I was told that there was a

25   meeting conducted that included the

164

1   investigators, Conley, all the

2   Defendants, Captain Skurkis

3   (phonetic) and Captain Brown.  And

4   the subject of this meeting was how

5   to conduct this witch hunt.  And that

6   they were told there had been no

7   regulations violated.

8   Q.      Who said that?

9   A.      I was informed of this fact by

10  Captain Brown.

11  Q.      No.  I meant, who said to

12  Evanko and Campbell.  I'm sorry.  My

13  question wasn't clear.  Who told

14  Campbell and Evanko that you hadn't

15  done anything wrong?

16  A.      I don't know.

17  Q.      You don't know who said that?

18  A.      No.

19  Q.      Whose opinion that was?

20  A.      No, I don't know.

21  Q.      Now, Colonel Evanko wasn't

22  privy to what had transpired between

23  you and the FBI; was he?

24  A.      No.

25  Q.      And he also was not privy to

165

1    what transpired between you and

2    Lieutenant Colonel Hickes?

3    A.      Correct.

4    Q.      So was it unreasonable for

5    Colonel Evanko to want to know what

6    had happened?

7                    ATTORNEY BAILEY:

8                    Objection.  The form of

9               that question calls for the

10              wildest speculation.  I really

11              object to that.  I ask

12              Counsel, please rephrase that.

13   BY ATTORNEY GUIDO:

14   Q.      I'm not asking to speculate.

15   I'm asking your opinion about whether

16   it was reasonable for Colonel Evanko

17   to want to know what had happened.

18                   ATTORNEY BAILEY:

19                   All right.  I'm going

20              to object.  But Counsel does

21              make a good point in terms of

22              --- are you asking is there

23              any basis for his ---?

24                   ATTORNEY GUIDO:

25                   I'm going to follow up

166

1          on that, yes.

2                    ATTORNEY BAILEY:

3                    If you want to ask the

4          captain if he knows of any

5          basis for the ---.

6    BY ATTORNEY GUIDO:

7    Q.       I just want to know whether or

8    not ---

9                    ATTORNEY BAILEY:

10                   You can respond.

11   BY ATTORNEY GUIDO:

12   Q.       --- you think it was

13   --- was it reasonable or unreasonable

14   or not?

15   A.       For?

16   Q.       Your opinion about Colonel

17   Evanko --- okay.  In May 1999, you

18   tell Colonel Evanko for the first

19   time?

20   A.       Yes.

21   Q.       What has happened?

22   A.       Yes.

23   Q.       And Colonel Evanko learns for

24   the first time that the FBI contacted

25   you, that you told Hickes and that

167

1    Hickes ordered you not to say

2    anything to anybody else.  Now,

3    Colonel Evanko, he didn't hear what

4    the FBI told you or what you told the

5    FBI.  He didn't hear what you said to

6    Hickes or Hickes said to you or any

7    of that.  He wasn't privy to any of

8    that.  So was it reasonable or

9    unreasonable, in your opinion, for

10   Evanko to want to get to the bottom

11   of it and find out what happened?

12                    ATTORNEY BAILEY:

13                    Same objection.  But

14        you may respond.

15   A.        It was completely

16   unreasonable.

17   BY ATTORNEY GUIDO:

18   Q.        And why?

19   A.        Because there's no basis for

20   any further discussion on the matter.

21   He has senior commanders acting in

22   their capacity as senior commanders

23   in making decisions and he was

24   informed.  The investigation would

25   run its course without his

168

1    interference or not.  There was no
2    --- what good would come out of
3    conducting an investigation, for what
4    purpose?  What would be the objective
5    in asking anything?  He demanded a
6    memo from me that day, which I
7    supplied, that summarizes the thing.
8     There's nothing else to tell.
9    Q.      Well, in your Complaint you
10   allege that Colonel Evanko was upset
11   and ---.
12   A.      I'm alleging he was enraged.
13   Q.      Okay.  Enraged, whatever.  But
14   you said that he's upset because you
15   didn't act with blind loyalty and
16   inform him about the FBI
17   investigation.  And what I'm asking
18   you is, on the other hand, weren't
19   you expecting --- are you asking
20   Colonel Evanko to act with blind
21   loyalty to you and just accept what
22   you've told him as true, without
23   doing an investigation?
24   A.      There would certainly be no
25   reason not to.

169

1  Q.      So he's supposed to just

2  accept what you've said is true;

3  right?

4  A.      There's no reason not to.

5              ATTORNEY BAILEY:

6              I'm going to object to

7         the form of that question and

8         move to strike.  It's already

9         answered.

10  BY ATTORNEY GUIDO:

11  Q.      I guess I'm just kind of

12  trying to figure out what the harm

13  would be in an investigation.

14  A.      I'm trying to figure out what

15  the good would be.

16  Q.      Well, besides that ---.

17              ATTORNEY BAILEY:

18              What investigation are

19         you talking?  Are you talking

20         about, Counsel --- now, wait,

21         please.

22              ATTORNEY GUIDO:

23              I'll clarify.  I'll be

24         happy to clarify.

25              ATTORNEY BAILEY:

170

```
 1              Well, let me finish my
 2      request.  Are you talking
 3      about an investigation into
 4      Captain Ober for not running
 5      to the commissioner and
 6      telling him that there was a
 7      potential problem?  Or are you
 8      talking about the FBI
 9      investigation itself into the
10      corruption?   Which
11      investigation do you mean?
12              ATTORNEY GUIDO:
13              I said I'd be happy to
14      clarify.
15              ATTORNEY BAILEY:
16              Okay.  Thank you.
17 BY ATTORNEY GUIDO:
18 Q.      You were upset because Colonel
19 Evanko ordered an administrative
20 inquiry into the facts surrounding
21 the FBI's contact with you, your
22 decision to tell Hickes and Hickes'
23 decision that that should be kept
24 between you and Hickes?
25 A.      No.  I'm upset that an
```

171

1   investigative process was corrupted,

2   without any allegation or belief of

3   misconduct, ma'am.

4   Q.      What I'm asking you, though,

5   is, he asked to have that matter

6   investigated and that's what --- and

7   by an investigation, I'm referring to

8   what ---

9           ATTORNEY BAILEY:

10          What matter?

11  BY ATTORNEY GUIDO:

12  Q.      --- Major Werts and Major

13  Williams, the inquiry that they

14  conducted.  You were upset that they

15  conducted that inquiry; right?

16          ATTORNEY BAILEY:

17          What matter

18       investigated?

19          ATTORNEY GUIDO:

20          I just said.

21  BY ATTORNEY GUIDO:

22  Q.      We all know that Major Werts

23  and Major Williams conducted an

24  administrative inquiry or an

25  administrative investigation into the

172

1  facts surrounding the FBI's contact

2  with you, your report of the matter

3  to Hickes and the decision not to

4  tell anybody else about that.  That

5  was the subject of the administrative

6  inquiry.  And all I'm asking you

7  is ---.

8  A.     I don't know that I would

9  agree with that, ma'am.

10  Q.     Well, then tell me what you

11  would --- tell me what the

12  investigation ---.

13  A.     What I got out of that is that

14  was a witch hunt to scrutinize every

15  detail and look for any place that I

16  tripped up the handling.

17  Q.     And were you --- and that

18  really gets to the bottom of it.

19  Were you upset because you thought

20  that maybe the investigation would

21  reveal some type of error in judgment

22  on your part?

23              ATTORNEY BAILEY:

24              Objection.

25  A.     No, I wasn't worried about my

173

1    judgment at all, ma'am.

2                    ATTORNEY BAILEY:

3                    Objection and move to

4         strike.  You can respond.

5    BY ATTORNEY GUIDO:

6    Q.       So that's what I'm trying to

7    understand.  I mean, you've been the

8    subject of other investigations and

9    you've been vindicated?

10   A.       Yes.

11   Q.       So if an investigation is

12   going to be conducted, one of the

13   results of that can be that you're

14   vindicated?

15   A.       I've never received an

16   adjudication on this.  The heart and

17   soul of an investigative process is

18   an allegation of misconduct.  There

19   is none in this case, ma'am.  I know

20   enough about internal affairs to know

21   that you bastardize and prostitute

22   that process when you willy-nilly

23   start investigating people without

24   any evidence of wrongdoing.

25   Q.       Well, sometimes you have to do

174

1   some of the investigation before you

2   can really determine who the subject

3   of the investigation is.

4   A.      I've never heard of that.

5   That's a witch hunt.  Who the subject

6   is?

7   Q.      Yes.

8   A.      No, we had a subject.  Ma'am,

9   we had a subject.  That was me.  What

10  the investigation was for was to see

11  if I committed any wrongdoing, which

12  we already know we didn't.

13  Q.      I know.

14                  ATTORNEY GUIDO:

15                  Could you hand that

16          down to the Court Reporter to

17          be marked?  I forget what

18          exhibit number that is.

19  A.      Seven.

20                  (Deposition Exhibit

21                  Number Seven marked for

22                  identification.)

23                  ATTORNEY BAILEY:

24                  I'd like an offer on

25          this.  What's the point here?

175

1    ATTORNEY GUIDO:

2        Well, I think if

3        Captain Ober reads his note,

4        then we might be able to

5        understand what the point is.

6    BY ATTORNEY GUIDO:

7    Q.    On December 4 --- well, on a

8    memo dated December 4 at the bottom,

9    there is handwriting.  And that is

10   your handwritten note; is it not?

11   A.    Yes.  Uh-huh (yes).

12           ATTORNEY BAILEY:

13        What's the number of

14        this exhibit?

15   A.    Seven.

16           ATTORNEY GUIDO:

17        Seven.

18   BY ATTORNEY GUIDO:

19   Q.    And at the bottom of that, in

20   your handwriting, it says, file note,

21   it is my position that an

22   investigation should ultimately

23   determine if an individual is or is

24   not a subject.  I caution against

25   premature determinations.

176

1                 ATTORNEY BAILEY:

2                 I object.

3   BY ATTORNEY GUIDO:

4   Q.     Isn't the point of that that

5   sometimes an investigation has to be

6   ---?

7                 ATTORNEY BAILEY:

8                 Don't answer.

9   BY ATTORNEY GUIDO:

10  Q.     It takes the investigation to

11  determine whether the subject ---

12  who's the subject?

13               ATTORNEY BAILEY:

14           Don't respond, Mr.

15        Ober.  Counsel, I think this

16        is the worst kind of

17        sophistry.  And I think it's

18        an absolute disgrace.  I'm

19        going to object very strongly

20        to what you're trying to do

21        here.  These circumstances are

22        different.  You're trying to

23        characterize a different

24        situation, a totally different

25        fact situation and mislead and

177

1    obfuscate this legal process.

2    I very strongly object to what

3    you're doing on ethical

4    grounds.  It's unprofessional.

5         ATTORNEY GUIDO:

6         Your objection's noted.

7         ATTORNEY BAILEY:

8         And I wish you could

9    --- well, that's all right.

10    I'm going to let you go ---.

11        ATTORNEY GUIDO:

12        Your objection's noted.

13        ATTORNEY BAILEY:

14        Counsel, please, with

15   all due respect, I know we

16   respectfully disagree on some

17   things but try to let me

18   finish when I'm talking and

19   I'll finish up very quickly

20   for you.

21        ATTORNEY GUIDO:

22        Well, you've never

23   finished quickly yet.

24        ATTORNEY BAILEY:

25        All right.  Move to

178

1          strike the snide, irrelevant,

2          incorrect and rude comment.

3          Mr. Ober, you can go ahead and

4          read and respond to the

5          exhibit. But I object, not

6          only to the question that

7          Counsel had posited, but to

8          the exhibit itself. You can

9          respond.

10   A.     Well, I don't know the factual

11   background beyond this one item that

12   was presented to me. But, you know,

13   I'll assume or deduce that at some

14   point in this investigation, this IAD

15   number 11029, there was an allegation

16   of misconduct. And that an

17   investigation was being conducted.

18   And at some point there was

19   discussion about whether or not

20   someone was or wasn't a subject, and

21   the investigation continued in order

22   to determine whether or not

23   misconduct occurred or this person

24   should or shouldn't be carried as a

25   subject. I guess that's what this is

179

1    all about.

2    BY ATTORNEY GUIDO:

3    Q.      And my question ---.

4    A.      And I don't have any clue as

5    to how it compares to my situation.

6    Q.      Well, because my question had

7    been to you that isn't it true that

8    sometimes it takes the investigation

9    --- it takes some investigating, some

10   finding out of the facts to determine

11   whether a particular person is or is

12   not the subject of an investigation.

13   And you yourself wrote a note in

14   which you cautioned against making a

15   premature determination of whether a

16   person is a subject or not.

17   A.      Ma'am, ---.

18                    ATTORNEY BAILEY:

19                    Please, you know, I

20          very strenuously object to

21          this.  He has testified that

22          there was an underlying, or at

23          least based upon his limited

24          knowledge, there's an

25          underlying factual situation,

180

1    which brought this

2    investigation or some need to

3    evaluate these facts before.

4           You're taking a

5    situation in which there is

6    absolutely no basis for an

7    inquiry.  And his terminology

8    in describing that as a witch

9    hunt is correct.  And I think

10   without providing the

11   documents or some facts upon

12   which --- you can study the

13   ceiling as long as you wish,

14   Counsel.  And when you want to

15   give us a report on its

16   contents, we'd be grateful.

17          But the point in fact

18   is, he can respond to this.

19   But I think you have a duty to

20   place some facts in evidence.

21   You haven't done so.  I

22   respond to your --- I object

23   to your question.  I object to

24   this issue.  I think it's

25   decidedly misleading.

181

1    And there are no facts in this
2    record whatsoever to support
3    what the background of this
4    exhibit investigation are.
5    Mr. Ober, if you have a
6    recollection of it, you can
7    respond. But I caution you
8    not to speculate.
9 A.    I have no recollection of the
10 background or exact circumstances
11 surrounding this document.
12 BY ATTORNEY GUIDO:
13 Q.    I'm not asking you that, sir.
14 Maybe I should clarify what my
15 question is.
16 A.    I don't think you need to.
17 Your question makes no sense, because
18 it's comparing apples and oranges.
19 This cart is so far ahead of the
20 horse, ma'am. This investigation,
21 I'm sure, had some element of
22 reporting of misconduct or something.
23 And it would appear that there was a
24 need to put in an investigator to
25 make a decision about a subject's

182

1    status.  That has absolutely nothing

2    to do with the situation I was in

3    whatsoever.

4    Q.    But that's kind of my point.

5    And that is, that each case turns on

6    its own facts and its own

7    circumstances.

8    A.    That assumes there is a case,

9    ma'am.

10   Q.    But each case is, each

11   situation is unique; isn't it?

12   A.    I don't know what you ---

13   what situation?

14   Q.    Well, you're trying to say

15   this is apples and oranges because

16   what happened in that case is not

17   like what happened to me.  So what

18   I'm saying is, all cases are not

19   alike.

20   A.    Yes, they are.

21   Q.    And how a particular case may

22   be handled in certain circumstances

23   may be different.

24   A.    Those cases are alike in the

25   most critical area that I can

Sargent's Court Reporting Service, Inc.
(814) 536-8908

183

1    imagine.  That is, they have a report

2    of misconduct as the trigger

3    mechanism.  I have never been a part

4    of an investigation when someone just

5    said, go investigate something and

6    see what you find and then we'll

7    initiate the internal affairs

8    process.

9         You're trying to mix things up

10   here.  There was nothing about what

11   was done to me that resembles what

12   you've just described up to and

13   including an adjudication.  You

14   mentioned earlier I've been a subject

15   of investigation.  That's true.

16   Those have been handled in accordance

17   with the department procedures and in

18   accordance with my labor contract.

19   And I received an adjudication that

20   was unfounded.

21   Q.     And on paragraph 37, you say

22   investigations such as those done on

23   Captain Ober have the effect of

24   destroying an officer's standing and

25   reputation among his colleagues.

184

1    Now, as of September 1998, you've

2    told us that you were one of the best

3    and brightest at PSP and that there

4    was no foreseeable limit to your

5    potential. But you had been

6    investigated before September 1998;

7    right?

8    A.    Yes.

9    Q.    And so that mere fact that an

10   investigation was conducted, did not

11   damage your career in any way?

12   A.    Those investigations didn't,

13   to my knowledge, damage my career.

14   That's correct.  This one has.  Would

15   you care for me to speak to that?

16   Q.    No.  I think we've gotten it.

17   And we'll go over the damage in a

18   minute.  You said in, I think it's in

19   that same paragraph, you said that

20   one of the purposes of Evanko's

21   investigation was to learn the

22   breadth and depth of your knowledge

23   about the FBI investigation and

24   whether Evanko and someone in the

25   governor's office was a target, or

185

1    actually under suspicion.  What's

2    wrong with that?

3    A.      Where are you in the

4    Complaint, ma'am?

5    Q.      On page 11.

6                    ATTORNEY BAILEY:

7                    Page 11.

8    BY ATTORNEY GUIDO:

9    Q.      Paragraph 37.

10                   ATTORNEY BAILEY:

11                   It starts on the third

12           or fourth sentence.

13   ATTORNEY GUIDO:

14   Q.      You said that there were

15   two ---.

16                   ATTORNEY BAILEY:

17                   Give him a chance to

18           read the paragraph to refresh

19           it.

20                   ATTORNEY GUIDO:

21                   I just was going to

22           tell him where.

23                   ATTORNEY BAILEY:

24                   Yes.

25   BY ATTORNEY GUIDO:

186

1    Q.      If you look to where it says

2    two unlawful reasons.  That's where

3    it starts.

4                    ATTORNEY BAILEY:

5                    Darrell, go to the

6            beginning.  Read the entire

7            paragraph.  Think about it

8            before you answer her

9            question.

10   WITNESS COMPLIES

11   A.      Okay.  What's your question,

12   ma'am?

13   BY ATTORNEY GUIDO:

14   Q.      My question is, when you state

15   that one of the reasons that Evanko

16   --- one of the two illegal reasons

17   that you cite, are that Evanko wanted

18   to learn the breadth and depth of

19   your knowledge about the FBI

20   investigation and whether Evanko and

21   someone in the governor's office was

22   actually a target or under suspicion,

23   and what I'm asking you is, what's

24   wrong with that?  What's wrong with

25   Evanko wanting to find out, after the

187

1  fact, whether or not the FBI

2  investigation, he and the governor's

3  office really were the target of the

4  investigation? What's wrong with

5  that?

6  A.       A number of things.  The first

7  thing that comes to mind is that's

8  really a matter that he needs to

9  discuss with the FBI.  Because I

10  wasn't conducting the investigation.

11  Q.       Well, but your reasons for not

12  telling him about the case and your

13  reasons for not letting Major Conley,

14  the bureau director, know about it,

15  was that the potential target was

16  high-ranking members and someone

17  supposedly in the governor's office.

18  So what's wrong with after you've

19  told Evanko that that's why you

20  didn't tell him, what's wrong with

21  him wanting to know whether that's

22  true or not?  What's wrong with him

23  wanting to find out whether that's

24  true?

25  A.       But there's just no follow up.

188

1   That is the answer.

2   Q.      I don't get your answer.

3   A.      Managing that position

4   politically ---.

5                 ATTORNEY BAILEY:

6                 Did you say wanting to

7         know or to investigate?

8                 ATTORNEY GUIDO:

9                 I'm saying what's wrong

10        with him --- it's two parts.

11                ATTORNEY BAILEY:

12                Wanting to know.

13  BY ATTORNEY GUIDO:

14  Q.      One, what's wrong with him

15  wanting to know whether you're

16  telling him the truth?  Is there

17  anything wrong with him wanting to

18  know whether you're telling him the

19  truth about what happened?

20  A.      We told him what happened.

21  Q.      Right.  But is there anything

22  wrong with ---?

23  A.      And we gave him a verbal

24  report and gave him a written report.

25  Q.      But what's wrong with him

189

1  wanting to find out whether or not

2  you're telling him the truth?

3  A.     I don't understand the

4  question about truth.  It has nothing

5  --- that's what happened.

6  Q.     Right.  That's what you say

7  happened.  But what I'm saying is,

8  Colonel Evanko wasn't there, he

9  doesn't know what happened.  What's

10  wrong with him wanting to know

11  whether what you say happened, in

12  fact, happened?

13                 ATTORNEY BAILEY:

14            You're suggesting that

15        you should investigate someone

16        simply because you don't like

17        hearing what they report, just

18        to investigate?

19                 ATTORNEY GUIDO:

20            That's not what I'm

21        suggesting.

22  BY ATTORNEY GUIDO:

23  Q.     What I'm saying is, what is

24  wrong with --- you said that one of

25  the illegal purposes here was to find

190

1  out, you know, whether, in fact,

2  Evanko and someone in the governor's

3  office was a target. I'm saying, you

4  told him he was a target, but he

5  doesn't know that. So what's wrong

6  with Evanko wanting to find out and,

7  in fact, investigating whether what

8  you said is true, so that he knows

9  whether that's right or not?

10 A.        Well, as a practical matter, I

11 would think that's something that, as

12 the commissioner of the state police,

13 he specifically wouldn't do to avoid

14 the accusation that he has tried to

15 influence.

16 Q.        But the investigation's over.

17 So what I'm saying is, after the

18 fact, if at the time he was trying to

19 do that, then I might see your point.

20 But I'm saying, case closed, you've

21 gone and told him. The case is

22 closed.

23 A.        I don't know that ---.

24              ATTORNEY BAILEY:

25              He doesn't know that,

191

1    the FBI said the case was

2    closed.  That's the trouble

3    with too leading of questions

4    here.  He never said the case

5    was closed.  The FBI said the

6    case was closed.  Go to the

7    FBI and find out.  Investigate

8    the FBI.

9            ATTORNEY GUIDO:

10           Well, as part of the

11   investigation, they did go to

12   the FBI.

13           ATTORNEY BAILEY:

14           A lot of people ought

15   to investigate the FBI.

16           ATTORNEY GUIDO:

17           So what I'm saying

18   is - - -.

19           ATTORNEY BAILEY:

20           I'd like to investigate

21   them.

22           ATTORNEY GUIDO:

23           I'm sure you would.

24           ATTORNEY BAILEY:

25           I sure would.  I'd give

192

1    anything to get my hands on

2    them.

3    BY ATTORNEY GUIDO:

4    Q.    The bottom line --- okay. Just

5    so I understand.  The bottom line is,

6    you told Evanko, yes, that such and

7    such happened.  So he has to take you

8    at your word, in your opinion?

9    A.    I don't think that's

10   necessarily the case.  He could have

11   to me.  Being, I think, a rational

12   clinical way to handle it, would have

13   just been to call me in and ask me.

14   If he had any more questions, ask.

15   Q.    He asked you.  Right.  Okay.

16   He asked you ---.

17   A.    But what he did was ---.

18   Q.    Wait a second.  Before you

19   talk about what he did, what I'm

20   saying is, if he doesn't necessarily

21   believe you, what's wrong with him

22   asking Major Werts and Williams, go

23   out there, do an investigation, find

24   out what happened, talk to the FBI,

25   find out what they told him, talk to

193

1    Hickes, talk to all the people that
2    were involved, find out for me what
3    happened?  If he doesn't necessarily
4    believe you, then what's wrong with
5    him doing that?
6    A.      Because that's not what he
7    did.  I was named as the subject, as
8    the focus of the investigation.  This
9    was never about what you just
10   described, Ms. Guido.  It was never
11   about that.  And no one can look at
12   this and come to that conclusion.  It
13   would be very self-serving for you to
14   believe that now.  This investigation
15   was handed to two of the highest-
16   ranking members of the department.
17          I was put in an interrogation.
18   I was named the subject.  I was given
19   my rights.  This was an internal
20   affairs investigation.  This was
21   never an investigation what you've
22   just described.  So I can't answer
23   that question.
24   Q.      If it was, though?
25   A.      I'm not going to answer about

194

1    what ---.

2    Q.    There would be nothing wrong

3    with that?

4    A.    I've had so many

5    hypotheticals, I don't know where to

6    start and stop now.  That's not what

7    this was.

8    Q.    In your opinion?

9    A.    As a matter of fact, ma'am.

10   Q.    In your opinion, that's not

11   what this was; right?

12                ATTORNEY BAILEY:

13                Counsel, you're being

14        argumentative.  He's here as a

15        fact witness.  It's not

16        important what he thinks about

17        these things.  What's

18        important is ---.

19                ATTORNEY GUIDO:

20                It is important what he

21        thinks.

22                ATTORNEY BAILEY:

23                No, it's not important.

24        It's important what ---.

25                ATTORNEY GUIDO:

195

1            We can argue relevance

2      later, sir.

3            ATTORNEY BAILEY:

4            It has nothing to do

5      with relevance.  That's not

6      the issue, legally or

7      factually.

8            ATTORNEY GUIDO:

9            Well, we'll argue about

10     that later.

11           ATTORNEY BAILEY:

12           The fact is that Mr.

13     Evanko did certain things.

14     Certain things were done to

15     him.  He's testifying to

16     certain fact things and he can

17     respond to those kinds of

18     questions.  It's endless

19     speculation to ask him what he

20     thinks about what peoples'

21     reasons were and, for that

22     matter, what legal conclusions

23     were.  He's not a lawyer.

24           ATTORNEY GUIDO:

25           We'll argue about all

196

1     that later in court.  I'm here

2     to ask him questions.  That's

3     it.  And we're going to take a

4     break now for lunch.

5             ATTORNEY BAILEY:

6             What time do you want

7     to come back?

8             ATTORNEY GUIDO:

9             How long do you need?

10            ATTORNEY BAILEY:

11            Well, I don't know.

12    Were you hoping to finish up

13    today?  I'm going to have ---.

14            ATTORNEY GUIDO:

15            Hoping.

16            ATTORNEY BAILEY:

17            Hoping to?

18            ATTORNEY GUIDO:

19            Yes.

20            ATTORNEY BAILEY:

21            I'm going to have some

22    questions probably.  Maybe we

23    need to think about another

24    day or continuation.

25            ATTORNEY GUIDO:

197

1          Well, I'd like to do as

2     long as we can today.

3          ATTORNEY BAILEY:

4          Yes.  That's all right.

5     We can do that.

6          ATTORNEY GUIDO:

7          Okay.  That's no

8     problem.

9  OFF RECORD DISCUSSION

10          ATTORNEY BAILEY:

11          Why don't we just go

12     ahead and take an hour?  Is

13     that okay?

14          ATTORNEY GUIDO:

15          That's fine.  Yes.  I

16     don't have a problem with

17     that.

18          MS. LYDE:

19          It's 11:48 a.m.  We'll

20     take an hour break for lunch.

21  SHORT BREAK TAKEN

22          ATTORNEY BAILEY:

23          Please be advised

24     there's a tape recording

25     device in operation.

198

1          MS. LYDE:

2               1:03 p.m., we're back

3          on video.

4               COURT REPORTER:

5               You're still under

6          oath, Mr. Ober.

7     BY ATTORNEY GUIDO:

8     Q.        This morning at one point you

9     had asked me to come back to whether

10    or not if you remember anybody else

11    who told you that Evanko asked

12    Campbell's permission.  And I was

13    wondering since you've had the lunch

14    break, I'd come back to that.  Do you

15    happen to remember anybody else who

16    may have told you that?

17    A.        No.  I actually didn't give

18    that any thought, but I will try to

19    do that.

20    Q.        And also, I did want to follow

21    up one thing on that because I can't

22    remember if I asked you.  And that

23    was, you heard it from either Major

24    Morris or Lieutenant Colonel Hickes

25    or perhaps both of them, that Evanko

199

1    had asked for Campbell's permission.

2     Do you remember if they told you how

3    they knew that?

4    A.     No.  No, I don't recall how

5    they knew that.

6                    ATTORNEY GUIDO:

7                    Okay.  I guess we need

8           --- do you have the exhibits

9           still?  Because I think

10          Exhibit Three was what we were

11          --- I just wanted to give him

12          the copy of the Complaint

13          again so that we could follow

14          along where we left off.

15          Thank you.

16   BY ATTORNEY GUIDO:

17   Q.     Paragraph 42 or we'll pick up

18   at paragraph 42.  Let me look.  I

19   think we covered what was in the

20   other paragraphs.  In paragraph 42

21   you talk about the two PSP --- you

22   say two PSP majors conducted a

23   custodial interview of the Plaintiff.

24   What do you mean by a custodial

25   interview?

200

1   A.      I mean that I was called by
2   two PSP majors, sat down in the
3   deputy commissioner of
4   administration's office, read my
5   Garrity warnings and notification of
6   inquiry, and I was told, as the
7   documents indicate, I was being
8   compelled to participate in that
9   interview.
10  Q.      What's a Garrity warning?
11  A.      Garrity warnings are warnings
12  that are issued to subjects of
13  internal affairs investigations that
14  puts the bright line between their
15  criminal liability and their
16  administrative liability, with
17  respect to what statements can be
18  used against them ---.
19  Q.      And Garrity warnings are given
20  when it's not going to be a criminal
21  investigation; is that right?
22  A.      Correct.
23  Q.      And I think my recollection of
24  Garrity is that, in fact, anything
25  that you were to say in that

201

1    compelled interview, could not be

2    used later in a criminal proceeding;

3    is that correct?

4    A.      That's correct.

5    Q.      And those Garrity warnings,

6    they're given on a standard form?

7    A.      Yes.

8    Q.      And that form is used in

9    virtually every internal affairs

10   investigation?

11   A.      I would assume so, yes.

12   Q.      Okay.  And have you contacted

13   those same type of interviews before?

14   A.      Yes.

15   Q.      An administrative interview

16   with Garrity warnings?

17   A.      I've conducted internal

18   affairs investigations and issued

19   administrative warnings, yes.

20   Q.      And you would issue the

21   administrative warnings to everybody

22   you interviewed or to who?

23   A.      Subjects.

24   Q.      The subject of the

25   investigation?

202

1   A.      Subjects and anyone that
2   potentially could be a subject.
3   Q.      Now, you said it's a custodial
4   interview.  You weren't under arrest;
5   were you?
6   A.      No.
7   Q.      Well, how were you in custody?
8   A.      I was in custody by the mere
9   fact that I was being compelled to
10  participate or face disciplinary
11  action if I didn't.  Leaving the room
12  would have not been cooperating.
13  Q.      Right.  You could have left
14  the room; correct?
15  A.      And suffered the
16  administrative consequences, yes.
17  Q.      Right.  You could have been
18  disciplined for leaving the room?
19  A.      I could have been disciplined
20  for not participating in the
21  investigation,
22  Q.      Okay.  But if you had left the
23  room, nobody was going to handcuff
24  you and throw you back in the room;
25  correct?

203

1   A.      After two years, ma'am, I

2   don't know that I would make that

3   statement.

4   Q.      You had no reason at the time

5   to believe you were under arrest; did

6   you?

7   A.      I was not under arrest.

8   Q.      Okay.  And you weren't given

9   any kind of Miranda warnings?

10  A.      No, I was not.

11  Q.      I think you --- I know that

12  you've been interviewed before in

13  other administrative investigations;

14  is that right?

15  A.      Correct.

16  Q.      And previously been given your

17  Garrity warnings; correct?

18  A.      Yes.

19  Q.      What was different about this

20  interview that made it a custodial

21  interview, as compared to the other

22  interviews that you went through

23  before?

24                  ATTORNEY BAILEY:

25                  I want to object.  You

204

1          can go ahead and respond, if

2          you know.  I'd just remind

3          Counsel, he is not an

4          attorney.  And I think you're

5          asking for a legal definition.

6           You can go ahead and respond,

7          Mr. Ober.

8    A.     Well, I think that's just

9    about where I was going to go.  Not

10   having ---.

11   BY ATTORNEY GUIDO:

12   Q.     How long have you been a state

13   trooper?

14   A.     Twenty (20) years.

15   Q.     And you've done, I think you

16   said, hundreds of criminal

17   investigations?

18   A.     Probably.

19   Q.     And you don't understand the

20   term, custodial interview?

21   A.     I didn't say I didn't

22   understand the term, ma'am.

23   Q.     Okay.  I thought that was the

24   objection that the term --- that

25   since you weren't a lawyer, you

Sargent's Court Reporting Service, Inc.
(814) 536-8908

205

1  didn't know what the term, custodial

2  interview meant.  But being a state

3  trooper all these years, you do know

4  what a custodial interview is; don't

5  you?

6  A.      I believe I do.

7  Q.      Okay.  Were the other

8  interviews that were conducted in the

9  past administrative investigations in

10 which you were a subject, were those

11 interviews also custodial interviews?

12                ATTORNEY BAILEY:

13                Again, I'm going to

14         object.  Let me just --- so I

15         don't have to object anymore.

16         I object to having, or at

17         least attempting to elicit

18         from the Deponee, what amounts

19         to a legal definition.  Maybe

20         I don't understand what a

21         custodial interview is, but an

22         example, in a great deal of

23         school law, custodial

24         interviews can be conducted at

25         schools of children.  They're

206

1      not under arrest. But they
2      are coercive in the sense that
3      the person is unfree to leave
4      or go.
5              So I would defer to
6      you, Counsel, and I'm not
7      trying to be argumentative,
8      but I wrote the Complaint and
9      he's not an attorney. With
10     that in mind, I'll just have a
11     standing objection. I won't
12     interrupt you anymore and you
13     may respond to her questions.
14  A.     Well, in my mind, what
15  separates this interview from any one
16  I've ever been involved in, was the
17  whole context of the interview. And
18  considering the context and the form
19  and content of the interview, made it
20  a unique experience for me. And made
21  it custodial in that sense that I was
22  compelled to participate. Had I not
23  participated, I would suffer
24  disciplinary actions. That is also
25  true of the other investigations I

207

1   was involved in.  But in this

2   particular one, I was being

3   interviewed by two majors in the

4   deputy commissioner of

5   administration's office, without any

6   advanced warning as our regulations

7   and our labor contract affords me the

8   opportunity.  Taking all of these

9   things into consideration, it was

10  tantamount to a custodial situation,

11  in my mind, in that I was not free to

12  leave and I was not free to say, you

13  have no complaint, see you.  And I

14  did raise those objections to the

15  people interviewing me.

16  BY ATTORNEY GUIDO:

17  Q.      You did --- every interview

18  you ever conducted for internal-type

19  investigations, those are always ---

20  the member of the state police is

21  always required to answer; isn't he?

22  A.      Right.

23  Q.      He or she is always required

24  to answer?

25  A.      Yes.

208

1    Q.      And to always be subject to

2    discipline if they aren't; is that

3    right?

4    A.      Yes.

5    Q.      And you've conducted many of

6    those kinds of interviews yourself?

7    A.      Some, yes.  But there's a big

8    difference between those, ma'am.  In

9    every other instance, but mine, there

10   was a reason to conduct an

11   investigation.  There was a

12   complaint.  There was an allegation

13   of misconduct.  I have never been a

14   part of and never issued warnings to

15   someone willy-nilly, simply hoping to

16   find something that they did wrong or

17   tell them that we're to conduct an

18   investigation, review it, and if we

19   find misconduct, then conduct an

20   internal affairs investigation.  That

21   I have never been a part of.

22   Q.      Okay.  I think you mentioned

23   something about your union

24   representative.  You did have union

25   representation; correct?

209

1   A.       Yes, I did.  I was not

2   afforded --- what I had indicated was

3   I was not afforded the opportunity to

4   provide one in advance.

5   Q.       Okay.  How is that supposed to

6   work?

7   A.       That's supposed to work pretty

8   much as I've just described.  Unless

9   there's exigent circumstances,

10  subjects are to be notified in

11  advance of an interview and afforded

12  the opportunity to provide either a

13  PST representative or counsel.

14  Q.       When were you notified of the

15  interview?

16  A.       That day I received a phone

17  call from Colonel Coury's secretary

18  and said --- I was at my office at

19  the IIMS building, strategic

20  development building.

21                ATTORNEY BAILEY:

22                Is that IIMS?

23  A.       IIMS, correct.

24                ATTORNEY BAILEY:

25                Okay.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

210

1   A.      Which is detached from

2   headquarters, and told to be over at

3   headquarters in Colonel Coury's

4   office in ten minutes.  Excuse me,

5   she asked me how long it would take

6   to get there and I said, I guess, ten

7   minutes.

8   BY ATTORNEY GUIDO:

9   Q.      Was that the first that you

10  knew of the --- well, first, was it

11  the first you knew about the

12  administrative inquiry that was being

13  conducted?

14  A.      Yes.

15  Q.      Did you get some ---?

16              ATTORNEY BAILEY:

17              Were you told of the

18          purpose to be at the office

19          for?

20  A.      No.

21              ATTORNEY BAILEY:

22              Well, then ---.

23              ATTORNEY GUIDO:

24              But that's what I was

25          just getting ---.

211

1           ATTORNEY BAILEY:

2               The question was, was

3       that the first you knew.

4       Obviously, at the point you

5       received the telephone call,

6       you didn't know.  Is your

7       testimony that you didn't know

8       until you got to the office?

9   A.      That's correct.

10          ATTORNEY BAILEY:

11              All right.

12  A.      I was called and told to

13  report.

14          ATTORNEY GUIDO:

15              Maybe I'll just have to

16      depose you.  It might be

17      easier.

18          ATTORNEY BAILEY:

19              That's all right.  I'd

20      be very happy to answer your

21      questions.

22          ATTORNEY GUIDO:

23              It might be easier.

24  A.      I didn't understand.

25          ATTORNEY BAILEY:

212

1          I know you didn't.

2      That's why I ---.

3              ATTORNEY GUIDO:

4              Just ask me if you

5      don't understand.

6  A.      Well, I guess I did.  The

7  first time I knew about it is when

8  they sat me down.

9  BY ATTORNEY GUIDO:

10 Q.      When they sat you down, what

11 happened?

12 A.      They sat me down and told me

13 that I was there --- they were

14 ordered by Colonel Evanko to conduct

15 an administrative inquiry into the

16 facts surrounding the FBI probe that

17 was conducted in western

18 Pennsylvania.

19 Q.      At that time did they tell you

20 that you were the subject of the

21 inquiry?

22 A.      I don't recall.  Yes, they

23 did, as a matter of fact.

24 Q.      Do you remember who said what

25 about that?

213

A.      Well, what I recall then is my

inquiry as to what's the allegation

of misconduct.  And several times I

asked that question and several times

I was told there is no allegation of

misconduct.  And then I said, why am

I here?  They said, well, we're

conducting this inquiry.  And I said,

into what?  And they repeated

basically what I've said.  And I

said, well, I've already briefed the

commissioner --- Colonel Evanko, and

I've already briefed him.  I already

supplied him a memo.  I don't know

what else there would be --- what

there would be to investigate.

        And they were very persistent.

And at one point I said to Major

Williams, I said, well, I guess

you're just doing your job and he

said, I guess so.  I said, well, if

you don't have an allegation of

misconduct, then this is a witch hunt

and you can't do this.  I was very

emphatic with them.  I said, you

214

1  can't do this, you don't have a
2  reason for me to be here and keep me
3  here. And their response was and
4  Major Williams' response was and
5  Major Werts, non-verbal head nods
6  were that --- he kept repeating, we
7  are not conducting an investigation.
8  We are gathering the facts. We are
9  making no recommendation. We're
10 going to supply that to Colonel
11 Evanko. And if, on his review, if he
12 believes misconduct occurred, then
13 he's going to order an internal
14 affairs investigation.
15 Q.    Okay.
16 A.    And I said this makes no
17 sense. I'm the director. And I
18 recall this, of all the things you've
19 asked me to recall, I will tell you,
20 I recall this the best. Because I
21 was absolutely floored. I said I'm
22 the director of the internal affairs
23 division, albeit detached. I'm
24 telling you, you can't do this. You
25 can't interview me, put me in this

215

1    situation, without an allegation.

2          And with that, they slid a

3    notification of inquiry in front of

4    me that had been custom-made to fit

5    this circumstance, because the

6    standard reporting procedures and

7    blocks to check off didn't fit.  So

8    they X'd out attorney work product by

9    the order of chief counsel and

10   inserted Commissioner Evanko's ---.

11   I don't have the form in front of me.

12   Q.     Do you want me to see if I can

13   find it so that you can explain what

14   you're ---?

15   A.     That would be very helpful.

16   Q.     Yes.

17   A.     Do you remember the MASH

18   episode when they erased machine gun

19   and inserted microwave?  Well, that's

20   what they did.

21   Q.     I think I've seen almost all

22   of them and I can't remember that

23   MASH.

24   A.     Well, that's what this

25   reminded me of.

216

1  Q.      Let me see if I can find that,

2  because it will be helpful to me if

3  you can show me on the form what's

4  changed.  Exhibit Eight, is this the

5  notification of inquiry; is that the

6  right document that we were

7  discussing?

8  A.      Yes, ma'am.

9                  (Deposition

10                 Exhibit Number Eight

11                 marked for

12                 identification.)

13                 ATTORNEY BAILEY:

14                 Have you got a number

15     ---?  What is the number of

16     that, Eight?

17                 ATTORNEY GUIDO:

18                 That's Eight.

19  A.      Eight.

20                 ATTORNEY BAILEY

21                 Thank you.

22  BY ATTORNEY GUIDO:

23  Q.      And you were talking about

24  there something be wrong with it.

25  Could you explain what you were

217

1  talking about?  It's easier to

2  understand with you looking at the

3  document.

4  A.       I'm looking at Exhibit Eight

5  and I note that ---.

6              ATTORNEY BAILEY:

7              Wait, stop, hold it.

8  Thank you.  Syndi, could you

9  repeat your question, please.

10             ATTORNEY GUIDO:

11             Yes.

12 BY ATTORNEY GUIDO:

13 Q.        You were saying that the

14 document had been changed.  In order

15 to understand your response that you

16 were giving, I think it's helpful if

17 you point out what you're talking

18 about in the document for me, which

19 is now Exhibit Eight?

20 A.        Well, I was just noting that

21 when the document was presented to

22 me, I could see the obvious

23 alterations to it, in that it had

24 been customized by X'ing out, I

25 think, office of chief counsel, and

218

1    inserting commissioner.  Also note

2    that there is no BPR control number

3    assigned to it and I inquired about

4    that.  When a complaint is received,

5    there's a sequential number issued at

6    that point in time when it's

7    received.

8         And I also noted that by

9    virtue of the fact that this was

10   being presented to me as the note

11   says, it's provided to the --- a copy

12   is provided to the subject of the

13   investigation.  And that's what I

14   asked them.  I said, what is the

15   allegation of misconduct?  They kept

16   insisting this administrative inquiry

17   had some legitimacy, to which I then

18   responded, again, I'm the director of

19   internal affairs, where is

20   administrative inquiry and its

21   processes and my rights defined?

22   Because I've never heard of it.

23   Q.      What did they tell you about

24   why there wasn't a BPR number?  You

25   said you asked about the BPR number.

219

1   A.      I asked and the response that
2   I initially received was, well,
3   they're not conducting an internal
4   affairs investigation.  It's an
5   administrative inquiry.
6   Q.      Do you know whether or not
7   there was, in fact, a BPR number?
8   A.      Yes, there was.
9   Q.      Do you know when that was
10  issued?
11  A.      No, I do not.
12  Q.      So you don't recall off the
13  top of your head whether the BPR
14  number was issued before or after
15  this interview was conducted?
16  A.      Well, by deduction, it was
17  issued considerably after this.
18  Because the number that was assigned
19  to it, I believe is 503.  The
20  administrative --- the supervisory
21  inquiry that they put me through
22  three or four months later was issued
23  number 409.  So the number was
24  assigned at least after then.
25  Q.      Okay.  503.

220

1    A.      I was interviewed in

2    September.  So it would have most

3    likely been sometime after then, I'm

4    guessing.

5    Q.      I think you were interviewed

6    in June; weren't you?

7    A.      No, I mean, for the

8    administrative.

9    Q.      Okay.

10   A.      The other ---.

11   Q.      I'm sorry.  So this interview

12   was in June of '99; right?

13   A.      Yes.

14   Q.      So at that point you said ---

15   I'm trying to remember.  At the

16   beginning of the interview, you had

17   not been given the notification of

18   inquiry; right?

19   A.      Oh, yes, I had been.

20   Q.      I thought you had said that

21   they talked to you and then at one

22   point they slipped it under your

23   nose?

24   A.      Well, when we first sat down,

25   all of these things I've described,

221

1    this was the exchange between the

2    three of us.  And when it became

3    obvious that they were going to do

4    this over my objections and despite

5    my objections, it was, okay, let's

6    get started.

7    Q.      Okay.

8    A.      And at that point, I asked for

9    a PSTA representative.

10    Q.      At the point that you realized

11    that the interview was going to go

12    forward?

13    A.      At the point where I realized

14    this is going to happen.

15                    ATTORNEY BAILEY:

16                    I think her question

17            was, when this Exhibit Number

18            Eight was given to you.

19    A.      Well, it was before the

20    interview.

21    BY ATTORNEY GUIDO:

22    Q.      Okay.  But then you went ---

23    after you got Exhibit Number Eight,

24    then you asked for a union --- PSTA,

25    that's the union; right?

222

1   A.      Yes.

2   Q.      Is there a difference?

3   A.      No.  I assumed that it would

4   have been before, because the rep was

5   there when this was issued.

6   Q.      Okay.

7   A.      At some point ---.

8                   ATTORNEY BAILEY:

9                   I guess you mean

10          Exhibit Number Eight?

11  A.      Exhibit Number Eight.

12                  ATTORNEY GUIDO:

13                  That's what I was

14          confused about.

15                  ATTORNEY BAILEY:

16                  Right.

17  A.      I asked for a representative

18  and one was provided for me.  And

19  then, I'm guessing this document was

20  executed, because a PSTA rep's name

21  was on it.  I signed it also.

22  BY ATTORNEY GUIDO:

23  Q.      And that would be Trooper

24  Thomas Carr?

25  A.      Correct.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

223

1  Q.     In an administrative

2  interview, the member of the state

3  police, and this time being you, but

4  as a general rule, you don't have a

5  right to have a lawyer there; right?

6  A.     I'm sorry.  What was your

7  question?

8  Q.     Do you have a right to have a

9  lawyer in an administrative

10  interview?  You said you had the

11  right to have a union rep.  I was

12  wondering about lawyers.  Do you have

13  ---?

14  A.     Yes.  If the subject requests

15  one and a reasonable time was

16  afforded for them to obtain one,

17  I've never known of one that's

18  request has been refused.  I don't

19  know that it rises to the level of a

20  right.  I believe if the member would

21  exercise that, he would be entitled

22  to one, yes, ma'am.  Had I had any

23  idea what I was in for, I assure you,

24  and been given the opportunity, I

25  would have had counsel with me.

224

1    Q.    Okay.

2                ATTORNEY BAILEY:

3                I think the only

4        objection I've ever seen was,

5        you can't have both.

6                ATTORNEY GUIDO:

7                Okay.  I didn't know.

8                ATTORNEY BAILEY:

9                I'm not sure either.

10               ATTORNEY GUIDO:

11               I mean, I'm just asking

12       you because I don't know the

13       answer.

14               ATTORNEY BAILEY:

15               Maybe Joanne would

16       know.  Do you know whether

17       it's --- you don't know?

18               ATTORNEY REYNOLDS:

19               I would need to call.

20       I don't know.

21               ATTORNEY BAILEY:

22               Okay.

23   BY ATTORNEY GUIDO:

24   Q.    Before the interview, were you

25   --- well, at the time of the

225

1    interview, were you armed?  In other

2    words, did they make you surrender

3    your firearm?

4    A.     No.  I was not required to

5    surrender any firearm.

6    Q.     That's what I was wondering.

7    A.     That would have been

8    --- no, I was not required.

9    Q.     And were you told that this

10   was strictly an administrative

11   interview?

12   A.     That's what I was told, it's

13   an administrative inquiry.

14   Q.     And did you have any concerns

15   that there was somehow criminal

16   allegations at issue?

17   A.     At that point, no.

18   Q.     Okay.

19   A.     When the interview started,

20   ma'am, no.

21   Q.     Okay.  During the course of

22   the interview did you become

23   concerned?

24   A.     At some point in time, I

25   became concerned that experiencing

226

1    what I've experienced, that there

2    could be criminal charges that were

3    at least being evaluated against me.

4    Q.      What caused you to become

5    concerned about that during the

6    interview?

7    A.      The irrational nature of this

8    whole thing.

9    Q.      Well, what was --- why don't

10   you just tell me what about the

11   interview itself?  You talked about

12   the nature of the questions, et

13   cetera.  Can you describe in a little

14   bit more specifics for me?

15   A.      Sure.  During the interview,

16   it became obvious --- well, it was

17   obvious at the onset of the

18   interview, that any rational

19   explanations were going to be

20   completely overlooked and that this

21   was an exercise in finding

22   wrongdoing.  I was very --- I became

23   concerned that in this exercise of

24   conducting this witch hunt for

25   wrongdoing, that if given the

227

1    opportunity, that the department

2    might try to conjure up a criminal

3    charge against me.

4    Q.    What were you asked by either

5    Major Werts or Major Williams that

6    made you think that?

7    A.    The whole interview, ma'am.

8    This whole business is rotten to the

9    core.  I had no assurance and no

10   faith that this interview and this

11   process was going to be a fair

12   objective and impartial one and yield

13   an objective result.

14   Q.    Did it have anything to do

15   with either Major Werts or Major

16   Williams?

17   A.    No.  I viewed their roles as

18   messengers.

19   Q.    Okay.  Did you know both of

20   those majors?

21   A.    Know them in what capacity?

22   Know who they are, yes.  Work with

23   them, Major Werts, never, Major

24   Williams, yes.  We shared at least

25   one project that comes to mind.  So

228

1  business-type relationship, yes,

2  ma'am.

3  Q.     My recollection from Major

4  Williams' deposition was that he said

5  that he thought well of you.  So

6  that's why I wondered if you knew him

7  from the past?

8  A.     Yes.  We had worked on a

9  project together.  I believe it was a

10 legislative budget and finance

11 committee report, I think.

12 Q.     And as far as you knew, there

13 wasn't any bad blood between you or

14 anything like that; was there?

15 A.     Not to my knowledge.

16 Q.     Okay.  Now, you've described

17 this as being different from any

18 other administrative inquiries that

19 you've been involved in as, at least

20 as a subject or a witness, as opposed

21 to doing the investigation?

22 A.     Yes.

23 Q.     The 1994 investigation that

24 was initiated by Commissioner Walp,

25 that involved the Lykens Station; is

229

1   that correct?

2   A.      Yes.

3   Q.      What was the --- what did that

4   stem from?

5   A.      There was an allegation.  This

6   was --- let me start again.  When I

7   was assigned to the systems and

8   process review division, the

9   inspection division, there was an

10  allegation made against --- I don't

11  know if there were other subjects,

12  other than myself or not.  I believe

13  I was the only subject, as I recall.

14  But there was an allegation made by

15  the station commander that I had

16  issued him inappropriate orders and

17  that I had forced him to break open

18  desks or one desk.  As I recall,

19  that's what the essence of the issue

20  was.

21  Q.      And was the basic issue

22  whether or not you had exercised your

23  judgment appropriately during the

24  inspection of that station?

25  A.      No.  The issue is what I just

230

1  described, that I gave him an
2  inappropriate order.  This is what I
3  recall from my interview with then
4  Captain Capriotti (phonetic), is that
5  I ordered him, outside of his chain
6  of command, to break open desks to
7  retrieve items that were missing.
8  And I now recall that there was a
9  second leg to that, I believe, in
10 that I ordered a binder be returned.
11 When I left that station I
12 inadvertently left a binder of
13 information behind.  And it was
14 relayed to Harrisburg that I
15 inappropriately had ordered him to
16 have that relayed down there by
17 shorting his patrol shifts for
18 coverage that night.
19 Q.     Do you remember whether the
20 allegation was that your orders were
21 inappropriate or whether you actually
22 gave them?  Do you understand the
23 difference?
24 A.     Yeah.  But do you know what
25 would be helpful, if you have the

231

1    investigation, we can just take a

2    look at it to what the allegation

3    was.

4    Q.      Let's see if I do.

ATTORNEY BAILEY:

6            Let me place an

7    objection on the record to

8    relevancy.  You may respond.

COURT REPORTER:

10           Number Nine.

11           (Deposition

12           Exhibit Number Nine

13           marked for

14           identification.)

15   A.      I believe that answers the

16   question then.  There's an allegation

17   of criminal conduct.

18   BY ATTORNEY GUIDO:

19   Q.      Well, what I didn't, I guess,

20   what I didn't understand is whether

21   from your answer that you said that

22   it didn't involve your judgment.  I

23   didn't know whether you were saying

24   that the allegation was --- because

25   if the question is whether or not it

232

1   was appropriate for you to order the

2   desk to be opened, that would be

3   judgment.  On the other hand, if the

4   question was whether you had, in

5   fact, ordered anyone to open the

6   desk, that would be a factual issue.

7   So I was wondering if you know

8   whether the issue is, did you really

9   order it or was it appropriate for

10   you to order it?

11   A.      What I remember is that was an

12   issue that was explored, the

13   appropriateness of that order,

14   because that is governed by

15   regulation.  A headquarters

16   lieutenant would not have the

17   authority to order, without going

18   through that member's chain of

19   command, absent exigent

20   circumstances, to do much of

21   anything.  I remember that issue

22   being explored.  But now that you've

23   shared this with me, I do recall now

24   the allegation of criminal conduct,

25   which is what apparently triggered

233

1    the investigation.

2                ATTORNEY BAILEY:

3                What was the

4        disposition of this, Counsel?

5                ATTORNEY GUIDO:

6                Unfounded.

7                ATTORNEY BAILEY:

8                Unfounded.

9                ATTORNEY GUIDO:

10                I thought we had

11        established that earlier.

12                ATTORNEY BAILEY:

13                I wasn't sure.  I just

14        want to make sure the record's

15        clear.

16    BY ATTORNEY GUIDO:

17    Q.        I think I'm still a little

18    confused.  Did you order the desk to

19    be broken into or not?

20    A.        No.

21    Q.        Okay.  That answers my

22    question that I was having trouble

23    with.  When the desk was opened,

24    though, did you find --- were there

25    drugs or drug paraphernalia that was

234

1    found in the desk; do you recall?

2                    ATTORNEY BAILEY:

3                    Are you asking him to

4          re-visit the underlying

5          histories, back histories

6          here?

7                    ATTORNEY GUIDO:

8                    Just that one fact.

9                    ATTORNEY BAILEY:

10                   Well, I'm going to

11         place an objection on the

12         record, but I'm going to let

13         him answer it.  You have an

14         investigation that was

15         unfounded.  The investigation

16         and his comments speak for

17         themselves.  If you want to

18         let him review the contents of

19         the investigation, let him

20         comment on them, that's fine.

21         I'm going to place the

22         objection on the record.  I'm

23         going to permit him to

24         respond,

25         if he recollects.

235

1  A.      Well, looking at Exhibit Nine,

2  Counsel, I don't recall the details.

3  This is so long ago.

4  BY ATTORNEY GUIDO:

5  Q.      Okay.

6  A.      Apparently, we found drug

7  paraphernalia, yes.

8  Q.      And I'm not meaning to imply

9  that you did anything wrong here.

10 What I was asking, so the drug

11 paraphernalia was found and then did

12 you report that to someone?

13 A.      Yes.

14 Q.      And who would you have

15 reported to?

16 A.      The station commander.

17 Q.      To the station commander

18 there?

19 A.      Yes.

20 Q.      Would you also report that to

21 your immediate supervisor?

22 A.      I'm sure I did.

23 Q.      Do you know who was your

24 supervisor at that point in time?

25 A.      Yes.  Major --- then Captain

236

1   DeWire.

2                   ATTORNEY BAILEY:

3                   Can you spell DeWire

4          for the record?

5   A.        D - E - W - I - R - E.

6                   ATTORNEY BAILEY:

7                   A capital W or small?

8   A.        Capital W.

9                   ATTORNEY BAILEY:

10                  Thank you.

11  BY ATTORNEY GUIDO:

12  Q.        The interview that was

13  conducted in respect to that

14  investigation, it differed from this

15  one in what way?

16                  ATTORNEY BAILEY:

17                  Objection.  You may

18          respond.

19  BY ATTORNEY GUIDO:

20  Q.        The one on June 28th.

21                  ATTORNEY BAILEY:

22                  Objection.  You may

23          respond.

24  A.        I think I've already answered

25  that.

237

BY ATTORNEY GUIDO:

Q.       Maybe I didn't follow.  I'm sorry.

A.       Maybe we need it read back then.  This interview that I --- the interview with Werts and Williams?

Q.       Yes.

A.       Differed from this and every other investigation interview that I've ever been involved in, in that there was no legitimate, rational basis to be there, because there was no allegation of misconduct.  There was no complaint sheet indicating there was misconduct.  There was no legal way to put this into an internal affairs environment where my rights are invoked.  So there was nothing about this that was the same. There was no nexus for this.

Q.       Okay.  So what led up to you being investigated was different. But as far as the just procedural aspects of the interview, the Garrity warnings, the union representation,

238

1    interview being tape-recorded,  et

2    cetera, were all the procedural

3    aspects done, just like every other

4    administrative interview?

5    A.      No.

6                    ATTORNEY BAILEY:

7                    Objection, objection,

8            objection.  You may respond.

9    A.      No, of course, they weren't.

10   I've already testified to that.  I

11   was not given notification in

12   advance, which I was in this case.

13   BY ATTORNEY GUIDO:

14   Q.      Okay.

15   A.      And in this case, Major, then

16   Captain Capriotti, called me, I was

17   at the Milton Station, to arrange a

18   date and a time in advance. I was

19   afforded then an opportunity to

20   provide a PSTA representative.  I'm

21   assuming that all of the other

22   procedures were followed.  I can't

23   sit here and recall that they were or

24   weren't, with respect to issuance of

25   control numbers and what have you.

239

1    So far, the only thing that I can

2    tell you was the same is the fact

3    that I was issued my warnings.

4    Q.      I'm sorry.  Do you know

5    whether as part of the administrative

6    inquiry, and I'm talking about this

7    one in the summer of 1999 for which

8    you were being interviewed on that

9    day, do you know whether or not

10   Lieutenant Colonel Hickes was also

11   interviewed?

12   A.      Yes.  I do know that he was

13   interviewed.

14   Q.      Do you know if any other

15   members of the state police were

16   interviewed?

17   A.      When I was interviewed, Major

18   Werts and Williams told me that they

19   had interviewed Hickes.  And I

20   believe Major Merryman was

21   interviewed, but I don't recall

22   whether they told me that or not.

23   That's the only ones I know of.

24   Q.      Okay.  Do you know whether or

25   not the commissioner was also

240

1  subjected to an interview?  If you

2  know.

3  A.      At that time, no.  I'm

4  thinking that that has come out

5  during this litigation.  But at that

6  time, no, I don't know whether he was

7  interviewed or not.

8  Q.      And do you know whether or not

9  Lieutenant Colonel Coury was also

10  interviewed?

11  A.      I don't know.

12              ATTORNEY BAILEY:

13              Did the commissioner

14      interview himself?  I only ask

15      that, Syndi, Exhibit Number

16      Eight says request from the

17      commissioner.  So I assume he

18      requested an interview for

19      himself?

20              ATTORNEY GUIDO:

21              Exhibit Number Eight is

22      --- I see what you're saying.

23      Okay.

24  BY ATTORNEY GUIDO:

25  Q.      No.  I'm just asking, do you

241

```
1   know if he was interviewed?  And you
2   said you think you've heard that, but
3   maybe through this litigation?
4   A.      Yes.  At that time, no, I did
5   not know that.  But I'm thinking that
6   came up during a deposition or
7   something during this process.  I
8   think maybe Major Williams mentioned
9   that, but I don't recall now.
10  Q.      Now, in paragraph 43, you've
11  alleged that Lieutenant Colonel Coury
12  blocked your promotional
13  opportunities.  What promotional
14  opportunities did Lieutenant Colonel
15  Coury block?
16  A.      So far, I would say that he
17  has blocked my promotion, promotional
18  opportunity to the Bureau of
19  Professional Responsibility, as well
20  as the Bureau of Liquor Control
21  Enforcement.
22  Q.      What promotion to the Bureau
23  of Professional Responsibility?
24  A.      The bureau director's
25  position, the rank of major.
```

242

1   Q.      Would that be at the time ---
2   you mean to replace Conley?
3   A.      Yes.
4   Q.      Okay.  And do you know when
5   that was?  I really don't know how
6   long ago Colonel Conley was promoted.
7   A.      Well, with all the dates
8   floating around, ma'am, I can't
9   recall.
10  Q.      But to give us some context,
11  Major Conley was still a major at the
12  time that Colonel Evanko ordered the
13  administrative inquiry in the summer
14  of 1999?
15  A.      '98 --- '99, correct.  You're
16  right.
17  Q.      And at some point after that,
18  he was promoted to lieutenant
19  colonel?
20  A.      Yes.
21  Q.      So the bureau director
22  position opened up again?
23  A.      Yes.
24  Q.      And that's the one that you
25  had applied for that or what

243

1  happened?

2  A.      No.   There's no need to apply.

3  I completed --- I participated in a

4  competitive exam process.

5  Q.      And how do you know that

6  Lieutenant Colonel Coury blocked your

7  promotional opportunity, kept you

8  from being promoted to director of

9  the BPR?

10  A.      Well, by deduction, and having

11  been involved in this fiasco for two

12  years, as was the case then and now,

13  I'm the only individual on this

14  planet who has been in charge of both

15  of the divisions that comprise BPR.

16  So by simple logic, I have to deduce

17  that the only legitimate reason for

18  me not being offered that promotional

19  opportunity is as a result of the

20  actions by the Defendants to include

21  Coury.  I'm senior to probably 90

22  percent of the captains in this state

23  right now.  I've been a captain for

24  six years, almost seven years.

25  Q.      The decision about who to put

244

1  in charge of that bureau, would that

2  be Lieutenant Colonel Coury's

3  decision to make?

4  A.    Well, I believe that according

5  to what Colonel Coury has told me in

6  the past, there's an exchange of

7  information.  There's a discussion

8  amongst the deputies, particularly,

9  the deputy who was most affected by

10 that position and a recommendation

11 made.

12 Q.    But do you have first-hand

13 knowledge that Lieutenant Colonel

14 Coury did anything to prevent you

15 from being made the director of that

16 bureau?

17 A.    Well, as in the case of LCE,

18 I'm aware that Colonel Coury sent out

19 a message to his bureau directors and

20 asked for recommendations from the

21 bureau directors for various

22 promotional --- promotions.

23 Q.    And so Lieutenant Colonel

24 Coury sent out a message asking,

25 basically saying give me some names

245

1    of who would be good for this job?

2    A.      Yes.

3    Q.      And who submitted your name to

4    Lieutenant Colonel Coury as the

5    person that would be great for being

6    director?

7    A.      I don't think that happened,

8    ma'am.

9    Q.      I just wondered because you

10   said that Lieutenant Colonel Coury

11   asked for recommendations.  And then

12   you said that he blocked your

13   promotional opportunities.  So I'm

14   trying to figure out what he did,

15   what actions Lieutenant Colonel Coury

16   took?

17   A.      What I've testified to earlier

18   is based on my experience in

19   discussing promotional opportunities

20   with Colonel Coury when I was the

21   director of IA or systems and process

22   review, in that the process is what

23   I've described, that the commissioner

24   takes recommendations.

25   Q.      So rather than blocking you,

246

1   essentially, he just didn't recommend

2   you?

3   A.      That's extremely likely,

4   ma'am.

5   Q.      Okay.  And then over at BLCE,

6   that's the Bureau of Liquor Control

7   Enforcement, I think?  I should know

8   that one, but ---.

9   A.      Correct.

10  Q.      Can you tell me what promotion

11  there was blocked?

12  A.      The bureau director's

13  position.

14  Q.      When was that open; do you

15  know?

16  A.      I believe Major DeWire was

17  promoted and transferred in about

18  July of 2000.

19  Q.      Who took his place?

20  A.      Captain McDonald.  Who took

21  Major DeWire's place?

22  Q.      Yes.

23  A.      Captain McDonald.

24  Q.      And he's the current bureau

25  director?

247

1   A.      Major DeWire is the current

2   bureau director; correct.

3   Q.      Okay.  I'm confused.  The

4   opening that you think that you

5   should have gotten was the position

6   that Major DeWire got?

7   A.      Yes.

8   Q.      Okay.  I understand now.  So

9   that's where Koscelnak comes in;

10  right?   Was Koscelnak the former

11  bureau director?

12  A.      Yes.

13  Q.      And that was while you were

14  actually working in the Bureau of

15  Liquor Control Enforcement?

16  A.      When I was assigned there,

17  Major Koscelnak was the bureau

18  director, correct.  And then he

19  transferred.

20  Q.      Okay.  And then that's when

21  Major DeWire was promoted?

22  A.      Yes.

23  Q.      And again, do you have any

24  first-hand knowledge of anything that

25  Lieutenant Colonel Coury actually did

248

1    to stop you from receiving that

2    promotion?

3    A.      By this time, I believe,

4    Colonel Coury has now moved over to

5    the director --- deputy commissioner

6    of operations position.  Whereas,

7    before, he was the director of

8    administrations.  So the rest would

9    then logically follow as I've just

10   described, recommendation and what

11   have you.

12   Q.      And that's because why?  Why

13   would that logically follow?  I'm

14   sorry.  You have to help me out,

15   because I don't really know.

16   A.      Well, what I just described

17   about the input of the deputy as to

18   who gets the position.

19   Q.      I think what I don't

20   understand is, him changing from ---

21   because I don't really know what the

22   administration versus operations.

23   A.      Because the Bureau of Liquor

24   Control Enforcement is in the chain

25   of command relationship under the

249

1    deputy of operations.

2    Q.       Okay.  So administration ---

3    so BPR would be under administration?

4    A.       Correct.

5    Q.       So that when he was --- so you

6    believed that when he was the deputy

7    commissioner in charge of

8    administration that he could have had

9    you made the bureau director of BPR.

10   A.       Yes.

11   Q.       And then when he moved to

12   operations and an opening came up in

13   the Bureau of Liquor Control

14   Enforcement, he could have made you

15   the major then?

16   A.       Correct.

17   Q.       Okay.  Do you know of any

18   other promotional opportunities that

19   Lieutenant Colonel Coury somehow

20   blocked?

21   A.       Not personally, no.

22   Q.       What do you mean by not

23   personally?

24   A.       I don't have personal

25   knowledge that he has blocked any

250

1   additional opportunities for me.

2   Q.      Do you have some other kind of

3   hearsay-type knowledge of that?

4   A.      Would you consider rumors to

5   be hearsay?

6   Q.      Is it just some rumors or ---?

7   A.      Yes.

8   Q.      And what's the rumor?  Taking

9   it for what it is, it's a rumor, but

10  what's the rumor?

11  A.      Well, the rumors that surround

12  me and my opportunities are that I

13  don't have any.  And that I was sent

14  to Washington --- they attempted to

15  send me to Washington to let me know

16  that my career was over.

17              ATTORNEY BAILEY:

18              Washington,

19      Pennsylvania?

20  A.      Washington, PA.

21  BY ATTORNEY GUIDO:

22  Q.      Okay.

23  A.      And that whenever my name is

24  brought up amongst my peers or in a

25  context of rumors, it's generally

251

1  thought of as quite laughable that

2  they would even think of promoting me

3  because of the actions of these

4  Defendants and what they've done to

5  my reputation in this agency.

6  Q.      Who have you heard those

7  rumors from?

8  A.      Ma'am, I couldn't even begin.

9  Okay.  If you want a list, I'll try

10 to come up with a list, the best I

11 can.  Major DeWire, Captain McDonald,

12 Major Merryman, Major Morris, Major

13 Sillhamer (phonetic), Lieutenant

14 Benedict, subordinates, Corporal

15 Karbowski, Sergeant Sweeting,

16 Sergeant Starr, Sergeant Backenstoss

17 (phonetic), and virtually everyone

18 that I have worked directly with or

19 indirectly with for the past two or

20 three years.

21 Q.      Has Lieutenant Colonel Hickes

22 ever told you that?

23 A.      No, not that I can recall.

24 Q.      He certainly wouldn't have any

25 reason not to think highly of you;

252

1   would he?

2                    ATTORNEY BAILEY:

3               Objection.  The

4   question was not what these

5   people thought of him.  The

6   question is what was imparted

7   him by rumor.  And any

8   inference that the people he

9   named ever indicated they do

10  not think highly of Captain

11  Ober or any indication of

12  anything of that sort is

13  objected to.

14                    ATTORNEY GUIDO:

15              I didn't make that

16  inference.

17                    ATTORNEY BAILEY:

18              That's a

19  mischaracterization.

20  BY ATTORNEY GUIDO:

21  Q.      I'm sorry.  That wasn't an

22  inference I was intending to put out

23  there, that these people didn't think

24  highly of you.  What I was saying is,

25  Lieutenant Colonel Hickes is part of

253

1    the command staff.

2    A.      Yes.

3    Q.      Who could make

4    recommendations, et cetera, about who

5    should be a major.  And I'm saying

6    --- you're saying that you think that

7    the rumor is that your career is

8    over.  And I'm saying, well, isn't it

9    true that Lieutenant Colonel Hickes

10   would still think quite highly of

11   you?

12   A.      It's more than rumor, ma'am.

13   You just have to look at where I've

14   been for the past two years and that

15   would pretty much come clear to you,

16   I believe.

17   Q.      Okay.

18   A.      But to answer your question

19   about Colonel Hickes, yes, I would

20   expect that he would have a high

21   recommendation for me, yes.

22   Q.      Okay.  And then in the same

23   paragraph you said that Lieutenant

24   Colonel Coury launched another

25   totally improper investigation into

254

1    your personal affairs.   What

2    investigation are you referencing

3    there?

4    A.      He launched an investigation

5    into my personal collection of PSP

6    memorabilia.

7    Q.      That would be the one ---

8    that's the investigation you were

9    talking about that was IAD 1999-409?

10    A.      Yes.

11    BRIEF INTERRUPTION

12                    ATTORNEY GUIDO:

13                    Exhibit Number Ten

14            would be the use of force

15            complaint, reception,

16            processing worksheet for that

17            investigation, IAD 1999-409.

18                    (Deposition

19                    Exhibit Number Ten

20                    marked for

21                    identification.)

22    BY ATTORNEY GUIDO:

23    Q.      And that's the one that you

24    said that Lieutenant Colonel Coury

25    launched?

255

1    A.        Yes.

2    Q.        According to the use of force

3    complaint processing worksheet, it

4    indicates that a complaint was

5    received from Philip Conti; correct?

6    A.        Uh-huh (yes).

7    Q.        Wouldn't Philip Conti really

8    be the complainant there?

9    A.        He would be the complainant,

10   according to the way this is

11   documented, yes.

12   Q.        Rather than Lieutenant Colonel

13   Coury?

14   A.        No.

15   Q.        Lieutenant Colonel Coury ---.

16   A.        It has Coury listed as the

17   complainant.

18   Q.        That's what I'm asking.  Can

19   you help me find the --- the

20   complaint information, so this is

21   where you put the complainant's name?

22   A.        Yes, ma'am.

23   Q.        Okay.  And he says that he's

24   initiating this, according to this

25   document, based on a complaint

256

1  received from Philip Conti?

2  A.     Yes.

3  Q.     Now, you indicated in your

4  Complaint that this IAD 1999-409 was

5  a completely improper investigation.

6  What was improper about this

7  investigation?

8  A.     Can I have a moment to review

9  this?

10  Q.     Sure.

11  WITNESS REVIEWS DOCUMENT

12  A.     I'm sorry.  Did you have

13  a ---?

14  BY ATTORNEY GUIDO:

15  Q.     Yes.  You've made an

16  allegation that Lieutenant Colonel

17  Coury ---.

18  A.     Wait, I didn't read this.  Can

19  I finish this, please?  I didn't

20  realize there was another letter

21  here.

22  WITNESS REVIEWS DOCUMENT

23  A.     Well, you've answered your own

24  question if you read these letters,

25  ma'am.  But I'll try to clarify ---.

257

BY ATTORNEY GUIDO:

Q.      I haven't answered my own question.  Okay.  Let me ask the question this way.  With respect to the administrative inquiry, and I forget the other number but the one that Colonel Evanko did in June of 1999, the one he ordered, that you said that it was different than all the others that you had been part of?

A.      Yes.

Q.      And you said the thing that was really improper about that was that it was launched when there was no allegation of wrongdoing by anybody. Now, in this situation, there is an allegation of wrongdoing.  So what is improper about this particular investigation, 1999-409?

A.      Well, I've seen more information now about this incident than I have ever been allowed to see.  So can I change an answer?  This might be the second most improper investigation I've ever seen.  If the

258

1    one that Werts and Williams did on me

2    was the first, then this might be the

3    second.  Because there is no

4    allegation of misconduct here.

5    Q.      Okay.  And so your position is

6    that there's no allegation of

7    misconduct in 1999-409?  So that

8    one's also improper?

9    A.      Can you show me?  Counsel, can

10   you steer me to where there's an

11   allegation of misconduct.

12   Q.      I'm just asking you, is there

13   or is there not an allegation ---?

14   A.      No, I'm asking, can you point

15   me in the direction?  I'm asking for

16   some help.  I don't see it.  I see a

17   lot of conjecture by someone.

18   Q.      By someone, meaning who?

19   A.      Well, enclosure number four is

20   from Philip, retired Colonel Conti.

21   And he even says, he's using his rank

22   and post within the department to

23   give the impression, blah, blah,

24   blah.  There's no evidence that any

25   of that ever occurred.  But he

259

1  continues to say, if we can't prove

2  it --- if we can't prove him doing

3  something criminally wrong, then I

4  believe he is doing something for

5  which he should be disciplined.  But

6  no one seems to know what.

7                    ATTORNEY BAILEY:

8                    Could be disciplined by

9        the department.

10  A.        And on this basis an

11  investigation of my personal affairs

12  was launched by the department.

13  BY ATTORNEY GUIDO:

14  Q.        Okay.  But now at that time,

15  Mr. Conti was retired; correct?  He

16  wasn't somebody in the state police?

17  A.        That's correct.  He was then

18  probably 82, 83 years old.

19  Q.        So someone outside the state

20  police, whether there is any facts to

21  back them up or not, someone outside

22  the state police complained that you

23  had improperly used your position as

24  a state trooper.  Whether that's true

25  or not, I'm not asking you.  What I'm

260

1    saying is, he complained about it.

2    Whether he had facts, didn't have

3    facts, someone outside the department

4    complained that you had improperly

5    used your position as a state

6    trooper; is that right?

7                    ATTORNEY BAILEY:

8                    I object.

9    BY ATTORNEY GUIDO:

10   Q.      Isn't that what you just read

11   to me, said to me?

12                   ATTORNEY BAILEY:

13                   Counsel, you're using a

14              conclusion by someone that he

15              did something wrong, as if an

16              investigator or someone who's

17              capable in looking at this

18              material would say, yes, there

19              is something wrong there,

20              somebody qualified.

21                   ATTORNEY GUIDO:

22                   No, that's not what I

23              mean.  It's not my implication

24              and that's not what I'm asking

25              you.

261

1       ATTORNEY BAILEY:

2           Well, it may not be

3       your implication, but you're

4       asking us to make an

5       assumption that there is an

6       underlying basis for the

7       complaint - - -

8           ATTORNEY GUIDO:

9           No, I'm not.

10          ATTORNEY BAILEY:

11          - - - by this Phil

12      person, this Phil Conti.

13          ATTORNEY GUIDO:

14          No, I'm not.

15          ATTORNEY BAILEY:

16          It's obviously a desire

17      to get at Mr. Ober, because he

18      has some reason to compete

19      with him.

20          ATTORNEY GUIDO:

21          I'm not asking - - -.

22          ATTORNEY BAILEY:

23          Not that Mr. Ober did

24      anything wrong.

25  BY ATTORNEY GUIDO:

262

1  Q.    I'm not asking you that, sir.

2  In fact, I'm asking you just the

3  opposite.  Whether there's any truth

4  to it or not, to the underlying

5  allegation, the fact is that Mr.

6  Conti did send a complaint in

7  accusing you of this; right?

8  A.    I think there's a little more

9  to it than that, Counsel.

10  Q.    Okay.  But first answer that

11  question and then go on to explain.

12  But he did send in something accusing

13  you of that; correct?

14  A.    He sent something to Bill.

15  Q.    Bill?

16  A.    I don't know.  I don't know

17  who Bill is.

18  Q.    Whoever the letter ---

19  there's an accusation here?

20  A.    No.  This is not a letter of

21  complaint to the Pennsylvania State

22  Police.  This is a letter to Bill.

23  Q.    Right.  I understand.

24  A.    Well, what's to prevent ---.

25  Q.    But what I'm saying is, he has

263

1   made a complaint?

2   A.     If you wrote a letter to your

3   husband and said something about the

4   state police, would that

5   automatically springboard --- I'm

6   trying to answer your question.

7   Q.     No, you're not.

8            ATTORNEY BAILEY:

9            Move to strike.

10  BY ATTORNEY GUIDO:

11  Q.     And I really don't want to,

12  you know, try to go through all of

13  this in detail, but ---.

14           ATTORNEY BAILEY:

15           Counsel, you're asking

16       him to respond to a

17       conclusory ---

18           ATTORNEY GUIDO:

19           No, I'm not.

20           ATTORNEY BAILEY:

21           --- comment by someone.

22       If I wrote a letter to someone

23       and say, please investigate

24       Syndi Guido, because didn't

25       she rob a bank the other day.

264

1          I mean, I hope I'd need to

2          have something more.

3   BY ATTORNEY GUIDO:

4   Q.      I am not trying to imply in

5   any way, shape or form that you did

6   anything wrong here, sir.  As a

7   matter of fact, it was unfounded;

8   right?

9   A.      And, ma'am, I'm not taking it

10  as such.

11  Q.      I think that seems to be that

12  people are reading something into my

13  questions.  That's not ---

14               ATTORNEY BAILEY:

15               No, I'm not reading

16          anything into ---.

17  BY ATTORNEY GUIDO:

18  Q.      --- what's meant there.

19               ATTORNEY BAILEY:

20               Just frame the question

21          properly.  Why don't you

22          simply ask him what he knows

23          about this?

24               ATTORNEY GUIDO:

25               I am asking the

265

1    questions.  When you ask the

2    questions, you ask them the

3    way that you want to.

4            ATTORNEY BAILEY:

5            Well, don't frame them

6    in a way that puts him in a

7    box and commenting ---.

8            ATTORNEY GUIDO:

9            Quit being an

10   obstructionist.  You know,

11   I've been very patient in

12   letting you make all sorts of

13   comments, speaking objections,

14   telling your client how to

15   answer, answer questions for

16   your client, and this

17   particular issue is really not

18   a big complicated question.

19   It's a simple one.

20   BY ATTORNEY GUIDO:

21   Q.      And that is, this situation is

22   different than the situation that

23   you're talking about in the summer of

24   1999, because here there was some

25   outside complaint, right, wrong,

266

1  false, whatever, that you had done

2  something wrong?  Is that what you

3  were trying to say?

4              ATTORNEY BAILEY:

5              Objection to the use of

6         the word complaint.  You may

7         respond.

8  A.       Here's what I was trying to

9  get to earlier.  This is a letter

10  from Phil Conti to Bill.

11  BY ATTORNEY GUIDO:

12  Q.       Right.

13  A.       Okay?

14  Q.       That somehow makes its way to

15  the state police?

16  A.       Yes.

17  Q.       Okay.

18  A.       Somewhere in this canyon, this

19  ends up in the state police as a

20  complaint.  According to our

21  regulations, one thing that's

22  supposed to happen, and if you have

23  that, I'd be very eager to see it,

24  would be a complaint verification

25  form, where the complainant, if it's

267

1    Phil or Bill or Tom or whomever, I'd

2    like to see the complaint

3    verification, wherein those people

4    are asked to attest to what it is

5    they're speaking of.

6    Q.        I'll have to look for it.  I

7    don't know.

8    A.        Okay.

9    Q.        But I'm getting at the part

10   about what's improper.  I mean, here,

11   this is an investigation that ends up

12   clearing you, ends up vindicating

13   you.  What's wrong with having ---

14   I'm trying to understand what could

15   possibly be so bad about having

16   somebody out there saying that you

17   did something wrong and you didn't do

18   anything wrong?  An investigation is

19   done.  It shows you didn't do

20   anything wrong.  What's so bad about

21   that?  That's all I'm trying to find

22   out.

23   A.        Well, the fact that you have

24   to ask the question tells me you

25   don't understand, Ms. Guido.  So let

268

1    me try to explain it to you.

2    Q.    Okay.

3    A.    What's wrong, first of all is,

4    my off-duty affairs are not the

5    business of the state police.

6    Secondly, in this particular

7    instance, I was disciplined for this

8    before I was ever interviewed.  And

9    as you have emphatically stated, the

10   investigation was ultimately

11   determined to be unfounded.

12   Q.    Yes.  By Lieutenant Colonel

13   Coury; right?

14   A.    I found that out eventually.

15   I was never informed of that.

16   Q.    Well, didn't you get a notice

17   of it?

18   A.    No.

19                ATTORNEY GUIDO:

20                I want the part that

21        says he was cleared.

22                ATTORNEY BAILEY:

23                I think you're

24        referring to the notification,

25        Syndi.  Your question to him

269

1    was whether he was ever

2    notified.  His response was

3    no, he was not notified.

4            ATTORNEY GUIDO:

5        That it was unfounded,

6    was my question to him.

7  A.    I know the form that you're

8  looking for and it's not important.

9  I know which one you're looking for.

10 I did find it, but it was never given

11 to me.

12 BY ATTORNEY GUIDO:

13 Q.    Exhibit Eleven is a memo to

14 you dated December 23, 1999.  It's

15 from Lieutenant Colonel Coury;

16 correct?

17            (Deposition

18            Exhibit Number Eleven

19            marked for

20            identification.)

21 A.    Yes.

22 BY ATTORNEY GUIDO:

23 Q.    And in paragraph one it says,

24 after careful review of enclosure

25 one, I have concluded that the

270

1   allegation is unfounded; correct?

2   A.      Yes.

3   Q.      So Lieutenant Colonel Coury is

4   the person who decided that in the

5   end, after reviewing the evidence,

6   that the complaint against you was

7   unfounded?

8   A.      Yes.  But I was never given

9   this, ma'am.  This was never

10  presented to me.  I found this.  The

11  only way I ever knew this was when I

12  requested to review my troop bureau

13  file, I found a copy of this ---

14  well, whenever that was.  In the

15  summer of 2000, I believe.

16  Q.      So in December 1999, the memo

17  was written to you, but for whatever

18  reason, you didn't receive it?

19  A.      For whatever reason, I didn't

20  receive it.

21  Q.      And you don't know what the

22  reason you didn't receive it was?

23  A.      No, ma'am.

24  Q.      Whether it got lost or it was

25  intentional?

271

1    A.       No.

2    Q.       You don't know one way or the

3    other?

4    A.       No.  I also don't know why

5    Lieutenant Colonel Coury was the

6    adjudicator of this investigation,

7    when in normal circumstances that

8    would be the troop commander bureau

9    director's responsibility.  At the

10   time I was assigned --- during the

11   time when this investigation was

12   conducted through its conclusion, I

13   was not assigned under Lieutenant

14   Colonel Coury's command.  I was under

15   Lieutenant Colonel Hickes.

16   Q.       Well, even if he wasn't the

17   right person to be the final

18   adjudicator, you certainly didn't

19   suffer any harm from that; did you?

20   A.       Yes, I most certainly did.

21   Q.       With him finding you

22   unfounded?  How were you harmed by

23   him making a decision when he found

24   that it wasn't founded?

25   A.       Do you have notification that

272

1  they sent follow-up correspondence to

2  these individuals, to Tom ---?

3                    ATTORNEY BAILEY:

4                    Hold it just a minute.

5  BRIEF INTERRUPTION

6                    ATTORNEY BAILEY:

7                    Okay.  Snydi, your

8         question was how has he been

9         injured?

10 BY ATTORNEY GUIDO:

11 Q.       Yes.  My question is how were

12 you harmed by Lieutenant Colonel

13 Coury making a decision when he made

14 a decision that was favorable for

15 you?

16 A.       Well, I've been harmed in that

17 I go back to the very nexus of this

18 investigation.  There was never

19 enough threshold standards to even

20 conduct it to begin with.  I've been

21 harmed --- you have correspondence

22 that was sent to Mrs. Hayman or Tom

23 and Phil and Bill that follow up and

24 tell them that I've been vindicated

25 on these accusations and these

273

1    charges?   I was removed from the book

2    committee before I was ever

3    interviewed, as a disciplinary action

4    by Evanko.

5         I get a letter in my in-box

6    without any conversation with me.   No

7    one discussed this with my

8    supervisor, with the project

9    director, with the bureau director,

10   with Deputy Commissioner Hickes.   The

11   memo said I was basically being

12   kicked off the book committee because

13   I'm too busy with my IIMS assignment.

14   I made inquiries of my supervisors

15   and I said, has there been a problem

16   with me completing my work on time?

17   Is time management an issue?   And

18   they were all flabbergasted.   They

19   had no idea what I was talking about.

20   Q.      Okay.  Some of your answers

21   are so long, I need to go back a

22   little bit because you lost me at one

23   point.  About whether when you were

24   --- these people, Phil Conti, the

25   people at --- you said that they had

274

1    or hadn't received correspondence?

2    A.      I'm asking you if they have

3    ever received correspondence from the

4    department clearing my name on these

5    charges?

6    Q.      I don't know.  I thought you

7    were telling me that they had or they

8    hadn't.

9    A.      Well, I certainly hope they

10   have.

11   Q.      I was clarifying your answer.

12   A.      And the other harm and damage

13   that's come to me as a result of this

14   improper investigation is my

15   reputation among my peers.  I've been

16   --- I've heard rumors that I've been

17   a criminal suspect in stealing PSP

18   grade markers, for God's sake.

19   Q.      Who said that?

20   A.      Major DeWire.  He called ---

21   a rumor came up out of the northeast.

22   Phil Conti writes an article for

23   The Communicator.  When he broadcasts

24   his plea for artifacts and under no

25   circumstances is anyone to turn

275

1  anything over to a private collector

2  and wrote some very, very

3  inflammatory things about private

4  collectors, I must have gotten half a

5  dozen phone calls from people who

6  said, Conti's writing about you.

7  Also, I'm aware that he made these

8  complaints to the museum committee.

9  And during that museum committee ---.

10  Q.      Conti made the complaints?

11  A.      Conti made these --- Conti and

12  others at the museum committee raised

13  these objections to which Evanko

14  said, well, write it up in

15  The Communicator or I'll make sure it

16  gets in The Communicator, words to

17  that effect.  And Coury says, without

18  any more info than you have here,

19  just give me their names and we'll

20  have them investigated.

21  Q.      Have who investigated?

22  A.      Have these collectors

23  investigated.

24  Q.      So whether in writing or at

25  these different meetings, I mean,

276

1    there's no doubt Mr. Conti was going

2    around making accusations against you

3    that were unfounded, but were Mr.

4    Conti badmouthing you?

5    A.      Unfortunately, he's no longer

6    with us to verify that statement,

7    ma'am.  But all I see in the letter

8    from Mrs. Hayman is I received a

9    letter and visit from Darrell Ober.

10   Q.      How did you know then that he

11   was saying, casting these aspersions

12   against you at the museum committee

13   meetings?

14   A.      Several of the committee

15   members told me that.

16   Q.      Do you remember who?

17   A.      Captain Simmers (phonetic)

18   would be one, Major Regan (phonetic)

19   would be another.

20   Q.      Okay.  Now, in paragraph 44,

21   you said that on at least two

22   occasions Lieutenant Colonel Westcott

23   also personally violated your rights

24   in carrying out the vindictive,

25   unlawful desires of Colonel Evanko by

277

1   changing his recommendation for a
2   PEMA appointment causing Plaintiff's
3   removal.  And then there's another
4   part about changing your selection.
5   Can you just tell me what happened
6   with PEMA?  I don't really understand
7   what the allegation is there.
8   A.      Okay.  Before we get there, I
9   need you to also know that Colonel
10  Conti is someone that I was familiar
11  with and had talked to a number of
12  occasions over the years.  Prior to
13  the museum being --- the committee
14  forming and the plans taking shape,
15  Colonel Conti is someone that I would
16  often go to to seek assistance in
17  identifying various artifacts.
18          There was also a point in time
19  that through his retirees' column,
20  Colonel Conti advertised not only his
21  own items for sale, principally his
22  book, but he allowed others to
23  participate.  In fact, I believe some
24  of those are museum committee
25  members.  They, on different

278

1    occasions, listed items of PSP

2    memorabilia for sale.  And on at

3    least one occasion, Colonel Conti put

4    me in touch with someone who had PSP

5    artifacts for sale, which I

6    subsequently purchased.  On paragraph

7    44 - - -.

8    Q.       Yes.  I need to understand

9    what the accusation is against

10   Lieutenant Colonel Westcott.

11   A.       With respect to PEMA, after

12   the injunction, the Commonwealth

13   Court injunction, which stopped the

14   disciplinary transfer of mine to

15   Troop B, Washington, I was

16   subsequently demoted to the rank of,

17   to the position of section commander

18   in the Bureau of Liquor Control

19   Enforcement.  Excuse me.  I forgot a

20   part.  When I was first notified or

21   soon after being notified of my

22   transfer to Washington, I had e-

23   mailed Captain Davis and let him know

24   that I would no longer be available

25   for a PEMA assignment.  I don't know

279

1    how much detail you want about that

2    assignment, but it's a secondary

3    assignment that I participated in for

4    several years.

5    Q.    I think I understand what the

6    PEMA assignment is, but I guess

7    you're getting now at the chronology

8    that --- my real question is, that

9    is, you were transferred to LCE and

10   then you notified who that you

11   wouldn't be able to do the PEMA

12   assignment?

13   A.    When I was first transferred

14   to Troop B, Washington, I notified

15   Captain Davis, who was the department

16   --- all I can think of is discipline.

17   Department ---.

18   Q.    Is he in charge of PEMA stuff?

19   A.    Yeah.  Why don't we call him

20   captain of disaster?  I can't recall

21   exactly ---.

22   Q.    Just so that we're clear, PEMA

23   is the Pennsylvania Emergency

24   Management Agency; right?

25   A.    Yes.

280

1    Q.     And the state police's role

2    with that agency is what?

3    A.     That's a multi-agency endeavor

4    and PSP's role is to have on call an

5    officer and two or three subordinates

6    that comprise that team.  The teams

7    are loosely structured.  But in the

8    event of an emergency call-out, that

9    officer usually is activated by

10   Captain Davis or perhaps the bureau

11   director.  But Captain Davis acts in

12   that role to facilitate and to make

13   sure --- he's a one-man show and he

14   makes sure that someone is available

15   to staff the cell at the PEMA

16   emergency headquarters.

17   Q.     And so if there is an

18   emergency, such as when the plane

19   went down on September 11th, is that

20   a time consuming role to be a PEMA

21   officer?

22   A.     It can be.

23   Q.     If there's an emergency, it

24   can turn into something that's ---?

25   A.     It can.  I served on PEMA

281

1    since at least 1993.  When I first
2    went on to that detail, I think the
3    component heads were all lieutenants.
4    I could be wrong on that, but I think
5    I went in as a lieutenant.  I had
6    served in that position as a central
7    section commander of the systems and
8    process review division, as the
9    division director of the systems and
10   process review division, as a
11   division director of the internal
12   affairs division.  And when I was
13   assigned to the multi-million dollar
14   IIMS project, at no time, no time,
15   was there ever a question on conflict
16   and duty with PEMA, and with respect
17   to my primary duty assignment ever.
18   Q.      Well, I was just wondering why
19   when you were told of your transfer
20   out west, why did you tell Captain
21   Davis you weren't going to be able to
22   be a PEMA liaison any more?
23   A.      Because I was told by Major
24   Washington --- excuse me, by Major
25   Zapinka (phonetic) that I was to

282

1   report for work and remain during the

2   workday and end my workday at my duty

3   station of Troop B, Washington.

4   Therefore, that would make me

5   ineligible.  PEMA is basically a

6   Harrisburg assignment.  Does that

7   help?

8   Q.      Okay.  So if you're not

9   located in the Harrisburg area, you

10  can't do PEMA?

11  A.      Correct.  Typically, it's been

12  my experience --- I'm not saying that

13  it's never been done.  But I don't

14  know of an occasion when they used

15  troop members.  It's a headquarters

16  assignment.

17  Q.      And then what happened next,

18  getting to the part of where

19  Lieutenant Colonel Westcott got

20  involved somehow?

21  A.      Well, as you know, the

22  Commonwealth Court blocked the

23  disciplinary transfer.  And a short

24  time thereafter I was demoted to LCE.

25  That being the case, I then e-mailed

283

1    Captain Davis, like, well, I'm still
2    in Harrisburg, so there would be no
3    reason for me not to continue in the
4    assignment that I've been enjoying
5    for several years.  So I e-mailed
6    Captain Davis words to the effect of,
7    you know, the transfer didn't go
8    through, I'm available, is my spot
9    still open or whatever?  And he
10   responded by saying that it was fine
11   with him, you know ---.
12   Q.      With Captain Davis?
13   A.      With Captain Davis and Major
14   Washington, the bureau director.
15   Just make sure that it's suitable or
16   just touch base with my bureau
17   director.  As a matter of protocol,
18   more than anything else.  My bureau
19   director being Major Koscelnak.  When
20   I approached Major Koscelnak or, I
21   guess, the first --- I believe the
22   first dialogue we had over that issue
23   was by e-mail, I think.  But I did
24   e-mail him on several occasions.  But
25   anyway, I summarized what I've just

284

1   said to you in ten words or less that

2   I'd like to continue in PEMA now that

3   I'm here.  And his response was that

4   he would have to check into that and

5   get back to me.

6   Q.      And then what happened next?

7   A.      The day after the newspaper

8   article about the injunction that

9   prohibited the disciplinary transfer

10  to Troop B, Washington, the day after

11  that appeared in the newspaper, I was

12  told I could not serve on PEMA.

13  Q.      Who told you that?

14  A.      Major Koscelnak.

15  Q.      And did Major Koscelnak say

16  why?

17  A.      Yes.

18  Q.      What did he say?

19  A.      He said he wanted to afford me

20  the opportunity to become fully

21  involved in my new duties.

22  Q.      Okay.  And how did Westcott

23  come into play there?

24  A.      Initially, he didn't.  I

25  subsequently found that Westcott had

285

1    --- well, the term front office was

2    used.

3    Q.      By Koscelnak?

4    A.      I determined --- no, by Major

5    DeWire.  I determined that front

6    office more than likely meant

7    Westcott, if not the whole bunch of

8    them.

9    Q.      So at what point did you --- I

10   guess maybe I should just let you go

11   on chronologically.  It might be

12   simpler.  What happened next with

13   this ---?

14   A.      Well, I'd also like to ---.

15               ATTORNEY GUIDO:

16               Hold on we need to

17         change ---.

18               MS. LYDE:

19               Excuse me.  Before he

20         goes there I  need to change

21         tapes.  2:17 p.m.  This is the

22         end of tape two, Darrell

23         Ober's deposition.

24   SHORT BREAK TAKEN

25               MS. LYDE:

286

1      2:27 p.m., we're back

2      on video.

3  BY ATTORNEY GUIDO:

4  Q.      I think what we were ---.

5  A.      Pardon me.  Before we go ---.

6  Q.      Sure.

7  A.      I believe we're into PEMA.

8  Something occurred to me during the

9  break I'd like to finish.  I think I

10  started this response, but didn't

11  finish it.

12  Q.      On PEMA or a different topic?

13  A.      On a different topic.

14  Q.      Okay.

15  A.      On the museum investigation.

16  Q.      Yes.

17  A.      You had talked about damages

18  and how that's affected me.  I was a

19  part of a book committee and there

20  were several other members on that

21  committee.  Mark Infantino would be

22  the project chairperson, I guess, for

23  lack of a better term.  And my

24  question or my observation would be

25  the same with respect to have my

287

1    fellow committee members ever been

2    notified of this?  I was booted off

3    that committee before ever being

4    interviewed regarding this whole

5    matter.  It was a terribly abusive

6    thing to have happened and I'm only

7    left to wonder what my fellow

8    committee members have concluded,

9    based on my removal.

10   Q.      Do you have any reason to

11   think that they know about this

12   investigation?

13   A.      Yes.

14   Q.      The 409-99 ---?

15   A.      Yes.  Mark Infantino knew

16   about it before I did.  The letter

17   was sent to him.  That letter booting

18   me off the committee was not even

19   sent to me.  It was sent to ---.

20   Q.      That letter doesn't mention

21   anything about the investigation;

22   correct?

23   A.      Correct.  It talks about how

24   busy I am for a project that was four

25   years from being completed.  I was in

288

1    a six or eight-month detached

2    assignment.  That's what the

3    silliness of this whole matter is,

4    Ms. Guido, is the letter articulated

5    that I had to devote my time to this

6    project.  I was only ever intended on

7    being there six or eight months.

8    Q.     The IIMS project?

9    A.     Yes, ma'am.  The centennial

10   book is not even due to be published

11   until the year 2004 or 2005.

12   Q.     Did Mr. --- is his name

13   Infantino?

14   A.     Infantino, correct.

15   Q.     Did he tell you at any point

16   that he believed you were taken off

17   the committee because you had done

18   anything wrong?

19   A.     He told me that he knew I had

20   a target on my back and they were out

21   to get me.

22   Q.     And I don't know the answer to

23   your question.  Backing up to or

24   going forward again to PEMA.

25   A.     Yes.

289

1    Q.      I think we were at the point
2    where Captain DeWire told you that
3    --- and maybe it wasn't Captain
4    DeWire --- Major Koscelnak checked
5    with the front office?
6    A.      Yes.
7    Q.      Okay.  Let's go from there.
8    What did you find out about what
9    Major Koscelnak did?
10   A.      I think we might have left off
11   where Major Koscelnak said that he
12   would check on my inquiry which, by
13   the way, I found odd.  All the other
14   bureau directors I've had were able
15   to reach a determination almost
16   instantly.  But it was a couple
17   weeks, if not more than that, until I
18   found out --- until Major Koscelnak
19   did get back to me.  He came and
20   visited me in my office and, again,
21   that was a day after the newspaper
22   article, first newspaper article
23   appeared, and told me that, you know,
24   he needed me there for section
25   duties.

290

1          He has subsequently testified

2    in these deposition that the position

3    for --- need was crucial, I believe

4    was the term that he used.  I would

5    just like to tell you that if that

6    were the case, no one told me about

7    that.  That's a whole other matter,

8    I'm sure.

9    Q.      Okay.

10   A.      But with respect to PEMA,

11   that's when he told me I could not

12   perform PEMA duties.

13   Q.      Do you know whether or not

14   there are any restrictions that would

15   keep somebody from LCE --- assigned

16   to LCE, from working on PEMA?

17   A.      None.  I believe it's been

18   testified that there may be some

19   budgetary impact.  I believe Major

20   Koscelnak might have mentioned that,

21   but that's ---.

22   Q.      Do you know what the budgetary

23   --- what budgetary impact?

24   A.      He was trying, and I don't

25   recall how he phrased it, he was

291

1  trying to make the inference or
2  reference that the members assigned
3  to the Bureau of Liquor Control
4  Enforcement come under Appropriation
5  Code 171, the Liquor Control Board
6  Appropriations.  I believe he was
7  lamely trying to justify that as an
8  excuse to boot me off of PEMA.  But
9  the reality is, we've had members
10 assigned in long-term assignments in
11 LCE, doing non-LCE activities, most
12 recently two LCE agents assigned to
13 the IIMS project for probably a year
14 or so.
15 Q.     I guess the budgetary thing,
16 so I'm clear, that's because LCE
17 receives its funding differently?
18 A.     Yes, that's correct, from the
19 board.
20 Q.     And so there might be some
21 restrictions about how LCE money
22 could be spent as opposed to general
23 appropriations for the state police?
24 I mean, general state police funds,
25 as opposed to LCE funds?

292

1    A.      He was trying to advance that

2    argument.

3    Q.      Okay.

4    A.      But that's patently incorrect.

5    Q.      After Koscelnak --- after the

6    article came out, then Koscelnak told

7    you you couldn't be in it, then what

8    happened next, because you said

9    Westcott blocked you two different

10   times?

11   A.      Yes.  Along about the time

12   Major DeWire was promoted and I'm

13   thinking that was the summer of 2000,

14   probably June or July, off the top of

15   my head.  You had made an earlier

16   inquiry about who replaced him.

17   Well, I knew who replaced him and his

18   home troop, where he came from, was

19   Captain McDonald, Coleman McDonald,

20   who was also one of the PEMA

21   officers.  There were three of us,

22   Captain McDonald, myself and Captain

23   Conway, I believe.

24           But anyway, knowing that

25   Captain McDonald was now serving in a

293

1    troop assignment, he previously had

2    served in the Bureau of Patrol, I

3    e-mailed Captain Davis and said

4    basically that in light of Captain

5    McDonald's transfer from the Bureau

6    of Patrol to a troop location, do you

7    find yourself in the position of

8    having an opening on PEMA?  And of

9    course, he responded yes, I do.  And

10   by the way, after I was booted off

11   the first time, they went ahead and

12   posted the position for someone new.

13        But bringing you up to the

14   second time, Captain Davis said,

15   sure, I'd love to have you back on or

16   words, whatever.  And just clear it

17   with your bureau director the same as

18   before, so I did.  I went in to

19   Captain --- or excuse me, then Major

20   DeWire, who had assumed command and

21   had also previously supervised me as

22   a member of PEMA, made that request.

23    And he said, sounds good to me.

24   That's fine with me.  And he would

25   call --- I don't recall whether he

294

1    initiated the call to Major

2    Washington, who's the bureau director

3    of PEMA, Captain Davis' boss.  Got

4    it?

5    Q.    Yes.

6    A.    Okay.  I don't know who

7    initiated what call.  But in any

8    event, there was a discussion between

9    them, apparently.  Because after I

10   made the request of Major DeWire it

11   was --- I don't know, it was only a

12   day, it may have been that day, but

13   it was only a day or so.  He walked

14   by my office in the morning and, you

15   know, give me the thumbs up and said,

16   do you know you're back on the red

17   team or blue team or whatever color

18   team you're in charge of?  You're

19   back on PEMA.  I said, okay.

20   Q.    Major DeWire?

21   A.    Major Dewire told me this.

22   Q.    Okay.

23   A.    About four hours later the

24   same day, he came to me and asked me

25   to come over and he wanted to see me

295

1    in his office.  So I went back to his

2    office.  And he said your PEMA career

3    has come to a screeching halt again.

4    I said, why?  He said, well, Major

5    Washington had just phoned him and

6    said that I was not permitted to

7    resume my duties on PEMA.  Major

8    DeWire said he inquired why.  Major

9    Washington said when the request got

10   to the front office, it was denied.

11   Q.      Okay.

12   A.      And Major DeWire said, then I

13   asked why.  And Major Washington's

14   comment to him was, just let it go.

15   Q.      And the front office in this

16   instance, you take that to mean

17   Lieutenant Colonel Westcott.  And why

18   is it that Westcott would be the

19   person that you attribute to putting

20   a stop to it?

21   A.      Well, he was the deputy

22   commissioner of operations at that

23   time.

24   Q.      And the deputy commissioner of

25   operations would be the person that

296

1  would be overseeing PEMA?

2  A.      Yes.  And in this instance, he

3  would have been both of those majors'

4  next supervisor and next in their

5  chain of command.

6  Q.      Okay.  Now, on paragraph 45

7  ---.

8  A.      Can you give me a second?

9  Q.      Sure.

10  A.      There's something about that I

11  wanted to just mention, but I lost my

12  train of thought now.

13  Q.      If you think of it, we can

14  stop and go back to it.

15  A.      Yeah.  I lost my ---.

16  Q.      In paragraph ---.

17  A.      Oh, I know what it was.

18  Q.      Okay.

19  A.      Excuse me for interrupting

20  you.  I don't know whether it's

21  important for you to know this or

22  not.  I'm assuming that you do, but

23  in the event that you don't, all of

24  these or a number of these actions

25  that were taken against me, I was

297

1    filing grievances, by the way.  I

2    don't know if you're aware of that or

3    not.  Going back to the

4    administrative inquiry, the end

5    result of that witch hunt was that

6    denial of my leave and pay.  And I

7    grieved that.  And I filed another

8    grievance on these PEMA removals.  I

9    filed grievances on those, as well.

10   Q.      Okay.  Now, on paragraph 45,

11   where you said that Lieutenant

12   Colonel Conley also performed acts of

13   vengeance for Evanko.  And you

14   mentioned stripping you of a cell

15   phone and denying you of

16   reimbursements.  Was there anything

17   else besides that that Colonel Conley

18   ever did that constitutes one of

19   these acts of vengeance?

20   A.      Yes.  I would say there's

21   probably a number of things that

22   Colonel Conley did, in addition to

23   these.  I'll give you an example.

24   When he called me on January 10th to

25   let me know I was being transferred

298

1   to Troop B, Washington and I, of

2   course, asked the obvious question,

3   why?  He never did give me an answer.

4   He meandered around like he's prone

5   to do.  But I asked him again.  I

6   repeated the question and he said,

7   well, you know I don't want you back

8   in IAD.  So I took that to mean that

9   he had some hand in my removal,

10  summarily my removal from internal

11  affairs division.  That would be

12  another instance of an adverse action

13  that comes to mind.

14  Q.      Now, on the cell phone, that

15  cell phone that you're talking about,

16  is that a BPR cell phone?

17  A.      Yes.

18  Q.      And wouldn't the reason that

19  you had to give the cell phone up is

20  because you left BPR?

21  A.      At that time, I was still

22  detached to BPR.

23  Q.      Well, tell me about your cell

24  phone then.  Maybe I'm just confused

25  about it.

299

1    A.      I was detached from BPR --- do
2    you understand detachment?
3    Q.      Yes.
4    A.      Okay.  I was detached from BPR
5    by way of a clean message, which is a
6    form of a department directive, on
7    April 26th or so, 1999.
8    Q.      That's the IIMS?
9    A.      To the IIMS project, yes.  As
10   was the case when Colonel Evanko
11   called me in from a day off and
12   interviewed me for the position, the
13   clean message indicates that upon
14   completion of the IIMS assignment, I
15   would be returned to the internal
16   affairs division as the director.
17   Sometime later that summer, along
18   about July or August, as I recall, is
19   when my cell phone was taken from me.
20   Q.      I thought that he didn't take
21   the cell phone until you were
22   reassigned to the LCE, the Bureau of
23   Liquor Control Enforcement?
24   A.      No, ma'am.
25   Q.      Wasn't there a memo or

300

1    something that went to you saying,

2    turn in your property, good luck in

3    your next assignment?

4    A.      Yes.  He had already stripped

5    my cell phone of me by then.

6    Q.      Was the cell phone mentioned

7    in that?

8    A.      I don't believe so.

9    Q.      You don't remember?

10   A.      No.  I remember the e-mail.

11   But no, the cell phone had already

12   been turned in by then, it was

13   already taken from me.

14   Q.      At what point did the cell

15   phone thing become an issue?  While

16   you were still at IIMS?

17   A.      Yes, yes.  Corporal Lydek

18   (phonetic) called me and said that on

19   behalf of, you know, he was

20   collecting them, on behalf of the

21   bureau director.  They were going to

22   be reissued.

23   Q.      And he didn't give you any

24   reason about that?

25   A.      Well, at that point, I didn't

301

1   know I wasn't going to be reissued a

2   phone. And when I followed up a few

3   weeks later and called them, Corporal

4   Lydek got very nervous about this

5   whole conversation. And I asked him

6   if they had been reissued and he said

7   yes. I said, well, do you need me to

8   stop over or words to that effect.

9   And he said, well, I know there was

10  an issue. He said, you really have

11  to talk to the major. Between he and

12  Skurkis, they didn't think you should

13  have one and your cell phone is not

14  going to be reissued to you.

15  Q.      Okay. Now, on the denying

16  reimbursement for expenses allowed to

17  others.

18  A.      Yes.

19  Q.      What expenses, what

20  reimbursements for what expenses,

21  specifically?

22  A.      Sometime, about this same time

23  frame, August, September, again, as I

24  recall, possibly October. I don't

25  recall. I made an inquiry of

302

1    Sergeant Christie as to the --- I had
2    been talking to --- I'm sorry, back
3    up.  Somewhere along that time frame,
4    I was talking to retired Sergeant
5    Ronald Hillegass.  I think we might
6    have met for lunch or something, but
7    retired --- former retired sergeant.
8    And I asked him if he ever received
9    his division director's letter of
10   commendation, which when I left
11   internal affairs, we were going to
12   frame it for him and give it to him,
13   as a token of his years of service or
14   retirement gift or whatever.  He had
15   indicated that he did not receive it.
16        So I made an inquiry of
17   Sergeant Christie, who was the
18   administrative officer in internal
19   affairs.  And pretty much the same
20   reaction as when I talked to Corporal
21   Lydek, it was, well, you know, I
22   don't know.  You really need to --- I
23   know there was a big stink about that
24   or there's a big issue about that.
25   I'm like what, it's a letter of

303

1  commendation, what's the big deal?
2  Well, you really need to talk to
3  Major Conley.  Okay.  Well, he must
4  not have been around or whatever, but
5  I e-mailed him.  And just basically
6  said, you know, what's the issue,
7  what's the problem?  I understand
8  there's some concern - - -.
9  Q.      Before the thing's ever been
10 framed?
11 A.      No.  It had already been
12 framed.  It had already been,
13 according to the receipt that I was
14 eventually provided, when he made me
15 pay for it, it had been framed for
16 months.
17 Q.      I was confused by that.
18 A.      Okay.
19 Q.      You lost me chronologically.
20 A.      Okay.  Try to stay with me
21 here, Counsel.  Sergeant Hillegass
22 retired in January of 1999.  And I
23 awarded him a division director's
24 letter of commendation.
25 Q.      Right.

304

1    A.      And sometime during his
2    retirement dinner or luncheon that we
3    had for him, I said to him, would you
4    like to have us frame that for you,
5    and he said, sure.  This was a big
6    deal.  I tasked that responsibility
7    to our administrative assistant, Ms.
8    Blough, Donna Blough.
9          The only recollection I have
10   after that was I believe she
11   attempted to have it framed in-house
12   and it came back that they couldn't
13   do it because it wasn't formatted
14   correctly on the paper.  I remember
15   some discussion about, you know, we
16   didn't observe some rules of margins.
17   Don't ask me what, I don't know.
18          And if we took it to Framers'
19   Workshop, they could do it for about
20   $30.  I remember the cost estimate.
21   That sounds fine to me, whatever.  So
22   I just, I can't remember these words,
23   but I'm sure I just asked Donna,
24   please take care of that.  Well,
25   subsequently then, I was transferred

305

1    to IIMS.  And I just lost track of

2    the whole process.  I really never

3    knew what happened.  I was gone.

4    Q.      But Donna had taken care of

5    getting it framed?

6    A.      Yes.

7    Q.      Okay.

8    A.      At my request.  So anyway,

9    jumping ahead now to when I follow up

10   this conversation with Conley, he

11   sends me back an e-mail, well, the

12   problem is unauthorized expenditure

13   of the Commonwealth blah, blah, blah.

14   And in order for you to bring

15   resolution to this, you owe the

16   Commonwealth $69 and whatever.

17   Q.      Who actually paid for the, you

18   know, physically went over and paid

19   Framers' Workshop and picked up the

20   frame?  Maybe that's where I was

21   losing the story.

22   A.      I'm not sure.  I would assume

23   Donna, but I don't know if I know

24   that one.  I don't know.

25   Q.      So you were asked to reimburse

306

1   the Commonwealth for the frame,

2   rather than you paying for the frame

3   and asking the Commonwealth to

4   reimburse you?  Do I have that right?

5   A.    You lost me.

6   Q.    In other words, you were

7   saying that you were denied

8   reimbursement for expenses.  So I

9   thought that maybe you had paid for

10  the framing and that ---

11  A.    I did.

12  Q.    --- you wanted them to

13  reimburse you, as opposed to them

14  saying, you owe the Commonwealth $69

15  or whatever it is?

16  A.    Well, I think all that

17  happened.  It was paid for,

18  apparently, which I didn't understand

19  what the issue was with that.  It was

20  already paid for.  But when I talked

21  to Conley, he was really ticked about

22  all this.  What's the big deal?

23  Well, in order to make this

24  --- I said, you mean to tell me this

25  hasn't been given to Sergeant

307

1   Hillegass over $69?  I'll go out and
2   pay for it myself.  And he said,
3   well, you're going to have to.
4           So I drove out there, took my
5   checkbook, walked into his office.  I
6   said I'm here to pick up or I stopped
7   and they said I could go in or
8   whatever.  And I said I'm here to
9   pick up the commendation and he says,
10  do you have the money?  I said you're
11  not even going to let me see it until
12  I give you a check and he says, no.
13  I said, well, I want a receipt for it
14  then.
15  Q.      So you paid the state police?
16  Somebody else had paid Framers'
17  Workshop?
18  A.      I wrote a check out to the
19  Commonwealth of Pennsylvania.
20  Q.      Okay.  I get it now.
21  A.      In the same office where he
22  has had probably everything in there
23  framed by the Commonwealth.
24              ATTORNEY BAILEY:
25              Do you have any

308

1          evidence that the Commonwealth

2          had paid for the $69?

3    A.      Yes.  Yes, there was a Visa

4    receipt, I think.  It had been paid

5    for.  I remember Donna had signed

6    something, but I'd have to check.

7    There was some discussion about all

8    this now.  I said, look, I'm just

9    trying to understand what the big

10   deal is, because he was really livid

11   with me about this money.  And he

12   said how inappropriate it was.  And I

13   said, this is something that --- this

14   type of thing is quite common, I

15   would suggest.  Well, did I do

16   something wrong?  Well, blah, blah

17   --- are you initiating disciplinary

18   action against me?  Well, no.  Well,

19   then, why all of a sudden after these

20   many months is this even being an

21   issue?

22          Well, then he wanted to talk

23   about the FBI investigation and how,

24   in his opinion, I screwed things up.

25   And I should have notified him and

309

1  blah, blah, blah.  I said, look

2  Major, I don't want to discuss that

3  with you.  Okay.  I've already filed

4  a grievance and I don't think that's

5  appropriate.  And he started to try

6  and tell me what a good guy he's been

7  to me and the fact that he withheld

8  doing my performance evaluation

9  because he wanted to clear his head

10 and he wanted to make sure he did it

11 right.  Rationally that can't be

12 right.  It was due long before the

13 FBI ---.

14 BRIEF INTERRUPTION

15 BY ATTORNEY GUIDO:

16 Q.      He said he considered?

17 A.      He considered taking the

18 commendation out of the frame and

19 then using the frame in some means in

20 BPR.  I remember he said that to me.

21 I said, well, if you want to do that,

22 that's fine, I don't have a problem

23 with that.  So I handed it back to

24 him.  And when I did that, he even

25 got angrier.  He said, no, I changed

310

1    my mind.  I'm not going to do that.

2    He was essentially telling me he had

3    considered recycling this, ripping

4    the commendation out and recycling

5    this in order to keep it there.  I

6    said, well, that's fine.  So the end

7    result was I was forced to pay for

8    that, which I also grieved.

9    Q.       Okay.  And other than the

10   frame, were there other expenses?

11   A.       Yes.  Oh, I'm sorry.  On this

12   instance, no.

13   Q.       That Colonel Conley didn't

14   deny any other?

15   A.       No.

16   Q.       Okay.

17   A.       I also considered Colonel

18   Conley to be a part of these other

19   investigations, in that as the

20   director of BPR, he, I assume you're

21   asking --- I think your question

22   originally way back was acts of

23   vengeance and what have you?

24   Q.       Yes.

25   A.       I'm not foregoing his role as

311

1    the director of BPR in these illegal
2    investigations that were conducted on
3    me, as well.
4    Q.        Okay.  Now, in paragraph 46,
5    they're separated out by letters.  So
6    we'll look at 46A.  And you've
7    indicated that the transfer to
8    Washington, Pennsylvania, was a
9    hateful attempt to separate you from
10   your children.  And I just was
11   wondering how your children came in
12   to any of this?
13   A.        How my children?
14   Q.        Yes.  Do you know what I'm
15   saying is like, how did Evanko ---
16   what would make Evanko think, if I
17   transfer him, then it's going to be a
18   big problem for his children or ---
19   do you see what I'm saying?  You
20   don't understand my question?
21   A.        Actually, I'm quite shocked,
22   Ms. Guido, to be honest with you.  It
23   almost seems like a question you
24   ought to ask him.  The man knows ---.
25   Q.        Why would your children be

312

1   part of his motive?  Do you think his
2   motive --- what makes you think he
3   was motivated by a desire to separate
4   you from your children, as opposed to
5   some other motive?
6   A.      They would all be equally
7   evil, in my mind.
8   Q.      I guess I'm just wondering if
9   anybody ever said anything to you,
10  like, you know, Evanko wanted to put
11  you away from your kids or he told us
12  he was laughing about it at the bar,
13  whatever?  I was wondering if there
14  was --- do you see what I'm trying to
15  say?
16  A.      That's a better question for
17  me to answer.
18  Q.      Okay.
19  A.      No.  No one has ever come up
20  to me and said, he's looking to
21  separate you from your children.
22  Q.      So nobody ---?
23  A.      But the end result, as I've
24  said before, speaks for itself.  He
25  knows I have kids.  He knows I have

313

1    little children.  My kids, when they

2    were three and four and five years

3    old, we used to take them to have

4    their picture taken with him at the

5    farm show on his horse.  And he has

6    - - -

7    Q.    I apologize for the inept

8    question.

9                    ATTORNEY BAILEY:

10                    Let him answer the

11          question.

12   BY ATTORNEY GUIDO:

13   Q.    Sorry.

14   A.    - - - autographed those pictures

15   with words to the effect of, my kids

16   being a part of the state police

17   family.

18   Q.    Okay.  So back to what I was

19   getting at and that is, other than

20   the effect of the transfer being that

21   you would be far from home, you don't

22   have any other - - - don't know of any

23   other facts that would show that that

24   was his motivation, to separate you

25   from your kids?

314

1   A.      I think the act in and of

2   itself, of the transfer, knowing what

3   I've just described to you, speaks

4   for itself.

5   Q.      Okay.  Now, on 46B, you've

6   complained about ---.

7   A.      Can I ---?

8   Q.      Sure.

9   A.      I feel like we're not on the

10  same page with respect to my family.

11  This 210-mile transfer took my life

12  with my family away from me, had they

13  gotten away with it.  At that time,

14  my kids were four and five and twelve

15  years old.  I have boys.  I've been

16  very fortunate.  And my wife is a

17  stay-at-home mom.  This was taking

18  over my life with this transfer, a

19  transfer that I didn't request.

20          As opposed to every other

21  transfer I've had in my 18, 19 years

22  at this point, they were by request

23  or they were promotional

24  opportunities that I either accepted

25  or I declined, based on family.  I

315

1  have never been involuntarily

2  transferred anywhere.  This little

3  charade would have taken control of

4  my life.  When I talked to Zapinka

5  that night, he was very specific.  He

6  told me --- this is January 10th,

7  after Conley called me.  He was very

8  specific and told me that I was only

9  going to be entitled to 30 days

10  reimbursement, which is consistent

11  with regulations.  He told me there

12  were no sleeping arrangements in all

13  of Area 3, which I know to be

14  patently false.  But he told me I

15  would not be permitted --- there were

16  none, I would not be permitted to

17  sleep anywhere.

18  Q.     What do you mean by sleeping

19  arrangements?

20  A.     Bedrooms in the barracks.

21  Q.     Okay.

22  A.     He then told me that I would

23  have to seek my own --- after my 30

24  days travel subsistence ran out, I

25  would have to seek my own living

316

1   arrangements, which they would be
2   generous enough to help me find
3   arrangements.  I was a member of the
4   baseball association in two different
5   wards.  I coached my kids.  We chose
6   the lifestyle that we lead, based on
7   the neighborhood, you know, typical
8   things that you might expect upper
9   middle class people to choose and
10  enjoy.
11          This transfer completely
12  turned my life upside down and took
13  control.  This was the department.
14  And this is the most hateful thing
15  I've ever seen our department do and
16  it's a disgrace.  I just want you to
17  know how adamant I am in what a
18  disgraceful abusive act this was.
19  Q.      I know you just said you've
20  been fortunate enough not to have any
21  other transfers that you didn't want.
22  A.      Correct.
23  Q.      But other members of the state
24  police have been transferred before,
25  without wanting the transfer; isn't

317

1    that right?

2    A.    I'm not suggesting I'm the

3    only one that's ever been abused this

4    way.  I do note under our transfer

5    regulations, under the FR 3.3, it

6    specifically states transfers are not

7    to be used in lieu of discipline.

8                    ATTORNEY BAILEY:

9                    That's 3.3, Subsection

10            C, 3.3.

11    BY ATTORNEY GUIDO:

12    Q.    Since you brought up the

13    conversation with Major Zapinka on

14    January 10th, I wanted to skip

15    forward to that a little bit.

16    A.    Yes.

17    Q.    And that was when, I guess,

18    you called him at home?

19    A.    Yes.

20    Q.    Were you calling out of the

21    blue or were you returning calls from

22    him?

23    A.    I initiated the call.  It's

24    possible that he wasn't there the

25    first time I called.  I either called

318

1    back or --- I initiated this

2    conversation.

3    Q.       That's what I was asking.

4    A.       Yeah.

5    Q.       I didn't know if he called you

6    and you called him back or ---?

7    A.       No, no.

8                        ATTORNEY BAILEY:

9                        Who was that with?

10   A.       Major Zapinka.

11                       ATTORNEY BAILEY:

12                       Major Zapinka.  Thank

13           you.

14   BY ATTORNEY GUIDO:

15   Q.       Just tell me about that

16   conversation.  You told me some of

17   it.

18   A.       I called Major Zapinka.  I

19   told him I had ---.  The chronology

20   of the events on January 10th were

21   this.  At 12:30 I had a step-one

22   grievance hearing before Conley on

23   one of the grievances I filed.  At

24   1600 or 4:00 p.m., he calls me and

25   tells me I'm being transferred to

319

1    Washington.  And I asked him specific

2    questions.  What's my assignment?  I

3    don't know.  How long am I going to

4    be there?  I don't know.  Why am I

5    being transferred?  I don't know.

6    All I got was vague answers.  And he

7    referred me to either Major Zapinka

8    or the commissioner.  Well, I figured

9    my best chance of getting any

10   reasonable answers would be out of

11   Zapinka.  So I called him at home.  I

12   had his number by virtue of my PEMA

13   assignment.  We have contact

14   information for all the advanced

15   staff or we did.

16          So I called him and I let him

17   know that I had received --- had this

18   conversation earlier in the afternoon

19   or late afternoon, whatever, with

20   Major Conley.  And I wanted to know

21   what my job in Troop B, Washington

22   was supposed to be.  And his response

23   to that was I have no idea.  He said,

24   I didn't ask.  I asked, I said, did

25   you ask for me, Major, and he said,

320

1      no, he did not.  I said, what do you

2      know about this transfer?  And he

3      said, I got a call last week from

4      Westcott and he said you're getting

5      Ober.  I said, how long am I going to

6      be out there?  And he said, I have no

7      idea.

8            He said there's a lot to learn

9      out here, you know, you can visit

10     stations and you can learn about

11     being troop commander and blah, blah,

12     blah.  And you be a good boy,

13     basically, and I'll put in a good

14     word for you.

15     Q.      Did you --- I'm sorry.

16     A.      I said, wait a minute, what is

17     my job assignment?  He said, well,

18     you're just going to assist me, I

19     guess.  He said, we'll work on that

20     when you get here is what he said.

21     Well, I said, we both know what this

22     is all over, Major.  This is all over

23     that FBI investigation.  And he said,

24     I'm not getting in the middle of

25     that.

321

1  Q.     Did the two of you discuss the
2  National Governors' Association at
3  all?
4  A.     He mentioned it in passing
5  when he rattled off a number of
6  things about the area.  And I believe
7  he said, words to the effect of, you
8  know, either Troop B or one of the
9  troops is the largest or this is the
10 largest area.  And he said, there's a
11 number of things to learn.  And he
12 mentioned that as an incidental, oh,
13 by the way, the NGA is scheduled for
14 this year.  It's a large commitment
15 of our resources.  Yes, that was
16 mentioned.
17 Q.     Did he make any offer to let
18 you come in late on Mondays or go
19 home early on Fridays or anything
20 like that?
21 A.     In that conversation,
22 absolutely not.  He was very clear
23 that my time to report was eight
24 o'clock Monday morning and departure
25 was from Troop B, Washington, by the

322

1    way.  In subsequent e-mail, he made

2    an offer for me to be --- I think it

3    was words to the effect of when my

4    first day to report was whenever that

5    was going to be, I think he said, his

6    response was, well, I'll see you at

7    noon.

8    Q.      Were you keeping any notes of

9    your conversation with him?

10   A.      I think I did at the time.

11   Q.      Do you still have any notes of

12   your conversation with him?

13   A.      I very well could.

14   Q.      Okay.  And did you talk with

15   him again?

16   A.      No.  That's the only --- no, I

17   don't think I ever had a conversation

18   with him.  We had e-mail dialogue.

19   But I never had a ---.

20   Q.      E-mail.  Well, did you --- I

21   know you were supposed to report

22   there on, I believe, January 28th.

23   Was it e-mail or phone conversations

24   where you had a conversation with him

25   about taking a few days off?

323

1   A.      E-mail.  I don't think we ever

2   spoke after that, after the 10th.

3   Q.      And so it was then during the

4   e-mail that he said that he made an

5   offer about coming in late, going

6   home early, that kind of thing?

7              ATTORNEY BAILEY:

8              Before you respond,

9       wait, please.

10  BRIEF INTERRUPTION

11  A.      No.  There was never a

12  discussion about going home late.

13  There was one e-mail when --- I think

14  what had happened was, I put in for a

15  couple days' leave, right at the

16  beginning of that transfer period.

17  The transfer would be effective ---

18  practically speaking, it would affect

19  Monday.  I think I might have had a

20  request for that Monday or Tuesday.

21  And I e-mailed him, letting him ---

22  probably asking permission or

23  whatever.  And I think his response

24  said, okay, or great, see you about

25  noon on whatever that next day was.

324

1    That's the only conversation we ever

2    had about reporting times, other than

3    what I've just testified to.

4    BY ATTORNEY GUIDO:

5    Q.      Now, were these e-mails going

6    back and forth at work?

7    A.      Yes.

8    Q.      Did you have any discussion

9    with him by phone or by e-mail about

10   the first week coming all the way out

11   to Washington, going and stopping at

12   Troop G?

13   A.      Yes.

14   Q.      And what was that discussion?

15   A.      He --- well, to back up, the

16   yo-yo that I was on, I was notified

17   on January 6th by Major Waugh that I

18   was being returned to internal

19   affairs. After my grievance hearing

20   the same day, then Conley called me

21   and tells me I'm going to Troop B,

22   Washington. But I was not going there

23   right away. I was supposed to go back

24   to --- I think I skipped that part,

25   which I apologize.  He told me I was

325

1   to report back to internal affairs on

2   January 24th, I think that was

3   Monday, for five days.  And then I

4   was to report to Troop B, Washington.

5           So during an e-mail exchange

6   with Major Zapinka, he said that he,

7   in conversation with Major Conley, he

8   wanted to know if it would be

9   uncomfortable for me to go back to

10  internal affairs for that week and,

11  if so, I could visit stations in

12  Troop G for that period of time.  To

13  which I think I responded, well, if

14  you believe what they're saying,

15  there shouldn't be anything

16  uncomfortable.  But since we all know

17  what this was really about, of

18  course, it would be uncomfortable.  I

19  was kicked out of my command for no

20  legitimate reason.

21          So I said, yes, I would just

22  as soon not report back to internal

23  affairs.  But it made no sense to

24  tell a captain to go visit stations

25  when they're not the commanding

326

1    officer.  What do you do?  It's

2    parading me around like the village

3    idiot.  I'm not going to suffer that

4    humiliation if I don't have to.  And

5    more importantly, I said to Major

6    Zapinka in those exchanges, that with

7    all due respect, it's a far better

8    investment of my time to keep doing

9    what I'm doing on the IIMS project,

10   since I was being kicked out of

11   there, too, before that project was

12   completed.  So I stayed there and

13   kept working on the project that I

14   was originally assigned to do.

15   Q.      Now, did you ever have a

16   conversation, you were mentioning

17   about Troop G, and I know that the

18   National Governors' convention was

19   held in State College.

20   A.      Yes.

21   Q.      I think that's around that

22   area; right?

23   A.      Yes.  That would be relative

24   --- a lot closer to my home, than

25   Troop B, Washington, ma'am.

327

1    Q.      And I was wondering whether

2    you and Zapinka ever discussed you

3    being able to sometimes work out of

4    Troop G?

5    A.      Never.

6    Q.      Do you know what arrangements

7    that Major Zapinka may or may not

8    have made in anticipation of your

9    transfer, you know, for you to have a

10   work space, that kind of ---?

11   A.      I know that he said that he

12   would make sure there was a work

13   space at Troop B, and a parking space

14   at Troop B, Washington.

15   Q.      Were you going to have a car?

16   A.      Yes.  They didn't take my car.

17   Q.      That's why I didn't know

18   whether you have to drive your

19   personal car back and forth or if you

20   would have ---?

21   A.      No.  I did take my --- Conley

22   did demand that I turn in my turnpike

23   credit card.  They wouldn't allow me

24   to use that until I got to Troop B,

25   since the officer who replaced me,

328

1    Captain Brown, wouldn't need that

2    card.  When he sent that list of

3    items that you referred to about

4    turning in, I called him and said,

5    well, can't I at least keep the

6    turnpike card in order to get me to

7    Washington?  And he said, no, pay out

8    of your pocket and submit for

9    reimbursement.  I said, but the

10   officer who's here doesn't need it.

11   No, absolutely not.

12   Q.      And did Major Zapinka ever say

13   anything to you to the effect of, you

14   know, he knew that this was going to

15   be a difficult situation for you

16   because you really didn't want to be

17   out there, anything like that?

18   A.      Yes.

19   Q.      What was that?  Was that

20   during that first discussion or

21   subsequent discussions?

22   A.      No.  We only had one

23   discussion.  The only other

24   discussion we had in this time frame

25   would have been when he chewed me out

329

1  at the academy.  He confronted me in

2  April --- no, that's not right.

3  Q.       April of 2000?

4  A.       No.  Give me a minute here.

5  In August of 1999, right around that

6  time period.  At an IT steering

7  committee meeting, I saluted Major

8  Zapinka when he walked by me and

9  didn't acknowledge me, only turned

10 and said, I want to talk to you at

11 the break.  And at the break he

12 ordered me into the officers' mess

13 and proceeded to confront me about

14 the FBI investigation and why I

15 didn't call him and why he wasn't

16 contacted and how dare I doubt his

17 integrity.  And he was all over me,

18 up one side and down the other about

19 that whole business.

20 Q.       Was that because he was the

21 area commander where Stanton was

22 located?  I'm wondering what he said

23 to you about why he would have called

24 you?  Why did he think you should

25 have called him?

330

1    A        Because yes, he would have

2    been the Area --- as he is now, still

3    the Area 3 commander.

4    Q.       So he was the Area 3

5    commander?

6    A.       Yes.

7    Q.       And Stanton is in Area 3?

8    A        Not any more.

9    Q.       He was at the time.  Okay.

10   A.       I think I lost your question,

11   though.  You had asked me what?

12   Q.       I may have lost it, too.  I

13   was just asking about whether or not

14   you had had any other conversation,

15   any conversation with him where,

16   essentially, he was saying to you,

17   you know, I know it's going to be

18   difficult, but I'll do what I can to

19   help you.

20   A.       That night, when I called him

21   that night, he said to me, he

22   realized the position I was in.  He

23   wasn't getting in the middle of

24   anything.  He knew there was a rift

25   between Evanko and I and he knew

331

1   exactly why I was being sent out

2   there.  And he said he would do what

3   he can for me.  But he was very clear

4   that where I was to report from work

5   --- that where I was to report to

6   work, when I was expected to report,

7   how long I was expected to be there.

8   And it was very clear about the hotel

9   accommodations that that would run

10  out after 30 days.

11          He was also, I'm sure,

12  perceptive enough to know that,

13  according to our own regulations,

14  unless a transfer is a temporary

15  transfer or indicates otherwise, that

16  by regulations, they're to be

17  considered permanent.  So when that

18  personnel order came out, applying

19  our regulations to that personnel

20  order, that was a permanent transfer.

21  Q.      Is there something different

22  between a transfer and an assignment?

23  I noticed on a lot of the --- the

24  reason I'm asking this question is I

25  noticed on a lot of the personnel

332

1  orders where they have lists of

2  people, and some will say this person

3  is transferred and others will say,

4  this person is assigned.  They're all

5  a list.  But sometimes they'll use

6  the term transferred, sometimes they

7  use the term assigned.  Is there a

8  difference between those under your

9  regulations?

10  A.      Not to my knowledge.  If you

11  go to work on Friday and you're

12  somewhere different on Monday, I

13  guess you've been transferred.

14  Q.      I just wondered if there was

15  significance to the state police that

16  I, you know, as a non-state police

17  person, would not know the difference

18  between by some of them saying

19  transfer and some of them say

20  assignment?

21  A.      I never heard that discussion,

22  no.

23  Q.      Okay.  But during your

24  conversation with Major Zapinka, you

25  didn't get the impression that he

333

1   personally was out to make your life
2   miserable; did you?
3   A.      I got the impression that
4   Major Zapinka was on the receiving
5   end of a phone call just exactly as
6   he described, you're getting Ober.
7   Now, whether he was told exactly how
8   to handle me once I was supposed to
9   get there or not, he didn't say.
10  Q.      And he was polite enough to
11  you?  Was he polite?  You know, you
12  said during that conversation ---
13  I'm trying to get an idea of the tone
14  of the conversation.
15  A.      Major Zapinka was --- Major
16  Zapinka was polite to me.  That was a
17  very difficult conversation for me to
18  have then.  When I picked up that
19  phone on January 10th and Conley was
20  on the other end, my wife happened to
21  be sitting by my side, and when I
22  told Kim what I had been told, she
23  broke down.
24  Q.      If you want to take a break,
25  we can.  Would that be helpful?

334

1    A.       And asked me why are they

2    doing this to us.  And I was unable

3    to give her an answer, beyond what

4    she already knew.  So the answer to

5    your question about Major Zapinka is,

6    that was a very emotionally charged

7    conversation for me.  And he was a

8    professional to me.

9    Q.       Okay.  Now, on paragraph 46B,

10    you've alleged that you suffered

11    demeaning career injuring transfers

12    and constructive demotions that have

13    destroyed your reputation and

14    effectiveness.  So I'd kind of like

15    to break that down a little bit and

16    make sure I understand what transfers

17    and demotions we're talking about.

18    If there's any transfers or demotions

19    that we have not discussed yet, that

20    are encompassed by that paragraph.

21    So what were your references there?

22    A.       Well, I don't believe there

23    are any transfers that we haven't

24    covered.  The career damage and

25    demeaning transfers would start with

335

1    the first transfer from the IIMS

2    project back to internal affairs to

3    Troop B, Washington.  And then a

4    demotion and a transfer to the

5    central section command of LCE.

6    Q.      And then how long were you the

7    central section commander at LCE?

8    A.      About four months.

9    Q.      And then since then, your

10   current position, I hate to say, I

11   know you're the director of

12   something, but ---.

13   A.      Administration.

14   Q.      Is that a division of the LCE?

15   A.      Two divisions, operations and

16   administration.

17   Q.      And I guess, within that, then

18   there's the central section, western

19   section; is that --- I think you were

20   telling me that earlier in the day

21   about there being three different

22   regions.

23   A.      In the operations division,

24   there are three sections, correct.

25   Q.      Okay.  And those are broken

336

1  out regionally?

2  A.      Yes.

3  Q.      All right.  Now, you talk

4  about those transfers, et cetera,

5  having destroyed your reputation and

6  effectiveness.  In what way do you

7  think that your reputation has been

8  destroyed?

9  A.      It probably would be shorter

10 if we talked about in what way my

11 reputation hasn't been destroyed.  Do

12 you want to start there and work

13 backwards?

14 Q.      We could do it that way, you

15 know, if you ---.

16 A.      Well, ma'am, you don't

17 understand.  This is a paramilitary

18 organization and it's run by command

19 personnel who rise through the ranks,

20 people such as myself.  When I made

21 captain, I believe I was the youngest

22 captain in the state.  Let me

23 backtrack, with the possible

24 exception of Jack Miller.  I think

25 that most folks who know me and know

337

1   my work ethic, know my reputation and

2   character, understand a whole lot

3   about me and what my abilities are.

4          And I would like to think that

5   that was one of the reasons I was

6   selected to be a part of the IIMS

7   project.  When you take someone who's

8   on the career path and has the

9   credentials that I have, and you put

10  the title special projects by their

11  name and put it on a personnel order,

12  and whether it's a transfer or

13  assignment or I don't care what, in

14  our organization, that's the penalty

15  box.  You have just killed their

16  career.  You have just singled them

17  out and you've told the whole entire

18  6,000 personnel organization, that

19  this person's in the box, they're in

20  trouble, they're a screw-up, and

21  you've also told them if you

22  associate with them, you're likely to

23  meet with the same fate.

24          And that's what these people

25  did to me.   When I defeated that

338

1    transfer to Troop B, Washington, I

2    was offered, by way of settlement, in

3    exchange for dropping grievances and

4    any future actions, I was offered the

5    transfer to the LCE, central section

6    command, which attorneys being

7    professionals, my response --- my

8    word-for-word response never made it

9    to paper.  But it wasn't flattering.

10   And the first words out of mouth

11   were, that's a demotion, are you

12   telling me they're out of their

13   minds?  They had a chance to fill

14   that vacancy.  Houston Williams, the

15   lieutenant that was in that position

16   was arrested on January 10th or

17   January 11th.

18        Again, with all due respect to

19   Major Koscelnak, if it was such a

20   critical important position, I would

21   have expected them to fill that on

22   January 29th, along with the rest of

23   the promotions when they tried to

24   ship me to Washington.  But they

25   didn't.  They left it vacant.  They

339

1    had no idea.  There could have been

2    no way they would have been able to

3    predict they needed to keep that spot

4    open for me.  The people on the

5    project where I was assigned, the

6    IIMS project, from the project

7    executives right up through and to

8    include Colonel Hickes, all wanted me

9    there  working on the project,

10   completing my assigned duties, which

11   is what I was put there for.  But I

12   was summarily removed from that.

13        And the career damage and the

14   effect of demotion, not only was an

15   indicator to people within the

16   organization, but the people I was

17   dealing with outside the

18   organization.  I was a part of a

19   project committee.  And on that

20   committee were deputy secretary-level

21   individuals.  Now, Barb Shelton comes

22   to mind, from DGS, Mr. Greenwood,

23   all of the vendors that we dealt

24   with.  I was the face of that part of

25   that project.  That was the key piece

340

1   in the technology project was the

2   systems integrator contract.  I was

3   the point of contact.  I was the

4   ranking officer.  I was that project

5   to those vendors.  And when I was

6   removed, it was humiliating.  Because

7   people would ask the obvious

8   question, well, why are you being

9   transferred?  What's going on?  Some

10  big project out there, what was I

11  supposed to say?  No.  No, I'm being

12  sent out there to visit stations.

13  Hell, I was in Troop B for four

14  years.  I know where all the stations

15  are.  I don't know what I'm supposed

16  to visit.  I already know that.

17        So all this was unbelievably

18  --- it was the lowest point in my

19  career, ma'am.  And being sent to a

20  section command.  As I said, we're a

21  paramilitary organization.  I was a

22  section commander eight or nine years

23  ago as a lieutenant.  That's a

24  lieutenant's position.

25  Q.     Okay.  I'm sorry.

341

1    A.        That's okay.

2    Q.        I was thinking area command.

3    A.        No, no.  I was a section

4    commander.  And our regulations, and

5    I believe it's AR 1-11, indicate that

6    sections are to be supervised or

7    commanded by lieutenants, not

8    sergeants, not captains, but

9    lieutenants.  Excuse me.  I didn't

10   mean sergeants.  Sergeants can be

11   acting.  And in the case of LCE,

12   that's exactly what was occurring.

13   Houston Williams, the former section

14   commander, was transferred in

15   September of '99, or thereabouts,

16   because of an allegation of sexual

17   harassment.  Sergeant Valencik

18   (phonetic) was put in an acting

19   status and ran that section for

20   several months.  They didn't feel a

21   need to bring in a captain then.

22   They put Sergeant Valencik in it.

23   And when I left the position, they

24   brought in a new lieutenant, meaning,

25   somebody who had been a sergeant the

342

1   day before.

2          So there was never an issue

3   about, is there a need for a captain.

4   That section wasn't even created

5   until 1994.  It's the smallest

6   section in LCE.  When the LCE was

7   first created, there was only an east

8   and a west section.

9   Q.       I'd just like to back up to

10  the special projects officer, because

11  essentially you said that when that's

12  the title that you're given, the

13  special projects officer, that's sort

14  of like the kiss of death on your

15  reputation or whatever.

16  A.       The culture of our

17  organization is and the instances

18  that I can think of, people that have

19  been brought in for special projects

20  are in trouble.

21  Q.       Would that be the case with, I

22  think, Cynthia Trance (phonetic) who

23  was sent to Philadelphia as a special

24  projects officer to that area

25  commander, around the same time

343

1    frame?  Was that your information

2    that that was some type of punishment

3    for her?

4    A.      If you compare the documents,

5    you'll see the difference.  The

6    document that sent me to Troop B,

7    Washington says special projects

8    officer.  This myth about the NGA,

9    was created after the injunction was

10   filed.  The next personnel document

11   --- the next personnel order that was

12   released by the department then

13   flowered this up.  I don't think

14   there's any question that Captain

15   Trance, who's not in trouble, in

16   fact, I would suggest quite the

17   opposite.  But they don't compare.

18          I know that the Defendants are

19   quite --- I'm sure they are very

20   hopeful that that comparison will

21   hold.  But once you --- I would like

22   to scratch below the surface of that

23   whole issue with you, because they

24   don't compare.  They don't even

25   compare on paper.

344

1    Q.      And do you think if her
2    paperwork, if I would find that,
3    would be something different?
4    A.      Oh, yes.
5    Q.      I have not seen her paperwork.
6    A.      I assure you it would be quite
7    different.
8    Q.      Okay.
9    A.      I've mentioned to you the
10   financial impact that this
11   disciplinary transfer was going to
12   have on my family.  I also would like
13   you to recognize or at some point
14   understand that the individual who
15   was selected to take my place
16   received a promotion for that
17   position, which by now we know means
18   it's not required.  It's optional.
19   But with that promotion and his
20   enlistment date, that would mean a
21   $7,000 a year pay raise for him.  I
22   was not going to be the benefactor of
23   such a promotion or windfall.
24   Q.      Okay.  Now, back to the
25   allegation that your reputation was

345

1    destroyed and you mentioned about

2    the, you know, special projects

3    officer.  I understand the point

4    you're making with respect to people

5    that don't necessarily know you in an

6    organization that large.  But other

7    people that know you and worked with

8    you closely on these projects that

9    you're discussing, your reputation

10   among them would still be good;

11   wouldn't it?

12   A.       In some cases.

13   Q.       For example, the people that

14   you worked with on the IIMS project?

15   A.       Well, I'm not quite sure what

16   the question is, but I'll try it.

17   There's a stigma that's associated

18   with being the one in the box.  While

19   privately or in some other area

20   people might, or one on one,

21   acknowledge that you're still a

22   pretty good guy and all of those

23   things, the reality is when you have

24   the target on your back and when

25   they've attached a stigma to you,

346

1    human nature being what it is, many,

2    many individuals will make sure that

3    that association is kept private or

4    they will make sure that, you know,

5    you're ostracized.  Go to meetings

6    and you're the person that no one

7    wants to sit with or there's

8    continual references about that.

9    That just happened to me yesterday at

10   the PeachTree when I went there for

11   lunch.  Oh, gee, we didn't know you

12   were going to be here, hope the

13   commissioner doesn't come by.

14   Q.    Is the PeachTree a restaurant?

15   A.    Yes, it's a restaurant on

16   Progress Avenue.

17              ATTORNEY BAILEY:

18              Near the intersection

19       of Walnut Street.

20   BY ATTORNEY GUIDO:

21   Q.    I'm not a Harrisburg-familiar

22   person.  Sorry.  I'm Cumberland

23   County side.

24   A.    So the reputation, many folks

25   or --- it hasn't been the case that

347

1    there hasn't been anyone that still

2    --- that believes these things.  As

3    was said to me the other day, this

4    transfer, that planned disciplinary

5    transfer is something that everyone

6    in the agency knew what it was when

7    they read it in print.  They knew

8    ---.

9    Q.      Who said that?

10   A.      Major DeWire.

11   Q.      Now, in paragraph C there of

12   46, you talked about being denied

13   opportunities for overtime?

14   A.      Yes.

15   Q.      What overtime opportunities

16   were you denied?

17   A.      I have been denied principally

18   through my PEMA assignments.

19   Q.      That's what I was wondering.

20   Is there anything other than PEMA?

21   Because that would give you the

22   opportunity.

23   A.      That would give me the

24   opportunity.  I've also been denied

25   the opportunity to act in the role of

348

1    acting bureau director since my

2    ascent back to a captain's job in LCE

3    as division director of

4    administration.

5    Q.        Hasn't Major DeWire made you

6    acting bureau director a few times?

7    A.        Five days, when Captain

8    McDonald wasn't available.

9    Q.        Okay.

10   A.        Captain McDonald in the last

11   year --- I think the last time I

12   looked at that was actually at the

13   end of October, so give me some

14   leeway.  But in the last year,

15   Captain McDonald has acted in acting

16   capacity, I believe, around 40 days,

17   maybe 40 some.  I've acted in a grand

18   total of five.

19   Q.        Would that be, the decision of

20   who to name as acting, would that be

21   Major DeWire's decision?

22   A.        Major DeWire and Colonel

23   Conley --- or Colonel Coury.  Sorry.

24   Q.        Would Major DeWire need to

25   consult with Lieutenant Colonel

349

1    Conley --- I mean, I forget which one
2    you just told me.
3    A.      Coury.
4    Q.      Coury in order to decide who
5    would be the acting director or could
6    he do that on his own?
7    A.      I'm not exactly sure how he
8    does that.
9    Q.      Okay.
10   A.      I just know, as I said many
11   times, I know the end result.  We
12   have department regulations and
13   there's a governor's management
14   directive that says that is an
15   assignment that is, unless --- I
16   can't remember the exact verbiage ---
17   peculiar or some set of circumstances
18   exist.  That's an assignment that's
19   to be equalized among the eligible
20   participants.  And it's also in
21   addition to taking money out of my
22   pocket, they're also not affording me
23   the opportunity, the career
24   advancement opportunity of learning
25   the functions of another position.

350

1    Q.      Is that because, do you get

2    some type of pay differential while

3    you're the acting bureau director?

4    A.      Yes.  It costs me over $30 a

5    day every time he doesn't name me.

6    Q.      And then to be --- the

7    reimbursements that you're talking

8    about in that paragraph C, are those

9    different reimbursements than we've

10   discussed before the frame?

11   A.      No.

12   Q.      Then with respect to

13   paragraph D, when you said you

14   haven't been allowed to get certain

15   educational opportunities, what were

16   those?

17   A.      I applied for the police staff

18   and command school in '99, about the

19   fall of '99.  And it was rejected.

20   It came back from the deputy

21   commissioner of administration's

22   office.  I was denied because they

23   said it was received late, that I had

24   missed the deadline.  Well, I never

25   knew until I looked through my

351

1    personnel file that that wasn't the

2    case at all.

3    Q.      What did you find in your

4    personnel file?

5    A.      I found a copy with the note

6    from Tech Services that said that the

7    thing was sent over on October 20th.

8    The deadline was October 22nd.  And

9    the memo I received back said that it

10   wasn't received until October 28th.

11   The mail goes once a day.  So there's

12   no possible way that they didn't

13   receive something for eight days when

14   the mail is shuffled over there every

15   day.

16   Q.      Did you know what the deadline

17   was?

18   A.      Yeah.  I met the deadline.  I

19   put it in or forwarded it to my

20   bureau director on October 20th.

21   Q.      Okay.  Did it need to just get

22   to your bureau director or who did it

23   actually have to get to by the 22nd?

24   A.      As I recall from the special

25   order or whatever the directive was,

352

1   it needed to get to --- it was either

2   the director of personnel or the

3   director of the --- deputy of admin.

4   I don't recall which one.

5   Q.      And your bureau director at

6   the time that you submitted it to was

7   who?

8   A.      Major Waugh.

9   Q.      And there was --- would Major

10  Waugh have had any reason to sit on

11  it?

12  A.      None whatsoever.

13                      ATTORNEY BAILEY:

14                      How do you spell Waugh?

15  A.      W-A-U-G-H.

16  BY ATTORNEY GUIDO:

17  Q.      Okay.  Now, that's the police

18  command staff school in 1999.  What

19  other educational opportunities?

20  A.      I had --- not long after I was

21  transferred to LCE, Major Koscelnak

22  --- I'm in the section job now.

23  Major Koscelnak --- oh, before we do

24  that, can I go back to the preceding

25  paragraph?

353

1    Q.        Sure.

2    A.        With respect to acting, I'm

3    not sure if it's that paragraph, but

4    it might be.   With respect to acting

5    duties, I was transferred to the

6    Bureau of Liquor Control Enforcement

7    as a section commander on, I believe,

8    February 18th.   I'm a captain

9    assigned to a section job, as my

10   grievance said, of the 69 or 70

11   section commanders in the state,

12   they're all Lieutenants, except for

13   me.

14            Now, shortly thereafter,

15   within three or four weeks or two

16   weeks, Captain Campbell, who was the

17   director of the administration

18   division, goes on leave.   I was not

19   put in that position.   I'm already a

20   captain and have already been a

21   division director for five years,

22   four years.   Instead, they brought a

23   lieutenant from the western section

24   from Pittsburgh, across the state,

25   paid him out-of-class wages, put him

354

1    in my chain of command as a

2    lieutenant and let him sit there for

3    a week.

4            When I had my first discussion

5    with Major Koscelnak after I was

6    transferred over there, I asked what

7    I'm sure you would probably say are

8    the obvious questions, who do I

9    answer to?  Major Koscelnak said you

10   answer to Captain McDonald.  So who

11   does my performance evaluations?

12   Captain McDonald.  Who's going to do

13   my leave slips, approve my leave

14   slips?  He said Captain McDonald.

15   And he said --- he said, do you have

16   a problem with that?  I said, yes, I

17   have a problem with that.  He's a

18   captain.  So this situation that I

19   was put in is something I've never

20   seen.  And I think some of our

21   witnesses have already indicated they

22   haven't seen in some 30 years'

23   experience on their part.

24           When I was in the section

25   command job as a captain, Major

355

1  Koscelnak put out a bureau directive
2  or bureau memo asking for and
3  soliciting for interest in attending
4  a national alcohol symposium
5  conference in Washington, D.C.  And I
6  believe that it said one of the
7  section commanders would attend.  I
8  believe that's how it was worded.
9  But in any event, I expressed
10 interest, put in a memo to attend
11 this conference.  LCE had sent three
12 or four or five individuals a year
13 before to the first conference.  This
14 was the second one.  That had all
15 been approved.
16      I submitted a memo to Major
17 Koscelnak and he approved it.
18 Subsequently then, the out-service
19 training authorizations and
20 appropriate forms were completed by
21 someone, I guess the AA.  I really
22 don't know.  But anyway, a package
23 went over to --- or that package went
24 over to the deputy of operations, who
25 was Defendant Westcott.  And

356

1    basically, those of us that had put

2    in for it and had been approved, were

3    making plans to go, schedule

4    preparations and what have you.

5        I was then, about again a

6    couple weeks, I'd have to look at the

7    documents, but a couple weeks or so

8    later, I was called in by Captain

9    McDonald and he said, well, guess

10   what, you're not going to the

11   conference and neither is anyone

12   else.  Westcott denied them all.  And

13   at that point, the other individuals

14   who had been approved, when I seen

15   them in the hallway, they kind of

16   snickered and said, thanks a lot, you

17   know, it's because of you we're not

18   allowed to go this year.  Colonel

19   Karbowski, I believe, said, yeah, I

20   guess it would have been too obvious

21   just to deny you and not everybody

22   else, so they denied everybody.

23   Q.      So nobody went to - - -

24   A.      So nobody went.

25   Q.      - - - that conference?

357

1  A.      They went the year before,

2  when I wasn't there.  The year that

3  I'm there and requested, we don't go.

4  Q.      And you said it would be

5  helpful for you to look at the

6  paperwork from that?

7  A.      Oh, yes.  I mean, I can

8  confirm the dates for you.

9  Q.      Can we find them?  I'm sure I

10 have it somewhere.

11 A.      Unless I missed something.

12 BRIEF INTERRUPTION

13              ATTORNEY GUIDO:

14              Can we just mark that

15         as an exhibit.  Here's Twelve.

16              (Deposition Exhibit

17              Number Twelve

18              marked for

19              identification.)

20              ATTORNEY BAILEY:

21              While he's looking at

22         that, Syndi ---.

23              ATTORNEY GUIDO:

24              Yes.

25              ATTORNEY BAILEY:

358

1          I really --- are you
2     going to finish by 5:00?  I
3     mean, you're a paragraph ---.
4               ATTORNEY GUIDO:
5          Yes.  Well, I had some
6     other stuff I'd like to cover
7     after that.
8               ATTORNEY BAILEY:
9          I'd really like to
10    finish him up today if it's
11    possible to do so.
12              ATTORNEY GUIDO:
13         We can see how far we
14    can get.
15    BY ATTORNEY GUIDO:
16    Q.     I don't know if this paperwork
17    is helpful to you at all or not, in
18    that this is the only paperwork I've
19    seen about it.  At least it gives us
20    a time frame date.  The training was
21    in June 2000?
22    A.     Yes.
23    Q.     And as of March 23, 2000,
24    there's a memo from Major Koscelnak?
25    A.     Yes.

359

1  Q.      At what point --- at that
2  point, it looks like everybody
3  submitted paperwork and travel
4  vouchers, et cetera?
5  A.      Yes.
6  Q.      Does this help you at all in
7  figuring out when you were told that
8  the whole deal was off?
9  A.      No.  Other than it was after
10 April 18th.  Is my memo in here?
11 Q.      That's what I was looking to
12 see what was here.  But the bottom
13 line is this wasn't something that
14 you chose not to go to?
15 A.      Oh, no, I expressed interest.
16 I put in a memo requesting
17 consideration and was approved.
18 Well, here it is.  Yeah, this is it.
19 This is from Koscelnak.
20                ATTORNEY BAILEY:
21                That's page two?
22 A.      Yes.  On Exhibit Twelve, page
23 two, this is from Koscelnak to me.  I
24 was the central section commander.
25 It says you have been approved.

360

1    BY ATTORNEY GUIDO:

2    Q.      Right.  And that's what I was

3    wondering.  Did you ever get anything

4    after this, saying that you had been

5    disapproved or was it a verbal

6    conversation?

7    A.      Well, Captain McDonald

8    reported it to me verbally.  I think

9    there was --- I never received

10   anything personally from anybody, no.

11   But I think there was something

12   generated, although, I don't recall

13   what that was.

14   Q.      But you didn't receive

15   anything in writing saying that that

16   had been rescinded or whatever?

17   A.      I'd have to look to make sure.

18   I don't think so.  I don't think

19   anything was directed personally to

20   me.  I think the package was just

21   rejected is my recollection.

22   Q.      Were there any other

23   educational opportunities that you

24   put in for and were denied?

25   A.      No.  By this point, having no

361

1    success, candidly, should any come

2    along, I really didn't see the point.

3    It was clear that I was not going to

4    be selected anyway, so what's the

5    point.

6    Q.      When Captain McDonald said

7    that no one was going and if you told

8    me this, I apologize for not

9    remembering, did he say who made that

10   decision or who told him?

11   A.      It's likely that he did.

12   Koscelnak would have never said a

13   word.  See, I think something came

14   from Westcott.  Whether it was a

15   posted, you know, rejected or

16   whatever, but I was told it was from

17   Westcott.

18   Q.      You were told by Captain

19   McDonald that Westcott said no?

20   A.      That's my recollection.  As a

21   fellow captain, I can't imagine, you

22   know, it would come from a

23   subordinate.  So he was really the

24   only peer I would have had to talk

25   to.  Wait a minute, I'm forgetting.

362

1   I'm overlooking Captain Campbell.  It

2   could have come from Captain

3   Campbell.  I just don't remember.

4   Q.      And Captain McDonald, his

5   position was?

6   A.      Director of operations.

7   Q.      Okay.  And at that time was

8   Captain Campbell the ---?

9   A.      Director of administration.

10  Q.      The job you have now?

11  A.      Yes.

12  Q.      What happened with him?  Where

13  did he go?

14  A.      He came in April, late April,

15  he came into my office on a Monday

16  morning and said, you know, I was

17  driving --- Captain Campbell and I

18  were promoted together.  And he came

19  into my office, shut the door and

20  said, you know, I was driving back

21  from --- I think he has a place in

22  North Carolina or down south

23  somewhere.  And he said, I was coming

24  back and I got to the beltway and I

25  said, you know what, that's it for

363

1    me.  I'm done.  He said, I just want

2    you to know that you're one of the

3    reasons I'm retiring.

4    Q.       And did he say more about why?

5    A.       Yes.  That was my question.

6    When someone tells you that, it

7    raises a level of concern.  He said

8    that he had 28 years on the job, I

9    think was what he told me.  And that

10   in 28 years he had never seen anybody

11   treated like they've treated me.  He

12   had a great deal of respect for me.

13   We were promoted together.  We were

14   peers.  I had many occasion to have

15   conversations by virtue of his

16   assignments as director of operations

17   and administration at different

18   points in the Bureau of Liquor

19   Control Enforcement.

20       He said he thought what they

21   were doing to me was a disgrace in

22   that he had been avoiding the

23   commissioner for months.  Any

24   opportunity he had, he was avoiding

25   any kind of face-to-face meeting with

364

1    him, because his fear was that the

2    commissioner would ask him something

3    like, how's things going?  And if he

4    were asked that --- if you know

5    anything about Captain Campbell, he

6    would then be obligated to unload

7    with the truth.  And he said he would

8    have just as soon at that point go

9    out now before he blew his leg off at

10   the kneecap.  But he said having seen

11   what they were doing to me was enough

12   for him.  He no longer wanted to be a

13   part of this organization.

14   Q.      And then he retired and then

15   you moved in to the position that he

16   had held?

17   A.      Eventually.

18   Q.      How long was the lag time

19   there?

20   A.      Until I was --- well, he put

21   his retirement papers in on May 8th.

22    On May 30th, a Tuesday, as I recall,

23   Major Koscelnak called me.  I was at

24   a conference that we were putting on.

25   I was not attending as a participant.

365

1  LCE was putting on a conference in
2  Bloomsburg.  He paged me or
3  telephoned me and asked me to meet
4  him at the Bloomsburg Station.  And
5  when I met him at the Bloomsburg
6  Station, he said that the purpose of
7  me being called there was that he
8  wanted to offer m  the position of
9  the director of administration.  And
10 wanted to know if I was interested in
11 accepting that.  And when the
12 personnel order came out, it was
13 backdated to, I believe, May 26th to
14 cover the time that I wasn't ---
15 hadn't been offered or wasn't named
16 as the admin division director.
17 Q.     Okay.  Now, let's see,
18 paragraph ---.
19              ATTORNEY BAILEY:
20         Darrell, let me just,
21     while she's checking, federal
22     rules provide that we have to
23     make you available for six
24     hours.  Obviously, in fairness
25     to opposing Counsel, it is a

366

1    detailed Complaint.  There's a

2    lot to it.  Quite frankly, I

3    don't see how she's going to

4    be able to finish by 5:00, in

5    fairness to her.

6         I'm going to suggest

7    that we proceed until about

8    4:00 or 4:15, then you and I

9    talk and see if there's

10   somewhere where this could

11   break.

12        ATTORNEY GUIDO:

13        Okay.

14        ATTORNEY BAILEY:

15        Or, you know, I just

16   can't see pushing on a --- I

17   know it's very difficult for

18   you.  I understand that.  But,

19   you know, we are the

20   Plaintiffs. It's our story to

21   tell.

22        With that in mind, I'm

23   just wondering, Syndi, if in a

24   few minutes at least, give

25   some thought to where you are

367

1     in the deposition, how much

2     time to complete, and maybe we

3     can compromise a few more

4     hours or something for you.

5              ATTORNEY GUIDO:

6              Okay.  That would be

7     great.

8              ATTORNEY BAILEY:

9              But he's, you know, I

10    know this guy.  And he's

11    starting to get tired.

12             ATTORNEY GUIDO:

13             And I can --- I know

14    I'm very tired, too.

15             ATTORNEY BAILEY:

16             You know, it's almost

17    six hours.  And, I mean,

18    that's tough on anybody, you

19    know that.

20             ATTORNEY GUIDO:

21             Right.  I'll just ---

22    let me know at the end of the

23    deposition, whether it's

24    something that we can work out

25    or whether I need to file a

368

1    motion.

2         ATTORNEY BAILEY:

3         We'll work it out.  You

4    don't need to ---.

5         ATTORNEY GUIDO:

6         I'm just saying ---.

7         ATTORNEY BAILEY:

8         Well, you know how ---

9         ATTORNEY GUIDO:

10        You were saying about

11   the rules.  I'm just saying

12   ---.

13        ATTORNEY BAILEY:

14        You know how reasonable

15   I am, Syndi.  You know what

16   I'm like.  All we have to do

17   is talk about it and get it

18   worked out.  No problem.

19   We'll get it worked out.

20        ATTORNEY GUIDO:

21        Well, I mean, to be

22   honest with you, I have a

23   couple hours, several hours

24   more, probably three more

25   hours of questions.

369

1          ATTORNEY BAILEY:

2          Yes.  That's what I was

3     thinking.

4          ATTORNEY GUIDO:

5          If you guys want to

6     break and do it another day,

7     I'm not pushing to do it.

8          ATTORNEY BAILEY:

9          Well, you know what I'd

10    like to do?  I'd like to

11    respectfully, because you're

12    at a hiatus now between

13    sections, I'd request a five-

14    minute recess.  I'd like to

15    talk with Darrell and ---

16         ATTORNEY GUIDO:

17         That would be fine.

18         ATTORNEY BAILEY:

19         --- get my client's

20    permission, approval and

21    advice.

22         ATTORNEY GUIDO:

23         That's not a problem.

24         ATTORNEY BAILEY:

25         Okay.  Thank you.

370

1          MS. LYDE:

2              It's 3:42 p.m.  We'll

3      take a short break.

4  SHORT BREAK TAKEN

5          MS. LYDE:

6              3:54, we're back on

7      video.

8          ATTORNEY BAILEY:

9              Okay.  I might as well

10     lead on this because I was the

11     one that made the request.

12     Let the record show that

13     during our break, I made a

14     request of opposing Counsel or

15     suggestion, should I say,

16     which she can respond to in

17     her own words, that because

18     she's going to need more time,

19     she's indicated roughly three

20     hours or so, traffic

21     conditions, it's been a very

22     long day for Mr. Ober, that we

23     break at this point.

24             The only request I

25     would have, Syndi, is that we

371

1    get back together.  I don't

2    want a whole lot of time in a

3    break in his deposition.  I

4    have some time available on

5    Friday.  And usually, it's a

6    half-way decent day for most

7    attorneys.  And I'm wondering

8    if it's possible if you need

9    him three or four hours, we

10   get back together on Friday.

11        ATTORNEY GUIDO:

12        I need to go check my

13   calendar.

14        ATTORNEY BAILEY:

15        Okay.

16        ATTORNEY GUIDO:

17        Is that something I

18   should do now before ---?

19        ATTORNEY BAILEY:

20        No.  No, I mean, I can

21   call tomorrow morning.  I've

22   got to be out of town all day

23   tomorrow on depositions in

24   another case.  But I would

25   just like to make that

372

1  suggestion, if it's at all

2  possible.

3          ATTORNEY GUIDO:

4          I'll see if I can,

5  because I know I do have a

6  bunch of dates during the next

7  two weeks where I am really

8  tied up because of another

9  case that I have.  I don't

10  know offhand what Friday's

11  like, maybe Friday morning

12  might ---.

13          ATTORNEY BAILEY:

14          That would be great.

15  That would be great.  And you

16  can even voice mail my home

17  phone number, which is in the

18  phone book.  So I don't care,

19  we might as well depose me on

20  it.  It's 232-7542.  Friday is

21  at your convenience. Darrell,

22  is that okay with you?  Is

23  that possible?

24          ATTORNEY GUIDO:

25          I mean, I can go check

373

1          real quick.

2    A.       As far as I know.

3                ATTORNEY BAILEY:

4                As far as you know.

5          Okay.

6    A.       I'm burning leave, so

7    whatever.

8                ATTORNEY GUIDO:

9                I mean, Dorothy will be

10         able to tell me whether I am

11         or am not.  I just have to ask

12         her.

13               ATTORNEY BAILEY:

14               All right.  Then I

15         guess we could end this.  I've

16         got to, you know, again, I'm

17         going to do a revised document

18         request.  We're obviously

19         going to have a disagreement.

20         I'm going to suggest that

21         maybe we get with Judge

22         Caldwell on the issue of the

23         document request.  Because,

24         again, I don't feel some of

25         your requirements are fair and

374

1    you, obviously, feel they are.

2    We need to work that out.

3         ATTORNEY GUIDO:

4         It depends on --- what

5    are you concerned about,

6    relevance issues ---

7         ATTORNEY BAILEY:

8         Well, I can't go into

9    them now.

10        ATTORNEY GUIDO:

11        --- or the cost?

12        ATTORNEY BAILEY:

13        No.  Even some of the

14   mechanics, you know.

15        ATTORNEY GUIDO:

16        Okay.

17        ATTORNEY BAILEY:

18        I mean, paying labor

19   --- we're not paying anyone

20   $25 an hour to make copies.

21        ATTORNEY GUIDO:

22        That's what I was

23   wondering if the labor ---.

24        ATTORNEY BAILEY:

25        I mean, it's not going

375

1     to happen.  But I don't want

2     to be unreasonable.  We'll

3     talk about it.

4              ATTORNEY GUIDO:

5              Okay.

6              ATTORNEY BAILEY:

7              Okay.

8              ATTORNEY GUIDO:

9              Because I'm not sure

10    that it's something we

11    necessarily need to bring up

12    with the Judge.  There are

13    certain issues that ---.

14             ATTORNEY BAILEY:

15             No, no.  I'm saying if

16    we need to get there, if we

17    can't work it out.  So I'm

18    going to do some revising in

19    my request and whatnot.  And

20    then if we need to, we can

21    just agree in a friendly way

22    to go to the Judge and say,

23    hey, Judge, we disagree about

24    some things.

25             ATTORNEY GUIDO:

376

1     Okay.

2     ATTORNEY BAILEY:

3     I don't have anything

4  further.  I'd like to thank

5  you for your cooperation,

6  though, for today.

7     ATTORNEY GUIDO:

8     No, I don't.

9     ATTORNEY BAILEY:

10    So the deposition is

11  --- it will be continuing

12  then.

13    MS. LYDE:

14    3:57 p.m., deposition

15  of Darrell Ober will be

16  continued at a later date.

17    VIDEOGRAPHER:

18    Off record.

19

20    * * * * * * * *

21  DEPOSITION CONCLUDED AT 3:57 P.M.

22    * * * * * * * *

23

24

25

COMMONWEALTH OF PENNSYLVANIA)

COUNTY OF HUNTINGDON           )

C E R T I F I C A T E

I, Bernadette M. Black, a Notary Public in and

for the Commonwealth of Pennsylvania, do hereby

certify:

That the witness was first duly sworn to testify

to the truth, the whole truth, and nothing but the

truth; that the foregoing deposition was taken at the

time and place stated herein; and that the said

deposition was taken stenographically by me and

reduced to typewriting, and constitutes a true and

correct record of the testimony given by the witness.

I further certify that the reading and signing

of said depositions were (not) waived by counsel for

the respective parties and by the witness.

I further certify that I am not a relative,

employee or attorney of any of the parties, nor a

relative or employee of counsel, and that I am in no

way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand

and stamp this _17_ day of _January 2002_ .

_Bernadette M Black_

Notarial Seal
Bernadette M. Black, Notary Public
Broad Top City Boro, Huntingdon County
My Commission Expires Jan. 26, 2004
Member, Pennsylvania Association of Notaries

## LAWYER'S NOTES

| Page | Line | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

PITTSBURGH, PA
HARRISBURG, PA
GREENSBURG, PA
ERIE, PA
INDIANA, PA
HOLLIDAYSBURG, PA
STATE COLLEGE, PA



**SARGENT'S
COURT REPORTING
SERVICE, INC.**

210 MAIN STREET
JOHNSTOWN, PA  15901
(814) 536-8908

PHILADELPHIA, PA
WILKES-BARRE, PA
OIL CITY, PA
SOMERSET, PA
CLEARFIELD, PA
*CHARLESTON, WV*

# RESUME

## DARRELL G. OBER
71 Millers Gap Road
Enola, Pennsylvania  17025

Home Telephone: (717) 790-0708
Work Telephone: (717) 787-3264

### Department Experience

<u>May 1998 to present</u> - Assigned as the Director, Internal Affairs Division, Bureau of Professional Responsibility.  The position involves managing the internal affairs function of approximately 4,100 enlisted and 1,500 civilian personnel.  Direct management is provided in the form of leadership to three Sections each comprised of a Lieutenant, three or four investigators, and the administrative staff.  Members of the Internal Affairs Division conduct administrative and criminal investigations into the activities of Department members.

### March 1995 to May 1998

March 1995 - Promoted to Captain and assigned as the Director, Systems and Process Review Division, Bureau of Professional Responsibility.  This position involves supervising the inspection activities of approximately 160 Department components.  Oversight is provided in the form of leadership to three Sections each comprised of a Lieutenant and three non commissioned officers. The Systems and Process Review Division is responsible for conducting in-depth inspections of Department personnel and installations.  Inspections include evaluations of reporting procedures, policies and procedures, as well as determination of compliance levels of both Department policy and standards established by the Commission on Accreditation for Law Enforcement Agencies.  A thorough working knowledge of Department rules, regulations, cultural effects and application of process modeling is fundamental to this position.  I am the only remaining charter member of the Systems and Process Review Division.  As Division Director, significant accomplishments include a complete rewrite of Operations Manual 7-4, Inspections; creation of the Systems and Process Review Service Evaluation Form; implementation of a training program for property management; establishing a line inspection program for the Bureau of Professional Responsibility; and creation of a Division newsletter for dissemination of internal information.

### March 1993 to March 1995

March 1993 - Promoted to Lieutenant and assigned as the Central Section Commander, Systems and Process Review Division, Bureau of Professional Responsibility.  My initial administrative responsibilities included developing Department policy, candidate selection criteria, and internal procedures for the newly-created inspection Division. Upon staffing, my duties expanded to include operational responsibilities of the Central Section comprised of Troops F, G, H, all Bureau Headquarters and decentralized components co-located in the aforementioned Troops.



EXHIBIT
# 1

### March 1991 to March 1993

March 1991 - Promoted to Sergeant and assigned as Supervisor, Systems and Procedures Section, Programming Division, Bureau of Research and Development. My duties in this position included supervising the development, writing, editing, revising, and staffing of the entire Department directives system; Suggestion Program, Records Management Units, and clerical staff.

### August 1989 to March 1991

August 1989 - As a result of a competitive selection process, I was selected and transferred to the Systems and Procedures Section, Programming Division, Bureau of Research and Development, as a staff analyst. My duties included writing, editing, revising, and preparing assigned Department draft directives for the Commissioner.

### September 1988 to August 1989

September 1989 - Requested and received a preference transferred to Troop G, McConnellsburg. Performed supervisory functions in the Patrol Unit.

### February 1988 to September 1988

February 1988 - Promoted to Corporal and transferred to Troop T, Bowmansville. Performed supervisory functions in the Patrol Unit.

### June 1985 to February 1988

June 1985 - Requested and received a preference transfer to Troop G, McConellsburg. Performed general police duties in both the Patrol and Criminal Investigation Units.

### September 1983 to June 1985

September 1983 - Requested and received a preference transfer to Troop D, Mercer. Performed general police duties in traffic and criminal investigations.

### December 1981 to September 1983

December 1981 - Assigned to Troop S, Mercer. Performed general police duties in traffic and criminal investigations.

### July 1981

Enlisted in the Pennsylvania State Police on July 20, 1981.

## TRAINING

Advanced In-Service Training, sponsored by the Department, include the following: Radar; Statements and Confessions; Intoxilyzer Certification; Criminal Investigation; Annual Pistol Qualification; Advanced First Aid and Emergency Care Courses; Operation Whiteline; Aids Awareness; Stress Management; Ethnic Intimidation and Institutional Vandalism; Sentinels;

Interview and Interrogation Technique Course; Ethics Training; Leadership Courses; Supervisory Training; Cult Investigation; Advanced Police Executive Training; Professionalism, Proper Conduct and Civil Liability; and annual updates to keep current.

Out-Service Training, sponsored by the Office of Administrative include the following: Effective Writing; The Basics of Writing Policies and Procedures; Conflict Management; Personnel Selection Interviewing; and Managing For Government Responsiveness; How to Conduct Internal Investigations; Official Misconduct and the Independent Counsel Power.

Other Out-Service Training includes the following: Internal Audit and Staff Inspection sponsored by Rollins College, Winter Park, Florida; and Comprehensive Staff Inspections Training Workshop, sponsored by The Institute of Police Technology and Management, Jacksonville, Florida.

## EDUCATION

Pennsylvania State University
University Park, Pennsylvania

Bachelors of Science Degree
Administration of Justice
May, 1979

Pennsylvania Law
Enforcement Academy
Scotland, Pennsylvania

Act 120 Certification
April, 1980

## ADDITIONAL DEPARTMENT RESPONSIBILITIES

In addition to my regular duties, I serve as the Department representative on the Cadet Background Investigation Screening Board; the Chairman, Background Investigation Hearing Board; and am the Cadet Dismissal Hearing Officer.

I am also one of the Emergency Preparedness Liaison Officers for the Pennsylvania Emergency Management Agency.

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

DATE:          January 17, 2000

SUBJECT:       Director, Legislative Affairs Office

TO:            Commissioner
               (Through channels)

FROM:          Captain Darrell G. Ober
               Systems Integrator Procurement Team Leader
               Bureau of Technology Services

1. This officer kindly requests consideration for the position of Director, Legislative Affairs Office, which was recently vacated due to the retirement of Major Richard D. A. Morris.

2. I have given careful thought to the duties and responsibilities of this position. Given my variety of experience, administrative background, solid interpersonal and leadership skills, I would make an excellent choice for this position.

3. By way of reference, I have attached a resume. At your convenience, I am available to further discuss this most important assignment should you deem such action necessary.

4. Thank you for your consideration.

EXHIBIT
#2

# RESUME
## CAPTAIN DARRELL G. OBER

Home Address
71 Millers Gap Road
Enola, Pennsylvania 17025
Home Telephone: (717) 790-0708
Work Telephone: (717) 657-4231

## DEPARTMENT EXPERIENCE

**April 1999 to Present** – Selected by the Commissioner of the Pennsylvania State Police to serve as the Team Leader for the Incident Information Management System (IIMS) Systems Integrator Procurement Process. In this capacity, my assignment was to create an organization project structure designed to secure the services of a systems integrator for the Pennsylvania State Police. This integration project is the largest technology project of its kind in the history of law enforcement.

**May 1998 to April 1999** - Assigned as the Director, Internal Affairs Division, Bureau of Professional Responsibility. The position involves managing the internal affairs function of approximately 4,100 enlisted and 1,500 civilian personnel. Direct management is provided in the form of leadership to three sections, each comprised of a Lieutenant, three or four investigators, and the administrative staff. Members of the Internal Affairs Division conduct administrative and criminal investigations, Supervisory Inquires, and Attorney Work Products.

**March 1995 to May 1998** – Promoted to Captain and assigned as the Director, Systems and Process Review Division, Bureau of Professional Responsibility. This position involves supervising the inspection activities of approximately 160 Department components. Oversight is provided in the form of leadership to three sections, each comprised of a Lieutenant and three non-commissioned officers. The Systems and Process Review Division is responsible for conducting in-depth inspections of Department personnel and installations. Inspections include evaluations of reporting procedures, policies and procedures, as well as determination of compliance levels of both Department policy and standards established by the Commission on Accreditation for Law Enforcement Agencies (CALEA). A thorough working knowledge of Department rules, regulations, cultural effects, and application of process modeling is fundamental to this position. I am a charter member of the Systems and Process Review Division. As Division Director, I am responsible for the complete rewrite of Operations Manual 7-4, Inspections; creation of the Systems and Process Review Service Evaluation Form; implementation of a training program for property management; establishing a line inspection program for the Bureau of Professional Responsibility; and creation of a Division newsletter for dissemination of internal information.

# RESUME
## CAPTAIN DARRELL G. OBER

**March 1993 to March 1995** – Promoted to Lieutenant and assigned as the Central Section Commander, Systems and Process Review Division, Bureau of Professional Responsibility. My initial administrative responsibilities included developing Department policy, candidate selection criteria, and internal procedures for the newly-created inspection Division. Upon staffing, my duties expanded to include operational responsibilities of the Central Section, comprised of Troops F, G, H, all Bureau headquarters, and decentralized components co-located in the aforementioned Troops.

**March 1991 to March 1993** – Promoted to Sergeant and assigned as Supervisor, Systems and Procedures Section, Programming Division, Bureau of Research and Development. My duties in this position included supervising the development, writing, editing, revising, and staffing of the entire Department directives system Suggestion Program, Records Management Units, and clerical staff.

**August 1989 to March 1991** – As a result of a competitive selection process, I was selected and transferred to the Systems and Procedures Section, Programming Division, Bureau of Research and Development, as a staff analyst. My duties included writing, editing, revising, and preparing assigned Department draft directives for the Commissioner.

**September 1988 to August 1989** – Requested and received a preference transfer to Troop G, McConnellsburg. Performed supervisory functions in the Patrol Unit.

**February 1988 to September 1988** – Promoted to Corporal and transferred to Troop T, Bowmansville. Performed supervisory functions in the Patrol Unit.

**June 1985 to February 1988** – Requested and received a preference transfer to Troop G, McConellsburg. Performed general police duties in both the Patrol and Criminal Investigation Units.

**September 1983 to June 1985** – Requested and received a preference transfer to Troop D, Mercer. Performed general police duties in traffic and criminal investigations.

**December 1981 to September 1983** – Assigned to Troop S, Mercer. Performed general police duties in traffic and criminal investigations.

**July 1981** – Enlisted in the Pennsylvania State Police on July 20, 1981.

## TRAINING

Advanced In-Service Training, sponsored by the Department, include the following: Radar; Statements and Confessions; Intoxilyzer Certification; Criminal Investigation; Annual Pistol Qualification; Advanced First Aid and Emergency

# RESUME
# CAPTAIN DARRELL G. OBER

Care Courses; Operation Whiteline; Aids Awareness; Stress Management; Ethnic Intimidation and Institutional Vandalism; Carnival Fraud; Interview and Interrogation Technique Course; Kinesics Interviewing; Ethics Training; Worldwide Lessons in Leadership; Basic Supervision; Cult Investigation; Basic and Advanced Police Executive Training (POLEX); Professionalism, Proper Conduct and Civil Liability: Issues for Consideration as Professional Law Enforcement Manager; and annual updates.

Out-Service Training: Office of Administrative courses to include the following: Effective Writing; The Basics of Writing Policies and Procedures; Conflict Management; Personnel Selection Interviewing; Managing for Government Responsiveness. Other courses to include: State Nuclear-Biological-Chemical Officer Training in Planning, Preparedness and Response to Terrorist Incidents Involving Weapons of Mass Destruction (PEMA); How to Conduct Internal Investigations; Official Misconduct and the Independent Counsel Power; Internal Affairs, Managing Citizen Complaints and Employee Discipline; Character-Based Behavioral Training (Ohio State Highway Patrol). I have attended the New York State Police Internal Affairs Bureau Conference -1999; International Association of Chiefs of Police – Advanced Internal Affairs: Proactive Steps for Corruption Prevention; Portsmouth, New Hampshire.

Other Out-Service Training includes the following: Internal Audit and Staff Inspection sponsored by Rollins College, Winter Park, Florida; and Comprehensive Staff Inspections Training Workshop, sponsored by The Institute of Police Technology and Management, Jacksonville, Florida.

## EDUCATION

Pennsylvania State University
University Park, Pennsylvania
(Cum laude)

Bachelors of Science Degree
Administration of Justice
May 1979

Pennsylvania Law
Enforcement Academy
Scotland, Pennsylvania
(Class rank: 1)

Act 120 Certification
April 1980

## ADDITIONAL DEPARTMENT RESPONSIBLITIES

In addition to my regular duties, I have served as the Department representative on the Cadet Background Investigation Screening Board; the Chairman, Background Investigation Hearing Board; and as the Cadet Dismissal Hearing Officer.

I am also one of the Emergency Preparedness Liaison Officers for the Pennsylvania Emergency Management Agency.

3

# RESUME
## CAPTAIN DARRELL G. OBER

I have been selected to serve on Oral Board Promotion Panels for both the Pennsylvania (for Corporals) and Virginia State Police (for Lieutenants).

RECEIVED

BY_____

MAY - 3 2001

OFFICE OF GENERAL COUNSEL

REFERRED_____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER )     CIVIL ACTION LAW
)
    Plaintiff )
)     1:CV-01-0084
    vs. )
)     (JUDGE CALDWELL)
PAUL EVANKO, MARK )
CAMPBELL, THOMAS COURY, )     JURY TRIAL DEMANDED
JOSEPH WESTCOTT, )
HAWTHORNE CONLEY )
JOANNA REYNOLDS and )
SYNDI GUIDO )
    Defendants )

FILED
HARRISBURG, PA

MAY 3 2001

MARY E. D'ANDREA, CLERK
Per _____
        Deputy Clerk

## AMENDED COMPLAINT

## INTRODUCTORY STATEMENT

This is an amended civil rights complaint brought by the plaintiff, a Pennsylvania

State Police Captain, against the Commissioner of the Pennsylvania State Police in his

individual capacity, for the deprivation of the plaintiff's federally guaranteed rights

under the Due Process Clause, and the Privileges and Immunities Clause, of the 14th

Amendment, his 1st and 4th Amendment rights and his interest in property. The

gravamen of Captain Ober's complaint is that Commissioner Evanko unlawfully

1



promulgated a pattern of career damaging personnel actions against Captain Ober because Captain Ober properly obeyed lawful directives during a probe into alleged illegal activities by Governor's Office personnel and PSP "higher ups," that could have included Colonel Evanko himself. Commissioner Evanko retaliated against Captain Ober for what Evanko considered treasonous behavior towards himself personally even though Ober had no lawful alternative but to follow FBI requests and could not inform Colonel Evanko of the federal probe without committing a crime. In a vindictive display of intentional abuse, after he learned of the investigation, Paul Evanko set out on a course of conduct that severely damaged   Captain Ober's career and caused irreparable injury to his person. Mr. Evanko successfully secured the permission and concurrence of the   defendant Campbell to violate Captain Ober's rights and then, despite knowing they were wrong, he enlisted the support of the other defendants to systematically injure and destroy the career and person of Captain Darrell G. Ober.

This Amended Complaint adds paragraphs 52 to 60. It modifies the caption to add Joanna Reynolds and Syndi L. Guido as defendants (paragraph 9a) and it also modifies the ad damnum clause accordingly.

## JURISDICTION AND VENUE

2.) Jurisdiction is conferred on this Court by 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) and (4) and the remedial statute 42 U.S.C. §1983.

2

3.) This court's supplemental jurisdiction is invoked as per 28 U.S.C. §1367.

4.) A jury trial is demanded.

5.) Punitive damages are requested.

6.) Venue is properly in the Middle District of Pennsylvania since the parties, witnesses, material facts, and other evidence are all common to Dauphin County Pennsylvania.

## PARTIES

7.) Darrell Ober is a Captain in the Pennsylvania State Police currently assigned to the Bureau of Liquor Control Enforcement (LCE) as the Director, Administration Division.

8.) The defendant, Colonel Paul Evanko, is the Commissioner of the Pennsylvania State Police. Coury, Westcott, and Conley all assisted Commissioner Evanko in running the Department.

9.) The defendant Mark Campbell was, at all times complained of herein, Governor Tom Ridge's Assistant Chief of Staff.

9a.) The defendant Joanna Reynolds is an attorney with the Pennsylvania State Police. She and the defendant Syndi L. Guido represent the defendants.

3

## RIGHTS VIOLATED

10.) The defendants Paul Evanko and Mark Campbell violated the plaintiffs' rights to substantive due process of law, a 14th Amendment right, and deprived plaintiff of his federally protected interest in property. At various times, as hereinafter described Coury, Westcott, and Conley knowingly assisted Evanko in carrying out the plan to injure Ober. Reynolds also violated Obers due process rights.

11.) The defendants violated the plaintiff's right to enjoy the protections afforded by the Privileges and Immunities Clause of the 14th Amendment.

12.) The defendants Evanko and Campbell violated the plaintiff's 1st Amendment rights and discriminated against him in his right to enjoy the equal protection of the laws.

13.) The defendants Paul Evanko and Mark Campbell violated the plaintiff Darrell Ober's right to be free of civil conspiracies both as a matter of federal law pursuant to 42 U.S.C. §1983 and as a matter of Pennsylvania tort law.

14.) The defendants unlawfully violated plaintiff's 4th Amendment rights, subjecting him unlawfully to custodial investigations and invasions of privacy in a series of investigations and administrative actions as part of an intentional effort to destroy plaintiff's career and use him as a teaching example to other members of the PSP, that they must adhere to an employment policy of blind loyalty to Evanko above

4

any other dictate of law, duty, or morality, or face debilitating professional or personal injury.

15.) The defendants violated Captain Ober's rights to be free of debilitating and injurious policies and practices intentionally designed to inflict emotional distress on Captain Ober.

15a.) The defendants Evanko, Reynolds and others retaliated against plaintiff for filing his original complaint and secretly changed a regulation then made false representations to this Court hoping to have the complaint dismissed.

## DAMAGES

16.) The plaintiff seeks compensatory and punitive damages for pain and suffering for humiliation, embarrassment, retaliation, injurious adverse employment actions, and emotional trauma, pursuant to 42 U.S.C. §1983 and according to Pennsylvania tort law.

17.) The plaintiff seeks damages for lost earnings and lost promotional, and career opportunities, and also for injuries to reputation and privacy.

18.) The plaintiff seeks compensatory damages for the deprivation of his federally guaranteed rights, and if and when appropriate, intends to move for punitive damages against the individual defendants.

5

19.) The defendants unlawfully damaged plaintiff's reputation and cruelly placed him in a false light to his colleagues and the public in violation of Pennsylvania law.

## OPERATIVE FACTS

20.) Darrell G. Ober, on or about September 1998, was one of the brightest and the best, a rising star in the Pennsylvania State Police (PSP) organization. A Cum laude graduate of the Pennsylvania State University, Darrell graduated with a class rank of number 1 from the Pennsylvania Law Enforcement Academy. His work history was replete with numerous career enhancing achievements, citations, and experience qualifications. His career potential was without any foreseeable limit.

21.) On May 2, 1998, Captain Ober was named as Director, Internal Affairs Division, and later, in early September 1998, Darrell Ober was named as the Acting Bureau Director of the PSP's Bureau of Professional Responsibility.

22.) This career path is customarily associated in the State Police with advancement to the very highest ranks in the organization including Commissioner. Colonel Evanko's career included service in the Bureau of Professional Responsibility, as did Colonel Coury's and Colonel Conley's careers.

23.) On or about late September or early October 1998, the plaintiff was contacted by the FBI about a political corruption case.

6

24.) The FBI indicated that a reliable confidential Informant (CI ) had reported that members of the "Governor's Office" and "high-ranking members of the PSP" might be involved in accepting payoffs in return for special consideration for certain applicants on the PSP cadet eligibility list.

25.) The FBI expressly and clearly requested that Darrell not divulge this information to potential investigation targets including top-ranking PSP officials. There is no PSP policy or regulation to guide a member on how to conduct or report on an investigation into alleged criminal or other misconduct by a high-ranking PSP official such as Commissioner or Deputy Commissioner.

26.) Since Ober was chosen by the FBI as a contact, obviously because he was not a target, or potential target, of the investigation, he felt, consistent with FBI directives, that it was equally important to limit any superior to whom he might report, to someone he was personally certain would not be involved in an unlawful matter, and to whom no conflict would present itself, but at the same time, be someone who was, hopefully a superior in his chain of command. It never occurred to Captain Ober that he should not, or would not, comply with the letter and spirit of PSP practices and policies and that is precisely what he did.

27.) Consequently, Captain Ober (he was promoted to Captain in the Spring of 1995) reported the corruption matter, as related by the FBI, to Lieutenant Colonel

7

Robert C. Hickes, newly appointed Deputy Commissioner of Staff. Captain Ober was confident that Colonel Hickes was of impeccable character, and knew, because of his position, that Hickes could not be involved. Though not in his direct chain of command, informing Lt. Col. Hickes, meant plaintiff complied with PSP Regulations. He could not inform Evanko or one of his assistants because of the clear and unambiguous FBI directive. Upon learning of the FBI probe from Ober, Hickes ordered Ober to maintain confidentially, and to keep Hickes informed. These were lawful orders.

28.) On or about May 1999 the plaintiff learned from the FBI that the FBI had reached the conclusion that the wrong doing seemed limited to one PSP Trooper and that it had not reached higher. Subsequently, it was learned that the investigation may have been compromised even before plaintiff was informed by Agent Kush. Plaintiff made the latter deduction because Campbell, to whom Evanko went for permission to unlawfully investigate plaintiff, was in the Governor's office. FBI body wires from an informant mentioned sources in the Governor's office, high PSP officials and even a State Senator and a State Representative, earlier in the investigation. Ober even learned that another PSP member had been informed before Ober was, in an earlier attempt at investigation. Only the FBI to whom Evanko personally went, knows the answers to these questions.

8

29.) Thus upon information and belief, the plaintiff believes that a real possibility still exists that the corruption investigation referred to above was truncated or otherwise limited because of PSP leadership interests and/or the concerns of others, regardless plaintiff was unlawfully investigated by defendants to ascertain what he knew, and to punish him for putting the law above the PSP leadership's interests.

30.) Subsequently, on May 12, 1999, the plaintiff and Lieutenant Colonel Hickes informed Commissioner Evanko about the FBI investigation.

31.) Upon being told of the investigation by plaintiff and LTC Hickes, the defendant Evanko exploded in a fit of rage. He told Hickes and the plaintiff Darrell Ober that "I will have Louie Freed (Director of the FBI) on the phone tonight and have the agents involved transferred by tomorrow."

32.) Upon information and belief plaintiff alleges that FBI Special Agent Ralph Kush was quickly transferred from the underlying corruption case, in a display of what plaintiff believes was an inappropriate influence on the FBI by Colonel Evanko.

33.) Subsequent to learning about the FBI investigation, Col. Evanko sought the personal and official approval of the defendant Mark Campbell to begin an investigation into Captain Ober. Campbell was an Assistant to the Pennsylvania Governor's Chief of Staff.

9

34.) At the time Campbell and Evanko conferred on investigating Ober, they both knew that Ober had committed no wrong, had broken no law, and had violated no regulation, practice, or custom of the Pennsylvania State Police.

35.) Nonetheless, in order to punish Ober because he had followed proper PSP procedure, obeyed the law, and conducted himself in a spirit supportive of proper law enforcement duties and practices, consistent with his oath,  as opposed to demonstrating blind devotion, obedience and subservience to the personal and political interests  and concerns of the defendants, both Evanko and Campbell decided to use Ober as an example to PSP officers and members to show that obedience  to the political sensitivities  of  their  PSP leader  and his political mentors, is a necessity regardless of what the law may require, even if that leader himself  is a target, or potential target,  of an official law enforcement agency investigation himself.

36.) Campbell and Evanko then decided to launch the first investigation into the affairs of Captain Ober, which was only the beginning of a series of unlawful antipersonnel actions undertaken, by the defendants,  to destroy Captain Ober's career and to inflict personal pain.

## INVESTIGATIONS

37.) Investigations such as those done on Captain Ober have the effect of destroying  an officer's standing and reputation among his colleagues. He becomes

10

shunned and is subjected to insults and is ostracized. When this policy is fostered by

the leader of the PSP, the impact, like here, is dramatic. Plaintiff was subjected to

an unlawful and improper investigation into his activities at the direction of Evanko

and Campbell. These investigations were conducted for two unlawful reasons. The

first was to learn the breadth and depth of Ober's knowledge about the FBI

investigation and whether Evanko and someone in the Governors office was a

target, or actually under suspicion, and the second was to harass and injure Ober as

a way to send a signal to others that the defendants as a leadership cadre, require the

obedience, even the unlawful obedience of PSP members, above all other

considerations, as an unwritten term and condition of employment. Such a policy is

a shocking perversion of the public trust and of plaintiff's rights.

38.) Shortly after Evanko had been informed by plaintiff about the FBI probe,

and after he had threatened action against the FBI agents involved, he had a meeting

in his office with a number of his top staff members to discuss the "investigation" he

planned into Captain Ober.

39.) It is averred that this meeting followed Colonel Evanko's meeting with

the defendant Mark Campbell where Evanko secured permission to investigate the

plaintiff, because Evanko proceeded to harass plaintiff, have others, such as the

defendants, Conley, Coury and Westcott, harass him, and have him officially

11

investigated despite the fact that Evanko was told he should not conduct an investigation into plaintiff because it was not proper, there being no cause for such an inquiry, as required by PSP policies and rules and by both the Pennsylvania and the United States Constitution.

40.) In that meeting were a number of Commissioner Evanko's top confidants, among which were the defendants Conley, Coury and Westcott.

41.) Each of the foregoing individuals personally participated in various violations of the plaintiff's federally guaranteed rights as a way to demonstrate their loyalty to Commissioner Evanko and to show their agreement with his policy that loyalty to the leader is above all, even if it means the law will be violated and the integrity of an investigation into matters of public corruption should be compromised if the leader's interest is at issue. Beyond being against the stated goals and purposes of the Pennsylvania State Police, this policy is anti American and violates due process clauses of the 5th and 14th Amendments in their spirit and letter.

42.) Acting upon the orders of their superiors, two PSP majors conducted a custodial interview of the plaintiff that was no more than an inquiry into his personal loyalty to Evanko. The format of the interrogation was permeated with an ill disguised plan to learn what was discovered about the role, if any, of PSP upper

echelon leaders and Governor's Office personnel, in the alleged money for hiring

scam the FBI was investigating.

43.) Later the defendant, Coury, blocked certain of plaintiff's promotional

opportunities and also launched another totally improper investigation into

plaintiff's personal affairs, for a PSP pet project of Col. Evanko's that clearly

exceeds the proper role and function of the PSP as a government agency.

44.) On at least two occasions Lieutenant Colonel Westcott also personally

violated plaintiff's rights in carrying out the vindictive, unlawful desires of Col.

Evanko to injure plaintiff by changing his recommendation for a PEMA

(Pennsylvania Emergency Management Agency) appointment causing Plaintiff's

removal. Lieutenant Colonel Wescott changed plaintiff's selection for appointment

to PEMA as an act of unlawful blatant abuse of plaintiff's rights to please Evanko.

45.) Colonel Conley also performed acts of vengeance for the defendant

Evanko, such as stripping plaintiff of his cell phone for no reason, and denying him

reimbursements for expenses allowed others.

46.) The defendant Evanko, by and through the aforementioned group of

conspirators, who acted at his behest, unlawfully, and for no just or proper purpose,

violated the plaintiff's rights and interests in his property and his right to be free of

irrational and purposeless government actions devoid of rational or reasonable

13

government purposes that rose to shocking levels. The defendants committed at least the following adverse employment actions against the plaintiff solely because Plaintiff obeyed the law, performed his public duty in a proper fashion, and put his right and duty to perform his job in a lawful manner, over blind obedience and misplaced loyalty to his PSP leaders.

a.) Plaintiff was summarily transferred to Washington, Pennsylvania from Harrisburg, Pennsylvania in a hateful attempt to separate him from his children. Only the intervention of the Pennsylvania Courts saved plaintiff from an unlawful transfer and,

b.) plaintiff was made to suffer demeaning career injuring transfers and constructive demotions that have destroyed his reputation and effectiveness among colleagues, and totally destroyed his opportunities to advance in his chosen profession and,

c.) has been denied opportunities for overtime and to be reimbursed like those of equal rank and experience in the PSP and,

d.) has been unduly and unreasonably discriminated against in his attempts to obtain educational opportunities within the PSP and,

e.)was subjected to career destroying investigations without just cause.

14

f.) was subjected to an irrational, baseless, series of vituperative personal attacks on his character, and a series of attacks on his job performance, meant to destroy his reputation, career, self confidence, and motivation to perform his duties and,

g.) was denied a number of opportunities to improve his career through promotion and, or, transfer and,

h.) was refused considerations for promotional opportunities or requests for career enhancing transfers of assignments and,

i.) was discriminated against by defendants who created a pervasive atmosphere among PSP staff fostering retaliation, resentment, and officially sanctioned harassment of Darrell Ober through petty humiliations, acts and threats of personnel actions, and outright ostracism designed to destroy Obers' good will and effectiveness among the PSP workforce, and

j.) as a matter of PSP policy, the defendants effectuated numerous actions meant to intentionally injure plaintiff primarily through himself, Westcott, Coury, and some other of plaintiffs' superiors which have essentially decimated Captain Ober's career, his professional credentials, his opportunities and availability for promotion, and which have hampered the performance of his law enforcement duties to the detriment of the PSP and the public.

15

47.) The plaintiff has suffered innumerable insults, humiliations and embarrassments at the hands of PSP officers who were made to fear that they would suffer official retribution from their leaders if they treated plaintiff in an even handed, fair, way.

48.) Conclusive evidence of Evanko's unlawful misconduct is evidenced by a series of transfers, constructive demotions, and injurious personnel actions engendered by Evanko's abuse of lawful authority.

49.) Captain Ober was unlawfully removed from a prestigious assignment to the PSP Centennial Book Committee when Lt. Col. Coury instituted the unjustified, illegal and subsequently unfounded, investigation into Ober's personal activities. He was never informed that the investigation ended with an "unfounded" result, and he was never returned to the Committee in violation of his rights.

50.) On or about April 24, 1999, Captain Ober was assigned as project manager on the largest and most technical law enforcement project in PSP history (Incident Information Management System). He was promised personally by Commissioner Evanko that he would be returned to his position as Director of Internal Affairs, Bureau of Professional Responsibility upon completion of the project . Afterwards Evanko, in an irresponsible act of outlandish and extreme retribution summarily removed Ober from the assignment and returned him to the

16

position of Director of Internal Affairs for 5 days before transferring Ober to Troop

"B" Washington Pa away from his family. The Commissioner's unlawful action in

removing Ober, created a project liability, cost taxpayers countless dollars, and

caused unconscionable delay. All of this was to facilitate the personal vengeance of

Paul Evanko in violation of federal and state law, and his own governor's wishes.

51.) Captain Ober, as a Captain, was transferred into a position that has

traditionally and consistently called for a Lieutenant in the Pennsylvania State Police

Bureau of Liquor Enforcement. This was done to humiliate, embarrass and demean

plaintiff and to demonstrate to him that any chance to move forward in his career in

the PSP is essentially over, merely because, he believes in the rule of law.

52.) On or about January 16, 2001 to March 16, 2001 the defendants Syndi L.

Guido and Joanna Reynolds claim to have investigated the underlying fact situation

and complied a brief entitled "Defendants Motion to Dismiss all Claims"

(hereinafter "MTD") which was filed and served on March 16, 2001.

53.) Syndi L. Guido claims to have rewritten the original brief submitted to

her by Joanna Reynolds on March 9, 2001 and also to have conducted her "own

investigation," including a review of the "Historical" file for AR1-1.02.

54.) The MTD, on page 12 purports to advise the court that PSP AR 1-1.02

authorized the defendant Evanko to investigate Ober for an unauthorized breach of

17

his chain of command.

55.) That representation was false. AR 1-1-02 had just been changed on February 22, 2001 and was personally approved by the defendant Evanko according to file documents.

56.) The subject change, adding the key matter (subsection C) at issue in this case, that defendants expressly represented in their brief was a legal justification for Evanko and Campbell to act, was distributed only days (March 6, 2001 at the earliest) before defendants composed and filed their brief.

57.) The "Historical File" for change # 866, for AR 1-1.02 was not in compliance with PSP custom, practice, usages and regulations appertaining to the maintenance and content of "Historical" files to be kept for regulations and directives, in that the applicable file for the change to AR1-1.02  did not even contain documentation in conformance with AR 1-2.03 (B)(5).

58.) However, the file did contain a copy of the July 1997 version of AR 1-1.02 which was in effect and applicable to Obers conduct prior to when he filed his original complaint, and thus to the issue of whether Evanko and Campbell were justified in investigating Ober. Evanko's purported authority according to his MTD (subsection "C"), was clearly not a part of AR 1-1.02 at the applicable time.

18

59.) Additionally FR 1-1.17 (B) is misrepresented to the Court on page 12 of the MTD as "requiring members to promptly notify their supervisor when they receive any information indicating another member "might" have violated the law," emphasis added. The subject FR uses the words and phraseology "has violated any law, rule, regulation, or order" emphasis added. It does not use the word "might."

60.) These matters are not of minor importance and are key material issues in the current litigation.

61.) These misrepresentations to this court where intentional and constitute an abuse of legal process.

**WHEREFORE** the plaintiff Darrell G. Ober demands judgement of the defendants for the deprivation of his federally guaranteed rights and for the violation of his rights under Pennsylvania law more particularly as follows:

a.) Plaintiff demands judgement jointly and severally of the defendants Evanko, Reynolds, Guido, Campbell, Coury, Westcott, and Conley for the deprivation of his 1st Amendment rights to be free of unlawful injurious employment actions in retaliation for his proper exercise of protected speech and to punish him for filing his original complaint.

b.) Plaintiff demands judgement jointly and severally of the defendants Evanko, Reynolds, Guido, Campbell, Coury, Westcott, and Conley for the

deprivation of his federally guaranteed rights to substantive due process and of his interest in property pursuant to the due process clause of the 14th Amendment and,

c.) Plaintiff demands judgement of the defendants Evanko, Campbell, and Coury for the deprivation of his 4th Amendment rights to be free of unlawful seizures of his person subjecting him to unlawful custodial interrogations denying him other procedural safeguards and,

d.) Plaintiff demands judgement of the defendant Evanko under the Privileges and Immunities clause of the 14th Amendment for depriving him of his rights to pursue his chosen occupation free of arbitrary and capricious government molestation.

e.) Plaintiff demands judgement of all defendants for the deprivation of his right to be free of unlawful conspiracies to deprive him of his federally guaranteed rights under the 14th Amendment pursuant to 42 U.S.C. §1983 and,

f.) Plaintiff demands judgement of all defendants jointly and severally for the deprivation of his federally guaranteed rights to be free of emotional pain and mental distress imposed pursuant to the intentional effort engaged in by all defendants to deprive him of his federally guaranteed rights under 42 U.S.C. §1983 and,

g.) Plaintiff demands judgement of all defendants, jointly and severally for the violation of his rights under Pennsylvania law to be free of civil conspiracies and

20

the intentional infliction of mental distress as supplemental state claims and,

h.) Plaintiff demands judgement of the defendants jointly and severally for the denial of his rights pursuant to the equal protection of the laws clause of the 14th Amendment pursuant to 42 U.S.C. §1983 and,

i.) Plaintiff demands judgement of the defendant Evanko for falselight defamation as a supplemental state claim, all together with costs, fees, special damages in the amount of $25,000.00 for legal fees incurred in defeating the unlawful efforts by the defendant Evanko to illegally assign plaintiff to Washington County Pennsylvania, punitive damages and such other relief as the court may deem appropriate.

J.) plaintiff demands judgement of the defendants Reynolds and Guido for the deprivation of his right to be free of abuse of legal process as a federally guaranteed right.

Respectfully Submitted,

DON BAILEY
PA ID# 23786
4311 N. 6TH STREET
HARRISBURG, PA 17110
(717) 221-9500

21

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DARRELL G. OBER** | ) | **CIVIL ACTION LAW** |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **1:CV-01-0084** |
| **vs.** | ) | |
| | ) | **(JUDGE CALDWELL)** |
| **PAUL EVANKO, MARK** | ) | |
| **CAMPBELL, THOMAS COURY,** | ) | **JURY TRIAL DEMANDED** |
| **JOSEPH WESTCOTT,** | ) | |
| **HAWTHORNE CONLEY and** | ) | |
| **JOANNA REYNOLDS** | ) | |
| **Defendants** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this **2nd day of May 2001**, a true and correct copy of the foregoing

**Document** was served upon the following counsel of record by United States Mail, postage

prepaid:

**SYNDI L. GUIDO**
**DEPUTY GENERAL COUNSEL**
**OFFICE OF GENERAL COUNSEL**
333 Market Street, 17th Floor
Harrisburg, PA 17101
Attorney for Defendants')

BY: _____
Don Bailey ID# 23786
4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500





COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF EDUCATION
PENNSYLVANIA LAW ENFORCEMENT ACADEMY

P. O. Box 128
Scotland, PA 17254

## OFFICIAL TRANSCRIPT

Student __DARRELL G. OBER__          Social Security # __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__

Home Address __Main Street__          Date of Birth __11/16/57__

__Mahaffey, PA 15757__

Dates of Attendance __1/13/80 – 4/3/80__          Date of Graduation __4/3/80__

Rank in Class __2 / 20__

| | Course of Instruction | Hours | Grade |
|---|---|---|---|
| I. | Criminal Justice System | 44 | A |
| II. | Law | 94 | A |
| III. | Human Values and Problems | 77 | A |
| IV. | Patrol and Investigation Procedures | 138 | A |
| V. | Police Proficiency | 117 | A |
| VI. | American Red Cross First Aid | 20 | P |
| VII. | Physical Education | 50 | P |

Firearms:  PPC 282/300

Date __June 16, 1980__

Assistant Director



EXHIBIT
# 4

COMMONWEALTH OF PENNSYLVANIA
STD-502                    REV. 2/93

## DESK MEMORANDUM

SUBJECT

| TO (NAME & ADDRESS) | FROM (NAME & ADDRESS) |
|---|---|
| Deputy of Administration | Commissioner |

| DATE SENT | DATE NEEDED |
|---|---|
| September 14, 1998 | |

| PLEASE CALL: | APPROVAL | SEE ME |
|---|---|---|
| RETURNED YOUR CALL | AS REQUESTED | COMMENT |
| INFORMATION & FILE | PREPARE REPLY / REPORT | NOTE AND RETURN |
| NECESSARY ACTION | SIGNATURE | |

| RECEIVED BY | DATE | TIME |
|---|---|---|

| ROUTE | INITIAL | DATE | ROUTE | INITIAL | DATE |
|---|---|---|---|---|---|
| AO | | 9/15 | | | |
| Director, BPR | | | | | |
| Sgt. H | | | | | |

MESSAGE:

Tom:

Handle as you normally would.

Colonel Evanko

ATTACHMENT ___1___
PAGE __3__ OF __4__

*Assign to I.A.D Central — Anony Complant.

LT. Brown — See me. I would like you to handle this investigation.


EXHIBIT
#5

Dear Mr. Commissioner:

District Attorney Barrasse, Deputy Commissioner Westcott & Trooper Jorge have committed fraud. This conspiracy defrauded Lackawanna County and the federal government. Mark Jorge owned an airplane. He sold shares to Westcott and Barrasse. They used the airplane to provide transportation to sheriff deputies and witnesses in Lackawanna County. They billed Lackawanna County for the use of the airplane and for Jorge's time. They concealed the fact that Westcott and Barrasse were part owners in the plane. Barrasse and Westcott paid for their share of the plane by getting this extra work for Jorge and by getting payment for the flights. These plane trips were not put out for bid.

One case I can tell you about is the Harding case. The DA made arrangements to use his own plane that he owns with Jorge and Westcott to fly three sheriff deputies to pick up a witness and fly the witness in for a deposition. The witness is dead now. These three criminals billed Lackawanna County thousands of dollars for flying the witness and the sheriff deputies.

It is a common occurrence for Westcott and Barrasse to have Jorge fly them around the country for their private business and vacations. Jorge does this on State Police time. Westcott covers for him. This is fraud.

Jorge has not reported to you and did not get approval for this business he owns in secret with Westcott and Barrasse. This may not be fraud of itself but it is a violation of the regulations by Jorge and Westcott.

One of them lies and the others swear to it. I think Westcott is too close to you for you to investigate this properly. Maybe the FBI and the Scranton Times can make sure that the facts are found out by the public.

SP 101 (-93)

PENNSYLVANIA STATE POLICE

**E OF FORCE OR COMPLAINT**
**RECEPTION AND PROCESSING WORKSHEET**

| BPR CONTROL NUMBER | |
|---|---|
| 1. | IAD-10855 |

## 2. COMPLAINT INFORMATION

| NAME | FIRST ANONYMOUS | | M.I. | LAST ANONYMOUS | |
|---|---|---|---|---|---|
| **HOME ADDRESS** | STREET/P.O. BOX | | | | |
| | CITY | | STATE | ZIP CODE | HOME PHONE |
| **EMPLOYER** | NAME & ADDRESS | | | | WORK PHONE |

## 3. NON-COMPLAINT  USE OF FORCE REPORT

☐ SHOOTING INCIDENT    ☐ PHYSICAL FORCE    ☐ LEGAL INTERVENTION

## 4.  SUBJECT OF ALLEGATION/REPORT (List additonal subjects on back)

| NAME | FIRST Joseph | | M.I. J | LAST Westcott | |
|---|---|---|---|---|---|
| **LOCATION** | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT Deputy Commissioner of Operations | |
| SSN 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 | | DOE 02/27/1969 | ← TO BE COMPLETED IF KNOWN OR AVAILABLE | | |

## 5.  DETAILS OF ALLEGATION

ROUTE/STREET

| CITY/TWP/BORO | COUNTY Lackawanna | DATE | TIME | DAY |
|---|---|---|---|---|

| TYPE OF ALLEGATION (CHECK ONE) | ☐ PHYSICAL ABUSE ☐ VERBAL ABUSE ☒ CRIMINAL CONDUCT | ☐ IMPROPER CONDUCT ON DUTY ☐ IMPROPER CONDUCT OFF DUTY ☐ DISSATISFACTION WITH PERFORMANCE OF DUTY |
|---|---|---|
| | ☐ OTHER (Please explain) | |

**SYNOPSIS**

SEE ATTACHED CORRESPONDENCE.

In the correspondence to the Commissioner, the complainant alleges that Subjects are in business together.  The complainant also alleges that business is conducted on state time and it is covered up.  The complainant alleges that there is not approval from the Commonwealth to conduct this business  as a secondary employment.

**EXHIBIT**
**#6**

## 6.  RECEPTION DATA

| DATE RECEIVED 09/14/1998 | TIME RECEIVED 0900 | LOCATION RECEIVED | TROOP/BUREAU Commissioner | STATION/DIVISION |
|---|---|---|---|---|
| RECEIVED BY | NAME Sergeant Ronald L. Hillegass | | | SSN |

## 7.  FOR BUREAU USE

| INVESTIGATOR | NAME Lieutenant John R. Brown | | SSN 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 |
|---|---|---|---|
| CONTROL NO. ISSUED BY Sergeant Ronald L. Hillegass | DATE ASSIGNED 09/16/1998 | DATE DUE 10/26/1998 | SP 1-101-A ☐    LIMITED INVESTIGATION ☐ |

ATTACHMENT

PAGE __1__ OF __4__

## 8  ADDITIONAL SUBJECT OF ALLEGATION/REPORT

| NAME | FIRST Mark | | M.I. E | LAST George |
|---|---|---|---|---|
| LOCATION | TROOP/BUREAU R | STATION/DIVISION Gibson | | JOB ASSIGNMENT Corporal |

| SSN 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 | DOE 04/11/1988 | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
|---|---|---|

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |

| SSN | DOE | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
|---|---|---|

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |

| SSN | DOE | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
|---|---|---|

## SYNOPSIS
## (CONT.)

IAD-10855 (Continued).

ATTACHMENT ___1___

PAGE __2__ OF __4__

STD-50:. 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:               December 4, 1998

SUBJECT:            Administrative Investigation, IAD-11029

TO:                 Director, Bureau of Professional Responsibility

FROM:               Lieutenant John R. Brown
                    Commander, Central Section
                    Internal Affairs Division

1.  On December 4, 1998, at 1235 hours, this officer contacted Lieutenant Susan S. Lysek, Internal Affairs Division, Eastern Section, and discussed the circumstances surrounding the above subject investigation in regards to Trooper Sandra L. Coleman being carried as a subject in the incident. Lieutenant Lysek indicated there is no evidence or information available at the present time which would indicate Trooper Coleman violated any statutes or Department regulations.

2.  Due to the circumstances outlined above, Lieutenant Lysek shall direct Corporal Casey M. McCormick to no longer carry Trooper Coleman as a subject in her assigned investigation, effective immediately.

cc:    DIR., IAD
       BPR FILE

*FILE NOTE: It is my position that an investigation should ultimately determine if an individual is/is not a subject. I caution against premature determinations*

EXHIBIT
#7

SP 1-102 (8-93).

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**
**NOTIFICATION OF INQUIRY**

NOTE: INVESTIGATORS SHALL PREPARE ORIGINAL AND ONE COPY, RETAIN THE ORIGINAL WITH CASE FILE AND PROVIDE COPY TO THE SUBJECT OF INVESTIGATION. ONE OF THE THREE LISTED INVESTIGATION TYPES SHALL BE CHECKED.

BPR -

| Captain | Darrell G. Ober | Bureau of Professional Responsibility |
|---|---|---|
| RANK | NAME | TROOP/STATION |

**YOU ARE HEREBY NOTIFIED OF THE FOLLOWING:**

☐ A COMPLAINT INVESTIGATION IS BEING CONDUCTED INTO AN INCIDENT IN WHICH YOU ARE ALLEGED TO HAVE BEEN INVOLVED. THE DETAILS OF THE COMPLAINT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐ A NON-COMPLAINT INVESTIGATION IS BEING CONDUCTED IN ACCORDANCE WITH DEPARTMENT DIRECTIVES. THE DETAILS OF YOUR INVOLVEMENT ARE AS FOLLOWS: (EXPLANATION BELOW)

☒ AN ADMINISTRATIVE INVESTIGATION IS BEING CONDUCTED PURSUANT TO A REQUEST FROM THE ~~OFFICE OF CHIEF COUNSEL.~~ YOUR INVOLVEMENT HAS BEEN IDENTIFIED AS FOLLOWS: Commissioner

By order of the Pennsylvania State Police Commissioner, Paul J. Evanko, I have been assigned to make inquiry into your knowledge of the facts or circumstances surrounding the political corruption investigation that was conducted by the FBI in Western Pennsylvania.

**EXHIBIT #8**

SIGNATURE OF INVESTIGATOR

...CKNOWLEDGE RECEIPT OF THIS NOTIFICATION AND I AM AWARE OF MY RIGHT TO UNION REPRESENTATION.

| SIGNATURE | BADGE/I.D. NO. | SOCIAL SECURITY NO. | DATE | TIME |
|---|---|---|---|---|
| | #15 | 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 | 4/23/99 | 1220 |

SP 4-101 (5-91)

**PENNSYLVANIA STATE POLICE**
**USE OF FORCE OR COMPLAINT**
**RECEPTION AND PROCESSING WORKSHEET**

**BPR CONTROL NUMBER**
BPR-8275A

**2.**

| COMPLAINANT INFORMATION | | | |
|---|---|---|---|
| NAME | FIRST Ralph | M.I. G. | LAST McALLISTER |
| HOME ADDRESS | STREET/P.O. BOX 246 W. Main Street | | |
| | CITY Elizabethville | STATE Penna. | ZIP CODE 17023 | HOME PHONE # ( 717 ) 362-8109 |
| EMPLOYER | NAME & ADDRESS Pa. State Police, Comm. of Pa. | | WORK PHONE # ( 717 ) 362-8700 |

**3.**

| NON-COMPLAINT USE OF FORCE REPORT | ☐ SHOOTING INCIDENT | ☐ PHYSICAL FORCE | ☐ LEGAL INTERVENTION |
|---|---|---|---|

**4.**

| SUBJECT OF ALLEGATION/REPORT (List additional subjects on back) | | | |
|---|---|---|---|
| NAME | FIRST Darrell | M.I. G. | LAST OBER |
| LOCATION | TROOP/BUREAU of Professional Responsibility | STATION/DIVISION Systems and Process Review Division | ASSIGNMENT |
| SSN — — | DOE | | TO BE COMPLETED IF KNOWN OR AVAILABLE |

**5.**

| DETAILS OF ALLEGATION |
|---|

ROUTE/STREET
S.R. 209, RD 1, Box 510, Elizabethville, Pa. 17023

| CITY/TWP/BORO Washington Twp. | COUNTY Dauphin | DATE 03-17-94 | TIME 1445-1530 | DAY Thursday |
|---|---|---|---|---|

| TYPE OF ALLEGATION (CHECK ONE) | ☐ PHYSICAL ABUSE ☐ VERBAL ABUSE ☒ CRIMINAL CONDUCT | ☒ IMPROPER CONDUCT ON DUTY ☐ IMPROPER CONDUCT OFF DUTY ☐ DISSATISFACTION WITH PERFORMANCE OF DUTY |
|---|---|---|
| | ☐ OTHER (Please explain) | |

**SYNOPSIS**

On 03-17-94, a team from Systems and Process Review Division was at the Lykens Station to conduct systems and process reviews of all organizational components.

Lt. OBER at apox. 1445 hrs. ordered Tpr. Thomas SANTAI to give him the keys to his desk and then started to go through Tpr. SANTAI's desk. Lt. OBER found a plastic baggie allegely containing drug paraphernalia that wasn't marked evidence, and took same.

It. OBER then talked to Sgt. Lynn HESS, OIC-Lykens and advised that they were either going to break into this writer and Tpr. John MURPHY's desk or tape them shut with evidence tape, and Sgt. HESS then pried open both desks and the team went through both desks. Damage done to the drawer of the desk and lock. Also this officer's pistol was secured in a desk drawer and wasn't removed to a secure place by the team.

The team also removed the plastic baggie from the Lykens Station and returned same on 03-18-94.

Lt. OBER spoke to this officer on 03-18-94 and when asked who was suppose to pay for damage to the desk advised this officer to talk to Sgt. HESS.

| RECEPTION DATA | | | | |
|---|---|---|---|---|
| DATE RECEIVED 03/22/94 | TIME RECEIVED 1400 | LOCATION RECEIVED | TROOP/BUREAU H | — | STATION/DIVISION HARRISBURG |
| RECEIVED BY | NAME CAPT. KATHRYN E. DOUTT | | | SSN — — |

| BUREAU USE | | | | |
|---|---|---|---|---|
| INVESTIGATOR | NAME | | | |
| CONTROL NO. ISSUED BY | | DATE ASSIGNED | DATE DUE | LIMITED INVESTIGATION ☐ |

EXHIBIT #9

ATTACHMENT PAGE 2 OF 2

AR 1-25     83-200

| 8. |  |  |  |  |  |
|----|----|----|----|----|----|
| **ADDITIONAL SUBJECTS OF ALLEGATION/REPORT** | | | | | |

| **NAME** | FIRST Ronald | | M.I. L. | LAST HILLEGASS | |
| **LOCATION** | TROOP/BUREAU B.P.R. | DISTRICT/DIVISION Systems and Process Review Division | | ASSIGNMENT | |
| **SSN** | — — | DOE | | → TO BE COMPLETED IF KNOWN OR AVAILABLE | |

| **NAME** | FIRST Diane | | M.I. M. | LAST STACKHOUSE | |
| **LOCATION** | TROOP/BUREAU B.P.R. | DISTRICT/DIVISION Systems and Process Review Division | | ASSIGNMENT | |
| **SSN** | — — | DOE | | → TO BE COMPLETED IF KNOWN OR AVAILABLE | |

| **NAME** | FIRST William | | M.I. A. | LAST HORGAS | |
| **LOCATION** | TROOP/BUREAU B.P.R. | DISTRICT/DIVISION Systems and Process Review Division | | ASSIGNMENT | |
| **SSN** | — — | DOE | | → TO BE COMPLETED IF KNOWN OR AVAILABLE | |

**SYNOPSIS (CONT.)** Also missing is a returned F.B.I. Fingerprint Card on Merritt Graham STANSFIELD, Jr., who was processed on OCA No. H-32233 on 10-07-93, which was on this officer's file tray.

SP 1-101 (1-93)

**PENNSYLVANIA STATE POLICE**

**USE OF FORCE OR COMPLAINT**
**RECEPTION AND PROCESSING WORKSHEET**

BPR CONTROL NUMBER

IAD 1999-409

**2. COMPLAINT INFORMATION**

| NAME | FIRST LT. COL. THOMAS | M.I. K | LAST COURY |
|---|---|---|---|

| HOME ADDRESS | STREET/P.O. BOX DEPUTY Comm. ADMINISTRATION | | |
|---|---|---|---|
| | CITY | STATE | ZIP CODE | HOME PHONE # ( ) |

| EMPLOYER | NAME & ADDRESS | WORK PHONE # ( ) |
|---|---|---|

**3. NON-COMPLAINT USE OF FORCE REPORT** ☐ SHOOTING INCIDENT ☐ PHYSICAL FORCE  LEGAL INTERVENTION

**4. SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)**

| NAME | FIRST DARRELL | M.I. G. | LAST OBER |
|---|---|---|---|

| LOCATION | TROOP/BUREAU DHQ | STATION/DIVISION BUR. TECH. SERVICES | JOB ASSIGNMENT CAPTAIN |
|---|---|---|---|

| SSN 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 | DOE 7/20/81 | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
|---|---|---|

**5. DETAILS OF ALLEGATION**

ROUTE/STREET

CITY/TWP/BORO   COUNTY   DATE   TIME   DAY

| TYPE OF ALLEGATION (CHECK ONE) | ☐ PHYSICAL ABUSE ☐ VERBAL ABUSE ☐ CRIMINAL CONDUCT | ☐ IMPROPER CONDUCT ON DUTY ☒ IMPROPER CONDUCT OFF DUTY ☐ DISSATISFACTION WITH PERFORMANCE ON DUTY |
|---|---|---|
| | ☐ OTHER (Please explain) | |

**EXHIBIT #10**

SYNOPSIS    COMP. RECEIVED CORRESPONDENCE
FROM PHILIP M. CENTI AND A LETTER FROM
MRS. WILLIS J. HAYMAN THE WIDOWER OF
WILLIAM HAYMAN, A DECEASED RETIRED
TROOPER FROM THE RODEO DETAIL. INFORMATION
CONTAINED THEREIN IS THAT CAPTAIN
OBER CONTACTED AND MET WITH HER
AFTER HER HUSBAND'S DEATH AND OBTAINED
RODEO BOOKS AND PICTURES. THERE IS
ALSO MENTION THAT CAPTAIN OBER IS NOT

**6. RECEPTION DATA**

| DATE RECEIVED 05/27/99 | TIME RECEIVED 1235 | LOCATION RECEIVED | TROOP/BUREAU Q-BPR | STATION/DIVISION |
|---|---|---|---|---|
| RECEIVED BY | NAME LT. JOHN R. BROWN | | | SSN - - |

**7. FOR BUREAU USE**

| INVESTIGATOR | NAME CPL. MRGICH, IAD CENTRAL | SSN - - |
|---|---|---|

ENCLOSURE
PAGE _____ OF _____

| CONTROL NO. ISSUED BY SGT. L.S. CHRISTIE | DATE ASSIGNED 5/27/99 | DATE DUE 7/6/99 | SP 1-101A | LIMITED INVESTIGATION ☐ |
|---|---|---|---|---|

8.   ADDITIONAL SUBJECTS OF ALLEGATION/REPORT

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |
| SSN | | DOE | ← TO BE COMPLETED IF KNOWN OR AVAILABLE | |

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |
| SSN | | DOE | ← TO BE COMPLETED IF KNOWN OR AVAILABLE | |

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |
| SSN | | DOE | ← TO BE COMPLETED IF KNOWN OR AVAILABLE | |

**SYNOPSIS (CONT.)**

A REPRESENTATIVE OF THE RR MUSEUM PROJECT.

SEE ATTACHED CORRESPONDENCE.

N 3

Dear Phil Conti -

I'll have to explain for I forgot about in 1995, after Bill died I received a letter & a visit from Darrell Ober & I gave him some things of rodeo books & a picture. You can check with him for I am sorry to have forgot all about it. I had a stroke in '91 & my right side of my head was not too smart at that time.

I think that the pictures in the envelope will help.

I hope you can stop some time & we can meet - Remember I'm 89

Probably maybe we met in the several time we can to Retiree meetings.

It has been very nice talking with you. I have enjoyed reading the Retiree Scops you sent.

ENCLOSURE ___2___

PAGE ___1___ OF ___1___

**Philip M. Conti**
**1081 Acri Drive**
**Harrisburg, Pennsylvania 17111**
**717-564-8088**

May 22, 1999

Dear Tom:

Your attention is invited to the attached exchange of correspondence with Marian Hayman, the widow of Willis J. Hayman, who was one of the most colorful entertainers in our rodeo history.   He was an outstanding horseman, and was featured playing his violin while standing on his motorcycle and circling the field.

The other incident was one involving a Stitt, who was and may still be working with Marc Infantino on the pictorial history book.   He approached a coal region family, and was given artifacts which we will never see.   Unfortunately, I cannot come across my notes.   My contacts with the family were by phone, not written.

In my last two columns, I have devoted space to this problem of dealing with private collectors.   Since I have taken time to do that, I'm sure the message will get across.   So, perhaps it might be best to set this matter aside and see what happens.   Should there be a repeat of this nature, I will contact you immediately.   Let's hope that does not happen.

It is indeed my pleasure to be working with you on this PSP-HEMC project.   Let's hope that we will by the year 2005 have something we can truly be proud of.

Warmest regards,

*Phil*

Philip M. Conti
1081 Acri Drive
Harrisburg, Pennsylvania 17111
717-564-8088

July 9, 1999

Dear Bill:

Today I received another shipment of artifacts from the family of James Brooks.  In the accompany correspondence I was informed that Jim, who died last December at the age of 95, had been solicited by Captain Darryl Ober to whom Jim gave some uniform items.   These items were not specifically described.

This is another incident in which Ober has approached our aged retirees to solicit artifacts.  In each case, he takes pain to identify himself as a State Police captain, showing them his business card indicating his rank and post.   To date, I have not been able to prove that he has actually misrepresented himself as an official of PSP-HEMC in seeking items for the museum.   But, he is coming close to crossing the line.   He is using his rank and post with the Department to give the impression at least that he is somehow connected with our museum effort.   If we cannot prove him doing something criminally wrong, I believe he is doing something for which he could be disciplined by the Department.

You, Jim Hazen and I have spoken to him at one time or another about his aggressive actions in obtaining artifacts from our retired personnel and their families.   Apparently he chooses to set aside these admonishments .

I understand that he now comes under the command of Lt. Colonel Hickes.  I would suggest that you get in touch with Hickes, and let him know that we are not pleased with Ober's competition, especially the method he pursues.

Warmest regards,

*Phil*

ENCLOSURE ___4___

PAGE ___1___ OF ___1___

STD-501, 9-86

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**

DATE:        December 23, 1999

SUBJECT:     Supervisory Inquiry IAD# 1999-409

TO:          Director, Bureau of Professional Responsibility

FROM:        Lt. Colonel Thomas K. Coury
             Deputy Commissioner of Administration

ENCLOSURES: (1)    Supervisory Inquiry, IAD# 1999-409, prepared by Corporal
                   Robert D. Mrgich, Bureau of Professional Responsibility, dated
                   August 23, 1999, with attachments.

            (2)    Notification of result of investigation directed to Director, Bureau
                   of Technology Services, Attn:  Captain Darrell G. Ober, in
                   regards to the above inquiry.


1.    After careful review of Enclosure (1), I have concluded that the
      allegation is unfounded.    No additional inquiry or formal
      investigation is warranted in this case.

2.    It was alleged that Captain Ober had used his position of being
      a member of the Centennial Book Committee to obtain
      Pennsyvlania State Police historical items for his personal use.
      However, examination of the facts and circumstances of this
      investigation indicate that this allegation is not true.

3.    In 1995 Captain Ober corresponded with two Department
      retirees or their caregivers.  He later received historical items
      from these individuals.    Written correspondence to the
      individuals as contained in Enclosure (1) demonstrate that at no
      time did Captain Ober identify himself as a member of the
      museum project or of the Centennial Book Committee.
      Additionally, Captain Ober obtained the historical items in 1995,
      and he did not become a member of the Centennial Book
      Committee until August 1996.

4.    Enclosure (2) was sent to Captain Ober advising him of my
      determination in this case.  Unfortunately, the complainant in
      this case recently past away and no notification of the results of
      the investigation can be made.



EXHIBIT
# 11

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:          March 23, 2000

SUBJECT:       Training Opportunity –
               Alcohol Policy XII Conference – June 11-14, 2000

TO:            Section Commanders

FROM:          Major Francis E. Koscelnak
               Director, Bureau of Liquor Control Enforcement

REFERENCE:     (a)   1998-2000 Provisions from Boards of Arbitration Awards and Collective
                     Bargaining Agreements Between Commonwealth of Pennsylvania and the
                     Pennsylvania State Troopers Association, effective July 1, 1998 to June 30,
                     2000.

ENCLOSURE:     (1)   Registration Packet for National Crime Prevention Council, Alcohol Policy
                     XII Conference Alcohol and Crime Research and Practice for Prevention.

               1.    In accordance with Article 37, Section 9 of Reference (a), a training
opportunity is available to attend the National Crime Prevention Council, Alcohol Policy XII Conference,
Alcohol and Crime Research and Practice for Prevention, to be held on June 11-14, 2000 in Washington,
D.C.  Enclosure (1) contains details on the contents of this conference.

               2.    One (1) Bureau representative will attend.  Interested Section Commanders
shall forward correspondence to this office, to be received no later than the close of business April 17,
2000.

               3.    Selection of the attendee will be in accordance with the provisions of
Reference (a).

FEK/mp

cc:  Capt. Campbell
     Capt. McDonald
     A. Belmont
     File
     B. Deimler

EXHIBIT
#12

ATTACHMENT _____ 100
PAGE _____ OF _____

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

TE:                April 18, 2000

SUBJECT:           Alcohol Policy XII Conference -
                   June 11-14, 2000

TO:                Central Section Commander

FROM:              Major Francis E. Koscelnak
                   Director, Bureau of Liquor Control Enforcement

REFERENCES:    (a)    Memorandum dated March 23, 2000 from Director, Bureau of Liquor
                      Control Enforcement relative to Subject.

               (b)    Your memorandum dated March 28, 2000.


         1.    In accordance with References (a) and (b), you have been approved to
end the Subject conference.  You shall also select one (1) Enforcement Officer 3 from your section
to accompany you to the conference.

         2.    The name of the affected Enforcement Officer 3 shall be provided to this
office no later than the close of business April 21, 2000 so that the appropriate arrangements can be
made.


FEK/jla

cc:  Capt. Campbell
     Capt. McDonald
     A. Belmont
     B. Deimler
     File

 

# Registration Form

Forms must be postmarked no later than April 30 for early bird fees. Increased fees until May 15; after May 15, all registrations must occur onsite.

**PARTICIPANT INFORMATION**
This section must be completed for proper registration. Check the box that applies.

**'E AND ADDRESS INFORMATION**

*Print carefully. Your badge will be printed with the information below. To save time, attach your business card if all information is included.*

| O B E R | | | | | | D A R R E L L | | | | G | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
LAST NAME | | FIRST NAME | | INITIAL | PREFIX

D A R R E L L  O B E R     C A P T A I N
NAME TO BE PLACED ON BADGE    PROFESSIONAL TITLE

P E N N S Y L V A N I A  S T A T E  P O L I C E
COMPANY/AGENCY

3 6 5 5  V A R T A N  W a y
ADDRESS

H A R R I S B U R G    P A  1 7 1 1 0
CITY    STATE    ZIP/POSTAL CODE

U S A
COUNTRY    E-MAIL ADDRESS

7 1 7 - 5 4 0 7 4 4 3    7 1 7 - 5 4 1 7 8 6 1
DAYTIME TELEPHONE    FAX

☐ I am a Chaperone.

☐ Disability accommodation required. List your needs. _____

_____

**Professional Affiliation**
- ☐ Private sector
- ☐ Community group
- ☐ Criminal justice
- ☐ Education
- ☐ Elected official
- ☐ Faith community
- ☐ Law enforcement
- ☐ Military
- ☐ Public health
- ☐ Parks/Recreation
- ☐ Researcher/Evaluator
- ☐ Social services
- ☐ Youth/Youth service group
- ☐ Volunteer
- ☐ Nonprofit
- ☐ Other (specify)

**Job Jurisdiction**
- ☐ National
- ☐ Federal
- ☐ State/Province
- ☐ County
- ☐ City/town
- ☐ Sovereign nation
- ☐ International

**'. all that apply. Meals must be reserved; this information assists in conference planning and meal preparation. I plan to attend:**

☑ Sunday Reception    ☑ Monday Continental Breakfast    ☑ Monday Lunch
☑ Tuesday Continental Breakfast    ☑ Tuesday Sit-Down Lunch    ☑ Wednesday Continental Breakfast

**Check for special meals:**    ☐ Vegetarian    ☐ Other_____

## SPECIAL ACTIVITIES

I plan to attend: ☐ Emerging Issues Roundtables, Sunday, June 11  ☐ Simulated Compliance Check, Monday, June 12

Your assistance in completing the information below will help us to market our program. We sincerely appreciate your time and effort spent in answering these questions.

- ☐ Male    ☐ Female

- ☐ Age 19 and under
- ☐ Age 20-25
- ☐ Age 26-40
- ☐ Age 41-56
- ☐ Age 57 and up
- ☐ African American
- ☐ Asian/Pacific
- ☐ Caucasian
- ☐ Hispanic
- ☐ Multi-racial
- ☐ Native American

| | Early bird (postmarked by 4/30) | Regular fees (postmarked between 5/1 and 5/15) | Subtotal |
|---|---|---|---|
| Individual Registration | $250 | $275 | |
| Adult Group Registration (*three or more*) | $225 per person | $250 per person | |
| Youth (*student ID required*) | $150 | $175 | |
| Youth Group Registration (*three or more; student IDs required*) | $150 per person | $150 per person | |
| | | **Total** | |

## Method of Payment

- ☐ Check # _____ (payable to NCPC-AP12)    ☐ Government PO # _____ (PO must be attached)
- ☐ Visa    ☐ MasterCard    ☐ American Express    ☐ Diners Club    ☐ Discover

_____
CARD NUMBER    EXP. DATE

_____
CARD HOLDER'S NAME    SIGNATURE

**Mail payments to: NCPC–AP12** ■ PO Box 631824, ■ Baltimore, MD 21263-1824
National Crime Prevention Council's Federal Tax ID number is 133129302.

# Registration Form

Forms must be postmarked no later than April 30 for early bird fees. Increased fees until May 15; after May 15, all registrations must occur onsite.

## E AND ADDRESS INFORMATION

*Print carefully. Your badge will be printed with the information below. To save time, attach your business card if all information is included.*

| M | E | R | L | I | N | A | | | | | T | O | D | D | | | | | | M | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

LAST NAME                          FIRST NAME                          INITIAL    PREFIX

| T | O | D | D | | M | E | R | L | I | N | A | | E | N | F | O | R | C | E | M | E | N | T | | S | U | P | E | R | V | I | S | O | R |

NAME TO BE PLACED ON BADGE                          PROFESSIONAL TITLE

| P | A | | S | T | A | T | E | | P | O | L | I | C | E | | L | I | Q | U | O | R | | E | N | F | O | R | C | E | M | E | N | T |

COMPANY/AGENCY

| 8 | 6 | 5 | 5 | | N | A | R | T | A | N | | W | A | Y |

ADDRESS

| H | A | R | R | I | S | B | U | R | G | | | | | | P | A | | | 1 | 7 | 1 | 1 | 0 |

CITY                          STATE          ZIP/POSTAL CODE

| | | | | | | | | | | | | | |

COUNTRY                          E-MAIL ADDRESS

| 7 | 1 | 7 | - | 5 | 4 | 1 | - | 7 | 9 | 6 | 1 | | | 7 | 1 | 7 | - | 5 | 4 | 1 | - | 7 | 8 | 6 | 1 |

DAYTIME TELEPHONE                          FAX

☐ I am a Chaperone.

☐ Disability accommodation required. List your needs. _____

_____

_____

... all that apply. Meals must be reserved; this information assists in conference planning and meal preparation. I plan to attend:

☒ Sunday Reception            ☒ Monday Continental Breakfast     ☒ Monday Lunch
☒ Tuesday Continental Breakfast  ☒ Tuesday Sit-Down Lunch        ☒ Wednesday Continental Breakfast

Check for special meals:  ☐ Vegetarian   ☐ Other _____

## SPECIAL ACTIVITIES

I plan to attend: ☐ Emerging Issues Roundtables, Sunday, June 11  ☐ Simulated Compliance Check, Monday, June 12

| | Early bird (postmarked by 4/30) | Regular fees (postmarked between 5/1 and 5/15) | Subtotal |
|---|---|---|---|
| Individual Registration | $250 | $275 | |
| Adult Group Registration (*three or more*) | $225 per person | $250 per person | |
| Youth (*student ID required*) | $150 | $175 | |
| Youth Group Registration (*three or more; student IDs required*) | $150 per person | $150 per person | |
| | | **Total** | |

## Method of Payment

☐ Check # _____ (payable to NCPC-AP12)   ☐ Government PO # _____ (PO must be attached)
☐ Visa   ☐ MasterCard   ☐ American Express   ☐ Diners Club   ☐ Discover

CARD NUMBER _____          EXP. DATE _____

CARD HOLDER'S NAME _____     SIGNATURE _____

**Mail payments to: NCPC-AP12 ■ PO Box 631824, ■ Baltimore, MD 21263-1824**
National Crime Prevention Council's Federal Tax ID number is 122120292

---

### PARTICIPANT INFORMATION

This section must be completed for proper registration. Check the box that applies.

**Professional Affiliation**

☐ Private sector
☐ Community group
☐ Criminal justice
☐ Education
☐ Elected official
☐ Faith community
☒ Law enforcement
☐ Military
☐ Public health
☐ Parks/Recreation
☐ Researcher/Evaluator
☐ Social services
☐ Youth/Youth service group
☐ Volunteer
☐ Nonprofit
☐ Other (specify)

---

### Job Jurisdiction

☐ National
☐ Federal
☒ State/Province
☐ County
☐ City/town
☐ Sovereign nation
☐ International

Your assistance in completing the information below will help us to market our program. We sincerely appreciate your time and effort spent in answering these questions.

☒ Male      ☐ Female

☐ Age 19 and under
☐ Age 20-25
☒ Age 26-40
☒ Age 41-56
☐ Age 57 and up
☐ African American
☐ Asian/Pacific
☐ Caucasian
☐ Hispanic
☐ Multi-racial
☐ Native American

# Registration Form

Forms must be postmarked no later than April 30 for early bird fees. Increased fees until May 15; after May 15, all registrations must occur onsite.

## AND ADDRESS INFORMATION

*Print carefully. Your badge will be printed with the information below. To save time, attach your business card if all information is included.*

LAST NAME: Sweeting    FIRST NAME: Pearl    INITIAL: A    PREFIX: Ms

NAME TO BE PLACED ON BADGE: Pearl A Sweeting    PROFESSIONAL TITLE: Sergeant

COMPANY/AGENCY: Penna State Police Bur of Liq Contents

ADDRESS: 3655 Vartan Way

CITY: Harrisburg    STATE: PA    ZIP/POSTAL CODE: 17110

COUNTRY: United States    E-MAIL ADDRESS: psweeting@psp.state.pa.us

DAYTIME TELEPHONE: 717-540-7425    FAX: 717-540-7452

☐ I am a Chaperone.

☑ Disability accommodation required. List your needs. NONE

**all that apply. Meals must be reserved; this information assists in conference planning and meal preparation. I plan to attend:**

- ☑ Sunday Reception
- ☐ Monday Continental Breakfast
- ☑ Monday Lunch
- ☑ Tuesday Continental Breakfast
- ☑ Tuesday Sit-Down Lunch
- ☑ Wednesday Continental Breakfast

**Check for special meals:** ☐ Vegetarian    ☐ Other_____

## SPECIAL ACTIVITIES

**I plan to attend:** ☐ Emerging Issues Roundtables, Sunday, June 11    ☐ Simulated Compliance Check, Monday, June 12

| | Early bird (postmarked by 4/30) | Regular fees (postmarked between 5/1 and 5/15) | Subtotal |
|---|---|---|---|
| Individual Registration | $250 | $275 | |
| Adult Group Registration (*three or more*) | $225 per person | $250 per person | |
| Youth (*student ID required*) | $150 | $175 | |
| Youth Group Registration (*three or more; student IDs required*) | $150 per person | $150 per person | |
| | | **Total** | |

## Method of Payment

- ☐ Check #_____ (payable to NCPC-AP12)
- ☐ Government PO #_____ (PO must be attached)
- ☐ Visa
- ☐ MasterCard
- ☐ American Express
- ☐ Diners Club
- ☐ Discover

RD NUMBER _____    EXP. DATE _____

CARD HOLDER'S NAME _____    SIGNATURE _____

Mail payments to: **NCPC-AP12** ■ PO Box 631824, ■ Baltimore, MD 21263-1824
National Crime Prevention Council's Federal Tax ID number is 133129302.

## PARTICIPANT INFORMATION

This section must be completed for proper registration. Check the box that applies.

### Professional Affiliation

- ☐ Private sector
- ☐ Community group
- ☐ Criminal justice
- ☐ Education
- ☐ Elected official
- ☐ Faith community
- ☑ Law enforcement
- ☐ Military
- ☐ Public health
- ☐ Parks/Recreation
- ☐ Researcher/Evaluator
- ☐ Social services
- ☐ Youth/Youth service group
- ☐ Volunteer
- ☐ Nonprofit
- ☐ Other (specify)

### Job Jurisdiction

- ☐ National
- ☐ Federal
- ☑ State/Province
- ☐ County
- ☐ City/town
- ☐ Sovereign nation
- ☐ International

Your assistance in completing the information below will help us to market our program. We sincerely appreciate your time and effort spent in answering these questions.

- ☐ Male
- ☑ Female

- ☐ Age 19 and under
- ☐ Age 20-25
- ☐ Age 26-40
- ☑ Age 41-56
- ☐ Age 57 and up
- ☑ African American
- ☐ Asian/Pacific
- ☐ Caucasian
- ☐ Hispanic
- ☐ Multi-racial
- ☐ Native American

# Registration Form

Forms must be postmarked no later than April 30 for early bird fees. Increased fees until May 15; after May 15, all registrations must occur onsite.

## NAME AND ADDRESS INFORMATION

*Print carefully. Your badge will be printed with the information below. To save time, attach your business card if all information is included.*

LAST NAME: KARBOWSKI
FIRST NAME: DENISE
INITIAL: A
PREFIX:

NAME TO BE PLACED ON BADGE: Denise Karbowski
PROFESSIONAL TITLE: CORPORAL

COMPANY/AGENCY: PENNSYLVANIA STATE POLICE

ADDRESS: 3655 VARTAU WAY

CITY: HARRISBURG
STATE: PA
ZIP/POSTAL CODE: 17110

COUNTRY: USA
E-MAIL ADDRESS: dkarbowsk@psp.state.pa.us

DAYTIME TELEPHONE: 717-540-7428
FAX: 717-540-7459

☐ I am a Chaperone.

☒ Disability accommodation required. List your needs. _____

### PARTICIPANT INFORMATION

This section must be completed for proper registration. Check the box that applies.

**Professional Affiliation**

☐ Private sector
☐ Community group
☐ Criminal justice
☐ Education
☐ Elected official
☐ Faith community
☒ Law enforcement
☐ Military
☐ Public health
☐ Parks/Recreation
☐ Researcher/Evaluator
☐ Social services
☐ Youth/Youth service group
☐ Volunteer
☐ Nonprofit
☐ Other (specify)

**Job Jurisdiction**

☐ National
☐ Federal
☒ State/Province
☐ County
☐ City/town
☐ Sovereign nation
☐ International

Your assistance in completing the information below will help us to market our program. We sincerely appreciate your time and effort spent in answering these questions.

☐ Male          ☒ Female

☐ Age 19 and under
☐ Age 20-25
☐ Age 26-40
☒ Age 41-56
☐ Age 57 and up
☐ African American
☐ Asian/Pacific
☐ Caucasian
☐ Hispanic
☐ Multi-racial
☐ Native American

---

Check all that apply. Meals must be reserved; this information assists in conference planning and meal preparation. I plan to attend:

☒ Sunday Reception          ☒ Monday Continental Breakfast          ☒ Monday Lunch
☒ Tuesday Continental Breakfast          ☐ Tuesday Sit-Down Lunch          ☒ Wednesday Continental Breakfast

Check for special meals:          ☐ Vegetarian          ☐ Other _____

## SPECIAL ACTIVITIES

I plan to attend: ☒ Emerging Issues Roundtables, Sunday, June 11   ☒ Simulated Compliance Check, Monday, June 12

| | Early bird (postmarked by 4/30) | Regular fees (postmarked between 5/1 and 5/15) | Subtotal |
|---|---|---|---|
| Individual Registration | $250 | $275 | |
| Adult Group Registration (*three or more*) | $225 per person | $250 per person | |
| Youth (*student ID required*) | $150 | $175 | |
| Youth Group Registration (*three or more; student IDs required*) | $150 per person | $150 per person | |
| | | **Total** | |

## Method of Payment

☐ Check # _____ (payable to NCPC-AP12)          ☐ Government PO # _____ (PO must be attached)
☐ Visa          ☐ MasterCard          ☐ American Express          ☐ Diners Club          ☐ Discover

CREDIT CARD NUMBER: _____
EXP. DATE: _____

CARD HOLDER'S NAME: _____
SIGNATURE: _____

Mail payments to: NCPC-AP12 ■ PO Box 631824, ■ Baltimore, MD 21263-1824
National Crime Prevention Council's Federal Tax ID number is 133129302

STD-501, 9-8J

COMMONWEALTH OF PENNSYLVANIA

.TE: ·         April 19, 2000

SUBJECT:       Request for Approval of Out-of-State Travel
               National Alcohol Education Symposium
               June 11 – 14, 2000

TO:            Deputy Commissioner of Operations

FROM:          Major Francis E. Koscelnak
               Director
               Bureau of Liquor Control Enforcement

REFERENCE:     (a)  FR 5-1, Section 1.05, Travel and Subsistence, Request for
                    Approval of Out-of-State Travel

ENCLOSURE:     (1)  Training Agenda from subject Conference

               (2)  Approval of Out-of-State Travel Form

               (3)  Out-Service Training Authorization Form

               (4)  Approval of Out-of-State Travel Form

               (5)  Out-Service Training Authorization Form

        1.   Enclosures (1) through (5), are forwarded for your
information and approval.

        2.   The method of transportation will be state automobile and
the mileage one way is 128 miles.  Below is a breakdown of estimated
costs:

| | |
|---|---:|
| Registration | $ 225.00 |
| Transportation | 0.00 |
| Lodging three nights | 447.00 |
| Meals | 216.00 |
| | $ 888.00 (per person) |

FEK/bld
cc:  F I L E

COMMONWEALTH OF PENNSYLVANIA
STD-279     REV. 12-95

**OUT-SERVICE TRAINING AUTHORIZATION**

ICS
□ 310
□ 320    OT  818852

SHOW THIS NUMBER
ON INVOICE

DATE PREPARED
April 19, 2000

**EMPLOYE OR TRAINING SOURCE NAME AND ADDRESS)**
ICPC-AP12 Conference
P.O. Box 631824
Baltimore, MD 21263-1824

PAYEE FED. I.D./SOC. SEC. NO.

**BILL TO - AGENCY (PROVIDE ORIGINAL AND TWO COPIES OF INVOICE)**

DEPARTMENT    PA State Police
BUREAU/INSTITUTION   Bureau of Liquor
ADDRESS    Control Enforcement
3655 Vartan Way
Harrisburg, PA 17110

EFFECTIVE DATE
June 11, 2000

TERMINATION DATE
June 14, 2000

TRAINING SITE (CITY/STATE)
Washington, DC

**EMPLOYE NAME, ADDRESS AND TELEPHONE NO.**
See Course Title & Description

**TRAINING SOURCE NAME, ADDRESS AND TELEPHONE NO.**
Renaissance Washington DC Hotel
999 9th Street, NW
Washington, DC 20001
(202) 898-9000

PAYMENT NOT TO EXCEED
$225.00

SEE INSTRUCTIONS
ON REVERSE SIDE

| CLASSIFICATION | CREDIT OFFERED | | CLASS MEETS | M | T | W | T | F | S | S | LEAVE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| See Course Title and Description | -0- | | BEGINS | | | | | | | 0800 | TYPE | HOURS | DAYS |
| | CREDIT HOURS PAID IN PREVIOUS 12 MOS. | | ENDS | | | 1800 | | | | | Work Assignment No Leave Charged | | |

COURSE TITLE AND DESCRIPTION (OUTLINE TRAINING OBJECTIVES AND RELEVANCE OF TRAINING TO EMPLOYE'S PRESENT DUTIES.)

Pearl A. Sweeting, Sergeant, Executive Officer, Bureau of Liquor Control Enforcement
Denise A. Karbowski, Corporal, Supervisor, Special Investigations Section, Bureau of Liquor
Control Enforcement

Course Title and Description – Alcohol Policy XII Conference "Alcohol and Crime Research and
Practice for Prevention" – The following topics will be discussed: Alcohol and Crime Research &
Practice, Environmental Approaches to Reducing Drinking-Related Violence and Other Crimes,
Reducing DUI-Keeping Us on Track, Keynote Address on Alcohol and Crime, and other various
related sessions.
1. Method of Transportation and Mileage one way – State Car, 128 miles
2. Estimated Costs:
   a. Transportation – $0.00
   b. Lodging – $447.00
   c. Meals – $216.00
   d. Registration – $225.00
   e. Miscellaneous – $0.00
   f. Total: $888.00 per person    $1,776.00 (two people) Note: These expenses associated with
this training are charged to the Enforcing Underage Drinking Law Program Grant-Grant Code LC.
Training is too enhance our performance with the Federal Grant process.

I HEREBY CERTIFY THAT I WILL ATTEND THE FULL PROGRAM OUTLINED ABOVE.

EMPLOYE'S SIGNATURE     DATE

SUPERVISOR'S SIGNATURE     DATE
X  Capt. Gerald N McDevit

ESTIMATED COSTS FOR AGENCY INFORMATION

SUMMARY OF TRAINING COSTS

| LODGING AND SUBSISTENCE EXPENSE | TRANSPORTATION EXPENSES | TOTAL EST. TRAVEL EXPENSES | TRAINING COSTS | TRAINING COSTS TO BE PAID BY EMPLOYER |
|---|---|---|---|---|
| $ | $ | $ | $ | $ |

ACCOUNT CODE

| FUND | DEPT | APP | YR | LDG | ORG | COST FUNCTION | OBJ | AMOUNT OF ENCUMBRANCE | | CODED |
|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 020 | 899 | 99 | 8 | 5400 | 00899 | 335 | 1,326 00 | | |
| 001 | 020 | 899 | 99 | | 5400 | 00899 | 335 | 450 00 | | PRE-AUDIT |
| | | | | | | | | | | POSTED |

AGENCY APPROVAL     DATE

COMPTROLLER APPROVAL     DATE

FL 1591187 6/98'  146097

COMMONWEALTH OF PENNSYLVANIA
STD-274            (REV. 4-96)

# REQUEST FOR APPROVAL OF OUT OF STATE TRAVEL
## (Complete when required by Management Directive 230.10.)
### THIS FORM MUST BE APPROVED PRIOR TO TRAVEL.

DEPARTMENT
PA STATE POLICE, BUREAU OF LIQUOR CONTROL
ENFORCEMENT

DATE
APRIL 19, 2000

APPROVAL IS REQUESTED OF THE OFFICIAL EXPENSES TO BE INCURRED BY

| NAME | POSITION TITLE | ORGANIZATIONAL UNIT / BUREAU |
|------|----------------|------------------------------|
| PEARL A. SWEETING | SERGEANT - EXECUTIVE OFFICER | LIQUOR CONTROL ENFORCEMENT |
| DENISE A. KARBOWSKI | CORPORAL - SUPERVISOR SPECIAL INVESTIGATIONS SECTION | LIQUOR CONTROL ENFORCEMENT |

DESTINATION (CITY AND STATE)

FROM  HARRISBURG, PA  TO  WASHINGTON, DC

ACTUAL DATES OF TRAVEL

FROM  JUNE 11, 2000  TO  JUNE 14, 2000

PURPOSE (EXPLAIN IN DETAIL)

ATTEND THE ALCOHOL POLICY XII CONFERENCE "ALCOHOL & CRIME RESEARCH AND PRACTICE FOR
PREVENTION"

METHOD OF TRANSPORTATION

- [ ] PLANE (TOURIST CLASS UNLESS AN EXCEPTION IS APPROVED
  IN ACCORDANCE WITH THE TRAVEL REGULATIONS)
  - [ ] CONVENTIONAL TICKET
  - [ ] SUPERSAVER TICKET (STD-201 MUST BE APPROVED.)
- [ ] TRAIN
- [ ] RENTAL CAR
- [X] STATE CAR
- [ ] PERSONAL CAR
- [ ] OTHER (SPECIFY)

ESTIMATED COST

| | |
|---|---|
| TRANSPORTATION | _____ |
| LODGING | $447.00 |
| MEALS | $216.00 |
| CONFERENCE REGISTRATION | $225.00 |
| MISCELLANEOUS | _____ |
| OTHER | _____ |
| TOTAL | $ 888.00 per person |

APPROVED  __

_____
AGENCY HEAD

- [ ] APPROVAL BY THE OFFICE OF ADMINISTRATION ATTACHED.

APPROVAL OF THIS FORM DOES NOT AUTHORIZE SUBSIS-
TENCE OR LODGING RATES WHICH ARE HIGHER THAN THOSE
AUTHORIZED IN M. D. 230.10.  ACTUAL EXPENSES INCURRED,
UP TO THE ALLOWABLE MAXIMUMS, WILL BE REIMBURSED IF
PROPERLY PRESENTED AND JUSTIFIED ON FORM STD-191.

| ACCOUNT CODE | | | | | | |
|---|---|---|---|---|---|---|
| FUND | DEPT | APP | YEAR | LDG | ORG | COST FUNCTION |
| | | | | | | |



COMMONWEALTH OF PENNSYLVANIA
STD-279    REV. 12-95

## OUT-SERVICE TRAINING AUTHORIZATION

ICS
☐ 310
☐ 320    OT    **SHOW THIS NUMBER ON INVOICE**    811934

DATE PREPARED
April 19, 2000

**PAYEE** (EMPLOYE OR TRAINING SOURCE NAME AND ADDRESS)
CPC-AP12 Conference
PO Box 631824
Baltimore, MD  21263-1824

PAYEE FED. I. D./SOC. SEC. NO.

**BILL TO - AGENCY** (PROVIDE ORIGINAL AND TWO COPIES OF INVOICE)

DEPARTMENT    PA State Police
BUREAU/INSTITUTION    Bureau of Liquor
ADDRESS    Control Enforcement
3655 Vartan Way
Harrisburg, PA  17110

EFFECTIVE DATE
June 11, 2000

TERMINATION DATE
June 14, 2000

TRAINING SITE (CITY/STATE)
Washington, DC

EMPLOYE NAME, ADDRESS AND TELEPHONE NO.
See Course Title & Description

TRAINING SOURCE NAME, ADDRESS AND TELEPHONE NO.
Renaissance Washington DC Hotel
999 9th Street, NW
Washington, DC  20001
(202) 898-9000

PAYMENT NOT TO EXCEED
$ 225.00

**SEE INSTRUCTIONS ON REVERSE SIDE**

CLASSIFICATION
See Course Title
and Description

CREDIT OFFERED
-0-

CREDIT HOURS PAID IN PREVIOUS 12 MOS.

| CLASS MEETS | M | T | W | T | F | S | S | LEAVE | | |
|---|---|---|---|---|---|---|---|---|---|---|
| BEGINS | | | | | | | 0800 | TYPE | HOURS | DAYS |
| ENDS | | | 1800 | | | | | Work Assignment No Leave Charged | | |

COURSE TITLE AND DESCRIPTION (OUTLINE TRAINING OBJECTIVES AND RELEVANCE OF TRAINING TO EMPLOYE'S PRESENT DUTIES.)

Darrell G. Ober, Captain, Central Section Commander, Bureau of Liquor Control Enforcement
Todd M. Merlina, Enforcement Officer 3, Harrisburg District Enforcement Office, Bureau of
   Liquor Control Enforcement

Course Title and Description – Alcohol Policy XII Conference "Alcohol and Crime Research and
Practice for Prevention" – The following topics will be discussed:  Alcohol and Crime
Research & Practice for Prevention, Environmental Approaches to Reducing Drinking-Related
Violence and Other Crimes, Reducing DUI – Keeping Us on Track, Keynote Address on Alcohol
and Crime, and other various related sessions.

1.  Method of Transportation and Mileage one way – State Car, 128 miles
2.  Estimated Costs
    a.  Transportation – $0.00
    b.  Lodging – $447.00
    c.  Meals – $216.00
    d.  Registration – $225.00
    e.  Miscellaneous – $0.00
    f.  Total:  $888.00 per person    $1,776.00 (two people)

3.  Department required.

I HEREBY CERTIFY THAT I WILL ATTEND THE FULL PROGRAM OUTLINED ABOVE.

EMPLOYE'S SIGNATURE    DATE

SUPERVISOR'S SIGNATURE    DATE
X  Capt. Leonard N. McDonald

ESTIMATED COSTS FOR AGENCY INFORMATION    SUMMARY OF TRAINING COSTS

| LODGING AND SUBSISTENCE EXPENSE | TRANSPORTATION EXPENSES | TOTAL EST. TRAVEL EXPENSES | TRAINING COSTS | TRAINING COSTS TO BE PAID BY EMPLOYER |
|---|---|---|---|---|
| $ | $ | $ | $ 450.00 | $ 450.00 |

ACCOUNT CODE

| FUND | DEPT | APP | YR | LDG | ORG | COST FUNCTION | OBJ | AMOUNT OF ENCUMBRANCE | | CODED |
|---|---|---|---|---|---|---|---|---|---|---|
| 084 | 020 | 171 | 99 | 1 | 5400 | | 339 | 1,326 | 00 | |
| 084 | 020 | 171 | 99 | 1 | 5400 | | 147 | 450 | 00 | PRE-AUDIT |
| | | | | | | | | | | POSTED |

AGENCY APPROVAL    DATE    COMPTROLLER APPROVAL    DATE

FL 1591187 6/98' 146097 

COMMONWEALTH OF PENNSYLVANIA
STD-274 (REV. 4-96)

# REQUEST FOR APPROVAL OF OUT OF STATE TRAVEL
### (Complete when required by Management Directive 230.10.)
### THIS FORM MUST BE APPROVED PRIOR TO TRAVEL.

| DEPARTMENT | DATE |
|---|---|
| PA State Police, Bureau of Liquor Control Enforcement | April 19, 2000 |

APPROVAL IS REQUESTED OF THE OFFICIAL EXPENSES TO BE INCURRED BY

| NAME | POSITION TITLE | ORGANIZATIONAL UNIT / BUREAU |
|---|---|---|
| Darrell G. Ober | Captain – Central Section Commander | Liquor Control Enforcement |
| Todd M. Merlina | Enforcement Officer 3 Harrisburg District Enforcement Office | Liquor Control Enforcement |

DESTINATION (CITY AND STATE)

FROM Harrisburg, PA    TO Washington, DC

ACTUAL DATES OF TRAVEL

FROM June 11, 2000    TO June 14, 2000

PURPOSE (EXPLAIN IN DETAIL)

Attend the Alcohol Policy XII Conference "Alcohol & Crime Research and Practice for Prevention"

---

METHOD OF TRANSPORTATION

- [ ] PLANE (TOURIST CLASS UNLESS AN EXCEPTION IS APPROVED IN ACCORDANCE WITH THE TRAVEL REGULATIONS)
    - [ ] CONVENTIONAL TICKET
    - [ ] SUPERSAVER TICKET (STD-201 MUST BE APPROVED.)
- [ ] TRAIN
- [ ] RENTAL CAR
- [X] STATE CAR
- [ ] PERSONAL CAR
- [ ] OTHER (SPECIFY)

ESTIMATED COST

| | |
|---|---|
| TRANSPORTATION | |
| LODGING | $447.00 |
| MEALS | $216.00 |
| CONFERENCE REGISTRATION | $225.00 |
| MISCELLANEOUS | |
| OTHER | |
| TOTAL $ | $888.00 per person |

APPROVED __

_____
AGENCY HEAD

- [ ] APPROVAL BY THE OFFICE OF ADMINISTRATION ATTACHED.

APPROVAL OF THIS FORM DOES NOT AUTHORIZE SUBSISTENCE OR LODGING RATES WHICH ARE HIGHER THAN THOSE AUTHORIZED IN M. D. 230.10. ACTUAL EXPENSES INCURRED, UP TO THE ALLOWABLE MAXIMUMS, WILL BE REIMBURSED IF PROPERLY PRESENTED AND JUSTIFIED ON FORM STD-191.

| ACCOUNT CODE | | | | | | |
|---|---|---|---|---|---|---|
| FUND | DEPT | APP | YEAR | LDG | ORG | COST FUNCTION |
| | | | | | | |




*Hosted by*

National Crime Prevention Council

*In partnership with the*

Bureau of Justice Assistance, Office of Justice Programs,
U.S. Department of Justice

*and*

Center for Substance Abuse Prevention,
Substance Abuse and Mental Health Services Administration,
U.S. Department of Health and Human Services

**Registration Packet**

*Sub - 2.6.    Brenda*

*Sunday, Tues*
*Mon, Tues    /97+*

*June 11- 12- 13*

*B153329 -*
*consultation ref division*
*Michelle  B153904*

**ALCOHOL POLICY**

## ALCOHOL POLICY XII CONFERENCE

# ALCOHOL & CRIME

## Research and Practice for Prevention

**JUNE 11-14, 2000**
**RENAISSANCE WASHINGTON D.C. HOTEL**
**WASHINGTON, DC**





Alcohol Policy XII, referred to as **AP12**, is the twelfth in a series of international conferences that have addressed research, policy, and prevention issues related to alcohol. The first was held in Charleston, South Carolina, in 1981. Even after all these years, the conference is not "owned" by any organization. The conference has no secretariat, no official standing, and no organizational affiliation; yet, on eleven occasions since 1981, this national conference has been held, propelled by the professional interest and commitment of alcohol policy researchers and advocates brought together by the need to learn from each other.

The Alcohol Policy conferences have become self-perpetuating because real community change is hard work and personally challenging—people come to this conference because they genuinely want to share experiences and perspectives with others who are doing similar work.

### Who Should Attend

Local law enforcement, state police, and criminal justice personnel; judges and court personnel; public health and criminal justice researchers and evaluators; youth/youth group leaders; service providers; public health and medical professionals; community-based organizations; faith community groups; and local, state, and national leaders.

### Conference Highlights

- More than 80 presentations on proven enforcement strategies, up-to-date research, innovative programs, strategic problem-solving, and environmental approaches
- Exhibit Hall with 30 resource organizations and poster presentations
- Welcome Reception
- Roundtable discussions on emerging issues in alcohol and crime



The National Crime Prevention Council
thanks the following organizations for
their invaluable assistance in preparing
for the Alcohol Policy XII Conference.

American Medical Association
American Psychological Association
Bureau of Justice Assistance
Californians for Drug-Free Youth, Inc.
Center for Health and Social Policy
Center for Substance Abuse Prevention
Centre for Addiction and Mental Health
The Century Council
Drug Strategies
FACE—Truth and Clarity on Alcohol
Higher Education Center for Alcohol and
    Other Drug Prevention
Indian Health Service
Join Together
Latino Council on Alcohol and Tobacco
Louisiana Alliance to Prevent
    Underage Drinking
The Marin Institute
Montgomery County (MD) Police Department
Mothers Against Drunk Driving
National Council on Alcohol and
    Drug Dependence, Inc.
National Highway Traffic Administration
National Institute on Alcohol Abuse
    and Alcoholism
National Prevention Network
National Youth Network
New Mexico Department of Health
ONYX
Oregon Office of Alcohol and
    Drug Abuse Programs
Pacific Institute for Research and Evaluation
Pennsylvania State Police
Petersburg (VA) Commonwealth
    Attorney's Office
Research Institute on Addictions
Robert Wood Johnson Foundation
Sacramento (CA) Sheriff's Department
San Antonio (TX) Fighting Back of the
    United Way
State College (PA) Police Department
Street Law, Inc.
University of Minnesota, School of
    Public Health
...ginia State Police

# Contents

You Are Among the Leaders     2

Conference at a Glance     3

Featured Events     4

Sampling of Workshop Topics and Poster Sessions     7

Conference Housing     8

Getting There and Getting Around     9

Registration Information     11

Exhibitor Registration Information and Contract     12

Registration Form     13

# You Are Among the Leaders

It gives me great pleasure to invite you to the Alcohol Policy XII Conference, Alcohol and Crime: Research and Practice for Prevention. The National Crime Prevention Council is proud to be the official host of this dynamic conference being held June 11 to June 14, 2000, in Washington, DC. AP12 is the latest in a series of international conferences designed to examine proven policies and strategies to reduce problems associated with alcohol. It is the first in the series to focus on the links between alcohol and crime.

The conference will bring together researchers and practitioners from both public health and criminal justice backgrounds. Both Attorney General Janet Reno and Secretary of Health and Human Services Donna Shalala have cited alcohol-related problems as among the most pressing criminal justice and health concerns we face. We must continue to work together to understand the latest research and implement effective policies and strategies. AP12 is the forum in which we can come together to strengthen and improve our current efforts and envision a better future.

During the conference, we will hear from experts in the field to understand what we know, and what we need to know, about the connections between alcohol and crime. We will learn how the criminal justice and public health systems can and should work together. We will reinvigorate our commitment to freeing our communities from the negative effects of the irresponsible use of alcohol.

This work is challenging. We know that alcohol impacts many types of crime and community problems. We know that youth who drink alcohol are at greater risk of criminal behavior and being victims of other crimes. We are fortunate for the opportunity provided by the Alcohol Policy XII Conference to learn more about how to prevent these problems.

This conference will give you the best and latest information. But you will give much to this conference, for you are among the leaders in helping prevent alcohol-related crime and violence. We look forward to meeting you and working with you in June.

With every good wish,

Jack Calhoun
*President & CEO*
National Crime Prevention Council .

# Conference at a Glance

*Subject to change*

### SATURDAY, June 10

| | |
|---|---|
| 2:00 p.m. – 6:00 p.m. | Registration and Information Center open |

### SUNDAY, June 11

| | |
|---|---|
| 8:00 a.m. – 6:00 p.m. | Registration and Information Center open |
| 10:00 a.m. – 5:00 p.m. | Exhibit/Poster Session set-up |
| 10:00 a.m. – 12:00 p.m. | Emerging Issues: Roundtable Discussions on Alcohol and Crime |
| 12:00 p.m. – 1:30 p.m. | Lunch on your own |
| 1:30 p.m. – 3:30 p.m. | Emerging Issues: Roundtable Discussions on Alcohol and Crime |
| 4:00 p.m. – 5:30 p.m. | Opening Plenary |
| 4:00 p.m. – 5:30 p.m. | Youth Kick-Off Event |
| 5:30 p.m. – 7:30 p.m. | Welcome Reception in the Exhibit Hall |
| | Poster Sessions open |

### MONDAY, June 12

| | |
|---|---|
| 7:00 a.m. – 5:00 p.m. | Registration open |
| 7:45 a.m. – 3:45 p.m. | Exhibit Hall open |
| 8:00 a.m. – 9:00 a.m. | Continental Breakfast in Exhibit Hall |
| 9:00 a.m. – 10:15 a.m. | Plenary Session |
| 10:30 a.m. – 12:00 p.m. | Concurrent Workshops |
| 12:00 p.m. – 2:00 p.m. | Networking Lunch with Exhibitors |
| | Poster Sessions open |
| 2:00 p.m. – 3:00 p.m. | Plenary Session |
| 3:15 p.m. – 4:45 p.m. | Concurrent Workshops |
| 5:00 p.m. – 6:00 p.m. | Simulated Compliance Check |

### TUESDAY, June 13

| | |
|---|---|
| 7:00 a.m. – 5:00 p.m. | Registration open |
| 7:45 a.m. – 12:00 p.m. | Exhibit Hall open |
| 8:00 a.m. – 9:00 a.m. | Continental Breakfast in Exhibit Hall |
| 9:00 a.m. – 10:00 a.m. | Plenary Session |
| 10:15 a.m. – 11:45 p.m. | Concurrent Workshops |
| 12:00 p.m. – 1:45 p.m. | Luncheon Address |
| 2:15 p.m. – 3:45 p.m. | Concurrent Workshops |
| 4:00 p.m. – 5:00 p.m. | Plenary Session |

### WEDNESDAY, June 14

| | |
|---|---|
| 8:00 a.m. – 8:30 a.m. | Continental Breakfast |
| 8:30 a.m. – 10:00 a.m. | Concurrent Workshops |
| 10:15 a.m. – 12:00 p.m. | Plenary Session and Closing |

# Featured Events

## Emerging Issues: Roundtable Discussions on Alcohol and Crime

SUNDAY, June 11, 10 a.m.–12 p.m. and 1:30 p.m.–3:30 p.m.

*Coordinators:* **Lorraine Collins**, Research Institute on Addictions; **Johnnetta Davis**, Pacific Institute for Research and Evaluation; and **Norman Giesbrecht**, Centre for Addiction and Mental Health.

Join us for informal discussions of research issues and prevention strategies related to alcohol, crime, and policy. These roundtables are open to all conference participants and will rely heavily on active discussion among participants in order to be most effective.

Please let us know in advance about specific research questions, policy, and/or practice challenges you wish to discuss; for example, effective community collaboration, using research to improve practice, or evaluating the impact of prevention programs. If you have specific questions about these roundtables or topics you would like considered, please contact **Lorraine Collins** at 716-887-2252 (fax) or e-mail collins@ria.org.

## Simulated Compliance Check

MONDAY, June 12, 5:00 p.m.–6:00 p.m.

Many law enforcement agencies and coalitions from around the country use compliance checks as a key strategy to reduce underage access to alcohol. Research shows that compliance checks can have a major impact on merchant actions related to the sale and service of alcohol and youth attempts to purchase alcohol illegally.

Watch or join in the interactive simulation that will include how to organize and run a check, how to involve youth to benefit your project, and how to work with the media to educate the public. Hear from experienced law enforcement officers, youth, community members, researchers, and retailers on best practices for compliance checks and how to overcome obstacles you may face.

## Invest in Your Future: Invite the Youth You Work With to AP12

Alcohol Policy XII is not just for adults. The issue of alcohol affects youth and their schools and campuses. We also know that youth/adult partnerships strengthen prevention efforts.

The youth component of AP12 will draw youth from across the country. Some are involved in local or state issues. Others work with national organizations. All will learn about other successful youth initiatives, gain exposure to the national context of prevention efforts, and share their perspectives with other youth and adults.

Youth will be invited to speak out on issues and have their voices heard by policymakers. They will present a simulated compliance check open to all conference participants. Youth will benefit from attending general conference sessions, in addition to several youth-only events focused on engaging youth as alcohol policy advocates. Most importantly, they will be energized to take what they learn home to their communities and take action. In turn, adult participants at AP12 will learn about youth perspectives and the importance and benefits of including youth as full partners in their prevention efforts.

Youth registering for the conference receive a discounted rate (with a valid student ID). Youth 17 and under at the time of the conference must be accompanied by a chaperone. See page 11 for complete details.

# General Sessions and Invited Speakers

The general sessions are designed to be inspirational and informational and will establish the framework for the more than 80 workshop presentations.

## Alcohol and Crime: Research and Practice for Prevention

**Jeremy Travis**, National Institute of Justice *(invited)*
**George Kelling**, author of *Fixing Broken Windows*
**John A. Calhoun**, National Crime Prevention Council

How does alcohol use impact crime and violence? How effective is policy for preventing alcohol-related crime and violence? Learn about recent studies and reports and explore problem-solving alternatives to traditional methods of dealing with alcohol-related crime and violence.

## Environmental Approaches To Reducing Drinking-Related Violence and Other Crimes

**Jim Mosher**, The Marin Institute
**David Jernigan**, The Marin Institute
**Larry Greenfield**, Bureau of Justice Statistics

Irresponsible use of alcohol affects both the public health and criminal justice fields. Both fields work to the same ends—preventing alcohol-related problems and improving the community environment—yet they do not always work together. Learn how criminal justice and public health can appreciate their shared interests and overcome obstacles to effective collaboration.

## The Share of Violence Attributable to Drinking: What Do We Know and What Research Is Needed?

**Robin Room**, Centre for Social Research on Alcohol and Drugs
**Ingeborg Rossow**, National Institute for Alcohol and Drug Research
**Chief Charles Moose**, Montgomery County Police Department *(invited)*

We suspect that alcohol and violence are linked, but is this proven through a strong research base? What portion of violence can we hope to prevent through alcohol policy? Find out what current research shows about this relationship.

## Reducing DUI: Keeping Us on Track
Speaker to be announced

In the past 20 years, public awareness of drinking and driving has increased and alcohol-related traffic deaths have decreased, but recently progress seems to have slowed. Reenergize your community around comprehensive DUI prevention and learn what efforts and policies have proven most effective to prevent DUI and deal with repeat offenders.

## Keynote Address on Alcohol and Crime: The Public Health Perspective
Speaker to be announced

Alcohol has a huge impact on both the public health and criminal justice systems. The session will focus on partnerships and national models for effective collaboration between these fields.

### Domestic Violence and Alcohol: What Do We Know and What Do We Need To Know To Encourage Environmental Interventions?

Ken Leonard, Research Institute on Addictions

The relationship between alcohol and domestic violence, and our perception of this relationship, affects the way we treat batterers and victims. Learn what research shows about alcohol and domestic violence and which common prevention and intervention strategies are validated or questioned by current research.

### Inspired Solutions: Collaboration To Prevent Underage Access to Alcohol

Brendan Brogan, Youth Board Member, Mothers Against Drunk Driving *(invited)*
Judge Michael Martone, Troy, MI
Kathryn Stewart, Pacific Institute for Research and Evaluation

Underage drinking remains the number one killer of America's youth. Collaboration among schools, public health officials, community-based organizations, law enforcement, and the criminal justice system is essential if we are to reduce underage drinking. This session will focus on creative youth/adult partnerships, the courts, and law enforcement and community-based policy solutions.

### Presentation of Conference Learnings

James E. Copple, National Crime Prevention Council
Senator Robert Byrd, West Virgina *(invited)*

Key learnings derived from participants in workshop and plenary sessions will be presented. Senator Byrd, who sponsored legislation that has put $29 million into the fight to reduce underage drinking, will discuss opportunities and directions for new policy initiatives.

### COMMISSIONED PAPERS

Top experts in the field of alcohol policy were invited to write and present on major topics that frame the issues that bring researchers and practitioners together for Alcohol Policy XII. Four of our general sessions will feature presentations of these papers. The commissioned papers will be published, and each conference participant will receive a pre-release copy of these important documents.

## Exhibit Hall

Thirty organizations will display their resources on publications, trainings, Web sites, and much more. Take advantage of this opportunity to discuss your community's special needs with representatives from resource organizations, and to meet prevention colleagues from across the country, learning about resources you can use in your work and sharing successful strategies from your community.

Join your colleagues for the Welcome Reception Sunday evening. The Hall will also be open all day Monday and Tuesday morning. Monday's box lunch will also provide networking time.

## Poster Sessions

Take time to learn about research and programs and discuss areas of interest with authors of poster sessions. Poster sessions visually present information of value to participants. Authors will be available both Sunday evening during the Welcome Reception and again Monday during the Networking Lunch to describe their programs and answer questions about the relevance to your community.

# Sampling of Workshop Topics and Poster Sessions

**Subject to change**

*At this year's Alcohol Policy conference, participants will benefit from attending workshop presentations of interest to both researchers and practitioners from the fields of public health and criminal justice. Participants will have the unique opportunity to learn to work with different disciplines, and overcome obstacles to work toward their common goal of reducing alcohol-related crime and violence.*

**Underage Access to Alcohol**

Actively Involving Youth in Prevention Efforts
Enforcing the Underage Drinking Laws Program
The Effects of Alcohol Advertising on Youth
Issues of Passing and Protecting Alcohol Legislation
The Role of Alcohol Retailers and Beverage Control Boards
Enforcing Zero Tolerance and Minimum Drinking Age Laws
Prevention in University Communities
Creating and Sustaining Dynamic Coalitions

**Domestic and Interpersonal Violence**

Alcohol and Domestic Violence in Rural Communities
Interconnections Between Youth Alcohol Use and Violence
Gender Roles in Alcohol Advertising
The Impact of Alcohol on Sexual Victimization
Alcohol-Related Violence in Bars and Outlets

**Quality-of-Life Issues**

The Impact of Alcohol in Specific Racial and
    Cultural Communities
Enforcement as a Key Prevention Strategy
Issues of Outlet Density
Involving Community Stakeholders in Comprehensive Efforts
Using GPS/GIS To Map Community Problems

**Driving Under the Influence**

Best Practices for Sobriety Checkpoints
Promising Criminal Justice Interventions in DUI Cases
Reducing Recidivism Rates
Closing Drive-Up Liquor Windows
The Effects of Neighboring Community and
    Cross-Border Policies

**Sample Poster Topics**

Approaches To Dealing With Repeat DUI Offenders
Media Literacy as a Prevention Tool
Global Perspectives of the Alcohol Issue
Unique Funding Opportunities
Creative Partnerships for Prevention
Underage Drinking Prevention in Specific Populations
Current Research on the Alcohol and Violence Connection

# Conference Housing





RENAISSANCE
WASHINGTON D.C. HOTEL
999 9th Street, NW
Washington, DC 20001
800-228-9290 (reservations)
202-898-9000 (phone) 202-789-4213 (fax)
Single and double $149 inclusive of taxes

Each guest room features a remote-controlled TV, voice mail, and data ports. Some rooms have coffee makers, hair dryers, irons, cotton bathrobes, and newspaper delivery. The hotel boasts two restaurants, a New York-style deli, a snack bar, and a 10,000-square-foot Swim and Fitness Center.

## Housing Instructions

*Please Read Carefully*

Rooms are assigned on a first-come, first-served basis. **Reservations must be made directly with the hotel by May 25 to receive the discounted conference rate and to ensure a room. Be sure to state that you are attending the Alcohol Policy XII Conference. When booking hotel rooms for youth attending the conference, be sure to tell the hotel the number of youth in your party.**

A credit card, check, or cash deposit of one night's room and tax is required to hold your room. The hotel will follow up with a confirmation letter.

The Renaissance requires cancellation notification to be received 72 hours in advance or one night's room and tax costs will be charged.

Check-in time is 3:00 p.m. Checkout time is 1:00 p.m.

# Getting There and Getting Around

## MAKING AIR RESERVATIONS

**Passport Executive Travel**, the official conference travel agency, is offering the lowest airfare available. American Airlines and US Airways are offering 10 percent off any full coach fare and five percent off any discounted fare.

Call **Passport Executive Travel** at 800-222-9800 or 800-344-7794, Monday through Friday, 8:30 a.m.-6:00 p.m. ET. Be sure to identify yourself as an Alcohol Policy XII Conference participant.

## Flying into Washington, DC

Washington, DC, is serviced by three major airports that offer a variety of ground transportation options.

|  | Ronald Reagan National (DCA) | Washington Dulles International (IAD) | Baltimore/Washington International (BWI) |
|---|---|---|---|
| **Time to Hotel** | 15 min | 40 min | 45 min |
| **Means of Transport** | | | |
| Washington Flyer 888-927-4359 | $16 | $16 | Not Available |
| SuperShuttle 800-258-3826 | $9 | $24 | $28 |
| Taxi | $12 | $50 | $40 |
| Metro (Subway) System 202-637-7000 | $1.10-$1.35 Yellow line to Gallery Place | NA | NA |
| MARC Train 800-325-7245 | NA | NA | $5 Mon-Fri to Union Station |
| Amtrak 800-872-7245 | NA | NA | $16-$26 to Union Station |

All rates are approximate, per person, one-way fares and do not include applicable tips or tax. All rates are subject to change without notification. Please contact the service directly for more information.

# Getting There and Getting Around (Continued)

*Read These Instructions Carefully*

## Metrorail System (Subway)

The Renaissance Washington D.C. Hotel is located near both the Gallery Place Metro station, which is served by the Green and Yellow lines, and the Metro Center station, which is served by the Orange, Blue, and Red lines. Maps will be available in the conference packets.

## Taxis

DC cabs charge on a zone system instead of meters; by law, basic rates must be posted in each cab. There is a $1.25 charge for each additional passenger and a $1 surcharge during morning and evening rush hours. Maryland and Virginia cabs have metered fares. They may transport you into the city, but not between points within the city.

## For Those Driving to Hotels

The Renaissance Washington D.C. Hotel is conveniently located between 8th and 9th Streets, NW, across from the Washington Convention Center.

## Parking

Parking at the Renaissance Hotel is $15 per day. Other parking facilities in the area offer outside parking only, at rates from $5 to $10 per day; there is limited metered and street parking.

## Three Easy Ways To Register Prior to May 15

1. Mail your form and payment to: NCPC— AP12 Conference, PO Box 631824, Baltimore, MD 21263-1824

2. Fax your form and credit card number to: NCPC— AP12 Conference, 202-785-2134. If you fax your registration form with credit card information, please do not mail it to NCPC.

3. Print your registration form from the Internet: www.ncpc.org/alcoholpolicy/

## Critical Dates

APRIL 30 . . . . . . . . .Last day for discounted early bird registration

MAY 15 . . . . . . . . . .Last day for regular registration; after this date, you must register onsite. Last day to cancel any registration

MAY 25 . . . . . . . . . .Last day to reserve discounted hotel rooms

JUNE 1 . . . . . . . . . .Last day for discounted airline rates

JUNE 10-13 . . . . . . .Onsite registration

JUNE 11-14 . . . . . . .Alcohol Policy XII Conference

*See you there!*

## Onsite Registration Hours at the Renaissance Hotel

SATURDAY, JUNE 10 . . . . . . . . . . . .2:00 p.m.-6:00 p.m.

SUNDAY, JUNE 11 . . . . . . . . . . . . . .8:00 a.m.-6:00 p.m.

MONDAY, JUNE 12 . . . . . . . . . . . . .7:00 a.m.-5:00 p.m.

TUESDAY, JUNE 13 . . . . . . . . . . . . .7:00 a.m.-5:00 p.m.

## Telephone Directory

General Registration Information . . . . . . .202-261-4165

NCPC Fax . . . . . . . . . . . . . . . . . . . . . . . .202-785-2134

Renaissance Washington D.C. Hotel . . . . . .800-228-9290

Passport Executive Travel . . . . . . . . . . . . . .800-222-9800

# Registration Information

*Read These Instructions Carefully*

### Pre-Register and Save

Pre-register by completing the registration form. To qualify for the early bird rates, registration forms must be post-marked no later than April 30, 2000. Registrations post-marked after May 1, 2000, and no later than May 15, 2000, will be charged the regular rates. No registrations postmarked after May 15 will be accepted; after this date, you must regis-ter onsite.

In order to receive group rates, all individuals MUST REGISTER AND PAY AT THE SAME TIME.

Registration fees include all workshops, general sessions, a pre-release copy of the commissioned papers, a welcome reception, two lunches, and three continental breakfasts.

### Youth

Youth participants must present a valid student ID to receive the discounted youth rate. To receive the discounted youth group rate, all individuals MUST REGISTER AND PAY AT THE SAME TIME. Youth participants aged 17 and under must be accompanied by a chaperone that is at least 21 years of age. If you are a chaperone, please indicate so by selecting the appropriate box on the registration form.

### Presenters

Presenters will receive their registration information under separate cover.

### Exhibitor Registration

Please refer to page 12 for information on how to exhibit and receive conference registration.

### Don't Leave Home Without It ... Bring Your Letter of Confirmation

A confirmation letter will acknowledge all conference regis-trations received by May 15. Please bring this letter to the conference, as it will serve as your receipt and indicate any balance due remaining on your account. All balances must be paid prior to receipt of your registration materials onsite. If you sent a purchase order with your registration form, your account will maintain a "balance due" status until actual pay-ment has been received from your organization.

### Summary and Payment

Full payment of conference registration must accompany each registration form. (U.S. federal, state, and local govern-ment employees, see below.) Forms received without full pay-ment will be returned unprocessed. Participants are responsi-ble for payment of fees, including those billed to third parties. The National Crime Prevention Council's Federal Tax ID number is 133129302.

If payment covers several registrations, please staple check to forms covered by payment. Early registration deadline is April 30, 2000, postmarked or faxed with payment (we will not accept faxed registrations without payment). Final regis-tration deadline is May 15, 2000. Only registrations with credit card payment or government purchase orders attached may be sent by fax. Purchase orders are not considered pay-ment. A balance due will remain on your account until actual payment has been received.

### Cancellation Policy

A refund, less a $30 processing fee, is available until May 15. No refunds are available after May 15. In order to receive a refund, written requests must be sent to NCPC Conference Cancellations, PO Box 65179, Washington, DC 20035-5179, or faxed to 202-785-2134. Cancellations must be postmarked or faxed by May 15. Refunds will be issued after the confer-ence. Registrations are not transferable.

### U.S. Federal, State, and Local Government Employees

If you are paying with a government purchase order or train-ing authorization form, it must accompany your registration form. Registrations that do not include the proper author-ization forms will be returned unprocessed. Likewise, pur-chase orders or authorization forms with missing or incorrect information, or not accompanied by a completed registration form, will be returned unprocessed. Purchase orders and training authorization forms are not considered payment. A "balance due" will remain on the registrant's account until actual payment is paid prior to or onsite at the conference. Participants are ultimately responsible for pay-ment of fees.

| | Early bird fee (postmarked by 4/30) | Regular fees (postmarked between 5/1 and 5/15) | Onsite fees |
|---|---|---|---|
| **Individual Registration** | $250 | $275 | $300 |
| **Adult Group Registration** (three or more) | $225 per person | $250 per person | $300 per person |
| **Youth** (student ID required) | $150 | $175 | $200 |
| **Youth Group Registration** (three or more; student IDs required) | $150 per person | $150 per person | $200 per person |
| **Daily** (onsite registration only) | NA | NA | $100 |

# Exhibitor Registration Information and Contract

Your company is invited to join with prevention researchers and practitioners from across the globe as they develop skills, explore strategies, and build and strengthen partnerships. You are an important part of that partnership and strategy. As an exhibitor, 500 attendees will see your product, service, or organization. You can make their job easier.

## Exhibit Agenda

**Set-Up:** SUNDAY, June 11, 10 a.m.–5 p.m.

**Exhibit Hours:**

**SUNDAY, June 11**
5:30 p.m.– 7:30 p.m.    Exhibit Hall open
                        Welcome Reception

**MONDAY, June 12**
7:45 a.m.– 3:45 p.m.    Exhibit Hall open
8:00 a.m.– 9:00 a.m.    Continental Breakfast
12:00 p.m.– 2:00 p.m.   Networking Lunch

**TUESDAY, June 13**
7:45 a.m.–12:00 p.m.    Exhibit Hall open
8:00 a.m.– 9:00 a.m.    Continental Breakfast

**Tear-Down:** TUESDAY, June 13, 12:30 p.m.

## Exhibit Options

10' x 10' Tabletop . . . . . . . . . $250    20' x 20' Booth . . . . . . . . . $400

**Above Fees Include:**

- One 6' skirted table
- One chair
- Professional company sign
- Listing in conference program
- Planned activities in the exhibit area
- One conference registration (additional persons will receive the group rate registration fee of $225 per person, up to five people)

Exhibit space is limited and available on a first-come, first-serve basis. We cannot guarantee a space, but we will do our best to accommodate your request.

Guarantee exposure of your services and products! Advertise in the conference program, distributed to all conference participants.

If you are interested in placing an ad in the conference program, e-mail rmodglin@ncpc.org by March 30, 2000.

| Full Page Ad | $700 | Quarter Page Ad | $200 |
| Half Page Ad Long | $400 | Business Card Ad | $100 |
| Half Page Ad Short | $400 | | |

### For Office Use Only

DATE RECEIVED _____

AMOUNT RECEIVED _____

CHECK # _____

BOOTH # _____

AUTHORIZED BY _____

---

**Please complete the following form (please print)**

CONTACT PERSON *(This person will receive all correspondence)*

COMPANY NAME *(As you would like it to appear on company sign)*

STREET ADDRESS

CITY                    STATE                    ZIP

(          )                    (          )
TELEPHONE                    FAX

E-MAIL

| Item | Quantity | Price | Total Price | |
|------|----------|-------|-------------|---|
| 10'x 10' Tabletop | | $250 | | |
| 20'x 20' Booth | | $400 | | Names *(please print)* |
| One Conference Registration | 1 | Free | Free | |
| Additional Conference Registration | | $225 | | |
| | | **Total** | | |

Total payment is due with this contract.

Amount Enclosed $ _____

## Method of Payment

**Payment must be received in full by May 1, 2000.**

❑ Check # _____ (payable to NCPC-AP12)

❑ Government PO # _____ (PO must be attached)

❑ Visa          ❑ MasterCard          ❑ American Express

❑ Diners Club          ❑ Discover

CREDIT CARD NUMBER                    EXP. DATE

CARD HOLDER'S NAME

SIGNATURE

*Mail payments to:* **NCPC–AP12**, PO Box 631824
Baltimore, MD 21263-1824

National Crime Prevention Council's Federal Tax ID number is 133129302.

❑ My company will donate a door prize(s) of $50 or more for a drawing

# Registration Form

Forms must be postmarked no later than April 30 for early bird fees. Increased fees until May 15; after May 15, all registrations must occur onsite.

## NAME AND ADDRESS INFORMATION

*Print carefully. Your badge will be printed with the information below. To save time, attach your business card if all information is included.*

LAST NAME                   FIRST NAME                   INITIAL   PREFIX

NAME TO BE PLACED ON BADGE             PROFESSIONAL TITLE

COMPANY/AGENCY

ADDRESS

CITY                        STATE        ZIP/POSTAL CODE

COUNTRY                      E-MAIL ADDRESS

DAYTIME TELEPHONE           FAX

❑ I am a Chaperone.

❑ Disability accommodation required. List your needs. _____

_____

_____

- Check all that apply. Meals must be reserved; this information assists in conference planning and meal preparation. I plan to attend:

❑ Sunday Reception          ❑ Monday Continental Breakfast    ❑ Monday Lunch
❑ Tuesday Continental Breakfast   ❑ Tuesday Sit-Down Lunch     ❑ Wednesday Continental Breakfast

**Check for special meals:**   ❑ Vegetarian      ❑ Other_____

## SPECIAL ACTIVITIES

**I plan to attend:**   ❑ Emerging Issues Roundtables, Sunday, June 11   ❑ Simulated Compliance Check, Monday, June 12

| | Early bird (postmarked by 4/30) | Regular fees (postmarked between 5/1 and 5/15) | Subtotal |
|---|---|---|---|
| Individual Registration | $250 | $275 | |
| Adult Group Registration (*three or more*) | $225 per person | $250 per person | |
| Youth (*student ID required*) | $150 | $175 | |
| Youth Group Registration (*three or more; student IDs required*) | $150 per person | $150 per person | |
| | | **Total** | |

## Method of Payment

❑ Check # _____(payable to NCPC-AP12)   ❑ Government PO # _____(PO must be attached)
❑ Visa        ❑ MasterCard        ❑ American Express        ❑ Diners Club        ❑ Discover

CARD NUMBER                          EXP. DATE

CARD HOLDER'S NAME                   SIGNATURE

**Mail payments to: NCPC-AP12 ■ PO Box 631824, ■ Baltimore, MD 21263-1824**
National Crime Prevention Council's Federal Tax ID number is 133129302.

## PARTICIPANT INFORMATION

This section must be completed for proper registration. Check the box that applies.

### Professional Affiliation

❑ Private sector
❑ Community group
❑ Criminal justice
❑ Education
❑ Elected official
❑ Faith community
❑ Law enforcement
❑ Military
❑ Public health
❑ Parks/Recreation
❑ Researcher/Evaluator
❑ Social services
❑ Youth/Youth service group
❑ Volunteer
❑ Nonprofit
❑ Other (specify)
_____

### Job Jurisdiction

❑ National
❑ Federal
❑ State/Province
❑ County
❑ City/town
❑ Sovereign nation
❑ International

Your assistance in completing the information below will help us to market our program. We sincerely appreciate your time and effort spent in answering these questions.

❑ Male        ❑ Female

❑ Age 19 and under
❑ Age 20-25
❑ Age 26-40
❑ Age 41-56
❑ Age 57 and up
❑ African American
❑ Asian/Pacific
❑ Caucasian
❑ Hispanic
❑ Multi-racial
❑ Native American

June 12, 2001

Don,

        I have completely my factual analysis of the Defendant's MTD.  I hope this is not too much detail!

Paragraph 1 - Last sentence is misleading, "According to Ober, the defendants retaliated against him for going outside his chain of command and confiding in Lieutenant Colonel Hickes, who *supposedly* (emphasis added) ordered Ober to keep the FBI investigation secret from his superiors."

Nothing supposed it.  Defendants established this as fact nearly two years ago, through their own investigation.  There is no dispute that Hickes issue the order.

FR 2.03 (Lawful Orders – Exhibit A) states that any verbal order issued by any Deputy Commissioner is valid; not conditional on chain of command.  This, coupled with the fact that no Department regulation existed at the time mandating the chain of command be followed, (already acknowledged by the defendants), is critical.

If the sentence were written as it really happed, (".... Lieutenant Colonel Hickes *ordered* ..."), the court would be able to draw the conclusion that I, as a subordinate officer, was under lawful orders not to divulge the investigation to anyone.  Once Hickes gave the order, the responsibility for that order was his.

Paragraph 2– Re: defendants March 16 MTD, "...which was authored, signed, and served by defendants' lead counsel, Syndi Guido."  Reynolds name is on the cover of the MTD.  Didn't she admit to writing it?  Are they trying to suggest that Reynolds had nothing to do with the drafting of this response?  It is a lie.

It is misleading to state, "...defense counsel mistakenly cited the wrong administrative regulation...".  Then what is the correct citing?  It suggests that chain of command regulation does exist; they just cited the wrong one.

Paragraph 3 – According to Exhibit B, the judge struck the April 2, 2001 brief and motion from the record.  We should request the judge strike this paragraph from the defendant's motion.

Paragraph 4 – No comment.

Paragraph 5 – The first sentence refers to a "second amended complaint"; there is no second amended complaint.  The second sentence directs the reader to footnote 1.  Defendants are correct, I believe their actions are vile, hateful, etc., and I believe my actions were legal and proper.  I am complaining they misrepresented FR 1-1.17 because they did!

EXHIBIT
#13

*Exhibit G*

Footnote number 2 should be stricken from this motion.  It also refers to statements made in the proposed amended complaint that were stricken from the record.

Paragraph 6 - No comment.

Paragraph 7 - Use of the word "secret".  Maybe we should put this in bold print: OBER DID NOT KEEP THE EXISTENCE OF THE FBI INVESTIGATION A SECRET.  HE REPORTED IT TO LIEUTENANT COLONEL HICKES!

Again, with the "According to Ober, Lieutenant Colonel Hickes ordered him not to tell anyone else about the investigation".  The factually correct statement would be: "Upon hearing the information, LTC Hickes ORDERED Captain Ober, a subordinate officer, not to divulge this information."

Exhibit C is a copy of the Oath of Enlistment that I signed which requires me to obey the orders of a superior officer; which is preciously what I did.

We should respond to footnote number 3 and elsewhere in the MTD where this appears.  Conley and Hickes promotions were effective the same day (Saturday October 3rd).  However, the information from the FBI came to me BEFORE the 3rd and they damn well know this from their own investigation.  Yet they continue to rail on about my obligation to report to Conley; knowing that Conley did not report to BPR until at least the 6th and that I had already informed Hickes, and been given his order, on the 5$^{th.}$  This is all established on the tape of my IAD interview.

Paragraph 8: "Yet, he has not mentioned a single person who has treated him in that fashion because of the particular inquiry".  The defendants would be five examples.  If I am obligated to supply names, I can.  How many would they like?

Paragraph 9: The defendants are fixated on the transfer as the only evidence of action taken by Evanko.  The timeline between May 1999 and January 2000 is filled with numerous examples of actions taken against me.  The transfer was the egregious action that "sparked" the intervention of the state court.  Why did Evanko rescind the transfer?  The logical conclusion is because he knew it was illegal, he had been caught and knew he would be exposed.

Paragraph 10: Paragraph is a blatant lie.  "...Evanko explained that Captain Ober had been transferred to Washington in order to assist the Area Commander in coordinating services at the Conference of the National Governors Association...".  Evanko OR ANYBODY ELSE, NEVER "EXPLAINED" this to me.  Accordingly to the personnel order, the transfer was permanent with no mention of the NGA (refer to Defendants OWN Exhibit B; FR 3-2).

Defendants are trying to pull a fast one with the regulations.  They are co-mingling sections 2.04 and 2.05.  They are attempting to use Evanko's authority

under 2.04 (A) to assign me to Washington but call it a temporary transfer that falls under the provisions of 2.05. These are two entirely different regulations. They cannot transfer a member under 2.04 without following section B., Procedures. In my situation subsection 3. would apply. This failure was pointed out to them in Exhibit E; page 13. Their way around this is to call it a temporary transfer under the provisions of 2.05. The problem is, I was not assigned to a Troop and do not fall under these provisions. Besides, they would have followed the procedures of this section either. This is a giant "I got you" and evidence of another misrepresentation to the court.

Interestingly, defendants did not include page one of FR 3-2 that contains the most damning section; (I included at the end of Exhibit E); which states transfers may not be used in lieu of discipline.

The NGA assignment is a lie; created for after the fact to cover their tracks. Why didn't Evanko send me to "the important Washington position"? Because I filed and injunction? The NGA story is a myth and I am eager to prove it.

"In the meantime, to fulfill his promise to Ober, Colonel Evanko temporarily assigned him as the Central Section Command...." What promise? The only promise we ever discussed was being sent back to IAD after IIMS. If Evanko was fulfilling a promise, why didn't he send me to the Central Section Command to begin with? It was open in January. Doesn't this contradict his promise to send me back to IAD? That was a problem inasmuch as he already promoted Lieutenant Brown into the position? Why was that necessary?

There was nothing "temporary" about my assignment to the Central Section. It was temporary because of the unexpected and unannounced retirement of Captain Alfred Campbell. Proof of the fact lies in the Personnel Orders (Exhibits F and G and FR 3-2, Transfers). Unless noted otherwise, transfers are to be considered PERMANENT. Neither personnel order indicates the transfer was temporary; by regulation that makes them permanent.

This sentence would be more accurate if the defendants had said, "Because Ober was able to defeat Evanko's planned illegal transfer to Washington, Evanko decided to find another way to punish Ober. He decided to demote him to a Lieutenant's position which was his way of disgracing Ober to the entire Department."

Paragraph 11: "Still, Ober was not happy. Even though he retained the same rank any pay, Ober did not like the fact that his new position had been held by a Lieutenant". The position was so unimportant, it had been held by a SERGEANT for the previous seven months. Why would I be happy; this was a punitive, disciplinary action intended to disgrace and humiliate me. Of the 70 Section Commanders in the State; 69 of them were Lieutenants and one was a Captain! Assigning me to a Lieutenant's position also violates the provisions of AR 1-10.07 (C) (Exhibit H).



Paragraph 12 - If we are required to provide specifics, we can.

Paragraph 13 – See above re: specifics.  The last sentence is interesting, the conclusion we are asking to be drawn is for a jury to decide.  Defendants are saying it is unjustified because they were caught red-handed.  They are asking me and the court to accept an "Oops, just a little mistake, sorry about that, don't be mad".

Paragraphs 14 and 15- Legal stuff, your area.

Paragraph 16 – Defendants state that our complaint contains very few factual averments, then they proceed to list four specific examples of actions taken against me that are listed in the complaint!

Paragraph 17 – Hard to respond as it contains so much doublespeak.  Defendants overlooked the other investigation into my personal affairs; Westcott blocked my from PEMA on two occasions; my overtime and equal pay opportunities; training denials; and request for career enhancing assignments.  Instead they make Evanko sound benevolent by "allowing" me to stay in Harrisburg and me sound ungrateful by "complaining" that I had been assigned a job previously filled by a Lieutenant. Ridiculous!

Paragraphs 18, 19, 20, 21, 22, 23, 24 & 25 – Legal stuff; all yours.

Paragraph 26 – Legal stuff all yours; I do note the statement: "…and the Commissioner's actions were in no way retaliatory":  Are they kidding??

Paragraph 27 – Do they really believe that potential corruption in the hiring practices of a state police agency is NOT speech constituting on a matter of public concern??!!

Paragraph 28 – Defendants are trying to set a trap by saying that I could not have been acting in the public interest by telling Hickes after being requested by the FBI to keep the matter confidential.  Therefore, I had to be acting on my personal interest.  This "theory" ignores two facts.  One, the FBI's request not to divulge the existence of their investigation was not a legally binding one; it was a request commonly made by law enforcement investigators not to divulge details to potential target that might hamper or impede the investigation.  I informed Hickes because I made a JUDGEMENT call that someone of appropriate rank and authority ought to be made aware and, to me, Hickes was an obvious choice.   This has been explained to the defendants many, many times. The second point is in all of their rhetoric; the defendants NEVER acknowledge the precarious position I was in.  They arguing that I my actions were inappropriate and violated regulations, yet, they ignore the LEGAL implications of informing potential targets of the existence of the FBI probe.  It is clear they were expecting me to break the law to keep them informed (Exhibit H - Obstruction).

Defendants also fail to mention their Exhibit AR 4-25.08 (F) 3. states, "Investigators shall assist federal, state, county and municipal law enforcement agencies with investigations wherein personnel may be implicated in illegal activities or other acts of misconduct". In my situation, we could argue I was loosely defined as an "investigator".

In my situation, the provisions of FR 1-2.13, Cooperation With Other Agencies (Exhibit J) were implicated. "Members shall cooperate with other agencies…"

Paragraph 29 – The report was not "belated"; it was given to Evanko as soon as the FBI indicated the probe yielded no other members than Trooper Stanton. (Exhibit K).

There is nothing significant about me not alleging Evanko retaliated against me because I knew of independent evidence of corruption in the cadet selection program. This is an interesting statement and one that makes me think they are very nervous. They have either been listening in or realize they are vulnerable because of some of the "irregularities" I have seen.

Paragraph 30 – Defendants have not proven my reasoning is "…so clearly distorted". What is "so clearly distorted" was Evanko's reaction and the actions taken against me.

Paragraph 31 – Defendants are again fixated on the transfer as the only important discipline or punishment being taken against me. Punishment began with the witch-hunt investigation. Actions taken against me ran on a continuous cycle for the ENTIRE eight month into January. I protested the actions through the grievance process. In fact, I was transferred four hours after a Step One hearing with Conley on the second grievance.

The "significant" Washington assignment is a myth and was created after the fact. Comparing my situation to LIEUTENANT Young's is preposterous. Defendants are again misrepresenting the facts. Young was a Lieutenant and could have turned the promotion down. Because he was given a choice; it is irrelevant WHERE he is from. If we ever get the chance, we will see how sweet his deal really was!

Paragraph 32 – My fourth amendment rights are implicated when the defendants, knowing no violations were committed, used the administrative provisions to compel me to participate in an administrative interview process hoping to find some evidence of wrongdoing. This occurred twice.

Paragraphs 33, 34, and 35 – Legal stuff; all yours.

Paragraph 36 – "Ober has chosen to take a simple mistake and blow it completely out of proportion". Matter for a jury. There is no evidence this was a simple mistake other than the defendants saying so.

Re: FR 1-1.17 – To the contrary! Defendants did NOT describe that regulation to the court. In fact, they so obviously and, "stubbornly", misrepresented the regulation they again have no credible explanation to offer in this MTD.

Paragraphs 37, 38, 39 and 40 – Legal stuff; yours.

Paragraph 41 – Evanko may be ultimate responsibility for the conduct of every member of the force (FR 3-3.04); however, he has no authority or immunity to violate members labor contract or due process rights. He cannot use this regulation to conduct "star chamber" inquiries.

Paragraph 42 – Again, a misquote of the regulation. Additionally, this section, even being misrepresented, still does apply in either situation. When the FBI first contacted me, no specific members where implicated. By the time Trooper Stanton was implicated, I had already long been under Hickes valid order not to divulge information.

New assertions that I violated regulations!! I will first deal with them one by one.

AR 4-25.10 – I DID comply! My verbal report to a Deputy Commissioner would easily satisfy this requirement. In fact, the rest of the regulation states: "When the complaint involves personnel in the chain of command and the process described in Appendage I is inappropriate (underline added), contact may be made directly with the Internal Affairs Division" (Note: Not the Director, BPR but the Internal Affairs Division).

Appendage I of AR 4-25 D. 1. states: "If the complaint involves an individual in the chain of command, the individual may be bypassed when submitting the Worksheet through channels".

Defendant's allegations of my wrong doing not only fails to recognize the sensitive nature of the investigation, they fail to recognize their OWN RULES WHICH PERMIT EXCEPTIONS. The language of AR 4-25 clearly recognizes exceptions do exist. You could argue that had I taken the actions they are suggesting, in addition to breaking the law, I would be violating the very regulations they are citing!

Additional support to the exceptions policy is found in AR 4-25, Appendage I which states: "When a complaint is received concerning a member assigned to the Bureau of Professional Responsibility, the Worksheet shall be sent directly, under confidential cover, to the Deputy Commissioner of Administration."



When I informed Hickes, the decision to grant an exception to existing regulations was his; if he wanted a Worksheet generated, he would have ordered it.

FR 1-1.28 – Preparing a written statement, etc. I went well beyond this requirement and reported to a Deputy Commissioner! Hickes orders negated any obligation or requirement to record anything. Yet, defendants NEVER discuss Hickes order. They must know they are vulnerable and there is no way around the implications and defense of an order issued by a Deputy Commissioner.

Paragraph 43 – The regulation references to the Conley's position as the Director, BPR are irrelevant. I do note that AR 4-25 C. states: The Director, Internal Affairs Division <u>shall</u>:

    1.    In the absence of the Director, Bureau of Professional Responsibility, assume all duties relative to the administration of the Internal Affairs Division.

As an aside, Conley was unknown to me. Coury told me he was recommending me for the Director, BPR and not Conley because Colonel Walp promoted Conley out of BPR because he was incompetent as a Lieutenant. Colonel Walp needed a minority Captain and promoted Conley into the Emergency Preparedness Officer's position where he had no staff and couldn't hurt anyone. Hickes will back this up.

Paragraph 44 – I vehemently dispute the statement "..it is well within Commissioner Evanko's authority to investigate that unauthorized breach in the chain of command". The defendants have <u>not</u> established that such a breach EVER occurred. And any personnel investigations Evanko orders must comply with the rules and regulations of the agency and my civil rights.

AR 4-25 .09 (A) (11) states: "Investigations conducted at the request of the Commissioner". However, this regulation does not supercede either the labor contract or my constitutional rights.

Defendants again misrepresented AR 4-25.04 (B) both as policy and practice. This is an exercise in word-smithing and misdirection.

I was specifically told an Administrative "<u>Inquiry</u>" was being conducted and an Administrative <u>Investigation</u> was not. Administrative Investigations are defined; Inquiry's are not. Assuming the defendants position, then why were the provisions of AR 4-25 regarding notification NEVER followed? According to AR 4-25, I should have been notified of the results of the investigation in writing or initiation of administrative action (would have been Conley's responsibility).

I was also told (PSTA Representative was present) by Majors Werts and Williams they were NOT conducting an administrative investigation and at the time of my interview, they had found NO evidence of misconduct.

The Notification of Inquiry (Exhibit L) is an altered document that was necessary to accomplish their investigative objective; it was "customized" for me.

Also, contrary to the rules and practices of the agency, no BPR Control Number was assigned to the Administrative Warning (Exhibit M) that is a clear indication this one was conducted "off the books".

The definition of "Administrative Investigation" in AR 4-25.04 B. states: "Inquires into alleged misconduct by personnel OR any inquiry into the actions of Department personnel required by directives where no misconduct is alleged." In policy and practice, the latter refers to "Non-Complainant Investigations" which are defined in AR 4-25.04 (L). Examples would be use of force, failure to qualify, prisoner escapes, attorney work products, etc. Defendants again misrepresented the application and intent of this regulation.

Paragraph 45 – Yes, it was ENTIRELY inappropriate for Evanko to consult Campbell because there was no reason to! The investigation by the FBI was completed and a Trooper was arrested.

Paragraph 46 – Again, a reference to "...the way it had been mishandled by personnel under Evanko's command". Defendants have not shown that Hickes or I mishandled ANTHING!

Paragraph 47 – There was nothing "temporary" about this transfer; see prior comments.

Defendant's misrepresentation and half-truths of their authority under FR 3-2.04 (A) must be challenged. See prior comments, the procedures required to affect a transfer under this regulation were not followed.

Paragraph 49 – "...to a position where Evanko felt I would be the most useful..." If this is true, this statement indicts Evanko as the world's worst police administrator. If he REALLY believed the needs of the Department would be better served with me being prematurely ripped from a $100 million dollar technology project and sent 200 miles to an assignment for which the preparations were already wrapped up and then, having failed in that maneuver, transferring me to replace a Sergeant who was filling in for a Lieutenant, he should be removed as a public disgrace!

AR 4-25.11 (B) – "It is a generally accepted practice to periodically rotate members assigned to an Internal Affairs Division". THIS IS ANOTHER

MISREPRESENTATION TO THE COURT.  This is a statement about internal affairs in general; it does not establish this a Department policy.

As a matter of fact, it is NOT the customary practice to rotate personnel through internal affairs in PSP.  In general, members leave by one of three ways: they are asked to leave because of performance issues; they retire or they get promoted.  I think it is safe to say IAD is one of the most stable divisions in the Department; experiencing little turnover.

This is particularly true for the Directors position.  Besides, the statement is irrelevant; are they forgetting that Evanko promised to bring me back to IAD upon completion of the IIMS Project? (Exhibit N).

Paragraph 50 – More legal stuff. I note their failure to acknowledge the actions taken against me were disciplinary.

Paragraph 51, 52, 53, 54, 55 – All legal stuff and in your ballpark.


In summary, the defendants MTD does not survive even cursory analysis.  It is replete with contradictions, misleading references, play on words, and selective references.  Despite trying to dazzle us with exhibits and misdirection, their motion easily falls apart when you scratch below the surface. Defendants MTD is a desperate attempt to justify their actions totally devoid of any credibility.

The case is quite simple.  The FBI called me.  I informed Hickes.  Hickes gives an order.  Evanko becomes enraged and, despite knowing that I have not violated any regulations, proceeds to discipline me in a number of ways.  In doing so, he violates the agency rules and regulations as violates my rights.

With this MTD; the defendants have cited three regulations that were supposedly violated.  They also state the investigation was "mishandled".  If all that were true, why have they NEVER initiated a single action against me in accordance with Department regulations?  As they say, isn't Evanko ultimately charged with the discipline of the entire Department?  I was never counseled, never received an oral or written reprimand, never issued a Supervisors Notation never one mention on a performance evaluation.  If they REALLY believe I violated regulations, they are derelict in their duties in not taking action against me.

Exhibit O is a recent example of what one arbitrator had to say about disciplinary transfers.  It certainly applies in my case.

Finally, much has been said about chain of command.  The truth is, it is widely recognized even among the most rigid organizations, that strict adherence to the chain of command leads to gridlock and paralysis.  The defendants themselves, in their most recent creation (AR 1-1.02 (c)) acknowledge there are instances

when the chain is not followed.  Exhibits P, Q, R, S, T and U are but a few of the many, many instances when the chain of command is not only on a regular basis.

I am also loaning you a copy of Retired Colonel McKetta's book.  It provides some great insight in the PSP.  I have met with Colonel McKetta.  He is 85 and in poor health.  He is very empathetic to my situation.  Should we weigh the benefit of having the Colonel give us an affidavit re: the practices of the agency, etc.?

Thanks,

Darrell



PENN 'ANIA STATE POLICE
BUREA~ OF TECHNOLOGY SERVICES

UNISYS 1100    LOG TAPE EDIT

MESSAGE TYPES: IN    JT
EDIT START: 042599
EDIT END: 042699

```
E M
04/20/99.13:03:07.BZOLWK1HPCYZ B SN P..      FILE.14      PAGE  1 OF  1 B WKLC21-01198 S XRRD41-00002 04/26/99 11:56:39 -
5     B B TO:    AREA, TROOP, AND STATION COMMANDERS;    EXECUTIVE AND ADMINISTRATIVE OFFICES B- B SUBJECT: DETACHED STATU
1.  EFFECTIVE MONDAY, APRIL 26, 1999, CAPTAIN DARRELL G.    AND BUREAU AND OFFICE DIRECTORS - B DETACHED STATU
RESPONSIBILITY. WILL BE DETACHED TO THE BUREAU OF TECHNOLOGY SERVICES. B OBER, DIRECTOR, INTERNAL AFFAIRS DIVISION, BUREAU OF PROFESSIONAL
ERATOR B PROCUREMENT FOR THE INCIDENT INFORMATION MANAGEMENT SYSTEM (IIMS) PHASE B OF THE DEPARTMENT AUTOMATION PROJECT. CAPTAIN
OBER WILL RETURN TO THE    B INTERNAL AFFAIRS DIVISION UPON COMPLETION OF THE ASSIGNMENT.  B B
OF THIS MESSAGE IS REQUIRED.    B. B. AUTH\COLONEL.PAUL.J.EVANOV.COMMISSIONER\PSP--SLO--    2. NO ACKNOWLEDGEMENT

RECORD COUNT VALUE:       0001612444
END OF SPECIFIED EDIT...
LAST DATE READ: 04/27/99
LAST TIME READ: 00:00:00      (000000490).
```

ATTACHMENT 2 OF

EXHIBIT #14
PENGAD-Bayonne, N. J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                              :
                   Plaintiff       :          NO. 1: CV-01-0084
                                 :          (Judge Caldwell)
                                 :
       vs.                                    :          CIVIL ACTION - LAW
                                 :
PAUL EVANKO, MARK CAMPBELL,                   :
THOMAS COURY, JOSEPH WESTCOTT,                :          JURY TRIAL DEMANDED
HAWTHORNE CONLEY,                             :
JOANNA REYNOLDS, AND                          :
SYNDI GUIDO                                   :
                     Defendants     :

---

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS OR STRIKE PLAINTIFF'S SECOND AMENDED COMPLAINT

---

JAMES M. SHEEHAN
General Counsel
Commonwealth of Pennsylvania

SYNDI L. GUIDO
Deputy General Counsel

Governor's Office of General Counsel
333 Market Street, 17th Floor
Harrisburg, PA 17101
(717) 783-6563

JOANNA N. REYNOLDS
Assistant Counsel
Pennsylvania State Police
1800 Elmerton Avenue
Harrisburg, PA 17110
(717) 783-5568
(Counsel for Defendants)

Dated: May 29, 2001


EXHIBIT
#15

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

PROCEDURAL HISTORY AND STATEMENT OF THE CASE .............................. 1

ARGUMENT ............................................................................................. 5

    I.    Ober's complaint must be dismissed for failure to state a claim ................. 5

          A.  Substantive Due Process Rights ............................................... 7

          B.  Privileges and Immunities Clause of the Fourteenth Amendment ......... 8

          C.  First Amendment Right to Free Speech .................................... 9

          D.  Fourth Amendment Rights .................................................... 11

          E.  Equal Protection ................................................................ 12

          F.  Right to Be Free of Civil Conspiracies and Emotional Distress ........... 12

          G.  Abuse of Process .............................................................. 12

    II.    To the extent Ober's suit is brought against defendants
          in their individual capacities, they are protected by
          qualified immunity ................................................................. 13

    III.    To the extent Ober's suit is against defendants in their official
          capacities, it is barred by sovereign immunity ............................... 17

CONCLUSION ......................................................................................... 18

EXHIBITS

Selected Pennsylvania State Police Administrative Regulations ..................... Exhibit A

Selected Pennsylvania State Police Field Regulations ..................................... Exhibit B

i

*Ober v. Evanko*, Pet. for Prelim. Inj., No. 35 M.D. 2000
     (Pa. Commw. filed Jan. 26, 2000).............................................................Exhibit C

*Ober v. Evanko*, Pet. for Mandamus, No. 35 M.D. 2000
     (Pa. Commw. filed Jan. 26, 2000)............................................................. Exhibit D

*Ober v. Evanko*, Petitioner's Mot. to Withdraw, App. A,
     No. 35 M.D. 2000 (Pa. Commw. filed Jan. 27, 2000) ...............................Exhibit E

*Ober v. Evanko*, Respondents' Application to Dismiss
     for Mootness Pursuant to Pa.R.C.P. 1972(4),
     No. 35 M.D. 2000 (Pa. Commw. filed Feb. 23, 2000)...............................Exhibit F

*Ober v. Evanko*, No. 35 M.D. 2000 (Pa. Commw. Mar. 30, 2000) ................. Exhibit G

*Ober v. Evanko*, Pet. for Review, No. 238 M.D. 2000
     (Pa. Commw. filed May 9, 2000)............................................................. Exhibit H

*Ober v. Evanko*, 238 M.D. 2000, slip. op. at 6
     (Pa. Commw. Sept. 6, 2000) ....................................................................Exhibit I

# TABLE OF AUTHORITIES

__Cases__                                                                                  __Page__

*Anderson v. Creighton*, 483 U.S. 635 (1987)...............................................................13, 14

*Angus v. Shiley*, 989 F.2d 142 (3d Cir. 1993).....................................................................6

*California v. Byers*, 402 U.S. 424 (1971) ........................................................................11

*Czurlanis v. Albanese*, 721 F.2d 98 (3d Cir. 1983)...........................................................9

*Dixon v. City of Lawton*, 898 F.2d 1443 (10th Cir. 1990)................................................12

*Doug Grant, Inc. v. Great Bay Casino Corp.*,
     232 F.3d 173 (3d Cir. 2000)....................................................................5, 6, 10

*Galahad v. Weinshenk*,  555 F.Supp. 1201 (D.C. Colo. 1983)...........................................8

*Garrett v. Lehman*, 751 F.2d 997 (9th Cir. 1985).............................................................11

*Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410 (1979)......................................9

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...............................................................13, 14

*Harrah Indep. Sch. Dist. v. Martin*, 440 U.S. 194 (1979)................................................12

*Huang v. Board of Governors of Univ. of North Carolina*,
     902 F.2d 1134 (4th Cir. 1990)............................................................................7

*Hunt v. Dunn*, 439 A.2d 240 (Pa. Commw. 1982).............................................................16

*Jennings v. Shuman*, 567 F.2d 1213 (3d Cir. 1977)...........................................................13

*Kelly v. Borough of Sayreville*, 107 F.3d 1073 (3d Cir. 1997).................................7, 8, 17

*Laskaris v. Thornburgh*, 661 F.2d 23 (3d Cir. 1981)........................................................18

*Maio v. Aetna, Inc.*, 221 F.3d 472 (3d Cir. 2000).............................................................6

*Mauriello v. Univ. of Med. & Dentistry of New Jersey*,
     781 F.2d 46 (3d Cir. 1986).................................................................................7

*McKinney v. Pope*, 20 F.3d 1550 (11th Cir. 1994)................................................7

*Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997)........................................6

*Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133 (3d Cir. 2000)..............................7, 8

*Ober v. Evanko,* Pet. for Prelim. Inj., No. 35 M.D. 2000
    (Pa. Commw. filed Jan. 26, 2000)..................................................3

*Ober v. Evanko*, Pet. for Mandamus, No. 35 M.D. 2000
    (Pa. Commw. filed Jan. 26, 2000)..................................................3

*Ober v. Evanko,* Petitioner's Mot. to Withdraw, App. A,
    No. 35 M.D. 2000 (Pa. Commw. filed Jan. 27, 2000) ....................................4

*Ober v. Evanko*, Respondents' Application to Dismiss
    for Mootness Pursuant to Pa.R.C.P. 1972(4),
    No. 35 M.D. 2000 (Pa. Commw. filed Feb. 23, 2000)....................................4

*Ober v. Evanko*, No. 35 M.D. 2000 (Pa. Commw. Mar. 30, 2000) .......................................4

*Ober v. Evanko*, Pet. for Review, No. 238 M.D. 2000
    (Pa. Commw. filed May 9, 2000).....................................................4

*Ober v. Evanko*, 238 M.D. 2000, slip. op. at 6
    (Pa. Commw. Sept. 6, 2000) ........................................................4

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)....................................17

*Salem Blue Collar Workers Ass'n v. City of Salem*,
    33 F.3d 265 (3d Cir. 1994)........................................................9

*Seigert v. Gilley*, 500 U.S. 226 (1991).........................................................13

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)..........................................17

*Shoop v. Dauphin County*, 766 F.Supp. 1327 (M.D. Pa. 1991),
    *aff'd*, 945 F.2d 396 (3d Cir. 1991),
    *cert. denied*, 502 U.S. 1097 (1992) ..............................................18

*Singleton v. Cecil,* 176 F.3d 419 (8th Cir. 1999) ..............................................7

iv

*Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339 (6th Cir. 1992)...........................................7

*Toomer v. Witsell*, 334 U.S. 385 (1948)..........................................................................8

*Will v. Michigan, Dep't of State Police*, 491 U.S. 58 (1989)..............................................18

## Constitutions

U.S. Const. amend. XIV, §1 ........................................................................................8

## Statutes

1 Pa.C.S. § 2310 .......................................................................................................18

42 U.S.C. § 1983 ......................................................................................................18

42 P.S. § 8521(b).....................................................................................................18

42 Pa.C.S. § 8522 ....................................................................................................18

71 P.S. § 67.1(d)(1) .................................................................................................16

71 P.S. § 250(b).......................................................................................................16

71 P.S. § 251 ...........................................................................................................16

71 P.S. § 251(a).................................................................................................14, 16

71 P.S. §1192 ..........................................................................................................16

## Regulations

Pennsylvania State Police Administrative Regulations

    AR 4-25.01 ..............................................................................................15
    AR 4-25.04(B)..........................................................................................15
    AR 4.25.08(B) ..........................................................................................15
    AR 4-25.09(A),(B).....................................................................................15
    AR 4-25.09(A)(11).....................................................................................15
    AR 4-25.10 (B)(1) .....................................................................................14
    AR 4-25.11(B)...........................................................................................16
    AR 4-25, Appendage I(D)(3) .....................................................................15

Pennsylvania State Police Field Regulations

    FR 1-1.17(B)...................................................................12, 14
    FR 1-1.28.............................................................................14
    FR 3-2.04(A) ......................................................................16
    FR 3-3.04......................................................................14, 15
    FR 3-3.05(B)........................................................................15

## **Other**

Blacks Law Dictionary, (7th ed. 1999)..............................................13

## PROCEDURAL HISTORY AND STATEMENT OF THE CASE

On January 16, 2001, the plaintiff, Captain Darrell Ober, filed a civil rights complaint against State Police Commissioner Paul Evanko, Deputy Commissioner Thomas Coury, Deputy Commissioner Hawthorne Conley, former Deputy Commissioner Joseph Wescott, and the Governor's Chief of Staff, Mark Campbell. The thrust of Ober's complaint was that the defendants caused unspecified damage to his career because they were upset with Ober for not telling them about an FBI investigation into possible corruption at the State Police Academy. According to Ober, the defendants retaliated against him for going outside his chain of command and confiding in Lieutenant Colonel Hickes, who supposedly ordered Ober to keep the FBI investigation a secret from his superiors.

On March 16, 2001, defendants filed a motion to dismiss Ober's complaint, along with a supporting brief, which was authored, signed, and served by defendants' lead counsel, Syndi Guido. In that brief, defendants noted that Ober's decision to bypass his chain of command directly violated state police regulations. Unfortunately, to support that proposition, defense counsel mistakenly cited the wrong administrative regulation – incorrectly referencing AR 1-1.02(c) ("Chain of Command"), which had not been in effect during the relevant time period.

On April 2, 2001, Ober filed a brief opposing defendants' motion to dismiss, as well as a motion to amend his complaint and an amended complaint, which added Joanna Reynolds (Ms. Guido's cocounsel) as a defendant. In a curious turn of events, Ober accused Ms. Reynolds, rather than Ms. Guido, of attempting to defeat his claims by secretly altering state police regulations to add AR 1-1.02(c), intentionally misrepresenting facts to the Court, and removing the regulation's "historic file."

On April 19, 2001, defendants filed a reply brief, in which counsel readily admitted their citation error, explaining that it was unintentional and could be stricken without altering the substance

1

of their argument. At the same time, defendants moved to dismiss or strike Ober's amended complaint. That motion was granted on April 23, 2001.

On May 2, 2001, Ober filed a second amended complaint. Like his earlier filings, Ober's current complaint is comprised almost entirely of inflammatory rhetoric and conclusory allegations that are unsupported by factual averments.[1] In essence, Ober has merely reiterated his prior claims and added defendants' lead attorney, Syndi Guido, as another defendant, accusing her, as well as Ms. Reynolds, of abuse of process based on the previous citation to AR 1-1.02(c). This time, Ober also complains that defense counsel misrepresented another state police regulation, FR 1-1.17(B), in that same brief. (Plaintiff's Second Amended Complaint, filed May 2, 2001, at ¶¶ 54-56, 59-61).[2]

As Ober tells the story, his problems began while serving as Director of the Internal Affairs Division in the Bureau of Professional Responsibility. (Plaintiff's Second Amended Complaint, filed May 2, 2001, at ¶ 21.) In late September or early October 1998, an unnamed person from the FBI contacted Ober. *Id.* at ¶ 23. This FBI source supposedly had information from an anonymous informant that "high-ranking members of the PSP," as well as members of the Governor's Office, might be taking payoffs in exchange for giving special consideration to certain cadet applicants. *Id.* at ¶ 24. Ober was allegedly ordered not to divulge the investigation's existence to the Commissioner (Colonel Evanko) or Deputy Commissioners (Lieutenant Colonels Coury, Westcott, and Hickes). *Id.* at ¶ 25.

In spite of the FBI's directive, Ober felt he should report these allegations; yet he did not want to share the information with anyone he did not personally trust. *Id.* at ¶ 26. For that reason, Ober kept the investigation a secret from everyone in his chain of command and instead confided in

---

[1]For example, Ober's complaint is peppered with accusations that the defendants' actions were "vile," "hateful," "irresponsible," and "outlandish," while consistently characterizing his own actions as "legal," "lawful," and "proper."

[2]In his second amended complaint, Ober has retracted his allegation that defendants removed the historical file on AR 1-1.02. Instead, Ober claims that the file does not comply with "PSP custom, practice, usages and regulations." *Id.* at ¶ 57.

Lieutenant Colonel Hickes.[3] *Id.* at 27. According to Ober, Lieutenant Colonel Hickes ordered him not to tell anyone else about the investigation. *Id.*

In May 1999, someone at the FBI informed Ober that any wrongdoing was limited to a single trooper. *Id.* at ¶ 28. On May 12, Ober and Hickes told Colonel Evanko about the FBI's investigation. Colonel Evanko was angry that it had been kept secret from him and decided to conduct an administrative inquiry into the facts surrounding Ober's involvement. *Id.* at ¶¶ 30-33. The Governor's Deputy Chief of Staff, Mark Campbell (now Chief of Staff), supposedly approved Colonel Evanko's request to conduct that investigation. *Id.* at ¶ 33. Ober believes that administrative inquiries such as this generally destroy an officer's reputation, causing him to be shunned, insulted, and ostracized. *Id.* at ¶ 37. Yet, he has not mentioned a single person who treated him in that fashion because of this particular administrative inquiry.

In any event, what actually sparked this litigation was Ober's eventual transfer to an assignment in Washington, Pennsylvania. Even though that transfer was not ordered until the end of January 2000 – more than eight months after the events that supposedly outraged Colonel Evanko – Ober insists it was done solely out of spite. *Id.* at ¶¶ 46, 46(a), 50; *Ober v. Evanko,* Pet. for Prelim. Inj., No. 35 M.D. 2000 (Pa. Commw. filed Jan. 26, 2000). To prevent being transferred, Ober filed a petition for mandamus in state court and requested a preliminary injunction. *Ober v. Evanko*, Pet. for Mandamus, No. 35 M.D. 2000 (Pa. Commw. filed Jan. 26, 2000). On January 27, 2000, in exchange for Captain Ober's withdrawal of his motion for a preliminary injunction, Colonel Evanko voluntarily rescinded Captain Ober's transfer to Washington and agreed to keep him in the Harrisburg area until

---

[3]Although Ober also mentions that he briefly served as the Acting Director of the Bureau of Professional Responsibility, by the time the events in question occurred, Major Hawthorne Conley (now Lieutenant Colonel) was the Director of the Bureau of Professional Responsibility. In fact, Conley was promoted to Major and named Director of the Bureau on the same day that Hickes was promoted to Lieutenant Colonel and named Deputy Commissioner of Staff. As Bureau Director, Major Conley was Ober's supervisor, and Ober's chain of command reported to Colonel Evanko through Lieutenant Colonel Coury, Deputy Commissioner of Administration, rather than Lieutenant Colonel Hickes, who was Deputy Commissioner of Staff.

a final decision on Ober's mandamus petition. *Ober v. Evanko,* Petitioner's Mot. to Withdraw, App. A, No. 35 M.D. 2000 (Pa. Commw. filed Jan. 27, 2000).

On February 25, 2000, Colonel Evanko filed a motion to dismiss Ober's mandamus petition as moot. *Ober v. Evanko,* Respondents' Application to Dismiss for Mootness Pursuant to Pa.R.C.P. 1972(4), No. 35 M.D. 2000 (Pa. Commw. filed Feb. 23, 2000). In that motion, Colonel Evanko explained that Captain Ober had been transferred to Washington in order to assist the Area Commander in coordinating services at the Conference of the National Governors Association, which was to be held in Pennsylvania later that year. *Id.* at ¶ 3. Since Evanko had agreed to keep Ober in Harrisburg and the important Washington position needed to be filled immediately, Captain Dave Young, a Philadelphia resident, was transferred there from his position as Commander of the Organized Crime Section in Harrisburg. *Id.* at ¶¶ 5, 6. In the meantime, to fulfill his promise to Ober, Colonel Evanko temporarily assigned him as Central Section Commander of the Bureau of Liquor Control Enforcement (which oversees the entire central region of the state). *Id.* at ¶ 7. Based on these facts, the Commonwealth Court granted Colonel Evanko's motion and dismissed Ober's lawsuit as moot. *Ober v. Evanko,* No. 35 M.D. 2000 (Pa. Commw. Mar. 30, 2000).

Still, Ober was not happy. Even though he retained the same rank and pay, Ober did not like the fact that his new position had been previously held by a lieutenant. (Plaintiff's Second Amended Complaint, filed May 2, 2001, at ¶ 51.) Accordingly, Ober filed a second action under Pennsylvania's Whistleblowers' Law. *Ober v. Evanko,* Pet. for Review, No. 238 M.D. 2000 (Pa. Commw. filed May 9, 2000). That action was dismissed for failure to state a claim. *Ober v. Evanko,* 238 M.D. 2000, slip. op. at 6 (Pa. Commw. Sept. 6, 2000).

A few months later, Ober filed this federal lawsuit, repeating the averments he made in Pennsylvania's Commonwealth Court and supplementing them with an assortment of vague contentions and innuendo. For example, at some unknown time, Ober was supposedly denied

4

unspecified promotions, transfers, educational opportunities, and overtime, as well as reimbursement for unnamed "expenses." (Plaintiff's Second Amended Complaint, filed May 2, 2001, at ¶ 46(c),(d),(g),(h).) Ober contends he "was subjected to career destroying investigations," without explaining what those investigations were about or how his career was adversely affected. *Id.* at ¶ 46(e). Similarly, Ober believes he was "constructively" demoted, somehow "destroying" his reputation and effectiveness among unmentioned "colleagues." *Id.* at ¶ 46(b).

Ober also suggests that the defendants took "numerous actions" meant to injure him, "decimate" his career, and "hamper" his performance, but Ober has not described those actions or indicated how he was harmed by them. *Id.* at ¶ 46(j). Ober offers no factual support for the proposition that he has "suffered innumerable insults, humiliations, and embarrassments at the hands" of anonymous "PSP officers" who were somehow "made to fear they would suffer official retribution" if they treated Ober fairly. *Id.* at ¶ 47. In that same vein, Ober summarily concludes, without supporting facts, that he has been subjected to personal attacks and an atmosphere fostering retaliation, resentment, and harassment. *Id.* at ¶¶ 46(f),(i). Finally, Ober asks this Court to draw the unjustified conclusion that defense counsel colluded with their clients to retaliate against Ober for filing the original complaint by secretly changing a regulation and making intentional misrepresentations to the Court. *Id.* at ¶¶ 15a, 61, Wherefore Clause ¶ (j).

## ARGUMENT

**I.    Ober's complaint must be dismissed for failure to state a claim.**

In assessing the sufficiency of Ober's complaint, the Court must accept all factual inferences as true; however, the Court is free to look beyond Ober's dramatic hyperbole. *See Doug Grant, Inc. v. Great Bay Casino Corp.,* 232 F.3d 173, 185 (3d Cir. 2000) (expressing displeasure at arguments "couched in hyperbole obfuscating the real issues"). In ruling on a motion to dismiss, the Court

should draw on the complaint's allegations in a "realistic, rather than slavish, manner" and avoid ruling based "upon the mere presence of words." *Id.* at 184.

To that end, the Court need not credit bald assertions, unsupported conclusions, or unwarranted inferences. *Id.* at 183-84 (court may reject unsupported conclusions and unwarranted inferences); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (court may disregard bald assertions and legal conclusions). Moreover, fair inferences may be drawn from what a plaintiff does *not* plead in the complaint. *See Maio v. Aetna, Inc.*, 221 F.3d 472, 500 (3d Cir. 2000) (court may infer events did not occur if not alleged in the complaint); *accord Angus v. Shiley*, 989 F.2d 142, 147 (3d Cir. 1993).

Strident rhetoric aside, Ober's complaint contains very few factual averments. The sole allegation against Mark Campbell is that Colonel Evanko consulted him about Ober's failure to report the FBI investigation, and they decided to examine the matter further. The planned inquiry was apparently discussed at a meeting attended by Lieutenant Colonels Coury, Westcott, and Conley (who was then a Major in charge of the Bureau of Professional Responsibility). Except for attending that meeting, the only specific allegation against Lieutenant Colonel Coury is that he removed Ober from an assignment with the "PSP Centennial Book Committee," which Ober considered "prestigious." Ober is upset with Lieutenant Colonel Conley for taking his cell phone and denying some sort of "expenses." Apparently, former Lieutenant Colonel Westcott did nothing more than reject a recommendation for Ober to serve as the state police contact with the Pennsylvania Emergency Management Agency.

Thus, Ober's specific allegations against defendants Campbell, Coury, Westcott and Conley boil down to three facts: (1) They knew Colonel Evanko was conducting an administrative inquiry into the events surrounding Ober's decision to conceal his contact with the FBI from his commanding officers; (2) Ober was relieved of some secondary responsibilities; and (3) Ober did not get to keep a

cellular phone. Ober makes two additional allegations against Colonel Evanko, which do little to enhance his case. Without explaining why he was entitled to remain in Harrisburg, Ober attacks Evanko for transferring him to an assignment in Washington, Pennsylvania. Then, when Evanko allowed Ober to stay in the Harrisburg area, Ober complained because the position had previously been filled by a lieutenant. Taken as a whole, these factual allegations are insufficient to support any of Ober's claims for relief.

### A.    Substantive Due Process Rights

First, Ober accuses the defendants of violating his Fourteenth Amendment right to substantive due process. (Compl. ¶ 10; Wherefore Clause ¶ (b).) To prevail on this claim, Ober must show that the government deliberately and arbitrarily abused its power to deprive him of a property interest that is "fundamental" under the United States Constitution. *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139-40 (3d Cir. 2000).

Not all property rights are protected by the concept of substantive due process. *Id.* at 140. So far, the Third Circuit has limited substantive due process protection to cases involving the ownership of real property. *Id.* at 141.[4] Less fundamental interests, such as rights created by contract, are not entitled to protection. *Id.* at 141-42 (tenured professorship at state university was not entitled to substantive due process protection); *Mauriello v. Univ. of Med. & Dentistry of New Jersey*, 781 F.2d 46 (3d Cir. 1986) (graduate student's interest in continued academic enrollment is not constitutionally protected). Likewise, reputation alone is not protected by due process. *Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1077 (3d Cir. 1997).

Ober complains bitterly that his "rights" have been violated. However, Ober has not explained what fundamental, constitutionally-protected property interest he has in being assigned to

---

[4] The majority of other circuit courts of appeal have adopted the same approach. *See Singleton v. Cecil*, 176 F.3d 419, 425-26 (8th Cir. 1999) (*en banc*) (state-law contract rights in employment are not fundamental Constitutional interests); *accord McKinney v. Pope*, 20 F.3d 1550, 1560 (11th Cir. 1994) (*en banc*); *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339 (6th Cir. 1992); *Huang v. Board of Governors of Univ. of North Carolina*, 902 F.2d 1134, 1142 n.10 (4th Cir. 1990).

any particular post, in serving on the Centennial Book Committee, in acting as the state police contact with PEMA, in being supplied with a cellular phone, or in having his expenses paid. Not one of these items rises to the level of a fundamental interest entitled to substantive due process protection. *See Kelly,* 107 F.3d at 1077 (police officer's allegations were insufficient to state a due process claim although he was subjected to a series of reprimands, disciplinary actions, reprisals, job-related actions, and damage to his reputation); *Nicholas,* 227 F.3d at 141-42 (tenured professorship unworthy of due process protection). Accordingly, Ober's due process claim should be dismissed.

**B.    Privileges and Immunities Clause of the Fourteenth Amendment**

Next, Ober makes the confusing assertion that the defendants violated "his right to enjoy the protections afforded by the Privileges and Immunities Clause" of the Fourteenth Amendment. (Compl. ¶¶ 11; Wherefore Clause ¶ (d).) There is simply no basis for Ober's claim.

The privileges and immunities clause provides that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, §1. In essence, "when a state affords rights or privileges to its own citizens, it may not deny them to citizens immigrant from other states." *Galahad v. Weinshenk,* 555 F.Supp. 1201, 1206 n.3 (D.C. Colo. 1983).

To prevail on a "privilege and immunities" claim, a plaintiff must prove that: (1) he has a fundamental interest that is being burdened by a state of which he is not a citizen; and (2) the defendants did not have a substantial reason to discriminate against citizens of other states. This does not mean that states cannot discriminate against the citizens of other states. In fact, there may be perfectly valid reasons for doing so. The inquiry is whether reasons for the discrimination exist and whether the degree of discrimination bears a close relation to those reasons. *Toomer v. Witsell,* 334 U.S. 385, 396 (1948).

The privileges and immunities clause is plainly irrelevant to these facts. As discussed above, Ober has not pointed to any fundamental right that has been adversely affected. *See Salem Blue Collar Workers Ass'n v. City of Salem*, 33 F.3d 265, 270 (3d Cir. 1994) (public employment is not a fundamental right). More importantly, Ober does not claim discrimination based on his state citizenship. His privileges and immunity claim is baseless and must be dismissed.

### C.     First Amendment Right to Free Speech

Ober also maintains that his First Amendment rights were violated by defendants Evanko and Campbell. (Compl. ¶ 12.) Ober then demands judgment against all the defendants for depriving him of his First Amendment "rights to be free of unlawful injurious employment actions in retaliation for his proper exercise of protected speech." (Compl. Wherefore Clause ¶ (a).)

In analyzing a public employee's retaliation claims, the Court must engage in a three-part analysis. Did the plaintiff engage in protected activity? *Czurlanis v. Albanese*, 721 F.2d 98, 103 (3d Cir. 1983). Was that protected activity a substantial or motivating factor in the alleged retaliatory action? *Id.* If the protected conduct had not occurred, would the employer still have taken the same action? *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 416-17 (1979). The allegations in Ober's complaint are insufficient to meet this test because Ober did not engage in protected conduct and the Commissioner's actions were in no way retaliatory.

Ober has not explained exactly what "protected speech" he was supposedly punished for. However, there are only two instances of speech mentioned in Ober's complaint: (1) In early October 1998, he told Lieutenant Colonel Hickes about the FBI investigation; and (2) in May 1999, Ober belatedly told Colonel Evanko about the investigation. Unless either of these incidents can be "fairly characterized as constituting speech on a matter of public concern" (as opposed to speech "upon matters of personal interest"), the reasons for the defendants' actions are not subject to scrutiny by the courts. *Czurlanis*, 721 F.2d at 103 (quoting *Connick v. Myers*, 461 U.S. 138, 146-47 (1983)).

Here, Ober's decision to tell Hickes about the FBI's investigation was motivated by his personal interests, not public concern. According to Ober's complaint, the FBI expressly directed Ober *not* to divulge the existence of his investigation to the Commissioner or the Deputy Commissioners. (Compl. ¶ 25.) Despite those instructions, Ober wanted to share his secret with someone he personally trusted – Deputy Commissioner Hickes. (Compl. ¶¶ 26, 27.) Accepting Ober's allegations as true, his report to Hickes was contrary to any public interest involved. Ober's act not only ran counter to his duty to report matters through his chain of command, it also ran counter to the FBI's directive.

Likewise, Ober's belated report to Colonel Evanko was not protected speech. When Ober and Hickes learned that the FBI had exonerated everyone in the state police except a solitary trooper, they finally told the Commissioner what was going on. Significantly, Ober does not allege that Colonel Evanko retaliated against him because Ober knew of any independent evidence of corruption in the cadet selection program. Rather, Evanko was apparently upset when Ober confessed hiding the investigation from his superiors, a purely personal decision.

Moreover, Ober asks this Court to draw the unjustified conclusion that he was transferred to Washington, Pennsylvania, "in an irresponsible act of outlandish and extreme retribution" in a "hateful attempt to separate him from his children." (Compl. ¶¶ 46(a), 50.) Although the Court must accept Ober's factual allegations as true, it may reject unwarranted inferences such as this one. *Doug Grant,* 232 F.3d at 183-84. This is particularly true where Ober's reasoning is so clearly distorted.

Colonel Evanko first learned of the FBI's investigation, as well as the fact that Ober had kept it secret, in May 1999. Yet Ober was not transferred to Washington until eight months later. If Colonel Evanko's goal was to punish Ober, why would he have waited so long? During that eight-month period, why would Colonel Evanko have trusted Ober to be the "project manager on the largest and most technical law enforcement project in PSP history"? (Compl. ¶ 50.) More

importantly, why would the Commissioner transfer Ober to a post as significant as Assistant to the Task Commander for the National Governors Association's Conference? If Colonel Evanko's sole motivation was a desire to punish Ober by separating him from his family, why would the Commissioner also have "punished" Captain Young, a Philadelphia resident and Commander of the Organized Crime Unit, by sending him to Washington in Ober's stead? Quite simply, Captain Ober's reasoning defies logic, his conclusions are not supported by the facts he has alleged, and Ober's retaliation claim should be dismissed.

### D.    Fourth Amendment Rights

Ober makes another puzzling claim – that the defendants violated his Fourth Amendment rights by subjecting him to "custodial investigations" and "invasions of privacy in a series of investigations and administrative actions." (Compl. ¶ 14; Wherefore Clause ¶ (c).) Accepting all of Ober's averments as true, it is clear he was never subjected to an unlawful seizure within the meaning of the Fourth Amendment. Ober was not seized as a suspect in a criminal case; he was interviewed during an administrative inquiry, which does not implicate the Fourth Amendment. *See Garrett v. Lehman*, 751 F.2d 997, 1004 (9th Cir. 1985) (holding the exclusionary rule of Fourth Amendment not applicable to military administrative discharge proceedings).

Issues of custodial interrogation arise under the Fifth Amendment, not the Fourth Amendment. Assuming Ober's complaint somehow implicitly alleges a Fifth Amendment claim, the concept of "custodial interrogation" is still inapplicable because it only arises in the context of criminal cases. *See California v. Byers*, 402 U.S. 424, 434 (1971) (statutory requirement that drivers involved in accidents stop and provide identification did not violate the Fifth Amendment when the purpose was civil not criminal). Ober's factual averments do not have Fourth or Fifth Amendment implications, and these claims must be dismissed.

### E.    Equal Protection

Evanko and Campbell are also said to have discriminated against Ober in violation of the equal protection clause. (Compl. ¶ 12.)  Ober then demands judgment against all of the defendants on this count. (Compl. Wherefore Clause ¶ (h).)  To make out an equal protection claim, Ober must establish that he is part of a suspect classification or that he has been deprived of a fundamental right. *Harrah Indep. Sch. Dist. v. Martin,* 440 U.S. 194, 199 (1979).  He has done neither.  Accordingly, Ober's equal protection claim cannot stand.

### F.    Right to Be Free of Civil Conspiracies and Emotional Distress

Next, Ober alleges that the defendants supposedly violated his rights "to be free of civil conspiracies" and "emotional distress." (Compl. ¶¶ 13, 15; Wherefore Clause ¶¶ (e)-(g)).  There is no federal constitutional right to be free of emotional pain and mental distress.  In order to state a conspiracy claim under § 1983, there must be an underlying constitutional deprivation.  *Dixon v. City of Lawton,* 898 F.2d 1443, 1449 (10th Cir. 1990).  Ober has not made out a case of any constitutional violation; accordingly, these claims fail.

### G.    Abuse of Process

Finally, in accusing defense counsel of violating his "federally guaranteed right" to be "free of abuse of legal process," Ober has chosen to take a simple mistake and blow it completely out of proportion.  Defense counsel have readily admitted that, earlier in this litigation, they erroneously cited an administrative regulation (AR 1-1.02(c)) that did not exist at the relevant time.  Without any basis in fact, Ober stubbornly insists that this mistake must have been an intentional misrepresentation.  To compound matters, Ober has added the entirely specious assertion that counsel also misrepresented a field regulation, FR 1-1.17(B), which states, "Members shall promptly report to their supervisor any information which comes to their attention and *which tends to indicate* that any other member or employe has violated any law, rule, regulation or order." (Emphasis added).  To the

contrary, defense counsel correctly described that regulation as "requiring members to promptly notify their supervisor when they receive any information indicating another member might have violated the law." (Defendants' Reply Brief, filed March 16, 2001.)

Regardless, neither of these two citations constitutes any sort of "abuse of legal process." As commonly understood, the term "process" refers to a summons, or summons and complaint, or a writ. Blacks Law Dictionary, 7th Edition (West 1999). Process "issues forth in order to bring the defendant into court." *Id.* An action for abuse of process lies when a party employs legal process for some unlawful object. *Jennings v. Shuman,* 567 F.2d 1213, 1214 (3d Cir. 1977). In this case, defendants have not attempted to use process for any improper purpose; they have merely defended against a suit initiated by Ober. Thus, even if the citation error had been intentional, the alleged facts would not give rise to a cause of action for abuse of process.

## II.    To the extent Ober's suit is brought against defendants in their individual capacities, they are protected by qualified immunity.

In the introduction to his complaint, Ober states that his suit is brought against Commissioner Evanko in his individual capacity. (Introduction to Plaintiff's Second Amended Complaint, filed May 2, 2001.) The complaint does not indicate whether the remaining defendants are being sued in their official or individual capacities. To the extent Evanko and the other defendants have been sued in their individual capacities, they are protected by qualified immunity.

Qualified immunity should be determined at the earliest possible stage because it constitutes immunity from suit and discovery, not just a defense to liability. *Anderson v. Creighton,* 483 U.S. 635, 646 n.6 (1987) (qualified immunity protects public officials from disruptive discovery); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (qualified immunity is a threshold question). In any qualified immunity analysis, the court must determine whether the plaintiff has presented a constitutional right that was clearly established at the time of the defendants' actions. *See Seigert v. Gilley,* 500 U.S. 226, 231 (1991) (court determines not only the currently applicable law, but whether that law was

clearly established at the time the action occurred). To be clearly established, the right's contours must have been obvious enough that a reasonable official would have known his actions violated that right. *Anderson*, 483 U.S. at 640.

As discussed above, Ober has not shown a violation of any clearly-established constitutional right. Assuming Ober's complaint sets forth the requisite constitutional violation, defendants still cannot be held liable because it was objectively reasonable for them to believe their actions were constitutional. *Harlow*, 457 U.S. at 819 (government officials performing discretionary functions are shielded from liability for civil damages unless their conduct violates clearly established constitutional or statutory rights that a reasonable person should have known about).

Even though Ober is upset that Colonel Evanko decided to examine his actions, as Commissioner of the State Police, Colonel Evanko is ultimately responsible for the conduct of every member of the force. Pennsylvania State Police Field Regulation, FR 3-3.04. The Commissioner also has a duty to maintain the State Police Academy. 71 P.S. § 251(a). On May 12, 1999, Colonel Evanko first learned that Ober had been contacted by the FBI about possible corruption in the academy. Evanko also learned that Ober had reported the matter to Lieutenant Colonel Hickes rather than Major Conley or Lieutenant Colonel Coury.

Ober's actions violated departmental regulations governing the receipt of information about possible misconduct. FR 1-1.17(B) (requiring members to promptly notify their supervisor when they receive any information indicating another member might have violated the law); AR 4-25.10 (B)(1) (requiring personnel to record every allegation of misconduct, whether anonymous, verbal, or written on a Use of Force or Complaint Reception and Processing Worksheet); FR 1-1.28 (requiring members to immediately prepare a written statement when any complaint is received indicating misconduct of personnel so that a record will be available for future reference).

Moreover, as Ober's supervisor and Director of the Bureau of Professional Responsibility, it was the responsibility of Major Conley, not Lieutenant Colonel Hickes, to determine what action should have been taken with respect to the information received from the FBI. *See* AR 4-25.01 (granting the Bureau of Professional Responsibility, Internal Affairs Division, authority over all allegations of misconduct by personnel); AR 4-25.08(B) (placing responsibility for all investigations into alleged misconduct upon the Director of the Bureau of Professional Responsibility); AR 4-25.09(A), (B) (making it the responsibility of the Director of the Bureau of Professional Responsibility to determine whether the Internal Affairs Division will investigate allegations of misconduct); AR 4-25, Appendage I(D)(3) (granting the Director of the Bureau of Professional Responsibility the discretion to determine whether an investigation is appropriate); FR 3-3.05(B) (holding Directors accountable for the conduct and performance of members under their immediate command).

After learning that Ober had reported to Lieutenant Colonel Hickes without consulting Major Conley, it was well within Commissioner Evanko's authority to investigate that unauthorized breach in the chain of command. *See* FR 3-3.04 (holding the Commissioner responsible for the conduct of every member of the force); AR 4-25.09(A)(11) (indicating that Commissioner may request administrative investigations); AR 4-25.04(B) (defining administrative investigation as "[i]nquiries into alleged misconduct by personnel or any inquiry into the actions of Department personnel required by directives where no misconduct is alleged.")

Ober further suggests there was something improper about Colonel Evanko consulting the Governor's Deputy Chief of Staff, Mark Campbell, about Ober's conduct. Colonel Evanko's conduct was not only reasonable, it was entirely appropriate under Pennsylvania law.

The Pennsylvania State Police is charged with the duty of assisting the Governor in administering Pennsylvania's laws, and the Commissioner is the head and chief executive officer of

the agency. 71 P.S. §§ 250(b), 251(a). The State Police Commissioner is appointed by the Governor. 71 P.S. §§ 67.1(d)(1), 1192. With the Governor's approval, the Commissioner prescribes the rules and regulations governing state police officers' conduct. 71 P.S. § 251(a). Accordingly, it is difficult to understand what Ober finds inappropriate about Colonel Evanko advising the Governor, through his Deputy Chief of Staff, about the FBI's investigation and the way it had been mishandled by personnel under Evanko's command. Under the circumstances, both Evanko and Campbell are protected by qualified immunity.

Next, Ober complains that, many months after the May 1999 disclosure to Evanko, he was transferred and "constructively demoted." Significantly, Ober does not claim to have suffered a reduction in either rank or pay – even during the three months he was temporarily assigned to head the state's Central Section of the Bureau of Liquor Control Enforcement.

State law authorizes the Commissioner to assign members of the state police so as to effect the most efficient performance of the force's law enforcement duties. 71 P.S. § 251 (Commissioner has the duty to efficiently distribute the force throughout the Commonwealth); Pennsylvania State Police Field Regulation 3-2.04(A) (giving Commissioner the authority to transfer members as needed to fulfill the requirements for additional services, specific or specialized skills or to accomplish any other needs of the Department); *see also Hunt v. Dunn*, 439 A.2d 240, 242 (Pa. Commw. 1982) ("the Commissioner has discretion founded on the need of the service in ordering transfers").

The Commissioner had a reasonable basis for believing he could transfer Ober from the Internal Affairs Division to a position where Evanko felt he would be most useful. Indeed, it "is a generally accepted practice to periodically rotate members assigned to an Internal Affairs Division." AR 4-25.11(B). In this type of command decision, the Court should not substitute its judgment for that of the Commissioner. The Commissioner is protected by qualified immunity for the transfer decisions he made regarding Ober.

Likewise, Deputy Commissioners Coury, Conley and former Deputy Commissioner Westcott are entitled to qualified immunity for their actions. They may have known that Colonel Evanko ordered an administrative inquiry, but the Constitution does not prohibit Ober's employers from examining the manner in which he did or did not carry out his duties. Even if the Deputy Commissioners decided not to have Ober serve on the Centennial Book Committee or act as the PEMA contact, what right were they violating? Similarly, the state police had no constitutional duty to pay Ober's expenses or provide him with a cellular phone. In short, there was nothing objectively unreasonable about any of the Deputy Commissioners' actions. *See Kelly*, 107 F.3d at 1077 (in a case where a police officer is not suspended, removed, fined, or reduced in rank, no deprivation of property right is alleged and claim should be dismissed). Consequently, Ober's complaint should be dismissed.

III.    **To the extent Ober's suit is against defendants in their official capacities, it is barred by sovereign immunity.**

As mentioned above, with the exception of Colonel Evanko, Ober's complaint does not indicate whether the defendants have been sued in their official or individual capacities. To the extent that Ober's action is brought against the defendants in their official capacities, it is barred by the Eleventh Amendment.

The Eleventh Amendment immunizes states from suit in federal court, and that immunity extends to a state's departments, agencies, and officials acting in their official capacities. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996). A state may waive this immunity, but that waiver must be unequivocal. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). Similarly, although Congress has the power to abrogate sovereign immunity with respect to rights guaranteed by the Fourteenth Amendment, an unequivocal expression of Congressional intent is also required. *Id.*

Pennsylvania has not waived its immunity, and Congress has not abrogated the states' immunity in the Civil Rights Act, 42 U.S.C. § 1983. *See* 42 P.S. § 8521(b) (expressly withholding consent to be sued in federal court); *Laskaris v. Thornburgh,* 661 F.2d 23 (3d Cir. 1981) (Pennsylvania has not waived its immunity); *Will v. Michigan, Dep't of State Police,* 491 U.S. 58, 67 (1989) (42 U.S.C. § 1983 does not abrogate sovereign immunity).

Moreover, even though the Eleventh Amendment permits a plaintiff to sue state officials for injunctive relief in order to end continuing violations of federal law, they cannot be sued in their official capacity for monetary damages. *Will,* 491 U.S. at 71. Monetary damages are the only form of relief Ober has requested; therefore, federal claims are barred by the Eleventh Amendment.

Ober's state law claims are likewise barred. Under Pennsylvania law, state employees enjoy sovereign immunity except in those situations where the General Assembly has waived that immunity. 1 Pa.C.S. § 2310. Our Legislature has carved out nine narrow exceptions to the rule of immunity, none of which apply to plaintiff's claims. *See* 42 Pa.C.S. § 8522, *Shoop v. Dauphin County,* 766 F.Supp. 1327 (M.D. Pa. 1991), *aff'd,* 945 F.2d 396 (3d Cir. 1991), *cert. denied,* 502 U.S. 1097 (1992) (finding that a state trooper had immunity from plaintiff's intentional tort claims, including a claim for the infliction of emotional distress).

## CONCLUSION

For all the foregoing reasons, defendants' respectfully ask this Court to dismiss Ober's complaint with prejudice.

Respectfully submitted,

May 29, 2001

Syndi L. Guido, Deputy General Counsel
Joanna N. Reynolds, Assistant Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                          :
                    Plaintiff    :    NO. 1: CV-01-0084
                             :    (Judge Caldwell)
                             :
     vs.                              :    CIVIL ACTION - LAW
                             :
PAUL EVANKO, MARK                         :    JURY TRIAL DEMANDED
CAMPBELL, THOMAS COURY,                   :
JOSEPH WESTCOTT,                          :
HAWTHORNE CONLEY,                         :
JOANNA REYNOLDS,                          :
AND SYNDI GUIDO                           :
               Defendants    :

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I served a copy of defendants' brief in support of their motion to dismiss or strike plaintiff's second amended complaint, as well as the supporting exhibits, upon plaintiff's counsel by First Class Mail, U.S. Postal Service, addressed as follows:

               Don Bailey, Esquire
               4311 North 6th Street
               Harrisburg, PA 17110

               Syndi L. Guido
               Deputy General Counsel
               Governor's Office of General Counsel
               333 Market Street, 17th Floor
               Harrisburg, PA 17101
Dated: May 29, 2001         (717) 783-6563

EXHIBIT A







**PENNSYLVANIA STATE POLICE**
**DEPARTMENT DIRECTIVE**

AR 4-25
9/2/93



SUBJECT:    INTERNAL INVESTIGATIONS

25.01    **AUTHORITY**

The Bureau of Professional Responsibility (BPR), Internal
Affairs Division, is authorized to recommend to the
Commissioner policies and procedures to initiate, conduct
and/or control all necessary investigations, and to
process all complaints or allegations of misconduct by
personnel.    Members of the Bureau of Professional
Responsibility, when performing Internal Affairs duties,
are vested with the line authority of the Commissioner.

25.02    **PURPOSE**

The purpose of this regulation is to establish a prompt,
fair, thorough, factual and impartial means to
investigate complaints or allegations involving
personnel.

25.03    **GOALS**

A.    <u>Protection of the Public</u>:  The public has the right
to expect efficient, fair and impartial law
enforcement.  Any misconduct by personnel must be
detected, thoroughly investigated and properly
adjudicated to assure these goals.

B.    <u>Protection of the Department</u>:  The integrity of the
Department depends on the personal integrity and
self-discipline of all personnel. When an informed
public knows that the Department honestly and
fairly investigates and adjudicates all allegations
of misconduct against its personnel, confidence
will be promoted and public support will be
enhanced.

C.    <u>Protection of Personnel</u>:  A thorough investigation
of all allegations of misconduct serves to protect
the integrity of personnel and will safeguard
against false or malicious complaints.

-1-

AR 4-25
9/2/93

D.    <u>Discovery of Unsatisfactory Performance</u>: Personnel who demonstrate an inability to satisfactorily perform their duties must be identified for the protection of the public, the Department and its personnel.

25.04    DEFINITIONS

A.    <u>Administrative Action</u>: Corrective action taken by command/supervisory personnel which may include the issuance of a Disciplinary Action Report (DAR), Form SP 3-336.

B.    <u>Administrative Investigation</u>: Inquiries into alleged misconduct by personnel or any inquiry into the actions of Department personnel required by directives where no misconduct is alleged.

C.    <u>BPR Control Number</u>: A sequential number assigned by the Internal Affairs Division to index all complaints and administrative investigations.

D.    <u>Bureau Register</u>: A compilation of data indexing the initiation and processing of administrative investigations by BPR Control Number.

E.    <u>Complainant</u>: A person with knowledge of an alleged incident of misconduct, or violation of a statute or Department directive, who brings the information to the attention of the Department.

F.    <u>Complaint</u>: Any allegation of misconduct made against Department personnel.

G.    <u>Complaint Investigation</u>: An administrative investigation which was initiated because of a complaint.

H.    <u>Full Investigation</u>: An in-depth investigation in which all pertinent facts are gathered and are thoroughly and impartially reported in a General Investigation Report, Form SP 7-0025.

I.    <u>Limited Investigation</u>: An investigation which is reported by Correspondence, Form STD-501, and clearly establishes that:

    1.    The alleged misconduct failed to constitute a violation of Department rules and regulations.

2.   The complainant was mistaken and the misconduct alleged was not attributed to personnel.

3.   The complaint appears to be as a result of official police action which was adverse to the complainant and alleges only a de minimus violation.

4.   The complainant(s) refused to verify their complaint by signing a completed Complaint Verification Form and the nature of the complaint does not include allegations of criminal conduct or conduct which could reasonably be construed to result in a recommendation of court-martial by the Department Disciplinary Officer.

J.   <u>Medical Treatment</u>:  Care received at a recognized medical facility or from a licensed medical practitioner.

K.   <u>Misconduct</u>:  Any violation of the Pennsylvania State Police Code of Conduct or any other conduct which could reasonably be expected to destroy public respect and confidence in the Pennsylvania State Police.

L.   <u>Non-Complaint Investigation</u>: An investigation into the actions of Department personnel as provided by directive or requested by the Office of Chief Counsel, and no misconduct is alleged.

M.   <u>Performance Inadequacies</u>:  Minor infractions of omission/commission by a member which violate a Department policy or regulation.  Infractions of this type do not include conduct which involves compliance to lawful orders, the veracity of a member, criminal or civil liability, or publicity which may adversely affect the Department or its personnel.

25.05   COMPLAINT INVESTIGATION CATEGORIES

A.   <u>Physical Abuse</u>:  An allegation that an individual was physically mistreated or assaulted (does not include physical force investigations that are initiated by Department directive with no complaint).

AR 4-25
9/2/93

    B.    <u>Verbal Abuse</u>:  An allegation that profane or demeaning language was directed at the complainant or another person by personnel.

    C.    <u>Criminal Conduct</u>:  Any alleged violation(s) of federal, state or local statutes.

    D.    <u>Improper Conduct On Duty</u>:  Any alleged misconduct committed while on duty that, by its very nature, is demeaning to the professional image of the Department, and constitutes a violation of Department rules and regulations.

    E.    <u>Improper Conduct Off Duty</u>:  Any alleged conduct which could reasonably be expected to impact negatively upon the public's perception of the Department even though it occurred off duty.

    F.    <u>Dissatisfaction With Performance of Duty</u>:  An allegation that personnel failed to adequately perform or document a required or expected task, e.g., improper or incomplete accident or criminal investigations, failure to assist a disabled motorist, etc.

    G.    <u>Other</u>:  Allegations that are not easily categorized or identified as falling into a specific category, etc.

25.06    NON-COMPLAINT INVESTIGATION CATEGORIES

    A.    <u>Legal Intervention</u>:  Incidents when a member/enforcement officer, while in the course of their duties, intentionally involves a vehicle in a collision or establishes a roadblock which results in a collision, for the purpose of preventing the escape of a subject.

    B.    <u>Shooting Incident</u>:  Incidents when a member/enforcement officer discharges a weapon, including tear gas; another law enforcement officer discharges a weapon in the presence of a member/enforcement officer; or, a subject fires a weapon while a member/enforcement officer is present. Exceptions are listed in Section 25.10 E. 9.

    C.    <u>Physical Force Incident</u>:  Incidents when a member/enforcement officer uses physical force which results in death, or injury which requires medical treatment to any involved individual other than the member/enforcement officer.

-4-

D.    <u>Attorney Work Product</u>:  Investigations conducted at the request of the Office of Chief Counsel.

25.07    DISPOSITIONS

A.    <u>Complaint Investigations</u>:

1.    Sustained:  Investigation indicates misconduct did actually occur.

2.    Not Sustained:    Investigation failed to conclusively prove or disprove the allegation.

3.    Unfounded:  Indicates that the incident did not or could not have occurred as alleged.

4.    Policy Void:  Indicates that the action of the Department or the involved member(s) was consistent with Department policy, but the complainant still suffered harm.

5.    Withdrawn:    Indicates that the complainant refused to sign a Complaint Verification and the investigation was terminated or an investigation was otherwise concluded on advice of the Director, Bureau of Professional Responsibility.

B.    <u>Non-Complaint Investigations</u>:

1.    Justified:  The actions taken were within the guidelines, for the use of force under the existing circumstances, as established by the Department.

2.    Improper:    The actions taken exceeded the limits defined by the Department or by law for the use of force.

25.08    DUTIES AND RESPONSIBILITIES

A.    <u>Personnel</u>:    Personnel shall ensure that the confidentiality of all complaints is maintained in accordance with existing regulations.

B.    <u>Director, Bureau of Professional Responsibility</u>:  The Director, Bureau of Professional Responsibility shall:

1.    Assign and coordinate all investigations required by this regulation.  Depending on the

AR 4-25
9/2/93

nature of the incident, the investigation may
be conducted by a member of the Internal
Affairs Division or assigned to a Commissioned
Officer or noncommissioned officer of the
Director's choice.

2.    Assist the Affirmative Action Officer in the
investigation of affirmative action-related
complaints upon request.  Also, review other
such complaints and investigations in
consultation with the Affirmative Action
Officer.

3.    Ensure that all investigations are conducted
in a fair, prompt, thorough and impartial
manner.   Reports shall be completed in a
timely manner and within established statutes
of limitations per collective bargaining
agreement.

4.    Retain supervisory responsibility for all
investigations.     Specific investigative
procedures may be ordered if it is determined
to be necessary, prudent or desirable.

5.    Furnish an acknowledgement of receipt, in
writing, to the complainant.   Refer to
Appendage III.

6.    Provide a report, as requested, summarizing
the Internal Affairs Division's activities, to
the Commissioner/designee.

C.   Director, Internal Affairs Division: The Director,
Internal Affairs Division shall:

1.    In the absence of the Director, Bureau of
Professional Responsibility, assume all duties
relative to the administration of the internal
affairs function.

2.    Exercise supervisory control over all
investigations assigned to members of the
Internal Affairs Division.

3.    Ensure all investigations are conducted in a
fair, prompt, thorough and impartial manner.

4.    Make the notifications to the Office of Chief
Counsel as outlined in Sections 25.10 D. 1.
and 25.10 E. 1.

-6-

D.   <u>Area Commanders/Bureau Directors</u>:   The Area Commanders/Bureau Directors shall:

1.   Review all investigative reports in a timely manner and within established statutes of limitations per collective bargaining agreement.

2.   Provide guidance and advice to the Troop Commander/Division Director responsible for making administrative decisions.

3.   Assume the responsibilities enumerated in Section 25.08 E. when the subject of the investigation is a Troop Commander/Division Director under their command, or as directed by a Deputy Commissioner.

4.   Endorse the Troop Commander's/Division Director's administrative decision by indicating concurrence or nonconcurrence.

    a.   In cases of verbal abuse or dissatisfaction with performance of duty, a simple statement of this finding shall suffice if there is concurrence. All statements of nonconcurrence require a full explanation of points of difference.

    b.   Allegations, other than verbal abuse and dissatisfaction with performance of duty, require an endorsement indicative of an independent review of the facts.

E.   <u>Troop Commanders/Division Directors</u>:   Troop Commanders/Division Directors shall:

1.   Ensure compliance with the provisions of this regulation.

2.   Determine, in concurrence with the Director, Bureau of Professional Responsibility, whether an investigation shall be a full or limited investigation.

    a.   Upon receipt of a Use of Force or Complaint Reception and Processing Worksheet, Form SP 1-101, in which the allegation involves only performance inadequacies, the Troop

-7-

AR 4-25
9/2/93

Commander/Division Director shall contact the Disciplinary Officer and provide the details of the complaint.

b.  If the Disciplinary Officer concurs with the Troop Commander/Division Director that the complaint involves only performance inadequacies, the Disciplinary Officer shall contact the Director, Bureau of Professional Responsibility, for concurrence. The Director, Bureau of Professional Responsibility, shall then ensure contact is made with the Troop Commander/Division Director and provide them with a BPR Control Number.

c.  For issues relating to performance inadequacies, the Troop Commander/Division Director shall be responsible for ensuring the preparation and submission of the Review of Performance Complaint, Form SP 1-101A. This report shall be appended to the Use of Force or Complaint Reception and Processing Worksheet, and a copy forwarded to the Bureau of Professional Responsibility for retention. The Troop Commander/Division Director shall retain a copy of this report and maintain it in a supervisory file established for that purpose.

d.  In all other cases, concurrence must be obtained directly from the Director, Bureau of Professional Responsibility, regarding the scope of investigations to be conducted.

e.  Inform the Director, Bureau of Professional Responsibility of those cases when a complainant refuses to sign a Complaint Verification after being requested to do so by a Troop/Bureau investigator.

3.  Assign a Lieutenant or noncommissioned officer, outside of the subject's chain of command, to those investigations required by this regulation which are to be investigated

-8-

at the Troop/Division level. An investigator in the subject's chain of command may be assigned when warranted by circumstances. All assignments shall be made in concurrence with the Director, Bureau of Professional Responsibility, prior to actual assignment.

NOTE: When the subject is a Pennsylvania State Troopers Association (PSTA) member, PSTA officers (President, Vice-President, Secretary, Treasurer) or members of the Grievance Committee shall not be assigned to conduct the investigation.

4. Assist members of the Internal Affairs Division in investigations required by this regulation upon request.

5. Notify affected personnel of the results of the investigation as soon as practicable and within established statutes of limitations. Notices to personnel who had previously been issued a Notification of Inquiry, Form SP 1-102, shall be made in writing, by either correspondence or initiation of administrative action. The correspondence shall include a specific disposition using one of the defined terms contained in this directive.

   a. If the disposition of the investigation is unfounded, the subject shall not be counseled. Other performance issues uncovered through the investigation shall be addressed in separate correspondence or by counseling, which shall be made a part of the supervisory file.

   b. If an allegation is not sustained, the member may be counseled on relevant regulations or directives.

6. Initiate administrative action when warranted, upon receipt of an investigation, in accordance with AR 4-9 or FR 3-3. When administrative action is initiated in accordance with FR 3-3, the Troop Commander/Division Director shall prepare a detailed summary outlining the basis for discipline. The summary will be provided to the member as required by existing collective bargaining agreements. If a DAR is issued, a copy of the summary will be forwarded as an attachment to

AR 4-25
9/2/93

the supplemental General Investigation Report. The DAR and a copy of the summary will also be forwarded under separate cover to the Disciplinary Officer. When administrative action is initiated for employees, the provisions of AR 4-9 shall be applicable.

7.  Institute the following steps when an investigation is reviewed and it is discovered that someone other than or in addition to the individual listed in Block 4 of the Use of Force or Complaint Reception and Processing Worksheet has violated Department policies, regulations or procedures and there is a likelihood that a DAR will be issued:

   a.  Advise the additional subject(s) of the complaint by issuing a Notification of Inquiry, Form SP 1-102.

   b.  Direct the subject(s) to submit correspondence, STD-501, to the Troop Commander/Division Director addressing the issue(s) listed in the Notification of Inquiry.

   c.  List the subject(s) in Block 5 of the supplemental General Investigation Report.

   d.  Direct further investigation or, if the investigation is complete, initiate the review process.

8.  Notify the complainant of the results of the investigation, either verbally or in writing. Notify public officials who were interviewed, such as district attorneys, judges, etc., either verbally or in writing, of the results of the investigation if it is unfounded. These notifications shall be noted in the supplemental General Investigation Report.

9.  Refer the investigation, if circumstances warrant, to the appropriate Criminal Investigation Unit when the facts of the investigation reveal that false information has been provided with the intent to implicate personnel in the commission of a crime, or the facts indicate other criminal conduct on the part of the complainant.

-10-

AR 4-25
9/2/93

F.  Underline{Investigators}:  Investigators shall:

1.  Ensure that all investigations conducted are thorough and impartial.

2.  Contact the Director, Bureau of Professional Responsibility immediately whenever investigative difficulties occur or when assistance is desired in any phase of the investigation.

3.  Assist federal, state, county and municipal law enforcement agencies with investigations wherein personnel may be implicated in illegal activities or other acts of misconduct.

4.  Assist, upon request, the Office of Chief Counsel, in preparing cases when personnel are subjected to administrative action and/or criminal action, and conduct an investigation into factual allegations contained in civil actions, claims or other notices which could expose the Department or its personnel to civil liability.

5.  Notify the Director, Bureau of Professional Responsibility, immediately, when it becomes apparent by the facts gathered during an investigation that the Department may be the subject of civil litigation.

6.  Obtain a written prosecutorial decision from the district attorney in all cases where the conduct alleged may be criminal in nature. This decision should be obtained prior to the issuance of the Administrative Warning. The Director, Bureau of Professional Responsibility, shall be notified in the event the district attorney declines to render such written prosecutorial decision, or fails to render same in a timely manner.

7.  When practical, the subject(s) shall be given reasonable notice of the time, date and location of their interview. They should be informed of their right to have a union representative present at the interview. In all cases, requests for union representation during an interview by a subject(s) of an investigation shall be granted.

AR 4-25
9/2/93

NOTE:  The subject(s) assumes responsibility for arranging for such representation. Absent exigent circumstances, the subject(s) shall be provided reasonable time to arrange for representation. The subject(s) has no right to a specific representative, only to one that is the nearest and most readily available.

8.  Ensure the constitutional rights specified in Miranda v. Arizona and Garrity v. New Jersey are protected; and provisions granted by existing collective bargaining agreements are not violated. (Refer to Appendages IX and X.) Issue the Administrative Warning, Form SP 1-104 (Appendage VIII), in administrative investigations to further advise the subject(s) of the investigation of their rights under "Garrity"; that the questioning concerns administrative matters relating to the official business of the Department. The Rights Warning and Waiver Notice to Pennsylvania State Police Personnel, Form SP 1-103 (Appendage IX), shall be given to the subject(s) of the investigation to advise of rights under "Miranda" when there is the possibility of criminal charges.

9.  Issue the Notification of Inquiry as soon as practical to the affected personnel. In those cases where the investigation could be impeded or compromised, the investigator shall determine the appropriate time to issue the notification. (Refer to Appendage IV.)

10.  Any subject interviewed in regards to an investigation who has reason to believe their statements could result in administrative action being taken against them, shall be afforded union representation if requested.

11.  Provide personnel, who are required or requested to sign any forms during a BPR investigation, with a copy of any signed forms.

12.  When applicable, transcribe the complaint on the Complaint Verification, Form SP 1-108, Appendage XII and obtain the complainant's signature.

G.    <u>Personnel Receiving Complaints</u>:    Personnel
receiving complaints shall:

1.    Receive complaints against personnel in a
courteous manner.

2.    Document complaints when they are received.
Complainants shall not be advised to call back
later to speak with a supervisor or instructed
to contact the Bureau of Professional
Responsibility directly.    This does not
prohibit supervisors from recontacting a
complainant to clarify complaint information.

<u>NOTE</u>:    Personnel desiring to initiate a
complaint shall be responsible for completing
their own Use of Force or Complaint Reception
and Processing Worksheet.

3.    Ensure the confidentiality of all complaints
is maintained.

4.    Process all complaints in accordance with the
provisions of this regulation.

H.    <u>Personnel Who are the Subject of an Administrative
Investigation</u>:

1.    May at any time during the course of an
internal investigation, be ordered by the
appropriate authority to submit to any or all
of the following:

a.    Breath test.

b.    Urine test.

c.    Blood test.

d.    Polygraph test.

e.    Lineup.

f.    Medical/psychological/psychiatric
examination.

g.    Any other non-testimonial evidence
test.

h.    Questioning related to alleged
misconduct or performance of duty.

-13-

AR 4-25
9/2/93

2.    Shall be advised that none of the results of the tests or information received from the procedures listed in Section 25.08 H. 1., can be used against them in a criminal prosecution.

3.    Shall, upon direction of the investigating officer or other authority, be required to submit correspondence related to the alleged misconduct or performance of duty.    Absent exigent circumstances the submission shall be within 48 hours of being directed to do so. The 48 hours can be extended with the approval of the investigating officer or the Director, Bureau of Professional Responsibility.

4.    Shall be interviewed by the investigating officer.

5.    May obtain the results of any of the test/examination procedures listed in Section 25.08 H. 1. upon written request to the Director, Bureau of Professional Responsibility.  The results may be provided in the form of a copy or other written documentation.

6.    Shall be afforded all rights contained in existing collective bargaining agreements.

7.    Shall maintain confidentiality of investigations until completed.

8.    Shall cooperate and answer all questions honestly and completely.

I.    Personnel Who are the Subject of a Criminal Investigation: Personnel who are the subject of a criminal investigation shall be afforded the constitutional protections which are guaranteed as a result of United States Supreme Court decisions in Miranda v. Arizona and Garrity v. New Jersey, as applicable.

25.09    INVESTIGATIVE ASSIGNMENT CRITERIA

A.    Circumstances:    Administrative investigations conducted under the following circumstances are subject to the provisions of this directive and the Internal Affairs Division may, at the discretion of the Director, Bureau of Professional Responsibility, retain primary investigative responsibility:

-14-

AR 4-25
9/2/93

1. Shooting incidents and physical force incidents as defined in directives, regardless of personnel duty status.

2. Any allegation of criminal conduct directed against personnel.

3. Any allegation of misconduct directed against members.

4. Citizen complaints or any allegation of misconduct directed against personnel which could result in termination of employment. The provisions of AR 4-9 shall apply to performance inadequacies and/or cases of minor misconduct, e.g., traffic citations.

5. Allegations of violations of AR 4-6, FR 1-1 and other allegations of discrimination, harassment or violation of civil rights.

6. Investigations initiated in accordance with FR 6-4, legal intervention.

7. Investigations initiated as a result of contemplated administrative action related to FR 6-4.

8. Investigations initiated in accordance with FR 5-4.

9. Motor vehicle accidents resulting in the death of any person when:

   a. Pursuit is a factor.

   b. A Department vehicle is involved.

10. Any dog bite resulting from a Canine Enforcement Team requiring treatment by a licensed medical practitioner.

11. Investigations conducted at the request of the Commissioner.

B. <u>Investigative Responsibility</u>:   The following criteria will be considered by the Director, Bureau of Professional Responsibility, in determining if the Internal Affairs Division will assume investigative responsibility or if the investigation will be assigned to Troop/Division personnel:

-15-

1. Seriousness or complexity of the allegation to be investigated.

2. Source of the complaint.

3. Number of personnel involved.

4. Duty assignment of personnel involved.

5. Geographical limitations.

6. Need for internal security relative to all or part of the investigation.

7. Any exceptional circumstance noted by or brought to the attention of the Director, Bureau of Professional Responsibility.

C.    Performance Inadequacies:    The Internal Affairs Division will not assume investigative responsibility for mere performance inadequacies or procedural discrepancy violations unless they are indicative of a more serious underlying problem. Addressing the preceding issues is a function of first line supervision and should be handled at that level through counseling, training or other remedial action.

D.    Complaints Initiated by Personnel:    The Use of Force or Complaint Reception and Processing Worksheet shall be completed in accordance with Section 25.10 B. of this regulation.    No investigation will be undertaken into complaints lodged by personnel unless a substantiation of the allegation would give rise to formal discipline.

E.    Investigatory Difficulties:    If in the course of monitoring an ongoing investigation, the Director, Bureau of Professional Responsibility, determines that investigatory difficulties exist, the Internal Affairs Division may be directed to assume full or partial responsibility for conducting that specific investigation.    This may occur at any stage of the investigation.

25.10    COMPLAINT PROCESSING

A.    Types of Complaints: Complaints may be received in any of the following manners and shall be processed in accordance with this regulation in all instances:

-16-

AR 4-25
9/2/93

1.   Telephone:  Self-explanatory.

2.   In Person:   Individuals may appear at a
     Department installation, or may make a
     complaint to personnel at any location.

3.   Correspondence:  Self-explanatory.

B.   <u>Receiving Complaints</u>:

1.   Every complaint, whether anonymous, verbal or
     written, received by personnel shall be
     recorded on the Use of Force or Complaint
     Reception and Processing Worksheet, and
     processed as described in Appendage I.  When
     the complaint involves personnel in the chain
     of command and the process described in
     Appendage I is inappropriate, contact may be
     made directly with the Internal Affairs
     Division.

2.   Complainants shall not be required to appear
     at a Department installation to initiate a
     complaint.

3.   Complainants may remain anonymous; however, a
     reasonable effort to obtain identification
     should be made.

4.   If their identity is known, complainants shall
     be advised that a Department representative
     will contact them.

5.   The following procedure shall be followed by
     personnel receiving a complaint at times other
     than normal working hours:

     a.   In those cases which are not of a
          serious nature and do not require an
          immediate response from an Internal
          Affairs Division investigator, the
          information shall be documented and
          processed in accordance with
          Appendage I.

     b.   In serious cases which warrant the
          immediate response of an Internal
          Affairs Division investigator,
          personnel receiving the complaint
          shall immediately notify, through
          channels, the Troop Officer of the
          Day (OD).  The Troop OD shall then
          contact the Department Headquarters

-17-

AR 4-25
9/2/93

OD, who shall provide the name of the appropriate Bureau of Professional Responsibility duty member to call for an evaluation of the necessity of an immediate response. Any incident which results in the death or serious injury of a person; that involves the physical arrest of personnel, or major breaches of conduct by personnel; or that is likely to generate more than routine public interest, should be considered serious in nature.

C.    Notifying Involved Individuals:

1.    The Director, Bureau of Professional Responsibility, shall notify the complainant that their complaint has been received. When personnel initiate a complaint, this notification may not be required. (Refer to Appendage III.)

2.    The assigned investigator shall officially notify affected personnel of a pending investigation, unless circumstances dictate otherwise. The Notification of Inquiry shall be issued to the subject(s) and serve as the official notification. (Refer to Appendage IV.)

D.    Investigation Procedures: The following procedures shall be followed by individuals conducting personnel investigations:

1.    Complaints of physical abuse, discrimination and sexual harassment provide a high potential for liability to the Department and its personnel. Based upon a request from the Office of Chief Counsel, all such complaints shall be investigated immediately to determine the factual circumstances surrounding the complaint in order to assist the Office of Chief Counsel in developing legal theories that can be advanced in defense of any resulting claims and to properly evaluate the potential for liability to which the Department or its members could be exposed. The Office of Chief Counsel shall be provided notice of complaints of this nature by the Director, Internal Affairs Division as soon as possible after receipt.

-18-

2.  The Use of Force or Complaint Reception and Processing Worksheet shall be prepared in accordance with this regulation and will serve in place of an incident memo. A BPR Control Number shall be obtained by the Troop Commander/Division Director and entered in Block 1. No incident memo will be prepared, nor will a Troop Incident Number be assigned.

3.  Complaints from citizens shall be verified through the completion of the Complaint Verification, Form SP 1-108, Appendage XII. In some cases this would have been accomplished through the use of Appendage XIII by the Bureau of Professional Responsibility by mail prior to assignment. If the verification is not attached to the complaint the investigator shall complete Appendage XII. In doing so, investigators shall request the complainant's signature in the allotted block before the interview.

    a.  If the complainant refuses to sign the form, the investigator shall print "Refused" in the signature block. The complainant shall be informed that such refusal constitutes a withdrawal of their complaint. The investigator shall attempt to complete an interview of the complainant, and shall afterwards confer with the Director, Bureau of Professional Responsibility for a determination on the future course of the investigation. Except in cases of criminal conduct or those which could give rise to court-martial proceedings, as determined by the Department Disciplinary Officer, the investigation shall be terminated with the submission of a limited investigation documenting action taken.

    b.  If travel distance or other circumstances prohibit a personal interview, the investigator shall request assistance from the Bureau of Professional Responsibility in obtaining a completed verification form.

-19-

AR 4-25
9/2/93

4.      The General Investigation Report shall be used
        to report full investigations. Correspondence
        shall    be    used    to    report    limited
        investigations.

        NOTE:   When appropriate, an Initial Crime
        Report, Form SP 7-004, or Non-Traffic
        Citation, Form SP 7-0017B shall be prepared
        and assigned a Troop Incident Number.

5.      Personal contact, when practical, shall be
        made with complainants, witnesses and involved
        personnel. Anonymous complaints shall not be
        automatically   dismissed.   A   thorough
        investigation   shall   be   conducted   to
        independently   prove   or   disprove   the
        allegation. The investigator should make a
        reasonable effort to determine the identity of
        anonymous complainants.

        NOTE: No administrative action shall be taken
        against personnel solely on the basis of an
        unsupported anonymous complaint. In addition,
        no investigation shall be initiated into
        anonymous complaints unless a substantiation
        of the allegation could give rise to formal
        discipline as determined by the Disciplinary
        Officer.

6.      Personnel who are directly or indirectly
        associated with a matter under investigation
        may be directed by the investigating officer
        or other authority to submit correspondence
        containing an account of their knowledge and
        involvement.   Such   correspondence   shall
        include complete answers to any related
        questions of the investigator. Absent exigent
        circumstances; personnel shall be provided 48
        hours to submit the correspondence to the
        investigator or higher authority. Any
        subsequent requests for additional information
        may be made by the investigator citing
        specific questions to be answered. All
        submitted correspondence shall be included as
        attachments to the General Investigation
        Report.

7.      The subject of the investigation shall be
        personally interviewed.

        a.   All related interviews conducted
             during BPR personnel investigations
             which allege criminal conduct or

-20-

AR 4-25
9/2/93

gross misconduct shall be tape-recorded.

(1) Prior to beginning an interview which requires tape-recording, the subject shall be informed that their statement will be tape-recorded.

(2) Personnel, during administrative investigations, have no right to refuse the interview being tape-recorded.

(3) Individuals not employed by the Department have the right to refuse their interview being tape-recorded.

b. The subject(s) of a taped interview may obtain a copy of the related cassette tape.

(1) Upon written request to the Director, Bureau of Professional Responsibility, and within 15 working days after the last interview is completed, the subject(s) shall be provided with a copy of their taped interview. Requesting personnel shall immediately provide correspondence encompassing a written receipt. For other than Department personnel, a handwritten receipt is acceptable.

(2) The subject(s), who is a PSTA member, may simultaneously tape-record the interview being conducted and also be tape-recorded by a member conducting a BPR investigation. At the conclusion of the interview, the subject's cassette tape shall be removed and immediately placed in an envelope by the BPR investigator. The envelope shall then be sealed and the subject directed to place their

-21-

AR 4-25
9/2/93

signature, date and time upon the seal. The sealed envelope shall be further enveloped in a postage stamped and addressed mailing envelope provided by the member. The package shall be immediately mailed to the PSTA office where the enclosed envelope will be retained in a sealed condition until notified by BPR that the contents of the interview may be released to the subject(s).

c.  Interviews meeting the criteria set forth in this regulation for tape-recording which have not, for whatever reason, been tape-recorded will be reduced to writing by the investigator, who shall then show the written statement to the subject for their review. The subject will then be requested to sign each page and complete the signature block on the statement's last page. The signature block shall state:

By my signature on this and each of the foregoing _____ pages, I hereby adopt the statement contained herein and acknowledge the statement's completeness and veracity.

_____ Signature

_____ Date

d.  Tape-recorded interviews may be summarized for reporting purposes. The investigator must ensure that the summary is accurate and that the original tape is included as an attachment to the investigative report.

8.  All documents and/or reports, or copies thereof, if originals are not available, which have been generated by the investigation shall be collected.

-22-

9.   All available investigative tools shall be employed to secure evidence to assist in determining the facts of an investigation. All evidence collected shall be processed in accordance with the procedures outlined in OM 7-7. Examples of investigative tools and evidence to be used in the investigation are as follows:

a.   Documents and Records:

    (1)   Medical reports - refer to Appendage V.

    (2)   Licenses, registrations or any applications.

    (3)   Telephone toll records.

    (4)   Financial records - refer to Appendage VI.

    (5)   Credit Bureau checks.

    (6)   Search warrants/affidavits.

    (7)   Employment records - refer to Appendage VII.

    (8)   Subpoenas.

    (9)   Initial Crime Reports.

  (10)   Accident Reports.

NOTE: A Request for Criminal Record Check, Form SP 4-164, commonly referred to as a "rap sheet," shall only be included if relevant.

b.   Clothing: Especially important in incidents of shooting or alleged physical abuse.

c.   Photographs:

    (1)   Victims - physical abuse, shootings, etc.

    (2)   Scenes - location of alleged violation.

AR 4-25
9/2/93

    (3)   Photo lineups - <u>U.S. v. Wade</u> covers the Supreme Court guidelines associated with lineups. Refer to Appendage XI.

d.    Radio Tapes: These are reused on a 30 or 60-day cycle. It is incumbent upon the investigator to obtain the tape prior to its reuse or erasure.

e.    Sketches: Prepared of scene, if warranted.

f.    Weapons: Ascertain if:

    (1)   Issued/personal.

    (2)   Ammunition - issued/personal.

    (3)   Alterations.

    (4)   Make, model, serial number and caliber.

    (5)   Qualified with weapon - Permanent Firearms Scoring Record, Form SP 8-104.

    (6)   Request to Carry a Personal Handgun on Duty, Form SP 1-600, is completed and on file.

g.    Technical Aids:

    (1)   Laboratory.

        (a)   Ballistics Section.

        (b)   Chemistry Section.

        (c)   Documents Section.

        (d)   Photographic Section.

        (e)   Latent Print Section.

        (f)   Automated Fingerprint Identification System Section.

    (2)   Polygraph.

-24-

(3)  Helicopter.

(4)  Scuba Teams.

10.  Personal property of personnel is not subject to search and seizure for administrative work-related investigations without reasonable suspicion.  Probable cause and/or a search warrant, as required by law, are necessary to search and seize the personal property for criminal investigative purposes.  However, Department property may be searched at any time, even if assigned to or used exclusively by a single individual.  This search may be conducted by any authorized person pursuant to an investigation.

11.  At no time will recommendations be offered as to the appropriate administrative action to be taken.  The investigator shall not express assumptions, personal opinion, or conclusions in the General Investigation Report.

12.  The following exceptions to completing a General Investigation Report are necessary when conducting full investigations:

a.  Block 5 shall read as follows:

Name of Subject Personnel
Troop/Bureau - Station/Division
Date of Enlistment/Hiring
Social Security Number of Subject Personnel

NOTE:  Additional subjects shall be entered in the INSTRUCTIONS Block, under the subheading ADDITIONAL SUBJECTS, using the above format.

b.  The subheadings CONCLUSION, and RECOMMENDATION and COMMENT in Block 6 shall not be included when the report is used for administrative investigation purposes.

c.  All attachments shall be consecutively numbered under the subheading, LIST OF ATTACHMENTS. Each attachment shall be numbered, along the lower right corner to correspond with this list.  In the format of:  Attachment No._____,

AR 4-25
9/2/93

Page_____ of_____. The Use of Force or Complaint Reception and Processing Worksheet shall always be Attachment Number 1. Attachments to supplemental General Investigation Reports shall continue consecutively from the last attachment number in the original report.

d.   No references to race/ethnicity shall be included when identifying interviewees, unless relevant to the issue under investigation.

13.   When the facts of an investigation indicate that a Report of Incident/Accident, Form STD-430, shall be submitted according to AR 4-12, it shall be submitted directly to the Director, Bureau of Staff Services, and noted in the details section of the report. A copy shall not be made an attachment to the General Investigation Report.

14.   Department directives, contract/agreement provisions, the Pennsylvania Rules of Criminal Procedure and statutes shall be strictly adhered to while conducting investigation(s).

15.   Individuals under investigation shall be advised of their Constitutional Rights, which may apply during the investigation.

16.   The investigation shall be completed and all reports shall be received by the Director, Bureau of Professional Responsibility within 30 days after assignment, unless another time period is specified by the Director. It is important for the assigned investigator to complete the investigation and submit the report promptly.

E.   Investigation of Non-Complaint Incidents:

1.   Incidents involving legal intervention, shooting or use of physical force, provide a high potential for liability to the Department and its personnel. Based on a request from the Office of Chief Counsel, in all such incidents an immediate investigation shall be conducted into the factual circumstances surrounding the incident in order to assist the Office of Chief Counsel in developing legal theories that can be advanced in defense

-26-

of any resulting claims and to properly
evaluate the potential for liability to which
the Department or its members could be
exposed. The Office of Chief Counsel shall be
provided notice of the above-referenced types
of incidents by the Director, Internal Affairs
Division as soon as possible after their
occurrence.

2.   The involved member(s)/enforcement officer(s)
     shall immediately notify, through the chain of
     command, the Troop Commander responsible for
     the area in which the incident occurred. For
     a member not under their command, the Troop
     Commander shall notify the member's Troop
     Commander, Division Director; and, if on
     detached status, the member's current Troop
     Commander/Division Director shall also be
     notified. For Enforcement Officers, the Troop
     Commander shall notify the Director,
     Operations Division, Bureau of Liquor Control
     Enforcement.  If serious injury or death
     occurred to an individual, the Troop Commander
     shall immediately notify the Deputy
     Commissioner of Operations, through the chain
     of command, if possible. The Troop Commander
     shall also provide immediate notification to
     the Bureau of Professional Responsibility, in
     accordance with Department directives, in all
     shooting/physical force incidents.

3.   In those incidents requiring immediate
     response, the Troop Commander shall ensure
     that a supervisor who is not directly involved
     in the incident is immediately assigned to
     secure the scene of the incident.  The
     assigned supervisor shall initiate a
     preliminary investigation, pending assignment
     of a principal investigator, who shall be
     selected through concurrence with the
     Director, Bureau of Professional
     Responsibility.

4.   If the use of physical force results in injury
     which requires medical treatment to personnel
     only, and no other investigative criteria
     applies, an administrative investigation is
     not required.

5.   Any member/enforcement officer, who discharges
     a weapon which results in an injury or death,
     or whose use of physical force results in a
     death, shall immediately be assigned to

AR 4-25
9/2/93

Station/Office duties, pending an evaluation of the circumstances surrounding the incident by the Deputy Commissioner of Administration. In addition, any member/enforcement officer whose use of physical force results in an injury may, at the discretion of the Deputy Commissioner of Administration, be assigned to Station/Office duties pending evaluation of the circumstances surrounding the incident. For those incidents in which responsibility cannot be immediately determined, all members/enforcement officers directly involved in the incident shall be placed in this status, where appropriate. This action is not to be construed as disciplinary in nature.

6.  Whenever a member/enforcement officer is directly involved in a shooting incident which results in injury or death:

    a.  The assigned criminal investigator and BPR investigator shall interview the involved personnel, as soon as possible.

    b.  The Troop Commander/Bureau Director shall ensure that the Member Assistance Program Office Manager is notified immediately.

    c.  The member's/enforcement officer's Troop Commander/Bureau Director, in conjunction with the Manager, Member Assistance Program, shall, as soon as possible, but not more than 72 hours after the incident, arrange for the affected member(s)/ enforcement officer(s) to receive appropriate professional counseling. This shall not preclude professional counseling of members/enforcement officers involved in shooting incidents not resulting in injury or death or in other use of physical force incidents. In addition, the Troop Commander/Bureau Director, in conjunction with the Manager, Member Assistance Program, shall ensure appropriate professional counseling is provided to any personnel, e.g., Police Communications Operators, supervisors, etc., indirectly

-28-

AR 4-25
9/2/93

involved with and adversely affected
by an incident.

d.    The Troop Commander/Bureau Director
shall ensure the PSTA President is
notified, as soon as possible in
those incidents involving members.

7.    During the investigation of a shooting
incident, it may be necessary for the
investigator to take possession of a member's/
enforcement officer's weapon. The Troop
Commander/Division Director shall make
arrangements for immediate replacement of the
weapon.

8.    Release of a member's/enforcement officer's
name to the news media shall be coordinated
through the Public Information Office.

9.    An investigation of a non-complaint incident
is not required for the following shooting
incidents:

a.    Firearms training/qualification.

b.    A member/enforcement officer
discharging a weapon while off duty
as permitted by law for purposes
such as hunting, fishing, target
shooting, etc.

c.    When a member destroys an animal in
accordance with the provisions of
FR 7-3.

10.   During the investigation of a non-complaint
incident, the investigator shall exercise
discretion in determining if an aggrieved
citizen should be interviewed. This does not
apply to instances where the citizen initiates
the complaint and alleges physical abuse.

F.    Limited Investigations:

1.    A limited investigation may be conducted when
a requirement under the definition of "Limited
Investigation" is met. In addition, a limited
investigation may be conducted when the Troop
Commander/Division Director and the Director,
Bureau of Professional Responsibility concur
that a full investigation is not warranted due
to mitigating circumstances. A BPR Control

-29-

AR 4-25
9/2/93

Number and investigator shall be assigned to all limited investigations.

2.   Limited investigations shall be prepared on correspondence directed to the investigator's Troop Commander/Bureau Director.

a.   Limited investigations should include a synopsis of the allegations. Enclosures may include:

(1)   Information from involved personnel submitted correspondence.

(2)   Copies of pertinent investigative reports.

(3)   Any other documents which are relevant to the investigation.

(4)   Notification of Inquiry issued to involved personnel.

b.   Investigator's assessment as to why this investigation should be handled on a limited basis, as defined in Section 25.04 I.

3.   Upon completion of a limited investigation, the Troop Commander/Division Director shall prepare an endorsement, citing reasons for their decision and a notation that the complainant and involved personnel were notified of this decision. The endorsement shall also include a statement of the disposition using one of the defined categories listed in Section 25.07, excluding the categories "Sustained" or "Not-Sustained." The limited investigation must be converted into a full investigation if any element of misconduct is determined.

4.   Troop Commanders/Division Directors shall forward the endorsed, limited investigation, through channels, to the Director, Bureau of Professional Responsibility. If, during the review process, a determination is made that the facts contained in the limited investigation are insufficient to support the final disposition, the report may be returned to the Troop Commander/Division Director

-30-

directing that the investigator conduct a full investigation. If a limited investigation is returned under these circumstances, all prior notifications to the complainant and involved personnel shall be deemed to be void.

G.   Submission of Internal Investigation Reports for Full Investigations:

1.   All applicable General Investigation Reports shall be forwarded directly, in duplicate, to the Director, Bureau of Professional Responsibility, by the assigned investigator.

2.   After reviewing the report for investigative content, the Director, Bureau of Professional Responsibility, shall either forward it to the Deputy Commissioner of Administration for further processing or return it to the investigator for additional investigation. A copy of the investigative reports on incidents involving legal intervention, shooting, use of physical force, or complaints of physical abuse, discrimination, or sexual harassment shall be forwarded to the Office of Chief Counsel for evaluation at the time the report is forwarded to the Deputy Commissioner of Administration.

3.   The Deputy Commissioner of Administration or designee shall forward the investigative report to the appropriate Area Commander/Bureau Director, who shall review and forward it to the Troop Commander/Division Director. In cases which appear to warrant the issuance of a DAR, the Area Commander/ Bureau Director shall ensure consultation with the Troop Commander/Division Director prior to an administrative decision being made. An administrative decision shall be formulated by the Troop Commander/Division Director and communicated to the subject(s) of the investigation in a timely manner.

   a.   If the investigation involves a member and a DAR will be issued, the provisions of FR 3-3 apply.

   b.   If disciplinary action will be taken against an employee, the provisions of AR 4-9 apply.

-31-

4.   The investigative report shall be returned, through channels, to the Deputy Commissioner of Administration, by the appropriate Troop Commander/Division Director, after they have completed their supplement report of the General Investigation Report and detailed their administrative decision. The supplement report shall, at a minimum, contain the following:

   a.   A statement of the disposition using one of the defined categories listed in Section 25.07. If there is more than one element to the allegation and the dispositions differ, each element must be individually addressed. Allegations in the categories Verbal Abuse or Dissatisfaction with Performance of Duty that are disposed of as unfounded or not sustained may be satisfactorily addressed by simply stating the appropriate disposition with no explanation necessary.

   b.   Except as exempted in the above section, a statement on those mitigating or aggravating circumstances that influenced the dispositional decision.

   c.   A statement that notification regarding the disposition of the complaint was made to the subject and the complainant. The method used to notify the complainant must be stated.

   d.   When a DAR is issued, the detailed summary provided to the involved member shall be included as an attachment.

5.   The Deputy Commissioner of Administration shall forward all reports to the Director, Bureau of Professional Responsibility, for further action or filing.

6.   The central location for the collection and maintenance of all administrative investigation information shall be the Bureau of Professional Responsibility, Internal Affairs Division. All personnel investigations are of

-32-

AR 4-25
9/2/93

a confidential nature and may be reviewed only upon authorization of the Commissioner/ designee.

7.    General Investigation Reports and limited investigation reports shall be purged after ten years, or two years after the member/employee separates, unless litigation warrants retention.

25.11    INTERNAL AFFAIRS DIVISION PERSONNEL

A.    <u>Selection</u>:  Staffing an Internal Affairs Division is an important factor in the success or failure of the Division.  To be considered for assignment in the Internal Affairs Division, members must:

1.    Be volunteers.

2.    Have demonstrated that they possess a high degree of investigative skill and the ability to write clear, concise and complete investigative reports.

3.    Have an excellent reputation, among both their peers and supervisors, in terms of integrity and overall performance as members.

4.    Be familiar with those statutes, collective bargaining agreements, and Department directives, policies and procedures which are related to administrative investigations.

5.    Have a thorough knowledge in the collection and preservation of evidence.

6.    Should have knowledge of the availability of records and information maintained by other sources and agencies.

7.    Should possess the ability to perform photographic surveillance and possess or be willing to acquire the proper certification required to perform electronic surveillance.

8.    Should be in good physical condition and present a professional appearance.

9.    Should be able to interact effectively with people and be proficient in interviewing and interrogation techniques.

-33-

AR 4-25
9/2/93

B.    <u>Tenure</u>:   It is a generally accepted practice to periodically rotate members assigned to an Internal Affairs Division.    This rotation process will assure the infusion of new personnel and new ideas, and allow greater member participation.    The investigator positions within the Division shall be posted in accordance with AR 4-20.   Investigators shall serve for a period of time to be determined by the Commissioner.

AR 4-25
9/2/93

APPENDAGE  I

USE OF FORCE OR COMPLAINT RECEPTION AND PROCESSING WORKSHEET
FORM SP 1-101

A.   PURPOSE:  This form is used to provide a uniform method of
     receiving and recording complaints against personnel and
     recording incidents for non-complaint investigations.

B.   PREPARATION:  This form shall be printed with ballpoint pen or
     typewritten, in original only, by the individual receiving the
     complaint.

C.   BLOCK INSTRUCTIONS:

     1.   BPR CONTROL NUMBER:  To be. obtained by the Troop
          Commander/Division Director from the Director, Bureau of
          Professional Responsibility.

     2.   COMPLAINANT INFORMATION:  This section is for recording
          the vital information regarding the individual making the
          complaint.  Personnel shall not place their names in this
          section unless they are the actual complainant.   When
          personnel receive information from an outside source,
          that source shall be noted in this section.   For
          non-complaint investigations and anonymous complaints,
          this section shall be left blank.

     3.   NON-COMPLAINT USE OF FORCE REPORT:  Check the appropriate
          box.

     4.   SUBJECT OF ALLEGATION/REPORT:  Self-explanatory.

     5.   DETAILS OF ALLEGATION:

          a.   ROUTE/STREET:  Self-explanatory.

          b.   CITY/TWP/BORO:  Self-explanatory.

          c.   COUNTY:  Self-explanatory.

          d.   DATE:  Self-explanatory.

          e.   TIME:  Self-explanatory.

          f.   DAY:  Self-explanatory.

          g.   TYPE OF ALLEGATION:  Refer to Section 25.05.
               Check the appropriate box.

I-1

AR 4-25
9/2/93

    h.   SYNOPSIS:  A brief explanation of what the complaint alleges or what occurred during a non-complaint incident is sufficient.

6.   RECEPTION DATA:

    a.   DATE RECEIVED:  Self-explanatory.

    b.   TIME RECEIVED:  Self-explanatory.

    c.   LOCATION RECEIVED:  Self-explanatory.

    d.   RECEIVED BY:  The name of the individual who initially receives the details of the allegation from the complainant shall be recorded here.  Do not advise complainants to call back later to speak to a supervisor.

7.   FOR BUREAU USE:  This space shall be used <u>only</u> by the Bureau of Professional Responsibility.

8.   ADDITIONAL SUBJECTS OF ALLEGATION/REPORT: Self-explanatory.

D.   DISTRIBUTION WHEN A COMPLAINT IS RECEIVED AT A TROOP/BUREAU LOCATION:

1.   Personnel Receiving Complaint - Forward through channels to the individual's Troop Commander/Division Director by the most expedient means possible.  If the complaint involves an individual in the chain of command, the individual may be bypassed when submitting the Worksheet through channels.

2.   Troop Commander/Division Director - The Troop Commander/Division Director, after reviewing the Worksheet, shall assess if a full or limited investigation is appropriate.

    a.   The Director, Bureau of Professional Responsibility or a designee shall then be contacted by telephone for concurrence.  At this time, a BPR Control Number will be assigned and recorded in the Bureau Register. An investigator will also be assigned.

        (1)  If the decision is made for the investigation to be conducted by Troop/Bureau members, the Worksheet shall be forwarded to the investigating officer for inclusion as the first attachment to the General Investigation Report.

I-2

(2) If the decision is made for the investigation to be conducted by a member of the Internal Affairs Division, the Worksheet shall be immediately forwarded to the Director, Bureau of Professional Responsibility. It will then be forwarded to the Internal Affairs Division investigator for attachment to the General Investigation Report.

b. Upon receipt of a nonwritten complaint which alleges dissatisfaction with performance of duty or verbal abuse, the Troop Commander/Division Director shall immediately contact the Director, Bureau of Professional Responsibility to discuss the details of the allegation. When appropriate, the Director, Bureau of Professional Responsibility may elect to proceed by forwarding a Complaint Verification, Form SP 1-108, to the complainant requesting more specific information about the allegation, before initiating an investigation. In such cases, the Troop Commander/Division Director shall forward the original Worksheet to the Bureau of Professional Responsibility and retain a copy in a chronological file at the Troop/Bureau for 60 days, after which the Worksheet shall be purged.

c. The original Worksheet shall be retained in an active file at the Bureau of Professional Responsibility for 30 days, following the mailing of the Complaint Verification Form. Failure of the complainant to complete and return the Complaint Verification Form within 30 days will result in termination of the complaint and transfer of the original Worksheet to an inactive file. Completed Complaint Verification Forms shall be evaluated by the Director, Bureau of Professional Responsibility to determine if an investigation is warranted.

3. It may be determined by the Director, Bureau of Professional Responsibility that action other than an investigation is appropriate; in such cases the Worksheet shall be forwarded to the Director, Bureau of Professional Responsibility with related cover correspondence.

AR 4-25
9/2/93

E.  DISTRIBUTION WHEN A COMPLAINT IS RECEIVED BY THE BUREAU OF
    PROFESSIONAL RESPONSIBILITY:

    1.  When it is determined that the investigation shall be
        conducted by a member of the Internal Affairs Division,
        the Worksheet shall be prepared and forwarded to the
        assigned Internal Affairs Division investigator for
        attachment to the General Investigation Report.

    2.  When it is determined that the investigation shall be
        conducted by Troop/Bureau members, the Worksheet shall be
        prepared and forwarded to the Troop Commander/Division
        Director of the affected personnel.   The assigned
        investigator shall attach it to the General Investigation
        Report.

F.  DISTRIBUTION WHEN THE SUBJECT OF THE COMPLAINT IS A MEMBER
    ASSIGNED TO THE BUREAU OF PROFESSIONAL RESPONSIBILITY:  When
    a complaint is received concerning a member assigned to the
    Bureau of Professional Responsibility, the Worksheet shall be
    sent directly, under confidential cover, to the Deputy
    Commissioner of Administration.

I-4

SP 1-101 (1-93)

**PENNSYLVANIA STATE POLICE**
## USE OF FORCE OR COMPLAINT
### RECEPTION AND PROCESSING WORKSHEET

| BPR CONTROL NUMBER |
|---|
| 1. AR 4-25 |
| 9/2/93 |

---

**COMPLAINANT INFORMATION**

| | | | | |
|---|---|---|---|---|
| **NAME** | FIRST | M.I. | LAST | |
| **HOME ADDRESS** | STREET/P.O. BOX | | | |
| | CITY | STATE | ZIP CODE | HOME PHONE # ( ) |
| **EMPLOYER** | NAME & ADDRESS | | | WORK PHONE # ( ) |

---

| 2. NON-COMPLAINT USE OF FORCE REPORT | ☐ SHOOTING INCIDENT | ☐ PHYSICAL FORCE | ☐ LEGAL INTERVENTION |
|---|---|---|---|

---

**4. SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)**

| | | | |
|---|---|---|---|
| **NAME** | FIRST | M.I. | LAST |
| **LOCATION** | TROOP/BUREAU | STATION/DIVISION | JOB ASSIGNMENT |
| **SSN** __ __ | DOE | ◄——— TO BE COMPLETED IF KNOWN OR AVAILABLE | |

---

**5. DETAILS OF ALLEGATION**

| ROUTE/STREET | | | | |
|---|---|---|---|---|
| CITY/TWP/BORO | COUNTY | DATE | TIME | DAY |

| **TYPE OF ALLEGATION (CHECK ONE)** | ☐ PHYSICAL ABUSE ☐ VERBAL ABUSE ☐ CRIMINAL CONDUCT | ☐ IMPROPER CONDUCT ON DUTY ☐ IMPROPER CONDUCT OFF DUTY ☐ DISSATISFACTION WITH PERFORMANCE OF DUTY |
|---|---|---|
| | ☐ OTHER (Please explain) | |
| **SYNOPSIS** | | |

---

**6. RECEPTION DATA**

| DATE RECEIVED | TIME RECEIVED | LOCATION RECEIVED | TROOP/BUREAU — | STATION/DIVISION |
|---|---|---|---|---|
| **RECEIVED BY** | NAME | | SSN __ __ | |

---

**7. FOR BUREAU USE**

| | NAME | | SSN __ __ | | |
|---|---|---|---|---|---|
| INVESTIGATOR | | | | | |
| CONTROL NO. ISSUED BY | | DATE ASSIGNED | DATE DUE | SP 1-101-A ☐ | LIMITED INVESTIGATION ☐ |

I-5

AR 4-25

9/2/93



**a.** ADDITIONAL SUBJECTS OF ALLEGATION/REPORT

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |
| SSN | — — | DOE | ← | TO BE COMPLETED IF KNOWN OR AVAILABLE |

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |
| SSN | — — | DOE | ← | TO BE COMPLETED IF KNOWN OR AVAILABLE |

| NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT |
| SSN | — — | DOE | ← | TO BE COMPLETED IF KNOWN OR AVAILABLE |

| SYNOPSIS (CONT.) | |
|---|---|

I-6

AR 4-25
9/2/93

APPENDAGE II

REVIEW OF PERFORMANCE COMPLAINT
SP 1-101A

A.  PURPOSE:  The review of performance complaint is used to:

1.  Provide Troop Commanders/Division Directors with a guideline to assist in determining if a member is merely lacking in a performance outside the Department Internal Affairs/Discipline System.

2.  Document action taken in cases of performance inadequacies for future reference in the event of repeated behavior; a basis for progressive discipline; to document/maintain consistency throughout the Department.

B.  BLOCK INSTRUCTIONS:  This form shall be printed with ballpoint pen or typewritten, in original only, by the Troop Commander/ Division Director reviewing the complaint.

1.  SUBJECT AND BPR NUMBER:  Self-explanatory.

2.  DATE(S) OCCURRED:  Self-explanatory.

3.  DID COMMISSION/OMISSION TAKE PLACE OR BECOME KNOWN TO THE PUBLIC?  Check appropriate box.

4.  WAS THE COMMISSION/OMISSION WHOLLY A MATTER OF INTERNAL ADMINISTRATION?  Check appropriate box.

5.  WAS THE MEMBER PREVIOUSLY COUNSELED REGARDING SIMILAR BEHAVIOR?  IF YES, LIST DATES, CIRCUMSTANCES, AND BY WHOM:  This requires review of member's supervisory file and performance evaluation.  Check appropriate box.  If yes is checked, provide details.

6.  WHAT, IF ANY, EFFECT DID THE MEMBER'S COMMISSION/OMISSION HAVE (E.G. DESTROYED RESPECT FOR THE PENNSYLVANIA STATE POLICE, IMPROPER EXAMPLE FOR OTHERS, ETC.):  Self-explanatory.  If none, leave blank.

7.  LIST AND IDENTIFY AGGRAVATING AND/OR MITIGATING CIRCUMSTANCES:  Self-explanatory.

8.  WAS MEMBER DISCIPLINED WITHIN THE PAST FIVE YEARS REGARDING SIMILAR PERFORMANCE?  IF YES, LIST DATES AND PENALTIES:  Self-explanatory.

9.  WAS MEMBER PREVIOUSLY GIVEN REMEDIAL TRAINING REGARDING SIMILAR PERFORMANCE?  IF YES, LIST DATES AND CIRCUMSTANCES:  Self-explanatory.

II-1

AR 4-25
9/2/93

10. PRE-ADJUDICATION MEETING WAS HELD?   DATE:   Self-explanatory.   This is to verify whether the Troop Commander/Division Director met with the member for the purpose of determining the validity of a performance inadequacy.

11. ATTENDEES:  List the names of any persons, in attendance with the member and their position.  Example:  Trooper John J. Jones - Troop PSTA Representative.

12. REMARKS:  List any pertinent comments made by the parties during the meeting.

13. DETERMINATION:  Check appropriate box.

14. DATE MEMBER WAS NOTIFIED OF DETERMINATION:   Self-explanatory.

15. DATE COMPLAINANT WAS NOTIFIED OF DETERMINATION:   Self-explanatory.  Check appropriate box if notification was written or verbal.

16. DISCIPLINARY OFFICER CONTACTED?   IF YES, LIST DATE: Self-explanatory.

17. MEMBER COUNSELED? IF YES, LIST DATE:  Self-explanatory.

18. DAR/TROOP COMMANDER'S WRITTEN REPRIMAND ISSUED?  IF YES, LIST DATE:  Self-explanatory.

19. BPR INVESTIGATION INITIATED:  Check appropriate box.

20. REMEDIAL TRAINING SCHEDULED?  IF YES, LIST DATE(S) AND TYPE:  Self-explanatory.

21. REMARKS/DETAILS:  Self-explanatory.

22. INITIATING OFFICER, TITLE AND DATE:  Self-explanatory.

C.  DISTRIBUTION:

1. If a performance inadequacy is founded, the Troop Commander/Division Director shall be responsible for ensuring the preparation and submission of the Review of Performance Complaint.  This report shall be appended to the Use of Force or Complaint Reception and Processing Worksheet, Form SP 1-101, and forwarded to the Bureau of Professional Responsibility.

2. The Troop Commander/Division Director shall retain a copy of this report in a supervisory file established for that purpose.

II-2

AR 4-25
9/2/93

SP 1-101A (8-93)

**REVIEW OF PERFORMANCE COMPLAINT**

| 1. SUBJECT | | | | BPR # | | | |
|---|---|---|---|---|---|---|---|

2. DATE(S) OCCURRED:

| 3. DID COMMISSION/OMISSION TAKE PLACE OR BECOME KNOWN TO THE PUBLIC? | ☐ YES | ☐ NO |
|---|---|---|

| 4. WAS THE COMMISSION/OMISSION WHOLLY A MATTER OF INTERNAL ADMINISTRATION? | ☐ YES | ☐ NO |
|---|---|---|

| 5. WAS THE MEMBER PREVIOUSLY COUNSELED REGARDING SIMILAR BEHAVIOR? IF YES LIST DATES, CIRCUMSTANCES AND BY WHOM: | ☐ YES | ☐ NO |
|---|---|---|

6. WHAT, IF ANY, EFFECT DID THE MEMBER'S COMMISSION/OMISSION HAVE (E.G. DESTROYED RESPECT FOR THE PENNSYLVANIA STATE POLICE, IMPROPER EXAMPLE FOR OTHERS, ETC.):

7. LIST AND IDENTIFY AGGRAVATING AND/OR MITIGATING CIRCUMSTANCES:

| 8. WAS MEMBER DISCIPLINED WITHIN THE PAST FIVE YEARS REGARDING SIMILAR PERFORMANCE? IF YES, LIST DATES AND PENALTIES: | ☐ YES | ☐ NO |
|---|---|---|

| 9. WAS MEMBER PREVIOUSLY GIVEN REMEDIAL TRAINING REGARDING SIMILAR PERFORMANCE? IF YES, LIST DATES AND CIRCUMSTANCES: | ☐ YES | ☐ NO |
|---|---|---|

**ADJUDICATION OF PERFORMANCE COMPLAINT**

| 10. PRE-ADJUDICATION MEETING WAS HELD?              DATE: | ☐ YES | ☐ NO |
|---|---|---|

11. ATTENDEES:

12. REMARKS:

13. DETERMINATION:    ☐ UNFOUNDED    ☐ SUSTAINED    ☐ NOT SUSTAINED

14. DATE MEMBER WAS NOTIFIED OF DETERMINATION:

| 15. DATE COMPLAINANT WAS NOTIFIED OF DETERMINATION: | ☐ WRITTEN | ☐ VERBAL |
|---|---|---|

II-3

AR 4-25

9/2/93

**ACTION TAKEN**

16. DISCIPLINARY OFFICER CONTACTED? IF YES, LIST DATE:

☐ YES   ☐ NO

17. MEMBER COUNSELED? IF YES, LIST DATE:

☐ YES   ☐ NO

18. DAR/TROOP COMMANDER'S WRITTEN REPRIMAND ISSUED? IF YES, LIST DATE:

☐ YES   ☐ NO

19. BPR INVESTIGATION INITIATED?

☐ YES   ☐ NO

20. REMEDIAL TRAINING SCHEDULED? IF YES, LIST DATE (S) AND TYPE:

☐ YES   ☐ NO

21. REMARKS/DETAILS

22. INITIATING OFFICER                        TITLE                        DATE

II-4

AR 4-25
9/2/93

APPENDAGE III

Dear:

    This will acknowledge receipt of the complaint which you filed with this agency.

    You will be contacted by a Department representative in the near future.  Any questions you may have concerning your complaint should be directed to the Bureau of Professional Responsibility at (717) 783-5145.

                Very truly yours,

                Director
                Bureau of Professional Responsibility

AR 4-25                    APPENDAGE IV

| SP 1-182 (8-93) 9/2/93 | NOTE: | INVESTIGATORS SHALL PREPARE ORIGINAL AND ONE COPY, RETAIN THE ORIGINAL WITH CASE FILE AND PROVIDE COPY TO THE SUBJECT OF INVESTIGATION. ONE OF THE THREE LISTED INVESTIGATION TYPES SHALL BE CHECKED. |
| :-- | :-- | :-- |

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**
**NOTIFICATION OF INQUIRY**

BPR

_____          _____          _____
    RANK                         NAME                      TROOP/STATION

**YOU ARE HEREBY NOTIFIED OF THE FOLLOWING:**

☐  A COMPLAINT INVESTIGATION IS BEING CONDUCTED INTO AN INCIDENT IN WHICH YOU ARE ALLEGED TO HAVE BEEN INVOLVED. THE DETAILS OF THE COMPLAINT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐  A NON-COMPLAINT INVESTIGATION IS BEING CONDUCTED IN ACCORDANCE WITH DEPARTMENT DIRECTIVES. THE DETAILS OF YOUR INVOLVEMENT ARE AS FOLLOWS: (EXPLANATION BELOW)

☐  AN ADMINISTRATIVE INVESTIGATION IS BEING CONDUCTED PURSUANT TO A REQUEST FROM THE OFFICE OF CHIEF COUNSEL. YOUR INVOLVEMENT HAS BEEN IDENTIFIED AS FOLLOWS:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

                                        _____
                                        SIGNATURE OF INVESTIGATOR

**I ACKNOWLEDGE RECEIPT OF THIS NOTIFICATION AND I AM AWARE OF MY RIGHT TO UNION REPRESENTATION.**

_____          _____     _____     _____     _____
SIGNATURE                 BADGE/I.D. NO.      SOCIAL SECURITY NO.   DATE        TIME

APPENDAGE V

AR 4-25
9/2/93

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
**AUTHORIZATION TO OBTAIN MEDICAL INFORMATION**

I, _____, do hereby, voluntarily and without promises or threats of

any kind, authorize _____, of the Pennsylvania State Police to

obtain information from all medical authorities, hospitals, clinics, or physicians who possess any and all records

concerning my medical examinations, treatments, and/or hospital/clinic admissions relative to the examination and/or

treatment of _____.

I further understand that the information obtained is to be used for internal, administrative purposes only and will not be

used as evidence against me in any criminal proceeding.

_____
SIGNATURE

_____        _____
WITNESS                                                    PRESENT STREET ADDRESS

_____        _____
WITNESS                                                    CITY                STATE            ZIP CODE

_____
DATE OF BIRTH

_____
DATE                                    TIME

V-1

SP 1-106 (9-66)

AR 4-25
9/2/93



APPENDAGE VI

**COMMONWEALTH OF PENNSYLVANIA**
**PENNSYLVANIA STATE POLICE**
## AUTHORIZATION TO OBTAIN FINANCIAL INFORMATION

I, _____ , do hereby, voluntarily and without promises or threats of
any kind, authorize _____ of the Pennsylvania State Police to
obtain and examine my financial records held by any financial institution that possess such records.

I further understand that the information obtained is to be used for internal, administrative purposes only and may not be
used as evidence against me in any criminal proceeding.

_____
SIGNATURE

_____         _____
WITNESS                                          PRESENT STREET ADDRESS

_____         _____
WITNESS                                          CITY          STATE          ZIP CODE

_____
DATE                              TIME

APPENDAGE VII

AR 4-25
9/2/93

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

## AUTHORIZATION TO OBTAIN EMPLOYMENT RECORDS

I, _____ , do hereby, voluntarily and without promises or threats of

any kind, authorize _____ of the Pennsylvania State Police to

obtain and examine all records held by my previous employer(s) concerning my employment history and job performance.

I further understand that the information obtained is to be used for internal, administrative purposes only and will not be

used against me as evidence in any criminal proceeding.

_____
SIGNATURE

_____          _____
WITNESS                                                                                    PRESENT STREET ADDRESS

_____          _____
WITNESS                                                                                    CITY               STATE              ZIP CODE

_____
DATE                                                       TIME

VII-1

AR 4-25
9/2/93

APPENDAGE VIII

SP 1-104 (8-93)

COMMONWEALTH OF PENNSYLVANIA
**PENNSYLVANIA STATE POLICE**
**ADMINISTRATIVE WARNING**

Member/Employe _____

Interviewer _____

BPR Control No. _____     Date _____


This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police. I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any pending criminal action. During the course of this questioning, even if you disclose information which indicates you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statement nor its fruits will be used against you in a criminal proceeding.

Since this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action. You do have the right to have a union representative with you during such questioning. If during the course of interview, you have reason to believe that your statements could result in administrative action being initiated against you, union representation will be provided upon request.


Do you understand what I have just explained to you?     ☐ YES     ☐ NO

Do you have any questions concerning what I have just explained to you?     ☐ YES     ☐ NO




_____          _____
SIGNATURE OF EMPLOYE/MEMBER                               DATE



_____          _____
SIGNATURE OF INTERVIEWER                                        DATE


VIII-1

**APPENDAGE IX**

PENNSYLVANIA STATE POLICE

**RIGHTS WARNING AND WAIVER NOTICE
TO PENNSYLVANIA STATE POLICE PERSONNEL**

AR 4-25
9/2/93

TIME _____

DATE _____

PLACE _____

My name is _____ of the Pennsylvania State Police. You have an absolute right to remain silent and anything you say can and will be used against you in a court of law. You also have the right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge before any questioning, if you so desire. If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue. If you do exercise your right to remain silent, your refusal to answer will not be grounds for administrative action.

**WAIVER**

I fully understand the statement warning me of my rights, and I am willing to answer questions. I do not want an attorney and I understand that I may stop answering questions anytime during the questioning. No promises have been made to me, nor have I been threatened in any manner. I also understand that my refusal to answer questions will not be grounds for administrative action.

_____
SIGNATURE

WITNESS:

S/ _____

S/ _____

IX-1

AR 4-25
9/2/93

APPENDAGE X


Garrity v. New Jersey, 87 S.Ct. 616, 385 U.S. 493, 17 L.Ed. 2d 562
(1967)

This case involved a situation where police officers who were being
criminally investigated were given a choice to either incriminate
themselves or forfeit their jobs under a state (New Jersey) statute
dealing with forfeiture of office, tenure and pension rights by
public employees who refuse to testify on grounds of self-
incrimination.  The officers chose to make confessions.  However,
the Supreme Court of the United States held the confessions were
not voluntary, but were coerced.  The court said that the option to
lose their means of livelihood or to pay the penalty of self-
incrimination is in direct contrast of free choice to speak out or
to remain silent.  That practice, the court said, is likely to
exert such pressure upon an individual as to disable him from
making a free and rationale choice.  The protection of an
individual under the Fourteenth Amendment against coerced
statements prohibits the use of these statements, obtained under
threat of removal from office, in subsequent criminal proceedings.


In summary, Garrity held that public employee statements that are
induced by threat of dismissal or other discipline may not be used
in a subsequent criminal prosecution.

X-1

AR 4-25
9/2/93

## APPENDAGE XI

<u>U.S. v. Wade</u>, 87 S. Ct. 1926, 388 U.S. 218, 18 L.Ed. 2d 1149 (1967)

The question addressed in this case was whether courtroom identifications of an accused at trial are to be excluded from evidence because the accused was exhibited to the witnesses before trail at a post indictment lineup conducted for identification purposes without notice to and in the absence of the accused's appointed counsel. The Supreme Court of the United States held that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence, and was no violation of Wade's privilege against self-incrimination. However, the courtroom identification should have been excluded because the lineup was conducted without notice to and in the absence of counsel. The principle followed is that, in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial. The security of that right is as much the aid of the right to counsel as it is of the other guarantees of the Sixth Amendment.

In summary, <u>Wade</u> held that pretrial lineups constitute a critical step in the prosecutive process such that every individual has a right to counsel at such proceedings.

AR 4-25
9/2/93

APPENDAGE XII

COMPLAINT VERIFICATION
FORM SP 1-108

A.   PURPOSE:  The Complaint Verification provides a complainant with the opportunity to directly lodge a complaint with the Department in writing and on an official form.  It also serves to formally involve a complainant as a party in our complaint process.

B.   POLICY:  The form shall be used to verify citizen complaints that have not already been articulated in writing and properly signed by the complainant.   The form may be used for other type complaints with the approval of the Director, Bureau of Professional Responsibility.

C.   PREPARATION:  The verification form will only be employed by an investigator assigned a BPR investigation or of the Bureau of Professional Responsibility.

  1.   Except  as  outlined  in  paragraph  2.  below,  the verification form shall be completed by the assigned investigator. The allegations shall be recorded from the complaint worksheet or from the complainant's present account.   The form shall then be presented to the complainant for review and signing.   A copy of the completed form may be mailed to the complainant by the investigator upon request.  If travel distance or other circumstances  preclude  personal  contact  with  a complainant, the investigator shall request that the verification form be sent by the Bureau of Professional Responsibility.

  2.   The form will be mailed by the Bureau of Professional Responsibility to the complainant under the following circumstances:

    a.   When the Director, Bureau of Professional Responsibility  determines  that  an investigation  would  most  likely  not  be conducted if the complainant failed to return a completed verification form.

    b.   At other times, with the approval of the Director,  Bureau  of  Professional Responsibility.

AR 4-25
9/2/93

D.    BLOCK INSTRUCTIONS:

    1.    NAME:  Self-explanatory.

    2.    HOME ADDRESS:  Self-explanatory.

    3.    REMARKS:  The complainant's allegations will be detailed under remarks.  When the form is completed by the investigator, the allegations may be recorded from the complaint worksheet or as related by the complainant.

    4.    SIGNATURE:  Self-explanatory.

    5.    DATE:  Self-explanatory.



SP 1-180 (6-93)



ONWEALTH OF PENNSYLVANIA
**PENNSYLVANIA STATE POLICE**
**COMPLAINT VERIFICATION**

AR 4-25
9/2/93

BPR CONTROL NUMBER

**COMPLAINANT INFORMATION**

| 1. NAME | FIRST | | M.I. | LAST |
|---|---|---|---|---|

| 2. HOME ADDRESS | STREET/P.O. BOX | | | |
|---|---|---|---|---|
| | CITY | | | |
| | STATE | ZIP | HOME PHONE # ( ) | WORK PHONE # ( ) |

3. **REMARKS:** PROVIDE A DETAILED NARRATIVE OF THE INCIDENT. IF THE COMPLAINT INVOLVES VERBAL ABUSE OR RUDENESS STATE THE SPECIFIC TERM, PHRASE, OR LANGUAGE CONSIDERED TO BE OFFENSIVE. IF THE COMPLAINT CONCERNS DISSATISFACTION WITH AN INVESTIGATION OR OTHER POLICE SERVICE, EXPLAIN WHAT ACTION OR OMISSION WAS UNACCEPTABLE. IF ADDITIONAL SPACE IS NEEDED USE THE REVERSE SIDE.

**I AFFIRM THAT THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION OR BELIEF.**

| 4. SIGNATURE | 5. DATE |
|---|---|

XII-3

AR 4-25
9/2/93

## APPENDAGE XIII

Dear:

The preliminary personnel complaint you filed with the Pennsylvania State Police has been referred to the Bureau of Professional Responsibility for processing. To initiate an investigation, you must complete and return the enclosed Complaint Verification Form within thirty (30) days. Failure to return the completed verification form signed and within thirty (30) days will result in the termination of your complaint.

When completing Block 3, "Remarks," consider the following issues: Where did the incident occur? Give a location to the best of your knowledge and ability. When did the incident take place? Note the date, day of week and time, if possible. Who was present when the incident happened? List names, addresses and telephone numbers, if known. What are the details of the incident? Begin with your initial contact and give a detailed account of the events surrounding your complaint. If the allegation is verbal abuse or rudeness, please state the specific term, phrase or language that you considered offensive. An allegation such as "poor attitude" is not definite enough to permit a determination as to any wrongdoing having occurred. Complaints that indicate displeasure with service rendered by State Police personnel should also indicate a specific instance or instances of lack of action or unacceptable action. Merely disagreeing with the result of an action taken is not basis for a complaint.

Please be aware that your complaint will have no impact on cases before a court of law. If an arrest is at issue, proper redress is found through the judicial system and should be pursued there.

Upon our receipt of the completed verification form, you will be notified of the action to follow.

Any questions you may have concerning your complaint should be directed to the Bureau of Professional Responsibility, at (717) 783-5145.

Very truly yours,

Director
Bureau of Professional Responsibility

XIII-1

Suspensions of members who have been charged criminally with misdemeanors or felonies under the laws of the United States, Commonwealth of Pennsylvania, any other state(s) of the United States, and/or subdivisions thereof, shall be reviewed by the Office of Administration on a case-by-case basis, in consultation with the PSTA and the Department, as necessary, to determine whether benefits will continue in accordance with the provisions of this Section. A decision will be rendered as soon as possible, but not later than 20 working days from the date the Department is notified of the filing of charges in the case of a member who has been charged criminally with a felony or work-related misdemeanor and not later than 20 working days from the date the Department notifies the member that the member is being suspended in the case of a member who has been charged criminally with a non work-related misdemeanor. If the aforementioned time limits are exceeded, benefits will continue in accordance with the provisions of this Section. The determination of the Office of Administration will not be subject to the grievance and arbitration procedures.

Benefits during suspensions of one full pay period or less shall be processed in accordance with the current practice.

<u>Section 4.</u>    Court-Martial Board

Court-martial proceedings shall provide that the accused may name, or designate the PSTA to name one of the three members of the Court-Martial Board.

<u>Section 5.</u>    Rights

A member shall be advised of their Garrity/Miranda Rights when applicable.

A member who is the subject of an administrative inquiry or internal investigation shall be advised of and upon request, be afforded PSTA representation at any interview, predisposition conference, DAR issuance, or any hearing.

33



EXHIBIT #17

PSP BPR HDQTRS            ☏ 717 541 7896        12/04/01  16:11 ☐ :02/05 NO:179

Special Order

SUBJECT:        Internal Investigations - Supervisory Inquiry Process

TO:             Area, Troop and Station Commanders, and Bureau Directors

FROM:           Deputy Commissioner of Administration

REFERENCE:      (a)    AR 4-25, Internal Investigations

ENCLOSURE:      (1)    SUPERVISORY INQUIRY PROCESS

1.      The Bureau of Professional Responsibility, Internal Affairs Division, is in the process of revising Reference (a). The revision will include policy and procedure related to the Supervisory Inquiry process. The Supervisory Inquiry process is intended to provide the Department with an efficient and effective means to resolve minor complaints made against Department members. The process was introduced in 1998, and has been extensively field-tested. When revised, Reference (a) will include policy/procedures concerning Supervisory Inquiries. In the interim, Enclosure (1) has been established to ensure uniformity and consistency of application throughout the Department.

2.      Questions concerning the contents of this Special Order shall be directed to the Director, Internal Affairs Division at (717) 657-4201.

3.      Commanders and Directors shall ensure that Troop office and library copies of Reference (a) are properly annotated.

Thomas K. Coury
Lt. Colonel    PSP

Distribution "B"

EXHIBIT #18

, PSP BPR HDQTRS                    ☎ 717 541 7896        12/04/01  16:11 🖷 :03/05 NO:179

ENCLOSURE (1)

## SUPERVISORY INQUIRY PROCESS

A.    Definition:    Complaints    which    can    be    resolved    by Commanders/Supervisors through the Supervisory Inquiry process include minor infractions; omissions/commissions which violate Department policy or regulation; and performance inadequacies for which, if true, would not give rise to formal discipline (written reprimand and above).  Other examples include: dissatisfaction with performance of duty, rudeness/discourtesy, etc.  Complaints processed as Supervisory Inquiries are those that can be resolved by the appropriate command/supervisory personnel.

B.    General:    The Supervisory Inquiry process is intended to afford Commanders/Directors a mechanism by which minor complaints can be resolved at their level without the need to enter the complaints into the formal discipline system. Addressing and resolving minor complaints or performance inadequacies are a function of supervision and chain of command.  Supervisory Inquiries are intended to be resolved through counseling, training or other remedial action.

C.    Responsibilities:

1.    Troop Commanders/Division Directors shall ensure:

a.    Assignment:  All Supervisory Inquiries are assigned to the appropriate command/supervisory personnel for resolution.

b.    Upgrading: The Director, Bureau of Professional Responsibility, shall be contacted when an inquiry uncovers facts that warrant an Internal Affairs investigation.

c.    Notifying Complainants: Complainants are advised, in writing, of the results of an inquiry.

    d.    Notifying Subjects:  Subjects of Supervisory Inquiries are notified of the results. Notification can be in the form of correspondence outlining counseling, issuance of a Supervisory Notation, etc.

    e.    Determinations: A determination is made based on the results of the inquiry.  NOTE:  The term "Sustained" shall be not be utilized.  This term is used by the adjudicator in full Internal Affairs investigations.

2.    The Director, Internal Affairs Division shall:

    a.    Ensure the Supervisory Inquiry process is administered in a uniform manner throughout the Department.

    b.    Determine, in concurrence with Commanders/Directors, which complaints are processed as Supervisory Inquiries.

    c.    Ensure records of Supervisory Inquiries are maintained.

D.    **Reporting**:

1.    The results of Supervisory Inquiries shall be reported on correspondence, Form STD-501.  The depth of inquiry should be a reflection of the seriousness of the complaint or incident. Supervisory Inquiries should contain the following:

    a.    A brief synopsis of the allegation.

    b.    A brief synopsis of information obtained from an interview with the complainant.

    c.    A brief synopsis containing information obtained from interviews with the subject and any other involved personnel or witnesses.

    d.    Copies of reports or other documents that are relevant to the inquiry.

2.    In accordance with Reference (a), all subjects of a Supervisory Inquiry shall be issued a Notification of Inquiry and

Administrative Warning. A copy of both shall be attached to the completed Supervisory Inquiry.

E.   <u>Endorsement</u>:   Upon completion of a Supervisory Inquiry, Troop Commanders/Division Directors shall prepare an endorsement indicating their determination and what action was taken. An explanation shall be included if the complainant was not contacted and advised of the results of the inquiry.

F.   <u>Upgrading</u>:   Supervisory Inquiries shall be upgraded to a full investigation if the inquiry uncovers allegations of misconduct that would give rise to formal discipline. This determination will be made by the Director, Bureau of Professional Responsibility, with the concurrence of the Troop Commander/Division Director.

G.   <u>Routing</u>:   Troop Commanders/Division Directors shall forward the original copy only of completed Supervisory Inquiries to the Director, Bureau of Professional Responsibility.

H.   <u>Documentation of Action Taken</u>:   Troop Commanders/Division Directors shall ensure, upon completion of an inquiry, appropriate action (e.g., issuance of a Supervisory Notation, interim Performance Evaluation Report, etc.) is taken.

## SUPPLEMENTAL REPORT – IAD #1999-391

I was contacted by telephone in late September or early October 1998 by Federal Bureau of Investigation Special Agent Ralph W. Kush, of the Pittsburgh Office.  KUSH stated he was conducting an investigation into political corruption in Western Pennsylvania.  During his investigation, an individual, (later identified as DENNIS JAY BRIDGES), who was seeking assistance in entering the Pennsylvania State Police as a Cadet, approached a FBI Confidential Informant (CI).  According to KUSH, BRIDGES had taken the Cadet entrance examination and was in Band "B".  BRIDGES was seeking assistance in moving from Band "B" to Band "A" through a series of financial payoffs to an unknown political figure.

According to KUSH, the meeting between BRIDGES and the CI was arranged by Trooper Kip Stanton of the Pennsylvania State Police.  During their meeting with the CI, KUSH stated that BRIDGES and STANTON portrayed entrance into the Department through a series of payoffs as commonplace.

Due to the nature of the investigation, KUSH requested this information be kept confidential.  To facilitate their investigation, KUSH also requested that I provide resource information to him on such things as Cadet entrance examination process, selection process, Cadet class schedule dates, etc. KUSH agreed to my request that the Internal Affairs Division of the State Police be permitted to initiate any criminal charges against any member or employee of the Department should the FBI determine the system had been compromised.

I informed Lieutenant Colonel Hickes of this investigation in early October 1998. LTC Hickes ordered me to maintain the FBI's request for confidentially, cooperate to the extent possible with any request for assistance by the FBI and keep him informed of any significant developments in the case.

I met with KUSH and his supervisor Michael J. SOOHY at Troop T, Everett on October 21, 1998.  KUSH played an audiotape obtained from a body wire of a conversation between BRIDGES, STANTON and the CI.  (KUSH later mailed me a copy of a transcript of the conversation.)

I had sporadic contact with KUSH over the next few months.  Occasionally KUSH telephoned me regarding the next scheduled Cadet class date, etc.  On occasion I, in turn, provided case updates to LTC Hickes.

Sometime in late February or early March of 1999, KUSH contacted me to report the CI received a payoff of $1,000, which the FBI captured on videotape between BRIDGES, STANTON and the CI.  On March 15, 1999 I met with KUSH and SOOHY at the Holiday Inn in Indiana. I viewed the tape at this time.  I provided LTC Hickes with an update of this development.

EXHIBIT
#15

SOOHY mailed a package of transcripts to me in mid-April, 1999 which arrived either shortly before or during the week I was attending an Internal Affairs Conference in Portsmouth, New Hampshire.

On May 1, 1999, KUSH informed me he thought the investigation had reached its conclusion. In his opinion, he believed the investigation ruled out any possibility of system comprise.

During the week of May 3, 1999 I informed LTC Hickes of the status of this investigation. LTC Hickes indicated he would arrange for a briefing with the Commissioner.

On May 12, 1999 LTC Hickes and I briefed the Commissioner on this investigation.

On May 19, I faxed a SP 1-101 to the Internal Affairs Division in which I named Trooper Kip Stanton as a subject of a criminal investigation.

On May 26, I gave Lieutenant John R. Brown the videotape and transcripts sent to me by the FBI.

PSP STRAT DEVEL DIV    717 ● 57 4360        05/19 '99 14 ●  NO.212  02/02

BP 1-101 (1-83)

**PENNSYLVANIA STATE POLICE**
**USE OF FORCE OR COMPLAINT**
**RECEPTION AND PROCESSING WORKSHEET**

| BPR CONTROL NUMBER |
| --- |
| 1. *IAD 1999-391* |

**2. COMPLAINT INFORMATION**

| NAME | FIRST *DARRELL* | M.I. *G.* | LAST *OBER* |
| --- | --- | --- | --- |

| HOME ADDRESS | STREET/P.O. BOX *2629 MARKET PLACE - BUREAU OF TECHNOLOGY SERVICES* | | |
| --- | --- | --- | --- |
| | CITY *HARRISBURG* | STATE *PA* | ZIP CODE *17110* | HOME PHONE # ( *717* ) *790-0708* |

| EMPLOYER | NAME & ADDRESS *PA. STATE POLICE* | WORK PHONE # ( *717* ) *657-4231* |
| --- | --- | --- |

**3. NON-COMPLAINT USE OF FORCE REPORT**   ☐ SHOOTING INCIDENT   ☐ PHYSICAL FORCE   LEGAL INTERVENTION

**4. SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)**

| NAME | FIRST *KIPP* | M.I. *A.* | LAST *STANTON* |
| --- | --- | --- | --- |

| LOCATION | TROOP/BUREAU *B* | STATION/DIVISION *UNIONTOWN* | JOB ASSIGNMENT *PATROL* |
| --- | --- | --- | --- |

| SSN *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* | DOB *1/3/94* | ← TO BE COMPLETED IF KNOWN OR AVAILABLE |
| --- | --- | --- |

**5. DETAILS OF ALLEGATION**

| ROUTE/STREET *SEE BELOW* | | | | |
| --- | --- | --- | --- | --- |
| CITY/TWP/BCRO | COUNTY | DATE | TIME | DAY |

| TYPE OF ALLEGATION (CHECK ONE) | ☐ PHYSICAL ABUSE   ☐ VERBAL ABUSE   ☒ CRIMINAL CONDUCT | ☐ IMPROPER CONDUCT ON DUTY   ☐ IMPROPER CONDUCT OFF DUTY   ☐ DISSATISFACTION WITH PERFORMANCE ON DUTY |
| --- | --- | --- |
| | ☐ OTHER (Please explain) | |

| SYNOPSIS | *Approx. 10/98 FBI Agent Ralph Kush telephoned me to report the subject may be involved in attempting to bribe a public official. Investigation by the F.B.I. has been on-going. On May 1 Agent Kush notified me the investigation cannot proceed & a criminal investigation handled by PSP IAD could move forward on subject Stanton. Kush is located in the Pittsburgh F.B.I. office.* |
| --- | --- |

**EXHIBIT #20**
PNGAD-Bayonne, N.J.

**6. RECEPTION DATA**

| DATE RECEIVED *5/19/99* | TIME RECEIVED *1423* | LOCATION RECEIVED | TROOP/BUREAU *C - B* DETACHMENT | STATION/DIVISION *6* |
| --- | --- | --- | --- | --- |
| RECEIVED BY | NAME *LT. JOHN R. BROWN* | | PAGE *1* OF *1* |

| FOR BUREAU USE | | ENCLOSURE 1 |
| --- | --- | --- |
| INVESTIGATOR | NAME *IAD WEST - SGT. SEIFNER* | |

CONTROL NO. ISSUED BY                     DATE ASSIGNED              DATE DUE

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:              May 13, 1999

Rc'd 5/13/99
PJE

SUBJECT:           FBI Investigation

TO:                Commissioner

FROM:              Captain Darrell G. Ober
                   Bureau of Technology Services

1.     During my assignment as the Director, Internal Affairs Division, and while the Acting Director of the Bureau of Professional Responsibility, I was contacted, by telephone, in early October, 1998 by FBI Special Agent Ralph W. Kush, Pittsburgh Office, regarding an on-going investigation the FBI was conducting involving possible political corruption in Western Pennsylvania.

2.     According to Kush, an FBI informant was approached by a subject, Dennis Jay Bridges, who was seeking assistance in entering the Pennsylvania State Police Academy as a Cadet. Bridges had taken the entrance examination and finished in Band "B". Kush stated Bridges was attempting to become a Trooper through a series of financial transactions involving an unidentified State Senator and unknown high ranking individuals in either the Governor's Office, the State Police, or both. Bridges made contact with the CI through Trooper Kip A. E. Stanton, Troop B, Uniontown. According to Kush, Bridges and Stanton both knew other Troopers who were able to gain entry into the Department in such a manner.

3.     During my initial contact with Kush, he expressed his desire to make contact with someone from the Internal Affairs Division in the State Police. Kush stressed the need for discretion until such time as more information could be developed. He further stressed the State Police would not be needed to play an active role in the investigation; only as resource for information such as enlistment process data, procedure, Cadet class schedule, etc. Since the focus of their investigation was on political corruption, Kush was agreeable to the State Police Internal Affairs Division handling any and all criminal prosecution of Department members, if warranted.

4.     After weighing all of the options, it was my decision to approach Lieutenant Colonel Hickes (inasmuch as he had just assumed office) and inform him of this on-going investigation. I briefed LTC Hickes on the details as I knew them to be. Upon orders of LTC Hickes, I have not spoken about this investigation to any other Department personnel. I was further ordered to assist the FBI to the extent possible and only until such time as disclosure could be made without compromising the outcome of this investigation.

EXHIBIT
#21

5.    Since October, I have had incidental contact with Kush and his Supervisor, Michael J. Soohy.  Sporadically Kush would telephone me to provide me with a status report or to make further inquiry mostly concerning Cadet applications issues, e.g., class appointment dates, etc.

6.    I met with both Kush and Soohy on two occasions; the most recent being March 15, 1999.  Within the past two weeks, Kush has informed me that recent developments in the case have lead him to conclude the investigation cannot move forward and the no evidence of impropriety in the either the Governor's Office or the State Police have been uncovered.  Kush stated it was the appropriate time for the State Police to pick up the criminal investigation on Trooper Stanton.

7.    When informed of the status of the investigation, I contacted LTC Hickes and provided him with this information.  LTC Hickes stated to me that he would arrange for a time to brief the Commissioner at the earliest possible opportunity.



Exhibit 22



**TOP COP**

Pennsylvania Law Enforcement

Academy

**DARRELL OBER**

3 April, 1980




29

ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DARRELL G. OBER** | : | **CIVIL ACTION LAW** |
| **Plaintiff** | : | **1: CV-01-0084** |
| | : | |
| **vs.,** | : | **(JUDGE CALDWELL)** |
| | : | |
| **PAUL EVANKO, MARK** | : | **JURY TRIAL DEMANDED** |
| **CAMPBELL, THOMAS** | : | |
| **COURY, JOSEPH** | : | |
| **WESTCOTT,** | : | |
| **HAWTHORNE CONLEY** | : | |
| **JOANNA REYNOLDS and** | : | |
| **SYNDI GUIDO** | : | |
| **Defendants** | | |

|  |  |
|---|---|
| **Proceedings:** | **Video Deposition** |
| | **Charles Skurkis** |
| | |
| **Date:** | **March 5, 2002** |

**APPEARANCES:**

**For the Plaintiff:**  **Donald Bailey, Esquire**
**4311 North 6th Street**
**Harrisburg, PA 17110**

**For the Defendants:**  **Joanna Reynolds Esquire**
**1800 Elmerton Avenue**
**Harrisburg, PA 17110**

1        TONY MARCECA: Good afternoon ladies and

2    gentlemen, its 1:15, 5 March 2002.  Be advised the video

3    and audio is in operation.  My name is Tony Marceca.

4    My address is 2219 Dixie Drive, York Pennsylvania,

5    17402.  I've been contracted by PR Video to be the video

6    operator for this deposition.  The case is the United

7    States District Court, Middle District of Pennsylvania. It's

8    caption C: 01 correction 00-0084.

9        MR BAILEY: Yeah let's make sure, that's 1:CV-

10   01-0084.

11       TONY MARCECA: Thank you.

12       MR BAILEY: That's okay.

13       TONY MARCECA: This deposition is being held

14   at the law office of Mr. Don Bailey at 4311 N. 6th Street,

15   Harrisburg Pennsylvania, 17110.  The video deposition is

16   being taken on behalf of the plaintiff Mr. Darrell Ober.

17   The witness name is Captain. Charles Skurkis.

18       MR BAILEY: Ah, SKURKIS

19       TONY MARCECA: SKURKIS?

20       MR.BAILEY: SKURKIS

21       TONY MARCECA: And the time now is 1:16.

22   And Captain would you please raise you're a right hand

23   and state your name.

24       CAPTAIN. SKURKIS: Charles Skurkis

25       TONY MARCECA: And you do swear to tell the

2

1  truth, the whole truth so help you God.

2          CAPTAIN. SKURKIS: I do.

3          TONY MARCECA: And thank you. Mr. Bailey

4          MR BAILEY: Yes

5          TONY MARCECA: Could we have a sound

6  check around the room please?

7          MR BAILEY: Yep, yeah.  First of all just make

8  sure the record, Captain that's S-K-U-R-K-I-S right?

9          CAPTAIN. SKURKIS: That's correct.

10          MR BAILEY: Skurkis, Capt. Charles Skurkis.

11  Okay, yeah my name's Don Bailey.  I'm attorney for

12  plaintiff Darrell G. Ober.  Joanna if you and Barb could

13  put your name and official address on the record and a

14  phone number would help too.

15          JOANNA REYNOLDS: My name is Joanna

16  Reynolds.   I'm an assistant counsel with the State Police.

17  I represent the defendant in this action.  My address is

18  1800 Elmerton Avenue, Harrisburg PA, 17110 and my

19  phone number; my office phone number is 717-783-

20  5568.

21          BARBARA CHRISTI: Barbara Christi, Chief

22  Counsel Pennsylvania State Police. My address and

23  phone number are as given by assistant counsel Joanna

24  Reynolds.

25          MR BAILEY: Okay, Captain what we're going to

1    do here this is a video deposition.  The videotape will be

2    maintained here, although your counsel's already

3    indicated that they're going to be getting a copy of it.

4    Under the rules it has to be maintained here for you to

5    come and look at it if you want to. That's up to you, and

6    as I said they've indicated they're going to pursue a copy

7    anyway.  We will be making a transcript.  We'll have a

8    transcript made from the tape. During this deposition I'm

9    gonna be asking you a series of questions and that sort

10   of thing.  Let me just give you a few pointers which I give

11   to everyone in these kind of situations.  If, make sure you

12   get an opportunity to answer fully and completely.  If

13   some how perchance I interrupt you or you don't get a

14   chance to finish, make sure you either stop me or make

15   sure that you get a more complete answer, okay?   I won't

16   be doing it on purpose, but you know maybe

17   unintentional something these kind of things you get lost

18   in thought or whatever happens.  I don't know.  Now also

19   during the process from time to time there might be an

20   objection raised by an attorney. Stop, the attorneys may

21   have something to say.  You go by the advice of your

22   lawyers here.  I assume the attorneys here will be

23   representing you for purpose of this deposition.  Counsel,

24   I guess, are we okay with objections except those formal

25   requests reserved the time of trail?

1    BARBARA CHRISTI: That's fine.

2    MR BAILEY: That's acceptable.  I can't think of

3    much else.  I don't think we'll be too long with you

4    anyway.  The last thing, if you don't understand a

5    question make sure that you ask me to explain it.  If you

6    even for that matter, get curios about where I'm going

7    with questions or why I'm asking questions.  I like to

8    develop a good rappore and maintain a good rappore of

9    the witness so you feel free to answer in a relaxed way.

10   We get a better fact record that way.  So if I'm going

11   somewhere with questions and you're even curios

12   sometimes witness, you know, cause it's a tough position

13   to be in they'll be concerned or they'll want to know what

14   your getting that sort of thing.  I don't mind you asking

15   me. I have no trick questions in mind.  I have no interest

16   in that kind of nonsense. Okay?  I just want to try and

17   learn what I can from you and that sort of thing.  Do you

18   have any questions that you want to ask of me or that

19   you can think of?

20   CAPTAIN. SKURKIS: Not at this time.

21   MR BAILEY: All right well, don't be afraid if

22   you do.  If you need a break or something like that just

23   tell your lawyers and your fine.  Okay captain how are

24   you employed and where do you work and what do you

25   do for I assume the Pennsylvania State Police.  But tell

5

1  me what you do for them and where you work, where

2  you're assigned, and that sort of thing real quick.

3      CAPTAIN. SKURKIS: Currently I'm the Director

4  of the Systems and Process, the new division Bureau of

5  Professional Responsibility.  Basically I oversee three

6  inspection teams which travel to all the installations

7  through out the state and inspect the facilities for

8  compliance and regulation and department policy.

9      QUESTION: And the other division within BPR

10  is Internal Affairs, IAD it's called.

11      ANSWER: That's correct.

12      QUESTION:  So you got the two divisions and

13  you're heading up one division and they're both with in

14  the Bureau of Professional Responsibility. Right?

15      ANSWER: That's correct.

16      QUESTION: And who's the head guy for

17  Professional Responsibility?  Is that Major Conley?

18      ANSWER: Currently, it's

19      QUESTION: I'm sorry.

20      ANSWER: Currently it's Major John Pudliner.

21      QUESTION: Oh that's right.  That's right.  And

22  Mr. Conley you see he's been promoted.  Right?

23      ANSWER:  That's correct.

24      QUESTION: I'm sorry, sir.

25      ANSWER: He's the Deputy of Administration

1    for the department.

2          QUESTION:  Okay so he's moved on from BPR

3    there.  He was at BPR before Mr. Pudliner.  Right?

4          ANSWER: That's correct.

5          Question: Okay, now my research indicates

6    that you've also served in IAD.

7          ANSWER: That's correct.

8          QUESTION: And you were an Administrative

9    Sergeant, a Lieutenant. Section Commander, and as a

10   Captain.  Is that right?

11         ANSWER: That's correct.

12         QUESTION: Now when did you first find out

13   about the investigation into Captain. Darrell Ober?  You

14   know what I mean by investigation into Captain Darrell

15   Ober?

16         ANSWER: No I don't.

17         QUESTION: You know, you're familiar with the

18   lawsuit that's been filled in this case?

19         ANSWER: Yes, I have been.

20         QUESTION: This is a copy of the complaint,

21   the amended complaint have you had an opportunity to

22   read it?

23         ANSWER: No I have not.

24         QUESTION: Do you want to just take a look at

25   the caption?  You can keep it

1       ANSWER: I've seen, I notice two appear here.

2   I've seen the defendant's name.

3       QUESTION: Do you know what the lawsuit is

4   about, at least generally?

5       ANSWER: What I read in the newspaper.

6   That's what I know and it has something to do with a

7   treatment regarding a transfer.  The impropriety of a

8   transfer and some other ill treatment.

9       ANSWER: Okay, now Captain Skurkis.  How

10  long have you known Darrell Ober?

11      ANSWER: I would estimate, I remember

12  knowing him as a Sgt. in Research and Development. So

13  that was probably the end of the 80's beginning of the

14  90's.

15      QUESTION: Now did you become aware at

16  some point that he had been approached or I guess a

17  better word would be informed by the FBI about some

18  sort of investigation that may have involved the State

19  Police?

20      ANSWER: Yes I am aware of that.

21      QUESTION: When did you learn about that?

22  In other words, when did you learn that the FBI had

23  approached or you know come to Captain. Ober.   Who at

24  the time, I'm sure we both know this anyway, who at the

25  time I believe was the Director of IAD.

1   ANSWER: Okay, I'm aware that I knew in
2   June.  It was probably earlier than June, about a month
3   earlier than June of 1999.
4   QUESTION: All right now, is it fair to say that
5   sometime in the fall of 1998 the FBI had come to
6   Captain. Ober and indicated that they where doing some
7   kind of investigation that might or might not implicate
8   the State Police in some way?
9   ANSWER: I had heard that, but I don't know if
10  that's factual.
11  QUESTION: What did you learn?  What do you
12  recollect learning in the spring of 1999?
13  ANSWER: That there was a question of
14  Captain Ober having information and not properly
15  passing it on to his superiors.
16  QUESTION: Who did you learn that from?
17  ANSWER: It may have been Major Conley,
18  probably Major Conley.
19  QUESTION: Do you remember what Major
20  Conley said at the time?
21  ANSWER: No.  There may have been several
22  conversations regarding this over a period of time.  I don't
23  know what was said in what conversation.  I know the
24  issues where in my capacity as Director of IAD what I
25  had felt, it had come upon myself to pass this

1  information on to my Major.  If the information was

2  delivered to me. Whether or not I was aware of any

3  regulation regarding the requirement to pass this

4  information on.

5  QUESTION:  Okay, now you say, I may have

6  misunderstood your response.  Were you saying this is

7  what you were thinking or is this what Major Conley

8  discussed with you?  And I didn't make my question

9  clear.  What you have just shared with me was that

10  something that you were thinking, questions that

11  occurred to you or where these things that Major Conley

12  had raised with you?

13  ANSWER:  They were at the very least

14  questions I have in my mind.  They were probably

15  predicated on on issues that Major Conley brought up. I

16  wasn't persuaded to exactly what had happened or how it

17  had happened.  So if I had heard basically what you had

18  said now the first question in my mind would be well I

19  was in that position what would I do with the information

20  if I learned it from the FBI.

21  QUESTION: Right and you would have passed

22  it on?

23  ANSWER: Yes I would have passed it on, sure.

24  QUESTION:  Would you have investigated to

25  see if the person you were passing it on to were a target

1    or a potential target?

2              ANSWER: I would have to consider what the

3    information is other wise if it was information that a

4    trooper stopped someone on the interstate and was

5    verbally abusive.  I would assume it wasn't my Major.

6    Especially if it happened in Lackawanna County.

7              QUESTION: And what if it was your Major that

8    stopped some body?  What if the FBI came to you and

9    said your Major was suspected of stopping some body on

10   the highway and stealing money from them?  You'd go

11   tell the Major that the FBI was investigating him for that?

12             ANSWER: No

13             QUESTION: Well why wouldn't you do that?

14             ANSWER: Because there would be a question

15   of whether or not investigatively would that be the proper

16   time to let the subject of the investigation know the

17   information you have.

18             QUESTION: And that's a matter not only of

19   training, but I mean its common sense?

20             ANSWER: Correct.

21             QUESTION: And particular if it wasn't your

22   investigation right?  I mean if it's an outside agency that

23   you respect like the FBI doing an investigation.  You're

24   going to respect the prerogatives of letting them conduct

25   their investigation without interference.  Am I correct?

1   ANSWER: Well, I would question why did they
2   tell me if they didn't want me to do anything with it.
3   QUESTION: Would you second-guess why they
4   would tell you?  Or would you wonder why they would
5   tell you?  Know the difference?
6   ANSWER: Well I would probably ask them then
7   why are sharing this with me.
8   QUESTION: Oh okay. And if they indicated
9   that there may be any number people above you in the
10  chain of command involved in a problem would you
11  assume well I must not be a suspect, but there may be
12  somebody up there who is.
13  ANSWER: If the information that was passed
14  on to me involved the possibility likely hood that someone
15  in my chain of command was involved then I would have
16  to evaluate the likely hood of that being possible. Now a
17  lot of times people aren't familiar with the Hierarchy of
18  the State Police and become confused or they think that
19  our captains and majors drive around on the road
20  stopping vechiles.  So without having all the information
21  there would be an evaluation process depending upon
22  what information I receive.
23  MR BAILEY: Absolutely. And would you
24  respond to that outside agency if it were the FBI out of
25  blind loyalty or would you.  You just told us that you

12

1   would use an evaluative process to do what's right.  That

2   would include if the information seemed justified not to

3   compromise the investigation. That's your first duty.

4   That's what you sort of told me.

5       ANSWER: I think I covered that, yeah.

6       QUESTION:  Yes sir, absolutely.  Now, at the

7   time that you indicated that some time on or about June

8   of 1998 you had heard something about Captain. Ober.  I

9   don't want to mischaracterize your words.  I thought

10  you'd indicated something that Mr. Conley, that's why I

11  asked you this question about whether it was you

12  thinking or what Mr. Conley had thought about it or was

13  saying. But that some time on or around June 1999 a

14  question on whether or not Mr. Ober had properly

15  handled information he received form the FBI.  Is that a

16  fair way to say it?  If not tell me the way to say it.

17      ANSWER: The circumstances of Captain Ober

18  possibly not properly handling information.  I don't know

19  if it was a question.

20      QUESTION: Can you stop right there?  That's

21  exactly what you said.  I'm sorry I interrupted you. I

22  remember now that is what you said about properly

23  handling.  What do you mean by that sir?  Tell us

24  Captain what in terms of responding to my question,

25  what do you mean by that?

1       ANSWER: By?

2       QUESTION: Well properly handling

3  information.  What do you mean?  There must have been

4  surrounding facts or circumstances that cause you to

5  remember this in that context.  There must have been a

6  question in other words of whether Captain. Ober

7  properly handled information.  I'd like you to tell me what

8  you recollect about that

9       ANSWER: As a Director of the Internal Affairs

10  Division it is not outside the realm of possibility that you

11  would receive information regarding complaints of

12  misconduct against members of the department.

13       QUESTION: Yes sir exactly.  You would be a

14  logical place wouldn't it?

15       ANSWER: Well at some point.  You're usually

16  at the end of the series of notification, but you could be

17  the first person contacted.  That's possible.

18       QUESTION: But you are a logical person to

19  contact in a circumstance where allegations might

20  involve state police members himself or herself. Right?

21  As apposed to third parties outside the state police.

22       ANSWER: I'm assuming the third party outside

23  the state police is that's the shoe into the state police.  I

24  mean they're the one sharing the information.  How does

25  that information get to the state police?   Well I would

14

1    consider that a third party.

2         QUESTION: I mean interns of a target?  See if

3    a potential wrong doer is a state policemen or member of

4    the state police, my question is IAD might be a logical

5    place for an outside investigative agency to contact.

6    Right?

7         ANSWER: Correct.

8         QUESTION: So the issue then becomes with

9    that out of the way.  The issue then becomes; in this case

10   it was Captain. Ober, whether or not he handled that

11   information properly.  Right?  That's what you told us.

12   Isn't it?

13        ANSWER: Correct

14        QUESTIONS: What do you remember were the

15   questions about whether he handled it properly?  I'd like

16   to know what the facts were.  Did he, how he could have

17   mishandled it.

18        ANSWER:  What did he do with the

19   information would be, that was the issue.  Our regulation

20   AR 4.25 basically dictates that a member regardless of

21   their rank upon a receipt of a complaint of misconduct

22   against an individual that's a member of the department,

23   that they prepare a worksheet and forward it to the

24   Director of the Bureau of Professional Responsibly.

25        QUESTION: Let's stop right there.  This wasn't

1   about an internal complaint or a complaint form outside

2   the agency about misconduct.  Wasn't this about a

3   criminal investigation being conducted by the Federal

4   Bureau of Investigation?

5         ANSWER: I don't know.

6         QUESTION: So you're saying that rule, you're

7   saying that, are you telling us that in your view rule 4.25

8   governed how Captain Ober should have handled the

9   information form the FBI?

10        ANSWER: Not necessarily Captain Ober, but

11   any member.  What do they do with the information once

12   they receive it?

13        QUESTION: And you're saying that Captain.

14   Ober should have open an IAD investigation on it?

15        ANSWER: I still don't know what the

16   information is.  There are cases where you receive

17   information and it has nothing to do with a member of

18   the state police. Then there is no activity.

19        QUESTION:  No IAD action.

20        ANSWER: Right.

21        QUSETION: But in this case you don't know?

22        ANSWER: Exactly, I do not know.

23        QUESTION: Okay, so what I'm asking you then

24   and I can understand that.  What I'm asking you then is

25   what you recollect you might have heard that Captain

1    Ober may have done incorrectly?  Let's use the word
2    incorrectly.  What did you hear at the time that you can
3    recollect that Captain. Ober may have done incorrectly.
4    Here's where I'm going.  For example, did Major Conley,
5    at that time it was Major Conley. Right?  Did Major
6    Connelly say to you, CPT Skurkis Ober did this and
7    should have done that?  Or COL. Coury thinks he did
8    this and should have done that?  Or the Commissioner
9    thinks this or that?  What was said?  Do you remember?
10        ANSWER: Nah, it was more of a, you have to
11   remember that I remember that I started with the
12   Internal Affairs Division.  When we started the Internal
13   Affairs Division I was on the ground floor of that.  I have
14   the experience of, up to that point, fourteen years of
15   dealing with complaints and procedures in headquarter.
16   And his query was one of how would it  expect to have
17   been handled if information was provided by an outside
18   police agency regarding member misconduct.
19        QUESTION:  How are you defining member
20   misconduct?
21        ANSWER: Well a member violation.  Violating
22   either rule or regulations of the department or a violation
23   of Pennsylvania or Federal Law.
24        QUESTION:  So Member misconduct you
25   would include let's say a formal FBI investigation?  Or for

1    that matter a US Grand Jury investigation?

2            ANSWER:  If a member were an active

3    participant in whatever's being investigated, yes?

4            QUESTION:  Well and if a member were a

5    target?

6            ANSWER: Again assuming if the FBI or

7    another federal agency is conducting an investigation it

8    would be a mater of a criminal violation.  And yes if they

9    where a target I would assume there is some level of

10   allegation that this member was engaged in criminal

11   conduct.

12           QUESTION: What if the potential targets or

13   expressly stated targets where member of a group in the

14   Pennsylvania State Police?  Can I give you a example of

15   what I mean by that?  So you know what I mean

16           ANSWER: Please do.

17           QUESTION: Let's say that the FBI comes in

18   and says somebody.  We have reason to believe that

19   somebody involved in your Inspections Division of BPR

20   might be connected with a, it was some criminal activity,

21   but we don't know who.  We've got some information from

22   a CI and we don't know who.  Would you call a meeting of

23   the Inspections Division and say the FBI came in today,

24   facetiously of course, the FBI came in today and one of

25   your folks might be doing this?  I mean obviously you're

18

1  not gonna do that?

2  ANSWER: No. No.

3  QUESTION: Now what if the FBI come in and

4  says higher ups might be involved in this?  What would

5  you do then?  Do you think?

6  ANSWER: Try to determine what they mean by

7  higher ups.  Like I said a lot of times people just don't

8  understand our rank structure.  Coming from the FBI I

9  would say they would have a better understanding of it

10  than John Q. Citizen does, but even so that's very loosely

11  defined higher ups.

12  QUESTION: Sure it is, but you know it's above

13  you don't you?

14  ANSWER: To a trooper on the road a Corporal

15  is a higher up.  So if they can equate they're talking to

16  me as a Captain and they're saying higher ups of mine or

17  someone higher in rank then I am.  Then of course it

18  would be a superior of mine.

19  QUESTION: How many Majors in the state

20  police?

21  ANSWER:  I believe seven-teen.

22  QUESTION: Not a huge number is it sir?

23  ANSWER: No.

24  QUESTION: And you have a very small number

25  of Lieutenant Colonels.  Right?

1        ANSWER: That's correct.

2        QUESTION:  And the top guy or lady what ever

3    the case might be or might be in history we don't know.

4    That would be a Colonel?

5        ANSWER: Commissioner yes.

6        QUESTION: Commissioner, well

7    commissioner's a Colonel. Right?  But I mean they don't

8    have higher, you know like a Generals or Lieutenant

9    Generals and stuff like that.  Right?

10        ANSWER: No.

11        QUESTION: So you're talking about a Colonel,

12    one the only one Colonel in the state police?

13        ANSWER: That's correct.

14        QUESTION: A couple of Lt. Colonels. Right?

15    And you have seven-teen Majors might be give or take

16    one or two at some time.  And then you remember Major,

17    of course you got Captains, Lieutenants, and you know

18    sort of like the military.  But not completely, but I mean

19    you have Corporals and Troopers and that sort of thing,

20    Sergeants.  Now, you only have one rank Lieutenant

21    right?

22        ANSWER: Yes.

23        QUESTION: Not a first or second or anything

24    like that.  Okay now how many Lieutenants you have?

25        ANSWER: A hundred thirty.

1    QUESTION: A hundred thirty?

2    ANSWER: Yes.

3    QUESTION: And Captain significantly less, but

4    you might have a hundred Captains at some time or

5    close to it.  Right?

6    ANSWER: No.

7    QUESTION: Sixty, Seventy, Eighty?  Maybe?  If

8    you know.

9    ANSWER: I don't know.

10    QUESTION: I don't either.  I confess. Okay but

11    anyway.  But when you get to Major and above.  You're

12    not talking about more then twenty-five people are you?

13    ANSWER: I would say not.

14    QUESTION: It's fall. It's 1998.  Sometime on or

15    about early October of 1998.  Late September early

16    October of 1998.  Was Major Conley assigned to be the

17    head of BPR at that time?  Sometime around there?

18    ANSWER: I believe his promotion and

19    assignment was in the early part of October of 1998.

20    QUESTION: Okay and where was he

21    previously?

22    ANSWER: He was a Troop Commander, Troop

23    B, Washington.

24    QUESTION: Jurisdictionally?  Geographic

25    jurisdiction, what does Troop B cover?

1    ANSWER: I don't know the exact counties, but

2  it would be a section of South Western Pennsylvania.

3    QUESTION: Well how far East would it come?

4    ANSWER: I'm not sure.

5    QUESTION: Do you know how far North it

6  would go?

7    ANSWER: You put me on the West Side of the

8  Susquehanna River and I'm confused as to counties and

9  bounties and excreta etc.

10    QUESTION: That's okay. You don't know

11  where Westmoreland County, Mother Westmoreland

12  County as I know it?

13    ANSWER: Yes I do.

14    QUESTION: Mother Westmoreland is just east

15  of Allegheny County right?

16    ANSWER: Right.

17    QUESTION: And Allegheny County is a county

18  that's plum in the middle lies the city of Pittsburgh right?

19    ANSWER: Right.

20    QUESTION: And Washington County borders

21  Allegheny County to the South and South West right?

22    ANSWER: I would probably guess.

23    QUESTION: You know where Indiana County

24  is?

25    ANSWER: Somewhere North of there.

1    QUESTION: Maybe northeast of Westmoreland
2 County and joining Westmoreland County along maybe
3 like the Connemaugh River or Kiskiminitus Rivers.  Do
4 you know?
5    ANSWER: I'm not certain.
6    QUESTION: Well but it might.
7    ANSWER: It might.
8    QUESTION: Do you know where Indiana
9 County is jurisdictionally?  What troop it's in?
10    ANSWER: I believe Troop A.
11    QUESTION: Troop A, and where's Troop A
12 headquartered?
13    ANSWER: Greensburg
14    QUESTION: And where is a....   Troop B is
15 Washington.
16    ANSWER: Correct
17    QUESTION: And is Allegheny a different troop?
18    ANSWER: I believe Allegheny is part of Troop
19 B, but I'm not certain on that.
20    QUESTION: Well... Now... Anyway Captain. or
21 Major Conley had come from you said Troop B you
22 believe right?
23    ANSWER: I believe its Troop B, yes.
24    QUESTION: And he came in to be the Director
25 of Bureau Professional Responsibility right?

1    ANSWER: Correct.

2    QUESTION: Now have you ever learned what

3    Ober supposedly did wrong if indeed he did anything

4    wrong regarding that FBI investigation?

5    ANSWER: At some point I learned that the

6    information that he had received either was not shared or

7    it was shared at a much later date with his superiors.

8    QUESTION: Was he punished for that?

9    ANSWER: Not that I'm aware of.

10    QUESTION: Well if he did something wrong he

11    should have been punished for it.  Don't you think?  I

12    would think he should be.

13    ANSWER: Well a lot of people on our job do

14    things wrong and they're not punished for it.  It's not

15    necessarily a case of... like I said... What do you mean by

16    punishment?

17    QUESTION: I'm going to ask you that in a

18    minute.

19    ANSWER: I know when someone says don't do

20    that again.  I don't consider that a punishment.  I

21    consider that direction and possibly counseling, but I

22    wouldn't consider it a punishment.

23    QUESTION: Okay that's fair enough I'm sure.

24    Well if you're put in a penalty box what's penalty box?

25    What's that?

24

1    ANSWER: My opinion of what they meant by

2  penalty box, I haven't heard it for years, but it use to be

3  an assignment to the academy.  Basically you don't, you

4  have an office and a phone and you're given some type of

5  a project to work on.  It could be something statistical,

6  review policy, something to that effect.  But you're

7  basically without a staff and alienated to the point where

8  you're not interacting with other members of the

9  department.

10    QUESTION:  Your sort of an administrator

11  without a portfolio.

12    ANSWER: That's one way to put it.

13    QUESTION: Now do you have a recollection of

14  Captain. Ober being transferred down to or an attempt at

15  least being made transferring to Washington County?

16  Cause you had mentioned that on an earlier question.

17    ANSWER: I don't know.

18    QUESTION: In response to an earlier question

19  of mine I think you had... I may not remember correctly

20  so it's your memory that counts okay?  I thought you had

21  made a reference to a transfer.

22    ANSWER: I did to transfer, but I don't know if

23  it was Washington County.  I thought it was to assist the

24  Area Commander with his efforts in developing the plans

25  for the National Governor's Association meeting up in

1   State College.

2            QUESTION: Who is that Area Commander?

3            ANSWER: Major Szupinka.

4            QUESTION: He needed help out there did he?

5            ANSWER: It was a large plan.  I know it

6   involved several Troop Commanders.

7            QUESTION: If I told you we developed

8   information which indicates that he didn't need help or

9   didn't request help would that surprise you?  Do you

10  have any fact to support, give any knowledge of that?

11           ANSWER: No I don't know either way.

12           QUESTION: All right.  Are you telling us that

13  you had heard that Captain Ober was sent to help Mr.

14  Szupinka?

15           ANSWER: Yes

16            QUESTION:  And is it your

17       understanding that Captain. Ober requested that

18       opportunity to go and help Mr. Szupinka.

19           ANSWER: No I don't know that he requested it.

20            QUESTION: Is it your understanding that

21  he didn't request it?

22             ANSWER: Yes.  Well I don't know.

23            QUESTION:  Well you said yes sir.  Now

24  something popped up there.  Something popped into the

25  front of the that very fertile mind of yours and said you

1    know, yes.  Why? What prompted that?

2                  ANSWER: You had asked I believed the

3    question before that was, was I aware that he had been

4    requested.  No and then you said something..

5                  QUESTION: That he didn't

6                  ANSWER:  Did he request it.

7                  QUESTION: No.  I'd indicate that he

8    didn't want it.

9                  ANSWER: That he didn't want it, exactly.

10   I don't know.

11                 QUESTION: Did you hear anything about

12   it?

13                 ANSWER: After the fact I believed I had.

14                 QUESTION:  Tell me what you heard after

15   the fact?

16                 ANSWER: This is maybe again predicated

17   on I believed there was newspaper article challenging the

18   appropriateness of his transfer.

19                 QUESTION: Okay, well you know he

20   fought it right?

21                 ANSWER: He what?

22                 QUESTION: He fought it.  You know that

23   he fought it in court?

24                 ANSWER: Yes. Yes.

25                 QUESTION: Cause you read a newspaper

1    article.

2          ANSWER: Yes.

3          QUESTION: And you know that the State

4    Police defended their actions. Be it unsuccessfully, but

5    they defended their actions right?

6          BARBARA CHRISTI: Just for the record again

7    because this keeps coming up.  The State Police agreed

8    not to transfer Captain. Ober.  We successfully defended

9    that action; in fact we won that action.  It was dismissed

10   on preliminary objections.  Just so the witness, the

11   attorney, everyone understands we agreed not to transfer

12   him and there where certain stipulations that we're going

13   to run into as a result of that. We did not lose that

14   action.  We successfully defended that action and in fact

15   were granted a dismissal of that case.

16         MR BAILEY: Is it your understanding that the

17   State Police in an act of grand and uncompromising

18   generosity backed away from having Captain. Ober

19   transferred to Washington.  Is that your understanding?

20         CAPTAIN SKURKIS: My understanding is

21   that the transfer was rescinded.  I don't know if it was

22   mandatory.  I don't know if it was out of...

23         QUESTION: You don't know if they were

24   encouraged to do so by any opinions or actions in

25   the legalsphere.

1       ANSWER: Well I assumed based on

2       QUESTION: Or there was an act of love.  You

3  don't know?

4       ANSWER: No I don't know that.

5       QUESTION:  So it could have been an act of

6  love and kindness?

7       ANSWER: It could have been.

8       QUESTION: Could have been. But in any event

9  we do know that Captain. Ober did not go to Washington.

10  Is that correct?

11       ANSWER: I don't know if he went for a short

12  period of time.  I don't know. I don't know.  I know

13  eventually the transfer was rescinded.  I don't know if it

14  had already been effected and he was traveling and it

15  dissipated.  I don't know.

16       QUESTION: Now Captain Ober, he had been

17  with IAD.  Is that right?

18       ANSWER: That's correct.

19       QUESTION: And at some point he was working

20  on an innovative technology project for the Pennsylvania

21  State Police wasn't he?  A information management kind

22  of system?

23       ANSWER: Right he was detached to that

24  position.  I don't know what exactly his assignment was.

25       QUESTION: Well did he...I'm sorry.

1    ANSWER: He was assigned over to our Bureau

2  of Technology Services.

3    QUESTION: Well at some point he became

4  disengaged from the IIMS Project right?

5    ANSWER: Yes.

6    QUESTION: And he was sent back to IAD as

7  Mr. Evanko had promised him right?

8    ANSWER: I know he was at... I don't

9  remember.  If he was it probably wasn't for a very long

10  period of time.  I don't remember.

11    QUESTION: Okay.  Do you have a recollection

12  of him requesting an opportunity to serve the

13  Pennsylvania State Police in LCE?

14    ANSWER: No.

15    QUESTION: Do you have a recollection of him

16  being transferred or assigned to LCE?

17    ANSWER: Yes.

18    QUESTION: And do you have a recollection of

19  what he was assigned to do with LCE?

20    ANSWER: To take a step back, you asked if I

21  have a recollection of his requesting.  Unless Captain.

22  Ober told me that he had requested it.  I am not in that

23  chain of command.  I would be unaware of any request.

24  That's not something that would be publicized.

25    QUESTION: Well the people talk and you know

1    you can hear it when...

2    ANSWER: Well I might have heard all kinds of

3    things.  I don't know really.  I don't subscribe to rumor to

4    the point where it's in one ear and out the other.  There

5    has to be something more than that.  So I don't know of

6    his application for the LCE, but I do know ultimately

7    that's where he was assigned.

8    QUESTION:  Do you know what he was

9    assigned to do over...I'm sorry.  Do you know what he

10   was assigned to do over at LCE?

11   ANSWER: I believe there was a Lieutenant that

12   was either under suspension at the time for misconduct,

13   and Captain. Ober was assigned to that division.  My

14   guess is to take over the responsibilities of the

15   Lieutenant.

16   QUESTION: Okay.  Now um forgive because I

17   was asking those LCE question and I got mixed up in my

18   own mind about certain thing. You, you, different, one of

19   those different questions forgive me.  You know?  You

20   replaced Captain. Ober at something right?   As I

21   recollect.

22   ANSWER: Replaced him at something?

23   QUESTION: At some kind of duty or function?

24   I can't remember off the top of my head what is was.

25   ANSWER: Yes

1    QUESTION: Okay.  What was that?

2    ANSWER: In May of 1998, ah prior to May of

3    1998 I was Director of Internal Affairs.  Captain Ober was

4    the Director of the Systems and Process of Review BPR

5    Division.  In May of 1998 our Bureau Director reassigned

6    CPT. Ober to Internal Affairs and myself to the Assistant

7    and Process of BPR Division.  So effectively we swapped

8    jobs.

9    QUESTION: Did you ever replace him at

10   anything else?

11   ANSWER: No.

12   QUESTIONS: Where you ever appointed to

13   PEMA?

14   ANSWERS: Yes.

15   QUESTIONS: Did you see him there?

16   ANSWERS: Yes.

17   QUESTIONS: Well how did you come to PEMA

18   in place of Captain. Ober?

19   ANSWER: I was approached I would say

20   around May of 2000.  By one of my subordinates

21   Corporal Marlin Leidig who was assigned to PEMA.  And

22   he encouraged me to apply for a vacancy at PEMA.  I

23   explained to him that back when I first made captain

24   then Joseph Blackburn who was the Director of the

25   Bureau of Inspectorial Emergency Operations asked me

1    to go into PEMA and I turned it down then. I wasn't

2    interested and I said I wasn't interested now to Leidig.

3    And he said he enjoys working with me. He thinks I

4    would find it interesting. He filled me in a little bit about

5    the details of what the job encompasses which at that

6    point I really wasn't aware of exactly what was being

7    done over there. I told him I would think about it and

8    the matter dropped for several weeks. And he

9    approached me and said hey have you made a decision

10   yet? Actually I told him my decision was no, and we

11   discussed a little further. And he said look you can put

12   in if you don't like it. You can just get out. There's no

13   strings attached it's free to go. I told him find out about

14   what I would have to do to obtain the position. And he

15   came back several days later and told me to do

16   correspondence to the Director of the Bureau of

17   Emergency Inspection Operations and express and

18   interest in it along with some personal data.

19          QUESTION: Who was that?

20          ANSWER: That would have been, at the time

21   Major Leonard Washington.

22          QUESTION: Colonel or excuse me. Is Mr.

23   Wescott involved in that at all?

24          ANSWER: I don't believe so.

25          QUESTION: Do you ever talk with Mr. Wescott

1  about it?

2  ANSWER: No.

3  QUESTION:  Do you know if Mr. Washington
4  ever talked with Mr. Wescott about it?

5  ANSWER: No I don't.

6  QUESTION: Well one of the problems with
7  PEMA is that it causes you a lot of unreimbursable out of
8  pocket expenses though.  Doesn't it?

9  ANSWER:  There it taxes your getting your job
10  done. Then you get paid don't you?

11  QUESTION:  But you get paid.  If you get paid
12  do you get any overtime pay for that or anything?

13  ANSWER: In the event of an activation,
14  depending on the duration of the activation there's a
15  potential for overtime yes.

16  QUESTION:  How long have you been on
17  PEMA?

18  ANSWER: I believed I never received any type
19  of correspondence as far as a starting date. But I got a
20  phone call from Captain. Davis, who was the department
21  Emergency Operations Officer sometime in June saying
22  that I was selected, approved for.  I don't what the term
23  he used for PEMA.  And would I be interested in going to
24  a one day training exercise at PEMA, which was
25  scheduled for the later part of that month.

1    Accompanying him to that training, and I said yes.

2          QUESTION: All right.  Well what do you... have

3    you ever had gotten anytime in on PEMA that you were

4    paid for?  Anytime that you gave to it?

5          ANSWER: Yes I did.

6          QUESTION:  Okay.  How much for the year?

7    You know let's say the first year we're there.  How much

8    money did PEMA put in their pocket?

9          ANSWER: The first year I was there I had a

10   total of four hours overtime.

11         QUESTION: Not much uh?

12         ANSWER: No.

13         QUESTIONS: Okay.  What about since then?

14         ANSWER:  Since September 11th I would

15   estimate somewhere between thirty and forty hours of

16   overtime.

17         QUESTION: Okay.  Is that largely due to the

18   September 11th events?

19         ANSWER: Right.  And I consider that very

20   abnormal.

21         QUESTION: Yeah I thought you would say...

22         ANSWER:  In fact I didn't appreciate the

23   amount of time I had to spend over there.  It wasn't

24   worth it to me let's put I that way.

25         QUESTION: Would you say that the kind of

1   person that works for PEMA is somebody that's typically

2   motivated or interested in that type of duty?   That's a

3   sacrifice to some extent?

4           ANSWER: I believe it is a sacrifice.

5           MR BAILEY: Hold on just one-second sir.

6           QUESTION: Okay. In what ways is it a

7   sacrifice?

8           ANSWER: Well for one thing you're sharing a

9   lot of your work time.  Basically simulating additional

10  work and not getting any extra pay for it.  And when I say

11  work I mean going to training, attending informational

12  meetings, just being on call two weeks out of three

13  weeks.  I'm somewhat restricted as to where I can go and

14  what I can do because I'm on an on call status with

15  PEMA.

16          QUESTION: So the on balance, assisting with

17  PEMA on balance is a sacrifice that you do for the good of

18  the State Police because you care about the organization

19  which you're a part.  Is that what you're telling us?  I

20  mean are you in effect saying that....

21          ANSWER: In my case?

22          QUESTION: Sure in your Case.  Why do you do

23  it?  Do you do it because you care?  Do you do it because

24  you want the overtime?  Do you do it for both reasons?

25  Obviously there's not much overtime.  Why do you do it?

1    ANSWER: Well in my case, there's a concern
2    for the department of course, but also I find that
3    interesting.  I wanted to learn more about emergency
4    operations.  And as a department, headquarters with a
5    department or headquarters assignment you don't get the
6    exposure to field activities that a Troop Commander, a
7    Captain of in the field would get.  This is the closest thing
8    that I can personally experience without transferring into
9    a troop. As far as an operation field operation?
10    QUESTION:  Well its career enhancing in the
11    sense that it's a good qualification and experience to have
12    on your career resume. Isn't it?  I mean it certainly has to
13    be positive to some degree in that regard or does it hurt
14    you?
15    ANSWER:  I don't think…. I don't know that
16    anyone would consider it further into your career saying
17    well that person.  We have two people here that are the
18    same in all respects, except the person was assigned to
19    PEMA.  Let's choose that person. I don't think it's going
20    to help there.  Now possibly if you sought employment
21    outside of the department. That's something on a resume
22    would enhance your stature.
23    QUESTION: But you do it because you want to
24    have the experience that it offers you. And because based
25    upon your knowledge and experiences with the

1  Pennsylvania State Police it gives you an exposure to

2  things that you want to do. But you feel enhance your

3  opportunity to enjoy your employment experience.  Now

4  that's what you've just described for me or am I

5  incorrect?

6          ANSWER: I think what you're....

7          QUESTION: I'm looking for your reasons.

8  ANSWER: Look my reasons are I find it interesting.

9          QUESTION: Captain you originally started

10 telling me how reluctant you were to do this.

11          ANSWER: Right.

12          QUESTION: That you considered it a burden

13 and that you had a friend and somebody who had

14 admired you and respected you. And I'm not over doing

15 it, but I mean.  Said hey you'll be good at this and

16 apparently believed that you where need there or they

17 would have approached you and thought that you would

18 be a good person for that job.  And also thought that

19 once you were exposed to it you would like it.  How long

20 have you been there?

21          ANSWER: It will be two years in June.

22          QUESTION: How many times have you asked

23 to quit, resign, or be transferred from it?

24          ANSWER: I have not been.

25          QUESTION: No. Because you have found it to

1  be something that you have enjoyed.  And you find it to

2  be something that has in fact been a learning experience

3  for purposes of your Pennsylvania State Police career.

4  Am I correct?  Or am I wrong?  I'm not trying to blow it

5  out of...

6         ANSWER: I think you're wrong with that.  I've

7  never looked at it as a career enhancing.  In fact I'll be

8  frank, I don't expect to ever go beyond the rank of

9  Captain.  That's not... I see people

10         QUESTION:  You're not ambitious to go beyond

11  the rank of Captain.

12         ANSWER: Well I see a lot of people that are

13  ambitious ultimately do a disservice to the department.

14         QUESTION: Why?

15         ANSWER: Because their motivation is simply

16  to take care of themselves.  That's not my motivation

17  everything I do...

18         QUESTION:  Is that common with in the state

19  police?

20         ANSWER: Yes I would say it is common.

21         QUESTION: Why?  Why Captain?  Who's built

22  that environment into the Pennsylvania State Police?

23         ANSWER: I don't know.

24         QUESTION:  Had it been the leadership or has

25  it been the troopers out there that did it?

1       ANSWER: I think it's common sense.  It's not

2   the State Police.  I don't know that the State Police is any

3   different in a comparative ratio then IBM.

4       QUESTION: Captain Skurkis is Evanko

5   responsible for it at all?

6       ANSWER: Responsible for what?

7       QUESTION: Captain. Skurkis is it too much

8   politics involved in the job in the State Police?  Is that

9   what you are trying to tell us?

10      ANSWER: No just I have no aspiration to go

11  beyond the rank of Captain.

12      QUESTION: I don't mean you sir.  I'm talking

13  about your observations about the State Police and what

14  happens. Is there a problem internal in the Pennsylvania

15  State Police with too much political infighting?

16      ANSWER:  As I began to say before, I

17  personally do the things I do for the department strictly

18  for the bettering of the department.  I'm not looking to

19  favor myself,

20      QUESTION: I don't question that.  I don't

21  question that sir.

22      ANSWER: Well that's what I was trying to say.

23      QUESTION: Did you pick it up from?

24      ANSWER: What I am saying is that I don't have

25  motivation like whole lots of others may have.  I'm gonna

1    do this cause I'm gonna be in a better light to get

2    promoted.

3            QUESTION: Precisely and I believe you sir.

4    And if I understand you correctly what that means is you

5    seen people.  You know by the way I'm gonna let you off

6    the hook cause I'm not gonna ask you who.  But you're

7    telling me and the fact that you have seen this kind of

8    ambition within the State Police has perhaps done harm

9    to the organization.  That's what you seem to say to me.

10   Is that correct?

11           ANSWERING: I'm saying that I don't know it if

12   has done harm.  I'm saying though in my case that's not

13   my motivation.

14           QUESTION:  It's not for you.

15           ANSWER: Right it is not for me.

16           QUESTION:  It's not for you.  And you did say

17   and you did indicate however that there are problems in

18   the State Police or have been with that type of thing?

19           ANSWER: No I'm saying that there are people

20   in the State Police that probably would find a motivation

21   for promotion to be a overriding career incentive.

22           QUESTION: Okay.  And is it your view that

23   people that put their duty and responsibility second.

24   They set that aside and instead advance their personal

25   interest.  That that's a wrong thing to do?

1      ANSWER: Well some people can do it.  It can

2    be beneficial to both.  But I find that I know in my case

3    strict dedication to the job.  No concern about am I gonna

4    step on someone toes?  Am I gonna say something wrong

5    to someone?  I'm not concerned about that.  I'm gonna do

6    my job and I'm doing it the best.  I'll tell people if they're

7    wrong if I feel they're wrong, and not worry that there's

8    gonna be repercussions of hey you can't tell that Major

9    that.  Hey, if the Major's wrong I'm gonna tell the major I

10    feel in my opinion that what he's doing is wrong

11        QUESTIONS:  That's called candor right?

12        ANSWER: True.

13        QUESTION: It's called being open and being

14    honest right?  And that's what you meant when you had,

15    in response to earlier questions, indicated that in a

16    situation where somebody came to you and revealed the

17    contents of an investigation.  Where you said your duty

18    and responsibility would be not to inform a target of an

19    investigation.  Because that might violate a law or that

20    might compromise the integrity of an investigation.

21    That's the same type of thing isn't it?  The right thing to

22    do.  Isn't it Capt. Skurkis?

23        ANSWER:  If you're saying that one has

24    knowledge that an individual is a target of investigation

25    and to intentionally go to that target and share

1    information that you know about the investigation.  Yes

2    that's wrong.

3            QUESTION: Or even that the investigation

4    exists, tipping them off.

5            ANSWER: Correct

6            QUESTION: Yes sir exactly right.  I'm right

7    with you.  Okay. Now you've been with PEMA roughly two

8    years?

9            ANSWER: Yes.

10           QUESTION: And in that two year period of time

11   if we were not going to include those maniacs on that

12   September 11th if that's excluded and that's out of the

13   way.  Aside from that particular tragedy, you may be

14   talking less then ten hours of PEMA activity a year.  You

15   think or..

16           ANSWERS: When you say ten hours you mean

17   ten hours of..

18           QUESTION: I really don't know that much

19   about it to be honest with you.

20           ANSWER: Well a nah there's more.  I would

21   say more like...

22           QUESTION: Let's say on a given month.  Is

23   there an average on a month?

24           ANSWER: No it basically amounts to training

25   and whether you want to avail yourself to that training.

1    Those training meeting exercise at Three Mile Island
2    tomorrow night.  There's gonna be an exercise at Three
3    Mile Island is in peril.  Would you be available to go to
4    training?  If you chose to do that it would be an eight-
5    hour shift.  That's eight hours right there.
6         QUESTION: Of additional time?
7         ANSWER: No.
8         QUESTION: Is that additional or promised?
9    Like a flex kind of thing.
10        ANSWER: No. No. So in other words instead of
11   my working in my office that day, seven to three, or
12   eighty to four.  I'd be working at PEMA from three to one.
13   So it would be eight hours away from my office, but not
14   in any additional premium pay.
15        QUESTION: Thank you.  Okay.  I under stood
16   that after you explained that.
17        ANSWER: And as I said if you excluded
18   October 11th.  In two years my overtime happened to be
19   four hours.
20        QUESTION: Alright.  So in a word it's not
21   required?
22        ANSWER: What's not required?
23        QUESTION: The training the different things.
24   They're elective.  In other word you can choose to go.
25        ANSWER: Yes. I don't know of anything that

1  says you must go to this or go to that.  It's a question of

2  do you want to fool of yourself in the event something

3  happens and your totally out there with no direction at

4  all. I don't want to be in that position so I will go to the

5  training when it's available.  I don't go to every training,

6  but I've probably gone to four exercises over this two-year

7  period so far.

8        QUESTION: Okay.  Who makes the ultimate

9        assignment to PEMA within the Pennsylvania State

10       Police?   I mean if PEMA is an outside state police

11       organization right?

12       ANSWER: Right.

13       QUESTION: Headed up by the Governor or

14  somebody.  But the point is that it's outside the

15  Pennsylvania State Police.  You'd be like a Pennsylvania

16  State Police Participant or designee or something of that

17  sort right?

18       ANSWER: The technical term is liaison.

19       QUESTION:  Okay, liaison

20       ANSWER: From the Pennsylvania State Police

21  to other representatives to PEMA.

22       QUESTION: I see.  Who appoints to that

23  position?  Is it the Commissioner ultimately?  Or who

24  does that?

25       ANSWER: Actually I thought it was Captain

1   Davis and his Major the Director of the Bureau of

2   Emergency Inspection Operations.

3           QUESTION: But you don't know for sure?

4           ANSWER: No I don't.

5           QUESTION: Now normally in BPR, a BPR

6   number is assigned when an investigation arises right?  I

7   mean whenever there's an investigation launched or what

8   not.

9           ANSWER: When a well... What by launched?

10  Knowingly it's just lined after a complaint worksheet is

11  prepared.

12          QUESTION: Okay.

13          ANSWER: It is not normally assigned until that

14  worksheet is prepared, because that's the tracking

15  number.

16          QUESTION: Yes that's a worksheet. And when,

17  I wanna just ask you a couple questions.  I wanna keep

18  your investigation closed down. How does it close down?

19  What happens?

20          ANSWER: Closes down?

21          QUESTION:  Yeah.  When it closes down.

22  When it stops.

23          ANSWER: The investigation is terminated upon

24  the last relevant interview and the preparation of the

25  report.

1    QUESTION: Is a person as the object of a BPR

2  investigation suppose to be informed when it's closed or

3  done?

4    ANSWER: You mean the subject of the

5  investigation?  You said the..

6    QUESTION: Subject object yah whatever.

7  Subject that's a good word go ahead.

8    ANSWER: The subject of the investigation

9  upon adjudication is notified.  The adjudication is not  to

10  me an investigative step.  You asked the question about

11  when is the investigation over.  The investigation's over

12  when the report's done. There are additional

13  administrative steps that we take after that.  Which

14  require outside of the room of the Internal Affairs

15  Division.

16    QUESTION: I understand.  In other words

17  there's an investigation, but let me then withdraw my

18  question and come back with a different question.  After

19  the adjudication is a person suppose to be told?

20    ANSWER:  The results of an adjudication

21  should be communicated to the subject in the best case.

22  Yes.

23    QUESTION: Is there any duty or obligation to

24  inform a person.  This might be a rather silly question.  I

25  assume most of this investigation are Internal Issue they

47

1 can interview a person so they're going to know anyway,

2 but is there any formal process of notifying.  That

3 requires notifying a person that they're being investigated

4 or going to be investigated?

5 ANSWER: The regulations indicate that if an

6 individual is identified as the subject of an investigation.

7 That they are to be provided with a notification of inquiry.

8 That document basically tells the individual that an

9 investigation is being conducted, and it may touch on

10 areas of their conduct, which are subject to the inquiry.

11 Now the regulations say that shall be presented to the

12 subject as soon as possible.  Normally it occurs at the

13 time of the interview.  When the person shows up for the

14 interview after direction of the investigator.  They're given

15 this piece of paper which is the Notification of Inquiry.

16 There it's laid out the fact that there's an investigation

17 being conducted and that whatever interview of their

18 participation or non-participation in this conduct is

19 what's being looked at.

20 QUESTION: And it has a number on it right?  I

21 mean, the number's a sign they put on there and they're

22 given it right?

23 ANSWER: There's a provision for the number,

24 but I know of cases where let's say a shooting happens in

25 the night. I'm going to respond as an investigator and

1    interview the participants.  I don't have a number but I'm
2    gonna give them that document telling them that this is
3    why I'm talking to you and this is why we're speaking.
4    So I would say no it's not an absolute.
5         QUESTION: What position do you hold now?
6         ANSWER: Corrector of System and Process
7    Review Division.
8         QUESTION:  Do you know of any outstanding
9    BPR's on Captain. Ober?  As we sit here today?
10        ANSWER: No I do not.
11        QUESTION:  But you wouldn't necessary know
12   if there where one?
13        ANSWER: That's no I wouldn't.  You're correct?
14        QUESTION:  Have you ever seen an
15   investigation into somebody in the Pennsylvania State
16   Police without a reason?   Now this may be rather basic
17   to you so don't please don't rebel, in the sense that.  You
18   know have you ever seen an investigation done just to get
19   something on somebody without having a reason to do it?
20        ANSWER: No.
21        QUESTION:  That' s pretty basic to any
22   investigator, to any member of a democratic society with
23   a small bee. That's pretty much common sense.  Well
24   maybe it's not?
25        ANSWER:  Well nah I'll say this.  Being on

49

1     board with BPR since day one I'd like to support the fact

2     that that's why BPR was created.

3           QUESTION: To prevent that kind of abuse

4     right?

5           ANSWER: Right

6           QUESTION: And to provide a procedure so that

7     members of the Pennsylvania State Police know that

8     there is a policy and procedure that governs

9     investigations into them and their rights as a member of

10     the organization of Pennsylvania State Police right?

11     That's what it's about.  Isn't that correct.

12           ANSWER:  That's part of it.

13           QUESTION: And the organization has been in

14     existence I guess formally for…it's only been about ten

15     years or so?  Maybe ten fifteen years?

16           ANSWER: Ah 2002 would be the sixteenth

17     year.

18           QUESTION: It's not really that old.  The

19     sixteenth okay.  It's not really that old.  Given the fact

20     that the agency was one of the first.  And admittedly I'd

21     be the first one to doubt your reputation on the street

22     corner.  One of the finest state departments of it's type

23     since what 1905?

24           ANSWER:  That correct.

25           QUESTIONS: So it's not a place that is

1    designed to foster or tolerate abusive people, particularly

2    members right.  And that's one of the reasons BPR came

3    into existence.  As you told us.

4            ANSWER: That's one of the reasons.

5            QUESTION: Additionally there are probably

6    three overriding reasons.  The one that you had

7    mentioned. The second is protection of the public.  And

8    the third is protection of the department.  And the

9    protection of department is something that's frequently

10   over looked, but I believed it spelled right in 425 that's

11   it's to determine the process helps to determine the

12   performance inadequacies that occur at different levels

13   What I've in past and know again being partly an author

14   of 425.  What is meant by that there are instances that

15   may not raise to the level of misconduct.  Yet the

16   department has invested interest in investigating it

17           QUESTION: Sure incident for example.

18           ANSWER: Pardon me?

19           QUESTION: Incident for example.  Let's say

20   there... Well can I can I give you an example?  There's

21   been a discharge of a firearm.

22           ANSWER: Right okay there again there nothing

23   wrong but the person

24           QUESTION:  Well we don't know that..

25           ANSWER: You don't know that, but

51

1      QUESTION: But it's an incident.

2      ANSWER: We are investigating it to look into

3 the fact. Was this shooting legal?  Was it in accordance

4 with regulation?  And then, of course, there's an

5 overriding interest in gathering evidence at the time in

6 the event that some civil action is taken later on.  You

7 what to get whatever is available and preserve that to

8 whether it answers you defense or actually serves to

9 prove that the shooting was in fact a proper and the

10 victim was in the shooting.

11      QUESTION: Okay would you know how

12 requested if indeed anybody did the investigation into

13 CPT. Ober?

14      ANSWER: Do I ah...

15      QUESTION: Where did it oringinate?

16      ANSWER: No I've never seen.  Normally that

17 information would be a part of the complaint worksheet.

18 In the complaint block.  I've never seen the worksheet so

19 I don't know and nor have I have seen the investigation

20 for that matter.  So I don't the actual complaint is.  Well I

21 don't know that.  There was an investigation done really.

22 There was.  I don't know if it was IAD investigation?  I

23 don't if it was a criminal investigation?  I don't know if it

24 was a supervisory type of investigation?  I know

25 something was looked at, but I don't know ultimately

1    exactly what.

2            QUESTION: Were you ever interviewed in

3    connection with CPT. Ober's, I know I still don't know

4    what to call it.  After three or four months of depositions I

5    don't know what to call it yet.  Whatever it was.  You

6    have a recollection of discussing the investigation of

7    Captain. Ober with anyone?  Now for example go down

8    the list of defendants very quickly if I may?  Is it fair to

9    say you probably never a... Have you the issue of

10   Captain. Ober with Mr. Evanko?

11           ANSWER: No.

12           QUESTION:  Have you ever discussed Captain.

13   Ober with Mr. Wescott?

14           ANSWER: No.

15           QUESTION: How about Mr. Williams or Mr.

16   Wertz?

17           ANSWER: Yes.

18           QUESTION: Tell me about it.

19           ANSWER: Sometime of 1999 Major Williams

20   and Major Wertz were at the BPR offices here in

21   Harrisburg.  I don't know what their agenda was.  I don't

22   even know why they were there except they were in our

23   kitchen/ conference room reviewing reports. I believe

24   they may have been transcripts.  In Fact that's what I

25   subsequently found out that they were there to look at

1   transcripts.  In any event, I had gone into the room to get
2   a cup of coffee and Major Williams asked me a question
3   regarding investigative procedure for IAD.  Now again he
4   was aware that I had been in IAD for fourteen years and
5   that I would be familiar with it.  Where as a I think he
6   joked that his only involvement was in his addictions.
7   And he really had never conducted any IAD
8   investigations. I don't know how said what, I remember
9   that my advise to them was that an investigation, an IAD
10  investigation could be conducted into the circumstances
11  of an incident.  One member misconduct is involved.  Or
12  number two if the commissioner, well three I guess it
13  was.  If the commissioner directed IAD to look into
14  something.  Or number three if department directive
15  dictated that IAD investigated certain circumstances.
16          QUESTION:  Stop right there.  If existing
17  regulations indicated that the IAD is to check into
18  something I assume that IAD's gonna check into it if it's
19  brought to their attention.  Right?
20          ANSWER; Again it depends on what is and
21  who brings it to their attention.
22          QUESTION: Okay but the fact is that if
23  regulation provide that IAD either evaluates or initiate
24  some action it's fair to assume you follow the regulations.
25  Right?

1          ANSWER: Right.  Correct.

2          QUESTION:  So that was the one incident, and

3      there are one incident and where you pointed that out

4      right?

5          QUESTION: Where did regulations give the

6      Commissioner power to initiate and direct investigations?

7      I'd like to know that is.

8          ANSWER: Direct investigations?

9          QUESTION: Well I don't know what he's doing.

10     You told me you told them.  I want to know what that

11     means because let me tell you where I'm coming from.

12     I've looked till I'm blue in the face and I'm sort of an

13     ideologue on issues like Constitutional Rights.  I'm a

14     idealist on these kinds of things and I study them a lot,

15     probably more then most.  I don't know where the

16     Commissioner gets this power that you mentioned

17     towards the Williams.  And I'd like to know where it is.

18     And I'm not saying it isn't there I honestly don't know.

19     Can you tell me where it is?

20         ANSWER:  Actually I again I think I was

21     somewhat instrumental in getting that authority to

22     commissioner.  It was Commissioner Cochran at the

23     time.  When we were developing.  There was a special

24     order anywise eighty-five....

25         QUESTION: Now what's a special order?

1    ANSWER: A special order is a department

2    directive, which provide guidance with regard to what

3    action to be taken under certain circumstances.  And

4    what actions not to be taken under certain

5    circumstances.

6    QUESTION: Okay what's the number on this

7    special order?

8    ANSWER: It was I think it was 85111.

9    QUESTION:  85111 okay now you say were... I

10    mean how do you give the commissioner power?  If I

11    understood you correctly.  How do you do that?

12    ANSWER: Well we have meeting in the

13    development of the Bureau of Professional Responsibility.

14    We needed a document that gave us the authority.

15    Basically the creation of the Bureau of the Professional

16    Responsibility.  It can't just appear from no where.  So it

17    was created by virtue of this special order.  And I

18    remember on of Colonel Cochran's concerns he was not a

19    member of the state police prior to being appointed

20    commissioner.  He came form the FBI into the

21    department.

22    QUESTION:  Who a this is Commissioner

23    Cockren?

24    ANSWER:  Correct.  What he found was there

25    were a lot of issues.  For example a lawsuit being filed

56

1   about conduct that members where involved in a year

2   before two years or whatever the time limitations allowed.

3   And that when he would go to find information regarding

4   what had occurred there's no record.  There's no

5   investigation.  None of this was ever looked at.

6          QUESTION:  Say what's that?  Okay,

7          ANSWER: I don't think that has to do... Well

8   he was concerned that as Commissioner he should be

9   aware of what's going the department.

10          QUESTION: Absolutely.

11          ANSWER:  And if he's not made aware of it.

12   Then it should be investigated and preserved in a report

13   somewhere that in the event three years from now this

14   becomes an issue it can be retrieved and the information

15   has already been recorded.  I would say that was the

16   major impetus for the creation of the Bureau

17   Professional Responsibility/ Internal Affairs Division.  In

18   drafting this special order

19          QUESTION:  Can we explore that for just a

20   momment?

21          ANSWER: Okay we're gonna lose.

22          QUESTION: All right then you go ahead.

23          ANSWER: I think we've been cut in to four or

24   five times here.  That I don't know.  I'm not answering

25   your questions from way back.

1    QUESTION:   Okay that's fair enough.  You go

2  ahead?

3    ANSWER:  With the creation of the Bureau

4  Professional Responsibility there were circumstances

5  outlined where an investigation must be conducted on

6  member conduct.  That is misconduct,  violation of rules

7  and regulations, and shooting in cities.  There was also

8  determined that there would be citations where the

9  Commissioner would like to know the circumstances of

10  what occurred even though it doesn't necessarily fall into

11  the realm of those two perimeters.  Meaning shooting

12  incidents or misconduct. One example that comes to my

13  mind was the suicide of Bud Dwyer.  Commissioner

14  Cochran called over and asked then myself and then

15  Captain.  Shaffer go down to the capitol and look into the

16  events that occurred down there.  And we did.  And that

17  would have been in my opinion under the authority

18  granted by that special order, and to take it a step

19  further AR-4.25 replaced a special order.

20    QUESTION: What occurred in Bud Dwyers

21  death that would cause the commissioner know what

22  happened?

23    ANSWER: I don't know. All I know is he

24  directed us to go down there and make our presents

25  know.  Then look into what was going on and report back

1    to him, and we did.  In any event that was then.  Today

2    we have AR-4.25.

3         QUESTION: Before we leave the Bud Dywer

4    thing we'll come back.  Well ah we'll come back to that

5    Bud Dywer thing.

6         ANSWER:  Well I'm giving that to you as that

7    this thing hasn't been created overnight.  This authority

8    of the Commissioner.   It was invested back then, but it

9    is codified in AR-2.45.

10         QUESTION: What do you mean it's an

11    authority of the commissioner?

12         ANSWER:  Again, I'm not answering your

13    question.  You keep changing the question.  The

14    questions here where does this authority for the

15    commissioner do this?  I'm about to get there.

16         QUESTION:  It's still the question

17         ANSWER: Okay

18         QUESTION: Okay that's all I'm asking.

19         ANSWER:  AR-4.25 I don't have copy with me

20    and I don't know the section off hand, but it identifies

21    criteria under which an investigation would be

22    conducted.   And one of those issues I think it's the last

23    very last thing.  Is at upon request of the commissioner.

24         QUESTION: Of who?

25         ANSWER: Internal Affairs well it say.  I believe

1    that the caption's under an administrative investigation

2    shall be conducted when, and then lists, ten or eleven

3    items the last one of which is upon the request of the

4    commisioner.

5    QUESTION: So.

6    ANSWER:  So to me that's one of the accepted

7    of the administrative investigation can be conducted even

8    though on it's face there isn't or there isn't a shooting

9    incident or an accidental death or there are a lot of other

10   criteria, but

11   QUESTION: So if the commissioner wants to

12   investigate, why Bud Dwyer killed him self over

13   something astensably Mr. Tornburn had supposively

14   done he can look into it.  He can say I want you guys to

15   go check it out. Right?  If that's what his reasoning is.

16   ANSWER:  Well I don't know what his

17   reasoning was.

18   QUESTION:  Exactly sir.  And that's why I

19   asked the question the way I did.  Not to offend.

20   ANSWER: But the regulations don't require

21   him to tell us what his reasoning was.

22   QUESTION: Thank you.

23   ANSWER: But it gives him the authority to

24   request one.

25   QUESTION:  He has the authority to do it if he

1  wants too?  Whether that thing gives him authority or

2  not?  Now what are you going to do if you don't think, if

3  you're sitting their sir.  Captain. Skurkis you're sitting

4  there and let's say you don't think the commissioner has

5  authority to ask you to go down and investigate the

6  assignation of John F. Kennedy, but he tells you do did

7  it.  Now You're gonna do aren't yah?

8            ANSWER:  As an Internal Affairs investigation

9  or as an investigator?

10           QUESTION: I don't know sir.

11           ANSWER: Well I'm not asking a Internal Affairs

12  investigator absent that caption in the regulation that

13  says he's allowed to ask for one.  I would say no.  Then it

14  would only be done on the cases of misconduct or

15  department directory.

16           QUESTION: Exactly

17           ANSWER: That extra thing allows him to make

18  a request and that the process be

19           QUESTION:  Well he doesn't have to come to.

20           BARBARA CHRISTI: Excuse me could the

21  witness just finish his answer cause I think... I don't

22  know maybe you were finished.

23           ANSWER:  Well no I'm not.

24  MR. BAILEY: I'm sorry

25           ANSWER: I also believe that the ah...We

61

1   certainly when we incorporated the into the regulation we

2   did not expect that so purifies investigations would be

3   done.  I mean if the commissioner requested it then he

4   can use the resources of the Internal Affairs for a reason

5   other then an obvious misconduct investigation or an

6   obvious investigation that's required to be a Director.

7           QUESTION: You done?

8           ANSWER: Yes.

9           QUESTION: What do you mean by that?  I

10  don't understand what you mean?  Do you mean that if

11  the commissioner wanted to come and ask to use

12  Internal Affairs Division resources to investigate some on

13  or something?  He doesn't have to give you a reason.  He

14  can just ask you to do it and you'll do it.  It that what you

15  mean?

16          ANSWER: No. I think that would have to be

17  some type of bases behind the request.

18          QUESTION: Sir I can't tell yah how I appreciate

19  that response, and I apologize to you because the times

20  that I have interrupted you I was trying to jump to that.  I

21  sort of thought that all that process that you were talking

22  about was for that reason and I apologize to you for

23  interrupting you.

24          ANSWER: You go ahead.

25          QUESTION: Do you have something else you

1    want to say.

2        ANSWER:  Yeah I do.  Now let me give you an

3    example of that.  Of course if the commissioner, if this

4    investigation would be in some way determined to an

5    illegal investigation.  In other words go wiretap, my wife

6    is having an affair.  I want you to go and follow this guy

7    around. No. That would be excluded. I would say that it

8    would mean coming upon him to show that somehow the

9    department either is, that this has to impact somehow on

10    the department, this investigation.  In other words for the

11    good or for the bad that there are some repercussions

12    some event that has taken place or should have taken

13    place that didn't and as a result ultimately is plenty

14    impact upon the operation of department.

15        QUESTION: Yes sir, absolutely.  And what you

16    meant in the sort of a additional response you do just a

17    minute ago, we know what meant was, I assume, that the

18    commissioner can't come to you for example the

19    wiretapping example that you gave.  The commissioner

20    can't come to you and say hey Skurkis ah I don't have a

21    warrant or anything.  I want you to do me a favor.  Go

22    wiretap my wife's phone cause I want to find out want

23    he's doing.  I mean the bottom line there is in a

24    ridiculous hypothetical, you would be.  The request

25    would be made or you to do something illegal or even

1   criminal and therefore it's improper, and you don't have
2   to do that right?  In fact you wouldn't do it.  Absolutely
3   Not!

4        ANSWER: And I'll tell you that if you look in
5   4.25 the word is request.  It doesn't say at the direction
6   of.  It says at the request of.  That allows the Internal
7   Affairs Division to evaluate the propriety of is this
8   investigation in anyway germane to the operation of the
9   department.  Or is this at the personal pleasure of the
10  commissioner or something else.  Again it adds at that
11  level of checks or balances there.  That the commissioner
12  can't just order you that he may request that the Internal
13  Affairs Division initiate a new investigation.

14        QUESTION:  Well at the time, I'm sorry where
15  you done?

16        ANSWER: And one time the fact what he does
17  makes it more then just his decision.  You know he may
18  be the cabalist, but other superiors would have to be in
19  agreement with conduction this investigation.  I mean
20  he's the Director of the Bureau Professional
21  Responsibility.

22        QUESTION: Okay so what your telling me then
23  Major Conley appointed Mr. Wertz and Mr. Willaims to be
24  investigated.

25        ANSWER:  Uh I don't know that.

1    QUESTION:  Well you would assume that he

2    did

3    ANSWER: No not necessarily.

4    QUESTION:  Well then the commissioner

5    appointed them? Could he appoint them?

6    ANSWER: I don't know what appoint, assign is

7    usually the term we don't ever appoint people to do an

8    investigation, we assign them.

9    QUESTION: I'm sorry sir.  I'll use the use the

10   word assignment

11   ANSWER:  And the assignment like in the case

12   of a troop let's say the troop member does something

13   wrong.  The troop commander may assign the

14   investigation.  It would be at the concurrence of the

15   Director of BPR, but the Director of BPR doesn't miss so

16   he assigned investigator.

17   QUESTION: So as you sit here today you're

18   assuming that Mr. Evanko concurred consulted and

19   there was a concurrence with Major Conley to appoint,

20   I'm sorry assign Mr. Wertz and Mr. Williams, the

21   investigators, In the Ober matter. Now you're assuming

22   that.

23   ANSWER: No I'm not assuming that cause I

24   don't know if the commissioner had anything to do with

25   it.  I don't how the investigation started.

65

1    QUESTION: I know.  Sir, I realize that, bare

2  with me.

3    ANSWER: We've taken quantum leaps here,

4  that apparently things you're saying, I don't really know

5  that to be a fact.

6    QUESTION: I'm not amnesia?  You're child of

7  BPR.  You're a lot of years of experience with BPR and

8  you're a fact witness here.  I'm asking you those

9  question.  I'm not assuming you know the answers to

10  those things. I happen to maybe know some things that

11  maybe you don't hear.

12    ANSWER: I guess you do?

13    QUESTION: Well okay, in fairness to me now.

14  The reason I'm asking the question to learn from

15  somebody who has more expertise then I do about BRP

16  and how it functions

17    ANSWER:  And that's fine.

18    QUESTION: The assignment, you don't know

19  how Mr. Williams and how Mr. Wertz came to be

20  assigned.

21    ANSWER: No I do not.

22    QUESTION: Now could Colonel Coury assign

23  them to investigate Captain Ober without the

24  concurrence of BPR?

25    ANSWER:  It's possible.  Do I know that is ever

1    been done the past?  No I don't

2            QUESTION: You don't know that it hasn't been

3    done

4            ANSWER: No I don't.  Well I know that up until

5    May of 98 I think I'm quite formulary with IAD operated

6    and BPR.  And during that ten years I don't know of any

7    case where the commissioner or any deputies assigned

8    investigators.  Now the subject of the investigation has a

9    lot to do with whose being assigned. Normally it's at least

10   an equal rank; well I shouldn't say that often is an equal

11   rank or a superior person being investigated. MR

12   BAILEY: Okay sir.  Thank you.

13           MR BAILEY: Okay.  Captain Skurkis,  your

14   now running an investigation of the book?  Is there any

15   such term?

16           ANSWER: Running it off the book?

17           MR BAILEY: Yeah.

18           ANSWER: I don't know ...

19           QUESTION:  Well you have made reference to

20   the possibility, at least at a relatively low level, that there

21   can be some type of investigation.  I hesitate to use that

22   word, maybe inquiry or something.  Let's say a Field

23   Commander of a situation that won't necessarily, and

24   remember I've used the word launched and you had

25   corrected me, launched or started or initiated a BPR

1  investigation? I've used the term full investigation, and
2  you had corrected me. You'd come in with a concept of
3  adjudication and that sort of thing. You know, it's
4  educating me to this process this is one of my questions.
5  I may not be exactly perfect. What I want to ask you
6  about now are questions about the process. And what
7  happens from an initial inquiry stage to where an
8  investigation becomes fully involved? I guess that's the
9  best way I know how to describe it. Okay. Let's say that
10 there is a, probably on a daily basis, commanders look
11 into and evaluate things that sometimes include what
12 people in their command do. Is that fair to say it's a
13 normal part of running a large organization?
14      ANSWER: Yes.
15      QUESTION: Okay. At some point in response
16 to questions I' asked you've made reference to having a
17 reason. You know, for want of a better description,  I
18 don't know how else to say this, to actually launching or
19 getting involved in, or initiating a full blown inquiry or
20 investigation; that there should be a reason for that.
21      ANSWER: Sure.
22      QUESTION: I mean that goes without saying.
23 That's common sense. And that one of the reasons that
24 BPR was created was to prevent abuse in situations
25 where there wasn't a good reason, to investigate someone

1  activities.  That sort of thing, but that was one of reasons

2  that BPR got started to create a process, a predictable

3  process.

4            ANSWER: Correct.

5            QUESTION: Okay.  Now aside from the

6  investigation do you know of any other....Strike that

7  because I don't think in fairness to you.  Did you at some

8  time since the fall of 1998 and the spring of 1999,  have

9  you at some time learned that it was the commissioner

10  who requested that Captain Ober be investigated?

11            ANSWER: Since then I had heard that.  Let me

12  put it that way.  I don't know.  You know again I'm a

13  person of evidence.  I want to see the document.  I want

14  to read what the report says.  I don't want to hear it,

15  because what you hear and what become fact are two

16  different things.

17            QUESTION: I sure agree with you.

18            ANSWER: I don't know that to be certain

19  because I haven't seen any documentation on it, but

20  that's what I had heard.  Yes.

21            QUESTION: The reason I asked you that

22  question is that you had related an experience where you

23  went into the conference room kitchen on an occasion

24  where Mr. Williams and Mr. Werts were reviewing

25  transcripts.  Do you remember your response?

1      ANSWER:  Yes

2      QUESTION:  And there was an inquiry about

3  you, a general a generic inquiry of you, about procedures

4  of BPR  tech?

5      ANSWER: Well I don't know what was asked of

6  me.  I don't know if it even had anything to do with my

7  response, but that is what I remember saying and I

8  believe that was one part we got cut off.  The other part of

9  my direction to them was that whichever avenue is

10  expressed, if it's done as an Internal Affairs investigation

11  then that you are to utilize the documentation that

12  Internal Affairs has incorporated in to 4-.25, in other

13  words administrative rights, notification inquiry, as well

14  as the format of investigation.  If you do not do it as an

15  Internal Affairs investigation then you do not use the

16  documents that are in 4-25.  Don't mix apples with

17  oranges was my direction to them.

18      QUESTION: Now you had mentioned an issue

19  there about where we had got cut off.  What you are

20  referring to is that I had interrupted you at that point

21  right?

22      ANSWER:  I never finished that statement, for

23  whatever.  I can't remember why.

24      QUESTION: With my bad manners I'm now

25  returning to it, my apologies.  At the time, when I was

1   thinking, when you raised that issue was that you had

2   also made reference at one point to use the word request,

3   the role of the word request from the commissioner.

4   Remember?  And you used that actually a little later on

5   after I had interrupted you right?  And is what you meant

6   by request is that the commissioner cannot direct?  The

7   commissioner can only request BPR to investigate

8   something.

9        ANSWER:  I view request as being less of a

10   concrete term.  Direct means this is the ways it's going to

11   be.  You're going to do this.  A request is something, is

12   something that you ask and then I think it usually is

13   accompanied by reasons for the request.  Direction

14   means I just tell you; you don't need a reason. Request

15   means that I would like you to do this because.

16        QUESTION: Agreed.  Now can the

17   commissioner direct BPR to investigate something?

18   Order them? You will investigate this.

19        ANSWER:  If it's misconduct, yes.  If there's a

20   situation of misconduct or perceived misconduct, yes.

21   But that's invested in the regulation 4-25.  You going do

22   it either way.

23        QUESTION: But 4-25 does not permit you to

24   go on a fishing expedition.  If I remember 4-25,

25   engendered in the regulation is an assumption that there

1    is stated ground for the investigation.

2         ANSWER: Well no those are my words. In other

3    words, those are my words behind what, when 425 was

4    written, what was expected, but that's not what's in the

5    regulation.   The regulation says at the request of.  And I

6    would fall back on my expectations, or our expectations

7    at the time we wrote that is that the commissioner would

8    have to in some way, have to believe whatever's being

9    investigated is really related to the department, will

10   impact it you know, even from the standpoint he used

11   the word witch hunt.  Let's say a gun comes up missing

12   out of the station.  We don't know why it's missing.  We

13   don't know if the cleaning lady took it.  We certainly can't

14   say that one of the members stole it.  We don't know

15   that.  So there may be an investigation conducted and

16   when you're done with the interviewing of every member

17   on that station trying to find out what his or her

18   involvement may have been, people at the station would

19   probably say he's conducting a witch hunt. They're trying

20   to pin this on somebody here.  Well as commissioner, I'd

21   be saying I've got to find out what's going on at that

22   station.  Why is this gun missing?  So it's an

23   investigation that's being conducted, but some people

24   may view it as a witch hunt.  And I view it as managerial

25   response to an activity that in someway shape or form I

1    may have to account for later.  IE that that gun is used in

2    a homicide, and traced back to the State Police.  In one

3    respect there is a very fine line there between categorizing

4    an investigation as a witch hunt verses a total review of

5    the circumstances.  So I fall back on what is the

6    relationship of this investigation to the department? If

7    there's a relationship there and the commissioner wants

8    it done, if he can show that relationship, I'd be hard

9    pressed as a captain or a major in BPR to say we're not

10   doing it.

11            QUESTION: Can you envision a circumstance

12   where you'd say we're not doing it?

13            ANSWER: The example I gave was if someone

14   said I believe my wife's having an affair.  I'd like you to

15   follow so and so around.  I'm not going do it sir.

16            QUESTION:  Do you know of any actual

17   circumstance where a commissioner come down and

18   asked BPR or made a request to BPR to do something

19   that was superfluous not any interest of the bureau or

20   was politically motivated let's say?

21            ANSWER: So far I think we've been blessed

22   with commissioners that have been above board and that

23   go by the book.

24            QUESTION: And if a commissioner comes in

25   here and doesn't have a good reason for doing something

1  then that might change your mind

2         ANSWER: Yes, if he doesn't have the reason.

3         QUESTION: If he doesn't have the reason you

4  might change your mind.  Now, I had also asked you

5  some questions and you had indicated that there were

6  circumstances where a commissioner would make a

7  request, and I'm not really clear on it,  that there would

8  need for BPR to concur in that decision before the

9  accrual process of investigation began.  Let me tell you

10  where I'm coming from to explain what I mean by that

11  end part.  It is my understand, in this situation,  that

12  indeed some investigators were assigned by the

13  Pennsylvania State Police without any kind of; this is my

14  understanding it doesn't make me right.  I don't want you

15  to; I want you to understand that in my making this offer

16  to you I'm reflecting what I can best remember.  And I'll

17  ask you a question based on that, but don't assume that

18  I'm correct in my assumptions.  I'll just tell you what I

19  have come to believe and understand.  It is my, Don

20  Bailey's understanding I'm not testifying here.  These are

21  not documents in front of you as blurted out, not very

22  appropriately referred to earlier, you know with being the

23  best situation.  I can just give you what I remember.  My

24  understanding is that investigators at the request of the

25  commissioner, deputies, or close assistants of his had

1    went and appointed investigators.  That's my
2    understanding.  You used the word assigned.  I don't
3    know if I agree with that term.  My understanding is that
4    they were just told to do this.  I may be wrong. It is my
5    understanding, based on the facts that I know, there was
6    no consulting with rules, regulations of BPR, no asking of
7    BPR of anything, no request or permission from BPR to
8    do anything.  Okay, and I'm not saying that BPR or the
9    Director of BPR would be in a position to tell the
10   commissioner no.  I don't know the answer to that.  From
11   a political point of view I have a tendency to think that
12   that would take an awful lot of courage in a real
13   repugnant situation.  I can't even imagine it arising.  I
14   can't, but I don't know of any; I know of no facts we
15   haven't interviewed Major Conley yet and we're going to
16   see what he has to say.  Although I think I know the
17   answers.  We'll see, but I don't know of any going
18   through what I would refer to normally as the proper
19   correct channels.  Okay, that I know of,  I'm not saying
20   what the commissioner did was wrong.  I just don't know
21   of any.  My understanding is these guys started
22   investigating at the direction of his deputies.  At some
23   point, to my understanding, yes it comes to the attention
24   of BPR.  I'm talking about as a bureaucracy.  It comes to
25   it's attention.  My question would be as follows.  If I am

1    correct about that, this thing took a direction, that it
2    started, that it's under way, this investigation, and then
3    organizationally; Sir I was using BPR, I should be saying
4    IAD okay.  So I'm at fault there.  I didn't mean BPR.  I
5    meant the attention of IAD.  I don't know whether
6    something can initiate at, you know here's BPR.  I view
7    them as the top and then view organizationally on an
8    organizational sheet.  I view IAD and I view your division.
9    Now at some point it comes to the attention of IAD after
10   it's started.  My understanding from your testimony and
11   the others testimony is that might not mean much of
12   anything, because there may be an initial inquiry stage
13   or evaluation stage where something is looked at.  When
14   it's final, maybe it takes on a form that there is a
15   suspicion you know a mere suspicion or that kind of
16   thing then it becomes more formal.  Okay at some point
17   it takes on a bureaucratic form and it gets and it starts to
18   tracks and all that sort of stuff.  Is that correct?  Is that
19   the way things could get started?  Is it possible that these
20   deputies can go and assign a couple of majors to
21   investigate Captain Ober and they learn something and
22   say -.  He maybe did this and then it gets a
23   bureaucratically assigned number, but something like
24   that happen?  Can you envision that?
25        ANSWER: Yes. It happens quite often on the

1    lower levels.  That there is a cursory inquiry conducted to

2    some allegation.  At some point it's determined..... Let me

3    give an example.  Someone calls into the troop

4    commander and says one of your cars ran me off the

5    road responding to an incident.  The commander

6    contacts a corporal.  This Corporal is looking at us.  The

7    Corporal looks into it and finds out it was not a state

8    police car, but it was an East Pennsboro Police car.

9    That's the end of it.  We're not going any further now.

10    This is not a State Police issue.  Maybe we'll forward the

11    information to East Pennsboro.  Refer it I don't know, but

12    as far as IAD goes that's over.  At the same time the

13    Corporal may find out there was a robbery taking place

14    and the State Police send in nine cars.  Yes, it's likely

15    that one of our cars ran this poor elderly lady off the

16    road.  We're going to do an Internal Affairs investigation

17    to determine who did, who was driving the car, which car

18    was it?  So circumstances could be looked at in a

19    preliminary determination as to whether the Internal

20    Affairs process should become involved.

21           QUESTION: So you expect that some point

22    before this became a formal investigation, a more formal

23    investigation, that there's some hiatus event or cursory

24    review, yielded information which would indicate that a

25    further or full investigation was justified.  Before you

1   assign the number and go through with it.

2   ANSWER:  Well there could similarly be

3   circumstances where this Corporal doesn't know which

4   way to go.

5   QUESTION: Doesn't know which way to go?

6   ANSWER: Doesn't have the resources.  Doesn't

7   have the time and it's decided hey we got to be on the

8   safe side and it's investigated.  Contact Internal Affairs

9   get a number, do a worksheet, and have an investigation

10   conducted.

11   QUESTIONS:  Could you hold at that one

12   point?  I think we need;  All right let me see if I can finish

13   this one.  Okay let's say there's a number's assigned that.

14   There's some kind of intervening information or

15   additional information or information has developed

16   sufficient to make this a situation where okay we need to

17   investigate and go forward.  And it's a formal IAD or BPR

18   investigation. I know so let's say it's a BPR.  Once that

19   process is completed, as I understand it, there's a report

20   written that is essentially is a factual summary. Am I

21   correct? It doesn't make recommendations on what to do

22   or anything like that.  It's a factual summary.

23   ANSWER:  That's correct.

24   QUESTION: Okay.  Then it goes to

25   adjudication, what you referred to as adjudication.

1           ANSWER: Correct.

2           QUESTION:  Do you know if that happened in

3  Captain Ober's case?

4           ANSWER: No I do not.

5           QUESTION: You don't know if it's ever been

6  adjudicated?

7           ANSWER:  No. I'm not certain of that. I don't

8  know that.  I know something was done because I know

9  interviews were conducted, but I don't know in what

10  shape or form that ultimately was documented.

11          QUESTION: Or if it was.

12          ANSWER: Well I'm assuming because there

13  were interviews.  At least there were transcript or tapes.

14  That record I'm sure exists, but I don't know what

15  beyond that.

16          QUESTION: Who would have this?

17          ANSWER: The investigators.

18          QUESTION: Who is the adjudicator?  If there

19  was any adjudicator on Captain Ober.  Do you know?

20          ANSWER: It depends on where he was

21  assigned at the time that the investigation was

22  completed.  It would be his commanding officer.  So

23  whoever his commanding officer was.

24          QUESTION:  Koselnak? He's in LCE I guess

25  he...

1    ANSWER: Okay LCE.  Then would he have

2    been in the bureau?

3    QUESTION: I guess.

4    ANSWER:  Well if he was there.

5    QUESTION: Major Wall, IMMS

6    ANSWER: Okay if he was assigned there then

7    he was assigned to Technology Services.   The Bureau of

8    Technology Services.  The Bureau Director is Major Wall.

9    He would responsible for Technology

10   QUESTION: And if it wasn't him, and he's

11   assigned to LCE then it's going to be Mr. Koselnak.

12   ANSWER: If Major Koselnak was the Bureau

13   Director at the time.  There's a different Bureau Director

14   at the time.

15   QUESTION:  Would it be anybody above that?

16   ANSWER: As a Captain assigned to a Bureau it

17   should be the Bureau Director that makes the

18   adjudication.  I don't know of any circumstances where

19   that's been other than that.

20   QUESTION: Once they do the adjudication

21   what do they do then?  Let me take that back.  What if

22   the facts don't suggest the person did anything wrong?

23   ANSWER:  Well if the person had been

24   provided with a notification of inquiry in writing.  That

25   spells out an issue.  That issue should be communicated

1  to them where it's adjudicated as to... I don't know what

2  it said, but addressing whatever the notification of

3  inquiry said.

4      MR BAILEY:  You know what.  I'm going to try

5  and pack this in to this two hour tape if I can.  Can we

6  suspend?

7      MR. MARCECA: Yes we can.  It's 3:04.  We're

8  now going to suspend the deposition.

9      MR.  MARCECA: It's 3:08.  We're back on

10  camera and deposition.

11      MR BAILEY: Is that one on down below?

12      MR. MARCECA:  Yes sir.

13      MR BAILEY: All right. Captain Skurkis I'd like

14  to thank you very much for you coming here today.  I

15  very much appreciate you cooperation.  I have no further

16  questions for you.  I again apologize sometimes it's hard.

17  Your answers are very involved and technical.  I think I

18  interrupted you a couple times.  I apologize for that.  I

19  think we were able to get back to them though.  Is there

20  anything you'd like to add or any questions I asked that

21  you'd like explained.  If not we're done.

22      A:  In response to one of your comments.  You

23  drew this scenario about you thought is was, what was

24  the term you used.  You believed it's next to impossible

25  that if the commissioner came to someone and asked

1  them to do an investigation that they wouldn't go ahead
2  and do it.  I know how you used the term there.  Anyway,
3  what I would like to say is you're looking at it from that
4  kind of standpoint.  From my standpoint I can... I think
5  what you said was unfathomable.  That they would not
6  go ahead with the investigation.
7        MR BAILEY:  If there was a reason for it.  I
8  mean a good reason for it.
9        A: Oh okay
10       MR. BAILEY:   I did not mean to imply if I
11  implied that someone would say to the commissioner,
12  you know, like go into some detailed question or question
13  the commissioner in a case where let's say that the
14  commissioner came with a totally frivolous request.  Now
15  I have difficulty envisioning a situation where most of the
16  State Police members I've talked to if a commissioner
17  came with a outlandishly frivolous or an irrelevant kind
18  of a personal request let's say that was obvious.  One of
19  the examples you raised I think was an improper
20  wiretapping situation.  Now I assume that most of you
21  would say oh no I'm not going to do that.  Although we
22  have had testimony here where some of the staff
23  members have indicated that if they knew that the
24  commissioner himself was target of an investigation I
25  believed that they indicated that they said yes out of

1 loyalty they would tell him.  I disagree with that.  Most of
2 the members that have testified here I think would have
3 disagreed with that.  I have not asked you that question.
4 I don't intend to.  I don't see any reason to.  I don't think
5 it's relevant, but you're not a defendant here.  For what
6 it's worth I have had a response like that which sort of
7 shocked me.  I maybe didn't hear it right, and maybe the
8 question wasn't understood properly either.
9            A: We're clear now.
10            MR BAILEY:  I, we're on the straight and
11 narrow.  We're reading from the same page.  Again I'd like
12 to thank you for being here.  And I'd like to thank you
13 very much for your courteous responses.  Any questions
14 before we go?
15            TONY MARCECA: It's 3:12 on 5 march 2002.
16 The video deposition is now completed.
17
18
19
20
21

30

1

1    UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT

3            OF PENNSYLVANIA

4        * * * * * * *

5    DARRELL G. OBER,    *

6        Plaintiff        * No.

7        vs.            * 1: CV-01-0084

8    PAUL EVANKO, MARK * Civil Action-Law

9    CAMPBELL, THOMAS    *

10   COURY, JOSEPH        *

11   WESTCOTT,            *    **ORIGINAL**

12   HAWTHORNE CONLEY,  *

13       Defendants    *

14        * * * * * * *

15

16    VIDEOTAPED DEPOSITION OF

17        MICHAEL J. SOOHY

18        MARCH 14, 2002

19

20

21

22

23   Any reproduction of this transcript

24   is prohibited without authorization

25       by the certifying agency

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

## Sargent's Correction Page

| Page | Line | Error | Correction | Reason |
|------|------|-------|------------|--------|
| 31 | 8 | Word "were" at end of line should be "was" | Change second to last word in line to "was" | I would not say "were" in this context |
| 31 | 8 | 2nd word in line (was) should be removed. | Remove word "was" | Again, I would not say as written |
| 32 | 4 | last word in line (a) should be the | Change last word from a to the | I would say the source not a source. |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

I have read the transcript of my testimony and certify that it is accurate with the above corrections.

Deponent's signature: Michael J. Soohy
Date of Deposition: March 14, 2002

Notary Public Signature/Seal
Vivian L. Mosley, Notary Public
Pittsburgh, Allegheny County
My Commission Expires Aug. 8, 2002

Member, Pennsylvania Association of Notaries

2

1           VIDEOTAPED DEPOSITION

2                    O F

3    MICHAEL J. SOOHY was taken on behalf

4    of the Defendants herein, pursuant

5    to the Rules of Civil Procedure,

6    taken before me, the undersigned,

7    Denise Jeanne Khorey-Harriman, a

8    Registered Merit Reporter and Notary

9    Public in and for the Commonwealth

10   of Pennsylvania, at the offices of

11   the Federal Bureau of Investigation,

12   3311 East Carson Street, Pittsburgh,

13   Pennsylvania, on Thursday, March 14,

14   2002, at 10:12 a.m.

15

16

17

18

19

20

21

22

23

24

25

3

APPEARANCES

DON BAILEY, ESQUIRE

4311 North 6th Street

Harrisburg, PA  17110

   COUNSEL FOR PLAINTIFF


SYNDI L. GUIDO, ESQUIRE

Deputy General Counsel

Governor's Office of General Counsel

333 Market Street, 17th Floor

Harrisburg, PA  17101

   COUNSEL FOR DEFENDANTS


JEFFREY B. KILLEEN, ESQUIRE

Chief Division Counsel

3311 East Carson Street

Pittsburgh, PA  15203

   COUNSEL FOR SOOHY AND KUSH


ALSO PRESENT:  DARRELL G. OBER

                 JOHN R. BROWN

                 ANTHONY MARCECA

4

## I N D E X

<u>WITNESS:</u> MICHAEL J. SOOHY

EXAMINATION

    BY ATTORNEY GUIDO          11-28

EXAMINATION

    BY ATTORNEY BAILEY         29-44

RE-EXAMINATION

    BY ATTORNEY GUIDO          45-60

RE-EXAMINATION

    BY ATTORNEY BAILEY         61-72

RE-EXAMINATION

    BY ATTORNEY GUIDO          72-75

RE-EXAMINATION

    BY ATTORNEY BAILEY         75-76

CERTIFICATE                   78

5

<u>EXHIBIT PAGE</u>

<u>PAGE</u>

NUMBER       IDENTIFICATION       IDENTIFIED

NONE OFFERED

6

<u>OBJECTION PAGE</u>

| <u>ATTORNEY</u> | <u>PAGE</u> |
|---|---|
| BAILEY | 15, 16, 22 |

7

1          P R O C E E D I N G S

2     - - - - - - - - - - - - - - - - - -

3              VIDEOGRAPHER:

4              Good morning.  Be

5         advised that the video is

6         in operation.  My name is

7         Anthony Marceca.  I live

8         at 2219 Dixie Drive, York,

9         Pennsylvania.  I've been

10        contacted by PR Video to

11        be the video operator for

12        this deposition.  The case

13        is in The United States

14        District Court for the

15        Middle District of

16        Pennsylvania.  It's

17        captioned Darrell G. Ober,

18        Plaintiff, versus Paul

19        Evanko, et al.  And it's a

20        civil action law.  And

21        it's tiled 1: CV-01-0084.

22        The deposition today is

23        being held at 3311 East

24        Carson Street, Pittsburgh,

25        Pennsylvania.  It is now

8

1    10:12 a.m. on March the

2    --- what's today, the

3    15th?

4          ATTORNEY BAILEY:

5          14th, I guess.  Yes.

6          VIDEOGRAPHER:

7          March 14th, 2002.

8    The video deposition is

9    being taken on behalf of

10   the Plaintiff, Mr. Darrell

11   Ober.  And the witness is

12   Michael Soohy.

13         ATTORNEY GUIDO:

14         Actually, this is ---

15   we're the ones that

16   noticed the deposition.

17         VIDEOGRAPHER:

18         Oh, I'm sorry.

19         ATTORNEY GUIDO:

20         That's all right.

21   The Defendants are taking

22   this deposition.

23         VIDEOGRAPHER:

24         Okay.  Let the record

25   show the Defendants are

9

1        taking the deposition of

2        Mr. Michael Soohy, an FBI

3        agent.  And Mr. Soohy,

4        would you please raise

5        your right hand and state

6        after me for the record?

7    MICHAEL J. SOOHY, CALLED AND SWORN

8    TO TESTIFY

9                    VIDEOGRAPHER:

10           Thank you.  Do you

11       mind a sound check around

12       the room?

13                    ATTORNEY GUIDO:

14           No, not at all.

15                    ATTORNEY BAILEY:

16           Sure.  My name is Don

17       Bailey.  I represent the

18       Plaintiff, Darrell G.

19       Ober, 4311 North 6th

20       Street, Harrisburg, PA,

21       717-221-9500.

22                    ATTORNEY GUIDO:

23           Syndi Guido.  I

24       represent the Defendants.

25       I'm from the Governor's

10

1          Office of General Counsel,

2          333 Market Street, 17th

3          Floor, Harrisburg, PA

4          17101.

5               ATTORNEY BAILEY:

6               Sir, could we get you

7          on there?

8               ATTORNEY KILLEEN:

9               Sure.  My name's Jeff

10         Killeen.  I'm the Chief

11         Division Counsel for the

12         FBI, Pittsburgh Division.

13         The address is 3311 East

14         Carson Street, Pittsburgh,

15         15203.  Telephone

16         412-432-4000.

17              ATTORNEY BAILEY:

18              It's Syndi's ---.

19              ATTORNEY GUIDO:

20              Yes.

21              ATTORNEY BAILEY:

22              I believe she wants

23         to ---.

24              ATTORNEY GUIDO:

25              I just get a little

11

1    confused when we have so

2    many different cameras as

3    to who's doing what.  Are

4    you guys all ready to go?

5    Okay.  And are we waiving

6    objections, except as to

7    the form of the question?

8            ATTORNEY BAILEY:

9            No, not waiving.

10    Objections, except as to

11    the form of the question,

12    will be reserved until the

13    time of trial.

14            ATTORNEY GUIDO:

15            That's fine.

16            ATTORNEY BAILEY:

17            We so stipulate.

18    Sure.

19            ATTORNEY GUIDO:

20            That's fine.

21    EXAMINATION

22    BY ATTORNEY GUIDO:

23    Q.        All right.  Sir, can you

24    tell us what your current position

25    with the FBI is?

12

1    A.        I'm a special agent with

2    the FBI right now.

3    Q.        Are you situated here in

4    the Pittsburgh area?

5    A.        Actually, my office is in

6    Cranberry Township, Pennsylvania,

7    resident agency.

8    Q.        And we're here to ask you

9    questions today about an interview

10   --- excuse me, an investigation that

11   the FBI conducted with respect to

12   Trooper ---?

13   A.        Kipp.

14   Q.        Kipp.  I knew that wasn't

15   the right name.  Kipp Stanton.  Do

16   you recall that?  Are you familiar

17   with the investigation?

18   A.        Yes, I am.

19   Q.        When did that

20   investigation first begin?

21   A.        I believe the

22   investigation with Trooper Stanton

23   started prior to the time I got to

24   Pittsburgh, maybe 1998 sometime.

25   Q.        When did you get to

13

1   Pittsburgh?

2   A.        I got here in August of

3   '98.  The case was ongoing at that

4   time.

5                    ATTORNEY BAILEY:

6                    Yes, if we could

7              clarify.  You meant it

8              began before you got here?

9   A.        I believe the

10  investigation began before I got to

11  Pittsburgh, yes.

12  BY ATTORNEY GUIDO:

13  Q.        And you got to Pittsburgh

14  ---?

15  A.        I ---.

16  Q.        Excuse me.  You arrived in

17  Pittsburgh when?

18  A.        I think it was August of

19  1998.

20  Q.        And in the course of that

21  investigation, did you have contact

22  with various members --- any contact

23  with members of the state police?

24  A.        Yes.

25  Q.        Who did you have contact

14

1  with?

2  A.        Captain Darrell Ober.

3  Q.        Did you have contact with

4  anyone else?

5  A.        No.  Personally, I didn't,

6  no.

7  Q.        When did you first meet

8  Captain Ober, to the best of your

9  memory?

10 A.        You know, I --- it must

11 have been --- it could have been in

12 '99.  It could have been early

13 2000.  I don't recall.  We met at

14 the state police barracks in

15 Everett, PA, myself and Ralph Kush.

16 Q.        What was that meeting

17 about?

18 A.        We wanted to inform

19 Captain Ober about an investigation

20 we had ongoing, and that we believed

21 that a trooper, Kipp Stanton, was

22 involved in some illegal activity.

23 And we wanted to inform Captain Ober

24 as head of the --- as a

25 representative of the state police

15

1    OPR about what we had found, where

2    we were going with it.

3    Q.        Did you have any

4    discussion with Captain Ober about

5    the confidentiality of the

6    information that you were providing

7    him?

8    A.        Per se, no.  We didn't

9    discuss confidentiality.  We

10   discussed the facts of the case as

11   best we knew them.

12   Q.        From your perspective, was

13   there any reason that he should not

14   tell his Major about the

15   investigation?

16              ATTORNEY BAILEY:

17              Objection.  You may

18              respond, sir.

19   A.        From my perspective, I

20   believe that I was informing State

21   Police OPR about a situation

22   involving one of their employees,

23   and possibly more.  And my position

24   personally was that I'm not going to

25   --- I'm not going to get involved

16

1  in telling anybody what to do with

2  that information.

3  BY ATTORNEY GUIDO:

4  Q.        Did you say anything to

5  Captain Ober along the lines of do

6  not report this to your superiors or

7  keep this to yourself, anything like

8  that?

9  A.        I don't recall saying

10 anything like that.

11 Q.        Did you --- from the

12 perspective of the investigation,

13 did you have any reason that his

14 superiors could not know about the

15 investigation?

16             ATTORNEY BAILEY:

17             Objection.  You may

18             respond, sir.

19 A.        We didn't --- we didn't

20 discuss per se who he should or who

21 he shouldn't tell.  I recall Captain

22 Ober having some concerns,

23 expressing some concerns about who

24 he should tell.

25 BY ATTORNEY GUIDO:

17

1    Q.        Do you remember what he

2    said?

3    A.        This investigation

4    involved the possibility that people

5    higher up in the State Police might

6    be somehow involved in change of

7    test scores or moving somebody from

8    one bracket to the other.  We

9    informed Captain Ober about what the

10   trooper in question had said on

11   tape.  We let him read the

12   transcripts.  We let him see a

13   videotape.  He had mentioned a few

14   names.

15        Captain Ober at that point

16   expressed some concerns about only

17   two or three people in the State

18   Police hierarchy that would be in a

19   position to do that, and that he

20   would have to be careful about who

21   he would notify about this.

22   Q.        So it was Captain Ober,

23   rather than yourself, that was

24   expressing the concerns?

25   A.        Captain Ober was

18

1    expressing some concerns about who

2    in the State Police needed to be

3    notified about this because he

4    didn't really want --- he was doing

5    the right thing on our side.  He

6    doesn't want to compromise anything

7    that we had going on.

8    Q.        Did he have any --- when

9    you say he said two or three people,

10   did he mention anybody that possibly

11   could be involved in that?

12   A.        He may have mentioned

13   positions.  The names wouldn't have

14   meant anything to me.  He may have

15   mentioned names.  I'm not sure.

16   Q.        Did you tell him anyone

17   that you thought from the course of

18   your investigation higher ups in the

19   State Police that could be involved?

20   A.        No.  The only name that we

21   had --- we had was trooper.  And we

22   had provided him with a couple other

23   names of people that the trooper had

24   told our source about.  And we asked

25   him to determine if these guys were,

19

1    in fact, employed by the State

2    Police.  I think one name in

3    particular, but I can't recall what

4    it was.

5    Q.        Did it turn out that those

6    people were employed by the State

7    Police?

8    A.        It turned out that this

9    person, this one person, was not.

10   Q.        Were any of them employed,

11   other than --- other than Trooper

12   Stanton, was there any other member

13   of the State Police that it turned

14   out that they were potentially a

15   target?

16   A.        No.

17   Q.        And that meeting that

18   you're discussing, do you remember

19   when that was?

20   A.        Well, there were two

21   meetings.  One was ---.

22   Q.        When was the first

23   meeting?

24   A.        One was in Everett at ---

25   again, I don't recall when it was.

20

1    I know it was cold outside.  Could

2    have been January, February, March

3    2000, 1999.  I don't know.  The

4    second meeting was ---.

5    Q.        By the time that you had

6    that meeting, though ---?

7                   ATTORNEY BAILEY:

8                   Please.  He started

9              the second meeting.  He

10             hadn't finished.

11   BY ATTORNEY GUIDO:

12   Q.        Well, let's stick with the

13   first meeting.

14   A.        Okay.

15                  ATTORNEY BAILEY:

16                  He hadn't finished.

17                  ATTORNEY GUIDO:

18                  We're going to stick

19             with the first meeting.

20                  ATTORNEY BAILEY:

21                  He hadn't ---.

22                  ATTORNEY GUIDO:

23                  We're sticking with

24             the first meeting, and

25             then we'll go on.

21

1      <u>ATTORNEY BAILEY:</u>

2      Syndi ---?

3      <u>ATTORNEY GUIDO:</u>

4      Please.  These are my

5      questions.  When you have

6      questions, you can ask

7      them.

8      <u>ATTORNEY BAILEY:</u>

9      Please.

10     <u>ATTORNEY GUIDO:</u>

11     No.

12     <u>ATTORNEY BAILEY:</u>

13     I'll tell you what.

14     We'll take equipment

15     down.  Now, let's stop

16     acting this way.

17     <u>ATTORNEY GUIDO:</u>

18     That's fine.

19     <u>ATTORNEY BAILEY:</u>

20     Ma'am, please, please

21     he was --- in all due

22     respect, I'm not trying to

23     obfuscate your

24     deposition.  He had --- he

25     was responding to the

22

1    question.  He had started

2    to say the second meeting

3    after describing the

4    first.  I --- he has a

5    right to respond.  I'd

6    like to hear his

7    response.

8        ATTORNEY GUIDO:

9        Sir, my question was

10    about the first meeting.

11    I didn't ask you a

12    question about the second

13    meeting yet.  Let's stick

14    with the first meeting.

15    Okay.

16        ATTORNEY BAILEY:

17        You don't have a

18    right to cut him off when

19        he hadn't finished.

20    BY ATTORNEY GUIDO:

21    Q.    Do you have anything else

22    to say about the first meeting?

23        ATTORNEY BAILEY:

24        Let me place an

25        objection, and then I'll

23

1     back off.  I want to
2     object on the record that
3     Counsel has intentionally
4     interrupted this witness
5     who, I think, was in a
6     very relaxed and
7     cooperative way responding
8     to a question that was on
9     a table --- on the table.
10    He had answered the
11    question and made
12    reference to a second ---
13    a meeting.  And he was
14    interrupted.  And Counsel
15    insists, I believe,
16    against every rule of
17    Court with which I am
18    familiar, on letting him
19    finish his answer, which
20    he has every right to do.
21    I object.  Thank you.
22    BY ATTORNEY GUIDO:
23    Q.        Now, as far as the first
24    meeting is concerned because that's
25    the one I mean, this is the one in

24

1  Everett; correct?

2  A.          Right.

3  Q.          Do you know --- do you

4  have any idea whether that --- at

5  the time you had that meeting, did

6  you have all the tapes from the

7  informant?

8  A.          We had some.  The

9  investigation was still ongoing.

10  Q.          Were there more tapes that

11  came later?

12  A.          Yeah, I believe there was

13  at least a videotape afterwards.

14  Q.          Now, you were going to

15  mention a second meeting.  Can you

16  tell me about the second meeting?

17  A.          The second meeting was

18  after we had obtained a videotape in

19  which Trooper Stanton and another

20  individual by the name of Jay Bridge

21  or Bridges had met with our source,

22  and we had videotaped a $1,000

23  payment from Bridge to Stanton to

24  our source.

25  Q.          Okay.

25

1    A.        At that point, we then

2    arranged a second meeting with

3    Captain Ober.

4    Q.        When you say we arranged,

5    who made the arrangements for the

6    meeting?

7    A.        Agent Ralph Kush.

8    Q.        Where was that meeting

9    held?

10   A.        That was in Indiana, PA,

11   at a Holiday Inn or something.

12   Q.        At a Holiday Inn, did you

13   say?

14   A.        It might have been --- I

15   believe it was a Holiday Inn.

16   Q.        Was it agent --- Special

17   Agent Kush that made the

18   arrangements to have the meeting at

19   the Holiday Inn?

20   A.        I instructed Agent Kush to

21   contact Captain Ober.  And I believe

22   it's my understanding that Captain

23   Ober arranged for the meeting at the

24   Holiday Inn.

25   Q.        Do you know why the

26

1    meeting was held at a Holiday Inn

2    rather than --- was there any reason

3    you couldn't have it at headquarters

4    is what I'm asking?

5    A.         It was my understanding

6    that Captain Ober was concerned

7    about who would know that we were

8    meeting with him.  And he wanted to

9    meet at a location where nobody

10   would --- nobody would know what was

11   going on.  He wanted to meet at a

12   hotel.

13   Q.         Was that your concern as

14   well or just his concern?

15   A.         No, that was his concern.

16   Q.         And do you remember when

17   that meeting was held?  I know it's

18   a long time ago.

19   A.         It was several months

20   after the first meeting is all I can

21   remember.  I don't know the exact

22   date.

23   Q.         That meeting --- what was

24   that meeting about?

25   A.         Again, we --- Captain Ober

27

1   rented a room.  We showed him the

2   videotape that I just described.

3   And we talked a little bit more

4   about the fact that Trooper Stanton

5   was still talking about other people

6   in the State Police, having

7   basically bought their jobs.

8   Q.        How long was the meeting?

9   A.        An hour, hour and a half.

10  Q.        During that second

11  meeting, was there any discussion

12  about confidentiality?

13  A.        From our end, no.  We

14  didn't --- we didn't discuss

15  confidentiality.  Again, every time

16  that we met with Captain Ober on the

17  two occasions, he always expressed

18  concern about who should know about

19  this and who shouldn't know about

20  this.  And again, I believe that

21  Captain Ober's intent was to make

22  sure that he didn't go somewhere and

23  cause something to compromise what

24  we were doing.

25  Q.        When you say he expressed

28

1  concern about that, did he ask for

2  your advice on who he should tell?

3  A.          No.

4  Q.          Did you give him any

5  advice on whom he should tell?

6  A.          No.  I don't believe it

7  would be my position to tell State

8  Police OPR what they should do with

9  information.

10  Q.          Did you ever speak with

11  Captain Ober again about this?

12  A.          You know, I don't believe

13  I did.  I may have had a phone

14  conversation with him just to fill

15  him in on the details of what was

16  happening since that meeting.  But

17  we didn't meet personally.  And I

18  don't know if we had a phone call or

19  not.  We may have.

20  Q.          So you --- just to

21  clarify, you don't have any

22  recollection of any other

23  conversations?

24  A.          No, I don't.

25          ATTORNEY GUIDO:

29

1       One moment, please.

2       It's your witness.

3       ATTORNEY BAILEY:

4       Thank you very much,

5   Syndi.

6   EXAMINATION

7   BY ATTORNEY BAILEY:

8   Q.      Good morning, sir.

9   A.      Good morning.

10  Q.      Mike, I understand you ---

11  I'll try to keep this very brief.  I

12  understand you've been up working

13  very hard.  And I compliment you for

14  that.  And I want to thank you for

15  coming here today to answer

16  questions.  I have just a few

17  questions for you, sir.  I follow a

18  practice, particularly when I'm

19  dealing with someone who's a skilled

20  professional, that if you want to

21  know where I'm going with a

22  question, whether it's curiosity or

23  concern of any type, I want you to

24  feel free to ask me.  I don't mind.

25  I have absolutely no interest in any

30

1   factual distortions, trick questions

2   or anything like that.  I don't want

3   that to occur.  And I know there's

4   no reason to expect that in this

5   case, incidentally, in terms of your

6   interview here.  But I want you to

7   feel free and relaxed to if you have

8   any curiosity at all to ask me, and

9   I'll be very happy to comply.  Okay?

10  A.        Okay.

11  Q.        And that goes for your

12  attorney, too, or for that matter,

13  opposing Counsel, I have no

14  objection.  Okay.  Sort of three

15  areas, Mike, I'd like to ask about.

16  The first one would be --- if you

17  --- I understand you came into this

18  particular area of FBI jurisdiction

19  to work sometime on or about August

20  of '98?

21  A.        Uh-huh (yes).

22  Q.        Okay.  Now, when you ---

23  when did you first become aware that

24  there was this --- could we call it

25  the Stanton thing?  I don't know

31

1    really what quite to call it.  For

2    want of a better description, the

3    Stanton thing, the Stanton matter.

4    Do you remember when you first

5    became aware of it?

6    A.        When I first got here,

7    part of what my job responsibilities

8    were was to find out what were going

9    on in any of the pending criminal

10   investigations.

11   Q.        Right.

12   A.        And I took a look at this

13   case that had been --- had been

14   going on for a couple of years.  And

15   I realized that there had been a

16   couple of occasions when our source

17   had discussed a trooper.

18   Q.        All right.

19   A.        Who was interested in

20   possibly doing some kind of

21   business.  I wasn't sure at that

22   point --- I don't recall at that

23   point if there were any

24   conversations between the trooper

25   and our source, but I talked to

32

1  Agent Kush.  And I said look, Ralph,

2  this looks like potentially we can

3  move this along a little further.

4  Let's --- you know, let's bring a

5  source in, which we did.  And we

6  talked to him about his relationship

7  with the trooper.  And we basically

8  at that point decided, well, let's

9  see what transpires.  Let's have

10  some conversations with this guy and

11  see what he's interested in and see

12  what he wants to do.

13         And at that point, which

14  would have probably been early 1999,

15  mid 1999, whatever, we directed the

16  source to reach out to this guy and

17  have some additional conversations

18  with him and see what he wanted.

19  Q.      Okay.  Now, I --- you

20  know, it's not my purpose to testify

21  here.  And I certainly would yield

22  to any corrections by opposing

23  Counsel.  But my perusal of what

24  documents have been made available

25  to me indicates the investigation

33

1  may have begun sometime around or

2  may have --- you know, or the fact

3  that there might have been a problem

4  with Stanton may have come to the

5  FBI's attention sometime on or about

6  1996.  Does that refresh your

7  recollection at all?

8  A.        It's possible.

9  Q.        Possible.  Okay.

10  A.        All I remember is that

11  when I came here, the case had kind

12  of floundered for a while.

13  Q.        Okay.

14  A.        Right.

15  Q.        All right, sir.  And it's

16  my understanding that at sometime,

17  there had been a mention of Mr. ---

18  of a state representative named Joe

19  Preston.  Is that possible?

20  A.        That's correct.

21  Q.        All right, sir.  And that

22  there was a Len Bodack, Senator Len

23  Bodack was also --- not to imply

24  that they did anything wrong, by the

25  way, but that somehow they had been

34

1   mentioned?

2   A.          That's correct.

3   Q.          All right, sir.  Now, do

4   you have a recollection based on

5   your involvement in the

6   investigation of when the State

7   Police were first notified, excuse

8   me, about Mr. Stanton's possible

9   wrongdoing?

10  A.          It's my understanding that

11  Ralph Kush had talked to somebody in

12  the State Police about Mr. Stanton's

13  possible involvement prior to my

14  arriving in Pittsburgh, sometime in

15  '96, '97.

16  Q.          Do you have a

17  recollection, Mike, if that might

18  have been some folks in the western

19  office of IAD, if you know?

20  A.          I have no idea who it was.

21  Q.          Okay.

22  A.          All I remember is that

23  when I instructed Ralph --- when we

24  discovered that Trooper Stanton was

25  fairly involved in this and was

35

1    teetering on criminal activity, I

2    instructed Ralph at that point to

3    contact the State Police OPR and

4    arrange a meeting with them because

5    we wanted to make sure they were

6    aware of what was going on.  And at

7    that point, I remember him telling

8    me that he had talked to somebody

9    previously about this.

10   Q.        Okay.

11   A.        And we didn't go into any

12   other detail about that.

13   Q.        Okay.  And Ms. Guido, I

14   think, pretty much covered the

15   sequence of events and the

16   conversations that you were involved

17   in with Captain Ober pretty much.

18   So I want to set that aside for just

19   a moment.  And I want you to go back

20   in your mind to the period of time,

21   I think you'd said that you weren't

22   sure, '99, 2000, you just weren't

23   sure.  But at some point, this thing

24   apparently, for purposes of what the

25   FBI was doing, came to a conclusion?

36

1   A.          That's correct.

2   Q.          And now, here's a few

3   questions I want to ask about that.

4   Let me tell you where I'm going.

5   It's our understanding that after

6   the investigation came to a

7   conclusion, and it forms a major

8   material legal artifice in the

9   current lawsuit, that Captain Ober

10  and another PSP official informed

11  the Commissioner.  And there's no

12  secret the Commissioner became

13  upset, for whatever reason, you

14  know, he did become upset.  After

15  the FBI had closed this

16  investigation initially, in other

17  words, I believe --- my

18  understanding is at some point you

19  notified Captain Ober that, hey, it

20  looks like it's just --- something

21  to the effect that it's just

22  Stanton, and that's basically it.

23  If that's correct, could you confirm

24  that?

25  A.          I don't know at what point

37

1   or if Captain Ober was notified

2   about.

3   Q.        Okay.

4   A.        I would --- I didn't do

5   that.

6   Q.        Okay.

7   A.        So I don't --- I can't

8   answer that question.

9   Q.        Fair enough.  Now, sir,

10  after at some point --- although at

11  some point you probably became aware

12  that the FBI, whether it was

13  Mr. Kush, whether it was Rick or

14  somebody had said, okay, hey, we're

15  satisfied.  After that point, did

16  you hear anything about the

17  investigation or how it was

18  conducted?

19  A.        Yeah.  I got called in to

20  my SAC's office.

21  Q.        Oh.

22  A.        And was informed that

23  Commissioner Evanko was not real

24  happy with the way this thing ended,

25  transpired.

38

1  Q.        Well, for what it's worth

2  to you, and it's probably not much,

3  it sure looked to me like you guys

4  did what you were supposed to do.

5  What was the problem?  What had you

6  done wrong or what --- I'm not

7  saying you did.  What was --- from

8  what you heard and from what was

9  said to you, Mike, what was the

10 problem?

11 A.        The problem, from the way

12 it was explained to me, is that the

13 Commissioner got blind-sided by this

14 and wasn't happy with it.

15 Q.        Mike, now you and I both

16 know I'm an old politician, you're

17 an experienced FBI agent.  I would

18 think that if you're investigating

19 something, I would assume that a

20 basic axiom of law enforcement

21 procedure is that unless there's

22 some good reason, you're not going

23 to tell a target or potential target

24 of an investigation, no matter how

25 unlikely it may seem that it could

39

1   be true, but you're not going to

2   tell them you're investigating them;

3   do you?

4   A.        No.

5   Q.        Well, that makes sense to

6   me.  Now, you had used the acronym,

7   I believe, OPR?

8   A.        Uh-huh (yes).

9   Q.        Is it possible that what

10  you mean is B --- the State Police

11  term for it is Bureau of

12  Professional Responsibility?  You're

13  using the acronym OPR to mean Office

14  of Professional Responsibility;

15  right?

16  A.        That's correct.

17  Q.        So we are talking about

18  the same thing?

19  A.        That's correct.

20  Q.        Okay.  So your reason for

21  contacting Mr. Ober, you may have

22  --- may not have had any specific

23  reason otherwise, but as you

24  recollect it, your reason was at the

25  time he --- you know, based on your

40

1   information, was in charge of BPR or

2   OPR, as you put it; right?

3   A.          Right.

4   Q.          So that would have been a

5   proper place to go?

6   A.          Correct.

7   Q.          Okay.  Sir, do you know

8   when Rick --- is it Mosquera?

9   A.          Yes.

10  Q.          Can you spell it for the

11  record for us, if you know?

12                  ATTORNEY BAILEY:

13                  Can you, sir?

14                  ATTORNEY KILLEEN:

15                  Yes.

16          M-O-S-Q-U-E-R-A.

17                  ATTORNEY BAILEY:

18                  Okay.  I have been

19          misspelling it.

20          M-O-S-Q-U-E-R-A.  Let me

21          get that down because I

22          have been misspelling it.

23          Not that it's a big deal,

24          but --- all right.

25  BY ATTORNEY BAILEY:

41

1  Q.        Now, do you have a

2  recollection, Mike, of when Rick

3  first became aware of the

4  investigation?

5  A.        Exact date, no.  I mean,

6  we're --- I don't walk up to the SAC

7  and inform them about every case.

8  At some point when this case became

9  --- when Stanton got more involved

10 in it, I'm sure at that point I

11 notified him about it.  But as far

12 as when, I couldn't tell you that.

13 Q.        Mike, is it fair to say

14 --- how many years have you been a

15 professional with the FBI?

16 A.        Almost 16.

17 Q.        Is it fair to say that you

18 have a high level of respect and

19 trust for your colleagues, and that

20 you operate on the assumption that

21 they have a high level of respect,

22 confidence and trust in you?

23 A.        Absolutely.

24 Q.        And is it fair, sir, to

25 say that one of the reasons why you

42

1  don't go up to Rick with every case

2  is that he's got a lot of work to

3  do, you have a lot of work to do,

4  you guys know what job you have to

5  do, and you trust and respect each

6  other to exercise good judgment?

7  A.        That's correct.

8  Q.        Is that right, sir?  And

9  would Mr. Mosquera ever want or

10 expect you to notify or inform a

11 potential target --- maybe a very

12 simple sort of kindergarten kind of

13 question, but bear with me.  Do you

14 believe that Mr. Mosquera would ever

15 want or expect you as an obviously

16 qualified and proficient

17 professional to notify a potential

18 target of an investigation that

19 there may be some need to be

20 concerned about them?  Would he

21 expect you to do that?

22 A.        I don't believe that he

23 would, no.

24 Q.        And he wouldn't expect you

25 to ever play politics with your job;

43

1    would he, sir?

2    A.        No.

3    Q.        And that's not the role

4    and function of the FBI or any law

5    enforcement agency?  It is to

6    investigate in accordance with the

7    law; isn't that correct, sir?

8    A.        Right.

9                   ATTORNEY BAILEY:

10                  Thank you.  I may be

11                  finished.  If you give me

12                  just one minute, sir.

13                  That's all I need to do is

14                  walk off with your sneaky

15                  little microphone.

16   OFF RECORD DISCUSSION

17                  ATTORNEY BAILEY:

18                  I'd like everybody to

19                  be careful.  Please

20                  remember that these mics

21                  are always running like

22                  attorneys, and you need to

23                  be aware of that so you

24                  don't say something.

25                  Counsel should be aware of

44

1       that.  I sometimes

2       forget.  That's why I

3       bring it up.  Sir, I don't

4       have any additional

5       questions.  I'd like to

6       express my gratitude and

7       also the appreciation of

8       Captain Ober for the time

9       you've taken today.  Thank

10      you.

11  A.      You're welcome.

12          ATTORNEY GUIDO:

13          I have some

14      follow-up.  Okay?

15          VIDEOGRAPHER:

16          One moment.  It's now

17      --- it's March 14th,

18      2002.  It's 10:40 a.m.

19      And this deposition is now

20      concluded.

21          ATTORNEY BAILEY:

22          No, no.  She has

23      additional questions.

24          VIDEOGRAPHER:

25          Oh, I'm sorry.

45

ATTORNEY BAILEY:

It didn't come

through.  I could hardly

hear it myself.  Why don't

you correct that?

ATTORNEY GUIDO:

I have some

follow-up.

VIDEOGRAPHER:

Excuse me.

ATTORNEY GUIDO:

Sorry.

VIDEOGRAPHER:

We're going to

continue the deposition.

RE-EXAMINATION

BY ATTORNEY GUIDO:

Q.      You mentioned several

times the acronym, your SAC?

A.      Uh-huh (yes).

Q.      Just so the record's

clear, what's SAC stand for?

A.      Special Agent in Charge.

Q.      Special Agent in Charge.

What is he in charge of?

46

1    A.        He's in charge of the ---

2    in this case, the Pittsburgh

3    Division of the FBI.

4    Q.        So that SAC would be your

5    boss?

6    A.        That's correct.

7    Q.        And from a business

8    standpoint, what was your

9    relationship with Special Agent

10    Kush?

11    A.        I was his immediate

12    supervisor.

13    Q.        So it was Kush's

14    responsibility to report matters to

15    you?

16    A.        That's correct.

17    Q.        Now, to your knowledge,

18    did anyone at the State Police do

19    anything that truncated or shortened

20    your investigation?

21    A.        To my knowledge, no.

22    Q.        To your knowledge, did

23    anybody at the State Police do

24    anything that hampered your

25    investigation?

47

1   A.       No.

2   Q.       Do you feel that the FBI

3   fully investigated, fully and

4   completely investigated the

5   allegations of possible selling of

6   positions at the State Police

7   Academy?

8   A.       Yeah, I believe we --- we

9   had an obligation to follow up on

10   some of the information that Trooper

11   Stanton was saying on tape, but none

12   of that panned out.

13   Q.       But, to your knowledge,

14   that didn't pan out, the reason it

15   didn't pan out had nothing to do

16   with somebody at the State Police,

17   you know, blowing the whistle on

18   your investigation or anything like

19   that?

20   A.       Not to my knowledge.

21   Q.       Why weren't any charges

22   filed by the FBI against Trooper

23   Stanton?

24   A.       The case was presented to

25   the United States Attorney's Office,

48

1  and they didn't believe that we had

2  evidence to --- for a Federal

3  violation.  So the case was then

4  turned over to the Attorney General.

5  Q.        What Attorney General?

6  A.        The State Attorney

7  General's office.

8  Q.        And have you followed up

9  on that investigation or had any

10  further contact with it?

11  A.        You know, I've read some

12  stuff in the paper about it.  And

13  I'm not totally up to date with what

14  happened.

15  Q.        Just have you been

16  involved with any of the

17  investigators or any of the

18  attorneys that are currently

19  handling it?

20  A.        Not personally, no.

21  Q.        Now, you mentioned OPR,

22  and you said that's the Office of

23  Professional Responsibility.  And I

24  think Mr. Bailey had talked about it

25  as being the Bureau of Professional

49

1    Responsibility.  Just so we're

2    clear, you --- when you said Office

3    of Professional --- you wanted to

4    make sure someone in OPR knew about

5    this, what did you mean?

6    A.        We call it OPR in our

7    organization.  All law enforcement

8    agencies have this branch that

9    investigates internal problems,

10   problem employees, employees that

11   crossed over the line.  Once we

12   found out about Trooper Stanton's

13   involvement, we felt we had an

14   obligation to notify the State

15   Police.  And Captain Ober was the

16   most logical person because he was

17   at the time --- my understanding, he

18   was running the Bureau of

19   Professional Responsibility.  And we

20   wanted to inform somebody in the

21   State Police of that.  That was

22   initially why we reached out to

23   him.

24   Q.        So at the time that you

25   talked to him, you believed he was

50

1  the director of the Bureau of

2  Professional Responsibility?

3  A.          Not the director, but ---

4  but certainly a person at least a

5  management level that would take the

6  information and be aware of what was

7  going on with our investigation,

8  because it did involve at least one

9  member of their department.

10  Q.          Were you familiar with the

11  structure of the equivalent of ---

12  the PSP's equivalent of OPR?

13  A.          No.

14  Q.          So you weren't aware that

15  there --- there was an Internal

16  Affairs Division that was just one

17  portion of the Bureau of

18  Professional Responsibility?

19  A.          No, I just --- it was our

20  --- our belief and my belief at the

21  time that Captain Ober was a Captain

22  in charge of what would be their

23  Bureau of Professional

24  Responsibility.

25  Q.          In your Office of

51

1    Professional Responsibility, are

2    there different levels?

3    A.        Everything of ours has

4    different levels, but I --- yeah,

5    there's a headquarters level that

6    handles most --- almost all of that

7    stuff.  And it's filtered out

8    through headquarters in Washington.

9    Q.        You said that you were

10   concerned that somebody at the ---

11   in the Internal Affairs portion of

12   Bureau of Professional

13   Responsibility would know about

14   this.  Why were you concerned about

15   that?

16   A.        Well, two reasons.  One

17   --- I think when somebody in the

18   State Police was contacted prior to

19   me getting here, we wanted to make

20   sure that they weren't running some

21   sort of operation, a sting

22   operation, using Trooper Stanton as

23   an undercover agent.

24   Q.        Okay.

25   A.        We wanted to make sure

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

52

1   that wasn't happening.  When Agent

2   Kush contacted whoever he contacted

3   in the State Police prior to me

4   getting here, that was the purpose

5   of that contact.  And Agent Kush,

6   from my understanding, was told, no,

7   that's not happening.  If Stanton's

8   doing something, he's doing it on

9   his own.  He's not doing it at the

10  behest of the State Police.

11          The second reason is

12  obviously just as if a state trooper

13  or state police person would come

14  into information about an FBI agent

15  out there doing something illegal,

16  you know, we have an obligation to

17  the law enforcement community to

18  make their department aware of it.

19  And we were fulfilling the

20  obligation, at least in my mind, of

21  notifying the State Police that we

22  got at least this trooper and

23  possibly other people involved in

24  doing some illegal activity.

25  Q.       By the time you arrived in

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

53

1  Pittsburgh, had Agent Kush already

2  been in contact with Captain Ober?

3  A.        I don't believe he was in

4  contact with Captain Ober.  I

5  believe he had contacted somebody

6  else, who subsequently was promoted

7  or moved on.  I don't know who he

8  called, but I do know he talked to

9  somebody.

10  Q.        Okay.

11  A.        I don't think it was

12  Captain Ober.

13  Q.        During the investigation,

14  was the --- was the Bureau --- the

15  Major in charge of the Bureau ---

16  excuse me, let me rephrase that.

17  Was the Major at the State Police

18  who was in charge of the Bureau of

19  Professional Responsibility ever a

20  target of your investigation?

21  A.        No.

22  Q.        And Major Hawthorne

23  Conley, specifically by name, was he

24  ever a target of your investigation?

25  A.        No.

54

1   Q.          The Lieutenant Colonel who

2   was in charge of administration for

3   the State Police, was he ever a

4   target of your investigation?

5   A.          No, but what I want to say

6   is that if you take what Stanton was

7   saying on tape, you know, he was

8   alleging that people were moving

9   test scores from one block to

10  another.  You know, that would imply

11  that somebody in a position to do

12  that was involved, although we never

13  had names of anybody that was doing

14  that.  We never had them as a

15  subject of a case.  There was always

16  that possibility out there that that

17  was what was occurring, if you would

18  take Stanton with what he was

19  saying.

20  Q.          And that's kind of where

21  I'm going with this.  I'm trying to

22  understand.  You wanted to know who

23  could --- if this was true, who

24  could possibly manipulate this;

25  right?

55

1    A.          If it was true, yes.

2    Q.          Right.  And what

3    information did you receive that

4    indicated to you that the Lieutenant

5    Colonel in charge of administration

6    would be able to do that kind of

7    ---?

8    A.          Well, when we first

9    notified Captain Ober, he was

10   talking about two or three people in

11   a position that would be able to do

12   that.

13   Q.          Okay.

14   A.          There's only two or three

15   people in the State Police that

16   could possibly do that.  And he

17   expressed concerns at that time that

18   he needs to be careful about who he

19   passes this information on to.

20   Q.          Okay.  That's what I was

21   trying to understand, was how you

22   identified who might be able to be

23   in a position where they could

24   manipulate the test scores, et

25   cetera?

56

1    A.        Right.  He may have given

2    us some names of individuals, three

3    or four individuals that would be in

4    that position to do it.  I don't

5    recall what the names were.  We

6    certainly didn't make these people

7    subjects of an investigation.  But

8    Captain Ober was concerned that he

9    needs to be very careful about who

10   he reports this information to.

11   Because he really did not want to

12   compromise potentially this case

13   going further.

14   Q.        Right.

15   A.        To his credit.

16   Q.        I understand that.  But

17   was it --- but it was Captain Ober

18   that was telling you that these are

19   the people that I think would be in

20   a position ---

21   A.        Right.

22   Q.        --- to do this?

23   A.        Right.  I mean, I would

24   have no way of knowing who would be

25   in a position to do that.

57

1  Q.        Did you have any

2  information from any other source,

3  other than Captain Ober, that these

4  are the people that potentially

5  could do something like that?

6  A.        No.  Captain Ober was

7  explaining to us how the system

8  worked.

9  Q.        All right.  And in

10 explaining that, was the

11 Commissioner of the State Police one

12 of the people that he identified as

13 somebody that could be in a position

14 to alter the test scores or do

15 whatever was necessary to get

16 someone into the Academy?

17 A.        He may have been.  There

18 was certainly some high-level people

19 that he was concerned about, yes.

20 Q.        Okay.  Did he ever talk to

21 you --- did the name Lieutenant

22 Colonel Hickes ever come up, if you

23 remember?

24 A.        I don't remember.

25 Q.        I know it's a long time

58

1  ago.

2  A.          You have to understand, I

3  wasn't writing this stuff down.  I

4  was there with Agent Kush, and we

5  were just exchanging information.

6  Q.          And just --- you were just

7  the supervisor of Agent Kush, who

8  was the one doing the investigation?

9  A.          That's correct.

10  Q.          Okay.  My question is, if

11  you suspected that --- if you

12  genuinely suspected that the command

13  staff at the State Police might be

14  involved in this kind of selling of

15  slots into the Academy, why would

16  you tell anybody at the State Police

17  about it?

18  A.          Well, when I look at a

19  Captain of OPR or Bureau of

20  Professional Responsibility, you

21  know, I feel an obligation that we

22  have to inform that other agency

23  about an investigation of one of

24  their own.  As if --- as somebody I

25  would expect would notify the FBI, I

59

1  would hope, if they come across some

2  possible criminal activity by an FBI

3  agent.  So we felt an obligation to

4  do it, to talk to somebody.  And my

5  position on OPR or Bureau of

6  Professional Responsibility is that

7  they're one level above reproach.

8  Q.       Well, if, for example, in

9  your Office of Professional

10  Responsibility, someone there got

11  information that the director of the

12  FBI was potentially involved in

13  something similar, who would need to

14  know about that?

15  A.       I don't know exactly who,

16  but it'd probably be somebody down

17  at headquarters at a pretty high

18  level.

19                 ATTORNEY GUIDO:

20            Can you hang on one

21         minute.  Let me just

22         confer.

23  A.       Sure.

24  BY ATTORNEY GUIDO:

25  Q.       I just have one other

60

1   thing I would like to ask you

2   about.  Trooper Stanton was a

3   target; correct?

4   A.        Right.

5   Q.        And he was stationed

6   somewhere here out west?

7   A.        I think he was in

8   Uniontown.  He might have been in

9   Indiana.  I don't remember.

10  Q.        Do you have any

11  recollection of whether Trooper

12  Stanton's troop commander was ever

13  suspected of being involved in any

14  way?

15  A.        Do I have any information

16  to that?

17  Q.        Yes.

18  A.        No, I don't.

19                   ATTORNEY GUIDO:

20                   All right.  That's

21            all I have.

22                   ATTORNEY BAILEY:

23                   Mike, you know how

24            these things go; don't

25            you?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

61

1   A.        I certainly do.

2                ATTORNEY BAILEY:

3            I have just a few

4        follow ups in connection

5        with what she asked.

6   RE-EXAMINATION

7   BY ATTORNEY BAILEY:

8   Q.        The fact is you had some

9   hard data, which indicated that

10  Mr. Stanton was engaged in criminal

11  or very close to criminal activity;

12  right?

13  A.        That's correct.

14  Q.        And to be very frank about

15  it, in doing your job, you didn't

16  know who above him at whatever level

17  or rank if indeed anyone else was,

18  if he wasn't just blowing off his

19  mouth or whatever, you really didn't

20  know who above him could be involved

21  in it, just that there were

22  references to indicate that someone

23  above him in the State Police

24  hierarchy might be involved; isn't

25  that fair to say, Mike?

62

1   A.          That's fair to say, yes.

2   Q.          Okay, sir.  And if you

3   begin an investigation, and there's

4   indication because of the verbiage

5   used by a source of information that

6   a particular group, if it's a - - -

7   you know, somebody says, well, there

8   are people in Pennsylvania that

9   might be involved, I mean, you're

10  dealing with 12 million people,

11  that's off the wall.  But if you

12  have a group defined, like you know

13  we read about this Texaco case and

14  stuff and somebody says, somebody at

15  the board level, you have at least a

16  reasonably identifiable group;

17  right?

18  A.          Correct.

19  Q.          Okay.  And if you don't

20  know who that is, you're not going

21  to sit down there and point a finger

22  at so and so and so and so unless

23  you have some reason to do so; isn't

24  that correct?

25  A.          That's correct.

63

1    Q.          Okay.  Now, do you know

2    why --- let me do this in an offer

3    form, so you know where I'm coming

4    from.  As a curiosity item to me,

5    the record seems pretty clear that

6    Mr. Kush at some point contacts

7    western office IAD, shares some

8    information obviously about Stanton,

9    because one of the questions is is

10   Stanton --- are you guys doing a

11   sting?  Perfectly legitimate,

12   reasonable thing to do.  But he

13   doesn't go back to the western

14   office of IAD.  Do you know if

15   Mr. Kush was referred to the head

16   office in Harrisburg, which ended up

17   being occupied at the time by

18   Mr. Ober, or whether Mr. Kush did

19   that for some reason that he --- he

20   --- that he shared with you that

21   you can tell us?  Do you know why?

22   A.          No, I don't.  I mean, as I

23   said, I don't know who Agent Kush

24   contacted prior to my arriving

25   here.  And Captain Ober was

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

64

1   contacted.  It's my understanding

2   that --- because of his position.

3   Q.        Right.

4   A.        At the time.

5   Q.        Well, the name Behrens has

6   been mentioned.  In fact, it's in

7   some of the product of the

8   investigation.  B-E-H-R-E-N-S.

9                 MR. OBER:

10                Correct.

11  BY ATTORNEY BAILEY:

12  Q.        Behrens.  No reason to

13  imply or suspect any wrongdoing on

14  that gentleman's part.  But I

15  believe he may have been in western

16  IAD.  Do you have any recollection

17  of that name?

18  A.        No, I don't.  I don't know

19  the name.

20  Q.        Okay.  Offhand, do you

21  have a recollection of how many

22  colonels, light colonels, full

23  colonels there are in the

24  Pennsylvania State Police?

25  A.        I have no idea.

65

1    Q.        Okay.  And obviously, you

2    didn't have any idea then and you

3    didn't know how many Majors there

4    were or anything like that; right?

5    A.        I don't know, no.

6    Q.        And in fairness to you,

7    you don't know even what rank a

8    troop commander has to be or might

9    be; is that fair to say?

10   A.        I don't know the State

11   Police's chain of command, their

12   reporting requirements, none of that

13   stuff.

14   Q.        Yes, sir.  And so what you

15   were doing was as a matter ---

16   because you have to work and

17   cooperate with this agency, because

18   typically in police organizations,

19   you know, they put folks that are

20   pretty much above it and apart from

21   any kind of a problem into the BPR

22   or RPR position, you made a judgment

23   as a highly qualified professional

24   --- or excuse me, Mr. Kush did, that

25   this would be the contact point, and

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

66

1  it didn't matter if it was Captain

2  Ober, Santa Claus, the truth --- the

3  tooth fairy or anybody else, it was

4  a professional judgment based upon

5  experience, and that's why you did

6  it; isn't that correct?

7  A.        Yeah.  You would give the

8  information to the logical person of

9  the department that you felt would

10  need to know.

11  Q.        Okay.  And I think you've

12  indicated a number of times that

13  Captain Ober expressed concern about

14  the integrity and respect for your

15  investigation.  And I don't think

16  there's any need to beat that --- to

17  beat that up anymore.  I think

18  you've been very --- you mentioned

19  that a number of times.  Do you know

20  how many tapes were turned over

21  after the investigation was over to

22  the Pennsylvania State Police?

23  A.        No.  Exactly, no, I don't

24  know what number.

25  Q.        Do you know what role the

67

1    Attorney General played in it,

2    whether they said they didn't want

3    to do the investigation or give it

4    to the State Police?  Let me tell

5    you why I asked that, so you know

6    where I'm coming from.  Our

7    information indicates that at some

8    point the FBI product, work product,

9    and this odd to me because I did

10   have some experience with the FBI in

11   some ways, not all good, by the way,

12   I'll be honest with you, Mike.  I

13   mean, you've got some tremendous

14   people.  I think you've got a few

15   ringers in there, too, in all

16   fairness.  But that's my opinion.

17            Now, my understanding is

18   there was a box of investigative

19   work product that included a number

20   of tapes, tape recordings.  Do you

21   know how or why they were turned

22   over to the Pennsylvania State

23   Police after the FBI was done?

24            The reason I ask is I

25   understand the way the FBI handles

68

1    evidence is if you have like, for

2    example, original tapes and that

3    sort of thing, they're documented,

4    and they're put into a case file,

5    agents --- even the stuff you do to

6    put your 302s together, and all that

7    stuff, bundled up, put together.  I

8    think it's shipped off to

9    Philadelphia or whatever.  Do you

10    know if the original tapes in that

11    matter were turned over to the State

12    Police?

13    A.        I don't know.  I doubt if

14    the original tapes were turned over.

15    Q.        Okay.

16    A.        But I know the information

17    was provided to the Attorney

18    General's office, because

19    prosecution wasn't going to occur

20    under the Federal system.  So the

21    tapes, transcripts, whatever

22    evidence we had against Stanton and

23    the other individual, Bridge, were

24    turned over to an attorney for the

25    state Attorney General's office.  I

69

1    don't know that any information was

2    given to the State Police.  I mean,

3    it may have been, but I don't ---

4    other than what we provided Captain

5    Ober with.

6    Q.        Do you know whether the

7    matter, as far as the State is

8    concerned, ended up with a District

9    Attorney in Indiana County?

10   A.        Yeah, I believe it did.

11   Q.        Do you know the powers of

12   the State Attorney General to

13   prosecute?

14   A.        Do I know the powers?

15   Q.        Yes.  Do you know what

16   their jurisdiction might be to

17   investigate and prosecute?

18   A.        To some extent, yes.

19   Q.        Do you know who that

20   attorney with the Attorney General's

21   office was?

22   A.        It might have been a

23   VonGeis.  I'm not sure.  I mean, I

24   had --- I was responsible for 200

25   investigations.

70

1    Q.        There is an Attorney

2    VonGeis, sir.

3    A.        It may have been.  That

4    name kind of sounds familiar.

5    Q.        However, I'm not so sure

6    it would have been ---?

7    A.        It might have been another

8    case.  I don't know.

9    Q.        Yes, I'm not so sure.  Do

10   you know whether the FBI turned over

11   any transcripts over to the State

12   Police?

13   A.        We gave Captain Ober some

14   transcripts and some tapes.

15   Q.        Okay.  Aside from Captain

16   Ober, do you know, sir?  If you

17   remember.  I know it's tough.

18   A.        I don't --- personally, I

19   don't know if anything was given to

20   the State Police, other than what we

21   provided to Captain Ober.  It may

22   have been.  I don't know.

23   Q.        Do you know a Captain

24   Monaco?  Did you ever know a Captain

25   Monaco?

71

1    A.        Frank?  Yeah, I know him.

2    Q.        It might have been ---

3    matter of fact, we had testimony, I

4    guess it was maybe yesterday, day

5    before yesterday, Lieutenant Colonel

6    Coury testified, I believe, that he

7    had a conversation with Mr. Monaco

8    about Stanton or matters relating to

9    Stanton.  Do you know anything about

10   that?

11   A.        No.  I know Frank Monaco

12   from things, other than the Stanton

13   case.

14   Q.        Right.

15   A.        I've never talked to him

16   about the Kipp Stanton case.

17   Q.        He's not --- again, I

18   don't want to imply that any of

19   these people are suspected of

20   wrongdoing or anything like that.  I

21   know him.  I have a high opinion of

22   him.  You know, that's not the

23   issue.  We're just trying to sort of

24   trace down what happened because the

25   Commissioner became so upset with

72

1  this.  And we're trying to figure

2  out what happened, and why he got so

3  upset.  Again, I'd like to say thank

4  you.

5  A.        You're welcome.

6              ATTORNEY GUIDO:

7              I have something that

8              I forgot to ask you.  And

9              he might --- Mr. Bailey

10             may have follow up on this

11             as well.

12 RE-EXAMINATION

13 BY ATTORNEY GUIDO:

14 Q.        You mentioned previously

15 when you were just talking to

16 Mr. Bailey about a meeting in which

17 your SAC called you in and told you

18 that Evanko was upset.  Do you

19 remember when that was?

20 A.        Well, it was when Rick

21 Mosquera was still in Pittsburgh.

22 And so I don't know when he left.

23 Q.        Okay.

24 A.        It wasn't very long

25 afterwards that he left.  When did

73

1  he leave, 2000 sometime?  I really

2  don't know.

3  Q.          Was there anybody else

4  present at that meeting between you

5  and the SAC?

6  A.          Ralph Kush may have been

7  there.  I don't remember.

8  Q.          Okay.

9  A.          I've had so many, many

10 meetings with the SACs about so many

11 things, it's hard to remember who's

12 in the room.

13 Q.          In the meeting, you were

14 told that Commissioner Evanko was

15 upset about it, but was there any

16 --- what I'm wondering is was there

17 any adverse outcome about that, the

18 fact that the Commissioner was

19 upset?  Did anything happen with the

20 FBI or ---?

21 A.          No.  Other than the

22 article in the Harrisburg newspaper

23 calling for my head and Ralph Kush's

24 head, I don't think there was any

25 adverse ---.

74

1  Q.        Which article was that?

2  A.        Somebody showed me an

3  article once where the Commissioner

4  had said something about he wasn't

5  happy with us.

6  Q.        Do you know if the article

7  you're referring about was the

8  article that was about Plaintiff's

9  suit, in which the Plaintiff claimed

10  that he knew that that's how the

11  Commissioner felt?

12  A.        I don't remember.  I know

13  that I saw it.  I was with somebody

14  from Harrisburg or Philadelphia, and

15  they pointed this article out to

16  me.

17  Q.        Was it in the Harrisburg

18  papers?

19  A.        It could have been a

20  Philadelphia paper, or a Harrisburg

21  paper.  But I'm still here and Kush

22  is still here, so I guess there were

23  no ---.

24  Q.        But what I'm saying is so

25  nothing ---?

75

1    A.        No.

2    Q.        Even if the Commissioner

3    was upset, nothing happened to you?

4    A.        No.

5                   ATTORNEY GUIDO:

6              Okay.  Thank you.

7              That's it.

8    RE-EXAMINATION

9    BY ATTORNEY BAILEY:

10   Q.        Well, do you know if the

11   Commissioner ever called Louis

12   Freeh?

13   A.        I don't know.

14   Q.        And by ---?

15   A.        Louis Freeh never called

16   me.

17   Q.        Whatever.  You know, for

18   what it may be worth and you ---

19   just if you recollect this.  If not,

20   maybe you don't.  Do you have a

21   recollection years ago there was a

22   situation where I think someone had

23   raised questions about what was

24   going on in the FBI front office.

25   And if my recollection serves me

76

1  correctly, there was some

2  investigative work done to the

3  credit of the Bureau, and the agents

4  and people involved, and worked on

5  that investigation in spite of the

6  director's position.  And this might

7  be 10, 15, 20 years ago, I'm not

8  sure.  But to me, that speaks to a

9  very important professional issue.

10  And that is if you're an

11  investigator and you do an

12  investigation, you have a duty and

13  responsibility professionally to

14  take the leads as they come and

15  follow them where they go.  And that

16  is your duty, and that's a duty you

17  owe to the law and your oath of

18  office; isn't that correct?

19  A.        That's correct.

20            ATTORNEY BAILEY:

21            Thank you, sir.

22       That's it.

23            ATTORNEY GUIDO:

24            That's it.

25            VIDEOGRAPHER:

77

1           Is it concluded?

2           ATTORNEY GUIDO:

3           Yes.

4           VIDEOGRAPHER:

5           Okay.  It's 11:05

6    a.m., March 14th, 2002.

7    The deposition is now

8    concluded.

9  A.        Thanks.

10       *  *  *  *  *  *  *  *

11  VIDEOTAPED DEPOSITION CONCLUDED AT

12           11:05 A.M.

13       *  *  *  *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1  COMMONWEALTH OF PENNSYLVANIA)

2  COUNTY OF CAMBRIA              )

3              C E R T I F I C A T E

4      I, Denise J. Khorey-Harriman, RMR, a Notary

5  Public in and for the Commonwealth of Pennsylvania,

6  do hereby certify:

7      That the witness was first duly sworn to testify

8  to the truth, the whole truth, and nothing but the

9  truth; that the foregoing deposition was taken at the

10  time and place stated herein; and that the said

11  deposition was taken stenographically by me and

12  reduced to typewriting, and constitutes a true and

13  correct record of the testimony given by the witness.

14      I further certify that the reading and signing

15  of said depositions were (not) waived by counsel for

16  the respective parties and by the witness.

17      I further certify that I am not a relative,

18  employee or attorney of any of the parties, nor a

19  relative or employee of counsel, and that I am in no

20  way interested directly or indirectly in this action.

21      IN WITNESS WHEREOF, I have hereunto set my hand

22  and stamp this 26th day of March 2002.

23

24  _Denise Jeanne Khorey-Harriman_

25

NOTARIAL SEAL
Denise Jeanne Khorey-Harriman, Notary Public
Johnstown, Cambria County, PA
My Commission Expires Mar. 7, 2005

· PITTSBURGH, PA

· CLEARFIELD, PA

· STATE COLLEGE, PA

· ERIE, PA

· OIL CITY, PA

· HARRISBURG, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA 15901

· INDIANA, PA

· GREENSBURG, PA

· PHILADELPHIA, PA

· SOMERSET, PA

· WILKES-BARRE, PA

LAWYER'S NOTES

| Page | Line | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

PITTSBURGH, PA
HARRISBURG, PA
GREENSBURG, PA
ERIE, PA
INDIANA, PA
HOLLIDAYSBURG, PA
STATE COLLEGE, PA



SARGENT'S
COURT REPORTING
SERVICE, INC.

210 MAIN STREET
JOHNSTOWN, PA 15901
(814) 536-8908

PHILADELPHIA, PA
WILKES-BARRE, PA
OIL CITY, PA
SOMERSET, PA
CLEARFIELD, PA
*CHARLESTON, WV*