IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                     :
                                     :
            Plaintiff                :     No. 1:CV-01-0084
                                     :     (Judge Caldwell)
      v.                             :
                                     :     CIVIL ACTION – LAW
PAUL EVANKO, MARK                    :
CAMPBELL, THOMAS                     :     JURY TRIAL DEMANDED
COURY, JOSEPH                        :
WESTCOTT, HAWTHORNE                  :
CONLEY                               :

**EXHIBITS TO DEFENDANTS' BRIEF IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
VOLUME 6**

FILED
HARRISBURG, PA

MAY 2   2002

MARY E. D'ANDREA, CLERK
Per _____
        Deputy Clerk

31

1

1    U.S. DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF PA

3    * * * * * * *

4    DARRELL G. OBER,    *

5        Plaintiff    * No.

6        vs.    * 1:CV-01-0084

7    PAUL EVANKO, MARK *

8    CAMPBELL, THOMAS  *

9    COURY, JOSEPH     *

10   WESTCOTT,         *

11   HAWTHORNE CONLEY, *

12   JOANNA REYNOLDS   *

13   and SYNDI GUIDO,  *

14       Defendants   *

15       * * * * * * *

16   VIDEOTAPE DEPOSITION OF

17   JOSEPH WESTCOTT

18   JANUARY 7, 2002

19

20   ORIGINAL

21

22

23   Any reproduction of this transcript

24   is prohibited without authorization

25   by the certifying agency

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

2

1              VIDEOTAPE DEPOSITION

2                      OF

3

4    JOSEPH WESTCOTT was taken on behalf

5    of the Plaintiff herein, pursuant to

6    the Rules of Civil Procedure, taken

7    before me, the undersigned, Denise

8    J. Khorey-Harriman, a Registered

9    Merit Reporter and Notary Public in

10   and for the Commonwealth of

11   Pennsylvania, at the law offices of

12   Don Bailey, Esquire, 4311 North

13   Sixth Street, Harrisburg,

14   Pennsylvania, on Monday, January 7,

15   2002, at 1:35 p.m.

16

17

18

19

20

21

22

23

24

25

3

```
 1              A P P E A R A N C E S

 2

 3   DON BAILEY, ESQUIRE

 4   4311 North Sixth Street

 5   Harrisburg, PA  17101

 6      COUNSEL FOR PLAINTIFF

 7

 8   JOANNA N. REYNOLDS, ESQUIRE

 9   BARBARA L. CHRISTIE, ESQUIRE

10   Office of Chief Counsel

11   Governor's Office of General Counsel

12   1800 Elmerton Avenue

13   Harrisburg, PA  17110

14      COUNSEL FOR DEFENDANTS

15

16

17

18

19

20

21

22

23

24

25
```

4

1                           I N D E X

2     WITNESS: JOSEPH WESTCOTT

3     Examination

4        By Attorney Bailey        10 - 190

5        By Attorney Reynolds   190 - 191

6     CERTIFICATE                        194

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                         <u>E X H I B I T   P A G E</u>

2                                                    <u>P A G E</u>

3      <u>N U M B E R</u>      <u>I D E N T I F I C A T I O N</u>      <u>I D E N T I F I E D</u>

4                              N O N E .

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

# OBJECTION PAGE

| ATTORNEY | PAGE |
|----------|------|
| Reynolds | 63 |
| Reynolds | 102 |
| Reynolds | 156 |

7

```
1              P R O C E E D I N G S

2    - - - - - - - - - - - - - - - - - - - -

3              THE VIDEOGRAPHER:

4              Good afternoon ladies

5         and gentlemen.  Please be

6         advised the video and

7         audio is in operation.  My

8         name is Crystal M. Lyde,

9         L-Y-D-E.  My address is

10        4310 Hillsdale Road,

11        Harrisburg, Pennsylvania,

12        17712.  I've been

13        contacted by PR Video to

14        be the operator for this

15        deposition.

16             The case is:  In the

17        United States District

18        Court for the Middle

19        District of Pennsylvania.

20        The caption is Darrell

21        Ober versus Paul Evanko,

22        et al.  The Docket Number

23        is 1:CV-01-0084.

24             The date is January

25        7th, 2002.  The time is
```

8

1         1:35 p.m.  The video

2         deposition is being taken

3         on behalf of Plaintiff,

4         Darrell Ober, and is also

5         being done

6         stenographically.  The

7         witness' name is Joseph

8         Westcott.

9            Would you raise your

10        right hand for me, please,

11        sir?  Please state your

12        name for the record and

13        spell it, please?

14 A.       Joseph H. Westcott,

15 W-E-S-T-C-O-T-T.

16         THE VIDEOGRAPHER:

17         Do you so swear to

18        tell the whole truth,

19        nothing but the truth so

20        help you God?

21 A.       I do.

22         THE VIDEOGRAPHER:

23         Could we get a sound

24        check around the room,

25        Mr. Bailey.

9

1      ATTORNEY BAILEY:

2          Yes.  My name is Don

3      Bailey.  I represent the

4      Plaintiff in this matter,

5      Darrell G. Ober.

6          ATTORNEY REYNOLDS:

7          Joanna Reynolds.  I

8      represent the Defendants

9      in this matter.

10         ATTORNEY CHRISTIE:

11         Barbara Christie,

12     Counsel --- Pennsylvania

13     State Police, co-counsel

14     in this matter.

15         ATTORNEY BAILEY:

16         Okay.  I know you

17     were here earlier.  Thank

18     you very much.  There is a

19     stenographer here.  The

20     stenographer is here on

21     behalf of the Defendants,

22     so there will be a

23     stenographic recording

24     also.  Do you want the

25     video or the video

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

10

1    transcript, either one of

2    you.

3         ATTORNEY REYNOLDS:

4         I think we still ---.

5         ATTORNEY BAILEY:

6         Well, let us know

7    later on.

8         ATTORNEY REYNOLDS:

9         All right.

10   EXAMINATION

11   BY ATTORNEY BAILEY:

12   Q.        Colonel, before I begin,

13   just a few instructions.  I know you

14   were here this morning but may or

15   may not be familiar with this

16   process.  This deposition is taken

17   by video and audio means.  You do

18   have a right to come here and view

19   --- to acquire a copy, you have to

20   pay for it.  But you do have a right

21   to come here in my office.  I will

22   make available a copy of your video

23   deposition.  You can sit down and

24   view it.  You have a right to that.

25        Otherwise, work with your

11

1    attorneys, whatever arrangements

2    they make on acquiring stuff, that's

3    fine.

4              Now, today, I'm going to

5    be asking you some questions and

6    during the process of responding to

7    questions, it's important that you

8    keep your voice up.  It's also

9    important that you remember that,

10   particularly because we have a

11   stenographer, that you have to ---

12   don't talk over my answers.  And if

13   you find that I'm interrupting you,

14   you make sure you stop me.  Okay?

15   A.         I will do that.

16   Q.         All right.  And so you get

17   a chance to answer fully and

18   completely.  I want to reemphasize

19   something that I indicated to

20   Mr. Wertz this morning, to Major

21   Wertz this morning.  And that is, if

22   you have any questions of me during

23   the deposition, I don't want you to

24   be bashful about asking me to

25   explain the question or ask me about

12

1  where I'm going.  Attorneys, I don't

2  know any other attorney that does

3  that, but I wish all of us did.  I

4  don't want any confusion in your

5  mind about a question or the purpose

6  of a question and that includes a

7  couple times, for example, this

8  morning Mr. Wertz took issue with

9  what I was doing with questions or

10  where I was going.  I think it makes

11  for a better record if you feel free

12  as a witness to raise objections or

13  ask me to explain.  Don't be shy

14  about doing that.  Okay?

15          The idea here is to get

16  what you know as fully and

17  completely as possible.  Now, you

18  heard the rest of the instructions

19  this morning.  There's no reason to

20  drag this out.  Do you have any

21  questions of me before we begin?

22  A.          No.

23  Q.          Okay.  I ---.

24              ATTORNEY REYNOLDS:

25              Mr. Bailey.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

13

1           <u>ATTORNEY BAILEY</u>:

2           One last - - -.

3           <u>ATTORNEY REYNOLDS</u>:

4           I assume we're going

5           to reserve all objections

6           except as to form.

7           <u>ATTORNEY BAILEY</u>:

8           Yeah.

9           <u>ATTORNEY REYNOLDS</u>:

10          And again, I would

11          like this witness to

12          review his deposition

13          transcript and sign off on

14          it, sign the errata sheet

15          of corrections.

16   <u>BY ATTORNEY BAILEY</u>:

17   Q.        Yeah.  Counsel has asked

18   - - - normally when you - - - if I had

19   ordered a - - - let me explain this

20   because you may not understand what

21   it is.  If I had asked for a - - -

22   brought a stenographer in here like

23   this young lady here, what the Rules

24   provide in that case is within 30

25   days you have a right to be notified

14

1    of the opportunity to review the

2    deposition.  And there's a sheet, it

3    doesn't allow you to change anything

4    but by page and line you can write

5    down on there an objection, an

6    observation, a disagreement, a

7    correction, a redaction, whatever.

8    You know, with a video deposition,

9    the deposition is the deposition.

10   It is there.  There's no provision

11   for that.

12           But your counsel has

13   asked, and I think it's a good idea

14   and I do not object, we'll be making

15   a transcript of the video

16   deposition.  You'll not be permitted

17   to take it out or to have that

18   unless it is purchased from the

19   video company, because it's not my

20   property.  I have to buy mine, too.

21   But what will happen is you can come

22   here once I get my copy.  You'll

23   have your own stenographic copy, but

24   you'll be allowed to come and Joanne

25   had asked you be allowed to do an

15

1  errata sheet, that's fine.  I'll

2  permit that.

3          Normally you wouldn't do

4  that with a video, but I have no

5  objection so ---.

6  A.        Okay.

7  Q.        Now, the other thing I

8  notice, sir, is you're a little bit

9  soft spoken.  That microphone, that

10 one that's not being --- the other

11 one, that's it.  Pull that just a

12 little bit wee closer.  Maybe you

13 don't have to be that close but give

14 me your name again.

15 A.        Joseph H. Westcott.

16 Q.        You can back it up about a

17 foot and a half.  That's fine, sir.

18 You're good.  Colonel, is that okay

19 to call you Colonel?

20 A.        That's fine.

21 Q.        Okay.  Colonel Westcott,

22 my understanding is you're retired?

23 A.        That's correct.

24 Q.        When did you retire?

25 A.        July 7th, 2000.  A year

16

1   and a half ago, whatever year that

2   was.

3   Q.          Okay.  Now, prior to your

4   --- prior to your retirement, how

5   were you employed?

6   A.          I was employed as the

7   Deputy Commissioner for operations

8   Pennsylvania State Police.

9   Q.          Can you give us a brief

10  summary of what your duties and

11  obligations were in that capacity?

12  A.          Sure, I was responsible

13  for pretty much all of the

14  operations of the department that

15  include the troop commands, area

16  commands, various bureaus, bureau

17  --- parole bureaus, criminal

18  investigations, drug law, liquor

19  control, emergency, special

20  operations.

21  Q.          In that capacity, do you

22  assign investigations?

23  A.          Oh, yes, sir.

24  Q.          And in what way?  How

25  would you assign an investigation,

17

1  tell us what that means in

2  Pennsylvania State Police?

3  A.        And I would not

4  necessarily assign investigations on

5  a daily basis.  Don't

6  misunderstand.  The troop commands

7  and area commands pretty much

8  respond to incidents that are

9  brought to their attention and they

10  then, of course, would advise me of

11  what was going on.  But there is,

12  you know, some times when it may be

13  necessary for me to ask an area

14  commander, and I always dealt with

15  area commanders.  If I were to deal

16  with any --- I was a stickler on

17  chain of command.  If there was ever

18  an opportunity that I had to discuss

19  something with a troop commander, I

20  most certainly first opportunity I

21  would have, I would discuss it.  I

22  would advise the area commander

23  that, you know, I was unable to get

24  a hold of him for one reason or

25  another then I'd talk to the troop

18

1    commander about it.  So there were

2    times when I'd talk to someone other

3    than an area commander but most

4    always an area commander.  I would

5    ask him if he would look into this

6    matter or that matter.  I had a

7    report of something, somebody told

8    me something and could somebody look

9    into it.

10   Q.       Well ---?

11   A.       So it's not a formal, it's

12   not a formal.

13   Q.       No.

14   A.       It's just sort of a

15   request, listen, my neighbor said he

16   had a problem with this or that.

17   Can you send a patrol over to look

18   at it and that sort of thing.

19   Q.       Well, and in that kind of

20   case, it's like any organization has

21   to run, particularly a law

22   enforcement investigation ---

23   organization.  I'm not talking about

24   more or less checking into things.

25   I assume on the day-to-day

19

1    operations of running any outfit as

2    large as the Pennsylvania State

3    Police that you've got to follow up

4    on a lot of loose ends and dangling

5    participles as part of doing your

6    job.  I'm talking more about the ---

7    I'm speaking more about the official

8    type of thing on, you know, formally

9    launching or initiating an

10   investigatory process.  Was that one

11   of your jobs?

12   A.          It could be.  It was not

13   very often.

14   Q.          Well, in what way could it

15   be?  You know, how would you go

16   about doing that?  Maybe I can do

17   this best by example.  I have a

18   limited experience with a military

19   organizations with the United States

20   Army.  In the United States Army if

21   somebody did something wrong out

22   there, even if it was witnessed by,

23   let's say, a brigade commander or a

24   full colonel, he couldn't initiate

25   or make any kind of disciplinary

20

1   thing.  He had to go to the

2   commander, the commander would

3   investigate that, reach a decision

4   on discipline with the exception of

5   a battalion commander who had a

6   limited so-called Article 15

7   authority.

8           Now, I'm talking about the

9   formal sense of getting an

10  investigation started where you hear

11  about something out there.  How do

12  you do that?  Do you do a written

13  report?  I mean, can you call up BPR

14  or call up some area commander and

15  say, I want Joe Blow investigated?

16  How does that work?

17  A.        No, I wouldn't do

18  something like that, of course.

19  Q.        Okay.

20  A.        And let's separate out

21  what you're asking here.

22  Q.        Okay.

23  A.        Let me give you a couple

24  of examples, okay, as a matter of

25  clarification.  The prison --- the

21

1  prison break in Pittsburgh some

2  years ago, four or five years ago.

3  Q.          I remember well.

4  A.          There were five or six

5  guys.

6  Q.          I remember the

7  investigation.  I can tell you how

8  it happened?

9  A.          Started a fire.

10  Q.          Started a fire?

11  A.          To find some other place

12  to live.

13  Q.          Right.

14  A.          The troop area command

15  began their investigation as they

16  would normally do based upon receipt

17  of information from corrections.

18  When I was advised of that right

19  away, because that's what's

20  required, I then assigned, I asked

21  our director of bureau of criminal

22  investigation and asked him to

23  assign people from our fugitive

24  apprehension squad to go out there

25  and assist the troop.  So in that

22

1  regard, I would make an assignment,

2  yes, send your people out there to

3  help out the troop.  That's for an

4  investigative thing like that.  If

5  it's a personnel complaint, no, I

6  did not assign anybody to do

7  personnel complaints.  Okay?  If I

8  received information about a

9  personnel matter, then I either

10 referred the complainant, whoever

11 was telling me, to BPR to make the

12 complaint, or if I received

13 information, for example, from a

14 troop commander, area commander,

15 something like that, I would direct

16 them to BPR with that.

17 Q.        I understand.

18 A.        So I would not pick up the

19 phone and call BPR and say, listen,

20 go do this or go do that.  No.

21 Q.        Why wouldn't you do that?

22 A.        It just doesn't ---.

23 Q.        Because in response to my

24 question you started off saying, I

25 wouldn't do anything like that.  And

23

1    I took note of that mentally.  You

2    know, why wouldn't you do anything

3    like that?

4    A.        Well, first off, it's not

5    appropriate for me or anybody else

6    to pick up the phone and ask BPR to

7    go do something.  There's written

8    procedure that you follow.  There's

9    written forms requesting that that

10   investigation be conducted.

11   Q.        Okay.

12   A.        BPR don't fall under my

13   area of responsibility anyway.  So,

14   you know, generally what I would do

15   is go see Colonel Coury and, say,

16   listen, here's the information I

17   just received.  I advised these

18   people to go contact BPR.

19   Q.        Okay.

20   A.        Sure.

21   Q.        All right, sir.  Thank you

22   very much.

23   A.        Sure.

24   Q.        Now, in going back, are

25   you familiar with --- at least

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

24

1 generally familiar, do you remember

2 reading or talking with the Amended

3 Complaint in this case?  I mean,

4 you're a Defendant here.  I'm going

5 to assume you did, but sometimes

6 people don't.  Have you read over

7 the Complaint?

8 A.        I have.

9 Q.        I'm going to ask --- most

10 of the questions I ask today are

11 going to be taken basically just

12 from that Complaint.  I have a copy

13 of it here for you to put in front

14 of you if your attorneys don't have

15 it for you to refer to.  Okay?  Now,

16 before I do that, just a few more,

17 just a few more general questions.

18 You made a comment in response to an

19 earlier question of mine that you

20 were, quote/unquote, correct me if

21 I'm in error, a stickler on chain of

22 command.

23 A.        I am.

24 Q.        All right, sir.  Can you

25 --- most of the colonels I'm

25

1   familiar with pretty much were, too,

2   I'll tell you.  Can you tell me what

3   that means to you?  You're a

4   Defendant in this matter.  Tell us

5   what stickler on chain of command

6   means to you.

7   A.          That means that I expected

8   the people who worked under my area

9   of command to follow the chain of

10  command up through and advise me

11  accordingly.  That also means that I

12  would follow that chain of command

13  back down the chain of command as

14  well.  I did not talk --- now, there

15  are exceptions, and I'll explain

16  those to you.  But I did not talk to

17  a trooper out on the road, because

18  that's not appropriate for a

19  Lieutenant Colonel to do that.

20  Q.          Right.

21  A.          Now, the exceptions are

22  this.  I have a lot of friends in

23  the Pennsylvania State Police of all

24  ranks.  And I --- that doesn't mean

25  I don't talk to them ever.  I

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

26

1   certainly talk to them.

2   Q.        All right.

3   A.        If any business discussion

4   is held between me and them, then I

5   certainly tell their commanders that

6   we had that conversation and I

7   direct them to be sure that they

8   also do the same thing.  That's what

9   I mean about being a stickler for

10  the chain of command.

11  Q.        When I --- when I was in

12  the Army, if you were a ground

13  commander, maybe just a Second

14  Lieutenant platoon leader, if you

15  were engaged in ground combat, I

16  don't know if it was ever written

17  down anywhere, but as a leader

18  engaged in ground combat, if you're

19  actually in a fire fight or

20  something, you --- you controlled

21  that situation.  General, a chairman

22  of the joint chiefs of staff could

23  not come down and interfere with

24  your command if you're involved in

25  that fight.  That meant supporting

27

1  fires and everything else.  Okay?

2  Does the State police have anything

3  like that?  Can you as a top

4  official in the Pennsylvania State

5  Police become involved in the

6  administration of a unit or in

7  giving orders to people?  Let's say

8  if you show up at a --- there's an

9  incident out on the Pennsylvania

10  Turnpike and people are involved in

11  a serious situation, can you take

12  over or replace somebody?

13  A.        I suppose I could.  I not

14  necessarily would but certainly

15  could.

16  Q.        Okay.  It's not quite the

17  same situation, I guess, but if

18  you're a trooper, now let's reverse

19  the roles.  Okay?  Now, you're not

20  the commanders in conflict, okay?

21  Let's say you're a trooper and

22  you're being given orders to do

23  something by your immediate

24  supervisor who maybe is a sergeant

25  and the Colonel calls up and tells

28

1   him to do something else, what are

2   they supposed to do?  Should they

3   follow the sergeant's orders or

4   should they follow the colonel?

5   A.          First place that would not

6   happen.

7   Q.          Okay.

8   A.          If I was there, that would

9   not happen.

10  Q.          Okay, sir.

11  A.          First, I would not ---

12  unless ---.

13  Q.          Right.

14  A.          I was understood by that

15  commander on scene commander there

16  that I was now in charge.

17  Q.          All right.

18  A.          Then that would not

19  happen.  I would not tell somebody

20  in that chain of command to go do

21  something.

22  Q.          Is it fair to say that the

23  higher you go in an organization the

24  more authority you have, obviously

25  your orders, provided they're lawful

29

1   orders, recognizably lawful orders

2   they're going to take precedent and

3   the person at top is going to be

4   charge?  That's the way the system

5   runs.  Is that fair to say?

6   A.        Yes, but you have to be

7   very careful.

8   Q.        Sure.

9   A.        And I did my best to be

10  very careful what I said and what

11  came out of my mouth under whatever

12  circumstances did not counteract

13  what this guy's immediate supervisor

14  might have said to him or whatever.

15  Okay?  You have to be very, very

16  careful about that.

17  Q.        You recognized, in other

18  words, that the integrity and the

19  effectiveness of your outfit

20  depended upon the fact that your

21  subordinates through the chain of

22  command, it was important that they

23  have respect and that respect be

24  given to their levels of command,

25  because the whole --- because you

30

1  can't micromanage the whole

2  organization; right?

3  A.        I don't know if I said

4  that, but that would be accurate.

5  Q.        Isn't that correct?

6  That's really what you're telling us

7  is that that's good --- that would

8  be good police or military or

9  paramilitary practice?

10  A.        Yes, that's correct.

11  Q.        In a minute when I get

12  back to it, I'm going to ask you

13  questions related to what we just

14  talked about, based upon the

15  testimony that you witnessed this

16  morning from Major Wertz and about

17  the situation that Captain Ober was

18  in.  Okay?  So I want you to file

19  that back away in your mind, because

20  we're going to revisit it in just a

21  couple minutes.  Now, at some point,

22  you learned about this FBI probe

23  that is one of the underlying

24  material issues in the Ober

25  Complaint.  Is that correct?

31

```
 1   A.         Yes, I did.

 2   Q.         How and under what

 3   circumstances did you learn of the

 4   FBI probation?

 5   A.         Colonel Coury called me up

 6   and told me about it.

 7   Q.         And ---?

 8   A.         In fact, he told me the

 9   conversation that the Colonel Fikus

10   (phonetic) and Captain Ober had with

11   the Commissioner.

12   Q.         And what did --- what did

13   Colonel Coury tell you?

14   A.         Well, just it was just

15   general terms that he --- that I can

16   recall and that was that generally

17   the FBI had been conducting an

18   investigation, that Captain Ober and

19   Captain --- and Colonel Fikus had

20   had knowledge of that and had

21   neglected to tell anybody other than

22   that.

23   Q.         Did he say neglected to

24   tell anybody?

25   A.         I'm not sure.  That's my
```

32

1    --- you know, that's my

2    understanding.  That's my verbiage

3    there.

4    Q.        Okay.

5    A.        Had not told anybody.

6    Q.        Okay.  They had failed to

7    or ---?

8    A.        They had not --- they had

9    not told anybody.

10   Q.        Was there any indication

11   that they had made an error in not

12   telling anybody?

13   A.        Oh, I don't know if there

14   was any innuendo that way at all.

15   He had apparently come by that

16   knowledge and --- and called me up

17   and told me about it.

18   Q.        But why not call you up,

19   if you know, why not call you up and

20   simply say, hey, I got great news.

21   Gee, the FBI was looking into a

22   problem out there and they cleared

23   us and we're okay.  Did he say

24   anything like that?

25   A.        No, he didn't say anything

33

```
1   like that.
2   Q.          Was he upset because
3   somebody didn't tell somebody?
4   A.          I'm not --- I can't tell
5   you whether was he upset or not.   I
6   was on the other end of the phone
7   line.
8   Q.          Who ---?
9   A.          And he's the one that told
10  me that Captain Ober and Colonel
11  Fikus had just told the Commissioner
12  that an investigation had been ---
13  an ongoing investigation had been
14  going on, and in --- and they hadn't
15  told him about it before but are
16  telling him about it now.
17  Q.          Okay.  Let's talk about
18  this a little bit.  I want to
19  underline a word back there,
20  sticking out in my mind, the word
21  just.  J-U-S-T.  Just told the
22  Commissioner.  Do you remember
23  saying that?
24  A.          Yes, but that was my word,
25  yes.
```

34

```
 1   Q.          Why did you --- was that
 2   the situation?
 3   A.          Because that was my
 4   understanding that he had just been
 5   told that on that particular day.
 6   Q.          Was that a hot item?
 7   A.          It was a conversation I
 8   had.  You know, we were all out at
 9   the Academy earlier.  I left to go
10   back to the office and apparently
11   that conversation had occurred.
12   Q.          Well, what else did he
13   tell you in that conversation?
14   A.          That generally is about
15   it.  I don't remember anything
16   else.
17   Q.          Well, did he indicate how
18   the Commissioner felt about that
19   issue, about this matter?
20   A.          No, he did not, that I can
21   recall.
22   Q.          So he called you up to
23   tell you that these guys had just
24   told --- had just told the
25   Commissioner about it.  Those were
```

35

1  your words; right?

2  A.        That's my understanding.

3  Q.        Well, how did that strike

4  you?

5  A.        How do you mean?

6  Q.        How did it, you know, what

7  did you deduce from what he told

8  you?  What did you think about what

9  he said?  Did it affect you in any

10 way?  Did it raise a red flag?

11 You'd indicated earlier, stickler

12 for the chain of command.  Did you

13 read anything into it?  You know,

14 how did it affect you?

15 A.        Well, Colonel Fikus or

16 Captain Ober were in my chain of

17 command so there was no chain of

18 command issue there so far as I was

19 concerned.

20 Q.        Well, every --- your

21 operations, you're like a battalion

22 level executive officer.

23 Everything's in your chain of

24 command, isn't it?

25 A.        Well, no, not

36

1   necessarily.  Certainly from a rank

2   perspective everybody of a lesser

3   rank, certainly that sort of thing.

4   But you are in charge of your area

5   of responsibility.  There were three

6   Deputy Commissioners there.  Each

7   had their own areas of

8   responsibility.  Those people that

9   worked in those areas reported up

10  through their chains of command to

11  them.  There's in other --- not

12  necessarily a need or requirement to

13  go outside that.

14  Q.        Well, then ---?

15  A.        Area of responsibility.

16  Q.        Did you assign --- I'm

17  sorry.  Were you done?

18  A.        Uh-huh (yes).

19  Q.        Then why did you assign

20  Williams and Wertz to do the

21  investigation in this Ober matter,

22  the inquiry?

23  A.        Well, because ---.

24  Q.        Did somebody ask you or

25  ---?

37

1    A.        Well, yes.  The next day,

2    we had discussion about what had

3    been told to the Commissioner and

4    what had we --- what little we knew

5    at that point.  It was decided that

6    we needed to know more information,

7    the Commissioner needed to know more

8    information so that we should make

9    an inquiry into it, find out what

10   happened.

11   Q.        Well, let's stop at that

12   point now.  Why not just call our

13   brothers in the FBI and find out

14   what went on?

15   A.        Well, if it was just going

16   to be a one --- one type of a

17   conversation maybe you would.  But

18   you need to do an inquiry to find

19   out what was involved here.  Already

20   we knew there was some people in the

21   FBI, we didn't know who there was,

22   Captain Ober and there was Colonel

23   Fikus.  What were the

24   circumstances?

25   Q.        Well, don't you trust the

38

1    FBI?

2    A.        I don't think it's a

3    matter of trust at all.

4    Q.        But the question ---?

5    A.        I think somebody needs to

6    go out there and talk to them.

7    Q.        Okay.  But the question

8    is, do you trust the FBI?

9    A.        Sure.  Why wouldn't I?

10   Q.        Well --- pardon?

11   A.        Why wouldn't I?

12   Q.        You wouldn't want me to

13   answer that, because we don't have

14   enough time.  But let me --- no, in

15   seriousness, in seriousness, I would

16   assume that you would have faith,

17   confidence and respect, generally at

18   least, I'm not saying everybody in

19   the organization.

20   A.        Unless there's reasons not

21   ---.

22   Q.        The FBI is like anybody

23   else, but generally speaking it's

24   fair to say without being facetious

25   or pejorative about it in any way,

39

1  it's fair to say that you respect

2  and you work with and you have some

3  respect for the FBI as a law

4  enforcement agency and obviously

5  they're quite good at what they do;

6  correct?

7  A.          In some things.  I have a

8  lot of friends in the FBI that I

9  have respect for.  There are others

10  that I don't care for.

11  Q.          I share your point of view

12  from what I know from my

13  perspective, but the point is ---

14  I'm asking the point is, why

15  couldn't somebody call the FBI and

16  check with them and ask them, you

17  know, what's the story here?

18  A.          Well, I don't --- I don't

19  think you would get a full and

20  complete inquiry if you did that.

21  There are also, understand, the ---

22  you know, there are other people

23  that have time to do those things,

24  whereas I would not necessarily have

25  time to do an inquiry plus

40

1  everything else I would do every

2  day.

3  Q.        Yeah.

4  A.        It depends on where --- I

5  have no idea where an inquiry may

6  take you, may lead you.

7  Q.        Well, you weren't

8  concerned about what the FBI found

9  out, were you, or were you?

10  A.        All I was concerned about

11  at that point was to get an inquiry

12  to find out what the circumstances

13  were.  Okay?  What were the

14  circumstances.

15  Q.        That's why I'm asking?

16  A.        What were they doing.

17  What --- how did that involve the

18  State Police, who in the

19  Pennsylvania State Police it

20  involved, when did it involve them,

21  what did they do with it, why did

22  they do it that way, and that ---

23  that pretty much was the basis for

24  requesting the inquiry.

25  Q.        Well, that's what I'm

41

1   asking.  You didn't have any

2   knowledge of the Pennsylvania State

3   Police doing their own inquiry;

4   right?

5   A.        Well, into what?

6   Q.        Into these allegations of

7   public corruption?

8   A.        No, I don't think we had

9   investigations into that.

10  Q.        Okay.  The information you

11  had was that Captain Ober and

12  Lieutenant Colonel Fikus knew of the

13  probe, but did not --- didn't tell

14  anybody.

15  A.        That was the information

16  that I had, yes.

17  Q.        And the information that

18  you had was that Captain Ober told

19  Colonel Fikus and that Colonel Fikus

20  told --- or did you?  Did you know

21  that Colonel Fikus had told Captain

22  Ober to keep it confidential and not

23  to divulge?

24  A.        I'm not sure I did know

25  that at that point.

42

1    Q.          Okay.  So in fairness to

2    you at that point you didn't know

3    that or you may not have, you might

4    have, but the point is what you did

5    know at that point, this much we can

6    share with certainty, at the point

7    that shortly after this point that

8    you got the call from Colonel ---

9    Lieutenant Colonel, I'm sorry, yeah,

10   Lieutenant Colonel Coury, at that

11   point you knew that Mr. Fikus and

12   Mr. Ober had known something and had

13   not immediately informed their

14   superiors, presumably that would be

15   Commissioner Evanko.  Am I correct?

16   A.          A ---.

17   Q.          You know, fix that up.

18   Respond to that completely as you

19   can.  That's --- you know, in other

20   words, I'm not trying to lead you

21   into some cul-de-sac with that.

22   Basically what you knew at the time,

23   in a nut shell, was that Ober and

24   Fikus knew about this and had not

25   reported it.  Am I correct?

43

1    A.          That's correct, yes.

2    Q.          Okay.  But nobody --- did

3    it occur to anybody --- and there

4    was a meeting.  There was a

5    meeting.  Who was at that meeting by

6    the way?

7    A.          Which meeting?

8    Q.          The meeting after

9    Mr. Coury called you, the meeting

10   that took place?

11   A.          The next morning?  I'm

12   sure it was just the Commissioner,

13   Colonel Coury and myself.

14   Q.          Okay.  Commissioner,

15   Mr. Evanko, Mr. Coury and yourself?

16   A.          Uh-huh (yes).

17   Q.          Anyone else in that

18   meeting?

19   A.          Not that I'm aware of.

20   Q.          Any other staff meetings

21   you had on this matter where the

22   Commissioner was present?

23   A.          Just at the end when Major

24   Williams and Major Wertz had

25   completed their inquiry and were

44

1   turning the documents over.

2   Q.        You were present at that

3   time?

4   A.        Well, you know, I don't

5   know the answer to that.  I know

6   they came to me and met in my

7   office, and then I took them in,

8   into the Commissioner's office, and

9   I'm just not sure whether I stayed

10  in there or whether I left.

11  Q.        You're not sure?

12  A.        I'm just not sure.  I just

13  don't remember.

14  Q.        Okay.  All right.  Now,

15  was Mr. Brown in any of these

16  meetings?

17  A.        I did not meet with Mr.

18  Brown.

19  Q.        Pardon me?

20  A.        I did not meet with Mr.

21  Brown.

22  Q.        Well, was he in any

23  meetings with the Commissioner about

24  these matters?

25  A.        I don't know.

45

Q.          So he could have been in
meetings with the Commissioner or
somebody else and you don't know
that?

A.          I don't know that.

Q.          Is that Captain Brown now,
by the way?

A.          That's my understanding,
yes.

Q.          Okay.  Now, tell me what
went on in this meeting the next day
that you had with the Commissioner
and with Mr. Coury.

A.          It was sort of just a
general meeting where, you know, we
wanted to find out what went on.  I
think the Commissioner said that
he'd like to know what happened
here, what went on here.  I said,
well, we need to have somebody get
out and do something, make some sort
of an inquiry in the matter.  He
said, okay, let's do that.  I made
the recommendation then that it be
Major Wertz and Major Williams to be

46

1  assigned.  That was agreed upon.  I

2  went out and asked each of them at

3  that point to do that.

4  Q.        Out in Phoenix?

5  A.        Well, Major Wertz I talked

6  to in Phoenix.  Major Williams I

7  think I met him up in --- up in

8  Mountoursville.

9  Q.        You met him up there?

10  A.        Yes, I believe I did.

11  Q.        What did you go up there

12  for?

13  A.        Well, and this is my

14  recollection, this was just before

15  we were to leave and it might have

16  been the day before we were to leave

17  to go to a CARE conference in

18  Phoenix.

19  Q.        Well, you didn't go up

20  there to talk to him about that?

21  A.        No, no, no, I went up

22  there specifically to ask him to do

23  this inquiry.

24  Q.        You drove up there.  Who

25  went up with ---?

47

1   A.          I flew up.

2   Q.          You flew up?

3   A.          Yes.

4   Q.          You flew up to talk to him

5   in Montoursville?

6   A.          That's correct.

7   Q.          I do not mean to be

8   disrespectful by this, by this

9   question.  What was so God awful

10  important that you would fly up to

11  see him about finding out what Ober

12  and Fikus did?

13  A.          It was --- it was an

14  inquiry that we wanted to get

15  underway, get started.  I was

16  leaving I believe the next morning

17  to go out to Phoenix, Arizona.  In

18  fact, I believe that was probably in

19  the afternoon and, you know, I got

20  it --- from my job, I go all over

21  the State.  And I flew most of the

22  times.

23  Q.          Okay.

24  A.          So it was not unusual for

25  me.  Don't put any emphasis on the

48

```
 1  fact that I flew from Harrisburg to
 2  Montoursville.
 3  Q.          You fly quite a bit for
 4  ---?
 5  A.          I fly quite a bit.
 6  Q.          For these things?  Okay.
 7  Well, when you flew up there to see
 8  Major Williams, that was within days
 9  then I would assume from your
10  responses, within days of when
11  Colonel Evanko had been informed by
12  Fikus and Ober about the matter?
13  A.          And again I --- I would
14  assume that also.  I --- I can't
15  give you a time frame, because I
16  just don't know.  Okay?  I don't
17  remember the dates.  I don't know
18  the dates that we went out there.
19  Q.          Do you know the dates of
20  when the CARE conference was?
21  A.          The only thing I can tell
22  you about it was it was in the
23  spring.
24  Q.          Spring?
25  A.          The CARE conference is
```

49

1    always in the spring.

2    Q.        May?

3    A.        I don't know.  I'd be

4    guessing.

5    Q.        All right.  But there

6    would be phone records there?

7    A.        It certainly can be

8    checked out, sure.

9    Q.        It would be easy to check

10   out the airplane records?

11   A.        Exactly, yeah, exactly.

12   Q.        What airport did you go

13   into up there?  You say

14   Montoursville?

15   A.        That was to Williamsport.

16   Q.        You went into

17   Williamsport, okay.  You're normally

18   headquartered where?

19   A.        Here in Harrisburg.

20   Q.        Just curious.  What's your

21   fly time up there?

22   A.        I don't know.  Probably 20

23   minutes.

24   Q.        Including ground time,

25   taxi time and all that stuff?

50

```
 1   A.        I don't know the answer to
 2   that.
 3   Q.        Is that the double engine
 4   turbo prop they use out there or
 5   plane ---?
 6   A.        Single engine.
 7   Q.        Single engine?
 8   A.        Single engine 182.
 9   Q.        A Cessna 182, you make
10   that flight in 20 minutes?
11   A.        I'm guessing at that.
12   That's about all there is.  It's not
13   that far up there by air.  I don't
14   know how long it takes you by car.
15   It's over an hour.
16   Q.        Straight shot.  Straight
17   shot, an hour-and-a-half at the most
18   but ---?
19   A.        You say an hour-and-a-half
20   by car.
21   Q.        At the most.  The road's
22   in quite good shape now.
23   A.        The road.
24   Q.        I know that because a lot
25   of you guys set there and patrol
```

51

1   that road.

2   A.        Rule of thumb is fly

3   time's about one third of your

4   driving time.  That's the rule of

5   thumb.

6   Q.        Is that the rule of thumb?

7   A.        20 minutes may not be

8   bad.

9   Q.        You'd know better than I

10  do.  Okay.  Let's go back to this

11  situation where you have a meeting

12  with Colonel Evanko and Colonel

13  Coury.  Who called that meeting?

14  Did the Commissioner call that

15  meeting?

16  A.        I would expect he asked us

17  to come into his office, yeah.

18  Q.        Did you discuss anything

19  else at that meeting?

20  A.        I don't recall.  We

21  certainly could have.  We met on a

22  regular basis on a number of issues.

23  Q.        Yeah, I would assume that

24  --- okay.  Does he have regular

25  staff meetings or ---?

52

1   A.          Well, sure.  You know,

2   there are monthly staff meetings of

3   all the staff.  I guess it's every

4   two weeks.

5   Q.          I was just ---?

6   A.          Maybe it's every two

7   weeks, I'm not sure.

8   Q.          I was just looking for

9   frequency.  How often, every two

10  weeks, every month.  So this wasn't

11  a regularly scheduled staff meeting?

12  A.          No, the Commissioner and I

13  met every day.  I briefed him every

14  day on what was going on out in the

15  field and what was going on, so it's

16  not unusual for me to meet with him

17  two or three times some days.

18  Q.          Okay.  All right.  So it's

19  not unusual to have meetings, but

20  you went in and you had a meeting on

21  this issue.  And you suggested

22  Mr. Williams and Mr. Wertz.  Right?

23  A.          That's correct.  That

24  would be my recommendation.

25  Q.          Okay.  And that was

53

1    okayed, and did you --- did you talk

2    about what the purpose of this

3    inquiry was?  What was the purpose

4    of this inquiry?  Why were you doing

5    this?  I know you said to find out

6    what happened, but why --- why a

7    formal inquiry?  What was that

8    about?

9    A.        Well, you know, I --- you

10   have to --- before you can evaluate

11   any kind of circumstances, you have

12   to find out what happened.  It

13   doesn't matter what it amounts to.

14   If you want to evaluate that

15   somebody come down the sidewalk here

16   and slipped and fell, you have to

17   have somebody look into that.  And

18   ---.

19   Q.        Well, that's an accident,

20   right?

21   A.        Well, whatever it is.  If

22   you're going to evaluate a certain

23   circumstance, you're going to have

24   to find out what the circumstance

25   is.

54

1  Q.        Well, a Trooper hauls off
2  and punches his Sergeant, you've got
3  to investigate that?
4  A.        Well, sure.
5  Q.        But nobody punched no
6  one.  No one had an accident.  What
7  were you investigating?
8  A.        I wanted to find out who
9  knew what, when they knew it, and
10  who they told about it.
11  Q.        Why?
12  A.        Well, because the
13  Commissioner asked for it.
14  Q.        Oh.
15  A.        And because, you know, in
16  my opinion, chain of command was not
17  followed.  What little I knew, let's
18  find out what it was.  Why didn't
19  he?  You know, why didn't he tell
20  Colonel Coury.  Why didn't he tell
21  his bureau director.
22  Q.        I don't know.
23  A.        I don't know either.
24  Q.        Well, tell us --- you've
25  looked at this and this is ---

55

1   you're a stickler for chain of
2   command and you were consulted by
3   the Commissioner.  Did you ever
4   reach a conclusion why he didn't?
5   A.        A ---.
6   Q.        I mean, why didn't he do
7   that, Colonel?  Why didn't he do
8   that?
9   A.        I don't know the answer to
10  that.  To this day, I don't know the
11  answer.
12  Q.        Well, I apologize.
13  A.        Excuse me, you'd have to
14  ask him that.
15  Q.        Yes, sir.  I don't mean to
16  ask you to tell us what was in his
17  mind.  That's clearly speculation,
18  speculative on your part.  But you
19  have reviewed the, quote, unquote,
20  work product in this matter.  Okay?
21  You had the two investigators
22  appointed, they were appointed on
23  your recommendation.  You gave them
24  the order to march, or told them
25  what to do.  We already know that.

56

1        What did you --- what
2   conclusion did you come to as to why
3   Ober and Fikus did this?  In your
4   opinion, you said they violated the
5   chain of command.
6   A.        Well, in the first place,
7   I didn't ---
8   Q.        Yeah.
9   A.        --- come to any
10  conclusion.
11  Q.        Oh, okay.  All right.
12  A.        Okay.  And I told you I
13  don't know why he did anything.  To
14  this day, I don't know why he didn't
15  let Colonel Coury know or Colonel
16  --- or Major Conley.  I want to
17  correct also a comment that you made
18  that I had --- you said I had
19  reviewed this work product.  That is
20  not correct either.
21  Q.        Okay.  Sorry about that.
22  A.        I asked those --- those
23  two Majors to take a look at this.
24  They completed their inquiry.  They
25  came back to me.  They said their

57

1   inquiry is completed.  They'd like

2   to give it to the Commissioner.  I

3   said, okay, stop down my office.

4   They stopped in.  We proceeded to

5   the Commissioner.  They gave it to

6   the Commissioner.

7   Q.          Okay.  You see, that's

8   where I'm a little bit confused.  I

9   thought you indicated that he

10  violated the chain of command and

11  you told us you're a stickler for

12  the chain of command.  Now, you're

13  telling us you didn't review the

14  work product?

15  A.          I'm telling you that ---.

16  Q.          I'm not trying to trick

17  you.

18  A.          No, but you're not

19  listening to what I'm saying.

20  Q.          I'm twisting things.  I

21  don't mean to.

22  A.          Exactly.

23  Q.          All right.  Go ahead.

24  A.          What I told you was if the

25  information that we heard that

58

1  initial time, that very first

2  information, was correct, then in my

3  opinion ---

4  Q.        Okay.

5  A.        --- he did not follow his

6  chain of command.  Okay.

7  Q.        Okay.  Sir ---?

8  A.        That was the purpose of

9  inquiry to find out who knew what,

10 when, why, how, those sorts of

11 things.

12 Q.        But, sir, I thought you

13 opined that you offered us as a ---

14 in part of your response that he

15 didn't tell Coury and he didn't tell

16 Conley.  Now, we know he didn't tell

17 Conley, but what's the difference

18 between telling Coury and telling

19 Fikus?

20 A.        Colonel Coury was in his

21 chain of command, was the Deputy

22 Commissioner in charge of what he

23 was doing at the time.  I think he

24 was assigned to BPR, and that came

25 under Colonel Coury's area of

59

1  responsibility.

2  Q.        What other regulations

3  that says an officer cannot report

4  or share information with a superior

5  officer who is not in his direct

6  chain of command?  I don't mean

7  general supervision.  I mean direct

8  chain of command.  What's the

9  regulation there?

10  A.        I have to plead ignorance

11  just like earlier with Major Wertz.

12  Q.        Okay.

13  A.        I can't tell you what's

14  written there and what isn't written

15  there.

16  Q.        Okay.

17  A.        It's just a understanding

18  of chain of command.

19  Q.        Just an understanding.

20  A.        I can be corrected.

21  Q.        Yeah, I was in the Army.

22  A.        I can be corrected, you

23  understand.

24  Q.        I keep going back to the

25  Army.  You're going to have to bear

60

1   with me, please.  This is the only

2   experience I have.  I've never been

3   in the police organization and I

4   understand the Pennsylvania State

5   Police is an exceptionally fine one,

6   but I don't know how you do business

7   there.  So I can only draw on what I

8   knew and my opinion about whether

9   that would violate an Army rule,

10  which I know it would not is

11  meaningless here, but I'm awful

12  proud of the U.S. Army.  I can tell

13  you that.  And I was in a couple of

14  great outfits.  But to me I don't

15  know if you can tell me how if it's

16  not written down or you're not sure

17  if it might be written down, if you

18  feel it might be, how does in your

19  --- based on your countless years

20  of experience as a stickler for

21  chain of command, how does an

22  inferior violate a chain of command

23  if he shares information with a

24  superior, not a colleague, not an

25  under --- not an equal and not an

61

1    underling, who is his superior if

2    for no other reason if he trusted

3    him or liked him, how does that

4    violate any chain of command

5    prerogative in the Pennsylvania

6    State Police?  Now, let me tell you

7    what I'm going to follow this up

8    with.

9            I'm going to ask if you

10   go, if you're not in somebody's

11   chain of command but they trust you,

12   admire you and like you, and they

13   ask your advice, just simply ask

14   your advice, I've got to unload

15   this, I've got concerns, I need to

16   ask your advice, and you say you

17   keep it to yourself and don't you

18   talk to anybody else, okay?  I'm

19   going to come back and ask you what

20   effect that has on this chain of

21   events, because that's a fact and we

22   know it's there.  Everybody admits

23   it's there.  But let's begin so you

24   know where I'm going at, right, you

25   know, what I'm going to try to get

62

1  at here, so you're not confused or

2  misled about anything, my first

3  question would be in this little

4  series of questions here, my first

5  question would be like this, what

6  rule do I violate, if it's not

7  written, what informal rule known to

8  you do I violate if I am a Captain

9  in the Pennsylvania State Police who

10  for any reason knows, likes,

11  respects, or has good solid

12  institutional reasons because I

13  think they're all there, and I go to

14  a Lieutenant Colonel, I share

15  information, what's wrong with

16  that?  I mean, do I have a duty,

17  here's the subquestions so you make

18  sure there's no confusion on this.

19  You know, do I have a duty to go to

20  my immediate superior first?  Is

21  that written?  Is that a rule?  Do I

22  have a duty not to tell anybody in

23  the world until I tell my immediate

24  supervisor?  Can you explain what in

25  terms of written and unwritten rules

63

1    of the Pennsylvania State Police

2    Captain Ober did wrong?

                ATTORNEY REYNOLDS:

4                I'm going to object

5                as to form.  There were

6                about five questions in

7                there.

                ATTORNEY BAILEY:

9                No, there's about ten

10               of them.  Correct,

11               correct.

                ATTORNEY REYNOLDS:

13               If the witness

14               understands what he's

15               answering, he may answer.

16   BY ATTORNEY BAILEY:

17   Q.          Do you understand where

18   I'm coming from?  I think I asked

19   ---?

20   A.          I think I do, yes.

21   Q.          Can you tell us in a good

22   old common sense way without my

23   lawyer --- multitude of lawyer

24   questions, and your counsel's

25   objection is well taken, the bottom

64

1 line question is, you know, what did

2 Captain Ober do wrong here?

3 A.        Captain Ober did not tell

4 his immediate chain of command what

5 had transpired.  I think he had a

6 responsibility to do that.  He did

7 not.  Okay?  There's a difference

8 --- in my opinion, there is a

9 difference in going to somebody else

10 for some advice on a matter, okay?

11 But I will tell you that if Captain

12 Ober came to me with this

13 information, any information, okay,

14 that did not pertain to my area of

15 responsibility, I would tell him

16 that he needs to get back in and

17 talk to his Lieutenant Colonel about

18 that.  If --- you know, there are

19 times when you'll sit down and say,

20 well, my advice to you would be

21 this, however, you need to talk to

22 Colonel Coury about that or you need

23 to talk to your bureau director

24 about that.

25 Q.        That's what you would have

65

1  done?

2  A.          That's exactly what I

3  would have done.  That's why ---.

4  Q.          That's not Captain Ober's

5  function, is it?  Captain Ober's not

6  the one that looked in the mirror

7  and said, Captain Ober, you're not

8  to talk to anyone.  He was given an

9  order by Captain Fikus, wasn't he?

10  A.          Well, Captain Ober in my

11  opinion should have been gone right

12  to Colonel Wertz in my opinion.

13  Q.          Okay.

14  A.          These guys have cell

15  phones.  They have car phones.  They

16  have phones in their car.  There's

17  no reason at all why you can't get a

18  hold of somebody.

19  Q.          Well, maybe the FBI was

20  listening.  There's a political

21  corruption probe into the State

22  Police and maybe into the Governor's

23  office.

24  A.          You want me to get started

25  on that, I'll get started on that.

66

Q.         No, I don't want you to
get started on it.  I just want to
say to you ---.

A.         No, I will tell you this
much, okay?

Q.         Yeah.

A.         Most investigators, a good
investigator will take a look at the
information that's received.  The
first thing they'll ask themselves
is, is this information reasonable?
Can this be considered reasonable
information?  Someone from outside
the department may not know whether
the information in this particular
case, whether somebody within the
department was selling jobs or not,
would not know whether that
information was reasonable or not.
But it is my opinion that somebody
inside our organization with the
experiences that Captain Ober had
should right away recognize that as
being not reasonable information.
Captain Ober has enough experience

67

1  within the headquarters in the

2  Pennsylvania State Police to know

3  that.  I think it's virtually

4  impossible to predetermine the

5  outcome of any cadet assignment.

6  Okay?  Now, with that information

7  - - -.

8  Q.        Don't you have - - -?

9  A.        With that knowledge.

10  Q.        Don't you have children

11  - - -?

12  A.        With that experience,

13  wouldn't you - - - why would you

14  suspect that a Lieutenant Colonel

15  could do that?

16                ATTORNEY BAILEY:

17                Just a minute.

18  A.        Why would you not - - - I'm

19  sorry.

20  BY ATTORNEY BAILEY:

21  Q.        All right.  Now, just a

22  second.  Let's - - -?

23  A.        Well, let me just finish

24  what I was going to say.

25  Q.        Sure.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

68

A.        Why would you not tell
your bureau director under those
circumstances?  Now, if Captain Ober
had not had those kinds of
experiences, those kinds of
experience within the department,
that kind of knowledge in a
headquarters setting, then perhaps I
can understand.

Q.        What I'm asking is, are
the rules of the Pennsylvania State
Police so clear and are they written
down?  One of the issues in this
case is when a certain chain of
command subsection was added to the
regulations.  There's a major
material issue in this case and
regardless what the trial judge does
with it, I'm going to follow through
on it to find out when it was
promulgated and worked up to this
case.  But to follow up, I'm going
to ask you what Pennsylvania State
Police rules and what Pennsylvania
State Police informal customs,

69

1   practices or usage would indicate

2   that he, first of all, has to go to

3   his immediate supervisor right away

4   before he tells anyone and also

5   disregard an order from a Lieutenant

6   Colonel that he happens to consult

7   for advice?  I don't understand,

8   because I have not been able to find

9   and with all due respect and I have

10  some limited experience as I said in

11  a different outfit, but can you tell

12  me what rules were violated?

13  A.        I don't know if there was

14  any.

15  Q.        You don't know if there

16  was any?

17  A.        I don't know if there was

18  any.

19  Q.        Okay.  Now, let me ask you

20  this.  You're telling us that based

21  upon the information that Captain

22  Ober received, he should have known

23  better.  He should have known that

24  the FBI was missing a --- was making

25  an error or there wasn't a good

70

1    reasonable basis.  Right?

2    A.          Yes, I think so.

3    Q.          Okay.  Have you ever

4    looked into, sir, the underlying

5    investigation for some of the things

6    that these --- that the FBI was

7    given, some of the information they

8    were given?

9    A.          No, I do not.

10   Q.          Well, thank God it ended

11   up being apparently, I don't know.

12   At this stage, we don't know if

13   somebody scuttled that

14   investigation.  We just don't know.

15   But there's very good reason to

16   believe that there was nothing to

17   the puffings or whatever, of some of

18   the folks that were doing wrong

19   things, but you'll admit that

20   Captain Ober was given information

21   to indicate that there could be

22   people in the Governor's office

23   involved.  Right?

24   A.          (NODS HEAD).

25   Q.          Okay.  And that --- was he

85

1  are friends and there are friends.

2  Okay.  Is he a friend of yours in

3  the sense that you could confide in

4  him or talk with him about things?

5  A.          No, I don't do that.  I

6  mean, he --- he is a --- he's not a

7  friend socially.  We don't

8  socialize.

9  Q.          Okay.

10 A.          But professionally we've

11 dealt with each other on a

12 professional basis every day, you

13 know.  There's no animosity, there's

14 no --- none of that.

15 Q.          It's professional?

16 A.          It's professional, yes.

17 Q.          Professional callings?

18 A.          Yes.

19 Q.          Okay.  In a large

20 organization?

21 A.          It's just that we never

22 developed a friendship through our

23 careers.  We were never hardly ever

24 in the same place.

25              ATTORNEY REYNOLDS:

86

1          Before we get any

2          further, do you want to

3          take a break?

4    A.    I'm fine so far.

5               ATTORNEY REYNOLDS:

6          Okay.  If you want

7          to, just go ahead.

8    A.    Okay.

9    BY ATTORNEY BAILEY:

10   Q.        Yeah, you --- yeah.  He

11   has to make a phone call.  He

12   doesn't have to be here anyway.

13   Okay.  Now, did you ever discuss the

14   Ober matter with Colonel Fikus?

15   A.        You know, I don't --- I

16   don't recall.  I wouldn't know why I

17   would, but I don't recall that I

18   did.

19   Q.        All right.  Did you ever

20   ---?

21   A.        If Colonel Fikus walked in

22   here and said, yeah, I had this

23   conversation on this date and blah,

24   blah, blah, maybe it would jar a

25   recollection, but I don't have that

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

87

1  recollection at all actually.

2  Q.        Okay.  Do you know a Mark

3  Campbell?

4  A.        I do know Mark Campbell.

5  Q.        And how long have you

6  known Mr. Campbell?

7  A.        I've known Mr. Campbell

8  since I was assigned as Deputy

9  Commissioner.

10  Q.        And when were you assigned

11  as Deputy Commissioner?

12  A.        That was probably February

13  of 1995 perhaps.

14  Q.        Aside from your own

15  ambition, who was responsible for

16  you becoming, and I mean that in a

17  very positive sense, who was

18  responsible for you becoming a

19  Deputy Commissioner?  Is there ---

20  these are appointed positions.  How

21  did you get there?

22  A.        Colonel Evanko spoke on my

23  behalf and I don't know who he spoke

24  to.  I'm --- I think he spoke to the

25  Governor, but I don't know who

88

1  else.

2  Q.        All right.  Was

3  Mr. Campbell part of that process?

4  A.        I don't know.

5  Q.        All right.

6  A.        Wouldn't surprise me.  Was

7  he --- he's like assistant chief of

8  staff to the Governor.  You know,

9  he's the guy down there.

10  Q.        I --- that's part of his

11  job and that's the way the

12  government should be run.  You know,

13  please don't read anything into

14  that.  We're trying to find out some

15  of these connections and some of

16  these relationships.  Did you have

17  any conversations with Mr. Campbell

18  about the Ober matter?

19  A.        I do not.

20  Q.        Do you know whether

21  Colonel Evanko ever had any

22  conversations with Mr. Campbell

23  about the Ober matter?

24  A.        I do not know.

25  Q.        Did Mr. --- excuse me.

89

1  Did Colonel Evanko ever indicate any

2  discussions with Mr. Campbell or

3  anyone else in the Governor's office

4  about the Ober matter?

5  A.      I don't recall.  But I

6  will qualify that by saying that

7  Colonel Evanko was in,

8  quote/unquote, Mark Campbell's chain

9  of command.  Okay?  So I would

10  expect that it would not be

11  unreasonable that he called him and

12  told him what was going on.  I have

13  no knowledge of that.

14  Q.      Okay.  Now, at what point

15  did you learn that the FBI had

16  indicated that there might be some

17  connection with this, this political

18  corruption into the Governor's

19  office, there might be some

20  connection?  Now, we understand that

21  it ended up not being and all that.

22  But my question is, when did ---

23  when did you first learn that the

24  FBI had facts that raised the

25  question about the Governor's office

90

1   being involved?

2   A.          Well, it would have been

3   in those first early days there.

4   I'm not sure that Colonel Coury

5   would have told me about that, that

6   day, but perhaps the next day.

7   Q.          All right.  By that day,

8   you mean the day that Colonel Evanko

9   was informed?

10  A.          No.  That day would be the

11  day after Colonel Evanko was

12  informed.

13  Q.          No, I --- okay.  That's

14  what I mean.  That's my error.

15  Okay.  Now, do you know Louie Freed?

16  A.          I'm not friends with Louie

17  Freed.

18  Q.          Well, I mean ---?

19  A.          I've met him.  I've

20  conversed with him, but I do not

21  know him.

22  Q.          Is it fair to say that

23  personal friendship aside, from

24  professionally the Pennsylvania

25  State Police and Louie Freed, who at

91

1   the time was the FBI director, have

2   to maintain some kind of

3   relationship; in other words, the

4   two organizations, the Pennsylvania

5   State Police and the FBI have to

6   maintain a relationship in the

7   interests of effective law

8   enforcement in the United States,

9   particularly in Pennsylvania; is

10  that correct?

11  A.        I think it's a fair

12  statement.

13  Q.        Okay.  Do you know whether

14  Colonel Evanko is familiar with

15  Judge Freed on a --- Director Freed

16  on a personal basis?

17  A.        I ---.

18  Q.        You know, in other words,

19  are they more than professional

20  acquaintances, do you know?

21  A.        I don't think so.  I don't

22  know.

23  Q.        The Complaint indicates,

24  the allegation is made in the

25  Complaint, I can dig the paragraph

92

1  out if you want and I'll do that if

2  you need me to or your attorney

3  wants me to, that Colonel Evanko

4  indicated that he was going to

5  contact Louie Freed over this

6  matter.  Do you have a recollection

7  of that?

8  A.        I do not.

9  Q.        Well, aside from the

10  Complaint if it's mentioned in

11  there, did you ever hear that the

12  FBI was contacted about this matter?

13  A.        Certainly they were

14  contacted by Williams and Wertz.

15  And I think that would have been

16  Agent Coon.  I think that's what

17  Wertz testified to this morning.

18  Q.        Well, let's set that

19  aside.  Do you know if anybody above

20  Special Agent Wertz --- oh, excuse

21  me, Special Agent Coon was contacted

22  by Wertz or anyone?

23  A.        I don't know that.  I

24  don't know if anyone else would or

25  not.

93

1    Q.        Do you know if Colonel

2    Evanko contacted anybody in the FBI?

3    A.        I do not know.

4    Q.        Do you know where Special

5    Agent Coon is now?

6    A.        I do not.

7    Q.        Mr. Coon is listed as one

8    of your witnesses.  Do you know who

9    talked to Mr. Coon aside from Wertz

10   and Mr. Williams, if anyone?

11   A.        I do not.

12   Q.        Do you know whether the

13   lawyers, your lawyers have talked to

14   him?

15   A.        I do not know.

16   Q.        Well, do you know where

17   Mr. Coon is now?

18   A.        I do not.

19   Q.        It indicated that aside

20   from Mr. Wertz who says he did not

21   talk with Mr. Coon, by the way, do

22   you know when Mr. --- when

23   Mr. Williams I guess it would have

24   been talked to Mr. Coon?

25   A.        I do not know when he did

94

1    that, no.

2    Q.         You were here when

3    Mr. Wertz testified that his best

4    recollection was that Mr. Williams

5    talked to Mr. Coon before

6    Mr. Williams and Mr. Wertz talked in

7    Phoenix.  You remember that?

8    A.         I remember Mr. Wertz or

9    Major Wertz talking about that,

10   yes.

11   Q.         So when you indicated

12   Williams and Wertz talked to Coon,

13   you didn't mean to imply that you

14   have any facts indicating that

15   Mr. Wertz talked to Mr. Coon?

16   A.         No, no, no, it's just they

17   were in an investigative --- I call

18   it an investigative team, but they

19   were a team of investigators doing

20   it so if I --- I didn't mean to

21   mislead you there.

22   Q.         Well, is there an

23   interview in the work product from

24   --- with Mr. Coon?

25   A.         I don't know that.  I'm

95

1  sure there must be.  I would expect

2  them to do that, but I did not

3  review it so I'm not going to answer

4  your question in an affirmative

5  fashion.

6  Q.      Because you don't know?

7  A.      Because I don't know

8  because I didn't read it.  I would

9  expect, however, that they would

10 have done that and that that would

11 be written down.

12 Q.      As head of operations do

13 you become involved in transfers,

14 personnel transfers?

15 A.      That's the Commissioner's

16 prerogative.  Sometimes he asks for

17 recommendations.

18 Q.      Well, who sent Mr. Ober

19 out to Washington?

20 A.      How do you mean by sent

21 Mr. Ober out to Washington.

22 Q.      I don't know how many

23 verbs we can come up with.  Sent,

24 transferred, assigned, suggested, I

25 don't know, whatever word you want

96

1    to use but ---?

2    A.         That would have been the

3    Commissioner's.

4    Q.         Commissioner did that?

5    A.         Commissioner's

6    responsibility to do that.

7    Q.         Okay.  Well, when did you

8    first learn about it from the

9    Commissioner?

10   A.         Well, we would have --- if

11   we had a meeting, I don't recall the

12   particular meeting that we had, but

13   I'm sure we did.  But it seems to

14   me at the time, well, let me back up

15   a little bit and explain how all

16   this gets started, I think.  I think

17   it would be helpful.  I had just

18   recently been to San Diego,

19   California, and met with --- in

20   fact, Major Wertz and I were both

21   out there, met with California

22   Highway Patrol and San Diego Police

23   Department, because they had

24   recently handled security for the

25   Republican National Convention that

97

1  had been held out there some three

2  or four years prior to this.  So we,

3  since that convention was coming to

4  Philadelphia, I went out along with

5  Major Wertz to San Diego to discuss

6  what they had done, how they had

7  done it.

8         One of the recommendations

9  that they made to us, and it was a

10  good one, is that as time gets

11  closer to the event, okay, the ---

12  your task force commander needs more

13  and more help because more and more

14  things are beginning to happen as

15  the event gets closer and closer.

16         Now, at that time there

17  were two events going on.  One, the

18  Republican National Convention in

19  eastern Pennsylvania and the

20  National Governor's Association

21  meeting actually in State College,

22  but that would come under our

23  western area command.

24         So that, having as a

25  background, okay, I think and again

98

1  this is my recollection, and I don't

2  want to misstate anything, but I

3  think at the time Captain Ober was

4  in between assignments, maybe with

5  IIMS in BPR.  And at that point, I

6  recommended that he be considered to

7  go out and assist Major Supinka with

8  the work for the National Governors

9  Association meeting.

10          Major Wertz was a task

11  force commander for the Republican

12  National Convention and he had a

13  similar person assigned to his

14  organizational group out there for

15  doing those preparations.  So I

16  thought that that was very important

17  for Major Supinka to have somebody

18  do that.  Captain Ober was

19  available.  He had skills that he

20  could have been of great help out

21  there and it would have been a good

22  thing, because he would have worked

23  under the tutelage of one of our

24  very best area commanders as well.

25  So I thought it was a good, good

99

1    thing, a win-win thing.

2    Q.          A win-win thing?

3    A.          Uh-huh (yes).

4    Q.          So you went to Captain

5    Ober or you had him come in to

6    discuss it with him?

7    A.          I didn't discuss it at all

8    with Captain Ober.  That was my

9    recommendation to the Commissioner

10   that Captain Ober be considered for

11   that position.  I thought that would

12   be good for the department, it would

13   be good for Captain Ober, it would

14   be good for Major Supinka.

15   Q.          You didn't do that,

16   because you wanted to pay Captain

17   Ober back, did you?

18   A.          No, sir.  Let me --- let

19   me clarify that right now before you

20   get any misconceptions.  I've known

21   Captain Ober, I don't know how many

22   years, but a number of years.  And I

23   have the utmost respect for Captain

24   Ober personally and for Captain

25   Ober's abilities, administrative

100

1    abilities.  I supported him 120

2    percent if not moreso when he was

3    the director of systems process

4    review.  I think he did a 100

5    percent job there.  He took that

6    particular division from a period

7    when they were having a tremendous

8    amount of difficulty to a well-run

9    division and did very, very well

10   with that.  I relied on him

11   immensely to keep me informed of

12   what he was finding or his folks

13   were finding when they were doing

14   their reviews of the stations.  So,

15   you know, let me clarify right now

16   that there's no get-even.  There's

17   no, you know, I do not like Darrell

18   Ober at all.  Okay?  In fact, I have

19   a great deal of respect for his

20   abilities, particularly his

21   administrative abilities.

22   Q.        Well, there was an

23   emergency need for him out there in

24   Washington.  Right?

25   A.        There was a need out

71

1   given information to believe that

2   there might be people involved in

3   the Legislature; right?

4   A.          (NODS HEAD).

5   Q.          And did you also come on

6   information that indicated that

7   there might be, quote/unquote,

8   higher ups in the Pennsylvania State

9   Police involved?  Do you know

10  whether that was ever indicated?

11  A.          I --- I'm sure it was.  I

12  don't --- can't tell you where that

13  came from, when it came from or from

14  whom it came, but, yes, I'm sure

15  that's correct.

16  Q.          All right.  Now, your

17  response to me in fairness to you,

18  was that Captain Ober should have

19  known enough to know that you

20  couldn't effect the process that way

21  through those people.  Right?  In

22  other words, that the FBI may not

23  have known that and would not have

24  had a way to know that, but Captain

25  Ober should have known that was just

72

1  not reasonable?

2  A.        Just not reasonable,

3  that's correct.

4  Q.        Okay.  Well, I maybe have

5  access to a lot more information

6  maybe than Captain Ober does about a

7  lot of things.  Weren't there issues

8  in the Pennsylvania State Police

9  about sons or relatives of members

10 being approved even though they

11 weren't recommended for membership

12 in a cadet class?

13 A.        I don't know anything

14 about that.

15 Q.        Have you ever heard about

16 such a thing?

17 A.        Never heard anything ---

18 not during the time where I was in a

19 position where I would have heard

20 about anything like that.

21 Q.        All right.  All right.

22 Okay.  Fair enough.  Fair enough.

23 Let me change direction then.  You

24 don't have any knowledge of anything

25 like that.  Now, let's --- let's

73

1    return then.  You have this meeting

2    and there's a meeting in there where

3    you've got Mr. Coury, yourself and

4    the Commissioner.

5           Do you remember what the

6    Commissioner said, if anything,

7    about Colonel Fikus?

8    A.         No, I don't know if he

9    said anything.

10   Q.         Do you know whether there

11   was any discussion about

12   investigating or inquiring into the

13   circumstances surrounding what

14   Colonel Fikus did?

15   A.         That would have been part

16   and parcel to a complete inquiry.

17   Q.         Do you know whether

18   Colonel Fikus was ever read his

19   rights and an inquiry --- I mean,

20   strike that.

21          As we know from this

22   morning and you may not have

23   personal knowledge of this, you know

24   that Captain Ober was addressed from

25   the formal point of here's a --- an

74

1   inquiry, here's a notice and you're

2   being --- you know, you've got to

3   sit here and answer questions.  This

4   is not an informal give or take.

5   This is a formal inquiry of some

6   kind.  Anyway we're going to check

7   into this.  You know that happened;

8   right?

9   A.        Well, I do from talking,

10  listening to Major Wertz.  I knew he

11  was interviewed.  I didn't know what

12  ---.

13  Q.        Okay.

14  A.        You know, how that was

15  accomplished.

16  Q.        Major Wertz indicated that

17  there may have been some other

18  individual who was also given their

19  rights, so to speak, or read their

20  rights as it's comes and its

21  progeny.  Do you know who the other

22  individual was who was given their

23  warnings or their rights?

24  A.        I do not.

25  Q.        Okay.  Sir, you were

75

1  interviewed at one point by the two

2  investigators, right?

3  A.        Yes.  I --- I --- Major

4  Wertz says so, and I agree.  I'm

5  sure he would have had to.

6  Q.        Do you remember the

7  interview?

8  A.        No, I do not.

9  Q.        Do you remember who was

10  present?

11  A.        I don't remember the

12  interview.

13  Q.        Okay.  Aside from flying

14  up to Williamsport to meet with

15  Major Williams and the meeting in

16  Phoenix, did you have any other

17  meetings with --- and the interview

18  if it took place, I understand you

19  don't remember, did you have any

20  other meetings with Major Williams

21  or Major Wertz?

22  A.        I --- I can't be specific

23  about the meeting, what went on in

24  the meeting, but there was one other

25  meeting, the Commissioner wanted to

76

1   meet with and that was shortly after

2   they were assigned.  And my

3   recollection is that it was shortly

4   after we came back from Phoenix, was

5   that he wanted to meet with Major

6   Williams and Major Wertz, and I was

7   present at that meeting.

8   Q.        Wasn't Colonel Evanko told

9   he shouldn't do this?

10  A.        I don't know that.

11  Q.        Do you know of anyone that

12  told Colonel Evanko that he didn't

13  have a basis or a right to make an

14  inquiry into Captain Ober?

15  A.        Oh, I don't know if

16  anybody ever told him, not to my

17  knowledge.

18  Q.        Why not?

19  A.        I never heard that.  I

20  would not have told him that.

21  Q.        So you would have done it?

22  A.        I would have done it.

23  Q.        Well, if --- if the FBI

24  had come to you and asked you to

25  keep an investigation confidential

77

1  that they're investigating Colonel

2  Evanko, would you have told Colonel

3  Evanko?

4  A.        I probably would have,

5  yes.

6  Q.        Oh --- strike that.

7  A.        Depending on those

8  circumstances, I probably would

9  have.

10  Q.        Okay.  All right.  Okay.

11  You'd indicated that at some point

12  after Major Williams and Major Wertz

13  had been assigned the task of making

14  the inquiry into Captain Ober, there

15  was a meeting with Colonel Evanko

16  wanted to talk to them?

17  A.        That's correct.

18  Q.        And you were present?

19  A.        I believe I was.

20  Q.        Can you tell us what

21  occurred in that meeting?

22  A.        It was --- the purpose of

23  the meeting I can't give you.  I

24  can't tell you exactly verbatim what

25  was said in the meeting.  But

78

1   Colonel Evanko wanted to make sure

2   that they just did a fair, thorough

3   inquiry into the matter.  I mean,

4   that was it.  He wanted the --- just

5   give me the facts.  You don't

6   editorialize.  You don't give me any

7   of your opinions.  Just give me the

8   facts to what went on here.

9   Q.        These are --- you know,

10  I've been at an occasion --- I know

11  Williams from before.  I never met

12  Mr. Wertz before.  I've deposed both

13  of these officers.  I must tell you

14  I'm very impressed with the

15  professionalism and intelligence and

16  the articulate --- the Pennsylvania

17  State Police is an absolutely fine

18  people and, you know, I add you to

19  that list.  I mean, I'm talking

20  about the professionalism.

21          Why would you need to tell

22  people with the intelligence and the

23  skill and abilities of people like

24  Williams and Wertz to do an

25  objective evaluation?  Why?  I mean

79

1  --- I mean, why is it necessary to
2  even tell them that?  I assume these
3  guys are pretty sharp fellows.  Why
4  do you need to tell them that?
5  A.        You'll have to ask the
6  Commissioner that, I don't know why
7  he wanted to do that, but he did.
8  Q.        All right.  How ---?
9  A.        And I think it's to his
10 credit.
11 Q.        Okay.  And how long was
12 --- this took place some time after
13 you came back from Phoenix, I
14 assume?
15 A.        Yeah, that's my
16 understanding.
17 Q.        Do you know how long, what
18 period of time the inquiry spanned?
19 A.        I do not.  I'm sorry.  I
20 mean, I'm sure it can be determined
21 ---
22 Q.        Yeah.
23 A.        --- factually by looking
24 at some documents and things, but I
25 don't have that knowledge.

80

1    Q.        Okay.  Sir, the --- when

2    you were here this morning, you

3    heard --- you heard Mr. Wertz

4    talking about a list that --- you

5    heard me ask him questions and him

6    respond with a list of witnesses.

7    You remember that?

8    A.        Uh-huh (yes).

9    Q.        And let me --- I tell you

10   I wrote them down so let me tell you

11   what his best recollection was.

12   Colonel Fikus, Major Conley, Major

13   Merriman, a Sifery or Sifert.  Does

14   that name mean anything to you?

15   A.        I expect it's Sifert.

16   Q.        Sifert.  I know --- okay.

17   Sifert, S-I-F-E-R-T, something like

18   that.

19   A.        That's my --- that's my

20   ---.

21   Q.        That's a guess.

22   A.        It's my guess, yeah.

23   Q.        Best as you can?

24   A.        Supposition.

25   Q.        Okay.  Colonel Westcott,

81

1   yourself, Colonel Evanko and Colonel

2   Coury.  Did you have any input at

3   all as to what witnesses would be

4   contacted during the inquiry?

5   A.          No, no.

6   Q.          Sir, do you have a

7   recollection of whether or not

8   Colonel Evanko had any input into

9   it?

10  A.          I would expect not.

11  Again, you hit the nail right on the

12  head there.  These are good

13  competent investigators.  That's why

14  they were chosen, because they're

15  good competent investigators.

16  Q.          They seemed very sharp to

17  me.

18  A.          And they're going to be

19  very fair to everybody that's

20  involved in this thing, to gather

21  the facts accurately.  That's why

22  they were chosen.  When you have

23  good investigators like that, there

24  was no need for me to assign them a

25  certain interview or make sure you

82

1  do that or make sure you do this,

2  they're certainly going to do it.

3  It's going to get done.

4  Q.        Okay.  One thing, though,

5  I have a problem, I have experience

6  with it, sometimes when

7  investigative work product is

8  reviewed, there are questions like

9  why didn't you interview so and so

10 and did you ask these questions, did

11 you find out an answer to that?

12 Everybody knows there's no such

13 thing as a perfect investigation and

14 it's easy to second-guess somebody

15 else's investigation.  My question

16 is, did Colonel Evanko, did you, did

17 Colonel Coury or anyone else discuss

18 the work product of this

19 investigation with these fellows and

20 ask them if they interviewed this

21 person, interviewed that person, or

22 for that matter make suggestions

23 during the course of the

24 investigation?

25 A.        I don't believe so.  I did

83

1  not.  First of all, as I said

2  before, I did not review the work

3  product.

4  Q.        Yeah.

5  A.        So I would not have made

6  any recommendations that, you know,

7  check this point with this person or

8  that point with that person, I just

9  didn't do that.  And I'm reasonably

10  certain that during the course of

11  that inquiry, and we talked to these

12  fellows on a daily basis, you know,

13  several times a week if not daily.

14  Q.        Right.

15  A.        As I did all the area

16  commanders, I'm --- other than

17  asking, well, how's things going,

18  you know.

19  Q.        Yeah.

20  A.        How are you progressing

21  with this, you know, I don't think I

22  had any conversation with them,

23  certainly not specific, you know,

24  that they talked to so and so and

25  learned this or that or the other

84

1    thing.  I didn't.  I didn't do

2    that.

3    Q.          Okay.  In the course ---

4    do you have a recollection again of

5    like how much time the inquiry

6    spanned?

7    A.          No, I don't. No.  As I

8    said, we can figure that out, but I

9    don't know that now.

10   Q.          Yeah, I can.  I'm just

11   wondering if that comes back to

12   you.  If that comes back to you how

13   much time they spent, I remember

14   Mr. Wertz indicated he thought it

15   was weeks but he's not sure either.

16   I'd appreciate it if you'd address

17   that.

18           Did you ever have a

19   discussion with Colonel Fikus about

20   this matter?

21   A.          I'm not sure.

22   Q.          Is Colonel Fikus a friend

23   of yours?  By that I mean, what I

24   mean is, I know that both of you are

25   professionals.  But, you know, there

101

1  there, yes.

2  Q.         No, no, no, emergency

3  need.  Wasn't there an emergency

4  need for him out there, Colonel?

5  A.         Well, I don't know if you

6  want to call that --- is that your

7  terminology?  I ---.

8  Q.         Yeah, my question is,

9  wasn't there an emergency need?

10 A.         Well, you ---.

11 Q.         If there was not an

12 emergency need, qualify the word

13 need for me, if you will.  Respond

14 any way you can.

15 A.         Well, I'm not sure

16 emergency is the correct

17 terminology.  If you want to use

18 that, that's fine, but the ---.

19 Q.         No, I'm not using it ---

20 sir, is it fair to say there was no

21 emergency need now?

22 A.         The convention was a

23 number of months away.

24 Q.         A number of months away?

25 A.         Yeah, absolutely.

102

1    Q.        How much notice was he

2    given about being transferred?

3    A.        I don't know the answer to

4    that.

5    Q.        You don't know the answer

6    to that?

7    A.        No.

8    Q.        You don't know when he was

9    told to report or when it happened?

10   A.        No, I don't.  Again, it

11   wasn't in my area of responsibility.

12   Q.        You know he went to Court?

13   A.        I've been told that, yes.

14   Q.        And the transfer took

15   place?

16   A.        I've been told that.

17             ATTORNEY REYNOLDS:

18             Objection.  That is a

19             mischaracterization.  I've

20             heard this before in these

21             depositions.  The Court

22             did not agree with him.

23             The Commonwealth settled

24             his case before it went to

25             a preliminary injunction

103

1       hearing.  We ultimately

2       won that investigation.

3       The Court did not

4       intervene in that.  We

5       settled that injunction.

6       The Court did not

7       intervene.

8   BY ATTORNEY BAILEY:

9   Q.          Did you learn at some

10  point the Commissioner backed off

11  and backed away and Mr. Ober did not

12  go to Washington --- at least in

13  Mr. Ober's perspective, he didn't go

14  to Washington?

15  A.          He didn't go to

16  Washington.

17  Q.          No, he did not.  He stayed

18  in Harrisburg with his family;

19  didn't he?

20  A.          Yes, he did.

21  Q.          Did you ever read Judge

22  Pelegrini's opinion?

23  A.          No, I did not.

24  Q.          All right.  Now, do you

25  remember when it was that you made

104

1  this recommendation to the

2  Commissioner that Mr. Ober would be

3  --- I guess would have his career

4  enhanced by going to Washington?

5  A.        When that was?

6  Q.        Well, would he have his

7  career enhanced by going to

8  Washington?

9  A.        In my opinion, yeah, it

10  would have been a pretty good

11  thing.  I'm not sure and I don't

12  know specifically what Captain

13  Ober's background in the department

14  is, but I'm not sure he's had a lot

15  of operational assignments and he

16  certainly would have been working

17  directly under a very, very good

18  commander, from a planning and an

19  operational perspective.  It would

20  have been good.

21  Q.        Well, who was that area

22  commander?

23  A.        Major Supinka.

24  Q.        Well, you talked with him

25  about meeting Mr. Ober out there;

105

1  didn't you?

2  A.        No.

3  Q.        Or somebody like him?

4  A.        I did, yes.

5  Q.        Yeah.  And he told you how

6  badly he needed him, right?

7  A.        Well, he was reluctant.

8  He did not have benefit of the

9  knowledge that I had at that point.

10 He had not gone to San Diego and he

11 was not told that that was --- as it

12 turns out, I think he would now

13 agree that it was important.

14 Q.        Okay.  But the question

15 --- okay.

16 A.        But at that time I told

17 him, in fact, yeah, I told him that

18 Captain Ober would be coming out and

19 I probably would have given him an

20 effective date, because he probably

21 would have asked me that so I would

22 have --- I don't recall what it was.

23 Q.        He knew what to do with

24 Ober, right?

25 A.        Yes.

106

1    Q.        He put him right to work

2    on this task.  If there wasn't an

3    emergency, there was an immediate

4    need for Mr. Ober out there?

5    A.        I can tell you that he

6    would have been put to work

7    immediately.

8    Q.        Yeah.  Doing what?

9    A.        Had he gotten ---.

10   Q.        Doing what?

11   A.        Any number of duties for

12   as far as getting ready for the

13   National Governor's Association

14   meeting.  You have to understand

15   that's pretty massive.  That's a

16   pretty massive thing.  It involved

17   over 500 Troopers, so to be assigned

18   to that --- there was an awful lot

19   of work to do.  There was an awful

20   lot of coordinating to do between

21   area commands, in between troop

22   commands.

23   Q.        Well, wouldn't you bring

24   him in to brief him on that?

25   A.        It would not have been

107

1   ---.

2   Q.          Wouldn't you say, Mr. Ober

3   ---?

4   A.          It would not have been my

5   responsibility to do that.

6   Q.          Wouldn't you at least say,

7   gee, I have a great idea for you,

8   you know, go out here to Washington,

9   this is a career enhancing move, et

10  cetera, et cetera.  No discussion or

11  anything like that.  You went to the

12  Commissioner with that, so do you

13  know whether the Commissioner had

14  any meetings with Mr. Ober to

15  discuss that?

16  A.          I do not know.

17  Q.          Now, are there any

18  regulations that would govern that

19  transfer?

20  A.          I would expect it would be

21  a general transfer, you know, at the

22  direction of the Commissioner.

23  Q.          Well, Mr. Ober didn't

24  request it, right?

25  A.          I don't believe so.

108

1   Q.          And once he objected to

2   it, his --- his --- he was consulted

3   or his wishes were respected or

4   whatever, right?

5   A.          That's correct.  He stayed

6   in the Harrisburg area.

7   Q.          Yeah.

8   A.          He did not go to Troop B

9   Washington.

10  Q.          That didn't have anything

11  to do with the --- any grievances or

12  any legal ---?

13  A.          About what didn't have

14  anything to do with it?

15  Q.          His staying in the

16  Harrisburg area didn't have anything

17  to do with the legal process, do you

18  know or didn't ---?

19  A.          I don't know.

20  Q.          You didn't follow that?

21  A.          I didn't follow that.

22  Q.          Or you weren't involved in

23  that?

24  A.          I didn't.

25  Q.          Was his transfer in

109

1    relation to a promotion of any kind?

2    A.          No, he was a Captain

3    already and that assignment out

4    there would have been naturally a

5    Captain's position.

6    Q.          Would have been for a

7    Captain?

8    A.          Uh-huh (yes).

9    Q.          It wasn't an emergency or

10   hardship, right?  You already told

11   us it wasn't an emergency?

12   A.          Oh, it's not an

13   emergency.  There were still a

14   number of months.

15   Q.          Do you know of a hardship

16   situation, I'm sorry?

17   A.          There were still a number

18   of months to the meeting.

19   Q.          Yeah.

20   A.          I don't call that an

21   emergency.  An emergency would mean

22   a number of days.

23   Q.          In fact, Mr. Young went

24   out there?

25   A.          Captain Young went out

110

1 there.

2 Q.          How did he happen to go

3 out there?

4 A.          Again, he was a good --- a

5 good guy and spent a lot of his

6 career in bureaus, not so much field

7 time.  It was a right fit for him as

8 well, he could get out there and

9 again help out a pretty good area

10 commander and learn from him.

11 Q.          Well, how do you know Mr.

12 Young?

13 A.          I've known --- I've known

14 Captain Young for years.

15 Q.          Now, was he a Lieutenant,

16 right?

17 A.          I don't know.  Could be.

18 I don't know.  He's a Captain now.

19 Q.          Did he get a promotion for

20 going out there or anything?  Does

21 that have anything to do ---?

22 A.          Well, we couldn't give

23 somebody a promotion because they

24 went out to Troop B Washington, no.

25 Q.          You said it called for a

111

1  Captain, though, do you remember?

2  A.        It was a Captain in

3  eastern Pennsylvania.  I would

4  expect it to be a Captain there.

5  Q.        It didn't call for a

6  Captain?

7  A.        There's no TO involved.

8  Q.        It's not part of your

9  organizational?

10  A.        No.

11  Q.        Structure?

12  A.        No.

13  Q.        So then Mr. Young,

14  Lieutenant Young did not see ---

15  receive a promotion in exchange for

16  his assignment, huh?

17  A.        Oh, I'd be very

18  surprised.  It's not my job to

19  promote people, but you don't

20  promote people for those kinds of

21  reasons.

22  Q.        Well, Mr. Young wasn't

23  ordered to take that position, was

24  he, out there?

25  A.        I don't know.

112

1    Q.        Was he consulted before he

2    was sent out?

3    A.        I do not know, I'm sorry.

4    I did not talk to him.

5    Q.        Who did?

6    A.        I don't know.

7    Q.        Do you know if the

8    Commissioner did?

9    A.        I don't know.  I mean, I

10   just don't know.

11   Q.        You didn't deal with it?

12   You don't know what happened with

13   Mr. Young, right?

14   A.        I don't know how it

15   happened that he was told to go out

16   there.  I don't know who told him.

17   Ordinarily I would expect I would

18   have, because was he in my area of

19   responsibility but I don't recall

20   doing it.

21   Q.        Did somebody violate the

22   chain of command?

23   A.        I don't know.  I'll tell

24   you ---.

25   Q.        If they did, what should

113

1  we do?

2  A.        I'll tell you I hollered

3  at some people already for doing

4  that in my career.

5  Q.        What should we do if they

6  did?

7  A.        I don't know what's your

8  situation.

9  Q.        I know if my kids do

10 something wrong I tell them let's

11 tar them and feather them and run

12 them out on a rail?

13 A.        That works pretty good.

14 Q.        So you weren't involved in

15 the Young thing but he was in your

16 area of operations?

17 A.        I say I don't remember

18 doing that.

19 Q.        You don't remember?

20 A.        I expect I would have, but

21 I just don't remember doing it

22 unless I was off or something at the

23 time.

24 Q.        What's IIMS?  What is

25 that?

114

1    A.          What is that?

2    Investigative information management

3    system.

4    Q.          What is IIMS?  Yeah, I

5    think something like that.  What ---

6    you know, it's --- can you tell me

7    about that, what that is?

8    A.          Don't know too much about

9    it, other than it is a --- it's a

10   very important aspect of the

11   department now.  It's the

12   computerization of the entire

13   department working on that.  More

14   specifically than that I couldn't

15   ask --- couldn't answer.

16   Q.          It's a very important

17   thing having to do with

18   relationships between police

19   departments and information and

20   credibility and all that kind of

21   stuff or what?

22   A.          Oh, I'm sure part of that,

23   part and parcel, I would think.

24   Q.          Yeah.  Well, what was Ober

25   doing when he was --- when the

115

1    Commissioner decided that he should

2    go to Washington?  What was he

3    doing, took your advice and sent him

4    to Washington?

5    A.          I don't know that.  It was

6    my understanding that at the time he

7    was in between jobs.  Okay?  In

8    between IIMS and BPR but I don't

9    know that.  There's other people you

10   could ask who would be more

11   definitive.

12   Q.          Okay.  What position was

13   he going to be assigned once the

14   National Governor's Association

15   conference or whatever was over,

16   what was he going to be doing after

17   that?

18   A.          I don't know.  I don't

19   know.

20   Q.          Well, did anybody --- you

21   don't know if anyone discussed with

22   him what he was going to be doing or

23   what his future was going to be?

24   A.          I don't know.  I do not.

25   Again it was not in my area of

116

1    responsibility so I would not

2    necessarily have those kinds of

3    conversations.

4    Q.          Does Major Conley ever

5    talk to you about a desire to have

6    Ober removed from IA, internal

7    affairs?

8    A.          No, he did not and would

9    not.

10   Q.          Do you know what Mr.

11   Young's schedule was before he went

12   out there?

13   A.          How do you recall?

14   Q.          What was he doing, what

15   his assignment was or anything like

16   that?

17   A.          He was probably assigned

18   to bureau of criminal investigation,

19   organized crime division, my guess.

20   Q.          Where's Mr. Young from?

21   A.          He is from the outskirts

22   of Philadelphia.

23   Q.          What's he doing now?

24   A.          He's still at BCI, is my

25   understanding.

117

1  Q.        And what's BCI stand for?

2  What's that acronym for?

3  A.        Bureau of criminal

4  investigation, I'm sorry.

5  Q.        Okay.  Now, is he --- did

6  he go to the FBI Academy, do you

7  know, Mr. Young?

8  A.        I think he did.

9  Q.        So he left the PA State

10 Police?

11 A.        No, no, no, no, no.  He's

12 still a member.  He went down to the

13 National Academy.

14 Q.        For training?

15 A.        Which is training, that's

16 correct.  The FBI gives training to

17 other agencies.

18 Q.        Okay.  Do you know if

19 Young was assigned any duties with

20 the Republican National Committee or

21 with the convention or anything?

22 A.        I don't know.  See, I was

23 gone.  I was retired by that time,

24 so I don't know.

25 Q.        Do you know whether he

118

1    picked up $50 worth of overtime in

2    working for the RNC in five days?

3    Do you know whether that happened?

4    A.        I was retired.  I have no

5    idea.

6    Q.        Okay.  All right.

7    Supinka, did he request anyone else

8    other than --- well, we know he

9    didn't request ---?

10   A.        He didn't request

11   anybody.

12   Q.        He didn't request

13   anybody.  Did you give him --- did

14   the Colonel or yourself or anybody

15   else give him anybody else in

16   addition to Ober and then Young?

17   A.        Oh, I don't think so.  Not

18   while I was there, anyway.

19   Q.        Young wasn't --- again,

20   please don't --- don't feel insulted

21   by my question.

22   A.        Uh-huh (yes).

23   Q.        But Mr. Young wasn't

24   chosen in order to make it look like

25   there was a reason to send Ober out

119

1  to Washington, was there?

2  A.        No, there was a need for a

3  person out there.  There was a need

4  for somebody to be in that

5  position.

6  Q.        There was a need.  But

7  that wasn't communicated, that came

8  out of your experience out there in

9  San Diego and it was based on your

10  knowledge, your own knowledge, of

11  the needs out there in the southwest

12  with what was coming up in

13  Pittsburgh, National Governor's

14  Association, but it wasn't Supinka

15  asked --- Supinka --- Supinka asking

16  you for information or asking you

17  for help; right?

18  A.        No, he did not.

19  Q.        He did not.

20  A.        Yeah, that was my

21  initiative.

22  Q.        I don't mean to

23  mispronounce his name, by the way.

24  I apologize.

25  A.        Uh-huh (yes).

120

1   Q.       And then Captain Transhue

2   (phonetic) was sent down to

3   Philadelphia, right?

4   A.       That's my understanding,

5   yes.

6   Q.       Were you responsible for

7   that?

8   A.       That would have --- let me

9   just think about that. That

10   probably was a request, not

11   probably, I'm sure it was a request

12   from Major Wertz. I would expect

13   that request to have been after we

14   came back from San Diego. Though

15   I'm not sure.

16   Q.       That was a request from

17   Mr. Wertz?

18   A.       Yes. He was in San Diego

19   with me.

20   Q.       All right. He is a friend

21   of Transhue, isn't he?

22   A.       Yeah, they served in the

23   same area command, troop commands

24   already together so they knew each

25   other.

121

1  Q.        Why did he make that

2  request?

3  A.        But I think at the time

4  she was assigned to R & D, or

5  something at the time.

6  Q.        R & D?

7  A.        Yeah.  So again it would

8  not have been --- I wouldn't

9  necessarily have made a

10  recommendation, you know, because

11  it's not in my area of

12  responsibility.

13  Q.        You know, that's ---?

14  A.        Fikus would have had to

15  deal with that, okay.

16  Q.        Who did you complain to

17  about Young, you being bypassed in

18  the case of Young?  I mean, you were

19  upset about that, right?

20  A.        I'm sorry.  About what?

21  Q.        That Young was assigned

22  without your knowledge?

23  A.        I'm not sure Young was

24  assigned without my knowledge, no.

25  Q.        Who were you concerned

122

1    about that your chain of command was

2    bypassed?

3    A.        I never was.

4    Q.        Well, you and I were

5    talking about some of these

6    assignments that got by you or got

7    around you?

8    A.        I don't - - -.

9              ATTORNEY REYNOLDS:

10             I would just note for

11             the record that I think

12             you brought up that issue

13             not Colonel Westcott.

14             ATTORNEY BAILEY:

15             Lieutenant Colonel

16             Westcott.

17             ATTORNEY REYNOLDS:

18             Lieutenant Colonel

19             Westcott.  What did I

20             say?

21             ATTORNEY BAILEY:

22             You said Lieutenant.

23             That's okay.  It's been a

24             long day.

25             ATTORNEY REYNOLDS:

123

1          My understanding of

2     that exchange, he said if

3     there was a violation of

4     chain of command then

5     something might have to be

6     done, but he didn't

7     acknowledge that there

8     was, in fact, a violation

9     of command.

10          ATTORNEY BAILEY:

11          Well, let's ---.

12          ATTORNEY REYNOLDS:

13          I think that was more

14     your comment.

15          ATTORNEY BAILEY:

16          Let's revisit that,

17     because I may have

18     misunderstood you.

19  A.          All right.

20  BY ATTORNEY BAILEY:

21  Q.          Didn't you indicate that

22  you did not send Mr. Young out to

23  Washington?

24  A.          I don't recall me

25  personally telling him, but I would

124

1  --- you know, I very well could

2  have.  It would have been in my

3  place to do.  I just don't recall

4  doing it.  The Commissioner may have

5  done it also.

6  Q.          Well, did you complain to

7  anybody about that happening without

8  your knowledge?

9  A.          No.  No, I'm not sure it

10  was done without my knowledge.  I'm

11  sure I knew he was going out there.

12  Whether I told him he was going out

13  there or whether the Commissioner

14  told him I just don't recall.

15  Q.          I did misunderstand then.

16  We need to clear this up on the

17  record, because I want that to be

18  clear on the record.  You had made

19  an error on the record and counsel

20  made an objection and --- by myself

21  not you by myself, I made an error

22  here and I want to clear it up.  You

23  had made a recommendation by the

24  Colonel about sending Mr. Ober out

25  to Washington.  Right?

125

1    A.       Yes.

2    Q.       You learned after the fact

3    that Mr. Young was sent ---?

4    A.       No, I probably also would

5    have made ---.

6    Q.       Not probably, do you know?

7    A.       No, listen.

8    Q.       Yeah.

9    A.       I'm trying to clarify so

10   that you're not confused.

11   Q.       Right.

12   A.       When I heard --- learned

13   that Captain Ober was not going out

14   there, but somebody else needed to

15   go out there because I had a need

16   for somebody out there, I would have

17   ---.

18   Q.       Yeah.  You didn't learn it

19   from somebody.  You knew ---?

20   A.       I would have recommended

21   Captain Young go out there.  I would

22   have recommended that to the

23   Commissioner.

24   Q.       Sir, you would have.  The

25   fact is you don't know if you did.

126

1  A.        I'm sure I did.

2  Q.        Oh, you are?  You're sure

3  that you did?

4  A.        I'm sure.  I'm sure the

5  Commissioner would have conversed

6  with me about that.  Well, you know,

7  who should we send out there?  Who

8  would you like to go out there?  And

9  I'm sure I would have given him the

10 answer.

11 Q.        All right, sir.

12 A.        Can I remember that

13 specifically?  No, I cannot.

14 Q.        Let's look at this now.

15 You had no request coming up through

16 channels asking to have somebody go

17 out to Washington?

18 A.        That's correct.

19 Q.        You originated this idea

20 because of your concern about and

21 your respect for Captain Ober and

22 your perceived need to have somebody

23 out there for those purposes to

24 help.

25 A.        That's one thing, my

127

1   perceived need.

2   Q.        Yes.

3   A.        Not whatever Captain Ober

4   was involved with or was not

5   involved with, okay.

6   Q.        No, you said ---?

7   A.        That just happened to be

8   the circumstances at the time.

9   Q.        Why did you pick him?

10  A.        I had a need --- because

11  he was available.

12  Q.        Yeah.

13  A.        Okay.

14  Q.        Oh, okay.  Well, how did

15  you know he was available?

16  A.        I was told he was

17  available.

18  Q.        Who did you ask?

19  A.        Probably the

20  Commissioner.  I don't know.  The

21  Commissioner or Colonel Fikus.

22  Q.        Okay.

23  A.        Somebody told me that.

24  Q.        Okay.  And you had this

25  --- because of your California

128

1  experiences, you had this perceived

2  need that, although you didn't check

3  with him, that the area commander

4  out there had a need for somebody

5  for the National Governor's

6  Conference; right?

7  A.        That's correct.

8  Q.        All right.  Now,

9  obviously, Mr. Ober's re ---

10  actually --- well, the decision to

11  send him out to Washington was made

12  by the Commissioner not you?

13  A.        That's the Commissioner's

14  decision, correct.

15  Q.        That's the Commissioner's

16  decision and that would be normal.

17  I assume that's normal thing?

18  A.        That's normal.

19  Q.        You don't know whether he

20  talked to Mr. Ober or not but you

21  know you didn't?

22  A.        I do not.

23  Q.        You don't know whether he

24  did?

25  A.        I do not know.

129

1   Q.      All right.  He --- just a

2   second here.  Okay.  You did not ---

3   you didn't speak to him again and

4   you don't know whether the Colonel

5   did.  But he reacted rather quickly

6   to the news that he was going to

7   Washington.  Right?

8   A.      I ---.

9         ATTORNEY REYNOLDS:

10         Who's he?  Is this

11         Dave Young?

12   A.      Yeah.

13         ATTORNEY BAILEY:

14         Mr. Ober.

15         ATTORNEY REYNOLDS:

16         Okay.  This is

17         Mr. Ober you're talking

18         about.

19   BY ATTORNEY BAILEY:

20   Q.      Mr. Ober reacted rather

21   quickly that he was going to

22   Washington?

23   A.      I presume so.  He didn't

24   talk to me at all.

25   Q.      When did you first learn

130

1 that he was going to Washington?  I

2 mean, how much time after when you

3 told the Commissioner about the need

4 for him out there and I assume you

5 learned that the Commissioner was

6 sending him out there, right?

7 A.          Uh-huh (yes).

8 Q.          Because he was in your

9 operational chain of command; right?

10 A.          Who was?

11 Q.          Mr. Ober?

12 A.          No, he was not.

13 Q.          Oh, he wasn't?

14 A.          No.  See.

15 Q.          That may be where the

16 misunderstanding comes.  Mr. Young,

17 see, Mr. Young was within your

18 operation?

19 A.          Mr. Young was, that's

20 correct.

21 Q.          Yeah.  And you don't

22 remember whether you recommended him

23 or not, but you know that you

24 recommended Mr. Ober but Mr. Ober is

25 not in your chain of command.

131

1  That's probably where I got

2  confused?

3  A.        That's correct.

4  Q.        Yeah.

5  A.        Yeah.

6  Q.        All right.  That will

7  help.  Now, did you ever discuss

8  with Mr. Young before or after the

9  fact his going to Washington?

10  A.        Did I ever discuss that

11  with him?

12  Q.        Yeah.

13  A.        I don't know.  I probably

14  --- I could have.

15  Q.        Okay.

16  A.        I could have.

17  Q.        Did you know he was

18  available to go out there or was he

19  available?

20  A.        I'm sure he was available,

21  but it --- I mean, he had an

22  assignment.

23  Q.        Yeah.

24  A.        Okay.  We would have just

25  borrowed him from that assignment

132

1   and gave him another thing,

2   something else to do.

3   Q.        You would have detached

4   him?

5   A.        That's correct.  But I'm

6   not sure that's the correct

7   terminology but ---.

8   Q.        May not be the right

9   word.  May not be the right word but

10  Mr. Ober was available.  He was

11  floating around?

12  A.        It was my information that

13  he was like in between jobs.  He was

14  available.

15  Q.        Okay.  Well, you sent Ober

16  over to BCE, right?  Is that your

17  decision?

18  A.        I didn't send him --- I

19  didn't send him anywhere.

20  Q.        You didn't send him

21  anywhere?

22  A.        The Commissioner did that.

23  Q.        Who sent him to BCE?

24  A.        The Commissioner did

25  that.

133

1   Q.      The Commissioner did that?

2   A.      It's the same thing.  It's

3   his job to do those transfers

4   normally.

5   Q.      He does them based upon

6   advice, right?

7   A.      That's correct.

8   Q.      And who advised that the

9   Commissioner send Mr. Ober to LCE?

10   A.      I --- I very well could

11   have done that.

12   Q.      But you don't know, do

13   you?

14   A.      I'm not sure whether I

15   would have done that or Colonel

16   Coury made that recommendation or

17   even Colonel Fikus.  I don't know.

18   I don't know that but I could have.

19   Q.      But you could have.

20   A.      Uh-huh (yes).

21   Q.      Why --- was that a career

22   enhancing move, send him to LCE?

23   A.      Well, again, it's my

24   understanding that he was he was no

25   longer going to Troop B Washington

134

1  and that he had to be put into a

2  Harrisburg assignment and I think

3  that was the about the only thing

4  available out there at that time.

5  That was my recollection that was

6  the only thing available.

7  Q.          Well, you described him

8  before as an exceptionally fine

9  officer, haven't you, or am I wrong?

10 A.          I think he has very good

11 administrative skills.  His

12 investigative skills could be

13 honeyed some.  I think there's some

14 lacking there, but the guy's got

15 some great administrative skills.

16 Q.          Who's Sergeant Valensic

17 (phonetic)?

18 A.          He's a Sergeant in liquor

19 --- or he was a Sergeant in liquor

20 control.

21 Q.          What he did he do at the

22 time you were recommending or

23 somebody was --- I don't mean you

24 now, but somebody was recommending

25 because you don't have any specific

135

1 recollection of recommending

2 Mr. Ober for LCE, right?  So ---?

3 A.        I don't have that

4 recollection but I could have.

5 Q.        You could have?

6 A.        I could have during

7 discussions, yeah.

8 Q.        Yeah.  But Mr. Valensic

9 was out there at BCE, right, or at

10 LCE, rather?

11 A.        LCE.

12 Q.        He was out there?

13 A.        I believe so.

14 Q.        Where did he go?  Did he

15 leave or retire or ---?

16 A.        No.  I think --- although

17 I've been retired for a year and a

18 half now, but when I retired he was

19 still there.

20 Q.        Was he promoted?

21 A.        He was a Sergeant there.

22 Q.        Right.

23 A.        Which would have made him

24 probable --- and I'm guessing

25 without looking at personnel

136

1  rosters, but a Sergeant at LCE is

2  generally an office supervisor.

3  Q.        Okay.

4  A.        And I think he might have

5  been filling in.  I think we had a

6  Lieutenant vacancy there so maybe he

7  was an acting.  I don't know that,

8  but Valensic I'm guessing that he

9  was a Sergeant and he would have

10 been as an office supervisor.

11 Q.        Well, the position that

12 Mr. Ober was put into, that was a

13 Captain's position, wasn't it?

14 A.        What position was he put

15 into?

16 Q.        Geez, I don't know.  Do

17 you remember?  I mean, I mean that

18 sincerely.  I don't know.  I don't

19 remember.

20 A.        I don't know.  Let me

21 think.  No, I don't know if there

22 was a Captain's position there.  My

23 guess is, is that --- and I'm

24 speculating without looking at

25 paperwork.  My guess is that --- I

137

1   think we have a Lieutenant out there

2   that left.  And there was a

3   Lieutenant vacancy.  And the

4   Lieutenant out there is a section

5   commander, and three sections out

6   there.  And I believe Captain Ober

7   would have gone into one of those

8   section commander positions.

9   Q.        A Lieutenant's position?

10  A.        That would be my

11  understanding, yes.

12  Q.        That was career enhancing,

13  wasn't it?

14  A.        It was a Harrisburg

15  assignment.

16  Q.        That's --- is Harrisburg a

17  career enhancing?  I mean, do you

18  geographic --- is there geographic

19  prejudice in the system?

20  A.        No.

21  Q.        It's a Harrisburg

22  position, true?

23  A.        That's where he --- that's

24  what we were required to do.

25  Q.        Pardon me?

138

1    A.          That's what we were

2    required to do.

3    Q.          Oh, okay.  Well, did

4    Castlenick (phonetic) insist that

5    the position be filled?

6    A.          No, I don't know if he

7    did.

8    Q.          Okay.  All right.

9    A.          I mean, all commanders are

10   anxious to get their vacancies

11   filled, but I don't know if we had

12   any conversation around that time

13   for that.

14   Q.          All right.  How about

15   Lieutenant Williams?  Remember

16   Lieutenant Williams who was

17   transferred to the bureau of patrol,

18   August 31, 1999?  Does that mean

19   anything to you?

20   A.          Would he have been the one

21   that transferred out that Captain

22   Ober took his spot.

23   Q.          Well, there's some issue

24   here, I have a fact list here that

25   he was arrested for something?

139

1   A.        I don't know that.

2   Q.        And it was his position in

3   19 --- in January 29 --- I'm just

4   curious.  Let me ask you this just

5   --- how many Lieutenants do you

6   have in the Pennsylvania State

7   Police?

8   A.        I don't know.  Probably

9   around a hundred.

10   Q.        A hundred.  Well, did you

11   promote or look at the promotion

12   list for getting somebody in that

13   LCE position who was a Lieutenant

14   and promote somebody into the

15   Lieutenant's position in there?

16   A.        At some point I suppose we

17   would have.  The Commissioner

18   decides when he wants to make

19   promotions.  So when he wants to do

20   that he asks for recommendations.  I

21   would have looked the list over at

22   that point.

23   Q.        So you take Ober and put

24   him out there?

25   A.        Not me.

140

1  Q.        Not you.  I'm sorry.  It

2  wasn't you.  Have you ever served in

3  a Lieutenant's position while you

4  were a Captain or above?

5  A.        I did not.

6  Q.        Do you know anybody else

7  besides Mr. Ober that has?

8  A.        I don't know.

9  Q.        How many years have you

10 been in the Pennsylvania State

11 Police?

12 A.        Thirty-one (31).

13 Q.        Before you retired, 31

14 years.  Have you ever been

15 supervised anybody equal to you or

16 below you in rank?

17 A.        I have.

18 Q.        Tell me the

19 circumstances.

20 A.        I was assigned as a

21 Trooper to a white collar crime unit

22 in eastern Pennsylvania.  The

23 supervisor in that unit was a

24 Corporal.  I was promoted to

25 Corporal and was assigned to stay

141

1   with that unit.  So there was two

2   Corporals there.  He was the boss.

3   I was investigator.

4   Q.          Now, you wouldn't --- is

5   that a standard TO and E position,

6   standard table organization and

7   equipment position?

8   A.          No, it happens sometimes

9   in bureaus in specialized positions.

10  Q.          That's not comparable to

11  the situation that Captain Ober is

12  in, is it?

13  A.          Probably not, no.

14  Q.          Okay.  Now, you've already

15  answered a question I had for you.

16  Section commanders typically are

17  Lieutenants, am I correct?

18  A.          In LCE, that's correct.

19  And in troop commands, that's

20  correct as well.

21  Q.          Are you familiar with the

22  regulation AR 1-11?

23  A.          What's that pertain to?

24  Q.          Assigning Captains to a

25  section commander's position.

142

1  A.          No, I'm not.

2  Q.          Did the Commissioner tell

3  you that he was going to assign Ober

4  to LCE?

5  A.          I don't recall.  I'm sure

6  he did.

7  Q.          Did you learn, did you

8  learn of it before Mr. Ober was

9  assigned to the LCE position or

10 after he had been assigned there?

11 A.          I --- I don't --- I'm sure

12 it was before, because we would have

13 had conversations.  He was pulling

14 in somebody on the operation side of

15 the department, though, I can't

16 recall a conversation it would have

17 just been standard procedure that he

18 would have let me know.  It would

19 have been standard procedure.  I

20 even would have had some input into

21 it.

22 Q.          Thirty-one (31) years' of

23 experience.  How long were you ---

24 was it from 1995 you were in charge

25 of the operational ---

143

1   A.        That's correct.

2   Q.        --- division of the State

3   Police?  Give me another situation

4   like Ober's.

5   A.        How do you mean like

6   that?

7   Q.        Sure.  I want a Captain

8   assigned to a section position out

9   there.  Give me another situation.

10  A.        I don't --- I don't know

11  of any.

12  Q.        You don't know of any.

13  A.        No.

14  Q.        I want to change a little

15  bit and ask you some questions about

16  PEMA.

17  A.        All right.

18  Q.        Okay.  First of all, very,

19  very quickly so that anybody's who's

20  not familiar reading the record

21  would know what the Pennsylvania

22  emergency management, what is it,

23  association, agency?  I'm sorry.

24  A.        Agency.

25  Q.        What it is?

144

1    A.          That's a separate agency

2    within state government and it has

3    to do --- well, it's emergency

4    management agency.

5    Q.          Uh-huh (yes).

6    A.          Uh-huh (yes).

7    Q.          Is it the Lieutenant

8    Governor who's in charge of that?

9    A.          That's correct.

10   Q.          Ultimately the head guy?

11   A.          That's correct.

12   Q.          And what role does the

13   Pennsylvania State Police play with

14   PEMA?

15   A.          Certainly as an agency we

16   maintain liaison with them, but we

17   do have what they call an emergency

18   cell that we man at the

19   PEMA building.  PEMA is,

20   quote/unquote, activated and the

21   cells are manned and we man our

22   cell.

23   Q.          What position did Ober

24   play with PEMA?

25   A.          I don't know that.

145

1    Q.        Any role at all?

2    A.        I don't know that.  I

3    don't know if he was ever assigned

4    to PEMA or not.

5    Q.        Did PEMA come under your

6    command?

7    A.        Yes.  Yes.  Because it

8    came under bureau of emergency and

9    special operations.  That came under

10   my area of command.

11   Q.        How do people become ---

12   how do Pennsylvania State Police

13   officers of any rank become assigned

14   to PEMA?

15   A.        That's done by BESO.

16   Bureau of emergency and special

17   operations.

18   Q.        Do they come under you

19   operationally?

20   A.        Yes.

21   Q.        So you're telling me that

22   somebody could just be assigned to

23   PEMA without your knowledge?

24   A.        By all means.

25   Q.        Oh, they can be?

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

146

1  A.        Well --- well, yeah.

2  Q.        Okay.

3  A.        I mean.

4  Q.        I don't know how.  Just

5  tell me how.

6  A.        Let me just clarify this,

7  okay?

8  Q.        Yeah, right.

9  A.        Initially, BESO, PEMA, the

10  emergency management thing, did not

11  come under the responsibility of the

12  Deputy Commissioner of operations.

13  That changed probably halfway

14  through my tenure when Colonel

15  March retired.  That came under his

16  area.  So I would not necessarily

17  have any knowledge as to who

18  actually was on, who manned those

19  cells, specific information as to

20  who manned those cells during that

21  time when Colonel March was there,

22  and, in fact, really not --- not

23  really while I was there other than

24  Captain Davis from BESO.  I mean, it

25  just --- I had no need to know

147

1  that.  That's all.  That's like I

2  don't know who is assigned to every

3  station.  I don't know who is

4  assigned to every LCE office.  I

5  just don't know.

6  Q.        You know, there's no use

7  in my wasting your time with

8  questions if you have no knowledge

9  of Captain Ober ever being part of

10 any PEMA team or having any

11 PEMA assignment, is there?

12 A.        No, I don't know if he

13 did.  He may have.  I just don't

14 know.

15 Q.        Well, let's make sure the

16 record is clear and wrap it up and

17 save us a lot of time here.  You as

18 you sit here today have no

19 recollection of Captain Ober ever

20 being a member of any --- ever

21 having a PEMA assignment?

22 A.        You know, I don't know.

23 The only thing I can to clarify

24 things, is I can say that I think he

25 wanted to go, had applied for a

148

1  position at PEMA, is my

2  understanding.

3  Q.        Where did you get that

4  understanding?

5  A.        I'm not sure.

6  Q.        Did you ever talk to

7  Castlenick about it?

8  A.        And it might have been.

9  It might have been BESO.  I don't

10  know.  I just don't know.  I just

11  don't know.  And I don't know

12  whether Captain Ober ever had a

13  position there.  He very well could

14  have.  I just don't know.  I don't

15  know whether it was or whether he

16  was just applying to become part of

17  the PEMA cell.  I don't know.

18  Q.        Well, I have a note here.

19  Can I read it to you?

20  A.        Please.

21  Q.        After serving on PEMA for

22  over five years on March 10, 2000,

23  just one day after a newspaper

24  article appeared in the local paper,

25  Harrisburg down here, that discussed

149

1  Ober's defeat of the Washington

2  transfer, Ober was removed from the

3  PEMA position.  Do you know anything

4  about that?

5  A.        No, I didn't ---.

6  Q.        How or why or what for or

7  anything about it?

8  A.        No, I do not.  I'm sorry.

9  I do not.  In fact, I couldn't have

10  told --- I wouldn't --- I can't

11  argue the fact that he was or was

12  not there.  I just don't know.  I

13  have no knowledge.

14  Q.        All right, sir.  If you

15  --- that's a --- provided it's an

16  honest thorough answer and I'm not

17  questioning you then I ---.

18  A.        I mean, if you have some

19  other information we can clarify it,

20  but I could not sit here and tell

21  you that I knew that Darrell Ober

22  was there for five years.

23  Q.        Well, if somebody wanted

24  to serve on PEMA, would you turn ---

25  is this a sought-after position?

150

1    A.         I don't know that.

2    Q.         You don't --- apparently

3    you didn't pay much attention to

4    PEMA.  I mean, don't take that

5    wrong.  You're a very busy man with

6    tremendous responsibilities and I

7    understand that, so I don't mean

8    that in a negative way.

9    A.         Uh-huh (yes).

10   Q.         But it's just not the kind

11   of thing you had time to spend much

12   time on apparently?

13   A.         No, my involvement there

14   was pretty much --- BESO pretty much

15   took care of that, okay.

16   Q.         Who's in charge of BESO?

17   A.         Well, there's a Major

18   there.

19   Q.         Who's that?

20   A.         At the time, it was Major

21   Washington.

22   Q.         Major Washington?

23   A.         Right.

24   Q.         Oh.

25   A.         The only involvement I had

151

1  really was if --- if the --- if an

2  emergency had occurred, okay, and

3  the PEMA cell was activated, the

4  commander at the PEMA cell would

5  call me and tell me that they were

6  activated and let me know what the

7  situation was and what was being

8  done.  It was strictly an advisory

9  thing.  But I --- see, I don't know

10  if anything ever came across my desk

11  asking permission to assign someone

12  to PEMA.  I don't know if I've ever

13  seen anything like that.

14  Q.        Five years, Ober served on

15  PEMA under you.  You're aware of ---

16  you have no recollection of him,

17  just none.  Just none?

18  A.        No, first of all, it

19  wasn't five years so don't misread

20  that in.  It was just probably a

21  year and a half, after George March,

22  Colonel March, retired that that

23  would have come under me.

24  Q.        How long ago was that?

25  A.        But let me tell you

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

152

1  something, there are Troopers around

2  that had assignments for 25 years

3  that I never knew had that

4  assignment.

5  Q.        Yeah.

6  A.        And that comes under my

7  area of command.  I just didn't have

8  any knowledge of it.  That's all.

9  Q.        Did Ober ever approach you

10 or express any interest to you about

11 PEMA, write you a letter, any memo

12 reach your desk, anything of that

13 nature?

14 A.        Not to me.

15 Q.        And you never had any

16 discussions with Major Washington

17 about it.  Is that correct?

18 A.        No, I don't recall.  Could

19 have.  Major Washington come in here

20 and tell you, oh, I had this on

21 such-and-such a day, you know, I'm

22 not sure I would say he was wrong.

23 I just don't remember.

24 Q.        Do you know whether

25 Commissioner Evanko personally

153

1  played any role in Mr. Ober not

2  having a PEMA assignment?

3  A.       I would be surprised if he

4  did.

5  Q.       Okay.  How about --- how

6  about Colonel Coury, do you know if

7  he played any role?

8  A.       I would be surprised there

9  also.

10  Q.       What does the ---?

11  A.       Actually it comes under my

12  area of responsibility and that's a

13  ---.

14  Q.       I know that.

15  A.       I understand.

16  Q.       But, sir, I'm asking you

17  some questions and I happen to know

18  --- I have background here,

19  obviously I'm not here to testify

20  today.

21  A.       I understand.

22  Q.       But I'm asking you

23  questions after a little bit of

24  research.

25  A.       Well, correct me if I'm

154

1  wrong.

2  Q.        I don't know.  It's not

3  right for me to do that.

4  A.        Tell me if I'm wrong,

5  because I want to straighten it

6  out.

7  Q.        I agree it's under your

8  jurisdiction as far as I know.  Let

9  me ask you, how is the front office

10  defined in State Police parlance?

11  Who's in the front office?

12  A.        That's the Commissioner's

13  office.

14  Q.        Okay.  Do you know whether

15  Major Washington had appointed Ober

16  back to PEMA, and then had that

17  decision overturned by the front

18  office?  Do you know anything about

19  that?

20  A.        I don't know anything

21  about that.  Okay.  Well, maybe I do

22  know something about that.

23  Q.        Think back on it.

24  A.        Oh.

25  Q.        Take a minute and try to

155

1   go back in your mind and see what

2   you can tell us, okay.

3   A.        Well, tell me more.

4   Q.        I can't tell you

5   any more.  I'm not allowed to.  Your

6   attorneys will kill me.

7   A.        Well, I'm trying to get a

8   recollection here.  I don't --- I

9   can't --- I could not have sit here

10  and told you that Captain Ober was

11  assigned to a PEMA cell.  I didn't

12  --- I just did not know that.

13  Q.        Okay.  Fair enough.

14  A.        Seems to me, though, that

15  I did know that he was wanting a

16  position with it.

17  Q.        Let's start there.

18  A.        Okay.

19  Q.        Let's start there.

20  A.        You're indicating I'm

21  incorrect in that, but that's just

22  my ---.

23  Q.        No, no, I think he was

24  there.  I think he was taken off of

25  there.  I think he wanted to go

156

1   back.   I think he wanted.   I think

2   he was ambitious to do it.

3   A.          Oh ---.

4   Q.          I think he was qualified

5   and I think he was put back on there

6   and I think somebody in the front

7   office axed it.   That's what I

8   think.

9   A.          I don't ---.

10  Q.          There.   If your attorneys

11  want to jump on that, they can.

12               ATTORNEY REYNOLDS:

13               I'm only going to

14               object, because that's a

15               statement.

16               ATTORNEY BAILEY:

17               See.

18               ATTORNEY REYNOLDS:

19               And not a question.

20               ATTORNEY BAILEY:

21               I agree.   I agree.

22               ATTORNEY REYNOLDS:

23               To the extent it may

24               not state what we believe

25               are the facts.

157

<u>ATTORNEY BAILEY</u>:

See what you got me

into, see what you did.

A.        I'm just trying to help.

I'm trying to clarify facts.

<u>BY ATTORNEY BAILEY</u>:

Q.        I know.  I just don't like

putting ideas in your head.  Tell me

what you want.

A.        Certainly, if it helps

clarify, I want to be factual.

Q.        All right.  Okay.

A.        I did not know that

Captain Ober was assigned to PEMA.

I have some recollection that I was

asked if he could be put onto PEMA.

And I'm not sure why I would have

been asked that, because that's not

something normally that I would do.

Q.        Right.  As you've told

us.  I understand that's something

that - - -.

A.        You know, that's something

- - -

Q.        Right.

158

1  A.        --- that would have been

2  done at the bureau level.

3  Q.        Right.

4  A.        So I don't know where to

5  go with it from that.  Did I answer

6  your question at all?

7  Q.        Yeah.  Well ---?

8  A.        I seem to lose sight ---

9  lost sight of the question, I guess.

10 Q.        You have a vague

11 recollection, right?

12 A.        Not that he was on it, but

13 that he was asking to be put on it.

14 Q.        All right.  So you don't

15 have recollection of his ever having

16 been there.  You do have a

17 recollection of him making a

18 request.  Do you know if indeed he

19 was denied or turned down, can you

20 tell us why that would have

21 happened?

22 A.        Again, see, I don't --- I

23 just don't remember.  I don't --- I

24 just don't remember making a

25 recommendation.  I very well could

159

1   have.

2   Q.        One way or another?

3   A.        One way or another.  In

4   fact, if I'm thinking I probably

5   would have recommended not but, see,

6   I don't know.

7   Q.        Why?  Why would you

8   recommend not?

9   A.        Well, the reasons ---

10  well, the reasons --- well, here's

11  why I'm confused here.

12  Q.        Yeah.  Yeah.

13  A.        Because the reasons that I

14  would do that are somewhat a little

15  bit inconsistent, because had he

16  been there for five years, okay?

17  Q.        Yeah.

18  A.        The reason I would not

19  have recommended him for that

20  position would have been his lack of

21  his operational skills.  Okay?

22  Q.        So it could be after five

23  years he's become not ---?

24  A.        Yeah, but since you're

25  telling me he's been there for five

160

1  years.

2  Q.        Qualified?

3  A.        It's not consistent.

4  That's why I have the confusion.

5  Q.        Oh, I see.

6  A.        Do you understand what I'm

7  saying.

8  Q.        Yeah, but if you ---?

9  A.        But certainly if he had

10  been there for five years, he would

11  have been qualified to be there,

12  unless somebody has knowledge that

13  he didn't do a good job there, which

14  I don't have that knowledge.  But if

15  I were to not recommend him for a

16  position there, it would have been

17  because of his non-operational

18  experience, you see, but that would

19  not be consistent if he had been

20  there for five years.  So that's

21  what has me confused, but anyway I'm

22  trying to be honest here and

23  factual.  Okay.

24  Q.        I appreciate that.

25  A.        Okay.

161

1   Q.        I appreciate that and the

2   front office, and we know apparently

3   it wasn't you, it wasn't you or you

4   don't have recollection of it, but

5   that would leave Colonel Fikus,

6   Colonel Coury, and Commissioner

7   Evanko to say not yet, you can't go

8   to PEMA.   Right?

9   A.        I would ---.

10  Q.        Or if he was even put on

11  there by Washington to actually take

12  him off to punish him.   I mean ---?

13  A.        Well, see, I don't know if

14  that happened, sir.

15  Q.        You don't know if that

16  happened?

17  A.        I don't know.

18  Q.        Okay.

19              THE VIDEOGRAPHER:

20              Excuse me.  We need

21          to change tapes.

22              ATTORNEY BAILEY:

23              Okay.

24              THE VIDEOGRAPHER:

25              It's 3:32 p.m. It's

162

1          the end of tape one of

2          Joseph Westcott.

3   (SHORT BREAK TAKEN).

4                    ATTORNEY BAILEY:

5          Okay.  Ladies and

6          gentlemen, please be

7          advised the recording

8          device is in operation.

9                    THE VIDEOGRAPHER:

10          It's January 7th,

11          2002, this is tape two, of

12          the deposition of Joseph

13          Westcott.

14   BY ATTORNEY BAILEY:

15   Q.          Okay.  Colonel Westcott,

16   we're back on the record.  I want to

17   go back to this IIMS this system

18   integration project.  You say you

19   don't know anything about that?

20   A.          Very little, sir.

21   Q.          Do you know anything about

22   a bicentennial book committee?

23   A.          No, I don't --- I knew

24   there was one, but I had no

25   involvement.

1   Q.        Do you know if being

2   involved in that would be a position

3   of prestige or honor?

4   A.        I just don't know.

5   Q.        You don't have any

6   interest in it?

7   A.        It wasn't in operational.

8   Q.        What about the idea of

9   collecting the State Police

10  memorabilia, do you know anything

11  about that?

12  A.        Don't know anything about

13  it.  I mean, I know the museum's

14  trying to do it, but other than

15  that, that's ---.

16  Q.        Ever have any discussions

17  with Colonel Coury about that?

18  A.        No.  I shouldn't say no.

19  I mean, other than that that museum

20  came under him.  He said we're out

21  trying to get stuff.

22  Q.        Let me be more ---.

23  A.        And so on and so forth

24  like that.

25  Q.        I'm sorry.  Let me be more

164

1  specific.  Did you have any

2  discussions with Colonel Coury where

3  Mr. Ober came into the discussion

4  about the issue of memorabilia of

5  Pennsylvania State Police?

6  A.          I don't recall.  I can't

7  say it didn't, but I don't recall.

8  Q.          Do you know an

9  LCE officer named Wilson or

10 Christianson, either one of those

11 two?

12 A.          I'm not sure I know Wilson

13 but I do know Christianson.

14 Q.          Who's the bureau of

15 technology services?

16 A.          I think that comes under

17 Colonel Fikus.  That has to do with

18 the --- all of the commuters and

19 that sort of thing.

20 Q.          Do you know why LCE with

21 your authority would send those

22 folks over to detach them over to

23 BPTS?

24 A.          Probably because they

25 asked for them to be on some sort of

165

1  project action team would be my

2  guess any way.

3  Q.        Well, they weren't short

4  people or anything over at LCE or

5  were they?

6  A.        Well, everybody's short

7  people.  But you try and do --- it's

8  an important project for the

9  department, so you try to suck it up

10  where you have to so they have the

11  tools they need to get it done.

12  Q.        I see.  Do you have a

13  recollection of Major Castlenick

14  recommending and approving Ober's

15  request to attend training in

16  Washington, DC, the national alcohol

17  education symposium and you turning

18  it down?

19  A.        I don't.

20  Q.        Can you tell us why you

21  did that?

22  A.        I don't remember doing

23  that.

24  Q.        Why would you do that?

25  A.        I'm not sure why I would

166

1   do that.  If he was assigned LCE,

2   would --- I'm not sure.  No, the

3   only reason you do --- you know,

4   unless there's some fiscal concerns

5   which I don't believe there were,

6   the only reason you would do that is

7   if it was not pertinent to his job

8   at hand.

9   Q.        Not pertinent but it was

10  approved ---?

11  A.        But if he's assigned to

12  LCE you've got to give him the tools

13  to do the job so I'd be surprised if

14  I said no.

15  Q.        Well, you did.  I can tell

16  you you did.

17  A.        I don't recall.

18  Q.        He's approved by

19  Castlenick.  It's sent over by the

20  bureau.

21  A.        I don't know why I did

22  that.

23  Q.        Okay.

24  A.        Did I --- did I give a

25  reason for that?  I don't remember

167

1    doing that, I'm sorry.

2    Q.         Well, we believe we know

3    the reason but that would, you know,

4    do you know why if it was approved

5    one year and not the next?

6    A.         What?  I don't know what

7    conference it was.

8    Q.         Was Ober singled out,

9    sir?  Was he singled out?

10   A.         No, I told you before ---.

11   Q.         He was never singled out

12   for anything, right?

13   A.         Certainly not, you know.

14   Q.         All right.  Okay.  Give me

15   30 seconds.  I got some FBI ---

16   group of FBI questions I think I've

17   been through them already.  Let me

18   check.

19   A.         Okay.

20   Q.         Were there any --- was

21   there any investigation into the,

22   you know, the public corruption

23   thing that the FBI was looking

24   into?  Was there any investigation

25   done on that by the Pennsylvania

168

1   State Police?

2   A.          I don't know that.  Could

3   be.

4   Q.          Who assigns investigations

5   to the organized crime division?

6   A.          Oh, that could --- their

7   request for an investigation could

8   come from anywhere.  Probably if

9   they were doing something there BTS

10  would help them out.  That would be

11  my speculation.  I would not

12  necessarily know about that.

13  Q.          Do you know what happened

14  to Trooper Stanton?

15  A.          I do not.

16  Q.          Have you ever been

17  assigned to the organized crime

18  division?

19  A.          I was.

20  Q.          And in what --- what

21  Deputy Commissioner has authority

22  over OCD?

23  A.          That comes under the

24  bureau of criminal investigation

25  which comes under Dep ---.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

169

1  Q.        That's you, isn't it?

2  A.        That's me.

3  Q.        And you don't know whether

4  that was ever --- that

5  investigation, the underlying

6  political corruption case, was ever

7  assigned to the organized crime

8  division, had ever been there

9  whether an associated case could

10  have?

11  A.        I don't know.

12  Q.        You don't know anything

13  about it?

14  A.        I don't know.  It may have

15  been there.  It certainly wouldn't

16  surprise me if it was.  Oftentimes

17  BCR goes to other divisions to help

18  them out, and FBI to help them out

19  with an investigation,

20  surveillances, whatever they are.

21  But that doesn't necessarily mean I

22  in my position would have had

23  knowledge of that.

24  Q.        In investigating Ober and

25  what had happened with the FBI

170

1   coming to the Pennsylvania State

2   Police, wasn't it important to know

3   what the underlying political

4   corruption case was about to see

5   whether Ober had some reason for

6   doing what he did?

7   A.          It was --- it was my

8   understanding that that was all over

9   till we even found out about it.

10  Q.          Well, you know, that's all

11  --- well, we'll save that for a

12  later time.

13  A.          I don't know.

14  Q.          Let me ask you, well, let

15  me ask, why didn't you just bring

16  Ober in and just sit him down and

17  say, hey, what's this about or

18  what's --- I mean, if you felt

19  strongly about this thing with

20  Conley and Fikus, why not call both

21  of them in, or at least call Ober in

22  and say, hey, what's going on?

23  A.          Well, not --- not my job.

24  Q.          Yeah.

25  A.          Okay.  I mean, Ober was

171

1   not under my area of command.  It

2   would have been improper for me to

3   ask him to come up and see me.  It

4   would have been improper for me to

5   chastise him.  If that was a proper

6   thing to do.

7   Q.          Was it proper for you ---?

8   A.          It just would have been

9   improper for me to do that and I

10  wouldn't do that.

11  Q.          Was it proper for you to

12  handle the assignment of the two

13  investigators?

14  A.          It would be ---.

15  Q.          That's not your area, is

16  it?

17  A.          Oh, absolutely, because

18  they were operational.  The BPR did

19  not come under me.  They're area

20  commanders.  They worked under the

21  law enforcement section.

22  Q.          I know they're area

23  commanders for the normal process,

24  but for this inquiry, what are you

25  avoiding BPR?  Were you avoiding

172

1    ---?

2    A.        We don't know if there's

3    violations of anything.  And

4    BPR kicks in when there's

5    violations.

6    Q.        You didn't know that there

7    were violations of anything?

8    A.        To my knowledge.

9    Q.        Isn't that what you just

10    said?

11    A.        To my knowledge.  I still

12    don't know if there were any

13    violations of department rules and

14    regulations involved.

15    Q.        Okay.

16    A.        Let me ask you, was a

17    BPR investigation ever completed?

18    Q.        Sir, I --- I --- if it

19    weren't during deposition, I'd take

20    some time and answer that and some

21    of my concerns, but it would be like

22    being on a soap box or something.

23    I'd probably bore you to death so I

24    won't.  And I'm sure I'd bore you to

25    death and I don't mean to avoid your

173

1   question.

2           Do you know how Mr. Fikus

3   came to be Lieutenant Colonel in the

4   Pennsylvania State Police?  Because,

5   you know, I think it's common

6   knowledge he wasn't recommended by

7   Colonel Evanko, was he?

8   A.          I don't know that.

9   Q.          You don't know that?

10  A.          No.

11  Q.          Do you know who his

12  political patrons are?

13  A.          No, I didn't.

14  Q.          Or who suggested he be in

15  that position?

16  A.          No idea.  No idea.

17  Q.          Do you know whether

18  Commissioner Evanko has some

19  political fear or some fear of

20  Lieutenant Colonel Fikus?

21  A.          I don't know that.  You

22  have to ask him.

23  Q.          Do you ever get involved

24  in the politics of the Pennsylvania

25  State Police at all?

174

1    A.        I do my very best not to.

2    Q.        Okay.  Disciplinary

3    process in the Pennsylvania State

4    Police, can you tell us normally,

5    let's say an --- excluding a

6    criminal investigation into

7    allegations whether from inside or

8    out of the organizations of criminal

9    misconduct, one of the things we

10   know here, there's no question,

11   there's no issue here of criminal

12   misconduct at all.  So we're talking

13   about some horse of a different

14   color and we're sort of trying to

15   pin down exactly what it is, and you

16   may know.  You may be able to

17   describe a particular species

18   involved and we're having a problem

19   with it.

20           Now, the disciplinary

21   process, how does it work?  How does

22   it begin?  Remember I had some

23   questions of Mr. Wertz and we talked

24   about complaints and that sort of

25   thing.  And we know here the piece

175

1  of paper that was given, the notice

2  of inquiry that was given to Captain

3  Ober, it said that the office of

4  chief counsel was Xed out which is

5  normally what goes on the form and

6  the Commissioner was put in there.

7  Now, Mr. Wertz had never seen a form

8  --- he wasn't used to that.  You

9  may know more about it.  Well, you

10 may not ---?

11 A.        I don't.

12 Q.        And that's why I want to

13 ask.

14 A.        I don't.  I don't.

15 Q.        All right.  From your 31

16 years of experience, how is a

17 disciplinary, how is the or a

18 disciplinary process initiated

19 within the Pennsylvania State

20 Police?

21 A.        Well, there's no

22 disciplinary implemented until an

23 investigation is conducted.  That

24 investigation is if there's any

25 allegation of wrong doing.  That

176

1  Complaint is referred to the bureau

2  of professional responsibility.

3  It's either done by having the

4  complainant go directly to them, or

5  there's a form that whoever receives

6  that information can fill out,

7  forward to BPR. At that point BPR

8  either assigns an investigator

9  either one of their own or asking a

10 troop command to do, to assign an

11 investigator to it. At that point,

12 an investigation is conducted. When

13 it's done to the satisfaction of the

14 people in BPR, it is --- the

15 investigation I guess is in --- is

16 forwarded then to the appropriate

17 commander who makes an

18 adjudication. If discipline is

19 appropriate, he issues the required

20 paperwork. And it then goes to a

21 department disciplinary officer.

22 And I guess he decides what the

23 discipline is pertinent. That's a

24 general overview and I probably

25 should not be any more specific than

177

1  that because I don't --- you know,

2  I'm not that familiar with it.

3  Q.        Don't know.  Well, when

4  you met with Captain --- I'm sorry,

5  when you met with Commissioner

6  Evanko now regardless of any

7  differences anyone would have with

8  Commissioner Evanko about anything,

9  no doubt about his intelligence,

10 you'd agree with that?

11 A.        Absolutely.

12 Q.        Rather bright man.  Now,

13 you had a meeting with him or had

14 meetings after this thing came up

15 about Ober and Fikus, informing him

16 late.  What --- did he indicate what

17 he thought these guys might have

18 done wrong, particularly Mr. Ober?

19 I mean, we know they didn't tell him

20 which personal offensive.  I'm sure

21 that was personally offensive.  But

22 aside from that if indeed he even

23 --- you know, I'm not saying that

24 he even indicated a personal

25 feeling, what did these guys do

178

1  wrong?  I mean, what did Ober do

2  wrong?  What was the ---?

3  A.          I don't know and as you

4  heard ---.

5  Q.          You didn't know at the

6  time?

7  A.          As you heard Major Wertz

8  ---

9  Q.          Yeah.

10  A.          --- we weren't out looking

11  to see if anybody did anything

12  wrong.  We were out looking to see

13  what all the attendant facts were

14  and then bring those facts to the

15  attention of the Commissioner and he

16  can make those decisions based on

17  those, whatever he wants to decide.

18  Q.          Okay.  So being sent to

19  Washington was not a punishment at

20  least to the best of your knowledge,

21  correct?

22  A.          That certainly was not

23  motivated on my part that way.

24  Q.          Being removed from PEMA,

25  or not permitted to get back on

179

1    PEMA, or not be permitted to even

2    participate in PEMA regardless of

3    what the underlying scenario is and

4    you said you don't know?

5    A.        And I don't know, true.

6    Q.        And you don't know, but to

7    the best of your knowledge or belief

8    that was not a punishment for

9    anything?

10   A.        Well, you know, I can't

11   comment, because I don't know.  I

12   don't know what the circumstances

13   were.

14   Q.        All right.  IIMS, being

15   removed from it, not being allowed

16   to participate in it, was not any

17   kind of a punishment or discipline

18   in any way, right?

19   A.        No, no, it had nothing to

20   do with that.

21   Q.        Being assigned to LCE was

22   not a punishment or discipline in

23   any way, right?

24   A.        No, it's my understanding

25   that was required.

180

1  Q.        Young was a Captain when

2  he was sent out to Washington,

3  right?

4  A.        I'm not sure.

5  Q.        You're not sure.

6  A.        You had said earlier that

7  he was a Lieutenant.

8  Q.        I thought he was.

9  A.        And I ---.

10 Q.        But it's not me.

11 A.        I'm not sure.

12 Q.        It's what you recollect.

13 It's what you say that counts not

14 me.

15 A.        I don't know.  I mean, I

16 could stand to be corrected.  He

17 could have been a Lieutenant.  He

18 could have been a Captain.  I don't

19 remember when he made rank.

20 Q.        Washington, DC, and being

21 disallowed the training down there

22 was not retaliation or punishment,

23 right?

24 A.        What Washington, DC?

25 Q.        The training for the

181

1    alcohol symposium?

2    A.        Oh.

3    Q.        He was at LCE and they had

4    done that training and they

5    continued I guess, but he was

6    disallowed?

7    A.        I don't remember.

8    Q.        But you don't remember so

9    you can't say.

10   A.        I just don't remember the

11   circumstances.

12   Q.        Being --- in your view he

13   was not investigated because there

14   was a desire to teach him a lesson,

15   get back at him or stigmatize him,

16   is that right?

17   A.        I'm sorry?

18   Q.        Investigating Captain Ober

19   or investigating whatever polite

20   euphemism is used to describe it,

21   the investigation or inquiry into

22   the affairs or the conduct of

23   Captain Ober in regards the

24   FBI probe was not done to stigmatize

25   Captain Ober in any way, correct,

182

1  sir?

2  A.        No, it's my understanding

3  it's to find the facts.

4  Q.        Just ---?

5  A.        That's my instructions

6  find out what they are and report

7  them to the Commissioner.

8  Q.        Now, out of those facts,

9  did somebody come up in the

10  investigation that the regulations

11  of the Pennsylvania State Police did

12  not address the need for some sort

13  of regulation defining the chain of

14  command and what somebody's supposed

15  to do when they learn something or

16  whatever?

17  A.        I have no idea, sir.  I

18  don't.

19  Q.        Okay.  Now, Colonel, let

20  me ask you about that last thing

21  just one --- or a couple of

22  additional questions.  On the --- is

23  there a chain of command regulation,

24  do you know?

25  A.        I don't.  I don't know

183

1  that.

2  Q.        Okay.  See, I've never

3  seen one.  Even in the Army I've

4  never seen one.

5  A.        I'm not sure I have

6  either.

7  Q.        Do you know why there

8  isn't anything?

9  A.        It's sort of the way I was

10 raised on the department.

11 Q.        Yeah, I know, I understand

12 the way you're sort of raised, but

13 do you know of any military

14 organization or any police

15 organization that has a strict chain

16 of command regulation?

17 A.        I don't.  I don't know.

18 Q.        Do you know whether

19 accreditation with the national ---

20 or any national organizations

21 require a chain of command

22 regulation?

23 A.        I don't know.

24 Q.        Do you think there should

25 be a chain of command regulation

184

1  which says to an underling out there

2  you shall only report to your

3  immediate superior and shall not

4  talk to anybody else about a matter

5  of importance to Lord knows I don't

6  know how you're supposed to decide

7  these things, but do you think

8  something like that's a good idea?

9  A.          No, I don't.  I don't

10  think so.

11  Q.          Either do --- neither do

12  I.  Regulation AR --- is it 1.102

13  C?  Am I saying that right, 1.102 C,

14  are you familiar with that?

15  A.          No, if I could read it

16  perhaps but ---.

17  Q.          No, that's okay.  I don't

18  want to --- that's not fair to you.

19  If you're --- you're retired since

20  July of?

21  A.          2000.

22  Q.          2000, is that it?  2000?

23  A.          Yeah, a year and a half

24  ago.

25  Q.          Yeah, I'm sorry.  Do you

185

1  know whether Darrell Ober was

2  removed from the bicentennial book

3  committee as a, you know, who

4  removed him from there and why that

5  was done?

6  A.       I'm sorry, I don't know.

7  No knowledge at all.

8  Q.       Do you know whether in

9  September of 1999 Mr. Conley barred

10 Ober from attending an internal

11 affairs division meeting?

12 A.       No knowledge at all.

13 Q.       Have you ever heard about

14 that before?

15 A.       Didn't even hear about it

16 until just now.

17 Q.       Do you think a Trooper

18 Jorge, J-O-R-G-E, Jorge or --- I

19 don't know how they're pronouncing

20 it, does that mean anything to you?

21 A.       No.

22 Q.       An internal affairs

23 division where a Captain Brown

24 investigated a Trooper, Trooper

25 J-O-R-G-E?

186

1    A.        No, I don't.

2    Q.        Doesn't strike a

3    responsive cord?  Now, Captain Ober

4    was where when the decision was made

5    on January 7th, 2000, by the

6    Commissioner to send him to

7    Washington?  Where was he?  Where

8    was he?

9    A.        I don't know.  All I was

10   told and my only recollection is

11   that I was told that he was

12   available.  Where he was, I don't

13   know.  I know he was, I know he was

14   --- he was in BPR, and he was in

15   IIMS, but which one when, where, I

16   can't tell you that.

17   Q.        Now, here's internal

18   affairs division, bureau of

19   professional responsibility.  What

20   comes under internal affairs

21   division?  Is bureau of professional

22   responsibility one bureau, that's

23   just one bureau?

24   A.        Uh-huh (yes).

25   Q.        How many other bureaus are

187

1  under IAD?

2  A.        No, no, BPR is the

3  bureau.   IAD is the division.

4  Q.        Okay.

5  A.        There's another division

6  of systems and provides review.

7  Q.        Okay.  So IAD if you're an

8  IAD member again we have these

9  things spread all over the record

10  and I don't want a judge getting

11  confused in reading this stuff, if

12  you're in IAD, BPR, are they the

13  same thing?

14  A.        Yes.

15  Q.        Yeah, same thing.  Well,

16  Lieutenant John Brown he gets

17  promoted to Captain when Ober gets

18  sent out to Washington, right, or am

19  I wrong about that?

20  A.        I don't know that.  I

21  mean, I just don't know that.  See,

22  BPR didn't come under me, so I

23  didn't --- I didn't have any

24  knowledge of that or didn't have any

25  need to know that.  That was Colonel

188

1  Coury.

2  Q.        All right.  Let me go back

3  over that.  You don't know if ---

4  you --- somebody told you Ober was

5  available.  Do you remember who told

6  you Ober was available?

7  A.        I --- it could have been

8  Colonel Fikus.  Could have been

9  Colonel Coury.  Could have been

10  Colonel Evanko.  I don't know.

11  Q.        Well, here it is now.

12  Here's February 14th.  Lieutenant

13  David Young bureau of criminal is

14  assigned as special projects officer

15  assisting the commander area three.

16  The assignment of Captain Darrell

17  Ober of special projects officer

18  commander area three is rescinded.

19        Well, now look here.  On

20  January 7, it looks like Darrell

21  Ober is director of the internal

22  affairs division BPR.  And then he's

23  pulled out of that.  Somebody else

24  is put in.  And he's sent out there

25  to Washington.  And then that's

189

1    rescinded.  So I wonder what

2    available meant.  You don't know

3    when somebody said he was available?

4    A.        I don't.

5    Q.        You don't know what

6    availability meant?

7    A.        No, I don't.

8    Q.        Now, he's assigned to the

9    bureau of liquor control officer, to

10   a Lieutenant's position as central

11   section commander operations

12   division, and that is on a February

13   14th department directive from the

14   Commissioner, from the boss.  The

15   boss sent him to LC.  Okay.  That's

16   all right.  Okay.  Let me do one

17   final check.

18                  ATTORNEY BAILEY:

19                  Do you two have any

20               questions?

21                  ATTORNEY REYNOLDS:

22                  I have.

23                  ATTORNEY BAILEY:

24                  Why don't you go

25               ahead and I'll step out

190

1           with Darrell whenever

2           you're finished.

3   EXAMINATION

4   BY ATTORNEY REYNOLDS:

5   Q.          Okay.  You indicated,

6   Colonel Westcott, that you didn't

7   have any independent recollection of

8   turning Captain Ober down for a PEMA

9   assignment, is that correct?

10                  ATTORNEY BAILEY:

11                  Incidentally for the

12              record, this is Joanna

13              Reynolds.  Okay.

14  A.          No, I --- no, I don't.

15  BY ATTORNEY REYNOLDS:

16  Q.          And you indicated that you

17  don't know who, if anyone, in the

18  front office, meaning of the

19  Defendants here, Colonel Coury or

20  Colonel Evanko, would have turned

21  him down for a PEMA assignment if,

22  in fact, that happened; is that

23  correct?

24  A.          I don't know if any of

25  those would have.

191

1    Q.        Do you know then if anyone

2    was seeking to punish him by turning

3    him down for a PEMA assignment?  If

4    you don't know who did it, would you

5    have any knowledge as to what the

6    intent was to punish him?

7    A.        Not to PEMA, no.

8              ATTORNEY REYNOLDS:

9              I think that's all I

10             have.

11             ATTORNEY BAILEY:

12             Okay.  If we could

13             hold on for just one

14             second.  In fact, I'm

15             going to leave the

16             equipment on, because I

17             think it's going to take

18             about ten seconds.  Okay.

19             So please don't talk among

20             yourselves instead of

21             shutting all this junk

22             down and turning it on in

23             ten seconds.  I think

24             we're about done.

25    (OFF RECORD DISCUSSION).

192

<u>ATTORNEY BAILEY</u>:

1    Colonel Westcott, I'd
2    like to express my
3    appreciation for you
4    coming here today and
5    answering questions.  I
6    understand you have quite
7    a drive.  I think I could
8    probably go on for about
9    another hour,
10   hour-and-a-half but I
11   think we're okay.  It's
12   four o'clock and I know
13   you had wanted to get
14   somewhere so you have some
15   daylight.  Thank you very
16   much.

18   A.    Okay.

19         <u>ATTORNEY BAILEY</u>:

20         I appreciate your
21   cooperation, sir.  Thank
22   you, sir.

23         <u>THE VIDEOGRAPHER</u>:

24         I'll shut this down.

25         <u>ATTORNEY BAILEY</u>:

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

193

1          Yes.

2          THE VIDEOGRAPHER:

3          The time is a little

4     different from yours.

5     4:04 p.m., the deposition

6     of Joseph Westcott is

7     concluded.   Thank you.

8          ATTORNEY BAILEY:

9          Thank you.

10          *  *  *  *  *

11    DEPOSITION CONCLUDED AT 4:04 P.M.

12          *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

1  COMMONWEALTH OF PENNSYLVANIA)

2  COUNTY OF CAMBRIA              )

3                C E R T I F I C A T E

4      I, Denise J. Khorey-Harriman, RMR, a Notary

5  Public in and for the Commonwealth of Pennsylvania,

6  do hereby certify:

7      That the witness was first duly sworn to testify

8  to the truth, the whole truth, and nothing but the

9  truth; that the foregoing deposition was taken at the

10 time and place stated herein; and that the said

11 deposition was taken stenographically by me and

12 reduced to typewriting, and constitutes a true and

13 correct record of the testimony given by the witness.

14     I further certify that the reading and signing

15 of said depositions were (not) waived by counsel for

16 the respective parties and by the witness.

17     I further certify that I am not a relative,

18 employee or attorney of any of the parties, nor a

19 relative or employee of counsel, and that I am in no

20 way interested directly or indirectly in this action.

21     IN WITNESS WHEREOF, I have hereunto set my hand

22 and stamp this 22 day of _____ .

23

24

25

NOTARIAL SEAL
Denise Jeanne Khorey-Harriman, Notary Public
Johnstown, Cambria County, PA
My Commission Expires Mar. 7, 2005

· PITTSBURGH, PA
· CLEARFIELD, PA
· STATE COLLEGE, PA
· HOLLIDAYSBURG, PA
· ERIE, PA
· OIL CITY, PA
· HARRISBURG, PA
SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA 15901
(814) 536-0000
· INDIANA, PA
· GREENSBURG, PA
· PHILADELPHIA, PA
· SOMERSET, PA
· WILKES-BARRE, PA
· CHARLESTON, WV

SP 3-200 (2-89)



**PENNSYLVANIA STATE POLICE**
DEPARTMENT DIRECTIVE

AR 4-25
9/2/93

*See SO. 98-69,
dated, 06-09-98*



*See Subject CLEAN
Message, dated 09·17·93*

*See Special Order
95·82, dated 05·12·95.*

**SUBJECT:    INTERNAL INVESTIGATIONS**

*See Special Order
98-22, dated 03·05·98.*

**25.01    AUTHORITY**

The Bureau of Professional Responsibility (BPR), Internal Affairs Division, is authorized to recommend to the Commissioner policies and procedures to initiate, conduct and/or control all necessary investigations, and to process all complaints or allegations of misconduct by personnel. Members of the Bureau of Professional Responsibility, when performing Internal Affairs duties, are vested with the line authority of the Commissioner.

**25.02    PURPOSE**

The purpose of this regulation is to establish a prompt, fair, thorough, factual and impartial means to investigate complaints or allegations involving personnel.

**25.03    GOALS**

A.    <u>Protection of the Public</u>:  The public has the right to expect efficient, fair and impartial law enforcement. Any misconduct by personnel must be detected, thoroughly investigated and properly adjudicated to assure these goals.

B.    <u>Protection of the Department</u>:  The integrity of the Department depends on the personal integrity and self-discipline of all personnel. When an informed public knows that the Department honestly and fairly investigates and adjudicates all allegations of misconduct against its personnel, confidence will be promoted and public support will be enhanced.

C.    <u>Protection of Personnel</u>:  A thorough investigation of all allegations of misconduct serves to protect the integrity of personnel and will safeguard against false or malicious complaints.

ATTACHMENT_____**B**_____
-1-
PAGE_____ OF_____

D.   <u>Discovery of Unsatisfactory Performance</u>:  Personnel who demonstrate an inability to satisfactorily perform their duties must be identified for the protection of the public, the Department and its personnel.

25.04   DEFINITIONS

A.   <u>Administrative Action</u>:  Corrective action taken by command/supervisory personnel which may include the issuance of a Disciplinary Action Report (DAR), Form SP 3-336.

B.   <u>Administrative Investigation</u>:  Inquiries into alleged misconduct by personnel or any inquiry into the actions of Department personnel required by directives where no misconduct is alleged.

C.   <u>BPR Control Number</u>:  A sequential number assigned by the Internal Affairs Division to index all complaints and administrative investigations.

D.   <u>Bureau Register</u>:  A compilation of data indexing the initiation and processing of administrative investigations by BPR Control Number.

E.   <u>Complainant</u>:  A person with knowledge of an alleged incident of misconduct, or violation of a statute or Department directive, who brings the information to the attention of the Department.

F.   <u>Complaint</u>:  Any allegation of misconduct made against Department personnel.

G.   <u>Complaint Investigation</u>:  An administrative investigation which was initiated because of a complaint.

H.   <u>Full Investigation</u>:  An in-depth investigation in which all pertinent facts are gathered and are thoroughly and impartially reported in a General Investigation Report, Form SP 7-0025.

I.   <u>Limited Investigation</u>:  An investigation which is reported by Correspondence, Form STD-501, and clearly establishes that:

1.   The alleged misconduct failed to constitute a violation of Department rules and regulations.

-2-

AR 4-25
9/2/93

2. The complainant was mistaken and the misconduct alleged was not attributed to personnel.

3. The complaint appears to be as a result of official police action which was adverse to the complainant and alleges only a de minimus violation.

4. The complainant(s) refused to verify their complaint by signing a completed Complaint Verification Form and the nature of the complaint does not include allegations of criminal conduct or conduct which could reasonably be construed to result in a recommendation of court-martial by the Department Disciplinary Officer.

J. <u>Medical Treatment</u>: Care received at a recognized medical facility or from a licensed medical practitioner.

K. <u>Misconduct</u>: Any violation of the Pennsylvania State Police Code of Conduct or any other conduct which could reasonably be expected to destroy public respect and confidence in the Pennsylvania State Police.

L. <u>Non-Complaint Investigation</u>: An investigation into the actions of Department personnel as provided by directive or requested by the Office of Chief Counsel, and no misconduct is alleged.

M. <u>Performance Inadequacies</u>: Minor infractions of omission/commission by a member which violate a Department policy or regulation. Infractions of this type do not include conduct which involves compliance to lawful orders, the veracity of a member, criminal or civil liability, or publicity which may adversely affect the Department or its personnel.

25.05 COMPLAINT INVESTIGATION CATEGORIES

A. <u>Physical Abuse</u>: An allegation that an individual was physically mistreated or assaulted (does not include physical force investigations that are initiated by Department directive with no complaint).

-3-

AR 4-25
9/2/93

B. <u>Verbal Abuse</u>:  An allegation that profane or demeaning language was directed at the complainant or another person by personnel.

C. <u>Criminal Conduct</u>:  Any alleged violation(s) of federal, state or local statutes.

D. <u>Improper Conduct On Duty</u>:  Any alleged misconduct committed while on duty that, by its very nature, is demeaning to the professional image of the Department, and constitutes a violation of Department rules and regulations.

E. <u>Improper Conduct Off Duty</u>:  Any alleged conduct which could reasonably be expected to impact negatively upon the public's perception of the Department even though it occurred off duty.

F. <u>Dissatisfaction With Performance of Duty</u>:  An allegation that personnel failed to adequately perform or document a required or expected task, e.g., improper or incomplete accident or criminal investigations, failure to assist a disabled motorist, etc.

G. <u>Other</u>:  Allegations that are not easily categorized or identified as falling into a specific category, etc.

## 25.06    NON-COMPLAINT INVESTIGATION CATEGORIES

A. <u>Legal Intervention</u>:  Incidents when a member/enforcement officer, while in the course of their duties, intentionally involves a vehicle in a collision or establishes a roadblock which results in a collision, for the purpose of preventing the escape of a subject.

B. <u>Shooting Incident</u>:  Incidents when a member/enforcement officer discharges a weapon, including tear gas; another law enforcement officer discharges a weapon in the presence of a member/enforcement officer; or, a subject fires a weapon while a member/enforcement officer is present. Exceptions are listed in Section 25.10 E. 9.

C. <u>Physical Force Incident</u>:  Incidents when a member/enforcement officer uses physical force which results in death, or injury which requires medical treatment to any involved individual other than the member/enforcement officer.

-4-

D. <u>Attorney Work Product</u>: Investigations conducted at the request of the Office of Chief Counsel.

25.07   DISPOSITIONS

A.   <u>Complaint Investigations</u>:

1.   Sustained: Investigation indicates misconduct did actually occur.

2.   Not Sustained:   Investigation failed to conclusively prove or disprove the allegation.

3.   Unfounded:   Indicates that the incident did not or could not have occurred as alleged.

4.   Policy Void: Indicates that the action of the Department or the involved member(s) was consistent with Department policy, but the complainant still suffered harm.

5.   Withdrawn:   Indicates that the complainant refused to sign a Complaint Verification and the investigation was terminated or an investigation was otherwise concluded on advice of the Director, Bureau of Professional Responsibility.

B.   <u>Non-Complaint Investigations</u>:

1.   Justified:  The actions taken were within the guidelines, for the use of force under the existing circumstances, as established by the Department.

2.   Improper:   The actions taken exceeded the limits defined by the Department or by law for the use of force.

25.08   DUTIES AND RESPONSIBILITIES

A.   <u>Personnel</u>:   Personnel shall ensure that the confidentiality of all complaints is maintained in accordance with existing regulations.

B.   <u>Director, Bureau of Professional Responsibility</u>: The Director, Bureau of Professional Responsibility shall:

1.   Assign and coordinate all investigations required by this regulation. Depending on the

nature of the incident, the investigation may be conducted by a member of the Internal Affairs Division or assigned to a Commissioned Officer or noncommissioned officer of the Director's choice.

2.  Assist the Affirmative Action Officer in the investigation of affirmative action-related complaints upon request. Also, review other such complaints and investigations in consultation with the Affirmative Action Officer.

3.  Ensure that all investigations are conducted in a fair, prompt, thorough and impartial manner. Reports shall be completed in a timely manner and within established statutes of limitations per collective bargaining agreement.

4.  Retain supervisory responsibility for all investigations. Specific investigative procedures may be ordered if it is determined to be necessary, prudent or desirable.

5.  Furnish an acknowledgement of receipt, in writing, to the complainant. Refer to Appendage III.

6.  Provide a report, as requested, summarizing the Internal Affairs Division's activities, to the Commissioner/designee.

C.  <u>Director, Internal Affairs Division</u>: The Director, Internal Affairs Division shall:

1.  In the absence of the Director, Bureau of Professional Responsibility, assume all duties relative to the administration of the internal affairs function.

2.  Exercise supervisory control over all investigations assigned to members of the Internal Affairs Division.

3.  Ensure all investigations are conducted in a fair, prompt, thorough and impartial manner.

4.  Make the notifications to the Office of Chief Counsel as outlined in Sections 25.10 D. 1. and 25.10 E. 1.

AR 4-25
9/2/93

D.  Area Commanders/Bureau Directors:    The Area
    Commanders/Bureau Directors shall:

    1.  Review all investigative reports in a timely
        manner and within established statutes of
        limitations per collective bargaining
        agreement.

    2.  Provide guidance and advice to the Troop
        Commander/Division Director responsible for
        making administrative decisions.

    3.  Assume the responsibilities enumerated in
        Section 25.08 E. when the subject of the
        investigation is a Troop Commander/Division
        Director under their command, or as directed
        by a Deputy Commissioner.

    4.  Endorse the Troop Commander's/Division
        Director's administrative decision by
        indicating concurrence or nonconcurrence.

        a.  In cases of verbal abuse or
            dissatisfaction with performance of
            duty, a simple statement of this
            finding shall suffice if there is
            concurrence.  All statements of
            nonconcurrence require a full
            explanation of points of difference.

        b.  Allegations, other than verbal abuse
            and dissatisfaction with performance
            of duty, require an endorsement
            indicative of an independent review
            of the facts.

E.  Troop Commanders/Division Directors:    Troop
    Commanders/Division Directors shall:

    1.  Ensure compliance with the provisions of this
        regulation.

    2.  Determine, in concurrence with the Director,
        Bureau of Professional Responsibility, whether
        an investigation shall be a full or limited
        investigation.

        a.  Upon receipt of a Use of Force or
            Complaint Reception and Processing
            Worksheet, Form SP 1-101, in which
            the allegation involves only
            performance inadequacies, the Troop

-7-

Commander/Division Director shall contact the Disciplinary Officer and provide the details of the complaint.

b.  If the Disciplinary Officer concurs with the Troop Commander/Division Director that the complaint involves only performance inadequacies, the Disciplinary Officer shall contact the Director, Bureau of Professional Responsibility, for concurrence. The Director, Bureau of Professional Responsibility, shall then ensure contact is made with the Troop Commander/Division Director and provide them with a BPR Control Number.

c.  For issues relating to performance inadequacies, the Troop Commander/Division Director shall be responsible for ensuring the preparation and submission of the Review of Performance Complaint, Form SP 1-101A. This report shall be appended to the Use of Force or Complaint Reception and Processing Worksheet, and a copy forwarded to the Bureau of Professional Responsibility for retention. The Troop Commander/Division Director shall retain a copy of this report and maintain it in a supervisory file established for that purpose.

d.  In all other cases, concurrence must be obtained directly from the Director, Bureau of Professional Responsibility, regarding the scope of investigations to be conducted.

e.  Inform the Director, Bureau of Professional Responsibility of those cases when a complainant refuses to sign a Complaint Verification after being requested to do so by a Troop/Bureau investigator.

3.  Assign a Lieutenant or noncommissioned officer, outside of the subject's chain of command, to those investigations required by this regulation which are to be investigated

-8-

at the Troop/Division level. An investigator in the subject's chain of command may be assigned when warranted by circumstances. All assignments shall be made in concurrence with the Director, Bureau of Professional Responsibility, prior to actual assignment.

NOTE: When the subject is a Pennsylvania State Troopers Association (PSTA) member, PSTA officers (President, Vice-President, Secretary, Treasurer) or members of the Grievance Committee shall not be assigned to conduct the investigation.

4. Assist members of the Internal Affairs Division in investigations required by this regulation upon request.

5. Notify affected personnel of the results of the investigation as soon as practicable and within established statutes of limitations. Notices to personnel who had previously been issued a Notification of Inquiry, Form SP 1-102, shall be made in writing, by either correspondence or initiation of administrative action. The correspondence shall include a specific disposition using one of the defined terms contained in this directive.

   a. If the disposition of the investigation is unfounded, the subject shall not be counseled. Other performance issues uncovered through the investigation shall be addressed in separate correspondence or by counseling, which shall be made a part of the supervisory file.

   b. If an allegation is not sustained, the member may be counseled on relevant regulations or directives.

6. Initiate administrative action when warranted, upon receipt of an investigation, in accordance with AR 4-9 or FR 3-3. When administrative action is initiated in accordance with FR 3-3, the Troop Commander/ Division Director shall prepare a detailed summary outlining the basis for discipline. The summary will be provided to the member as required by existing collective bargaining agreements. If a DAR is issued, a copy of the summary will be forwarded as an attachment to

-9-

the supplemental General Investigation Report.
The DAR and a copy of the summary will also be
forwarded under separate cover to the
Disciplinary Officer. When administrative
action is initiated for employees, the
provisions of AR 4-9 shall be applicable.

7. Institute the following steps when an
investigation is reviewed and it is discovered
that someone other than or in addition to the
individual listed in Block 4 of the Use of
Force or Complaint Reception and Processing
Worksheet has violated Department policies,
regulations or procedures and there is a
likelihood that a DAR will be issued:

a. Advise the additional subject(s) of
the complaint by issuing a
Notification of Inquiry, Form
SP 1-102.

b. Direct the subject(s) to submit
correspondence, STD-501, to the
Troop Commander/Division Director
addressing the issue(s) listed in
the Notification of Inquiry.

c. List the subject(s) in Block 5 of
the supplemental General
Investigation Report.

d. Direct further investigation or, if
the investigation is complete,
initiate the review process.

8. Notify the complainant of the results of the
investigation, either verbally or in writing.
Notify public officials who were interviewed,
such as district attorneys, judges, etc.,
either verbally or in writing, of the results
of the investigation if it is unfounded.
These notifications shall be noted in the
supplemental General Investigation Report.

9. Refer the investigation, if circumstances
warrant, to the appropriate Criminal
Investigation Unit when the facts of the
investigation reveal that false information
has been provided with the intent to implicate
personnel in the commission of a crime, or the
facts indicate other criminal conduct on the
part of the complainant.

-10-

F.    Investigators:    Investigators shall:

1.    Ensure that all investigations conducted are thorough and impartial.

2.    Contact the Director, Bureau of Professional Responsibility immediately whenever investigative difficulties occur or when assistance is desired in any phase of the investigation.

3.    Assist federal, state, county and municipal law enforcement agencies with investigations wherein personnel may be implicated in illegal activities or other acts of misconduct.

4.    Assist, upon request, the Office of Chief Counsel, in preparing cases when personnel are subjected to administrative action and/or criminal action, and conduct an investigation into factual allegations contained in civil actions, claims or other notices which could expose the Department or its personnel to civil liability.

5.    Notify the Director, Bureau of Professional Responsibility, immediately, when it becomes apparent by the facts gathered during an investigation that the Department may be the subject of civil litigation.

6.    Obtain a written prosecutorial decision from the district attorney in all cases where the conduct alleged may be criminal in nature. This decision should be obtained prior to the issuance of the Administrative Warning. The Director, Bureau of Professional Responsibility, shall be notified in the event the district attorney declines to render such written prosecutorial decision, or fails to render same in a timely manner.

7.    When practical, the subject(s) shall be given reasonable notice of the time, date and location of their interview. They should be informed of their right to have a union representative present at the interview. In all cases, requests for union representation during an interview by a subject(s) of an investigation shall be granted.

-11-

AR 4-25
9/2/93

● ●

NOTE: The subject(s) assumes responsibility for arranging for such representation. Absent exigent circumstances, the subject(s) shall be provided reasonable time to arrange for representation. The subject(s) has no right to a specific representative, only to one that is the nearest and most readily available.

8. Ensure the constitutional rights specified in <u>Miranda v. Arizona</u> and <u>Garrity v. New Jersey</u> are protected; and provisions granted by existing collective bargaining agreements are not violated. (Refer to Appendages IX and X.) Issue the Administrative Warning, Form SP 1-104 (Appendage VIII), in administrative investigations to further advise the subject(s) of the investigation of their rights under "Garrity"; that the questioning concerns administrative matters relating to the official business of the Department. The Rights Warning and Waiver Notice to Pennsylvania State Police Personnel, Form SP 1-103 (Appendage IX), shall be given to the subject(s) of the investigation to advise of rights under "Miranda" when there is the possibility of criminal charges.

9. Issue the Notification of Inquiry as soon as practical to the affected personnel. In those cases where the investigation could be impeded or compromised, the investigator shall determine the appropriate time to issue the notification. (Refer to Appendage IV.)

10. Any subject interviewed in regards to an investigation who has reason to believe their statements could result in administrative action being taken against them, shall be afforded union representation if requested.

11. Provide personnel, who are required or requested to sign any forms during a BPR investigation, with a copy of any signed forms.

12. When applicable, transcribe the complaint on the Complaint Verification, Form SP 1-108, Appendage XII and obtain the complainant's signature.

-12-

G.  <u>Personnel Receiving Complaints</u>:    Personnel receiving complaints shall:

1.  Receive complaints against personnel in a courteous manner.

2.  Document complaints when they are received. Complainants shall not be advised to call back later to speak with a supervisor or instructed to contact the Bureau of Professional Responsibility directly.   This does not prohibit supervisors from recontacting a complainant to clarify complaint information.

   <u>NOTE</u>:   Personnel desiring to initiate a complaint shall be responsible for completing their own Use of Force or Complaint Reception and Processing Worksheet.

3.  Ensure the confidentiality of all complaints is maintained.

4.  Process all complaints in accordance with the provisions of this regulation.

H.  <u>Personnel Who are the Subject of an Administrative Investigation</u>:

1.  May at any time during the course of an internal investigation, be ordered by the appropriate authority to submit to any or all of the following:

   a.  Breath test.

   b.  Urine test.

   c.  Blood test.

   d.  Polygraph test.

   e.  Lineup.

   f.  Medical/psychological/psychiatric examination.

   g.  Any other non-testimonial evidence test.

   h.  Questioning related to alleged misconduct or performance of duty.

-13-

AR 4-25
9/2/93

2.  Shall be advised that none of the results of the tests or information received from the procedures listed in Section 25.08 H. 1., can be used against them in a criminal prosecution.

3.  Shall, upon direction of the investigating officer or other authority, be required to submit correspondence related to the alleged misconduct or performance of duty. Absent exigent circumstances the submission shall be within 48 hours of being directed to do so. The 48 hours can be extended with the approval of the investigating officer or the Director, Bureau of Professional Responsibility.

4.  Shall be interviewed by the investigating officer.

5.  May obtain the results of any of the test/examination procedures listed in Section 25.08 H. 1. upon written request to the Director, Bureau of Professional Responsibility. The results may be provided in the form of a copy or other written documentation.

6.  Shall be afforded all rights contained in existing collective bargaining agreements.

7.  Shall maintain confidentiality of investigations until completed.

8.  Shall cooperate and answer all questions honestly and completely.

I.  <u>Personnel Who are the Subject of a Criminal Investigation</u>: Personnel who are the subject of a criminal investigation shall be afforded the constitutional protections which are guaranteed as a result of United States Supreme Court decisions in <u>Miranda v. Arizona</u> and <u>Garrity v. New Jersey</u>, as applicable.

25.09  INVESTIGATIVE ASSIGNMENT CRITERIA

A.  <u>Circumstances</u>: Administrative investigations conducted under the following circumstances are subject to the provisions of this directive and the Internal Affairs Division may, at the discretion of the Director, Bureau of Professional Responsibility, retain primary investigative responsibility:

-14-

1. Shooting incidents and physical force incidents as defined in directives, regardless of personnel duty status.

2. Any allegation of criminal conduct directed against personnel.

3. Any allegation of misconduct directed against members.

4. Citizen complaints or any allegation of misconduct directed against personnel which could result in termination of employment. The provisions of AR 4-9 shall apply to performance inadequacies and/or cases of minor misconduct, e.g., traffic citations.

5. Allegations of violations of AR 4-6, FR 1-1 and other allegations of discrimination, harassment or violation of civil rights.

6. Investigations initiated in accordance with FR 6-4, legal intervention.

7. Investigations initiated as a result of contemplated administrative action related to FR 6-4.

8. Investigations initiated in accordance with FR 5-4.

9. Motor vehicle accidents resulting in the death of any person when:

   a. Pursuit is a factor.

   b. A Department vehicle is involved.

10. Any dog bite resulting from a Canine Enforcement Team requiring treatment by a licensed medical practitioner.

11. Investigations conducted at the request of the Commissioner.

B. <u>Investigative Responsibility</u>: The following criteria will be considered by the Director, Bureau of Professional Responsibility, in determining if the Internal Affairs Division will assume investigative responsibility or if the investigation will be assigned to Troop/Division personnel:

1. Seriousness or complexity of the allegation to be investigated.

2. Source of the complaint.

3. Number of personnel involved.

4. Duty assignment of personnel involved.

5. Geographical limitations.

6. Need for internal security relative to all or part of the investigation.

7. Any exceptional circumstance noted by or brought to the attention of the Director, Bureau of Professional Responsibility.

C. <u>Performance Inadequacies</u>:  The Internal Affairs Division will not assume investigative responsibility for mere performance inadequacies or procedural discrepancy violations unless they are indicative of a more serious underlying problem. Addressing the preceding issues is a function of first line supervision and should be handled at that level through counseling, training or other remedial action.

D. <u>Complaints Initiated by Personnel</u>:  The Use of Force or Complaint Reception and Processing Worksheet shall be completed in accordance with Section 25.10 B. of this regulation.  No investigation will be undertaken into complaints lodged by personnel unless a substantiation of the allegation would give rise to formal discipline.

E. <u>Investigatory Difficulties</u>:  If in the course of monitoring an ongoing investigation, the Director, Bureau of Professional Responsibility, determines that investigatory difficulties exist, the Internal Affairs Division may be directed to assume full or partial responsibility for conducting that specific investigation.  This may occur at any stage of the investigation.

25.10  COMPLAINT PROCESSING

A. <u>Types of Complaints</u>:  Complaints may be received in any of the following manners and shall be processed in accordance with this regulation in all instances:

1.    Telephone:  Self-explanatory.

2.    In Person:   Individuals may appear at a
Department installation, or may make a
complaint to personnel at any location.

3.    Correspondence:  Self-explanatory.

B.    <u>Receiving Complaints</u>:

1.    Every complaint, whether anonymous, verbal or
written, received by personnel shall be
recorded on the Use of Force or Complaint
Reception and Processing Worksheet, and
processed as described in Appendage I.  When
the complaint involves personnel in the chain
of command and the process described in
Appendage I is inappropriate, contact may be
made directly with the Internal Affairs
Division.

2.    Complainants shall not be required to appear
at a Department installation to initiate a
complaint.

3.    Complainants may remain anonymous; however, a
reasonable effort to obtain identification
should be made.

4.    If their identity is known, complainants shall
be advised that a Department representative
will contact them.

5.    The following procedure shall be followed by
personnel receiving a complaint at times other
than normal working hours:

a.    In those cases which are not of a
serious nature and do not require an
immediate response from an Internal
Affairs Division investigator, the
information shall be documented and
processed in accordance with
Appendage I.

b.    In serious cases which warrant the
immediate response of an Internal
Affairs Division investigator,
personnel receiving the complaint
shall immediately notify, through
channels, the Troop Officer of the
Day (OD).  The Troop OD shall then
contact the Department Headquarters

AR 4-25
9/2/93

OD, who shall provide the name of the appropriate Bureau of Professional Responsibility duty member to call for an evaluation of the necessity of an immediate response. Any incident which results in the death or serious injury of a person; that involves the physical arrest of personnel, or major breaches of conduct by personnel; or that is likely to generate more than routine public interest, should be considered serious in nature.

C.    <u>Notifying Involved Individuals</u>:

    1.    The Director, Bureau of Professional Responsibility, shall notify the complainant that their complaint has been received. When personnel initiate a complaint, this notification may not be required. (Refer to Appendage III.)

    2.    The assigned investigator shall officially notify affected personnel of a pending investigation, unless circumstances dictate otherwise. The Notification of Inquiry shall be issued to the subject(s) and serve as the official notification. (Refer to Appendage IV.)

D.    <u>Investigation Procedures</u>: The following procedures shall be followed by individuals conducting personnel investigations:

    1.    Complaints of physical abuse, discrimination and sexual harassment provide a high potential for liability to the Department and its personnel. Based upon a request from the Office of Chief Counsel, all such complaints shall be investigated immediately to determine the factual circumstances surrounding the complaint in order to assist the Office of Chief Counsel in developing legal theories that can be advanced in defense of any resulting claims and to properly evaluate the potential for liability to which the Department or its members could be exposed. The Office of Chief Counsel shall be provided notice of complaints of this nature by the Director, Internal Affairs Division as soon as possible after receipt.

-18-

2.   The Use of Force or Complaint Reception and Processing Worksheet shall be prepared in accordance with this regulation and will serve in place of an incident memo. A BPR Control Number shall be obtained by the Troop Commander/Division Director and entered in Block 1. No incident memo will be prepared, nor will a Troop Incident Number be assigned.

3.   Complaints from citizens shall be verified through the completion of the Complaint Verification, Form SP 1-108, Appendage XII. In some cases this would have been accomplished through the use of Appendage XIII by the Bureau of Professional Responsibility by mail prior to assignment. If the verification is not attached to the complaint the investigator shall complete Appendage XII. In doing so, investigators shall request the complainant's signature in the allotted block before the interview.

   a.   If the complainant refuses to sign the form, the investigator shall print "Refused" in the signature block. The complainant shall be informed that such refusal constitutes a withdrawal of their complaint. The investigator shall attempt to complete an interview of the complainant, and shall afterwards confer with the Director, Bureau of Professional Responsibility for a determination on the future course of the investigation. Except in cases of criminal conduct or those which could give rise to court-martial proceedings, as determined by the Department Disciplinary Officer, the investigation shall be terminated with the submission of a limited investigation documenting action taken.

   b.   If travel distance or other circumstances prohibit a personal interview, the investigator shall request assistance from the Bureau of Professional Responsibility in obtaining a completed verification form.

-19-

AR 4-25
9/2/93

4.  The General Investigation Report shall be used to report full investigations. Correspondence shall be used to report limited investigations.

    NOTE: When appropriate, an Initial Crime Report, Form SP 7-004, or Non-Traffic Citation, Form SP 7-0017B shall be prepared and assigned a Troop Incident Number.

5.  Personal contact, when practical, shall be made with complainants, witnesses and involved personnel. Anonymous complaints shall not be automatically dismissed. A thorough investigation shall be conducted to independently prove or disprove the allegation. The investigator should make a reasonable effort to determine the identity of anonymous complainants.

    NOTE: No administrative action shall be taken against personnel solely on the basis of an unsupported anonymous complaint. In addition, no investigation shall be initiated into anonymous complaints unless a substantiation of the allegation could give rise to formal discipline as determined by the Disciplinary Officer.

6.  Personnel who are directly or indirectly associated with a matter under investigation may be directed by the investigating officer or other authority to submit correspondence containing an account of their knowledge and involvement. Such correspondence shall include complete answers to any related questions of the investigator. Absent exigent circumstances, personnel shall be provided 48 hours to submit the correspondence to the investigator or higher authority. Any subsequent requests for additional information may be made by the investigator citing specific questions to be answered. All submitted correspondence shall be included as attachments to the General Investigation Report.

7.  The subject of the investigation shall be personally interviewed.

    a.  All related interviews conducted during BPR personnel investigations which allege criminal conduct or

-20-

gross    misconduct    shall    be tape-recorded.

(1)  Prior to beginning an interview which requires tape-recording, the subject shall be informed that their statement will be tape-recorded.

(2)  Personnel,    during administrative investigations, have no right to refuse the interview being tape-recorded.

(3)  Individuals not employed by the Department have the right to refuse their interview being tape-recorded.

b.  The subject(s) of a taped interview may obtain a copy of the related cassette tape.

(1)  Upon written request to the Director,    Bureau    of Professional    Responsibility, and within 15 working days after the last interview is completed, the subject(s) shall be provided with a copy of their    taped    interview. Requesting    personnel    shall immediately    provide correspondence encompassing a written receipt.    For other than Department personnel, a handwritten    receipt    is acceptable.

(2)  The subject(s), who is a PSTA member,    may    simultaneously tape-record the interview being conducted and also be tape-recorded by a member conducting a BPR investigation.    At the conclusion of the interview, the subject's cassette tape shall    be    removed    and immediately    placed    in    an envelope    by    the    BPR investigator.    The envelope shall then be sealed and the subject directed to place their

AR 4-25
9/2/93

signature, date and time upon the seal. The sealed envelope shall be further enveloped in a postage stamped and addressed mailing envelope provided by the member. The package shall be immediately mailed to the PSTA office where the enclosed envelope will be retained in a sealed condition until notified by BPR that the contents of the interview may be released to the subject(s).

c.  Interviews meeting the criteria set forth in this regulation for tape-recording which have not, for whatever reason, been tape-recorded will be reduced to writing by the investigator, who shall then show the written statement to the subject for their review. The subject will then be requested to sign each page and complete the signature block on the statement's last page. The signature block shall state:

By my signature on this and each of the foregoing _____ pages, I hereby adopt the statement contained herein and acknowledge the statement's completeness and veracity.

_____ Signature

_____ Date

d.  Tape-recorded interviews may be summarized for reporting purposes. The investigator must ensure that the summary is accurate and that the original tape is included as an attachment to the investigative report.

8.  All documents and/or reports, or copies thereof, if originals are not available, which have been generated by the investigation shall be collected.

-22-

9.  All available investigative tools shall be employed to secure evidence to assist in determining the facts of an investigation. All evidence collected shall be processed in accordance with the procedures outlined in OM 7-7.  Examples of investigative tools and evidence to be used in the investigation are as follows:

   a.  Documents and Records:

   (1)  Medical reports - refer to Appendage V.

   (2)  Licenses, registrations or any applications.

   (3)  Telephone toll records.

   (4)  Financial records - refer to Appendage VI.

   (5)  Credit Bureau checks.

   (6)  Search warrants/affidavits.

   (7)  Employment records - refer to Appendage VII.

   (8)  Subpoenas.

   (9)  Initial Crime Reports.

   (10)  Accident Reports.

   NOTE:  A Request for Criminal Record Check, Form SP 4-164, commonly referred to as a "rap sheet," shall only be included if relevant.

   b.  Clothing:  Especially important in incidents of shooting or alleged physical abuse.

   c.  Photographs:

   (1)  Victims - physical abuse, shootings, etc.

   (2)  Scenes - location of alleged violation.

-23-

(3) Photo lineups - <u>U.S. v. Wade</u> covers the Supreme Court guidelines associated with lineups. Refer to Appendage XI.

d. Radio Tapes: These are reused on a 30 or 60-day cycle. It is incumbent upon the investigator to obtain the tape prior to its reuse or erasure.

e. Sketches: Prepared of scene, if warranted.

f. Weapons: Ascertain if:

(1) Issued/personal.

(2) Ammunition - issued/personal.

(3) Alterations.

(4) Make, model, serial number and caliber.

(5) Qualified with weapon - Permanent Firearms Scoring Record, Form SP 8-104.

(6) Request to Carry a Personal Handgun on Duty, Form SP 1-600, is completed and on file.

g. Technical Aids:

(1) Laboratory.

(a) Ballistics Section.

(b) Chemistry Section.

(c) Documents Section.

(d) Photographic Section.

(e) Latent Print Section.

(f) Automated Fingerprint Identification System Section.

(2) Polygraph.

-24-

(3)  Helicopter.

(4)  Scuba Teams.

10.  Personal property of personnel is not subject to search and seizure for administrative work-related investigations without reasonable suspicion.  Probable cause and/or a search warrant, as required by law, are necessary to search and seize the personal property for criminal investigative purposes.  However, Department property may be searched at any time, even if assigned to or used exclusively by a single individual.  This search may be conducted by any authorized person pursuant to an investigation.

11.  At no time will recommendations be offered as to the appropriate administrative action to be taken.  The investigator shall not express assumptions, personal opinion, or conclusions in the General Investigation Report.

12.  The following exceptions to completing a General Investigation Report are necessary when conducting full investigations:

a.  Block 5 shall read as follows:

Name of Subject Personnel
Troop/Bureau - Station/Division
Date of Enlistment/Hiring
Social Security Number of Subject Personnel

NOTE:  Additional subjects shall be entered in the INSTRUCTIONS Block, under the subheading ADDITIONAL SUBJECTS, using the above format.

b.  The subheadings CONCLUSION, and RECOMMENDATION and COMMENT in Block 6 shall not be included when the report is used for administrative investigation purposes.

c.  All attachments shall be consecutively numbered under the subheading, LIST OF ATTACHMENTS. Each attachment shall be numbered, along the lower right corner to correspond with this list.  In the format of:  Attachment No._____,

-25-

AR 4-25
9/2/93

Page_____ of_____.  The Use of Force or Complaint Reception and Processing Worksheet shall always be Attachment Number 1.  Attachments to supplemental General Investigation Reports shall continue consecutively from the last attachment number in the original report.

d.  No references to race/ethnicity shall be included when identifying interviewees, unless relevant to the issue under investigation.

13.  When the facts of an investigation indicate that a Report of Incident/Accident, Form STD-430, shall be submitted according to AR 4-12, it shall be submitted directly to the Director, Bureau of Staff Services, and noted in the details section of the report.  A copy shall not be made an attachment to the General Investigation Report.

14.  Department directives, contract/agreement provisions, the Pennsylvania Rules of Criminal Procedure and statutes shall be strictly adhered to while conducting investigation(s).

15.  Individuals under investigation shall be advised of their Constitutional Rights, which may apply during the investigation.

16.  The investigation shall be completed and all reports shall be received by the Director, Bureau of Professional Responsibility within 30 days after assignment, unless another time period is specified by the Director.  It is important for the assigned investigator to complete the investigation and submit the report promptly.

E.  Investigation of Non-Complaint Incidents:

1.  Incidents involving legal intervention, shooting or use of physical force, provide a high potential for liability to the Department and its personnel.  Based on a request from the Office of Chief Counsel, in all such incidents an immediate investigation shall be conducted into the factual circumstances surrounding the incident in order to assist the Office of Chief Counsel in developing legal theories that can be advanced in defense

-26-

of any resulting claims and to properly evaluate the potential for liability to which the Department or its members could be exposed. The Office of Chief Counsel shall be provided notice of the above-referenced types of incidents by the Director, Internal Affairs Division as soon as possible after their occurrence.

2. The involved member(s)/enforcement officer(s) shall immediately notify, through the chain of command, the Troop Commander responsible for the area in which the incident occurred. For a member not under their command, the Troop Commander shall notify the member's Troop Commander, Division Director; and, if on detached status, the member's current Troop Commander/Division Director shall also be notified. For Enforcement Officers, the Troop Commander shall notify the Director, Operations Division, Bureau of Liquor Control Enforcement. If serious injury or death occurred to an individual, the Troop Commander shall immediately notify the Deputy Commissioner of Operations, through the chain of command, if possible. The Troop Commander shall also provide immediate notification to the Bureau of Professional Responsibility, in accordance with Department directives, in all shooting/physical force incidents.

3. In those incidents requiring immediate response, the Troop Commander shall ensure that a supervisor who is not directly involved in the incident is immediately assigned to secure the scene of the incident. The assigned supervisor shall initiate a preliminary investigation, pending assignment of a principal investigator, who shall be selected through concurrence with the Director, Bureau of Professional Responsibility.

4. If the use of physical force results in injury which requires medical treatment to personnel only, and no other investigative criteria applies, an administrative investigation is not required.

5. Any member/enforcement officer, who discharges a weapon which results in an injury or death, or whose use of physical force results in a death, shall immediately be assigned to

AR 4-25
9/2/93

Station/Office duties, pending an evaluation of the circumstances surrounding the incident by the Deputy Commissioner of Administration. In addition, any member/enforcement officer whose use of physical force results in an injury may, at the discretion of the Deputy Commissioner of Administration, be assigned to Station/Office duties pending evaluation of the circumstances surrounding the incident. For those incidents in which responsibility cannot be immediately determined, all members/enforcement officers directly involved in the incident shall be placed in this status, where appropriate. This action is not to be construed as disciplinary in nature.

6. Whenever a member/enforcement officer is directly involved in a shooting incident which results in injury or death:

   a. The assigned criminal investigator and BPR investigator shall interview the involved personnel, as soon as possible.

   b. The Troop Commander/Bureau Director shall ensure that the Member Assistance Program Office Manager is notified immediately.

   c. The member's/enforcement officer's Troop Commander/Bureau Director, in conjunction with the Manager, Member Assistance Program, shall, as soon as possible, but not more than 72 hours after the incident, arrange for the affected member(s)/enforcement officer(s) to receive appropriate professional counseling. This shall not preclude professional counseling of members/enforcement officers involved in shooting incidents not resulting in injury or death or in other use of physical force incidents. In addition, the Troop Commander/Bureau Director, in conjunction with the Manager, Member Assistance Program, shall ensure appropriate professional counseling is provided to any personnel, e.g., Police Communications Operators, supervisors, etc., indirectly

-28-

involved with and adversely affected by an incident.

d. The Troop Commander/Bureau Director shall ensure the PSTA President is notified, as soon as possible in those incidents involving members.

7. During the investigation of a shooting incident, it may be necessary for the investigator to take possession of a member's/enforcement officer's weapon. The Troop Commander/Division Director shall make arrangements for immediate replacement of the weapon.

8. Release of a member's/enforcement officer's name to the news media shall be coordinated through the Public Information Office.

9. An investigation of a non-complaint incident is not required for the following shooting incidents:

a. Firearms training/qualification.

b. A member/enforcement officer discharging a weapon while off duty as permitted by law for purposes such as hunting, fishing, target shooting, etc.

c. When a member destroys an animal in accordance with the provisions of FR 7-3.

10. During the investigation of a non-complaint incident, the investigator shall exercise discretion in determining if an aggrieved citizen should be interviewed. This does not apply to instances where the citizen initiates the complaint and alleges physical abuse.

F. Limited Investigations:

1. A limited investigation may be conducted when a requirement under the definition of "Limited Investigation" is met. In addition, a limited investigation may be conducted when the Troop Commander/Division Director and the Director, Bureau of Professional Responsibility concur that a full investigation is not warranted due to mitigating circumstances. A BPR Control

-29-

AR 4-25
9/2/93

Number and investigator shall be assigned to all limited investigations.

2.    Limited investigations shall be prepared on correspondence directed to the investigator's Troop Commander/Bureau Director.

    a.    Limited investigations should include a synopsis of the allegations. Enclosures may include:

        (1)    Information from involved personnel submitted correspondence.

        (2)    Copies of pertinent investigative reports.

        (3)    Any other documents which are relevant to the investigation.

        (4)    Notification of Inquiry issued to involved personnel.

    b.    Investigator's assessment as to why this investigation should be handled on a limited basis, as defined in Section 25.04 I.

3.    Upon completion of a limited investigation, the Troop Commander/Division Director shall prepare an endorsement, citing reasons for their decision and a notation that the complainant and involved personnel were notified of this decision. The endorsement shall also include a statement of the disposition using one of the defined categories listed in Section 25.07, excluding the categories "Sustained" or "Not-Sustained." The limited investigation must be converted into a full investigation if any element of misconduct is determined.

4.    Troop Commanders/Division Directors shall forward the endorsed, limited investigation, through channels, to the Director, Bureau of Professional Responsibility. If, during the review process, a determination is made that the facts contained in the limited investigation are insufficient to support the final disposition, the report may be returned to the Troop Commander/Division Director

directing that the investigator conduct a full investigation. If a limited investigation is returned under these circumstances, all prior notifications to the complainant and involved personnel shall be deemed to be void.

G. Submission of Internal Investigation Reports for Full Investigations:

1. All applicable General Investigation Reports shall be forwarded directly, in duplicate, to the Director, Bureau of Professional Responsibility, by the assigned investigator.

2. After reviewing the report for investigative content, the Director, Bureau of Professional Responsibility, shall either forward it to the Deputy Commissioner of Administration for further processing or return it to the investigator for additional investigation. A copy of the investigative reports on incidents involving legal intervention, shooting, use of physical force, or complaints of physical abuse, discrimination, or sexual harassment shall be forwarded to the Office of Chief Counsel for evaluation at the time the report is forwarded to the Deputy Commissioner of Administration.

3. The Deputy Commissioner of Administration or designee shall forward the investigative report to the appropriate Area Commander/Bureau Director, who shall review and forward it to the Troop Commander/Division Director. In cases which appear to warrant the issuance of a DAR, the Area Commander/Bureau Director shall ensure consultation with the Troop Commander/Division Director prior to an administrative decision being made. An administrative decision shall be formulated by the Troop Commander/Division Director and communicated to the subject(s) of the investigation in a timely manner.

   a. If the investigation involves a member and a DAR will be issued, the provisions of FR 3-3 apply.

   b. If disciplinary action will be taken against an employee, the provisions of AR 4-9 apply.

-31-

AR 4-25
9/2/93

4. The investigative report shall be returned, through channels, to the Deputy Commissioner of Administration, by the appropriate Troop Commander/Division Director, after they have completed their supplement report of the General Investigation Report and detailed their administrative decision. The supplement report shall, at a minimum, contain the following:

    a. A statement of the disposition using one of the defined categories listed in Section 25.07. If there is more than one element to the allegation and the dispositions differ, each element must be individually addressed. Allegations in the categories Verbal Abuse or Dissatisfaction with Performance of Duty that are disposed of as unfounded or not sustained may be satisfactorily addressed by simply stating the appropriate disposition with no explanation necessary.

    b. Except as exempted in the above section, a statement on those mitigating or aggravating circumstances that influenced the dispositional decision.

    c. A statement that notification regarding the disposition of the complaint was made to the subject and the complainant. The method used to notify the complainant must be stated.

    d. When a DAR is issued, the detailed summary provided to the involved member shall be included as an attachment.

5. The Deputy Commissioner of Administration shall forward all reports to the Director, Bureau of Professional Responsibility, for further action or filing.

6. The central location for the collection and maintenance of all administrative investigation information shall be the Bureau of Professional Responsibility, Internal Affairs Division. All personnel investigations are of

-32-

a confidential nature and may be reviewed only upon authorization of the Commissioner/ designee.

7. General Investigation Reports and limited investigation reports shall be purged after ten years, or two years after the member/employee separates, unless litigation warrants retention.

## 25.11    INTERNAL AFFAIRS DIVISION PERSONNEL

A. <u>Selection</u>:  Staffing an Internal Affairs Division is an important factor in the success or failure of the Division.  To be considered for assignment in the Internal Affairs Division, members must:

1. Be volunteers.

2. Have demonstrated that they possess a high degree of investigative skill and the ability to write clear, concise and complete investigative reports.

3. Have an excellent reputation, among both their peers and supervisors, in terms of integrity and overall performance as members.

4. Be familiar with those statutes, collective bargaining agreements, and Department directives, policies and procedures which are related to administrative investigations.

5. Have a thorough knowledge in the collection and preservation of evidence.

6. Should have knowledge of the availability of records and information maintained by other sources and agencies.

7. Should possess the ability to perform photographic surveillance and possess or be willing to acquire the proper certification required to perform electronic surveillance.

8. Should be in good physical condition and present a professional appearance.

9. Should be able to interact effectively with people and be proficient in interviewing and interrogation techniques.

AR 4-25
9/2/93

B.    <u>Tenure</u>:   It is a generally accepted practice to periodically rotate members assigned to an Internal Affairs Division.   This rotation process will assure the infusion of new personnel and new ideas, and allow greater member participation.   The investigator positions within the Division shall be posted in accordance with AR 4-20.   Investigators shall serve for a period of time to be determined by the Commissioner.

APPENDAGE I

USE OF FORCE OR COMPLAINT RECEPTION AND PROCESSING WORKSHEET
FORM SP 1-101

A.   PURPOSE:  This form is used to provide a uniform method of receiving and recording complaints against personnel and recording incidents for non-complaint investigations.

B.   PREPARATION:  This form shall be printed with ballpoint pen or typewritten, in original only, by the individual receiving the complaint.

C.   BLOCK INSTRUCTIONS:

   1.   BPR CONTROL NUMBER:  To be obtained by the Troop Commander/Division Director from the Director, Bureau of Professional Responsibility.

   2.   COMPLAINANT INFORMATION:  This section is for recording the vital information regarding the individual making the complaint.  Personnel shall not place their names in this section unless they are the actual complainant.  When personnel receive information from an outside source, that source shall be noted in this section.  For non-complaint investigations and anonymous complaints, this section shall be left blank.

   3.   NON-COMPLAINT USE OF FORCE REPORT:  Check the appropriate box.

   4.   SUBJECT OF ALLEGATION/REPORT:  Self-explanatory.

   5.   DETAILS OF ALLEGATION:

      a.   ROUTE/STREET:  Self-explanatory.

      b.   CITY/TWP/BORO:  Self-explanatory.

      c.   COUNTY:  Self-explanatory.

      d.   DATE:  Self-explanatory.

      e.   TIME:  Self-explanatory.

      f.   DAY:  Self-explanatory.

      g.   TYPE OF ALLEGATION:  Refer to Section 25.05. Check the appropriate box.

I-1

AR 4-25
9/2/93

h.  SYNOPSIS:  A brief explanation of what the complaint alleges or what occurred during a non-complaint incident is sufficient.

6.  RECEPTION DATA:

a.  DATE RECEIVED:  Self-explanatory.

b.  TIME RECEIVED:  Self-explanatory.

c.  LOCATION RECEIVED:  Self-explanatory.

d.  RECEIVED BY:  The name of the individual who initially receives the details of the allegation from the complainant shall be recorded here.  Do not advise complainants to call back later to speak to a supervisor.

7.  FOR BUREAU USE:  This space shall be used only by the Bureau of Professional Responsibility.

8.  ADDITIONAL  SUBJECTS  OF  ALLEGATION/REPORT: Self-explanatory.

D.  DISTRIBUTION WHEN A COMPLAINT IS RECEIVED AT A TROOP/BUREAU LOCATION:

1.  Personnel Receiving Complaint – Forward through channels to the individual's Troop Commander/Division Director by the most expedient means possible.  If the complaint involves an individual in the chain of command, the individual may be bypassed when submitting the Worksheet through channels.

2.  Troop  Commander/Division  Director  –  The  Troop Commander/Division  Director,  after  reviewing  the Worksheet,  shall  assess  if  a  full  or  limited investigation is appropriate.

a.  The  Director,  Bureau  of  Professional Responsibility or a designee shall then be contacted by telephone for concurrence.  At this time, a BPR Control Number will be assigned and recorded in the Bureau Register. An investigator will also be assigned.

(1)  If  the  decision  is  made  for  the investigation  to  be  conducted  by Troop/Bureau members, the Worksheet shall be forwarded to the investigating officer for inclusion as the first attachment to the General Investigation Report.

I-2

(2) If the decision is made for the investigation to be conducted by a member of the Internal Affairs Division, the Worksheet shall be immediately forwarded to the Director, Bureau of Professional Responsibility. It will then be forwarded to the Internal Affairs Division investigator for attachment to the General Investigation Report.

b. Upon receipt of a nonwritten complaint which alleges dissatisfaction with performance of duty or verbal abuse, the Troop Commander/Division Director shall immediately contact the Director, Bureau of Professional Responsibility to discuss the details of the allegation. When appropriate, the Director, Bureau of Professional Responsibility may elect to proceed by forwarding a Complaint Verification, Form SP 1-108, to the complainant requesting more specific information about the allegation, before initiating an investigation. In such cases, the Troop Commander/Division Director shall forward the original Worksheet to the Bureau of Professional Responsibility and retain a copy in a chronological file at the Troop/Bureau for 60 days, after which the Worksheet shall be purged.

c. The original Worksheet shall be retained in an active file at the Bureau of Professional Responsibility for 30 days, following the mailing of the Complaint Verification Form. Failure of the complainant to complete and return the Complaint Verification Form within 30 days will result in termination of the complaint and transfer of the original Worksheet to an inactive file. Completed Complaint Verification Forms shall be evaluated by the Director, Bureau of Professional Responsibility to determine if an investigation is warranted.

3. It may be determined by the Director, Bureau of Professional Responsibility that action other than an investigation is appropriate; in such cases the Worksheet shall be forwarded to the Director, Bureau of Professional Responsibility with related cover correspondence.

AR 4-25
9/2/93

E.   DISTRIBUTION WHEN A COMPLAINT IS RECEIVED BY THE BUREAU OF PROFESSIONAL RESPONSIBILITY:

   1.   When it is determined that the investigation shall be conducted by a member of the Internal Affairs Division, the Worksheet shall be prepared and forwarded to the assigned Internal Affairs Division investigator for attachment to the General Investigation Report.

   2.   When it is determined that the investigation shall be conducted by Troop/Bureau members, the Worksheet shall be prepared and forwarded to the Troop Commander/Division Director of the affected personnel. The assigned investigator shall attach it to the General Investigation Report.

F.   DISTRIBUTION WHEN THE SUBJECT OF THE COMPLAINT IS A MEMBER ASSIGNED TO THE BUREAU OF PROFESSIONAL RESPONSIBILITY: When a complaint is received concerning a member assigned to the Bureau of Professional Responsibility, the Worksheet shall be sent directly, under confidential cover, to the Deputy Commissioner of Administration.

SP 1-101 (1-93)

**PENNSYLVANIA STATE POLICE**
**USE OF FORCE OR COMPLAINT**
**RECEPTION AND PROCESSING WORKSHEET**

| BPR CONTROL NUMBER |
| --- |
| 1. AR 4-25 9/2/93 |

### 2. COMPLAINANT INFORMATION

| | | | | |
| --- | --- | --- | --- | --- |
| **NAME** | FIRST | | M.I. | LAST |
| **HOME ADDRESS** | STREET/P.O. BOX | | | |
| | CITY | | STATE | ZIP CODE | HOME PHONE # ( ) |
| **EMPLOYER** | NAME & ADDRESS | | | WORK PHONE # ( ) |

3.
| NON-COMPLAINT USE OF FORCE REPORT | ☐ SHOOTING INCIDENT | ☐ PHYSICAL FORCE | ☐ LEGAL INTERVENTION |
| --- | --- | --- | --- |

### 4. SUBJECT OF ALLEGATION/REPORT (List additional subjects on back)

| | | | |
| --- | --- | --- | --- |
| **NAME** | FIRST | M.I. | LAST |
| **LOCATION** | TROOP/BUREAU | STATION/DIVISION | JOB ASSIGNMENT |
| SSN ― ― | DOE | ← TO BE COMPLETED IF KNOWN OR AVAILABLE | |

### 5. DETAILS OF ALLEGATION

ROUTE/STREET

| CITY/TWP/BORO | COUNTY | DATE | TIME | DAY |
| --- | --- | --- | --- | --- |

| TYPE OF ALLEGATION (CHECK ONE) | ☐ PHYSICAL ABUSE ☐ VERBAL ABUSE ☐ CRIMINAL CONDUCT | ☐ IMPROPER CONDUCT ON DUTY ☐ IMPROPER CONDUCT OFF DUTY ☐ DISSATISFACTION WITH PERFORMANCE OF DUTY |
| --- | --- | --- |
| | ☐ OTHER (Please explain) | |

| SYNOPSIS | |
| --- | --- |
| | |

### 6. RECEPTION DATA

| DATE RECEIVED | TIME RECEIVED | LOCATION RECEIVED | TROOP/BUREAU ― | STATION/DIVISION |
| --- | --- | --- | --- | --- |
| **RECEIVED BY** | NAME | | SSN ― ― | |

### 7. FOR BUREAU USE

| **INVESTIGATOR** | NAME | | SSN ― ― |
| --- | --- | --- | --- |
| CONTROL NO. ISSUED BY | DATE ASSIGNED | DATE DUE | SP 1-101-A ☐ | LIMITED INVESTIGATION ☐ |

I-5

AR 4-25

a.   9/2/93

**ADDITIONAL SUBJECTS OF ALLEGATION/REPORT**

| NAME | FIRST | | M.I. | LAST | |
|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT | |

SSN _____ — _____ — _____   DOE _____   ← TO BE COMPLETED IF KNOWN OR AVAILABLE

| NAME | FIRST | | M.I. | LAST | |
|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT | |

SSN _____ — _____ — _____   DOE _____   ← TO BE COMPLETED IF KNOWN OR AVAILABLE

| NAME | FIRST | | M.I. | LAST | |
|---|---|---|---|---|---|
| LOCATION | TROOP/BUREAU | STATION/DIVISION | | JOB ASSIGNMENT | |

SSN _____ — _____ — _____   DOE _____   ← TO BE COMPLETED IF KNOWN OR AVAILABLE

| SYNOPSIS (CONT.) | |
|---|---|

I-6

AR 4-25
9/2/93

APPENDAGE II

REVIEW OF PERFORMANCE COMPLAINT
SP 1-101A

A.  PURPOSE:  The review of performance complaint is used to:

1.  Provide Troop Commanders/Division Directors with a guideline to assist in determining if a member is merely lacking in a performance outside the Department Internal Affairs/Discipline System.

2.  Document action taken in cases of performance inadequacies for future reference in the event of repeated behavior; a basis for progressive discipline; to document/maintain consistency throughout the Department.

B.  BLOCK INSTRUCTIONS:  This form shall be printed with ballpoint pen or typewritten, in original only, by the Troop Commander/Division Director reviewing the complaint.

1.  SUBJECT AND BPR NUMBER:  Self-explanatory.

2.  DATE(S) OCCURRED:  Self-explanatory.

3.  DID COMMISSION/OMISSION TAKE PLACE OR BECOME KNOWN TO THE PUBLIC?  Check appropriate box.

4.  WAS THE COMMISSION/OMISSION WHOLLY A MATTER OF INTERNAL ADMINISTRATION?  Check appropriate box.

5.  WAS THE MEMBER PREVIOUSLY COUNSELED REGARDING SIMILAR BEHAVIOR?  IF YES, LIST DATES, CIRCUMSTANCES, AND BY WHOM:  This requires review of member's supervisory file and performance evaluation.  Check appropriate box.  If yes is checked, provide details.

6.  WHAT, IF ANY, EFFECT DID THE MEMBER'S COMMISSION/OMISSION HAVE (E.G. DESTROYED RESPECT FOR THE PENNSYLVANIA STATE POLICE, IMPROPER EXAMPLE FOR OTHERS, ETC.):  Self-explanatory.  If none, leave blank.

7.  LIST AND IDENTIFY AGGRAVATING AND/OR MITIGATING CIRCUMSTANCES:  Self-explanatory.

8.  WAS MEMBER DISCIPLINED WITHIN THE PAST FIVE YEARS REGARDING SIMILAR PERFORMANCE?  IF YES, LIST DATES AND PENALTIES:  Self-explanatory.

9.  WAS MEMBER PREVIOUSLY GIVEN REMEDIAL TRAINING REGARDING SIMILAR PERFORMANCE?  IF YES, LIST DATES AND CIRCUMSTANCES:  Self-explanatory.

II-1

AR 4-25
9/2/93

10. PRE-ADJUDICATION MEETING WAS HELD? DATE: Self-explanatory. This is to verify whether the Troop Commander/Division Director met with the member for the purpose of determining the validity of a performance inadequacy.

11. ATTENDEES: List the names of any persons, in attendance with the member and their position. Example: Trooper John J. Jones - Troop PSTA Representative.

12. REMARKS: List any pertinent comments made by the parties during the meeting.

13. DETERMINATION: Check appropriate box.

14. DATE MEMBER WAS NOTIFIED OF DETERMINATION: Self-explanatory.

15. DATE COMPLAINANT WAS NOTIFIED OF DETERMINATION: Self-explanatory. Check appropriate box if notification was written or verbal.

16. DISCIPLINARY OFFICER CONTACTED? IF YES, LIST DATE: Self-explanatory.

17. MEMBER COUNSELED? IF YES, LIST DATE: Self-explanatory.

18. DAR/TROOP COMMANDER'S WRITTEN REPRIMAND ISSUED? IF YES, LIST DATE: Self-explanatory.

19. BPR INVESTIGATION INITIATED: Check appropriate box.

20. REMEDIAL TRAINING SCHEDULED? IF YES, LIST DATE(S) AND TYPE: Self-explanatory.

21. REMARKS/DETAILS: Self-explanatory.

22. INITIATING OFFICER, TITLE AND DATE: Self-explanatory.

C. DISTRIBUTION:

1. If a performance inadequacy is founded, the Troop Commander/Division Director shall be responsible for ensuring the preparation and submission of the Review of Performance Complaint. This report shall be appended to the Use of Force or Complaint Reception and Processing Worksheet, Form SP 1-101, and forwarded to the Bureau of Professional Responsibility.

2. The Troop Commander/Division Director shall retain a copy of this report in a supervisory file established for that purpose.

SP 1-101A (8-93)

AR 4-25
9/2/93

**REVIEW OF PERFORMANCE COMPLAINT**

| 1. SUBJECT | | BPR # |

'E (S) OCCURRED:

3. DID COMMISSION/OMISSION TAKE PLACE OR BECOME KNOWN TO THE PUBLIC?

☐ YES    ☐ NO

4. WAS THE COMMISSION/OMISSION WHOLLY A MATTER OF INTERNAL ADMINISTRATION?

☐ YES    ☐ NO

5. WAS THE MEMBER PREVIOUSLY COUNSELED REGARDING SIMILAR BEHAVIOR?
IF YES LIST DATES, CIRCUMSTANCES AND BY WHOM:

☐ YES    ☐ NO

6. WHAT, IF ANY, EFFECT DID THE MEMBER'S COMMISSION/OMISSION HAVE (E.G. DESTROYED RESPECT FOR THE PENNSYLVANIA STATE POLICE, IMPROPER EXAMPLE FOR OTHERS, ETC.):

7. LIST AND IDENTIFY AGGRAVATING AND/OR MITIGATING CIRCUMSTANCES:

8. WAS MEMBER DISCIPLINED WITHIN THE PAST FIVE YEARS REGARDING SIMILAR PERFORMANCE? IF YES, LIST DATES AND PENALTIES:

☐ YES    ☐ NO

9. WAS MEMBER PREVIOUSLY GIVEN REMEDIAL TRAINING REGARDING SIMILAR PERFORMANCE? IF YES, LIST DATES AND CIRCUMSTANCES:

☐ YES    ☐ NO

**ADJUDICATION OF PERFORMANCE COMPLAINT**

10. PRE-ADJUDICATION MEETING WAS HELD?                    DATE:

☐ YES    ☐ NO

11. ATTENDEES:

12. REMARKS:

DETERMINATION:          ☐ UNFOUNDED    ☐ SUSTAINED    ☐ NOT SUSTAINED

ATE MEMBER WAS NOTIFIED OF DETERMINATION:

15. DATE COMPLAINANT WAS NOTIFIED OF DETERMINATION:

☐ WRITTEN    ☐ VERBAL

II-3

AR 4-25
9/2/93

**ACTION TAKEN**

16. DISCIPLINARY OFFICER CONTACTED? IF YES, LIST DATE:

17. MEMBER COUNSELED? IF YES, LIST DATE: ☐ YES ☐ NO

18. DAR/TROOP COMMANDER'S WRITTEN REPRIMAND ISSUED? IF YES, LIST DATE: ☐ YES ☐ NO

19. BPR INVESTIGATION INITIATED? ☐ YES ☐ NO

20. REMEDIAL TRAINING SCHEDULED? IF YES, LIST DATE (S) AND TYPE: ☐ YES ☐ NO

☐ YES ☐ NO

21. REMARKS/DETAILS

22. INITIATING OFFICER                    TITLE                    DATE

II-4

AR 4-25
9/2/93

APPENDAGE III

Dear:

     This will acknowledge receipt of the complaint which you filed with this agency.

     You will be contacted by a Department representative in the near future.  Any questions you may have concerning your complaint should be directed to the Bureau of Professional Responsibility at (717) 783-5145.

            Very truly yours,

            Director
            Bureau of Professional Responsibility

AR 4-25                          APPENDAGE IV

SP 1-102 (8-93)    9/2/93

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA<br>PENNSYLVANIA STATE POLICE<br>**NOTIFICATION OF INQUIRY** | **NOTE:** INVESTIGATORS SHALL PREPARE ORIGINAL AND ONE COPY, RETAIN THE ORIGINAL WITH CASE FILE AND PROVIDE COPY TO THE SUBJECT OF INVESTIGATION. ONE OF THE THREE LISTED INVESTIGATION TYPES SHALL BE CHECKED. |

BPR -

_____    _____    _____
RANK                          NAME                        TROOP/STATION

**YOU ARE HEREBY NOTIFIED OF THE FOLLOWING:**

☐ **A COMPLAINT INVESTIGATION IS BEING CONDUCTED INTO AN INCIDENT IN WHICH YOU ARE ALLEGED TO HAVE BEEN INVOLVED. THE DETAILS OF THE COMPLAINT ARE AS FOLLOWS: (EXPLANATION BELOW)**

☐ **A NON-COMPLAINT INVESTIGATION IS BEING CONDUCTED IN ACCORDANCE WITH DEPARTMENT DIRECTIVES. THE DETAILS OF YOUR INVOLVEMENT ARE AS FOLLOWS: (EXPLANATION BELOW)**

☐ **AN ADMINISTRATIVE INVESTIGATION IS BEING CONDUCTED PURSUANT TO A REQUEST FROM THE OFFICE OF CHIEF COUNSEL. YOUR INVOLVEMENT HAS BEEN IDENTIFIED AS FOLLOWS:**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

                                    _____
                                    SIGNATURE OF INVESTIGATOR

**I ACKNOWLEDGE RECEIPT OF THIS NOTIFICATION AND I AM AWARE OF MY RIGHT TO UNION REPRESENTATION.**

_____          _____    _____    _____    _____
SIGNATURE                    BADGE/I.D. NO.      SOCIAL SECURITY NO.    DATE         TIME

APPENDAGE V

AR 4-25
9/2/93

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

## AUTHORIZATION TO OBTAIN MEDICAL INFORMATION

I, _____, do hereby, voluntarily and without promises or threats of any kind, authorize _____, of the Pennsylvania State Police to obtain information from all medical authorities, hospitals, clinics, or physicians who possess any and all records concerning my medical examinations, treatments, and/or hospital/clinic admissions relative to the examination and/or treatment of _____.

I further understand that the information obtained is to be used for internal, administrative purposes only and will not be used as evidence against me in any criminal proceeding.

_____
SIGNATURE

_____
WITNESS

_____
PRESENT STREET ADDRESS

_____
WITNESS

_____
CITY                STATE          ZIP CODE

_____
DATE OF BIRTH

_____
DATE                            TIME

AR 4-25
9/2/93

APPENDAGE VI

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
## AUTHORIZATION TO OBTAIN FINANCIAL INFORMATION

I, _____, do hereby, voluntarily and without promises or threats

any kind, authorize _____ of the Pennsylvania State Police to

obtain and examine my financial records held by any financial institution that possess such records.

I further understand that the information obtained is to be used for internal, administrative purposes only and may not b

used as evidence against me in any criminal proceeding.

_____
SIGNATURE

_____          _____
WITNESS                                       PRESENT STREET ADDRESS

_____          _____
WITNESS                                       CITY          STATE       ZIP CODE

                                             _____
                                             DATE                    TIME

VI-1

SP 7-107 (9-88)

APPENDAGE VII

AR 4-25
9/2/93

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE
## AUTHORIZATION TO OBTAIN EMPLOYMENT RECORDS

I, _____, do hereby, voluntarily and without promises or threats of

any kind, authorize _____ of the Pennsylvania State Police to

obtain and examine all records held by my previous employer(s) concerning my employment history and job performance.

I further understand that the information obtained is to be used for internal, administrative purposes only and will not be

used against me as evidence in any criminal proceeding.

_____

SIGNATURE

_____          _____

WITNESS                                  PRESENT STREET ADDRESS

_____          _____

WITNESS                                  CITY          STATE          ZIP CODE

_____

DATE                    TIME

VII-1

AR 4-25
9/2/93

APPENDAGE VIII

SP 1-104 (8-93)

COMMONWEALTH OF PENNSYLVANIA
**PENNSYLVANIA STATE POLICE**
**ADMINISTRATIVE WARNING**

Member/Employe _____

Interviewer _____

BPR Control No. _____    Date _____

This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police.  I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any pending criminal action.  During the course of this questioning, even if you disclose information which indicates you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statement nor its fruits will be used against you in a criminal proceeding.

Since this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action.  You do have the right to have a union representative with you during such questioning.  If during the course of the interview, you have reason to believe that your statements could result in administrative action being initiated against you, union representation will be provided upon request.

Do you understand what I have just explained to you?        ☐ YES     ☐ NO

Do you have any questions concerning what I have just explained to you?        ☐ YES     ☐ NO

_____
SIGNATURE OF EMPLOYE/MEMBER                                 DATE

_____
SIGNATURE OF INTERVIEWER                                     DATE

SP 1 - 103 (9 - 86)

APPENDAGE IX

AR 4-25
9/2/93

PENNSYLVANIA STATE POLICE

**RIGHTS WARNING AND WAIVER NOTICE
TO PENNSYLVANIA STATE POLICE PERSONNEL**

TIME _____

DATE _____

PLACE _____

My name is _____ of the Pennsylvania State Police.
You have an absolute right to remain silent and anything you say can and will be used against you in a court of law. You also have the right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge before any questioning, if you so desire. If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue. If you do exercise your right to remain silent, your refusal to answer will not be grounds for administrative action.

**WAIVER**

I fully understand the statement warning me of my rights, and I am willing to answer questions. I do not want an attorney and I understand that I may stop answering questions anytime during the questioning. No promises have been made to me, nor have I been threatened in any manner. I also understand that my refusal to answer questions will not be grounds for administrative action.

_____
SIGNATURE

WITNESS:

S/ _____

S/ _____

IX-1

AR 4-25
9/2/93

APPENDAGE X

<u>Garrity v. New Jersey</u>, 87 S.Ct. 616, 385 U.S. 493, 17 L.Ed. 2d 562 (1967)

This case involved a situation where police officers who were being criminally investigated were given a choice to either incriminate themselves or forfeit their jobs under a state (New Jersey) statute dealing with forfeiture of office, tenure and pension rights by public employees who refuse to testify on grounds of self-incrimination. The officers chose to make confessions. However, the Supreme Court of the United States held the confessions were not voluntary, but were coerced. The court said that the option to lose their means of livelihood or to pay the penalty of self-incrimination is in direct contrast of free choice to speak out or to remain silent. That practice, the court said, is likely to exert such pressure upon an individual as to disable him from making a free and rationale choice. The protection of an individual under the Fourteenth Amendment against coerced statements prohibits the use of these statements, obtained under threat of removal from office, in subsequent criminal proceedings.

In summary, <u>Garrity</u> held that public employee statements that are induced by threat of dismissal or other discipline may not be used in a subsequent criminal prosecution.

APPENDAGE XII

COMPLAINT VERIFICATION
FORM SP 1-108

A.  PURPOSE:  The Complaint Verification provides a complainant with the opportunity to directly lodge a complaint with the Department in writing and on an official form.  It also serves to formally involve a complainant as a party in our complaint process.

B.  POLICY:  The form shall be used to verify citizen complaints that have not already been articulated in writing and properly signed by the complainant.  The form may be used for other type complaints with the approval of the Director, Bureau of Professional Responsibility.

C.  PREPARATION:  The verification form will only be employed by an investigator assigned a BPR investigation or of the Bureau of Professional Responsibility.

  1.  Except as outlined in paragraph 2. below, the verification form shall be completed by the assigned investigator.  The allegations shall be recorded from the complaint worksheet or from the complainant's present account.  The form shall then be presented to the complainant for review and signing.  A copy of the completed form may be mailed to the complainant by the investigator upon request.  If travel distance or other circumstances preclude personal contact with a complainant, the investigator shall request that the verification form be sent by the Bureau of Professional Responsibility.

  2.  The form will be mailed by the Bureau of Professional Responsibility to the complainant under the following circumstances:

    a.  When the Director, Bureau of Professional Responsibility determines that an investigation would most likely not be conducted if the complainant failed to return a completed verification form.

    b.  At other times, with the approval of the Director, Bureau of Professional Responsibility.

AR 4-25
9/2/93

D.    BLOCK INSTRUCTIONS:

   1.    NAME:  Self-explanatory.

   2.    HOME ADDRESS:  Self-explanatory.

   3.    REMARKS:  The complainant's allegations will be detailed
       under remarks.   When the form is completed by the
       investigator, the allegations may be recorded from the
       complaint worksheet or as related by the complainant.

   4.    SIGNATURE:  Self-explanatory.

   5.    DATE:  Self-explanatory.

APPENDAGE XI

U.S. v. Wade, 87 S. Ct. 1926, 388 U.S. 218, 18 L.Ed. 2d 1149 (1967)

The question addressed in this case was whether courtroom identifications of an accused at trial are to be excluded from evidence because the accused was exhibited to the witnesses before trail at a post indictment lineup conducted for identification purposes without notice to and in the absence of the accused's appointed counsel.  The Supreme Court of the United States held that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence, and was no violation of Wade's privilege against self-incrimination.  However, the courtroom identification should have been excluded because the lineup was conducted without notice to and in the absence of counsel.  The principle followed is that, in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.  The security of that right is as much the aid of the right to counsel as it is of the other guarantees of the Sixth Amendment.

In summary, Wade held that pretrial lineups constitute a critical step in the prosecutive process such that every individual has a right to counsel at such proceedings.

XI-1

COMMONWEALTH OF PENNSYLVANIA
**PENNSYLVANIA STATE POLICE**
## COMPLAINT VERIFICATION



AR 4-25
9/2/93

BPR CONTROL NUMBER

**COMPLAINANT INFORMATION**

| | | | | |
|---|---|---|---|---|
| **1.** **NAME** | FIRST | | M.I. | LAST |
| **2.** **HOME ADDRESS** | STREET/P.O. BOX | | | |
| | CITY | | | |
| | STATE | ZIP | HOME PHONE # ( ) | WORK PHONE # ( ) |

**3.**

**REMARKS:** PROVIDE A DETAILED NARRATIVE OF THE INCIDENT. IF THE COMPLAINT INVOLVES VERBAL ABUSE OR RUDENESS STATE THE SPECIFIC TERM, PHRASE, OR LANGUAGE CONSIDERED TO BE OFFENSIVE. IF THE COMPLAINT CONCERNS DISSATISFACTION WITH AN INVESTIGATION OR OTHER POLICE SERVICE, EXPLAIN WHAT ACTION OR OMISSION WAS UNACCEPTABLE. IF ADDITIONAL SPACE IS NEEDED USE THE REVERSE SIDE.

I AFFIRM THAT THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION OR BELIEF.

SIGNATURE

S. DATE

XII-3

AR 4-25
9/2/93

AR 4-25
9/2/93

## APPENDAGE XIII

Dear:

The preliminary personnel complaint you filed with the Pennsylvania State Police has been referred to the Bureau of Professional Responsibility for processing. To initiate an investigation, you must complete and return the enclosed Complaint Verification Form within thirty (30) days. Failure to return the completed verification form signed and within thirty (30) days will result in the termination of your complaint.

When completing Block 3, "Remarks," consider the following issues: Where did the incident occur? Give a location to the best of your knowledge and ability. When did the incident take place? Note the date, day of week and time, if possible. Who was present when the incident happened? List names, addresses and telephone numbers, if known. What are the details of the incident? Begin with your initial contact and give a detailed account of the events surrounding your complaint. If the allegation is verbal abuse or rudeness, please state the specific term, phrase or language that you considered offensive. An allegation such as "poor attitude" is not definite enough to permit a determination as to any wrongdoing having occurred. Complaints that indicate displeasure with service rendered by State Police personnel should also indicate a specific instance or instances of lack of action or unacceptable action. Merely disagreeing with the result of an action taken is not basis for a complaint.

Please be aware that your complaint will have no impact on cases before a court of law. If an arrest is at issue, proper redress is found through the judicial system and should be pursued there.

Upon our receipt of the completed verification form, you will be notified of the action to follow.

Any questions you may have concerning your complaint should be directed to the Bureau of Professional Responsibility, at (717) 783-5145.

Very truly yours,

Director
Bureau of Professional Responsibility

XIII-1

33

*LT BROWN*

# 1998 - 2000

PROVISIONS FROM BOARDS

OF ARBITRATION AWARDS

AND

COLLECTIVE BARGAINING AGREEMENTS

BETWEEN

COMMONWEALTH OF PENNSYLVANIA

AND

THE PENNSYLVANIA STATE TROOPERS

ASSOCIATION

EFFECTIVE JULY 1, 1998 TO JUNE 30, 2000

Distributed by:
Pennsylvania State Police
Bureau of Personnel
Labor Relations Section
Harrisburg, PA 17110
Phone 717-783-5547

b.　　Unresolved grievances shall be presented to a tripartite panel consisting of an arbitrator appointed by each party and a neutral arbitrator as Chairperson as established in Article 28, Grievance Procedure.

c.　　The decision of the arbitrator shall be final and binding on both parties.

d.　　Grievances which are pending and ready for a hearing shall be scheduled monthly for the purpose of adjusting grievances under this section.

e.　　Grievances that need to be scheduled for arbitration shall be scheduled independent of other scheduled grievances.

<u>Section 11.</u>  It is understood that the provisions of this Article are not applicable to Commissioned Officers.


## ARTICLE 38
## TRANSFERS

<u>Section 1.</u>　　If a member is transferred not at his/her request, on a temporary transfer (less than six months) and he/she is not provided transportation, he/she shall receive a travel allowance equal to the IRS rate applicable in Pennsylvania for all miles in excess of fifty miles (driven miles) per day from his/her place of residence to his/her station and return.

<u>Section 2.</u>　　If a permanent involuntary transfer results in a subsequent involuntary transfer (the permanent transfer lasting for less than six months) the above allowance shall be applicable retroactively to the member.

<u>Section 3.</u>　　When an involuntary intratroop transfer must be made, the member to be transferred must be the member who has the least seniority in his/her rank in that station (provided he/she has not been moved involuntarily in the previous six months) except in cases of promotion, in conjunction with the imposition of discipline or where there is a need for special skills or specialty.

56



When the least senior member is transferred under this section, the Department shall not be required to consider the seniority of any member concurrently or subsequently transferred into that station.

# ARTICLE 39
## BADGE

Section 1.    The Commonwealth shall provide each member who retires under one of the following conditions with his/her badge at no cost to the member:

    a.    Superannuation retirement (age 50)
    b.    Retirement with 25 years of service
    c.    Service-connected disability retirement

Section 2.    Any member who, at the time of retirement, has been found guilty of criminal charges resulting from the performance of his/her duties or who has had Court-Martial proceedings instituted against him/her shall be excepted from the provisions set forth in Section 1 above.

Section 3.    Unless such investigation involves allegations of criminal misconduct, no member shall be denied his badge under the circumstances set forth above as a result of a pending BPR investigation.

# ARTICLE 40
## CAR UTILIZATION STUDY

The seven-member committee which was appointed by the Pennsylvania State Troopers Association to meet periodically with the State Police Administration to discuss the feasibility of developing a program to permit State Police officers to use State Police vehicles during off-duty hours shall continue during the term of this Agreement.

57

ATTACHMENT 109
PAGE 3 OF 3

34

OM 7-9
5/8/98

CHAPTER 3

PROMOTIONS - SECONDARY CRITERIA

A.     PURPOSE

This regulation defines the secondary criteria to be utilized in making Corporal, Sergeant, Lieutenant, Captain, and Major promotions from within bands on the promotional eligibility lists.

B.     BANDING

As recommended by an Expert Panel of Industrial Psychologists, the Department will employ the use of banding beginning with the 1997 Promotional Eligibility Lists for Corporal, Sergeant, and Lieutenant. All candidates within a band are deemed to be equivalent with respect to test score.

C.     SECONDARY CRITERIA

The Pennsylvania State Police, the Bolden Plaintiffs, and the Pennsylvania State Troopers Association have agreed upon the following secondary criteria (Refer to Appendage B):

1.     Corporals: Total job seniority up to 180 months with random numbers to break ties.

2.     Sergeants: Total job seniority up to 180 months with random numbers to break ties.

3.     Lieutenants: Commissioner's discretion to consider the following factors:

   a.     Time in grade as Corporal and Sergeant.

   b.     Discipline or commendations with a one-year limitation on discipline consideration at time of the promotion review.

   c.     Founded BPRs within two years of the promotion review.

   d.     Annual performance evaluations limited to the two most recent evaluations at time of promotion review.

3.1

OM 7-9
5/8/98

   e. Evaluation of the position to be filled and the relational suitability of the candidate.

**D. JOB SENIORITY**

Total job seniority for Corporals and Sergeants is defined by the member's enlistment date and will be calculated in number of months from enlistment date to the date the promotional eligibility list is established, with a maximum of 180 months.

**E. RANDOM NUMBERS**

Random numbers will be used to break ties in seniority within a band. The random number is a six-digit number assigned to every member who is eligible to participate in the promotion examination process. Random numbers will be issued prior to the administration of the examinations and will also be included on individual examination results notices. The highest number is given first priority.

**F. CORPORAL AND SERGEANT ELIGIBILITY LISTS**

The official State Police Corporal and Sergeant eligibility lists will be established by score bands in seniority order. Members will be placed in top-down random number order where seniority is tied. Promotions will be offered from the lists in that order.

**G. LIEUTENANT ELIGIBILITY LIST**

The official State Police Lieutenant eligibility list will be established alphabetically within each score band. Promotions will be offered in accordance with the procedures outlined above.

**H. CAPTAIN AND MAJOR PROMOTIONS**

At the discretion of the Commissioner, promotions to the ranks of Captain and Major shall be made on an as-needed basis from those candidates appearing in the top band of the eligibility list.

I.    PROMOTION OFFERS

Promotion offers must have been made to all members in a band before moving to the next lower band.  During subsequent rounds of promotions, members in the top band of the Corporal and Sergeant eligibility lists who have declined an offer of promotion shall continue to be offered vacant field positions prior to extending such offers to members in the next lower band.  If the situation arises on the Lieutenant eligibility list that a member remains in a band by virtue of declining a promotion offer and promotion offers have been initiated in the next lower band, said member shall be given priority consideration by the Commissioner in accordance with the procedures outlined above.

CAPTAIN DARRELL OBER      *    IN THE

        Petitioner,      *    COMMONWEALTH COURT

vs.      *    OF

COLONEL PAUL EVANKO, et. al.      *    PENNSYLVANIA

        Respondents.      *    Case No. 35MD2000

*  *  *  *  *  *  *  *  *  *  *  *

## PETITIONER'S MOTION TO WITHDRAW
## PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION AND
## PETITIONER'S MOTION TO WITHDRAW
## PETITIONER'S REQUEST FOR EXPEDITED HEARING

Petitioner, Captain Darrell Ober (Captain Ober), by and through his attorneys, John Miller, Esq., Byron L. Warnken, Esq., James A. Lanier, Esq., hereby withdraw: (1) Petitioner's Motion for Preliminary Injunction and (2) Petitioner's Request for Expedited Hearing.

The Respondents have stipulated to the injunctive relief sought by Captain Ober in his Motion for Preliminary Injunction, thereby making the need for a preliminary injunction hearing and the need for an expedited hearing moot. The Respondents have agreed to maintain this stipulation until the Court rules upon Captain Ober's Application for a Writ of Mandamus. This stipulation is attached at Appendix A.

This motion to withdrawal in no way affects Petitioner's Application for Writ of Mandamus.

         _____
         John Miller, Esquire
         7 West Main Street
         P.O. Box 27
         Fawn Grove, Pennsylvania 17321

Bar No. 50033

Byron L. Warnken, Esquire
James A. Lanier, Esquire
32 East Preston Street
Baltimore, Maryland 21202-2727

Attorneys for Petitioner Ober.

January 27, 2000



**PENNSYLVANIA STATE POLICE**
**DEPARTMENT HEADQUARTERS**
**1800 ELMERTON AVENUE**
**HARRISBURG, PA. 17110**
Office of Chief Counsel
(717) 783-5568

January 27, 2000

FAXED AND SENT FIRST CLASS MAIL

Mr. Byron L. Warnken, Esquire
32 East Preston Street
Baltimore, MD 21202-2727

RE: <u>Ober v. Evanko and Pennsylvania State Police</u> (Commonwealth Court of Pennsylvania)

Dear Mr. Warnken:

Pursuant to our conversation, this confirms that we will suspend the transfer of Captain Ober in exchange for your withdrawal of the motion for a preliminary injunction.

We agree to return Captain Ober to the IIMS (Integrated Incident Management System) position he served in prior to the transfer, in the Bureau of Technology Services, under the supervision of Major Wesley Waugh. We agree also not to transfer Captain Ober outside the Harrisburg/Hershey area until such time as the instant litigation is resolved either in our favor or your favor; however, we reserve the right to transfer Captain Ober to other existing positions in this area, that meet the operational needs of the Department, during the pendency of the litigation. (This agreement would not extend to any appeal from a Commonwealth Court determination).

This suspension of transfer will not affect the Department's intent to proceed forward with the mandamus action nor does it waive or limit any arguments that we may raise in this action, but it will obviate the need for the preliminary injunction hearing scheduled for tomorrow.

I assume that you will be cancelling the preliminary injunction hearing scheduled for tomorrow in Philadelphia – please fax me a copy of whatever document you file with the court that accomplishes this.

Very Truly Yours,

*Joanna N. Reynolds*

Joanna N. Reynolds

A



*An Internationally Accredited Law Enforcement Agency*

CAPTAIN DARRELL OBER        \*   IN THE

     Petitioner,          \*   COMMONWEALTH COURT

                    \*   OF

v.                  \*   PENNSYLVANIA

COLONEL PAUL EVANKO, et. al.   \*   Case No. 35MD2000

     Respondents.       \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### ORDER GRANTING PETITIONER'S MOTION TO WITHDRAW PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION AND PETITONER'S MOTION TO WITHDRAW PETITIONER'S REQUEST FOR EXPEDITED HEARING

Having reviewed Petitioner's Motion to Withdraw Petitioner's Motion for Preliminary Injunction and Petitioner's Motion to Withdraw Petitioner's Request for Expedited Hearing, and any Response filed by the Respondents, this Court hereby issues, this _____ day of January, 2000, that:

1. Petitioner's Motion for Preliminary Injunction be dismissed as moot in light of the stipulation by Respondents;

2. Petitioner's Motion for Expedited Hearing be dismissed as moot in light of the stipulation by Respondents;

3. Petitioner's Application for Writ of Mandamus be set on the docket in the ordinary course of business.

 

 

_____

Judge

| | | |
|---|---|---|
| **CAPTAIN DARRELL OBER** | * | **IN THE** |
| **Petitioner,** | * | **COMMONWEALTH COURT** |
| **vs.** | * | **OF** |
| **COLONEL PAUL EVANKO, et. al.** | * | **PENNSYLVANIA** |
| **Respondents.** | * | **Case No. 35MD2000** |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## CERTIFICATE OF SERVICE

This is to certify that one copy of (1) Petitioner's Motion to Withdraw Petitioner's Motion for Preliminary Injunction and Petitioner's Motion to Withdraw Petitioner's Request for Expedited Hearing; and (2) a certificate of service in the above-caption matter was mailed, first class, postage prepaid, this 27th day of January, 2000, to: Joanna N. Reynolds, Esq., Office of Chief Counsel, Pennsylvania State Police Department Headquarters, 1800 Elmerton Avenue, Harrisburg Pennsylvania 17109.

John Miller, Esquire
7 West Main Street
P.O. Box 27
Fawn Grove, Pennsylvania 17321

Bar No. 50033

Attorney for Petitioner Ober



**PENNSYLVANIA STATE POLICE**
DEPARTMENT HEADQUARTERS
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

85-198
Special Order
December 23, 1985

SUBJECT:     Bureau of Professional Responsibility/
             Internal Affairs Division

TO:          Area, Troop and Station Commanders
             and Bureau Directors

FROM:        Commissioner

REFERENCE:   (a)  Special Order 85-179 dated November 29, 1985

ENCLOSURE:   (1)  INTERNAL AFFAIRS DIVISION

1.  Enclosure (1) becomes effective on January 23, 1986.  It establishes policies and procedures to initiate, conduct and/or control all necessary investigations, and to process all complaints or allegations of misconduct by Department personnel.

2.  An initial supply of the Complaint Reception and Processing Worksheet, Form SP 1-101 (12-85); Pennsylvania State Police Personnel Rights Warning and Waiver, Form SP 1-103 (12-85); Administrative Warning, Form SP 1-104 (12-85); Consent to Obtain Medical Information, Form SP 1-105 (12-85); Consent to Obtain Financial Information, Form SP 1-106 (12-85); and Consent to Obtain Employment Records, Form SP 1-107 (12-85), will be distributed under separate cover.  Troop Commanders/Bureau Directors shall ensure the forms are available for use on the date the provisions of this directive become effective.  Additional supplies of the forms may be obtained through established requisition procedures.

3.  Commanders/Directors shall ensure that all personnel under their command review and become familiar with the contents of this Directive.  It shall be made a subject of weekly classes.

*Jay Cochran Jr.*

Jay Cochran, Jr.
Commissioner

Distribution "B"
plus All Personnel



**PENNSYLVANIA STATE POLICE**
DEPARTMENT HEADQUARTERS
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

Enclosure (1)
Special Order 85-198

SUBJECT:  INTERNAL AFFAIRS DIVISION

.01    AUTHORITY

The Bureau of Professional Responsibility, Internal Affairs Division, is authorized by the Commissioner of the Pennsylvania State Police to recommend policies and procedures to initiate, conduct and/or control all necessary investigations, and to process all complaints or allegations of misconduct by Department personnel.

.02    PURPOSE

The purpose of this directive is to establish a prompt, thorough, factual and impartial means to investigate incidents and complaints involving Department personnel.

.03    GOALS

A.    <u>Protection of the Public</u>:  The public has the right to expect efficient, fair and impartial law enforcement. Any misconduct by Department personnel must be detected, thoroughly investigated and properly adjudicated to assure these goals.

B.    <u>Protection of the Department</u>:  The integrity of the Department depends on the personal integrity and self-discipline of all personnel.  The Department must not be subjected to public scorn and censure because of misconduct by a few.  When an informed public knows that the Department honestly and fairly investigates and adjudicates all allegations of misconduct against its personnel, confidence will be promoted and public support will be enhanced.

C.    <u>Protection of Personnel</u>:  All personnel must be protected against false allegations of misconduct.  Allegations will be thoroughly investigated to protect the integrity of all personnel.

D.    <u>Discovery of Unsatisfactory Performance</u>:  Personnel who engage in acts of misconduct or have demonstrated that

-1-

they are unfit in the performance of their duties must be identified for the protection of the public, the Department and Department personnel.

.04    DEFINITIONS

A.    Administrative Action:  Corrective action taken by command/supervisory personnel which may include the issuance of a Disciplinary Action Report.

B.    Administrative Investigation:  Inquiries into alleged misconduct of Department personnel which are intended to lead to an objective finding, or any inquiry into the actions of Department personnel required by directives where no misconduct is alleged.

C.    Bureau Register:  A compilation of data indexing the initiation and processing of administrative investigations by control number.

D.    Complainant:  A person with knowledge of an alleged incident of misconduct, or violation of a statute or Department directive who brings the information to the attention of the Department.

E.    Complaint:  Any oral or written receipt of information which by directive requires the initiation of an administrative investigation, or any allegation of misconduct, or violation of a statute or Department directive made against Department personnel.

F.    Control Number:  A sequential number assigned by the Internal Affairs Division to index all complaints and administrative investigations.

G.    Misconduct:  Any violation of the Pennsylvania State Police Code of Conduct or any other conduct which could reasonably be expected to destroy public respect and confidence in the Pennsylvania State Police.

.05    DUTIES AND RESPONSIBILITIES

A.    All Personnel:  Personnel shall ensure that the confidentiality of all complaints is maintained.

B.    Director, Bureau of Professional Responsibility:

    1.    Exercise administrative and command supervision over the Internal Affairs Division.

    2.    Assign and coordinate all investigations of complaints against Department personnel.  Depending on the nature of the incident, the investigation

-2-

may be conducted by a member of the Internal
Affairs Division, or assigned to the Troop or
Bureau of affected personnel, or assigned to a
Commissioned Officer of the Director's choice for
subsequent investigation.

3. Ensure that all investigations are conducted in a
prompt, thorough and impartial manner.

4. Furnish an acknowledgement of receipt, in writing,
to the complainant. Refer to Appendage B.

5. Furnish notification, in writing, to the affected
Department personnel of a pending investigation,
unless circumstances dictate otherwise. Refer to
Appendage C.

6. Provide a monthly report summarizing the Division's
activities to the Commissioner/designee.

7. Notify the affected Troop Commander/Bureau Director
of the results of an investigation for subsequent
notification of the affected Department personnel.

C. Troop Commanders/Bureau Directors:

1. Ensure compliance with the provisions of this
Directive.

2. Supervise and coordinate all investigations of
complaints against Department personnel conducted
within their Troop/Bureau.

3. Assign a Commissioned Officer to those complaints
which are to be investigated at the Troop/Bureau
level. This will be in concurrence with the
Director, Bureau of Professional Responsibility.

4. Assist members of the Internal Affairs Division in
the investigation of complaints should any investi-
gatory difficulties occur.

5. Notify affected Department personnel of the results
of the investigation.

6. Ensure that in those cases where the investigation
is conducted by Troop/Bureau personnel administra-
tive action is initiated when warranted.

7. Initiate administrative action when warranted upon
receipt of an investigation which was conducted by
a member of the Internal Affairs Division.

-3-

D.  Investigators:

1.  Ensure that all investigations conducted are thorough and impartial, and that the constitutional rights specified in Garrity vs. New Jersey and Miranda vs. Arizona are protected, and that any provisions granted by contract are not violated. Refer to Appendages G & H.

2.  Notify the Troop Commander/Bureau Director or the Director, Bureau of Professional Responsibility immediately whenever investigative difficulties occur.

3.  Assist federal, state, county and municipal police agencies with investigations wherein Department personnel may be implicated in illegal activities or other acts of misconduct.

4.  Assist the Office of Chief Counsel, upon request, in preparing cases when Department personnel are subjected to administrative action and/or criminal action, as well as gathering information for legal response when the Department or its personnel are named in a civil lawsuit.

5.  Notify the complainant of the results of the investigation. *Include other parties involved*

E.  Personnel Receiving Complaints:

1.  Receive complaints against Department personnel courteously, regardless of the circumstances under which they are received.

2.  Process all complaints in accordance with the provisions of this directive.

F.  Personnel Who are the Subject of an Administrative Investigation:

1.  Personnel may at any time during the course of an internal investigation be ordered, in writing, by the Commissioner/Troop Commander/Bureau Director or their designee to submit to any or all of the following in accordance with FR 1-1 and/or FR 1-2.:

    a.  Breath Test.

    b.  Urine Test.

    c.  Blood Test.

-4-

d. Polygraph Test.

e. Lineup.

f. Correspondence, Form STD-501, related to the alleged misconduct or performance of duty.

g. Medical/psychological/psychiatric examination.

h. Any other non-testimonial evidence test.

i. Questioning related to alleged misconduct or performance of duty.

2. Personnel shall be advised, however, that none of the results or information can be used against them in a criminal prosecution. Refer to Administrative Warning, Appendage G.

G. **Personnel Who are the Subject of a Criminal Investigation:** When interviewed during the course of an investigation, personnel shall if applicable, be afforded the constitutional protections which are guaranteed as a result of U.S. Supreme Court decisions in Miranda vs. Arizona and Garrity vs. New Jersey. Refer to Appendage H.

.06 INVESTIGATIVE ASSIGNMENT CRITERIA

A. The Internal Affairs Division may, at the discretion of the Director, Bureau of Professional Responsibility, retain primary investigative responsibility for personnel inquiries under the following circumstances:

1. Shooting incidents and physical force incidents as defined in directives, regardless of personnel duty status.

2. Any allegation of criminal conduct directed at Department personnel.

3. Any case of alleged misconduct by Department personnel.

4. Allegations of violation of FR 1-1.34, AR 4-6.03 A 6, and other allegations of discrimination, harassment or violation of civil rights.

5. Requests for assistance by personnel who are victims of personal harassment, false accusations, or contrived situations intended to harm.

6. Special requests for investigation initiated by the Commissioner.

B. The following criteria will be considered by the Director, Bureau of Professional Responsibility in determining if the Internal Affairs Division will assume investigative responsibility or if the investigation will be assigned to Troop/Bureau personnel:

1. Seriousness or complexity of the allegation to be investigated.

2. Source of the complaint.

3. Number of personnel involved.

4. Assignment of personnel implicated in the allegation.

5. Geographical limitations.

6. Need for internal security relative to all or part of the investigation.

7. Any exceptional circumstance noted by or brought to the attention of the Director, Bureau of Professional Responsibility.

C. While the Internal Affairs Division is concerned with all instances of misconduct, it will not assume investigative responsibility for mere performance inadequacies or procedural discrepancy violations unless they are indicative of a more serious underlying problem. Monitoring of these latter types of violations will occur to identify trends.

D. If, in the course of monitoring an ongoing investigation, the Director, Bureau of Professional Responsibility determines that investigatory difficulties exist, the Internal Affairs Division may be directed to assume full or partial responsibility for conducting that specific investigation. This may occur at any stage of investigation including post-completion. Even when the investigation is being handled by Troop/Bureau personnel, the Director may direct that specific investigative procedures be undertaken if it is determined to be necessary, prudent or desirable.

.07   COMPLAINT PROCESSING

A. Types of Complaints: Complaints may be received in any of the following manners and shall be processed in accordance with this directive in all instances:

-6-

1. Telephone - Self-explanatory.

2. In-Person - Individuals may appear at a Department installation, or may make a complaint to personnel at any location.

3. Correspondence - Self-explanatory.

B. Receiving Complaints:

1. Every complaint, whether anonymous, verbal or written, received by personnel at the Troop/Bureau level shall be recorded on the Complaint Reception and Processing Worksheet, Form SP 1-101, and processed as described in Appendage A. When the complaint involves personnel in the chain of command and the process described in Appendage A is inappropriate, contact may be made directly with the Internal Affairs Division.

2. Complainants shall not be required to appear at a Department location or submit correspondence to initiate a complaint.

3. Complainants may remain anonymous regardless of the type of complaint. However, personnel receiving the complaint shall attempt to discover the identity of the complainant if possible.

4. Complainants shall be advised that a Department representative will contact them if their identity is known.

5. The following procedure shall be followed by personnel receiving a complaint during a weekend, holiday or after hours:

   a. In those cases which are <u>not</u> of a serious nature and do not require an immediate response from an Internal Affairs Division investigator, the information shall be documented and and processed in accordance with Appendage A during normal working hours.

   b. In cases of a <u>serious</u> nature that would logically dictate a swift response on behalf of an Internal Affairs Division investigator, personnel receiving the complaint shall immediately notify the supervisor who in turn shall notify the Troop Officer of the Day who will then notify the Officer of the Day at Department Headquarters. The Officer of the Day at Department Headquarters shall contact the appropriate Bureau of Professional

-7-

Responsibility duty member to evaluate the necessity of an immediate response into the investigation; e.g., use of excessive force, shooting incidents, civil rights violations, serious breaches of conduct by Department personnel that ultimately would be investigated by the Internal Affairs Division, and incidents that are likely to generate more than routine public interest.

C.  **Notifying Involved Individuals**: The following individuals shall be notified by the Director, Bureau of Professional Responsibility:

1.  The complainant shall be notified that the complaint has been received. Refer to Appendage B.

2.  The individual(s) involved in the complaint shall be notified unless circumstances dictate otherwise. Refer to Appendage C.

D.  **Investigation Procedures**: The following procedures shall be followed by individuals conducting Department personnel investigations:

1.  An Incident Memo, Form SP 7-001, shall be prepared.

2.  The General Investigation Report, Form SP 7-0025, shall be used to report all Department personnel investigations.

    NOTE: In those instances where a violation of a statute is alleged, an Initial Crime Report, Form SP 7-004, or a Non-Traffic Citation, Form SP 7-0017B, as appropriate, shall also be prepared.

3.  Make a _personal_ contact when practical with complainants, witnesses and personnel who are involved. Anonymous complaints shall not be automatically dismissed. A thorough investigation shall be conducted to independently prove or disprove the allegation. No action shall be taken against any Department personnel solely on the basis of an anonymous complaint. Sincere attempts shall be made to discover the identity of such complainant. The investigations shall take place because they may reveal the only clue to the discovery of problems impacting the Department's integrity and operation.

4.  Take oral or written statements as to the alleged misconduct by Department personnel.

-8-

NOTE: Tape recorded statements may be taken, if appropriate, with the consent of the party involved.

5. Collect all documents and/or reports or copies thereof, if originals are not available, which have been generated concerning the incident being investigated.

6. Employ all available investigative tools to secure evidence to assist in determining the facts of an investigation. All evidence collected shall be processed in accordance with the procedures outlined in Operations Manual 7-7. Examples of investigative tools and evidence to be used in the investigation are as follows:

   a. Documents and Records

      (1) Medical Reports - Refer to Appendage D.

      (2) Licenses, Registrations or any Applications.

      (3) Telephone toll records.

      (4) Financial Records - Refer to Appendage E.

      (5) Credit Bureau Checks.

      (6) Search Warrants/Affidavits.

      (7) Employment Records - Refer to Appendage F.

      (8) Subpoenas.



      (9) Statements/Interviews - NOTE: All statements/interviews obtained shall be recorded on separate sheets of paper and attached to the investigative report along with the appropriate Warning Form, Appendage G or H.

   b. Clothing

      (1) Victims - e.g., shootings, brutality, etc.

      (2) Department Personnel - Collection of clothing for purposes of exoneration, if warranted.

-9-

c.  <u>Photographs</u>

(1)  Victims - Brutality, shootings, etc.

(2)  Scenes - Location of alleged violation.

(3)  Photo Lineups - Refer to U.S. vs. Wade, covering the Supreme Court guidelines associated with Lineups. Refer to Appendage J.

d.  <u>Radio Tapes</u> (Self-explanatory).

e.  <u>Sketches</u> - Prepared of scene, if warranted.

f.  <u>Weapons</u> - ascertain if:

(1)  Issued/personal.

(2)  Ammunition - issued/personal.

(3)  Alterations

(4)  Make, Model, Serial Number, Caliber.

g.  <u>Technical Aids</u>

(1)  Laboratory - chemistry, comparisons, etc.

(2)  Ballistics.

(3)  Polygraph.

(4)  Helicopter.

(5)  Scuba Team.

7.  Ensure that the personal property of Department personnel is not subjected to search and seizure without probable cause and a search warrant as required by law. However, Department property may be searched at any time, even if assigned to or used exclusively by a single officer. This search will be conducted by any authorized person pursuant to an investigation.

8.  Accurately report the facts of any action which violates Department directives and/or actions which also involve violations of statutes. <u>At no time will recommendations be suggested or offered as to the appropriate administrative action to be taken.</u> This does not preclude listing Department directives violated.

*Clarify*

-10-

9.    Strictly adhere to all Department directives, the Pennsylvania Rules of Criminal Procedure and statutes while conducting an investigation of any Department personnel.

10.   Ensure that all individuals under investigation are advised of their Constitutional Rights which may apply during the investigation. Refer to Appendages G and H.

11.   Terminate the investigation when it is determined that the complaint is unfounded or that the individual is clearly exonerated.

12.   Ensure that the investigation is completed and all reports are received within 30 days after assignment unless another time period is specified by the Director, Bureau of Professional Responsibility.

E.   Submission of Internal Investigation Reports:

1.    Investigations completed by Troop/Bureau personnel shall be forwarded to the appropriate Troop Commander/Bureau Director.

   a.   Upon completion of an investigation which warrants administrative action, the Troop Commander/Bureau Director shall process the report(s) in accordance with FR 3-3.

   b.   Upon completion of an investigation which does not require administrative action, the Troop Commander/Bureau Director shall endorse and forward the investigative report(s) with the attached worksheet through the Area Commander to the Director, Bureau of Professional Responsibility.

2.    Investigations completed by Bureau of Professional Responsibility personnel shall be forwarded to the Director, Bureau of Professional Responsibility.

   a.   Upon completion of an investigation which warrants administrative action the Director, Bureau of Professional Responsibility shall endorse the investigative report(s) and forward it to the Deputy Commissioner for review. The report(s) shall then be returned through the Area Commander to the appropriate Troop Commander/Bureau Director for administrative action, in accordance with FR 3-3.

b.   Upon completion of an investigation which does not warrant administrative action, the Director, Bureau of Professional Responsibility shall endorse the investigative report(s) and forward it to the Deputy Commissioner for review.

3.   The central location for the collection and maintenance of all administrative investigation information shall be the Bureau of Professional Responsibility, Internal Affairs Division. All personnel investigations are of a confidential nature and may be reviewed only upon authorization of the Commissioner/designee.

.08   INTERNAL AFFAIRS DIVISION PERSONNEL

A.   <u>Selection</u>: Staffing an Internal Affairs Division is an important factor in the success or failure of the Division. The below listed factors will be considered in the selection process:

1.   Members assigned to the Internal Affairs Division shall be volunteers.

2.   Members shall have demonstrated that they possess a high degree of investigative skills and the ability to write clear, concise and complete investigative reports.

3.   Members shall have an excellent reputation, among both their peers and supervisors, in terms of integrity and overall performance as members.

4.   Members shall be familiar with those statutes, and Department directives, policies and procedures which are related to internal investigations.

5.   Members should have a thorough knowledge in the collection and preservation of evidence.

6.   Members should have knowledge of records maintained by other sources and agencies, and their availability.

7.   Members should possess the ability to perform photographic surveillance and possess or be willing to acquire the proper certification required to perform electronic surveillance.

8.   Members should be in good physical condition and present a neat appearance.

9.   Members should be able to interact effectively with people and be proficient in interviewing and interrogation techniques.

B.   <u>Tenure:</u>  It is a generally accepted practice to period-ically rotate members assigned to an Internal Affairs Division.  The assignment of an investigator to this Unit should be for a period of approximately 3 years. This time limitation may be altered for good cause at the discretion of the Commissioner.  This rotation process will assure the infusion of new personnel and new ideas, foster a career development process, and allow greater member participation.  These factors should create a greater understanding and respect for the internal affairs investigation process and thereby lessen the alienation of investigators from peers and supervisors.

-13-

APPENDAGE A

COMPLAINT RECEPTION AND PROCESSING WORKSHEET
FORM SP 1-101

A.  PURPOSE:  This form is used to provide a uniform method of receiving and recording complaints against Department personnel.

B.  PREPARATION:  This form shall be printed with ball-point pen or typewritten in original only by the individual receiving the complaint.

C.  BLOCK INSTRUCTIONS:  Self-explanatory.

D.  DISTRIBUTION WHEN A COMPLAINT IS RECEIVED AT A TROOP/BUREAU LOCATION:

   1.  Personnel Receiving Complaint - Forward thru channels to the Troop Commander/Bureau Director by the most expedient means possible.  If the complaint involves an individual in the chain of command, the individual may be bypassed when submitting the Worksheet thru channels.

   2.  Troop Commander/Bureau Director - The Troop Commander/Bureau Director, after reviewing the Worksheet, shall determine if an investigation is warranted.

      a.  If the Troop Commander/Bureau Director determines that an investigation is not warranted, the Troop Commander/Bureau Director shall immediately forward the Worksheet, through channels, to the Director, Bureau of Professional Responsibility.  An endorsement shall be attached to the Worksheet citing reasons for his decision.  At this time a control number will be assigned and recorded in the Bureau Register.

      b.  If the Troop Commander/Bureau Director determines that an investigation is warranted, the Director, Bureau of Professional Responsibility or his designee shall be contacted by telephone for concurrence and to determine assignment of the investigation.  At this time a control number will be assigned and recorded in the Bureau Register.

         (1)  If the decision is made for the investigation to be conducted by Troop/Bureau members, the Worksheet shall be forwarded to the investigating officer for inclusion as an attachment to the General Investigation Report.

A-1

(2) If the decision is made for the investigation to be conducted by a member of the Internal Affairs Division, the Worksheet shall be immediately forwarded to the Director, Bureau of Professional Responsibility. It will then be forwarded to the Internal Affairs Division investigator for attachment to the General Investigation Report.

E.   DISTRIBUTION WHEN A COMPLAINT IS RECEIVED BY THE BUREAU OF PROFESSIONAL RESPONSIBILITY:

1.   When it is determined that an investigation is not warranted, a Worksheet shall be prepared and filed.

2.   When it is determined that an investigation shall be conducted by a member of the Internal Affairs Division, the Worksheet shall be prepared and forwarded to the assigned Internal Affairs Division investigator for attachment to the General Investigation Report.

3.   When it is determined that the investigation is to be conducted by Troop/Bureau members, the Worksheet shall be prepared and forwarded to the Troop Commander/Bureau Director of the affected personnel. The assigned investigator shall attach it to the General Investigation Report.

SP 1-101 (12-85)

 

Enclosure (1)
Special Order 85-198

## COMPLAINT RECEPTION AND PROCESSING WORKSHEET

1. Complainant's name: _____

2. Complainant's address: _____

   _____

3. Complainant's phone number: (      ) _____

4. Complainant's place of employment and phone number: _____

   _____ (      ) _____

5. Type of allegation: _____

   ☐ Physical Force

   ☐ Shooting Incident

   ☐ Physical Abuse

   ☐ Verbal Abuse

   ☐ Criminal Conduct

   ☐ Improper Conduct on duty

   ☐ Improper Conduct off duty

   ☐ Dissatisfaction with performance of duty

   ☐ Other _____

6. Synopsis of allegation: _____

   _____

   _____

   _____

   _____

   _____

   _____

7. Location of incident: _____

   _____

8. Date and time occurred: _____ Day _____

9. Date/day and time complaint received: _____

10. Bureau/Troop-Division/Station & location code receiving the complaint: _____

    _____

11. Personnel receiving complaint-name/SS#: _____

12. Subject named in complaint: _____

13. Subject's rank/position: _____ SS# _____

14. Bureau/Troop-Division/Station & location code/type of assignment: _____

    _____

15. BPR member contacted/time: _____ / _____

16. BPR control number-#: _____

A.3

SP 1-100 (12-85)

APPENDAGE B



**PENNSYLVANIA STATE POLICE**
DEPARTMENT HEADQUARTERS
1800 ELMERTON AVENUE
HARRISBURG, PA. 17110

Dear

    This will acknowledge receipt of the complaint which you filed with this agency.

    You will be contacted by a Department representative in the near future. Any questions you may have concerning your complaint should be directed to the Bureau of Professional Responsibility at (717) 783-5145.

                    Very truly yours,

                    John K. Schafer, Captain
                    Director
                    Bureau of Professional Responsibility



APPENDAGE C
COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

Enclosure (1)
Special Order 85-198

<u>NOTIFICATION OF COMPLAINT</u>

TO: _____  _____  _____
     (Rank)                (Name)                (Station)

A complaint has been received concerning an incident in which you were alleged to have been involved. The details of the complaint are as follows:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

You will be apprised of other issues which may arise from the investigation of this complaint.

_____        _____  _____
       (Witness)                (Signature)     (Badge #)

                             _____  _____
                               (Date)          (Time)

(Prepare in two copies)         _____
                             (Social Security #)

** One copy to be kept with case file

** One copy to be given to subject of investigation

SP 1-105 (12-85)

APPENDAGE D

COMMONWEALTH OF PENNSYLVANIA

PENNSYLVANIA STATE POLICE

CONSENT TO OBTAIN MEDICAL INFORMATION

I, _____, do hereby, voluntarily and without promises
or threats of any kind, give permission to _____
of the Pennsylvania State Police to obtain information from all medical authorities,
hospitals, clinics, or physicians who possess any and all records concerning my medical
examinations, treatments, and/or hospital/clinic admissions relative to the examination
and/or treatment of _____

I understand that the information obtained is to be used for administrative purposes only
and will not be used against me in any criminal proceeding.

_____          _____
      (Witness)                        (Signature)


                                  _____
                                       (Address)

_____
      (Witness)
                                  _____
                                  (City/Town)        (State)


                                  _____    _____
                                     (Date)              (Time)

SP 1-106 (12-85)

APPENDAGE E

Enclosure (1)
Special Order 85-198

COMMONWEALTH OF PENNSYLVANIA

PENNSYLVANIA STATE POLICE

CONSENT TO OBTAIN FINANCIAL INFORMATION

I, _____ do hereby, voluntarily and without promises or threats of any kind, give permission to _____ of the Pennsylvania State Police to obtain and examine my financial records held by any financial institution that possess such records.

I also understand that the information obtained is to be used for internal, administrative purposes only and may not be used as evidence against me in any criminal proceeding.

_____
(Signature)

_____
(Witness)

_____
(Address)

_____
(Witness)

_____
(City/Town)         (State)

_____
(Date)            (Time)

SP 1-107 (12-85)

APPENDAGE F

COMMONWEALTH OF PENNSYLVANIA

PENNSYLVANIA STATE POLICE

## CONSENT TO OBTAIN EMPLOYMENT RECORDS

I, _____ do hereby, voluntarily and without promises or threats of any kind, give permission to _____ of the Pennsylvania State Police to obtain and examine all records held by my previous employer(s) concerning my employment history and job performance.

I understand that the information obtained is to be used for internal, administrative purposes only and will not be used against me in any criminal proceeding.


_____
(Signature)


_____
(Witness)


_____
(Address)


_____
(Witness)


_____
(City/Town)        (State)


_____
(Date)            (Time)

APPENDAGE G                                    Enclosure (1)
                                               Special Order 85-198

COMMONWEALTH OF PENNSYLVANIA

ADMINISTRATIVE WARNING

Member/Employe _____

Interviewer_____

Case Control No. _____ Date: _____

Time Started _____ Time Ended: _____

At this time I am going to question you about the following allegation:

_____

_____

_____

This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police.  I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any pending criminal action.  During the course of this questioning, even if you disclose information which indicates you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statement nor its fruits will be used against you in a criminal proceeding.

Since this is an administrative matter within the Pennsylvania State Police, you are required to answer my questions fully and truthfully or you will be subjected to administrative action.

Do you understand what I have just explained to you?        _____YES        _____NO

Do you have any questions concerning what I have just explained to you? ____YES        ____NO

_____
          Witness

_____
          Witness

                    Signature _____
                                  Employe/Member

SP 1-103 (12-85)

APPENDAGE H

PENNSYLVANIA STATE POLICE PERSONNEL

RIGHTS WARNING AND WAIVER

TIME _____

DATE _____

PLACE _____

My name is _____ of the Pennsylvania
State Police.  You have an absolute right to remain silent and anything you say can and
will be used against you in a court of law.  You also have the right to talk to an attor-
ney before and have an attorney present with you during questioning.  If you cannot afford
to hire an attorney, one will be appointed to represent you without charge before any
questioning, if you so desire.  If you do decide to answer questions, you may stop any
time you wish and you cannot be forced to continue.  If you do exercise your right to
remain silent, your refusal to answer will not be grounds for administrative action.

WAIVER

I fully understand the statement warning me of my rights and I am willing to answer
questions.  I do not want an attorney and I understand that I may stop answering questions
anytime during the questioning.  No promises have been made to me, nor have I been threat-
ened in any manner.  I also understand that my refusal to answer questions will not be
grounds for administrative action.

_____
Signature

WITNESS:

S/ _____

S/ _____

APPENDAGE I


Garrity v. New Jersey, 87 S.Ct. 616, 385 U.S. 493, 17 L.Ed.2d 562 (1967)

This case involved a situation where police officers who were
being criminally investigated were given a choice to either
incriminate themselves or forfeit their jobs under a state (New
Jersey) statute dealing with forfeiture of office, tenure and
pension rights by public employes who refuse to testify on grounds
of self-incrimination.  The officers chose to make confessions.
However, the Supreme Court of the United States held the confes-
sions were not voluntary, but were coerced.  The court said that
the option to lose their means of livelihood or to pay the penalty
of self-incrimination is in direct contrast of free choice to
speak out or to remain silent.  That practice, the court said, is
likely to exert such pressure upon an individual as to disable him
from making a free and rationale choice.  The protection of an
individual under the Fourteenth Amendment against coerced state-
ments prohibits the use of these statements, obtained under threat
of removal from office, in subsequent criminal proceedings.


In summary, Garrity held that public employe statements that are
induced by threat of dismissal or other discipline may not be used
in a subsequent criminal prosecution.

APPENDAGE J

<u>U.S. v. Wade</u>, 87 S.Ct. 1926, 388 U.S. 218, 18 L.Ed. 2d 1149 (1967)

The question addressed in this case was whether courtroom identifi-
cations of an accused at trial is to be excluded from evidence
because the accused was exhibited to the witnesses before trial at
a post-indictment lineup conducted for identification purposes
without notice to and in the absence of the accused's appointed
counsel.  The Supreme Court of the United States held that compel-
ling the accused merely to exhibit his person for observation by a
prosecution witness prior to trial involves no compulsion of the
accused to give evidence, and was no violation of Wade's privilege
against self-incrimination.  However, the courtroom identification
should have been excluded because the lineup was conducted without
notice to and in the absence of counsel.  The principle followed
in that an addition to counsel's presence at trial, the accused is
guaranteed that he need not stand alone against the State at any
stage of the prosecution, formal or informal, in court or out,
where counsel's absence might derogate from the accused's right to
a fair trial.  The security of that right is as much the aim of
the right to counsel as it is of the other guarantees of the Sixth
Amendment.

In summary, <u>Wade</u> held that pre-trial lineups constitute a critical
step in the prosecutive process such that every individual has a
right to counsel at such proceedings.

RECEIVED TIME    MAY.    2:19PM

FR 3-2
5/23/2001

5.    Bureau/Office Director whenever the requested transfer is between Divisions/Sections of that Bureau/Office.

6.    Deputy Commissioner of Staff, Administration, and/or Operations, whenever the transfer is from an organizational segment under one's authority to a segment under the other's authority. In such cases, the sending authority shall make a recommendation and the receiving authority shall make the final decision.

F.    <u>Monthly Report</u>: Troop Commanders and Bureau/Office Directors shall submit a monthly supplemental investigation, through channels, under confidential cover, to the approving authority, concerning every member assigned from another Troop, Bureau, or Office. The supplemental investigation shall indicate the status of the individual concerned in regards to the emergency or hardship, and a recommendation to continue/discontinue the emergency or hardship transfer. A copy shall be provided to the involved member's assigned Troop, Bureau, or Office.

2.05    GENERAL TRANSFERS

A.    <u>Applicability</u>: Any member may be transferred anywhere within the Department whenever it is determined that such transfer(s) is necessary to:

1.    Fulfill the requirement(s) for additional services.

2.    Fulfill the need(s) for specific or specialized skills.

3.    Accomplish any other need(s) of the Department.

B.    <u>Procedures</u>: All general transfers require one of the following approvals, dependent upon the nature of the transfer:

1.    Intratroop: General transfers within Troops may be made at the discretion of the Troop Commander, consistent with the provisions of existing labor agreements in effect and with the approval of the Area Commander. The exception is for newly graduated Troopers during their Coach-Trainee period, in which case no such approval is required.

-7-

FR 3-2
5/23/2001

a.  A draft of all proposed general transfers shall be submitted, under confidential cover, to the Area Commander at least 15 days prior to the proposed effective date.  The 15-day requirement may be waived by the Area Commander when the transfer is to fill a vacancy which is a result of a promotion, intertroop transfer, or separation.  The draft shall be in triplicate, indicating the reason(s) for the transfer(s) and the likelihood of incurring moving expenses.  The Area Commander shall, within five days of receipt of the proposed transfers, approve/disapprove the proposal as authorized and return same to the Troop Commander.

b.  Upon receipt of an approved general transfer, the Troop Commander shall submit, to the Director, Bureau of Personnel, the required number of copies needed for inclusion in the member's official personnel folder.

2.  Intertroop:  General transfers between Troops shall be made by the Commissioner.  The Director, Bureau of Personnel, shall submit, as the needs of the Department require, a draft of proposed intertroop transfers to the Commissioner for approval.  The Commissioner, after evaluating the proposal, shall make whatever order deemed necessary and forward the action to the Director, Bureau of Personnel, for implementation.

3.  Administrative:  General transfers between organizational segments within a Bureau/Office may be made at the discretion of the Bureau/Office Director, except that transfers between training installations within the Bureau of Training and Education; laboratory facilities within the Bureau of Forensic Services; Aviation Patrol Units within the Bureau of Emergency and Special Operations; or the District Enforcement Offices within the Bureau of Liquor Control Enforcement; require the approval of the Commissioner. Transfers between Bureaus/Offices, Area Commands or an Area Command and a Bureau/Office, require approval of the Commissioner.  The following procedure shall be followed:

-8-

FR 3-2
5/23/2001

a.    Transfers directed by a Bureau/Office Director shall be reported to the Director, Bureau of Personnel, on a Bureau/Office Personnel Order.

b.    The Director, Bureau of Personnel, shall submit, as the needs of the Department require, a draft of other proposed administrative transfers to the Commissioner for approval. The Commissioner, after evaluating the proposal, shall make whatever order necessary and forward action to the Director, Bureau of Personnel, for implementation.

2.06        **TEMPORARY INTRATROOP TRANSFERS**

A.    **Applicability:** A temporary intratroop transfer may be made to fulfill a special need of the Department. Verbal approval for such transfers may be obtained in extreme cases; however, written justification shall be furnished, through channels, to the Area Commander for approval as soon as possible.

    1.    Temporary transfers shall not exceed 30 days unless a longer period is authorized by the Area Commander. Requests for an extension of an additional 30-day period must include justification, and shall be approved by the Area Commander prior to the beginning of any extension.

    2.    All temporary transfers shall be covered by a Troop Personnel Order and shall be specifically identified as temporary.

B.    **Coach-Trainee Period:** Newly graduated Troopers may be assigned to another Station prior to assignment to their allotted Station as part of their training and familiarization of the Troop area; however, Troop Commanders shall endeavor to allow newly graduated Troopers to receive their Coach-Trainee training at their regularly assigned Station.

    1.    Troop Commanders shall advise all newly graduated Troopers of their proposed assigned Station at least ten days prior to the effective date of the assignment.

    2.    Changes of assignment during this training period may be made by the Troop Commander without prior approval.

-9-

*38*

FR 1-1
9/20/2000

1.27     PAYMENT OF DEBTS

A.     Members shall promptly pay their just debts.  They shall not
assign their salary or contract for any debts or liabilities which
they are unable or unwilling to pay.  They must discharge
honorably and promptly all claims or judgements and satisfy all
executions which may be held against them within a reasonable
amount of time.

B.     Members who file bankruptcy petitions or receive notice that a
financial judgement and/or creditor claim has been filed against
them shall submit correspondence, through channels, to their
Commander, or Director.  The correspondence shall set forth the
circumstances of the bankruptcy petition, or an accounting of how
the judgement/claim will be satisfied or the grounds for contesting
the judgement/claim.  The Commander or Director shall forward
the correspondence, through channels, to the Director, Bureau of
Personnel.  After appropriate review, the correspondence shall be
filed in the member's official personnel folder.

1.28     INTERNAL INVESTIGATIONS

Whenever there is public criticism of the Department or when complaints
are received in connection with any police action; investigation or inquiry
indicating misconduct of personnel; harassment or intimidation of
subjects, individuals, or groups; or dereliction of any nature by the
Department or members of the Department; all members engaged in
such police action; investigation; hearing or other inquiry; shall prepare
written statements, at once, setting forth the facts in order that a record
will be available for future reference. Due to the internal administrative
nature of such police action, investigation, hearing or other inquiry, all
members are required to truthfully and completely answer all questions
relating thereto.   Procedures in cases that will result· in criminal
prosecution will include those rights accorded to all citizens of the
Commonwealth.

1.29     CARRYING OF WEAPONS AND AMMUNITION

A.     Members/▓▓▓▓▓▓▓▓▓▓, while on duty and in uniform,
shall     carry     the     issued     ▓▓▓     and     ammunition.
Members/▓▓▓▓▓▓▓▓▓▓ may also carry one authorized
personal handgun and ammunition. The personal handgun and

-11-

RECEIVED TIME MAY. 20. 2:33PM

39

FR 1-1
9/20/2000

B.    Vote as they choose.

C.    Express their opinion on any political subject or candidate, privately.

D.    Maintain political neutrality.

E.    Attend political meetings as private citizens.

1.14    USE OF OUTSIDE INFLUENCE

Members shall not knowingly use, attempt to use, or permit the use of any outside influence to gain promotion, transfer, or change of duty for themselves or other members.

1.15    

1.16    REQUIRED RESIDENCY

Members shall reside within the limits of the Commonwealth and shall maintain a telephone in such residence.  Any change of address or telephone number shall be reported in accordance with AR 4-2.

1.17    REPORTING OF INFORMATION

A.    Members shall report to their supervisor all information that comes to their attention concerning organized crime, racketeering, vice conditions or violations of any laws concerning such activities.

B.    Members shall promptly report to their supervisor any information which comes to their attention and which tends to indicate that any other member or employe has violated any law, rule, regulation or order.

-7-