IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARRELL G. OBER | : | 1: CV – 01-0084 |
| Plaintiff | : | |
| vs. | : | |
| | : | |
| PAUL EVANKO, MARK | : | (Judge Caldwell) |
| CAMPBELL, THOMAS COURY, | : | |
| JOSEPH WESTCOTT, | : | |
| HAWTHORNE CONLEY | : | |

FILED
HARRISBURG, PA
JUN 1 1 2002
MARY E. D'ANDREA, CLE
Per _____
Deputy Clerk

**Plaintiffs Counter Statement of Material Facts In Opposition to Defendants Motion for Summary Judgement And Ober Affadavit II**

## INTRODUCTORY STATEMENT

The plaintiff incorporates here all of the Exhibits, his Addendum to Exhibits, his Undisputed Statement of Material Facts, including his Affidavit, that were filed in support of his own motion for Summary Judgement.

It is particularly noted that Ober's affidavit to his own Motion for Summary Judgement is incorporated herein. Plaintiff also incorporates the documents, depositions and affidavits filed in support of defendants Summary Judgement Motion. Where appropriate, the above materials are cited and referred to in this Counter Statement, and in Plaintiffs Brief in Opposition. Lastly, this Counter Statement of Material Facts has 3 Exhibits of it's own appended to it ("A", "B", and "C"). They are specifically referenced in certain paragraphs in this Counter Statement.

1.    Denied. It is admitted Ober was employed by the Indiana University of
Pennsylvania Police Department and attended the Pennsylvania Law
Enforcement Academy.  However, he graduated first in his class.  Stating
otherwise is an intentional misrepresentation.  Ober made this point clear
during his deposition and even supplied documentation (Ober Dep.,
12/5/2001 at 58-59; Exhibit 22).

2.    Denied.  It is agreed that Ober graduated from the Academy on December
5, 1981 and that Ober signed an Oath of Office and received at least
general training on the meaning of Field Regulations.

However, there is no documentation provided to support the statement
contained in paragraph four of Einsel's affidavit.

It is also admitted that Ober received training as to the inter-workings of a
paramilitary organization.  In context, Ober's Oath of Office reads as
follows:

"….I do solemnly swear (or affirm) that I will bear true faith and allegiance
to the COMMONWEALTH OF PENNSYLVANIA (no emphasis added),
that I will serve it honestly and faithfully, that I will support the constitution
of the Commonwealth of Pennsylvania, that I will perform all my duties as
a Pennsylvania State Police Officer according to the *law and regulations*

*governing same* (emphasis added), that I will conduct myself according to the regulations as set forth by the Commissioner of the Pennsylvania State Police, *and that I will obey the orders of my superior officers* (emphasis added)."

It is generally agreed that paragraph five summarizes State Police policy with respect to Field Regulation changes; however, no documentation is offered that would confirm Ober has or has not been in compliance with this policy. Ober never served under Einsel's command and Einsel could in no way attest to Ober's conformance with this policy.

Einsel's affidavit does not provide any documentation whatsoever to support the statement contained in paragraph 8: "The importance of reporting matters through his chain of command was emphasized during Ober's instruction at the Academy". It does however, raise an interesting question. If Ober and other members of the State Police receive training regarding the importance of reporting matters through their chain of command and this was emphasized, why would the Department need AR 1-1.02 (c)? Captain Riley, the Director of the Administrative Division at the Academy testified that he could not find any chain of command provisions in Department regulations when requested by Major Washington for assistance. In fact, Captain Riley telephoned the Bureau of Research and

Development requesting assistance to locate it. (Riley Dep. 10/23/01 At 6).

The provisions of FR 1-1.07 (B) are not material to this case. What is material is the persistent misrepresentation of the language of this section by the defendants to this court.

3.    Admitted.

4.    Denied.  While it is admitted that Ober was the Director of the Internal Affairs Division when the FBI contacted him, Ober was also serving as the Acting Director, Bureau of Professional Responsibility (P22).  Agent Kush, in his initial contact with Ober, never informed Ober that he had contacted other members of the State Police regarding this investigation into Stanton (Ober Dep., 12/5/01 at 89, 90; Ober second affidavit to be written) as the defendant's allegations imply.

Kush contacted Ober at Soohy's direction (Kush Dep. 03/14/02, at 12) and because Kush believed "…They're (IAD) charged with a higher responsibility" (Kush Dep. 03/14/02, at 131).  Additionally, according to Soohy, "…we wanted to inform Captain Ober as the head of the as a representative of the State Police OPR about what we had found and what, we were going with it" (Soohy Dep. 03/14/02 at 5) and "…my

position on OPR or Bureau of Professional Responsibility is they're one level above reproach." Soohy also stated, "Once we found out about Trooper Stanton's involvement, we, we, we felt we had an obligation to notify the State Police, and Captain Ober was the most logical person because he was at the time, to my understanding, he was running the Bureau of Professional Responsibility and we wanted to inform somebody in the State Police of that." (Soohy Dep. 03/14/01 at 25).

The following excerpts from Soohy's deposition are noteworthy:

Soohy indicated "Captain Ober at that point expressed some concerns that about only two or three people in the State Police hierarchy that would be in a position to do that and that and that he would have to be careful who he would notify about this". (Soohy Dep. 03/14/02 at 6).

"Captain Ober was expressing some concerns about who in the State Police needed to be notified about this because he didn't want to, he was doing the right thing on our side, he didn't want to compromise anything we had going on". (Soohy Dep. 03/14/02, at 7).

"Again, every time that we met with Captain Ober on the two occasions, he, he always expressed concern about who, who should know about this and who shouldn't  know about this.  And again, I believe that, that

Captain Ober's intent was to, to make sure that he didn't go somewhere and cause something to compromise what we were doing". (Soohy Dep. 03/14/02, at 12).

"no, but what, what I want to say is that if you take what Stanton was saying on the tape, he was alleging that people were moving test scores from one block to another. You know, that would imply that, that somebody in a position to that was involved. Although we never, we never had the names of anybody that was doing that. We never had them as a subject of the case. There was always the possibility out there that that was what was occurring if you would take Stanton with what he was saying". (Soohy Dep. 03/14/02, at 27 -28).

"But, Captain Ober was very concerned that he needs to be very careful about who he reports this information to. Because he really did not want to compromise potentially this case going further, to his credit". (Soohy Dep. 3/14/02, At 56).

5.    Denied. Any implication that Kush told Ober of the earlier investigation is denied. It is worth noting, according to Behren's affidavit, that Behrens, Captain Pudliner, Lieutenant McKnight, Trooper Reidenbaugh, Captain Miller (by the way, his supervisor would have been Coury) all knew about this inquiry into Stanton's duty status, yet not one of them ever completed

a Use of Force and Complaint Reception and Processing Worksheet as required by AR 4-25.08; G.  In addition, according to Monoco's affidavit and Kush's testimony, the following additional members of the State Police knew of the existence of this probe prior to October 1998 and did nothing about it: Monoco, Lieutenant Sergeant Ryan, Corporal Lieberum and Corporal Shaw.  Never were any of these members of the State Police investigated as Ober was.

Noticeably, defendant's paragraph continues stating that Monoco (head of Organized Crime) determined that Kush did not require the assistance of the Bureau of Criminal Investigation and referred him (Kush) to BPR.   Yet it was BCI (specifically Organized Crime) who investigated and arrested Stanton and his accomplice.  Never were

With respect to matters of public corruption, the following are excerpts from the affidavit's of probable cause and criminal complaints files against the participants of the FBI probe "…for the express purpose of having Mr. Fiore funnel it (money) to a public servant who was to exert his influence with the Pennsylvania State Police on behalf of the actor, all for the purpose of unlawfully securing Pennsylvania State Police employment…" and …"Mr. Fiore would forward the money to a public servant who would exert his influence to insure employment for Mr. Bridge with the Pennsylvania State Police…" P58, P59, P60, P61).

Also,  Behrens was not disclosed as a potential witness in the defendant's
September 19, 2001 disclosure  statement.


6.      Admitted.


7.      Denied.  The date indicated is one that Hickes has identified; not Ober.
Ober does not know the specific date (Ober Dep., 12/5/01 at 76-77).


Further, Hickes is in Ober's chain of command.  Claiming that Hickes is
not in Ober's *direct* chain of command, is an acknowledgement that
Hickes *does* occupy a position in Ober's chain of command; it is just not
direct and is indicative of the trivial nature of the defendant's argument.
By way of further response, FR 1-2 gives a Lieutenant Colonel in the State
Police the authority to issue orders to subordinates officer. Ober was
expected to follow those orders. (Evanko Dep., 03/27/02 at 104).  By way
of further response, it is emphatically denied that defendants inappropriate
insistence that plaintiff violated FR 1-1.07, which defendants know is false,
is denied; no violation of FR 1-1.07 (B) ever existed.  It is important to note
the defendants slipped in the word **"IMMEDIATE"** (as in "immediate
supervisor") into their paragraph (see para. 7; line 5).  The word
**"IMMEDIATE"** is not in the regulation; by inference defendants are again
misquoting a regulation in order to harm plaintiff and mislead this court.

There has been no evidence, and no testimony, that Kush, in his initial contact with Ober, indicated that Stanton or anyone else in the State Police had committed any violations of the law.  Since no violation of the law had yet been committed, the provisions of FR 1-1.07 (B) clearly did not apply and Ober could not be in violation even if defendants were not being disingenuous.  "All, all I remember is that when I instructed Ralph, we, we discovered that, that Trooper Stanton was fairly involved in this and was teetering on criminal activity". (Soohy Dep. 03/14/02 at 16).

The defendants have repeatedly misrepresented the section to read "might have" into this litigation.  Changing the wording of the  regulation to include "might have" arguably could have meant that Ober, technically, committed an enforceable violation of regulations and one that may have provided sufficient justification for Evanko to order the investigation.  This continuous flaunting of the truth should offend this court as it does the plaintiff.  Regardless of how the defendants twist the language of this section, by informing a Lieutenant Colonel, Ober went well beyond both the obvious intent and requirement of this regulation to ensure proper notification to an appropriate supervisor was accomplished.  Needless to say, Conley also carried certain baggage.  He was from the Stanton's area, was Stanton's Commanding Officer and knew the politicians involved.  See Ober Aff. in Support of Summary Judgement; para 9.

Case in point, Evanko himself directly contradicts this by stating he "thought the regulation "says "might have violated the law". (FR 1.1-17) (Evanko Dep. 03/27/02, at 314).  Yet, when asked the question: "Well, why didn't you punish Ober for that if you --- I mean, do you believe Ober misrepresented what happened on October 5th or early October?"; Evanko responded, "I don't know what happened there". (Evanko Dep. 03/27/02 At 59-60).  This is from the individual who ordered the investigation.

Ober was concerned as to who he should share this information with (Soohy Dep. 03/14/02 At 6, 7,12, 28); Hickes Dep. 03/25/02 at 50, 58, 97; Ober Dep. 12/5/01 At  80-81, 97)  Kush Dep. 03/14/02 at 48-49, 53-54).  Based in his concerns, Ober sought the advice of a Lieutenant Colonel; a Deputy Commissioner (Ober Dep. 12/05/02 at 80-81, 191).  In doing so Ober acted lawfully and it full compliance with all PSP regulations.

By way of further response, Ober stated his reasons for seeking Hickes were as follows: "Most of my exposure to Colonel Hickes was through when he was the Director, the Director of BPR and as the Deputy Commissioner of Operations when I was assigned to the Bureau of Research and Development...Well I don't know that it was so much as a matter of trust.  It was what would be the appropriate thing to do.  Who would be the appropriate individual to report this to and seek any guidance or advice or what have you?  And the reason I thought Colonel Hickes

made sense is I think the for the reasons I've just described.  He is a

former Director of the Bureau of Professional Responsibility.  He is a

former Deputy Commissioner of Operations.  At that time he was probably

and may still be remains one of the most credentialed officers in the entire

State Police organization...At the time I made a judgment call, it was

based on what I, my first and foremost consideration was projecting the

needs of the agency. Making an ethical decision as well as a legal

decision.  And I did that because I thought it was the right thing to do.  It's

no more complex than that.  I will tell you Mr. Bailey, having experienced

what I've experienced from this agency in the past two years, their

reactions to my judgment call, confirm in my mind more than ever that I

made the right decision.  I would never go to potential targets of any

investigation, much less one of political corruption" (Ober Dep. 12/05/01 At

80-8; Ober Dep. 12/07/01 At 186 – 187).


8.     Denied.  While it is agreed that Ober informed Hickes of the existence of

the FBI probe; the characterization of that conversation by Hickes is being

taken out of context and differs from Ober's account of his conversation

with Kush.  Ober testified that Kush and he discussed the possibilities of

how an individual might affect entry and that discussion included political

influence (Ober Dep. 12/07/01 At 179-181).

9.    Denied.  Confidentiality was discussed, expected and supported by Kush
      and Soohy. (Ober Dep. 12/05/01, at 95-96, 146-147); Kush interview by
      Werts/Williams; 05/25/99; page 2, (Kush Dep. 03/1402 at 60, 80-81, 95,
      96, 98, 109-110, 129-130); (Soohy Dep. 03/14/02 at 18, 20-21, 27, 30, 31-
      32, 34).

      By way of further response, the issue of confidentiality is best summarized
      by FBI Special Agent Ralph Kush, who in response to the question: "But,
      you know, and today is altered by  the you uncovered in an investigation,
      but what you knew when you called Captain Ober was, as a, at least, at
      the very least as a matter of common sense matter, was that a Trooper in
      Southwestern Pennsylvania was not going to be able to single handedly
      without help manipulate an Academy appointment up in Harrisburg, right?"
      Kush response: "Sure". Question: "That was only; I mean that just basis
      common sense, right?  He had to have somebody helping him?"
      Response; "Sure". (Kush Dep. 03/14/02, 60).

      Virtually every individual deposed, with the exception of  Westcott, stated
      that it is a fundamental rule is not to inform potential targets of the
      existence of the investigation including Kush; "...well, we certainly
      wouldn't want targets to get the information..." Kush Dep. 03/14/02 at 96).

The statement "Ober even admits that Agent Kush never told him to keep the investigation a secret from his Bureau Director, Major Conley" (Ober Dep. 12/05/01, at 131) is false. There is no mention whatsoever on page 131 of this statement.

When asked the question: "Well, why didn't you punish Ober for that if you --- I mean, do you believe Ober misrepresented what happened on October 5th or early October?"; Evanko responded, "I don't know what happened there". (Evanko Dep. 03/27/02 At 59-60). This is from the very defendant who ordered the investigation. Later, Evanko contradicts himself, "He violated rule 1.17" (Evanko Dep. 03/27/02 At 105).

"And to tell you the truth after I came to the conclusions after reading the administrative inquiry and after I advised Lieutenant Colonel Hickes of what my conclusions were, very frankly, I didn't give Captain Ober much of a second thought" (Evanko Dep. 03/27/02 At 178).

10.   Denied.   The exact language, exchange and what transpired between Ober and Kush is a disputed fact. (Ober Dep. 12/05/01, at 146; see number 9 above). Plaintiff believes someone softened Kush up on this point.

11.    Denied.  This is taken out of context.  While this may be the only references to Governor's Office and higher-ups in the State Police during *this* conversation, without full disclosure of all files and records into this matter by the FBI and State Police we will never know to what extent either names or positions were mentioned.  The defendants continue to withhold the files and recordings in the underlying case.  Nonetheless, the fact is both the Governor's Office and the term was used by individuals involved in the FBI wiretap (Kush Dep. 3/14/02, Exhibit 3).  Even Evanko's own investigators assumed the use of the words "Colonel" and "Governor's Office".  Though now irrelevant in this retaliation case, the defendants are still litigating the investigation they claim is over.

There was apparently sufficient "accurate information" regarding the complexity of the PSP hiring process to cause the FBI to pursue the investigation to the point where at least one State legislator was approached by their confidential informant in an attempt to further the investigation.

By way of further explanation, consider the following with respect to the political corruption nature of the FBI investigation:

1.    Kush was assigned to the Political Corruption Unit and the investigation was being conducted was a

political corruption case (Kush Dep. 03/14/02 At 96, 100).

2.  At least the following political figures were mentioned as potential targets of the probe by the participants: State Senator Joe Preston, Committeeman Doc Fielder; State Senator Leonard Bodak. (Soohy Dep. 03/12/02, At 96, 119).

3.  "…at least, at the very least as a matter of common sense matter, was that a Trooper in Southwestern Pennsylvania was not going to be able to single handedly without help manipulate an Academy appointment up in Harrisburg, right?" Kush response: "Sure". Question: "That was only; I mean that just basis common sense, right?  He had to have somebody helping him?"  Response; "Sure". (Kush Dep. 03/14/02, 60).

12.  Admitted.

13.  Denied.  While it is acknowledged that Hickes and Ober informed Evanko, no one ever stated, "because Colonel Evanko, his deputies, and the

Governor's Office has all been targets of the investigation". This is a histrionic characterization of the facts and is not supported by the cite referred to in Hickes deposition. There were many potential targets; higher ups were included.

Wooley and Lebecki affidavits represent F.R. Civ. P. 26 violations and should have been disclosed earlier. The court should strike them from the record. They were not disclosed as potential witnesses in the defendant's September 19, 2001 disclosure statement and clearly they are witnesses or potential witnesses who certainly should have been disclosed.

14. Denied. As previously mentioned, Ober's report to Hickes, a Lieutenant Colonel, a Deputy Commissioner in the State Police far exceeded any existing regulation requirement both in spirit and intent. "Colonel Evanko was particularly concerned about Hickes involvement…" Yet it was Ober who was named as the subject of the official IAD investigation into this matter (P22). Evanko feared Hickes and Ober became a vehicle to vent frustrations and send messages.

15. Denied. The fact that other investigations have been ordered does not make them proper. For example, Skurkis' testimony that IAD "made an appearance" at the scene of Budd Dwyer's suicide, clearly exceeding the role and purpose of IAD speaks for itself (Skurkis Dep. 03/05/02 At 58-59).

By way of further response, if an investigator lacks any reason akin to probable cause, as here, it is merely a means of harassment, intimidation, and a means to destroy status, relationships and a career.

16.   Denied.  "As a courtesy…" is supposition.  The evidence easily demonstrates this notification had a sinister intent (P312).  "And to tell you the truth after I came to the conclusions after reading the administrative inquiry and after I advised Lieutenant Colonel Hickes of what my conclusions were, very frankly, I didn't give Captain Ober much of a second thought"  (Evanko Dep. 03/27/02 At 178).  If this were true, why would Evanko e-mail Campbell to inform him that Ober was being transferred(P32)?  This e-mail, it's choice of words, tone, and the absolute lack of any valid reason for it evidences the conspiracy to injure plaintiff.

17.   Admitted.

18.   Denied. This investigation was *not* conducted in the same manner as other administrative investigations and is a disputed fact in this case that it was (Ober Dep. 12/05/01 at 205 - 227). "As long as he was willing to risk employment sanctions, Ober could have refused to answer questions and left the interview". This statement in and of itself is an admission of the compelled nature of Ober's interview.  Ober did *not* understand the nature of this administrative inquiry because it was without basis and legitimate

17

justification. (Ober Dep. 12/05/01 At 113).  How could an investigation, which still has no identifiable purpose in law, regulation or fact, need compulsory practices and custodial interviews to be carried out?

19.    Denied.  There has been no evidence presented to the plaintiff that indicates this investigation is completed.  Ober has never been informed in any way that it is closed (Ober Dep. 12/05/01 At 115, 126).  By way of further response, the defendant Evanko, with virtually no reason to do so other that to further injure the plaintiff retaliate against him by pressuring a witness in this case, namely Major R. Dane Merryman, remarked on his performance evaluation that he used an "appalling" lack of judgement by allowing Ober to see the AR 1-1 historic file.

The statement that Evanko believed Ober (and Hickes) had not exercised good judgment and chose not to discipline either is a deliberate attempt to mislead this court.  The State Police do not have a "Good Judgment" regulation.  Stating that Evanko decided not to discipline Ober as if Evanko were being kind is a ridiculous statement designed to distort this record.  It is self-serving and insulting.  Discipline Ober for what?  There is absolutely nothing to discipline Ober or Hickes for.  To imply otherwise is misleading.

20.   Denied.  There is overwhelming evidence that Ober's assignment in IIMS
      was not completed when he was transferred (P 325, P324, P194, P196,
      P197, P198, P199, P200, P201, P202, P203, P204, P205, P206, P207,
      P208, P209, P181, P182).

This paragraph is an intentional misrepresentation of Hickes' deposition.
Hickes did not state that the assignment was completed in *January 2000*
as indicated in the defendant's statement of material facts. The question
posed to Hickes was: "Did Captain Ober fulfill his assignment with the
IIMS project?"

In explaining Ober's role (Hickes Dep. 03/25/02 at 30-31), "His (Ober) role
was a team leader for the request for qualified quotation for the vendors
that were under evaluation to be the systems integrator"…"He had worked
as the team leader for the request for qualified contractor to evaluate
proposals and score those proposals and make a recommendation of who
the successful bidder should be." Question: "Well, what's the voting
committee?  What's that do?"  Hickes response: "Well, that's the portion of
the team  that has a role of scoring the proposals and then rendering the
vote on the best solution or the best  company that has made their
proposal." (Hickes Dep., 03/25/02 at 140)

On April 26, 1999 Ober was detached from IAD to the IIMS project to select a Systems Integrator; Ober was to return to IAD upon completion of IIMS assignment (P195, P196, and P197); Ober Dep. 12/07/01 At 65; Evanko Dep. 03/27/02 At 214).

January 10, 2000 Conley notified Ober that he was being transferred from the IIMS project to Troop B, Washington (Ober Dep. 12/05/01 At 199; P193).

January 14, 2000, Ober was supposed to be returned to IAD for one week; later changed to January 24 – 28; later changed to not returned at all (Ober Dep. 12/05/01 At 218; P193).

January 14, 2000, Initial Proposals for the Systems Integrator were due. (P198, P 199).

January 27, 2000 Ober's transfer to Washington was rescinded and Ober was permitted to stay in IIMS until February 18, 2000 at which time he was demoted to a Lieutenant's position at LCE (P127; Personnel Order 00-03).

On January 17, 2000, the official evaluation process Chaired by Ober began the evaluation process. (P198).

On February 18, 2000 official voting for the Systems Integrator by the Evaluation Committee Chaired by Ober was conducted (P142). In fact, the initial proposals had not even been received from the vendors until January 14, 2000 (P324). Evanko had to have known this.

The IIMS evaluation process and period that Ober had been scheduled to lead did not begin until January 17, 2000 (P198, P199, P200, P201, and P202).

The evaluation period ran from January 17 - February 17, 2000. (P198)

The final vote on the successful systems integrator was not conducted until February 18, 2000. (P203, P204).

Ober, after defeating the transfer to Washington (P245) in Commonwealth Court, was demoted to the Bureau of Liquor Control Enforcement (P124, P127; Personnel Order 00-03).

Ober continued to be involved in the IIMS Systems Integrator process even after his demotion to LCE in the form of Executive Oversight Committee findings (P201, P202) and debriefings, the last of which was scheduled for April 6, 2000 (P206, P207).

21.    Denied; this information presented as material undisputed facts, is

deliberately misleading.  It is agreed that the State of Pennsylvania was

hosting two large-scale events (RNC and NGA) in 2000.  Westcott and

Werts attended a conference with the California Highway Patrol and San

Diego Police Department in **1998** (P213, P212).  Werts' report (P213)

states: "The after action report of that operation clearly suggests that an

individual be identified *well in advance* (emphasis added) and that person

be permanently assigned to handle planning and liaison with other law

enforcement agencies".

The Task Force Commander, Major Werts, requested Captain Transue be

assigned to assist with preparations for the RNC as early as January 1999

(P212, P213, P215, P216).  Then Major Werts make the following

statement in P213 (para 3); "The individual who would serve in this

capacity would in fact have two responsibilities.  The first deal with

planning….An overall  Task Force Operational Plan will have to be

developed over the next year.  It is imperative that an individual be

assigned to this on a daily basis to insure our plan has the desired effect".

P214, P217, P218 make it clear the planning and preparation for the NGA

was well underway, if not near completion, by January 2000 and any

statements or representations to the contrary are simply false. This was a

year before the defendants aborted attempts to punish Ober by
transferring him 200 miles from home to Washington, Pennsylvania.

Compare Captain Transue's assignment to the RNC and Ober's
(subsequently Young's).  Major Szupinka, the NGA Task Force
Commander, did not request assistance in preparation for the NGA
(Westcott Dep. 01/07/02 At 61).  In his affidavit, Captain Young makes
vague and inconsistent references to his involvement in the NGA
Operational Plan.  "I wrote the Operations Plan for the National Governor's
Association (NGA) 2000 Annual Summer Meeting.  I was required to
personally author some of the sections of the plan; I had to review and
correct 17 plans submitted by the various coordinators and then combine
all of this information into a comprehensive Operations Plan" (Young
Affidavit).  It is difficult to discern if Young "…wrote the plan…" or
"…personally authored some sections…" or "had to review and correct 17
plans…".  Regardless, this is standard stuff.  Young was promoted into the
position because the defendants knew they had to cover their backs.

The credibility of Young's affidavit and his true role with respect to the
operational plan causes considerable doubt when you consider the
following:

1.    Young received a promotion from Lieutenant to Captain to replace Ober (approximate $8,000 per year pay raise) (P127; Personnel Order 00-03). Young's transfer to Washington was voluntary. Ober's transfer was involuntary, permanent, and he did not receive a promotion.  In fact, the <u>NGA was not even mentioned</u> on the Personnel Order (P127; Personnel Order 00-01) proving it was an excuse made up after the fact.

2.    The NGA was scheduled to be held July 8 – 11, 2000 (P217).  Young was not transferred until February 12, 2000.  Taking into account Young's attendance at the Philadelphia School of Police Staff and Command from February 28 – March 10, 2000 and the leave that he utilized from 02/12/00 to 07/03/00, Young would have had but a few weeks that he could have "wrote...authored...or reviewed the plan" (Young affidavit) for an event that "..involved two years of planning between event organizers, the NGA, the staff of State College NGA 2000, the Office of Governor Tom Ridge, and the Pennsylvania State Police" (P285)...."We had been planning for the NGA

and RNC literally for years.  The plans and

preparations were nothing less than extraordinary.

The Coordination with literally hundreds of

organizations and thousands of people, including

local, state and federal agencies was astonishing"

(P218) and one for which the Task Force

Commander, Major Szupinka is quoted on January

26, 2000 in response to the question if 'things were

pretty much wrapped up', responded by stating

"About 90%,.  All we are waiting for is them to tell us

where some of the events will be held" (P214).   Page

1.5 of the NGA Plan (see Exhibit 'A" hereto) states:

"Each facet of the security operation has been

assigned to a State Police Command Officer to act as

a coordinator.  Each Coordinator has submitted an

action plan concerning his or her area of

responsibility.  Those plans are included in this

master plan". Based on this statement, it would

appear that Young had little, if anything, to do with the

operational plan. The defendants have simply

concocted an excuse and are once more attempting

to mislead this court.

3.     The State Police were "...assigned the responsibility
       of providing security and transportation of the
       governors for the 2000 meeting" (page 1.3; NGA Plan
       – Exhibit "A" hereto).

4.     Major Szupinka's Letter or Commendation to Young,
       in part, and in contradiction to Young's affidavit (see
       Exhibit "C") reads as follows: ""Having not been
       previously involved in the planning process for NGA
       2000 allowed you an objective overview of our
       efforts".  Beyond that, only vague references are
       made to exactly what Young's role in the NGA really
       was.  Young actually had no serious role other than to
       make it appear that someone was needed.  He
       obviously failed.

5.     The NGA Plan is an approximate 400-page document
       consisting of 15 sections. It appears that Young's true
       role in the After Action Report has also been greatly
       embellished. Page 1.6 (Exhibit "A" hereto) indicates;
       "At 1000 hours on July 12, 2000 all Coordinators shall
       meet at the Command Post for debriefing.  Each
       Coordinator shall complete as After Action Report by

July 17, 2000. Those reports shall be forwarded to
Captain David Young, Liaison to the Republican
National Convention. Young apparently served in a
dual role as the Liaison to the RNC that was held near
Young's home in Philadelphia from July 31 – August
3, 2000. Young was able to fulfill his liaison
responsibilities while at the same time utilizing five
days leave between the two events (July 17 – 21,
2000). The defendants have falsely concocted this
entire scenario about Young being needed for these
events to mislead this court and to affect this litigation.

6.        Young's role in assisting "…in coordinating of a
contingency plan for the emergency response and
assistance of other Troops outside of Area III"
appears to have amounted to gathering information
from surrounding Troops in his June 19, 2000 memo
(see Exhibit "B" hereto).

7.        In reviewing the NGA Plan, it would appear Young
true role in NGA statements is summarized on page
4.9 (Exhibit "A" hereto); "Captain David Young will be
present to welcome all dignitaries at the airport and

introduce the assigned driver". Why, if he were filling an essential coordination and decision making role would he be dispatched to say hello at the airport and "introduce the assigned driver"?

8.      Compounding the ability to discern what, if any, legitimate role Young may have played at the NGA has been the defendants continued refusal to produce key documents that would account for Young's whereabouts from February – July 2000. This is one more example of how the defendants have intentionally attempted to distort this record.

22.   Denied. This is an intentional misrepresentation of the facts to this court. There was never any mention of any World Trade Organization riots in any document, brief, Personnel Order or anything else until through Mr. Evanko, it was introduced as an excuse in this litigation. The true nature and intent of Ober's assignment to Washington remains a disputed material fact with virtually no evidence to support defendants position (Ober Dep. 12/05/01 at 218-219).

23.   Denied. The assignment greatly impacted on Ober's status; this was a "penalty box", involuntary, permanent transfer. (Ober Dep. 12/05/01 At

227–228; Ober Aff. 05/20/02 para. 18).  It was clearly meant to punish and
injure.  It was disciplinary in nature, otherwise these defendants,
particularly Evanko, would not been retreated from fighting plaintiff's
Commonwealth Court action.


24.    Denied.  This is another totally misleading false statement.  FR 3-2
provides a process by which members of the Department could be
subjected to a General Transfer to fulfill certain needs of the Department.
No special provisions exist for "Commissioned Officers". There is no line
whatsoever that states: "The Commissioner has the authority to transfer
commissioned officers as needed to fulfill the needs of the Department…".
The FR identifies only three types of transfers.  (Preference, Hardship and
General).  Ober's transfer was a General Transfer (Westcott Dep.
01/07/02 At 62).  This was the case when Evanko transferred Captain
Transue to assist with preparations for the RNC, (P212, P213, P214,
P215, and P216).  In order to effect a General Transfer against Ober,
Evanko has no choice but to follow the process.  This was not done.
There was no request from the Area Commander (Westcott Dep. 01/07/02
At 61) consequently the process was not followed.


The Mandamus filed by Ober in January 2000 outlines the failure of the
defendants to follow the process (Amended Complaint; Plaintiff's Exhibit in
Opposition to Motion to Dismiss, June 25, 2001; Exhibit G).

The defendants also intentionally attempted to mislead this court through the use of the term "intertroop transfer"; this was not an "intratroop transfer"; applying the provisions of P284. Ober's transfer was a General (and permanent) Transfer. The defendants have misrepresented the regulations once again.

25.    Denied. Ober filed an injunction to stop the punitive, disciplinary transfer. As has been plainly demonstrated the NGA assignment was concocted as a cover-up after Ober filed his injunction. The characterization that Evanko "voluntarily" rescinded the transfer is another misrepresentation. He was clearly forced to back off because of legal realities.

26.    Denied. The IIMS assignment was not completed contrary to defendant's inaccurate representations and IIMS is exactly where Ober remained. Ober's assignment in IIMS was not completed (see para. 20 above). "Colonel Evanko did not transfer him back to IIMS because Ober had already finished his assignment there." This is not correct. Ober continued his assignment in IIMS (see para. 20 above).

27.    Denied. The fact that no other Captain's position was available in Harrisburg/Hershey was not due to an "unfortunate" set of circumstances. It was, however, due to deliberate actions by the defendants to ensure

there was no position for Ober; especially in BPR (Ober Aff. 5/20/02 At para. 20). The defendants add to this distortion by making the additional false statement; "...Evanko temporarily assigned Ober to serve as the Central Section Commander...".  The Personnel Order 00-03 (P127) makes no indication that the transfer was temporary and, according to PSP regulations, unless stated otherwise, transfers are to be considered permanent (P284; Ober Dep. 12/05/01 At 223).  Further, it would have been virtually impossible for Evanko to know the demotion to Lieutenant in LCE was going to end in May 2000.

Also, the phrase,  "a position previously held by a Lieutenant..."  in reference to the demoted position Ober was transferred to in LCE is not accurate.  The position was, always has been, and remains today a Lieutenant's position.  However, the ironic fact is that the position was being fill by a Sergeant for the seven months prior to Ober's demotion (Ober Aff. 5/20/02 At Para. 28; Ober Dep. 12/05/01 At 230' P224)

And Evanko could not have known Campbell was going to retire making any reference to his moving Ober a "temporary" transfer a patently false statement.  (P312, P235; Ober Dep. 12/05/01 At 245-247).

The best evidence that the transfer to LCE was a demotion is to compare the following line; "Ober's assignment involved no loss of pay or rank, and

the Pennsylvania State Troopers Association did not object to it" to

paragraph 23 of the defendants Statement of Material Facts; "Captain

Ober's assignment to assist Major Szupinka was made more than eight

months after Ober and Hickes told Colonel Evanko of the FBI

investigation, and it did not affect Ober's rank, pay, benefits, or status."

Notice how, in explaining the demotion to LCE, they did not use the word

"status" as they did in describing the assignment to Washington?

28.   Denied; the use of the term "shortly" is misleading.  Ober was only

restored to a Captain's position because of the legal implications for not

doing so (Grab Dep. 02/05/02 At 44 - 47).

29.   Denied; all of these actions by the defendants are a matter of record.

Evanko personally shunned Ober at a public event in front of numerous

people.

30.   Denied; there is overwhelming evidence that Coury ordered a totally

improper investigation into Ober's personal and private activities violating

his 1st Amendment rights.  It was without cause and lacked any rational

purpose.  The letter referred to is one of a general nature and never

mentions Ober by name and even requests that no action be taken.  Once

again the defendants make a totally false statement; Coury never

informed Ober of the results of the investigation. (Ober Dep. 12/07/01 At

179; P47).  Besides, as evidenced through discovery, this investigation is still active.

31.    Denied.  The evidence that defendants blocked Ober's restoration to PEMA is simply uncontestable.  Once more, with an incredibly crass disregard of overwhelming evidence, the facts have been distorted.  Ober did not "voluntarily" withdraw from PEMA; he withdrew because he had been INVOLUNTARILY transferred 200 miles away from home and PEMA headquarters (P177, P178; Ober Dep. 12/07/01 At 185-187).

The reference to OM 7-1, 10.6 is irrelevant.  OM 7-1, page 10.6 doesn't say a thing about voluntarily resignations.  Koselnak's statements re: Ober needing time to "concentrate on his new operational duties" are totally preposterous (Ober Dep. 12/07/01 At 188-197).  By way of further response, if, according to Koselnak, Ober was removed from PEMA to allow him to focus on his new LCE duties, why would he have been permitted to serve on PEMA while assigned to the IIMS project?  Or as the Head of IAD?  Or as the Head of Systems and Process Review?  Or as a Section Commander in SPR?

Also, Koselnak's statements regarding the "restrictive funding" of LCE which "did not allow for alternative part-time assignments" is, simply put, false.  Under Koselnak's command, Liquor Enforcement Officers

Christensen and Wilson (P331, P332) were assigned in long-term capacity (approximately two years collectively) to IIMS (Ober Dep. 12/05/01 At 193-195).

Koselnak has a history of testimony that is "diaphanous" and that "...does not have the ring of truth" (P319).

Likewise, the assertion that Washington refused to consider Ober for PEMA is not true; (Ober Dep. 12/05/01 At 195-197; Ober Aff. 05/20/02 Para's 24-25).

32. This paragraph is objected to as argumentative and it further conveys a tone of threat that betrays the language used. This paragraph should be viewed for what it is, a reminder to Ober that Colonel Evanko's anger and retaliation suffers no limits. It is an admission against interest by Colonel Evanko and will be used against him at trial.

33. Denied. Ober was transferred from BPR on April 26, 1999 (P195, P4). Conley did not remove Ober's phone until August 23, 1999 (P9), (after the investigations into Ober began), thus, contrary to defendants errors of fact this is more evidence of the retaliation Ober was forced to suffer.

34. Denied. It was Paul Evanko who denied the reimbursement associated with the FBI investigations (P51; P127). Further, the defendant Conley's

dusting off of an invoice seven months after it had been paid, and demanding reimbursement (P15, P13, P16, P17; Ober Aff. 05/20/02; para's 15, 30) is additional evidence of retaliation and speaks plainly for what it was, namely, vindictive and spiteful retaliation. When the harassing investigation into Ober yielded no toehold for the defendants to proceed with punishing Ober, Conley reacted with whatever injury he could think of.

35. Denied. There has been no evidence, and no testimony, that the National Alcohol Symposium training was "designed for Section Commanders." To the contrary, a Sergeant, a Corporal, and a civilian supervisor were all approved to attend (P250) and in the year prior, the approved attendees included Major Koselnak. The defendants' next statement is also false, i.e., "By June...". In fact, the training was denied on April 28, 2000 by Westcott (P246).

And with respect to the Northwestern University's police and command school, the defendant's false representation is denied. Ober's application could not have been received late (P6, P66, P165, P281; Ober Dep. 12/05/01 At 236-237, Ober Aff. 05/20/02 Para 30).

36. Denied. Ober successfully and without conflict served on the Book Committee while holding the following full-time job assignments: Central

Section Commander, Systems and Process Review Division; Division
Director, Systems and Process Review Division; Director, Internal Affairs
Division and Procurement Team Leader, IIMS, Bureau of Technology
Services from April 26, 1999 until August 24, 1999 until removed by
Evanko.  In all of the time Ober served on this committee, he spent
approximately one duty hour devoted to this project total (Ober Dep.
12/05/01 At 181; Ober Aff. 05/20/02; At para 11).


Respectfully Submitted,

Don Bailey PAID# 23786
4311 N. 6th Street
Harrisburg, Pa 17110
(717) 221-9500

6-10-02

NGA – 2000
OPERATIONAL PROCEDURES – GENERAL INFORMATION
APPENDAGE A – CHAIN OF COMMAND

# PENNSYLVANIA STATE POLICE
## NATIONAL GOVERNORS' ASSOCIATION 2000 DETAIL
### CHAIN OF COMMAND
### APPENDAGE A

```
                        EVENT COORDINATOR
                        Major Lyle Szupinka
                               |
        +----------------------+----------------------+
        |                                             |
ASSISTANT TO EVENT                         DEPUTY COORDINATOR/
  COORDINATOR                              QUICK RESPONSE TEAM
Capt. David Young                              COORDINATOR
                                              Lt. Lee Fisher
        |                                             |
        |                              INTELLIGENCE COORDINATOR
        |                                 Lt. William Horgas
        |                                             |
SECURITY COORDINATOR --------------------------------+
Capt. Joseph Holmberg
        |
   +----+------------------------------+
   |                                   |
ADMINISTRATIVE                    OPERATIONS
  DIRECTOR                         DIRECTOR
Capt. W. John Pudliner           Capt. Frank Monaco
   |                                   |
```

| ADMINISTRATIVE DIRECTOR | | | | | OPERATIONS DIRECTOR | | | | |
|---|---|---|---|---|---|---|---|---|---|
| TRAINING COORDINATOR Sgt. Michael Patrick | LOGISTICS COORDINATOR Lt. Charles Way | PERSONNEL COORDINATOR Lt. Robert Weaver | OUTSIDE AGENCY COORDINATOR Lt. Harvey Cole | COMMUNICATIONS COORDINATOR Kathy Skiles | EMERGENCY OPERATIONS COORDINATOR Lt. Kevan Dugan | TRANSPORTATION COORDINATOR Lt. Thomas Hill | ON-SITE SECURITY COORDINATOR Lt. Jeffrey Watson | OFF-SITE SECURITY COORDINATOR Lt. Brian Simpson | SPOUSE AND YOUTH COORDINATOR Lt. Richard Kovalik |

June 19, 2000

# GENERAL INFORMATION

## Background

The National Governors' Association (NGA) hosts annual summer business meetings with all the governors of the states and territories. The 2000 Summer Meeting will be held in State College, Pennsylvania. The meeting will begin on Saturday, July 8, and end on Tuesday, July 11, 2000.

The meetings are attended by the governors, their families, staff members, media and corporate fellows. While not all governors attend these meetings, there are a total of 55 states and territories whose governors, staff and media can attend. The attendance at these meetings generally falls in the 1200 to 1500 range. The meetings consist of plenary sessions, which all of the attending governors and specifically invited persons attend, and special or breakout sessions for committee and special interest work. The President of the United States is invited to address the business meeting, usually on the last day.

The governors and attendees are also invited to several social events during non-business hours. An initial social event is planned for the governors, their families and specially invited guests. This event is usually hosted by the governor of the host state or the sitting President of the NGA and it is usually held the first evening of the gathering. The next two evenings generally feature social events to which all credentialed persons are invited. Other social events are hosted for the governors' senior staff members and the media, which may or may not be attended by the governors.

The site of the business meetings will be the Penn Stater Conference Center Hotel in State College, Pennsylvania. Governors will be staying at the Penn Stater Conference Center Hotel and the Nittany Lion Inn.

## Security and Transportation of Governors

The Pennsylvania State Police has been assigned the responsibility of providing security and transportation of the governors for the 2000 Meeting.

Security will take several forms during the NGA 2000 event. One form is personal principle protection for individual governors during their stay in State College. This will be accomplished by members who will be assigned as drivers to specific governors during the entire event. The second form will be area security for the Penn Stater Conference Center Hotel and the Nittany Lion Inn. A third form will be area security for off-site social events. A fourth form will be security for spouses and youth during their separate travels and events. These tasks will be accomplished by members assigned to specific security details. A fifth form of security will be a presence at each NGA-associated hotel.

*June 19, 2000*

NGA – 2000
OPERATIONAL PROCEDURES – GENERAL INFORMATION

Area security means buildings, rooms and grounds where governors are to attend meetings or social events will be free from threat. This activity will include a sweep of the area and the rooms for explosives by canine and physical search. After a sweep, and until the meeting or event has concluded, individual, or teams of members will be posted as stationary or roving security elements.

Spouse and youth security will mean that separate events and facilities to be attended by the spouse and family of the governors will be free from threat or harm. A detail of members will accompany traveling spouses and youth during their activities and provide general security.

Transportation for the governors will mean that a member will be assigned to a specific governor. The assigned member will pick up the governor and family at designated locations and transport them, at the governor's request, for the duration of their stay in State College. The member will also drive the governor back to a departure point as necessary. During the governor's stay in State College, it is possible that the governor could ask to be transported to each of the social events, any of their planned events and/or to any personal location. It is also possible that the governor could arrive days ahead and depart days after the NGA meeting dates. The assigned member will maintain their assignment from arrival to departure of the governor.

### Expectations of Members Assigned to the Event

Confidentiality

Members assigned to any portion of the security or transportation for the NGA meetings are to exercise extreme caution regarding the information they will come to learn, conversations they will hear and the plans they will execute. Any information obtained by or overheard by members as a result of their assignment shall be treated as privileged and confidential, and is not to be discussed with anyone who has no legitimate need to know that information. All information regarding any aspect of this meeting, those who are or are not attending, the agenda and the off-site events, times of arrival, departure, etc., is to be handled as confidential information which is not to be discussed with anyone. Any requests for information will be directed to the Command Post.

Appearance

Members will, unless otherwise specified, dress in appropriate, conservative business attire. The objective is to establish a dress pattern consistent to the business being conducted and to the dress of those attending the meetings. When uniforms are required, all items of the uniform will be properly worn in accordance with existing policy and procedure. A distinctive lapel pin will be provided to each member of the event to be worn as a form of identification to others while in civilian clothes.

1.4

## Conduct

Members will maintain a professional, low profile presence during the course of performing their duties.  Members will at all times devote full attention to the details of their assigned duties.  Members are expected to contribute any and all reasonable effort within the scope of their skills, knowledge and abilities, to ensure a safe, well-organized meeting.  Conduct and activity which draws attention to individuals or groups associated with the meeting is to be avoided, except as might be necessary to fulfill duties.

## Media Relations

No State Police personnel shall provide statements to the media except as directed by the Event Coordinator.  Any media releases shall be coordinated through the NGA and the State College NGA 2000.  The Operations Director is designated as the event spokesperson for State Police news releases.  All interviews, statements, etc. shall be conducted by the spokesperson at the direction of the Event Coordinator.  All media inquiries shall be directed to the Command Post.  Any conflicts with media personnel will be reported through supervisory personnel to the Command Post.  Members will cooperate with media events that may be scheduled and authorized by the NGA but not at the compromise of security procedures.

## *Security Operations*

Each facet of the security operation has been assigned to a State Police Command Officer to act as a coordinator.  Each Coordinator has submitted an action plan concerning his or her area of responsibility.   Those plans are included in this master plan.

The State Police Command Post will be at the Penn Stater Conference Center Hotel (refer to Appendage B).  A Satellite Command Post will be in place continually at the Nittany Lion Inn and a Mobile Command Post at each off-site location for the duration of that function.  The Penn Stater Conference Center Hotel Command Post shall be obtained June 30, 2000.  The Nittany Lion Inn Satellite Command Post shall be obtained July 5, 2000.  Operations at the Command Post will begin at 0700 hours, July 3, 2000.  Operations at the Nittany Lion Inn Satellite Command Post will begin at 1800 hours, July 6, 2000.  Troop G, Hollidaysburg shall provide a security presence in both Command Posts on June 30, 2000 through July 6, 2000.

At 0700 hours, July 3, 2000, the Pennsylvania State Police NGA 2000 Command Staff will begin operations and continue until the event concludes.

A briefing shall be conducted of all Command Coordinators each morning at a time and place designated by the Pennsylvania State Police Event Coordinator. Usually, this briefing will be at the Command Post at 0600 hours.  If necessary, an end of the day debriefing/planning meeting shall be held.

*June 19, 2000*



Refer to Appendage A for the Pennsylvania State Police NGA 2000 Event Chain of Command.

A liaison will be maintained by the Security Coordinator with the NGA and the State College NGA 2000 staff throughout the event. Issues concerning actions by the NGA or the State College NGA 2000 shall be brought to the attention of the Security Coordinator by the involved State Police Coordinator via the most expedient means.

Temporary reassignment of personnel from one detail to another, permanent reassignment between details, and dismissal from the event shall be done only after consultation with the Security Coordinator. The Personnel Coordinator shall be advised of any permanent change in detail assignment, or any dismissal from the event.

Deactivation from the event will be done according to function. As functions are no longer necessary, assigned personnel may be deactivated. Each Coordinator shall consult with the Security Coordinator prior to deactivations.

Deactivation will require a process of equipment turn in, paperwork completion, hotel checkout, and any necessary debriefing. It is anticipated deactivation of personnel will be completed on the morning of July 12, 2000.

At 1000 hours on July 12, 2000, all Coordinators shall meet at the Command Post for debriefing. Each Coordinator shall complete an After Action Report by July 17, 2000. Those reports shall be forwarded to Captain David Young, Liaison to the Republican National Convention.

In the event of a presidential visit, the Pennsylvania State Police security effort will be closely coordinated with the United States Secret Service. If the visit is held on-site, conflicting requirements of the United States Secret Service shall take precedence over this written plan. If the visit is held at the Bryce Jordan Center, the University Police will be the primary local agency in providing security. The Pennsylvania State Police shall provide support to the United States Secret Service and the University Police.

Members of the Rhode Island State Police and the Alaska State Troopers will be attending the State College NGA 2000. Members of the Rhode Island State Police shall be provided as much assistance as feasible by the corresponding Pennsylvania State Police Coordinator. Rhode Island State Police members shall be given the opportunity to attend briefings, meetings, etc. during the NGA 2000.

Although security is of paramount importance, all command and supervisory personnel shall stress diplomacy in dealing with NGA 2000 attendees. Expedient, tactful resolution of any problems regarding access or activities by NGA 2000 attendees is the goal.



The Penn Stater Conference Center Hotel will be closed to the general public for the duration of the NGA 2000. Access to the Penn State Research Park will be controlled beginning July 6, 2000, at 1800 hours. The access road (Park Avenue) into the Penn Stater Conference Center Hotel will be closed by authority of a permit issued through College Township officials to the State Police.

Designated protest locations will be provided at the Penn Stater Conference Center Hotel and the Nittany Lion Inn and at each off-site event. Lawful protest is a right protected by both the United States and Pennsylvania Constitutions. Willful, unlawful disruption of NGA 2000 events or activities must be dealt with by State Police members. Members shall immediately report to their supervisor, by the most expedient means, any observations of protest or potentially disruptive activity.

Security of NGA locations will be provided in layers. Access to an area will be restricted. A building perimeter will be maintained and credentialed entry to specific points will be controlled. Persons observed in secure areas without NGA credentials should be politely challenged. Those attendees not yet possessing credentials shall be directed to an NGA credentialing location. Individuals with no NGA connection without credentials in restricted areas shall be detained and a supervisor summoned. Detained persons shall be interviewed and checked by the Intelligence Section.

Extraordinary incidents such as arrests, threats, protests, disturbances, etc., shall be brought to the attention of the NGA and State College NGA 2000 by the Security Coordinator. Decisions relating to changing NGA activities or schedules shall be made by the NGA.

Security Credentials

The following lapel pins allow full access to meetings and events:

National Governors' Security Association (NGSA) lapel pins are worn by Governors' Security Detail members. The specific design and color of the pin will be shown to all State Police personnel assigned to the NGA 2000 Event during the pre-event training.

NGA 2000 security lapel pins will be issued per capita for personnel assigned to the Event. Personnel shall wear the pin on the left jacket lapel or shirt collar. The specific design, color and designation of the pins will be covered in the pre-event training.

Members of the United States Secret Service will wear a lapel pin specific to their agency. This pin is square in shape with a gold five-pointed star over a solid colored background.

*NGA – 2000*
*OPERATIONAL PROCEDURES – GENERAL INFORMATION*

## NGA Credentials

Credentials are required to attend the various NGA meetings and events. The NGA will issue the credentials to all attending governors, governors' families, staff members, media, corporate fellows and other persons.

The credential identification system will include a white badge. For general attendees, the badge will be inserted into a clear plastic carrier. For single session attendees, the badge will be inserted into a blue plastic carrier, and for the media, the badge will be inserted into a yellow plastic carrier. The plastic carriers will display the NGA logo, the meeting dates, and the name of the individual. Affixed to the bottom of the plastic carrier will be a color-coded ribbon which further identifies the individual. The coding system will be covered during the pre-event training.

## Entertainer, Vendor and Hotel Identification Credentials

Employees of the Nittany Lion Inn, the Penn Stater Conference Center Hotel, and event entertainers, contract vendors, etc. affiliated with the NGA will be required to wear an employer-issued identification card and wristband for access to rooms and sites where governors, their spouses or children will be present. A different colored wristband will be issued each day to appropriate individuals.

## Reporting

Any police action taken by members will be properly reported. An Incident Number (G7-0730884) has been assigned to the NGA 2000. Once the Command Post becomes operational, all incidents will be assigned by the Command Post. A sequential number as a suffix will be added to the assigned number (i.e., G7-0730884-0001). Members assisting in arrest activity shall submit an appropriate supplemental report.

*June 19, 2000*

*NGA – 2000*
*TRANSPORTATION PLAN*

Captain David Young will be present to welcome all dignitaries at the airport and introduce the assigned driver.  There will also be a non-commissioned member at each terminal to coordinate parking, call cars up to the boarding area, etc.  These members should be constantly coordinating with the members of the University Police Department, who will provide airport security.  A room will be available for the governors' convenience, if they choose not to leave the airport immediately.  These members, and any additional members required to assist at the airport, will be assigned on an as-needed basis.  They may also perform other duties at the Command Post.

The same procedures will apply when the governor is taken to the airport for departure, with the exception of Captain Young's presence.  Drivers will notify the Command Post after the governor/VIP has left the ground.

An additional three to five pool drivers may be assigned to the Airport Detail at busy times, to assist with the transportation of attendees.  Pool drivers will also be utilized to guard the Park Avenues while the drivers are inside either airport terminal.

Drivers are not to assume the governor is going straight to his hotel; instead, they will inquire as to where he/she will be going from the airport.

As soon as a governor is en route to the Penn Stater Conference Center Hotel or the Nittany Lion Inn, the driver shall advise the Command Post, who will in turn notify the appropriate registration desk that a governor is about to arrive.

## EMERGENCY RESPONSE PLAN:

(Refer to Appendage D).

## VIP GUESTS:

There will be certain individuals who will be designated as VIP's, and they may also be assigned one or two members for the purposes of transportation and security. All guidelines regarding the governors apply to the VIP's as well.

## MEDICAL EMERGENCIES:

For any medical emergencies, immediately notify the Command Post, and request assistance at your location, or proceed to the Centre Community Hospital, depending on the situation.

*June 21, 2000*

NGA – 2000
QUICK RESPONSE TEAM PLAN
APPENDAGE A – ENCLOSURE 1

COMMONWEALTH OF PENNSYLVANIA

DATE:                   June 19, 2000

SUBJECT:                National Governors' Association (NGA) 2000 Business Meeting –
                        Areas I & II Emergency Assistance Plan

TO:                     Commander, Area III

FROM:                   Captain David F. Young
                        Special Projects Coordinator
                        Area III

ENCLOSURES:    (1)   Correspondence dated June 15, 2000, from Captain Michael J.
                     Marcantino, to Troop "H" Section and Station Commanders, re:
                     National Governors' Conference.
               (2)   Mobilization Roster, National Governors' Association Convention,
                     Captain Michael J. Marcantino, Company Commander, Lieutenant
                     Cheryl A. Hickes, Troop H Command Post Representative
               (3)   Correspondence dated June 6, 2000, from Captain John G. Rice to
                     Section/Station Commanders Troop N, re:   National Governors'
                     Conference.
               (4)   Correspondence dated June 2, 2000, from Captain Phillip L. DeWire
                     to All Troop F Members, re:  National Governors' Conference.
               (5)   Areas I & II Emergency Contact List, dated June 19th, 2000.


        1.      In the event of mass demonstrations at the National Governors'
Association (NGA) 2000 Business Meeting in State College provisions have been made to
obtain assistance from Area I and Area II. Enclosures (1), (2), (3), and (4) detail the
provisions each affected Troop will provide.

        2.      As a precaution, all surrounding Stations will be put on alert prior to
and during the NGA Business Meeting, starting July 7th through July 12th, 2000.  On-duty
members will be required to carry all Department-issued riot gear.  In the event of mass
demonstrations on-duty, members may be called to provide immediate assistance.

        3.      Enclosure (5) contains the contact names and telephone numbers
along with the number of members available from each Area and Troop.

June 21, 2000

Exhibit "B"

# PENNSYLVANIA STATE POLICE

Commonwealth  of Pennsylvania

### LETTER OF COMMENDATION
#### TASK FORCE COMMANDER LETTER OF COMMENDATION

December 15, 2000

Captain David F. Young
Pennsylvania State Police
Director
Special Investigation Division
Bureau of Criminal Investigation
1800 Elmerton Avenue
Harrisburg, Pennsylvania 17110

Dear Captain Young,

The National Governors' Association Year 2000 Business Meeting culminated with a high level of success due to the relentless hours devoted by many in the planning stages, and additionally the long, arduous staffing hours during the event.

Upon your assignment as Special Projects Officer to Area III on February 12, 2000, you played a crucial role in ensuring the success of our mission. Having not been previously involved in the planning process for NGA 2000 allowed you an objective overview of our efforts. As a result, you were able to effectively critique, identify areas of concern and offer possible solutions. You greatly assisted in the editing and preparation of the written Operational Plan and the After Action Report. Additionally, you assisted in the coordinating of a contingency plan for the emergency response and assistance of other Troops outside Area III. You also assisted in handling numerous Area III issues for this officer, which allowed more valuable time to be devoted directly to NGA 2000 planning.

There is no question your contribution toward maintaining the security of numerous dignitaries, public officials and members of the public helped to ensure the ultimate success of this operation.

This Letter of Commendation is presented as a written record of the critical assistance you provided.

Sincerely,

Lyle H. Szupinka
Major        PSP

*Exhibit "C"*

**STATE OF <u>PENNSYLVANIA</u>**        :

**COUNTY OF <u>DAUPHIN</u>**        :

<u>AFFIDAVIT</u> ~ _II_

I, Captain Darrell G. Ober, being first duly sworn according to law, depose and say:

1.     The first I learned that there had been prior contact by the FBI with members of the State Police concerning the FBI probe into the State Police hiring process was in January or February 2000. Sometime after filing an injunction in Commonwealth Court to block my disciplinary transfer to Washington County, I telephoned FBI Special Agent Ralph Kush.   Kush told me that had contacted Lieutenant Klaus Behrens in 1995 or 1996 to determine Trooper Stanton's duty status.

2.     The first I learned that Agent Kush had discussed this case with Captain Frank Monoco, Sergeant Jerry Ryan, Corporal Jeffery Shaw or Corporal Frank Lieberum prior to contacting me was during Kush's desposition on March 14, 2002.

3.     The first I learned that Lieutenat Klaus Behrens informed Captain John Pudliner, Lieutenant McKnight, Trooper Jean Reidenbaugh or Captain Geoff Miller of the probe was when I read Behrens affidavit dated May 17, 2002.

4.     After my first contact with Kush, I personally checked Trooper Statnton's IAD file.  There were no flags, no notations, there were no open or pending criminal or administrative reports, no BPR

⬤                                    ⬤

Contol Number issued, there was no documentation whatsoever indicating that Lieutenant Behrens, Captain Miller (both assigned to IAD), Captain Monoco, Sergeant Jerry Ryan, Corporal Jeffery Shaw, Corporal Frank Lieberum (all assigned to the Organized Crime Division), Captain John Pudliner (Stanton's Commanding Officrer, Lieutenant McKnight (Stanton's Crime Section Commander) or Trooper Jean Reidenbaugh (BCI) had knowledge or information concerning this investigation or that Stanton was a potential suspect in an on-going crimnal investigation. The only itmes in Stanton's file were copies of prior investigations.

5.      Exhibit "A" is the cover memo to the transition plan I prepared for Captain Skurkis when we switched commands on May 2, 1998. Accompaning Exhibit "A" was a two-inch thick binder of infromation of support documentation. Exhibit "B" is a copy of the transition plan provided to me by Captain Skurkis. You will note there is no mention of any open or pending criminal or administartive investigation into Trooper Statanton by the FBI or any other law enforcment agency.

6.      Upon accepting the detached position in IIMS, Colonel Evanko promised me personally that he would return me to IAD upon completion of my IIMS assignment.

7.) Obers analysts of Brief in Support paragraph by paragraph.

2

05/03

Darrell,

There are several things pending — notes from me are attached (in your in-box). Per. files are in bottom right desk drawer.

Thurs., 5/7 works best for Frank's lunch. East was notified — also central. Will work out details on Tues.

I will not be in until Tues — see you then.

Charlie

Sorry about the mess — I dusted, however, no vacuum cleaner avail. —

STD-501, 9-86

COMMONWEALTH OF PENNSYLVANIA

DATE:           May 1, 1998

SUBJECT:      Transition Plan - Systems and Process Review Division

TO:              Director, Internal Affairs Division

FROM:         Captain Darrell G. Ober
                    Director, Systems and Process Review Division

ENCLOSURE:    (a)    Subject plan.

        1.     To facilitate the orderly transfer of command of the Systems and Process Review Division, I have prepared Enclosure (1) for your information and use as you deem appropriate.

        2.     Enclosure (1) contains the following information:

### 1. SYSTEMS AND PROCESS REVIEW DIVISION MISSION STATEMENT
This statement was developed approximately two years ago. It was my intention to revisit the statement during either the third or fourth quarter Division meeting of this year to evaluate whether any revisions are needed.

### 2. SYSTEMS AND PROCESS REVIEW DIVISION ORDERS
Enclosed are copies of all existing Systems and Process Review Division orders.

### 3. SYSTEMS AND PROCESS REVIEW PRE-INSPECTION PACKAGE
To orient you, I have included a complete SPR Pre-Inspection Package. This is representative of what is sent to Stations at least 30 days prior to a review. Reviewing this should give you a good overview of how the process begins.

### 4. SYSTEMS AND PROCESS NEWSLETTERS
I included the newsletters in this plan as I believe they provide a unique glimpse into the culture and environment which has been established in the Systems and Process Review Division.

### 5. SPR CALL OF HONOR
This is current and up-to-date.

### 6. OPERATIONS MANUAL 7-4, TRAINING PROGRAM
As you know, OM 7-4 was recently revised. OM 7-4 is critical to Systems and Process Review as it integrates all three aspects of the Department's inspection program; Self-Assessment, Line Inspection and Systems and Process Review. Important functional authority to oversee the line inspection process resides in OM 7-4. Responsibility to track

**Transition Plan**
**Page 2**

submission of line inspection forms has been placed with Lisa. However, she will need to be informed of how the revisions impact on her tracking.

I have included the original correspondence from the Major re: this subject, the training schedule to date, the OM 7-4 Training Syllabus and OM 7-4 Handout. The Training Syllabus has been utilized in Troop H, Harrisburg. It seemed to work well. I would suggest the training target remain focused on high level, quality control theme issues. A key opportunity exists to reshape the culture on how Commanders/Directors/Supervisors view their responsibilities. Self Assessment affords all levels the opportunity to push themselves away from the daily grind and be introspective.

### 7. SYSTEMS AND PROCESS PROJECTED REVIEW SCHEDULES

Section Commanders are charged with the responsibility of maintaining their review schedules. This may be a key time for them to review these projections to ensure they are still on tract.

### 8. SYSTEMS AND PROCESS REVIEW REPORT RECORD

This is a record of all reviews which have been conducted since 1994. Tracking reviews has not been a task that I asked Lisa to perform, as I find that I refer to this quite a bit. Donna tracks Correction Report Due Dates, as there are times commanders are delinquent in returning the reports.

### 9. ACTION RECOMMENDATION LOG

With the signing of OM 7-4, this is now a significant process to monitor. There are process duties assigned to SPR in OM 7-4. This process has exciting potential utility in the Department. The file is in your desktop under "98action".

### 10. COPIES OF PAST SPR DIVISION MEETING AGENDAS
September, 1997
January, 1998
April, 1998

### 11. NOTES FROM TROOP/AREA COMMANDERS CONFERENCE - SEPTEMBER, 1997

### 12. NOTES - BUREAU OF L.C.E. MEETING MARCH, 1998

### 13. PROPERTY MANAGEMENT TRAINING SYLLABUS

Property Management Training has gone very well for SPR. This has proven to be an effective method to communicate SPR's interpretation of the revisions to AR 3-3, as well as provide insight gained through the review process. Most Troops have received the training. The Section Commanders can advise you in as to what remaining Troops need this training.

**Transition Plan**
**Page 3**

### 14. SYSTEMS AND PROCESS REVIEW SERVICE EVALUATION FORM

This evaluation form has also proven to be an added asset for the Division. It's continued use should serve you well. It will provide you customer level feedback as to how the process is being executed and provide insight to your subordinates.

### 15. SYSTEMS AND PROCESS REVIEW BASIC SUPERVISION TRAINING SYLLABUS

This needs the indicated minor revisions.

### 16. SYSTEMS AND PROCESS REVIEW FLOW CHART

This was designed in 1996 by Lieutenant Hill, and needs some obvious updating. I am including it because I thought it might be of some assistance.

### 17. STAFFING RESPONSE TO AR 3-3

The review teams have been field testing the revised AR 3-3, and have a few suggested revisions. I was waiting until a sufficient amount of time elapsed to made these recommendations as I did not want to "piece meal" the project. In the meantime, Ms. Buck asked for our staffing comments regarding Sergeant Murphy's suggestion. I thought it would be best to combine both items and would suggest this be done.

### 18. FIRST QUARTER SIGNIFICANT ACTIVITY REPORT

This is being provided to update on the most recent reported activity by Division members.

### 19. ACTION RECOMMENDATIONS/CONSIDERATIONS

This is an important project for SPR. It was my goal to have all considerations/recommendations, functionally assigned Bureaus, and outcomes identified. Completion of this project would facilitate completing the SPR Annual Report. Lieutenant Manning completed quite a bit of draft work on this project prior to his transfer. I believe Lieutenant Hicks has the draft work.

### 20. DRAFT WORK - SYSTEMS AND PROCESS REVIEW ANNUAL REPORT

I am providing the draft work that has been completed on this project. Successful completion continues to be hampered by the lack of an administrative support person being assigned to SPR. While the data from this project was relatively easy to assemble, the task at hand is meaningful interpretation. I would suggest this be continued inasmuch as this project could be viewed as the report that SPR quantifies it's accomplishments.

### 21. POLICY QUESTIONS

This is draft work of our attempts to include policy questions in the review process. I continue to believe this is a good idea and has great utility in the inspection process. Also included is a copy of the CALEA Field Tour Checklist. As suggested during the recent Division meeting, utilizing this checklist may be a good solution.

**Transition Plan**
**Page 4**

### 22. LITTLE RANDOLPH-SHEPPARD ACT

Inasmuch as this issue has not been successfully resolved at the Department level, I am including a copy of my staffing comments from 1996. Also enclosed is a copy of a handout provided by our contact at the Blindness and Visual Services, Ms. Nowak. She attended our last Division meeting and gave a good presentation.

### 23. LIST OF MISSING PROPERTY RECORDS

I am including this list as the total number is staggering, worthy of keeping for reference.

### 24. PEMA ANNEX E CHANGE NUMBERS

Last week I found out that no process exists to ensure Changes to this Plan are made. I provided copies of this to the Section Commanders at the last Division Meeting. I suggest SPR integrate this oversight into the process.

### DRAWING BOARD IDEAS

During the last Division Meeting, it was suggested SPR further define the Comment Summary Report to include Property Management as it's own category. (In addition to Crime, Patrol and Staff). I think this is an excellent idea which you might want to consider.

### "THE BAREFOOT AUDITOR"

Corporal Leidigh recently received the subject package from Kim FREED, Bureau of Audits. SPR has been evaluating the most effective method to audit Department software in accordance with Special Order 95-94. This software has not been fully tested to determine if it is the most efficient system to employ. You may want to further evaluate. Due to the size of the packaging, I placed the box in your in-basket.

### SYSTEMS AND PROCESS NEWSLETTERS

We have discussed the utility of developing a newsletter process targeted and suitable for distribution to Area/Troop Commanders and Bureau Directors. This idea seems to have a lot of merit and you may want to consider further developing. We thought a newsletter distributed quarterly which discussed observations, cited problematic areas, sharing observations on a larger scale and listing Action Recommendations would be another method to achieve our stated objectives.

### OUTSIDE AGENCY TRAINING - OFFICE PROCEDURES MANUAL

Whenever SPR received the administrative support position, it was always our intention to develop a training program suitable for presentation to outside agencies; particularly other State Accredited Agencies similarly situated. To that end, Corporal Leidigh has been working on an internal office procedures manual. Lieutenant Miller provided much staff work and insight into this project. We thought our training could be specific right down to including copies of our software.

Transition Plan
Page 5

## SPR ORGANIZATIONAL CHANGES

We have also evaluated the merits of incorporating the CLEAN Auditing (PSP Stations only) and CALEA compliance monitoring components into the SPR Division. Both ideas have merit and have received tacit agreement from the respective Bureau Directors. However, action beyond this point has been lacking and somewhat out of our ability to achieve the desired outcome.

## SYSTEMS AND PROCESS REVIEWS TRAINING VIDEOS

During our Division Meeting in January, we came up with an unusual training idea. To assess the uniformity of interpretation of data and subsequent reporting, we developed three training videos for SPR. Three identical videotapes of several episodes of "The Andy Griffith Show" have been distributed to each Section. Each Section Commander was to ensure an Executive Summary Report was developed from these videos. This assignment was intended to provide the teams with a source of stress relief while at the same time accomplishing a training objective. Should you decide to follow through with the reports and have them presented at the next Division meeting, I would appreciate the opportunity to hear the final work products. Thanks.

2.    For your planning information, Lieutenant Miller is scheduled to attend a Staff Inspection Training Conference in Jacksonville, Florida the week of May 4-7, 1998.

3.    Pending SPR Executive Summary Reports are as follows:

a.    Troop D, Butler - (draft work competed, exit interview scheduled for May 8.

b.    Bureau of Staff Services- (draft in your in-basket; I did not yet approve).

c.    Speciality Review of Troop A, Greensburg I.D. Unit. - Corporal Hostert and I have this draft very close to final form. However, it is my understanding Captain Pudliner has already made the two most significant changes we were going to recommend. I suggest we discuss these changes with Pudliner and re-visit our draft to ensure SPR receives the credit it deserves in resolving this situation.

d.    Southeast Training Center - The draft is completed and the exit briefing is scheduled for May 12, 1300.

e.    Speciality Review - Troop M, Bethlehem Overtime Report. Essentially the same situation exists as in Greensburg. Captain Kohuth has already put the suggested overtime

**Transition Plan**
**Page 6**

control measures in place and they have produced positive results. Again, I would ensure SPR receives the credit it deserves.

f.     Troop H, Lykens – This is an ongoing review being conducted by the Central Section. I have not reviewed any draft work.

4.     Also in your in-basket is a copy of the handouts I provided to the review teams during our last Division meeting.

5.     Believe it or not, I am probably forgetting something. If you have any questions, please feel free to give me a call. SPR will always be special to me. Good luck.


cc:     Director, BPR

## REBUTTLE TO DEFENDANTS' BRIEF IN SUPORT OF THEIR MOTION FOR SUMMARY JUDGEMENT

DON – I HAVE NUMBERED THE PARAGRAPHS FOR EASY REFERENCE;

Paragraphs 1 – 4; These look like legal arguments that are yours.

Para. 5 – 6; With respect to the First Amendment claim, as you said I believe the Judge has already ruled that I was engaged in protected activity.  If not, there are tons of references in the depositions (mine, Kush and Shooy to name a few) that would allow us to develop the public interest theme.

Para 7 – Misstatement of facts.  Stanton did not accept a payoff until after October 1998; this had not yet occurred when Kush contacted me.

Para 8 - The characterization of "decided not disclose" and "when completely outside his own chain of command" is out of context.  I went to Hickes for a two reasons.

Hickes is in Ober's chain of command.  Stating Hickes is not in Ober's *direct* chain of command, is an acknowledgement that Hickes *does* occupy a position in Ober's chain of command; it is just not direct and is indicative of the trivial nature of their argument.

1

Hickes is in Ober's chain of command. Stating Hickes is not in Ober's *direct* chain of command, is an acknowledgement that Hickes *does* occupy a position in Ober's chain of command; it is just not direct and is indicative of the trivial nature of their argument.

I went to Hickes for advice on how to handle this sensitive situation. Although assigned, Conley had not yet reported to BPR. In fact, due to Conley's leave schedule, my attendance at Disciplinary Committee Meetings and taking the Major's promotion exam, Conley and I were never in the Bureau together until at least October 13, 1998 (need to confirm this date).

"Ober told Hickes that the FBI had expressed directly to him to maintain absolute confidentiality. That was untrue. The FBI never asked Ober to keep the matter a secret; in fact, the FBI has already talked to several members of the state police about the very same investigation".

Confidentiality was discussed, expected and supported by Kush and Shooy. (Ober Dep. 12/05/01, at 95-96, 146-147); Kush interview by Werts/Williams; 05/25/99; page 2, (Kush Dep. 03/1402 at 60, 80-81, 95, 96, 98, 109-110, 129-130); (Shooy Dep. 03/14/02 at 18, 20-21, 27, 30, 31-32, 34).

Confidentiality was discussed, expected and supported by Kush and Shooy. (Ober Dep. 12/05/01, at 95-96, 146-147); Kush interview by Werts/Williams; 05/25/99; page 2, (Kush Dep. 03/1402 at 60, 80-81, 95, 96, 98, 109-110, 129-130); (Shooy Dep. 03/14/02 at 18, 20-21, 27, 30, 31-32, 34).

By way of further response, the issue of confidentiality is best summarized by FBI Special Agent Ralph Kush, who in response to the question: "But, you know, and today is altered by the you uncovered in an investigation, but what you knew when you called Captain Ober was, as a, at least, at the very least as a matter of common sense matter, was that a Trooper in Southwestern Pennsylvania was not going to be able to single handedly without help manipulate an Academy appointment up in Harrisburg, right?" Kush response: "Sure". Question: "That was only; I mean that just basis common sense, right? He had to have somebody helping him?" Response; "Sure". (Kush Dep. 03/14/02, 60).

Virtually every individual deposed, with the exception of Westcott, stated a fundamental rule is not to inform potential targets of the existence of the investigation including Kush; "…well, we certainly wouldn't want targets to get the information…" Kush Dep. 03/14/02 at 96).

Exactly what transpired between Ober and Kush is a matter of differing opinion. By way of this brief the defendants are now making judgements about Ober's veracity that Evanko himself could not; make any determination. When asked the question: "Well, why didn't you punish Ober for that if you --- I mean, do you believe Ober misrepresented what happened on October 5th or early October?"; Evanko responded, "I don't know what happened there". (Evanko Dep. 03/27/02

3

At 59-60). This is from the individual who ordered the investigation. Later, Evanko contradicts himself, "He violated rule 1.17" (Evanko Dep. 03/27/02 At 105).

"And to tell you the truth after I came to the conclusions after reading the administrative inquiry and after I advised Lieutenant Colonel Hickes of what my conclusions were, very frankly, I didn't give Captain Ober much of a second thought" (Evanko Dep. 03/27/02 At 178).

The information that other members of the State Police had been informed as to the existence of the FBI probe was unknown to Ober when he informed Hickes (Ober Second Aff.).

Para 9 – There is ample testimony that the FBI Agents knew that Trooper Stanton could not facilitate entry into the State Police on his won; that it took someone in the right position and there is ample testimony the agents did not want potential targets informed of the existence of the probe (I can cite to the record if you need me to).

"Moreover, Ober leapt to that conclusion based on gratuitous statements made by Dennis Jay Bridge…". This is an inaccurate statement. Ober treated the information with respect. Agent Shooy's statement sums it very well "……"

4

Response to footnote: The "mischaracterization" of "Colonel" and "Lieutenant Colonel" is blow out of proportion. Evanko and others admit the words are used interchangeable.

The has been no evidence provided by the defendants that Ober reported to Hickes for personal reasons. What would they be?

Ober has testified that in the early stages of receiving this information from the FBI, he was unsure who to share this information. He was uncertain because he did not want to do anything that could hinder or comprise the FBI investigation. Conley was new to BPR and was Stanton's former commanding officer. Part of Conley responsibilities as a Troop Commander was to maintain contact with the legislators within his Troop area.

Para 11 – The defendants are embellishing the facts. Ober went to Hickes for advice and guidance. All Ober ever reported to Hickes was that the term "Colonel" was used (which the defendant's themselves admit) and that the investigation could go into the Governor's office. These are true and accurate statements. Ober repeatedly expressed concern over safeguarding the integrity of this investigation and was motivated solely for that reason.

There is no evidence that Ober engaged in "misrepresentation". Evanko himself is on record as saying that he "did not know what happened".

Ober cannot be held liable for any thing that Hickes divulged to anyone.

To place in perspective, during the time when Ober received the information from the FBI on possible irregularities in the State Police hiring system, a friend of Evanko's daughter had already been given the opportunity to re-test having already failed to meet the physical standards the first time.

Para 12 – "…Ober has not produced any evidence to support any of his allegations". I don't know where to start since, in my view, there is an avalanche of supporting documentation.

Para 13 – Legal stuff; all yours.

Para 14 – Here the defendants are trying to tell us this was a "lateral" transfer that does not involve a demotion in form or substance. The testimony and evidence to refute this is overwhelming; where do I start? As you say, they are relying on the fact that if salary, rank or benefits were not impacted then it isn't an adverse action.

They even have the nerve to say the transfer to Washington would have enhanced my opportunity for promotion; there is no evidence to support this.

6

Para 15 – "Of course, Ober was not happy with that either…"  This is a deliberately snide comment.  "…claiming his temporary assignment…"  They cannot make they statement this was "temporary".  How could they have known that when I was transferred?  Regulations state (FR 3-2) transfers are considered permanent unless stated otherwise.

Koselnak "urgently" needed a Section Commander.  Presented like this makes it sound as though it is the truth.  The truth is the position, and functions of the position, were being preformed by Sergeant Valencic.  He had been serving in that role since September 1999.  Valencic was filling in for Lieutenant Huston Williams who was transferred pending the results on an on-going criminal investigation.  Williams was arrested on January 10 or 11, 2000.  If Koselnak "urgently" needed a Section Commander, why did they not fill the position when they promoted Lieutenant's on January 29, 2000?  What if Ober had not been available?  When would it have been filled?  The truth is the need was NOT so urgent that they was no rush to fill it.

Now the time that Ober was demoted to a Lieutenant's position is being referred to as a "very brief period".  As I have repeatedly said, the transfer to this position was permanent; they had no foreknowledge that Captain Campbell would retire in May.

7

Para 16 – There is an abundance of evidence that supports the denied overtime through his removal from PEMA; 9-11 for example. "…he rejected the chance to earn the extensive overtime involved with the Special Projects position…" is so preposterous I don't know how to respond.

Para 17 – There is no question that Ober has been denied educational opportunities and removed from the Book Committee.

The absurdity and of the this motion is best summed up by the following contradiction: "As far as the administrative inquiry Colonel Evanko requested, Ober was not disciplined or counseled about his actions. Colonel Evanko was not even particularly concerned about Ober's actions; his primary focus was on how Lieutenant Colonel Hickes has handled the situation." Now compare this statement those contained in para 11: "Regulations require ….Ober to tell his supervisor…Inexplicable, Ober chose not to do so…there was no legitimate reason no to tell Conley (from footnote 3)…Ober circumvented his chain of command; he gave Lieutenant Colonel Hickes misleading information, falsely portraying top management of the State Police as targets of a criminal investigation….These baseless rumors obviously caused the Commissioner and his Deputies unwarranted embarrassment….clearly …government interests …outweigh and personnel reasons Ober may have had for going outside of his chain of command and misrepresenting the facts…"

Given all of Ober's alleged failures, do the defendants expect anyone to believe that "Colonel Evanko was not even particularly concerned about Ober's actions.."? If Evanko wasn't concerned; who was? Shouldn't someone have been concerned about Ober's actions? The defendants are alleging a serious breakdown in performance and essentially accusing Ober of lying to Hickes. Yet, they admit, Ober was not "disciplined or counseled". Ober has testified that he never received so much as Supervisors Notation or was marked down on his Annual Performance Evaluation. How can this happen? Troopers are investigated and disciplined for much less serious failures on a regular and frequent basis. Discipline, after all, it the backbone of a para-military organization. According to FR 3-3: "The Commissioner has the ultimate responsibility for the conduct and discipline of members and therefore has the authority to discipline members pursuant to the provisions of this regulation".

As we have previously stated, the failure to correct Ober's behavior represents a serious breakdown in supervision…or was it? Or were Ober's sins viewed so critically that Evanko and the others decided to bypass the established discipline process? Is it possible that Evanko was so offended he did not want to leave Ober's discipline fate in the hands of the process; one that would afford Ober grievance and arbitration provisions? Whatever discipline Ober would have received through the process would never total add up to the actions the defendants could take against him by keeping this "off the books"; just like the investigation he ordered Werts and Williams to conduct.

9

Para. 18 – Subject determinations; there is ample evidence that demonstrate
Ober is more qualified than several of the individuals who have been promoted.
Best evidence appears to be Evanko  not even acknowledging Ober's application
for Legislative Liaison position; a Major's position.  The selection process
included an interview.  How was Evanko able to determine Ober would not be the
best candidate?  Particularly when compared to a subordinate officer or one with
a discipline history (refer to para. 31).

Para 19 – 30: This looks like legal stuff; all yours.

Para 31 – "Although Ober had violated FR 1.17 (b), Evanko felt discipline was
unnecessary".  The defendants have not established either through their
investigation or this litigation that Ober committed any violations of Department
regulations.  In fact, when Evanko was asked the question: "Well, why didn't you
punish Ober for that if you --- I mean, do you believe Ober misrepresented what
happened on October 5th or early October?"; Evanko responded, "I don't know
what happened there". (Evanko Dep. 03/27/02 At 59-60).

Para 32 – "The Commissioner has the discretion to transfer commissioned
officers anywhere he desires within the Department to suit the needs of the
organization".  This is a half-truth.  First, FR 3-2 makes no mention of this
provision for "commissioned officers".  Second, there is a needs provision that

10

allows transfers if the process is followed; as was the case for Captain Transue. Third, the best evidence that plaintiff has is that no other officers in Evanko's nearly completed eight year term have been involuntarily transferred over 200 miles; Ober is and remains the only one.  Just like the demotion to a Lieutenant's position; Ober is the only one.

Again, the defendants use the word "temporarily" to describe Ober's demotion to LCE.  "Temporary" is subjective and there is nothing that suggests the transfer was temporary. It was only "temporary" due to Captain Campbell sudden and unannounced retirement.  This does not detract in any way from the retaliatory and disciplinary intent of this transfer.

Again, the defendants characterize the Section Commander's vacancy as "urgent".  False statement provided by a Major whose untruthful testimony is a matter of record.  Not urgent considering a Sergeant had been serving the position for seven months and apparently not urgent since Evanko, who they continually remind us has the sole authority to promote, did not promote someone into the position on January 29, 2000 when he had the opportunity.

Para 33 – No comment.

Para – 34; The volunteer work they describe amounted to one hour in two or three years; this was an off-duty committee.  As I have testified, Evanko checked

11

with no one regarding my duty time.  This clearly does demonstrate that Evanko took a personnel interest in my affairs.  How is it that the IIMS Project Director, the Project Executive, the Major or LTC Hickes never saw this problem with my time but Evanko did?

Para 35 – 37; all  yours.

Para 38 – The statement that Ober voluntarily withdrew from PEMA is twisting the truth.  Ober withdrew because he was being transferred to Washington.

Para 39 and 40 – These are conclusions formed without supporting testimony or evidence.

Don – I notice this is a common theme in this motion; no supporting documentation and no reference to testimony.

Don,                    *Review of Opposition Affidavits*

I have reviewed the defendant's affidavits.  They really don't say much.
Here are the comments I think are most appropriate:

- Klaus Behrens – No comment except to note that Behrens and a host of others did do anything with the information.  Also, the Department failed to disclose the existence of other individuals with information about this case.  We even disposed Pudliner and they sat their silent knowing he had prior information about this case.

- Linda Bonney – Doesn't say anything.

- Rick Brown – I am just mad as hell about this one. Go to para 6 and look at the wording.  "It is my understanding….".  "This is false…".  How dare ▮▮▮▮ make this statement?  I have reviewed the transcript and I can find no reference that I did not know the proper procedure for investigating an allegation against a Deputy Commissioner, Commissioner or other top management.  Perhaps it is in there and I cannot locate it.  Pages 69 – 80 (attached) certainly don't say that.  They certainly don't provide a deposition cite for us.  I will keep looking to see if I can find any reference.  I believe in our complaint we say no process exists that defines how the Colonels are to be investigated; this is true to the extent that all members of the State Police except the Colonels are members of the bargaining unit. Para 7; Brown says I have accused him of shunning or harassing me; where and when did we make this accusation?  Not to my knowledge, no cite is provided an I think this is another false statement.

- Campbell – Doesn't say anything.

- Conley – a lie.

- Coury – a lie.

- DeWire – Did you notice there are two paragraph three's?  Anyway, the second paragraph three is an admission that the situation that exists between Evanko and I and the other defendants is a direct casual factor in me being treated differently.  If anything, we could argue the defendants failure to act or apathy toward DeWire's prejudice or whatever we could call it is tantamount to approval.

  Para 4 is exactly what we have said; Washington said; then changed his mind.

  Missing from DeWire's affidavit is any mention of why I am not named as acting and Coury's fitness for duty caper.

1

- My comments about Einsel's affidavit are in my material facts rebuttal.

- Evanko – all it talks about is promotion; nothing else.  Notice that it doesn't say he never directed or requested anyone to shun, ostracize, harass or insult me like the other defendants affidavits do? (maybe it was autopenned – kidding).

- Infantino – doesn't say anything but I do note use of phrase "…although the committee occasionally meets during work hours."

- Koselnak – My statement of material facts rebuttal speaks to the veracity of Koselnaks testimony.  Para. 4 contains a false statement re: the legality of compensation to LCE members.  If there are legal concerns, consider the following, during Koselnak's command,  have already noted that two LCE officers served in long-term assignment to IIMS.  Since then I have also discovered the following:

Exhibit "A" – Liquor Enforcement Officer Mary Lou Corbett serves as a member of the Department's Member Assistance Program.

Exhibit "B" - Liquor Enforcement Officers Earl Killion, Dick Magolis and Sergeant Steve Valencic all serve as members of the Department's Member Assistance Program.

Exhibit "C" - Liquor Enforcement Officer Mary Lou Corbett serves as a member of the Department's Ceremonial Unit.

I am also aware that up until one month ago, Sergeant Craig Steve also served on the Department's Ceremonial Unit; having done so for the past three years.

All of the above individuals served in these assignments while the Bureau was under the direction of Major Koselnak. (should this go in my second affidavit?).

Exhibit "D" - As recently as September 2001, Sergeant Valencic was selected to serve as a Physical Fitness Coordinator.

It would appear that I might be the only one singled out and not permitted to participate in secondary assignments.

- Labecki – strike.

- Monoco – Confirms that Monoco did nothing with the information.  Did you notice that he did not say he reported this to his supervisor (Major

2

Periandi)?  Would he be in violation of FR 1-1.07 (b)?  Para 8 should be stricken from the record; it is his opinion.  Interestingly, Big Frank is offering his opinion on what a FBI agent would do in this situation.  Fortunately, for us we have a real live agent telling us wheat he would do.  Q: "My question is if you suspected that the, if you genuinely suspected that the command staff of the State Police might be involved in this kind of selling slots into the Academy, why would you tell anybody at the State Police about it?"

A: "Well, when I look at a Captain of OPR or Bureau of Professional Responsibility, I feel an obligation that we have to inform that other agency about an investigation of one of their own.  I mean, as if, as somebody I would expect would notify the FBI, I would hope if they come across some possible criminal activity by an FBI agent.  So, we felt an obligation to do it, to talk to somebody and my position on OPR or Bureau of Professional Responsibility is that they're, they're one level above reproach" (Soohy Dep. 03/14/02 At 30).  So perhaps this explains Monaco's confusion.  Perhaps since he wasn't, and never has been the Director of IAD, Monoco is unable to identify in a first-hand way what it is like to occupy a position that is thought to be one level of reproach.

- Skurkis – I like the affidavit.  It doesn't hurt me and it confirms his credibility as the resident expert on AR 4-25 which supports his deposition!!

- Westcott – a lie.

- Woolley – strike.

- Young- best summarized in my rebuttal to material facts.  I am personally offended at the reference to hardship.  HE VOLUNTEERED AND WAS PROMOTED; A CHOICE HE MADE.

I SWEAR the AFOREMENTIONED is correct to the
BEST OF MY KNOWLEDGE, Information
AND BELIEF.  I INTEND to
BE LEGALLY BOUND HEREBY
SUBJECT TO THE PROVISIONS
OF PERJURY for MAKING FALSE
STATEMENTS TO AUTHORITIES.

3

SHEET 18    PAGE 69

didn't.

Q:   Did you make an effort to clarify whether it was something that you would be able to tell Major Connelly?

A:   No.

Q:   Did you make an effort to clarify if it was something that you would be able to tell Lt. Colonel Coury?

A:   No.

Q:   How about Colonel Evanko?

A:   Not that I can recall in that discussion.

Q:   Did you clarify whether you could tell his station, his troop commander?

MR. BAILEY: Whose?

MS. GUIDO: Stanton's.

A:   I don't recall any of that discussion.

Q:   And you didn't talk to him about whether you could talk to the area commander?

A:   I don't have any recollection of that.

Q:   Returning to paragraph twenty-five you say there is no PSP policy or regulation to guide a member on how to conduct a report on alleged

PAGE 70

criminal or other misconduct of a high-ranking PSP official such as Commissioner or Deputy Commissioner. For purposes of internal affairs don't the commissioner and deputy commissioners get treated like everybody else?

A:   I would certainly hope so.

Q:   So when you say that there is nothing to guide you on how to report or conduct an investigation into misconduct by the commissioner or his deputies the AR 4-25 that governs internal affairs wouldn't it apply to them just as well?

A:   I think I'm living proof of what happens when you treat them like everyone else.

Q:   But wouldn't that apply, don't the same rules apply to them?

A:   I think what the intent of that section or sentence is ma'am that the AR 4-25 has a great deal of specificity with respect to lower or subordinate ranks. In the situation that we're describing those reporting requirements and it calls them chain of command requirements, but the reporting requirements don't specifically address how that's to be handled. Should those ranks or those positions be implicated?

MR. BAILEY: Hold it for one second.

PAGE 71

END OF AUDIOTAPE ONE - SIDE TWO. BEGIN TAPE TWO.

MR. BAILEY: Ok. Thank you. Tape two. Thank you.

MS. GUIDO: While you were in internal affairs did you have other complaints against Colonel Evanko or his deputies?

A:   I recall, yes. I think we did get a complaint. I believe it might have been against Colonel Westcott. I'm not certain.

Q:   Do you recall receiving a complaint against Lt. Colonel Westcott in September 1998, involving an anonymous letter received by Colonel Evanko?

A:   No. If you can help me. I don't recall.

MR. BAILEY: While we are doing this and Mr. Brown is helping you can you have him identify himself for the record. State his position and title, please.

MR. BROWN: Captain John R. Brown, Director of Internal Affairs for the State Police.

MR. BAILEY: You're the investigator on the Ober case?

MR. BROWN: Yes.

PAGE 72

MS GUIDO: Just for while we are on the record we're clarifying that you are assigned as an attorney work product

MR. BROWN: That's correct.

MS. GUIDO: We're going to have to get

MR. BAILEY: Copies?

MS. GUIDO: That's as many as I happen to have.

MR. BAILEY: Why don't we suspend for a minute. I need to call my office anyway. You have a phone down here don't you?

MS. GUIDO: Sure do. Actually there's one over there. Let's take a five-minute break.

MR. BAILEY: Wait. Wait. Wait. Let the video please; sit down until the video operators get a chance to handle their machinery.

VIDEOGRAPHER: It's 10:27 AM. Short break.

BREAK:

MR. BAILEY: Could you repeat that please?

VIDEOGRAPHER: It's 10:37 AM. We're back on the record.

MR. BAILEY: 10:37 AM. Back on the record. Ok, thank you.

MS. GUIDO: Captain, if you'll take a look at Exhibit 5. That's the desk memorandum. Do you

SHEET 19  PAGE 73

1  recognize you own handwriting at the bottom of it?
2      A:  Yes.
3      Q:  And did you have a chance yet to look
4  over
5      MR. BAILEY: Do you have a copy of that for
6  me?
7      MS. GUIDO: He has it, I'm sorry. I have
8  the original though.
9      MR. BAILEY: Ok, thank you.
10     MS. GUIDO: Did you have a chance to look
11  over it?
12     A:  I think I got the gist of it. To tell
13  you the truth I haven't studied it but I think I got
14  the gist of it.
15     Q:  Is that a complaint that came into
16  Internal Affairs through the commissioner and
17  involved Deputy Commissioner Westcott? Correct?
18     A:  It came; the routing slip is from the
19  commissioner to the deputy of admin ultimately to
20  the director of BPR. Yes.
21     Q:  Who would the deputy of
22  administration be then?
23     A:  Colonel Coury.
24     Q:  So it came from the commissioner to
25  Coury to you?

PAGE 74

1      A:  Yes. Apparently.
2      Q:  And is there a date on that?
3      A:  Yes. September 14, 1998.
4      Q:  So this is right about the same time
5  frame that you received the information from the
6  FBI?
7      A:  Yes.
8      MR. BAILEY: Is this Lieutenant Brown the
9  same; is this the same man here?
10     MS. GUIDO: Yes. And you assigned that
11  investigation to Lt. Brown?
12     A:  Yes.
13     Q:  And this notation on there does it
14  say how that is supposed to be handled?
15     A:  It says Tom handle as you normally
16  would. Colonel Evanko.
17     Q:  And then if you'll look at Exhibit 6.
18  Can you tell me what that is, document is?
19     A:  This is a, Exhibit 6, is a use of
20  force or complaint reception and processing
21  worksheet. Indicating the complaint was anonymous
22  for BPR Control Number IAD- 10855.
23     Q:  And what's that form used for?
24     A:  This is the recording document that's
25  used when complaints are made.

PAGE 75

1      Q:  Is that the initial document?
2      A:  Yes, it's for complaints made against
3  department personnel.
4      Q:  Is that the same; is that the
5  standard document that would be used for if any
6  other member of the State Police were the subject of
7  an investigation?
8      A:  Yes.
9      Q:  And what did, did you say there was a
10  date on that document?
11     A:  I don't believe I did but it was. It
12  says date received 9/14/98.
13     Q:  Ok, take a look for a second. And I
14  see that it says date assigned. Is there a date when
15  the case was assigned?
16     A:  Yes. 9/16/98.
17     Q:  So the form was filled out relatively
18  close in time. In other words it's like two days
19  after you get it, after it comes in it's assigned a
20  case number?
21     A:  Yes.
22     Q:  And then an investigator was
23  assigned.
24     A:  Yes.
25     Q:  Which goes back to my original point

PAGE 76

1  that the commissioner and his deputies for purposes
2  of internal affairs complaints should be treated be
3  treated like everyone else. Correct?
4      A:  I would hope so.
5      Q:  Now paragraph twenty-six of your
6  complaint, if you could just hand those down to the
7  court reporter, it says since Ober was chosen
8      A:  That previous document that you just
9  showed me that went directly to the commissioner's
10  office, I note. Is that correct?
11     Q:  I believe so, if you want to look at
12  it again you can.
13     A:  This is a complaint that was made
14     MR. BAILEY: Make reference to the exhibit.
15     MR. OBER: Exhibit #5 is an unsigned
16  anonymous letter that was sent directly to the
17  commissioner. Apparently, routed to the deputy
18  commissioner of administration and then is
19  ultimately routed down to or through the Bureau of
20  Professional Responsibility for assignment.
21     Q:  And the commissioner's direction on
22  there was to treat him like everybody else, like
23  every other one. Is that right?
24     A:  His direction is "Handle as you
25  normally would."

SHEET 20    PAGE 77

1    Q:    Ok.
2         MR. BAILEY: Now I want to clarify this
3    because she has asked you a question, I don't think
4    this was clear. "Lt. Brown see me, I would like you
5    to handle this investigation." Whose words are
6    those?
7         MR. OBER: Those are mine.
8         MR. BAILEY: Ok.
9         MS. GUIDO: Now paragraph twenty-six of
10   your complaint. Since Ober was chosen by the FBI as
11   a contact, obviously because he was not a target or
12   potential target of the investigation that portion
13   there, is that your assumption that you were chosen
14   because you were not a target or were you told that
15   you were chosen because you were not a target?
16        A:    I don't remember being told I wasn't
17   a target. I knew I didn't do it so, I don't remember
18   that part of the conversation, no.
19        Q:    I think you said this but if you
20   didn't correct me. Did you say that you weren't
21   really sure why they chose you? That they didn't
22   really tell you, Agent Kush didn't tell you why he
23   called you?
24        A:    No. No he didn't.
25        Q:    And next in that paragraph you state

PAGE 78

1    that you felt it was important that you limit your
2    reporting of the information to someone that you
3    were personally certain would not be involved in a
4    unlawful matter and to whom no conflict would
5    present itself but at the same time be someone who
6    was hopefully be a superior in your chain of
7    command. At that time when the FBI contacted you who
8    was in your chain of command?
9         A:    My direct chain of command, would
10   have been, during the time I was the acting bureau
11   director, my direct chain of command would have been
12   Colonel Coury and then Colonel Evanko.
13        Q:    Well who was your immediate
14   supervisor?
15        A:    At that time I was the acting bureau
16   director. I would have been supervised by the Deputy
17   Commissioner of Administration.
18        MR. BAILEY: Who was?
19        A:    Colonel Coury.
20        Q:    As of the date that you told Colonel
21   Hickes about this who was your immediate supervisor
22   as of that?
23        A:    Major Connelly.
24        Q:    And you did not report the matter to
25   Major Connelly. Right?

PAGE 79

1    A:    Correct.
2    Q:    Or to Lt. Colonel Coury?
3    A:    Correct.
4    Q:    Or to Colonel Evanko obviously.
5    A:    Correct.
6    Q:    And you had said you wanted to report
7    it to someone you were personally certain would not
8    be involved in an unlawful matter. So of the people
9    in your direct chain of command, Major Connelly, Lt.
10   Colonel Coury, Colonel Evanko none of those people
11   were people that you could be personally certain
12   would not be involved in an unlawful activity?
13        MR. BAILEY: I'm going to object to the
14   form of the question. You can go ahead and respond.
15        A:    I think what the statement represents
16   to me is my personal knowledge of Colonel Hickes'
17   background and experience and the fact that he by
18   the process of elimination was not a potential
19   target. That's more what the statement means to me.
20        MR. BAILEY: In other words that's what you
21   mean by the statement.
22        A:    Yeah. It was not as though I didn't
23   personally know who Colonel Hickes was or what his
24   background was. I think that is what I took that to
25   mean.

PAGE 80

1    MS. GUIDO: Ok and how well did you know
2    Colonel Hickes at that time?
3         A:    Personally?
4         Q:    Yes.
5         A:    Not well.
6         Q:    Did you have much professional
7    contact with him at that time?
8         A:    No.
9         Q:    Essentially how did you know him?
10        A:    Most of my exposure to Colonel Hickes
11   was through when he was the director, the director
12   of BPR and as the deputy commissioner of operations
13   when I was assigned to the Bureau of Research and
14   Development. He might have been an officer in Troop
15   G when I was stationed there but I don't recall that
16   for sure. But I worked with him on a variety of
17   assignments when I was in R&D.
18        Q:    Why did you feel that Colonel, Lt.
19   Colonel Hickes was someone you could trust and not
20   your own immediate supervisor, Major Connelly?
21        MR. BAILEY: Objection to the form of the
22   question. You may respond.
23        A:    Well I don't know that it was so much
24   as a matter of trust. It was what would be the
25   appropriate thing to do? Who would be the

EXECUTIVE AND ADMINISTRATIVE OFFICES (cont'd.)

## BUREAU HEADQUARTERS PEER CONTACTS

| NAME AND LOCATION | TELEPHONE NUMBER | SPECIAL INTEREST |
|---|---|---|
| Ms. Elaine M. Backus<br>Bureau of Human Resources | (W)  717-705-5485<br>(H)  717-652-0667 | CISM, SEAP |
| Tpr. Susan E. Clark<br>Bureau of Drug Law Enforcement | (W)  1-800-252-1206<br>(H)  717-361-2539<br>Pager 1-877-812-9825 | CISM |
| Ms. Mary Lou Corbett<br>Bureau of Liquor Control Enforcement<br>Special Investigations Section, Philadelphia | (W)  877-812-9659<br>(H)  215-659-3428 | CISM |
| Ms. Kathleen M. Counsman<br>Bureau of Records and Identification | (W)  717-772-0352<br>(H)  717-545-5050 | CISM, SEAP |
| Tpr. Tracy A. Coutts<br>Bureau of Human Resources<br>Recruitment Office – Dunmore | (W)  570-963-4296<br>(H)  570-894-5121<br>Pager 570-480-3213 | CISM |
| Tpr. Brett J. Fedderson<br>Bureau of Emergency and Special Operations<br>Aviation Patrol Unit VI | (W)  814-432-3424<br>(H)  724-622-4770<br>Pager 1-888-441-3622 | |
| Cpl. H. Gregory Fersner<br>Bureau of Research and Development | (W)  717-772-4899<br>(H)  717-540-1964 | |
| Cpl. Timothy F. Galloway<br>Bureau of Training and Education<br>SETC | (W)  610-584-8633<br>(H)  610-515-8056 | CISM |
| Cpl. William H. Gibson<br>Bureau of Training and Education<br>Service & Rickards Roads<br>Building P6-111<br>Annville, PA  17003 | (W)  717-865-9236<br>(H)  717-645-5951<br>FAX 717-861-5456<br>Pager 717-310-0573 | PTSD, CISM, SEAP |
| Tpr. Donald Hughes<br>Bureau of Training and Education | (W)  717-533-9111, Ext. 320<br>(H)  717-671-6637 | |

*A*

EXECUTIVE AND ADMINISTRATIVE OFFICES (cont'd.)

### BUREAU HEADQUARTERS PEER CONTACTS (cont'd.)

| NAME AND LOCATION | TELEPHONE NUMBER | SPECIAL INTEREST |
|---|---|---|
| Cpl. Robert M. Jankoviak<br>Bureau of Training and Education | (W) 570-288-3650<br>(H) 570-287-1991 | CISM |
| Earl A. Killion<br>Bureau of Liquor Control Enforcement<br>District Enforcement Office #5, Altoona | (W) 814-693-6200<br>(H) 814-345-5246<br>Pager 1-888-984-9509 | CISM |
| Dick Magolis<br>Bureau of Liquor Control Enforcement<br>District Enforcement Office #7, Punxsutawney | (W) 814-938-0565<br>(H) 814-938-8825 | CISM |
| Cpl. Kevin Schmidt<br>Bureau of Criminal Investigation<br>Organized Crime Unit – Wilkes-Barre | (W) 570-826-2314<br>(H) 570-868-0343<br>Cell 570-430-0098<br>Pager 1-800-822-3000 PIN 1717 | CISM |
| Cpl. William Stanback<br>Bureau of Training and Education | (W) 717-533-9111, Ext. 425<br>(H) 717-564-3786 | |
| Ms. Kim H. Studenroth<br>Bureau of Human Resources | (W) 717-787-6752<br>(H) 717-939-9517 | CISM, SEAP |
| Sgt. Steven F. Valencic<br>Bureau of Liquor Control Enforcement<br>District Enforcement Office #3, Harrisburg | (W) 717-541-7963 or 541-7961<br>(H) 717-737-8339<br>Pager 1-877-812-9344<br>Cell phone 717-805-0638 | |

### MANAGEMENT PEER CONTACTS

| NAME AND LOCATION | TELEPHONE NUMBER | SPECIAL INTEREST |
|---|---|---|
| Capt. Mark E. Lomax<br>Bureau of Drug Law Enforcement | (W) 215-560-3983<br>(H) 215-491-0994<br>Pager 1-877-812-9830 | CISM, SEAP |
| Lt. Sheldon Epstein<br>Troop B, Belle Vernon | (W) 724-929-6262<br>(H) 724-222-6816 | |

BUREAU OF TRAINING AND EDUCATION (cont'd.)

CEREMONIAL UNIT ROSTER (cont'd.)

Troop P

| Tpr. Todd A. Norton | Wyoming | Active |

Troop R

| Cpl. James A. Seamon | Honesdale | Active |
| Tpr. Matthew M. Redick | Dunmore | Active |
| Tpr. Charles G. Sands | Dunmore | Active |

Bureau of Human Resources

| Marisol Cummings | DHQ/Harrisburg | Ancillary (Singer) |

Bureau of Liquor Control Enforcement

| LEO3 Mary Lou Corbett | Philadelphia | Ancillary (Bagpiper) |

Bureau of Training and Education

| Lt. Rodney A. Manning | Academy/Hershey | Section Commander |
| Sgt. Stephen S. Heitz | Academy/Hershey | Active/Section Supervisor |
| Sgt. Byron L. Locke | NWTC/Meadville | Active |
| Cpl. William H. Gibson | Academy/Hershey | Active |
| Cpl. Lawrence J. Wallick | Academy/Hershey | Active/Unit Supervisor |
| Tpr. Rahn Richards | Academy/Hershey | Ancillary (Singer) |

STD-501 9-86                                          COMMONWEALTH OF PENNSYLVANIA


**DATE:**          September 14, 2001


**SUBJECT:**       Mandatory Training for Newly Appointed Physical Fitness Coordinators


**TO:**            Commanding Officers, Troops A, D, E, H, K, M, N, R, and T
                   Director, Bureau of Drug Law Enforcement
                   Director, Bureau of Liquor Control Enforcement
                   Director, Bureau of Training and Education


**FROM:**          Lt. Colonel Hawthorne N. Conley
                   Deputy Commissioner of Administration


**REFERENCE:**     (a)    OM 7-17, Staff Services, Chapter 6, Travel and Subsistence.

**ENCLOSURE:**     (1)    List of Newly Appointed Physical Fitness Coordinators.


1. Fitforce training is mandatory for new Physical Fitness Coordinators (PFCs).

2. The PFCs listed on Enclosure (1) shall report to the office of the Supervisor, Physical Fitness/Wellness Unit, located at Fort Indiantown Gap, Service and Rickards Roads, Building P6-111, Annville, Pennsylvania. The training will commence at 1300 hours on Monday, October 22, and conclude on Friday, October 26, 2001, at 1200 hours. Lodging and meals will not be available at the Academy; therefore, Hotel Orders shall be obtained in accordance with Reference (a).

3. Questions regarding this correspondence shall be directed to the Supervisor, Physical Fitness/Wellness Unit at 717-865-9236.


cc:   Commander, Community/Special Services Section – BT&E
      Commander, Staff Services Section – BT&E
      Supervisor, Physical Fitness/Wellness Unit – BT&E
      Miss Ruth Finney – BT&E
      File

ENCLOSURE (1)

# NEWLY APPOINTED PHYSICAL FITNESS COORDINATORS

| NAME | BUREAU/TROOP |
|------|--------------|
| Tpr. Joseph V. Durham | Bureau of Drug Law Enforcement |
| Sgt. Stephen F. Valencic | Bureau of Liquor Control Enforcement |
| Tpr. Deron Julian | Bureau of Training and Education |
| Cpl. Marlo Y. A. Nolan | Troop A, Greensburg |
| Tpr. Kevin J. Foley | Troop A, Greensburg |
| Tpr. William S. Williams | Troop D, Butler |
| Cpl. Randy J. Rzepecki | Troop E, Erie |
| Tpr. Gary Carter, Jr. | Troop H, Harrisburg |
| Tpr. Tracy M. Shull | Troop H, Harrisburg |
| Tpr. Joseph N. Altieri | Troop K, Philadelphia |
| Cpl. Robert J. Mahady | Troop M, Bethlehem |
| Tpr. Mark Amato | Troop N, Hazleton |
| Tpr. Patrick J. Finn | Troop N, Hazleton |
| Tpr. Blair G. Talijan | Troop N, Hazleton |
| Cpl. James Seamon | Troop R, Dunmore |
| Tpr. Deanna L. Bearde | Troop R, Dunmore |
| Tpr. Michael T. Carroll | Troop R, Dunmore |
| Tpr. Corey L. Tyler | Troop R, Dunmore |
| Tpr. Anthony T. Grobinski | Troop T, Highspire |
| Tpr. Craig D. Madara | Troop T, Highspire |


RECEIVED
SEP 1 9 2001
By

2001 SEP 18 PM 12:12
RECEIVED
BUR. OF L.C.E.

## CERTIFICATE OF SERVICE

I, Don Bailey do hereby certify that a true and correct copy of the aforegoing *Plaintiff's*

*Counter Statement of Material Facts in Opposition to Defendants Motion for Summary Judgment*

was served upon the individual named below via first class mail postage pre-paid at the indicated

address:


Joanna Reynolds, Esquire
Barbara Christie, Esquire
1800 Elmerton Avenue
Harrisburg, Pa 17110

Syndi Guido, Esquire
Deputy ATTORNEY General
333 Market Street, 17th Floor
Harrisburg, Pa 17101



DON BAILEY ESQUIRE
4311 N. 6TH STREET
HARRISBURG, PA 17110
(717) 221-9500

June 11, 2002