



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                     :
                Plaintiff     :       NO.  1: CV-01-0084
                       :       (Judge Caldwell)
     vs.                            :
                       :       CIVIL ACTION - LAW
PAUL EVANKO, MARK                    :
CAMPBELL, THOMAS COURY,              :       JURY TRIAL DEMANDED
JOSEPH WESTCOTT,                     :
HAWTHORNE CONLEY,                    :
                Defendants     :

## DEFENDANTS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS AND AFFIDAVIT OF DARRELL OBER

AND NOW, pursuant to LR 56.1, the defendants, by and through their attorneys, respond to the Plaintiff's Concise Statement of Undisputed Material Facts and Affidavit of Darrell Ober (hereinafter "Ober's Statement") as follows:

1.     It is undisputed that the plaintiff, Captain Darrell Ober, was the Director of the Internal Affairs Division of the Pennsylvania State Police, Bureau of Professional Responsibility, in September 1998; he was appointed to that position on May 2, 1998. (Ober Dep., 12/05/2001, at 43-44.)  It is also undisputed that Ober temporarily served as

the Acting Director of the Bureau of Professional Responsibility from mid-September,

when Major R. Dane Merryman was transferred to the Bureau of Research and

Development, until Major Hawthorne N. Conley was appointed Director on October 3,

1998. (Merryman Dep. at 5, Ober Dep., 12/05/2001, at 77; Conley Dep. at 15-16.)

      2.     It is agreed that FBI Special Agent Michael Soohy testified that he believes

individuals assigned to an Office or Bureau of Professional Responsibility are "one level

above reproach." (Soohy Dep. at 59.) Defendants also agree that retired FBI Special

Agent Ralph Kush testified that the Office of Professional Responsibility is "charged

with a higher responsibility." (Kush Dep. at 225.) However, there is no evidence that the

FBI, as an agency, or Soohy and Kush, as individuals, hold the opinion that individuals

"who head up internal affairs are a cut above the average, the brightest and most honest

of the best," and Ober has not cited a specific reference to the record for that proposition.

(Ober's Statement at ¶ 2.)

      3.     It is agreed that retired FBI Special Agent Ralph Kush contacted Ober

sometime between September 17, 1998, and October 3, 1998, while Ober was

temporarily serving as the Acting Director of the Bureau of Professional Responsibility.

(Ober Dep., 12/05/2001, at 77; Soohy Dep. at 35, 49-50; Kush Dep. at 27.) Defendants

have no idea how Ober has suddenly refined that date to "on or about September 29,

1998." (Ober's Statement at ¶ 3.) Ober has not provided a citation to the record, and

Ober and the FBI Agents have never been able to pinpoint the exact date Kush first telephoned Ober. (Ober Dep., 12/05/2001, at 76-77; Soohy Dep. at 34-35; Kush Dep. Exhibit 2 at 3.) However, it is undisputed that Agent Kush contacted Ober because Ober was the Director of Internal Affairs, which the FBI Agents understood to be the equivalent of the FBI's Office of Professional Responsibility. (Kush Dep. at 26-28, 224; Soohy Dep. at 39-40, 49-50; Ober Dep., 12/05/2001, at 77-78.)

Special Agent Soohy directed Special Agent Kush to contact the State Police because he felt the FBI had an obligation to let the Department know it had a trooper who was involved in illegal activity. (Soohy Dep. at 15-16, 52, 58-59; Kush Dep. at 79, 82.) Defendants agree that Special Agent Kush called Ober and told him about an FBI investigation into possible public corruption. However, defendants deny Ober's assertion that Agent Kush told Ober the FBI's investigation involved "higher ups in the PSP and the Governors office." (Ober's Statement at ¶ 3.)

To the contrary, the undisputed evidence is that Agent Kush did not tell Ober anything of the sort during the initial phone call. (Kush Dep. at 39-41, 45, 51-53, 103, 106, 113, 115, 122, 132.) The FBI's information involved a single trooper (Kipp Stanton); it was Ober who first suggested that the Commissioner or his deputies would need to be involved. (Soohy Dep. at 14-15, 17-18, 53-57; Kush Dep. at 39-41, 132, 138-139, 170, 200-203, 205-207.) The FBI was never concerned that Major Conley was

involved, either as Trooper Stanton's Troop Commander or as the Director of the Bureau of Professional Responsibility. (Soohy Dep. at 53; Kush Dep. at 50-51.) The FBI never investigated the Governor's Office. (Kush Dep. at 113.) The first reference to the Governor or a Lieutenant Colonel was made during a conversation tape-recorded on October 13, 1998. (Kush Dep. at 193-194, 200-203, 205-207, and Kush Exhibit 3.) The FBI did not even notice those references until Ober pointed them out on October 21, 1998. (Kush Dep. at 132, 138-139, 170, 194, 200-203, 205-207.)

        In fact, paragraph 3 of Ober's Statement is contradicted by his own testimony. In describing his recollection of the initial telephone call, Ober testified Agent Kush said "it came to their attention that there was an individual who believed that through a series of payoffs or through exerting political influence, that he could gain entry into the State Police Academy as a cadet." (Ober Dep., 12/05/2001, at 80-81.) Ober believes they discussed ranks or positions within the agency. (Ober Dep., 12/05/2001, at 81-82.) Ober's recollection of the conversation is rather vague. (Ober Dep., 12/05/2001, at 80-88.) He does not remember the Colonel, the Lieutenant Colonels, or Major Conley being mentioned. (Ober Dep., 12/05/2001, at 81, 86-87.) During that first phone call, Ober cannot be sure if the investigation was "mature" enough to have information beyond the fact that a state trooper was acting as a facilitator. (Ober Dep., 12/05/2001, at 87-88, 96-97.) Although Ober thinks there may have been a general discussion about the

Governor's Office or high-ranking members of the State Police, he does not recall who made that suggestion – himself or the FBI.  (Ober Dep., 12/05/2001, at 96-98.)

4.    The defendants do not agree that the FBI ever discussed a concern for confidentiality with Ober, and Ober has not supported this contention with a reference to the record.  To the contrary, the evidence is that Ober – not the FBI – was concerned with keeping this information from his superiors.  Although the FBI characterized the information as sensitive (Kush Dep. at 189-190), Agents Soohy and Kush never discussed confidentiality with Ober.  (Soohy Dep. at 15-16, 27-28; Kush Dep. at 35-36, 71-72, 190.)  Both FBI agents deny asking Ober to maintain strict confidence or to keep the information from his supervisors or anyone else at the State Police.  (*Id.*; Kush Dep. at 164, 189-191, 212, 218-220.)

Indeed, when confronted with the allegation in his complaint that the FBI "expressly and clearly requested that [Ober] not divulge this information to potential investigative targets, including top PSP officials," Ober equivocated and said, "I don't remember what was exactly said."  (Ober Dep., 12/05/2001, at 98-99.)  It was merely Ober's "perception of [their] discussion" that this was "a very sensitive matter, that discretion and confidentiality would be necessary" and "it never occurred to [him] that this wouldn't be a matter that great confidence and care should be exercised...." (Ober Dep., 12/05/2001, at 99-100.)  Although defense counsel repeatedly asked Ober if the

FBI ever explicitly told him not to disclose the information, Ober continuously evaded

the question, responding that "it was express and clear in [Ober's] mind that [Kush] was

telling [him] that in the form and content and context of this conversation, the fact that

this is a matter of great confidence." (Ober Dep., 12/05/2001, at 101-102; 103-107.)

Ober admits, however, that the FBI never told him to keep the investigation from his

Bureau Director. (Ober Dep. 12/05/2001, at 106.) Likewise, Ober does not recall being

directed not to share the information with Colonel Evanko, Lieutenant Colonel Coury,

Stanton's troop commander, or the Area Commander. (Ober Dep., 12/05/2001, at 106-

107.) Ober concedes that the FBI was not in a position to give him such a directive.

(Ober Dep., 12/05/2001, at 105-106, 146.)

5.      Paragraph 5 of Ober's Statement does not contain any uncontested material

facts; rather, it is a statement of Ober's personal opinions and conclusions, which are not

supported by any reference to the record.

6.      Paragraph 6 of Ober's Statement does not contain any uncontested material

facts; rather, it is a statement of Ober's personal conclusion about Agent Kush's

expectations. Ober has not supported his conclusion with any reference to the record, and

as set forth fully in paragraph 4 above, Ober's conclusion is directly contradicted by the

evidence. Although Special Agent Kush characterized the information as sensitive, the

FBI did not ask or expect Ober to keep the information a secret from his Bureau Director

or anyone else at the State Police.  (Soohy Dep. at 15-16, 27-28; Kush Dep. at 35-36, 71-72, 164, 189-190, 212, 218-220.)  According to Ober's own testimony, he made no attempt to clarify this point with Agent Kush.  (Ober Dep., 12/05/2001, at 105-107.)

7.     None of the averments in paragraph 7 of Ober's Statement are supported with references to the record.  As Lieutenant Colonel Conley testified, from January 1998 to October 2, 1998, he was the Commander of Troop B, Washington, Pennsylvania. (Conley Dep. at 16-17.)  Lieutenant Colonel Conley does not know whether Trooper Kipp Stanton was assigned to Troop B; there were over 400 officers assigned to that troop during Conley's command.  (Conley Dep. at 135-136.)

It is an undisputed fact that as early as 1994, the FBI first obtained information about the possibility Trooper Stanton was engaged in illegal activity.  (Kush Dep. at 10-13, 84, 155.)  Stanton was not assigned to Troop B until May 30, 1998.  (Polek Aff. at 3.) The FBI investigation was dormant during most of Conley's tenure as Commander of Troop B; it was not revived until August 1998.  (Soohy Dep. at 12-13, 30-32, 33-35; Kush Dep. at 10-13, 23.)  On October 3, 1998, Conley left Troop B to become the Director of the Bureau of Professional Responsibility.  (Conley Dep. at 16-17.)  Conley had not even heard of Trooper Stanton until the Spring of 1999.  (Conley Dep. at 29-30.) Further, defendants do not agree with Ober's speculative conclusion that "Conley had a

duty to contact elected representations [sic] who were implicated in the scam," and Ober

has offered no evidentiary support for that proposition. (Ober's Statement at ¶ 7.)

8.    Defendants agree that Conley was promoted to Director of the Bureau of

Professional Responsibility effective October 3, 1998. (Conley Dep. at 18.) Conley was

notified of his appointment on the morning of October 2, 1998. (Conley Dep. at 19.)

Defendants dispute Ober's assertion that Conley was unavailable and did not report to the

Bureau of Professional Responsibility until October 12-13, 1998. Ober has not offered

any reference for this proposition, and it is contradicted by the record. The evidence

establishes that Conley was available to Ober as early as Friday, October 2, 1998. On

that day, Conley called and told Ober of his appointment. They discussed Conley's

expectations, as well as Ober's disappointment at not receiving the position. (Conley

Dep. at 50.)  Conley told Ober that he would not be in the office until Tuesday,

October 6, 1998, and specifically asked Ober if there was anything significant he should

be aware of; Ober told Conley there was not. (Conley Dep. at 50-51.)

Conley was physically present at the Bureau of Professional Responsibility on

Tuesday, October 6, 1998. (Conley Dep. at 19.)  Conley met with the Bureau's two

division directors, Ober and Captain Charles Skurkis, that same day. (Conley Dep. at

42.) Skurkis recalls meeting with Conley on that date. (Skurkis Aff. at ¶ 3.)  Ober

testified that he does not believe he encountered Conley until mid-October but expressed

no certainty on the subject.  (Ober Dep., 12/05/2001, at 131.)  Moreover, as retired

Lieutenant Colonel Westcott explained, the Bureau Directors carry cellular phones and

can be contacted at virtually anytime.  (Westcott Dep. at 64-65.)

9.    Although Ober has not provided any reference to the record, the defendants

agree that Ober told Lieutenant Colonel Robert Hickes about the FBI's investigation on

October 5, 1998.  (Hickes Dep. at 42, 47-48, Hickes Exhibit 1.)  Ober testified that he

does not remember when he told Hickes but admits that it occurred while Conley was his

immediate supervisor.  (Ober Dep. 12/05/2001, at 88-89, 120, 147.)

10.    Paragraph 10 of Ober's Statement consists of Ober's personal conclusion

that Lieutenant Colonel Hickes was not in a position to be part of political corruption and

that Hickes would not be involved in such corruption.  (Ober's Statement at ¶ 10.)  Ober

has not supported his conclusion with any references to the record.

11.    Paragraph 11 of Ober's Statement is unclear.  It consists of Ober's personal

conclusion that Colonel Evanko and Lieutenant Colonel Coury were unlikely to have

been involved in selling positions at the State Police Academy, coupled with a comment

that Ober believed he had a duty to respect the FBI investigation.  (Ober's Statement at

¶ 11.)  Ober has not provided any reference to the record, and defendants are not sure

what information he is trying to convey.  As set forth fully in paragraphs 3, 4, and 6

above, any implication that the FBI wanted Ober not to disclose the existence of its

investigation to either Colonel Evanko or Lieutenant Colonel Coury is directly

contradicted by the record.  Ober has provided no evidentiary basis for an alternate

conclusion.

12.     Paragraph 12 of Ober's Statement consists of his personal opinion that

Colonel Evanko and Lieutenant Colonel Coury were capable of "manipulating Academy

admissions for political or personal reasons."  (Ober's Statement at ¶ 12.)  Ober has

provided no evidentiary support for his personal opinion, and the record contains none.

12[a].  Because Ober's Statement contains two paragraphs labeled 12, defendants

are referring to the second paragraph 12 as paragraph 12[a].  Defendants agree that Ober

told Lieutenant Colonel Hickes about the FBI probe on October 5, 1998.  (Hickes Dep. at

42, 47-48, Hickes Exhibit 1.)  Defendants also agree that Lieutenant Colonel Hickes was

a Deputy Commissioner at the time.  (Hickes Dep. at 15, 47.)  Due to the paragraph's

poor sentence structure and Ober's failure to cite any portion of the record, defendants

are not certain what other information Ober is trying to convey in paragraph 12[a] of

Ober's Statement.

13.     Although Ober has not provided any reference to the record, defendants

agree that, based solely on the information given to him by Ober, Lieutenant Colonel

Hickes directed Ober to cooperate with the FBI and not to tell anyone else about the

investigation.  (Hickes Dep. at 58-59.)  According to the undisputed evidence, Lieutenant

Colonel Hickes made that decision because Ober told him the FBI had explicitly asked

Ober to maintain strict confidentiality and not disclose the information to anyone else in

the State Police. (Hickes Dep. at 49, 50-51, 58-59, 60-61, 177-178.) Hickes did not

know that the FBI agents had already told several other members of the State Police

about the investigation. (Hickes Dep. at 68, 177-178; Kush Dep. at 11-13, 17-19, 23-25,

86-87, 157; Monaco Aff. at ¶¶ 3-7; Behrens Aff. at ¶¶ 3-4,7-8.) Hickes based the order

on his erroneous belief that no one else in the State Police had any knowledge of the FBI

investigation. (Hickes Dep. at 68.)

    14.    Paragraph 14 of Ober's Statement blends fact with Ober's personal

opinions and conclusions. Defendants agree that, for the reasons outlined in paragraph

13 above, Hickes directed Ober not to tell anyone else about the FBI investigation.

However, defendants do not agree with Ober's contention that he was "working to make

sure he maintained the security and integrity of the FBI investigation into public

corruption." (Ober's Statement ¶ 14.) Ober has offered no factual support for that

assertion.

    15.    Once again, Ober has failed to support any assertion in paragraph 15 of his

Statement with relevant references to the record. However, defendants agree that on

April 26, 1999, Colonel Evanko temporarily dispatched Ober from the Bureau of

Professional Responsibility to the Bureau of Technology Services, where Ober was the

Team Leader for the System Integrator Procurement for the Incident Information Management System (IIMS).  (Evanko Dep. at 212-214, 216; Hickes Dep. at 30-32.)  Ober's role was to develop the selection criteria for the systems integrator.  (Evanko Dep. at 213.)  The purpose of the IIMS project is to modernize and streamline the Department's business processes, centralize the dispatching function, create a records management system, put mobile data terminals in patrol cars, and otherwise apply technology to information gathering and problem solving.  (Hickes Dep. at 24-25.)  Although the IIMS project is certainly important, it is a gross exaggeration to characterize the IIMS project as the Department's "upmost [sic] and highest priory [sic]."  (Ober's Statement ¶ 15.)  In fact, Colonel Evanko testified that his highest priority is the safety of his troopers.  (Evanko Dep. at 251.)

16.    Paragraph 16 of Ober's Statement contains his personal conclusion that serving as Team Leader for the System Integrator Procurement portion of the IIMS project is a "major career enhancing move and marked him among his colleagues as an exceptional career officer."  (Ober's Statement ¶ 16.)  Ober has not referenced any evidentiary support for this proposition, and defendants are not aware of any.  In fact, many members of the State Police have been rotated through various assignments at IIMS.  (Hickes Dep. at 30; Evanko Dep. at 286.)

17.   Despite Ober's failure to provide any references to the record, defendants agree that on May 12, 1999, Ober and Lieutenant Colonel Hickes first informed Colonel Evanko about the FBI's investigation. (Hickes Dep. at 76-77; Evanko Dep. at 42.) Defendants also agree that Hickes and Ober told Colonel Evanko that the FBI investigation produced evidence that a single state trooper had been involved in criminal conduct but that no one else in the State Police or the Governor's Office was implicated. (Hickes Dep. at 78-80; Evanko Dep. at 43-44, 47, 139.)

18.   Ober has not provided any evidentiary support for the averments contained in paragraph 18 of his Statement. However, it is true that when Ober and Lieutenant Colonel Hickes told Colonel Evanko about the FBI's investigation on May 12, 1999, Colonel Evanko became very angry. (Evanko Dep. at 44; Hickes Dep. at 82.) Evanko rhetorically questioned why he had not been told of the investigation sooner. Evanko mentioned that he was personal friends with Louis Freeh (then Director of the FBI) and the Special Agent in Charge of the Pittsburgh FBI Office. (Evanko Dep. at 44-45; Hickes Dep. at 82.) Evanko stated his opinion that if the FBI had actually been conducting an investigation into the top ranks of the State Police without notifying him, then he should call Louis Freeh and have the Special Agent in Charge transferred. (Evanko Dep. at 45; Hickes Dep. at 82.) At that point, however, Hickes and Ober had not

mentioned the possibility that a "colonel" was involved. (Evanko Dep. at 45; Coury

Dep., 03/12/2002, at 43.)

19.    There is absolutely no evidence that Colonel Evanko ever called the FBI

Director, Louis Freeh. In support of this fallacy, Ober cites pages 44-45 of Colonel

Evanko's deposition; however, Ober has blatantly misrepresented the Colonel's

testimony by taking those pages out of context and ignoring the rest of the

Commissioner's deposition.

On pages 44-45, Evanko testified that when Ober and Hickes told him about the

investigation, he was angry and said he should call the SAC (Special Agent in Charge) of

the Pittsburg office, who is a friend of his. (Evanko Dep. at 44.) Evanko went on to say

that Louis Freeh (then the FBI Director) was also a friend of Evanko's. (Evanko Dep. at

44-45.) Evanko told Ober and Hickes that he *ought* to call Louis Freeh. (Evanko Dep. at

44-45, 152; *Compare* Hickes Dep. at 82.) However, Evanko never called Freeh.

(Evanko Dep. at 63, 152.) The Special Agent in Charge of the Pittsburgh office was the

only person Evanko ever talked to at the FBI about the investigation. (Evanko Dep. at

44-45, 61-63.)

20.    Defendants agree that Colonel Evanko felt that Hickes and Ober's failure to

tell him about the FBI investigation could have been embarrassing for Evanko. (Evanko

Dep. at 46.) However, that was only one of many concerns Evanko had about their

conduct.  (Evanko Dep. at 46-49, 52-55.)  Ober mentions that Lieutenant Colonel Coury

was also concerned that Colonel Evanko and the Governor's Office might be

embarrassed.  Ober cites "paragraph 64" for that proposition, but it is unclear what

document Ober is referencing.  (Ober's Statement at ¶ 20.)  Nevertheless, defendants

agree that Lieutenant Colonel Coury was concerned that Hickes and Ober had placed the

Commissioner in a potentially embarrassing situation.  (Coury Dep., 03/12/2002, at 38-

39.)

     21.    Paragraph 21 of Ober's Statement is unclear.  However, to the extent Ober

is trying to articulate the fact that Colonel Evanko was upset that he had not been told

about the FBI investigation until May 12, 1999, defendants agree that fact is true.

(Evanko Dep. at 44-49, 52-55.)

     22.    Defendants agree that Colonel Evanko testified it was Lieutenant Colonel

Hickes's responsibility to inform him of the FBI investigation.  (Evanko Dep. at 46-48,

52-54.)

     23.    Defendants agree that on May 12, 1999, in Ober's presence, Lieutenant

Colonel Hickes told Colonel Evanko he had ordered Ober not to tell anyone else about

the FBI investigation.  (Evanko Dep. at 49.)

     24.    Defendants do not agree that Ober and Hickes ever "expressed fear to

Evanko that the probe might involve higher ranking individuals in the state police and

governors [sic] office and for this reason they could not reveal knowledge of it." (Ober's Statement at 24.)  However, defendants do agree that on May 12, 1999, Ober and Hickes told Colonel Evanko that "in late September or early October an FBI agent from the Pittsburgh office called [the Bureau of Professional Responsibility] and talked to [Ober] and told him that they were conducting a political corruption investigation and that part of that political corruption investigation involved high-ranking officials or individuals in the state police and/or the Governor's Office or both."  (Evanko Dep. at 44; *see also* Coury Dep., 03/12/2002, at 39-40, 43.)

      25.    Defendants agree that Colonel Evanko was upset, in part, because he had not been told about the FBI investigation when Ober and Hickes first learned about it. (Evanko Dep. at 51-55.)

      26.    The defendants admit that no one from the FBI ever told Colonel Evanko about the FBI investigation.  (Evanko Dep. at 55-56.)  However, defendants do not agree that the FBI agents ever made a conscious decision not to tell Colonel Evanko about the probe; rather, the FBI agents relied on Ober to notify the appropriate people within the state police.  (Evanko Dep. at 56, 82; Kush Dep. at 71, 131, 164, 212, 220; Soohy Dep. at 15-16.)  Indeed, it would have been unusual for an FBI agent to personally contact the Commissioner of the State Police; normally, investigators deal with their peers.  (Coury Dep., 03/12/2002, at 92.)

27.     Defendants agree that Colonel Evanko testified he subsequently learned that when Agent Kush called Ober, Kush did not raise the possibility that high-ranking members of the state police or the Governor's office were involved in the alleged corruption. (Evanko Dep. at 56, 82.)  As Colonel Evanko explained, that issue did not surface until October 21, 1998, when the FBI played a wiretap tape for Ober. (Evanko Dep. at 58.)  On that recording, taped October 13, 1998, Dennis Bridge (the individual who was trying to buy his way into the Academy) mentioned that he might have to go to some Lieutenant Colonel or someone affiliated with the State Police. (Evanko Dep. at 58; Kush Dep. at 39-41, 43, 45, 132, 142-143, 197-202, 206-207, and Kush Exhibits 2 and 3; Ober Dep. 12/07/2001, at 287-288.)  Ober's assertion that this "is a red herring that is not relevant to any material issue in this case" is his personal conclusion. (Ober's Statement at ¶ 27.)  Defendants have no idea why Ober has included this information in his statement of undisputed facts.

28.     Defendants agree that Colonel Evanko has no knowledge of Ober ever being clairvoyant or having supernatural abilities.  However, defendants do not agree that there is "no explanation of how Ober could have known on October 5, 1998, that a confidential informant would refer to higher ups in the state police or the governors [sic] office" after Ober told Hickes about the probe. (Ober's Statement at ¶ 28.)  It was Ober – not the FBI – who surmised that a high-ranking State Police official, or someone in the

Governor's office, would have to be involved. (Kush Dep. at 39-41, 45, 50, 103, 106, 113, 115, 122, 132, 138-139, 170; Soohy Dep. at 18.) If Ober told Hickes that on October 5, 1998, it was pure speculation on his part.

The more logical explanation, however, is that on October 5, 1998, Ober did not tell Hickes the term "colonel" had been used. Indeed, when Hickes and Ober first told Evanko about the FBI probe on May 12, 1999, they made no mention of the term "colonel." (Evanko Dep. at 135; Coury Dep., 03/12/2001, at 41-43.) It was not until the next day, when Hickes submitted a memorandum to Colonel Evanko, that Hickes excused his failure to report the matter earlier by claiming that the FBI Agent mentioned the term "colonel" during his first contact with Ober. (Hickes Dep., Exhibit 1 at 1.) By then, Hickes may have forgotten that the term had not surfaced at all until the tape-recording made on October 13, 1998 – over a week after Ober first told Hickes of the probe. In fact, neither Ober's memorandum of May 13, 1999, nor his supplemental report say anything about Agent Kush using the term "colonel" during his initial contact with Ober. (Ober Dep., 12/05/2001, Exhibits 19 and 21.)

28[a]. Ober's Statement contains two paragraphs labeled 28. For convenience, defendants are referencing the second paragraph 28 as 28[a]. Ober maintains that, as of the date of his deposition, Colonel Evanko had not reached any conclusion about who had the best recollection of the October 5, 1998, conversation between Ober and Agent

Kush. (Ober's Statement at ¶ 28.) Ober has not cited any portion of the record, but

defendants presume Ober is referencing the point in his deposition where Colonel Evanko

was asked whether he had decided the FBI was more trustworthy than Ober; Colonel

Evanko responded, "I didn't draw a distinction between the two." (Evanko Dep. at 66.)

Regardless, nothing in paragraph 28 of Ober's Statement constitutes a material fact.

29.    Although Ober has not cited any portion of the record, defendants agree

that Evanko did not believe the FBI suspected him of wrongdoing. (Evanko Dep. at 61,

65, 81.) Further, there is absolutely no evidence that the FBI ever suspected Colonel

Evanko of illegal activity.

30.    It is admitted that on May 20, 1999, Colonel Evanko called Rick Mosquera,

the Special Agent in Charge of the FBI's Pittsburgh Office. (Evanko Dep. at 61-62.)

Mosquera did not know anything about the Stanton investigation. (Evanko Dep. at 61-

62, 88.) Mosquera told Colonel Evanko he would check into the matter and get back to

him. (Evanko Dep. at 88.) Mosquera called back later that day. (Evanko Dep. at 88-89,

91.) Mosquera told Evanko that the FBI's investigation did not involve "higher-ups" at

the State Police; it involved a single state trooper. (Evanko Dep. at 92-93, 98, 121, 130-

131, 140-141, 147-148; Evanko Exhibit 2.) Moreover, Evanko's testimony is

unequivocal: he never called Louis Freeh. (Evanko Dep. 63, 152.) Ober has simply

taken page 44 of Evanko's deposition out of context. (Ober's Statement at ¶ 30.)

Reading the deposition as a whole, it is clear that Evanko did not call Louis Freeh; rather, Evanko told Hickes and Ober that he *should* call Freeh. (Evanko Dep. 44-45; 152.) This fact is born out by Hickes's testimony about his conversation with Evanko on May 12, 1999. (Hickes Dep. at 82.)

31.    Ober's Statement does not contain a paragraph 31.

32.    It is true that Special Agent Kush was transferred. (Kush Dep. at 59-60.) However, there is no evidence that Agent Kush's transfer had anything to do with the FBI investigation involving Trooper Stanton. (Kush Dep. at 60-61, 65.) Rather, Agent Kush is an accountant and was transferred to work on a bank failure. (Kush Dep. at 61.) Kush was subsequently transferred to a surveillance squad. (Kush Dep. at 61.) However, there is absolutely no evidence substantiating Ober's opinion that surveillance duty is "a merial [sic] or undesirable work detail for FBI Agents." (Ober's Statement at ¶ 32.) Clearly, Agent Kush did not think so. (Kush Dep. at 157-158.)

33.    It is true that Colonel Evanko called Mark Campbell on the afternoon of May 12, 1999, after Ober and Hickes told him of the FBI probe. (Evanko Dep. at 64.) Ober's citations to the record are garbled; however, defendants agree that Evanko sent Mark Campbell an e-mail in which he mentioned transferring Ober effective January 28, 2000. Colonel Evanko testified that he was keeping Campbell up to date on preparations for the upcoming convention of the National Governors Association. (Evanko Dep. at

256-258.) Defendants are not certain why Ober apparently believes the e-mail was sent on January 4, 2000; however, defendants agree that Ober testified Conley advised him of the transfer on January 10, 2000. (Ober Dep., 12/05/2001, at 318.) In support of these facts, Ober's Statement cites "¶ 32" of an unnamed document and paragraph 17 of his own affidavit. (Ober's Statement at ¶ 33.) Paragraph 17 of Ober's affidavit has nothing to do with his transfer to Area III. (Ober's Aff. at ¶ 17.)

34.    It is true that Lieutenant Colonel Hickes told Mary Woolley, of the Governor's office, about the FBI probe before disclosing it to Evanko on May 12, 1999. (Hickes Dep. at 183; Woolley Aff. at ¶¶ 4-6, 8; Labecki Aff. at ¶¶ 3-4, 6.) It is also true that Colonel Evanko first learned of that fact when he attended Lieutenant Colonel Hickes's deposition. (Evanko Dep. at 259-260.) Lieutenant Colonel Hickes was deposed on March 25, 2002. (Hickes Dep., 03/25/2002.) Colonel Evanko was deposed two days later. (Evanko Dep., 03/27/2002.)

35.    Paragraph 35 of Ober's Statement has no place in a supposed statement of undisputed material facts. The Federal Rules of Civil Procedure require each party to disclose "the name and if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment...." Fed. R. Civ. P. 26(a)(1)(A). To the best of defense counsel's knowledge, prior to his deposition, Lieutenant Colonel

Hickes had maintained that Colonel Evanko was the first person he told about the FBI investigation. Because defense counsel believed the testimony of Mary Woolley and Lee Ann Labecki would be used solely for impeachment purposes, there was no reason to disclose their names prior to Lieutenant Colonel Hickes's deposition on March 25, 2002.

36.     In paragraph 36 of Ober's Statement, he has mischaracterized Evanko's testimony. During his deposition, Evanko testified that *on May 12, 1999,* he never thought about whether Ober had violated any State Police regulation. (Evanko Dep. at 71 (emphasis added).) During that same deposition, Evanko repeatedly testified that he believes Ober violated State Police Field Regulation 1.17. (Evanko Dep. at 80-81, 105, 109, 173-175, 177, 297, 320-321, Evanko Exhibit 4.) Regardless, defendants agree that Colonel Evanko has never carried any personal anger against either Hickes or Ober because of their failure to timely advise him of the FBI investigation. (Evanko Dep. at 71.)

37.     Ober has offered no evidentiary support for his contention that "[w]ithin days of being told about the FBI probe Evanko ordered an investigation into Captain Ober." (Ober's Statement at ¶ 37.) To the contrary, the evidence establishes that Colonel Evanko never ordered an investigation "into Captain Ober." Rather, shortly after learning of the FBI probe, Colonel Evanko asked Majors Werts and Williams to conduct an administrative inquiry into all of the facts and circumstances surrounding the FBI

investigation. (Evanko Dep. at 52-56, 69, 108, 179-180, 183, 300, 304; Coury Dep.,

03/12/2002, at 51, 53-54, Westcott Dep. at 37, 40, 53-54, 73, 78; Conley Dep. at 82-83,

91, 94, Campbell Dep. at 34, 43, 44, 49, 68; Werts Dep. at 15-16, 24, 32, 44, 50, 57-58;

Hickes Dep. at 122; Ober Dep., 12/05/2001, at 212-214.) Ober was not the focus of that

inquiry; to the contrary, Lieutenant Colonel Hickes's actions were the Commissioner's

primary concern. (Evanko Dep. at 178.)

        38.    Defendants agree that Colonel Evanko did not request an administrative

inquiry into the facts and circumstances surrounding the FBI's earlier contacts with

members of the State Police concerning the Stanton investigation. As Colonel Evanko,

by the time he learned of the FBI's earlier contacts, the entire matter was already being

investigated both criminally and administratively. (Evanko Dep. at 112-115.)

        39.    Defendants agree that it was Ober who expressed concern to FBI Agent

Kush about what to do with the information Kush had given him. (Kush Dep. at 39-41,

48-51; Soohy Dep. at 15-18, 27-28.) However, the record is clear that the FBI agents

were not concerned about Ober disclosing the information to his Bureau Director or

anyone else in his chain of command. (Kush Dep. at 35-36, 50-51, 70-72, 122, 131, 164,

191, 218-220; Soohy Dep. at 15-16, 18, 27-28, 53; Ober Dep., 12/05/2001, at 106-107.)

To the contrary, the FBI believed it was important for the State Police to know that

Trooper Stanton was involved in illegal activity. (Soohy Dep. at 15-16, 52, 58-59; Kush Dep. at 79, 82.)

40.    The averments in paragraph 40 of Ober's Statement are garbled and confusing; in addition, Ober mixes fact with personal opinions and conclusions. As set forth in paragraph 39 above, Ober did voice concern to the FBI about what to do with the information they had provided him. When Special Agent Kush called Ober, Kush did not tell him that the FBI investigation involved "higher-ups" in the State Police. At that point, the FBI was investigating a single state trooper, and its focus was on the legislature because Trooper Stanton wanted the FBI's confidential informant to make arrangements, through a state representative or senator, to get Stanton's friend into the State Police Academy. (Kush Dep. at 10-13, 39-41, 45, 51-53, 103, 106, 113, 115, 122, 132, 138-139, 170, 194, 200-203, 205-207, Kush Exhibit 2 at 3; Soohy Dep. at 14-15, 17-18, 53-57.)

After the initial call from Agent Kush, Ober chose to bypass his Bureau Director, then Major Conley, and give the information to Lieutenant Colonel Hickes, who was outside Ober's chain of command. (Hickes Dep. at 47, 50, 58-60; Evanko Dep. at 80, 104-105, 109, 316, 320-321; Conley Dep. at 32-33, 50, 84-85, 87-89, 99-105, 107-108, 178-180; Ober Dep., 12/05/2001, at 88-89, 120, 147.) Defendants dispute the notion that Ober went to Hickes, rather than his Bureau Director, in order to preserve the integrity of the investigation. Defendants also dispute Ober's conclusion that his decision to go to

Hickes, rather than Conley, was "a matter of great public concern." (Ober's Statement at ¶ 41.)

41.    Defendants agree that Colonel Evanko called Rick Mosquera, Special Agent in Charge of the FBI's Pittsburgh office, on May 20, 1999, and asked if the FBI was investigating "higher-ups" at the Pennsylvania State Police. (Evanko Dep. at 118-119, 130.) However, Ober's suggestion that there was ever an FBI investigation into possible corruption by State Police "higher ups," including Evanko, is false and directly contradicted by the record. (Kush Dep. at 39-41, 45, 51-53, 103, 106, 113, 115, 122, 132, 138-139, 200-203, 205-207; Soohy Dep. at 14-15, 17-18, 53-57; Evanko Dep. at 93, 96, 98, 121, 130-131, 140-141, 144-145, 146-148, 268-269, 271, Evanko Exhibit 2.)

42.    Defendants agree that Special Agent Mosquera told Colonel Evanko that if Evanko's name had surfaced during the FBI investigation, Mosquera would have been told about it. (Evanko Dep. at 140-141, 144-145, 146-148, 268-269, 271, Evanko Exhibit 2.)

43.    Paragraph 43 of Ober's Statement needs to be placed in its factual context. When Colonel Evanko first called Agent Mosquera on May 20, 1999, Evanko asked whether he (Evanko) or any of his Lieutenant Colonels had been the subject of an FBI investigation. (Evanko Dep. at 116-119, 140-141, Exhibit 2.) Mosquera said he was not familiar with the investigation Evanko was referring to, but that Evanko's name had

never been mentioned.  (Evanko Dep. at 61-62, 130-131, 140-141, 146-148, 268-269, 271, Exhibit 2.)  Mosquera added, "I remotely remember something about an investigation with local municipalities and testing."  (Evanko Dep. at 150, Exhibit 2.)  However, Mosquera said he would have to get back to Evanko.  (Evanko Dep., at 152, Exhibit 2.)  The fact that Mosquera mentioned testing is not material to this case.

44.    It is true that "Evanko denies telling Ober or Lieutenant Colonel Hickes that "he was going to have the FBI Agent involved in the underlying investigation transferred."  (Ober's Statement at ¶ 44; *see also* Evanko Dep. at 151.)  Evanko actually said that *if* the FBI had actually been conducting an investigation into the top ranks of the State Police without notifying him, then he *should* call the FBI Director and have the Special Agent in Charge of the Pittsburgh office transferred.  (Evanko Dep. at 45 (emphasis added).)

45.    Defendants agree the record establishes that Colonel Evanko discussed the situation with Lieutenant Colonels Coury, Westcott, and Hickes on May 13, 1999.  (Evanko Dep. at 156-157.)  It is unclear whether the meeting took place at the State Police Academy or in the Commissioner's Office, but the location of the meeting is immaterial.  (Evanko Dep. at 157; Coury Dep., 03/12/2002, at 53-54.)  Regardless, defendants agree that after Lieutenant Colonel Hickes left, Colonel Evanko, in consultation with Lieutenant Colonels Coury and Westcott, decided to assign Majors

Werts and Williams to conduct an administrative inquiry. (Evanko Dep. at 179-180;

Coury Dep., 03/12/2002, at 53-54; Westcott Dep. at 37, 40, 43-46.)

46.    Defendants agree that Trooper Kipp Stanton was implicated in overt

criminal actions. (Kush Dep. at 11-13, Kush Exhibit 2 at 3; Soohy Dep. at 14, 47-49.)

Stanton was not, however, under Conley's command throughout the course of the FBI

investigation. The FBI's investigation into Trooper Stanton's conduct first began in 1994

or 1995. (Kush Dep. at 11, 84, 155.) Conley became the Commander of Troop B in

January 1998. (Conley Dep. at 17.) Stanton was not assigned to Troop B until May 30,

1998. (Polek Aff. at ¶ 3.) At the beginning of October 1998, Conley was promoted to

Director of the Bureau of Professional Responsibility. (Conley Dep. at 18.) Defendants

do not know whether Conley was Stanton's troop commander when the FBI first

contacted Ober because no one remembers the exact date of that phone call. (Ober Dep.,

12/05/2001, at 76-77; Soohy Dep. at 35; Kush Dep. at Exhibit 2 at 3.) The evidence

establishes the FBI called Ober shortly before Ober talked to Hickes on October 5, 1998.

(Ober Dep., 12/05/2001, at 88-89.) Conley became the Director of the Bureau of

Professional Responsibility effective October 3, 1998. (Conley Dep. at 16.)

47.    Defendants agree that Colonel Evanko's primary concern was the manner

in which Lieutenant Colonel Hickes dealt with Ober's disclosure of the FBI investigation.

(Evanko Dep. at 178.) It is also true that after conducting an administrative inquiry and

discussing his findings with Lieutenant Colonel Hickes, Colonel Evanko never gave Ober

"much of a second thought." (Evanko Dep. at 178.) Colonel Evanko believes that Ober

violated State Police Field Regulation 1.17 when he chose not to inform his Bureau

Director, then Major Conley, that the FBI contacted him with information that Trooper

Stanton was involved in illegal activity. (Evanko Dep. at 80-81, 105, 109, 173-175, 177,

297, 320-321, Evanko Exhibit 4.) Evanko explained that any scheme to sell

appointments to the State Police Academy would have to be systemic, involving

psychologists, Academy personnel, background investigators and others. (Evanko Dep.

at 169.) There is no evidence that Stanton's troop commander would have had to be

involved in the scheme; indeed, there is no evidence that Evanko or anyone else thought

Stanton's Troop Commander was, or would be need to be, involved.

48. Defendants agree that, after Lieutenant Colonel Hickes left on May 13,

1999, Colonel Evanko talked to Lieutenant Colonels Westcott and Coury about assigning

Bureau of Professional Responsibility ("BPR") investigators to conduct an administrative

inquiry. (Evanko Dep. at 179.) It is also true that Lieutenant Colonel Coury expressed

his opinion that the matter should be handled as an administrative inquiry rather than a

BPR investigation. (Evanko Dep. at 179; Coury Dep., 03/12/2002, at 54.) On the

recommendation of Lieutenant Colonels Coury and Westcott, Colonel Evanko assigned

Majors Werts and Williams to conduct an inquiry into the facts and circumstances

surrounding the FBI investigation. (Evanko Dep. at 179-180, 182-183; Coury Dep., 03/12/2002, at 53-54; Westcott Dep. at 37, 40, 43-46.)

On July 20, 1999, Lieutenant John R. Brown, then Acting Director of the Internal Affairs Division, assigned a Bureau of Professional Responsibility control number to the administrative inquiry. (Brown Dep. at 21-22, 25-27.) The evidence clearly indicates that Brown personally decided to assign a Bureau of Professional Responsibility control number for tracking purposes. (Brown Dep. at 26-27, 100-102; Evanko Dep. at 304-306; Conley Dep. at 95-96.)

49.    None of the averments in paragraph 49 of Ober's Statement are material. However, defendants agree that Evanko testified that he did not know whether Ober and Major Merryman were read their administrative rights when they were interviewed by Majors Werts and Williams. (Evanko Dep. at 180.) Colonel Evanko did not testify that he had any personal knowledge of Lieutenant Colonel Westcott flying in a State Police plane to brief Major Williams on his assignment. Colonel Evanko testified that he did not know whether Lieutenant Colonel Westcott flew, but Evanko remembered Westcott stating that at his deposition. (Evanko Dep. at 181-182.)

50.    Paragraph 50 of Ober's Statement contains no material facts and inappropriately mingles Ober's personal opinions with evidence. The record establishes that, several years ago, Colonel Evanko authorized a state police escort for PNC Bank

when it transported five billion dollars in negotiable instruments across the state of Pennsylvania. (Evanko Dep. at 15-16, 185-189.) There is no basis for Ober's conclusion that Evanko's action was unauthorized or improper.

Defendants agree that Lieutenant Colonel Conley denied Ober's request to be reimbursed for a hotel room and drinks he purchased for a meeting with the FBI at the Holiday Inn in Indiana, Pennsylvania. (Coury Dep., 04/15/2002, at 161-165, 172, 177.) Agent Kush recalled drinking coffee during that meeting. (Kush Dep. at 173.) However, there is no evidence that the drinks Ober purchased consisted solely of two cups of coffee. Indeed, that would have been rather strange since there were at least three people at the meeting – Ober, Kush, and Soohy. (Kush Dep. at 55-56; Soohy Dep. at 14-15, 19-20, 24-25.)

51. Evanko did not testify that he was not concerned about Ober's actions. Rather, Evanko testified that he was primarily concerned with Hickes's actions. (Evanko Dep. at 105, 178.) When Colonel Evanko assigned Major Williams to investigate, Colonel Evanko did not know whether Hickes had been involved with the FBI. Colonel Evanko had no personal knowledge of Lieutenant Colonel Hickes's role in the investigation. When he spoke with Agent Mosquera on May, 20, 1999, Evanko told Mosquera that Williams would be coming to Pittsburgh to see him. (Evanko Dep. at 195.)

52.     Not withstanding Ober's personal speculation, there is no evidence that Plaintiff's Exhibit 281 was removed from Ober's State Police personnel file or that Plaintiff's Exhibit 66 was substituted as a "sanitized" version.  Ober cites pages 199 through 202 of Colonel Evanko's deposition for the proposition that Ober checked his personnel file and learned that a document was missing from it.  Those pages of Colonel Evanko's deposition contain no evidence; they merely document unsworn representations made by Ober's attorney, Don Bailey.

Moreover, contrary to Ober's assertion, Plaintiff's Exhibit 281 is not a document "from [Lieutenant] Colonel Coury to [Ober]."  (Ober's Statement at ¶ 52.)  Instead, Plaintiff's Exhibit 281 is an initialed memorandum, dated October 19, 1999, from Ober to the Director, Bureau of Personnel, asking that he be considered for "Specialized Training – School of Police Staff and Command."  At the bottom of the memo is a handwritten notation by an unnamed person – "BTS:  Personnel:  10/22/99."  Plaintiff's Exhibit 66 is the identical memo but without Ober's initials or the handwritten notation at the bottom. Rebecca Brown, an employee in the Bureau of Technology Services, made the handwritten notation on a copy of Ober's memo and retained the copy in the Bureau's file.  The original memo, which did not contain that notation, was then forwarded to the Bureau of Personnel.  (Brown Aff. at ¶¶ 3-4.)

There is simply no evidence that anyone performed an "unjustified anti-personnel action" against Ober. Finally, none of the representations in paragraph 52 of Ober's Statement are material to the issues in this case.

53.    Defendants agree that Colonel Evanko believes that any expenses incurred during the FBI's investigation should have been paid by the FBI rather than the State Police. (Evanko Dep. at 206.)

54.    Defendants agree that after Ober was denied reimbursement for renting a hotel room to secretly meet with the FBI in Indiana, Pennsylvania, he filed a grievance. Defendants also agree that Ober ultimately prevailed on that grievance and was reimbursed. (Coury Dep., 04/15/2002, at 161-163; Evanko Dep. at 206.) Defendants further agree that the State Police did not ask the FBI to reimburse the Department for the expenditures incurred by Ober. (Evanko Dep. at 206.) The evidence establishes that it was Ober, not the FBI, who insisted on meeting at a hotel room in Indiana, Pennsylvania, rather than at FBI headquarters or a mutually convenient State Police barracks. (Kush Dep. at 55-59; Soohy Dep. at 25-26.)

55.    Defendants agree that the Historical Educational and Museum Committee is an entity distinct from the Pennsylvania State Police. (Evanko Dep. at 207; Coury Dep., 04/15/2002 at 45-46.) The Committee is a nonprofit organization that is attempting

to build a State Police museum and memorial center.  (Evanko Dep. at 208; Coury Dep., 04/15/2002 at 45.)

56.    Defendants agree that Colonel Evanko assigned Ober to be the team leader to develop selection criteria for the systems integrator for Phase I of the IIMS project. (Evanko Dep. at 213; Hickes Dep. at 30-33.)

57.    Defendants agree Colonel Evanko told Ober he could return to the Internal Affairs Division when he completed his assignment for the IIMS project.  (Evanko Dep. at 214.)

58.    Evanko subsequently learned that Ober had filed grievances, but Evanko did not know when those grievances were filed.  (Evanko Dep. at 217.)  Although Ober has not provided proper citations to the record, it appears he is referring to grievance HQ-164, filed November 8, 1999, and grievance HQ-167, filed December 22, 1999. (Plaintiff's Exhibit 127.)

These two grievances are just two of a number of grievances Ober filed, complaining about everything from being denied reimbursements to his removal from the Book Committee, the Commissioner's refusal to retain him on the IIMS project, his transfer to Washington, his temporary service in a lieutenant's position, and rejection of his request to serve as a PEMA liaison.  (Plaintiff's Exhibit 127.)  Only one of Ober's grievances was sustained – the Department's refusal to reinstate eight hours of leave

Ober used and pay for the hotel room Ober rented when he met with FBI agents at the

Holiday Inn in Indiana, Pennsylvania. (Plaintiff's Exhibits 131, 132.)

59.     Evanko is not informed when grievances are filed. (Evanko Dep. 218.)
The record contains no evidence to the contrary.

60.     Defendants agree that Colonel Evanko is the one who decided to transfer

Ober to assist the Area III Commander, situated in Washington, Pennsylvania, with

preparations for the upcoming convention of the National Governors Association.

(Evanko Dep. at 218-219.) It is also true that Washington, Pennsylvania, is more than

200 miles from Ober's home in central Pennsylvania. (Ober Dep., 12/05/2001, at 314;

Ober Aff. at ¶ 18.) Evanko issued that order on January 7, 2000. (Plaintiff's Exhibit 127,

Grievance No. HQ-169.) Ober filed a grievance on December 22, 1999. (Plaintiff's

Exhibit 127, Grievance No. HQ-167.) There is no evidence that Evanko knew Ober had

filed a grievance or that the grievance played any role in Evanko's decision to transfer

Ober.

61.     Defendants agree that Colonel Evanko decided to transfer Ober to assist the

Area III Commander because (1) Ober had finished his assignment with IIMS, (2) Major

Conley did not want Ober back in the Bureau of Professional Responsibility, and

(3) Ober was capable of doing the job. (Evanko Dep. at 219; Conley Dep. at 125, 166,

169-175.) Further, Lieutenant Colonel Westcott felt strongly that Colonel Evanko

needed to send someone to work on the National Governors Association conference as
soon as possible because there had recently been a riot at the World Trade Conference in
Seattle, requiring activation of the National Guard. (Evanko Dep. at 218-219, 229, 231,
285; Westcott Dep. at 96-98, 104-106; Coury Dep., 03/12/2002, at 64.) There is no
evidence that Colonel Evanko had any other motive for transferring Ober. Ober's
personal beliefs about Evanko's motivation are not supported by facts of record.

Furthermore, Colonel Evanko did not "create" Ober's availability by promoting
John R. Brown to Director of the Internal Affairs Division. Ober was available because
he had completed his IIMS assignment at the Bureau of Technology Services and the
Director of the Bureau of Professional Responsibility did not want Ober back in his
Bureau. (Evanko Dep. at 219; Conley Dep. at 125, 166, 169-175.) The fact that Colonel
Evanko did not personally discuss these issues with Ober is irrelevant.

62. The evidence is that Ober was finished with his IIMS assignment. (Evanko
Dep. at 219, 222-223; Hickes Dep. at 33; Westcott Dep. at 98; Conley Dep. at 164.)
Evanko was not the person who determined that Ober had finished that assignment;
rather, Evanko knew Ober was available for a new assignment because Lieutenant
Colonel Hickes advised him that Ober had completed his portion of the IIMS project.
(Evanko Dep. at 222-223.) Defendants do not agree that part of Ober's IIMS assignment
was to "vote on the project" or attend any "important meetings that were planned when

Ober was transferred to Washington." (Ober's Statement at ¶ 62.) Obviously, there is a

factual dispute about whether Ober was finished with the IIMS project; however, that fact

is not material. The undisputed material fact is that Lieutenant Colonel Hickes advised

Colonel Evanko that Ober was finished, and Colonel Evanko believed him. (Evanko

Dep. at 222-223.) There is no evidence to support any contrary conclusion.

63.    Defendants agree that after Lieutenant Colonel Hickes informed Colonel

Evanko that Ober was finished with his IIMS assignment, Major Waugh (the Director of

the Bureau of Technology) asked Colonel Evanko if Ober could remain with IIMS.

(Evanko Dep. at 222.) However, this fact is irrelevant and immaterial to the issues in this

case.

64.    Defendants agree that Ober was the only Captain that Colonel Evanko

initially considered to assist the Area III commander prepare for the National Governors

Association's convention. (Evanko Dep. at 223.) While undisputed, this fact is

irrelevant and immaterial.

65.    Paragraph 65 of Ober's Statement says that he "complained of retaliation in

one of his grievances he filed in late 1999." (Ober's Statement at ¶ 65.) Ober has not

cited any portion of the record; however, it appears Ober is referencing Grievance HQ-

167, filed December 22, 1999. (Plaintiff's Exhibit 127.) Ober filed Grievance HQ-167

after Conley ordered him to reimburse the department for the cost of framing a commendation letter. (Plaintiff's Exhibit 127, HQ-167.)

HQ-167 is only one of a number of grievances Ober filed, complaining about everything from being denied reimbursements to his removal from the Book Committee, the Commissioner's refusal to retain him on the IIMS project, his transfer to Washington, his temporary service in a lieutenant's position, and rejection of his request to serve as a PEMA liaison. (Plaintiff's Exhibit 127.) Only one of Ober's grievances was sustained – the Department's refusal to reinstate eight hours of leave Ober used and pay for the hotel room Ober rented when he met with FBI agents at the Holiday Inn in Indiana, Pennsylvania. (Plaintiff's Exhibits 131, 132.)

There is no evidence that Colonel Evanko read any of the grievances Ober filed. Ober seems to acknowledge as much in paragraph 65, when he states, "Evanko said he never read the grievances." (Ober's Statement at ¶ 65.) Although Ober has not cited the record, it appears he is referencing Evanko's deposition, in which Evanko testified he had not read Ober's grievances. (Evanko Dep. at 221.) Indeed, the record contains no evidence to the contrary.

66.    It is true that if Ober returned from the Bureau of Technology Services to the Bureau of Professional Responsibility, it was for a very short period of time. (Evanko Dep. at 224.)

67.    Defendants agree that Evanko transferred Ober back to Internal Affairs for a pay period and that he did so as a formality. (Evanko Dep. at 225.) There is no evidence contradicting Colonel Evanko's testimony that he did not mean to insult or harm Ober. (Evanko Dep. at 225-227.)

68.    It is a matter of public record that on January 26, 2000, Ober filed a petition for preliminary injunction and a petition for mandamus seeking a permanent injunction in the Commonwealth Court of Pennsylvania. (Exhibit A, *Ober v. Evanko,* Pet. for Prelim. Inj., No. 35 M.D. 2000 (Pa. Commw. filed Jan. 26, 2000); Exhibit B, *Ober v. Evanko*, Pet. for Mandamus, No. 35 M.D. 2000 (Pa. Commw. filed Jan. 26, 2000).)

69.    Ober has misconstrued Colonel Evanko's testimony. Ober was needed to finish deciding the selection criteria for the systems integrator to be used in the IIMS project. (Evanko Dep. at 213-214, 228.) However, any implication that Ober did not finish that portion of the project is contradicted by the record. (Hickes Dep. at 33; Evanko Dep. at 219, 222-223, 236.) Defendants agree that Ober never returned to the Internal Affairs Division. (Evanko Dep. at 224, 228, 309-310; Ober Dep., 12/05/2001, at 325-326.) Defendants also agree that Ober never went to Washington, Pennsylvania. (Evanko Dep. at 228; Exhibit C, *Ober v. Evanko,* Petitioner's Mot. to Withdraw, App. A, No. 35 M.D. 2000 (Pa. Commw. filed Jan. 27, 2000).)

The record establishes that Colonel Evanko wanted someone to assist Major Lyle Szupinka immediately. (Evanko Dep. at 229.) To avoid further delay during litigation, Colonel Evanko chose to send Captain David F. Young to Area III instead of Ober. (Evanko Dep. at 220-221, 232.) In exchange for Ober's withdrawal of his motion for a preliminary injunction, Colonel Evanko agreed to keep Ober in the Harrisburg/Hershey area. (Exhibit C, *Ober v. Evanko,* Petitioner's Mot. to Withdraw, App. A, No. 35 M.D. 2000 (Pa. Commw. filed January 27, 2000).) Given Captain Young's assignment to Area III, Ober's lawsuit was dismissed as moot. (Exhibit D, *Ober v. Evanko,* Respondents' Application to Dismiss for Mootness Pursuant to Pa. R. C.P. 1972(4) (Pa. Commw. filed Feb. 23, 2000); Exhibit E, *Ober v. Evanko,* No. 35 M.D. 2000 (Pa Commw. filed Mar. 30, 2000).)

At the time, there were no immediate openings in the Harrisburg/Hershey area for a Captain. (Evanko Dep. at 238.) However, Major Koscelnak, the Director of the Bureau of Liquor Control Enforcement, urgently needed a Central Section Commander, a position that generally calls for a Lieutenant. (Koscelnak Dep. at 8, 13-14.) Consequently, Colonel Evanko briefly assigned Ober to that position; however, Colonel Evanko assigned Ober to the next available Captain's position. (Evanko Dep. at 237, 293.)

70.    Paragraph 70 of Ober's Statement is comprised of Ober's personal conclusions, supposedly supported by paragraphs 17-19 of his affidavit.  On this point, however, Ober's affidavit is devoid of facts; it consists of nothing more than his personal opinions and beliefs.

71.    It is true that retired Lieutenant Colonel Westcott believed that Major Szupinka, the Area III Commander, needed someone to assist him with preparations for the National Governors Association's convention.  (Evanko Dep. at 218-219, 229-232; Westcott Dep. at 98-99, 119.)  It is also true that this was Lieutenant Colonel Westcott's decision, not Major Szupinka's decision.  (Evanko at 230-231; Westcott Dep. at 98-99.)

72.    Ober's Statement does not contain a paragraph 72.

73.    Ober's assertion that he "won in Commonwealth Court" is not true.  Ober filed two actions in the Commonwealth Court; the first was dismissed as moot and the second was dismissed for failure to state a claim.  (Exhibit E, *Ober v. Evanko*, No. 35 M.D. 2000 (Pa. Commw. March 30, 2000; *Ober v. Evanko*, slip op. at 6 (Pa. Commw. Sept. 6, 2000.)  Lieutenant Colonel Westcott insisted that someone be assigned to assist Major Szupinka as soon as possible.  (Evanko Dep. at 218-219, 229; Westcott Dep. at 97-99, 105-106, 119.)  Colonel Evanko did not want to postpone assigning someone and he did not know how long Ober's lawsuit might take to litigate.  (Evanko Dep. at 229, 233-234, 235.)  Consequently, Evanko chose to promote David F. Young and send him to

Area III instead of Ober. (Evanko Dep. at 220-221, 231-233.) Evanko does not recall whether he talked to Captain Young about the assignment. (Evanko Dep. at 233.) However, Evanko normally speaks with officers that he promotes. If he discussed the matter with Captain Young, Evanko would have offered Young the position of Captain with the caveat that he would be assigned to assist Major Szupinka. (Evanko Dep. at 232-233.)

74.    Defendants dispute Ober's personal opinion that it is "a reasonable inference that Evanko promoted Young to cover himself because Ober had taken legal action and succeeded in defeating the transfer." (Ober's Statement at ¶ 74.)The evidence is that a Captain was needed to assist Major Szupinka with preparations for the National Governors Association convention. (Evanko Dep. at 229-232; Westcott Dep. at 109, 111.) Another Captain was already helping Major Werts prepare for the Republican National Convention. (Evanko Dep. at 219-220; Westcott Dep. at 98, 120.) Ober did not want to assist Major Szupinka and filed suit seeking a preliminary and permanent injunction to prevent his transfer. (Exhibit A., *Ober v. Evanko,* Pet. for Prelim. Inj., No. 35 M.D. 2000 (Pa. Commw. filed Jan. 26, 2000); Exhibit B, *Ober v. Evanko,* Pet. for Mandamus, No. 35 M.D. 2000).) Colonel Evanko did not know how long the litigation would take and did not want to prolong assigning someone to assist Major Szupinka. (Evanko Dep. at 229, 233-234, 235.) For that reason, Colonel Evanko promoted Young

to Captain and assigned him to assist Major Szupinka. (Evanko Dep. at 232-235.) In that

capacity, Young played an important role in providing security for our nation's

Governors when they met in Pennsylvania. (Young Aff. at ¶ 4.) Based on the evidence,

it is not reasonable to infer that "Evanko promoted Young to cover himself because Ober

had taken legal action and succeeded in defeating the transfer." (Ober's Statement at

¶ 74.) Further, including Ober's unreasonable conclusion in his affidavit does not

transform it from personal opinion into a material fact.

75.     Ober claims that pages 227 to 228 of Colonel Evanko's deposition establish

that Ober is the only captain Evanko knows of who ever served in a lieutenant's position.

(Ober's Statement at ¶ 75.) Those pages of Evanko's testimony have nothing to do with

captains serving in lieutenants' positions. (Evanko Dep. at 227-228.) Defendants believe

that Ober intended cite pages 237 to 238 of Evanko's deposition. Colonel Evanko

explained that he placed Ober in the Bureau of Liquor Control Enforcement because he

had agreed to keep Ober in the Harrisburg/Hershey area during pendency of his lawsuit

and there were no Captains positions available in the area at that time. (Evanko Dep. at

237-238.) Evanko also explained that this was the first time he had placed a captain in a

lieutenant's position. (Evanko Dep. at 238.) Significantly, Ober was not reduced in rank

or pay. (Ober's Dep., 12/07/2001, at 39-40; Conley Dep. at 185; Lazzaro Dep. at 82-83.)

76.    Ober has not provided any references to the record for the proposition that
every witness who has been deposed testified that "Captain Ober was the only Captain
who was ever assigned to fill a lieutenant's position, to their knowledge." (Ober's
Statement at ¶ 76.) Many of the witness were not asked whether they knew another
captain who had been assigned to a lieutenant's position. Defendants could not find that
question in the depositions of Mark Campbell, Robert Werts, Mary Bungo, Michael
Soohy, Ralph Kush, William McAreavy, Marie Marshall, John R. Brown, Phillip
DeWire, Larry Riley, Walter Margeson, or Thomas Carr. The witnesses who were asked,
indicated they did not know whether any other captain had served in a lieutenant's
position. (Coury Dep., 03/12/2002, at 76; Westcott Dep. at 140; Pudliner Dep. a 32,
Merryman Dep. at 79; Grab Dep. at 42; Hickes Dep. at 145.) Further, Ober's union, the
Pennsylvania State Troopers Association, chose not to contest Ober's assignment as
Central Section Commander; although it was not routine, Ober was not harmed by the
assignment. (Lazzaro Dep. at 60-62, 83-84.) Finally, while the collective experience of
the witnesses may cover a period of the past 20 or 30 years, it certainly does not cover a
period of 300 years as Ober claims in paragraph 76 of his Statement.

77.    Obviously, the defendants agree that Colonel Evanko never gave his
personal secretary, Mary Bungo, the authority to decide how the State Police is

organized.  (Evanko Dep. at 245; Bungo Dep. at 2-3.)  This fact is irrelevant and immaterial to the case.

78.    Defendants agree that the Commissioner's secretary, Mary Bungo, is authorized to auto-pen Colonel Evanko's name to a regulation if the appropriate Deputy Commissioner has signed off on it.  (Evanko Dep. at 245-246, 248-249; Bungo Dep. 3-5, 9; Hickes Dep. at 136.)  This fact is not material to the case.

79.    Defendants agree that Colonel Evanko did not sign a change order regarding AR 1-1.02(c), chain of command.  (Evanko Dep. at 248; McAreavy Dep. at 62-53; Bungo Dep. at 5-6, 8-9.)  The change was auto-penned after review by the Deputy Commissioners.  (Evanko Dep. at 249; Bungo Dep. at 4, 8-9; McAreavy Dep. at 31-67.)  Defendants also agree that Colonel Evanko is not familiar with the process through which AR 1-1 was submitted, corrected, or resubmitted; indeed, Evanko had nothing to do with the addition of § 1.02(c) to AR 1-1.  (Evanko Dep. at 248-249; Margeson Dep. at 21, 24-25, 28, 30; McAreavy Dep. at 18; Riley Dep. at 5-6, 10, 14-15, 20, 29; Bungo Dep. at 4-9, 19.)

80.    Ober has misconstrued defense counsel's representations concerning AR 1-1.02(c).  Defense counsel has indicated that AR 1-1 was amended for accreditation purposes, and the record supports that representation.  (McAreavy Dep. at 66, 68; Bungo Dep. at 11; Margeson Dep. at 22-23; Evanko Dep. at 250.)  Defense counsel have never

intended to convey the idea that the subsection on chain of command – 1.02(c) – was added for accreditation purposes.  To the contrary, defense counsel have repeatedly acknowledged that the subsection on chain of command was added because of problems experienced by Major Leonard Washington, Director of the Bureau of Emergency and Special Operations.  (McAreavy Dep. at 20-21; Margeson Dep. at 24, 30; Riley Dep. at 15, 23-24, 25, 32;  Defendants' Motion for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure at ¶¶ 19, 20; Defendants' Brief in Support of Their Motion for Sanctions at 4-5.)  Regardless, the amendment to AR 1-1 is not material to this case.

81.     Paragraph 81 of Ober's Statement is difficult to follow.  However, defendants believe Ober is trying to articulate the fact that in January 2000, Evanko sent Mark Campbell an e-mail in which he mentioned transferring Ober effective January 28, 2000.  Colonel Evanko testified that he was keeping Campbell up to date on preparations for the upcoming convention of the National Governors Association.  (Evanko Dep. at 256-258.)  The record does not indicate whether Colonel Evanko notified Mark Campbell that he was sending Captain David F. Young to assist Major Szupinka.  Defendants deny refusing to cooperate with discovery.  Further, nothing in paragraph 81 is material to the outcome of this litigation.

82.     In paragraph 82, Ober again blends facts with opinions that are not supported by the record.  The record does establish that Lieutenant Colonel Hickes told

Mary Woolley, of the Governor's Office, about the FBI's investigation before disclosing that information to Colonel Evanko. (Hickes Dep. at 183, Woolley Aff. at ¶¶ 5, 6, and 8; Labecki Aff. at ¶¶ 3-4, 6-7.) Colonel Evanko testified that he did not even know that had occurred until Lieutenant Colonel Hickes testified at his deposition. (Evanko Dep. at 67, 259.) Hickes was deposed only two days before Colonel Evanko's deposition. (Hickes Dep., 03/25/2002; Evanko Dep., 03/27/2002.)

Colonel Evanko has never indicated that "speaking to someone about a matter of public concern without advising him first is a violation of the chain of command." (Ober's Statement at ¶ 82.) Rather, Colonel Evanko testified that it was inappropriate for Lieutenant Colonel Hickes to tell Mary Woolley about the FBI investigation before disclosing it to Evanko. (Evanko Dep. at 259, 262-263.) In Colonel Evanko's opinion, Hickes circumvented the appropriate chain of command. (Evanko Dep. at 262.)

83.    It is true that Colonel Evanko has no recollection of signing a change order for AR 1-1 on or about February of 2001. (Evanko Dep. at 263.) That is because Colonel Evanko did not sign a change order for AR 1-1. The record clearly establishes that the change order for AR 1-1 was auto-penned by Colonel Evanko's secretary. (Bungo Dep. at 5, 34; McAreavy Dep. at 31; Evanko Dep. at 248-249.) In any event, the averment of paragraph 83 is not material to this case.

84.    Paragraph 84 of Ober's Statement says, "This is the change that defendants' counsel told the Court in argument was in effect at the time Ober was handling the FBI probe.  Ober Aff.¶31." (Ober's Statement at ¶ 84.)  Ober's citation to paragraph 31 of his own affidavit is curious because the subject of paragraph 31 is Ober's belief that he should have been selected to be the Director of the Legislative Affairs Office.  (Ober Aff. at ¶ 31.)  Perhaps Ober intended to cite paragraph 35 of his affidavit, which contains his personal conclusion that defense counsel's error was an intentional effort to mislead the Court.  (Ober Aff. at ¶ 35.)

In any event, defense counsel have repeatedly acknowledged erroneously citing to AR 1-1.02(c) in their original brief in support of a motion to dismiss Ober's original complaint.  (*See* Defendants' Reply Brief In Support of Their Motion to Dismiss All Claims at 2-3; Defendants' Brief in Support of Their Motion to Dismiss or Strike Plaintiff's Second Amended Complaint at 1-2; Defendants' Brief in Support of Their Motion for Sanctions at 3.)  Moreover, there is absolutely no evidence that defense counsel played any role in the promulgation of AR 1-1.02(c); Ober's contrary opinion is not based on evidence, and reiterating his opinions in an affidavit does not transform them into facts.

85.    Paragraph 85 of Ober's Statement is irrelevant and immaterial to this case; however, it is true that Colonel Evanko cannot recall the ink smearing on a document he signed. (Evanko Dep. 244, 264.)

86.    There is no question that the conference of the National Governor's Association took place in State College, Pennsylvania. However, Major Szupinka, the Area III commander, was in charge of security for the conference, and Major Szupinka is headquartered in Washington, Pennsylvania, where the planning took place. (Evanko Dep. at 283-284; Pudliner Dep. at 28-29; Westcott Dep. at 97; Young Aff. at ¶ 6.)

87.    A fair reading of the testimony establishes that Colonel Evanko, in consultation with Lieutenant Colonel Coury, decided that Ober should devote his time to the IIMS project rather than working with the Centennial Book Committee. (Evanko Dep. at 285-288; Coury Dep., 04/15/2002, at 76.)

88.    Colonel Evanko testified that he believes Ober was taken off the book committee because Lieutenant Colonel Hickes wanted people assigned full-time to the IIMS project. (Evanko Dep. at 286.) Colonel Evanko also testified that he did not personally discuss the issue with Ober or the head of the book committee. (Evanko Dep. at 287-288.) The committee's book is scheduled to be published in 2005 for the 100th Anniversary of the State Police. (Evanko Dep. at 288.)

89.    Defendants dispute Ober's contention that Colonel Evanko ever investigated Ober. (Ober's Statement at ¶ 89.) Rather, Colonel Evanko requested an administrative inquiry because he wanted to determine why the FBI or Lieutenant Colonel Hickes did not tell him about the FBI investigation involving Stanton. (Evanko Dep. at 301.) Defendants agree that Evanko was interested in finding out whether he was a target of the FBI's investigation. (Evanko Dep. at 301-302.) Evanko clarified that he wanted to know whether he was a target; he did not request the investigation to determine if someone in the Governor's office was a target. (Evanko Dep. at 302.)

90.    Defendants do not agree that paragraph 90 of Ober's Statement is an accurate description of the testimony on page 302 of Colonel Evanko's deposition. Colonel Evanko did not "redescribe his motives regarding the Governor's Office and his reasons for ordering an investigation." (Ober's Statement at ¶ 90.) Rather, Colonel Evanko clarified that, in response to an earlier question, it was accurate to say that one purpose of the administrative inquiry was to find out if the FBI ever suspected him of wrongdoing; however, Evanko was not concerned with whether the Governor's Office was a target of the FBI investigation. (Evanko Dep. 301-302.)

91.    Defendants agree that the Commissioner requested an inquiry into the facts and circumstances surrounding the FBI probe. The requested inquiry was not a full BPR investigation in that sense that its purpose was not to investigate an allegation of

wrongdoing; the purpose was to gather the facts. Once the facts were gathered, a determination could be made whether anyone had engaged in conduct warranting a full BPR investigation. (Evanko Dep. at 108, 179-180, 183; Westcott Dep. at 37, 40; Coury Dep., 03/12/2002, at 54; Conley Dep. at 234-236; Pudliner Dep. at 15-16, 17-18, 24; Brown Dep. at 16, 24, 112-113; Skurkis Dep. at 77.) Captain Brown assigned IAD #1999-503 to the requested inquiry as a tracking number. (Brown Dep. at 21-22, 26, 33; Evanko Dep. at 305-306; Conley Dep. at 95-96.)

Captain Brown was assigned to assist counsel in defending the Commissioner and his deputies. (Brown Dep. at 5-6, 113.) Attorney work product assignments are routine and authorized by State Police regulations. (Pudliner Dep. at 8-9; Merryman Dep. at 68.) Ober falsely accused defense counsel and their clients of conspiring to defraud the Court by creating a new regulation and altering the regulation's historic file. (Plaintiff's Amended Complaint, filed April 2, 2001, at ¶ 52-55; Plaintiff's Amended Complaint, filed May 2, 2001, at ¶¶ 54-56.) At defense counsel's request, Captain Brown interviewed Major Merryman about the historic file at issue. (Brown Dep. at 85-86; Merryman Dep. at 29, 44, 65-66.) Captain Brown advised Major Merryman of his administrative rights. (Merryman Dep. at 29.) Ober's conclusion that the interview was "an act of retaliation" is not based on fact, and Ober has failed to explain what harm he could possibly have suffered because Major Merryman was interviewed.

92.     The regulation at issue is FR 1.17(B), not FR 1.17(6), and Ober has completely misconstrued defense counsel's representation to the Court about that regulation.  Defense counsel have never indicated that FR 1.17(B) contains the word "might."

On March 16, 2001, defendants filed a brief in support of their motion to dismiss Ober's complaint.  In that brief, counsel wrote:

> Ober's decision to bypass his chain of command directly violated state police regulations.  *See* FR 1-1.17(B) (requiring members to promptly notify their supervisor when they receive any information indicating another member might have violated the law)....

(See Defendants' Brief In Support of Their Motion to Dismiss All Claims, filed March 16, 2001.)  Counsel were clearly paraphrasing the regulation, not quoting it. Further, counsel accurately described the mandate of FR 1.17(B), which states:

> (B)     Members shall promptly report to their supervisor any information which comes to their attention and *which tends to indicate* that any other member or employee has violated any law, rule, regulation or order."

(See Evanko Dep. Exhibit 4, Pennsylvania Field Regulation 1.17(B) (emphasis added); Evanko Dep. at 318-321.)

93.     Paragraph 93 of Ober's Statement is mislabeled as paragraph 92.  Ober claims that when he and his counsel reviewed the historic file for AR 1-1, it contained two change orders that had both been signed by autopen.  Frankly, defense counsel do not understand what information Ober is trying to convey in this paragraph, and the only

citation given is to "Ober Aff.93." Yet, Ober's affidavit does not contain 93 paragraphs

or 93 pages. Defense counsel read through the entire affidavit and found only four

paragraphs that refer to AR 1-1. (Ober Aff. at ¶¶ 34-37.) One of those paragraphs relates

to Ober and his attorney's review of AR 1-1's historic file; however, it says nothing about

two auto-penned change orders. (Ober. Aff. at ¶ 36.)

94.    As indicated in paragraph 93 above, defense counsel found no mention of

two change orders in Ober's affidavit. Ober has not referenced any evidentiary support

for the proposition that change orders "had fresh ink on them which smeared when

rubbed with moderate pressure by plaintiff's counsel during a review of documents at

PSP headquarters." (Ober's Statement at ¶ 94.) Nevertheless, defense counsel have read

Ober's affidavit and note that paragraph 36 asserts that when Ober and his attorney "were

examining the Change Sheet bearing Evanko's signature, which had supposedly been

signed over a year ago, the ink smudged." (Ober's Aff. at ¶ 36.) While acknowledging

the fact that he is not "an ink hydration expert," Ober goes on to speculate that the ink

was "wet," somehow reinforcing his unfounded conclusion that "defendants will go to

any length to defeat" him. (Ober Aff. at ¶ 36.) None of Ober's speculations and opinions

are supported by the evidence, nor are they material to the issues in this case.

95.    There is no evidence to support Ober's irrational conclusion that the change

order for AR 1-1 was not part of the historic file for AR 1-1 and was "prepared to benefit

defendants in this litigation." (Ober's Statement at ¶ 95.) AR 1-1 is irrelevant to the issues, and defendants have no idea how preparing a new change order would benefit them in this litigation.

96.    Paragraph 96 of Ober's Statement reads, "Mary Bungo, Mr. Evanko's personal secretary, has no rellection [sic] of 'sub section [sic] c' or what it relates to." Defendants presume Ober is referring to the fact that Ms. Bungo does not recall AR 1-1.02(C). (Bungo Dep. at 28-30.) Neither AR 1-1.02(C) nor Ms. Bungo's recollection of it are relevant or material to this lawsuit.

97.    Defendants agree that Mary Bungo would only have used the Commissioner's auto-pen to sign a completed document; she would not have auto-penned a draft. (Bungo Dep. at 20; Evanko Dep. at 244-247.) This fact is irrelevant and immaterial to this case.

98.    Defendants agree that when Corporal William McAreavy was deposed, two copies of Change No. 866, dated February 23, 2001, were introduced as Exhibits 4 and 5 respectively. (McAreavy Dep. Exhibits 4 and 5.) Both change sheets state that AR 1-1 has been revised. The instructions on Exhibit 4 direct the reader to remove pages 1 through 70 and replace them with pages 1 through 68. (McAreavy Dep. Exhibit 4.) The instructions on Exhibit 5 direct the reader to remove pages 1 through 70 and replace them with pages 1 through 66. (McAreavy Dep. Exhibit 5.)

Mary Bungo testified that she did not recall how many change sheets she had auto-penned for the change to AR 1-1 on February 23, 2001. Ms. Bungo was then shown Exhibits 4 and 5 from Corporal McAreavy's deposition. (Bungo Dep. at 20.) Ms. Bungo testified that both documents appear to have been signed with the auto-pen. (Bungo Dep. at 20.) Ms. Bungo commented that the print on Exhibit 5 appeared darker than the print on Exhibit 4 and that the font might be different on the two documents. (Bungo Dep. at 21.) Of course, Ms. Bungo was not shown the original change sheets; she was shown photocopies of those sheets. (Bungo Dep. at 20.)

While defendants do not agree that there is any difference in print, it is true the two change orders are different. As noted above, Exhibit 4 directs the insertion of pages 1 through 68, whereas Exhibit 5 directs the insertion of pages 1 through 66. Defendants have no way of determining whether the ink on either of these documents was smeared; Colonel Evanko's signature does not appear to have been smeared on McAreavy Exhibits 4 or 5. (McAreavy Dep., Exhibits 4 and 5.) Regardless, nothing contained in paragraph 98 of Ober's Statement is relevant or material to this case.

99.     Defendants agree that Mary Bungo does not recall having any trouble with the ink drying on signatures written with the auto-pen. (Bungo Dep. at 25.) That fact is irrelevant and immaterial to this case.

100.    Ober cites pages 129-130 of Hickes's deposition for the proposition that Hickes and Ober "could have gained absolutely nothing from not telling Colonel Evanko about the FBI probe (into possibly higher ups)." (Ober's Statement at ¶ 100.) Those pages of Hickes's deposition have nothing to do with whether Hickes and Ober had anything to gain by keeping the investigation a secret.  (Hickes Dep. at 129-130.)[1] Regardless, defendants agree that Hickes testified he did not gain any advantage by withholding the information and that he could not think of any advantage Ober would have gained.  (Hickes Dep. at 183-184.)  The questions posed to Hickes did not involve "higher ups."  Id.  Further, as set forth above, the evidence establishes that the FBI investigation never involved allegations that "higher-ups" at the State Police were involved in illegal activity.

In any event, defendants have never contended that Ober should have told Colonel Evanko about the FBI investigation; that was Lieutenant Colonel Hickes's responsibility. Ober's responsibility was to tell his Bureau Director, then Major Conley.  Whether Hickes believes Ober had anything to gain by circumventing his Bureau Director is irrelevant.  Moreover, whether Hickes had anything to gain by keeping the matter secret is also irrelevant because Hickes does not claim to have been punished or otherwise harmed as a result of his decision.

---

[1] All of Ober's citations to Hickes's deposition are incorrect.  Defendants have no idea what transcript Ober is relying on; however, defendants have gone through Hickes's deposition and provided the Court with correct page

101.    Ober cites page 134 of Hickes's deposition for the proposition that Ober did

not violate PSP culture by "not telling Mr. Evanko he was a potential target of the

investigation." (Ober's Statement at ¶ 101.) Page 134 of Hickes's deposition consists of

a rambling question posed by Ober's attorney. The question pertains to the amendment

of AR 1-1; it has nothing to do with PSP culture. (Hickes Dep. at 134.) Much later in his

deposition, Hickes testified that he is not aware of any culture, or value, that Ober

violated by reporting the FBI information to Hickes. (Hickes Dep. at 190.)

102.    Defendants dispute the allegations contained in paragraph 102 of Ober's

Statement. Ober cites to a question his attorney, Don Bailey, posed to Lieutenant

Colonel Hickes as somehow supporting these averments. The relevant questions appear

on pages 193-194 of Hickes's deposition, not page 136. (Hickes Dep. at 193.)

Mr. Bailey asked Hickes whether he remembered being asked the following

question when he was interviewed by Major Williams on July 2, 1999: "At any

conversation you'd had with Commissioner Evanko, did either you or Captain Ober ever

tell him that the allegations of influence were not specific as to a colonel in the PSP or

someone in the governor's office, but rather the trooper claimed to have contacts with

high-ranking officials in the agency and the administration?" Hickes replied, "Not

specifically, but yeah." (Hickes Dep. at 193.) Mr. Bailey then asked whether Major

references for all of the testimony Ober has referenced in his factual statement.

Williams' question seemed to say that the Majors had "learned that, in fact, there were some allegations against higher ups in the agency and higher ups in the Governors office." Hickes replied, "I'd have to read that again," and Bailey countered "It speaks for itself." (Hickes Dep. at 194.)

First of all, Mr. Bailey's questions are not evidence; Lieutenant Colonel Hickes's answers are the evidence. Mr. Bailey's question is not even relevant. The fact that Major Williams asked whether Hickes or Ober ever told Evanko that the allegation involved a trooper who claimed to have contacts with high-ranking officials (1) is not proof that Hickes or Ober said that to Evanko, (2) is not proof that the trooper claimed to have contacts with high-ranking officials, and (3) is not proof that the trooper had contacts with high-ranking officials. In sum, Major Williams' question is not evidence at all.

103.    It is true that Mr. Bailey asked Lieutenant Colonel Hickes, "Have you ever known a deputy commissioner to jump in an airplane and fly off to tell a major to go investigate something?" Hickes answered, "No." The question and answer appear on page 157 of Hickes's deposition, not page 112 as cited by Ober. (Hickes Dep. at 157.) Hickes' testimony on this point is irrelevant and immaterial.

103[a].  Ober's Statement contains two paragraphs labeled 103. Consequently, defendants are referencing the second paragraph 103 as paragraph 103[a]. Defendants agree that Mr. Bailey asked Lieutenant Colonel Hickes, "The truth of the fact is, the

Commissioner reacted so strongly it scared you a little; didn't it?" Hickes replied, "A little, yes." The question and answer appear on page 151 of Hickes's deposition, not page 107. (Hickes Dep. at 151.) It is unclear precisely what Hickes was slightly afraid of; regardless, that fact is immaterial to this litigation.

104.    Defendants' agree that Lieutenant Colonel Hickes contacted Barbara Christie, Chief Counsel to the State Police, on May 13, 1999. (Hickes Dep. at 82-83.)

105.    Ms. Christie did not tell Hickes "that he was 'reasonable' in his judgment regarding the decision he made about the FBI probe." (Ober's Statement at ¶ 105.) Lieutenant Colonel Hickes actually testified as follows: "She said that based upon the circumstances as I presented them to her, that it appeared that I was reasonable in my judgment." That testimony appears on page 153 of Hickes's deposition, not page 108. (Hickes Dep. at 153.) There is no evidence that the circumstances were as Hickes presented them to Ms. Christie.

To the contrary, Ober told Hickes "that the FBI had asked him for the strictest confidence" and that it was a very sensitive matter and that he was to tell no one about this." (Hickes Dep. at 51.) Based on what Ober told him, Hickes believed the FBI had been explicit in requesting confidentiality and in asking Ober not to disclose the information to other people. (Hickes Dep. at 60.) Despite Ober's representations to Hickes, the evidence unequivocally establishes that the FBI was not investigating high-

ranking members of the State Police, they did not request confidentiality, and they did not

ask Ober to withhold information from his supervisor or anyone else in the State Police.

(Soohy Dep. at 14-16; 17-18, 27-28, 53-57; Kush Dep. at 133-36, 39-41, 45, 51-53, 71-

72, 103, 106, 113, 115, 122, 132, 164, 190-191, 212, 220; Ober Dep., 12/05/2001, at 106-

107.)

106. Defendants agree that on October 5, 1998, Lieutenant Colonel Hickes

ordered Ober not to tell anyone else about the FBI investigation until it was completed.

(Hickes Dep. at 59.) It is also an undisputed fact that Lieutenant Colonel Hickes made

that order because (1) Hickes believed the FBI had explicitly asked Ober to keep the

information strictly confidential; (2) Hickes did not know that the FBI agents had already

discussed their investigation with other members of the State Police. (Hickes Dep. at 51,

59-61, 177-178.)

107. Defendants agree that when Colonel Evanko was first informed of the FBI

investigation on May 12, 1999, he was also informed that on October 5, 1998, Hickes

ordered Ober not to disclose the information to anyone else until the FBI investigation

was complete. (Hickes Dep. at 48, 58-59, Hickes Exhibit 1 at 2; Evanko Dep. at 42, 46,

49-50.)

108.    Defendants agree that Lieutenant Colonel Hickes has been a member of the State Police for 29 years and Ober is the only captain he recalls serving in a lieutenant's position. (Hickes Dep. at 145.)

109.    Page 104 of Lieutenant Colonel Hickes' deposition does not support the fact that an "officer stationed in IAD is put there because of a reputation for integrity." (Ober's Statement at ¶ 109, citing Hickes Dep. at 104.)  Regardless, defendants agree that it is vital for officers in the Internal Affairs Division to have the utmost integrity.  It is a privilege to work in Internal Affairs, and the officers assigned there are scrutinized more closely than officers working at other places in the Department." (Hickes Dep. at 147-148; Ober. Dep., 12/07/2001, Exhibit 16 at AR 4-25.11(A)(3).)

110.    Defendants agree that on May 12, 1999, Colonel Evanko asked Hickes and Ober if the FBI had suspected him (Evanko). (Hickes Dep. at 118.)  Evanko asked that same question of Special Agent Rick Mosquera on May 20, 1999. (Evanko Dep. at 61-64, 116-119, 134, 140-141, 267-268.)

111.    Defendants dispute the averments contained in paragraph 111 of Ober's Statement.  Ober has misconstrued the relevant testimony, which appears on pages 120-121 and 176-178 of Hickes's Deposition (rather than pages 83-84, as cited by Ober).

When asked what difference it would have made if Ober misrepresented the FBI's request for confidentiality, Hickes replied, "I don't know that it would have made any

difference or not." (Hickes Dep. at 120-121.) Hickes felt that information about the

FBI's investigation should not go beyond the FBI until the FBI indicated it was okay.

(Hickes Dep. at 121.) Hickes explained that answer later on in the deposition. Hickes

testified that even if the FBI had not requested confidentiality, he still would have

directed Ober not to tell anyone about the investigation because it was an investigation

into public corruption, it was the FBI's investigation, the FBI had not asked the State

Police for assistance, and the term "colonel" was used. (Hickes. Dep. at 176-177.)

However, Hickes went on to say that his decision might have been different if he had

known that the FBI had already discussed the investigation with other members of the

State Police. (Hickes Dep. at 177-178.)

As indicated, Hickes based his order, in large part, on the representation that the

term "colonel" had surfaced in the FBI investigation. (Hickes Dep. at 177-178, Hickes

Exhibit 1.) The record clearly establishes that Hickes was given incorrect information

about the term "colonel" being used. That term was not used until October 13, 1998, and

Ober did not learn about it until October 21, 1998. (Kush Dep. at 132, 138-139, 170,

193-194, 200-203, 205-207.) Finally, Hickes never testified that "Ober made the right

decision as to informing Evanko." (Ober's Statement at ¶ 111.) Hickes was the one who

made the decision not to inform Evanko; Ober made the decision to inform Hickes rather

than his Bureau Director, then Major Conley. (Hickes Dep. at 50-51; Ober Dep.

12/05/2001, at 120, 125.)  At his deposition, Hickes testified he (Hickes) did the right thing based on the information he had at the time.  (Hickes Dep. at 116.)  In October 1998, Hickes believed it was okay for Ober to circumvent the chain of command; that belief was based solely on information provided by Ober.  (Hickes Dep. at 60-61, 66-70, 128.)  In any event, Hickes's personal opinion about the propriety of Ober's actions is not relevant or material to this case.

112.    It is a fact that there are three Lieutenant Colonels and one Colonel in the Pennsylvania State Police.  (Hickes Dep. at 112.)  Otherwise, Ober has misconstrued Lieutenant Colonel Hickes's testimony.  Hickes did not say that Colonel Evanko was in a group targeted by the FBI and should not have been told about the investigation.  Hickes testified that *if* the Colonel and three Lieutenant Colonels were a group targeted by the FBI, Hickes would not tell them about the investigation.  (Hickes Dep. at 114.)

More importantly, the FBI information did not indicate that a colonel might be involved.  The record establishes that the FBI had a confidential informant who had been approached several times by Trooper Stanton.  Trooper Stanton told the informant that he had a friend, Jay Bridge, who would pay $10,000 to get an appointment to the State Police Academy.  Trooper Stanton wanted the confidential informant to make arrangements, through a state legislator, to get Bridge into the Academy.  (Kush Dep, 10-13, 21, 23, 103, 106, 108-110, 112-113, 180-182, 187-193, Exhibit 2 at 3.)

On October 13, 1998, the FBI tape-recorded a conversation between the confidential informant, Trooper Stanton, and Stanton's friend, Dennis Jay Bridge. (Kush Dep. at 193-194, 197-199, Exhibit 3.) During that conversation, Bridge said, "Apparently he's gonna have to talk to some Lieutenant Colonel...he's gonna talk with somebody that's affiliated with the State Police...that's gonna know all that." (Kush Dep. at 200-201, Exhibit 3 at 49.) They go on to discuss someone named Ben who supposedly got into the Academy with the help of a politician. *Id.*

If one gives credence to Bridge's statement, every single person at the State Police, including Ober and Lieutenant Colonel Hickes, were potential targets of the investigation. If one gives credence only to the mention that a Lieutenant Colonel might be involved, Lieutenant Hickes would have been in the potential group of targets, but Colonel Evanko would not. Regardless, the recorded conversation had not yet occurred when Ober told Hickes about the FBI's investigation on October 5, 1998. Ober did not hear that conversation until October 21, 1998, and the FBI agents had not even noticed the mention of a Lieutenant Colonel until Ober pointed it out to them on October 21, 1998. (Kush Dep. at 132, 138-139, 170, 194, 200-203, 205-207.)

113.    Ober has not provided any citation for the proposition that "Doc Fielder" is a well-known street politician in Pittsburgh who was directly involved in the subject matter of the FBI probe. (Ober's Statement at ¶ 113.) However, the information about

63

Doc Fielder can be found on Exhibit 2 of the Kush Deposition. During an interview with Major Williams, Kush said that at one point during the FBI investigation, the confidential informant referred Bridge to Doc Fielder. Agent Kush explained that Fielder is an influential man in the Pittsburgh area who has political connections. Fielder either contacted a state legislator or put Bridge in contact with him; however the state legislator told Bridge he could not get him into the State Police Academy. (Kush Dep., Exhibit 2, at 4.)

114. Ober's representation that "Hawthorne Conley knows Doc Fielder and admits to knowing him" is misleading. (Ober's Statement at ¶ 114.) Although Ober has not provided a citation to the record, the relevant testimony can be found on page 155 of Lieutenant Colonel Conley's deposition. Conley testified that he has heard of Doc Fielder but does not know him personally. (Conley Dep. at 155.) This fact is irrelevant and immaterial to the case.

115. Defendants agree that Lieutenant Colonel Hickes testified that Ober seemed genuinely concerned about the FBI investigation and "somewhat caught in the middle." (Hickes Dep. at 97.) Hickes's impression of Ober's attitude is not relevant or material to this case.

116.    Defendants agree that Lieutenant Colonel Hickes does not believe Ober is psychic or has powers of prophecy. (Hickes. Dep. at 95.) This fact is irrelevant and immaterial to the case.

117.    Defendants agree that after Majors Werts and Williams finished their administrative inquiry into the facts and circumstances surrounding the FBI probe, Colonel Evanko told Lieutenant Colonel Hickes that Ober had misrepresented the facts when he gave them to Hickes. (Hickes Dep. at 88-89.)

118.    Defendants deny that their attorneys have failed to comply with Fed. R. Civ. P. 26. This unfounded accusation is not relevant or material to the case.

119.    Defendants do not believe Ober has accurately characterized Lieutenant Colonel Coury's testimony. Coury testified that he was not aware of any rule Ober had violated with respect to chain of command. However, Coury went on to say, "I think that there may be some FR [Field Regulation] violations...." (Coury Dep., 03/12/2002, at 27.) Besides, Coury's personal knowledge of what regulations may have been violated is not material to the case.

120.    Defendants have no idea what information Ober is trying to convey in paragraph 120; it certainly is not relevant or material. Moreover, Coury's interview with Majors Werts and Williams is not the equivalent of sworn testimony.

121.  Paragraph 121 of Ober's Statement is confusing.  However, it appears Ober may be trying to convey the fact that, prior to his deposition, Lieutenant Colonel Coury had not read Majors Werts and Williams' report of the administrative inquiry they conducted.  (Coury Dep., 03/12/2002, at 28.)  Coury testified that he had reviewed the statement he gave to Majors Werts and Williams.  (Coury Dep., 03/12/2002, at 28-29.)

Defendants agree that Coury told Majors Werts and Williams he felt the FBI investigation was a major incident that Lieutenant Colonel Hickes should have discussed with Colonel Evanko.  Coury explained that he felt there was a great potential for information to leak out.  Coury did not complain that "the FBI aren't tight hipped." (Ober's Statement at ¶ 121.)  Rather, Coury said, "the FBI is not noted for their, uh, tight lip, so to speak." (Plaintiff's Exhibit 64 at 5.)  That portion of Coury's interview appears on page 5, rather than page 6, of Plaintiff's Exhibit 64.  Again, Coury's statement to Werts and Williams is not sworn testimony.  More importantly, nothing in paragraph 121 of Ober's Statement is relevant or material to this case.

122.  Defendants agree that Coury told Werts and Williams he believed Colonel Evanko had a duty to tell the Governor's Office about the inquiries being made.  Since it was an election year, Coury did not want the Governor's Office to be blindsided if the press called asking questions about the FBI investigation.  That portion of the interview

appears on page 5, rather than page 6, of Plaintiff's Exhibit 64. Lieutenant Colonel

Coury reiterated that concern during his deposition. (Coury Dep., 03/12/2002, at 78-80.)

123.    Paragraph 123 of Ober's Statement is extremely confusing. Ober appears

to be citing Plaintiff's Exhibit 64, page 6, for the proposition that Coury told Major

Williams that if he (Coury) had been Ober, he would have reported the FBI probe to his

supervisor. However, it appears Ober is actually referencing testimony given by Coury at

his deposition. Coury testified that, if he had been in Ober's shoes, he would have

informed his superiors. (Coury Dep., 03/12/2002, at 24.) The record does not support

Ober's suggestion that Ober could identify Colonel Evanko and Lieutenant Colonels

Westcott and Coury as potential targets of the FBI investigation.

124.    Defendants do not agree with Ober's characterization of the question Major

Williams asked Lieutenant Colonel Coury during his interview on June 28, 1999.

Moreover, Williams was not asking Lieutenant Colonel Coury how he felt about Ober's

obedience to Hickes's order; rather, Williams was asking Coury his opinion about Ober's

decision to talk to Hickes in the first place. (Plaintiff's Exhibit 64 at 7.) Regardless,

there is nothing relevant or material about the questions Williams posed to Coury during

the June 1999 interview.

125.    The record establishes that it was Major Robert Einsel, rather than

Lieutenant Colonel Coury, who advised Ober his application for training had been

received after the deadline.  (Evanko Dep. at 274-276; Coury Dep., 04/15/2002, at 138-140; Einsel Supplemental Affidavit at ¶¶ 3-5.)

126.    There is no evidence that Ober's request for training was received prior to the October 22, 1999, deadline.  Ober has no personal knowledge of when his request was received in the Bureau of Personnel, and the record clearly establishes that it was received there on October 28, 1999.  (Einsel Supplemental Aff. at ¶¶ 3-4; Polek Aff. at ¶ 4.)  There is no basis for Ober's representation that Plaintiff's Exhibit 281 somehow proves his training request was received in the Bureau of Personnel on October 20, 1999.

Plaintiff's Exhibit 281 is a memo, dated October 19, 1999, from Ober to the Director of the Bureau of Personnel.  In the lower right-hand corner is a hand-written notation that reads, "BTS: Personnel: 10/20/1999."  Plaintiff's Exhibit 281 is a copy of Captain Ober's memorandum; that copy was made by Rebecca Brown, Management Technician in the Strategic Development Division of the Bureau of Technology Services, before she forwarded the original memo the Director of the Bureau of Technology Services.  (Brown Aff. at ¶¶ 2-4, Exhibit U-1.)  Ms. Brown is the person who made the handwritten notation on the Bureau's copy of Ober's memo.  Her notation indicates that Ober's request was received in the Bureau of Technology Services, needed to be sent to the Bureau of Personnel, and was received in Technology Services on October 20, 1999.  (Brown Aff. at ¶¶ 2-3.)  The original memo, which was sent to the Director of the Bureau

of Technology Services for approval before being forwarded to the Bureau of Personnel, did not contain Ms. Brown's handwritten notation. (Brown Aff. at ¶ 4.)

As Ms. Brown indicated in an e-mail message to Ober on November 10, 1999, she believes Ober's training request may have unintentionally been delayed in the Bureau of Technology Services. (Brown Aff. at ¶ 7, Exhibit U-2.) There is certainly no evidence that the defendants had anything to do with Ober's request not being received at the Bureau of Personnel until after the October 22, 1999, deadline.

127.    Ober's speculation aside, there is no evidence that Plaintiff's Exhibit 281 was removed from Ober's personnel file during this litigation. Even if the document was removed, there is no evidence that the defendants had anything to do with its removal. Plaintiff's Exhibit 68 is an e-mail message from Rebecca Brown to Ober; it has nothing to do with Ober's conjecture that Plaintiff's Exhibit 281 was removed from Ober's personnel file. Neither Plaintiff's Exhibit 281 nor Plaintiff's Exhibit 68 support the proposition that the people chosen to attend the School of Police Staff and Command were less qualified to attend than Ober. Regardless, nothing contained in paragraph 127 of Ober's Statement constitutes a relevant or material fact.

128.    There is no evidence to support Ober's belief that "a Colonel in the state police, or people in the Governor's Office, might have been involved in the illicit activity the FBI was investigating." (Ober's Statement at ¶ 128.) At Coury's deposition,

Mr. Bailey asked how Ober would know that the Governor's office or higher-ups in the State Police would be mentioned unless he is an extremely lucky prophet, the FBI mentioned it, or he was involved with the confidential informants. Coury replied, "He wouldn't." (Coury Dep., 03/12/2002, at 44.)

129. Ober has not accurately characterized Lieutenant Colonel Coury's testimony, which appears on pages 25-26 of his deposition, not page 32. Lieutenant Colonel Coury did not suggest Ober should have told Colonel Evanko about the FBI investigation. Coury testified that Ober should have given the information to his Major, rather than the Commissioner. (Coury Dep., 03/12/2002, at 25.) Mr. Bailey asked Coury why Ober should not have gone directly to Evanko, and Coury replied, "Because the culture of the State Police is we have a chain of command and we operate through it." (Coury Dep., 03/12, 2002, at 25-26.) Coury said when he first heard of the investigation on May 12, 1999, there was nothing to indicate Ober had violated the regulations. However, Coury felt Ober had made an error in judgment and violated a principle of culture. (Coury Dep., 03/12/2002, at 45.) Nothing in the record supports the conclusion that Ober would have "violated basic law enforcement rules or even been guilty of obstruction of justice" if he had informed Coury of the FBI investigation, and Ober has not provided any authority for this proposition. (Ober's Statement at ¶ 129.)

130.    Defendants agree that when he first learned about the FBI investigation, Coury did not think any member of the State Police and had violated the field regulations and recommended against a BPR investigation.  (Coury Dep., 03/12/2001, at 45, 54-55.)  However, Coury also testified that he now believes Ober may have violated the field regulations.  (Coury Dep., 03/12/2002, at 27.)  In any event, whether Coury initially realized Ober had violated the regulations is not material to this case.

131.    Defendants agree that Colonel Evanko called Mark Campbell on the afternoon of May 12, 1999.  (Evanko Dep. at 64.)  However, there was no staff meeting ; rather, Ober and Lieutenant Colonel Hickes chose that day to tell Colonel Evanko about the FBI investigation.  Then Colonel Evanko asked Lieutenant Colonel Coury to join them, and Ober and Hickes repeated the information in Coury's presence.  (Evanko Dep. at 155; Coury Dep., 03/12/2002, at 35-36.)

132.    It is an uncontested fact that only the State Police Commissioner has the authority to transfer a member of the Department.  (Evanko Dep. at 218-238; Coury Dep., 03/12/2002, at 60.)

133.    It is an uncontested fact that Conley had no faith in Ober after Ober chose not to inform him of the FBI investigation.  (Conley Dep. at 125, 173; Coury Dep., 03/12/2002, at 62; Evanko Dep. at 219.)

134.    It is true that Lieutenant Colonel Coury asked Conley, then the Director of the Bureau of Professional Responsibility, how he would feel about making Captain Skurkis the Director of Internal Affairs and moving Ober into Captain Skurkis's position as Director of the Division of Systems and Process Review. (Coury Dep., 03/12/2002, at 63.) However, both positions were in the Bureau of Professional Responsibility, and Conley did not feel he could work with Ober any longer. (Coury Dep., 03/12/2002, at 63; Conley Dep. at 125, 166-167, 170-171, 173-176.)

Ober's conclusion that the discussion between Coury and Conley demonstrates that Evanko was not being truthful about Ober's availability is completely illogical. To the contrary, the fact that Conley and Coury discussed placing Ober into Skurkis's position shows that Ober was finished with his assignment on the IIMS project; otherwise, there would be no need to discuss where Ober should be assigned. Ober cites his own affidavit for the proposition that Evanko created Ober's availability by promoting Captain Brown to Ober's position at the same time he transferred Ober to Washington. However, the affidavit does not contain any facts that support Ober's conclusion. (Ober Affidavit at ¶ 20.) Further, it is an undisputed fact that Colonel Evanko did not promote Captain Brown or transfer Ober to Washington until after Lieutenant Colonel Hickes advised Evanko that Ober had finished his assignment with

IIMS.  (Hickes Dep. at 31-34, 139-143; Evanko Dep. at 218-220, 223, 229, 232; Coury

Dep., 04/15/2002, at 79.)

135.    It is true that at the time Ober was transferred to assist the Area III

commander, Conley did not want Ober assigned to the Bureau of Professional

Responsibility.  (Conley Dep. at 125, 166-167, 170-171, 173-176; Coury Dep.,

03/12/2002, at 63, 68.)  Lieutenant Colonel Coury said he did not recall any supervisory

inquiries, counseling memoranda, or other documents admonishing Ober.  (Coury Dep.,

03/12/2002, at 69.)  Ober also claims that page 50 of Coury's deposition proves he had

never received a poor performance evaluation or been the subject of Department

discipline.  However, page 50 of Coury's deposition on March 12, 2002, is not related to

the subject, nor is page 50 of Coury's deposition on April 15, 2002.  Regardless, the only

pertinent fact is that Conley did not want Ober to return to the Bureau of Professional

Responsibility.  (Conley Dep. at 125, 166-167, 170-171, 173-176.)

136.    Paragraph 136 of Ober's Statement is extremely difficult to follow.  It

consists of a 16-line run-on sentence, mixing together facts, conclusions, and

unwarranted speculation.  The only citations are to ¶ 69 of an unnamed document and to

an unspecified paragraph of Ober's affidavit.  The record supports few of the factual

averments contained in this confusing jumble.  There is no evidence that Ober was denied

training opportunities based on false information.  Ober's own testimony firmly

establishes that he was never subjected to a "full-blown custodial investigation" as he now claims. (Ober's Statement at ¶ 136; Ober Dep., 12/05/2001, at 200-225.) Ober was interviewed and read administrative warnings in which he was advised that he had to answer questions but that his answers could not be used against him in any criminal proceeding. (Ober Dep., 12/05/2001, at 200-203.)

The record does establish that Ober was briefly assigned to a position that had been held by a Lieutenant. (Ober Dep., 12/05/2001, at 335; Evanko Dep. at 237-238, 292-293.) He was also transferred to Washington, Pennsylvania, which is more than 200 miles from his home in Enola, Pennsylvania. (Ober Dep., 12/05/2001, at 314; Ober Aff. at ¶ 18.) However, Ober was not transferred without warning. To the contrary, the transfer order was issued January 7, 2000 (Plaintiff's Exhibit 127), and Conley verbally told Ober of the transfer on January 10, 2000. (Ober Dep., 12/05/2001, at 318.) Obviously, Ober received sufficient notice of his transfer because he had time to obtain counsel and petition the court for preliminary and permanent injunctions. (Exhibit A, *Ober v. Evanko,* Pet. for Prelim. Inj., No. 35 M.D. 2000 (Pa. Commw. filed Jan. 26, 2000); Exhibit B, *Ober v. Evanko,* Pet. for Mandamus, No. 35 M.D. 2000 (Pa. Commw. filed Jan. 26, 2000).) Indeed, Ober never went to Washington at all because the Commissioner agreed to keep him in the Harrisburg/Hershey area until his lawsuit was

resolved, and that lawsuit was later dismissed as moot. (Exhibit E, *Ober v. Evanko,* No. 35 M.D. 2000 (Pa. Commw. filed Feb. 23, 2000); Evanko Dep. at 227-228, 238, 240.)

There is no evidence supporting Ober's contention that he was selectively investigated for acquiring State Police artifacts. There is absolutely no evidence that the State Police, any of its members, or any of the defendants have ever violated state and federal law or State Police regulations regarding the acquisition of State Police artifacts.

Defendants agree that Ober was removed from the Centennial Book Committee; however, there is no evidence that his removal was improper. (Evanko Dep. at 285-286.) It is also true that Ober's request for a PEMA assignment was denied; again, there is no evidence that the decision was improper. (Koscelnak Dep. at 16-20; Koscelnak Aff. at ¶¶ 3-4; DeWire Dep. at 73-74; DeWire Aff. at ¶ 4.)

Defendants agree that Ober has not been promoted from Captain to Major. The record establishes that the rank of major is the highest enlisted rank in the State Police. There are only 18 majors, and there are seldom vacancies at that rank. (Evanko Aff. at ¶ 4.) When a position becomes available, the Commissioner is given a list of all captains who are eligible for promotion and all are carefully evaluated. (Evanko Aff. at ¶ 5.)

Captain Ober became eligible for promotion to Major in December 1996. Since then, there have been 44 other Captains who were also eligible for promotion, and Colonel Evanko has promoted 15 of those Captains to Major. (Evanko Aff. at ¶ 6.)

Aside from Ober's inflated opinion of himself, there is no evidence that he was any more deserving of promotions than the individuals who received them. Rather, Ober's performance and qualifications are comparable to other State Police Captains. (Evanko Dep. at 291.)

It is true that Lieutenant Colonel Coury was concerned about Ober's stress level and discussed the matter with Major DeWire and the State Police psychologist, Larry Walker. (Coury Dep., 04/15/2002, at 88-96, 98-102, 108.) However, there is no evidence that Coury was motivated by anything except genuine concern for Ober; there is certainly no evidence that Coury was retaliating against Ober for filing this lawsuit. (Coury Dep., 04/15/2002, at 107-108, 110-111; DeWire Dep. at 47.) In fact, Ober's affidavit details a litany of stress and emotional turmoil he has supposedly suffered, evidencing the fact that Coury's concern for Ober's welfare was not unfounded. (Ober Aff. at ¶¶ 7, 18, 27, 38, 40; Plaintiff's Answers to Defendants Interrogatories 6, 7, and 8.)

There is no evidence that material documents have been taken from Ober's personnel file. Even if documents have been removed, there is no evidence the defendants had anything to do with it.

There is no truth to Ober's assertion that he has witnessed an attempt to mislead the presiding judge. It is true that defendants filed a motion to have Ober's counsel, Don

Bailey, sanctioned for making irresponsible accusations that have no factual support whatsoever.

137.    Defendants agree that Lieutenant Colonel Coury testified that he did not know whether any other Captain has served in a Lieutenant's position.

138.    Defendants agree that Lieutenant Colonel Coury said he would not tell a target that he was being investigated. (Coury Dep., 03/12/2002, at 88.) However, Coury went on to explain that a target is a named person and that Colonel Evanko was never a target of the FBI investigation. (Coury Dep., 03/12/2002, at 88.)

139.    The evidence does not support Ober's assertion that Lieutenant Colonel Coury initiated the investigation into Ober's procurement of State Police artifacts. The uncontroverted evidence establishes that retired Lieutenant Colonel Phillip Conti's complaint initiated the investigation. (Coury Dep., 04/15/2002, at 16-37; 42, 53.) When he received Conti's complaint, Coury forwarded it to the Bureau of Professional Responsibility as State Police regulations required. (Coury Dep., 04/15/2002, at 55-56, 83.) It is true that Coury adjudicated the investigation. (Coury Dep., 04/15/2002, at 15.) The evidence also establishes that Ober was not harmed by Coury serving as adjudicator; to the contrary, Coury adjudicated the complaint as unfounded. (Coury Dep., 04/15/2002, at 50, 74.)

140.    Ober states that his request for training was of a type that is normally approved; however, he does not specify what training request he is referring to. Ober cites pages 38-46 of Coury's deposition but does not specify which day of the deposition. Pages 38-46 of neither deposition supports paragraph 140 of Ober's Statement. In any event, nothing in this paragraph is material.

141.    Defendants agree that Coury and Conley initially denied Ober's request to be reimbursed for a hotel room he rented to meet with the FBI Agents in Indiana, Pennsylvania. (Coury Dep., 04/15/2002, at 162-164; Conley Dep. at 252-246; Evanko Dep. at 185.) The evidence also establishes that when they made that decision, Coury and Conley did not know Hickes had approved the expenditure. (Coury Dep., 04/15/2002 at 171-173.) Defendants also agree that Ober filed a grievance and was ultimately reimbursed for the expenditure. (Evanko Dep. at 184-185.)

142.    Defendants agree that Lieutenant Colonel Coury believes Ober should not have been reimbursed for renting a hotel room. (Coury Dep., 04/15/2002, at 167-169.) Defendants also agree that based on the information provided him by Ober, Lieutenant Colonel Hickes directed Ober to maintain secrecy until the FBI closed its investigation. (Hickes Dep. at 49, 50-51, 58-59, 60-61, 177-178.) However, these are not material facts.

143.   Defendants agree that Coury testified that he does not know of anyone who was *involuntarily* transferred more than 200 miles from his or her home.  (Coury Dep., 04/15/2002, at 193.)  However, Ober was not actually transferred more than 200 miles from his home; when Ober filed suit to stop his transfer, Colonel Evanko voluntarily rescinded it and kept Ober in the Harrisburg area.  (Exhibit C, *Ober v. Evanko,* Petitioner's Mot. to Withdraw, App. A, No. 35 M.D. 2000 (Pa. Commw. filed Jan. 27, 2000); Evanko Dep. at 227-228, 238, 240.)  In the end, Captain David F. Young was transferred to the position in Area III – an assignment located more than 300 miles from Young's home.  (Young Aff. at ¶ 6.)

144.   Defendants agree between May 30, 2000, and September 20001, Ober served as Acting Director of the Bureau of Liquor Control Enforcement for 5 days or 40 hours.  (Ober Dep. 12/05/2001, at 348; Plaintiff's Exhibit 318.)  According to Plaintiff's Exhibit 318, since September 2001, Ober has been appointed to serve as Acting Bureau Director on at least 24 other days.  (Plaintiff's Exhibit 318.)  Defendants do not know how Ober determined that Captain McDonald served as Acting Bureau Director for 208 hours between May 30, 2000, and September 2001.  (Ober's Statement at ¶ 144.)  According to Plaintiff's Exhibit 318, Captain McDonald served in that capacity on approximately 40 days.  (Plaintiff's Exhibit 318; Ober Dep., 12/05/2001, at 348.)

The decision to appoint someone as Acting Director is left to the sole discretion of the Bureau Director. There is no evidence that the defendants were involved in the decision to appoint Captain McDonald more frequently than Captain Ober. Rather, Major DeWire made the decision on his own with no input from any of the defendants. (DeWire Supplemental Affidavit at ¶ 3.)

145.    It is true that Lieutenant Colonel Coury first learned that AR 1-1.02(C) had been added to the regulations during this litigation. (Coury Dep., 04/15/2002, at 208-209.)

146.    It is true that retired Lieutenant Colonel Conti's complaint involving Ober and State Police artifacts was closed as unfounded. (Coury Dep., 04/15/2002, at 50, 74.) The evidence does not support Ober's assertion that Lieutenant Colonel Coury initiated the investigation; the uncontroverted evidence establishes that Conti's complaint initiated the investigation. (Coury Dep., 04/15/2002, at 16-37; 42, 53.) That investigation is assigned Internal Affairs Division control number 1999-409. The investigation was ruled unfounded on December 23, 1999. (Coury Dep. 04/15/2002, at 49-50; Coury Exhibit 2 at 1; Ober Dep., 12/05/2001, at 269-270.) The file on Internal Affairs Division control number 1999-409 contains a memo, dated February 12, 2001, from Major Pudliner to Lieutenant Colonel Coury. (Coury Dep., 04/15/2002, at 223-224, Coury Dep., 03/12/2002, Exhibit 2.) This fact is irrelevant and immaterial to the case.

147.    Defendants agree that on March 5, 1998, Coury sent a hand-written note to Ober, thanking him for doing a good job and telling him to keep up the good work. (Coury Dep., 04/15/2002, at 232, Coury Dep., 03/12/2002, Exhibit 6.)

148.    Ober has not accurately characterized Lieutenant Colonel Coury's testimony.  It is true that Coury said it is acceptable to by-pass the chain of commands when there are exigent circumstances.  (Coury Dep., 04/15/2002, at 237-238, Coury, 03/12/2002, Exhibit 7.)  However, Coury went on to explain that exigent circumstances are those that require immediate action, such as life-threatening events.  (Coury Dep., 04/15/2002, at 243, 250.)  Coury further explained that Ober was not faced with exigent circumstances when he chose to bypass his Bureau Director and tell Lieutenant Colonel Hickes about the FBI investigation involving Stanton.  (Coury Dep., 04/15/2002, at 245-246.)

149.    According to Ober's affidavit (not his deposition), in the first 18 years of his service in the State Police, he was not disciplined, was not removed from a committee, had no equipment taken from him, did not have to reimburse the State Police for any expense, and was not involuntarily transferred or removed from a special assignment.  (Ober Aff. ¶ 1.)  Defendants do not know whether these factual assertions are true; however, they are neither relevant nor material to this case.

150.   The facts do not support the averments in paragraph 150 of Ober's Statement.  There is no evidence that Ober was ever disciplined after telling Colonel Evanko about the FBI investigation.  There is no evidence that Ober was forced to reimburse the State Police for expenses or that he was removed from a special assignment.  The evidence does establish that Ober was removed from the Book Committee.  (Evanko Dep. at 285-286; Infantino Aff. at ¶ 5.)  Ober was also transferred to the Bureau of Liquor Control Enforcement; however, that transfer was made to honor an agreement to keep Ober in the Harrisburg area.  (Evanko Dep. at 227-228, 238, 240)  There record also establishes that Ober was required to return the Bureau of Professional Responsibility's cellular phone after he was detached to the Bureau of Technology Services.  (Ober Dep. 12/05/2001, at 298-299; Plaintiff's Exhibit 9; Conley Dep. at 77-80.)  There is no evidence that Ober suffered from these events or from any other action of the defendants.

151.   In paragraph 151 of Ober's Statement, he claims that Lou Lazzaro, president of Ober's union, the Pennsylvania State Troopers Association (PSTA), did not tell Coury that "Ober was mentally ill, was unstable, or needed counseling."  (Ober's Statement at ¶ 151.)  Ober also claims Lazzaro "never indicated in anyway that Ober wasn't performing his job in a proper way or was losing perspective."  (Ober's Statement at ¶ 151.)  In support of these assertions, Ober cites pages 28-32 of Lazzaro's deposition;

however, those portions of the testimony have nothing to do with any conversations Lazzaro and Ober may have had. Defendants believe Ober may have intended to cite pages 48 to 53 of that deposition.

The undisputed fact is that Lieutenant Colonel Coury had heard from the union that Ober was under a lot of stress. (Coury Dep., 04/15/2002, at 88.) Ober had filed a lot of grievances and had asked the PSTA for help paying his attorney's fees. (Coury Dep., 04/15/2002, at 88; Lazzaro Dep. at 34-36, 78-80.) The union had mentioned these facts to Coury a number of times. (Coury Dep., 04/15/2002, at 88.) During one of those conversations, the union mentioned that Ober was under a lot of stress. (Coury Dep., 04/15/2002, at 88-89.) Coury does not recall whether it was Lou Lazzaro, the PSTA president, or Paul McCommons, the past president of the PSTA, who talked to him about Ober's situation. (Coury Dep., 4/15/2002, at 88-91.)

When Lazzaro was president of the PSTA, he spoke with Lieutenant Colonel Coury on a frequent basis. (Lazzaro Dep. at 74.) If Lazzaro was concerned about how a member of the State Police was being treated, he raised the issue with Coury. (Lazzaro Dep. at 75.) Lazzaro confirmed that he knew Ober was upset about his transfer and huge legal fees and probably talked to Coury about it during one of their conversations. (Lazzaro Dep. at 47-48, 51-57, 76-77.)

152.    Defendants agree that Lieutenant Colonel Coury talked to Major DeWire and the State Police psychologist, Larry Walker, about Ober's mental and emotional status. (DeWire Dep. at 45-48, 53-54; Coury Dep., 04/15/2002, at 87, 98, 101-106.) Defendants are not sure when that meeting took place. (Coury Dep., 04/15/2002, at 98, 104.)

153.    The record does not establish that Major DeWire told Lieutenant Colonel Coury that Ober "was stable and seemed to be in good mental health." (Ober's Statement at ¶ 153.) Ober cites DeWire's deposition without a page reference; defense counsel have reviewed DeWire's entire deposition and it does not appear DeWire was ever asked what he told Lieutenant Colonel Coury. Nevertheless, defendants agree that DeWire told Coury he "thought everything was fine." (Coury Dep., 04/15/2002, at 105.)

154.    Defendants do not agree that DeWire felt that the purpose of the meeting was to threaten Ober. To the contrary, Major DeWire testified that he felt Lieutenant Colonel Coury was expressing heartfelt concern for Ober. (DeWire Dep. at 47.) When Mr. Bailey asked DeWire if it ever occurred to him Coury might be sending a message or veiled threat to Ober, DeWire said it had occurred to him that *may* have been the purpose. (DeWire Dep. at 37, 70.) DeWire went on to say it was very possible Coury just wanted an independent opinion regarding whether there was any issue of Ober's psychological fitness. (DeWire Dep. at 70.) Further, even though DeWire may have wondered about

the purpose of the meeting, there is no evidence that Lieutenant Colonel Coury was motivated by anything except genuine concern for Ober's mental and emotional well-being.  (Coury Dep., 04/15/2002, at 107, 110-111.)

155.    Defendants do not agree that DeWire felt that the purpose of the meeting was to carry a message to Ober.  To the contrary, Major DeWire testified that he felt Lieutenant Colonel Coury was expressing heartfelt concern for Ober.  (DeWire Dep. at 47.)  When Mr. Bailey asked DeWire if it ever occurred to him Coury might be sending a message or veiled threat to Ober, DeWire said it had occurred to him that *may* have been the purpose.  (DeWire Dep. at 37, 70.)  DeWire went on to say it was very possible Coury just wanted an independent opinion regarding whether there was any issue of Ober's psychological fitness.  (DeWire Dep. at 70.)  Further, even though DeWire may have wondered about the purpose of the meeting, there is no evidence that Lieutenant Colonel Coury was motivated by anything except genuine concern for Ober's mental and emotional well-being.  (Coury Dep., 04/15/2002, at 107, 110-111.)

156.    Defendants agree that Lou Lazzaro is the immediate past president of the Pennsylvania State Troopers Association (PSTA), a union representing over 4200 state troopers for collective bargaining and grievances.  (Lazzaro Dep. at 14, 37.)  Defendants also agree that Lazzaro does not know whether any other Captain has been assigned to do a Lieutenant's position.  (Lazzaro Dep. at 59-62.)  Lazzaro went on to explain that the

PSTA (Ober's union) chose not to contest Ober's assignment because he was not harmed

by it. (Lazzaro Dep. at 83-84.) Lazzaro also testified he did not feel Ober's transfer was

punitive. (Lazzaro Dep. at 22.)

157. Defendants agree Lieutenant Colonel Hickes has been a member of the

State Police for 29 years with the State Police and Ober is the only Captain he knows of

who was assigned to a Lieutenant's position. (Hickes Dep. at 144-145.)

158. Defendants agree that before May 12, 1999, Ober rose through the ranks

and had just been appointed a team leader for part of the IIMS project. (Ober Dep.,

12/05/2001, at 13-23; Evanko Dep. at 213; Hickes Dep. at 30-33.) Defendants would not

characterize Ober's service record as "spotless." Indeed, Lieutenant Colonel Conley

testified that he was dissatisfied with Ober's performance even before he learned that

Ober had chosen to conceal the FBI investigation. (Conley Dep. at 45, 48-49, 52-54, 56-

64, 172-176.)

159. There is no evidence that Ober was investigated in connection with the FBI

probe. All of the evidence establishes that Colonel Evanko did not ask for an

investigation of Ober; he asked for an administrative inquiry into all of the facts and

circumstances surrounding the FBI investigation. (Evanko Dep. at 108, 183; Coury Dep.

at 03/12/2002, at 51-53; Westcott Dep. at 37-40, 45; Conley Dep. at 82-83; Werts Dep. at

15-16, 24 32, 36-38, 44, 50; Williams Dep. at 15, 31-33, 37-38;Ober Dep., 12/05/2001, at

212-214.) Likewise, there is no evidence that the administrative inquiry did not conform to State Police practice and custom. All of the evidence is to the contrary. (Evanko Dep. at 179-180; Hickes Dep. at 158-159, 161-162; Conley Dep. at 92; Brown Dep. at 24, 106; Pudliner Dep. at 15-16, 18-19, 24; Skurkis Dep. at 48-49, 58-60; Bonney Aff. at ¶¶ 3-4, 6-7.) Ober's personal conclusion on the propriety of the inquiry is self-serving and not based on the facts or the regulations. More importantly, the propriety of the administrative inquiry is not relevant or material to the issues remaining in this case.

160.    Ober's personal opinion notwithstanding, there is no evidence Ober was selectively investigated about anything. There are only two investigations at issue. In the first, Colonel Evanko requested an administrative inquiry into all of the facts and circumstances surrounding the FBI probe; Ober was not the subject of the investigation. (Evanko Dep. 108, 300-302; Westcott Dep. at 37-40, 45; Coury Dep., 03/12/2002, at 51; Hickes Dep. at 122; Werts Dep. at 15-16, 24, 44, 50; Williams Dep. at 15, 31-33, 37-38; Conley Dep. at 92, 94-95; Ober Dep., 12/05/2001, at 212-214.) The second investigation stemmed from a complaint received from retired Lieutenant Colonel Conti. State Police regulations required an investigation be conducted into the validity of Conti's complaint. (Coury Dep., 04/15/2002, at 55-56.)

161.    Ober's personal opinion notwithstanding, there is no evidence that the investigation into Conti's complaint that Ober was improperly soliciting artifacts was

designed to embarrass Ober. To the contrary, the investigation vindicated Ober. (Coury Dep., 04/15/2002, at 74.) Likewise, aside from Ober's personal opinion, there is no evidence that this particular investigation did not conform to State Police protocol.

162.    Ober's personal opinion notwithstanding, there is no evidence supporting Ober's conclusion that his removal from the Centennial Book Committee was a retaliatory act. The evidence is that Colonel Evanko believed Ober needed to devote his all of his attention to the IIMS project. (Evanko Dep. at 285-288; Infantino Aff. at ¶ 5.)

163.    Defendants agree that Conley asked Ober to return his cellular phone. The evidence establishes that Conley's request was eminently reasonable. (Conley Dep. at 77-78; Plaintiff's Exhibit 9.) Ober has failed to explain what was vindictive or unreasonable about Conley's request. (Ober's Aff. at ¶ 12; Ober Dep., 12/05/2001 at 297-300.) Further, the evidence does not support Ober's assertion that Conley took his cellular phone on the same day Ober was removed from the Book Committee. Ober's testimony, combined with Plaintiff's Exhibit 9, establishes that Ober returned his cellular phone in late July 1999. (Plaintiff's Exhibit 9; Ober Dep., 12/05/2001, at 300-301.) Colonel Evanko removed Ober from the Book Committee on August 24, 1999. (Plaintiff's Exhibit 223.) Ober apparently learned of his removal on August 31, 1999. (Plaintiff's Exhibit 223.)

164.   Defendants dispute Ober's accusation that Lieutenant Colonel Conley falsely testified that Ober slammed a door after leaving a meeting.  In any event, this disputed fact is neither relevant nor material to resolution of this case.

165.   Ober claims that while he was detached to the Bureau of Technology Services, Conley would not allow him to attend an Internal Affairs Division meeting, even though he had been invited by Captain Brown, then Acting Director of Internal Affairs.  (Ober Dep., 12/07/2001, at 313-316.)  There is no evidence to support Ober's conclusion that Conley's actions served no viable purpose, were purely retaliatory, or meant to humiliate Ober.  To the contrary, Ober thought it was strange Brown had invited him in the first place.  (Ober Dep., 12/07/2001, at 314.)

166.   Defendants agree that Conley directed Ober to reimburse the Department for this expenditure.  (Ober. Dep., 12/05/2001, at 301-307; Conley Dep. at 111-112.)  However, defendants dispute Ober's contention that "Conley searched Ober's records and came up with an invoice already paid by the PSP eight months before."  (Ober's Statement at ¶ 166.)  Rather, Conley first learned that Ober had improperly used the Bureau of Professional Responsibility's VISA card to pay for framing a letter of commendation after Ober called Sergeant Lisa Christie in early December 1999 to find out if Sergeant Hillegas had received the framed letter.  (Conley Supplemental Aff. at ¶¶ 3-4.  On December 10, 1999, Captain Ober sent Conley an e-mail inquiring about the

status of Sergeant Hillegas's letter.  After investigating the matter within the Bureau,

Conley sent Ober an e-mail on December 13, 1999, advising him that using the Bureau's

VISA card to pay for framing the letter was inappropriate.  Conley directed Ober to

reimburse the Commonwealth for $69.35, the amount charged to the Bureau's VISA

card.  (Conley Supplemental Aff. at ¶ 3; Plaintiff's Exhibit 127.)

Further, after Ober complied with Conley's directive and reimbursed the Bureau,

Ober turned around and submitted a general invoice seeking to be reimbursed for the

check Conley had ordered him to write.  Ober submitted the invoice, listing himself as

payee, to the Headquarters Advancement Account.  On the invoice, Ober used Bureau of

Professional Responsibility codes, even though he was not assigned to the Bureau at the

time.  Conley did not learn of Ober's actions until he filed Grievance No. HQ-167, which

was ultimately denied.  (Conley Supplemental Aff. at ¶ 5.)

167.    Defendants agree that Conley first learned of Ober's improper use of the

Bureau's VISA card in early December 1999, after Ober had already filed a grievance

contesting the refusal to reinstate leave or to reimburse him for the cost of renting a hotel

room to meet with the FBI.  However, Ober did not use the word "retaliation" in the

grievance concerning the hotel room and day of leave; rather the first grievance alleging

retaliation was Grievance No. HQ-167, filed December 22, 1999, in which Ober sought

reimbursement for the cost of framing Sergeant Hillegas's commendation letter. (Plaintiff's Exhibit 127.)

168.    Defendants agree that Ober filed a grievance contesting Commissioner Evanko's denial of Ober's request for reinstatement of an annual day and reimbursement for the cost of renting a hotel room to meet with the FBI.  (Plaintiff's Exhibit 127.) Ober's personal opinion aside, there is no evidence to support his conclusion that Evanko acted out of spite or retaliation.  (Coury Dep., 04/15/2002, at 163; Conley Dep. at 242-246; Evanko Dep. at 206.)

169.    There is no evidence to support Ober's assertion that he was transferred to Washington, Pennsylvania, without notice or warning.  The personnel order transferring Ober was issued on January 7, 2002, and Ober was notified of that transfer on January 10, 2000.  (Plaintiff's Exhibit 127; Ober Dep., 12/05/2001, at 297, 318.)  Indeed, Ober received sufficient notice that he was able to obtain counsel and petition the Commonwealth Court for a preliminary injunction.  (Ober Aff. at ¶ 18; Lazzaro Dep. at 19-20; Exhibit A, *Ober v. Evanko,* Pet. for Prelim. Inj., No. 35 M.D. 2000 (Pa. Commw. filed Jan. 26, 2000); Exhibit B, *Ober v. Evanko*, Pet . for Mandamus, No. 35 M.D. 2000 (Pa. Commw. filed Jan. 26, 2000.)  Defendants agree that Colonel Evanko rescinded Ober's transfer and agreed to keep him in the Harrisburg area until the Court resolved his request for a permanent injunction.  (Evanko Dep. at 227-228, 238, 240; Exhibit C, *Ober*

*v. Evanko,* Petitioner's Mot. to Withdraw, App. A, No. 35 M.D. 2000 (Pa. Commw. filed Jan. 27, 2000.)  Ober's personal opinion notwithstanding, there is no evidence that Colonel Evanko made that decision because the transfer was disciplinary in nature.  All of the evidence proves the transfer was not disciplinary.  (Evanko Dep. at 235; Westcott Dep. at 99-100, 104; Coury Dep. at, 04/15/2002, at 190; Conley Dep. at 175, 187.)

170.    Ober's personal opinions notwithstanding, there is no evidence to support the averments in paragraph 170 of Ober's Statement.  First of all, the record clearly demonstrates that Ober did not successfully use the courts to prevent his transfer.  Rather, Colonel Evanko wanted someone assigned to assist Major Szupinka as soon as possible because the National Governors Convention was only seven months away.  (Evanko Dep. at 218-219, 231; Coury Dep., 03/12/2002, at 57-58; Westcott Dep. at 98, 101, 106.) Since Ober did not want to leave the Harrisburg area and Conley did not want Ober back at the Bureau of Professional Responsibility, Evanko assigned Captain Young to Area III and rescinded Ober's transfer.  (Evanko Dep. at 219, 237.)

There were no Captains positions vacant at the time; however, the Bureau of Liquor Control Enforcement urgently needed a Central Section Commander.  (Evanko Dep. at 238; Koscelnak Dep. at 13-14.)  Consequently, Evanko temporarily assigned Ober to serve as Central Section Commander; as soon as a Captain's position became available three months later, Ober was given that vacancy.  (Evanko Dep. at 293; Ober

Dep., 12/05/2001, at 335, 364-365.)  In the interim, Ober's rank, pay, and benefits

remained that of a Captain.  (Ober Dep., 12/07/2001, at 39-40; Lazzaro Dep. at 60, 83-84;

Conley Dep. at 185.)  It is true that Colonel Evanko assigned Captain Brown to Ober's

former position as Director of Internal Affairs.  Evanko made that decision because the

Bureau Director, then Major Conley, felt he could no longer work effectively with Ober.

(Conley Dep. at 107-110, 125, 166, 170, 173, 175; Evanko Dep. at 219, 237; Coury Dep.

at 03/12/2002, at 62-63.)   Members assigned to the Bureau of Professional

Responsibility are excluded from the provisions of the Collective Bargaining Agreement

that selection establish criteria for assignment to specialized positions and selection for

training.  (Conley Aff. at ¶ 6.)

    171.    Once again, Ober has misconstrued the evidence.  Colonel Evanko did not

testify that Ober was still needed at IIMS when he was transferred.  Colonel Evanko

testified that Ober had been needed on the project and that Ober completed his

assignment.  (Evanko Dep. at 213, 219, 273.)  Likewise, Lieutenant Colonel Hickes

verified that Ober completed the IIMS assignment for which he was needed.  (Hickes

Dep. at 31-34, 139-143.)  Defendants do not know what Ober means when he asserts that

"in fact Ober spent 2 months at full time just completing his duties."  (Ober's Statement

at ¶ 171.)  Ober cites paragraph 21 of his affidavit as support for that proposition, but

paragraph 21 says nothing of Ober working for two months to complete his duties.  Ober

may be of the personal opinion that the IIMS project still needed him; however, it is an undisputed fact that Lieutenant Colonel Hickes told Colonel Evanko Ober had finished his assignment at IIMS. (Hickes Dep. at 31-34, 139-140; Evanko Dep. at 223.)

172. The record does not contain evidence establishing any causal connection between the defendants' actions and the personal, emotional and financial harm Ober claims to have suffered.

173. There is absolutely no evidence that Colonel Evanko, or any of the other defendants, had any involvement in the decision not to assign Ober as a PEMA liaison. (Koscelnak Dep. at 16-20; DeWire Dep. at 67, 69, 74; Evanko Dep. at 241-242; Westcott Dep. at 145-147; Coury Dep. at 03/12/2002, at 100-101.) Ober's assertion that Major DeWire told him his approval for PEMA was withdrawn because the "front office" got involved is not evidence that Colonel Evanko or any other defendant was consulted about Ober's request for a PEMA assignment. (Ober Aff. at ¶ 25; Evanko Dep. at 241-242.)

Major DeWire's sworn testimony is that Major Leonard Washington called and asked DeWire if he had any objection to Ober serving with PEMA. Major DeWire said that he had no objection. A short while later, Major Washington called DeWire back and told him to forget about the first call and not to ask any questions. (DeWire Dep. at 44; DeWire Aff. at ¶ 4.) There is no evidence that Major Washington, or anyone else, discussed the matter with any of the defendants. Major Washington never mentioned

discussing Ober with Lieutenant Colonel Westcott. (DeWire Dep. at 67.) No one ever told DeWire that any of the defendants had given a directive not to appoint Ober to PEMA. (DeWire Dep. at 74.). Even if DeWire leapt to the conclusion that the "front office" had been involved in the decision, there are no facts in the record to support that conclusion.

174.  The record does not support Ober's personal belief that Colonel Evanko has intentionally prevented him from being promoted since May 12, 1999. Despite Ober's inflated opinion of himself, there is no evidence that he was the "most credentialed, eligible member in the entire Department for position of Director of the Bureau of Professional Responsibility. (Ober Aff. at ¶ 26.) Nor is there any evidence to support Ober's belief that he "was easily the most qualified candidate" for Director of the Legislative Affairs Office. (Ober. Aff. at ¶ 31.) Even if Ober had been appointed Director of Legislative Affairs, he would not have received a promotion. (Ober Dep., 12/07/2001, at 30.) Likewise, there is no evidence that Ober, rather than Major DeWire, should have been promoted to Director of the Bureau of Liquor Control Enforcement. (Ober. Aff. at ¶ 26.)

175.  Defendants agree that on February 17, 2000, Major Koscelnak temporarily assigned Lieutenant Jerry Ryan to serve as Acting Director of the Division of Administration, Bureau of Liquor Control Enforcement, from March 6-10, 2000.

(Plaintiff's Exhibit 231.)  There is no evidence that the defendants had anything to do with this decision.  (Ober Aff. ¶ 28; Ober Dep., 12/05/2001, at 353-354; Koscelnak Supplemental Aff. at ¶¶ 3-5.)  Rather, Ober had just been transferred to the Bureau of Liquor Control Enforcement, and Major Koscelnak believed Ober did not yet have the requisite experience to serve as Acting Director.  (Koscelnak Supplemental Aff. at ¶ 4.)

176.    Ober's personal opinion that he was denied training in order to humiliate him is not supported by the record; merely including that opinion into an affidavit does not transform it into fact.  Ober's Statement and affidavit do not specify what training he is talking about.  However, the record establishes that Ober has complained about not being chosen for two educational opportunities.  (Ober Dep., 12/05/2001, at 350-352, 354-362.)  The first was a national alcohol symposium conference designed for section commanders that was scheduled for June 2000.  (Ober Dep., 12/05/2001 at 354-355, 358.)  By June 2000, however, Ober had been transferred from Central Section Commander to Director of the Administrative Division, and the course was no longer pertinent to Ober's duties.  (Ober Dep., 12/05/2002, at 364-365; Evanko Dep. at 292-293; Westcott Dep. at 166.)

Second, Captain Ober was not chosen to attend the Northwestern University's police staff and command school.  (Ober Dep., 12/05/2001, at 350-352.)  While Lieutenant Colonel Coury was away, Major Einsel (who is not a defendant in this action)

denied Ober's request because his application had been received after the deadline.

(Evanko Dep. at 274-276; Coury Dep. 04/15/2002, at 138.  There is no evidence to

support Ober's belief that his application must have been received in time.  (Einsel

Supplemental Aff. at ¶¶ 3-5.)

177.    There is no evidence to support Ober's personal conclusion that documents

must have been removed from Ober's personnel file.  Even assuming, for the sake of

argument, that documents were removed, there is no evidence that the defendants had

anything to do with their removal or that the documents are relevant or material to this

case.

178.    Ober does not specify what other opportunities he was denied.  However,

Ober has referenced paragraph 31 of his own affidavit.  In that paragraph, Ober gives his

personal opinion that he should have been appointed Director of the Legislative Affairs

Office because he "was easily the most qualified candidate" for Director of the

Legislative Affairs Office.  (Ober. Aff. at ¶ 31.)  There is no evidence supporting Ober's

opinion of himself.  Further, even if had received the appointment, it would not have

involved a promotion.  (Ober Dep., 12/07/2002, at 30; Plaintiff's Exhibit 32.)

179.    Paragraphs 34-37 of Ober's affidavit consist of outrageous hyperbole

coupled with paranoid speculation.  (Ober Aff. at ¶¶ 34-37.)  There is absolutely no

evidence to support Ober's stubborn insistence that the defendants have made

misrepresentations to the Court and manipulated files in an effort to keep him from

pursuing this litigation.  Ober's speculation and personal opinions are irrelevant and

immaterial.

180.   Defendants agree that Lieutenant Colonel Coury was concerned about

Ober's emotional state and discussed the matter with Major DeWire and the State Police

psychologist.  (Coury Dep., 04/15/2002, at 88-96, 98-103, 108-109.)  Coury testified that

he believes the subject of Ober's stress level was originally brought up by either Lou

Lazzaro, the PSTA president or Paul McCommons, the former PSTA president.  (Coury

Dep., 04/15/2002, at 89-91.)  There is no evidence to support Ober's personal belief that

Lieutenant Colonel Coury's testimony was false.

Moreover, there is no evidence to support Ober's contention that DeWire felt he

was being asked to convey a threat or message to Ober.  To the contrary, Major DeWire

testified that he felt Lieutenant Colonel Coury was expressing heartfelt concern for Ober.

(DeWire Dep. at 47.)  When Mr. Bailey asked DeWire if it ever occurred to him Coury

might be sending a message or veiled threat to Ober, DeWire said it had occurred to him

that *may* have been the purpose.  (DeWire Dep. at 37, 70.)  DeWire went on to say it was

very possible Coury just wanted an independent opinion regarding whether there was any

issue of Ober's psychological fitness.  (DeWire Dep. at 70.)  Further, even though

DeWire may have wondered about the purpose of the meeting, there is no evidence that

Lieutenant Colonel Coury was motivated by anything except genuine concern for Ober's

mental and emotional well-being.  (Coury Dep.,04/15/2002, at 110-111.)  Major

DeWire's speculation about Lieutenant Colonel Coury's motives is irrelevant and

immaterial.

Respectfully submitted,

JAMES M. SHEEHAN
General Counsel
Commonwealth of Pennsylvania

By: _____
Syndi L. Guido, Deputy General Counsel
Barbara L. Christie, Chief Counsel
Joanna N. Reynolds, Assistant Counsel
Governor's Office of General Counsel
333 Market Street, 17th Floor
Harrisburg, PA  17101
(717) 783-6563

Dated: June 12, 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,                         :
                          Plaintiff      :        NO. 1: CV-01-0084
                                         :        (Judge Caldwell)
              vs.                        :
                                         :        CIVIL ACTION - LAW
PAUL EVANKO, MARK CAMPBELL,              :
THOMAS COURY, JOSEPH WESTCOTT,           :        JURY TRIAL DEMANDED
HAWTHORNE CONLEY,                        :
                          Defendants     :

**CERTFICATE OF SERVICE**

I hereby certify that on this date a copy of Defendants' Response to Plaintiff's

Concise Statement of Material Facts and Affidavit of Darrell Ober was served on

plaintiff's counsel, by first-class mail, addressed as follows:

Don Bailey, Esquire
4311 North 6th Street
Harrisburg, PA  17110

Barbara L. Christie, Chief Counsel
Pennsylvania State Police
Office of Chief Counsel
3rd Floor, Department Headquarters
1800 Elmerton Avenue
Harrisburg, PA  17110
(717) 783-5568

Dated:  June 12, 2002