

ORIGINAL

# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER            :     1: CV – 00-0084

     **Plaintiff**             :

     **vs.**                :

PAUL EVANKO, MARK       :     **(Judge Caldwell)**
CAMPBELL, THOMAS COURY,    :
JOSEPH WESTCOTT,  AND      :
HAWTHORNE CONLEY        :

FILED
HARRISBURG, PA
JUN 2 7 2002
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## PLAINTIFF'S REPLY BRIEF TO DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT

This is a reply brief to defendant's brief in opposition to plaintiff's motion for summary judgment. This case has been awfully contentious and has seen numerous exaggerations of irrelevant and inmaterial facts. For example, no matter how plaintiff has tried to keep focused, he has been bombarded with what he feels is a diversionary attempt to characterize his case as one where the defendants actually had a viable reason to investigate him, and take the actions they did against him. A review of DeWire's affidavit (Exhibit "A") hereto, and the e-mails from retired Major Leonard Washington (Exhibit "B") hereto, is a good illustration of just one issue that conclusively demonstrates that the defendant Joseph Westcott, his friend Major Francis Koselnak, and the defendants' legal team, may have all committed perjury, or suborned same, and misled this Court, and also may have violated Ober's rights of access to the Courts.

More specifically, in their efforts to falsely claim that Ober's allegations regarding PEMA were not adverse personnel actions, the defendants have simply testified

1

falsely, as in Westcott's case, and then intentionally covered up the truth in possible violation of even the criminal law in the case of Mr. Brown and the defendants' attorneys.

They have certainly violated Federal Rules of Civil Procedure and the civil law and Fed.R.Civ. P. 11 as well as other ethical standards governing lawyers. Please see Exhibit "A" and "B" hereto. Exhibit "A" is an affidavit provided by PSP Major Phillip DeWire and Exhibit "B" is a copy of e-mails to, Captain Ober, from retired PSP Major Leonard Washington.

Now please see paragraph 173 of "Defendants Response to Plaintiff's Concise Statement of Material Facts and Affidavit of Darrell G. Ober", and compare Exhibits "A" and "B" hereto with that paragraph. Especially see paragraph 5 of DeWire's affidavit, Exhibit "A" hereto. These defendants,' their lawyers, and their investigator Rick Brown, continue to knowingly present false information to this Court, and defy process, while complaining with unmatched gall that plaintiff, and his counsel, and counsel's family, aren't acting properly. They do this while violating Fed.R.Civ.P. 26 which required them to disclose what Mr. Brown knew.

Defendants' brief in Opposition to Plaintiff's Motion for Summary Judgment ("hereinafter defendants brief") is a simple rehash of legal arguments they have already made, to which this Court responded, in their earlier Motion to Dismiss. The only remaining task is one of applying the standard of review. In short it boils down to the facts. Plain and simple. Just the facts.

## I.)     Background

### A.)   Procedural History

On or about May 20, 2002 the plaintiff filed a motion for summary judgment. On June 14, 2002 the defendant filed a brief in opposition. This brief is in reply to that brief.

### B.)   Factual History

Plaintiff will not recite again the factual history of this case. Plaintiff incorporates herein his Concise Statement of Material Facts, his affidavits, and all of his exhibits and affidavits in support of his motion for summary judgment. Plaintiff also incorporates his counterstatement of material facts in opposition to defendants' motion for summary judgment. Further, because this is a reply brief, plaintiff incorporates any averments of fact which may appear in any of the parties pleadings.

## II.)    Issues

A.)   Did the defendants meet the burden of Rule 56 in their response to plaintiffs motion for summary judgment?

## III.)   Argument

Rule 56 requires the Court to review the matters for summary judgment in a light most favorable to the "non moving party". With this motion that would of course be the defendants. *Matsushita Electrical Industrial Company v. Zenith Radio Corp.* 475 U.S. 574 (1986).

In this matter there is no dispute as to the standard of review. Rather, the question is one of whether defendants, even if the facts they offer are viewed in their favor, have

raised issues of genuinely disputed material facts sufficient to defeat summary judgment. Plaintiff argues they have not.

The defendants have not responded with facts, so the following references in reply are to their brief.

Pages 1-2, Para's 1 – 7; there is an overwhelming abundance of evidence that supports plaintiff's motion for summary judgment.

Page 1, Para's 8 – 9; Defendants response to plaintiffs motion for summary judgment is devoid of countervailing facts that would justify a dismissal.

Pages 3 and 4, Para's 10 – 11; Ober's engagement in protected speech is well supported in the record. The Criminal Complaints and Affidavits of Probable Cause (P58, P59, P60, P61) that were filed against Trooper Stanton and Mr. Bridges, coupled with the fact that with the exception of Westcott, every individual who was asked whether they would inform potential targets of the existence of a criminal investigation and FBI Agent Kush's statements that Trooper Stanton could not carry out his scheme on his own (Kush Dep. 03/14/02 At 60) demonstrate clearly that Ober's conduct was protected speech.

Page 4, Para 12 – At Soohy's direction, Kush specifically telephoned BPR (Kush Dep. 03/14/02 At 12) because Kush believed, "They're (BPR) charged with a higher responsibility" (Kush Dep. 03/14/02 At 131) meaning police officers in the Bureau of Professional Responsibility.

Page 4, Para 13 – It is a matter of record that Conley was not available on October 5 (Ober Affidavit III). It is also a matter of record that Hickes does occupy a position in Ober's chain of command and that Ober's report to Hickes, out of sensitivity to the

information, went well beyond and abundantly exceeded his duty requirement to report this information to a superior officer.  (See Plaintiff's Counterstatement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; page 9).

There is no evidence to support the defendants' statement, that  "Ober falsely told Hickes the FBI had expressly directed him to maintain absolute confidentiality".  Compounding this false claim, the defendants falsely continue to accuse Ober of violating the provisions of FR 1-1.7.  By providing false information, Ober would have also violated the provisions of FR 1.28 requiring members of the State Police answer questions truthfully.  These accusations are without any support or citation to the record or legal authority.

The defendants have consistently contradicted themselves in this litigation.  Compare the following: "Ober *falsely* told Hickes….(emphasis added)…" to their portrayal of Ober in Defendants' Brief In Support Of Their Motion for Summary Judgment, "…he (Ober) gave Lieutenant Colonel Hickes *misleading* information…(emphasis added)".  Now, compare both of these to  Defendants Statement Of The Material Facts As to Which There is No Genuine Issue to be Tried; "Although he (Evanko) believed Captain Ober and Lieutenant Colonel Hickes had not exercised *good judgment* in dealing with the FBI matter…".   Compare all of these statements to "As far as the administrative inquiry Colonel Evanko requested, Ober was not disciplined or counseled about his actions. ***Colonel Evanko was not even particularly concerned about Ober's actions;*** his primary focus was on how Lieutenant Colonel Hickes had handled the situation (emphasis added)"; (Defendants' Brief In Support Of Their Motion

for Summary Judgment; page 7). (additional discussion of Ober's conduct contradicts any clear understanding of what defendants mean. See Plaintiff's Counterstatement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; page 10).

There are further contradictions with defendants' brief; see page 12; "Although Ober had violated FR 1.17 (b), Evanko felt discipline was unnecessary because Ober had obeyed Hickes' orders to keep the FBI probe a secret…" "Colonel Evanko was not even particularly concerned about Ober's actions; Evanko's primary focus was on how Lieutenant Colonel Hickes had handled the situation". Yet, it was Ober, not Hickes, who was named as the subject of the investigation launched by Evanko. This truth is Evanko feared Hickes politically. He couldn't touch Hickes so he used Ober to send his message to express his inordinate fear of Hickes. Besides, how could Evanko use Hickes' order not to divulge the FBI investigation as justification to discipline Ober for allegedly violating FR 1-17 (b)? One has nothing to do with the other. If Ober had violated Hickes' order of confidentiality, Ober would have been violating a direct order or committing insubordination. Ober would not have been in violation of FR 1-17(b). The defendants' make no sense.

Other contradictions in this brief merit even further discussion. Had Ober made a false report to Hickes; why was he not disciplined? If Ober made a false report to Hickes, then he <u>also</u> made a false written report to Evanko in his May 13, 1999 memo to Evanko; (P22); he <u>also</u> provided a false Supplemental Report to Stanton's criminal investigation (P22) and he <u>also</u> provided false information during his interrogation by Majors Werts and Williams (P22). At a minimum, Ober would have violated the

provisions of FR 1-1.28 (Internal Investigations) and FR 1-2.17 (Reports).  A sustained

adjudication on either of these violations could, and has, resulted in members of the State

Police receiving discipline ranging from suspensions to termination. Yet, for his "false"

report, Ober is not disciplined? The defendants cannot be considered credible.

Wouldn't Ober, a senior commander holding the fourth highest rank in the

Department, making false written and verbal reports, raise serious questions about his

core values, his character, his trustworthiness, his integrity, his ability to function in

sensitive assignments?  A recent  PSP arbitration case  addresses this issue.  The

Department Disciplinary Officer, Captain Robert A. Titler's, testimony regarding this

issue can be found on pages 43 – 44 of  Exhibit "C" attached hereto. And if Ober is guilty

of providing a false report to a Lieutenant Colonel and is guilty of by- passing his chain

of command, why would Evanko trust Ober to serve in the "important", "significant"

assignment like the Special Projects Officer for the National Governor's Association

Convention?  One that, "If anything, the transfer (to Washington) would have enhanced

his (Ober's) chances for promotion" (page 10; Defendants' Brief in Opposition to

Plaintiff's Motion for Summary Judgment).  Yet, as the record clearly states and Evanko

himself admits, Ober was never counseled, he never received a Supervisor's Notation,

nor did he ever receive a negative performance evaluation.  The truth is, Ober never made

a false report and did not violate FR 1.17 or any other PSP regulations and the defendants

know this.

Ober was never informed about any discussions the FBI had with any other

members of the Department (Plaintiffs Counter Statement of Material Facts In

Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; para. 1 - 4).

Page 5, Para. 14 - The defendant's self-serving conclusions are disputed. Ober has testified that he and Kush had discussions about confidentially, the need to treat the information carefully, and positions in the State Police that could be implicated in such activity, if it were true. (See Plaintiffs Counter Statement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II, page 12; Ober Dep. 12/05/01, at 95-96, 146-147; Kush interview by Werts/Williams; 05/25/99; P30; page 2, Kush Dep. 03/1402 at 60, 80-81, 95, 96, 98, 109-110, 129-130; (Soohy Dep. 03/14/02 at 18, 20-21, 27, 30, 31-32, 34; Plaintiffs Counter Statement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; P22 – Ober interview with Werts/Williams, page 2; P22).

From the investigation Evanko ordered, his own investigator reported that Kush did not recall what he said to Ober but supported Ober's decision not to disclose the case to members of the State Police ( See interview with FBI Agent Kush; May 25, 1999; P22; P30).

There is no evidence Ober leapt to any conclusions. The words "Lieutenant Colonel" intercepted on an FBI wiretap were uttered by one of the eventual defendants (Bridges). Ober had nothing to do with this. Bridges use of the term "Lieutenant Colonel" and discussion of the "Governor's Office", an investigation in which at least one State Senator was approached, and other political figures were potential targets, validates Ober's concerns regarding the need to remain sensitive to this investigation.

The defendants, misusing the benefit of hindsight, are now trying to fashion a defense around facts that were unknown at the time.

The statement "Ober had no reason to believe Bridges had any accurate information about Pennsylvania State Police hiring practices" is purely speculative and self-serving. It was equally true that Ober no reason *not to believe* that Bridges had accurate information about Pennsylvania State Police hiring practices. FBI Agent Soohy stated: "No, but what, what I want to say is that if you take what Stanton was saying on the tape, he was alleging that people were moving test scores from one block to another. You know, that would imply that, that somebody in a position to do that was involved. Although we never, we never had the names of anybody that was doing that. We never had them as a subject of the case. There was always the possibility out there that, that was what was occurring if you would take Stanton with what he was saying" (Soohy Dep. 03/14/02 At 27-28).

Further support of plaintiff's position can be found in the testimony of Soohy (See Soohy Dep. 03/14/02 at 6, 7, 12, 28, 56); Hickes (Hickes Dep. 03/25/02 at 50, 58, 97), Ober (See Ober Dep. 12/5/01 At 80-81, 97), Kush (See Kush Dep. 03/14/02 at 48-49, 53-54).

Based in his concerns, Ober sought the advice of a Lieutenant Colonel; a Deputy Commissioner (Ober Dep. 12/05/02 at 80-81, 191). In doing so Ober acted lawfully and in full compliance with all PSP regulations. (See Plaintiffs Counter Statement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II).

The defendant's brief itself demonstrates the propriety of Ober's actions. Clearly, the defendants have put Ober's decision to inform Hickes under the microscope, they

have Monday morning quarterbacked it to death and second-guessed it to an irrational level. Yet, despite the false representations, creation of regulations after the fact, misquoting regulations, mischaracterization of events, testimony, facts, and Department regulations, the defendants have not identified one single shred of evidence that disputes what Ober has said all along; he did what he did because he thought it was the right, proper, ethical and legal thing to do (See P22, Ober interview by Werts/Williams, June 28, 1999; page 18) and he did nothing they could discipline him for.

See Footnote 2; bottom of page 5 of defendants' brief– The defendants have tried to make much out of the fact that Ober apparently used the term "Colonel" instead of the term "Lieutenant Colonel". As many of the defendants, including Westcott, have testified, it is a matter of common practice in the State Police to use the term "Colonel" and "Lieutenant Colonel" interchangeably (See Westcott Dep. 01/07/02, At 15). Indeed this is the practice in every military organization in the Western world.

Page 6, Para 15 – False statement. There is nothing "unclear" about why Ober chose not to inform Conley (See Ober Affidavit in Support of Summary Judgment; para 9.; Plaintiffs Counter Statement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; page 9; Plaintiff's Affidavit In Support of Motion For Summary Judgment; pages 4-5).

Rather than accepting Ober's response or even pretending that one exists, why the defendants persist on misrepresenting Ober's actions to this court remains a mystery. Not a single shred of evidence has been introduced to support the assertion that Ober had any personal reason, any personal motive or would benefit in any personal way by informing

Hickes.  This is a wild, unsupported allegation.  The public interest in these matters  is plain and obvious.

Page 6, Para 16 – The defendants have not offered one credible example when any of the five prongs of *Swineford* would have been implicated by Ober's report to Hickes.  It was Evanko, not Ober, who chose to put this issue in the spotlight when Evanko ordered the witch-hunt investigation into Ober.   Ober kept the matter confidential, just as he had been ordered.

Page 6, Para 17 – Ober has endlessly explained why he chose to seek Colonel Hickes advice and was concerned that he inform the correct individual (See Soohy Dep. 03/14/02 At 6, 7,12, 28; Hickes Dep. 03/25/02 at 50, 58, 97; Ober Dep. 12/5/01 At  80-81, 97; Kush Dep. 03/14/02 at 48-49, 53-54).

Based on his concerns, Ober sought the advice of  Lieutenant Colonel Hickes (Ober Dep. 12/05/02 at 80-81, 191).  In doing so Ober acted lawfully and it full compliance with all PSP regulations (See Ober Dep. 12/05/01 At 80-8; Ober Dep. 12/07/01 At 186 – 187; Plaintiffs Counter Statement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; page 10).

Ober's report to Hickes, a Lieutenant Colonel, the second highest-ranking officer in the entire 4,100 member force, far exceeded both the technical requirements and the intent of FR 1-17 (b).  Inexplicably the defendants chose to ignore this fact and again misrepresent to this court that Ober has violated PSP rules.  And in doing so, they again fail to account for the fact that if this were true, why was Ober not disciplined (see para 13 above).

Regarding the footnote on the bottom of page 6 and 7 of defendants brief,  Ober has testified and provided his reasons for not informing Conley (see para 17 above); the defendants "inexplicably" chose to continue ignoring  them.

Page 6, Para 18 – A collection of misstated facts. "…Ober circumvented his chain of command….gave…Hickes misleading information, falsely portraying top management of the State Police as targets of a criminal investigation ….misrepresented the confidential nature of the issue".   If all this were true, what does a member of the State Police have to do to be disciplined?  According to the defendants, Ober did all of these things and wasn't even counseled. The defendants are  simply not believable.

It is unknown what "…baseless rumors" the defendants are referring to since the existence of any has not been  established anywhere  in this litigation.  And saying that they "*could have*" caused the Commissioner and his Deputies unwarranted embrassment is evidence that they *did not*; which is no surprise being that the theory  itself is politically inspired and  faulty.

Again there is reference to personal reasons but not one shred of evidence exists to support  defendants'  scandalous  claims.  As previously mentioned, the record clearly establishes that Ober was concerned about doing the correct, legal, ethical and proper thing with this information.  Even defendants' counsel agreed with Hickes assessment of the situation (Plaintiff's concise Statement of Material Facts; Hickes Dep. At 107)

Page 9, Para 25 – Defendants conclusory statement regarding a supposed lack of support for Obers allegations is frivilous. See plaintiff's facts in support and Affadavit in support.

Page 9, Para 27 – Defendants have never demonstrated that Ober's transfer to Washington was a "lateral" one.  The evidence that this transfer was punitive, did not conform to PSP rules, was involuntary and retaliatory,  is overwhelming and is most notably demonstrated by Mr. Evanko's withdrawl from opposing Ober's actions in court and then harassing him later. See facts in support..  The best evidence of this is the fact that the defendants, in less than 24 hours, rescinded the transfer when faced with an injunction hearing (See Plaintiff's Affidavit In Support of Motion For Summary Judgment; para 18; Plaintiff's Counter Statement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; pages 28-29).

Page 10, Para. 28 – See para 27 response above.  The defendants continue to misquote the provisions of FR 3-2.05.  This has been a consistent pattern of misconduct by defendants throughout this litigation.  The defendants continue to make references to regulations and then either infer, misquote or outright misrepresent the contents of those regulations.  In being vague as to any specific language in the regulations, and only saying that regulations exist, the defendants are hoping this court will draw erroneous conclusory conclusions and make assumptions as to the applicability of those regulations in this case, and  produce rulings for the defendants.  It is deceptive to state that  the State Police have a regulation which addresses the concept  "General Transfer" but fail to point out that contained within that regulation is "B. Procedures" and that these procedures were not followed in Ober's case by the defendants (See Plaintiff's Counter Statement of Material Facts In Opposition to Defendants' Motion for Summary Judgment and Ober Affidavit II; para 24).

To further confuse and distort the record, the defendants even tried to call Ober's transfer to Washington an "...inter-troop transfer, such as Captain Ober's." (See Defendants Statement of The Material Facts As To Which There Is No Genuine Issue To Be Tried, para. 24).

Compare the defendants statement, "Consequently, Colonel Evanko decided to assign Captain Ober to assist Major Szupinka, the Area III Commander, in preparing for that conference (NGA), just as had assigned Captain Transue to help Major Werts with the Republican National Convention" (see Defendants Statement Of The Material Facts As To Which There Is No Genuine Issue To Be Tried, para 22).

Yet, when you compare the transfers of Ober and Transue, you find the two having nothing in common; particularly as they relate to conformance to PSP regulations; specifically FR 3-2.05. In Transue's case, the existence of a paper trail is proof the process was followed; in Ober's case, the lack of the same paper trail is proof that the process was not followed and, therefore, was improper.

The Area VI Commander specifically made a written request that Captain Transue be assigned to assist with the RNC on December 28, 1998 (P213). The Area III Commander never requested assistance, written or otherwise, for the NGA much less Captain Ober (Westcott Dep. 01/07/02 At 105).

The Area VI Commanders request for Captain Transue was favorably endorsed by the Deputy Commissioner of Operations; Lieutenant Colonel Westcott on January 4, 1999 (P212). No such endorsement from Westcott exists because no request for Ober or anyone else was ever made. Ober's transfer originated with Evanko and his anger.

There is evidence Captain Transue began working on the RNC as early as January 4, 1999; a full 19 months prior to the RNC. (P212).  At best, had Ober not defeated the transfer, with approved leave, Ober could not have begun any work on the NGA until February 3, 2000, a mere five months prior to the event.  Even when the Area Commander had the opportunity to assign Ober to NGA work in mid-January 2000, he chose not to.  Instead, he gave Ober the option of remaining in IIMS or "visiting Stations in Troop G". (P238 ).  There is clearly no sense of urgency or even mention of the NGA in Ober's communication with the Task Force Commander.

Captain Transue was assigned to work at Troop "K"; Philadelphia in the city where the RNC was being held.  Captain Ober was being assigned to work at Troop "B" Washington, over 230 miles from where the NGA was being held.

Being assigned to the RNC revised Captain Transue's daily commute to and from her home in New Hope to Harrisburg (125 miles).  Instead, her daily commute was reduced to 35 miles per day (New Hope to Philadelphia).  Being assigned to the NGA in Washington altered Ober's daily commute of 12 miles from Enola to Harrisburg to over 210 miles (Enola to Washington).

Personnel Orders and CLEAN Messages sent to confirm Captain Transue's assignment to the RNC complied with Department regulations. (P215, P216, Personnel Order 00-03 P127).  Personnel Order 00-01(P127) announcing Captain Ober's transfer never mentions the NGA.  It was not until after Ober filed legal action against the Department that any reference to the NGA was ever made in any written document by the Department. (Personnel Order 00-03; P127,  para. 21 of  Plaintiffs Counter Statement of

Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II.

Page 10, Para. 29 – "…no captain's position was vacant in the Harrisburg/Hershey area…the Commissioner briefly assigned Ober to the Bureau of Liquor Control Enforcement…a position Major Koscelnak urgently needed to fill." (See Plaintiffs Counter Statement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; para. 30).

Page 11, Para. 30 – "Of course, Ober was not happy with this brief assignment as the Central Section Commander, viewing it as a constructive demotion because the position is generally held by a Lieutenant".  Of course Ober was not happy; he was being demoted? (See Plaintiff's Affidavit In Support of Motion For Summary Judgment; para 29).

"Brief assignment" (See Ober Aff. 5/20/02 At Para. 28; Ober Dep. 12/05/01 At 230' P224 and P312, P235; Ober Dep. 12/05/01 At 245-247; Plaintiffs Counter Statement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; para's. 27-28).

"…because the position is *generally* (emphasis added) held by a Lieutenant."  As the record has shown, the position is not *generally* held by a Lieutenant, it is held by a Lieutenant in *every* instance but when Captain Ober was assigned.  Not one officer, encompassing hundreds of years of PSP experience, who was asked to think of a situation that compares to Ober, a Captain, being assigned to a Section Commanders position, a Lieutenant, could come up with even one example.  For good reason, it never happened and if it did, would violate PSP own rules (P287) regarding Span of Control.  Evanko's

irrational anger and vindictive treatment of Captain Ober literally made PSP history

(Ober Aff. 5/20/02 At Para. 28; Ober Dep. 12/05/01 At 230' P224, Plaintiffs Counter

Statement of Material Facts In Opposition to Defendants Motion for Summary Judgment

and Ober Affidavit II; para 27; page 31).

Page 11, Para. 31 – To the contrary, there is an abundance of evidence that the

defendants, specifically Westcott, prevented Ober from being assigned to PEMA. (See

Ober Affidavit III).  Major Koscelnak's lack of credibility as a witness and his false

statements regarding so-called "restrictive funding" of LCE have already been addressed

(See Ober Dep. 12/05/01 At 193-195;). See Exhibits "A" and "B" hereto, and See

attached, Ober Affidavit with exhibits.

Koscelnak has a history of testimony that is "diaphanous" and that "...does not

have the ring of truth" (P319). (See Plaintiffs Counter Statement of Material Facts In

Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; para 31;

page 33-34; Ober Affidavit III).

As has already been pointed out, if the need to fill the Lieutenant's position

vacated by Lieutenant Williams was so "urgent" why wouldn't  Evanko have filled it in

January after Williams was arrested?  Williams was arrested on January 11, 2000 (P225)

yet a CLEAN Message announcing the ceremony was distributed the very same day and

did not announce that anyone was being promoted to fill this "urgent" vacancy (P264)

when there was obviously ample opportunity to do so.  It wasn't until *after* Ober filed the

injunction on January 27, 2000 defeating Evanko's disciplinary transfer to Washington

that demoting Ober to LCE became a matter of urgency.

Page 11, Para. 32 – Ober has complained about all of these actions that have been taken against him and he has a right to exercise his rights to object to this treatment.

Page 12, Para. 33- The evidence clearly indicates that Ober's request for training was submitted in time. The defendant's affidavits do prove otherwise and only speculate as to what happened.

Ober has been harmed by the irrational and purposeless investigations conducted into his personal affairs. "In fact, Ober was completely vindicated by the investigation into retired Colonel Conti's complaint that Ober was misusing his position as a state police officer to improperly solicit historical artifacts from retired members or their widows." This is an outrageous, false and scandalous statement. There is no record whatsoever that Colonel Conti made any complaint of this nature. The only document that exists to support the defendant's wild assertion is one that clearly states the opposite; that Colonel Conti did not want any investigation (See P47) because he had no evidence of wrongdoing. Despite the fact that Colonel Conti does not make any complaint whatsoever, mention Ober's name or request an investigation; just five days later Colonel Coury orders Ober investigated (P36).

The complaint form completed by Captain Rick Brown fails to allege any violation of State Police regulation (See Use of Force or Complaint Reception and Processing Worksheet ;P36).

Potential witnesses were not interviewed, none of the individuals, including Ober were ever notified Ober was exonerated, and the letter from Mrs. Hayman fails to articulate any violation (P46). Yet, in their zeal to punish Ober, an investigation was launched. Long before Ober was even interviewed; he was punished by Evanko by

removing him from the Book Committee (See Ober Dep. 12/07/01 At 179; P47). Incredibly, this investigation is still active. (See Plaintiffs Counter Statement of Material Facts In Opposition to Defendants Motion for Summary Judgment and Ober Affidavit II; para 32; pages 32-33; Plaintiff Affidavit in Support of Plaintiff's Motion to Dismiss; page 5; para 10).

Page 12, Para. 34 – Defendants have not provided any evidence whatsoever as to the relevance of any other administrative inquires that may have been ordered by past Commissioners and how they specifically related to what was done to Captain Ober. No testimony or evidence has been introduced (other than to say they have been conducted) into this record that even remotely suggests past Commissioners had ordered any investigations that in any way has anything to do with the circumstances, propriety, similarities etc. as the investigation that was conducted on Ober. Again, only a vague reference that something might exist falls far short of validation. Moreover, whether or not past Commissioners may or may not have ordered administrative inquires in irrelevant. See paragraph 13 for the reminder of comments re: this paragraph.

Page 12, Para. 35 – Ober was assigned full time to IIMS; the Book Committee was not a factor in Ober's ability to complete the IIMS assignment (See Plaintiff Affidavit in Support of Plaintiff's Motion to Dismiss; page 7; para 11; Plaintiffs Counter Statement of Material Facts In Opposition to Defendants' Motion for Summary Judgment and Ober Affidavit II; para 36; pages 35-36).

Page 13, Para. 36 – Proof of Ober's assertion that the Defendants actions have ruined his career is in the fact that Ober continues to be by-passed for positions that he is uniquely qualified for and there is ample evidence to support Ober's claim; namely his

uniquely qualified for and there is ample evidence to support Ober's claim; namely his resume. Defendant's admission that Evanko is solely responsible for selecting promotees places the liability for damaging Ober's career clearly at his feet.

Page 13, Para 37 – Conclusion; doesn't call for a response other that the statement is ridiculous.

Pages 13-14 Para's 38 – 42; Ober was subjected to custodial interview and compelled to participate and was not free to leave without risking the possibility that he would suffer employment sanctions up to and possibly including termination. Defendants do not dispute these facts.

The defendants have also raised questions about certain of plaintiff's affidavits. See exhibits "D", "E", and "F" which are copies of previously filed Ober affidavits' which are incorporated herein (all have been executed). The first was appended to Ober's Motion for Summary Judgment (Exhibit "D" hereto), the second was appended to Ober's Counterstatement of Material Facts in Opposition to Defendants Motion for Summary Judgment (Exhibit "E" hereto), the third was appended to Ober's Brief in Opposition to Defendants Motion for Sanctions and Request for Alternative Relief (Exhibit "F" hereto) and Ober Affidavit IV (Exhibit "G" hereto) is also appended hereto and offered in support hereof, as are the other exhibits. Ober Affidavit IV has 5 exhibits of its own (A,B,C, D & E.)

Lastly, plaintiff appends hereto Exhibit "H". Exhibit "H" is offered to show that the importance of the IIMS Project was of the highest priority to the Department. If it were, and Evanko were not motivated by malice, then why would he have tried to send Captain Ober out West and then to LCE and a Lieutenants position?

**STATE OF PENNSYLVANIA**         :

**COUNTY OF DAUPHIN**              :

## AFFIDAVIT

I, Major Phillip L. DeWire, swear and affirm the following:

1. I am currently the Director of the Bureau of Liquor Control Enforcement.

2. In July 2000, Captain Ober requested my permission to rejoin PEMA as one of the Liaison Officers. I had no objection. I spoke with the Director, Emergency and Special Operations, Major Leonard Washington who also had no objection.

3. Later that same day, Major Washington telephoned me and told me to forget our prior conversation about Captain Ober and "to just let it go".

4. Major Frank Koscelnak was not in my office when I took the call from Major Washington but came in later. When the subject came up, he and said to me; "Don't give that guy anything" or words to that affect (meaning Ober).

5. Captain Rick Brown, Director of the Internal Affairs Division, interviewed me approximately two months before my deposition in this case. I related all of the above to Captain Brown, including what Major Koscelnak had said to me.

*I declare the above to be true and correct to the best of my knowledge information and belief. I make this declaration subject to the provisions against perjury and intend to being legally bound thereby.*

Major Phillip L. DeWire                          Date

_Phillip L DeWire_                    06/26/02

1            *Exhibit "A"*

| Subj: | **affidavit reply** |
| Date: | 6/15/2002 12:02:08 PM Eastern Daylight Time |
| From: | Lennywash@cs.com |
| To: | PSPNUT |

Received your email and will look at mailing the affidavit on Monday.

There are changes to #5 and #6 as follow:

5. Sometime in July 2000, Captain Jeffery R. Davis of Pennsylvania Emergency Management Agency (PEMA), informed me that Captain Ober expressed an interest to return to PEMA. I had no objection. Captain Davis suggested that I check with the front office. I personally telephoned Colonel Westcott and informed him that Captain Ober expressed that he wanted to return to PEMA. Colonel Westcott gave a reply of no and there was no further discussion.

6. After receiving Colonel Westcott's answer, I telephoned Captain Ober's supervisor, Major Phillip DeWire and informed him to disregard our prior conversation regarding Captain Ober and PEMA.


Any questions, please call or email.

*Exhibit "B"*
*1 of 2*

| Subj: | **Affidavit Response** |
| Date: | 6/17/2002 11:44:49 AM Eastern Daylight Time |
| From: | Lennywasn@cs.com |
| To: | PSPNUT |

Darrell:

After careful consideration, I have decided not to sign the affidavit and would be more than happy to appear, if subpoena.

Leonard Washington

Exhibit "B"
2 of 2

# ARBITRATION PROCEEDING

COMMONWEALTH OF PENNSYLVANIA
PENNSYLVANIA STATE POLICE

    And

PENNSYLVANIA STATE TROOPERS
ASSOCIATION
(WILLIAM KEPHART)

CASE NO. 01-DS-135/H-200

CASE NO. 01-DS-146/H-201

CASE NO. 01-DS-195/H-204

CASE NO. 01-DS-356/H-209


HEARINGS:  October 15, 2001
           October 16, 2001
           October 17, 2001
           December 18, 2001
           December 19, 2001


BRIEFS:  April 18, 2002


AWARD:  May 30, 2002


JOHN J. MORGAN, ESQ.
Suite 300, 1034 Fifth Avenue
Pittsburgh, PA  15219
412-261-0268

EXHIBIT "C"

**APPEARANCES**

For the Commonwealth

| | |
|---|---|
| Christopher D. Carasone | Assistant Counsel |
| Robert B. Titler | Department Disciplinary Officer |
| | |
| Reyna Scott | Witness |
| Robert D. Kodak | Witness |
| Lynn E. Hess | Witness |
| Stephen L. Kiessling | Witness |
| William W. Arndt | Investigator |
| Judy L. Miller | Witness |
| Lois E. Kimmel | Witness |
| Roy C. Bridges | Witness |
| Michael J. Marcantino | Troop H Commander |
| Beverly Whitcomb | Witness |
| Angela Manigault | Witness |
| Francis Barrett | Witness |
| Timothy Shannon | Witness |
| Peggy Breasseale | Witness |
| Daniel Reynolds | Witness |
| Michael Breasseale | Witness |
| Dayne Dufford | Witness |
| Sean Rooney | Witness |
| John Thierwechter | Witness |

For the PSTA

| | |
|---|---|
| Sean T. Welby | Attorney |
| William P. Kephart | Grievant |
| John Gilbert | Witness |
| Michael Fortley | Witness |
| Kevin Ponicsan | Witness |
| Shawn Dilliard | Witness |
| Russel Stine | Witness |
| Carl Harrison | Witness |

## GRIEVANCE

These four consolidated grievances arise from disputes concerning a series of incidents which resulted in a series of suspensions and ultimately in discharge for alleged violations of various Field Regulations.  The Grievance Form for H-200 states:

> "On 5/20/00 I received a D.A.R. charging a violation of FR 1-2.02 Performance of Duty
>                   FR 1-2.17 Reports
>                   FR 1-1.02 Unbecoming Conduct
>
> On 9/28/00 I was notified that a five day suspension was being imposed as a result of the D.A.R.
>
> I deny violations of FR 1-2.02, 1-2.17, 1-1.02."

The Grievance Form for H-201 states:

> "On 10/25/00 I received a D.A.R. charging violation of FR 1-2.02
>                   FR 1-1.02
>                   FR 1-1.28
>
> On 10/25/00 I was notified that a ten day suspension was being imposed as a result of that D.A.R.
>
> I deny any violations of FR 1-2.02, 1-1.02, 1-1.28."

The Grievance Form for H-204 states:

> "On 11/10/00, I recieved (sic) DAR charging violation of FR 1-2.12
>                   FR 1-2.02
>                   FR 1-2.17
>                   FR 1-2.28
>                   FR 1-2.05

On 11/30/00, I was notified that a fifteen day suspension was being imposed as a result of this DAR.

I deny any violation of the above listed Field Regulations."

The Grievance Form for H-209 states:

"FR 1-2.02    FR 1-2.17    FR 1-1.28    FR 1-2.05

On 5/1/01, I received a notification of dismissal for the above listed violations of field regulations. Said dismissal being directly related to IAD 2000-0526 for which a suspension was issued, followed by a notice of court martial.

Above IAD investigation and related discipline are currently awaiting arbitration.

I deny any violation of above listed field regulations."

## POSITIONS OF THE PARTIES

The Commonwealth contends that the grievant's misconduct in four different situations was just cause for discipline culminating in termination after progressive potentially corrective disciplinary suspensions were imposed. The Association asserts that the grievant was not guilty of many of the offenses alleged, that the penalties were excessive, and that just cause was lacking.

## RELEVANT CONTRACT PROVISIONS

ARTICLE 2        PRIOR ARBITRATION AWARDS AND AGREEMENTS

ARTICLE 26       DISCIPLINE

ARTICLE 28       GRIEVANCE PROCEDURE

2

## HISTORY

The grievant joined the Pennsylvania State Police (PSP) in October 1991. Since 1997 he had been assigned to Troop H at Harrisburg as a Trooper on patrol duty. The events leading to the disciplinary actions and grievances at issue occurred during the period of March 15, 1999 to June 21, 2000.

The first disciplinary action at issue is a five-day suspension resulting from the grievant's activities concerning an incident reported to him on January 31, 2000. His actions and/or inactions resulted in alleged violations of Field Regulations regarding performance of duty, reports, and unbecoming conduct.

The second disciplinary action at issue is a ten-day suspension resulting from the grievant's activities in connection with a report of an April 16, 2000 assault. His actions and/or inactions resulted in alleged violations of Field Regulations regarding performance of duty, internal investigations, and unbecoming conduct.

The third disciplinary action at issue is a fifteen-day suspension resulting from the grievant's activities during his investigation of a motor vehicle accident on June 21, 2000. His actions and/or inactions resulted in alleged violations of Field Regulations regarding courtesy, performance of duty, reports, use of tobacco, and competency.

The fourth disciplinary action at issue is the termination resulting from the grievant's activities involved in his

investigation of a March 15, 1999 motor vehicle accident. His actions and/or inactions resulted in alleged violations of Field Regulations regarding performance of duty, reports, internal investigations, and competency.

The grievances were filed on a timely basis and proceeded unresolved to arbitration via the contractually authorized procedures. At the hearings the witnesses were sworn, and both parties were afforded full and fair opportunity to present evidence and testimony, to examine and cross-examine witnesses, to introduce exhibits and authority, and to provide oral and written argument in support of their respective positions. At the conclusion of the hearings the parties agreed to submit post-hearings briefs, both of which have been studied and considered by the arbitrator prior to the preparation of this written Opinion and Award.

## DISCUSSION

At the outset of this analysis it should be noted that counsel for the Association in his post-hearing brief argues and relies in part on the so-called "Daugherty Tests" of just cause. These are a checklist of seven criteria first published in 1964 by the late Carroll R. Daugherty as an appendage to his opinion and award in the case of Grief Bros. Copperage Corp., 42 LA 555 (Daugherty 1964).

The Association's post-hearing brief stated that the Pennsylvania Commonwealth Court "adopted the seven tests" in AFSCME Council 88 v. City of Reading, 568 A.2d 1352 (Pa. Cmwlth. 1990).   In that case the Court in fact only made peripheral reference to the seven tests, and enumerated and identified them. The Court instead focused on the essence test and the Court's limited power of review of a labor arbitration award.   All subsequent case citations to the 1990 case reiterated the essence test and/or the limited power of review, but did not reference the Daugherty Tests.

These tests generally have been discredited.   John E. Dunsford, a past President of the National Academy of Arbitrators, presented an address at the NAA 1989 annual meeting in which he stated in pertinent part:

> "My thesis with regard to these tests may be stated briefly.  If taken as an introduction to an academic discussion of just cause in the classroom, or a schematic for organizing a textbook or commentary, the seven tests may have some utility.  But employed as agenda for resolving disputes in arbitration, the tests are in my judgment misleading in substance and distracting in application.  Worse yet, they assume controversial positions with regard to the role of the arbitrator without frankly addressing the value judgments they embody."

The undersigned has declined to utilize the Daugherty Tests in other cases and does so in this case.

The following are the Field Regulations cited in the Disciplinary Action Reports (DARs) in the grievances at issue.

FR 1-1, 1.02 states:

"UNBECOMING CONDUCT

Unbecoming conduct is that type of conduct which could reasonably be expected to destroy public respect for Pennsylvania State Police officers and/or confidence in the Department.  Members shall not conduct themselves in a manner which is unbecoming to a police officer."

FR 1-1, 1.28 states:

"INTERNAL INVESTIGATIONS

Whenever there is a public criticism of the Department or when complaints are received in connection with any police action; investigation or inquiry indicating misconduct of personnel; harassment or intimidation of subject, individuals, or groups; or dereliction of any nature by the Department or members of the Department; all members engaged in such police action; investigation; hearing or other inquiry; shall prepare written statements, at once, setting forth the facts in order that a record will be available for future reference.  Due to the internal administrative nature of such police action, investigation, hearing or other inquiry, all members are required to truthfully and completely answer all questions relating thereto.  Procedures in cases that will result in criminal prosecution will include ensuring members are accorded those rights granted to all citizens of the Commonwealth."

FR 1-2, 2.02 states:

"PERFORMANCE OF DUTY

Members shall conscientiously strive to enforce the laws of the Commonwealth and render service to all citizens within the Commonwealth.  Members shall also be held responsible for the proper performance of all duties assigned to them; the appropriate use of delegated authority; and strict adherence to the rules, regulations, and directives promulgated by the Department.  Ignorance of the rules, regulations, and directives shall not be considered an excuse or justification of any violation of such by a member.  Members shall be responsible for their acts and shall not attempt to shift the burden of responsibility for

6

executing or failing to execute a lawful order or police duty. Supervisors shall ensure that members are given commensurate authority necessary for the effective performance of duty."

FR 1-2, 2.05 states:

"COMPETENCY

A.   Competency to be Maintained:   Members shall maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions. They shall direct and coordinate their efforts in such a manner as will tend to establish and maintain the highest standards of efficiency in carrying out the functions and objectives of the Department. The fact that a member was deemed competent at the time of employment shall not preclude a later judgment of incompetency arising from their performance which would indicate a deficiency in adequate strength, qualifications, or capacity to fulfill the requirements of their assigned tasks. Such incompetency may be demonstrated by lack of knowledge or application of laws required to be enforced, apparent unwillingness or inability to perform assigned tasks, or the failure to conform to work standards established for the member's rank or position.

B.   Record of Incompetency:   In addition to other methods of proof, a written record of repeated disciplinary actions for infractions of the rules, regulations, or directives shall be considered prima facie evidence of incompetency."

FR 1-2, 2.12 states:

"COURTESY

A.   Military Courtesy:  Members shall be familiar with and practice proper military courtesy in accordance with the provisions of FR 1-3.

B.   Conduct and Demeanor:   Courtesy toward the public shall be strictly observed. The conduct and deportment of members shall always be civil, orderly, and courteous. Members shall be diplomatic and tactful in the performance of their

duties, controlling their temper, and exercising the utmost patience and discretion. Members shall not engage in argumentative discussions even in the face of extreme provocation. However, when required, they must act with firmness and sufficient energy to properly perform their duties. Members shall at all times, while on duty or in uniform, refrain from using coarse, violent, profane, or insolent language, and from voicing any bias or prejudice concerning race, religion, national origin, sex, age, handicap, or politics."

FR 1-2, 2.17 states:

"REPORTS

Members shall submit all necessary reports on time and in accordance with existing regulations. Reports shall be truthful and no member shall knowingly enter or cause to be entered any inaccurate, false, or improper information or date, or misrepresent the facts in any record or report."

FR 1-2, 2.28 states:

"USE OF TOBACCO

A.  <u>Out of Uniform</u>:  Members on duty, but not in uniform, are permitted to smoke or chew tobacco, except at those times when it would interfere with the proper and courteous discharge of their duties.

B.  <u>In Uniform</u>:  Members in uniform may smoke or chew tobacco as long as they:

1.  Are not in contact with the public.

2.  Are not in a formation or at an official function.

3.  Do not have to leave their assignment or post for the sole purpose of smoking or chewing. Members may receive permission to leave their assigned post or duty to smoke when conditions are deemed appropriate by their supervisor."

8

H-200 is the first grievance at issue and involves allegations of violations of Field Regulations regarding performance of duty, reports, and unbecoming conduct. The PSTA brief concedes that "In many respects Trooper Kephart did violate these regulations." The DAR assessing a five-day suspension was issued July 20, 2000.

The underlying case concerned a January 31, 2000 complaint of harassment of an 11-year-old child by another neighborhood child. The victim's mother made the complaint about a series of threats and assaults by the other child. The Department Disciplinary Officer (DDO) testified at length concerning the grievant's misconduct in this case which included his failure to conduct a timely and complete investigation into an allegation of harassment; failure to follow through on his promise to the victim's mother that he would file charges of harassment and that she would be notified of a court date; falsifying his Assignment Report indicating that he advised the victim's mother that she should refer her complaint to neighborhood mediation; filing a non-traffic citation for harassment after several complaints from the victim's mother which citation falsely indicated that he had contacted the suspect's parents when he had not; circumventing supervisory review of his actions by not submitting his citation for approval as required; intentionally failing to notify the victim and his family of the hearing date because he wanted the case to be dismissed; and lying during the internal investigation

9

by claiming both that the victim's mother never reported a specific assault to him and that he never told the victim's mother that he would be filing charges, only to be confronted with his own email to his superior officer to the contrary. (10/15 T. pp. 200-214).

The grievant under direct and cross-examination on the issues testified as follows in pertinent part:

"Q.    It seems that you essentially conceded a large part of what (the) disciplinary action charged. Why did you file the grievance report?

A.    There's no doubt in my mind that I'm ashamed of what I did.   It's not something I normally do. It's not my normal work.   I could go into it.   I notice there's things in my personal life that I was dealing with at the time.   But this is totally bad police work.   I felt that I did do something wrong.   I recognized it and I wasn't happy about.

Q.    But do you know also that PSP does not give an individual member the discretion to not do an investigation?

A.    That's right.   You get paid to do police work, so you should investigate people.

Q.    Right.   You are required by regulations to do certain things when you do an investigation; correct?

A.    Yes.

Q.    And you didn't do those things; right?

A.    In this case, correct.

Q.    You didn't interview Neil Scott, the suspect here; correct?

A.    That's correct, I did not.

10

Q.   Okay. You didn't interview the witness that was identified, Paul Berkotsen; correct?

A.   No.

Q.   Mrs. Kimmel offered you documentation of incidences and you refused to collect them; correct?

A.   Yes.

Q.   Okay. You completed a non-traffic citation indicating that you had notified the Scott family and you hadn't actually done that; correct?

A.   Correct.

Q.   You told Mrs. Kimmel that you were going to be filing charges and that she'd be notified of a court date?

A.   No.

Q.   You didn't say that? See, I guess the part that I'm really confused about is the e-mail that you wrote, Exhibit C-2. You say, I did advise Kimmel that I would be filing a harassment charge.

A.   And that was an untrue statement.

         . . .

Q.   At the summary trial you intentionally tanked this prosecution; correct?

A.   I have never used that term, but I threw the hearing. Yes, I did.

   . . .

Q.   I'll show you what has been marked as Exhibit C-13. And ask you about this as regards the investigation.

A.   I concurred with the fact that I was less than sympathetic with the complaint made by Mrs. Kimmel.

11

Q.   Thank    you.    And    your    conduct    was    also
     unprofessional; is that correct?

A.   As far as that citation goes and not calling the
     witnesses, that was unprofessional.  It was very
     bad work.

. . .

Q.   Thank you, Trooper.  Exhibit C-11, can you read
     your e-mail?

A.   Attempted to contact Kimmel again today but with
     negative results.   I have already filed a
     non-traffic citation in this case.   I sent her
     correspondence today regarding this.

Q.   Did you send her correspondence?

A.   That's another case where I didn't get around to
     doing that.

Q.   So you didn't send her correspondence?

A.   Right.

. . .

Q.   Trooper, you believe that discipline is warranted
     in this case?

A.   I can't deny that.  I admitted from the beginning
     it was bad police work.   It shouldn't have been
     handled    that    way.    It's    unprofessional."
     (10/15 T. pp. 272-281).

It is abundantly clear that the grievant did violate the cited Field Regulations.   The Association, however, asserts mitigating circumstances and an overly harsh penalty.   The asserted extenuating circumstances are that the grievant was pressured by "supervisory scrutiny" and was "conflicted".   The Troop H Commander testified that because of the grievant's performance problems since at least February 1998 there were

12

"ongoing supervisory issues".    (10/15 T. p. 116).    Supervisory scrutiny was not inappropriate in the grievant's circumstances, and should have provided the grievant with the opportunity for positive response by improved performance.    Instead, by his own admissions, the grievant conducted "unprofessional and very bad police work".    The asserted extenuating/mitigating circumstances provide no basis for relief or reduction in the discipline imposed.

The grievant's relevant and recent prior record include three disciplinary actions.    He had received a written reprimand for failure to appear at a hearing, which failure caused the case to be dismissed.    He had received a one-day suspension for failure to obtain warrants for suspects and for providing false information in a department investigation.    He had received a two-day suspension for a combination of offenses including failure to comply with the verbal and written directives of supervisors, failure to follow orders as to where to park his vehicle, tardiness, and fabricating information pertaining to arrests and other activities he reported on his daily activity reports.    The five-day suspension in the instant case cannot be regarded as overly severe in consideration of the nature of the offenses involved in combination with the prior record.    Instead, the five-day suspension can be regarded as for just case and as an appropriate step in progressive discipline as a potentially corrective measure.

H-201 is the second grievance at issue and involves allegations of violations of the Field Regulations regarding performance of duty, internal investigations, and unbecoming conduct. The DAR assessing a ten-day suspension was issued October 25, 2000. The underlying case concerned an incident which occurred April 16, 2000, when a registered nurse was assaulted by an inmate patient at the Harrisburg State Hospital.

On April 18, 2000, the victim reported to the PSP Troop H Harrisburg Station to report the incident. A Police Communications Operator (PCO) was the lobby receptionist who arranged for a Trooper to be called in from patrol to take the information from the complainant. The grievant was the Trooper called in to conduct the interview.

The grievant met with the victim who supplied him with the identities of her assailant and witnesses as well as the details of the assault. The grievant took notes during the interview and advised the complainant that he would file harassment charges but that it was unlikely that anything would result. The grievant partially filled out a Non-Traffic Citation form with basic information but without a narrative. He did not prepare an Incident Report and did not obtain an incident number.

On May 2, 2000, two weeks after the victim was interviewed by the grievant, she called the Station to inquire about the status of her complaint. The PCO who handled her call was the same one who was the receptionist when the complainant came to

14

the Station.  The PCO checked the computer and found no relevant record.  The PCO advised the victim that a supervisor would be in touch, and the PCO reported the situation to her supervisor, Corporal Murphy.

Corporal Murphy contacted the victim and obtained the basic information.  He then reassigned the case to Trooper Barrett who within a few days obtained an incident number and conducted a full investigation including interviews with the victim, the assailant, the witnesses, and the hospital social worker. Trooper Barrett prepared a detailed Incident Report and reviewed the case with the District Attorney's representative who authorized filing charges of aggravated assault, simple assault, and harassment.  The assailant was subsequently convicted of aggravated assault and was sentenced to Muncy for 15 to 36 months.

In the interim, an investigation into the circumstances was assigned to Corporal Shannon who was the Criminal Investigations Supervisor at the Elizabethville Station.  Corporal Shannon conducted the BPR internal investigation which included three interviews with the grievant.  Corporal Shannon informed the grievant of his findings.  He found that there was no question that two weeks after receiving the victim's complaint no Incident Report was done, no witness or suspect interviews had been done, no victim/witness assistance guide had been provided to the victim, no charges were filed, and the communications tape for

15

the time did not contain the call the grievant claimed to have made to obtain an incident number. The grievant told Corporal Shannon of his "displeasure" with the investigation and called it a "witch hunt" (10/16 T. p. 161), but he did not deny the findings. Corporal Shannon's report of his investigation resulted in the DAR and suspension at issue in this grievance.

The complainant described the grievant's attitude during his interview with her as "disinterested (uninterested)" and "aloof". (10/16 T. pp. 40, 62). The PCO who observed the interview testified that the grievant "didn't seem interested at all", that "he was upset he had to handle it", and that he "was huffing". (10/16 T. pp. 88-90). The complainant told the grievant of the assault and told him that she wanted the assailant "prosecuted". (10/16 T. pp. 39-40). The grievant responded that he would file harassment charges but that probably nothing would happen. (10/16 T. pp. 42, 332).

The complainant and the grievant provided different versions of some of the events. The complainant testified that her nose was extremely swollen and her face bruised and contused, (10/16 T. pp. 33-34, 51), and that she told the grievant of the nature of her injuries. (10/16 T. p. 39). The PCO testified that the complainant was bruised. (10/16 T. p. 75). The grievant testified that there was no observable bodily injury and that she related none whatsoever. (10/16 T. pp. 330, 332). The PCO and the complainant both testified that she told the grievant

16

that she was a nurse (10/15 T. pp. 40, 70), but the grievant denied that in his testimony. (10/16 T. pp. 361, 363). The complainant testified that the grievant told her that she should probably hear something in approximately two weeks. (10/16 T. pp. 41, 63). The PCO testified that the grievant said that it would take a couple weeks. (10/16 T. pp. 77-78). The complainant made her follow up phone call two weeks after her interview with the grievant. The grievant testified that he told her it would be approximately a month, thirty days before she would receive any notice. (10/16 T. p. 339).

The grievant testified that in the lobby after the interview he used the lobby phone to request an incident number from the PCO on duty in the communications room upstairs. (10/16 T. p. 342). He gave the same information to Corporal Shannon, and identified two PCOs, one of whom he believed to have made the request to. (10/16 T. p. 147). Neither of those individuals were the PCO on duty at the time. The communications tape record for that time does not include the alleged call. The grievant received no incident number.

The grievant did not provide the complainant with a victim/witness assistance guide as is required. His explanation for this was that he had none with him. The guides, however, were immediately available in the patrol room. The complainant testified that the grievant gave her no documents or papers. The grievant claimed to have given the complainant a piece of

17

notebook paper with his name, phone number, and incident number on it, but recanted the claim when confronted by Corporal Shannon with the fact that he had obtained no incident number.

The grievant's responses to Corporal Shannon's inquiry and his testimony at arbitration are rife with inconsistencies and contradictions.  The grievant's version of the events conflicts markedly with the testimony of the complainant and the PCO.  The grievant simply is not credible.

The grievant admits only to failure to file a report on time.  The Association argues that this offense does not constitute just cause for a ten-day suspension, and argues that the DDO even conceded that five days would be appropriate. (10/16 T. p. 263).  The flaw in this argument is that the failure to file a report on time was not the only offense established by the preponderance of the credible evidence.

The grievant's attitude on the events at issue is exemplified by his remark that to interview the suspect would have been "a pain in the butt" (10/16 T. p. 337), so he decided not to conduct any interviews or investigation.  That was contrary to FR 7-1 and OM 7-2.  The grievant's lack of veracity in the internal investigation and at arbitration is particularly disturbing.

The grievant's acts of omission and commission as detailed above established violations of the FRs addressing unbecoming

18

conduct, internal investigations, and performance of duty.  The prior five-day suspension notice stated in pertinent part:

> "Trooper Kephart is hereby advised that any future violations of Department rules and regulations of a similar nature will result in more severe discipline."

The violations at issue in the instant case were "of a similar nature" to the prior case.  The ten-day suspension in the instant case was for just cause and was an appropriate step in progressive and potentially corrective discipline.

H-204 is the third grievance at issue and involves allegations of violations of Field Regulations regarding performance of duty, competency, courtesy, reports, and use of tobacco.  The DAR assessing a fifteen-day suspension was issued November 30, 2000.  The case again presents a credibility issue.  The underlying case concerned incidents which occurred June 21, 2000, when the grievant was dispatched to investigate a one-car motor vehicle accident.

At that time a bad storm had blown through and it was still raining.  At the scene the grievant had conversations and interaction with the driver and his mother, portions of which were overheard by the driver's father and step-father as well as a fire police officer at the scene.

The following day, June 22, 2000, the driver's mother wrote the PSP Commissioner, Colonel Evanko, a complaint which states in pertinent part:

"Patrol Officer Kephart (badge #6340) arrives.  I
was cleaning out Morgan's personal items from his
vehicle and spoke to the officer.  He ignored me.  He
later came up to me and asked me where the driver was.
I told him he was being checked out by the EMT's
(sic).  He entered the ambulance and told them he
needed to speak to Morgan.  From the first his attitude
was very curt.  The EMT's (sic) told the officer they
were almost finished.  He stepped outside of the
ambulance for a couple of minutes then reentered by the
side door once again stating that he needed to talk to
Morgan.  His impatience and his attitude were evident.
The officer then asked Morgan if he had been drinking.
Morgan was surprised at his tone of voice and
aggressive attitude but he replied 'no'.  The officer
then asked Morgan to explain what happened.  Morgan
did, the officer said to him that he did not believe
him.  He stated that he had been driving this highway
all evening at 55 miles an hour and had no problems.
So he indicated to my son that he not only could speed
on the road whenever he wished to but that my son was
not in any way telling the truth.  The fact that his
vehicle is two thousand pounds heavier and that he had
has many more years driving experience were not
mentioned.  The EMT's (sic) rapidly finished the
evaluation and Morgan came out of the ambulance.  The
officer then said a couple of things to Morgan about
the accident then he went to his car.  The officer then
informed us we could wait in our vehicle or stand by
the wrecked vehicle until he was done.  After quite
some time he gets out, hands Morgan his registration
and other paper work describing it as he went along.  I
had a question that I wanted to ask, as I said excuse
me, he held up his finger at me.  I am guessing he
thought I was an errant child that he needed to keep
quiet.  So I waited until he finished his speech, which
was delivered once again in a disturbingly curt manner
and asked the question of why he felt the way he did
about Morgan lying.  He once again reiterated that he
had been driving this road all night at 55 and had had
no problems.  I asked if he thought with the storm as
bad as it was had contributed to the accident.  He said
no . . . . you don't see any other accidents on this
road do you.  This was his response.  He then informed
me he was done speaking becoming very loud, waving his
finger in the air in front of my face, and taking up an
aggressive stance.  I then told him that I did not
think it was rite (sic) for him to treat Morgan the way
he had.  He once again informed me this conversation is

20

over and that he had had a bad day and had a very short
temper.    I said 'yes sir' in a sarcastic manner.
Forgive me if I am wrong but was this not a public
servant speaking to me in this manner.  I had only been
trying to clarify why he was treating my son in the
manner that he was.  I guess I should have just noticed
that he was in a bad mood and let him walk all over my
child.  I was greatly offended by his rudeness and his
attitude.  It was totally unnecessary, and I told him
this.  At that point he was even more aggressive and
displayed an attitude that make our young people fear
and hate the police.  Having a background in law
enforcement I understand that it is often a difficult
and unrewarding job.  But informing a victim of an
accident and his parents that you are having a bad day
and they are making it worse does not seem to be the
correct response to questions being asked."

Her testimony at arbitration reiterated her comments in her
complaint.  She described the grievant as "curt", "annoyed", and
"aggressive".  (10/16 T. pp. 29, 30, 65).  She further testified
that the grievant told her:

"I didn't want to mess with him, that he had a temper.
He told me he was having a bad day and I was making it
worse    and    this    conversation    is    over."
(10/16 T. p. 39).

The grievant at arbitration admitted to raising his finger
just for a moment to let the mother know to please wait until he
finished his commentary.  (10/17 T. pp. 272-274).  The grievant
at arbitration admitted that after letting the mother talk for a
while he told her the conversation was over, turned his back on
her, and walked away.  (10/17 T. p. 278).  He described her as
very loud, very rude, demanding, interrupting, angry, and
yelling.  (10/17 T. pp. 274-277).  He denied telling her that he
had had a bad day, that she didn't want to make him angry, that

21

there is one in every crowd, and that such comments would have been ridiculous and would not make any sense. (10/17 T. p. 278).

As noted above, the instant case presents a classic credibility issue of "she said/he said". There are, however, witnesses to the interactions and conversations between the driver's mother and the grievant.

The driver's step-father was in the EMT vehicle with the driver when the grievant conducted his interview there. He was also with the driver and the driver's mother, his wife, for a portion of their discussion. He described the grievant as "rude" (10/16 T. pp. 73, 77) and that the grievant had commented that he was "having a real bad day". (10/16 T. p. 79).

The driver's father was with the driver and the driver's mother, his ex-wife, during the grievant's discussion with them. He testified that he thought the grievant was being a "jerk" because of his attitude (10/16 T. p. 98), and that the grievant pointed his finger at the driver's mother and told her he was having a bad day, she was making it worse, and that there's one in every crowd. (10/16 T. pp. 86, 87, 100, 101).

A fire police officer happened on the accident scene and reported the accident to the Troop H PCO. He set out flares, directed traffic, and "observed" the grievant speak with the other parties. (10/17 T. p. 147). He testified that he did not hear the grievant say he was "having a bad day" and could not recall the grievant say anything "out of hand".

(10/17 T. p. 148). He testified that the grievant acted as Troopers normally do at accident scenes (10/17 T. p. 150) and that the grievant did not appear "argumentative" or "impatient" or "upset". (10/17 T. p. 151). He testified that he recalled no ambulance at the scene. (10/17 T. p. 146). However, there was an emergency ambulance there. (10/17 T. p. 257). He testified that he didn't recall the grievant smoking at the scene. (10/17 T. p. 151). However, everybody else at the scene observed the grievant smoke and the grievant admitted such.

The testimony of the witness basically focused on what he did not observe, hear, or recall. Except for testifying that he heard the driver's mother tell the grievant that it wasn't right to issue a ticket, the witness did not testify as to what he did specifically see and hear or how much of the conversation he heard. The fire police officer's attention was concentrated on directing traffic. (10/17 T. p. 163). He has been a friend of the grievant's father for 19 years. (10/17 T. pp. 156, 164).

The June 22, 2000 letter of complaint by the driver's mother resulted in a BPR investigation conducted by the Carlisle Station Commander. In August 2000 he interviewed the EMTs, the driver, the driver's mother, father, and step-father as well as the grievant. His General Investigation Report details of his interviews with the driver and the driver's mother, father, and step-father are essentially corroborative with their testimony at

arbitration concerning the grievant's demeanor.  The details of the interview with the grievant state in pertinent part:

> "KEPHART said he did not indicate by raising his finger or saying for BREASSEALE to be quiet.  KEPHART denied pointing his finger at BREASSEALE's face.  KEPHART also denied saying he had a bad temper, was having a bad day or there is one in every crowd.  When asked if he was rude, discourteous or aggressive, KEPHART replied, 'no'."

At arbitration he reiterated the grievant's statements. (10/16 T. pp. 106, 107).  At arbitration the grievant was asked about the report, and he replied as follows:

> "Basically, I noticed that my statement was fine except for one part about the finger issue.  He has two sentences in there.  One question he asks did I point my finger in her face.  Of course, I said no.  And another one was I said that I didn't raise my finger as to tell her to hush or something to that effect.  I believe I did do that.  But there's a difference between doing this, you know, just a moment, please, and doing – sticking your finger in somebody's face, you know, a big difference."  (10/17 T. p. 284).

It is not unusual for there to be some conflicts in the evidence presented by the parties at an arbitration.  The instant case represents a classic difference in the parties' versions of the incidents.  It is apparent that the obvious conflict between the testimony of the grievant and the driver family member witnesses are irreconcilable and present a basic credibility issue.  Such issues are not easily resolved generally, and the instant case is no exception.

Various factors influence credibility and may include but are not limited to the interest of a witness in the outcome of

the grievance, animosity toward the other party, behavior and demeanor while testifying, consistency and/or inconsistency of the testimony, and reasonableness or unreasonableness of the testimony in light of all the attendant circumstances of the grievance.

How Arbitration Works, Elkouri and Elkouri, Fifth Edition, p. 443, states in pertinent part:

"Arbitrator Clair V. Duff, in turn, has offered some considerations relevant in evaluating testimony:

Any attempt to sort credible testimony from that which is not worthy of belief is very difficult for at least four basic reasons. They may be briefly stated:

INTEREST. While having an interest or stake in the outcome does not disqualify a witness, it renders his testimony subject to most careful scrutiny. Few witnesses will deliberately falsify but there is a common tendency to 'put your best foot forward'. This tendency, either consciously or unconsciously, leads many witnesses to remember and express testimony in a way favorable to the result which they hope the Hearing will produce.

PERCEPTION. Frequently the initial observation is faulty or incomplete because the observer has no prior knowledge that a dispute will develop concerning what he has seen or heard and his casual sensory impression is not sharp and keen.

MEMORY. The remembrance of an event weeks or months after it occurred is frequently dim and inaccurate and a witness may be confused as to facts which initially he correctly perceived. By lapse of time precise details may elude his memory.

COMMUNICATION.  The manner in which a witness expresses what he saw and heard may fail to communicate exactly his initial perception of the occurrence, so that after listening to the testimony and the cross-examination of the witnesses, the fact-finder may not have had transmitted to him a completely accurate impression of the facts, even though they were initially observed carefully and well remembered by the witness."

It is the duty of the arbitrator to determine the truth of the issues in controversy, as he believes it to be based upon a full and fair evaluation of all the relevant evidence, according that evidence the weight to which he honestly believes it to be entitled.  The arbitrator has no divine perception to enable him to state with absolute confidence whose recollection may be faulty or who did or did not tell the whole truth, but instead must sift and weigh the testimony and reach the best conclusion he can as the actual facts of the incident giving rise to the grievance.

In general, the testimony of a union witness is entitled to no more and no less consideration and credibility than that of an employer's witness.  There are, however, special considerations involved in evaluating the credibility of testimony in discipline and discharge cases.  As stated in How Arbitration Works, supra, at page 445:

". . . an accused employee has an incentive for denying the charge against him, in that he stands immediately to gain or lose in the case, and that normally there is no reason to suppose that a plant protection man, for example, would unjustifiably pick

one employee out of hundreds and accuse him of an offense, although in particular cases the plant protection man may be mistaken or in some cases even malicious. Umpire Shulman declared that, if there is no evidence of ill will toward the accused on the part of the accuser and if there are no circumstances upon which to base a conclusion that the accuser is mistaken, the conclusion that the charge is true can hardly be deemed improper."

In the instant case the testimony of the driver's family was forthright, quite consistent, and contained only such minor discrepancies as would typically be expected. Conversely, their testimony was not so identical as to suggest that it was purposely scripted. The mother was unhappy to have been subpoenaed to appear at arbitration, had no ill will toward the grievant, and had nothing to be gained because the citation against her son had already been dismissed. (10/16 T. pp. 62-64). Her letter of complaint had previously been sustained by the Troop H Commanding Officer on October 28, 2000. Likewise, the father and step-father had no vested interest.

The fire police officer had been a friend of the grievant's father for 19 years and cannot be considered as a disinterested witness. His "observations" are also somewhat suspect inasmuch as he did not recall seeing the ambulance and did not recall seeing the grievant smoking. His attention was concentrated on directing traffic and it is unknown how much he may have seen or heard of the interchange between the grievant and the family members. The grievant's credibility is impaired from the outset

27

because of his lack of veracity in the incidents leading up to his prior disciplinary sanctions.

A full consideration of all the relevant factors compels the conclusion that the credibility issue must be resolved against the grievant, and that the testimony of the family must be credited as factual. FR 1-2, 2.12 states in pertinent part:

> "Conduct and Demeanor: Courtesy toward the public shall be strictly observed. The conduct and deportment of members shall always be civil, orderly, and courteous. Members shall be diplomatic and tactful in the performance of their duties, controlling their temper, and exercising the utmost patience and discretion. Members shall not engage in argumentative discussions even in the face of extreme provocation. However, when required, they must act with firmness and sufficient energy to properly perform their duties. Members shall at all times, while on duty or in uniform, refrain from using coarse, violent, profane, or insolent language, and from voicing any bias or prejudice."

The grievant's conduct was discourteous and was violative of the relevant Field Regulation.

The grievant was also charged with violations of FRs concerning use of tobacco, reports, performance of duty, and competency. The grievant admitted that after his conversations with the family members he walked away and smoked a cigarette while talking with the fire police officer. (10/17 T. p. 280). He was observed doing so by the family members and may have been seen doing so by passing motorists. This disregard of FR 1-2, 2.28 was an additional offense.

The Police Accident Report prepared by the grievant misidentified the ambulance at the scene. Additionally, the first words in the narrative state "no cell phone present or in use", whereas the driver had called his mother from his car on his cell phone after the wreck (10/16 T. p. 22) and she removed it at the scene in the grievant's presence. (10/16 T. p. 45-46). The grievant testified that he could not recall asking about a cell phone. (10/17 T. p. 285). These erroneous entries on the report constitute violations of FR 1-2, 2.17.

The DDO testified as follows on performance of duty:

> "The performance of duty here relates to the whole — to everything that he did. It was inappropriate for the manner in which he was conducting himself overall at the accident scene."
> (10/17 T. p. 180).

The DDO testified as follows on competency:

> "The reason I felt the regulation of competency was violated was the fact that Trooper Kephart at this point in the process had a continuing record of failure to conform with the standards of the Department. So as a result, he's either unable or unwilling to conform to the Department's standards. He's received numerous disciplinary notices, been advised that his performance is not — is not at the standards that is expected. He himself has acknowledged that he gets a lot of attention from his supervisors. And he still continues to do these things that rise to a level of discipline. All anybody who is a member of the state police has to do to maintain their level of competency is just do the things we're trained to do, go out and do your job, and do it the way the regulations require. If you either can't or won't do that, then the Department deems it as a record of incompetency. And it's actually spelled out in the regulation." (10/17 T. pp. 187-188).

The preponderance of the credible evidence does establish violations of Field Regulations concerning use of tobacco, reports, performance of duty, competency, and courtesy. The use of tobacco violation is not a grievous offense. Likewise, the relatively minor report errors are not serious violations. The performance of duty and the competency violations for the grievant's actions at the scene overall and for his continuing failure to conform to standards are catch-all offenses added on by the DDO but are not necessarily unwarranted under all the relevant circumstances.

The PSTA post-hearing brief asserts that the record shows that the grievant made none of the statements alleged and that there is no objective or credible evidence that he was discourteous. This assertion is erroneous. The courtesy violation is a serious offense and is the most serious offense in this case.

None of the offenses standing alone or even the combination of all of the offenses if viewed in a vacuum would be likely to justify the fifteen-day suspension imposed on the grievant. Nevertheless, this was the grievant's sixth disciplinary action in five years, fourth disciplinary action in twelve months, and third disciplinary action in four months. The most recent prior disciplinary action was the ten-day suspension, the notice for which included the standard warning that future violations "of a similar nature will result in more severe discipline". The

violations at issue in this case, H-204, again were of a similar nature and thus did result in more severe discipline. The fifteen-day suspension in this case was proven to have been for just cause and as an appropriate step in progressive and potentially corrective discipline.

H-209 is the fourth and final grievance at issue and involves allegations of violations of Field Regulations regarding performance of duty, reports, internal investigations, and competency. The resultant Notice of Dismissal is dated April 18, 2001. The case once again presents credibility issues. The underlying case concerned the grievant's activities involved in a one-car motor vehicle accident on March 15, 1999.

The grievant was on patrol duty during the evening of March 15, 1999, when the PCO dispatched him to the scene of an auto accident. He observed an unattended car off the berm against a tree. He ran the license plate and obtained the name and nearby address of the registered owner. He was also advised that an ambulance had been requested at the residence at that address.

The grievant went to the residence and met with the sole occupant, Sean Rooney. He interviewed Mr. Rooney at the house and then followed the ambulance to the hospital as Mr. Rooney was transported there. He conversed further with Mr. Rooney at the hospital and obtained his written consent for a blood alcohol content (BAC) test, the result of which was .22%.

The grievant prepared a Police Accident Report, a Supplemental, and an Intoxication Report. The Police Accident Report was submitted May 21, 1999. The Intoxication Report was submitted approximately one year later. The grievant did not prepare a Criminal Complaint for DUI. These various documents and the import of their contents became the basis for the instant case.

On June 1, 2000, a Patrol Supervisor was doing his daily review of various reports for his shift, and he noted a report submitted by the grievant. He testified as follows:

> "A couple of things stood out about this intoxication report. First off was the date of report was listed as 3/15/99, which was a long time ago. And the report appeared brand new. They use a carbon — on this particular report, there's a carbon in between. And the carbon usually gets rubbed against with from filing and whatnot. You usually see the transfer of the carbon and everything, and I didn't see any of this on this particular report.

> The offense tracking number wasn't on the top of the report, and the departmental headquarters copy was still attached. There was no supervisory initials on this report. And I didn't — I didn't see it in the DUI log that we keep either.

> . . .

> Well, I noted that in block seven it was listed as an accident — relative to an accident arrest. Okay? So I proceeded to go to the accident file and I pulled the accident which should have had the same corresponding incident number on it, and I looked at that accident report.

> . . .

32

Exhibit C-3, the supplemental accident report, block six, the approval by a supervisor block and badge number was blank.

. . .

The accident report states that operator one related he was traveling north in – on Sand Beach Road. He experienced a mechanical problem of the carburetor, unit one – which caused unit one to travel off the roadway on the left side where he struck a tree.

This led me to believe that the operator was placed behind the wheel and operating the vehicle. And then I refer to the intoxication report, and the intoxication report stated that – I'll refer to page 3, that he – Trooper Kephart stated I cannot prove to a sufficient degree that this defendant was operating the vehicle at the time of the accident.

. . .

The defendant would not say if he was driving and there were no witnesses or evidence to prove the allegation, which again was in contradiction to the statement of the operator.

. . .

After I reviewed them, I placed them in an envelope and I took them to my supervisor, Sergeant Stanley Foss. And I advised him that upon reviewing these reports I found several contradictions and I wondered, as how he was the section supervisor, as how he wanted to proceed with this." (12/19 T. pp. 78-89).

Sergeant Foss reviewed the matter and submitted a complaint to BPR. The Crime Unit Supervisor at the Newport Barracks was assigned to conduct the investigation. He provided the grievant with a Notification of Inquiry which states in pertinent part:

"This is to advise you that an investigation is being conducted upon receipt of a Use of Force or Complaint Reception and Processing Worksheet, which was submitted by Sgt. Stanley W. FOSS III, Troop H, Harrisburg Patrol Sergeant.

33

Sgt. FOSS alleges that you falsified an accident report supplemental and an intoxication report by stating that you could not prove an individual was driving a vehicle, which had been involved in an alcohol related hit and run accident, when you had already reported, on the initial submission of the accident, that suspect was driving. (Refer to accident investigation incident number H1-1057465.)

He alleges that you submitted the intoxication report in June of 2000, approx. 14 and a half months after the accident, even though you carried a date of preparation on the report of 03/15/99.

Sgt. FOSS believes that you prepared an unapproved accident supplemental and stapled the carbon copy to the station copy of the accident, without submitting it to a supervisor. He believes this was done to make it appear as though it was prepared and submitted in proximity to the accident date.

Sgt. FOSS alleges that you were derelict in your duties by failing to file charges on a man that you had found to be driving under the influence, that you intentionally falsified the reports in order to justify terminating the investigation and that you failed to follow proper procedures in submitting reports to a supervisor in a timely manner.

Sgt. FOSS believes that your conduct on duty was impoper (sic) and that he is dissatisfied with the performance of said duty."

The investigation resulted in various offenses being charged against the grievant which in turn led to the alleged violations of the cited FRs. The grievant was charged with submitting the Police Accident Report late, with submitting the Intoxication Report late, with submitting the Supplemental Report late and making it appear as if it had been submitted earlier, circumventing supervisory review of it, and with falsifying information on both the Intoxication Report and the Supplemental.

34

A Police Accident Report was required to have been submitted by the end of the shift or no later than within 24 hours. (12/19 T. p. 154). The accident was March 15, 1999, and the Report was not submitted until May 21, 1999. (12/19 T. p. 212). The grievant admitted that the report was "almost two months late". (12/20 T. p. 449).

An Intoxication Report was required to have been submitted within thirty days of the accident. (12/19 T. pp. 154-155). The Report was not submitted until sometime in 2000, approximately fifteen months after the accident. The grievant admitted that the Report was over a year late. (12/20 T. pp. 460, 507). The Patrol Supervisor's remarks regarding suspicious aspects of the Report are quoted above.

After reviewing the Intoxication Report the Patrol Supervisor researched the station accident files and retrieved the Police Accident Report which had a Supplemental Report stapled to it. He noted that the Supplemental Report was deficient and suspicious in several respects as quoted above. Critically, block six of the Report requires entries of review and approval with the name and badge number of the supervisor before the Report is placed in station files. The block, however, was blank.

The PSP contends that the grievant attached the Supplemental to the Accident Report in the station files and circumvented the requirement for supervisory review in an attempt to cover up his

late preparation and filing of both the Intoxication Report and the Supplemental Report. There was no supervisory approval entry on the Supplemental. There is no copy of either report with the Accident Report on file at the Bureau of Records as is required. (12/18 T. pp. 75, 76, 184-185). If a supervisor had reviewed the Supplemental it is highly doubtful that the supervisor would have overlooked the inconsistencies between the original and Supplemental concerning the driver's identity, missed numerous blocks not filled in, omitted signing it, failed to send a copy to the Bureau of Records, and neglected to cancel the assignment slip out of the computer.

The grievant had motive and opportunity for such a charade. The motive was to avoid disciplinary problems attendant to his filing reports one year late and to his failure to file DUI charges. The opportunity is displayed by his admission that he had altered the original Report (12/19 T. p. 454) after he had accessed and retrieved it from the station files or the supervisor's desk. (12/19 T. pp. 513-515).

The March 15, 1999 Accident Report identified Sean Rooney in block 80 as the sole occupant and as the operator of the car, and also in block 58 as the driver of the car. The narrative states in pertinent part:

> "Opr. 1 related he was traveling north on Sand Beach Rd. He experienced a mechanical problem with the carburetor of Unit 1 which caused him to travel off the roadway on the left side where he struck a tree."

36

The grievant wrote nothing in the Accident Report concerning Mr. Rooney not answering questions about who was driving or that there was any doubt that he was the driver. At the hospital the grievant had Mr. Rooney execute a form for BAC testing. On the form the grievant certified that he had reasonable grounds to believe that Mr. Rooney "had been driving under the influence".

At arbitration Mr. Rooney's testimony concerning the day and time of the accident, the calling of the ambulance, and his drinking before and after the accident was contradictory. He was, however, consistent in his testimony that he told the grievant that he was the driver (12/19 T. pp. 43, 59, 67) and that he did not refuse to answer questions whether he was the operator. (12/19 T. p. 50). The BPR Investigating Officer interviewed Mr. Rooney in September 2000 at which time he was also confused about the accident circumstances (12/19 T. p. 236) but did give oral and written statements that he told the grievant March 15, 1999, he was the driver. (12/19 T. pp. 237, 238).

The Intoxication Report dated March 15, 1999, which the grievant submitted approximately fifteen months after the accident states in pertinent part:

> "Defendant would not say whether he was driving or if there were passengers.
>
> . . .

I asked if he had been driving at the time and he would not answer.  Additional information will be reported as it is recieved (sic)."

The additional Report dated March 20, 1999 states in pertinent part:

"On this date, I recieved (sic) BAT results listing defendant's BAC as .22%.  After contemplating the evidence available in this case, I decided not to file charges.  I can not prove to a sufficient degree that defendant was driving at time of the accident. Defendant would not say if he was driving and there were no witnesses or other evidence to prove that allegation.  I request this case be closed."

The Supplemental Report states in pertinent part:

"After consideration of facts/evidence in this case, I do not fee (sic) there is sufficient evidence to file charges.  I can not positively place defendant, behind the wheel at time of accident.  OPR 1 would not say if he was driving, just that he was in the vehicle.  There are no witnesses.  I request this case be closed for reporting and reopened if new information is uncovered."

These three documents prepared by the grievant are in obvious conflict with the original Accident Report and BAC testing form prepared by him as well as the statements and testimony of Mr. Rooney.

The original Accident Report signed by the grievant states "Crim. Complaint & Intox Report completed" at the end of the narrative in block 87 and states "driving under influence of alcohol or contr. Subst. 3731" in block 89 and 90 as "violations charged".  No criminal complaint was actually completed and no violations were actually charged.

The BPR Investigating Officer in his interview with the grievant confronted him about the inconsistencies in the reports involved, but the grievant claimed there were no conflicts or inconsistencies. (12/19 T. pp. 207, 213). As per the Notification of Inquiry, in their interview the Investigating Officer essentially accused the grievant of falsifying the Intoxication Report and Supplemental Report to cover up his failure to submit them timely and his failure to do a criminal complaint and charge Mr. Rooney, accusations which the grievant denied. (12/19 T. pp. 213, 217).

At the interview and at arbitration, the grievant claimed that he did the Intoxication Report contemporaneously with the Accident Report but jammed it in his briefcase and forgot to turn it in. (12/20 T. pp. 450, 457-458). At the interview and at arbitration he claimed that he completed and submitted the Supplemental Report shortly after submitting the Accident Report. (12/20 T. p. 456). The grievant's credibility on these issues is highly suspect because of the circumstances detailed above and his history of untruthfulness. The grievant did admit that despite stating on the Accident Report that he had filed criminal charges he in fact did not do so, thereby deliberately entering false information in the Report. (12/20 T. pp. 451, 496). Despite all of the foregoing, the PSTA has advanced arguments against the discipline.

The Association argues a due process issue on the basis that the DAR did not specify that there was an offense of late submission of the Police Accident Report.   The DAR states in pertinent part:

> "On March 15, 1999, you responded to a hit and run accident.   You conducted an accident investigation and submitted an Intoxication Report.   The Intoxication Report references a Blood Alcohol content of .22.   The Intoxication Report was dated March 15, 1999, but was first noticed on June 1, 2000, by Corporal Stephen Kiesling.   The investigation was terminated due to your falsification of reports to negate criminal prosecution.   However, an accident supplemental falsely reports that a criminal complaint was completed by you. Your failure to take appropriate enforcement action and the subsequent actions to conceal your failure to act are in violation of State Police rules and regulations.

> <u>Refer to Summary of Personnel Investigation IAD #2000-0526, presented to you on October 27, 2000.</u>" (Emphasis added.)

The DAR does not specifically address the late filing as an offense, nor does it specifically address the details of some of the other charges. However, as testified to by the DDO, this is typical.   (12/19  T. pp.  316-331).   Additionally, and more importantly, the DAR essentially incorporates by reference the IAD investigation summary which was provided to the grievant and which did specify the offenses and the details.   The Association's argument on this topic must be rejected as an attempt to exalt form over substance.

The Association asserts that although the Police Accident was submitted late it was approved and filed by the Patrol Supervisor without any warning that discipline would result, and

40

that the DDO conceded that usually such would not be grounds for discipline. (12/19 T. p. 333). The DDO did qualify his remarks, however, with the comment that if an individual has substantial problems with submission of reports it becomes a disciplinary issue. The grievant admitted that he had been given notice of a number of overdue reports (12/20 T. pp. 458-459), "numerous BPR complaints", and that he was having "a real hard time keeping his head above water". The violation charged for late submission of the Police Accident Report was not inappropriate under the circumstances and in conjunction with its relationship to the other documents involved.

The PSP claimed that the grievant deliberately circumvented supervisory review of the Supplemental by inserting it directly in the file. The grievant claimed that he did submit the Supplemental for supervisory review and approval. The Association argues that the PSP's reliance on the absence of a supervisor's entry of his name and number on the Supplemental is misplaced. The Association produced seven other reports from Troop H which lacked supervisor's initials or name as approved. The Association's argument is not persuasive for several reasons. There were literally "thousands upon thousands" of reports on file (12/20 T. p. 390) but only seven, a miniscule number, were found without the relevant entries. Of the seven reports produced, two were Accident Reports, five were Intoxication Reports, and none were Supplemental Reports, the type of report

41

at issue in the instant case.    (12/20 T. pp. 380-389).    The Bureau copies of the Accident Reports all did contain supervisors' entries (12/20 T. p. 403), whereas there was no Bureau copy of the grievant's Supplemental.

The Association alleges that the testimony of Sean Rooney was "unreliable and not credible", thus the charges are unfounded concerning the grievant's handling of his case.    If the charges were based solely on Mr. Rooney's testimony the Association's allegation would not be without some degree of merit. Nevertheless, it is the grievant's own entries on the Police Accident Report stating that Mr. Rooney was the operator of the vehicle as well as not stating that he refused to admit that he was, which corroborate Mr. Rooney.    Likewise, as to the BAC consent form, Mr. Rooney was a basically disinterested witness with nothing to gain or lose whereas the grievant's job was at risk.    Mr. Rooney was confused about his recall of the details of the accident, but the grievant also was when undergoing the BPR interview in October 2000.    (12/20 T. p. 482).

In support of the grievant's denial of falsification of reports, he denied that there were inconsistencies or contradictions.    (12/19 T. pp. 213, 217; 12/20 T. p. 519). However, apparently arguing in the alternative, the grievant attributed any differences between the Accident Report and the Intoxication Report to the differences between an accident investigation and criminal prosecution.    These two reports, both

42

of which he allegedly completed on March 15, 1999 (12/20 T. p. 536) as well as the two supplements do contain significant differences concerning the driver's identity. The grievant testified that this was because of the difference in the burden of proof beyond a reasonable doubt for prosecution versus a prima facie case for charging. This disingenuous claim was made at arbitration but was not made to the BPR Investigating Officer, and is simply not credible.

The grievant's credibility was impaired at the outset because of his prior record of a pattern of poor performance and lack of veracity and integrity. The grievant was a ten-year veteran who should have recognized that accountability comes with the responsibilities of being a Trooper. The purpose of the prior disciplinary actions was not just to punish but also to correct faults and behavior so as to prevent further future infractions. The prior disciplinary actions were not effective in the latter regard.

The preponderance of the credible evidence compels the conclusion that the grievant's misconduct violated the Field Regulations regarding Performance, Competency, Reports, and Internal Investigations. The DDO testified as follows that the grievant was beyond salvage:

"I believe that Trooper Kephart cannot, particularly with regard to the integrity questions. Trooper Kephart has - has displayed such a lack of integrity in his dealings with the department, in dealing with the department's report system, in dealing

43

with simple information, things that there should be no
reason to lie about, he just — he feels — he apparently
feels that he's unable to respond in any other way but
to lie to them, lie about situations, or prepare false
information and place it in reports.

That goes to the heart of what — what the
Pennsylvania State Police is all about.   Pennsylvania
State Police and any police agency, it's essential that
the members of that agency have the integrity and the
willingness to stand up and take responsibility for
their actions, recognize when things are done wrong and
learn from them.

To do otherwise actually is place — places that
individual   and   the   entire   agency   at   risk   for
impeachment whenever we're dealing with matters of far
more serious nature than what may be before us today.

Trooper — anything Trooper Kephart touches now
will have the taint of his inability to display any
integrity and could very will poison a very serious
investigation.   The simple fact that he may take a
phone call of a serious incident report could very well
place an investigation at risk, and the Pennsylvania
State Police and the law enforcement profession can no
longer take that risk.

Trooper Kephart has been given opportunity upon
opportunity throughout his career to recognize that
integrity is the most essential thing we have.   If —
and he has chosen not to — to — not to accept that.   So
as a result, I don't believe that in any case Trooper
Kephart can remain as a Pennsylvania State Trooper."
(12/20 T. pp 303-305).

The undersigned concurs.

It is always tragic to an employee and his or her family
when that employee is discharged for misconduct, and it is no
benefit to an employer to lose a trained and experienced
employee.   In the instant case, despite the Union's ardent
presentation,   cogent   brief,   and   attempt   to   challenge   the
evidence,   it   is   the   arbitrator's   determination   that   the

44

preponderance of the credible evidence clearly establishes the grievant's guilt of offenses for which suspensions and ultimate discharge were the appropriate penalties, and that there are insufficient mitigating or extenuating circumstances to outweigh the aggravating circumstances or to justify a modification of the sanctions which are found to have been for just cause and not found to have been arbitrary, discriminatory, or capricious.

## AWARDS

The grievances are denied.

JOHN J. MORGAN, ESQ.
Arbitrator

STATE OF <u>PENNSYLVANIA</u>　　　:

COUNTY OF <u>DAUPHIN</u>　　　　　:

<u>AFFIDAVIT</u>

I, Captain Darrell G. Ober, being first duly sworn according to law, depose and say:

1.　In May 1999, I had been a member of the Pennsylvania State Police for over 18 years.　I rose quickly through the organization to the rank of Captain faster than any of my Academy classmates and the vast majority of my peers.　There are nearly 4,200 enlisted members in the State Police, fewer than 45 of us are privileged enough to hold the rank of Captain. I had a spotless service record.　In over 18 years, I had never been involuntarily transferred over 200 miles from my family, removed from any committees, demoted, had any issued equipment removed from me, forced to reimburse the Department for expenditures, or removed from any special assignments.　Yet, in the span of eight months, Paul Evanko, Mark Campbell, Thomas Coury, Joseph Westcott and Hawthorne Conley took all of the above actions, and many more, against me.

2.　My career with the State Police and my life changed forever on May 12, 1999. On May, 12, 1999 Lieutenant Colonel Hickes and I informed Evanko of the existence of an FBI investigation into possible job selling in the State Police; an investigation that could have included the defendants as potential targets (P22).　The FBI informed me of the probe the preceding October during the time when I was assigned as the Director, Internal Affairs Division (P22).　Evanko became enraged when we told him of the existence of the probe (P22).　Since that time, the defendants have intentionally abused their power and authority and conspired to injure me without regard or concern for the consequences.　The defendants have

1

*Exhibit "D"*

witch hunt to ferret out members disloyal to Evanko.  I know from my experience as the Director, Internal Affairs that this investigation was improper and without a legitimate basis either in the law, Pennsylvania State Police regulations, custom or practice.  The irrational and overzealous mindset of the defendants is best represented by Westcott's testimony that he personally assigned this investigation to two State Police Majors and even felt it necessary to jump in a State Police airplane and fly to Montoursville to personally discuss it with one of them; namely Major Williams.  These Major's ordered me, without any prior notice or opportunity to secure legal counsel, to report to a Deputy Commissioners Office and compelled me to participate and forced me to answer questions.  They told me that they knew I had not violated any regulations but were ordered by the Commissioner to investigate me.  To this date, not one defendant or anyone else has ever identified any regulation that I supposedly violated by participating in the FBI investigation or handling it in the manner in which I did; at least not a regulation that existed in October 1998.

6.   As I have testified, having two Majors assigned to investigate me in and of itself meant I was in deep trouble.  This was done to send a message to me and to the entire Department that my career was over and that I had committed an unpardonable sin.  Majors in the State Police (there are less than 20 Majors in the entire Department) are not assigned to conduct investigations when a member is suspected of committing a crime.  For example, it was a Corporal who investigated and arrested the Trooper involved in accepting a $1,000 bribe and who was one of the eventual targets of the FBI job-selling probe (P60 and P61).

7.   Nothing about this investigation conformed to the rules or practices of the agency.  As a former Director of Internal Affairs, they knew I was fully aware that their intimidating "investigation" was off the books, i.e. not in

3

conformance with law or regulation. There was never a complaint, a complaint verification and never an allegation of wrongdoing which PSP rules requires. Yet the defendants knowing full well that I did nothing wrong, circumvented the law, my due process rights (P309) and State Police regulations (P302) in order to punish me in a never ending series of actions against me which included a constructive demotion, denied reimbursements, punitive transfers, harassment, treated me like a criminal by reading me my rights, and forced me to answer questions over absolutely nothing, used investigations to destroy my reputation through insinuating that I would misrepresent my badge, and the list goes on. I have never been informed of the results of Evanko's off the book investigation or if it has ever been closed (P2). This is a source of never ending concern and stress for me.

8.    Evanko, Coury and Westcott have singled me out for investigation and persecution. Through discovery and their testimony, they knew rather quickly in the investigation that, unbeknownst to me, at least five other members of the Department (including another Captain and a Lieutenant) also knew of the existence of this FBI probe before I was informed (P22, P30). Yet, they were never made the target of an intense high level probe.

9.    The defendants have tried to make much about the fact that I reported the existence of the FBI probe to Hickes and not to Coury or Evanko (P63). The record is painfully clear as to my reasons for not initially reporting this information to individuals who I believed occupied positions that could have come under the scrutiny of the FBI probe. I went to Hickes for advice and guidance. Hickes gave me specific orders to maintain the confidentially and integrity of the FBI probe and I followed his orders (P280). As far as I or anyone else should be concerned, if Evanko was unhappy with Hickes' orders, he should direct his attention to Hickes; not me. The defendants have also expressed great displeasure with me for

not informing Conley.   In doing so, they conveniently overlook two important facts.   One is the ample evidence and testimony that LTC Hickes had already ordered me not to discuss the investigation with anyone by the time Conley came into the picture (P22).  According to PSP rules and regulations, this was a valid and lawful order (P134, P282). Secondly, before he came to BPR as the Director, Conley was the Commanding Officer of Troop B, Washington; the very Troop where the FBI probe was being conducted.  The defendants, including Conley, know full well that PSP regulations (P141) requires Troop Commanders to hold meetings with each member of the General Assembly in their respective areas of responsibility.  The FBI probe of possible job selling in the PSP was into the local legislators in and around the Troop B area.   The defendants also ignore the fact that had I reported the existence of the FBI probe to potential targets, I would have possibly been committing the crime of obstruction of justice (P244).

10.    The defendants, particularly Coury, launched a second totally improper investigation in May 1999 into my personal affairs as it relates to collecting State Police artifacts (P36).  They bastardized the Supervisory Inquiry process in order to harm me (P33, P34, P35).  The Supervisory Inquiry process was designed to be an expedient way for *supervisors* to resolve minor complaints lodged against their subordinates.  I was made to suffer the humiliation of being investigated by a Corporal from Internal Affairs; one of my own subordinates and certainly not my supervisor.   Coury testified that this investigation was launched based on a letter he received and a conversation he had with the author and one other individual.  Yet, through discovery I find the letter referred to by Coury does not even mention my name (P47).   In fact, the author stated he did not want anything done.  The author is now deceased and his memo speaks for itself.  The other individual Coury testified that he had a conversation with about me was never even interviewed during the investigation.   This

"inquiry" was allowed to continue for over seven months; longer than most full investigations would take and four months longer than permitted by my labor contract (P309). Not one person was ever required to complete a Complaint Verification Form and none of the people interviewed were ever told that the inquiry was ultimately adjudicated as "unfounded" and that I had done nothing wrong. This is, however, not surprising since no one ever informed me either. In preparing for this lawsuit, I requested to review my personnel file (P137, P138). There, seven months after the case was adjudicated, I found a copy of the adjudication that was never given to me (P78). The fact that this investigation was ever launched in the first place has caused damage to my name and reputation. I have a right to my private life and to collect PSP memorabilia. Evanko himself collects State Police memorabilia and openly admitted it in his deposition. The inquiry was not adjudicated by any supervisor in my chain of command like is normally done. Instead it was technically adjudicated by one of my peers; another Captain, but in reality, by Coury (P37, P38). It was humiliating enough to be put through this ordeal, but to know that one of my peers reviewed the file and sat in judgement of me is embarrassing beyond what I am able to describe. Worse yet, through discovery, I have learned the defendants are still investigating me and this case is not closed despite being adjudicated as "unfounded". I found a supplemental report was placed in the file over 14 months after the case was supposedly closed (P44). Ironically, the file was supplemented less than *one month* after I filed this lawsuit! I was never informed that this case had remained opened or that it has been re-opened. I live under the threat that investigations are being conducted on me and will never end; even after they are "unfounded". Through their investigations Coury and the others have inserted themselves into all aspects of my life; even my hobbies. The hypocrisy of investigating me and not other memorabilia collectors is now a matter of record. Minutes of the State Police museum committee and the defendants own in-house newsletters shown how, as early as

1997, the defendants knew I had violated no rule and that the existence of non-museum collectors of State Police memorabilia is common (P70, P71, P72, P73, P74, P77, P254, P255, P256, P257, P258, P259, P260, P261, P262). Evanko himself has admitted to improperly diverting items donated to the State Police museum for private display in his own office. Evanko has sent letters to family members of deceased Troopers using his official title and position soliciting their donations (P75). Yet, when confronted with these facts, Coury testified that he never had Evanko investigated like he did me. Thus I am selectively singled out for anti-personnel actions. Even as I write this affidavit, the defendants are permitting the State Police to house a 1972 Plymouth Fury at the Academy (P69). This vehicle is being restored for the State Police museum. PSP regulations clearly say this is a blatant violation and misuse of state owned facilities. State money, time, labor, and facilities are being abused for this project.

11. Years ago I swelled with pride when I was asked to serve on the Pennsylvania State Police Centennial Book Committee by Chairman Marc Infantino. This project would afford me an opportunity to share my pride and interest in Pennsylvania State Police history with the world. In all the years I served on the Committee, I attended one meeting during my working hours that lasted for one hour. I never had any problems whatsoever with this committee interfering with my primary duty assignments. I devoted many off-duty hours toward the project. However, without so much as a phone call, Evanko and Coury removed me from the committee on August 24, 1999 (P189, P192, P223). I was removed by way of a memo that was sent to the Committee Chairman from Evanko. The Chairman told me that I was the only member of the Committee that Evanko took a personal interest in. Evanko's memo says I was too busy working on IIMS to serve on the Committee. This is ridiculous. The book was not due to be published for *five* years (2004). As I have testified, I personally checked with the entire project and command staff at IIMS and

found that neither Evanko nor anyone else ever made even one inquiry into my workload or ability to fulfill my project obligations before deciding that I was too busy and kicking me off this committee. I cannot describe the anger and humiliation I experienced over this vindictive and hateful act meant to limit my associations and freedom to express myself.

12.     Shortly after the investigations were launched against me, Conley began his personal harassment of me. First, he directed that a Corporal remove my cell phone from me due to what he claimed was "substantial" usage. I have never been told what constitutes "substantial" (P9). Oddly, this happened the very same day that Evanko and Coury kicked me off the Book Committee. As I have testified, Conley never asked me one question about airtime charges; he never discussed it with me (P12). He took the phone simply because he had the power and authority to do so. Conley's hatred of me is easily seen in his deposition and one would only need to compare Conley's cell phone airtime usage and charges to mine to appreciate the hypocrisy of his actions (P10 and P11). By removing my cell phone, Conley was showing me that he and the other defendants would take any and all actions against me, no matter how petty, to harass, intimidate and embarrass me. Conley's interest in the economies of the State Police are curious considering as a matter of routine, Conley, although assigned to Harrisburg, regularly reported to and from work at a satellite office located near his home in Western Pennsylvania. Checking in and out of a satellite office afforded Conley the advantage of being able to continue his commute to home or work to and from Harrisburg on State time and while being paid. Comparing this abuse of authority with the false pretense that I had to leave the Book Committee for being "too busy" shows that I was put into a special punishment category.

13.     According to documents and to his deposition, Conley wanted me removed as the Director, Internal Affairs. Yet, at no time did Conley or

anyone else ever indicate to me that they wanted me removed. Conley's testimony makes it clear that he easily went along with the investigations ordered by Coury and Evanko. As further evidence of the proclivity for embellishment and the irrational mindset of the defendants, Conley testified falsify in his deposition about an incident when I supposedly slammed a door after storming out of a meeting with him. Having been somewhat involved in the design of the IAD building, I not only knew this was not true, but was not physically possible. After his deposition, I visited the Internal Affairs Division and found that I was correct. The door slamming incident testified to by Conley is not physically possible and his testimony was not true. Besides, I would have never behaved in such an unprofessional manner and there is nothing in any of my records or files that would even remotely suggest that I would.

14.    In August 1999 Evanko publically humiliated me by snubbing me when he ignored my hand salute to him during an award ceremony held to honor the employee of the month in IIMS. September 1999, Conley barred me from attending an IAD Division meeting after I had been invited to attend by the Acting Division Director, then Lieutenant Brown. As I have testified, there was no basis for Conley to bar me from this meeting, a meeting with my own subordinates. Conley's action was purely retaliatory and served only to demonstrate that he wanted no one to trust me. Acting with such hateful pettiness served no legitimate purpose other than to harass, intimidate and retaliate against me. It was an action intentionally designed to demonstrate to not only my colleagues but my subordinates that I was to be shunned and was not entitled to respect in the eyes of my fellow state police personnel.

15.    Seven months after the fact, and after I filed my first grievance (P127), on December 13, 1999 Conley dug up an old invoice (P15) and ordered me to reimburse the State $69.00 (P13, P16, P17) for a bill that had already

been paid by the Department in May 1999. The charge was for framing a Letter of Commendation that was issued to a retiring Sergeant (P14). In an agency with a half billion-dollar budget, I never imagined $69.00 would be viewed so critically. If Conley disagreed with the propriety of the expenditure, the most that he would have ever needed to do was explain his position and caution me against future occurrences. Instead, seven months after the costs were incurred (and after the investigations into me were launched) he ordered me to reimburse the Department. When I reported to his office to pay the bill, he would not even let me look at the frame until after I had written a check. He treated me like a juvenile criminal who could not be trusted. This act, after the fact, was meant to tell me I was being reviewed and every activity and action was being studied to find a way to harass me consequently in the grievace I filed I alledged retaliation.

16.    At about the same time, I received a memo from Evanko saying he was denying me 8.00 hours annual leave reimbursement and was also denying me reimbursement for $84.00 (P50, P51, P52, P53, P54, P55, P56, P57). Both of these reimbursements were related to the FBI probe. LTC Hickes, the equivalent of Deputy Secretary in state government, had already approved both of these requests. Commissioner Evanko's "pulling rank" and denying these reimbursements was just another example of spitefulness, vindictive hatred and persistent harassment. No one else has been treated this way but me; more insults, more embarrassment, and more intimidation.

17.    I filed a grievance when Commissioner Evanko denied these reimbursements (P127). The grievance was heard before a Special Appeals Board and I won (P129, P131, P132). However, as Mr. Grab testified, in an unprecedented move Evanko and Coury ordered the Special Appeals Board ruling appealed. They did this even though the

labor contract says the Board's decisions are final and binding on the parties (P309). It was pure harassment and their appeal was denied. Even after the appeal was denied (P130), they still wouldn't pay me; I was forced to submit a request for reimbursement in writing to Coury to get my $84.00 (P132). I have never seen anyone in all my years of service be treated so badly; so consistently in such a persistently unfair way.

18.   It seemed as though the harassment would never end. However, in January 2000, in an irrational and hateful act of vengeance, Evanko, Coury, Westcott and Conley conspired to destroy my life with my family by involuntarily transferring me over 200 miles from my home in Enola to Washington, Pennsylvania (P127, P161, P193). P32 confirms that by January 4, 2000 Evanko sought the approval and concurrence of Campbell to exectute my punitative transfer. In doing so they carried their irrational hatred of me to a level beyond what I am able to describe. They did so because I refused to suffer quietly at their whim and in retaliation for me exercising my contractual rights to grieve the improper actions they were taking against me. Being involuntarily transferred to Washington was the lowest point of my career and my life. I was in Conley's office for a Step One grievance hearing at 12:30 PM on January 10, 2000. Conley (P4) knew I was being transferred. Yet, he waited until I went home and telephoned me at 4:30 PM the same day to inform me of the transfer. He didn't even have the courage to tell me to my face; just like the other improper cowardly acts the defendants have taken against me. All one has to do is read the Personnel Order 00-01 and PSP regulations FR 3-2 (P284) to know this was a *permanent,* disciplinary transfer. My wife and I were devastated. She sobbed for hours after we were told and neither of us slept that night. I thought my union would fight this injustice for me. However, the only action they would take on my behalf would not bring immediate relief to the situation. I felt completely alone, helpless and desperate. On our own, we filed an injunction in Commonwealth Court

and blocked the transfer.  When faced with an injunction, the Department quickly withdrew the transfer within 24 hours.  Evanko and Coury have testified, in part, this was because out of Evanko's concern for me and because he did not want to prolong placing someone in Washington.  This is false. Where was his concern for me when he transferred me to Washington in the first place?  In reality, Evanko and his attorney's knew he had been caught red-handed.  As I have indicated, according to PSP's own regulations, this was a *permanent transfer*.  Promoting Lieutenant Young to Captain, inventing the story about Szupinka needing assistance, the NGA myth, comparisons to the RNC and trying to fluff up the story with histrionics related to the World Trade Organization riots in Seattle are blatantly transparent attempts to cover-up the disciplinary intent of my transfer to Washington.  The numerous inconsistencies in the depositions of Westcott, Coury, and Evanko and a review of the applicable PSP rules (P214, P215, P216, P217, P218) and Personnel Orders are all that are necessary to debunk these falsehoods.

19.    For example, Westcott testified the transfer to Washington was necessary because of information provided to Major Werts during a conference Werts attended in San Diego; that the closer an organization got to a big event, the more it was necessary to assign an assistant to the task force commander.    However, what Westcott failed to tell us and what the documents prove; that meeting was held in *1998 and Werts own report states the exact opposite with respect to when support personnel should be assigned* (P212 and P213)*.* On the other hand, Evanko states the transfer was necessary for some vague reason related to the World Trade Organization riots (they occurred in November 1999).   Westcott also testified that the Department would not promote someone into the position earmarked for me in Washington.  In reality, that is exactly what Evanko and Westcott did to cover their tracks after I filed the injunction (P314).

20.    After defeating the transfer by filing an injunction, Evanko withdrew the transfer to Washington. However, they were not through with me. Instead of leaving me in a position where I had been playing a critical role in a multi-million dollar technology project, Evanko and Westcott testified they decided to demote me to a Lieutenants position. In trying to explain this demotion, Evanko has tried to hide behind the injunction agreement as a sanctuary that justified the demotion (P245, P252). This is another falsehood. Westcott said I was chosen for the position in Washington because I was "available". This is also false. The defendants themselves conspired to manufacture the very chain of events to make it *appear* that I was "available". I was "available" because they ripped me from the IIMS project and, at the same time, promoted someone into my former position in IAD namely the "investigator" in this case Captain Rick Brown. Coury testified that he and Conley considered transferring me back to my former position in BPR as the Director of the Systems and Process Review Division. However, they decided against that. Evanko, Coury, Westcott and Conley all had a hand in manufacturing the scenario by which it would appear that I was "available" and are now trying to sell this story.

21.    My job in IIMS was not completed when the defendants tried to ship me to Washington. My assignment in the IIMS project was to get a systems integrator selected (P195, P196). Not only was I to lead the integrator selection process, I was also requested to lead the contract negotiations (P197). The selection process for the systems integrator was not finished in January 2000 (P4, P5, P142, P193, P197, P198, P199, P200, P201, P202, P203, P204, P205, P206, P207, P208, P209, P210, P320, P324) and the contract negotiations were not completed until August 2000 (P143, P144, P145, P146, P147). The defendants have purposely misrepresented the truth about my IIMS assignment and are trying to take advantage of the time lapse and the complexity surrounding the procurement process to mislead this court. Even LTC Hickes' memory, in

part, was faulty in the way he characterized the completion of my assignment.  Had Evanko not been obsessed with punishing me, he would have just left me in IIMS to complete my original assignment; one that he gave to me personally.  As I have testified, to fill my shoes, Major Waugh, with no day-to-day experience in the project, was detached from his regular position (just like I was) to complete my job on the project (P194).  In turn, Captain Nagurny was paid out of class wages for six months until Major Waugh returned to full duty.    What an incredible abuse of government resources of PSP talent, and all to do anything to get me and cause injury.

22.    Fighting for my rights has had a huge financial impact on my family.  We have spent approximately $30,000 to protect ourselves from the despicable acts committed by these defendants (P293).  We cannot afford to replace our 11 year old vehicle with 140,000 miles on it.  For the past three years we have put our family vacation plans to Disney World on hold, we have all but abandoned our dream of buying a vacation cabin and have also been forced to put our home remodeling plans on hold.  Meanwhile, the defendants do not have to worry about paying any bills; the taxpayers are footing their bills.  I have to live with this injustice everyday.  I do not have a free staff of attorney's, free discovery costs; I drive my own vehicle to depositions and cannot afford to travel by airplane or helicopter.  I have used a tremendous amount of annual leave to fight for my rights; time I would have used to spend with my family.  I do not have the benefit of having resources like the Director, Internal Affairs, personally assigned to assist me in defeating my opponents.  I have swallowed my pride and asked for financial support to pay my legal bills (P156, P166, P168, P174, P299, P300, P301), and for that, my opponent's lawyers at the behest of Evanko, investigate me further.  They have lied to this court, misled my attorney, and they do so with absolutely no fear or concern.  Documents have been added and removed from my

personnel files; false documents sporting wet ink have been created, and my attorney and me have been falsely accused of not producing documents.

23. The defendants' actions against me have hampered my ability to provide for my family and live my life free from their oppressive influences. I am motivated by the same desire to provide for my family as any other father is. However, the defendants have either directly or indirectly caused my earning potentials to be reduced. For example, since May 1999, I am no longer selected to serve in temporary, higher-class positions and receive the extra compensation commonly enjoyed by my peers (P318). I estimate the compensation I have been denied to be approximately $500.00 per year. The other Captain in my Bureau is selected to serve over five times as often as I am. According to PSP and Management Directives (P315), higher-class assignments are *supposed* to be given on an equal basis (P136). But not in my case. It is humiliating, degrading, and embarrassing to not be selected on an equal basis for these assignments. Before the defendants singled me out for persecution, I was given the same opportunities as my peers (P7, P8, P124); but not anymore.

24. Another way my earning potential has been reduced by the defendants (particularly Westcott) was by summarily removing me from an assignment to a secondary job function as a liaison officer for the Pennsylvania Emergency Management Agency (PEMA). Westcott did this in March 2000 (P232). Prior to then, I served on PEMA for many years. Yet, just *one day* after an article appeared in a local newspaper about the injunction I filed in Commonwealth Court to block my disciplinary transfer to Washington (P177, 178, P190, P191, P230), Major Koscelnak removed me from PEMA. Koscelnak testified the reason I was removed from PEMA was so I could devote my time to learning the duties of the position

I demoted to in LCE.   One more blatant inaccuracy.   I had been a Lieutenant for eight years prior to being demoted to LCE and a Captain for five of those years.   Until being placed in Evanko's penalty box, I was empowered to be the lead procurement officer in the multi-million-dollar systems integrator selection process.   There was nothing remotely suggestive that would let anyone believe that I would not be able to handle an occasional callout to PEMA while being demoted to a Lieutenant and running the smallest Section in LCE.   PEMA afforded me some professional growth opportunity as well as a means to supplement my income through overtime.   My wife has not worked outside of our home for the past seven years; choosing instead to stay home and be a full-time mother to our three sons.   Kicking me off PEMA, out of sheer spite, was one more glaring example of retaliation taken against me.   To be treated this way for no legitimate purpose causes me pain; pain that is so deep, it's hard to describe.

25.    In July 2000, an opening happened to come up in PEMA (P233, P234); by now I have been transferred within LCE to a Captain's position.    I expressed interest in the position (P191).   After a few days Major DeWire told me Major Washington (who was in charge of PEMA) had approved my request.   However, a few hours later that very same day, Major DeWire told me my approval was withdrawn because the "front office" got involved.   Eventually Captain Skurkis, who had no experience whatsoever with PEMA, and, according to his testimony, was not even interested in the assignment, was eventually selected (P128).   As an example of the earnings I have been denied, Skurkis testified he has earned approximately 40 hours overtime on PEMA just for duty related to September 11 alone (approximately $2,500).   It frustrates me knowing I can no longer serve in an assignment that I enjoyed, while knowing how much the extra income would mean to my family (P335).

26.    Since the defendants began taking actions against me, my career advancement opportunities have been decimated. The fact that Evanko did not promote me to the Director of BPR speaks for itself (P158, P266, P277). Despite being the most credentialed, eligible member in the entire Department for the position, I was not selected. Evanko also passed me over for a promotion as the Director of LCE; the Bureau where I currently am a Division Director. In both instances, instead of promoting me, Evanko promoted individuals who have never served in either Bureau in any capacity over me. Failing to promote me into these positions has impacted on my earnings potential by approximately $8,000 per year.

27.    From May 12, 1999 (when Evanko blew up at LTC Hickes and I), I went from being the lead procurement officer on a crucial, monumental, 100 million dollar technology project, to a one week transfer back to IAD; to a 200 mile transfer to Washington Pennsylvania (a penalty box created just for me); to being demoted to a Lieutenant's position; to being kicked off a career enhancing committee and being denied overtime and promotional chances. These malicious transfers and denials seem endless. The uncertainty, stress and anxiety subjected me and my family to periods of intense stress. We never knew what to expect next; especially after we won the injunction. It is emotionally debilitating knowing the defendants have subjected me to these actions for no other reason than to satisfy their need for punishment and revenge. My career opportunities can be best summed up by what Major DeWire told me. He said he would not recommend me for promotion because he knew I would not be promoted anyway; there was no value in alienating him against his boss when I stood no chance and would not be promoted. Being treated as I have been has shaken me to my core; I have no hopes and no dreams. Without a future it is sometimes difficult to show up for work everyday and perform a job for executives who are out to destroy me but my respect and

commitment to the Pennsylvania State Police will not allow me to be a quitter.

28.    In February 2000, after I stopped the transfer to Washington, Evanko and Westcott demoted me to a Lieutenant's position in LCE.  There was no need to put me there.  There was no urgent need to fill this Lieutenant position.  This is evidenced by the fact that no Sergeant was promoted to Lieutenant to fill the position in January when other vacant Lieutenant positions were being filled.  Furthermore, a Sergeant had been filling the position in out of class status for over seven months (P224, P225, P226, P227, P228, P229).  As if being demoted wasn't humiliating enough, when the Director, Administration Division went on leave in March, a Lieutenant from Pittsburgh was brought to Harrisburg and paid out of class wages and subsistence to sit in as the Acting Director, Administration Division during the Director's absence (P231).    The Director, Administration Division, is a Captain's position.  There I sat a Captain for over five years, demoted to a Lieutenants position (P271, P272), now answering to a Lieutenant!

29.    Distributing a Personnel Order transferring me, a Captain, to a Lieutenant's position, was the defendant's way of announcing that Darrell Ober is being punished and his career is over.  For three months I was put on display and humiliated; I was put under the supervision of another Captain and for a time, technically under the supervision of a Lieutenant; given the job description of a Lieutenant and forced to perform Lieutenant's work.  It was the biblical version of being stoned in public. There was no temporary or larger plan; this was, according to PSP regulations, a *permanent transfer and permanent demotion.*  Eventually, I was restored to a Captain's position; but not in some grand display of forgiveness but rather because one of the Captains assigned to LCE unexpectedly retired (P235).  Realizing more legal opposition I am certain,

the defendants relented and grudgingly restored me to a Captain's position (P233).

30.   As if taking away promotional opportunities from me weren't hurtful enough, Westcott and Coury went out of their way to deny me training opportunities (P246, P247, P248, P249, P250, P251). In March of 2000, I was humiliated in front of my co-workers and peers, when after being approved to attend training in Washington D.C one day, it was disapproved the next day by Westcott. This was training that other members of my Bureau had been approved to attend just one year before. As if everyone didn't know, Westcott was sending a message to me and everyone else that I am a marked man, I am persona non grata, I have the plague and the defendants will go to any lengths to get me. In November 1999, another training I applied for (P6, P66, P76) was rejected because Coury said I was eight days too late in submitting my application (P65, P133). This is false. Fortunately for me, I made a copy of the application when I found it in my Bureau file. The copy that I made clearly indicates the application was submitted at least two days in advance of the deadline. Luckily there is a staff member who witnessed it all and made a notation on that document proving me right (P68, P281). That memo is now missing from my file (P139, P140). I no longer bother applying for any specialized training; I can't subject myself to any more rejections. What is the use?

31.   In January 2000, I applied to Evanko for the position as Director, Legislative Affairs Office (P219, P220, P221, P222, P326). Based on the applicants who were interviewed and who was ultimately selected, I was easily the most qualified candidate. Yet, Evanko never even acknowledged my resume and application. How humiliating to learn that I did not even rate consideration above a subordinate officer (a Lieutenant) or a Captain with a disciplinary history of sexual harassment, and who

was, at the time, under investigation on another complaint (and is currently a defendant in another sex discrimination civil suit). The Captain who was selected over me has since been promoted to Major. This is another promotion opportunity taken from me by Evanko.

32.    I worry about what official files are being kept on me and how that affects not only my career in the State Police, but also any post State Police career I might consider. I know my files have been altered. As mentioned previously, documents that would have assisted me in proving my case have been removed. When this was discussed during depositions, one of the defendants' attorneys made the statement that maybe I removed this document from the file myself. What a totally outrageous and hurtful statement. I have never been in possession of any of my personnel files unsupervised. What possible motive could I possibly have for removing documents that support my case? This litigation itself is a joke to these people.

33.    Until I made an official request to review my file, I knew nothing about an adjudication regarding the museum investigation until I discovered it in my file. That adjudication could have been an important document for other court actions and grievances that I had filed. Just like the witch-hunt investigation Evanko ordered on me, (which after extensively investigating me and coming up dry) no one ever informed me of the results. It makes me feel like I live and work under a microscope. Imagine what would happen to me if I ever did stumble and make a mistake?

34.    One of the most outrageous things that has happened in this litigation has been the false representation of regulations to the judge in order to get my lawsuit thrown out of court. Even the judge said that one of the regulations, had it been in effect at the time, could have defeated me. It has been frustrating to watch the Department manipulate the facts to try

innocent is to believe in the tooth fairy. This experience has only added to my mistrust of the defendants. Because PSP regulations are not accessible by electronic means, there is no possible way the attorney's made an innocent mistake in referring to a 2001 regulation in their motion to dismiss. No one from Research and Development or anywhere else would have had a reason to alert the defendants to the existence of the 2001 version of the infamous AR 1-1.02 (c). Placing the wrong regulation cite in their brief was an intentional act. There is simply no believable way that any attorney could mistakenly cite the February 2001 version of AR 1-1.02 (c) unless they participated in the scheme to fool this court (P85).

36.    During discovery, my attorney and I reviewed the historical file of AR 1-1. It had been altered. When we were examining the Change Sheet bearing Evanko's signature, which had supposedly been signed over a year ago, the ink smudged (P95, P105). I am not an ink hydration expert, but it seems to me that there is no logical way a document can have wet ink a year after it was signed. When this issue was brought up in depositions, the Chief Counsel made the outrageous statement that maybe the ink was smeared by my attorney because of a hoagie that he had eaten. If I ever did something like this I would find myself in deep trouble. Knowing the defendants will go to any length to defeat me, including altering files and fabricating evidence, cause me pain and is an affront to my rights as a citizen of this country.

37.    Not only did the defendants create AR 1-102 (c) to try and keep me from getting into court, they misquoted another. Changing a word from "has" to "might have" in FR 1-1.17 (b) completely changes the meaning and applicability of the regulation (P282).

38.    I suffer in other ways from the stigma the defendants have hung on me. For example, Major DeWire goes out of his way to make sure I am not

included in things like attending the Commissioner's Staff meetings. This would be one reason why I am not assigned to fill in as the acting director in his absence. He does other things like making sure I was not selected to attend a recent awards ceremony to represent my Bureau. Instead, a Lieutenant was selected over me after the other Captain was not available (P322). God bless him, he is a decent man who thinks he is protecting me. Experiences like these are constant reminders of how deep-seated the defendant's hatred of me is and how it affects others around me. When I am in my peer group, I feel like everyone is looking at me and talking about me (P211, P159). Some will make polite conversation but most will treat me like a leper. I am the guy no one wants the Commissioner to see them with; and I have been told that. I have not written down every instance when this has happened, but as recently as last month, when I was fueling my car at Department Headquarters, Lieutenant Wesley Thurston pulled up and said, "Hi Captain, is it safe to be seen with you yet?" Now I don't believe these officers say these things to hurt me and probably think joking about it eases the tension, however, they don't know or realize the hurt and anger I feel inside when this happens, because it reminds me of how powerless I am.

39.    I have lived and worked for over a year knowing that Coury was secretly making inquires into my emotional state, and the plotting against me never ends. Within two weeks of filing my amended complaint, Major DeWire told me that Coury requested that DeWire meet with Coury and the State Police psychologist to discuss my mental well being. Major DeWire testified that he believed that he was being used to carry a message to me that I had better back off or I would be put through a psychological evaluation. Imagine what it is like to catch the defendants cheating red-handed, file an amended complaint and for my trouble, have them question my mental health? The intimidation never ends. Coury testified that his inquiry into my emotional well being was based on a concern that

came to him from the president of my union.   According to President Lazzaro's deposition, he never expressed any concern to Coury that would have ever justified Coury making a mental health inquiry (P134).  It certainly makes me wonder why Coury never made any inquiry or showed any concern for the health and welfare for my family or me when he and the other defendants were trying to split us up.  The truth is there was no concern; Coury's interest in my well being was triggered by my discovery of the fraud they tried to perpetrate on this court and in retaliation for the amended complaint I filed. Coury's inquiry was another despicable act of retaliation and a desperate attempt to control me and prevent my getting to trial.  DeWire thought Coury's inquiry was a threat and clearly it was.  It was meant to injure me.

40.   I manage the stress created by the defendants the best way that I can.  I am trained how to act under periods of great stress.  However, all of my training has been on how to react to threats from outside the State Police. Nothing has prepared me for the stress that I have had to endure at the hands of these defendants.  I am the only breadwinner of my family.  I have to provide for my family and must find ways to cope and finish out my career.   From looking at my career with eager anticipation and enthusiasm I been forced into a posture that has put me constantly in fear of the next injustice, the next act of retaliation.  That is my emotional state.

I, Darrell Ober intend to be legally bound hereby and further swear that this was true and correct to the best of my knowledge, information and belief when filed previously in this litigation.  I make this statement with knowledge that making false statements to authorities in a legal matter is unlawful.

Darrell G. Ober

24

STATE OF <u>PENNSYLVANIA</u>      :

COUNTY OF <u>DAUPHIN</u>          :

<u>AFFIDAVIT</u> -- <em>II</em>

I, Captain Darrell G. Ober, being first duly sworn according to law, depose and say:

1.    The first I learned that there had been prior contact by the FBI with members of the State Police concerning the FBI probe into the State Police hiring process was in January or February 2000. Sometime after filing an injunction in Commonwealth Court to block my disciplinary transfer to Washington County, I telephoned FBI Special Agent Ralph Kush.  Kush told me that had contacted Lieutenant Klaus Behrens in 1995 or 1996 to determine Trooper Stanton's duty status.

2.    The first I learned that Agent Kush had discussed this case with Captain Frank Monoco, Sergeant Jerry Ryan, Corporal Jeffery Shaw or Corporal Frank Lieberum prior to contacting me was during Kush's desposition on March 14, 2002.

3.    The first I learned that Lieutenat Klaus Behrens informed Captain John Pudliner, Lieutenant McKnight, Trooper Jean Reidenbaugh or Captain Geoff Miller of the probe was when I read Behrens affidavit dated May 17, 2002.

4.    After my first contact with Kush, I personally checked Trooper Statnton's IAD file.  There were no flags, no notations, there were no open or pending criminal or administrative reports, no BPR

*Exhibit "E"*

Control Number issued, there was no documentation whatsoever indicating that Lieutenant Behrens, Captain Miller (both assigned to IAD), Captain Monoco, Sergeant Jerry Ryan, Corporal Jeffery Shaw, Corporal Frank Lieberum (all assigned to the Organized Crime Division), Captain John Pudliner (Stanton's Commanding Officer, Lieutenant McKnight (Stanton's Crime Section Commander) or Trooper Jean Reidenbaugh (BCI) had knowledge or information concerning this investigation or that Stanton was a potential suspect in an on-going criminal investigation.  The only items in Stanton's file were copies of prior investigations.

5.      Exhibit "A" is the cover memo to the transition plan I prepared for Captain Skurkis when we switched commands on May 2, 1998. Accompanying Exhibit "A" was a two-inch thick binder of information of support documentation.  Exhibit "B" is a copy of the transition plan provided to me by Captain Skurkis. You will note there is no mention of any open or pending criminal or administrative investigation into Trooper Stanton by the FBI or any other law enforcement agency.

6.      Upon accepting the detached position in IIMS, Colonel Evanko promised me personally that he would return me to IAD upon completion of my IIMS assignment.

I, Darrell Ober intend to be legally bound hereby and further swear that this was true and correct to the best of my knowledge, information and belief when filed previously in this litigation.  I make this statement with knowledge that making false statements to authorities in a legal matter is unlawful.

Darrell G. Ober

9/26/02 Adrienne I. Bailey

2

STATE OF <u>PENNSYLVANIA</u>          :

COUNTY OF <u>DAUPHIN</u>              :

## <u>AFFIDAVIT</u>

I, Captain Darrell G. Ober, being first duty sworn according to law, depose and say:

1.    In August 1989, as a Corporal, I was selected through a competitive selection process, to serve in the Pennsylvania State Police,  Bureau of Research and Development, Systems and Procedures Section, Programming Division, as a Staff Analyst.  As a Staff Analyst, my duties included researching, writing, editing, revising, and preparing assigned Department draft directives for the Commissioner.  My duties also included creating and maintaining directive historical files and conducting historical directive research for the Office of Chief Counsel in pending litigation for actions filed against the Department and its members.

2.    In March 1991 I was promoted to Sergeant and assigned as Supervisor, Systems and Procedures Section, Programming Division, Bureau of Research and Development.  My duties included supervising the development, writing, editing, revising, and staffing of the entire Department directives system, Suggestion Program, and Records Management Unit.  I also supervised the directive historical files and directive research projects for the Office of Chief Counsel in regard to pending litigation for actions filed against the Department and its members. I served in this position until I was promoted to Lieutenant and transferred to the Bureau of Professional Responsibility in March 1993.

3.    I recruited Sergeant Walter J. Margeson into the Bureau of Research and Development and was his immediate Supervisor.  I also trained Sergeant Margeson as my replacement regarding the aforementioned duties as Section Supervisor upon my promotion to Lieutenant.

4.    As a Lieutenant and the Central Section Commander of Systems and Process Review Division, Bureau of Professional Responsibility, my duties, in part, included administrative responsibility for ensuring in-depth, comprehensive staff inspections of personnel, installations and for compliance with the rules, regulations and established policies of the Pennsylvania State Police for the following organizational components: Troops F, G, H, all Bureau headquarters, (including the Bureau of Research and Development) and decentralized components co-located in the aforementioned Troops.

*Exhibit "F"*

5.     In March 1995, I was promoted to the rank of Captain and assigned as the Division Director in the Systems and Process Review Division.  As such I maintained responsibility for the aforementioned staff inspection function in the State Police for the entire Department.

6.     The defendants self-serving explanations and affidavits notwithstanding, based on my extensive experience in composing and inspecting for Department compliance with regulations, the historic file of AR 1-1.102 (c) provided to me for review by Major Merryman was **NOT** in conformance with the existing policy and customary practices of the Pennsylvania State Police.

7.     Based on my experience, it is inconceivable that not a single trace of evidence exists which would explain the origins of a far ranging directive that affects every enlisted member (4,168 individuals) and every civilian employee (1,534 individuals) in the Department.

8.     I also attest to the fact that at no time in the extensive litigation history that I have been involved in with the Department have I **EVER** been accused or otherwise informed that I violated *any* Department regulation, including AR 1-1.02 (C) or FR 1-1.17 (B).  The litigation history includes filings, briefs and related materials dating back to January 2000 which include an injunction,  a writ of mandamus, a complaint filed in Commonwealth Court for Violation of the Pennsylvania Whistleblower Act as well as documents authored by the defendants in response to a series of grievances I filed in response to the actions taken against me.

9.     I also attest to the fact that during the administrative "inquiry" that conducted on me in June 1999, I was informed by the investigators, Major Thomas F. Williams and Major Robert G. Werts, that they had found **NO** evidence that I had committed any violations of Department regulations.  The Notification of Inquiry, Form SP 1-102, issued to me on June 28, 1999 during my interrogation also attests to the fact the defendants knew I had not committed any violations of any agency rule or regulation.  The alterations of the document from its original form and format also attest to the defendants need to "customize" it for their unlawful purpose.  Additionally, the block that is to be utilized when a member *is* suspected of committing a violation is blank.  Also left blank is the BPR Control Number block which **is** a violation of Department regulations and practice and demonstrates proof that this investigation was conducted "off the books".  The final testament to the defendants prior knowledge that I committed no wrongdoing is in the narrative of the "Notification of Inquiry" which reads as follows:

"By order of the Pennsylvania State Police Commissioner, Paul J. Evanko, I have been assigned to make inquiry into your knowledge of the facts or circumstances surrounding the political corruption investigation that was conducted by the FBI in Western Pennsylvania."

Sworn to and subscribed before me this

26th Day of June 2001

Notary Public 4/14/03
My Commission Expires:

3

**STATE OF <u>PENNSYLVANIA</u>**      :

**COUNTY OF <u>DAUPHIN</u>**      :

<u>**AFFIDAVIT- IV**</u>

I, Captain Darrell G. Ober, being first duly sworn according to law, depose and say:

1.      I was personally notified by Major Francis E. Koscelnak that I was being demoted and transferred to a Lieutenant's position in the Bureau of Liquor Control Enforcement on February 16, 2000. Major Koscelnak informed me of the transfer in his office at the Bureau of Liquor Control Enforcement. I was at the Bureau of Liquor Control Enforcement for a meeting regarding the IIMS project. (refer to P209; Koscelnak Dep. 10/23/01 At 28).

2.      On June 14, 2002 I telephoned retired Major Leonard Washington. His contact information is as follows:

     Major Leonard Washington

     2138 Coral Point Dr.,

     Cape Coral, Florida

     (941) 242-5252

Major Washington and I discussed his role and that of defendant Westcott in my PEMA denials. Major Washington told me that sometime in July of 2000 he became aware that I was seeking re-instatement to PEMA. He had no objection nor did my supervisor, Major DeWire. In discussing this with the head of PEMA, Captain Jeffery Davis, Captain Davis suggested that Major Washington might want to check with the front office. Major Washington stated that he personally telephoned Colonel Westcott and informed him that I wanted to return to PEMA. Westcott said no. Major

1

*Exhibit "G"*

Washington, in turn, informed Major DeWire of the denial.   Major Washington initialed stated he would sign an affidavit confirming these details.  On June 14, 2002, I drafted an affidavit and e-mailed it to Major Washington for his review. On June 15, 2002 Major Washington e-mailed me a few minor changes to paragraphs 5 and 6 of the draft affidavit.   He indicated he would mail the affidavit to me the following Monday.  On June 17, 2002 Major Washington e-mailed me again saying he would not sign the affidavit but "would be more than happy to appear, if subpoena(ed)". (refer to Exhibits "A phone listing", "B" draft affidavit, "C" e-mail dated 6/15 and "D" e-mail dated 6/17).

3.      On October 5, 1998, then Major Conley was not in the BPR office in Harrisburg.  From October 6 – 8, I was not in the BPR Office in Harrisburg due to attending Disciplinary Committee Meetings at the Pennsylvania State Troopers Association (Exhibit "E").  On October 9, 1998 I was not in the office due to taking the promotion examination for the rank of Major. October 10-11, 1998 were weekend days and the office was closed. October 12, 1998 the office was closed in observance of the Columbus Day.   October 13, 1998 was Major Conley's promotion ceremony. Therefore, the earliest opportunity I could have had to discuss anything with Major Conley would have been at least October 14, 1998.

4.      I have no recollection of exactly when Major Conley called me to discuss his upcoming promotion to Major when he was transferred from Troop B, Washington to the Bureau of Professional Responsibility.  I recall that it was nothing more than an "introductory" type call and I remember extending my congratulations to him.  There was no discussion about expectations or my "disappointment" at not getting the position.  In fact, to this  day  we  have  not  any  conversation  whatsoever  about  "my disappointment".  We did have a discussion in his office re: expectations. However, it was after October 13, 1998 (see para. 3 above).

statement with knowledge that making false statements to authorities in a legal matter is unlawful.

Darrell G. Ober

_____

6/20/02
Adrienne L. Bailey

Search Results - MSN.com  

Page 1 of 2

MSN Home | My MSN | Hotmail | Search | Shopping | Money | People & Chat

  **SEARCH PUBLIC RECORDS**
> Court Records   > Public Records   > Property Records
> Social Security   > Driving Records   > Background Checks

**White Pages**      # Search Results      

**White Pages Home    Reverse Number Lookup    Email Search    Yellow Pages**

**'Add To Outlook' Help**

Our Sponsors

### TRY PUBLIC RECORDS!


Do you know this person?

update/remove | add listing

**Result 1 of 1**

**Leonard Washington**
2138 Coral Point Dr
Cape Coral, FL 33990

**Phone:** 941-242-5252

**Find Anyone!**
#1 People Finder
Click here

ADD TO OUTLOOK

• DMV Records
• Divorce Records
• Social Security Records
• Background Checks

**More for Leonard Washington:**
• **Map** • **Directions** • **Email Search** • **Find Neighbors** •

• **Leonard Washington is in our Database! Click Here**
• **Find Leonard Washington at Classmates.com!**

**Horoscopes:** What's your sign?
Find High School Friends!

• **Cape Coral Services**
Apartments
Autos
Employment
Home Listings
Personals
More...

• **Find a Gift for Leonard Washington**

• **Florida**
Lottery Results

**Other Searches**

**eShopping**
**Health**
**Classifieds**
**Movie Listings**
**International**
**Fun Stuff**
**Government**

• **Government Directory**

**Refine Your Search**

Last Name
(required for Canada)     `Washington`

First Name/Initial     `Leonard`

City     `[          ]`

State/Province
(required for US and Canada)     `Florida  ▼`

☐ Including Surrounding Region (U.S. Only)

Country
(required)     `United States  ▼`

`Find`

**Note:** To search a country not listed above, see our list of World Directories.

*EXHIBIT "A" to Affidavit IV* 

STATE OF **FLORIDA**                        :

COUNTY OF _____        :

## **AFFIDAVIT**

I, Leonard Washington, Jr., being first duly sworn according to law, depose and say:

1.      I retired from the Pennsylvania State Police on January 5, 2001.  I retired holding the rank of Major as the Director, Bureau of Emergency and Special Operations.  I enlisted in the State Police on January 25, 1973.

2.      The Emergency Operations function, specifically, the Pennsylvania Emergency Management Agency (PEMA) function as it relates to the Pennsylvania State Police, was under my command.  Captain Darrell G. Ober was one of the officers's in the Department who served in the part time capacity as a PEMA Liaison Officer.

3.      During the time I was the Director, Bureau of Emergency and Special Operations, Captain Ober completed his assigned PEMA duties without incident.

4.      It is my recollection that Captain Ober withdrew from his PEMA assignment due to his being transferred to Troop B, Washington.

5.      Sometime in July 2000, Captain Jeffery R. Davis informed me that Captain Ober expressed interest in being re-instated on PEMA.  I had no objection to Captain Ober being re-instated.  Captain Davis suggested to me that I check with Lieutenant Colonel Joseph Westcott, the Deputy Commissioner of Operations.  I personally telephoned Colonel Westcott

1                    *EXHIBIT "B" to Affidavit*

and requested permission to re-instate Captain Ober to PEMA.  Colonel Westcott said no and refused to allow Captain Ober back on PEMA.

6.    Having been refused by Colonel Westcott, I telephoned Captain Ober's supervisor, Major Phillip DeWire and informed him that Captain Ober was not permitted back on the PEMA detail.

| Subj: | **affidavit reply** |
|---|---|
| Date: | 6/15/2002 12:02:08 PM Eastern Daylight Time |
| From: | Lennywash@cs.com |
| To: | PSPNUT |

Received your email and will look at mailing the affidavit on Monday.

There are changes to #5 and #6 as follow:

5. Sometime in July 2000, Captain Jeffery R. Davis of Pennsylvania Emergency Management Agency (PEMA), informed me that Captain Ober expressed an interest to return to PEMA. I had no objection. Captain Davis suggested that I check with the front office. I personally telephoned Colonel Westcott and informed him that Captain Ober expressed that he wanted to return to PEMA. Colonel Westcott gave a reply of no and there was no further discussion.

6. After receiving Colonel Westcott's answer, I telephoned Captain Ober's supervisor, Major Phillip DeWire and informed him to disregard our prior conversation regarding Captain Ober and PEMA.

Any questions, please call or email.

EXHIBIT "C" to Affidavit IV

| Subj: | **Affidavit Response** |
| Date: | 6/17/2002 11:44:49 AM Eastern Daylight Time |
| From: | Lennywash@cs.com |
| To: | PSPNUT |

Darrell:

After careful consideration, I have decided not to sign the affidavit and would be more than happy to appear, if subpoena.

Leonard Washington

EXHIBIT "D" to Affidavit II

| Subj: | **Affidavit** |
|---|---|
| Date: | 6/14/2002 2:58:39 PM Eastern Daylight Time |
| From: | PSPNUT |
| To: | Lennywash@cs.com |
| BCC: | PSPNUT |
| File: | **AFFIDAVIT3.doc** (88064 bytes) DL Time (38666 bps): < 1 minute |

Major:

 Thank you so much for speaking with me today.  It is refreshing to finally hear a true account about what was done to me.

 I am attaching a Word document (I hope you have Word or someway to open and print the document).  Please look it over. I hope it doesn't need any corrections.  The most important point is that you called Westcott about putting me back on PEMA and he said no.  I will follow this up with a phone call and fix anything you think needs revised before you sign it.

 Unfortunately, time is of the essence.  The quickest way I can think to handle this is, assuming no revisions as necessary, to have you print it and sign, get it notarized and fed x or overnight mail it to me.  Of course, I will reimburse you for travel costs, notary fees, mailing charges and anything else you can think of.

 My address is as follows:

Darrell Ober
71 Millers Gap Road
Enola, Pa 17025

home phone 717-790-0708
work phone 717-540-7460

 Thank you again, I can't tell you how much I appreciate your assistance.  Your integrity and honestly is going a long way to restoring my faith.

 P.S. - Kim says "Hi" and thanks also.

Darrell

P.S.S. - In case you can't open the document; below is a cut and paste (that way this message is not a total waste).

STATE OF FLORIDA   :

COUNTY OF _____ :

AFFIDAVIT

 I, Leonard Washington, Jr., being first duly sworn according to law, depose and say:

1. I retired from the Pennsylvania State Police on January 5, 2001.  I retired holding the rank of Major as the Director, Bureau of Emergency and Special Operations.  I enlisted in the State Police on January 25, 1973.

2. The Emergency Operations function, specifically, the Pennsylvania Emergency Management Agency (PEMA) function as it relates to the Pennsylvania State Police, was under my command.  Captain Darrell G. Ober was one of the officers's in the Department who served in the part time capacity as a PEMA Liaison Officer.

3. During the time I was the Director, Bureau of Emergency and Special Operations, Captain Ober completed his assigned PEMA duties without incident.

EXHIBIT "D" to Affidavit IV



4. It is my recollection that Captain Ober withdrew from his PEMA assignment due to his being transferred to Troop B, Washington.

5. Sometime in July 2000, Captain Jeffery R. Davis informed me that Captain Ober expressed interest in being re-instated on PEMA. I had no objection to Captain Ober being re-instated. Captain Davis suggested to me that I check with Lieutenant Colonel Joseph Westcott, the Deputy Commissioner of Operations. I personally telephoned Colonel Westcott and requested permission to re-instate Captain Ober to PEMA. Colonel Westcott said no and refused to allow Captain Ober back on PEMA.

6. Having been refused by Colonel Westcott, I telephoned Captain Ober's supervisor, Major Phillip DeWire and informed him that Captain Ober was not permitted back on the PEMA detail.



PENNSYLVANIA
STATE TROOPERS
ORGANIZED 1962        ASSOCIATION

*COPY*

October 9, 1998

**SUBJECT:**        Discipline/Grievance Committee Report

**TO:**        Louis J. Lazzaro, President

**FROM:**        Paul T. McCommons, Committee Chairman

The Discipline/Grievance Committee met on October 6, 7, 8, 1998, with the following members present:

| **PSTA Representatives** | **Department Representatives** |
| --- | --- |
| Joe Sarkis | Major Merryman |
| Scott Neal | Captain Points |
| Dennis Rodriguez | Captain Zink |
| Paul T. McCommons | Captain Ober |

Please find attached a copy of the minutes prepared by Scott Neal. The next proposed meeting date for the committees to meet is November 9-10, 1998, at 9:00 a.m., at the PSTA office building.

A discussion was held and agreed to that Capt. Points would attempt to invite the head of Maryland's Discipline System, and the head of their Union to the meeting on November 9-10, to discuss their process.

*EXHIBIT "E" to Affidavit*

**PSTA** 3625 Vartan Way, Harrisburg, PA 17110    (717) 540-5646 • 800-541-9934    Fax (717) 540-5318 • 800-540-5318
e-mail: psta@paonline.com    website: www.psta.org

PSP-501X

COMMONWEALTH OF PENNSYLVANIA

DATE:                    May 18, 2000

SUBJECT:                 Criminal Investigative Traffic Safety Incident Information Management System
                         (IIMS) Program Newsletter Item

TO:                      Area, Troop, and Station Commanders; Bureau and Office Directors

FROM:                    Colonel Paul J. Evanko
                         Commissioner

ENCLOSURE:               (1)    *Lockheed Martin Today,* Volume 6, Number 4, dated April 2000.

                         1.     Enclosure (1) is forwarded for your information.  The IIMS Program is
featured on page 2.

*Exhibit "H"*

# Pulled Over

**M&DS vies for state police work using lessons learned in the federal arena**

Lockheed Martin Management & Data Systems (M&DS) may soon be doing its part to help fight crime in Pennsylvania.

The Pennsylvania State Police in early March selected M&DS to develop and implement a high-tech, centralized information system that will revolutionize the department's operations across the state. The Pennsylvania State Police anticipate a final contract award given the successful completion of negotiations later this spring.

The agreement calls for the Valley Forge, Pa., company to oversee all work related to the law enforcement agency's proposed Criminal Investigative Traffic Safety Incident Information Management System, or IIMS. The centralized information system will computerize 80 percent of the operations the department now handles manually.

"This system will enable us to provide more proactive law enforcement to the citizens of Pennsylvania," says Ron Wilt, IIMS program manager, PA State Police. "We'll be able to put more troopers on the road using the same complement, because our operations will be more efficient and effective. Troopers will be able to respond to incidents faster, and they'll be armed with better information because they'll have mobile offices right in their cars."

As IIMS systems integrator, M&DS will coordinate:

- the development of the computer-aided dispatching and geographic information systems

- the integration and installation of computers in patrol vehicles

- the implementation of the bar-coding technology for processing evidence.

The IIMS contract represents M&DS' continued expansion into state and local government systems integration work. The company has a long and proven track record handling massive systems integration projects for the federal government.

"We are an industry leader for technical project management and systems engineering and integration," says Chris D'Ascenzo, M&DS' director



Management & Data Systems may soon be developing a high-tech, centralized information system for the Pennsylvania State Police, putting mobile offices in trooper cars and computerizing 80 percent of the operations the department now handles manually.

of business development, Integrated Technology Solutions. "That's our competitive advantage, that we do this type of work for large, complex, mission-critical systems — which the IIMS program will be."

The PA State Police estimates that the IIMS will cut its administrative paperwork in half because troopers will use computer technology — rather than time-consuming manual processes — for tasks such as recording information at the scene of incidents, processing evidence, and building information as an investigation continues.

Many of the department's operations currently are paper-based. For example, when an incident is reported, a dispatcher writes the information on a form, then radios

*Troopers will be able to respond to incidents faster, and they'll be armed with better information because they'll have mobile offices right in their cars.*

the information to the trooper dispatched to the scene.

The trooper takes notes while the dispatcher is talking, then writes his or her information on another form after responding to the incident. Other reports are completed as follow-up work is done and, often, those reports contain common information that needs to be filled in on several different forms.

The PA State Police Department currently has 81 dispatch centers, a number that will be substantially reduced when the IIMS is in place. The system's computer-aided dispatch capabilities will immediately match the location of the caller with an available trooper close to the scene.

The information collected on the computer-aided dispatch screen will

be transmitted to the "mobile office" in the trooper's car. After the trooper responds to the incident, he or she will complete a form electronically. After the report is created, only new information needs to be added to the computer file.

The three-year IIMS project has been cited as a top priority by Gov. Tom Ridge's administration, which has proposed more than $17 million for it in the 2000-01 budget.

The 4,168 sworn members and 1,503 civilian personnel of the PA State Police handle criminal investigations as well as highway patrol across the state. The department has 1,200 patrol cars and an aviation patrol capability, each of which will be equipped with a mobile office. Another 1,000 administrative, undercover and special-purpose vehicles may be equipped with various devices as well.

"Our department patrols 84.6 percent of the geography of the state, and the mobile office will provide everything the trooper needs to perform his or her job," Wilt says. "The IIMS really will improve how we fight crime and reduce crashes, thus creating a safer environment."

During a highly competitive selection process for the work, M&DS emphasized that the IIMS project is a systems-integration challenge the company is well-equipped to handle as a partner with the Pennsylvania State Police.

"M&DS brings to this challenge well-proven methodologies and processes that repeatedly produce excellent results," says Tom Carroll, IIMS program manager at M&DS. "We will apply lessons learned in the federal government environment to benefit the citizens of the commonwealth of Pennsylvania."

M&DS' teammates on the project include TRW, SAIC, DynCorp, Applied Digital Solutions, Innovative Business Concepts, L. Robert Kimball and Associates, Matthew Hunt and Associates, The Cider Group, Carnegie Mellon Research Institutes and Pennsylvania State University. ■



## Youngest Raptor Takes To Skies

The third F-22, Raptor 4003, made its first flight in March. The third F-22 Raptor is the most recent addition to the U.S. Air Force's stable of next-generation air dominance fighter jets at Lockheed Martin Aeronautics Company-Marietta in Marietta, Ga. Raptor 4003 will join Raptors 4001 and 4002 at Edwards Air Force Base for additional testing. Raptor 4004, slated to debut in a few months, will test the aircraft's avionics. The F-22 test program has logged nearly 600 hours of test time to date. In all, the flight test program is anticipated to encompass some 3,500 test hours and 2,400 flights. The F-22 is scheduled to enter service in 2005.

*For more information, contact M&DS communicator Jim Waddington at 610-354-5477 or e-mail james.r.waddington@lmco.com.*

## OBER, DARRELL G

| | |
|---|---|
| **From:** | PSP Commissioner |
| **Sent:** | Wednesday, February 07, 2001 11:59 AM |
| **To:** | Everyone |
| **Subject:** | Governor's Executive Budget Recommendations |

*In an effort to keep all personnel informed of significant issues that impact on the Department, the following information is being provided regarding the 2001-02 Budget.*

## Highlights

2001-02 Governor's Executive Budget Recommendations

1.   The 2001-02 Governor's Executive Budget recommends funding for the State Police of $599.2 million, an increase of $40 million over the current budget. On March 7, 2001, the Deputy Commissioners, Fiscal Director and I will be appearing before the House and Senate Appropriations Committees to answer questions concerning the Governor's recommended funding for the State Police.

2.   Over $50 million is recommended to support high-tech projects in the Department. This includes:

- $25.2 million to fund the Department's continuing implementation of its wide-ranging Traffic Safety Criminal Investigative Incident Information Management System (IIMS).

- $14.7 million will be invested into improvements to the Department's computer infrastructure to support IIMS and related projects.

- $5.8 million for improvements to the computerized Criminal History Record Information system maintained by State Police. Among other benefits, the upgrades will significantly speed up the processing of criminal background record checks that are required by many employers.

- $2.8 million for improvements to the Commonwealth Law Enforcement Assistance Network (CLEAN) system. CLEAN upgrade will allow storage of photographs and fingerprints in its electronic files, which are routinely accessed by law enforcement agencies throughout the nation through the CLEAN connection with the FBI's National Crime Information Center (NCIC).

- $1.3 million for application upgrades to the Enterprise Network. This will computerize thousands of pages of regulations, directives and operations manuals on-line for instant access by Troopers.

- $1.5 million to upgrade and automate the Municipal Police Training database.

3.   $466,000 is included for the addition of four civilian positions and additional equipment of the State Police Computer Crime Unit, which investigates crimes such as computer hacking, cyber stalking, distribution of child pornography and counterfeiting of computer software.

4.   $2.0 million is recommended to replace an aging helicopter with the more advanced Bell Model 407. This model will provide more endurance, range, and lift capabilities.

5.   The Governor's budget proposal also contains $1,548,000 for 76 new civilian Police Communications Operator (PCO) positions across the state and $257,000 from the Pennsylvania Turnpike Commission for eight civilian Clerk positions at Troop T.

6.   $18.1 million is included to provide resources for base stations and mobile and portable radio

equipment for our 800 MHz Statewide Public Safety Radio System.

7.    $454,000 is recommended to increase liquor control enforcement activities.

8.    Funding is also recommended to purchase 500 new patrol cars.

9.    I am extraordinarily pleased with the Governor's continued support of the Department. We look forward to  the same level of commitment from the Pennsylvania General Assembly.

Colonel Paul J. Evanko
Commissioner

## CERTIFICATE OF SERVICE

I, Don Bailey do hereby certify that on this **27th day of June 2002** a true and correct copy of

the aforegoing **PLAINTIFF'S REPLY BRIEF** served upon the individual named below via first

class mail postage pre-paid at the indicated address:

SYNDI GUIDO, ESQUIRE
OFFICE OF GENERAL COUNSEL
333 MARKET STREET, 17TH FLOOR
HARRISBURG, PA 17101

DON BAILEY ESQUIRE
4311 N. 6TH STREET
HARRISBURG, PA 17110
(717) 221-9500