

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DARRELL G. OBER,  :
    Plaintiff

    vs.  :  CIVIL ACTION NO. 1:CV-01-0084

PAUL EVANKO,
MARK CAMPBELL,
THOMAS COURY,
JOSEPH WESTCOTT,
HAWTHORNE CONLEY,
    Defendants  :

M E M O R A N D U M

I.   Introduction.

    Plaintiff, Darrell G. Ober, a captain with the Pennsylvania State Police ("PSP"), filed this civil rights action, principally alleging violations of his First and Fourth Amendment rights. Defendants are Paul Evanko, the Commissioner of the PSP; Thomas Coury and Hawthorne Conley, PSP Deputy Commissioners; Joseph Westcott, formerly PSP Deputy Commissioner; and Mark Campbell, formerly assistant chief of staff to the former Governor of Pennsylvania, Thomas Ridge.

    Before us are cross-motions for summary judgment. The claims at issue are: (1) the First Amendment claim, based on allegedly retaliatory conduct for Plaintiff's handling of an FBI probe involving the PSP; (2) a related conspiracy claim that Defendants conspired to retaliate against Plaintiff for exercising

his First Amendment rights; and (3) the Fourth Amendment claim that Plaintiff was seized when he submitted to questioning for the purpose of an administrative inquiry into his handling of the FBI matter.

For the reasons discussed below, we will deny Plaintiff's motion for summary judgment and grant in part Defendants' motion for summary judgment.

II.   Standard of Review.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Id. at 586-87, 106 S.Ct. at 1356, 89 L.Ed.2d at 552 (citations omitted).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of

AO 72A

material fact. <u>Celotex</u>, 477 U.S. at 323, 106 S. Ct. at 2253, 91 L.Ed.2d at 274. It can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325, 106 S.Ct. at 2253-54, 91 L.Ed.2d at 275.

An issue is "genuine" "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." <u>Childers v. Joseph</u>, 842 F.2d 689, 693-94 (3d Cir. 1988) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is "material" when it would affect the outcome of the trial under the governing law. <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211.

When a moving party has carried his or her burden under Rule 56, the burden shifts to the nonmoving party to demonstrate that an issue of material fact exists. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586-87, 106 S.Ct. at 1356, 89 L.Ed.2d at 552 (citations omitted). The nonmoving party "must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment," and cannot "simply reassert factually unsupported allegations contained in [the] pleadings." <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted). "If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S.

at 249-50, 106 S.Ct. at 2511, 91 L.Ed.2d at 212 (citations omitted). Factual averments in briefs do not satisfy the nonmoving party's burden. <u>Harter v. GAF Corporation</u>, 967 F.2d 846, 852 (3d Cir. 1992)(brackets added).

These same standards apply to cross-motions for summary judgment, and we consider such cross-motions separately. The filing of cross-motions is not a concession by either party that summary adjudication is appropriate. <u>Transportes Ferreos de Venezuela II CA v. NKK Corp.</u>, 239 F.3d 555, 560 (3d Cir. 2001).

III. <u>Background</u>.

For the purpose of summary judgment, the following is the background to this litigation.

On July 20, 1981, Plaintiff enlisted as a cadet with the PSP, and on December 5, 1981, he became a PSP trooper. (Ober Dep. at p. 16). Over the years, he was promoted to the ranks of corporal, sergeant, lieutenant, and finally captain on March 3, 1995.

In 1998, he became the director of the internal affairs division ("IAD") of the bureau of professional responsibility ("BPR"). (<u>Id.</u> at p. 22). As director of the IAD, he was in charge of assigning investigations and routing the completed investigations to the proper authority. (<u>Id.</u> at p. 47). On April 26, 1999, Ober was temporarily transferred from IAD to the bureau of technology as a team leader to assist with the Incident

Information Management System ("IIMS") project. (Id. at pp. 22-23). Plaintiff and Col. Evanko had an agreement which provided that Plaintiff would return to IAD when his work with IIMS was completed.

While director of IAD, Plaintiff was contacted by FBI special agent Ralph Kush in late September or early October 1998. (Id. at pp. 76-77; Kush Dep. at p. 95). Agent Kush informed Plaintiff that the FBI was conducting a political-corruption investigation into whether a political figure was taking payoffs from police academy applicants in exchange for admission into the academy. (Kush Dep. at pp. 10-11, 99-100). The two discussed how such a scheme could occur. Plaintiff maintains that during the conversation they concluded that this job-selling scheme could not be accomplished without help from someone within the state police force, and that only certain members of the force had access to the police academy examination process. (Ober Dep. at pp. 81, 85-86).

Plaintiff believed that although Agent Kush did not expressly tell him to keep the FBI investigation confidential, the two had a clear understanding they would do so. (Ober Dep. at pp. 105, 146-47). Consistent with Ober's assertion, Agent Kush testified that although he did not instruct Plaintiff to keep the information confidential, he had expected Ober to handle the sensitive information in the appropriate manner and had hoped that Ober would not discuss it with anyone. (Kush Dep. at p. 118).

Shortly after his telephone conversation with Kush, and believing that Lt. Col. Hickes, deputy commissioner of staff, would not be involved in the alleged corrupt activity, Plaintiff sought his guidance. (Ober Dep. at pp. 121, 131). Hickes told Plaintiff to keep him informed but not to discuss the matter with anyone else. (Ober Dep. at p. 150). Hickes was not in Ober's direct chain of command.

On May 12, 1999, after the FBI investigation ended, Plaintiff and Hickes informed Evanko of the FBI's investigation and the concern that high-ranking officials in the state police or in the governor's office might have been involved. (Evanko Dep. at pp. 42, 51). They also informed Evanko that while the investigation was unfounded as to higher-ups, the investigation did uncover the involvement of one PSP trooper. (Id. at p. 69). Evanko was embarrassed and upset for several reasons, including the decision to keep the information from him and that Hickes had become involved in another deputy commissioner's command. (Id. at pp. 44, 46-47).

After being informed of the FBI investigation, on May 12, 1999, Col. Evanko informed the governor's deputy chief of staff, Mark Campbell, of the situation. (Evanko Dep. at p. 64). Col. Evanko also informed Campbell that an administrative inquiry would be conducted by the State Police. (Id. at pp. 69, 113-14). Evanko notified Campbell as a courtesy. (Id. at pp. 68-69). Campbell did not authorize or approve the administrative investigation. (Campbell Dep. at pp. 30-34).

AO 72A

Evanko assigned Majors Thomas Williams and Robert Werts to conduct the inquiry. (Evanko Dep. at pp. 179-83). Its purpose was to identify the facts involved with (1) the FBI contact with Ober; (2) Ober's conversation with Hickes; and (3) the decision to keep the FBI investigation confidential. (Id.). The inquiry was not an official investigation by BPR. (Id. at 183). It was completed by July 21, 1999, and neither Ober nor Hickes was disciplined. (Id. at p. 184).

In the course of the administrative inquiry, the Majors interviewed the plaintiff and at least five others. At his interview in June 1999, Plaintiff was given his Garrity warning.[1] (Ober Dep., 12/5/01, at p. 132), but no Miranda warnings. (Id. at p. 134). The Garrity warning is given when there is not going to be a criminal investigation. (Id. at p. 132). Plaintiff was not told whether he could leave the interview or not, and he kept his firearm. (Id. at p. 149).

In a letter dated May 22, 1999, retired Colonel Philip Conti notified Col. Coury of possible off-duty misconduct by Ober. (See Ex. 10, attached to Ober's Dep.). The allegation was that Ober had improperly solicited historic artifacts from the widow of a state police retiree. (Id.). In a subsequent letter dated July 9, 1999, Conti notified Col. Coury of a similar incident involving Ober. (Id.). Pursuant to PSP administrative regulation 4-25, Col. Coury forwarded the information to the BPR, which initiated

---

[1] Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

an inquiry. The allegations against Ober were deemed unfounded. (Id. Ex. 11). Plaintiff maintains that this investigation into his personal affairs was conducted in retaliation for his involvement in the FBI investigation. (Ober Dep. at p. 254).

On August 20, 1999, Col. Evanko informed the head of the PSP centennial book committee that Plaintiff could no longer volunteer with the committee because the IIMS project required Plaintiff's full attention. (Id. at pp. 287-88). A few days later, on August 23, 1999, while temporarily assigned to the bureau of technology, Plaintiff was asked to turn in the BPR's cellular telephone he had been using. (See id. at pp. 297, 299-300; Conley Dep. at pp. 77-80).

About this same time, Plaintiff made inquiries into the location of a retired policeman's letter of commendation. (Ober Dep. at pp. 301-02). Conley notified Plaintiff that he owed $69 to the Commonwealth for the cost of framing the letter, which had been done months earlier at Plaintiff's direction. (Id. at pp. 304, 305). Plaintiff then paid Conley the $69 in exchange for the release of the letter. (Id. at p. 307). Plaintiff filed a grievance in an effort to recoup the $69 but was unsuccessful. (Id. at p. 310).

Plaintiff also claims that he was improperly denied two educational opportunities. In the fall of 1999, Major Einsel denied Plaintiff's application to Northwestern University's police staff and command school. (Ober Dep. at p. 350). His application was denied because it was submitted past the deadline. (Id.).

Also, Plaintiff complains that around April of 2000, he was denied the opportunity to attend a national alcohol symposium scheduled for June 2000. (Id. at pp. 355-60). That year, no state police employee attended the conference.

In early January 2000, Plaintiff was nearing the completion of his assignment with IIMS. Although Evanko and Plaintiff had agreed that Plaintiff would be returned to the BPR upon the completion of his assignment with IIMS, (Evanko Dep. at pp. 214-15), Major Conley requested that Plaintiff not be returned to the BPR. (Id. at p. 219). On January 10, 2000, Plaintiff was notified that he was being transferred to Washington County to assist in the preparations for the National Governors' Association conference. (Id. at pp. 218-19). The transfer was for an indefinite duration and was about 200 miles from Harrisburg, where Ober was stationed.

In attempting to block his transfer, Plaintiff filed a petition for mandamus and a request for a preliminary injunction in the Pennsylvania Commonwealth Court. On January 27, 2000, Evanko agreed to rescind the transfer until the court ruled on the mandamus petition. In exchange, Ober withdrew the preliminary injunction motion. On February 19, 2000, Ober was assigned as the central section commander within the bureau of liquor control enforcement. This was typically a lieutenant's position, so Plaintiff considered it a demotion. Some three months later, when a position for a captain became available in the Harrisburg area, on May 30, 2000, Evanko assigned Plaintiff as the director of the

administration division in the bureau of liquor control enforcement.[2]

After Plaintiff was notified of Evanko's order transferring him to Washington County, Ober withdrew from a position with the Pennsylvania Emergency Management Agency (PEMA). (Ober Dep. at p. 278). However, when the transfer did not go through, Ober requested that he return to PEMA. (Id. at pp. 283-84). His request was denied because Major Francis Koscelnak supposedly wanted Ober to concentrate on his new duties. (Id. at pp. 284, 289). In the summer of 2000, when Major Phillip DeWire replaced Major Koselnak, Plaintiff made a second request to return to PEMA, which was denied. (Id. at pp. 292-95; DeWire Dep. at p. 44). Plaintiff contends that Lt. Col. Westcott was ultimately responsible for denying his request. (Ober Dep. at p. 295). Plaintiff further contends that because he was not allowed to return to PEMA, he was denied opportunities for overtime.

Finally, Plaintiff claims that Col. Coury blocked two opportunities for Plaintiff to be promoted to the rank of major. (Id. at p. 241). The first opportunity was an opening for the director of the BPR in late 1999 or early 2000 and the second was an opening for the director of the bureau of liquor control enforcement around July of 2000. (Id. at pp. 243-247).

---

[2] In the meantime, on March 30, 2000, the commonwealth court had dismissed Ober's petition for mandamus as moot because Evanko had filled the Washington, Pennsylvania, position and because Ober had been assigned as central section commander.

AO 72A

IV. <u>Discussion</u>.

Initially, we dispense with two defense motions concerning some of Plaintiff's summary-judgment evidence: (1) Defendants' Motion to Strike Plaintiff's purported affidavits and other documents submitted in opposition to Defendants' motion for summary judgment; and (2) Defendants' Motion to Strike exhibits to Plaintiff's reply brief. We will dismiss these motions as moot because none of the challenged evidence was necessary to a determination of the cross-motions for summary judgment.

A. <u>The First Amendment Retaliation Claim</u>.

We first address Plaintiff's claim that Defendants retaliated against him in various ways for asserting his First Amendment right to free speech when he discussed the FBI's investigation with Lt. Col Hickes rather than stay within his own chain of command.[3] Specifically, Plaintiff asserts that the following actions were retaliatory: (1) the administrative investigation into his handling of the FBI investigation after Kush notified him of it; (2) the investigation into his personal collection of PSP memorabilia; (3) his removal from the PSP centennial book committee; (4) the recall of his cellular phone;

---

[3] Prompted by our speculation in our memorandum dealing with Defendants' motion to dismiss, Plaintiff argues that he is entitled to summary judgment on additional First Amendment claims based on the right of association and the right to petition the government. (<u>See</u> Pl's Supp. Br. at pp. 6-7). However, Plaintiff did not support these claims with citation to precedent, so Plaintiff will be denied summary judgment on those claims. In making this decision, we do not reach Defendants' argument that no such claims were set forth in the amended complaint.

(5) denial of reimbursements; (6) denial of educational opportunities; (7) the attempted transfer to Washington County; (8) a constructive demotion to a lieutenant's position; (9) denial of overtime opportunities when he was not reappointed to PEMA; and (10) the failure to promote him to the rank of major.

First Amendment retaliation claims are evaluated under a three-step process: (1) the plaintiff must show that he engaged in activity protected by the First Amendment; (2) the plaintiff must show that the protected activity was a substantial or motivating factor for the alleged retaliation; and (3) when the plaintiff establishes a substantial or motivating factor, the defendants may defeat the plaintiff's claim by showing that they would have taken the same actions in the absence of the protected conduct. Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001) (citations omitted). The first step is a question of law for the court, while the second and third steps are normally questions of fact for the fact finder. Id. at 195.

In moving for summary judgment, Defendants first argue that Plaintiff cannot satisfy the first step because his conduct was not activity protected by the First Amendment. They provide two reasons. First, "Ober's decision to ignore state police regulations [concerning chain of command mandates] and report the matter to Lieutenant Colonel Hickes was a matter of personal concern, rather than public, concern." (Defs' Supp. Br., at p. 4). Second, the government's interest in proper management of the

PSP by investigating Ober outweighed any reason Plaintiff may have had for going outside his chain of command.

To qualify as protected activity, Plaintiff must satisfy the Pickering balancing test. Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). We weigh Plaintiff's free speech interest in commenting on a matter of public concern against the public employer's interest in promoting the efficiency of the public services it performs through its employees. Board of County Comm'rs v. Umbehr, 518 U.S. 668, 675-676, 116 S.Ct. 2342, 2347-48, 135 L.Ed.2d 843, 852 (1996); Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811, 817 (1968). First, however, we must determine whether the speech in question involved a matter of public concern. Baldassare, 250 F.3d at 195 (citations omitted).

"'A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community.'" Id. (quoting Green v. Philadelphia Hous. Auth., 105 F.3d 882, 885-86 (3d Cir. 1997)) (internal quotation marks omitted). We look to the content, form, and context of the alleged protected speech. Id. (citations omitted).

In doing so, we reject Defendant's contention. As Plaintiff asserts, his conduct involved a matter of public concern because it dealt with "a political corruption investigation that included high officials." (Pl's Opp'n Br., at p. 8). The Third Circuit has established that "'allegations of corrupt practices by

government officials are of the utmost public concern.'" Baldassare, 250 F.3d at 197 (quoting O'Donnell v. Yanchulis, 875 F.2d 1059, 1061 (3d Cir. 1989)); see also Swineford v. Snyder County Pa., 15 F.3d 1258, 1271 (3d Cir. 1994) ("speech disclosing public officials' misfeasance is protected"); McDonald v. McCarthy, No. 89-319, 1990 WL 131393, at *7 (E.D. Pa. Sept. 7, 1990) ("It is a matter of public concern if a police officer's job is threatened because he investigates alleged illegal activity and brings to light potential wrongdoing by public officials.").

Defendants rely on the following assertions in maintaining that Plaintiff was not dealing with a matter of public concern: (1) Agent Kush did not instruct Plaintiff to keep the information confidential; (2) Plaintiff misrepresented his conversation with Agent Kush to Col. Hickes; (3) the FBI did not believe that Commissioner Evanko, his deputies, or anyone in the governor's office were involved in illegal activity; and (4) Plaintiff inappropriately discussed the investigation with Col. Hickes, who was outside his chain of command. These issues are irrelevant to whether the speech at issue here was a matter of public concern. Mindful of the content, form, and context of the speech, we believe it clearly dealt with attempts by Ober to assist in the investigation of alleged wrongdoing by public employees. We also note that Plaintiff contests these assertions, and that they are therefore not undisputed facts.

Because we have determined that Plaintiff's speech was on a matter of public concern, we proceed to the balancing of

interests under Pickering. An employer's interests may outweigh the Plaintiff's interest where the speech causes disruption in the workplace. Swineford, 15 F.3d at 1272 (citations omitted). We must also consider whether Plaintiff "knowingly or recklessly made false statements and whether [the] speech was motivated by animus." Id.

The parties dispute whether any policy or regulation required Ober to report the FBI investigation to someone within his direct chain of command. In any event, we would find the balance tilts in favor of Plaintiff, especially since Defendants assert that Evanko and his chief deputies suffered only "unwarranted embarrassment" (Defs' Supp. Br., at p. 5).

"Enforcement of the chain of command directive, requiring subordinates to report problems to immediate superiors, is a legitimate means of promoting efficiency. But [the PSP's] interest is outweighed by the public's interest in encouraging investigation of alleged wrongdoing." McDonald v. McCarthy, No. 89-319, 1990 WL 131393, at *7 (E.D. Pa. Sept. 7, 1990). "On the employee's side of this balance, the public's interest in exposing potential wrongdoing by public employees is especially powerful." Baldassare, 250 F.3d at 198. Therefore, we conclude that Plaintiff engaged in protected activity.

Defendants next argue that their conduct is not sufficient to constitute retaliatory conduct because none of it affected Plaintiff's terms or conditions of employment, having instead only intangible or indirect effects on Ober's employment

status. They point out that during the relevant time Plaintiff's rank, salary and benefits remained unchanged. In support they cite, among other cases, <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286 (3d Cir. 1997), <u>Williams v. Bristol-Myers Squibb Co.</u>, 85 F.3d 270 (7th Cir. 1996), and <u>Moore v. Grove North America, Inc.</u>, 927 F. Supp. 824 (M.D. Pa. 1996)(Caldwell, J.).

We disagree. The cases cited dealt with employment-discrimination cases under statutes like Title VII and the ADA. They are not relevant here because the Third Circuit has a different standard for First Amendment retaliation claims. It is sufficient if "the allegedly retaliatory conduct" would "'deter a person of ordinary firmness' from exercising his First Amendment rights . . . ." <u>Suppan v. Dadonna</u>, 203 F.3d 228, 235 (3d Cir. 2000)(quoted case omitted). Under the standard, we think that the issue of retaliatory conduct is a question of fact in the instant case.

B. <u>The Fourth Amendment Claim</u>.

Plaintiff asserts that he was unlawfully seized in violation of the Fourth Amendment when he was subjected to an interview during the course of the inquiry into his handling of the FBI investigation.

Defendants have moved for summary judgment on this claim and we agree with their reasoning. In the context of a paramilitary organization like the state police, Plaintiff was not subjected to a custodial interrogation, as he asserts. Rather, he

was interviewed in the course of an administrative inquiry, which does not violate the Fourth Amendment.  See <u>Driebel v. City of Milwaukee</u>, ___ F.3d ___, 2002 WL 1734023 (7th Cir. 2002).  In any event, there was no seizure here.  <u>Id.</u>

    C.  <u>Individual Liability</u>.

Defendants also argue that there is no evidence that they individually violated Plaintiff's rights.  We disagree except as to defendant Campbell, a former assistant chief of staff in the governor's office.  His only connection to the case is that Evanko notified him that Evanko was going to investigate Ober's handling of the FBI investigation.  (We will also not dismiss the conspiracy claim against the remaining Defendants.)[4]

    D.  <u>Qualified Immunity Defense</u>.

Finally, we reject Defendants' claim that they are entitled to qualified immunity.  Qualified immunity is an immunity from suit which provides that government officials who perform discretionary functions are shielded "'from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have

---

[4] Plaintiff also alleges Defendants violated Plaintiff's right to be free of unlawful conspiracies in violation of Pennsylvania tort law.  In a footnote to their supporting brief, Defendants argue that this claim is barred by sovereign immunity. (<u>See</u> Defs' Supp. Br., at p. 10 n.4).  We agree and will grant Defendants summary judgment on this state-law claim.  <u>See</u> <u>Maute v. Frank</u>, 441 Pa. Super. 401, 403, 657 A.2d 985, 986 (1995) (citing <u>Borough of Jefferson v. Century III Assocs.</u>, 60 Pa. Commw. Ct. 94, 430 A.2d 1040 (1981), <u>vacated on other grounds</u>, 498 Pa. 57, 444 A.2d 665 (1989)).

violated.'"  McLaughlin v. Watson, 271 F.3d 566, 570 (3d Cir. 2001), cert. denied, 122 S.Ct. 1543 (2002) (quoting Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523, 530 (1987)).  Plaintiff may defeat a claim of qualified immunity by alleging that the public officials violated a "'clearly established right.'"  Id. at 570-71 (quoting Anderson, 483 U.S. at 638-39, 107 S.Ct. at 3038, 97 L.Ed.2d at 530).  We must ask "whether a reasonable official in [a] defendant's position at the relevant time 'could have believed, in light of clearly established law, that [his or her] conduct comported with established legal standards.'"  Id. at 571 (quoting Merkle, supra, 211 F.3d at 797) (internal quotation marks omitted).  Because the law was clear at the time Defendants acted that a public employee cannot be subjected to retaliation for exercising his rights under the First Amendment, we reject Defendants' claim of qualified immunity.  See Baldassare, 250 F.3d at 201.

We will issue an appropriate order.

                                          */s/ William W. Caldwell*
                                          William W. Caldwell
                                          United States District Judge

Date:  August 27, 2002